1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
 2          BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE


 3


 4    RALPH COLEMAN, et al.,


 5                    Plaintiffs,
      vs.                              Sacramento, California
 6                                     No. 2:90-CV-0520 KJM
      EDMUND G. BROWN, JR.,            Friday, December 14, 2018
 7    et al.,                          10:30 a.m.


 8                    Defendants.
      _____/

 9


10

                           ---o0o---
11

                REPORTER'S TRANSCRIPT OF PROCEEDINGS
12                    RE: STATUS CONFERENCE


13                         ---o0o---


14


15    APPEARANCES:


16    For Plaintiffs:       ROSEN BIEN GALVAN & GRUNFELD LLP
                            LISA ELLS, Attorney At Law
17                          THOMAS NOLAN, Attorney At Law
                            JESSICA WINTERS, Attorney At Law
18                          CARA TRAPANI, Attorney At Law
                            101 Mission Street, Sixth Floor
19                          San Francisco, CA  94105


20
      (Appearances continued on page 2.)
21


22
      Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
23              Official Court Reporter USDC, 916-446-6360
                501 I Street, Room 4-200
24              Sacramento, California  95814


25    TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

```
 1                        APPEARANCES CONTINUED

 2                             ---o0o---

 3

 4   For the Defendants:      OFFICE OF THE ATTORNEY GENERAL
                              ANDREW GIBSON, Deputy AG
 5                            600 West Broadway, Suite 1800
                              San Diego, CA  92101
 6
                              OFFICE OF THE ATTORNEY GENERAL
 7                            ADRIANO HRVATIN, Deputy AG
                              455 Golden Gate Avenue, Suite 11000
 8                            San Francisco, CA  94102

 9                            OFFICE OF THE ATTORNEY GENERAL
                              ELISE THORN, Deputy AG
10                            1300 I Street
                              Sacramento, CA  95814
11

12                            OFFICE OF THE ATTORNEY GENERAL
                              TYLER HEATH, Deputy AG
13                            1300 I Street
                              Sacramento, CA  95814
14

15   Special Master:         PANNONE LOPES DEVEREAUX & O'GARA LLC
                              MATTHEW A. LOPES, JR., Atty. At Law
16                            1301 Atwood Avenue, Suite 215 N
                              Johnston, RI  02919
17

18

19

20

21

22

23

24

25                             ---o0o---
```

1    SACRAMENTO, CALIFORNIA, FRIDAY, DECEMBER 14TH, 2018, 10:30 A.M.

2                            ---o0o---

3            THE CLERK:  All rise.  Court is now in session.  The

4    Honorable Kimberly J. Mueller, United States District Judge,

5    presiding.

6            Thank you.  You may be seated.

7            Calling Civil Case 90-520, Coleman versus Brown.  This

8    is on for status conference.

9            THE COURT:  Good morning.  Appearances, please, for

10   the plaintiffs.

11           MS. ELLS:  Good morning, Your Honor.  Lisa Ells, Tom

12   Nolan, Jessica Winter, Cara Trapani, appearing for plaintiffs'

13   counsel.

14           THE COURT:  And for the defendants?

15           MR. GIBSON:  Good morning, Your Honor.  Andrew Gibson,

16   Adriano Hrvatin, Elise Thorn and Tyler Heath for defendants.

17           THE COURT:  Good morning to you all.

18           And on the phone?

19           MR. STEVENS:  Good morning, Your Honor and Counsel.

20   This is Charles Steven with Gibson Dunn, and I am joined by my

21   partner Benjamin Wagner.

22           THE COURT:  All right.  Good morning to you.

23           May I also ask, is Miss Musell present in the

24   audience?

25           She is not.

1          Miss Musell is counsel for Dr. Golding.  I had a

2     question for her about the Gonzalez report.  In her absence,

3     she's not required to be present, let me just understand the

4     parties' positions.  The court has received a copy of that

5     report.  It is not on the docket.  Do all parties have the

6     report?

7          Plaintiffs have the report, Miss Ells?

8          MS. ELLS:  Yes, Your Honor.

9          THE COURT:  Do defendants have the report, Mr. Gibson?

10          MR. GIBSON:  Yes, Your Honor.  I believe with what

11     you're referring to, I do believe we have it.  Yes, Your Honor.

12          THE COURT:  So there is a -- do the parties have a

13     position regarding whether or not we should go through the same

14     process we did with the Golding report?

15          At this point I don't have a request from Miss Musell

16     to put that report on the court's docket.  Do the parties have

17     a position as to whether or not that report should be on the

18     docket, sealed or not?

19          Miss Ells?

20          MS. ELLS:  Your Honor, I think it should be on the

21     docket.  I think it is an important input into the allegations

22     that Dr. Golding is making.  And I also think, Your Honor, that

23     you relied on it, in part, as one of the additional bases for

24     proceeding in the manner in which you are proceeding.  Given

25     that there are now two whistleblowers instead of one, we do

1    think it should be on the docket.

2            THE COURT:  I relied on the fact of its existence,

3    certainly.

4            Mr. Gibson, your position?

5            MR. GIBSON:  Your Honor, our position, we maintain, is

6    that this doesn't need to be on the docket.  This can be

7    treated just like any other correspondence the court has

8    received from non-parties.  It can be shared with the parties,

9    but it doesn't need to be on the docket.

10           THE COURT:  All right.  Before I make a decision about

11   the handling of that report, I'm going to request Miss Musell's

12   position on behalf of that whistleblower.

13           Just one more bit of housekeeping before we get into

14   the substance of the agenda items.  The defendants' motion to

15   strike, I have reviewed that.  My position is that I'm going to

16   deny that motion.

17           The plaintiffs' filing of this week did not affect the

18   court's decision in its order issued yesterday.  It did provide

19   one example of a concern the court had previously independently

20   identified.  That was the concern about what would happen if

21   discovery is opened, so that example was incorporated into the

22   order.  But otherwise, in terms of the substance of the order,

23   it did not affect it.

24           Is there anything else that either party wants to say

25   on the motion to strike before I just make that a final bench

1   order?

2        Mr. Gibson?

3        MR. GIBSON:  Yes, Your Honor.  We believe the court

4   hasn't fairly applied the rule in terms of disregarding

5   filings.  The court expressly said that the parties are to

6   respond to your proposed order within seven days.  There was no

7   contemplation of anything further.

8        I think it is unfair that plaintiffs are then given an

9   opportunity to respond to our response, which was per the

10  court's order, and then the court's final order does cite to

11  plaintiffs' submission, notwithstanding what the court just

12  said regarding the decision in the final order.

