**FILED**

**May 03, 2019**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# GIBSON DUNN

## NEUTRAL EXPERT REPORT

### *Coleman v. Newsom*, 2:90-cv-00520 KJM-DB (PC)

Submitted:  April 22, 2019

**Gibson, Dunn & Crutcher LLP**
Charles J. Stevens
Benjamin B. Wagner
Vivek Gopalan
Andrew Paulson
Emma Strong
Courtney Aasen

**LitService LLC**
Greg Nelson

Beijing • Brussels • Century City • Dallas • Denver • Dubai • Frankfurt • Hong Kong • Houston • London • Los Angeles • Munich
New York • Orange County • Palo Alto • Paris • San Francisco • São Paulo • Singapore • Washington, D.C.

**GIBSON DUNN**

Table of Contents
Page i

I.      Introduction ..................................................................................................... 1

II.     Executive Summary ......................................................................................... 2

        A.     "Resetting the Clock" Upon Patient Transfer ................................... 3

        B.     Redefining "Monthly" to Lengthen the Intervals Between EOP
               Appointments ..................................................................................... 3

        C.     Combining CCCMS and EOP Compliance Numbers ........................ 3

        D.     Counting All Encounters as Evaluations .......................................... 4

        E.     Reporting of Scheduled and Missed Appointments ......................... 4

        F.     Psychiatric Supervisors Acting as Line Staff ................................... 5

        G.     Medication Noncompliance ............................................................... 5

III.    The Investigative Process ................................................................................ 7

        A.     Methodology ...................................................................................... 7

               1.      Party Briefings ...................................................................... 7

               2.      Whistleblower Interviews ...................................................... 7

               3.      Witness Interviews ................................................................ 8

               4.      Documents ............................................................................. 8

               5.      Data Analysis ........................................................................ 9

        B.     Attorney-Client Privileged Information ............................................ 9

IV.     Background .................................................................................................... 10

        A.     The Program Guide .......................................................................... 10

        B.     The Special Master .......................................................................... 10

               1.      The Special Master's Monitoring Role and Process ........... 11

Table of Contents
Page ii

2.    All-Parties' Workgroup Meetings and Other Collaborative
      Efforts ....................................................................................... 11

C.    Relevant CDCR Personnel............................................................... 12

D.    CDCR's Data Reports and Systems.................................................. 12

      1.    The Electronic Health Record System................................. 13

      2.    Mental Health Performance Indicators and Reports........................ 14

      3.    CDCR Mental Health's Methodology of Measuring
            Compliance with Timelines Using "Patient-Weeks"
            Compliant............................................................................ 16

      4.    Continuous Quality Improvement ("CQI") Development................ 18

E.    The 2009 Staffing Plan and CDCR's Staffing Proposal............................... 19

F.    Witnesses' General Perspectives ..................................................... 20

      1.    CDCR's Increasing Reliance on Data to Manage the
            Statewide Mental Health Delivery System........................................ 21

      2.    Conflicts Between Psychiatry and CDCR Mental Health
            Leadership............................................................................ 23

V.    Findings and Recommendations................................................................. 25

A.    "Resetting the Clock" Upon Patient Transfer................................................. 25

      1.    Perspectives of the Whistleblowers and Parties ............................... 26

      2.    Summary of the Evidence.................................................... 28

      3.    Findings ................................................................................ 35

      4.    Recommendations.................................................................. 36

B.    Redefining "Monthly" to Lengthen the Intervals Between EOP
      Appointments............................................................................... 37

      1.    Perspectives of the Whistleblowers and Parties ............................... 37

GIBSON DUNN

Table of Contents
Page iii

|   | 2. | Summary of the Evidence | 39 |
|   | 3. | Findings | 43 |
|   | 4. | Recommendations | 44 |
| C. | Combining CCCMS and EOP Compliance Numbers | | 45 |
|   | 1. | Perspectives of the Whistleblower and Parties | 45 |
|   | 2. | Summary of the Evidence | 46 |
|   | 3. | Findings | 47 |
|   | 4. | Recommendations | 48 |
| D. | Counting All Encounters as Evaluations | | 49 |
|   | 1. | Perspectives of the Whistleblowers and Parties | 50 |
|   | 2. | Summary of the Evidence | 53 |
|   | 3. | Findings | 62 |
|   | 4. | Recommendations | 64 |
| E. | Reporting of Scheduled and Missed Appointments | | 65 |
|   | 1. | Perspectives of the Whistleblowers and Parties | 65 |
|   | 2. | Summary of the Evidence | 67 |
|   | 3. | Findings | 70 |
|   | 4. | Recommendations | 71 |
| F. | Psychiatric Supervisors Acting as Line Staff | | 72 |
|   | 1. | Perspectives of the Whistleblowers and Parties | 72 |
|   | 2. | Summary of the Evidence | 74 |
|   | 3. | Findings | 77 |
|   | 4. | Recommendations | 78 |

Table of Contents
Page iv

G. Medication Noncompliance ........................................................................... 79

1. Perspectives of the Whistleblowers and Parties ................................. 79

2. Summary of the Evidence .................................................................. 81

3. Findings ............................................................................................ 86

4. Recommendations.............................................................................. 87

VI. Recommendations for Further Action by the Court on Related Issues .................... 89

A. Exclusion of EOP Patients Not on Psychiatric Medications from
Compliance Metrics ....................................................................................... 89

B. Exclusion of EOP "Overflow" Patients from Compliance Metrics.............. 90

VII. Conclusion .......................................................................................................... 91

**Appendices**

List of Abbreviations and CDCR Institutions.........................................................Appendix A

List of Document Productions ...............................................................................Appendix B

Description of Key CDCR Personnel .....................................................................Appendix C

Attachment A to the Program Guide .....................................................................Appendix D

CCHCS Medication Adherence Procedure.............................................................Appendix E

April 22, 2019
Page 1

## I.    Introduction

*Coleman v. Newsom* (formerly *Coleman v. Brown* and *Coleman v. Wilson*), No. 2:90-cv-00520-KJM-DB (E.D. Cal.), was filed in 1990 as a federal class action alleging various constitutional and civil rights claims related to California Department of Correction and Rehabilitation's ("CDCR" or "Defendants") provision of mental health care to patients in the California prison and parole system.  In 1995, the District Court found CDCR had violated class members' Eighth Amendment rights, in part because it was "significantly and chronically understaffed in the area of mental health care services." *Coleman v. Wilson*, 912 F. Supp. 1282, 1307 (E.D. Cal. 1995); ECF No. 640.  The Court also appointed a Special Master to monitor CDCR's compliance with certain court-ordered injunctive relief. *Id.*

On October 3, 2018, Dr. Michael Golding, Chief Psychiatrist of CDCR, submitted a report entitled "CDCR Mental Health System Report" (the "Golding Report") which was subsequently filed in redacted form.[1]  *See* ECF No. 5988-1.  Allegations contained in the Golding Report suggest that Defendants have presented materially misleading data and information to the Special Master and the Court in an effort to justify a reduction in the number of psychiatrists necessary to meet their constitutional obligations.  Dr. Melanie Gonzalez, a Senior Psychiatrist Specialist at CDCR headquarters, subsequently submitted a letter to the Court raising similar concerns (the "Gonzalez Complaint").[2]

On December 14, 2018, the Honorable Kimberly J. Mueller issued an order appointing Charles J. Stevens of Gibson, Dunn & Crutcher as a neutral expert under Federal Rule of Civil Procedure 706 to conduct an independent investigation into certain allegations raised in the Golding Report and to assemble a team to assist in the investigation.[3]  ECF No. 6033, amended and superseded by ECF No. 6064.

---

[1]  The Golding Report was first submitted to the court-appointed Receiver in the companion case to *Coleman*, *Plata v. Newsom*, No. 3:01-cv-01351 (N.D. Cal.).

[2]  The Gonzalez Complaint was submitted to the Receiver on October 24, 2018.

[3]  For purposes of this report, "we" or "us" refers to the neutral expert Mr. Stevens and his team, including partner Benjamin B. Wagner, associates Vivek Gopalan, Andrew Paulson, Emma Strong, and Courtney Aasen, and litigation consultant Greg Nelson of LitService LLC.

GIBSON DUNN

April 22, 2019
Page 2

## II.      Executive Summary

The Court stated in its order that "[t]he purpose of the investigation is limited to assisting this court in assessing whether facts exist that require this court to hold an evidentiary hearing to decide whether fraudulent or misleading information has been presented to the court in this case, in the specific context of ongoing remedial efforts concerning adequate mental health staffing in CDCR's prisons." ECF No. 6032 at 8.[4] Specifically, we were tasked with identifying "whether facts exist raising a question whether defendants committed fraud on the court or intentionally misled the court or the Special Master" regarding seven specific issue areas raised in the Golding Report. ECF No. 6064 at 2-3.

Our investigation lasted approximately four months. During that time, we received more than 12,000 documents, which consisted primarily of internal CDCR communications and communications between the parties. *See* Appendix B. We received in-depth oral and written briefings from parties in the case—Plaintiffs' counsel, the whistleblowers Drs. Golding and Gonzalez, CDCR, and the Special Master. We interviewed members of CDCR Mental Health Leadership,[5] the whistleblowers, and many other witnesses identified during the course of our investigation, including a number of current and former psychiatrists at CDCR. We also received and analyzed CDCR data relevant to the issues addressed in this report. As discussed below, we did not have access to material covered by CDCR's attorney-client privilege or the attorney work product doctrine. *See infra* at § III.B.

We find that the evidence supports some of Dr. Golding's allegations that CDCR's data reporting practices resulted in the reporting of misleading data. Nonetheless, we also find that on each issue the evidence does not establish that CDCR intentionally misled the Court or the Special Master. As a result, we do not recommend that the Court hold an evidentiary hearing on any of the seven issues. We note throughout our report that there are several instances where there are material differences between CDCR and the Special Master relating to implementation of the Mental Health Services Delivery System Program Guide (the "Program Guide") or reporting of compliance with it. In these instances, the data that CDCR reports to the Special Master and the Court tends to reflect higher compliance rates than would be the case under the Special Master's view of the Program Guide. Where we have observed a material disconnect on the meaning of Program Guide requirements, we recommend that the Court consider directing the parties to seek to resolve such disputes to ensure clarity going forward.

---

[4]   Citations to page numbers of documents filed in the Court's Electronic Case Filing ("ECF") system in *Coleman v. Newsom*, No. 2:90-cv-00520-KJM-DB (E.D. Cal.) are to the page number assigned by the ECF system located in the upper right-hand corner of the page.

[5]   The term "CDCR Mental Health Leadership" refers to the high-ranking officials working out of CDCR's headquarters, excluding the members of Dr. Golding's psychiatry team. CDCR Mental Health Leadership includes: Deputy Director Katherine Tebrock; Assistant Deputy Director Dr. Brittany Brizendine, PhD; Dr. Laura Ceballos, PhD; Dr. John Rekart, PhD; Dr. David Leidner, PhD; and Angela Ponciano.

GIBSON DUNN

April 22, 2019
Page 3

Below is a brief overview of our specific findings and recommendations on the seven issues:

**A.**  **"Resetting the Clock" Upon Patient Transfer:**  The Court directed us to investigate whether CDCR committed fraud or intentionally provided false or misleading information to the Court or Special Master by "[l]engthening the intervals between psychiatric appointments beyond court-mandated timelines for inmate-patients at the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) levels of care who are transferred to new institutions by resetting the clock for such appointments from the time of transfer rather than from the last completed appointment, rescheduling such appointments at the maximum time allowed in the Program Guide, and reporting compliance with Program Guide requirements using the reset timelines."  ECF No. 6064 at 2-3.  We find that CDCR's practice of "resetting the clock" upon transfer does not conflict with the Program Guide, and so does not result in the reporting of false or misleading data to the Court or Special Master.  Because the practice is not misleading, we also find that there was no intent to mislead the Court or Special Master, so we do not recommend an evidentiary hearing on this issue.  Nonetheless, the issue raised by Dr. Golding implicates an important continuity of care concern that is clinically important to psychiatrists and the Special Master, relating to what time frame is applied to a transferred patient's initial psychiatry evaluation once the clock is "reset."  Accordingly, we recommend that the Court consider directing the parties and the Special Master to meet and confer in order to clarify the proper time frame under the Program Guide for an initial psychiatry evaluation for transferred patients.

**B.**  **Redefining "Monthly" to Lengthen the Intervals Between EOP Appointments:**  The Court directed us to investigate whether CDCR committed fraud or intentionally provided false or misleading information to the Court or Special Master by "[l]engthening the interval between psychiatrist appointments for EOP inmate-patients and reporting compliance based on the extended intervals."  *Id.* at 3.  While CDCR's modification of its business rule interpreting "monthly" from 30 days up to 45 days potentially had a significant positive effect on compliance rate data submitted in two filings, the evidence does not establish that the specific data in the relevant filings were material to the Court or Special Master.  We do not find that the evidence establishes an intent to falsify or mislead, but there were serious flaws in CDCR's decision-making process in making such a significant change to the rules governing psychiatric patients and implementation of the Program Guide requirements without consulting any psychiatrist or the Special Master.  Because CDCR reverted to the original rule when Dr. Golding raised the issue, the modified rule was likely immaterial and is now moot.  Accordingly, we do not recommend an evidentiary hearing on this issue.

**C.**  **Combining CCCMS and EOP Compliance Numbers:**  The Court directed us to investigate whether CDCR committed fraud or intentionally provided false or

GIBSON DUNN

April 22, 2019
Page 4

misleading information to the Court or Special Master by "[c]ombining CCCMS and
EOP appointment compliance numbers into one reporting category." *Id.* at 3.  While
Dr. Golding's factual allegations—that CDCR combined "Timely Psychiatry
Contacts" compliance statistics for EOP and CCCMS patients in 2017, and did not
report EOP timeliness statistics in 2018—are undisputed, there is no evidence that
such reporting was false or misleading, or that such reporting was material.  We do
not recommend an evidentiary hearing on this issue.

**D.    Counting All Encounters as Evaluations:**  The Court directed us to investigate
whether CDCR committed fraud or intentionally provided false or misleading
information to the Court or Special Master by "[i]nflating compliance numbers by
counting every encounter between a psychiatrist and an inmate-patient as an
appointment for purposes of measuring Program Guide timeline compliance, without
regard to whether the encounter was a psychiatry appointment or, *e.g.*, a wellness
check or a cell-front attempt to communicate with an inmate patient." *Id.* at 2-3.  We
find that that CDCR's reporting of data relating to its "Timely Psychiatry Contacts" is
misleading because it shows a higher level of compliance with Program Guide
requirements than it should as a result of CDCR's inclusion of non-confidential
encounters with inmates as qualifying evaluations under the Program Guide.  A fair
reading of the text of the Program Guide, its context, and the common understanding
among psychiatrists as to what constitutes a psychiatric "evaluation" indicate that a
psychiatric evaluation for purposes of the Program Guide must be confidential.  We
do not, however, find that CDCR intentionally misled the Court or the Special
Master, because the Special Master monitored specifically for confidentiality-related
concerns, and though it was the Special Master's understanding that non-confidential
appointments were not counted towards measuring Program Guide timeline
compliance, we did not find evidence that CDCR intentionally hid data about non-
confidential appointments from the Special Master.  As a result, we do not
recommend that the Court hold an evidentiary hearing on this issue.  We do,
nonetheless, recommend that the Court consider directing the parties and the Special
Master to meet and confer in order to clarify what psychiatry appointments may
properly be considered an "evaluation" under the Program Guide, and how data
relating to non-confidential appointments should be reported.

**E.    Reporting of Scheduled and Missed Appointments:**  The Court directed us to
investigate whether CDCR committed fraud on the Court or intentionally misled the
Court or Special Master by "[t]he manner of reporting of scheduled appointments and
missed appointments." *Id.* at 3.  We do not find any evidence that data from the
"Treatment Cancelled" and "Treatment Refused" indicators was ever provided to the
Court or the Special Master, so there was no misleading data in that respect.  In
addition, although CDCR described the "Appointments Seen as Scheduled" indicator

GIBSON DUNN

April 22, 2019
Page 5

in a misleading way, we find no evidence to conclude that CDCR did so intentionally. We therefore do not recommend an evidentiary hearing on this issue.

**F.     Psychiatric Supervisors Acting as Line Staff:**  The Court directed us to investigate whether CDCR committed fraud or intentionally provided false or misleading information to the Court or Special Master by "[f]ailing to report that psychiatric supervisors were also performing some or all the functions of staff psychiatrists."  *Id.* at 3.  The Special Master was aware that supervisors often see patients for various reasons, and noted that a reasonable level of supervisory participation would not have had a material impact on his view of CDCR staffing data.  Although we found that at certain institutions psychiatry supervisors sometimes maintained an active caseload comparable to line staff, we did not find evidence that, across CDCR, the portion of patient care provided by supervisors was sufficiently high that it would have impacted the Court or Special Master's assessment of staffing data.  We do not find that CDCR made a specific false or misleading statement with respect to this issue, or that the omission of supervisory workload data, if misleading, was material.  We therefore do not recommend an evidentiary hearing on this issue.

**G.     Medication Noncompliance:**  The Court directed us to investigate whether CDCR committed fraud on the Court or intentionally misled the Court or Special Master by "[t]he way in which medication non-compliance is measured."  *Id.* at 3.  We find that the "Timely MH Referrals" performance indicator that CDCR uses to report compliance with medication nonadherence appointments is misleading because it does not include all of the patients who require a medication noncompliance appointment, and therefore overstates compliance with the Program Guide requirements and the mandates of the California Correctional Health Care Services ("CCHCS") policy.  We do not find, however, that CDCR intentionally violated the Program Guide by undercounting medication noncompliant patients in a manner intended to provide misleading data to the Court or the Special Master.  The language of the CCHCS policy is less than clear, and there appears to be genuine confusion and inconsistent interpretations of the policy within CDCR.  As a result, we do not recommend an evidentiary hearing on this issue.  We do, nonetheless, recommend that the Court consider directing the parties and the Special Master to meet and confer about how to address the conflicting interpretations of the Program Guide and the CCHCS policy and the inconsistent applications of them across CDCR.  We further recommend that the Court consider directing the parties and the Special Master to consider revisions to the procedure for reporting compliance with the "Timely MH Referrals" indicator.

In addition to the foregoing issues, two other data reporting matters closely related to some of those issues came to our attention: the exclusion of mainline EOP patients not on psychiatric medications and "overflow" patients from EOP compliance metrics.  Because these items appear to reflect a disconnect between CDCR practices and the Program Guide,

GIBSON DUNN

April 22, 2019
Page 6

and may have a material impact on patient care for some EOP patients, we also recommend that the Court consider directing the parties and the Special Master to meet and confer regarding those matters.

April 22, 2019
Page 7

### III.    The Investigative Process

We were instructed to submit "a report identifying whether there is evidence sufficient to warrant an evidentiary hearing into whether defendants have intentionally presented false or misleading information to the court in one or more of the areas addressed in the Golding Report and, if so, identifying that evidence."  ECF No. 6064 at 4.

### A.    Methodology

At the outset, we held briefings with the parties and whistleblowers, and gave each the opportunity to provide us with relevant documents and suggested witnesses.  Having obtained information from all parties, we then interviewed witnesses and requested additional relevant documents, as described in further detail below.  Once we had developed a baseline understanding of the relevant witnesses and documents, we began to narrow the universe of information to that relevant to the seven discrete issues we were tasked with investigating.  We attempted to interview everyone identified as potentially having information relevant to the seven issue areas.[6]  Though some documents and data were not available for our review, we believe we have reviewed sufficient information to reach recommendations and conclusions in connection with the seven issues.

#### 1.    Party Briefings

In January 2019, we conducted initial briefings with Defendants, counsel for the Plaintiffs, and the Special Master.[7]  Each briefing focused on identifying relevant information, documents, and witnesses for each area of investigation.  On January 30, 2019, Defendants provided a second briefing, focused on Defendants' Staffing Proposal (discussed *infra* at § IV.E.  On February 15, 2019, we met with Defendants again for an interactive tutorial on CDCR's data systems, including the Electronic Health Record System ("EHRS") (discussed *infra* at § IV.D.1) and the Mental Health Performance Report (discussed *infra* at § IV.D.2).  We had additional calls with the Special Master on February 20 and April 2, 2019.  We solicited counsel for both Plaintiffs and Defendants to provide relevant documents and to identify relevant witnesses, and both did so.

#### 2.    Whistleblower Interviews

We interviewed Dr. Golding in person on January 25, 2019 and March 15, 2019.  We separately interviewed Dr. Gonzalez in person on January 30, 2019 and by phone on

---

[6]  Throughout this process, witnesses raised various additional concerns related to patient care, policy, and workplace culture.  We do not reach ultimate findings on those issues which fall outside the seven discrete issues we have been retained to investigate, and when such issues arose, we endeavored to explain the limited scope of our role.

[7]  For purposes of this report, we refer to the Special Master's collective team of experts and monitors singularly as "the Special Master."

GIBSON DUNN

April 22, 2019
Page 8

March 8, 2019.  Both witnesses were credible and helpful.  Counsel for Dr. Golding and
Dr. Gonzalez was present at each interview.  We also requested that they provide us with
relevant documents, and each did so.

### 3.    Witness Interviews

We interviewed witnesses who came forward voluntarily and witnesses identified by parties
or other witnesses as having information relevant to the specific issue areas.  Each witness
was permitted to have their counsel present during the interview.  Interviews of witnesses
who were not represented by the California Attorney General's office ("OAG") were not
recorded or transcribed verbatim.  Counsel for CDCR stated it intended to record interviews
of witnesses represented by the OAG "to maintain an accurate record of the questioning and
information provided by the witnesses," and we agreed, as an alternative, to retain a court
reporter to transcribe the interviews of those CDCR and CCHCS witnesses, and each was
placed under oath.[8]  Copies of transcripts were not provided to CDCR until all relevant
interviews were completed.  This report does not purport to provide a detailed account of
each witness's testimony, and the summaries contained herein are limited to information
deemed to be significant to our recommendations and conclusions.

In total, we interviewed or met with approximately thirty individuals.  Seven[9] of the
witnesses interviewed were senior CDCR employees identified by CDCR as having
potentially relevant information.  We found them to be credible and helpful.  In addition, we
interviewed four witnesses who directly reached out to us and 14 additional witnesses, who
were identified as potentially having relevant information by the parties or other witnesses.
In total, we spoke with 13 current headquarters staff, including five psychiatrists working at
headquarters.  We also spoke with six current psychiatrists working at institutions, including
two Chief Psychiatrists, and one Senior Psychiatrist Supervisor.  In addition, we spoke with
five former CDCR staff, including Dr. Kevin Kuich, the former Chief Telepsychiatrist at
headquarters, and two former Chief Psychiatrists from institutions.

We did not interview counsel for CDCR, given Defendants' position that attorney-client
privileged information would not be provided.

### 4.    Documents

In connection with the investigation, we received documents from the parties and certain
witnesses.  CDCR produced approximately 2,798 documents, including emails and data sets.

---

[8]   For efficiency, we recorded the telephone interviews of two later witnesses who elected to be represented
by the OAG.

[9]   Deputy Tebrock, Assistant Deputy Brizendine, Dr. Ceballos, Deputy Lambert, Ms. Ponciano, Dr. Rekart,
and Dr. Leidner.

GIBSON DUNN

April 22, 2019
Page 9

Dr. Golding produced approximately 3,851 pages of documents, including emails and other information relevant to the investigation areas and Dr. Gonzalez produced approximately 304 pages of documents.  In addition, Plaintiffs submitted approximately 109 documents, and the Special Master provided us with approximately 9,017 documents.[10]  Other witnesses also voluntarily provided materials to us.  Pursuant to the Court's order that we maintain and provide a list of all documents obtained and reviewed in the course of the investigation, a list describing the documents received is attached hereto as Appendix B.  *See* ECF No. 6038 at 2.

    **5.    Data Analysis**

CDCR provided certain data sets from its data warehouse, which we used to analyze various issues that arose during this investigation.  More detailed descriptions of the data analyses we performed are discussed in the relevant sections below.

**B.    Attorney-Client Privileged Information**

The Court granted us authority to "interview counsel for defendants and members of their staff," and "[t]o have access to the records, files and papers maintained by defendants to the extent that such access is related to the performance of the neutral expert's duties[.]"  ECF No. 6064 at 4-5.  Defendants filed a motion for protective order on February 14, 2019 seeking protection against the production of documents to the neutral expert that are subject to claims of attorney-client privilege or attorney work product protection.  *See* ECF No. 6086.  On February 19, 2019, the Court denied Defendants' motion.  *See* ECF No. 6096.

Nonetheless, Defendants advised us that they would not provide any privileged material and that they would object to any interview questions or document requests that involved privileged information.  We did not raise this issue with the Court, as we believed that we could make the findings requested by the Court without litigating these privilege claims.  We were, in fact, able to make the requested findings without access to privileged material, but of course all of our findings are subject to the qualification that we did not review information claimed by Defendants to be protected by attorney-client or work product privileges.[11]

To the extent that we may have received information that potentially could be subject to a claim of privilege, we have avoided including such information in this report.  Thus, in our view, no portion of this report must be redacted or filed under seal on that basis.

---

[10]   This number excludes duplicative documents removed by our electronic discovery provider.

[11]   The Special Master and Plaintiffs' counsel take the view that CDCR has an aggressive approach towards data bearing on compliance which may be influenced by the Governor's office and a strategy to terminate the litigation.  Because we have not had access to communications relating to the Governor's office and litigation strategy due to Defendants' privilege objections, we make no finding in that regard.

April 22, 2019
Page 10

## IV.     Background

### A.     The Program Guide

In 1997, the parties agreed to an initial detailed Program Guide to govern the policies and procedures related to CDCR's provision of mental health services. The Program Guide is the court-ordered remediation plan for CDCR's delivery of mental health services, and describes the constitutional minimum level of care that CDCR must provide to mentally ill patients in its custody. *See generally Coleman v. Brown*, No. 17-17328, slip op. at 2 (9th Cir. Nov. 28, 2018) ("[T]he Program Guide sets out the objective standards that the Constitution requires in this context[.]"). Therefore, material deviation from the Program Guide provisions requires a court order, and would usually first begin with a process of dialogue between the Special Master and CDCR, before involving counsel for Plaintiffs and ultimately the Court. CDCR's provision of mental health services is also governed by a number of additional policies and procedures, occasionally referred to as "pocket parts." *See* ECF No. 5864-1.

The Program Guide is generally organized into chapters centered around levels of care and levels of confinement. A number of the issues raised in the investigation implicate the proper measurement for timeliness of psychiatric evaluations for patients at the CCCMS and EOP levels of care under the Program Guide, which are governed by the following provisions:

> 12-3-11: "Each CCCMS inmate-patient on psychiatric medication shall be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues."

> 12-4-9: "A psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues."

Additional relevant Program Guide provisions and policies are discussed in more detail within each issue.

### B.     The Special Master

In 1995, the Court appointed a neutral special master to assist in developing a remedial plan for CDCR's provision of mental health services that was compliant with the Constitution and to monitor CDCR's compliance on an ongoing basis. *See* ECF No. 640. Matthew A. Lopes currently holds the position of Special Master. Mr. Lopes works with a team of about 19 monitors and experts that are collectively responsible for monitoring and enforcing CDCR's compliance with the Program Guide (collectively referred to in this report as the "Special Master").

April 22, 2019
Page 11

The Special Master told us that he was always available to CDCR officials to discuss the Program Guide, any ambiguities in the Program Guide, implementation and policy issues, or proposed changes to the Program Guide. The Special Master and members of his team spoke frequently with senior CDCR Mental Health officials.

Dr. Golding reported that although Deputy Tebrock recently told him he was always permitted to contact the Special Master, he did not believe he could do so. He also indicated that he felt he could only answer questions that were asked of him, but not volunteer any additional information. Other psychiatrists we interviewed expressed similar sentiments. Multiple psychiatrists said they had been told that "the Special Master is not your friend," or words to that effect, by senior-ranking CDCR Mental Health officials.

### 1. The Special Master's Monitoring Role and Process

In addition to numerous other activities, the Special Master prepares and submits regular monitoring reports to the Court that detail findings and recommendations related to CDCR's compliance with the plans, policies, and protocols contained in the Program Guide and its pocket parts. Each of these monitoring reports is based in part on on-site visits at CDCR institutions, during which the Special Master audits each prison in person, including talking with staff and inmates, sitting in on group therapy, and reviewing extensive records. The Special Master sends a document request to CDCR in advance of each on-site visit, and CDCR provides responsive institution-specific data. To date, the Special Master has submitted 27 monitoring reports, the most recent of which was submitted to the Court on February 13, 2018, and was based on institutional site visits conducted between May 3, 2016 and January 26, 2017. ECF No. 5779 at 16. The Special Master commenced the 28th round of monitoring in early 2019.

Between the conclusion of the 27th round of site visits in January 2017 and the commencement of the 28th round in early 2019, the Special Master has engaged in various other case-related projects, including negotiations on CDCR's Staffing Proposal, but has not actively monitored CDCR in the field through institutional site visits. The bulk of the data the Special Master reviews is in connection with these monitoring rounds—thus, was prior to January 2017. Conversely, the data primarily at issue in the Golding Report and the Gonzalez Complaint is from 2017 and 2018—after the Special Master had concluded his last monitoring round—and is available through CDCR's Mental Health Performance Report or other internal CDCR tools. Although CDCR has made the Mental Health Performance Report available to the Special Master, his team generally does not actively monitor CDCR's compliance using that tool.

### 2. All-Parties' Workgroup Meetings and Other Collaborative Efforts

Beginning in 2016, the Special Master began to conduct a series of All-Parties' Workgroup meetings, where representatives from Defendants and Plaintiffs met with the Special Master

April 22, 2019
Page 12

to discuss ongoing issues related to the delivery of mental health care. All-Parties' Workgroup meetings were held regularly—often weekly—until the Golding Report was released in October 2018. The Special Master provided 46 separate agendas for the All-Parties' Workgroup meetings that reflect wide-ranging topics, including proposed updates to the Program Guide and CDCR's proposed revisions to the 2009 Staffing Plan (discussed *infra* at § E). In addition, the All-Parties' Workgroup meetings provided the parties and the Special Master an opportunity to discuss issues informally, including CDCR's data collection processes. In addition to these meetings, the Special Master and leadership for CDCR's Mental Health program were frequently in contact regarding a variety of issues.

## C.    Relevant CDCR Personnel

Deputy Director Katherine Tebrock leads CDCR's Statewide Mental Health Program. Assistant Deputy Director Dr. Brittany Brizendine, PhD, reports to Deputy Tebrock. Associate Director Angela Ponciano reports to Assistant Deputy Brizendine and oversees administrative functions of the Mental Health program, including policy development, operations, and labor negotiations. Ms. Ponciano was largely responsible for the design and development of CDCR's Staffing Proposal (discussed *infra* at § E). Dr. Laura Ceballos, PhD, also reports to Assistant Deputy Brizendine and oversees CDCR Mental Health's Quality Management ("QM") team, which includes Dr. John Rekart, PhD and Dr. David Leidner, PhD. Dr. Rekart was responsible for much of the design and implementation of EHRS (discussed *infra* at § D.1), and Dr. Leidner manages CDCR's Mental Health QM systems, including the Mental Health performance indicators and related business rules (discussed *infra* at § D.2).

Dr. Michael Golding is the statewide Chief Psychiatrist of Statewide Policy Oversight at CDCR headquarters. Dr. Golding worked alongside Dr. Kevin Kuich, the former Chief Psychiatrist of Telepsychiatry at CDCR headquarters before Dr. Kuich left CDCR in early 2019. Dr. Melanie Gonzalez is one of four Senior Psychiatrist Specialists at CDCR headquarters who report to Dr. Golding.

Annette Lambert is the Deputy Director of Quality Management, Informatics and Improvement for CCHCS. Separate from CDCR's Mental Health program, and independent from the Dr. Ceballos's Mental Health QM team, Deputy Lambert's team is responsible for developing and maintaining medical performance indicators included on the CCHCS Dashboard.

