Wendy Musell, SBN 203507
STEWART & MUSELL, LLP
2200 Powell Street, Suite 440
Emeryville, CA 94608
415-593-0083
Fax: 415-520-0920
E-mail: wmusell@stewartandmusell.com

Attorneys for Non-party Witness
Michael Golding, M.D.
Melanie Gonzalez, M.D.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAPLH COLEMAN, et.al., | Case No.: 2:90-CV-0520 KMJ DB P |
| Plaintiffs, | **RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT** |
| v. | |
| GAVIN NEWSOME., et. al., | |
| Defendants. | |

Pursuant to the Court's Order, dated Aril 26, 2019, Document 6135, requesting that Michael Golding, M.D. and Melanie Gonzalez, M.D. file briefs responsive to the substance of the "Neutral Expert Report" (hereinafter "Expert Report") and identifying issues, if any, raised by the Golding Report that were not referred to the Neutral Expert and may require further action by the parties, the Special Master, and/or the court," Drs. Golding and Gonzalez submit the following:

### I.    Issues Raised by the Neutral Expert Report
#### A.  The Totality of the Circumstances Was Not Considered in Determining if There was Fraud or Misrepresentation Upon the Court and Special Master

The Expert Report identified specific areas where CDCR had provided misleading data or sought, successfully or not, to mislead the Court, Special Master or others.  While the Expert Report sets

forth each individual subject area for investigation and findings, it appears that the findings were siloed and not considered as a whole. The totality of the circumstances was not considered. In *US v. Sierra Pacific Indust., Inc.* (9th Cir. 2017) 682 F.3d 1157, 1173, the Ninth Circuit observed the following when considering if there has been a fraud on the Court:

> Contrary to the district court's assertion that "the whole can be no greater than the sum of its parts," a long trail of small misrepresentations—none of which constitutes fraud on the court in isolation—could theoretically paint a picture of intentional, material deception when viewed together.

*Id. See also Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944) (consideration of totality of the circumstances required to determine whether there has been a fraud on court); *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1132 (9th Cir. 1995) (appellant, through its in-house counsel, engaged in a scheme to defraud the jury, the district court, and appellee through the use of misleading, inaccurate, and incomplete discovery responses and the presentation of fraudulent evidence).

While the Expert Report considered each individual issue set forth by the Court for investigation, it does not appear that the Expert Report considered the totality of the circumstances in making its determinations regarding whether there was fraud or intentional misrepresentations on the Court and/or Special Master. The Expert Report detailed numerous occasions that CDCR misrepresented material information. Each of these misrepresentations favored CDCR in the presentation of data and higher compliance rates. While some of these misrepresentations were deemed to be unintentional, the consistent pattern of demonstrating higher compliance rates using incorrect assumptions and faulty and misleading data was not considered. We posit that these misrepresentations were no accident. When each part is viewed together, what appears is a tableau of intentional, material misrepresentations. In addition to determining if further evidentiary proceedings are warranted, the Court should also consider whether the totality of the circumstances demonstrates fraud and/or intentional misrepresentation to the Court. *Sierra Pacific Indust., Inc.*, 682 F.3d 1157, 1173.

Further, as set forth in section 3B, the Court repeatedly ruled that attorney client privileged and work product information shall be considered in the investigation in order to determine if there was fraud on the Court or intentional misrepresentation. *See* Docket Nos. 6064, 6096. CDCR refused to comply with requests for information from the Court's appointed experts related to these areas, in defiance of the Court's Orders and in the absence of any order by a reviewing court. The question of

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

1  whether intentional misrepresentations or fraud on the Court and Special Master occurred through

2  communications by counsel, therefore, was completely omitted from consideration. Given that these

3  material facts were concealed from discovery, it is difficult to understand how a determination of

4  whether there is fraud on the Court or intentional misrepresentations occurred.

5      The administration of justice is severely hampered and undermined when a powerful state entity

6  is permitted to pick and choose which of the federal court's orders it wishes to comply with. This is

7  especially true in the context of a decades-long civil rights case regarding violation of the Eighth

8  Amendment and failure to provide a minimally constitutionally required provision of mental health care

9  to incarcerated patients.

