# EXHIBIT A

# TO REQUEST FOR LEAVE TO FILE AMICUS BRIEF BY UNION OF AMERICAN PHYSICIANS AND DENTISTS

# RALPH COLEMAN, et al. v. GAVIN NEWSOM, et al.
# U.S. DISTRICT COURT, EASTERN DISTRICT
# CASE NO. 2:90-CV-00520-KJM-DB

1  ANNE I. YEN, Bar No. 187291
   WEINBERG, ROGER & ROSENFELD
2  A Professional Corporation
   1001 Marina Village Parkway, Suite 200
3  Alameda, California 94501
   Telephone (510) 337-1001
4  Fax (510) 337-1023
   E-Mail: ayen@unioncounsel.net
5          courtnotices@unioncounsel.net

6  Attorneys for Union of American Physicians and Dentists

8                   UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

11 RALPH COLEMAN, et al.,                    No. 2:90-cv-00520-KJM-DB

12                Plaintiffs,
                                             **AMICUS BRIEF OF UNION OF**
13       v.                                  **AMERICAN PHYSICIANS AND**
                                             **DENTISTS**
14 GAVIN NEWSOM, et al.,

15                Defendants.

16                                           Judge:   Hon. Kimberly J. Mueller

**WEINBERG, ROGER &
ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
**Case No. 2:90-cv-00520-KJM-DB**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. REVIEW OF RELEVANT LEGAL STANDARDS............................................2

    A. THE NEED FOR TIMELY EVALUATIONS AND TREATMENT BY COMPETENT *MEDICAL* STAFF .........................................2

    B. CONSTITUTIONAL STANDARDS SET FORTH IN PROGRAM GUIDE .................................................................3

    C. RELEVANT REGULATORY STANDARDS ..................................................3

III. SUMMARY OF FACTS .......................................................................................3

    A. CDCR ENGAGES IN MISLEADING PRACTICES, CREATING A FALSE APPEARANCE OF COMPLIANCE ...............................3

        1. Falsely Reporting Compliance as to Transferred Patients Who Have Not Received Timely Psychiatric Evaluation ............................3

        2. Unilaterally Redefining "Monthly" Without Consulting the Special Master ..............................................................................4

        3. Counting All Encounters as "Evaluations" for Compliance Purposes ..............................................................................4

        4. Refusing to Report the Extent that Psychiatric Supervisors Are Carrying Caseloads ............................................................5

        5. Refusing to Count All Medication Non-Compliance Appointment Requirements ......................................................................5

        6. Exclusion of EOP Patients Who Are Not on Psychiatric Medications from Compliance Metrics ..........................................................6

        7. Exclusion of EOP Overflow Patients from Compliance Metrics ...........................................................................................7

    B. NON-MEDICAL LEADERSHIP UNDERMINES PSYCHIATRIC CARE............................................................................7

IV. ANALYSIS............................................................................................................10

    A. UAPD SUPPORTS ORDERING CDCR TO CORRECT THE FIVE MISLEADING PRACTICES IDENTIFIED IN THE NEUTRAL EXPERT'S REPORT ......................................................................10

    B. UAPD SUPPORTS HOLDING A HEARING REGARDING

i

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

**WEINBERG, ROGER & ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

# TABLE OF CONTENTS (cont'd)

|  | Page |
|---|---|
| WHETHER CDCR HAS PRESENTED MISLEADING INFORMATION | 10 |
| C. CDCR SHOULD NOT BE ALLOWED TO CONTINUE REDUCING PSYCHIATRY POSITIONS AND SUPPLANTING THEIR SERVICES WITH PSYCHOLOGISTS | 13 |
| V. CONCLUSION | 15 |

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Coleman v. Brown*,
  756 Fed.Appx. 677 (9th Cir. 2018) .................................................................................................. 3

*Coleman v. Wilson*,
  912 F.Supp.1282 (E.D.Cal. 1995) ............................................................................................ *passim*

**Constitutions**

Eighth Amendment ................................................................................................................. 2, 11

**Regulations**

22 CCR § 79599 ........................................................................................................................... 3

22 CCR § 79609 ........................................................................................................................... 3

iii

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

**WEINBERG, ROGER &
ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

## I. INTRODUCTION

In the Court's 1995 decision, the Court ordered the appointment of a Special Master to oversee corrective measures, because of the California Department of Corrections and Rehabilitation (CDCR)'s failure to provide adequate psychiatric care. Psychiatry at CDCR was and still is severely understaffed. The constitutional standard requires ready access to competent *medical* staff – that is, psychiatrists. (See, e.g., *Coleman v. Wilson*, 912 F.Supp.1282, 1307, 1308 (E.D.Cal. 1995). Unfortunately, as the reports of Dr. Michael Golding and the Neutral Expert have shown, CDCR has engaged in misleading practices in reporting to the Special Master and the Court – misleading practices which tend to cover up or under-report the deficiencies caused by CDCR's understaffing of psychiatrists.

