XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7325
  Fax: (916) 324-5205
  E-mail: Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO GIBSON, DUNN & CRUTCHER LLP'S REPORT**<br><br>Status Conference Date: June 10, 2019<br>Time: 1:30 p.m.<br>Location: Courtroom 3, 15th Floor<br>Judge: The Hon. Kimberly J. Mueller |

**INTRODUCTION**

This Court appointed the Gibson Dunn law firm with a narrow purpose—to determine whether evidence existed to warrant an evidentiary hearing on whether CDCR or its counsel committed fraud or intentionally misled the Court or its Special Master with regard to seven specific categories of information identified by the Court. On April 22, 2019, after four months of investigation, including thousands of personnel-hours, dozens of witness interviews, the production of thousands of pages of documents, and over $1.5 million in fees billed to state taxpayers, Gibson Dunn issued its final report and confirmed what Defendants articulated to the

1

Court in November 2018, *before* Gibson Dunn's appointment: Dr. Michael Golding's allegations that CDCR defrauded or intentionally misled the Court or Special Master were wrong and unsupported by the evidence.

Even though Gibson Dunn confirmed what Defendants had already demonstrated, and appropriately concluded that no evidentiary hearing is necessary, Defendants remain troubled with the events leading up to this point, and they are concerned as to how this investigation will be used in the future. As a threshold matter, the report vindicates Defendants' November 20, 2018 filing. That filing should have ended the fraud inquiry six months ago because it demonstrated precisely why Dr. Golding's fraud allegations were unfounded. While the Court disregarded that filing, in the end, Gibson Dunn affirmed Defendants' representations explaining why Dr. Golding's allegations did not constitute fraud. To avoid wasting time and resources in the future, any similar allegations should first be referred to CDCR or the Special Master for internal investigation.[1]

In addition, the Court should enforce its own order about the limited scope of the investigation and restrict the purposes for which the report may be used in this litigation. As its appointment orders make clear, this Court never commissioned Gibson Dunn to make legal or factual findings. The report constitutes unsworn testimony from an appointed expert, relying almost entirely on inadmissible hearsay, including some testimony that was never recorded. While the report correctly concludes that no fraud occurred, it includes some factual mistakes, inaccuracies, or misunderstandings regarding CDCR's operating procedures and the Program Guide. Given Defendants' desire to move forward and focus on the provision of mental health care and compliance issues, Defendants do not believe that it would be a productive use of their

---

[1] Defendants do not concede that Gibson Dunn was appropriately appointed under Federal Rule of Evidence 706, or that the investigation was an appropriate subject for a court-appointed expert. Defendants moved the Court for leave to deposit funds for Gibson Dunn's fees and costs into the Court registry, pending completion of the investigation and Defendants' appeal of the Court's appointment orders. (*See* ECF No. 6121.) That motion is submitted and the parties await the Court's decision. (ECF No. 6157.) Among other things, Defendants' appeal challenges the Court's decision to keep Gibson Dunn's itemized billing records under seal, requiring the people of California to pay for work they are unable to review or challenge. Now that Gibson Dunn has submitted its final report, Defendants filed a motion requesting that the firm's itemized billing records be disclosed to the parties. (ECF No. 6160.)

2

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

or the Court's time to litigate these factual disputes here.  Accordingly, Defendants submit that, moving forward, the Court should make clear that nothing in the report should be considered established fact or admissible evidence simply on account of having been included in the report.  If the Court were to find otherwise, then its own limitation under Federal Rule of Evidence 706 that Gibson Dunn would not make any legal or factual conclusions would be illusory.

The Court has stated in multiple orders and conferences that its end goal is to steer the case to a "soft landing" toward termination.  (*See e.g.,* Sept. 7, 2018 Tr. at 35:21-22; ECF No. 5711 at 28; ECF No. 5852 at 8.)  Unfortunately, the appointment of Gibson Dunn to investigate Dr. Golding's purported "whistleblower" allegations had the opposite effect—it ground this case to a halt and for six months diverted and distracted CDCR's mental health program and its dedicated staff from many of CDCR's initiatives to improve the system.  Nonetheless, CDCR is willing to meet and confer with the Special Master and Plaintiffs to address the narrow policy areas that Gibson Dunn recommended the Court consider referring to the workgroup process—a process Defendants supported before Gibson Dunn was appointed.  That approach would be consistent with CDCR's desire to move forward and work toward the Court's intended "soft landing" with the assistance of Judge Drozd and through meaningful workgroups with Plaintiffs and the Special Master.

