DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO NEUTRAL EXPERT REPORT** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

I.    The Neutral Expert Report Was Too Limited in Scope, While Simultaneously Exceeding Its Bounds. ..................................................... 2

    A.    Several Limitations Materially Restricted the Scope of the Neutral Expert Report, and Therefore the Force of Its Findings and Conclusions. ............................................................................... 2

    B.    The Neutral Expert's Approach to the Investigation, and Its Conclusions, Exceeded the Bounds of the Court's Order of Reference. ........ 6

II.   Despite Its Limitations, the Neutral Expert Report Reveals an Extremely Troubling Pattern Demonstrating CDCR's Reliance on Misleading and Inaccurate Data, and a Culture Permitting Serious Errors of Judgment to Infect CDCR's Data-Reporting Practices ................................................... 7

    A.    The Neutral Expert Concluded CDCR's Data Was Misleading in Numerous Ways. .......................................................................... 7

    B.    The Neutral Expert Report Raised but Did Not Analyze a Number of Serious Issues with the Accuracy and Transparency of CDCR's Data Reporting, and Did Not Opine as to the Larger Implications Resulting From the Compounding of Those Issues ........................................ 14

III.  Defendants' Misrepresentations Were Material and Their Interpretations of the Program Guide Were Unreasonable, Not Reasonable Interpretations of Ambiguous Language ................................................................................. 19

    A.    In Several Instances, the Neutral Expert Concluded the Program Guide Was Ambiguous but Failed to Give Weight to Plaintiffs' Interpretation of the Document and to Consider Context Sufficiently. ........ 19

    B.    Many of the Data Issues Identified in the Neutral Expert Report Were Material in Ways the Report Did Not Account for. ..................................... 21

IV.   The Neutral Expert Report Did Not Investigate or Address a Number of Significant Issues Raised Directly or Indirectly by the Golding Report. ................ 25

    A.    Additional Serious Concerns Raised in the Golding Report, but Not Addressed in the Neutral Expert Report........................................... 25

        1.    Timely Primary Clinician Contacts.................................... 26

        2.    Psychiatrist Continuity of Care ....................................... 26

        3.    Evaluating Compliance of Appointments Ordered More Frequently than Program Guide Minima ........................... 26

        4.    "Averaging of days" issue................................................ 27

i

5. Medication Administration Process Improvement Program ("MAPIP")........................................................................... 28

6. Non-Quantifiable Misrepresentations to the Special Master ............ 30

7. Failure to Disclose Unilateral Revisions to Operative Remedial Policies ............................................................................ 32

B. The Tension Between and Changing Roles of Psychiatrists and Psychologists Within CDCR .......................................................... 34

V. Given the Findings in the Neutral Expert Report, as Well as Its Limitations, a Number of Additional Steps Are Necessary to Ensure the Serious Allegations in the Golding Report Are Comprehensively Investigated.................. 37

A. The Court Is Empowered to Take Steps Necessary to Remedy the Numerous Serious Problems Identified with Defendants' Data. .................. 37

B. Defendants Should Be Required to Purge the Docket of Any Filings Tainted by Misleading or Inaccurate Data, and to Certify, Going Forward, that Filings Relying on Data Are Accurate.................................... 40

C. Plaintiffs Should Be Provided with the Transcripts of Defendants' Interviews and the Documents Provided to the Neutral Expert in the Course of the Investigation.................................................................. 42

D. The Court May Order the Neutral Expert to Turn Over All Witness Information Not Deemed Within the Scope of the Investigation.................. 43

E. The Court May Order the Neutral Expert to Investigate and Report on the Additional Issues Identified Above and Re-Report on the Original Seven Issues After Expanding the Scope of Materials for Review.............. 43

F. The Court May Still Pursue Its Identified "Parallel Tracks" to Clarify Prior Court Orders and Program Guide Provisions, and to Improve Defendants' Data. ............................................................................ 44

G. The Parties Could Be Required to Address in the Workgroup Policy Issues Regarding Psychiatry Roles—Both Broadly and in Specific Instances Raised in the Golding Report. ....................................................... 47

H. The Court, Special Master, and Parties May Need to Revisit the PSU and ASU EOP Hub Certification Process. ................................................. 47

I. The Parties May Need to Evaluate the Golding and Neutral Expert Reports' Additional Potential Impacts on CDCR's Sustainable Process for Evaluating the Appropriateness of Decisions Relating to Class Members' Needs for Higher Levels of Care........................................ 49

CONCLUSION.................................................................................................... 51

CERTIFICATION ............................................................................................... 51

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

5    *B.K.B. v. Maui Police Dep't*,
        276 F.3d 1091 (9th Cir. 2002), *as amended* (Feb. 20, 2002) ................................... 38

6    *Chambers v. NASCO, Inc.*,
        501 U.S. 32 (1991) .................................................................... 5, 37, 38
7

8    *Coleman v. Brown*,
        28 F. Supp. 3d 1068 (E.D. Cal. 2014) ................................................... 48

9    *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*,
        244 F.3d 1128 (9th Cir. 2001) ........................................................... 37
10

11   *Fink v. Gomez*,
        239 F.3d 989 (9th Cir. 2001) ............................................................ 38

12   *Goodyear Tire & Rubber Co. v. Haeger*,
        137 S. Ct. 1178 (2017) .................................................................. 37
13

14   *Hendricks & Lewis PLLC v. Clinton*,
        766 F.3d 991 (9th Cir. 2014) ............................................................ 37

15   *In re Girardi*,
        611 F.3d 1027 (9th Cir. 2010) ........................................................... 38
16

17   *In re Levander*,
        180 F.3d 1114 (9th Cir. 1999) ...................................................... 5, 37, 38

18   *Leon v. IDX Sys. Corp.*,
        464 F.3d 951 (9th Cir. 2006) ............................................................ 38
19

20   *Mark Indus., Ltd. v. Sea Captain's Choice, Inc.*,
        50 F.3d 730 (9th Cir. 1995) ............................................................. 39

21   *Melendres v. Arpaio*,
        Case No. 2:07-cv-02513-GMS, 2016 WL 3996453 (D. Ariz. July 26, 2016) ......... 39
22

23   *Ready Transp. Inc. v. AAR Mfg., Inc.*,
        627 F.3d 402 (9th Cir. 2010) ............................................................ 39

24   *Rodriguez v. W. Publ'g Corp.*,
        563 F.3d 948 (9th Cir. 2009) ............................................................ 38
25

26   *United States v. Wunsch*,
        84 F.3d 1110 (9th Cir. 1996) ............................................................ 39

27   *Zambrano v. City of Tustin*,
        885 F.2d 1473 (9th Cir. 1989) ........................................................... 39

28

PLAINTIFFS' RESPONSE TO NEUTRAL EXPERT REPORT

1  **STATUTES**

2  Cal. Bus. & Prof. Code §§ 6103, 6106 ................................................................. 39

3

4  **RULES**

5  Cal. R. Prof'l Conduct 3.3 & 4.1 ......................................................................... 39

6  E.D. Cal. L.R. 180(e) ........................................................................................... 39

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ASP | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| CCCMS | Correctional Clinical Case Management System |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CHCF | California Health Care Facility |
| CCHCS | California Correctional Health Care Services |
| CMF | California Medical Facility |
| COR | California State Prison–Corcoran |
| CQI | Continuous Quality Improvement |
| CQIT | Continuous Quality Improvement Tool |
| DSH | Department of State Hospitals |
| EHRS | Electronic Health Record System |
| EOP | Enhanced Outpatient Program |
| HDSP | High Desert State Prison |
| IDTT | Interdisciplinary Treatment Team |
| MAPIP | Medication Administration Process Improvement Program |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PC | Primary Clinician |
| PSU | Psychiatric Services Unit |
| SAC | California State Prison–Sacramento |
| SATF | California Substance Abuse Treatment Facility |
| SVSP | Salinas Valley State Prison |

PLAINTIFFS' RESPONSE TO NEUTRAL EXPERT REPORT

# INTRODUCTION

The April 22, 2019 Neutral Expert Report, submitted by Charles Stevens and members of his team ("Neutral Expert Report" or "Report," and "Neutral Expert," respectively)[1] reached its conclusions without consideration of the most probative evidence of Defendants' motive and intent in misleading the Court by misrepresenting its data—Defendants' internal communications between and among CDCR's mental health leadership and its legal team, and all documents and information from the Governor's Office.  In direct contravention of this Court's order concerning the powers of the Neutral Expert and the issues of privilege, *see* Order (Dec. 13, 2018), ECF No. 6032 at 9; Order (Feb. 20, 2019), ECF No. 6096 at 6, Defendants and their counsel took an aggressive position with the Neutral Expert and refused to produce any documents or information from the Governor's Office and any documents or information from CDCR as to which a privilege could be asserted.  The Neutral Expert chose, without explanation, not to challenge Defendants and completed his Report without the benefit of this critical information.  For this and other reasons, the Neutral Expert Report is incomplete and does not, in any way, put to rest the serious issues raised by Dr. Michael Golding in his whistleblower report ("Golding Report"), ECF No. 5988-1 (Oct. 31, 2018).

The scope of the Neutral Expert's investigation was confined to seven discrete issues, and the Neutral Expert adhered strictly to that limitation, even in the face of interviews with credible witnesses who apparently disclosed additional highly concerning problems with CDCR's approach to data reporting and achieving constitutional compliance.  These issues and others raised by Dr. Golding that were not included in the Court's Order of Reference to the Neutral Expert must be addressed.

Yet despite the investigation's limited scope, the Neutral Expert confirmed the central point of Dr. Golding's allegations:  Defendants provided materially inaccurate and

---

[1] The Neutral Expert Report is filed at ECF No. 6147.  Citations to the Neutral Expert Report contained herein are to the Report's internal pagination, located in the upper left-hand corner of each page.

[3386575.7]

misleading data to the Court, Special Master, and Plaintiffs, including the data that nearly led Plaintiffs, with the Special Master's approval, to agree to settle a critical component of the case—by reducing the number of allocated psychiatrists by approximately 20%. More fundamentally, Defendants' data underlies all their representations as to constitutional compliance, and the Neutral Expert identified multiple serious issues with the data. Accordingly, further steps to investigate the issues raised by the Golding Report, as well as those raised by other whistleblowers and those identified by the Neutral Expert, are necessary and critical to the ultimate goal of achieving a sustainable remedy to the ongoing constitutional violations in this case.

## I.    The Neutral Expert Report Was Too Limited in Scope, While Simultaneously Exceeding Its Bounds.

The Neutral Expert both failed to include in his Report an examination of the most probative evidence of Defendants' intent, and then presented his evaluation as an ultimate determination of fact, a step the Court expressly reserved for itself. The Court also tasked the Neutral Expert with investigating only a discrete set of issues, limiting the Neutral Expert's ability to uncover the full extent of the serious problems in Defendants' data systems.

### A.    Several Limitations Materially Restricted the Scope of the Neutral Expert Report, and Therefore the Force of Its Findings and Conclusions.

The Court tasked the Neutral Expert with investigating a specified, limited set of issues raised by the Golding Report. The Neutral Expert's investigation was hampered by Defendants' refusal to comply with this Court's orders concerning the Neutral Expert's powers to review all documents and information, without regard to claims of privilege. The Neutral Expert chose not to seek additional relief from this Court in the face of Defendants' refusal to comply with this Court's orders. As a result, the Neutral Expert did not review several significant categories of documents and witnesses that must be considered before this dispute can be put to rest. In summary, the Neutral Expert did not:

- Review materials Defendants deemed privileged, or evaluate whether the

1  purportedly privileged materials were in fact subject to attorney-client or any

2  other privileges.  Neutral Expert Report at 9 n.11;

3  • Interview, gather material from, or otherwise involve in the investigation

4  members of the Governor's office who participated in, and presumably

5  substantially directed, decision-making about this litigation.  Neutral Expert

6  Report at 9 n.11;

7  • Interview members of CDCR's in-house legal team or members of the

8  California Attorney General's office.  Neutral Expert Report at 9 n.11;

9  • Review materials related to matters in the Golding Report beyond those

10  specifically outlined by the Court.  Neutral Expert Report at 20 n.19; or

11  • Investigate allegations made from current and former CDCR employees who

12  provided information directly or indirectly related to the Golding Report,

13  despite those witnesses' credibility during interviews.  Neutral Expert Report

14  at 7 n.6, 20 n.19, 23 n.23.

15  The failure to gather and evaluate materials Defendants deemed privileged, as well

16  as communications and other documents from the Governor's office, prevented the Neutral

17  Expert from unveiling the most probative evidence of intent available.  Plaintiffs have a

18  window of insight into what these materials could reveal, given just a single email quoted

19  in the Neutral Expert Report.  The quoted email describes an exchange, between Deputy

20  Director of Mental Health Services Katherine Tebrock and individuals in the Governor's

21  office, revealing that the Governor's office was actively looking for data points to make

22  the Mental Health Services Delivery System ("MHSDS") appear compliant.  *See* Neutral

23  Expert Report at 43.  The Neutral Expert Report noted Plaintiffs' and the Special Master's

24  concerns on this topic, stating:

25  The Special Master and Plaintiffs' counsel take the view that CDCR has an
   aggressive approach towards data bearing on compliance which may be
26  influenced by the Governor's office and a strategy to terminate the litigation.
   Because we have not had access to communications relating to the
27  Governor's office and litigation strategy due to Defendants' privilege
   objections, we make no finding in that regard.

28

[3386575.7]

1  Neutral Expert Report at 9 n.11.

2      The Neutral Expert's quote highlights the interplay of Plaintiffs' major concerns—

3  the need to evaluate direction and communications from the Governor's office regarding

4  CDCR's approach to compliance metrics and Defendants' assertion that they would not

5  turn over purportedly privileged information, despite the Court's orders granting the

6  Neutral Expert full access to precisely those materials.  *See* Order (Dec. 13, 2018), ECF

7  No. 6032 at 9 (refusing to "preclude the gathering of whatever information is relevant");

8  Amended Order Appointing Neutral Expert (Jan. 8, 2019), ECF No. 6064 at 4-5

9  (authorizing Neutral Expert to interview "Governor Edmund G. Brown and members of

10  his staff" and "counsel for defendants and members of their staff," and obtain from all

11  parties "copies of all information he deems relevant"); Order (Feb. 20, 2019), ECF No.

