1           IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
2         BEFORE THE HONORABLE KIMBERLY J. MUELLER

3

4    RALPH COLEMAN, et al.,

5                   Plaintiffs,
     vs.                          Sacramento, California
6                                 No. 2:90-CV-00520
                                  Monday, June 10, 2019
7    GAVIN NEWSOM, et al.,        1:36 p.m.

8                   Defendants.
     _____/
9

10

11

12                        --oOo--

13              TRANSCRIPT OF PROCEEDINGS

14                 STATUS CONFERENCE

15                        --oOo--

16

17

18

19

20   Official Reporter:     KACY PARKER BARAJAS
                            CSR No. 10915, RMR, CRR, CRC
21                          501 I Street
                            Sacramento, CA  95814
22                          kbarajas.csr@gmail.com

23

24   *Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.*

25

```
 1   APPEARANCES:

 2   For the Plaintiffs:     ROSEN BIEN GALVAN & GRUNFELD LLP
                             LISA A. ELLS
 3                           CARA E. TRAPANI
                             JESSICA L. WINTER
 4                           Attorneys at Law
                             101 Mission Street, 6th Floor
 5                           San Francisco, CA  94105-1738

 6   For the Defendants:     DEPARTMENT OF JUSTICE
                             OFFICE OF THE ATTORNEY GENERAL
 7                           ADRIANO HRVATIN
                             Attorney at Law
 8                           455 Golden Gate Avenue, Suite 11000
                             San Francisco, CA  94102
 9
                             DEPARTMENT OF JUSTICE
10                           OFFICE OF THE ATTORNEY GENERAL
                             ELISE THORN
11                           TYLER HEATH
                             Attorneys at Law
12                           1300 I Street
                             Sacramento, CA  95814
13
     For Michael Golding,    STEWART & MUSELL
14   M.D. and Melanie        WENDY E. MUSELL
     Gonzalez, M.D.:         Attorney at Law
15                           2200 Powell Street, Suite 440
                             Emeryville, CA  94104
16
     Also Present:           Kelli Evans
17                           Deputy Legal Affairs Secretary
                             Office of the Governor
18
                             Rei Onishi
19                           Deputy Legal Affairs Secretary
                             Office of the Governor
20
                             Jennifer Neill
21                           Assistant Secretary/General Counsel

22                                  --oOo--

23

24

25
```

1           SACRAMENTO, CALIFORNIA, MONDAY, JUNE 10, 2019, 1:36 PM

2                               --oOo--

3           THE CLERK:  Calling civil case 90-520, Coleman, et al.

4    versus Newsom, et al.  This is on for a status conference.

5           THE COURT:  All right.  Good afternoon.  Appearances,

6    please, for the plaintiffs.

7           MS. ELLS:  Good afternoon, your Honor.  Lisa Ells,

8    Jessica Winter, and Cara Trapani for the plaintiffs.

9           THE COURT:  All right.  Good afternoon to you.

10          MR. HRVATIN:  Good afternoon, your Honor.  For

11   defendants, Adriano Hrvatin appearing from the Attorney

12   General's Office.  With me at counsel table, Elise Thorn and

13   Tyler Heath.  We have other folks from defendants joining us

14   today.  I know at the last status conference your Honor wanted

15   to make a record as to the appearance of others including from

16   the Governor's Office.  There are members present here today.

17   I would be happy to make that record this afternoon.

18          THE COURT:  Could you do that now, please.

19          MR. HRVATIN:  Yes, ma'am.  From the Governor's Office

20   we have present Kelli Evans and Rei Onishi.  Would you like

21   representatives from legal affairs at CDCR as well?

22          THE COURT:  Anyone else you want to identify.

23          MR. HRVATIN:  Jennifer Neill from CDCR is present.

24   She is the general counsel.

25          THE COURT:  All right.

1          MR. HRVATIN:  Thank you, your Honor.

2          MS. MUSELL:  Good afternoon, your Honor.  Wendy Musell

3     here on behalf of Dr. Golding and Dr. Gonzalez who are present

4     in the courtroom.  I wasn't sure which side I should sit at

5     today, your Honor, so I leave that to you.

6          THE COURT:  You could come forward and sit on the edge

7     here.

8          MS. MUSELL:  Thank you, your Honor.

9          THE COURT:  And I'd like to -- I'm not going to order

10    this, but I think it would be constructive for Ms. Evans and

11    Mr. Onishi to be seated next to their counsel.  Any objection

12    to that, Ms. Evans and Mr. Onishi?

13         MS. EVANS:  No objection.

14         THE COURT:  All right.  If you could come forward and

15    just be accessible to your counsel to the extent that might

16    assist.

17         MS. EVANS:  Thank you.

18         THE COURT:  All right.  Thank you.

19         All right.  The purpose of this status is to review

20    the neutral expert report which has been on the docket now for

21    some time.  The Court has reviewed that, of course the parties'

22    filings, Ms. Musell's filing on behalf of her clients, and I

23    did grant the request to file an amicus brief, and I've

24    reviewed that.

25         So to clarify where the Court is, and I'll do that

1    continually as we go along, I am accepting the neutral's report

2    in this respect.  I'm accepting it as addressing the areas

3    raised by the Court.  I acknowledge the significant effort that

4    was taken to compile the report.  I find it is a useful tool in

5    the Court's making its own decisions as to next steps that may

6    be required, and I'm going to share with the parties my

7    thoughts about the next steps that are required.  I have at no

8    time delegated any fact finding to the neutral.  So even to the

9    extent the neutral uses language that might suggest I delegated

10   that, I did not.  In summary form, and we'll talk through this

11   in more detail, at this point I'm not inclined to engage in

12   further investigation in the form of evidentiary hearings to

13   answer the very specific focused question as to whether or not

14   there was fraud on the Court.  But I'm willing to set that

15   question aside for now.

16          I believe the report identifies, in a number of areas

17   that we'll discuss today, very serious questions about whether

18   or not certain actions and filings are misleading.  Again, the

19   neutral expert has signaled conclusions.  I am not accepting

20   those or rejecting them.  Ultimately it's up to this Court to

21   make that determination, and I believe there's more work to be

22   done before I make a final conclusion.  I will have some

23   questions for the parties about whether or not there are any

24   stipulations they might be prepared to enter into today or

25   after some consideration within a short period of time.  If the

1    parties would do that, it might further focus the Court's own

2    efforts.

