# RALPH COLEMAN, et al. v. GAVIN NEWSOM, et al.

## U.S. District Court, Eastern District of California

## Case No. 2:90-cv-00520-KJM-DM

### EXHIBIT A TO

### UAPD'S REQUEST FOR LETTERS TO BE ADDED TO THE PUBLIC DOCKET

April 25th, 2019

Honorable Judge Mueller

Re: Case #: 2:90-CV-00520-KJM-DB

My name is Navreet Mann. I am a Psychiatrist working for California Department of Corrections and Rehabilitation (CDCR) since April 2011. I am currently a Senior Psychiatrist Specialist at headquarters. My previous positions in the state have been of a Staff Psychiatrist(SQSP,CSP-Sac), Supervising Psychiatrist(CHCF), and most recently Chief Psychiatrist ( MCSP).

I know that the scope of the investigation by the neutral party was limited, and all the issues raised by Dr. Michael Golding in the Golding report were not explored. The focus of the investigation appeared to be the determination of whether CDCR committed fraud upon the court. I am writing to you not to point you in one direction or the other, instead to talk about what I believe to be is the true spirit of the "Coleman" court order. I believe that the true spirit of court order, aligns with the hypocratic oath I took of treating my patients to the best of my ability and judgment, and most importantly to "do no harm".

For years it felt like Psychiatrists' input was not considered in the determination of the Psychiatric standard of care in CDCR. There was no clear path to raise patient care or patient safety issues. A few years ago while I was Chief Psychiatrist at MCSP I noticed a shift. Dr. Golding became the Statewide Chief and Chiefs like myself in the field felt supported. For the first time it felt like we have a manager who understands our scope of practice, and one who supports our efforts of providing appropriate care. We found a way of advocating for our patients

Though I know I have a lot of examples that I can share with you where we failed to provide adequate Psychiatric care, or where there is still potential for bad outcomes due to our policies and culture. But that is not why I am writing to you. I will not delve into those at this time, as your honor may already be aware.

I am writing to Thank you. By ordering an investigation based on the Golding Report, you have renewed my faith (and possibly the faith of other Psychiatric physicians) in our judicial system. I am hopeful that I may finally be able to provide care to my patients to the best of my ability and judgment. I believe these concerns came to your attention probably because a Psychiatric physician, who understands the full scope (medical and Psychological) of mental health care, listened to staff in the field about problems in our system.

I am also writing to request that you consider the organizational structure of CDCR Department of Mental Health which is top heavy with Psychologists. We would probably be more successful if we have a psychiatric physician led department like you see in hospitals. A Psychiatric physician aka Psychiatrist has the widest scope of practice within mental health, which makes them the most appropriate to lead a Mental Health team.

I was hesitant to write to you since there can be ramifications of speaking up in this organization. I have decided to bear these risks professionally, perhaps financially, opening the door to potential retaliation(which I know can be subtle and difficult to prove). I believe that bringing these issues to your attention, and possibly resolving them, is worth the risk.

I thank you for taking the time to read my letter, and considering my request.

Sincerely,
Navreet Mann,MD

*[signature]*

Senior Psychiatrist Specialist,
Department of Mental Health
California Department of Corrections and Rehabilitation
Phone: 786-942-2867

Honorable Judge Mueller,

We, a group of CDCR psychiatrists, would like to express some grave concerns about mental health care in the California Department of Corrections and Rehabilitation. The report of Dr. Michael Golding highlighted CDCR's continued failure to deliver adequate mental health care to the severely mentally ill at the hands of State officials. Aptly, the court ordered an independent, neutral investigator to look into the allegations made in the Golding report. Met with substantial resistance by the State, the scope of the investigation appeared to have been significantly narrowed. While the specific points tasked as the investigator's purview are vital and would likely benefit from further follow-up, as it is extremely easy to be misleading about one's intent, they are merely by-products of much larger problems that compromise the humane delivery of patient care.

