UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No.  2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | ORDER |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

On November 5, 2018, the Special Master filed his report based on the third re-audit and update on suicide prevention practices in the prisons of the California Department of Corrections and Rehabilitation (CDCR) prepared by the Special Master's expert Lindsay M. Hayes, M.S. *See* ECF No. 5993.  The Special Master also provided a copy of Mr. Hayes' report. ECF No. 5993-1.  On November 15, 2018, defendants filed objections to the recommendations contained in the Special Master's report.  ECF No. 6007.  On November 26, 2018, plaintiffs filed a response to defendants' objections.  ECF No. 6014.  This order addresses both reports and resolves the defense objections.

/////

/////

/////

/////

1

1    I.     BACKGROUND

2             The report and recommendations before the court are the fourth in a series of

3    reports filed by the Special Master and his suicide prevention expert, Mr. Hayes.  The first report

4    was filed January 14, 2015, ECF Nos. 5258, 5259.  It contained a "comprehensive" set of

5    recommendations for action by defendants to enhance their suicide prevention policies and

6    practices.  Order filed Feb. 3, 2015, ECF No. 5271 at 2.  On February 3, 2015, this court ordered

7    defendants to adopt those recommendations.  *Id*. at 3.  There were a total of thirty-two

8    recommendations in the initial report.  *See* ECF No. 5396 at 4.  After Mr. Hayes' second re-audit,

9    he and the Special Master recommended withdrawal of three of those recommendations.  ECF

10   Nos. 5671, 5672.  On January 25, 2018, the court adopted, *inter alia*, the latter recommendation,

11   ECF No. 5762 at 3, leaving twenty-nine recommendations to be completed.

12           A.     Special Master's Current Recommendations

13                  In the report now before the court, the Special Master recommends the following:

14                  (1)    That the Court reject defendants' proposal to activate a
                    temporary unlicensed 20-bed MHCB [mental health crisis bed] unit
15                  at RJD [Richard J. Donovan Correctional Facility];

16                  (2)  That the Court order defendants to continue to implement the
                    remaining 29 initial recommendations and develop corrective action
17                  plans based upon deficiencies found in Mr. Hayes' most recent
                    assessment; and
18
                    (3)  That the Court order the Special Master to provide an update
19                  report to the Court on the status of defendants' continued
                    implementation of the initial recommendations and the development
20                  of related corrective action plans.

21   ECF No. 5993 at 10.[1]

22           B.     Defendants' Objections and Plaintiffs' Response

23                  Defendants raise two objections to the report and its recommendation.  First,

24   defendants object on several grounds to the Special Master's recommendation that the court reject

25   the proposal to activate a temporary unlicensed MHCB at RJD.  Second, defendants request

26   ───────────────────
            [1] Citations to page numbers for documents filed in the court's Electronic Case Filing
27   (ECF) System are to the page number assigned by the ECF system located in the upper right-hand
     corner of the page.
28

                                            2

clarification of the expert's report "with respect to a Quality Improvement Plan [(QIP)] that issued following a suicide at San Quentin State Prison (SQ)." ECF No. 6007 at 7. Plaintiffs oppose defendants' objection to the recommendation concerning the unlicensed MHCBs at RJD, on several grounds, and they contend defendants have waived their request for clarification of the expert's report with respect to the QIP that issued at SQ by not raising it with the Special Master previously. ECF No. 6014, *passim*.

II.     DEFENDANTS' REQUEST FOR CLARIFICATION OF EXPERT'S REPORT

The court will not consider defendants' request for clarification of the finding concerning the QIP issued after a suicide at SQ. Defendants had an opportunity to submit to the Special Master objections to the expert's draft third re-audit report, and they did so. ECF No. 5993 at 31-41. Nowhere in those objections did defendants request clarification of the expert's report concerning the QIP they now raise. *See id*., *passim*. As a result defendants have waived this objection, given the ground rules established for this case long ago. *See* Order of Reference, ECF No. 640 at 8 ("The court will entertain no objection to the report unless an identical objection was previously submitted to the special master in the form of a specific written objection. . .").

