UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | No. 2:90-cv-0520 KJM DB P<br><br><br><br>AMENDED[1] ORDER |

I. <u>INTRODUCTION</u>

   In 1995, the court found defendants in violation of their Eighth Amendment duty to provide California's seriously mentally ill prison inmates with access to adequate mental health care. *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. Cal. 1995). The court also found Eighth Amendment violations in certain custodial practices as applied to these inmates, including use of force, segregated housing and mechanical restraints. *See id*. Over more than two decades, the court has been overseeing defendants' development and implementation of remedies for these Eighth Amendment violations with the assistance of a Special Master.

---

[1] This order amends the order filed July 3, 2019, ECF No. 6211, by removing the following language from page 19, lines 3-4: "and the indices to Appendices A and B."

1

The defendants' remedial plan for the identified violations in the delivery of mental health care to California's prisoners is the California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guide (Program Guide). *See* ECF No. 4361 at 2-6[2] (discussing history of development of Program Guide as remedial plan for identified constitutional violations). Defendants' proposed remedies for the Eighth Amendment violations in custodial practices are primarily found in state regulations and provisions of the CDCR Department Operations Manual (D.O.M.). *See*, *e.g.*, ECF No. 5190 (defendants' revised policies and plans for use of force and segregated housing involving class members, required by court order, ECF No. 5131 at 72-74). Other remedial measures include a court-ordered mental health staffing plan, *see* ECF Nos. 3613 at 2 (court order), 3693 (staffing plan), regular mental health bed projections, *see* ECF No. 3629, and concomitant planning for and building of necessary mental health beds and clinical treatment space, *see, e.g.*, ECF No. 3556.

As required by court order, on June 29, 2018 the Special Master filed a report on the CDCR MHSDS Program Guide Update, accompanied by two appendices to the 2009 Revised Program Guide and an index (hereafter Program Guide Update Report). ECF No. 5844. On July 30, 2018, as the court required by minute order, ECF No. 5860, the Special Master filed with the court for review and approval the complete 2018 Revision to the Program Guide, referred to throughout this order as the 2018 Program Guide Revision. ECF No. 5864-1. The 2018 Program Guide Revision consists of : Chapters 1 through 10 of the Program Guide 2009 Revision; Appendix A, a glossary of terms; Appendix B,[3] a list of 68 policies that the Special Master and the parties agree should be included in the current consolidated Program Guide, *see* ECF No.

---

[2] References to page numbers for documents filed in the Court's Electronic Case Filing (ECF) system are to page numbers assigned by the ECF system and located in the upper right-hand corner of each page.

[3] Appendices B and C to the 2018 Program Guide Revision were originally identified as Appendix A to the Special Master's June 29, 2018 Program Guide Update Report. *Compare* ECF No. 5864-1 at 203-597 *with* ECF No. 5844 at 11-387.

5844 at 8; ECF No. 5864 at 1; Appendix C,[4] an index to the same policies listed in Appendix B and a complete copy of each policy, *see* ECF No. 5864 at 1-2; Appendix D,[5] a memo clarifying "several changes to Chapter 6 of the Program Guide (2009 Revision) concerning inpatient care," ECF No. 5864-1 at 599; and Appendix E,[6] which contains "policies that are currently in flux and by agreement will be reviewed by the parties and the Special Master at a later time to determine whether they are appropriate for inclusion in the Program Guide." ECF No. 5864 at 2.

The June 29, 2018 Program Guide Update Report contains four recommendations:

> 1. That, the Court formally adopt the policies attached to th[e] report as Appendix A and the clarification memo attached as Appendix B, as addenda to the MHSDS Program Guide 2009 Revision.
>
> 2. That, the Court enter an order directing the parties, under the guidance and supervision of the Special Master, to work on the development of an improved method for modifying the Program Guide utilizing the workgroup process already in place.
>
> 3. That, the Court enter an order directing the Special Master to report back to the Court on the new proposed Program Guide modification process within 60 days of entry of the order.
>
> 4. That, any proposed Program Guide-related regulations be provided to plaintiffs and the Special Master 90 days in advance of the public comment period, and/or any Program Guide-related policies currently incorporated into regulations that substantively change in the future.

ECF No. 5844 at 10. On July 20, 2018, defendants filed a response to the Program Guide Update Report, ECF No. 5861, and on July 23, 2018, they filed a corrected updated response, ECF No. 5862. On August 3, 2018, plaintiffs filed a response to defendants' corrected response. ECF No. 5875.[7] The only area the parties dispute concerns the Special Master's fourth recommendation:

---

[4] *See* note 2 *supra*.

