XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**JOINT REPORT FOLLOWING JUNE 10, 2019 STATUS CONFERENCE**<br><br>Hearing Date: September 13, 2019<br>Time: 10:00 a.m.<br>Location: Courtroom 3, 15th Floor<br>Judge: The Hon. Kimberly J. Mueller |

## INTRODUCTION

On June 10, 2019, the Court held a special status conference to discuss issues raised by the Neutral Expert's Report. In a June 14, 2019 order, the Court accepted the Neutral Expert's Report[1] and directed the parties to address a series of issues to determine whether misleading data was presented to the Court and/or Special Master and to establish steps to clear up ambiguities and other issues related to CDCR's mental health program and policies. (ECF No. 6187 at 2:1-4:13.)

---

[1] The Court did not delegate any fact finding to the Neutral Expert and accepted the Report to the extent it addresses the areas delegated to the neutral expert by the Court in the order of appointment. (ECF No. 6187 at 2.)

[3406703.11]                                      1

                                    Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

As part of that process, the Court scheduled an evidentiary hearing for September 13, 2019, to take evidence on the following five issues, which, if confirmed, could establish that misleading data was presented to the Court and/or the Special Master:

    a.    Issue B: Redefining "Monthly" to Lengthen the Intervals between Enhanced Outpatient (EOP) Appointments;

    b.    Issue D:  Counting All Encounters as Evaluations;

    c.    Issue E:  Reporting of Scheduled and Missed Appointments;

    d.    Issue F:  Psychiatric Supervisors Acting as Line Staff; and

    e.    Issue G:  Medication Noncompliance.

(*Id.* at 2:5-15.)  The purpose of the evidentiary hearing is to assist the Court in determining (a) whether misleading data was presented to the Court and/or the Special Master; (b) if misleading data was presented, how and why that happened; and (c) what action is required to correct the record and avoid future submission of misleading data.  (*Id.* at 2:14-18.)

The Court ordered the parties to meet and confer to determine whether they can stipulate to one or more of the underlying facts suggested by the results of the Neutral Expert's investigation as they pertain to the five issues.  (*Id.* at 2:19-23.)  The Court directed the parties to present any agreed upon facts as stipulations in a joint report.  (*Id.* at 2:21-23.)  The Court further ordered the parties to discuss Plaintiffs' self-certification proposal and include the results of their discussion in the joint report (*id.* at 2:24-26), along with agreements on any other areas within the scope of the evidentiary hearing (*id.* at 3:1-3), and the parties' positions with respect to eight additional issues referenced in footnote 19 of the Neutral Expert's Report and provided by the Neutral Expert to the Court, which are identified in Exhibit A to the June 14, 2019 order (*id.* at 3:4-8). The June 14 order also allowed the parties to propose additional witnesses to appear and provide testimony at the evidentiary hearing.  (*Id.* at 3:17-20.)  Pursuant to a joint scheduling report filed with the Court on June 21, 2019, the parties agreed to submit their witness-related proposals in this joint report.  (ECF No. 6205 at 2).  The parties' joint report was due on July 15, 2019 (ECF No. 6187 at 2:23), which the Court extended to July 22, 2019 in response to the parties' joint request for a short continuance (ECF No. 6219).

[3406703.11]    2

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

The parties met and conferred multiple times leading up to the July 22, 2019 joint submission deadline. The parties submit their stipulations concerning the five issues identified by the Court for consideration at the September 13, 2019 evidentiary hearing, their positions on disputed facts related to the five issues, Plaintiffs' proposal for self-certification, other issues within the scope of the evidentiary hearing, the eight issues set forth in Exhibit A, and the parties' proposals regarding additional witnesses to appear and provide testimony at the September 13, 2019 evidentiary hearing.

## STIPULATED FACTS ON FIVE ISSUES FOR EVIDENTIARY HEARING

This section sets forth the facts stipulated to by the parties. To the extent the parties were unable to stipulate, the parties provide their respective positions explaining why they could not reach agreement and the facts that remain in dispute.

### ISSUE B: REDEFINING MONTHLY TO LENGTHEN THE INTERVALS BETWEEN ENHANCED OUTPATIENT PROGRAM APPOINTMENTS.

#### A.    Stipulations.

1. The Program Guide states that a psychiatrist shall evaluate each Enhanced Outpatient Program (EOP) inmate-patient "at least monthly to address psychiatric medication issues." (Program Guide at 12-4-9; Neutral Expert's Report at 33.[2])

2. The Program Guide does not define the term "monthly." (Neutral Expert's Report at 44.)

3. The Special Master referenced monitoring whether EOP patients prescribed psychotropic medications were seen by a psychiatrist "every 30 days" in his Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth round monitoring reports. (*See, e.g.*, ECF No. 5439 at 309, 392; ECF No. 4298 at 188, 372; ECF No. 4205 at 229; *see also* Neutral Expert's Report at 43.) The Court adopted these reports. (*See* ECF Nos. 5477; 4361; 4232.)

4. In December 2016, CDCR modified its business rule for measuring the timeliness of psychiatry appointments for EOP patients.

---

[2] All page citations to the Neutral Expert's Report are to the ECF-generated pagination.

[3406703.11]    3

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

5.      Prior to the rule change in December 2016, CDCR used 30 days as the interval to measure compliance with the Program Guide requirement that EOP patients have "monthly" psychiatric evaluations.  (Neutral Expert's Report at 45.)

6.      No headquarters psychiatrist was consulted before the rule change to the definition of "monthly" was implemented in December 2016.  (*Id.* at 44.)

7.      CDCR representatives who implemented the business rule change, including Dr. Laura Ceballos (who oversees CDCR's Mental Health Quality Management team), were regularly in contact with the Special Master, including meeting frequently with the parties during the All-Parties Workgroups, during the time that the change was made and then reversed.  (*Id.*)

8.      In March 2017, Dr. Michael Golding, a headquarter's Chief Psychiatrist, raised concerns with Dr. David Leidner and Dr. Ceballos regarding increased compliance rates.  (*Id.* at 46.)  On March 22, 2017 and April 12, 2017, Dr. Golding requested that the rule measuring compliance be changed back to "every 30 days."  On April 13, 2017, CDCR agreed to change the rule back.  (*Id.* at 48.)  Dr. Golding insisted to Dr. Ceballos that the rule change should have been reported to the Court.  (*Id.* at 46.)  Dr. Ceballos disagreed with Dr. Golding and stated that CDCR did not need to inform the Court about every change, but only "major" changes that have a "significant impact."  (*Id.* at 46-47.)

9.      On April 24, 2017, CDCR reinstated the prior definition of the term "monthly" in the business rule for the Performance Report indicator measuring timely compliance with EOP routine psychiatric appointments to "within 30 days."  (*Id.* at 48.)

10.      CDCR never notified the Special Master, the Court or the Plaintiffs of the business rule change in December 2016 or the April 2017 change back to 30 days.  (*Id.* at 42 and 44.)

11.      On March 30, 2017, Defendants filed a Response to the Special Master's Report on the Status of Mental Health Staffing (ECF No. 5591 at 14), and an accompanying declaration by Katherine Tebrock, Deputy Director of CDCR's Mental Health Program (ECF No. 5591-2 at 4, 9), relying on data reported using the revised business rule.  (Neutral Expert's Report at 44, 48.)  Defendants' April 14, 2017 reply brief in support of their objections (ECF No. 5601 at

[3406703.11]                                           4

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    8-9) also refers to Performance Report data based on the revised business rule.  (Neutral Expert's

2    Report at 44.)

3         12.    Defendants submitted five monthly ASU EOP Hub Certification letters to the

4    Special Master and Plaintiffs that were based in part on data from the Performance Report that

5    measured timely compliance with EOP routine psychiatric appointments using the revised

6    business rule.

7    **B.    Plaintiffs' Position and Additional Proposed Stipulated Facts.**

8         As an initial matter, for all five issues identified by the Court (ECF No. 6187 at 2:8-13),

9    Defendants have refused to stipulate to numerous underlying facts quoted directly from the

10   Neutral Expert's Report.  Many of these facts were drawn from paragraphs the Court specifically

11   directed the parties to review during the June 10, 2019 status conference.  (Hr'g Tr., ECF No.

12   6185 at 9:5-15; 10:14; 11:9; 12:1-22; 13:6-16.)  By and large, Defendants are not willing to

13   stipulate to evidence identified in the Neutral Expert's Report that CDCR's data related to the five

14   issues was developed, collected, or reported in a misleading way.  As a result, the Court's core

15   purpose for holding the evidentiary hearing—to determine "whether misleading data was

16   presented to the court and/or the Special Master" (ECF No. 6187 at 2:16)—remains hotly

17   contested.  Throughout this joint report, Defendants suggest that Plaintiffs are refusing to

18   cooperate with Defendants' purported attempts to answer the "how" and "why" questions posed

19   by the Court's June 14, 2019 order (ECF No. 6187 at 216-17).  However, these efforts are

20   premature given Defendants' refusal in most instances to stipulate that a problem occurred in the

21   first place.

22        Plaintiffs also note that for all five issues, Defendants requested stipulations based on the

23   portions of the Neutral Expert's Report that describe "CDCR's Response" to Drs. Golding and

24   Gonzalez's allegations.  But the Court directed the parties to focus on the portions of the Report

25   that outline the Neutral's "findings."  (*See, e.g.*, Hr'g Tr., ECF No. 6185 at 9:5-15; 10:14; 11:9;

26   12:1-22; 13:6-16.)  Plaintiffs do not have access to any of the documents Defendants' provided to

27

28

[3406703.11]                                     5

1   the Special Master, and are therefore unable to independently verify many of their explanations

2   regarding how or why something happened.

3           Throughout this joint report, Defendants say they are committed to the Court's goal of

4   reestablishing trust between the parties.  But this is belied by Defendants' unwillingness to

5   provide Plaintiffs with the documents they produced to the Neutral Expert, in exchange for

6   Plaintiffs' documents and an agreement to jointly request access to the transcripts of interviews

7   and other documents relied on by the Neutral Expert.  During the meet and confer process,

8   Plaintiffs repeatedly asked for additional information that would have helped Plaintiffs stipulate

9   to additional facts.  Defendants refused those requests.  Moreover, Plaintiffs did not receive

10  Defendants' explanations for refusing to stipulate to certain facts until Sunday afternoon on July

11  21, 2019, the day before this filing.  Plaintiffs therefore had very limited time to consider or

12  respond to Defendants' positions.

13          With respect to Issue B, *supra*, the parties have several disputes.  Most importantly, the

14  parties dispute the exact nature of CDCR's December 2016 business rule change.  There is

15  significant evidence in the report that after the rule was changed, CDCR counted as compliant

16  some psychiatric appointments that occurred up to 60 days after the previous appointment.

17  Defendants refuse to stipulate to those facts.  Due to the ambiguity of the exact nature and effect

18  of the change, Plaintiffs are not willing to stipulate to Defendants' proposed characterization of

19  the revised rule as changing from 30 days to "once every calendar month, never to exceed 45

20  days."

21          The parties also dispute where the impetus for the rule change originated.  But Defendants

22  falsely characterize Plaintiffs' position as more broadly disputing the chronology of events

23  leading up to, and emanating from, the business rule change.  Contrary to Defendants' below

24  characterization (*see* Section I.C.¶1, *infra*), Plaintiffs were willing to stipulate that "redefining the

25  term 'monthly' when measuring compliance with timely psychiatry contacts was first raised on

26  November 2, 2015 by a medication court administrator at the California Health Care Facility."

27  (Neutral Expert's Report at 45.)  Plaintiffs were not willing to stipulate only to the allegation that

28  the CHCF administrator first raised this issue "at the request of two CDCR psychiatrists."  The

[3406703.11]                                          6

1  Neutral Expert never conclusively determined that occurred and Defendants refused to produce

2  any documents to substantiate the claim.  (*Id.*)  Also in contrast to Defendants' below

3  characterization (*see* Section I.C.¶4, *infra*), Plaintiffs were willing to stipulate that "[o]n

4  December 5, 2016, the medication court administrator submitted a request that CDCR's data

5  quality management team for the Statewide Mental Health Program change the definition of the

6  term 'monthly' in the business rule for the Performance Report indicator measuring timely

7  compliance with EOP routine psychiatric appointments."  The only things to which Plaintiffs

8  were not willing to stipulate were the allegation that the CHCF administrator made the request

9  "on behalf of psychiatry" and, for the reasons noted above, Defendants' characterization of the

10  rule change.  Although Plaintiffs agreed to stipulate to a substantial portion of these facts,

11  Defendants refused to include them in the joint stipulations.

12      In addition, Plaintiffs requested Defendants stipulate to the following underlying facts

13  identified in the Neutral Expert's Report, but Defendants refused:[3]

14      1.  The Special Master has consistently interpreted "monthly" to be "30 days."

15  (Neutral Expert's Report at 43.) [Defendants were only willing to stipulate that the Special Master

16  referenced his interpretation in the Twenty-Fourth, Twenty-Fifth, and Twenty-Sixth round

17  monitoring reports.  (*See* Section I.A.¶3, *supra*.)]

18      2.  The December 2016 change in the definition of the term "monthly" in the

19  business rule for the Performance Report indicator measuring timely compliance with EOP

20  routine psychiatric appointments represented a significant alteration in the implementation of the

21  Program Guide.  (*Id.* at 49.)

22      3.  After the business rule was changed, CDCR counted as compliant some

23  instances where EOP patients were not seen by a psychiatrist for up to 60 days.  (Report at 38,

24  40.)

25      4.  Compliance rates for timely EOP psychiatry contacts improved after the rule

26  change took effect.  (*Id.* at 46, 48.)

27  _____

28      [3] The bracketed text following some stipulations is meant to provide further context to the
Court regarding the parties' dispute.

1    5.    Defendants filed their March 30, 2017 Response to the Special Master's Report

2  on the Status of Mental Health (ECF No. 5591 at 14) and an accompanying declaration by Deputy

3  Director Tebrock (ECF No. 5591-2 at 4, 9) *after* Dr. Golding raised concerns about the business

4  rule change but *before* the rule was reverted back to "30 days."  (Neutral Expert's Report at 44,

5  48.)  On April 14, 2017, Defendants filed their Reply in support of their Response to the Special

6  Master's Report on the Status of Mental Health, which relies on performance report data that uses

7  the December 2016 business rule change (ECF No. 5601 at 8-9), before the rule was reverted

8  back to "30 days."  [Defendants agreed to the majority of these facts in the joint stipulations,

9  above.  However, Defendants refused to stipulate to the specific framing proposed here, i.e. that

10  CDCR filed its March 30, 2017 and April 14, 2017 filings after Dr. Golding raised concerns about

11  the business rule change, but before CDCR reinstated the prior definition of monthly.  This is

12  inexplicable, because Defendants have agreed in the joint stipulations to this timeline of events,

13  just so long as those facts are not strung together in a single stipulation.]

14    6.    On March 28, 2017, Deputy Director Tebrock sent an email noting that the

15  Governor's office had asked to "explain in more detail what metrics can be used to show that the

16  care by psychiatry is adequate."  (*Id.* at 48.)  [The Neutral Expert quotes this email directly, but

17  Defendants still refused to stipulate to this fact or produce the email to the extent the Neutral

18  Expert's recitation is inaccurate.]

19    7.    Redefining the term "monthly" when measuring compliance with timely

20  psychiatry contacts was first raised on November 2, 2015 by a medication court administrator at

21  the California Health Care Facility.  (*Id.* at 45.)

22    8.    On December 5, 2016, the medication administrator submitted a request that

23  CDCR's data quality management team for the Statewide Mental Health Program change the

24  definition of the term "monthly" in the business rule for the Performance Report indicator

25  measuring timely compliance with EOP routine psychiatric appointments.  (*Id.* at 45-46.)

26    9.    Eight minutes after the request was submitted, Dr. Leidner responded that he

27  had received verbal approval from Dr. Ceballos to change the business rule.  (*Id.* at 46.)

28

[3406703.11]

8

10.     That same afternoon on December 5, 2016, Dr. Ceballos and Dr. Golding communicated via email about other policy issues, but Dr. Ceballos never mentioned the rule change to him.  (*Id.* at 46.)

## C.     Defendants' Position and Additional Proposed Stipulated Facts.

This is a good example of how Plaintiffs intend to expand the Court's June 14, 2019 order that otherwise scheduled a narrow and focused evidentiary hearing on five discrete issues.  Defendants proposed stipulating to an extensive number of facts supported by the Court's expert's report.  But Defendants, as Plaintiffs propose, cannot stipulate to facts to Plaintiffs' liking—CDCR's mental health data reporting is complex, which is reflected by the Court's expert report.  If the Court is unwilling to accept Defendants' proposals and instead accept Plaintiffs' attempts to reach into areas beyond the Court's June 14, 2019 order, Defendants request an opportunity to be heard at a pre-hearing conference and through formal motion practice to make an appropriate record for appellate review.

