UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | ORDER |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

On June 10, 2019, the court held a special status conference to review the Neutral Expert Report filed May 3, 2019, ECF No. 6147. At that status conference, the court set an evidentiary hearing for September 13, 2019, to address five issues identified in the Neutral Expert Report. *See* ECF No. 6187 at 2. The court also directed the parties to determine whether they could stipulate to facts underlying the Neutral Expert's investigation, and to report any agreed upon facts to the court in at joint stipulation. *Id.* The parties filed their joint report on July 23, 2019 (hereafter Joint Report), which included a request for a prehearing conference. ECF No. 6226 at 55. The court granted the request and the matter came on for telephonic prehearing conference on August 8, 2019. ECF No. 6233. Lisa Ells, Esq., Jessica Winter, Esq. and Cara Trapani, Esq. appeared as counsel for plaintiffs. Adriano Hrvatin, Supervising Deputy Attorney General, Neah

1

Huynh, Supervising Deputy Attorney General, Elise Thorn, Deputy Attorney General, Tyler Heath, Deputy Attorney General, and Robert Henkels, Deputy Attorney General, appeared as counsel for defendants. Glenn Danas, Esq. and Roman Silberfeld, Esq. appeared specially as counsel for defendants. California Department of Corrections and Rehabilitation (CDCR) Undersecretary for Health Care Services Diana Toche also was present on the conference call, as were the court's Special Master Matthew A. Lopes, Jr., and Court Monitor Kristina Hector. This order confirms and clarifies the following matters addressed at the prehearing conference hearing.

I.  Purpose and Scope of Evidentiary Proceeding

The telephonic status conference was set to clarify the scope and purpose of the evidentiary hearing, presently set for September 13, 2019. The primary purpose of the evidentiary hearing is to allow the court to ask questions of certain specifically identified persons so the court can determine whether, as the Neutral Expert's report suggests, misleading data was presented to the court and/or the Special Master in specifically identified categories and, if it was, what steps need to be taken to ensure the record has been corrected and similar missteps will not be repeated.[1] As the court stated at the last status conference, the parties will be permitted to ask focused follow up questions, but the evidentiary hearing will not be "a free for all." ECF No. 6185, RT at 26.

At the June 10, 2019 status conference, the court identified five areas "most critical to the Court" as "most troubling" or most in need of clarification. *Id*. at 8-12. Those areas were memorialized in the court's June 14, 2019 order after hearing. ECF No. 6187 at 2. As noted above, the court directed the parties to meet and confer to determine whether they could "stipulate to one or more relevant facts suggested by the results of the Neutral Expert's investigation" and to file a joint statement memorializing any such stipulations. *Id*. The court provided this direction expressly "[i]n an effort to narrow the issues for hearing." *Id*. The court also invited the parties "to explore whether they can reach agreement in any other areas within the scope of the evidentiary hearing" and to include any such additional agreements in the joint statement. *Id*. at 3.

---

[1] The court previously determined it will not delve further into the possibility of fraud on the court at this time, while reserving the possibility that new information may at some point cause the court to reconsider this determination. *See* ECF No. 6185, Reporter's Transcript of Proceedings (RT), at 6.

2

The court included the latter invitation in the June 14, 2019 order to signal that if the parties could reach agreement on other issues regarding the five identified topics, beyond the facts identified in the Neutral Expert Report and highlighted by the court at the June 10, 2019 hearing, they should so stipulate. As an example, the parties could have considered whether to stipulate to -- or the defendants could have straightforwardly offered up -- an acknowledgement that redefinition of monthly from "thirty" to "not more than forty-five days" was a material change to both policy and long-standing practice in this case and, as such, defendants should have informed the Special Master and his team of the proposed change before implementing it. As the court noted briefly at the last hearing, it had appeared to the court from the Neutral's report that in many instances the CDCR defendants had taken responsibility for certain mistakes identified by the Neutral and were willing to take, or had taken, steps to address the identified problems; the court also noted that the defendants' attorneys' litigation posturing might be getting in the way of productive remedial work. ECF No. 6185, RT at 8. The court's suggestion had contemplated that stipulations confirming defendants' necessary, responsible and constructive substantive efforts were realistic and achievable.

