DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' RESPONSE TO SUPPLEMENT TO DEFENDANTS' THIRD STATUS REPORT ON FUNDING FOR THE CONSTRUCTION OF 100 MENTAL HEALTH CRISIS BEDS**<br><br>Judge: Hon. Kimberly J. Mueller |

[3426391.2]

PLAINTIFFS' RESPONSE TO SUPPLEMENT TO DEFENDANTS' THIRD STATUS REPORT ON FUNDING FOR THE CONSTRUCTION OF 100 MENTAL HEALTH CRISIS BEDS

Defendants' Supplement to Defendants' Third Status Report on Funding for the Construction of 100 Mental Health Crisis Beds ("Supplemental Third Status Report") concludes that even with the activation of only 50 of the originally-planned 100 licensed crisis beds in the Southern Region, Defendants "anticipate" achieving compliance with the Program Guide's 24-hour transfer timeline requirements. Supplemental Third Status Report, ECF No. 6235, at 4. But Defendants' filing leaves unanswered numerous questions regarding their ability to achieve the full compliance required by the Court's April 2017 and October 2017 orders, particularly given the substantial delays in the projects, the sheer number of existing unlicensed crisis beds that must be replaced with licensed ones, the uncertainty about whether both projects will move forward and when, and the likelihood that the need for crisis beds could again quickly exceed the currently projected demand.

Plaintiffs continue to have serious concerns regarding Defendants' failure to expedite the CIM and RJD projects, even though the MHCB bed shortage has been longstanding and Defendants' operation of "temporary" unlicensed crisis beds has stretched into years despite Court mandates to replace those beds with licensed crisis beds. Without prompt completion of the full slate of 100 planned licensed beds in the near term, there is no realistic prospect that CDCR will achieve full compliance with the Program Guide and this Court's orders.

### I. DEFENDANTS HAVE NOT PROVIDED SUFFICIENT INFORMATION ABOUT THEIR ABILITY TO ACHIEVE FULL COMPLIANCE WITH THE ADDITIONAL CRISIS BEDS, AND ADMIT THAT ADDITIONAL OBSTACLES MAY PREVENT FULL COMPLIANCE

Defendants' compliance with the twenty-four hour timeline requirement has certainly improved, as Defendants' Supplemental Third Report notes. Supplemental Third Report at 3. Defendants are still not in "full" compliance, as the Court's April and October 2017 orders indicated was necessary for meeting their Eighth Amendment obligation. April 19, 2017 Order, ECF No. 5610 at 11; October 10, 2017 Order, ECF No. 5710, at 17-18. Each of the patients who do not reach a crisis bed within 24 hours—some of whom

1

PLAINTIFFS' RESPONSE TO SUPPLEMENT TO DEFENDANTS' THIRD STATUS REPORT ON FUNDING FOR THE CONSTRUCTION OF 100 MENTAL HEALTH CRISIS BEDS

[3426391.2]

Defendants concede would not be covered by any exception the parties are negotiating pursuant to the April 26, 2019 Order, ECF No. 6135, which includes an exception covering any circumstances outside of Defendants' control—is a patient who required immediate, emergency crisis care and instead spent more than 24 hours in a harsh alternative housing setting.

Defendants state without elaboration that they "anticipate" that the addition of 50 crisis beds will allow them to meet the transfer timeline. Supplemental Third Status Report at 4. They have provided no information about how they intend to eliminate the remaining set of transfers over timeframes that are not covered by an exception, nor have they explained whether adding 50 beds in the Southern Region while taking down the unlicensed beds at CSP-SAC would result in transfer delays for patients in the Northern and Central regions, or if those beds would be sufficient for males in the Southern Region. *See* Section I.B., *infra*.

Defendants in fact admit that "the number of crisis beds has never been the only obstacle to compliance with the twenty-four hour requirement," suggesting that even if the CIM project or both 50-bed projects are approved, full compliance may not be possible. *Id.* at 4. And Defendants' "anticipate[d]" compliance based on the construction of only the CIM beds may be short-sighted, because it appears to be based on current population projections that project a need for fewer MHCBs in coming years, *see id.* at 2, while CDCR's bed needs projections can and do fluctuate significantly over time and are predicated on a 90% occupancy rate rather than the 80% occupancy rate used in the community for inpatient settings, leaving Defendants with little to no cushion should their projections prove incorrect. If future studies project a higher need, as they did in the four years prior to the current bed needs study, CDCR will not be able to move quickly enough to bring the additional 50 licensed beds online. *See* Order, September 22, 2017, ECF No. 5689 at 3-4 (just two years ago, projected need for MHCBs was expected to rise significantly over the course of the next 2 years); *see also* Order, July 3, 2019, ECF No. 6212 at 8 (discussing fluctuating bed needs projections). Without a more complete picture,

2
PLAINTIFFS' RESPONSE TO SUPPLEMENT TO DEFENDANTS' THIRD STATUS REPORT ON FUNDING FOR THE CONSTRUCTION OF 100 MENTAL HEALTH CRISIS BEDS

[3426391.2]

it is impossible for Plaintiffs to address whether the Court could find Defendants in full compliance with the transfer timeline requirement after activation of some or all of the planned 100 beds.

