1    XAVIER BECERRA, State Bar No. 118517
     Attorney General of California
2    ADRIANO HRVATIN, State Bar No. 220909
     Supervising Deputy Attorney General
3    ELISE OWENS THORN, State Bar No. 145931
     TYLER V. HEATH, State Bar No. 271478
4    ROBERT W. HENKELS, State Bar No. 255410
     Deputy Attorney General
5     1300 I Street, Suite 125
     P.O. Box 944255
6     Sacramento, CA 94244-2550
     Telephone: (916) 210-7325
7     Fax: (916) 324-5205
     E-mail: Tyler.Heath@doj.ca.gov
8    *Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                Plaintiffs,<br><br>     v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO THE COURT'S AUGUST 14, 2019 ORDER**<br><br>Judge:      The Hon. Kimberly J. Mueller |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................. 1

Defendants' Additional Stipulations and Concessions on Issues B, E, and F ............................. 2

Defendants' Commitment to Transparency .................................................................. 8

Witnesses for Any Focused and Narrow Evidentiary Hearing .................................. 13

      I. The persons most knowledgeable on Issues E and F. ................................. 13

      II. The August 14, 2019 Order limited the need for other witnesses. ............................. 14

Defendants' Position on Rei Onishi's Anticipated Testimony .................................. 16

    I.    Counsel from the Governor's Office, Rei Onishi, should not be called as a witness because he has little or no personal knowledge, and any testimony he could provide would be protected by various privileges ................................. 16

        A.   Mr. Onishi has little or no personal knowledge of the specific data-reporting issues identified by the court's august 14, 2019 order as subjects for live testimony. ................................................................ 16

        B.   The attorney-client privilege is sacrosanct, and covers Mr. Onishi's testimony on the lone issue as to which he could conceivably have personal knowledge. ................................................................ 18

        C.   Mr. Onishi's testimony is protected by work-product immunity. ............. 21

        D.   Mr. Onishi's testimony is also protected by the deliberative process privilege. ................................................................................ 22

    II.   Defendants' proposed alternative processes strike the appropriate balance between honoring the privileges that protect Mr. Onishi's testimony and helping the court obtain information. ................................................. 23

        A.   The court should choose to elicit any information from Mr. Onishi by written interrogatory. .......................................................... 23

        B.   in the alternative, the court should choose to interview Mr. Onishi in camera. ................................................................................ 23

Defendants' Commitment to Amending the Record ............................................ 24

Defendants' Proposal for New Pre-Hearing Deadlines .......................................... 27

Conclusion ...................................................................................................... 28

i

Defs.' Resp. Aug. 14, 2019 Order (2:90-cv-00520 KJM-DB (PC))

# INTRODUCTION

On August 14, 2019, the Court issued an order confirming and clarifying matters addressed during the Court's August 8 status conference concerning the evidentiary hearing set to address five issues identified in the Neutral Expert Report. Defendants agree with the Court that the primary goal of this case must be to provide constitutional care to the Plaintiff class. Defendants have not lost sight of their fundamental responsibility and remain committed to providing greater than constitutional care to all of their patients and working constructively with the Court, Special Master, and Plaintiffs in this critical endeavor.

The Court's order also addressed the scope of the anticipated evidentiary hearing. Specifically, it referred two of the issues—counting all encounters as evaluations and medication noncompliance—to the Special Master for additional work by the parties and outlined the specific questions it intends to address at the evidentiary hearing on the other three issues—redefining "monthly," reporting of scheduled and missed appointments, and psychiatric supervisors acting as line staff. The Court also asked the parties to meet and confer to determine if they could reach any additional stipulations and asked Defendants to inform the Court whether they are prepared to make additional commitments to transparency in their data generation and production. The Court ordered the parties to file responses to the order within fourteen days.

Defendants welcome the opportunity in this filing to provide the Court additional stipulations (both joint and individual) aimed at addressing the Court's continuing questions on the three issues currently set for the evidentiary hearing. Defendants also appreciate the opportunity to respond to the Court's ruling on each of the five issues and provide additional commitments regarding transparency. Through the provision of this information, Defendants hope to communicate to the Court that it understands the problems with the manner in which it provided or did not provide certain data to the Court and Special Master and to reassure the Court of its commitment to a number of important reforms and to setting a new course. Below, CDCR provides a comprehensive list of remedies and commitments to transparency it believes would remedy any past mistakes or erosion of trust, and would provide additional transparency in this case. Defendants also agree with the Court that any evidentiary hearing that takes place should

1

1  not become an open-ended detour.  To that end, Defendants do not object to the Court's order

2  denying discovery, referring issues D and G to the Special Master for additional work, and

3  proposal to address the matters implicated by footnote 19 of the Neutral Expert Report.

4  **DEFENDANTS' ADDITIONAL STIPULATIONS AND CONCESSIONS ON ISSUES B, E,**
**AND F**

5

6          On August 26, 2019, Defendants sent Plaintiffs proposed additional stipulations to further

7  address the Court's questions and potentially obviate the need for an evidentiary hearing.

8  Defendants also requested that Plaintiffs reconsider Defendants' previously proposed stipulations

9  that Plaintiffs rejected in July—Defendants submit that those stipulations provide important

10  context and address the Court's questions.  The parties appear to have agreement on the following

11  additional stipulations on issues B and E:

12          **Issue B:  Redefining "Monthly"**

13          •        Nonetheless, because the change in the definition in the business rule impacted the

14          way compliance for timeliness of psychiatry appointments was measured, the Chief

15          Psychiatrist should have been consulted prior to the creation and implementation of the

16          rule change.

17          •        CDCR acknowledges that it must notify the Special Master and Plaintiffs

18          regarding business rule changes that materially alter the way compliance with Program

19          Guide requirements is measured before such rule changes are implemented.  CDCR will

20          work with the Special Master and Plaintiffs to determine the best way to keep them

21          informed of relevant updates to the Performance Report.

22          •        After meeting and conferring with the Special Master and Plaintiffs, CDCR will

23          also issue internal guidance to all CDCR mental health administrators further clarifying

24          which business rule changes must be provided to the Special Master and Plaintiffs before

25          implementation.

26

27          **Issue E:  Reporting of Scheduled and Missed Appointments**

28          •        CDCR acknowledges that additional quality control measures must be taken to

2

1    ensure that indicators and definitions are developed with appropriate consultation and

2    quality control in the future.

3    Defendants will work with Plaintiffs to prepare and file a joint document reflecting these

4    additional stipulations in compliance with the Eastern District Local Rules.

5    Given that the Court directed the parties to address its August 14 order within fourteen

6    days and because Defendants were not able to provide additional proposed stipulations to

7    Plaintiffs until August 26, the time to meet and confer with Plaintiffs was limited.  However, it

8    appears the parties were able to reach agreement on several stipulations, as stated above, and

9    Defendants welcome the opportunity to continue to meet and confer regarding their proposed

10    stipulations in the coming weeks if Plaintiffs agree that the parties may be able to reach additional

11    stipulations to further narrow any evidentiary hearing or eliminate the need for an evidentiary

12    hearing, as contemplated by the Court's August 14 order.

13    The Court's August 14 order suggested that Defendants could have simply offered up

14    certain acknowledgements even without reaching a stipulation with Plaintiffs.  (ECF No. 6242 at

15    3.)  To that end, CDCR provides the Court with their newly proposed stipulations (labeled Newly

16    Proposed Stipulation), which were offered before the August 28 response deadline, but upon

17    which the parties could not reach agreement, as well as Defendants' prior individual stipulations

18    (labeled "Defendants' Prior Individual Stipulation from July 22, 2019 Joint Status Report"),

19    which Plaintiffs rejected in connection with the parties' joint July 22, 2019 joint submission.

20    Defendants offer these new and prior individual stipulations responsive to issues B, E, and F as

21    concessions and acknowledgements.  Defendants offer all of the stipulated facts together, by

22    issue, so that the Court may consider them in context.

