XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
ROBERT W. HENKELS, State Bar No. 255410
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**PARTIES' JOINT SUBMISSION OF CUSTODY-RELATED POLICIES AND ORDERS REQUIRED BY JULY 9, 2019 ORDER [ECF NO. 6214]**<br><br>Judge: The Hon. Kimberly J. Mueller |

**INTRODUCTION**

On July 3, 2019, the Court directed the parties to "prepare and file a document that identifies all negotiated or court-ordered remedial measures adopted in this action that cover custodial issues and are not included in the 2018 Program Guide Revision." (ECF No. 6211 at 16, 19.) The Court intended by this effort to identify, "except for specific disputes . . ., the content of the completed remedial plan," and therefore to make the remedy "fully transparent . . . for the court and the parties going forward." (*Id.* at 4-5.) The order also required the parties to confirm that the Special Master has reviewed the list and concurs that it is a comprehensive list of

[3419376.1]                                          1

1  such remedial measures. (*Id*. At 16, 19.) The July 3, 2019 order was amended on July 9, 2019,
2  but did not change the obligation to file a document that identifies custody-related policies and
3  orders by August 2, 2019. (ECF No. 6214.) The August 2 deadline was extended to September
4  4, 2019, by court order entered on August 12, 2019. (ECF No. 6240.) On September 4, 2019, the
5  parties filed a stipulation and proposed order seeking a two-day extension of the September 4
6  deadline. (ECF No. 6265.) The Court has not yet acted on the parties' stipulation.

7      The parties have met and conferred extensively under the direction of the Special Master
8  and agree that the policies and court orders set forth in Appendix A comprise the negotiated or
9  court-ordered remedial measures adopted in this action that cover custodial issues not included in
10 the 2018 Program Guide revision. Plaintiffs want certain policies and court orders included in the
11 list of negotiated or court-ordered remedial measures adopted in this action that cover custodial
12 issues that Defendants dispute are responsive to the July 9 order. Those policies and orders,
13 described in more detail by the parties below, are:

14     1. Department of State Hospital's (DSH) Health Care Access System (HAS) Policies and
15 March 8, 2017 Order;

16     2. June 18, 2009 Order regarding filling Atascadero State Hospital (ASH) beds;

17     3. July 5, 2016 Memorandum – Utilization of Administrative Determinants Based Upon
18 Positive and Negative Behavior and Increased Access to Rehabilitation Programs (15 C.C.R. §§
19 3375, 3375.2); and,

20     4. August 8, 2016 Memorandum – C&PR Approval for Movement to a Higher or Lower
21 Level Facility Within the Same Institution.

**I. PLAINTIFFS' RESPONSE IN SUPPORT OF INCLUSION OF THE DISPUTED POLICIES AND COURT ORDERS IN THE COMPENDIUM IN RESPONSE TO THE JULY 9 ORDER.**

    **A.  March 8, 2017 Order and DSH's Hospital Access System (HAS) Policies.**

The Court's March 8, 2017 Order adopted the Special Master's May 25, 2016 inpatient monitoring report, ECF No. 5448, along with the recommendations contained therein. *See* Order, ECF No. 5573 at 1 (Mar. 8, 2017). Neither party objected to the report and its recommendations. *See id.* Acknowledging the impending "Lift and Shift"—the transition in management of

[3419376.1]                                           2

inpatient programs housed in CDCR institutions from DSH to CDCR—the Court ordered DSH Defendants to:

> develop within 90 days a plan for the creation of a consistent and uniform patient level system to be utilized across all of [DSH's] inpatient programs that treat *Coleman* class members. There shall be a system for use across all acute care inpatient programs, and a system for use across all intermediate inpatient care programs.

*See id.* at 1 n.1; *id.* at 3. DSH developed its HAS policies in response to this order and to address the Special Master's concerns that the different DSH facilities used a variety of custody-based systems to determine patients' privileges, their ability to move physically through the facilities and therefore access treatment, and the security restrictions, such as cuffs, to which they were subject. *See* Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation, ECF No. 5448 at 117 (May 25, 2016).

