DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br>　　　　Plaintiffs, <br><br>　　v. <br><br>GAVIN NEWSOM, et al., <br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB <br><br>**DECLARATION OF JESSICA WINTER IN SUPPORT OF RESPONSE TO COURT'S JULY 9, 2019 ORDER RE CUSTODIAL POLICY UPDATE TO THE PROGRAM GUIDE** <br><br>Judge: Hon. Kimberly J. Mueller |

[3432963.3]

DECLARATION OF JESSICA WINTER IN SUPPORT OF RESPONSE TO COURT'S JULY 9, 2019 ORDER RE CUSTODIAL POLICY UPDATE TO THE PROGRAM GUIDE

I, Jessica Winter, declare:

1. I am an attorney admitted to practice law in California, a member of the bar of this Court, and an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify. I make this declaration in support of the parties' Response to the Court's July 9, 2019 Order re Custodial Policy Update to the Program Guide.

2. In preparing Plaintiffs' portion of the parties' response to the Court's July 9 Amended Order, ECF No. 6214, I reviewed contemporaneous notes, memos, emails, and billing records regarding numerous phone calls and meetings between Plaintiffs' counsel and representatives from the Governor's office and/or CDCR, including then-Secretary of CDCR Jeffrey Beard in the time period between November 2015 and June 2016, including in-person meetings on December 7, 2015 and June 29, 2016. . I also reviewed Plaintiffs' contemporaneous notes from all-parties meetings that occurred on April 27, July 19, July 20, August 16, and August 17, 2016. I was the author of the notes for the July 19, July 20, August 16, and August 17, 2016 meetings.

3. Those notes, memoranda, and emails reflect that from at least November 2015 through August 2016, Plaintiffs' counsel were actively discussing with individuals from the Governor's office and CDCR leadership the problems resulting from the unprecedentedly high and increasing population of *Coleman* class members in CDCR. Plaintiffs' counsel were particularly concerned that the heavily impacted system was causing hundreds of EOP class members to be stuck in segregated settings well beyond their terms and past agreed-upon transfer timeframes, to be held in in reception centers without adequate programming and mental health treatment past the required timeframes, and to be housed above their security levels and/or in high-security settings like Level III and IV yards when they could safely program in lower custody settings.

4. In the meantime, the Special Master released his draft 26th Round Monitoring Report on March 1, 2016 for the parties' comments. *See* Special Master's 26th

1  Round Monitoring Report, ECF No. 5439 ("26th Report"), at 124.[1]  In that report, he
2  documented the rising *Coleman* population, and the impacts of that rising population on
3  CDCR's limited resources and on class members' mental health treatment.  *See, e.g.*, 26th
4  Report at 13, 22.  In their comments on the draft report, Plaintiffs requested that the
5  Special Master make additional recommendations requiring Defendants to study the
6  disproportionate growth in the mental health caseload in order to identify strategies to
7  address it, and to take additional steps to address the growth of EOP patients in segregation
8  including lack of sufficient beds.  *Id.* at 124-30.  Defendants did not lodge objections to the
9  draft 26th Report.

10      5.    At an April 27, 2019 all-parties teleconference convened by the Special
11  Master to discuss Plaintiffs' comments on the draft report, Plaintiffs continued to raise the
12  issues relating to the dramatically increasing *Coleman* population, and the pressures this
13  was causing within the overall system, mostly leading to class members being housed
14  outside their least restrictive settings, both in segregation and in high-security settings.
15  The Special Master stated his intent to finalize the 26th Report without adding Plaintiffs'
16  requested recommendations.  The parties and Special Master agreed to discuss further the
17  issues concerning the population pressures and the rise in the number of class members in
18  segregation at upcoming policy meetings.

19      6.    The Special Master issued his final report on May 6, 2016.  ECF No. 5439.
20  In doing so, he recognized the importance of the issues raised by Plaintiffs but declined to
21  include additional recommendations.  *Id.* at 124.  He did, however, recommend that
22  Defendants be ordered to work closely with the Special Master, and Plaintiffs' counsel as
23  appropriate, to resolve Defendants' increasing inability to provide adequate clinical staff to
24  treat the rising population of class members, including by discussing the possibility of
25  clustering high-acuity class members, including EOP patients.  *Id*. at 131.  Neither party

---

[1] Pagination refers to the Court's ECF numbering system.

filed formal objections, and the Court adopted the 26th Report's findings and the staffing recommendation. *See* ECF No. 5477.

