1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF CALIFORNIA
2


3      Ralph Coleman, et al.,
                Plaintiffs,
4

       vs.                                    Sacramento, California
5                                             No. 2:90-cv-00520
       Gavin Newsom, et al.,                  Thu., Aug. 8, 2019
6             Defendants.                     10:01 a.m.
       _____/
7

                       TRANSCRIPT OF TELEPHONIC HEARING
8         BEFORE THE HONORABLE KIMBERLY J. MUELLER, DISTRICT JUDGE
                              ---oOo---
9

       APPEARANCES:
10

11      For the Plaintiffs:          Rosen, Bien, Galvan and
                                     Grunfeld, LLP
                                     50 Fremont Street, 19th Floor
12                                   San Francisco, CA  94105
                                     By:  Lisa Adrienne Ells
13                                   Cara Elizabeth Trapani
                                     Jessica L. Winter
14                                   Attorneys at Law

15      For the Defendants:          Office of the Attorney
                                     General
16                                   455 Golden Gate Ave.
                                     Suite 11000
17                                   San Francisco, CA  94102
                                     By: Adriano Hrvatin
18                                   Tyler Heath
                                     Robert W. Henkels
19                                   Neah Huynh
                                     Deputies Attorney General
20

       (Appearances continued on following page)
21

        Official Court Reporter:      Kimberly M. Bennett,
22                                     CSR, RPR, RMR, CRR
                                       501 I Street
23                                     Sacramento, CA 95814


24      Proceedings recorded by mechanical stenography, transcript
        produced by computer-aided transcription
25

```
 1                      APPEARANCES CONTINUED

 2   For the Defendants:          Office of the Attorney
                                  General
 3                                1300 I Street
                                  Sacramento, CA  94244
 4                                By: Elise Owens Thorn
                                  Monica Anderson
 5                                Deputies Attorney General

 6   Special Counsel for the      Glenn Danas
     Defendants:                  Roman Silberfeld
 7
     CDCR Office of Legal Affairs: Jerome Hessick
 8                                Nick Weber
                                  Melissa Bentz
 9
     Undersecretary, CDCR Health  Dr. Diana Toche
10   Care Services:

11   Special Master Team:         Matty Lopes, Jr.
                                  Kristina Hector
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to order of the court, 10:01 a.m.)

 2              THE CLERK:  Calling civil case 90-520; Coleman, et

 3   al. versus Newsom, et al.  This is on for a telephonic status

 4   conference.

 5              THE COURT:  Good morning.  I'm going to call roll and

 6   because this is a telephonic it will be important for the

 7   parties to wait for the Court to keep -- the Court to stop

 8   speaking and then respond when I prompt you.

 9         So for the plaintiffs, Lisa Ells is present?

10              MS. ELLS:  Yes, Your Honor.

11              THE COURT:  Ms. Trapani?

12              MS. TRAPANI:  Yes, Your Honor.

13              THE COURT:  And Ms. Winter?

14              MS. WINTER:  Yes, Your Honor.

15              THE COURT:  Is there also Ms. Hector appearing for

16   the plaintiffs?  I'm sorry.  I'm sorry, that's --

17              THE COURT REPORTER:  I'm sorry, I don't know what she

18   just said.

19              THE COURT:  Ms. Hector is part of the Special

20   Master's team.

21              MS. HECTOR:  Yes, Your Honor.

22              THE COURT:  All right.  Sorry about that.

23         And for the defense, Mr. Hrvatin?

24              MR. HRVATIN:  Yes, Your Honor.  Good morning.

25              THE COURT:  And is it pronounced Danas or Danis?
```

```
 1   Mr. Danas?

 2             MR. DANAS:  Yes, Your Honor.  It's Danas.  Thank you.

 3             THE COURT:  Danas.  All right.

 4      For CDCR Office of Legal Affairs, Mr. Hessick?

 5             MR. HESSICK:  Yes, Your Honor.

 6             THE COURT:  Mr. Weber?

 7             MR. WEBER:  Yes, Your Honor.

 8             THE COURT:  Ms. Bentz?

 9             MS. BENTZ:  Yes, Your Honor.

10             THE COURT:  And we have the undersecretary for CDCR's

11   Healthcare Services.

12             DR. TOCHE:  Yes, Your Honor.

13             THE COURT:  And how do you pronounce your last name?

14             DR. TOCHE:  Toche.

15             THE COURT:  Toche.  All right.

16      And Special Master Lopes is on the phone?

17             MR. LOPES:  Yes, Your Honor.

18             THE COURT:  Is there any other member of your team on

19   the phone, Mr. Lopes?

20             MR. LOPES:  There shouldn't be.

21             THE COURT:  All right.  Is there anyone on the phone

22   who has not been called?  If so, let me know.

23             MR. SILBERFELD:  Yes, Your Honor.  This is Roman

24   Silberfeld for --

25             THE COURT:  How do you spell your last name?
```

1          MR. SILBERFELD:  S as in Sam, I-L, B as in boy, E-R,

2   F as in Frank, E-L, D as in David.  And the first name is

3   Roman, R-O-M-A-N.

4          THE COURT:  Who did you say you're with?

5          MR. SILBERFELD:  Robins Kaplan.  I'm a colleague of

6   Mr. Danas's and we are special counsel to the defendants.

7          THE COURT:  All right.  When you say "colleague of

8   Mr. Danas's," what does that mean?

9          MR. SILBERFELD:  He's one of my partners.

10         THE COURT:  So Mr. Danas, you are with the firm that

11  Mr. Silberfeld just identified?

12         MR. DANAS:  Yes, Your Honor.  I'm sorry about that.

13  Glenn Danas at Robins Kaplan as well.

14         THE COURT:  All right.  Is there anyone else on the

15  phone?

16         UNIDENTIFIED SPEAKER:  (Inaudible) from the Attorney

17  General's office.

18         THE COURT:  All right.

19         THE COURT REPORTER:  I didn't catch the name.

20         THE COURT:  Ms. Schultz does her best to obtain the

21  identity of all persons on the phone so we'll just sort through

22  this.  It's a difficult record.

