XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
ROBERT W. HENKELS, State Bar No. 255410
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                              Plaintiffs,<br><br>     v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                              Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF N. WEBER IN SUPPORT OF DEFENDANTS' NOTICE OF ERRATA OF ECF NOS. 5591, 5601, AND 5841**<br><br>Judge: The Hon. Kimberly J. Mueller |

I, Nicholas Weber, declare:

1.  I am an attorney with the Office of Legal Affairs for the California Department of Corrections and Rehabilitation (CDCR) and work on the *Coleman* class-action matter. I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify. I make this declaration in support of Defendants' Notice of Errata of ECF Nos. 5591, 5601, and 5841.

2.  When CDCR's "Timely Psychiatry Contacts" data from December 2016 through April 2017 was called into question in October 2018 by CDCR Chief Psychiatrist, Dr. Michael

[3419376.1]                                                                 1

Weber Decl. Supp. Defs.' Not. of Errata of ECF Nos. 5591, 5601, and 5841 (2:90-cv-00520 KJM-DB (PC))

Golding, I learned that the business rule applied to the indicator was changed from requiring contacts between Enhanced Outpatient Program patients and psychiatrists every 30 days to requiring contacts each calendar month, not to exceed 45 days. I requested that CDCR re-run the data presented in Exhibit 2 to the March 30, 2017 filing (ECF No. 5591-2) using the once every 30 days definition. Attached as Exhibit 1 is a true and correct copy of a table created using the once every 30 days definition.

    3.    Attached as Exhibit 2 is a true and correct copy of a revised draft of CDCR's May 17, 2018 staffing proposals with the reference to the "Appointments Seen as Scheduled" data stricken from the document.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Sacramento, California on October 1, 2019.

                                                **/s/ Nicholas Weber**
                                                NICHOLAS WEBER
                                                Attorney
                                                CDCR Office of Legal Affairs
                                                *(original signature retained by attorney)*

# Exhibit 1

Mental Health Staff Psychiatrist Staffing vs Compliance
2/23/2017

| SITES | Total Allocated January 2017 | Total Filled January 2017* | Precent Vacant January 2017** | Timely Psychiarty Contacts[1] (Access to Care Banner) 8/1/2016-1/31/2017*** | Psychiatrist Continuity of Care[2] (Quality of Care Banner) 8/1/2016-1/31/2017*** | MAPIP[3] (QM Dashboard-Pop Health Management) 8/1/2016-1/31/2017*** | MH Mission |
|---|---|---|---|---|---|---|---|
| ASP | 5.0 | 3.6 | 71% | 100% | N/A | 100% | CCCMS |
| CCI | 7.0 | 4.5 | 65% | 83% | N/A | 93% | CCCMS |
| CCWF | 12.0 | 7.5 | 63% | 96% | 99% | 92% | FEMALE |
| CHCF | 24.0 | 17.4 | 73% | 55% | 88% | 92% | MHCB/EOP/CCCMS |
| CIM | 12.0 | 10.5 | 88% | 98% | N/A | 95% | RC/CCCMS |
| CIW | 9.0 | 8.4 | 93% | 97% | 75% | 98% | FEMALE |
| CMC | 19.3 | 15.5 | 80% | 91% | 97% | 98% | MHCB/EOP/CCCMS |
| CMF | 17.0 | 13.7 | 81% | 96% | 89% | 97% | MHCB/EOP/CCCMS |
| COR | 14.5 | 9.6 | 66% | 74% | 58% | 98% | MHCB/EOP/CCCMS |
| CRC | 6.0 | 5.5 | 92% | 91% | N/A | 99% | CCCMS |
| CTF | 7.0 | 4.3 | 61% | 88% | N/A | 95% | CCCMS |
| DVI | 4.5 | 5.1 | 113% | 100% | N/A | 99% | RC/CCCMS |
| FSP | 3.0 | 3.4 | 112% | 97% | N/A | 96% | CCCMS |
| HDSP | 6.0 | 4.0 | 67% | 99% | N/A | 94% | CCCMS |
| KVSP | 9.0 | 4.2 | 47% | 88% | 59% | 95% | EOP/CCCMS |
| LAC | 13.0 | 8.6 | 66% | 87% | 55% | 89% | EOP/CCCMS |
| MCSP | 17.0 | 14.7 | 86% | 78% | 84% | 90% | EOP/CCCMS |
| NKSP | 11.0 | 7.0 | 64% | 98% | N/A | 93% | RC/CCCMS |
| PBSP | 4.0 | 3.0 | 76% | 91% | N/A | 92% | CCCMS |
| PVSP | 5.0 | 4.0 | 81% | 99% | N/A | 100% | CCCMS |
| RJD | 16.0 | 12.2 | 76% | 77% | 73% | 96% | EOP/CCCMS |
| SAC | 22.0 | 11.7 | 53% | 52% | 81% | 89% | MHCB/EOP/CCCMS |
| SATF | 17.0 | 9.0 | 53% | 93% | 93% | 96% | MHCB/EOP/CCCMS |
| SCC | 3.0 | 3.0 | 100% | 99% | N/A | 96% | CCCMS |
| SOL | 7.5 | 4.0 | 53% | 80% | N/A | 92% | CCCMS |
| SQ | 9.0 | 13.3 | 148% | 99% | 98% | 96% | RC/CCCMS |
| SVSP | 13.0 | 5.8 | 45% | 68% | 90% | 90% | EOP/CCCMS |
| VSP | 11.0 | 7.0 | 63% | 75% | 81% | 99% | EOP/CCCMS |
| WSP | 10.0 | 7.1 | 71% | 98% | N/A | 78% | RC/CCCMS |

