1

2                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
3

4      Ralph Coleman, et al.,
                Plaintiffs,
5
       vs.                              Sacramento, California
6                                       No. 2:90-cv-00520
       Gavin Newsom, et al.,            Fri., Sept. 13, 2019
7            Defendants.                10:09 a.m.
       _____/
8
                          TRANSCRIPT OF HEARING
9        BEFORE THE HONORABLE KIMBERLY J. MUELLER, DISTRICT JUDGE
                            ---oOo---
10
     APPEARANCES:
11
       For the Plaintiffs:              Rosen, Bien, Galvan and
12                                      Grunfeld, LLP
                                        50 Fremont Street, 19th Floor
13                                      San Francisco, CA  94105
                                        By:  Lisa Adrienne Ells
14                                      Michael Bien
                                        Marc J. Shinn-Krantz
15                                      Attorneys at Law

16     For the Defendants:             Office of the Attorney
                                        General
17                                      455 Golden Gate Ave.
                                        Suite 11000
18                                      San Francisco, CA  94102
                                        By:  Adriano Hrvatin
19                                      Tyler Heath
                                        Kyle Anthony Lewis
20                                      Deputies Attorney General

21    (Appearances continued on following page)

22     Official Court Reporter:        Kimberly M. Bennett,
                                        CSR, RPR, RMR, CRR
23                                      501 I Street
                                        Sacramento, CA 95814
24
       Proceedings recorded by mechanical stenography, transcript
25     produced by computer-aided transcription

1
                            APPEARANCES CONTINUED
2
        For the Defendants:          Office of the Attorney
3                                     General
                                      1300 I Street
4                                     Sacramento, CA  94244
                                      By:  Elise Owens Thorn
5                                     Deputies Attorney General

6       Special Counsel for the      Glenn Danas
        Defendants:                  Roman Silberfeld
7

8       Special Master:              Matty Lopes, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Call to order of the court, 10:09 a.m.)

2              THE CLERK:  Calling civil case 90-520.  Coleman, et

3    al. versus Newsom, et al.  This is on for a second quarterly

4    status conference.

5              THE COURT:  All right.  Good morning.  Appearances,

6    please, for plaintiffs.

7              MR. BIEN:  Good morning, Your Honor.  Michael Bien,

8    Lisa Ells, and Marc Shinn-Krantz for plaintiff class.

9              THE COURT:  All right.  Good morning to you all.

10             MR. LEWIS:  Good morning, Your Honor.  Kyle Lewis

11   with Adriano Hrvatin, Elise Thorn and Tyler Heath from the

12   Attorney General's office for defendants.

13        Also invite co-counsel to make appearance.

14             MR. SILBERFELD:  Good morning, Your Honor.  Roman

15   Silberfeld, special counsel for the defendant.

16             MR. DANAS:  Glenn Danas from Robins Kaplan, special

17   counsel for defendant.

18             THE COURT:  Good morning to you all.

19        Just so you know, the Court's law clerk, Ms. Gracey, is

20   just listening on the phone.

21        And the Special Master is present.

22        Let's walk through the agenda for today.  We aren't talking

23   about October 15th.  I have been in trial but I hope to issue

24   my order clarifying the agenda for October 15th later today

25   now.  There might be some overlap on issues we discuss, but

1  really we're not talking about that hearing today.  If we need

2  another status prior to that hearing we can set that

3  separately.  This really is meant to ensure forward momentum on

4  the key issues in this case that are relevant to the case

5  reaching a termination, if that's at all possible.

6      So let's talk about first the desert institutions.

7      And I just want to acknowledge the stipulated agreement

8  that's now been filed.  And I give you all kudos.  I think

9  that's a significant development.  I have yet to review the

10  stipulation but I'll do that in the next several days.  And I

11  don't imagine that takes the institutions off the table

12  entirely, but it is a significant development.  And so, really,

13  I want to commend you and the Special Master for the effort

14  that went into that.

15      Is there anything else anyone wants to say about the desert

16  institutions issue at this point, recognizing I have yet to

17  review the stipulation?

18          MR. LEWIS:  No, Your Honor.

19          MS. ELLS:  No, Your Honor.

20          THE COURT:  All right.  On the mental healthcare data

21  question, recognizing the significant need to ensure

22  reliability and transparency going forward, including as

23  relevant to the CQI Tool, which is critical to bringing the

24  case to a close, I think I've let the parties know I am fully

25  prepared to authorize the Special Master to meet and confer

1    with the Receiver in the Plata case to determine whether or not

2    it is possible to take advantage of resources the Receiver has

3    developed to satisfy the requirements of Coleman.  It will be

4    with clear instructions and some conditions, and so let me just

5    clarify.

6        The parties know, we always have to remind ourselves and I

7    find myself having to remind some of my judicial colleagues,

8    that the structure of the two cases is very different.  The

9    Special Master does not have the authority that the Receiver

10   does.  The Special Master answers to me and he's -- he's

11   clearly aware of that.  He reminds me of that on a regular

12   basis.  So I ultimately have to be persuaded that this is going

13   to -- that any collaboration is really going to satisfy

14   Coleman.

15       And there are specific requirements -- you know better than

16   I do in many respects -- specific requirements in this case

17   that I would need to be fully satisfied that anyone in the

18   Receiver's operation understands fully.  So there may be an

19   education process that's required to bring the Receiver's team

20   up to speed.

21       And ultimately I'm going to need to see -- right now all I

22   can visualize is the need for some matrices that identify data

23   points that show what I need to know is being collected

24   accurately and in compliance with court orders in Coleman, and

25   is that really on all fours with what's being collected in the

1   Plata case.

2       And then what are the business rules, what are the -- what

3   are the methods that the reports -- what are the methods used

4   to generate the reports, how transparent are those methods.

