Wendy Musell, SBN 203507
STEWART & MUSELL, LLP
2200 Powell Street, Suite 440
Emeryville, CA 94608
415-593-0083
Fax: 415-520-0920
E-mail: wmusell@stewartandmusell.com

Attorneys for Non-party Witness
Michael Golding, M.D.
Melanie Gonzalez, M.D.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAPLH COLEMAN, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et. al.,<br><br>Defendants. | **Case No.: 2:90-CV-0520 KMJ DB P**<br><br>**RESPONSE OF DR. MICHAEL GOLDING RE EVIDENTIARY HEARING** |

**A. CDCR's Blame the Whistleblower Defense Ignores the Evidence In this Case and Further Attempts to Mislead the Court**

It appeared from the evidentiary hearing that the defense themes related to whether CDCR misrepresented information or committed fraud upon the Court and Office of Special Master were (1) Dr. Golding never told CDCR of his concerns and if he had, CDCR would have addressed the problems identified promptly; (2) Dr. Golding is wrong; there are no material issues that Dr. Golding raised and the Court ought to ignore each of Dr. Golding's concerns as immaterial or irrelevant; and (3) Dr. Golding's reports that CDCR presented false or misleading data to the Court and reports of patient safety concerns made life personally difficult for certain staff and that should somehow be taken into account to lessen the legal burdens upon CDCR.

This well-trod trope of "blame the victim" defense should be disregarded by the Court. The evidence presented in the evidentiary hearing, as well as the Neutral Expert's Report demonstrates that these "blame the whistleblower" defense themes are nothing more than further false and misleading narratives to the Court in a transparent effort to evade responsibility and to avoid enacting any real change to ensure a minimum level of mental health care that is constitutionally mandated.

First, it is demonstrably false that CDCR was not informed by Dr. Golding of each and every issue in the Golding Report, including each subject area of the evidentiary hearing. It was shocking to Dr. Golding that CDCR officials under penalty of perjury claimed in the evidentiary hearing that they had no knowledge of Dr. Golding's concerns. The evidentiary record in this case is replete with instances that Dr. Golding informed CDCR, including Ms. Tebrock, attorneys for CDCR, and other high level management of CDCR of the exact issues that he raised subsequently in a report to the Receiver in the Plata case.

Dr. Golding has provided to the Court and the Court designated investigators emails of these exchanges, a declaration detailing his reports, as well as days of testimony with court appointed investigators detailing that he attempted to get CDCR to do the right thing and correct false or misleading data presented to the Office of Special Master and the Court, but CDCR refused and failed to do so.

Dr. Golding also repeatedly raised with CDCR his concern that CDCR was presenting misleading data that formed the basis of Staffing Proposal that would cut psychiatry staff by twenty (20) percent. After exhaustively attempting to get CDCR to respond and being rebuffed and retaliated against, and up against the time frame that an agreement would be signed and ordered by the Court based on misleading data regarding psychiatry staffing that would have wide ranging negative impacts on patient care, Dr. Golding finally provided his report to the Receiver. Thus, the defense narrative and testimony by former Deputy Director Tebrock and other witnesses that Dr. Golding failed to bring forward relevant data and other concerns and if he had only done so none of these proceedings involving the Court would have been necessary is false and made up from whole cloth.

It is also belies Deputy Tebrock's testimony, given that she testified that the only data presented to the Court that she would retract as in error, if given another chance, was data Dr. Golding did not give

her -- data about Administrative Segregation Hubs that was shown to her by the Plaintiffs' counsel Lisa Ells. Thus, Deputy Tebrock's testimony demonstrates that regardless of the false or misleading data presented to the Court as outlined in the Neutral Expert's Report, Deputy Tebrock did not feel any action was necessary to correct these representations made to the Court, Special Master and Plaintiff regardless of whether and when Dr. Golding raised with her the data and other concerns or not.

Also refuting a lack of knowledge to the issues before the Court in the evidentiary hearing was Deputy Tebrock's admission to signing documents in 2017 specifying that the psychiatry EOP time compliance interval had been increased to 45 days in CDCR's Administrative Segregation Hubs, yet she reportedly took no actions to correct the data or to determine how widespread the 45 day increased interval was to other institutions. These documents clearly demonstrated her knowledge of the problem in 2017. However, no action was taken to retract data and correct it in reports provided to the Special Master and the Court.

