Wendy Musell, SBN 203507
Stewart & Musell, LLP
2200 Powell Street, Suite 440
Emeryville, CA 94608
415-593-0083
Fax: 415-520-0920
E-mail: wmusell@stewartandmusell.com

Attorneys for Non-party Witness
Dr. Melanie Gonzalez

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et.al., | Case No.: 2:90-CV-0520 KMJ DB P |
| Plaintiffs, | **DECLARATION OF MELANIE GONZALEZ, M.D.** |
| v. | |
| EDMUND G. BROWN, JR. et. al., | |
| Defendants. | |

I, Melanie Gonzalez, M.D., declare:

1.    I hold the position of Senior Psychiatrist Specialist at Headquarters – Elk Grove, with the California Department of Corrections and Rehabilitation. I have held this position since January 2017. I have worked for the California Department of Corrections and Rehabilitation since July 2014, first as a Staff Psychiatrist at California Health Care Facility in Stockton from July 2014 until January 2015, then as a Staff Psychiatrist (telepsychiatrist) at Headquarters – Elk Grove from February 2015 through December 2016.

2.    In relation to the Court's Minute Orders, Docket Nos. 6053 and 6055; as well as the ongoing evidentiary hearing in the above captioned matter, I hereby submit this declaration along with the Whistleblower Complaint Regarding Patient Care and Safety, dated October 24, 2018, that I sent to J. Clark Kelso, Receiver, State of California, Prison Health Services on that date.

**DECLARATION OF MELANIE GONZALEZ, M.D.**
Case No. 2:90-CV-0520 KMJ DB P

3.     With this declaration I seek to authenticate the Whistleblower Complaint Regarding Patient Care and Safety and the attachments therein, and do so herein by reference to the page numbers located in the lower right corner of the document.

4.     Attached hereto as Exhibit A is a true and correct copy of my 50 page whistleblower complaint that I drafted entitled "Whistleblower Complaint Regarding Patient Care and Safety." I submitted this complaint to Mr. J. Clark Kelson, Receiver for the State of California on October 24, 2018. The whistleblower complaints consists of my four page letter, marked as PL-165, Page 001-004 and subsequent attachments designated as PL-165 Page 005-Page 050, which are discussed in detail within my complaint and authenticated herein.

5.     To the best of my knowledge and based on a review of my work records, review of data available to me, my own expert analysis and materials referred to in the Whistleblower Complaint Regarding Patient Care and Safety (Exhibit A) is true and accurate, with the following exceptions:

6.     In the document entitled "Psychiatry Indicators and Biases" at PL-164, Page 005, subsection 1.e. I wrote, "In December 2016 the indicator was inexplicably changed to count EOP appointments as timely if they occurred within 45 days of the prior appointment, despite the Program Guide rule that EOP psychiatry appointments must occur at least monthly." That passage should read as follows: "In December 2016 the indicator was inexplicably changed to count EOP appointments as timely **if they occurred within 45 days of the prior appointment, or by the end of the next calendar month, whichever is sooner,** despite the Program Guide rule that EOP psychiatry appointments must occur at least monthly."

7.     I mention several times in my complaint that refused appointments are counted as completed. I believed that statement to be true at the time, because the few appointments I saw that were marked as refused were counted as completed. I have since learned that those refused appointments I found were incorrectly counted as completed, and that the vast majority of refused appointments were not actually counted as completed.

8.     I also want to clarify that on PL-164, Page 006, (Timely MH Referrals, 1.a.i) I wrote "to discuss their medication non-compliance within seven days" and on PL-164, Page 010, (Medication Non-Compliance Appointments as CHCF, second full paragraph) I wrote "and require an appointment with a psychiatrist within 7 days, per policy." The policy does not specify the timeframe, it just states that the patient is required to have a medication non-adherence appointment with a psychiatrist.

9.     PL-165, Page 005-Page 009, entitled "Psychiatry Indicators and Biases", is a true and correct copy of a document that I created and provided to Dr. Golding on September 4, 2018.

**DECLARATION OF MELANIE GONZALEZ, M.D.**
Case No. 2:90-CV-0520 KMJ DB P

10.    PL-165, Page 010-Page 013, entitled "Medication Non-Compliance Appointments at CHCF" is a true and correct copy of a document that I created. The document discusses issues with the Timely MH referrals indicator, as fully described in my whistleblower complaint. I gave a draft of this document to Dr. Golding on August 3, 2018, and an updated version at the end of August.

11.    PL-164, Page 014-Page 019, entitled "CDCR Mental Health Performance Report for 5/1/18 to 5/31/18" is a true and correct copy of the Performance Report indicators, with footnotes that I added briefly explaining my issues with some of the indicators.

12.    PL-164, Page 020-Page 026, entitled "Psychiatrist Continuity of Care" is a true and correct copy of a document that I created based on my review of the Psychiatrist continuity of care indicators. I reviewed the definitions and the reported compliance numbers statewide for January 2018 through August 2018 and put my findings in this document.

13.    Pl-164, Page 027-Page 030 is a true and correct copy of an email I sent to Dr. Golding on November 16, 2017. It is a summary of my findings from interviews I conducted of psychiatrists at California State Prison Sacramento during the month of November 2017.

14.    PL-164, Page 031 is a true and correct copy of a screenshot of the Appointments Seen As Scheduled description and definitions, showing the description ("Percentage of all scheduled appointments that were seen") and the definition of the denominator ("All scheduled appointments"), both of which were incorrect and misleading. I took the screenshot myself on the date noted in the bottom right corner of the image.

15.    PL-164, Page 032- Page 035 is a true and correct copy of an email I sent to Dr. Golding, on July 31, 2018, including spreadsheet attachments that I created showing the percentage of appointments coded as confidential during the month of May 2018.

16.    PL-164, Page 036-Page 050, are true and correct copies of emails I sent and received utilizing CDCR email to the persons stated in the email. The dates set forth on the face of the email are accurate.

I declare under penalty of perjury under the laws of the State of California and federal law that the foregoing is true and correct.

Respectfully Submitted,

Melanie Gonzalez, M.D.

**DECLARATION OF MELANIE GONZALEZ, M.D.**
Case No. 2:90-CV-0520 KMJ DB P

3

# Exhibit A

October 24, 2018

**Via USPS Certified Mail and Email (Clark.Kelso@cdcr.ca.gov)**

J. Clark Kelso
Receiver
State of California
Prison Health Care Services
P.O. Box 4038
Sacramento, CA 95812-4038



Re:    **Whistleblower Complaint Regarding Patient Care and Safety**
       *Coleman v. Brown, Case No.* 2:90-CV-0520 KMJ DB P

Dear Mr. Kelso:

I am writing to you in order to bring to your attention matters that I think implicate very serious health and safety concerns for patient/inmates statewide, as well as concerns I have regarding the accuracy of reporting of patient/inmate data for the purposes of monitoring required patient care and outcomes in the *Coleman v. Brown, Case No.* 2:90-CV-0520 KMJ DB P, currently pending before the United States District Court for the Eastern District of California.

I am coming forward at this time, at significant risk to my career, because I am concerned that mental health treatment of patient/inmates is not being accurately reported and certain practices place patient/inmates at significant risk of injury or death. These issues are preventable, in my medical opinion, with accurate monitoring, reporting and policy changes with implementation of such changes. I am also concerned about retaliation for my whistleblowing, but feel that my oath to patients and my profession require me to come forward at this time.

I have worked for the California Department of Corrections and Rehabilitation since July 2014, first as a Staff Psychiatrist at California Health Care Facility in Stockton from July 2014 until January 2015, then as a Staff Psychiatrist (telepsychiatrist) at Headquarters - Elk Grove from February 2015 through December 2016, and most recently as a Senior Psychiatrist Specialist at Headquarters - Elk Grove since January 2017.

My job duties currently include representing psychiatry on numerous committees, writing statewide policies and procedures, performing thorough chart investigations of cases of interest, assisting psychiatrists with electronic health record system (EHRS) problems, working with IT and Cerner to update EHRS, training psychiatrists on EHRS, and reviewing and analyzing quality management data related to psychiatry.

I received my Medical Doctorate from Keck School of Medicine at the University of Southern California in 2010, and completed Psychiatry Residency at California Pacific Medical Center in San Francisco in 2014. My undergraduate degree is a Bachelor of Science in Psychology with a Mathematics emphasis from the University of California at Davis.

J. Clerk Kelso, Receiver
October 24, 2018
Page 2

While working as a telepsychiatrist, I frequently checked the Current Due Dates report, and noticed in December 2016 that my patients were suddenly due for follow-up appointments every 45 days or by the end of the next calendar month (whichever was sooner), rather than every 30 days. At the time, I had thought it was likely due to a policy change.

Shortly after starting my new position as a Senior Psychiatrist, Specialist, I learned that there had been no policy change regarding how frequently Enhanced Outpatient (EOP) patients required psychiatry appointments. I informed my supervisor, Dr. Golding, of the change in the Current Due Dates report, and he asked me to look into it further.

