1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   MARGOT MENDELSON – 268583
    PRISON LAW OFFICE
3   1917 Fifth Street
    Berkeley, California  94710-1916
4   Telephone:   (510) 280-2621

5   CLAUDIA CENTER – 158255
    AMERICAN CIVIL LIBERTIES UNION
6   FOUNDATION OF NORTHERN
    CALIFORNIA, INC.
7   39 Drumm Street
    San Francisco, California  94111-4805
8   Telephone:   (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

9   Attorneys for Plaintiffs

10

11                 UNITED STATES DISTRICT COURT

12                 EASTERN DISTRICT OF CALIFORNIA

13

14   RALPH COLEMAN, et al.,

15           Plaintiffs,

16        v.

17   GAVIN NEWSOM, et al.,

18           Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' PROPOSED REMEDIES FOLLOWING EVIDENTIARY HEARING**

Judge:   Hon. Kimberly J. Mueller

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................... 1

I.    Proposed Remedies Following the October 2019 Evidentiary Hearing.................... 2

    A.    Moving Mental Health Care Data From Mental Health Headquarters
        to CCHCS's Quality Management Section ...................................................... 2

    B.    Continued Central Monitoring of Mental Health Headquarters By The
        Special Master Team .................................................................................... 5

    C.    Increasing Plaintiffs' And The Special Master's Access to Data And
        Improving Transparency of Defendants' Provision of Mental Health
        Care................................................................................................................ 6

    D.    Revisiting The ASU EOP Hub And PSU Certification Process ................... 13

    E.    Posting Notice of The Court's Remedial Order And Requiring
        Training to Ensure Defendants And Their Counsel Are Aware of
        Their Remedial Obligations ........................................................................ 14

II.   The Court Should Require An Update Regarding Remedial Measures
    Already Referred to the Special Master ................................................................. 17

III.  The Court Should Refer Additional Issues to The Workgroup.............................. 21

CERTIFICATION ....................................................................................................... 23

[3454674.7]

**INTRODUCTION**

On October 23, 2019, the fourth day of the evidentiary hearing related to Dr. Golding's Whistleblower Report, this Court issued a bench ruling. *See* Minutes Re: Oct. 23, 2019 Evid. Hr'g, ECF No. 6365 at 1. The Court found, *inter alia*, that Defendants knowingly provided false and misleading information to the Court and the Special Master. The Court ordered Plaintiffs to file a summary brief, within seven days, memorializing their proposed remediation in light of the Court's findings. *Id*.

Evidence and testimony at the evidentiary hearing showed that Defendants consistently failed to disclose that they had changed metrics that were routinely reported to the Court, the Special Master, and Plaintiffs. These changes were material and tended to demonstrate that Defendants were closer to compliance and that psychiatric care was better than it actually was. As the Court recognized in its bench ruling, the disparities between the on-the-ground reality and Defendants' data evidence an ends-justifying-the-means approach that was centered on litigation strategy, at the expense of providing treatment to members of the Plaintiff class, who have an absolute undeniable right to constitutionally adequate mental health care. The Court has broad equitable authority to shape whatever remedies it deems are necessary to remedy Defendants' misleading practices and prevent these circumstances from ever happening again. In addition to whatever corrective action the Court, in its discretion, finds is appropriate, Plaintiffs propose several remedies in Section I, below. Plaintiffs submit that these remedial measures are necessary to rebuild trust and return the focus to Defendants' efforts to providing constitutionally adequate mental health treatment to all *Coleman* class members.

In addition to proposing remedies, Sections II and III below summarize issues that have already been referred to the Special Master and identify outstanding issues that have yet to be addressed. Plaintiffs propose that the Court request an update from the Special Master regarding issues already referred to him within ninety days, as well as refer two outstanding issues raised in the Neutral Expert Report and Dr. Golding's Whistleblower Report to the Special Master for resolution.

I.      **Proposed Remedies Following the October 2019 Evidentiary Hearing**

Plaintiffs identify five distinct areas of proposed remediation.  First, the Court should proceed with Defendants' solution of moving mental health data to the California Correctional Health Care System's (CCHCS) Quality Management Section.  Second, the Court should order the Special Master to continue his central headquarters monitoring.  Third, the Court should formally order the parties to engage in a process to improve transparency and increase Plaintiffs' and the Special Master's access to data.  Fourth, the Court should refer the issue of renegotiating the Administrative Segregation Unit (ASU) EOP Hub and Psychiatric Services Unit (PSU) certification process to the All-Parties Workgroup.  And finally, the Court should order that notice of its remedial order be posted, and that Defendants devise a durable plan to train staff and attorneys on their remedial obligations in this case.

   A.      **Moving Mental Health Care Data From Mental Health Headquarters to CCHCS's Quality Management Section**

Plaintiffs agree that the Court should proceed with Defendants' proposed solution, as testified to by Healthcare Undersecretary Diana Toche and summarized by the Court in its October 23 bench ruling, of moving all mental health data out of Mental Health Headquarters to CCHCS's Quality Management Section, which is overseen by the *Plata*[1] Receiver, Clark Kelso.  *See also* Defs.' Resp. to Aug. 14, 2019 Order, ECF No. 6257 at 14 (Aug. 29, 2019) ("The data that [the CCHCS Quality Management Section] generates is widely trusted and recognized for its integrity.  Defendants believe that using this existing system not only would better integrate the care teams and providers who serve patients, thereby improving mental health outcomes, but also help restore the parties' trust in the integrity and reliability of CDCR's mental health data.").  There is no question after the evidence presented and this Court's findings that maintaining compliance reporting within

---

[1] *Plata v. Newsom*, No. C01-1351 JST (N.D. Cal.).

[3454674.7]

1   the existing mental health department—when the people responsible for ensuring

2   compliance with this Court's orders supervise the people responsible for reporting on the

3   success of their compliance efforts—is inherently problematic.  This structure presents a

4   major barrier to both restoring trust and to ensuring the parties, the Special Master, and the

5   Court have an accurate and fully transparent picture of the status of mental health care in

6   Defendants' institutions.  Moving mental health reporting into a separate entity, where it is

7   overseen by a third-party such as the *Plata* Receiver who is not directly invested in

8   demonstrating constitutional compliance and ending federal oversight, is a necessary step.

