```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
 2                            --oOo--

 3    RALPH COLEMAN, ET AL.,       ) Docket No. 90-CV-520
                                   ) Sacramento, California
 4                  Plaintiff,     ) October 15, 2019
                                   ) 9:05 a.m.
 5             v.                  )
                                   )
 6    GAVIN NEWSOM, ET AL.,        ) Re: Evidentiary Hearing
                                   ) Day 1
 7                  Defendants.    )

 8                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE KIMBERLY J. MUELLER
 9                 UNITED STATES DISTRICT JUDGE

10    APPEARANCES:

11    For the Plaintiff:     ROSEN BIEN GALVAN & GRUNFELD, LLP by
                             MS. LISA ADRIENNE ELLS
12                           MS. CARA ELIZABETH TRAPANI
                             MR. MICHAEL W. BIEN
13                           MS. JESSICA L. WINTER
                             101 Mission Street, 6th Floor
14                           San Francisco, CA 94105

15    For Dr. Golding and    STEWART & MUSELL
      Dr. Gonzalez:          MS. WENDY ELLEN MUSELL
16                           2200 Powell Street, Suite 440
                             Emeryville, CA 94104

17

18    Also Present:          Gregorio Winter, paralegal

19

20        (Appearances cont'd next page.)

21
                      JENNIFER COULTHARD, RMR, CRR
22                      Official Court Reporter
                       501 I Street, Suite 4-200
23                       Sacramento, CA 95814
                        jenrmrcrr2@gmail.com
24                          (312)617-9858

25        Mechanical Steno - Computer-Aided Transcription
```

1    APPEARANCES (CONT'D)

2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL
                               XAVIER BECERRA by
3                              MS. ELISE OWENS THORN
                               MR. TYLER VANCE HEATH
4                              1300 I Street, Suite 125
                               Sacramento, CA 94244
5                              MR. ADRIANO HRVATIN
                               MR. JEFFREY THOMAS FISHER
6                              MR. KYLE ANTHONY LEWIS
                               455 Golden Gate Avenue
7                              Suite 11000
                               San Francisco, CA 94102
8                              MS. SHARON A. GARSKE
                               1515 Clay Street, 20th Floor
9                              P.O. Box 70550
                               Oakland, CA 94612
10
                               ROBINS KAPLAN, LLP
11                             MR. ROMAN SILBERFELD
                               GLENN A. DANAS
12                             2049 Century Park East, Suite 3400
                               Los Angeles, CA 90067-3208
13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2   WITNESSES                                        PAGE

3   MICHAEL GOLDING
          Exam By The Court ........................ 13
4         Exam By Ms. Ells ......................... 41
          Exam By Mr. Silberfeld ................... 56
5         Exam By Ms. Ells ......................... 75

6   KATHERINE TEBROCK
          Exam By The Court ........................ 82
7         Exam By Mr. Lewis ........................ 116
          Exam By The Court ........................ 125
8
    ANGELA PONCIANO
9         Exam By The Court ........................ 134
          Exam By Ms. Ells ......................... 143
10        Exam By Ms. Garske ....................... 155
          Exam By Ms. Ells ......................... 162
11
    JOHN REKART
12        Exam By The Court ........................ 165
          Exam By Ms. Trapani ...................... 175
13
    DAVID LEIDNER
14        Exam By The Court ........................ 188
          Exam By Ms. Trapani ...................... 211
15        Exam By Mr. Fisher ....................... 223
          Exam By Ms. Trapani ...................... 228
16        Exam By Mr. Fisher ....................... 231

17

18

19

20

21

22

23

24

25

1                          E X H I B I T S

2

PLAINTIFFS' EXHIBITS                        ADMITTED
3
        No. 101   ................................. 232
4       No. 172   ................................. 131
        No. 173   ................................. 131
5       No. 174   ................................. 131
        No. 175   ................................. 131
6       No. 176   ................................. 129
        No. 210   ................................. 239
7       No. 212   ................................. 239
        No. 214   ................................. 239
8       No. 215   ................................. 239
        No. 240   ................................. 232
9
JOINT EXHIBITS
10
        No. 0   ................................. 159
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            SACRAMENTO, CALIFORNIA, TUESDAY, OCTOBER 15, 2019

 2                               --o0o--

 3       (In open court.)

 4            THE CLERK:  Calling Civil Case 90-520, Coleman, et al.

 5  v. Newsom, et al.  This is on for an evidentiary hearing.

 6            THE COURT:  All right.  Good morning.  Appearances,

 7  please, starting with the plaintiffs.

 8            MS. ELLS:  Good morning, Your Honor.  This is Lisa

 9  Ells for the plaintiffs.

10            I have with me Michael Bien, Jessica Winter, Cara

11  Trapani; and our paralegal, Gregorio Gonzalez.

12            THE COURT:  All right.  Good morning to you all.

13            And for the defense?

14            MR. SILBERFELD:  Good morning, Your Honor; Roman

15  Silberfeld, Robins Kaplan, for the defendants.

16            MR. DANAS:  Good morning, Your Honor; Glenn Danas,

17  Robins Kaplan, for the defendants.

18            MS. THORN:  Elise Thorn, for defendants.

19            MR. LEWIS:  Morning, Your Honor; Kyle Lewis for

20  defendants.

21            MR. HRVATIN:  Good morning, Your Honor; Adriano

22  Hrvatin for defendants.

23            MS. GARSKE:  Good morning, Your Honor; Sharon Garske

24  for defendants.

25            MR. FISHER:  Good morning, Your Honor; Jeffrey Fisher

1    for defendants.

2          MR. HEATH:  And good morning, Your Honor; Tyler Heath

3    for the defendants.

4          THE COURT:  All right.  Good morning to you all.

5          MS. MUSELL:  Good morning, Your Honor; Wendy Musell on

6    behalf of Dr. Golding and Dr. Gonzalez, both of whom are

7    present in the courtroom.

8          THE COURT:  All right.  Good morning, Ms. Musell.  I

9    was going to acknowledge your presence in the audience for now.

10         Just a couple of housekeeping matters, and then I'd

11   like to proceed to questioning.  I acknowledge receipt of the

12   supplemental attorney declarations, and we'll talk about that

13   before the end of the day.

14         MR. SILBERFELD:  Thank you, Your Honor.

15         THE COURT:  Dr. Rekart is available by video beginning

16   at 2:00 p.m. Pacific Standard Time; is that correct?

17         MR. LEWIS:  Yes, Your Honor.  That is correct.

18         THE COURT:  All right.  And so we will work to fit him

19   in then.

20         And recognizing the plaintiff's desire to have

21   Dr. Rekart appear in person, you're satisfied that the video

22   arrangements are made so that he can appear that way today,

23   Ms. Ells?

24         MS. ELLS:  We understand those arrangements were made.

25   We were not brought in to review any of those arrangements, but

1   that is our understanding of how we're proceeding, and we're

2   satisfied with that, so long as the Court is also satisfied

3   with that.

4          THE COURT:  All right.  Well, we'll see how it goes.

5          Are there any witnesses besides Dr. Golding who have

6   schedule restrictions that are on the list for today that

7   anyone knows of?

8          MR. LEWIS:  None, Your Honor.

9          THE COURT:  All right.  Just for now, so it's clear, I

10  said we'll talk about the attorneys' supplemental declarations

11  later.  We're keeping the Wednesday afternoon schedule.  I'm

12  not vacating that at this point.  Is there anything else we

13  need to discuss before the Court begins with Dr. Golding?

14         MS. ELLS:  Yes, Your Honor.  Plaintiffs would move to

15  exclude the witnesses from the courtroom unless they are

16  testifying, that's all.

17         THE COURT:  Any objection, Mr. Silberfeld?

18         MR. LEWIS:  Your Honor, Kyle Lewis for the defense.

19         Your Honor, this has been a very long process.  It's

20  been going on for a year.  The witnesses are entitled to

21  participate in this process and by being here they are

22  participating fully in what is a very important process to both

23  the Court and to CDCR and to the witnesses themselves.  This is

24  also a way to restore trust among all the parties in allowing

25  them to observe the proceedings and also participate, as Your

1     Honor has indicated, and we would ask that they be permitted to

2     stay in the courtroom to witness this and also assist with our

3     management of the case.

4           THE COURT:  What was the last part?

5           MR. LEWIS:  They are management for CDCR, so they are

6     part of this case and part of the overall things we're trying

7     to address here, Your Honor.

8           THE COURT:  All right.  Ms. Ells, your response to

9     that?

10          MS. ELLS:  Your Honor, if I may, that would not

11    rebuild trust.  In fact, having the witnesses hear the

12    testimony of the other witnesses, it would give us concerns

13    that that testimony may change with what they hear from the

14    other witnesses, and it's very standard to exclude the

15    witnesses.  I'm not hearing anything from defendants that would

16    make it appropriate in this case.  It's very standard to

17    exclude the witnesses, and we would request that you do so.

18          MR. LEWIS:  Your Honor, if I may?

19          THE COURT:  Apart from whether it's standard, I mean,

20    given the specific questions I anticipate asking, I think it

21    does make some sense to exclude.  What's the reason they need

22    to be present?

23          MR. LEWIS:  Your Honor, as part of this whole process,

24    this brings in all of the relevant parties, some of whom are

25    clients and have been clients in the past.  They are the

1    representatives of the agency at the highest levels involved in

2    this, so their participation in this, both to observe and to

3    give Your Honor information, is essential to the process.  And

4    part of this whole, basically, evidentiary hearing that we're

5    having is to make sure they can become involved and have full

6    participation.

7            THE COURT:  Well, I'm granting the motion, so any

8    witnesses on the list for today should leave the courtroom now,

9    and they'll be called back in when it's time for them to

10   testify.

11           MS. ELLS:  Thank you, Your Honor.

12           THE COURT:  So I don't necessarily recognize all of

13   them.  If the defense can make certain that anyone who's

14   present is now leaving.

15           MS. MUSELL:  Your Honor, may I ask for a point of

16   clarification?

17           THE COURT:  You may, Ms. Musell.

18           MS. MUSELL:  Thank you, Your Honor.

19           THE COURT:  Can the court reporter hear Ms. Musell?

20           COURT REPORTER:  Yes.

21           THE COURT:  All right.

22           MS. MUSELL:  Dr. Gonzalez is here.  I understand she

23   is not on the witness list.  I don't know if she will be called

24   as a rebuttal witness.  How would Your Honor like to handle

25   that?

1          THE COURT:  What are the parties' positions?  The

2     Court's thought is she would not need to leave the courtroom.

3     I don't anticipate her being called.

4          MS. ELLS:  We also agree that we don't see any reason

5     to exclude her.  She's not on the witness list.

6          MR. LEWIS:  Your Honor, one point of clarification.

7     For example, Dr. Diana Toche is here.  She is a named defendant

8     witness within the suit and is entitled to observe these

9     proceedings, which are very germane to her job and her

10    position.  So it's along those lines that we believe it is

11    important that not only Dr. Toche but many of the others who

12    are --

13         THE COURT:  Well, you've made a distinction regarding

14    Dr. Toche as a named party.  Does that change anything in your

15    view, Ms. Ells?

16         MS. ELLS:  No, Your Honor.  Ms. Toche can review the

17    transcript and, you know, it seems to us that it doesn't make

18    sense for her to hear all of the other witnesses' testimony.

19    She has access to it through the transcripts, and we don't

20    think it's appropriate.

21         We'd also --

22         THE COURT:  Dr. Toche is the only named party?

23         MR. LEWIS:  Yes, Your Honor.  But in addition, these

24    are our clients, so --

25         THE COURT:  I understand that, but I'm going to make

1    an exception for Dr. Toche as a named party.  So Dr. Toche may

2    remain of the persons on the list.  I think that accords with

3    notions of fair play; but otherwise, the witnesses shall be

4    excluded.

5              MS. ELLS:  Your Honor --

6              THE COURT:  All right.  So have the witnesses been

7    excluded except for Dr. Toche?

8              MS. ELLS:  Your Honor --

9              THE COURT:  If you can answer that for me.

10             MS. ELLS:  Just a question of clarification.  Are you

11   including the attorney witnesses?

12             MR. SILBERFELD:  That's what I was going to ask, Your

13   Honor, actually.

14             THE COURT:  Yes.

15             MS. ELLS:  Yes?  Okay.

16             THE COURT:  Anyone who's not a party.

17             All right.  Does the defense represent that all but

18   Dr. Toche now has left the courtroom?

19             MR. LEWIS:  We'll need a minute, Your Honor.

20             THE COURT:  All right.

21             MR. SILBERFELD:  May we be excused for one moment just

22   to make arrangements?

23             THE COURT:  Is there any other housekeeping?

24             MS. ELLS:  Not for plaintiffs, Your Honor.

25             THE COURT:  All right.

1         MR. LEWIS:  Your Honor, one matter.

2         Plaintiffs yesterday submitted designations as to

3 Dr. Kuich's deposition.  We received that late in the day

4 without any meeting and conferring regarding that, so we would

5 ask that we have until the end of tomorrow, the close of

6 Wednesday, to submit our counter-designations.

7         THE COURT:  All right.  Any reason not to allow that,

8 Ms. Ells?

9         MS. ELLS:  That's fine, Your Honor.

10         THE COURT:  All right.  That request is granted.

11         MR. LEWIS:  Thank you.

12         THE CLERK:  The Court also has just recently received

13 that information, and so I will, by Friday, have completed my

14 review of the Dr. Kuich materials.

15         Anything else?  Any other housekeeping, Ms. Ells?

16         MS. ELLS:  No, Your Honor.

17         THE COURT:  Mr. Silberfeld?

18         MR. SILBERFELD:  No, Your Honor.

19         THE COURT:  All right.  I'd like to ask Dr. Golding

20 then to come forward.  And Ms. Musell, where would you request

21 to sit?

22         MS. MUSELL:  Wherever Your Honor would like me to sit.

23         THE COURT:  Can we make room at counsel table?

24         MR. SILBERFELD:  Sure.

25         THE COURT:  All right.  Looks like there's one empty

Golding - Exam by The Court

1   chair there, so perhaps defense attorneys can move down.

2             Dr. Golding, please come forward.

3             THE WITNESS:  Your Honor, this is a blank pad --

4             THE COURT:  Well, we'll cover that once you're in the

5   stand.

6             THE WITNESS:  Okay.

7             THE CLERK:  Please step into the witness stand, remain

8   standing and raise your right hand.

9             THE WITNESS:  Okay.  May I affirm?

10            THE COURT:  Yes, you may affirm.

11       (Witness duly affirmed and takes the stand.)

12            THE CLERK:  Thank you.  Please be seated.

13            Please say and spell your first and last name for the

14   record.

15            THE WITNESS:  Michael Golding, M-I-C-H-A-E-L,

16   G-O-L-D-I-N-G.

17                  MICHAEL GOLDING, WITNESS, SWORN

18                            EXAMINATION

19   BY THE COURT:

20   Q   All right.  Good morning, Dr. Golding.

21   A   Good morning, ma'am.

22   Q   And you are represented by Ms. Musell, correct?

23   A   Yes, ma'am.

24   Q   And she is present?

25   A   Yes, ma'am.

Golding - Exam by The Court

1    Q    I have several questions for you.  I'm dividing them by the

2    areas, the subject matter areas I've identified for this

3    hearing, and I'm going to pose questions to you, and I would

4    ask for short answers.  If I have follow-up questions, I'll ask

5    you the follow-up questions.

6    A    Sure.

7    Q    So I'm not asking for lengthy narratives.  If you don't

8    understand a question, let me know.  All right?

9    A    Yes, ma'am.

10   Q    So I'm starting first with the issue of lengthening EOP

11   guidelines from 30 to 45 days.  And you had indicated, as you

12   were walking towards the witness stand, that you have brought

13   with you an empty pad of paper?

14   A    Yes, ma'am.

15   Q    And so you're just making some notes on that pad of paper?

16   A    Yes, if it's okay.

17   Q    That's fine.  But, again, if you don't understand a

18   question, let me know.

19   A    Yes, ma'am.  Sometimes it helps me to organize my thoughts.

20   Q    All right.  Can you pull the microphone a bit closer to

21   you.  I realize this is a not traditional setup, but the court

22   reporter needs to make certain that she can hear you.

23   A    Yes, ma'am.

24   Q    Also, if you don't know the answer to a question, just let

25   me know that.  I'm not trying to put words in your mouth.  I'm

Golding - Exam by The Court

1   just trying to gather some additional information to help me

2   understand what's happened in this case.  You understand that?

3   A   I do.

4   Q   All right.  So just to clarify in my mind, did any person

5   in CDCR's management structure provide you with information

6   about the origin of the 30 to 45 days rule change?

7   A   In the management structure?  I don't -- no.  I mean, there

8   were senior specialists at headquarters whom I read told me in

9   January in that neutral expert's report that there was a

10   change.  The neutral expert said -- I don't recall, but the

11   neutral expert said that apparently someone from -- my two

12   specialists emailed me, Dr. Mann and Dr. Lindgren.

13   Q   When you say "January," which January?

14   A   January of 2017, ma'am.

15   Q   All right.  Did any person in CDCR's management tell you

16   the reasons for the rule change at any point in time?

17   A   No, ma'am.

18   Q   What do you understand to be the reasons for the rule

19   change, as you sit here today?

20   A   Oh, at that time, I think after they had made the change

21   there was -- that there was an explanation.

22   Q   And what was that explanation?

23   A   The explanation was that it would be easier for the

24   psychiatrists to be compliant with that rule, given their

25   vacations and such.

Golding - Exam by The Court

1   Q   And who told you that?

2   A   I heard that from Dr. Ceballos, I believe.

3   Q   And did that explanation make sense to you?

4   A   No.

5   Q   Did you disbelieve it?

6   A   Yes.

7   Q   Why did you disbelieve it?

8   A   Because the rule change would have -- I mean, it would have

9   made it easier for the psychiatrists, but at the expense of

10  following court mandates and -- as specified in the program

11  guide.  Thus, I thought that the purpose was to help meet court

12  mandates.

13  Q   All right.  In your report, I believe it's page 25 of your

14  report, but I'm not asking you to refer to your report, you

15  said you told your senior executive that the change from 30 to

16  45 was truly problematic.  Just so I'm perfectly clear, who was

17  the senior executive to whom you refer?

18  A   I told many people, but Deputy Tebrock --

19  Q   All right.

20  A   -- as well as Dr. -- I mean, I told Executive Ceballos.  I

21  also told Executive Leidner on March 21st, 2017.

22         THE COURT:  Cell phones need to be off, and they're

23  subject to seizure.  I hear a cell phone.

24         THE WITNESS:  March 21st I told --

25

Golding - Exam by The Court

1    BY THE COURT:

2    Q    But so who's the senior executive you referred to in your

3    report?  You said Dr. Tebrock.  Is that the senior executive?

4    A    Not doctor.  The senior executive is Deputy Tebrock.

5    Q    I mean Ms. Tebrock.

6    A    Yes.  Yes.

7    Q    So how did you explain the problem to her?

8    A    I told her in -- well, I have email documentation on April

9    12th, which -- 2017 that I told her that we had increased the

10   rule to allow appointments up to 45 to 60 days and actually a

11   little bit over 60 days.  I told her in that email, which I

12   delivered to Linda Patterson Turl, that that violated -- that

13   was wrong and violated the Court mandates.

14        I also, on April 13th forward an email to Deputy Tebrock

15   that I had also sent to Dr. Ceballos saying that Deputy Tebrock

16   had given me permission to disambiguate the rule and figure out

17   what the difference would be between their change and what

18   actually it was.  And, indeed, on April 10th, 2018, Deputy

19   Tebrock said that it would be misrepresenting the data to

20   combine CCC and EOP in that way.  I also --

21   Q    All right.  So did Deputy Director Tebrock provide any

22   other response to your telling her about the truly problematic

23   rule change?

24   A    In what time frame, Your Honor?

25   Q    Within a short period of time after your first telling her.

1    You've identified a number of things she did.

2    A    I think that I don't -- I don't recall her doing something.

3    I know that at some point on April 12th -- and I inferred that

4    she ordered this on April 12th -- the rule change was changed

5    back from 60 days to 45 days.  And on April 23rd, it was

6    changed from 45 days back to 30 days.  So it was a two-step

7    process.  And I assume that that was -- and believe that Deputy

8    Tebrock had ordered it reversed, but I'm not sure who ordered

9    it reversed.

10   Q    Do you consider the problem fixed now?

11   A    No, because the problem was not just making a mistake.  The

12   issue was failing -- we all make mistakes.  The issue was

13   failing to report the mistake.

14   Q    All right.  I understand that.  So just focusing on the

15   business rule, has the business rule been changed, if "business

16   rule" is the right terminology?  Has the businesses rule been

17   changed permanently such that it's back to 30 days?

18   A    I -- yes, ma'am.  To my knowledge, it's at least within 30

19   days; although, they still combine a plethora of CCC patients,

20   like 28,000 of them, with EOP patients, which blurs the -- with

21   EOP patients only about 6,000 or so, and that blurs, so you

22   can't tell that EOP patients are not being seen in a timely

23   way.  So that aspect of the problem, which was going on at that

24   time, has not been corrected.

25   Q    All right.  Just so I'm clear, do you believe that the rule

1  was changed as part of an intentional effort to artificially

2  inflate --

3  A    Oh, yes --

4  Q    -- compliance data?

5  A    Yes.

6  Q    Let me finish.

7  A    I'm sorry.  I'm sorry.

8  Q    So I was saying, do you believe the rule was changed as

9  part of an intentional effort to artificially inflate

10 compliance data?

11 A    Yes, ma'am.

12 Q    And why?

13 A    Because when I brought that rule up again and spoke on

14 April 17th to a group of Dr. Leidner -- April 17th, 2018,

15 Dr. Leidner, Ms. Ceballos, Dr. Mann, Dr. Rekart, Dr. Kuich and

16 others, I confronted them with that, and Dr. Ceballos said that

17 I had accused her of fraud and was quite angry and used

18 colorful language.  But interestingly, April 24th Deputy

19 Tebrock had a meeting, and during that meeting and then

20 confirmed by an email on April --

21 Q    Was this a meeting you were in?

22 A    Yes.

23 Q    All right.

24 A    -- a meeting on April 25th -- I'm sorry.  April 24th was a

25 meeting with her, Dr. Rekart Dr. Kuich, Deputy Brizendine.  And

Golding - Exam by The Court

1   in that meeting, she said that she objected to me saying that

2   that interval had been lengthened.  She said that I had

3   attacked the integrity of Dr. Ceballos, though I have three

4   letters saying that I had attacked the integrity of the data.

5   She --

6   Q    And the "she" here is Director --

7   A    Deputy Tebrock.

8   Q    Deputy Director Tebrock?

9   A    Yes.  Deputy Director Tebrock.  She --

10  Q    Did she say anything to support your conclusion that the

11  change had been an intentional effort to artificially inflate

12  data?

13  A    She had previously said -- well, in that context, I felt

14  that she was saying that I had trust issues in order to deflect

15  but also on April -- I'm sorry, on March 28th, 2017, before

16  the -- before the data had gone to the Court on March 30th,

17  Deputy Tebrock had said that they had gotten word from the

18  Governor's Office that they were looking for data that would

19  demonstrate compliance with the program guide -- with -- I'm

20  sorry -- with the adequacy of care.

21      And I had suggested to her that we use 30-day readmission

22  rates, and her response to that was that that -- to send the

23  data over to her but she thought that that might not be

24  favorable to us.  So she was -- so that appeared to me that she

25  was looking for data that would be compliant and also the fact

Golding - Exam by The Court

1   that she ordered the data reversed, though she knew about it

2   beforehand.

3   Q   She ordered it -- you mean the 30 to 45 days, she ordered

4   that reversed?

5   A   Reversed.  And also the 45 -- well, someone ordered the 45

6   to 60 days reversed first and the 45 to 30 days reversed on two

7   different dates.  That indicated to me also that there was a

8   sense that they thought that it was wrong but needed to change

9   the data to get the data out prior to reversing.

10  Q   And are you saying there's something about the timing of

11  the reversal orders?

12  A   Yes.  They occurred after the data was given to the Court

13  on, I believe, March 30th.

14  Q   All right.  I understand that you did not raise your

15  specific concerns with the Coleman Special Master at the time

16  this was happening.

17  A   At that time, yes, ma'am.

18  Q   All right.  And why not?

19  A   I very much thought that we were not allowed to and thought

20  that, indeed, that I might even, over the course of time, be

21  prosecuted for releasing information.  That is a -- as a

22  neutral expert said, that is a common thought amongst the

23  psychiatrists whom we interviewed.

24  Q   But you understand today that you are able to contact the

25  Special Master directly?

Golding - Exam by The Court

1    A    Yes, ma'am.

2    Q    All right.  I want to move on to -- and I'm just asking the

3    questions I have to clarify the record in my mind.  So the

4    category of "Appointments seen as scheduled."

5    A    Yes, ma'am.

6    Q    I don't have particular questions for you.  Is there

7    anything not covered by your report or the neutral expert's

8    findings --

9    A    Yes, ma'am.

10   Q    -- that's not in the record --

11   A    Yes.

12   Q    -- that you believe I need to know?

13   A    Yes, ma'am.

14   Q    And again, not a narrative.

15   A    I understand.

16   Q    So if there is, give me a bullet point of what I need to

17   know that's not currently in the record, as you understand it.

18   A    Well, the big thing that's not in the record is that --

19   well, two things are not in the record.  One is that on July --

20   on or around July 10th, I specifically --

21   Q    July 10th of?

22   A    Of 2018.  I specifically told her about a problem at Sac in

23   which eleven patients might be scheduled and three were seen

24   and it was as if those eight patients had or those eight other

25   patients with appointments had been canceled or not counted.

Golding - Exam by The Court

1       And furthermore --

2   Q   When you say "her."

3   A   Deputy Tebrock.  I'm sorry.

4   Q   And Sac is CSP Sac?

5   A   Yes, ma'am.

6   Q   All right.

7   A   Furthermore, I compiled in --

8   Q   Is this a separate bullet point?

9   A   Yes.

10  Q   All right.

11  A   It's a separate bullet point.

12      Furthermore, I compiled in August -- I'm sorry, in July and

13  we compiled it -- I think we gave it to Deputy Tebrock, though

14  no attorney had asked us to compile any of this.  We compiled

15  significant data about all of our institutions; and,

16  furthermore, I gave it to Deputy Tebrock and Jason Scholl and

17  many others and not attorneys, and she rapidly classified that

18  as attorney-client privilege, but in those documents --

19  Q   So July of 2018 as well?

20  A   It was -- no.  There was one document delivered --

21  delivery, which was, I believe, towards the end of August or

22  early September, which was voluminous data.

23  Q   Of 2018?

24  A   Yes, ma'am.

25  Q   All right.

Golding - Exam by The Court

1    A    That was rapidly classified as attorney-client privilege in

2    which, amongst other things, I said that patients were not

3    being seen as scheduled.  And in a separate part of the report

4    on CSP Sac, I told her that it seemed that appointments that

5    were canceled and refused were in some way eliminated from

6    being counted.  And --

7    Q    All right.  So just to go back, on the July 10th, 2018 --

8    A    Around then.

9    Q    -- communication, on or about, when you say eight were

10   canceled --

11   A    Or refused.

12   Q    -- did they show up in a report as canceled?

13   A    No.  I had visited CSP Sac -- no.  I think I had visited

14   CSP Sac on July 10th, and July 12th is when I wrote to Deputy

15   Tebrock.  And so we went -- physically went, Dr. Mann and I,

16   there.  We met Dr. Roman, who we could see that he had told us

17   how his appointments were counting -- how they were doing the

18   counting rules in a very unusual way.  And they were not

19   basically counting as not seen as scheduled patients who had

20   been canceled or refused.  I mean, he said --

21   Q    So did the eight show up on some report someplace?

22   A    Actually, yes.  The answer to that question is yes and no.

23   Appointments can actually be disappeared as well.  There are --

24   Q    Well, that's -- so these eight that you're talking about,

25   just as an example, did they show up?

Golding - Exam by The Court

1    A    That was -- that, ma'am, is a -- was a hypothetical example

2    that I gave to her, but we did see actual numbers and we did

3    research Dr. Gonzalez and the actual numbers of patients that

4    went from his own report in which patients had canceled and

5    refused appointments that counted but also canceled and refused

6    appointments that disappeared.  It took us awhile to figure out

7    how the disappearance of the appointments occurred.

8    Q    So disappeared with no record?

9    A    No record.  Absolutely.  Right.  Absolutely not.

10   Q    So in terms of the report you delivered in or about August

11   of 2018 --

12   A    Yes, ma'am.

13   Q    -- you did not provide that with your report to the Court.

14   A    That's -- that's correct because --

15   Q    And why not?

16   A    Because it was attorney-client privileged data.

17   Q    But do you still have that report?

18   A    Yes.  It's not large.  It just says patients are not being

19   seen -- I have the whole report of all the data, but in terms

20   of this specific subject area it's just two things.  It says,

21   patients are not being seen as scheduled and that the canceled

22   and refused appointments seemed to be eliminated in some way.

23   Q    All right.  Was there any other bullet points you wanted to

24   provide under this heading, "appointments seen as scheduled"

25   indicator?

Golding - Exam by The Court

1    A    I would just say that I repeatedly tried to tell people

2    about this bullet point.

3         For example, on August 4th, August 27th, August 31st,

4    September 4th and September 17th I spoke personally with

5    Dr. Jeff Metzner and asked him to ask me -- I have telephone

6    records -- about that, and --

7    Q    About specifically appointments seen as scheduled?

8    A    Yes.

9    Q    And this is --

10   A    As well as other -- as well as I wanted to reveal a whole

11   bunch of the problems.  I wanted to reveal a whole bunch of the

12   problems to him, but he was not able to ask me -- he hinted

13   that he had heard that there were -- that I was something like

14   some other psychiatrists who had had some personnel problems

15   and so they didn't -- the Special Master didn't get involved

16   with personnel problems.

17   Q    And this was all in 2018?

18   A    Correct.

19        In addition, in one-to-one conversations with Deputy

20   Tebrock that were uncalendared, some of which she invited me to

21   and some of which I knocked on her door and she allowed me to

22   speak with her, I let her know that I thought that this failure

23   with the seen as scheduled as well as other things was, in

24   fact, fraudulent.  Her response to me was that she was a

25   representative of the court, herself, as an attorney and,

1   therefore, I had unburdened myself.

2       Furthermore, she said that -- and Dr. Brizendine also

3   repeated this -- that I would be able to tell the Special

4   Master in January.

5       Finally, on September --

6   Q   In January of 2019?

7   A   Yes.  January of 2019.  That was the very, very common

8   theme of --

9   Q   What was happening in January of 2019 that would give you

10  that opportunity?

11  A   Ms. Tebrock as well as Dr. Brizendine repeatedly said to me

12  that the Special Master would be reviewing the data then, and I

13  could save everything until then because that's when it would

14  be addressed.  It was further put off by -- on September 26th I

15  told a meeting full of attorneys, including Ms. Thorn --

16  Q   This is all information that's not in your report?

17  A   Correct.  To my knowledge.  I don't -- including

18  Ms. Thorn --

19          MR. SILBERFELD:  Pardon me, Your Honor.  I'm sorry to

20  interrupt Dr. Golding, but from the preface of his answer, it

21  seems like he's about to go into attorney-client privileged

22  material, and I'll be happy to state I need to object.

23  BY THE COURT:

24  Q   Well, what's the -- before you describe the meeting, what

25  was the purpose of the meeting?

1          MR. SILBERFELD:  That you're just starting to discuss.

2          THE WITNESS:  The purpose --

3    BY THE COURT:

4    Q    September 26th of 2018.

5    A    The purpose of the meeting was to discuss the report, the

6    staffing issues affecting --

7    Q    Who called the meeting?

8    A    It was a standard CDCR weekly meeting, to the best of my

9    knowledge.  There may have been an extra one in there, but I

10   don't quite remember.

11   Q    Who called the meeting?

12   A    The answer to that is I don't know.

13   Q    All right.  Well, I may come back to that.  Let me move on

14   to the --

15          MS. MUSELL:  Your Honor, may I be heard on this very

16   briefly, Your Honor, on whether there's attorney-client

17   privilege for this one sentence that Dr. Golding would like to

18   share with the Court?

19          THE COURT:  You may.

20          MS. MUSELL:  The information that I'm aware that

21   Dr. Golding would share with you, Your Honor, is not any advice

22   that he was being provided.  He was simply reporting fraud,

23   which of course is not attorney-client privilege.

24          THE COURT:  Well, I haven't heard from Dr. Golding,

25   but if it's not -- if no one is seeking advice, agreed it's not

1    covered by attorney-client, Mr. Silberfeld?

2           MR. SILBERFELD:  No, Your Honor.  It's a communication

3    with counsel and a representative of the client.  It's a

4    privileged communication.

5    BY THE COURT:

6    Q    I'm not persuaded by the breadth of the defense claims of

7    attorney-client privilege, just so that's clear.  If you have

8    one sentence, let me just ask you this:  At the meeting was

9    anyone seeking attorney advice?

10   A    Not specifically about the issue that I was bringing up,

11   no.

12   Q    Was any attorney saying that that attorney was providing

13   legal advice?

14   A    No.

15   Q    Well, what's the -- what's the one sentence?

16   A    The one sentence is that Elise Thorn -- that I told Elise

17   Thorn that I would be happy to provide detailed information to

18   her, and she scheduled an appointment for me on October 9th to

19   discuss it after the staffing agreement was to be made, similar

20   to Deputy Tebrock and Brizendine wishing to speak -- wishing

21   that I would hold off until January of 2019 to speak with the

22   Special Master then.

23   Q    Did you have a meeting with Ms. Thorn on October 9th?

24   A    No, because on October 3rd a report came out and --

25   Q    All right.  So let me ask you about psychiatric supervisors

Golding - Exam by The Court

1    acting as line staff.

2    A    Sure.

3    Q    Would you say that you're familiar with the 2009 staffing

4    plan?

