```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
 2                           --oOo--

 3    RALPH COLEMAN, ET AL.,     ) Docket No. 90-CV-520
                                 ) Sacramento, California
 4                  Plaintiff,   ) October 16, 2019
                                 ) 1:34 p.m.
 5              v.               )
                                 )
 6    GAVIN NEWSOM, ET AL.,      ) Re: Evidentiary Hearing
                                 ) Day 2
 7                 Defendants.   )

 8                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE KIMBERLY J. MUELLER
 9                 UNITED STATES DISTRICT JUDGE

10    APPEARANCES:

11    For the Plaintiff:     ROSEN BIEN GALVAN & GRUNFELD, LLP by
                             MS. LISA ADRIENNE ELLS
12                           MS. CARA ELIZABETH TRAPANI
                             MR. MICHAEL W. BIEN
13                           MS. JESSICA L. WINTER
                             101 Mission Street, 6th Floor
14                           San Francisco, CA 94105

15    For Dr. Golding and    STEWART & MUSELL
      Dr. Gonzalez:          MS. WENDY ELLEN MUSELL
16                           2200 Powell Street, Suite 440
                             Emeryville, CA 94104
17

18    Also Present:          Gregorio Winter, paralegal

19

20        (Appearances cont'd next page.)

21
                       JENNIFER COULTHARD, RMR, CRR
22                        Official Court Reporter
                         501 I Street, Suite 4-200
23                        Sacramento, CA 95814
                          jenrmrcrr2@gmail.com
24                          (312)617-9858

25        Mechanical Steno - Computer-Aided Transcription
```

```
 1   APPEARANCES (CONT'D)

 2   For the Defendant:      OFFICE OF THE ATTORNEY GENERAL
                             XAVIER BECERRA by
 3                           MS. ELISE OWENS THORN
                             MR. TYLER VANCE HEATH
 4                           1300 I Street, Suite 125
                             Sacramento, CA 94244
 5                           MR. ADRIANO HRVATIN
                             MR. JEFFREY THOMAS FISHER
 6                           MR. KYLE ANTHONY LEWIS
                             455 Golden Gate Avenue
 7                           Suite 11000
                             San Francisco, CA 94102
 8                           MS. SHARON A. GARSKE
                             1515 Clay Street, 20th Floor
 9                           P.O. Box 70550
                             Oakland, CA 94612
10
                             ROBINS KAPLAN, LLP
11                           MR. ROMAN SILBERFELD
                             GLENN A. DANAS
12                           2049 Century Park East, Suite 3400
                             Los Angeles, CA 90067-3208
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2   WITNESSES                                          PAGE

3   LAURA CEBALLOS

          Exam By The Court ........................ 249
4         Exam By Ms. Ells ......................... 272
          Exam By Mr. Lewis ........................ 287
5         Exam By Ms. Ells ......................... 302
          Exam By The Court ........................ 306
6         Exam By Ms. Ells ......................... 309
          Exam By Mr. Lewis ........................ 312

7

8   BRITTANY BRIZENDINE

          Exam By The Court ........................ 315
          Exam By Ms. Trapani ...................... 320
9         Exam By Ms. Garske ....................... 332
          Exam By Ms. Trapani ...................... 336
10        Exam By The Court ........................ 339
          Exam By Ms. Trapani ...................... 341

11

12  DIANA TOCHE

          Exam By The Court ........................ 344
          Exam By Mr. Bien ......................... 356
13        Exam By Mr. Lewis ........................ 360
          Exam By The Court ........................ 366

14

15                        E X H I B I T S

16  PLAINTIFFS' EXHIBITS                          ADMITTED

17
          No. 181  ................................. 369
          No. 182  ................................. 369
18        No. 183  ................................. 369
          No. 206  ................................. 378
19

20  JOINT EXHIBITS

          No. D  ................................... 369
21        No. C  ................................... 369

22

23

24

25

1    SACRAMENTO, CALIFORNIA, WEDNESDAY, OCTOBER 16, 2019

2                              --oOo--

3        (In open court.)

4             THE CLERK:  Calling civil case 90-520, Coleman, et al.

5    v. Newsom, et al.  This is on for an evidentiary hearing, and

6    today is day two.

7             THE COURT:  All right.  Good afternoon.  All counsel

8    are present.  Just a bit of housekeeping.  We'll talk about

9    Exhibit 164 at some point before we're done today.

10            I looked back at the transcript.  What I had clearly

11   contemplated was that we would have time for your closing

12   statements today.  I don't know if I spelled that out because I

13   had thought Friday would be the day that I'd be ready to

14   provide some kind of bench resolution of the issues before the

15   Court to be memorialized in a written order.

16            Here's an alternate proposal.  And I know I surfaced

17   this possibility yesterday.  Would it be possible, assuming we

18   get done today, which I think we will, for you to provide your

19   closing statements tomorrow morning 10:30 and then I would -- I

20   would strive to be ready tomorrow afternoon to provide my bench

21   explanation of my rulings?  If I'm not ready based on what you

22   tell me in your closing statements, then I'll set a later date.

23   Would that schedule work for the plaintiffs?

24            MS. ELLS:  Your Honor, I think we are -- we have not

25   seen the documents that Dr. Golding's counsel was referring to

1    yesterday, and we don't know what's in them.  So I am a little

2    bit concerned about the turnaround time on that.  We also

3    haven't had an opportunity for responding to the

4    counter-designations that were filed.  I think we can do

5    that --

6              THE COURT:  Oh, to the Kuich depo.

7              MS. ELLS:  -- pretty quickly.

8              THE COURT:  All right.  Well, maybe we'll take a

9    little more.  Maybe we'd take a little more time.

10             Would the defense be available on that schedule if, by

11   some miracle, it came together?

12             MR. SILBERFELD:  Your Honor, I have a number of

13   obligations, unfortunately, back home tomorrow in Los Angeles

14   because I was premised that we would be here on Friday.

15             THE COURT:  Okay.

16             MR. SILBERFELD:  There may be others as well, but if

17   everybody else is available, I'll explain it at home.

18             THE COURT:  All right.  We'll talk more about this at

19   the end of the day.

20             Just so I'm clear, have I received from Ms. Musell the

21   documents she was referencing yesterday?

22             MS. MUSELL:  Good afternoon, Your Honor.  I have the

23   documents here ready to provide.

24             THE COURT:  All right.  You can hand them up to

25   Ms. Schultz.  I'll take a look at them on our mid-afternoon

1    break.  And while I'm doing that, I'm ready to proceed to the

2    questioning of Dr. Ceballos next.

3              And here's my -- I haven't referenced -- I will, in my

4    summation, explain how I've handled the privileged documents.

5    If I had relied on any privileged document, I was prepared --

6    it might have been over objection -- but to share it without

7    opening wide the doors of discovery.  I have not relied on any

8    specific document.  I do have a question about one privileged

9    document, and I would like to ask -- I believe I see Ms. Evans

10   in the audience.

11             MS. EVANS:  Yes.

12             THE COURT:  I would like to ask that Ms. Evans and

13   Mr. Silberfeld just come to my chambers and once we adjourn

14   today I would like to have a short discussion with you about

15   one document that's been claimed as privileged.  Does that work

16   for you, Ms. Evans?

17             MS. EVANS:  Yes, it does.

18             THE COURT:  All right.  And Mr. Silberfeld?

19             MR. SILBERFELD:  Yes, Your Honor, of course.

20             THE COURT:  All right.

21             MR. SILBERFELD:  Your Honor, I have a 30-second

22   housekeeping --

23             THE COURT:  All right.  Can you make certain you're

24   speaking into a microphone?

25             MR. SILBERFELD:  May I come forward?

1          THE COURT:  Yeah, you may come forward.

2          MR. SILBERFELD:  This is a holdover from yesterday,

3     the testimony of Dr. Leidner.  And I shared this with counsel

4     for the plaintiffs.  We have an offer of proof to make in lieu

5     of calling Dr. Leidner back.

6          THE COURT:  All right.

7          MR. SILBERFELD:  And the offer of proof is as follows:

8     Yesterday, during Dr. Leidner's testimony, at about page 199 of

9     the rough transcript of yesterday's proceedings, Dr. Leidner

10    was describing for the Court how the "appointments seen as

11    scheduled" indicator is calculated.  At that time he stated

12    that the indicator is a ratio or a fraction where the

13    denominator is all scheduled appointments and the numerator is

14    the same number of appointments minus those that were canceled

15    for controllable reasons and also excluding rescheduled

16    appointments.

17         Overnight Dr. Leidner realized that this was an

18    incorrect description in part and has asked that we inform you

19    of that mistake.  Dr. Leidner informed us that the correct

20    description would be that the indicator is a ratio where the

21    denominator is all mental health appointments that were either

22    seen or canceled and not rescheduled for one of the four

23    controllable cancellation reasons:  Technical difficulties,

24    modified program, lack of transport or provider unavailable.

25    The numerator is all appointments from the denominator that

1   were seen.

2          THE COURT:  All right.  You've shared that with --

3          MR. SILBERFELD:  I have.

4          THE COURT:  -- the plaintiffs?  Ms. Ells, is it

5   acceptable to accept that as a correction of the record, or

6   Ms. Trapani?

7          MS. TRAPANI:  Yes, Your Honor.

8          THE COURT:  All right.

9          MR. SILBERFELD:  Thank you, Your Honor.

10          THE COURT:  So your reading it into the record will

11   suffice to clarify.

12          MR. SILBERFELD:  Yes, I hope so.

13          THE COURT:  All right.  The Court accepts that

14   correction.

15          All right.  Anything else before we begin, Ms. Ells?

16          MS. ELLS:  No, Your Honor.

17          THE COURT:  All right.  We'll go for about an hour and

18   a half, take a break.  I think we will get through the

19   witnesses remaining on the Court's list.  So if someone could

20   collect Dr. Ceballos, please.

21          MR. LEWIS:  Yes, Your Honor.

22          THE CLERK:  Dr. Ceballos, please step into the witness

23   stand and remain standing.  Please raise your right hand.

24      (Witness duly sworn and takes the stand.)

25          THE WITNESS:  I do.

 1          THE CLERK:  Thank you.  You may be seated.

 2          Will you please say and spell your first and last name

 3    for the record.

 4          THE WITNESS:  Laura Ceballos.  L-A-U-R-A,

 5    C-E-B-A-L-L-O-S.

 6               LAURA CEBALLOS, WITNESS, SWORN

 7                        EXAMINATION

 8    BY THE COURT:

 9    Q   Good afternoon, Dr. Ceballos.  I have a number of questions

10    for you, and then the parties will have a chance to address

11    you.  And just so I'm keeping track of how much time we're

12    using, I'm putting the clock on myself as well.

13          So, first, I have some questions about the lengthening of

14    the time for EOP contacts from 30 to 45 days as a general

15    header.

16    A   Okay.

17    Q   Do you understand what I'm referring to?

18    A   Yes.

19    Q   And I'm looking at some documents that are in the record.

20    This one, I believe, is attached to Dr. Golding's report.  And

21    in one communication with Dr. Golding, you wrote that "We don't

22    tell the Court or the Special Master about every change," but

23    you do let them know when a major change that has a significant

24    impact is made.  So when you say "we," who exactly does that

25    mean, in your mind?

Ceballos - Exam by The Court

1   A    I meant our mental health program.

2   Q    All right.  Could you pull the microphone slightly closer

3   to you, please.

4   A    Sure.

5   Q    All right.  And your role in that program?

6   A    So my title is mental health administrator.  And I oversee

7   our in-patient facilities and quality management.

8   Q    So just help me understand why you did not view the 30 to

9   45 days change as a major change with significant impact.

10  A    To me it was very clearly within the program guide policy

11  requirements.

12  Q    So even though it had been a certain outline, changing it

13  had no effect, in your mind?

14  A    So we had -- our quality management team had established

15  that 30 days several years ago internally as an interpretation

16  of the program guideline language that said monthly; and so, to

17  me, this was a decision that was going to help the field

18  improve patient continuity of care and was very clearly within

19  the policy requirements, so -- and I view my role as chief of

20  quality improvement, not chief of litigation.  So when we make

21  these decisions, my audience is the institution staff.  We

22  build reports for the managers to manage their programs and

23  make improvements.

24  Q    So the quality management team first determined the 30

25  days?

1  A    Yes.

2  Q    Was that without any input from the Special Master or

3  sharing of that information with the Special Master?

4  A    I don't believe so.

5  Q    So when you say "Major change that has a significant

6  impact," is that just your judgment call, or is that a finding?

7  A    So it's fairly subjective, right, but if there was going to

8  be a change that pushed, perhaps, the policy requirements,

9  something that was going to significantly change the

10  percentages to the point where it would -- I'm trying to think

11  of an example, but I'm not thinking of one, but something that

12  would push the policy requirements, we would consult with them

13  first.

14  Q    Consult with them, who's "them"?

15  A    The Coleman monitors.

16  Q    The Coleman monitors.

17  A    There have been examples over the years where someone

18  requests something that is outside of or pushes the

19  interpretation of the program guide rules.  When that happens,

20  we would either bring those items to the all parties meetings

21  or we would consult with the homeland Special Master's team.

22  And in some cases it results in a refinement of policy or

23  clarification of policy.

24  Q    All right.  But this was not one of those.

25  A    No.  Again, to me, "monthly" means at any time once per

1   month and if -- depending upon the month, if you saw them on

2   the 2nd of April and the end of May, you could actually go out

3   to 60 days in between seeing patients, if you follow the strict

4   monthly rule.

5   Q   You also wrote, "The problem is and always has been that

6   the program guide is not always written clearly, at least not

7   as concretely as needed for computer rules."  Why is that not

8   an issue to raise expressly with the special master or a member

9   of his team?

10  A   I think it is an issue to expressly raise.  We had started

11  a project, which has continued, to embark upon writing some

12  regulations, to help clarify language.  But remember, for

13  computer rules, the language has to be really specific.

14  Q   But that's why I'm asking you.

15  A   Yeah.

16  Q   You pointed that out and, yet, the change from 30 to 45

17  days you did not see as falling under the definition of this

18  problem that you, yourself, identify.

19  A   So, to me, though, that problem where the program guide

20  language is much broader than our computer rules is a much

21  larger project.  It's more -- to me, that's a legal project.

22  It is something that I have brought up from time to time, which

23  is why we initiated a project to start writing regulations.

24  It's also why we've written some clarifying policies for the

25  field where areas are not followed by the field because the

Ceballos - Exam by The Court

1    language is so unclear.

2    Q    So help me understand how you -- where do you draw the

3    line?  What do you bring forward to the Special Master and what

4    do you just consider yours to decide internally when the

5    program guide is not written clearly -- not concretely enough

6    as needed for computer rules?

7    A    So there are some specifics in the program guide.  If I got

8    a request to change our IDTT rules to go beyond 14 days, that

9    would be denied because the program guide is clear that the

10   IDTT rule is 14 days.

11   Q    And no -- no practice, no matter how well established, ever

12   develops the concreteness of that example of 14 days?

13   A    I'm not sure I understand that question.

14   Q    If there's a well-established practice, 30 days, 30 days,

15   30 days, that's the understanding, does that practice ever

16   become so consistent that it's equivalent to a rule, in your

17   mind?

18   A    My message to the field is always that the policy has to be

19   the controlling source, not business rules, not reporting

20   rules.  Reporting rules generate indicators, which are designed

21   for institution management and staff to go look to see that

22   there may be something going wrong or right in their system but

23   that they should go look.

24   Q    And the policy is the program guide?

25   A    The policy is the program guide.

1  Q    So you've described generally some steps you've taken to

2  raise the issue.  Just so I'm clear, what exactly have you done

3  to raise the problem created by the program guide not always

4  being written clearly to raise any issues resulting from that

5  general problem with the Special Master?

6  A    So since this has occurred, I've raised and I know that my

7  colleagues have raised to the Special Master's team while

8  they've been at our headquarters to sit down together and go

9  through business rules.

10  Q    And all business rules, or do you -- is there a -- I'm

11  trying to understand.  Is there a subset that you think CDCR

12  has the right to just decide on its own, or do you consider at

13  this point that every business rule should be raised with the

14  Special Master?

15  A    Well, I'll have to tell you, I don't know anymore because I

16  was under the impression that I was building the reports for

17  our own self-monitoring, not for litigation; not for the

18  Coleman team but for our own self-monitoring.  And this has

19  made me question what my role is in relation to reporting.

20  Q    I'm just asking you separate and apart from, you know,

21  whatever -- you're represented here.

22  A    Uh-huh.

23  Q    And so there's an attorney who will object if they think

24  I'm straying into some area, and I'll decide if I'm going to go

25  ahead and ask you the question, but I'm just actually asking

1    you practically speaking.  I understand that you were a

2    critical communicator with the Special Master's team.  Did you

3    see yourself that way?

4    A    I communicate with them.

5    Q    Were you a point person for communications with the Special

6    Master?

7    A    At times.

8    Q    Who else would have been a point person for communications

9    with the Special Master, if not you?

10   A    It has shifted other the years, so Angela Ponciano from

11   time to time, Katherine Tebrock when she was the deputy

12   director took point to be the communicator with the Special

13   Master's team more often than not.

14   Q    But on an issue like this, the 30 to 45 days, if anyone was

15   going to tell the Special Master of that change, would it have

16   been you?

17   A    Most likely, yes.

18   Q    So you can appreciate that they may have been very

19   surprised to know that you did not tell them of that change?

20   A    We have many, many rules and so, yeah, I would be.  I'm

21   surprised they're surprised because, again, it was my

22   impression that we were doing reports for our own internal

23   self-monitoring.

24   Q    Self-monitoring as in process?

25   A    Performance improvement.  Our own performance improvement.

Ceballos - Exam by The Court

1   Q    Uh-huh.  All right.  So just -- if you can just focus on

2   the question, because I think you ended up not fully answering

3   it.

4        What steps have you taken, let's say since the Golding

5   report --

6   A    Uh-huh.

7   Q    -- to make certain that all areas where the program guide

8   is not always written clearly, as needed for computer rules, to

9   raise all of those issues with the Special Master?

10  A    Well, so the program guide, as I understand it, is a legal

11  document.  I have expressed that the program guide isn't

12  clearly written to translate into computer rules.

13       I should add that it would be really difficult to write all

14  policies to clearly translate into computer rules.  You're

15  always going to have a translation just because of how very

16  specific computer rules have to be; although, there is room for

17  improvement.

18       But that discussion, that would be a complete revision of

19  the program guide which would be -- in my opinion and under my

20  impression would be a legal decision.

21  Q    I'm assuming we're not talking about a wholesale revision

22  of the program guide, but I'm just trying to understand what

23  you said in your own words to Dr. Golding.  "The program guide

24  is not always written clearly, at least as not concretely as

25  needed for computer rules."  And all I'm asking is, do you have

1    a list, a discrete list of where the program guide is not

2    written clearly so as to support the writing of computer rules?

3    Do you have in mind --

4    A   So I don't have a discrete list, but I also think it's more

5    complicated than that.  The level of specificity that's

6    required for accurate reporting is such that while we could

7    improve policy language and make things clearer; for example,

8    saying "working days" and "calendar days," in some areas it

9    says, you know, seven days.  Definition of "emergent."  There's

10   no definition of "emergent."  Within what timelines does a

11   person have to be seen emergently?  That's not clear.

12        So there are examples where we could do some cleanup.  But

13   even with all of that, the level of specificity that's required

14   for computer calculation, one couldn't write a policy

15   succinctly enough to address all of those details that have to

16   go into computer rules.

17   Q   I understand that response generally.

18   A   Yeah .

19   Q   I'm just trying to -- here we have an issue of 30 to 45

20   days.

21   A   Uh-huh.

22   Q   So let's assume that the better practice at the time would

23   have been to run that up to the Special Master and say "We are

24   contemplating this change."

25   A   Okay.

Ceballos - Exam by The Court

1    Q    Any problem with that?  So let's assume that's best

2    practice.  Can you at least accept that, for sake of argument

3    here today?  Are there other such business rule changes that

4    you currently believe need to occur internally?  Are there?

5    A    There are definitely policies that we could sit down

6    together and go through to ensure that they're clearer for

7    clearer interpretation of the business rules, yes.