13       I would also like to point out, Your Honor, that in

14  that submission, plaintiffs commented on today's status

15  conference, the issues that the court was going to talk about

16  today.  The court expressly said no reports before this status

17  conference.

18       Now, we referred back to our submission on December 6

19  that substantively responded to Dr. Golding's allegations, and

20  the court disregarded it, on its own, without any motion from

21  plaintiffs.

22       I think it would just only be fair for the court to do

23  likewise whenever plaintiffs similarly violate a court order.

24            THE COURT:  All right.  Anything to say, Miss Ells?

25            MS. ELLS:  Yes, Your Honor.  I think it is clear that

1    in contrast to the court's specific bench order in response to

2    defendants' specific request to file a merits response to

3    Dr. Golding, which the court affirmatively stated you would not

4    accept, then the defendants did it anyway, that's very

5    different than an absence of any statement to prohibit --

6    expressly prohibit any filing.

7              And to be clear, Your Honor, your original order said

8    that you would rule by yesterday.  So we knew that there would

9    be no opportunity to discuss any of the statements made in

10   defendants' filing at today's hearing, because we knew that you

11   were going to issue an order yesterday.  You said you were

12   going to do it and you did.  So we needed to make certain

13   things clear on the record about our position.

14             And I would also say that defendants went far beyond

15   the scope of what this court permitted.  In the order you

16   expressly stated that you wanted commentary on the appointment

17   of Mr. Stevens as a person.  You did not state that you wanted

18   commentary generally on whether or not you should issue an

19   appointment order of the type that you were contemplating.

20             Your order was very specific, and defendants went far

21   beyond the scope of what you asked for.  And we felt the need

22   to address those statements because we knew that there would be

23   no additional opportunity to do so.

24             But notwithstanding, I think, Your Honor, you acted

25   consistent with what you said that you are intending to do.  So

1   whether or not you took into account our filing or not, I think

2   it doesn't actually really matter.

3          So, you know, we would say that it was completely

4   appropriate for us to respond.  There was nothing prohibiting

5   us from doing so, unlike defendants' filing.  And because

6   defendants went far beyond the scope of what you requested that

7   they do, it was appropriate for us to respond in kind, knowing

8   there would be no other opportunity to do so.

9          So that's our position.  Obviously, a motion to strike

10  is well within your discretion, so however you choose to

11  proceed, I think it doesn't actually affect the outcome here.

12          THE COURT:  Mr. Gibson, any final world in a minute or

13  less?

14          MR. GIBSON:  Sure, Your Honor.  I'll just speak to

15  plaintiffs' position that we went far beyond what the court

16  asked for.

17          The court's language, in both the November 29th order

18  and the subsequent plan, both contemplated defendants' views on

19  your plan.  There was no -- there was no express limitation on

20  how we could respond.  We responded in good faith.

21          I can't say the same about plaintiffs because there

22  was no order allowing them to do that.  Simply because they

23  didn't think they would have a chance to voice their concerns,

24  I don't see how that is relevant.

25          THE COURT:  All right.  Well, I did not specifically

1    preclude a status report.  I said no status report is required.

2    I didn't invite them.  I didn't need them.

3            Also, just to restate the court's position, the

4    plaintiffs' filing did not affect the substance of the court's

5    order.  Really, the only thing that's reflected in the court's

6    order, based on that filing, is the example of what would

7    happen if I allowed discovery to be unleashed.  If that example

8    is stricken from the order, it would be the same.

9            So the motion is denied.  There is no prejudice to

10   defendants in the court's having read the plaintiffs' filing.

11           So in terms of discussion of the neutral, independent

12   investigation, the court is prepared to approve.  Before I turn

13   to Mr. Stevens and simply ask him whether or not he confirms

14   his consent to accept the appointment, and whether or not he

15   has any questions or comments based on the court's order of

16   yesterday, I wanted to just very briefly review the

17   communications I've had with Mr. Stevens in the interest of

18   transparency.

19           I have, at no point, discussed with Mr. Stevens the

20   substance of any investigation or the goal of any investigation

21   other than to prepare the court for an evidentiary hearing if

22   one is needed.

23           So I have had several communications with him, by

24   phone and by email, to first ascertain whether or not he would

25   be available after having exhausted and considered other

1    options for an independent investigation once it became clear

2    to this court that that was really the only path available to

3    the court given the circumstances it's presented with.

4         So I first reached out to him, asked if he would be

5    available.  After some checking, he confirmed he would be.

6    After some further checking, he confirmed that he believed he

7    had no conflict.  The parties agree at this point there is no

8    conflict -- legal conflict.

9         He did note he would need a scope of work, and so the

10   court's order has described a scope of work.  At one point he

11   did ask what might be involved in the number of witnesses and

12   the number of documents, and the court, based on its assessment

13   of the Golding report provided a mere estimate, without

14   providing any limitation on what an independent investigation

15   might involve.

16        That estimate was possibly 35 to 45 witnesses, and

17   identification of documents, by description only.  No provision

18   of any documents.

19        The documents include:  The Golding report,

20   unredacted, the Program Guide -- the 2009 Program Guide with

21   pocket parts, MapIt Protocols, CDCR'S Mental Health Dashboards,

22   information the special master has on the factual record on

23   staffing.  The court also noted that the defendant's business

24   rules and data dictionary may need review.  The court does not

25   have those.

1          So I first reached out in late October.  I had a

2     series of phone calls focused on only whether or not

3     Mr. Stevens would be available and on what terms.

4          At no point did Mr. Stevens see, in any draft form,

5     the substantive orders the court has issued.  At one point he

6     saw, before I presented his name on the public docket, he saw

7     the proposed order of appointment so that I could represent

8     that he had indicated to the court that he would consent to

9     appointment as required by Rule 706.

10         Then this week I let him know I was requesting his

11    telephonic appearance at this hearing.

12         So my question really for Mr. Stevens is, at this

13    stage, assuming that you have read the order I put on the

14    docket yesterday, are you prepared to accept appointment as

15    proposed and assuming that I sign the proposed order I have

16    previously published?

17         MR. STEVENS:  Yes, Your Honor, I have reviewed all of

18    the court's orders regarding this potential appointment and

19    agree to accept the appointment on the terms stated therein.

20         I would also confirm, consistent with the court's

21    recitation, that I have not reviewed other matters regarding

22    the merits in this matter, not even Dr. Golding's report.  I

23    decided to defer any consideration of the merits contained in

24    any document until we were formally appointed by the court.

25         THE COURT:  All right.  And are you prepared to start

1    immediately?