More detailed descriptions of key CDCR personnel and their backgrounds are included in Appendix C.

## D.    CDCR's Data Reports and Systems

Importantly, the data that CDCR reports to the Special Master and the Court in connection with the *Coleman* litigation is not coextensive with the data or reports that CDCR generates

April 22, 2019
Page 13

internally for its own management purposes.  As discussed in more detail below, from 2016
to present, CDCR has been developing and implementing a robust system of data collection
and analysis in order to support a more data-driven management system for the statewide
delivery of mental health services.  Some of the concerns articulated in the Golding Report or
otherwise uncovered during this investigation relate to data that were never directly provided
to the Special Master or the Court.  Our limited task is to evaluate whether CDCR has
"intentionally provided false or misleading information to the court or the Special Master."
ECF No. 6064 at 2 (emphasis added).  Thus, although there may be legitimate concerns
about the accuracy of certain data CDCR uses internally—some of which we discuss in this
report—our investigation focused on data that was ultimately provided to, or relied upon by,
the Special Master or the Court.  Nonetheless, because the data that was reported to the
Special Master or Court was derived from CDCR's internal systems, a basic understanding
of the structure and function of these systems, as described briefly below, was integral to our
analysis of the relevant issues.

  **1.**  **The Electronic Health Record System**

In 2017, CDCR completed a rollout of a new Electronic Health Record System ("EHRS"),
which replaced its predecessor paper records system and the accompanying Mental Health
Tracking System ("MHTS.net").  The EHRS system represents a movement away from a
manual, paper-based patient record to an electronic system that can be more efficiently
stored, accessed, and analyzed across all CDCR institutions.

Cerner Corporation, a health information technology supply company, provides the operating
system at the core of EHRS.  *See generally* https://www.cerner.com/solutions/health-
systems.  Because Cerner had limited experience with managing mental health records,
however, CDCR Mental Health—primarily Dr. John Rekart and his staff—customized much
of the system.  CDCR psychiatrists, including Dr. Golding and Dr. Kevin Kuich, were
involved in the development of the Mental Health components of the EHRS, including
configuration of psychiatry forms, orders, and notes.  Both Dr. Golding and Dr. Kuich
reported, however, that they experienced difficulty in getting certain requested changes and
modifications approved—particularly those that relate to how psychiatrists input encounters
and schedule follow-up appointments.  *See, e.g.*, CDCR0016842 (July 4, 2018 email from
Dr. Golding to various headquarters psychiatrists describing concerns escalated to Deputy
Tebrock, including inefficiencies with the psychiatry EHRS components, and noting that
Deputy Tebrock "was reporting to the court that there have been substantial efforts to help
psychiatrists with the EHRS, though we can see that the opposite is true").

Prior to the rollout of EHRS, CDCR conducted training for clinicians, including
psychiatrists, at each institution.  A team of CDCR psychiatrists lead by Dr. Kevin Kuich,
and including Dr. Gonzalez, conducted psychiatrist-specific EHRS training on-site at CDCR
institutions prior to the rollout.  Both psychiatry witness accounts and email correspondence
reflect that Dr. Golding and headquarters psychiatry felt that they were allocated

April 22, 2019
Page 14

disproportionately fewer resources for psychiatry EHRS training than other disciplines. *See, e.g.*, GOLDING00486 (March 23, 2016 email from Dr. Golding to Dr. Ceballos and Amy Eargle, copying Ms. Ponciano, asking for updates on hiring help for EHRS training and noting Dr. Kuich would likely "be asked to be in 3 or 4 places, all at once").

After the EHRS rollout was complete, Dr. Golding and Dr. Kuich stated that it was difficult to get CDCR Mental Health Leadership to permit them to release psychiatry-specific revisions and updated training. An email sent from Dr. Kuich to Deputy Tebrock in December 2018 stated that a psychiatry EHRS training memo was still sitting "in limbo" (GOLDING003797), and as of April 2019, Dr. Golding reported that headquarters still had not approved this training memo for release to psychiatrists.

### 2.      Mental Health Performance Indicators and Reports

Dr. Golding raises issues that implicate certain CDCR performance indicators. Each CDCR performance indicator is governed by "business rules" that determine what data is pulled from what source, including patient mental health records, and how that data is reflected in the indicator. The indicators are then depicted visually by a percentage and corresponding color "data flag" (green, yellow, or red). Some of the indicators were designed to track compliance with Program Guide requirements, while others were designed solely for CDCR's internal self-monitoring.

The Mental Health Performance Report ("Performance Report") is one of a variety of "On Demand" Mental Health reports, each of which reflect various performance indicators. *See* Figures 1-2. Separately, CCHCS, which is more broadly responsible for healthcare services within CDCR, publicly produces a monthly "Dashboard" reflecting certain performance indicators, including some CDCR Mental Health performance indicators.[12] Figure 3; *see also* https://cchcs.ca.gov/reports. Although, according to CDCR, the Special Master was granted access to the Performance Report in 2015, the Special Master states he does not regularly review the Performance Report or Dashboard.[13] Instead, the Special Master reviews compliance data in connection with the monitoring rounds and related institution site visits, which include detailed requests for specific data and information.[14]

---

[12]   When some CDCR Mental Health staff, including Dr. Golding, refer to the "dashboard," they are referring to the Mental Health Performance Report, not the CCHCS Dashboard.

[13]   Dr. Ceballos reported that the Special Master's access to the Performance Report expired because he was not using it. Ceballos Tr. at 99:23-100:1.

[14]   It is unclear whether CDCR was aware of the extent to which the Special Master reviewed or relied upon the Performance Report or Dashboard prior to the Golding report. We do not make findings on whether CDCR may have *attempted* to mislead the Special Master through these avenues, and instead focus our analysis on the data that the Special Master or the court *actually* received or reviewed.

April 22, 2019
Page 15



*Figure 1: Mental Health On Demand Reports, including a link to the Mental Health Performance Report.*



*Figure 2: Excerpt of the Mental Health Performance Report.*

GIBSON DUNN

April 22, 2019
Page 16



Figure 3: Excerpt of the CCHCS Dashboard.

### 3. CDCR Mental Health's Methodology of Measuring Compliance with Timelines Using "Patient-Weeks" Compliant

Dr. Golding's Report references CDCR's method for measuring compliance with deadlines that occur on an ongoing basis (*e.g.*, the "Timely Psychiatry Contacts" indicator), and a number of issues addressed in this report also involve that methodology. *See, e.g.*, ECF No. 5990-4 (the Golding Report) at 2, 47, 55; *see also* CDCR0014292 (April 12, 2018 email from Dr. Golding to psychiatrists on his team discussing accuracy of CDCR's current measurement methodology). Some witnesses and documents suggested that CDCR Mental Health Leadership errs on the side of over-reporting compliance, citing as one example CDCR's use of an internally-developed method for reporting timely psychiatric contacts based on the percent of weeks that a patient is current on their required appointments. There is a reasonable basis for using such a methodology, and whether that methodology is accurate or the most appropriate is outside the scope of this report. But because this methodology is integral to a host of performance indicators that CDCR Mental Health uses to report Program Guide compliance, including some of the performance indicators discussed below, we describe that methodology here.

CDCR Mental Health measures compliance with ongoing time frames using a methodology developed primarily by Dr. David Leidner. This methodology—sometimes referred to as "patient-weeks"—measures the amount of time that a patient is current on their required appointments. CDCR performs a weekly check every Sunday that looks back at the week

April 22, 2019
Page 17

prior to determine whether the patient was up to date on their routine contact for that week.[15]
For instance, if an EOP patient was seen on April 1, 2019 (making him due for another
appointment by May 1) and again on May 1, CDCR would report four weeks of compliance
because the patient was never overdue on his required psychiatry contacts by the time the
Sunday check occurred, thus resulting in a compliance rate of 100%.  But if that same patient
was not seen until May 14, CDCR would report four weeks of compliance (weekly checks on
April 7, April 14, April 21, and April 28) and two weeks of noncompliance (weekly checks
on May 5 and May 12), thus resulting in a compliance rate of 66%.  Because the patient was
seen again on May 14, that week would be considered compliant and the clock for the next
routine appointment would begin anew.  Graphically, these two examples would appear as
follows:

| Example | April 7 | April 14 | April 21 | April 28 | May 5 | May 12 | Compliance |
|---|---|---|---|---|---|---|---|
| Seen April 1 and May 1 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 100% |
| Seen April 1 and May 14 | ✓ | ✓ | ✓ | ✓ | X | X | 66% |

According to CDCR, this methodology is the best way to have a single number that includes
both whether an appointment was late and how late the appointment was.  Using example
two from above, if the patient was not seen on May 14, but was instead seen on May 21, this
would further decrease compliance from 66% to 57%.  In essence, the later the appointment,
the lower the compliance number.  Simply measuring whether the appointment occurred by
the deadline would result in either 100% compliance or 0% compliance regardless of how
late the second appointment was.

One alternative to the "patient-weeks" methodology would be to measure whether the
appointment occurs by the deadline.  If the appointment occurred by the deadline, it would
be 100% compliant.  If it did not, it would be 0% compliant.  For example, if a patient had 12
appointments during the year, 9 of which occurred before the deadline and 3 of which did
not, CDCR's compliance rate for that patient would be 75% for the year.  According to
CDCR, this methodology is inferior because it does not tell the viewer *how* late an
appointment is; it only tells the viewer whether the appointment *was* late.  To determine the

---

[15] Because of these weekly compliance checks, if a patient is due for an appointment on a Monday but is not
seen until Friday, rendering that appointment four days late, CDCR would still report that week as
compliant because the appointment occurred within that week.  But if a patient is due for an appointment
on a Friday but is not seen until the following Monday, rendering the appointment only three days late, the
intervening Sunday check would deem the entire week (seven days) noncompliant.  With a large enough
data set, Dr. Leidner reported this over-compliance and under-compliance cancels out.  It is unclear,
however, how large a data set must be for this cancelling to occur.

April 22, 2019
Page 18

amount of lateness, a separate figure is needed (*e.g.*, the average days late for those appointments that were untimely).  Additionally, CDCR asserts that this methodology fails to account for multiple appointments occurring within a short period of time, thereby increasing compliance ("clumping"), or for the fact that an appointment that is only slightly late would result in 0% compliance ("insensitivity").

We performed an analysis of all routine appointments that occurred across CDCR between January 1 and September 30, 2018, and compared the compliance rates for these two methodologies.[16]  For CCCMS patients, the patient-weeks methodology yielded a 97.9% compliance rate, while the on-time appointments methodology yielded an 85.7% compliance rate, representing a difference of 12.2%.[17]  For EOP patients, the patient-weeks methodology yielded a 90.9% compliance rate, while the on-time appointments methodology yielded a 67.2% compliance rate, representing a 23.7% difference.[18]

### 4.   Continuous Quality Improvement ("CQI") Development

In response to a Court order in August 2012, and under the guidance of the Special Master, CDCR began developing Continuous Quality Improvement ("CQI") processes to review the applicable policies, guidelines, and regulations to develop indicators and measurement tools. *See* ECF No. 4232.  The Special Master explained that the goal of the CQI process was to enable CDCR to rely on the data produced to expand its self-monitoring role, while contracting the monitoring role of the Special Master.  The Special Master stated that the CQI process and related reports are extremely meaningful to the case because, if effective, they could ultimately result in CDCR ending the litigation.

In July 2015, CDCR provided a presentation and related CQI Report Writing Outline to Plaintiffs' counsel and the Special Master on the CQI process.  *See* CDCR0009503; *see also* ECF No. 6012-2 at 8 (Ceballos Decl. at Ex. 1).  The CQI Report Writing Outline was

---

[16]   We noticed an error in the data CDCR provided to us for this period that resulted in CDCR marking as fully compliant under the patient-weeks methodology 1,965 (3.16%) of CCCMS appointments that occurred and 756 (1.47%) of EOP appointments that occurred even though they occurred well past the applicable deadline.  Although the cause of this error was unclear, it was not due to the inherent buffer caused by CDCR's weekly compliance checks, because all of these appointments occurred more than seven days after they were due.

[17]   These figures are rounded to the nearest tenth.

[18]   Our comparison does not include appointments that, although scheduled, did not ultimately occur.  In these circumstances, CDCR still reports compliance for the weeks these patients remained subject to the routine contacts requirements.  For example, if an EOP patient was released from CDCR three weeks after their last appointment, CDCR would report three weeks of compliant patient-weeks.  Similarly, if an EOP patient was released from CDCR six weeks after their last appointment, CDCR would report four weeks of compliant patient-weeks and two weeks of noncompliant patient-weeks.  Taking this into account, the patient-weeks compliance rate for CCCMS is 98.1% while EOP is 92.0%—increases of 0.2% and 1.1% respectively.

April 22, 2019
Page 19

subsequently modified and developed into a Report Writing Guidebook.  *See, e.g.*,
CDCR0012127 (June 20, 2018 revision).  Some of the data referenced in the CQI process
overlaps with data included in the Performance Report, including from the performance
indicators "Timely Psychiatry Contacts," "Appointments Seen as Scheduled," and "Timely
MH Referrals."  *See, e.g.*, CDCR0012146-47.  CDCR conducted its first round of CQI tours
for ten CDCR institutions in 2016.  CDCR generally led the tours, with the Special Master
monitoring their process.  In the course of this process, CDCR would first produce data, then
it would conduct on-site tours, and then it would draft a report of the findings at each
institution.  CDCR conducted a second round of CQI tours in 2018, and had submitted data
to the Special Master but not yet submitted the CQI reports before the Golding Report was
released in October 2018.

**E.      The 2009 Staffing Plan and CDCR's Staffing Proposal**

On June 12, 2002, the Court ordered that Defendants "maintain the vacancy rate among
psychiatrists and case managers at a maximum of ten percent" (ECF No. 1383 at 2), and on
September 30, 2009, CDCR submitted a 30-page comprehensive mental health staffing plan,
which the Special Master subsequently approved (the "2009 Staffing Plan").  *See* ECF No.
3693.

As relevant here, on March 30, 2017, Defendants filed a response to the Special Master's
Report on the Status of Mental Health Staffing and the Implementation of Defendants'
Staffing Plan.  ECF No. 5591.  Relying in part on Performance Report data, the response
asserted that CDCR was providing adequate mental health care to *Coleman* class members
despite psychiatry vacancies.  *See id.* at 13-14 (citing Tebrock Decl., ECF No. 5591-2).  On
March 14, 2017, Dr. Golding emailed Deputy Tebrock stating that "[t]he picture that we are
presenting the court about psychiatry staffing may be a bit incomplete," and listing various
concerns, including with the "patient-weeks" methodology and other topics.
GOLDING00577.  Deputy Tebrock responded that "[a]uditing and counting rules we
developed and approved by the court so there is no misrepresentation of the facts."  *Id.*

On October 10, 2017, the Court ordered that within one year CDCR "take all steps necessary
to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the
maximum ten percent vacancy rate required by the court's June 13, 2002 order."  ECF No.
5711 at 30.  On February 15, 2018, the Court asked the parties to consider whether there
were "any adjustments to the psychiatrist staffing ratios that could be made to alleviate the
psychiatrist staffing shortages without compromising the constitutionally required access to
adequate mental health care."  ECF No. 5786 at 4.  From March through October 2018, the
parties met regularly regarding a proposed revision to the 2009 Staffing Plan during the All-
Parties Workgroup Meetings.

On May 17, 2018, CDCR presented a proposed revision to Plaintiffs and the Special Master,
which was subsequently filed with the Court on June 21, 2018 as an attachment to the

April 22, 2019
Page 20

Parties' Joint Status Report.  ECF No. 5841-2.  The May 2018 Staffing Proposal (the "Staffing Proposal") cited excerpts of data compiled by Ms. Angela Ponciano, the Associate Director of Statewide Mental Health Program.  *See, e.g.*, ECF No. 5841-2 at 31. Ms. Ponciano led CDCR's efforts to develop the Staffing Proposal, based on her knowledge that certain methodologies and assumptions underlying the 2009 Staffing Plan needed to be updated.  All proposals were routed through CDCR Mental Health Leadership, including Deputy Tebrock.

There is some dispute over the extent to which psychiatry leadership was involved in developing or endorsing CDCR's Staffing Proposal.  Ms. Ponciano and Deputy Tebrock reported that Dr. Golding and Dr. Kevin Kuich were involved throughout the process. Ponciano Tr. at 30:14-17; Tebrock Tr. at 48:18-49:23.  Conversely, Dr. Golding stated that psychiatry was not involved in developing the Staffing Proposal, and that although Deputy Tebrock and Assistant Deputy Brizendine asked him to sign documents in support of it, he never provided a copy of the Staffing Proposal before it was submitted.  *See* GOLDING00237.  In an email to Dr. Kuich after meeting with Deputy Tebrock in May 2018, Dr. Golding states, "CDCR has been using the data that I was challenging to argue that there is adequate psychiatric staffing, because psychiatric appointments are on time."  *Id.* at GOLDING00241.

In August 2018, Plaintiffs agreed to CDCR's Staffing Proposal, subject to certain revisions and close monitoring.  The Special Master told us that when evaluating the Staffing Proposal, the most compelling reasons for reducing the number of psychiatrists were factors other than representations about the psychiatric contact time frames or frequency, such as the decrease in the patient population after implementation of the 2009 Staffing Plan, or that some full time equivalent ("FTE") positions allocated under the Plan were intended for functions that had never ultimately been implemented.  CDCR submitted two additional proposed revisions on August 24, 2018 and September 17, 2018.  *See generally* CDCR001408; ECF No. 5922 at 13.  Dr. Golding submitted the Golding Report on October 3, 2018—just days prior to the Court's deadline for CDCR to comply with the 2009 Staffing Plan.  After the Golding Report was submitted, discussions related to CDCR's Staffing Proposal were put on hold.

**F.    Witnesses' General Perspectives**

Our investigation was limited to information relevant to the seven issues we were tasked with investigating.[19]  Nonetheless, both the parties and witnesses provided us with additional perspectives, including general and background information that informed our general understanding and analysis of the issues.

---

[19]   We also spoke to current and former members of CDCR's psychiatry team who raised other issues relating to alleged fraud or wrongdoing more generally.  While these witnesses appeared credible, we did not investigate the veracity of their claims given that they dealt with historical conduct outside the scope of our seven issues.

April 22, 2019
Page 21

1.      **CDCR's Increasing Reliance on Data to Manage the Statewide Mental Health Delivery System**

In part due to the Court's August 2012 order (ECF No. 4232, discussed *supra* at § D.4), CDCR Mental Health has been moving towards an increased self-monitoring role. A necessary component of that movement has been developing CDCR Mental Health's data management systems:  both in terms of how mental health data is inputted and recorded in the EHRS, and how that data is then translated into meaningful measurements in the form of performance indicators.

As noted above, with regards to the development of EHRS, although there were established data systems that could be adopted and deployed for conventional medical care, there was a lack of similar preexisting models for mental health care at the scale required by CDCR Mental Health.  Therefore, CDCR's Mental Health QM team was largely responsible for developing and customizing their own Cerner-based EHRS system in-house, and the system continues to be developed.  With the statewide rollout of EHRS completed in 2017, CDCR had significantly increased access to large volumes of patient data.

Similarly, CDCR's Performance Report and related indicators, although in existence prior to the adoption of EHRS, continue to be regularly assessed, developed, and modified.  Despite their design as primarily internal CDCR self-management tools, CDCR has increasingly used these tools to report its performance externally, including for the CQI process (discussed *supra* at § D.4), CDCR's Staffing Proposal (discussed *supra* at § E), and for Administrative Segregation Unit ("ASU") EOP Hub certifications.

The increased use of data-driven management has resulted in an accompanying increase in the need for decisions on what is measured, how it is measured, how it is reported, and how it should be used.  There has been a corresponding increase in disagreements and misunderstandings about each of these decisions.  In addition, while the management of CDCR is becoming more data-driven, not all stakeholders are equally "data-literate," that is, are fully familiar with how to understand, interpret, and use the data CDCR produces in a meaningful way, both within CDCR and externally.

a.      **Internal Access and Change Requests to CDCR Mental Health's Systems**

CDCR Mental Health Leadership expressed concern with permitting broad access to CDCR's data systems for various reasons, including to minimize demands on the systems, avoid duplication, protect data integrity, and ensure there is a consistent understanding of the data.  CDCR Mental Health does not yet have a written policy on data governance, but we were informed that most CDCR Mental Health staff who want to obtain data that is not already included on the Performance Report or other On-Demand reports, including Dr. Golding, must submit a solution center ticket which is then prioritized by CDCR Mental

April 22, 2019
Page 22

Health Leadership. CDCR headquarters psychiatrists we interviewed, including Dr. Golding, generally reported that it can be extremely difficult for psychiatrists' requested changes to be approved because psychiatrists hold a minority vote within headquarters committees, including the Mental Health Change Management[20] and the Mental Health QM Committees.[21]

Dr. Golding was aware of the importance that functioning and useful data systems and reporting mechanisms serve in providing psychiatric care to patients, and served as the mouthpiece for escalating many psychiatry-related concerns from psychiatry leaders at the institution level to CDCR Mental Health Leadership. Dr. Golding was not a data expert, however, and as discussed in further detail below, there were communication difficulties between CDCR Mental Health Leadership and Dr. Golding that may have affected their responsiveness to these concerns.

> **b.    The Special Master's Role and CDCR's Data Systems**

Dr. Ceballos and Dr. Leidner noted that there can be inherent difficulty in translating the sometimes vague policy language from the Program Guide requirements into concrete and measurable performance metrics. Dr. Ceballos acknowledged that a lot of the issues raised in this investigation concern the method in which CDCR Mental Health translated these Program Guide requirements into "computer speak," but that it did not occur to her or the Special Master to discuss those nuances while they were being developed. *See* Ceballos Tr. at 20:10-22:4. Instead, she stated the Special Master's focus was on "the questions associated with the chart audits and the on-site audits."[22] *Id.* at 20:18-22.

The Special Master generally confirmed that his focus had been on on-site audits, and he had not previously been extensively involved in the nuances of CDCR Mental Health's development of the performance indicators. Instead, he had generally trusted CDCR Mental

---

[20]  The Mental Health Change Management Committee was implemented in 2018 to evaluate and prioritize the submitted requests before they proceed to an interdisciplinary committee. Before its implementation, change requests would be directly submitted to the interdisciplinary committee.

[21]  In addition, there is a disconnect between what some psychiatrists say they need and what the CDCR Mental Health data provides with respect to prescriptions and medication administration. Data on medication administration is tracked in the general CCHCS health care data system run by Deputy Annette Lambert, not through the CDCR Mental Health systems run by CDCR's Mental Health QM team, which is led by psychologists (Dr. Ceballos, Dr. Rekart, and Dr. Leidner) rather than psychiatrists or medical doctors. Psychiatrists expressed some frustration with this divide and the effect it has on psychiatrists' ability to provide patient care.

[22]  Unlike Dr. Ceballos, Dr. Leidner did not regularly interact with the Special Master or members of his team directly, and instead would escalate these types of questions to Dr. Ceballos or other CDCR Mental Health Leadership. *See* Leidner Tr. at 20:5-9 ("I've always presumed that up at leadership, they make a decision somehow about what needs to go on to the special master and what doesn't, as well as all sorts of other considerations that I'm not privy to and I don't need to know.").

April 22, 2019
Page 23

Health's QM team to put together the indicators in a way that enabled accurate self-monitoring of their performance. Nonetheless, the Special Master stated that his expectation was that CDCR's self-monitoring tools would follow the Program Guide requirements, and that if CDCR was unclear on the interpretation of the relevant Program Guide provisions they were expected to either directly contact the Special Master or raise it during one of the numerous work groups or policy meetings. The Special Master acknowledged that in light of CDCR's increasing reliance on data to monitor compliance with Program Guide requirements—particularly for purposes of the CQI reports—he planned to explore hiring a specialist to do a more thorough review of CDCR's performance indicators and other compliance metrics.

## 2. Conflicts Between Psychiatry and CDCR Mental Health Leadership

Dr. Golding feels strongly that psychiatry is under-represented in the leadership structure of CDCR Mental Health, and that psychologists do not fully appreciate or accommodate the needs of psychiatry. Many of the psychiatrists we interviewed echoed Dr. Golding's concerns with CDCR Mental Health's reporting structure, and that psychiatry viewpoints and concerns were often ignored or marginalized, with negative impacts on patient care. A number of witnesses also described a widespread perception that disagreement with CDCR leadership could result in retaliation, thus possibly contributing to an underreporting of psychiatry-related concerns to CDCR non-psychiatry leadership.[23]

Psychiatrists we spoke with generally reported that psychiatry was not involved in decision-making related to how psychiatry performance would be measured or reported. Many psychiatrists were unaware of or confused by how performance metrics are calculated (particularly as relates to the "patient-weeks" measure, discussed *supra* at § D.3), and some reported that they did not think that data reported on the Performance Report was an accurate depiction of their performance.[24] Two psychiatrists at headquarters reported that they had inquired into the methodology underlying the "Timely Psychiatry Contacts" indicator around April 2018, and that Dr. Leidner had said during a webinar that the psychiatry methodologies had been developed so that CDCR could "err on the side of over-reporting compliance," or words to that effect. *See also* GOLDING00226 (April 27, 2018 email from the two psychiatrists to Dr. Golding describing the statement). Dr. Leidner did not recall specifically what he said during that webinar, but stated that he had never told anyone that CDCR should choose the methodology that results in CDCR showing better compliance. Whatever the nature of Dr. Leidner's statement during the webinar, it seemed to influence the perception of

---

[23] We did not delve in depth into the validity of any individual concerns raised.

[24] In addition to concerns about the methodology underlying CDCR Mental Health data, some psychiatrists also reported feeling pressured by institutional leadership to keep performance indicators green or to meet certification thresholds, and described institution-specific practices or specific instances where data was allegedly recorded in an improper manner to inflate compliance metrics.

April 22, 2019
Page 24

these two psychiatrists and Dr. Golding regarding the nature and intent of the performance indicators.[25]

Many witnesses reported that CDCR Mental Health operates under a rigid hierarchical structure and that staff are expected to follow the "chain of command" when escalating concerns.  According to our interviews of psychiatrists at institutions, their concerns generally must be routed through the Chief of Mental Health—a position held almost exclusively by a non-psychiatrist.  Psychiatrist leaders at institutions reported that at times they would escalate concerns directly to Dr. Golding, and that he in turn could elevate them to CDCR Mental Health Leadership.  Based on our interviews of 15 current and former CDCR psychiatrists, both in the field and at headquarters, Dr. Golding is generally held in high regard among psychiatrists.

Some of CDCR Mental Health Leadership, however, felt that Dr. Golding was demanding and unwilling or unable to work effectively through the institutional and bureaucratic processes to get things accomplished.  Over time, the relationship between Dr. Golding and CDCR Mental Health Leadership had become somewhat confrontational and distrustful, hindering collaborative efforts to address issues.  Our investigation revealed that some in CDCR Mental Health Leadership appeared to avoid engaging with Dr. Golding where possible.  In addition, they felt that Dr. Golding did not present his concerns in the form of a tangible request that could be addressed.  At the same time, Dr. Golding became increasingly frustrated with what he interpreted as a dismissal of his and other psychiatrists' concerns about the accuracy of CDCR's data.  This lack of trust and communication, and mounting frustration by Dr. Golding at what he saw as obstacles to the effective delivery of psychiatric care, set the stage for the submission of his report in October 2018.

---

[25] This perception does not appear entirely unique to psychiatrists:  two non-psychiatrist witnesses we spoke to also reported a general impression that CDCR Mental Health engages in improper practices to meet performance objectives.

April 22, 2019
Page 25

## V.  Findings and Recommendations

In its order appointing the neutral expert, the Court identified seven issues, culled from the Golding Report, for the neutral expert's investigation.  ECF No. 6064 at 2-3.  Each issue is discussed below in turn.

## A.  "Resetting the Clock" Upon Patient Transfer

The Court directed us to investigate whether CDCR committed fraud or intentionally provided false or misleading information to the Court or Special Master by "[l]engthening the intervals between psychiatric appointments beyond court-mandated timelines for inmate-patients at the Correctional Clinical Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) levels of care who are transferred to new institutions by resetting the clock for such appointments from the time of transfer rather than from the last completed appointment, rescheduling such appointments at the maximum time allowed in the Program Guide, and reporting compliance with Program Guide requirements using the reset timelines."  ECF No. 6064 at 2.

The Program Guide does not expressly address if or how timelines for psychiatry evaluations apply to CCCMS or EOP patients who transfer between institutions.  Dr. Golding's interpretation of the Program Guide is that its silence means that there should be no interruption to the compliance time frame associated with the existing appointment schedule at the prior institution.  In his view, data reported under the "Timely Psychiatry Contacts" indicator is inflated because by "resetting the clock" upon transfer, CDCR does not report transferred patients' psychiatry appointments as "untimely" until later than they would be if timeliness were measured from the patient's last psychiatric appointment at the prior institution.  CDCR does not dispute that it "resets" timelines for psychiatry evaluations when a patient transfers institutions, and reports compliance from the date of the patient's arrival at the new institution.  CDCR contends that its practice is consistent with the Program Guide and with other provisions in the Program Guide that impose new timelines for other post-transfer events (such as the Primary Clinician intake evaluation).

We find that CDCR's practice of "resetting the clock" upon transfer does not conflict with the Program Guide, and so does not result in the reporting of false or misleading data.  Given that a transferring patient is transitioning to a new care team, it is not illogical for CDCR to initiate a new schedule under the auspices of that inmate's new mental health providers.  Moreover, the Special Master was aware of CDCR's long-standing practice to subject transferring inmates to new "initial" timelines upon arrival at new institutions.  Because this practice is not misleading, we also find that there was no intent to mislead the Court or Special Master.  Nonetheless, the issue raised by Dr. Golding implicates an important continuity of care concern that is clinically important to psychiatrists and the Special Master, relating to what time frame is applied to a transferred patient's initial psychiatry evaluation once the clock is "reset."  Accordingly, we recommend that the Court consider directing the

April 22, 2019
Page 26

parties and the Special Master to meet and confer in order to clarify the proper time frame under the Program Guide for an initial psychiatric evaluation for transferred patients.

### 1.   Perspectives of the Whistleblowers and Parties

#### a.   Dr. Michael Golding

In Dr. Golding's view, transferred patients should only be counted as compliant with Program Guide timeliness metrics if they are seen by a psychiatrist at the receiving institution before the date ordered by their psychiatrist at the prior institution, or at most within the maximum Program Guide interval since their last psychiatric appointment. *See generally* ECF No. 5990-4 at 14-16. Since CDCR restarts a transferring patient's time frame within which he must have a psychiatric evaluation under the Program Guide, Dr. Golding believes that the compliance data for "Timely Psychiatry Contacts" is overstated. *See generally id.* at 22-23. Dr. Golding alleges he raised his concerns about the practice of "resetting the clock" with CDCR Mental Health Leadership around April or May 2018, and again in a Mental Health Subcommittee/QM meeting in June 2018.

A closely related concern is that, although the Program Guide requires that a newly arriving patient be scheduled for an initial Interdisciplinary Treatment Team meeting ("IDTT") within 14 working days of arrival for CCCMS patients and 14 calendar days of arrival for EOP patients (Program Guide ("PG") at 12-3-10, 12-4-7), because deadlines for routine psychiatric appointments are reset, an individual psychiatric evaluation may not occur for many weeks after the transfer, undermining the psychiatric value of the required IDTT meeting. Dr. Golding alleges that Dr. Jeff Metzner, an expert on the Special Master's team, previously told CDCR that patients must have a psychiatric evaluation prior to their initial IDTT, and that Dr. Ceballos was aware of this as early as 2016. Dr. Golding alleges that the headquarters psychiatry team attempted to initiate a change in policy through a Mental Health Subcommittee/QM meeting in June 2018 to address the issue, but that the non-psychiatrists on the committee voted down his proposal.[26]

#### b.   Dr. Melanie Gonzalez

Like Dr. Golding, Dr. Gonzalez understands the Program Guide time frames for psychiatry appointments to be tethered to the patient, rather than the institution, and that therefore they should continue when the patient transfers institutions. She told us that CDCR's usual

---

[26]   Dr. Golding reported he voted in favor of continuing the timelines from the prior institution, and all three psychiatrists present (Dr. Kuich, Dr. Adams, and himself) attempted to vote that a patient should be seen by a psychiatrist within 14 days of transfer, but everyone else present voted against both of those proposals, including Dr. Ceballos, Assistant Deputy Brizendine, Ms. Ponciano, and Dr. Rekart, among others. See generally GOLDING0041-GOLDING0043. Dr. Golding states that after the vote, he asked the group whether Dr. Metzner would agree with CDCR's method of tracking compliance for initial psychiatry evaluations, and "[t]he group laughed and said, 'No'." GOLDING0045.