   **B. Exclusion of EOP Patients Not on Psychiatric Medications from Compliance Metrics**

10     As set forth in the Expert Report, Drs. Golding and Gonzalez reported that patients at the EOP

11 level of care who were not on psychiatric medications were not included in CDCR's compliance

12 metrics, including timeliness of initial and routine psychiatric appointments. This is more than simply a

13 numbers compliance issue (although accurate compliance reporting is important). This can result in

14 patients who are in the highest designated category of medical need not being scheduled and reviewed

15 for needed medical care. This practice can lead to needless suffering by severely mentally disabled

16 patients and is medically dangerous for the patient. The Program Guide does address required medical

17 evaluations that must occur for EOP patients, as set forth in the Expert Report. These Program Guide

18 requirements are not currently being followed by CDCR and therefore, compliance numbers are

19 artificially elevated.

20     Both Drs. Golding and Gonzalez indicated that for minimally required patient care to be

21 provided EOP patients not on medications must be seen by a psychiatrist, and further, the Program

22 Guide clearly mandates a specific time frame for that to occur. According to Drs. Golding and Gonzalez,

23 many patients (for example patients with schizophrenia), refuse medications due to lack of insight into

24 their illness even though it is the medications that have previously restored their mental health. But such

25 individuals will need medications in the future when they experience predictable decompensations after

26 they stop their potentially life-saving medications.

27

28 **RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

A further concern is that patients may be placed at a lower level of care than medically required because non-psychiatric staff may mistakenly base their judgements of whether or not there is a need for higher level medical care on whether patients are being currently being treated by a psychiatrist. As detailed in the Expert Report,

> The Special Master noted that the language in the Program Guide reflects the notion that patients in EOP, a higher level of care, should be seen monthly to determine their medication needs regardless of whether they are already on medication.

Expert Report, p. 95. While the Expert Report did not consider whether it was reasonable for CDCR to interpret the Program Guide to be saying that EOP patient not on psychiatric medications do not require psychiatric follow-up, this information is relevant to the totality of the circumstances test, as set forth above.

### C. Exclusion of EOP Patients in "Overflow" Locations Excluded from Compliance Metrics

The Expert Report confirmed that EOP level of care patients who were placed in an "overflow" location are not being included in the compliance metrics. These EOP patients have the same medical needs regardless of whether the patients are physically located in a designated EOP program or in an "overflow" location. While this issue was raised in 2016 and Dr. Golding was informed that EOP overflow patients would be included in compliance metrics, for no discernable legitimate reason, this has not occurred. The methodologies utilized by CDCR to ensure that EOP patients receive the required level of care are triggered by its compliance metrics. Thus, the failure to include EOP overflow patients can have a grave negative effect on patient care and artificially inflates reported compliance numbers.

### D. Findings of the Expert Report and CDCR's November 20, 2018 Staffing Proposal

In order to properly evaluate whether there was the requisite level of intent to commit fraud on the Court and/or Special Master, or whether there was intentional misrepresentation by CDCR, any reasonable inquiry must inquire who would benefit from such misrepresentations, how and why. The Expert Report did not delve into the uses of the data by CDCR that were found to be inaccurate and/or misleading. In other words, it does not address the question of *how and why* the misleading and incorrect data was used by CDCR in this legal matter. Such an inquiry is highly relevant to determining whether inaccurate or misleading data was intentionally used for a particular result or purpose before the

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

Court. The information contained within the Expert Report also serves to highlight that inaccurate, inflated compliance data metrics have real world consequences for patient care.

As the Court is aware, there are ongoing proceedings to determine if there could be decreases in Court mandated staffing for psychiatry overall and practices to wind down this decades-long and very expensive legal battle. Data that the Expert Report indicated was inaccurate or misleading was used to support changing psychiatry staffing levels and practices across all its prisons and to incrementally end this case. Specifically, CDCR provided to Plaintiffs for the purposes of amending current Court orders a staffing report on November 20, 2018. *See* Decl. of Marc Shinnkrantz in Support of Plaintiff's Response to November 13, 2018 Order to Show Cause, Ex. A (Docket No. 6010) (hereinafter "Staffing Report").[1] Data and reported practices relied upon in the Staffing Report, according to the Expert Report, are inaccurate and/or misleading.[2]