The Union of American Physicians and Dentists (UAPD) submits this amicus brief in part to support ordering CDCR to correct misleading practices that were identified and substantiated in the Neutral Expert report. UAPD contends that the misleading practices undermine both patient care and working conditions for the psychiatrists that UAPD represents.

In addition, although the Neutral Expert does not recommend holding a hearing regarding whether CDCR has presented misleading information, UAPD supports holding a hearing. Unfortunately, the psychiatrists represented by UAPD have found that the non-medical leadership of CDCR have increasingly sought to eliminate psychiatric oversight of patient care. CDCR leadership, which is dominated by psychologists, has been shifting authority and functions to psychologists, beyond the proper scope of practice for non-physicians. Therefore, the CDCR's misleading practices are quite deliberate, being designed to cover up the dangers of understaffing – and undermining -- psychiatrists.

Likewise, UAPD urges the Court to consider this amicus brief, and the supporting declarations of psychiatrists, when considering any and all proposals by CDCR that would involve decreasing psychiatry positions or psychiatry supervisor positions, or which would affect the authority of non-medical staff to make decisions affecting patient care – including, but not limited to, CDCR's Staffing Proposal and revisions thereto, and the CDCR's Custody and Mental Health Partnership Plan ("CMHPP") to be filed by June 7, 2019 (Dkt. 6126).

**WEINBERG, ROGER & ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

1

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

## II. REVIEW OF RELEVANT LEGAL STANDARDS

### A. THE NEED FOR TIMELY EVALUATIONS AND TREATMENT BY COMPETENT *MEDICAL* STAFF

In the 1995 decision, the Court found, *inter alia*, "in order to provide necessary mental health care to prisoners with serious mental disorders, there must be a system in place to identify those individuals, both at the time they are admitted to the Department of Corrections and during their incarceration." 912 F.Supp. at 1305.  Some inmates with serious mental disorders are, by virtue of their condition, incapable of making their needs for mental health care known to staff. Delivery of adequate mental health care to such inmates requires their identification. *Id.* The Court found, "evidence before the court plainly shows that thousands of inmates suffering from mental illness are either undetected, untreated, or both… The federal Constitution does not tolerate such a lack of medical care." *Id.* at 1305-1306.

In order to provide inmates with access to constitutionally adequate mental health care, defendants must employ mental health staff in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders. *Id.* at 1306. This requires "ready access to competent *medical staff*." *Id.* at 1307, emphasis supplied; see also the Court's determination that the required access to adequate medical care means ready access to "physicians," at 1308. Monitoring was ordered in part to address the "unacceptably long delays in access to every level of care… a critical sign of understaffing." *Id.* at 1307. The understaffing-related delays "result in exacerbation of illness and patient suffering, a violation of the objective facet of the test for violation of the Eighth Amendment." *Id.* at 1309.

Monitoring was ordered in part because the Court found that "defendants' supervision of the use of medication is completely inadequate; prescriptions are not timely refilled, there is no adequate system to prevent hoarding of medication, there is no adequate system to ensure continuity of medication, inmates on psychotropic medication are not adequately monitored, and it appears that some very useful medications are not available because there is not enough staff to do necessary post-medication monitoring." *Coleman v. Wilson*, 912 F.Supp. at 1309.

2

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

1  The Court summarized, "due to a systemic failure to provide adequate mental health care, thousands of class members suffer present injury and are threatened with great injury in the future." *Id*. at 1315.

### B. CONSTITUTIONAL STANDARDS SET FORTH IN PROGRAM GUIDE

The Program Guide is the court-ordered remediation plan designed to provide the constitutionally required standards in the context of CDCR mental health services. *Coleman v. Brown,* 756 Fed.Appx. 677, 679 (9th Cir. 2018). The Program Guide requires, *inter alia*, that each Correctional Clinical Case Management System ("CCCMS") patient on psychiatric medication be reevaluated by a psychiatrist a minimum of every 90 days; and that a psychiatrist shall evaluate each Enhanced Outpatient Program ("EOP") patient at least monthly. (See Neutral Expert report at p. 10.)