**DISCUSSION**

**I.    GIBSON DUNN'S REPORT CONFIRMS THE ACCURACY OF DEFENDANTS' DETAILED FINDINGS AND EXPLANATION TO THE COURT ON NOVEMBER 20, 2018.**

After the Court solicited the parties' input on its initial proposed plan to appoint an independent investigator to evaluate Dr. Golding's allegations, Defendants filed their comments on the Court's proposed appointment order.  (ECF No. 6012.)  Defendants' submission relayed the results of Defendants' initial voluntary discussions with CDCR personnel to understand the facts behind Dr. Golding's allegations.  Those discussions revealed that Dr. Golding's allegations were largely inaccurate and often the result of his confusion and misunderstanding.  Moreover, any suggestion that CDCR or its counsel had committed intentional fraud was completely unsupported.  Although the Court disregarded Defendants' explanations (ECF No. 6018 at 1:27-

3

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

2:2.), Gibson Dunn validated nearly all of the conclusions in Defendants' November 20, 2018 submission.

For example, regarding the allegations of "resetting the clock," Defendants informed the Court that "[w]hile CDCR's Performance Report can be characterized as 'resetting the clock' on routine timelines when a patient transfers institutions, the more accurate framing is that CDCR considers transferred patients to have exited their existing recurring appointment cycle and entered a new intake process." (ECF No. 6012 at 6.) Defendants stated that "Dr. Golding has raised a *policy* concern regarding the possibility of gaps between routine psychiatry appointments and a patient's initial post-transfer appointment," and that while this "may be a legitimate policy question . . . it does not implicate fraud." (*Id.*) Defendants also noted that the Program Guide did not provide explicit deadlines for post-transfer initial contacts. Gibson Dunn's report echoes this conclusion, finding that "[t]he Program Guide does not address what psychiatry evaluation time frames" should apply to transferring inmates, and that "CDCR follows the Program Guide requirements for 'new' patients, under the logical theory that the patient is being received into a new care environment." (Report at 41.)[2] Like Defendants, Gibson Dunn suggested that "[t]he scenario that concerned Dr. Golding"—that some transferred inmates might go an inordinate amount of time between psychiatric evaluations—"is . . . a valid concern," but found no evidence of fraud. (*Id.* at 40; ECF No. 6012 at 11.)

Gibson Dunn similarly echoes Defendants' initial response regarding the other six areas of inquiry. The investigation confirmed Defendants' explanation that the change in the definition of "monthly" for routine psychiatric contacts for Enhanced Outpatient Program patients was temporary, lacked fraudulent intent, and was prompted by a suggestion from CDCR psychiatric staff. (*See id.* at 48-49; ECF No. 6012 at 12-13.) And Gibson Dunn confirmed Defendants' assertion that, contrary to Dr. Golding's allegations, CDCR did nothing fraudulent or even misleading by combining compliance data in a single filing for patients at the Correctional Clinical Case Management System and the Enhanced Outpatient Program levels of care. (*See* Report at 52-53; ECF No. 6012 at 10-11.)

---

[2] Page citations to Gibson Dunn's report are to the ECF page number.

4

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

1     Regarding alleged over-counting of psychiatric contacts, Gibson Dunn pointed to a
2 disagreement between Defendants' and the Special Master's understanding of whether non-
3 confidential contacts should be counted as satisfying Program Guide requirements—while
4 acknowledging that the Special Master received broken-out data including details on appointment
5 confidentiality—and also pointed to inconsistent data entry by psychiatrists.  (Report at 57, 67.)
6 This is almost identical to Defendants' November 20, 2018 submission on the topic, which
7 provided CDCR's position on whether to count non-confidential contacts, acknowledged that
8 psychiatrists may be entering data inconsistently, and "welcomed" a policy discussion of whether
9 or not non-confidential contacts should be counted as satisfying Program Guide requirements.
10 (ECF No. 6012 at 15-16.)