12  6096 at 6 ("To ensure that the neutral investigation is carried out efficiently and fairly …

13  the court already has addressed defendants' concerns regarding materials for which they

14  may claim attorney-client privilege or work product protection, by providing that those

15  claims are not waived and potentially privileged material be disclosed only to the court's

16  neutral expert during the investigation and then to the court, subject to the claim of

17  privilege.").  The Neutral Expert did not attempt to seek guidance from the Court or

18  Plaintiffs regarding Defendants' aggressive litigation stance and did not attempt to probe

19  the validity of Defendants' privilege claims, leaving aside all of this potentially highly

20  probative evidence informing the Court's central question.

21      The decision not to review or pursue allegedly privileged information is especially

22  troubling given this Court's ruling that all information, without regard to privilege claims,

23  must be turned over.  In addition, this Court has rejected Defendants' overbroad and

24  unsupported assertions of attorney-client, work product and deliberative process and

25  executive privilege at earlier stages of this case.  *See, e.g.*, Order (Feb. 14, 2013), ECF No.

26  4341 at 9-11; Order (July 28, 2006), ECF No. 1922 at 1 (citing June 21, 2006 Order, ECF

27  No. 1852).  Plaintiffs (and the Court) cannot, at this time, evaluate Defendants' assertions

28  of privilege as not even the privilege log Defendants submitted to the Neutral Expert on

1   April 18, 2019 has been made available.  *See* Neutral Expert Report, App'x B.

2          The Neutral Expert stated, with major qualifications, that he was able to investigate

3   the Court's designated set of issues adequately without access to privileged materials.  *See*

4   Neutral Expert Report at 9.  The Governor and his staff have ultimate authority over the

5   prison system and directly participate in the litigation, and members of CDCR's legal team

6   and the California Attorney General's office have extensive insight into the ways in which

7   CDCR presents information to the Special Master and the Court regarding its compliance

8   with various remedial policies and plans and themselves made representations in pleadings

9   and arguments before the Court.  In light of this reality, the only way to evaluate fully

10  Defendants' state of mind with respect to the allegations of fraud and misconduct in the

11  Golding Report is to interview these individuals and access their documents.  This

12  information cannot be gleaned by other means, and is critical to answering the Court's

13  question whether facts exist to establish that Defendants "intentionally misled the court or

14  the Special Master."  Amended Order Appointing Neutral Expert (Jan. 8, 2019), ECF No.

15  6064 at 2.

16         Another equally important limitation of the Neutral Expert Report is its lack of any

17  legal section defining the standards it relied on to determine questions of intent,

18  materiality, reliance, mootness, and factual disputes.  The Report does not define "fraud on

19  the Court" and concludes that even where inaccurate data was filed with the Court, that

20  data had no material effect on the Court's analysis, so it did not result in the Court being

21  misled.  *See, e.g.*, Neutral Expert Report at 43; Neutral Expert Report at 3 (asserting that

22  the change from 30 to 45 days for psychiatry contacts "was likely immaterial and is now

23  moot").  But a court need not explicitly rely on the misconduct or misleading data for it to

24  harm "the integrity of the judicial process," so long as the court relies on it indirectly as a

25  result of the parties' interactions.  *See In re Levander*, 180 F.3d 1114, 1119-20 (9th Cir.

26  1999); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 50–51 (1991).  The Neutral Expert

27  Report does not explain its conclusions in light of these and other relevant legal standards,

28  which are discussed in Section V.A., *infra*.

1    These very significant limitations of the Neutral Expert's investigation compel

2  further investigation, analysis, and focused attention by the Court, Special Master team,

3  and parties.

4    **B.    The Neutral Expert's Approach to the Investigation, and Its Conclusions, Exceeded the Bounds of the Court's Order of Reference.**

5

6    The Court's Order appointing the Neutral Expert described the Neutral Expert's

7  purpose as "to *assist* the court in investigating allegations raised in the verified report of

8  Dr. Michael Golding," and "to identify whether facts exist *raising a question whether*

9  defendants committed fraud on the court or intentionally misled the court or Special

10  Master."  Amended Order Appointing Neutral Expert (Jan. 8, 2019), ECF No. 6064 at 2

11  (emphasis added); *see also* Order (Feb. 20, 2019), ECF No. 6096 at 6 ("As the court has

12  explained and confirmed in prior orders, the process [of investigation] it has put in place

13  does not delegate the court's factfinding or decision-making authority to the neutral

14  expert.").  But the Neutral Expert Report and its findings and conclusions were written as

15  though they were final determinations of fact.  *See, e.g.*, Neutral Expert Report at 36

16  ("Because we do not find that the 'Timely Psychiatry Contacts' data is misleading due to

17  CDCR's practice of 'resetting the clock' upon patient transfers, or that there was an intent

18  to mislead …."); *id.* at 44 ("While CDCR's change to the modified rule [for "monthly"

19  psychiatry contacts] reflects a flawed decision-making process, the evidence does not

20  establish an intent to mislead.").  And as described in Section II.A., *infra*, in many

21  instances the Neutral Expert identified seriously misleading data and highly questionable

22  practices by CDCR, but fairly inexplicably came to the conclusion, without relying on any

23  particular legal standard, that no fraud occurred.  This approach is far removed from

24  assessing whether the evidence *raised questions* as to the possible existence of fraud in

25  order to *assist* the Court in making its own determination on that point.

26    The bottom line is that this Court has, and expressly retained, the authority to make

27  the ultimate determination whether the investigation revealed sufficient questions that

28  require further proceedings or remedies to resolve fully the serious issues raised by

1   Dr. Golding. The Neutral Expert identified extensive misrepresentations and questionable

2   practices that came to light at a critical juncture in the case—just after the Special Master

3   had stamped his approval of and just before Plaintiffs were likely to agree to Defendants'

4   proposal to cut their psychiatry staffing by 20%, based on their reported data. In these

5   circumstances, the Neutral Expert's findings of no fraud should not be accepted simply at

6   face value. The Court should consider the Neutral Expert's conclusions carefully and

7   ultimately come to its own conclusions regarding what the evidence reveals.

8   **II.    Despite Its Limitations, the Neutral Expert Report Reveals an Extremely
        Troubling Pattern Demonstrating CDCR's Reliance on Misleading and**

9   **Inaccurate Data, and a Culture Permitting Serious Errors of Judgment to
        Infect CDCR's Data-Reporting Practices.**

10

11      Even despite the investigation's circumscribed and otherwise limited scope, the

12  Neutral Expert confirmed that Dr. Golding was correct in his admission that Defendants

13  were providing to the Court, Special Master, and Plaintiffs seriously misleading data and

14  engaging in practices that systematically undermined the goal of using accurate, objective

15  measures to demonstrate true conditions in the provision of mental health services in

16  CDCR's institutions. The misrepresentations were revealed in the process of the Court's

17  effort to resolve one longstanding and intractable component of this case—Defendants'

18  psychiatry staffing ratios and allocations—and in many other respects had significant,

19  material impacts on Defendants' representations of constitutional compliance or near-

20  compliance.

21      **A.    The Neutral Expert Concluded CDCR's Data Was Misleading in
            Numerous Ways.**

22

23      As set forth below, the Neutral Expert Report identified a number of ways in which

24  CDCR's data was misleading or inaccurate:

25      •    CDCR unilaterally decided to redefine the longstanding and indisputable

26          meaning of "monthly" by extending it an additional 50%, from 30 to 45

27          days, without informing the Court, Special Master, or Plaintiffs. *See* Neutral

28          Expert Report at 37. Mental health leadership approved the change in eight

7

minutes, by email.  Neutral Expert Report at 41.  In practice this meant EOP class members could go for twice the Program Guide interval of 30 days—up to 60 days—between contacts with their psychiatrist, yet CDCR would still report those contacts as complying with court-mandated timeframes.  Neutral Expert Report at 37, 38, 40.  The Neutral Expert Report identified this as majorly flawed decision-making and determined that it showed a lack of transparency with the Court, but ultimately concluded that because Defendants "fixed" the issue, it was "moot" and did not need to be addressed further.  Neutral Expert Report at 3, 37.  But because this definition of "monthly" was so obviously wrong, it is sufficient to show intent to mislead.  *See* Neutral Expert Report at 38-39 (reporting that the Special Master found the change, and Defendants' failure to notify him of the change, "deeply troubling, even shocking").  The timeline associated with this change in data reporting, and its eventual correction, only underscore that the change is highly probative of fraudulent intent.  Specifically, on December 5, 2016 mental health leadership effectuated in just eight minutes this drastic and illogical change heavily favoring the reporting of constitutional compliance.  Neutral Expert Report at 41.  Then, after discovering that compliance rates for timely psychiatry contacts increased markedly and unexpectedly, Dr. Melanie Gonzalez, a Senior Psychiatrist Specialist at CDCR headquarters, notified Dr. Golding that the business rules had been changed.  Neutral Expert Report at 41.  On March 21, 2017, Dr. Golding raised the issue with mental health leadership, along with his well-justified concerns that the business rules should be changed back immediately.  Neutral Expert Report at 41.  Dr. Golding also insisted that the rule change be reported to the Court, but it never was.  Neutral Expert Report at 41.  Instead, on March 30, 2017, just over a week after Dr. Golding raised the issue and its implications with mental health leadership, Defendants submitted the

1   declaration of Katherine Tebrock, Deputy Director of Mental Health

2   Services, as well as a pleading relying on that declaration, to the Court, both

3   of which relied on the data Defendants had specifically been notified was,

4   effectively, false.  Neutral Expert Report at 43.  Not until April 24, 2017

5   were the business rules fully fixed.  Neutral Expert Report at 43.  In

6   summary, after Dr. Golding notified leadership of the extremely problematic

7   nature of this data change, it took weeks for the error to be fixed, weeks

8   during which Defendants submitted to the Court a declaration and pleading

9   relying on the false data—neither of which has ever been corrected—and

10  during which individuals in the Governor's Office were actively seeking to

11  find ways to make CDCR's data show compliance.  *See* Neutral Expert

12  Report at 43.  Seven months after Dr. Golding notified Defendants of the

13  highly misleading nature of the data and Defendants' obligation to notify the

14  Court of the problem, the Court entered a staffing order that flowed from the

15  parties' submissions, including the March 30, 2017 pleadings.  *See* Order

16  (Oct. 10, 2017), ECF No. 5711 at 6, 9, 12, 21-22, 24 (citing Defendants'

17  knowingly falsified pleadings).  That the Court ultimately did not accept

18  Defendants' false assertions of compliance should not excuse their knowing,

19  intentional attempt to inflate compliance data and to use that data to claim

20  compliance.  Defendants' failure to correct this known issue only reinforces

21  the suspicious nature of the circumstances regarding the changes to the

22  "monthly" rule.

23  •   CDCR counted as compliant "initial" psychiatric evaluations at a new

24      institution that occur *after* the class member's initial interdisciplinary

25      treatment team meeting ("IDTT") at the new institution.  Neutral Expert

26      Report at 26, 28.  The Special Master reported to the Neutral Expert that this

27      practice was misleading, and explained that the Special Master team has

28      consistently monitored whether the initial psychiatry contact occurs *prior* to

9

the initial IDTT at a new institution.  Neutral Expert Report at 26, 28.  The Special Master team also reported "that this understanding was repeatedly expressed to CDCR Mental Health Leadership, and that based on those discussions the CQI process requires CDCR to monitor whether the initial psychiatry evaluation has taken place prior to the initial IDTT."  Neutral Expert Report at 28; *see also id.* at 30-31, 33 (CDCR leadership acknowledging this expectation, including that just prior to Dr. Golding's release of his report, members of the Special Master team raised and pressed the issue again); *id.* at 32 (noting that emails from 2015 and 2016 showed that mental health leadership was aware of the Special Master's view on initial psychiatry encounters).

- CDCR counted brief, non-confidential encounters between psychiatrists and class members, including through a locked cell door, as "psychiatric evaluations" for the purpose of ensuring CDCR was complying with court-mandated timeframes for psychiatric care.  *See* Neutral Expert Report at 49 (finding that CDCR's interpretation of brief, informal, and cell-side interactions as "psychiatric evaluations" was "at odds with a fair reading of the text of the Program Guide, its context, and the common understanding among psychiatrists"); *see also id.* at 52 (explaining that the Special Master provided a "detailed list of instances" in his monitoring reports where he and his team identified non-confidential psychiatry contacts as non-compliant).  Psychiatrists in the field reported to leadership that they did not have an accurate way to enter these brief, non-confidential encounters into the Electronic Health Record System ("EHRS") without making it look like a full, confidential "evaluation" for measuring Program Guide compliance.  Neutral Expert Report at 58, 59, 61; *see also id.* at 57 (noting that at least one psychiatrist in CDCR headquarters raised this issue with mental health leadership, but was ignored).  Mental health leadership never responded to

10

1    requests to allow field psychiatrists to accurately enter informal psychiatry

2    contacts, as such, into EHRS.  Neutral Expert Report at 50, 56.

3    •    Defendants used business rules for data indicators relating to psychiatry

4    appointments that were misleading as to what was being measured in four

5    ways:  (1) CDCR excluded from the "Appointments Seen as Scheduled"

6    metric appointments not seen due to patient refusal, no-shows, or scheduling

7    errors; (2) CDCR schedulers moved missed appointments to later dates,

8    rather than marking them as missed, causing the appointments to be counted

9    as "seen as scheduled"; (3) CDCR used arbitrary cutoffs for the "Treatment

10    Cancelled" and "Treatment Refused" indicators; and (4) CDCR counted as

11    "Seen as Scheduled" appointments where the provider actually saw the

12    patient at a later date, so long as the original appointment was not

13    rescheduled or cancelled.  Neutral Expert Report at 65-66, 70; *but see id.* at

14    70 (describing the reported issues with the "Treatment Cancelled" and

15    "Treatment Refused" indicators as not misleading because they were not

16    provided to the Court or Special Master, and attributing issues with "seen as

17    scheduled" data as not stemming from "any effort to present misleading data

18    to the Court or the Special Master").