3              In some, a lot of work has been done, but some more

4    work needs to be concluded in the Court's view.  And let me

5    identify one sensitive point that the plaintiffs certainly have

6    raised, and it caught the Court's eye in its first review of

7    the report, and that is the privileged materials.  The neutral

8    determined that he could ultimately conclude his work without

9    reviewing the privileged materials given the position that the

10   defendants took.  I do not find at this point that the

11   defendants violated a court order.  The neutral chose not to

12   litigate the question, and so the Court did not issue a final

13   order specifically directing the defendants to produce

14   privileged materials to the neutral, although I had cleared the

15   way for the neutral doing that and the Court certainly had an

16   expectation that the defendants would do that to ensure that

17   the report was as complete as it could be.

18             We'll talk again about those privileged materials

19   before we conclude today, but to signal where the Court is

20   going with that, I have received from the neutral the privilege

21   log the defense provided, and it would be my plan at this

22   point, rather than request that the neutral or direct that the

23   neutral pursue that issue, the Court anticipates directing the

24   provision of the privileged materials to the Court for in

25   camera review.  I believe I need to take that additional step

1  given the current posture of the case and the parties --

2  considering carefully the parties filings and also consulting

3  with the Special Master.

4          And let me further clarify why I believe that's an

5  essential step to get us beyond the issues raised initially by

6  Dr. Golding, by Dr. Gonzalez, and explored by the neutral.  The

7  fundamental challenge before the Court and for the parties

8  frankly at this stage is to restore the trust that it appeared

9  had been created through years of joint effort, through work

10  groups that appeared to be working well together, through the

11  Special Master's working with the state, CDCR in particular.

12  That trust is not fully restored.  And the Court's simple

13  acceptance of the neutral's report and filing on the shelf will

14  not restore that trust at this point in time.  I think the

15  Court's being able to say it's reviewed the privileged

16  materials is one step at restoring that trust, and some of the

17  additional steps I'd like to talk about today are also.  That

18  is the Court's goal, to facilitate the restoration of trust

19  between and among the parties and the Special Master.

20          The trust is essential.  I don't need to tell the

21  parties the trust is essential for the remedy here to work.

22  The Court has anticipated that the case is on track towards the

23  defendants implementing the CQIT tool.  But for the Court to

24  ultimately hand off CQIT to the defense, it needs to hear from

25  all parties.  It needs to hear from the Special Master.  And

1    the CQIT tool depends on complete confidence in the reporting,

2    and that confidence has been called into question.

3          I do acknowledge that there are points in the report

4    where representatives of CDCR in particular are forthcoming,

5    acknowledge issues, take steps quickly to fix problems.  I'll

6    just say this.  There appears to be some disconnect between

7    some of the acceptance of responsibility reported in the

8    neutral's report, not across the board, and some of the

9    litigation positions taken by counsel in the brief.  So I don't

10   know.  I'm just saying this so you can hear me say it.  I have

11   had a question as to whether or not some of the litigation

12   posture is getting in the way of the client getting as much

13   credit as it could for the work it's trying to do.  That's all

14   I'll say about this at this point in time.

15         What I'd like to do is go through some of the findings

16   and recommendations embedded in the seven areas covered by the

17   neutral.  I'm going to be selective.  I don't feel the need at

18   this point to address every single issue raised.  I have my own

19   annotated copy of the report here.  As I said, I'm not taking

20   anything off the shelf, but I've identified, in consultation

21   with the Special Master, certain areas that are the most

22   troubling or need the most clarification.  And I'd like to

23   identify those for you now.  I can confirm them in a short

24   order following this hearing.

25         These are the areas where I believe the Court has more

1    work to do before it can make a finding.  On the resetting the

2    clock issue at this point, just so it's clear, I don't feel the

3    need for more development of the record.  But looking at the

4    redefinition of what "monthly" means from 30 to 45 days, and

5    specifically looking at page 43 of the neutral's report, that

6    is an area that I do need to clarify in my own mind for the

7    sake of the case, and this is perhaps the most troubling piece

8    of this report from the point of view of the need for trust to

9    be restored.  And specifically page 43, drawing the parties'

10   attention to the neutral's report that the decision to redefine

11   monthly from 30 to 45 days to lengthen the intervals between

12   EOP appointments would have likely resulted in the reporting of

13   misleading data, and that data was reported to the Court in two

14   filings.  It's inexplicable as to how that happened, as the

15   neutral himself reported, looking at page 44.  First, why did

16   neither Dr. Leidner or Dr. Ceballos consult with Dr. Golding,

17   but why was the Special Master -- why was not any member of the

18   Special Master's team informed of that decision given the

19   significant alteration that it made to the program guide.  So

20   there's an issue I need to get to the bottom of.

21        I believe that a focused evidentiary hearing with Drs.

22   Leidner and Ceballos testifying is the next step.  I would ask

23   though if the parties would stipulate to the decision to

24   redefine monthly from 30 to 45 days resulting in the reporting

25   of misleading data and that that data was reported to the Court

1    in two filings.

2          I don't know if anyone's prepared to respond to that

3    today.  Anything to say, Mr. Hrvatin, if you're the lead

4    speaker?

5          MR. HRVATIN:  Your Honor, if I may just understand

6    exactly.  We appreciate the Court's guidance here.  And so that

7    we can understand exactly what the Court might be asking us to

8    stipulate to with respect to this issue, if I understood the

9    Court, you would like us to explore stipulating with plaintiffs

10   that this 30- to 45-day issue was misleading and otherwise

11   submitted to the Court in two court filings; am I understanding

12   that correctly?

13         THE COURT:  That's the essence of the portions of what

14   appears on pages 43 and 44.  If the parties were to stipulate

15   to that, then it clarifies the record, and then perhaps a

16   hearing would focus on how could it be that that change got

17   made without any member of the Special Master's team ever

18   knowing about it.  That goes to the trust issue.  So there's an

19   example.