To put things in a more comprehensive perspective, imagine a friend or family member so mentally ill he has lost touch with reality, and sees and hears things that are not real. He is extremely paranoid. He may hurt himself or someone else. He is taken to the emergency room. The ER physician sees him and finds nothing physically wrong. Then the psychiatric physician sees him, and admits him to a psychiatric hospital. He is treated by a team of psychiatrists, nurses, social workers, and case managers, all led by the psychiatrist. When this team decides the patient is stable enough to go home, the psychiatrist writes discharge orders. This tried and true model is the community standard, and patients have the best chance of getting better. Now, let's look at how this patient would be treated in CDCR. He is brought to CDCR's version of an emergency room by the custody officer (prison guard in other systems) because he is acting bizarre. By CDCR policy, seeing the medical physician is bypassed by default. A psychologist, a non medically trained person, usually with no experience in psychiatric hospitals or with treating the severely mentally ill, is called to see this patient. The psychologist gives "admission orders" to a psychiatric hospital. The prisoner is sent to a psychiatric hospital. A team led by the psychologist, consisting of psychologists, prison officers, and psychiatrists, treat the patient. The team decides the patient is stable enough to go back to his prison cell. The psychologist enters "discharge orders". These irregular practices of CDCR run counter to the standard of care, and the real tragedy is that they very often have negative, tangible effects on patients. Before examining CDCR practices a bit more closely, it may be helpful to clarify the differences between a psychiatrist and a psychologist.

> **Psychiatrists** are medical doctors specializing in psychiatric conditions. They take a Hippocratic Oath to "First, do no harm". They have a broad scope of practice encompassing psychology and physiology, how they interact, and how to determine if a psychological symptom is being caused by a medical condition. Psychiatrists can often determine medical and physical risks and dangers. They spend a significant amount of their training after medical school in psychiatric hospitals, medical hospitals, and with outpatients. A valid medical license is a required condition of employment.
>
> **Psychologists** are not physicians and do not have a medical license. Their scope of practice is geared toward behavioral therapies. Their graduate training involves a thesis. They have no training to rule out medical causes of psychological symptoms, nor assess the physical/medical risks and dangers in a whole-patient way. In CDCR, psychologists are allowed to practice for nearly 4 years without licensure.

If we expand our example of the psychiatric patient in the CDCR emergency room, in one scenario, this patient may be acting in a strange way due to overdosing on illegal drugs, which is a potentially life threatening situation. The psychiatrist wanted the patient to get a medical evaluation by the medical physician. The psychologist thought differently, overruled the psychiatrist, per CDCR policy, and admitted the patient directly to the psychiatric hospital. Subsequently, the patient was found to have a drug overdose and had a heart attack; and suffered serious medical complications. We can't know for sure if the psychiatrist could have prevented the heart attack, but certainly the severity of the bad outcome would have been better had the patient had access to appropriate psychiatric care.

Further, a somewhat recent policy change now states that this medical clearance is no longer needed by default, opening the door for many medically related psychiatric emergencies to be missed. This simplistic approach to mental health care delivery can be particularly dangerous to prisoners, who are often complicated to treat because they commonly have a combination of co-morbid medical problems, a history of drug and childhood abuse, and poor self-care.

Continuing to follow the course of the severely mentally ill patient, once in a psychiatric hospital, the psychologist is in control of nearly all aspects of his care. At times, the psychiatric physician may feel the patient needs to stay in the hospital a bit longer for treatment. If the psychologist disagrees, they are able to overrule the physician and discharge the patient. This has led to some very real consequences, from re-admissions to the hospital to completed suicides. In the very sad cases of completed suicides, CDCR once again deviates from accepted practices of reviewing mortality that have proven effective. Not surprisingly, suicide rates, on average, have not changed in CDCR over the years, and remain high compared to other prison systems, despite great efforts by Mental Health leaders.