III.    PROPOSED TEMPORARY MHCB UNIT AT RJD

        A.      Background

Defendants propose converting twenty cells in an administrative segregation unit at RJD to unlicensed MHCB beds and closing a temporary unlicensed 20-bed Mental Health Outpatient Housing Unit (MHOHU) at California State Prison-Sacramento (CSP-Sac). The Special Master recommends rejection of this proposal, which he represents has been extensively discussed and has received "careful consideration" through the All Parties Workgroup Process. The Special Master shares Mr. Hayes' concerns that "activation of the unit would result in deplorable conditions unacceptable for class members needing an MHCB level of care." ECF No. 5993 at 8. Mr. Hayes' concerns, which are elaborated in his report, can be summarized as follows:

3

1    (1)  While the proposal includes retrofitting the cells at RJD to make them suicide-

2  resistant, the cells could not be enlarged and would remain dark:  "the 20 cells that comprise this

3  proposed MHCB unit would simply resemble retrofitted new intake cells commonly found in

4  administrative segregation units."  ECF No. 5993-1 at 34.

5    (2)  As retrofitted administrative segregation unit cells, the floor size of each cell

6  would be "dramatically less than the traditional MHCB room found in licensed facilities" and

7  "MHCB suicide-resistant beds regularly found in licensed MHCB units would *not* fit in these

8  cells."  *Id.* (emphasis in original).

9    (3)  Proposed locations for clinical offices and interview rooms risk compromising

10  privacy and confidentiality of patient communications.  *Id.*

11    (4)  The inmate-patients in the proposed converted unit would compete for yard

12  time with administrative segregation inmates, making it "very challenging" to schedule adequate

13  yard time and, in any event, "all MHCB patients (regardless of security classification level)

14  would be required to be placed in the special management 'walk-alone' yards because it is the

15  *only* option available in the administrative segregation unit yard."  *Id.*  (emphasis in original).

16    (5)  Defendants have no plans to install fencing or netting to prevent suicidal

17  MHCB patients from jumping from the second tier where some proposed converted cells would

18  be located. *Id.* at 35.

19    As part of effectuating the proposed temporary MHCB unit at RJD, defendants

20  propose to close unlicensed MHCBs at California State Prison-Sacramento (CSP-SAC) and to

21  transfer to RJD the funding and staff currently allocated to the unlicensed unit at CSP-SAC. *See*

22  ECF No. 6007 at 4.  Defendants contend the proposed RJD unit is preferable because it will

23  increase the number of MHCBs in Southern California where more units are needed, thereby

24  /////

25  /////

26  /////

27  /////

28  /////

aiding compliance with the twenty-four hour timeline for transfer to MHCBs required by the

Program Guide and court order. *Id*. at 2. Defendants also contend the proposed RJD MHCB unit

> is superior to the current CSP-SAC unit for a number of reasons, including:
>
> 1) patients have access to small management yards and group recreation on the unit; 2) it provides temperature control within the unit; 3) individual confidential treatment sessions will be provided on the unit, on both floors instead of in the dining area, which is the practice at CSP-SAC; 4) it has available interdisciplinary treatment team and confidential clinical group space; and 5) it will have restraint and observations rooms, a medication room, linen storage, and nurses stations on the unit, none of which are available at CSP-SAC.

*Id*. at 4 (citing ECF No. 6007-1, Decl. of Ponciano at ¶ 16.)

Neither the Special Master nor Mr. Hayes agree that closure of CSP-Sac will solve

the problems evident there. Mr. Hayes reports that the MHOHU at CSP-Sac designated for

closure "has been problematic for many years" and that there is "universal agreement" that it

should be closed. ECF No. 5993-1 at 35. He describes ongoing problems in that unit in the

current report:

> [A]ll cells in the 20-bed MHOHU (Mental Health Outpatient Housing Unit) were previously designated to provide temporary, unlicensed MHCB level of care. Each cell was suicide-resistant, and had solid cement beds, ventilation grates, and light fixtures. However, as previously reported in the November 2013 assessment, the environment of the MHOHU remained sterile. Cells still appeared dirty and dark, and offered limited visibility of their interiors. Further, although IDTT meetings were conducted in an area outside of the housing unit, there continued to be no clinician offices in the MHOHU, therefore, clinical assessments were regularly conducted at cell-front or in therapeutic modules in the MHOHU. The modules were located adjacent to large industrial floor fans (i.e., swamp coolers). Due to the excessive noise, this reviewer observed that clinicians and IPs had a great deal of difficulty hearing each other, negatively impacting the assessment process. In addition, because both nursing and custody workstations were also located in the small high traffic dayroom area, adequate privacy, confidentiality, and programming were severely compromised. As a result, many inmates refused out-of-cell clinical appointments in the modules. Other observed deficiencies within the MHOHU will be discussed below.