[5] Appendix D to the 2018 Program Guide Revision was originally identified as Appendix B to the Special Master's June 29, 2018 Program Guide Update Report. *Compare* ECF No. 5864-1 at 598-600 *with* ECF No. 5844 at 388-390.

[6] Appendix E to the 2018 Program Guide Revision was originally identified as Appendix C to the Special Master's June 29, 2018 Program Guide Update Report. *Compare* ECF No. 5864-1 at 601-603 *with* ECF No. 5844 at 391-393.

[7] At the outset, the court notes that defendants rely on the twenty-one day period in

3

defendants object to it on several grounds, while plaintiffs support the recommendation. As part of its overall effort to move this case toward a conclusion, the court now makes the following findings and orders concerning the 2018 Program Guide Revision and the recommendations contained in the Program Guide Update Report.

        The court ordered preparation and submission of the 2018 Program Guide Revision as part of its ongoing effort to consolidate the court's past decisions and clarify the record of the case, which the court deems essential to an orderly conclusion of the case once the durability of the remedy is demonstrated. For the reasons explained below, in addition to giving final approval to the 2018 Program Guide Revision and addressing the recommendations in the Program Guide Update Report, the court also clarifies for the record that remedial planning for this action is substantially complete. To memorialize the additional remedial planning not reflected in the Program Guide itself, the court will require the parties to submit a companion document to the 2018 Program Guide Revision that lists any regulations, provisions of the D.O.M., and any other provisions that control the remedy for the already identified constitutionally deficient custodial practices and that are not included in the 2018 Program Guide Revision. With this additional document, except for specific disputes identified in this order, the

---

Federal Rule of Civil Procedure 53(f)(2), rather than the ten-day period in the Order of Reference, ECF No. 640, to support the timeliness of their response. ECF No. 5862 at 3 n.1. Noting that as recently as February 2017, this court declined to resolve conflicts between relevant timeline provisions of the Order of Reference, ECF No. 640, and those of Federal Rule of Civil Procedure 53, *see* ECF No. 5875 at 2 n.1 citing ECF No. 5571 at 2-3, plaintiffs object to defendants' failure to file within the ten-day period either their objections or a request for leave to file the objections within the twenty-one day period granted by Rule 53(f)(2). The court agrees defendants should have, within ten days, either filed their objections or moved for application of the twenty-one day period of Rule 53(f)(2) to this objection period. Nonetheless, the court is persuaded that where, as here, the Special Master's report was not circulated to the parties for review or comment prior to its filing, the court should err on the side of considering all of the parties' views. The court has therefore considered both defendants' corrected response and plaintiffs' response in making this order. To avoid further confusion, the parties will be directed to meet and confer and present a proposed stipulation and order for modification of the ten-day objection period in the Order of Reference to add a provision governing the objection period for reports the Special Master does not circulate to the parties for review and comment prior to filing. The parties shall seek the input and concurrence of the Special Master in the proposal to be submitted to the court.

4

content of the completed remedial plan will be made fully transparent and serve as a reference point for the court and the parties going forward. The court's finding that remedial planning is substantially complete is, of course, separate and apart from a finding regarding implementation of the remedy. The record makes clear that a number of implementation tasks remain.

To review again, in 1995 the court found defendants in violation of their Eighth Amendment duty to provide California's seriously mentally ill prison inmates with access to adequate mental health care. *Coleman v. Wilson*, 912 F.Supp. 1282. Specifically, the court found (1) defendants lacked "a systematic program for screening and evaluating inmates for mental illness," *id*. at 1305; (2) California's prison system was "significantly and chronically understaffed in the area of mental health care services "and defendants did "not have sufficient staff to treat large numbers of mentally ill inmates" in prison, *id*. at 1307; (3) defendants had no quality assurance program to ensure competence of staff, *id*. at 1308; (4) there were significant delays in access to mental health care throughout the system that "result[ed] in exacerbation of illness and patient suffering," *id*. at 1309; (5) "'defendants' supervision of the use of medication [was] completely inadequate; prescriptions [were] not timely refilled, there [was] no adequate system to prevent hoarding of medication, there [was] no adequate system to ensure continuity of medication, inmates on psychotropic medication [were] not adequately monitored, and . . . some very useful medications [were] not available because there is not enough staff to do necessary post-medication monitoring,'" *id*. (quoting June 6, 1994 Findings and Recommendations at 50); (6) several deficiencies in the availability and utilization of involuntary medication, *id*. at 1311-13; (7) the absence of any adequate systemwide procedures for use of mechanical restraints on seriously mentally disordered inmates, *id*. at 1313-14; (8) an "'extremely deficient'" medical records system, *id*. at 1314 (quoting Findings and Recommendations at 61); (9) inadequate implementation of defendants' suicide prevention program, *id*. at 1315; (10) inadequate training of custodial staff "in the identification of signs and symptoms of mental illness," *id*. at 1320; (11) placement of seriously mentally ill inmates in administrative segregation and segregated housing units "without any evaluation of their mental status" and without access to necessary mental health care while housed in such units, *id*.; and (12) use of tasers and 37mm guns against class

members without considering whether the behavior leading to use of the weapon was caused by mental illness, or the impact of such weapon's use on that illness, *id*. at 1321.