Plaintiffs refuse to stipulate that CDCR changed the business rule applied to measure compliance with required "monthly" psychiatry contacts from thirty days to once every calendar month, never to exceed 45 days, despite clear documentation that this was the rule change.  (*Id.* at 46 and ECF No. 6012-3 at 54.)  Accordingly, the stipulated facts simply refer to a business rule change without reference to the fact that the rule change was consistent with the Program Guide requirement that EOP patients be seen monthly.  Plaintiffs also refuse to stipulate to the facts reported by the Court expert as to why CDCR initiated the change in the business rule. Defendants' proposed stipulated facts would answer the "how" and "why" questions posed by the Court's June 14, 2019 order.  Absent a stipulation on such facts, Defendants will be prepared to answer the Court's questions on this issue at the September 13, 2019 hearing.

Plaintiffs refused to stipulate to the following facts underlying the Court's expert's conclusions:

1.     Redefining the term "monthly" when measuring compliance with timely psychiatry contacts was first raised on November 2, 2015 by a medication court administrator at

[3406703.11]                                    9

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1 the California Health Care Facility at the request of two CDCR psychiatrists. (*Id.* at 45.) When

2 the psychiatrists attended a webinar hosted by Dr. Leidner to discuss the issue, Dr. Leidner

3 instructed them to raise the issue with Dr. Golding. (*Id.*) On February 25, 2016, the psychiatrists

4 e-mailed Dr. Golding and asked to substitute the 30-day rule with a "monthly" rule to "help ease

5 psychiatrists' tracking issues, reduce staffing needs, help psychiatrists manage their own

6 outpatient caseloads and other issues." (*Id.* at 46.)

7  [Plaintiffs agree that redefining the term "monthly" was first raised on November 2, 2015,

8 but they dispute each other fact Defendants proposed.]

9   2. The medication court administrator at the California Health Care Facility raised

10 the issue again in November and December of 2016. (*Id.*)

11   3. On December 5, 2016, the medication court administrator submitted a request

12 on behalf of psychiatry that CDCR's data quality management team for the Statewide Mental

13 Health Program change the definition of the term "monthly" in the business rule for the

14 Performance Report indicator measuring timely compliance with EOP routine psychiatric

15 appointments from 30 days to once every calendar month, to never exceed 45 days between

16 appointments. (*Id.* at 45-46.)

17  [Plaintiffs refused to stipulate to the facts setting forth the complete chronology of the

18 change in the business rule for the Timely Psychiatry Contacts indicator summarized by the

19 Court's expert on the basis that they could not verify them. Instead, Plaintiffs would only agree

20 to certain select facts, sometimes divorced from relevant context from the expert's summary.]

21   4. Under the revised rule, timely compliance continued to require at least one

22 appointment every calendar month, without exception. (*Id.* at 43, 45-46.)

23   5. There was no release note for the change since release notes were not being

24 issued at that time. (*Id.* at 46.)

25   6. In December 2016, when CDCR changed the definition in the business rule,

26 there was no established process or practice in place to notify the Chief Psychiatrist before a

27 business rule was changed.

28

[3406703.11]    10

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    7.    The change in the definition of the term "monthly" in the business rule for the

2    Performance Report indicator measuring timely compliance with EOP routine psychiatric

3    appointments was not reported to the Special Master or the Court because CDCR mental health

4    administrators believed that the rule change would still measure whether patients would be seen

5    every month  consistent with the Program Guide's requirement that each EOP inmate-patient be

6    evaluated "at least monthly to address psychiatric medication issues." (*Id*. at 45.)

7    [Plaintiffs agree with the factual statement that the rule change was not reported to the

8    Court, but will not stipulate to the explanation CDCR witnesses provided to the Court expert

9    concerning why they did not report the business rule change.]

10    8.    Since April 2017, Defendants have implemented a Mental Health Management

11    Change Committee to ensure all stakeholders, including the Chief Psychiatrist, are informed of

12    requests for Performance Report modifications and that CDCR's psychiatrists are made aware of

13    psychiatry indicator-related requests and have an opportunity to opine on the appropriateness of

14    the proposed change in advance. (*Id*. at 49.)

15    **ISSUE D: COUNTING ALL ENCOUNTERS AS EVALUATIONS.**

16    **A.    Stipulations.**

17    1.    The Program Guide does not define the term "psychiatric evaluation."

18    2.    According to the Neutral Expert, based on the common understanding among

19    psychiatrists as to what constitutes a psychiatric evaluation, a psychiatric evaluation for purposes

20    of the Program Guide must be confidential except under very limited circumstances. (Neutral

21    Expert's Report. at 54.)

22    3.    Chapters 3 and 4 of the Program Guide require psychiatrists to "evaluate"

23    Correctional Clinical Case Management System (CCCMS) and EOP patients during clinical

24    contacts. (Program Guide 12-3-11, 12-4-9.) Attachment A to the 2009 Program Guide defines a

25    clinical encounter as "when a clinician communicates with an inmate-patient in a clinical setting."

26    Attachment A defines a clinical setting as "the location where a confidential communication

27    occurs." Attachment A also provides examples of how confidentiality is maintained outside of

28    clinical settings. (Neutral Expert's Report at 59 and 2009 Program Guide at Exh. A.) Chapter 4

[3406703.11]                11

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    of the Program Guide also requires that individual clinical contacts between EOP patients and

2    their primary clinician—which can include "a psychiatrist, a psychologist, or a CSW [clinical

3    social worker]"—"shall be held in a private setting out of cell, or cell-front if an inmate-patient

4    refuses." (Program Guide 12-4-14 through -15.)

5        4.    The Program Guide requires that all mental health screening and evaluation

6    interviews occurring in reception centers and segregation settings be conducted "in a private

7    setting." (Program Guide 12-2-3, 12-2-5, 12-7-6, 12-7-14, 12-8-12.)

8        5.    The Performance Report measures non-confidential psychiatry contacts as

9    compliant with the Program Guide's requirement for monthly evaluations. (Neutral Expert's

10   Report at 56.)

11       6.    Any appointment checked in and out within the Electronic Health Records

12   System (EHRS) and designated as a psychiatry contact is counted as a completed psychiatry

13   evaluation. (*Id*. at 61.) Any completed appointment is counted towards Performance Report

14   compliance measures. (*Id*.)

15       7.    When a psychiatrist documents an encounter with a patient in CDCR's EHRS,

16   the encounter defaults to "confidential" unless the psychiatrist selects the option from the drop-

17   down menu to reflect that the encounter was not "confidential." (*Id*. at 65-66.)

18       8.    The Court's Neutral Expert found that the data provided by CDCR on "Timely

19   Psychiatry Contacts" overstates compliance with the Program Guide timeline requirements

20   because (1) CDCR counts all non-confidential psychiatry contacts entered into EHRS towards

21   Program Guide timeline requirements for EOP and CCCMS psychiatric evaluations, and (2)

22   because of CDCR's decision to default the appointments in EHRS to confidential, combined with

23   insufficient training and oversight related to this mechanism. (*Id*. at 67.)

24       9.    Timely Psychiatry Contacts data were provided to the Special Master and

25   Plaintiffs in connection with the Twenty-Sixth and Twenty-Seventh monitoring rounds (ECF No.

26   6012-2 at 3), in connection with Defendants' Continuous Quality Improvement (CQI) monitoring

27   tours and in Defendants' draft CQI reports provided to the Special Master and Plaintiffs, in

28   Defendants' monthly ASU EOP Hub and PSU Certification letters provided to the Special Master

[3406703.11]                                    12

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1   and Plaintiffs, and in "Exhibit I – HDSP Performance Report" to Defendants' June 5, 2018

2   Clustering Proposal.

3          10.    Timely Psychiatry Contacts data were provided to the Court as part of CDCR's

4   2018 Staffing Proposals (ECF No. 5741-2 at 9-10; ECF No. 5841-2 at 4 n.5, 9, 14, 16, 31-33;

5   ECF No. 5841-3 at 2; ECF No. 5922 at 15, 21), in Defendants' Objections to the Special Master's

6   Report on the Proposed Telepsychiatry Policy Addendum (ECF No. 5879 at 17 and 5879-4 at 4),

7   and in Defendants' 2017 filings, including in a declaration by Deputy Director Tebrock, in

8   response to the Special Master's report on CDCR's staffing plan (ECF No. 5591 at 14; ECF No.

9   5591-2 ¶¶ 8 & 10, and at ECF page 9; ECF No. 5601 at 8-9).  (*See also* Neutral Expert Report at

10  59.)

11         **B.      Plaintiffs' Position and Additional Proposed Stipulated Facts.**

12         Defendants refused to stipulate to evidence in the Neutral Expert's Report "that CDCR's

13  reporting of data relating to its 'Timely Psychiatry Contacts' is misleading."  (Neutral Expert's

14  Report at 9.)  Instead, Defendants were only willing to stipulate that "[t]he *Court's Neutral Expert*

15  *found* that the data provided by CDCR on 'Timely Psychiatry Contacts' overstates compliance

16  with the Program Guide timeline requirements."  (Section II.A.¶8, *supra* (emphasis added).)

17  Defendants contend that the issue of psychiatry appointments occurring in confidential settings

18  has never been brought forward for discussion and clarification.  (Section.II.C., *infra*.)  However,

19  it is Plaintiffs' position "that the Program Guide … provides sufficient guidance that psychiatric

20  evaluations must be confidential to count towards Program Guide timeline compliance" (Neutral

21  Expert's Report at 57), particularly given the numerous Program Guide provisions relating to

22  confidentiality quoted above, (*see* Section.II.A.¶¶3-4).  Plaintiffs are also unable to stipulate to

23  facts regarding Defendants' discussions with the Special Master, as Plaintiffs lack independent

24  knowledge to verify those allegations.

25         Plaintiffs requested that Defendants stipulate to the following underlying facts, but

26  Defendants refused:

27

28

[3406703.11]                                    13

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    1.    CDCR's interpretation of psychiatric "evaluation" in the Program Guide is at

2    odds with the text and context of the document and the repeatedly-expressed position of the

3    Special Master.  (*Id.* at 68.)

4    2.    There is no option for psychiatrists to log an appointment that would not be

5    counted towards Program Guide compliance, such as a wellness check, into the EHRS System.

6    (*Id.* at 68.)

7    3.    Psychiatrists in the field reported to CDCR's Mental Health leadership that they

8    did not have an accurate way to enter brief, non-confidential encounters into the EHRS without

9    making it look like a full, confidential "evaluation" for measuring Program Guide compliance.

10    (*Id.* at 63-64, 66.)

11    4.    At least one psychiatrist at CDCR Headquarters raised the issue of needing to

12    count wellness checks separately from psychiatric evaluations at a meeting with CDCR Mental

13    Health Leadership, but the leaders present ignored the request.  (*Id.* at 62.)

14    5.    CDCR provided data on "Timely Psychiatry Contacts" to the Court, the Special

15    Master, and Plaintiffs that overstates compliance with the Program Guide timeline requirements.

16    (*Id.* at 67.)

17    6.    CDCR was or should have been aware that many psychiatrists were not

18    properly recording whether their visits were non-confidential.  (*Id.* at 67-68.)

19    Additionally, CDCR disputes that "the common understanding among psychiatrists as to

20    what constitutes a psychiatric evaluation, a psychiatric evaluation for purposes of the Program

21    Guide must be confidential except under very limited circumstances."  (*Id.* at 54.)  Defendants are

22    only willing to stipulate that the Neutral Expert holds this view.

23    **C.    Defendants' Position and Additional Proposed Stipulated Facts.**

24    Since the development of the Program Guide in 1997, CDCR's policies have not

25    exclusively restricted psychiatrist-patient contacts to confidential settings.  And the issue has

26    never been brought forward for discussion and clarification.  Even assuming that the policy

27    requires clarification, it is clear that the tracking and reporting of psychiatry contacts has not been

28    limited to only those in confidential settings.

[3406703.11]                                14

1   Defendants requested that the Plaintiffs stipulate to the following facts reported by the
2   Court's expert, but Plaintiffs refused:

3       1.    The Program Guide does not contain an express requirement that all psychiatric
4   contacts must be held in a confidential setting.  (Neutral Expert's Report at 58.)

5       2.    Because the parties and the Special Master's regular compliance and remedial
6   discussions do not include CDCR's business rules, the parties and the Special Master did not
7   discuss whether non-confidential appointments should be counted for purposes of reporting
8   compliance with timely psychiatry contacts.  (*Id*. at 60.)

9       3.    Defendants provided the Special Master with data showing the frequency of
10  confidential and non-confidential appointments, including the reasons why non-confidential
11  appointments occur.  (*Id*. at 57.)

12      4.    Defendants did not "design or present the data in a manner to conceal the fact
13  that non-confidential appointments entered into EHRS were being counted" towards compliance.
14  (*Id*. at 68.)

15  **ISSUE E:  REPORTING OF SCHEDULED AND MISSED APPOINTMENTS.**

16      **A.**    **Stipulations.**

17      1.    The "Appointments Seen as Scheduled" indicator does not report any Program
18  Guide requirements.  (Neutral Expert's Report at 72.)

19      2.    Tracking the number of treatment hours offered, attended, and refused is an
20  important component of the Special Master's compliance monitoring.  (*Id.* at 71.)

21      3.    In 2016, CDCR changed the "Appointments Seen as Scheduled" indicator
22  methodology—which was defined as including ***all*** scheduled appointments—to include only
23  appointments missed due to factors within CDCR's control.  (*Id.* at 75.)  CDCR excluded from
24  the "Appointments Seen as Scheduled" indicator appointments not seen due to patient refusal or
25  no-shows.  (*Id.* at 70.)  At that time, CDCR did not update the corresponding definition of the
26  indicator to reflect that the indicator did not include all scheduled appointments that were missed.
27  As a result, data on the rate of patients who missed scheduled appointments CDCR provided to
28  the Special Master, Plaintiffs, and the Court in connection with its 2018 Staffing Proposals (ECF

1  No. 5841-2 at 4 n.5) (and to the Special Master and Plaintiffs as part of its CQI evaluations and

2  draft reports, and in connection with the Twenty-Sixth and Twenty-Seventh monitoring rounds,

3  and in Defendants' June 5, 2018 Clustering Proposal) was described in a manner that did not

4  accurately reflect the indicator's underlying methodology.  (Neutral Expert's Report at 75.)

5       4.    After reviewing Dr. Golding's allegations on October 3, 2018, Defendants

6  corrected the definition for the "Appointments Seen as Scheduled" indicator to accurately reflect

7  the indicator's methodology.  (*Id.*)

8       5.    The "Treatment Cancelled" indicator reflects only the number of treatment

9  hours cancelled greater than a certain threshold, not the total number of treatment hours

10  cancelled.  (*Id.* at 70.)

11       6.    The "Treatment Refused" indicator reflects only the number of treatment hours

12  cancelled greater than a patient's refusal of fifty percent of all offered treatment and whose

13  attendance is less than one-half of the threshold of required treatment hours for that patient's level

14  of care and housing setting, not the total number of treatment hours refused.  (*Id.* at 70; ECF No.

15  6012-3 ¶ 43.)

16       **B. Plaintiffs' Position and Additional Proposed Stipulated Facts.**

17       Plaintiffs requested that Defendants stipulate to the following underlying facts, but

18  Defendants refused:

19       1.    CDCR excluded from the "Appointments Seen as Scheduled" indicator

20  appointments not seen due to scheduling errors.  (Neutral Expert's Report at 70.)  [But

21  Defendants agreed to stipulate to Dr. Golding's allegation that the indicator excluded

22  appointments not seen due to patient refusal or no-shows.  (Section III.A.¶3, *supra*.)]