The court's expectation has not been satisfied by the parties' Joint Report to date. Rather, in key respects, the parties appear anxious to expand the nature and scope of the factual disputes the court has identified, and open wide the gates of discovery in advance of the hearing. The court DENIES all requests for discovery, including requests to have the Neutral Expert provide documents or identify witnesses.[2]

To clarify for purposes of going forward, on the one hand the court must understand why defendants presented misleading data to the court and the Special Master, the record must be corrected and all necessary steps taken to ensure transparency and accuracy in reporting going forward. The events surrounding the whistleblower reports from Drs. Golding and Gonzalez, everyone agrees, have led to a substantial erosion in the trust between the parties and between and

---

[2] The court authorized the deposition of one witness, Dr. Leidner, not as a discovery device but solely to preserve testimony in the event he is absent from the United States at the time of hearing. At the status conference, defendants informed the court Dr. Leidner would be present at the evidentiary hearing.

3

among the parties and the court's Special Master -- trust that is essential to successful completion of the remedy in this case. The court recognizes the importance of restoring this trust, particularly in light of the serious findings in the Neutral Expert Report. On the other hand, the long history of this case shows all too clearly that in the past at least full throttle litigation generally has served to delay forward progress and thrown dust into the gears of the kind of productive working relationship required between and among the parties and the Special Master.

Moreover, the court and the parties must not lose sight of the larger context of this case. Nearly a year has passed since the court-ordered deadline for defendants to come into full compliance with the staffing ratios in their 2009 staffing plan and the maximum ten percent vacancy rate the court required in its June 13, 2002 order, *see* ECF No. 5711, yet defendants' last staffing report still shows a 30 percent vacancy rate in authorized psychiatrist positions. *See* ECF No. 6232 at 4. The buildout of 100 mental health crisis beds (MHCBs), originally projected for 2021 as necessary to complete the remedy in this case is now delayed at least; defendants report the project's scope is now under discussion with the Legislature, may be scaled back and funding will not be available before July 1, 2020. *See* ECF No. 6231 at 3; ECF No. 6232 at 2-3. For the sake of the plaintiff class, and satisfaction of their Constitutional rights in accordance with prior court orders, completion of these and other essential remedial measures cannot continue to be delayed unnecessarily or indefinitely. However necessary the court's focused evidentiary hearing is at this time to purge and cleanse the court's docket now and for the future, the hearing must not become an open-ended detour.

II. Specific Preparations for Evidentiary Hearing

    a. Parties' Stipulations Accepted

The court recognizes the parties' Joint Report is the product of significant effort, even as some of their discussions remain incomplete. The court accepts all stipulations contained in the Joint Report that the parties have reached to date.

At the status conference, the court reviewed the five subject areas of the evidentiary hearing as discussed in the Joint Report and in light of the record. The court's review is memorialized below. The parties will be given a period of fourteen days to comment on this order,

4

to reach additional stipulations to the extent possible and to let the court know if defendants are prepared to make additional commitments to transparency in their data generation and production so as to further narrow the scope of the hearing, if not obviate the need for it entirely.

> b. Issue B: Redefining "Monthly" to Lengthen the Intervals between Enhanced Outpatient (EOP) Appointments

At the June 10 hearing, the court directed the parties' attention to page 43 of the Neutral Expert Report, where he reported that CDCR's decision to redefine "monthly" from 30 to 45 days to lengthen the intervals between EOP appointments "would have likely resulted in the reporting of misleading data, and that data was reported to the court in two filings." ECF No. 6185, RT at 9.[3] The court asked the parties if they would stipulate to these two facts. *Id*. at 9-10. The court explained it would need to get to the bottom of why neither Dr. Leidner nor Dr. Ceballos consulted with Dr. Golding in connection with this redefinition and also why neither the Special Master nor any member of his team was informed of this decision. *Id*. The court has already found the decision made a "significant alteration" to the Program Guide. *Id*. at 9.