Moreover, it is not clear that the methods Defendants have used to achieve such a substantial drop in untimely MHCB admissions are entirely positive. Plaintiffs are concerned, based on a review of Defendants' recent monthly data and Plaintiffs' counsels' observations at numerous recent site inspections conducted as part of the Special Master's 28th Monitoring Round this year, that Defendants have achieved the reduction in delayed transfers by employing utilization management strategies that are not always clinically appropriate, such as focusing on reducing the number of patients referred for crisis care, imposing strict limits on patients' lengths of stay in crisis beds, and hastening MHCB discharges. While these administrative measures may increase MHCB capacity in some institutions and allow for more timely transfers, Plaintiffs are concerned that some patients needing inpatient crisis care or longer lengths of stay in MHCBs to stabilize are not receiving adequate treatment—the suicide rate in CDCR in 2018 was the highest per 100,000 inmates since 2005, at the height of overcrowding, and there have already been 19 suicides in the first eight months of 2019, for a current rate per 100,000 of 23.6. Declaration of Jenny S. Yelin in Support of Plaintiffs' Response to Supplement to Defendants' Third Status Report on Funding for the Construction of 100 Mental Health Crisis Beds ("Yelin Decl."), filed herewith, at ¶ 2. In six of the nineteen suicides in CDCR in 2019 to date, or thirty-two percent, the person had been discharged from a higher level of care within 30 days of their suicide, and in four of those cases, the discharge was from an MHCB. *Id* at ¶ 4. In previous recent years, a far lower number and percentage of CDCR suicides occurred shortly after a discharge from a higher level of care, including crisis beds. *Id.* at ¶ 6.

Compliance with the Program Guide's twenty-four hour transfer requirement should not come at the cost of quality care for every patient in psychiatric crisis. Additional analysis of these issues, including through the completion of the Special

Master's ongoing 28th Monitoring Round, is necessary for a comprehensive understanding of Defendants' Program Guide compliance.

### A. PLAINTIFFS HAVE SERIOUS CONCERNS REGARDING THE DELAYS IN THE PROJECT, AS WELL AS ITS POSSIBLY CHANGING SCOPE, CONSIDERING DEFENDANTS' LONGSTANDING CRISIS BED SHORTAGES

At the September 28, 2017 hearing regarding obstacles to Defendants' compliance with the MHCB transfer requirement, then-Deputy Director for Statewide Mental Health Katherine Tebrock testified that Defendants initiated the "long-term plan" to add licensed MHCBs in early 2016, and that as of early January 2017, the 100 bed project had been proposed to the Legislature. Transcript of Sept. 28, 2017 hearing, ECF No. 5707, at 55:3-7, 16-19. She noted that the project was then in the design phase, which she expected to take one year, and that CDCR expected the projects to be completed in five years—i.e., by Fall 2022. *Id.* at 56:22-25. Now, two years after that hearing, Defendants assert that the design phase (which Ms. Tebrock testified would be completed in 2018) is stalled due to questions raised by the Joint Legislative Budget Committee, presumably pushing the completion date well past 2022. *See* Supplemental Third Status Report, ECF No. 6235 at 3; Third Status Report, ECF No. 6231 at 3. And Defendants assert that based on the most recent bed needs study, the Legislature may not approve funding for one or both 50 bed projects, making it likely that—given the changing nature of population projections and bed needs—Defendants will be perpetuating the long-term shortage of MHCBs. Supplemental Third Status Report at 2. If CDCR proceeds with only the CIM project, and the projected need for MHCB care returns to previously projected levels, it would take at least another 5 years to bring an additional 50-bed project to completion.

Defendants have known for years that their MHCB capacity was not sufficient, particularly in the Southern Region, and the Court has repeatedly ordered Defendants to act urgently to address the bed shortage. *See* Order, July 3, 2019, ECF No. 6212, at 7-11 (discussing historical shortages and prior Court Orders requiring Defendants to activate sufficient licensed beds); Order, April 19, 2017, ECF No. 5610 at 12 (noting that

4

PLAINTIFFS' RESPONSE TO SUPPLEMENT TO DEFENDANTS' THIRD STATUS REPORT ON FUNDING FOR THE CONSTRUCTION OF 100 MENTAL HEALTH CRISIS BEDS

[3426391.2]

"defendants do not presently have sufficient capacity to meet the need for MHCB level of care"); Order, Sept. 22, 2017, ECF No. 5689, at 3-4 (describing projected MHCB shortages and ordering Defendants to "to explain why they have not activated the number of mental health crisis beds . . . projected by their Bed Need Studies"); ECF No. 5710 at 4-7, 20 (Court's October 10, 2017 order describing the long history of MHCB shortages and ordering defendants to "build and activate the required number of mental health crisis beds with an urgency greater than shown"); *see also* Defendants' Objections to the Recommendations of the Special Master's Report on his Expert's Third Re-Audit, ECF No. 6007 at 2 (discussing MHCB shortage in Southern Region).