23    **Issue B:  Redefining "Monthly"**

24    •    Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:
25    Redefining the term "monthly" when measuring compliance with timely psychiatry
      contacts was first raised on November 2, 2015 by a medication administrator at the
26    California Health Care Facility at the request of two CDCR psychiatrists.  (Neutral Expert
      Report, ECF No. 6147 at 45.[1])  When the psychiatrists attended a webinar hosted by Dr.
27    _____

28    [1] Defendants cite to the page numbers automatically generated by the Court's Electronic

3

Leidner to discuss the issue, he instructed them to raise the issue with Dr. Golding. (*Id.*) On February 25, 2016, the psychiatrists e-mailed Dr. Golding and asked to substitute the 30-day rule with a "monthly" rule to "help ease psychiatrists' tracking issues, reduce staffing needs, help psychiatrists manage their own outpatient caseloads and other issues." (*Id.* at 46.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The medication administrator at the California Health Care Facility raised the issue again in November and December of 2016. (*Id.*)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: On December 5, 2016, the medication administrator submitted a request on behalf of psychiatry that CDCR's data quality management team for the Statewide Mental Health Program change the definition of the term "monthly" in the business rule for the Performance Report indicator measuring timely compliance with EOP routine psychiatric appointments from 30 days to once every calendar month, to never exceed 45 days between appointments. (*Id.* at 45-46.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: Under the revised rule, timely compliance continued to require at least one appointment every calendar month, without exception. (*Id.* at 43, 45-46.)

• Newly Proposed Stipulation: Because Dr. Ceballos believed that the methodology was consistent with the Program Guide rule requiring "monthly" psychiatry contacts for EOP patients, she did not believe that the rule change was a change in policy.

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: There was no release note for the change since release notes were not being issued at that time. (*Id.* at 46.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: In December 2016, when CDCR changed the definition in the business rule, there was no established process or practice in place to notify the Chief Psychiatrist before a business rule was changed.

• Newly Proposed Stipulation: Instead, the rule change was announced at two statewide Management Reporting webinars, one on December 7, 2016 and one on December 8, 2016, and also appeared in the Compliance Rules Report for the entire time it was in effect. The Compliance Rules Report was viewable both directly and through links from the Performance Report to any staff who had access to the Performance Report.

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The change in the definition of the term "monthly" in the business rule for the Performance Report indicator measuring timely compliance with EOP routine psychiatric appointments was not reported to the Special Master or the Court because CDCR mental

---

Case Filing system that appear in the header of each page of the Neutral Expert Report, ECF No. 6147.

health administrators believed the business rule change was consistent with the Program Guide's requirement that each EOP inmate-patient be evaluated "at least monthly to address psychiatric medication issues." (*Id.* at 45.)

• Newly Proposed Stipulation: The decision to implement the business rule change without notifying the Special Master resulted in part from the lack of any criteria for determining what types of business rule changes should be provided to the Special Master; and the lack of a regular process for providing business rule changes to the Special Master.

• Newly Proposed Stipulation: These steps reflect CDCR's commitment to ensure that processes and practices are in place to prevent what happened in December 2016 from happening again and rebuild the parties' trust.

**Issue E: Reporting of Scheduled and Missed Appointments**

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The "Appointments Seen as Scheduled" indicator was developed by CDCR's data quality management team for the Statewide Mental Health Program independent of the Program Guide to measure and track whether inmate-patients housed at CDCR's institutions statewide were being seen by a psychiatrist based on scheduled appointments. (Neutral Expert Report, ECF No. 6147 at 73.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The "Treatment Refused" and "Treatment Cancelled" indicators do not reflect or capture any Program Guide requirements. (*Id.* at 75.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: The cutoffs used to calculate the "Treatment Refused" and "Treatment Cancelled" indicators reflect CDCR's chosen methodology for achieving a meaningful data set that can be utilized to enhance care within the institutions. (*Id.*)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: Defendants have not provided data from the "Treatment Refused" or "Treatment Cancelled" indicators to the Court or the Special Master. (*Id.*)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: Defendants did not rely on data from the "Treatment Refused" Performance Report indicator to support their proposal to reduce the number of CCCMS patients on psychiatrists' caseloads as part of Defendants' 2018 Staffing Proposals, which were provided to the Special Master, Plaintiffs, and the Court. (ECF No. 5841-3 at 2; ECF No. at 5922 at 14.)

• Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report: During monitoring, the Special Master conducts interviews of staff to determine whether the institutions are offering the required number of hours and did not find any major issues with compliance data. (Neutral Expert Report, ECF No. 6147 at 71.)

5

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** This change was made as a part of its effort to examine whether the mental health system's management of patients was causing patients to miss appointments. (*Id.* at 75.)

- **Newly Proposed Stipulation:** The methodology was changed to bring CDCR in line with the methodology and definition used by California Correctional Health Care Services (CCHCS), and came at a time when CDCR was aligning its performance improvement work plans and reports with those at CCHCS.

- **Newly Proposed Stipulation:** The "Appointments Seen as Scheduled" indicator includes group, IDTT, and individual contacts provided by mental health staff, across all levels of care. The majority of appointments included in the "Appointments Seen as Scheduled" indicator are not psychiatry contacts and the measure is not directly related to the provision of psychiatric care.

- **Newly Proposed Stipulation:** At the time of the change in 2016, Dr. Ceballos did not inform the Chief Psychiatrist about every methodology change. Instead, she only consulted with the subject matter expert for the affected discipline.

- **Newly Proposed Stipulation:** In April 2017, CDCR implemented a Mental Health Management Change Committee to ensure that all stakeholders, including the Chief Psychiatrist, are informed of requests for Performance Report modifications, and to ensure that CDCR's psychiatrists are made aware of psychiatry indicator-related requests and have an opportunity to opine on the appropriateness of proposed changes. (*Id.* at 49.) The work of that committee was paused when Dr. Golding issued his allegations.

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** The "Appointments Seen as Scheduled" indicator does include appointments not seen due to scheduling errors in the denominator.

- **Newly Proposed Stipulation:** If a provider sees a patient after an appointment is scheduled, but simply checks the patient in and out in EHRS when the patient is seen without requesting that the appointment be rescheduled, only one appointment will be recorded and it will be included in the Appointments Seen As Scheduled indicator as a seen appointment.[2]

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** CDCR first learned that the indicator's definition did not reflect the change in the methodology when Dr. Golding submitted his allegations to the Plata Receiver on October 3, 2018. (*Id.* at 75.)

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** The reporting of the "Appointments Seen as Scheduled" data without updating the

---

[2] In the July 22, 2019 Joint Status Report, Defendants included a slightly different version of this proposed stipulated fact. (ECF No. 6226 at 18.)

definition was an inadvertent oversight and not intended to mislead the Court or the Special Master.

• **Newly Proposed Stipulation:** CDCR is committed to taking additional steps to ensure that this problem does not occur again. One important step is reviewing the definition of each indicator and ensuring that it corresponds to the data measured.

### Issue F: Supervisors Acting as Line Staff

• **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** Plaintiffs and the Special Master were aware that supervising psychiatrists were occasionally seeing patients. (*See* Neutral Expert Report, ECF No. 6147 at 77.) Defendants' representation in their 2018 Staffing Proposal that patients were being seen by psychiatrists necessarily included some treatment by supervising psychiatrists. As a result, Defendants believed that the Special Master and Plaintiffs were aware that the data included contacts completed by supervising psychiatrists, and they did not tell the Special Master or Plaintiffs that the data included contacts completed by supervising psychiatrists. (*Id.*)

• **Newly Offered Stipulation:** When gathering data for the 2018 Staffing Proposal, CDCR relied upon the contact data from the EHRS system, which did not specify whether the provider was a supervisor or a line psychiatrist. CDCR thus did not consider, let alone evaluate, the degree to which different institutions relied upon supervisory patient contacts to satisfy patient contact requirements.

• **Newly Offered Stipulation:** Defendants included data on the frequency and timeliness of patient contacts in their 2018 Staffing Proposal to illustrate to the Special Master that certain staffing assumptions from 2009 were outdated or unreasonable from a systemic perspective. Defendants were not trying to use this data to make a statement regarding the adequacy of care at thinly staffed institutions where supervisors may have had to perform the functions of line staff. Defendants acknowledged at the time, and continue to acknowledge, that they need to fill the vacant positions at those institutions to ensure that patients receive adequate mental health care.