   DSH Defendants have objected to the inclusion of the March 8, 2017 Order and associated HAS policies on two primary bases: (1) the Lift and Shift changed the structure of the inpatient programs treating *Coleman* class members, and therefore the force of the March 18, 2017 Order directing DSH to develop the HAS policies; and (2) DSH uses its HAS policies at all its institutions, with all commitment types, including non-*Coleman* class members, so tethering it to a remedy in this case will unduly limit its flexibility to treat all commitment types.

   As noted above, however, the Court ordered DSH to develop its HAS policies while specifically acknowledging the Lift and Shift transition. No new or changed circumstances, therefore, affect the court-ordered remedy. And the fact that DSH's flexibility to implement a patient-level system may be limited is just a practical reality that has nothing to do with whether the HAS policies and the March 8, 2017 Order are responsive to this Court's July 9 Order. The Court ordered DSH to create a uniform patient-level system as to the *Coleman* class only, *see* Order, ECF No. 5573 at 3, and never required any specific components to the system. DSH has not said it is unable to work within these practical constraints, only that it would be more

administratively convenient not to.  The custody-based court-ordered HAS policies, and the order requiring DSH to develop them, fall squarely within the ambit of the July 9 Order.

> **B.     June 18, 2009 Order to Fill the Full Complement of 256 Coleman Beds at Atascadero State Hospital (ASH).**

In relevant part, the June 18, 2009 Order required Defendants to use 256 intermediate inpatient care beds at ASH to provide care to *Coleman* class members, and to fill those beds at a rate of 10 patients per week, until all 256 beds were dedicated to class members.  Defendants' inability consistently to fill its 256 *Coleman*-dedicated beds at ASH is a highly topical issue, requiring regular intervention by the Court and/or Special Master, and inspiring regular advocacies from Plaintiffs.  Its remedial nature cannot be reasonably disputed.  But Defendants have characterized the June 18, 2009 Order as merely a "bed planning" order.  That is too simplistic a view.

The Court's order arose out of well-documented concerns that *Coleman* patients were not receiving timely access to inpatient care as their critical mental health conditions necessitated. One major impediment to getting patients into inpatient care were the obstacles presented by arbitrary custodial barriers, like the de facto exclusion of *Coleman* patients from the low-custody unlocked dorms at ASH, the least restrictive setting available to *Coleman* patients who need inpatient-level treatment.  For that reason, the Court ordered Defendants not only to make the "full complement of 256 intermediate [care] beds at ASH [available] to Coleman class members," but also to begin filling those beds with *Coleman* class members "at a rate of not less than ten per week until all 256 beds are filled by Coleman class members not later than October 31, 2009." June 18, 2009 Order at 4.  The 10-patients-per-week component of the June 18, 2009 Order is not directed at bed planning, as it assumes those beds are available.  Instead, it requires Defendants to take affirmative steps to place class members in those beds and therefore to remove the custody-based barriers to *Coleman* class members' admission that had previously stood in the way. Accordingly, although the order contains bed planning elements, it captures the important principle that continues to require regular remedial enforcement today:  Defendants cannot keep *Coleman* class members out of their least restrictive custodial setting by erecting artificial barriers

or choosing not to actively review and find patients to fill those beds, a constitutional and ADA-based mandate.

    **C.**    **July 5, 2016 Memo – Utilization of Administrative Determinants Based Upon Positive and Negative Behavior and Increased Access to Rehabilitation Programs, and Associated Regulations, 15 C.C.R. §§ 3375, 3375.2; and August 8, 2016 Memo – C&PR Approval for Movement to a Higher or Lower Level Facility Within the Same Institution.**

There is no question that Defendants intended these two memoranda as remedial measures to address Plaintiffs' concerns about the rapidly (and disproportionately) expanding *Coleman* population and CDCR's inability to timely transfer class members to appropriate beds where they could receive treatment and program in their least restrictive housing settings.