7. The parties and Special Master team then convened two sets of two-day policy meetings on July 19 and 20, and on August 16 and 17, 2016 to address these and other systemic issues.

8. A significant portion of the July 19, 2016 meeting was devoted to the problems caused by the rising EOP population and the relationship between that increase and Defendants' difficulties providing and staffing adequate numbers of EOP beds, particularly as they related to the recommendations in the Special Master's 26th Report. Specifically, in the portion of the meeting addressing Defendants' concerns about the further clustering of high-acuity class members like EOP patients, the parties and the Special Master team exchanged ideas in a lengthy discussion regarding how to move more Level IV EOP patients into lower-security settings and thereby improve patient movement throughout the system so that EOP class members were not also getting stuck in segregation settings for extended time periods. During this discussion, CDCR's then-Director of the Division of Adult Institutions, Jeff Macomber, who now is CDCR's Undersecretary of Administration, specifically referenced the July 5, 2016 Memo – Utilization of Administrative Determinants Based Upon Positive and Negative Behavior and Increased Access to Rehabilitation Programs, although Defendants had not provided it to the parties or Special Master despite the ongoing discussions. Mr. Macomber stated that this new memo would allow classification committees and custodial staff the ability to override class members' security-level designations, based on good behavior and an individualized assessment of the true security risk presented by the class member. Mr. Macomber represented to Plaintiffs' counsel and the Special Master team that the initiative was intended to allow more class members to access lower-security settings, and therefore to alleviate precisely the sorts of population issues Plaintiffs had been raising and asking Defendants to solve since at least November 2015.

9. The July 5, 2016 memo came up again in discussions the next day, July 20,

3

DECLARATION OF JESSICA WINTER IN SUPPORT OF RESPONSE TO COURT'S JULY 9, 2019 ORDER RE CUSTODIAL POLICY UPDATE TO THE PROGRAM GUIDE

[3432963.3]

2016, when Defendants were identifying measures they had taken to address the backlog in their system and their inability to timely move EOP patients stuck in segregation into general population beds. In these meetings, Defendants acknowledged that a shortage of high-custody EOP beds was exacerbating the problem, which could be alleviated in part by moving some class members with lower classification scores into lower-custody EOP beds.

10. In a letter I sent to Defendants on August 2, 2016 memorializing commitments and other follow-up items from the July 19 and 20, 2016 meetings, Plaintiffs' counsel specifically referenced these efforts and requested additional information. A true and correct copy of my letter is attached hereto as **Exhibit A**, which includes the pertinent discussion at page 3 item 8.

11. Defendants revised the former version of the August 8, 2016 Memo – entitled C&PR Approval for Movement to a Higher or Lower Level Facility Within the Same Institution – just after the July 2016 policy meetings, but before the August 2016 meetings, when the parties revisited the same population-pressures discussion, including with then-CDCR Secretary Scott Kernan, who was present at that meeting.

12. The August 8, 2016 Memo represents an additional effort to address the problem of moving patients through an impacted and backlogged system that the parties had long been negotiating. The August 2016 revisions to the memo streamlined the process for the individualized review of potential security-level overrides by removing steps that were impeding the process and exacerbating the backlog of prisoners stuck in inappropriate settings. The revisions therefore reflect an additional effort to encourage the flow of EOP class members to less restrictive settings within CDCR, alleviating at least some of the security-level, reception center, and segregation logjams that Plaintiffs had been advocating for directly with Defendants and in all-parties meetings.

13. When then-Secretary of CDCR Scott Kernan discussed CDCR's population issues at the August 16, 2016 all-parties meeting, he referenced the new flexibility built into CDCR's classification system, which was intended to allow less-dangerous patients to

1  escape Level III and IV yards where they had been stuck.  The parties also continued to
2  explore clustering as part of CDCR's response to the overall population pressures issues,
3  including CDCR's inability to staff its institutions sufficiently to meet patients' treatment
4  needs.

5      14.  Although Defendants referred to the initiatives outlined in the July 5 and
6  August 9, 2016 memos during negotiations in the same time frame, Plaintiffs' counsel
7  received the policies shortly after the August policy meetings under the auspices of the
8  *Armstrong* case, for which we also serve as class counsel.  Plaintiffs' counsel immediately
9  identified that the polices were the same ones that Defendants had been proposing as
10 partial remedies to address various facets of the population pressures affecting *Coleman*
11 class members, especially EOP class members, discussed above.