23     So Ms. Thorn, you are present?

24         MS. THORN:  Yes, Your Honor.

25         THE COURT:  So that's Elise Thorn, E-L-I-S-E,

```
 1   T-H-O-R-N, for the defendants.

 2      Is there someone else?

 3            (Inaudible.)

 4            THE COURT REPORTER:  I'm sorry.

 5            THE COURT:  We couldn't hear that.

 6            MR. HEATH:  It's Tyler Heath; T-Y-L-E-R, H-E-A-T H.

 7            THE COURT:  All right.  Also for the defendants.

 8      Anyone else?

 9            MS. ANDERSON:  Monica Anderson, also for the

10   defendants.

11            THE COURT:  That's Monica Anderson.

12      Anyone else?

13            MR. HRVATIN:  Your Honor, good morning.  Adriano

14   Hrvatin here from the Attorney General's office.

15      I have two deputy colleagues with me; Robert Henkels,

16   H-E-N-K-E-L-S is the last name, as well as Neah Huynh, N-E-A-H

17   Huynh, H-U-Y-N-H.

18      My apologies for not making the appearance for them

19   earlier.

20            THE COURT:  How do you spell Ms. Huynh's last name

21   again?

22            MR. HRVATIN:  H-U-Y-N-H.

23            THE COURT:  All right.  Anyone else?

24      All right.  Let me -- for the plaintiffs, can I -- who is

25   speaking?  Can I ask Ms. Ells to speak for plaintiffs if need
```

1    be?

2             MS. ELLS:  Yes, Your Honor.

3             THE COURT:  Mr. Hrvatin, you for the defense?

4             MR. HRVATIN:  Yes, Your Honor.  And if I need any

5    support I can identify someone on our team who can handle those

6    questions.

7             THE COURT:  All right.  The courtroom is open but

8    there is no one in the courtroom, for the parties' information.

9        The purpose of this telephonic status is to bring a proper

10   focus to the proceedings the Court contemplates later this year

11   because the parties' filings suggest to the Court that the

12   parties are seeing this opportunity as one to engage in what

13   might be a free-for-all and that is not the point at all.  The

14   point is to have a highly focused hearing.

15       I had thought based on some of the messages being sent

16   through the respective filings in the last several months that

17   the parties were moving towards reaching some meaningful

18   stipulations that might narrow the focus of the hearing even

19   further.  It appears to the Court the parties haven't fully

20   exhausted that possibility given the back and forth in the

21   joint status report, the bracketed information, the

22   disagreement even about the scope of certain stipulations.

23       And so the Court currently contemplates a few next steps.

24   I'm going to review those.  I'll give the parties a chance to

25   let me know if they think I've just got something completely

1   wrong.  But really, the goal is to keep a proper narrow focus

2   on what remains in the Court's efforts to ensure that the

3   record is purged of any misleading filings, and those filings

4   are corrected; that the Court is clear on the why and how to

5   the extent it needs to be so that misleading filings don't

6   happen in the future; and to the extent ancillary issues are

7   identified by the parties' filings, those are teed up in a way

8   -- referred to the Special Master, the workgroup, in a way that

9   the parties can focus on resolving issues that need to be

10   resolved.

11       The issues raised by the Golding Report and the Gonzalez

12   report as well need to be addressed, but they cannot take the

13   parties' eye off the ball of the much bigger picture here.  And

14   the Court's concern is that the joint status report suggests

15   that the parties might be engaging in a significant detour when

16   it's not needed.

17       The Court of course reserves judgment until it publishes

18   its own findings, but having reviewed the relevant filings so

19   far I'm thinking there is a much more focused way to proceed.

20       Someone is typing and the Court can hear that.  So if that

21   person can mute their microphone unless called on, that would

22   be helpful.

23       Let me just give you one example of where a stipulation --

24   it appears the parties have not reached a stipulation and yet

25   it -- the Court believes they may be able to, particularly if

1    they're thinking constructively, even while preserving their

2    litigation records.

3        So the parties could have stipulated to an acknowledgment

4    that redefinition of monthly from 30 to not more than 45 days

5    was a material change to both policy and longstanding practice,

6    and that defendants should have informed the Special Master and

7    his team of the proposed change before implementation.

8        Here is an example where the Court, perhaps reading between

9    the lines, thought that defendants were prepared to take full

10   responsibility on that front but litigation postures might have

11   gotten in the way.  So that's the kind of stipulation that the

12   Court had thought might be in the offering, just for the

13   parties' information.

14       To the extent any further meet and confer on the issues

15   that haven't been fully exhausted as reflected in the joint

16   status report can get the parties to that kind of stipulation,

17   that would be significant.  I'm not -- I can't require that you

18   stipulate but, again, I'm just providing that feedback for you

19   in case it's helpful.

20       In terms of some of the questions the parties have, I don't

21   intend to open discovery.  I don't intend to require the

22   Neutral to provide documents.  I have authorized only the

23   deposition of Dr. Leidner and that's for the purpose of

24   preserving testimony.

25       On that front, I don't believe I'm aware of any date

1    currently set for his deposition.

2        Is that correct, Ms. Ells?

3            MS. ELLS:  I think defendants should address this.

4    They have -- there is an update on this situation that may make

5    the deposition obsolete.

6            THE COURT:  All right.  Mr. Hrvatin?

7            MR. HRVATIN:  Yes.  Thank you, Your Honor.

8        I think consistent with defendants' approach per the

9    instruction that we received and direction from the Court both

10   in -- at the June 10th conference and the followup order on

11   June 14th, we certainly want to take this September 13th

12   proceeding seriously and approach it with efficiency.  And so

13   in that regard, Dr. Leidner has advised that he will cancel his

14   travel plans so that he can appear in person at the hearing and

15   provide testimony like the other witnesses that the Court has

16   identified we'd like to ask some questions of so as to remove a

17   logistical issue and further focus the parties' work going

18   forward.

19           THE COURT:  All right.  That's helpful.  The Court

20   asked because there is the issue of the Court's questions.

21       And we'll talk about the schedule given the parties' desire

22   to know the entire schedule.  And ultimately, this -- the

23   question of the total length that the Court would need to

24   reserve is coming into greater focus.