**Footnote**

[1] Percentage of patient-weeks during which patients were up-to-date on their required psychiatry contacts.

[2] Percentage of psychiatrist contacts seen by the most frequent provider.
All psychiatry contacts seen in person during the 5 months before the start of the reporting period through the end of the reporting period (6 months total) for any patient who has been EOP in the same housing program at the same institution, without interruption, for the past six months.

[3] Percentages in this column represent the average compliance for MAPIP Measures 1A-1G. These percentages do not capture MAPIP Measure 1A-1G that are baseline, 3 months or triggered by medication dose changes.

* Includes registry

** Percentage compliance < 90% highlighted in red

*** Percentage compliance > 90% highlighted in green

# Exhibit 2

**PROPOSALS TO ACHIEVE A MORE EFFICIENT AND EFFECTIVE MENTAL HEALTH SERVICES DELIVERY SYSTEM WITH ADJUSTMENTS TO UNNEEDED PSYCHIATRY POSITIONS**

On October 10, 2017, the Court ordered the California Department of Corrections and Rehabilitation (CDCR) to come into compliance with the staffing ratios set forth in the 2009 Staffing Model by October 10, 2018, with no more than a 10 percent vacancy rate. 10/10/2017 Staffing Order, ECF No. 5711 at 30. In response to this order, CDCR hired John Allen and Associates as consultants to review the Department's current staffing plan and recommend options for bringing the Department into compliance with the court-ordered vacancy rate.

On February 15, 2018, the Court asked the parties to consider whether there are "any adjustments to the psychiatry staffing ratios that could be made to alleviate the psychiatrists staffing shortages without compromising the constitutionally required access to adequate mental health care." 2/15/2018 Order, ECF No. 5786 at 4. In April 2018, the staffing consultants provided CDCR their initial recommendations. These recommendations were also shared with Plaintiffs and the Special Master.

Plaintiffs and the Special Master have asked CDCR to identify the recommendations that CDCR agrees should be adopted and plan to pursue. In accordance with the Court's February 15, 2018 order, and after carefully reviewing the consultants' recommendations as well as Plaintiffs' response to these recommendations, CDCR has developed a set of staffing-related proposals to achieve a more efficient and effective Mental Health Service Delivery System (MHSDS). As described below, some of the proposals are drawn directly from the consultants' initial recommendations; others reflect modified versions of the recommendations; and still others arise from CDCR's own independent efforts to resolve issues identified by the consultants. If implemented, these proposals will bring Defendants into compliance with the court's October 10, 2017, and June 13, 2002, orders. Defendants look forward to discussing these proposals in the workgroups between the parties.

  **I. Recommendations from the John Allen and Associates Staffing Report**

The staffing consultants provided recommendations in five areas that CDCR agrees should be addressed: 1) "right- sizing" and maintaining the appropriate Enhanced Outpatient Program (EOP) population; 2) improving EHRS functionality to align with MHSDS processes; 3) expanding the use of telepsychiatry; 4) changing the staffing allocations at desert institutions; and 5) moving away from a "one size fits all" approach to treatment. Staffing Consultants' Report at 40. The consultants also recommended improving job satisfaction by remedying burdensome on-call responsibilities for psychiatrists. *Id*. at 17-18. CDCR agrees that adjustments could be made in each of these areas that would improve the system and resolve some of the outstanding staffing issues.