5       And so I -- there is a lot to work out.  I'm encouraged by

6   the notion that there is the potential for sharing of resources

7   and elimination of duplication, that makes sense to me, but

8   it's not as if anyone can just wave a magic wand and have that

9   happen.  And so I see the need for coordination.  And just so

10  you know, I have reached out to Judge Tigar.  I am planning,

11  hopefully within the next several weeks, to have a coordination

12  meeting, we have these on occasion, with Judge Tigar, myself,

13  the Receiver and the Special Master in the room.  And I've

14  asked for the tools to allow me to articulate my concerns as

15  they relate to what we need in Coleman.

16      So I think the meet and confer can be ongoing between the

17  Special Master and the Receiver.  I intend to play an active

18  role because I think this is a critical -- that data collection

19  and reporting is critical.  The reason we're having that

20  October 15th hearing is to ensure that there is consistency,

21  transparency, accuracy as relevant to the Coleman case.

22      I think, based on talking with the Special Master initially

23  prior to a coordination meeting, that I could expect a report

24  from him and get the parties' input within six months at the

25  outside, maybe sooner, but within six months get some clarity

 1  about whether or not this can work and how -- and what the

 2  steps are to -- to really clarifying that use of the mental

 3  healthcare data in the context of the receiver system will

 4  work.  I don't know that the Receiver has said finally he's

 5  willing to do this either, but coordination will help me

 6  understand what his position is and what issues he and Judge

 7  Tigar see as challenges.

 8      So those are my -- my observations.

 9      Is there anything the parties want me to know about the

10  plan to see if the Receiver has resources that can be used to

11  monitor compliance in Coleman?

12      Mr. Bien?

13          MR. BIEN:  Your Honor, I think that we appreciate

14  your consideration of this idea.  We have been in

15  communications with defendants and the Receiver's office about

16  this prospect and also with Special Master Lopes.  And I think

17  that it's important to compare this path to the alternative,

18  which is working with -- with the existing structure and

19  somehow verifying it and assuring that it can be -- meet the

20  Court's requirements, which are also what we see are key

21  requirements.

22      To us, this is -- this path has a -- hopefully would be

23  much more rapid in terms of getting to a point of trust because

24  we have some trust in the neutrality of the Receiver,

25  supervised by a federal judge.  And that quickly -- the fact

```
 1    that -- the fact to -- to us -- the fact that the State and
 2    defendants are willing to cede control of this function to the
 3    receivership at the same time when they're trying to, you know,
 4    end Plata and take controls, you know, from the Receiver back
 5    to the State, to us is a significant positive message that we
 6    heard loud and clear that, you know, we, the State, agree that
 7    there is a problem with the data that needs to be addressed,
 8    this is a way of achieving trust, and we'll even give up some
 9    of our power -- powers over this function and give it to
10    another federal court, obviously under supervision of this
11    Court too.  So, you know, two federal courts are going to have
12    their eye on this particular issue.
13        So we see this as a positive.  We're hoping that it would
14    get us to a position of trust more rapidly.  And I think that's
15    the most important thing, obviously in addition to accurate and
16    appropriate data.
17            THE COURT:  I understand that.  That's why I'm -- I'm
18    certainly not barring it.  And I'm not one at all to stand on
19    sticking with whatever has been considered in the past if it's
20    not working.  But I don't -- I don't -- I just think it's
21    obvious, given the different cultures and the different
22    parameters of the cases.  I don't think anyone can tell me
23    today that folks on the Receiver's team fully understand
24    Coleman.  That's -- that's just a working theory I have.
25            MR. BIEN:  All I -- I'm sorry.
```

1          THE COURT:  So I'm cautiously optimistic but I need

2   to be satisfied the Receiver won't be there forever.  And

3   there -- it's -- it's almost as if there needs to be the

4   equivalent of an MOU.  And I think there will be a need, if

5   this works out, for the Special Master certainly to retain some

6   kind of role and to provide tutorials for the Receiver's team,

7   with the Receiver's team understanding they may have something

8   to learn from Coleman.

9       That's -- that's the way I'm sizing this up, but that's

10  subject to a coordination meeting that I am taking steps to

11  plan.  It's not to put the brakes on it but it's to condition

12  and make clear that of course I need to sign off.  And it's

13  hard for me to see now that the Special Master is taken out of

14  this aspect of the case.  But I have -- I've said he can delay

15  hiring a data expert.

16      So for the defense?

17          MR. LEWIS:  Your Honor, Kyle Lewis.

18      If -- very briefly.  Defendants agree with your comments

19  about the need for transparency and integrity within the system

20  and fully agree that this is a process that needs to be worked

21  out.  This is not done yet and there is a lot of coordinations

22  that happen.  And we are fully committed to integrating that

23  coordination as part of this package.  And we fully acknowledge

24  that there is a lot of steps that need to be made and a lot of

25  things that need to be done.

1    I have spoken with the Receiver personally about this

2   issue.  He has indicated that he is willing to look at this.

3   He's going to -- basically wants to understand what is needed,

4   what are some of the steps that are needed.  He's not going to

5   commit to anything at this point.  He would like to look at

6   this.  And I think this shows there is a lot of coordination

7   going on among the parties on this important issue.

8       Defendants acknowledge there have been problems and there

9   are challenges with the data that has been presented to the

10   Court in the past.  This is one way to address that.  This is

11   one way the defendants can look at a system and use a system

12   that has established integrity and established trust among the

13   parties to move forward and hopefully move us towards the point

14   where the data can be integrated in one system as the long-term

15   goal to have a central repository for the data, fully

16   understanding that Coleman and Plata are different.