Second, CDCR's attempted to minimize the importance of CDCR's practice of (a) changing the time frame to provide mandated psychiatry appointments from thirty (30) days to up to sixty (60) days without informing the Office of Special Master and the Court, (b) not informing the Office of Special Master and the Court that the "appointments seen as scheduled" identifier measured something other than appointments seen as scheduled, and (c) not informing the Court or the Office of Special Master that supervisors were regularly serving as line staff, often with supervisors carrying a regular case load. Even after the Neutral Expert's Report, this Court's orders requiring CDCR to correct false or misleading pleadings filed in Court and this evidentiary hearing, CDCR's defense narrative was that these issues are not material or important. One witness characterized issues raised as not a big deal. This laissez faire approach is deeply disturbing and demonstrates that even after nearly a year of proceedings related to these issues, CDCR either fails to understand the importance of these issues or is strategically feigning ignorance to avoid taking responsibility.

Third, counsel for CDCR sought to elicit testimony from multiple witnesses that it was personally difficult for CDCR personnel to have to address the issues set forth in Dr. Golding's report to the Receiver. One can only surmise that the strategic reason for this was to attempt to cast Dr. Golding in a bad light as the perpetrator of some imagined wrong upon CDCR staff for making a whistleblower

complaint and to seek absolution from the Court for any manner in which CDCR mislead the Court or Special Master.

However, as was clear from the testimony of Dr. Ceballos, it was not Dr. Golding who was raising the specter of adverse legal consequences for individuals involved in the decisions set forth in Dr. Golding's Report, but CDCR management staff. Dr. Leidner and Dr. Ceballos' testimony made clear that Dr. Ceballos suggested to Dr. Leidner that he could be subjected to legal consequences because of Dr. Golding's Report. This lead Dr. Leidner to step down from his position. If anything, this suggests a retaliatory smear campaign was underway against Dr. Golding, a whistleblower. It also demonstrates that Dr. Golding was not the person threatening that CDCR staff would face some sort of legal consequences. Rather, Dr. Golding was focused on patient care and safety and truthful representations to the Court and Special Master.

**B. The Totality of the Circumstances Must Be Considered in Determining if There was Fraud or Misrepresentation Upon the Court and Special Master**

In order to make a determination whether CDCR had provided misleading data or sought, successfully or not, to mislead the Court, Special Master, the totality of the circumstances must be considered. In *US v. Sierra Pacific Indust., Inc.* (9th Cir. 2017) 682 F.3d 1157, 1173, the Ninth Circuit observed the following when considering if there has been a fraud on the Court:

> Contrary to the district court's assertion that "the whole can be no greater than the sum of its parts," a long trail of small misrepresentations—none of which constitutes fraud on the court in isolation—could theoretically paint a picture of intentional, material deception when viewed together.

*Id. See also Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238, 244 (1944) (consideration of totality of the circumstances required to determine whether there has been a fraud on court); *Pumphrey v. K.W. Thompson Tool Co*., 62 F.3d 1128, 1132 (9th Cir. 1995) (appellant, through its in-house counsel, engaged in a scheme to defraud the jury, the district court, and appellee through the use of misleading, inaccurate, and incomplete discovery responses and the presentation of fraudulent evidence).

The Expert Report detailed numerous occasions that CDCR misrepresented material information. Each of these misrepresentations favored CDCR in the presentation of data and higher compliance rates. Similarly, CDCR's practice of (a) changing the time frame to provide mandated psychiatry appointments from thirty (30) days to up to sixty (60) days without informing the Office of Special Master and the Court, (b) not informing the Office of Special Master and the Court that the

"appointments seen as scheduled" identifier measured something other than appointments seen as scheduled, and (c) not informing the Court or the Office of Special Master that supervisors were regularly serving as line staff also favored CDCR in showing higher level of compliance than actually existed.

The consistent pattern of demonstrating higher compliance rates using incorrect assumptions and faulty and misleading data must be considered. These misrepresentations were no accident. Rather, they were a pattern of conduct by CDCR that when viewed as a whole demonstrates intentionally misleading and /or false information provided to the Court and Special Master for the strategic advantage of CDCR to lower the staffing in psychiatry and to eventually cease being a party to this case. When each part is viewed together, what appears is a tableau of intentional, material misrepresentations. *Sierra Pacific Indust., Inc.*, 682 F.3d 1157, 1173.