I ran Current Due Dates reports for psychiatrists at multiple institutions, and then sent an email to him and Dr. Lindgren dated 3/21/17 explaining my findings. Attached was a copy of my Current Due Dates report from October 2016, showing the correct 30 day due dates for my patients, and a Current Due Dates report from 3/21/17 for a colleague's patients, showing the incorrect 45 day due dates. In a follow-up email, I also explained how due to Quality Management's methodology of measuring whether appointments occurred on time by using patient-weeks, an EOP patient could be seen on 2/2/17 and not have a follow-up appointment until 8 weeks later on 3/29/17, and yet be counted as 75% compliant with timeliness (due to having 6 weeks of compliance, and 2 weeks of non-compliance). Dr. Golding followed up with QM regarding this change, and the rule was subsequently reverted back to 30 days shortly thereafter. My emails to Dr. Golding regarding this topic are attached. I have not included the Current Due Dates reports, as they contain patient information, but can submit redacted copies if requested. However, I believe that the reporting of the prior data was not amended to demonstrate the correct percentages of compliance.

In September 2017, Dr. Golding asked me to review how often patients are discharged from crisis beds without evidence that the psychiatrist agreed with the plan to discharge the patient. I reviewed 32 cases from four institutions via checking each patient's chart for documentation or orders that showed that the psychiatrist had been consulted and agreed with discharge. I found that in half of all patient discharges, there was no evidence of psychiatric involvement in the discharge process. This was concerning to me, given that we have received feedback from psychiatrists in the field that they are sometimes not consulted about whether their patient is ready for discharge, and are told of the patient's discharge after the discharge has been ordered and custody has been called to pick up the patient. Further, a few psychiatrists have also informed me that they have had cases in which they stated the patient was not ready for discharge and required further medical care, but the patient was still discharged by the treatment team against the psychiatrists medical advice. I believe one example of the latter scenario was included in the Golding Report, with details I obtained from a review of the patient's chart.

In November 2017, Dr. Golding asked me to speak with the psychiatrists at California State Prison Sacramento, to determine whether they had barriers to seeing patients and engaging in a clinic-style model. I created a template of questions to ask, and asked all of their psychiatrists over the phone, with the exception of one I was unable to get ahold of, the questions

J. Clerk Kelso, Receiver
October 24, 2018
Page 3

in my template and recorded the answers contemporaneously in writing. I saved each psychiatrist's responses and comments in a separate document. I then emailed Dr. Golding a summary of my findings on November 16, 2017. These documents and a copy of the email are attached. The communications with the psychiatrists disclosed numerous and significant barriers to seeing patients, seeing patients timely and engaging in a clinic-style model.

I was on maternity leave from December 29, 2017 until July 16, 2018. When I returned to work in July, Dr. Golding asked me to look into the Timely Psychiatry Contact indicator again, as the reported compliance numbers seemed too high.

On July 25, 2018, Dr. Golding received an email from a senior psychiatrist in the field stating the timely mental health referrals indicator only tracks the ordered medication non-compliance appointments, rather than tracking *all* of the patients who required medication non-compliance appointments and ensuring that each patient's required appointment occurred in a timely fashion.

Dr. Golding asked me to look into this issue and evaluate the data to determine if the information received from the psychiatrist was accurate. I found that not only does the indicator only look at ordered appointments, but it also excludes almost all cancelled appointments from the calculation, and counts refused appointments as completed. This leads to a significant and false over-reporting of the percentage of compliance, meaning the data would show levels of compliance that were not accurate and much higher than the actual level of compliance.

Due to discovering several issues with the way data was being analyzed and reported, Dr. Golding asked me to review all of the quality management indicators that are relevant to psychiatry, to see if there were any other oddities. Over the next month, whenever I was not busy with other tasks, I reviewed the indicators included in the Performance Report and the Dashboard, using data from other indicators or from talking to psychiatrists in the field to check the indicators' accuracy. I also checked the indicators' definitions, and learned that some indicators, such as 'Appointments seen as scheduled' and 'Diagnostic monitoring', were excluding a large portion of data points, in a manner that led to the appearance of greatly improved compliance that was inaccurate. I updated Dr. Golding whenever I discovered anything of note, and compiled my findings in the document titled 'Psychiatry Indicators and Biases', which I submitted to him on September 4, 2018. Prior to completing this document, I also gave Dr. Golding a print-out of the Performance Report indicators, with footnotes briefly explaining my issues with some of the indicators.

One of the indicators I reviewed was the 'Timely MH referrals', which I cross-checked against the 'Appointments' indicator, and the 8/3/18 'Huddle report' (the Huddle report is updated daily, and it is not possible to review old Huddle reports, thus the date of the Huddle report I included is simply the date that I checked the report). I created a document titled 'Medication Non-Compliance Appointments at CHCF' that discusses issues with the 'Timely MH referrals' indicator, and gave a draft of this document to Dr. Golding on August 3, 2018 and

J. Clerk Kelso, Receiver
October 24, 2018
Page 4

an updated version at the end of August.  I also referred to this information in 'Psychiatry Indicators and Biases'.

On 10/13/18, I reviewed the 'Psychiatrist continuity of care' indicator. I reviewed the definitions and the reported compliance numbers statewide from January 2018 through August 2018. I put my findings in a document titled 'Psychiatrist Continuity of Care.'  I found there were significant problems related to accurately reporting continuity of care, as set forth in my document.

Approximately one week prior to Dr. Golding submitting his report "CDCR Mental Health System Report" to the State Receiver, I read a draft version of the document, and can attest to my agreement with the statements it contained, including the systemic issues it reveals relating to patient health and safety and the misreporting of data resulting in inaccurate inflating of compliance.

I can be contacted through my attorneys Wendy Musell, Stewart & Musell, LLP 2200 Powell Street, Suite 440 Emeryville, CA 94608, 415-593-0083.


Sincerely,

Melanie Gonzalez, M.D.

Cc: KJMOrders@caed.uscourts.gov;

cschultz@caed.uscourts.gov

Encl.

## Psychiatry Indicators and Biases

<u>Timely Psychiatry Contacts</u>

1. Biases due to measurement:
   a. Measured in weeks, rather than on-time versus late. This causes significant bias towards inflating compliance.
      i. E.g. an Enhanced Outpatient Program (EOP) patient had a psychiatry appointment on Monday, 8/13/18, and their next appointment wasn't until Friday, 9/21/18. They were due to be seen by 9/12/18 (per Program Guide rules), so are 9 days late, but due to compliance being measured by weeks, there are four weeks of compliance and one week of non-compliance, which is then reported as 80% compliant. If you have 100 patients, 50 of whom are seen on time, and 50 of whom are seen late by one week, the reported Timely Psychiatry Contacts compliance rate will be 90%. It would be very easy to think that the 90% compliance rate meant that 90% of the patients were seen on time, when in actuality only 50% were.
   b. The clock resets when patients transfer.
      i. E.g. a Correctional Clinical Case Management System (CCCMS) patient had a psychiatry appointment on 3/5/18, and was due to been seen again by 6/3/18 (90 days later). However, the patient transferred to a different CCCMS institution on 5/25/18. Instead of requiring that the patient still be seen by 6/3/18 (to comply with the Program Guide rules), and reporting it as late if it occurs after 6/3/18, this indicator resets the clock to the date of transfer, and only reports the appointment as late if it occurs more than 90 days after transfer. In this example, the patient could go 172 days (from 3/5/18 to 8/23/18) without seeing a psychiatrist, and still be counted as compliant.
   c. Physician orders for follow-ups prior to maximum time per Program Guide are ignored by this indicator.
      i. E.g. a CCCMS patient has a psychiatry appointment on 3/5/18, and the psychiatrist is concerned about him, so orders a follow-up appointment for three weeks later. This appointment was scheduled but cancelled due to custody, or was refused, or did not occur for any number of reasons, and the patient was not seen again until 6/2/18. This indicator counts that appointment as compliant, because it occurred within 90 days, despite the appointment being 68 days late based on the psychiatrist's clinical judgment, and order, that the patient needed follow-up within three weeks.
   d. Sixty percent of psychiatry supervisors see patients (per our polling data), due to staffing shortages. The compliance numbers in this indicator are presented as having been obtained by line staff alone, and are used to determine psychiatry staffing needs. This both results in an underestimate of staffing needs, and in supervisors being unable to do necessary supervisory work due to having to compensate for the line staff shortage.
   e. In December 2016 the indicator was inexplicably changed to count EOP appointments as timely if they occurred within 45 days of the prior appointment, despite the Program Guide rule that EOP psychiatry appointments must occur at least monthly. This

significantly inflated the compliance percentages statewide, and allowed for an inaccurately favorable report to the court in March 2017. The indicator was not fixed until this change was discovered by the psychiatry team in March 2017.

<u>Appointments seen as scheduled</u>

1.  Biases due to measurement:
    a.  The definition of this indicator states that it measures "All scheduled appointments", but in actuality it only includes appointments that are coded as Seen, Cancelled due to ProviderUnavailable, Cancelled due to ModifiedProgram, or Cancelled due to TechnicalDifficulties (see snip titled Appointments seen as scheduled). It excludes Refusals, No Shows, and all other cancelled appointments, which account for approximately half of all scheduled appointments.
        i.  E.g. the Appointments seen as scheduled indicator reports that 95% of mainline CCCMS appointments in CDCR in February 2018 were seen as scheduled. (see attachment CDCR CCCMS appointments seen as scheduled) However, per the Appointments report, in February 2018 in mainline CCCMS, there were 84,120 mental health appointments, 35,642 of which were seen (see Excel spreadsheets titled CDCR CCCMS all appointments in February 2018 and CDCR CCCMS completed appointments in February 2018). Thus the percentage of appointments that were seen as scheduled was 42%, not 95%.