9   But it is highly unlikely that trust can be rebuilt in the near term (and possibly ever) if

10  individuals who have participated in past misleading data practices continue to be involved

11  in developing, reporting, managing, or overseeing any data covered by the *Coleman* case.

12  Mental health data specialists, including psychiatrists, should be appointed within the

13  CCHCS Quality Management Section so that those familiar with the Mental Health

14  Services and Delivery System (MHSDS) are involved in generating data sufficient to

15  satisfy *Coleman* requirements.  Those specialists should be fully educated on what those

16  requirements are in light of this case's longstanding violations and subsequent remediation

17  orders to ensure they fulfill their role properly.

18         Plaintiffs agree with the Court's view, as expressed in its bench ruling, that once

19  mental health data is moved to CCHCS, the *Plata* Receiver would become the service

20  provider and the Court and Special Master would be the client.  Accordingly, the Court

21  and Special Master will necessarily need to maintain authority to ensure that Defendants'

22  data reporting practices accurately and transparently measure compliance with *Coleman*

23  orders and Program Guide requirements, and that the people responsible for the data fully

24  understand those orders and requirements as well as their responsibilities to the Court, the

25  Special Master, and Plaintiffs.  This Court is acting appropriately to proceed with

26  Defendants' proposed remedy carefully to ensure the transition is subject to careful

27  planning and coordination, monitoring, and oversight by all stakeholders in *Plata* and

28  *Coleman*.  *See, e.g.*, Oct. 8, 2019 Order, ECF No. 6312 at 2-3 (calling coordination

[3454674.7]

1   meeting between this Court, Special Master, *Plata* Receiver, and presiding judge in *Plata*).

2   Plaintiffs agree with the Court's plan, as articulated in its bench ruling, to move up the

3   deadline for the Special Master to issue a report "regarding whether the general concept of

4   data system sharing is indeed feasible, case compliant and will result in greater efficiency

5   and transparency than could be achieved otherwise." *Id.* at 3.  Adding this topic as an

6   agenda item for the December 13, 2019 status conference will help focus the parties'

7   efforts on implementing this important remedy, or developing an alternative if the Special

8   Master determines (and this Court agrees) that the existing plan is not workable.

9        In the process of transitioning control of the data to the *Plata* Receiver, Defendants

10  must ensure that the requirements of *Plata* and *Coleman* are separately met and that

11  decisions in one case do not have negative unintended consequences in the other case.  To

12  that end, Defendants should be required to alert the Special Master and Plaintiffs in writing

13  promptly when they become aware of a change or potential change in data tracking or in

14  other policies or practices that could directly or indirectly affect *Coleman* orders or how

15  Program Guide requirements are measured.  In other words, to the extent that a decision or

16  other change in *Plata* (or indeed in any other case) in any way, shape, or form, explicitly or

17  implicitly, affects *Coleman*, Defendants should have an affirmative obligation to

18  proactively report that to the Special Master and Plaintiffs in a fully transparent manner,

19  including by identifying the potential conflict or issue.  Those overlapping functions

20  include, but are not limited to, health care staffing, including nursing, medical records,

21  pharmacy issues, and data reporting and methodology.  This is necessary because, for

22  example, CDCR was not fully transparent with stakeholders in *Coleman* regarding the

23  existence of a Statewide Performance Improvement Plan ("PIP") developed under *Plata*

24  that related in part to provision of mental health care.  CDCR withheld an email detailing

25  this plan as allegedly privileged, but the Court determined that the majority of the

26  document was non-privileged and ordered Defendants to file it on the docket.  *See* Oct. 23,

27  2019 Minute Order, ECF No. 6365 at 1; *see also* Defs.' Notice Submitting Documents in

28  Resp. to Oct. 23, 2019 Minute Order, ECF No. 6370 (Oct. 24, 2019).  In addition to

[3454674.7]

1 notifying the Special Master and Plaintiffs in *Coleman* of any overlapping mental health

2 and healthcare functions, CDCR should notify the *Plata* Receiver whenever areas

3 governed by *Plata* directly or indirectly impact areas related to *Coleman* (or vice versa) so

4 that the Court, the Special Master, and Plaintiffs can understand the issue and take

5 appropriate action, including through case coordination efforts or otherwise.

**B.    Continued Central Monitoring of Mental Health Headquarters By The Special Master Team**

8 Dr. Toche testified at the evidentiary hearing that the Special Master and his team

9 have had a regular presence in CDCR's Mental Health central office for several months.

10 This monitoring is critical given the problems with productivity of and trust between

11 Mental Health Leadership, as testified to by Dr. Toche, and is necessary to rebuild trust

12 between the parties.  It should be continued.  Indeed, Dr. Toche testified that the Special

13 Master's central oversight has been very advantageous for the mental health program.

14 Including because of Defendants' apparent agreement that this process is working well, the

15 Court should direct the Special Master to continue his central office monitoring for another

16 twelve months, and to report and recommend at that point regarding whether further

17 central office monitoring in some form remains warranted and appropriate.  Along with

18 helping to restore trust and order within the mental health department, this will likely aid

19 the Special Master in addressing the numerous issues raised in Dr. Golding's report that

20 the Court has referred to him for resolution.  *See generally* Aug. 14, 2019 Order, ECF No.

21 6242; June 14, 2019 Order, ECF No. 6187; *see also* Section II, *infra*.

22 As part of this central office monitoring, the Special Master should investigate and

23 report on the proliferation of committees and subcommittees that the Court raised concerns

24 about in its bench ruling.  In addition to the Court receiving a list of the committees, which

25 it has already requested from the Special Master, it is important that all stakeholders,

26 including Plaintiffs, better understand the purpose each of these committees serves or is

27 intended to serve, who is on them, and what they do.  Moreover, given the evidence

28 presented at trial and otherwise reported, the Special Master should also work with

1  Defendants to inform the Court and parties regarding the organizational structure at

2  headquarters, staff turnover there, and the reporting structure between Mental Health

3  Leadership and the Special Master team, including identifying key point people within

4  CDCR's mental health department responsible for ensuring understanding of and

5  compliance with the *Coleman* requirements.

6      Plaintiffs request that the Special Master continue to regularly update Plaintiffs'

7  counsel regarding his headquarters monitoring.