5    A    May I get a little bit of water, please.

6    Q    Yes, you may.

7    A    Thank you.  I'm sorry.

8            THE COURT:  The Court anticipates maybe 10 to 15 more

9    minutes with this witness, and then I would give the parties a

10   chance.  This one witness will take longer, slightly longer

11   than my estimate for other witnesses.

12   BY THE COURT:

13   Q    So my question is would you say that you're familiar with

14   the 2009 staffing plan?

15   A    I am familiar with aspects of it, but I won't claim

16   comprehensive knowledge.

17   Q    In your report do you believe you purport to draw

18   conclusions about whether or not CDCR is complying with that

19   plan?

20   A    I believe that I am writing -- I believe that I wrote a

21   report that showed that what the Special Master and what the

22   program guide anticipated was not being followed.

23   Q    With emphasis on the program guide?

24   A    The program guide but also what the Special Master had told

25   us was the agreed-upon interpretation of the program guide.

1   Q   All right.  Do you understand that psychiatric supervisor

2   job descriptions do not provide for those supervisors

3   administering direct patient care?

4   A   No.  I actually did not know that.  My assumption was

5   that --

6   Q   Don't read anything into my question.  I'm not testifying.

7   A   Okay.  I'm sorry.

8   Q   I said is that your understanding.

9   A   No.

10  Q   All right.  What is your understanding about psychiatric

11  supervisor job descriptions when it comes to providing direct

12  patient care?

13  A   My understanding is that it was reasonable for them to fill

14  in, particularly in crisis beds, and I think the program guide

15  says that that's okay.

16  Q   And has that always been okay, in your view?

17  A   I think it is not okay if they are doing anything other

18  than sort of consulting and helping.  They're supposed to be

19  acting in a supervisory role and not as line staff.

20  Q   Is it your position that supervising psychiatrists, chiefs

21  and other supervisors are currently performing duties of staff

22  psychiatrists?

23  A   Oh, I'm sorry.  Yes, ma'am.  They are.

24  Q   When did -- so they are today?

25  A   Oh, yes.

Golding - Exam by The Court

1    Q    Was there a point in time when chiefs and supervisors'

2    duties changed to include greater provision of line care?

3    A    I think that -- I mean, I think certainly when there are

4    more shortages they do line staff stuff, but I think it has

5    always been the extension of CDCR that psychiatrists weren't --

6    in terms of the management weren't really needed to manage the

7    clinic structural organized care, that they could be considered

8    effectively line staff.

9    Q    But on an as-needed basis?

10   A    No.  They were -- I'm sorry.  No, ma'am.  They were asked

11   to regularly see patients as line staff.

12   Q    And do you think of a point in time as when that first

13   started?

14   A    I don't know of the point in time it first started.

15   Q    All right.  So as long as you've been at CDCR that's been

16   going on?

17   A    Yes.

18   Q    So I'm not certain you can answer this question, given what

19   you said about the 2009 staffing plan, but do you have a

20   position about the effect of using psychiatric supervisory to

21   provide direct patient care on CDCR's obligation to comply with

22   staffing ratios for psychiatrists, as set forth in the 2009

23   staffing plan?

24   A    Yes, ma'am.

25   Q    What is your position?

1   A    My position is that the staffing plan talks about frequency

2   of mandatory visits and that they were trying to decrease the

3   frequency CDCR from, for example, at EOP from 1.5 visits on

4   average, which is the keyword, on average per month to 1, which

5   would actually violate the program guide because the program

6   guide says that one should be seen at least every 30 days, and

7   a ratio of 1 would not be consistent with that.

8   Q    But how does that relate to the staffing ratios?

9   A    I'm sorry.  It relates to the staffing ratio like this:

10  Because if you do not have people organizing care, each little

11  bit of care that is done per patient is less complete and less

12  well done and, thus, fewer supervisors creates a need for

13  greater frequency of care, not lesser frequency of care.

14       And in the staffing plan they were arguing for lesser

15  frequency of care precisely because you eliminate the

16  organization of care, which is really what CDCR has done.  Then

17  you really, in my view, decimate the ability of our

18  psychiatrists to take care of our patients.  We need

19  psychiatric supervisors to be helping to organize and manage

20  care so that it's quality care.

21  Q    So do you believe that there's a tradeoff between achieving

22  the staffing ratios set forth in the 2009 staffing plan and

23  proper care?

24  A    Not necessarily, ma'am.  I mean, if CDCR were willing to

25  reorganize care radically, and that would mean that they would

1    have to allow psychiatrists to supervise people, then

2    psychiatrists wouldn't have to be the -- you wouldn't have to

3    have the CEO to be the secretary, metaphorically.  And when you

4    do that, then of course you could decrease the number of

5    psychiatrists dramatically, as most organizations do.  But if

6    we are going to insist that psychiatrists are not involved in

7    management and leadership and have to take care of each detail

8    of care and are not permitted to organize it, then yes, it

9    becomes entirely inappropriate to cut a psychiatric staff.

10   Q    So one last question as tied to the 2009 staffing plan.  Do

11   you believe the use of psychiatric supervisors to provide

12   direct patient care is part of an effort to achieve a 10

13   percent vacancy rate?

14   A    Could you rephrase?

15   Q    If you know.

16   A    Could you rephrase?

17   Q    I understand what you're saying, but you're making a

18   different point than what I'm trying to get at.

19   A    Okay.

20   Q    So do you have any opinion regarding whether or not the use

21   of psychiatric supervisors to provide direct patient care is

22   related to an effort to achieve 10 percent vacancy?

23   A    Yes, it is.  It's an effort to decrease the absolute number

24   of psychiatrists.  They can show compliance on a variety of

25   measures and, thus, fewer psychiatrists are needed because look

1    at the compliance with various non-quality measures.  Look at

2    how people are frequently being seen by a psychiatrist.  Look

3    how -- without taking into account that it's supervisors who

4    are doing that.  So, yes, it's part of the effort to decrease

5    the absolute numbers of psychiatrists.

6    Q    All right.  So let me ask you now some general questions

7    before I give the parties a chance to ask you questions.

8         You filed your report, as you've indicated, because you

9    believed you were unable to work internally to correct the use

10   of proper business rules and proper reporting to the Court.

11   That's a generalization.

12        To the extent there were impediments --

13   A    Yeah.

14   Q    You might quibble with my wording, but to the extent there

15   were impediments prior to your filing of your report, which

16   made its way to the Court, have those impediments been removed

17   at this point?

18   A    No.

19   Q    So you currently do not believe you're able to work through

20   internal channels and raise any and all issues you believe need

21   to be raised?

22   A    Not entirely.  I think it's -- I think correlated with

23   Court scrutiny it has improved.

24   Q    If you had to identify concretely the impediments, what are

25   the impediments that are still in place?

Golding - Exam by The Court

1    A    Well, in terms of data, the -- we still lack any ability to

2    program the EHRS database to get information that we need, and

3    it is being very much -- we are very much excluded from that.

4    Q    When you say "we," you mean psychiatrists?

5    A    The psychiatry leadership, not -- the psychiatrists who

6    work, for example, for Dr. Ceballos can do that, but they're

7    not allowed to independently evaluate data.  CDCR says that if

8    we were to get that, it would be -- it would violate data

9    integrity for them to allow us to have access to the data.

10   Furthermore --

11   Q    So your not having access means you -- how is that an

12   impediment?

13   A    It's an impediment because we are unable to point out

14   severe problems and causes and solve problems.  For example --

15   Q    So that means you can't see?  You aren't able to see,

16   yourself, the business rules?

17   A    No.  We can see the business rules, but we can't organize

18   data and program data to look across institutions to be able to

19   see whether there are errors being made in medical care;

20   therefore, we cannot organize medical care appropriately

21   because of that denial of information.

22   Q    All right.  During your work -- during the time you've

23   worked for CDCR, has any person ever directed you to manipulate

24   data for any purpose related to remediation in Coleman?

25   A    Close.  The psychiatry team was desperate to demonstrate

Golding - Exam by The Court

1    the productivity of MAs and as hard --

2    Q    That's the team led by you?

3    A    Say again?

4    Q    The team that you lead?

5    A    Yes.  Yes.

6    Q    All right.

7    A    And we looked as hard, as hard, as hard as we could to try

8    to find a way that the MAs increased productivity.

9    Q    "MAs" meaning medical assistants?

10   A    Yes.  And we could not find any such way.  And we reported

11   that, much to the chagrin of our compatriots who, on the other

12   side of the house, actually compiled, I would say, at very best

13   extraordinarily misleading data.

14   Q    When you say "compatriots on the other side of the house,"

15   who do you mean?

16   A    Dr. Ceballos' team.  Extraordinarily misleading data about

17   that issue and --

18   Q    Was that data provided to the Court?

19   A    No, it wasn't, only because we were just so -- as a former

20   researcher, I was just appalled by that attempt to do it, and I

21   let -- and I let them know that the data that I think it was

22   Ms. Ponciano's team had compiled was utter statistical rubbish.

23   Q    And in that case your message was heard?

24   A    It was.

25        Furthermore, the major problem in terms of data -- there

1  are many other problems, but the major problem in terms of data

2  is that the receiver is now supposedly doing a lot of our data

3  analysis, but the very same people who -- in mental health are

4  the very same people guiding those in receiver to tell them

5  what should be included in things, and it is not really the

6  case that our team is the one that -- and therefore -- that is

7  asked and, therefore, my view, therefore, is that data will --

8  unless something else happens, unless there's some external

9  monitoring by others, by the plaintiffs and by the Office of

10 the Special Master with an external team that there's just no

11 way that our data can become reliable and reasonable.

12 Q   Do you have specific information?  Do you know that the

13 receiver is providing data analysis for the Coleman case?

14 A   Yes.

15 Q   And how do you know that?

16 A   Because Annette Lambert works for the receiver, and they're

17 absolutely getting our data and organizing things and helping

18 us, and we have meetings concerning that.

19 Q   For the purposes of preparing reports for the Court?

20 A   I don't 100 percent know that, but certainly -- I don't

21 know what reports have recently been given to the Court, but

22 certainly --

23 Q   You understand -- are there separate data analysis

24 processes, one for Coleman, one for PLATA?

25 A   There was.  Dr. Leidner was running the database, and then

1  Annette Lambert's team has been far more active recently.

2  Q   So you believe they are no longer separate?

3  A   I don't think Dr. -- you could ask Dr. Leidner, ma'am.

4  Q   I just trying to understand what you are saying.

5  A   Yes.

6  Q   Do you believe there is a margin of error that's acceptable

7  in reporting of Coleman data to the Court?

8  A   Yes.

9  Q   All right.  How would you describe that?  What margin of

10 error is acceptable?

11 A   It depends on what the data is.  Some data requires

12 precision.  Some -- most does not.  That's the type of data

13 that we are -- but we're not talking 10 percent here, which I

14 tend not to be a stickler in that way, but in my -- in just the

15 way I look at things.  But when you're talking 50 percent or

16 when you're talking about, you know, a report by Ms. Ponciano

17 to the neutral expert that is off by a factor -- that leads the

18 neutral expert to come to conclusions that are off by a factor

19 of 7 or 8, then I start having a problem.

20 Q   Would you say you've personally ever agreed it was all

21 right to provide inaccurate data to the Court?

22 A   I think all data is, to some extent, inaccurate because we

23 have no direct knowledge of reality, so by -- nothing can be

24 perfect, if that's the question.  But no.  I want it to be very

25 precise, but just -- I don't know that there is a way of

1   getting it exactly precise.

2   Q    So last question for now.  Do I understand that you

3   officially provided your whistleblower report to the receiver

4   in the PLATA case?

5   A    Yes, ma'am.

6   Q    Just so I understand, why did you submit it to the receiver

7   alone?

8   A    Well, I also gave it to OLA and Ms. Thorn, for example.

9   Q    Looking at the court cases, there's Coleman and there's

10  PLATA.

11  A    Yes.

12  Q    I'm just -- was there --

13  A    Yes.

14  Q    Was there a reason you provided it to the receiver and not

15  the Special Master?

16  A    Yes.  I knew that the receiver's physicians had every right

17  to all of the data that we have because they consult with us

18  all the time and we share it with them.  I had been told that

19  when -- I can't communicate with Coleman directly unless they

20  ask and I was worried about litigation being directed against

21  me were I to do so.  So it seemed to me that the easiest

22  approach at that point and the best would be to give it to

23  someone whom I knew that -- I suspected that I would be legally

24  allowed to give it to.  And then my thought was that the

25  receiver could then give it to the Office of the Special

1    Master.  Indeed, I called Dr. Metzner and left a message on his

2    phone, I believe, if I'm remembering correctly, saying that he

3    could now get access to the data because the receiver had it.

4              THE COURT:  All right.  All right.  Those are the

5    Court's questions for now.  We didn't talk about order, but I

6    would give the plaintiffs the first opportunities to ask

7    questions.

8              MS. ELLS:  Thank you, Your Honor.

9              THE COURT:  And I had said 15 minutes.  I'll let you

10   know when you hit 15 minutes; and if you need more, you can let

11   me know.

12             MS. ELLS:  Thank you, Your Honor.

13                        EXAMINATION

14   BY MS. ELLS:

15   Q    Good morning, Dr. Golding.

16   A    Good morning, ma'am.

17   Q    So Dr. Golding, in your earlier testimony, you described a

18   series of events in April of 2017, and I'd like to just ask a

19   little bit more about that.

20        You said on April 12th that you typed up an email to

21   Katherine Tebrock expressing concerns about the data that was

22   being presented to the Court.  Is that accurate?

23   A    Yes.

24   Q    Okay.  And did you expressly raise in that email the

25   concern that the data for the timely psychiatry contact

1    indicator had been changed to be more than 30 days?

2    A    Yes.

3    Q    And did you send that email to Katherine Tebrock?

4    A    No.  I hand delivered that email to her administrative

5    assistant, Linda Patterson Turl.

6    Q    And that was on April 12th; is that correct?

7    A    I can't -- on or around April 12th.

8    Q    Okay.  And do you know -- do you have any -- did you ever

9    speak with Katherine Tebrock about that email around that same

10   time frame or, I'm sorry, about that document that you gave to

11   her assistant?

12   A    Yes.  Well, we had spoken previously in March, in or around

13   that date.  I don't recall having a direct conversation with

14   her around April 12th, as I'm thinking back.  I've certainly

15   subsequently had conversations about that issue in detail in

16   April of 2018 or on or around April 23rd, but I don't recall --

17   Q    Do you mean April 2017 --

18   A    April 23rd, 2018.

19   Q    2018?

20   A    In detail.

21   Q    A year later?

22   A    Yes.

23   Q    Okay.  And so I think you just testified that before this

24   document that you handed to her assistant on April -- on or

25   around April 12th that you had already mentioned orally some

1   concerns to Ms. Tebrock; is that correct?

2   A    Yes, it is.  And I have documentation on March 29th that I

3   sent an email to Dr. -- I believe it was -- I can't quite

4   remember, to either Dr. Gonzalez or Ms. Lambert saying that we

5   had -- that Deputy Tebrock had given us permission to

6   disambiguate the data, separating it from -- EOP from CCC data,

7   which was key, and also removing the 45-day rule as well as the

8   60-day rule and to look at and to understand them, and we later

9   on -- we did do an analysis.  They wouldn't -- obviously

10  they -- I'm sorry.  They don't allow us to do analyses

11  system-wide, so what we did is we did an analysis on one ward

12  at CHCF to be able to figure out the kinds of major differences

13  that would be readily obvious had they been willing to

14  separate.  So Deputy Tebrock gave us permission to do it, but

15  Dr. Leidner did a little bit of work but did not disambiguate

16  the CCC and EOP data, which is what one would need to do to see

17  the difference.

18  Q    Okay.  So I just want to be clear.  So sometime in March

19  prior to this email that you sent on March 29th describing this

20  conversation that you had had with Katherine Tebrock --

21  A    Yes.

22  Q    -- you had a conversation with Katherine Tebrock where you

23  raised a concern that the timely psychiatric indicator had been

24  changed from 30 to more than 30 days?

25  A    Oh, yes.  Yes.

1    Q    Okay.  So when you gave her this -- gave her assistant this

2    document on 4/12, had you already asked Ms. Tebrock to have

3    Dr. Leidner rerun the data to see if changing it from 30 to

4    more than -- more than 30 days would have had a significant

5    impact on the data, see if it made a difference?

6    A    I think we -- Deputy -- yes, because on March 29th Deputy

7    Tebrock had said -- I don't know March 29th.  On -- it may have

8    actually been considerably before then.  Maybe towards the

9    middle of March, for example, Deputy -- I don't exactly

10   remember, but, yes, Deputy Tebrock had given us permission to

11   disambiguate the data.

12   Q    Okay.  So I understand you have a concern that the data for

13   EOPs and CCCMS class members was being combined, but I want to

14   talk very specifically about this concern you had about moving

15   the EOP timely psychiatry contact --

16   A    Got it.

17   Q    -- indicator from 30 to 45 days.

18   A    Got it.

19   Q    So I want to be very clear.  You expressly told her you had

20   concerns about that change and how it might affect the data in

21   March of 2017; is that right?

22   A    Oh, yeah.  Yeah.

23   Q    Okay.  And so it sounds like you asked her permission if

24   you could review that data to see if there had been -- if it

25   would have affected the numbers in any significant way that had

1    been provided to the Court.  Is that right?

2    A    We were very sure that it would because the dashboard for

3    EOP had turned green, and people were contacting us.

4    Psychiatrists were contacting us across the state and laughing

5    about how much easier it was to be compliant at the EOP level

6    of care, so this was no secret.  This was an obvious, major,

7    significant change.

8    Q    Okay.  But you had, am I understanding you correctly, asked

9    for and received permission from Ms. Tebrock to rerun that data

10   to see exactly how different the data would have been if it had

11   been 30 days as opposed to more than 30 days for that timely

12   psychiatry contact indicator for EOPs?

13   A    Yes.  And furthermore, I put in an email to her on April

14   13th, I said something like -- I forwarded the email I sent to

15   Dr. Ceballos asking her to rerun it, and I asked her to please

16   put additional pressure on Dr. Leidner and Ms. Ceballos to

17   rerun the data to make it accurate so we could document what we

18   knew to be huge changes.

19   Q    So you did not have the ability to run that data yourself

20   because of what you've described about not being given

21   permission to do that?

22   A    No.

23   Q    Okay.

24   A    We can run it from an individual institution --

25   Q    Okay.

1   A    -- but nobody will allow us to do it.

2   Q    You had gotten information from Deputy Director Tebrock to

3   have Dr. Leidner, who is the data guy, rerun the data to see

4   the difference between 30 and more than 30 days for the timely

5   psychiatry contact indicator --

6   A    Yes.

7   Q    -- for EOPs?

8   A    He said he was too busy.

9   Q    He said he was too busy?

10  A    Correct.

11  Q    And did you tell his boss, Dr. Ceballos, that you needed

12  this data and Ms. Tebrock had told you that you could have

13  access to this data and did that make a difference?  When did

14  they give you that data?

15  A    They -- we got a little bit of data from them, but they

16  didn't fully, in any way, run it the way we needed to, to be

17  able to demonstrate the differences.

18       We needed them to disambiguate it and look institution by

19  institution, what is EOP and what is CCC compliance, and then

20  you could tell.  And I -- and I have that email from April

21  13th.

22  Q    Okay.  And are you aware whether Ms. Tebrock asked Laura

23  Ceballos or Dr. Leidner herself for that data to see if the

24  data that she had submitted to the Court would have been any

25  different?  Are you aware?

1    A    No.

2    Q    Okay.  And I don't think that we actually have these

3    documents that you're referring to in the record from April

4    12th and April 13th referring to your conversations that you

5    had had and the notification you provided to Ms. Tebrock of

6    your concerns about this change.  I don't believe you filed

7    those with your report.  Do you have access to those documents?

8    A    Yes, I have them.  I may have them today.

9    Q    So you could produce those if the Court wanted to see them?

10   A    Sure.

11   Q    Okay.  So I want to -- let me ask you one more question

12   about your concern about conflating and combining the EOP and

13   CCCMS data for this timely psychiatry contact indicator.

14   A    Sure.

15   Q    I understand your concern that combining them masks, to

16   some degree --

17   A    A large degree.

18   Q    -- the effects on EOP specifically --

19            THE COURT:  Just a reminder, one at any time.

20            THE WITNESS:  I'm sorry.

21            THE COURT:  All right.

22   BY MS. ELLS:

23   Q    -- the effect on EOP specifically, but you would still

24   expect to potentially see an effect from just fixing the EOP

25   rule; even if it was combined with the CCCMS data, it might not

1    be as significant an effect as you might otherwise expect if

2    they were separated, but you would expect to potentially still

3    see an effect; is that right?

4    A    Yes.  And -- yes.  One would see an effect.

5    Q    Okay.  And my understanding from what you've said today is

6    that you had knowledge throughout your career that

7    psychiatrists who perform supervisory duties in the

8    institutions were also performing direct patient care; is that

9    accurate?

10   A    I have detailed knowledge.

11   Q    Okay.  And that was a common theme that you were hearing

12   from the field throughout your time in headquarters?

13   A    Not only did we hear it.  Every single month we'd call the

14   institutions and we'd compile a report every month.

15   Q    And what exactly did you -- can you describe that process

16   for us, please?

17   A    Sure.  At least since 2018, Ms. Janiton, the telepsych

18   admin calls each institution and we get survey results and we

19   talk with them about what the coverage would be and whether

20   supervisors are providing coverage.

21       On numerous occasions, those reports have been in the hands

22   of Deputy Tebrock, Ms. Ponciano and Ms. Brizendine.  At one

23   point they tried to get us to stop doing it, but we absolutely

24   do that.

25   Q    And why do you do that?

1    A    We do that because we would like the supervisor to not

2    necessarily have to always see patients, and it helps us then

3    to provide telepsychiatric support for those institutions so

4    that the supervisors can do what they're supposed to do, which

5    is supervise and organize care rather than fail to do so.

6    Q    And if there were sufficient numbers of line psychiatrists

7    to provide direct patient care, would supervisors need to

8    perform those duties?

9    A    Almost never.  It might be the case that a supervisor would

10   consult with a line staff psychiatrist on a patient, but the

11   answer is, to be brief, you're correct.

12   Q    Do the supervisors have other important duties that they

13   are required to do as supervisors, separate from providing

14   direct patient care?

15   A    Absolutely.

16   Q    And does providing direct patient care take away from their

17   ability to do those jobs?

18   A    Absolutely.

19   Q    And you have described today that it is, in your experience

20   and your knowledge, based on these monthly phone calls and

21   other things, that it's routine for supervisory staff to

22   provide direct patient care in the prisons?

23   A    Yes.

24   Q    Have you ever attempted -- so CDCR has represented to the

25   neutral expert that they have no ability to track how often

Golding - Exam by Ells

1    that occurs.  Do you agree with that?

2    A    No.  That's false.

3    Q    Could you explain -- it sounds to me like you have actually

4    tried to study this problem.  Is that accurate?

5    A    Yes, ma'am.

6    Q    And did you find that you were able to get information

7    about how often supervisors were providing direct patient care?

8    A    Sure.

9    Q    How did you do that?

10   A    What you do is you use the caseloads report and you put in

11   the supervisors' names.  There are many ways of doing this.  We

12   did it in two different ways.  And then you get a list of the

13   patients.  You can control for the various ratios that people

14   use; for example, in CCC there's a 1 to 280 ratio most of the

15   time I think and then in EOP -- I'm coming up with these

16   numbers as I go.  It's like 1 to 120, I believe.  And I think

17   in the acute units it's 1 to 15, I think.  And in the

18   intermediate unit I believe it's 1 to 35.  And so you can look

19   at the number of patients that they're covering and where

20   they're covering it, and you can then calculate that each

21   supervisor is covering, at a bear minimum -- and this is --

22   this is absolutely a bear minimum because it's a massive

23   underestimate -- it would be about one-third of a caseload each

24   using the formal rules.

25        Furthermore --

1           THE COURT:  Is that -- you mentioned two methods.  You

2    need to telescope it here.

3           THE WITNESS:  Okay.  I'm sorry, Your Honor.

4           THE COURT:  Very summary.

5           THE WITNESS:  Yes, ma'am.

6           THE COURT:  You're still on the first method?

7           THE WITNESS:  Yes, ma'am, I am.

8           THE COURT:  So just bullet point on the second.

9           THE WITNESS:  The second method is comparing the

10   frequency of visits of the line staff, the psychiatrists or

11   hours of visits, if you'd like, but really the frequency of

12   visits of line staff psychiatrists to supervising

13   psychiatrists, actually the reverse.  And if you do it that

14   way, it's -- I think that's more approximate, but you get that

15   about -- supervisors spend about overall throughout the state

16   about 50 percent of their time doing that, which is very

17   different from what the neutral expert concluded from Deputy

18   Tebrock's -- I'm sorry, from Deputy Ponciano's work, that all

19   of the supervisors together are doing 1.75 caseload.  50

20   percent or a third is considerably different than 1.75

21   full-time equivalents.

22          THE COURT:  All right.  So before the next question,

23   you've gone about 16 minutes.  Do you think can you wrap up in

24   5?

25          MS. ELLS:  Yes.

1              THE COURT:  All right.

2    BY MS. ELLS:

3    Q    So it sounds line it is possible that you have methods that

4    you have personally utilized in order to study exactly how

5    prevalent it is for supervising psychiatrists to perform line

6    staff patient care; is that right?

7    A    We could be -- if we had access to the database, we could

8    be more precise, yes.

9    Q    And I wanted to talk to you a little bit about your

10   involvement in the 2008 staffing proposal.  You're aware that

11   there was a proposal to cut approximately 20 percent of the

12   allocated line psychiatry staff throughout the system; is that

13   right?

14   A    Yes, ma'am.

15   Q    And that was -- there were many versions of that provided

16   to the Special Master and plaintiffs over the spring and summer

17   of 2018.  Did anyone ever provide that proposal to you for your

18   comments before it was provided to the Special Master?

19   A    In May, Deputy Tebrock and Deputy Brizendine read to

20   Dr. Kuich and me aspects of it, not the whole thing, but would

21   not give it to us.  And I think -- I can't quite recall, but

22   sometime maybe in May, which may have been right before they

23   delivered it in June or possibly right after, but it might have

24   been right before, I did get a -- I believe I did get a copy.

25   Q    Did they give you that copy?

1   A   I think they may have.  I'm not sure.

2   Q   Okay.  Did you -- were you ever -- so it sounds like the

3   first time you heard about it, you were in a meeting and they

4   read you pieces from a document.  Were you given that document

5   to look at while you were discussing it?

6   A   No.

7   Q   Did they ask for your feedback as to whether or not you

8   thought these numbers of reductions were appropriate?

9   A   No.  They asked me to sign an affidavit that I agreed with

10  it, and I told them that unless I were able to read it that I

11  certainly wouldn't do that.

12  Q   And do you -- so it sounds to me like you were not given

13  any ability to evaluate whether the numbers that were being

14  proposed in the workgroup were appropriate; is that correct?

15  A   You know, "any" is a comprehensive term, but very very

16  little ability, I would say next to none, to evaluate whether

17  it was appropriate, except, perhaps, the allocation of the

18  telepsych piece in which they said they were going to have

19  eight psychiatrists cover the whole state call for a year --

20  I'm sorry, eight -- somehow -- all the time in the evening,

21  which was impossible.

22  Q   And you were asked to provide feedback on that number?

23  A   We tried to but were overruled by Ms. Ponciano.

24  Q   What feedback did you give?

25  A   It was ridiculous.

1   Q    Okay.  And did you provide any other broad feedback on

2   whether or not you thought this staffing reduction of 20

3   percent of allocated line staff was appropriate, given what you

4   knew about how the system was functioning at the time?

5   A    Yes.  We told them that it was entirely inappropriate, and

6   that's -- in April meetings, for example, I told Deputy Tebrock

7   about the supervisors acting as line staff and a variety of

8   things, yes, absolutely.  And Deputy Tebrock knew -- by the end

9   of April, she knew that we were -- did not think -- I had no

10  idea what they were actually planning, but -- in detail, but --

11  Q    And so it sounds like you specifically raised a concern

12  that the staffing proposal was reliant on supervisors acting as

13  line staff without making clear that it was doing so; is that

14  right?  Did you articulate that in those April meetings?

15  A    Absolutely.  In addition to many other bits of data,

16  including the medication referrals, including the Map It

17  problem, including the lack of confidentiality problem,

18  including the not -- you know, there were -- in detail we told

19  them that they were not counting correctly and, therefore,

20  providing false information.

21         THE COURT:  You have one more minute.

22  BY MS. ELLS:

23  Q    Why did you release your report on October 3rd, that

24  specific day?

25  A    I didn't exactly know when an agreement was going to come

1  about, but it seemed clear to me that my supervisors were not

2  willing to let people know about that issue and other issues

3  that I thought the Court needed to know about and needed to

4  know about and, therefore, I felt desperate and concerned in

5  that sense, and so I released it to the receiver, whom I

6  thought could take care of it.

7  Q   And when you articulated concerns about the nature of the

8  2018 staffing proposal, were any adjustments made to that

9  proposal, the numbers that were recommended for being reduced?

10  Did they take any feedback from you and adjust it, so far as

11  you know?

12  A   Nothing except the one thing I remember is that Deputy

13  Tebrock allowed me to say in a meeting that the -- I believe I

14  said in a meeting with you guys that the eight was -- the eight

15  was inappropriate.  I think I said that.  I can't exactly

16  remember.

17  Q   But you felt that?

18  A   I'm sorry?

19  Q   You had that concern?

20  A   Oh, yes, and told -- oh, no.  We were -- we were --

21  Deputy -- I mean, I'm sorry.  Dr. Kuich and I were really angry

22  about that part of it because it was utterly unrealistic.

23       MS. ELLS:  And prior to that workgroup call you had

24  articulated that?

25       THE COURT:  Last question.

1          THE WITNESS:  Yes.

2          MS. ELLS:  Thank you.

3          THE COURT:  All right.

4      (Off-the-record discussion.)

5                              EXAMINATION

6  BY MR. SILBERFELD:

7  Q    Good morning, Doctor.  Let me begin with some general

8  topics with you, if I can.

9          You mentioned that at some point in time in October of 2018

10 you felt as if you could not talk or communicate with the

11 Special Master, right?

12 A    Correct.

13 Q    And that's true, not withstanding the fact that in 2017 you

14 attended any number of policy meetings multiple times

15 throughout the year where the Special Master and his team were

16 present, correct?

17 A    That's correct.

18 Q    And in 2018 you attended on be a more frequent basis,

19 perhaps once a month, workgroup meetings where the Special

20 Master and his team were also present, correct?

21 A    Correct.

22 Q    Now, you are the chief psychiatrist at CDCR correct?

23 A    You used "The chief psychiatrist."  It's an interesting

24 question.  Say "A chief."  No.  Basically the report says, "A

25 chief psychiatrist."

Golding - Exam by Silberfeld

1   Q   I don't want to fuss about whether it's "a" --

2   A   Okay.

3   Q   -- or "the."  You are the subject matter expert as a

4   psychiatrist at headquarters, correct?

5   A   About what?

6   Q   Psychiatry, sir, in your field.

7   A   I think -- yeah, I'm supposed to be.  To the extent that I

8   have access to the right information to be the subject matter

9   expert, I am.

10  Q   And there are other chief psychiatrists at other various

11  institutions across the state, correct?

12  A   That is correct.

13  Q   And as the chief psychiatrist or a chief psychiatrist at

14  CDCR, you have access to any number of internal processes, do

15  you not, sir?

16          MS. MUSELL:  Objection, vague and ambiguous.

17          THE WITNESS:  I don't know which internal -- I have

18  access to some internal processes, and some I don't.

19          THE COURT:  I'm going to let the question and answer

20  stand.

21  BY MR. SILBERFELD:

22  Q   Okay.  Let me be more specific.  You have access, do you

23  not, to the quality management staff at CDCR, true?

24  A   It depends on what you mean by "access."  I can speak with

25  them.  That doesn't mean that they will respond to me.

Golding - Exam by Silberfeld

1    Q    They're available to you, true?

2    A    Depends on what you mean by "available."  They're not

3    available to do things that I request.

4    Q    Do you know what a weekly webinar is that the QM staff

5    conducts?

6    A    Yes.

7    Q    Okay.  And you've attended weekly webinars, have you not?

8              MS. MUSELL:  Vague and ambiguous as to time.

9    BY MR. SILBERFELD:

10   Q    April of 2017.

11   A    No.  At that time we very much trusted our colleagues.  It

12   was much more of a programming kind of a seminar where they

13   were dealing with programmatic issues.  So, no, it wasn't a

14   normal thing for me to attend that meeting.

15   Q    But one of the things that happens at the webinars is that

16   announcements are made about changes, right?

17             MS. MUSELL:  Vague and ambiguous as to time.  Calls

18   for speculation.  Overbroad.

19             THE COURT:  Sustained as to time.

20   BY MR. SILBERFELD:

21   Q    In 2017 and '18, sir.  That's what the purpose of the

22   weekly webinars is; is that true?

23   A    I'm not aware that the purpose is -- I think the -- no.

24   I'm not aware that the purpose is to inform higher level staff

25   about changes that are being made, no.

Golding - Exam by Silberfeld

1    Q    You had over time, in 2017 and '18, access to Dr. Leidner,

2    for example, correct?

3    A    I could write him emails, yes.

4    Q    Okay.  And would he respond to you?

5    A    Sometimes.  Often he would not.

6    Q    All right.

7    A    I mean, he would answer in an email or -- but he would say

8    he was busy or couldn't.

9    Q    You were aware, broadly speaking, that the performance

10   report provides 150 separate indicators of certain analyses of

11   information that are in the system.  You know that, don't you?

12   A    I know that there are a lot of them, but measurements can't

13   tell you whether they are accurate.

14   Q    It's not a question of measurement.  It's a question of

15   whether this information is available.  There's 150 separate

16   indicators, correct?

17   A    There are.  I take your word for it that it's 150.

18   Q    All right.  And then in addition to that, the system can

19   run what are called "custom queries," right?

20   A    Yes.

21   Q    Okay.  And you could submit, if you wanted to, a custom

22   query to answer a particular question that you thought should

23   be answered, correct?