8    Q    Have there been any business rule changes since the Golding

9    report, along the lines of the 30 to 45 days?

10   A    So my ability to change business rules since that -- we had

11   a change meeting that was decommissioned as a result of the

12   allegations that has been on hold since that time.  So I have a

13   list, a log that I'm keeping of business rule updates that are

14   needed that I haven't been able to change.

15   Q    Were there any other business rule changes prior to the

16   filing of the Golding report that occurred equivalent -- I

17   can't tell you what's equivalent, but along the lines of the 30

18   to 45 days made before the Golding report that were not shared

19   with the Special Master?

20   A    I would have to look back at our records.  Not that I'm

21   recalling, but I would have to look.

22       And I should add, we did make some business rule changes

23   that were in response to the Golding report that were approved

24   by our deputy director and legal, and that's the only way I've

25   been able to make business rule changes.  So, for example, we

1   applied the psychiatry rules to include EOP patients not on

2   medication.

3   Q    At this point is your understanding that business rule

4   changes are shared with the Special Master before

5   implementation or not?

6   A    That is still not clear to me.

7   Q    All right.  Who decided to exclude from the "appointments

8   seen as scheduled" indicator methodology appointments not seen

9   due to patient refusals or no shows?

10  A    That was cited by the healthcare quality management

11  committee.

12  Q    Any one person in particular take the lead in that

13  decision?

14  A    No.  It's an executive-level committee for healthcare.

15  Q    And why did that committee decide to make those changes?

16  A    So this is from my recollection, but I believe it was

17  because the CEOs felt like that particular indicator, which is

18  an efficiency measure -- so what it measures is for the

19  appointments that you scheduled, did those patient get seen as

20  scheduled.  So it's not designed to do any more than look to

21  see if you're using the resources appropriately.  The CEOs felt

22  like it would be more effective if they excluded appointments

23  that were not seen that were out of their control.

24  Q    And when you say "the CEOs," who is that?

25  A    So those are the executive-level staff who run the

1  healthcare at each individual institution.

2  Q    And who are those people?  Do they have names?

3  A    There are 35 of them.

4  Q    Ah.  Total of 35.

5  A    Yeah.

6  Q    So collectively that group --

7  A    Right.

8  Q    -- made the decision?

9       You're a member of that committee?

10 A    I'm not a voting member, but I do attend.

11 Q    And did you weigh in on that change?

12 A    I don't remember.

13 Q    Have you conducted any analysis to determine the impact of

14      that change on percentage of missed appointments?

15 A    No.  What we do if -- the QMC is the highest level

16      authority, in terms of quality management, so they voted and

17      approved that.  So what we do with healthcare is when we share

18      indicators, we apply their methodology.

19 Q    And for what purpose are you sharing indicators?

20 A    So we're kind of a sub-umbrella under the larger healthcare

21      quality management, so we share indicators and then we have

22      more that are mental health specific on top of the overall

23      healthcare indicators.

24 Q    And for what purpose?

25 A    For performance improvement.

Ceballos - Exam by The Court

1    Q    And is that to satisfy court-ordered requirements in

2    Coleman in any respect?

3    A    Not from my perspective.

4    Q    Is it to satisfy any court-ordered requirements of any

5    kind?

6    A    Well, we do have a 2012 court order that requires us to

7    have a self-monitoring system that I was asked about.

8    Q    So it is, in part, to satisfy that requirement?

9    A    Right.

10   Q    Do you know what the rate of missed appointments for

11   various groups, individuals, groups, IDTTs was prior to the

12   changes made to the "appointments seen as scheduled" indicator?

13   A    No.

14   Q    Do you know what the rate of missed appointments was

15   following the change?

16   A    No.

17   Q    Would you be in a position to run those reports?

18   A    We may be able to.  Because it was quite a few years ago, I

19   don't know if we could run them that far back and get the

20   result that you're looking for.  We might have to do a special

21   ad hoc query, which may or may not be exact as what it would

22   have been two years ago.

23   Q    Do you recall a meeting chaired by nursing attended by the

24   PLATA receiver and mental health where the reporting of

25   scheduled and missed appointments was discussed?

1    A    No.

2    Q    So if there was a meeting, you were not aware of it or were

3    not in attendance?

4    A    I may have been in attendance and I may not even remember.

5    We have meetings all day long, hundreds of emails, so . . .

6    Q    But apart from the broader committee you just mentioned, no

7    meetings specifically to discuss the issue of scheduling missed

8    appointments?

9    A    Not that I recall.

10   Q    Do you recall at any point the PLATA receiver expressing

11   concern as to how CDCR was reporting scheduled and missed

12   appointments?

13   A    No.

14   Q    Here, again, with respect to the "appointments seen as

15   scheduled" indicator, have you taken any steps to ensure that a

16   change like that does not occur without the Special Master

17   first being informed?

18   A    No.  Again, I don't have any clarity related to if and when

19   and how we're supposed to be informing the Special Master's

20   team of any reporting changes.

21   Q    The Court has heard some testimony regarding this

22   indicator, that it was essentially for CDCR's use in

23   determining effectiveness of scheduling and not for monitoring

24   program guide requirements, consistent with what you seem to be

25   saying here today.

1   A    Uh-huh.

2   Q    Are you aware that the Special Master does use that

3   information to assess compliance with program guide

4   requirements for access to care?

5   A    No.

6   Q    So you're not aware that he requests this information as

7   part of pre-site document requests prior to monitoring?

8   A    He may request it, but I don't -- I didn't realize that he

9   was using it for an access-to-care measure.  We have other

10  access-to-care measures that would be more appropriate for that

11  purpose.

12  Q    When you say "he may request it," you're not aware of those

13  requests in the past?

14  A    I know that we get the document request, and I don't

15  remember if that specifically is in it.

16  Q    And just so I'm clear on this, you did not report changes

17  to the "appointments seen as scheduled indicator" methodology

18  to the Special Master?

19  A    No.

20  Q    And you did not see that as something that should be

21  reported to the Special Master?

22  A    No.  Again, I viewed our reporting as for our own internal

23  performance management purposes.

24  Q    And how -- do you, in your mind, draw a line between

25  internal reporting and reporting to the Court?  There must be

1    some overlap there, no?

2    A    Yeah.  In our system it's a little unique because we have a

3    quality improvement system and we have a lot of data and the

4    data are very helpful.  And so our data are often used for

5    other purposes.  But my job is quality management.  My job is

6    to make sure that we're monitoring our performance, and that is

7    the way that we've developed our reports.  We've developed our

8    reports for that purpose.

9    Q    You did at one point report that the error with the

10   "appointments seen as scheduled" indicator was the result of an

11   inadvertent failure to update, correct?

12   A    What we failed to update was the definitions.  So in our

13   reports you can push the indicator and it will tell you about

14   the report, and in that we'll have a description of the

15   indicator.  What we failed to update when the code was updated

16   was that description.  And I didn't know about that error until

17   I saw Michael Golding's report.  Had he come down the hall and

18   told me about it when he identified it many months prior, I

19   would have changed it immediately, just as I did when we got

20   the report.

21   Q    So the description only, no coding error?

22   A    No coding error.  It was just the description.

23   Q    Are there other indicators that CDCR mental health has

24   changed to match the receiver's healthcare dashboard?

25   A    I'm certain there would be.  What we do is, if there are

Ceballos - Exam by The Court

1    any updates, either through QMC or through our own, we share

2    the code.  So I don't have specific examples, but I'm certain

3    there would have been others.

4    Q    When you say "code," you mean the software code, the

5    programming code?

6    A    Yeah.  Yeah.  The behind-the-scenes code.

7    Q    Since when has that kind of sharing been going on?  When

8    did it first start?

9    A    Since we first started building up our quality management

10   system many years ago.

11   Q    So what -- first year, if you had to estimate?

12   A    2009.

13   Q    So even if you can't answer with specificity here today,

14   could you go back and identify when changes to CDCR mental

15   health have been made to match the receiver's healthcare

16   dashboard?

17   A    Yeah.  We could probably identify some.  I don't know how

18   far back in time we'd be able to look.

19   Q    Do you know who first decided to share data on caseload

20   inmates between mental health and the receiver?

21   A    It was -- I don't.  It just -- it kind of started as -- the

22   healthcare QM team and the mental health QM really started

23   building our QM programs at the same time together so that we

24   actually share a data warehouse that we started together with

25   IT's support.  So it's just kind of come up that way.  I don't

266
Ceballos - Exam by The Court

1   know.

2   Q    So all the data, whether it's mental health or healthcare,

3   is in the same data warehouse?

4   A    That's correct.

5   Q    What steps are taken to identify data that may be relevant

6   to the Coleman case as distinct from data relevant to the PLATA

7   case?

8   A    So we have programmers and when the programmers build

9   reports for specific disciplines, they use different tables and

10  would build the report based upon the relevant data for that

11  indicator.  But again, I don't know that we're building reports

12  for the Coleman case.

13  Q    Is the data ever pulled out of the data warehouse into a

14  separate database for Coleman purposes?

15  A    No.  The data warehouse is kind of a repository for all of

16  our data.  It's kind of just where it pulls different sources

17  together.

18  Q    So it's not as if there's a sharing on a monthly basis, for

19  example, of data?  It's just always -- it's just in the same

20  warehouse all the time, is that what you're saying?

21  A    Yeah.  It's a repository, an IT repository for many

22  different data sources.

23  Q    So there's no updating running separate databases against

24  the warehouse to import data from mental health, for example?

25  There's no separate repository of mental health data?

Ceballos - Exam by The Court

1    A    No.

2    Q    And are there regular meetings to discuss the maintenance

3    of the data warehouse?

4    A    We have a database administrator who is an IT person, and

5    the healthcare QM team works with that person to do regular

6    maintenance of the data warehouse.

7    Q    And who is that person, the database administrator?

8    A    I don't know who it is at present.

9    Q    And are there regular meetings with that person?

10   A    I believe so.  As I said, the healthcare QM team, so the

11   receiver's QM team are the team that meets with that database

12   administrator.

13   Q    But you attend those meetings as a nonvoting member?

14   A    No, I don't attend those meetings.

15   Q    Does anyone representing mental health attend those

16   meetings?

17   A    No.  It's a technical meeting.  It's an IT technical

18   meeting to ensure that the data warehouse is working as it

19   should be.  I think Dr. Leidner used to attend, but it's a very

20   technical meeting between IT staff.

21   Q    So does that committee have the ability to change business

22   rules?

23   A    That's not a committee.  It's a technical group that

24   discusses the functional --

25   Q    Okay.

1    A    -- functioning of the data warehouse.

2    Q    So technical group.  Does that technical group have the

3    ability to change business rules?

4    A    No, because the business rules come from when a programmer

5    develops a report, they're really just looking to make sure

6    that the data are -- the data warehouse is operative.  It

7    has -- it's separate from the reporting piece.

8    Q    So it would never be the case that anyone with the

9    receiver's organization would make changes to healthcare

10   business rules that would impact a mental health indicator?

11   A    That does happen.  That's the example of this "appointments

12   seen as scheduled."  So we communicate -- mental health is a

13   voting member at the QMC, the quality management committee.  If

14   there are concerns, they would be raised at that committee.

15   And then when things are approved, whatever code is updated, we

16   would apply that to the mental health code as well.

17   Q    So the QMC committee decides on the business rules where

18   mental health is nonvoting, correct?

19   A    We have -- our deputy director would be the voting member.

20   Q    The voting member?

21   A    Yeah.

22   Q    All right.  But then the business role, once approved, is

23   referred to the technical committee to implement?

24   A    No.  The technical committee the data -- those -- that's

25   just a team that just makes sure that the data warehouse that

1    holds the data, from a technical perspective, is operative.

2    Q   Okay.

3    A   It has nothing to do with reporting except we were making

4    sure that the data are there and coming through accurately.

5    Q   So if a business rule is changed, who implements it?

6    A   Programmers, ultimately.

7    Q   And so that would be -- if it's mental health, mental

8    health programmers?

9    A   Yes.

10   Q   And if it's healthcare --

11   A   Well, sometimes.  So we partner with healthcare QM because,

12   again, we're under their umbrella, right?  And so it depends.

13   If we have the bandwidth and resources and the skills to update

14   the code within our shop, we will do so if it's mental health

15   specific.  But if we need their assistance, we reach out to

16   them and they would do it for us.

17   Q   And if healthcare affects a business rule change, what's

18   the quality control to make sure it's done correctly for mental

19   health's purposes?

20   A   So both the healthcare QM team and our mental health team

21   have a validation process.  So we have staff who will do random

22   selection of some cases and go through and make sure that the

23   code is operating correctly.

24   Q   So if the receiver's programmers make a change, then mental

25   healthcare would run the validation process on that change?

Ceballos - Exam by The Court

1   A   Typically their team will run the validation process.  At
2   times they may reach out to us to also test some cases.
3   Q   So Dr. Leidner worked for you, correct?
4   A   Yes.
5   Q   Did you ever suggest to him that he faced exposure because
6   of the proceedings going on in this court?
7   A   Can you repeat the question?
8   Q   Did you ever suggest to him that he faced exposure,
9   liability, based on the proceeding going on in this court?
10  A   No, not until recently when we all realized that as a
11  result of Dr. Golding's report that we were being -- we had
12  allegations against us.
13  Q   So you didn't until recently, but you did recently?
14  A   I don't know if I expressly did it, but we all knew because
15  we were all presented with Dr. Golding's allegations.
16  Q   But so you might have suggested to him that he faced
17  exposure?
18  A   I don't know that "exposure" is the correct word.  I
19  think -- because there's nothing to expose except that we're
20  all being -- have allegations against us as if we had done
21  something nefarious, and Dr. Golding started those allegations
22  well before he released his report.
23  Q   All right.  So just some general wrap-up questions.  During
24  your work for CDCR Mental Health, has any person ever directed
25  you to manipulate data for any purpose related to Coleman

Ceballos - Exam by The Court

1   remediation?

2   A    No.

3   Q    Has any person ever directed you to provide misleading data

4   to the Special Master?

5   A    No.

6   Q    Have you ever provided misleading data to the Special

7   Master?

8   A    No.

9   Q    Has any person ever directed you not to correct misleading

10  data provided to the Court?

11  A    Can you repeat that question?

12  Q    Has anyone ever directed you not to correct misleading data

13  provided to the Court?

14  A    No.

15  Q    Have you ever agreed that it would be all right to provide

16  misleading information to the Court?

17  A    No.

18  Q    Do you think there's a margin of error that applies to data

19  relevant to the Coleman case?

20  A    Yes.

21  Q    How would you describe that margin of error?

22  A    We have hundreds of reports.  We have hundreds of business

23  rules.  We have probably thousands of lines of code, and so

24  there will be a margin in terms of the code itself.  And also,

25  it depended upon what goes into the system.  So there's a human

1  error component.  If someone enters information incorrectly

2  into the healthcare record or into the custody database, then

3  our report will be wrong as a result of that human error.

4  Q   Can you quantify?  Is there an acceptable, quantifiable

5  margin of error when it comes to key statistics being provided

6  to the Coleman court?

7  A   So, typically, in statistics you look for a margin of error

8  of less than 10 percent.  I don't know if we have a

9  quantifiable margin of error for our reports.  What I do know

10  is Dr. Leidner is an expert in this area, has spent years

11  researching the most accurate methodology possible and we

12  are -- we have constantly worked to update reports to make them

13  as accurate as possible over the years.

14  Q   So recognizing all of that, is -- in your mind is there an

15  acceptable margin of error in the Coleman case, quantifiably?

16  A   I can't speak to that.

17          THE COURT:  All right.  Those are my questions for

18  now.

19          Ms. Ells?

20                          EXAMINATION

21  BY MS. ELLS:

22  Q   Good afternoon, Dr. Ceballos.

23      When you approved the change that Dr. Leidner called you

24  about on December 5th to change the measure for timely

25  psychiatry contacts to be greater than 30 days, did you inform

1    your boss, Dr. Brizendine, about that change?

2    A    No.

3    Q    Did you inform Deputy Director Tebrock about that change?

4    A    No.

5    Q    Were you aware that Deputy Director Tebrock personally

6    certifies the EOP ad seg hubs every month to make sure that

7    they're compliant with program guide requirements?

8    A    Yes.

9    Q    Were you aware that she uses timely psychiatry contacts as

10   part of those measures?

11   A    Yes.

12   Q    But you didn't tell her that you had changed how that was

13   being measured?

14   A    So the EOP hub certificates have --

15   Q    That's just a question.  Did you tell her that that was

16   being changed, yes or no?

17   A    No.

18   Q    And you were also in the middle at this time when you

19   authorized this rule change, you were in the middle of the 27th

20   round of Special Master monitoring of the prison system, right?

21        MR. LEWIS:  Objection, Your Honor, as to "you," vague

22   and ambiguous.

23        MS. ELLS:  CDCR.

24        THE COURT:  All right.  With that clarification, you

25   may answer.

1    BY MS. ELLS:

2    Q    And you were the point person for the pretour production of

3    documents in response to the Special Master's pretour document

4    request for that round; is that right?

5    A    Yes.

6    Q    And you provided in your declaration, which is Joint --

7    sorry -- Exhibit 3 to your declaration, which is Joint

8    Exhibit D that what you call a sample of the methodology that

9    you provided to the Special Master during that round, so Joint

10   Exhibit C is the document request and it requests the

11   methodology for every report and piece of data that you

12   provided to him as part of your pretour production.  Do you

13   recall that, that he requested the methodology?

14   A    We had an attachment that included the methodology, yes.

15   Q    So you recall that he requested the methodology for every

16   piece of data you gave him for the 27th round of monitoring?

17   A    I don't remember that specifically.  We had an attachment

18   in which we explained how the data were run.

19   Q    I'll represent to you that in Joint Exhibit 2 -- Joint

20   Exhibit C, which you attached to your declaration last

21   November, the document request specifically said that you need

22   to provide a methodology for every data point that you provide

23   to him.

24          MR. LEWIS:  Objection, your Honor.  The witness can

25   actually look at the document that's right behind her.

1        THE COURT:  That's fair.

2        MR. LEWIS:  If counsel could possible direct her to

3    that.

4        MS. ELLS:  Sure.  Go ahead.  Joint Exhibit C.

5        THE COURT:  There's a binder behind you you can pull

6    out and set up on the stand in front of you.

7    BY MS. ELLS:

8    Q    Turn to page 4, please.

9        The middle paragraph that begins "Proof of practice

10    material," the second sentence says, "Each audit and report

11    provided must include a detailed description of the

12    methodology, time frame, sample size, results and remedial

13    action, if applicable."  Do you recall that?

14    A    Yes.

15    Q    And attached as the next exhibit, Exhibit 3 to your

16    declaration from last November, which is Joint Exhibit D, you

17    provide what you call a sample of the methodology that you

18    provided in response to that document request.  Do you recall

19    that there were tours of prisons in January of 2017,

20    specifically CIW and CCWF were toured January 24th through 26th

21    of 2017?  Do you recall that?

22    A    I don't recall that specifically.

23    Q    In the sample that you provided in Joint Exhibit D, I'd

24    like you to turn to page 16.  Now, you represented in your

25    declaration that this is a sample of the methodology you

1    provided the Special Master as part of your pretour productions

2    in that round, which included the time frame that you had

3    approved changing the indicator.

4         On Joint Exhibit D, page 16, it represents that the timely

5    routine psychiatry contacts for EOPs is 30 days, right?  Do you

6    see that?

7    A    I see the 30 days.

8    Q    Is this what you provided to the Special Master in advance

9    of the January 24th through 26 tours in 2017?

10   A    Apparently.

11   Q    And in the sample that you provided attached to your

12   declaration of the methodology you provided for the 27th round

13   to the Special Master, you don't include anything about the

14   methodology that you used to measure timely contacts for EOP ad

15   seg psychiatry contacts.  Do you recall what you told him the

16   methodology you used was?

17   A    No.

18   Q    Both CIW and CCWF have EOP ad seg hub programs, right?

19   A    Yes.

20   Q    And you also didn't include in your sample that you filed

21   in your declaration the PSU timely psychiatry contact

22   methodology that you provided to the Special Master for the

23   psychiatric services unit, which holds EOP patients --

24   segregation unit that holds EOP patients, right?