2              MR. STEVENS:  Yes.

3              THE COURT:  So the court's plan would be to sign the

4    order of appointment, likely later today.

5              The court would also provide an identification of

6    documents by docket number.  I would arrange with the Clerk's

7    Office -- the Clerk's Office is in a position to provide

8    Mr. Stevens with a copy of the unredacted Golding report as

9    filed on the docket.  That will be provided with the

10   understanding it will be treated as a document that is

11   confidential under seal.

12             I will provide additional documents consistent with

13   the identification I previously provided to Mr. Stevens.  And I

14   will put on the court's docket a list of anything I have

15   provided, so the parties will see that.

16             And then the court's plan would be to await

17   Mr. Stevens' report without requiring any interim reports.  I

18   would clarify, however, if at any point Mr. Stevens believes

19   that he needs to contact the court, he may do that initially in

20   an ex parte manner.  Ultimately, the parties will know of all

21   contacts, but I will leave that up to his considered judgment.

22             All right.  Having confirmed Mr. Stevens' consent,

23   I'll issue the order.  We will proceed with that investigation.

24             The parties' positions are clear in the filings, so I

25   don't know that there is anything more I need to hear from the

1    parties.  But if there's anything the parties want to say at

2    this point, I would give them just a few minutes each before we

3    move on.

4          I would request that Mr. Stevens, with his partner,

5    Mr. Wagner, remain on the line to listen to the next

6    discussion.  That is the role of the special master presently

7    and going forward.

8          I want to review what I understand the special master

9    proposes to do, see if there are any questions or comments from

10   the parties, and then I would give Mr. Stevens a chance to let

11   me know if he has any concerns or questions based on what the

12   special master proposes to do going forward.

13         Once we're done with that discussion, and we move on

14   into the discussion of the Program Guide update, Mr. Stevens

15   and Mr. Wagner could leave the status conference.

16         So just briefly, without repeating anything in your

17   filings, is there anything you want to say, any question you

18   have?

19         Miss Ells?

20         MS. ELLS:  Yes, Your Honor.  Two points of

21   clarification.

22         In the list of documents that you said would be

23   provided, we would -- you indicated that you will be providing

24   the unredacted Golding report.  I want to confirm the

25   exhibits -- the unredacted exhibits will also be provided.

1          THE COURT:  I consider those part of the report, so

2     yes.

3          MS. ELLS:  Thank you.

4          THE COURT:  I also will provide the Gonzalez report.

5          MS. ELLS:  That was my next question.

6          Thank you, Your Honor.

7          THE COURT:  Anything else, Ms. Ells?

8          MS. ELLS:  No, Your Honor.

9          THE COURT:  Mr. Gibson?

10          MR. GIBSON:  Yes, Your Honor.  Also some points of

11     clarification.

12          First, we appreciate the transparency.  That was one

13     concern, so we do appreciate that.

14          In line with that, will the parties be getting copies

15     of any correspondence to date and going forward between the

16     court and Mr. Stevens?

17          THE COURT:  At this point what I have said is that I

18     will let you know of any contact I have with Mr. Stevens

19     between now and the provision of his report.  I will do that

20     most likely after I receive the report.

21          In terms of copies of correspondence, there has been

22     no formal correspondence.  There have been -- there is the one

23     email.  I don't know that the court has an obligation to put on

24     the record email correspondence.  I am making a representation

25     to you, as a member of the Article III branch, that that is the

1    substance of the emails.

2           So if you can give me authority that indicates that I

3    should publish every communication, I'll consider that.

4           MR. GIBSON:  Your Honor, we will do that.  I'm not

5    sure if I was referring to publishing or putting anything on

6    the record but more akin to discovery and normal expert, where

7    whatever the parties communicate to an expert, the other party

8    is entitled to.

9           That was all I was referring to.  Nothing on the

10   record, but we'll look further into that.

11          The next question for clarification, is the court

12   going to issue another order outlining the scope, or is it

13   simply going to be a referral back to the court's, I believe it

14   was Exhibit B, to the previous submission?

15          THE COURT:  Given Mr. Stevens has indicated he accepts

16   appointment -- that he's read all of my orders leading up to

17   this stage, and that he accepts appointment based on the terms

18   of the proposed order, read in conjunction with my explanatory

19   orders, I plan to simply sign the order as proposed.

20          MR. GIBSON:  Okay.  Will the parties be given an

21   opportunity to respond to that order?

22          THE COURT:  You have been given an opportunity.  It

23   has been out there for some time now.

24          MR. GIBSON:  Finally, Your Honor, there are just

25   two -- there were a couple of points in our submission we

1    didn't receive a response to.

2         They were concerning the attorney-client privilege --

3    Mr. Stevens' invasion of the attorney-client privilege or

4    potential invasion, along with interviewing high-ranking

5    officials who there is no allegation of any personal knowledge.

6         I've read the court's order.  I didn't see any

7    response to that.  That's why I bring it up today.

8         THE COURT:  My response was, I believe, in a single

9    line in the order issued yesterday, and that is I'm not going

10   to put any artificial limits on the investigation.  The

11   information will lead where it will.

12        The investigation is initiated based on the Golding

13   report, so that's a limiting parameter.  And the court has

14   identified the areas in which it believes the investigation is

15   warranted.  Mr. Stevens, if he exercises his independent

16   judgment and comes back to me and says that he wants to expand

17   or he believes the parameters should be expanded, then the

18   court will consider that.

19        And the court ultimately decides.  That's another

20   limiting factor that defendants have not recognized.  This is

21   not a free-wheeling inquisitorial investigation by an

22   independent investigator.  The court defines the limits.  And

23   so I'm deferring.  I'm not going to provide Mr. Stevens with

24   more direction than I have.  I think that would interject me

25   impermissibly into the investigation at this point.

1          Anything further, Mr. Gibson?

2          MR. GIBSON:  No, Your Honor, other than to just

3    reiterate that we believe Dr. Golding's allegations, in any way

4    that they can be interpreted to allege fraud or

5    misrepresentation, are unfounded, and we welcome whatever

6    ultimate inquiry will resolve that issue.

7          THE COURT:  All right.  Very good.

8          Then in terms of the role of the special master, the

9    court understands from this special master that he currently

10   plans to proceed with monitoring in 2019 for the 28th Round

11   monitoring process, but his plan under the current

12   circumstances is to not utilize any aggregate system-wide

13   mental health data to report on compliance with Program Guide

14   requirements.