April 22, 2019
Page 27

practice is that upon arrival, the primary clinician will schedule transferred patients on psychiatric medications for an initial psychiatry evaluation at the *maximum routine* Program Guide time frame:  within 30 days of arrival for EOP patients and 90 days for CCCMS, without reference to the psychiatrist's orders at the previous institution.  These appointments would then be counted as "timely" under CDCR's business rules, because they would occur within 30 days from arrival for transferred EOP patients and 90 days for CCCMS patients.

> c.   **CDCR's Response**

CDCR does not dispute that its compliance measures for timeliness of psychiatric appointments of patients transferred to new institutions are based on the date of arrival at the new institution and the clock is therefore "reset" by transfer.  *See generally* ECF 6012 at 9-10.  CDCR "considers transferred patients to have exited their existing recurring appointment cycle and entered a new intake process," and therefore a patient's transfer "discontinues prior orders for routine psychiatric appointments" from the prior institution.  *Id.* at 10.  CDCR states that because the Program Guide "is silent as to a specific time frame for initial psychiatry contacts," it instead uses the Program Guide time frames for routine contacts when measuring timeliness of initial psychiatry appointments (currently 30 days for EOP patients and 90 days for CCCMS patients), measured from date of arrival at the new institution.  *Id.*

CDCR states that it has been transparent with the Special Master about its methodology for measuring initial psychiatry contacts by providing the Special Master with copies of the methodology for its "Initial Psychiatry Contacts" performance indicator during the 27th monitoring round, which stated a "[p]sychiatry contact is required at current institution *within 30 calendar days after last arrival*, program start or mhi."  *Id.* at 11 (citing Ceballos Decl. ¶ 10, Ex. 3).[27]

Further, CDCR alleges that this practice is unlikely to have a material impact on "Timely Psychiatry Contacts" compliance figures because "only a small percentage of inmates transfer in any given period and thus initial contacts that occur after transfer make up only a small portion of all psychiatry contacts in the indicator."  *Id.* at 11 (citing Leidner Decl. ¶ 23).  Specifically, Dr. Leidner states that he performed an analysis of transferred patients between August 1, 2017 and August 1, 2018 and found that on average each month, 1% of CCCMS patients on psychiatrist-prescribed medications went more than 90 days without being seen by a psychiatrist during a transfer, and 3% of EOP patients on psychiatrist-prescribed medications went more than 30 days without being seen by a psychiatrist during transfer.[28]  ECF No. 6012-3 at 7 (Leidner Decl. ¶¶ 23-24).

---

[27]   We confirmed this definition was provided to the Special Master in the 27th Round data.

[28]   Dr. Leidner later made minor revisions to his analysis, which did not materially affect these overall percentages.  *See* CDCR0022254.

April 22, 2019
Page 28

### d.    The Special Master's Perspective

The Special Master tends to agree with CDCR that upon transfer, a patient enters a new intake process, and the time frames for routine psychiatric appointments at the prior institution would not follow. The Special Master also confirmed that he was aware that CDCR reset the clock upon arrival at a new institution.

The Special Master disagrees, however, with CDCR on the proper time frame for the initial psychiatric evaluation at a new institution. In the Special Master's view, the purpose of the IDTT as described in the Program Guide is to modify or develop a treatment plan and review whether the patient is at the appropriate level of care, and that neither could be effectively done without an initial psychiatry evaluation having been completed before the IDTT. Further, the Program Guide requires the IDTT to occur at the end of an "evaluation process" (PG at 12-4-7), and it is impossible to do an evaluation of an EOP patient without including the psychiatrist. Accordingly, the Special Master has consistently monitored whether a psychiatrist evaluated the inmate prior to the initial IDTT, and in the Special Master's view it would be misleading to count initial psychiatry evaluations that occur after the IDTT as compliant. The Special Master stated that this understanding was repeatedly expressed to CDCR Mental Health Leadership, and that based on those discussions the CQI process requires CDCR to monitor whether the initial psychiatry evaluation has taken place prior to the initial IDTT. *See* CDCR0012066 (July 2, 2018 CQI On-Site Writing Guidebook developed by CDCR and the Special Master includes an audit question and states that "[t]he psychiatrist must complete an initial evaluation . . . prior to the IDTT").

### 2.    Summary of the Evidence

### a.    Program Guide Provisions

As discussed above, the Program Guide requires that "[e]ach CCCMS inmate-patient on psychiatric medication shall be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues" and "[a] psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues." PG at 12-3-11; 12-4-9. In addition, the Program Guide contains provisions for certain intake requirements for patients upon "referral/arrival," including:

> For CCCMS patients: a clinical intake assessment by the Primary Clinician within ten working days, and completion of an individualized treatment plan by the Primary Clinician "based on current assessments from all disciplines" and "in consultation with the other IDTT members" (including the patient's assigned psychiatrist) within 14 working days. PG at 12-3-8–12-3-10.

> For EOP patients: an initial clinical assessment by the Primary Clinician within 14 calendar days, and an IDTT review, interview, and determination "[a]t the conclusion

April 22, 2019
Page 29

>of the evaluation process and within 14 calendar days from arrival at the EOP."  PG
>at 12-4-7.

The Program Guide does not expressly address whether and how transfer of an existing
patient to a new institution affects the time frame for psychiatric evaluations.  It is undisputed
that although the patient's assigned psychiatrist must participate in the initial IDTT, the
IDTT itself does not count as a psychiatry evaluation—either for initial or routine
compliance.

The relevant Program Guide provisions for timeliness have not changed since the 2009
Program Guide was implemented.  Therefore, the same timeliness guidelines for CCCMS
and EOP patients were in place prior to implementation of the EHRS in 2017 and MHTS.net
in 2010.  *See supra* at § IV.D.1.  EHRS was the first system that directly integrated medical
records across institutions; the prior MHTS.net system was institution-based.  At the time the
Program Guide was compiled in 2009, CDCR was, logically, applying the relevant Program
Guide timelines institution by institution, and "resetting the clock" upon transfer would not
have appeared anomalous.[29]

### b.        Representations to the Special Master and/or Court

It is undisputed that CDCR reports data from its "Timely Psychiatry Contacts" performance
indicator to the Special Master in connection with the Special Master's monitoring role,
including:

- Data reported in connection with the Special Master's monitoring rounds, including
  in response to tabs N(6)(f) and O(1)(b) during the 27th round.  *See* 6012-2 at 107, 109
  (27th round document request requesting data related to compliance with EOP and
  CCCMS "Timeliness of psychiatrist contacts").

- CQI reports and related data.  *See, e.g.*, CDCR0010054 (draft 2016 SVSP CQI
  Report, reporting timely psychiatry contacts of 91% for mainline ("ML") CCCMS
  and 76% for ML EOP).

- ASU EOP HUB Certifications.  *See, e.g.*, CDCR0012381 (certifying "Timely
  Psychiatry Contacts is 99%" at RJD in September 2018).

---

[29]   One institution's Chief of Mental Health reported to us, however, that [s]he understood that transferred
patients' timelines continued prior to implementation of EHRS.

April 22, 2019
Page 30

Further, data from the indicator has been included in filings with the Court, including, as relevant here:

- Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan.  ECF No. 5591 at 14 ("Over the past year, inmates were seen timely . . . by their psychiatrist ninety percent of the time."); *see also* Tebrock Decl., ECF No. 5591-2 ¶ 10.

- Defendants' May 17, 2018 Staffing Proposal.  ECF No. 5841-2 at 31 (referencing 91% compliance for initial timely psychiatry contacts for ML CCCMS, and 94% compliance for routine).

- Defendants' August 24, 2018 Staffing Proposal.  ECF No. 5922 at 21 ("Between May 1, 2017 and April 30, 2018 . . . [HDSP was at] 99 percent compliance for timely psychiatry contacts[.]").

    **c. CDCR Mental Health Leadership Witnesses**

CDCR witnesses confirmed that CDCR currently "resets the clock" upon patient transfer based on their interpretation that transferred patients should be treated as new patients under the Program Guide.  *E.g.*, Ceballos Tr. at 80:3-13; Tebrock Tr. at 90:1-5.  In their view, treating transferred patients as new patients is logical and clinically appropriate, since the patients are commencing a new mental health care regime, with new providers, at the new institution.  *See, e.g.*, Ceballos Tr. at 85:19-86:3.  They also pointed to the various intake mechanisms and the IDTT process to ensure effective continuity of care.  *E.g.*, Tebrock Tr. at 93:11-23.

CDCR witnesses asserted that there is no current requirement that a transferred patient undergo an initial psychiatry evaluation prior to the IDTT.  Tebrock Tr. at 85:23-86:4; Ceballos Tr. at 87:9-10.  Dr. Ceballos stated that during development of CQI, Dr. Metzner had acknowledged the Program Guide did not mandate a psychiatry evaluation before the IDTT, but that she had agreed to include a question on it in the "IDTT on-site audit" because both she and Dr. Metzner acknowledged that it was good clinical practice.  Ceballos Tr. at 80:17-81:2; *see also, e.g.*, CDCR0001562 (CVSP CQI Report submitted to the Special Master referencing 100% compliance with "IDTTS in which Psychiatry Intake Evals were Completed Prior").  Dr. Ceballos stated that after the IDTT audit question was added, the topic was then not discussed "for years," until Dr. Metzner raised the issue during a recent on-site CQI visit with another staff member and "was insistent" that the initial psychiatry evaluation has to occur before the IDTT "as a matter of practice."  Ceballos Tr. at 90:4-6; *see also* CDCR0016915 (September 28, 2018 email stating that after being told during a CQI visit that the psychiatrist "had 30 days to complete their initial assessment," Dr. Metzner had stated that the psychiatrist's assessment "should be available prior to the initial IDTT").

April 22, 2019
Page 31

Dr. Ceballos stated that it was possible Dr. Metzner had not recalled that they had agreed it was not required by the Program Guide.  *Id.* at 89:18-90:14.

Many witnesses, including Deputy Tebrock and Dr. Ceballos, reported that from their perspective, the initial psychiatry evaluation *should* occur before the initial IDTT, and noted that CDCR has been moving towards modifying its existing practices to require a transferred patient's initial psychiatry evaluation to occur within 14 days of arrival.  *See* Tebrock Tr. at 86:4-10; Ceballos Tr. at 88:16-17; Rekart Tr. at 60:4-8.  The witnesses generally stated that the proposed change could not be approved at the June 2018 QM meeting when Dr. Golding and Dr. Kuich initially raised it because it would implicate a policy change, and needed to be routed through the administration for approval instead.  *See* Tebrock Tr. at 87:25-88:8; Ceballos Tr. at 78:10-79:6; Brizendine Tr. at 24:1-24.

### d.    Additional Witnesses

CDCR Psychiatrists that we interviewed generally stated that when transferred patients arrive at a new institution, the Primary Clinician will place an order for an initial psychiatry evaluation for patients on psychiatric medication within the maximum routine Program Guide time frames:  30 days for EOP patients and 90 days for CCCMS.  Some psychiatrists expressed clinical concerns about the effect "resetting the clock" can have on patient care, particularly when it results in the patient not being seen within the time frame ordered by the psychiatrist at the prior institution for clinical reasons, such as recently removing a patient from medications.  Although psychiatrists are required to participate in the initial IDTT within 14 days of arrival, some reported that the psychiatrist's role in the initial IDTT can often be fairly perfunctory:  the psychiatrist participating in the IDTT may not be the patient's assigned or treating psychiatrist, and will rarely have time to review the patient's records from the prior institution, so their role may be limited to essentially reading from a script to confirm the medications the patient is currently prescribed.  Dr. Kuich's recollection of the QM meeting described by Dr. Golding around June 2018 largely conformed with Dr. Golding's.

Deputy Lambert oversees QM for CCHCS (medical care, not mental health), and reported that CDCR Mental Health performance metrics are generally developed and maintained independently by the CDCR Mental Health QM team, so they often differ from CCHCS.  Lambert Tr. at 44:8-23.  For example, for most timeliness metrics, CCHCS medical will use the *sooner* time frame between a physician's order and the maximum policy time frame in calculating timeliness compliance.[30]  *See* Lambert Tr. at 56:20–58:15.

---

[30]  Deputy Lambert used Chronic Care time frames as an example.  We note that on the CCHCS Dashboard the Chronic Care compliance metrics are labeled "Chronic Care *as ordered*" whereas the Mental Health compliance metrics are referred to as "Contact Timeframes."  *See, e.g.*, https://cchcs.ca.gov/wp-content/uploads/sites/60/QM/Public-Dashboard-2019-01.pdf (emphasis added).

April 22, 2019
Page 32

e.        **Documents**

CDCR identified 32 business rules applicable to CDCR's "Timely Psychiatry Contacts" indicator.  *See* January 9, 2019 Production Letter.  The business rules applicable to mainline CCCMS patients and EOP patients on psychiatric medications,[31] CDCR measures compliance for initial psychiatry appointments for transferred patients by measuring from the date of arrival at the new institution, regardless of when the patient was last seen by a psychiatrist at their previous institution.  These business rules further confirm that CDCR "resets the clock" at transfer.

Email correspondence from May 2018 confirms Dr. Golding alerted CDCR to his concerns regarding "resetting the clock" for transferred patients, and that Dr. Ceballos confirmed that the business "rules DO restart the 'clock' for transfers" and also explained CDCR's interpretation of the relevant Program Guide provisions.  CDCR0006684-85 (May 10, 2018, email from Dr. Ceballos to Dr. Golding, Dr. Kuich, Assistant Deputy Brizendine, and Ms. Ponciano, copying Dr. Rekart, and Deputy Tebrock).  Dr. Golding also communicated with Deputy Tebrock in July 2018 about his concerns related to the practice of "resetting the clock" at transfer and the prospect that transferred inmates could go for long periods of time without being seen by a psychiatrist.  CDCR0020420.

Email communications from 2015 and 2016 appear to reflect that Dr. Ceballos understood that the Special Master expected initial psychiatry evaluations to occur prior to the initial IDTT.  *See* GOLDING00495.  Meeting minutes drafted by Dr. Ceballos after the June 28, 2018 Mental Health QM Committee meeting reflect the result of the vote held on whether to change CDCR's policies for when a psychiatry contact should be required for transferred CCCMS patients:

---

[31]  As discussed in further detail below, mainline EOP patients not on psychiatric medications or not at an EOP institution (*i.e.*, in EOP overflow) are not covered by the business rules, and therefore not included in compliance metrics.  *See infra* at § VI.

GIBSON DUNN

April 22, 2019
Page 33

---

**Committee Vote: Rules change for 90 day CCCMS Routine Psychiatry Contacts Discussion – Dr. Laura Ceballos**

Dr. David Sirkin has requested a change to the current transfer workflow and policy. Currently, if someone transfers, their CCCMS contact resets as the Program Guide is written on a referral based system. Dr. Sirkin would like to amend the policy so that it require a Psychiatry contact within the 90 days timeframe. The issue with that is there is not a Psychiatry contact requirement in the Program Guide for CCCMS and we would be asking Psychiatrists to do more work. The three options Dr. Ceballos would like the committee to vote on are: conduct a contact within 90 days regardless of institution movement, create a 14 day intake, or leave as is. The pro to having contact within 90 days regardless of movement is patients will get seen no matter what, however, that method would be a scheduling nightmare. Creating a 14 day intake policy would be a Program guide change and an increase in workload, but patients would be seen and there would not be any scheduling issues. Leaving the contact rules as-is gives the Providers more discretion. Regardless of what the committee approves for, Dr. Ceballos would like MH HQ to send out a reminder memorandum to the field encouraging them to not wait until the maximum of 90 days to see patients. See voting outcomes below:

1. See patient every 90 days regardless of movement:  1/9
2. Create a 14 day intake contact policy: 4/9
3. Leave policy and workflow as-is and send memo to field to remind & clarify:   win – 6/9

MH HQ Psychiatry and Tele-Psychiatry believe option two is the best option for all.

**Motion:** Leave policy and workflow as-is and send memo to field to remind & clarify
**Vote:** Approve
**Resolved:** Policy and workflow will stay the same.

*Figure 4: CDCR0008443.*

---

On July 2, 2019, Dr. Ceballos emailed Deputy Tebrock a summary of the vote, stating that "[w]e thought that these should come to you for final decision."  CDCR0007558 (July 2, 2019 email from Dr. Ceballos to Deputy Tebrock, copying Assistant Deputy Brizendine and Dr. Rekart); *see also* CDCR0007894 (July 23, 2018 email thread between Dr. Ceballos, Assistant Deputy Brizendine, and Ms. Ponciano noting that Deputy Tebrock had not yet responded to the July 2, 2019 email, followed by discussion about conducting a workload increase analysis for the proposals).

Email correspondence in the days leading up to Dr. Golding's report reflect a renewed interest by CDCR Mental Health Leadership in evaluating whether an initial psychiatry evaluation should be required before the IDTT, after one of the Special Master's experts, Dr. Metzner, raised the issue during a CQI on-site visit.  *See* CDCR0016915.  On September 28, 2018, Dr. Golding forwarded an email referencing Dr. Metzner's opinion "that the [psychiatry] evaluation is valuable and should be available prior to the initial IDTT" to Deputy Tebrock, who agreed that the initial psychiatric evaluation should occur prior to the IDTT.  *Id.*  Later that day, Dr. Ceballos emailed Dr. Kuich stating that to change the EOP psychiatry intake evaluation to 14 days would require a clarifying memorandum, update to the business rules, and potentially a notice to the union.  *See* CDCR0008360.  On October 2, 2018, Dr. Ceballos emailed various CDCR staff, including Dr. Golding, stating, among other things:

GIBSON DUNN

April 22, 2019
Page 34

The MHPG indicates an initial eval has to be completed prior to IDTT. It does not specify if a psychiatry eval is required. The MHPG also indicates that a PC can be either a psychiatrist, psychologist, or CSW (except in MHCB) – so I believe at the time it was written the idea was that a single provider would do the intakes, and it likely would/could be a psychiatrist. But - that was never the way it was implemented. As long as I have been at HQ, the intake has been a single intake done by a psychologist or CSW.

When we developed the CQI tool with the monitors, Jeff Metzner was insistent that it is critical that a psychiatry eval is done before IDTT. This makes perfect sense to me as well, but, since the MHPG didn't explicitly require this, I was told we could add the audit but would not add the policy. We have a few other audit items like this too – such as quality of group treatment. The difference with these is that we can't write a policy for the delivery of treatment, but we do write policies for timelines all of the time, which is why I think this particular item has become confusing.

Please let your staff know when/if they are questioned about this or any other policy to reference policy (MHPG or ancillary policy) – never our performance rules. We write those to literally emulate existing policy but they are NOT POLICY – they are computer rules to monitor adherence to policy.

Michael's team is going to issue a memo clarifying the EOP initial requirement for psychiatrists. Until this goes out, the psychiatry intake prior to IDTT is not clearly articulated in policy and is not required (yes, clinically should be done regardless of policy, but has not been past practice and therefore will likely require labor notification). As soon as the memo goes out, our performance rules will be updated to match the requirement. The way to articulate the CQI audit item is just to note it is good clinical practice, so we ask about it. We don't write a policy for all things that are good clinical practice.

*Figure 5: CDCR00078901 (October 2, 2018 email from Dr. Ceballos to four CDCR recipients, copying Dr. Golding and three others).*

In a further exchange between Dr. Golding and Dr. Ceballos regarding measuring the frequency with which patients are seen within the time frame ordered by a psychiatrist, regardless of transfer, Dr. Ceballos wrote that Dr. Golding was requesting "a new indicator," and requested additional details from Dr. Golding so that the proposal for the indicator could be brought to the Mental Health Change Management Committee meeting.  CDCR0007898 (October 2, 2018 email from Dr. Ceballos to Dr. Golding, Assistant Deputy Brizendine, and Ms. Ponciano).

f.      **Data Analysis**

According to Dr. Leidner's analysis, on average each month, only 1% of the total CCCMS population on psychiatrist-prescribed medications both transferred and went more than 90 days without being evaluated by a psychiatrist, and 3% of the total EOP population on psychiatrist medications both transferred and went more than 30 days without being evaluated by a psychiatrist.  CDCR0022254.  Therefore, the analysis would tend to suggest that if CDCR were to stop its practice of "resetting the clock," and instead apply the routine contact time frames to patients regardless of whether they transfer institutions, compliance

GIBSON DUNN

April 22, 2019
Page 35

metrics for overall "Timely Psychiatry Contacts" would have been lowered by about 1% and 3% for CCCMS and EOP respectively.[32]

Nonetheless, Dr. Leidner's analysis also supports Dr. Golding's concern that a significant portion of transferred patients are not seen by a psychiatrist within the Program Guide time frames. According to the figures supplied by Dr. Leidner in his analysis, over 20% of transferred CCCMS patients on medications, nearly 35% of transferred EOP patients on psychiatric medications, and approximately 57% of transferred EOP patients not on psychiatric medications were not seen by a psychiatrist within Program Guide timelines. CDCR0022254.

In addition, we analyzed the percentage of mainline EOP and CCCMS patients statewide who had initial psychiatry contacts that occurred within 14 days of the date upon which CDCR indicated that their initial contact "clock" had started. Our analysis was limited to those patients with clock start dates between January 1 and September 30, 2018.[33] We also limited our analysis to those patients who were eventually seen by a psychiatrist. For these patients, 49.6% of ML EOP and 45.1% of ML CCCMS were seen within 14 days of the clock start. This data would suggest that during this period, nearly half of mainline EOP and CCCMS patients starting a new clock were not seen by a psychiatrist before their initial IDTT.

3.      Findings

It is undisputed that CDCR "resets the clock" for calculating "Timely Psychiatry Contacts" when a patient transfers to a new institution, and reports timeliness compliance metrics based on the date of the patient's arrival at a new institution rather than their previous psychiatric evaluation. Further, it is undisputed that CDCR's business rules apply the maximum *routine* time frames when measuring compliance of timely initial psychiatry evaluations:  30 days for EOP patients and 90 days for CCCMS patients, starting on the date of arrival at the new institution. The scenario that concerned Dr. Golding—that transferred patients could go longer between psychiatric evaluations than contemplated by the Program Guide and still be counted as compliant—is therefore a valid concern.

a.      Whether Representations Were Misleading

We find that the "Timely Psychiatry Contacts" data reported by CDCR is not misleading on the basis that CDCR "resets the clock" for transferred inmates. The Program Guide does not

---

[32]  Note that Dr. Leidner's analysis does not use the "patient-weeks" method of compliance (discussed *supra* at § IV.D.3).

[33]  In the data CDCR provided to us, there were 47 (0.8%) initial ML EOP appointments and 764 (9.44%) initial ML CCCMS appointments that were reported to have occurred before the date upon which the clock started. We did not include these appointments in this analysis.

GIBSON DUNN

April 22, 2019
Page 36

address what psychiatry evaluation time frames should apply to EOP or CCCMS patients who transfer between institutions.  CDCR follows the Program Guide requirements for "new" patients, under the logical theory that the patient is being received into a new care environment.  At the time the Program Guide was adopted in 2009, the mental health medical records systems were institution-specific, so the time frames for compliance would necessarily "restart" upon transfer to a new institution.  Moreover, CDCR points out that a new treatment plan and medical orders will be created at the new institution, and that carrying over time frames from the previous institution could create conflict and ambiguity.

###### b.      Whether There Was an Intent to Mislead

We find that CDCR's long-standing practice of "resetting the clock" upon transfer when measuring timeliness of psychiatry appointments did not reflect an intent to mislead the Special Master or Court.  As noted above, CDCR's practice was known to the Special Master and reflects a logical interpretation of the Program Guide.

###### 4.      Recommendations

Because we do not find that the "Timely Psychiatry Contacts" data is misleading due to CDCR's practice of "resetting the clock" upon patient transfers, or that there was an intent to mislead, we do not recommend the Court conduct an evidentiary hearing on this issue. Dr. Golding's allegation, however, calls attention to a disconnect between CDCR and the Special Master concerning CDCR's interpretation of the Program Guide relating to transferred patients that could have important clinical ramifications.[34]  Specifically, although CDCR Mental Health Leadership understands that the Special Master strongly believes that a new arrival must be evaluated by a psychiatrist before the initial IDTT, and concedes that a pre-IDTT evaluation would be good clinical practice, CDCR's view is that the Program Guide does not require evaluations before the IDTT.  Accordingly, it reports compliance for timeliness of initial psychiatry evaluations based on the longer time frames of 30 days of arrival for EOP patients and 90 days for CCCMS patients.  Dr. Golding, Dr. Gonzalez, and the Special Master believe that the purpose of the IDTT as described in the Program Guide assumes the necessity of a previous psychiatric evaluation.  Although Dr. Golding did not succeed in changing CDCR policies relating to transferred CCCMS patients last year, CDCR has been examining the issue of modifying its policies and business rules to require that an initial psychiatry evaluation occur within 14 days of arrival at a new institution, which would bring its practices into closer alignment with the Special Master's interpretation of the Program Guide.  We recommend that the Court consider directing the parties and the Special Master to meet and confer in order to clarify the proper time frame under the Program Guide for an initial psychiatry evaluation for transferred patients.

---

[34]   Several witnesses told us that for psychiatric patients, transfers between institutions is a particularly stressful experience, and that good clinical practice would dictate more frequent, not less frequent, contact with a psychiatrist during that period.

April 22, 2019
Page 37

## B. Redefining "Monthly" to Lengthen the Intervals Between EOP Appointments

The Court directed us to investigate whether CDCR committed fraud on the Court or intentionally misled the Court or Special Master by "[l]engthening the interval between psychiatrist appointments for EOP inmate-patients and reporting compliance based on the extended intervals." ECF No. 6064 at 3. The Program Guide requires that EOP patients be evaluated by a psychiatrist "monthly." PG at 12-4-9. It is undisputed that in December 2016, CDCR modified its business rule for measuring the timeliness of psychiatry appointments for EOP patients from 30 days to up to 45 days without consulting with the Special Master. It is also undisputed that CDCR submitted data using the modified rule to the Court in at least one filing. The rule change, however, was in effect for only about five months, between December 2016 and April 2017. It was changed back to 30 days after Dr. Golding and Dr. Gonzalez raised concerns about it in March 2017.

The rule, while in effect, generated misleading data about CDCR compliance with routine EOP psychiatric evaluations under the Program Guide. We do not find, however, that the evidence establishes an intent to falsify or mislead. Although the decision to change the definition of "monthly," with no consultation with the Special Master or the Chief Psychiatrist, does not cast CDCR's decision-making on this issue in a favorable light, the short-term change was likely immaterial. Because CDCR reverted to the original rule when Dr. Golding raised the issue, we do not recommend further action by the Court on this issue.

### 1. Perspectives of the Whistleblowers and Parties

#### a. Dr. Michael Golding

Dr. Golding alleges that in December 2016, CDCR increased the compliance interval for routine EOP psychiatry appointments, resulting in psychiatry appointments held 45 to up to 60 days after their last appointment to be recorded as timely. *See* ECF No. 5988-1 at 2, 23-26. Dr. Golding reports that in March 2017, Dr. Gonzalez told him that the on-demand "Current Due Dates" report listed her patients' due dates as due within 45, rather than 30, days. *See* GOLDING002307. Dr. Golding then emailed with Dr. Ceballos and Dr. Leidner about the change and requested the business rule be changed back to 30 days. CDCR0010628-29. Dr. Golding states that he and Dr. Gonzalez also realized that appointments were being counted as "compliant" up to 60 days after their previous psychiatry evaluation, and Dr. Leidner corrected the 60-day issue around April 12, 2017. *See* CDCR0022329. Dr. Golding alleges that despite his insistence to Deputy Tebrock that the data submitted to the Court should be corrected, CDCR never alerted the Special Master or Court to the issue, nor corrected the data that had been submitted.

#### b. Dr. Melanie Gonzalez

As noted by Dr. Golding, Dr. Gonzalez first discovered the modified business rule when checking the "Current Due Dates" on-demand report in March of 2017. She then raised this

April 22, 2019
Page 38

issue to Dr. Golding, who told her there had been no policy change.[35]  She looked into data on due dates for other psychiatrists and noticed they were calculated as up to 45 days out, but that some patients were nonetheless marked compliant when their next appointment was beyond 45 days and up to 60 days.  *See* CDCR0016953.

Dr. Golding and Dr. Gonzalez in turn reported the issue to Dr. Leidner and Dr. Ceballos.  Dr. Gonzalez submitted an issue report regarding the 60-day "bug" to Dr. Leidner, who responded that he fixed the reported issue on April 12, 2017.  CDCR0022329.

### c.   CDCR's Response

CDCR confirmed that in December 2016, CDCR changed the definition of "monthly" in the business rule for the performance indicator measuring timely compliance with the EOP routine psychiatric appointments from "within 30 days" to "once every calendar month, to never exceed forty-five days between contact."  ECF No. 6012 at 12.  CDCR reported the request was made in response to various requests from the field regarding the impact the 30-day rule had on patient care continuity, and was approved by Dr. Ceballos.  *Id.*; ECF No. 6012-3 at 7-8 (Leidner Decl. ¶¶ 25-27).  CDCR also says that under the rule, it would still require 12 psychiatry visits a year.  ECF No. 6012 at 12; ECF No. 6012-3 at 8 (Leidner Decl. ¶ 27).

CDCR acknowledges Dr. Golding raised the issue around March 2017, and the rule was then changed back to "30 days."  CDCR also acknowledges that data reflecting the rule change was reported in one court filing (ECF No. 5591), but claims that the Court did not rely on that information when adopting the Special Master's report.  ECF No. 6012 at 13.

It is CDCR's position that the Program Guide does not define "monthly," and the issue of how "monthly" should be operationalized for purposes of the performance indicator business rules was never discussed with the Special Master.  Further, CDCR reported that the Special Master had access to the relevant business rules, and could have seen the change.

### d.   The Special Master's Perspective

The Special Master reported that he has consistently interpreted "monthly" to be "30 days," since he began monitoring EOP routine appointments in the late 1990s.  The Special Master also provided us with a list of various times that he had expressly referenced the frequency of psychiatry contacts for EOP patients during their monitoring reports.  For example, in the 26th Round Monitoring Report, the Special Master occasionally referenced monitoring EOP psychiatry contacts "every 30 days."  ECF No. 5439 at 309, 492.  The Special Master strongly believes that changing the measure of "monthly" would constitute a material change to the Program Guide that would require Court approval.

---

[35]  *See* CDCR0010663; CDCR0016945; CDCR0016951-52.

April 22, 2019
Page 39

Further, the Special Master noted that CDCR representatives who implemented the change, including Dr. Ceballos, were regularly in contact with the Special Master and should have known that such a change should be discussed with the Special Master. The Special Master noted that during the time that the change was made (and then reversed), the Special Master was meeting frequently with the parties during the All-Parties' Workgroups, which provided CDCR ample opportunity to raise the proposed change. *See generally supra* at § IV.B.2. The Special Master found it deeply troubling, even shocking, that CDCR would unilaterally change a long-standing interpretation of an important provision of the Program Guide without consulting him.

### 2. Summary of the Evidence

#### a. Program Guide Provisions

The Program Guide states that "[a] psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues." PG at 12-4-9. It is undisputed that the Program Guide does not define "monthly."