### 1.     EOP Population Review

 The Staffing Report states that "CDCR initiated a review of the EOP population at Mule Creek State Prison. A review of the remaining EOP institutions began in January 2018, with the last institutional review beginning in January 2019. Data for the entire population is expected to be gathered by April 2019." *Id.* p. 6. The Staffing Report also states, "CDCR remains committed to continuing its EOP review process, as was previously agreed to with the Special Master and Plaintiffs' counsel." *Id.*

However, according to the Expert Report, the Special Master was unaware that CDCR was not regularly scheduling psychiatrists to see patients not on medications at the EOP level of care. Expert Report p. 95 ("It appears this issue was likely unknown to the Special Master, Plaintiffs, and many CDCR staff (including psychiatrists) prior to our investigation....The Special Master noted that the language in the Program Guide reflects the notion that patients in EOP, a higher level of care, should be seen monthly to determine their medication needs regardless of whether they are already on medication."). Failing to have psychiatrists evaluate patients not on medications potentially influences up to nearly 10% of the EOP population. Expert Report, p. 95 ("CDCR produced data to us that

---

[1]     Page numbers referred to herein to the Staffing Report are those set forth in Docket No. 6010.

[2]     Drs. Golding and Gonzalez offer these observations to illustrate the need to examine the totality of the circumstances and how the misleading data and practices was used, not as a comprehensive substitution for further investigation, discovery or evidentiary hearings on these questions.

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

indicated that as of February 26, 2019, approximately 9.7% of the total EOP population (and 9.1% of the mainline EOP population) was not on psychiatrist-prescribed medications. *See* CDCR0005114." The Expert Report disclosed that EOP patients in "overflow" locations were similarly excluded from compliance metrics. *Id.* at p. 90-91. The "review process" described in the Staffing Plan regarding EOP did not disclose these practices.

## 2. EHRS Improvements

The Staffing Report stated, "more work needs to be done to support psychiatrists and to better align the logic and workflow of EHRS with the practices of CDCR's mental health system." *Id.* at 26. The Staffing Report indicates, "prioritization" of EHRS improvements in order to "understand the importance of the requested EHRS improvements to psychiatry and the MHSDS as a whole."

The Expert Report, by contrast, details the difficulty of psychiatry in getting requested changes, training, and input into the EHRS system. Expert Report, p. 13 ("Dr. Kuich reported, however, that they experienced difficulty in getting certain requested changes and modifications approved—particularly those that relate to how psychiatrists input encounters and schedule follow-up appointments. *See, e.g.*, CDCR0016842 (July 4, 2018 email from Dr. Golding to various headquarters psychiatrists describing concerns escalated to Deputy Tebrock, including inefficiencies with the psychiatry EHRS components, and noting that Deputy Tebrock 'was reporting to the court that there have been substantial efforts to help psychiatrists with the EHRS, though we can see that the opposite is true')."

## 3. Telepsychiatry Cell-side Appointments

CDCR's staffing report discussed expanding tele-psychiatry. Staffing Report, p. 6-7. Concerning non-confidential cell-side visits being counted as full appointments, including telepsychiatry cell-side visits, the Expert Report finds this practice "potentially misleading" and "misleading." *Id.*, pp. 67-68. While Drs. Golding and Gonzalez do not oppose the use of telepsychiatry appointments as a treatment methodology, the issue of confidentiality is a concern for adequate patient care and any expansion of telepsychiatry should address confidentiality.

## 4. Reducing Psychiatry Staffing at Desert Institutions

The Staffing Report proposed reducing psychiatric staffing allocations to desert institutions. Staffing Report, p. 7. ("The 2009 Staffing Model allocates 0.5 psychiatrists to each of the desert

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

institutions. 2009 Staffing Model at 20. However, the total number of psychiatry contacts for all five desert institutions, including urgent, emergent, and routine contacts, was only 403 over a six-month period, meaning an average of 16.8 contacts per week. Attachment A- Desert Psychiatry Contacts. Therefore, the workload, which takes into account the average contacts and contact duration for all five desert institutions, could easily be accomplished by half of a psychiatrist allocation.").

According to the Expert Report, however, Dashboard measurements of psychiatric contacts per day are inaccurate.  Expert Report, p. 67-68. The Expert Report states "[t]he anecdotal evidence from multiple psychiatrists suggests that Ms. Ponciano's data analysis undercounts the amount of patient care being provided by supervisors."  Expert Report, p. 81.  Thus, data relied upon to propose cuts to psychiatry personnel in desert institutions was inaccurate.