### C. RELEVANT REGULATORY STANDARDS

Licensed physicians are responsible for the care of inmate-patients in a correctional treatment center. All inmates admitted to or accepted for medical care by a correctional treatment center shall be under the care of a physician. 22 CCR § 79599. By contrast, psychologist services are only consultative to the patient. 22 CCR § 79609.

### III. SUMMARY OF FACTS

#### A. CDCR ENGAGES IN MISLEADING PRACTICES, CREATING A FALSE APPEARANCE OF COMPLIANCE

##### 1. Falsely Reporting Compliance as to Transferred Patients Who Have Not Received Timely Psychiatric Evaluation

When a mental health patient is transferred from one institution to another, CDCR resets the clock to the maximum interval between psychiatry appointments (30 days for some patients and 90 days for others), which causes the time during that re-set interval in which the patient does not receive an evaluation to falsely appear compliant. (Dkt. 5988-1, p. 1.) Dr. Golding explains that the strategy of resetting the clock overstates timeliness of psychiatric appointments and thereby leads to mistaken conclusions about psychiatry staffing needs. (*Id.*) The non-medical CDCR leadership seeks to defend the practice on the basis that the Special Master knows about "resetting the clock." (Neutral Expert Report, p. 27.) However, the Neutral Expert reports that

3

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

the Special Master agrees with the psychiatrists that a psychiatry evaluation necessarily must be done before the initial Interdisciplinary Treatment Team ("IDTT") meeting, which in turn is supposed to occur within 14 working days of the patient's arrival. (Neutral Expert Report, pp. 26, 28, 36.) The Special Master indicates that it is misleading to count initial psychiatry evaluations that occur after the IDTT as compliant -- as CDCR leadership knows or should know, because it is in the written guidebook developed by CDCR and the Special Master, and the Special Master has made his understanding clear. (*Id.*, p. 28.) The Neutral Expert finds "a disconnect between CDCR and the Special Master concerning CDCR's interpretation of the Program Guide relating to transferred patients that could have important clinical ramifications" – that is, CDCR is reporting itself compliant during the re-set time a transferred patient is not receiving a psychiatric evaluation, even if the patient has not received a pre-IDTT evaluation. (*Id.* at p. 36.)

### 2. Unilaterally Redefining "Monthly" Without Consulting the Special Master

Between December 2016 and April 2017, CDCR modified its business rule for measuring the timeliness of psychiatry appointments from 30 days to 45 days without consulting the Special Master. The Special Master found it shocking that CDCR unilaterally changed a long-standing interpretation of the Program Guide. (Neutral Expert Report, p. 39.)

### 3. Counting All Encounters as "Evaluations" for Compliance Purposes

Dr. Golding demonstrates, and the Neutral Expert agrees, that by counting every encounter as a "psychiatric appointment," CDCR does not correctly report the extent that patients are receiving timely psychiatric appointments (reporting more timely psychiatric appointments than the reality). (Dkt. 5988-1, p. 6.) Dr. Golding has raised the issue with CDCR Mental Health Leadership numerous times and requested CDCR correct the problem, but the non-medical CDCR leadership refuses to acknowledge that a psychiatric evaluation, as required by the Program Guide, must be confidential. (Neutral Expert Report, p. 49.) Moreover, the Special Master advises that he has regularly told CDCR that non-confidential contacts should not qualify as evaluations under the Program Guide. (*Id.* p. 52.)

As CDCR Senior Psychiatrist Specialist Dr. Navreet Mann explains, psychiatrists have been trying to get executive leadership to address the need for confidential appointments, but

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

4

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

nothing has been done; and non-confidential encounters, such as cell-front contacts, are a rampant problem at CDCR, not just a minor aberration. (See Dr. Mann's declaration at paragraph 4.d.)

### 4. Refusing to Report the Extent that Psychiatric Supervisors Are Carrying Caseloads

The 2009 Staffing Plan includes staffing ratios for Staff Psychiatrists, but not Psychiatry Supervisors. Some Psychiatry Supervisors are carrying caseloads like Staff Psychiatrists, which impacts the representations CDCR makes regarding staffing ratios when making staffing proposals. However, CDCR did not disclose the fact that Psychiatry Supervisors have been providing direct services, some carrying full caseloads, when CDCR has proposed psychiatrist reductions. (See Neutral Expert Report, p. 72.) The Special Master asserts that CDCR has not provided sufficient information regarding this issue; such as how many full-time equivalents are actually used for direct services and the duration. (*Id.*, p. 74.) The "Timely Psychiatry Contacts" reported by CDCR does not disclose that some portion of the data reflects appointments seen by supervisors. (*Id.*, p. 77.) Although the Neutral Expert does not make a finding that the misleading data has necessarily impacted the Special Master or the Court, that is because CDCR has failed and refused to provide sufficient data to quantify this activity. (*Id.* pp. 76-77.)