11     Regarding the "Appointments Seen as Scheduled," "Treatment Cancelled," and "Treatment
12 Refused" Performance Report indicators, Gibson Dunn confirmed Defendants' conclusion that
13 Dr. Golding had been misled by an erroneous definition for the "Appointments Seen as
14 Scheduled" indicator, and misunderstood the purpose of the other two indicators (which were
15 never reported to the Court or Special Master).  (*See* Report at 75-76; ECF No. 6012 at 13-17.)
16 Additionally, as to the issue of psychiatric supervisors allegedly working line-staff caseloads,
17 Gibson Dunn confirmed Defendants' statements that there was no misrepresentation as a
18 threshold matter; the Special Master was aware that some supervisors carried a caseload and, in
19 any case, he had not based his evaluation of the 2018 Staffing Proposal on current psychiatric
20 staff levels.  (*See* Report at 78-79, 82-83; ECF No. 6012 at 20-21.)  Finally, regarding compliance
21 with medication non-adherence referrals, Gibson Dunn confirmed Defendants' "assertion that a
22 software bug caused cancelled consultations to be erroneously included in the indicator" and that
23 the indicator only tracks compliance with non-adherence consults that are actually ordered.[3]  (*See*
24 Report at 91; ECF No. 6012 at 21-22.)  And, Gibson Dunn confirmed Defendants' representation
25 that the fraud alleged by Dr. Golding regarding scheduling medication non-compliance follow-

---

[3] Gibson Dunn misses the mark when it suggests that the indicator is supposed to measure whether non-adherence consults were ordered because the indicator is a measure of timeliness (whether the ordered consult was completed on time), not a measure of compliance with the non-adherence policy, which Gibson Dunn admits is open to interpretation.  (Report at 91-92; ECF No. 6012 at 22.)

5

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

1  ups is really a policy disagreement over the Program Guide and policy requirements. (Report at
2  93; ECF No. 6012 at 22.)
3      Defendants' November 20, 2018 filing was submitted just one week after the Court first
4  identified the seven areas of inquiry. (*See* ECF No. 5973 at 3.) For each area of inquiry, Gibson
5  Dunn confirmed the factual explanation provided by Defendants in that filing. In other words, the
6  parties and the Court have spent six months distracted from the merits of the case, spending
7  thousands of personnel-hours and processing thousands of pages of documents, simply to arrive
8  at the same conclusion Defendants reached by November 2018: that there is no evidence of fraud
9  on the Court or the Special Master.[4]
10     By confirming the accuracy of Defendants' November 20, 2018 filing, Gibson Dunn's
11 report also proves that Defendants can conduct a fair and honest internal inquiry into allegations
12 of employee misconduct. Should the parties again be confronted with "whistleblower"
13 allegations, the Court should allow Defendants to conduct an internal investigation into the matter
14 first, before allowing the allegations to needlessly absorb months of time and millions of dollars
15 in state resources.[5] Should the Court determine an independent assessment is required to review
16 allegations related to CDCR's mental health programs and policies, that task should be directed to
17 the Court's Special Master, who is charged under the Court's order of reference to address issues
18 like those raised by Dr. Golding. (ECF No. 640 at 2 ("The principal responsibilities of the special
19 master . . . are to provide expert advice to defendants to ensure that their decisions regarding the
20 provision of mental health care to class members conforms to the requirements of the federal
21 constitution and to advise the court regarding assessment of defendants' compliance with their
22 constitutional obligations.").)

---

[4] Through April 2019, California taxpayers have been charged almost $1.5 million in fees to Gibson Dunn on top of the time spent by Plaintiffs' counsel and the Special Master on the investigation. (ECF Nos. 6083, 6107, 6115, 6155.)

[5] As Defendants' counsel stated at the October 10, 2018 status conference, "CDCR has a division within itself of internal affairs that conducts fair, independent investigations concerning these kinds of allegations all the time. That is their job. They do these, and they do a good job." (ECF No. 5948 at 17:13-16.)

6

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

## II. DEFENDANTS AGREE TO WORK IN THE WORKGROUPS TO RESOLVE THE FEW ISSUES GIBSON DUNN RECOMMENDED REFERRING TO THE WORKGROUPS.