19    •    Defendants knowingly allowed psychiatric supervisors to perform significant

20    line staff functions, at least at certain institutions, without informing the

21    Court, Special Master, or Plaintiffs of the extent of this practice or otherwise

22    tracking it.  *See* Neutral Expert Report at 72, 77.  Doing so made CDCR's

23    psychiatric staffing allocations look more favorable than they may have been

24    in actuality, given the extent to which supervisory staff were fulfilling the

25    roles of line staff in providing direct patient care.  This implicates every

26    aspect of psychiatric patient care duties and provides a misleading picture

27    regarding the adequacy of current staffing ratios.

28    •    Defendants overstated, to a significant but unquantifiable degree, the extent

to which psychiatrists should have seen and were seeing the proportion of the *Coleman* population who were not taking their medications as directed, in contravention of the Program Guide requirement that a prescriber "'shall' conduct 'medication non-adherence counseling'" for those patients who miss three consecutive days or 50% of scheduled medication doses. *See* Neutral Expert Report at 79, 81, 86-87. The Neutral Expert Report noted that Dr. Golding and other psychiatrists raised this issue with mental health leadership as early as 2016, and were frustrated by the lack of response. Neutral Expert Report at 84 n.56. And although the policy required the medication "prescriber" to counsel the patient, several institutions allowed psychologists or social workers, who lack medical training, to conduct the counseling session. Neutral Expert Report at 85. Ultimately, the Neutral Expert concluded "there is a significant gap between the number of patients determined to be medication nonadherent, and those for whom a psychiatrist orders a medication nonadherence appointment." Neutral Expert Report at 86.

While the Neutral Expert did not specify that certain additional practices by CDCR resulted in inaccurate or misleading data, he did raise the following as areas of significant concern:

- Defendants' decision to exclude mainline EOP patients not on medications from all metrics, despite seemingly clear language in the Program Guide that "each EOP inmate-patient" "shall" be evaluated at least monthly by a psychiatrist. Neutral Expert Report at 89. Not only was CDCR aware of this issue, but members of the mental health leadership have been aware of the issue since at least 2012. Neutral Expert Report at 89 nn.60 & 61. Psychiatrists interviewed in connection with the Neutral Expert's investigation indicated that because of the acuity of mental illness being treated at the EOP level of care, it only made sense that psychiatrists evaluate

1    EOP patients, particularly those *not* on medications, at least monthly.

2    Neutral Expert Report at 89, 90.

3    •    The intentional decision to exclude from EOP patient-care metrics those

4         EOP patients who were housed in "overflow" pending transfer to an EOP

5         unit.  Neutral Expert Report at 90-91.  As Dr. Golding advised mental health

6         leadership in 2016, the Program Guide requires EOP patients to be seen at

7         least monthly, and does not provide a separate rule for those patients deemed

8         EOP but not housed correctly.  *See* Neutral Expert Report at 91.  This

9         interpretation is also consistent with representations Defendants made to

10        Plaintiffs and the Special Master during workgroups and policy meetings that

11        class members clinically deemed to need a certain level of care would

12        receive that care, regardless of their particular housing situation.  And

13        because Defendants restart the clock upon transfer, the time these EOP

14        patients spend receiving no treatment in overflow units is permanently erased

15        from Defendants' compliance calculations.  Nonetheless, after being alerted

16        to the problem and consequent data inaccuracy, mental health leadership

17        elected to "leave it as is" because "[i]t has been this way for years."  Golding

18        Report (Oct. 31, 2018), ECF No. 5988-7 at 14.

19   •    The Neutral Expert Report quotes an email exchange between the

20        Governor's office and the Deputy Director of Mental Health, Katherine

21        Tebrock, asking her to identify ways to make CDCR's psychiatry care

22        *appear* compliant.  Neutral Expert Report at 43 (noting email describing

23        conversation between the Governor's office and Katherine Tebrock, asking

24        her "to explain in more detail what metrics can be used to show that the care

25        by psychiatry is adequate").

26   •    CDCR generally finds ways to err on the side of making compliance look

27        better, *see* Neutral Expert Report at 16, 23, including, for example, reports

28        that a member of CDCR's mental health leadership stated during a webinar

PLAINTIFFS' RESPONSE TO NEUTRAL EXPERT REPORT

1      that CDCR's approach is to "err on the side of over-reporting compliance,"

2      Neutral Expert Report at 23, and CDCR's attempt to switch the coding for its

3      Continuous Quality Improvement (CQI) indicators to report that it had

4      achieved compliance upon reaching a threshold of 85%, rather than the 90%

5      historically and consistently applied in the case and approved by the Court,

6      *see* Order (Feb. 28, 2013), ECF No. 4361 at 9; Order (July 12, 2018), ECF

7      No. 5852 at 2.  This approach tends to show that CDCR intentionally chose

8      to compound small changes in data reporting that all favor compliance,

9      resulting in an overall materially rosier picture, rather than choosing the

10     objectively obvious metrics to evaluate constitutional compliance.

11     The pervasive and systemic nature of these misrepresentations to the key players in

12 this case should give the Court pause and merit further focused investigation and

13 remediation.

14     **B.**    **The Neutral Expert Report Raised but Did Not Analyze a Number of**
**Serious Issues with the Accuracy and Transparency of CDCR's Data**
15        **Reporting, and Did Not Opine as to the Larger Implications Resulting**
**From the Compounding of Those Issues.**
16

17     The Neutral Expert Report identifies a number of serious problems with CDCR's

18 data-gathering and reporting mechanisms, and reveals a tendency within CDCR to err,

19 systematically, on the side of making compliance numbers look better.  These many

20 additional issues, along with CDCR's general approach of making the data look better than

21 reality, is circumstantial evidence of intent to mislead and even deliberate indifference to

22 class members' needs.  The most prominent of these issues are:

23     •    CDCR's use of its unique patient-weeks methodology to count compliance,

24        contrary to the most apparent and intuitive measure of compliance:  Did the

25        appointment happen on time or did it not?  *See* Neutral Expert Report at 23

26        (describing psychiatrists' confusion with the patient-weeks methodology for

27        evaluating compliance).  While mental health leadership stated they used the

28        patient-weeks methodology because it provides additional information—the

extent of delays for untimely appointments—that is a separate question and therefore should be captured in a separate metric, one that CDCR apparently could measure. *See* Neutral Expert Report at 17-18 (discussing the possibility of an "average days late" indicator for untimely appointments). Using the patient-weeks methodology has a tendency to obscure the basic question at issue, again: Did the appointment happen on time? The Neutral Expert calculated the impact this choice has made in terms of reporting compliance with the "Timely Psychiatry Contacts" metric, and it starkly favors showing compliance. *See* Neutral Expert Report at 18; *cf.* Neutral Expert Report at 35 n.32 (noting that when a member of mental health leadership analyzed data relating to the impact on the "Timely Psychiatry Contacts" indicator of resetting timelines for psychiatry contacts upon a patient's transfer, that individual did <u>not</u> use the patient-weeks methodology). The Neutral Expert Report addressed the issue only in the background section, *see* Neutral Expert Report at 16-18, but this methodological choice skews many aspects of Defendants' data reporting, including, for example, the "EOP Treatment Hours" measurement Defendants rely on in their self-certification process for the Administrative Segregation Unit (ASU) EOP hub and Psychiatric Services Unit (PSU) programs, required by this Court's April 10, 2014 Order, ECF No. 5131. Although Defendants do not file their self-certifications with the Court, they do submit them to the Special Master and Plaintiffs. *See* Neutral Expert Report at 39.

- Increasing reports of compliance by including as "compliant" appointments that never came due. *See* Neutral Expert Report at 18 at n.18.
- Another unspecified data or coding error that caused compliance numbers to increase. *See* Neutral Expert Report at 18 n.16.
- Failing to report inaccuracies in Defendants' affirmative defense in response

15

1     to the Golding Report.  Specifically, in response to the Court's Novem-

2     ber 13, 2018 Order to Show Cause, Dr. David Leidner, a headquarters-level

3     Senior Psychologist Specialist, submitted a declaration that purported to

4     provide evidence rebutting the Golding Report.  *See* ECF No. 6012-3 (Nov.

5     11, 2018).  During the Neutral Expert's investigation, Dr. Leidner made

6     revisions to the analysis in his declaration.  *See* Neutral Expert Report at 32

7     n.28 (citing ECF No. 6012-3 at 7).  The Neutral Expert determined that

8     Dr. Leidner's changes were not material, *see* Neutral Expert Report at 27

9     n.28.  But this provides yet another example of CDCR reporting inaccurate

10    data in a pleading and failing to alert the Court once the inaccuracy is

11    discovered.

12  •   Not providing an option in EHRS for psychiatrists to document wellness

13    checks, as opposed to confidential, formal psychiatric evaluations, the former

14    of which should not count toward Program Guide compliance, while the

15    latter should.  Neutral Expert Report at 50-51.

16  •   Making "confidential" the default setting in EHRS for psychiatric

17    appointments, despite knowing that at many institutions most appointments

18    were not confidential.  This default setting resulted in misreporting that these

19    contacts were confidential and therefore should count toward Program Guide

20    compliance numbers.  Neutral Expert Report at 50-51.

21  •   The Golding Report noted the significant difference between what CDCR's

22    compliance data reports and what he and other psychiatrists see in practice

23    on the ground.  *See, e.g.*, Golding Report (Oct. 31, 2018) ECF Nos. 5988-2

24    & 5988-3 (reports from Dr. Golding to mental health leadership regarding

25    confidentiality concerns at SVSP and SAC); *see also* Neutral Expert Report

26    at 23 n.24 (noting that CDCR psychiatrists "feel[] pressured by institutional

27    leadership to keep performance indicators green … and describ[ing]

28    institution-specific practices or specific instances where data was allegedly

recorded in an improper manner to inflate compliance metrics"); Neutral Expert Report at 24 n.25 ("[T]wo non-psychiatrist witnesses we spoke to also reported a general impression that CDCR Mental Health engages in improper practices to meet performance objectives."); Neutral Expert Report at 50 (describing Dr. Golding's report to mental health leadership that data showed almost all psychiatry appointments at certain institutions were occurring in a confidential setting, "despite the fact that it was common knowledge that few of the visits at those institutions were confidential"). The Neutral Expert Report did not examine adequately whether institutional leadership manipulate data or facility conditions for the purpose of improving the appearance of compliance, and/or whether Defendants knew of and failed to correct or disclose such manipulation. For example, the Golding Report asserts that at CSP-Sacramento, for July 2018, CDCR reported only one urgent psychiatrist consult referral, two emergent psychiatrist consult referrals, and three routine psychiatrist consult referrals, even though those numbers were exceptionally low for SAC's large mental health population and therefore obviously suspect. Golding Report (Oct. 31, 2018), ECF No. 5988-1 at 138-39. Similarly, mental health staff at North Kern State Prison (NKSP) reported a highly improbable single emergent psychiatrist referral consult for the same month. When headquarters staff inquired, NKSP staff reported that they take steps to avoid generating such referrals so as not to require an on-call psychiatrist to complete a face-to-face examination within four hours as required by policy, and encourage non-psychiatry health care staff to informally discuss patient medication concerns with psychiatrists rather than referring patients for in-person psychiatry appointments. *See* Golding Report (Oct. 31, 2018), ECF No. 5988-5 at 46-48. A member of mental health leadership signaled clear approval of this dangerous practice without addressing whether evading data reporting

1    improperly inflated compliance numbers.  *See id.*  The disparity between the

2    on-the-ground reality and Defendants' data makes it evident that Defendants

3    are concerned with what their data says about the provision of mental health

4    care, and not necessarily about the actual provision of mental health care.

5  •  At a larger scale, the Neutral Expert did not address the potential for fraud by

6    omission where mental health leadership failed to raise certain material

7    changes to policy, regulations, data rules, and so forth, despite knowing the

8    Court, Special Master team, and/or Plaintiffs would be concerned about the

9    changes.  For example, the Neutral Expert Report states that a member of

10   mental health leadership deemed the change from 30 to 45 days for timely

11   psychiatry contacts no "big deal," and not important enough to raise to the

12   Special Master team.  Neutral Expert Report at 40.  In a second example,

13   after deciding that a psychiatric evaluation was not necessary before a

14   patient's initial IDTT at a new institution, mental health leadership members

15   laughed about how a particular psychiatrist on the Special Master's team

16   would not agree with the result.  *See* Neutral Expert Report at 26 n.26; *see*

17   *also id.* at 41-42 (quoting an email exchange between a member of mental

18   health leadership and Dr. Golding, where the leadership team member stated

19   that the issue was not a "major" change with "a significant impact");

20   *compare id.* at 22 (noting the leadership team member's statement "that it

21   did not occur to her" to discuss with the Special Master changes and nuances

22   in coding metrics used for data reporting), *with id.* at 23 (noting the Special

23   Master's expectation that "if CDCR was unclear on the interpretation of the

24   relevant Program Guide provisions, they were expected to either directly

25   contact the Special Master or raise it during one of the numerous work

26   groups or policy meetings").  At the very least, these failures to disclose

27   material data issues show disrespect to the Court, Special Master team, and

28   Plaintiffs, and a failure to recognize that Defendants have been found

18

[3386575.7]

1    responsible for ongoing violations of the Eighth Amendment and are

2    required to comply with this Court's Orders to remediate those violations

3    and regularly report to the Special Master and the Court about their progress.