20         MR. HRVATIN:  Understood, your Honor.  We would be

21   happy to explore that particular issue and meet and confer with

22   plaintiffs' counsel at the Court's direction.

23         THE COURT:  All right.  So anything to say about that

24   at this point Ms. Ells, if you're the --

25         MS. ELLS:  No.  We're prepared to meet and confer.  We

1   think that the findings say what they say and that they are

2   accurate.

3           THE COURT:  All right.  Again, the Court is not rubber

4   stamping findings, so it will ultimately be the Court's

5   findings.

6           All right.  At this point I have nothing further to

7   focus on in terms of combining CCCMS and EOP numbers.

8           In terms of the timeliness of psychiatry contacts,

9   however, looking at pages 62 and 63, here again the expert lays

10  out what he believes to be the case based on the information he

11  was provided.  That is, that CDCR's reporting of timely

12  psychiatry contacts is likely misleading because CDCR counsel

13  nonconfidential psychiatry contacts toward compliance, and the

14  reporting system defaults appointments to confidential, meaning

15  that nonconfidential contacts were reported as confidential,

16  and timely psychiatry contacts were reported in connection with

17  the 27th monitoring round and included in CDCR's submission in

18  support of the 2018 staffing proposal.

19          So here's another area where I believe the Court needs

20  to clarify the record.  The question for the parties would be

21  would they stipulate to my accepting that CDCR's reporting of

22  timely psychiatry contacts has been misleading for the reasons

23  found by the neutral?  I also have some additional thoughts on

24  ways in which the Special Master can follow up in the meantime

25  in this area.

1          Looking at page 70 of the report -- I'm just going to

2     assume you're going to tell me you'll meet and confer on each

3     one of these areas that I call out.  Page 70, and this is the

4     definition of appointments seen as scheduled, and this is the

5     expert's observation that the definition of appointments seen

6     as scheduled was incorrect and potentially misleading because

7     it described the indicator as including all scheduled

8     appointments when in fact it only included appointments that

9     were scheduled to occur during the reporting range but did not

10    occur due to factors within CDCR's control.  And that the

11    neutral expert observes likely resulted in the reporting of

12    misleading data to the Court on June 21st of 2018 and to the

13    Special Master as part of the CQIT evaluations.  A critical

14    observation and, if true and accepted by the report, that feeds

15    into the kind of lack of trust that will impede the remedy ever

16    being implemented in this case.  So here the Court would also

17    ask if the parties would stipulate to the facts as reported by

18    the neutral expert on page 70, fundamentally in the second

19    paragraph under subsection A of the findings.

20          Turning to page 77, I have two more areas, and then I

21    would allow you to make any wrap-up or general comments on this

22    approach if you have them at this point in time.  On page 77

23    the expert reports, again under "Findings" I'm focusing on the

24    language summarizing there.  Data on timely psychiatric

25    contacts submitted in support of the 2018 staffing proposal to

1    reduce the number of psychiatrists was potentially misleading

2    because it did not disclose that appointments with psychiatric

3    supervisors were included in the data.  First paragraph under

4    "3a. Findings."  Would the parties stipulate to the

5    establishment of that fact?

6           Finally, on page 86, here the expert observes that a

7    software bug caused canceled medication noncompliance

8    appointments to be counted as completed.  Here that resulted in

9    inaccurate data, actually less favorable to CDCR but still

10   inaccurate data reported to the Court and the Special Master.

11   Would the parties stipulate to those facts?

12          The expert also reports that CDCR's timely mental

13   health referrals performance indicator is misleading because it

14   does not include all patients who require medication

15   noncompliance appointments, therefore overstating program guide

16   compliance.  He goes on on page 87 to say it's undisputed that

17   CDCR includes only those patients referred for medication

18   noncompliance appointment in the denominator of its performance

19   indicator.  Is that in fact undisputed such that the parties

20   would stipulate?

21          Those are the areas I am calling out at this time as

22   the most critical to the Court.  Again, I'm not taking anything

23   off the table, but those are the areas I would ask the parties

24   to let me know within a reasonable period of time.  You can let

25   me know how much time you would need, perhaps 14 days.  If the

1    parties stipulate, then it could narrow the scope of any

2    evidentiary hearing.  I believe regardless the Court will

3    require an evidentiary hearing.  At such a hearing, the Court

4    would ask its own questions.  It rarely does that, but in this

5    case I would begin.  But then I would allow the parties to ask

6    questions.  And I do mean the parties.

7          If the parties were to stipulate to all of the facts

8    I've called out, would the defendants agree that corrected

9    filings need to be -- corrected pleadings need to be filed as

10   proposed by the plaintiffs?  In their filing at ECF 6170, pages

11   40 to 42, that's plaintiffs' own pagination, they identify a

12   number of documents they believe need to be removed and

13   replaced.  So the defendants can let me know if they agree or

14   if the parties have a stipulation about how to accomplish

15   correcting the record.

16         The Court's position is, if there's anything

17   misleading that's been filed with the Court, it needs to be

18   corrected.  It's for the Court to determine whether or not

19   something is material, but everything filed with the Court must

20   be accurate and in full compliance with Rule 11.

21         So any comments based on that plan of the Court's,

22   Ms. Ells?

23         MS. ELLS:  Your Honor, I think your approach makes a

24   lot of sense.  However, we have a couple of concerns.  I think

25   the Court's initial comment is exactly right that there appears

1    to be a disconnect between some of the statements and testimony

2    in the report and the approach taken by defendants in their

3    assessment of this report.  It is to us extremely troubling

4    that defendants appear to take no responsibility for what, at a

5    minimum, is serious incompetence in repeatedly providing

6    inaccurate and misleading data to the Court, the Special

7    Master, and the plaintiffs.  It is very disheartening to see

8    that approach taken.  There is no acceptance of responsibility

9    of any sort.

10           So that to us does not set us off well for rebuilding

11   trust which this Court recognizes is essential for a durable

12   remedy in this case, and as you've already stated, it's

13   absolutely essential to our working relationship with

14   defendants as we work in these work groups, negotiate things

15   all the time.