Another situation potentially troubling to patient care is the State's current efforts to expand psychologists' scope of practice by allowing them to order seclusion and restraints unilaterally, overruling another vital healthcare discipline: Nursing. Nurses have the training and experience to assess whether a patient's health problems may need a physician's evaluation before having all their limbs and body held down by leather straps and placed in a solitary room. Seclusion and restraints are always a last resort, only used when the patient is in terrible danger. If psychologists have the ability to overrule not just psychiatric physicians but also nurses, much more humane and safe options, including medication management, are completely bypassed for the most severely ill patients.

Some of CDCR Mental Health Leadership's practices not only differ significantly from national standards, but also those of other physicians employed by CDCR. To explain, the Primary Care Physician's compliance for patient's being seen on-time is measured by what the physician deems appropriate. If the medical physician orders a patient to return in two weeks, and this does not happen, it is counted as late. In contrast, if the psychiatric physician orders a patient to return in two weeks, and this does not happen, it is NOT counted as late. The compliance in Mental Health is dictated by policies and procedures mostly written by psychology leadership, rather than the clinical judgment of the provider.

CDCR's direction for mental health care is also evident in the recent development and implementation of a Crisis Intervention Team to handle psychiatric emergencies. Touted as a tool to limit inpatient hospital admissions, the team consists of a psychologist, a nurse, and a custody representative. Notably absent is a psychiatrist, per the unilaterally made policy. This is interesting because many 'Crises' involve medication issues. One particular concern is the potential for this Crisis Intervention Team to limit a prisoner's access to appropriate, available, complete psychiatric care. Regarding CDCR discharge from acute settings, CDCR is contemplating that the psychologist can overrule the psychiatrist, even in the face of medical need to remain in a crisis bed.

Finally, the mental health leadership employs some questionable, but legal, budget tactics. In a practice called 'Cost Savings', State officials use tax-payer's dollars the Legislature specifically set for psychiatry positions for other purposes. Normally, this is common and often economical. The question arises in this case because of a potential conflict of interest. There is some concern that psychology leaders may be making unilateral decisions to use the money meant for hiring psychiatrists to hire office staff and compliance staff who indirectly help decrease psychiatrists' scope of practice, instead of using the funds in more transparent ways.

The State does face significant shortages of psychiatrists, likely, in part, from having a system that is so different from the normal practice of psychiatry. Many of the current policies of the CDCR Mental Health Leadership are

unnecessarily outside of national and professional ethics. It is disheartening that mentally ill imprisoned human beings have to tolerate ethical standards different than the rest of us, or even other prisoners getting medical care. It is unfortunate that State officials could greatly improve mental healthcare delivery, but appear to be going in the other direction, with hostile and defiant attitudes toward the courts, 'cooking the books' with misleading numbers and compliance that are elaborately disguised and difficult to decipher, and driving psychiatric physicians away. The intent is unclear, but the facts presented above are clear. Within the last ten years, there seems to be a disturbing, unrecognized reversal of the progress in mental health care delivery intended by the Coleman lawsuit. The inequities and injustices being suffered by these prisoners are hypocrisy to the justice system we believe in and live by; the same system that incarcerated these inmates. Any hope for rehabilitating inmates must begin with rehabilitating the system, which benefits the inmates, the civil servants, and the public.

We humbly request your thoughtfulness of the danger of retaliation and cover-up that is CDCR culture in your deliberations, and earnestly thank you for your consideration and time.

| | | | |
|---|---|---|---|
| Daniel Jackson, MD | Rinata Wagle, MD | Roger Flanigan, MD | Drew Ross, MD |
| Semen Spira, MD | Navreet Mann, MD | Garen Gharakhanian, MD | Melanie Gonzales, MD |
| Shahil Patel, MD | Soumyadipta Hazera, MD | Sujatha Ramkumar, MD | Al Bunn, MD |
| Mark Ritchie, MD | Navdeep Baaht, MD | Cheryl Paizis, DO | Amar Mehta, MD |
| Jamilia Fields, MD | Pamela Jones, MD | Sukdeep Grewal, MD | Vikram Malhotra, MD |