*Id*. at 40. These additional deficiencies include "most MHOHU patients locked down in their

cells 24 hours a day (with the exception of occasional shower time). MHOHU patients were

given the "choice" of either yard or therapeutic treatment modules (TTMs). As described above, use of these TTMs was problematic." *Id*. at 41. These inmate-patients rarely received access to the yard, and telephone usage was non-existent even though "telephone privileges were often recommended by clinicians." *Id*. "[S]afety planning developed by MHOHU clinicians was consistently inadequate." *Id*. at 42. Mr. Hayes also observed that the interdisciplinary treatment team (IDTT) process in the MHOHU was "exemplified by an atmosphere of harsh attitudes toward patients by treatment team members, including a few unnecessary confrontational discussions." *Id*. at 43. Mr. Hayes opines that approval of the RJD proposal would merely result in the transfer of "similar problematic conditions" to the temporary unit at RJD, which in his view is "simply not acceptable." *Id*.

Defendants contend their proposal is reasonable and designed to solve the current longer transfer times for inmates in southern California in need of crisis bed care. ECF No. 6007 at 4. They contend Mr. Hayes offered "no legal basis" for rejecting their proposal and "did not base the rejection on any of the criteria he routinely uses to determine compliance with suicide-prevention policies." *Id*. They also argue he ignored the fact that he can audit the unit closely, and contend they "provided solutions" to the "physical plant concerns" he relied on to recommend rejection of the proposal. *Id*. at 5. Finally, defendants contend "CDCR has found no other viable alternatives for a temporary unlicensed unit" and that Mr. Hayes has offered none. *Id.* at 6.

In response, plaintiffs contend defendants have not shown clear error in the Special Master's factual findings, the showing required by the Order of Reference, ECF No. 640, to support rejection of those findings. ECF No. 6014 at 6. Plaintiffs also contend defendants have not come close to showing required to demonstrate their proposed efforts to remedy the concerns raised by Mr. Hayes would actually be effective. *Id*. at 7-11. Plaintiffs argue the court must consider the RJD proposal in light of the ongoing failures in CDCR's suicide prevention efforts generally. *Id*. at 11-12. Plaintiffs argue that defendants have failed to demonstrate why the RJD unit is the only space available for a temporary MHCB unit. Finally, plaintiffs contend

6

"[d]efendants could have avoided this crisis altogether" if they had acted expeditiously to build and bring online enough permanent MHCBs to meet demand. *Id*. at 14-15.

        B.    <u>Analysis</u>

                1.    <u>Relevant Program Guide Provisions and Court Orders</u>

        The remedial plan for delivery of adequate mental health care, which is known as the Program Guide, requires mental health crisis beds to be "part of a licensed General Acute Care Hospital (GACH), Skilled Nursing Facility (SNF), or a Correctional Treatment Center (CTC) offering 24-hour basic medical, nursing, and other health services. A Central Health Services building which houses CTC services houses the MHCB beds, staff offices and therapy space." Mental Health Services Delivery System (MHSDS) Program Guide, 2018 Revision, at 12-1-9, ECF No. 5864-1 at 11.[2] Defendants' proposed location for the temporary MHCB unit, the Building 7 administrative segregation unit at RJD, is not one of the licensed facilities where the remedial plan requires MHCBs to be located.