To remedy these violations, the court "directed defendants to work with the Special Master and his staff to develop and implement" remedial plans. *Coleman v. Brown*, 938 F.Supp.2d 955, 972 (E.D.Cal. 2013). The Program Guide represents the bulk of the operative remedy. *See* ECF No. 4361 at 2-3 ("At this time, the Revised Program Guide is the primary remedial plan in this action. . ."). The Guide contains the structure and requirements for delivery of mental health care in California's prisons as challenged in this case, and "'represents defendants' considered assessment, made in consultation with the Special Master and his experts, and approved by this court, of what is required to remedy the Eighth Amendment violations identified in this action and meet their constitutional obligation to deliver adequate mental health care to seriously mentally ill inmates.'" *Coleman v. Brown*, 938 F.Supp.2d at 972 (quoting ECF No. 4361 at 3). The United States Court of Appeals for the Ninth Circuit has determined it is "established that the Program Guide sets out the objective standards that the Constitution requires in this context. . . ." *Coleman v. Brown*, 756 Fed.Appx. 677, 679 (9th Cir. 2018).

As noted above, the remedies for the identified Eighth Amendment violations in the custodial management of seriously mentally ill inmates are generally found in state regulations or provisions of CDCR's D.O.M, while other remedial measures include defendants' staffing plan, *see* ECF No. 3693, regular mental health bed projections, *see* ECF No. 3629, and concomitant planning for and building of necessary mental health beds and clinical treatment space, *see*, *e.g.*, ECF No. 3556. In addition, the remedy also requires targeted provisions to address inmate suicides: since 2015 defendants have been under court order to adopt specific recommendations made by the Special Master's expert on suicide prevention, Lindsey Hayes. *See* ECF No. 5993 at 2 (citing ECF Nos. 5259, 5271).

The remedial phase of this action has been shaped by the court's early recognition that in a case of this magnitude and complexity "the standards for compliance with the Eighth Amendment must and indeed 'can only be developed contextually.'" *Coleman v. Brown*, 938 F.Supp.2d at 971 (quoting *Coleman v. Wilson*, 912 F.Supp. at 1301). Thus, the complete remedy

for the Eighth Amendment violations identified by the court has continued to evolve over the past two decades while implementation of court-approved and court-ordered components of the remedy has been ongoing.

Since the time this action was reassigned to this court in 2014, *see* ECF No. 5213, the court has articulated its understanding that most of the remedial planning in this case was complete; the court also has stated its intention to keep the case "on a path toward resolution in our lifetimes, sooner rather than later." Reporter's Transcript of Proceedings (RT), Aug. 19, 2015, ECF No. 5342, at 3. In 2017, the court turned its efforts to enforcement of aspects of the remedy long complete but never fully implemented, including compliance with timelines for transfer to inpatient care, *see* ECF No. 5610, and full implementation of defendants' mental health staffing plan accompanied by compliance with a June 2002 order requiring a maximum ten percent vacancy rate in psychiatrists and case managers. ECF No. 5711; *see also* ECF No. 1383 at 4. The court's efforts to enforce these prior orders has been delayed by intervening events, including the court-ordered independent investigation prompted by whistleblower reports the court received in October 2018 and defendants' pending appeal concerning a proposed final telepsychiatry policy. An additional speed bump has presented itself in the form of defendants' continued use of unlicensed mental health crisis bed (MHCB) units that were intended only for temporary use, *see*, *e.g.*, ECF No. 3516, and defendants' proposed temporary use of additional unlicensed MHCBs pending the long drawn-out completion of planned additional permanent MHCB units, *see*, *e.g.*, ECF No. 5993-1 at 32-33.

In its efforts to enforce prior orders, the court has made clear its need for an updated comprehensive Program Guide. Before addressing the Special Master's one recommendation the parties dispute, the court considers whether in fact the 2018 Program Guide Revision now presented represents a substantially developed remedial plan for delivering constitutionally adequate mental health care to class members. If it does, the court, the Special Master and the parties can bring full focus and effort to the tasks that remain in implementing and ensuring the durability of that remedy.