23       2.    If a provider sees a patient after an appointment is scheduled, but simply checks

24  the patient in and out in EHRS when the patient is seen without requesting that the original

25  appointment be rescheduled, the original appointment will be measured as having been completed

26  as scheduled.  (*Id.* at 74.)  [Defendants falsely state below that Plaintiffs refused to stipulate to

27  this fact.  This is wrong.  As Defendants state below (*See* Section III.C.¶3, *infra*.)  Plaintiffs were

28  not willing to stipulate only to the sentence after this fact that "CDCR had already taken steps to

[3406703.11]                    16

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1  address this issue through training before receiving of Dr. Golding's report." Plaintiffs dispute

2  this because Plaintiffs cannot verify what internal steps Defendants have taken, or whether the

3  issue has been addressed. Despite that both parties agree to the first sentence proposed here,

4  Defendants refused to add it to the joint stipulations.]

5         3.    Defendants relied on treatment refusal data to support their proposal to reduce

6  the number of CCCMS patients on psychiatrists' caseloads as part of Defendants' 2018 Staffing

7  Proposal, multiple versions of which were provided to the Special Master, Plaintiffs, and the

8  Court. (*See* ECF No. 5841-3 at 2; ECF No. 5922 at 14.)

9         As Defendants state below, Plaintiffs do not dispute that "[i]n 2016, CDCR changed the

10  "Appointments Seen as Scheduled" indicator methodology—which was defined as including ***all***

11  scheduled appointments—to include only appointments missed due to factors within CDCR's

12  control." (*See* Section III.C.¶4, *infra*.) Indeed, the parties jointly stipulated to this fact. (*See*

13  Section III.A.¶3, *supra*.) Plaintiffs only dispute that CDCR made this change "as part of its effort

14  to examine whether the mental health system's management of patients was causing patients to

15  miss appointments." Plaintiffs have no way to verify CDCR's purported reasoning here.

16         Plaintiffs cannot stipulate that the "Treatment Cancelled" and "Treatment Refused"

17  performance report indicators do not capture any Program Guide requirements because there are

18  numerous Program Guide provisions requiring CDCR to provide patients treatment and to track

19  refusals and take remedial steps. (*See, e.g.*, Program Guide 12-3-9 and 12-4-6 through -7.)

20  Plaintiffs are also unable to verify that CDCR never provided data from these indicators to the

21  Special Master because Plaintiffs are not included in all communications between the Special

22  Master and Defendants.

23         **C.    Defendants' Position and Additional Proposed Stipulated Facts.**

24         Defendants requested that Plaintiffs stipulate to the following underlying facts reported by

25  the Court's expert, but Plaintiffs refused:

26         1.    During monitoring, the Special Master conducts interviews of staff to determine

27  whether the institutions are offering the required number of hours and did not find any major

28  issues with compliance data. (Neutral Expert's Report at 71.)

[3406703.11]                                    17

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    2.    The "Appointments Seen as Scheduled" indicator was developed by CDCR's

2  data quality management team for the Statewide Mental Health Program independent of the

3  Program Guide to measure and track whether inmate-patients housed at CDCR's institutions

4  statewide were being seen by a psychiatrist based on scheduled appointments.  (*Id.* at 73.)

5    3.    If a provider sees a patient after an appointment is scheduled, but simply checks

6  the patient in and out in EHRS when the patient is seen without requesting that the original

7  appointment be rescheduled, that original appointment will be measured as having been

8  completed as scheduled.  (*Id.* at 74.)  CDCR had already taken steps to address this issue through

9  training before receiving of Dr. Golding's report.  (*Id.*)

10    4.    In 2016, CDCR changed the "Appointments Seen as Scheduled" indicator

11  methodology—which was defined as including ***all*** scheduled appointments—to include only

12  appointments missed due to factors within CDCR's control as part of its effort to examine

13  whether the mental health system's management of patients was causing patients to miss

14  appointments.  (*Id.* at 75.)

15  [Plaintiffs refused to stipulate to the statement identifying the context and purpose for the

16  change, that the indicator was changed "as part of [CDCR's] effort to examine whether the

17  mental health system's management of patients was causing patients to miss appointments."]

18    5.    CDCR first learned that the indicator's definition did not reflect the change in

19  the methodology when Dr. Golding submitted his allegations to the Plata Receiver on October 3,

20  2018.  (*Id.*)

21    6.    The reporting of the "Appointments Seen as Scheduled" data without updating

22  the definition was an inadvertent oversight and not intended to mislead the Court or the Special

23  Master.

24    7.    The "Treatment Refused" and "Treatment Cancelled" indicators do not reflect

25  or capture any Program Guide requirements.  (*Id.* at 75.)

26  [Defendants stipulated to the Court expert's description of the data reflected in the

27  "Treatment Refused" and "Treatment Cancelled" indicators as requested by Plaintiffs.  But

28  Plaintiffs refused to stipulate to the expert's conclusion that those indicators do not capture

[3406703.11]                                      18

1    Program Guide requirements, likely because the indicators are not published to the Special

2    Master, Plaintiffs, or the Court, and any discussion related to them is irrelevant to a determination

3    of the facts at issue in the neutral expert's investigation.]

4          8.    The cutoffs used to calculate the "Treatment Refused" and "Treatment

5    Cancelled" indicators reflect CDCR's chosen methodology for achieving a meaningful data set

6    that can be utilized to enhance care within the institutions.  (*Id.*)

7          9.    Defendants have not provided data from the "Treatment Refused" or

8    "Treatment Cancelled" indicators to the Court or the Special Master.  (*Id.*)

9          10.   Defendants did not rely on data from the "Treatment Refused" Performance

10   Report indicator to support their proposal to reduce the number of CCCMS patients on

11   psychiatrists' caseloads as part of Defendants' 2018 Staffing Proposals, which were provided to

12   the Special Master, Plaintiffs, and the Court.  (ECF No. 5841-3 at 2; 5922 at 14.)

13   **ISSUE F: PSYCHIATRIC SUPERVISORS ACTING AS LINE STAFF.**
IV.

14        **A.    Stipulations.**

15        1.    CDCR psychiatrists in supervisory roles sometimes see patients.  (Neutral

16   Expert's Report at 77.)

17        2.    The degree to which supervising psychiatrists provide direct patient care varies

18   widely by institution and over time.  (*Id.* at 82.)  CDCR's current EHRS system does not include

19   a function for retrieving data on the number of hours that supervisors spend providing direct care

20   to patients.  (*Id.* at 80.)

21        3.    Defendants' Court-ordered 2009 Staffing Plan includes requirements for

22   allocating supervisory psychiatrists separate from the required ratios for line psychiatrists.  (2009

23   Staffing Plan at 22, 31-32 and Ex. 20.)

24        4.    The Program Guide states that supervising psychiatrists may provide services to

25   inmate patients assigned to mental health crisis beds.  (Neutral Expert's Report at 79; Program

26   Guide 12-5-33.)  The Program Guide does not state whether supervising psychiatrists can provide

27   care to patients assigned to any other level of mental health care.  (Neutral Expert's Report at 79.)

28

[3406703.11]                                    19

1      5.      In their 2018 Staffing Proposal, Defendants proposed, inter alia, reducing the

2  required number of staffing positions for psychiatrists in units housing inmates assigned to the

3  CCCMS and EOP levels of care.

4      6.      Defendants' 2018 Staffing Proposal included data related to the average

5  frequency of patient contacts with psychiatrists (Joint Status Statement, ECF No. 5841-2 at 32-

6  33). That data included contacts completed by supervising psychiatrists. Defendants' proposal

7  did not specify what contacts were included in the data, including whether the data included only

8  contacts completed by line staff or also included contacts completed by supervising psychiatrists.

9  (*Id*. at 80.)

10      7.      Defendants' 2018 Staffing Proposal was filed as an attachment to the parties'

11  June 21, 2018 Joint Status Statement. (*Id*. at 79; *see also* ECF No. 5841.) Defendants filed an

12  updated version of their 2018 Staffing Proposal as an attachment to the parties' September 14,

13  2018 Joint Status Report. (ECF No. 5922.) Both versions of Defendants' Staffing Proposal

14  included data implicated by this issue. (ECF No. 5841-2 at 4 n.5.)

15      8.      Defendants represented to the Court that they expected the 2018 Staffing

16  Proposal, if adopted, to immediately lead to CDCR being at or above the staffing levels

17  requiredin the Court's June 13, 2002 Order, which would immediately bring CDCR into

18  compliance with the October 10, 2017 Order, ECF No. 5711 at 30. (ECF No. 5922 at 4.)

19      **B.      Plaintiffs' Position and Additional Proposed Stipulated Facts.**

20      Plaintiffs requested that Defendants stipulate to the following underlying facts, but

21  Defendants refused:

22      1.      CDCR psychiatrists in supervisory roles are not obligated to treat patients as

23  part of their employment duties. (Neutral Expert's Report at 77.)

24      2.      At certain institutions, psychiatric supervisors maintain an active caseload

25  comparable to that of line staff. (*Id.*)

26      3.      Defendants did not tell the Special Master or Plaintiffs that the data in their

27  2018 Staffing Proposal included contacts completed by supervising psychiatrists.

28

4.      Defendants report compliance data related to psychiatric patient care duties—including the "Timely Psychiatry Contact," "Psychiatrist Continuity of Care," "Appointments Seen as Scheduled," and "Timely Mental Health Referrals" performance report data; interdisciplinary treatment team meeting (IDTT) attendance measures (as psychiatrists are required to be present at IDTTs); and medication management data (as managing psychiatric medications is a psychiatry function)—to the Court and the Special Master.  For example, Defendants submitted data implicated by this issue in their 2017 filings in response to the Special Master's Report on the Status of Mental Health.  (ECF No. 5591 at 4, 14; ECF No. 5591-2 at 9; ECF No. 5601 at 9).  [Defendants argue below that Plaintiffs have attempted to take CDCR's performance reports out of context.  This is false.  As set forth in Plaintiffs' Response to the Neutral Expert Report, Defendants regularly used, and continue to use, internal data from the performance report and other reporting mechanisms to validate their own perception that the constitutional violations in this case have been cured.  (ECF No. 6170 at 27.)  Contrary to Defendants' position that they only share their performance reports for a very narrow purpose, the history of this case shows that Defendants rely on their data in myriad ways and in interactions with the Court, Special Master, and Plaintiffs, and will presumably seek to use this data to end the case.  (*See id.* at 27-29.)]

5.      Since February 2018, Defendants have filed monthly psychiatry vacancy reports with the Court, which do not report vacancies for supervisory psychiatrists or report when supervisors are acting as line staff.  [Defendants argue below (Section IV.C.¶3) that they cannot stipulate to this fact because Defendants' monthly psychiatry vacancy "reports do not contain information on what psychiatrists are doing, they only state whether they are working in a given position."  To the extent that psychiatric supervisors are "working in a given position" as psychiatric line staff, Defendants should include them in this report on psychiatry line staff vacancies.  In addition, contrary to Defendants' baseless assertion below, Plaintiffs are willing to work with Defendants to clarify the reporting of CDCR's data.  But Defendants must also commit to increased transparency, starting with assuming responsibility for the misleading nature of CDCR's past data reporting practices.]

[3406703.11]                                        21

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    In addition, while Defendants agreed to stipulate that two versions of CDCR's 2018

2    Staffing Proposal that were filed with the Court included data implicated by this issue,

3    Defendants only agreed to cite to a single footnote in an exhibit to the parties' June 21, 2018 Joint

4    Status Statement (ECF No. 5841-2 at 4 n.5).  Plaintiffs also requested that Defendants agree to

5    cite to the following pages from the June 21 and September 14, 2018 joint status reports, but

6    Defendants refused:  ECF No. 5841-2 at 9, 14, 16, 17, 31-33; ECF No. 5841-3 at 2; ECF No.

7    5922 at 13-15, 21.  According to Defendants' below position (which Plaintiffs only received on

8    Sunday afternoon prior to the Monday deadline to file this joint report), Defendants refuse to so

9    stipulate because Plaintiffs are taking the performance report indicators out of context and

10    claiming the data measures psychiatric duties, rather than patient care.  This argument rests on a

11    false dichotomy.  In most cases, CDCR's measurement of psychiatrists' functions, such as the

12    timeliness of their patient evaluations, whether they participate in IDTTs, etc., is inextricably

13    linked to the adequacy of patient care.  Defendants' failure to realize this bolsters Dr. Golding's

14    core allegation that CDCR does not adequately value psychiatrists in providing mental health care

15    to severely mentally ill patients.

16    **C.    Defendants' Position and Additional Proposed Stipulated Facts.**

17    Plaintiffs asked Defendants to stipulate that they had provided the court with Performance

18    Report data on Defendants' compliance of providing patients with psychiatric services.  Plaintiffs

19    inappropriately attempt to conflate Defendants' ad hoc reports on psychiatrist workload with

20    Defendants' Performance Report data showing whether a patient received care.  To the extent

21    Plaintiffs demand that Defendants stipulate to a laundry list of facts or data taken out of context in

22    court filings, Defendants cannot do so, although Defendants stand behind all data reported in those

23    filings.

24    Defendants requested that Plaintiffs stipulate to the following underlying facts, but

25    Plaintiffs refused:

26    1.    Plaintiffs and the Special Master were aware that supervising psychiatrists were

27    occasionally seeing patients.  (*See* ECF No. 6147 at 77.)  Defendants' representation in their 2018

28    Staffing Proposal that patients were being seen by psychiatrists necessarily included some

[3406703.11]    22

1    treatment by supervising psychiatrists.  As a result, Defendants believed that the Special Master

2    and Plaintiffs were aware that the data included contacts completed by supervising psychiatrists,

3    and they did not tell the Special Master or Plaintiffs that the data included contacts completed by

4    supervising psychiatrists.  (*Id.*)

5        2.    Defendants' data shows that supervising psychiatrists assigned to facilities

6    housing inmate-patients at the CCCMS and EOP levels of care provided limited direct patient

7    care as part of their daily duties.  (Neutral Expert's Report at 80-81 (showing that supervisor

8    workload in the CCCMS and EOP programs statewide was equivalent to 1.75 full-time

9    positions).)

10        3.    Since February 2018, Defendants have filed monthly psychiatry vacancy

11    reports with the Court that report only on vacancies for line staff psychiatrists.  This is consistent

12    with the court's order requiring only reporting of vacancies for line staff and the subsequent

13    report template negotiated with the Plaintiffs and Special Master.

14    [Plaintiffs refused to stipulate to Defendants' revised statement of fact without Defendants'

15    agreement to add that the monthly reports indicate "when supervisors are acting as line staff."

16    But Defendants' staffing reports do not contain information on what psychiatrists are doing, they

17    only state whether allocated positions are filled or vacant.  Adding Plaintiffs' qualifying statement

18    would incorrectly imply that CDCR had a requirement to report data not requested under the

19    Court's order.]

20    **G:  MEDICATION NON-COMPLIANCE.**

21        **A.    Stipulations.**

22        1.    The Program Guide requires CDCR to comply with "Inmate Medical Services

23    Policies and Procedures."  (Neutral Expert's Report at 86; Program Guide 12-3-12 and 12-4-

24    9.)  This California Correctional Health Care System (CCHCS) Medication Adherence Procedure

25    policy is located at CCHCS Volume 4, Chapter 11, Section 4.11.5.  (Neutral Expert's Report at

26    86.)

27        2.    The CCHCS Medication Adherence Procedure policy applies to both

28    psychiatrists and medical doctors who prescribe medication.  (*Id*. at 87-88.)

[3406703.11]                                23

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

3.      The Medication Adherence Procedure policy states that nurses must conduct a weekly review of the Medication Adherence Medication Administration Record and refer any patient who misses three consecutive dates or at least 50% of scheduled medication doses to the prescriber.  The policy states that the prescriber "shall" conduct "medication non-adherence counseling," which includes an interview of the patient and discussion of the "implications/consequences of not taking the medication."  (*Id.* at 86.)  The policy requires that patients who refuse even one dose of "critical medications" (e.g. Clozapine and those ordered under Penal Code section 2602), must be referred for an urgent mental health evaluation, which must occur within 24 hours.  (*Id.*)

4.      At some CDCR institutions, including CHCF, NKSP, and KVSP, psychologists or social workers conducted medication noncompliance appointments.  (*Id.* at 90.)  When KVSP stopped using psychologists and social workers for medication noncompliance appointments, its compliance numbers dropped.  (*Id.*)

5.      The timely medication non-compliance referral indicator only counts whether appointments that were ordered for a medication non-adherence appointment were completed on time.  (*Id.* at 84.)

6.      CDCR's data mechanisms did not capture whether medication non-adherence appointments were ordered or occurring for all patients who were noncompliant with medication.  (*Id.* at 86-87.)

7.      Medication non-compliance referrals and appointments are a component of the "Timely Mental Health Referral" indicator.  (ECF No. 6012-3 at 15.)  CDCR includes only those patients referred for a medication noncompliance appointment in the denominator of the "Timely Mental Health Referrals" indicator.  (Neutral Expert's Report at 92.)

8.      Defendants reported data on the timeliness of mental health referrals to the Special Master, Plaintiffs, and the Court in connection with their 2018 Staffing Proposal (ECF No. 5841-2 at 4 n.5; ECF No. 5922 at 21) and to the Special Master and Plaintiffs in connection with Defendants' CQI evaluations and draft reports, Defendants' June 5, 2018 Clustering proposal, and in Defendants' monthly ASU EOP Hub and PSU Certification letters.