The court's review of the Joint Status Report compels the conclusion that the parties are, in effect, in agreement regarding two key facts: the decision to redefine "monthly" in CDCR's business rules did result in the reporting of misleading data to the court, and the data was reported in two filings. *See* ECF No. 6226 at 3-4, Issue B(A)(4), (11), (12). Moreover, defendants represent they will re-run the Performance Reports affected by the business rule change under the current business rule, which defines monthly as 30 days, and file amended documents. *Id*. at 30 ¶ 3. With their responses to this order, the parties shall propose a date certain by which these filings will be amended.

Defendants also acknowledge that five monthly Administrative Segregation Unit (ASU) EOP Hub Certification letters provided to the Special Master and plaintiffs were based on data generated using the erroneous business rule, but they contend they should not have to re-run these reports because the time for certification of the hubs has passed, and the timely psychiatry

---

[3] The Court's Electronic Case Filing (ECF) System assigned page 48 to this page of the Neutral Expert Report. *See* note 4 *infra*.

5

contact indicator was not one of the five mandatory compliance indicators. *Id*. at 30 ¶ 4. Defendants' position regarding the purported immateriality of these letters at this stage does not relieve them of the obligation to correct the record, which must satisfy the highest levels of integrity. Defendants will be required to correct these five monthly certification letters as well as the two reports defendants have agreed to amend. With their responses to this order, the parties shall propose a date certain by which these documents will be amended.

While the parties have identified a number of other disputes they have about the precise nature of the business rule change, when it started, and how it came about, the court does not view those disputes as material to the key questions identified by the court at the June 10, 2019 hearing and which remain: why neither Dr. Leidner nor Dr. Ceballos consulted with Dr. Golding in connection with the decision to change the business rule, and why no one from CDCR informed the Special Master or any member of his team about the change. To develop the record on this issue, the scope of the evidentiary hearing will be limited to testimony designed to answer these questions, with the witnesses identified as Dr. Leidner, Dr. Ceballos and, as appropriate, former Deputy Director Katherine Tebrock. In response to this order, the parties shall advise the court whether Ms. Tebrock will appear in response to a court order or whether other process is required for her attendance. At hearing, the court will ask questions initially, and the parties will be permitted to ask focused follow-up questions suggested by the court's questions.

### c. Issue D: Counting All Encounters As Evaluations

At pages 62 and 63 of his report, the Neutral Expert finds that CDCR's reporting of timely psychiatry contacts is likely misleading for two reasons: (1) CDCR counts all non-confidential psychiatry contacts toward compliance; and (2) their reporting system defaults appointments to confidential and there is evidence this resulted in reporting of non-confidential contacts as confidential. ECF No. 6147 at 67-68.[4]

/////

---

[4] Citations to page numbers in this order are to the page numbers assigned by the Court's Electronic Case Filing System, located at the upper right hand corner of the page. At hearing, the court referred to this information as located at pages 62 and 63 of the Neutral Expert Report, which are the page numbers assigned by the Neutral Expert. *See* ECF No. 6185, RT at 11.

The parties' Joint Report demonstrates that the material dispute here stems from differing interpretations of relevant Program Guide requirements. Plaintiffs take a position similar to that offered by the Neutral Expert, that psychiatry contacts must be confidential in order to be compliant with Program Guide requirements. Defendants do not dispute that they count non-confidential psychiatry contacts toward compliance; they dispute whether the Program Guide is clear that such contacts must be confidential to satisfy Program Guide requirements.

In relevant part, the Program Guide requires that every "CCCMS inmate-patient on psychiatric medication be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues," ECF No. 5864-1 at 43, and that a psychiatrist "evaluate each EOP inmate-patient monthly to address psychiatric medication issues. *Id*. at 58.[5] The parties agree the Program Guide does not define "evaluation." ECF No. 6226 at 11; *see also* Neutral Expert Report, ECF No. 6147 at 58. The evidence compiled by the Neutral Expert included a memo dated April 18, 2007, which is attached as Appendix D to the Neutral Expert Report. *See* ECF No. 6147 at 108-119. This memorandum was also attached as Attachment A to the 2009 Program Guide Revision, and a plain reading of the Program Guide support the conclusion these psychiatric evaluations must be confidential. *See id*. at 58-59.[6]