Yet rather than make efforts to expedite the construction of the 100 beds in the Southern Region to address those chronic shortages, Defendants elected not to do so, *see* Sept. 28, 2017 hearing transcript, ECF No. 5707 at 80:18-82:3, and instead persisted with a plan to open an unlicensed unit in an Administrative Segregation space at R.J. Donovan State Prison ("RJD") for a year and a half, despite strident opposition from Plaintiffs, the Special Master's Suicide Prevention Expert, and the Special Master. *See* ECF No. 5993 at 8; ECF No. 5994 at 32-35 (Suicide Prevention Expert Lindsay Hayes calling the proposed RJD unit "stark and anti-therapeutic" and likely to "result in deplorable conditions – unacceptable for class members needing an MHCB level of care); Plaintiffs' Response to Defendants' Objections to the Recommendations of the Special Master's Report on his Expert's Third Re-Audit, ECF No. 6014; Declaration of Jenny S. Yelin in Support Thereof, ECF No. 6014-1, at Ex. C.  CDCR chose not to take available steps to expedite construction for the desperately needed beds, even though prior experience had shown that construction projects like this one frequently fall significantly behind schedule or end up abandoned. *See* Twenty-Fifth Round Monitoring Report of the Special Master, Jan. 18, 2013, ECF No. 2520, at 39 of PDF (50-bed MHCB unit at CMC was "significantly delayed"); Twenty-Sixth Round Monitoring Report of the Special Master, May 6, 2016, ECF No. 5439, at 75-83 of PDF (noting that the planned MHCB unit had been in the works since 2006, and that as of 2015, all construction projects, including that one, were

finally completed); *see also Plata v. Brown*, 563 U.S. 493, 528 (2011) (noting the State's history of promising construction to cure constitutional violations, but then failing to follow through).

Plaintiffs are concerned that Defendants' recent updates to the Court, including the Supplemental Third Status Report, indicate a continued lack of urgency to achieve adequate crisis bed capacity in the long-term, including planning for the permanent deactivation of all unlicensed units so that Defendants can achieve durable compliance with the Program Guide.

**B. DEFENDANTS' SUPPLEMENTAL REPORT DOES NOT FULLY ADDRESS WHETHER COMPLETION OF THE 100 BEDS WOULD ALLOW ALL TEMPORARY UNLICENSED CRISIS BEDS TO BE TAKEN OFFLINE**

Defendants' Supplemental Third Status Report represents that if CDCR completes construction of both 50-bed units, "all temporary unlicensed mental health crisis beds [could] be taken offline." Supplemental Third Status Report at 3. The Report also states that if the CIM project is not completed and activated, Defendants "may not have sufficient beds to take the unlicensed beds in the Walker Unit at the California Institution of Women offline." *Id.* Defendants do not clearly state, however, whether they would be able to deactivate all unlicensed units for men even if neither 50 bed project is ultimately completed. Nor do they explain whether they would have sufficient capacity for all men requiring MHCB care (particularly in the Southern Region, where Defendants have repeatedly stated they lack sufficient numbers of crisis beds to meet the need) if the Legislature approves only the CIM project, but not the RJD project, and whether they would be able to deactivate all male unlicensed units in that scenario. Defendants currently operate 54 unlicensed MHCBs for men, some for a decade. Supplemental Third Status Report at 3. Defendants have testified that they need some of the 50 CIM MHCBs for women, which is consistent with their statement that the unlicensed CIW beds cannot be decommissioned unless and until the CIM 50-bed unit is completed. *See* Transcript of Sept. 28, 2017 hearing, ECF No. 5707, at 56:5-14; *see also* Supplemental Third Status

Report at 3.  Basic mathematics indicate that it is all but impossible for Defendants to deactivate all 54 unlicensed male MHCBs if the RJD 50-bed project is not also approved and complete.  This is particularly true given this Court's orders making clear that unlicensed inpatient units cannot be decommissioned until it is abundantly established they will never be needed in the future to meet class members' need for timely access to crisis care.  Order, June 15, 2012, ECF No. 4199, at 5; *see also* Order, Dec. 9, 2016, ECF No. 5529, at 4 (citing 2012 Order).  It is also unclear whether Defendants have fully incorporated and accounted for their reliance on alternative housing placements in their crisis bed projections and planning, which this Court has declared is necessary for a durable remedy.  *Coleman v. Brown*, 938 F. Supp. 2d 955, 983 (E.D. Cal. 2013); *see also* Order, June 15, 2012, ECF No. 4199, at 2.