• **Newly Offered Stipulation:** While CDCR made no representation to the Court or the Special Master that all patient contacts are seen only by line psychiatrists (*see* Neutral Expert Report, ECF No. 6147 at 77), its failure to further assess the extent to which supervisory psychiatrists, as opposed to line psychiatrists, were providing care meant that its data on the timeliness of patient contacts, as presented in the 2018 Staffing Proposal, was not by itself sufficient to justify revising the 2009 staffing assumptions.[3]

---

[3] The Neutral Expert Report noted that "the Special Master did not primarily rely on current staffing ratio data in evaluation the 2018 Staffing Proposal" and "[t]he focus of CDCR's proposal, and of the Special Master's evaluation of it, was on staffing cuts that could be justified by changes since the original 2009 Staffing Plan, such as the changes in CDCR patient-inmate populations, changes in the number of CCCMS inmates on medications, and the existence of unfilled FTEs relating to unused functions contemplated in the original plan." (ECF No. 6147 at 74.)

7

- **Newly Offered Stipulation:** CDCR's Associate Director of Statewide Planning and Policy, Angela Ponciano, conducted a review of the data in response to Dr. Golding's allegations by manually searching the system for appointments associated with the name of each supervisor and chief. Her review of the data reflected that a very small portion of appointments statewide were conducted by supervisors. This suggests that the inclusion of supervisory patient contacts may have had little, if any, material effect on Defendants' statewide numbers. (*Id.* at 80-81.)

- **Defendants Prior Individual Stipulation from July 22, 2019 Joint Status Report:** Since February 2018, Defendants have filed monthly psychiatry vacancy reports with the Court that report only on vacancies for line staff psychiatrists. This is consistent with the court's order requiring only reporting of vacancies for line staff and the subsequent report template negotiated with the Plaintiffs and Special Master.

To the extent that the Court determines that an evidentiary hearing is still necessary, Defendants proffer that the witnesses they identified as persons most knowledgeable will testify consistent with Defendants' newly proposed stipulations and the proposed individual stipulations that Plaintiffs previously rejected in July. For the Court's convenience, Defendants attach as Exhibit A a list of the stipulations that the parties previously agreed on, Defendants' proposed stipulations that Plaintiffs rejected in July, the new stipulations to which the parties agreed, and Defendants' newly proposed stipulations that Plaintiffs rejected so that the Court has in a single document the key facts that Defendants believe would be presented at any evidentiary proceeding.

### DEFENDANTS' COMMITMENT TO TRANSPARENCY

The Court's August 14 order invited Defendants "to let the court know if [they] are prepared to make additional commitments to transparency in their data generation and production so as to further narrow the scope of the hearing, if not obviate the need for it entirely." (ECF No. 6242 at 4-5.) Defendants appreciate this opportunity to make additional commitments that will expand on existing practices that grant the Special Master and Plaintiffs access to CDCR's mental health care system, along with the proposals made in Defendants' portion of the July 22, 2019 joint status report.

Before Dr. Golding published his allegations, there were already a number of transparency practices in place. The order of reference grants the Special Master access to CDCR's

8

documents, facilities, and employees, and CDCR complies with that order. (*See* ECF No. 640 at 5-7.) Moreover, the Special Master and Plaintiffs have real-time access to CDCR's electronic health records system and regularly tour CDCR's facilities. And CDCR regularly participates in workgroups with the Special Master and Plaintiffs and responds to countless questions. The Special Master and Plaintiffs have always had the ability to question Defendants about their performance report indicators and underlying methodologies and CDCR will continue to answer those questions to the extent possible.

However, Defendants also represented in the July 22, 2019 joint status report that CDCR is responsible for a number of unintentional and inadvertent errors related to the collection and reporting of data and the use of that data in negotiations with Plaintiffs and the Special Master and in filings with the Court. CDCR recognizes that certain steps are necessary to prevent these types of errors from occurring in the future. To that end, Defendants' joint statement (ECF No. 6226 28-32) offered the following remedies, to which CDCR remains committed:

1. To avoid issues with the tracking and reporting of data and the mischaracterization of methodologies, CDCR will meet and confer with Plaintiffs, under the guidance of the Special Master, to review the definitions and methodologies CDCR uses to report data related to Program Guide requirements or the Continuous Quality Improvement Tool.

2. The parties will meet and confer under the guidance of the Special Master to discuss discrepancies in policy and data collection methodology, as the Court envisioned. (Tr. at 23:13 – 24:18, Dec. 14, 2018, ECF No. 6054.)

3. Defendants will meet with Plaintiffs and the Special Master to explain CDCR's processes for analyzing change requests to their compliance tracking systems. These processes include those already in place like the Mental Health Change Management Committee, designed to ensure all stakeholders, such as the psychiatry team, are notified of proposed methodological changes to psychiatric appointment metrics and requests for Performance Report modifications.

4. CDCR will issue a memo to the field reminding psychiatrists of their duty to report the confidentiality of patient encounters appropriately, what default settings are used in Electronic Health Records System (EHRS) related to timely contacts, and how to use drop-down menus.

9

1    5.  The parties should review with the Special Master the issue of how to track non-

2    confidential encounters initiated by psychiatrists and whether those contacts should be, under

3    appropriate clinical circumstances, counted towards compliance.

4    6.  Defendants have processes in place to ensure data system accuracy.  Report users who

5    identify an error or discrepancy are encouraged to report that error using CDCR's "Solution

6    Center" system.  (*See* Leidner Decl., Nov. 20, 2018, ECF No. 6012-3 at 5.)  Should an error be

7    identified with the "Appointments Seen as Scheduled" indicator, or any other indicator, the error

8    will be reported to the appropriate data systems staff.  To ensure staff are aware of the obligation

9    and process for reporting such errors, CDCR will issue a memorandum to the field re-educating

10   staff regarding the "Solution Center" system.

11   7.  In connection with continuing discussions related to the Staffing Proposal, CDCR will

12   provide Plaintiffs and the Special Master with any additional data (including the methodology

13   used to calculate the data) they request that is available to satisfy their concerns with the proposal,

14   including data on supervisor workload in outpatient programs.

15   8.  The parties will discuss the methodology for CDCR's medication nonadherence

16   indicator to eliminate, to the extent possible, ambiguities or misunderstandings as to what is being

17   measured and what data is included in the measurement.

18   CDCR also remains committed to its self-certification proposal providing that for all

19   performance report data referred to in future Court filings, a person most knowledgeable (who

20   may or may not be CDCR's Chief Psychiatrist) will certify that the source of the data, the

21   methodology used to calculate the data, and the reference to the data is an accurate representation

22   of the underlying reported data.  (ECF No. 6226 at 34.)  Defendants believe this proposal will

23   ensure that the parties, Court, and Special Master understand precisely what Defendants' data is

24   reporting.  Defendants request that the Court approve this proposal.

25   In response to the Court's August 14 order, CDCR makes the following additional

26   proposals to improve transparency and restore trust:

27   1.  The Court ordered Defendants "to take all steps necessary to ensure that their EHRS

28   allows staff to record data that accurately reflects whether a clinical evaluation was confidential

10

1   or non-confidential, without allowing electronic auto defaults to contribute to the generation of

2   misleading data." (ECF No. 6242 at 8.)  In addition to CDCR's prior commitment to instruct the

3   field on their duty to accurately record the confidentiality of an appointment and to review with

4   the Special Master how to track non-confidential encounters, CDCR is in the process of

5   eliminating the default confidentiality setting for psychiatry and primary clinician contacts in

6   EHRS.  Instead of defaulting, this field will be mandatory and will require the provider to select

7   whether the encounter was confidential or non-confidential.  CDCR is currently drafting a memo

8   to the field regarding this change and will present that draft to the Special Master and Plaintiffs.