The memoranda authorize custodial staff to implement a more flexible approach to housing patients at high-security settings, allowing for security-level overrides, and also make that system more efficient, to facilitate more and necessary flow through a highly impacted system. Defendants issued them in the midst of ongoing, focused negotiations between the parties—sometimes conducted directly, and sometimes involving the Special Master—spanning from November 2015 through the fall of 2016 pertaining to Defendants' efforts to triage the rising mental health population, which by Defendants' admission was causing hundreds of EOP class members to remain unnecessarily in segregated settings, reception centers, and high-custody yards due to a lack of adequate numbers of appropriate beds. *See* Declaration of Jessica Winter in Support of Joint Statement ("Winter Decl."), filed hereto, at ¶¶ 2-12 & Ex. A at 3. Plaintiffs' concerns about these issues are further reflected in the Special Master's 26th Round Report, in which he discussed, and ultimately rejected, Plaintiffs' request for further recommendations to address the population and segregation problems. *See* Special Master's 26th Round Monitoring Report, ECF No. 5439 ("26th Report"), at 124-130. In particular, the initiative formalized in the July 5, 2016 memorandum was specifically raised by Defendants during the portion of one policy meeting, on July 19, 2016, devoted to this Court's directive requiring Defendants seriously to consider clustering as a possible solution to their ongoing inability to provide adequate numbers of clinical staff to treat the rising EOP population. *See* Winter Decl. ¶ 7.

These memoranda were directly responsive to the parties' negotiations, including those conducted with the Special Master in workgroup settings, in late 2015 through the fall of 2016. *See* Winter Decl. ¶¶ 3-14. The initiatives formalized in the memos were presented by high-level CDCR staff to Plaintiffs and the Special Master team during all-parties workgroups as a partial solution to the population issues affecting class members that Plaintiffs had been persistently raising to Defendants and the Special Master. *See* Winter Decl. ¶¶ 7-13. Defendants' representations at multiple all-parties' meetings in July and August 2016 led Plaintiffs to believe their longstanding concerns regarding the rising EOP population and overly restrictive housing settings, which the parties had been actively working on, were being addressed as part of Defendants' ongoing remediation efforts. *See* Winter Decl. ¶¶ 15. Plaintiffs relied on those representations, and turned their attention to other aspects of the ongoing remedial efforts instead of continuing to pursue further reform on the topics covered by these policies. *See* Winter Decl. ¶¶ 15. In addition, Plaintiffs remain concerned that excluding policies that were referenced and relied on in all-parties' meetings to assuage Plaintiffs' concerns will incentivize the withholding of remedial documents from Plaintiffs' and the Special Master's view in the future. Because the contents of these memoranda were presented as remedies to address Plaintiffs' concerns, and Plaintiffs relied on their existence as proof of Defendants' remediation efforts, they are remedial custodial policies within the ambit of the July 9 Order.

## II. DEFENDANTS' RESPONSE AGAINST INCLUSION OF THE DISPUTED POLICIES AND COURT ORDERS IN THE COMPENDIUM IN RESPONSE TO THE JULY 9 ORDER.

### A. The July 9 Order Requires the Identification of Policies and Custody-related Orders Adopted in this Action.

Section III.D. of the July 9 order describes the required contents of the "compendium of additional settled remedial measures" as remedial measures "to address violations of law in the custodial management of class members." (ECF No. 6214 at 16.) The parties are required to identify "all negotiated or court-ordered remedial measures adopted in this action that cover custodial issues and not included in the 2018 Program Guide Revision." (*Id*. at 19.) Defendants agree that orders entered in this case and policies and regulations adopted in response to those orders should be included in the compendium of additional settled remedial measures. But

Defendants do not agree that custodial-related policies and regulations, and orders that did not arise from an order or negotiation in this action should be part of this document. Nor do Defendants agree that orders or policies that are not related to custodial practices should be included.