12     15.  Plaintiffs accepted and relied on Defendants' representations regarding their
13 attempts to use a more flexible and efficient classification system to address population
14 pressures as formalized in the July 5 and August 9, 2016 memos, and considered them
15 appropriate remedial steps to address, in part, Plaintiffs' concerns.  Had Defendants not
16 taken these steps, as represented during the parties' July and August 2016 discussions,
17 Plaintiffs may well have continued to push for further reforms on the specific issues
18 covered by these memos instead of turning their attention to other critical aspects of the
19 remedy requiring their attention.

20     I declare under penalty of perjury under the laws of the United States and the State
21 of California that the foregoing is true and correct, and that this declaration is executed at
22 San Francisco, California this sixth day of September, 2019.

*/s/ Jessica Winter*
Jessica Winter

# Exhibit A



50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email:  jwinter@rbgg.com

August 2, 2016

VIA ELECTRONIC MAIL ONLY

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Devereaux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI  02908
mlopes@pldlaw.com

Nick Weber
CDCR Health Care Legal Team
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA  94283-0001
Nicholas.Weber@cdcr.ca.gov

Re:   July 19 & 20, 2016 Staffing and ASU EOP Meetings
       *Coleman v. Brown*
       Our File No. 0489-03

Dear Matt and Nick:

Plaintiffs write to memorialize commitments made during the Staffing and ASU EOP meetings held on July 19 and 20, 2016, and to note outstanding issues from those meetings.  If you believe we have missed something or listed something in error, please let us know.

## July 19, 2016 STAFFING MEETING

### CDCR Staffing

1. <u>Monthly Updates of the Division of Health Care Services Report</u>:  Defendants agreed that they will provide an updated monthly report reflecting the true authority for telepsychiatry and other psychiatrist staffing, broken out by individual institution, as they did for the staffing meeting.  This information is not included in the current monthly report.  Plaintiffs reiterate their request from the meeting that this information about the use of telepsychiatry positions at each institution, as well as the "true" hiring authority for each institution, be provided in the routine monthly staffing reports concerning each institution, along with the information about registry and overtime coverage, so that the true staffing picture for each institution is available in the monthly data.

Matthew A. Lopes, Jr.
Nick Weber
August 2, 2016
Page 2

2. <u>Recruitment and Retention Report</u>:  Defendants stated at the meeting that they believed CDCR's recruitment and retention report was included in the June staffing update, but it was not.  Please provide Plaintiffs a copy of the report.

3. <u>Hiring and Retention Surveys</u>:  Defendants stated that they are in the process of developing a formal exit survey to gather information about the reasons why psychiatrists leave CDCR.  We request a copy of the exit survey and information on when it will be rolled out.  To the extent there is information gathered through the exit survey in advance of the next work group meeting on staffing, we request a written update in advance of that meeting.

4. <u>Data Regarding the Registry Hiring Timeline</u>:  During the meeting, Dr. Metzner asked how much the hiring time frame for registry psychiatrists had been sped up by Defendants' streamlining efforts.  Defendants stated that they can gather numbers regarding how hiring timelines have changed since they began streamlining the registry hiring process.  Plaintiffs request this information at the next staffing work group meeting.

5. <u>New Yard at Corcoran for Level IV SNY EOP Program</u>:  During the meeting, Defendants stated that they will be adding a Level IV SNY EOP yard at Corcoran to address the urgent need for such a program, since in many cases EOP SNY inmates are waiting in segregation units for placement into such a program.  We appreciate Defendants' candid discussion of their considerations in deciding where to locate the program.  Defendants indicated that the new EOP program at Corcoran would be only a temporary measure, lasting until their longer term plan for an EOP program on C-Yard at LAC can be implemented.  Plaintiffs request a specific time frame for the Defendants' plans to open a permanent SNY EOP on C-Yard at LAC and for closing the Corcoran SNY EOP.

6. <u>Information About the Percentage of Level IV EOP Patients Who Are SNY</u>:  Defendants stated during the meeting on July 19, 2016 that they would bring to the July 20 meeting data showing the percentage of Level IV EOPs who are SNY, but this information was not provided.  Plaintiffs reiterate their request for this data.

7. <u>High Desert State Prison</u>:  The Special Master Team has recommended, and Plaintiffs have repeatedly demanded, that Defendants stop housing class members at High Desert State Prison.  Defendants agreed to speak with executive staff about this issue.  Please provide an update.