25       Let me just put a question out there and then we can return

 1    to it.  And ultimately it will depend on the total number of

 2    witnesses and whether or not the parties can reach any

 3    additional stipulations.  I also understand there are some

 4    other meetings occurring with the Special Master and party

 5    representatives and the Court has begun to wonder if some of

 6    those meetings might provide information to address the

 7    parties' legitimate concerns; for example, regarding

 8    certifications of accuracy of filings.

 9        And so I had begun to wonder, but I'm asking for the

10    parties' input before we adjourn today, whether or not it might

11    make some sense to proceed on the 13th with a more routine

12    status with the parties providing the Court with agenda items.

13    And then if there is value in giving the parties time to

14    conclude meeting and conferring regarding stipulations and

15    gathering some information in discussion with the Special

16    Master, particularly regarding issues such as data auditing,

17    would there be some value in providing a bit of breathing room

18    on the evidentiary hearing and bumping that for approximately a

19    month until October 15th.

20        Now, if Dr. Leidner has already changed his plans then I

21    realize that could affect the parties' thinking.  But if an

22    extra month on the evidentiary hearing would bring greater

23    focus and perhaps further narrow the issues, I'm currently

24    contemplating that.  And I could provide, essentially, the week

25    of the 15th.  I think if properly conducted the proceedings

1    would take two to three days at most.  That's my current

2    thinking.  So hold that thought and we'll return to it.

3        The Court also is continuing its review of the privileged

4    materials.  Just to provide a brief update on that.  I expect

5    to be done with that by the end of this month.  And so my

6    conclusion of that would allow me to, if necessary, have

7    discussions with the defense and create whatever record is

8    needed with respect to those materials.

9        I also am mindful of the settlement discussions and I know

10   that Judge Drozd has vacated the most recent date he had set.

11   And the more we can get done in the meantime I think would lead

12   him to reset another session with the parties.  And I

13   understand from the joint status report the parties are anxious

14   to get back to that forum and the Court wants to do everything

15   it can to not delay further discussions with Judge Drozd.

16       Just to review the bigger picture that we need to all keep

17   our eyes on, there is the -- the psychiatrist staffing issue.

18   At this point, given the schedule the Court originally

19   contemplated, we're more than a year -- or approaching a year

20   past the date for compliance.  The last staffing report shows a

21   fill rate of 70 percent.  At this point, the Court has stood

22   down only with respect to telepsychiatry.  I understand that

23   issue remains on appeal.

24       There is also the mental health crisis beds.  I mean, that

25   appears to be delayed, and the legislature may have something

1    to do with a further delay.  So beds and staff remain critical,

2    big picture issues that stand in the way of this case

3    resolving.

4        The data -- the review of the data, the defendants' ability

5    to certify accurate data, is an issue that I believe the

6    Golding Report proceedings has helped bring some focus to.

7        Cultural collaboration is also a great concern to this

8    Court.  I understand that there have been discussions with the

9    Special Master and I'm awaiting an update on that front which I

10   think could be instrumental in getting the case to the finish

11   line.  I don't see the finish line on the horizon at this point

12   when I look out there but hope springs eternal.

13       So here is what the Court is contemplating:  I'm going to

14   go through the major issues that I previously identified, try

15   to bring some focus to those, ask you if you disagree with my

16   thinking, and request that you have some further focused

17   discussions with the Special Master in the next several weeks

18   on certain topics.  I believe certain issues can simply be

19   referred, as the parties themselves suggest, to the workgroup

20   and discussions with the Special Master.  And I believe

21   ultimately the issues for the evidentiary hearing can be

22   brought into proper focus.

23       So let's go through the issues and then we'll return to the

24   scheduling issue.

25       So the first issue, Redefining "Monthly" to Lengthen

 1    Intervals Between EOP Appointments.

 2        I've reviewed the parties' stipulations and I believe the

 3    two key facts the parties have stipulated to are:

 4        That the decision to redefine monthly resulted in the

 5    reporting of misleading data, specifically in two filings.

 6        And the defendants will rerun the performance reports

 7    affected by the change using the current business rule defining

 8    monthly as 30 days and file amended documents.

 9        So those are important stipulations.

10        The key questions I believe remaining are:

11        Why neither Dr. Leidner nor Dr. Ceballos consulted with

12    Dr. Golding in connection with the decision.

13        And why no one from CDCR informed the Special Master or any

14    member of his team about the change.

15        So at this point the Court anticipates asking questions at

16    the hearing of Dr. Leidner and Dr. Ceballos.  And the procedure

17    the Court has contemplated I believe should be clear to the

18    parties.  The Court will ask questions initially, the parties

19    will be allowed to ask followup questions.

20        Also, in this subject matter area there is the issue of the

21    five monthly ASU EOP Hub Certification letters.  And the Court

22    notes that the defendants believe that because the time for

23    certification has past and timely psychiatry contact indicators

24    was not one of the five mandatory compliance measures, the

25    defendants believe that they don't need to correct the record

1    with respect to those certification letters.

2         The defendants are incorrect on that point.  So any -- any

3    incorrect information in the record, and specifically these

4    certification letters, the Court views as material and so the

5    defendants will be required to correct those five monthly

6    certification letters in addition to the two reports they've

7    already indicated they plan to amend.

8         So, really, the focused question -- it's -- this is the

9    Court's proceeding to, again, vindicate its procedures and

10   purge and correct the record.  So do the parties need to object

11   in writing, or do they have any objections to communicate to

12   the Court now given its intent with respect to resolving the

13   record in the context of the Golding Report proceedings on this

14   issue, redefinition of monthly to lengthen the interval?

15         Ms. Ells?

16              MS. ELLS:  Thank you, Your Honor.  We appreciate the

17   careful attention to the issue.  I do think that it would help

18   us to formulate our thoughts in writing with respect to this

19   proposal.

20         We certainly agree that the Hub Certification documents

21   need to be fixed.

22         As to whether or not the witnesses should be restricted to

23   Dr. Leidner and Dr. Ceballos, we think that there is a larger

24   context that gave rise to the decision not to tell the Special

25   Master and defendants and we think that Deputy Director Tebrock

 1   is the best person to provide information on that larger

 2   context.

 3       And I think that additionally we may -- I'm sorry, I lost

 4   my train there.