    A. Review the EOP Population

The parties have long recognized that ensuring inmates are appropriately placed in the correct level of care is a cornerstone of providing adequate care and resolving staffing challenges. The staffing consultants' report also stressed the importance of "right-sizing" and maintaining an appropriate EOP population. Staffing Consultants' Report at 40, 42-43. Although based primarily on anecdotal information, the consultants' recommendation reinforces the necessity of this review and the importance of ensuring that the right inmate is in the right level of care so that staff can be properly allocated to each level of care. In July 2017, after months of discussion and negotiation with the Special

Master's team and Plaintiffs' counsel, CDCR initiated a review of the EOP population at Mule Creek State Prison. A review of the remaining EOP institutions began in January 2018, with the last institutional review beginning in January 2019. Data for the entire population is expected to be gathered by April 2019.

CDCR remains committed to continuing its EOP review process, as was previously agreed to with the Special Master and Plaintiffs' counsel.[1]

      B.   Improve the Electronic Healthcare Records System (EHRS)

The consultants' report identified improvements to EHRS as critical for increasing efficiency in the MHSDS. Staffing Consultants' Report at 40. In their May 9, 2018 Comments on Defendants' Staffing Experts Report, Plaintiffs agreed that the functionality of EHRS must be improved. Since the implementation of EHRS, CDCR has worked to improve the program so it is more user-friendly and works in tandem with the daily practices of mental health providers. However, CDCR acknowledges the consultants' point that more work needs to be done to support psychiatrists and to better align the logic and workflow of EHRS with the practices of CDCR's mental health system. *Id.* at 26.

CDCR is considering changes to three major areas of EHRS functions, that if improved could positively impact the work environment for psychiatry. These functions include: 1) Documentation; 2) Workflows; and 3) Scheduling. One example of how CDCR proposes to change EHRS is to improve automatic medication reconciliation, which is currently in progress. These improvements will decrease duplicative work and make the system more user-friendly for psychiatrists. CDCR is unable to give specific completion dates for some EHRS improvements as they require external CERNER resources. By improving psychiatrists' work environment and efficiency, psychiatrists should have more time to spend with their patients.

In the comments on Defendants' Staffing Experts Report, Plaintiffs stated that improving functionality of EHRS should be a priority and CDCR agrees. Mental Health is currently in discussion with it partners in the California Correctional Health Care Services (CCHCS) regarding the prioritization of the requested EHRS improvements. Both entities understand the importance of the requested EHRS improvements to psychiatry and the MHSDS as a whole.

      C.   Expand Telepsychiatry

CDCR has used telepsychiatry to treat patients since 1999. In its January 2017 staffing plan, CDCR indicated its intention to expand the use of telepsychiatry by opening additional telepsychiatry offices across the state and increasing the telepsychiatry team to at least 100 positions. The current space plan estimates office space for 105 telepsychiatrists by the end of 2018.

---

[1] During the All Parties Workgroup on Monday, May 14, 2018, the Special Master directed that Plaintiffs shall be allowed to attend four of the remaining EOP reviews. Plaintiffs have chosen to attend the IDTT portion of the EOP reviews at Central California Women's Facility, Salinas Valley State Prison, California State Prison, Corcoran, and California State Prison, Los Angeles County.

One of the consultants' main recommendations is to shift toward providing all outpatient psychiatry care though telehealth.[2] CDCR does not plan to adopt this recommendation in full. Instead, CDCR intends to continue to expand its use of telepsychiatry as appropriate and consistent with the telepsychiatry policy it is continuing to craft with the Special Master's team and Plaintiffs' counsel.[3] A number of CDCR's proposals to achieve a more efficient system depend on the expanded use of telepsychiatry.

> D. Reduce the Psychiatrist Allocation for Desert Institutions in Line with the Limited Workload for the Small Population Temporarily Housed There

CDCR's five desert institutions[4] do not consistently house inmates in the MHSDS and only provide interim mental health programming. These institutions are staffed only to provide necessary mental health care until the inmate can be transferred to an institution that treats MHSDS patients.[5] The Program Guide provides strict transfer timeframes to move MHSDS patients out of the desert institutions. *See* Program Guide at 12-1-16.