17       But that's why the working groups and the things that the

18   Court I believe is understanding would happen are going to come

19   together and move us towards that point where we can hopefully

20   look and see what the challenges of integrating data will be.

21   But it is something that we're very committed to as part of

22   that transparency and data accuracy that we all want.

23            THE COURT:  All right.  All right.  Well, that will

24   move forward.  I'll ask the Special Master to keep me updated.

25   I will have that coordination meeting hopefully within the next

1    several weeks.

2        And the concept of an integrated data system I bless.

3        All right.  Let's talk about MHCBs.  So here, do I

4    understand correctly that at this point the MHCB project is

5    reduced to 50 beds at CIM with 50 beds at RJD put on hold?

6            MS. THORN:  That's correct, Your Honor.

7            THE COURT:  This is Elise Thorn.

8            MS. THORN:  This is Elise Thorn.  Yes, Your Honor.

9    Yes, I --

10           THE COURT:  I think that the obvious question is,

11   given the patterns over time and population trends, how can

12   that possibly satisfy the Court that those number of beds is

13   sufficient to handle the need over time?

14           MS. THORN:  Your Honor, I think we -- we can show by

15   the bed usage and the demand over the past year, as well as

16   defendants near -- near 100 percent compliance that the beds --

17   the 50 bed project which addresses the -- mostly the female

18   need, but will also be a flex unit, will satisfy the need going

19   forward based on the most recent bed projections.

20       So we know that the spring projections projected a need

21   that is lower than the current bed capacity, and so bringing on

22   those 50 licensed beds will in fact allow the defendants to

23   satisfy the need going out to the future.

24           THE COURT:  The Special Master assured the Court some

25   population statistics suggesting there is an ongoing population

1   challenge.

2          MS. THORN:  I think that that may be the case.  I

3   know that the -- CDCR's population has been on a decline.

4          THE COURT:  Not the mental health.  Not the mental

5   health population.

6          MS. THORN:  It's true that the mental health

7   population has not been on a decline but there hasn't been a

8   significant growth.  And if you look at the actual bed

9   projections and the usage that goes back both from 2018 to

10  2019, CDCR's expectation is that bringing on the 50 beds will

11  be sufficient.  Even though the scope of the project is reduced

12  so that we don't have the 50 beds at RJD, we believe that the

13  licensed beds will be sufficient to satisfy the requirements

14  under the Program Guide.

15         THE COURT:  I had asked for clarification on whether

16  the Governor has authority to waive provisions of state law to

17  expedite.  What's the answer to that question?

18         MS. THORN:  The -- actually, Judge, the answer is no

19  to that question in this situation.  While under the law the

20  Governor does have the capacity to waive state law for an

21  emergency situation, those -- that just doesn't exist given the

22  current population projections.

23      Also given the fact that defendants have been compliant

24  with the transfer timelines to crisis bed for the males and the

25  females over the past year.  The compliance rate for the

 1  females is -- over the past six months is at 96 percent, and

 2  for the males at 97.8 percent.  So we would submit that that

 3  situation doesn't support a finding that there would be some

 4  type of emergency for the Governor to invoke his powers to

 5  waive the law.

 6         THE COURT:  Well, the parties know this has been a

 7  long-running issue.  The schedule has slipped repeatedly.  I'm

 8  just flagging it as a concern.

 9     I -- at this point there is no action I'm contemplating

10  taking.  But if you look at the history of the case with

11  respect to the need for additional MHCBs, you look at the

12  backdrop of the mental health population not declining, I think

13  if the Special Master's summary is correct, and I'm reading it

14  correctly, the numbers are higher than they were a decade ago.

15  Maybe not knowing the defense sees this statistically

16  significant, but there is no sign that population is declining.

17  Bed planning has been an issue for over a decade and

18  projections are only as good as the history has shown and not

19  always been on target.

20     Separate and apart from MHCBs, I -- perhaps -- I don't know

21  the root causes but I've just heard that there were nine

22  suicides in August.  And I -- so again, maybe there is no

23  direct connection to the MHCB question there but population

24  issues, and serious issues with mental health population

25  specifically, continue to plague the case and are a potential

 1   roadblock on the way to resolution.

 2            MS. THORN:  Defendants, Your Honor, are committed to

 3   addressing the lack of or insufficient number of crisis beds,

 4   that's why they're committed to going forward with the project

 5   to add the 50 beds.  We've been informed that, this morning,

 6   the State Public Works Board approved the project and so it's

 7   going to go forward for re-appropriation of the funds and will

 8   be part of the budget for the next year with a completion date

 9   of November 2022 anticipated for the project.

10       Also, if you take the last two years into account,

11   defendants' compliance with the transfer timelines and the fact

12   that they have had adequate capacity to meet the need based on

13   not the development of new beds, except for the unlicensed beds

14   for the females, but a focused oversight of the crisis bed

15   referrals and admissions to meet those transfer timelines and

16   get patients to crisis bed within 24 hours of referral.

17       So while it's true that in the past, and prior to the

18   Court's orders in 2017, the demand for crisis bed and the

19   waitlist was -- was excessive, the defendants have taken

20   focused steps to improve that.  And if you look at our monthly

21   reports you can see that we have been compliant with those

22   timelines and that compliance continues to improve.

23            THE COURT:  All right.  Again, I'm flagging the

24   issue.  I'll let the plaintiffs weigh in.

25       50 beds, assuming they're done by November 2022, is better

1   late than never.  And if you're right then -- then that's

2   forward progress in a way that leads to sustainability.