**1. Testimony and Findings of the Expert Report and CDCR's November 20, 2018 Staffing Proposal Demonstrate that CDCR Mislead the Court and Special Master**

In order to properly evaluate whether there was the requisite level of intent to commit fraud on the Court and/or Special Master, or whether there was intentional misrepresentation by CDCR, any reasonable inquiry must inquire who would benefit from such misrepresentations, how and why. The testimony at hearing, information contained within the Expert Report and the Golding Report serves to highlight that inaccurate, inflated compliance data metrics have real world consequences for patient care and were enacted to reach predetermined strategic goals by CDCR in this case.

Misleading data was utilized to determine if there could be decreases in Court mandated staffing for psychiatry overall and practices to wind down this decades-long and very expensive legal battle. Data that the Expert Report indicated was inaccurate or misleading was used to support changing psychiatry staffing levels and practices across all its prisons and to incrementally end this case. Specifically, CDCR provided to Plaintiffs for the purposes of amending current Court orders a staffing report on November 20, 2018. *See* Decl. of Marc Shinnkrantz in Support of Plaintiff's Response to November 13, 2018 Order to Show Cause, Ex. A (Docket No. 6010) (hereinafter "Staffing Report").[1]

[1] Page numbers referred to herein to the Staffing Report are those set forth in Docket No. 6010.

Data and reported practices relied upon in the Staffing Report, according to the Expert Report, are inaccurate and/or misleading.[2]

The Staffing Report proposed decreasing psychiatry staffing generally and expected frequency of psychiatric care contacts based, in part, on reported psychiatry caseloads. *See, e.g.* Staffing Report, p. 12-13. The Expert Report, however, found that "[t]he evidence confirms that at certain institutions psychiatric supervisors maintain an active caseload comparable to line staff." Expert Report, p. 77. "A senior supervising psychiatrist said it was expected that supervisors perform the same duties as line staff when there are staffing shortages—the culture of leadership was that psychiatrists should be utilized. That psychiatrist explained that when [s]he took on the senior supervisor position [s]he was doing line staff work at least 50% of the time, and [s]he currently still covers IDTTs and other line work when other psychiatrists are not available…The anecdotal evidence from multiple psychiatrists suggests that [the Associate Deputy Director] Ms. Ponciano's data analysis undercounts the amount of patient care being provided by supervisors." *Id.* at 81.

The Staffing Report also proposed reducing psychiatric staffing allocations to desert institutions. Staffing Report, p. 7. ("The 2009 Staffing Model allocates 0.5 psychiatrists to each of the desert institutions. 2009 Staffing Model at 20. However, the total number of psychiatry contacts for all five desert institutions, including urgent, emergent, and routine contacts, was only 403 over a six-month period, meaning an average of 16.8 contacts per week. Attachment A- Desert Psychiatry Contacts. Therefore, the workload, which takes into account the average contacts and contact duration for all five desert institutions, could easily be accomplished by half of a psychiatrist allocation.").

According to the Expert Report, however, Dashboard measurements of psychiatric contacts per day are inaccurate. Expert Report, p. 67-68. The Expert Report states "[t]he anecdotal evidence from multiple psychiatrists suggests that Ms. Ponciano's data analysis undercounts the amount of patient care being provided by supervisors." Expert Report, p. 81. Thus, data relied upon to propose cuts to psychiatry personnel in desert institutions was inaccurate.

---

[2] Drs. Golding and Gonzalez offer these observations to illustrate the need to examine the totality of the circumstances and how the misleading data and practices was used, not as a comprehensive substitution for further investigation, discovery or evidentiary hearings on these questions.

As detailed in Court's Order Docket No. 6242, p.10, there are transparency and intent issues implicated regarding CDCR's presentation of data and the representations made in support of CDCR's 2018 Staffing Proposal. This was also clear from testimony at the evidentiary hearing, where the practice of not disclosing whether supervisors are serving as line staff carrying a case load could mask serious staffing shortages over time. Further, while Dr. Brizendine admitted the Office of Special Master should be involved in the discussion of the amount of work that supervisors should perform in direct patient treatment as it relates to staffing level decisions, this never occurred, likely because accurate data was not presented to the Special Master and Plaintiffs regarding how profound of a problem existed concerning supervisors serving as line staff.