<u>Timely MH Referrals</u>

1.  Biases due to measurement:
    a.  Only measures the referrals that were ordered, not all of the referrals that occurred, *or should have occurred.* Ordered referrals are much more likely to be completed and done on time than are referrals that should have been ordered but weren't.
        i.  E.g. on 8/3/18 at CHCF, 225 patients were flagged as non-compliant with their psychiatric medication (meaning they refused 50% or more of their psychiatric medication in a week, or refused three consecutive days of psychiatric medication, or refused one dose of a critical psychiatric medication). Each of these patients is supposed to be seen by a psychiatrist to discuss their medication non-compliance within seven days, or within one day for refusal of a critical medication. However, during the entire month of August, there were only 17 medication non-compliance appointments scheduled at CHCF – 10 were seen, 7 were cancelled. The cancelled appointments were excluded from the Timely MH Referrals measurement, with the exception of one cancelled appointment that was counted as completed, despite never having occurred. Additionally, two refused appointments were counted as completed, and one seen appointment was counted twice, so the compliance was recorded as 12/12, or 100% for the month of August (see CHCF August Timely MH referrals screenshot). In actuality, 225 patients required follow-up for medication non-

compliance on a single day in August, and only 8 patients (12 minus the appointment that was counted twice, minus the cancelled appointment that was counted as completed, and minus the two refused appointments) in the whole month of August had a completed medication non-compliance consult. If we use these numbers (8 out of 225), the compliance percentage is 3.6%. However, if the entire month of August is included – not just a single day – this compliance percentage would be much lower.

ii. E.g. for the month of July at CSP-Sacramento, there was one urgent MHMD consult, two emergent MHMD consults, and three routine MHMD consults (see snip titled SAC Timely MH referrals). It is unlikely that there were truly only three routine MHMD consults in a month at an institution with such a large mental health population. The far more likely scenario is that most routine MHMD consults were "ordered" by psychologists or social workers via stopping by the psychiatrist's desk, calling them on the phone, or emailing them, rather than placing an official order (see email from Dr. Golding titled "FW: MHMD emergent consults"). This prevents an institution from having a low compliance rate despite insufficient psychiatry staffing to complete these consults, because these consults will not be measured by the indicator. Compare this to an institution with sufficient psychiatry staffing – at San Quentin during the same month there were 32 routine, 11 urgent, and one emergent MHMD consults (see snip titled SQ Timely MH Referrals).

b. Excludes most cancelled appointments, and counts refusals as "completed". As described in "Appointments seen as scheduled 1 a" above, all cancelled appointments, except those coded as ProviderUnavailable, TechnicalDifficulties, and ModifiedProgram are also excluded from this indicator's calculations.

2. Biases due to lack of knowledge:

a. Many psychiatrists appear to not know about the medication non-compliance appointment order in EHRS, or are not aware of the requirement to see patients who have been flagged for medication non-compliance. If all psychiatrists had this knowledge, and placed a medication non-compliance appointment order for every patient flagged as non-compliant, there would be thousands of medication non-compliance appointments statewide per month. Psychiatry staffing is not sufficient to complete all, or even most, of these appointments; so the percentage of MH referrals completed on time would significantly decrease.

3. Biases due to random error:

a. Medication non-compliance appointments may be ordered erroneously as a psychiatry follow-up appointment, and thus not captured by this indicator. Also, as mentioned above, mental health referrals may be communicated to the requested provider verbally and an order never placed in EHRS, despite knowledge of the process and intention to place an order. In both of these examples the appointment is less likely to occur when there is no official order, due to a number of factors, including the increased likelihood of the provider forgetting, the provider having limited time and triaging some of these appointments as less important, and there being less pressure from supervisors on the

provider to complete the appointment in a timely manner to improve the indicator results.

Appointment confidentiality: There is an indicator for "Group treatment in a confidential setting", but not for psychiatry appointment in a confidential setting. However, this is an important indicator of quality care, and should be one of the measured indicators. Currently, there is no easy way to determine the percentage of psychiatry appointments at a given institution or level of care that were confidential, but it is possible to use the Appointments report to check on whether individual appointments were recorded as confidential or non-confidential, count all of the confidential appointments in the population of interest, then divide by the total number of appointments in order to get a percentage. This is time-consuming, but more importantly it is inaccurate, due to the following biases.

1. Biases due to measurement: In the Electronic Health Record System (EHRS), confidentiality is recorded in a drop-down menu on the appointment check-out screen. The default value is "Confidential", thus if the provider does not change this selection, all appointments are recorded as confidential. If an accurate measure of confidentiality was desired, this drop-down menu would default to NULL (no selection), and it would require the provider to change the selection to either confidential or non-confidential.
2. Biases due to lack of knowledge: If a provider does not know how to record an appointment as non-confidential, it is recorded as confidential (due to #1 above).
   a. E.g. in the MHCB at CCWF, the psychiatrists reported that all routine psychiatry appointments are conducted in the patient's cell, not in a confidential treatment room, thus 100% of the routine appointments are non-confidential. All of the psychiatrists stated they did not know how to record an appointment as non-confidential. Per the Appointments report, there were 96 completed psychiatry appointments in CCWF MHCB in May 2018, 100% of which were recorded as confidential.
3. Biases due to random error: Even if a provider knows how to record an appointment as non-confidential, if they forget, or are in too much of a hurry, to change the drop-down menu to non-confidential, it is recorded as confidential.
   a. E.g. in the MHCB at CHCF, the psychiatrists reported that all routine psychiatry appointments are conducted cell-front, not in a confidential treatment room, so 100% of the routine appointments are non-confidential. All of the psychiatrists stated they knew how to record an appointment as non-confidential. Per the Appointments report, there were 289 completed routine psychiatry appointments in CHCF MHCB in May 2018, 31% of which were recorded as confidential.

Diagnostic Monitoring (Medication Administration Process Improvement Program)

1. Biases due to measurement:
   a. Until June 2018, this indicator ONLY measured whether annual labs and tests were done. MAPIP guidelines mandate obtaining baseline, 3 month, and annual labs for antipsychotics (except Clozapine) and mood stabilizers, obtaining labs within 14 days of increasing the dose of mood stabilizers, and obtaining baseline, 3 month, and annual

weight/height and blood pressure for antipsychotics and Clozapine. However, until June 2018, the indicator monitoring compliance with these guidelines did not even measure whether baseline, 3 month, or dose increase labs and tests were done. It only checked to see if annual labs and tests were done, and reported 100% compliance if the annual lab draw and tests occurred (see Memorandum dated 7/3/2018).

    i.   E.g. A patient is prescribed an antipsychotic, and has labs, a blood pressure measurement, and his weight obtained 8 months after starting the medication, but had no tests or labs done at baseline or 3 months. This indicator reports that this patient is 100% compliant with MAPIP, despite being only 33% compliant. This is very misleading, but more importantly it is *dangerous* and poor care. If his blood pressure is elevated, he is morbidly obese, and his fasting lipid levels are critically high at 8 months, we have no idea whether those problems were all present prior to starting the antipsychotic – in which case we likely would not have started the medication – or occurred within the first few months after starting the medication – in which case we would likely have stopped it after obtaining the 3 month test results. Failing to obtain these labs and tests can lead to permanent organ damage or death.

b.   Until June 2018, it counted annual labs and tests as completed if the patient had the relevant labs and tests done at any point within a year of starting the medication. Since June 2018, it still counts annual labs and tests as completed if the patient had the relevant labs and tests done between 91 and 365 days after starting the medication. The baseline, 3 month, annual, and after dose increase criteria for obtaining labs and tests is not arbitrary. It was created by physicians, per their clinical judgment of the minimum monitoring necessary to maximize patient safety. Therefore, measuring whether the required tests were done at any point within a year or at any point from 91 to 365 days after starting the medication – not within limited periods around the baseline, 3 month, annual, and dose increase time points – is inappropriate, and leads to falsely elevated compliance.

c.   Until June 2018, it excluded patients who were not on the same medication class for the whole year. This inflated MAPIP compliance, because these patients were less likely to have had the required labs and tests, due to the provider not having had an entire year during which to have ordered labs and tests.

## Medication Non-Compliance Appointments at CHCF

There were 17 medication non-compliance appointments scheduled at CHCF for the month of August.