8   **C.    Increasing Plaintiffs' And The Special Master's Access to Data And
        Improving Transparency of Defendants' Provision of Mental Health**

9       **Care**

10      In light of the evidence presented at the evidentiary hearing regarding Defendants'

11  misleading data practices, and the Court's finding that Defendants knowingly provided

12  false and misleading data, increased transparency is a necessary remedy to these

13  proceedings.  The Court has held that it must understand "the business rules that apply to

14  report generation, the transparency of those rules and any other procedures or methods

15  used to generate reports."  Oct. 8, 2019 Order, ECF No. 6312 at 3.  And the Special Master

16  and Plaintiffs must be able to fully test and challenge Defendants' data and information.

17  Defendants have already proposed some solutions to these problems, but they do not go far

18  enough.  The Court should build upon Defendants' proposals and formally order a process

19  by which Plaintiffs and the Special Master can fully understand and monitor Defendants'

20  data.  Plaintiffs' proposals for such a process, which likely cannot be completed until after

21  the Court determines whether the *Plata* Receiver or another entity will be responsible for

22  the data, are discussed in further detail below.

23      On August 14, the Court acknowledged Defendants' proposal to "meet and confer

24  with plaintiffs, under the guidance of the Special Master, to review the definitions and

25  methodologies they use in the future to report data related to Program Guide requirements

26  for purposes of the CQIT tool."  Aug. 14, 2019 Order, ECF No. 6242 at 9 (citing Joint

27  Status Report, ECF No. 6226 at 31 (July 23, 2019)).  Additionally, Defendants have

28  promised to explain their "processes for analyzing change requests to their compliance

tracking systems," and have proposed that "[t]he parties meet and confer under the guidance of the Special Master to discuss discrepancies in policy and data collection methodology." Joint Status Report, ECF No. 6226 at 29 (July 23, 2019). In response to the August 14 Order, the parties stipulated that:

> CDCR acknowledges that it must notify the Special Master and Plaintiffs regarding business rule changes that materially alter the way compliance with Program Guide requirements is measured before such rule changes are implemented. CDCR will work with the Special Master and Plaintiffs to determine the best way to keep them informed of relevant updates to the Performance Report.

*See* Defs.' Resp. to Aug. 14, 2019 Order, ECF No. 6257 at 4 (Aug. 29, 2019); Pls.' Resp. to Aug. 14, 2019 Order, ECF No. 6255 at 3-4 (Aug. 28, 2019).

While Plaintiffs do not agree that these proposals go far enough, Plaintiffs agree that a Court order structuring this type of collaborative process is necessary. Accordingly, Plaintiffs request that the Court require the parties and the Special Master to take the following steps, in coordination with the Receiver and his staff if appropriate:

First, the parties must engage in a focused process during which Defendants explain to the Special Master and Plaintiffs, in detail, what their current data captures and how, what it is intended to show with reference to court-ordered requirements as appropriate, and the statistical basis for measuring the data the way they do. The Special Master should be empowered to secure expert assistance with this process to ensure all parties understand and agree upon the technical or statistical methodology, and it should not be limited to Performance Report indicators but to any data or report Defendants provide or ever intend to provide to the Court, the Special Master, or Plaintiffs.

Defendants have stated that "CDCR is committed to …. reviewing the definition of each indicator and ensuring that it corresponds to the data measured." Defs.' Resp. to Aug. 14, 2019 Order, ECF No. 6257 at 9 (Aug. 29, 2019). Understanding the existing system and how it is designed is a necessary first step in ensuring data integrity and transparency in the future. Plaintiffs and the Special Master should be provided the opportunity to review all metrics that relate to Defendants' provision of mental health care,

7

1  including each metric in CDCR's Performance Report and Continuous Quality

2  Improvement Tool (CQIT).  As evidenced by Dr. Golding's testimony and evidence in the

3  Neutral Expert Report, Defendants' misleading data and reporting practices that affected

4  psychiatry data—the only data Dr. Golding was focused on in his role as Chief of

5  Statewide Psychiatry—could easily have permeated other non-psychiatry data and

6  compliance reporting beyond just the Performance Reports, and indeed the record shows it

7  has in the past.  For instance, Defendants changed their methodology for measuring

8  MHCB transfer timelines in a manner that conflicted with the Program Guide and

9  overrepresented compliance without ever making that change clear to Plaintiffs or the

10  Court.  *See* Plfs' Opening Br. Re: Obstacles to Timely Access to MHCBs, ECF No. 5677

11  at 18-22 (Sept. 13, 2017); Decl. of Jessica Winter In Supp. of Pls.' Opening Br. Re:

12  Obstacles to Timely Access to MHCBs, ECF No. 5679 at ¶¶ 8-9 & Exs. C-D (Sept. 13,

13  2017).  Plaintiffs discovered the change many years after it took effect, and at that point

14  alerted the Court and Special Master, which resulted in an order that was upheld on appeal

15  barring Defendants from using the undisclosed methodology.  *See* Pls.' Reply to Defs.' Br.

16  on Obstacles to Full Compliance with Program Guide Transfer Timelines for Crisis Beds,

17  ECF No. 5686 at 13-14 (Sept. 19, 2017); Oct. 10, 2017 Order, ECF No. 5710; Mandate,

18  Ninth Cir. Case No. 17-17328, ECF No. 6094 (Feb. 14, 2019).  Additionally, this Court

19  determined during the segregation trial in 2013 that Defendants' segregation length of stay

20  reporting was seriously misleading in that it purported to represent a class members' total

21  length of stay in segregation when in fact the report reset that stay to zero every time, for

22  example, a class member was admitted to a crisis bed, moved to a new segregation unit, or

23  changed levels of care.  *See* Pls.' Trial Ex. No. 240 (Reporter's Tr. of Dec. 4, 2013 Evid.