24   A    There were many times that we attempted to do that.  After

25   awhile, we stopped doing it because our requests were not

Golding - Exam by Silberfeld

1    prioritized and were put very low, and it just wasn't

2    considered relevant.

3    Q    Before you issued your report, did you ever check the

4    accuracy of any of the statements you made in the report with

5    CDCR staff?

6    A    Yes.

7    Q    When was the first time you did that?

8    A    Well, in April of -- I'm sorry.  In March of -- I'm sure

9    well -- long, long before March of 2017 there was a very -- but

10   in March of 2017 I was very much telling Deputy Tebrock about

11   the problems in -- I mean, I don't know how many -- how many

12   dates do you want?  I could --

13   Q    Well, that's fine.  Let's stick with that one for a moment.

14   A    Okay.

15   Q    Ms. Tebrock and you had a discussion, I think, in the

16   spring and summer of 2018 about your idea for a clinic model.

17   Do you remember that?

18   A    Yes.

19   Q    And, in essence, your idea was to cluster or aggregate

20   patients to come to a place so that psychiatrists could be more

21   efficient.  Is that a sort of lay description of what the idea

22   was?

23   A    Yes.

24   Q    Okay.  And Ms. Tebrock encouraged you in that effort,

25   right?

Golding - Exam by Silberfeld

1    A    Not really, because -- she encouraged me to go to the

2    institutions, but she refused to enable me to have -- she said

3    that I was, quote, "parsing the data" when I asked about the

4    individual -- she told me that in May of 2018 that I should

5    stop parsing the data when I was asking for specific

6    information about whether patients were being seen

7    confidentially or not.  I had a whole host of information that

8    I needed to be able to clinically manage the institution and

9    make the appropriate changes, but Deputy Tebrock refused to

10   allow me to have that information and, instead, told me that I

11   was parsing the data and I needed to get more involved with

12   direct management.

13   Q    All right.

14   A    So that's false.

15   Q    So you wanted to pursue your clinic model idea, and she

16   said go ahead, true?

17             MS. MUSELL:  Misstates testimony.

18             THE WITNESS:  I don't --

19             THE COURT:  Overruled.  You may answer.

20             THE WITNESS:  Could you ask it again, please.

21   BY MR. SILBERFELD:

22   Q    Sure.

23        You suggested studying the clinic model idea, and

24   Ms. Tebrock said, "Go ahead"?

25   A    She didn't say --

Golding - Exam by Silberfeld

1   Q   That's a yes or no --

2   A   -- comprehensively --

3   Q   -- Doctor, if you could --

4   A   She did not --

5   Q   -- in the interest of time.

6   A   She did not say "study," because she did not allow us to

7   have access to the information that I requested to be able to

8   study it.

9   Q   Well, you did a study and you provided her a report in

10  September of 2018, right, about your clinic model idea?

11  A   Yes, but without the relevant -- but without relevant data

12  that we needed to put in it, sir.

13  Q   And that was all going on at the same time that you were

14  preparing your report that brings us here today, the 161-page

15  report, correct?

16  A   I think I was collecting -- yeah.  I was collecting data as

17  best as I -- as best as I could, but she -- yeah.  I mean,

18  that's true.

19  Q   When did --

20  A   And speaking with her about it.

21  Q   Sure.

22  A   I'm sorry.

23  Q   When did the work actually begin, Dr. Golding, that

24  resulted in the completed 161-page report?  When did you start

25  writing?

1    A    Oh, I think probably in 2017 as issues came up I was trying

2    to get them resolved, and so I kept notes in my mind of the

3    various things that were problematic.

4    Q    All right.  And so from 2017 until October of 2018, did you

5    ever tell anyone at CDCR leadership that you were in the

6    process of writing this report, or did you keep it secret, sir?

7            MS. MUSELL:  Exceeds the scope, Your Honor.

8            THE COURT:  Overruled.

9            THE WITNESS:  There's nothing secret.  I told people

10   that I was absolutely compiling this data and that I very much

11   hoped that -- and I told Deputy Tebrock repeatedly about that

12   data and others, as I've testified to, in hopes that they would

13   come clean and tell people.

14   BY MR. SILBERFELD:

15   Q    Are you in the process of writing another report now?

16           MS. MUSELL:  Exceeds the scope, Your Honor.

17           THE COURT:  Sustained.

18   BY MR. SILBERFELD:

19   Q    Let's turn to the Issue B that the Court has asked you

20   about.  This is the change from 30 to 45 days.  You first

21   learned about this, did you not, in January of 2017?

22   A    The neutral expert report said that I got -- well, there's

23   a slight problem with your question.  I don't accept that it

24   was 30 to 45 days.  They allowed appointments up to 60 days

25   because they rounded.

Golding - Exam by Silberfeld

1    Q    I'm just describing the topic, sir, that's all.  I'm sorry

2    if I used the wrong words.  The change in the definition of

3    monthly.  You first learned about that in January of 2017,

4    correct?

5    A    I wasn't cognizant of knowing about it in January of 2017,

6    and know the neutral expert says that there's an email from

7    Dr. Mann and Dr. Lindgren that I apparently received.

8    Q    Dr. Mann wrote to you and this is -- Dr. Mann is someone on

9    your team, correct?

10   A    Correct.

11   Q    Dr. Mann wrote to you in January of 2017 agreeing with the

12   rule change.  Do you remember that?

13   A    No.

14   Q    Is Dr. Mann wrong at the time when Dr. Mann agreed that the

15   rule change was reasonable?

16   A    Absolutely.

17   Q    Okay.  The rule change was in effect for a grand total of

18   about four months, correct, from December of '16 to roughly --

19   A    That's what I -- I don't have direct knowledge of that, but

20   I think that's true.

21   Q    Close enough.  Maybe it's five months.

22        And the reason for the rule change began as far back as

23   2015.  Do you remember that?

24   A    No.

25   Q    Who is Julie Kirkman?

Golding - Exam by Silberfeld

1   A    I am told that she is -- I think the report said that she's

2   a court administrator at CHCA.

3   Q    The subject matter of changing the definition of monthly

4   goes back to 2015 when Ms. Kirkman raised the issue from the

5   field.  You understand that to be true, don't you?

6   A    Yes.

7              MS. MUSELL:  Calls for speculation.

8              THE COURT:  You may answer, if you're able.

9              THE WITNESS:  Yes.  However, I get dozens of rule

10  change requests from the field on an extraordinarily --

11  BY MR. SILBERFELD:

12  Q    Right.

13  A    -- regular basis.

14             THE COURT:  Before we go further, CHCF stands for?

15             THE WITNESS:  Oh.  California Health Care Facility.

16             THE COURT:  All right.

17             THE WITNESS:  In Stockton.

18             THE COURT:  All right.  In Stockton.  All right.

19  BY MR. SILBERFELD:

20  Q    And this proposed rule change came from the field.  It

21  didn't come from CDCR headquarters, correct?

22  A    That's -- I don't think that's accurate.  I don't think --

23  to my knowledge, no one, Dr. Mann or no one else, would approve

24  allowing 45 to 60 days, nor did they request that.

25  Q    I'm just talking about the genesis of the idea.  The idea,

Golding - Exam by Silberfeld

1    you know well, came from the field, from Ms. Kirkman, in 2015,

2    but the first action on it was in late 2016.  You know that,

3    don't you?

4    A    No.  I don't agree that the idea for what they did

5    originated there.

6    Q    And the rationale for this change that came from the field

7    was that it would solve tracking issues, reduce staffing needs,

8    prevent cross-coverage, and increase the continuity of care for

9    patients.  You understood --

10            MS. MUSELL:  Objection.

11            THE WITNESS:  That's nonsense.

12            MS. MUSELL:  Objection, Your Honor, compound.  Also

13   calls for speculation.  And if Dr. Golding could actually be

14   allowed to answer the questions that are asked of him rather

15   than being cut off.

16            THE COURT:  Sustained.

17            MR. SILBERFELD:  Well, I would like to actually finish

18   the question.

19            THE COURT:  Sustained as to compound.

20   BY MR. SILBERFELD:

21   Q    You understood that this rule change came about for

22   continuity of care purposes, correct?

23   A    False.

24   Q    So to the extent that other people, not at headquarters but

25   in the field, said at the time that the idea is to provide

1    greater continuity of care to patients, they would be wrong

2    about that, correct?  That's your view?

3    A    What was implemented provided less --

4              MS. MUSELL:  Speculation --

5              COURT REPORTER:  I'm sorry?

6              THE COURT:  Hold on one second.

7              THE WITNESS:  -- continuity of care.

8              THE COURT:  Hold on one second.  What's the objection?

9              MS. MUSELL:  Calls for speculation and incomplete

10   hypothetical.

11             THE COURT:  Sustained.

12   BY MR. SILBERFELD:

13   Q    On this topic of this change, you asked that it be changed

14   back, correct, to 30 days?

15   A    Yes.

16   Q    And it was?

17   A    It was; certainly not immediately, and it was done in two

18   separate steps.  It was done -- on April 12th it was changed

19   from 60 days back to 45 days.  It actually was a minimum 60

20   days.  And then on April 23rd, it was changed back, but it

21   certainly wasn't immediately changed back, and it was done only

22   after the report to the Court had been submitted on March 30th.

23   Q    And you agree, do you not, Dr. Golding, that the program

24   guide requirement of 12 visits per year was never changed?

25   A    That's false.

Golding - Exam by Silberfeld

1    Q    Do you agree with the neutral expert that there was no

2    intent to mislead the Court or the Special Master on this

3    topic?

4    A    No.

5    Q    Do you agree that there was no intent to falsify

6    information presented to the Court or the Special Master on

7    this topic?

8    A    No.

9    Q    Moving on to Issue E.  And this is the one about

10   appointments seen as scheduled.  You understand and agree, do

11   you not, Dr. Golding, that the "appointments seen as scheduled"

12   indicator does not relate to any program guide requirement?

13   A    I think the Special Master was using it to monitor

14   compliance in many of his rounds, like the 26th and the 27

15   round.

16   Q    Yeah.

17   A    And so to the extent that the Special Master needs certain

18   types of information to be accurate to measure compliance, then

19   I think it is relevant.

20   Q    Well, thank you for the answer.  That wasn't the question.

21   The question was:  Is the "appointments seen as scheduled"

22   indicator a program guide requirement, as you understand the

23   program guide?  That's a yes or a no, sir, and I'll let you

24   explain if you need to.

25   A    I think an interpretation of the program guide could

Golding - Exam by Silberfeld

1   legitimately be that we need to understand seen as scheduled.

2   I don't think that the -- if you're asking me whether the

3   program guide explicitly says in words that you will monitor

4   seen as scheduled, it doesn't -- doesn't say that.

5   Q    Okay.

6   A    But I think many aspects of the program guide make that

7   measure quite relevant.

8   Q    You understand that the purpose of that indicator is simply

9   to see whether appointments were not completed due to factors

10  within CDCR's control?

11  A    That's false in a number of ways.  It's false, one, because

12  the most common reason that appointments are not seen as

13  scheduled is that people say "Canceled unspecified" and

14  "Refused."  But particularly the canceled -- or no, no, not

15  refused -- "no show."  That the very most common reason that

16  psychiatrists check that is because they don't know.  And it is

17  utterly, utterly false that that cannot be controlled.  It

18  absolutely can and is controlled whether patients bring

19  patients, and so --

20  Q    You're missing my question, Doctor.  I'm sorry to

21  interrupt, but I'm limited to time here.

22       The reason that the "seen as scheduled" indicator was used

23  the way it was, was to match the indicator used for the

24  healthcare program as opposed to the mental healthcare program.

25  You understood that to be the case, right?

Golding - Exam by Silberfeld

1    A    That's false.

2    Q    That's why that happened?

3    A    No.  That's false.

4    Q    All right.

5    A    The denominators on both of them are not in any way

6    equivalent, and the denominator for the CCHCS indicator has far

7    more terms in it than the denominator for the CDCR one.  So it

8    doesn't even match the CCHCS one.

9    Q    When did you first come to realize that, as you say, this

10   was being improperly applied, this particular indicator?  When

11   was that, what point in time?

12   A    The 30 to --

13   Q    No, not the 30 to 45 days.  The "appointments seen as

14   scheduled" indicator.

15   A    I started having a pretty good idea around July 10th, yeah.

16   Around July 10th, 2018.

17   Q    A month and a year will do.

18   A    '18.

19   Q    July 2018?

20   A    Yes.

21   Q    Okay.  And did you report that to anyone within CDCR

22   leadership?

23   A    Yes.

24   Q    Who?

25   A    On July 10th, I sent an email to, as I told the Judge, sent

Golding - Exam by Silberfeld

1   an email to Deputy Tebrock giving the hypothetical example.

2   Q   Of the eight and the eleven?

3   A   Of the three patients --

4   Q   Okay.

5   A   -- and the eight and the eleven.  I also put it in

6   attorney-client privileged data in August or September in the

7   notebook.  I also repeatedly told Deputy Tebrock when we were

8   speaking together, and her response to that was that if

9   patients don't come to their appointments, it is their choice

10  because they are -- they have capacity and they're competent.

11          THE COURT:  All right.  You have time for maybe two

12  more questions.

13          MR. SILBERFELD:  Your Honor, if I could have a few

14  more minutes, I have one more topic that I haven't even

15  touched.

16          THE COURT:  How much total time do you need?  I'm also

17  thinking about the break that we need for the court reporter.

18          MR. SILBERFELD:  I'm happy to take a break if --

19          THE COURT:  How much total time do you estimate you

20  need?

21          MR. SILBERFELD:  Perhaps five or six minutes.

22          THE COURT:  All right.  Madam Court Reporter, can you

23  go for that long?

24          COURT REPORTER:  Yes.

25          THE COURT:  All right.  I'll give you five more

Golding - Exam by Silberfeld

1    minutes.

2            MR. SILBERFELD:  Thank you.

3            THE COURT:  There will be a couple minutes rebuttal

4    after we come back from the break, if the plaintiffs want a few

5    more questions.

6    BY MR. SILBERFELD:

7    Q   Dr. Golding, the issue you raised in your report of October

8    3rd, 2018, as to appointments seen as scheduled was fixed

9    within a week, wasn't it?

10   A   No.

11   Q   Okay.  Let's move on -- oh.  By the way --

12   A   It wasn't fixed because changing --

13           THE COURT:  Wait.  Wait, wait, wait.

14           THE WITNESS:  I'm sorry.

15           THE COURT:  Wait for the next question.

16           MR. SILBERFELD:  Yeah.

17   BY MR. SILBERFELD:

18   Q   The next question is you described this issue, Issue E, as

19   arbitrary and not useful in your report.  I note with some

20   interest that you didn't say it was misleading, right?

21   A   I don't exactly recall the exact words I used.  I take your

22   word for it.

23   Q   Yeah.  You'll adopt whatever word --

24   A   I believe you.

25   Q   Okay.  Let's do the last issue, psychiatric contacts.  This

Golding - Exam by Silberfeld

1    indicator or this report came up as part of the 2018 staffing

2    proposal?

3    A    Psychiatric contacts, which -- what exhibit?

4    Q    This is the supervisor versus line staff --

5    A    Okay.  Got it.

6    Q    -- question.  All right?  Are we on the same page?

7    A    Yes, sir, we are.

8    Q    Good.  The object of this report was to try to understand

9    how many line staff psychiatrists would be needed to deal with

10   the CCC and EOP populations, correct?

11   A    No, because you can't determine the number of line staff

12   psychiatrists that are needed to deal with the EOP and CCC

13   populations unless you've also determined whether there is

14   supervision.  The absence of supervision means you need far

15   more line staff psychiatrists.  And the presence of supervisors

16   and organization -- appropriate organization of care, only that

17   leads to need for less or fewer.

18   Q    The measurement that was being made was how many patients

19   are being seen by psychiatrists, whether they are supervisors

20   or line staff, for the purpose of figuring out on a

21   going-forward basis how many line staff psychiatrists would be

22   needed.

23   A    That's false.  The purpose would be -- each person you have

24   to measure the quality of the interaction; and without

25   supervisor's organizing care, the care provided to each person

Golding - Exam by Silberfeld

1    is less --

2    Q    Okay.

3    A    -- and the quality is less.  And so part of the assumption

4    of whether a patient is seen is not if they're seen with

5    someone waiving at them and saying "hello" or someone who's not

6    sick or extremely sick.  Part of the assumption about whether

7    patients are seen is whether there's some quality involved in

8    them being seen.

9    Q    There's no doubt in your mind that everyone involved in

10   Coleman:  You, staff, the Special Master's Office, perhaps even

11   the Court and certainly counsel know that supervisors,

12   supervising psychiatrists, see patients as a broad concept.

13   You know that, right?

14   A    I think they -- no.  They do know, yes.

15   Q    And with regard to the staffing proposal in 2018, you know

16   that the Special Master had no objection to the changes that

17   were being proposed at the time?

18             MS. MUSELL:  Calls for speculation, overbroad,

19   incomplete hypothetical, vague and ambiguous.

20             THE COURT:  Overruled.  Just answer yes or no if

21   you're able.

22             THE WITNESS:  The Special Master did not -- could not

23   have made an informed choice without knowing that 50 percent of

24   the supervisor's time may have been spent being line staff.

25

1    BY MR. SILBERFELD:

2    Q    Okay.  And do you agree with the neutral expert's finding

3    on this point that no false or misleading statements were made

4    to the Court or to the Special Master?

5    A    No.

6    Q    Okay.  The information about this subject was never adopted

7    by the Court in any proceeding or hearing or order; you

8    understand that, right?

9    A    I don't understand the question.

10         MR. SILBERFELD:  You don't understand.

11         That's all I have.  Thanks.

12         THE COURT:  All right.  Let's take a break, 20-minute

13   break.  Be back here at 10:00 after 11:00.

14       (Recess at 10:51 a.m.)

15         THE COURT:  You may be seated.  Does plaintiff's

16   counsel have another two minutes of questions for Dr. Golding?

17         MS. ELLS:  Yes, Your Honor.

18         THE COURT:  All right.

19                          EXAMINATION

20   BY MS. ELLS:

21   Q    Briefly, Dr. Golding.  Defense counsel asked you about

22   Julie Kirkman.  Is it your understanding that she is not a

23   clinician?

24   A    Yes.

25   Q    She's not a psychiatrist or any kind of mental health

1   clinician?

2   A   No, she isn't.

3   Q   And she's the one who initiated that request to change the

4   30 to 45-day rule?

5   A   To my knowledge, yes.

6   Q   Dr. Golding, you also testified in your report that you

7   learned about the 30 to 45-day change because Dr. Gonzalez, who

8   worked for you, told you that the dashboard was looking greener

9   than you expected it to be, and you asked her to look at the

10  data to see what was going on.  Is that accurate?

11  A   That's correct.

12          MS. ELLS:  I'd like to introduce an exhibit that's

13  premarked as Plaintiffs' 164.

14          THE COURT:  All right.  Any objection?  I know there

15  were some objections filed, but now the time has come.

16          MS. THORN:  Yes, Your Honor.  That's the report of I

17  believe Dr. Gonzalez, so the objection is it's hearsay.

18          THE COURT:  Are you moving to introduce it?

19          MS. ELLS:  Yes.

20          THE COURT:  What's the exception?

21          MS. ELLS:  The exception is that it is nonhearsay

22  because it is by a party opponent.  Dr. Gonzalez performed this

23  in the line of her duty.  She was on the job when she looked at

24  this data.  She did it at the direction of her boss.  She still

25  works for CDCR.  It is not hearsay.

1          THE COURT:  And your response to that?

2          MS. THORN:  Our response is that there's no formal

3    proceeding filed or initiated by Dr. Melanie Gonzalez against

4    any of the defendants in this action, so she's not a nonparty

5    opponent.

6          MS. ELLS:  She is a whistleblower.  It is entitled

7    "Whistleblower Complaint Regarding Patient Care and Safety,

8    Coleman v. Brown."

9          THE COURT:  Well, I'm going to allow questioning based

10   on the document at this point, and I'm inclined to allow it to

11   be admitted, but I may check the record more carefully before

12   more formal admission.  But in any event, it would be the Court

13   relying on this document.  Whether or not it's admitted into

14   the record formally I'll let you know, but you can ask

15   questions at this point.

16   BY MS. ELLS:

17   Q    Dr. Golding, have you reviewed this complaint, which is

18   dated October 24th, 2018?  It's entitled "Whistleblower

19   Complaint Regarding Patient Care and Safety, Coleman v. Brown."

20   A    Yes.

21   Q    And did you review it before Ms. Gonzalez provided it to

22   the Court or, I'm sorry, to the PLATA receiver?

23   A    Not the entirety of it, but virtually -- I knew all about

24   it, yes.

25   Q    Okay.  And there's a number of emails and analyses in here

1    about her concerns about why the performance report indicators

2    were not accurate.  Did you direct her to look into that --

3    those issues?

4    A   I -- yes.

5    Q   And you did that in the course of her employment?

6    A   Yes.

7    Q   Dr. Golding, you --

8            THE COURT:  You're now at three minutes.

9            MS. ELLS:  This is one last question.

10           THE COURT:  All right.

11           MS. ELLS:  Literally one last.

12   BY MS. ELLS:

13   Q   Dr. Golding, you received a lot of questions from opposing

14   counsel about your attendance at workgroup meetings and policy

15   meetings where the Special Master was also present.  Did you

16   feel free to express your opinions at those meetings --

17   A   Absolutely not.

18   Q   Wait until I finish, please.

19   A   I'm sorry.

20   Q   Did you feel free to express your opinions to the Special

21   Master at those meetings?

22   A   No, ma'am.

23           MS. ELLS:  Thank you.

24           THE COURT:  All right.  At this point the Court feels

25   the need to move on, and so I'm going to allow Dr. Golding to

1    step down.

2         He is available for the rest of today, Ms. Musell?

3         MS. MUSELL:  Yes, Your Honor.  And if we could have

4    clarity regarding the ruling at the beginning of the day that

5    witnesses should not be in the courtroom, given that

6    Dr. Golding has now been -- provided testimony from all parties

7    and the Court, would he be allowed to stay in the courtroom,

8    Your Honor?

9         THE COURT:  Once a witness has completed testimony,

10   the witness can remain in the courtroom.  My question for the

11   parties will be are there additional critical questions you

12   believe must be posed to Dr. Golding before he is excused as a

13   witness?

14        MR. SILBERFELD:  Not at this time, depending upon what

15   the rest of the day brings, though, Your Honor, and for that

16   reason we ask that Dr. Golding, as with the other witnesses, be

17   excluded for now.

18        THE COURT:  Ms. Ells, your position on that before I

19   turn back to Ms. Musell?

20        MS. ELLS:  Well, Your Honor, it's -- again, it makes

21   sense for Dr. Golding to testify.  He has already completed

22   his -- or I'm sorry.  It makes sense for him to remain in the

23   room.  He's already completed his testimony.

24        Defense counsel has no idea if they have any further

25   questions for him or what reason there would be to ask

1    additional information from him or recall him at this point.

2         THE COURT:  Ms. Musell?

3         MS. MUSELL:  I agree with that, Your Honor.  He has

4    been -- the parties were allowed to ask whatever they wished of

5    Dr. Golding, as has the Court.  It seems he has completed his

6    duty and then probably a lot more than that and should be

7    allowed in the courtroom.

8         THE COURT:  All right.  I'm going to allow Dr. Golding

9    to remain in the courtroom.  I believe his testimony is

10   concluded.  Moreover, he may not be named as a party, but he

11   is -- it's his report that has prompted these proceedings.

12        MR. SILBERFELD:  Your Honor, if I --

13        THE COURT:  And so to the extent he's asked any

14   further questions, his presence in the courtroom can be used

15   for impeachment value.

16        MS. MUSELL:  Thank you, Your Honor.

17        THE COURT:  Mr. Silberfeld?

18        MR. SILBERFELD:  Your Honor, one additional reason

19   Dr. Golding should be excused from the courtroom, and that is,

20   there may well be an intimidation factor associated with his

21   presence in the courtroom during the testimony of other

22   witnesses.

23        MS. MUSELL:  If I may --

24        THE COURT:  If that becomes evident, I'll reconsider

25   at that point.

1          MS. MUSELL:  If I may just simply state, Your Honor,

2    that that is far more a factor for Dr. Golding as a

3    whistleblower, as demonstrated throughout these proceedings

4    about the retaliation which we have raised with the Court and

5    the treatment that Dr. Golding has experienced after trying to

6    raise these issues internally with CDCR and gotten nowhere.  So

7    if there's any intimidation factor, your Honor, and I'd like

8    this to be stated explicitly, that's towards Dr. Golding.

9          THE COURT:  All right.  I understand that position.

10   I'm not resolving the merits of any such arguments today.

11         Dr. Golding, you may step down.

12         THE WITNESS:  Thank you, Your Honor.

13         THE COURT:  And you may remain in the courtroom.

14         THE WITNESS:  Thank you, ma'am.

15      (Witness excused.)

16         THE COURT:  Former Deputy Director Tebrock will be

17   next.

18         MR. LEWIS:  Yes, Your Honor.  We're getting her right

19   now.

20         THE COURT:  All right.

21         THE CLERK:  Ms. Tebrock, please come forward, step

22   into the witness stand and remain standing.  Please raise your

23   right hand.

24      (Witness duly sworn and takes the stand.)

25         THE WITNESS:  I do.

1          THE CLERK:  Thank you.  Please be seated.

2          Will you please say and spell your first and last name

3     for the record.

4          THE WITNESS:  Sure.  Good morning or afternoon.  My

5     name is Katherine Tebrock, K-A-T-H-E-R-I-N-E, last name

6     Tebrock, T-E-B, as in "brother," R-O-C-K.

7                KATHERINE TEBROCK, WITNESS, SWORN

8                          EXAMINATION

9     BY THE COURT:

10    Q    I believe it's still morning, Ms. Tebrock.

11    A    Oh, good.

12    Q    I'm hoping we still have some morning time.

13         So first clarify for me, you were deputy director of CDCR?

14    A    Of the state-wide mental health program, that's correct.

15    Q    Of the mental health program?

16    A    That's correct.

17    Q    From what date to what date?

18    A    I was appointed in the late 2015 time frame but didn't

19    actually assume the job until January 1st of 2016.  Last day

20    was July 12th of this year.

21    Q    And you left on your own accord?

22    A    That's correct.

23    Q    Do you continue to be represented in this case, in this

24    matter today by the Attorney General's Office?

25    A    I am, yes.

1    Q    All right.  And for 2015 what was your title?  Remind me.

2    A    Sure.  Chief Deputy General Counsel at the Office of Legal

3    Affairs at CDCR.

4    Q    All right.  I have a series of questions for you organized

5    by topic.  So first, I want to ask you some questions about

6    what I'm describing generally as the lengthening of EOP

7    timelines from 30 to 45 days for a period of time.  When did

8    you first learn of the rule change that lengthened the timeline

9    from 30 to 45 days?

10   A    Sure.  Before I answer that, I just want to take a moment

11   to thank you for including me, not withstanding the fact that

12   I'm not with the agency anymore.  I appreciate coming and

13   having the opportunity to talk.  The issues are important, and

14   so I'm glad that I have a voice now answering your question

15   about when I became aware.  My memory is that I first really

16   became aware when I got the report from Dr. Golding in October.

17   Q    Have you ever heard about the rule change prior to that?

18   A    It may have been part of some conversations, but I don't

19   think I really connected the dots the way Dr. Golding laid it

20   out in his report until I saw the report.

21   Q    What's your understanding of why the rule change happened

22   in the first place?

23   A    Sure.  My understanding of why the rule change occurred was

24   that there was a request that came in from the field, from

25   psychiatry in particular, to make a change to ease some of the

Tebrock - Exam by The Court

1    demands on psychiatry in the field and that that was the

2    impetus for the change.

3    Q    And when you say "in the field," how do you define that?

4    A    From an institution.  I believe the request came from a

5    psychiatry team out at CHCF.

6    Q    All right.  And that stands for?

7    A    The California Health Care Facility.  It's in Stockton.

8    Q    Did the change in the rule allow the generation of data

9    that was more favorable to the defendants in making its reports

10   in this case?

11   A    So I think that was -- it was a question of debate

12   certainly around whether that change made an impact.  Certainly

13   one can imagine that it -- that it could have.  I haven't --

14   I'm not aware of anybody having run the reports either way, but

15   I'm assuming that that would probably show a slightly more

16   favorable results.  But I think it's important to note that

17   there was never an intent to drive any kind of more favorable

18   result in this case.  That wouldn't have been -- certainly

19   wasn't for me or for those who work with me an intent to

20   somehow create more favorable information.

21   Q    You said it was a question of debate.  Who debated that?

22   A    Oh.  What I mean is once the report same out I think there

23   was -- and I think it's actually in the pleadings and filings

24   between defendants and plaintiffs around what the import of

25   that change was.

1   Q    Is there any chance that the change was made because of a

2   request from the Governor's Office to find ways to generate

3   favorable data?

4          MR. LEWIS:  Objection, Your Honor.  To the extent that

5   this could get into attorney-client privilege, we are all about

6   transparency, perhaps the witness can answer to the best of her

7   knowledge based on information she may not have had or

8   conversations she may not have had with attorneys.

9   BY THE COURT:

10  Q    Well, you can answer the question.

11  A    Sure.  The request came in through the field.  It did not,

12  to my knowledge, come in through the administration in any way

13  and it was, my understanding, intended to help line

14  psychiatrists in getting some of their work done.

15  Q    So once you learned of the rule change, what specific steps

16  did you take to address it?

17  A    So by the time I really was aware of the rule change, the

18  rule itself had already been changed back.  Dr. Golding had

19  interacted with Dr. Ceballos and others about it and

20  Dr. Leidner corrected it soon after Dr. Golding raised the

21  issues.  So by the time I really had an understanding of what

22  was happening, it was already cured.

23  Q    So your approval was not needed either to make the change

24  in the first place --

25  A    Correct.

Tebrock - Exam by The Court

1    Q    -- or to change it back?

2    A    Correct.

3    Q    Is the change from 30 to 45 days, is that a change that

4    should have been raised with the Special Master in the Coleman

5    case before it was ever implemented?

6    A    It probably should have.  It probably should have come to

7    me.  And if it had come to me, I would have gone to the Special

8    Master.  The Special Master and I have had a long, productive

9    working relationship, and we talked about things both favorable

10   and unfavorable, and we often had some pretty lively debates

11   about things.

12        There were times when I shared things that were unfavorable

13   to defendants and raised things and kind of worked through

14   issues with him, and he was great about working through those

15   things.  So there's no reason I wouldn't have raised something

16   like that, had I known about it.

17   Q    You said it probably should have come to you.  Should it

18   absolutely have come to you before the change was ever made in

19   the first place?

20   A    Yeah.  So in retrospect, of course, the answer is yes.

21        The challenge is that the system is quite large and there

22   are -- as you know, there are many many data points for which

23   you have to have business rules.  And I generally didn't get

24   into each of those business rules with the team.  I had teams

25   of people who specialized in those areas, and I trusted their

1    judgment.

2         I was also aware that prior to the implementation of

3    CERNER, CDCR had the MHTS.net program, which had been

4    negotiated and discussed with the Special Master and his team

5    over the course of many years, and I really understood that we

6    had preserved or attempted to preserve, to the extent possible,

7    all of those rules to maintain fidelity.

8    Q    Had you provided the staff working under you with

9    directions about what qualified as an issue to raise with the

10   Special Master before implementation of any change?

11   A    No.  We didn't have -- the short answer is no.

12   Q    Once Dr. Golding filed his report, did you then clarify

13   when issues needed to be raised with the Special Master before

14   implementation?

15   A    It became clear after the report had issued that a lot of

16   the communication needed to stop internally so that we could

17   make sure we were organizing in a way that allowed us to

18   continue to communicate completely and transparently with the

19   Special Master team.  So certainly any changes thereafter

20   people understood.  And I certainly gave direction that it

21   should come up through the Special Master team.

22   Q    And how did you provide that direction?

23   A    It actually came -- I think we paused the mental health

24   change committee, and I think there may have been a

25   communication that came through -- and in fact, I think it came

1    through legal to the staff just directing a pause.

2    Q    Was some policy or procedure memorialized in writing?

3    A    We didn't complete a new policy.  We simply paused the

4    activity so that we could make sure that we were lining up

5    those conversations with the Special Master and whomever else,

6    understanding at the time -- not anticipating that it would be

7    such a long pause, going a year.

8    Q    What's your explanation as to why the change happened

9    without your knowing, without the Special Master knowing in the

10   first place?

11   A    Yeah.  I think -- I've thought a lot about this.  I think

12   that the system itself moves very quickly, and there are a lot

13   of small decisions that people have to be able to make at their

14   level.  And I think it was an inadvertent oversight.  I think

15   it's clear now that those things should have gone up through

16   the channels and over to the Special Master.  I think it was

17   inadvertent oversight.

18   Q    And when you say "the system," what do you mean by the

19   system moving quickly?

20   A    Yeah.  Day to day a lot of activity occurs at headquarters

21   and trying to move certain pieces of -- whether it be policy

22   development or going out to institutions or identifying system

23   fixes like system bugs that might be apparent in the CERNER

24   system, those are things that have to be handled on a

25   day-to-day basis.

1   Q    All right.  I want to move to appointments seen as

2   scheduled.

3   A    Yes.

4   Q    What role did you play in the 2016 update to the CDCR

5   Mental Health "appointments seen as scheduled" indicator?

6   A    I generally didn't interact on those rules.  As I said

7   earlier, the rules setting for the business rules in the CERNER

8   system were not issues that I dealt with directly.  There were

9   committees with CCHCS, including all of our representatives

10  from mental health, both Dr. Rekart was there, Dr. Kuich and

11  otherwise, to identify any changes that needed to be made.  And

12  that was done in concurrence with CCHCS.

13  Q    So you were not in those meetings?

14  A    I was not in those meetings.

15  Q    And so you said you generally didn't act on those rules,

16  but specifically with regard to the 2016 update did you have

17  any role to play in the quote/unquote update to match the PLATA

18  healthcare dashboard indicator?