25   A    I'm sorry, can you repeat that?

1    Q    The PSU is a psychiatric services unit that houses EOP

2    patients in segregation, correct?

3    A    Yes.

4    Q    And in the sample that you filed with your declaration of

5    the methodology you provided the Special Master for the 27th

6    round, you don't include what methodology you used for counting

7    timely psychiatry contacts in the PSU.  Do you recall what you

8    told him that methodology was?

9    A    No.

10   Q    Dr. or Deputy Director Tebrock filed a declaration that

11   attached data from the performance reports in this court on

12   March 30th, 2017.  Did you help prepare that data?

13   A    I don't remember.

14            THE COURT:  Can you speak closer to the mic?

15            THE WITNESS:  Sure.  I don't remember.

16   BY MS. ELLS:

17   Q    I'll provide it to you so you can review it.

18        This is Plaintiff's Exhibit 182.  This is the declaration

19   of Katherine Tebrock filed March 30th, 2017, ECF 5591-2.  Could

20   you please turn to page 9.  This chart do you see at the top

21   says "Timely Psychiatry Contacts, Access to Care Banner"?  Is

22   that data from your reporting?

23   A    I forgot to bring up my glasses.  Hold on.  I can't say

24   that with any level of certainty.

25   Q    Do you have any idea where else she would have gotten that

Ceballos - Exam by Ells

1    data?

2    A    So we could have used our performance report data, but we

3    also could have pulled an ad hoc query that would have done

4    special to the request.

5    Q    Do you have any reason to think you would have done that

6    for this report?

7    A    I don't know.  We have data requests, many data requests

8    all the time, so I don't recall this specifically.

9    Q    Either way, that data would have come from your department,

10   correct?

11   A    At times we ask healthcare QM for help when we don't have

12   resources, so I can't say that with any level of certainty

13   either.

14   Q    But you would have been the one making that decision to ask

15   for that data from somebody else?  It's your responsibility for

16   the data; is that right?

17   A    So typically, a request would come to me and I would reach

18   out, but there are, at times, exceptions where data are run

19   that don't go through me.

20   Q    Do you recall -- you have no recollection of assisting in

21   preparing this data?

22   A    I really don't.

23   Q    So in an email that you discussed earlier, which is already

24   in evidence, it's the email that you sent to Dr. Golding on

25   March 22nd where you said that you didn't think it was

Ceballos - Exam by Ells

1    necessary to tell the Special Master or the Court about the

2    change from 30 to greater than 30 days for EOP patients because

3    you didn't think it would be a major change that has a

4    significant impact.  Did you evaluate what the impact of

5    changing that metric to be more generous by 50 percent would

6    look like in the data?

7    A    I didn't look at that change in the data.  My decision was

8    based upon patient care and if it was within policy

9    requirements.

10   Q    But you said you didn't think it would have a significant

11   impact.  Did you actually evaluate and look to whether it would

12   have a significant impact on your numbers?

13   A    I didn't mean significant impact in terms of percentages.

14   I meant significant impact to the system.  Outside of policy

15   requirements, for example, would be significant.

16   Q    So you didn't care that it would have increased the time to

17   comply by 50 percent in terms of the numbers that you produced

18   to the Special Master and to others; is that right?

19        MR. LEWIS:  Objection, Your Honor, as to the use of

20   the word "care."  It's argumentative.

21   BY MS. ELLS:

22   Q    You only cared about continuity of care from patients; is

23   that right?

24        THE COURT:  Overruled.  You may answer.

25        THE WITNESS:  I'm sorry, can you -- which answer do

1  you want me to -- question do you want me to answer?

2  BY MS. ELLS:

3  Q   So you said right now that you didn't care if it had a

4  significant impact on the dashboard numbers to increase the

5  timeline to comply by 50 percent.  You only cared about patient

6  care; is that right?

7  A   Yeah, I don't do an analysis to see the impact on

8  percentages.  We make changes that decrease our percentages.

9  What I care about is accurately measuring our performance and

10 our ability to provide the patient care.

11 Q   So it doesn't matter to you that when your counsel

12 corrected the data to use the 30 percent marker, which they did

13 in an errata filed with this Court last week, that CHCF's

14 compliance dropped by 18 percent?  Is that not a significant

15 impact to you?  Is that not something you think the Court or

16 Special Master would care about or want to know about?

17 A   So, once again, my impression of my job and our system is

18 to manage our performance to develop a system for us to self

19 monitor and make sure that we're taking the best care of

20 patients that we can.

21 Q   Are you aware that the Special Master uses your data that

22 you produced to him for his monitoring rounds?

23 A   Certainly.  As I told the Judge, I provide reports.  My

24 audience is the institution staff and leadership.  And when our

25 reports and our data are used for others -- for other purposes,

1  they are in our system.  It's a little bit of a unique

2  situation.

3  Q    So you're aware that he uses your data and relies on it.

4  Was there any question in your mind that the Court might care

5  what your reporting said?

6  A    I'm sorry?

7  Q    Was there any question in your mind that the Court or

8  Special Master might care what your data showed?

9  A    No.

10  Q    You really thought that nobody ever looked at it except for

11  internal purposes?

12  A    So I know people look at it, but my job is to provide

13  accurate reports for us to self monitor and make sure that

14  we're doing the best we can for patient care.

15  Q    And it doesn't matter if they know what your reports that

16  you're showing them actually mean --

17  A    So --

18  Q    -- so long as internally you know what they are?

19  A    So I was under the impression that the monitors also had

20  access to our reports.  You can access any report about the

21  report.  You can look at the methodology.  You can access

22  business rules.  And we also do announcements on our webinars.

23  The changes aren't secrets.  It just didn't occur to me that

24  this would be for litigation.

25  Q    So you stated in that same email dated 3/22/17 that one of

1   reasons that you thought it was okay to change this marker

2   without checking with anybody else, including your supervisors

3   or the Special Master and the Court, was because you thought

4   the program guide was vague regarding what it meant by

5   "monthly"; is that accurate?

6   A   No, that's not accurate.

7   Q   So the sentence where you say that it's not clear what the

8   program guide means, that doesn't mean you felt like there was

9   an ambiguity about what monthly meant?

10  A   What the program guide does is, it says "monthly," which

11  means once per month.  To -- in a computer system, at least in

12  the early days, we thought that we needed to concretely put in

13  a number of days for computing purposes, which is where the 30

14  came from to begin with.

15      Later, as we evolved, it was identified that, oh, we can

16  actually just have the computer look for a time period.

17  Q   And so, again, did you think that the program requirement

18  monthly was vague as to what it meant in practice?

19  A   It means at any time during the month.

20  Q   So you thought it was completely clear?

21  A   So monthly means any time during the month, yes.

22  Q   Okay.  So why did you not pick 60 days, then, or 59 days?

23  A   Because we didn't want to allow an extended period like

24  that between patient care.

25  Q   So you made a judgment call about what was appropriate, but

1    you never checked with psychiatry about what they thought was

2    appropriate before you made that judgment call?

3    A    Yes.  In my email to Dr. Golding, I observed that.  It was

4    an oversight.

5    Q    Now you were in communication with him that same day about

6    other measurement issues; isn't that right?

7    A    I don't remember.

8              MS. ELLS:  I'd like to introduce Plaintiff's 161.

9              THE COURT:  You're at 15 minutes.

10             MS. ELLS:  Okay.

11             THE COURT:  How much longer do you have?

12             MS. ELLS:  Less than 5 minutes.

13             THE COURT:  All right.  We'll give equal time.

14   BY MS. ELLS:

15   Q    Could you please turn to page 15 of this exhibit.  Now,

16   this is an email towards the bottom, an email from you dated

17   December 5th, 2016.  That's the same day you authorized the

18   change to the timely psychiatry metric.

19        Do you see here that this email sent to Dr. Golding

20   references a question about how to interpret the program guide

21   with respect to EOP level of care people in overflow units?  Do

22   you see that?

23   A    Yes.

24   Q    So you were asking his advice about program guide

25   interpretation and what's clinically appropriate in this case

1    on the same day?

2    A    Yes.

3    Q    So you just forgot to ask him about the 30 to 45-day

4    change?

5    A    Yeah.  It was an oversight.  We are dealing with meetings

6    back to back and hundreds of emails every day.  We're very --

7    we're working very hard and very quickly.  That change was so

8    clearly within program guide requirements to me that it didn't

9    occur to me in that moment to consult with him.

10   Q    So on the same day, 3/22, he made very clear to you that he

11   didn't agree with that change, but you didn't change it back?

12   A    We did.  I replied to him, and I asked him if he would like

13   for us to change it back and indicated that we would.

14   Q    That's not in this email string.  Is that a document that

15   you filed in the record?

16   A    I don't know.

17   Q    We've never seen that.  That's interesting.  That's

18   contrary to his testimony as well.

19        And my understanding from Dr. Leidner's testimony is that

20   he got the green light to change it on April 13th or 14th and

21   that he did it at that date.  Is that not consistent with what

22   you recall?

23        MR. LEWIS:  Okay.  Your Honor, that misstates

24   testimony.  Dr. Leidner had a lot to say about this issue.

25        THE COURT:  You're not testifying.

Ceballos - Exam by Ells

1            MR. LEWIS:  Very well, Your Honor.  Misstates

2    testimony.

3            THE COURT:  All right.  The objection is made of

4    record, but you can answer.

5            THE WITNESS:  Can you repeat your question, please.

6    BY MS. ELLS:

7    Q   So you just testified that you authorized on March 22nd

8    that the rule change be changed back, according to

9    Dr. Golding's request.  Is that what you just said?

10   A   I replied to Dr. Golding's email contesting the change.  I

11   apologized for not consulting with him and indicated that I

12   should have and actually thought that I had and said, "Would

13   you like for us to change it back?"  He replied he would.

14           And when he did that, I said, "Okay.  We will.  We have a

15   list of changes and priorities."  It went on that list and, as

16   soon as we were able to get to that request, we changed it back

17   retroactively.

18   Q   So it took you more than a month to do that, according to

19   your testimony?

20   A   So I didn't say it took more than a month.

21   Q   Dr. Leidner testified and it's in the record that the rule

22   change was reversed on April 23rd or 24th.  He said that he

23   initiated and he worked on that, which took him very little

24   time, on April 13th or 14th.

25           THE COURT:  Dr. Leidner's testimony speaks for itself.

1    Pose a question to this witness.

2    BY MS. ELLS:

3    Q    But it's your testimony that you had approved changing that

4    back in or around March 22nd; is that right?

5    A    Right.  But you're suggesting that we can just make changes

6    to things right away.

7    Q    I'm just trying to get clear on when you authorized that

8    change.

9         MR. LEWIS:  Your Honor --

10        THE COURT:  One at a time.

11   BY MS. ELLS:

12   Q    I just want to know when you authorized that change.

13   A    So I -- what do you mean by "authorized"?

14   Q    When did you tell Dr. Leidner to change it back?

15   A    I don't recall exactly what date I told Dr. Leidner to

16   change it back.  We put it on our list.

17   Q    Did you hear anything from Deputy Director Tebrock about

18   the proprietary of that change ever?  Did you tell her it had

19   been changed ever even after the fact?

20   A    I don't recall.

21        MS. ELLS:  Thank you.

22        THE COURT:  All right.  Mr. Lewis?

23        MR. LEWIS:  Yes, Your Honor.

24

25

Ceballos - Exam by Lewis

1                            EXAMINATION

2    BY MR. LEWIS:

3    Q    Good afternoon, Dr. Ceballos.  Very quickly, on -- you were

4    shown what has been marked as Joint Exhibit C.  I wanted to ask

5    you a quick question about that.  If you could look at that

6    specifically, if you look at the top there's an ECF number page

7    60 of 158.  And the title at the top of that is "Coleman Site

8    Visit Round 27 Document Request."  Can you see that?

9    A    Yes.

10   Q    Can you please look at the first paragraph and tell me what

11   it says the dates of the tour review will run, from when to

12   when?

13   A    May 13, 2016 to December 15th, 2016.

14   Q    And so that predated when the monthly change that happened

15   that's Issue B before the Court right now happened; is that

16   correct?

17   A    That's correct.

18   Q    Now, let's talk about what your job is.  What is your exact

19   title at CDCR?

20   A    Mental health administrator.

21   Q    And what is your billet or responsibility right now?

22   A    I'm responsible for the management of our in-patient

23   facilities, which includes ensuring that we meet all

24   court-mandated transfer timelines.  And then I'm responsible

25   for our quality management and infomatic department, which also

1    includes mental health management of our electronic health

2    records and reporting and performance improvement.

3    Q    So the QM, the quality management piece is just one part of

4    what you do?

5    A    It's a -- yes.

6    Q    So you have many other roles besides just working on

7    quality management issues, tracking data, et cetera?

8    A    That's correct.

9    Q    How many in the QM arena, how many requests a month do you

10   get regarding rule changes?

11   A    Hundreds.  In July of this year, for example, we had

12   approximately 130 requests from the field for changes.

13   Q    So you had mentioned that there were -- the Court had asked

14   you questions about what you do to make sure that people know

15   about these changes or these requests for changes.  The Golding

16   allegations brought up the issue of the -- what we call "Issue

17   B," this monthly change.  He came to you, told you about it,

18   you changed it.  That was back in 2017, correct?

19        Since 2017, when this happened that you admit was your

20   error, correct?  You did not contact him, correct, on this?

21   A    That's correct.

22   Q    And you did not tell anyone else about this, correct?

23   A    That's correct.

24   Q    You made this decision because you thought it was in the

25   best concerns of patient continuity of care and what else?

1    A    That's correct.  I thought it was in the best interests of

2    patient care and consistent with our -- very clearly consistent

3    with the program guide policy requirement.  And while I should

4    have consulted Dr. Golding, I didn't notify my deputy director

5    or anyone else because I was under the impression I was given

6    the authority to make those changes.

7    Q    Now, you mentioned that there's an ambiguity about monthly,

8    and you said because it could mean once in a calendar month,

9    which would span that two-month period.  So, say, April 1st

10   someone could get care and then the following month, May 30th

11   they'd get care, and that would mean monthly?

12   A    Correct.

13   Q    You also said there were issues with daily and weekly.  So

14   could you explain what some of those other issues that may be

15   present in the program guide could be, certain other

16   ambiguities that you're talking?

17   A    Well, the program guide has references to weekly, for

18   example, so right now we measure weekly.  Does weekly mean

19   seven days?  Because right now we're measuring weekly.  So

20   there's another area where others may disagree.

21   Q    Is it fair to say your concern is consistency and applying

22   these things in a way that can be properly measured?

23   A    Well, correct.  The way it's currently written, some of the

24   language is different.  Reasonable minds could disagree with

25   what these things mean.  So what does weekly mean?  So if we're

1    look -- using the monthly means 30-day argument, then weekly

2    would mean 7 days.  However, that isn't currently how we're

3    measuring weekly.

4    Q    And then you also mentioned monthly, and say February;

5    February sometimes has 28 days, sometimes has 29 days.  So that

6    can also create errors or create problems for counting,

7    correct?

8    A    Correct.  And October has 31 days.

9    Q    Okay.  So since Dr. Golding came to you in April 2017 to

10   fix this, what were some of the steps that you, your office,

11   CDCR had taken to address business rule change issues that had

12   come up starting in around the 2017 time frame?  Did something

13   happen to address these problems?

14   A    So in April, which is well before Dr. Golding made his

15   allegations --

16   Q    And excuse me.  April --

17         THE COURT:  Well, April was since.

18   BY MR. LEWIS:

19   Q    Yeah.  April of when?

20         If I could, Your Honor.

21   A    2018.

22   Q    Okay.  Please continue.  I'm sorry.

23         So since Dr. Golding came to you and said, "Hey, there's

24   this problem" in April 2017, have changes been made to ensure

25   that this doesn't happen again?

1   A    So do you mean -- when you said "this problem," do you mean

2   when he wrote the email --

3   Q    Exactly.

4   A    -- about the --

5   Q    When he raised it to you back in April of 2017.

6   A    Okay.  So April 2017.  Sorry.  I'm terrible.  So in April

7   we established a change meeting where we had all of our mental

8   health leadership come to the regular meeting and we actually

9   reviewed all proposed changes, not just business rule changes

10  but any requests from the field or electronic health record or

11  reporting was reviewed at that meeting.

12  Q    And was that an area where you could let other people know

13  about potential business rule changes coming?

14  A    Right.  So that was a meeting with all of our mental health

15  leadership where we would discuss those proposed changes and

16  requests before we moved them forward to the next step, which

17  would have been putting them in our queue.

18  Q    Uh-huh.  And in the queue is where they get acted on in a

19  certain order, correct?

20  A    Right.  So the other thing we established was a monthly

21  prioritization meeting where that same leadership team would

22  also establish our priorities because at any give time we have

23  more work than we can accomplish in a month.

24  Q    And so when a business rule was going to get changed coming

25  out of that queue, how did people know about the business rule

Ceballos - Exam by Lewis

1   change that was coming?

2   A    So when we do business rule changes -- we do this now.  We

3   do it for all reporting updates and electronic health record

4   updates.  We do release notes, which you could compare to if

5   you have an app on your phone and you update the app, that's

6   exactly what you get.  You get the release notes that tells you

7   what's been changed.

8   Q    And who do those release notes go to?

9   A    They go to every user of the mental health reports.

10  Q    When you say "user," who are the users of the mental health

11  reports?

12  A    So to access the mental health reports you have to have

13  requested permission, and so it makes you part of a user group.

14  And those would go to everybody on that user group.

15  Q    Have those notifications or that rule change committee

16  process stopped recently?

17  A    It stopped when Michael's allegations were released.

18  Q    Has it been restarted yet?

19  A    No.

20  Q    Are you aware of any attempts to restart it?

21  A    We are working on restarting it, but we need to make sure

22  that we have formal policies and procedure in place to include

23  quorum requirements, voting structure, et cetera.

24  Q    Are you aware of people actually working on policies and

25  procedures right now to get these committees started back up?

Ceballos - Exam by Lewis

1   A    Yes.  They're in progress.

2   Q    And do you think once those committees are started up

3   again, they will help -- and when I say "committees," the

4   business rule change committee and I believe it's the

5   prioritization rule committee -- will those help spread the

6   word about business rule changes?

7   A    Well, it will ensure that the entire mental health

8   leadership team weighs in on any changes.  It really helped us

9   tremendously when we initiated it.

10  Q    Okay.  Now, so there have been a lot of impacts about the

11  Golding allegations as a result of the Golding allegations,

12  haven't there?  Have you lost Dr. Leidner as one of your staff

13  members?

14  A    Unfortunately, yes.

15  Q    And why do you say "unfortunately"?

16  A    He is an expert in what he does.  He's a really earnest,

17  hard-working person who's been -- for years dedicated his time

18  day and night to try to report as accurately as possible, to do

19  the best job he can do.  This is a person that sends emails at

20  2:00 in the morning because he loved his job so much.

21       And the State, it's a huge loss because.  He's an expert

22  programmer, clinician, researcher and statistician, the entire

23  package that any -- any company would want to have as an

24  employee.

25  Q    Now, Dr. Golding has made allegations based on the data

1    that your people prepared.  Did Dr. Golding understand the data

2    that he was looking at?

3                 MS. ELLS:  Objection, calls for speculation.

4                 THE COURT:  Sustained.

5    BY MR. LEWIS:

6    Q    Based on your interactions with Dr. Golding, do you believe

7    that he understood the data that he was looking at?

8                 MS. ELLS:  Objection, calls for speculation.

9                 THE COURT:  Sustained.

10   BY MR. LEWIS:

11   Q    Based on your interactions with Dr. Golding, did you

12   believe that he was misinterpreting the data that he

13   provided -- that you had been providing?

14                 MS. ELLS:  Objection, calls for speculation.

15                 Your Honor, I'm asking this question --

16                 THE COURT:  Sustained.  You can ask a different kind

17   of question, most likely, but not that one.