15         So to clarify, as the parties will understand, in the

16   27th Round, the special master requested and relied on data

17   demonstrating compliance with timeliness in a number of

18   different areas looking over the previous six months before the

19   site visit.  But the special master's plan at this point is to

20   return to practices used previously as in the 25th Round, for

21   example, and engage in monitoring through direct observation.

22         And that would include reviewing progress notes,

23   electric and hard copy documents such as institutional

24   spreadsheets, staff and inmate interviews, and then, as I said,

25   direct observation to determine compliance.

1        And that is not looking retrospectively based on

2   anything set forth in the Golding report.  And so I just want

3   to see if there is any concern first from the parties about

4   that plan, and then see initially if Mr. Stevens has any

5   questions or comments based on hearing this now for the first

6   time?

7        Just to give a further example, to assess compliance

8   with Program Guide time sensitive requirements, the special

9   master's experts would select a sample of patients and use

10  progress notes by primary clinicians, psychiatrists and

11  treatment plans in the EHRS records of patients to determine

12  compliance.

13       This would be, as with all monitoring, a lengthy

14  process.  It would occur over most of 2019.  And so the court's

15  question is does that raise any concerns with either party in

16  light of the need for the investigation to proceed unfettered?

17       Miss Ells?

18       MS. ELLS:  Your Honor, we have a few thoughts on this.

19  The first is that I think that we would like the opportunity to

20  have some conversations with the special master about what the

21  monitoring will look like in this round, and particularly about

22  whether or not there are any practices that he intends to

23  utilize that will be different than previous rounds and whether

24  there ought to be any.

25       So we would like to have that conversation in advance

1   of the round, to make sure that we are all comfortable that the

2   information that he'll be reviewing will actually track as

3   closely as possible to what the actual conditions are.

4        The other thought that I have is that we do have this

5   pending, percolating telepsychiatry issue.  And I think that

6   one of the things that we realized is that because things have

7   changed so dramatically in the last couple of years, since the

8   last time the special master and his team did a full-fledged

9   monitoring round, we don't have a very good sense of where

10  things are in the system right now with respect to

11  telepsychiatry specifically.

12       And I realize this also gets into a topic that you

13  have reserved for later, but we would request that in the scope

14  of that monitoring round the special master prioritize

15  institutions that have significant telepsychiatry utilization

16  and reliance and visit those institutions first, and issue an

17  interim report on specifically the state of telepsychiatry

18  while reserving the larger compliance review of all

19  institutions, on all topics, for the full report at the end of

20  the round.

21       Our concern about that is simply that the

22  telepsychiatry, defendants have been expanding it in very

23  dramatic ways, apparently under our noses, in ways we were not

24  aware of.  And we think that having a baseline of where things

25  are sooner than a full-fledged monitoring round will allow --

1    would benefit everybody in knowing what the state of

2    telepsychiatry is in case we do need to litigate that dispute

3    before this court.

4           The final thing that I would say is that plaintiffs,

5    we really feel that we have become a little too reliant and

6    trusting of the defendants and their representations about the

7    state of the system at this point.  The Golding report has

8    revealed to us a lot of things that we probably should have

9    known were happening in the system that we simply did not know.

10          And we have, as class counsel, an obligation and a

11   duty to conduct our own monitoring to ensure compliance with

12   the court's orders and with the Constitution, and we are

13   preparing to ask Your Honor to expand and provide us with our

14   own monitoring of the conditions in the institutions.

15          And I don't mean to make that into anything larger

16   than it is.  We believe that this is a complementary process

17   with the special master.  We do not intend to or even want to

18   supplant his expertise, but we do feel that as class counsel we

19   have obligations, particularly with respect to interviewing and

20   providing the perspective of our class members, in ways that we

21   simply can't do if we do not get out to the institutions and

22   interview them and look at the conditions in which they're

23   receiving treatment.

24          THE COURT:  So that would be by motion practice?

25          MS. ELLS:  Yes.

1          THE COURT:  The latter, the request for --

2          MS. ELLS:  Yes.  I just wanted to preview that for

3    Your Honor.  We do intend to meet and confer with defendants

4    about this, but it seemed relevant to the topic that Your Honor

5    placed on the agenda today so we wanted to raise it.

6          THE COURT:  So I'm alerted that that would proceed by

7    motion practice.

8          MS. ELLS:  Thank you.

9          THE COURT:  I do understand with respect to

10   telepsychiatry, which we'll return to in terms of the resetting

11   of a hearing, that the special master proposes to include in

12   the next monitoring round monitoring of use of telepsychiatry

13   at Triple CMS facilities and believes he can do that on a

14   separate track.

15         So Mr. Gibson?

16         MR. GIBSON:  Thank you, Your Honor.  A lot to unpack

17   from what the plaintiffs just discussed.

18         THE COURT:  Let's assume that the plaintiffs' request

19   for their own parallel monitoring is deferred until there's

20   meet and confer and a motion before the court.

21         MR. GIBSON:  Understood.  Yes, Your Honor.

22         I would simply say that's the special master's job,

23   but we'll address that when appropriate.

24         THE COURT:  All right.

25         MR. GIBSON:  With regard to the special master job in

1   particular, I understand you're talking about a proposal --

2   this is a proposal regarding the 28th Round.  This is the first

3   time we've heard it, so I think defendants should be given an

4   opportunity to respond further.  So in that regard I do agree

5   with plaintiffs that perhaps further discussions are warranted.

6           THE COURT:  I typically don't preview the special

7   master's plans in this way.  I'm doing it now because of the

8   launching of the independent investigation by a neutral.  So

9   that's why I'm previewing these issues now.

10          I just wanted to see if there are initial concerns.

11  I'm prepared to direct the parties to meet with the special

12  master.

13          MR. GIBSON:  Thank you, Your Honor.

14          One other thing, one concern we did have is that when

15  the investigation is complete, and when whatever report

16  identifies that no misrepresentation or fraud has taken place,

17  we would like the opportunity to ask that the special master do

18  take a look at our data that we, again, believe is reliable,

19  and so that can be an accurate report again during the 28th

20  Round.

21          THE COURT:  So would defendants continue to collect

22  data in the CEQA tool?

23          MR. GIBSON:  Yes, Your Honor.  That's an ongoing

24  process.

25          THE COURT:  I do think, assuming defendants continue

1   that data collection effort, then the special master would be

2   in a position, based on the direct observation approach, to

3   then evaluate the information collected by the defendants in

4   the CEQA tool once the investigation is complete.

5           MR. GIBSON:  Excellent.  Thank you, Your Honor.

6           MS. ELLS:  Your Honor, may I add just two quick

7   points?