#### b. Representations to the Special Master and/or Court

Defendants acknowledge that they submitted data using the modified rule to the Court in at least one filing. *See* ECF No. 5591 at 14 (Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan); ECF No. 5591-2 at 4, 9 (Tebrock Decl. ¶ 10, Ex. 2). The same data was also cited in a subsequent filing. ECF No. 5601 at 8-9 (Defendants' Reply to Plaintiffs' Objections and Request for Additional Relief). Each of these filings was made after Dr. Golding raised his concerns about the business rule change, but before the rule was reverted back to "30 days."

CDCR also reported compliance figures from the "Timely Psychiatry Contacts" indicator during this time frame on at least one ASU EOP HUB certification. This report was not filed with the Court, but was submitted to the Special Master. *See* PLTF005299 (RJD).

#### c. CDCR Mental Health Leadership Witnesses

CDCR witnesses confirmed that no psychiatrist was consulted before the rule change to the definition of "monthly" was implemented in December 2016. In his interview, Dr. Leidner reflected what the documents produced by CDCR show regarding the genesis of the rule change. He confirmed that Julie Kirkman, a medication administrator at the CHCF facility, called him on the phone to make the proposal, and followed up via email on December 5, 2016 with the formal request. He stated that he was on the phone later that day with Dr. Ceballos and mentioned the proposal. She gave him verbal authorization, so he made the change. He does not remember psychiatry ever being consulted about it. He also noted that he regretted running the rule change through so quickly.

April 22, 2019
Page 40

In subsequent conversations, Dr. Leidner claimed that in the period between December 2016 and April 2017, when the rule was changed to allow for up to 45 days between appointments, that the rule was 45 and not 60 days. He explained that for those patients showing as "compliant" for more than 45 days, the system was reflecting some sort of error unique only to certain (and not all) patients and/or data.

In her interview, Deputy Tebrock indicated that she was unsure why a psychiatrist was not consulted about the rule change in December 2016, and implied that this was a mistake and part of the impetus for the formation of the Mental Health Change Committee in the spring of 2017. She stated, however, that they changed the rule back to "30 days" as soon as Dr. Golding raised the issue.

In her interview, Dr. Ceballos stated that the request to make the rule change came from psychiatrists in the field and "made perfect clinical sense to [her]." Ceballos Tr. at 61:16-17. She stated that it was an oversight that she did not consult with Dr. Golding first. She also stated that the change was announced on a webinar along with other business rule changes, but was unsure if anyone from psychiatry HQ attended. She was not aware of any other announcement of the change. She stated she did not discuss the change with the Special Master because she did not think it was a "big deal." Ceballos Tr. at 73:25.

> **d.    Documents**

Prior to the rule change described above, documents show that CDCR used 30 days to measure compliance with the Program Guide requirement that EOP patients have "monthly" psychiatric evaluations. In 2016, for example, in connection with the production of data for the Special Master for the 27th Round of monitoring, CDCR used a definition of "every 30 calendar days after previous psychiatry contact" to measure compliance with the "monthly" requirement for EOP psychiatric appointments. ECF No. 6012-2 at 154 (Ceballos Decl. at Ex. 3).[36] According to documents produced by CDCR, redefining "monthly" was first raised by Ms. Kirkman as a question to Cynthia Mendonza in an email on November 2, 2015. *See* CDCR0008260. Ms. Kirkman is a Medication Court Administrator and Pre-Release Coordinator at CHCF, not a psychiatrist or psychologist. Ms. Mendonza responded on November 4, 2015, that they would not be changing the policy. *Id.* Ms. Kirkman's request appears to have originated with two psychiatrists, Dr. Karuna Anand and Dr. Mohammad Jahangiri. *See id.* Ms. Kirkman suggested that they attend a management webinar on November 18, 2015 apparently hosted by Dr. Leidner. *See id.* Dr. Jahangiri attended the November 18 webinar and "presented the case" to Dr. Leidner, who asked him to approach Dr. Golding. *Id.* On February 25, 2016, Dr. Anand emailed Dr. Golding, copying Ms. Kirkman, Dr. Jahangiri, and Dr. Leidner. *See id.* She requested Dr. Golding's assistance

---

[36] Witness interviews and documents suggest that in prior years this interpretation of the EOP "monthly" rule may have been implemented situationally at some institutions during times of short staffing, including at CSP Sacramento at some point in 2014 to 2015, as a way of relieving scheduling pressure on psychiatrists.

April 22, 2019
Page 41

with substituting the "30 day" rule with a "monthly" rule so as to help ease psychiatrists' tracking issues, reduce staffing needs, help psychiatrists manage their own outpatient caseloads, and other issues.  *Id.*  It is unclear why the matter did not proceed further at that time.  During our interview, Dr. Golding stated that he did not recall Dr. Anand raising this issue via email.  Dr. Leidner recalled the issue being raised, but that no proposal followed.

Months later, in late November and early December 2016, Ms. Kirkman sought the input of Dr. Leidner and Chief of Mental Health and psychologist Dr. Yashodara Rao on the wording of a renewed request.  *See* CDCR0010643; CDCR0010649.  On December 5, 2016, Ms. Kirkman renewed her proposal to change the definition of "monthly" from 30 to 45 days in an email to CDCR's "MH Policy Unit," copying Dr. Leidner, Christopher Barr, and Dr. Rao.  That email was sent at 1:57 pm.  ECF No. 6012-3 at 54 (Leidner Decl. at Ex. 6) (CDCR000238).  Eight minutes later, at 2:05 pm, Dr. Leidner responded, "I just got Laura to approve this rule.  We don't need to run it up the flagpole."  CDCR00010620.

That same afternoon on December 5, 2016, Dr. Ceballos and Dr. Golding communicated via email about other policy issues, including EOP overflow (discussed *infra* at § VI.B).  Dr. Ceballos apparently never mentioned this rule change to him.

The completed change was announced to colleagues by Dr. Rao via email at 8:06 am the next morning.  *See* CDCR0007845.  CDCR confirmed there was no release note for the December 2016 change to "monthly not to exceed 45 days," since release notes were not being issued at that time.  At least some of the psychiatry team was notified of the rule change in January 2017.  *See* CDCR0016721-22.  An email discussing the modified rule was forwarded to Dr. Golding by psychiatrists Dr. Mann and Dr. Lindgren, but it is unclear whether Dr. Golding read it.  CDCR0016719-21.

In March of 2017, Dr. Gonzalez noticed an unexpected increase in compliance rates for timely EOP psychiatry contacts, and subsequently raised concerns about the change with Dr. Golding.  They exchanged a variety of emails on the issue, analyzing how the rule change affected timely compliance numbers.  *See, e.g.*, CDCR0016945; CDCR0016953.  Dr. Golding inquired about the matter with Dr. Leidner and Dr. Ceballos on March 21, 2017.  Dr. Leidner responded that the "rule was changed . . . in December.  If you and Laura feel it should be otherwise, let me know and I will modify."  CDCR0020144.  Dr. Golding responded "[o]bviously we told the courts, right?."  CDCR0020143.  Dr. Leidner responded, "Rule was changed in December based on verbal approval from Laura.  She would better be able to answer if/when court was notified."  CDCR0020142.

Dr. Golding insisted to Dr. Ceballos that the rule change should have been reported to the Court, stating he was "concerned that if we change a rule, and if that rule has a large impact on our numbers and what we report, we probably ought to let the court know."  CDCR0010628.  Dr. Ceballos disagreed with Dr. Golding, stating that they do not inform the

April 22, 2019
Page 42

Court about every change, but only "major" changes that have "a significant impact."
CDCR0010627.

Dr. Leidner then explained how certain time periods are defined under CDCR policy:

**From:** Leidner, David@CDCR
**Sent:** Wednesday, March 22, 2017 3:38 PM
**To:** Ceballos, Laura@CDCR; Golding, Michael@CDCR
**Subject:** RE: ML EOP Psychiatry Rule Change Proposition

Given our current discussion about 30 days versus 1 month, I added another case to the description below.

Of necessity, we have a pretty unambiguous policy on how we interpret the time frames verbiage in the PG for our compliance reporting. Appended below is a brief summary I wrote back in September about our method.

The MH management reports have a precise definition for all of the following units of time:

· Month = a full calendar month beginning on the first of the month at 00:00 and ending on the last day of the month at 23:59, inclusive.

· Week = a full week beginning Monday 00:00 and ending Sunday 23:59, inclusive.

· Calendar day = a full day beginning 00:00 and ending 23:59, inclusive.

· Working day = a full day that is not a Saturday, Sunday, or state holiday, beginning 00:00 and ending 23:59, inclusive.

· Hour = a full hour beginning at 00 minutes and ending at 59 minutes, inclusive.

· Minute = a full minute beginning at 00 seconds and ending at 59 seconds, inclusive

Given these definitions, our reports calculate any given due date as follows: given a trigger date, which is the date and time the rule was triggered (e.g., Friday at 09:15), and a time frame of $x$ units, where units is one of the units of time listed above and $x$ is the number of units (e.g., 2 calendar days, 1 week, 24 hours), the due date is the end of the $x$th full unit after the trigger date.

*Figure 6: ECF No. 6012-3 at 48 (Leidner Decl. at Ex. 4).*

In the same email, Dr. Leidner provides the following examples of "what the due date would be for a rule with a trigger date of Friday, June 5, 09:15 and different time frames":

| Friday, June 5, 09:15 | 30 calendar days | July 5, 23:59 |
| Friday, June 5, 09:15 | 1 month | July 31, 23:59 |

*Figure 7: ECF No. 6012-3 at 49 (Leidner Decl. at Ex. 4).*

April 22, 2019
Page 43

According to Dr. Golding, on April 12, 2017, he emailed Deputy Tebrock, raising, among other issues, the change in the definition of "monthly" and requesting data on the effect this change had on the timely compliance numbers reported to the Court. CDCR0016723-34. The next day, he emailed Dr. Ceballos, again requesting they use the 30-day and not 45-day measurement, urging her to emphasize to Dr. Leidner that changing the rule back should be a priority, and stating that Deputy Tebrock agreed. CDCR0017037-38. Later that day, Dr. Ceballos responded, "We can change the rule and I will make it a priority." CDCR0017037. She then followed up with Dr. Leidner. CDCR0020162.

After Dr. Golding requested the rule be changed back to every 30 days, Dr. Ceballos and Dr. Leidner changed the rule back without pushback, but it took considerably longer to change it back than to make the initial change in December of 2016. Dr. Golding made his request on March 22, 2017, and it was apparently changed back in mid-April. CDCR produced a "release note" reflecting the change back to "30 calendar days" on April 23, 2017. CDCR000992. The rule change went "live" on April 24, 2017. CDCR0017054-55.

In the interim period, on March 28, 2017, Deputy Tebrock sent an email noting that the Governor's office had asked "to explain in more detail what metrics can be used to show that the care by psychiatry is adequate." CDCR0016999. On March 30, 2017, CDCR filed Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan, ECF No. 5591, relying upon data under the 45-day rule. ECF No. 6012 at 13.

### 3. Findings

#### a. Whether Representations Were Misleading

Given the plain language of the Program Guide, the prior usage of the parties, and the views of the Special Master, CDCR's change of the definition of "monthly" for compliance purposes would likely have resulted in the reporting of misleading data. By extending the period in which an EOP routine psychiatry appointment would be compliant by 50%, the change was not immaterial. Indeed, in several documents, witnesses noted that the change was having a positive effect on compliance rates. *See, e.g.*, CDCR0017048.

Although CDCR submitted to the Court or cited to data using the modified rule in two filings (*see* ECF No. 5591 at 14; ECF No. 5591-2 at 4, 9 (Tebrock Decl. ¶ 10, Ex. 2); ECF No. 5601 at 8-9 (citing data from Tebrock Decl. at Ex. 2)), the evidence does not establish that the use of the modified rule for this limited time had a material effect on the Special Master or the Court's decision-making. Given that the modified rule was in effect for less than five months, we find that any temporary deviation from the Program Guide requirements was likely immaterial.

April 22, 2019
Page 44

### b.    Whether There Was an Intent to Mislead

While CDCR's change to the modified rule reflects a flawed decision-making process, the evidence does not establish an intent to mislead.  When the issue arose in late 2015, the source of the inquiry appeared to be Dr. Jahangiri and Dr. Anand, both psychiatrists.  When the issue was raised with Dr. Leidner at that time, he indicated that Dr. Golding should be consulted about any rule change.  Dr. Leidner thus knew that this rule change was significant enough to consult the Chief Psychiatrist.  When Ms. Kirkman raised the proposal anew in December of 2016, however, it is unclear whether she spoke to any psychiatrists about it.  Nor did Dr. Leidner or Dr. Ceballos consult Dr. Golding.  Within eight minutes of Ms. Kirkman submitting her formal request via email, Dr. Leidner responded that he "got Laura to approve this rule" and that there was no need to "run it up the flagpole."  Given the earlier emails reflecting that Dr. Leidner knew Dr. Golding should be consulted, and that Dr. Ceballos was emailing with Dr. Golding that same day, it is inexplicable why neither Dr. Leidner nor Dr. Ceballos consulted him.  The greater failing, however, was in neglecting to inform the Special Master of this change, since it represented a significant alteration in the implementation of the Program Guide.

Although CDCR's decision-making process on this issue was seriously flawed, we do not find the evidence establishes an intent to falsify or mislead and thus do not recommend that the Court conduct an evidentiary hearing.

### 4.    Recommendations

Because we do not find that the evidence establishes an intent to mislead, we do not recommend an evidentiary hearing on this issue.  Further, because the rule change was in effect for a limited time from December 2016 to April 2017, and the rule was changed back to 30 days after Dr. Golding complained, the issue is now moot and we do not recommend further action by the Court on this issue.

April 22, 2019
Page 45

## C.    Combining CCCMS and EOP Compliance Numbers

The Court directed us to investigate whether CDCR committed fraud on the Court or intentionally misled the Court or Special Master by "[c]ombining CCCMS and EOP appointment compliance numbers into one reporting category." ECF No. 6064 at 3. While Dr. Golding's factual allegations—that CDCR combined "Timely Psychiatry Contacts" compliance statistics for EOP and CCCMS patients in 2017 and did not report EOP timeliness statistics in 2018—are undisputed, there is no evidence that such reporting was false or misleading, or that such reporting was material. We recommend no further action on this issue.

### 1.    Perspectives of the Whistleblower and Parties

#### a.    Dr. Michael Golding

In a report submitted to the Court in 2017, CDCR combined compliance statistics for "Timely Psychiatry Contacts" for CCCMS and EOP patients. *See* ECF No. 5591-2 at 9. In Dr. Golding's view, this concealed the relative lack of success with EOP patients because CCCMS patients are far more numerous, and only need to be seen every 90 days (as opposed to "monthly" for EOP patients). Dr. Golding alleged that Deputy Tebrock agreed with him that combining CCCMS and EOP data was misleading (*see* CDCR0006339), and the data was broken out in 2018, but the 2017 data was never corrected.[37] In 2018, CDCR eliminated EOP timeliness figures entirely from their Staffing Proposal. *See* ECF No. 5841-2 (Defendants' May 2018 Staffing Proposal) at 31. EOP data was presented as frequency of visits, but not timeliness. *See id.* at 33.

---

[37]    Dr. Golding also alleged that at some point in May or June of 2018, CDCR QM eliminated a filter option on the Performance Report that allowed for distinguishing "Timely Psychiatry Contacts" between EOP and CCCMS patients. *See* ECF No. 5988-1 at 27. Dr. Gonzalez noted in her interview that when she returned from leave in July 2018 the filter option was no longer available. She had a meeting with Assistant Deputy Brizendine where Assistant Deputy Brizendine showed her how to get the separate data. CDCR responded that while it did modify the Mental Health Performance Report database function in mid-2018, the disaggregated information was "always readily available by merely selecting a button next to the overall indicator." ECF No. 6012 at 14; *see also* ECF No. 6012-3 at 14-15 (Leidner Decl. ¶ 36); Ceballos Tr. at 96:24-98:4. Dr. Ceballos also stated that the filter was removed after she noticed an error, and the removal was intended to be temporary, but it had not been returned due to a freeze on Golding Report-related changes to the Performance Report. *Id.* at 96:20-97:24, 98:5-13. CDCR states that Dr. Golding was shown how to separate data by level of care in July of 2018. ECF No. 6012 at 14. Dr. Ceballos also confirmed that the Special Master previously had access to the Performance Report, but that access lapsed due to a lack of use, and has not been updated or reinstated. Ceballos Tr. at 117:3-20. Because neither the Court nor the Special Master use the Performance Report, however, whether the filter option existed is irrelevant to the question of whether CDCR misled them.

April 22, 2019
Page 46

### b.      CDCR's Response

CDCR responds that in the 2017 report of "Timely Psychiatry Contacts," it never suggested that the data in the report was from a single level of care, nor has it been required that all performance indicators cite separate data by levels of care. *See* ECF No. 6012 at 14.

### c.      The Special Master's Perspective

The Special Master observed that aggregated CCCMS and EOP data was likely never reported to the Special Master because the document requests he submits in connection with monitoring visits require the CCCMS and EOP data to be separated, and he has always received it in that manner.  He therefore does not believe he received any misleading data in this respect.[38]

### 2.      Summary of the Evidence

### a.      Program Guide Provisions

There are no relevant Program Guide provisions or other requirements setting forth how CCCMS and EOP data should be reported.

### b.      Representations to the Special Master and/or Court

On March 30, 2017, CDCR filed a chart titled "Mental Health Staff Psychiatrist Staffing vs Compliance," dated February 23, 2017, attached as Exhibit 2 to the Declaration of Katherine Tebrock in Support of Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan.  ECF No. 5591-2 at 9.  In that chart, one column is labeled "Timely Psychiatry Contacts."  The last column labels the level(s) of care, including some institutions where EOP and CCCMS statistics are combined.

---

[38]   Plaintiffs also stated that they do not believe that the data submitted to the Court in 2017 was false or misleading, intentionally or otherwise.  *See* Letter from Cara Trapani, dated Jan. 24, 2019, at 22-23.

GIBSON DUNN

April 22, 2019
Page 47

| SITES | Total Allocated January 2017 | Total Filled January 2017* | Precent Vacant January 2017** | Timely Psychiatry Contacts[1] (Access to Care Banner) 8/1/2016-1/31/2017*** | Psychiatrist Continuity of Care[2] (Quality of Care Banner) 8/1/2016-1/31/2017*** | MAPIP[3] (QM Dashboard-Pop Health Management) 8/1/2016-1/31/2017*** | MH Mission |
|---|---|---|---|---|---|---|---|
| ASP | 5.0 | 3.6 | 71% | 100% | N/A | 100% | CCCMS |
| CCI | 7.0 | 4.5 | 65% | 91% | N/A | 93% | CCCMS |
| CCWF | 12.0 | 7.5 | 63% | 97% | 99% | 92% | FEMALE |
| CHCF | 24.0 | 17.4 | 73% | 72% | 88% | 92% | MHCB/EOP/CCCMS |
| CIM | 12.0 | 10.5 | 88% | 99% | N/A | 95% | RC/CCCMS |
| CIW | 9.0 | 8.4 | 93% | 97% | 75% | 98% | FEMALE |
| CMC | 19.3 | 15.5 | 80% | 99% | 97% | 98% | MHCB/EOP/CCCMS |
| CMF | 17.0 | 13.7 | 81% | 99% | 89% | 97% | MHCB/EOP/CCCMS |
| COR | 14.5 | 9.6 | 66% | 84% | 58% | 98% | MHCB/EOP/CCCMS |
| CRC | 6.0 | 5.5 | 92% | 93% | N/A | 99% | CCCMS |
| CTF | 7.0 | 4.3 | 61% | 92% | N/A | 95% | CCCMS |
| DVI | 4.5 | 5.1 | 113% | 100% | N/A | 99% | RC/CCCMS |
| FSP | 3.0 | 3.4 | 112% | 97% | N/A | 96% | CCCMS |
| HDSP | 6.0 | 4.0 | 67% | 99% | N/A | 94% | CCCMS |
| KVSP | 9.0 | 4.2 | 47% | 88% | 59% | 95% | EOP/CCCMS |
| LAC | 13.0 | 8.6 | 66% | 86% | 55% | 89% | EOP/CCCMS |
| MCSP | 17.0 | 14.7 | 86% | 87% | 84% | 90% | EOP/CCCMS |
| NKSP | 11.0 | 7.0 | 64% | 98% | N/A | 93% | RC/CCCMS |
| PBSP | 4.0 | 3.0 | 76% | 86% | N/A | 92% | CCCMS |
| PVSP | 5.0 | 4.0 | 81% | 98% | N/A | 100% | CCCMS |
| RJD | 16.0 | 12.2 | 76% | 78% | 73% | 96% | EOP/CCCMS |
| SAC | 22.0 | 11.7 | 53% | 66% | 81% | 89% | MHCB/EOP/CCCMS |
| SATF | 17.0 | 9.0 | 53% | 95% | 93% | 96% | MHCB/EOP/CCCMS |
| SCC | 3.0 | 3.0 | 100% | 100% | N/A | 96% | CCCMS |
| SOL | 7.5 | 4.0 | 53% | 84% | N/A | 92% | CCCMS |
| SQ | 9.0 | 13.3 | 148% | 99% | 98% | 96% | RC/CCCMS |
| SVSP | 13.0 | 5.8 | 45% | 78% | 90% | 90% | EOP/CCCMS |
| VSP | 11.0 | 7.0 | 63% | 73% | 81% | 99% | EOP/CCCMS |
| WSP | 10.0 | 7.1 | 71% | 98% | N/A | 78% | RC/CCCMS |

Mental Health Staff Psychiatrist Staffing vs Compliance
2/23/2017

Footnote
[1] Percentage of patient-weeks during which patients were up-to-date on their required psychiatry contacts.

*Figure 8: ECF No. 5591-2 at 9.*

In its May 2018 Staffing Proposal submitted to the Court on June 21, 2018, CDCR eliminated EOP figures entirely, and only included data from mainline CCCMS when reporting compliance for "Timely Psychiatry Contacts." *See* ECF No. 5841-2 at 31.

**3.    Findings**

**a.    Whether Representations Were Misleading**

While Dr. Golding's factual allegations—that CDCR combined "Timely Psychiatry Contacts" compliance statistics for EOP and CCCMS patients in 2017 and did not report EOP timeliness statistics in 2018—are undisputed, there is no evidence that such reporting was false or misleading, or that such reporting was material to the Special Master or the Court. CDCR accurately labeled the compliance statistics and what data was included (or not) in both reports.

**GIBSON DUNN**

April 22, 2019
Page 48

### b.      Whether There Was an Intent to Mislead

We did not find any evidence that CDCR intended to mislead the Special Master or the Court with respect to the presentation of the data described above.

### 4.      Recommendations

We do not recommend an evidentiary hearing on this issue.

April 22, 2019
Page 49

**D.     Counting All Encounters as Evaluations**

The Court directed us to investigate whether CDCR committed fraud or intentionally provided false or misleading information to the Court or Special Master by "[i]nflating compliance numbers by counting every encounter between a psychiatrist and an inmate-patient as an appointment for purposes of measuring Program Guide timeline compliance, without regard to whether the encounter was a psychiatry appointment or, *e.g.*, a wellness check or a cell-front attempt to communicate with an inmate patient."  ECF No. 6064 at 3. CDCR does not contest the substance of this allegation, acknowledging that it counts non-confidential psychiatrist-patient encounters entered into EHRS by psychiatrists as appointments for the purposes of measuring Program Guide timeline compliance, but argues that this practice is not problematic because the Program Guide is silent on this issue.  The Program Guide requires that "a psychiatrist shall evaluate each EOP inmate-patient at least monthly," and each CCCMS patient be "reevaluated by a psychiatrist a minimum of every 90 days."  PG at 12-4-9, 12-3-11.

We find that CDCR's interpretation of the Program Guide is at odds with a fair reading of the text of the Program Guide, its context, and the common understanding among psychiatrists as to what constitutes a psychiatric "evaluation," all of which indicate that a psychiatric evaluation for purposes of the Program Guide must be confidential.  As a result, we find that that CDCR's reporting of data relating to its "Timely Psychiatry Contacts" shows a higher level of compliance with Program Guide requirements than it should, because non-confidential encounters with inmates are included as qualifying evaluations under the Program Guide.  We did not, however, find evidence to suggest that CDCR intentionally deceived the Court or the Special Master with respect to this issue.  The Special Master monitored specifically for confidentiality-related concerns, and though it was the Special Master's understanding that non-confidential appointments were not counted towards measuring Program Guide timeline compliance, there is no evidence that CDCR intentionally hid data about non-confidential appointments from the Special Master.  Dr. Golding and Dr. Gonzalez also raised serious questions about whether CDCR's data on confidential appointments overstated the actual number of appointments conducted confidentially.  We find that there was merit to these concerns, but that psychiatrists had the ability to correctly report whether their encounters were confidential and where they occurred, and that this data was available to the Special Master.  Thus, while we do not recommend that the Court conduct an evidentiary hearing on this issue, we do recommend that the Court consider directing the parties and the Special Master to meet and confer in order to clarify what psychiatry appointments may properly be considered an "evaluation" under the Program Guide, and how data relating to non-confidential appointments should be reported.

April 22, 2019
Page 50

1.     **Perspectives of the Whistleblowers and Parties**

a.     **Dr. Michael Golding**

Dr. Golding alleges that the "Timely Psychiatry Contacts" indicator is misleading because it overstates the number of timely psychiatric appointments by counting "wellness checks"[39] and other non-confidential appointments as sufficient to meet the requirements of a psychiatric evaluation under the Program Guide.  According to Dr. Golding, CDCR includes brief non-confidential encounters—for example, in the prison yard or cell-side—as compliant evaluations, skewing the "Timely Psychiatry Contacts" indicator in CDCR's favor.  *See* ECF 5990-4 at 5-6, 54-57, 80; ECF No. 5988-3 at 19 (Exhibit Y), 59 (Exhibit HH); ECF No. 5988-5 at 9-12 (Exhibit UU).  Dr. Golding alleges that this practice is contrary to the Program Guide, and thus these non-confidential appointments should not be counted towards compliance with the Program Guide timelines.[40]

In addition to this reporting issue, Dr. Golding also questions the validity of the underlying data on confidentiality.  Dr. Golding argues that CDCR's data on whether psychiatric contacts are confidential is skewed because psychiatrists are not overriding the default selections and therefore incorrectly recording encounters as confidential in EHRS, when they were, in fact, not.  Dr. Gonzalez makes this same allegation.  Dr. Golding alleges that he made CDCR aware of this data issue on numerous occasions, and gave examples to CDCR Mental Health Leadership where the data showed that all or almost all appointments in some institutions occurred in confidential settings, despite the fact that it was common knowledge that few of the visits at those institutions were confidential.  Dr. Golding further alleges that he requested CDCR make changes to the manner in which psychiatrists record whether an encounter is confidential, but CDCR did not respond to his request.

b.     **Dr. Melanie Gonzalez**

Dr. Gonzalez notes that there is no way for a psychiatrist to record a non-Program Guide compliant appointment—any time a psychiatrist checks in and checks out a patient in EHRS, CDCR counts that encounter towards its compliance numbers.  Dr. Gonzalez claims that because there is no allowance for a "wellness check" in the system, if a psychiatrist did not want a non-confidential appointment to count towards CDCR's Program Guide compliance figures, his or her only choice would be to not record the appointment at all.

---

[39]   During our interviews, we learned there is an inconsistent interpretation within CDCR of the meaning of "wellness check."  For purposes of this report, however, we use the term "wellness check" to refer to a psychiatric encounter that, in the psychiatrist's clinical judgment, is less comprehensive than a psychiatric evaluation.

[40]   Dr. Golding does allow that in certain situations a non-confidential appointment may count towards Program Guide compliance measures.  Dr. Golding gave the example of a situation where a patient refuses treatment without being prodded to do so by custodial staff.

April 22, 2019
Page 51

Dr. Gonzalez also argues that CDCR over-reports on the number of non-confidential psychiatric encounters as a result of "confidential" being the default option for psychiatrists recording an appointment in EHRS, rather than no selection or null. Because psychiatrists lack knowledge about the system or simply fail to change the default as a result of click fatigue or time pressure, Dr. Gonzalez claims that the data is significantly biased in favor of reporting appointments as confidential. Both Dr. Golding and Dr. Gonzalez indicated that psychiatrists generally understand that a patient cannot be effectively evaluated in a non-confidential setting.

<strong>c.    CDCR's Response</strong>

CDCR does not dispute that it permits psychiatrists to enter into EHRS, and then counts as compliant under the Program Guide, brief and non-confidential psychiatry contacts. *See* ECF No. 6012 at 15-16; ECF No. 6012-2 at 6 (Ceballos Decl. ¶ 15); ECF No. 6012-3 at 9-10 (Leidner Decl. ¶¶ 31-33). CDCR disagrees with Dr. Golding's assessment that this practice is problematic with respect to the Program Guide or in any way misleading. CDCR argues that "[t]he fundamental premise of Dr. Golding's allegation is flawed because he identifies no Program Guide rule or court order that defines a 'psychiatry contact,' nor any Program Guide rule or court order that excludes short or non-confidential contacts from the definition of a 'psychiatry contact.'" ECF No. 6012 at 12. Indeed, CDCR claims that the Program Guide is silent on the definition of a psychiatric evaluation.[41]

CDCR acknowledged to the Court that it counts what it characterizes as a small number (10%) of brief and non-confidential psychiatry contacts as appointments for compliance purposes, and claims that the Special Master was aware of this practice. *See* ECF No. 6012 at 15-16; ECF No. 6012-2 at 6 (Ceballos Decl. ¶ 15); ECF No. 6012-3 at 9-10 (Leidner Decl. ¶¶ 31-33). CDCR does not state, however, whether this practice extends beyond the limited circumstances—such as inmate refusal or where there are safety issues—where the Special Master has stated that it may be appropriate to count non-confidential psychiatric contacts for Program Guide compliance.

CDCR also argues that the relevant data is readily available, and thus not misleading. "Because CDCR's psychiatrists enter information regarding encounter length and location, that data is easily available through the Performance Report." ECF No. 6012 at 15. Indeed, according to CDCR, in the 27th Monitoring Round, the Special Master specifically asked for data on contacts that occurred in non-confidential settings and ones conducted at cell-front, which CDCR provided. ECF No. 6012-2 at 106 (Ceballos Decl. at Ex. 2) (Tab N)). When

---

[41]  CDCR frequently uses the term "psychiatry contact" in referring to what it measures in the "Timely Psychiatry Contacts" performance indicator. As noted above, however, the Program Guide requires that EOP and CCCMS patients be periodically "evaluated" by a psychiatrist. While there may be value from a management perspective in recording all "contacts" with patients, CDCR cannot reasonably use that data to show compliance with the Program Guide unless the contact constitutes an evaluation under the Program Guide.

April 22, 2019
Page 52

looking at this data, CDCR claims that only a small percentage of contacts, 5%, "were logged as lasting fewer than five minutes, 10% were logged as non-confidential, and 7% were logged as cell-front encounters." ECF No. 6012-3 at 10 (Leidner Decl. ¶ 32). Indeed, CDCR claims that "[o]nly 1% of encounters were logged as cell-front encounters under five minutes, far below Dr. Golding's 'generous' estimate of 20-30%." *Id.*

> ### d.       The Special Master's Perspective

The Special Master rejects CDCR's contention that the Program Guide is silent on the issue of what defines an evaluation, and takes the position that the Program Guide language described below provides sufficient guidance that psychiatric evaluations must be confidential to count towards Program Guide timeline compliance. The Special Master acknowledges that many contacts with patients at some CDCR facilities were not in confidential settings.[42] But he was unaware that CDCR counts all non-confidential contacts such as cell-side or yard visits towards their compliance metrics for timely appointments under the Program Guide.

The Special Master believes that a confidential setting is clinically critical to a psychiatric evaluation, and represents that he regularly told CDCR that non-confidential contacts should not qualify as evaluations under the Program Guide, and that cell-side appointments are only permissible if the inmate refuses—in other words, they cannot be initiated by the clinician. The Special Master noted that he consistently spoke to CDCR about the difference between a confidential and non-confidential setting, leaving no ambiguity that a confidential setting is an office, and non-confidential is operationalized as cell-front. This is reflected in his monitoring reports, where the Special Master notes the absence of non-confidential space as a driver of noncompliance. In fact, the Special Master provided us a detailed list of instances from Monitoring Round Reports where he noted his observations and concerns relating to non-confidential psychiatry contacts.