**5.    Eliminate Psychiatric Involvement with CCC Patients not on Medications**

The Staffing Report proposes that psychiatrists should not be involved with the care of CCC patients not on medications because their involvement is "unnecessary."  Staffing Report, p. 8 ("And it is unnecessary because the psychiatrist is not treating the patient and therefore would have nothing to contribute to the IDTT. Given the limited number of psychiatrists and the difficulty in hiring this scarce position, it is appropriate to limit assignment of psychiatrists only to those individuals who require their services…Nor are they required prophylactically in the event that the need for medication arises; CDCR already has systems in place to refer patients to psychiatrists should the need for medications arise and a separate psychiatry staffing allocation for urgent or emergent referrals.").

According to the Expert Report, the figures regarding medical non-compliance are misleading. Expert Report, p. 91 ("Our analysis showed that between January 1 and September 30, 2018, there were 5,022 instances of medication nonadherence 58 and 219 orders for medication nonadherence counseling appointments. Additionally, 416 CHCF patients had one or more instances of medication nonadherence during that period, but only 134 patients received medication nonadherence orders. While this data is limited, it suggests that, at CHCF at least, there is a significant gap between the number of patients determined to be medication nonadherent, and those for whom a psychiatrist orders a medication nonadherence appointment."). Further, "[a]s to Dr. Golding's main allegation, we find that the "Timely MH Referrals" performance indicator that CDCR uses to report compliance with medication

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

nonadherence appointments is misleading. It is misleading because it does not include all of the patients who require a medication noncompliance appointment, and therefore overstates compliance with the Program Guide requirements and the mandates of the CCHCS policy." Given CDCR's inability to manage "Timely Mental Health referrals" to psychiatrists when patients need appointments for medication counselling, it would be a mistake to rely on CDCR's non-medical "systems in place to refer patients to psychiatrists" more generally.

The Expert Report further stated, "[i]n the Special Master's view, the purpose of the IDTT as described in the Program Guide is to modify or develop a treatment plan and review whether the patient is at the appropriate level of care, and that neither could be effectively done without an initial psychiatry evaluation having been completed before the IDTT." Expert Report, p. 33. According to the Special Master, psychiatrists are needed during the Treatment Team for several reasons including to determine the appropriate level of care for the patient. The Expert Report also indicated the data regarding medication non-adherence counselling was incorrect and misleading. Thus, proposals to eliminate psychiatrists from the IDTT's of patients not on medications at the CCC level of care should be rejected given that CDCR has failed to demonstrate that it has adequate "systems in place to refer patients to psychiatrists," for example, when patients need medication counselling.[3] If, as CDCR proposes, psychiatrists are eliminated from patients' yearly IDTT's, these patients are denied not only needed medical treatment referrals, but also psychiatric medical evaluation for potential treatment needs at least once per year that should occur in preparation for the Treatment Team. Without a psychiatrist, the Treatment Team cannot determine the appropriate level of care for the patient, as the Special Master noted.

### 6.    Eliminating Psychiatry Staff Overall

The Staffing Report proposed decreasing psychiatry staffing generally and expected frequency of psychiatric care contacts based, in part, on reported psychiatry caseloads. *See, e.g.* Staffing Report, p. 12-13. The Expert Report, however, found that "[t]he evidence confirms that at certain institutions

---

[3]    There are further examples of patient harm caused by CDCR's inability or unwillingness to refer patients to a psychiatrist when medically needed in the Golding Report. *See, e.g.* Golding Report, pp. 18-21.

RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT
Case No. 2:90-CV-0520 KMJ DB P

psychiatric supervisors maintain an active caseload comparable to line staff." Expert Report, p. 77. "A senior supervising psychiatrist said it was expected that supervisors perform the same duties as line staff when there are staffing shortages—the culture of leadership was that psychiatrists should be utilized. That psychiatrist explained that when [s]he took on the senior supervisor position [s]he was doing line staff work at least 50% of the time, and [s]he currently still covers IDTTs and other line work when other psychiatrists are not available…The anecdotal evidence from multiple psychiatrists suggests that [the Associate Deputy Director] Ms. Ponciano's data analysis undercounts the amount of patient care being provided by supervisors." *Id.* at 81.