As Dr. Navreet Mann explains in the accompanying declaration:

> CDCR's practice of using psychiatry supervisors as caseload-carrying line staff is material. Carrying full or partial caseloads not only impacts the compliance data, but also keeps Psychiatrists from running successful programs. By overloading Psychiatry supervisors with disproportionate direct care duties, CDCR excludes us from the planning and oversight functions that should be the Psychiatry supervisors' primary focus. Though Psychiatrists are not involved in how their programs should be run, they are held accountable when the plans start to fail.

(See Dr. Mann's declaration at paragraph 4.e.)

### 5. Refusing to Count All Medication Non-Compliance Appointment Requirements

Dr. Golding demonstrates, and the Neutral Expert agrees, that CDCR's system for reporting compliance is misleading, because it does not capture all patients who require a medication noncompliance appointment – and therefore overstates compliance (see, e.g., Neutral

5

**WEINBERG, ROGER & ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

Expert report, pp. 5, 79, 86-87).  The psychiatrists and the Special Master believe that medication-noncompliant patients must be seen by a psychiatrist; however, patients are frequently not referred to a psychiatric appointment for medication noncompliance and are therefore not counted in the reporting to the Special Master.  The administrators and psychologists who "dominate CDCR Mental Health's policy and data analysis apparatus" (Neutral Expert Report, p. 84) have refused to comply with the mandate for medication non-adherence counseling by the prescriber, which in the case of mental health patients is the psychiatrist. (*Id.*, pp. 81, 82.)  All psychiatrists interviewed by the Neutral Expert consider medication non-compliance counseling by a psychiatrist to be mandatory, and the Special Master believes all patients must be referred to a psychiatrist unless the noncompliance issue is quickly resolved.  (*Id.,* pp. 86-87.)  However, the non-medical leadership deliberately refuses to acknowledge the requirement.  (*Id.*, p. 82.)

Dr. Mann attests:

> Over the past few years questions have been raised from the field regarding the process of involuntary treatment of patients, as allowed under Penal Code 2602. The most pressing issue currently raised by Psychiatry is that patients are not receiving involuntary treatment ordered by the physician, and there is a substantial delay in patients getting their medications after the court has granted an order to involuntarily treat the patient. Patients under a court order need to be medicated as ordered by the court, which is not always happening.

(See Dr. Mann's declaration, paragraph 5.)

**6.   Exclusion of EOP Patients Who Are Not on Psychiatric Medications from Compliance Metrics**

The psychiatrists and the Special Master confirm that timely psychiatric evaluations must apply to all EOP patients under the Program Guide, yet CDCR and its counsel refuse to acknowledge this requirement.  CDCR only counts EOP patients who are on psychiatric medications as requiring psychiatric evaluations for the purpose of reporting whether CDCR is in compliance.  Before the Neutral Expert investigation, this issue had been unknown to the Special Master, Plaintiffs, and psychiatry staff.  (Neutral Expert Report pp. 89-90.)  While the Neutral Expert did not investigate, nor make any findings, whether the non-medical CDCR Mental Health Leadership intentionally concealed this misleading practice, non-medical leadership have "long

6

**WEINBERG, ROGER & ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

been aware" that it was an issue under the Program Guide, and they privately discussed it amongst themselves (*Id.*, fn. 61).  The inference is clear that the Special Master, Plaintiffs, and psychiatry staff were unaware of the issue, while non-medical leadership were aware of it, *because* non-medical leadership deliberately failed and refused to disclose it.

### 7. Exclusion of EOP Overflow Patients from Compliance Metrics

EOP Overflow patients have been assigned to the EOP level of care, but are not yet in an institution where there is an EOP program or space in that program.  CDCR has excluded those patients from reporting whether CDCR is providing patients with timely psychiatry contacts.  Psychiatry leadership raised this issue with the psychologist leadership at least as early as 2016; the psychology leadership then falsely assured Dr. Golding that Overflow patients would be included.  However, it has not been done. (Neutral Expert Report, pp. 90-91.)