From the time the Court began considering ways to review Dr. Golding's allegations, Defendants have consistently stated that if a review is necessary, then it should be conducted by the Special Master in consultation with the parties. (ECF No. 6009 at 16-19.) The Court, however, referred seven discrete issues to Gibson Dunn. At the conclusion of its investigation, Gibson Dunn recommended no further action be taken on four of the issues it was appointed to investigate. (Report at 49, 53, 76, 83.) On the other three issues, it recommended taking the course Defendants initially suggested at the outset—referring the issues to the Special Master and the parties for discussion or clarification. (*Id.* at 41, 69, 92-93.) As discussed in this and Defendants' other filings related to Dr. Golding's allegations, Defendants believe this is the appropriate approach and look forward to participating in those discussions. The Special Master and parties are the most familiar with the Program Guide and CDCR's data, quality improvement, and compliance systems, and can more efficiently discuss these topics in collaborative workgroups rather than through external and costly investigations that detract from the Court's objective of focusing this case toward termination.

Indeed, Defendants were already in the process of addressing the three issues that Gibson Dunn recommended for referral to the Special Master. As one example, Gibson Dunn's report acknowledges that CDCR was in the process of modifying its policy to require a psychiatry contact within a specific time after the inmate's transfer to a new program. (Report at 41.) That effort began in June 2018, before Dr. Golding published his allegations. (ECF No. 6012 at 8, n.8.) However, Dr. Golding's decision to raise the issue in this proceeding rather than continuing to work on an internal resolution circumvented well-established processes in place at CDCR for mental health staff like Dr. Golding to raise and address policy disputes. The Court instead referred this particular policy issue to Gibson Dunn, which required a four-month investigation. With the Special Master's assistance, CDCR is prepared to address the narrow policy-based issues Gibson Dunn recommended could be resolved through the parties' workgroup process.

7

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

### III. THE COURT SHOULD CONFIRM THAT GIBSON DUNN WAS NOT ENGAGED IN FACT-FINDING, AND THAT THE REPORT DOES NOT ESTABLISH ANY FACTS.

Defendants request that the Court clarify and limit the purposes for which Gibson Dunn's report may be used throughout the future of this litigation. It would be improper, for instance, for Plaintiffs or any other litigant to cite the report in future filings, presenting assertions and opinions proffered by Gibson Dunn as if they are settled facts. Gibson Dunn's report relies on hundreds of hearsay statements and unauthenticated documents and contains some factual assertions that are incomplete or inaccurate regarding CDCR's operating procedures and the Program Guide.[6] This includes assertions relying on witness interviews, which Gibson Dunn admits "were not recorded or transcribed verbatim." (Report at 13.)

In federal litigation, unsworn expert reports are generally not themselves admissible evidence; opinions contained within a report are brought into evidence through the sworn testimony of the expert. *See, e.g.*, *Liebling v. Novartis Pharm. Corp.*, No. CV1110263, 2014 WL 12576619, at *1 (C.D. Cal. Mar. 24, 2014). This has not occurred here. Moreover, even if the report itself were to become sworn testimony, this would not authenticate underlying documents or cure hearsay issues involving these documents or statements purportedly made in interviews; an expert may rely on inadmissible evidence, but that does not render the evidence itself admissible. *See K&N Eng'g*, *Inc v. Spectre Performance*, No. EDCV091900, 2011 WL 13131157, at *10 (C.D. Cal. May 12, 2011) (citing Fed. R. Evid. 703 Committee Notes (2000) ("[W]hen an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted.")).

---

[6] For example, as stated above, Gibson Dunn suggests that the medication non-compliance indicator is supposed to measure whether non-adherence consults were ordered (*see* Report at 91-92), when in reality the indicator is a measure of timeliness (whether the ordered consult was completed on time), not a measure of compliance with the non-adherence policy. (ECF No. 6012 at 22.) However, given that most of these inaccuracies are unlikely to lead to any material or prejudicial impact on Gibson Dunn's recommendation, rebutting each of these misstatements and inaccuracies would not be an efficient use of state or judicial resources. Therefore, in the interests of moving on from a costly, lengthy, and unnecessary derailment from the merits of this case, and because Gibson Dunn's bottom-line conclusion reflects the truth that there has been no fraud perpetrated on the Court or Special Master, Defendants do not here seek to rebut each identified misstatement or inaccuracy.