4    Defendants' refusal to be transparent—making a number of choices that

5    positively impact compliance numbers—and the practice of sidelining

6    psychiatrists and ignoring medical input, point to a deliberate indifference to

7    class members' needs and demonstrate that the actual delivery of mental

8    health care has become secondary to making the numbers look good.

9  **III.  Defendants' Misrepresentations Were Material and Their Interpretations of
       the Program Guide Were Unreasonable, Not Reasonable Interpretations of**
10     **Ambiguous Language**

11    The Neutral Expert Report improperly deemed certain disagreements about the

12  meaning of the Program Guide insignificant, and therefore misunderstood the force of the

13  document and Plaintiffs' and the Special Master team's central role in negotiating and

14  defining Program Guide requirements over the course of many years.  In other ways, the

15  Neutral Expert also failed to appreciate the materiality of Defendants' misrepresentations.

16     **A.    In Several Instances, the Neutral Expert Concluded the Program Guide
             Was Ambiguous but Failed to Give Weight to Plaintiffs' Interpretation**
17     **of the Document and to Consider Context Sufficiently.**

18    The Neutral Expert Report treated some of the disagreements regarding the

19  interpretation of the Program Guide as resulting from ambiguity in the document.  But the

20  Program Guide, despite being the central document in defining constitutional care for class

21  members, does not include language that definitively controls every issue that has been

22  negotiated in the case.  *See, e.g.*, Amended Order Appointing Neutral Expert, ECF No.

23  6064 at 3-4 (directing Neutral Expert to consider not only requirements of Program Guide

24  but also "orders of this court, and directives of the Special Master").

25    In attempting to understand the meaning of certain Program Guide provisions, the

26  Neutral Expert did not consider Plaintiffs' view or give credence to Plaintiffs' lengthy

27  history with and understanding of the document.  Plaintiffs' counsel developed the

28  Program Guide with Defendants and the Special Master, and its development was a major

step in the remedial process for this case.  Accordingly, the Neutral Expert should have

given weight to Plaintiffs' views on the Program Guide's meaning—for example, Plaintiffs

and the Special Master team both understood that having a meaningful initial IDTT upon a

patient's transfer necessarily requires a psychiatrist to have evaluated the patient before the

IDTT.  Even if the precise language of the Program Guide does not explicitly state this

requirement, the negotiation process and clinical context put the issue beyond dispute.

But the Neutral Expert Report identifies a more serious issue.  If Defendants

identify a legitimate dispute about what the Program Guide means, they are obligated to

raise that question and work through its resolution with the other major players whose

input is required—Plaintiffs and the Special Master team.  And in the event the parties and

Special Master cannot come to a resolution on their own, Defendants are required to bring

the issue to the Court for resolution.  A similar, Plaintiff-initiated series of steps occurred

with respect to the ways in which Defendants calculated mental health crisis bed

("MHCB") transfer timelines.  While litigating those timelines, Plaintiffs' counsel noticed

an inconsistency between the Program Guide's language and Defendants' reported times to

transport patients to MHCBs.  Plaintiffs raised the issue with Defendants in workgroups

overseen by the Special Master, allowing the parties to follow the process of narrowing

and then Court order.  The issue has since been put to rest, but only because Plaintiffs

surfaced an issue that Defendants should have raised on their own.

The Golding and Neutral Expert Reports reveal that in several other instances,

rather than taking the above-board approach, Defendants hid the fact that they were

reporting data based on their own interpretation of the Program Guide.  They did so while

knowing that Plaintiffs and the Special Master had or likely would have a different

interpretation than the one Defendants were applying.  The most obvious example is

Defendants' choice, in eight minutes, to switch the well-established and crystal clear

interpretation of "monthly" from 30 to 45 days, without telling anyone they had done so.

Another example is Defendants' decision to ignore years of input from the Special Master

team and their own Chief Psychiatrist and conclude that a psychiatrist does not have to

1   meet with a patient before an initial IDTT at a new institution or that a short, non-

2   confidential psychiatric encounter with a patient could be reported as a full psychiatric

3   evaluation.

4          The Neutral Expert Report failed to recognize the critical role Plaintiffs' and the

5   Special Master team's interpretations of the Program Guide play in this case.  Along with

6   the larger systemic trends the Neutral Expert identified—favoring compliance, ignoring

7   and/or failing to act on unfavorable input, and failing to be transparent and communicate

8   with other actors in this case—Defendants' unreasonable interpretations of the Program

9   Guide are yet another piece of evidence that Defendants' intent in reporting to this Court

10  and the Special Master concerning compliance remains at issue and should be addressed

11  by this Court in further proceedings.

12  **B.      Many of the Data Issues Identified in the Neutral Expert Report Were
            Material in Ways the Report Did Not Account for.**

13

14         The Neutral Expert Report made an inappropriate distinction between externally-

15  reported versus "internal" data, and failed to address the reality that CDCR regularly used

16  and continues to use internal data to validate its own perceptions that the constitutional

17  violations in the case have been cured, and presumably would use the same data to seek to

18  end the case.

19         Defendants have been advocating for several years to turn the case over to self-

20  monitoring, through CQI, and their "internal" data plays a central role in that proposal.

21  *See, e.g.*, Defs.' Requests for Discussion at the January 20, 2017 Status Conference (Nov.

22  23, 2016), ECF No. 5525 at 1 (requesting "to update the Court on their efforts to reach

23  agreement between the parties and the Special Master concerning issues that no longer

24  require Court monitoring, and discuss the development of a process to end Court

25  oversight"); Defs.' Objections to the Recommendations of the Special Master's Report on

26  his Expert's Third Re-Audit of Suicide Prevention Practices (Nov. 15, 2018), ECF No.

27  6007-2, Ex. 2 (letter from Defendants to Special Master proposing transition of suicide

28  prevention monitoring to CDCR); Special Master's Report on his Expert's Third Re-Audit

[3386575.7]

1  and Update of Suicide Prevention Practices (Nov. 5, 2018), ECF No. 5993 at 6

2  (specifically "reject[ing] defendants' suggestion that they are ready to assume self-

3  monitoring of suicide prevention practices as incredibly premature"); Joint Status Report

4  Re: Oct. 11, 2018 Status Conference (Sept. 14, 2018), ECF No. 5922 at 9-10 ("Defendants

5  welcome the opportunity to discuss reducing Court oversight in this case and propose a

6  discussion on the process for removing, in the near future, Court oversight including, but

7  not limited to: (1) Heat Plans; (2) the Desert Institutions; (3) Screenings and Referrals;

8  (4) Mental Health Records/Forms; (5) Medication Management; and (6) Involuntary

9  Medication." (footnote omitted)).  The Court has supported this approach to ending the

10  case.  *See* Order (Feb. 21, 2018), ECF No. 5794 at 8 (CQIT is "the tool defendants will use

11  to assume the mantle of ultimate responsibility for diagnosing of its own problems … and

12  create a quality improvement process that it can use to achieve and maintain compliance,

13  and *move on to eventual removal from federal court oversight*" (citation omitted)).

14       The Neutral Expert Report acknowledges as much:

15       The Special Master also indicated that the CQI process, and the data sub-
         mitted as part of that process, were extremely important to the progress of
16       this case. … As part of the CQI process, the Special Master relied on the data
         CDCR provided to him to inform his validation inspections of the individual
17       institutions and, in turn, his evaluation of the effectiveness of CDCR's self-
         monitoring programs as a whole.  The Special Master therefore views any
18       inaccuracies in the CQI data CDCR provided as material.

19  Neutral Expert Report at 67; *see also id.* at 21 ("CDCR Mental Health has been moving

20  towards an increased self-monitoring role.  A necessary component of that movement has

21  been developing CDCR Mental Health's data management systems:  both in terms of how

22  mental health data is inputted and recorded in the EHRS, and how that data is then

23  translated into meaningful measurements in the form of performance indicators."); *id.*

24  ("CDCR has increasingly used [its performance report and related indicators] to report its

25  performance externally, including for the CQI process …, CDCR's Staffing Proposal …,

26  and for Administrative Segregation Unit ("ASU") EOP Hub certifications.").

27       In one specific example, the Neutral Expert found that many performance report

28  indicators that were problematic or misleading were not material to the investigation

1   "[b]ecause neither the Court nor the Special Master use the Performance Report."  Neural

2   Expert Report at 45 n.37.  But this is too narrow a view.  Defendants rely on their data in

3   myriad ways and in interactions with the Court, Special Master, and Plaintiffs, and through

4   self-monitoring they necessarily share that information directly with the Court and Special

5   Master.  Defendants relied on their "internal" data in support of their motion to terminate

6   in 2013 and in opposition to Plaintiffs' enforcement motion related to segregation.  *See*

7   Decl. of Michael W. Bien In Support of Pls.' Response to Neutral Expert Report, filed

8   herewith ("Bien Decl.") at ¶¶ 15-16; Decl. of Diana Toche (Jan. 7, 2013), ECF No. 4275-

9   3; Decl. of Debbie Vorous (Jan. 7, 2013), ECF No. 4275-4; Decl. of Kathleen Allison (July

10  24, 2013), ECF No. 4713 at 13.  And more recently, on several workgroup calls, Plaintiffs

11  requested, and later reviewed, data derived from CDCR's "internal" reports.  *See* Bien

12  Decl. at ¶ 10.

13      The Neutral Expert's view of materiality also failed to give sufficient weight to

14  Plaintiffs' counsel's reliance on Defendants' representations and our opinions regarding

15  the Golding Report.  In fall 2018, Plaintiffs' counsel was preparing to sign the staffing

16  stipulation that would have effectively closed a significant piece of the litigation.  *See* Bien

17  Decl. at ¶ 11.  Much of the data the Neutral Expert found misleading impacted the staffing

18  stipulation.  (It may not have been a coincidence that Dr. Golding issued his report just on

19  the cusp of Plaintiffs' signing the stipulation.)  The Court had already expressed its

20  appreciation regarding the progress made during the parties' staffing negotiations, and may

21  well have followed Plaintiffs' lead in agreeing to Defendants' massive staffing reduction.

22  *See* June 28, 2018 Hrg. Tr., ECF No. 5870 at 16-17; Order (July 3, 2018), ECF No. 5850 at

23  2-3, 8.

24      The only way Plaintiffs' counsel would have ever contemplated signing the

25  stipulation was with the assurance that the care currently being provided to class members

26  with existing psychiatric staffing levels was adequate—otherwise, we could never

27  conceive of making such extensive cuts.  Bien Decl. at ¶¶ 4-10.  Defendants assured us the

28  care *was* adequate by sharing their internal data.  *See, e.g.*, Defs.' Psychiatrist Staffing

[3386575.7]

1   Proposal, filed as Exhibit 2 to Joint Status Report (June 21, 2018), ECF No. 5841-2 at pdf

2   page 4 n.5 ("CDCR is meeting the needs of class members in the desert institutions.  Over

3   the past twelve months, each institution has been 100% compliant with timely psychiatry

4   contacts and timely treatment team meetings.  Appointments occurred as scheduled 98% to

5   100% of the time over the same timeframe.  The institutions are 92% to 99% compliant

6   with timely mental health referrals."), 9 ("[T]he state average for timely psychiatry

7   contacts for CCCMS inmates is at 94%."), 14 (performance report data showing timely

8   psychiatry contacts for CCCMS and EOP patients), 16 (same), 17 (performance report data

9   showing timely psychiatry referrals for CCCMS and EOP patients), 31 (performance

10   report data showing timely psychiatry contacts for CCCMS patients), 32 (graph listing

11   psychiatry contact data for CCCMS programs), 33 (graph listing psychiatry contact data

12   for EOP programs).[2]

13        Another example of Defendants using data to assure the Court and the Special

14   Master that their care was sufficient to justify reduced psychiatry staffing comes from the

15   representation in Ms. Tebrock's March 30, 2017 declaration in response to the Special

16   Master's Report on the Status of Mental Health Staffing.  *See* ECF No. 5591-2.  Relying

17   on performance report data that the Neutral Expert has concluded was misleading,

18   Ms. Tebrock's declaration discusses the many ways that patients are receiving timely

19   psychiatric care throughout the system.  *Id.* at 3-5.  Defendants' counsel in turn relied on

20   these representations to represent to the Court that CDCR was providing adequate mental

21   health care to the *Coleman* class despite consistently high psychiatry vacancy rates.  ECF

22   No. 5591 at 13-14.  The Neutral Expert concluded that the representations in Defendants'

---

24   [2] Plaintiffs were surprised by the Neutral Expert Report's characterization that the Special
Master did not rely on Defendants' data in evaluating the Psychiatry Staffing Proposal, *see*

25   Neutral Expert Report at 20, as the parties and the Special Master team discussed
Defendants' assessment of their current care, which is necessarily rooted in their

26   performance report data, at length in the months it took to negotiate the Staffing Proposal.
*See* Bien Decl. at ¶¶ 4-10, 19.  In any event, Plaintiffs needed to sign the stipulation, not

27   the Special Master, and therefore it is significant that Plaintiffs relied on Defendants'
misleading data—a fact to which the Neutral Expert Report gives little weight.

1   filings "did not have a material effect on the Special Master or the Court's decision-

2   making."  Neutral Expert Report at 43, *see also id.* at 47.  But just because the Court, the

3   Special Master, and Plaintiffs did not immediately agree with Defendants' characterization

4   of the status of its MHSDS at that time does not make Ms. Tebrock's and Defendants'

5   counsel's representations immaterial to the Court's fraud inquiry.  At the very least,

6   questions of fact remain as to the elements of materiality and reliance on Defendants'

7   misrepresentations.  The position and facts asserted by Ms. Tebrock and Defendants in

8   their March 30, 2017 pleading and declaration are the same position and facts that

9   ultimately convinced the Special Master and Plaintiffs' counsel to agree to Defendants'

10   proposal in 2018 to reduce the number of psychiatrists by 20%: Defendants' data showed

11   that they were delivering appropriate psychiatric care with only 80% of the allocated

12   psychiatrists.