16           I think that, to be honest, we got a little too

17   comfortable with accepting the representations that defendants

18   were giving us, and we accept responsibility for that.  And we

19   will be more careful in the future of making sure that we probe

20   and fully understand exactly what the representations they're

21   providing are, that they, you know, accurately reflect what

22   should be reflected in terms of program guide compliance and

23   that we have a meeting of the minds on that.  I'm sure the

24   Court's going to address that aspect of things which were

25   originally raised by the Court in the three-track analysis you

1    laid out last fall.

2         I think the one other thing or couple other things I

3    would say is we remain concerned that there was no attempt to

4    gather any information or interview anybody from the Governor's

5    Office.  There is evidence in this report that there was

6    pressure or at least probing inquiries from the Governor's

7    Office as to whether and how data could be used to support

8    termination of this case ultimately, and that occurred at

9    exactly the same time as the misleading pleadings where the

10   definition of monthly was changed.  And that combined with the

11   reported statements in this report from the Special Master and

12   plaintiffs' counsel that it was their impression as well that

13   there was a significant amount of input from the Governor's

14   Office on the strategy of this case.  That gives us pause as to

15   why there was no attempt to evaluate any information or speak

16   to anybody from the Governor's Office.  So we think that's

17   something that should be considered by the Court as to whether

18   or not it's appropriate to delve into that area.

19         Two other quick points I'll make, which the first is

20   that we also have concerns about the initial psychiatry

21   appointment, the second of the two or of the categories,

22   whether or not the psychiatry appointment occurring after

23   transfer occurs before the IDTT or after and whether or not it

24   is in fact compliant to account a psychiatry appointment that

25   occurs after the initial IDTT as timely.  There's a significant

1    amount of information in this record that the Special Master

2    made very clear that he understood and communicated to

3    defendants that the correct measure for compliance was whether

4    or not that psychiatry appointment occurred before the IDTT

5    after a patient transfers.  Nonetheless, defendants continued

6    to count as compliant psychiatry contacts that occurred after

7    that IDTT.

8              So we think that there is more to probe there as well

9    given the very clear communication from the Special Master that

10   that is what he expected CQIT to capture.  That is his

11   understanding of the program guide at least as reported in this

12   report.  It was our impression as well that that was what

13   compliant psychiatry contact would look like upon transfer.

14             THE COURT:  Are you looking at a page in the report?

15             MS. ELLS:  Unfortunately.

16             THE COURT:  As a general matter, I am going to be

17   referring -- I want to talk through some other areas, but much

18   of the other information, if I haven't called it out, the

19   Special Master may follow up in work group or in some cases

20   specially focused meetings to try and get to the bottom of

21   what's going on.  So again, nothing's off the table.  I've

22   identified the areas where I think I need to focus right now to

23   keep this part of resolving issues raised by the Golding report

24   on track and resolved sooner rather than later.

25             MS. ELLS:  We understand.  The one other thing I'd

1    like to say is that before any evidentiary hearing we hope that

2    we would be able to receive the transcripts that defendants

3    already have of their testimony provided to the investigator.

4    It would be very difficult for us to produce a factual record

5    for this Court that accurately probes the validity and

6    credibility of the testimony without access to the documents

7    and testimony that defendants believe which is it does exist.

8    It is transcribed.  Defendants have it.  We do not.  So we

9    renew that request before any evidentiary hearing to have

10   access to those transcripts.  We think it's essential to make

11   the right record.

12          THE COURT:  I know you've made that request.  I'm not

13   going to rule on that today, but I'll address it before any

14   hearing.

15          MS. ELLS:  And then I think the final two points are

16   sort of related which is just that we maintain and we think

17   this Court understands that there are a number of issues

18   presented in the Golding report which are not resolved on this

19   first track, and we continue to maintain that those are

20   absolutely necessary in order to fully wrap up and move forward

21   in this case.  And we've presented a number of those in our

22   papers.  And I think that's sufficient for now.

23          THE COURT:  All right.  Mr. Hrvatin.

24          MR. HRVATIN:  Your Honor, thank you.  There are a

25   number of issues that the Court raised and plaintiffs' counsel

1   has just now.  I think kind of a broader picture here, your

2   Honor, is that we will engage in any further meet-and-confer

3   negotiations that the Court has requested with respect to

4   potentially being able to stipulate.  That approach is

5   consistent with the approach defendants have taken throughout

6   Gibson Dunn's investigation from the very beginning cooperating

7   with the investigators, producing thousands of pages of

8   documents.  Multiple dozens of witnesses were spoken with and

9   examined.  We do not have -- to the extent the Court said it

10  will be addressing this issue later, we do not have the

11  transcripts of the witness interviews that were transcribed, so

12  we're in a similar position as plaintiffs.  Those are in Gibson

13  Dunn's possession, as far as I know, or potentially with the

14  court reporter retained to record those interviews.

15          THE COURT:  So you have none of them?

16          MR. HRVATIN:  I'm sorry, your Honor?

17          THE COURT:  You have none of them?

18          MR. HRVATIN:  We have none of them.

19          THE COURT:  I didn't probe that with the neutral

20  expert, but you're making that representation, so it's a matter

21  of record.

22          MR. HRVATIN:  Thank you, your Honor.  Separately, and

23  again there are a number of different components here that we

24  would hope that in a couple of different fashions here, to the

25  extent we're more than happy to meet with plaintiffs' counsel,

1   try to work through these issues.  We would request an

2   opportunity, depending on how the Court envisions the parties

3   reporting back to the Court with respect to those

4   meet-and-confer discussions, if the parties aren't able to

5   reach a stipulation, we would request an opportunity to submit

6   a position as to why and to clarify these issues so that the

7   Court has an understanding as to why we may not have been able

8   to reach a stipulation.

9            And in that regard, with respect to why we don't

10  maintain that any attorney-client type of information is an

11  appropriate part of this record falls squarely on Gibson Dunn's

12  report to the extent that the Court granted in its orders of

13  appointment some far-reaching discretion to Gibson Dunn.