        Court-approved use of temporary MHCB programs in locations that do not meet Program Guide requirements dates back more than a decade, as do court orders requiring defendants to activate sufficient numbers of permanent MHCBs to meet the needs of the plaintiff class. In 2006, the court ordered defendants to file a plan that would, among other things, provide sufficient MHCBs to meet demand for transfer to such care within twenty-four hours, as required by the Program Guide. *See* ECF No. 1800 at 1. Defendants timely filed that plan, which they admitted "in no way adequately respond[ed] to the severe shortage of . . . . mental health crisis beds" then existing in CDCR. *Id*. at 2. As a temporary solution to the severe shortage, the court directed that, notwithstanding state licensing requirements, certain unlicensed beds be dedicated

---

      [2] A companion order approves the 2018 Revision to the Program Guide; the requirement cited here is also contained in the 2009 Revision, which has been the controlling remedial plan for the last decade, and in the January 2006 Program Guide, ECF No. 1753-2 at 1. Since March 3, 2006, defendants have been under court order to implement all undisputed provisions of the Program Guide. On March 3, 2006, the court ordered implementation of all undisputed provisions of the Program Guide. ECF No. 1773. Nothing in the record suggests this provision was ever disputed.

1  on a temporary basis to MHCB care. *Id*. at 3. The court directed defendants to accelerate, as

2  feasible, ongoing building projects and to "file a plan for interim provision of . . . mental health

3  crisis beds." *Id*. at 4. The court further directed defendants not to close any MHCBs "on the

4  basis of state licensing requirements without approval of the special master." *Id*. at 6.

5  The ensuing three years saw no relief in the ongoing severe shortage of MHCBs.

6  *See*, *e.g.*, Order filed Feb. 17, 2009, ECF No. 3516, at 1 ("The court finds that the urgent need by

7  class members for mental health crisis beds persists with such severity that state licensing

8  requirements must temporarily give way to remedy the Eighth Amendment violations that remain

9  unsolved in this action.") At one point in 2009, in response to a defense request for more time to

10  file a bed plan, the court observed:

11     To say the least, the court is deeply disappointed and distressed with
        the State's response. This court has been engaged in the process of
12     attempting to bring the State in conformance with the Constitution of
        the United States for roughly fourteen years. To say now that the
13     State has no current viable bed plan, is uncertain as to when it can be
        developed in light of changing circumstances, and needs at least
14     ninety (90) days to develop such a plan, seems to demonstrate an
        unacceptable lack of commitment to its constitutional duty, much
15     less to the orders of this court."

16  March 5, 2009 Order, ECF No. 3540, at 1-2.

17  Ultimately, in September 2009, the court ordered defendants to file a detailed

18  long-range plan for the provision of a full complement of necessary MHCBs and to fully staff and

19  activate those beds by defendants' own target date of 2013. *See* September 24, 2009 Order, ECF

20  No. 3686 at 3. Defendants filed this plan on November 6, 2009. ECF No. 3724-1. Going back

21  several years, since approximately early 2006, defendants have contracted with consultants "to

22  conduct annual population reviews and updates of their projections for mental health program

23  populations from 2007 through 2009." Order filed Oct. 20, 2006, ECF No. 1998 at 2 (ordering

24  defendants to consult with Navigant Consulting for 2007-2009 population projections); Order

25  filed May 2, 2006, ECF No. 1800 at 2 n.1 (citing testimony re defendants' contract to update bed

26  planning methodology). The population projections, which continue, serve as a necessary aid to

27  development and maintenance of an adequate number of fully activated mental health beds at

28  each level of the mental health care delivery system.

8

1     Defendants' November 2009 plan was based on the Spring 2009 mental health

2  population projections through 2013. *See* ECF No. 3724-1 at 58. Those projections showed a

3  need for 470 MHCBs. *Id*. On January 4, 2010, the court confirmed its September 2009 order that

4  all projects in the long-range plan were "to be 'fully staffed and activated by the 2013 target date'

5  previously established by defendants." ECF No. 3761 at 1-2.