1    II.     HISTORY OF REMEDIAL PLANNING

2           A.      June 1997 Remedial Plans

3                   On June 6, 1997, the Special Master submitted the first set of remedial plans to the court together with a report on those plans. Dkt. No. 850.[8] The Special Master reported to the court that "[w]ith few exceptions, the parties agree that the blueprint for the defendants' mental health care delivery system contained in these documents describes a system that comports with the requirements of the court in this case." *Id*. at 2. The remedial plans were framed around the twelve "broad areas of concern" "consistently identified" by the court. *Id*. These twelve areas corresponded to the twelve areas identified in the court's 1995 order, as set forth on page 4 of this order above. By order filed June 27, 1997, the court gave provisional approval to the initial set of remedial plans, with some modifications, and "directed the Special Master to begin monitoring defendants' implementation of and compliance with those plans, and to file quarterly monitoring reports." ECF No. 4361 at 5; *see also* Dkt. No. 858.

                    The Special Master also reported that the parties had "agreed to a process for future modifications of the plans" submitted to the court. ECF No. 850 at 21. That three-step process required (1) defendants to "submit, with a copy to plaintiffs," any modification "to the special master fourteen days prior to its effective date," or on a shorter time frame in the event of an emergency; (2) the Special Master to determine whether the modification conflicted with any court order(s) and, if so, to "work with the defendants to reconcile the conflict," and (3) if reconciliation proved impossible, the Special Master would file a report with the court setting forth findings explaining why the modification violated court orders and recommending action to be taken on the modification. *Id*.

                    The process contemplated by the court in 1997 never took hold. In 2006, the Special Master reported that between 1997 and 2005, many aspects of the original set of remedial plans were "revisited and amended by the court, while other provisions were modified and

---

[8] "Dkt. No." refers to the docket entry number for documents filed in this action prior to implementation of the court's ECF system that have not subsequently been entered into the ECF system.

upgraded by the defendants on their own initiative." ECF No. 1749 at 3. During the same period, the scope of this action expanded to include all of California's adult prison institutions, and the mentally ill prison population more than doubled, "growing from 14,293 inmate/patients in July 1997 to 30,272 in October 2005." *Id*. In 2002, "after more than five years of experience with the provisionally approved program guides,[9] the special master and the parties agreed that the time was ripe to revise and update the program guides and seek their final approval." *Id*. As the Special Master reported, that 2002 agreement was followed by three years of "meetings among parties, counsel, and the special master and his experts and monitors" and, finally, production of a proposed final set of remedial plans. *Id*. When presented to the court in early February 2006, those plans were identified as the January 2006 Revised Program Guide.

B. 2006 Revised Program Guide

On February 3, 2006, defendants filed the January 2006 Revised Program Guide, Chapters 1 Through 10 and Glossary. ECF No. 1753. On the same day, the Special Master filed a Report and Recommendations on Defendants' Revised Program Guide. ECF No. 1749. He reported that the January 2006 Revised Program Guide had taken over three years to finalize and represented a "semantic identity change" from the initial "provisional program guides." *Id*. at 3-4. As he explained:

> The 'program guides' adopted in mid-1997 included a series of multiple guides, one for each level of care or program in CDCR's Mental Health Services Delivery System. The revision entitles the whole document simply as a "Program Guide" in the singular, with chapters within the overall guide devoted to different levels of care and programs. Unlike the original program guides, which were accompanied by a miscellany of materials, including memoranda, reports, bulletins, procedures, etc. the revised Program Guide supersedes and incorporates most of these miscellaneous materials.

*Id*. at 4. The Special Master reported that he and the parties had agreed that "ninety-five percent of the revised Program Guide" was ready for final approval by the court. *Id*. at 5. The "purpose" of his report was twofold: to obtain final approval from the court for that ninety-five percent of

---

[9] The Program Guide was originally presented to the court in 1997 as a series of plans, protocols, and procedures collectively referred to as remedial plans. *See* Dkt. No. 850 (Special Master's Report on Plans).

9

the revised Program Guide on which full agreement had been reached, and to "initiate a process for resolving the five percent of remaining issues that continue to elude resolution." *Id*. In his February 2006 report, the Special Master described in detail the "five percent" of issues that remained unresolved at the time, as well as plaintiffs' continuing objections to other issues. *Id*. at 4-10.[10]

On March 3, 2006, the court approved "the undisputed provisions of the January 2006 Revised Program Guide" and ordered defendants to "immediately implement all such provisions." ECF No. 1773 at 2. The court also ordered the parties to continue to work under the auspices of the Special Master to resolve outstanding disputes, setting a deadline of thirty days for finalizing the "provisions of the Program Guide related to the review of psychiatrist qualifications, staffing ratios, CPR and video monitoring" and a separate deadline of forty-five days "to report to the court concerning resolution of those matters." *Id*. at 3. On April 17, 2006, the parties filed a joint status report containing, *inter alia*, updates on the four issues. *See* ECF