**B.      Plaintiffs' Position and Additional Proposed Stipulated Facts.**

Plaintiffs proposed the following facts for stipulation, but Defendants refused to stipulate:

1.      Because CDCR does not include all medication noncompliant patients in the denominator of the measurement, the measurement necessarily results in higher compliance figures than is accurate.  (Neutral Expert's Report at 92.)

2.      Significant numbers of medication nonadherent patients are not receiving any medication noncompliance counseling.  (*Id.*)

3.      Prior to October 2018, cancelled medication non-compliance appointments were being included in the medication non-compliance indicator.  (*Id.* at 84-85, 91.)  Cancelled appointments were included in the indicator and counted as late.  (*Id.* at 91.)  [Contrary to Defendants' characterizations below, Plaintiffs are willing to stipulate to these facts.  (*See* Section V.C.¶¶3-4.)  Plaintiffs are not willing to stipulate only that these issues were "due to a software error."  Plaintiffs cannot independently verify that allegation.  Instead of agreeing to add the above facts that both parties agree to into the joint stipulations, Defendants refused to stipulate to any part of these facts.]

4.      The CDCR psychiatrists interviewed by the Neutral Expert believe all medication noncompliant patients must be scheduled for noncompliance counseling appointments.  (*Id.* at 84.)  [Defendants' framing of this fact in Section V.C.¶1, *infra*, initially suggests that Plaintiffs would not agree to this fact, but as Defendants correctly explain in their subsequent explanatory parenthetical, it is *Defendants* who refused to stipulate to this fact.  Plaintiffs did agree to stipulate that the policy had been implemented inconsistently but will not stipulate to Defendants' request to frame this as a "good faith misunderstanding."]

Plaintiffs cannot agree with Defendants that the CCHCS Medication Adherence Procedure policy provides no timeframe for completing the follow-up counseling appointment required for patients who do not adhere to medications that are not deemed "critical" under the policy because this would incorrectly imply that the policy does not require any follow-up appointments for those patients despite using mandatory language.  The Neutral Expert's Report identified evidence that CDCR psychiatrists believe that "all medication noncompliant patients must be

[3406703.11]                                                          25

1    scheduled for noncompliance counseling appointments" (*id.* at 84.), but as stated above,

2    Defendants refused to add this fact to the joint stipulations.  Accordingly, Plaintiffs cannot

3    stipulate as Defendants request.

4              **C.       Defendants' Position and Additional Proposed Stipulated Facts.**

5              Defendants requested that Plaintiffs stipulate to the following underlying facts reported by

6    the Court's expert, but Plaintiffs refused:

7              1.      There are differing views within CDCR, at headquarters and within the field,

8    about whether the CCHCS Medication Adherence Procedure policy requires all medication

9    noncompliant patients to be scheduled for medication noncompliant counseling appointments or

10   whether the policy gives psychiatrists discretion to schedule such appointments.  (*Id.* at 84.)   As

11   a result of good faith misunderstandings by mental health staff, implementation of the policy is

12   inconsistent.  (*Id.*)

13             [Plaintiffs would only agree to this fact from the neutral expert's report if Defendants would

14   stipulate that "[t]he CDCR psychiatrists interviewed by the Neutral Expert believe all medication

15   noncompliant patients must be scheduled for noncompliance counseling appointments.  (*Id.* at

16   84.)"  However, Defendants believe that such a requirement is a departure from established

17   policy and practice, which leaves this decision to the discretion of the treating psychiatrist.

18   Consequently, Defendants are unable to verify this statement and cannot stipulate to this fact as

19   proposed by Plaintiffs.]

20             2.      Except for critical medications (i.e., Clozapine or those ordered under Penal

21   Code section 2602), the policy provides no timeframe for completing the nonadherence follow-up

22   appointment.  (*Id.* at 86 & n.52, 89.)

23             [Plaintiff refused to stipulate to this fact without adding the word "specific" before the word

24   "timeframe."  Defendants cannot agree to add that word because the policy provides *absolutely*

25   *no* timeframe and adding the word "specific" incorrectly implies that there is some non-specific

26   timeframe.

27

28

[3406703.11]                                    26

                          Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1         3.      Prior to October 2018, cancelled medication non-compliance appointments

2    were being included in the medication non-compliance indicator due to a software error.  (*Id*. at

3    84-85, 91.)

4         4.      Because of the software error, canceled appointments were included in the

5    indicator and counted as late.  CDCR's reported data therefore showed a level of compliance that

6    was actually lower than what the data should have shown.  (*Id*. at 91.)

7         5.      CDCR first learned of this issue after reading Dr. Golding's report, and

8    promptly corrected the error.  (*Id*. at 92.)

9    **AGREEMENT ON OTHER AREAS WITHIN EVIDENTIARY HEARING'S SCOPE**

10        One of the purposes of the evidentiary hearing is to examine what action is required to

11   record and avoid future submission of misleading data.  This section sets forth Defendants'

12   proposed remedies to avoid any miscommunication or mischaracterization of data in the future

13   for each of the five areas of inquiry, along with Plaintiffs' agreement or response to Defendants'

14   proposed remedies, and Defendants' response to Plaintiffs' position.  This section also sets forth

15   the parties' agreements, proposals, or positions on other areas within the scope of the evidentiary

16   hearing.

I.

17   **PROPOSALS TO RESOLVE ISSUES IN THE ALL PARTIES WORKGROUPS AND TO
     CORRECT COURT FILINGS OR SUBMISSIONS TO THE SPECIAL MASTER AND
18   PLAINTIFFS.**

19        **A.     Plaintiffs' Position.**

20        Plaintiffs cannot at this stage properly determine or assess in full "what action is required to

21   correct the record and avoid future submission of misleading data" (ECF No. 6187 at 2) in

22   advance of the evidence to be presented at the upcoming hearing.  Given that Defendants are

23   unwilling to stipulate that data in any of the five areas identified in the Neutral Expert's Report

24   was misleading in the first instance, Plaintiffs cannot discern "why and how" any misleading data

25   was presented, much less agree on what steps should be required to "avoid future submission of

26   misleading data." (*Id*. at 2.)  This is particularly true given that Plaintiffs do not have access to,

27   and therefore cannot evaluate, the underlying evidence considered by the Neutral Expert,

28   including the documents produced by Defendants or the transcripts of the interviews of

1    Defendants' witnesses.  Nor has the Court completed its review of the documents Defendants

2    previously withheld from the Neutral Expert on privilege grounds.

3        Plaintiffs therefore continue to maintain that the remedies requested in their Response to the

4    Neutral Expert's Report (ECF No. 6170) are appropriate and warranted, and reserve the right to

5    request additional remedies after the close of evidence through post-trial briefing, after meeting

6    and conferring with Defendants as appropriate.

7                **B.        Defendants' Position.**

8        After a wide-ranging investigation spanning several months, the Court's expert, Gibson

9    Dunn, concluded that Defendants did not commit fraud on the Court or act to intentionally

10   mislead anyone in any of the seven categories investigated, including in any of the five categories

11   the Court intends to pursue at the September 13, 2019 evidentiary hearing.  At the same time, it is

12   clear that Defendants are responsible for a number of errors related to the collection and reporting

13   of data in their mental health system, most of which Defendants corrected soon after they were

14   identified and brought to Defendants' attention.  Other issues arose, as Gibson Dunn noted,

15   because of ambiguities in the Program Guide or confusion about the purported intent of certain

16   metrics.  This confusion was not limited to one side; it existed even within CDCR.  Defendants

17   are committed to cooperating with the Court, Special Master, and Plaintiffs to find reasonable and

18   suitable solutions to avoid future issues.  Defendants' primary goal has been and continues to be

19   the provision of care to inmates at a level above what the Constitution requires.

20       Defendants seek to build consensus as they pursue their goal of providing care above what

21   the Constitution requires, as evidenced by their work on a wide variety of issues in workgroups

22   and through their participation in the alternative-resolution process provided by District Judge

23   Drozd.  But many of Plaintiffs' proposals go too far and would improperly displace CDCR and

24   insert Plaintiffs to manage the day-to-day affairs of California's prisons.  For example, Plaintiffs

25   request that the Court order the parties and Special Master to "create a formalized process for

26   changing or adding metrics" and allow Plaintiffs to review how CDCR is customizing its

27   Electronic Health Records System.  (ECF No. 6170 at 51-52.)  That request does not recognize

28   that CDCR may create metrics for its internal management rather than the ultimate remedy in this

[3406703.11]                                28

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    case, which would give Plaintiffs oversight of tasks that fall squarely within CDCR's internal

2    administration.  Many of Plaintiffs' requests also fail to take into consideration the complexities

3    inherent in CDCR's mental health delivery system and accompanying data management system.

4    Ensuring the accuracy of that system is an intensive process, and requires ongoing effort and

5    revision by CDCR's employees and officials.

6         Defendants believe there are additional steps they can take to work toward the shared goal

7    of establishing continued trust between the parties.  The Special Master and Plaintiffs already

8    have access to a large body of data and information central to the mental health care system

9    through workgroups, a variety of tours, document requests, and on-demand access to CDCR's

10   Electronic Health Records System.  As noted by the Court's expert, CDCR previously provided

11   the Special Master access to its performance report, which included its methodology.  (*See* ECF

12   No. 6147 at 19 n.13.)  Many of Defendants' proposals to avoid future confusion and

13   misunderstandings include significant additional steps towards openness and access.  For

14   example, Defendants' proposals include sharing with Plaintiffs and the Special Master their

15   processes for analyzing change requests and meetings with Plaintiffs and the Special Master to

16   explain the methodologies they use for compiling and reporting data.  Defendants' proposals also

17   directly respond to the Court's desire to determine "what action is required to correct the record

18   and avoid future submission of misleading data."  (*Id*. at 3.)  Defendants believe that the proposed

19   solutions will help prevent future confusion and misunderstandings regarding data presented to

20   the Court, Special Master, or Plaintiffs.

21          **Issue B:  Redefining Monthly to Lengthen the Intervals Between Enhanced
            Outpatient Program Appointments.**

22

23          **Defendants' Proposals.**

24          1.    The parties will meet and confer under the guidance of the Special Master

25   to discuss discrepancies in policy and data collection methodology, as the Court envisioned.  (Tr.

     at 23:13 – 24:18, December 14, 2019, ECF No. 6054.)

26
27          2.    Defendants will meet with Plaintiffs and the Special Master to explain

28   Defendants' processes for analyzing change requests to their compliance tracking systems to the

[3406703.11]                                    29

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1   Plaintiffs and Special Master.  These processes include those already in place like the Mental

2   Health Change Management Committee, designed to ensure all stakeholders, such as the

3   psychiatry team, are notified of proposed methodological changes to psychiatric appointment

4   metrics and requests for Performance Report modifications.

5        3.    Defendants will re-run the "Timely Psychiatry Contacts performance

6   reports for the period December 2016 through April 2017 and file amended documents to replace

7   the Performance Report data that defined the term "monthly" as "once per calendar month, to

8   never exceed 45 days between contacts."

9        4.    Defendants submitted five monthly ASU EOP Hub Certification letters to

10   the Special Master and Plaintiffs based on data from December 2016 through April 2017.  The

11   certifications based on the longer measurement were submitted on 3/1/17 (letter for December

12   2016); 3/23/17 (letter for January 2017); 4/18/17 (letter for February 2017); 5/10/17 (letter for

13   March 2017); and 6/26/17 (letter for April 2017).  Local and regional staff use data and on-site

14   monitoring to determine whether the ASU EOP Hub is meeting Program Guide requirements on a

15   monthly basis.  (*See* ECF No. 5190, Defendants Plans and Policies in Response to Court's April

16   10, 2014 Order (ECF No. 5131).)  Requiring staff to reanalyze the performance of ASU EOP

17   Hubs in late 2016 and early 2017 to issue new certification letters for that timeframe will have

18   little meaning as the time to certify the hubs has long passed; when an ASU EOP Hub does not

19   meet Program Guide requirements for two consecutive months, it is closed to intake; and the

20   timely psychiatry contact indicator is not one of the five mandatory compliance indicators that

21   must meet 90% to certify, therefore, any difference in measurement would not be material or

22   result in a different outcome.

23        **Issue D: Counting All Encounters as Evaluations.**

24        **Defendants' Proposals.**

25        1.    CDCR will issue a memo to the field reminding psychiatrists of their duty

26   to report the confidentiality of patient encounters appropriately, what default settings are used in

27   EHRS related to timely contacts, and how to use drop-down menus.

28

1          2.      The parties should review with the Special Master the issue of how to

2    track non-confidential encounters initiated by psychiatrists and whether those contacts should be,

3    under appropriate clinical circumstances, counted towards compliance.

4          3.      Defendants do not propose any amendments to Court filings or

5    submissions to the Special Master.  Instead, as reflected above, Defendants will pursue

6    clarification of applicable procedures and policies and will work to achieve a consensus as to

7    Program Guide and any other clinical requirements for the tracking and reporting of confidential

8    and non-confidential contacts.

9          **Issue E:  Reporting of Scheduled and Missed Appointments.**

10          **Defendants' Proposals.**

11          1.      Defendants have processes in place to ensure data system accuracy.

12    Report users who identify an error or discrepancy are encouraged to report that error using

13    CDCR's "Solution Center" system.  (*See* Leidner Decl., Nov. 20, 2018, ECF No. 6012-3 at 5.)

14    Should an error be identified with the "Appointments Seen as Scheduled" indicator, or any other

15    indicator, the error will be reported to the appropriate data systems staff.  To ensure staff are

16    aware of the obligation and process for reporting such errors, CDCR will issue a memorandum to

17    the field reeducating staff regarding the "Solution Center" system.

18          2.      To avoid issues with the tracking and reporting of data and the

19    mischaracterization of methodologies, Defendants will meet and confer with Plaintiffs, under the

20    guidance of the Special Master, to review the definitions and methodologies Defendants use to

21    report data related to Program Guide requirements or the Continuous Quality Improvement Tool.

22          3.      Defendants will modify CDCR's 2018 Staffing Proposal by striking the

23    one reference to the "Appointments Seen as Scheduled" data. Issue F:  Psychiatric Supervisors

24    Acting as Line Staff.

25          **Defendants' Proposals.**

26          1.      Further discussion regarding supervising psychiatrists is appropriate.

27          2.      The parties will meet and confer to resolve any further issues with the

28    2018 Staffing Proposal.  In connection with continuing discussions related to the Staffing

1    Proposal, Defendants will provide Plaintiffs and the Special Master with any additional data

2    (including the methodology used to calculate the data) they request that is available to satisfy

3    their concerns with the proposal, including data on supervisor workload in outpatient programs.

4              3.    To remedy the concerns regarding the "Timely Psychiatry Contact" data

5    or the frequency of psychiatry contacts data used to support the 2018 Staffing Proposal,

6    Defendants will supplement the June 21, 2018 joint report with a statement that some portion of

7    the data underlying the "Timely Psychiatry Contact" indicator or data on frequency of psychiatry

8    contacts may include appointments completed by supervising psychiatrists.

9              **Issue G:  Medication Non-Compliance.**

10             **Defendants' Proposals.**

11             1.    Revisions to improve CCHCS's Medication Nonadherence Procedure

12   will require the coordinated efforts of CDCR and CCHCS.

13             2.    The parties will discuss the methodology for the medication

14   nonadherence indicator to ensure there are no ambiguities or misunderstandings as to what is

15   being measured and what data is included in the measurement.

16             3.    Given the ambiguities in CCHCS's Medication Adherence Procedure,

17   Defendants do not propose any amendments to Court filings or submissions to the Special Master.

18   Instead, as reflected above, Defendants will pursue clarification of applicable procedures and

19   policies and will work to achieve a consensus as to Program Guide and any other clinical

20   requirements for tracking and reporting of patients who are medication non-compliant.

21             **PLAINTIFFS' SELF-CERTIFICATION PROPOSAL**

22             **PLAINTIFFS' STATEMENT.**

23        Just as the Court has ordered the parties to include in their filings a certification of all court

24   orders reviewed in preparing that filing (*see* ECF No. 5726 at 10), and just as Defendants certify

25   the compliance of their ASU EOP Hub and PSU programs each month, Plaintiffs propose that

26   Defendants be ordered to certify as accurate all future Court filings that rely on their data, by a

27   person with personal knowledge of the data and the manner in which it is collected and reported.

28   Any representation or data concerning psychiatric care, psychiatric staffing or functions should

[3406703.11]                                    32

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    include a certification from the Chief Psychiatrist endorsing and validating the representation and

2    data.  This self-certification requirement must also apply to data Defendants provide to the

3    Special Master and Plaintiffs.  For example, moving forward, Defendants would need to certify

4    that all data contained in their monthly ASU EOP Hub and PSU Certification letters is accurate.