The court is persuaded by the text of the April 18, 2007 memorandum and the Special Master's input to the Neutral Expert Report, as consistent with the other information provided in the Neutral Expert Report, that psychiatric evaluations must be "confidential" to satisfy the 30 and 90 day Program Guide requirements. In particular, the court adopts the analysis of relevant portions of the memorandum incorporated in the Neutral Expert Report, as follows:

---

[5] The Program Guide also requires that EOP inmates have "individual clinical contact" with their primary clinician (PC) "at least every other week," ECF No. 5864-1 at 68, but the focus of this section appears to be on the 30 and 90 day evaluation requirements.

[6] The April 18, 2007 memo attached as Attachment A to the 2009 Program Guide Revision appears to have been inadvertently omitted from the 2018 Program Guide Revision recently approved by the court. *See* ECF Nos. 6214, 5864-1. At hearing, the parties agreed that the April 18, 2007 memorandum remains in effect and should be part of the 2018 Program Guide Revision. The court will provide the direction necessary to accomplish this in a subsequent order.

7

> [The April 18, 2007 memorandum] defines "clinical encounters" as "when a clinician communicates with an inmate-patient in a clinical setting," and defines a "clinical setting" as "the location where a confidential communication occurs." Attachment A to PG at PLTF000205 . . . . As clinical encounters, the evaluations required under Program Guide therefore appear to require a confidential setting. *See* PG at 12-4-9, 12-3-11.

ECF No. 6147 at 59. For these reasons, the court rejects defendants' interpretation of the Program Guide and finds implementation of relevant systems, policies and protocols must be corrected accordingly. No evidentiary hearing testimony is needed to reach this conclusion.

Furthermore, the court has determined it is not necessary to examine the intent behind defendants' erroneous interpretation. Accordingly, this issue also need not be covered during the evidentiary hearing. Rather, it will be referred to the Workgroup for development of protocols to ensure the 30 and 90 day psychiatric evaluations required by the Program Guide are confidential unless an inmate-patient refuses to be seen in a confidential setting, and that defendants' compliance reporting is consistent with this requirement as now clarified.

The parties have stipulated that defendants included data on Timely Psychiatry Contacts based on the erroneous interpretation of the Program Guide requirements in several documents provided to the Special Master and/or filed in this action. *See* ECF No. 6226 at 12-13, ¶¶ 9-10. In their response to this order, defendants shall propose a date certain by which corrected documents will be provided to the Special Master and filed with the court as necessary to correct the record.

In the Joint Report, the parties stipulate that "[w]hen a psychiatrist documents an encounter with a patient in CDCR's EHRS [Electronic Health Record System], the encounter defaults to 'confidential' unless the psychiatrist selects the option from the drop-down menu to reflect that the encounter was not 'confidential.'" *Id*. at 12 ¶ 7. Going forward, defendants will need to take all steps necessary to ensure that their EHRS allows staff to record data that accurately reflects whether a clinical evaluation was confidential or non-confidential, without allowing electronic auto defaults to contribute to the generation of misleading data. These steps shall be taken under the supervision and with the guidance of the Special Master. The Special Master shall report to the court if relevant components of the EHRS system are not timely corrected.

8

### d. Issue E: Reporting of Scheduled and Missed Appointments

As the court discussed at the June 10, 2019 hearing, the Neutral Expert reports that "between approximately 2016 and October 2018, the definition of the 'Appointments Seen as Scheduled' indicator was incorrect and potentially misleading because it described the indicator as including 'all scheduled appointments' when it in fact only included appointments that were scheduled to occur during the reporting range but that did not occur due to factors within CDCR's control." ECF No. 6147 at 75. This, the Neutral Expert reports, likely resulted in the reporting of misleading data to the court on June 21, 2018 and to the Special Master as part of the CQI evaluations essential to completion of the remedy and entrusting the defendants with full compliance going forward. *Id*.