        The Court should require additional information from Defendants about whether CDCR would be able to take offline all unlicensed crisis beds for men and women if neither the RJD nor the CIM projects are approved, if only the CIM project is approved, and if both projects are approved.  Defendants should also explain the basis for their projections about the continued need for unlicensed crisis beds, and whether they are derived from the most recent Bed Needs Study or another source.

**II.   THE COURT SHOULD ORDER DEFENDANTS TO DISCLOSE THEIR COMMUNICATIONS WITH THE LEGISLATURE AND OTHER STATE AGENCIES REGARDING THE PROJECTS, AND TO PROVIDE DETAILED MONTHLY REPORTS TO THE SPECIAL MASTER AND PLAINTIFFS' COUNSEL ABOUT THE STATUS OF THE PROJECTS**

        Given the historical pattern of significant delays in major construction projects like this one, the already substantial lag from the schedule CDCR originally reported to the Court, and the inability of the Court, Special Master, or Plaintiffs to participate directly in CDCR's communications with the Department of Finance and Legislature, Plaintiffs are concerned that the funding and construction of the project(s) will continue to be pushed back significantly beyond the original Fall 2022 projected completion date.  And as discussed above, Plaintiffs have serious concerns about Defendants' ability to achieve compliance with the Program Guide transfer requirement with the addition of 50 or 100

7

PLAINTIFFS' RESPONSE TO SUPPLEMENT TO DEFENDANTS' THIRD STATUS REPORT ON FUNDING FOR THE CONSTRUCTION OF 100 MENTAL HEALTH CRISIS BEDS

[3426391.2]

licensed crisis beds, let alone without them.  The Court should not permit the projects to be delayed further based on vague representations about the Legislature's concerns.

Plaintiffs respectfully request that the Court require additional reporting from CDCR regarding the progress of the project in the legislative process, in its communications with the Department of Finance and any other public entities necessary for approval of financing, design, construction and licensing, and in the design and construction of the facilities.  The Court has in the past required Defendants to provide detailed monthly updates to the Special Master and Plaintiffs' counsel regarding the status of major construction projects, including "all action" taken on the projects, unanticipated delays of more than a month, and the reasons for and persons or agencies responsible for such delays, and to provide the Special Master and Court with notice of "any impediment to timely completion" of a project within ten days of discovery of the impediment, as well as a "proposed remedy to the impediment."  *See, e.g.*, Order, January 4, 2010, ECF No. 3761 at 4-5; Order, September 24, 2009, ECF No. 3686 at 3-4; Order, June 18, 2009, ECF No. 3613 at 2; *see also* Yelin Decl. at ¶ 8 and Ex. C (monthly report to Special Master on construction projects in response to June 18, 2009, September 24, 2009, and January 4, 2010 orders, and showing significant delays in various projects).  This Court has also in the past required Defendants to accelerate construction projects to the extent possible, and "to take all steps necessary" to secure the necessary funding for "full implementation" of the promised beds.  *See* Order, June 18, 2009, ECF No. 3613 at 2.  The Court should take similar action here.

Moreover, the Court should order CDCR to disclose its communications about the CIM and RJD projects with the Legislature (and any committees thereof, including the Joint Legislative Budget Committee), the Department of Finance (a party to this case), and any other state executive agencies with which CDCR has corresponded regarding the projects.  It is crucial that the Court, Special Master, and Plaintiffs be informed about how CDCR has communicated with those entities regarding the urgency of constructing the beds, the fluctuation in bed needs projections over time, the Department's decades-long

use of unlicensed crisis beds, and the Court's orders requiring activation of sufficient numbers of licensed crisis beds (including accounting for the deactivation of the existing 73 unlicensed crisis beds) that are a prerequisite to a complete remedy in this case. If the Legislature refuses to fund both 100 bed projects now, and the need for crisis bed or other inpatient care again increases in future projections to the levels forecast just two years ago, it will be many years before CDCR will be able to fulfill that need and achieve constitutional compliance.

## CERTIFICATION

Plaintiffs' counsel certifies that she reviewed the following orders relevant to this filing: ECF No. 3613, ECF No. 3686, ECF No. 3761, ECF No. 4199, ECF Bi, 5529, ECF No. 5610, ECF No. 5689, ECF No. 5710, ECF No. 6135, and ECF No. 6212.

DATED: August 23, 2019        Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Jenny S. Yelin*
    Jenny S. Yelin

Attorneys for Plaintiffs