9        2.  The Court also stated its intention to take testimony regarding "what steps Defendants

10  plan to take to ensure indicators and definitions are developed with appropriate consultation and

11  quality control in the future." (ECF No. 6242 at 9.)  CDCR submits that it is in the process of

12  working with the California Correctional Health Care services (CCHCS) to create a data

13  governance policy, the intent of which is to manage the availability, usability, reliability,

14  integrity, and security of the data.  Once that policy is complete, CDCR will create its own

15  change management and data governance policy specifically for Mental Health.  That will allow

16  CDCR Mental Health to restart its Mental Health Change Management Committee, which started

17  in April 2017 to ensure all stakeholders were informed of Performance Report modifications, and

18  will continue to address any changes required or proposed regarding the Performance Report or

19  any other indicators.[4]  The data governance policies will also allow CDCR to begin an ongoing

20  review of each indicator and corresponding methodology, business rules, and definitions to make

21  sure they are accurate.  Through this process, CDCR will confirm that each indicator corresponds

22  to the data measured.

23       3.  It has also become apparent to CDCR through this process that there was a lack of

24  communication with the Special Master regarding when he expected to be informed of changes to

25  CDCR's quality improvement performance report business rules and methodologies.  This, in

26  turn, resulted in a failure of CDCR to set those expectations for its staff members responsible for

27

28       [4] Since Dr. Golding published his allegations in October 2018, the committee has been
    suspended pending development of policies to govern the process.

11

1   creating CDCR's quality improvement systems, including the performance report.  As recognized

2   in the tentatively agreed stipulations above, CDCR acknowledges that it must notify the Special

3   Master and Plaintiffs regarding business rule changes that materially alter the way compliance

4   with Program Guide requirements is measured before such rule changes are implemented.  CDCR

5   will work with the Special Master and Plaintiffs to determine the best way to keep them informed

6   of relevant updates to the Performance Report.  And, after meeting and conferring with the

7   Special Master and Plaintiffs, CDCR will also issue internal guidance to all CDCR mental health

8   administrators further clarifying which business rule changes must be provided to the Special

9   Master and Plaintiffs before implementation.

10      4. On August 28, 2019, the parties met with the Special Master and the *Plata* Receiver to

11  discuss Defendants' proposal to improve data management, integrity, transparency, and analytics

12  by integrating mental health care data into the data system used for all other health care data at

13  CDCR.  Currently, the CCHCS Quality Management Section provides patient quality, quality

14  management, and data analytics functions for all of CDCR's health care programs except mental

15  health.  The data that it generates is widely trusted and recognized for its integrity.  Defendants

16  believe that using this existing system not only would better integrate the care teams and

17  providers who serve patients, thereby improving mental health outcomes, but also help restore the

18  parties' trust in the integrity and reliability of CDCR's mental health data.  Defendants intend to

19  pursue further discussions with the Special Master and Plaintiffs to advance this proposal.

20      Defendants' proposed remedies represent a comprehensive approach to correcting past

21  errors related to data reporting, with the short- and long-term objectives of improving trust and

22  understanding among the parties.

### WITNESSES FOR ANY FOCUSED AND NARROW EVIDENTIARY HEARING

**I.      THE PERSON'S MOST KNOWLEDGEABLE ON ISSUES E AND F.**

25      The Court's August 14 order stated the Court's intention to ask focused questions on

26  issues B, E, and F at the evidentiary hearing, if one is necessary.  On issue B—redefining

27  monthly—the Court identified Dr. Leidner, Dr. Ceballos, and former Deputy Director Katherine

28

12

1    Tebrock as the individuals the Court expected to question.  (ECF No. 6242 at 6.)[5]  CDCR

2    believes that Drs. Leidner and Ceballos can appropriately address the specific areas of inquiry for

3    issue B identified by the Court, and do not believe that former Deputy Director Tebrock is

4    necessary.

5           With respect to issue E—reporting of scheduled and missed appointments—the Court

6    ordered the parties to identify the persons most knowledgeable about "why and how the

7    Appointments Seen as Scheduled indicator was developed incorrectly and in the absence of

8    consultation with Dr. Golding or other quality control measures, and what steps defendants plan

9    to take to ensure indicators and definitions are developed with appropriate consultation and

10   quality control in the future."  (ECF No. 6242 at 9.)  Defendants identify Drs. Ceballos and

11   Leidner as the persons most knowledgeable.

12          On issue F, the Court ordered the parties to identify the person most knowledgeable

13   regarding "(1) why defendants did not disclose in their 2018 Staffing Proposal whether, and to

14   what extent, the reporting of data related to average frequency of patient contacts did not disclose

15   the use of supervisory psychiatrists to complete caseload contacts with patients; and (2) to what

16   extent defendants knowingly relied on active participation of supervisory psychiatrists in

17   performing the duties of line psychiatrists both in defendants' 2018 Staffing Proposal and in

18   supporting their representation that, if adopted, the 2018 Staffing Proposal would bring

19   defendants into compliance with the October 2017 staffing order."  (ECF No. 6242 at 10.)

20   Defendants identify Assistant Deputy Director Angela Ponciano as the person most

21   knowledgeable on this issue.

22          During the meet-and-confer process, Plaintiffs stated they believe that Katherine Tebrock,

23   John Rekart, Kevin Kuich, and Eureka Daye are additional persons most knowledgeable on issue

24   E, and Katherine Tebrock, Brittany Brizendine, Laura Ceballos, and Kevin Kuich as additional

25   persons most knowledgeable on issue F.  At this time, CDCR does not believe that these

26   individuals are the persons most knowledgeable to respond to the narrow issues identified by the

27   ───────────────────

28          [5] If their testimony is necessary, Dr. Leidner, Dr. Ceballos, and former Deputy Director
     Tebrock will not require additional service to appear at the evidentiary hearing.

13

1  Court.  And Plaintiffs' inclusion of these individuals is contrary to the Court's direction that

2  "[h]owever necessary the court's focused evidentiary hearing is at this time to purge and cleanse

3  the court's docket now and for the future, the hearing must not become an open-ended detour."

4  (ECF No. 6242 at 4.)  Plaintiffs' contention that several of these individuals are persons most

5  knowledgeable lacks foundation.  For example, Eureka Day was only recently made the acting

6  Deputy Director of Mental Health—long after Dr. Golding made his allegations.  Because

7  Plaintiffs did not explain why these individuals are persons most knowledgeable until the day of

8  this filing, Defendants were unable to fully address Plaintiffs' proposal.  Accordingly, Defendants

9  reserve their right to raise additional objections.  In the interim, the Court should reject Plaintiffs'

10  additional persons most knowledgeable.

11  **II.    THE AUGUST 14, 2019 ORDER LIMITED THE NEED FOR OTHER WITNESSES.**

12      Defendants appreciate the Court's willingness to hear from several of their original

13  proposed witnesses, but now that the Court has referred two issues to the Special Master and

14  parties for resolution and narrowed the scope of the evidentiary hearing with regards to the three

15  other issues, several of those witnesses are no longer necessary.  Specifically, the testimony of

16  Ms. Julie Kirkman, Dr. Shama Chaiken, and Dr. John Rekart is no longer required.  Below,

17  Defendants also address the Court's determination that "it may have a focused few questions for

18  Deputy Legal Affairs Secretary Onishi as a witness."  (ECF No. 6242 at 12.)

19      Defendants expected Ms. Kirkman to testify concerning the request she made to CDCR

20  headquarters to change the business rule that measures compliance with the Program Guide's

21  requirement that '[a] psychiatrist shall evaluate each EOP inmate-patient at least monthly to

22  address psychiatric medication issues."  (ECF No. 6226 at 53.)  Defendants expected Dr. Chaikin

23  to provide background testimony regarding the development and implementation of the Program

24  Guide's requirement of monthly psychiatry evaluation of EOP patients.  (*Id.* at 53.)  However, the

25  Court's August 14 order clarified the questions it intends to ask with regards to issue B, and

26  Defendants no longer believe their testimony is necessary.

27      Defendants anticipated calling Dr. Rekart to provide testimony regarding issue D—

28  counting all encounters as evaluations.  Similarly, Plaintiffs noted that the Neutral Expert cited

14

1    Dr. Rekart's opinions and testimony with regards to issues A, D, and G.  (ECF No. 6226 at 48.)

2    Following the Court's August 14 order, none of these three issues are part of the proposed

3    evidentiary hearing.  (ECF No. 6242 at 8, 10.)  To the extent Plaintiffs insist on the Court calling

4    Dr. Rekart at the proposed hearing, Defendants request the Court require them to make a specific

5    offer of proof showing the relevant information they expect him to provide in response to the

6    narrowed issues for the evidentiary hearing.