As described above and as the list of policies and orders in Appendix A reflects, Defendants have agreed on the inclusion of many policies and orders as responsive to the July 9 order. But the inclusion of certain policies and orders remain in dispute. The policies and orders described below are not responsive to the Court's July 9 order and not properly included in a list of policies and orders negotiated or court-ordered in this action.[1]

**B.  Plaintiffs' Proposed Disputed DSH Policies and Court Orders Are Not Responsive to the July 9 Order.**

Defendants object to the inclusion of two orders and one set of policies regarding the Department of State Hospitals in the list of custody policies and orders responsive to the Court's July 9, 2019: (1) the Court's June 18, 2009 order; (2) the Court's March 8, 2017 order; and (3) the Hospital Access System policies for DSH-Atascadero, DSH-Coalinga, and DSH-Patton.

**1.  The June 18, 2009 order is a non-responsive bed planning order.**

Defendants do not agree that the June 18 order should be included in the compendium of custodial-related policies in this case because it is not responsive to the Court's order to "prepare and file a document that identifies all negotiated or court-ordered remedial measures adopted in this action that cover custodial issues and are not included in the 2018 Program Guide Revision." (ECF No. 6214 at 16.)

The June 18 order required Defendants to "comply with the schedule to fill the full complement of 256 intermediate care beds at Atascadero State Hospital (ASH)." (ECF No. 3613 at 3.) DSH is committed to timely admitting and treating up to 256 clinically and custodially eligible *Coleman* class members to DSH-Atascadero. However, the order did not require the adoption of any custody-related policies—it is a bed planning order the Court issued after its consideration of "matters related to bed planning." (ECF No. 3613 at 1.) The June 18 order

---

[1] Defendants provided a version of their objections to the Special Master and Plaintiffs in letters dated July 31, 2019 and August 21, 2019.

addressed a specific need and set of circumstances at the time and adopted and modified a specific plan for answering that need. (*Id*. at 3-4.) The Special Master and Plaintiffs have not proposed that any other bed plans or bed-plan orders be included in the list of custody policies and orders contemplated by the Court's July 9, 2019 order. To the extent Plaintiffs argue that custody barriers to DSH-Atascadero admissions exist, Defendants have already agreed to include relevant policies. Moreover, the custody policies governing inmate admission to DSH-Atascadero are already referenced in the Revision to the Program Guide. Indeed, Appendix C to the 2018 Revision to the Mental Health Services Delivery System Program Guide provides that patients will be treated in their least restrictive housing within the inpatient system when clinically appropriate, (ECF No. 5864-1 at 599), and Defendants agreed to include the least restrictive housing policy in response to the July 9, 2019 order (ECF No. 6234 at 5).

**2.   The March 8, 2017 order and Hospital Access System policies concern Department of State Hospitals operations are not responsive.**

Separately, the March 8, 2017 order and DSH's HAS policies should not be included as responsive to the Court's July 9 order. The March 8, 2017 order, which directed DSH to develop a staffing plan, develop a continuous quality improvement process, and create a uniform patient level system, does not include any custody-related requirements. (ECF No. 5573 at 2-4.) Even the HAS policies, which are part of DSH's patient access system and arguably referenced by the March 8, 2017 order, are not strictly custody policies because, as noted by the Special Master's inpatient reports, that system is handled by DSH's clinical staff, not custodial, staff. (ECF No. 5894 at 56, 57 ("The treatment team decided a patient's HAS level"); ECF No. 5448 at 140 ("Change in level was a team decision.").)

In addition, the Court issued its March 8, 2017 order when DSH was still operating inpatient facilities within CDCR, and was therefore responsible for developing the System to Encourage Progress policies for those inpatient facilities. At that time, the Special Master's inpatient report on this topic concluded that there were "significant differences in the inpatient programs protocols for access to privileges and programming." (ECF No. 5448 at 93.) However, his subsequent report noted that prior to the issuance of the March 8, 2017 order, DSH had

developed a uniform patient level system for use at DSH-Atascadero and DSH-Coalinga. (ECF No. 5894 at 56-58.) He did not have any additional recommendations for DSH's Hospital Access System. (*Id*.) Now, after the transfer of operations, standardization is no longer an issue and CDCR has responsibility for developing the System to Encourage Progress policy for the Psychiatric Inpatient Facilities and has agreed to include them in response to the July 9 order upon completion.