[3023842-9]

Matthew A. Lopes, Jr.
Nick Weber
August 2, 2016
Page 3

8. <u>Adjusting Security Levels for EOP Class Members</u>:  Defendants stated they are looking at shifting security levels for certain EOP individuals downward based on new behavior-based adjustments to the classification point system, and that they expect the opening of new Level II EOP programs will allow class members held in higher security EOP programs who have lower classification scores to move into EOP programs consistent with their custody scores.  We request additional information about these plans and population movements as they develop.

9. <u>Viewing Telepsychiatry in Action</u>:  Defendants agreed to facilitate a tour for Plaintiffs' counsel of their telepsychiatry program.  We request to do so.

10. <u>The 2009 Staffing Plan</u>:  Defendants indicated they intend to revisit their court-ordered 2009 staffing plan.  Plaintiffs request that any proposal to modify the plan be in writing and provided well in advance of the meeting at which the proposal will be discussed.

**DSH Staffing**

11. <u>Telepsychiatry Policies and Procedures</u>:  Plaintiffs asked for DSH's policies and procedures regarding the use of telepsychiatry.  Defendants agreed to provide them.

12. <u>Blanket Positions</u>:  Defendants agreed to discuss with the Department of Finance whether the blanket positions used by DSH are, as the Department has assured them, permanent and equivalent to budgeted positions.  Plaintiffs asked for, and Defendants agreed to provide any agreement that purports to make the blanket positions permanent.  The Special Master stated, and Defendants agreed, that a representative from the Department of Finance must attend the next staffing meeting, because blanket positions continue to be discussed and both the Special Master Team and Plaintiffs have concerns about their continued use for DSH staffing.

\* \* \*

**July 20, 2016 EOP ASU MEETING**

**Population Data and Lengths of Stay of EOPs in ASU**

1. <u>Data Regarding Numbers of EOP Patients in Segregation</u>:  The Special Master asked Defendants to chart the number of EOP patients in ASUs and PSUs and

[3023842-9]

Matthew A. Lopes, Jr.
Nick Weber
August 2, 2016
Page 4

> their average lengths of stay from 2009 to the present, and to provide this data to the Special Master Team and Plaintiffs prior to the August meetings.

2. <u>Surveys</u>:  Defendants stated that they have conducted surveys to assess why EOP patients are going to the ASU.  Plaintiffs requested a write-up reflecting CDCR's findings, which Defendants agreed to send.  Defendants also agreed to provide information regarding why GP and CCCMS patients are placed in the ASU, and whether the numbers are similar to the numbers for EOPs.

3. <u>ASU Inmates Whose Safety Concerns Were Not Verifiable</u>:  Defendants agreed to talk to clinicians regarding the 31% of ASU inmates surveyed whose safety concerns put them in ASU, but whose concerns were not verifiable.  Please provide an update.

4. <u>Data Regarding Number of EOP Patients in ASU Hubs Awaiting Different Housing</u>:  Defendants agreed to provide Plaintiffs with the number of EOP patients in ASU hubs waiting to be moved to different housing, like GP.

5. <u>Reception Center Data</u>:  Plaintiffs asked for data regarding the number of EOPs who have waited in reception centers for more than 60 days, as well as the numbers of GP and MHCB inmates.  Defendants stated they will put together information regarding reception centers that can be reviewed jointly.

6. <u>SNY Numbers</u>:  Plaintiffs requested, and Defendants agreed to provide, the number and percentage of *Coleman* inmates, including EOP patients, categorized as SNY, as compared to the general population of prisoners categorized as SNY.

**Efforts to Reduce the Number of EOP Patients in Segregation**

1. <u>PSU Stepdown Unit</u>:  Defendants reported that they expect to be able to provide an update on how the new PSU stepdown unit at SAC is working within 60 days.  Please provide an update by the September meeting.  Defendants also agreed to facilitate Plaintiffs' visit to the new PSU step down unit.  Plaintiffs request to do so.

2. <u>Stepdown Program from EOP ASU Hubs</u>:  Plaintiffs asked if there was a plan for a stepdown program from EOP ASU hubs.  Defendants agreed to discuss this possibility internally.  Please provide an update.

[3023842-9]

Matthew A. Lopes, Jr.
Nick Weber
August 2, 2016
Page 5


3. <u>Removing Non-Programming EOP Patients from Yards</u>:  Defendants stated that they are attempting to remove non-programming EOP patients from yards in order to ensure a more therapeutic environment for EOP class members.  Defendants agreed to provide more information in 60 days as to how this process is working.  The issue should be addressed at the September meeting.