 5           THE COURT:  Well, what I -- I'll memorialize these

 6   proposals in as short an order as possible following this

 7   hearing and I'll give the parties 14 days to file any written

 8   objections.

 9       The Court does contemplate Deputy Director Tebrock -- or, I

10   gather, former or soon-to-be-former Deputy Direct Tebrock -- I

11   do anticipate she will be a witness.  And she may be a witness

12   globally on each of the areas.

13           MS. ELLS:  Okay.  That's helpful.

14       So when you've identified Dr. Leidner and Dr. Ceballos for

15   these focused questions, that doesn't preclude the Court asking

16   additional questions on this topic from other witnesses?

17           THE COURT:  Well, Ms. Tebrock in particular.

18           MS. ELLS:  And Ms. Tebrock.  Okay.  We agree that she

19   appears to be the most critical witness here.

20       Is any input from Dr. Golding or Dr. Gonzalez appropriate?

21   We certainly would contend that it is given that they have

22   significant input into what was happening in the Department at

23   the time and how and when they were consulted for important

24   decisions of this nature.

25           THE COURT:  I understand that position.  It may be

1    that there are focused questions for those two witnesses.  I'm

2    considering that.

3        All right.  So recognizing I will memorialize what I'm

4    saying in an order, give the parties a chance to object -- I

5    might put a page limit on you -- Mr. Hrvatin, any problem with

6    that process and anything to say at this point?

7            MS. ELLS:  Your Honor, could I just make one more

8    brief comment?

9            THE COURT:  This is Ms. Ells?

10           MS. ELLS:  Yes.  Ms. Ells again.

11       I guess our larger concern on this issue is that, you know,

12   the Court sort of framed this particular topic as defendants

13   being willing to stipulate that misleading data was provided

14   and we don't read -- and certainly in the course of our

15   negotiations did not feel -- that defendants were actually

16   willing to stipulate to that and/or do not agree that that was

17   what happened.

18       So I think there is some question still remaining as to

19   whether or not defendants have or are willing to accept any

20   responsibility for this issue.  And in our view, nearly

21   correcting the pleadings without making any sort of additional

22   statement about why those pleadings are being corrected, and

23   the Certification documents as well, sort of doesn't really

24   address the core issue which is that there was misleading

25   information provided, and people did rely on it, and that that

1   information should be reflected in the record when any

2   pleadings are amended.

3            THE COURT:  I understand that global concern.  The

4   Court is -- will address that one way or the other.

5        The defendants -- I believe I said it before, the

6   defendants have the ability to accept full responsibility if

7   they will.  If the lawyers are standing in the way of their

8   doing that, well, that's a question I can't answer.

9        I do -- I previously indicated that one possible conclusion

10   from the totality of the record is that litigation postures are

11   impeding what needs to happen here.  And that in fact some of

12   the principals should get more credit than they are.

13        So ultimately, if the Court needs to reach independent

14   conclusions based on a developed record, I will.  If the

15   gladiators in the room can think hard about what I've just

16   said, they're invited to do that.

17        Mr. Hrvatin?

18            MR. HRVATIN:  Thank you, Your Honor.

19        Defendants welcome the Court's invitation to address the

20   followup order to this proceeding.

21        I do take issue with some of the representations made by

22   plaintiffs' counsel with respect to -- we're trying to focus

23   this proceeding and I think some of the statements that were

24   just made with respect to further sub-issues-- and we're just

25   on -- we're just on issue number one here -- and additional

 1   witnesses, etc., is inconsistent with what we understood the

 2   Court's direction to be a month and a half ago -- two months

 3   ago now -- and that we tried to bring to the meet and confer a

 4   process.

 5       We are -- we continue to be open to further -- further

 6   discussions with plaintiffs' counsel to see whether we can,

 7   through further negotiations, sort out some of the -- the

 8   complexity to these issues to further focus any evidentiary

 9   proceeding.

10       But I think from our position here at the outset it seems

11   that there is a threshold inconsistency that we're struggling

12   with with respect to what and how the plaintiffs are looking at

13   the focus and purpose of this evidentiary proceeding.  We'll --

14   we'll -- we'll address that issue as well, Your Honor, as we --

15   as we address the Court's order following today's proceeding.

16            THE COURT:  All right.  Let's move on.

17       Counting All Encounters As Evaluations is the second

18   subject area.

19       I believe the joint status report does signal that the

20   primary issue here is interpretation of the Program Guide

21   requirements.  As a result of reviewing the record on this

22   point, the Court has identified what appears to have been an

23   inadvertent omission from the 2018 Revised Program Guide and

24   it's taking steps with the Special Master to ensure that the

25   confidentiality memo is made a part of the Program Guide.

1          I believe the parties may be aware of this issue and so,

2    one, that will clarify the record, and I believe it's

3    understood that that memo is -- is a part of the Program Guide.

4          Agreed, Ms. Ells?

5               MS. ELLS:  Your Honor, you're referring to the

6    memorandum that is an appendix to the 2000 -- to the previous

7    version of the Program Guide; is that correct?

8               THE COURT:  Correct.  Attachment A, April 18, 2007

9    memo.

10              MS. ELLS:  Yes, we certainly believe that is part of

11   the Program Guide.

12              THE COURT:  Mr. Hrvatin, agreed?

13              MR. HRVATIN:  Your Honor, on this one, if I may, I'd

14   like to defer to my colleague, Ms. Thorn, our resident expert

15   on the Program Guide.

16              THE COURT:  Ms. Thorn?

17              MS. THORN:  Thank you, Your Honor.

18        As the defendant set forth in the stipulations on this

19   issue as well as their position on those underlying facts

20   plaintiff would not stipulate to, we certainly agree that that

21   memo is part of the 2009 Program Guide, and that it speaks to

22   the requirement that patient records be maintained in a

23   confidential manner, but that does not necessarily without the

24   inclusion of some context, as well as some additional

25   information referred to in the Gibson Dunn report as the widely

1    known observations or opinion of psychiatrists that all

2    contacts must be confidential.

3        So I don't think the Program Guide is actually -- expressly

4    states that and that is the position we set forth in the joint

5    report.