The 2009 Staffing Model allocates 0.5 psychiatrists to each of the desert institutions. 2009 Staffing Model at 20. However, the total number of psychiatry contacts for all five desert institutions, including urgent, emergent, and routine contacts, was only 403 over a six month period, meaning an average of 16.8 contacts *per week*. Attachment A- Desert Psychiatry Contacts. Therefore, the workload, which takes into account the average contacts and contact duration for all five desert institutions, could easily be accomplished by half of a psychiatrist allocation.

The staffing consultants' report, noting the inefficient allocation of psychiatrist positions to desert institutions, recommended that CDCR decrease the transfer timeline for CCCMS and EOP inmates out of desert institutions to seven days. Staffing Consultants' Report at 41-42. CDCR has determined that this transfer timeline is not feasible. At the same time, given the minimal workload associated with the small population for which care is provided, CDCR agrees that the psychiatry staffing allocation at the desert institutions should be reduced by using telepsychiatry to provide all required psychiatry care until a patient is transferred to a different institution.

---

[2] Defined as care for the CCCMS and EOP levels of care.

[3] Although the parties and the Special Master's Team are close to reaching an agreement on the telepsychiatry policy, a few important outstanding issues remain. During the workgroup call on Monday, May 14, 2018, the Special Master requested that Plaintiffs memorialize their agreements and concerns with the current version of the telepsychiatry policy in a letter by Monday, May 21, 2018. CDCR will then respond by Friday, May 25, 2018.

[4] California Conservation Center, Calipatria State Prison, Centinela State Prison, Chuckawalla Valley State Prison, and Ironwood State Prison.

[5] CDCR is meeting the needs of class members in the desert institutions. Over the past twelve months, each institution has been 100% compliant with timely psychiatry contacts and timely treatment team meetings. The institutions are 92% to 99% compliant with timely mental health referrals. *See* Attachment B- Desert Timely Psych Contacts and Referrals.

3

CDCR's proposal is two-fold: 1) reduce the psychiatry allocation for all desert institutions to 0.5; and 2) utilize telepsychiatry to allow access to all five desert institutions.

This proposal would result in a reduction of 2.0 psychiatry positions.

> E. Apply the Psychiatrist Staffing Ratio for the CCCMS General Population Only to the Percent of the Population Who are Prescribed Psychotropic Medication

The 2009 Staffing Model establishes a psychiatry staffing ratio for CCCMS patients in the General Population (GP) who are receiving psychiatric medication. This ratio is based on the Program Guide requirement that "[e]ach CCCMS inmate-patient on psychiatric medication" "be reevaluated by a psychiatrist a minimum of every 90 days." Program Guide at 12-3-11.

However, as the consultants pointed out, this staffing ratio is being incorrectly applied. *See* Staffing Consultants' Report at 45. While the staffing ratio should only be applied to CCCMS patients "on psychiatric medication," the ratio is in fact being applied to the entire CCCMS population, including thousands of CCCMS patients who are not prescribed any psychiatric medication and who are not seeing a psychiatrist. As a result, numerous psychiatry positions within the CCCMS program are currently allocated to provide psychiatry appointments once every 90 days to thousands of CCCMS inmates who are not receiving psychotropic medication and are not actually seeing a psychiatrist on a routine basis. These positions are not required under either the Program Guide or the 2009 Staffing Model. Nor are they required prophylactically in the event that the need for medication arises; CDCR already has systems in place to refer patients to psychiatrists should the need for medications arise and a separate psychiatry staffing allocation for urgent or emergent referrals. Plaintiffs would seem to agree. In their May 9, 2018 Comments on Defendants' Staffing Experts Report, they emphasized that "the Program Guide requires only those CCCMS patients on [psychiatric] medications to be seen every 90 days by a psychiatrist," and that "the notion that non-medicated CCCMS patients have the same minimum care requirements as CCCMS patients on psychotropic medication is wrong." CDCR intends to correct this error.

In addition to not requiring routine psychiatry contacts for those CCCMS inmates who are not on medication, psychiatrists should not be assigned to patients who are not currently prescribed psychotropic medication. Currently, CDCR assigns a psychiatrist to every inmate in the MHSDS, regardless of whether that inmate is on medication. The only workload for psychiatrists assigned to CCCMS inmates who are not on medication is to attend annual IDTTs, even though they are not required to see these inmates for routine contacts.

As noted above, this practice is at odds with the Program Guide requirement that only CCCMS inmates on medication be seen by a psychiatrist. And it is unnecessary, because the psychiatrist is not treating the patient and therefore would have nothing to contribute to the IDTT. Given the limited number of psychiatrists and the difficulty in hiring this scarce position, it is appropriate to limit assignment of psychiatrists only to those individuals who require their services.