3       Do the plaintiffs have anything to say on this point?

4           MS. ELLS:  Yes, Your Honor.

5       So I think the first point that needs to be front and

6   center here is that defendants said nothing about shutting down

7   the 73 unlicensed beds in that entire statement.  There was not

8   a single mention of how the compliance rates that they're

9   touting -- which we have serious questions about which I'll

10  address in a minute -- could be achieved with taking 73 beds

11  offline.

12      That doesn't even include all of the -- I think it's over

13  200 unlicensed inpatient beds that are still in existence in

14  the system.  So if you -- we're deeply concerned about what the

15  Department is telling the legislature and the Department of

16  Finance as well.

17      If you look at the August 26th letter the Department of

18  Finance sent to the legislature in response to their request

19  about the scope of this project, it's attached to the Borg

20  declaration filed on 8/28, you'll find, first of all, that

21  there is not a single mention of taking down the unlicensed

22  male beds.  There is a discussion about the CIM beds and the

23  justification is entirely predicated on the female inpatient

24  need.  And in that, CDCR does talk about the 19 unlicensed

25  women's beds that need to come offline, but it also signals

1    that the Department is planning to use those 50 beds to take

2    Patton offline, which is the inpatient setting within DSH that

3    provides treatment to women.  So these beds are being planned

4    to be used and solely to women.  They're not planning to use

5    them just for mental health crisis beds.

6         And as to the male capacity, the justification for not

7    continuing with RJD again makes no mention of the 54 unlicensed

8    male beds and this Court's orders requiring defendants to take

9    those down to end this case.  No mention to the legislature at

10   all about that.

11        And as to the -- the -- you know, the projected need, that

12   same letter indicates that the last four months have seen a 38

13   percent increase in referrals for men.  So even this same

14   letter notes that the projections appear to be out of sync with

15   reality.

16        And that is the typical process that we see in this case,

17   is that the last four years of bed planning have shown

18   increasing need for mental health crisis beds, that's why these

19   beds were being built.  There is one blip in projections that

20   shows, oh, maybe it's not going to increase as much as we

21   thought and, you know, the Department turns on a dime and says,

22   oh, we don't need those beds, we'll abandon them.

23        As to the 2022 completion date, I think that is seriously

24   called into question because former Director -- Deputy Director

25   Tebrock testified that the beds would take five years.  She

1  anticipated the design portion would take one year.  We are not

2  even finished with the design phase.  So the other four years

3  that she said would be used for the construction piece, that

4  does not equate to 2022.

5      So, you know, it's concerning that the Department says it

6  wants to end this case but there is no plan.  And I don't hear

7  anything from defendants about how they could possibly meet the

8  need with taking down all 373 unlicensed MHCBs, much less the

9  inpatient unlicensed beds.

10      And the other couple points I'd like to make is that, you

11  know, as this Court knows, the projections defendants use

12  are -- allow for only a ten percent cushion of occupancy rate

13  even though the community uses 80 percent as its governing

14  rate.  So they've already planned their projections to be

15  extraordinarily lean.  There is no cushion in those

16  projections.

17      And we remain very concerned about the Department's

18  compliance with the 24-hour timeline rate.  As this Court

19  notes, the suicide rate is extremely high.  There have been

20  eight suicides in less than three weeks in the Department.  The

21  suicide rate for this year is literally the highest it's ever

22  been in the history of this case at this point.

23      And the -- it's on -- and I guess the most concerning part

24  of it all is we think there is significant reason to think that

25  one of the causes for the increasing suicide rate is the

1  utilization management techniques that defendants are using in

2  order to meet these compliance deadlines.  I don't think it's

3  coincidental that the suicide rate and the rate of suicides in

4  particular that come within 30 days of a discharge from a

5  higher level of care started trending dramatically upward in

6  2017, which is when this Court started putting pressure on

7  defendants to meet timelines.

8      So in this year, 30 percent of suicides so far came within

9  30 days of a discharge from higher level of care.  In 2015 that

10  was 8 percent.  2016 it was 11 percent.  15 percent of suicides

11  this year have been from people discharged from a crisis bed

12  within 30 days of their death.  That number was 4 percent,

13  almost a quarter of what it was, in 2015, less than half in

14  2016 at 7 percent.

15      There are serious problems with -- probably with the

16  quality of care, it appears to us certainly with utilization

17  management techniques.  When we have attended the Special

18  Master's tours in this most recent round we hear reports every

19  single time we attend from clinicians saying they feel pressure

20  not to refer people to higher levels of care, pressure to

21  decrease people's level of care.  And we think that the suicide

22  rate reflects that and we think that the compliance rate

23  defendants are talking about has something to do with that too.

24      The other note I'll make about the compliance rate, it has

25  been extremely concerning to us that in the workgroup

 1  negotiations over the mental health crisis bed exceptions

 2  negotiations we learned that the number that defendants are

 3  using to report to this Court of when the 24-hour timeline

 4  starts is not the actual correct time for that timeline to

 5  start.

 6      The 2018 Program Guide update says that per defendants' own

 7  policy that timeline should start at the date of referral.  The

 8  clinician then has an hour to provide notice to HCPOP, which is

 9  their population management group, to assign a bed, and then --

10  but the -- the timeline is supposed to start with the clinical

11  referral.  Defendants have told us that they're actually not

12  using the referral time, they are using the time of the HCPOP

13  e-mail, which by their own policy can be an hour later, and

14  which in multiple cases that we looked at was four to eight

15  hours after the clinical referral.

16      So we think there is very serious problems with the data

17  that defendants haven't accounted for.  And we have serious

18  questions about their compliance that they're reporting and the

19  data that they're reporting about it.