In October 2017, this Court ordered CDCR to come into compliance with their staffing ratios with a 10 percent court ordered maximum vacancy requirement per year. *See* ECF Docket No. 5711. CDCR, in the position of being past the Court's deadline and non-compliant with the Court's Order found itself in a pickle. Unless the number of psychiatrists required and vacancy rate was changed and there was a new Court order, CDCR was not going to come into compliance with the Court's October 2017 Order, either in the near term, or it appeared ever. It is in this context that the negotiations to lessen the legal requirements for psychiatry staffing and 2018 Staffing Report came into play.

Dr. Golding testified that he was informed on a nearly daily basis from psychiatrists at various institutions that supervisors were serving as line staff and in many cases, were carrying a patient case load. These supervisors were complaining of a lack of staff to cover their patient loads and were requesting additional staff or help to address the problem.

Dr. Golding, in turn, informed CDCR management of these facts in multiple ways. He provided a monthly report (copies of which were provided to the Court) that detailed that supervisors were serving as line staff. These were provided to Deputy Tebrock, Deputy Brizendine, Ms. Ponciano and others multiple times per year when discussing staffing related issues and the allocation of telepsychiatric resources to help institutions in which supervisors were performing line staff work. With Deputy Tebrock's knowledge, Dr. Golding went to multiple institutions in July and August of 2018 and spoke to the psychiatry supervisors there and inspected the institution for certain variables. He wrote up a report and provided it to Deputy Tebrock. The report detailed which institutions where supervisors

were serving as line staff and carrying a patient load, which institutions did not appear to have this problem, as well as other concerns that were ultimately detailed in Dr. Golding's Report to the Receiver.

Rather than address the issues detailed in this report, the report was marked by Deputy Tebrock as "attorney client privilege." This is the case even though no attorney informed Dr. Golding to go to the institutions; no attorney informed Dr. Golding what to look for or what to ask staff about and no attorney took party in the writing or any other aspect of the report. This "attorney client privilege" designation resulted in the September 2018 report not being further distributed and Dr. Golding not including this report in his Golding Report to the Receiver.

At the time that the 2018 Staffing Report was being developed, Dr. Golding also informed Ms. Tebrock and other CDCR management who testified that psychiatry supervisors were serving as line staff with a patient load, and if psychiatry staff were cut in the manner that appeared to be proposed by CDCR, this would result in very bad patient care outcomes. Indeed, Deputy Tebrock admitted that she and Dr. Golding had long talks about the issue of supervisors seeing patients as linestaff. Dr. Golding testified (and it was not disputed by CDCR), that supervisors are necessary to manage patient care and without supervisors more, not fewer, psychiatrists would be required to provide constitutionally minimum levels of mental health care to patients.

Despite these disclosures, CDCR appeared to take two directly contradictory positions at hearing: (1) Dr. Golding never told them of the problem of supervisors serving as line staff with a regular patient load; and (2) everyone already knew of the problem of supervisors serving as line staff, so CDCR did not have to explicitly tell the Court, Plaintiffs or Special Master that its data supporting the 2018 Staffing Plan was predicated on supervisors continuing to serve as line staff with a patient load.

The manner that CDCR approached the 2018 Staffing Report also indicates that it intended to have a predetermined result, not based on accurate data. Testimony at hearing confirmed that both Dr. Golding and Dr. Kuich were excluded from receiving a copy the 2018 Staffing Proposal while it was being developed and presented to Plaintiffs and the Office of Special Master. Instead of simply providing a copy, witnesses testified that Dr. Golding and Dr. Kuich were pulled into meetings, with no advance review of the data or proposal and asked to support the Staffing Plan's staffing ratios. Each was

talked at (not with), the staffing plan psychiatry ratios without providing any of the written data or the 2018 Staffing Plan itself.

Dr. Golding was even asked to sign a declaration to be filed before this Court without CDCR providing to him any data or a copy of the Staffing Report, essentially asking that Dr. Golding serve as a rubber stamp for pleadings filed before this Court. Dr. Golding refused. He testified that he stated he could not sign a declaration in support of the 2018 Staffing Plan without actually being provided the staffing plan and data supporting it. Rather than provide Dr. Golding the requested information so that he could provide a truthful declaration before this Court regarding the proposed 2018 Staffing Plan, CDCR forwent getting a declaration from Dr. Golding, electing to keep him in the dark about the 2018 Staffing Plan. It is clear from this evidence that CDCR wanted to ensure that no one upset the apple cart and called into question the plan to lower the amount of psychiatry staff in order for CDCR to come into compliance with this Court's order and ultimately review its own compliance (as opposed to Court and the Plaintiffs class oversight).