10 were "completed": 8 on-time, 2 refused

7 were cancelled: 5 as CancelledUnspecified, 1 as SchedulingError, 1 as SchedulingConflict

Thus CHCF appears to be 59% compliant with completing medication non-compliance appointments, since refused appointments are counted as completed. The percentage of scheduled medication non-compliance appointments that were seen on time was 47% (8 divided by 17). The Performance Report shows 100% compliance for medication non-compliance consults completed within 7 days.[1]

It is important to note that the Timely MH Referrals report excludes cancelled appointments. Appointments are frequently cancelled on the day of the appointment, often due to the patient refusing to attend or not showing up, and these are sometimes coded as CancelledUnspecified due to the provider not giving an appointment cancellation reason. In the case of the medication non-compliance appointments, these are patients who have been flagged as medication non-compliant and require an appointment with a psychiatrist within 7 days, per policy. Many, but not all, of these cancelled appointments are rescheduled, but the patients who do not have their appointment rescheduled do not receive their required medication non-compliance appointment. By removing cancelled appointments from the calculations, this indicator ignores these patients, and reports a falsely elevated timely completion rate.

One might argue that this is an indicator for *timeliness* of referrals, and thus should only include referrals that were completed. However, if a referral is required by policy, but is never done, that required referral is not timely, and this deficiency needs to be recorded. An indicator that only reports on the timeliness of completed consults, and excludes all consults that were cancelled or never occurred despite being required, is not very helpful, and is incredibly misleading. Plus, the definition of the Timely MH Referrals denominator is "Number of Routine, Urgent, Emergent, Med Refusal, and RVR MHA referrals that either came due or were completed during the reporting period." Thus even though these cancelled appointments were not completed, they *came due* during the reporting period and should be included in the compliance statistics.

More concerning, per the Huddle Report on 8/3/18, for that ONE day, 225 patients were flagged as psychiatric medication non-compliant (had refused 50+% of their psychiatric medication doses in a week, or refused three consecutive days of psychiatric medication, or refused one dose of a critical psychiatric medication). To get this number I had to open the Huddle Report for each Care Team (e.g. D5B, D6A – each entry with a number listed below is a separate Care Team), scroll down to the section titled **"EHRS Institutions Only: Patients with Medication Administration Policy Alerts (All Medication Admin Alerts):"**, and sort through to find the psychiatric medication refusals. Many of the patients only had medical medications listed, so those patients were excluded. Additionally, many patients had medications listed that could have been prescribed by either Medical or Psychiatry – if there were no other psychiatric medications listed for that patient, I excluded the patient and assumed the medication was prescribed by Medical, thus 225 is likely lower than the real total.

---

1. This number was obtained by excluding the cancelled appointments from the denominator, counting the refusals as timely completions, including one of the cancelled appointments as completed, and counting one of the completed appointments twice.

Although it would have taken minutes to get the above data if I had access to the database and could run a query for CHCF patients who were flagged as non-compliant with psychiatric medication, compiling this information manually took me over 3 hours.

Please note, 225 is the number of patients flagged on one day. If we were to extremely conservatively estimate that those 225 patients are the only patients at CHCF who were flagged as psychiatric medication non-compliant for the whole month of August, then 8 of the 225 (3.6%) patients actually received their required appointment. It is highly likely that there were more patients flagged as psychiatric medication non-compliant if the whole month of August were included, not just a single day, in which case this percentage would be lower.

Additionally, the Timely MH Referrals indicator reported 291 MH referrals at CHCF during the month of August. This figure only includes the 12 previously mentioned medication non-compliance appointments. If every patient who required a medication non-compliance appointment had one scheduled for them, at the very least there would be 213 (225 minus 12) additional MH referrals, for a total of 504 MH referrals during the month of August. Using this more accurate, but still extremely conservative, figure, the percentage of MH referrals completed on-time would be 55%, not 96% as is reported in the Performance Report.

Number of patients who were flagged as psychiatric medication non-compliant on 8/3/2018 in the CHCF Mental Health Huddle Report, listed by Care Team:

| | |
|---|---|
| A1A | 5 |
| A1B | 3 |
| A2A | 5 |
| A2B | 4 |
| B1A | 2 |
| B1B | 3 |
| B2A | 0 |
| B3A | 1 |
| B3B | 2 |
| B4A | 5 |
| B4B | 1 |
| B5A | 6 |
| B5B | 4 |
| B6A | 4 |
| B6B | 3 |

| | |
|---|---|
| B7A | 2 |
| B7B | 4 |
| B8A | 0 |
| B8B | 3 |
| C1A | 1 |
| C1B | 1 |
| C2A | 0 |
| C2B | 1 |
| C3A | 0 |
| C3B | 1 |
| C4A | 0 |
| C4B | 2 |
| C5A | 1 |
| C5B | 0 |
| C6A | 1 |
| C6B | 1 |
| D1A | 1 |
| D1B | 2 |
| D2A | 0 |
| D2B | 1 |
| D3A | 1 |
| D3B | 1 |
| D4A | 0 |
| D4B | 1 |
| D5A | 0 |
| D5B | 0 |
| D6A | 1 |
| D6B | 0 |
| D7A | 0 |

| | |
|---|---|
| D7B | 1 |
| E 01-25 | 32 |
| E 26-50 | 23 |
| E 51-75 | 42 |
| E 76-00 | 34 |
| E1A 01-25 | 2 |
| E1A 26-50 | 1 |
| E1A 51-75 | 3 |
| E1A 76-00 | 2 |
| Work Crew | 11 |

Total = 225 patients (not medications) were flagged as non-compliant with their psychiatric medication at CHCF on 8/3/18. This only includes the patients who: 1) refused 3 consecutive days of psychiatric medication; or 2) refused 50% or more of their psychiatric medication doses in a week; or 3) refused one dose of a critical psychiatric medication.

# CDCR Mental Health Performance Report for 5/1/18 to 5/31/18



## Performance Improvement Priorities

**Timely MH Referrals** [1]
92%
(15,724)

**Appointments Cancelled Due to Custody** [2]
2%
(461,238)

**Primary clinician continuity of care**
83%
1,589,344)

**Psychiatrist continuity of care**
85%
(344,552)

**Treatment plans with satisfactory documentation**
67%
(33)

**Discharges from MHCB with clinician review of d/c summary**
100%
(3)

**Diagnostic Monitoring** [3]
95%
(126)

**Polypharmacy Medication Review**
97%
(6,120)

**Effective Communication Achieved**
96%
(148,106)

**Discharge FollowUps**
93%
(5,397)

**Timely PC Contacts** [4]
97%
(294,708)

**Timely Psychiatry Contacts** [5]
93%
(257,390)

## Mental Health Crisis Bed

**DSH/PIP physical discharges within timeframes**
77%
(176)

**Timely admission to MHCB**
86%
(845)

**MHCB clinical stays within timeframes**
90%
(803)

**MHCB physical discharges within timeframes**
95%
(674)

## Suicide Prevention

**Suicide Risk Evaluation**
92%
(5,557)

**Discharge FollowUps**
93%
(5,397)

**SREs that met all audit criteria**
79%
(34)

**Suicide Count**
1
(1)

## Access to Care

**Timely MH Referrals**
92%
(15,724)

**Timely IDTTs**
98%
(130,055)

**Timely PC Contacts**
97%
(294,708)

**Timely Psychiatry Contacts**
93%
(257,390)

**Treatment Scheduled**
92%
(25,973)

**Effective Communication Achieved**
96%
(148,106)

**all IDTTs observed in which a health record and C-file are available**
100%
(22)

**Adequate IDTT space**
100%
(3)

**Mental Health Screens**
93%
(7,412)

1. Timely MH Referrals only measures the percentage of *ordered* referrals that were completed on time. Ordered referrals are much more likely to be completed than referrals that should have been ordered but weren't (e.g. most med refusal referrals), thus leading to inflated compliance.
2. For an appointment to be measured as "Cancelled due to custody" the provider must first choose "cancelled", and then give custody as the reason. Most cancelled appointments are labeled as "CancelledUnspecified", because the provider did not choose a cancellation reason.
3. Diagnostic monitoring appears to be measuring MAPIP compliance, but it is unclear how they achieved the above percentage, as MAPIP compliance is nowhere near that value.
4. Timely PC Contacts are measured in patient-weeks, and when a patient transfers institutions the clock resets.
5. Timely Psychiatry Contacts are measured in patient-weeks, when a patient transfers institutions the clock resets, and the indicator only looks at whether an appointment occurred within the maximum allowed period per the Program Guide rules, not whether it occurred within the period ordered by the psychiatrist, per their clinical judgment.

CDCR Mental Health Performance Report  for 5/1/18 to 5/31/18



**MCB and DSH discharges not readmitted within 30 days**

79% →
(14,851)

**SREs that met all audit criteria**

79% ←
(34)

**Non-Formulary by Psychiatrist**

4% ↔
(58,470)

**Appointments seen as scheduled** 6

92% ←
(10,592,35 3)

**Timely IDTTs**

98% →
(130,055)



**5 day follow-ups with documentation of current suicidality**

93% ▲
(14)



**Treatment Offered**

87% ▲
(25,973)

**Treatment Attended**

58% →
(25,973)

**MHSDS patient transfers out of desert institutions**

82% ▼
(11)

**Timely transfers to CCCMS/EOP**

61% ↔
(1,866)

6. The denominator is defined as "All scheduled appointments", however QM excludes all cancelled appointments, except those cancelled due to ProviderUnavailable, TechnicalDifficulties, or ModifiedProgram. Approximately half of all scheduled appointments are cancelled due to a reason that is not included by this indicator, which makes the true Appointments seen as scheduled percentage closer to 50%, not 90+%.