24  Hr'g) 13-66; April 10, 2014 Order, ECF No. 5131 at 56 n.39.

25        Once Defendants explain what their current data shows, Plaintiffs and the Special

26  Master must fully understand how information is inputted into the system used to generate

27  that data.  Defendants concede "that the data is only as accurate as it was inputted" into the

28  EHRS.  Defs.' Resp. to Aug. 14, 2019 Order, ECF No. 6257 at 29 (Aug. 29, 2019).  And

[3454674.7]

even before Dr. Golding issued his Report, Defendants acknowledged that "EHRS functionality" must be improved "to align with MHSDS processes." *See* Joint Status Report, ECF No. 5841-2 at 2 (June 21, 2018). Given the evidence and testimony at trial from Dr. Kuich, among others, making clear there is a disconnect between how EHRS is designed and how it is used in the field, and that that disconnect affects the accuracy of Defendants' data reporting, the Court should order the Special Master, with Plaintiffs observing as appropriate, to monitor Defendants' data systems at the point of entry—the "workflows"—to evaluate whether those systems have been designed in a way that minimizes user error and is useable by all disciplines, and especially psychiatrists. The Special Master should be authorized to hire an expert to assist with this evaluation as appropriate. The Special Master should also observe and report on how clinicians and related staff in the field utilize EHRS, including whether they are following the designed procedures or employing workarounds that could hinder accurate reporting or patient care. Plaintiffs and the Special Master should also have the opportunity to review Defendants' EHRS training. This is necessary to ensure common understanding of what is being reported, and that psychiatrists are being adequately trained. EHRS is a critical component of the remedy in this case, and it is fundamental to Defendants' reporting system. Fully understanding the design and functionality of EHRS, including how clinicians are actually using it in the field, is part and parcel of understanding and ensuring the accuracy of Defendants' data methodologies.

Second, if limitations or inaccuracies are identified during the first phase of Plaintiffs' proposed process to improve transparency, CDCR must ensure that those problems are addressed in a timely manner. First and foremost, Defendants must disclose any and all changes they have made to their data since Dr. Golding issued his Report. Additionally, if certain areas affecting compliance are not being measured (such as how often supervising psychiatrists act as line staff), CDCR must develop new methodologies to track those areas. And if certain business rules do not accurately capture the intended compliance measure, that must be remedied. While the Court in its bench ruling referred

9

1   to the Special Master the issue of tailoring the EHRS to the requirements of the *Coleman*

2   case, the Court should reaffirm in its remedial order that fixing scheduling and other

3   problems in EHRS is part of the remedy for these proceedings.  As part of this process, the

4   Special Master should be authorized, if he deems it necessary, to hire a data expert to help

5   assess whether EHRS functions and/or Performance Report indicators must be changed or

6   created to measure compliance with *Coleman* orders and the Program Guide.  Given

7   evidence at trial that some CDCR employees overseeing the data found certain Program

8   Guide requirements vague or unclear, a data expert could aid the Special Master and

9   parties in translating those and other remedial measures into data points that provide

10  useful, transparent information to the Court and the Special Master.

11          Third, once a baseline understanding is established and any corrections to

12  Defendants' reporting are implemented, the parties should meet and confer, under the

13  guidance and leadership of the Special Master, to create a formalized process for changing

14  or adding to their metrics and reports, as well as a process for providing Plaintiffs and the

15  Special Master with advanced notice when Defendants plan to change any of those reports

16  or data in any way.  Plaintiffs are encouraged by Defendants' commitment to "work with

17  the Special Master and Plaintiffs to determine the best way to keep them informed of

18  relevant updates to the Performance Report."  Defs.' Resp. to Aug. 14, 2019 Order, ECF

19  No. 6257 at 14 (Aug. 29, 2019).  Defendants have also promised to "notify the Special

20  Master and Plaintiffs regarding business rule changes that materially alter the way

21  compliance with Program Guide requirements is measured before such rule changes are

22  implemented."  *See id*.  But again, Defendants' unwillingness to extend this process

23  beyond the Performance Report indicators to include all data and reports provided to this

24  Court, the Special Master, and Plaintiffs reflects their failure to understand that

25  transparency and accuracy is necessary for all of their compliance reporting and data

26  submitted to the Court and its Special Master.  For example, as testified to at trial, CDCR

27  employees believed that the business rule change to the Timely Psychiatry Contacts

28  indicator was not substantial enough to report to the Court, the Special Master, or

1    Plaintiffs.  But since that change was made in December 2016, the Court has clearly

2    articulated that "the decision [to redefine 'monthly' from 30 to 45 days] made a significant

3    alteration to the Program Guide."  Aug. 14, 2019 Order, ECF No. 6242 at 5 (citations

4    omitted).  As this disconnect shows, Plaintiffs cannot trust Defendants' assessment of what

5    changes constitute a "material alteration" to compliance measures.

6         Also as part of this third phase of improving transparency, Defendants must develop

7    methods of ensuring there are robust internal processes to receive, prioritize, track, and

8    implement data change requests that come from the field.  For example, Dr. Toche testified

9    that Defendants should improve the "release note" process to allow individuals to write

10   back to the entity releasing the change and comment on any problems or bugs they notice.

11   And the parties have stipulated that Defendants will issue "internal guidance to all CDCR

12   mental health administrators further clarifying which business rule changes must be

13   provided to the Special Master and Plaintiffs before implementation."  *See* Defs.' Resp. to

14   Aug. 14, 2019 Order, ECF No. 6257 at 14 (Aug. 29, 2019); Pls.' Resp. to Aug. 14, 2019

15   Order, ECF No. 6255 at 4 (Aug. 28, 2019).  The parties should discuss how best to

16   implement these proposals as part of this process.

17        Fourth, to ensure that the circumstances leading to these proceedings do not recur,

18   Plaintiffs require online, realtime access to Defendants' CQIT and Performance Report,

19   including their definitions and business rules.  Providing such access would create a shared

20   understanding of what is being reported from the field about mental health care, and be a

21   major step toward ultimately reestablishing trust in Defendants' reporting system.

22   Defendants provide the Special Master with such access, as does the Receiver to Plaintiffs'

23   counsel in *Plata*.  Particularly in light of the Court's finding that Defendants knowingly

24   provided false and misleading data, continuing to deny Plaintiffs access to the data that

25   Defendants rely on to represent their level of compliance (and to demonstrate their ability

26   to honestly assess their own compliance) to this Court, the Special Master and Plaintiffs

27   can only continue to foster mistrust.

28        Along these same lines, Plaintiffs request that the Court authorize Plaintiffs'

---

11

[3454674.7]

1    counsel to conduct more direct monitoring of Defendants' compliance with the Court's

2    orders in this case to enhance and support the Special Master's monitoring.  Other than

3    observing seven of the Special Master's site visits per monitoring round and periodic ad

4    hoc institutional visits focused on discrete issues, Plaintiffs' counsel have no ability to

5    directly observe Defendants' provision of mental health treatment to the class or the

6    conditions in which class members receive that treatment.  But Plaintiffs' counsel has a

7    non-delegable duty to the members of the class to monitor compliance with the Court's

8    orders independent of monitoring by the Special Master.  *See, e.g.*, *Keith v. Volpe*, 833

9    F.2d 850, 857-58 (9th Cir. 1987); *Duran v. Carruthers*, 885 F.2d 1492, 1495 (10th Cir.

10   1989); *Plata v. Schwarzenegger*, No. 01-cv-1351-TEH, 2007 WL 2601391, at *5 (N.D.