19  A    No.  I think I was generally aware that there was some work

20  being done to -- to make those measurements consistent, but I

21  didn't have the time or the expertise to opine and left it to

22  the special -- the subject matter experts to address that.

23  Q    And who were those subject matter experts, in your mind?

24  A    We had a number of folks who were experts in CERNER.

25  Dr. Rekart was one, Dr. Kuich was another.  They attended

Tebrock - Exam by The Court

1    meetings together on behalf of mental health and those -- they

2    met with CCHCS task force members on -- and I'm missing the

3    name of the -- oh.  It was CLAC.  Stands for something, and of

4    course I'm completely forgetting the acronym.

5    Q    C-L-A-C?

6    A    C-L-A-C.

7    Q    All right.  So taking into account what you just said,

8    still, are you aware of any other data indicators that CDCR

9    Mental Health changed during your tenure to match the

10   receiver's healthcare dashboard?

11   A    Oh, gosh.  Offhand the answer is no.  I'm sure there are a

12   number.  I know there was some medication management

13   indicators.  I think there was a meeting before I left related

14   to medication management with the Special Master team and

15   nursing and others to talk through those medication management

16   changes.  That's just one example that comes to mind.

17   Q    You used the word "consistent" previously, that is, making

18   the mental health information consistent with the receiver's

19   information.  Was that a goal of CDCR, as you understand it?

20   A    I think the issue for the overall management of CDCR's

21   healthcare system to include the mental health system is that

22   locally at the institution you have a CEO who oversees the

23   healthcare program, and it can be a little confusing, I think,

24   when you have different measurements for different things.  And

25   so we're trying to make sure that it was understandable across

Tebrock - Exam by The Court

1    the board.

2    Q    Is the confusion a reason to merge the data, to eliminate

3    distinctions across cases?

4    A    I think at least relative to medication management, as an

5    example, there's some utility in having similar metrics.  And

6    that being said, there are some unique metrics that each system

7    should maintain, specifically those outlined with specificity

8    in the program guide, for example, like you might have a

9    different time frame for when you need to see a patient in a

10   program guide than you might have under the PLATA policies and

11   procedures.  That being said, there are probably some

12   indicators that across the board would make sense to look at in

13   the same way, access to care, those kind of things.

14   Q    Did you see it as part of your job to, at your level,

15   monitor and ensure that the distinctions critical to the

16   separate reporting required in Coleman as compared to PLATA

17   were observed?

18   A    Yes.  I mean, it's -- it was clear that we -- there were

19   always some pieces that were unique to mental health, and we

20   took pains to make sure that folks understood that that needed

21   to be retained and honored.  And that wasn't a hard -- hard

22   process.  It was just making sure that people were aware of the

23   requirements.

24   Q    And who's the "we" there, we took pains?

25   A    Oh, gosh.  The CDCR Mental Health has a number of folks at

1   headquarters who interacted regularly with partners in nursing

2   and QM and medical and other areas, and those people each have,

3   you know, an obligation to make sure that the mental health

4   program and its requirements are maintained and honored.  So it

5   wouldn't only be me.  It's incumbent on all of the staff.

6   Q    But what -- just so I -- I'm just trying to understand the

7   system you're describing here.  To the extent the buck stops

8   with someone on -- okay.  We have obligations to the PLATA

9   Court, we have obligations to the Coleman Court, and sometimes

10  the same numbers work and sometimes they absolutely don't.

11  Where did the buck stop to ensure that the data being reported

12  to the Coleman Court was fully compliant with court orders in

13  this case?

14  A    So it should have come up through me, and I should have

15  communicated with counsel, both in-house and at the Attorney

16  General's Office, to ensure that it was proper.  To the extent

17  somebody else was signing a declaration, I think they, too,

18  would be under an affirmative obligation to ensure that the

19  information they were submitting and signing was correct.

20  Q    Were there processes in place to ensure that the reports

21  were consistent with the Coleman criteria separate from the

22  PLATA criteria, or was it just --

23  A    I'm not sure I understand the question.  Do you -- well --

24  Q    Again, I'm just playing off of your word "consistency,"

25  that there's a utility in achieving consistency but not to

1   eliminate court requirements.

2   A   Correct.

3   Q   So what steps were in place to ensure that consistency

4   didn't trump a court requirement that might be different in

5   Coleman as compared with PLATA?

6   A   Sure.  So in -- early on, before CERNER was implemented

7   there was a lot of conversation with the Special Master team.

8   And if my memory serves, plaintiffs were participants at some

9   point.  And this was, gosh, back in the 2013 time frame,

10  talking about MHTS.net.  And folks went through and talked

11  about business rules and, you know, I think that after that

12  CERNER process was engaged, recalling, of course, that it was a

13  process implemented by and through the receiver and mental

14  health got the benefit of being a part of that --

15  Q   So Rekart -- Drs. Rekart and Kuich were the representatives

16  of mental health?

17  A   Correct.

18  Q   They were the voice for mental health and, thus, the

19  watchdogs for the Coleman case in --

20  A   Correct.

21  Q   All right.

22       So once you learned about the incorrect indicator, as

23  reported by Dr. Golding, what steps did you take to learn

24  whether or not the specific information he pointed to was

25  reported incorrectly to the Court?

1    A    So this was the -- now we're talking about the seen as

2    scheduled; is that correct?

3    Q    Yes.

4    A    It's my understanding that the indicator itself, the

5    definition didn't match the indicator.  I didn't know that.  So

6    that was very quickly addressed, I understand, by making the

7    adjustment to the definition associated, the business rule

8    associated with the indicator so that it correctly captured the

9    information that -- so that the title of the report correctly

10   captured the information that was being pulled into that

11   report.

12   Q    And who made the change?

13   A    Dr. Leidner did.

14   Q    And what was your role with respect to that change?

15   A    Minimal, because I think when he saw that it was an error,

16   he very quickly took action to cure it.

17   Q    And is that the kind of information that should have been

18   reported to the Special Master at the time the change was first

19   made?

20   A    Had we known that it would have been helpful to do that,

21   yes, I agree.

22   Q    Dr. Golding has reported that with respect to certain

23   appointments of inmates in the mental health program that some

24   appointments were canceled but not recorded as such and, in

25   fact, any record disappeared of the cancellation.  Do you know

Tebrock - Exam by The Court

1    what issue I'm talking about?

2    A    I do a little bit.  I would be remiss if I started trying

3    to describe CERNER and its --

4    Q    I'm talking more generally because I'm -- like you, I'm not

5    the computer.

6    A    Right.

7    Q    But you're aware that he has said that certain canceled

8    appointments -- that records disappeared such that they

9    couldn't be measured?

10   A    I'm aware that he's alleged that.  I think that's

11   incorrect.  I think, in fact -- and I think it actually may be

12   in one of the filings already, but I think the way it works, if

13   I understand it properly --

14   Q    Let me ask you this --

15   A    Yeah.

16   Q    -- did he deliver a report to you in or about August of

17   2018 laying out his position on this point?

18   A    I don't recall a report from him on this point.  I'd be

19   happy to have my recollection refreshed on that, but I don't

20   remember seeing a report on that.

21   Q    All right.  When you became aware of his concerns, what did

22   you do about them?

23   A    That was when the report issued.  And as I noted,

24   Dr. Leidner had already taken steps to correct it.

25   Q    So you did nothing more?

Tebrock - Exam by The Court

1    A    I had no need to do any more.

2    Q    All right.  Regarding psychiatric supervisors acting as

3    line staff, were you aware of this issue before reviewing the

4    Golding report?

5    A    Well, the answer is yes and no.  I was aware that

6    supervisors sometimes acted as line staff, but I didn't

7    appreciate Dr. Golding's concern about it particularly because

8    we had long talked, he and I, about the fact that there were

9    some supervisors doing work but, you know, I didn't -- I didn't

10   think that it was as problematic as he did or may still

11   consider it, in part because I view it really as part of the

12   obligation for -- clearly if you have vacancies as an example,

13   to use an example, one of your staff goes on --

14   Q    Let me ask, so you didn't agree with him?

15   A    Correct.

16   Q    That was before you saw his report?

17   A    Right.

18   Q    Did your view change after you saw his report?

19   A    It did not.

20   Q    So did you do anything based on the information contained

21   in his report provided in October of 2018 with respect to

22   psychiatric supervisors acting as line staff?

23   A    I did not.

24   Q    So you did not see a need for any change?

25   A    No.  I think that I -- you know, there will always be some

1   vacancies, and there will be a time for -- when a supervisor

2   will have to step in to cover needed appointments, and

3   that's -- that's a tough challenge, but it's certainly one that

4   I think can be expected in that -- in that job.

5   Q   In forming your views on this question, were you exercising

6   your independent judgment?

7   A   I'm not sure what you mean by that.

8   Q   Were you acting at the direction of any other person?

9   A   No.  That's my judgment.  I've been a manager for a long

10  time; and certainly if there are vacancies, I understand that

11  you attempt to fill those vacancies, but in the interim, you

12  have to still do the work.  So that comes from my experience

13  directly.

14  Q   So did Dr. Golding approach you in the fall of 2018 to

15  share with you his concerns that data on which CDCR was relying

16  in preparing staffing proposals was fraudulent?

17  A   I seem to recall that he had a difference of opinion about

18  whether the information was correct.  I attributed some of that

19  to what seemed to me to be his desire to have different

20  measurements taken.  Now, what gave me comfort was a few pieces

21  of information.  We used the best information we had, which is

22  the information we shared.  We also knew that the staffing

23  report itself, the proposal, was going to be monitored.  In

24  fact, the Special Master and his team made a point -- made this

25  point over and over during our negotiations that whatever

1    agreement we came to would be tested.

2        I also --

3    Q   So just back to what Dr. Golding -- did he ever tell you he

4    thought the staffing data was fraudulent?

5    A   I don't remember him using the phrase "fraudulent."  That

6    has certain connotations.  I don't -- I don't recall him using

7    that kind of language.

8    Q   Do you recall telling him at some point in response to

9    whatever he said in that conversation, raising concerns about

10   the accuracy of data, that you were an officer of the court and

11   that by his telling you of his concerns that he had satisfied

12   his obligations to the Court?

13   A   No.  I don't remember that at all.  In fact, if I said I

14   was an officer of the court, then I might have referred to my

15   own obligation to ensure that the information that I was

16   declaring to was accurate, but at no point did I tell him that

17   he was precluded from raising concerns.  In fact, to the

18   contrary.

19       I engaged Dr. Golding over and over about his concerns and

20   tried to really tease out from him what his main concerns were.

21   In fact, the staffing proposal you'll see includes not only the

22   proposals on adjustments to the 2009 assumptions, but it also

23   includes an entire section that has to do with improvements to

24   EHRS, a section dedicated to the clinic model.

25       In fact, I asked him -- directed him to have his team go

1    out and do a review of the clinics from a clinical perspective

2    throughout the state to really get a sense of whether

3    psychiatrists could function at their -- in the best way

4    possible, and --

5    Q   Was Dr. Golding able to review the proposal in full before

6    it was submitted to the Court?

7    A   Well, he certainly saw the drafts --

8    Q   That's not my question.  Was he given a chance to review a

9    draft and comment on it before it was filed with the Court?

10   A   Before it was filed with the Court?  Yes.  He saw the

11   drafts that went back and forth with plaintiffs, and he was

12   present in the meetings with plaintiffs.  In fact, at one point

13   he raised a concern with me --

14   Q   Before anything was shared with the plaintiffs or the

15   Court?

16   A   He and I sat with Dr. Brizendine and Dr. Kuich, and I

17   talked through each of the proposals with him.  I don't recall

18   having shared a hard copy of the document with him, which kind

19   of makes sense because what I needed to understand was whether

20   the proposal itself and the modifications to the assumptions

21   from 2009 were going to be safe and whether he agreed with

22   them.

23   Q   Why would you -- so you talk it through with him --

24   A   Uh-huh.

25   Q   -- then there's a written proposal prepared.  Why would he

1   not see that and have a chance to comment on it before it's

2   finalized?

3   A   So the way -- the way the process really works, we had an

4   idea drafted, and it went over to counsel.  And obviously it's

5   a document written for the Court, and so it really needed to be

6   to drafted with an eye toward attention to the Court, and so it

7   necessarily would have changed over time; not substantively but

8   some kind of tweaking language, and so --

9   Q   Are you saying Dr. Golding had nothing to offer of

10  substance in terms of the written document?

11  A   I'm saying that normally when you write for a court, you

12  use a slightly different skill-set than the clinical review,

13  and he was really -- I needed his clinical perspective on

14  whether it was safe to make the adjustments, but this was

15  primarily not a clinical document.  It was a document having to

16  do with staffing numbers and the assumptions that underlie the

17  2009 agreement.  And those staffing assumptions are really

18  based primarily on what folks thought the work would entail.

19  So really getting his buyoff initially on the clinical

20  appropriateness was important to me, but then how it was then

21  word-smithed was -- he didn't -- he didn't necessarily need to

22  have that exchange.

23  Q   Did you feel pressure at any point from the Governor's

24  Office to massage the data being presented to the Coleman Court

25  to make compliance look more favorable?

Tebrock - Exam by The Court

1    A    Not at all.

2    Q    During your tenure at CDCR did any person ever direct you

3    to manipulate data for any purpose related to Coleman?

4    A    Not at all.

5    Q    Did you ever direct anyone to do so?

6    A    I did not.

7    Q    Did any person ever direct you to provide inaccurate data

8    to the Special Master?

9    A    No.

10   Q    Did anyone ever direct you to provide data that, in

11   context, could be misleading and you knew that?

12   A    No.

13   Q    Did any person ever direct you not to correct misleading or

14   inaccurate data once you became aware of it and its provision

15   to the Court?

16   A    No.  I think, Your Honor, are you referring to the earlier

17   2017?

18   Q    I'm not.  I'm talking generally.

19   A    The answer is no.

20   Q    The same for the Special Master.  Any person ever direct

21   you not to correct misleading or inaccurate data that had been

22   presented to the Special Master?

23   A    No.

24   Q    Have you ever agreed that it was all right to provide

25   inaccurate data to the Court?

1    A    No.

2    Q    Do you consider that a margin of error is acceptable with

3    respect to reporting data in the Coleman case to the Court?

4    A    No.  I don't -- I don't -- well, I don't know how that

5    would come up, but I think to the extent there is a margin of

6    error, that would simply need to be called out to say "this is

7    accurate give or take."  I mean, you would just have to call it

8    out.

9            THE COURT:  All right.  Those are my questions for

10   now.

11           Ms. Ells?

12           And here I'll let you know at 15 minutes.  We'll need

13   to take a lunch break at some point.

14           MS. ELLS:  Thanks.

15                              EXAMINATION

16   BY MS. ELLS:

17   Q    Good morning, Ms. Tebrock.  I think it is still morning.

18   A    So it seems, yes.

19   Q    So you testified today that you were not aware of the

20   timely psychiatry contact metric being changed from 30 to

21   greater than 30 until after Dr. Golding's report was released;

22   is that right?

23   A    I think what I testified to is that that's when I first

24   became fully aware, yeah.  And there may have been some

25   conversation, but I don't recall having any knowledge of it

1  before.

2  Q    What do you mean by "fully aware"?

3  A    I don't recall having any knowledge of it before the report

4  came out.

5  Q    Okay.

6  A    If you have something that can refresh my recollection, I'm

7  happy to look at it.

8  Q    You used a very specific phrase there you were not "fully

9  aware" of it until after that, and that's why I was asking did

10  you have some vague awareness that Dr. Golding or anybody else

11  had concerns about the way the timely psychiatry metric had

12  been measured for a time period?

13  A    Sure.  Let me -- let me clarify to the extent I have been

14  confusing.

15       I don't remember knowing that there was a concern about it.

16  Q    Until after Dr. Golding's report was released?

17  A    Correct.

18  Q    After that happened, did you ask to rerun the data that you

19  had -- I'm sorry.  After Dr. Golding's report was released and

20  you became aware that there was this issue where there was a

21  five-month time period where there was a more generous measure

22  for the 30 to 45 or, I'm sorry, for the timely psychiatry

23  contact, did you ask anyone to rerun the data?

24  A    You can well imagine that once the report was released and

25  the issue was a matter of the Court's attention that I didn't

1  go in and do my own investigation.

2  Q   My question is a yes-or-no question.  Did you ask anyone to

3  rerun the data in your declaration to the Court on March 30th,

4  2017, after you found out that that data was based on a metric

5  that was more than 30 days?

6  A   I did not.

7  Q   And it's now been a year.  Have you ever asked anybody to

8  rerun that data so you could see how much it mattered?

9  A   I have not done that because all of this has been before

10  the Court, and I wasn't interested in doing my own

11  investigation.  I thought it was really important for this

12  process to be fully completed.

13  Q   Right.  You were not at all curious whether the data that

14  you sponsored to the Court would have been different if it had

15  been using the 30-day metric?

16  A   I'm sorry.  Are you asking about my curiosity?

17  Q   Yeah.  You weren't curious if the data that you had

18  sponsored to the Court was actually incorrect?

19  A   I trusted that this Court's proceeding would address all of

20  the data in an open and transparent way.

21  Q   You've still never filed a declaration changing the

22  statements in your declaration from May 30th, 2017, or

23  correcting the data in that chart that you sponsored?

24  A   I am no longer an employee of CDCR, so I couldn't do it

25  today.

1   Q   Why could you not do that?  Do you work for the executive

2   office, the defendant in this case?

3   A   Currently?

4   Q   Yes.

5   A   No.  I don't work for CDCR.

6   Q   I'm not asking about CDCR.  Do you work for the governor?

7   A   I'm not appointed by the governor.

8   Q   Do you work for the State of California, Katherine?

9   A   Yes.  I work for the State of California.

10  Q   So you felt like you didn't need to find out how

11  significant the change was to the data that you had sponsored

12  to the Court after you found out that it was based on a much

13  more generous metric; is that correct?

14  A   I'm sorry.  Is that a question?

15  Q   Yes.

16  A   I don't recall having done an investigation.

17          MS. ELLS:  I'd like to offer at this time Plaintiffs'

18  Exhibit 176.

19  BY MS. ELLS:

20  Q   Ms. Tebrock, you were required by court order to personally

21  certify that segregation units holding EOP class members were

22  complying with program guide mandates; is that accurate?

23  A   Correct.

24  Q   And you were required to do that every month?

25  A   I did.

Tebrock - Exam by Ells

1    Q    So do you recognize this document, which is dated June

2    22nd?

3    A    That looks like my signature, yes.

4    Q    So this is one of your certifications --

5    A    Uh-huh.

6    Q    -- for the segregation units holding EOP class members?

7    A    Yep.

8              THE COURT:  And the year is 2017.

9              MS. ELLS:  Oh.  Pardon me, Your Honor.  Thank you.

10   BY MS. ELLS:

11   Q    Could you please turn to page 6 of this document.  So this

12   is a document produced to you by CHCF, and it says at the top

13   that it covers the period 4/4/2017 through 5/4/2017.  Do you

14   recognize that document?

15   A    It's been a couple of years, but it looks like a document

16   that I would have sent, yes.

17   Q    And on the next page, page 7 of this document, in the last

18   section there it says timely psychiatry contacts 4/4/2017 to

19   5/4/2017 were at 80 percent.  "For explanation, please see

20   addendum," which is Section 3, "attached."  Could you please

21   turn to the next page?  So here --

22             THE COURT:  You're now on page 7?

23             MS. ELLS:  Page 8, Your Honor.

24             THE COURT:  Page 8.  All right.

25             MS. ELLS:  Thank you.

1    BY MS. ELLS:

2    Q    So here -- and this is a document CHCF provided to you,

3    right?

4    A    Uh-huh.

5    Q    And you would have reviewed this for your personal

6    certification of the EOP segregation units that month?

7    A    Uh-huh.

8             THE COURT:  Yes or no, please.

9             THE WITNESS:  Yes.

10   BY MS. ELLS:

11   Q    So this says "CHCF uses the current due dates report to

12   schedule for ASU EOP hub psychiatry.  When the rule was recoded

13   on April 24th, 2017, to have a psychiatry contact once every 30

14   calendar days versus monthly or 45 calendar days, whichever

15   came first, CHCF ASU psy" -- you understand that means

16   psychiatry -- "contacts were all affected; however, from the

17   heat grids shown for those same months prior to April 24th, we

18   were in the green."

19        So you reviewed this document and then in your cover letter

20   on page 1 it says here in the third paragraph that you found

21   that CHCF did not pass certification due to the timely

22   psychiatry contacts being 80 percent, and you referenced a new

23   coding for the indicator that went into effect on April 24th

24   requiring contacts to be held every 30 calendar days versus

25   monthly or every 45 calendar days based on whatever came first.

1    Prior to the coding change, 19 of 22 contacts were

2    compliant.  The remaining 3 were due to scheduling errors, and

3    the scheduling staff has since been retrained.

4    Now, the second paragraph below that referring to CSP

5    Sacramento also did not pass certification, you say in your

6    letter, due to the timely psychiatry contacts 83 percent.  That

7    paragraph also references the coding change that went into

8    effect of April 24th requiring contacts to be held every 30

9    calendar days versus monthly or every 45 calendar days.  And

10   your signature is on the next page, right?

11   A    Yes.

12   Q    This is dated June 22nd, 2017?

13   A    Uh-huh.

14   Q    And you didn't pass those two institutions for

15   certification on the second page of your letter.  So you put in

16   your letter that you understood that there had been a change in

17   the coding of this contact.  Did you not understand what you

18   were saying in that letter?

19   A    Well, what I -- I think what I wrote -- of course this was

20   now two years ago, but what I'm noting is that the coding had

21   been corrected, and I'm relying on the new standard to reflect

22   that CHCF and Sac did not pass pursuant to the current rules.

23   Q    Right.  But you understood that there had been a coding

24   error and CHCF specifically told you that when the prior coding

25   was used, all of their contacts were in the green.  What do you

1  understand "in green" to mean?

2  A    I understood in green meant that it was generally

3  acceptable.

4  Q    And you mean by that compliant with the program guide?

5  A    I mean that it was -- it was, yeah, generally -- generally

6  acceptable.

7  Q    Again, do you mean compliant with the program guide when

8  you say "generally acceptable"?  Yes or no answer.

9  A    So green in the performance report, it's an interesting

10  question you raise because --

11  Q    I'm just asking you, do you agree that saying something is

12  in the green to you meant the institution understood that they

13  were in compliance with the program guide for that specific

14  indicator about timely psychiatry contacts?

15  A    I would guess that -- so there's a yes-and-no answer to

16  that.  Generally, yes.  If you are compliant, then we would

17  argue that you're in compliance with the program guide.  Of

18  course, there has been robust debate, as you know, about

19  whether being in the green, in fact, is the same as being

20  compliant.

21  Q    But you failed them because they were at 80 percent?

22  A    Sure.  If you're not in the green, then you can't be --

23  Q    Now, none of the institutions in there report to you in

24  this document that you signed certifying that the EOP

25  institution -- EOP ad seg hub institutions where EOP class

1  members are held in segregation were compliant with program

2  guide standards, none of the other institutions made any

3  reference of whether or not their psychiatry contact timeliness

4  had been affected by this rule change.  Did you ask them

5  whether or not this rule change that two institutions said

6  dramatically changed their compliance, did you ask the other

7  institutions if they also had had their compliance affected?

8  A   I don't recall having had that conversation.

9  Q   But you certified those institutions anyway?

10     On the second page here, you certified every institution

11 except CHCF and CSP Sac, the two institutions that specifically

12 told you that their compliance had been affected by that rule

13 change?

14 A   Sure.  What I would have done is looked at their data.

15 Q   I'm not asking what you would have done.  I'm asking did

16 you certify them and did you ask them whether or not their

17 compliance had been affected by that rule change?

18 A   I don't think I needed to look at that in order to look at

19 their current --

20 Q   So you didn't --

21     THE COURT:  All right.  Just answer this person's

22 questions.

23     THE WITNESS:  I don't remember what I did in June of

24 2017.

25 BY MS. ELLS:

1  Q   But you did certify those institutions as complying with

2  the program guide?

3  A   Correct.

4  Q   Now, you mentioned that you didn't see the notion that

5  supervisors were sometimes performing line staff duties to be a

6  big deal and that you didn't feel like even after you found out

7  about Dr. Golding's concerns that you needed to take any

8  corrective action on that.  Is that accurate?

9  A   I'm not sure I used the phrase "Not a big deal."  I mean,

10  it's always --

11  Q   I believe you did.

12  A   Okay.  Well, let me rephrase because I think --

13  Q   Did you think it was significant enough to make any

14  changes?  I'm just trying to be efficient with our time here.

15  A   Oh.  I think I already answered no.

16  Q   Okay.  So I believe you also said that in your view it's

17  appropriate for supervisors to step in to cover needed contacts

18  when they're -- you know, someone's on vacation or absent due

19  to disability leave.  Is that accurate?

20  A   Correct.

21  Q   Do you think it's appropriate for supervisors to carry

22  permanent line staff duties for an indefinite period of time?

23  A   I think there are duty statements that actually create the

24  expectation for some line staff duties.

25  Q   Is there anything in the 2009 staffing plan saying that

1    supervisors are expected to permanently carry caseloads?

2    A    I don't recall that being in there.

3    Q    Is there anything in the program guide, with the exception

4    of MHCB units, that sets an expectation that supervisors will

5    provide line staff duties?

6    A    I'm not -- I'm not sure that's articulated.

7    Q    Did Dr. Golding tell you that he disagreed with the

8    staffing proposal that you were working with him on to some

9    degree in 2018?

10   A    He raised a couple of concerns, but he didn't -- I don't

11   recall him saying he disagreed with the proposal in total.  In

12   fact, I had express conversations with him wherein he agreed

13   with the approach.  And so I was a little surprised also

14   noting, by the way, that he was present during those meet and

15   confers.  Lisa, you were there.  I mean, you recall the back

16   and forth and there was a lot of discussion with you and your

17   team asking questions, and I don't recall him raising concerns

18   except one time --

19   Q    I'm actually --

20   A    -- he did --

21   Q    -- asking about internally before it came to the Special

22   Master and plaintiffs.  You said that you met with him and that

23   you orally discussed --

24   A    Uh-huh.

25   Q    -- a proposal.

1    A    I did.

2    Q    And at that -- at that meeting did you specifically tell

3    him that the reductions that you were anticipating would cut 20

4    percent of supervisory -- or excuse me, of psychiatry line

5    staff positions?

6    A    No.  At that time we hadn't actually associated any numbers

7    with any of it.  We were talking conceptually --

8    Q    So conceptually --

9    A    -- about what it would look like.

10   Q    But you didn't discuss any numbers of actual cuts with him?

11   A    I didn't have numbers at that time.

12   Q    At the point --

13   A    It was very early in that time.

14              THE COURT:  One at a time.

15   BY MS. ELLS:

16   Q    There were numbers, though, transmitted in the very first

17   version of the staffing proposal sent to plaintiffs --

18   A    Correct.

19   Q    -- and the Special Master in May of 2018?

20   A    Right.

21   Q    Had you run those numbers by him at the time that you sent

22   that?

23   A    I don't think I ran those numbers through him, but he

24   certainly saw them, and he was present at the meetings.  He did

25   raise one concern after a meeting, and we corrected that the

1  next meeting that we had.

2  Q   What was that?

3  A   We engaged with him directly.

4  Q   What was the correction that you made?

5          THE COURT:  One at a time.

6          THE WITNESS:  Sure.  Happy to share.

7          THE COURT:  What were those meetings, because there's

8  been some blurring of the lines.  Were those meetings internal

9  meetings or meetings with plaintiffs and others?

10         THE WITNESS:  Sure.  So in the meeting -- so we had a

11 meet and confer --

12         THE COURT:  I'm just asking for a definition.  You

13 just used the word "In the meetings."

14         THE WITNESS:  Yeah.  Let me -- let me clarify.  We had

15 meet-and-confer meetings --

16 BY MS. ELLS:

17 Q   Are you talking --

18 A   -- between plaintiffs and the Special Master.  And after

19 one of those meetings, we had an internal discussion wherein

20 Dr. Golding raised concerns.  I had conversations then later

21 with some folks and at the following meet and confer, which

22 occurred the next week -- and I don't remember the dates, of

23 course, but we made a point to make sure that we corrected

24 Dr. Golding -- addressed Dr. Golding's concern head-on.  And,

25 in fact, if my memory serves, Dr. Kuich made a presentation

Tebrock - Exam by Ells

1   during that meeting to correctly frame the issue that was --

2   that would address Dr. Golding's concern.

3           THE COURT:  You need to yield the witness so the

4   defense can have 16 minutes before lunch.

5           MS. ELLS:  Okay.  Did you say wrap it up?

6           THE COURT:  Well --

7           MS. ELLS:  Couple more minutes.

8           THE COURT:  How much more time do you think you need?

9           MS. ELLS:  I mean, I would appreciate five more

10  minutes to explore this topic, but I understand the Court's

11  constraints.

12          THE COURT:  I'll give you two more questions.

13  BY MS. ELLS:

14  Q   Okay.  So you said that you provided Dr. Golding and

15  Dr. Kuich with the physical proposal at some point before it

16  was provided to the plaintiffs and Special Master; is that

17  correct.

18  A   That's not what I said.

19  Q   Okay.

20  A   What I said was that he certainly got a copy of it when it

21  went to plaintiffs and the Special Master team.

22  Q   Now, how did he get that copy?  Was he transmitted on the

23  emails that --

24  A   I don't -- I don't know how.

25  Q   How do you know he got that copy?  Did you give it to him?

1   A    I didn't personally hand it to him.  We normally send

2   things electronically, so it would have been distributed to him

3   in some way.

4   Q    Could you produce that email?  I will represent to you that

5   he is not --

6   A    I have no idea.

7   Q    -- copied --

8            MR. LEWIS:  Your Honor --

9   BY MS. ELLS:

10  Q    -- on any of the --

11           THE COURT:  Okay.  This is where -- you'll have a

12  chance for wrap-up argument, so you've got your answer.  I

13  think at this point we need to give the defense equal time

14  before lunch, and then we'll talk about whether or not we're

15  done with this witness.

16           MS. ELLS:  Thank you, Your Honor.

17           THE COURT:  All right.  And I'm sorry, I'm not --

18  Mr. Lewis --

19           MR. LEWIS:  Thank you, Your Honor.

20           THE COURT:  -- you're going to question this witness?

21                           EXAMINATION

22  BY MR. LEWIS:

23  Q    Good afternoon, Ms. Tebrock.  You said you no longer work

24  at CDCR.  Have the Golding allegations had -- have they had an

25  effect on you?

1    A    Oh, sure.  It's been a long year.

2    Q    Have they had a personal effect on you?

3    A    Yes and no.  They've -- it had a little bit of an effect on

4    the family.  Last night -- I loved my job at CDCR, but I was --

5    tell you a story.  I was driving my then 14-year-old son to

6    school, and he had a very candid conversation with me about my

7    presence at home, and it gave me great pause.  And while I

8    don't normally take employment advice from a teenager, in this

9    instance I had to take a minute to think about whether I was

10   taking home some of the stress.  So it was then that I decided

11   to look for other employment.

12   Q    And at its core -- you answered the Court's questions but I

13   want to reaffirm this -- you at no time have ever been

14   pressured to falsify data or to produce misleading --

15   intentionally misleading information to the Court or the

16   Special Master or plaintiffs in this case, have you?

17   A    I have not.

18   Q    Did you have an issue with Dr. Golding raising his

19   allegations in a report filed in October of 2018 rather than

20   using some of the internal processes at CDCR?

21   A    I wish he would have handled it a little differently.  We

22   had been meeting to try to address his concerns.  He was not

23   shy about having -- having broad concerns about the system and

24   the structure and, in fact, has taken, I think, pains to

25   express that he disagrees with a lot of the requirements of the

1    program guide and the order and mandates and agreements of the

2    case.  So I was really trying to sit and tease out with him

3    those issues that he felt were most important and to try to

4    distill what we could do to try to address his concerns because

5    I didn't want to be dismissive of him, and I thought we were

6    still in the throes of doing that.  In fact, I had engaged with

7    him -- I kind of bought in on some of his -- some of his

8    perspective, particularly as it related to the clinic model, as

9    an example.  He expressed concern about the way the

10   psychiatrists were treated and marginalized at the

11   institutional level, and part of that was felt because the

12   patients weren't being brought to psychiatrists and it was

13   making them less efficient and less productive, and I get that.

14   It makes sense to me.

15        And so I asked him to go out with his team and look at the

16   clinic space across the state and he produced a report to me in

17   mid-September that we were scheduled to sit down and talk

18   about, but we never actually got to actually meet about it.

19   That's actually why we included that component to -- within the

20   staffing plan, itself, because not withstanding the cuts that

21   we were going to propose, we really felt like one of the safety

22   nets that was built into the proposal was that we would have

23   additional efficiencies through those elements, that kind of

24   second half of the staffing proposal that included the EHRS

25   improvements that were needed, which would address a lot of the

1    EHRS-centric concerns that Dr. Golding raised and the clinic

2    model, which would address some of the efficiencies and

3    productivity and also that sense of working in an environment

4    that's more conducive to the physician psychiatrists.  So we

5    were dedicated to making that happen.  So when I saw the

6    report, I would say I was a little bit heartbroken because I

7    felt like we had been making progress, and I was dismayed that

8    it didn't --

9    Q   So I'd like to ask you about some of the things that were

10   going on at CDCR before he issued his report, in particular as

11   to the -- what's known as the Issue B, the monthly that was

12   extended from 30 to 45 days.  I understand that there was some

13   kind of business change or rule change committee that was

14   enacted to cover these things, are you familiar with that, to

15   make sure this stuff didn't happen back in the early 2018 time

16   frame?