18   BY MR. LEWIS:

19   Q    So you mentioned that Dr. Golding was down the hall from

20   you.  Does Dr. Golding work at the same building as you?

21   A    Yes.

22   Q    How far away does he work from you?  Is he on the same

23   floor?

24   A    Same floor.

25   Q    Okay.  So is his office -- in the space of this courtroom

Ceballos - Exam by Lewis

1    is his office from the distance of that wall to this wall?

2    A    Maybe from here to that corner with some doors in between.

3    Q    So 30 yards, 20 yards, maybe?

4    A    Sure.

5    Q    So in the space of that time, would you have regular

6    meetings with him?

7    A    Sure.

8    Q    And what would those meetings be about?

9    A    A variety of things; sometimes clinical care, sometimes --

10   he had initiated some questions about reporting, so we had some

11   meetings about reports.

12   Q    Okay.  When he talked to you about those reports, did he

13   try to ask you questions about the data in the reports?

14   A    He did.

15   Q    And would you have conversations about what the data meant?

16   A    We tried.

17   Q    When you say you "tried," what does that mean?

18   A    At one meeting I recall Dr. Leidner repeatedly tried to

19   explain that methodology to Dr. Golding.  Dr. Golding would

20   restate what he thought was said, but it would be inaccurate

21   and wouldn't -- when we would try to explain to him again, he

22   would again misstate the information, and he would

23   misunderstand the information and restate it as his own truth

24   and restate it to others as truth when, in reality, it would be

25   inaccurate.

Ceballos - Exam by Lewis

1   Q    So based on these interactions do you believe that he was

2   misinterpreting the data that he was pulling?

3           MS. ELLS:  Objection, calls for speculation.

4           THE COURT:  Sustained.

5   BY MR. LEWIS:

6   Q    You said that he was misunderstanding the data.  What do

7   you mean by that?  How was he misunderstanding the data?  Was

8   it saying things that it did not actually say or was it saying

9   things to prove his point that it didn't say?

10          MS. ELLS:  Objection, calls for speculation --

11          THE COURT:  Sustained.

12          MS. ELLS:  -- also compound.

13  BY MR. LEWIS:

14  Q    When you say he misunderstood the data, is that because his

15  opinion or his understanding of data differed from what

16  Dr. Leidner and you believe the data meant?

17          MS. ELLS:  Objection, calls for speculation.

18          THE COURT:  Sustained.

19  BY MR. LEWIS:

20  Q    Did you discuss with Dr. Golding what he thought the data

21  meant?

22  A    Yes.

23  Q    Did his understanding -- did what he say about the data

24  differ from what you said?

25  A    Yes.

1    Q    Based on that and based on your expertise and Dr. Leidner's

2    expertise as the data people, did you believe that

3    Dr. Leidner -- that Dr. Golding's belief of what the data said

4    was incorrect --

5              MS. ELLS:  Objection.

6    BY MR. LEWIS:

7    Q    -- as to what the rules said --

8              THE COURT:  Sustained.

9    BY MR. LEWIS:

10   Q    -- that you would --

11             THE COURT:  There's not foundation for this.

12   BY MR. LEWIS:

13   Q    In your job, you said -- you mentioned there's a data

14   warehouse and then QM pulls items from the data warehouse,

15   correct?

16   A    Correct.

17   Q    QM is based on a series of rules -- both business rules and

18   indicators that are drawn up by computer programmers, correct?

19   A    Yes.

20   Q    Those rules are turned into a series of business rules and

21   a series of indicators, correct?

22   A    The business rules feed into the indicators.

23   Q    Okay.  So is there like a dictionary or something like that

24   of what the rules and indicators are supposed to mean?

25   A    With every -- yes.

Ceballos - Exam by Lewis

1   Q    So then a report would generate data based on certain
2   rules, and you would understand what those rules would mean it
3   to mean, correct?
4   A    Yes.
5   Q    When you were having your discussions with Dr. Golding, did
6   he ever say that the data means something that was contrary to
7   the rules as you understood them?
8   A    Yes.
9   Q    So based on your understanding, his interpretation of the
10  data was correct --
11          MS. ELLS:  Objection --
12  BY MR. LEWIS:
13  Q    -- was incorrect?
14          MS. ELLS:  -- calls for speculation.
15          THE COURT:  Sustained.
16  BY MR. LEWIS:
17  Q    Did you ever tell people about some of the issues you were
18  having with Dr. Golding and his attempts to gather information
19  about certain programming issues or certain computer QM issues?
20  A    Yes.
21          MS. ELLS:  Objection, calls for hearsay.
22          THE COURT:  Well, just answer yes or no.  So you said
23  yes?
24          THE WITNESS:  Yes.
25          THE COURT:  All right.  So that's recorded.

Ceballos - Exam by Lewis

1    BY MR. LEWIS:

2    Q    And then did you memorialize these in any memorandums or

3    emails or anything like that?

4    A    Yes.

5    Q    What was your impression of how Dr. Golding would treat you

6    and other staff members who raised -- who discussed data issues

7    with him?

8              MS. ELLS:  Objection, relevance.

9              THE COURT:  Sustained.

10   BY MR. LEWIS:

11   Q    What was your impression of Dr. Golding's dealings with you

12   about the truth that you ascribed to his allegations about

13   data?

14             MS. ELLS:  Objection.

15             THE COURT:  Sustained.

16   BY MR. LEWIS:

17   Q    Did you ever have a question to or a time to disagree with

18   Dr. Golding about statements about data?

19   A    Yes.  We met --

20             THE COURT:  Wait for the next question.

21   BY MR. LEWIS:

22   Q    Did you ever have time to disagree with him about his

23   statements about data?

24   A    Yes.

25   Q    Were those in those meetings that you had with Dr. Leidner,

Ceballos - Exam by Lewis

1    et cetera?

2    A    Yes.

3    Q    What were some of the things that he had raised with the

4    data?

5              MS. ELLS:  Objection, vague as to "he."

6              THE COURT:  Well, I think the "he" is clear, but it's

7    still vague.  Sustained.

8    BY MR. LEWIS:

9    Q    Did Dr. Golding say things about the data that was wrong?

10   Did he say "This is wrong?"

11   A    Yes.

12   Q    Did you disagree with his statements about what was wrong

13   with the data?

14   A    Yes.

15   Q    What were some of the things you disagreed with?

16   A    It would depend upon the discussion.

17   Q    Did you ever have a chance to discuss some of the Issue E

18   markers that we're talking about, the missed appointments or

19   anything like that?

20   A    So Dr. Golding believed that the "appointments seen as

21   scheduled" was a measure of if patients attended appointments

22   or didn't attend appointments.  We have another measure that

23   does that.  This measure simply looks at if I scheduled an

24   appointment did the patient get seen by that scheduled

25   appointment or do we have to reschedule the appointment.

Ceballos - Exam by Lewis

1    Q    And so why is that different than what Dr. Golding

2    understood it to mean?

3              MS. ELLS:  Objection, calls for speculation as to what

4    he understood it to mean.

5              THE COURT:  Sustained.

6    BY MR. LEWIS:

7    Q    Based on what he had said it means, how is that different?

8    A    So we have patients -- treatment attended and treatment

9    refused, separate indicators that tell us if patients attend an

10   appointment or refused appointments, and you can look at those

11   in comparison to treatment offered and scheduled.  Those are

12   access measures.

13        The "seen as scheduled" intentionally counts appointments

14   that were canceled outside of the institution's control.  It's

15   really just to look to see if we're scheduling appointments

16   efficiently that are actually carried through and not

17   rescheduled regularly.

18   Q    And then did you ever at any time tell your staff to change

19   the data or to provide data that would have been intentionally

20   misleading as to any indicator or any report within your

21   control?

22   A    No.

23             MR. LEWIS:  I have no further questions, Your Honor.

24   Thank you.

25             THE COURT:  All right.  Did you have any follow-up,

1    Ms. Ells?

2            MS. ELLS:  Three minutes or so.

3            THE COURT:  All right.  We'll do that and then take

4    our break.

5                                EXAMINATION

6    BY MS. ELLS:

7    Q    Dr. Ceballos, could you turn back to Joint Exhibit C and

8    turn to page 5, please.  This is the 27th round document

9    request from the Special Master.

10   A    Which page?

11   Q    Page 5, please.

12   A    Okay.

13   Q    So you'll see on this page that the Special Master's

14   request is that you and Ms. Owens, who I believe is your

15   assistant, three weeks prior to the Coleman Special Master

16   team's visit prepare the reports that were requested in here.

17   Did you typically provide those reports much more than three

18   weeks in advance of tours?

19   A    No.

20   Q    And would you use it based on data that you had run at the

21   time when you produced them?  Would you run the data at the

22   time that you produced them or approximately that time frame?

23   A    The data would reflect the reporting period.

24   Q    But I'm asking when you ran the data.

25   A    Well, I don't know that it would matter when we ran --

1    Q    Any query you can say -- applying the current business

2    rule, you could say "I want to see this business rule as

3    applied to data from last June, just the month of June."  So

4    unless you change that business rule before you run that query,

5    it would reflect data utilizing that business rule that was in

6    place at the time when you ran the query; is that right?

7    A    So our analytical team, who ran the data --

8    Q    That called for a yes or no.  Would it apply the business

9    rule in place at the time when you ran the data?

10   A    Yes.

11   Q    Thank you.  So you said earlier also that you felt like

12   there were a lot of places in the program guide where

13   reasonable minds could disagree about what exactly was

14   intended.  When you felt like there were those kind of places

15   where there were reasonable minds that could disagree, did you

16   check with your superiors about their understanding of what it

17   would be, what the correct interpretation would be?

18   A    Our business rules were established many many years ago

19   when we first established our reporting system.

20   Q    Right, but then you changed some of those business rules,

21   didn't you?

22   A    Sure.

23        MR. LEWIS:  Objection, vague, Your Honor.

24        THE COURT:  Overruled.

25

Ceballos - Exam by Ells

1  BY MS. ELLS:

2  Q   So I'm asking about the decisions you made to change

3  business rules when you felt like there were ambiguities that

4  allowed for you to interpret what the proper business rule

5  should be for the phrase in the program guide.

6  A   If it's clear that the request was within policy

7  requirements and an improvement to the existing interpretation,

8  no, I didn't consult with my managers.

9  Q   And you also didn't inform them that you had changed it,

10  but -- excuse me.  Let me step back one minute.

11      So you said earlier you didn't think the Special Master or

12  the Court ever relied on your reporting; is that true?

13  A   I didn't say that.

14  Q   So you knew that the Special Master and Court relied on

15  your reporting?

16  A   I knew they used my reports.  What I said was, my

17  impression of our reports was, it was for our own internal

18  monitoring.  If others used our reports for other purposes,

19  they used them for other purposes.  But from my perspective, my

20  job was to make sure that we had a system in place, including

21  reports, to self monitor our performance.

22  Q   But you knew that self-monitoring was something that was

23  court ordered that CDCR was trying to encourage more of, to get

24  more responsibility for self-monitoring, right?

25  A   I'm a clinician, I'm not an attorney.  My answer --

1    Q    You designed CQI, didn't you?

2              THE COURT:  One at a time.

3    BY MS. ELLS:

4    Q    Did you design the CQI program?

5    A    I did.

6    Q    And was it your understanding that that was an effort to

7    prove to the Court and Special Master that you were capable of

8    self monitoring as a system?

9    A    So it was in part, but it is to develop a self-monitoring

10   system.

11   Q    Were you not aware that part of the reason and rationale

12   for developing that was in order to decrease monitoring by the

13   Court and Special Master, to prove that the CDCR could do it by

14   themselves?

15   A    Sure, but the key here is self-monitoring.

16   Q    Are you aware that the CQI monitoring tours that occurred

17   in 2016 and 2018 were subject to oversight and monitoring by

18   the Special Master?

19   A    Yeah.

20   Q    Was it important that the Special Master understand what

21   you were reporting in order to report on your ability to

22   self-monitor?

23   A    Yes.  We did those tours together for that reason.

24   Q    And when you provided methodology during those tours, did

25   you make sure that he understood the methodologies that you

1   were reporting?

2   A    Which methodologies are you referring to?

3   Q    All of them.  All of the methodologies for the data that

4   you were reporting during the CQI process.  Did you ensure that

5   he understood what all of those were?  Did you provide him

6   documents about what those were?

7   A    No.  That wasn't requested.

8            MS. ELLS:  That's all.  Thank you.

9            THE COURT:  All right.  Let's go ahead and take a

10  break.

11           Dr. Ceballos, if you can just stand by.  You can step

12  down.

13           All right.  20-minute break.

14       (Recess at 3:00 p.m. to 3:22 p.m.)

15                          EXAMINATION

16  BY THE COURT:

17  Q    All right.  We're back on the record.  I have just a couple

18  of additional questions for Dr. Ceballos.

19       Just to try to make certain I understand what you're

20  saying, you appear to believe that there's a wall between

21  internal monitoring and Coleman reporting.  Do I have that

22  right?

23  A    Yeah.  I think that -- yes, I do think that.

24  Q    So where did you get that idea?

25  A    I think that litigation is very different from quality

1   improvement.

2   Q    You were critical in developing what I've heard referred to

3   as the "CQIT tool," correct?

4   A    Yes.

5   Q    So why -- what led you to develop that tool?  For what

6   purpose did you develop that tool?

7   A    We had a court order to develop a self-monitoring tool, so

8   I developed that tool with our Coleman experts who mostly were

9   clinicians and relied upon their expertise.  But I think when

10  you start talking about the attorneys and what it means to get

11  out of the case and use of data for litigation purposes, it's

12  very different from quality improvement and self monitoring.

13  Q    So once the CQIT tool was developed and got to a certain

14  point where it could be deployed in the field, did you at that

15  point think there was no connection with reporting to the

16  Coleman court?

17  A    I'm aware there's a connection.  In fact, because they

18  developed -- the Coleman monitors developed our chart audit

19  tools with us, our on-site questions and audit tools, I'm well

20  aware that we can't take liberties of changing those things

21  without consulting with them first, because they took special

22  interest in and assisted in development of those tools.

23       We didn't discuss our business rules for reporting.  We had

24  established those well before that project.  And so it has just

25  never occurred to me that they would have specific interests in

Ceballos - Exam by The Court

1  every business rule change for the automated reports that we

2  have.

3  Q    And you see those automated reports as separate from

4  anything happening in the Coleman case?

5  A    So not entirely.  I recognize that there's interest in our

6  performance and ability to self-monitor, but the use of them to

7  establish if we should remain in Coleman or not in Coleman, no,

8  I believe our responsibility is to show that we can self

9  monitor, and that means looking at a number of different areas,

10  including the tool that we developed with the special monitors,

11  which is the on-site tours and chart audits.  I think the key

12  here is to show that we can self monitor.  I didn't know they

13  were interested in the specifics of every -- every indicator.

14  Q    And who do you have to show that to, as you understand it,

15  that you have the ability to self monitor?

16  A    You.

17  Q    Well, okay.  You got that right.

18      All right.  I just -- I was, frankly, quite confused with

19  some of the answers I was hearing.

20      Two minutes each if there are follow-up questions based on

21  this.

22           MR. LEWIS:  Yes, Your Honor.

23           THE COURT:  Ms. Ells?

24

25

1                          EXAMINATION

2    BY MS. ELLS:

3    Q    Hi again, Dr. Ceballos.  Were you aware that your

4    performance reports were being presented to the Court at any

5    point?

6    A    The performance reports specifically, no.

7    Q    Were you aware that the data in your QM, that runs through

8    your QM, was being reported to the Court at any point?

9    A    I was aware that data was presented to the Court.

10   Q    Did you ever prepare or direct anyone in your department to

11   prepare that data?

12   A    For what purpose?

13   Q    For any purpose; that was being presented to the Court?

14   A    I don't know because it's too vague.

15   Q    Did you have any idea that data through your QM department

16   was being presented to the Court, and did you ever direct or

17   personally provide that data for that use?

18   A    So I don't know.

19   Q    You said earlier that you think -- well, let me -- correct

20   me if I'm restating or misstating your testimony.

21        I understood you to be saying that you feel like it's very

22   different to have reporting that's developed for internal use

23   and reporting that's used in litigation.  Is that accurate?

24   A    Yes.

25   Q    Do you feel like your reporting should be used in

1   litigation?

2   A    I'm not the right person to make that assessment.

3   Q    I'm asking you do you feel like your data should be used in

4   litigation, given that what I understand you to say is that you

5   didn't develop it for that purpose?

6   A    I'm sorry.  I'm not an attorney, and I don't believe that

7   I'm the right person to make that assessment.

8   Q    So you don't have any opinion on whether your data should

9   be used in litigation?

10          MR. LEWIS:  Objection, Your Honor, to the extent this

11  seeks a lay opinion.

12          THE COURT:  It's not -- I'm not construing it as a lay

13  opinion -- a legal opinion.  I'm just -- it's just what do you

14  think?  I'm not giving you any expert weight.  So what's your

15  answer to that question?

16          THE WITNESS:  Can you repeat the question again?

17  BY MS. ELLS:

18  Q    So again, correct me if I'm wrong, but I understood you to

19  testify that you feel like there is -- that your data was

20  developed for internal self-monitoring purposes; is that

21  accurate?

22  A    Yes.

23  Q    Do you feel like it's appropriate for that data, therefore,

24  to be presented to the Court in litigation in support of

25  arguments that there is constitutional care in the system and

 1   that the Special Monitor's role can be reduced or that you're

 2   compliant with court orders or any other purpose in litigation?

 3              MR. LEWIS:  Objection to the extent that it seeks a

 4   legal opinion, Your Honor.

 5              THE COURT:  Sustained.

 6              MS. ELLS:  Can I ask two more questions?

 7              THE COURT:  You may.

 8   BY MS. ELLS:

 9   Q   Are you aware that data pulled from your department was

10   used in support of the staffing proposals in 2018?

11              MR. LEWIS:  Objection.  Outside the scope, Your Honor.

12              THE COURT:  Overruled at this point.

13              THE WITNESS:  I'm not certain of that.

14   BY MS. ELLS:

15   Q   Were you on the phone calls in the workgroup?

16   A   I was not involved in the staffing plan intimately, no.

17   Q   Were you on the workgroup phone calls where we discussed

18   intimately the data that was presented in support of those

19   proposals which was purported to come from your department?

20   Were you on the phone calls for those?

21   A   I don't believe so.  I'm not sure.

22              MS. ELLS:  That's all.  Thank you.

23              THE COURT:  All right.  Mr. Lewis?

24              MR. LEWIS:  Thank you, Your Honor.

25              THE COURT:  Equal time, which is three and a half

1    minutes.

2            MR. LEWIS:  Yes, Your Honor.

3                              EXAMINATION

4    BY MR. LEWIS:

5    Q    Quick question.  Data.  There's data and there's reporting,

6    okay, so data is the warehouse.  Who has access to the data

7    that is used to generate the reports?

8    A    Healthcare QM staff and a few programming staff who work in

9    mental health and medical.  I don't know if nursing has or not.

10   Q    Are you aware if the Special Master has access to that data

11   repository that you talked about?

12           MS. ELLS:  Objection, beyond the scope, also calls for

13   speculation.

14           THE COURT:  Just answer yes or no.

15   BY MR. LEWIS:

16   Q    Are you aware if the Special Master has access to the data

17   vault that you've talked about, the collection of data?

18   A    They're not, no.

19   Q    So the -- but there are reports that are generated using

20   that data for the purposes of internal QM reporting.  Is that

21   what your testimony was?

22   A    Yes.

23   Q    And your job is to provide those internal QM reports,

24   correct?

25   A    Yes.

1              MR. LEWIS:  No further questions, Your Honor.  Thank

2     you.

3              THE COURT:  All right.  Anything further, Ms. Ells?

4              MS. ELLS:  No, thank you.

5              THE COURT:  All right.  You're excused, ma'am.  You

6     may step down.

7              THE WITNESS:  Thank you.

8          (Witness excused.)

9              THE COURT:  All right.  Assistant Deputy Director

10    Brizendine, please.

11             MS. ELLS:  Your Honor, is it possible to do one quick

12    piece of housekeeping while the witness is coming up?