8           I want to be very clear that we fully support the

9   special master's plan to go out and tour the institutions.  We

10  absolutely think that does need to happen.  We don't have a

11  great baseline in this case, and neither does this court, of

12  what is happening in the system.

13          And I agree also with defendants that there needs to

14  be an audit of the data.  We think it is probably appropriate

15  for the special master to add some expertise to his team

16  specifically about healthcare data auditing.  That is -- my

17  understanding is that it is a particular niche and that there

18  is a skill set that is particularly adept at that.

19          And that type of understanding of what the data is is

20  something that the plaintiffs need to be involved with too,

21  because as this court understands, there's a level of distrust

22  about defendants' data and whether or not there has been

23  falsification or manipulation.

24          It is apparent that there is a lack of understanding

25  or at least a common understanding between the parties and

1    perhaps the court and special master about what exactly is

2    being reported and whether or not it is accurately capturing

3    what compliance indicators should be capturing.  So we believe

4    that that is an important process that needs to occur, and we

5    need to be a part of it as well.

6             THE COURT:  All right.  Then on the -- I think the

7    court's plan is addressing the issues raised by the plaintiffs

8    and also the defendants.

9             In terms of the parallel tracks the court previously

10   had put out there, thinking that also on a parallel track there

11   could be discussion with the parties and the special master in

12   a workgroup format regarding improved reporting and

13   clarification of ambiguity, if any, in prior orders, at one

14   prior hearing plaintiffs made clear that they thought it was

15   premature given the lack of trust.  I don't know if the

16   parties' positions have changed on that.

17            The court's current thought is to defer returning to

18   those issues until the investigation is complete.

19            Any objection to that plan to defer, Miss Ells?

20            MS. ELLS:  No, Your Honor.  It's still our position

21   that's the most appropriate approach.

22            THE COURT:  Mr. Gibson?

23            MR. GIBSON:  Your Honor, we're always willing to meet

24   and confer with plaintiffs regarding any issues that they may

25   have about the case, but we agree that deferring this matter is

1    appropriate.

2                THE COURT:  All right.

3                MR. GIBSON:  Confirming the accuracy is important.

4                THE COURT:  I believe the parties know, but at some

5    point the special master is looking at developing his own

6    auditing tool.  But that would come at some point in the future

7    with full transparency.

8                So Mr. Stevens, let me ask you, having heard a summary

9    description of the special master's plans for 2019 monitoring,

10   does anything you have heard raise any concerns in your mind?

11               MR. STEVENS:  Not at all, Your Honor.

12               THE COURT:  All right.  All right.

13               Mr. Stevens, do you have any other questions or

14   comments at this point?

15               MR. STEVENS:  I do have a few.  I would put these

16   mainly in sort of the housekeeping or administrative bucket.

17   If it is appropriate, I can raise them briefly now.

18               First, and perhaps this relates to Mr. Gibson's

19   comment about attorney-client privilege, I think it is clear to

20   us from the court's orders that the court contemplates that we

21   will at various times have access to information that is

22   appropriately deemed to be privileged information pursuant to

23   attorney-client privilege.

24               In our view, and this is our interpretation of the

25   orders, if a party provides access to attorney-client

1   privileged information, that would not effectuate a waiver of

2   the attorney-client privilege because we are acting as an arm

3   of the court.  And thus, the disclosure of privileged

4   information to us would be the functional equivalent of

5   submitting privileged information to the court, under seal, for

6   in camera review.

7           Consisting with that, assuming that interpretation is

8   right, I would confirm on the record that our intention would

9   be, to the extent that we do have attorney-client information

10  from any party, that we would not publicly disclose that, nor

11  disclose it to the other side.  And any such information that

12  is flagged by the parties as privileged information would only

13  be submitted to the court, under seal, for in camera review.

14  And only the court would be free to decide the validity of any

15  privilege claim and disclose that information.

16          We are very respectful of parties' privileges and will

17  do everything in our power to avoid any intentional or

18  inadvertent disclosure of privileged material.

19          I would just like to confirm that is a correct

20  interpretation of the court's order.

21          THE COURT:  The court would confirm that is a correct

22  interpretation, that any access provided will not operate as a

23  waiver and there will be no public disclosure.

24          To the extent Mr. Stevens provides any information

25  covered by a privileged claim, it will be not publicly

27

1  provided.  It will be provided under seal to the court, and the

2  court would ultimately, after adversarial proceedings, make any

3  determination about unsealing that information if it thought it

4  was required to do so.

5          All right.  Did you have other matters to clarify,

6  Mr. Stevens?

7          MR. STEVENS:  Yes.  Second, consistent with what the

8  court said earlier, I specifically requested a scope outline

9  for the investigation because as an independent investigator we

10  never like to leave it to our own discretion as to how broadly

11  or narrowly to investigate.  We're now satisfied we have an

12  appropriate scoping of our work.

13          I would just like to add that if at any time the

14  parties believe that we are operating in excess of that scope,

15  we are fully prepared to discuss with them why they think we're

16  doing so.  And in the event that we disagree, we would promptly

17  bring that scope issue to the court.

18          At no time do we ever wish to transgress the limits on

19  the limited jurisdiction that we have been given.  Consistent

20  with that, and perhaps this also relates to a concern

21  Mr. Gibson raised, we do note that the court placed no limits

22  on our access to witnesses as high up as the Governor.  We

23  don't mean that as a suggestion we should interview all those

24  people at that high level, and we rarely, if ever, do so.

25          We understand that is simply a way of saying that

1   there are no limits on witnesses that we can interview.  We

2   would limit our interviews, however, to people that in our

3   judgment are reasonably likely to have relevant information.

4   And we would not interview people at a high level simply for

5   the sake of interviewing people at a high level.

6        When we do corporate internal investigations, for

7   example, although we always have access to the CEO or chairman

8   of the board, I can't think of a case where we exercised our

9   discretion to do so.

10       I'm not saying that we wouldn't in this case, but we

11  would not and we do not interpret the court's order to be in

12  any way directing us to interview people at the highest level.

13  You're leaving it to our discretion to decide who, if anyone,

14  at the high level may have relevant information.

15       THE COURT:  That also is a correct reading of the

16  court's order.

17       MR. STEVENS:  Third, just for efficiency, we would

18  anticipate collaborating, if that's the right word, with

19  counsel for both parties.  Indeed, hopefully with counsel for

20  Dr. Golding.  Because the more information we have, the more

21  efficient and effective and fair we can be to the parties.