The Special Master noted that CDCR does report data that shows both confidential and non-confidential contacts, and psychiatrists have a significant percentage of non-confidential contacts. The Special Master noted that many of these non-confidential contacts are non-confidential for reasons other than patient refusals, and he has requested and received information for why these non-confidential contacts occur. Thus, the Special Master believes it would be misleading if CDCR reported data to him that counted non-confidential appointments that occurred for reasons other than patient refusal as evaluations compliant with the Program Guide.

As a general matter, the Special Master did not access or rely on CDCR performance indicator data for "Timely Psychiatry Contacts." Although CDCR submitted data derived

---

[42]   In a custodial institution, physical facility limitations, security concerns, and other factors may hinder efforts to conduct confidential appointments.

April 22, 2019
Page 53

from the "Timely Psychiatric Contacts" indicator in support of their Staffing Proposal in 2018, the Special Master indicated that in evaluating the Staffing Proposal, he did not heavily rely on this for his judgment on the Staffing Proposal.  Rather, his focus in evaluating the proposed plan was on structural and organization changes since the original staffing plan was issued in 2009, such as the changes in CDCR patient-inmate populations, changes in the number of CCCMS inmates on medications, and the existence of unfilled FTEs relating to functions contemplated in the original staffing plan that had never been instituted.

> 2.    **Summary of the Evidence**

> a.    **Program Guide Provisions**

The Program Guide does not include a definition of psychiatric evaluation.  The overall text and context of the document supports the view of Dr. Golding, Dr. Gonzalez, and the Special Master that psychiatric evaluations, with the exception of patient refusals, must be confidential in order to count towards the monthly evaluation requirement for EOP patients, and the 90 day evaluation requirement for CCCMS patients.[43]

Chapters 3 and 4 of the Program Guide, which cover CCCMS and EOP patients respectively, do not include specific language regarding confidentiality, despite the fact that the language is otherwise fairly specific.  The Program Guide requires that "a psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues."  PG at 12-4-9.  Similarly, the Program Guide states that "[e]ach CCCMS inmate-patient on psychiatric medication shall be reevaluated by a psychiatrist a minimum of every 90 days."  PG at 12-3-11.  The term "evaluate" itself suggests a meaningful clinical interaction with an individual patient, implying confidentiality.  For clinical intake assessment for CCCMS the Program Guide requires "a face-to-face interview with the inmate patient."  PG at 12-3-8.  The monitoring contacts that need to be conducted at least every 90 days are described only as "face-to-face individual contacts" with no mention of confidentiality or the setting.  PG at 12-3-15.  Similarly, the initial evaluation for EOP "involves an interview" with the patient, but there is no specified requirement of confidentiality.  PG at 12-4-7.  In a related context, the Program Guide notes that EOP patient clinical contacts by the Primary Clinician (who may or may not be a psychiatrist) "shall be held in a private setting out of cell, or cell-front if an inmate-patient refuses."  PG at 12-4-15.

Confidentiality is a theme throughout other chapters of the Program Guide, and explicitly referenced in certain clinical situations, where confidentiality may be harder to achieve.  As examples, in the reception center, in administrative segregation, and security housing units, mental health screening and evaluations by psychiatrists and psychologists must occur in a private and confidential setting unless the security of the institution or the safety of staff will be compromised.  *See e.g.*, PG at 12-2-3, 12-2-5, 12-7-6, 12-7-14, 12-8-12.

---

[43]  Plaintiffs also share this view.

April 22, 2019
Page 54

Attachment A to the Program Guide also indicates that evaluations should be confidential. Attachment A is a memorandum from April 18, 2007 that has been incorporated into the Program Guide, describing the parameters of confidentiality.  Attachment A defines "clinical encounter" as "when a clinician communicates with an inmate-patient in a clinical setting," and defines a "clinical setting" as "the location where a confidential communication occurs." Attachment A to PG at PLTF000205 (attached hereto as Appendix D).  As clinical encounters, the evaluations required under Program Guide therefore appear to require a confidential setting.  *See* PG at 12-4-9, 12-3-11

In the Special Master's view, the fact that "evaluate" is not a defined term in the Program Guide is not significant, because the Program Guide includes a requirement of confidentiality.  Given the foregoing text and context, and the common clinical understanding of psychiatrists, the Special Master believes that confidentiality is an assumed component of a psychiatric evaluation.

> **b.      Representations to the Special Master and/or Court**

As described above, it is undisputed that CDCR reports data from its "Timely Psychiatry Contacts" performance indicator to the Special Master in connection with the Special Master's monitoring role, and that the Special Master relies on this indicator for a variety of reasons.

In addition, CDCR's May 17, 2018 Staffing Proposal, which was filed with the Court, relies on data relating to "Timely Psychiatry Contacts" when arguing for the appropriateness of reducing the number of psychiatrists employed by CDCR.  *See* ECF No. 5841-2 at 9-10 (filed June 21, 2018) (reporting that the state average for "Timely Psychiatry Contacts" for CCCMS inmates is at 94%, and that EOP patients are being seen for routine contacts .94 times every 30 days).

> **c.      CDCR Mental Health Leadership Witnesses**

CDCR Mental Health Leadership agreed that, as a clinical matter, psychiatrists should see patients in confidential spaces and must properly record the details of their patient interactions.  *See, e.g.,* Tebrock Tr. at 116:24-117:1; Ceballos Tr. at 101:8-16.  No CDCR Mental Health Leadership witness disputes that a cell-front encounter is not confidential. Tebrock Tr. at 113:14-18.

CDCR witnesses agreed that the Program Guide indicates that psychiatry appointments should be confidential, but acknowledged that sometimes confidentiality is not possible. Dr. Rekart argued that in certain situations, where, for example, a patient will not come out of his cell, a non-confidential appointment is "better than not seeing him at all," and the psychiatrist could do a full routine appointment.  Rekart Tr. at 79:1-80:2.  But Dr. Rekart claimed this issue is not as widespread as Golding is purporting: "It's really localized, and

April 22, 2019
Page 55

when we look at data like this and we see this [data showing that CDCR is 89% compliant with this kind of stuff] it's a supervisory issue." Rekart Tr. at 85:24-86:14.

Similarly, Deputy Tebrock made the following statement regarding the Program Guide requirements:

> [M]y understanding [of the Program Guide] is that [CCCMS and EOP evaluations] should be confidential, and the expectation is that you have a confidential space adequate for that interaction.  But we also know that there are interactions that occur in less than perfect spaces and reasonable minds can differ about exactly what amounts to confidential space or what is sufficiently confidential.  But we think it's incumbent upon the provider directly to be the best reporter of that information.

Tebrock Tr. at 114:2-10.  When asked if the Program Guide requires that an evaluation be confidential in order to satisfy the monthly and 90-day requirements, however, Deputy Tebrock answered "I don't know . . . I think that, certainly, we all have an ideal expectation that they should all be confidential.  But I don't know whether having a less than perfectly confidential space vitiates the interaction altogether.  I think they're – you can have a meaningful interaction in a lot of different environments . . . I think it's something we probably need to take up with the Special Master team."  *Id.* at 115:16-116:2.[44]

CDCR Mental Health Leadership did not recall specific conversations with the Special Master as to how non-confidential appointments should be counted for purposes of reporting psychiatry time frame compliance.  Dr. Rekart did not recall any discussions with the Special Master on this issue as they set up the EHRS.  Dr. Ceballos did not recall discussions with the Special Master about what types of appointments could be counted towards the timeliness measures.  Ceballos Tr. at 103:5-20.  Similarly, Deputy Tebrock would not speculate about what the Special Master knows about what CDCR counted for the purposes of a "Timely Psychiatry Contact."  Tebrock Tr. at 120:2-6.  Deputy Tebrock did state, however, that they had multiple conversations about data gathering in prior years and gave presentations to the Special Master over time, and that the Special Master has access "to the EHRS and have gone through some training." *Id.* at 120:7-17.

CDCR Mental Health Leadership uniformly suggested that the issue of determining whether a contact with a patient was meaningful enough to merit counting for timeliness purposes under the Program Guide is left to the psychiatrists.  Dr. Ceballos, for example, confirmed that clinicians often use the phrase "meaningful interaction" but was unaware of a policy defining it, other than a CCHCS "Effective Communication Policy."  Because this system is based on psychiatrist discretion, Dr. Ceballos stated, CDCR does not have guidelines for time.  Ceballos Tr. at 103:10-105:1.  Similarly, when asked what appointments qualify as a

---

[44]   Consistent with this testimony by Deputy Tebrock, we make precisely this recommendation to resolve the disconnect on this issue.

April 22, 2019
Page 56

timely appointment Dr. Rekart stated, "it's all those appointments – the initial and the
routine."  Rekart Tr. at 77:12-20.  There is no minimum time required for an appointment.
*Id.* at 78:7-11.

CDCR Mental Health Leadership further agreed that if a psychiatrist checks a patient in and
then checks that patient out, then that appointment would count for Program Guide
compliance purposes.  Rekart Tr. at 80:12-24.  These witnesses also agreed there is no way
to log a wellness check in the system, or any other way for a psychiatrist to log an interaction
with a patient that they did not determine met the requirements of an evaluation under the
Program Guide.[45]  Rekart Tr. at 81:5-10; Tebrock Tr. at 116:12-23.  For example,
Dr. Ceballos confirmed that any appointment recorded as "completed" is counted towards
the compliance measures, and there is no wellness check option.  Ceballos Tr. at 120:7-
121:19. Her view, however, is that a clinician should only record an appointment as
completed if it was a "meaningful interaction," and it should be recorded as "not completed"
if it was not a meaningful encounter, but that there is not a policy or any guidance to the field
on that.  *Id.* at 121:21-122:8.  According to Dr. Rekart, there have been no conversations
about adding an option to include a wellness check as an option for psychiatrists.  Rekart Tr.
at 81:11-17.

With respect to Dr. Golding's allegation that psychiatrists are failing to change the
confidentiality designation when seeing patients in non-confidential settings, CDCR's
witnesses were generally unsympathetic to Dr. Golding's views.  Dr. Ceballos noted that the
defaults are set for what staff are expected to do—*i.e.*, conduct confidential evaluations.
According to these witnesses, if psychiatrists are entering information incorrectly, that is a
training issue and ultimately the responsibility of Dr. Golding, who is responsible for both
EHRS and clinical training for psychiatry.[46]  *See* Ceballos Tr. at 108:15-111:13; Rekart Tr. at
82:3-84:5 (arguing that psychiatrists failing to enter the data properly was a matter of
supervision and accountability).

Deputy Tebrock's view on the data entry issues is similar.  As to Dr. Golding's allegation
that CDCR was on notice that at some institutions psychiatrists were consistently indicating
in EHRS that a psychiatric appointment was confidential when it was not confidential,
Deputy Tebrock responded that it is a complicated issue.  Tebrock Tr. at 131:11-132:4.  She
explained that there is a review process, in which regional staff do regular tours.  These staff
should "be able to see and observe . . . whether people are seeing patients cell side or not."

---

[45]  Dr. Rekart suggested that a psychiatrist could devise ways to log a non-meaningful interaction, such as
     entering a patient as a "no show" and rescheduling that patient for another appointment, or by continuing
     an appointment.  Alternatively, Dr. Rekart suggested that psychiatrists could change the original
     appointment to a consult, rather than an initial or routine appointment, to avoid having that contact count as
     an evaluation for Program Guide purposes.  Rekart Tr. at 79:18-80:11.

[46]  As discussed above, Dr. Golding and Dr. Kuich assert that CDCR Mental Health Leadership has not
     authorized their release of psychiatry-related EHRS training to the field.  *See supra* at § IV.D.1.

April 22, 2019
Page 57

She also explained that locally there are "supervisors and chiefs . . . monitoring and having oversight.  The message needs to be sent through training, and I believe it has been trained appropriately.  And whether people are not complying with their training is a matter of supervision.  We probably do need to go retrain people." *Id.*  Deputy Tebrock asserts that she does not know if data at some institutions is skewed towards confidentiality as a result of EHRS defaulting to confidential appointments.  She noted that there are visits that are marked as non-confidential, so at least some psychiatrists are able to properly code their interactions.  *Id.* at 132:5-22.

> ### d.      Additional Witnesses

The psychiatrists we spoke with confirmed that best clinical practice requires evaluations to be confidential, and that a cell-side encounter could not be considered confidential.  One psychiatrist noted that an evaluation should have at minimum a full mental-status exam, and discussion of symptoms, progress and regression, treatment, and a plan forward.  Psychiatrists based in CDCR prison facilities described how scheduled evaluations can evolve into non-confidential contacts.  Appointments are generally not scheduled to occur cell-side.  Rather, when a psychiatrist cannot see a patient at the time of the appointment— which can occur for a variety of reasons—psychiatrists will often follow up with the patient in a non-confidential setting, such as cell-side.  Psychiatrists reported that it was best practice in the field to document these cell-side contacts in EHRS, even if the contact was not meaningful enough to constitute an evaluation under the Program Guide.

CDCR psychiatrists reported that counting wellness checks as evaluations was a known issue.  One psychiatrist at CDCR Headquarters stated that this was a big issue at every prison [s]he had been to and that [s]he raised concerns about the practice beginning in 2012.  That same psychiatrist stated that [s]he personally raised the issue of needing to count wellness checks separately from psychiatric evaluations at a meeting with CDCR Mental Health Leadership, but the leaders present ignored the request.  No others reported bringing up this issue directly with CDCR Mental Health Leadership.

Psychiatrists reported that ensuring patients come to scheduled appointments is a constant challenge in the custodial setting.  Patients may not come to appointments because they refuse, for logistical reasons, or because getting patients to appointments is simply not prioritized by the institution.  It is also possible that the institution lacks a confidential space where the psychiatrist and the psychiatrist can meet.  One staff psychiatrist explained that although such non-confidential appointments are not optimal, they are necessary, and stated that it is possible to have a quality cell-front visit, so long as the patient consents to the non-confidential setting.

CDCR psychiatrists we spoke with uniformly agreed that the data over-reports appointments as confidential.  One psychiatrist provided the example of CSP-SAC, where [s]he estimated that 70%-80% of patient interactions were non-confidential, yet reporting indicated much

April 22, 2019
Page 58

higher rates of confidentiality.  Psychiatrists had a variety of explanations for why psychiatrists may not record a non-confidential visit as such, but all agreed that defaulting appointments to confidential was at the root of the problem.  Some psychiatrists explained it was a matter of "click fatigue," meaning that there were too many fields to report, so the psychiatrists kept the defaults.  Some psychiatrists also attributed the problem of over-reporting confidential visits to a lack of training, stating that before Dr. Golding's report, psychiatrists were not trained to realize that by default the system set to a confidential visit, and that many psychiatrists did not understand how the system of logging and reporting of confidential appointments worked.  One psychiatrist stated that [s]he had heard anecdotally that leaders at certain institutions instructed psychiatrists to leave the defaults as is.

>    e.    Documents

The documents and correspondence we reviewed were consistent with what we learned in the interviews.  Communications confirm that psychiatrists shared concerns relating to CDCR's practice of counting non-confidential appointments as Program Guide compliant, and that Dr. Golding attempted to alert CDCR Mental Health Leadership about these confidentiality related concerns.  The documents also confirmed that EHRS defaults appointments to "confidential," and does not provide an option to record a non-Program Guide compliant appointment, such as a wellness check.

Communications among psychiatrists indicate that the issue of non-confidential appointments has been a topic of concern.  In April of 2016, for example, a psychiatrist directly raised the issues to Dr. Golding.  The psychiatrist wrote that they had been directed to see patients cell-front to meet the requirements of the Program Guide, even though doing so "does not meet that requirement."  CDCR0021262.  Further, [s]he wrote:

>    [I]t is impossible to provide any Psychiatric care cell side.  Cell side visits can only be wellness checks, those can be completed by custody or nursing as well; it is not an efficient use of the Psychiatrist's time, it is ONLY done to meet the "numbers".  FYI – Cell side, you cannot hear the patient, you can't fully see them, and you don't really want to discuss symptoms, medications or side effects.  There is absolutely no treatment provided cell front!

*Id*.  Dr. Golding on several occasions notified CDCR Mental Health Leadership, including Deputy Tebrock, about these concerns relating to non-confidential appointments.  Based on their responses, however, the communications do not indicate that CDCR fully understood the scope of Dr. Golding's allegations on this issue prior to the issuing of his report.

Dr. Golding brought to our attention several communications specifically relating to his concerns about confidentiality at CSP-SAC, which witnesses described as a particularly difficult facility in which to provide mental health care.  In late 2017, Dr. Golding, along with Dr. Gonzalez, specifically looked at various issues relating to psychiatric appointments

April 22, 2019
Page 59

at CSP-SAC in order to determine whether inmates had barriers to seeing patients and engaging in a clinic-style model.  In a detailed email, Dr. Gonzalez reported that she interviewed psychiatrists at that facility, and found, among other things, issues with custody bringing patients to appointments, psychiatrists' dissatisfaction at searching for and seeing most of their patients at cell side units, and a high incidence of patients refusing psychiatry appointments.  Gonzalez Complaint at 27.  The documents showed that Dr. Golding relayed some of these concerns to Deputy Tebrock and Assistant Deputy Brizendine in 2018 prior to the release of his report.  *See* ECF No. 5988-2 at 47 (Exhibit L); ECF No. 5988-3 at 19 (Exhibit Y).

Beyond the issues relating to confidentiality at CSP-SAC, Dr. Golding also communicated his larger concerns relating to the data regarding confidential appointments to others in CDCR Mental Health Leadership.  In an email on May 23, 2018 Dr. Golding wrote to a member of CDCR Mental Health Leadership about the prevalence of non-confidential appointments.  GOLDING00940.  Deputy Tebrock responded that CDCR had "much work to do to improve the system."

The EHRS system confirmed the psychiatrists' representations regarding EHRS default settings and the unavailability of an option to record a wellness check as an alternative form of appointment.  The figures below provide an overview of what the psychiatrists see in that system when they check out a patient.



*Figure 9: CDCR000957 (emphasis added).*

April 22, 2019
Page 60

The highlighted fields are the default options for psychiatrists.  The image below provides an overview of the psychiatrists' options beyond the defaults.



*Figure 10: CDCR0008257.*

April 22, 2019
Page 61

As shown above, psychiatrists are presented with a series of default options, which they must affirmatively change if they are not accurate. The default setting for the "contact confidentiality" designation is "confidential." The checkout form does remind psychiatrists that "If cell front contact location is selected, contact confidentiality needs to be changed to non-confidential," but the system does not have any systems in place to ensure that psychiatrists make changes to the default when necessary.

The evidence shows that Dr. Golding voiced systemic concerns relating to the potential over-reporting of confidential appointments as a result of the EHRS system defaults. In July 2018, Dr. Golding conducted an informal poll of CDCR telepsychiatrists. After collecting the results, Dr. Golding raised the broader issue of in-person cell-front psychiatric encounters. He wrote to Deputy Tebrock that "for many onsite psychiatrists and settings, it is close to 80% cellside, as we tour the facilities. In some places it is 100% cell-side for certain types of patient[s] in certain settings." Further, he wrote that:

> Whatever the data shows (if we were allowed to know) is a vast underestimate. This is so because on each facility that I tour, I ask the psychiatrists whether they **know** how to escape the default setting on the EHRS that reports these visits as in a confidential space. I have not found a single institution in which each psychiatrist knows. At CCWF and VSP not a single psychiatrist knows how to record a visit as non-confidential.

GOLDING003759.

f.      **Data Analysis**

Our analysis of data produced by CDCR confirms that CDCR deems all non-confidential encounters between psychiatrists and patients recorded in EHRS as resulting in psychiatrist-patient evaluations compliant with the Program Guide. Taking the data at face value—*i.e.*, assuming all contacts were correctly logged as confidential or non-confidential—this represented a relatively small portion of total clinical encounters. From the time period of January 1 to September 30 2018, there were 9,849 non-confidential appointments entered in EHRS that were deemed completed by CDCR under the Program Guide, which represented 6.87% of the total seen appointments. Of those, 8,015 appointments were considered 100% compliant with the Program Guide requirements using the "patient-weeks" methodology, which represented 5.6% of total seen appointments. These non-confidential appointments fell in all categories: standard, cell front, yard, holding cell, NULL, Therapeutic Module, bedside.

The evidence also shows that the data as to confidentiality of appointments is imprecise. There are also many instances where the EHRS system contains data that is mischaracterized for certain types of visits. For example, from the time period January 1 to September 30, 2018, appointments taking place cell-front, in a holding cell, or in the yard were

April 22, 2019
Page 62

mischaracterized 12.37% of the time as being confidential, when appointments in these locations are almost always non-confidential as a matter of course. Thus, it appears that certain psychiatrists either do not understand that these cell-front, holding cell, or yard appointments cannot be confidential, incorrectly logged these details with respect to their appointments, or these contacts are factually accurate and represent a rare occurrence where no other person is within ear shot in the yard, holding cell, or cell-front. As noted above, there is also substantial anecdotal evidence that other non-confidential appointments are logged as confidential.

3.    **Findings**

a.    **Whether Representations Were Misleading**

We find that CDCR's reporting of "Timely Psychiatry Contacts" overstates CDCR's compliance with the Program Guide timeline requirements as a result of the two confidentiality-related issues identified by the whistleblowers. First, because CDCR counts all non-confidential psychiatry contacts entered into EHRS towards Program Guide timeline requirements for EOP and CCCMS psychiatric evaluations, the "Timely Psychiatry Contacts" indicator is biased towards compliance by some non-trivial percentage. Second, the data is biased towards compliance as a result of CDCR's decision to default the appointments in EHRS to confidential, combined with insufficient training and oversight relating to this mechanism.

On the first issue, because CDCR data presented to the Court and Special Master is inconsistent with the Program Guide, and results in CDCR reporting that it is more compliant with the Program Guide timeline requirements for evaluations than it actually is, we find that CDCR's representations related to this issue are potentially misleading. We cannot, however, precisely determine the degree to which the CDCR data overstates compliance. The 5.8% figure cited above likely represents the minimum percentage of non-confidential appointments that were counted towards Program Guide timeline compliance.[47] Some of these appointments, however, may have been the result of an inmate refusing his or her appointment, which is allowed to be counted as compliant under the Program Guide, but the data does not allow us to measure the frequency of those situations.[48]

On the second issue, we conclude that CDCR should have been aware that many psychiatrists were not properly recording whether their visits were non-confidential, and, as a

---

[47]  That figure counts only appointments in which the default setting of confidential was overridden by the psychiatrist entering the data. As noted above, there is substantial anecdotal evidence that some portion of the appointments entered as confidential were not in fact confidential, which cannot be readily quantified.

[48]  Because there is no uniform way that psychiatrists record appointment refusals followed up by cell-side psychiatric contact, we cannot determine what percentage of non-confidential appointments are the result of patient refusal.

April 22, 2019
Page 63

result, presented misleading data to the Special Master and the Court. Again, we cannot determine the degree to which the data is skewed towards confidential evaluations as a result of CDCR's decision to default appointments to confidential, inadequate training, or other issues. It is not possible to ascertain how frequently psychiatrists fail to change the default confidential notation in EHRS when seeing patients in a non-confidential setting.

As a result of the factors described above, we find the data provided by CDCR on "Timely Psychiatry Contacts" is misleading. There is a substantial question, however, as to whether, and to what degree, the Court and Special Master relied on the data. As noted above, the Special Master did not generally rely on the Performance Report indicator for "Timely Psychiatry Contacts" in conducting its oversight function. Although "Timely Psychiatry Contacts" data was reported to the Special Master in connection with the 27th monitoring round and included in CDCR's submission in support of the 2018 Staffing Proposal, the Special Master's review of that proposal was primarily based on other factors.

> **b.     Whether There Was An Intent to Mislead**

We do not find that CDCR intentionally misled the Court or the Special Master with respect to the reporting of "Timely Psychiatry Contacts" data. While CDCR relied on an interpretation of psychiatric "evaluation" in the Program Guide which is at odds with the text and context of the document and the repeatedly-expressed position of the Special Master, it did not design or present the data in a manner to conceal the fact that non-confidential appointments entered into EHRS were being counted. In CDCR's view, individual psychiatrists have the discretion to determine when they have had sufficiently meaningful interactions with patients to enter those contacts into the EHRS system. While there is no option for psychiatrists to log an appointment that would not be counted towards Program Guide compliance, such as a wellness check, if psychiatrists log a clinical contact in EHRS, the system allows them to enter whether an appointment was confidential or non-confidential. CDCR provided data on non-confidential encounters to the Special Master. Thus, while the EHRS data on compliance with Program Guide timelines for compliance with psychiatric evaluations is potentially misleading because it is includes non-confidential encounters, we cannot conclude on the basis of the information available to us that this was a deliberate attempt to mislead the Special Master or the Court.

We also find that CDCR did not intend to mislead the Special Master or the Court by setting the default setting to "confidential" in EHRS. The system does permit treating psychiatrists to indicate whether a visit was "confidential" or "non-confidential," and to record where the visit occurred. Individual psychiatrists may have failed to accurately record their encounters for a variety of reasons—they did not know or chose not to change the default setting from confidential to non-confidential, or it was suggested by a supervisor that all contacts should be recorded as confidential—but the psychiatrists still had ultimate control over that patient's chart. As CDCR pointed out, it is the provider's responsibility to ensure the accuracy of the patient's health record. Although it appears that CDCR was aware that the data on

GIBSON DUNN

April 22, 2019
Page 64

confidential appointments was skewed, it does not appear that CDCR intended for the data to be improperly entered in the field.

**4.      Recommendations**

Because we find no evidence of an intent to mislead, we do not recommend an evidentiary hearing on this issue.  Because there is a significant disagreement between CDCR and the Special Master, however, concerning what patient contacts satisfy Program Guide requirements for psychiatric evaluations, and this disconnect impacts the collection and reporting of compliance data, we recommend that the Court consider directing the parties and the Special Master to meet and confer about what psychiatry encounters may properly be considered an "evaluation."  *See* PG at 12-4-9, 12-3-11.  The Court should also consider tasking the Special Master with examining how CDCR psychiatrists are entering data in EHRS relating to the confidentiality of patient appointments, and how that data is reported in the "Timely Psychiatry Contacts" indicator for purposes of compliance with the Program Guide.

April 22, 2019
Page 65

**E.    Reporting of Scheduled and Missed Appointments**

The Court directed us to investigate whether CDCR committed fraud on the Court or intentionally misled the Court or Special Master by its "manner of reporting of scheduled appointments and missed appointments."  ECF No. 6064 at 3.  There are three performance indicators at issue here:  "Appointments Seen as Scheduled," "Treatment Cancelled," and "Treatment Refused."  Dr. Golding alleges that CDCR used these indicators to report materially misleading compliance figures to the Court and the Special Master, resulting in the inaccurate impression that patients were being seen on schedule and that the refusal rate for these appointments was low.  As discussed in more detail below, we do not recommend that the Court hold an evidentiary hearing on this issue because there was no evidence to conclude that data from the "Treatment Cancelled" and "Treatment Refused" indicators was ever presented to the Court or the Special Master, and we find no evidence to conclude that CDCR intentionally misled the Court when it submitted figures for the "Appointments Seen as Scheduled" indicator that were inaccurately described.

**1.    Perspectives of the Whistleblowers and Parties**

**a.    Dr. Michael Golding**

Dr. Golding reports that when calculating the percentage of "Appointments Seen As Scheduled," CDCR excludes appointments that were not seen due to patient refusal, no-shows, or scheduling errors, thus resulting in an inaccurate report of approximately 95% of scheduled appointments having been "seen as scheduled."  Including these appointments would have resulted in a report of closer to 46% of appointments "seen as scheduled."  *See* ECF No. 5988-1 at 7-8, 35-47.

Dr. Golding also contends that CDCR schedulers move missed appointments to later dates rather than marking those appointments as missed and then rescheduling them.  This, in turn, increases the appearance of compliance by decreasing the number of missed appointments reported.  *Id.* at 40-43.

Finally, Dr. Golding asserts that the "Treatment Cancelled" and "Treatment Refused" indicators utilize arbitrary cut-offs to artificially inflate compliance.  For example, the "Treatment Cancelled" indicator does not reflect the total number of treatment hours cancelled, but instead reflects only the number of treatment hours cancelled greater than a certain CDCR-established threshold (*i.e.*, more than three hours of treatment cancelled for ASU EOP Hub or more than one hour of treatment cancelled for SRH/LRH CCCMS).  According to Dr. Golding, the "Treatment Refused" indicator employs a similarly "arbitrary" cut-off, only measuring, for instance, when an inmate refuses greater than 50% of treatment offered and attends less than five hours of treatment for ASU EOP Hub.  *Id.* at 62-63.

April 22, 2019
Page 66

### b.        Dr. Melanie Gonzalez

In addition to what Dr. Golding alleges, Dr. Gonzalez claims that when a provider sees a patient on a later date than the patient's original appointment date, the "Appointments Seen as Scheduled" indicator still reflects that patient having been seen as scheduled so long as the original appointment was neither rescheduled nor cancelled.

### c.        CDCR's Response

CDCR responds that the "Appointments Seen as Scheduled" indicator "does not track any Program Guide requirements," and the data generated by it "is not regularly provided to the court or Special Master."  ECF No. 6012 at 17.  According to CDCR, the "Appointments Seen as Scheduled" indicator was developed so that CDCR could track internally how many appointments were missed due to circumstances within its control, such as logistical problems and lockdowns.  This data is therefore aimed not at inflating compliance relating to patient participation in therapy, but at assisting CDCR in monitoring whether events within its control are impediments to inmates receiving care.  CDCR concedes that Dr. Golding was correct that the business rules for "Appointments Seen as Scheduled" described the Performance Indicator as including "all scheduled appointments" rather than the subset of appointments discussed above, but CDCR corrected this definition on October 9, 2018 once it learned of the issue through the Golding Report.  Thereafter, it correctly defined the more limited scope and purpose of the "Appointments Seen as Scheduled" indicator.  *See* ECF No. 6012-3 at 12-13 (Leidner Decl. ¶¶ 38-39).

According to CDCR, the "Treatment Refused" and "Treatment Cancelled" indicators also do not track any Program Guide requirements.  CDCR states that it is "not aware of any instance in which information from [the "Treatment Refused" and "Treatment Cancelled"] indicator[s] [have] been shared with the Special Master or the Court."  ECF No. 6012 at 19.

Lastly, even if schedulers were moving missed appointments to later dates rather than marking them as missed and rescheduling, CDCR asserts that this would not affect the data because "[a]ll rescheduled appointments are automatically coded as cancelled in CDCR's reporting data.  This designation cannot be changed by users."  ECF No. 6012-3 at 10 (Leidner Decl. ¶ 33).

### d.        The Special Master's Perspective

The Special Master was unaware of these issues before the Golding Report.  The Special Master did, however, note that the number of treatment hours offered, attended, and refused were important components of his compliance monitoring.  The Special Master stated that in addition to reviewing the data CDCR provided in conjunction with the monitoring rounds, he would also conduct interviews of staff at the various institutions to determine whether the institution was actually offering the required number of hours.  During the course of his monitoring, he did not discover any major issues with the compliance data for this issue.

April 22, 2019
Page 67

The Special Master also indicated that the CQI process, and the data submitted as part of that process, were extremely important to the progress of this case, including data derived from the "Appointments Seen as Scheduled" indicator (but not the "Treatment Refused" or "Treatment Cancelled" indicators).  As part of the CQI process, the Special Master relied on the data CDCR provided to him to inform his validation inspections of the individual institutions and, in turn, his evaluation of the effectiveness of CDCR's self-monitoring programs as a whole.  The Special Master therefore views any inaccuracies in the CQI data CDCR provided as material.