The Expert Report described that psychiatric evaluation contact compliance numbers are further biased and misleading. "[For] Program Guide timeline requirements for EOP and CCCMS psychiatric evaluations, the "Timely Psychiatry Contacts" indicator is biased towards compliance by some non-trivial percentage. Second, the data is biased towards compliance as a result of CDCR's decision to default the appointments in EHRS to confidential, combined with insufficient training and oversight relating to this mechanism." *Id.*, at 67-68. The Expert Report did not evaluate the adequacy of medical care that can be provided in non-confidential cell-side visits of short duration, although witnesses stated that adequate medical care cannot be provided in that setting. In considering the findings of the Expert Report in its totality, if CDCR is claiming in order to lessen Court and Plaintiffs' monitoring and oversight that patients are receiving the constitutionally minimum level of mental health care, including timely seeing a psychiatrist in a confidential setting and receiving required medications, the pattern of misleading data in these areas is critical to the Court's analysis. It is also relevant to understand the question of intent related to why there is a pattern of false increased compliance metrics.

## II.    Issues Raised By the Golding Report That Were Not Referred to in the Neutral Expert Report and Require Further Action

### A.    CDCR's Policy of Having Non-medical Staff Make Medical Decisions Harms Patients

As set forth in the Golding Report, nonmedical staff who do not have medical expertise or training are making patient medical decisions, overruling psychiatrists' medical decisions, or are not seeking a licensed medical care provider's opinion before making medical decisions for patients at critical moments of patient care. *See* Golding Report, pp. 10, 15, 86, 88. This has led to significantly

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

bad medical outcomes for patients that may have been averted had licensed medical personnel been consulted for medical treatment of patients. *See* Golding Report, pp. 83-95. There is a complex and varying relationship between many medical and psychiatric conditions that require psychiatric medical expertise to diagnose and manage appropriately.  Without medical training, certain severe and potentially life-threatening conditions may be inadvertently overlooked by non-medically trained personnel.  As described in the Golding Report, pp. 83-117, the practice of allowing non-medical psychologists designated as the "primary clinician" to override the medical opinion of the attending psychiatric physician in cases in which the attending physician disagrees with the "primary clinician" can lead to severe injury or death.  *See* Golding Report, pp. 83-117.

CDCR's policy of having non-medical staff act as if they were psychiatric medical doctors can be seen in their refusal to have psychiatrists in crisis teams, and by its removal of mandatory medical clearance before patients are sent to the crisis psychiatric hospital. *See* Golding Report 111, 114-116. The effect of eliminating psychiatric medical clearance and psychiatrists from crisis intervention teams at the time patients need to see a psychiatrist the most (during psychiatric emergencies), means the patients do not see a psychiatrist and may not receive appropriate medical care.

Additionally, psychologists with no medical training are making potentially dangerous medical decisions, including placing patients in restraints.  Because the use of restraints can be medically dangerous, there are specific requirements under the law requiring physician approval to use restraints. Yet, CDCR allows psychologists to make this determination without a psychiatrist, physician or nurse determining if the use of restraints is medically safe. While no medical clearance is permitted, CDCR mandates that the psychiatrist sign the psychologist's restraint order after the fact and often without ever seeing the patient. This is deeply concerning for patient care, accurate medical records and for obvious ethical and legal implications.

If the psychiatrist is unavailable and the patient needs to be placed into restraints, and there is medical/nursing clearance by the attending nurse, it is reasonable for the psychiatrist to sign the nurse's order, because the nurse was then acting like the psychiatrist's proxy in an emergency. Nurses have a scope of practice encompassing the physical/medical; psychologists do not. In short, there must be

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

required medical clearance before psychologists place patients into restraints for minimum patient safety.  *See* Golding Report, pp. 159-161.

### B.  Eliminating Psychiatric Medical Clearance When Patients Are Referred to and Discharged from the Hospital

Eliminating psychiatric medical clearance when patients are being transferred to the hospital is very dangerous, as illustrated by the example in the Golding Report of the psychotic patient who pulled out her eye and swallowed it. *See* Golding Report, pp. 83-95. Patients sent to or discharged from the hospital are at increased risk and without psychiatric medical clearance, the result can be disastrous for the patient. For patient safety, it is vital to mandate psychiatric medical clearance before patients are sent to or discharged from licensed inpatient settings. *See* Golding Report, pp. 98-107,124-125.