## B.   NON-MEDICAL LEADERSHIP UNDERMINES PSYCHIATRIC CARE

Dr. Golding reports that psychiatry is under-represented in the leadership structure.  The Neutral Expert finds that the psychiatrists his firm interviewed corroborate that concern, and that they express psychiatry concerns are ignored or marginalized, with negative impacts upon patient care.  (Neutral Expert report, p. 23.)  Headquarters committees, including the Mental Health Change Management and Mental Health Quality Management Committees, are led primarily by psychologists, with psychiatrists being in the minority.  (*Id.* at p. 22 and fn. 21.)  While CDCR makes many decisions on a regional level, it staffs no psychiatrists at the regional offices; and at the local level, most Chief Psychiatrists report to psychologists.  (Dr. Schultz-Ross' declaration, para. 10-11.) Moreover, CDCR reduced psychiatrists in its Staffing Proposal without psychiatry leadership's agreement (see Neutral Expert Report, pp. 19-20).  As Dr. Mann notes:

> In certain responses CDCR misuses Psychiatry understaffing, by having Psychologists take over certain services that cannot be provided by Psychiatrists due to short staffing, instead of focusing on hiring new staff.  This raises some serious scope of practice issues. Psychologists and Psychiatrists are not interchangeable. Our leadership has been made aware of the differences, but have failed to address these scope of practice issues.

(See Dr. Mann's declaration at paragraph 4.g.)

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

7
AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

As CDCR Psychiatrists Dr. Navreet Mann and Dr. Amar Mehta explain in the accompanying declarations, psychologists do not have the training to safely manage, supervise and overrule psychiatrists.  The decisions psychiatrists make regarding patient care are informed by the standardized, extensive medical training they receive as physicians, enabling them to care for the health of the whole patient and to understand the risks and benefits of different medical treatment options (see Dr. Mann's declaration at paragraph 2, and Dr. Mehta's declaration at paragraph 2).  Psychologists, on the other hand, are not trained as physicians, and they cannot be expected to fully understand the medical issues and treatments handled by the psychiatrists (see Dr. Mann's declaration at paragraph 3, and Dr. Mehta's declaration at paragraph 2).

Dr. Mehta's statement is consistent with the concern other members express:

> I understand that there is a critical psychiatrist shortage in this country, and a larger physician shortage in general. That is a real problem, with real consequences. However, simply handing that responsibility to other professions without adequate training is not a solution. Psychiatric patients do not deserve to be treated as second class citizens, as the sole group of patients that can be treated by people who have no general medical training…An exception for psychiatry reflects a deep misunderstanding of the interconnected and complicated nature of human physiology, and is demeaning to patients with very real suffering.

(Dr. Mehta's declaration at paragraph 3.)

CDCR Psychiatrist Dr. Andrew Schultz-Ross attests in his declaration:

> In CDCR, psychologists generally govern psychiatrists at the departmental and facility levels.  Psychiatrists generally are not in charge of the treatment team and due to psychiatrist understaffing, often cannot attend treatment team meetings due to scheduled appointments with patients or other tasks.  I experienced circumstances in which I was not included in my patients' treatment team meetings, due to the way the workflow was organized.
>
> As discussed in more detail in Dr. Golding's report, against the wishes of the psychiatry leaders, CDCR is moving toward granting psychologists the ability to order seclusion and restraint. Psychologists in CDCR already often order admission and discharge into hospital levels of psychiatric care in the prisons. They sometimes overrule psychiatrists in these decisions, not admitting patients that psychiatrists say need more care, and discharging patients who are in the midst of medication changes best done in an inpatient setting.  As psychologists have no medical training, they may make decisions involving medical risks that they may not be able to recognize or fully assess.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

8

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

(Dr. Schultz-Ross' declaration at paragraphs 3-4.)

Accordingly, UAPD stresses that CDCR's unusual working conditions, in which psychologists manage and overrule psychiatrists, are unsafe for the patients and deeply concerning to the psychiatrists in carrying out their responsibilities as licensed physicians.

Dr. Golding's report shows numerous ways the non-medical leadership undermine psychiatric care:

- Authorizing psychologists to overrule psychiatrists' orders (including incidents in which untreated patients harmed themselves as the result) (Golding Report, Dkt. 5988-1, e.g. pp. 18, 21, 84, 99, 103);

- Making policy decisions to lengthen "compliant" intervals between appointments without including psychiatry leadership (*Id.*, p. 24);

- Providing no organizational support to ensure psychiatric appointments are met in a timely fashion, forcing the psychiatrists to spend time wandering the institutions searching for their patients, and forcing the psychiatrists to have non-confidential, inadequate visits with the patients once they are found (*Id.,* pp. 42, 57, 65-66);