8

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

Defendants therefore reserve their right to challenge any purported fact or summary of facts contained in the report, if any party attempts to cite to the report in the future. Further, Defendants request that the Court confirm that no evidence relied upon by Gibson Dunn can be considered admissible evidence simply by virtue of it appearing in the report, and similarly make clear that the report does not establish any facts. Doing so would comport with the Court's multiple statements asserting the limited purpose of the investigation and that Gibson Dunn would not be making any legal or factual conclusions. (ECF No. 6032 at 8.) Moreover, if Plaintiffs' concurrent response, or other non-party responses cite to the report as purportedly establishing any fact, and the Court chooses not to disregard such citation, Defendants request the opportunity to respond to those factual assertions.

### IV. THE COURT SHOULD ENFORCE ITS PRIOR REPRESENTATIONS REGARDING THE LIMITED SCOPE OF GIBSON DUNN'S APPOINTMENT, AND REJECT ANY EFFORTS TO REOPEN GIBSON DUNN'S INVESTIGATION OR EXPAND ITS SCOPE.

Defendants anticipate that Plaintiffs' counsel or Drs. Goldings or Gonzalez will ask the Court to reopen Gibson Dunn's investigation, or expand its scope into other areas. Indeed, in response to the Court's initial plan to appoint an investigator, Plaintiffs sought to add eight additional areas of inquiry to the Court's draft order of appointment. (ECF 6011-1 at 3-4.) And Plaintiffs' counsel signaled as much at the April 26, 2019 status conference.

The Court should decline to reopen or expand Gibson Dunn's investigation. The Court has repeatedly stated that, with regard to Gibson Dunn's appointment, the central issue for resolution was whether the Court should hold an evidentiary hearing into potential fraud on the Court or Special Master. (ECF No. 6018 at 10; ECF No. 6032 at 6.) The Court first raised its plan to appoint an investigator during a November 5, 2018 status conference, calling for a "focused investigation" into "only those issues" that "rais[e] the question of whether or not fraud has been committed on the Court." (ECF No. 5998 at 5:10; 7:17-23.) The investigation was not intended, for instance, to "weigh in on the psychiatrist versus psychologist battle," as that was an issue "where the Special Master will ultimately assist the Court." (*Id.* at 7:19-23.) The Court's subsequent orders of appointment stated that "[t]he purpose of [Gibson Dunn's] appointment is to assist the court in investigating" allegations made by Dr. Golding "to determine whether

9

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

defendants have committed any fraud on the court or the Special Master, or have intentionally provided false or misleading information to the court or the Special Master." (ECF Nos. 6033 at 1:24-2:1 & 6064 at 2:4-8.)

In every instance in which the Court has described Gibson Dunn's role, the Court has made clear that Gibson Dunn was retained specifically and narrowly to investigate allegations of potential fraud on the Court and identify whether an evidentiary hearing into these allegations was warranted. Indeed, in asserting that the Prison Litigation Reform Act did not apply to Gibson Dunn's appointment, the Court reiterated that the "*sole function* of the independent investigator will be to determine whether there is a sufficient factual foundation" to hold an evidentiary hearing into potential fraud, and that he was not otherwise authorized to "make any recommendations to the court concerning adjudication of any facts." (*See* ECF No. 6018 at 10:1-10 (emphasis added).)

The Court relied on the narrow scope of Gibson Dunn's authority in ruling on other matters. For instance, in rejecting Defendants' motion for a protective order to safeguard CDCR's privilege over communications with its counsel, the Court reiterated that "the process it has put in place does not delegate the court's factfinding or decision-making authority to the neutral expert" and that "the sole function of the neutral expert" would be to investigate potential fraud, and "provid[e] his views on what documents and which witnesses, if any, support the court's holding of an evidentiary hearing." (ECF No. 6096 at 6:3-11.)