13   **IV.   The Neutral Expert Report Did Not Investigate or Address a Number of**
        **Significant Issues Raised Directly or Indirectly by the Golding Report.**
14

15        The Neutral Expert was tasked with reviewing only a narrow and discrete set of

16   issues raised by Dr. Golding's report.  As the Court envisioned might occur, a number of

17   very seriously concerning issues remain.  *See* Amended Order of Appointment (Jan. 8,

18   2019), ECF No. 6064 at 3 (leaving door open to expand scope of investigation "based on a

19   showing that allegations of the Golding Report or facts identified during the investigation,

20   or both, warrant such expansion").  These, combined with the Neutral Expert's findings

21   that CDCR presented inaccurate and misleading data on a number of different levels, and

22   the other limitations on the scope of the Neutral Expert Report, as discussed in Sections I.,

23   II. and III., *supra*, evidence real and pervasive problems with CDCR's approach to data

24   and reporting that must be addressed.

25        **A.   Additional Serious Concerns Raised in the Golding Report, but Not**
                  **Addressed in the Neutral Expert Report**
26

27        Below are many specific issues identified in the Golding Report that are serious

28   enough to require additional focused attention.

### 1.    Timely Primary Clinician Contacts

Similar to issue (a) identified by the Court regarding "resetting the clock" for psychiatry appointment timeframes upon patient transfer, *see* Amended Order of Appointment (Jan. 8, 2019), ECF No. 6064 at 2-3, Dr. Golding states that the "Timely PC Contacts" indicator, which purports to show Defendants' compliance with Program Guide timelines for class members' required appointments with their primary clinician, is also reset when a patient transfers institutions.  Golding Report (Oct. 31, 2018), ECF No. 5988-1 at 146; *see also* Whistleblower Report of CDCR Headquarters Senior Psychiatrist Specialist Dr. Melanie Gonzalez ("Gonzalez Report") at 14 n.2.[3]  The Neutral Expert Report does not discuss this allegation.

### 2.    Psychiatrist Continuity of Care

Also relevant to issue (a) identified by the Court, but not thoroughly investigated by the Neutral Expert, is Dr. Golding's allegation that Defendants' "Psychiatrist Continuity of Care" indicator includes only patients who have been EOP, at the same institution, and in the same housing program, without interruption for six months.  Golding Report (Oct. 31, 2018), ECF Nos. 5988-1 at 121-22; 5988-3 at 63; 5988-6 at 34; *see also* Gonzalez Report at 20-26.  This method of reporting excludes huge numbers of EOP class members, including those who have had short crisis care admissions or who moved units within the same institution's EOP, and thus does not truly report actual continuity of care.  The "Psychiatrist Continuity of Care" indicator is regularly reported to the Special Master in the CQI context.  Bien Decl. at ¶ 13.

### 3.    Evaluating Compliance of Appointments Ordered More Frequently than Program Guide Minima

Dr. Golding raised, but the Neutral Expert Report did not evaluate the impact of, the Defendants' failure to account for the fact that the Program Guide assumes that

---

[3] The Gonzalez Report is not publically filed, but was submitted to the *Plata* Receiver on October 24, 2018, Neutral Expert Report at 1 n.2, and the Court, Special Master, Neutral Expert, and parties have access to the report.

1  psychiatrists will determine certain of their patients need to be seen more frequently than

2  the maximum permitted interval of 30 or 90 days for EOP and CCCMS patients,

3  respectively.  *See* Program Guide at 12-3-11, 12-4-9; *see also* Golding Report (Oct. 31,

4  2018), ECF No. 5988-1 at 28. 47-48, 57, 147 (explaining that even when a doctor

5  specifically orders treatment exceeding Program Guide minima, Defendants do not count a

6  psychiatry appointment as untimely unless it exceeds the maximum limit).  Despite this

7  being an inherent component of several compliance measurements, including the "Timely

8  Psychiatry Contact" indicator, and contrary to doctors' orders, Defendants treat the

9  Program Guide requirement as the maximum, rather than the minimum, requirement.  *See,*

10 *e.g.*, Neutral Expert Report at 25 (addressing CDCR's practice of "resetting the clock"

11 upon patient transfers between institutions).[4]

12           **4.    "Averaging of days" issue**

13           Relevant to issue (b) identified by the Court, regarding Defendants' unilaterally

14 changing the definition of "monthly" from 30 days to up to 60 days, *see* Amended Order

15 of Appointment (Jan. 8, 2019), ECF No. 6064 at 3, Dr. Golding alleges that Defendants

16 average out "early" and late appointments to skew compliance figures.  Golding Report

17 (Oct. 31, 2018), ECF Nos. 5988-1 at 2-3, 48-49, 53; 5988-5 at 9.  By reporting the

18 timeliness of appointments as an average, Defendants mask the number of late

19 appointments because those untimely appointments are inappropriately cancelled out by

20 "early" appointments, i.e., appointments that occur timely but before the last possible date

21 required under the Program Guide.

22           Dr. Golding illustrates how CDCR could report 100% compliance with Program

23 Guide timelines even where 50% of patients were seen past the 30-day timeframe required,

24 using a hypothetical based on data that Defendants provided to the Special Master in

25 support of their May 17, 2018 Psychiatry Staffing Proposal.  *See* Golding Report (Oct. 31,

26 ─────────────────────
[4] This issue from the Golding Report also points to the larger issue of CDCR's discounting
27 psychiatric judgment and minimizing psychiatrists' role within the MHSDS, as addressed
more fully in Section IV.B., *infra*.

28

1  2018), ECF Nos. 5988-1 at 53; 5988-5 at 28 (this exhibit to Defendants' staffing proposal

2  is also filed at ECF No. 5841-2 at 33).  This allegation must be investigated to determine

3  whether Defendants are using this practice to skew the "Timely Psychiatry Contacts"

4  indicator.

5  **5.    Medication Administration Process Improvement Program ("MAPIP")**

6

7  At the December 14, 2018 Status Conference, the Court made clear that

8  Dr. Golding's allegations related to MAPIP should be addressed by the Neutral Expert's

9  investigation.  Dec. 14, 2018 Hrg. Tr., ECF No. 6054 at 10 (including "MAP[IP]

10  Protocols" in list of documents to be reviewed during investigation).  The Neutral Expert

11  found, however, that this issue was "not directly related to the issue of medication

12  nonadherence."  Neutral Expert Report at 84 n.55.  In light of the Court's holding in 1995

13  that CDCR's medication management violated the Eighth Amendment, *Coleman v.*

14  *Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal. 1995), and the Special Master's ongoing

15  documentation of these problems, *see, e.g.*, Special Master's 26th Round Monitoring

16  Report (May 6, 2016), ECF No. 5439 at 33-36 ("26th Round Report"), Dr. Golding's

17  allegations that Defendants misrepresented MAPIP data must be thoroughly investigated.

18  CDCR developed a medication management audit tool through MAPIP in

19  coordination with the Special Master's psychiatric experts and the *Plata* Receiver's

20  medical staff.  *Id.* at 35.  In his monitoring round reports, which this Court has adopted, the

21  Special Master has endorsed the use of MAPIP as a remedial measure to address the

22  original medication management violation.  *See, e.g.*, 26th Round Report at 36 ("The

23  MAPIP audit tool should also continue to advance CDCR's capacity to assume

24  responsibility for self-monitoring of medication management, eventually mitigating the

25  need for outside monitoring in this area."); Order (Aug. 9, 2016), ECF No. 5477 (adopting

26  26th Round Report).  The Golding Report alleges that Defendants manipulated MAPIP

27  data in several ways to misrepresent their compliance levels.

28  First, Dr. Golding alleges that Defendants' MAPIP reporting counted annual blood

draws only for patients who had been on the same class of medication for an entire year
(i.e., the most stable class members), and excluded from reported data all class members
who switched medication classes at any time during the year (i.e., those requiring more
than one measurement in the year) or who changed medication dosages. Golding Report
(Oct. 31, 2018), ECF No. 5988-1 at 30-31. These are material omissions, as the excluded
categories contain the patients most at risk and who therefore require closest monitoring.
Dr. Golding states that CDCR started including patients who had switched medication
classes (and thus required multiple measurements) in the MAPIP compliance reports only
as of June 2018. Golding Report at 30. Defendants did not disclose this practice.

Second, Defendants allegedly include only one of the four mandatory blood draws
(the annual blood draw) when reporting on their timeliness of required lab tests. Golding
Report (Oct. 31, 2018), ECF No. 5988-1 at 3. In Defendants' March 30, 2017 filing in
response to the Special Master's report on staffing, Defendants acknowledged this
practice, albeit somewhat cryptically. *See* Tebrock Decl. (Mar. 30, 2017), ECF No. 5591-2
at 9 (stating in a footnote to an exhibit that the MAPIP data included in the exhibit "do not
capture MAPIP Measure 1A-1G that are baseline, 3 months or triggered by medication
dose changes"). This amounts to selective reporting because Defendants elected to report
only that "annual" blood draw, the easiest of the four required measures to track and
comply with. Defendants also misled the Court in using this selective data to represent
that "CDCR's systemic, statewide compliance with its medication-administration measures
totals ninety-six percent over the past twelve months." Tebrock Decl. (Mar. 30, 2017),
ECF No. 5591-2 at 4; Defs.' Response to the Special Master's Report on the Status of
Mental Health Staffing (Mar. 30, 2017), ECF No. 5591 at 4 & 14 (same).

Third, Dr. Golding states that Defendants further manipulated the single data point
they did report—the "annual" blood draw—by defining the requirement differently than
required under MAPIP protocols. Specifically, although the protocols required the
"annual" measurement to occur between 91 and 365 days from the medication start date,
Defendants measured the blood draw as compliant so long as it occurred any time between

1 and 365 days from the medication start date. *See* Golding Report (Oct. 31, 2018), ECF

Nos. 5988-1 at 33. This made it easier for Defendants to achieve compliance in a way that

does not comport with actual medical requirements. Defendants deviated from this

MAPIP protocol without notice to Plaintiffs, the Court, or the Special Master.

Furthermore, Defendants failed to mention this issue in Ms. Tebrock's March 30, 2017

declaration. *See* Tebrock Decl. (Mar. 30, 2017), ECF No. 5591-2 at 9.

### 6.    Non-Quantifiable Misrepresentations to the Special Master

The Golding Report alleges that Defendants misrepresented aspects of their mental

health practices and operations to the Special Master unrelated to compliance data, but the

Neutral Expert did not explore these allegations thoroughly even though the Court

authorized him to expand the scope of the investigation if appropriate. If true, these

allegations (which include manipulating conditions at institutions for Special Master tours,

misrepresenting information during workgroup meetings, and misleadingly omitting

material information in statements to Special Master team members) provide

circumstantial evidence of reckless or intentionally fraudulent acts relevant to all issues

identified by the Court.

First, Dr. Golding states that in the Central California Women's Facility (CCWF)

mental health crisis bed (MHCB) unit, women are double-celled in four cells, but when the

Special Master team arrives to monitor the institution, those who are double-celled are

individually escorted to a private space for treatment so that contacts that routinely occur

in the cell (meaning in front of the other double-celled patient) are instead inaccurately

shown as occurring in a confidential environment. *See* Golding Report (Oct. 31, 2018),

ECF No. 5988-1 at 67; *see also* Gonzalez Report at 33. If true, this a blatant example of

Defendants portraying a false picture of compliance and adequate care to the Special

Master, whose factual findings the Court formally adopts and relies on.

Second, Dr. Golding provides evidence that Defendants meet with patients for a

shorter amount of time during IDTTs whenever the Special Master team is not present, and

specially select patients for the Special Master's viewing when monitors are present. *See*

Golding Report (Oct. 31, 2018), ECF No. 5988-3 at 22 (July 2018 email from Dr. Golding to mental health leadership stating that "[w]hen we have 25-minute treatment teams that Coleman observes, with select patients for the day of their arrival, of course the care looks reasonable.  If you actually follow a real psychiatrist throughout the day (and we followed two), you quickly understand what medical danger is"); *see also id.*, ECF No. 5988-3 at 21 (complaining that the quality management team schedules 30-50 IDTTs in only three to four hours at SAC).  If clinicians usually meet with patients for only short periods of time during IDTTs, their conduct of meeting with patients for longer periods of time (and possibly hand-picking patients) when monitors are watching makes it appear as though IDTTs are of higher quality than what actually occurs in practice.

Third, the Golding Report includes evidence that Defendants intentionally misled the Special Master team about the nature of their current, system-wide use of cell-front telepsychiatry—even while the Special Master was tasked by the Court with opining on that exact issue.  During the live demonstration of cell-front telepsychiatry technology that Defendants presented to the Special Master team and Plaintiffs' counsel at CHCF on July 11, 2018, a member of CDCR's mental health leadership falsely represented to one of the Special Master's experts that cell-front telepsychiatry was not being used anywhere in CDCR.  But as was later revealed, Defendants *had* been using cell-front telepsychiatry throughout CDCR for a long time, just not via the specific computer set-up demonstrated on July 11, 2018.  (Indeed, Defendants were using laptops held up to cell doors, an even more obviously objectionable technology than the "telepsychiatry carts" being demonstrated.)  Up to that point in negotiations over Defendants' proposed telepsychiatry policy, Plaintiffs had argued that cell-front telepsychiatry was dangerous for class members and should be prohibited.  On the other hand, Defendants wanted to include provisions in the draft telepsychiatry policy allowing for widespread use of cell-front telepsychiatry.  Notably, the Neutral Expert found that "[n]o CDCR Mental Health Leadership witness disputes that a cell-front encounter is not confidential."  Neutral Expert Report at 54.

After the demonstration, Dr. Golding wrote an email to mental health leadership regarding misrepresentation. *See* Golding Report (Oct. 31, 2018), ECF No. 5988-3 at 19. It was not until the September 7, 2018 status conference that Plaintiffs (and perhaps the Special Master) first learned that cell-front telepsychiatry contacts were, in fact, occurring regularly throughout the system. *See* Sept. 7, 2018 Hrg. Tr., ECF No. 5915 at 41-42. Defendants failed to correct or explain this misrepresentation in later filings.