14  Plaintiffs didn't oppose that appointment.  And with their

15  expertise and the work that they did in again reviewing

16  documents, speaking to the parties, examining and interviewing

17  witnesses found that at bottom, to the extent that it was a

18  task with a very specific goal of identifying whether anyone on

19  the defense side had defrauded the Court, was able to conclude

20  that attorney-client communications didn't inform that

21  analysis.

22           And so, you know, we're left with a very extensive

23  150-page-plus report that identifies all the work that Gibson

24  Dunn performed to reach its recommendations to the Court, none

25  of which suggests that any lawyer on the defendants' side at

1   any time took any action to defraud the Court, and to the

2   extent Gibson Dunn had it over the four months that it was

3   engaged as the Court's expert, did not find it necessary to

4   probe that issue.  And so in that regard --

5           THE COURT:  Well, in the face of a position, the

6   information would not be provided despite the protections the

7   Court had put in place.  So it's a caveat.  I think you've got

8   it in the neutral's report is including the caveat that it did

9   not review that.  From the Court's point of view, it would be

10   nice to have it all buttoned up and for the neutral to be able

11   to have said -- reviewed those but didn't.  It's a caveat, and

12   under the circumstances, I assume if the Court ordered the

13   defense to produce that information in camera, that it would.

14           MR. HRVATIN:  Defendants will comply with the court

15   order, your Honor, yes.

16           THE COURT:  All right.  I understand your position,

17   but it's a clear caveat.  And I think the neutral, from what I

18   can tell, made a judgment.  It would have led to extended

19   litigation, more costs, more time, and the neutral made a

20   judgment that he and his team could do their job with what they

21   had but noting the absence of those documents from their

22   record.

23           MR. HRVATIN:  With that caveat, your Honor, to the

24   extent that the Court, in setting the parameters around this

25   appointment, provided Gibson Dunn with a substantial amount of

1    discretion to pursue whatever paths it thought necessary to

2    reach its ultimate conclusion and recommendations with respect

3    to the seven discrete areas identified by the Court as to

4    whether defendants defrauded the Court or the Special Master,

5    and without that information, was still able to reach a

6    recommendation that there was no fraud and there were no facts

7    to warrant an evidentiary hearing.  And in that regard, given

8    the discretion granted by this Court to Gibson Dunn, we'd

9    expect that decision to be granted some deference given the

10   amount of authority given to Gibson Dunn in conducting its

11   investigation.

12        THE COURT:  It had the authority.  It could have

13   litigated the question.  But the buck stops with me.

14        MR. HRVATIN:  Yes, as many things do in this case,

15   your Honor.  You're correct.  We're happy to comply with

16   whatever order comes forth on that particular issue, and again

17   we would appreciate the opportunity to be heard with respect to

18   written submission on that issue as well as the others that

19   have been identified substantively with respect to the report.

20   Particularly to the extent that several referred to misleading

21   information that otherwise may not be defined, we would like an

22   opportunity to investigate those issues, meet and confer with

23   plaintiffs' counsel and see whether we can resolve those

24   matters so as to not burden the Court any further consistent

25   with Gibson Dunn's recommendation that there is no factual

1   foundation for an evidentiary hearing.  We would like to be

2   able to make that presentation to the Court as it renders its

3   own fact-finding determination as to what's necessary here to

4   resolve the matter.

5           THE COURT:  I certainly cannot force a stipulation, so

6   anything can be presented in a joint format by area that I've

7   identified.  So if there's a stipulation, you let me know.  If

8   there are any limits to the stipulation, let me know.  To the

9   extent there's separate positions, you can set them forward in

10  a section of a joint report addressing the area where there's

11  not agreement.

12          MR. HRVATIN:  May I ask, your Honor, by way of the

13  timing for this submission, if I heard correctly, you

14  referenced 14 days which we would do the best that we can to

15  meet that.  But given with the summer hitting and a couple of

16  other intervening deadlines that we face here over the summer,

17  defendants would request at least 30 days, particularly to the

18  extent that we need to meet and confer with plaintiffs, those

19  always take some time to negotiate and if we can't reach a

20  stipulation be able to incorporate the input from our clients

21  on the number of issues that the Court has set out here, I'd

22  make a request for a little bit more time, as much as 30 days

23  to either submit stipulations and/or our respective positions

24  on these issues.

25          THE COURT:  If the outside were 30 days, that could

1    work.  Here's what I'm thinking.  I'm thinking we could either

2    convert the third quarterly status to a hearing or at least

3    supplement the third quarterly status.  I do want to keep the

4    rest of the case going on a parallel track.  I have some orders

5    that are -- I'm going to issue soon along those lines.  I'm not

6    prepared to discuss those issues in full today, but my thought

7    would be evidentiary hearing in September, and so if the

8    schedule works in full to allow preparation by September, 30

9    days could work.

10           Your thoughts on the time frame, Ms. Ells?

11           MS. ELLS:  Yes.  September sounds right.  I continue

12   to think that these issues really need to be resolved, and it's

13   very difficult to move forward with anything in this case so

14   long as these trust issues -- as long as we can't even agree

15   around what the parameters of the inaccurate information are in

16   the past, much less going forward.  It's very difficult to

17   negotiate basically.

18           THE COURT:  In the meantime --

19           MS. ELLS:  Pardon me.  Go ahead.

20           THE COURT:  So September hearing, just assume that.

21   So if you tell me -- but if you want to work out a schedule,

22   assuming we have a hearing as focused as possible.  I'll give

23   you the names of witnesses I think I need to hear from.  If the

24   30 days allows proceeding with the hearing in September, that's

25   fine, perhaps you meet and confer and within the next seven

1    days at the outside give me a proposed schedule that would

2    provide you with the due process you believe you need.  And I

3    am going to direct/request that the Special Master do some

4    things in the meantime to try to get things back on track so we

5    aren't just in a holding pattern until September.  The Court

6    does not consider itself in a holding pattern, but this issue

7    is front and center right now.  It needs to be resolved.