6     On June 12, 2012, defendants moved to modify the bed plan to conform to

7  reductions in the prison population. ECF No. 4196. By order filed June 15, 2012, the court

8  granted defendants' request in substantial part. ECF No. 4199 at 2. In relevant part, the court

9  directed defendants to use the Spring 2012 population projections for 2013, in place of the 2009

10 projections used for the November 2009 bed plan. *Id*. The 2012 population projections for 2013

11 showed a need for a total of 343 male MHCBs and eight female MHCBs. ECF No. 4196-1 at 20,

12 24. The court also directed defendants to continue to work with the Special Master to ensure that

13 data on inmates in need of crisis bed care who were placed in alternative settings were counted in

14 the bed planning projections, and to adjust the projected bed need accordingly. ECF No. 4199 at

15 2. The most recent bed need study, from Spring 2019, projects a need for a total of 306 male

16 MHCBs and 27 female MHCBs for this year. Mental Health Bed Need Study Based on Spring

17 2019 Population Projections, at 14, 20.[3] Defendants currently have 433 male MHCBs and 41

18 female MHCBs. ECF No. 6152 at 9. Fifty-four of the male MHCBs, 20 at California State

19 Prison-Sacramento and 34 at California Institution for Men, are temporary unlicensed beds.

20 Eighteen of the female MHCBs, at California Institution for Women, are temporary unlicensed

21 beds. *See* ECF No. 5993-1 at 33. The male beds are located in 19 prison institutions around the

22 state, and the female beds are located in two prisons.[4]

23

24

---

25     [3] At the court's request, the Special Master has provided a copy of the most recent Mental
Health Bed Need Study, which is filed separately.

26

27     [4] This information was provided to the court by the Special Master from a Summary of
Mental Health Population by Institution and Level of Care (H1), printed March 25, 2019. The
report is prepared by CDCR's Health Care Population Oversight Program (HCPOP).

28

1          2.      Application

2          The court's 2006 and 2009 orders authorizing use of unlicensed MHCBs were

3    intended to be temporary:  in the face of a severe shortage of necessary crisis care beds a state

4    court judgment requiring compliance with state licensing requirements, ordinarily entitled to

5    deference from this federal court, would have to "temporarily give way to measures necessary to

6    remedy the Eighth Amendment violations that remain in this action."  ECF No. 1800 at 3-4; *see*

7    *also* ECF No. 3516 at 1.  This temporary use of unlicensed MHCBs, approved as a stop-gap

8    measure to limit harm to the plaintiff class resulting from the severe shortage of MHCBs, was

9    never intended to be a permanent remedy.  Against this backdrop, the court cannot and will not

10   countenance new purportedly temporary MCB units presenting the "deplorable" conditions

11   inmates in need of mental health crisis care would be subjected, according to the Special Master

12   and his expert.

13          The court understands that defendants seek to open the temporary MHCBs at RJD

14   to "improve access and transfer times to crisis care for patients" in southern California prisons,

15   "to meet demand while CDCR completes construction of 100 additional crisis beds in southern

16   California."  ECF No. 6007 at 2.  Defendants have known about the increased demand for crisis

17   bed care in southern California since at least 2017, when they first sought approval to build an

18   additional 100 crisis beds, *see* Decl. of K. Tebrock, ECF No. 5680-10, but they have not

19   expedited construction of those beds, *see* Reporter's Transcript of Proceedings (RT), ECF No.

20   5707, at 55-57.  Recently, on April 29, 2019, the court ordered defendants to file specific

21   information in aid of ensuring timely completion of the needed beds.  *See* ECF No. 6135.  On

22   May 28, 2019, defendants provided the required status report.  ECF No. 6168.  At that time,

23   defendants reported, *inter alia*, that the status of the new MHCB construction project is still

24   subject to legislative review, which "may include discussion regarding whether CDCR's Spring

25   2019 Total Institution Population Projections, which forecast a decreased need for crisis beds out

26   to 2023, support revisiting the bed construction needs reflected in the 2017 budget proposals."  *Id*.

27   at 4.  Since May 2019, defendants have provided a further status, which is discussed below.