---

[10] The unresolved issues included: (1) application of newly adopted education-based qualifications for psychiatrists to psychiatrists hired before adoption of those qualifications; (2) defendants' development of staffing ratios for incorporation into the Program Guide; (3) refinement of the Program Guide chapter on Suicide Prevention and Response to incorporate agreement on use of CPR and video-monitoring; (4) "reduction of psych tech rounds of non-caseload inmates in administrative segregation units from daily to weekly"; (5) "reduction of the number of minimally required clinical case managers' contacts with 3CMS (Correctional Clinical Case Management System) inmates in administrative segregation units from weekly to every other week or more frequently if clinically indicated"; (6) frequency of psych tech rounds for CCCMS and non-caseload inmates in a SHU; (7) frequency of clinical case managers' contacts with CCCMS inmates in a SHU; (8) limiting to 60 days the length of stay for Enhanced Outpatient (EOP) inmates in EOP administrative segregation hubs; (9) limitations on the use of secure individual treatment modules for inmates in EOP administrative segregation hubs and psychiatric services units (PSUs); (10) a rule for exclusion of class members from all SHU units in CDCR; (11) expanded programming and improved conditions for class members confined in a SHU; (12) banning placement of class members in unlicensed Outpatient Housing Units for crisis observation or mental health treatment; (13) elimination of the four point addition to classification scores for incoming inmates with a history of mental illness, and additional programming and housing options for EOP and CCCMS inmates; and (14) development of a computerized management information to track all inmates discharged from the MHSDS and all non-MHSDS inmates with a suicidal history. *Id*. at 4-9.

10

No. 1785. They reported they had (1) agreed on language to be added to the Revised Program Guide to cover "the court-mandated policy" for administration of CPR to inmates, *id*. at 2; (2) agreed on application of the board-eligible status requirement for new psychiatrist hires but had not agreed on a grandfathering provision for already employed psychiatrists, *id*.; (3) agreed that video monitoring would no longer be the sole means of suicide watch and were continuing negotiations for procedures to be followed in the event defendants wanted to reinstitute video monitoring as the only way to conduct suicide watch, *id*.; but (4) had not reached agreement on staffing ratios. *Id*. The disagreement on staffing ratios was resolved later by defendants' 2009 staffing plan, ECF No. 3693. At this point, the court presumes the disputes over grandfathering provisions for psychiatrists employed prior to 2006 and procedures to be followed in the event defendants proposed to resume suicide watch by video monitoring only have been resolved or mooted by the passage of time. With regard to the latter issue in particular, the court notes that the 2018 Program Guide Revision provides that video monitoring is "a supplement to direct visual observation" of inmates on suicide watch, ECF No. 5864-1 at 170.

The January 2006 Revised Program Guide contained a specific section entitled "Program Guides Revision Policy and Procedure." ECF No. 1753-1 at 14. That section provided that "[t]he MHSDS Program Guide revisions shall occur annually" and set forth specific provisions for distribution, review, and approval of such revisions by specifically identified CDCR staff. *See* ECF No. 1753-1 at 14-15. The section contained no provision for submitting annual revisions to the court. *See id*. If that relatively cumbersome internal process has been followed to any extent, it has not resulted in publication of annual updates to the Program Guide on the court's docket.

C. Program Guide 2009 Revision

The Program Guide has undergone one revision since its 2006 approval, resulting in the Program Guide 2009 Revision.[11] In his June 29, 2018 Report on the California Department

---

[11] The Program Guide 2009 Revision has been the operational remedial plan for almost a decade and is the foundation of the 2018 Program Guide Revision. *See* ECF No. 5864-1 at 2-201.

11

of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide Update, ECF No. 5844, the Special Master explains the process that resulted in the Program Guide 2009 Revision.

> In late 2007, the Special Master determined that the Program Guide should be reviewed and updated. In 2008, under the guidance of the Special Master, the parties commenced a series of negotiations over the course of several months, the outcome of which was the 2009 Revised Program Guide. [Footnote omitted.] In his Twenty-Third Round Monitoring Report, filed December 1, 2011 (ECF No. 4124), the Special Master characterized the Program Guide as the standards which drive the examination, evaluation, findings, and recommendations that are found in each of his compliance reports. *Id*. at 17. He advised the court that the Revised Program Guide remained a work in progress which continued to undergo negotiated revision and updating as the need arose, "in order to remain responsive to the demands of changing conditions and emerging issues in the prisons." *Id*.