5             **DEFENDANTS' RESPONSE.**

6             Defendants agree that they should continue to take all reasonable measures to ensure that

7    their mental health data is accurate and is reported accurately to the Court, Special Master, and

II.
8    Plaintiffs.

9             But Plaintiffs' proposal that "a person with personal knowledge of the data and the manner

10   in which it is collected and reported" certify as accurate all future Court filings that rely on

11   CDCR's data is impractical.  Accurate data begins with proper data entry in the field, and

12   clinicians and CDCR mental health staff take seriously their duty to enter information accurately.

13   CDCR maintains an extensive and complex data collection and reporting system, and its mental

14   health performance reports are comprised of millions of data points entered by thousands of

15   CDCR mental health professionals statewide.  (D. Leidner Decl. ¶ 8, Nov. 20, 2018, ECF No.

16   6012-3.)  There is no one individual, however, who could certify that each CDCR mental health

17   professional entered every individual data point accurately as Plaintiffs propose.  Similarly,

18   Plaintiffs' proposal that CDCR's Chief Psychiatrist endorse and validate "[a]ny representation or

19   data concerning psychiatric care, psychiatric staffing or functions" is similarly impractical.

20   CDCR's Chief Psychiatrist may not be the person most knowledgeable as to the data collected

21   and reported in any given Court filing, even if the data concerns "psychiatric care, psychiatric

22   staffing or functions," terms which Plaintiffs do not define.  Although psychiatry is represented

23   on CDCR's quality management team, the Chief Psychiatrist is not a part of the quality

24   management team responsible for tracking the performance of CDCR's mental health program

25   through data.  Consequently, the Chief Psychiatrist will not be in the best position to review or

26   validate all data.  Moreover, contrary to Plaintiffs' assumption, the Chief Psychiatrist does not

27   have the duty to directly supervise all psychiatrists in the field and may not always have

28   knowledge of the conditions across all CDCR's institutions.

[3406703.11]                                    33

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1   Defendants are committed to meeting the Court's objective to restore trust among the

2   parties and are committed to taking all reasonable steps to make sure that all data submitted to the

3   Court is accurate.  Accordingly, for all performance report data referenced in Court filings,

4   CDCR agrees that a person most knowledgeable (who may or may not be the Chief Psychiatrist)

5   will certify that the source of the data, the methodology used to calculate the data, and the

6   reference to the data is an accurate representation of the underlying reported data.

7   Defendants are also committed to taking all reasonable steps to ensure that all data

8   submitted to the Special Master and Plaintiffs is accurate.  The Special Master and Plaintiffs are

9   welcome to ask questions about any of the data Defendants provide to them, including the

10  methodology for gathering and reporting that data.  Defendants will provide the methodology and

11  take all reasonable steps to answer any questions the Special Master and Plaintiffs have about the

12  data or methodology.

13  **PLAINTIFFS' RESPONSE TO DEFENDANTS' RESPONSE.**
III.

14  Plaintiffs appreciate Defendants' willingness to include with all performance report data in

15  future Court filings a certification from "a person most knowledgeable … that the source of the

16  data, the methodology used to calculate the data, and that the reference to the data is an accurate

17  representation of the underlying data reported."  But that proposal does not go nearly far

18  enough.  First, Defendants have only agreed to provide this information with respect to

19  performance report data, not all data submitted to the Court.  That is far too narrow, given the

20  trust concerns raised by the Neutral Expert and Golding Reports about the transparency and

21  accuracy of Defendants' data reporting practices generally, as well as the concerns about

22  Defendants' data literacy.  The Court must be able to rely on and understand exactly what

23  Defendants are representing to the Court when they file any sort of data, including ensuring that

24  someone with personal knowledge of the data will attest to its accuracy, in order to continue in its

25  efforts of guiding the parties toward full remediation.  Defendants have provided no rationale for

26  limiting their willingness to self-certify to performance data alone, and they routinely submit data

27  from other sources including MAPIP which had been directly called into question here.  *See, e.g.*,

28  Tebrock Decl., March 30, 2017, ECF No. 5591-2, at 8 & Ex. 2.  Equally problematic is

1   Defendants' unwillingness to agree to even these basic certification steps to ensure the data they

2   routinely provide to the Special Master and Plaintiffs as part of the complex remedial negotiations

3   is accurate or transparent.  Instead, they seek to continue the current unacceptable status quo that

4   gave rise to the Golding and Neutral Expert Reports, whereby the onus is on Plaintiffs and the

5   Special Master to ask questions in an effort to suss out what Defendants are representing and if it

6   actually accurately reflects condition on the ground.  That unwillingness to certify extends even to

7   Court-ordered remedies such as the PSU and ASU EOP Hub Certification letters, which are not

8   currently filed with the Court (but should be).  Although Plaintiffs asked for Defendants to

9   explain the basis of their limited agreement, Defendants have offered no explanation for why they

10   are not willing or able to attest to the accuracy of their own data in any context beyond only

11   performance-related data filed in Court pleadings.

12          Moreover, Defendants' counter-proposal misses the mark as to the purpose of Plaintiffs

13   self-certification proposal.  It is important that CDCR's Chief Psychiatrist, or a psychiatrist

14   designee of his or her selection if that person has better personal knowledge, certify the accuracy

15   of psychiatry-based data to address the issues that gave rise to the Golding Report in the first

16   place.  Defendants have stated that the Chief Psychiatrist is not a member of CDCR's quality

17   management team, and does not supervise psychiatrists in the field directly or always know the

18   conditions in CDCR's institutions.  To the extent that this is so, Plaintiffs are willing to agree that

19   the Chief Psychiatrist may designate another psychiatrist, who is on the quality management

20   team, knowledgeable about one or more institution, and/or directly supervises line psychiatrists,

21   to make the certification.  Requiring the Chief Psychiatrist, or his or her designee, to certify, to

22   the best of his or her knowledge, that the data accurately represents conditions on the ground

23   would ensure that a disconnect like what Dr. Golding reported—where CDCR's data showed

24   high levels of compliance despite Dr. Golding's knowledge that the data did not comport with or

25   reflect his understanding of the actual conditions in the system, which were much worse—does

26   not repeat itself.  If Defendants cannot ascertain if a particular piece of data relates to psychiatric

27   care, staffing, or functions, Defendants should presumably be able to resolve that issue by

28

1     consulting with the Chief Psychiatrist, who is in the best position to know whether a piece of data

2     implicates psychiatry, and/or with the Special Master or Plaintiffs as appropriate.

3                    **FOOTNOTE 19:  EXHIBIT A TO JUNE 14, 2019 ORDER**

4          Footnote 19 to the Neutral Expert's Report commented that current and former CDCR

5     psychiatrists interviewed during the investigation "raised other issues relating to alleged fraud or

6     wrongdoing."  (ECF No. 6147 at 25 n.19.)  The Neutral Expert stated that "while these witnesses

7     appeared credible, we did not investigate the veracity of their claims given that they dealt with

8     historical conduct outside the scope of our seven issues."  (*Id.*)  The Court separately requested

9     and obtained from the Neutral Expert a list of the issues referred to in this footnote and appended

10    that list to its June 14, 2019 order.  (ECF No. 6187 at 3.)  Those issues are:

11
12      1.    "False testimony allegedly provided to the *Coleman* Court in October 2013 by a CDCR employee relating to the existence of a hospital program at San Quentin Prison.  When the SM investigated in 2014, CDCR allegedly took away 10 beds
13              from the Mental Health Crisis Bed to make it look like the program existed."

14      2.    "Allegedly false statements contained in a suicide report submitted to the Special Master's team."

15
16      3.    "Implementation of a 'Zero Provider Cancellation Policy' in Fall 2011 to allegedly inflate inmate-patient contact data submitted to the Coleman court and 'manipulate perceptions' of the adequacy of staffing."

17
18      4.    "A nurse supervisor allegedly altering a doctor's order related to 'keep-on-patient' medications in order to 'make the dashboard look better.'"

19      5.    "Primary clinicians allegedly being permitted to discharge patients from the Mental Health Crisis Bed without a psychiatrist being involved."

20
21      6.    "The Utilization Management ('UM') department allegedly being moved from Mental Health to CCHCS Medical in 2015 because of concerns that the data would be manipulated or altered if Mental Health had continued control over it."

22
23      7.    "Psychiatrists allegedly not being permitted to speak with Special Master about patient safety concerns, and being disciplined for doing so."

24      8.    "A psychiatrist allegedly receiving a cease and desist order for comments (s)he made regarding psychologists supervising psychiatrists, which (s)he believed to be
25              retaliation for his/her involvement in the Golding Report."

26 (*Id.* at 5.)  Under the June 14, 2019 order, the parties agree that, because issues 1 through 4 are

27 either outdated, apparently isolated, or only tangentially related to the matters raised in Dr.

28 Golding's Report, they do not require further investigation.  The parties, however, disagree as to

1    additional steps required for the remaining four issues.  The parties here provide their respective

2    positions regarding issues 5 through 8, including "whether any of the issues should be explored

3    further by the court, either in an evidentiary hearing or by other process."  (*Id.* at 3.)

4         **DEFENDANTS' POSITION.**

5         Defendants take all allegations of misconduct seriously.  But the list provided does not give

6    Defendants sufficient information to respond to the allegations, save for the two issues addressed

7    below.  Without further details on the issues and the source of the allegations, Defendants are left

8    only to speculate as to the scope and extent of the issues raised in the anonymous allegations.

9         Despite the limited information provided, Defendants can address two issues.  Regarding

10   issue 5, "primary clinicians allegedly being permitted to discharge patients from the Mental

11   Health Crisis Bed without a psychiatrist being involved."  Defendants submit that this issue stems

12   from a policy disagreement raised by Dr. Golding with his CDCR colleagues and in his

13   allegations.  It is currently the subject of discussions and analysis through CDCR's policy-making

14   process.  The issue falls within the broader debate over the role mental health professionals in the

15   field of psychiatry and psychology should play in particular areas of mental health care, an issue

16   the Court referred to the Special Master.  (ECF No. 6187 at 4.)  Accordingly, Defendants agree

17   with Plaintiffs' that the Court refer this issue to the Special Master for resolution.

18        Issue 7 refers to the allegation that psychiatrists are not permitted to speak with the

19   Special Master about patient safety concerns and are disciplined for doing so.  Defendants dispute

20   this allegation and deny they have disciplined any staff member for speaking to the Special

21   Master or his team.  CDCR is presently unaware of a time when mental health leadership told

22   employees that they cannot speak with the Special Master and his team or prevented its

23   employees from speaking to the Special Master or members of his team.  CDCR respects the

24   powers granted to the Special Master in the order of reference to speak with its employees.

25   Contrary to Plaintiffs' suggestion, CDCR and Defendants do not have a formal or informal policy

26   for its employees regarding communications with the Special Master or members of his team, let

27   alone a policy dissuading them from speaking to the Special Master or members of his team.  In

28   fact, the Special Master, his deputies, and his team of experts regularly speak to CDCR staff,

including psychiatrists, on tours and during teleconferences.  Any CDCR mental-health

professional or other CDCR staff may speak with the Special Master and his team.  CDCR will

reiterate to the field that staff can speak with the Special Master and his team.

As to issues 6 and 8, Defendants are accused of wrongdoing but, as presented, those issues

do not provide sufficient information for Defendants to evaluate and address them.

Issue 6: The Utilization Management ("UM") department allegedly being moved from
Mental Health to CCHCS Medical in 2015 because of concerns that the data would be
manipulated or altered if Mental Health continued control over it.

There is not enough factual detail to make sense of, let alone address, this allegation.  For

example, it is impossible based on this allegation alone to identify the "UM department" at issue.

Although, four Utilization Management nurses were assigned to the Mental Health Quality

Management team in 2011 and 2012, their duties involved reviewing referrals to inpatient levels

of care.  Eventually, nursing positions were moved to California Correctional Health Care

Services (CCHCS) and Defendants created a new team (the current Inpatient Referral Unit or

IRU) to monitor and audit inpatient referrals.  The nursing staff in question did not handle data

issues while at Mental Health and CCHCS did not take over the duties previously assigned to the

nurses when the positions transferred to CCHCS.  Defendants agree with Plaintiffs that the

Court's expert should provide additional information underlying this issue.  But it is premature

for the Court to take any additional action on the issue until Defendants have had an opportunity

to review the underlying allegations.

Issue 8:  A psychiatrist allegedly receiving a cease and desist order for comments (s)he
made regarding psychologists supervising psychiatrists, which (s)he believed to be
retaliation for his/her involvement in the Golding Report.

The Court's expert raised this "cease and desist" issue to Defendants during his

investigation.  Defendants requested additional information so they could evaluate the allegation,

but the expert did not provide any additional information.  Defendants informed the expert that

CDCR did not issue any "cease and desist" orders to any employee related to Dr. Golding's

allegations or the expert's investigation.  Defendants agree with the Plaintiffs that additional

information should be provided so that Defendants can understand the basis for this accusation.

1   However, it is premature to include it in the evidentiary hearing or refer it to the Special Master

2   before Defendants are informed of the underlying accusations.

3                                        *        *        *

4          Defendants take any allegation of wrongdoing seriously and are committed to taking

5   appropriate action whenever an allegation is substantiated.  In addition, the allegations listed in

6   the Court expert's summary were not brought by a party to the action and have not been presented

7   in a manner consistent with the rules governing civil litigation, including the Federal Rules of

8   Civil Procedure and Federal Rules of Evidence.  Defendants are concerned that holding hearings

9   for every complaint or allegation made by an unnamed non-party who disagrees with mental

10  health policies or the manner in which CDCR manages its mental health program will grind the

11  remediation of this action to a halt.

12         Defendants are committed to the goal of reestablishing trust between the parties.  Avenues

13  exist within and outside CDCR for employees to file complaints and have allegations of

14  misconduct reviewed and addressed, including through the Office of the Inspector General, *see*

15  Cal. Gov. Code § 6125, *et seq*., and the California State Auditor*, see* Cal. Gov. Code § 8547, *et*

16  *seq.*  And the Special Master, as he has done before, may review allegations that he deems

17  warrant further inquiry.  Plaintiffs, too, regularly present individual allegations and concerns to

18  the Special Master and Defendants.  Accordingly, Defendants request, as discussed above, that

19  issue five be referred to the Special Master for consideration as he deems appropriate, and that the

20  Court direct its expert to provide the information underlying issues six through eight.  However,

21  Defendants think it is premature for the Court to take any additional action on those issues.

22  Consistent with the Court's orders, if the Court directs the disclosure of this information,

23  Defendants will make all reasonable efforts to ensure that no individual is retaliated against in this

24  process.

25         **PLAINTIFFS' RESPONSE.**

26         Plaintiffs' positions on issues 5 through 8 raised in the June 14, 2019 order are set forth

27  below.  Plaintiffs agree that at least some of the issues lack sufficient detail to allow a fully

28  comprehensive response here, as noted below as to individual issues.  We reject, however,

[3406703.11]                                        39

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    Defendants' suggestion that none of the issues should be addressed during the evidentiary

2    hearing. To the extent Defendants are concerned that "every complaint or allegation made by an

3    unnamed non-party" who disagrees with CDCR's mental health leadership will be aired in this

4    forum, Plaintiffs note that the Court in its June 14, 2019 order identified for consideration only

5    the eight issues noted above, and Plaintiffs have agreed that half of those issues do not require

6    further attention here.

7         Issue 5: Primary clinicians allegedly being permitted to discharge patients from the
          Mental Health Crisis Bed without a psychiatrist being involved

8

9         That primary clinicians, without psychiatrist approval or consultation, may be discharging

10   patients from crisis beds is a very concerning and important issue that affects critically mentally

11   ill patients' safety and wellbeing. This practice, to the extent it has been implemented, means that

12   severely mentally ill patients are being discharged from licensed hospital settings without

13   assessment by or the agreement of the only medically-trained member of the treatment team—the

14   psychiatrist. Plaintiffs request that, similar to other issues identified in the Neutral Expert's

15   Report, the Court "refer this issue to the Special Master to explore and, as appropriate, resolve in

16   whatever format he deems appropriate." (ECF No. 6187 at 3.)

17        Issue 6: The Utilization Management ("UM") department allegedly being moved from
          Mental Health to CCHCS Medical in 2015 because of concerns that the data would be
          manipulated or altered if Mental Health had continued control over it
18

19        Plaintiffs lack sufficient information to assess fully the allegation that CDCR's UM

20   department allegedly moved from Mental Health to CCHCS Medical in 2015 because of concerns

21   that Mental Health would manipulate or alter data. If true, this is a serious problem that goes to

22   the heart of Dr. Golding's allegations that Defendants are in the business of making their data

23   look more favorable than reality, rather than actually delivering adequate mental healthcare.

24   While Defendants have stated that they, too, lack sufficient information to evaluate this

25   allegation, they have described events that may form the bare bones of the allegation.