In relevant part, the parties have stipulated that after defendants reviewed Dr. Goldings' report about this issue on October 3, 2018, they corrected the definition of this indicator to accurately reflect the methodology underlying it. ECF No. 6226 at 16. The court infers from this stipulation there is general agreement that the definition of the Appointments Seen As Scheduled indicator was incorrect for the period from approximately 2016 through October 2018. Defendants have agreed to modify and refile their 2018 Staffing Proposal to modify the reference to the inaccurate indicator, and to meet and confer with plaintiffs, under the guidance of the Special Master, to review the definitions and methodologies they use in the future to report data related to Program Guide requirements for purposes of the CQIT tool. With their responses to this order, the parties shall propose a date certain by which this filing will be amended and a date certain by which the relevant definitions and methodologies will be reviewed and, as necessary, corrected.

The scope of the evidentiary hearing as to this issue thus will be limited to testimony from a person or persons most knowledgeable of why and how the Appointments Seen as Scheduled indicator was developed incorrectly and in the absence of consultation with Dr. Golding or other quality control measures, and what steps defendants plan to take to ensure indicators and definitions are developed with appropriate consultation and quality control in the future. The parties should identify this person or persons in their responses to this order.

/////

9

e. Issue F: Psychiatric Supervisors Acting As Line Staff

At the June 10, 2019 hearing, the court asked the parties if they would stipulate to the fact, reported by the Neutral Expert, that the data on timely psychiatric contacts submitted in support of CDCR's 2018 Staffing Proposal to reduce the number of CDCR psychiatrists was "potentially misleading" because the proposal did not disclose that appointments with psychiatric supervisors were included in the data. ECF No. 6185, RT at 12. In the Joint Report, the parties stipulate to the following:

> Defendants' 2018 Staffing Proposal included data related to the average frequency of patient contacts with psychiatrists (citation omitted). That data included contacts completed by supervising psychiatrists. Defendants' proposal did not specify what contacts were included in the data, including whether the data included only contacts completed by line staff or also included contacts completed by supervising psychiatrists.

ECF No. 6226 at 20 ¶ 6. The court interprets this stipulation as agreement with the factual finding reported by the Neutral Expert and highlighted by the court at the June 10, 2019 hearing.

This issue goes both to transparency and to defendants' intent in presenting data and the representations made in support of their 2018 Staffing Proposal. As noted above, in October 2017, the court ordered defendants to come into compliance with their staffing ratios and a 10 percent court-ordered maximum vacancy requirement within one year. ECF No. 5711. It is undisputed defendants are out of compliance with this order and are ten months past the deadline for coming into compliance. At the evidentiary hearing, the court will take testimony from a person or persons in a position to know (1) why defendants did not disclose in their 2018 Staffing Proposal whether, and to what extent, the reporting of data related to average frequency of patient contacts did not disclose the use of supervisory psychiatrists to complete caseload contacts with patients; and (2) to what extent defendants knowingly relied on active participation of supervisory psychiatrists in performing the duties of line psychiatrists both in defendants' 2018 Staffing Proposal and in supporting their representation that, if adopted, the 2018 Staffing Proposal would bring defendants into compliance with the October 2017 staffing order. The parties should identify this person or persons in their responses to this order.

/////

10

The issue of whether, and to what extent, supervising psychiatrists can or should perform the duties of line psychiatrists, consistent with the 2009 Staffing Ratios, is referred to the Special Master in coordination with the other related issues referred by paragraph 8 of this court's June 14, 2019 order.

  f. <u>Issue G: Medication Noncompliance</u>

As discussed at the June 10, 2019 hearing, at page 86 of his report, the Neutral Expert reports that a software bug caused cancelled medication non-compliance appointments to be counted as completed, which caused inaccurate data, less favorable to CDCR, to be reported to the court and the Special Master.

The Neutral Expert also reports it appears that CDCR's Timely Mental Health Referrals performance indicator is misleading because it does not reflect all patients who require medication non-compliance appointments and therefore overstates Program Guide compliance. He further reports it is undisputed that CDCR includes only patients referred for a medication non-compliance appointment in the denominator of its performance indicator, and not all medical non-compliant patients. Although the parties did not directly adopt the Neutral Expert's phrasing in the Joint Report, it appears they agree with these factual findings. *See* ECF No. 6226 at 23-24.