7         Although Defendants did not list Dr. Kuich as a potential witness for the evidentiary

8    hearing, Defendants do not think he is a necessary witness now that the Court has narrowed the

9    issues for the hearing.  Defendants initially objected to his inclusion as a witness because their

10   designation of extensive additional represented an intent to open the evidentiary hearing to any

11   and all factual and policy issues raised by Dr. Golding and the Court's expert and this objection

12   remains applicable.  (ECF No. 6226 at 54.)  Defendants do not believe Dr. Kuich would provide

13   testimony relevant to the three issues identified for the evidentiary hearing and do not believe he

14   is a person-most-knowledgeable concerning those issues.  Removing Dr. Kuich as a witness for

15   the proposed hearing would be consistent with the Court's plan to conduct a narrow and focused

16   hearing on only three issues.  However, if Plaintiffs believe that Dr. Kuich should still be called to

17   testify, the Court should require them to make an offer of proof showing the relevant information

18   they expect him to provide on the three issues.

19        Defendants previously informed the Court that Drs. Rekart and Kuich no longer work for

20   CDCR or any other state agency.  To the extent the Court determines it will call Drs. Rekart and

21   Kuich for testimony, CDCR is informed and believes that Dr. Rekart has agreed to appear without

22   any additional service.  CDCR is informed that Dr. Kuich accepted a new position in Hawaii—

23   CDCR has not discussed with him whether he would agree to appear without additional service.

24        Plaintiffs informed Defendants that they learned Dr. Kuich would not be available the

25   week of October 15 and will request his deposition in lieu of trial testimony.  Defendants object

26   to this request.  As stated, Defendants do not believe that Dr. Kuich's testimony is necessary for

27   the narrowed evidentiary hearing envisioned by the Court.  Requiring a deposition in lieu of

28   testimony for an unnecessary witness is contrary to the Court's desire to conduct a narrow and

15

1  focused hearing.  The Court should reject Plaintiffs' open-ended deposition request.

2  **DEFENDANTS' POSITION ON REI ONISHI'S ANTICIPATED TESTIMONY**

3  The Court has indicated that it expects one of the Governor's attorneys, Deputy Legal

4  Affairs Secretary Rei Onishi, to testify at the upcoming evidentiary hearing.  (ECF No. 6242 at

5  12:26-28.)  Defendants request the Court to reconsider that possibility.  While Mr. Onishi has

6  advised two gubernatorial administrations on *Plata*,[6] this litigation, and the related Three-Judge

7  Panel proceedings, Mr. Onishi has little or no personal knowledge of the specific data-reporting

8  issues on which this Court will hear testimony at the evidentiary hearing.  Moreover, even if Mr.

9  Onishi could provide relevant testimony, it would be protected by the attorney-client, work-

10  product, and deliberative process privileges.  For these reasons, the Court should not call Mr.

11  Onishi as a witness in court at the evidentiary hearing and instead either submit written questions

12  to Mr. Onishi, to be answered in writing, or question Mr. Onishi *in camera*, outside the presence

13  of Plaintiffs and their counsel.  Both alternatives are discussed further below.

14  I.  COUNSEL FROM THE GOVERNOR'S OFFICE, REI ONISHI, SHOULD NOT BE CALLED
    AS A WITNESS BECAUSE HE HAS LITTLE OR NO PERSONAL KNOWLEDGE, AND ANY
15  TESTIMONY HE COULD PROVIDE WOULD BE PROTECTED BY VARIOUS
    PRIVILEGES.
16
    A.  Mr. Onishi Has Little or No Personal Knowledge of the Specific Data-
17      Reporting Issues Identified by the Court's August 14, 2019 Order as
        Subjects for Live Testimony.
18

19  As this Court has made clear, the evidentiary hearing is not a "free for all."  (ECF No. 6185

20  at 26:6-8.)  The Court's expert has already conducted a wide-ranging four-month investigation

21  (ECF No. 6147 at 7), and issued an exhaustive report, which the Court accepted.  (ECF No. 6187

22  at 2:1-3.)  The Court scheduled the evidentiary hearing to take evidence identified by the expert to

23  determine whether misleading data had been presented to the Court in relation to five specified

24  issues, if so, how and why, and what to do about it.  (*Id.* at 2:5-18.)  In the Court's more recent

25  August 14, 2019 order, the Court narrowed the topics to be covered further, specifically

26  identifying three subjects that it intends to explore at the evidentiary hearing through live witness

27  testimony: (1) why CDCR mental health administrators did not inform Dr. Golding or the Special

28  _____
    [6] *Plata v. Newsom*, 3:01-cv-01351 (N.D. Cal.).

16

Defs.' Resp. Aug. 14, 2019 Order (2:90-cv-00520 KJM-DB (PC))

1  Master when they changed the definition of "monthly"; (2) why the internal "Appointments Seen

2  as Scheduled" indicator was developed incorrectly and in the absence of consultation with Dr.

3  Golding or other quality control measures; and (3) why Defendants did not disclose in their 2018

4  Staffing Proposal whether, and to what extent, the reporting of data related to average frequency

5  of patient contacts did not disclose the use of supervisory psychiatrists to complete caseload

6  contacts with patients, and to what extent Defendants knowingly relied on that data in the 2018

7  Staffing Proposal.  (ECF No. 6242 at 6:10-18; 9:22-26; 10:19-26.)

8          In connection with these issues, the Court has informed the parties that it may have a

9  "focused few questions" of Mr. Onishi.  (ECF No. 6242 at 12:26.)  The Court should reconsider

10  calling Mr. Onishi as a witness.  Mr. Onishi does not have personal knowledge as to the first and

11  second of these issues, and he thus would not be a helpful witness for the Court.  (*See* Onishi

12  Decl. ¶¶ 4-7.)  The first and second issues specified by the Court concern internal policies

13  developed and enacted by CDCR.  Mr. Onishi, however, was not involved in any of the policy

14  decisions related either to the change of the business rule or the Appointments Seen as Scheduled

15  indicator.  (*Id.* at ¶¶ 4-7.)  He thus lacks personal knowledge regarding whether, or how, data

16  relevant to issues one and two were generated and who was consulted (or not), and his testimony

17  would be unhelpful as to those matters.  Furthermore, while Mr. Onishi has some knowledge

18  about the data used in Defendants' 2018 Staffing Proposal, he has very limited personal

19  knowledge relevant to issue three.  In any case, any limited testimony Mr. Onishi could

20  conceivably provide on issue three falls under several applicable privileges as to which the

21  procedure for overcoming them has not been followed.

22          **B.     The Attorney-Client Privilege Is Sacrosanct, and Covers Mr. Onishi's
                      Testimony on the Lone Issue as to Which He Could Conceivably Have
23                    Personal Knowledge.**

24          In addition to lacking personal knowledge, the very limited testimony that Mr. Onishi could

25  conceivably provide is protected from disclosure by the attorney-client privilege.  Federal

26  common law recognizes a privilege for communications between a client and attorney for the

27  purpose of obtaining legal advice.  *Gomez v. Vernon*, 255 F.3d 1118, 1131-32 (9th Cir. 2001).

28  "The attorney-client privilege is the oldest and arguably most fundamental of the common law

17

privileges recognized under Federal Rule of Evidence 501." *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), abrogated on other grounds by *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). And as the Supreme Court has explicitly stated, this privilege applies equally to government clients. *United States v. Jicarilla Apache Nation,* 564 U.S. 162, 169-70 (2011). Accordingly, the government may invoke the attorney-client privilege in civil litigation to protect confidential communications between government officials and government attorneys. *Id.* Mr. Onishi is an attorney who, as the Deputy Legal Affairs Secretary, represents and advises the Governor's Office for the State of California, including on the matters at issue in this lawsuit and with respect to the strategy and details of the litigation itself. (Onishi Decl. at ¶¶ 2-3.) As such, the attorney-client privilege applies, and protects any confidential communications between himself and other government officials. *See In re Grand Jury Subpoena*, 909 F.3d 26, 32 (1st Cir. 2018) (providing that state attorneys are entitled to invoke attorney-client privilege to shield privileged information from federal subpoena).