DSH currently only provides care to *Coleman* class members in its own hospitals—DSH-Atascadero, DSH-Patton, and DSH-Coalinga. DSH's pending HAS regulations and the policies under those regulations apply to all of its hospitals and the 6000 mental health beds, including facilities that do not treat *Coleman* patients. They do not apply only to the 336 *Coleman*- mental health beds. While DSH does not oppose the response to the Court's July 9, 2019 order, referencing that the HAS regulations and policies apply to *Coleman* patients, the HAS regulations and policies themselves should not be included as part of the of the companion document to the 2018 Program Guide Revision contemplated by the Court's July 9, 2019 order. DSH must have the discretion to control the safety and security of all its hospitals and patients and respond to the needs of all of its patients and unique hospital environment through its generally-applicable policies and regulations. And the HAS regulations are subject to the Administrative Procedures Act and will go through a public comment period allowing interested individuals to comment on the policies—they do not need to be included as part of the remedial plan responsive to the Court's July 9, 2019 order.

**C.     Plaintiffs' Proposed Disputed CDCR Policies and Court Orders Are Not Responsive to the July 9 Order.**

Plaintiffs submit that the July 5, 2016 Memorandum – Utilization of Administrative Determinants Based Upon Positive and Negative Behavior and Increased Access to Rehabilitation Programs (15 C.C.R. §§ 3375, 3375.2), and the August 8, 2016 Memorandum – C&PR Approval for Movement to a Higher or Lower Level Facility Within the Same Institution should all be part of the compendium of custody-related policies and orders negotiated or court-ordered in this case. Defendants disagree for the reasons set forth below.

### 1. July 5, 2016 Memorandum Was Not Created in the Context of This Litigation and is Not Responsive to the July 9 Order.

The July 5, 2016 Memorandum is not responsive to the July 9 order because it was not implemented in response to an order and was not negotiated as part of the remedial plan in this case. Plaintiffs first learned of the memo on July 19, 2016, two weeks after it was finalized. This memorandum was not the product of a *Coleman* court order or negotiation. That Plaintiffs received a copy of the memorandum or discussed it with CDCR executives does not support the conclusion that it is part of the *Coleman* remedial plan addressed to the mental-health population. Nothing in the July 5, 2016 memorandum indicates that it applies only to the mental-health population or was developed and promulgated in response to an order from this Court.

### 2. The August 8, 2016 Memorandum Was Not the Product of the This Litigation and is Not Responsive to the July 9 Order.

As with the July 5, 2016 memorandum, there is no record in this case that the August 8, 2016 memorandum was the product of an order in this case or negotiations between counsel in the context of *Coleman*. Plaintiffs may have received the memorandum in the context of their work this or other class actions against CDCR, but the memorandum was not the product of this this litigation. Plaintiffs have stated that this policy was discussed at a July or August 2016 workgroup, yet the policy is not identified in either of the policy meeting agendas. Accordingly, it does not meet the Court's criteria for inclusion in the submission of custody-related policies and orders.

///

///

| | | |
|---|---|---|
| 1 | Dated:  September 6, 2019 | |
| 2 | | XAVIER BECERRA<br>Attorney General of California |
| 3 | | ADRIANO HRVATIN<br>Supervising Deputy Attorney General |
| 4 | | |
| 5 | | /s/ ELISE OWENS THORN<br>Elise Owens Thorn<br>Deputy Attorney General |
| 6 | | *Attorneys for Defendants* |
| 7 | Dated: September 6, 2019 | ROSEN BIEN GALVAN & GRUNFELD LLP |
| 8 | | |
| 9 | | /s/ JESSICA WINTER<br>Jessica Winter |
| 10 | | *Attorneys for Plaintiffs* |

[3419376.1]

11