4. <u>Accelerating the 90-Day and 150-Day Reviews</u>:  Plaintiffs asked whether, if the 90-day and 150-day review processes are working and occurring in a timely fashion as Defendants claim, Defendants can accelerate the timelines by 30-to-60 days.  Defendants stated that they would consider changing the timelines, but first wanted to map out for Plaintiffs how often patients are being seen.  Defendants volunteered to provide this information at the next meeting.  Prior to the next meeting, Defendants also agreed to provide Plaintiffs with further information about the case-by-case review process in general, including the number and percentage of EOP patients who have been released from segregation and the outcome of such reviews.

5. <u>Orientation Program</u>:  Defendants are starting an orientation program for EOP patients, which will include a custody officer, a prisoner, and a clinician.  The team will talk to new EOP patients about what an EOP yard is like and what they should do if they have problems.  Plaintiffs request an update regarding the progress of this program.

6. <u>Tailored Conflict Resolution Program</u>:  Defendants reported that they have identified a company that can develop a conflict resolution program tailored to the particular needs of EOP patients.  Plaintiffs request updates regarding the progress of any implementation of this program.

7. <u>Misclassifying Inmates as EOPs</u>:  Defendants agreed to look into the percentage of EOP patients who do not actually require EOP level of care, and are instead engaging in predatory behavior on EOP yards.  Please provide an update.

**Delivery of Care in Segregation and Certification**

1. <u>Information Regarding EOP ASU Certification Decisions</u>:  Defendants agreed to provide more information regarding EOP ASU hub certification decisions, including a clarifying rationale for certification decisions.  Defendants initially agreed to report on this during the July 20, 2016 meeting, but did not do so.  Plaintiffs request that Defendants report on this at the next meeting in August.

[3023842-9]

Matthew A. Lopes, Jr.
Nick Weber
August 2, 2016
Page 6

2. <u>Allegations of Abuse in SAC PSU</u>:  Defendants stated that they are investigating the recent allegations of abuse at the SAC PSU and that they will share more information at a later date.  Plaintiffs' investigations of this serious issue are ongoing as well.

3. <u>Information Regarding Delays</u>:  Plaintiffs requested information regarding, and Defendants agreed to look into transfer delays for EOP class members held in non-hub ASUs for over 30 days per Nick Weber's July 11, 2016 email, including: (1) why inmates who are awaiting transfer to DSH are not held in MHCBs, rather than in ASUs, to ensure they receive the appropriate level of care; (2) why class members slated to parole are held in non-hub units rather than transferred to a hub where they can receive appropriate care; (3) why a class member who had already been in a non-hub unit for over 30 days should remain there, rather than transferring to a hub, on the grounds that he is expected to be released to GP in another month; and (4) why inmates who are in segregation while on out to court status are experiencing such long delays.

**SNY Classification**

1. <u>Tightening SNY Criteria</u>:  Defendants stated they will look into tightening the criteria for inmates to enter the SNY classification.

2. <u>Removing the SNY Classification for EOPs</u>:  At Defendants' request, Plaintiffs agreed to consider whether they would support removing the SNY designation for EOP patients.  Plaintiffs' internal discussions are ongoing at this point.  Defendants also agreed to provide more information about the related process at Stockton by the August meeting.

**Crisis Beds**

1. <u>Joint Interviews with MHCB Class Members to Address Safety Concerns</u>: Defendants stated that they will implement joint interview/problem-solving sessions with prisoners who are requesting to go to crisis beds due to safety concerns in order to determine if the concern can be addressed without the need for admission to a crisis bed.  These sessions would be conducted by specially trained clinical and custody staff members.  Please provide an update.

Matthew A. Lopes, Jr.
Nick Weber
August 2, 2016
Page 7


**CQIT Process for DSH**

1. <u>Developing a CQIT Process for DSH</u>: The Special Master directed DSH to develop a CQIT process and stated that CDCR will serve as a mentor in this process. This issue will be discussed at the August meeting.

    Please contact us to clarify if our understanding of any of the commitments listed above is incorrect. We appreciate Defendants' continued efforts and constructive engagement on these important issues.

                Sincerely,

                ROSEN BIEN
                GALVAN & GRUNFELD LLP

                */s/ Jessica Winter*

             By: Jessica Winter

JLW:cg
cc: *Coleman* Special Master Team
   Elise Thorn
   Christine Ciccotti
   Co-Counsel

[3023842-9]