6            THE COURT:  Well, my question is this, you do -- I'm

7    just trying to get to the threshold here, cleaning up the

8    record.  The Court just approved the Revised Program Guide,

9    Attachment A, April 18, 2000 memo should be incorporated into

10   the Program Guide.  Agreed?

11           MS. THORN:  Agreed, Your Honor, yes.

12           THE COURT:  All right.

13           MS. THORN:  Thank you.

14           THE COURT:  So that's what I had understood.  So I

15   believe the Court can -- can clarify for the parties what that

16   means based on the record.  I don't -- I don't think I need

17   evidence on the fundamental interpretation of some of that

18   language.

19       But I do believe that some protocols need to be clarified

20   to ensure the 30- and 90-day evaluations that are required are

21   confidential, with exceptions -- well-defined exceptions; if a

22   patient refuses, for example.  And then also protocols to

23   ensure compliance reporting that's consistent with -- with the

24   requirements.

25       There are also issues related to the Yolo County health

1   record system in terms of accurate entry of data which is

2   critical to accurate reports being generated.  But again, I

3   believe the development of protocols and revising the EHRS can

4   be referred to the Special Master to work on in the workgroup.

5       So I am not seeing a reason to call any witnesses on this

6   subject given that I think it can be resolved in this way.  So

7   I'll put that in my order, give you a chance to object or tell

8   me why I'm wrong.

9       Anything to say about that at this point, Ms. Ells,

10  recognizing you'll have the chance to file something?

11          MS. ELLS:  I -- I guess my only clarification or

12  question is whether the Court feels that any of the -- anything

13  that has been filed that you'd --

14          THE COURT REPORTER:  I'm sorry.  I didn't understand

15  her.

16          THE COURT:  Ms. Ells, the court reporter is not

17  catching what you're saying.  Can you slow down and break up

18  your words.  Pretend you're in court.

19          MS. ELLS:  Sure.

20      The only clarification I would ask the Court is whether the

21  Court feels that any of the documents provided to the Special

22  Master and plaintiffs or filed with the Court need

23  clarification given that I think it is clear from the record

24  today and has been clear in this case we have all understood

25  Attachment A to be part of the Program Guide and there has

1    never been any sort of clarification as to when and whether

2    evaluations should be confidential because we all assumed that

3    they were.

4        So there is a remaining question and we'll address it

5    further in our briefing, but as to whether or not any

6    documentation filed with the Court or provided to the Special

7    Master and plaintiff should be updated as well.

8            THE COURT:  Fair enough.

9            MS. THORN:  Your Honor, this is Elise Thorn.  I

10    wanted to make just one point.

11        I did not say that the Attachment A indicates as part of

12    the Program Guide that all contacts must be confidential.  The

13    Program Guide is vague on that.  It is not clear.  It's not

14    expressly stated as part of the Program Guide.  So that's our

15    position.  And that is also reflected in the joint statement.

16        Thank you.

17            THE COURT:  I understand that's your position.  The

18    Court can engage in some interpretation and clarify the record

19    and the parties will have a chance to identify, with

20    particularity, any documents they believe should be re-filed.

21        All right.  Reporting of Scheduled and Missed Appointments.

22    I gather from the parties' stipulations here that the parties

23    do agree that the definition of "appointments seen as

24    scheduled" was incorrect for the period from approximately

25    sometime in 2016 through October 2018.

 1          Is that fair, Mr. Hrvatin?

 2               MR. HRVATIN:  Your Honor, again, on that particular

 3    issue I'd ask Ms. Thorn if she has a -- if she has a position

 4    on that.

 5               THE COURT:  Ms. Thorn?

 6               MS. THORN:  That's correct, Your Honor, as set forth

 7    in our stipulation.

 8               THE COURT:  And the defendants have agreed to modify

 9    the 2018 staffing proposal to reflect the -- the correction

10    needed in the indicator and then meet and confer with

11    plaintiffs, under the guidance of the Special Master, to review

12    the definitions and methodologies they're using to report data

13    related to Program Guide requirements for purposes of ensuring

14    the CQI Tool is --

15               MS. THORN:  That's correct.

16               THE COURT:  -- accurate.

17               MS. THORN:  Yes, Your Honor.

18               THE COURT:  That was Ms. Thorn saying "correct"?

19               MS. THORN:  That's correct.  I'm sorry.  Ms. Thorn,

20    yes.

21               THE COURT:  Ms. Ells, anything to say about that?

22               MS. ELLS:  We're talking specifically about the

23    appointments seen as scheduled indicators?

24               THE COURT:  Yes.  So you agree -- do you agree with

25    everything I've just said?  General agreement about the lack of

1    correctness previously and the process for fixing it going

2    forward.

3              MS. ELLS:  Yes.  Again with the caveat that we think

4    there should be some sort of acknowledgment in that

5    clarification on the record that the data was in fact

6    misleading.  But it sounds like defendants are willing to agree

7    to do that.

8              THE COURT:  And that is -- so in this respect the

9    hearing would be focused on testimony from the persons most

10   knowledgeable with the why and how the indicator was developed

11   incorrectly and without consultation with Dr. Golding or other

12   quality control contacts.

13      So it -- can you tell me -- off the top of your head, just

14   tell me who you think the persons most knowledgeable on this

15   point are.  Ms. Ells?

16             MS. ELLS:  Your Honor, I'd have to review that a

17   little more closely.

18             THE COURT:  All right.  You can respond in your

19   filing in response to my order.  Each party can zero in on that

20   question, which I'll memorialize, and tell me who are the

21   persons most knowledgeable.

22             MS. ELLS:  Thank you, Your Honor.

23             THE COURT:  All right.  Anything further on this,

24   Ms. Thorn?

25             MS. THORN:  No, Your Honor.

1          THE COURT:  All right.  The Psychiatric Supervisors

2    Acting As Line Staff.  I've seen the parties' stipulation here

3    that the staffing proposal -- the 2018 staffing proposal

4    included data related to the average frequency of patient

5    contacts and the data included contacts completed by

6    supervising psychiatrists, did not specify what contacts were

7    included in the data, including only contacts completed by line

8    staff.

9       So I've seen the entire stipulation.  So I interpret the

10   parties' stipulation on this point as agreeing with the factual

11   finding made by the mutual expert.