CDCR therefore proposes two changes: (1) apply the 2009 psychiatry staffing ratio to CCCMS patients who are receiving psychiatric medication, and eliminating the staffing allocation for routine psychiatry contacts of CCCMS patients who are not on psychotropic medication; and (2) end the practice of assigning psychiatrists to patients at annual IDTTs where the CCCMS patient is not on medication and does not require psychiatry services.

Given that approximately 30 percent[6] of the current CCCMS population has not been on psychotropic medication for 3 months or more and thus is not seeing a psychiatrist, the CCCMS GP staffing allocation should be reduced by approximately 38 positions to accurately account for the actual workload.  *See* Attachment C- CCCMS Patients Not on Psychiatric Medication.  The future allocations for the percent of the CCCMS population on medication would be based on population (consistent with the current practice), and will be reassessed every six months.  This change is not an alteration of the staffing ratio laid out in the 2009 Staffing Model; rather, it represents correctly applying the staffing ratio to the CCCMS population that is in need of routine psychiatry services.

> F.  Eliminate Weekend and Holiday Crisis Intervention Psychiatrist Allocations Positions, Yet Retain Eight Positions for On-Call Coverage

A persistent complaint heard by the staffing consultants during their visits to the institutions was the difficulty of working on-call.  The staffing consultants' report indicated that the on-call responsibilities of on-site psychiatrists were a "major source of frustration, job dissatisfaction, and concern."  Staffing Consultants' Report at 17.

One of the major complaints was the frequency of phone contacts on-call psychiatrists received per night, the difficulty of using EHRS remotely to complete medication orders, and the dissatisfaction that telepsychiatrists and registry psychiatrist do not to take call.[7]  Plaintiffs noted their concern regarding the dissatisfaction by on-site psychiatrists that their registry and telepsychiatry counterparts and recommended CDCR should consider increasing on-call compensation and requiring all psychiatrists to take call.  Plaintiffs' May 9, 2018, letter at 2.  It bears mention that the staffing consultants' report came from a limited number of institutions and does not reflect the experience at other institutions.  For example, there are institutions at which telepsychiatrists and registry psychiatrists take call.[8]  But CDCR agrees that improving the on-call experience is important.

---

[6] Defendants are mindful that this is a higher proportion than that which was disclosed to Plaintiffs in 2016 during the discussion on the CCCMS review process.  *See* Plaintiffs' May 9, 2018, letter at page 35.  The data reflected in the staffing consultants' report is accurate and the data used for the CCCMS review was undercounting the true number of CCCMS not on medication.  The CCCMS review data pulled in the past only reflected CCCMS patients who had once been on psychiatric medication but were now off medication for at least six months.  That data collection did not account for the population of patients who had never been on psychiatric medication and had been in the CCCMS program for at least six months.  The data provided to the staffing consultants reflects all patients not on medication for at least six months.  The CCCMS review process has been adjusted to also review those patients who have never been on medication.

[7] Please note that under current policy, on-call psychiatrists are not required to access EHRS while on-call.

[8] Currently, there are five telepsychiatrists who volunteer to take call on nights and/or weekends at the following institutions: Pelican Bay State Prison, California State Prison, Solano, California State Prison, Corcoran, Chukawalla

5

CDCR proposes instead to expand the pilot program it began in November 2017 to provide nighttime telepsychiatry coverage for six institutions three days per week.  In their May 9, 2018, letter, Plaintiffs expressed an interest in learning more about this program.  Plaintiffs' May 9, 2018, letter at page 2.  Thus far, the program has been very successful.  A local psychiatrist is still required to be on-call, in case an in-person examination of a patient is required overnight, which rarely occurs.  Nighttime telepsychiatry will cover virtually all nighttime consultations, and the resulting workload for the local on-call psychiatrist is reduced to nearly zero.  This program also addresses the concerns raised by staff regarding the difficulty of remotely accessing EHRS, as the nighttime telepsychiatrists work in a telepsychiatry hub that is hard-wired into CDCR's network and has ready access to electronic records.  The staffing consultants noted this pilot program in their report and believed "consideration should be given to expansion and formalization" of the program.

If CDCR were to expand this program to provide night shift telepsychiatry coverage to all institutions, seven days per week, it would likely require an allocation of eight positions.  By eliminating the psychiatry allocations for crisis intervention, described in section II.A.(2) below, and using 8 of those positions to hire nighttime telepsychiatrists to cover on-call requirements system-wide, these changes would result in a net reduction of 9.6 psychiatry positions.