20      The final thing I want to note is this Court has in the

21  past looked at the vacancy rate at ASH as sort of a canary in

22  the coal mine about unmet need in this case.  Right now as of

23  defendants' most recent filing there are 106 empty ASH beds,

24  and there are 14 vacant Coalinga beds.  Typically they're

25  mostly able to fill Coalinga, they're not even doing that.

1          So there are serious reasons to think that these mental

2    health crisis beds are needed.  There is a dramatic lack of

3    transparency regarding the communications from the Department

4    of Finance about what this Court's requirements actually are

5    with regard to the unlicensed beds, and --

6          THE COURT:  Say that last bit about Department of

7    Finance.

8          MS. ELLS:  Well, the Department of Finance's letter

9    to the legislature makes no mention of the unlicensed beds.

10         THE COURT:  All right.  So I'll ask Ms. Thorn -- the

11   Court is not forgetting the language in its orders about

12   unlicensed beds coming offline.  But -- so do you have specific

13   recommendations about a different course that the Court should

14   order given the issues you've just raised?

15         MS. ELLS:  Well, we certainly think that at a minimum

16   the Court should take steps to require enhanced and very

17   specific reporting about the ongoing CIM project to ensure that

18   that 2022 deadline actually is met.  This Court has done that a

19   number of times in the past.

20      And we also think that the Court should take steps to

21   require them to create -- to expedite those beds to the extent

22   possible.  Again, there are existing Court orders from previous

23   situations in the case.

24      And, you know, I still think that the -- that defendants

25   have never told this Court how they anticipate meeting the --

1   meeting the need while also taking down all 73 beds.  They

2   still have not addressed that --

3          THE COURT:  I understand that point.

4      So apart from the Court more closely monitoring the 2022

5   completion date, and thinking about what I would do that

6   escalates my prior orders regarding compliance with

7   construction dates, would the other issues -- are they being

8   worked through in workgroups?  Do I need to specifically refer?

9      I'm just trying to understand your position.

10          MS. ELLS:  Yeah.  Yeah.  So we think that the Court

11   should consider requiring them to continue the RJD project.

12   It's currently on hold.  It's not scuttled forever.  But

13   certainly there should be a more significant justification to

14   this Court about how they could possibly take that project

15   offline and still accomplish the goals the Court has set out in

16   its order for today.

17          THE COURT:  So, for example, that could be through

18   some more detailed briefing on this subject for the next

19   quarterly meeting in December?

20          MS. ELLS:  Yes.

21          THE COURT:  All right.

22          MS. ELLS:  And we do think that the Court should also

23   require defendants to revisit their data practices regarding

24   the MHCB timeframes that it's reporting to this Court which are

25   not based on the referral timeframe.  And that may have some

1   impact on this Court's assessment of compliance with the MHCB

2   timelines.

3            THE COURT:  All right.

4       So Ms. Thorn, recognizing that I'm inclined, based on what

5   I just heard, to set this item as an agenda topic for December,

6   again, and allow some full development of the record on the

7   multiple questions raised by the plaintiffs, what is the

8   defendants' position on those unlicensed beds?  Are they coming

9   offline?

10           MS. THORN:  So, Your Honor, the unlicensed beds, we

11   -- cannot come offline until we have additional beds, the

12   additional 50-bed project online.

13           THE COURT:  But would they come offline as soon as

14   the 50 beds are constructed?

15           MS. THORN:  That is -- the plan would be to take them

16   offline, yes, Your Honor.

17           THE COURT:  All right.  Anything else you want to

18   say?

19       I do have a jury note.  I know Ms. Schultz let you know I

20   have a jury deliberating.  So we'll finish this topic and then

21   take a short break for me to talk with counsel in that case

22   about an answer to the note.

23           MS. THORN:  Your Honor, defendants disagree with the

24   plaintiffs' position on the points they made on the data.

25           THE COURT:  I thought that might be the case but

1   that's where I think I need to -- so my plan would be to -- to

2   allow full development of the parties' respective positions for

3   me to consider in December.

4          MS. THORN:  All right.  All right.  That's fine, Your

5   Honor.

6          THE COURT:  Is there anything else you want to

7   highlight for me right now?

8          MS. THORN:  No.  I just think that if you -- if we

9   look at the actual usage of the beds over the past year, even

10  the usage as Ms. Ells indicated, there has been an increase in

11  the population recently and if you look at the past four months

12  of our compliance reports we're still in compliance.

13     And the fact of the matter is that if you look at the full

14  census for 2019, the need by the males for crisis care has not

15  exceeded the capacity.  And so the --

16         THE COURT:  It's long-term, though.  It's long-term

17  trends we need to be thinking about.

18         MS. THORN:  That's correct.  We agree that --

19         THE COURT:  What about Atascadero and Coalinga?

20         MS. THORN:  Your Honor, again, the -- it's true that

21  the referrals to those inpatient programs have decreased and so

22  there are empty beds there, but there -- the defendants have

23  focused their energies to look at the referrals and make sure

24  that the patients who need the care and qualify to be placed in

25  ASH and Coalinga are referred and placed there.

1          So the fact of the matter is that based on clinical reasons

2     defendants have not been able to refer and place more patients

3     in those beds.

4               THE COURT:  Are there impediments to articulation

5     with Department of State Hospitals?

6               MS. THORN:  No, I don't believe so, Your Honor.

7               THE COURT:  All right.

8          All right.  Anything else on this point?

9          I want to come back after my short break -- hopefully

10    15-minute break -- talk about staffing and then other business.

11         Just let me know, is there other business that the Court

12    had not published?