CDCR could not provide a cohesive answer regarding why it failed to provide Drs. Golding and Kuich a copy of the 2018 Staffing Plan and supporting data, claiming that it did not want to burden psychiatry with unnecessary information or tasks, while admitting it pulled Drs. Golding and Kuich in meetings about the staffing plan while not giving them the plan at the meeting to discuss the plan. CDCR witnesses, upon questioning by the Court, had to admit its explanation for its actions made no sense. These actions speaks volumes regarding whether CDCR intended to provide truthful, transparent data in support of its 2018 Staffing Plan and not mislead the Court, Plaintiffs' counsel and the Special Master.

It is undisputed that CDCR did not disclose to the Court or the Special Master (1) to what extent the reporting of average frequency of patient contacts relied on supervisory psychiatrist to complete caseloads contacts with patients; and (2) to what extent CDCR relied on active participation of supervisory psychiatrists in performing the duties of line psychiatrics both in CDCR's 2018 Staffing Proposal and in supporting their representation that, if adopted, the 2018 Staffing Proposal would bring CDCR into compliance with the October 2017 staffing order.

Ms. Ponciano testified that Dr. Golding said there were "too many" psychiatrists, suggesting he supported the psychiatry staffing ratios proposed in the 2018 Staffing Proposal. This testimony was misleading and omitted key facts that Dr. Golding was referring to the ability of CDCR to cut psychiatry staffing if it implemented a clinic based model.

As detailed in the Golding Report, many CDCR psychiatrists waste most of their time searching the prison for their patients because CDCR has failed to create psychiatric clinics in which patients are brought one after the other to their appointments with a psychiatrist who stays seated in one place – a clinic office. *See* Golding Report, pp. 77-81. Having found a patient in the yard, the showers, cell blocks or other areas of the prison, the psychiatrist then must attempt to provide adequate medical care to that patient in a non-confidential setting. Due to the time taken to find the patient, the psychiatrist has less time in which to evaluate and medically treat the patient. There are also reported institutional barriers to locating patients, as at times some correctional officer staff are less helpful in locating patients.

There are obvious medical implications of these practices: (1) patients are not reliably seen for psychiatric appointments; and (2) these brief medical evaluations in inappropriate conditions do not constitute proper psychiatric medical care. One simply has to visualize patients actually having to answer if they are suicidal and taking their medications while stepping out of a shower surrounded by other inmates and prison staff to understand that this is an absurd approach to patient care, would not lead to truthful medical disclosures and would discourage patients from electing to receive medical care in the future. In these circumstances, it is understandable why patients would refuse care if they are asked to disclose highly personal confidential medical information in this setting.

Dr. Golding's Report also detailed there are no executive psychiatrists in institutions or in the regions. These medical implications could be addressed by a team of regional psychiatrists, supervised by Headquarters Psychiatry staff, who could travel to the institutions to implement a clinic model where patients are brought to psychiatrists. *See* Golding Report p. 45, 46, 56, 65, 66, 126. Dr. Golding testified, and informed CDCR management staff that if CDCR implemented a clinic model (as exists in virtually all other health care systems), it could safely cut psychiatry staff. He did not say, as testified by Ms. Ponciano, that there were "too many" psychiatrists.

Additionally, testimony by Ms. Ponciano and Dr. Brizendine indicated that CDCR did not, would not and could not track the supervisors who served as line staff. However, this is again not accurate. Dr. Golding and Dr. Gonzalez provided CDCR methodologies to track this metric, and did in fact provide reports tracking this metric. Dr. Golding provided this information on a monthly basis from information provided from each institution and regularly shared this information in staffing meetings with Deputy Tebrock, Ms. Ponciano, and Dr. Brizendine. It is a simple computer fix for the clinician who sees the patient to input who s/he is and whether that psychiatrist is a supervisor or not. CDCR is the third largest law enforcement agency in the United States with the largest state run prison system in the United States, according to its own publications. The representation that it cannot figure out a way to identify when psychiatry supervisors provide medical care to patients and cannot tell the Court whether it was a supervisor or not that gave medical care to a patient is not credible.

**2. CDCR's Changing of the 30 Day Indicator and Conflating EOP and CCC**

The Neutral Expert Report, page 43 indicated that the change from 30 to 45 days of psychiatric contacts for EOP was misleading and included in two filings with the court. This Court found these actions of changing the timeframe from thirty days to a longer period of time to be a significant alternation of the Program Guide.