CDCR Mental Health Performance Report for 5/1/18 to 5/31/18

## Quality of Care

| IDTT Staffing | IDTTS in which PC intake evals were completed prior to initial | IDTTS in which psychiatry intake evals were completed prior to initial | Psychiatrist continuity of care |
|---|---|---|---|
| 87% (11,985) → | 100% (18) ↗ | 95% (22) ▲ | 85% (344,552) ↔ |

| MH documentation of consultation from medical staff | Discharges from MHCB with clinician review of d/c summary | IDTTs meeting all audit criteria | Treatment plans with satisfactory documentation |
|---|---|---|---|
| 100% (1) ▲ | 100% (3) ↔ | 68% (22) ▼ | 67% (33) ↔ |

| Group treatment in a confidential setting 7 | Inmate-patients without conflicting diagnoses | Treatment plans with reason for refusal and intervention documented for high refusers | Treatment plans with documented and implemented pre-release plans |
|---|---|---|---|
| 97% (160,153) → | 77% (13) ▼ | 100% (6) ↔ | 0% (4) ▼ |

| RVR MH assessments where the patient was informed of the limits of confidentiality. (Beta) | Average PHQ-9 Score (Beta) | | |
|---|---|---|---|
| 80% (20) ▲ | 10.9 (270) ↗ | | |

## Utilization and Resource Management

| Treatment Cancelled 8 | Treatment Refused 9 | Appointments Cancelled Due to Custody | Appointments seen as scheduled |
|---|---|---|---|
| 19% (25,973) ▼ | 24% (25,973) ↔ | 2% (461,238) ↔ | 92% (10,592,353) ▼ |

| DSH/PIP physical discharges within timeframes | MHCB clinical stays within timeframes | MHCB physical discharges within timeframes | |
|---|---|---|---|
| 77% (176) ↔ | 90% (603) ↔ | 95% (674) ↔ | |

## Segregated Housing

| ICCS with MH clinician presence and relevant information provided | Placement of ASU EOPs in appropriate housing within timeframes | Placement of ASU/SHU CCCMS in STRH/LTRH within timeframes | Timely transfer of MHSDS out Standalone ASU |
|---|---|---|---|
|  60% (5) ▼ |  90% (144) ▼ |  67% (191) ▲ |  63% (16) ▼ |

7. There is an indicator for group treatment being conducted in a confidential setting, but not for psychiatry appointments being conducted in a confidential setting.

8. Instead of giving a straight-forward percentage of the treatment that is cancelled (e.g. if there are 100 appointments, and 30 were cancelled, this indicator would show 30%), the numerator is defined as "Number of patient-weeks included in denominator during which the following number of hours of treatment were cancelled: More than 3 for ASU EOP Hub, PSU-EOP, and ML-EOP; More than 1.5 for RC-EOP and ASU EOP non hub; More than 1.0 for SRH/LRH CCCMS."

9. Instead of giving a straight-forward percentage of the treatment that is refused (e.g. if there are 100 appointments, and 40 were refused, this indicator would show 40%), the numerator is defined as "Number of patient-weeks included in denominator during which over 50% of all offered treatment was refused AND less than the following hours of treatment were attended: less than 5 for ASU EOP Hub, PSU-EOP, and ML-EOP; less than 2.5 for RC-EOP and ASU EOP non hub; less than 1.0 for STRH CCCMS and LTRH CCCMS."

CDCR Mental Health Performance Report for 5/1/18 to 5/31/18



**DSH Discharges with Clinician to Clinician Contact within 5 days**

100%
(1) →

**MHPS meeting audit criteria**

100%
(2) →

**EOP IDTTs discussion of clinical appropriateness for work, educ, accommodation addressed**

90%
(21) →

**Primary clinician continuity of care**

83% →
1,589,344)

**Interventions for high utilizers tailored to decrease risk**

67%
(3) ▲

**RVR assessments where all documentation requirements were met (Beta)**

70%
(29) →







**Alternative Housing Stays**

91%
(775) →

**MCB and DSH discharges not readmitted within 30 days**

79% →
(14,851)



of

CDCR Mental Health Performance Report for 5/1/18 to 5/31/18

## Data Entry

| Appointment Closure Lag | MH referral resolved before it was received | Seen/Refused MH appointment duration greater than 4 hours | MHI change during in-transit/temp departure |
|---|---|---|---|
| **1%** (2,166,879) — | **1,977** (1,977) ▲ | **542** (542) ▲ | **56** (56) ▲ |

| Patients in CDCR over 30 days with no MHI entry since admission | MH referral date(s) in the future | MH referral received date later than data entry date | Unresolved pending appointments |
|---|---|---|---|
| **3** (3) ▲ | **13** (13) ▲ | **1,267** (1,267) ▲ | **195** (195) ▲ |

PL-164, Page 018

CDCR Mental Health Performance Report  for 5/1/18 to 5/31/18

**Program/subprogram change during in-transit/temp departure**

6
(6) ▲

**Use of DSH MHI**

10
(10) ▲

**Inpatient MHI errors**

40
(40) ▼

**MH Milestones Over/Under Awarded**

92%
(291,011) ▲

PL-164, Page 019

Psychiatrist Continuity of Care

Definition:



Per the definition, the indicator ONLY includes patients who have been in EOP, at the same institution, in the same housing program, without interruption (so likely no MHCB or outside hospital stay) for six months.

Interestingly, the Dashboard definition differs from the Performance Report definition in a very important way. The Dashboard definition does not include the requirement of being at the same institution, and explicitly states that patients who transferred to a different institution were still included, as long as their housing program did not change.



The denominator should give a good understanding of how many patients are included/excluded. Oddly, the denominator for mainline EOP has changed a lot during the past year (see image below). In January 2018 it was 169, and it has rapidly increased each month since. In August 2018 the denominator was 17,881. From the definition, we know that 17,881 is the total number of psychiatry contacts during the past 6 months for any patient who meets the inclusion criteria. If we use 7 as the average number of psychiatry appointments during a 6 month period for an EOP patient, this means approximately 2,500 patients were included. The approximate mainline EOP census on 7/23/2018 was 6,660, so roughly 62% of ML EOP patients are excluded from (or alternately, roughly 38% are included in) the August 2018 psychiatry continuity of care indicator.



How did the denominator go from 169 in January 2018 to 17,881 in August 2018?



The image above shows how this indicator is calculated. E.g. Lindgren is listed as having 138 measurements. This number was obtained by counting the number of "Total MHTS Encounters Within Last 6 Months" for each patient for whom he was the "Most Frequently Visited Psychiatrist", excluding any patient who changed LOC, institution, or housing unit within the past 6 months (see below image).



Interestingly, every single ML EOP psychiatrist in January 2018 had a continuity of care percentage of 100%. There were only 34 psychiatrists listed in the measurement.



In February 2018, there wasn't a single psychiatrist for ML EOP who had a continuity of care percentage less than 80%. 68 of the 85 psychiatrists (80%) listed had a continuity of care percentage of 100%. Somehow the number of psychiatrists increased from 34 in January 2018 to 85 in February 2018.



In March 2018, 61 of 80 (76%) ML EOP psychiatrists had a reported continuity of care of 100%.



In April 2018, only 34 of 89 (38%) psychiatrists had a reported continuity of care of 100%.



In May 2018, only 14 of 95 (15%) psychiatrists had a reported continuity of care of 100%.

In June 2018, only 11 of 94 (12%) psychiatrists had a reported continuity of care of 100%.





There is definitely something very wrong with this indicator. Clearly they are severely limiting the patients included in the measurements to only the patients most likely to have had continuity of care. But even throwing out 60% of the patients doesn't account for how they were able to get 100% continuity of care for the month of January 2018, and why the compliance steadily decreased, and the number of measurements steadily increased, over several months.

| From: | Gonzalez, Melanie@CDCR |
|---|---|
| To: | Golding, Michael@CDCR |
| Subject: | SAC information |
| Date: | Thursday, November 16, 2017 1:03:00 PM |

Hi Michael,

Here's a synopsis of what I've found:

CTC: Rare custody barriers; there are a couple COs who push back when asked to bring patients they feel will be a lot of work, but overall custody is very helpful. Office space is limited, and the times available for seeing patients are short (due to breakfast, pill line, lunch, change of shift – usually they can see patients from 7:30 – 10:30, and 11 – 1:30), but the psychiatrists denied any significant problems with office availability thanks to COs bringing patients promptly and the psychiatrists and psychologists working well together. There are lots of PC 2602s to do, which somewhat decreases ability to see many patients. Biggest complaint from two of the psychiatrists was how many trainings (SRE, Columbia scale, etc) they have to do. Overall the CTC psychiatrists feel things run smoothly.

MHCBU: "All 3 or 4 custody officers will put on their sunglasses and sleep. If you ask them for patients to be pulled they'll say 'oh, he won't come out'" without even attempting to get the patient. He stated the psychologist has an office, but the psychiatrist does not have an office and has to sit in the hallway to see patients or do any work. He reported it's really noisy in the hallway, there is no privacy, and other prisoners can listen to the appointments and even see his computer/notes if they are in a nearby cell. There are lots of PC 2602s.