11   Cal. Sept. 6, 2007).  Even if Defendants remedy the problems with their data, data alone

12   can be deceptive.  It does not measure quality and cannot fully capture conditions that class

13   members experience on the ground, as Dr. Golding and Dr. Gonzalez's reports make clear.

14   During the 2018 staffing negotiations, for instance, Plaintiffs had no way to see behind

15   Defendants' data and challenge it, and would have stipulated to Defendants' proposal to

16   dramatically reduce psychiatry staffing allocations if Dr. Golding had not issued his

17   Whistleblower Report.  Expanding Plaintiffs' counsel's ability to monitor Defendants'

18   compliance efforts in this case is necessary and appropriate to ensure that Plaintiffs never

19   again misplace reliance on Defendants' representations as to the adequacy of mental health

20   treatment.  *See Duran*, 885 F.2d at 1495-96.  At the very least, Plaintiffs should be

21   provided Defendants' pre-tour document productions for all monitoring tours conducted by

22   the Special Master (as opposed to just the subset of tours they also attend in person), and

23   be allowed to attend more than seven monitoring site visits per round.  Indeed, Defendants

24   do not even provide Plaintiffs with a list of their own clients on a routine basis.  This Court

25   should order Defendants to provide Plaintiffs with a list of all *Coleman* class members by

26   level of care and housing location/institution on a monthly basis (similar to what

27   Defendants produce to Plaintiffs' counsel in the *Armstrong* case, No. 4:94-cv-02307-CW

28   (N.D. Cal.)), and online access to non-confidential portions of class members' custody

[3454674.7]

1   records, just as Defendants have provided Plaintiffs' counsel with access to class

2   members' electronic medical records.

3       **D.    Revisiting The ASU EOP Hub And PSU Certification Process**

4           The evidence presented at trial more than demonstrated that the current process

5   permitting Defendants to self-certify the adequacy of mental health care provided in their

6   ASU EOP Hubs and PSUs must be substantially revamped to ensure class members

7   receive minimally adequate treatment in these dangerous segregation settings.  This is a

8   critical remedy borne out of proof at the 2013 trial that segregation is seriously dangerous

9   and harmful to the mental health of class members, and in particular EOP class members.

10  This Court ordered Defendants to ensure Program Guide protections—including adequate

11  mental health treatment such as timely psychiatry contacts—are provided to EOPs, and

12  ordered Defendants to stop housing EOPs in units that cannot do so.  *See generally* April

13  10, 2014 Order, ECF No. 5131.

14          While Plaintiffs continue to maintain that conditions in segregation—including both

15  the level of mental health care and the custodial practices that interfere with that care, such

16  as the use of treatment modules—are dangerous and unconstitutional, at a minimum this

17  proceeding has demonstrated that the self-certification remedy Defendants designed in

18  response to the April 2014 Order is a failure and must be revisited.  The self-certification

19  process is entirely reliant on Defendants' data and on their own internal assessment of

20  what that data shows regarding compliance.  That analysis occurs in a black box, months

21  after the fact, and Defendants routinely leave units open that failed their own certification

22  criteria if they find there is an excuse to do so, such as improvements in subsequent

23  months that do not obviate the documented failures in the month being certified.  *See e.g.*

24  Pls.' Trial Ex. No. 174 at 1 (February 2017 ASU EOP Hub certification allowing CHCF to

25  pass certification "with explanation" despite failing to meet the 90% required compliance

26  threshold for IDTTs because "CHCF has historically performed well on this measure");

27  *see also* Pls.' Trial Ex. Nos. 172 (December 2016 ASU EOP Hub certification) and 173

28  (January 2017 ASU EOP Hub certification).  The record from the evidentiary hearing,

1  including testimony and documentary evidence, showed that Defendants knowingly

2  employed data that manifestly violated the Program Guide's requirements for psychiatric

3  care to keep failing segregation units open in violation of the Court's April 2014 Order.

4  Defendants also knowingly failed to inquire whether other segregation units that did not

5  self-report their reliance on that faulty data did so before certifying those units as in

6  compliance with the Program Guide.  *See, e.g.*, Pls.' Trial Ex. No. 176 (April 2017 ASU

7  EOP Hub certification).  Defendants cannot be trusted to present and analyze their data in a

8  fair and transparent manner, much less to honestly assess their Program Guide compliance

9  for these high-risk solitary confinement units housing vulnerable EOP patients as required

10  by the April 2014 Order.  Because the existing self-certification remedy is entirely

11  dependent on Defendants' unilateral evaluation of their own data, which is not trustworthy

12  or transparent, it must be revisited to ensure adequate protection to the *Coleman* class

13  consistent with this Court's April 2014 Order.

14       Accordingly, Plaintiffs renew their request to renegotiate the current self-

15  monitoring process.  *See* Pls.' Resp. to Defs.' Resp. to Para. 5 of Sept. 17 Order, ECF No.

16  6360 at 10 (Oct. 21, 2019); Pls.' Resp. to Neutral Expert Report, ECF No. 6170 at 53-55

17  (May 28, 2019).  Plaintiffs request that the Court refer this issue back to the Workgroup

18  under the guidance of the Special Master, and require the parties to submit a joint proposal,

19  or dual competing proposals, regarding how to restructure this process within ninety days.

20  **E.    Posting Notice of The Court's Remedial Order And Requiring Training
21          to Ensure Defendants And Their Counsel Are Aware of Their Remedial
        Obligations**

22       In its October 23 bench order, the Court stressed that Defendants, including their

23  attorneys, must fully understand the context of this case and their remedial obligations.