17   A   Yeah.  There was a change committee that was initiated that

18   was intended to bring stakeholders from mental health into the

19   room to talk about each of the issues that were coming from the

20   field so that there was no concern about it.  And that was an

21   initiative led by Dr. Ceballos to try to make sure that the --

22   there was more transparency in that process.  Now, that

23   committee, although folks sat and voted on issues, didn't

24   preclude others from raising issues in the CLAC committee

25   meeting.  That was the meeting having to do with the CERNER

1    EHRS pieces.  And I think the name has now been changed to

2    something different, but it wasn't a barrier to additional

3    communication in CLAC, but it was intended to create some

4    consensus within the division on the EHRS changes.

5    Q   And then you said that there were meetings going on.  If

6    you could maybe explain, did you have an opportunity to have

7    regular meetings with Dr. Golding?

8    A   So we had periodic meetings.  There were times when they

9    ended up being canceled, but I tried to have one-on-one

10   meetings with him or meetings with him and Dr. Kuich, depending

11   on what was going on at the time.

12   Q   Okay.  And then so going back into the 2017 time frame when

13   you were the deputy director, did you have meetings with

14   Dr. Golding during 2017 about various issues that he would

15   bring to you on psychiatry?

16   A   Yeah.  So I want to be clear that Dr. Golding and I talked

17   every day.  I mean, we met in the -- had a morning meeting with

18   my team every morning, and we talked about what was going on

19   each morning, and that often led to additional meetings or

20   conversations being scheduled or ad hoc conversations that

21   would occur as needed.  So there were routine meetings, and

22   then there were additional ad hoc kind of conversations.

23   Q   So would there have been opportunity before he released his

24   report in October of 2018 to come to you with problems of data

25   manipulation or data misrepresentations?

Tebrock - Exam by Lewis

1    A    Absolutely.

2    Q    And did he ever, to your recollection, come to you with

3    allegations of fraud?

4    A    He didn't come with allegations of fraud.  We did talk

5    about problems related to EHRS.  And that, again, I can't

6    emphasize this enough, is really why we included that piece in

7    the staffing plan.  It was in recognition of the concerns that

8    he had raised because we knew we needed to do a little better

9    and we used the best information that we had and then we knew

10   we could further improve the system.

11   Q    While you were talking with Dr. Golding about the staffing

12   plan, did he ever raise any objection about the potential to be

13   losing line psychiatrist positions?

14   A    I think when we initially talked, he and Dr. Kuich and

15   Dr. Brizendine and I, it was clear that there were going to be

16   some cuts that might occur, and he didn't seem to have too much

17   of a problem with that in concept.  But, again, really

18   important to it was also recognizing that we needed to make

19   further system improvements so that the psychiatrists were able

20   to be most productive and that they feel valued and can do the

21   best job they can.

22   Q    If Dr. Golding had raised the issues that he raised in the

23   report internally with CDCR through you or through other --

24   perhaps your boss, would CDCR have taken action on those

25   besides having him file a report?

1    A    Yeah, absolutely.  Listen, I was actively trying to talk

2    with him about his concerns.  I didn't think that we had

3    concluded those conversations.  In fact, it was early August we

4    were having pretty frequent conversations about concerns, and

5    it was -- felt a little bit like he didn't want to have

6    complete conversations.  In fact, he had indicated to me that

7    he had a -- well, I asked for some documentation of his

8    concerns so that I can understand.  Sometimes Dr. Golding

9    speaks in generalities and maybe speaks at a little bit higher

10   level than me or than I do, so I think we talked across each

11   other a bit.  So hoping -- having something documented would

12   have given me some assistance.  He indicated that he had a

13   report that he wasn't sure what to do with.  I asked to have a

14   copy of it.  He said no.

15   Q    Now, you said that there were times that he'd be talking

16   over you.  In some of these meeting did you have other duty

17   experts with you, such as people who worked in data or worked

18   in other fields?

19   A    Sure.

20   Q    So who were those people?

21   A    So it was usually Dr. Kuich, Dr. Rekart, Dr. Ceballos.

22   Those are the folks that I would deal with directly.

23   Q    And if Dr. Golding may have had issues with data or

24   reporting metrics, those were the people he could address them

25   to right then and there, correct?

Tebrock - Exam by Lewis

1    A    Yeah.  And I think that there were a lot of conversations

2    that took place, but certainly I had an expectation that the

3    team would be talking -- I didn't have to be in every

4    conversation.  They needed to be able to work things out at

5    their level as well.

6    Q    Now, in your role as the Deputy Director of Mental Health

7    Programs, did you have other things to do besides verifying

8    reports, verifying letters, et, cetera that were submitted to

9    the Court regarding Coleman?

10   A    Sure.  I relied on the subject matter experts to give me

11   good information, and we sat and talked about things so that I

12   could understand what was happening.  But certainly I had other

13   obligations, other duties to include being an external face

14   with other executive staff as well as outside agencies and the

15   legislature and those kinds of things.

16   Q    So you didn't have an opportunity to review every single

17   line of data or reporting that was given to you for your review

18   and signature?

19   A    Certainly not.  There are thousands of data points.  I

20   wouldn't have reviewed all of those business rules.  Just

21   impossible.

22   Q    But at no time did you intend to mislead the Court, Special

23   Master or plaintiffs regarding those findings?

24   A    Absolutely not.

25   Q    And if given the chance, you would correct them if you had

1    the opportunity?

2    A    Correct.

3    Q    Did Dr. Golding ever come to you and tell you that you or

4    people working for you were falsifying data?

5    A    I don't remember the word "false" or "fraud" being used.

6    Certainly he expressed concerns about the data points, and

7    that's part of why we were engaging in our conversations.

8    Q    And so you were attempting, you said, to tease more

9    information out of him?

10   A    Correct.

11   Q    Did he ever ultimately give you something that you could

12   act upon?

13   A    No.  Unfortunately, he didn't.  And in fact, he refused to

14   give me the document that he -- ultimately was his October 3rd

15   report.  It would have been helpful to have had that before.

16   Q    Did you ever advise him that he couldn't release the report

17   because it would be subject to attorney-client privilege?

18   A    His report?

19   Q    A report of any kind.

20   A    I didn't tell him that he couldn't release his report of

21   any kind.  There was one exchange I recall where he raised a

22   legal issue, legal was engaged, legal opined, and he asked

23   whether it was attorney-client privileged, and I indicated that

24   was a privileged exchange.

25   Q    But you never prevented him or took any steps to prevent

Tebrock - Exam by The Court

1   him from reporting his issues to anyone within CDCR or outside

2   CDCR?

3   A   Certainly not.

4   Q   Did you, at any time, feel that CDCR -- did you have reason

5   to believe that CDCR was misrepresenting the data they were

6   presenting to the Court or Special Master?

7   A   No.

8   Q   If you had, would you have taken steps to correct it?

9   A   Absolutely.

10  Q   Do you believe that the people working for you would have

11  done the same thing?

12  A   Absolutely.

13  Q   Do you trust the people that were working for you back in

14  2017 and 2018 in the Quality Management Division?

15  A   I do.

16  Q   Would you trust them today?

17  A   Absolutely.

18      MR. LEWIS:  No further questions, Your Honor.  Thank

19  you.

20                      EXAMINATION

21  BY THE COURT:

22  Q   All right.  The Court has just one follow-up question.

23      You just said in response to a question that if given the

24  chance, you would correct any document that, in retrospect, was

25  misleading or contained inaccurate information.  So as you sit

1    here now, are there any documents that you can think of that

2    you would correct?  You're being given the chance.

3    A    Sure.  I think I -- to Ms. Ells' point, I think probably

4    would pull if it's possible, and I don't know if it's possible

5    to pull the old --

6    Q    Just assume that there's no barrier.  In your mind, do you

7    have a list of documents that, if given the chance, which you

8    are being given --

9    A    Sure.

10   Q    -- you could correct, what would those documents be?

11   A    That would be the one, the one from 2017.

12   Q    That's the only one?

13   A    I would just look to see if there was a difference and

14   submit that.

15   Q    That's the only document?

16   A    That's the only one I'm aware of that I think would make a

17   difference.  The other items I don't think were issues that

18   were actually submitted that would require a correction at E

19   and F.

20        THE COURT:  All right.  All right.  Let's take a lunch

21   break and be back here at 1:30.  I'd like to propose a change

22   in order for this afternoon, assuming we're ready to move on.

23        For what period of time is Dr. Rekart available?

24        You may step down, ma'am.

25        THE WITNESS:  Thank you.

1          THE COURT:  Don't assume you're excused.

2          MR. FISHER:  From 2:00 until at least 6:00, so --

3          THE COURT:  2:00 to 6:00 p.m.?

4          MR. FISHER:  Yes, Your Honor.

5          THE COURT:  I'd like to propose Assistant Deputy

6    Director Ponciano and then Dr. Rekart, and then we would return

7    to Leidner and Ceballos.

8          MR. LEWIS:  So, Your Honor --

9          THE COURT:  And to the extent we need to spill over,

10   we'd spill over to tomorrow afternoon.  Is there any reason

11   that we can take the witnesses in that order so we can fit

12   Dr. Rekart?

13         MS. GARSKE:  Your Honor, we have no objection to that

14   order.  Dr. Brizendine --

15         COURT REPORTER:  I'm sorry, could you please speak up

16   a little bit?

17         MS. GARSKE:  Sure.  Your Honor, we have no objection

18   to that order; however, Dr. Brizendine is also here and on the

19   list to testify, and I did not hear her name.

20         THE COURT:  I thought I just said --

21         MR. LEWIS:  You said Dr. Ceballos, Your Honor.

22         THE COURT:  Dr. Ceballos and Dr. Leidner.  There's

23   Brizendine and Undersecretary Toche --

24         MR. LEWIS:  Yes, Your Honor.

25         THE COURT:  -- are still on the list.  So it's taking

1    a little longer than the Court had hoped.  What I just said is

2    that to the extent we need more time, we would spill over until

3    tomorrow afternoon when the Court has already blocked time for

4    this case.

5           So is there any witness that cannot appear tomorrow

6    afternoon, if we don't get to them today, who's currently on

7    the list?

8           MR. LEWIS:  I do not believe so, no, Your Honor.

9           THE COURT:  All right.  All right.  So that's the

10   plan, to fit Dr. Rekart in there and get him over with.

11          I think -- I think Ponciano, Ms. Ponciano and

12   Mr. Rekart will take a little less time than Drs. Leidner and

13   Ceballos.

14          MR. LEWIS:  And so, Your Honor, after lunch would be

15   Ms. Ponciano and then Dr. Rekart?

16          THE COURT:  Yes.

17          MR. LEWIS:  Very well, Your Honor.

18          THE COURT:  All right.  Very good.  See you here at

19   1:30.

20      (Recess at 12:36 to 1:34 p.m.)

21          THE COURT:  All right.  Any objection to Ms. Tebrock's

22   being excused at this point subject to potential recall,

23   Ms. Ells?

24          MS. ELLS:  I would like to ask her to --

25          THE COURT:  I need you to use the microphone.

1          MS. ELLS:  I am.  Can you hear me?

2          THE CLERK:  Sorry, Your Honor.  That was me.

3          MS. ELLS:  Pardon me.

4          THE COURT:  All right.

5          MS. ELLS:  I did have two questions for her that I

6    would like to ask, but --

7          THE COURT:  Two more?

8          MS. ELLS:  Yes.

9          THE COURT:  Did you have more questions, just so I'm

10   clear, Mr. Lewis?

11         MR. LEWIS:  No, Your Honor.

12         THE COURT:  All right.  Well, five minutes.  I'll

13   allow up to five minutes.

14         MS. ELLS:  Yeah.

15         THE COURT:  So we'll bring Ms. Tebrock back, and then

16   we'll move straight to Ms. Ponciano.

17         Can I, in the meantime, clarify?  I understood that

18   Plaintiffs' 176 was admitted without objection.  Was that your

19   intent to admit that document, Ms. Ells?

20         MS. ELLS:  That was one of the housekeeping items I

21   intended to wrap up, which I never formally attempted to move

22   it into evidence, but we would like to move that in.

23         THE COURT:  Any objection?

24         MR. LEWIS:  No objection, Your Honor.

25         THE COURT:  All right.  So Plaintiffs' 176 is in

1   evidence.  The Court has deferred a ruling on Plaintiffs' 164.

2        (Plaintiffs' Exhibit 176 admitted in evidence.)

3             THE COURT:  Ms. Tebrock, please come forward.

4             Plaintiffs' counsel has two briefs follow-up

5   questions.  You continue to respond under oath.

6             THE WITNESS:  Okay.

7             THE COURT:  Ms. Ells.

8             MS. ELLS:  Thank you, Your Honor.

9                              EXAMINATION

10  BY MS. ELLS:

11  Q   Ms. Tebrock, the Court offered you the opportunity to

12  correct any reference that you felt like should be corrected

13  that had been provided to the Court or Special Master.  We

14  discussed an EOP ad seg hub report for prisoners in segregation

15  for the month of April 2017 when we spoke last.

16        There were four prior reports covering the months of

17  December through March, December 2016 through March 2017, that

18  all used that same formula of greater than 30 days to calculate

19  timeliness.  If given the opportunity, would you go back and

20  adjust those at all?

21  A   It's my understanding there was something recently filed

22  related thereto, so it may be that the defendants have already

23  spoken about that.  To the extent that you are looking for my

24  thoughts on it, I think it would be incumbent on defendants to

25  go back and take a look at it and then they could resubmit if

1    they found it made sense.  I haven't seen those filings, so I

2    don't know.  All of that activity is post my departure, so I --

3    it sounds like folks have already contemplated that --

4    Q    If given the opportunity --

5    A    -- and I would defer to them.

6    Q    Pardon me.  If given the opportunity, though, would you go

7    back and rereview your certifications that you personally

8    signed during that time period that you now know used data that

9    was greater than 30 days to measure timeliness for psychiatry

10   contacts?

11         MR. LEWIS:  Objection, Your Honor, to the extent this

12   assumes an incomplete hypothetical and, frankly, it calls for

13   data that the witness no longer has access to.

14         THE COURT:  Overruled.  You may answer to the extent

15   you're able.

16         THE WITNESS:  Sure.  My answer is that I think that

17   the defendant certainly should do that and can go back and look

18   at that information and file updates.  Unfortunately, as you

19   can imagine, I don't have control over access to that

20   information.

21         MS. ELLS:  Thank you.  Your Honor, I would like to

22   move Plaintiffs' 172 through 175 into the record at this point.

23   Those are the EOP ASU certifications for the months that we

24   just discussed.

25         THE COURT:  Any objection?

1          MR. LEWIS:  No objection, Your Honor.

2          THE COURT:  All right.  Plaintiffs' 172 to 175 are

3    also admitted.  Do you have copies for the Court?

4          MS. ELLS:  I do.

5          THE COURT:  All right.  You can just provide those to

6    Ms. Schultz on the next break.

7          (Plaintiffs' Exhibits 172, 173, 174 and 175 admitted in

8          evidence.)

9    BY MS. ELLS:

10   Q    One last question.  The Special Master was conducting the

11   27th round through the end of 2017 and held two or more tours

12   in the month of January 2017.  CDCR, your department, provides

13   pretour data in advance of those tours that included this

14   timely psychiatry contact metric and this, again, is during the

15   time frame when that metric was more than 30 days.  If given

16   the opportunity, would you go back and adjust the data that you

17   provided to the Special Master for those tours?

18         MR. LEWIS:  Same objection, Your Honor, also lacks

19   foundation.

20         THE COURT:  Overruled.  You can answer if you're able.

21         THE WITNESS:  Yeah.  I think one of the important

22   factors to remember about the Special Master's monitoring is

23   that there is a time frame for the data to be produced to the

24   Special Master, and it's a retrospective look, so I don't know

25   exactly what the data set would have included.  For that

1    January 2017 tour my understanding and expectation is that it

2    would be six months in arrears, meaning they likely would not

3    have had information that included that modified time frame in

4    there, I think, but I would have to go back and look.  And

5    again, one of the challenges for me right now is that I don't

6    have access to the information.

7    BY MS. ELLS:

8    Q    But if it did include that metric being -- when it was --

9    when the metric reflected greater than 30 days would you go

10   back and revisit that and provide updated data if you had the

11   opportunity?

12   A    I think I wouldn't do that.  I think the agency could take

13   a look at that and the agency could share that information.

14   I'm not sure it would make a material difference to the Special

15   Master's conclusions vis-á-vis that, but I think that's -- that

16   would be up to him to make that determination through

17   discussion with the agency.

18            MS. ELLS:  Thank you.

19            THE COURT:  All right.  Now may Ms. Tebrock be

20   excused?

21            MR. LEWIS:  Yes, Your Honor.  No further questions.

22            THE COURT:  Ms. Ells?

23            MS. ELLS:  Yes, Your Honor.  Thank you.

24            THE COURT:  All right.  You're excused.  You may step

25   down.

Ponciano - Exam by The Court

1           THE WITNESS:  Thank you.

2       (Witness excused.)

3           THE COURT:  All right.  Ms. Ponciano?

4           THE CLERK:  Ms. Ponciano, please come to the witness

5   stand, remain standing and raise your right hand.

6       (Witness duly sworn and takes the stand.)

7           THE WITNESS:  Yes.

8           THE CLERK:  Thank you.  You may be seated.  Please say

9   and spell your first and last name for the record.

10          THE WITNESS:  Angela Ponciano, A-N-G-E-L-A,

11  P-O-N-C-I-A-N-O.

12              ANGELA PONCIANO, WITNESS, SWORN

13                       EXAMINATION

14  BY THE COURT:

15  Q   Good afternoon, Ms. Ponciano.

16  A   Good afternoon, Your Honor.

17  Q   I have a few questions for you.  And these are within the

18  subject matter of psychiatric supervisors acting as line staff.

19      So to your knowledge, has CDCR tracked how the number of

20  patients seen by psychiatric supervisors providing direct

21  patient care affects staffing ratios?

22  A   It is not something that has been tracked specifically.

23  Q   Has there been an attempt to analyze how reliance on

24  psychiatric supervisors providing direct patient care would

25  affect staffing ratios?

1    A    When I became aware of the concern, I looked into the

2    number of contacts by supervisors to the specific levels of

3    care in which the staffing proposal was related to.  The

4    staffing proposal was related to the CCCMS and EOP ratios only.

5    And when the issue was brought to my attention after the report

6    was issued, I did look to see how many supervisor contacts were

7    being made.

8    Q    All right.  So when you say "The reporting," you're talking

9    about the Golding report?

10   A    Correct.

11   Q    And so when exactly did you first become aware of the

12   issue?

13   A    When I read the Golding report.

14   Q    And when was that?

15   A    October of 2018.

16   Q    '18.  All right.  And so you said you did look to see how

17   many contacts were being made by supervisors?

18   A    At the time the proposal was developed is that or after?

19   Q    Well, you said after the Golding report.

20   A    After the Golding report, yes.

21   Q    Isn't that what you said?

22   A    Yes.

23   Q    All right.  So when you say you looked to see, what did you

24   find?

25   A    Well, I looked to see in regards to the allegations in the

1   Golding report.  And what I found when it came specific to the

2   CCCMS and EOP levels of care, again, because that's what the

3   staffing proposal was focused on, I found that there were not

4   60 percent of supervisors carrying a full line staff caseload

5   for those levels of care.

6   Q   And did you put that in the form of a written report?

7   A   I did put it into a chart, yes.

8   Q   All right.  To whom did you provide that chart?

9   A   I provided it up my chain of command to my supervisors, and

10  then I also provided it to Gibson Dunn when I met with them.

11  Q   All right.  So when you say "Up the chain of command," just

12  so I'm clear, how does that work or how did it work in October

13  of 2018?

14  A   That would have been to Brittany Brizendine and Katherine

15  Tebrock.

16  Q   But then you also, when I asked for clarification, you

17  referenced the staffing proposal.

18  A   Correct.

19  Q   Did you also do an analysis that was relied on in

20  preparation of the internal document that served as the CDCR

21  staffing proposal?

22  A   After the fact I did.

23  Q   So after the fact?

24  A   Yes.

25  Q   After what fact?

1    A    When I became aware of the concern about supervisors, I

2    looked to see if I was to remove supervisor contact from the

3    data, again, provided just two of the initiatives in the

4    proposal.  The staffing proposal had numerous initiatives and

5    the data set in question in regards to the supervisor was only

6    related to two sections of the staffing proposal.  And so when

7    it was just specific to that staffing proposal, had I not

8    included supervisors -- because the point of the report was

9    really to look at the frequency that patients were being seen.

10   The staffing model had an assumption back in 2009 that patients

11   at the CCCMS and EOP levels of care would be seen one and a

12   half times every 90 or 30 days, and so really was looking at

13   what the patient needs were and the frequency of the patient

14   contacts, not necessarily who was doing the contacts.  It was

15   about the patient needs to see the frequency because the

16   proposal was to change the one-and-a-half times assumption

17   that's used to calculate the ratio.

18   Q    So what I'm trying to understand is you described an

19   analysis you performed after reading the Golding report.

20   A    Correct.

21   Q    Did you do a second analysis also after, a separate,

22   distinct analysis?

23   A    So if I removed the supervisor contacts, it would have been

24   under --

25   Q    Just --

1    A    I'm sorry.

2    Q    Just yes or no.

3    A    Yes.

4    Q    I can't tell if I'm hearing you describe two separate

5    analyses.

6    A    Yes.

7    Q    All right.  So you've already described one to me that you

8    undertook after reading the Golding report.

9    A    Yes.

10   Q    So just clarify for me the second analysis, when did that

11   occur -- when did that occur compared to the analysis you've

12   already described?

13   A    The second analysis occurred later.  That occurred earlier

14   this year when there were subsequent orders regarding this

15   issue and whether or not new data would or should be provided

16   that had been provided previously.

17   Q    All right.  So that was in 2019?

18   A    Yes.

19   Q    And what was the result of that analysis?

20   A    The result of that shows that it would have been

21   underreporting the frequency of contacts for the EOP and CCCMS

22   levels of care, which was the analysis used to propose and

23   where we landed going from assumption and building of ratios of

24   patients being seen one and a half times to patients being seen

25   one and a quarter times, but --

1    Q    So specifically what would have been underreported?

2    A    So where -- what the reports show is that for the CCCMS

3    patients, they were being seen on average 1.07 times every 90

4    days.  Had I removed the supervisor contacts, it would have

5    shown that they were being seen .98 times every 90 days, which

6    would have been an underreporting.

7    Q    All right.  Do you know was the result of that latter

8    analysis shared with the Court in any way?

9    A    No.

10   Q    Was it shared with the Special Master?

11   A    No.

12   Q    Or any member of the Special Master's team?

13   A    No.

14   Q    At any point in time did you discuss with the Special

15   Master how the use of psychiatric supervisors to perform direct

16   patient care was affecting CDCR's ability to comply with the

17   2009 staffing plan?

18   A    No.  We have not had those discussions yet.

19   Q    When do you plan to?

20   A    We plan to have them in the near future.  It is one of the

21   items that was delegated to the Special Master.  The Special

22   Master's team has been in headquarters and we've been working

23   on a number of issues, and that is on the list to discuss.

24   Q    Is there a reason that you have not previously raised the

25   issue with the Special Master?

1    A    May I ask what issue?

2    Q    The results of your analyses, for example.  Any issues

3    related to the use of psychiatric supervisors performing direct

4    patient care and how that affects compliance with the 2009

5    staffing plan?

6    A    So, Your Honor, I don't believe it's an issue.  I believe

7    that when -- for all classifications, when you have a vacancy,

8    when you have a line staff member out on vacation or leave,

9    that when you have that void, supervisors will come in and fill

10   in on some of the work.  I also -- in the program guide it

11   specifically states in the crisis bed level of care that the

12   supervisors will see patients.  And I --

13   Q    You think is there a tipping point?  If supervisors spend a

14   certain percentage of their time does it go beyond their

15   filling in, as you say?

16   A    So I think that the priority is the patient care.  And then

17   I think from there what you see as positions or vacancies are

18   filled then the supervisor's work begins to decrease.

19   Q    Right.  But, still, is there a way to know when the filling

20   in has gone too far, in your view?  If a supervisor is spending

21   30 percent of his or her time filling in, is that beyond --

22   A    I haven't done an analysis to determine how that impacts

23   the supervisor's other responsibilities.

24   Q    Do you, in your own mind, see a certain percentage of time

25   beyond which, that is, beyond what is contemplated by the

Ponciano - Exam by The Court

1    staffing plan?

2    A    Well, what I have seen is in the analysis that I completed

3    and provided to Gibson Dunn, what that chart shows is that

4    there's actually one supervisor at one institution that had the

5    highest caseload, and that individual was spending about 50

6    percent of his or her time seeing patients.  At that point that

7    institution had about a 52 to 55 percent vacancy rate.

8         I reran the same data for the spring of 2019, and that

9    supervisor is no longer seeing patients and is at an 83 percent

10   fill rate.  So for approximately a year and a half, that

11   supervisor spent a portion of his or her time filling in behind

12   the line staff and then once he was able to fill positions is

13   no longer spending that same time.

14   Q    So it would have been a concern if it continued beyond that

15   period of time?

16   A    I think it would be a concern, yes.

17   Q    So the Court has been receiving errata.  Are you familiar

18   with the errata or corrections that the Court has been

19   receiving in the last week, two weeks?

20   A    I'm not.

21   Q    All right.  So you're not involved in preparing those for

22   the Court?

23   A    No.

24   Q    All right.  So during your work with CDCR Mental Health,

25   has any person ever directed you to manipulate data for any

Ponciano - Exam by The Court

1    purpose --

2    A    No.

3    Q    -- related to remediation in Coleman?

4    A    Sorry.  No.

5    Q    Have you ever directed anyone else to manipulate data?

6    A    No.

7    Q    Has any person ever directed you to provide misleading data

8    to the Special Master?

9    A    No.

10   Q    Has any person ever directed you not to correct misleading

11   data that you knew had been presented to the Court --

12   A    No.

13   Q    -- to the Special Master?

14   A    No.

15   Q    And have you ever played a role in telling someone not to

16   correct inaccurate data presented to the Court --

17   A    No.

18   Q    -- or the Special Master?

19   A    No, Your Honor.

20   Q    Have you ever agreed that incorrect information could be

21   filed with the Court?

22   A    No.

23   Q    Do you think there's a margin of error that could be

24   applied to Coleman data reporting, that is, as long as the

25   number is within a certain percentage one way or the other

1    that's still accurate?

2    A    I'm not involved in the details of the data reporting.

3    That's really not what I'm over, so I don't make those

4    decisions or have any part of that or determining if there is a

5    percentage.

6         THE COURT:  All right.  Those are my only questions at

7    this point in time.

8         Ms. Ells?

9         MS. ELLS:  Thank you, Your Honor.

10                          EXAMINATION

11   BY MS. ELLS:

12   Q    Good afternoon, Ms. Ponciano.

13   A    Good afternoon.

14   Q    I believe that you were just discussing with the Court an

15   analysis you performed in 2019 where you looked at whether or

16   not there had been underreporting of frequency of contacts, and

17   you describe that you found there had been for the CCCMS

18   population and it went, and correct me if I'm wrong, from 1.07

19   to .98 times per every 90 days when you took out the

20   supervisors; is that right?

21   A    Correct.  So for the purpose of the report in regards to

22   the actual frequency of patients being seen, which was the

23   purpose of the report, for that portion of the proposal, and

24   when you remove the supervisor contacts, yes, it decreases the

25   frequency, which is underreporting if you don't include the

Ponciano - Exam by Ells

1    supervisors.

2    Q    Okay.  Did you perform a similar analysis for EOP patients?

3    A    I did.  I don't recall how it changed it, but it decreased

4    it as well.

5    Q    Okay.  So you found that there had been some degree of

6    underreporting with respect to the EOPs as well?

7    A    No.

8              MS. GARSKE:  Objection, misstates testimony, Your

9    Honor.

10             THE COURT:  Sustained.  As the --

11   BY MS. ELLS:

12   Q    My understanding is that you said that the -- what

13   terminology would you use for the change that occurred when you

14   studied the EOP population and took out the portion of the

15   contacts that were conducted by supervisors?

16   A    Had I not included supervisors like I did --

17   Q    Right.

18   A    -- I provided a report that included all contacts, which I

19   believe is the accurate report to provide for the proposal.

20        If I was to have removed the supervisor contacts and then

21   provided that report to everybody, I would have been

22   underreporting.

23   Q    So the number would have gone down?

24   A    Correct.

25   Q    Okay.  So you provided -- so -- but you have not provided

1    that analysis to the Special Master or plaintiffs or the Court?

2    A    No.

3    Q    And you didn't bring it with you today?

4    A    No.

5    Q    And you also produced some data to the neutral expert

6    during the investigation, and that's a separate pot of data

7    than what you're talking about today, right?

8    A    Correct.

9    Q    Okay.  Or so far.

10       All right.  So for that -- for that data, you included an

11   ad hoc analysis of November 2017 through March 2018, and you've

12   included a chart.  And I'm going to provide that to you so that

13   we can talk about it.  This is Plaintiffs' Exhibit 201.

14       And could you please turn to what's marked at the bottom as

15   page 81?  This is the Gibson Dunn neutral expert report that

16   was filed with the Court, ECF 6147.  Is this the chart that you

17   provided?

18   A    Yes, it is.

19   Q    So this chart only shows 20 prisons; is that right?

20   A    Correct.

21   Q    What happened to the other 15?

22   A    So this chart shows all of the prisons that a supervising

23   psychiatrist or chief psychiatrist had a contact with a CCCMS

24   or EOP level of care.

25   Q    So you're saying that for the 15 prisons that are not

1    included, there were zero supervisory contacts performed in

2    this time period?

3    A    For CCCMS and EOP levels of care, yes.

4    Q    And so that's true even though --

5    A    Excuse -- may I correct myself?

6    Q    Sure.

7    A    I apologize.

8        The other thing to understand is this is specific to

9    initial and routine contacts.  It does not include IDTTs and

10   it -- because the staffing proposal and the data related to the

11   staffing proposal was specific to CCCMS, EOP initial and

12   routine contacts, this analysis matches that same report.

13   Q    Okay.  So even though there were EOP programs at multiple

14   institutions not included in this chart, which also had

15   supervisory staff at work, none of those places had any

16   supervisory contacts during this time frame?

17   A    When I ran the supervisor's name, which is how we did this

18   report because we know EHRS is not reliable, we ran by

19   supervisor name and by this specific type of contact and no,

20   there were none in the EHRS system.

21   Q    Okay.  And is every contact captured in the EHRS system

22   that you're aware of?

23   A    As long as it's entered by the provider.

24   Q    And is it uncommon for people not to enter contacts?

25            MS. GARSKE:  Objection, calls for speculation.

Ponciano - Exam by Ells

BY MS. ELLS:

Q   Are you aware whether or not it occurs with any frequency
that appointments are not entered into the system properly in
EHRS?

          MS. GARSKE:   Objection, calls for speculation.

          THE COURT:   Just answer yes or no.   Overruled.   Are
you aware?

          THE WITNESS:   I have been told.   I have not
independently observed that.

BY MS. ELLS:

Q   But you've been told that?

A   Yeah.

Q   I'd like to talk to you briefly about the tracking of
supervisors acting as the line staff.

     I believe you've testified that there is no mechanism to do
that right now in EHRS; is that correct?

A   I believe what I said is it's not something we do do.
There's not a performance report in EHRS that allows accurate
reporting of that.   In order for me to develop a report, do an
ad hoc query, it takes multiple steps.   We do an ad hoc query
to pull down every contact and then I have a State
Comptroller's Office appointments report so I can verify the
name of the actual supervisor and that they are in the
classification of supervisor, and then I do a cross-reference,
and so I will run that individual's name.

Ponciano - Exam by Ells

1    Q    Okay.  And have you looked into creating a formalized

2    process rather than this ad hoc process for tracking these

3    contacts?

4    A    I have not.

5    Q    And have you ever evaluated how often supervisors engage in

6    other direct patient care, such as attending IDTTs, performing

7    medication reconciliations or any of those other direct patient

8    care duties?

9    A    I have not looked into that.

10   Q    Have you ever asked anyone if it's possible to create a

11   report that pulls all of the contact or other line staff duties

12   that are performed by supervisors, whether that's even

13   possible?

14   A    I haven't asked, but to my knowledge, because line staff

15   are able to change their title in the EHRS system to

16   supervisor, to my knowledge I don't believe it's possible, as

17   long as that is able to occur.

18   Q    So people are just allowed to change their title to pick

19   anything they want?

20   A    That's my understanding.

21   Q    Okay.  And do you have any -- a mechanism available to

22   track whether patients are assigned to a supervisor as their

23   primary psychiatrist?

24   A    Not that I'm aware of.

25   Q    Okay.  And have you ever made any phone calls to

1  institutions to find out how often that is occurring?

2  A   No, I have not.

3  Q   Have you conducted any survey to ask them -- knowing that

4  you're aware that not all contacts are captured in EHRS, have

5  you ever tried to conduct a survey or do anything else to

6  actually directly engage with the institutions to find out that

7  information?

8  A   I did not.  And because the proposal -- the one initiative

9  in the proposal was just specific to that one-and-a-half-time

10  assumption, which was even more specific to the routine

11  contacts, that was what we were analyzing to verify against the

12  staffing proposal.  So, no, I did not look at those other

13  things.

14  Q   And you were largely responsible for the design and

15  development of the 2018 staffing proposal, right?

16  A   Yes.

17  Q   And that proposal ultimately would have resulted in cutting

18  79 line psychiatry positions system-wide, which is

19  approximately 20 percent?

20  A   Correct.

21  Q   And if that had happened and been ordered by the Court,

22  that would have put CDCR in compliance with the prior court

23  orders requiring a 90 percent fill rate, correct?

24  A   As I recall, based on the allocating numbers and filled at

25  that time.  As you know, they change frequently, so at that

Ponciano - Exam by Ells

1   time, yes.

2   Q    So the numbers in that proposal, did you come up with those

3   numbers?

4   A    Which numbers?

5   Q    The numbers in the proposal of reductions.  Numbers of

6   staff to be reduced that were presented in those -- in that

7   staffing proposals.

8   A    Well, those were calculated based on the change in the

9   assumptions and methodologies.