13             THE COURT:  All right.

14             MS. ELLS:  I'd like to move some documents into

15    evidence.

16             THE COURT:  All right.

17             MS. ELLS:  I'd like to move in Plaintiff's 116, which

18    is Exhibit III to the Golding report and was discussed with

19    that witness; Exhibit 181, which is defendant's response to the

20    Special Master's staffing report; 182, the Tebrock declaration

21    in support thereof; 183, defendant's reply on that briefing;

22    207, which is the Weber declaration in support of their recent

23    errata; and Joint Exhibits C and D.

24             THE COURT:  Any objection?

25             MR. LEWIS:  Yes, Your Honor.  Objection as to the

Ceballos - Exam by Lewis

1    number here, actually, 161.  This is an email, it appears, from

2    Dr. Golding.

3              THE COURT:  Why don't you just let me know which ones

4    you're objecting to.

5              MR. LEWIS:  161, Your Honor.

6              MS. ELLS:  I moved in 116.

7              MR. LEWIS:  Oh, 116.  I'm sorry.

8              MS. THORN:  Hold on.  Sorry.  You were talking very

9    quickly, and so --

10             MS. ELLS:  116, 181, 182, 183.

11             MS. THORN:  Hang on.  Hang on.  116.

12             THE COURT:  Okay.  We don't have time to do this now.

13   We'll come back to it.

14             MS. ELLS:  Yeah.  I'll give you that list.

15             THE COURT:  All right.  I was going to ask for

16   exhibits.  So we'll have a full round up of exhibits before we

17   leave today.

18             MR. LEWIS:  Thank you, Your Honor.

19             THE CLERK:  Ma'am, please come forward, step into the

20   witness stand and remain standing.  Raise your right hand.

21        (Witness duly sworn and takes the stand.)

22             THE WITNESS:  I do.

23             THE CLERK:  Thank you.  You may be seated.

24             Will you please say and spell your first and last name

25   for the record.

Brizendine - Exam by The Court

1      THE WITNESS:  Brittany Brizendine, B-R-I-T-T-A-N-Y,

2    B-R-I-Z-E-N-D-I-N-E.

3              BRITTANY BRIZENDINE, WITNESS, SWORN

4                      EXAMINATION

5    BY THE COURT:

6    Q    All right.  Good afternoon, Ms. Brizendine.

7    A    Good afternoon.

8    Q    I have a relative few questions for you, but, first, can

9    you just answer a pretty basic question for me?  Are you

10   familiar with what I've referred to as the CQIT tool?

11   A    Generally familiar.

12   Q    All right.  Do you understand what the purpose of that tool

13   is?

14   A    Yes.

15   Q    How would you describe the purpose of it?

16   A    The purpose of the CQIT tool is for our clinical folks in

17   custody to go on site and to monitor the institutions, which is

18   including kind of what they see in conjunction with data that

19   they put together.  They put it all together in a report and

20   the report is basically a self-monitoring tool, but ultimately

21   it leads to a report that helps -- that will ultimately help

22   the institution to manage.

23   Q    And is that report that you've just described provided to

24   the Special Master?

25   A    I believe ultimately.  We did -- we're still in kind of the

1    pilot phase.  So I think we did one round of piloting.  We've

2    been working on the CQIT, the collective "we" for, I think,

3    about seven years.  And I think the first pilot 10 institutions

4    was in about 2016, and then we did another 10 institutions

5    about a year and a half ago.

6    Q    Do you perceive any -- is there any kind of wall between

7    what the clinical folks do with their monitoring and data

8    that's provided to the Court in Coleman?

9    A    I'm sorry, could you ask that again?

10   Q    I mean, you just described a process of gathering data

11   using the CQIT tool.

12   A    Uh-huh.  Well, the CQIT tool I think -- and I'm not an

13   expert in the CQIT tool, but -- I've never done it myself, but

14   I believe it prompts the folks who are using the tool while

15   they're at the institution and even in preparation before they

16   go to get certain data.

17   Q    But is it your understanding that there's full transparency

18   such that the Special Master can see all of that data and the

19   methods used to collect it?

20   A    Absolutely, of course.

21   Q    All right.

22   A    We've been --

23   Q    And ultimately provide to the Court for review?

24   A    Absolutely.

25   Q    All right.  Is there any quality monitoring that is behind

Brizendine - Exam by The Court

1    a wall where there is data generated that may relate to Coleman

2    but is not shared with the Special Master?

3    A    There is -- there are so many indicators on the performance

4    report.  I don't know what all the Special Master monitors or

5    looks at.  I think there's probably a couple hundred indicators

6    and there's registries that, you know, will cite lab values and

7    so forth.  I'm not sure what the Special Master monitors, but

8    he has access to anything he needs.

9    Q    All right.  So a question in the general area of

10   psychiatric supervisors acting as line staff.  Has CDCR tracked

11   the number of patients seen by psychiatric supervisors to

12   analyze how relying on supervisors for direct patient care

13   might affect staffing ratios?

14   A    We don't track whether it was a supervisor or a line staff

15   in our indicators.  I know that -- I believe that through the

16   neutral expert report, Ms. Ponciano ran some data to try to

17   parcel it out, but I believe it was a manual process to try to

18   see who was a supervisor at the time and trying to pull that

19   data out; because what we look at really is patient care, was

20   the patient taken care of.  And so that's what -- that's what

21   the, you know, institutions care about.

22   Q    So apart from the work that Ms. Ponciano did, you're not

23   aware of any other effort to track --

24   A    No.

25   Q    -- or to analyze?

Brizendine - Exam by The Court

1    A    I believe that Dr. Golding may have asked anecdotally to

2    the field.  But in terms of any way that we track it, we

3    don't -- I've never seen the need for it to track because

4    really it's been the patient getting the care they need and, at

5    times, especially when there are staffing shortages, of course,

6    supervisors and chiefs chip in.

7    Q    So you don't see any connection between reliance on line

8    supervisors to provide direct care at times at least and the

9    staffing requirements imposed by Coleman court orders?

10   A    Could you ask that one more time?  Any conflict?  Did you

11   say conflict?

12   Q    Yeah.  So there are staffing requirements imposed in

13   Coleman.  There are --

14   A    Sure.

15   Q    -- court orders.  There's a minimum vacancy rate.

16   A    Sure.

17   Q    So to the extent psychiatric supervisors are being used to

18   provide direct care --

19   A    We're still --

20   Q    -- could that -- could that not affect staffing

21   requirements?

22   A    Well, we're still held to the 90 percent.  My understanding

23   is that chiefs and seniors are not included in the 90 percent.

24   We still have to fill those positions with line staff, of

25   course.

Brizendine - Exam by The Court

1   Q    And are you aware of any limit on the amount of time that a

2   psychiatric supervisor should spend providing direct care or if

3   more than 50 percent of a supervisor's time is needed to fill

4   in, in your mind, would that be acceptable?

5   A    I -- ultimately, I believe that chiefs and seniors should

6   be able to manage and supervise their team.  Some of that would

7   include seeing patients.

8        If you're a chief at a low-level institution, Folsom versus

9   Sac, you're going to have a -- you should be able to see

10  patients and have an understanding of what your team is dealing

11  with.  It's very different at different institutions.  But I

12  don't think that full-time ongoing -- I mean, crisis bed, I

13  think, chiefs do see some patients and so forth, complicated

14  cases in crisis beds; but ongoing, they should be able to

15  manage and to supervise.  And it's generally when -- they cover

16  generally when there are serious staffing shortages.

17  Q    So do you see this issue of how much time psychiatric

18  supervisors spend performing direct patient care as an issue

19  that should be surfaced with the Special Master?

20  A    I think it's -- I think -- sure.  I think the Special

21  Master, of course, can be included in that, but the goal is to

22  fill our staffing vacancies, right, and so they should only

23  have to be seeing patients, aside from a small number, when

24  there are serious shortages.  So I think we want to try to get

25  them back to supervising.  And if there is a serious

1    shortage -- you know, because we may be at this percent, but at

2    one institution it could be really low.  And generally those

3    are the places where they do chip in more.  And having been a

4    chief of mental health and a CEO at institutions where we had

5    serious psychiatry shortages, I -- it was -- I mean, the chiefs

6    chipped in because they needed to take care of the patients.

7    But ultimately, as the chief, I wanted to be able to get them

8    so where they can manage.  That means that we have to fill the

9    positions.

10   Q    Right.  But the practice could mask serious shortages,

11   couldn't it, over time?

12   A    Mask in what way?  Because we still are held to the 90

13   percent.

14   Q    You said you didn't track it -- you don't track it.

15   A    No.  Because we still have to fill the 90 percent.  So even

16   if, because the chiefs and seniors are seeing the patients

17   there's more compliance, that still doesn't set us -- you know,

18   allow us to not fill to that 90 percent.  We still have that

19   responsibility.

20        THE COURT:  All right.  I'll probably have some

21   follow-up questions, but at this point I'd allow plaintiffs to

22   ask some questions.  Ms. Trapani.

23                              EXAMINATION

24   BY MS. TRAPANI:

25   Q    Good afternoon, Dr. Brizendine.

1    A    Good afternoon.

2              MS. TRAPANI:  Thank you, Your Honor.

3    BY MS. TRAPANI:

4    Q    Dr. Brizendine, you were just speaking about whether you

5    believed that having seniors and chiefs care for patients

6    directly masked underlying needs for line staff, and I wanted

7    to ask you about that in the context of the staffing proposal

8    that was proposed last summer, in the summer of 2018.

9              So you were part of the -- you were consulted on preparing

10   that staffing proposal, right?

11   A    Uh-huh.  Yes.

12   Q    And you were provided a copy of it before it was provided

13   to the Special Master and plaintiffs; is that correct?

14   A    Yes.

15   Q    And wouldn't it be important in that situation to propose

16   cutting staff for the Special Master to know if supervisors

17   were providing direct patient care duties?

18   A    Well, I think it depends on -- on what we were looking at.

19   We weren't just looking at an overall cut.  What we did was we

20   looked at the basic assumptions of the staffing -- the staffing

21   plan from 2009, right.  And so if we break down each individual

22   assumption, it made perfect sense to me.

23   Q    But it's accurate that those -- that that staffing proposal

24   resulted in a proposal to reduce the line staff allocations by

25   about 20 percent, right?

1    A    I'm not sure.  I think it was around 70 something PY, but

2    I'm not sure what percentage it was.

3    Q    About 79 positions?

4    A    That sounds about right.

5    Q    And it wouldn't have been important at that time to tell

6    the Special Master that supervisors and chiefs were seeing

7    patients when there are staffing shortages; is that your

8    testimony?

9    A    What I will say is as long as I worked in CDCR, supervisors

10   and chiefs have seen patients when they needed to, so -- and

11   this was an ongoing issue.  We were trying to help fill

12   positions.  And I agree, they should actually be able to

13   supervise and chief -- and do chief work generally, but I never

14   thought, hum, is this a supervisor or the chief.

15       I was kind of peripheral on the project.  Ms. Ponciano was

16   the subject matter expert and did most of the staffing

17   proposal.  So I personally never even thought about it.  And it

18   doesn't mean that I wasn't having discussions about how do we

19   try to, you know, recruit because of course we need to do that.

20   And I was definitely aware that supervisors and chiefs were

21   seeing patients, some more at different institutions, but I

22   never thought, like, "oh," or it was never said or we had

23   weekly all-parties meetings, ample time for folks to ask

24   questions, and to my recollection nobody asked that question.

25   Because if they did, we would have gone back and tried to

1   manually look at the data.  There was often requests on our

2   all-parties meetings, our workgroup meetings every Monday, and

3   we'd go back and try to get the data and bring it to the next

4   meeting.

5   Q    Thank you.  In my limited time I just need to move on here.

6        Isn't it true, though, that Dr. Golding wasn't given a

7   chance to review a draft of that proposal and opine on the

8   amount of staffing cuts before it was provided to the Special

9   Master and plaintiffs?

10           MS. GARSKE:  Objection, compound.

11           THE COURT:  Sustained.  Just break it up.

12  BY MS. TRAPANI:

13  Q    Was Dr. Golding provided a draft of the staffing proposal

14  before you provided it to the Special Master and to the

15  plaintiffs in May of 2018?

16  A    I do not know if he was provided a draft.  I was present at

17  a meeting where Ms. Tebrock went over every tenet of the

18  proposal with Dr. Kuich and Dr. Golding.

19  Q    But you never provided him a physical copy of the proposal;

20  is that right?

21  A    No.  I wasn't -- I did not, no.

22  Q    And did Dr. Golding ever disagree with any of the proposals

23  in that plan?

24  A    Yes.  Well, a conjunction with him and Dr. Kuich.  One

25  thing originally, an original idea that we had discussed was

1    for the CCCMS patients actually going to 120 days.  So is that

2    possible?  Would it be safe for patients of CCCMS level of care

3    to be seen in 120 days?

4        And we talked about it and specifically talked about it

5    with Dr. Kuich, and we were in support of this complete care

6    model with these morning huddles where there was nurses.  And

7    what Dr. Kuich and I talked about was, we're not there yet.  So

8    psychiatry doesn't have that kind of access.  And so he wasn't

9    comfortable with 120 days, so that was put back down to 90

10   days.

11       And another thing was the CIT psychiatrists.  So I think

12   the original kind of idea -- again, it's a workgroup, so we're

13   kind of having discussions, was 8 of those 17.5 positions would

14   go to nighttime telepsychiatry to cover the state, which I was

15   really in support of, Dr. Golding was in support of, but

16   Dr. Kuich said that he didn't think that 8 was enough.  So then

17   I -- in our next updated proposal, I think we said 8 could

18   provide 6 institutions 3 nights a week and that will still

19   leave call for other places.  There was a few things that --

20   Q   But you didn't change the number of 8; is that correct?

21           MS. GARSKE:  Objection, Your Honor.  I would ask the

22   witness be able to respond fully before she's interrupted.

23           THE COURT:  That's fair.  At this point, though,

24   you're getting into quite a narrative.

25           THE WITNESS:  Okay.

1          THE COURT:  And so is there a thought you needed to

2     complete --

3          THE WITNESS:  No.

4          THE COURT:  -- to finish your answer?

5          THE WITNESS:  No.

6          THE COURT:  All right.

7     BY MS. TRAPANI:

8     Q    Do you remember part of the proposal, of the staffing

9     proposal, the 2018 staffing proposal, that included looking at

10    these -- the frequency of contacts for EOP and CCCMS patients,

11    how frequent they're seeing psychiatrists per month or per

12    every 90 days, as required by the program guide?

13    A    Yes.

14    Q    And was part of the -- were those numbers also measuring

15    how supervisors were also seeing those patients?

16    A    Yes.

17    Q    And you never told the Special Master or the plaintiffs

18    during all the workgroup meetings that you were participating

19    in that those numbers included appointments that were being

20    covered by supervisors and chiefs?

21    A    I never thought to, and it's actually to the advantage

22    because the overall number would have been smaller.  If the

23    supervisors and chiefs -- if we thought to disclose that and

24    take it out, instead of 1.07 times every three months they were

25    seen, it could have been .90 or something, so it would have

Brizendine - Exam by Trapani

1   actually shown that there was less contacts.  This was in

2   hindsight because I didn't think about it at the time.

3   Q    And when you say that it was dropped from 1.07 to .90, are

4   you talking about if you exclude the appointments that were

5   being seen by supervisors and chief psychiatrists?

6   A    I'm hypothetically speaking that if -- the 1.07 would have

7   meant more contact because it included the chief and seniors,

8   right?  So if it didn't, it would have been less contacts.  So

9   the overall average would have been less than 1.07.  I don't

10  know what it would have been.

11  Q    And you're talking about the proposal for CCCMS patients;

12  is that correct?

13  A    Correct.

14  Q    And did you ever run that analysis for EOP patients?

15  A    Yes.  I didn't run the analysis, but, yes, the analysis was

16  run for EOP.  I want to believe it was .97, maybe, over the 30

17  days.

18  Q    And when you -- did you ever conduct an analysis of what

19  that number would be if you removed the amount of appointments

20  that were conducted by supervisors?

21  A    I did not.  I believe Angela did a manual kind of analysis

22  for Gibson Dunn, but I don't recall what it was.  It was a very

23  low number, but I don't remember the exact number.

24  Q    And it reduced the number, is that your understanding, to

25  remove the appointments that were being conducted by

1    supervisors?

2    A    What I remember was that she was -- she ran what percentage

3    of the appointments were seen by chiefs and seniors.  That was

4    a small number.  I don't know that she reran it to say what was

5    the overall average.

6    Q    Are you aware of any analysis that Ms. Ponciano did after

7    providing her analysis to the neutral expert earlier this year?

8    A    Any other analysis for what?

9    Q    Any other analysis to determine which appointments were

10   being provided by supervisors.

11   A    I believe that was the only one I was aware of.

12   Q    It's the only one you're aware of?

13   A    Yeah, that I recall.

14   Q    And is there currently any mechanism to track which

15   patients have primary physicians -- primary psychiatrists,

16   excuse me, who are chiefs or senior supervisors?

17   A    I have not been trained in CERNER, so I don't know

18   personally.  What I do understand is that there's a way for

19   psychiatrists to update their status for the purpose of

20   nonformulary approval.  I don't know that we can actually pull

21   that data -- that we could write some sort of code to be able

22   to pull it, so -- and I think that wouldn't -- I'd be concerned

23   about the accuracy, but that's like a line psychiatrist

24   upgrading themselves, right, for purpose of nonformulary, so

25   they may or may not be actually a supervisor.

1   Q    But wouldn't it be important for you to know that
2   information, which patients had primary psychiatrists who were
3   supervisor or chiefs?
4   A    I don't -- not necessarily.  I don't know for what purpose.
5   Q    So you're saying in your role as an administrator in
6   headquarters my understanding of your job is that you develop
7   policies, you are involved in labor negotiations, right?
8   A    Uh-huh.
9   Q    And you're saying that knowing which patients are being
10  seen frequently by supervisors or chiefs isn't important to
11  your job functions?
12  A    What I will say is important is to actually fill the
13  positions.  That's what's important to me.  Because I don't
14  think that chiefs and supervisors should be ongoing seeing
15  patients.  They should see them from time to time, they should
16  cover when they need to, but they should be able to supervise.
17  Q    I'm going to show you an exhibit that's already been
18  introduced into evidence, Plaintiff's 182.  And if you can turn
19  to page 9.
20           MS. GARSKE:  If we could just have one moment.  We're
21  looking at that exhibit.
22           MS. TRAPANI:  Okay.
23           MS. GARSKE:  Thank you.
24           THE WITNESS:  Can you tell me the page so I can
25  review?

Brizendine - Exam by Trapani

1           MS. TRAPANI:  Yes.  It's page 9.

2           THE COURT:  Has the defense found the exhibit?

3           MS. GARSKE:  Yes, we have, Your Honor.  Thank you.

4           THE COURT:  All right.  This is page 9 referencing the

5    top of the page.

6    BY MS. TRAPANI:

7    Q   Dr. Brizendine, this is an exhibit to a declaration

8    submitted by Ms. Katherine Tebrock on March 30th of 2017.  Are

9    you familiar with where this data was pulled from?

10   A   March 30th of 2017 I was not at headquarters, I was at

11   Salinas Valley State Prison, so I would just be guessing.

12   Q   So you're not aware of whether this was pulled from the

13   performance report or not?

14   A   I would just be guessing because it's before my time.

15          THE COURT:  We don't want you to guess.

16          THE WITNESS:  Yeah.  I don't want to do that.

17   BY MS. TRAPANI:

18   Q   Since coming to headquarters, what steps have you taken to

19   ensure that data that reported to the Special Master is

20   accurate?

21          MS. GARSKE:  Objection, vague as to "data."

22          THE COURT:  Overruled.

23          Are you able to answer?

24          THE WITNESS:  Sure.  You know, we -- now that we're

25   fully live with the CERNER system we're in the big data

1   business.  And being in big data you have to have validation

2   processes and kind of a good system to make sure you see if

3   bugs come up and so forth.  So we do have a system for solution

4   center tickets that any provider can put in when there are

5   potential -- when something doesn't look right, and we try to

6   timely review those and address any issues.