22       So we believe it would be very helpful if each party

23  would designate one primary point of contact that we could use

24  for ongoing discussions about an orderly procedure for getting

25  access to documents we need to review, for conducting witness

1    interviews and the like.

2            Obviously, we can't require that.  We just suggest

3    that would be the most efficient approach.  And I think it is

4    clear from the court's record that the court contemplates that

5    we would indeed have ex parte communications with counsel for

6    the parties and that would be efficient.

7            On the other hand, we note from the court's report --

8    I'm sorry -- the court's order that if we confer with the

9    special master, which we think would be very, very helpful in

10   terms of getting us up to speed, that the court, as we

11   understand it, would like us to include counsel for the parties

12   in any such communications.  And we'll do so unless the court

13   orders to the contrary.

14           THE COURT:  That is the court's sense of the best

15   practice.  And if there is a -- if there is a request for a

16   briefing from the special master, I would just clarify, unless

17   there's any objection or better thought, that Mr. Stevens would

18   serve as the effective chair of any such briefing.

19           Does that work for you, Mr. Stevens?

20           MR. STEVENS:  Yes, it does.

21           THE COURT:  In terms of --

22           MR. STEVENS:  Then --

23           THE COURT:  Go ahead.

24           MR. STEVENS:  Finally, one final issue, Your Honor.  I

25   don't believe this is addressed explicitly in the orders, but

1    it pertains to counsel for the witnesses.

2            It is our general practice to permit all witnesses to

3    be represented by counsel of their choosing.  We would not in

4    any way, shape or form ever attempt to direct a witness on how

5    he or she chooses to be represented or not.

6            Our position is witnesses may have counsel for an

7    interview.  They may select their own counsel.  They may ask

8    counsel for one or both of the parties to attend any

9    interviews.  Our practice is to defer entirely to the wishes of

10   the witness and respect that.

11           THE COURT:  All right.  So that practice is made of

12   record.

13           On the primary point of contact, that seems a fair

14   request.  Let me just ask, are the parties currently prepared

15   to identify a primary point of contact?

16           For the plaintiffs, Miss Ells?

17           MS. ELLS:  No, Your Honor, but we can in a filing

18   today.  I would need to confer with my team.

19           THE COURT:  All right.  Mr. Gibson?

20           MR. GIBSON:  The same, Your Honor.

21           THE COURT:  All right.  So then by the close of

22   business today the parties will identify for the court and for

23   Mr. Stevens their primary point of contact.

24           And the court will notify Miss Musell that Mr. Stevens

25   also requests the opportunity to communicate with her.

```
 1            MR. GIBSON:  Your Honor, just one matter of
 2    clarification, something to follow up what Mr. Stevens
 3    discussed about interviews and representation of any witnesses.
 4            This is something that perhaps whoever the point man
 5    for each party is, that they can meet and confer further as to
 6    who may also attend those interviews.
 7            I don't know if that was made clear or not.  If it
 8    was, I apologize, but I wanted to make sure that any attendance
 9    at any of those interviews is clear.
10            THE COURT:  Witness interviews?
11            MR. GIBSON:  Correct, Your Honor.
12            THE COURT:  Mr. Stevens, did you understand
13    Mr. Gibson's question, and if so, do you care to review your
14    practice with respect to witness interviews?
15            MR. STEVENS:  Sure.  Sure.  I think I understand
16    Mr. Gibson's question to be if a witness is represented by
17    counsel John Doe, who is chosen by the witness, would
18    Mr. Gibson, as counsel for the defendant, also have the right
19    to attend the witness interview.
20            I think our preference is to allow that decision to be
21    made by the witness.  That's our general practice.  If the
22    witness decides that he or she would prefer not to have counsel
23    for either party present and to have his or her own counsel
24    present, we would respect that.
25            If they choose to appear alone without counsel of
```

1   their choosing or counsel for either party, we would respect

2   that.

3          And at the time we arrange the witness interview, we

4   would communicate to the witness or the witness's counsel that

5   is our practice.  So unless the court directs otherwise and the

6   parties agree otherwise, that's the approach we would take.

7          THE COURT:  All right.  So that practice is

8   clarified.

9          MS. ELLS:  Your Honor, because of the role of the

10  Attorney General in all of this, we are uncomfortable not

11  attending if the Attorney General's Office will be attending a

12  witness interview.

13         THE COURT:  That is made of record.  I'll let

14  Mr. Stevens proceed following his professional practices in

15  this respect.  If there is a dispute the court needs to

16  resolve, he can let me know.

17         MR. GIBSON:  Your Honor, one last point of

18  clarification regarding Mr. Stevens' practice.

19         Is it his practice to -- well, the better question is:

20  What is his practice with regards to recording any such

21  interviews?

22         THE COURT:  Mr. Stevens?

23         MR. STEVENS:  Our practice is not to record interviews

24  or to have a stenographer present just for matters of

25  efficiency.  We typically have two lawyers or a lawyer and

1   paralegal attend every witness interview.  And the one who is

2   not doing most of the talking is there with a laptop taking

3   very careful notes of answers the witness provides to the

4   questions.  That's our standard practice, and the one that we

5   would propose to follow here.

6          THE COURT:  All right.  Again, so that's clarified for

7   the record.

8          So Mr. Stevens, is it sufficient for you to check the

9   court's docket by the end of the day to learn the names of each

10  party's primary point of contact?

11         MR. STEVENS:  Yes.

12         THE COURT:  All right.  Very good.

13         Have you raised everything you feel the need to at

14  this point, Mr. Stevens?

15         MR. STEVENS:  I have.  Thank you, Your Honor.

16         THE COURT:  All right.  Then I will sign the order of

17  the appointment today yet.  While you are welcomed, Mr. Stevens

18  and Mr. Wagner, to continue listening, I believe at this point

19  there is no need for you to, and so are you relieved.

20         MR. STEVENS:  Thank you, Your Honor.  We'll drop

21  off.

22         MR. WAGNER:  Yes.  Thank you, Your Honor.

23         THE COURT:  All right.  In terms of covering the rest

24  of the agenda items, Discussion of Program Guide Update, at

25  this point I simply want to let the parties know I do

1    anticipate issuing an order in the foreseeable future.  That's

2    been pending for some time.  I believe I can clarify the status

3    of the Program Guide reasonably soon.

4         Telepsychiatry.  We touched on that.  Here's my

5    question for the parties:  The court would like to reset the

6    hearing on the use of telepsychiatry with respect to EOP.  And

7    at this point the question is can I set that sooner rather than

8    later?

9         Do the parties have a view on the optimal time for

10   resetting that hearing?