>   2.      **Summary of the Evidence**

>       a.      **Program Guide Provisions**

There does not appear to be any Program Guide provision that directly implicates the "Appointments Seen as Scheduled" indicator.  Although the Program Guide contains at least two provisions requiring certain documentation when inmate-patients refuse to participate in IDTT planning (PG at 12-3-9 (CCCMS), 12-4-6–7 (EOP)), one provision requiring that primary clinicians take certain actions when inmate-patients in ASUs refuse more than 50% of offered treatment during a one-week period (PG at 12-7-10–11), and multiple provisions requiring that inmate-patients be evaluated or seen by certain providers within a certain time frame (*see, e.g.*, PG at 12-3-15 (face-to-face contacts with Primary Clinicians for CCCMS patients every 90 days), 12-4-9 (monthly evaluation of EOP patients by psychiatrists)), it seems that these measurements are tracked using different performance indicators.  *See, e.g.*, "Timely Psychiatry Contacts," which measures the timeliness of required psychiatric evaluations of CCCMS and EOP patients.

The "Treatment Refused" and "Treatment Cancelled" indicators also do not appear to track any Program Guide requirements.  There are a number of provisions that require CDCR to offer EOP patients a certain number of "structured therapeutic activities" each week.  *See* PG at 12-2-8 (Reception Center), 12-4-9 (Mainline), 12-4-19 (condemned), 12-7-10 (ASU EOP Hubs), 12-9-7 (PSU).  CDCR does not, however, track compliance with these mandates using the "Treatment Refused" and "Treatment Cancelled" indicators.  Instead, it uses other indicators such as the "TX Hours Report" for this purpose, and there is no suggestion that the data on that report was misleading.

>       b.      **Representations to the Special Master and/or Court**

We did not find instances in which CDCR reported data derived from the "Treatment Refused" or "Treatment Cancelled" indicators to the Court or Special Master.[49]  With respect

---

[49]   As noted elsewhere, Dr. Golding and Dr. Gonzalez did not always have visibility into what data CDCR collected and utilized for internal management purposes, and what data related to Program Guide compliance was shared with the Special Master or the Court.

GIBSON DUNN

April 22, 2019
Page 68

to the "Appointments Seen as Scheduled" indicator, CDCR made the following
representations to the Special Master and/or the Court:

- Defendants' May 17, 2018 Staffing Proposal.  ECF No. 5841-2 at 4 n.5 (stating
  "[a]ppointments occurred as scheduled 98% to 100% of the time" over the prior 12
  months to support the assertion that "CDCR is meeting the needs of class members in
  the desert institutions").

- CQI data provided to the Special Master.  *See, e.g.*, PLTF000894, "CEN Mental
  Health Performance Report for 4/1/16 to 10/24/16" (reporting 100% of
  "Appointments Seen as Scheduled"); PLTF000896, "LAC Mental Health
  Performance Report for 3/1/16 to 9/26/16" (reporting 91% of "Appointments Seen as
  Scheduled").

- At least one CQI Report to the Special Master.  *See* CDCR0019053, Regional
  Continuous Quality Improvement Review for RJD, October 10-14, 2016 at 12 ("ML
  EOP had 94% of appointments seen as scheduled" and "ML CCCMS had 94%
  (n=16,333) of their appointments seen as scheduled").

### c.   CDCR Mental Health Leadership Witnesses

The CDCR witnesses generally reported that the "Appointments Seen as Scheduled,"
"Treatment Refused," and "Treatment Cancelled" indicators were developed for internal use
only for measuring the performance of the institutions, and that they were not provided to the
Special Master or the Court.  According to Deputy Lambert, the "Appointments Seen as
Scheduled" indicator was developed independently from the Program Guide by the medical
unit, and adopted by Mental Health around 2016.  She stated, "[F]rom the medical
perspective we introduced seen as scheduled as an efficiency metric.  And what we were
primarily looking at is how much are we seeing cancellations of clinics based on factors that
arguably are under our control."  Lambert Tr. at 82:16-20.  Since Mental Health adopted this
indicator in 2016, both medical and Mental Health made modifications to better suit their
specific needs, thus resulting in divergent measurement components.  Confusingly, therefore,
Mental Health and medical each use similar indicators, which share the same name, but
which measure different types of data.

Dr. Ceballos indicated in her interview that CDCR Mental Health updated its "Appointments
Seen as Scheduled" indicator sometime in 2016 to match the CCHCS Health Care
Dashboard indicator, and thereby include only those appointments that were missed due to a
factor within CDCR's control.  Ceballos Tr. at 147:8-16, 148:9-10, 148:22-149:3.  After
making the change, CDCR Mental Health inadvertently failed to update the definition of the
indicator to reflect the more limited scope of the measurement in this indicator.  *Id.* at 149:4-
10.  CDCR identified the discrepancy between what the indicator actually measures and the
language defining the indicator when Dr. Golding submitted his report.  *Id.*

GIBSON DUNN

April 22, 2019
Page 69

Dr. Ceballos also stated that when a patient does not show up for his or her appointment and the provider does not ultimately see the patient, the provider is supposed to enter into EHRS that the appointment was "not completed" and then request that the scheduler reschedule the patient for another time. *Id.* at 183:2-12. In CDCR terms, this would "adhere[] to workflows." *See* CDCR0007811. But if the provider instead simply checks the patient in and out whenever the patient is actually seen (*e.g.*, when the provider sees the patient on the next day) without requesting that the original appointment be rescheduled, that original appointment may be reflected as having been completed as scheduled. *Id.* According to Dr. Ceballos, this was a problem that CDCR was addressing through training prior to the Golding Report. *Id.*

With respect to the "Treatment Cancelled" and "Treatment Refused" indicators, Dr. Ceballos stated that these data were used for internal purposes only, and that CDCR uses the "TX Hours Report," which relies on different business rules for its calculations, to report compliance with the structured therapeutic activities required under the Program Guide. Ceballos Tr. at 159:25-160:21; ECF No. 6012-2 at 6 (Ceballos Decl. ¶ 16).

In his interview, Dr. Leidner confirmed that the "TX Hours Report," which is regularly provided to the Special Master, uses different business rules than the "Treatment Cancelled" and "Treatment Refused" indicators that are at issue in the Golding Report. Leidner Tr. at 125:25-126:9. In other words, the "Treatment Cancelled" and "Treatment Refused" indicators do not "roll up" into the "TX Hours Report," but are instead distinct indicators that, although relying on the same underlying data, apply distinct business rules to render their respective measurements. *Id.* at 126:10-127:14.

>    **d.    Documents**

In July 2015, CDCR counsel submitted materials related to the CQI process to both Plaintiffs' counsel and the Special Master, including a slide deck and CQI Report Writing Outline, which listed "Percentage of all mental health encounters that occur as scheduled" as a "Quality Improvement Indicator Categor[y]." CDCR0009503; CDCR0009512; *see also* ECF No. 6012-2 at 16 (Ceballos Decl. at Ex. 1). Although the measurements for the "Appointments Seen as Scheduled" indicator was updated around 2016 to no longer measure the "[p]ercentage of all mental health encounters that occur as scheduled," the description was not updated in later iterations of CDCR's CQI materials. *See, e.g.*, CDCR0012147 (June 20, 2018 CQI Report Writing Guidebook listing "Percentage of all mental health encounters that occur as scheduled" as a ML EOP indicator).

Deputy Director Lambert provided us with an analysis she conducted after the Golding Report was released of the differences between the current numerators and denominators for the "Appointments Seen as Scheduled" indicator for CDCR Mental Health and CCHCS medical, which tends to show that there are significantly fewer metrics included in the denominator for Mental Health's indicator. In a letter to us on March 28, 2019, Dr. Leidner

April 22, 2019
Page 70

clarified that since reviewing this information, he does not know when CDCR Mental Health and CCHCS's "Seen as Scheduled" indicators diverged or if they ever precisely matched. CDCR0022297.

3.    **Findings**

a.    **Whether Representations Were Misleading**

As to Dr. Golding's allegation that the "Appointments Seen as Scheduled" data understates the rate of actual patient participation in appointments, we find that the underlying data for this performance indicator was not misleading in light of CDCR's intended purpose. While Dr. Golding logically viewed the "Appointments Seen as Scheduled" indicator as a measurement of patient clinical experience, CDCR witnesses credibly described it as in fact intended as a measurement of institutional performance for its internal use. CDCR's failure to accurately describe the limited purpose of the indicator and the nature of the data being measured, however, reasonably created confusion about this performance indicator.

Between approximately 2016 and October 2018, the *definition* of the "Appointments Seen as Scheduled" indicator was incorrect and potentially misleading because it described the indicator as including "*all* scheduled appointments" when it in fact only included appointments that were scheduled to occur during the reporting range but that did not occur due to factors within CDCR's control. As a result, the data that CDCR provided to the Court on June 21, 2018 and to the Special Master as part of the CQI evaluations was described in a manner that was likely misleading. CDCR corrected the definition after reading Dr. Golding's report, so that issue has been resolved.

Because there is no evidence that the "Treatment Cancelled" and "Treatment Refused" indicators were ever provided to the Court or the Special Master, we find that the data in these indicators did not mislead the Court or the Special Master. Like the "Appointments Seen as Scheduled" indicator, these indicators track internal CDCR measures that are not tied to any specific Program Guide requirements. While Dr. Golding criticizes the cutoffs used to calculate these indicators as "arbitrary," this does not make them misleading. These cutoffs are merely CDCR's chosen methodology for achieving what it believes is a meaningful data set that can be utilized within the institution to enhance care.

Finally, we did not find evidence to contradict CDCR's assertion that rescheduled appointments are automatically coded as cancelled appointments for purposes of compliance data. It does appear possible, however, that appointments that are neither rescheduled nor cancelled can be marked as having been seen as scheduled if the provider and/or scheduler do not properly classify the originally missed appointment as "not completed." It appears that this problem stems from imprecise data entry by the EHRS user and not any effort to present misleading data to the Court or the Special Master.

April 22, 2019
Page 71

### b.  Whether There Was an Intent to Mislead

Although CDCR submitted data on the "Appointments Seen as Scheduled" indicator to the Special Master and the Court that was presented in a misleading manner and that the Special Master relied upon to evaluate the efficacy of CDCR's CQI process, we did not find evidence of an intent to mislead.  Indeed, as noted above, it appears that CDCR was not aware of the divergence between the business rule for collecting that data and the description of that business rule until Dr. Golding submitted his report.

### 4.  Recommendations

Because we find the "Treatment Cancelled" and "Treatment Refused" data was never presented to the Court and Special Master, and that with respect to the "Appointments Seen as Scheduled" indicator there is no evidence of an intent to mislead, we do not recommend an evidentiary hearing on this issue.

April 22, 2019
Page 72

## F.     Psychiatric Supervisors Acting as Line Staff

The Court directed us to investigate whether CDCR committed fraud or intentionally provided false or misleading information to the Court or Special Master by "[f]ailing to report that psychiatric supervisors were also performing some or all the functions of staff psychiatrists." ECF No. 6064 at 3. Although supervising psychiatrists are not obligated to treat patients as part of their employment duties, all parties and the Special Master agree that supervisors are generally expected to assist as needed in seeing patients, especially when there are shortages of staff psychiatrists. The frequency of supervisors performing direct patient care varies significantly by institution.

The evidence confirms that at certain institutions psychiatric supervisors maintain an active caseload comparable to line staff. If supervisors are responsible for a substantial portion of the patient workload across CDCR, then CDCR's representations relating to psychiatry staffing ratios were potentially misleading. While the parties and the Special Master expect some degree of supervisory participation in patient care, if supervising psychiatrists were filling in for line staff to a substantial degree, this information would have been material to Plaintiffs and the Special Master when considering whether to agree to CDCR's proposed reductions in psychiatry staffing as part of the 2018 Staffing Proposal. Nevertheless, we did not find evidence that CDCR made a specific false or misleading statement with respect to this issue, or that such data, if misleading, was material, and so we do not recommend that the Court hold an evidentiary hearing on this issue.

### 1.     Perspectives of the Whistleblowers and Parties

#### a.     Dr. Michael Golding

Dr. Golding alleges that CDCR made misrepresentations by failing to report that psychiatric supervisors were also performing some or all the functions of staff psychiatrists. Dr. Golding asserted that the 2018 Staffing Proposal proposed decreasing the average frequency of psychiatric care, but did not address the supervisory structure. According to Dr. Golding, it was misleading to the Special Master and Plaintiffs, who were trying to come to agreement with CDCR about mandated psychiatric staffing numbers, for CDCR not to report the extent to which psychiatric supervisors act as line staff. Dr. Golding estimates that about 50% of CDCR's supervisors are regularly seeing patients in the outpatient and crisis bed areas of care, and about 60% of supervisors are seeing patients in the psychiatric inpatient programs.

Dr. Golding claims CDCR Mental Health Leadership, specifically Deputy Tebrock and Assistant Deputy Brizendine, were aware of this issue prior to the release of his report. He believes that in an April 2018 meeting with these individuals, Dr. Kuich mentioned that many psychiatry chiefs and supervisors were working as line staff and that these supervising psychiatrists were not considered in the staffing ratios. Dr. Golding also says he spoke to these same individuals about this issue at a later meeting.

April 22, 2019
Page 73

### b.    Dr. Melanie Gonzalez

In her report, Dr. Gonzalez stated, in relevant part:  "[S]ixty percent of psychiatry supervisors see patients (per our polling data), due to staffing shortages.  The compliance numbers in this indicator ["Timely Psychiatry Contacts"] are presented as having been obtained by line staff alone, and are used to determine psychiatry staffing needs.  This both results in an underestimate of staffing needs, and in supervisors being unable to do necessary supervisory work due to having to compensate for the line staff shortage."  Gonzalez Compl. at 5.

### c.    CDCR's Response

CDCR states that "Defendants never claimed or asserted that no psychiatry supervisors will ever perform the functions of line staff [. . . and] in some cases supervising psychiatrists are expected to carry a caseload under the 2009 Staffing Plan."  ECF No. 6012 at 20 (citing ECF No. 3693 at 22).  CDCR also argues that Dr. Golding's claim that 60% of psychiatric supervisors seeing patients alongside line staff has no supporting evidence, including no details about the classification or level of care the supervisors are assigned to, and makes no mention of how many patients are on these supervisors' caseloads.

CDCR also argues that Dr. Golding is incorrect about the meaning of "staffing ratio" and the data provided to support CDCR's 2018 Staffing Proposal to reduce psychiatric staffing allocations.  According to CDCR, staffing ratios are not retrospective, as they believe Dr. Golding views them, but prospective:  an agreed-upon figure used to generate overall staffing goals based on the size of the patient population.  "The parties reached agreement on target staffing ratios that were outlined in the 2009 Staffing Plan.  Those ratios include a relief factor that accounts for work done by psychiatrists filling vacancies caused by illness, vacations, or staff turnover."  ECF No. 6012 at 21 (citing ECF No. 3693 (2009 Staffing Plan) at 22).  CDCR further notes that Defendants' proposals for adjusting the 2009 Staffing Plan did not make any representations regarding the per-capita workload currently being performed by CDCR psychiatrists, and would not have been impacted in any way by whether line staff or supervisors are currently providing care.  ECF No. 6012 at 21 (citing ECF No. 5841-2).

### d.    The Special Master's Perspective

The Special Master stated that in assessing the proper staffing level, it is fair to say that he assumes that direct patient care is primarily done by line staff, but that some level of supervisory participation would be normal and expected.  The Special Master noted that under the job descriptions for supervisors, they should do minimal clinical work, but that supervisors, particularly those in thinly staffed institutions, would be expected to sometimes provide direct care to patients, which would be clinically necessary and appropriate.

April 22, 2019
Page 74

The Special Master asserted that CDCR did not provide sufficient information for the Special Master to determine whether the overall data relating to this issue was misleading.  For example, the Special Master would need to know how many full-time equivalents were actually used for direct services, as well as the duration, and that they could over time determine the number of psychiatrists needed.  From the perspective of evaluating a staffing proposal, if 35% of the work is done by supervisors, that would have significant impact; if only 5 or 10% were done by supervisors, it may not have a significant impact.

Finally, and as also noted above, the Special Master did not primarily rely on current staffing ratio data in evaluating the 2018 Staffing Proposal.  *See supra* at § IV.E.  The focus of CDCR's proposal, and of the Special Master's evaluation of it, was on staffing cuts that could be justified by changes since the original 2009 Staffing Plan, such as the changes in CDCR patient-inmate populations, changes in the number of CCCMS inmates on medications, and the existence of unfilled FTEs relating to unused functions contemplated in the original plan.

### 2.    Summary of the Evidence

#### a.    Program Guide Provisions

The Program Guide is generally silent on the issue of supervisory psychiatrists providing patient care.  The Program Guide explicitly allows supervisors to provide clinical services in addition to supervisory/management responsibilities in the Mental Health Crisis Bed ("MHCB") setting, stating that "[s]upervising clinical staff may assist in [clinical] services if required by workload, staffing considerations or unusual complexity of an individual case." 12-5-33.  But no similar provision exists in the EOP and CCCMS context.

The 2009 Staffing Plan includes staffing ratios for "Staff Psychiatrist" but not for Psychiatry Supervisors.  ECF No. 3693 (filed September 30, 2009); *see also id*. at 12 (CCCMS-GP ratios), 17 (EOP-GP ratios).  Additionally, that same document set out the job description of supervisors, which did not include significant patient care responsibilities.  *Id*. at 32.

#### b.    Representations to Special Master and/or Court

This issue impacts representations CDCR had made regarding staffing, including the Staffing Proposals presented to this Court and the Special Master.  Most notably, this issue impacts CDCR proposed "staffing ratios" in CDCR's 2018 Staffing Proposal.  *See generally* ECF No. 5841-2; ECF No. 5841-3.

Additionally, CDCR made representations as to staffing in other documents which do not include contributions from psychiatrist supervisors, including:

- Monthly reports on staff psychiatrist vacancy rates.  *See, e.g.* PLTF005201, PLTF005207.

April 22, 2019
Page 75

- Defendants' Response to the Special Master's Report.  ECF No. 5591 at 14 ("Over the past year, inmates were seen timely . . . by their psychiatrist ninety percent of the time.") (emphasis added), 15 (reporting 74% average fill rate for psychiatrists).

- 27th Round Monitoring Data, Tab B: Staffing.  *See* ECF No. 6012-2 at 69.

- Other representations CDCR made to the Special Master and the Court regarding the adequacy of their current staff psychiatry staffing levels.  *See e.g.*, Joint Status Report RE: October 11, 2018 Status Conference (Sept. 15, 2018), ECF No. 5922 at 4 ("CDCR expects that implementation of the proposed staffing plan will immediately lead to CDCR being at or above the staffing levels required in the Court's June 13, 2002 Order (ECF No. 1383), and therefore immediately bring CDCR into compliance with the October 10, 2017 Order [ECF No. 5711 at 30].").

## c.    CDCR Mental Health Leadership Witnesses

CDCR witnesses did not deny that psychiatric supervisors sometimes see patients, but argue that Dr. Golding overstates the extent to which they do so.  Witnesses told us that the current EHRS system did not include a function for retrieving data on the number of hours that supervisors spend providing direct care to patients.  *See e.g.* Ceballos Tr. at 143:10-144:22.  Dr. Ceballos stated this issue was not raised to her before the Golding Report.  *Id.* at 144:23-145:4.

Ms. Ponciano provided us with an analysis that she conducted after Dr. Golding submitted his report, on the number of CCCMS and EOP psychiatry appointments involving supervisors and chiefs at each institution.  She compiled the data by manually searching in the system for appointments associated with the name of each supervisor and chief.  *See* Ponciano Tr. at 7:20-9:1, 91:15-92:12.  She reported that she attempted to use the same time frame that was used for data reported in connection with the 2018 Staffing Proposal, the six months from October 2017 through March 2018.  *Id.* at 92:18-93:25.  Due to a problem with the availability of October 2017 data, however, her analysis covered only five of these six months, beginning in November 2017.  *Id.*

Her chart, set forth below, tended to show a very low number of appointments conducted by supervisors (about 149 appointments per week or the equivalent of 1.75 FTE system-wide, assuming 30 minute appointments).

April 22, 2019
Page 76



| | | | November 2017 through March 2018 Psychiatry Appointments for CCCMS and EOP | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Count of eventdate | Column Labels | | | | | | |
| Row Labels | CCCMS | EOP | EOPMod | Grand Total (5 Months) | Average Appts per Month | Average Appts per Week | Average Hours per Week (assumes 30 min appts) |
| CCI | 893 | 10 | | 903 | 180.6 | 45.2 | 22.6 |
| CCWF | 200 | 95 | 2 | 297 | 59.4 | 14.9 | 7.4 |
| CIM | | | 1 | 1 | 0.2 | 0.1 | 0.0 |
| CMF | | 19 | | 19 | 3.8 | 1.0 | 0.5 |
| COR | 82 | 157 | 5 | 244 | 48.8 | 12.2 | 6.1 |
| CRC | 19 | | | 19 | 3.8 | 1.0 | 0.5 |
| CTF | 333 | | | 333 | 66.6 | 16.7 | 8.3 |
| DVI | 1 | | | 1 | 0.2 | 0.1 | 0.0 |
| KVSP | 2 | 2 | 6 | 10 | 2.0 | 0.5 | 0.3 |
| LAC | 15 | 12 | | 27 | 5.4 | 1.4 | 0.7 |
| MCSP | 2 | 12 | 1 | 15 | 3.0 | 0.8 | 0.4 |
| NKSP | 62 | 118 | | 180 | 36.0 | 9.0 | 4.5 |
| PVSP | 88 | 5 | | 93 | 18.6 | 4.7 | 2.3 |
| RJD | 1 | | | 1 | 0.2 | 0.1 | 0.0 |
| SAC | 1 | | | 1 | 0.2 | 0.1 | 0.0 |
| SATF | 131 | 51 | 1 | 183 | 36.6 | 9.2 | 4.6 |
| SCC | 128 | 3 | | 131 | 26.2 | 6.6 | 3.3 |
| SQ | 165 | 4 | | 169 | 33.8 | 8.5 | 4.2 |
| SVSP | 7 | 44 | | 51 | 10.2 | 2.6 | 1.3 |
| WSP | 274 | 30 | | 304 | 60.8 | 15.2 | 7.6 |
| Grand Total | 2404 | 563 | 15 | 2982 | 596.4 | 149.1 | 74.6 |

*Figure 11: CDCR0008467.*

### d.    Additional Witnesses

Psychiatrists agreed that this issue varied significantly by institution, but all acknowledged that it was not uncommon for psychiatry supervisors to see patients.  One psychiatrist noted that at some institutions, a single psychiatrist (sometimes a supervisor or chief) handles all IDTT appointments.  Another psychiatrist noted that as a supervisor, she was assigned the case load of three line staff.  One Chief Psychiatrist described that [s]he provides a lot of the care, but could not provide a specific volume.  [S]he commented that if [s]he did not provide direct care, the institution would be out of compliance.  Another Chief Psychiatrist reported that [s]he did not routinely see patients or have a set patient load.

A senior supervising psychiatrist said it was expected that supervisors perform the same duties as line staff when there are staffing shortages—the culture of leadership was that psychiatrists should be utilized.  That psychiatrist explained that when [s]he took on the senior supervisor position [s]he was doing line staff work at least 50% of the time, and [s]he currently still covers IDTTs and other line work when other psychiatrists are not available.[50]

The anecdotal evidence from multiple psychiatrists suggests that Ms. Ponciano's data analysis undercounts the amount of patient care being provided by supervisors.  It is clear,

---

[50]  Some psychiatrists stated that having to see patients further marginalized them from decision making. Because they were busy seeing patients, non-psychiatrists would make decisions about psychiatrists without psychiatry being present.

April 22, 2019
Page 77

however, that the degree to which supervisors provide direct care varies widely by institution and over time, and so we were unable to more precisely quantify this activity.

### e.    Documents

We identified no internal CDCR correspondence that materially impacted our analysis of this issue.  This issue does not lend itself well to a comprehensive data analysis, because there is currently no system mechanism to separate appointment data by line psychiatrist versus supervisor.[51]  It does not appear that CDCR had ready access to a data set based on supervisor-only appointments.  Although Ms. Ponciano provided us with her analysis on the volume of patients seen by supervisors, we were not able to verify the accuracy of those metrics.

### 3.    Findings

### a.    Whether Representations Were Misleading

The data on "Timely Psychiatry Contacts" which CDCR submitted in support of its position in the 2018 Staffing Proposal that the number of CDCR psychiatrists could be cut was potentially misleading because CDCR did not disclose that some portion of that data reflected appointments seen by supervisors, not line psychiatrists.  We do not find, however, that there was sufficient evidence that this data, if misleading, was material, nor do we find that the failure to break down supervisor and line psychiatrist appointment data misled the Special Master or the Court.

CDCR made no misrepresentation to the Court or the Special Master that all patient contacts are seen only by line psychiatrists.  It could not be determined whether the omission of data about supervisory appointments would have materially changed the data.  As noted above, the Special Master confirmed that he was generally aware that supervisors see patients at some times for various reasons, and stated that a reasonable level of supervisory participation would not have had a material impact on his view of the staffing data.  Ms. Ponciano's after-the-fact analysis suggests that the number of patient appointments handled by supervisors across the system is equivalent to a relatively small number of FTEs.  While the statements of psychiatrists we interviewed cast some doubt on the reliability of that analysis, we cannot conclude that the number of hours in which supervisors provided direct care was substantially higher.  Moreover, the Special Master assumed that at certain institutions, especially those where psychiatry staffing shortages are acute, supervising psychiatrists regularly fill in for line psychiatrists.

---

[51]  Further complicating a comprehensive analysis of this issue is the fact that the data likely overstates the number of supervising psychiatrists.  Under the previous CERNER system, the system was not designed to handle approval of formulary prescriptions.  As a work around, staff psychiatrists were permitted to promote themselves in the system to supervisor status in order to authorize formulary prescriptions, thus potentially resulting in confusing data about supervisory status at any given time.

April 22, 2019
Page 78

Moreover, as noted above, the Special Master's evaluation of the 2018 Staffing Proposal was primarily *not* based on an analysis of staffing ratio data. We do not find, therefore, that the data submitted by CDCR, even if potentially misleading, impacted the Special Master or the Court.

**b.      Whether There Was an Intent to Mislead**

We do not find that CDCR intended to mislead the Special Master or the Court by omitting supervisory workload data from its submission in support of the 2018 Staffing Proposal. As noted above, the data may have been immaterial, but in any event we did not find evidence that CDCR attempted to withhold information about supervisors' patient workload. CDCR did not have ready access to supervisory workload data at the time of the submission. Ms. Ponciano's analysis was conducted after the submission of the Golding report, and required a manual search with various assumptions.

**4.      Recommendations**

Because we did not find evidence of an intent to mislead, we do not recommend an evidentiary hearing on this issue.

April 22, 2019
Page 79

## G.    Medication Noncompliance

The Court directed us to investigate whether CDCR committed fraud on the Court or intentionally misled the Court or Special Master by "[t]he way in which medication non-compliance is measured." ECF No. 6064 at 3. The performance indicator for "Timely MH Referrals" includes data for medication nonadherence, which measures how many patients have been scheduled for medication noncompliance appointments. According to the Program Guide, the scheduling of such appointments is governed by the CCHCS Medication Adherence Procedure. The gravamen of this issue is whether CDCR's interpretation and implementation of that policy results in an under-referral of medication noncompliant patients for appointments, and therefore undercounts noncompliant patients. Dr. Golding and CDCR psychiatrists we interviewed believe that all medication noncompliant patients must be scheduled for noncompliance counseling appointments. CDCR contends that the policy gives psychiatrists discretion whether to schedule a patient for a medication noncompliance appointment. The interpretation of the CCHCS Medication Adherence Procedure that more reasonably comports with the Program Guide as a whole is that it requires referrals of all medication noncompliant patients for an appointment with a psychiatrist.

We find that the "Timely MH Referrals" data reported by CDCR was misleading, because for medication noncompliant patients it only counted those patients for whom a psychiatrist ordered a medication noncompliance counseling appointment as a matter of discretion. We did not find evidence, however, to suggest that CDCR intentionally under-reported data on medication noncompliant patients. As discussed below, there is confusion within CDCR about what the policy requires, and implementation of the policy appears to be inconsistent as a result of good faith misunderstandings. Accordingly, while we do not recommend that the Court conduct an evidentiary hearing on this issue, we do recommend that the Court consider directing the parties and the Special Master to meet and confer in order to achieve consistent application of the Medication Adherence Procedure across CDCR.

### 1.    Perspectives of the Whistleblowers and Parties

#### a.    Dr. Michael Golding

According to Dr. Golding, the way in which CDCR tracks and reports timely medication noncompliance appointments results in artificially high compliance rates. First, the compliance data only counts patients who have been scheduled for a medication nonadherence appointment rather than all the patients who are actually medication noncompliant. Second, medication noncompliance appointments that are refused are counted as having been completed, and medication noncompliance appointments that occur are sometimes double-counted. *See* ECF No. 5988-1 at 8, 58-62. An analysis of medication noncompliance appointments during one month at one institution (CHCF) submitted by Dr. Golding and by Dr. Gonzalez suggested that less than 4% of noncompliant patients were

April 22, 2019
Page 80

scheduled for appointments, and that CDCR may therefore have overreported compliance
with medication noncompliance referrals by as much as 96%.  ECF No. 5990-6 at 120; *see
also* ECF No. 5988-5 at 21-26.  Dr. Golding claimed that he raised his concerns in a series of
meetings from July to September 2018 with CDCR headquarters staff, including Deputy
Tebrock and Assistant Deputy Brizendine.

> **b.**      **CDCR's Response**

With respect to Dr. Golding's first allegation, CDCR's view is that under the applicable
policy, whether to schedule a patient for a medication noncompliance appointment is solely
within the psychiatrist's clinical discretion.  Moreover, CDCR states that "there is no
Program Guide requirement or court order mandating that an appointment be automatically
scheduled to provide consultation to medication non-compliant patients."  ECF No. 6012 at
22.  CDCR asserts that Dr. Golding's concern is merely a policy difference, not a matter of
"data reporting or fraud."  *Id.*

For Dr. Golding's second allegation, CDCR learned of this "inadvertent software error that
caused cancelled appointments to be counted as late" when Dr. Golding submitted his report
to the *Plata* receiver.  In response, CDCR promptly "removed the cancelled appointments
from the indicator," thus causing CDCR's compliance with medication nonadherence
referrals to increase—a clear indication that the error "was not a deliberate attempt to inflate
results."  *Id.* (citing Leidner Decl. ¶ 47.)

> **c.**      **The Special Master's Perspective**

The Special Master was unaware of these data reporting issues prior to Dr. Golding's
allegations.  According to the Special Master, the Program Guide requires CDCR to comply
with the CCHCS Medication Adherence Procedure.  The Special Master's view is that the
text of the policy, read in the context of the Program Guide, mandates that, unless a nurse or
clinician is able to resolve the noncompliance issue immediately, every medication
noncompliant patient must be referred to a psychiatrist for a medication noncompliance
counseling appointment.  He has assumed that CDCR psychiatrists follow up with every
medication nonadherent patient, and believes that leaving patients who are not scheduled for
appointments out of the denominator for the measurement of medication noncompliance
would be misleading.  The Special Master acknowledges that the Medication Adherence
Procedure is not entirely clear, however, and has observed wide variation in how each CDCR
institution implements the policy.  The Special Master also acknowledges that, except for
"critical medications," the time for scheduling medication noncompliance counseling
appointments with the prescribing psychiatrist is a matter of clinical judgment.