### C.  CCC Not on Medications.

As set forth in the Golding Report, many CCC patients not on medications are not seen by a psychiatrist when the patient is discharged from the hospital. *See* Golding Report pp. 18-21. This can be dangerous to the patient.  Some patients may require medications and refuse them; yet they are not being seen, because CDCR non-medical staff often mistakenly deem patients who have refused medications, not to *need* to see a psychiatrist. Moreover, non-medical personnel without medical training or a medical license determine whether a patient needs medication, and whether the patient must be seen by a psychiatrist.  *See* Golding Report, pp. 10, 15, 86, 88.  These practices have led to bad outcomes for patients.

The Golding Report details that the determination of whether a CCC patient not on medications requires regular psychiatric appointments can only be made appropriately by a psychiatrist. CCC patients not on medications determined by a psychiatrist to need regular psychiatry evaluations must be added to the On Demand Scheduling Report so that the psychiatrist sees these patients at least every 90 days. All other CCC patients not on medications should be seen yearly. CDCR should provide clear and accurate information regarding CCC level patients not on medications in their data sets regarding when these patients are seen by a psychiatrist and scheduled to be seen. When a CCC patient not on medications whom a psychiatrist has said needs to be seen regularly is not seen within 90 days, that data should not be excluded from the timeliness compliance figure.

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

**D.  Medically Urgent Scheduled Appointments that Did Not Occur Are Not Counted as Late**

As set forth in the Golding Report at pp. 28, 47-48, CDCR does not count medically urgent scheduled appointments that do not occur when the physician psychiatrist ordered them as late. Thus, the recorded timeliness measurements are falsely inflated and misleading. For example, at the CCC level of care, if a physician orders that a patient be seen seven (7) days after he/she was just seen because of a medical emergency and the patient is actually seen 83 days late, the appointment is considered to be on time in terms of CDCR's timeliness-of-appointments measure.  CDCR's position is that appointments scheduled any time during the maximum Program Guide interval of ninety (90) days are on time, regardless of when physicians schedule the patient to be seen, within that interval.

Further, in the 2018 Staffing Report to the Court, to arrive at the figure that CCC appointments were on average 2.6 days overdue, CDCR took an average of what they deemed late appointments with what they deemed early appointments. *See* Golding Report, p. 48. If a psychiatrist ordered that a CCC level of care patient be seen a week later and the patient was indeed seen a week later, instead of counting that appointment as having been on-time, CDCR counted that appointment as being 83 days early. If a psychiatrist ordered that a patient be seen a month later but the patient did not see a psychiatrist for two months, CDCR counted that appointment as a month early rather than a month late, as was actually the case. The on average 2.6 days overdue figure significantly underestimated how late on average appointments were occurring.  Golding Report, pp. 2-3, 48.

**E.  MAPIP: Biasing the Sample**

As set forth in the Golding Report, pp. 3-4, 30-35, in its 2017 Staffing Report, CDCR reported it had eliminated three of the four mandatory blood draws (baseline, three months, and dose-related measurements), thus leaving only the annual measurement.  An "annual" blood test could mean: (1) a blood test done a year after starting a medication and then at yearly intervals thereafter; or (2) a blood test performed within the first year and then at yearly intervals thereafter.  The definition utilized should be disclosed.

In its calculation of compliance with mandatory blood draws, CDCR included data regarding some but not all patients who had blood draws done within a year of starting medication. It included the

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

data from patients who remained on medication for a full year.  It excluded from the calculation data from those patients least likely to have had the mandatory blood draw — those who had been taken off the medication within a year of starting it. Such patients are less likely to have had the mandatory blood drawn because there was less time in which to get the blood draw done. Thus, in its 2017 Staffing Report, CDCR provided misleading data and overstated the MAPIP compliance figure. This also impacts patient care where patients on medications are not receiving required blood tests and the attendant information that testing would provide is needed to provide adequate patient care.

### F.  Psychiatrist Continuity of Care

CDCR does not consider moving a patient from location to location, where the psychiatrist and medical treatment teams would therefore change, in its evaluation of patient continuity of care.  In its measurement of continuity of care, only those patients that stay at the same institution and are assigned a different psychiatrist are considered to experience discontinuity of care. For example, if a patient moves five times in three months and has five different psychiatrists, that patient is excluded from measurements of discontinuity of care, despite experiencing repeated instances discontinuity of care. *See* Golding Report, p. 121.