- Excluding from the data of "required" appointments those that have been ordered by psychiatrists, so that those appointments are not counted for the purpose of reporting whether "required" appointments have been complied with (*Id.,* p. 56);

- Excluding psychiatry's requests from the design of the Electronic Health Records System (*Id.,* p. 71);

- Establishing a psychologist-run Change Management Committee to decide mental health workflow, where the two psychiatrists are always out-voted by the 22 non-medical personnel, including 12 psychologists (*Id.* pp. 71-72);

- Excluding psychiatrists when admitting patients to crisis bed hospital units (*Id.* p. 87);

- Misinforming custody staff that psychologists are the physicians to call (*Id.* p. 90; see also Dr. Mann's declaration at paragraph 4f);

- Authorizing psychologists to determine whether psychiatrists complete their probationary periods (*Id.* p. 96);

- Excluding psychiatrists from treatment "team" decisionmaking, so that the psychiatrist does not know of a decision to discharge a patient or a decision to change the level of care until the psychologist is telling the patient (*Id.* p. 104);

- Expanding psychologists' authority to admissions and discharge (*Id.* p. 112).

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

## IV. ANALYSIS

### A. UAPD SUPPORTS ORDERING CDCR TO CORRECT THE FIVE MISLEADING PRACTICES IDENTIFIED IN THE NEUTRAL EXPERT'S REPORT

The Neutral Expert's report identified a need to correct at least five CDCR practices which help CDCR under-report noncompliance: setting an incorrect extended timeline for psychiatric evaluation upon patient transfer, counting all encounters as evaluations, refusing to count all medication non-compliance appointments that are required, excluding EOP patients not on psychiatric medications from compliance metrics, and excluding EOP overflow patients from compliance metrics. These practices all conceal psychiatry appointments that are required but either are not provided or are delayed, so that the data reported to the Special Master does not reveal that those appointments are untimely or missed entirely.

From UAPD's perspective, these practices must be corrected. They are mechanisms to conceal the true scope of CDCR's failure to provide at least a minimum level of psychiatric care. Until CDCR hires sufficient psychiatrists and restores authority to psychiatrists to care for their patients, CDCR will continue to fail to meet minimum constitutional standards. But instead of devoting its resources to meeting those standards, CDCR is trying to cut psychiatrists and hide its shortcomings from the Special Master and the Court. Although there are likely other misleading practices that the Neutral Expert did not uncover, the Neutral Expert's investigation substantiated these five misleading practices, and these at least must be rectified. The Neutral Expert recommends ordering CDCR to meet and confer with the Special Master and Plaintiffs regarding resolution of these issues; UAPD urges the Court to do so, but also to require CDCR to report back to the Court and to demonstrate corrective measures are taken, with prompt deadlines.

### B. UAPD SUPPORTS HOLDING A HEARING REGARDING WHETHER CDCR HAS PRESENTED MISLEADING INFORMATION

The Court's Order appointing the Neutral Expert indicates that the Court is considering whether to hold a hearing; more specifically, whether facts exist raising a question about whether CDCR has intentionally presented misleading information to the Court and Special Master.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

10

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

While the Neutral Expert does not recommend a hearing, UAPD believes the facts in the record do support holding a hearing, and UAPD urges the Court to do so.

As the Court held in the 1995 decision which began the monitoring process, it is not plausible for CDCR officials to deny the subjective component of an Eighth Amendment violation – "deliberate indifference" – while they oppose taking reasonable corrective measures to abate deficiencies of which they are aware.  912 F.Supp. at 1299, *citing Farmer v. Brennan,* 114 S. Ct. 1970, 1984 n.9 (1994).

Similarly, here there is evidence that CDCR has been on notice that the acts and omissions that CDCR conceals or under-reports are either non-compliant in the Special Master's view, or (with respect to acts and omissions unknown to the Special Master) could be considered non-compliant if discovered.  With that knowledge, CDCR leadership have deliberately engaged in the misleading practices anyway, on the basis that they disagree that the underlying acts or omissions violate the Program Guide.  But assuming *arguendo* that they disagree with the Special Master's interpretation, such disagreement would not refute the evidence that they have acted knowingly and intentionally in concealing or under-reporting it.

The non-medical CDCR Mental Health Leadership have long been aware of the issues identified by Dr. Golding or uncovered by the investigation; but they refuse to acknowledge that their practices violate the minimum standards required in the Program Guide.  In the first example discussed in the Neutral Expert's investigation, according to the Special Master, CDCR leadership is amply on notice that it is misleading to count initial psychiatry evaluations that occur after the IDTT as if they are compliant. (Neutral Expert report, p. 28.)  But nevertheless, CDCR has falsely reported compliance for each week a transferred patient's "re-set" deadline has not expired, even though the patient has not had a pre-IDTT evaluation. (*Id.* p. 36.)  CDCR therefore should be imputed with knowledge that it has been representing compliance when (in the Special Master's view as well as the psychiatrists' understanding) it is not compliant.