Gibson Dunn itself did not request any expansion of the scope of its investigation to search for evidence of fraud, even though the Court specifically granted it the power to make such a request. (ECF No. 6064 at 3.) As the recipient of thousands of pages of documents and dozens of witness interviews during the investigation, Gibson Dunn was better positioned than Plaintiffs to seek to expand the investigation but did not do so. The Court should reject any request from Plaintiffs or others to engage Gibson Dunn in a further fishing expedition. To the extent that concerns are raised unrelated to the allegations of fraud in response to the report or Dr. Golding's allegations, such concerns should be addressed through existing procedures, such as the workgroup process—an approach the Court has taken in the past. (*See* ECF No. 6009 at 11-12

10

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

(Defendants' response to the Court's November 13, 2018 order to show cause provided examples of when the Court had referred allegations of misconduct to the Special Master).)[7]

## V. THE COURT SHOULD CEASE TREATING NON-PARTIES AS PARTIES TO THIS ACTION.

Throughout the course of Gibson Dunn's investigation, the Court allowed non-parties to this action to participate in the case as if they had the status of parties. Most recently, the Court granted Drs. Golding and Gonzalez the right to weigh in on whether Gibson Dunn's report should be filed publicly, and to file a response addressing the report's substance. (ECF No. 6135.) Dr. Golding and Dr. Gonzalez have not been joined as parties to this action, and neither has standing to respond to Gibson Dunn's investigation, the outcome of which will have no impact on either individual. *See Clark v. Hamilton Mortg. Co.*, No. 1:07-CV-252, 2008 WL 919612, at *2 (W.D. Mich. Apr. 2, 2008) (proposed defendants were not entitled to oppose motion to amend because they were unaffected by the proposed amendment); *see also Castellani v. City of Atl. City*, No. CV 13-5848, 2015 WL 12829622, at *2 (D.N.J. Aug. 4, 2015) (same); *Vasquez v. Summit Women's Ctr., Inc.*, No. CIV. 301CV955PCD, 2001 WL 34150397, at *1 (D. Conn. Nov. 16, 2001) (opposition to motion to amend by a non-party is "dubious").

Defendants request that moving forward, Drs. Golding and Dr. Gonzalez not be granted leave to participate in this litigation as quasi-parties, and instead employ the Court's existing procedures for third-party correspondence. (*See* ECF No. 5435 (ordering that third party correspondence from state employees will be returned or forwarded to the Special Master at the discretion of the Court).)

## CONCLUSION

Gibson Dunn confirmed Defendants' longstanding position that no fraud occurred, and Defendants look forward to putting this matter behind them. It is time now to focus on the critical mental health care and compliance issues the parties are working through, with the assistance of

---

[7] In addition, CDCR and the State of California have a number of agencies or government bodies that are already tasked with the responsibility of reviewing allegations of wrongdoing, including but not limited to the California State Auditor, *see* Cal. Gov. Code § 8547 *et seq.*, and the California Office of the Inspector General, *see* Cal. Gov. Code § 6125 *et seq.* Indeed, orders in this case recognize the California's internal auditing systems. (ECF No. 6095 at 3.)

11

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))

the Special Master and Judge Drozd, and bring this case to resolution.  Defendants hope that the Court agrees.

## CERTIFICATION

The undersigned Defendants' counsel certifies that he reviewed the following Court orders relevant to this filing:  December 11, 1995 (ECF No. 640); April 22, 2016 (ECF No. 5435); October 10, 2017 (ECF No. 5711); October 12, 2018 (ECF No. 5852); October 12, 2018 (ECF No. 5949); October 15, 2018 (ECF No. 5951); October 17, 2018 (ECF No. 5967); October 18, 2018 (ECF No. 5973); October 25, 2018 (ECF No. 5986); October 31, 2018 (ECF No. 5989); November 7, 2018 (ECF No. 5999); November 13, 2018 (ECF No. 6002); October 29, 2018 (ECF No. 6018); December 14, 2018 (ECF Nos. 6032, 6033); January 8, 2019 (ECF No. 6064); January 11, 2019 (ECF No. 6067); February 20, 2019 (ECF Nos. 6095, 6096); February 28, 2019 (ECF No. 6101); April 9, 2019 (ECF No. 6122); April 29, 2019 (ECF Nos. 6135, 6136), and May 3, 2019 (ECF No. 6146).

Dated:  May 28, 2019

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

/s/ *Tyler V. Heath*

TYLER V. HEATH
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003
13774872

12

Defs.' Resp. Gibson Dunn's Report (2:90-cv-00520 KJM-DB (PC))