Fourth, the Golding Report asserts Defendants failed to disclose to the Special Master and Plaintiffs during the workgroup negotiations over Defendants' proposed psychiatrist staffing reductions that its Chief Psychiatrist estimated that at least 25 telepsychiatrists would be needed to provide night-time on-call coverage, even though Defendants represented to the workgroup that fewer than a third of those would be sufficient. *See* Golding Report (Oct. 31, 2018), ECF No. 5988-1 at 127. In their May 17, 2018 psychiatry staffing proposal, Defendants in fact proposed allocating only eight telepsychiatry positions to cover "all institutions, seven days per week," which would cover "virtually all nighttime consultations" and reduce onsite psychiatry demand to "nearly zero." *See* Joint Status Report (June 21, 2018), ECF No. 5841-2 at 7. This proposal would have resulted in a net reduction of 9.6 out of 17.6 positions previously allocated for crisis intervention. This misrepresentation was material to Defendants' psychiatry staffing proposal.

**7.    Failure to Disclose Unilateral Revisions to Operative Remedial Policies**

The Golding Report also discusses Defendants' development and issuance of a memo to the field by high-level administrators regarding a change to the language in operative policy directives relating to discharges of patients from mental health crisis beds. *See* Golding Report (Oct. 31, 2018), ECF Nos. 5988-1 109-11, 114-16; 5988-6 at 12-15, 17-21. Despite the parties' agreement, with the Special Master's ratification, that Defendants would raise exactly these types of policy changes to Plaintiffs and the Special Master, *see* Special Master's Report on the Program Guide Update (June 29, 2018), ECF

1    No. 5844 at 8 ("Program Guide Update"), Defendants did not present this memo to the

2    Special Master or Plaintiffs. The Neutral Expert did not investigate this allegation.

3          Among other things, the memo, which issued on September 18, 2018 and took

4    effect October 15, 2018, expands the scope of clinical staff authorized to make discharge

5    decisions—which are in fact discharges from licensed hospital settings—from psychiatrists

6    to non-medically-trained psychologists. *See* Golding Report (Oct. 31, 2018), ECF No.

7    5988-6 at 12, 19. In addition, the policy changes impacted at least three policy memos

8    previously submitted to this Court as part of the Court-ordered, Program Guide update

9    process. *See* Program Guide Update at 132-34, 146-48, 319-20 (referencing policies

10   12.05.301, 12.05.501, and 12.05.601). These policies were included in category one of the

11   Program Guide update process—i.e., those policies the parties and Special Master agreed

12   should be included in the Program Guide update—and each had been the subject of close

13   negotiation. *See id.* at 8 & App'x A. Dr. Golding asserts, and Plaintiffs' agree, that

14   CDCR's changes raise major patient safety issues and must be reversed.

15         Defendants' unilateral formal modifications to these policies occurred without

16   notice to Plaintiffs, the Special Master, or the Court, despite the Program Guide Update

17   being less than three months past finalization and submission to the Court, and less than

18   two months past the Special Master's filing, directly in response to Court order, of the

19   consolidated updated Program Guide, with appendices, *see* Order (July 20, 2018), ECF

20   No. 5860; Special Master's Suppl. Filing Re: Program Guide Update (July 30, 2018), ECF

21   No. 5864. Examination of why Defendants failed to disclose this and other important

22   unilateral changes to remedial policies or regulations is necessary.[5]

23

24

25

---

26   [5] In several recent circumstances, Plaintiffs have discovered that Defendants proposed or
     implemented material changes to regulations that conflicted with closely-negotiated
27   policies implemented just a year before. *See, e.g.*, Bien Decl. at ¶¶ 17-18 (discussing "C-
     status" policy and acute inpatient admissions procedures changes).

28

[3386575.7]

1
2

**B.    The Tension Between and Changing Roles of Psychiatrists and Psychologists Within CDCR**

3    Issues raised in the Golding Report suggest a pervasive culture of sidelining

4 psychiatrists, reducing their roles within the MHSDS, and perhaps also of specifically

5 stifling and sidelining Dr. Golding and other psychiatrists in leadership positions.

6 According to the Golding Report, the impact of this problematic culture on Defendants'

7 data systems and reporting is that CDCR's mental health leadership blocks efforts to

8 remedy real problems in the provision of mental health care and fails to investigate

9 whether what is happening on the ground lines up with reported data. The Neutral Expert

10 Report addresses only tangentially these potential barriers to accurate reporting. It

11 describes CDCR's "rigid hierarchical structure" and that staff must follow the chain of

12 command. Neutral Expert Report at 23. Many psychiatric staff reported that this

13 hierarchical culture suppressed viewpoints conflicting with those of CDCR leadership and

14 created a culture of retaliation against those who disagreed with leadership. Neutral Expert

15 Report at 23-24.

16    Marginalizing psychiatrists in this way would seriously implicate whether adequate

17 medical-based mental health care is being provided within CDCR's institutions. Both the

18 Neutral Expert and Golding Reports describe ways in which non-medical professionals not

19 only do not know key elements of psychiatric care, but also do not know what they do not

20 know, and therefore place patients' safety at risk when attempting to expand their scope of

21 practice into a medical role. *See, e.g.*, Neutral Expert Report at 82-84 (describing a

22 fundamental disagreement between psychiatric and non-medical members of CDCR's

23 mental health leadership regarding who must evaluate a patient's medication non-

24 adherence, stemming at least in part from differences in clinical training and understanding

25 as to the import and implications of a patient's failure to take medications).

26    One example of this noted in Dr. Golding's report was the creation of the "Change

27 Management Committee," responsible for evaluating and deciding whether and how to

28 make changes to CDCR's EHRS and data reporting systems. *See, e.g.*, Neutral Expert

1    Report at 21-22 & n.20; *see also* Golding Report (Oct. 31, 2018), ECF No. 5988-1 at 71-

2    72.  At Change Management Committee meetings, Dr. Golding reported that psychiatrists

3    were outnumbered by other clinical, non-medical staff, and so were outvoted routinely on

4    matters central to the provision of *psychiatric*, as opposed to general clinical, mental health

5    care.  Neutral Expert Report at 26 n.26.

6          Dr. Golding also reported that psychiatrists were excluded from providing

7    meaningful input into data decisions because they were not permitted direct access to

8    CDCR's data.  *See* Neutral Expert Report at 21-22.  Instead of CDCR's head psychiatrist

9    having the ability to pull and review data when needed to resolve an issue, he and his staff

10   were relegated to "submit[ting] a solution center ticket which [wa]s then prioritized by

11   CDCR Mental Health Leadership"—the precise body Dr. Golding felt was systematically

12   excluding psychiatry from important data-related decision-making.  *See* Neutral Expert

13   Report at 21-22; *see also id.* at 22 n.21 (describing the schism between CDCR's medical

14   data system and the mental health system, run by non-medically-trained psychologists).

15         The Golding Report provides further examples of CDCR's extensive internal efforts

16   to dilute the role of psychiatrists and concomitantly expand the role of psychologists

17   within CDCR, including by authorizing non-medically trained psychologists to perform

18   tasks in licensed hospital settings beyond of their scope of practice.  *See* Golding Report

19   (Oct. 31, 2018), ECF Nos. 5988-1 at 13, 97-116, 124-25, 131-32, 159-60; 5988-6 at 12-15,

20   17-21.  Dr. Golding maintains that Defendants knew, for instance, that authorizing non-

21   medical clinical staff to perform medical tasks like admitting and discharging patients from

22   licensed inpatient settings and ordering the use of seclusion and restraints violated

23   licensing and professional standards, both of which reserve such tasks for physicians such

24   as psychiatrists.  *Id.*, ECF No. 5988-1 at 131-32.  Dr. Golding further asserts that

25   Defendants empowered psychologists and other non-medically trained clinical staff—even

26   unlicensed interns—to override psychiatrists' medical orders and professional opinions at

27   great risk and danger of harm to class members.  *See, e.g.*, *id.* at ECF No. 5988-1 at 9, 94.

28   The extent to which Defendants disclosed or failed to disclose the scope of these

1   changes—which Dr. Golding expressly links to numerous instances of patient harm—to

2   the Special Master should be thoroughly investigated.

3       Each of these changes also reduced the tasks of the psychiatrists and therefore

4   relates directly to Defendants' effort to demonstrate that CDCR could make do with a far

5   smaller cadre of psychiatrists than their own staffing model required. The fact that

6   Defendants made these changes over the objections of their own psychiatrists, who pointed

7   out that the changes directly implicated patient safety, and without disclosure to the Court

8   or Special Master, is highly significant.

9       The Neutral Expert Report even identified several ways in which Dr. Golding

10  specifically may have been stifled or marginalized by other members of mental health

11  leadership, despite his having valuable insight to offer—insight Defendants later adopted

12  and operationalized, after Dr. Golding issued his public report. Some members of CDCR's

13  mental health leadership avoided engaging Dr. Golding when things got tense over time,

14  which "may have affected their responsiveness to [his] concerns." Neutral Expert Report

15  at 22. The Neutral Expert elsewhere noted:

16      Over time, the relationship between Dr. Golding and CDCR Mental Health
        Leadership had become somewhat confrontational and distrustful, hindering
17      collaborative efforts to address issues. Our investigation revealed that some
        in CDCR Mental Health Leadership appeared to avoid engaging with
18      Dr. Golding where possible. … At the same time, Dr. Golding became
        increasingly frustrated with what he interpreted as a dismissal of his and
19      other psychiatrists' concerns about the accuracy of CDCR's data.

20  Neutral Expert Report at 24.

21      CDCR mental health leadership's alleged failure to receive and consider valuable

22  input from its chief medical officer and other psychiatrists, if true, represents a

23  fundamental disregard of Defendants' Eighth Amendment obligation to protect class

24  members from unnecessary pain, suffering, and death. *See* Neutral Expert Report at 23

25  (expressing CDCR psychiatrists' view that ignoring or marginalizing psychiatrists'

26  viewpoints would have "negative impacts on patient care"); *see also* Golding Report (Oct.

27  31, 2018), ECF No. 5988-1 at 83-88 (describing the extremely troubling impact of

28  allowing a psychologist to determine whether a patient needed emergent psychotropic

1   medication—that the critically mentally ill patient extracted and ingested her own eyeball).

2   Because of the far-reaching implications of Dr. Golding's allegations in this regard, a more

3   thorough and probing investigation of cultural issues within CDCR mental health

4   leadership is critical to resolving the issues raised in the Golding Report.

5   **V.    Given the Findings in the Neutral Expert Report, as Well as Its Limitations, a Number of Additional Steps Are Necessary to Ensure the Serious Allegations in the Golding Report Are Comprehensively Investigated.**

6

7        The Court has emphasized that its duty to investigate Dr. Golding's allegations

8   comes directly from the fact that "the court is using [Defendants' data] to assess

9   defendants' progress toward achieving a durable remedy in this long-running action."

10  Order (Dec. 13, 2018), ECF No. 6032 at 3.  In light of this purpose, the Neutral Expert's

11  core conclusion—that CDCR has misleading data-reporting practices that result in

12  reporting higher data compliance rates to the Court and Special Master, Neutral Expert

13  Report at 2—alone warrants remedial action.  Coupled with the Court's previously-

14  identified "parallel tracks" of remedial action, *see* Order (Nov. 29, 2018), ECF No. 6018 at

15  5, and the limitations of the Neutral Expert Report discussed above, *see* Sections II. and

16  III., *supra*, a number of additional steps are necessary to investigate and fully remedy

17  Defendants' misleading data practices.

18       **A.    The Court Is Empowered to Take Steps Necessary to Remedy the Numerous Serious Problems Identified with Defendants' Data.**

19

20       The Supreme Court and Ninth Circuit recognize a court's inherent authority—

21  separate from the federal rules of civil procedure or statute—to manage its own affairs.

22  *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (citing *Chambers*,

23  501 U.S. at 44-45; *see also F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244

24  F.3d 1128, 1136 (9th Cir. 2001) ("All federal courts are vested with inherent powers

25  enabling them to manage their cases and courtrooms effectively and to ensure obedience to

26  their orders.").  Courts may use this inherent power to vacate or amend judgments obtained

27  by misconduct that harms "the integrity of the judicial process."  *See Hendricks & Lewis*

28  *PLLC v. Clinton*, 766 F.3d 991, 1000 (9th Cir. 2014); *In re Levander*, 180 F.3d at 1119.

This standard is met if the court ultimately relies on the misconduct through reliance on the parties' interactions.  *See In re Levander*, 180 F.3d at 1120 ("[N]ot only did the Corporation and the Partnership deceive the Levanders, but they also deceived the court, because the court relied on the Corporation's depositions….").  Such is the case here, where the Neutral Expert concluded that "the evidence supports some of Dr. Golding's allegations that CDCR's data reporting practices resulted in the reporting of misleading data," Neutral Expert Report at 2, and the accuracy of CDCR's data is central to the integrity of the Court's proceedings and its ability to guide the parties to the end of this case, *see* Dec. 13, 2018 Order, ECF No. 6032 at 3. ("[O]nly once the court is fully satisfied that reliable data show a durable remedy has been achieved can the action be closed."); Nov. 29, 2018 Order, ECF No. 6018 at 9 ("The investigation here is necessary to clear the air so the court is assured it has an accurate foundation for determining whether and when defendants have achieved a durable and reliable remedy in this action.").