8            So in terms of other issues, I did want to let the

9    parties know that based on footnote 19 in the neutral's report,

10   just flagging other issues relating to alleged fraud or

11   wrongdoing were generally and noting that there were witnesses

12   who appeared credible, but because the claims were outside the

13   scope of the neutral's assignment, the neutral did not spend

14   more time or provide more information.  I did request from the

15   neutral a list of those other issues, and I have it.  I will

16   file it on the docket along with a short order.  Perhaps you

17   could address those as well in your joint report.  Do you

18   believe that there is more I need to know about them?  Would

19   any of them be covered in an evidentiary proceeding?  I won't

20   read the list.  It's ten items, less than ten items.  So you

21   can add a section to your joint report letting me know your

22   response to that list.

23           The persons I have identified based on the information

24   in the report and with some input from the Special Master,

25   not -- this list does not come from the Special Master alone.

1    It's the Court's list with some supplementation.  Ms. Tebrock,

2    Dr. Ceballos, Dr. Leidner, Dr. Golding, I believe it's

3    Dr. Brizendine, and is it Dr. Eargle, Amy Eargle.  Those are

4    the witnesses I would anticipate directing to appear and

5    provide testimony.

6         The parties in their joint report can provide a

7    response to that list and propose additional names.  But again,

8    this is not a free for all.  These are really the names

9    implicated by the short list that I've called out.  So that's

10   the scope I'm envisioning subject to clarifying once I hear

11   from you.

12        You wanted to say something, Ms. Thorn.

13        MS. THORN:  Your Honor, I just wondered what the scope

14   of the evidentiary hearing would be.  I think you just

15   clarified that it was based on your list of short issues, that

16   short list of issues?

17        THE COURT:  Yeah.  That's my starting point, and then

18   I will refine it based on what I hear from you in your joint

19   report.

20        MR. HRVATIN:  Your Honor, may I?

21        THE COURT:  Yes.

22        MR. HRVATIN:  Just to confirm for the record here, is

23   the Court holding today that it will have an evidentiary

24   hearing in September regardless of what the parties submit?

25        THE COURT:  I don't know if I would call it a holding,

 1   but that's my very strong tentative.  Now I mean, if there's a

 2   sea change, I've signaled to you what matters to me.  Given the

 3   briefing I've seen, how do we -- how does the Court establish a

 4   record to satisfy itself in light of some of the positions the

 5   defense has taken.  You know, it's premature for the defense to

 6   declare victory.  And it almost sounds as if that's -- I mean

 7   cherry picking parts of the neutral's report and focusing on

 8   the positive, and, you know, I know that's a great Aretha

 9   Franklin song, but there are serious issues here.  And even if

10   there's not fraud, there is a serious suggestion that there

11   have been actions that have led to misleading reports to the

12   Court and the Special Master, who is an arm of the Court.

13          So I cannot imagine now having those issues go away

14   without the steps I'm proposing, specifically focused

15   evidentiary hearing and the Court's review of the privilege

16   log.  And stay tuned.  If I find something in the privilege

17   log, I will carefully let the parties know.  But if I say I've

18   reviewed the privilege log, nothing there raises an additional

19   question in the Court's mind, then we put that issue to bed

20   too.  It's how do we put this issue to bed while taking account

21   of what matters in this report.

22          MR. HRVATIN:  Very good, your Honor.  We'll have an

23   opportunity to address those issues in this joint submission.

24          THE COURT:  You may.

25          MR. HRVATIN:  As well with respect to the privilege

1   log issue, is that also contemplated within this further

2   submission?

3         THE COURT:  Previously I think there was an offer.  I

4   realize it was perhaps a conditional offer, but there was a

5   suggestion that the Court should review the privilege log.  I

6   realize it was in the context of thinking about the crime-fraud

7   exception, but at this point, unless within a week the

8   plaintiffs tell me and the Special Master tells me, you know

9   what, that issue has gone away, then I'll hold off.  But I

10  don't see that happening right now because there's a gap

11  between the information in the neutral's report and full

12  acceptance of responsibility.  If there were full acceptance of

13  responsibility in a way that trust was restored, then we

14  wouldn't be here.  So that's as clear as I can possibly get.

15        What I'm going to do after this hearing and the order

16  I issue, I'm going to order the defendants to provide those

17  privileged materials because it appears they could be

18  voluminous.  I can't tell.  I see a privilege log.  But the

19  sooner I start reviewing those, the better to know if there's

20  anything more there.

21        MR. HRVATIN:  Very good, your Honor.

22        THE COURT:  I can't think of a reason you wouldn't.

23  It burdens the Court.  There's no question.  But if the

24  neutral's request wasn't complied with and the neutral decided

25  not to litigate that, that's where I have a job to do.

```
1              MR. HRVATIN:  Thank you.

2              THE COURT:  All right.

3              MS. ELLS:  Your Honor, may I?  This is Ms. Ells, for

4    the plaintiffs.

5              THE COURT:  All right.

6              MS. ELLS:  I'm trying to discern the relationship from

7    your review of purportedly privileged materials and the

8    evidentiary hearing.  Does the Court anticipate that, if the

9    Court does determine that certain documents either were not

10   appropriately claimed as privileged or have some bearing on the

11   issues in the evidentiary hearing, that they would be provided

12   to the parties or to the plaintiffs?

13             THE COURT:  I would immediately notify the parties.

14             MS. ELLS:  Okay.

15             THE COURT:  I'm not presuming that.

16             MS. ELLS:  Right.

17             THE COURT:  But if there's something there, then I

18   will appropriately notify the parties, and we'll go step by

19   step.

20             MS. ELLS:  Okay.  So that would be in advance of the

21   evidentiary hearing?

22             THE COURT:  Yes.  That's why I need them now.

23             MS. ELLS:  Thank you.

24             THE COURT:  All right.  In terms of policy, the

25   recommendation is to clarify the policy, and here again there's
```

1    language the neutral used that doesn't quite, I believe,

2    comprehend the roles of the various parties here.  So I don't

3    direct the Special Master to meet and confer.  The parties meet

4    and confer.  The Special Master, arm of the Court.  The Special

5    Master has powers that he can exercise.  And so I'm not

6    accepting any suggestion that the Special Master meet and

7    confer with CDCR, but I am prepared to refer issues raised by

8    the neutral to the Special Master to explore in whatever format

9    he believes is appropriate.  There's the work group format.