28

The court's prior decision to authorize temporary use of unlicensed MHCBs arose more than a decade ago at a time when there was a severe shortage of crisis beds. It is not at all clear from the current record whether there continues to be a shortage of MHCBs or, instead, whether to achieve the required remedy the current need is to create permanent licensed beds in southern California in order to ensure compliance with the 24-hour timeline for transfer to MHCBs, required by the Program Guide, and to decommission, finally, all unlicensed MHCBs. In either event, the crisis that led to approval of temporary use of unlicensed MHCBs appears to be a thing of the past. The justification that existed for use of temporary MHCBs a decade ago no longer exists, which is on balance good news. The work that remains is to complete, on an expedited basis as necessary,[5] a sufficient number of licensed MHCBs so that defendants can take the remaining temporary MHCBs offline and accomplish the required timely transfers to regional MHCBs. Again, the record does not support, and the court will not authorize even temporarily, use of a new temporary MHCB unit that would subject class members in need of MHCB care to "deplorable" conditions. The court is persuaded by Mr. Hayes' thorough reporting that, while defendants' proposed new temporary unit at RJD might save transportation time for some inmate-patients in need of MHCB care, the new temporary unit would not provide those inmate-patients the constitutionally adequate care required by the Eighth Amendment. The time for temporary stops along the way to constitutional compliance has come to an end.

3. Going Forward

In its April 29, 2019 order the court directed defendants to file status reports every thirty days on the status of the funding process for the 100 bed MHCB project. ECF No. 6135 at 2. On June 27, 2019, defendants filed the second status report required by that order. ECF No. 6208. In this report, defendants provide the following update:

> On June 12, 2019, the Joint Legislative Budget Committee notified the Department of Finance that, due to CDCR's declining inmate population, CDCR's projections for crisis bed needs in the future,

---

[5] At a hearing before this court on September 28, 2017, Deputy Director Tebrock suggested the California governor may have some "authority to waive provisions of state law to expedite public works projects." ECF No. 5707 at 81.

and changes to the project's scope and costs, the MHCB Construction Project may not be justified. (Beland Decl. ¶ 4 & Exh. 1.) The Joint Legislative Budget Committee requested that CDCR further analyze its population and explore alternatives to the MHCB Construction Project for discussion and consideration when the Legislature reconvenes after August 12, 2019. (*Id.*) On June 19, 2019, the Department of Finance responded to the Joint Legislative Budget Committee to reiterate the Administration support for CDCR's proposed MHCB Construction Project because of the need for additional crisis beds in the state's southern region and because projections for the female population continue to grow. (*Id.* ¶ 5 & Exh. 2.) The Department of Finance also confirmed that it will reevaluate the scope of the MHCB Construction Project and work with the Joint Legislative Budget Committee to address the concerns that it identified in its June 12, 2019 letter. (*Id.*) Nonetheless, because the funds for the working drawings cannot be encumbered this fiscal year, which ends June 30, 2019, a re-appropriation will be necessary.

ECF No. 6208 at 3.

With the understanding that funding for the 100 bed MHCB project is now delayed into the next fiscal year, the court directs defendants to address in their next status report required by the April 29, 2019 order, in addition to the other matters required by that order, (1) whether the funding process and/or completion of all or part of the 100 bed MHCB project can be expedited; (2) whether completion of this project will permit all temporary unlicensed MHCBs to be taken offline; and (3) whether completion of this project will permit the court to find defendants in compliance with prior court orders requiring defendants to fully staff and activate a sufficient number of licensed MHCBs to ensure compliance with the Program Guide timeline for transfer to crisis bed care. Plaintiffs may respond to the third issue within fourteen days after defendants' next status report is filed.

IV.     OTHER MATTERS

In late 1998, the Special Master assumed responsibility for monitoring suicide prevention and policy in California's prisons. *See* ECF No. 1229 at 1 n.1. Mr. Hayes joined the Special Master's team in October 2013, ECF No. 4857, following the resignation of Dr. Raymond Patterson. During his tenure with the Special Master's team, Dr. Patterson filed fourteen annual reports on suicides in California's prisons, *see* ECF No. 4376 at 23 (explaining current report would be last written by Dr. Patterson, that he had written fourteen annual reports, and that "all that can be recommended by this reviewer to help CDCR divert itself from its course of a

12

1    seemingly intractable elevated rate of inmate suicides has already been said, in some cases

2    repeatedly") that included recommendations for "corrective actions to improve CDCR's suicide

3    assessment and prevention program", *id*. at 22.  Dr. Patterson left his assignment with the Special

4    Master "because of his frustration arising from the defendants' repeated failure to implement his

5    recommendations."  *Coleman v. Brown*, 938 F.Supp.2d 955, 971 n.26 (E.D. Cal. 2013).  Before

6    joining the Special Master's team, Mr. Hayes served as a consultant for CDCR and, in that

7    capacity, prepared a "complete report on suicide prevention for CDCR."  ECF No. 4376 at 23

8    n.37.