ECF No. 5844 at 5-6. The Program Guide 2009 Revision has been the operative remedial plan since it was promulgated.

         D.         <u>Proceedings Leading to Development of 2018 Program Guide Revision</u>

In an order filed April 19, 2017, this court set a deadline for defendants to "come into full and permanent compliance with Program Guide timelines for transfer of inmate-patients to acute and intermediate care facility programs" and a mechanism for enforcement of that deadline. ECF No. 5610 at 13. In that order, the court noted it had been informed by the Special Master that the parties were "in the preliminary stages of updating the Program Guide to incorporate modifications required by court orders issued since March 2006, when the court gave final approval to most of the Program Guide." *Id*. at 6 n.3. The April 19, 2017 order was the first in a series of orders that ultimately led the court to order on December 15, 2017 that the parties file by March 31, 2018 "a current consolidated Program Guide incorporating all modifications required by court orders since March 2006." ECF No. 5750 at 4. The court has been clear that preparation of the consolidated Guide did not provide "an opportunity to renegotiate matters that have been settled by court order." ECF No. 5610 at 6 n.3.

On April 10, 2018, the court granted an extension of time to complete the required update and directed the Special Master to file the updated Program Guide on or before May 30,

1  2018.  ECF No. 5816.  The Special Master requested and received one final extension of time to
2  June 29, 2018.  ECF No. 5832.  The 2018 Program Guide Revisions and the Special Master's
3  Report were filed that day, ECF No. 5844, and, as required by minute order, ECF No. 5860, the
4  complete 2018 Program Guide Revision, as defined above, was filed July 30, 2018.  ECF Nos.
5  5864, 5864-1.

E. <u>Report of the Neutral Expert as Related to the Program Guide</u>

On October 5, 2018, plaintiffs notified the court that defendant CDCR's Statewide Chief Psychiatrist, Dr. Michael Golding, had issued a report alleging data submitted by defendants to this court has been inaccurate and misleading.  ECF No. 5936.  During the course of several proceedings occasioned by Dr. Golding's Report, the court sealed the complete Report, ECF No. 5990, and concurrently filed a redacted version of the Report on the public docket, ECF No. 5988.  After consultation with the parties, the court appointed its own neutral expert to conduct an independent investigation into certain allegations contained in the Golding Report to assist the court "in assessing whether facts exist that require this court to hold an evidentiary hearing to decide whether fraudulent or misleading information has been presented to this court in this case, in the specific context of ongoing remedial efforts concerning adequate mental health staffing in CDCR's prisons."  ECF No. 6032 at 8.

On April 22, 2019, the neutral expert submitted his report to the court (hereafter Neutral Expert Report).  Without objection, the court filed the Neutral Expert Report on the public docket on May 3, 2019.  ECF No. 6147.  As relevant here, the neutral expert "note[s] throughout [the] report that there are several instances where there are material differences between CDCR and the Special Master relating to implementation of the Mental Health Services Delivery System Program Guide (the 'Program Guide') or reporting of compliance with it."  *Id*. at 7.  The court has referred those matters to the Special Master "to explore and, as appropriate, resolve in whatever format he deems appropriate."  ECF No. 6149 at 3.

III. ANALYSIS

    A. <u>Approval of 2018 Program Guide Revision</u>

In his June 29, 2018 Program Guide Update Report, the Special Master recommends the court "formally adopt the policies attached to [that] report as Appendix A and the clarification memo attached as Appendix B, as addenda to the MHSDS Program Guide, 2009 Revision." ECF No. 5844 at 10. As discussed above, the court subsequently directed the Special Master to "file the entire current consolidated Program Guide, including the 2009 Revised Program Guide, proposed Appendices A and B thereto," as well as an additional index to Appendix A, ECF No. 5860, which he did on July 30, 2018. ECF No. 5864-1. As explained above, the Special Master conformed the complete document he submitted on July 30, 2018 to comply with the court's direction. Accordingly, the court understands the Special Master recommends formal adoption of the Program Guide 2009 Revision and Appendices A through D thereto, submitted to the court on July 30, 2018. ECF No. 5864-1. There are no objections to this recommendation. Good cause appearing, the 2018 Program Guide Revision will be adopted as modified.

    B. <u>Future Updates to Program Guide</u>

The question of how updates to the 2018 Program Guide Revision can and should be accomplished going forward still must be clarified. The Special Master's second recommendation is that an improved method for modifying the Program Guide be developed in the workgroup. ECF No. 5844 at 10. There is no objection to this recommendation, which is well-taken and overdue given the history reviewed above. The recommendation is now bolstered by the neutral expert's observations of "material differences" in the Special Master's and defendants' interpretations of provisions of the Program Guide relating to implementation of, or reporting compliance with, its provisions. *See* Section II(E) *supra*. The court will adopt this recommendation, with the following clarification.