26   Accordingly, Plaintiffs request that the Court order the Neutral Expert to provide more

27   information about this allegation and the identity of the witness(es) who raised this concern.

28   Plaintiffs also propose that the Court allow the parties to inquire more about this issue at the

[3406703.11]                                        40

1    evidentiary hearing, including by allowing Plaintiffs to probe witnesses regarding the situation

2    Defendants have identified above as potentially related to this allegation.

3        Issue 7:  Psychiatrists allegedly not being permitted to speak with the Special Master
         and/or his team about patient safety concerns, and being disciplined for doing so.

4

5        Plaintiffs are extremely concerned by the allegation that psychiatrists are not permitted to

6    speak with the Special Master, and may be disciplined for doing so.  The Neutral Expert noted a

7    similar concern in his report:

8        Dr. Golding reported that although Deputy Tebrock recently told him he was always
         permitted to contact the Special Master, he did not believe he could do so.  He also
9        indicated that he felt he could only answer questions that were asked of him, but not
         volunteer any additional information.  Other psychiatrists we interviewed expressed
10       similar sentiments.  Multiple psychiatrists said they had been told that "the Special
         Master is not our friend," or words to that effect, by senior-ranking CDCR Mental
11       Health Officials.

12

13   (Neutral Expert's Report at 16.)  Dr. Golding's good-faith belief is evidenced by the fact that he

14   initially provided his whistleblower report to the court-appointed Receiver in *Plata v. Brown*,

15   Case No. C-01-cv-1351 JST, rather than to the Special Master.  (ECF No. 5986 at 5.)

16       The Order of Reference in this case requires the Special Master "to monitor defendants'

17   implementation of and compliance with any remedial plan" and expressly permits the Special

18   Master to speak with CDCR staff and have unlimited access to all documents related to the

19   performance of his duties.  (ECF No. 640 at 4-6.)  If Defendants have a policy, informal or

20   otherwise, against psychiatrists speaking with the Special Master, it could compromise the

21   Special Master's monitoring role.

22       Defendants have stated that there has been no direction from leadership telling staff not to

23   speak with the Special Master and his team, and that no one has prevented staff from doing so.

24   Defendants do not address the portion of the allegation that psychiatrists have been disciplined for

25   providing information provided to the Special Master.  Further, Defendants have not stated

26   whether leadership has provided any guidance to staff regarding the content or form of their

27   communications with the Special Master and his team.  And Plaintiffs have been concerned for

28

[3406703.11]

41

1   some time regarding messaging issues from mental health leadership that are misunderstood by or

2   miscommunicated to staff members, even those at supervisory levels. Plaintiffs therefore request

3   that the Court order Defendants to provide their formal policy, if any, regarding CDCR staff's

4   communications with the Special Master and/or any informal policy or practice governing

5   communications with the Special Master. To the extent that there is a misunderstanding among

6   CDCR psychiatrists, as Defendants claim, Plaintiffs further request that Defendants issue a

7   clarifying memorandum to the field clarifying that staff, including but not limited to psychiatrists,

8   are not prohibited from raising concerns affecting patient with the Special Master, and will not be

9   disciplined for doing so. Plaintiffs also request that the Court allow the parties to solicit testimony

10  about this allegation at the evidentiary hearing.

11  
12          Issue 8: A psychiatrist allegedly receiving a cease and desist order for comments (s)he
        made regarding psychologists supervising psychiatrists, which (s)he believed to be
        retaliation for his/her involvement in the Golding Report

13  
14          The final issue identified by the Neutral Expert—that a psychiatrist received a "cease and

15  desist order" related to his/her involvement in the Golding Report (ECF No. 6187 at 19)—

16  warrants further investigation. Defendants have stated that they are not aware of this alleged

    cease and desist order, and that they asked the Neutral Expert for more information regarding the

17  allegation, but did not receive any. Plaintiffs ask that the Court order the Neutral Expert to

18  produce a copy of the "cease and desist order" for review by Plaintiffs' counsel, the Court, and

19  the Special Master, or disclose sufficient information that the parties, Court, and Special Master

20  can identify, procure, and review this document. Based on the document's contents, it may be

21  appropriate to address this issue in the context of the global discussions referred to the Special

22  Master regarding the respective roles of psychiatrists and psychologists in policy-making and the

23  delivery of mental health care. (ECF No. 6187 at 4.) To the extent a specific order or other

24  communication can be identified, Plaintiffs ask to be able to question witnesses regarding that

25  communication at the September evidentiary hearing.

26  
27  
28  

[3406703.11]                                    42

**PARTIES' PROPOSED ADDITIONAL WITNESSES**

In the July 14 Order, the Court identified six witnesses it anticipated directing to appear and provide testimony at the September 13, 2019 evidentiary hearing: (1) Deputy Director Katherine Tebrock; (2) Dr. Laura Ceballos; (3) Dr. David Leidner; (4) Dr. Michael Golding; (5) Assistant Deputy Brittany Brizendine; and (6) Dr. Amy Eargle.  The parties provide their respective positions regarding additional witnesses below.

**PLAINTIFFS' PROPOSALS.**

For the reasons set forth below, Plaintiffs propose seven additional witnesses for the evidentiary hearing:  (1) Dr. Melanie Gonzalez; (2) Dr. Kevin Kuich; (3) Rei Onishi; (4) Dr. Navreet Mann; (5) Dr. John Rekart; (6) Angela Ponciano; and (7) the Neutral Expert's Data Analyst or Person Most Knowledgeable.  Plaintiffs reserve the right to revise this list based on the Court's additional guidance regarding the evidentiary hearing, including based on new information should the Court allow the parties to review additional documents.  Defendants also did not provide their responses to Plaintiffs' witness proposals, or discuss the substantive of their position with Plaintiffs, prior to the filing of this joint report.

Plaintiffs also respond to Defendants' position regarding the testimony of Dr. Amy Eargle. Plaintiffs did not receive Defendants' written position regarding Dr. Eargle's testimony prior to the filing of this joint report.

### A.    Dr. Melanie Gonzalez

Dr. Melanie Gonzalez is a Senior Psychiatrist Specialist who works in CDCR headquarters.  (Neutral Expert's Report at 6.)  Dr. Gonzalez submitted her own whistleblower report on October 24, 2018.  (*Id.* & n.2.)  Her separate report addressed several of the issues raised in the Golding Report and expanded on her emails, independent field reviews and calculations, and other contributions Dr. Golding referenced in his Report.  (*See, e.g.*, Golding Report, Exs. A, D, G, J, M, CC through GG, II, OO through TT, BBB, III.)  The Neutral Expert interviewed Dr. Gonzalez twice and found her "credible and helpful."  (Neutral Expert's Report at 12-13.)  Dr. Gonzalez also provided more than 300 pages of documents to the Neutral Expert. (*Id.* at 14.)

[3406703.11]                                          43

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    The Neutral Expert Report discussed Dr. Gonzalez's testimony and opinions with regard

2    to Issues A ("resetting the clock"), B (redefining "monthly" to lengthen the intervals between

3    EOP psychiatry appointments), C (combining compliance numbers for EOP and CCCMS

4    patients), D (counting all psychiatry encounters as "evaluations"), E (reporting of scheduled and

5    missed appointments), F (supervisors performing line-staff duties), and G (medication

6    noncompliance), and additional issues not included in Dr. Golding's Report.  (*Id.* at 31-32, 42-43,

7    50 n.37, 55-56, 71, 78, 84-85, 91, 94.)  Dr. Gonzalez discovered, investigated, and analyzed the

8    December 2016 business rule change to the definition of "monthly," and brought the issue to

9    Dr. Golding's attention.  (*Id.* at 42-43, 46.)  Similarly, Dr. Gonzalez investigated in 2017 issues

10    with the confidentiality of psychiatry contacts and CDCR's reporting of the same.  (*Id.* at 63-64.)

11    Given the extent to which the genesis of the Golding Report relied on issues directly

12    identified and personally investigated by Dr. Gonzalez, as well as the Neutral Expert's reliance on

13    her input and analyses, Dr. Gonzalez would be a critical witness for the evidentiary hearing who

14    is certain to have helpful and relevant information.  She would not only be able to testify to the

15    issues at bar, but also provide a more detailed analysis on several items—including the "how" and

16    "why"—than other witnesses could.  For these reasons, Plaintiffs request that the Court order

17    Dr. Gonzalez to appear and provide testimony at the September evidentiary hearing.

18    **B.    Dr. Kevin Kuich**

19    Dr. Kevin Kuich is the former statewide Chief Psychiatrist of Telepsychiatry at CDCR

20    headquarters, who served in that role from 2017 to 2019.  (*See* Neutral Expert's Report, App'x C,

21    at 106.)  The Neutral Expert interviewed Dr. Kuich, identifying him as one of the "Key CDCR

22    Personnel" within CDCR's headquarters psychiatry leadership.  (*Id.*)  According to the Neutral

23    Expert, Dr. Kuich "took the lead for psychiatry in assisting with the EHRS rollout from about

24    2015 to 2017," and worked with Dr. Golding on "the development of the Mental Health

25    components of the EHRS, including configuration of psychiatry forms, orders, and notes."  (*Id.* at

26    18, App'x C at 106-07.)  Critically, Dr. Kuich was the only psychiatrist other than Dr. Golding

27    involved in developing and rolling out the EHRS; the effort was mostly spearheaded by

28    Dr. Rekart (a psychologist) and other non-medically trained personnel at CDCR headquarters.

[3406703.11]                                        44

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1   (*Id.* at 18-19.)  Dr. Kuich also worked closely with Dr. Golding, playing a role in the development

2   of CDCR's 2018 Staffing Proposal and in raising some of the Golding Report issues to the larger

3   mental health leadership team.  (*Id.* at 17-19, 25, 36.)  He, like Dr. Golding, experienced some

4   pushback from the larger team when asking for certain psychiatry-related modifications to EHRS

5   and psychiatry workflows.  (*Id.* at 18-19.)  Dr. Kuich also led the team of CDCR psychiatrists

6   who "conducted psychiatrist-specific EHRS training on-site at CDCR institutions prior to the

7   rollout."  (*Id.*)

8          The Neutral Expert noted Dr. Kuich's involvement in some instances of problematic

9   decisionmaking within CDCR leadership.  (*Id.* at 30, 31 n.26, 36.)  Dr. Kuich's testimony is also

10   cited as to Issues A, F, and G in the Neutral Expert Report.  (*Id.* at 30, 31 & n.26, 36, 38, 77, 89-

11   90 & n.56.)  Dr. Golding quoted him directly in his Report and Dr. Kuich was included in many

12   critical email chains attached to the Golding Report as exhibits.  (*See, e.g.*, Golding Report at 61,

13   75, 104; *id.*, Exs. E, G, J, Q, S, U, AA, DD through GG, MM, BBB, FFF, GGG, III.)  Dr. Kuich

14   was also identified in the Golding Report as having made a misrepresentation directly to the

15   Special Master team regarding the extent of use of cell-front telepsychiatry within CDCR

16   institutions.  (*See* Golding Report, Ex. Y.)

17          Dr. Kuich is the psychiatrist with the most EHRS and data-related experience both at the

18   headquarters level and, in his training and supervisory capacities, at the level of line psychiatry

19   staff directly inputting EHRS data via CDCR-developed workflows.  Accordingly, he has a

20   breadth of experience that would help the Court elucidate the issues raised in the Golding and

21   Neutral Expert Reports, and their genesis.  In addition, Dr. Kuich may be able to provide insight

22   into any dynamics within CDCR headquarters that may have led him to make a misrepresentation

23   to the Special Master team.  For these reasons, Plaintiffs request that the Court order Dr. Kuich to

24   appear and provide testimony at the September evidentiary hearing.

25          **C.     Rei Onishi**

26          Rei Onishi, Deputy Legal Affairs Secretary in the Office of the Governor, worked for the

27   Brown administration and now works in the Newsom administration on issues of criminal justice.

28   During both administrations, he worked closely with high-level decision-makers in the

[3406703.11]                                    45

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1  Governor's Office to effectuate policy goals related to the *Plata* and *Coleman* cases, including

2  participating in multiple meetings directly with Plaintiffs' counsel concerning Three-Judge Court

3  population issues and segregation issues in *Coleman*.  Mr. Onishi has attended recent status

4  conferences and been included in communications between the parties.  (*See, e.g.*, Minute Order

5  Re: June 10, 2019 Status Conf., ECF No. 6181; Minutes Re: April 26, 2019 Status Conf., ECF

6  No. 6134; Decl. of Jessica Winter in Support of Plaintiffs' Brief Re: MHCB Access, ECF No.

7  5679 at 33, 34 ).  Of the members of the Governor's Office participating in the *Coleman*

8  litigation, Mr. Onishi is the only staff member in the Newsom administration to have also served

9  in the Brown administration.

10      The Governor and his staff, including Mr. Onishi, have ultimate authority over the prison

11  system and directly participate in this litigation.  Although the Court's *in camera* review of

12  Defendants' purportedly privileged material may address the question whether any

13  communications with or documents from the Governor's office shed light on Dr. Golding's

14  allegations, the only way to evaluate fully Defendants' state of mind with respect to the

15  allegations of misconduct in the Golding Report is to have a knowledgeable member of the

16  Governor's staff give testimony about these issues.  This information cannot be gleaned by other

17  means, and is critical to answering the Court's question whether facts exist to establish "that

18  misleading data has been presented to the court and/or the Special Master."  (ECF No. 6187 at 2.)

19      The Court has already signaled the possibly critical role of the Governor's office in this

20  dispute by authorizing the Neutral Expert to interview, over Defendants' objections, "Governor

21  Edmund G. Brown and members of his staff," and obtain from all parties "copies of all

22  information he deems relevant."  (Order of Appointment, ECF No. 6064 at 4-5.)  Additionally,

23  the Neutral Expert reported that the Special Master shares Plaintiffs' concerns "that CDCR has an

24  aggressive approach towards data bearing on compliance which may be influenced by the

25  Governor's office and a strategy to terminate the litigation."  (Neutral Expert's Report at 14 n.11.)

26  Because Defendants refused to provide the Neutral Expert with communications relating to the

27  Governor's office and litigation strategy, the Neutral Expert "ma[d]e no finding in this regard."

28  (*Id.* at 14 n.11.)  Plaintiffs have a window of insight into what the communications and other

[3406703.11]                                              46

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    documents from the Governor's office could reveal based on a single email quoted in the neutral

2    expert's report.  The quoted email describes an exchange between Deputy Director Tebrock and

3    individuals in the Governor's office revealing that the Governor's office was actively looking for

4    data points to make the Mental Health Services Delivery System (MHSDS) appear compliant.

5    (*Id.* at 48.)

6        For these reasons, Plaintiffs request that the Court order Mr. Onishi to appear and provide

7    testimony at the September evidentiary hearing.

8                    **D.    Dr. Navreet Mann**

9        Dr. Navreet Mann is currently a Senior Psychiatrist Specialist at CDCR headquarters.

10    (ECF No. 6165 at 1.)  Dr. Mann has worked as a psychiatrist in CDCR since April 2011.  Before

11    moving to CDCR headquarters, she was a Staff Psychiatrist at San Quentin State Prison (SQSP)

12    and California State Prison, Sacramento (CSP-Sac), then a Supervising Psychiatrist at the

13    California Health Care Facility (CHCF), then the Chief Psychiatrist at Mule Creek State Prison

14    (MCSP).  (*Id.*)  Dr. Mann was one of three CDCR psychiatrists who submitted a declaration in

15    support of the Union of American Physicians and Dentists' (UAPD) amicus brief.  (ECF No.

16    6164 at 1.)  The Court granted the UAPD leave to file the amicus brief and accompanying

17    declarations.  (ECF No. 6177 at 2.)

18        In her declaration, Dr. Mann corroborated evidence identified in the Neutral Expert

19    Report related to Issues D, F, and G.  Dr. Mann explained that CDCR's methodology for

20    measuring compliance with Program Guide timeframes for psychiatry contacts is flawed because

21    psychiatrists do not determine what constitutes a psychiatry contact.  (ECF No. 6165 at 3.)

22    Dr. Mann also explained the harms caused "[b]y overloading psychiatry supervisors with

23    disproportionate direct care duties."  (*Id.*)  Dr. Mann also discussed CDCR's failure to ensure that

24    all patients receive their psychiatric medications.  (*Id.* at 4.)

25        Additionally, Dr. Mann was one of the psychiatrists who visited CSP-Sac with

26    Dr. Golding in July 2018, and raised concerns about the non-confidential psychiatry contacts

27    occurring at that institution that Dr. Golding later reported to Deputy Director Tebrock.  (*Id.*; *see*

28    *also* Golding Report at 41, 80-81, Ex. Y.)  Dr. Golding stated in his Report that when Dr. Mann

[3406703.11]                                    47

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    used to work as a psychiatrist at CSP-Sac, she was not able to see patients confidentially in

2    clinics, and that four years later "[n]othing ha[d] changed." (Golding Report at 80, Ex. Y.)