In part, the dispute here is over why this happens. According to the parties, the dispute turns at least in part on interpretation of how and why medication non-compliant patients are scheduled for follow-up under the CCHCS Medication Adherence Procedure policy. They may also dispute whether all medication non-compliance in fact must be captured. This matter will be referred back to the Workgroup for further work under the guidance and leadership of the Special Master. On or before November 1, 2019, the parties shall file a further joint report on this issue discussing the results of this additional work. The court will issue any further orders that may be required after consideration of that further joint report.

  g. <u>Matters Implicated by Footnote 19 of Neutral Expert Report</u>

The court attached to its June 14, 2019 order a list of eight issues provided by the Neutral Expert following the court's inquiry concerning footnote 19 of the Neutral Expert Report.

/////

11

The parties agree that the first four issues on this list are based on events of the past and need not be addressed further now. The court accepts this stipulation.

At the request of the parties, work on the last four issues will be referred to the Special Master, with the admonishment that the court expects the parties to cooperate fully with the Special Master as he leads the work on these issues. These include: whether primary clinicians are being allowed to discharge inmate-patients from mental health crisis beds (MHCBs) without involvement of a psychiatrist; whether the Utilization Management (UM) department was moved from Mental Health to California Correctional Health Care Services (CCHCS) Medical in 2015 because of concerns that data would be manipulated or altered if Mental Health continued to control it; whether psychiatrists have not been allowed to speak with the Special Master about safety concerns, and whether they have been disciplined for doing so; and whether a psychiatrist received a cease and desist order for comments made about psychologists supervising psychiatrists and, if so, whether that was in retaliation for the psychiatrist's involvement in preparation of the Golding Report. ECF No. 6187 at 5. As explained at hearing, the court will seek additional information from the Neutral Expert regarding the cease and desist order referred to in the eighth issue on the list. In addition, the court will ask the Neutral Expert for additional information the court might share with the Special Master and the parties about the sixth issue on the list, namely, the transfer of the UM department from Mental Health to CCHCS Medical in 2015.

h. Additional Witnesses for Hearing

The parties each have proposed additional witnesses for the evidentiary hearing. After review, the court agrees that the following witnesses may be added to the witness list: Dr. Kevin Kuich; Dr. John Rekart; Ms. Angela Ponciano; Dr. Shama Chaiken; and Ms. Julie Kirkman.

The court will entertain plaintiffs' request to call Drs. Golding and Gonzalez as rebuttal witnesses, on a showing made after all other witnesses have testified, that they have relevant testimony that might rebut in a material way testimony from other witnesses.

The court also anticipates it may have a focused few questions for Deputy Legal Affairs Secretary Onishi as a witness. The court's questions will be designed to not invade any privilege. Mr. Onishi is added to the witness list.

At hearing, the parties requested clarification of the scope of the proposed testimony of Dr. Amy Eargle. Upon reconsideration, the court has determined Dr. Eargle's testimony will not be required, unless the response of any party to this order demonstrates her testimony is necessary and relevant to one or more matters at issue in the hearing.

III. <u>Timing of Evidentiary Hearing, Further Quarterly Status Conference, Additional Meeting</u>

The court DIRECTS the parties to hold at least one additional meet and confer session to consider whether additional stipulations can be reached, given the guidance provided in this order. As the court signaled at the telephonic status conference, to allow the parties to fully exhaust the possibility of reaching relevant stipulations, the court is inclined to move the evidentiary hearing to the week of October 15, 2019. In lieu of evidentiary hearing on September 13, 2019, the court would conduct the regular quarterly status conference on that date, with the parties invited to propose agenda items on or before September 5, 2019, and a final agenda to be set by the court thereafter. The parties shall present their views on this schedule in their responses to this order, to be filed within fourteen days.

Finally, the Special Master is directed to share information concerning his plans for, and progress on obtaining, independent data auditing with the parties at a meeting scheduled for August 28, 2019 to the extent it may inform the parties' positions going forward.

In accordance with the above, IT IS HEREBY ORDERED that the parties shall file and serve responses to this order within fourteen days.

DATED: August 14, 2019.

                                                                                                                   UNITED STATES DISTRICT JUDGE