One exception to the inviolability of privileged communications is the so-called crime-fraud exception, under which otherwise privileged communications made to further an illegal scheme are not protected from disclosure. *See United States v. Zolin*, 491 U.S. 554, 556 (1989). Before the privilege may be breached, the party asserting the privilege is owed procedural and evidentiary safeguards. *See id.* at 572 (setting forth the process and evidentiary standard before in camera review of potentially privileged information); *In re Napster*, 497 F.3d at 1092-95 (setting forth the process and evidentiary standard before disclosure of potentially privileged information). The Court may not review information subject to a claim of privilege, even *in camera*, absent a threshold showing that the privilege does not apply. *See Zolin*, 491 U.S. at 572 (there must be a "factual basis adequate to support a good faith belief by a reasonable person [] that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."). A court's authority to conduct in camera review of privileged materials does not "authoriz[e] . . . indiscriminate judicial scrutiny of attorney client relationships." *Fed. Sav. & Loan Ins. Corp. v. Ferm*, 909 F.2d 372, 375 (9th Cir. 1990).

18

Defs.' Resp. Aug. 14, 2019 Order (2:90-cv-00520 KJM-DB (PC))

1    There has been no such threshold showing in this case.  Nor has the Court indicated that it

2    thinks such a threshold showing has been made in connection with Mr. Onishi or that it believes

3    the crime-fraud exception applies in any way to Mr. Onishi.  Indeed, in the same order calling Mr.

4    Onishi to be a witness, the Court stated that "it will not delve further into the possibility of fraud

5    on the court at this time."  (ECF No. 6242 at 2 n.1.)  And while the Court's order states that it will

6    only have a "focused few questions" that will be "designed to not invade any privilege" (ECF No.

7    6242 at 12:26-28), this reverses the required inquiry by foregoing the State's right to procedural

8    and evidentiary safeguards to ensure that the privilege is not wrongfully invaded.  Under the

9    Supreme Court's *Zolin* decision, the Court may not even intrude upon the privilege *in camera* –

10   much less in a hearing in open court – without a threshold evidentiary showing that "the

11   attorney's services were used to further an ongoing criminal scheme."  *In re Grand Jury*

12   *Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996).  Again, here there has been no such showing and

13   the Court itself has specifically indicated it is not "delv[ing] further" into the factual prerequisites

14   for the finding required under *Zolin*.

15   Invading the privilege under these circumstances would have harmful consequences in the

16   form of a chilling effect on clients—here, the Governor of the State of California—being able to

17   seek and rely on counsel for advice.  Plaintiffs earlier argued that Mr. Onishi's testimony is

18   necessary to evaluate the Governor's Office's "state of mind" with respect Dr. Golding's

19   allegations.  (ECF No. 6226 at 46.)  However, the purpose of the attorney-client privilege is to

20   encourage clients to make full disclosure to their attorneys, recognizing that sound advice

21   depends upon lawyers' being fully informed by the client.  *Upjohn Co. v. United States,* 449 U.S.

22   383, 389 (1981).  And it therefore protects not only the giving of professional advice to those who

23   can act on it, but also the giving of information *to the lawyer.  Id.* at 390.  Accordingly, to the

24   extent that Mr. Onishi can provide any information regarding the Governor's Office's "state of

25   mind," that information lies at the core of what is protected by the attorney-client privilege.  *See*

26   *United States v. Chen,* 99 F.3d 1495, 1500 (9th Cir. 1996) ("This valuable social service of

27   counseling clients and bringing them into compliance with the law cannot be performed

28

19

Defs.' Resp. Aug. 14, 2019 Order (2:90-cv-00520 KJM-DB (PC))

1  effectively if clients are scared to tell their lawyers what they are doing, for fear their lawyers will

2  be turned into government informants.").

3      It should be emphasized that Mr. Onishi has played a key role in this litigation, and

4  provided legal advice to the Governor, members of the Governor's staff, as well as the co-

5  Defendant agencies.  Perhaps most importantly, the Governor and members of the Governor's

6  staff rely on their ability to seek and obtain candid legal advice from Mr. Onishi in performing

7  their duties.  Thus, the harm that would follow from improperly invading the attorney-client

8  privilege here is not merely theoretical or abstract; in this case, the ability of the Governor himself

9  to engage in candid and open communications with his attorneys while managing the executive

10  branch of the nation's largest state would be irreparably impaired if his conversations—and the

11  legal advice received—were subject to compelled disclosure.

12      Finally, the fact that Mr. Onishi is a member of the Governor's staff does not destroy the

13  protections of the attorney-client privilege.  The attorney-client privilege applies to

14  communications between lawyers and their clients when the lawyers act in a counseling and

15  planning role, as well as when the lawyers represent their clients in litigation.  *Chen*, 99 F.3d at

16  1501.  And individuals do not forfeit the protections of the attorney-client privilege merely

17  because their attorney is a permanent member of their staff.  *See FTV v. Boehringer Ingelheim*

18  *Pharmaceuticals, Inc.,* 892 F.3d 1264, 1267 (D.C. Cir. 2018) (the "privilege applies to

19  communications between corporate employees and a corporation's counsel made for the purpose

20  of obtaining or providing legal advice…regardless of whether the attorney is in-house counsel or

21  outside counsel").

22  //

23  //

24      **C.    Mr. Onishi's Testimony Is Protected by Work-Product Immunity.**

25      To the extent the Court may also question Mr. Onishi regarding the contents of privileged

26  documents relating to the 2018 Staffing Proposal, any such testimony that would consist of Mr.

27  Onishi's "mental impressions, conclusions, opinions, or legal theories" are protected by the work-

28  product doctrine.  The attorney work-product privilege protects from discovery in litigation

20

1  "mental impressions, conclusions, opinions, or legal theories of a party's attorney" that were

2  "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3)(B). The privilege was

3  first recognized in *Hickman v. Taylor*, 329 U.S. 495 (1947), and is codified in Federal Rule of

4  Civil Procedure 26(b)(3). As *Hickman* recognized, shielding from discovery materials prepared

5  "with an eye toward the anticipated litigation" protects the integrity of adversarial proceedings by

6  allowing attorneys to prepare their thoughts and impressions about a case freely and without

7  reservation." 329 U.S. at 498, 510-11. To qualify for work-product protection, documents must:

8  "(1) be 'prepared in anticipation of litigation or for trial' and (2) be prepared 'by or for another

9  party or by or for that other party's representative.'" *United States v. Richey*, 632 F.3d 559, 567

10  (9th Cir. 2011) (quoting *In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004)).

11  As with respect to the attorney-client privilege, the inviolability of the work-product

12  doctrine is subject to the so-called crime-fraud exception, under which otherwise privileged

13  communications made to further an illegal scheme are not protected from disclosure. *In re*

14  *Richard Roe, Inc.*, 68 F.3d 38, 40 n.2 (2d Cir. 1995) ("Where, as here, the attorney-client

15  privilege and the work product immunity substantially overlap, we see no reason to apply a

16  different standard for attorney work product.") (citing *In re Grand Jury Proceedings*, 604 F.2d

17  798, 803 (3d Cir. 1979)). However, before the work-product doctrine may be dispensed with, the

18  court must find that an initial evidentiary showing has been satisfied justifying *in camera* review,

19  and then, after the *in camera* review, must find that the evidence supports application of the

20  crime-fraud exception. *Zolin*, 491 U.S. at 572; *In re Grand Jury Investigation*, 974 F.2d 1068,

21  1072 (9th Cir. 1992).

22  Here, Defendants have produced for the Court's *in camera* review privileged documents

23  relating to the 2018 Staffing Proposal. These documents were created within the course of this

24  litigation, and to the extent they contain Mr. Onishi's "mental impressions, conclusions, opinions,

25  or legal theories," they are protected from further invasion by the Court during the upcoming

26  hearing. If the Court believes that the crime-fraud exception applies, it must make specific

27  findings to that effect. At this point, however, the Court has made no such findings and may

28  therefore not invade the attorney-client privilege or work-product doctrine by questioning Mr.