12      Is that fair, Ms. Ells?

13          MS. ELLS:  The ultimate factual finding that the

14   information provided to the Court did not include psychiatry --

15   I'm sorry, supervisory psychiatry positions or people that were

16   providing line services --

17          THE COURT:  Correct.

18          MS. ELLS:  -- is that what -- yes.  I believe that's

19   sufficient for this, yes.

20          THE COURT:  Mr. Hrvatin?

21          MR. HRVATIN:  Your Honor, I'd have to look at that

22   issue more closely, unless Ms. Thorn can respond directly.

23          THE COURT:  I'll tell you how I construe your

24   stipulation and you can tell me if you are holding out on that

25   one, both of you, in terms of my construction.  I just --

1    again, I'm trying to properly construe your stipulations.  I'm

2    not trying to put words in your mouth.

3        So on this point -- and again, noting the outstanding

4    compliance with staffing ratios -- the evidentiary hearing

5    would allow the Court to hear testimony from the persons most

6    knowledgeable regarding the -- why the defendants didn't engage

7    in full disclosure in the proposal and to what extent

8    defendants knowingly or unknowingly relied on active

9    participation of supervisory psychiatrists in performing the

10   duties of line psychiatrists.  And I'll let you tell me who you

11   think the persons most knowledgeable are.

12       I would plan to refer the issue of whether supervising

13   psychiatrists can perform the duties of line psychiatrists to

14   the Special Master.  I understand there are some constructive

15   discussions going on regarding the interface between line and

16   supervisors and psychiatrists and psychology as well.  So I'd

17   refer that outstanding issue to the Special Master.  So I think

18   that focuses that issue.

19       On the next issue of medication noncompliance, it appears

20   to the Court -- I'll state this in my order and you can let me

21   know in writing -- the Neutral in his report indicated that the

22   timely mental health referrals performance indicator is

23   misleading because it does not include all patients who require

24   medication noncompliance appointments and therefore it

25   overstates Program Guide compliance.

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    And he also noted he believed it was undisputed that CDCR

2   includes patients referred for medication noncompliance in the

3   denominator of its performance indicator and not all medical

4   noncompliant patients.

5    So it appears to the Court that the parties agree with that

6   and so the real dispute is why this has happened.  And I know

7   defendants say it's a good faith dispute.

8    The Court here is not clear whether or not all medication

9   noncompliance is currently being captured as it needs to be,

10   and so I believe some more work needs to be done on this topic

11   before it can be properly focused.  And I don't know that it

12   comes back in the context of the Golding proceedings or if it

13   can come back in a different form.  The defendants do admit

14   that their implementation is inconsistent.  And so my thought

15   here is to refer this matter to the workgroup but set some

16   clear deadlines for resolution of the issue and assurances that

17   the defendants have achieved or are achieving consistent

18   implementation.

19    And so my question is how much time would the parties need

20   to file a further joint report on this issue, discussing

21   whether or not they can reach agreement on the proper

22   interpretation of the medication adherence policy.

23    So just a short answer, Ms. Ells, is it fair for the Court

24   to believe that further discussion between and among the

25   parties could get the parties to agreement on proper

1    interpretation of medication adherence?

2         MS. ELLS:  I'm not certain that that will work, Your

3    Honor.  My understanding of the defendants' position to date is

4    that headquarters' non-psychiatrists disagree that every --

5    that this policy at least requires that everybody who's

6    medication noncompliant meets, you know, the definition in the

7    policy should be scheduled for a noncompliance with the

8    prescriber specifically; meaning somebody who is able to

9    prescribe under their licensing.

10       It's our understanding -- and defendants obviously should

11   correct me if I'm wrong -- that they don't agree that that is

12   appropriate in every case or necessary.

13        THE COURT:  Your thoughts, Mr. Hrvatin?

14        MR. HRVATIN:  Your Honor, I think that if the Court

15   suggested -- and again, I think this is an issue that we can

16   confer with -- internally further and set forth our position

17   on -- in writing form, but certainly we would be open to

18   further discussions with plaintiffs and then with the

19   assistance of the Special Master and the workgroup process to

20   see if this is something that we can focus or resolve short of

21   any evidentiary proceedings.

22        THE COURT:  All right.  Well, in addition to giving

23   you time for objections within the 14-day period following your

24   receipt of my order following this hearing, you can provide me

25   with more detail on your respective positions on whether or not

1   meet and confer might further narrow this issue.

2       On the additional issues, the Neutral listed eight flowing

3   from the footnote.

4       I accept the parties' agreement that the first four issues

5   do not need to be addressed at this time; at least that's how

6   I'm construing the parties' position.

7       I am inclined to refer issues five through eight to the

8   workgroup and discussions with the Special Master.

9       I will check on the cease and desist order that the parties

10  discussed to see if I can get more details on that and share it

11  with the parties.  And I'll do that as promptly as possible.

12      In terms of additional witnesses, I don't contemplate --

13          MS. ELLS:  Your Honor, may I interrupt for a moment?

14  This is Lisa Ells.

15          THE COURT:  All right.

16          MS. ELLS:  On issue number six, which is the alleged

17  movement of the UM group from mental health to CCHCS in 2015

18  because of concerns of data manipulation, I think both parties

19  indicated that they can use more clarity on what those

20  allegations pertain to.  Defendant says they weren't sure.  We

21  don't have much insight either.  So I think if there is any

22  additional information to be had on that one, we would

23  appreciate -- I think it would benefit the workgroup

24  discussions.

25          THE COURT:  All right.  I'll see what I can find out.

1          Any objection to that, Mr. Hrvatin?

2              MR. HRVATIN:  No.  Defendants agree to take up the

3    issues in the workgroup process with the assistance of the

4    Special Master.

5              THE COURT:  All right.  And I'll see what I can find

6    out from the Neutral and if I find out more I'll -- I'll let

7    you know what I believe you need to know.

8          On additional witnesses, I am inclined to add Dr. Kuich,

9    Dr. Rekart, and Ms. Ponciano, and is it Ms. -- Dr. Chaiken --

10   Dr. Chaiken and Ms. Kirkman.  So those are the witnesses I

11   would consider adding to the list.  I'll finalize the list

12   based on what I hear from you in your objections or responses

13   to my order following this status.