## II. CDCR's Proposals for Adjustments to the 2009 Staffing Model and to Further Promote Efficiency and Job Satisfaction

CDCR is dedicated to maintaining the psychiatry staff required to provide constitutionally adequate mental health care to patients in its custody.  CDCR undertook an assessment of how it provides psychiatry services to patients today and compared that with the assumptions underlying the 2009 Staffing Model.  As a result of this assessment, CDCR proposes removing positions that are not providing patient care and eliminating excessive staffing allocations based on limited workload.  Additionally, CDCR proposes several operational adjustments to improve system efficiency, thereby improving the work environment for psychiatrists and enabling them to serve more patients without negatively impacting patient care.

### A. Additional Proposals for Adjustments to the 2009 Staffing Model

After review of the system, the staffing consultants determined that 157 psychiatrists should be more than adequate to provide care to the CCCMS and EOP populations in the MHSDS.  *See* Staffing Consultants' Report at 46.  CDCR's proposal does not recommend eliminating positions based on the consultants' specific methodology.  Instead, CDCR looked at whether all of the current psychiatry allocations as mandated by the 2009 Staffing Model were necessary to meet the Program Guide requirements and provide patient care.

---

Valley State Prison, Ironwood State Prison, and High Desert State Prison.  There are also a number of registry psychiatrists who take call at various institutions.

The following proposals are meant to answer the questions posed in the court's February 15, 2018, order: "[A]re there any adjustments to the psychiatry staffing ratios that could be made to alleviate the psychiatrists staffing shortages without compromising the constitutionally required access to adequate mental health care?" ECF No. 5786 at 4.

In carefully considering whether "any adjustments to the psychiatry staffing ratios" "could be made to alleviate the psychiatrists staffing shortages," ECF No. 5786 at 4, CDCR has concluded that certain premises on which the 2009 Staffing Model ratios were based have changed or no longer hold true. Numerous psychiatry positions are allocated pursuant to the staffing ratios, but not used for direct patient care. Other psychiatry positions are allocated to meet a hypothetical workload far in excess of what is required by the Program Guide itself. These unnecessarily allocated positions can be eliminated without any impact on current operations or delivery of care. In short, the following proposals can be immediately implemented, while maintaining high rates of psychiatry contacts, IDTT participation, and medication management:

      1. Modify the Psychiatry Allocation at Reception Centers for Intake and Screening So That It Is Adjusted Biannually Based on Intake Population

The 2009 Staffing Model includes positions to conduct the mental health screenings required for every new commitment and parole violator. The staffing model established 13.5 positions, based specifically on the assumption of an intake of 23.56 inmates per day and a ratio of one psychiatrist per every 33 inmates received in a reception center (RC). *See* 2009 Staffing Model, page 9 and Exhibit 12. This model was based on RC intake data from 2009, but the psychiatry allocations have not been adjusted in the budget process since that time. Nor has this allocation of 13.5 positions been adjusted in response to population changes.

This means that the number of positions allocated to treat that population has remained the same, even as the number of incoming inmates has decreased dramatically over the last ten years, due in part to Assembly Bill 109 (Public Safety Realignment). *See* Attachment D- RC Commitments Extracted from CDCR Fall 2017 Population Projections. In the 2008 to 2009 fiscal year, there were 63,375 court commitments to CDCR's custody. *Id*. Since that time, the number of commitments per year has been cut by almost half. In the last full fiscal year, there were just 36,545 total court commitments to CDCR. *Id*. As a result of this drastic reduction, the current psychiatry allocation for RC intake is well above what is required for that population, and—like other psychiatry allocations—should be adjusted in accordance with population changes.

CDCR proposes to adjust the currently fixed psychiatrist allocation for RC intake and screening to reflect the current incoming population. This would result in a reduction of approximately 6.5 psychiatry positions statewide at this time. To be clear, the proposed adjustment does *not* change the underlying staffing ratio in any way. Rather, it "unfreezes" the allocation of 13.5 positions dating from 2009 so that that number can be adjusted biannually in concert with the current RC intake population. Adjusting staffing allocation in response to population changes is consistent with the approach of the 2009 Staffing Model.