13         I know I told you what I wanted to talk about today.  I'm

14    not opening it up for a free-for-all to cover all the topics

15    the parties wanted to at this point.  But my thought would be

16    to let you know I know I have some disputes before me related

17    to the completion of the Program Guide, but I acknowledge there

18    is good collaboration from what I can tell, they're relatively

19    minor disputes.  So, again, kudos.  And I have a cultural

20    collaboration plan I'll be looking at shortly.  That's really

21    the other business I wanted to note.

22         Is there anything else you think we should cover besides

23    staffing, then, Mr. Lewis?

24         Oh, and also referral back to Judge Drozd.  We'll talk

25    about the timing.  I know someone had someone call Judge

1   Drozd's chambers.

2          MR. SILBERFELD:  Yes, Your Honor, I did that.

3          THE COURT:  All right.

4          MR. LEWIS:  Nothing further, Your Honor, for now.

5   We'll talk at the break but I don't anticipate anything else.

6          THE COURT:  Mr. Bien?

7          MR. BIEN:  No, Your Honor, nothing else.

8          THE COURT:  All right.  Let's take about a 15-minute

9   break and then we'll reconvene.

10       (Recess taken, 10:45 a.m. - 11:41 a.m.)

11          THE COURT:  You may be seated.  The Court's inability

12   to estimate time correctly doesn't let you off the hook for

13   complying with all of my timelines.  Just so that is clear.

14   That took longer than I expected, but that's litigation, which

15   can be highly inefficient, as you all know.

16       All right.  On staffing.  Just for the record, it's been 11

17   months since the defendants were to be in compliance, but I

18   understand that negotiations have resumed and the Special

19   Master has received -- received some documents related to

20   discussions that may lead to an agreement on telepsychiatry.

21       I don't know if -- I just -- I think in the last 24 hours

22   there was a development, at least some proposal delivered to

23   the Special Master.  So maybe the plaintiffs, based on

24   Ms. Ells' face, are hearing this for the first time.  So it

25   sounds as if there may be some developments, maybe they're

1   positive developments, I don't know.  But I'm looking forward

2   to updates, even in the next several weeks, from the Special

3   Master based on what he's told me this morning.  But there

4   is -- I mean, we're past a deadline there.

5       I'm prepared to refer the issue back to the workgroup both

6   for consideration of telepsychiatry but also staffing formula

7   for DSH programs.  And I understand that this -- this also

8   could be linked to some of the data issues.

9       So is there more the defendants want to put on the record

10  today about the staffing and the new developments?

11          MS. THORN:  Yes, Your Honor.  Thank you.

12      As the Court noted, we've been on a pause with respect to

13  staffing as a result of the investigation over the past year.

14  The defendants were prepared in September/October of 2018 to

15  enter into a stipulation with respect to proposals to reduce

16  psychiatry staffing.  Defendants believe that we can sit down

17  with the plaintiffs and the Special Master and resume talks

18  under some of those proposals.

19      The desert institutions, we were able to sit down and work

20  through that and refine that policy and come to an agreement.

21  That's the policy we submitted to the Court yesterday.

22  Notwithstanding some issues on data, defendants believe that

23  the parties can work together with the Special Master to go

24  back to the 2018 staffing proposals and see whether we can

25  satisfy plaintiffs' concerns and the Special Master's concerns

1    because the policies and the proposals actually remain

2    legitimate and valid opportunities to meet staffing compliance.

3        As for the telepsychiatry, defendants have refined the

4    policy and also look forward to working with the Special Master

5    and plaintiffs to try to come to an agreement on that policy

6    that will work for everyone.

7        I'd like to also just note that the Receiver -- the Plata

8    Receiver also has a workgroup on staffing.  That's a

9    multidisciplinary workgroup to address issues with staffing not

10   just for Coleman but other disciplines including nursing and

11   other folks who are involved with the mental health population.

12       So the idea that we could go back to the workgroups,

13   defendants would welcome that opportunity and --

14           THE COURT:  You're saying "workgroups."

15           MS. THORN:  That's correct, Your Honor.

16           THE COURT:  So how do those -- I can follow up with

17   the Special Master on this, but those workgroups interface?  Or

18   not?  They are separate tracks at this point?

19           MS. THORN:  That would be separate.  The Receiver's

20   workgroup would be separate, that's correct.  So the workgroup

21   with -- within Coleman we would continue to work on

22   requirements to the telepsychiatry policy, as well as try to

23   come to some agreement with respect to any of the five

24   remaining proposals that defendants presented in 2018.

25           THE COURT:  All right.  There is also an issue of an

1  appeal pending but it doesn't appear that you've been talking

2  about --

3          MS. THORN:  That's correct, Your Honor.

4          THE COURT:  -- telepsychiatry.

5      So having heard that, anything to say, Ms. Ells, on this

6  for the plaintiffs?

7          MS. ELLS:  Yes, Your Honor, a few things.

8      The first note I'd make is that we are certainly open to

9  considering reopening the telepsychiatry negotiations.  We

10  haven't seen any policy or gotten wind of what the proposal

11  might look like but we are open to it.

12      I will say that telepsychiatry is clearly not a panacea,

13  however.  Even right now the Department is only able to fill 70

14  percent of the allocated telepsychiatry positions so that is

15  not going to solve their problems in terms of compliance.

16      The other thing I would say is that the -- we remain

17  concerned that there has been no discussion about defendants'

18  compliance with hiring of supervisory and chief psychiatry

19  positions.  Their allocations do not account for the

20  requirements of the 2009 staffing plan where they're required

21  to allocate supervisory positions and they are currently out of

22  compliance with that on the allocation level.  So that's

23  certainly something that needs to be addressed as well.