The Expert Report described that psychiatric evaluation contact compliance numbers are further biased and misleading. "[For] Program Guide timeline requirements for EOP and CCCMS psychiatric evaluations, the "Timely Psychiatry Contacts" indicator is biased towards compliance by some non-trivial percentage. Second, the data is biased towards compliance as a result of CDCR's decision to default the appointments in EHRS to confidential, combined with insufficient training and oversight relating to this mechanism." *Id.*, at 67-68. The Expert Report did not evaluate the adequacy of medical care that can be provided in non-confidential cell-side visits of short duration, although witnesses stated that adequate medical care cannot be provided in that setting. In considering the findings of the Expert Report in its totality, if CDCR is claiming in order to lessen Court and Plaintiffs' monitoring and oversight that patients are receiving the constitutionally minimum level of mental health care, including timely seeing a psychiatrist in a confidential setting and receiving required medications, the pattern of

misleading data in these areas is critical to the Court's analysis. It is also relevant to understand the question of intent related to why there is a pattern of false increased compliance metrics.

The testimony at hearing supported the conclusion that CDCR's actions of changing the timely psychiatry contacts from thirty days to 45 or 60 days, and then not correcting this data after presenting it to the Court, was intentional and misleading.

The Golding Report at page 27 details a filter option to separate out EOP and CCC that was removed on or about May or June 2018 so that when evaluating patient care at EOP and CCC levels of care, the report returns one timely indicator. As testified by Dr Golding, this masks that the EOP levels of compliance are lower than is reported with the data mixed with CCC levels of care. EOP timeliness metrics are not reported at all in the Staffing report, where these figures would have been significantly lower. *See* Golding Report, pp. 47-57, 135-137.

The Court ordered at Docket No. 6242, p. 5, CDCR must rerun these Performance Reports and file amended documents. As noted on page 8 of Court's Order, Docket No. 6242, Timely Psychiatry Contacts was included in documents provided to the Special Master.

The testimony at hearing was astonishing in this area of inquiry. Despite a Court Order requiring CDCR to rerun these Performance Reports, it was clear from the testimony of Ponciano, Rekard and Leidner, CDCR had not complied with this order. Based on the testimony, it appeared CDCR had no particular plans to ever rerun these Performance Reports and provide them to the Court and Special Master. It also appeared that while some analysis was performed by CDCR to determine what the EOP data would show regarding level of compliance, though admitting discussions occurred with Dr. Golding regarding this indicator, it had not provided that data to anyone other than its own legal counsel and defense team and had no intention of sharing this data or correcting its representations to the Court that were inaccurate.

This is confirmed by Plaintiffs' Response to Defendants' Response to Paragraph 5 of the Court's September 17, 2019 Order, filed October 21, 2019, where Plaintiffs detailed that CDCR admitted it provided false information to the Court, yet failed to provide the Court ordered corrections to filings before this Court.

Dr. Ceballos' testimony was particularly noteworthy. She testified that her sole audience was her own chain of command, appeared to take no responsibility for representations to the Court or Special Master relating to data presented that was maintained by her department under her direction and even claimed she did not know her data was used by the Special Master for monitoring in this case. Dr. Ceballos testified that there are numerous ways in which the program Guide was vague and therefore could be interpreted by CDCR. Upon questioning by the Court, she would not or could not detail any manner in which there is a determination that the ambiguity should be raised with the Special Master to raise the issue of the Program Guide being not clearly written or subject to multiple interpretations. Dr. Ceballos confirmed there were other "business rules" that she changed, similar to the change from 30 to 45 or 60 days timeliness metric, but would not or could not detail all those she had changed without informing the Special Master, Plaintiffs or the Court. Dr. Ceballos testified it was still not clear to her whether she had any duty at all to inform the Special Master of rule changes before she implemented the rule changes.

Related to the Appointments Seen as Scheduled Indicator, Dr. Ceballos testified she took no steps and did not think she was required to or should have to take any steps to inform the Special Master that this change occurred. Dr. Ceballos testified that while the Special Master requests documents, and Dr. Ceballos responds to these requests, she did not realize or understand that the Special Master was relying upon the data that was produced. This is not credible. It also demonstrates a keen lack of interest in providing accurate information to the Court and Special Master and lack of interest in ensuring that when "business rules" are changed, leading to a change in the data that are relied upon by the Special Master and the Court, that there are proper disclosures of the change to ensure accurate information is provided and the Court and Special Master. After the Golding Report, the Court's Orders following the Golding Report revelations, the court-ordered investigation, Neutral Expert Report and evidentiary hearing, the complete lack of interest in ensuring transparency and that accurate data is presented to the Special Master and Court was as astonishing as it was demoralizing. Not providing this information served a purpose. It maintained the illusion that there was higher compliance with Program Guide mandates than actually existed, and thus that psychiatric staffing could be reduced, as set forth in Dr. Golding's testimony.