PSU A1: Approximately 70% of patients do not show up for their scheduled appointment – 50-60% of those say that they did not attend their appointment because custody never came to pick them up. Custody is mostly helpful when directly asked to do something, although a few are resistant to helping out the psychiatrist. Dr. Pleshchuk has forbidden patients from being taken out of groups to see the psychiatrist. The psychiatrist ends up seeing most patients cell-front, which can be time-consuming due to the psychiatrist needing to find them (the patient may be on the yard, in the law library, out to court, in group, or at a medical appointment). There are lots of PC 2602s. MAs come and go frequently – he has had 5 MAs since February – so he has to spend time to train them on expectations each time he gets a new one. Medical had priority over Psychiatry for MAs, so two of the five left because they were re-assigned to Medical.

PSU A2: Custody will pull patients when requested, unless the patient is in a group. He said Dr. Renata Pleshchuk informed custody that groups take precedence over psychiatry appointments, and that patients are never to be taken out of a group for a psychiatry appointment. Overall custody is helpful. Patients frequently (~50%+) refuse to attend appointments, and must be seen cell-front, which can result in time spent tracking them down.

PSU B: They were 50% staffed in PSU B until October. No custody issues. The psychology supervisor, Dr. Pleshchuk, did not allow psychiatrists to pull patients from groups, but she was transferred to PSU A recently, so psychiatrists are now able to pull patients from groups. 90+% of the psychiatrist's patients refuse their 1:1 appointments, largely "because they don't want to be stuck in there for an

hour or two" (custody transports patients in groups, so although the appointment with the psychiatrist may only be 10-15 minutes, they have to sit in the treatment center for 1-2 hours before or after the appointment waiting until custody transports the group back). The psychiatrist sees about 50% of her patients cell-side, due to them refusing both their 1:1 with her and their group. She no longer schedules appointments in advance, due to 90+% of them not coming, so all scheduling orders are placed in arrears by the MA, who places the order, schedules the appointment, and checks them in and out.

A3 EOP: Over 50% of patients do not show up for their scheduled appointments, which the psychiatrist believes is mostly due to them refusing, but could also be due to custody failing to bring them. He said custody is pleasant and helpful overall. He is able to pull patients out of groups without any push-back. He goes cell-front to see the patients that are not in group and that refuse their appointment, and has some difficulty tracking these patients down. There are a fair number of PC 2602s to do, which takes away from direct patient care time.

A5 Ad Seg EOP: One psychiatrist said "Custody won't bring any patients". He clarified that he has patients scheduled, they are ducated, but custody refuses to bring patients for any psychiatry appointments. He stated custody will bring patients for psychology 1:1 appointments, and for groups. He reported he tries to see his patients with the psychologist during the psychology appointment whenever possible, or pull them from group, but frequently ends up having to see patients cell-side. Often the patients aren't in their cell, and "custody says they don't know where [the inmate] is", so he has to go all over the yard trying to find his patients, which takes a significant amount of time. He noted that although he does pull patients from groups, it is "frowned on" to do so, and he has heard other psychiatrists have been told they are not allowed to do that by Dr. Pleshchuk. Another psychiatrist stated "I cannot see the patients in a confidential setting on the block", and explained that custody will not pull patients out of their cell for a psychiatry appointment, only for groups and psychology appointments. He noted he can only see patients in a confidential setting if he pulls them out of group to see him, and said that custody is cooperative with pulling patients out of groups for him. He sees most of his patients cell-front, and denied significant problems with tracking them down, as they are usually either in their cell or on the yard.

A6 EOP: "Custody is very rude and there are lots of problems. When I try to see my patients they tell me they cannot bring the patient because it's yard time, shower time, they're not in their cells yet, or 'we have a shortage of staff and can't'. If you schedule 6 patients, 1 or 2 will be brought, but the others won't because custody refuses." "Two psychiatrists have left SAC because of working in A6." He reported he ends up having to see most of his patients cell-side, but this takes a lot of time because there are 3 blocks, and "custody will often refuse to even open the block for you". If he is eventually let in to the block, often the patient isn't in his cell, so he then has to try to find out where the patient is.

A7 EOP: 75+% of patients refuse their appointment, especially if they are scheduled for yard at the same time. He tries to see the patients who refuse cell-side, but often can't find them, and spends a lot of time checking their cells, work, yard, groups, etc, which decreases the amount of time he has available for patient care. He reported there are lots of PC 2602s to do, and in order to complete the paperwork and hearings he often has to devote one full day per week to PC 2602s.

Scheduling:

Most of the psychiatrists had more notes than scheduling orders, meaning they are forgetting to place the scheduling order in arrears or not communicating to the MA to place the scheduling order in arrears. On average, the psychiatrists had 5.7 more notes than scheduled appointments in September. I am assuming that scheduled appointments all had a note, and that all notes signified a face-to-face contact – both of which could be false assumptions (Andres Murillo is looking into this for me, but I don't have the results back yet).

Dr. Barbara Smith appears to have only seen 2 patients in September (based on scheduling orders), because her MA checks all cell-front appointments in and out for her. Because of this, the MA got credit for all of those appointments (n = 36), not Dr. Smith.

Overall thoughts:
1. Psychiatrists' ability to see patients is significantly impeded by the priority hierarchy of Medical appointments > Groups > Psychiatry appointments.
2. The patient refusal rate is very high on most yards, and the psychiatrists appear to not have much (if any) help locating the patient, so the psychiatrists spend a lot of time just trying to find their patients.
3. Custody transporting many patients at once and making them wait for 1-2 hours while the psychiatrist quickly tries to see each of them, and then transporting them all back at the same time, likely leads to a much higher appointment refusal rate.
4. SAC has a lot of PC 2602s (currently 216), which significantly impacts SAC psychiatrists' time. This is not accounted for when looking at productivity data.
5. Custody is a very significant barrier to patient care on several yards.
6. Psychiatrists are unable to pull patients from groups on several yards. Many of the psychiatrists expressed that psychiatry appointments are often brief (10-15 minutes), and groups are often long (90-120 minutes), so the patient would still be able to participate in most of the group and receive credit for attending the group, even if they were pulled partway through for a psychiatry appointment. Not allowing psychiatrists to pull patients from groups often results in the psychiatry appointment not happening, due to barriers with custody, high patient refusal rates, and difficulty tracking patients down.

Recommendations:
1. Speak with the warden regarding the above custody issues.
2. Speak with relevant parties at HQ regarding the appointment priority hierarchy, and the need for psychiatry appointments to take precedence over groups (just like medical appointments do).
3. Educate psychiatrists and MAs on the importance of making sure there is a scheduling order placed for every appointment. This could be directed just at the psychiatrists who had the biggest difference between number of notes and number of appointments (Dr. Halloran at 21, Dr. Jackson at 13, Dr. Sanchez at 15, and Dr. Curren at 12), or at all psychiatrists. Likewise the MAs could be spoken to as a group, or the MA supervisor could be spoken with and asked to make sure the MAs all place scheduling orders appropriately.

4. Educate Dr. Barbara Smith and MA Katrina Garcia that the psychiatrist must be the one to check patients in and out on the ambulatory organizer, or the MA will get credit for the appointment.

5. From the September data (which could potentially paint a misleading picture, given that it's just one month), it appears these psychiatrists should be instructed to see more patients:



I hope this helps. Let me know if you need any more details.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864



**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| From: | Gonzalez, Melanie@CDCR |
| Sent: | Tuesday, July 31, 2018 12:30 PM |
| To: | Golding, Michael@CDCR |
| Subject: | Confidential appointments |
| Attachments: | CCWF MHCB.docx; CCWF MHCB Appointments May 2018.xlsx; SAC AdSeg EOP.docx; CHCF MHCB.docx; CHCF MHCB Appointments May 2018.xlsx; SAC AdSeg EOP Appointments May 2018.xlsx |

Hi Michael,

I have attached documents and spreadsheets for CCWF MHCB, CHCF MHCB, and SAC AdSeg EOP looking at the percentage of appointments coded as confidential during the month of May. None appear accurate, although CCWF is glaringly inaccurate, at 100% confidential.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1

CCWF MHCB

May 1 to May 31

104 scheduled appointments

8 cancelled

96 completed

     100% confidential

There were no non-confidential appointments.