24  Plaintiffs unequivocally agree, and were encouraged by Dr. Toche's testimony as to her

25  openness to discussing how best to achieve this goal.  As a first step, and utilizing its

26  inherent equitable authority to remediate Defendants' violations, the Court should order

27  that its remedial order be distributed and/or posted somewhere in the workplace for all

28  Defendants' employees to review.  *Cf. Doering v. Union Cty. Bd. of Chosen Freeholders*,

857 F.2d 191, 194 (3d Cir. 1988); *In re DeMarco*, 733 F.3d 457, 464-65 (2d Cir. 2013).

The Court should also order that Defendants' internal and external counsel, CDCR's and DSH's mental health staff, both at headquarters and in the field, and custody officials working on mental health issues under the *Coleman* case—including, but not limited to issues such as credit earning, classification, medical records, medication administration, housing, treatment, and discipline of *Coleman* class members—are all charged with notice of the Court's orders in this case, including this Court's most recent finding that Defendants provided false and misleading data to the Special Master and the Court. Although Defendants have committed to issuing a memorandum to the field "reeducating staff regarding [CDCR's] 'Solution Center' system … [t]o ensure staff are aware of the obligation and process for reporting [data system] errors," this does not go far enough even if such a memo does indeed issue.[2] *See* Joint Status Report, ECF No. 6226 at 31 (July 23, 2019); *see also* Defs.' Resp. to Aug. 14, 2019 Order, ECF No. 6257 at 12 (Aug. 29, 2019). Given the testimony from multiple witnesses at trial that they did not feel it was their job to inform the Special Master of key changes in compliance metrics, or of new interpretations of Program Guide provisions affecting their reporting to the Court and Special Master, all Defendants' staff, as well as their attorneys, should be obligated to err on the side of notifying the Special Master and Plaintiffs if they become aware of any change or potential change in policy and procedure, or in any data or charts presenting mental health information, that affects or may affect compliance with this Court's orders in any way. This corrective measure is all the more necessary given the history of this case. Indeed, Defendants' lack of "familiarity with this court's prior orders and the case history" and this Court's "building" concern over Defendants' repeated failures "to acknowledge or discuss prior relevant court orders," prompted the Court in 2017 to remind "all parties to this action and their counsel" that they "must be fully familiar with the remedial plans and

---

[2] Plaintiffs are not aware if any such internal clarifying memorandum has been issued.

[3454674.7]

1  court orders in this case." *See* Nov. 6, 2017 Order, ECF No. 5726.  Given that these

2  concerns have reemerged nearly two years later, the Court should order Defendants to

3  work with the Special Master to devise a plan to train all CDCR and DSH mental health

4  staff, and custodial officials who work on mental health issues, on the *Coleman* case.

5       Moreover, as the Court recognized in its October 23 bench order, counsel for

6  Defendants already have a preexisting obligation under Federal Rule of Civil Procedure 11

7  to ensure that all information presented to the Court is factually supported and not

8  presented for any improper purpose.  *See* Fed. R. Civ. P. 11(b); *see also* Cal. Prof. Conduct

9  Rules 3.3 & 4.1 (prohibiting lawyers from making, or failing to correct, false statements to

10 a court or third party); *id.* at Rule 8.4 (defining professional misconduct to include

11 engaging in conduct that involves "reckless or intentional misrepresentation" or that is

12 prejudicial to the administration of justice).  Indeed, the gravity of what has transpired in

13 these proceedings is dramatically underscored by Defendants' filings leading up to the

14 proceeding in which they admitted they did not fully vet representations previously made

15 to the Court before filing them and agreed they needed to "take remedial steps, including

16 reaffirming with counsel and program staff the need to confirm the accuracy of all data,

17 particularly data reported to the Court, Special Master, or Plaintiffs or that is otherwise

18 used for patient care or compliance purposes."  *See* Defs' Resp. to Para. 5 of Sept. 17,

19 2019 Order, ECF No. 6330 at 2, 9 (Oct. 11, 2019).  The Court is correct to repeat these

20 Rule 11 obligations and initiate a renewed effort to ensure everyone is aware of the context

21 of this case and their remedial obligations.

22      Further, this Court should take steps to ensure that all staff members understand that

23 they can speak honestly to the Special Master about compliance issues without fear of

24 reprisal.  As Dr. Golding and Dr. Kuich testified, and as the Neutral Expert found, mental

25 health staff—and especially psychiatrists—were fearful of retaliation if they spoke to the

26 Special Master or his staff or otherwise failed to agree with CDCR leadership.  *See* Neutral

27 Expert Report, ECF No. 6147 at 16, 23 (May 3, 2019).

28      Dr. Toche testified that she was willing to submit a clarifying memo that all staff

[3454674.7]

1  can report concerns to the Special Master.  And Defendants have asserted that "CDCR will

2  reiterate to the field that staff can speak with the Special Master and his team."  Joint

3  Status Report, ECF No. 6226 at 38 (July 23, 2019).  The Court should order Defendants to

4  proceed with issuing a written memorandum communicating this commitment to the field

5  forthwith.

6  **II.    The Court Should Require An Update Regarding Remedial Measures Already
        Referred to the Special Master**

7

8      In several orders leading up to the evidentiary hearing, the Court referred various

9  issues to the Special Master for resolution.  Defendants have also proposed remedial

10  measures in addition to those discussed in Section I, above.  Plaintiffs list those

11  outstanding issues below and request that the Court direct the Special Master to provide

12  the Court with an update regarding the resolution of these issues, and any outstanding

13  work remaining to be done, within ninety days.

14      In its June 14 Order, the Court referred the following issues to the Special Master to

15  explore and, as appropriate, resolve in whatever format he deems appropriate:

16      (a) whether CDCR policy does, or should, require that EOP and [CCCMS]
          inmate-patients transferred from one institution to another be evaluated by a
17          psychiatrist within 14 days of arrival and prior to the initial [IDTT] meeting
          at the new institution; (b) what contacts between inmate-patients and
18          psychiatrists are properly considered evaluations; (c) why all psychiatrist
          contacts default to confidential contacts in defendants' electronic reporting
19          system and whether that should be corrected; and (d) whether there are any
          other reports filed with the court that need to be corrected.

20

21  June 14, 2019 Order, ECF No. 6187 at 4-5.

22      As to issue (a), Defendants have stated that CDCR is "in the process of modifying

23  its policy to require a psychiatry contact within a specific time after the inmate's transfer to

24  a new program."  Defs.' Resp. to Neutral Expert Report, ECF No. 6169 at 7 (May 28,

25  2019).  Plaintiffs understand Defendants are currently working with the Special Master on

26  this issue.  *See* Pls.' Resp. to Defs.' Resp. to Para. 5 of Sept 17 Order, ECF No. 6360 (Oct.