10  Q    So did you do that calculation?

11  A    Yes.

12  Q    So you provided those numbers.  And so Dr. Golding was the

13  chief of psychiatry.  Did you ask him if he felt like

14  reductions of those numbers and magnitude would allow for the

15  system to provide constitutionally adequate patient care?

16  A    In my discussions with Dr. Golding in regards to the

17  staffing proposal, they were specific to his input and/or

18  agreement on the changes of the methodologies and assumptions.

19  Whatever the bottom line number was going to be, if we all

20  agreed that the assumptions and the methodology used back in

21  2009 no longer applies today, the calculation of the bottom

22  number is what it is based on the change of those

23  methodologies.

24  Q    But did you ever provide him those numbers and ask if he

25  thought that psychiatrists across the system could provide

1    adequate patient care with those kinds of reductions?

2    A    I don't know that I asked specifically.  He has stated to

3    me previously that he thinks we have too many psychiatrists.

4    Q    Interesting.  Okay.  You might not be surprised to hear

5    that he does not currently hold that position.

6         So Dr. Golding, did you actually send him ever the copy of

7    the staffing proposal in any iteration?

8    A    No.  That's -- Michael or Dr. Golding does not report to

9    me.  I'm not his supervisor, so --

10   Q    Okay.  But during the development of this process, you did

11   not provide the head of psychiatry for the department with the

12   actual proposal to reduce 20 percent of his staff, the

13   allocations of 20 percent of his staff?

14   A    So my portions of the proposal I submitted to my boss,

15   which is what I'm responsible to do, and then we have the

16   internal discussions, so that proposal, to my knowledge, was

17   shared because I later was in a meeting with Dr. Golding and

18   Dr. Kuich in which we talked about each of the initiatives in

19   the proposal.

20   Q    But you never provided it to him?

21   A    I did not.

22   Q    Okay.  And your direct supervisor is Dr. Brizendine?

23   A    Dr. Brizendine and then Katherine Tebrock was.

24   Q    So you had meetings during the development of this proposal

25   with Dr. Brizendine and with Ms. Tebrock; is that correct?

1   A    Yes.

2   Q    And you didn't bring in Dr. Golding.  Did you bring in

3   Dr. Kuich at that point during the development of the proposal?

4   A    No.  I you spoke to Dr. Kuich in the development of the CIT

5   portion of the proposal.

6   Q    And that's the proposal where there would be a reduction in

7   crisis intervention staff and a replacement of those staff with

8   eight telepsychiatrists to perform on-call work for the entire

9   system.  Is that what you're referring to?

10  A    Correct, but it wasn't for the entire system, but yes.

11  Q    Okay.  And that number eight, did you come up with that

12  number?

13  A    It was a suggested number, yes.

14  Q    You mean you were --

15  A    Yes.  I suggested the number.

16  Q    Okay.  So you came up with that number.  Did you perform

17  any analysis before you --

18  A    I had a discussion with Dr. Kuich.

19  Q    Did you ever have another --

20          THE COURT:  One at a time.

21          MS. ELLS:  Pardon me.

22  BY MS. ELLS:

23  Q    Did you propose that number to Dr. Kuich?

24  A    I don't recall if that's the specific number.  I recall

25  having a discussion with him about this and asking specifically

1    how many institutions the current provider was covering at that

2    time, which he informed me that it was six.  And he and I

3    talked about could that increase to more; how many nights per

4    week that person was working if we were to add more and, you

5    know, just kind of six or seven times, eight, and how many

6    nights per week.

7        But also part of that discussion was we would be able --

8    how many would we be able to hire?  At that time telepsychiatry

9    had been advertising for that nighttime shift and really had

10   not been receiving a lot of applications.

11       So part of that discussion was, you know, how about eight.

12   Let's do the math.  How many nights per week, how many

13   institutions.  In addition, the on-site staff have a right

14   to --

15   Q   Could I just follow up --

16   A   Yes.

17   Q   -- on a portion of what you said?

18           MS. GARSKE:  Your Honor, may I --

19           THE COURT:  You're at 15 minutes.

20           MS. GARSKE:  -- request that the witness be allowed to

21   answer, not be interrupted?

22           THE COURT:  Well, it's been a two-way street.

23           MS. GARSKE:  Well, just this last portion, Your Honor.

24   I think --

25           THE COURT:  Okay.  Well, you need to not talk over

Ponciano - Exam by Ells

1   me --

2           MS. GARSKE:  I'm sorry, Your Honor.

3           THE COURT:  -- while you're at it.

4           MS. GARSKE:  I'm sorry.

5           THE COURT:  You're at 15 minutes, and I didn't even

6   take my time.

7           MS. ELLS:  I need about 2 minutes --

8           THE COURT:  All right.

9           MS. ELLS:  -- is that acceptable?

10          THE COURT:  If it's focused questions and just answer

11  the question --

12          THE WITNESS:  Yes.

13          THE COURT:  -- no narrative.  All right?

14  BY MS. ELLS:

15  Q    So you proposed the number eight to Dr. Kuich?

16  A    I believe so, yes.

17  Q    And part of your reason for picking that number is you were

18  concerned that you couldn't hire more than eight?

19  A    Both of our concerns.

20  Q    Did Dr. Kuich -- did you provide some data analysis to

21  Dr. Kuich that he could look over and think about before he got

22  back to you as to whether or not eight was an appropriate

23  number?

24  A    No.  He and I sat together and talked and discussed the

25  math.

1  Q    Did you pull him out of a meeting when he was meeting with

2  other people to discuss that math with him?

3  A    I don't recall that.

4           THE COURT:  That's more than two questions.

5           MS. ELLS:  That's it.  Thank you, Your Honor.

6           THE COURT:  All right.  Ms. Garske?

7           MS. GARSKE:  Yes, Your Honor.

8           THE COURT:  All right.  You may proceed.

9                              EXAMINATION

10 BY MS. GARSKE:

11 Q    Ms. Ponciano, we've talked a lot about topics and I'd like

12 to bring you back to the 79 positions that were being proposed

13 to be cut under the 2018 staffing proposal.  Are you familiar

14 with how that breakdown was identified in the proposal?

15 A    Yes.  I -- yes.  I have a recollection of that breakdown.

16 Q    And we talked about there was a number 8 for

17 telepsychiatrists.  Was that part of the 79 positions that was

18 involved -- that was proposed to being cut?

19 A    No.  Those positions would remain.

20 Q    And how many would the eight telepsychiatry positions

21 impact the 2018 staffing proposal?

22 A    The original proposal was to reduce all of the positions

23 allocated for crisis intervention.  The 2009 staffing model

24 allocated a half-time PY specific to covering weekends and

25 holidays for crisis intervention.  And nine years later we knew

1  it was not implemented as assumed or proposed in the 2009

2  staffing model.

3      After further discussions of trying to help with retention

4  and assist on-site staff with on call and sort of a pilot of a

5  nighttime telepsych provider who was helping some of the

6  institutions, there were discussions about holding back some of

7  that original reduction of the CIT positions to staff more of

8  the nighttime telepsych, to assist with on call and help with

9  retention.

10 Q    And was it your understanding and belief that Dr. Golding

11 and Dr. Kuich was supportive of that proposition?

12 A    Yes, it was.  We -- I spoke with Dr. Kuich.  He was the

13 chief of telepsychiatry at the time, and that's who this would

14 impact.  And what we discussed is we weren't sure if eight was

15 the right number.  We knew there was no magic to come up with

16 that number.  We wanted to keep positions aside for that and we

17 both had a concern of whether or not we would be able to fill

18 all of those nighttime positions.

19     And we also discussed if we were able to fill them and we

20 needed more, we would be able to augment that and provide more

21 positions.  So it was never an eight or nothing and no change

22 going forward.  It was a proposal.

23 Q    Did Dr. Golding ever tell you it was ridiculous to consider

24 only eight telepsychiatrists to cover the state?

25 A    No, he did not.

1    Q    How many line psychiatrists were being proposed cut in that

2    total number of 79 in the 2018 staffing proposal?

3    A    All 79.

4    Q    Of those 79 --

5              THE COURT:  Can you pull the microphone closer to you?

6              MS. GARSKE:  Sure.

7    BY MS. GARSKE:

8    Q    Of those 79, how many would have those supervising care for

9    the CCCMS and EOP patient level of care?

10   A    The number specific to changing from a one-and-a-half-time

11   assumption to one-and-a-quarter-time assumption was

12   approximately 25 of the 79.

13   Q    And was that number discussed with Dr. Golding and

14   Dr. Kuich?

15   A    That number was provided to everybody in one of the all

16   parties workgroups.

17   Q    And when you say "everybody," who are you referring to?

18   A    The plaintiffs, the Special Master team and the mental

19   health, headquarters leadership team that attended the

20   workgroups, including Dr. Golding.

21   Q    At any time during those meetings did anyone ask you

22   whether or not it was the issue of -- having senior

23   psychiatrists performing line work was an issue with regard to

24   the data that you were providing?

25   A    No.  It was never raised in the work-up discussions.

1   Q    Did you ever discuss or infer to anybody that the data that

2   you provided in the 2018 staffing proposal was only line

3   psychiatrists?

4   A    No.

5           MS. GARSKE:   I'm going to refer Court and counsel to

6   the Joint Exhibit O.

7   BY MS. GARSKE:

8   Q    I believe it's in a binder that's available.  Is there a

9   binder there, Ms. Ponciano?

10  A    Yes.

11  Q    Okay.  Do you have it there in front of you?

12  A    I do.

13  Q    Do you recognize what's been marked as Joint Exhibit O?

14  A    I do.

15  Q    And what is it?

16  A    This would be the staffing proposal as to where we were in

17  negotiations in June of 2018.

18  Q    And this is the document that was provided to the

19  plaintiffs and the Special Master?

20  A    Yes.

21  Q    And this is the document that you helped prepare?

22  A    Yes.

23  Q    And does it fairly and accurately depict the 2018 staffing

24  proposal as it was submitted to the Special Master and the

25  plaintiffs?

1    A    Yes.  This was before the final with additional

2    negotiations, but, yes, this is where we were at that time.

3              MS. GARSKE:  Your Honor, we would request to move

4    Joint Exhibit O into evidence.

5              THE COURT:  Any objection?

6              MS. ELLS:  No, Your Honor.

7              THE COURT:  All right.  O is admitted.  It's filed on

8    the Court's docket.

9         (Joint Exhibit O admitted in evidence.)

10             MS. GARSKE:  Thank you, Your Honor.

11   BY MS. GARSKE:

12   Q    Ms. Ponciano, I'd like to refer you -- we've talked a lot

13   about the data and the reporting and the underreporting that

14   you were looking at, and I would like for you to turn to page

15   32 of Joint Exhibit O.  What is this document?

16   A    This document was specific to the initiative in the

17   staffing proposal in which the assumption in the 2009 staffing

18   model is that EOP patients would be seen by their psychiatrists

19   one and a half times every 30 days.

20        This report is specific to the frequency of the patients

21   being seen.

22   Q    Does the impact of the frequency in your mind when you

23   prepared this report have anything to do with who was seeing

24   them?

25   A    No.

1    Q    Why not?

2    A    This was specific to identifying what the patient's needs

3    were and determining whether or not they actually were in line

4    with the 2009 assumption.

5         So if the patients are scheduled -- excuse me -- are

6    scheduled to be seen every 30 days, this shows if they actually

7    are being seen one and a half times every 30 days regardless of

8    who they're being seen by, because we didn't believe that

9    psychiatrists were scheduling to see their patients one and a

10   half times in the 30 days.  That would be something that they

11   would have to initiate themselves.  We didn't know that that

12   was the needs of all of the CCCMS or EOP patients, so it was

13   really about focusing on the patient need.

14   Q    And you performed the same type of analysis for the EOP

15   patient level care?

16   A    This is the EOP.  I think page 31 is the CCC.

17   Q    Oh.  I apologize.  You're right.  I'm looking at the ECF

18   number.  So before I was asking about the EOP.  You performed

19   the same level of care for the CCCMS level of care, correct?

20   A    Yes.

21   Q    Okay.  And you had indicated that if you had removed the

22   contacts being done by the senior psychiatrists, it would have

23   decreased the frequency rate.  Why was that a concern?

24   A    That was a concern because we were in negotiations and when

25   we discussed this data in the workgroups and we showed that for

1    the CCCMS it was an average of 1.07 times every 90 days and

2    even a little less for the EOP, every 30 days, even though the

3    negotiations where we landed was developing the calculation,

4    including a ratio, an assumption of 1.25 times, so one and a

5    quarter times.  So that's even left a little bit of a buffer

6    for some extra contacts that may need to occur.

7         If we would have removed the supervisor, the number that we

8    would have been negotiating with would have started even lower

9    because the initial proposal was to make the assumption in line

10   with the program guide, which is just the one time.  By showing

11   the actual frequency, we landed a little bit higher.

12   Q    Okay.  And earlier we talked about this issue of promoting

13   oneself in the EHR system.  What do you mean by promoting

14   yourself?

15   A    So to my knowledge, I'm not an EHRS expert, but from what I

16   understand, in order for a psychiatrist to prescribe a

17   nonformulary medication, the system was developed with the

18   ability for a psychiatrist to change their title to a

19   supervisor in order for that medication to be prescribed.

20   Q    Before Dr. Golding issued his October 2018 report, did he

21   ever come to you and indicate that he had concerns with the

22   data that you prepared -- for the CCCMS level of care and the

23   EOP level of care that were used to support the 2018 staffing

24   proposal?

25   A    No, he did not.

1    Q    Ms. Ponciano, did you knowingly submit false data to the

2    Court in an attempt to comply with the Court's order?

3    A    No, I did not.

4            MS. GARSKE:  Your Honor, at this time I have no

5    further questions for Ms. Ponciano.

6            THE COURT:  All right.  Do you have any follow-up

7    questions, Ms. Ells?

8            MS. ELLS:  Yes, just about two to three minutes.

9            THE COURT:  All right.

10                              EXAMINATION

11   BY MS. ELLS:

12   Q    So Ms. Ponciano, I want to talk a little bit more about the

13   charts that you were just discussing at pages 31 and 32 of

14   Joint Exhibit O.  So these charts show how often contacts

15   occurred; is that correct?

16   A    Correct.

17   Q    Now, the system was staffed at about 73 percent of

18   psychiatry at this point.  Is it possible that people needed to

19   be seen more often than this but there simply weren't enough

20   staff to do it?

21   A    That was part of our discussion in our workgroups, in our

22   negotiations, and where he landed at the 1.25.

23   Q    So it is possible that they needed to be seen more

24   frequently than this but that there simply weren't sufficient

25   numbers of psychiatrists to see them?

1    A    Correct, which is why we agreed to the 1.25.

2    Q    And so you don't actually know how many of these -- you

3    don't know -- .94 on page 32, you don't know how much that went

4    down when you reran that data without the -- without the

5    supervisors, right?

6    A    I don't recall.

7    Q    Okay.  Could you flip to page 30 of that same exhibit?  So

8    this is a chart called "Timely psychiatry contacts from 10/1/17

9    through 3/31/18 for main line CCCMS."  And this reports on how

10   timely psychiatry contacts were occurring; is that correct?

11   A    Yes.

12   Q    And included in this is all of the supervisory contacts,

13   correct?

14   A    It should include -- this is a performance report off of --

15   this was not an ad hoc query.  This is based off of the -- this

16   is a performance report.

17   Q    So any contributions from supervisory staff would count

18   towards this compliance rate, correct?

19   A    I believe so.

20            MS. ELLS:  Thank you.

21            THE COURT:  All right.  May this witness be excused,

22   Ms. Ells?

23            MS. ELLS:  Yes, Your Honor.

24            THE COURT:  Ms. Garske?

25            MS. GARSKE:  Yes, Your Honor.

1    THE COURT:  All right.  You're excused, ma'am.  You

2  may step down.

3    (Witness excused.)

4    THE COURT:  We're going to take a short break just to

5  get the video set up, and then we'll have Dr. Rekart on the

6  line.

7    (Recess at 2:23 p.m. to 2:33 p.m.)

8    THE COURT:  All right.  We're back on the record.  We

9  have Dr. Rekart on the video monitors.

10    Dr. Rekart, you can hear us?

11    THE WITNESS:  Yes, I can.

12    THE COURT:  All right.  Can plaintiffs see Dr. Rekart

13  on their video monitor?

14    MS. ELLS:  Yes.

15    THE COURT:  All right.  And defendants?

16    MR. FISHER:  Yes, Your Honor.

17    THE COURT:  All right.  So I'm going to have

18  Ms. Schultz swear Dr. Rekart.  Ms. Schultz, can you -- are you

19  able to communicate with Dr. Rekart?

20    THE CLERK:  Yes, Your Honor.

21    THE COURT:  All right.

22    THE CLERK:  Doctor, please stand and raise your right

23  hand.

24    THE COURT:  You can remain seated, how about that.

25    THE WITNESS:  Okay.

1        (Witness duly sworn and takes the stand.)

2              THE WITNESS:  Yes, I do.

3              THE CLERK:  Thank you.  You may put your hand down.

4              Please say and spell your first and last name for the

5    record.

6              THE WITNESS:  It's John Rekart, J-O-H-N, R-E-K-A-R-T.

7                    JOHN REKART, WITNESS, SWORN

8                            EXAMINATION

9    BY THE COURT:

10   Q    All right.  Dr. Rekart, I know you can see me.  I can see

11   an image of what you can see.  I don't think the way the camera

12   is set up that there's eye contact, but you can see and hear

13   me?

14   A    Yes, I can.

15   Q    All right.  I am going to ask you several questions in the

16   general subject area of the "appointments seen as scheduled"

17   indicator.  You know what I mean when I reference that?

18   A    Yes, I do.

19   Q    All right.  What role did you have in the development of

20   the "appointments seen as scheduled" indicator?

21   A    None.

22   Q    When did you learn that it had been developed incorrectly?

23   A    Sorry.  I think the premise of the question I'm having a

24   hard time with.  I don't think it was developed incorrectly.

25   Q    All right.  What would you say?  Was it changed at some

1    point?

2    A    I think it was functioning as it was designed, from what I

3    can read from the business rules.

4    Q    All right.  At all points in time, say from 2015 to

5    present?

6    A    To be honest, I didn't look at that very frequently.  It

7    wasn't a very important measure, as far as I was concerned.

8    Q    And why is that?

9    A    It was a measure that was designed for the chiefs of mental

10   health to help with their resourcing as basically kind of an

11   indicator that was supposed to help them get a sense of how

12   their schedulers were doing.

13   Q    Was it not also shared at some point with the Special

14   Master, the information generated using the indicator?

15   A    I don't know.

16   Q    When did you learn that there was some dispute about that

17   the "appointments seen as scheduled" indicator was accurate?

18   A    It might have --

19       I'm sorry.  Can I ask the Court a clarifying question?

20   Q    You may.  I can decline to answer.

21   A    Okay.  Are you talking about the description or the

22   indicator itself?

23   Q    Well, why don't you respond in a way that helps me

24   understand your position?

25   A    Oh, okay.  I think I heard about it possibly after the

1  Golding report came out.  And the only thing that I'd heard was

2  incorrect was that it had -- the description had not been

3  updated to reflect the changes of elements outside of the

4  institution's control.

5  Q   And do you believe it should have been updated?

6  A   Yes.

7  Q   And do you understand why it was not?

8  A   From what I heard, it was just an oversight.

9  Q   All right.  I'm just being -- is there a court reporter in

10  the room with you?

11        COURT REPORTER:  Yes, there is.  I am here.

12        THE COURT:  Why is there a court reporter there?  Who

13  arranged for a court reporter?

14        MR. FISHER:  I think that was an oversight on our

15  part.  We didn't intend to arrange for a court reporter.  We

16  just intended to arrange for --

17        THE COURT:  I'm sorry.  I was not realizing.  I don't

18  see that person, but I now see on the table.  There's only one

19  official court record, and that's being created by this Court.

20        MR. FISHER:  Yes, Your Honor.

21        THE COURT:  Can I direct the court reporter to cease

22  and --

23        MR. FISHER:  Yes.

24        THE COURT:  -- leave the room?

25        MR. FISHER:  Yes, ma'am.

1          COURT REPORTER:  Yes.  Yes, your Honor.

2          THE COURT:  I'm sorry there's some misunderstanding,

3    but we have a court reporter who's able to see and hear, and we

4    can only have one record, as I'm certain you appreciate.

5          COURT REPORTER:  Yes, Your Honor.  I'll be glad to.

6          THE COURT:  All right.  We'll give you a moment to

7    depart.

8          COURT REPORTER:  Thank you.

9          THE COURT:  Is there anyone else in the room with you,

10   Dr. Rekart?

11         THE WITNESS:  No.

12         COURT REPORTER:  I need to make two trips.

13         THE COURT:  All right.

14         COURT REPORTER:  Thank you.  All clear.  Thank you.

15   BY THE COURT:

16   Q   All right.  So now, Dr. Rekart, there's no one else in the

17   room?

18   A   There's no one else in the room.

19         THE COURT:  All right.  And to the extent there's any

20   issue about any record that was being created, that is

21   disregarded in its entirety.  This Court is creating the record

22   of this proceeding.

23         MR. FISHER:  Yes, Your Honor.

24   BY THE COURT:

25   Q   So we were talking, Dr. Rekart, about the description.  You

Rekart - Exam by The Court

1    made a distinction between the indicator and a description and

2    you thought that was, in fact, inaccurate.  Do I have that

3    correct?

4    A    Yes.  It failed to note that events beyond their control

5    were not counted as a missed appointment or a moved

6    appointment, I should say.

7    Q    And when you use the word "description," what exactly is

8    that applied to, in your mind?

9    A    It's the descriptor of the actual indicator.  And usually

10   it -- if it's a ratio, it talks about the denominator and

11   enumerator and what those mean and where the data points are

12   pulled from.  It's to help people reading it to understand what

13   they're looking at.

14   Q    And why was that description incorrect, do you know?

15   A    I think it -- I had heard, I think, from -- I'm not sure, I

16   think from Dave that it had just -- they had missed that step

17   in updating the description.

18   Q    And when you say "Dave," who do you mean?

19   A    David Leidner, sorry.  Dr. Leidner.

20   Q    And what "they" had missed.  Who's the "they"?  "They had

21   missed that step in updating the description."  Who's "they"?

22   A    You know, that's a good question.  I think it was either

23   Dave or sometimes Dave had help updating that.

24   Q    And where was that help residing?

25   A    Sometimes another one of my staff actually helped

Rekart - Exam by The Court

1   Dr. Leidner update those.

2   Q    Anyone else?

3   A    Not that I'm aware of.

4   Q    So once he became aware of the description being

5   inaccurate, what steps did you take to ensure it was correct?

6   A    This happened all without my awareness.  This -- I had

7   found out about all of this after the fact.

8   Q    Are you saying it was corrected by the time you found out

9   about it?

10  A    As far as I'm aware, yes.

11  Q    How do you know that it's been corrected if, in fact, it

12  has, or do you?

13  A    Yeah.  At that point I don't know factually.  I was told it

14  was.

15  Q    By whom?

16  A    I don't recall at this point.

17  Q    Do you know if any data reported using the incorrect

18  indicator was ever reported to the Special Master in the

19  Coleman case?

20  A    I'm not aware of that.

21  Q    Was any information using the incorrect indicator or

22  descriptor reported to the Court?

23  A    I'm not sure about that either.

24  Q    Do you have any indication that it was?

25  A    No, I don't.

1    Q    Do I understand correctly that you're one of two or you

2    were one of two CDCR Mental Health representatives to what some

3    people have been referring to as the CERNER committee?

4    A    Yes.  I was the business owner for mental health on the

5    deployment of the electronic health record.

6    Q    For what period of time?

7    A    I don't recall the dates, but it was pre-go live when they

8    were going into testing and some of development of the content

9    all the way through the completion of the adoption state-wide

10   and well into post -- where the project went from a project to

11   being maintenance and operations.

12   Q    So roughly what time frame, if you had to assign years to

13   it?

14   A    Oh, may be 2014 up through 20 -- up until I left in 2019.

15   Q    And when you say "business owner," what does that mean to

16   you?

17   A    Basically, the buck stopped with me about -- initially

18   trying to make sure that we had a very good adoption and that I

19   interfaced with CERNER and our -- the clinical advisory team

20   around decisions and relaying decisions that our team had made

21   about how to configure the system up through configuration of

22   the system post go live.

23        I also helped develop the training because we developed a

24   lot of content that was not in CERNER and as well as the

25   strategy for go live and implementation.  I had some help in

1    the design of that.  I mean, I was instrumental in the design

2    of that for the mental health department.

3    Q    So when you say "we," you at all times are referencing

4    yourself as a representative of mental health?

5    A    Yes.

6    Q    All right.  Were you the only quote/unquote business owner

7    for mental health on the CERNER committee?

8    A    I'm sorry.  I was up until they appointed Dr. Tebrock to

9    also be a business owner for psychiatry and we split that off.

10   Q    So as compared to psychiatry did you have a distinct

11   specialty?

12   A    No.  I -- for most of mental health minus psychiatry.  I

13   worked with Dr. Kuich very closely around the integration of

14   those requirements.

15   Q    As a member -- as a business owner for mental health on

16   that committee --

17   A    Yes.

18   Q    -- was it your responsibility to be certain that data being

19   collected for reporting to the Coleman court was maintained in

20   a way that would comply with Coleman court orders?

21   A    No.  That's a completely different committee.  That

22   committee was more of a change management committee that worked

23   with any changes to the electronic health record.

24   Q    With no implications for Coleman?

25   A    Not directly.  Indirectly, you know, it's the data on

Rekart - Exam by The Court

1   the -- how the data is being collected on the front end, you

2   know, will affect how it's being reported on in the back end.

3   Q    Correct.  So couldn't that have implications for reports

4   made to the Court?

5   A    Yes, indirectly.

6   Q    But it was not -- if you were the business owner, why was

7   it not part of your profile to be alert to that issue?

8   A    Well, I was for -- so I spent a lot of time and we

9   developed a number of -- Dave Leidner and I and Laura Ceballo

10  developed a number of data flags to ensure compliance with the

11  workflow so that the -- it led to data integrity.  So the

12  biggest single threat to data integrity is workflow variation.

13  So we did a number of things, including analytics and sending

14  graphs out to the chiefs about compliance around data -- data

15  collection.

16  Q    And was the data collection for -- what was the purpose of

17  the data collection, as you understood it?

18  A    So, you know, primarily it's for the patient care and

19  patient safety, so access to care.  It was designed to try to

20  maximize and optimize access to care and patient safety and

21  with a mind to reporting on Coleman court requirements and the

22  program guide.

23  Q    Was the same database being used for reporting in the PLATA

24  case?

25  A    That -- it's the same domain, so, yeah, essentially it's

1   the same database.

2   Q    So were there separate programs written, if that's the

3   right language, to subsequent reports for Coleman specifically

4   as contrasted to PLATA?

5   A    Yes.  We had different dashboards and sometimes different

6   indicators.

7   Q    And was it your job to know what the differences were

8   between the two cases, in terms of reporting requirements?

9   A    Well, I didn't focus a lot on PLATA.  I was focused mainly

10  on the Coleman court requirements.

11  Q    So was it your job to get up to speed yourself, or was

12  someone telling you what was needed?

13  A    It was my job to get up to speed, but I also worked in

14  consultation with my superior, Laura Ceballos, and other

15  stakeholders in the case as well.

16  Q    All right.  And you said you didn't focus a lot on PLATA,

17  but you did some?

18  A    Right.  Well, I would sometimes attend the larger QM

19  meeting that medical had, and those indicators came up.  And

20  sometimes if there were different indicators and they had

21  different results, trying to work out why we had different

22  results, why we had different ways of measuring it.

23  Q    Comparing Coleman to PLATA?

24  A    Yeah.  But to be honest, for a large part of my tenure

25  between when I started there and roughly through go live

Rekart - Exam by Trapani

1   2017 -- no.  That was 2018 -- I was focused primarily on the

2   adoption of the electronic health record.

3            THE COURT:  All right.  I have no more questions at

4   this time.  Ms. Ells, are you questioning?

5            MS. TRAPANI:  Your Honor, I'm Cara Trapani.  I will be

6   questioning Dr. Rekart for the plaintiffs.

7            THE COURT:  I believe you can do it from there.  I

8   think the key is to use the microphone.

9            THE WITNESS:  I can hear her fine.

10           THE COURT:  Actually, she's going to come to the

11  podium, actually.  That's what our IT folks have directed.  All

12  right.  Ms. Trapani.

13                           EXAMINATION

14  BY MS. TRAPANI:

15  Q    Good afternoon, Dr. Rekart.  Can you hear me okay?  I'm

16  going to turn this monitor so now I can see you.

17  A    Yes, now I can.

18  Q    Excellent.  So as you were discussing with the Court, CDCR

19  has admitted that in 2016 the appointments in the scheduled

20  indicator methodology was changed.  You're aware of that,

21  right?

22  A    Yes.

23  Q    And when it was changed, it was measuring only four things:

24  The provider being unavailable, it measured that; the lack of

25  transport, it measured when that happened; it measured when a

1  program was modified, and it also measured when appointments

2  didn't happen due to technical difficulties.  Are you aware of

3  all of that?

4  A   Yes, vaguely.

5  Q   And you just testified that you discovered that the

6  definition for this indicator was not updated when those

7  changes were made.  Is that accurate?

8         MR. FISHER:  Objection, that does misstate the

9  testimony.

10  BY MS. TRAPANI:

11  Q   I can rephrase my question, Dr. Rekart.

12         THE COURT:  All right.  Rephrase.

13  BY MS. TRAPANI:

14  Q   You testified to the Court that you became aware of the

15  definition of this indicator, the "appointments seen as

16  scheduled" indicator not being accurate after Dr. Golding

17  submitted his whistleblower report; is that true?

18  A   I believe so, yes.

19  Q   And you're aware that the indicator was defined between

20  2016 and later on before this was changed to show that it

21  measured all scheduled appointments, correct?

22  A   I believe that was the case, yes.

23  Q   And is it accurate to say no one caught this error until

24  Dr. Golding submitted his report?

25  A   I don't know --

1           MR. FISHER:  Objection, calls for speculation.

2    BY MS. TRAPANI:

3    Q    To your knowledge?

4           THE COURT:  Overruled.  You may answer based on what

5    you know.

6           THE WITNESS:  I don't know.

7    BY MS. TRAPANI:

8    Q    Was there any independent entity that was validating the

9    updates that would occur to these indicators --

10          MR. FISHER:  Objection, vague.

11          THE COURT:  Overruled.

12   BY MS. TRAPANI:

13   Q    -- to your knowledge?

14          THE COURT:  If you're able to answer, you may.

15          THE WITNESS:  I'm not sure what you mean by

16   "independent."

17   BY MS. TRAPANI:

18   Q    Was there a person or a committee that was reviewing

19   changes before they were made and before they affected the

20   entire system?

21          MR. FISHER:  Objection, vague as to time period.

22          THE COURT:  Well, let's talk specifically about

23   changes to the "appointments seen as scheduled" indicator.  So

24   construe the question in that way.

25          THE WITNESS:  Could you repeat it again, please.

1    BY MS. TRAPANI:

2    Q    It's true, isn't it, that no committee or person reviewed

3    the change made to the "appointments seen as scheduled"

4    indicator in 2016 when it was changed, no one reviewed that the

5    underlying definition was corrected; is that true?

6    A    I don't -- I'm not aware of that.

7    Q    Now, the neutral expert found in his report that there were

8    other problems with this "appointments seen as scheduled"

9    indicator other than the definition being incorrect, and I'd

10   like to ask you some questions about that.

11        The neutral expert found in his report that if a patient

12   checks -- if a psychiatrist checks a patient in and out during

13   an appointment, then that appointment would count for the

14   program guide compliance purposes; is that correct?

15             MR. FISHER:  Objection calls for --

16             THE WITNESS:  Yes.

17             THE COURT:  Overruled.

18   BY MS. TRAPANI:

19   Q    And based on that, is my understanding correct that

20   appointments that are neither rescheduled nor canceled can be

21   marked as having been seen as scheduled even --

22   A    No.

23   Q    -- if the appointments -- if I can --

24   A    I think you're conflating --

25             THE COURT:  Dr. Rekart, let her finish.

1          THE WITNESS:  Oh, I'm sorry.  Sorry.

2          MS. TRAPANI:  Thank you.

3          THE COURT:  Just start over and state the whole

4     question.

5     BY MS. TRAPANI:

6     Q    So is my understanding correct that appointments that are

7     neither rescheduled or canceled can still be marked as

8     compliant even if they occur late, so long as the patient is

9     checked in and out whenever they're seen?

10    A    Yes.  If the appointment is not moved or rescheduled, it's

11    a 1 in that indicator, I think.

12    Q    And you were aware that psychiatrists were experiencing

13    difficulties using the scheduling module in EHRS, correct?

14    A    Can you define "difficulty"?

15    Q    You were aware that psychiatrists were complaining about

16    using this scheduling module; isn't that right?

17    A    Yes, I was aware of that.

18    Q    And you were part of the team, as you just testified to the

19    Court, that created the EHRS and customized it for CDCR's use,

20    correct?

21    A    That's correct.

22    Q    And were there any headquarters psychiatrists involve in

23    the development and rollout of the EHRS?

24    A    Yes.

25    Q    How many?

1    A    At what time period?

2    Q    At any time period.

3    A    Probably anywhere from one to several.

4    Q    Can you be any more specific as to several?

5    A    When I left, I think that I had two psychiatrists that

6    worked for me in quality management and there were several --

7    one, two, three psychiatrists that worked for Dr. Golding, that

8    worked on our modified electronic health record.

9    Q    And when you were first rolling out the EHRS before go

10   live, were any psychiatrists helping you with development of

11   the EHRS at that time?

12   A    Yes.

13   Q    And was that Dr. Kuich who was helping with that?

14   A    Yes, it was.

15   Q    And were there other clinical staff from headquarters

16   involved?

17   A    Yes.

18   Q    And were those other staff people psychologists, for the

19   most part?

20   A    It depended on what -- the area of expertise we needed.  It

21   depended on who the stakeholder was.