7         I will say that we had a change committee that was put

8   on hold with the release of the report, and I do think that we

9   need to get back to business with the change committee and the

10  prioritization committee so we can put all of the change

11  requests on the table and as a team be able to review those

12  along with the Special Master and to be able to move forward.

13  Q   So those are the steps that you've taken to ensure that all

14  the data that gets reported to the Special Master is accurate?

15  A   We had the change committee, it's been on pause, and we

16  would like to get it started again.

17  Q   And have you taken any steps to ensure that the data that

18  gets report to the Court is accurate?

19  A   Personal steps?  I think that we have experts who work in

20  QM who do the best of their ability to try to catch when

21  something doesn't seem right.  I'll tell you going forward we

22  have to sit down.  The plan was prior to the release of the

23  Golding report, which Dr. Golding and I discussed, is that the

24  Special Master was going to review all of our methodologies.

25  What's become crystal clear to me was that he wasn't aware of

1    all the methodologies.  So we were planning last year to sit

2    with him, and I told Dr. Golding, you'll be able -- because he

3    had many concerns.  I said you'll be able to sit down with the

4    Special Master's team, go through all of your concerns and

5    we'll get the business rules settled in.  Because, again,

6    there's many, many of them.  So I will say until we do that, I

7    don't -- we have to do that.

8    Q    If Dr. Ceballos had asked you if you were okay with the

9    change to the business rule for timely psychiatry contacts for

10   EOP patients, to move it from 30 days in between each

11   appointment to every 45 days in between each appointment, would

12   you have approved that?

13            MS. GARSKE:  Objection, beyond the scope of what this

14   witness has been identified to testify about.

15            MS. TRAPANI:  Your Honor, I think this is -- go ahead.

16            THE COURT:  Well, it's speculation, given the timing

17   particularly, right?  I'm going to sustain that objection.

18   BY MS. TRAPANI:

19   Q    All right.  Were you aware of the 40 --

20            THE COURT:  And you're at 15 minutes, so how much more

21   do you want to ask?

22            MS. TRAPANI:  I have no further questions.

23            THE COURT:  All right.  Ms. Garske.

24            MS. GARSKE:  Thank you, Your Honor.

25

Brizendine - Exam by Garske

1                              EXAMINATION

2    BY MS. GARSKE:

3    Q    Dr. Brizendine, earlier you had indicated that you were

4    aware that senior psychiatrists were acting and doing line duty

5    staff duties.  When was the first time, and if you know a date

6    that you became aware of that?

7    A    Oh, probably ten years ago.

8    Q    And in what capacity were you working when you learned of

9    this?

10   A    I was a line psychologist.

11   Q    Is it your understanding that the 2018 staffing proposal

12   went through several revisions before it was ultimately about

13   to be signed in September 2018?

14   A    Yes, and it was part of a -- what I thought was a very

15   productive workgroup process where all the parties got together

16   every week and we could have discussions and so forth.

17   Q    As part of those negotiations and discussions, was

18   Dr. Golding part of that?

19   A    Yes, he was.

20   Q    I believe earlier you testified that there were some

21   revisions or changes to the 2018 staffing proposal, correct?

22   A    Correct.

23   Q    And were any of those as a result of Dr. Golding's

24   recommendations or suggestions?

25   A    I didn't prepare the staffing proposal myself, I didn't

Brizendine - Exam by Garske

1    make changes physically, but I do believe that the modification

2    to the language for the eight overnight psychiatrists, that was

3    one of the modifications.

4    Q    Are you familiar with a clinic or EOP clinic model?

5    A    Yes, I am.

6    Q    Was that part of subsequent revisions made to the 2018

7    staffing proposal at the suggestion of Dr. Golding?

8    A    It might have been in the original discussion because it

9    was -- it was -- there were several things that were put in

10   that staffing proposal that were concerns that Dr. Golding had

11   brought up; one was the clinic model and if we could create an

12   environment where patients are kind of delivered more readily

13   throughout the day that it would increase efficiency and also

14   would increase work satisfaction.

15   Q    At any time during the either internal meetings or those of

16   plaintiff's counsel and Special Master, did Dr. Golding ever

17   indicate to you or to anyone in the room that he had a concern

18   that the data being used to support the 2018 staffing model for

19   the CCCMS and EOP levels of care was inappropriate?

20   A    He never brought up, that I recall, the chiefs or seniors

21   seeing patients and that being -- with the data.  We talked

22   about it all the time, that it was a problem, we're trying to

23   recruit and so forth.  So it was -- it was really just

24   separate.

25   Q    Okay.  Did you ever tell Dr. Golding that he had to wait

Brizendine - Exam by Garske

1   until January of 2019 to have his conversation with the Special

2   Master about his concerns related to data?

3   A    I told Dr. Golding on at least two occasions that the

4   Special Master was going -- and his team were going to meet

5   with us; he would have the opportunity to fully discuss all of

6   his issues.  Because he had other concerns about methodologies

7   and it's over my head.  I'm not a data expert.  And so I wanted

8   to make sure he was aware he would have his time to be able to

9   talk about those things, and maybe we would change them.

10  Q    At any time did you knowingly submit false data to the

11  Court in an attempt to comply with court orders?

12  A    No.

13  Q    Did you ask any of your staff to do that?

14  A    No.

15  Q    Did you receive pressure from anybody to falsify data in an

16  effort to comply with court orders?

17  A    No.

18  Q    As Assistant Deputy Director of the State-wide Mental

19  Health Program for CDCR, what role can you take to ensure that

20  inaccurate data is not presented to the Special Master or the

21  Court?

22  A    The Special Master and his team have been with us at

23  headquarters monitoring for the last several months, and it's

24  been very productive.  And I think going forward, we're, A,

25  going to have to get back to where we were a year ago where the

Brizendine - Exam by Garske

1    Special Master's team can review all of our methodologies.  And
2    I'm hoping that they can -- the Special Master can help
3    differentiate kind of what's program guide requirement and what
4    are the other number of indicators that really are just to help
5    the institutions manage.

6        And so obviously ones that are really directly related to
7    the program guide we can't change.  So, first of all, that
8    piece has to happen.  We have to start the change committee.
9    And I would like for the Special Master and his team to be a
10   part of that, to give us feedback, to observe the process and,
11   you know, if we need to make it better, we can make it better.

12       Also, the prioritization meeting, because there's so much
13   information coming so quick and many changes that need to
14   happen.  It's a new system so, you know, there's all sorts of
15   ideas to make the CERNER system better, but we have to
16   prioritize things.  So we have to have a prioritization
17   meeting, and I would like to have the Special Master's team to
18   be involved in that as well.  I think that will really help for
19   transparency and for building trust and for everybody to be on
20   the same page with what we're looking at and really to
21   differentiate kind of what's required by the Court and what are
22   all these other great things that we use as managers,
23   basically, to manage our institution.

24           MS. GARSKE:  Thank you.  No further questions.

25           THE COURT:  All right.  Anything further, Ms. Trapani?

1          MS. TRAPANI:  Just a few follow-up questions, Your

2     Honor.

3          THE COURT:  All right.

4                         EXAMINATION

5     BY MS. TRAPANI:

6     Q    Dr. Brizendine, you said just now that you spoke all the

7     time about your concerns of how frequently chiefs and

8     supervisors were seeing patients due to staffing shortages; is

9     that correct?

10    A    That's correct.

11    Q    And those -- were those discussions all internal among

12    headquarters of mental health?  Did you ever tell the Special

13    Master about those concerns that you had?

14    A    I didn't have much interaction personally with the Special

15    Master, and I didn't go on the tour, so I wasn't too often,

16    really until these last several months where I've been with the

17    Special Master's team more.  So, no, I don't recall saying

18    anything to them.  But it wasn't -- it was -- it was just

19    something that we all kind of -- I thought that was obvious to

20    folks.

21    Q    And so it wasn't your job to report that to the Special

22    Master, per your understanding?

23    A    I didn't -- I didn't think I needed to.  I mean, I just

24    didn't think about it.

25    Q    And do you know whose job that would have been?

1    A    The Special Master has been monitoring for many many years

2    and goes to institutions that have very low staffing.  I

3    couldn't imagine that he and his team didn't know or weren't

4    aware that at places that have very low staffing, the

5    supervisors and chiefs aren't chipping in.  I just -- I

6    couldn't imagine that they didn't know that.

7    Q    But it's your testimony that as the Assistant Deputy

8    Director of the entire mental health system, it wasn't your job

9    to communicate that to the Special Master, to make sure he

10   knew?

11             MS. GARSKE:  Objection, argumentative and asked and

12   answered.

13             THE COURT:  Overruled.

14             THE WITNESS:  I didn't think that he didn't know.

15   There's a lot of things that happen and, you know, he's been

16   monitoring us very closely.  We've had the same monitors for

17   many years.  It wasn't something I thought of.

18   BY MS. TRAPANI:

19   Q    So you agree it's an important fact for him to know?

20   A    Well, it's important for him to know, sure.  He's going to

21   see it reflected in his tour.  If he goes to an institution and

22   you have chiefs and seniors covering because there are low

23   staffing, there's going to be other problems that are going to

24   be apparent.

25   Q    Now, I want to turn to something else you just testified to

1    about how you told Dr. Golding that he could raise his concerns

2    about various things that he had discussed with you to the

3    Special Master --

4    A    Uh-huh.

5    Q    -- when he started his 28th monitoring round.  Is that an

6    accurate restatement of your testimony?

7              MS. GARSKE:  Objection, misstates testimony.

8              THE COURT:  Overruled.

9              THE WITNESS:  I didn't say the 28th round.  It was

10   soon.  So when we were going to meet with him -- we were all

11   getting ready for the telepsychiatry evidentiary hearing, and

12   so we were pretty busy with court stuff, so I knew -- I figured

13   after we were done with that hearing, then we'd be able to sit

14   down with the Special Master and his team and go over

15   everything.

16   BY MS. TRAPANI:

17   Q    And that was after the time that the plaintiffs were set to

18   sign a stipulation agreeing to cut 20 percent of the psychiatry

19   allocations within CDCR; isn't that correct?

20   A    I don't recall when they were set to sign it.  I knew we

21   were very close.

22             MS. TRAPANI:  Thank you.  No further questions.

23             THE COURT:  All right.  Just checking.  Anything,

24   Ms. Garske?

25             MS. GARSKE:  Nothing further, Your Honor.

1                          EXAMINATION

2    BY THE COURT:

3    Q    So I just have -- you said at one point there are QM

4    experts who do their best to catch something that's not right.

5    A    Uh-huh.

6    Q    So who are those experts?

7    A    We've had some changes.

8    Q    Well, let's say who were they at the time frame covered by

9    the Golding report?  Let's start with that.

10   A    Okay.  So what happens is, locally when the provider -- any

11   provider can put in a solution center ticket where they note

12   that there's -- something doesn't seem right in the system, and

13   that ticket comes to headquarters.  And I think our analysts do

14   some triaging of the tickets and they send it over to different

15   experts.  So it could potentially be -- and I don't know

16   exactly who does what.  It may be different for -- you know,

17   maybe psychiatry is a little bit different than nonpsychiatry,

18   but for sure Dave Leidner, Jake Adams, Jack Gills.  My

19   goodness.  And again, I don't know what all -- exactly what all

20   of the QM specialists do, but Carol Anderson.

21   Q    Do they all work within mental health?

22   A    They do, yeah.  And some stuff might go over to CCHCS

23   because we're kind of interconnected.  And I'm not sure exactly

24   when or at what point it goes over.  We work really closely

25   with the CCCMS QM shop.  But there's a way for anybody to say,

 1   "Hey, there's a problem," boom, send it.  And that's how

 2   they'll catch it.  Oftentimes they'll catch a bug and there's a

 3   bug in the coding or something, they'll be able to fix it.

 4   Q    All right.  So to follow up on some of Ms. Garske's

 5   questions, has anyone ever told you not to correct data that

 6   you considered inaccurate --

 7   A    No.

 8   Q    -- that had been presented to the Special Master --

 9   A    No.

10   Q    -- or to the Court?

11   A    No.

12   Q    Do you consider that there's a margin of error when it

13   comes to data reported to the Coleman court?

14   A    I'm not a data expert, but if we are aware of a margin of

15   error, we should say that there's a margin of error.

16   Q    And has --

17   A    I guess we're kind of as good as the data that's put in

18   because every provider -- you know, now we're straight live

19   with the CERNER system, so what happens, what the provider puts

20   in, that goes to the data warehouse.  So if they put in

21   something that's wrong, then potentially that's an error, but

22   it's hard for us to know, you know, if that's an error.

23   Q    But are you aware -- quantifiably has there ever been a set

24   of data that you think should have a margin of error applied to

25   it?

1    A    No.

2           THE COURT:  All right.  All right.  Any reason not to

3    excuse this witness, Ms. Trapani?

4           MS. TRAPANI:  Your Honor, if I may, I'd like to move

5    into evidence Plaintiff's Exhibit 239.  It's an organizational

6    chart.  The witness has been speaking about which department

7    each of these folks has been working in, and I think this would

8    be a helpful thing for her to look at.  So if I could show it

9    to her so that she could say if it was accurate or not.

10          THE COURT:  All right.  Any objection to showing that

11   to the witness?

12          MS. GARSKE:  As long as the proper foundation is laid,

13   no objection.

14          THE COURT:  All right.  All right.  You may approach

15   for that purpose, Ms. Trapani.

16                              EXAMINATION

17   BY MS. TRAPANI:

18   Q    Dr. Brizendine, if you could just look through there

19   organizational chart and let me know if it looks accurate to

20   you.

21   A    There's, like, eight pages and a lot of people on here.  I

22   think it would be hard for me to give its accuracy quickly.

23   Q    And this was produced to us by CDCR.

24   A    Okay.

25   Q    There's a date at the bottom, June 29th of 2018, if that

1    helps.

2    A    Okay.  I'll need a few minutes to look at it.

3    Q    Please, take your time.

4              MS. GARSKE:  Your Honor, in an effort to maybe

5    expedite this, if there's something in particular Ms. Trapani

6    wants the witness to look at to verify versus verifying

7    potentially dozens and dozens of physicians?

8              THE COURT:  Ms. Trapani?

9              MS. TRAPANI:  We would just like to know if this is an

10   accurate representation of the organizational structure within

11   headquarters, as was provided by defendants.

12             THE COURT:  So that calls for reviewing every page.

13             MS. TRAPANI:  Yes.

14             THE COURT:  All right.  How long would it take you to

15   do that, Ms. Brizendine?

16             THE WITNESS:  Maybe 10 minutes.

17             THE COURT:  Have you seen this document before?

18             THE WITNESS:  Yes.  Oh, yeah.

19             THE COURT:  Well, rather than take 10 minutes of court

20   time, any reason -- could Ms. Brizendine review this before she

21   leaves the building and then the parties could reach a

22   stipulation?

23             MS. GARSKE:  Your Honor, we don't necessarily object

24   to the document.  We're -- I just -- I want my witness to have

25   the ability to look at it.  So, yes.  If she could have a

1  moment to look at it and then I can speak to Ms. Trapani, see

2  if we'll stipulate to it.

3          THE COURT:  Right.  I'm saying I'm not going to give

4  you 10 minutes of open court time --

5          MS. GARSKE:  Exactly.

6          THE COURT:  -- for her to do that.  So I said can she

7  step down from the witness stand, remain on this floor, review

8  it.  If she needs to come back to the stand to make corrections

9  to the document, then we can work that in today yet; otherwise,

10 she can make a representation to Ms. Garske, and the parties

11 can enter a stipulation.

12         MS. TRAPANI:  Yes, Your Honor.

13         MS. GARSKE:  Yes.

14         THE COURT:  All right.  So Ms. Brizendine, you may

15 step down now.

16         THE WITNESS:  Okay.

17         THE COURT:  But please remain on this floor until

18 you're excused, and that will be once I hear from Ms. Garske

19 and Ms. Trapani as to whether or not there's a stipulation

20 regarding this exhibit.

21         THE WITNESS:  Okay.  Thank you.

22         THE COURT:  All right.  Thank you.

23         All right.  Undersecretary Toche, who is in the

24 courtroom, I believe.

25         THE CLERK:  Please step into the witness stand and

1    remain standing.  Raise your right hand.

2         (Witness duly sworn and takes the stand.)

3              THE WITNESS:  I do.

4              THE CLERK:  Thank you.  You may be seated.  Will you

5    please say and spell your first and last name for the record.

6              THE WITNESS:  Diana Toche, D-I-A-N-A, T-O-C-H-E.

7                   DIANA TOCHE, WITNESS, SWORN

8                        EXAMINATION

9    BY THE COURT:

10   Q    Good afternoon, Undersecretary Toche.

11   A    Good afternoon.

12   Q    I have a relative few questions for you; but first, can you

13   just -- I have this new interest in understanding what folks in

14   your position understand about CQIT.  Do you know what I am

15   referring to when I talk about CQIT?

16   A    I do.  I do.

17   Q    So how would you describe what that is, first?

18   A    I would describe it as a self-monitoring tool for the

19   mental health program to assess the performance of an

20   institution.

21   Q    And is that tool -- the data collected using that tool at

22   this point provided in full to the Special Master?

23   A    I don't know personally if it is.  I assume that it is.

24   Q    So you don't assume at this point that it's purely an

25   internal monitoring tool?

Toche - Exam by The Court

1    A    No.

2    Q    All right.  Do you see it as the tool that is -- the Court

3    contemplates is the pathway to CDCR's exit from this case?

4    A    Yes.

5    Q    All right.  And so you understand the Court's -- the

6    Court's reliance on the development, the application, the

7    collection of data using that tool is critical?

8    A    Yes.

9    Q    All right.  I understand that you may have been involved in

10   identifying and implementing remedial steps to address acts and

11   omissions that have led to these proceedings.

12   A    Yes.

13   Q    The defendants have acknowledged in some cases --

14   A    Yes.

15   Q    -- the provision of inaccurate if not misleading data to

16   the Court and the Special Master.  So can you describe since

17   Dr. Golding filed his report to date --

18   A    Yes.

19   Q    -- what remedial steps have you taken?

20   A    Yes.  So one of the first steps that we -- I have some

21   buckets that I have them in, if that's okay.

22        So one of the first steps that we took was actually just

23   trying to work on repairing the working relationship with

24   folks.  I'm sure, you know, as I've been sitting in the

25   courtroom you've heard that there has been some trust issues

1   even within the program area that are consequential to the

2   Golding report that was issued.

3   Q    With folks internally.

4   A    Internally within CDCR, within the mental health program.

5        So we hired an outside consultant to work with the program,

6   to work on restoring that trust.  I do have to admit that the

7   contractor has been met with mixed reviews, but we also know

8   that this is difficult work, and so we continue to work forward

9   on that.  And Dr. Day is working with the contractor and with

10  the people in mental health headquarters to get folks working

11  together again and more productively.

12       I have established monthly meetings with Dr. Golding so

13  that I can meet with him and hear what his concerns are and

14  what issues he would like to raise to me.  And also, we're just

15  kind of working on the culture and so, too, that

16  psychiatry/psychology is ensuring that when people are talking

17  about looking at policies, looking at issues, looking at

18  proposals, that psychiatry has been included.

19       And I want to believe and I do believe that in the past,

20  psychiatry was not left out because people didn't want to hear

21  their opinion, but we also know that psychiatry is a valuable

22  resource and a very valuable limited resource.  And so I think

23  that people thought this doesn't touch psychiatry, so we don't

24  want to bother them because their plate is pretty full.

25       And I know that happens to myself sometimes.  Sometimes

1   people forget to include me or they don't include me because

2   they think my plate is too full.  And I think, well, include

3   me.  You always want to be invited to the party, right?  You

4   always have the option of saying no, so . . .

5   Q   Depends on which party it is.

6   A   That's true.

7       So we're just trying to get people to be thinking about

8   psychiatry, including psychiatry, whether you think it touches

9   them or not.  And so that's a change in culture, kind of change

10  in the way people are thinking.

11      But Dr. Golding is being invited to -- and his staff are

12  being invited to more meetings and included in more processes.