11        Miss Ells?

12        MS. ELLS:  Well, Your Honor, we are concerned about,

13   given what I stated before, that we do not have a sense of what

14   is happening with telepsychiatry in defendants' system right

15   now.  We thought we had an understanding, and it turned out we

16   were wrong.

17        THE COURT:  I understand that.  I think the question

18   is, given what you have heard about the special master's plans

19   to monitor Triple CMS --

20        MS. ELLS:  Right.

21        THE COURT:  -- so I understand all of that.  So what

22   does that mean for timing?

23        Do we need to wait for the investigation to end?

24        Do we need to wait for the monitoring round to end

25   before a meaningful hearing on telepsychiatry in EOP can be

1    held?

2          MS. ELLS:  I think it certainly needs to await the

3    investigation.

4          I also am concerned that defendants will want to rely

5    on their own data to establish that telepsychiatry performance

6    or outcomes are as good as for live psychiatry in order to make

7    their case.  And I am concerned that we and the court will not

8    have any sense of whether or not that information can be

9    trusted.

10          So I would also think that it needs to await the data

11    verification process unless defendants will not be relying on

12    any of that information.

13          And similarly because, again, I think we need

14    additional information about what is happening in the field, we

15    would request some discovery in advance of any telepsychiatry

16    hearing because, again, the expansion of telepsychiatry has

17    occurred so dramatically and so much out of what we understood

18    to be happening in the field.

19          THE COURT:  All right.  Mr. Gibson, on the timing

20    question?

21          MR. GIBSON:  Sure, Your Honor.  So don't address the

22    request for discovery?

23          THE COURT:  No.  You know this court's views on

24    discovery.

25          MR. GIBSON:  We agree with plaintiffs' counsel.  The

1    telepsychiatry issue, at a minimum, should not take place

2    before the investigation is complete because the plaintiffs are

3    correct, defendants, in part, would rely on the data that

4    Dr. Golding alleges is somehow inaccurate to support the use of

5    telepsychiatry.

6         So we would ask, so there is no cloud hanging over

7    that evidence, that we do request the telepsychiatry hearing be

8    continued and perhaps reset at another date when we know for

9    certain.

10        THE COURT:  At this point I think the plan is to have

11   quarterly statuses.  So I would like to get those on a regular

12   schedule now.  So we would just discuss this again probably in

13   a first or second quarterly status in 2019.

14        MR. GIBSON:  Yes.

15        Your Honor, one other point that does relate somewhat

16   to the telepsychiatry hearing issue is that defendants have

17   pending currently an appeal on the telepsychiatry issue.  And

18   it is defendants' belief that any subsequent order following

19   the hearing would have to wait until that appeal was resolved

20   for it to go into effect.

21        So essentially it would be like a hearing could take

22   place, but any order regarding the evidence presented at that

23   hearing would likely have to wait until the resolution of the

24   appeal, however that comes down.

25        THE COURT:  All right.

1          MS. ELLS:  Your Honor --

2          THE COURT:  Well, there is no need to think about that

3    unless and until we reset the hearing.

4          Miss Ells.

5          MS. ELLS:  Briefly, Your Honor, when you represented

6    earlier the special master's plan is to evaluate telepsychiatry

7    at CCCMS institutions or the CCCMS level of care, I wasn't

8    clear from your statement whether or not he will also be

9    evaluating it at other levels of care during this round of

10   monitoring, and I would appreciate clarification on that.

11         THE COURT:  He's the best person to clarify that for

12   you.  So in your meeting with him -- the essential workgroup

13   meeting to talk about ongoing monitoring, you can get

14   clarification on that.

15         MS. ELLS:  Okay.  We certainly think that needs to

16   happen immediately.

17         THE COURT:  On the Transfer Timeline Enforcement, is

18   there any reason not to reset the hearing now on the

19   proceedings to address the level of accumulated fines and what

20   the court should do about it?

21         I don't think there is any reason not to reset that

22   hearing.  Agreed, Miss Ells?

23         MS. ELLS:  Well, Your Honor, again, because the

24   compliance relies on self-reporting about timeliness, we remain

25   concerned that the information may not be fully reliable.  And

1    I think we should wait until we can get comfort around that

2    information.

3           There is also some additional input that I believe

4    Your Honor has requested regarding the special master's

5    evaluation of the rescissions which have increased

6    significantly and whether or not those are appropriate.

7           So all of that is information that I think we would

8    need in advance of any contempt proceeding.

9           THE COURT:  So really any self-reporting is in doubt

10   in your -- in the plaintiffs' minds?

11          MS. ELLS:  Yes.

12          THE COURT:  Regardless of the subject matter?

13          MS. ELLS:  Yes.  And Your Honor, I think we could

14   prioritize some of the reporting, evaluation and auditing to

15   facilitate movement on some of these issues, but we remain very

16   concerned about self-reporting at this point.

17          THE COURT:  All right.  Anything to say on that,

18   Mr. Gibson?

19          Agree that we should also defer resetting of that

20   hearing?

21          MR. GIBSON:  Yes, Your Honor, but let me give you our

22   reasons.  We do believe the court should defer it.  Indeed, we

23   think the court should discharge the OFC.  As we reported last

24   time, defendants -- and with regards to inpatient transfer

25   timelines.

1          Again, we don't qualify that.  We believe that the

2     data is accurate.  And based on that data, CDCR, between the

3     months of September 2017 and October 2018, some 4,800 inmates

4     were transferred, all of them within the timeframe required by

5     the Program Guide.

6          That's 100 percent compliance for over a year.  I

7     don't see how there can be any contempt for that.  I don't

8     think there should be any contempt proceedings based on that,

9     whether it was because of the court's setting that or for other

10    reasons outside of it.  We are in compliance.

11         I believe last month in November there was one person

12    who was outside of the time frames.  That was a very unique

13    situation regarding someone out to court for over six months,

14    and then on his return this was an issue as to transferring

15    him, but ultimately approved.

16         The defendants have not been in contempt of the

17    court's order to transfer within the program guidelines.  I

18    don't think there is any reason to proceed with any contempt

19    hearing.

20         Not withstanding that, I believe the court had

21    previously set a September 2019 kind of deadline.  I believe

22    that was in October or perhaps the end of September of a status

23    conference.  I don't see why anything has changed in that

24    regard, but that's our position.

25         THE COURT:  All right.  Well, let me think about that.

1   It may be that it makes sense to defer, but discuss at a status

2   conference early 2019.