April 22, 2019
Page 81

### 2.   Summary of the Evidence

#### a.        Program Guide Provisions

The Program Guide requires CDCR to comply with "Inmate Medical Services Policies and Procedures."  PG at 12-3-12 and 12-4-9.  The CCHCS  Medication Adherence Procedure governs both psychiatrists and other medical prescribers.  CCHCS Volume 4, Chapter 11, Section 4.11.5 (attached hereto as Appendix E).  According to the policy, nurses must conduct a weekly review of the Medication Adherence Medication Administration Record and refer any patient who misses three consecutive days or at least 50% of scheduled medication doses to the prescriber (which in the case of mental health patients is the psychiatrist).  *See id.* at § IV(A)(2).  The prescriber then "shall" conduct "medication non-adherence counseling," which includes an interview of the patient and discussion of the "implications/consequences of not taking the medication."  *Id.* at § IV(D)(2).  Patients who refuse even one dose of "critical medications" (*e.g.*, Clozapine and "Penal Code (PC) 2602 medications"), must be referred for an urgent mental health evaluation, which must occur within 24 hours.  *Id.* at IV(F)(3) & (4).[52]

#### b.        Representations to the Special Master and/or Court

CDCR reported data from its "Timely MH Referrals" indicator, which includes medication nonadherence, to the Court and/or Special Master on at least the following instances:

- 27th Round Monitoring data submitted to the Special Master.  CDCR responses to Tab P of the Special Master's April 11, 2016 document request.  *See* ECF No. 6012-2 at 111.

- Defendants' May 17, 2018 Staffing Proposal.  ECF No. 5841-2 at 4, 17.

- Defendants' August 24, 2018 Staffing Proposal.  ECF No. 5922 at 21.

- ASU EOP Hub certifications.  *See generally, e.g.,* PLTF000990-1021 (October 26, 2018); PLTF001022-1053 (November 16, 2018); PLTF001054-1084 (December 17, 2018).

---

[52]   The policy does not clearly define the time frames within which medication nonadherent patients must be seen, except where a patient refuses a "critical medication," in which case a psychiatrist must see the patient within 24 hours (section IV(F)(3)(b) refers to this as an "urgent" referral).  The Program Guide, however, establishes three referral categories:  "Emergent," which requires immediate consultations (CDCR has implemented this to reflect compliance for appointments that occur within four hours); "Urgent," which requires consultations within 24 hours (this is consistent with the time frames in the policy); and "Routine," which requires consultations within five working days.  PG at 12-1-5 (establishing general timelines for referrals) and 12-3-11 (CCCMS Medication Evaluation and Management referrals). Though the Program Guide does not specifically reference these referral timelines in the chapter addressing the EOP program, CDCR applies these time frames to EOP and CCCMS patients alike.

April 22, 2019
Page 82

- CQI Reports submitted to the Special Master.  *See, e.g.,* PLTF001155 (LAC); PLTF001195 (NKSP); PLTF001239 (RJD).

### c.    CDCR Mental Health Leadership Witnesses

CDCR witnesses did not agree in their interpretation of the Medication Adherence Procedure.  CDCR psychiatrists interpreted the policy as rendering a medication noncompliance appointment by a psychiatrist as mandatory, while CDCR psychologists and administrators interpreted it as permitting the exercise of discretion.  Because the policy covers medications prescribed both by psychiatrists and by other medical doctors, and the administration and assignment systems in CDCR facilities for mental health and other types of health care are different, there was confusion over the correct interpretation and implementation of the policy.

Deputy Tebrock was generally familiar with the Medication Adherence Procedure.  She indicated that medication noncompliance was a topic that CDCR discussed with the Special Master and Plaintiffs during meetings about the Staffing Proposal.  After reading the policy, Deputy Tebrock stated, "I still am unclear whether *Coleman* would mandate the follow-up appointment.  This certainly does seem to suggest that there's a CDCR CCHCS policy.  I don't know what the Program Guide or *Coleman* would contemplate about this."  Tebrock Tr. at 157:6-10.

In her interview, Assistant Deputy Brizendine stated that she was not intimately familiar with the medication nonadherence policy or the process by which medication noncompliant patients are evaluated.  Documents we reviewed indicate that she was aware of Dr. Golding's concerns about the issue by August 2018.  In an August 9, 2018 email discussing an "Emergent Workflow Group," Dr. Golding raised his concern to Assistant Deputy Brizendine that the medication noncompliance measurement was inaccurate because it excluded from its calculation the number of inmate-patients who were medication noncompliant but who were not scheduled for a medication noncompliant counseling appointment.  *See* CDCR0006882-83.  In response, Assistant Deputy Brizendine said, "I agree with you that the medication noncompliance measurement base is wrong.  I just heard about this the other day." CDCR0006881.  In her interview, she stated that she could not remember why she said that she had heard "the other day" that the "medication noncompliance measurement base [was] wrong,"  and that she thought Dr. Golding had been the first person to tell her about this issue in the hallway a few days before that email exchange.  Brizendine Tr. at 98:16-18, 100:2-5.

Dr. Leidner agreed that CDCR's data excludes from its calculations those patients who qualify as medication nonadherent but for whom a psychiatrist does not order a

April 22, 2019
Page 83

noncompliance counseling appointment.[53]  In his words, "if a consultation is not created, no measurement is made."  ECF No. 6012-3 at 15 (Leidner Decl. ¶ 45).  In his interview, he emphasized that he was not responsible for interpreting the policy, but rather was responsible for implementing and operationalizing the policy as interpreted by CDCR leadership.  He stated that it would be possible for CDCR to craft a measurement that would account for all patients who are deemed medication nonadherent, not just those for whom an appointment is scheduled.

Of the CDCR-employed witnesses, Deputy Lambert, Dr. Ceballos, and Dr. Adams had the greatest level of familiarity with the Medication Adherence Procedure.  Neither Deputy Lambert nor Dr. Ceballos are psychiatrists.  According to Deputy Lambert and Dr. Ceballos, the Medication Adherence Procedure does not require the prescriber to conduct a medication nonadherence counseling, except for certain critical medications.  Moreover, "it doesn't necessarily have to be the primary care provider who counsels the patient.  It could be a LVN; it could be an RN; it could be any member of the care team."  *See* Lambert Tr. at 104:1-4.  For critical medications, however, "the primary care team must follow up.  So somebody has got to see the patient."  *Id.* at 104:12-13.[54]  Deputy Lambert stated that because of this policy interpretation, the CCHCS Dashboard similarly does not "measure how much adherence counseling is happening" because "we need to know that somebody made a decision that counseling has to happen."  Lambert Tr. at 113:16-24.  Mental Health measures compliance similarly, including only those patients for whom a medication nonadherence appointment is actually ordered by a psychiatrist.  Ceballos Tr. at 135:5-10.

---

[53]  The definition for the "Timely MH Referrals" performance indicator states that the denominator includes "Number of Routine, Urgent, Emergent, Med Refusal, and RVR MHA referrals that either came due or were completed during the reporting period.  Due dates determined using the time frames delineated in the Compliance Rules grid."  ECF No. 6012-3 at 77.  The numerator includes "Number of referrals in denominator that were completed within the time frames delineated in the Compliance Rules grid."  *Id.*

[54]  Deputy Lambert and Dr. Ceballos cited to subsections IV(B)(3)-(4) and IV(C)(2)-(3) as giving the prescriber discretion about whether to conduct a medication nonadherence counseling.  Subsection B applies to "no-shows for pill lines," while subsection C applies to "medication refusals," but the requirements are parallel.  Under each of these sections, "Licensed nursing staff shall notify the appropriate Primary Care Team (for medical prescriptions) or the Mental Health prescriber (for Mental Health prescriptions)" when a patient becomes medication nonadherent (subsections (B)(3) and (C)(2)).  Those subsections of the policy then indicate that the Primary Care Team must then discuss that patient's case in the daily huddle to determine the appropriate management.  It appears that this provision applies only to medical prescriptions, not mental health prescriptions, since mental health generally does not have a daily huddle.  We note that, for patients who do not show for pill lines, the policy requires "licensed health care staff" to provide medication nonadherence counseling when instructed to do so by the Primary Care Team or the Mental Health Prescriber (subsections (B)(4) and (C)(3)).  In both cases, "licensed health care staff shall contact the prescriber for guidance."  According to Deputy Lambert, the policy is "confusing," but seems to indicate that if medication nonadherence counseling is deemed medically indicated by the prescriber under subsections IV(B)(3)-(4) and IV(C)(2)-(3), then the medication nonadherence counseling for psychiatric patients must be by the psychiatrist under section IV(D).  Lambert Tr. at 109:13-18, 110:17-25.

April 22, 2019
Page 84

Dr. Adams, a psychiatrist, interpreted the policy differently. According to him, the language in section IV(D) of the policy under which the prescriber "shall" conduct medication nonadherence counseling, means that the prescriber does not have discretion whether to schedule a medication nonadherence appointment, although the policy is less clear on the time frame within which this consultation must occur (except for critical medications, which require consultation within 24 hours). Dr. Adams stated that although the policy addresses the process for referrals under the old paper-based system, which has since been upgraded to EHRS, the medication nonadherence appointments are still mandated. In his view, the language cited by Deputy Lambert in subsections IV(B)(3)-(4) and IV(C)(2)-(3) indicates that nursing staff, with the guidance of the psychiatrist, should also provide their own medication noncompliance counseling "at the point of care" (*e.g.*, when a patient presents to the nurse in the pill line and refuses his medication), but does not render a noncompliance counseling appointment with the psychiatrist discretionary. Adams Tr. at 59:3-17.

The inconsistency between how psychiatrists interpreted the policy and how other CDCR medical and administrative professionals interpreted the policy may be impacted by their differing clinical backgrounds. The issue of medication noncompliance is of strong interest to psychiatrists, nursing staff, and the pharmacy, but is less central to the psychologists and administrators who dominate CDCR Mental Health's policy and data analysis apparatus.[55]

### d.    Additional Witnesses, Documents, and Data

According to Dr. Kevin Kuich, the medication nonadherence system-generated messages frequently end up overwhelming psychiatrists. Because it was not realistic for psychiatrists to spend hours each day sorting through these messages, he believed that it was likely that psychiatrists relied on other methods to track medication noncompliant patients that were outside of the EHRS system (*e.g.*, paper records).[56] In his view, CDCR's medication

---

[55]  Although not directly related to the issue of medication nonadherence, it should be noted that CDCR is moving forward with new MAPIP measures, which should improve the data related to medication monitoring.

[56]  We heard from multiple witnesses that psychiatrists had difficulty managing medication noncompliance because of the difference in how medical doctors and psychiatrists are assigned—medical doctors are paneled on a primary care team that is responsible for all care relating to a specific group of inmates, whereas psychiatrists are assigned to mental health patients who cut across multiple primary care teams. Accordingly, the flow of information about patient medication compliance from nursing staff to psychiatrists is fragmented. Notably, unlike some of the other issues we examined, which CDCR indicated could have been addressed had Dr. Golding simply raised them with leadership, it appears that Dr. Golding and other psychiatrists attempted to get CDCR mental health to address the issue of how medication noncompliance is handled and measured, but they were frustrated with a lack of response. Dr. Kuich and Dr. Golding had requested that the medical unit change the flow of information that currently is handled through the daily huddle reports, so that psychiatrists can filter by their own patients. *See e.g.,* GOLDING001709 ("If a Psychiatry Huddle Report can be built by QM, as requested in 2016, we can turn off the automated Med Refusal messages and reduce Message Center Inbox burden."). The medical side of

April 22, 2019
Page 85

nonadherence procedures result in a significant gap between its reported compliance and its actual compliance.

According to Dr. Karuna Anand, who worked for CDCR from 2010 to 2017 in various psychiatry positions at multiple institutions, including at CHCF where she was Chief Psychiatrist from about January 2016 to October 2017, medication nonadherent patients at CHCF were not seen by the "prescriber" as the CDCR policy requires, but rather by psychologists.[57] The reported data would then reflect that these patients had received a medication noncompliance appointment with a psychiatrist even though they were seen by a psychologist. Although we could not independently verify Dr. Anand's claim, some documents we reviewed indicate that at least some CDCR institutions were utilizing non-prescribers to conduct the required medication nonadherence counseling. This information is consistent with the Special Master's observations, noted above, that there is wide variation in how the Medication Adherence Procedure is implemented.

Email exchanges in September and October 2016 indicate that at NKSP, psychologists and social workers, not psychiatrists, were being scheduled for the medication noncompliance appointments and that there were some "ethical issues" from staff with this approach. *See* CDCR0007810. There was an email exchange between Dr. Ceballos and Dr. Golding on October 24, 2016, concerning whether the practice was permitted under the Program Guide. CDCR00007809. Additionally, meeting minutes from a February 23, 2017 Mental Health QM meeting—which was attended by Ms. Ponciano, Deputy Lambert, Dr. Rekart, Dr. Kuich, Dr. Ceballos, and Dr. Gonzalez, among others—indicate that the committee discussed the issue of primary clinicians conducting medication nonadherence appointments at KVSP. *See* CDCR0009101. The minutes indicate that KVSP had been utilizing Primary Clinicians for medication noncompliance appointments, but stopped, causing its compliance numbers to drop. CDCR0009104; *see also* CDCR0009106. In a Region III Regional Report, NKSP indicated that it had "[i]nquired of HQ whether case managers can see patients for medication refusal referrals, to triage appropriate referrals, improve timely response to these referrals, and improve compliance." *See* CDCR0009106. It then noted that HQ had responded "that PG requires Psychiatry follow up, although case management may be helpful. Still awaiting clear direction." *Id.* Emails produced by CDCR also show that at least at some institutions, "many medication non-compliance referrals are not seen due to lack of staff." *See* CDCR0014335.

Because medication noncompliance data is maintained by the medical side of CDCR, we were unable to obtain data in a format that would allow for a valid comparison between what CDCR Mental Health currently reports for medication nonadherence and what the policy

---

CDCR, among others, resisted this change due to concern that it would create tools "to get around the complete care model" that drives medical assignments. Lambert Tr. at 123:23-25, 124:3-5, 124:23-125:1.

[57] Dr. Anand currently has a wrongful termination claim pending against CDCR in California Superior Court, which was filed in February 2018.

April 22, 2019
Page 86

appears to require that it report.  We were, however, able to analyze mental health data provided by CDCR for the CHCF institution regarding the total number of medication nonadherence referrals and orders for medication nonadherence appointments between January 1 and September 30, 2018.  We chose this facility and this time frame because Dr. Golding and Dr. Gonzalez both cited data from August 2018 at CHCF in their respective filings with the Court (ECF No. 5990-6 at 120 and Gonzalez Compl. at 10).  Our analysis showed that between January 1 and September 30, 2018, there were 5,022 instances of medication nonadherence[58] and 219 orders for medication nonadherence counseling appointments.[59]  Additionally, 416 CHCF patients had one or more instances of medication nonadherence during that period, but only 134 patients received medication nonadherence orders.  While this data is limited, it suggests that, at CHCF at least, there is a significant gap between the number of patients determined to be medication nonadherent, and those for whom a psychiatrist orders a medication nonadherence appointment.

### 3. Findings

#### a. Whether Representations Were Misleading

As to Dr. Golding's allegation that refused noncompliance appointments are counted as completed, we found no evidence contradicting CDCR's assertion that a software bug caused cancelled consultations to be erroneously included in the indicator.  ECF No. 6012-3 at 15 (Leidner Decl. ¶ 47).  Although this error resulted in CDCR providing inaccurate data to the Special Master and the Court, it appears that this inaccurate data was less favorable to CDCR than the corrected data.  *Id.* (Leidner Decl. ¶ 49).

As to Dr. Golding's main allegation, we find that the "Timely MH Referrals" performance indicator that CDCR uses to report compliance with medication nonadherence appointments is misleading.  It is misleading because it does not include all of the patients who require a medication noncompliance appointment, and therefore overstates compliance with the Program Guide requirements and the mandates of the CCHCS policy.

The CCHCS Medication Adherence Procedure is not carefully drafted, and there is confusion within CDCR as to whether it requires that psychiatrists see all medication noncompliant patients.  The text of the policy appears to support the view of every psychiatrist with whom we spoke:  that medication noncompliance counseling by a psychiatrist is mandatory.  The

---

[58]  For purposes of our analysis, "instances of medication nonadherence" is defined as any day on which an inmate-patient qualified as medication nonadherent for one or more of his medications.  Thus, if a patient refused to take three of his medications on a single day, resulting in three separate entries in the data CDCR provided to us, we only counted this as one instance of medication nonadherence.  Similarly, if there were multiple orders for medication nonadherence counseling appointments for a single patient on a single day, we only counted this as one order.

[59]  It is not possible to say what percentage of these instances of medication nonadherence resulted in a corresponding order because the data CDCR provided to us does not link the orders to the instances.

April 22, 2019
Page 87

Special Master believes that all patients should be referred to a psychiatrist unless the noncompliance issue is quickly resolved, and has assumed that psychiatrists were meeting with all medication nonadherent patients. In his view, a measurement of only that subset of medication noncompliant patients who were scheduled for an appointment would be an ineffective and misleading measurement of medication noncompliance.

It is undisputed that CDCR includes only those patients referred for a medication noncompliance appointment in the denominator of its performance indicator for "Timely MH Referrals." Because CDCR does not include all medication noncompliant patients in the denominator of the measurement, the measurement necessarily results in higher compliance figures. A more accurate measurement of CDCR's compliance with the Program Guide would compare the total number of medication noncompliant patients with the total number of patients who were timely seen for a noncompliance counseling appointment. Although we cannot reach any precise conclusions about the magnitude of CDCR's underreporting for medication nonadherence, the data we analyzed and the anecdotal information from witnesses and documents suggests that significant numbers of medication nonadherent patients are not receiving the medication noncompliance counseling that the policy appears to require.

      **b.      Whether There Was an Intent to Mislead**

We do not find that CDCR intentionally manipulated the medication noncompliance performance indicator to count refused appointments as completed and to double-count some appointments. As discussed above, CDCR learned of this issue after reading the Golding Report, and promptly corrected the issue that caused the error. ECF No. 6012-3 at 15 (Leidner Decl. ¶ 47). The evidence supports CDCR's position that this was a mistake that was corrected promptly upon being flagged.

We also do not find that CDCR intentionally violated the Program Guide by undercounting medication noncompliant patients in a manner intended to provide misleading data to the Court or the Special Master. The Program Guide incorporates the Medication Adherence Procedure, and the language of that policy is less than clear. The testimony of the CDCR witnesses, which we found credible, demonstrated that there was genuine confusion and inconsistent interpretations of the policy by CDCR.

    **4.  Recommendations**

Because we find there is no evidence of an intent to mislead, we do not recommend an evidentiary hearing on this issue. Because there are conflicting interpretations (even within CDCR) about the requirements of the Program Guide with respect to medication noncompliance, and inconsistency across the CDCR system as to how mental health patients are referred for noncompliance appointments, we recommend that the Court consider directing the parties and the Special Master to meet and confer about how to address this

GIBSON DUNN

April 22, 2019
Page 88

important issue.  A revision and clarification of the Medication Adherence Procedure may be appropriate.  In addition, because we conclude that the "Timely MH Referrals" indicator overstates CDCR's compliance by undercounting the total number of medication noncompliant patients who should be referred for a psychiatric appointment, we recommend that the Court also direct the parties and the Special Master to consider revisions to the procedure for reporting compliance with this indicator.

GIBSON DUNN

April 22, 2019
Page 89

## VI.     Recommendations for Further Action by the Court on Related Issues

In the course of our investigation into the issues addressed above, two items came to our attention that had not been raised as discrete issues in the reports submitted by Dr. Golding and Dr. Gonzalez, and, to our knowledge, had not been identified by the Special Master. These issues are closely related to the reporting of "Timely Psychiatry Contacts" data, particularly:  Issue A, "resetting the clock" upon patient transfer, Issue B, redefining "monthly" to lengthen intervals between appointments, and Issue D, counting all encounters as evaluations.  These concerns appear to represent a disconnect between CDCR practice and the Program Guide, and may have a material impact on patient care for at least some EOP patients.  We therefore raise them in case the Court and the parties wish to take some action to address these apparent differences in understanding.

## A.     Exclusion of EOP Patients Not on Psychiatric Medications from Compliance Metrics

Dr. Gonzalez reported that in late January 2019, she discovered that CDCR's business rules only apply to patients on psychiatric medications, and therefore CDCR's compliance metrics—including metrics on the timeliness of initial and routine psychiatric appointments—do not include EOP patients that are not on psychiatric medications. Dr. Gonzalez stated that in her view all EOP patients, regardless of whether they are on psychiatric medications, must be evaluated by a psychiatrist under the Program Guide. Dr. Golding reported that he too became aware of the issue in late January 2019.[60]

The relevant Program Guide language is:  "A psychiatrist shall evaluate *each EOP inmate-patient* at least monthly *to address* psychiatric medication issues."  PG at 12-4-9 (emphasis added).  The corresponding Program Guide language for CCCMS patients is somewhat different.  PG at 12-3-11 ("*Each CCCMS inmate-patient on psychiatric medication* shall be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues.").  CDCR subsequently confirmed that their business rules, and therefore the compliance metrics on timeliness of initial and routine psychiatry contacts, do not include mainline EOP patients that are not on psychiatric medications.[61]  CDCR's counsel further

---

[60]   Dr. Golding acknowledged that and that he subsequently found email correspondence that tends to show he may have previously been aware of the practice in around 2016.  *See* CDCR0021263 (April 29, 2016 from a chief of psychiatry to Dr. Golding stating that "when you are looking at compliance numbers, you can only see IPs who are on medications, so the numbers are not accurate.").

[61]   Internal CDCR communications tend to show that CDCR Mental Health Leadership has long been aware that the Program Guide is potentially ambiguous on this topic, and reflect that CDCR's practices may have changed over time.  *See e.g.*, CDCR0019865 (January 10, 2012 email from Dr. Ceballos stating she and Dr. Karen Higgins, the statewide chief psychiatrist at the time, discussed and agreed that though the Program Guide is not specific on this issue, it should be interpreted to require EOP patients to be seen by a psychiatrist monthly, regardless of whether or not they are on medications); CDCR0020544 (December 12, 2012 email from Dr. Higgins noting that CDCR's rule on this issue should be changed because she

April 22, 2019
Page 90

stated that it is their position that these patients are not required to be seen by a psychiatrist under the Program Guide.  When we raised the issue with the Special Master, he indicated that the Program Guide is clear that the timeliness metrics apply to all EOP patients, regardless of whether they are on psychiatric medication or not.  The Special Master noted that the language in the Program Guide reflects the notion that patients in EOP, a higher level of care, should be seen monthly to determine their medication needs regardless of whether they are already on medication.

In general, the psychiatrists we spoke to disagreed with CDCR's practice of excluding mainline EOP patients not on psychiatric medications from the business rules.  One psychiatrist opined that because of the severity of illness required to be at the EOP level of care, clinically EOP patients should be seen by a psychiatrist *more* frequently if they are not on medications.

CDCR produced data to us that indicated that as of February 26, 2019, approximately 9.7% of the total EOP population (and 9.1% of the mainline EOP population) was not on psychiatrist-prescribed medications.  *See* CDCR0005114.  By excluding the mainline EOP patients not on psychiatric medication from its business rules, data derived from the "Timely Psychiatry Contacts" and other performance indicators relating to timely routine evaluations for EOP patients likely overstates EOP compliance with the Program Guide.

It appears this issue was likely unknown to the Special Master, Plaintiffs, and many CDCR staff (including psychiatrists) prior to our investigation.  We do not reach findings on whether CDCR's interpretation is reasonable.  Similarly, we do not reach findings on whether the current data that excludes mainline EOP patients not on psychiatrist-prescribed medications is misleading.  We recommend, however, that the Court consider directing the parties and the Special Master to meet and confer about the applicability of the Program Guide's requirement that EOP patients be seen monthly to EOP patients not on psychiatric medication, and how data relating to appointments involving that subset of EOP patients should be reported.

## B.      Exclusion of EOP "Overflow" Patients from Compliance Metrics

Another issue we identified is the exclusion of EOP "overflow" patients from CDCR's compliance metrics.  EOP "overflow" refers to a population of inmate-patients who have been clinically assigned to the EOP level of care, but are not yet in an institution where there is an EOP program or any space in that program.  CDCR only measures compliance with timely psychiatry contacts for inmate-patients on psychiatric medications at institutions with an EOP program.  Under CDCR's business rules, EOP overflow patients are not required to

---

interpreted the Program Guide to not require EOP patients not on medications to be seen by a psychiatrist and noting it "is the waste of psychiatric time that we are trying to prevent").

April 22, 2019
Page 91

meet Program Guide routine psychiatry deadlines, and are excluded from "Timely Psychiatry Contacts" compliance indicators.

Dr. Leidner raised this issue to Dr. Ceballos and Dr. Rekart at least as early as August 29, 2016. CDCR0007882. On December 5, 2016, Dr. Ceballos asked for Dr. Golding's opinion on how often an EOP patient taking psychiatrist-prescribed medications should be seen by a psychiatrist, noting that "[t]here are no PG rules for people in EOP overflow waiting for transfer to an EOP program and these programs are not staffed to provide full complement of EOP care[.]" *Id.* Dr. Golding advised, "I think we need to require monthly visits, to be consistent with what is required in our system for EOP patients." *Id.* Dr. Ceballos stated on December 12, 2016, "Okay we will apply the rule to overflow." *Id.* In her interview, Dr. Ceballos confirmed that EOP overflow patients were not (and are still not) included in reported compliance metrics because they are not officially in the EOP program. Ceballos Tr. at 176:23-177:7. This issue was never formally resolved.

Several witnesses told us that, due to a decline in the overall patient population, the issue of EOP "overflow" patients is no longer a significant issue, and that inmates designated to the EOP level of care can be quickly transferred to an EOP institution. The current number of patients in EOP "overflow" status is likely small at any given time. Nonetheless, since this represents a gap in clinical treatment and reporting that may reoccur, we recommend that the Court consider directing the parties and the Special Master to meet and confer about the status of EOP "overflow" patients for purposes of the Program Guide and the reporting of compliance data.

## VII.    Conclusion

Based on the information available to us and the foregoing analysis, we do not find sufficient factual basis to recommend that the Court hold an evidentiary hearing to determine whether the defendants committed fraud on the Court or intentionally misled the Court or the Special Master regarding the seven specific issues articulated in the Court's order. As set forth above, we recommend that the Court consider directing the Special Master and the parties to meet and confer concerning several matters in which there is an apparent disconnect between current CDCR practices and the requirements of the Program Guide.

# Appendix A:

## List of Abbreviations and CDCR Institutions

**Appendix A**
**List of Abbreviations and CDCR Facilities**

| Abbreviation | Term |
|---|---|
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CCHCS | California Correctional Health Care Services |
| CDCR | California Department of Corrections and Rehabilitation |
| CQI | Continuous Quality Improvement |
| EHRS | Electronic Health Records System |
| EOP | Enhanced Outpatient Program |
| FTE | Full-Time Equivalent |
| IDTT | Interdisciplinary Treatment Team |
| MH | Mental Health |
| MHCB | Mental Health Crisis Bed |
| MHTS | Mental Health Tracking System |
| ML | Mainline |
| OAG | California Office of the Attorney General |
| PC | Primary Clinician |
| PG | Mental Health Services Delivery System Program Guide |
| PSU | Psychiatric Services Unit |
| QM | Quality Management |
| SHU | Security Housing Unit |

| CDCR Adult Facilities | |
|---|---|
| **Acronym** | **Facility** |
| ASP | Avenal State Prison |
| CAC | California City Correctional Facility |
| CAL | Calipatria State Prison |
| CCC | California Correctional Center |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CEN | Centinela State Prison |
| CHCF | California Healthcare Facility |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | California State Prison – Corcoran |
| CRC | California Rehabilitation Center |
| CSP-SAC | California State Prison – Sacramento |
| CTF | California Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| DVI | Deuel Vocational Institution |

| CDCR Adult Facilities | |
|---|---|
| **Acronym** | **Facility** |
| **FOL** | Folsom State Prison |
| **HDSP** | High Desert State Prison |
| **ISP** | Ironwood State Prison |
| **KVSP** | Kern Valley State Prison |
| **LAC** | California State Prison – Los Angeles County |
| **MCSP** | Mule Creek State Prison |
| **NKSP** | North Kern State Prison |
| **PBSP** | Pelican Bay State Prison |
| **PVSP** | Pleasant Valley State Prison |
| **RJD** | Richard J. Donovan Correctional Facility |
| **SATF** | California Substance Abuse Treatment Facility |
| **SCC** | Sierra Conservation Center |
| **SOL** | California State Prison – Solano |
| **SQ** | San Quentin State Prison |
| **SVSP** | Salinas Valley State Prison |
| **VSP** | Valley State Prison |
| **WSP** | Wasco State Prison |