### G.  Confidentiality Default

The EHRS system was designed to default to "confidential" setting as the description of where a psychiatry contact took place.  The default setting should be blank, requiring the psychiatrist to choose the setting so that accurate data regarding the treatment setting is provided.  Designing the system so that appointments default to being considered confidential and in an office falsely creates the impression that a higher percentage of patients were seen confidentially and in offices. It also creates false medical record entries.  While the Expert Report did discuss this issue in part, the EHRS system should be changed to ensure accurate confidentiality data.  *See* Golding Report, pp. 140-141.

Moreover, whether psychiatric appointments are confidential depends upon whether the Special Master is monitoring an institution. For example, at the CCWF crisis bed, all patients were brought to offices for confidential psychiatry appointments when the Special Master was monitoring. When the Special Master was not present, patients were never removed from their cell.  *See* Golding Report, p. 66.

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

### H.  Psychiatric Clinics

As detailed in the Golding Report, many CDCR psychiatrists waste most of their time searching the prison for their patients because CDCR has failed to create psychiatric clinics in which patients are brought one after the other to their appointments with a psychiatrist who stays seated in one place – a clinic office.  *See* Golding Report, pp. 77-81.  Having found a patient in the yard, the showers, cell blocks or other areas of the prison, the psychiatrist then must attempt to provide adequate medical care to that patient in a non-confidential setting. Due the time taken to find the patient, the psychiatrist has less time in which to evaluate and medically treat the patient. There are also reported institutional barriers to locating patients, as at times some correctional officer staff are less helpful in locating patients.

There are obvious medical implications of these practices: (1) patients are not reliably seen for psychiatric appointments; and (2) these brief medical evaluations in inappropriate conditions do not constitute proper psychiatric medical care.

There are no executive psychiatrists in institutions or in the regions. These medical implications could be addressed by a team of regional psychiatrists, supervised by Headquarters Psychiatry staff, who could travel to the institutions to implement a clinic model where patients are brought to psychiatrists. *See* Golding Report p. 45, 46, 56, 65, 66, 126.

### I.  Psychiatry Reporting Structure and the Relationship with CDCR Management

The Golding Report detailed significant concerns with patient care where psychiatrists are required to report to psychologists.  *See* Golding Report, pp. 108,125, 129-133. Psychiatrists should be hired, supervised, and peer-reviewed by peers, not by psychologists.  Golding Report, pp. 91-97,125, 129-133. The consequences of this reporting relationship are felt in a myriad of ways.  For example, important mental health policies regarding psychiatry and psychiatric medical care are created with zero input from psychiatry or any medical doctor.  Golding Report, pp.114-115. Psychiatrist retention is also negatively impacted.

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P

1

### J.   Psychiatry Access to Patient Data and Reports

The Golding Report detailed Headquarters psychiatry staff's great difficulties in obtaining permission to access databases containing patient data. *See*, *e.g.* Golding Report, pp. 29, 72-74, 95, 105, 119-120.  Headquarters Psychiatry staff require data in order to determine if there are factors adversely affecting patient care, and how those factors can be solved. It also creates transparency.  For example, in 1.5 years after CDCR took over the psychiatric inpatient program and changed the model of care, there were nine (9) successful suicides within 90 days of discharge. In the same locations prior to CDCR takeover in a period of 2.5 years and with a larger population, there was only one suicide within 90 days of discharge. Possible reasons for the increased suicide rate should be statistically explored.

The Golding Report further describes that since 2016, psychiatry has requested Huddle Reports (or a similarly simple system that facilitates patient care) for psychiatrists and their supervisors in order to allow psychiatrist to evaluate at a glance which of their patients are medication non-compliant and have or have not been seen.  This is a simple, low-cost solution that would dramatically improve patient care.

Respectfully submitted,

/s/ Wendy Musell
WENDY MUSELL

STEWART & MUSELL, LLP
Attorneys for Michael Golding, M.D. and Melanie Gonzalez, M.D.

**RESPONSE TO ORDER DATED APRIL 26, 2019 [DOCUMENT 6135] FOR DR. MICHAEL GOLDING AND DR. MELANIE GONZALEZ RE NEUTRAL EXPERT REPORT**
Case No. 2:90-CV-0520 KMJ DB P