In the next example, for a period of time CDCR had extended the deadline for psychiatry appointments from 30 to 45 days, without consulting the Special Master.  The Special Master rightfully found this shocking.  (*Id.* p. 39.)  The Program Guide was developed as the minimum

11

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

constitutional standards in the CDCR mental health care context; to unilaterally extend the minimum intervals between psychiatry appointments clearly shows "deliberate indifference" to providing at least the constitutionally-required care.

The evidence also reflects that CDCR's practice of counting non-confidential encounters as compliant psychiatric evaluations is deliberately incorrect. Both psychiatry leadership and the Special Master have advised the non-medical CDCR Mental Health Leadership that non-confidential contacts should not qualify as evaluations, yet the non-medical leadership simply refuses to acknowledge that a psychiatric evaluation has to be confidential. (*Id.* pp. 49, 52.) The Neutral Expert agrees that a fair reading of the Program Guide requires a confidential visit. While the Neutral Expert considers CDCR's mis-reporting to constitute an unintentional technical problem, UAPD respectfully disagrees, as psychiatrists have long been urging executive leadership to correct the rampant use of non-confidential contacts. (*Id.* p. 50; Dr. Mann's declaration at paragraph 4.d.) CDCR has consciously failed and refused to do anything about it.

With respect to the issue of Psychiatry Supervisors providing direct services, which CDCR has not disclosed while reporting staffing ratios -- and while requesting reductions in psychiatrist positions -- again, it is significant that CDCR has failed and refused to provide the Special Master and Neutral Expert with sufficient data to quantify this activity. (*Id.* pp. 74, 76-77.) From UAPD's perspective, this is clearly an important issue and reflects a) CDCR leadership's deliberate effort to conceal the extent of psychiatrist understaffing and b) the spiraling trend of marginalizing psychiatrists while dangerously supplanting them with psychologists acting beyond their scope. When the Psychiatrist Supervisors are busy carrying caseloads, they are unable to devote their primary activities to the planning and oversight that they should be doing.

Next, CDCR's failure to count all medication non-compliant patients as requiring a psychiatric evaluation should be deemed deliberate. Again, despite being on notice of the views of both the Special Master and the psychiatrists, CDCR's non-medical leadership wrongly denies that each medication non-compliant patient requires a psychiatric evaluation. (*Id.*, p. 82.)

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

12
AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

Therefore, the inference is clear that CDCR's refusal to count each such patient for the purpose of the non-compliance data when the patient is not seen is deliberately misleading.

Regarding the exclusion of EOP Patients not on psychiatric medications from compliance metrics, again, non-medical leadership have long been privately discussing among themselves that it was an issue under the Program Guide (*Id.*, fn. 61), but they did not disclose it to the Special Master, Plaintiffs, and psychiatry staff. (*Id.*, pp. 89-90.) The inference is clear that leadership deliberately concealed it until the Neutral Expert's investigation uncovered it.

CDCR is also excluding EOP "overflow" patients from the compliance metrics that are used to report whether CDCR is providing patients with timely psychiatry contacts. Despite knowing of the problem and assuring psychiatry leadership that it would be corrected in 2016, CDCR is still not including those patients in the data. (*Id.* pp. 90-91.) Accordingly, CDCR is clearly on notice that it is a misleading practice which fails to fully report non-compliance, and CDCR is deliberately persisting in the practice anyway.

Based on the above facts, there is ample basis for a hearing regarding whether CDCR has intentionally presented misleading information to the Court and Special Master.

## C. CDCR SHOULD NOT BE ALLOWED TO CONTINUE REDUCING PSYCHIATRY POSITIONS AND SUPPLANTING THEIR SERVICES WITH PSYCHOLOGISTS

The constitutional standard requires ready access to competent medical staff, in sufficient numbers to identify and treat in an individualized manner inmates suffering from serious mental disorders. 912 F.Supp. at 1306-1308. The Program Guide requires that CCCMS patients must be reevaluated by a psychiatrist at least every 90 days, and EOP patients must be reevaluated by a psychiatrist at least monthly.