The Court's inherent power to order sanctions exists regardless of whether Defendants' misleading data practices also meet the standard for sanctions under Federal Rule of Civil Procedure 11.  *Chambers*, 501 U.S. at 50-51; *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006).  In addition to being available when the misconduct harms the integrity of the court, such sanctions "are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001); *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir. 2002), *as amended* (Feb. 20, 2002) ("[R]egardless of whether defense counsel's behavior constituted bad faith *per se*, we readily find that counsel's reckless *and* knowing conduct in this case was tantamount to bad faith and therefore sanctionable under the court's inherent power."); *accord Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 959 (9th Cir. 2009) (recognizing a "duty of candor" owed to the court).  Possible sanctions include, as relevant here, issuing a formal reprimand, *In re Girardi*, 611 F.3d 1027, 1039-40 (9th Cir. 2010), striking documents from the docket, *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th

38

1    Cir. 2010), or even crafting or modifying an injunction, *see Melendres v. Arpaio*, Case No.

2    2:07-cv-02513-GMS, 2016 WL 3996453 at *10-*37 (D. Ariz. July 26, 2016).  The below

3    subsections offer some possible approaches, including requiring Defendants to re-file

4    pleadings that rely on misleading data and revising the court-ordered ASU EOP hub self-

5    certification process.

6         Moreover, the Court may issue a remedy based on Defendants' counsel's

7    involvement in reporting misleading or false data to the Court.  *Mark Indus., Ltd. v. Sea*

8    *Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th Cir. 1995) ("Courts have power to discipline

9    the members of the bar who appear before it.").  And even for conduct that occurs outside

10   court—for example in the context of reporting misleading data to the Special Master and

11   Plaintiffs' counsel—a court may use its inherent power to discipline attorneys admitted to

12   the State Bar for violations of the State Bar's rules of professional conduct.  *See United*

13   *States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996).  Relevant here, the California Rules

14   of Professional Conduct prohibit lawyers from making, or failing to correct, false

15   statements to a court or third party.  *See* Rules 3.3 & 4.1.  It is also professional

16   misconduct for lawyers to "engage in conduct involving dishonesty, fraud, deceit, or

17   reckless or intentional misrepresentation … [or] conduct that is prejudicial to the

18   administration of justice."  Rule 8.4.

19        Courts may also authorize sanctions against offending parties or counsel for

20   violations of local rules.  *Zambrano v. City of Tustin*, 885 F.2d 1473, 1479 (9th Cir. 1989).

21   Relevant here, Eastern District of California Local Rule 180(e) provides that "[n]o attorney

22   admitted to practice before this Court shall engage in any conduct that degrades or

23   impugns the integrity of the Court or in any manner interferes with the administration of

24   justice."  Similarly, this Court may consider the California Business and Professions Code,

25   which allows an attorney to be suspended for violations of court orders and acts of

26   dishonesty.  Cal. Bus. & Prof. Code §§ 6103, 6106.

27        These sources of law and administrative guidance provide ample authority for the

28   Court to take the action it believes necessary to remedy not only the misrepresentations

1  made, but also to prevent them from recurring.  Additional, specific recommendations for

2  remedial action are discussed in further detail below.

3       **B.**     **Defendants Should Be Required to Purge the Docket of Any Filings**
                **Tainted by Misleading or Inaccurate Data, and to Certify, Going**
4               **Forward, that Filings Relying on Data Are Accurate.**

5       Pursuant to the Court's inherent authority, Rule 11, and ethical rules, as outlined

6  above, the Court may wish to confirm that Defendants' past filings are not infected with

7  many of the misleading data problems identified in the Neutral Expert and Golding

8  Reports.  The Court can and should require Defendants to withdraw any court-filed

9  documents implicated by the misleading data practices identified in the Neutral Expert

10 Report, and to review and correct all declarations, pleadings, and other filings that contain

11 misleading data or information.  The Court has ordered similar precautions in the past

12 when additional clarity was needed regarding statements in Defendants' filings.  *See* Order

13 (Jan. 19, 2017), ECF No. 5551 at 1.  The following pleadings may require correction, as

14 they rely on problematic data relating to the "Timely Psychiatrist Contact," "Appointments

15 Seen as Scheduled" and "Timely MH Referral" indicators:

16      • Defendants' Response to the Special Master's Report on the Status of Mental

17         Health Staffing (Mar. 30, 2017), ECF No. 5591 at pdf page 14 ("Over the

18         past year, inmates were seen timely by their primary clinician ninety percent

19         of the time, by their psychiatrist ninety percent of the time, and by their

20         treatment team ninety-eight percent of the time.");

21      • Declaration of Katherine Tebrock (Mar. 30, 2017), ECF No. 5591-2 at pdf

22         page 3 (providing "completed psychiatrist contacts per appointment" data for

23         all CDCR institutions and specifying that the appointment data does not

24         include "unscheduled appointments," and relying on this data to state "in

25         many cases, despite an institution's staffing vacancy rate, inmates are

26         provided quality treatment at very high compliance rates"), pdf page 4

27         ("[O]ver the past year, 95% of primary clinician contacts … were made

28         timely. 90% of psychiatrist clinical contacts were made timely.  And 98% of

1    treatment team meetings were held timely."), pdf page 9 (exhibit showing

2    that specific institutions poorly staffed with psychiatrists are nonetheless

3    compliant with psychiatric contact requirements);

4    • Defendants' Reply to Plaintiffs' Objections and Request for Additional

5    Relief Re: the Special Master's Report on the Status of Mental Health

6    Staffing (Apr. 13, 2017), ECF No. 5601 at pdf page 8-9 (reporting "Timely

7    Psychiatric Contacts" compliance rates of 99%, 95%, and 78% at High

8    Desert State Prison (HDSP), Substance Abuse Treatment Facility (SATF),

9    and Salinas Valley State Prison (SVSP), respectively);

10   • Defendants' Objections to the Special Master's Report on the Proposed

11   Telepsychiatry Policy Addendum to the Program Guide (Aug. 13, 2018),

12   ECF No. 5879 at 17 (disputing Special Master's recommendation that HDSP

13   needs an on-site psychiatrist, rather than a telepsychiatrist, in the MHCB

14   because "that MHCB is meeting most Program Guide Requirements");

15   • Declaration of Katherine Tebrock (Aug. 13, 2018), ECF No. 5879-4 at pdf

16   page 4 ("[T]he MHCB unit at High Desert State Prison is meeting most

17   Program Guide requirements.");

18   • Exhibit 2 to Joint Status Report (June 21, 2018), ECF No. 5841-2 at pdf page

19   4 n.5 ("CDCR is meeting the needs of class members in the desert

20   institutions.  Over the past twelve months, each institution has been 100%

21   compliant with timely psychiatry contacts and timely treatment team

22   meetings.  Appointments occurred as scheduled 98% to 100% of the time

23   over the same timeframe.  The institutions are 92% to 99% compliant with

24   timely mental health referrals."), pdf page 9 ("[T]he state average for timely

25   psychiatry contacts for CCCMS inmates is at 94%."), pdf page 14 (data

26   showing timely psychiatry contacts for CCCMS and EOP patients), pdf page

27   16 (same), pdf page 17 (data showing timely psychiatry referrals for CCCMS

28   and EOP patients), pdf page 31 (data showing timely psychiatry contacts for

41

1    CCCMS patients), pdf page 32 (table listing psychiatry contact data for

2    CCCMS programs), pdf page 33 (table listing psychiatry contact data for

3    EOP programs);

4  • Exhibit 3 to Joint Status Report (June 21, 2018), ECF No. 5841-3 at pdf page

5    2 (reporting that "for the past year, both the psychiatry and primary clinician

6    performance metrics, related to timely contacts, have been in compliance"

7    and proposing to rely on treatment refusal data to justify reducing the

8    number of CCCMS patients on psychiatrists' caseloads); and

9  • Exhibit 1 to Joint Status Report (Sept. 14, 2018), ECF No. 5922 at pdf page

10   13-14 (proposing to rely on treatment refusal data to justify reducing the

11   number of CCCMS patients on psychiatrists' caseloads), pdf page 15

12   (proposing reductions to psychiatry staffing ratios for CCCMS and EOP

13   programs based on timeliness of psychiatry contacts despite current

14   psychiatric staffing vacancies), pdf page 21 ("HDSP was at 93 percent

15   compliance for timely mental health referrals, 98 percent compliance for

16   timely primary clinician contacts, and 99 percent compliance for timely

17   psychiatry contacts and timely IDTTs").

18    In addition, just as this Court has ordered the parties to include in their filings a

19 certification of all court orders reviewed in preparing that filing, *see* Order (Nov. 6, 2017),

20 ECF No. 5726 at 10, and just as Defendants certify the compliance of their PSU and EOP

21 ASU hub programs each month, the Court should require Defendants to certify as accurate

22 all future Court filings that rely on their data, by a person with personal knowledge of the

23 data and the manner in which it is collected and reported.  Any representations or data

24 concerning psychiatric care, psychiatric staffing or functions, should include a certification

25 from the Chief Psychiatrist endorsing and validating the representation and data.

26  **C.    Plaintiffs Should Be Provided with the Transcripts of Defendants'**
       **Interviews and the Documents Provided to the Neutral Expert in the**
27     **Course of the Investigation.**

28    The Neutral Expert Report states that all interviews of CDCR and CCHCS

witnesses represented by counsel were transcribed and that the witnesses were placed under oath. *See* Neutral Expert Report at 8. Those transcripts, to which the Neutral Expert cites extensively throughout the report, have apparently already been provided to Defendants. *Id.* Similarly, Defendants and the Special Master team provided to the Neutral Expert thousands of documents, also cited throughout the report, to which Plaintiffs have not had access. To understand and evaluate fully Defendants' responses to Dr. Golding's allegations, Plaintiffs similarly must have access to these transcripts and all other underlying documents. After reviewing these documents, Plaintiffs may be able to suggest additional remedies, or identify additional areas where misleading or inaccurate data was provided to the Court and Special Master that then should be addressed in remedial processes.

### D. The Court May Order the Neutral Expert to Turn Over All Witness Information Not Deemed Within the Scope of the Investigation.

The Neutral Expert Report states that "witnesses raised various additional concerns related to patient care, policy, and workplace culture. We do not reach ultimate findings on those issues which fall outside the seven discrete issues we have been retained to investigate." Neutral Expert Report at 7 n.6. Plaintiffs should be allowed to know the identities of all witnesses interviewed, as well as the substance of their allegations. At the very least, the Special Master and the Court must be made aware of these witnesses' additional concerns to evaluate their impact on the remedial status of this case. The Court may decide to order the Neutral Expert to fully investigate these additional issues.

### E. The Court May Order the Neutral Expert to Investigate and Report on the Additional Issues Identified Above and Re-Report on the Original Seven Issues After Expanding the Scope of Materials for Review.

As discussed in Sections I., II., III. and IV., *supra*, the Neutral Expert's investigation was limited in several important ways. It did not include: (1) a review and analysis of documents Defendants deemed privileged, without even a consideration as to whether those documents were indeed privileged and despite the fact that such documents likely would contain the most probative evidence of Defendants' intent; (2) interviews

1    with individuals from the Governor's Office, and review of documents from the

2    Governor's Office, despite the fact that those in the Governor's Office played a large role

3    in directing the litigation, including with respect to Defendants' reliance on data

4    representations regarding their constitutional compliance; or (3) an analysis of many

5    highly troubling issues raised in the Golding Report or any of the issues raised by other

6    credible witnesses, including current and former CDCR employees, where the issues fell

7    outside the scope of the Court's order of appointment.

8           These very significant limitations, combined with the serious, material

9    misrepresentations the Neutral Expert uncovered even in its limited-scope investigation,

10   merit further focused investigation.  The Court should order the Neutral Expert to expand

11   the investigation to ensure all stones have been turned, including by reviewing the

12   documents Defendants have withheld, given the Court's express authorization to the

13   Neutral Expert to do so; interviewing at least some individuals in the Governor's Office

14   who had a hand in the litigation and then re-interviewing Deputy Director Katherine

15   Tebrock and other members of CDCR's mental health leadership in light of those

16   interviews, to gain a better understanding of Defendants' motives and approaches to

17   achieving their desired ends; and investigating additional data-related issues raised in the

18   Golding Report, as specified in Section IV.A., *supra*, as well as those raised during

19   interviews with current and former CDCR employees.  Without taking these next steps, the

20   Court will not have a full picture of Defendants' intentions and the extent of the problems

21   with Defendants' data.  Nor can Plaintiffs have full faith in ongoing negotiations with

22   Defendants.

23           **F.     The Court May Still Pursue Its Identified "Parallel Tracks" to Clarify
                      Prior Court Orders and Program Guide Provisions, and to Improve
24                    Defendants' Data.**

25           The Court's proposed first remedial track, following the investigation, is to clarify

26   prior court orders and Program Guide provisions.  Order (Nov. 29, 2018), ECF No. 6018 at

27   5.  Plaintiffs could continue to work with Defendants and the Special Master team in the

28   workgroup setting to address these issues, where real ambiguity or a lack of clarity exists.

1   As noted above, however, in the course of the Neutral Expert's investigation many of the

2   positions Defendants took with respect to their interpretation of Program Guide

3   requirements were not reasonable, given the plain language of those provisions, their

4   context, and the history of litigated issues in the case.  Accordingly, it may make sense to

5   pursue the second proposed track first—fixing issues with Defendants' data—where the

6   two proposed tracks overlap and then return to the first track once trust has been rebuilt.

7          The second of the two additional tracks the Court envisioned is to identify areas

8   where data reporting to the Court must be improved to ensure full accuracy and

9   compliance, so the Court is confident in Defendants' reported progress toward a durable

10  remedy.  *See* Order, (Nov. 29, 2018), ECF 6018 at 5.

11         To achieve this goal, Plaintiffs and the Special Master team must have the

12  opportunity to review each metric in CDCR's performance report, CQI report, and any

13  other metrics currently or potentially[6] used to report on the adequacy of the mental health

14  care Defendants are providing.  Plaintiffs must be able to understand each metric on

15  several levels:  What area of compliance is being measured?  Why?  Do the business rules

16  accurately capture the intended compliance measure?