10   There may be other approaches here that would work better.

11        So for example, whether CDCR policy requires or

12   whether it should, if not, be modified to require that EOP and

13   CCCMS inmate patients transferred from one institution to

14   another be evaluated by a psychiatrist -- Ms. Ells raised this

15   issue earlier -- within 14 days of arrival prior to the initial

16   IDTT meeting.  That's an issue I'm referring to the Special

17   Master now.

18        Also what contacts between inmate patients and

19   psychiatrists are properly considered evaluations.  The neutral

20   noted this is a serious concern and noted that the defendants'

21   construction of evaluation stretched credulity.  I think that's

22   a fair paraphrasing.  So that set of issues, whether or not

23   default should be reset or clarified.  You have an electronic

24   reporting system, why is everything defaulted to confidential?

25   And then relatedly, if out of that discussion it becomes clear

1     that past reports need to be corrected, then I'll look to the

2     Special Master to let me know, and we'll talk about correcting

3     those additional reports.

4          I'd also note on page 45 of the neutral's report there

5     is discussion of combination of CCCMS and EOP numbers.  I'm

6     just noting that, if there's an issue like that that the

7     Special Master wants more information on, of course he can

8     obtain that.  I'm not calling that out as an issue, but it's an

9     example.  There may be information in the report that the

10    Special Master just needs to understand.  It would appear to

11    the Court that those numbers are used internally, but if the

12    Special Master has any questions, he can get clarification on

13    those with his team now.

14         And finally for now, this issue of the roles of

15    psychiatrists and psychologists, which is a backdrop to

16    Dr. Golding's and Dr. Gonzalez's report, I recognize that

17    there's a big issue there.  There are professional

18    disagreements.  There's a structure that the Court does not

19    micromanage, but the report confirms that there are issues

20    there related to the role of psychiatrists in providing input

21    into policy making.  Is it appropriate for a psychologist to

22    overrule medical decisions made by psychiatrists, where should

23    medical decisions rest finally and only with psychiatrists.

24    This is not an area that I plan to explore in any evidentiary

25    hearing, but I recognize, given the information in the

1  neutral's report and just applying common sense, this is an

2  issue that needs to be wrangled with and clarified and soon

3  because I understand that there may be confusion and the

4  landscape has been disrupted, hopefully only in a positive way

5  that clarifies for the long run what the proper roles are, what

6  the reporting mechanisms are.

7          I see that Dr. Golding has felt in the past he

8  couldn't talk to the Special Master.  Ms. Tebrock has now

9  clarified he can.  But what needs to be further clarified to

10  take all of this information and create modes of communication

11  to address whatever issues are properly raised, to prevent

12  free-for-alls going forward, there's got to be a way to bring

13  some order for the defendants to think deeply about what the

14  report says and make some decisions about management going

15  forward to ensure that those management decisions support the

16  remedy.

17          So I'm going to refer that question.  I can't define

18  it better right now.  I think you all know what I'm talking

19  about.  I'm going to refer that issue to the Special Master as

20  a special project that needs to be addressed and that needs to

21  be addressed now.  And I'll hear more on that between now and

22  September, and we can address that in September if we need to.

23          I've already said I'll hold other issues in abeyance.

24  I'm not taking anything off the table.

25          I know, Ms. Musell, you've been sitting there.  If you

1    want to say anything, you may.  I think the defendants have a

2    point that at this point we're going to revert to the parties

3    being the primary players that I hear from.  But I've said I

4    would like Dr. Golding -- Dr. Golding needs to testify in

5    September, and you of course will be present as his attorney.

6    But is there anything given the role that you've played, that

7    Dr. Golding has played, that Dr. Gonzalez has played until now

8    that you would like to say now?

9            MS. MUSELL:  Yes, your Honor.  And I appreciate the

10    opportunity to do so.  There are a few things.  The first thing

11    that I would like to point out is that Dr. Golding, contrary to

12    what was placed in defendants' papers, has tried for years to

13    get these issues addressed internally over and over again, has

14    indicated exactly what was wrong, and sought a remedy within

15    CDCR which unfortunately was not listened to or implemented.

16    It was the failure to do so that led us to this moment.

17            And the focus of both Dr. Gonzalez and Dr. Golding has

18    always been patient care.  I was deeply troubled to read

19    defendants' response because I observed as the Court has

20    referred to it a deep gulf between the findings in the neutral

21    expert report and the approach by CDCR in their papers before

22    the Court.  This can be seen in a myriad of ways, one of which

23    is not accepting even the fact that Dr. Golding and

24    Dr. Gonzalez are whistle-blowers.  Every time whistle-blowers

25    is mentioned, they use it in air quotes or quotes as if this

1    was not established as a matter of fact and law.  That's deeply

2    troubling.

3           It's deeply troubling to us that approaching this as

4    one of victory, there's no fraud, as opposed to there were

5    matters within the neutral expert reports that affect patient

6    care in a very deep, concerning way and have led to injury and

7    possibly death for patients.  These are not just numbers games.

8    These are real people whose lives are affected on a daily

9    basis, and that is why Dr. Golding came forward, and that is

10   why Dr. Gonzalez came forward.

11          It's not easy to sit there still employed looking at

12   your employers when you have to go to work tomorrow.  We would

13   ask that for Dr. Gonzalez and Dr. Golding that the retaliation

14   provisions that the Court has already acknowledged in your

15   prior rulings, that that continue.  Unfortunately, it's been an

16   extremely difficult workplace for Dr. Golding in particular.

17   He's found that his job duties have changed.  His influence has

18   changed and been minimized.  I have the same concerns for many

19   of the whistle-blowers who bravely came forward in support of

20   this Court's investigation.  As the Court may see, in looking

21   out at the courtroom, there are many doctors who came here

22   today from CDCR, and they did that because it's important for

23   patient care.  And they see these issues as important for the

24   Court to understand how it's impacting patient care on an

25   everyday basis.

1          In representing Dr. Golding and Dr. Gonzalez, while

2    they're concerned about their own retaliation, they're more

3    concerned about ongoing patient care in the areas identified.