9           Between November 2013 and July 2014, after assuming his current position, Mr.

10   Hayes conducted a comprehensive audit "of suicide prevention practices and individual suicide

11   case files in all 34 CDCR institutions."  ECF No. 5258 at 1.  As discussed above, the Special

12   Master's report on that audit, filed January 14, 2015, contained 32 recommendations by Mr.

13   Hayes aimed at addressing the ongoing problem of a disproportionately high rate of inmate

14   suicides in California's prisons.  *Id*. at 2, 5-9.  Neither party objected to the report or its

15   recommendations.  *See* ECF No. 5271 at 2.  On February 3, 2015, the court ordered defendants to

16   adopt the recommendations and "work with the Special Master in the Suicide Prevention

17   Management Workgroup and otherwise as may be necessary on the development of strategies and

18   the implementation of the changes and practices contained in those recommendations."  ECF No.

19   5271 at 3.[6]  The court also ordered the Special Master to provide an update on defendants'

20   progress.  *Id*.

21          Mr. Hayes' first audit was completed almost five years ago.  The court issued its

22   order directing adoption of the recommendations that followed that audit over four years ago.

23   Since then, Mr. Hayes has re-audited suicide prevention policies and practices three times.  The

24   Special Master's current report on Mr. Hayes' third re-audit reflects the same mixed progress as

25

26          ───────────────────
              [6] Also as discussed above, in 2018, three of Mr. Hayes' recommendations were
27   withdrawn, at his recommendation, following completion of his second re-audit of suicide
     prevention practices in California's prisons.  *See* ECF No. 5762.
28

1   the prior two reports:  some notable successes combined with ongoing failure to fully implement

2   several of the recommendations.

3         While some progress is being made in implementation of the court-ordered suicide

4   prevention measures, a substantial amount of work remains, and implementation is dragging out

5   and taking too long.  The court understands that Mr. Hayes's fourth re-audit is currently

6   underway.  If Mr. Hayes is unable to report full compliance with his recommendations at the end

7   of the fourth re-audit, the court anticipates reviewing with defendants at a future status conference

8   the specific steps necessary to enable Mr. Hayes to report no later than after his fifth re-audit that

9   all recommendations have by then been implemented.

10         In accordance with the above, IT IS HEREBY ORDERED that:

11         1.  The Special Master's November 5, 2018 report, ECF No. 5993, and Mr. Hayes'

12   November 5, 2018 report entitled The Third Re-Audit and Update of Suicide Prevention Practices

13   in the Prisons of the California Department of Corrections and Rehabilitation, ECF No. 5993-1,

14   are adopted in full;

15         2.  Defendants' request to correct a finding concerning a QIP issued following a

16   suicide at San Quentin State Prison is denied;

17         3.  Defendants' objection to the Special Master's recommendation concerning the

18   proposed temporary unlicensed MHCB at Richard J. Donovan Correctional Facility is overruled;

19         4.  Defendants' proposal to activate a temporary unlicensed 20-bed mental health

20   crisis bed (MHCB) unit at Richard J. Donovan Correctional Facility (RJD) is rejected;

21         5.  Defendants shall continue with, and expedite, implementation of the remaining

22   29 initial recommendations and shall develop corrective action plans based upon deficiencies

23   found in Mr. Hayes' most recent assessment;

24         6.  The Special Master shall provide an update report to the court on the status of

25   defendants' implementation of the initial recommendations and the development of related

26   corrective action plans; and

27   /////

28   /////

7. In their next status report required by the April 29, 2019 order, defendants shall include the additional information required by this order and plaintiff may respond as provided herein within fourteen days thereafter.

DATED: July 3, 2019.

_____
UNITED STATES DISTRICT JUDGE