As the court has made clear, the Program Guide has long "established the framework for delivering constitutionally adequate mental health care, and the time to materially alter its provisions has passed. It must be fully implemented and complied with." ECF No. 5710

at 17-18.  The purpose of finalizing and filing the 2018 Program Guide Revision is compliance-driven:  "for ease of reference and to ensure the parties and the court all agree on the contents of the Program Guide."  ECF No. 5750 at 2.  The need for a current consolidated Program Guide and a regular process for filing any updates to its provisions, for example by preparing and filing "pocket parts" or their equivalent, remains an essential administrative requirement.  Any method for regular, if not annual, modifications to the Program Guide must focus on this fact:  going forward, modifications should not work substantive changes to the approved remedy in this case.  Rather, any change that would effect a material or substantive alteration to the approved remedy in this case would need to be approved by the court.  *See GTE Sylvania, Inc. v. Consumers Union of United States, Inc.*, 445 U.S. 375, 386 (1980), quoted in *Celotex Corp. v. Edwards*, 514 U.S. 300, 306 (1995) (noting "well-established rule that 'persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.'").

The Special Master's third recommendation is that he be directed to report back to the court on this new proposed process within sixty days of entry of this order.  Given the court's resolution of the Special Master's fourth recommendation below, the court will instead require a joint report on this new proposed process from the parties on or before November 15, 2019.

        C.      <u>Recommendation Concerning Program Guide-Related Regulations</u>

The Special Master's fourth recommendation, as noted above, is disputed by the parties.  If adopted, it would require defendants to provide plaintiffs and the Special Master with "any proposed Program Guide-related regulations" or proposed changes to existing Program Guide-related regulations ninety days in advance of the applicable state law public comment period.  So long as remediation is ongoing and supervised by this court, the process going forward for incorporating aspects of the court-approved remedy in this case into state regulation must be carefully and thoughtfully developed so that the regulatory process does not become a vehicle for backdoor, substantive modification of the court-ordered remedy.  The Special Master's fourth recommendation recognizes the complexity of this case, the law of the case and the need to protect the court-ordered remedy to avoid material modification of the remedy

through the state regulatory process and without approval by this court. The fourth recommendation is also consistent with the court's primary purpose in requiring submission of an updated Program Guide: ensuring ease of reference and agreement on the contents of the complete remedy, covering mental health services and custodial considerations as well.

That said, the court has determined that adoption of the Special Master's fourth recommendation at this time is premature, given the complex issues implicated by the interface of the Program Guide, state regulations and/or the D.O.M., and the range of work that remains to be done in the All Parties Workgroup. With its eye firmly focused on the twin needs to protect the approved remedy and preclude disagreement about all of the remedy's contours as the case moves through the final stages of remediation -- compliance, enforcement as necessary, and durability – the court will defer resolution of the fourth recommendation at this time. Rather, this matter, as indicated and as consistent with the Special Master's second recommendation, will be referred back to the Workgroup to finalize a process for updates to the remedy as contained in the 2018 Program Guide Revision. The process for updating and revising any parts of the remedy not incorporated in the 2018 Program Guide Revision, and instead found in state regulations and/or the D.O.M., also will be referred back to the Workgroup to be developed under the guidance of the Special Master. The Special Master shall submit the final proposal for these processes not later than November 15, 2019, in advance of the quarterly status conference presently set for December 13, 2019.

D. <u>Compendium of Additional Settled Remedial Measures</u>

As discussed above, the remedy in this case includes some measures to address violations of law in the custodial management of class members. *See* pages 2, 4-5 *supra*. In order to ensure the complete remedy is fully identified in the record, the parties will be directed to, within thirty days, prepare and file a document that identifies all negotiated or court-ordered remedial measures adopted in this action that cover custodial issues and are not included in the 2018 Program Guide Revision. The parties shall confirm that the Special Master has reviewed the list and concurs that it is a comprehensive list of such remedial measures.

### E. Finalization of Remedial Planning

#### 1. Substantial Completion of Planning

As part of its consideration of the 2018 Program Guide Revision and the Program Guide Update Report, the court has reviewed relevant parts of the extensive record in this action and consulted with the Special Master. As discussed in section IIB above, in 2006 the court estimated that ninety-five percent of the remedy in this case had been finalized and ordered its "immediate" implementation. ECF No. 1773 at 2. At that time, the court also signaled it would begin a process for addressing the remaining outstanding disputes. *Id*. at 3. Given the years that have passed since that 2006 order, the time has arrived to confirm that, except as specifically noted in this order, all remedial planning is complete.