3    Dr. Mann was also included in many critical email chains attached to the Golding Report as

4    exhibits. (*See, e.g.*, Golding Report, Exs. G, R, Y, III.)

5         Relevant to Issue B—redefining "monthly" to lengthen the intervals between EOP

6    appointments—the Neutral Expert Report notes that Dr. Mann was one of two headquarters

7    psychiatrists who emailed Dr. Golding about the December 2016 business rule change. (Neutral

8    Expert's Report at 46.)

9         Finally, on June 13, 2019, the UAPD filed a request that two letters provided to the Court,

10   one signed by Dr. Mann, and one signed by twenty CDCR psychiatrists (including Dr. Mann), be

11   filed on the docket. (ECF No. 6186.) In her individual letter, Dr. Mann wrote that she was aware

12   of "a lot of examples … where we failed to provide adequate psychiatric care, or where there is

13   still potential for bad outcomes due to our policies and culture." (ECF No. 6186-1 at 2.)

14       Given Dr. Mann's extensive experience as a CDCR psychiatrist, serving both at multiple

15   institutions and at headquarters, she would be well equipped to answer the Court's "how" and

16   "why" questions during the evidentiary hearing. Furthermore, Dr. Mann's experience as a line

17   staff and supervising psychiatrist would also make her a valuable witness regarding Issues D

18   (psychiatry encounters improperly counted as evaluations), F (psychiatric supervisors acting as

19   line staff), and G (patients are not receiving required medication nonadherence counseling).

20   Based on the Neutral Expert Report, Dr. Mann would also be able to provide the Court with

21   information regarding Issue B—CDCR's December 2016 business rule change to the definition

22   of "monthly" for compliance purposes. For these reasons, Plaintiffs request that the Court order

23   Dr. Mann to appear and provide testimony at the September evidentiary hearing.

24       **E.    Dr. John Rekart**

25       Dr. John Rekart is the Chief Psychologist and Statewide Chief of Quality Management

26   and Informatics for Mental Health. (*See* Neutral Expert's Report, App'x C, at 106.) The Neutral

27   Expert deemed him one of several "Key CDCR Personnel" within CDCR mental health

28   leadership. (*Id.*) Dr. Rekart was one of seven members of CDCR's leadership team whom the

[3406703.11]                                                48

1  Neutral Expert interviewed.  (*Id.* at 13 & n.9.)

2        From his position on CDCR mental health's quality management team, Dr. Rekart helped

3  lead the development and implementation of the mental health side of EHRS.  (*See id.* at 17, 18.)

4  Dr. Rekart and his staff "customized much of" EHRS, because the off-the-shelf Cerner system

5  was not designed for mental health recordkeeping.  (*Id.* at 18.)

6        The Neutral Expert cited Dr. Rekart's opinions and testimony with regard to Issues A, D,

7  and G.  (*Id.* at 31 n.26, 36, 59-61 & n.45, 90.)  Several of the email chains cited as support for the

8  Golding Report and included in the Golding Report exhibits include Dr. Rekart.  (*See, e.g.*,

9  Golding Report, Exs. Q, S, BBB, FFF.)  Dr. Rekart also was present for and participated in some

10  of the problematic data-related decisionmaking implicated in Dr. Golding's report and identified

11  by the Neutral Expert.  (*See, e.g.*, Golding Report at 17-18; Neutral Expert's Report at 31 n.26,

12  38, 90.)

13        Given that Dr. Rekart was responsible for building EHRS from the ground up, presumably

14  including designing and implementing many of EHRS's business rules and data reporting

15  mechanisms, he would be well situated to answer the Court's "how" and "why" questions during

16  the evidentiary hearing.  In addition, he could provide sworn testimony regarding the issues for

17  which he provided information to the Neutral Expert, again informed by his understanding of how

18  and why EHRS and its business rules were built in the manner they were, as well as how and why

19  proposed changes were or were not made and/or were or were not communicated.  For these

20  reasons, Plaintiffs request that the Court order Dr. Rekart to appear and provide testimony at the

21  September evidentiary hearing.

22          **F.**        **Angela Ponciano**

23        Angela Ponciano is the Associate Director of Statewide Planning and Policy within

24  CDCR.  (*See* Neutral Expert's Report, App'x C, at 106.)  The Neutral Expert deemed her one of

25  several "Key CDCR Personnel" within CDCR mental health leadership, interviewed her during

26  the investigation, and cited her testimony as to Issue F.  (*Id.* at 13 & n.9, 80-81, App'x C at 106.)

27  Ms. Ponciano reports to Assistant Deputy Brizendine, who will testify at the evidentiary hearing.

28  (ECF No. 6187 at 3.)

[3406703.11]                                          49

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    As to Issue D—counting all encounters as evaluations—the Neutral Expert identified

2    evidence that Ms. Ponciano was aware of Dr. Golding's concerns that CDCR psychiatrists would

3    not receive sufficient training on EHRS when it was rolled out.  (Neutral Expert's Report at 18-

4    19.)  This is relevant to Issue D because psychiatrists' lack of adequate training on EHRS likely

5    contributed to CDCR counting non-confidential psychiatry appointments as compliant under the

6    Program Guide.  (*See id.* at 61 n.46 & 67.)  As to Issue F—supervising psychiatrists acting as line

7    staff—Ms. Ponciano provided the Neutral Expert her post-hoc manual analysis of data concerning

8    the extent of the practice, and the Neutral Expert evaluated her analysis in forming the opinion

9    that CDCR's representations were potentially misleading.  (Neutral Expert's Report at 80-83.)  As

10   to issue G—medication noncompliance—the Neutral Expert identified evidence that

11   Ms. Ponciano attended a February 23, 2017 Mental Health Quality Management meeting

12   discussing the issue of primary clinicians, who are not medically trained or licensed to prescribe

13   mediation, conducting medication nonadherence appointments at KVSP.  (*Id.* at 90.)

14   In addition, "Ms. Ponciano was largely responsible for the design and development of

15   CDCR's Staffing Proposal," compiled data in support of that proposal, and "led CDCR's efforts

16   to develop the Staffing Proposal, based on her knowledge that certain methodologies and

17   assumptions underlying the 2009 Staffing Plan needed to be updated."  (*Id.* at 17, 24-25.)

18   Ms. Ponciano presented the Staffing Proposal in workgroups with the Special Master and

19   Plaintiffs and took the lead on answering questions and responding to requests for additional

20   documents and information.  She also was included in exhibits to the Golding Report related to

21   staffing.  (*See* Golding Report, Ex. E (discussing EHRS business rules related to psychiatry

22   appointment scheduling and how appointment scheduling impacts Program Guide timelines).)

23   Ms. Ponciano's high-level role within mental health leadership also meant she was present

24   for and participated in decisions Dr. Golding identified as contributing to inadequate psychiatric

25   care for mental health care patients.  (*See* Neutral Expert's Report at 31 & n.26, 38, 39, 90;

26   Golding Report, Ex. MM.)

27   Given Ms. Ponciano's central role in developing CDCR's 2018 Staffing Proposal,

28   including by compiling EHRS-based data and incorporating her analyses of that data in the

[3406703.11]                                                  50

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    Proposal, she could provide useful insight into the materiality of CDCR's data-based

2    representations.  In a related vein, Ms. Ponciano provided the Neutral Expert the most

3    comprehensive and detailed analysis regarding the extent to which supervisory staff within

4    CDCR performed line-staff functions.  As a high-level member of the CDCR mental health

5    leadership team, she also could provide an additional window into the Court's "how" and "why"

6    questions regarding CDCR's misrepresentations.  For these reasons, Plaintiffs request that the

7    Court order Ms. Ponciano to appear and provide testimony at the September evidentiary hearing.

8              **G.        Neutral Expert's Data Analyst or Person Most Knowledgeable**

9         The Neutral Expert's Report discusses and relies on the Neutral Expert's internal data

10    analysis regarding several of the issues identified by Dr. Golding.  (*See* ECF No. 6147 at 21-23

11    (analyzing implications of use of patient-weeks methodology); 40 (calculating percentage of EOP

12    and CCCMS patients seen by psychiatrists within 14 days of transfer); 66-67 (discussing impact

13    of EHRS settings on reporting of confidential psychiatry contacts); 80-82 (evaluating Ms.

14    Ponciano's analysis of the extent to which supervisory psychiatrists perform line staff functions);

15    90-91, 92 (analyzing impact of business rules for reporting on timeliness of medication

16    noncompliance appointments).)  Defendants have made clear they intend to contest the Neutral

17    Expert's data analyses, including through the testimony of Ms. Ponciano who will attest to her

18    own ad hoc data regarding psychiatry supervisors performing line staff functions, which the

19    Neutral Expert did not fully credit.  Plaintiffs do not have access to the data reviewed by the

20    Neutral Expert, and thus lack any ability (and possibly the expertise) to conduct their own

21    analysis and/or to defend the Neutral Expert's analysis.  Plaintiffs therefore request that a member

22    of the Neutral Expert team with knowledge of the data analysis included in the Neutral Expert

23    Report appear to testify to the data reviewed, the data analysis methods utilized, and the

24    conclusions reached.

25              **H.        Dr. Amy Eargle**

26         Contrary to Defendants' position (which Plaintiffs have only received orally from

27    Defendants prior to the filing of this joint report), Plaintiffs support the Court's decision that

28    Dr. Amy Eargle should testify at the evidentiary hearing.  (ECF No. 6187 at 3.)  Dr. Eargle has a

[3406703.11]                                                                 51

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1  high level of authority as the Chief Psychologist for the Clinical Support Unit in CDCR's Mental

2  Health Program.  Plaintiffs understand that her position as Chief Psychologist is the functional

3  equivalent of Dr. Golding's position as Chief Psychiatrist in CDCR headquarters.  From that

4  vantage point, Dr. Eargle understands policy and clinical care requirements and how they work

5  together within CDCR's MHSDS.  She is familiar with and has ample opportunity to interpret

6  and apply Program Guide requirements.  Indeed, Dr. Eargle is one of the headquarters staff who

7  received a copy of, and was copied on correspondence regarding, CDCR's 2018 policy change

8  (without notice to the Special Master, Plaintiffs, or the Court) authorizing non-medical

9  psychologists to discharge patients from the licensed MHCB hospitals without the involvement of

10  psychiatrists.  (Golding Report, Exs. FFF, GGG.)  The Neutral Expert also identified evidence

11  that Dr. Eargle was aware of Dr. Golding's concerns that CDCR psychiatrists would not receive

12  sufficient training on EHRS when it was rolled out.  (Neutral Expert's Report at 18-19.)  This is

13  relevant to Issue D ("counting all encounters as evaluations"), as evidence in the Neutral Expert's

14  Report suggests that psychiatrists' lack of adequate training on EHRS contributed to CDCR

15  counting non-confidential psychiatry appointments as compliant under the Program Guide.  (*See*

16  *id.* at 61 n.46 & 67.)

17        Dr. Eargle works with the highest-level decisionmakers in CDCR, is in frequent contact

18  with the Special Master team, and attends most workgroups and policy meetings.  She is well-

19  situated to provide clinical context to the data-related issues raised by the Golding Report and

20  analyzed in the Neutral Expert Report, and to inform the Court's analysis of policy-level

21  decisionmaking within CDCR.  For these reasons, the Court should deny Defendants' request to

22  modify the June 14, 2019 order requiring Dr. Eargle to appear and provide testimony at the

23  September evidentiary hearing.

**II.**

24        **DEFENDANTS' POSITION ON WITNESSES.**

25        Given how the Court's June 14, 2019 currently frames the evidentiary hearing, Defendants

26  plan to call the following five additional witnesses to testify on September 13, 2019: Angela

27  Ponciano, John Rekart, Shama Chaiken, Annette Lambert, and Julie Kirkman.  Defendants briefly

28

describe here (as opposed to Plaintiffs' unnecessarily argumentative witness list) why these additional witnesses are positioned to provide relevant testimony at the hearing:

1. <u>Angela Ponciano</u>.  In addition to answering any questions from the Court, Ms. Ponciano will provide testimony concerning Issue F, psychiatric supervisors acting as line staff, and CDCR's 2018 Staffing Proposals.

2. <u>John Rekart, Ph.D.</u>  Dr. Rekart no longer works for CDCR, but Dr. Rekart will provide testimony concerning the development and implementation of CDCR's Electronic Health Record System.

3. <u>Shama Chaiken, Ph.D.</u>  Dr. Chaiken is a Senior Supervising Psychologist at CDCR headquarters.  Dr. Chaiken will provide testimony concerning the development and implementation of the Program Guide's requirement that "[a] psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues."

4. <u>Annette Lambert</u>.  Ms. Lambert is the Deputy Director of Quality Management, Informatics and Improvement for the California Correctional Health Care System (CCHCS).  Ms. Lambert will provide testimony concerning the Medication Non-adherence Procedure policy.

5. <u>Julie Kirkman</u>.  Ms. Kirkman is an Associate Government Program Analyst and the Medication Court Administrator at the California Health Care Facility.  Ms. Kirkman will testify concerning the request she made to CDCR headquarters to change the business rule that measures compliance with the Program Guide's requirement that "[a] psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues."

Defendants reserve the right to call additional witnesses at the evidentiary hearing, including the Court's expert, Charles Stevens, specifically, depending on the Court's guidance regarding the hearing's scope and evidence presented at the hearing.  Defendants also reserve the right to revise their witness list to remove witnesses, or identify alternate witnesses, depending on witness availability.

With respect to Plaintiffs' witness list, Defendants agree with Plaintiffs that Ms. Ponciano and Dr. Rekart can help the Court evaluate whether data related to the five issues specified in its June 14, 2019 order were misleading, and if so, how and why that happened, and what may be

1    done to avoid the future submission of misleading data.  (*See* ECF No. 6187 at 2:5-18.)  But aside

2    from Ms. Ponciano and Dr. Rekart, Plaintiffs' remaining witnesses reflect an intent to open the

3    evidentiary hearing up to any and all factual and policy issues raised in either Dr. Golding's

4    allegations or the Court's expert report.  Defendants object to Plaintiffs' efforts, through

5    witnesses, discovery requests, or otherwise, to expand the evidentiary hearing's scope beyond that

6    contemplated by the Court's June 14, 2019 order.

7         Relevant here for instance, Plaintiffs' witness list includes a member of the Governor's

8    legal team, Deputy of Legal Affairs Rei Onishi.  But Mr. Onishi did not make any policy

9    decisions implicated by the five issues the Court identified for the evidentiary hearing, and

10   Plaintiffs have made no contrary showing.  Instead, Mr. Onishi's involvement in this matter is

11   solely as legal counsel to the Governor—as a result, any testimony he would provide is protected

12   by several potential privileges, including, but not limited to, the attorney-client, work-product,

13   deliberative-process, and mental-process privileges.  *See, e.g.*, *Gomez v. Vernon,* 255 F.3d 1118,

14   1131-32 (9th Cir. 2001) ("Federal common law recognizes a privilege for communications

15   between client and attorney for the purpose of obtaining legal advice, provided such

16   communications were intended to be confidential."); *F.T.C. v. Warner Communications Inc.,* 742

17   F.2d 1156, 1161 (9th Cir. 1984) ("The deliberative process permits the government to withhold

18   documents that reflect advisory opinions, recommendations and deliberations comprising part of

19   a process by which government decisions and policies are formulated."); *Thomas v. Cate,* 715

20   F.Supp.2d 1012, 1024 (E.D. Cal. 2010) ("The mental process privilege is a corollary to the

21   deliberative process privilege that protects uncommunicated motivations for a policy or

22   decision.").  And Plaintiffs offer no basis to overcome those protections and otherwise allow such

23   intrusion into the internal operations of the State's executive branch.

24        Defendants object to other witnesses listed on Plaintiffs' list—for example, Drs. Gonzalez

25   and Mann appear prepared to present only cumulative testimony—but the Court's June 14, 2019

26   order does not contemplate objections to proposed evidence, pre-hearing motions, or

27   supplemental briefing.  For this additional reason, Defendants propose that the Court set a pre-

28   hearing conference so that the parties may discuss the hearing's scope, necessary witnesses, and a

[3406703.11]                                54

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1  schedule to formally brief issues leading up to the evidentiary hearing.  In the interim, Defendants

2  reserve all rights to move the Court to limit evidence both in advance of, and during, the hearing,

3  and to preserve and protect any and all rights and privileges, whether stated here or otherwise.