21

1    Onishi about his "impressions, conclusions, opinions or legal theories" in connection with the

2    privileged documents produced for the Court's review on June 19, 2019.  (ECF No. 6201.)  As

3    such, these subjects are off-limits to questioning and are absolutely privileged.

4          **D.**   **Mr. Onishi's Testimony Is Also Protected by the Deliberative Process**
     **Privilege.**
5

6         Any testimony Mr. Onishi could provide would be irrelevant and protected by the attorney-

7    client privilege and the work-product doctrine.  But to the extent he could provide any

8    information regarding current policies, such testimony would also be protected by the deliberative

9    process privilege.

10        The deliberative process privilege exempts from discovery information reflecting advisory

11   opinions, recommendations, and deliberations comprising part of a process by which government

12   decisions and policies are formulated.  *FTC v. Warner Communications, Inc.*, 742 F.2d 1156,

13   1161 (9th Cir. 1984).  The privilege is designed to allow agencies to freely explore possibilities,

14   engage in internal debates, or play devil's advocate without fear of public scrutiny.  *Assembly of*

15   *California v. United States Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992).  And the key

16   inquiry in determining whether particular information is "deliberative" is whether disclosure of

17   the information would expose the decision-making process in such a way as to discourage candid

18   discussion within the agency and thereby undermine the agency's ability to perform its functions.

19   *Carter v. United States DOC,* 307 F.3d 1084, 1090 (9th Cir. 2002).

20        Here, any Court questions to Mr. Onishi regarding the three main subjects the Court has

21   flagged for exploration at the evidentiary hearing would fall under the deliberative process

22   privilege.  How Mr. Onishi and Defendants approached, for instance, the 2018 Staffing Proposal,

23   lies at the core of the process of "internal debate" within the government agencies at issue that is

24   protected from public scrutiny.

25

26

27

28

1  II.  **DEFENDANTS' PROPOSED ALTERNATIVE PROCESSES STRIKE THE APPROPRIATE
      BALANCE BETWEEN HONORING THE PRIVILEGES THAT PROTECT MR. ONISHI'S
2     TESTIMONY AND HELPING THE COURT OBTAIN INFORMATION.**

3       **A.   The Court Should Choose to Elicit Any Information from Mr. Onishi by
             Written Interrogatory.**

4

5       In light of the potential challenges posed by the Court's plan to hear live testimony from

6  Mr. Onishi on any of the three general issues identified by the Court in its August 14, 2019 order,

7  a preferable alternative would be if the Court were to issue written interrogatories to which Mr.

8  Onishi may respond in writing under oath.  This would have the advantage of allowing for the

9  "procedural and evidentiary safeguards" that the Supreme Court's *Zolin* decision requires.  As

10 explained above, the Court would be required to make affirmative findings that the crime-fraud

11 (or some other) exception to the attorney-client privilege and work-product doctrine applies

12 *before* infringing on those evidentiary privileges.  No such findings have been made, and the

13 Court has further stated "it will not delve further into the possibility of fraud on the court at this

14 time," (ECF No. 6242 at 2 n.1), thus closing the door on applying *Zolin*.  If the Court believes

15 that its questions will not invade any privileges at all, and thus no exception to the privileges need

16 be established, eliciting testimony by written interrogatories would allow for Mr. Onishi to assert

17 any specific, relevant privilege(s) and for the Court to make its findings in an orderly fashion.  *Cf.*

18 *Halkin v. Helms (Halkin I)*, 598 F.2d 1, 6 (D.C. Cir. 1978) (discussing the district court's

19 procedure of propounding its own interrogatories to the Secretary of Defense).

20      **B.   In the Alternative, the Court Should Choose to Interview Mr. Onishi *In
            Camera*.**

21

22      If the Court is disinclined to put its questions to Mr. Onishi via written interrogatories, just

23 as it reviewed the attorney-client documents *I n camera*, the Court should, at a minimum, conduct

24 its questioning of Mr. Onishi *in camera*, outside the presence of Plaintiffs' counsel and the rest of

25 the Court.  It is well settled that *in camera* proceedings are an appropriate means to resolve

26 disputed issues of privilege.  *See, e.g.*, *Kerr v. United States District Court*, 426 U.S. 394, 405-06,

27 (1976) (in suit against the California prison system, upholding requirement that district court

28 individually assess, *in camera*, Adult Authority files for various privileges, before determining

23

1  whether each should nonetheless be produced); *Kasza v. Browner*, 133 F.3d 1159, 1169 (9th Cir.

2  1998) ("Elaborating the basis for the claim of privilege through *in camera* submissions is

3  unexceptionable."); *Olam v. Congress Mortg. Co.*, 68 F. Supp. 2d 1110, 1128 (N.D. Cal. 1999)

4  (taking testimony from the mediator in closed proceedings, under seal, to protect mediation

5  privilege).  This includes questioning of a witness *in camera*, outside of the presence of opposing

6  counsel, where considerations of confidentiality are paramount.  *Halkin I*, 598 F.2d at 9

7  (privilege invoked by Secretary of Defense, supported by *in camera* testimony of Deputy Director

8  of NSA, regarding applicability of state secrets privilege).  The potential damage that might be

9  done to the Governor's Office, Defendants, and this litigation by improperly invading the

10  privileges that apply to Mr. Onishi's testimony would be substantially mitigated by conducting

11  the questioning in this way, rather than in open court and with opposing counsel.

12      In short, Mr. Onishi has little or no personal knowledge over the information that the Court

13  has identified for the upcoming evidentiary hearing, and as to the narrow issue that Mr. Onishi

14  could conceivably possess any personal knowledge, the attorney-client privilege, the work-

15  product doctrine, and the deliberative process privilege shield disclosure.  Instead of having Mr.

16  Onishi testify in court, the Court should instead use well-established procedures invoked in

17  analogous situations, of either posing written interrogatories to Mr. Onishi or, in the alternative,

18  questioning Mr. Onishi *in camera*, outside the presence of other parties.

19                  **DEFENDANTS' COMMITMENT TO AMENDING THE RECORD**

20      The Court's August 14 order requires Defendants to make specific corrections or

21  clarifications to documents in the record and provided to the Special Master, as well as providing

22  the Court with dates certain by when Defendants will complete these tasks.  Defendants do not

23  object to the Court's order in this respect and provide the timeframes for doing so below.

24  However, as discussed below, some of the data may be impossible to correct.  For that data,

25  Defendants offer an alternative for the Court's consideration.

26      The Court ordered Defendants to re-run the performance reports affected by the change of

27  the EOP monthly business rule from every 30 days to "at least every calendar month and not to

28  exceed 45-days," and amend two filings which relied on the changed business rule.  (ECF No.

24

Defs.' Resp. Aug. 14, 2019 Order (2:90-cv-00520 KJM-DB (PC))

1    6242 at 5.)  Defendants offered to do this in the July 22, 2019 status report, and will do so within

2    thirty days.

3         The Court also ordered Defendants to amend five monthly Administrative Segregation

4    Unit EOP Hub Certification letters provided to the Special Master that used the alternative

5    business rule for routine EOP monthly psychiatry contacts.  (ECF No. 6242 at 6.)  CDCR

6    previously reported that they would need to correct five ASU EOP Hub Certification letters

7    submitted during the time the business rule for monthly was changed.  (ECF No. 6226 at 5.)