14       I would note that list may also be expanded depending on my

15   ultimate conclusions based on my review of the privileged

16   materials.

17       A question, probably for Mr. Hrvatin, is Mr. Onishi the one

18   holdover from the prior gubernatorial administration?

19             MR. HRVATIN:  Yes, he is, Your Honor.

20             THE COURT:  So it may be that I would add Mr. Onishi

21   to the list for a -- for some very focused questioning.

22             MR. HRVATIN:  Your Honor, this is Adriano Hrvatin.

23   Thank you.

24       I think that as we set forth in our portion of the report

25   our -- our side has objections to plaintiffs identifying

 1   Mr. Onishi as a potential witness and we would certainly

 2   request a full opportunity -- if the Court is inclined to go

 3   that route, a full opportunity to brief and be heard on that

 4   matter.  Certainly with respect to the basis or foundation for

 5   any testimony from Mr. Onishi as well as any objections that we

 6   would assert in connection with any anticipated testimony, we

 7   would make a request that we have the opportunity to do that.

 8            THE COURT:  You would be provided that opportunity.

 9       It's not -- I wouldn't say it's so much responding to the

10   plaintiffs' request, it is the Court's continuing to think

11   about the big picture and what's -- what's really going on

12   here.  And so if Mr. Onishi were added to the list it would be

13   the Court's addition.  And again, with some very focused

14   questioning that I believe -- without having completed my

15   review of the privileged materials, I believe there are a few

16   focused questions that would not invade privilege that could

17   help clarify in a public proceeding what's gone on and what's

18   going on.  That's all.

19       All right.  So on the date, given this discussion, given

20   that I'm going to issue an order hopefully within the next few

21   days now, and giving you 14 days to object, what are your

22   thoughts about the Court's tentative proposal to go forward

23   with the status on the 13th with proposed agenda items from the

24   parties to be reviewed and approved by the Court, and those

25   agenda items would focus on the big picture, on staffing, on

1    beds, on cultural collaboration, for example, and then to give

2    the parties time to finish meet and confer and also obtain some

3    information from the Special Master, moving the evidentiary

4    proceedings to the week of October 15.  The 14th is a federal

5    holiday, but the week of the 15th.

6        And I should say, my understanding is there is a meeting

7    set for late August with the Special Master and party

8    representatives.  I gather it's a constructive, generalized

9    discussion.  I have asked the Special Master to share at that

10   meeting the steps he's taking to consider whether or not to add

11   someone to his team who can serve for as long as needed in a

12   data auditing function, for lack of a better phrase.  And so I

13   want the parties to know what the Special Master is thinking

14   there, the steps he's taking, his schedule.

15       I've encouraged him to be proactive in that regard to the

16   extent that's a piece of the puzzle and it might inform the

17   parties' ability to reach some -- some agreement on -- on what

18   makes sense in terms of the defendants certifying the accuracy

19   of their filings.

20       The defendants have a point that the right person needs to

21   certify.  On the other hand, the defendants need to accept

22   ultimately the buck stops with defendants.  In the long run,

23   the Court has to be persuaded the defendants accept that the

24   buck stops with the defendants and the defendants are accepting

25   full responsibility and someone at the top has confidence in

 1    the organization's ability to certify accuracy of filings.

 2        So I don't rule out the parties coming together on that

 3    question.  I do think the Special Master's efforts may -- may

 4    help tailor a proposal that satisfies the plaintiffs'

 5    legitimate concerns, the Court's legitimate concerns, and the

 6    defendants' fair point, as long as the defendants ultimately

 7    accept responsibility.

 8        So on the scheduling, your thoughts, Ms. Ells, on

 9    September 13th as a status, evidentiary proceedings as needed,

10    perhaps further narrowed, the week of October 15?

11            MS. ELLS:  Thank you, Your Honor.

12        We are fine with continuing to meet and confer on the

13    issues you've identified and that you plan to identify.  Having

14    a traditional status conference addressing some issues you've

15    raised on the 13th is fine.  We are anticipating resolving

16    these issues as quickly as possible so we would appreciate a

17    quick opportunity to know whether or not the Court anticipates

18    any further evidentiary proceedings.

19        The one caveat about the week of October 14th is that I

20    have a trial in the District of Arizona starting on the 24th of

21    October and --

22            THE COURT REPORTER:  I'm sorry --

23            THE COURT:  You're cutting out.  You need to repeat

24    after, "the 24th."

25            MS. ELLS:  Okay.  Yes.  I have a trial starting in

 1  the District of Arizona on October 24th and a pretrial

 2  conference in Arizona on the 18th.  I believe that it is

 3  possible for us to manage the trial during the week of the 15th

 4  so long as it does conclude within a couple of days.  But if it

 5  looks like it's going to be broader inquiry that might span

 6  more than a couple of days, we may need to request a

 7  continuance of the dates until, you know, for instance the

 8  first week in November.  But it is also possible that my trial

 9  in Arizona may get moved.  So I just wanted to alert the Court

10  of that potential issue.

11          THE COURT:  All right.  I believe based on what I

12  currently know that three days would be sufficient, and perhaps

13  more than sufficient, for the testimony the Court needs to

14  hear.

15      Mr. Hrvatin, on that schedule, particularly given your

16  discussions with Dr. Leidner?

17          MR. HRVATIN:  Your Honor, thank you.

18      I -- we -- I don't believe we have any objections to

19  proceeding with the status on September 13th.  I would like an

20  opportunity to confer with our witnesses, particularly some

21  that the Court has identified it would additionally intend to

22  call, so as to certainly deal with Dr. Leidner's transition

23  with his schedule but also others.  And if that is an issue

24  that the Court would be amenable to the parties addressing in

25  this further submission, we'd appreciate that opportunity.

1          THE COURT:  All right.  That's fine.

2      In terms of witnesses who may no longer be employed by

3  CDCR, can the Court assume they will appear, such as

4  Ms. Tebrock?

5      And are you -- you're able to address her then ability for

6  October 15th, Mr. Hrvatin?

7          MR. HRVATIN:  That would be one of the issues, Your

8  Honor, that we'd like a further opportunity to confer about.

9  You're right, Ms. Tebrock is no longer employed by the

10 Department and so we would like an opportunity to -- and there

11 is some further transition afoot, so in that regard, an

12 opportunity to touch base with the witnesses and advise on that

13 matter as well.  We'd like an opportunity to confer internally

14 and report back to the Court.