7

2. Remove Psychiatry Positions Allocated to Crisis Intervention Teams on Weekends and Holidays

The 2009 Staffing Model includes psychiatry positions at every institution to provide crisis intervention on weekends and holidays. Specifically, the 2009 Staffing Model allocated 0.52 psychiatrist positions at every institution to work weekends and holidays for crisis intervention. This allocation was based on three premises: 1) adding these positions would allow for quicker interventions on weekends and holidays; 2) additional coverage would reduce costly overtime; and 3) institutions with assigned psychiatrists on evenings and weekends have fewer Mental Health Crisis Bed (MHCB) admissions. 2009 Staffing Model at 21.

The 0.52 psychiatrist allocation at each institution is no longer supported by these premises in light of CDCR's current model for crisis intervention teams (CITs) and nightly on-call psychiatry. The implementation of CITs has allowed for quicker interventions and has reduced MHCB referrals and admissions. *See* Attachment E- CIT Data. CITs provide conflict resolution skills, educate inmates regarding custody processes, and sometimes move inmates to a different cell. These types of interventions are best handled by psychologists, nurses, and custody staff. And since very few interventions require medication management, psychiatrists add little to no value to the crisis intervention process.[9]

In the very few cases on a weekend or holiday where a crisis requires the intervention of a psychiatrist specifically, an on-call psychiatrist is contacted. Thus, elimination of this psychiatry crisis intervention staffing allocation from each institution will have no impact on patient care or current practices.

If accepted, this proposal would result in a reduction of 0.52 positions at all 34 institutions, or approximately 17.6 psychiatry positions statewide. This is not an adjustment to the staffing ratios, but a removal of an unnecessary psychiatry allocation. But rather than completely eliminate all of the positions, CDCR recommends allocating some positions for nighttime on-call psychiatry coverage via telepsychiatry. *See* Part I.F, *supra*.

3. Adjust the CCCMS Staffing Ratio to Acknowledge the Program Guide Requirement of One Routine Psychiatry Contact Every 90 Days

The 2009 Staffing Model workload assumption for routine psychiatry contacts overstated the Program Guide requirement. The Program Guide requires that a patient on medication be seen every 90 days and CDCR is meeting this requirement. *See* Program Guide at 12-3-11 and *see* Attachment F- RC and GP Timely Psychiatry Contacts (showing the state average for timely psychiatry contacts for CCCMS inmates is at 94%.). In contrast, the 2009 Staffing Model assumes that each patient will be seen by a psychiatrist for routine contacts an average of 1.5 times every 90 days. 2009 Staffing Model, Exhibit 10. CDCR recognizes that one contact per every 90 days is a minimum and psychiatrists can see patients more

---

[9] In the summer of 2017, the parties discussed the composition and roll-out of CITs. Defendants informed Plaintiffs that the CITs are comprised of psychologists, nurses, and custody staff, and the parties agreed to Defendants' CIT model and committed to exploring further expansion of the program. *See* ECF 5669, Joint Report re: September 28, 2017, Evidentiary Hearing re: Timely MHCB Access.

8

frequently, if necessary. Current data shows that psychiatrists are going above the minimum required contacts and seeing patients more often as needed; however, even with the additional contacts, CCCMS patients receive an average of 1.07 psychiatry contacts per every 90 days. Attachment G- CCCMS ML Psychiatry Contacts. This is much lower than the 1.5 assumption in the 2009 Staffing Model. CDCR proposes a revision to the ratio of routine contact frequency to once every 90 days, instead of 1.5 contacts every 90 days.

The 2009 Staffing Model separately allocates staffing for urgent or emergent psychiatry referrals in between routine contacts. CDCR would leave intact this assumption of additional time for urgent and emergent contacts.

Although this proposal would reduce the psychiatry allocations to correspond with the Program Guide requirements of one routine psychiatry contact every 90 days, such a reduction would not interfere with CDCR's commitment to providing more than the minimum treatment required by the Program Guide to CCCMS inmates who require more individualized treatment. As mentioned in previous discussions, CDCR intends to create more support for CCCMS inmates who may require it as after, for example, transferring to a new institution or transitioning from EOP. This includes providing more group treatment and contacts with the inmate's primary clinician. That said, psychiatry has no role in the anticipated new groups and additional contacts. The additional groups, provision of coping skills, and whatever other therapy the individual inmate may require will be provided by psychologists, social workers, and recreational therapists, not psychiatrists. Therefore, the proposed reduction of the additional psychiatry positions would not affect an inmate's need for individualized care in CCCMS.

This proposal would result in a reduction of approximately 17 psychiatry positions, thus changing the 1:280 staffing ratio established in the 2009 Staffing Model to 1:338, with relief, if adopted.