24      As to defendants' 2008 -- sorry, 2018 -- time flies in this

25  case -- proposal, it's difficult for me to conceive of walking

1    back to that proposal which is the exact proposal that we were

2    on the verge of signing when we learned of Dr. Golding's

3    allegations.  And that proposal is very tainted for us.  And

4    particularly with the upcoming trial it's difficult to conceive

5    of how that could be a fruitful discussion.

6        But even setting that aside, it's concerning to me that the

7    Department's only proposal at this point is to reduce

8    psychiatry staffing.  That's the only proposal.  There has been

9    no progress in two years despite the Court's October 10, 2017

10   order.  And there are things that defendants could be doing

11   that they are not doing.  So we -- you know, they could be

12   reducing the Coleman class.  That would obviously reduce

13   demand, their allocations would go down, something that we've

14   been encouraging them to do for a number of years given the

15   ongoing population pressures that have made it difficult for

16   them to hire and comply with the Court's orders and provide

17   quality care, minimally adequate care.

18       But the Special Master also has provided to the parties in

19   draft form, subject to objections and not filed with this Court

20   yet, the recommendations and findings of his labor economist

21   expert which have suggested and corroborated in many ways some

22   of the things that Dr. Golding was saying in his report, that

23   the problems with psychiatry hiring, there are some

24   compensation things that can be done, but also there are

25   significant problems with the culture that defendants could be

1    addressing that would make it more palatable for psychiatrists

2    to work and stay within the Department.  There are big problems

3    with office and treatment space.  Again, defendants could be

4    taking steps to address those.

5        And essentially we -- we feel like it's -- it's concerning

6    that defendants' only proposal at this point is to cut

7    additional staff with a proposal that is -- is, as I mentioned,

8    in my mind at least, pretty tainted at this point, particularly

9    given the upcoming trial.  It's very difficult for me to

10   conceive about how that could be fruitful.

11       But -- those are some of the questions and issues that we

12   have but, you know, we're open to your -- your guidance, Your

13   Honor.

14           THE COURT:  All right.

15           MS. THORN:  Your Honor, if I may?

16           THE COURT:  Just to confirm, I would refer this to

17   the workgroup for the plaintiffs to get up to speed on what's

18   being proposed specifically to work through that.  But again, I

19   think we should put this issue on the agenda for December and I

20   can direct some focused briefing to see where you are then.

21       Ms. Thorn?

22           MS. THORN:  Yes.  Just to address some of the points

23   Ms. Ells raised.

24       The renewal of the 2018 staffing proposals certainly is not

25   the only initiative at this point that defendants submit to the

1    Court.  We have the telepsychiatry policy.  The Department is

2    also taking steps to address and finalize the psychiatric nurse

3    practitioner policy.  Also, the Department is working on HCFIT

4    projects to improve work space which will help with hiring and

5    retention issues for psychiatry.  Also, CCHCS has hired a

6    consultant to help with some developed policies and

7    improvements for retention and they're working on that.  That

8    would apply also to retention of psychiatry as well as

9    recruitment.  And so the proposals aren't the only thing.

10        But I might add that -- to the point that the 2018

11   proposals are tainted, in fact the proposal -- the policy that

12   we have submitted to the Court, the Desert Transfer Policy, was

13   part of the 2018 package.  And we were able to refine that

14   policy, present data that was not implicated by Dr. Golding's

15   allegations.

16        And defendants submit that there are additional policies

17   that were presented that are also not implicated by the data

18   concerns raised.  And we welcome the opportunity to work with

19   the plaintiffs and make that demonstration to them as well as

20   the Special Master.

21            THE COURT:  All right.  You'll have that opportunity.

22        And to the extent there is a separate workgroup, let me

23   just say again -- and I'm prepared to be fully educated on this

24   point, I just -- there just needs to be an awareness, to the

25   extent there are discussions going on convened by the Receiver,

 1   folks should not reasonably assume they address issues in

 2   Coleman.  If I see something and have coordination meetings

 3   that satisfy me that there is a recognition of the

 4   distinctions, that will help me ultimately embrace any final

 5   proposal for integration but at this point I'm not -- I have

 6   some concerns.

 7              MS. ELLS:  Your Honor, may I --

 8              THE COURT:  So to the extent there are separate

 9   discussions, no decisions can be made that affect Coleman

10   without them being fully integrated into the Coleman workgroup.

11   Unless I'm missing something.

12      Ms. Ells?

13              MS. ELLS:  If I may, Your Honor, I actually don't

14   know anything about this -- the Receiver-based workgroup.  So

15   that's news to us.  We're open to hearing more about it but we

16   understand your concerns and share them.

17              THE COURT:  All right.

18              MS. ELLS:  Although we do think given the lack of

19   success in hiring from the Department so far that it might be

20   an option at some point to consider having the Receiver handle

21   psychiatry hiring like he does nursing hiring.  But that's a

22   conversation, I think, that can happen later.

23      The one point I'd like to make about revisiting the 2018

24   plan is, you know, I think at the point where we were in 2018

25   where we were having those negotiations, we had a lot of trust

1  and faith in defendants' representations about what the quality

2  of care looked like on the ground, and we were assured that the

3  quality of the care was actually pretty good and that it was

4  better than we thought it was, and that was based on

5  defendants' representations and their affirmative evidence from

6  their data.

7      And now that that is not something that we can trust and

8  rely on to show us what the quality of care is on the ground

9  that might give us comfort that perhaps psychiatry --

10 psychiatrists are not needed that originally were thought to be

11 needed, I will say that having observed, personally, some of

12 the Special Master's tours, this round to date, and having

13 listened to exits of all of other ones, and in many cases

14 attended in person, we have grave concerns about the quality of

15 care that is occurring in the prison system that make us

16 extremely suspect about proposing reductions.