### 3. The Appointments Seen as Scheduled Metric was Misleading

At Docket 6242, page 9, the Court indicated the focus of the evidentiary hearing was on why appointments seen as scheduled indicator was developed incorrectly, and in the absence of consultation with Dr. Golding or other quality control measures, and what steps CDCR plans to take to ensure indicators and definitions are developed with appropriate consultation and quality control in the future.

The testimony at hearing demonstrated that there are no meaningful plans to include Dr. Golding or his staff in consultation regarding developing these metrics. It is also clear there was no meaningful quality control measures in place at the time and no meaningful plans to create quality control measures to ensure that the same issues that were detailed in the development of the changed Appointments Seen as Scheduled metric do not occur in the future.

The Appointments Seen as Scheduled Metric is misleading and was changed at a critical time when decisions regarding staffing were made. Drs. Golding and Gonzalez analyzed the data by importing each individual appointment that had occurred into an Excel spreadsheet and then calculating those appointments for CCC level of care for all of CDCR that actually occurred as scheduled on 7/10/18. The CDCR report of Appointments seen as scheduled said 95 percent, but a review of actual records was 42 percent. This is a difference of 53 percent of what was presented and the accurate data.

Similarly, at the SAC CCC level of care, on 2/2018 said CDCR claimed there was 91% compliant appointments seen as scheduled, where actual numbers were 22 percent. This is a difference of 69 percent. *See* Golding Report, pp. 36-47, 136.

Moreover, there was the issue of disappearing appointments. This occurs when patients do not come to scheduled appointments, with no entry made on that date. When psychiatrists subsequently see the patient on a later date, these initial appointments neither count as not seen as scheduled on the original date, nor do these appointments even count as cancelled or refused on that initial date, though they count as completed as scheduled on the subsequent date. It is as if these initial missed appointments never were scheduled at all. The initial appointments disappear. This also has the effect of increasing the compliance numbers for CDCR.

CDCR continued to maintain at the evidentiary hearing that the appointments seen as scheduled criteria was correct and excluded issues outside of CDCR's control. This is not accurate. As Dr.

Golding testified that the most common reasons that psychiatrists list when patients do not come to appointments are "Cancelled Unspecified" or "No Show" and when these are checked the patient is not counted as not seen as scheduled. These options are checked because usually the psychiatrist has no idea why the patient did not come. When there are patient no shows or cancellations for unspecified reasons, these reasons are very much within CDCR's control. Certain institutions are better than others at getting patients to appointment. The coding in the system as no show or refused treatment, when checked on by treating psychiatrists, is often incorrect. Even rates of so-called "refused" appointments vary greatly between institutions, indicating that certain institutions are better than others at getting patients to consent to coming to appointments. So, "factors outside of CDCR's control" are not in fact out of their control at all.

If this data were accurately reported, CDCR, the Court, the Special Master and Plaintiffs could pinpoint which institutions are a problem and target those for remediation, and use those institutions doing it well as an example in order to ensure patients received the constitutionally required level of mental health care. Thus, contrary to the argument put forth by witnesses at the evidentiary hearing that this metric is not important or relevant, it strikes at the heart of whether patients are actually getting to mental health appointments, receiving health cate and, and whether the whole system is working efficiently, without patients having to be rescheduled repeatedly. When patients are not being seen as scheduled, they have to be rescheduled to be seen, which means more work for psychiatrists and more psychiatrists that are needed.

Furthermore, the Court's Order, Docket 6242, p. 9, the Appointments Seen as Scheduled and missed appointments data was found by the Court to be incorrect from the time period of 2016 through October 2018. While CDCR agreed to modify this data, it was unclear from the testimony of Dr. Rekard and Ms. Ponciano if CDCR actually corrected this data and/or had any intention of doing so.