(See Excel spreadsheet CCWF MHCB Appointments May 2018)

SAC AdSeg EOP (includes ASU and ASUHub)

May 1 to May 31

168 scheduled appointments

64 cancelled

104 completed

      41 non-confidential (39%)

      63 confidential (61%)

if broken down by initial and routine appointments:

      66 initial appointments – 26 non-confidential, 40 confidential (**61% confidential**)

      38 routine appointments – 15 non-confidential, 23 confidential (**61% confidential**)

(See Excel spreadsheet SAC AdSeg EOP Appointments May 2018)

CHCF MHCB

May 1 to May 31

459 scheduled appointments

24 cancelled

435 completed

     242 non-confidential (56%)

     193 confidential (44%)

If broken down by initial and routine appointments:

     146 initial appointments – 42 non-confidential, 104 confidential (71% confidential)

     289 routine appointments – 200 non-confidential, 89 confidential (31% confidential)

(See Excel spreadsheet CHCF MHCB Appointments May 2018)

**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| From: | Gonzalez, Melanie@CDCR |
| Sent: | Wednesday, March 22, 2017 12:27 PM |
| To: | Golding, Michael@CDCR |
| Cc: | Kuich, Kevin@CDCR; Lindgren, John@CDCR |
| Subject: | RE: EOP compliance changed from 30 days to 45 days |
| Attachments: | Current_Due_Dates EOP CHCF.pdf |

Yes, but his explanation makes it sound like this is only impacting Initial appointments. EOP routine follow-ups are now due 45 days after their last appointment, not 30, so it is impacting both initial appointments and routine appointments. I have attached another Current Due Dates report for a different provider – if you check the "Contact DT", "Rule", and "Due DT" columns it will tell you when their last appointment was, whether this is a Routine or Initial appointment, and when Current Due Dates thinks the next appointment is due. You can see that the Routine appointments are due 45 days after their last appointment.

Kevin and I did look at the psychiatry contact rule parameters last week, and both agreed that "Then Routinely within 1 Month, or 45 Calendar Days if that is sooner, of the prior completion." does not make sense. 1 month should mean a calendar month, and the longest calendar month is 31 days, so 45 calendar days would never be sooner. If you define 1 month as 30 business days (which would be odd), 45 calendar days is still never sooner – only in November, when there are 3 holidays, is 30 business days ever equivalent to 45 calendar days. And per the above rule, you're supposed to go with whichever is sooner, so I really don't see how this rule change means all EOP routine follow-up appointments are now due in 45 days (as you can see demonstrated in the attached Current Due Dates) instead of 30 days.

From: Golding, Michael@CDCR
Sent: Wednesday, March 22, 2017 8:55 AM
To: Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov>
Subject: FW: EOP compliance changed from 30 days to 45 days

Dave usually has an explanation!
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

1



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, March 22, 2017 8:55 AM
**To:** Leidner, David@CDCR
**Cc:** Ceballos, Laura@CDCR
**Subject:** RE: EOP compliance changed from 30 days to 45 days

Thanks Dave. Yea. Missed that.
So an overly creative psychiatrist could first see his patient within 45-days of arrival, not 30 days of arrival, if for example
he gave the patient his meds 14 days after and then interviewed him 30 days later.
Got it.
Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** Leidner, David@CDCR
**Sent:** Tuesday, March 21, 2017 11:27 PM
**To:** Golding, Michael@CDCR
**Cc:** Ceballos, Laura@CDCR
**Subject:** RE: EOP compliance changed from 30 days to 45 days

You can always check the current Psychiatry Contact rule parameters (as well as all other contact rules) on the
Compliance Rules grid. Here's the rule for EOP and EOPMod:

2

First Psychiatrist Contact required no later than 30 Calendar Days after the Arrival Date or Program Start or MHI Start or Psychotropic Start, whichever happened last. Then Routinely within 1 Month, or 45 Calendar Days if that is sooner, of the prior completion.

The rule was changed to the above in December.  If you and Laura feel it should be otherwise, let me know and I will modify.

-Dave

**From:** Golding, Michael@CDCR
**Sent:** Tuesday, March 21, 2017 4:45 PM
**To:** Leidner, David@CDCR
**Cc:** Ceballos, Laura@CDCR
**Subject:** FW: EOP compliance changed from 30 days to 45 days

Hi Dave,
Has something changed? What are we missing?
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** Gonzalez, Melanie@CDCR
**Sent:** Tuesday, March 21, 2017 2:37 PM
**To:** Golding, Michael@CDCR; Lindgren, John@CDCR
**Subject:** EOP compliance changed from 30 days to 45 days

Hi Michael and John,

I have attached a copy of Current Due Dates that my OT sent me in October 2016, which correctly shows my EOP patients' appointments were due 30 days after their last appointment.

Also attached is a copy of Current Due Dates for EOP patients from today, which shows the EOP patients' appointments are not due until 45 days after their last appointment. I ran Current Due Dates at multiple institutions, and all show a 45 day window for EOP Psychiatry appointments.

Melanie

3

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

4

**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| From: | Gonzalez, Melanie@CDCR |
| Sent: | Wednesday, April 12, 2017 1:16 PM |
| To: | Golding, Michael@CDCR |
| Subject: | New EOP compliance rules |
| Attachments: | CHCF January 2017 compliance EOP.pdf |

Hi Dr. Golding,

I have been reviewing Dashboard Psychiatrist Contact Timeframes compliance data, and ran across something that I thought would be of interest. As previously discussed, the EOP follow-up appointment timeframe was changed in December to "within 45 days or within one calendar month of the previous contact, whichever is shorter", rather than 30 days. I discovered in Dashboard that this means if someone is seen by the end of the following month, they are considered compliant. For example:

Patient A is seen 12/2/16 for a routine EOP psychiatry appointment. Current Due Dates states his next appointment is due by 1/16/17 (45 days later). The compliance checks are done every Sunday, so on 1/1/17, 1/8/17, 1/15/17, 1/22/17, and 1/29/17 the program checks to see if the psychiatry contact timeframe is still within compliance. Since the next appointment is due 1/16/17, the compliance checks on 1/1, 1/8, and 1/15 all state "Yes" for compliance. However, the compliance checks on 1/22 and 1/29 also state "Yes" for compliance, because it is not yet the end of "one calendar month", if you interpret that to mean the entire month of January. This means the compliance for this EOP patient would be 100%, despite going almost 2 months (from 12/2/16 to 1/31/17) without being seen by psychiatry.

Further, let's say this patient was seen on 12/2/16, and his next appointment was not until 2/3/17. The weekly compliance checks in December and January would all state "Yes" for compliance. The first compliance check in February is on Sunday, 2/5/17, so all of the weekly compliance checks in February and March will state "Yes" for compliance because they'll see he was seen on 2/3/17. This EOP patient was seen twice in four months, yet is listed as 100% compliant for all of those months.

Last note, since compliance is checked weekly, the longer you can stretch that compliance interval, the less impact being out of compliance will have. If you use a strict 30 day deadline, and are late in seeing the patient by 1 week, your compliance percentage will be 4/5 = 80% (because you have 4 weeks of compliance, and 1 of non-compliance). If you stretch the interval of compliance to almost two months (e.g. from 12/2/16 to 1/31/17) like the compliance reports are currently doing, and again are late in seeing the patient by 1 week, your compliance percentage is now 9/10 = 90% (because you have 9 weeks of compliance, and 1 of non-compliance).

Hopefully this all makes sense. I attached a compliance report for one of the yards at CHCF for the month of January, and highlighted the relevant entries to help clarify the above. Let me know if you have any questions.

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1

**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| **From:** | Gonzalez, Melanie@CDCR |
| **Sent:** | Tuesday, March 21, 2017 1:27 PM |
| **To:** | Golding, Michael@CDCR; Lindgren, John@CDCR |
| **Subject:** | Dashboard compliance numbers |
| **Attachments:** | CHCF dashboard January compliance.PNG; Dashboard audit.pdf |

Hi Michael and John,

I think it would be very much worth our time to try to get a statistician to run some compliance numbers for us asap. I did a manual comparison of the dashboard numbers to actual numbers for psychiatry appointments (checking eUHR for each patient and using psychiatry notes as proof of an appointment) for one unit that I thought would be fairly representative of CHCF (chosen based on their dashboard compliance percentage being close to CHCF's overall percentage, and because there were enough patients to make it worthwhile yet not so many that a manual check would take days). This is what I found:

CHCF C3A (houses EOP and CCCMS patients)
January dashboard compliance: 66%
January actual compliance: 0%
N = 13

For my audit, I only included the patients who were due or overdue for an appointment in the month of January, which eliminated 11 of the 25 patients. One patient was removed due to being transferred to another facility during January prior to being seen, and another was removed due to not taking medication. 13 patients met criteria and were included. Interestingly, of the 10 patients removed due to not being due or overdue for an appointment in January, all are in CCCMS, and 9 of the 10 were due to be seen in early or mid-February but still haven't been seen as of 3/21/17 (meaning they were all last seen in November 2016). I realize my N is small, but I'm willing to bet there would be major differences between the dashboard numbers and the statistician's numbers.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1

**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| **From:** | Gonzalez, Melanie@CDCR |
| **Sent:** | Friday, September 29, 2017 3:42 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | MHCB Discharges |
| **Attachments:** | MHCB discharges.xlsx |

Hi Michael,

I have attached a revised spreadsheet of MHCB Discharges. I reviewed 32 cases total (8 from each of the 4 institutions), and 16 of these showed no evidence of psychiatric involvement in the discharge process. The items I looked at to determine this were: the PC Discharge Summary; Psychiatry Discharge Summary (if present); Master Treatment Plan (the IDTT documentation); the last Psychiatry progress note prior to the discharge IDTT/PC Discharge Summary; and the actual discharge order. Arianna has printouts of the PC Discharge Summary, Master Treatment Plan, and last Psychiatry progress note for each of the 16 cases, as well as a copy of the excel spreadsheet.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1

**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| From: | Gonzalez, Melanie@CDCR |
| Sent: | Tuesday, July 31, 2018 1:46 PM |
| To: | Golding, Michael@CDCR |
| Subject: | RE: SAC scheduling |
| Attachments: | Appointments seen as scheduled.JPG |

It is odd, and I don't understand why Appointments seen as scheduled is so high. When I drill down on Appointments seen as scheduled, the only options it shows are Seen, ProviderUnavailable, ModifiedProgram, and TechnicalDifficulties (I have attached a screenshot). There are several other options to choose from when cancelling an appointment, including IP No Showed, IP Refused, Scheduling Error, etc, so it appears they do not include any appointments with those outcomes in the denominator. But that is so illogical that I'm doubting myself.