27  21, 2019).  Plaintiffs have not yet received any policy proposal from Defendants.

28      Regarding issue (b), the Court resolved that issue in its August 14 Order.  *See* Aug.

14, 2019 Order, ECF No. 6242 at 7-8.  However, as Plaintiffs have objected to, Defendants

appeared to disagree that that issue has been fully resolved.  *See* Pls.' Resp. to Sept. 17,

2019 Order, ECF No. 6301 at 3-4 (Oct. 1, 2019) (citing Defs.' Resp. to Aug. 14, 2019

Order, ECF No. 6257 at 28-29 (Aug. 29, 2019)).  The Court has indicated it will issue a

ruling on these filings at a later date, and Plaintiffs have yet to receive any proposed policy

clarification from Defendants on this issue either.

Regarding issue (c), Defendants stated that "CDCR will issue a memo to the field

reminding psychiatrists of their duty to report the confidentiality of patient encounters

appropriately, what default settings are used in EHRS related to timely contacts, and how

to use drop-down menus."  Joint Status Report, ECF No. 6226 at 30 (July 23, 2019).

Plaintiffs are not aware whether any clarifying memo has been developed or issued.

Regarding issue (d), Plaintiffs have objected to Defendants' arguments as to why it

cannot correct certain filings, and identified numerous other deficiencies in the purported

corrections Defendants have made to some of the misleading data in the record.  *See*

*generally* Pls.' Resp. to Defs.' Resp. to Para. 5 of Sept. 17 Order, ECF No. 6360 (Oct. 21,

2019); Pls.' Resp. to Defs.' Notice of Errata, ECF No. 6316 (Oct. 8, 2019).  The Court has

yet to rule on Plaintiffs' objections, and on Plaintiffs' stated concerns about the overall

adequacy of Defendants' efforts to cure the false and misleading statements in the record

to date.  Plaintiffs also note that Defendants stated they would "supplement the June 21,

2018 joint report with a statement that some portion of the data underlying the 'Timely

Psychiatry Contact' indicator or data on frequency of psychiatry contacts may include

appointments completed by supervising psychiatrists."  Joint Status Report, ECF No. 6226

at 32 (July 23, 2019).  Although Defendants filed a notice of errata amending the June 21,

2018 status report, the only change they made was to remove the reference to the

Appointments Seen as Scheduled indicator from a footnote in the 2018 Staffing Proposal,

which was attached as an exhibit to that filing.  *See* Defs.' Notice of Errata Re: ECF Nos.

5591, 5601 & 5841, ECF No. 6302 at 3 (Oct. 1, 2019).  Plaintiffs also note that the same

clarification regarding the effect that supervisors acting as line staff has on the Timely

[3454674.7]

Psychiatry Contacts indicator should be added to Exhibit 2 to the declaration of former Deputy Director Katherine Tebrock filed with this Court on March 30, 2017 given that this chart, per its title, purports to show compliance data vis a vis the listed "staff psychiatrist" vacancy rates. *See* Decl. of Katherine Tebrock In Supp. of Defs.' Resp. to Special Master's Report on Staffing, ECF No. 5591-2 at 9 (Mar. 30, 2017).

Also in the June 14 Order, the Court referred the issue of addressing the pervasive culture of marginalizing psychiatrists within CDCR to the Special Master:

> The global questions raised by the reports from Drs. Golding and Gonzalez and the amicus, Union of American Physicians and Dentists, concerning the respective roles of psychiatrists and psychologists in policy-making and the delivery of mental health care also are referred to the Special Master. He shall assess those issues in conjunction with his monitoring tasks to ensure that both policy-making decisions and delivery of mental health care are consistent with the requirements of the remedy in this case.

June 14, 2019 Order, ECF No. 6187 at 5. Dr. Toche testified that this is indeed a problem and that the Special Master team's presence in headquarters has helped address this, further supporting the need for ongoing headquarters monitoring by the Special Master as discussed in Section I.B., above. The Special Master should provide an update on what structural or policy changes have been put in place to ensure both that psychiatrists play an appropriate role in policymaking and patient care decisions as the only medically trained clinical staff, and that headquarters leadership have in place the type of functional and appropriate reporting structure necessary to ensure a delivery of adequate mental health care to the 37,000 class members in the system as part of a durable remedy.

In the August 14 Order, the Court referred several additional issues to the Special Master. First, the Court ordered that the issue of "Counting All Encounters As Evaluations" would be:

> referred to the Workgroup for development of protocols to ensure the 30 and 90 day psychiatric evaluations required by the Program Guide are confidential unless an inmate-patient refuses to be seen in a confidential setting, and that defendants' compliance reporting is consistent with this requirement as now clarified.

Aug. 14, 2019 Order, ECF No. 6242 at 8. The parties have not yet discussed this issue in the Workgroup setting.

1    Second, the Court ordered:

2        Going forward, defendants will need to take all steps necessary to ensure that
         their EHRS allows staff to record data that accurately reflects whether a
3        clinical evaluation was confidential or non-confidential, without allowing
         electronic auto defaults to contribute to the generation of misleading data.
4        These steps shall be taken under the supervision and with the guidance of the
         Special Master.  The Special Master shall report to the court if relevant
5        components of the EHRS system are not timely corrected.

6    *Id*.  In response to the August 14 Order, Defendants submitted:

7        CDCR is in the process of eliminating the default confidentiality setting for
         psychiatry and primary clinician contacts in EHRS.  Instead of defaulting,
8        this field will be mandatory and will require the provider to select whether
         the encounter was confidential or non-confidential.  CDCR is currently
9        drafting a memo to the field regarding this change and will present that draft
         to the Special Master and Plaintiffs.
10

11   Defs.' Resp. to Aug. 14, 2019 Order, ECF No. 6257 at 13 (Aug. 29, 2019).  Plaintiffs are

12   not aware of the status of Defendants' proposals.

13       Third, the Court ordered that:

14       The issue of whether, and to what extent, supervising psychiatrists can or
         should perform the duties of line psychiatrists, consistent with the 2009
15       Staffing Ratios, is referred to the Special Master in coordination with the
         other related issues referred by paragraph 8 of this court's June 14, 2019
16       order.