22   Q    What do you mean by that?

23   A    For example, if we had to develop modules for or content

24   for a rec therapist, we connected with rec therapists and

25   looked at their current practice, their current state and what

1    they were trying to do along with other stakeholders in charge

2    of that area.

3    Q    And did Dr. Kuich, when he was working with you on the

4    EHRS, ever raise concerns to you about inefficiencies with the

5    scheduling module in EHRS?

6    A    I would say he -- initially he was very supportive of it

7    and then as we went live, he had gotten some feedback from the

8    field and, in particular, what he wanted -- so we had

9    created -- which I thought was going to be very helpful -- we

10   were able to, in the orders, put a lock on the requested end

11   date, which would prevent schedulers from scheduling past a

12   certain date, and those were based on the business rules in the

13   program guide.  And so what his issue was, was they wanted to

14   open that up so that psychiatrists could schedule beyond that

15   or request longer time frames.

16   Q    But you were aware, weren't you, that psychiatrists were

17   not using the scheduling module in EHRS as it was designed to

18   be used; isn't that right?

19   A    No.

20   Q    The neutral expert found that Dr. Ceballos was aware of

21   problems with scheduling and was attempting --

22   A    Yes.

23   Q    -- to address those problems through additional training;

24   is that accurate?

25   A    Yes.

Rekart - Exam by Trapani

1   Q   And you just --

2   A   They weren't always checking in and checking out.

3   Q   Did you provide any additional change to address that?

4   A   No.  That was -- I was -- that was psychiatry's purview.

5   Q   And you testified earlier that you would develop data flags

6   for situations where providers were not adhering to work flows?

7   A   Correct.

8   Q   Did any data flags apply to this situation with the

9   check-in and check-out functions that were being --

10  A   Yes.

11  Q   -- misused by psychiatrists?

12  A   I'm not going to say they were misused.  I'm just going to

13  say they're not compliant with the workflow.

14  Q   And you still never provided any training to the

15  psychiatrists in that regard to improve their use of the

16  system?

17  A   That was beyond my scope.

18  Q   I'd like to --

19  A   So we provided --

20          THE COURT:  Wait for the next question.

21          THE WITNESS:  Okay.  Certainly.

22  BY MS. TRAPANI:

23  Q   Thank you.  Given my limited time, I'd like to move along.

24  A   Sure.

25  Q   I'd like to ask you some questions now to the 2018 staffing

1  proposal that was proposed by CDCR in the summer of 2018.  As

2  part of mental health leadership, you were consulted on the

3  development of the proposals in that plan, right?

4  A   No, I wasn't.

5  Q   Were you part of the proposal to standardize the scheduling

6  module within that staffing plan?

7  A   I'm not aware of the staffing plan.  I was not involved in

8  that in any way.

9  Q   And were you shown a copy of it before it was given to the

10 Special Master or to the plaintiffs?

11 A   No, I was not.

12 Q   And are you aware that the "appointments seen as scheduled"

13 indicator was used -- was cited to in that proposal?

14 A   Am I aware now?

15 Q   Are you aware now, yes.

16 A   I believe so.

17 Q   So even though you knew that there were inefficiencies in

18 the way that psychiatrists were using the scheduling module,

19 you weren't part of the proposal to address some of those

20 things as part of the staffing plan; is that accurate?

21 A   Again, I wouldn't use the word "inefficiencies.  I would

22 say it was a matter of compliance with the work flow and as I

23 was aware of them, but I was told very clearly to stay in my

24 own lane and that psychiatry would handle any kind of problem

25 with that or any issue.

Rekart - Exam by Trapani

1   Q    And who told you that?

2   A    Dr. Kuich.

3   Q    Did anyone else tell you that?

4   A    Not that I recall.

5   Q    Did Dr. Kuich ever ask you for data related to psychiatry

6   within the EHRS?

7   A    Yes.

8   Q    Did he ask you about these things in June of 2017 after you

9   and Dr. Kuich went to CHCF at the direction of Dr. Brizendine?

10  A    I don't recall that.

11  Q    Do you remember going to CHCF with Dr. Kuich sometime in

12  2017 to conduct an audit?

13  A    I don't recall that.

14  Q    But you do remember that Dr. Kuich was asking for data

15  related to the EHRS so that he could determine the

16  psychiatrists' productivity rates; isn't that correct?

17  A    Yes.  Yes, I do.

18  Q    And did you ever provide him with that data he was asking

19  for?

20  A    No, I did not.  It got -- it got moved to the larger QM's

21  queue, and there -- because we were really busy, so I think

22  Dr. Ceballos had asked a larger QM to complete that task, which

23  I went to a few subsequent meetings where they did actually run

24  through some data for him.

25          THE COURT:  You have two more minutes.

Rekart - Exam by Trapani

1           MS. TRAPANI:  Okay.  Thank you, Your Honor.

2    BY MS. TRAPANI:

3    Q    And when you talk about the larger QM committee meeting,

4    are you speaking about the committee known as CLAC --

5    A    No.

6    Q    -- or are you talking about the internal mental health

7    change committee?

8    A    No.  I'm actually talking about the medical quality

9    management division, which we were a subcommittee of.  The

10   mental health quality management was a subcommittee of the

11   larger quality management.

12   Q    And on that larger committee did you have a vote?

13   A    No, I did not.

14   Q    Are you familiar with a committee called CLAC?

15   A    I am.

16   Q    And what is that -- what is the purpose of that committee?

17   A    It was advisory, and it was also a change management

18   committee.

19   Q    And did you have a vote on that committee?

20   A    Yes, I did.

21   Q    Did anyone else from mental health have a vote on that

22   committee?

23   A    Yes.  Dr. Kuich.

24   Q    Did he always have a vote on that committee?

25   A    No.

1   Q   So he didn't get a vote on the committee until after he

2   started complaining that psychiatry needed to have their own

3   independent representation on that committee; isn't that right?

4   A   I think as soon as he asked to be put on the committee, he

5   was put on the committee.

6   Q   And after the time that that committee received Dr. Kuich,

7   Dr. Kuich was able to have a vote on that larger committee,

8   that was around the same time that CDCR decided to implement an

9   internal mental health change management committee; isn't that

10  right?

11  A   I think so.

12  Q   And how many psychiatrists were on the internal change

13  management committee?

14  A   I don't think it was that formal.  I think anybody could

15  come.

16          THE COURT:  You're at 15 minutes.

17          MS. TRAPANI:  Thank you.  If I could ask one more

18  question, Your Honor.

19          THE COURT:  One more.

20  BY MS. TRAPANI:

21  Q   Is it accurate to say that there were significantly more

22  psychologists on that internal mental health management change

23  committee that controlled EHRS than there were psychiatrists?

24  A   I think there were more psychologists in the room but not

25  that -- not that many more.

1           MS. TRAPANI:  Thank you.  No further questions.

2           THE COURT:  All right.  For the defense.

3           MR. FISHER:  We have no questions for this witness,

4    Your Honor.

5           THE COURT:  All right.  Is Dr. Rekart excused?

6           MR. FISHER:  As far as defendants are concerned.

7           THE COURT:  Ms. Ells?  Ms. Trapani?

8           MS. TRAPANI:  Yes, Your Honor.

9           THE COURT:  All right.  Thank you, Doctor.  You're

10   excused.  We're going to disconnect you now.

11          THE WITNESS:  Thank you.

12       (Witness excused.)

13          THE COURT:  We'll take another short break, and then

14   let's just talk about schedule.  I think we'll get through

15   Dr. Leidner.  I don't know if we'll get through other

16   witnesses.  And so at this point, I would -- while I'm not

17   excusing them for today, I think at most Dr. Ceballos could

18   remain.  I don't think there's any chance we would get to

19   Deputy Director Brizendine or Undersecretary Toche today.

20   Undersecretary Toche can, of course, continue observing.

21          So let's just take a full break, 15, 20 minutes, and

22   then we'll get through Dr. Leidner and see where we are at that

23   point, and then we can do some housekeeping.  It may be that we

24   need some time on Thursday morning for any closing argument

25   you'd like to provide.  So that's my current thinking.

1          MR. FISHER:  Yes, Your Honor.

2          THE COURT:  All right.

3      (Recess at 3:10 p.m. to 3:29 p.m.)

4          THE COURT:  All right.  So we're ready for

5  Dr. Leidner.  And it may be, I'm doubtful, given the way things

6  are going, but it may be that we could actually get through

7  most of Brizendine today yet as well, so I think Ms. Schultz

8  told you to switch up your order --

9          MR. FISHER:  Yes, Your Honor.

10          THE COURT:  -- of having people stay.

11          All right.  So Dr. Leidner.

12          THE CLERK:  Doctor, please step into the witness

13  stand, remain standing, and raise your right hand.

14      (Witness duly sworn and takes the stand.)

15          THE WITNESS:  I do.

16          THE CLERK:  Thank you.  Please be seated.  Please say

17  and spell your first and last name for the record.

18          THE WITNESS:  David Leidner, D-A-V-I-D, L-E-I-D-N-E-R.

19              DAVID LEIDNER, WITNESS, SWORN

20                      EXAMINATION

21  BY THE COURT:

22  Q    Good afternoon, Dr. Leidner.

23  A    Good afternoon.

24  Q    So you're the data guy?

25  A    Yeah.  I'm the data guy.

1   Q    That's what I've heard.

2   A    Yes, Your Honor.

3   Q    All right.  I have some questions for you.

4   A    Yeah.

5   Q    I'm going to organize them by topic.

6   A    Okay.

7   Q    So first is lengthening EOP timelines from 30 to 45 days --

8   A    Okay.

9   Q    -- as a general header.

10      As you probably know, the neutral expert's report states,

11  Dr. -- I believe it's Jahangiri and Dr. Anand first raised the

12  issue of changing the EOP timeline from 30 to 45 days with you

13  in late 2015.

14  A    That's correct, Your Honor.  My memory is that it was

15  Dr. Jahangiri who attended my state-wide webinar that I ran

16  weekly sometime -- I think it was November of 2015 and brought

17  that issue up with me.

18  Q    Just to clarify for the record what was your response at

19  that time?

20  A    As I recall, my response was -- my job was to sort of opine

21  about whether it was technically possible, could we do it.

22  People would come and bring ideas about all sorts of things and

23  I would really say, "Well, yes, we could do it" or "No, we

24  can't."  So my response was, "Yes, it's technically possible."

25  And then I gave my standard response, which was when someone

1  from the field had an idea about I'd like to change some rule,

2  I'd say, "Okay.  Take it to headquarters.  Specifically talk to

3  Dr. Golding about it."  Because that part of the decision, you

4  know, would have to be made by headquarters.  I didn't make

5  decisions to change rules.  But I did give input on, you know,

6  could it be done, how could we do it, you know, what it would

7  look like and so forth.

8  Q   So after you said that, "take it to headquarters," no

9  follow-through, as far as you know?

10 A   Not that I remember.

11 Q   But then in 2016 --

12 A   Right.

13 Q   -- the request comes forward again?

14 A   Correct.

15 Q   And then very quickly the change gets made --

16 A   Yeah.

17 Q   -- fair?

18 A   Yes.  Yes.

19 Q   So why did it occur so quickly, then, in 2016?

20 A   Right.  So my memory there is that on December, sometime

21 around the 5th, I don't know if it was the 5th or before, but

22 anyway, an analyst from CHCF, same institution where

23 Dr. Jahangiri worked and someone I knew, you know, I worked

24 with --

25 Q   Ms. Kirkman.

1    A    -- Ms. Kirkman, yes.  She called me and then basically made

2    the same argument, you know, this is about trying to figure out

3    a better way to preserve continuity of care, you know,

4    psychiatrists were -- if they were taking a week off then they

5    weren't able to see their patients within 30 days, and so they

6    had to get some other psychiatrist to see them versus, you

7    know, if they had more time then they could just see them when

8    they came back.

9    Q    She's making this pitch to you?

10   A    She's making the pitch to me, right.  And she's asking --

11   you know, my recollection is not very clear about the

12   conversation other than the general idea, which was, you know,

13   is there a way to do it.  And what happened during that

14   conversation I remember, it was kind of an epiphany for me.  I

15   mean, up to that point the way I had always thought about it

16   was we either had to do every 30 days -- sorry for the detail.

17   This can get tricky.

18   Q    Well, I don't know that I need all the details --

19   A    Okay.

20   Q    -- specifically given that we don't have all day --

21   A    Yeah.

22   Q    -- or all afternoon at this point.

23   A    Okay.

24   Q    My only question is did you say to Dr. Kirkman --

25   Ms. Kirkman, "Well, take it to headquarters"?

1    A    I did.  I said, you know, go up the regular -- take it to

2    headquarters.  I guess at that time it was through the MH

3    policy group.

4    Q    All right.

5    A    Yeah.  That, again, was my standard response.

6    Q    So then you heard very quickly?

7    A    No.  No, no.  So what happened next was -- actually, I was

8    reviewing my emails.  I think about 1:30 that afternoon I had

9    emailed Dr. Ceballos about this -- about some other topic all

10   together.  I said, "Do you have some minutes for a phone call"

11   about this other topic?  And I presume that that was -- after

12   that, that's when we had a phone conversation.  And during that

13   phone conversation I mentioned this idea to her.

14        I thought it was a good idea because the thing I'd realized

15   about it was we could actually do two things here.  We could

16   actually do -- require the rule -- the monthly, the

17   psychiatrist's contact to be monthly and also still limit it to

18   some number of days; in other words, 45 days.  That's something

19   I didn't realize before, that is, I thought it had to be

20   either/or.  You either had to do days or once a month.

21        And I already knew that CDCR didn't want to allow, you

22   know, 60 days between contacts, but this seemed like a new

23   approach.  And so I was -- I thought, okay, I'll tell her about

24   it.  And at that point she says --

25   Q    So Dr. Ceballos -- Dr. Ceballos didn't call you to say,

1  "What do you think about this?"  She called you about something

2  else entirely?

3  A   I don't recall exactly the reason for the phone call.  I

4  don't know if I called her or she called me.  But I presume it

5  was about something else, yes.

6  Q   You said you had an epiphany.  What explains that?  Why

7  were you able to see this solving more than one problem, a

8  solution at this time?

9  A   I think just talking through it and realizing, oh, you can

10  actually kind of code it so that it's both requirements at the

11  same time.  That is, you could say it has to be one once every

12  calendar month and it has to be every certain amount of days,

13  for example, every 45 days.  That's a hybrid rule.  And just

14  from a programming perspective, that's something I didn't think

15  about before.  And what that would allow was, yes, it's still

16  once every calendar month, per my understanding of the policy,

17  but still you can limit it to even a shorter amount of time

18  than that and hopefully improve, you know, the continuity of

19  care, address that issue that they were bringing up.  So that

20  was -- that's why I thought, oh, here's a new idea about how to

21  solve this issue.

22  Q   And that all happened very quickly, didn't it, from the

23  time Ms. Kirkman called you to the time the rule got changed in

24  2016 was a matter of not even hours?

25  A   Well, no.  It was more than hours.  I mean, on the phone

1    call Dr. Ceballos did said, "Okay.  Do it."

2    Q    So approval?

3    A    Yeah.  Approval.  Approval happened, you know, very

4    quickly.

5         I do wish I had done what I've since started doing, which

6    was write out the decision, you know, and send it back to her

7    and say, "Is this what we agreed on?"  I think that's a

8    really -- obviously something I didn't do that I should have.

9    That would have been really helpful.

10   Q    But in any event, it's been changed back now to 30 days?

11   A    Yeah.  Yes.

12   Q    So does the current business rule for EOP timeline, does it

13   use -- does it use 30 days, as those terms are defined, in an

14   email you sent in March of 2017?  You went through in one of

15   your emails, which you've previously provided to the Court

16   attached to a declaration, methodologies.  So do you recall a

17   March 22nd, 2017, email?

18   A    Are you referring to the one where there was kind of a

19   table talking about different units of time, like a day, hour,

20   a week --

21   Q    Correct.

22   A    -- month?

23   Q    Trigger date, time frame, due date.

24   A    Okay.  And it talked about different time frames, correct?

25   So yes.  Okay.  So if you were using 24 hours, the due date

1   would be different than if you were using one day, for example,

2   yeah.

3   Q   Right.  So that's the methodology that is currently being

4   applied?

5   A   Well, currently now 30 days is being applied to all EOP

6   psychiatry rules.  It was reversed back --

7   Q   Right.

8   A   -- when I was asked to change it.

9   Q   Well, that's my question.  So is the 30 days as currently

10  implemented, does that return to the business rule exactly the

11  way it was before it was changed in -- towards the end of 2016?

12  A   Yes.

13  Q   Once the issue was raised by Dr. Golding, who made the

14  decision to change it back to the prior business rule?

15  A   Dr. Ceballos.  I guess I can say I took my marching orders

16  from Dr. Ceballos and my managers.  So for me I would have had

17  to have been told by Dr. Ceballos to change it.  And I have an

18  email that I can recall from April 13th instructing me to

19  change it back, and then I changed it back by April 14.

20  Q   Do you have an understanding about whether or not that kind

21  of change to that business rule should have been raised with

22  the Special Master before implemented?

23  A   I don't know.  That wasn't something I ever did.  I didn't

24  communicate with the Special Master about those -- about rule

25  changes.  I'm a rank-and-file employee, so, you know, I left

1   that to my managers.

2   Q    So you have no understanding?  You would not say, "I think

3   this was a good idea but I understand you have to run this by

4   the Special Master"?  That would not occur to you to say?

5   A    No.  It was really outside the realm of my expertise what

6   needs to be discussed with the Special Master and what doesn't,

7   you know, and who else needs to be consulted and so forth.

8   That wasn't something that I was involved with.

9   Q    All right.  I'm just curious, you also provided -- there's

10  the March 22nd, 2017, email.  There's also a July 1st, 2015

11  email that you've previously provided to the Court.

12  A    Right.

13  Q    Also has the chart that you've talked about with slightly

14  different information --

15  A    Right.

16  Q    -- in the chart.  Do you know were -- was any of that

17  definitional information ever provided to the Special Master?

18  A    I don't recall specifically, but I -- I sure feel like we

19  had conversations, for example, about weekly.  So, you know,

20  main line EOP patients are required to be seen weekly by their

21  primary clinicians.  That's from the program guide.

22      And for years we've defined weekly as you can see them on

23  Monday and you can see them again, you know, on Friday the next

24  week, that's okay.  Once every calendar week versus once every

25  seven days.

1    Q    But when you say "we had conversations," who's the "we"?

2    A    Well, I recall that I did give a presentation to the

3    monitors about our weekly compliance statistics sometime some

4    years ago, and I guess I'm thinking that at that time, for

5    example, we may have talked about the weekly time frame.

6    Q    Ah.  But weekly only?

7    A    Yes.  Correct.  Monthly was not even in that 2015 email, so

8    that was --

9    Q    So would the presentation have been pre-2015?

10   A    I don't recall.  I'm sorry.

11   Q    So that -- how often would you give presentations to the

12   Special Master?

13   A    Oh, just a handful of times.  I was asked to talk about our

14   methodology a couple of times, maybe two or three, I think,

15   over the years.

16   Q    All right.  So I want to move on to appointments seen as

17   scheduled, reporting of scheduled --

18   A    Okay.

19   Q    -- and missed appointments.

20   A    Okay.

21   Q    So who decided to exclude from the "appointments seen as

22   scheduled" indicator methodology appointments that were not

23   seen due to refusals or no shows?

24   A    That indicator was from the PLATA receiver, and I was asked

25   at some point, 2014 or earlier, I'm not sure when, but I know

1    it existed at least in 2014.  I was asked to replicate that on

2    our performance report using -- for mental health appointments.

3    So the criteria were theirs and then as they changed them over

4    time, I would change them on our end to match.

5    Q    The criteria were the PLATA receiver's criteria?

6    A    Correct.

7    Q    All right.  So when you replicated them in the Coleman

8    performance report is that what you're saying?

9    A    Correct.  Yes.

10   Q    You just imported it without any change?

11   A    No, no.  I had to recode it because it was for our mental

12   health appointments; whereas, the receiver's indicator was for

13   medical.

14   Q    So was the recoding making substantive changes to the

15   information collected?

16   A    No.  The -- I was trying to just replicate their

17   methodology.

18   Q    While taking account of any differences that might be

19   imposed by the Coleman court orders?

20   A    No.  I wasn't doing this -- my understanding is this

21   indicator doesn't connect to any program guidelines or none

22   that I'm aware of or any -- any court orders.  This was simply

23   the receiver's indicator that they thought was important and

24   they wanted or CDCR wanted that indicator on our performance

25   report too.

Leidner - Exam by The Court

1    Q    Who at CDCR?

2    A    Well, I don't recall specifically, but I think Dr. Ceballos

3    would have been the one who would have asked me to first create

4    that indicator, again, because she was the one who would

5    typically instruct me to do things like that.

6    Q    So then still I'm not certain I got an answer to my initial

7    question.  The context is helpful but --

8    A    Yes.

9    Q    -- just so I'm clear, do you agree that appointments not

10   seen due to refusals or no shows is not included in the

11   "appointments seen as scheduled" indicator methodology?

12   A    I have to this think about this.  It's a -- the question is

13   appointments not seen -- I'm sorry, could you repeat that

14   question?

15   Q    Appointments that didn't occur due to inmate refusals or no

16   shows.  Is that information excluded in the "appointments seen

17   as scheduled" indicator methodology?  I'm speaking as a

18   layperson.

19   A    Yeah.  And I'm trying to think it through.  The way I

20   understand the indicator is that it is -- all scheduled

21   appointments is the denominator.  The numerator is the same

22   number of appointments minus those appointments that were

23   canceled for controllable reasons and also excluding

24   rescheduled appointments.  Does that answer the question?

25   Q    So no separate counting of refusals or no shows?

1   A    Correct.  Not to my knowledge.  Not to my recollection.

2   Q    And is that because that's the way the receiver does it?

3   A    Yes.  Yeah.

4   Q    And no other reason?

5   A    No.  The indicator was not designed by me or by mental

6   health, to my knowledge, so we were just, you know, replicating

7   their requirements.

8   Q    So recognizing all of that, have you ever conducted an

9   analysis to determine the impact of the methodology on the

10  percentage of missed appointments for the Coleman class?

11  A    You know, so I think you're asking me have I tried to,

12  maybe, take out that percentage or put it -- see how it would

13  change if we left them in or took them out?  I have not done

14  that, no.

15  Q    All right.  For any subclass:  Individuals, groups, IDTTs?

16  A    Not to my recollection, no.  I can say I just looked at how

17  much of the appointments that are included in that indicator

18  are psychiatry appointments because I knew that would be --

19  that's a topic.  So for 2018, about 8.5 percent of all the

20  appointments in that indicator -- all the mental health

21  appointments are psychiatry appointments, and the others are

22  group appointments or primary clinician or IDTT.

23       The indicator itself is not about psychiatry appointments.

24  It's about -- an efficiency measure, you know, are we

25  scheduling things that then are getting canceled in a way that

1    we, you know, we can control.

2        If I'm scheduling appointments and there's a lockdown,

3    maybe I can do something about it.  That's the idea behind the

4    indicator.  It's not about compliance with the time frames or

5    anything like that.

6    Q    So can you answer this question:  What was the rate of

7    missed appointments for individuals for the three-month period

8    prior to changes being made to the "appointments seen as

9    scheduled" indicator methodology?

10   A    I don't know.

11   Q    Would you have the ability to find out?

12   A    Well, I think so, yes.

13       I guess you're asking before the "seen as scheduled"

14   indicator was changed.  The issue at hand, as I understand it,

15   was that the definition was incorrect but that the code was

16   always correct.  When was it changed?  You know, it was changed

17   sort of over time as the receiver changed their criteria, but

18   I'm not thinking of a specific point in time when that was --

19   there was some big change.  Maybe I'm forgetting or something,

20   but . . .

21   Q    So just help me understand --

22   A    Yeah.

23   Q    -- what that means to you if the definition was correct of

24   the indicator.

25   A    Yeah.

1   Q   Well, so doesn't changing the definition affect the --

2   what's collected and can be generated?

3   A   Right.  Sorry.  It wasn't clear.  The description, just the

4   verbal description of the indicator, yeah.  Okay.  I get it.

5   Q   So the description doesn't correspond to any coding?

6   A   No.  I think perhaps it did initially, I think and know I'm

7   right.  And then when it was changed because the receiver

8   changed some criteria, which would have been sometime before

9   2016, before February 2016, I can tell you that, I failed to

10  update the label, right, the description of the definition.

11  Q   Well, so help me understand.

12  A   Okay.

13  Q   Do you understand that changes made to the "appointments

14  seen as scheduled" indicator methodology resulted in

15  differences in reported percentages of missed appointments?

16  A   That seems quite plausible, yes.  And as you change the

17  criteria, you're going to change -- the numbers are going to

18  change, yes.

19  Q   Have you ever run any reports to demonstrate that?

20  A   No, I haven't.  I don't know which way the numbers changed.

21  I never looked at that.

22  Q   And to the extent you are making any changes in that

23  indicator, you would not have reported that to the Special

24  Master?

25  A   No.

1  Q   At most, Ms. Ceballos would know?

2  A   Right.  Yeah.

3  Q   Would she know everything you were doing at that level

4  working with the "appointments seen as scheduled" indicator?

5  A   I don't know.  I don't recall.  I'm not sure.

6  Q   Is there anyone else you would report to?

7  A   No.  No.  I mean, maybe colleagues.  Maybe I presented it

8  in a webinar or something when it was talking about it, but I

9  don't -- I don't recall specifically.

10  Q   Are there any other indicators that CDCR Mental Health

11  changed to match the receiver's healthcare data collection

12  methods?

13  A   Let me think.

14      None come to mind.  I know that we actually just pull

15  directly their data sometimes; for example, for a Map It,

16  medication compliance.  And we report it on our dashboards so

17  that -- our performance report so that if they change their

18  methodology, it would change on our report as well, but that

19  would be automatic.  I wouldn't be doing any programming.

20  "Seen as scheduled" is the only indicator I can think of where

21  I, you know, recreated the code for us.

22  Q   And when data is pulled over, as I believe you described

23  it --

24  A   Yes.

25  Q   -- just now is there any thought given to whether or not

Leidner - Exam by The Court

1    that is introducing distinctions into the Coleman data that

2    don't conform to Coleman court orders?

3    A    Well --

4    Q    Do you ever think about that?  Have you been told to think

5    about that?

6    A    No, not that I can think of.

7    Q    Are you aware of any problems that could be introduced by

8    pulling PLATA data into a Coleman database?

9    A    Well, just to clarify, it's all the same database, that is,

10   we all share the same healthcare data warehouse database.  So

11   we really are all pulling from in this case mostly EHRS data,

12   the Health Record System data, and maybe some other sources

13   too.

14   Q    But you said you pulled it over.

15   A    Uh-huh.  Okay.

16   Q    What does that mean to you?

17   A    What it means to me is the receiver -- the PLATA receiver's

18   quality management team actually wrote the code to calculate

19   the indicators.  I'm talking now about the medication, the Map

20   It indicators.  They wrote the code.  And that code applies to

21   psychiatry as well as to, you know, physicians in general.

22   Q    And we're not going -- we could go into that at some

23   point --

24   A    Yeah.

25   Q    -- but we're not doing that today.

Leidner - Exam by The Court

1    A    Thank you.

2    Q    So I know what you're talking about --

3    A    Yeah.

4    Q    -- but it's not on my agenda right now.

5    A    Right.  So when I say "pull it in," they make the

6    calculations, they store it in a table and then I write

7    basically just a query, you know, I pull the data in to also

8    display on our performance report.

9         And I do take care to make sure that the data we display

10   are the data that they have as well, but I don't -- I don't do

11   anything to the rules.  That's their indicator, and they've

12   decided what to do.

13        "Seen as scheduled" was very similar except there was no

14   data for mental health appointments; it was just medical.  So

15   some point a long time ago I was asked, "Okay.  Write the code

16   to do what we do with the medical appointments, with the mental

17   health appointments.  Replicate our rules.  Use our counting

18   rules."

19   Q    All right.  Let me ask a question from a different angle --

20   A    Okay.

21   Q    -- and just see.  In the neutral expert's report --

22   A    Yeah.

23   Q    -- he does indicate that in March 2019, you informed the

24   neutral that you reviewed information relevant to the updating

25   or changing of the mental health database --

Leidner - Exam by The Court

1    A    Right.

2    Q    -- to reflect what was going on with the receiver's

3    database.

4    A    Right.

5    Q    But you said you did not know when the "appointments seen

6    as scheduled" indicator had diverged from the receiver, so

7    whether they had ever precisely matched.

8    A    Right.   Right.

9    Q    So just help me --

10   A    Yeah.

11   Q    Taking into account everything you just said, what did you

12   mean by that?

13   A    Okay.   So -- right.   I wrote the code to replicate the

14   rules.   And then at some point during the neutral -- sorry --

15   the neutral expert's investigation, I was shown some comparison

16   of the -- of the criteria, and it became clear to me at that

17   point that they don't.   They don't seem to actually line up.   I

18   don't know when they diverged.   I don't know if they -- if they

19   ever exactly matched, but the intent was that they were

20   supposed to.

21       So I had that information and I shared that with CDCR after

22   the investigation was over.   And I'm not sure, I know that -- I

23   believe they're moving forward to rectify that, but I don't

24   know the status of that now.   I'm not up at headquarters

25   anymore.

Leidner - Exam by The Court

1   Q   Who did you report that to at CDCR?

2   A   I reported it to Dr. Ceballos and I think some other people

3   in -- well, I know I reported it to Dr. Ceballos, and there was

4   a meeting also at -- larger phone con that I talked about it as

5   well.

6   Q   And what were you telling people on that phone

7   conversation?

8   A   That I knew that the -- you know, I'd been shown

9   information that told me that they don't match.

10  Q   And did you make a recommendation as to what should be done

11  about that?

12  A   I don't recall that I did, no.

13  Q   Since then you've done nothing with the indicator, the

14  coding, the description?

15  A   I attended a meeting in July where we discussed with the

16  PLATA receiver taking steps to -- it was a phone conversation

17  where we discussed reconciling the measure, but I was not

18  involved in that.  And then I left headquarters at the end of

19  July, so I don't know the status of that now.

20  Q   So where are you now?

21  A   I'm at my local prison, California Men's Colony.

22  Q   All right.  Was that a move that you made by choice?

23  A   Yes.

24  Q   So what did the "appointments seen as scheduled" indicator

25  measure before the 2016 change?

1    A    I don't know because I don't have -- I could only go back

2    in my records and look at the code starting in about February

3    of 2016.  And in February 2016 it was almost exactly what it

4    does now, minus the rescheduled piece that was -- it was -- I'm

5    trying to remember.  It was including rescheduled.

6         And then I saw that there was a code change in May of 2016,

7    I believe, where rescheduled were also taken out.  And so

8    basically as of May 2016, it was what it is now.  And at some

9    point along the line I failed to update the label, the

10   description of the indicator.

11   Q    And prior to the change in 2016, to what use were you

12   putting the reports generated using the indicator?

13   A    I was just putting it on the performance report, making

14   sure that it showed up on the -- on the mental health

15   performance report.  That's the only thing I did with it.

16   Q    And again, you don't know whether that was reported to the

17   Special Master or the Court?

18   A    I'm sorry.  Which part, the indicator or --

19   Q    The information generated using the indicator, yes.

20   A    Right.  No.  I don't know how it was used or who it was

21   reported to.

22   Q    So if the information were -- if the indicator or

23   information generated were reported to the Court, do you know

24   why that would be, to the Coleman Court?

25   A    I don't.  That's not -- to my knowledge, that's not a

1    Coleman, you know, requirement kind of indicator.  It's not

2    about any of the orders or guidelines.  To the best of my

3    knowledge, it's really about just sort of efficiency of our

4    scheduling.  It seems -- it seems like it was misconstrued

5    to -- you know, it was supposed to be some kind of compliance

6    measure, never -- never intended to be.

7    Q    Misconstrued by?

8    A    Dr. Golding, I think.

9    Q    But if it were provided to the Court, it's possible the

10   Court might misconstrue it?

11   A    Yes.  You're right.  Absolutely.

12   Q    So the Court has been receiving some errata --

13   A    Yes.

14   Q    -- corrections.

15   A    Yeah.

16   Q    Are you involve in preparing those?

17   A    I am.

18   Q    You filed a declaration recently, I believe.

19   A    Yes.

20   Q    As far as you know, is the effort to identify the need to

21   file errata ongoing?

22   A    You mean for things that I've said?

23   Q    To the extent you're involved in verifying.

24   A    No.  I don't know.  I'm not involved in any other errata

25   filing or efforts.

1   Q   So to the extent you have identified a need for the Court

2   to be informed of a correction, your job is done?

3   A   Yes, as far as I know and -- yes.

4   Q   So during your tenure has any person ever directed you to

5   manipulate data for any purpose related to Coleman remediation?

6   A   Can you define what you mean by "manipulate data"?

7   Q   Right.  You may know all the ways to manipulate data.

8   A   Yeah.  You mean like in this --

9   Q   Massage the -- to create data to make it look as if

10  defendants are closer to compliance than they are.

11  A   So in other words, presented inaccurately in some way?  No,

12  I have not.

13  Q   Have you ever directed anyone else to do that?

14  A   No.

15  Q   Has any person ever told you not to correct any misleading

16  data that had been presented to the Court?

17  A   I want to say no, other than in the context of this

18  investigation.  I'd have to think about it, but, you know,

19  there was -- I was told don't -- don't go back and, you know,

20  make changes to business rules or fix things that you think

21  might be, you know, erroneous.  There was kind of a freeze on

22  changes during the investigation.  So other than that, no.

23  Q   Is that freeze still in effect?

24  A   Well, I left in July, so --

25  Q   It was up -- it was in effect until you left?

1  A   Well, as far as I know, business rules still weren't being,

2  you know, updated when I left.

3       I should say if we knew about bugs; in other words, if

4  something wasn't working as it was designed to or if data were

5  incorrect, we were always fixing those.  That never stopped.

6  Yeah.

7            THE COURT:  All right.  Those are my questions for

8  now.