13  So we're working on that.  But that's a work in progress.  I

14  mean, I think it is --

15  Q   You'd say structurally on his role as a psychiatrist?

16  A   Yeah.  Yes, yes.

17  Q   Yeah.

18  A   And then you've heard a lot about this, but we are working

19  on the change management committee and getting that policy in

20  place, the policy and procedure so that there's more structure

21  and rigor to -- and this was in place before, but we did stop

22  it after Dr. Golding issued his report, but to have the policy

23  in place, to have the structure and the rigor, as Dr. Ceballos

24  indicated, you know, to have a quorum, to have, you know, a

25  certain process.  What are we looking at?  How are we doing it?

1    How are we prioritizing things?  And, you know, I always think

2    it was prioritization.  You know, someone wants the screen

3    green instead of blue and then somebody wants something changed

4    that has to do with the business rule for counting.  What's

5    going to be in the top priority?

6        And, you know, and maybe I ask for something and so it gets

7    to the top of the queue as opposed -- you know, maybe the Court

8    wants something.  You'd go to the very top of the queue.  So

9    just how do we prioritize those things?

10        And then if it is a business rule change that once all the

11    stakeholders, including the Special Master, have opined on,

12    then it's coded, if there is a coding change, if there are

13    coding changes.  Then we have user acceptance, and that was

14    indicated in some other testimony.  I not sure who talked about

15    that.

16    Q    The release notes.

17    A    And the release notes.  But I think the release notes are a

18    really important part, and I don't think that everybody

19    appreciates that, is that, you know, you do get your iPhone

20    update, you get your release notes.  Everybody says they

21    accept.  I don't know anybody that actually reads those release

22    notes.  But you also need to have that person that you can

23    write back to that says, you know what, this release note --

24    this release that you guys did, I noticed that this is wrong,

25    and so that we have that loop to find the bugs that everybody

Toche - Exam by The Court

1    was talking about.  Because a lot of times we're working on

2    indicator X and then all of a sudden you notice that something

3    that you think was totally unrelated is an issue.  So we want

4    to maybe we close that loop.

5    Q    So just so I understand, you're talking about reinstituting

6    the change committee --

7    A    Yes.

8    Q    -- the prioritization?  Has that already happened?

9    A    No, it has not happened.

10    Q    When do you expect it to happen?

11    A    Well, we're working on policy and procedure, so I think as

12    soon as we can come to an agreement on that and working with

13    the Special Master and plaintiffs as necessary, we'll get the

14    change committee back working, because I think that's really,

15    really very important.

16    Q    And so any business rule change that has policy

17    implications would run through those --

18    A    Yes.  Yes.

19    Q    All right.

20         COURT REPORTER:  I'm sorry.  Could you please let the

21    Judge finish speaking before you answer.

22         THE COURT:  Thank you, madam court reporter.

23         THE WITNESS:  Oh.  I'm sorry.

24         And then finally, I know that the Court is aware of

25    this because of the order that came out talking about the shift

1    from the quality management folks that work in the mental

2    health program being transferred over to working under CCHCS

3    quality management, and this is a change.  And what I want to

4    say is that this is a construct change.  So in most major

5    healthcare organizations the people who report on quality, the

6    people who are looking at that data, they do not report to the

7    program area that they are actually gathering the data on.

8    They're a separate entity.

9            And so CCHCS, the quality management program is

10    overseen by a deputy director who reports to the director of

11    healthcare operations who, in turn, reports to myself and to

12    the chief deputy receiver and ultimately the receiver.

13            So in that respect, medical works with them, nursing

14    works with them, dental works with them.  Mental health does

15    work with them, but they have their own program within their

16    program.  And so what we'd really like to see is a shift over.

17    But that's not without complications.  And it's not without

18    people needing to be able to discuss what it looks like.

19            And so I just want to say that I think that that is

20    one of -- a major pathway so that we can restore trust between

21    everybody and that we can work on our transparency and move

22    forward.

23    Q    So on that point, just so I understand, are the -- you're

24    talking about the QM -- what all has been transferred over to

25    the CCHCS?

1    A    Nothing.

2    Q    All right.  What are you just describing?

3    A    What I would like to see the in future.

4    Q    What you would like to see?

5    A    Yes.  Sorry.

6    Q    All right.

7    A    We're talking about it.

8    Q    All right.  But there is the QM committee on which there's

9    a representative of mental health, one voting member?

10   A    Yes.

11   Q    All right.  And perhaps one nonvoting member, Dr. Ceballos?

12   A    Yes.

13   Q    All right.  You mentioned the psych resources being

14   limited.

15   A    Yes.

16   Q    You've been in the courtroom.  I allowed you to stay in the

17   courtroom.

18   A    Yes.

19   Q    You heard Ms. Tebrock's testimony about running points of

20   the staffing proposal by him in a meeting without showing him

21   the report.

22   A    Yes.

23   Q    How do you explain that?  Is that consistent with your,

24   "Oh, psych resources are limited, and so we're not going to tax

25   their resources"?

1    But what Ms. Tebrock described in terms of giving

2    Dr. Golding, as chief psychiatrist, a chance to weigh in on the

3    report doesn't seem consistent with that explanation to me.

4    A    Correct.  And so I -- you know what, I would be speculating

5    on why Katherine did that, and so --

6    Q    Well, I just wondered if it was consistent with that

7    general explanation or not.

8    A    No.

9    Q    You would agree it's not?

10   A    No.

11   Q    All right.  So are there any other measures that have been

12   put in place since Dr. Golding filed his report that you

13   haven't covered at this point?

14   A    I believe not.

15   Q    And in terms of what's planned, revised, formalized,

16   improved, change committee and prioritization committee and

17   also work on this piece of QM, mental health QM working with

18   healthcare QM?

19   A    Yes.

20   Q    But at this point that's a goal that has not been

21   implemented.

22   A    Correct.

23   Q    And in that process, if that goal is to be achieved, how is

24   the integrity of Coleman data protected separate from -- from

25   the data that may be required in PLATA, if your goal is

Toche - Exam by The Court

1    achieved?

2    A    If my goal is achieved.  So I think that there -- we have

3    an understanding of what the requirements are for Coleman, and

4    so I think that we would always recognize whatever the

5    requirements are for Coleman, and that would not change.

6        And I -- and in the process of doing whatever we're doing,

7    we would make sure that whatever business rules, however we

8    count things, however things are recorded, that we all agree

9    that that's how that should be.  I -- a full transparent

10   process.

11       And so I'm not really sure, because to me the whole data --

12   I got a little confused as everybody was talking because the

13   data is all in a warehouse.  There's all, you know, this data,

14   and I kind of liken it, like, that's one big huge gigantic hard

15   disk drive, and we all have different documents on there and we

16   want to write a report and we're going to pull different

17   documents and then different pieces to create this report.  And

18   so that's what the -- that's what I -- that's the way -- my

19   kind of analogy.  And so the data, itself, is in that warehouse

20   that Laura talked about, which is the big, huge sys drive.  And

21   the IT people make sure that when I go to look for the story

22   that I wrote 10 years ago, it's still there or, you know, the

23   data that's coming in from the electronic health record, it's

24   there for use to be pulled appropriately per the business rules

25   to create whatever report we want to have.

Toche - Exam by The Court

1   Q    But you acknowledge that it appears that some PLATA

2   indicators found themselves creeping into the Coleman case?

3   A    Yeah.  I think that we have, as Dr. Brizendine mentioned,

4   we have a lot of indicators, and so I am not sure if -- I think

5   that we would need to delineate what is actually, as Brittany

6   stated, what is a Coleman indicator and what is this

7   performance management indicator that's outside of Coleman, but

8   let's say that we do that.  I think that even if it is outside

9   of Coleman, we still all need to be making sure if it's

10  reporting on something that has to do with mental health that

11  we're all on the same page.

12  Q    In terms of clarifying structures, do you contemplate some

13  clarification regarding the reporting structure between CDCR

14  Mental Health and the Special Master?

15  A    I don't understand the question.

16  Q    Are there point people -- would certain people be

17  identified as the key communicators with the Special Master's

18  team or not?

19  A    I think that we would need to work with the Special Master

20  to figure out how that would work.

21  Q    So to the extent the Special Master or his team interacts

22  with folks across the board in mental health, have you taken

23  any steps to clarify your expectations, CDCR's expectations of

24  how that staff interacts with the Special Master's team?

25  A    No, we have not since them being at headquarters is so

Toche - Exam by The Court

1   relatively new.  But I do agree with what you're saying.  I
2   think we need to do that.
3   Q   And if you did that, that would be -- would that be
4   communicating to everyone within mental health?
5   A   Yes.
6   Q   Are you the person who is responsible for ultimate
7   supervision of any collection of data and reporting of data to
8   the Coleman court?
9   A   No.  I don't -- I wouldn't say that.
10  Q   All right.  Are you responsible -- what would you say --
11  does the buck stop with you on something relating to the
12  subject matter of this proceeding?
13  A   I think that higher-level policy calls the buck stops with
14  me.  I think that if you're talking about your day-to-day
15  operations and collecting data and it being presented to the
16  Court, we would rely on program people to do that and whoever
17  is doing a declaration, the buck stops with them.
18  Q   In terms of overarching reliability and transparency --
19  A   Yes.
20  Q   -- you see that as your -- that's your bailiwick?
21  A   Yes, ma'am.
22          THE COURT:  All right.  I have no questions at this
23  point in time.
24          Mr. Bien.
25

1                              EXAMINATION

2      BY MR. BIEN:

3      Q    Good afternoon, Dr. Toche.

4      A    Good afternoon.

5      Q    You talked about moving the existing staff from mental

6      health over to somewhere.  What would you call that new

7      location?

8      A    I would call that the quality management program within

9      CCHCS.

10     Q    And is the ultimate authority for that program currently in

11     the PLATA receiver?

12     A    Yes, sir, it is.

13     Q    Okay.  So that even though there are people reporting

14     above, including through you, the ultimate person in charge of

15     that group is the PLATA receiver?

16     A    Yes, sir.

17     Q    I was concerned when you said it would be the mental health

18     staff who are currently doing this function based on what has

19     come out in this proceeding.  Why do you think that's an

20     appropriate way of gaining trust?

21     A    So I'm glad that you asked this question because even as

22     you asked your prior question, I kind of wanted to correct you.

23     So I'm glad you asked this question.

24          So I think that you have existing quality management staff

25     that work with Dr. Ceballos.  A number of the staff, like

Toche - Exam by Bien

1    Dr. Leidner, have left already and so -- and I'm not -- we

2    haven't even discussed it yet.  And so I think that that would

3    be open to the discussions that the Court had indicated in the

4    order that had come out recently.  I think that we need to talk

5    about, you know, what is exactly the construct that quality

6    management thinks that they need?  And so I don't even know if

7    what quality management thinks that they need is what is in

8    Dr. Ceballos' shop right now.  And so I think that that is

9    still something that we all need to talk about.

10   Q    I think that -- let me try this again.  I think one issue

11   that has been of concern in this proceeding is whether the

12   Department of Corrections considers information provided to the

13   Special Master something that needs to be particularly checked

14   and accurate.  Do you agree that before information is provided

15   to the Special Master in this case, somebody should be

16   responsible to ensure that that information is accurate?  And

17   by "accurate," I also mean that the Special Master is told what

18   the information actually shows.  In other words, the descriptor

19   should be the same -- should accurately reflect what's in the

20   chart, for example.

21   A    So I agree that the information does need to be accurate,

22   and so currently within CCHCS they go through a double

23   validation process of their data.

24        And so not only does the quality management staff check it,

25   but IT staff checks it as well.  So there's already that

1  process built into place, that's my understanding.  And that

2  data that would be reported to the Court is data that staff is

3  currently using to treat patients, and so we want that data to

4  be accurate.

5  Q   I understand that, but do you agree that there should be an

6  additional step before something is provided to the Special

7  Master, one question; and then the second question, should

8  there be an additional step before information is provided to

9  this Court, which is another level of authority in this case?

10 A   I would need to think about how that would look and how

11 that would work.

12 Q   Okay.  Are you willing to issue a directive, as suggested

13 by the Court, that would allow mental health staff to

14 communicate freely to the Special Master and his team?

15 A   Oh.  To issue a memo saying that they're free to --

16 Q   Yes.

17 A   Yes.

18 Q   Okay.  And is that current policy?

19 A   I believe it's current policy.

20 Q   You've heard -- you've been in here, and you've heard

21 testimony that at least some employees may perceive that

22 they're not free to, for example, speak at a workgroup meeting.

23 Do you think that's accurate that people have to have

24 permission to speak their opinion at a workgroup meeting?

25 A   I do not -- I do not believe that people need to have

1   permission, but I also know that perceptions can vary from

2   person to person.  And so whatever we can do to correct

3   misperceptions, we will do.

4   Q   Would you agree that it would be inappropriate to

5   discipline an employee, a mental health clinician, for example,

6   for speaking to the Special Master or his staff?

7   A   Yes.

8   Q   Do you agree that every effort should be made to correct

9   any pleadings, in other words, court filings that have been

10  made in this case that defendants now believe are inaccurate?

11  A   Of course.

12  Q   One impression that has come through, at least to me

13  sitting in the courtroom, is that it's not clear that CDCR

14  officials understand that CDCR has been found to have violated

15  the Constitution as to the mental health program and is under a

16  remedial order supervised by this Court.  What efforts do you

17  think could be made to make clear to CDCR Mental Health

18  employees and officials that their -- Coleman is not just a

19  word, but this is a court order of a federal court upheld by

20  the United States Supreme Court that governs a remedial

21  process?

22          MR. LEWIS:  Objection, Your Honor.  This is an

23  argumentative question.  It also calls for a legal conclusion.

24          THE COURT:  Overruled, given the overarching

25  responsibilities Dr. Toche has said she carries.

1       THE WITNESS:  You know, I think that I would need to

2  think about that because you are bringing up a point that --

3  you know what, I need to consider that, and I won't have a

4  thoughtful answer for that question.

5  BY MR. BIEN:

6  Q   Do you understand why providing accurate information to

7  this Court about the CDCR's level of compliance is important in

8  an effort to -- let me start again.  Strike that, please.

9       Do you understand why CDCR needs to provide accurate

10 information to this Court about the delivery of mental

11 healthcare?

12 A   Yes.

13      MR. BIEN:  I have no further questions.

14      THE COURT:  All right.  Any questions for

15 Undersecretary Toche from the defense?

16      MR. LEWIS:  I've got a few questions, Your Honor.

17      THE COURT:  All right.

18                    EXAMINATION

19 BY MR. LEWIS:

20 Q   Ms. Toche -- or, I'm sorry.  Dr. Toche, how long have you

21 worked at CDCR headquarters as the undersecretary of

22 healthcare?

23 A   Since 2014.

24 Q   During that time did Katherine Tebrock work for you?

25 A   Yes, she did.

Toche - Exam by Lewis

1    Q    Do you believe that Katherine Tebrock would ever provide
2    misleading data to the Court or the Special Master?
3    A    No.
4    Q    Do you believe that Dr. Laura Ceballos would ever provide
5    misleading information to the Court or Special Master?
6    A    No.
7    Q    Do you believe that there's a large data system that
8    Dr. Ceballos had a part of -- being a part of processing a
9    large data system?
10   A    Yes.
11   Q    Do you trust her judgment or her decisions regarding
12   aspects of that quality management system?
13   A    Yes.
14   Q    In terms of Ms. Tebrock's role as the deputy director, she
15   and her staff would work on large group or large policy
16   decisions, correct?
17   A    Correct.
18   Q    Do you think it was appropriate that she would have group
19   discussions about those policies?
20   A    Yes.
21   Q    Do you think that it would be appropriate that in those
22   meetings, Dr. Golding would express maybe concerns about those
23   and that Ms. Tebrock would answer those concerns?
24   A    Yes.
25   Q    You've talked about some large ideas about remedial

Toche - Exam by Lewis

1   measures.  Were things kind of put on hold once the allegations

2   came down -- the Golding allegations came down?

3   A    Yes, sir.

4   Q    Have there been efforts to restart them but the concerns

5   about the Golding allegations holding things back?

6   A    Yes.

7   Q    So on the development of the business rule change

8   committee, there's actually policies and procedures that are

9   kind of working their way around, aren't there?

10  A    Yes, sir.

11  Q    So this is not just an idea.  This is actually pen-to-paper

12  ideas?

13  A    Yes.

14  Q    Have you seen, like, a workflow document?

15  A    Yes.

16  Q    And would that be worked on by various people that fall

17  within the mental health department?

18  A    Yes.

19  Q    So it's not just an idea.  There's actually pen to paper

20  right now?

21  A    Yes.

22  Q    What would be the best way to take that pen to paper and

23  turn it into a real business rule change committee with Special

24  Master input, in your opinion?

25  A    I think that we would need to finalize it and ensure that

1   all the internal stakeholders within the mental health program

2   have reviewed it and vetted it, send it over to the Special

3   Master, work with the Special Master to refine it, if there's

4   any refinement that need to be done, and then put it into

5   action.

6   Q   You mentioned that the Special Master is now at CDCR

7   headquarters and that that has helped in restoring trust.

8   Could you expand on that a little bit more?  What is it that

9   the Court can take from that interaction and kind of merge it

10  into some of the other ideas that we've talked about?

11  A   So I think that having the Special Master's team members at

12  headquarters has been real advantageous for the mental health

13  program.  They provide realtime feedback, and they're able to

14  help move things along and to provide some guidance from the

15  Special Master team.  So I think that the work that they've

16  been doing at headquarters has been helpful.

17  Q   Do you believe that there should be an additional step

18  similar to what Mr. Bien was asking you, an additional step to

19  verify reports that are made to the Court?

20  A   You know, I'm still -- I'm thinking about that, and I need

21  to think about what that would look like, and I want to make

22  sure that we're both thinking and talking and have a similar

23  understanding as to what exactly he's talking about, and I

24  don't think that we're going to work that out in the courtroom.

25  And so I want to make sure that I understand explicitly what

1    he's talking about and we make sure that we deliver a product

2    that we're all comfortable with.

3         And so I want to make sure that we're doing what makes

4    everyone comfortable and what would that look like, and I

5    just -- I just want to make sure that we have the same

6    understanding, you know, potato, *potato*.  So I just want to

7    make sure.  I think that we'd need further conversation for

8    that.

9    Q    And on the quality management integration piece where it

10   would, I guess -- mental health QM would move over, is there a

11   separate -- and imagine an org chart.  Do you have a separate

12   QM almost department or division that falls underneath you?

13   A    Yes.

14   Q    So there's an entirely separate -- essentially a wing that

15   does only quality management?

16   A    Yes.

17   Q    And that's referred to as the CCHCS quality management?

18   A    Yes.

19   Q    So then you would take it out of the mental health program

20   and move it over to this separate department?

21   A    Yes.

22   Q    What are some of the advantages of that -- of moving it

23   over to that separate division?

24   A    I think one of the main advantages is that those folks are

25   over there looking at data, providing data, and their goal is

1    to have the data that reports what is necessary to deliver good

2    patient care.  And so we want to deliver good patient care in

3    the end.  Actionable data.

4        And there are also -- they do also report data that has

5    some time frame mandates and some compliance measures, but

6    there's also, you know, patient care data so that are you --

7    are you doing X, Y and Z.

8        So the example we all like to use is diabetes.  You know,

9    are patients' diabetes controlled?  How is their compliance

10   when we look at this one measure, is it in the red, is it in

11   the yellow, is it in the green?  What patients do we need to

12   focus more effort on.  I mean, so it's actionable data so that

13   we can make sure that we're delivering appropriate care to all

14   our patients.

15   Q   And if you were to move some of the those quality

16   management staff over from mental health care to this separate

17   division I'm calling it -- I'm sorry if I'm getting the words

18   wrong -- would you trust the people that would move from

19   quality management, such as Dr. Leidner, Laura Ceballos,

20   et cetera, if they were to move into that function?

21   A   So I think that once -- whoever goes over there, and I'm

22   not sure that those people are the right people or not, and so

23   once -- I would prefer to not call them people or staff.  I

24   would prefer to call them PYs because it's -- you know, who

25   knows what would go over there.