3          I do want to acknowledge there is a proposal out there

4   to activate the 20 -- to activate 20 temporary unlicensed MHCDs

5   at R.J. Donovan.  I know that is pending before me in the

6   special master's presentation of the suicide expert's report.

7   So I know that's out there and relates to the 24 hour timeline.

8          I don't really need to say it again, a reason to have

9   proceedings is to determine whether or not an OSC should be

10  discharged.  So I don't know that it would ever be discharged

11  solely on the papers, but I'll take under consideration what

12  the parties have just said.

13         On the October 10th, 2017 staffing order, there will

14  be a need to reset the October 18th hearing at some point, but

15  in this case it is clear to the court I should defer resetting

16  that hearing until the investigation is completed.

17         Other Business.  Here's the court's other business:

18  Looking at what is before me and the various factors at play in

19  this case, really separate and apart from the investigation

20  that will proceed beginning today, if the court steps back, as

21  it has the luxury of doing, and takes a more aerial view

22  looking at staffing, ongoing issues, satisfying staffing

23  ratios, challenges, particularly in certain geographic areas,

24  when I look at -- without resolving yet the suicide expert's

25  report that is currently before me -- when I look at the

1    persistent suicide prevention problems at multiple

2    institutions, really a large number of institutions at issue

3    when it comes to suicide prevention, and when I look at the

4    absence of fully implemented cultural collaboration training at

5    all institutions, putting aside whether or not my July 2018

6    order could be read to not require it by now, it is impossible

7    for the court not to think that a more global view really needs

8    to be taken by the parties.

9          And I have been briefed on the special master's

10   efforts with respect to clustering.  The parties know that the

11   special master believes that clustering of patients in a

12   smaller number of institutions could be an approach that gets

13   at the root of the problems.

14         So if you look staffing, suicide prevention, cultural

15   collaboration alone, having these patients spread among so many

16   different institutions just appears, again from the aerial

17   view, to be at the root of the problem.

18         The special master, as I understand it, has exhausted

19   his efforts to persuade the defendants, in particular, that

20   clustering is a part of the solution.

21         Maybe there is something else that gets at the root of

22   the problem, but at this point the court is prepared to

23   initiate another approach to ensure that the court is satisfied

24   that clustering or its equivalent is fully exhausted.

25         The question that arises from the reporting in the

1   court's mind is, is there really no way to house these patients
2   at up to ten institutions, maximum, in a way to eliminate a
3   whole host of issues?
4          So here's what I want to do on this front:  It is rare
5   when district judges engage in settlement conferences, but I am
6   going to send the parties to settlement with one of my
7   colleagues to exhaust the question of whether or not clustering
8   is the answer that gets to the root of the problem or is there
9   some alternative.
10          I believe one of my colleagues is in the best position
11   to keep the focus on that big picture view, if appropriately
12   briefed by the special master.  I don't think this court can go
13   there, otherwise I would.  I think I need to retain my role I'm
14   fulfilling here as the presiding judge who will need to resolve
15   disputes.  So I'm going to send the parties -- I believe a day,
16   even setting aside a day, to review this issue from a global
17   perspective will satisfy the court and at least give the court
18   initial information, is the issue really exhausted or is there
19   some other reasonable solution that might be considered?
20          So I'm going to set something in January or February.
21   My courtroom deputy will be in touch just to check dates, and
22   then you'll get the -- get a confirmed date and you'll have the
23   judge.  And at most you would be expected to provide executive
24   summary settlement conference statements -- they can be
25   confidential to that judge -- and then you would attend that

1    settlement conference.

2         So that's the court's other business.  Is there other

3    business that you believe we should discuss today, Miss Ells?

4         MS. ELLS:  Briefly, Your Honor.

5         We believe that there are aspects of the Golding

6    report that have not been captured in the parallel tracks

7    identified by the court.  And I think the largest one is the

8    appropriate role of psychiatry in the CDCR system.

9         There were some fairly significant examples of both

10   alleged patient harm and also the effects of the

11   marginalization of psychiatry and what it does to retention and

12   ability to recruit within the system.

13        In particular we note and are greatly concerned that

14   since the lift and shift in which under DSH, psychiatry is in

15   charge of the program in DSH, in CDCR it is psychologists in

16   the PIP.  Thirty-six of the 59 psychiatrists in the inpatient

17   programs in the PIPs have left in the last year and a half

18   alone.  And they're well under 50 percent staffed at the

19   highest level of care in the system.

20        And so those sort of issues together makes us think

21   that there needs to be some focused attention with the input of

22   the special master's experts on what the appropriate scope of

23   psychiatry practice and the role of psychiatry in the system

24   and whether or not it is sufficiently aligned with providing

25   adequate care under the Constitution.

```
1          THE COURT:  I acknowledge that's an outstanding issue.

2   Would that not get folded into any reset hearing on staffing?

3          MS. ELLS:  I think that we may need to have some

4   workgroup type of discussions in advance of that.  It partially

5   depends though, however, on when Your Honor is thinking of

6   resetting that hearing for.  But it is something that I think

7   could use discussion between the parties with the assistance of

8   the special master in the meantime.

9          THE COURT:  All right.  I'm not going to preclude any

10  discussion at any time the parties want to engage in it with

11  the special master, but I will keep that on the agenda in the

12  court's mind in connection with the resetting of the hearing

13  which would occur after the investigation is completed.

14         MS. ELLS:  Okay.

15         THE COURT:  Anything else, Miss Ells?

16         MS. ELLS:  No, Your Honor.

17         THE COURT:  Mr. Gibson?

18         MR. GIBSON:  No, Your Honor.

19         THE COURT:  All right.  Very good.  Thank you very

20  much.  You'll see the order of appointment and notice of

21  settlement conference.

22         MR. GIBSON:  Thank you, Your Honor.

23         MS. ELLS:  Thank you, Your Honor.

24         THE CLERK:  Court is in recess.

25      (Off the record at 11:40 p.m.)
```

1          (Whereupon, the matter was concluded.)

2                          ---o0o---

3

4

5

6

7

8

9

10

11                  *REPORTER'S CERTIFICATE*

12                          *---o0o---*

13

*STATE OF CALIFORNIA   )*
14   *COUNTY OF SACRAMENTO )*

15

16      *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled matter.*
17
          *IN WITNESS WHEREOF, I subscribe this certificate at Sacramento,*
18   *California.*

19

20   */S/_Catherine E.F. Bodene_____*
          *CATHERINE E.F. BODENE, CSR NO. 6926*
21      *Official United States District Court Reporter*

22

23

24

25

Catherine E.F. Bodene, Official Court Reporter - USDC
916-446-6360