# Appendix B:

## List of Document Productions

**Appendix B**
**Documents Received in the Course of the Investigation**
(organized by producing party)

| Documents Received from Defendants | | |
|---|---|---|
| **Date Received** | **Bates Numbers** | **Description** |
| Dec. 20, 2018 | CDCR000001-000261 | Defendants' Comments on the Court's Proposed Order of Appointment (ECF No. 6012) (Unredacted) |
| Jan. 9, 2019 | CDCR000262-000914 | MAPIP protocols-related documents; EHRS data dictionary; Performance Report indicator descriptors and business rules |
| Jan. 31, 2019 | CDCR000915-001449 | Presentation on EHRS and Performance Reports; organizational charts; release notes related to "timely psychiatry contacts," "treatment cancelled," "treatment refused," and "timely MH referrals" indicators; documents relating to October 2018 reporting package; presentation on Psychiatrist Staffing Allocations |
| Feb. 20, 2019 | CDCR001450-1505 | Documents relating to "patient-weeks" measurement methodology; release notes related to the "treatment cancelled" indicator; screen shots from a CDCR systems demonstration |
| Mar. 1, 2019 | CDCR0001507-5122 | "Timely MH Referrals" performance report data; data relating to EOP patients on medications and in "overflow"; analysis relating to CCCMS and EOP patient transfers; data underlying the development of the Staffing Proposal; "scheduling" screenshots from February 2019 presentation; listserv participants; communications with the Special Master re: relevant indicators, business rules, CQI process, EOP ASU certification, and other issues |
| Mar. 6, 2019 | CDCR0005123-6215 | Data and release note relating to the "Timely Psychiatry Contacts" performance report indicator; EHRS training materials |
| Mar. 7, 2019 | CDCR006216-8460 | Documents collected by CDCR employees relating to Golding Report |
| Mar. 12, 2019 | n/a (Angela Ponciano) | Analysis of psychiatry appointments completed by supervisors for CCCMS and EOP for November 2017 through March 2018 |
| Mar. 13, 2019 | CDCR008461-8471 | Psychiatry appointment data provided to Ms. Ponciano; raw data on patient transfers; webinar videos re:  change in EOP contacts from 30 days to one calendar month not to exceed 45 days |
| Mar. 14, 2019 | n/a (Annette Lambert) | Chart regarding "Appointments Seen as Scheduled" indicator |

| Documents Received from Defendants | | |
|---|---|---|
| **Date Received** | **Bates Numbers** | **Description** |
| Mar. 18, 2019 | CDCR0008472-10670 | Documents and communications relating to various issues raised in Golding Report |
| Mar. 22, 2019 | CDCR0010671-20614 | Documents and communications relating to various issues raised in Golding Report |
| Mar. 25, 2019 | CDCR0020615-21371 | Documents and communications relating to various issues raised in Golding Report |
| Mar. 27, 2019 | CDCR0021372-22234 | Documents and communications gathered by Katherine Tebrock; other communications and documents |
| Mar. 28, 2019 | CDCR0022235-22248 | Documents and communications relating to the modified business rule interpreting "monthly"; Dr. Golding's handwritten notes |
| Mar. 29, 2019 | CDCR0022249-0022254 | Revised raw data and analyses relating to patient transfers |
| Apr. 5, 2019 | CDCR0022255-22391 | Letter from Dr. Leidner clarifying comments on previously-produced information; sample revised psychiatry raw appointment data; release notes relating to "timely psychiatry contacts" indicator; data relating to MH medication nonadherence messages; additional communications re:  mental health reporting issues |
| Apr. 9, 2019 | CDCR0022392-0022415 | April 12, 2017 webinar video; revised psychiatry appointment raw data; communications regarding April 11, 2018 meeting |
| Apr. 16, 2019 | CDCR0022416-23443 | Email with agenda and minutes for CDCR MH subcommittee meeting; Clinical Leadership Advisory Committee action logs; emails to or from Dr. Golding |
| April 18, 2019 | n/a | Defendants' privilege log |

| Documents Received from the Special Master | |
|---|---|
| **Date Received** | **Description** |
| Dec. 21, 2018 | Staffing Factual Record and related appendices |
| Dec. 22, 2018 | CDCR 27th round data; *Coleman* team roster and experts' CVs; filings related to the Program Guide; 27th round monitoring document request letter and report; 2016 to 2018 staffing proposals, orders, and reports; 2009 staffing plan documents |
| Jan. 9, 2019 | CQIT data from CDCR; 26th round monitoring report |
| Jan. 10, 2019 | Filings related to the Program Guide |
| Jan. 17, 2019 | All Parties Workgroup agendas |
| Jan. 25, 2019 | Representative list of activities and significant events identified in Special Master's reports; findings from 23rd through 26th round monitoring on non-confidential and cell-front contacts; and summary of discussions of 90 percent compliance standard |

| Documents Received from the Special Master | |
|---|---|
| **Date Received** | **Description** |
| Feb. 1, 2019 | Select orders mandating collaboration with the Special Master; references of frequency of "psychiatry contacts" in 16-27 round monitoring reports |
| Feb. 22, 2019 | CQI reports |
| Feb. 28, 2019 | Filings relating to Defendants' objections to the 25th round monitoring report; excerpts from termination order |
| Mar. 26, 2019 | Compilation of court orders and transcripts regarding reduction of Special Master monitoring |
| Apr. 9, 2019 | Communications with Dr. Golding |
| Apr. 17, 2019 | Email from Dr. Golding |

| Documents Received from Plaintiffs | | |
|---|---|---|
| **Date Received** | **Bates Numbers** | **Description** |
| Jan. 24, 2019 | PLTF000001-005957 | Proposed investigative outline re: Golding report; key supporting documents; list of relevant witnesses; historical overview of Coleman litigation; glossary of acronyms and key terms |
| Mar. 7, 2019 | PLTF005958-6569 | Receiver's 40th Tri-Annual Report; reports relating to quality improvement plans and inmate allegations of staff misconduct |

| Documents Received from the Whistleblowers | | |
|---|---|---|
| **Date Received** | **Bates Numbers** | **Description** |
| Jan. 16, 2016 | GOLDING001-002001 | Response to Declaration of David Leidner; narrative response and documents relating to issues A and G |
| Jan. 16, 2019 | GONZALEZ001-00282 | Documents and data relating to issues raised in the Gonzalez Complaint |
| Jan. 22, 2019 | GOLDING002002-002688 | Narrative response and documents relating to issues F and B |
| Jan. 23, 2019 | GOLDING002689-3160 | Narrative response and documents relating to issues C and D |
| Jan. 24, 2019 | GOLDING003161-3461 | Narrative response and documents relating to issue E |
| Feb. 1, 2019 | GONZALEZ00283-304 | Documents and data relating to issues including "Appointments Seen as Scheduled" indicator |
| Mar. 12, 2019 | GOLDING003462-3661 | Documents and communications relating to issues raised in the Golding Report |
| Mar. 15, 2019 | n/a | Spreadsheet regarding "Appointments Seen as Scheduled" indicator |
| Apr. 1, 2019 | GOLDING003685-3690 | Documents and communications relating to issues raised in the Golding Report |

| Documents Received from the Whistleblowers | | |
|---|---|---|
| **Date Received** | **Bates Numbers** | **Description** |
| Apr. 3, 2019 | GOLDING003691-3840 | Documents and communications relating to issues raised in the Golding Report |
| Apr. 4, 2019 | GOLDING003841-3848 | Documents and communications relating to issues raised in the Golding Report |
| Apr. 8, 2019 | GOLDING003849-3851 | Documents and communications relating to issues raised in the Golding Report |
| Apr. 11, 2019 | GOLDING003852-3858 | Documents and communications relating to issues raised in the Golding Report |
| Apr. 16, 2019 | GOLDING003859-3924 | Documents and communications relating to issues raised in the Golding Report |

| Documents Received from Other Witnesses | | |
|---|---|---|
| **Date Received** | **Witness** | **Description** |
| Feb. 8, 2019 | Former CDCR Psychiatrist | Documents and communications relating to psychiatry concerns |
| Mar. 29, 2019 | CDCR Psychiatrist 1 | Emails relating to psychiatry privileging |
| Apr. 5, 2019 | CDCR Psychiatrist 2 | Documents and communications relating to fraud and retaliation allegation |
| Apr. 8, 2019 | CDCR Psychiatrist 3 | Cease and desist order related to retaliation allegation |
| Apr. 10, 2019 | CDCR Psychiatrist 2 | Documents and communications relating to fraud and retaliation allegations |
| Apr. 11, 2019 | CDCR Psychiatrist 1 | Documents and communications relating to Golding Report |

4

# Appendix C:

## Description of Key CDCR Personnel

**Appendix C**
**Key CDCR Personnel**

## CDCR Mental Health Leadership

Deputy Director **Katherine Tebrock** oversees CDCR's Statewide Mental Health Program. She took the role of Deputy Director in January 2016. Prior to that, she served as Chief Deputy General Counsel at CDCR since 2007.

Assistant Deputy Director **Dr. Brittany Brizendine, Ph.D.** reports to Deputy Tebrock, and oversees administrative functions of CDCR MH. Dr. Brizendine has worked at CDCR since 2008, first as a line psychologist before becoming a supervisor and eventually the Chief of Mental Health at SVSP, Chief of Mental Health at CHCF, and CEO at SVSP. Dr. Brizendine started in her current role of Assistant Deputy Director at headquarters around May 2017.

**Angela Ponciano** is the Associate Director of Statewide Planning and Policy and reports to Assistant Deputy Brizendine. She oversees administrative functions of the Mental Health program including policy development, operations, and labor negotiations. Ms. Ponciano was also largely responsible for the design and development of CDCR's Staffing Proposal.

**Dr. Laura Ceballos, Ph.D.**, the Mental Health Administrator of Quality Management, Inpatient Facilities, oversees CDCR MH's QM team. She has worked at CDCR since 2000, first as a Staff Psychologist. Around 2009, Dr. Ceballos became Chief Psychologist of QM before assuming her current role in around 2015. Dr. Ceballos reports to Assistant Deputy Brizendine.

**Dr. John Rekart, Ph.D.** is Chief Psychologist of QM at CDCR headquarters and reports to Dr. Ceballos. Dr. Rekart first started at CDCR in the early 1990s as a staff psychologist. He has held various positions at CDCR, including the Chief of Mental Health at CHCF for about a year. Dr. Rekart came to CDCR headquarters around 2014 to work on the EHRS. When Dr. Ceballos was promoted to Mental Health Administrator in 2015, Dr. Rekart took her vacated position.

**Dr. David Leidner, Ph.D.** is a Senior Psychologist Specialist and has worked at CDCR since 2003. He has held his current position on the MH QM team since 2009, and was responsible for much of the development of CDCR's statewide QM systems, including the performance indicators and related business rules. Dr. Leidner reports to Dr. Rekart.

## CDCR Headquarters Psychiatrists

**Dr. Michael Golding** is the statewide Chief Psychiatrist of Statewide Policy Oversight at CDCR headquarters. He began at CDCR as a senior psychiatrist in late 2013 or early 2014. In December 2014, Dr. Golding took his current position where he has served ever since. In his current role, Dr. Golding is responsible for overseeing the delivery of psychiatric care throughout CDCR.

**Dr. Kevin Kuich** is the former statewide Chief Psychiatrist of Telepsychiatry at CDCR headquarters. He began at CDCR as a Staff Psychiatrist at CHCF in August 2013 before becoming a Senior Psychiatrist Specialist at CDCR headquarters in about January 2014. Dr. Kuich took the lead for psychiatry in assisting with the EHRS rollout from about 2015 to

2017.  Dr. Kuich became the Chief Psychiatrist of Telepsychiatry in late 2017, and left CDCR in early 2019.

**Dr. Melanie Gonzalez** is one of four Senior Psychiatrist Specialists at CDCR headquarters that report to Dr. Golding.  From July 2014 to January 2015, she worked as a Staff Psychiatrist at CHCF, then as a Staff Psychiatrist (telepsychiatrist) at CDCR headquarters from February 2015 to December 2016.  She began her current position in January 2017.

**Dr. Jacob Adams** is a Senior Psychiatrist Specialist on the CDCR Mental Health Quality Management team, and reports to Dr. Ceballos.  He took his current role on April 3, 2018. Dr. Adams has held various positions in CDCR since 2007, including as a Staff Psychiatrist at FOL, a Staff Psychiatrist and Acting Chief Psychiatrist at MCSP, a telepsychiatrist, and a Senior Psychiatrist Specialist reporting to Dr. Golding from April 3, 2015 to October 31, 2016.

# Appendix D:

## Attachment A to the Program Guide

# ATTACHMENT A

# CONFIDENTIALITY GUIDELINES

PLTF000202

PLTF000203

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date: April 18, 2007

To: Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)

Subject: **THE PARAMETERS OF CONFIDENTIALITY OF INMATE-PATIENT COMMUNICATIONS AND GUIDELINES FOR DISCLOSURE**

The purpose of this memorandum is to ensure that confidentiality of inmate-patient communications with mental health clinicians is protected.

**Overview**

Health care delivered in prison is constitutionally adequate when it meets community standards, or those established for correctional settings by national correctional health care organizations. One area where there is significant and recognized differences between community and correctional standards is that of confidentiality.

Confidentiality of the inmate-clinician relationship is based on ethical and legal principles. One example of a well-known limitation to confidentiality, in the community and in prisons, is the *Tarasoff* ruling: Where a patient tells a clinician that he or she intends to harm a readily identifiable person, then the clinician has a duty to protect, which may at times be discharged by warning the identified person and/or law enforcement. For additional information, reference Attachment A, Assembly Bill 733, amendment to Section 43.92 of the California Civil Code.

In prisons, confidentiality is further limited by the interests of people (staff and inmates) and property (the institution's physical plant and its environment), which together constitute a concept commonly referred to as "the safety and security of the institution."

All staff that intentionally, accidentally or inadvertently overhears confidential communications (arising from clinical contacts such as cell front visits) is also responsible for maintaining confidentiality of the communication.

There are many familiar situations where strict and traditional healthcare confidentiality is compromised, such as during pill lines, during Interdisciplinary Treatment Teams (IDTT) meetings because the team composition includes custody officers, and during cell front visits. Custody officers, correctional counselors, and other staff who are members of an IDTT are bound to not discuss health-related inmate-patient information with anyone other than the team members.

Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)
Page 2

In general, written clinical records, which often include documentation of conversations conducted in a private clinical setting, are entitled to the same protections as in the community. Clinicians should familiarize themselves with relevant State and federal laws (such as Health Insurance Portability and Accountability Act - HIPAA), which basically require written consent from patients for release of medical information outside of the treatment team. Exceptions arise, however, when information obtained by a clinician in the course of a therapeutic encounter, creates a set of security concerns that are much broader than those in the community. For example, if an inmate tells a clinician that he or she possesses a weapon, the clinician must report it to custody in the interest of protecting the safety and security of the institution. In a private practice setting, as an example, such a disclosure would not ordinarily be reported to the police.

To date, there are no nationally accepted guidelines/laws that govern all instances of limitations to confidentiality in a correctional setting. Therefore, the California Department of Corrections and Rehabilitation (CDCR) has developed guidelines regarding the handling of information disclosed in the context of an inmate clinician relationship, and during a clinical encounter.

**Definitions**

- For purposes of this policy, the general term of "clinician" is used when referring to psychiatrists, physicians, psychologists, clinical social workers, nurse practitioners, registered nurses, licensed vocational nurses, licensed psychiatric technicians, and recreational therapists.

- A "clinician-patient relationship" is established in the correctional setting when a clinician is engaged in the evaluation/assessment/diagnosis and/or treatment of a mental or emotional condition. A communication by an inmate, within the clinician patient relationship, to a clinician, is considered confidential if the inmate does not intend it to be disclosed to third persons.

- The location where a confidential communication occurs is referred to, in this memorandum, as the "clinical setting."

- A "clinical encounter" occurs when a clinician communicates with an inmate-patient in a clinical setting.

- The "safety and security of the institution" refers to and involves people (self, others, the community) and property (the institution's physical plant and environment).

Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)
Page 3

- The adjective "acute," in reference to intoxication, is a medical term that means "of abrupt onset," in reference to a disease or condition. Acute often also connotes a condition that is of short duration and in need of urgent attention. Further, for the purpose and clarification of this policy, "acute" essentially means signs and symptoms of being under the influence in the here-and-now.

**Guidelines**

These guidelines apply to all clinicians working within, or on behalf of, the CDCR as well as any nonclinical staff who overhear confidential communications.

A. Disclosure
The disclosure of confidential information to nonclinical staff is permissible when:

1. The inmate is suicidal and it is clinically necessary to inform others in order to protect the inmate-patient.

2. The inmate is:

    a. Receiving psychotropic medication: as an example, custody may need to know (without disclosing specifics) that an inmate is on a medication that causes side-effects that may interfere with the ability to follow orders or participate in programming.

    b. Being noncompliant with medication: as an example, custody may need to be informed that an inmate is medication noncompliant and needs to be restrained for the administration of such, pursuant to a *Keyhea* order.

3. The inmate requires movement to a special unit for observation, evaluation, or treatment of acute episodes.

4. The inmate requires transfer to a treatment facility outside the prison.

The disclosure of confidential information to appropriate nonclinical staff is mandatory when:

1. The inmate is homicidal, by virtue of either conduct or oral statements, and there is a reasonably identifiable victim.

2. The inmate specifically admits to, or leads the clinician to a reasonable suspicion of, child or elder abuse (clinicians are trained to recognize those situations requiring a report).

Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)
Page 4

3.   The psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be a danger to him/herself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger, by virtue of any of the following:

   a.   An inmate's conduct/behavior, including possession of a weapon.

   b.   An inmate's oral statements, including communications such as those that indicate a plan for drug trafficking or a plan for sexual misconduct.

   c.   Signs and symptoms that an inmate is in a state of acute intoxication, secondary to either illegal substances or prescribed medications (nonphysicians shall seek immediate consultation with a physician when they suspect acute intoxication). Refer to Page 6 of this memorandum for additional details.

4.   The inmate presents a reasonably clear risk of escape or the creation of internal disorder or riot.

Clinicians shall not use the CDCR counseling or disciplinary process to report confidential communications such as thoughts, feelings, fantasies, or behaviors of inmate-patients which do not indicate any of the risks detailed in the above guidelines.

B.  Scope of Disclosure
Only limited and relevant healthcare information should be shared, and only with those nonclinical staff who have a need to know. In situations where disclosure of confidential communication is deemed permissible, the clinician has the responsibility to weigh the potential harm and benefit of both maintaining confidentiality and of disclosing the information, in order to determine if disclosure is necessary.

In certain instances (such as, for example, matters involving communications that indicate a plan for drug trafficking or a plan for sexual misconduct) the clinician, exercising clinical judgment, may elect to report the inmate's behaviors and statements in general terms to custody staff, without identifying the specific inmate by name. Whenever a clinician elects to provide notification in this manner, they shall first seek consultation with a supervisor, and the two shall engage in the custody notification together.

More often than not, disclosure/non - disclosure issues cannot wait for presentation at a scheduled IDTT meeting.  Therefore, when the clinician needs guidance regarding disclosure versus nondisclosure, the clinician should consult with a supervisor or

Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)
Page 5

colleague and document the consultation in the Unit Health Record. If a consensus cannot be reached between the clinician and a supervisor/colleague, the issue/case should be elevated up the local chain of command, first within the healthcare structure, and then, if indicated, with the custody management structure.

Discussions beyond the level of the clinician and a supervisor/colleague should contain as little revelation of identifying information as possible until a consensus is reached. If necessary, the Warden and Health Care Manager can elevate the issue/case to Regional Administrators and Regional Mental Health/Medical Directors for guidance. If necessary, these regional managers can elevate the matter for further guidance.

**Duty To Disclose Limits Of Confidentiality**

Clinicians are responsible for informing the inmate-patient of the above limits of confidentiality, or ensuring that prior documentation in the Unit Health Record (UHR) indicates that this disclosure has occurred prior to commencement of a clinical encounter. CDCR Form 7448 Informed Consent For Mental Health Care shall be used for this purpose (see Attachment B).

Inmates should be informed that communication disclosed to a clinician, within the limits described in the guidelines above, and documented in the UHR, is generally confidential, but that information obtained in the context of a court ordered evaluation (such as for a Board of Prison Hearings determination, competency to stand trial, parole/probation reports, etc.) is not.

**Illegal Substance Use and Sexual Misconduct**

Illegal substance use (including alcohol and inmate manufactured "pruno") and sexual misconduct warrant special consideration for the clinician working in a CDCR environment.

In regard to illegal substance use, clinicians commonly solicit information about such in the course of formulating an accurate diagnosis and the development of an appropriate treatment plan. Inmates need to feel confident that they can openly and honestly discuss use/abuse/addiction issues with their clinician without fear of rules violation reporting or criminal prosecution. Inability to have this type of confidential communication with a health care provider could pose a limitation in terms of access to care, which is potentially an 8th Amendment violation.

Scenarios involving acute intoxication or disclosure of planned use of illegal substances requires careful clinical judgment, utilizing the guidelines above (particularly in terms of

Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)
Page 6

danger to self or others), in determining whether or not to disclose the information to custody. If an inmate solicits and is granted confirmation of confidentiality from the clinician prior to disclosing information about illegal substance use, it is incumbent upon the clinician to stop the inmate and warn of the potential need to disclose if the course of the conversation shifts in a direction that raises the issue of potential dangerousness. The guiding principle is to be helpful to the inmate seeking assistance with a problem that affects his or her health (and conceivably would thereby benefit the safety and security of the institution) within the confines of the limits of confidentiality outlined in this policy.

Issues surrounding the trafficking (buying, selling, possession, illegal trade, movement, transporting) of illegal substances are reportable. If, during a private communication in a clinical setting, an inmate starts to disclose information regarding the trafficking of illegal substances, the clinician should stop the inmate and warn of the duty to disclose, thereby allowing the inmate the opportunity to stop or proceed with full disclosure.

Sexual misconduct within the confines of a clinical setting, such as indecent exposure, intentionally sustained masturbation without exposure (such as under the clothing), or verbal/written epithets, sometimes occur in a therapeutic context. An inmate should be encouraged to discuss the feelings, motivations, fantasies, compulsions, etc., behind these behaviors, but also be warned that the actual behaviors themselves are violations of institutional policy, and sometimes State law. The clinician shall instruct the inmate-patient to cease the illegal behaviors immediately, and shall inform them that a continuation of such behaviors shall result in termination of the therapeutic session and a reporting of the incident(s). The clinician is permitted to exercise clinical judgment in determining how to best handle these clinical situations, and, when in doubt, the clinician should seek consultation with a supervisor or colleague. The reporting of sexual misconduct behaviors that occur in a private clinical setting is not always mandatory. As an example, the reporting of an initial incident is left to the discretion of the clinician. The clinician shall, however, instruct the inmate-patient to immediately cease the behavior and shall review the Department's policy regarding sexual misconduct with the inmate-patient, but may elect not to report the incident. Once the clinician has provided this instruction and reviewed the rules with the inmate-patient, all subsequent incidents of sexual misconduct shall be reported via the rules violation reporting process.

When in doubt about issues related to illegal substance use and/or sexual misconduct, seek consultation utilizing the above guidelines. These types of decisions are often difficult and involve multiple complex moral, ethical, legal, humanistic and practical dilemmas and issues that include the inmate's access to care, the safety and security of the inmate, the safety and security of coworkers, as well as the general safety and security of the institution.

PLTF000209

Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)
Page 7

The conscientious clinician will never go wrong in seeking consultation and documenting the outcome of such.

**Procedure For Disclosure Of Confidential Information**

When a decision is made to disclose confidential information, the clinician shall document, in the progress notes and treatment plan, consideration of:

1. The best way to limit the extent of disclosure while still preventing the threatened harm.

2. The potential strain to the therapeutic relationship with the clinician.

3. Any other relevant issues in regard to the therapeutic relationship and treatment goals, such as the potential need to reassign the inmate-patient's care to another clinician for the purpose of continued proper and sufficient access to care.

**Psychiatric Services Unit Considerations**

Inmates who are receiving Enhanced Outpatient Program (EOP) level-of-care and are serving a Secure Housing Unit (SHU) term are housed in the Psychiatric Services Unit (PSU). These PSU programs utilize "Behavioral Incentive Programs" in granting privileges and property. Clinicians may continue to use the CDCR counseling or disciplinary process to document ONLY inmate misconducts that occur outside a clinical setting, and/or when the exceptions listed in the guidelines above are applicable.

**Use of the Disciplinary Process**

When a clinician documents an inmate-patient's behavior using the CDCR disciplinary process, the clinician shall use a draft report worksheet. It is the responsibility of the custody-classifying official to designate the seriousness of the reported behavior, and whether it is categorized as a 128A Counseling Chrono or a CDCR Form 115 Rules Violation Report.

**Training**

Attachment C includes scenarios to be used for training purposes. A schedule for staff training on this topic will be distributed under separate cover.

Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)
Page 8


**Questions**

If you have any questions regarding this memorandum, you may contact Shama Chaiken, Ph.D., Chief Psychologist, Mental Health Program, Division of Correctional Health Care Services (DCHCS), at (916) 445-4114 or Michael Stone, J.D., Staff Counsel, Coleman Case, Office of Legal Affairs (OLA), at (916) 324-1421.


BRIGID HANSON                              LEA ANN CHRONES
Director (A)                              Director (A)
Division of Correctional Health Care Services    Division of Adult Institutions

Attachment

cc: Michael Stone, General Counsel, OLA
    Doug McKeever, Director (A), Mental Health Program, DCHCS
    Tim Rougeux, *Plata* Implementation Project Director, DCHCS
    Peg McAloon, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
    Shama Chaiken, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
    Andrew Swanson, M.D.; Chief Psychiatrist, Mental Health Program, DCHCS
    Mary Huttner, SSM I, DCHCS, QMAT
    Joseph Moss, Correctional Captain, DAI
    Mary Neade, Correctional Counselor II, DAI

Executive Staff
Associate Directors-Division of Adult Institutions
Regional Parole Administrators (Juvenile and Adult)
Regional Administrators-Division of Correctional Health Care Services
Superintendents
Wardens
Health Care Managers (Juvenile and Adult)
Page 9


bcc:   Helen Steenman, Ph.D., Senior Psychologist, Mental Health Program, DCHCS
       Deborah Lonergan, Ph.D., Senior Psychologist, Mental Health Program, DCHCS
       Sharon Riegel, Health Program Specialist, Mental Health Program, DCHCS
       Henry Willis, Ph.D., Sr. Psychologist, Specialist, Mental Health Program, DCHCS
       Staff Services Manager I, Correspondence & Appeals Unit, DCHCS
       Nola Grannis, Chief, Inmate Appeals

# Appendix E:

## Medication Adherence Procedure

**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**

| | |
|---|---|
| **VOLUME 4: MEDICAL SERVICES** | Effective Date: 10/2008 |
| **CHAPTER 11** | Revision Date: 01/2016 |
| **4.11.5 MEDICATION ADHERENCE PROCEDURE** | Attachments: Yes ☐ No ☒ |

## I. PROCEDURE OVERVIEW

This procedure provides guidelines for the monitoring and reporting of patient medication adherence issues.

## II. DEFINITIONS

**Cheeking:** Hiding Nurse Administered (NA) or Directly Observed Therapy (DOT) medications inside the mouth rather than swallowing them.

**Diversion:** The use of prescription drugs for other than the intended purpose.

**Hoarding:** Stockpiling of medications by the patient.

**Medication Adherence:** The extent to which patients take medications as prescribed.

**Medication No-Show:** The patient is not present to receive the prescribed medication.

**Medication Refusal:** The patient declines the prescribed medication (DOT, NA, or Keep-on-Person [KOP]) or declines to comply with medication procedures either at the cell front or during medication line (i.e., patient covering lights and windows so that DOT cannot occur, refusing to cuff up or come to the cell door with water, refusing to come to the medication line).

## III. RESPONSIBILITY

The Chief Executive Officer or designee of each institution is responsible for the implementation, monitoring, and evaluation of and compliance with this procedure.

## IV. PROCEDURE

**A. Medication Adherence Medication Administration Record (MAR)**

1. One day per week, as designated by the Local Operating Procedure requirements, licensed nursing staff assigned to medication administration shall review each MAR for documented refusals and no-shows.

2. After completion of the weekly MAR review, licensed nursing staff shall send a CDC 128-C, Chrono Medical-Psychiatric-Dental, to the relevant prescriber for patients who miss three consecutive days or at least 50 percent of scheduled doses of NA/DOT medication (excluding PRN [as needed]) within the seven day period reviewed.

3. A designated nursing supervisor shall audit the MARs of patients on a weekly scheduled basis to ensure compliance of medication administration staff with required reviews and indicated referrals.

**B. Medication No-Shows for Pill Lines (Medication Administration)**

1. At the conclusion of each medication line, licensed nursing staff shall review the MARs to identify patients who did not present to the pill window to receive their routine medications (no-shows) and/or other medication administration problems.

   a. Every attempt shall be made to ensure timely medication administration.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

    b. If the patient is a "no-show" for an NA/DOT medication, licensed nursing staff shall coordinate with custody to locate the patient and ensure the patient reports to the medication line for:

       1) Medication administration.

       2) Documentation of refusal of the medication and the reason for refusal.

       3) Documentation of barriers that prevented the patient from presenting to the medication line (i.e., lockdowns or transfers to another area or institution).

2. Licensed nursing staff shall document on the MAR each no-show for NA/DOT medication by writing and circling their initials in ink in the date and time slot where the medication would have been recorded had it been given. Licensed nursing staff shall document on the MAR (front or back, as appropriate) identified barriers that prevented the patient from coming to the medication line.

    a. When licensed nursing staff document on the reverse side of the MAR, they shall include the patient's name and California Department of Corrections and Rehabilitation (CDCR) number.

    b. Medication administration staff shall advise the nursing supervisor of the barriers and obtain assistance as indicated.

    c. The Facility Captain, Lieutenant, Sergeant, or Associate Warden Health Care Services shall be contacted to assist with resolving any identified barriers if appropriate.

3. Licensed nursing staff shall notify the appropriate Primary Care Team (for medical prescriptions) or the Mental Health prescriber (for Mental Health prescriptions) when the patient fails to pick up KOP medication within four business days of the medication becoming available. The Primary Care Team shall discuss in the daily huddle and determine the appropriate management (e.g., discontinue meds, discontinue auto-refill).

4. When indicated by the Primary Care Team or the Mental Health prescriber, licensed health care staff shall provide medication adherence counseling and document it on the CDCR 7230, Interdisciplinary Progress Notes. When indicated, licensed health care staff shall contact the prescriber for guidance. Prescribers shall consider discontinuing auto-refill or discontinuing medications and shall appropriately document the rationale for the action for those patients who repeatedly miss doses despite appropriate patient counseling.

5. Medication adherence issues shall also be documented on the problem list.

## C. Medication Refusals

1. Licensed nursing staff shall document on the MAR each refusal for NA/DOT medication by writing and circling "R" and initialing using ink in the date and time slot where the medication would have been recorded had it been given. Licensed nursing staff shall document on the MAR (front or back, as appropriate) the reason for each medication refused, as stated by the patient. When licensed nursing staff document on the reverse side of the MAR, they shall include the patient's name and CDCR number.

2. Licensed nursing staff shall notify the appropriate Primary Care Team (for medical prescriptions) or the Mental Health prescriber (for Mental Health prescriptions) when the patient refuses to pick up KOP medication. The Primary Care Team shall discuss

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

in the daily huddle and determine the appropriate management (e.g., discontinue meds, discontinue auto-refill).

3. Licensed health care staff shall provide medication adherence counseling as determined by the Primary Care Team (for medical prescriptions) or the Mental Health prescriber (for Mental Health prescriptions) and document it in the health record.  When indicated, licensed health care staff shall contact the presciber for guidance. Prescribers should consider discontinuing auto-refill or discontinuing medications and shall appropriately document the rationale for the action for those patients who repeatedly miss doses despite appropriate counseling.

**D.  Medication Non-Adherence Counseling**

1. Clinic health care staff shall provide a copy of the current MAR (both sides) and the referral (CDC 128-C) to the prescriber for the medication follow-up counseling appointment as a part of weekly adherence MAR review.

2. The prescriber shall interview the patient and provide education regarding the implications/consequences of not taking the medication, and consider modification to the medication regimen.

3. The prescriber shall conduct the interview/education and ensure that effective communication is provided and appropriately documented.

4. If the patient refuses life-sustaining medications, the prescriber shall assess the patient's decision making capacity and document it in the health record.  If the patient has significant mental illness it may be necessary to seek assistance from mental health clinicians regarding the patient's decision-making capacity. If a mental health referral is made, the Primary Care Provider shall communicate directly with the appropriate mental health clinician and inform the patient of the reason for the referral.

5. The prescriber may discontinue the medication and have the patient sign a CDC 7225, Refusal of Examination and/or Treatment, when a patient who has decision-making capacity continues to refuse medication.  (Refer to TB guidelines regarding refusal of TB medications.)

6. All refusals shall be signed by the patient and co-signed by licensed health care staff. If the patient refuses to sign the CDC 7225, two licensed health care staff shall sign; in very unusual circumstances (e.g., Administrative Segregation Unit, Mental Health Crisis Bed), the CDC 7225 may be signed by two staff members, one of whom shall be a licensed health care staff.

7. When a refusal is signed, a copy shall be placed behind the patient's MAR and the original refusal form forwarded to Health Information Management.

**E.  Hoarding/Cheeking/Medication Misuse**

1. Medication issues that may involve a security or safety issue (i.e., hoarding or diverting of medications) shall be referred to the Primary Care Team, mental health prescriber, and the appropriate Facility Lieutenant using a CDC 128-C or other appropriate chrono. Reporting staff shall complete the chrono describing the circumstances/issue of medication misuse.

2. Upon notification, the prescriber shall evaluate the need for a modification to the medication regimen (such as discontinuing medication, "crush and float", NA/DOT) and schedule an appointment with the patient as clinically appropriate.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

3. Prescribers shall take necessary action regarding the patient's prescribed medication based on information provided.  Providers shall document significant medication non-adherence issues in their progress notes as well as on the problem list.
4. Prescribers and medication administration staff shall notify the pharmacy of medication misuse for tracking purposes.

**F. Critical Medication Adherence**
1. Critical medications include:
   a. Active tuberculosis (TB) disease medications (not prophylaxis)
   b. Clozapine
   c. Antirejection medications post transplant
   d. Penal Code (PC) 2602 medications
2. No-shows
   Patients who are no-shows for these critical medications shall be called or escorted to the medication administration area to receive or refuse the medication whenever a scheduled dose is missed.
3. Refusal of critical medications
   Intervention after a refusal of a prescribed dose of a designated critical medication shall be managed as follows:
   a. Active TB Disease Medications – Any patient who refuses one dose of TB medication for active disease shall be immediately referred to the Primary Care Team (verbally and in writing per institution policy).
   b. Clozapine – Any patient who refuses one dose of Clozapine shall be referred for an urgent Mental Health evaluation (verbally and in writing per institution policy).
   c. Antirejection Medications Post Transplant – Any patient who refuses one dose of antirejection medications post transplant shall be immediately referred to the Primary Care Team (verbally and in writing per institution policy).
   d. PC 2602 Medications - Any patient who refuses one dose of PC 2602 medications shall be immediately referred to the Mental Health provider for medication follow-up counseling (verbally and in writing per institution policy).
4. Patients shall be seen by licensed health care staff within 24 hours when being referred for missing or refusing doses of critical medications.

## V.  REFERENCES
- California Penal Code, Part 3, Title 1, Chapter 3, Article 1, Section 2602
- California Pharmacy Rules and Regulations, Business and Professions Code, Section 4016