CDCR's under-reporting of noncompliance demonstrates that the Court and the Special Master cannot rely upon CDCR's representations regarding the frequency that the psychiatry appointment timelines are met. Instead, CDCR is failing to meet the minimum standards in the Program Guide, and the full extent of its noncompliance is hidden by the deceptive practices reported by Dr. Golding. Based upon the information available, at a minimum it is known that: CDCR is not meeting the requirement that transferred patients receive a psychiatric evaluation

**WEINBERG, ROGER & ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

13
AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS
Case No. 2:90-cv-00520-KJM-DB

before the IDTT within 14 days of transfer; patients who require a psychiatric appointment are instead receiving non-confidential contacts that are not suitable for psychiatric evaluation and treatment; psychiatric supervisors are supplementing the understaffed line psychiatrists by carrying caseloads themselves; CDCR is failing to refer all medication non-compliant patients to psychiatric evaluation; CDCR is not applying the psychiatric evaluations requirement to all EOP patients; and CDCR is not applying the psychiatric evaluations requirement to EOP patients when they are not at an institution with an EOP program or space in that program. CDCR's attempts to reduce psychiatry positions cannot be approved, in light of CDCR's failure to provide full reporting to the Special Master of the quantity of psychiatric care appointments that are required, and the quantity that are either missed or delayed beyond the minimum constitutional timelines.

As shown in Dr. Golding's report and the psychiatrist declarations submitted herewith, CDCR is improperly trying to avoid complying with the minimum constitutional standards for psychiatric services by shifting authority and functions to non-medical staff, primarily psychologists. For example, CDCR authorizes psychologists to decide whether or not to involve a psychiatrist when admitting patients to crisis bed hospital units, although psychologists are not trained to make such medical decisions. (See Golding Report, Dkt. 5988-1, e.g. pp. 86-88.) Similarly, CDCR misinforms custody staff that psychologists are the physicians to call, and authorizes psychologists to make decisions to discharge a patient or change the level of care without including the psychiatrist in the decision. (*Id.*, pp. 90, 104, 112.) And at CDCR, unlike other psychiatric service providers, psychologists are given management authority and overruling authority over psychiatrists, which is unsafe because psychologists do not have the medical training to do so. The trend has already proven harmful to patients, most graphically when untreated patients injure themselves. (*Id.,* pp. 18, 21, 84, 99, 103.)

CDCR psychiatrists are caught in a downward spiral. The shortage of psychiatrists is misused as an excuse to increase psychologists' authority and marginalize the psychiatrists, which in turn adversely affects psychiatrists' working conditions and deprives psychiatrists of the ability to provide adequate care to patients, which in turn undermines recruitment and retention of psychiatrists, exacerbating the understaffing problem. As Dr. Schultz-Ross attests:

14

**WEINBERG, ROGER & ROSENFELD**
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB

> Psychiatrists working in the prisons have asked me if the department has determined that we are solely medication consultants, and if psychology has assumed all responsibility and liability for everything else. In fact, psychiatrists remain liable for the care of their patients, but they often are not given authority commensurate with that responsibility. Emotionally, I often felt frightened when I cared for patients in this system in which I was committed to patients improving, but I was held back from managing their care as I had in other settings.
>
> The department has created a negative feedback loop, meaning that the results of negative action are used as justification for more negative action. By decreasing our scope of practice and autonomy, the department contributes to poorer recruitment and retention, which leads to understaffing, which is used as justification for expanding the scope of practice of the psychologists.

(Dr. Schultz-Ross' declaration, paragraphs 8-9.)

The Court and Special Master should not approve any proposals or requests by CDCR to reduce any psychiatry positions, nor to shift any authority affecting patient care or supervision of psychiatrists from psychiatrists to non-medical psychologists.

## V.     CONCLUSION

In sum, UAPD supports ordering CDCR to correct the five misleading practices identified in the Neutral Expert's report and holding a hearing regarding whether CDCR has presented misleading information to the Special Master and/or the Court.  UAPD further urges the Court and Special Master not to approve any requests by CDCR to reduce psychiatry positions at any level, nor to shift any authority affecting patient care or supervision of psychiatrists from psychiatrists to non-medical psychologists.

Dated:  May 28, 2019                     WEINBERG, ROGER & ROSENFELD
                                         A Professional Corporation


                                         /s/ Anne I. Yen
                                    By:  ANNE I. YEN
                                         Attorneys for Union of American Physicians and Dentists

147620\1027100

---

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
(510) 337-1001

15

**AMICUS BRIEF OF UNION OF AMERICAN PHYSICIANS AND DENTISTS**
Case No. 2:90-cv-00520-KJM-DB