17         In addition, review of the data at this level may require Plaintiffs and the Special

18  Master team to review Defendants' data systems at the point of entry—what Defendants

19  call their "workflows"—to evaluate whether those systems have been designed in a way

20  that minimizes user coding error.  For this same purpose, Plaintiffs and the Special Master

21  team also will need an opportunity to review Defendants' EHRS training.  Plaintiffs must

22  review the data at this level not only to ensure we understand what is being reported, but

23  also because the Golding Report and Neutral Expert investigation revealed a number of

24  quirks and bugs in Defendants' own systems of which Defendants were not aware.  *See,*

25  *e.g.*, Neutral Expert Report at 13 (finding "there may be legitimate concerns about the

26
    ---
    [6] Because Plaintiffs cannot foresee which metrics Defendants might use in the future to
27  represent constitutional compliance, Plaintiffs ask to see all recorded metrics that relate to
    Defendants' provision of mental health care to the *Coleman* class.

28

1    accuracy of certain data CDCR uses internally"), 18 n.16 (noting a coding glitch causing

2    data CDCR provided to the Neutral Expert to show more favorable compliance numbers).

3    A comprehensive review of Defendants' data systems is more than warranted, given the

4    confirmed allegations in the Golding Report and the Neutral Expert's findings.

5           The parties and Special Master should also work to create a formalized process for

6    changing or adding metrics, and guidelines for which changed or added metrics

7    Defendants must share with Plaintiffs and the Special Master.  Plaintiffs renew their

8    request made during the November 5, 2018 status conference that Defendants track and

9    disclose any and all changes they have made to their data since the Golding Report issued.

10   *See* Nov. 5, 2018 Hrg. Tr., ECF No. 5998 at 18.

11          The Special Master should also be authorized to hire a data expert, and the parties

12   and Special Master should be ordered to work together in a focused workgroup setting to

13   develop the formalized process outlined above.  *See* Neutral Expert Report at 23 ("The

14   Special Master acknowledged that in light of CDCR's increasing reliance on data to

15   monitor compliance with Program Guide requirements—particularly for purposes of the

16   CQI reports—he planned to explore hiring a specialist to do a more thorough review of

17   CDCR's performance indicators and other compliance metrics.").  The Neutral Expert

18   Report critically notes that "not all stakeholders are equally 'data-literate,' that is, are fully

19   familiar with how to understand, interpret, and use the data CDCR produces in a

20   meaningful way, both within CDCR and externally."  Neutral Expert Report at 21.  A

21   comprehensive workgroup to ensure all interested parties have at least a baseline

22   understanding of CDCR's metrics will be necessary to move forward in this case.

23          Finally, the Court should order Defendants to provide Plaintiffs and the Special

24   Master team online and real time access to Defendants' CQI, Dashboard, and Performance

25   Report.  Doing so would create a shared understanding of what is being reported from the

26   field about mental health care, and be a major step toward reestablishing trust in the

27   reporting system.  Given the many outstanding questions raised by the Neutral Expert

28   Report, and the undoubtedly many yet to be uncovered, increased self-monitoring or any

---

46

[3386575.7]

1  other proposals hinging on Defendants' presentations of their data are off the table until

2  these issues are fully and formally resolved .

3      **G.     The Parties Could Be Required to Address in the Workgroup Policy
           Issues Regarding Psychiatry Roles—Both Broadly and in Specific
4          Instances Raised in the Golding Report.**

5      The Court should order the parties and Special Master to engage in a focused

6  workgroup process to address the many efforts to marginalize psychiatrists, including

7  Dr. Golding, as identified in the Neutral Expert Report.  *See, e.g.*, Neutral Expert Report at

8  23-24.  The workgroup could address issues related to shifting the balance between

9  psychologist versus psychiatrist roles, and the apparently ever-expanding role of

10 psychologists within the MHSDS, at the expense of psychiatrists.

11     Such a workgroup is necessary because the problems Dr. Golding identified are in

12 fact serious Eighth Amendment violations to the extent that they expose patients to an

13 increased and substantial risk of serious harm.  Placing psychologists in the role of medical

14 decision makers, and stifling and ignoring contrary opinions by psychiatrists, puts patients

15 at risk.  More specifically, psychologists simply do not have the training to understand

16 certain medication interactions, and major hospital discharge decisions should not be made

17 without psychiatric input.  In addition, the failure to notify Dr. Golding, Chief of

18 Psychiatry for CDCR, directly when materially changing the rule for timely EOP

19 psychiatry contacts from 30 to 45 days evidences the extent to which psychiatrists have

20 been silenced in CDCR's high-level decision-making processes.  Neutral Expert Report at

21 41.  This issue requires thoughtful policy-level decision-making addressing the appropriate

22 balance of psychiatric and other clinical roles, all in an effort to achieve constitutional

23 compliance on a sustainable basis.

24     **H.     The Court, Special Master, and Parties May Need to Revisit the PSU
           and ASU EOP Hub Certification Process.**
25

26     The Golding Report and Neutral Expert Report raise significant questions regarding

27 the accuracy of Defendants' PSU and ASU EOP hub self-certification process.  Due to the

28 lack of transparency and reliability of Defendants' current self-monitoring, the parties need

1    to revisit the process to increase accountability and reduce serious risk of harm to class

2    members housed in segregation settings.

3        Since 2014, Court orders have required Defendants to provide the Special Master

4    and Plaintiffs' counsel monthly reports regarding the mental health programs in their ASU

5    EOP hubs.[7]  *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1103 (E.D. Cal. 2014).  The

6    Court determined that such focused compliance monitoring was necessary because

7    Defendants had failed to  remedy sufficiently the Eighth Amendment violations related to

8    segregated housing and "placement of seriously mentally ill inmates in California's

9    segregated housing units can and does cause serious psychological harm, including

10   decompensation, exacerbation of mental illness, inducement of psychosis, and increased

11   risk of suicide."  *Id.* at 1095, 1099.  The Court ordered that Defendants "provide monthly

12   reports on whether each EOP ASU hub meets Program Guide requirements for an EOP

13   ASU level of care and they will be prevented from admitting any *Coleman* class member

14   at the EOP level of care to any EOP ASU hub that does not meet or exceed Program Guide

15   requirements for a period of more than two consecutive months."  *Id.* at 1103-04.

16       Defendants developed a self-certification process that evaluates measures such as

17   whether referrals for mental health care are timely made, whether class members receive

18   Program Guide-mandated treatment hours, and whether class members are evaluated by

19   their primary clinician and psychiatrist within required timeframes.  Defendants proposed,

20   and the Court adopted, a protocol whereby each program must meet a 90% threshold for

21   each measure to be deemed compliant with the Program Guide.  *See* Defs.' Plan & Policies

22   Submitted in Response to Apr. 10, 2014 and May 13, 2014 Orders, ECF No. 5190 at 18,

23   16 (Aug. 1, 2014); Order Adopting Defs.' Plan & Policies, ECF No. 5196 at 2-3 (Aug. 11,

24   2014).

25       Most data points in Defendants' self-certifications—including the "Timely

26   Psychiatry Contacts," "Timely PC Contacts," "Timely MH Referrals," and "EOP

27   ───────────────
     [7] Defendants later extended the process to PSUs.

28

[3386575.7]

1   Treatment Hours" (measured in patient-weeks)—have been found misleading and

2   unreliable.  Plaintiffs are therefore deeply skeptical of Defendants' current process.  And

3   despite the Neutral Expert's finding that many of these indicators are constructed to

4   produce higher compliance figures than what is actually occurring on the ground,

5   Defendants' self-certifications over the past several years reveal that multiple ASU EOP

6   hub programs (particularly at CMF and COR) have persistently struggled and often fail to

7   meet treatment requirements.  This means that treatment in these programs is even more

8   constitutionally deficient than Defendants' current inaccurate indicators reveal.

9          These concerns are compounded by the recent trend in Defendants' self-

10  certifications of allowing ASU EOP hubs to pass certification—and therefore remain open

11  to intake—despite failing to meet one or more performance indicators at the required 90%

12  threshold.  Bien Decl. at ¶ 12, Exhibit B.

13         Other than reviewing the two-page certification letters for each institution, which

14  are often issued months late and lack any substantive information regarding the quality of

15  care provided, Plaintiffs (and likely the Special Master) have little insight into whether

16  Defendants' current self-certification process fulfills the strict requirements of the Court's

17  2014 segregation order and adequately protects class members from the documented harms

18  of segregation.  The Court should require the parties to meet and confer, under the

19  guidance of the Special Master, regarding ways to improve transparency and oversight of

20  the mental health treatment provided to EOP class members in segregation.

**I.     The Parties May Need to Evaluate the Golding and Neutral Expert Reports' Additional Potential Impacts on CDCR's Sustainable Process for Evaluating the Appropriateness of Decisions Relating to Class Members' Needs for Higher Levels of Care.**

23         Another process that must be investigated to determine the impacts of Defendants'

24  misleading data practices is Defendants' self-monitoring process for ensuring that patients

25  in need of inpatient care are timely identified, referred, and transferred to such care

26  ("sustainable process").  The Court adopted Defendants' sustainable process in 2011.

27  Stipulation & Order Regarding Process for Reporting on the Status of Progress of Defs.'

PLAINTIFFS' RESPONSE TO NEUTRAL EXPERT REPORT

1  Efforts to Address Access to Inpatient Care (Dec. 15, 2011), ECF No. 4134 at 2.  The

2  process involves CDCR's self-monitoring of the Form 7388-B, which clinicians use to

3  document considerations regarding patients' need for higher levels of care.  *See* Defs.'

4  Report on Assessment Process & Plan Re: Sustainable Self Monitoring (Dec. 13, 2011),

5  ECF No. 4132 at 8.

6          The Form 7388-B contains subjective and objective indicators that treatment teams

7  must review in considering whether to refer a patient to a higher level of care.  *Id*.  Most

8  relevant here, criteria six considers whether the patient "has had less than 50% overall

9  cooperation/participation with programming during the last 3 months due to mental health

10  issues that are substantially affecting the inmate-patient's ability to actively participate in

11  programming."  *Id.*  The Neutral Expert's findings regarding Defendants' misleading

12  "patient-weeks" methodology, which is used to measure treatment hours, *see* Bien Decl. at

13  Exhibit B, suggests that Defendants' reliance on treatment data to assess criteria six on

14  Form 7388-B must be investigated for accuracy.

15          Contributing to this concern is Dr. Golding's allegation that Defendants measure

16  treatment refusals and treatment cancellations in a misleading way that results in

17  underreporting such occurrences.  Golding Report (Oct. 31, 2018), ECF No. 5988-1 62-63,

18  149-50 (explaining that line psychiatrists at SAC reported that many patients reported to

19  have refused psychiatry appointments had not actually refused); *see also* Gonzalez Report

20  at 14, 16 nn.8 & 9, 27.  Although the Neutral Expert found the "Treatment Cancelled" and

21  "Treatment Refused" indicators did not mislead the Court because these specific measures

22  were never disclosed, they may still be relevant to clinicians' overall assessment of

23  patients' needs, which *does* impact the Special Master and the Court's monitoring of

24  Eighth Amendment compliance.  If clinicians are relying on misleading or inaccurate

25  portrayals of the amount of treatment hours patients receive or whether they refuse

26  treatment, this will impact the adequacy of their higher level of care considerations.

27          The Special Master has already investigated these concerns in part, but a more data-

28  oriented review is warranted.  *See* Special Master's 27th Round Report (Feb. 13, 2018),

[3386575.7]

1  ECF No. 5779 at 60 (finding "that policies and procedures requiring IDTTs to consider

2  and/or refer inmates to higher levels of care using the Form 7388-B process were not

3  consistently followed across institutions," and that "[t]his resulted in cases where inmates

4  were not considered for referral to a higher level of care when indicated").  The 27th

5  Round Report also notes some data issues that contribute to inadequate assessment of

6  patients' need for higher levels of care.  *Id.* at 572-73 (finding class member's treatment in

7  PBSP PSU "insufficient" where, among other things, the patient's IDTT noted "that the

8  'sustainable process' figures regarding treatment attendance [for the patient] were incorrect

9  due to a scheduling error").  In light of the Golding Report and the Neutral Expert's

10  findings, Defendants' self-monitoring sustainable process must be further investigated for

11  data-related problems.

## CONCLUSION

12

13  For the foregoing reasons, Plaintiffs respectfully request that the Court order the

14  parties to undertake, and the Special Master to oversee, additional remedial efforts, as

15  outlined above, to address fully the serious concerns raised in the Golding and Neutral

16  Expert Reports.

## CERTIFICATION

17

18  The undersigned counsel for Plaintiffs certifies that they have reviewed the

19  following relevant court orders: *Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal.

20  1995); ECF No. 1852 (June 21, 2006); ECF No. 1922 (July 28, 2006); ECF No. 4134

21  (Dec. 15, 2011); ECF No. 4341 (Feb. 14, 2013); ECF No. 4361 (Feb. 28, 2013); ECF No.

22  5131 (Apr. 10, 2014); ECF No. 5196 (Aug. 1, 2014); ECF No. 5477 (Aug. 9, 2016); ECF

23  No. 5551 (Jan. 9, 2017); ECF No. 5711 (Oct. 10, 2017); ECF No. 5726 (Nov. 6, 2017);

24  ECF No. 5794 (Feb. 21, 2018); ECF No. 5850 (July 3, 2018); ECF No. 5852 (July 12,

25  2018); ECF No. 5860 (July 20, 2018); ECF No. 6018 (Nov. 29, 2018); ECF No. 6032

26  (Dec. 13, 2018); ECF No. 6064 (Jan. 8, 2019); ECF No. 6096 (Feb. 20, 2019).

27

28

[3386575.7]

1    DATED:  May 28, 2019              Respectfully submitted,

2                                      ROSEN BIEN GALVAN & GRUNFELD LLP

3                                      By:  *Michael W. Bien*

4                                           Michael W. Bien

5                                      Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3386575.7]
PLAINTIFFS' RESPONSE TO NEUTRAL EXPERT REPORT