4    Specifically, one is a legal issue as to those areas that the

5    neutral expert report did cover, and the Ninth Circuit has

6    indicated that there's a totality of the circumstances test.

7    And if there's an evidentiary hearing, which I know both

8    Dr. Gonzalez and Dr. Golding do support, that the Court look at

9    that in particular.  Because if we look at these findings and

10   if you find five areas that were misleading, one has to ask

11   themselves, why is it for these areas that are misleading that

12   it always supports CDCR and that multiple of the highest

13   levels, very intelligent, accomplished people, how was that

14   wrong?  How was that incompetent?  Or was it by design?  Why do

15   you have multiple systems that failed to work, that provide

16   incorrect data that is always in support of CDCR.

17          I would posit, as the Ninth Circuit has indicated in

18   the *U.S. versus Sierra Pacific Industries* case, Ninth Circuit

19   2017 case, that the Court may wish to look at the totality of

20   the circumstances and how those areas where the neutral expert

21   report found misleading data, how do those interact together

22   and provide a complete picture?  We would posit, as I indicated

23   in the response, that that picture is of intentional

24   misrepresentation.

25          Setting that aside, there's very important patient

1  issues that the neutral expert report, as well as Dr. Golding

2  and Dr. Gonzalez, have raised.  When the Court had initially

3  started down this road, you had described three different areas

4  or three stages, for lack of a better way to put it.  And I

5  think we've only gone down one of those.  There was a number of

6  areas that the investigation did not address.  We've set some

7  of those in our papers, your Honor, about not only looking at

8  why this happened, how is that data utilized in a totality of

9  the circumstances test as directed by the Ninth Circuit but

10  also in those areas that the neutral expert report just didn't

11  touch that were part of the Golding report.  And so we would

12  ask that the Court, as the second phase, as you had previously

13  articulated in prior court rulings, address those.

14         And we understand that we have a very limited role.

15  We're not a party.  At some point it is inappropriate for us to

16  be providing pleadings to the Court.  But while the Court is

17  reviewing the Golding report's substance and having three

18  different tracks, we would request to maintain part of those

19  proceedings as the Court directs.  As you may have noticed,

20  your Honor, we've only responded as the Court has directed.  We

21  haven't flooded the Court with any sort of unwanted pleadings,

22  and we would ask that we be allowed to do so.

23         The last thing, your Honor, is we would ask that for

24  any evidentiary hearing for which we do support having that the

25  Court look at these issues in their totality, and additionally,

1    those issues for which there may or may not have been depending

2    upon what the whistle-blowers say had been fraud on the Court,

3    I think it's extremely important that the Court understand what

4    those issues are and allow those whistle-blowers to come

5    forward if they wish to do so with support from your Honor of

6    having an antiretaliation provision.

7         And we remain willing and able to provide whatever

8    information that the Court would like.  Both Dr. Golding and

9    Gonzalez have voluntarily provided information as requested.

10   We haven't ever indicated that we would not.  And I would like

11   to note that the neutral expert report did indicate that both

12   Dr. Golding and Gonzalez were credible, and every issue

13   identified was found as factually accurate.

14        Thank you, your Honor.

15        THE COURT:  All right.  Thank you, Ms. Musell.  I will

16   provide clarification on your role going forward.

17        MS. MUSELL:  Thank you.

18        THE COURT:  All right.  I have nothing else to cover

19   today.  I do -- you will see some orders from me as I work on

20   other aspects of the case.  You'll see them as soon as I can

21   get them out.  I have been in trial a fair amount recently, but

22   I am prepared to focus on issues that have been pending for

23   some time, program guide and suicide report in particular.

24   I'll get an order out very shortly just to follow up on this

25   hearing memorializing what I've told you and providing language

1     that you can take into account when you're preparing your joint

2     report.  You'll provide me with a proposed schedule

3     anticipating all steps between now and the hearing in

4     September.

5          I'll check my schedule and see if I'm confirming the

6     hearing to start on the date we currently have calendared,

7     assuming it might run for several days.

8          Is there anything else I need to know today, Ms. Ells?

9          MS. ELLS:  Your Honor, just a couple points of

10    clarification.  In our papers, among the potential remedies

11    that we describe that we think are warranted are the potential

12    of revisiting two court-ordered self-certification processes

13    that rely on the data that the neutral expert concluded was

14    misleading or inaccurate, is that something the Court is

15    willing to entertain?  Is that something that is going to be

16    referred to the work group process, or is the Court sort of

17    deferring on consideration of that at this time?

18         THE COURT:  I did see that.  Perhaps you can add that

19    to your joint status report and let me know does the defense

20    resist that, or is there any reason not to impose that now.  So

21    add that as a section to your joint report.

22         MS. ELLS:  And then finally, your Honor, if I may, two

23    quick things.  First of all, we echo the request for

24    antiretaliation orders against -- or I mean in benefit of the

25    witnesses who came forward to the neutral expert.  It's

1    possible that they may be identified through aspects of this

2    report and/or through the descriptions of the topics they

3    raised in a way that could subject them to potential

4    retaliation.  So we would request that the Court issue orders

5    and also renew the orders as to Drs. Gonzalez and Golding as

6    well.

7         And finally, I just wanted to clarify, does the Court

8    still intend to pursue the other two parallel tracks that were

9    initially outlined at some point?

10        THE COURT:  At this point, yes.

11        MS. ELLS:  Okay.  Thank you, your Honor.

12        THE COURT:  Mr. Hrvatin, anything further?

13        MR. HRVATIN:  No, your Honor.  Thank you.

14        THE COURT:  All right.  Thank you very much.  I'll be

15    in touch with you by order and see you in September.

16        THE CLERK:  Court is in recess.

17        (The proceedings adjourned at 2:42 p.m.)

18                        --oOo--

19   I certify that the foregoing is a correct transcript from the

20   record of proceedings in the above-entitled matter.

21                        /s/ Kacy Parker Barajas

22                   _____
                     KACY PARKER BARAJAS
23                   CSR No. 10915, RMR, CRR, CRC

24

25