This conclusion is supported by the voluminous record in this action, which shows that most, if not all, of the issues that remained disputed in 2006[12] have been resolved through the following: completion of defendants' staffing plan in 2009; adoption of recommendations from the Special Master arising from results of his ongoing monitoring; agreements achieved in meetings of the parties supervised by the Special Master, which have been a regular part of the remedial process in this action since its inception;[13] litigation on custody-related issues in this court, particularly in 2013 and 2014; and consolidation of claims remaining in the separate *Hecker*[14] action into this one, *see* ECF No. 5284. Additionally, the Special Master has advised the court that the disputed issues identified in the 2006 Special Master Report either have been resolved or are no longer the focus of efforts of the All Parties' Workgroup.

#### 2. Discreet Disputes Remaining

There is an outstanding dispute over the final proposed policy for use of telepsychiatry, and defendants' appeal from the court's July 3, 2018 order on this issue is still

---

[12] *See* note 9 *supra*.

[13] In 2016, the Special Master increased the frequency of these meetings and began to refer to them as meetings of the All Parties Workgroup.

[14] *Hecker v. California Department of Corrections and Rehabilitation, et al.*, Case No. 2:05-cv-2441 KJM DAD (E.D. Cal.).

17

pending. *See* ECF Nos. 5850, 5867; *see also Coleman v. Brown*, No. 18-16445, *appeal docketed* (9th Cir. Aug. 2, 2018). The court is not in a position to finalize this aspect of the remedy until the pending appeal is resolved.

As the court discussed with the parties at the status conference on April 26, 2019, the deadline for submission of a final proposed addendum covering exceptions to the twenty-four hour timeline for transfer to mental health crisis bed (MHCB) care must be reset. To that end, the court has approved a stipulation filed by the parties addressing this issue. *See* ECF No. 6158. In addition, a date certain must be set for taking all temporary MHCBs offline and, as necessary, replacing them with permanent licensed MHCB units.[15] There also is an unresolved issue currently under consideration by the Workgroup concerning the use of therapeutic treatment modules (TTMs) in inpatient settings. These matters are the subject of a separate, recent court order, ECF No. 6135.

Finally, while there are specifically identified "policies that are currently in flux," which are under review by the parties and the Special Master "to determine whether they are appropriate for inclusion in the Program Guide," *see* ECF No. 5864 at 2 (describing Attachment E to 2018 Program Guide Revision), and while there may be a need to clarify the interpretation of certain Program Guide provisions as suggested by the neutral expert, there are no substantive disputes regarding the provisions of the 2018 Program Guide Revision.

With the exception of the foregoing issues, the remedial planning in this action is complete. As noted above, of course, that remedial planning is complete does not mean implementation of the settled remedies is fulfilled. Quite a number of important implementation steps remain. But at this juncture, the court's view is that the stakeholders are in a position to turn their primary attention to the tasks remaining to ensure complete and durable implementation of the identified remedy, without further delay.

/////

---

[15] The need to complete this aspect of the remedy in this case is also addressed in the court's order on the Special Master's Report on his Expert's Third Re-Audit and Update of Suicide Prevision Practices, ECF Nos. 5993, 5993-1, filed concurrently with this order.

18

In accordance with the above, IT IS HEREBY ORDERED that:

1. The 2018 Program Guide Revision, defined as the 2018 Revision to the Mental Health Services Delivery System Program Guide and Appendices A through D, ECF No. 5864-1, is APPROVED.

2. Within thirty days the parties shall prepare and file a document that identifies all negotiated or court-ordered remedial measures adopted in this action that cover custodial issues and are not included in the 2018 Program Guide Revision. The parties shall confirm that the Special Master has reviewed the list and concurs that it is a comprehensive list of such remedial measures.

3. The parties shall, under the guidance and supervision of the Special Master, work through the All Parties Workgroup process to develop an improved method for regular administrative updating of the 2018 Program Guide Revision and to develop a process for updates and revisions to any part of the remedy found in state regulations and/or provisions of the California Department of Corrections and Rehabilitation's Departmental Operations Manual. The Special Master shall submit the final proposed processes to the court on or before November 15, 2019.

4. Within twenty-one days from the date of this order, the parties shall meet and confer and submit to the court a proposed stipulation and order for modification of the ten-day objection period in the Order of Reference to add a provision governing the objection period for reports from the Special Master that are not circulated to the parties for review and comment prior to filing. The parties shall seek the input and concurrence of the Special Master in the proposal to be submitted to the court.

DATED: July 9, 2019.

_____
UNITED STATES DISTRICT JUDGE

19