**ADDITIONAL RELEVANT REQUESTS**

4

5  **PARTIES' JOINT REQUEST FOR PREHEARING CONFERENCE.**

6         The parties request that the Court set a prehearing conference as soon as possible, ideally

7  within the next two weeks and on a date other than July 30 or August 2.  In addition to any items

8  the Court wishes to address, the parties would like to address the following issues at the

9  prehearing conference:

10         1.      The timing and dates of the evidentiary hearing should it extend past the

11  September 13, 2019 date set by the Court;

12         2.      Whether the Court intends to defer to the parties on witness order, or instead

13  wishes to hear testimony from any witness(es) in a particular order, and if so what that will be;

14         3.      The scope of the factual record that supports the Court's ultimate findings

15  following the Gibson Dunn report, including whether the Court intends to order Gibson Dunn to

16  produce all of the documents it relied upon in reaching its conclusions to the parties;[4]

17         4.      The timing for exchange of the parties' exhibits, particularly as it pertains to the

18  Court's deadline of August 30, 2019 to complete the deposition of Dr. Leidner and file the

19  deposition transcript per ECF No. 6216;

20         5.      The anticipated procedure for the witnesses' testimony, including the posture of

21  the witnesses (and particularly Dr. Golding) for the purposes of taking direct testimony or

22  conducting cross examination;

23         6.      Whether the Court will order the Neutral Expert, or any member of his

24  investigative team, to appear or testify at the hearing or by affidavit as to any portion of the

25  Neutral Expert Report.

26

27  _____

28  [4] This section of the Joint Report was edited after 11:15 p.m. and Plaintiffs may disagree
    with the text.

[3406703.11]                                    55

**PLAINTIFFS' RENEWED REQUEST FOR UNDERLYING DOCUMENTS AND TRANSCRIPTS.**

### A.    Plaintiffs' Position.

Plaintiffs renew their request for all interview transcripts and underlying documents associated with the Neutral Expert's investigation.  (ECF No. 6170 at 49-50.)  This information is necessary for both the Court and Plaintiffs' counsel to fully understand the Neutral Expert's report and for the Court to evaluate all of the necessary relevant evidence before making its ultimate factual findings.  The information is also necessary to create a record for possible appellate review.  Defendants have already made clear in their Response to the Neutral Expert Report that they intend to object to all statements and quotations in the Neutral Expert's Report as inadmissible hearsay.  Defendants already have access to the documents they produced to the Neutral Expert and to most, if not all, of the documents provided by the participating CDCR psychiatrist witnesses, including Drs. Gonzalez and Golding, given they are CDCR employees.  Defendants also know the content of their witnesses' testimony to the Neutral Expert because they were present.[5]   Plaintiffs and the Court must have access to that same information in order to present a full record of the facts underlying this important issue, including if necessary for impeachment purposes in case Defendants' witnesses present testimony, or Defendants present documents, that challenge or differ from the Neutral Expert's reported findings.  Precluding Plaintiffs and this Court from reviewing the evidence presented to the Neutral Expert permits Defendants to have an unfair advantage at the hearing and undermines the hearing's purpose, which is to "determine … whether misleading data was presented to the court and/or the Special Master" (ECF No. 6187 at 2), and the Court's ultimate goal to rebuild trust.

Plaintiffs also renew their request from their Response to the Neutral Expert's Report to be allowed to know the identities of all witnesses interviewed by the Neutral Expert, as well as the substance of their allegations.  (ECF No. 6170 at 49.)  This is critical to Plaintiffs' ability to

---

[5] As stated above (Section I.B.), Plaintiffs have offered to provide Defendants with the documents they produced to the Neutral Expert if Defendants will reciprocate and agree that both parties should have access to the transcriptions of Defendants' witnesses' interviews and all other documents relied on by the Neutral Expert.

1    prepare for the evidentiary hearing because the neutral expert's report provides little insight into

2    who said what with respect to each issue.  Defendants already know most, if not all, of the

3    witnesses' identities, as well as the substance of their testimony to the Neutral Expert.  Unless

4    Plaintiffs have access to that same information, Plaintiffs will be at a distinct disadvantage at the

5    hearing.  Plaintiffs may need to amend their proposed witness list if the Court orders that the

6    identities of additional witnesses be revealed.

7                    **B.        Defendants' Response.**

8            Plaintiffs' document request is inconsistent with the Court's express efforts to limit the

9    scope and adversarial nature of the proceedings scheduled for September 13, 2019.  However, to

10   the extent that the Court decides to grant Plaintiffs' request, Defendants request that all

11   documents provided by the Court's expert and all of the notes or recordings they took of all

12   witnesses interviewed, be provided to the parties.

13           At the June 10, 2019 hearing, the Court proposed that the evidentiary hearing be focused

14   and narrow.  (June 10, 2019 Tr. 9:21-22, 24:20-22, 27:13-16.)  Plaintiffs' discovery request is

15   neither focused nor narrow, and it would require the parties to re-litigate every issue investigated

16   by the Court's expert over a four-month period.  But the Court appointed Gibson Dunn as its

17   expert to avoid this very result—indeed, the Court previously rejected Plaintiffs' proposal that the

18   parties engage in extensive and overbroad discovery, holding that doing so would "unleash the

19   dogs of discovery wars in highly counterproductive ways."  (ECF No. 6032 at 5.)  Plaintiffs may

20   be dissatisfied with the Court's expert's recommendation that the Court need not hold an

21   evidentiary hearing, but that does not now warrant engaging in litigation as if the expert did not

22   exhaustively investigate its charge and meet the Court's appointment orders.

23           Plaintiffs' discovery request lacks foundation and is also based on incorrect assumptions.

24   They claim to be at a disadvantage because Defendants know the identity of all, if not most, of

25   the witnesses and the substance of their sworn testimony provided to the Court's expert.  But

26   Defendants only know who they offered as witnesses most knowledgeable to the Court's expert

27   and who are otherwise referred to by name in the expert's report (just like Plaintiffs).  They do

28   not know the identities of the anonymous, undisclosed witnesses provided by other parties, non-

[3406703.11]                                  57

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1    parties, or the Special Master.  The Court confirmed this fact in its recent order denying

2    Defendants access to the expert's detailed billing records, stating that "given the ongoing

3    proceedings in this court . . . including the evidentiary hearing set for September, the court is

4    persuaded that the itemized billing records should remain under seal to protect the integrity of the

5    investigation and the privacy of witnesses involved." (ECF No. 6215 at 3.)  Plaintiffs fail to show

6    why they are entitled to such broad discovery like all witness identifying information or the

7    information provided by those witnesses in interviews with the Court's expert, unless Plaintiffs

8    intend to undermine the expert's report.  The September 13, 2019 hearing will not be focused or

9    narrow, should the Court grant Plaintiffs' broad discovery request, and otherwise render the

10   expert's exhaustive investigation meaningless.

11          In addition, consistent with their representations at the June 10, 2019 hearing, Defendants

12   do not have transcripts from any of the interviews conducted of its witnesses.  The Court's

13   expert's statement that Defendants would not receive the transcripts until the investigation's

14   conclusion (Neutral Expert's Report at 13), suggests that the expert provided Defendants with the

15   transcripts upon submitting its report to the parties and Court.  That is not accurate.  Moreover, it

16   appears that the Court's expert interviewed other witnesses without creating an independent

17   verifiable record—Defendants understand that only their witnesses volunteered to be interviewed

18   under oath.  (*See id*. at 12-13.)  Accordingly, just like Plaintiffs, Defendants have no record (by

19   transcript or the Court's expert's notes) as to what information any witness provided the Court's

20   expert.  Plaintiffs are hardly at a disadvantage—the parties are on the same footing.

21          Plaintiffs also allege that they are disadvantaged because they do not have the documents

22   provided to the Court's expert.  But Plaintiffs are not alone.  Defendants, too, do not have all the

23   documents provided to the Court's expert, including by Plaintiffs, Dr. Golding, or any other

24   witness, save for the Special Master's initial document production, which Plaintiffs also received.

25   Plaintiffs' argument that they, and they alone, cannot adequately prepare for the evidentiary

26   hearing on this ground rings hollow.

27          Plaintiffs' document request is significant for another reason.  Because Defendants do not

28   know what documents were provided to the Court's expert by other interviewed CDCR

1    employees or by Drs. Gonzales and Golding, they may have disclosed privileged communications

2    without Defendants' authorization. *See Thomas v. Cate*, 715 F. Supp. 2d 1012, 1044 (E.D. Cal.

3    2010), order clarified, No. 1:05CV01198, 2010 WL 797019 (E.D. Cal. Mar. 5, 2010) (holding

4    that a government agency may claim attorney-client privilege to the same extent as a private

5    entity); *see also United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) (the power to waive a

6    corporation's privilege rests with its directors and only those with authority may waive it).

7    Defendants have stood on their privilege rights throughout the expert's investigation, and the

8    Court stated that the privilege would not be waived with the production of any such documents to

9    the Court or to its expert.  (ECF No. 6200 at 4.)  But providing potentially privileged documents

10   to Plaintiffs, as contemplated by their far-reaching request for documents, raises separate and

11   serious concerns.

12        If the Court is inclined to order its expert to turn over the documents that Plaintiffs

13   request, all records should be released so that the parties and the Court are operating on a level

14   playing field and the record in this case is consistent with the record the Court expert created

15   during its investigation and upon which it relied to formulate its opinions.  Also, this will ensure

16   that Defendants have a full and fair opportunity to defend the integrity of their employees.  The

17   production should include any documents provided by any of the other parties or individuals,

18   anonymous or not, and any of the Court's expert's notes and other recordings from every witness

19   interview the expert conducted over the course of its investigation.  But before any documents are

20   produced to Plaintiffs, Defendants request the opportunity to review them to identify documents

21   protected by the attorney-client privilege, attorney work-product doctrine, or other applicable and

22   asserted privilege.

23        In sum, if the Court were to grant Plaintiffs' request, then it should order that all

24   information that the Court's expert received, reviewed, or created in the course of its investigation

25   be disclosed to both parties to ensure a full and fair process and protect Defendants due-process

26   rights.

27

28

[3406703.11]

III.

1    **PLAINTIFFS' PROPOSAL FOR ADDITIONAL AREAS OF AGREEMENT.**

2    **A.    Plaintiffs' Proposal.**

3         The Court's June 14, 2019 order (ECF No. 6187 at 3:1-3) encouraged the parties to attempt

4    to reach additional agreements beyond those specifically referred for the upcoming evidentiary

5    hearing (*id.* at 2:5-13) or to the Special Master for further consideration (*id.* at 3:27-4:5).

6    Accordingly, Plaintiffs sent a letter to Defendants on July 3, 2019 as part of the meet and confer

7    process.  Plaintiffs' letter proposed additional areas of possible agreement separate from the five

8    issues specified in paragraph two, and the issues referred to the Special Master in paragraphs

9    seven and eight, of the June 14 order.  The proposed stipulations related to evidence drawn

10   directly from the Neutral Expert's and Dr. Golding's reports, including, but not limited to, (a)

11   CDCR's use of the patient-weeks methodology for measuring compliance with deadlines that

12   occur on an ongoing basis (Neutral Expert's Report at 21-23); (b) CDCR's exclusion from

13   compliance metrics all data points relating to EOP patients not on psychiatric medications and

14   EOP patients in "overflow" housing (*Id.* at 94-96); and (c) the alleged misleading nature of

15   CDCR's Medication Administration Process Improvement Program ("MAPIP") data (*see, e.g.*,

16   Golding Report, ECF No. 5988-1 at 3, 30-31, 33).  Plaintiffs also requested that Defendants agree

17   to jointly propose to the Special Master that the parties discuss four additional policy issues in the

18   context of the Special Master's exploration of the issues ordered by the Court in the June 14

19   order.  (ECF No. 6187 at ¶¶ 7-8.)  Lastly, Plaintiffs renewed their request from their Response to

20   the Neutral Expert's Report for online and real time access to Defendants' CQIT, Dashboard, and

21   Performance Report.  (ECF No. 6170 at 52.)

22        In response, Defendants signaled a willingness to address the issues in Plaintiffs' July 3,

23   2019 letter with Plaintiffs' counsel and the Special Master, and possibly the Court.  However,

24   Defendants were unwilling to stipulate to any of the underlying facts Plaintiffs proposed.

25   Plaintiffs disagree with Defendants' position that the additional areas of stipulation proposed are

26   not responsive to the Court's order or appropriate for this joint report.  On the contrary, these

27   issues are seriously concerning and must be addressed to achieve the Court's goal "that complete

28   trust be restored … as soon as possible" between and among the parties, the Special Master team,

[3406703.11]                                    60

                              Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

1   and the Court.  (ECF No. 6200 at 5.)  To that end, Plaintiffs request that the Court issue an order

2   clarifying the final sentence in paragraph two of the June 14 order (ECF No. 6187 at 3:1-3) to

3   explicitly allow the parties to explore additional areas for possible agreement beyond those

4   specifically referred for the upcoming evidentiary hearing (*id.* at 2:5-13) or to the Special Master

5   for further consideration (*id.* at 3:27-4:5).  The parties could then submit an additional joint

6   stipulation if any agreements are reached.

7                  **B.**        **Defendants' Response.**

8         In a July 3, 2019 letter entitled "Proposed Areas of Agreement for Joint Stipulation

9   Pursuant to the Court's June 14, 2019 Order," Plaintiffs listed seventeen proposed stipulations

10   and several policy changes to include in this joint report.  The request is not consistent with the

11   Court's June 14, 2019 Order.  The Court identified five issues in its June 14, 2019 order and

12   specifically limited the scope of the "evidentiary hearing as to these issues."  (ECF No. 6187 at

13   2:5-18.)  The Court stated that the parties "may, as appropriate, also explore whether they can

14   reach agreement in any of the other areas *within the scope of the evidentiary hearing* and include

15   any additional agreements in the joint stipulation."  (*Id*. at 3:1-3 (emphasis added).)  But as

16   evidenced by Plaintiffs' request to now modify the June 14, 2019 order, none of the seventeen

17   proposed stipulations or additional policy proposals relate to the five issues the Court identified

18   for trial on September 13, 2019.  The Court should reject Plaintiffs' request to expand the scope

19   of the evidentiary hearing, which this joint report reflects will likely be a substantial undertaking.

20         Defendants are open and willing to address the issues raised in Plaintiffs' July 3, 2019

21   letter with Plaintiffs, the Special Master, and if appropriate, the Court.  Defendants want to

22   collaborate with the Court and all stakeholders so "that complete trust [may] be restored . . . as

23   soon as possible," but the purpose of the September 13, 2019 hearing is not to resolve additional

24   or all policy concerns raised by Dr. Golding or suggested by the Court's expert report.  That goal,

25   as Plaintiffs appear to posture it throughout this joint report, is not realistic.  And Plaintiffs'

26   approach would only further sidetrack the parties' remedial efforts—for example, a settlement

27   conference set for August 30, 2019 to continue the parties' work with Judge Drozd on benchmark

28

[3406703.11]                  61

Jt. Report Following June 10, 2019 Status Conf. (2:90-cv-00520 KJM-DB (PC))

remedial issues was continued at Plaintiffs' request because they allegedly needed to focus all of their resources on the September 13, 2019 adversarial hearing.  (ECF No. 6210.)

The Court explicitly stated that the limited purpose of the evidentiary hearing is for the Court to hear evidence to determine whether misleading data was presented to it or the Special Master in relation to the five issues identified by the Court's expert after the expert's thorough and comprehensive four-month investigation.  (ECF No. 6187 at 15:5-18.)  Granting Plaintiffs' request to modify the June 14, 2019 order to expand the scope of the evidentiary hearing would confuse the issues and further impede the parties' ability to help the Court resolve the handful of issues it determined warrant further consideration.  Nonetheless, if the Court is inclined to entertain Plaintiffs' request, it should direct Plaintiffs to file a noticed motion consistent with the Federal Rules of Civil Procedure and this District's Civil Local Rules, which will allow Defendants to respond in due course so that the parties may make an appropriate record for appellate review.  In the meantime, Defendants are willing to meet their offer to Plaintiffs to discuss additional policy issues, including with the Special Master's guidance through the all-parties workgroup process.

Dated:  July 22, 2019                                    Respectfully submitted,

                                                         XAVIER BECERRA
                                                         Attorney General of California
                                                         ADRIANO HRVATIN
                                                         Supervising Deputy Attorney General

                                                         /s/ *Elise Owens Thorn*

                                                         ELISE OWENS THORN
                                                         Deputy Attorney General
                                                         *Attorneys for Defendants*

Dated:  July 22, 2019                                    ROSEN BIEN GALVAN & GRUNFELD LLP

                                                         /s/ Lisa Ells

                                                         LISA ELLS
                                                         *Attorneys for Plaintiffs*

CF1997CS0003