8    After reviewing the specific data included in those five letters, CDCR submits that timely

9    psychiatry evaluation data was based on the thirty-day rule.  The Program Guide requires that

10   EOP patients in an ASU EOP Hub be "evaluat[ed] by the psychiatrist at least every 30 days."

11   (Program Guide at 12-7-10.)  In this instance, the Program Guide prescribed a precise thirty-day

12   timeline, and CDCR did not modify the business rule timely psychiatry contacts conducted for

13   patients in the ASU EOP Hub program.  Accordingly, CDCR no longer needs to resubmit the five

14   ASU EOP Hub certification letters.

15        The Court ordered Defendants to provide a date certain by which they will amend and

16   refile their 2018 Staffing Proposal to modify its reference to the incorrectly defined Appointments

17   Seen as Scheduled indicator, as well as provide a date certain when they would review and

18   correct the relevant definitions and methodologies for the indicator.  (ECF No. 6242 at 9.)  As set

19   forth in Defendants' November 20, 2018 response, Defendants corrected the definition of the

20   Appointments Seen As Scheduled indicator on October 8, 2018, as soon as it was brought to

21   CDCR's attention.  (ECF No. 6012 at 18.)  Defendants' 2018 Staffing Plan was included as an

22   exhibit to Joint Status Report Re: June 28, 2018 Status Conference.  (ECF No. 5841-2.)

23   Defendants can file corrected versions of that exhibit within thirty days.

24        The Court ordered CDCR to correct the record regarding their inclusion of confidential

25   and non-confidential encounters for their timely psychiatry performance report indicator.

26   However, due to the nature of this data, CDCR submits that it is impossible to correct the record

27   as envisioned by the Court.  CDCR acknowledged to the Court that it provided data based on the

28   "timely psychiatry contacts" quality management indicator to the Special Master and the Court on

25

1   several occasions that included both confidential and non-confidential encounters.[7]  (ECF No.

2   6226 at 9-10.)  In its August 14 order, the Court interpreted the Program Guide to require that

3   psychiatric evaluations be conducted confidentially, "unless an inmate-patient refuses."  (ECF

4   No. 6242 at 8.)  The Court directed CDCR to "propose a date certain by which corrected

5   documents will be provided to the Special Master and filed with the court as necessary to correct

6   the record" and exclude non-confidential contacts that do not count as evaluations.  (Id.)  CDCR

7   submits that it has discussed with its quality management staff its ability to modify the data in the

8   manner contemplated by the Court and does not believe it is possible to accurately do so for two

9   reasons.

10          First, the allegation that non-confidential appointments are being coded as confidential

11  because psychiatrists are unaware of how to change the confidentiality drop down at checkout

12  suggests that CDCR may never be able to fully correct any erroneous data.  For CDCR to remove

13  the erroneously coded appointments and reclassify them properly as non-confidential, CDCR

14  submits that it would need to review each appointment by seeking out a collateral source of

15  evidence to determine if the appointment was properly coded as confidential.  However, it is

16  unlikely that a collateral source exists for all appointments in which the psychiatrist recorded the

17  setting of the appointment.  This process could not be automated and would require months, if not

18  years, of work to individually review patient files dating back to 2014.[8]

19          Second, the Court's order directs Defendants to count only confidential appointments, or

20  those non-confidential appointments following a refusal, as compliant encounters.  However,

21  CDCR's ability to determine which recorded non-confidential appointments follow a refusal is

---

22      [7] Data for each institution visited during the 26th round; data for each institution visited
    during the 27th round; data shared in connection with Defendants' Continuous Quality

23  Improvement (CQI) monitoring tours and in Defendants' draft CQI reports provided to the
    Special Master and Plaintiffs; any monthly Administrative Segregation Unit  or Psychiatric

24  Services Unit hub certification letters; Exhibit I—HDSP Performance Report to Defendants' June
    5, 2018 Clustering Proposal; CDCR's 2018 Staffing Proposals (ECF No. 5741-2 at 9-10; ECF

25  No. 5841-2 at 4 n.5, 9, 14, 16, 31-33; ECF No. 5841-3 at 2; ECF No. 5922 at 15, 21);
    Defendants' objection to Telepsychiatry policy (ECF Nos. 5879 at 17 and 5879-4 at 4); and

26  Defendants' 2017 filings, including in a declaration by Deputy Director Tebrock, in response to
    the Special Master's report on CDCR's staffing plan (ECF Nos. 5591 at 14, 5591-2 at ¶¶ 8, 10,

27  5591-2 at 9, and 5601 at 8-9).
        [8] Data produced for the 26th Round of Monitoring included timeliness data backdated to

28  2014.

26

limited by individual psychiatrists' data entry practices. CDCR would need to remove every non-confidential appointment that is also not coded as a refusal in the EHRS. Additionally, CDCR believes other exceptions may exist for cell-front visits to be counted as compliant, such as when a patient is too ill to exit their cell or when the unit is small, such as an inpatient unit, and where a cell-front visit could be conducted confidentially. The Court referred this issue to the workgroup to "develop protocols to ensure 30 and 90 day psychiatric evaluations required by the Program Guide are confidential unless an inmate-patient refuses to be seen in a confidential setting." (ECF No. 6242 at 8.) Until the development of those protocols are complete and the exceptions are clearly defined, CDCR will not be able to identify those non-confidential appointments that should count as evaluations. CDCR believes that it may be possible to design an automated filter, based only on how the psychiatrists record the appointment, but it may not be possible to apply the filter to all appointments included in the data provided to the court or Special Master. CDCR provided data on timeliness as far back as 2014 and retrieving that older data, much of which was generated using the predecessor to the EHRS, may not be possible.

Because CDCR represents it is unable to reliably retrieve, review, and provide corrected data in the manner requested by the Court, CDCR proposes refiling or resupplying the data to the Court and Special Master with the inclusion of the data's methodology at the time and any relevant limitations. For instance, in addition to the Performance Report methodology, CDCR could file a statement noting that the data counts all recorded psychiatric contacts, regardless of whether they were confidential or not, that the data is only as accurate as it was inputted by the psychiatrist, and that, for data entered after the implementation of the EHRS in 2017, the confidentiality field defaulted to "confidential," although it could be changed by the provider.

## DEFENDANTS' PROPOSAL FOR NEW PRE-HEARING DEADLINES

On August 23, 2019, the Court vacated the pre-hearing deadlines set forth in its July 11, 2019 order, and ordered the parties to meet and confer and propose new deadlines "in their next set of filings related to the evidentiary hearing." (ECF No. 6252 at 3.) During the meet-and-confer process, Defendants informed Plaintiffs that they believe it may be premature to designate precise dates until the Court confirms an evidentiary-hearing date and identifies the issues upon

27

1   which it intends to take testimony, including from which witnesses.  Without the Court's

2   guidance, the parties do not know the precise date of the hearing or the scope of the hearing on

3   each issue and what testimony and exhibits would be relevant.  Accordingly, Defendants

4   proposed that the Court allow the parties to propose dates once the Court confirms the date and

5   scope of any evidentiary hearing.

6        Plaintiffs proposed the following new dates:

7        •    September 24, 2019:  Last day for parties to exchange evidentiary exhibits they intend

8   to offer at the hearing.

9        •    October 1, 2019:  Last day for parties to exchange any demonstrative exhibits they

10  intend to offer at the hearing.

11       •    October 8, 2019:  Last day for parties to file a joint list of exhibits to be presented at

12  the hearing.

13  While Defendants do not oppose these dates, subject to the parties' ability to modify them at a

14  later date as necessary, they do believe, as previously stated, that it is premature at this time to set

15  precise dates for an evidentiary hearing that the Court has yet to confirm.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CONCLUSION**

2          Defendants appreciate this further opportunity to meet the Court's objective of restoring

3   trust among the parties and resolving these important data issues so the parties can return their

4   focus to the threshold goal of providing constitutional levels of mental health care to the Plaintiff

5   class.  This further submission, with additional stipulations and commitments to transparency,

6   reflects Defendants' ongoing commitment to that critical effort.

7   Dated:  August 28, 2019                      Respectfully submitted,

8                                                XAVIER BECERRA
                                                 Attorney General of California
9                                                ADRIANO HRVATIN
                                                 Supervising Deputy Attorney General
10
                                                 /s/ Tyler V. Heath
11
                                                 TYLER V. HEATH
12                                               Deputy Attorney General
                                                 *Attorneys for Defendants*
13

14  Dated:  August 2, 2019                       ROBINS KAPLAN LLP

15                                               /s/ Glenn A. Danas

16                                               ROMAN M. SILBERFELD
                                                 GLENN A. DANAS
17                                               *Special Counsel for Defendants*

18

19  CF1997CS0003 / 14058110

20

21

22

23

24

25

26

27

28