15         THE COURT:  All right.  If you can let me know if the

16 Court would need to issue special orders as well to the

17 extent --

18         MS. ELLS:  Your Honor --

19         THE COURT:  Ms. Ells?

20         MS. ELLS:  Pardon me, I did not mean to interrupt.

21 This is Ms. Ells.

22      The only caveat that I would say that I have not -- I don't

23 have insight into Dr. Golding's counsel's availability for

24 these dates and I would suggest that we loop her in to any

25 discussions on this front.

1          THE COURT:  All right.  I'll provide her with a

2     courtesy copy.  It will be served on her.  And the parties, of

3     course, can communicate with her directly.

4        Anything you need to say, I'm just -- just giving you the

5     opportunity, Dr. Toche?

6          DR. TOCHE:  No, I don't have anything to say, Your

7     Honor.  Thank you.

8          THE COURT:  All right.  Does anyone else on the phone

9     have anything to say before we adjourn?

10          MS. THORN:  Your Honor, this is Elise Thorn.

11        Defendants would like to understand the scope of proposed

12     questions for Dr. Amy Eargle.  The Court identified Dr. Eargle

13     as a witness in the June 14th order.  And we certainly have

14     taken the position that she -- we're confused as why she was

15     noted.  There is only one reference to Dr. Eargle in the Gibson

16     Dunn report and certainly we're just wondering if we could get

17     some clarification as to the scope of what the Court has in

18     mind for questions to Dr. Eargle.

19          THE COURT:  All right.  I'll consider that request.

20        Anything else?  Anyone else?

21          MR. HRVATIN:  Your Honor, this is Adriano Hrvatin.

22     And if I may follow up on the issue the Court addressed with

23     respect to potentially asking Mr. Onishi some focused

24     questions.

25        The defendants would ask if the Court would be amenable

 1  that in any order contemplated with respect to any testimony

 2  from Mr. Onishi that it identify either subject matter or

 3  specific questions that it would intend to address to

 4  Mr. Onishi so that, again, in the context of us being able to

 5  evaluate defendants' position, again, having given the Court

 6  some notice that there are various objections that we at least

 7  submitted to the plaintiffs' request, that we would be able to

 8  conduct a similar analysis before any questions and raise any

 9  issues with the Court in connection with that proceeding.

10          THE COURT:  All right.  I'll consider that request.

11      Anything else?

12          MS. TRAPANI:  Your Honor, this is Cara Trapani for

13  plaintiffs.

14      We would like to raise the question of having Melanie

15  Gonzalez appear at a future evidentiary hearing.  She has very

16  critical information regarding all seven issues and the Neutral

17  Expert found her credible and helpful in her report.

18      She was also one of the first to identify the business rule

19  change in December 2016 and we think that she would be a very

20  helpful witness to have at the hearing.

21      She was also part of the investigation of all of the

22  matters underlying the Golding Report and she did a lot of

23  those investigations personally and raised them with

24  Dr. Golding and we think she'd be a very important witness to

25  have.

1      THE COURT:  All right.  I've noted your prior request

2  but I'll -- I believe I understand your position on that.

3      Anyone else?

4      MR. HRVATIN:  Your Honor, this is Adriano Hrvatin

5  again.

6      By way of -- in anticipation of the evidentiary proceeding

7  that may happen in October or into November, depending on

8  scheduling, would the Court anticipate giving the parties an

9  opportunity to brief any type of evidentiary issue, let's say

10  through in limine proceedings, or invite trial briefs, or even

11  post-hearing proposed findings/conclusions of law?  Does the

12  Court intend to give the parties an opportunity to do that

13  leading up to the rescheduled conference?

14      THE COURT:  Well, to the extent you're requesting

15  that, you can clarify that in your filing in response to my

16  order issuing following this -- this status.

17      MR. HRVATIN:  Very good, Your Honor.  Thank you.

18      THE COURT:  I -- I know you know how to create your

19  record.  This is really the Court's proceeding, and obviously

20  the parties have a stake.  I just -- I repeat what I said

21  earlier that of course everything can be litigated to the hilt,

22  and every attorney who is a litigator knows how to be a

23  gladiator.  And so the Court is completely committed to a fully

24  fair process but I also am loathe to invite open-ended

25  litigation because there is a lot that can be nitpicked here

1    and we really all need to keep our eye on the ball while not

2    just sweeping under the rug the legitimate narrow concerns the

3    Golding and Gonzalez reports have exposed.

4        So I will review whatever you propose but I'd ask you to

5    bear in mind what really -- what really matters here; what

6    really matters in the long run for getting CDCR back fully in

7    the saddle and for really the -- the persons who are being

8    treated and to require constitutional levels of treatment and

9    have been waiting for a very long time.

10       So just I ask you to reflect deeply on that.  That is

11   really what this case is about and we all need to keep our eye

12   on the goal of satisfying the Constitution and getting those

13   folks the treatment they deserve.

14            MR. HRVATIN:  Your Honor --

15            THE COURT:  All right.  You'll have 14 days to

16   respond.

17       Is someone going to tell me they -- they're keeping their

18   eye on the ball?

19            MR. HRVATIN:  Your Honor, this the Adriano Hrvatin.

20       I wanted to acknowledge that defendants appreciate the

21   Court's direction and guidance and take very seriously its

22   obligations to provide constitutionally adequate care.

23   Defendants are committed to that process, Your Honor.

24       Thank you very much.

25            THE COURT:  All right.  All right.  Very good.

1   You'll see my order.  Thank you.

2           THE CLERK:  Court is in recess.

3               (Proceedings adjourned, 11:08 a.m.)

4                   ---oOo---

5   I certify that the foregoing is a correct transcript from the

6   record of proceedings in the above-entitled matter.

7

8                           /s/ Kimberly M. Bennett
                            KIMBERLY M. BENNETT
9                           CSR No. 8953, RPR, CRR, RMR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25