> 4. Adjust the EOP Staffing Ratio to Acknowledge the Program Guide Requirement of One Routine Psychiatry Contact Every 30 Days

The 2009 Staffing Model workload assumption applied to CCCMS routine contacts, as described above, was also applied to EOP routine contacts. 2009 Staffing Model, Exhibit 10. Thus, while the Program Guide requires an EOP participant to be seen once every 30 days, the 2009 Staffing Model assumes that each patient will be seen an average of 1.5 times every 30 days for routine contacts. *Id*.

CDCR proposes a revision to the ratio based on the Program Guide requirement for routine psychiatry contacts once every 30 days. Currently, EOP inmates are being seen for routine contacts 0.94 times every 30 days. Attachment H- EOP ML Psychiatry Contacts. The 1.5 assumption is inaccurate because it is out of line with the Program Guide requirements. Further, the 2009 staffing model separately allocates staffing positions for urgent or emergent psychiatry referrals in between routine contacts, which are left intact. 2009 Staffing Model, Exhibit 10. As explained above, the reduction of psychiatrists would not affect CDCR's ability to provide additional individualized group treatment, recreational therapy, or individual therapy, as these services are provided by classifications other than psychiatrists.

9

This proposal would result in a reduction of 24 psychiatry positions, thus changing the staffing ratio from 1:120 to 1:145, with relief, if adopted.

      B.      Proposals to Increase Efficiency and Job Satisfaction

In addition to the proposals above, CDCR intends to implement two additional proposals: 1) standardize the scheduling model; and 2) implement a clinic model for psychiatry contacts.  CDCR believes, if implemented, these proposals would improve the efficiency of the system by allowing psychiatrists to focus more on seeing patients.  These changes could also lead to higher job satisfaction, which CDCR anticipates will help in the recruitment and retention of psychiatry staff.  While CDCR intends to begin implementation of these proposals immediately, full implementation will take time and the benefits to the system reaped from these proposals may not be immediately evident.

      1.    Standardize the Scheduling Model

The current practices for scheduling psychiatry appointments are complicated and inefficient and are the source of many complaints from the field.  Complaints include lack of guidance on appropriate appointment scheduling timeslots, constantly shifting schedules driven by the Program Guide requirements, and inefficient IDTT scheduling.   These issues are a source of frustration and stress for psychiatry staff.

To remedy these issues, CDCR proposes moving to a standardized scheduling model.  A standardized scheduling model will address the above concerns and will create consistency for psychiatrist not only day-to-day, but institution to institution.  CDCR intends to direct the field to schedule appointments of appropriate duration and monitor the scheduling of routine contacts to avoid a last minute rush of appointments, and schedule IDTTs based on the schedule of the treatment team.  In addition to providing instructions to the field with directions and best practices to standardize scheduling across the MHSDS, CDCR will involve the regional staff, Chiefs of Mental Health, and supervisors at the institutions to ensure these directions and best practices are being implemented.  Should any institution struggle in implementing the standardized scheduling model, training and individualized attention will be provided.

The implementation of a standardized scheduling model will create a better work environment for psychiatrists by allowing more certainty in day-to-day scheduling, reducing the last minute schedule changes which can increase stress, and decreasing their time spent unnecessarily in IDTT.  Moving to a standardized scheduling model is also necessary in order to transition to an efficient clinic model, as discussed below.  These changes wrought by implementation of the standardized scheduling model will likewise help address some of the scheduling concerns raised regarding EHRS improvements above.

      2.    Implement a Clinic Model for Psychiatry Contacts

One of the most effective ways to improve job satisfaction and increase psychiatry efficiency would be to implement a clinic model for psychiatry contacts.  This model requires inmates come to, or be brought to, the psychiatrist, as opposed to psychiatrists traveling between housing units and facilities to

see patients. This is inefficient. The clinic model is how most medical facilities in the community are organized.

Ideally, this model would have adequate space for mental health providers, a staging area for patients waiting either before or after seeing their provider, and multiple treatment rooms to allow for providers to move from patient to patient, instead of waiting for the patient to enter and exit the treatment room. To ensure the clinic model is as efficient as possible, a strategy must be implemented to address patients who refuse to attend their appointments that will allow the psychiatrist to stay in the clinic.

CDCR will develop a plan to complete a review of all EOP facilities by the end of 2018. Once the review of the facilities is completed, clinics will be created at the locations that have the appropriate infrastructure.