17     We're not hearing from psychiatrists that they're twiddling

18 their thumbs with nothing to do because they're so overstaffed.

19 I -- at Corcoran State Prison I spoke to a psychiatrist with

20 defendants and the Special Master who said that his ITT

21 schedule for the following week was to see 50 patients in an

22 afternoon.  And that speaks to me of real problems of quality

23 of care and they arise from staffing and overpopulation.

24     So, you know, again, we can revisit that report, but

25 knowing what we know and where we are in the case right now, I

1    think the Department has to -- has to take steps to do more.

2        And again, telepsychiatry, they're already using it and

3    it's only 70 percent full.  So that is not going to solve the

4    30 percent gap -- the 20 percent from the -- you know, they're

5    currently at about 70 percent full on psychiatry.  That's not

6    going to solve the problem here.

7        So that's all I'd like to say.

8            THE COURT:  All right.  That position is made of

9    record.

10       I've referred the psychiatry question, including

11   psychiatry/psychologists, to the Special Master.  I understand

12   there's been monitoring at headquarters and otherwise, and so

13   I'm -- I'm waiting to hear more about that.  But I -- I

14   acknowledge the plaintiffs' position.  I'm going to refer these

15   questions to the workgroup.

16       I will issue an order setting the next quarterly status.

17   I'm proposing December 13th.  Any reason not to reconvene then?

18   Do we already have that date on the calendar?

19       That would be the Court's plan, convene again on

20   December 13th, we'll have another session like this.  I'll give

21   you some focused direction -- thank you, Ms. Schultz -- on the

22   unmet needs and the MHCB space and staffing including

23   telepsychiatry.

24       As of now I'm thinking we should add -- I just want to, as

25   a placeholder, add the suicides given the spike in August; very

```
 1    troubling.

 2        I'll look at what's been deferred and I'll give the parties

 3    a chance to weigh in.  And by then we will have had the

 4    evidentiary hearing in October.

 5        Again, although my time is dwindling, I still have to get

 6    an order out later today, it may not hit the docket until

 7    Monday, on October 15th.  So you'll see that.

 8        I have some ongoing discussions in camera with the

 9    defendants about the privileged documents.  At some point I

10    will clarify the results of my review of those documents, but

11    after at least one more discussion with the defense, I believe.

12        In terms of Judge Drozd, I was planning on telling Judge

13    Drozd I believe that it -- the case could be ready for referral

14    back to him for settlement purposes in November.  And so that's

15    consistent -- he would look to me for clarification that the

16    timing is right.  And I gather those are the dates that counsel

17    was seeking in any event.

18            MR. SILBERFELD:  Yes, Your Honor.  I first reached

19    out to the plaintiffs about resetting the August 30th date that

20    was taken off calendar with Judge Drozd, and we had both e-mail

21    and telephonic communications back and forth about when would

22    be an appropriate time.  We all think it's November, perhaps.

23        I asked counsel, Ms. Ells, whether I should just go ahead

24    and seek a date from Judge Drozd.  That's what I did, and so I

25    had some dates in November which we're all going to look at and
```

1    clear.  And at the same time I've reached out to the Special

2    Master and said next time I'm out east I want to come pay a

3    visit and talk about this case as well with the same subject

4    matter in mind.

5              THE COURT:  All right.  And I encourage those

6    informal discussions to the extent all the right players are

7    kept in the loop.  And I -- my hope is that the October

8    proceedings can be very focused.  I'm -- it -- the questions

9    are distilling in my mind.  I think they are very focused

10   questions and I'm hoping, trial schedules notwithstanding, that

11   I can resolve those questions in a way that clarifies the

12   record and the Court's findings promptly.  And I would -- I

13   will strive to do that by the end of October.  And so then I

14   think the coast would be clear for a meaningful settlement

15   discussion.

16      All right.  Anything else you'd like to discuss today,

17   Mr. Lewis?

18              MR. LEWIS:  Yes, Your Honor.  One brief issue, and

19   perhaps building on what you said about the very focused

20   hearing.

21      The parties have agreed for the deposition of Dr. Kuich,

22   which you had issued an order on, it's going to go next

23   Thursday and we're going to limit it to, obviously, the issues

24   you have identified.  But perhaps we're looking for some

25   further guidance as to what you may want the parties to ask

1    Dr. Kuich or look into based on your comments about how this is

2    your hearing and want to keep it focused.

3            THE COURT:  All right.  I'll include that in my order

4    to issue.

5            MR. LEWIS:  Very well.

6            THE COURT:  Thank you for letting me know it's next

7    Thursday now.

8        Ms. Ells?

9            MS. ELLS:  Just one quick point, Your Honor, which is

10   that I believe that counsel for Drs. Golding and Gonzalez

11   notified you and the parties that Dr. Golding is not available

12   after the -- on or after the 18th, and I just wanted to make

13   sure the Court took that into account.

14           THE COURT:  I am aware of that.

15           MS. ELLS:  Thank you.

16           THE COURT:  All right.  Very well.  Thank you very

17   much.  This has been helpful.  I'll provide guidance for

18   December and also for October shortly.  Thank you very much.

19           THE CLERK:  Court is in recess.

20               (Proceedings adjourned, 12:01 p.m.)

21                       ---oOo---

22   I certify that the foregoing is a correct transcript from the

23   record of proceedings in the above-entitled matter.

24                       /s/ Kimberly M. Bennett
                         KIMBERLY M. BENNETT
25                       CSR No. 8953, RPR, CRR, RMR