**4. Psychiatry Access to Patient Data and Reports Has Been Curtailed or Not Allowed**

The Golding Report detailed Headquarters psychiatry staff's great difficulties in obtaining permission to access databases containing patient data. *See, e.g.* Golding Report, pp. 29, 72-74, 95, 105, 119-120. Headquarters Psychiatry staff require data in order to determine if there are factors adversely

affecting patient care, and how those factors can be solved. It also creates transparency. For example, in 1.5 years after CDCR took over the psychiatric inpatient program and changed the model of care, there were nine (9) successful suicides within 90 days of discharge. In the same locations prior to CDCR takeover in a period of 2.5 years and with a larger population, there was only one suicide within 90 days of discharge. Possible reasons for the increased suicide rate should be statistically explored and obviously is an important issue regarding constitutionally required level of patient care. But Dr. Golding and his team are denied permission to do this kind of analysis.

There were serious findings in the Neutral Expert Report in this area. Yet, testimony of certain CDCR staff at the evidentiary hearing and to the court appointed experts was the lack of access to data and the concerns set forth in Drs. Golding and Dr. Gonzalez's reports was "not a big deal." This is alarming to Dr. Golding and should alarm the Court and Office of Special Master. The totality of the circumstances demonstrates that there must continue to be external oversight of the data, and access to the data for Dr. Golding and Leadership Psychiatry staff to determine if there are barriers to patient care and how to address such barriers, as well as to ensure meaningful quality control measures.

**5. There are No Meaningful Controls In Place to Ensure Data Reported to the Special Master and the Court are Accurate**

Even after all the proceedings that have occurred after the issuance of the Golding Report, it did not appear from testimony at the hearing that meaningful controls with specific oversight is being employed to ensure that data that is reported to the Special Master and the Court is accurate and past data reported was corrected. While Dr. Brizendine and Undersecretary Toche testified that while there was a change committee that is on hold, this committee's purpose was not to verify the accuracy of data. It also did not meaningfully include Psychiatry Leadership or provide any voting rights to Psychiatry Leadership.

There also appeared to be no methodology to ensure the integrity of the Coleman data separate and apart from the data that may be required in Plata. Testimony verified that certain changes to data to address indicators in Plata (because the data is same source data used in both Plata and Coleman), were changed to the Coleman data. There was no method or tracking of what those changes to the source data were for the Coleman case, when the changes occurred and how and to what extent the changes to the source data affected the indicators required for this case (as opposed to Plata).

There did not appear to be a staff person at CDCR who considered herself or himself ultimately responsible to ensure that collection of data and reporting of data to the Court and Special Master team was accurate, or in the words used by the Court, "the buck stops" with him or her. Without such a delineation, incorrect and misleading information will continue to be created, as there are no effective controls to ensure the problem does not continue.

It also appeared there was no understanding that the point people to communicate with the Special Master were required to accurately communicate with the Special Master, including disclosing concerns raised by staff (including Dr. Golding and other psychiatrists), methodology, disclosing changes made to data and business rules that implicate patient safety and care and required Court disclosures.

It was not clear from the testimony that there was a means employed to ensure reliability and transparency for correction of *all* data that was false and/or misleading that had been previously filed in this case.

Lastly, Dr. Golding's entire effort in first raising concerns within CDCR and then finally raising concerns set forth in the Golding Report to the Receiver is to ensure there is safe, effective and constitutionally required mental health care for CDCR patients. This has not been an easy road for him. As was clear by the testimony of CDCR witnesses, both in their words used, tone and body language, certain CDCR staff are not happy that Dr. Golding aired CDCR's dirty laundry in public and feel (rightly or wrongly) personally attacked.

It was not Dr. Golding's intent to personally attack anyone, hurt their feelings or make their professional lives more difficult. Rather, Dr. Golding has seen acute human suffering of CDCR patients that is preventable. He has detailed severe patient injury and preventable deaths. He objected to false and/or misleading data being used to make decisions that will impact patient care. Dr. Golding's entire effort has been to raise concerns that would alleviate this human suffering and allow CDCR to better and more accurately perform its job related to providing mental health care. As with many whistleblowers, Dr. Golding cared more about alleviating this human suffering than the personal cost to him for coming forward, which has included detrimental effects to his career, ongoing personal attacks, and ostracizing that he has experienced for having had the bravery to come forward and to tell the truth.

It is Dr. Golding's hope that real sustained change will be made as a result of his reports and personal sacrifice.

Respectfully submitted,

WENDY MUSELL

STEWART & MUSELL, LLP
Attorneys for Michael Golding, M.D. and Melanie Gonzalez, M.D.