From: Golding, Michael@CDCR
Sent: Tuesday, July 31, 2018 12:32 PM
To: Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov>
Subject: RE: SAC scheduling

So if I am understanding you correctly, it is good that appointments are being cancelled, because it allows us to see what a problem there is?

But that seems strange to me, since 75% to 80% of patients (manifestly) are not coming? How come the indicator does not say that and suggests a higher % are coming?

Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.562.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

From: Gonzalez, Melanie@CDCR
Sent: Tuesday, July 31, 2018 12:28 PM
To: Golding, Michael@CDCR
Subject: RE: SAC scheduling

1



**Gonzalez, Melanie@CDCR**

| | |
|---|---|
| From: | Gonzalez, Melanie@CDCR |
| Sent: | Wednesday, August 22, 2018 11:45 AM |
| To: | Golding, Michael@CDCR |
| Subject: | Appointments seen as scheduled versus Appointments reports February 2018 |
| Attachments: | Appointments seen as scheduled SAC CCCMS February.PNG; SAC CCCMS appointments February 2018.xlsx; CDCR CCCMS appointments seen as scheduled.PNG; CDCR CCCMS all appointments in February 2018.xlsm |

Hi Michael,

Per Appointments seen as scheduled, in SAC ML CCCMS in February 2018 87% of appointments were seen as scheduled. Per Appointments, in SAC ML CCCMS in February 2018, 22% of appointments were seen as scheduled, 74% were cancelled, and 4% were refused. I have attached the screenshot of Appointments seen as scheduled, and the excel spreadsheet for Appointments.

I have also attached the screenshot for CDCR ML CCCMS in February 2018 that shows 95% of appointments were seen as scheduled (I previously sent this same screenshot on 8/15/18), and the excel spreadsheet for Appointments for CDCR ML CCCMS in February 2018 that shows 42% (35,642 out of 84,120) of appointments were seen as scheduled.

Melanie

**Melanie Gonzalez, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation
916-691-0637
Cell phone: 916-823-2864

1





**Gonzalez, Melanie@CDCR**

From:           Golding, Michael@CDCR
Sent:           Tuesday, August 14, 2018 9:27 AM
To:             Gonzalez, Melanie@CDCR
Subject:        Re: Appointments Seen as Scheduled

Hi Melanie,

Thank you for the information.
The scheduling issue that led to this was the report from SAC, in which we, quite implausibly, report 91% compliance with coming to scheduled appointments.

You also report about 48% statewide cancellation rate or I think 52% scheduled appointments being made.

I would like to compare, if possible, either the 91% to a measure you calculate, for "not cancelled" at SAC.

Or compare the 52% figure, statewide, to a statewide scheduled percentage figure, like the 91% figure, but statewide.

Michael


Sent from my iPhone

> On Aug 14, 2018, at 8:04 AM, Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov> wrote:
>
> Definitely. And unfortunately I have no idea how much higher - it might be negligible, but it could also be significant.
>
>
> Melanie Gonzalez, MD
> Senior Psychiatrist, Specialist
> Elk Grove - Headquarters
> California Department of Corrections and Rehabilitation
> 916-691-0637
> Cell phone: 916-823-2864
>
> -----Original Message-----
> From: Golding, Michael@CDCR
> Sent: Monday, August 13, 2018 5:51 PM
> To: Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov>
> Subject: Re: Appointments Seen as Scheduled
>
> Hi Melanie, if it doesn't include the appointments that were rescheduled, the actual percentage of missed appointments would be higher, right?
> Michael
>
>
> Sent from my iPhone
>
>> On Aug 13, 2018, at 2:50 PM, Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov> wrote:

1

PL-164, Page 048

>>
>> I can't find anything that combines all scheduled and missed appointments. I asked Lisa Holcomb (she works with Susie Sim and Dave Leidner), and she said she doesn't know of any indicator or report that shows all scheduled and missed appointments, or even one just for refused appointments.
>>
>> There is a report called "Appointments" that allows for searching a specific institution (or all of CDCR), program, date range, and appointment type, and getting a list of all appointments that meet the search criteria. For example, I searched CDCR, ML CCCMS, psychiatrist contacts on 7/10/18 with all outcome types, and received a table with 955 rows (954 patient appointments). I then changed the outcome type to "cancelled", "refused", or "pending" (all of the outcome types except "completed"), and received a table with 461 patient appointments. So on 7/10/18 in all of CDCR, the percentage of scheduled psychiatry appointments that were missed was 48%, or to put it in performance report terms, the percentage of Appointments seen as scheduled was 52%. This doesn't include the appointments that were just rescheduled by schedulers without marking them as cancelled, but there's no way to track that. However, this is definitely not a quick or easy way to obtain appointment data.
>>
>> Melanie Gonzalez, MD
>> Senior Psychiatrist, Specialist
>> Elk Grove - Headquarters
>> California Department of Corrections and Rehabilitation
>> 916-691-0637
>> Cell phone: 916-823-2864
>>
>>
>> -----Original Message-----
>> From: Golding, Michael@CDCR
>> Sent: Saturday, August 11, 2018 6:21 PM
>> To: Gonzalez, Melanie@CDCR <Melanie.Gonzalez2@cdcr.ca.gov>
>> Subject: Appointments Seen as Scheduled
>>
>> Hi,
>>
>> Could you make sure there is not something that looks at all scheduled and missed appointments, rather than just some of them?
>> I am still astounded by the table you provided for SAC.
>>
>> Specifically also look for appointments seen as scheduled that were "refused". I would like to see those numbers as well.
>>
>> So they basically have two ways of reporting this, the ones that include provider unavailable, modified program, technical difficulties and a separate calculation for patient refusal?
>>
>> And they have nothing that combines all of the reasons for someone missing a scheduled appointment, to see the overall percentage who missed scheduled appointment?
>> Michael
>>
>> Sent from my iPhone

2

**From:** Ceballos, Laura@CDCR
**Sent:** Thursday, August 16, 2018 4:17 PM
**To:** Shahbazian, Randy@CDCR
**Cc:** Nikkel, Nancy @CDCR; Golding, Michael@CDCR; Kuich, Kevin@CDCR; Rekart, John@CDCR
**Subject:** RE: MHMD emergent consults

That is fantastic news!
Thank you so much.

Laura Ceballos, cchp, Ph.D.
Mental Health Administrator, Inpatient Facilities, Quality Improvement
Statewide Mental Health Program
916-691-0308

**From:** Shahbazian, Randy@CDCR
**Sent:** Tuesday, August 07, 2018 2:24 PM
**To:** Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>
**Cc:** Nikkel, Nancy @CDCR <Nancy.Nikkel@cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; Kuich, Kevin@CDCR <Kevin.Kuich@cdcr.ca.gov>; Rekart, John@CDCR <John.Rekart@cdcr.ca.gov>
**Subject:** RE: MHMD emergent consults

Good Afternoon, Dr. Ceballos-

I believe that your emergent MHMD consult statistic for NKSP is accurate.

One likely reason for this is that inmate-patients requiring Mental Health Alternative Housing very rarely receive an emergent MHMD consult; the process is mostly handled by the primary clinicians on the Crisis Team. While true that after-hours placements of inmate-patients into MHAH usually involve a nurse calling the on-call psychiatrist, our process here at NKSP does not generate an emergent MHMD consult since technically that would require the on-call psychiatrist to complete a face-to-face examination of the patient within the emergent four-hour window (possibly in the middle of the night).

Another reason for our low number of emergent MHMD consults is that we encourage health care staff members to communicate their patient care concerns directly to our psychiatrists who are very responsive overall. For example, if a patient is experiencing a side effect from a medication, the primary clinician, nurse, medical provider, etc. may directly contact the treating psychiatrist who will triage each problem to determine whether this matter can wait until next week; wait until tomorrow; or need to be addressed immediately. This is much preferred to the practice of reflexively ordering an emergent MHMD consult for "side effects."

Finally, I would hope that the relatively low number of emergent MHMD consults at NKSP is an indication that we have things running fairly smoothly here; I certainly am not hoping for more psychiatric emergencies at NKSP!

Please contact me if you have further questions/concerns about this matter.

RANDY SHAHBAZIAN, MD
SENIOR PSYCHIATRIST SUPERVISOR
NORTH KERN STATE PRISON
(661)721-2345 x4000