17   Aug. 14, 2019 Order, ECF No. 6242 at 11.  Defendants stated they "do not object to the

18   Court's order referring [this issue] to the Special Master for additional work."  Defs.'

19   Resp. to Aug. 14, 2019 Order, ECF No. 6257 at 4 (Aug. 29, 2019).  As part of this process,

20   the Court should require Defendants to work with the Special Master to create a way to

21   accurately track which psychiatric supervisors, at every level of care, directly care for

22   patients and how frequently that occurs, which may require changes to EHRS given the

23   deficiency Defendants repeatedly cited allowing psychiatrists to assign themselves

24   supervisory titles in order to prescribe non-formulary medications.  Defendants have

25   already offered to provide Plaintiffs and the Special Master "data on supervisor workload

26   in outpatient programs."  *Id*. at 12; *see also* Joint Status Report, ECF No. 6226 at 32 (July

27   23, 2019).  This is not sufficient.  Once Defendants establish a way to track which

28   supervisory psychiatrists perform line staff duties, they should be required provide regular

20

[3454674.7]

reports to the Special Master and Plaintiffs for *all* levels of care in which psychiatric supervisors directly care for patients to ensure everyone, including the Court, is aware of the extent to which supervisors are performing line staff functions.

Finally, the Court referred the footnote 19 issues from the Neutral Expert Report to the Special Master in its August 14 Order:

> [W]ork on the last four issues will be referred to the Special Master, with the admonishment that the court expects the parties to cooperate fully with the Special Master as he leads the work on these issues. These include: whether primary clinicians are being allowed to discharge inmate-patients from mental health crisis beds (MHCBs) without involvement of a psychiatrist; whether the Utilization Management (UM) department was moved from Mental Health to California Correctional Health Care Services (CCHCS) Medical in 2015 because of concerns that data would be manipulated or altered if Mental Health continued to control it; whether psychiatrists have not been allowed to speak with the Special Master about safety concerns, and whether they have been disciplined for doing so; and whether a psychiatrist received a cease and desist order for comments made about psychologists supervising psychiatrists and, if so, whether that was in retaliation for the psychiatrist's involvement in preparation of the Golding Report. ECF No. 6187 at 5. As explained at hearing, the court will seek additional information from the Neutral Expert regarding the cease and desist order referred to in the eighth issue on the list. In addition, the court will ask the Neutral Expert for additional information the court might share with the Special Master and the parties about the sixth issue on the list, namely, the transfer of the UM department from Mental Health to CCHCS Medical in 2015.

Aug. 14, 2019 Order, ECF No. 6242 at 12. Defendants stated they "do not object to the Court's … proposal to address the matters implicated by footnote 19 of the Neutral Expert Report." Defs.' Resp. to Aug. 14, 2019 Order, ECF No. 6257 at 4 (Aug. 29, 2019). Plaintiffs are not aware of the status of these inquiries, however.

## III.     The Court Should Refer Additional Issues to The Workgroup

During the parties' meet and confer process before filing the July 23, 2019 Joint Status Report, Plaintiffs sent a letter to Defendants on July 3, 2019 proposing additional underlying facts for stipulation and areas of agreement arising out of the Dr. Golding's and the Neutral Expert's reports. *See* Joint Status Report, ECF No. 6226 at 60 (July 23, 2019). Some of those issues have not been adequately addressed in these proceedings. Plaintiffs are most concerned by (1) evidence in the Neutral Expert Report that CDCR excludes from compliance metrics all data points relating to EOP patients in

[3454674.7]

1    "overflow" housing, and (2) evidence from Dr. Golding's Report that CDCR measures

2    compliance with its Medication Administration Process Improvement Program ("MAPIP")

3    in misleading ways that have yet to be corrected.  *See* Neutral Expert Report, ECF No.

4    6147 at 89 n.55, 95-96 (May 3, 2019); Pls. Trial Ex. No. 100 (Golding Report) at 3-4, 30-

5    35.  Defendants have stated they are "open and willing to address the issues raised in

6    Plaintiffs' July 3, 2019 letter with Plaintiffs, the Special Master, and if appropriate, the

7    Court."  Joint Status Report, ECF No. 6226 at 60 (July 23, 2019).  This necessarily

8    includes the issues of whether and how to measure EOP patients housed in "overflow"

9    settings (as well as resolving any potential ambiguity about the underlying requirement to

10   provide EOP-level of care to such class members) and compliance with, as well as

11   transparent reporting of, MAPIP requirements.  Given that these two issues impact

12   Defendants' data reporting in many of the same ways that led the Court to determine

13   Defendants' filing of other data was misleading, Plaintiffs renew their requests to address

14   these matters.  *See* Pls.' Resp. to Defs.' Resp. to Para. 5 of Sept. 17 Order, ECF No. 6360

15   at 9 (Oct. 21, 2019); Pls.' Resp. to Neutral Expert Report, ECF No. 6170 at 19, 34-36

16   (May 28, 2019); *see also* Amicus Brief of Union of Am. Physicians and Dentists, ECF No.

17   6164-1 at 18 (May 28, 2019) (characterizing Defendants' exclusion of EOP "overflow"

18   patients from compliance metrics as "a misleading practice which fails to fully report non-

19   compliance").  Accordingly, Plaintiffs request that the Court formally refer resolution of

20   these two issues to the Workgroup, under the guidance of the Special Master.

21   \ \ \

22   \ \ \

23   \ \ \

24   \ \ \

25   \ \ \

26   \ \ \

27   \ \ \

28   \ \ \

PLAINTIFFS' PROPOSED REMEDIES FOLLOWING EVIDENTIARY HEARING

[3454674.7]

1

**CERTIFICATION**

2      The undersigned counsel for Plaintiffs certifies that they have reviewed the

3  following relevant court orders:  ECF No. 5131 (Apr. 10, 2014); ECF No. 5726 (Nov. 6,

4  2017); ECF No. 5710 (Oct. 10, 2017); Mandate, Ninth Cir. Case No. 17-17328, ECF No.

5  6094 (Feb. 14, 2019); ECF No. 6187 (June 14, 2019); ECF No. 6242 (Aug. 14, 2019);

6  ECF No. 6288 (Sept. 17, 2019); ECF No. 6312 (Oct. 8, 2019); ECF No. 6365 (Oct. 23,

7  2019).

8

9  DATED:  October 30, 2019          Respectfully submitted,

10                                   ROSEN BIEN GALVAN & GRUNFELD LLP

11

12                                   By:  *Cara E. Trapani*

13                                        Cara E. Trapani

14                                   Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3454674.7]