9            Who's questioning Dr. Leidner?

10           MS. TRAPANI:  Your Honor, Cara Trapani.

11           THE COURT:  Ms. Trapani?

12           MS. TRAPANI:  Yes.

13           THE COURT:  All right.

14                        EXAMINATION

15  BY MS. TRAPANI:

16  Q   Good afternoon, Dr. Leidner.

17  A   Good afternoon.

18  Q   I'd like to ask you some questions about this business rule

19  change that you made in December 2016.

20  A   Uh-huh.

21  Q   I'm going to hand you an email that was sent to you on

22  December 5th, 2016.  It's been marked as Plaintiffs'

23  Exhibit 101.

24      If you could turn to page 4, Dr. Leidner.  Is this the

25  email that Ms. Julie Kirkman sent to you on December 5th, 2016,

1    requesting you to make the business rule change?

2    A    This is the email she sent to the policy unit requesting

3    the business rule change, and I was Cc'd on it.  I would not

4    have been the one to approve or deny the request.

5    Q    But you're Cc'd on this email, correct?

6    A    Correct.

7    Q    And are there any psychiatrists in the recipient list?

8            THE COURT:  There's some interference we have not

9    experienced so far yet today.

10           THE WITNESS:  It's me.

11           THE COURT:  We need a brief recess to see if we can

12   get to the bottom of this.  So Ms. Schultz, I'll ask you to

13   call IT, I guess.

14           THE CLERK:  Okay.

15           THE COURT:  Unless there's someone here who thinks

16   they know what's going on and can help solve the problem.

17       (Recess at 4:06 p.m. to 4:12 p.m.)

18           THE COURT:  All right.  We think we identified the

19   culprit.  You were mid-question, so hopefully you can start

20   with the question you were posing.

21           MS. TRAPANI:  Yes, Your Honor.

22   BY MS. TRAPANI:

23   Q    Dr. Leidner, I was asking you about this exhibit that's

24   been marked Plaintiffs' 101 at page 4.  This is an email that

25   you just said you received from -- you were Cc'd on it from

Leidner - Exam by Trapani

1    Ms. Kirkman on December 5th of 2016.  And my question to you

2    was, are there any psychiatrists who are Cc'd on this email

3    along with you?

4    A    I'm not exactly sure.  I know that Christopher Barr is not

5    a psychiatrist.  I don't think that Yosha Dara Row is, but I'm

6    not certain.

7    Q    So, to your knowledge, no one here is a psychiatrist?

8    A    I'm not sure.

9    Q    Okay.

10   A    I don't believe so.

11   Q    And after you received this email, it's time stamped at

12   1:57 p.m., you called Dr. Ceballos; is that right?

13   A    No.  I don't recall whether she called me.  I don't -- or I

14   called her.

15   Q    You spoke to Dr. Ceballos; is that right?

16   A    I spoke with Dr. Ceballos sometime on December 5th.  I

17   don't know if it was before or after this email.

18   Q    Okay.  And when you spoke to Dr. Ceballos on December 5th,

19   she told you you could change the rule to the time frame

20   between EOP psychiatry contacts, correct?

21   A    Correct.

22   Q    And you never consulted with anyone except Dr. Ceballos

23   before you made that change; is that right?

24   A    Not to my recollection, no.

25   Q    You understand, do you not, that at the time you made this

1   business rule change in December of 2016, that coincided with

2   the time frame that the Special Master was evaluating CDCR's

3   psychiatry staffing?

4   A    I don't know that.

5   Q    But it's true, right, that the business rule change that

6   you made in December of 2016 at that same time made it easier

7   for the psychiatrists to comply with their time frames to see

8   their patients, right?

9            MR. FISHER:  Objection, calls for speculation.

10           THE COURT:  Overruled.  You may answer if you're able.

11           THE WITNESS:  I can say that it allowed -- in most

12   cases, it allowed more time for psychiatrists to see their

13   patients for EOP, yeah.

14   BY MS. TRAPANI:

15   Q    I want to turn to how this rule change applied to the

16   segregation units now.

17   A    Okay.

18   Q    You're aware that the program guide requires that patients

19   housed in administrative segregation units, that's the ASU EOP

20   hubs, are required under the program guide to be seen by a

21   psychiatrist every 30 days, right?

22   A    I am now, yes.

23   Q    You are now?

24   A    Yes.

25   Q    And you understand that this requirement, this 30-day

1  requirement means that the absolute minimum requirement for a

2  patient to be seen is literally 30 days?

3  A   I do understand that, yes.

4  Q   But when you changed the rule in December of 2016 for

5  psychiatry contacts for EOP patients to be up to 45 days and in

6  some cases even up to 60 days, you applied that change to the

7  segregation hubs, correct?

8  A   Not correct.  I did not change the rule to be up to 60 days

9  in any case.

10 Q   Did you change the rule to be more than 30 days for the

11 segregation hubs despite the fact that the program guide

12 literally said that patients in those units need to be seen

13 every five days?

14 A   I did.  That was a mistake.  There was -- rule change was

15 not intended ever to apply in a case where the program guide

16 used 30 days, only in cases where it used the term "monthly."

17 That was the intent.

18 Q   But that is not what actually happened; is that right?

19 A   Correct.

20 Q   Did you also change -- apply this longer time frame rule to

21 the psychiatric services units, which is another certification

22 unit for EOP patients?

23 A   Yes.

24 Q   And did you ever tell anyone about that?

25 A   Well, I announced it at two statewide webinars in December,

Leidner - Exam by Trapani

1    December 7th and 8th.  The rule changes for all the different

2    areas where it was applied were visible on the compliance rules

3    report, which is a report that all of our users could call up

4    at any time.  And that was visible for the duration of the rule

5    change.  So in those two ways I did.

6    Q    And when you made those changes, you said they're available

7    through this compliance rules report and also that you

8    announced them through webinars, but did you ever make a

9    written statement about the rule changes that you made -- that

10   you made and to which population it applied to?

11   A    I don't recall that I did.

12   Q    So you never sent an email about the change alerting

13   Dr. Golding or anyone else in headquarters about it?

14   A    Not that I recall.

15   Q    And when you made these changes on the compliance rules

16   report, were there any highlights or red lines to show where

17   your changes had occurred?

18   A    No.  The compliance rules report is an automatic report

19   that actually looks at the code itself and so then just reports

20   what was actually coded.  So it's a very accurate

21   representation.  And so with the rule changes, the description

22   changes.

23        During the webinars, I pulled up the compliance rules

24   report and, you know, we have showed the different definitions.

25        I should -- I would like to say that report also pops --

1   any given rule pops up from the performance report when you

2   click on -- you know, any given observation in the performance

3   report, you click on it, it will show you the rule that's being

4   applied, including, for example," "monthly not to exceed 45

5   days."

6   Q    Okay.  So someone would have to go and seek that out and

7   click on it to be able to see that the rule change occurred; is

8   that correct?

9   A    That's correct.

10  Q    But even if they did that, they would not have known that

11  this applied to the segregation hubs despite that the program

12  guide requirement for those units was different; is that right?

13  A    They would have known.  The rule -- there's a different

14  rule for every area, so it would have shown for PSU, main line,

15  ASU hubs.  And so you would see every one of those.

16       Also, if you were looking, for example, at the ASU EOP

17  performance report timely psychiatrist indicator and then you

18  looked at the details and click on one of those, the ASU EOP

19  version of that rule would pop up.  So it should be clear that

20  that's the criteria that was being used at the time, if you did

21  that at the time.

22  Q    But isn't it true that you didn't catch that you had done

23  that until just last week?

24  A    It is true.

25  Q    And when you had your webinars, did you publish any written

1   meeting minutes to go over the changes that you discussed in

2   those webinars?

3   A    No.  We didn't start putting out notes on the changes we

4   made until March of 2017, and that's when we started our

5   release notes process where we really do now log all the

6   different changes, like that would have been on there if we had

7   been doing it at the time.

8   Q    Okay.  But that was about six months or so after you made

9   the change.

10  A    Yeah.  Something like that.  Four months, yeah.

11  Q    Four months, sure.

12       So I'd like to go back to the time frame that you made this

13  change --

14  A    Uh-huh.

15  Q    -- December of 2016.  Is it true that at that time you had

16  the power to make changes to the performance reports without

17  any other person ever reviewing or proofing your work?

18  A    Can you clarify what you mean by I had the power to?

19  Q    Did you have the authority to make a change without anyone

20  double checking that your change was accurate and that it

21  followed the compliance requirements of the program guide?

22  A    No.  I didn't have that authority.  I had to get all

23  approval -- any substantive approvals to any business rules

24  from my managers.

25  Q    And was that Dr. Ceballos who approved those changes?

Leidner - Exam by Trapani

1   A    It was Dr. Ceballos, also Dr. Rekart was a manager of mine.

2   And then above them would have been Dr. Brizendine and

3   Katherine Tebrock.

4   Q    But in this case it was Dr. Ceballos only who approved your

5   rule change; is that correct?

6   A    That is correct.

7   Q    And at the time, in December 2016 when you made this rule

8   change, there was no independent entity that was outside of

9   CDCR Mental Health that was validating the rule changes that

10  you were making to the performance report; is that correct?

11  A    That's correct.

12  Q    And is there any outside entity doing those kind of

13  validations right now, to your knowledge?

14  A    I left in the end of July, so I don't know what's happened

15  since then, but up to the time of my departure -- an entity

16  outside of CDCR?

17  Q    Outside of CDCR Mental Health.  And if I may --

18  A    Yeah.

19  Q    -- and as you may know, the receiver in PLATA has hired a

20  consulting firm to validate their data and look at the

21  dashboard and ensure that that is accurate, and that's in the

22  PLATA case.  I'm wondering if there's anything like that in the

23  Coleman case for the performance report changes you were

24  making?

25  A    So as of the time I left, not to my knowledge, no.

1    Q    CDCR submits special court-ordered reports on the

2    timeliness of psychiatry contacts for EOP patients held in

3    segregation to the Special Master each month, and these are

4    called the self-certification letters for CDCR's ASU EOP hubs

5    and the PSUs.  Are you familiar with those self-certification

6    letters?

7    A    I don't have any -- I know they exist.  I don't know much

8    more about them than that.

9    Q    And you're aware that the timely psychiatry contact

10   indicator is one of the measures that's used in those reports,

11   right?

12   A    I'm not actually aware of that.  It certainly seems likely

13   that it would be.

14   Q    And it's true you never told the Special Master or anyone

15   on his team that you made this business rule change in December

16   2016, right?

17   A    That is correct.

18           THE COURT:  I think you have about two more minutes.

19           MS. TRAPANI:  Okay.

20           THE COURT:  Giving you credit for -- not counting the

21   break against you, of course.

22           MS. TRAPANI:  Thank you, Your Honor.

23   BY MS. TRAPANI:

24   Q    Did you ever ask anyone if you should report the change

25   that you made to the business rule in 2016 to the Special

1   Master or to the Court?

2   A   No, not that I recall.

3   Q   And you understood that change to be a significant change

4   to the program guide, right?

5   A   No.  I didn't understand it that way.

6   Q   So the 45 days was not a significant change to the program

7   guide for segregation units, for example, which literally

8   required 30 days between contacts?

9   A   That is -- that was not -- that was a mistake.  It should

10  not have been applied to those.  So I guess if I had known at

11  the time that it had been applied to those, I would have said

12  something because that's wrong and that was my mistake.  That

13  was never an intended change.

14  Q   I'd like to ask you a couple of questions about this second

15  issue in my limited time left, the "appointments seen as

16  scheduled" indicator.  You said you were aware that the

17  definition was altered and that the methodology for that

18  indicator was altered in about 2016 and that the underlying

19  description for the indicator was not updated; is that correct?

20  A   I'm sorry.  All I can -- all I know for sure is that by

21  February 2016 it had basically the current criteria it uses

22  now.  So it had to have -- the change had to have been before

23  February 2016.  And I can say I would have been the one to make

24  the change, and I did not change the description to match it.

25  That seems clear to me.  So that was my oversight.

Leidner - Exam by Trapani

1   Q    All right.  And there were other problems that the neutral

2   expert found plagued the "appointments seen as scheduled"

3   indicator that made it inaccurate, and I'd like to ask you one

4   question about that.

5        Is my understanding correct that rescheduled appointments

6   were counted as completed under this indicator if the scheduler

7   did not mark those appointments as canceled?

8   A    I don't know.  That's -- not to my knowledge.  I'm not

9   aware that that was the case.

10  Q    And what about if a patient is checked in and out from an

11  appointment, even if it didn't occur when the appointment was

12  supposed to happen, say it occurred a couple of days later.  So

13  long as that patient was checked in and out, that patient --

14  that appointment could be seen as scheduled even if it was

15  late; isn't that right?

16  A    I'm not sure that is possible.  If you check out an

17  appointment, it does mean that it occurred in our system, and

18  so I'm not positive.  I don't know the answer to that exactly.

19            THE COURT:  That would be your time.

20            MS. TRAPANI:  Thank you, Your Honor.

21            THE COURT:  All right.  Any questions from the

22  defense?

23            MR. FISHER:  Yes, Your Honor.

24            THE COURT:  All right.  And I'm sorry, I really should

25  know this.  Is this Mr. Heath?

Leidner - Exam by Fisher

1             MR. FISHER:  This is Mr. Fisher.

2             THE COURT:  Mr. Fisher.  All right.

3             MR. FISHER:  Sorry.  I'll announce myself.

4             THE COURT:  It was either Heath or Fisher.  All right.

5    You may proceed.

6                           EXAMINATION

7    BY MR. FISHER:

8    Q    Good morning, Dr. Leidner.

9    A    Good afternoon.

10   Q    The Court had asked about your July 2019 change in

11   position.  I was going to ask you did you like your position at

12   headquarters?

13   A    Yeah.  I loved it.  It was a great job, great colleagues,

14   great boss, got to work remotely.  That was really great.

15   Q    Why did you decide to leave?

16   A    Well, you know, when the investigation started, I thought,

17   okay, we'll go through the investigation, we'll say what

18   happened and then everything will be okay, we'll move on with

19   fixing whatever problems there are.  But after the Court issued

20   its June order, I think for this hearing, I became afraid,

21   basically, that, you know, any new error or change I made or,

22   you know, disagreement about some methodology would be taken up

23   as an allegation, you know, by the Court and I was -- I got

24   afraid.  And I asked my managers are these concerns overblown,

25   you know, am I being paranoid?  And they told me the concerns

Leidner - Exam by Fisher

1  were legitimate, so I decided I needed to leave just to sort of

2  protect myself.

3  Q    Sure.  Now, you discussed a couple of errors with the

4  indicators, one we'll talk about.  It's the issue redefining

5  monthly.  When you learned that you should change that back did

6  you do so?

7  A    Sorry?  Could you please repeat the question?

8  Q    Sure.  There was one issue that's been referred to in the

9  briefing and -- such as Issue B relating to the definition of

10  monthly for purposes of timely psychiatry contacts.

11  A    Yes.

12  Q    When you learned about that problem did you remedy it?

13  A    Yes, I did.

14  Q    How long did it take you to do that?

15  A    So let's see.  I was asked to do it on April 13 by

16  Dr. Ceballos, and then I had it all coded by April 14th.  And

17  then it needed to be validated by somebody other than me, and

18  so then we rolled it out with the next scheduled release of

19  changes, which was April 23rd.

20  Q    And now regarding the second issue we've been discussing,

21  this "appointments scheduled as seen" indicator.

22  A    Yeah.

23  Q    At some point you learned that there was an inconsistency

24  between what the indicator measured and what the indicator was

25  described as; is that right?

1    A    Yeah.

2    Q    Do you recall when you learned of that?

3    A    Dr. Ceballos asked me sometime around October 9th, I think,

4    before I had any knowledge of the Golding report.  I think she

5    asked me "Is this right?"  And I said "Oh, no, it's not."  And

6    I basically changed it that day to match what it was really

7    doing.

8    Q    Those were going to be my next questions.  Did you fix it?

9    A    Yeah.

10   Q    And how long did it take you to fix it?

11   A    Same day.

12   Q    And to your knowledge, did anything change from when you

13   started working in quality management to when your time at

14   quality management ended to get better control over changes to

15   indicators and other metrics using the data?

16   A    No.  Well, obviously a lot has changed.  Maybe I'll just

17   start from when these issues occurred to the present.  You

18   know, I've been there for ten years --

19   Q    Sure.

20   A    -- so a lot has changed, of course.  You know, one thing

21   I've learned is it is very important to make sure you get

22   all -- and this is a requirement now -- get all approvals

23   written down, you know, reiterate them in an email and then get

24   the person to approve them, to confirm it or modify it or

25   whatever.  That really helps, of course, to make sure you

Leidner - Exam by Fisher

1   actually agree on the same thing.  It memorializes the change

2   and also gives the person another chance to, you know, look

3   over it, make sure nothing's, you know, been left out or, you

4   know, an oversight or anything like that.

5        We went to a -- we now batch -- well, as of the time I

6   left, we went to putting out all of our changes in batches,

7   which we call "releases," which is a much better way to sort of

8   control the changes and to validate them.  And then, of course,

9   when we do that, there are notes that go out now with all the

10  changes.  And the notes are now posted in perpetuity on a --

11  probably a place that everyone can look at them.

12       We also send out an email to everyone whenever we put out

13  one of these releases with a link to the notes.  It also --

14  here's the link to how to report issues or questions or

15  whatever.  And we started a ticketing process, which is another

16  way to help people report their issues without having to come

17  to a webinar or whatever.

18  Q   Can you briefly describe what a ticketing process is?

19  A   Yeah.  You could create a problem ticket.  You simply just

20  go to a website managed by the CDCR and you can say, "Okay.

21  I'm noticing this problem with the report" or "I have a

22  question about how this works."  And my team and I would meet

23  twice a week and review the tickets, you know.  And a lot of

24  them they can just answer themselves, but if they needed my

25  input, I would give my input.  So we churned through a lot more

1  bug fixes and so forth.

2  And in 2018 -- I know you didn't ask -- we fixed I think

3  400 bugs and did 200 design changes to the reports, so there

4  was a lot of fixing and tweaking going on.

5  Q  And were there any other, I don't know, steps or processes

6  put in place to control changes to these indicators or the

7  data?

8  A  Well, the change management committee was established,

9  change control -- I forget which it's called now.  Change

10  management, I think.

11  Q  Can you describe what its purpose was?

12  A  Yeah, that -- where, you know, all the important stake --

13  the relevant stakeholders, right, would meet and review any

14  requested changes to reports, business rules, things like that

15  and then approve them so that it's done, you know, by committee

16  and that everyone important gets to chime in.

17  Q  Okay.  Now, these are just my last few.  Did you ever

18  change any data, business rules or indicators, for purposes of

19  making CDCR appear more compliant with program guide

20  requirements?

21  A  No.

22  Q  Did you ever feel pressure to change any data, business

23  rules or indicators, for purposes of making CDCR appear more

24  compliant with the program guide?

25  A  No.

1   Q    Did you ever intentionally prepare or create code that

2   would prepare false or misleading compliance data?

3   A    No.

4           MR. FISHER:  I have no further questions.

5           THE COURT:  All right.  May Dr. Leidner be excused?

6           MS. TRAPANI:  Your Honor, I have a few follow-up

7   questions I'd like to ask.

8           THE COURT:  All right.

9                           EXAMINATION

10  BY MS. TRAPANI:

11  Q    Dr. Leidner, you said that you were able to -- you were

12  ordered by Dr. Ceballos to change the business rule back on

13  April 12th of 2017, and that you made that change on April 13th

14  of 2017.

15  A    Did I -- I thought it was April 13 and April 14.

16  Q    I may have misstated your testimony.

17  A    Yeah.

18  Q    Please tell me --

19  A    Okay.  Yes.

20  Q    -- if I'm wrong.

21  A    So I got an email from her and, to my memory, on April 13th

22  asking me to change it, and then I changed it -- I changed it

23  by the end of the 14th.

24  Q    And you stated that it took another few weeks through a

25  validation process until that rule change went live on about

1   April 23rd or 24th of 2017; is that correct?

2   A    So it wasn't a few weeks, right.  That would have been one

3   week.

4   Q    Ten days?

5   A    Nine days.  Yeah.  That's correct.  It really couldn't have

6   happened sooner because we were now on that release schedule I

7   talked about where we were putting things out in batches.  So

8   that was the next scheduled release.  So it went out,

9   basically, as quickly as it could in the next release.

10  Q    So it's fair to say that it took much longer to change the

11  rule back than it did to make the original rule change, which

12  you did in about 8 minutes after Dr. Ceballos approved the rule

13  change; is that correct?

14           MR. FISHER:  Objection, misstates the testimony.

15           THE COURT:  Overruled.

16           THE WITNESS:  No, it's not correct.  It still took

17  me -- well, I don't know about 8 minutes for anything, but I --

18  it still took me a time to code the rule change, and I know

19  that it was changed by December 7th, but it would be highly

20  unlikely that I could make the rule change within 8 minutes and

21  I'm -- yeah.  So it probably took me about the same time to

22  code the rule change as it did to uncode it.

23  BY MS. TRAPANI:

24  Q    But based on what -- go ahead.

25  A    The difference is that by the time we uncoded the rule

1    change, now we had a process in place that was better for

2    quality management that included validation and batched

3    releases, so it did take longer to finally roll out; but in

4    terms of me changing it, it was about the same amount of time,

5    I believe, roughly.

6    Q    You said earlier to the Court that you were never told to

7    think very much about the Coleman Court's orders when you made

8    your business rule changes.  I'd like to introduce into

9    evidence a transcript of your testimony that you made before

10   the Court in 2013.  It's marked as Plaintiffs' Exhibit 240.

11             THE COURT:  Is it two documents?

12             MS. TRAPANI:  This is a single document, Your Honor.

13             THE COURT:  All right.

14   BY MS. TRAPANI:

15   Q    Do you recall, Dr. Leidner, testifying before the Court in

16   December of 2013 in the segregation trial?

17             MR. FISHER:  Objection.  This is Dr. Leidner.

18             THE COURT:  What's the objection?

19             MR. FISHER:  Apologies.  I misinterpreted the

20   question.

21             THE COURT:  All right.

22             THE WITNESS:  Yes.  I recall testifying about a report

23   relating to ad seg, yeah.

24   BY MS. TRAPANI:

25   Q    And you were aware at that time that the Court was looking

Leidner - Exam by Fisher

1    at your report about the segregation units and relying on the

2    report that you created to make findings in this case about

3    segregation; is that correct?

4    A   I honestly don't recall.  I remember I was just asked to

5    sort of explain the genesis and purpose of the report.  I don't

6    recall knowing that much about the purpose, no.

7    Q   And do you recall the Court asking you questions about your

8    report?

9    A   Yes.

10   Q   And so you were aware that the Court was looking at your

11   reports that you created for determining its order in this

12   case?

13   A   I don't -- I don't recall.  I don't know that I was aware

14   specifically what they were using the report for.

15           MS. TRAPANI:  Thank you, Your Honor.  No further

16   questions.

17           THE COURT:  All right.  Now, anything further,

18   Mr. Fisher?

19           MR. FISHER:  Yeah.  Just one clarifying question, Your

20   Honor.

21           THE COURT:  All right.

22                        EXAMINATION

23   BY MR. FISHER:

24   Q   Dr. Leidner, during your prior testimony, I believe you

25   mentioned making approximately 200 design changes to reports.

Leidner - Exam by Fisher

1    Those were reports internal to CDCR; is that correct?

2    A    Yes.

3              MR. FISHER:  Okay.  That's my last question.  Thank

4    you.

5              THE COURT:  All right.  Now is Dr. Leidner excused?

6              MS. TRAPANI:  Your Honor, I apologize.  I would like

7    to move into evidence Exhibits 101 and Plaintiffs' Exhibit 240.

8              THE COURT:  Any objection?

9              MS. THORN:  What was the second one?

10             MS. TRAPANI:  Exhibit marked Plaintiffs' 240.

11             MS. THORN:  No objection to the first.  The second one

12   is a transcript -- (inaudible.)

13             COURT REPORTER:  I'm sorry, Counsel, could you please

14   use the microphone?

15             THE COURT:  Actually, Mr. Fisher should be handling

16   these.

17             MR. FISHER:  No objections, Your Honor.

18             THE COURT:  All right.  So 101 and 240 are admitted.

19        (Plaintiffs' Exhibit 101 and 240 admitted in evidence.)

20             THE COURT:  All right.  You may step down and you are

21   excused.

22        (Witness excused.)

23             THE COURT:  All right.  At this point the Court

24   believes it does not make sense to start with Ms. Brizendine,

25   and so let me just ask the plaintiffs, I did read the parties'

1   stipulation regarding the attorney testimony.  The plaintiffs'

2   position at this point is that it's prepared to accept the

3   declarations provided if the Court determines that it does not

4   need to ask questions of the attorneys?

5           MS. ELLS:  Yeah.  Your Honor, I just want to make our

6   role clear.  That stipulation was to indicate that we did not

7   consider these stipulations to be a waiver.

8           We have not been privy to a lot of the information

9   that Your Honor has been able to review, so we can't speak to

10  whether or not these are sufficient, for the Court's purposes,

11  to answer your inquiries.  So we defer to you.  We do not

12  consider these a waiver.  If you believe that these are

13  sufficient to satisfy you based on what you've reviewed, we

14  will agree to that.

15          THE COURT:  All right.  At this point I'm inclined to

16  accept the declarations, but if anything changes tomorrow

17  afternoon, then we will revisit that question.

18          So we will start tomorrow at 1:30 with Dr. Ceballos

19  and then Assistant Deputy Director Brizendine and then

20  Undersecretary Toche, and I believe we will complete those

21  witnesses tomorrow.  There should be more than enough time if I

22  hold us all to the clock, including myself, and I don't believe

23  that would allow enough time for closing.  If I recall

24  correctly, you want to make closing argument, agreed, Ms. Ells?

25          MS. ELLS:  Yes.  I think some short closing argument

Leidner - Exam by Fisher

1    would be appropriate here.

2            THE COURT:  All right.  So my thought is that we

3    schedule Thursday morning, 10:00 a.m., half hour each.  Does

4    that work, Ms. Ells?

5            MS. ELLS:  We can make that work.  We had understood

6    that the Court would not hold these proceedings on Thursday,

7    but we can make that work.

8            THE COURT:  I had not planned to, but my plan has been

9    working towards some kind of pronouncement on Friday to be

10   memorialized in an order.  I still hope to get there, so that's

11   why I'm proposing burdening all of our schedules with an

12   additional hour on Thursday.  Does that work for the defense?

13   Who's the lead?

14           MR. LEWIS:  Your Honor, if I can clarify.  So it would

15   be both Thursday and then Friday morning as well?

16           THE COURT:  Thursday would be for you to make your

17   closings.

18           MR. LEWIS:  And then would we be coming back to court

19   on Friday to hear the Court's announcement?

20           THE COURT:  Yes.  So I previously told you your

21   closings are on Friday?

22           MS. ELLS:  Yes, Your Honor.

23           THE COURT:  Ah, okay.

24           MR. LEWIS:  And, Your Honor, perhaps -- and I don't

25   want to get into what your decision process may be, but if we

1    do move tomorrow, we could possibly be prepared tomorrow

2    afternoon for closings.  As you said, they would be brief and

3    we could obviate the need for that issue to come up.  So

4    perhaps if you wanted to bring us back on Thursday morning --

5    and I, of course, would respect Your Honor's schedule, but I'm

6    just trying to determine if you need us here for Thursday and

7    Friday.

8         THE COURT:  All right.  Well, if I told you closings

9    on Friday, then I was getting ahead of myself because I want to

10   think about your closings before I make a final decision.  But

11   maybe I can recess and do that.

12        All right.  Well, let's see how it goes tomorrow.  If

13   we were, in fact -- I think at least two of the witnesses will

14   take as much time as some of the longer witnesses today, and

15   I'm not -- I set aside the afternoon, so starting at 1:30.  So

16   we'll see where we are at the end of the day tomorrow.

17        Ms. Musell, you'd like to say something?  Why don't

18   you come forward so we can hear you properly.  Do you wish to

19   make a closing as well?

20        MS. MUSELL:  Well, Your Honor, it was a separate

21   issue.  There was some testimony today that indicated that

22   Dr. Golding had not made communications, and we have emails

23   that would demonstrate that that's false or incorrect to the

24   Court.  So my question, Your Honor, is, given that we were

25   unaware that that's how certain witnesses would testify, that

Leidner - Exam by Fisher

1    communications did not occur when we do have emails that

2    demonstrate that they do, would the Court like that information

3    in the record in order to make your determination?

4         THE COURT:  I believe that would make sense, yes, to

5    supplement the record.  So if you can -- could you provide by

6    tomorrow afternoon copies?  You can mark them as exhibits for

7    ease of identification and then have copies for the parties.

8         MS. MUSELL:  I'm happy to do that.  The way that we

9    had provided -- we've provided thousands of pages, Your Honor,

10   to the neutral expert, assuming that Your Honor would have

11   received those, but we are happy to do that here so that all

12   parties can see the same information as to those specific

13   communications.

14        THE COURT:  I have not previously opened up discovery.

15   I've consciously not allowed full discovery.  Are you -- you're

16   talking about selected emails --

17        MS. MUSELL:  Select.

18        THE COURT:  -- within the --

19        MS. MUSELL:  Yes.  We did understand, Your Honor, that

20   there had not been a mechanism to provide it to either party,

21   so we did not without an order directly from Your Honor.  We

22   wanted to honor whatever orders Your Honor had made --

23        THE COURT:  All right.

24        MS. MUSELL:  -- so we did not distribute that.

25        But as to these very particular issues that were

1  testified to today that indicated that there were no

2  communications with Dr. Golding when I've seen emails that said

3  they did, I think Your Honor may be interested in that.

4       THE COURT:  Yes.  Provide a packet to me with courtesy

5  copies for the parties.  Your position is there's no privilege

6  implicated by any of the --

7       MS. MUSELL:  That is my position.

8       My position additionally as to the 20 -- the report

9  that Dr. Golding had made of the inspection, if you will, going

10 to the particular institutions is also not attorney-client

11 privilege, but it was designated so after the fact even though

12 no attorney was provided it.  So I suppose that I should ask

13 Your Honor can I include that or not, given that it was

14 subsequently designated.  But my personal understanding is it

15 would not meet any definition of attorney-client privilege that

16 I'm aware of in practicing law.

17      THE COURT:  Is that the April 2018 document?

18      MS. MUSELL:  Yes, Your Honor.

19      THE COURT:  Well, why don't you prepare three sets,

20 provide them all to the Court tomorrow afternoon, I'll review

21 them and we'll go through a process.

22      I see you, Mr. Silberfeld, standing.

23      So if I think, based on all I know about potential

24 claims of privilege, I'll give the defense a chance to register

25 that objection.

 1            MR. SILBERFELD:  Appreciate that.  I was going to

 2    address one other thing, Your Honor.

 3            MS. MUSELL:  Thank you, Your Honor.

 4            THE COURT:  Do you want to make some closing statement

 5    to the Court, Ms. Musell?

 6            MS. MUSELL:  We had not contemplated it, Your Honor,

 7    but we certainly -- Dr. Golding has views on these issues, as

 8    you might imagine.  If it would help Your Honor, we're happy to

 9    do so.

10            THE COURT:  All right.  I'll let you know.

11            MS. MUSELL:  Thank you.

12            THE COURT:  All right.  Mr. Silberfeld?

13            MR. SILBERFELD:  Your Honor, the only thing I'd like

14    to reserve is the opportunity, depending upon what these

15    documents show, we may ask to call Dr. Golding back.

16            THE COURT:  All right.  May not be the only witness

17    implicated by the emails.  It could reopen portions of the

18    hearing entirely.

19            MR. SILBERFELD:  Yes, Your Honor.

20            THE COURT:  All right.  Ms. Ells?

21            MS. ELLS:  Your Honor, just one small housekeeping

22    matter.

23            We'd like to introduce into evidence Plaintiffs' 210,

24    212, 214 and 215.  These are the various iterations of the 2018

25    staffing plan.  And my understanding is, defendants are

Leidner - Exam by Fisher

1  stipulating to their admissibility.

2          THE COURT:  All right.  Agreed?

3          MR. FISHER:  Yeah, no objections.

4          THE COURT:  All right.  So those exhibits are

5  admitted.  You can provide courtesy copies to the Court before

6  you leave today.

7      (Plaintiffs' Exhibits 210, 212, 214 and 215 admitted in

8      evidence.)

9          THE COURT:  In terms of Exhibit 164, my request is

10  that you each identify for me the case law, a handful of cases.

11  I don't need argument.  Just let me know what the cases are

12  that you think guide my decision as to whether or not 164

13  qualifies as a document not covered by the hearsay rule.  And

14  if you could do that by tomorrow noon, you can email it to

15  Ms. Schultz and -- I mean, you can file the document just in

16  the form of a letter, "Here are the case."  Just simultaneous

17  filings by noon tomorrow.

18          MS. ELLS:  One clarification, Your Honor.  Do you want

19  any analysis in that?  Did you want argument in that or just

20  literally the case citation?

21          THE COURT:  Just the cases.

22          MS. ELLS:  Thank you.

23          THE COURT:  If I need argument, I'll let you know when

24  I see you tomorrow afternoon.

25          MS. ELLS:  Thank you.

Leidner - Exam by Fisher

1          THE COURT:  All right.  Any other housekeeping from

2    either side?  Any of the plaintiff class representatives?

3          MS. ELLS:  Not today, Your Honor.

4          THE COURT:  All right.  Any defense?

5          MR. LEWIS:  Nothing further, Your Honor.

6          THE COURT:  All right.  We'll see you tomorrow at

7    1:30.

8       (Concluded at 4:49 p.m.)

9

10

11                    C E R T I F I C A T E

12

13       I certify that the foregoing is a true and correct

14    transcript of the record of proceedings in the above-entitled

15    matter.

16

     _/s/ JENNIFER L. COULTHARD_              October 28, 2019

17                                                 DATE

18

19    JENNIFER L. COULTHARD, RMR, CRR
      Official Court Reporter

20

21

22

23

24

25