1    Once those people -- those PYs go over there, they would be

2    directed by the deputy director of quality management, and so I

3    think that, you know.  And they have all the validations

4    processes and everything is very transparent.  And so I'm not

5    really sure that the "who" exactly matters, but I do understand

6    that some feelings have -- some people have strong feels about

7    certain people, too, as well.

8  Q   Are you confident that no matter who ended up there, that

9    there would be sufficient integration among people to ensure

10   that the Court's concerns, the Coleman Court's concerns about

11   integration of data could be discussed and satisfied?

12 A   Yes.

13       MR. LEWIS:  No further questions.  Thank you, Your

14 Honor.

15       THE COURT:  All right.  Any follow up, Mr. Bien?

16       MR. BIEN:  No, Your Honor.

17                         EXAMINATION

18 BY THE COURT:

19 Q   All right.  Just one follow-up from the Court.  The Court

20   has been receiving errata.  I referred to them at one point

21   during this proceeding I think as "rolling errata."

22 A   Yes.

23 Q   Are you involved in the process of identifying when errata

24   need to be filed to correct past filings?

25 A   No.

Toche - Exam by The Court

1    Q    You're not part of that process at all?

2    A    No.  I mean, I saw that it was being filed, but not --

3    Q    As part of your portfolio, including ensuring reliability

4    and transparency, that does not include looking backwards to

5    identify what needs to be cleaned up?

6    A    No.

7            THE COURT:  All right.  All right.  You may step down.

8            THE WITNESS:  Thank you.

9        (Witness excused.)

10           THE COURT:  All right.  Is there a stipulation on

11   Exhibit 239, or do we need to call Ms. Brizendine back?

12           MS. GARSKE:  Your Honor, Dr. Brizendine indicates she

13   cannot authenticate this document; however, defendants are

14   looking for someone who can.  And we will work with plaintiff's

15   counsel this evening or tomorrow and if we can get that

16   agreement, we'll file it with the Court or let the Court know.

17           THE COURT:  All right.  Does that work for you

18   Ms. Trapani?

19           MS. TRAPANI:  Yes.

20           THE COURT:  All right.  So we'll defer 239.

21           Let's just do some housekeeping, and then I believe

22   we're done for the day.  And we'll talk about schedule as part

23   of that.

24           So who from the defense team can tell me are more

25   errata coming?  And if so, what's the -- at what point will I

1    know when all the errata that the defense plans to file have

2    been filed?

3         MR. LEWIS:  Your Honor, my understanding is that right

4    now we are current on all of them, but, of course, ongoing

5    process, but my understanding is, yes, they are current and

6    they are complete for now.

7         THE COURT:  Complete.  All right.

8         MS. ELLS:  Your Honor, just to be clear, I'm sure

9    you've seen our filing --

10        THE COURT:  Yes.

11        MS. ELLS:  -- but we have concerns and -- yeah.

12        THE COURT:  All right.  I've seen your responses, but

13   I just wanted to understand if more were coming, to the extent

14   I want to think about that.

15        MR. LEWIS:  And Your Honor, if I wasn't clear, if we

16   do ever identify anything, we will let the Court know.

17        THE COURT:  I understood that.

18        So Ms. Ells, you were moving some exhibits in.  Let's

19   get back to that.  What exhibits does plaintiff wish to move in

20   that have not yet been admitted?

21        MS. ELLS:  So we had proposed to defendants to

22   stipulate to Plaintiff's 181.  So these are -- and Ms. Thorn

23   can correct me if I'm wrong, but I believe that we've

24   stipulated to 181, 182, 183, 207 --

25        MS. GARSKE:  Not -- that's one we haven't seen, so --

1    you didn't present that or publish it.

2            MS. ELLS:  Oh, that -- the Weber.

3            MS. GARSKE:  So if you can just show it to us and we

4    can look at it, we'll consider that.

5            MS. ELLS:  We will do that.

6            Joint Exhibit D, Joint Exhibit C.  And we are

7    continuing to meet and confer about Plaintiff's 161.

8            THE COURT:  So 116 was not on that list?

9            MS. ELLS:  Yes.  I apologize.  I misspoke.

10           THE COURT:  All right.  All right.  So 181, 182, 183,

11   D and C are admitted.  Agreed, Ms. Thorn?

12           MS. THORN:  Agreed.

13       (Plaintiff's Exhibits 181, 182 and 183 admitted in

14       evidence.)

15       (Joint Exhibits C and D admitted in evidence.)

16           THE COURT:  All right.  So if the plaintiff can

17   provide courtesy copies to the Court.  I have 182.

18           MS. TRAPANI:  We will do that.

19           THE COURT:  Does the defense have any exhibits to move

20   in that have not been moved?

21           MR. LEWIS:  None, Your Honor.

22           THE COURT:  All right.  Ms. Musell provided the

23   documents that she had referenced yesterday.  The Court does

24   have three sets.  Just to create a process, my plan would be to

25   provide the defense with one set and just have the defense let

1    me know if they are standing on any objections to any of those

2    documents at this point in time, given the purpose for which

3    they're being offered, which is to clarify the record as to

4    whether or not Dr. Golding did communicate with persons who

5    testified here.

6           So my thought would be to provide that to the defense

7    this evening before they leave the building and then have them

8    let me know if they're standing on objections or if those

9    exhibits can be made part of the record.  And I understand the

10   defense had said, well, they might want to call Dr. Golding.

11   We'll cross that bridge when we come to it.

12          MR. LEWIS:  Yes, Your Honor.

13          MR. SILBERFELD:  By when would the Court like us to

14   respond?

15          THE COURT:  So looking at the schedule, given what you

16   said earlier, I think we will maintain Friday morning at this

17   point, and at this point Friday morning will be closing

18   statements.

19          And Ms. Musell, I will leave it up to you if you wish

20   to make a closing statement on Friday morning.

21          MS. MUSELL:  May I briefly be heard on that, Your

22   Honor?

23          THE COURT:  All right.

24          MS. MUSELL:  The issue --

25          THE COURT:  Come forward so we can --

1        MS. MUSELL:  Thank you.

2        The issue is, I had put in a pleading a while ago, I

3    can't remember the date, regarding the unavailability of both

4    myself and Dr. Golding.

5        THE COURT:  Ah.

6        MS. MUSELL:  I am unavailable on Friday because I'm

7    the chair of the California Employment Lawyers Association and

8    I'm required to be presenting at 9:00 a.m. in San José to 500

9    people for our annual conference, which is Friday and Saturday.

10   So Dr. Golding, as I had informed both defense and plaintiffs,

11   has a scheduled vacation and has been prepaid, so --

12       THE COURT:  And what's the time frame for that

13   vacation, remind me?

14       MS. MUSELL:  He is leaving, I believe, on Sunday.  And

15   so we're definitely available tomorrow.  I'm actually available

16   right now if you'd like me to give a closing.

17       And Dr. Golding, of course, would be available to

18   describe any of the documents, answer any questions about them,

19   why they were provided, what pages are relevant.

20       THE COURT:  Well, are you saying that you do wish to

21   make some kind of closing statement?

22       MS. MUSELL:  I am happy to, Your Honor.

23       THE COURT:  That wasn't the question, so I don't --

24   I'm just -- given your role here --

25       MS. MUSELL:  I understand.

1           THE COURT:  -- I'm not asking for one.

2           MS. MUSELL:  Okay.  We were unaware that Your Honor

3    may give us that opportunity; however, when you raised that

4    yesterday, I did draft one, which I'm happy to share and I'm

5    able to do today or tomorrow.  In fact, I have it right here.

6           THE COURT:  Yeah.  How long would it take for you to

7    provide that, or is it in a pleading form that you would file?

8           MS. MUSELL:  It is not in a pleading form; although,

9    if Your Honor would prefer it to be in a pleading form, I

10   certainly could get that to Your Honor next week.

11          THE COURT:  That might be the best way to provide that

12   at this point.

13          MS. MUSELL:  Thank you, Your Honor.  Is there a

14   particular day you would like that by?

15          THE COURT:  Well, let me think about this in terms of

16   the global schedule.

17          MS. MUSELL:  Thank you, Your Honor.

18          THE COURT:  I guess one follow-up question for

19   Ms. Musell.  Dr. Golding understands that the Court is on track

20   to -- at this point it may be next week -- issue some statement

21   of my conclusions that I would then memorialize in an order,

22   and he accepts that that would happen when he is not present.

23          MS. MUSELL:  We understand that, Your Honor.

24          THE COURT:  All right.

25          MS. MUSELL:  The original schedule --

1        THE COURT:  I see him nodding his head.

2        MS. MUSELL:  -- that had been proposed by the Court

3   was, you know, a month before.  And so when he had made his

4   vacation plans that are prepaid, they absolutely took into

5   account any hearing that may happen.  Of course, when that

6   moved, I did file a pleading in order to give everyone notice

7   as to any limitations.  I completely understand that, you know,

8   this must go on.

9        THE COURT:  Right.

10       MS. MUSELL:  And Dr. Golding --

11       THE COURT:  It appears Dr. Golding does as well.

12       MS. MUSELL:  -- understands that too.

13       THE COURT:  All right.

14       MS. MUSELL:  And, in fact, is willing to go to

15  extraordinary measures to provide whatever this Court would

16  like.  So if there is something, even though it would impact

17  his vacation, if we needed to do something video or --

18       THE COURT:  All right.  Understood.  And you could be

19  present next week?

20       MS. MUSELL:  Whatever date you'd like, Your Honor.

21       THE COURT:  All right.  Well, that said -- okay.  You

22  may now return to the audience.

23       MS. MUSELL:  Thank you.

24       THE COURT:  My thought would be to accept whatever

25  statement Ms. Musell has but go ahead and hear closing

1    statements from the parties on Friday at 10:30.  Of course a

2    record would be made and Ms. Musell could request that

3    transcript.

4            And then at this point in time I would look to next

5    week, Tuesday or Wednesday, where I would issue some statement

6    from the bench to be memorialized in an order.  And Ms. Schultz

7    would just work with you, it would be Tuesday -- at some point

8    Tuesday probably afternoon or Wednesday afternoon.  And so

9    that's my current thinking.

10           Is there anyone who's a critical player who could not

11   be here either Tuesday or Wednesday with the understanding

12   Ms. Schultz will work her magic and find the best time for all

13   concerned?

14           MS. ELLS:  Plaintiffs are available.

15           THE COURT:  Defense?

16           MR. SILBERFELD:  No problem.

17           MR. LEWIS:  We're ready, Your Honor.  We are

18   available.

19           THE COURT:  All right.  We did not yet discuss Exhibit

20   164.  I have read the cases that the parties provided.

21           Just so I'm clear, what objections exactly are the

22   defendants lodging against 164?  This is the Dr. Gonzalez's

23   whistleblower complaint previously provided to the Court.  It's

24   addressed in at least one court order.

25           MS. THORN:  So, Your Honor, defendants have raised the

1    objection of hearsay as to that exhibit.

2         THE COURT:  Is that the only objection?

3         MS. THORN:  Oh.  Also, Your Honor, earlier on in these

4    proceedings defendants had objected to Dr. Gonzalez's report as

5    an unsigned document.  Also, she was unwilling to submit the

6    document to the Court by way of a signed declaration under

7    penalty of perjury, so we would maintain that objection along

8    with the hearsay objection.

9         THE COURT:  All right.  So on the authentication

10   question, the verification, which the Court had previously

11   noted -- and I can ask Ms. Musell to weigh in on this, but your

12   response to the -- that lack of verification of the report?

13        MS. WINTER:  Your Honor, Jessica Winter.  I believe

14   Dr. Golding already testified sufficiently to authenticate the

15   document yesterday.

16        THE COURT:  This is a document signed by Dr. Gonzalez.

17        MS. WINTER:  Correct, but he said that he reviewed the

18   document, he was familiar with virtually all of it and, indeed,

19   significant portions are included in his report.

20        THE COURT:  How does that satisfy the portions of the

21   document that are prepared by Dr. Gonzalez only?

22        MS. WINTER:  It doesn't, but I don't think that

23   there's a particular certification requirement as long as it is

24   fully authenticated and falls within a hearsay exception.

25        MS. ELLS:  Your Honor, we would note that Dr. Gonzalez

Toche - Exam by The Court

1    is also available to attest to it.  She's made herself

2    available for this proceeding if need be.  And we had indicated

3    that we wanted her to be on the exhibit list -- excuse me, on

4    the witness list.

5              THE COURT:  It is late in the day.

6              Well, Ms. Musell, on this point, just so I understand,

7    because I had previously acknowledged the report based on, I

8    believe, communications from you or with you, the --

9    Dr. Gonzalez's complaint was not filed in this action, and at

10   this point the Court has never received a verified copy,

11   correct?

12             MS. MUSELL:  We have not filed a declaration;

13   although, Dr. Gonzalez would be happy to provide whatever

14   information or testimony that this Court would find helpful,

15   including anything in that particular exhibit.

16             So if Your Honor would find it to be useful for her to

17   come back next week, so long as her employers, for which it

18   appears there's about 20 representatives here, could approve

19   her time off, she would be happy to be here and provide your

20   Honor with whatever information would be useful to you.

21             THE COURT:  But at this point she is prepared to

22   verify the document, that is, sign it under penalty of perjury?

23             MS. MUSELL:  She's prepared to verify any of the data

24   in there.  I have not asked her because this is the first time

25   I'm being asked after that prior order.  And she is not

1    currently present today because she was not informed she was

2    going to testify, but she absolutely stands by that data.  She

3    stands by her report, she stands by her whistleblower concerns,

4    and she is happy to state that under penalty of perjury.

5            THE COURT:  All right.  Well, I believe the document

6    is covered by a hearsay exception if it's verified.  So if

7    plaintiffs can obtain a verification that covers the contents

8    of the reports, we can revisit this.  So we can come back to

9    any other exhibits, and including this one, on Friday morning

10   before closing statement.

11           At this point 164 is not admitted, but it's only

12   because of the absence of a verification.

13           MS. MUSELL:  May I ask a point of clarification, Your

14   Honor, which may assist the parties and the Court?  For a

15   verification, precisely what would the Court want in order to

16   admit that document?

17           THE COURT:  Again, this is not the Court's wanting.

18   It's what the plaintiffs -- the plaintiffs need to talk to you,

19   and they're the ones offering the document.  And so they are

20   free to obtain the verification they believe is necessary to

21   satisfy authentication requirements to the extent they want the

22   document in the record.

23           MS. MUSELL:  Okay.  Thank you, Your Honor.

24           THE COURT:  They are capable attorney,s, from what

25   I've seen, so I think they can read the rules of evidence and

Toche - Exam by The Court

1    work with you.

2            MS. MUSELL:  Thank you, Your Honor.

3            THE COURT:  All right.  Is there any other

4    housekeeping?

5            MS. THORN:  Your Honor.  The defendants agree to admit

6    Plaintiff's Exhibit 206.

7            THE COURT:  All right.  206 is admitted.

8        (Plaintiff's Exhibit 206 admitted in evidence.)

9            THE COURT:  Anything else?

10           MR. LEWIS:  Your Honor, I have one question about

11   Friday's closing statements.  Do you anticipate time limits?

12           THE COURT:  Time limits?

13           MR. LEWIS:  Yes.

14           THE COURT:  Well, tell me first what you're thinking.

15   I mean, I'm thinking 30, 45 minutes max.

16           MR. LEWIS:  30 minutes max, Your Honor.

17           THE COURT:  Does that work for you, Ms. Ells?

18           MS. ELLS:  30 minutes is fine, Your Honor.  Thank you.

19           THE COURT:  All right.  30 minutes each,

20   Mr. Silberfeld?

21           MR. SILBERFELD:  Yes, Your Honor.  There's an

22   evidentiary piece of this that relates to Dr. Kuich's

23   testimony.

24           THE COURT:  Correct.  I've received

25   counter-designations, have I not?

1          MR. SILBERFELD:  Yes.  Yeah.  Just before we close on

2     Friday I just wanted to see if we could resolve that somehow.

3          THE COURT:  Ah.  There are objections pending.  Do I

4     have a copy of the deposition clearly identifying for me the

5     portions objected to?  That's what I need to rule on

6     objections.

7          MS. THORN:  We'll get that to the Court this evening,

8     Your Honor.

9          THE COURT:  All right.  The way that's worked best,

10    you probably know, but just use different colors so one color

11    for plaintiff's designations, one color for defense

12    designations and other colors for portions objected to.  So

13    give me a legend.  And do I know what the objections are?  I

14    don't see the substantive objections.  Well, in some cases I

15    do.  All right.  So where there's an objection, it is spelled

16    out, for instance, lack of foundation.

17         MS. THORN:  Yes, your Honor.

18         THE COURT:  All right.  Have plaintiffs filed any

19    objections to the counter-designations, or do they anticipate

20    doing so?

21         MS. ELLS:  We have not reviewed them.  We received

22    them, I believe, today, so we have not yet reviewed them.  We

23    can do so tomorrow.

24         THE COURT:  All right.  Just work together.  Get me

25    one copy once any objections are identified by plaintiff.

1          MS. THORN:  Yes, Your Honor.

2          THE COURT:  All right.

3          MR. SILBERFELD:  Then the only other date or time that

4     we needed, Your Honor, was when does the Court want to hear

5     from us about the Golding documents, whether we continue to

6     have them --

7          THE COURT:  Well, I was thinking we could to that on

8     Friday.  We can have a housekeeping session before closing

9     statements.

10         MR. SILBERFELD:  Thank you.

11         THE COURT:  And I'm going to meet with you and

12    Ms. Evans now --

13         MR. SILBERFELD:  Yes, Your Honor.

14         THE COURT:  -- and I'll provide you that set.

15         MR. SILBERFELD:  All right.

16         MS. ELLS:  Your Honor, will we see those documents

17    before the closing?

18         THE COURT:  Well, that's a fair question.  If -- I

19    will ask -- all right.  I'll ask the defendants to let me know

20    by noon tomorrow --

21         MS. ELLS:  Thank you, Your Honor.

22         THE COURT:  -- their position.  And if I'm making them

23    part of the record, then do you have someone in Sacramento who

24    can pick them up?

25         MS. ELLS:  We can make arrangements.

1           THE COURT:  All right.  All right.

2           MS. MUSELL:  Your Honor, may I ask --

3           THE COURT:  So you'll hear from Ms. Schultz by

4    tomorrow midday.

5           MS. ELLS:  Okay.  Thank you.

6           THE COURT:  Ms. Musell?

7           MS. MUSELL:  I would not want to put anything in the

8    record, you know, for a closing that referred to a document

9    that Your Honor had not allowed to be in the record.  If I

10   could be informed by either of the parties as to what was

11   permitted so that I don't want to foul up any Court

12   determinations, that would be greatly appreciated.

13          THE COURT:  I think the Court can provide you a

14   courtesy notice --

15          MS. MUSELL:  Thank you.

16          THE COURT:  -- of what is being admitted.

17          MS. MUSELL:  I appreciate that.

18          THE COURT:  All right.

19          All right.  Anything else?

20          MS. ELLS:  Not for plaintiffs, Your Honor.

21          THE COURT:  For the defendants?

22          MR. LEWIS:  Nothing from defendants, Your Honor.

23          THE COURT:  All right.  Then I'll see the parties'

24   counsel on Friday morning at 10:30.

25          MS. ELLS:  Thank you, Your Honor.

1       THE COURT:  And then Ms. Schultz can bring Ms. Evans

2    and Mr. Silberfeld back.

3       MR. SILBERFELD:  Your Honor, may Ms. Thorn join us?

4    She's the most familiar person with regard to the privileged

5    documents.

6       THE COURT:  If that's Ms. Evans' request, she may.

7       MS. EVANS:  Please.

8       THE COURT:  All right.

9    (Concluded at 5:06 p.m.)

10

11              C E R T I F I C A T E

12

13       I certify that the foregoing is a true and correct

14    transcript of the record of proceedings in the above-entitled

15    matter.

16
     _/s/ JENNIFER L. COULTHARD_              October 28, 2019
17                                                   DATE

18

19    JENNIFER L. COULTHARD, RMR, CRR
      Official Court Reporter
20

21

22

23

24

25