1                UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
2                        --oOo--

3    RALPH COLEMAN, ET AL.,      ) Docket No. 90-CV-520
                                 ) Sacramento, California
4                  Plaintiff,    ) October 22, 2019
                                 ) 2:04 p.m.
5          v.                    )
                                 )
6    GAVIN NEWSOM, ET AL.,       ) Re: Evidentiary Hearing
                                 ) Day 3
7                  Defendants.   )

8                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE KIMBERLY J. MUELLER
9                UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:     ROSEN BIEN GALVAN & GRUNFELD, LLP by
                            MS. LISA ADRIENNE ELLS
12                          MS. CARA ELIZABETH TRAPANI
                            MR. MICHAEL W. BIEN
13                          MS. JESSICA L. WINTER
                            101 Mission Street, 6th Floor
14                          San Francisco, CA 94105

15
     ALSO PRESENT (telephonically):  SPECIAL MASTER LOPES
16

17       (Appearances cont'd next page.)

18

19

20

21               JENNIFER COULTHARD, RMR, CRR
                    Official Court Reporter
22                 501 I Street, Suite 4-200
                    Sacramento, CA 95814
23                  jenrmrcrr2@gmail.com
                       (312)617-9858
24

25       Mechanical Steno - Computer-Aided Transcription

```
 1   APPEARANCES (CONT'D)

 2   For the Defendant:      OFFICE OF THE ATTORNEY GENERAL
                             XAVIER BECERRA by
 3                           MS. ELISE OWENS THORN
                             MR. TYLER VANCE HEATH
 4                           1300 I Street, Suite 125
                             Sacramento, CA 94244
 5                           MR. ADRIANO HRVATIN
                             MR. KYLE ANTHONY LEWIS
 6                           455 Golden Gate Avenue
                             Suite 11000
 7                           San Francisco, CA 94102

 8                           ROBINS KAPLAN, LLP
                             MR. ROMAN SILBERFELD
 9                           2049 Century Park East, Suite 3400
                             Los Angeles, CA 90067-3208
10

11                           I N D E X

12   CLOSING ARGUMENTS                            PAGE
```
```
13       On Behalf of Plaintiff ................... 389
         On Behalf of Defendant ................... 412
14
```
```
15

16

17

18

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, TUESDAY, OCTOBER 22, 2019

2                            --o0o--

3          (In open court.)

4          THE CLERK:  Calling civil case 90-520, Coleman, et al.

5     v. Newsom, et al.  This is on for evidentiary hearing, and

6     today is day three.

7          THE COURT:  All right.  Appearances, please, just so

8     it's clear who's here today.

9          MS. ELLS:  Good afternoon, Your Honor.  This is Lisa

10    Ells, Michael Bien, Cara Trapani and Jessica Winter for the

11    plaintiff class.

12         THE COURT:  All right.  Good afternoon to all of you.

13         MR. SILBERFELD:  Good afternoon, Your Honor; Roman

14    Silberfeld for the defendants.

15         THE COURT:  All right.

16         MR. LEWIS:  Good afternoon, Your Honor; Kyle Lewis

17    from the Office of the Attorney General.  I'm joined by Elise

18    Thorn, Adriano Hrvatin and Tyler Heath.

19         THE COURT:  All right.  Good afternoon to all of you.

20         I'm just checking, is Ms. Musell present?  We have

21    received Dr. Golding's filing.  Did the parties receive a copy

22    of that filing?

23         MR. SILBERFELD:  Just a few minutes ago, yes.

24         THE COURT:  All right.  And I believe I directed that

25    that be filed on the docket.  We'll follow up to make certain

1    it does get filed on the docket.  And Ms. Musell had asked for

2    clarification.  To the extent Dr. Gonzalez wishes to file a

3    closing statement, she will do so by the end of today, by 4:00

4    p.m. today.

5         All right.  Special Master Lopes is on the telephone

6    correct, Mr. Lopes?

7              MR. LOPES:  I am, Your Honor.

8              THE COURT:  All right.  Thirty minutes each.  Did the

9    plaintiffs wish any rebuttal time reserved?

10             MS. ELLS:  Maybe three minutes, Your Honor.

11             THE COURT:  All right.  All right.  Are the parties

12   ready?

13             MS. ELLS:  Your Honor, we'd like to cover a little bit

14   of housekeeping, if that's okay with you --

15             THE COURT:  All right.

16             MS. ELLS:  -- before we begin.

17             MS. TRAPANI:  Your Honor, Cara Trapani for the

18   plaintiffs.

19        Just a few housekeeping matters from last week.  We

20   have copies of some documents that the Courtroom Deputy

21   informed us that you needed copies of.  We'd be happy to

22   provide those to you now.

23        We also wanted to just confirm that there -- the

24   exhibits to Dr. Kuich's deposition are, indeed, part of the

25   record and are in evidence now that the designations and

1    objections have been resolved by Your Honor.

2        THE COURT:  The Court's understanding is yes.  Some of

3    the objections were directed towards exhibits.  And I believe

4    all of those were overruled, so yes.

5        MS. TRAPANI:  Thank you, Your Honor.

6        And I also wanted to inform the Court that the parties

7    have stipulated to two additional exhibits.  Those are marked

8    as Plaintiffs' 239 as well as Plaintiffs' 207.

9        THE COURT:  And what are those?  Can you briefly

10   describe them?  Is one the organizational chart?  I know that

11   issue was not resolved the last I checked.

12       MS. TRAPANI:  Yes, Your Honor.  Plaintiffs' 239 is the

13   organizational chart we discussed, and Plaintiffs' 207 is a

14   declaration of Mr. Weber filed October 1st, 2019, and it's ECF

15   No. 6302-1.

16       THE COURT:  All right.  So the defense is agreeing to

17   207 and 239 being admitted, Ms. Thorn?

18       MS. THORN:  Yes, Your Honor.

19       THE COURT:  All right.  Those exhibits are admitted.

20       MS. TRAPANI:  And as part of the meet and confer

21   process after the evidentiary hearing last week, it came to our

22   attention that the Golding report, itself, and the exhibits

23   that were included with that report as well as Dr. Golding's

24   declaration certifying those exhibits were not listed in the

25   Court's minute orders as part of the record after the hearing.

1    We've always operated under the assumption that Dr. Golding's

2    report and the associated exhibits, as well as his declaration

3    are part of the record.  They're -- they underpin the entire

4    proceeding here, and they've been filed -- they've been noted

5    on plaintiffs' exhibit list as the very first exhibits.

6    Dr. Golding testified regarding the contents of his report as

7    well as the exhibits as well as every other witness who

8    testified as to their reactions to the Golding report itself.

9            THE COURT:  All right.  So but there's no stipulation?

10            MS. TRAPANI:  And there's no stipulation.  That's

11    correct, Your Honor.

12            THE COURT:  So what's the exhibit identifier?

13            MS. TRAPANI:  The exhibits are plaintiffs', marked 100

14    through 163.

15            THE COURT:  That's the Golding report declaration and

16    attachments?

17            MS. TRAPANI:  And the declaration is -- the

18    declaration is marked Plaintiffs' 193.  My apologies.

19            THE COURT:  All right.  Is the defense objecting to

20    admission of 100 to 163 and 193?

21            MS. THORN:  Yes, Your Honor.

22            THE COURT:  That objection is overruled.

23            MS. THORN:  Your Honor, if I may just say the

24    objections are based on Federal Rule of Evidence Rule 401 and

25    403 based on relevance, lack of relevance, and the submission

1    or the admission of all of those exhibits, including

2    specifically Dr. Golding's report and the exhibits to it were

3    not presented to any of the witnesses in the course of the

4    evidentiary proceeding.  Many of them greatly exceed the scope

5    of the three issues the Court identified for the focused

6    proceeding, and they should not be part of the record for the

7    evidentiary hearing; although, we do acknowledge that they've

8    been filed in the Coleman action.

9            THE COURT:  All right.  Well, that record is made.

10   The objections are still overruled.  The Court can assign

11   whatever appropriate weight to the contents of the Golding

12   report.

13           Anything further, Ms. Trapani?

14           MS. TRAPANI:  No.  That's all.  Thank you, Your Honor.

15           THE COURT:  Any housekeeping from the defense?

16           MR. SILBERFELD:  No, Your Honor.

17           THE COURT:  I mean, to the extent you want the Court

18   really looking at any exhibit, you can display it on the Elmo;

19   but otherwise, a simple reference to an exhibit and page number

20   would be sufficient.

21           All right.  So the plaintiffs may proceed.

22               CLOSING ARGUMENT ON BEHALF OF PLAINTIFF

23           MS. ELLS:  Good afternoon, Your Honor.  May it please

24   the Court.  These proceedings concern the fallout from

25   Dr. Golding's heroic decision last October to become a

1    whistleblower prompted by his concerns that the Special Master,

2    Court and plaintiffs were being misled by defendant's data

3    reporting practices.  He repeatedly raised his concerns

4    internally but then he testified that he grew so alarmed by the

5    fact that plaintiffs were days away from agreeing to stipulate

6    to reduce psychiatric staffing positions by 20 percent based on

7    defendant's misleading data that he felt he had no option but

8    to release the report.

9          That agreement, of course, would have put defendants

10   in compliance with one of the last critical barriers to ending

11   this case, and that was the last straw for Dr. Golding who,

12   along with his headquarters psychiatry peer, Dr. Kuich, had

13   been cut out of the development of that very proposal.

14         Dr. Golding's allegations have been fully vetted by

15   the Court's neutral expert who found that Dr. Golding had,

16   indeed, uncovered misleading data practices going to the heart

17   of this case.  In fact, the evidence has also revealed that as

18   a result of his whistleblower allegations, serious questions as

19   to all of defendant's data, not just their psychiatric data,

20   are now seriously in question.

21         There is now no question defendants provided false and

22   misleading data in information to the Court, Special Master and

23   plaintiffs.  The only questions remaining for this Court are

24   whether they did with knowledge or failure to correct the

25   information after they knew it was wrong and what the Court

Closing Argument - Plaintiff

1  should do about it.

2        Plaintiffs submit there is more than sufficient

3  evidence in the record for the Court to conclude defendants

4  did, in fact, knowingly fail to disclose that they had changed

5  metrics and that they routinely reported those to the Court and

6  Special Master.  They changed them in material ways, all of

7  which tended to demonstrate that defendants were closer to

8  compliance and that psychiatric care was better on the ground

9  than it actually was.

10        This Court can and should take steps not only to

11  ensure that defendants fully and transparently correct all of

12  the misleading data, but to make sure they never do so again.

13        Before we turn to the evidence discussed last week, we

14  must consider the overarching context of the litigation and the

15  relevant time frame.  In 2016, the special master was under a

16  court order to closely scrutinize defendant's plan to fill

17  psychiatric vacancies.  He was ordered to submit a report on

18  the adequacy of that plan in January 2017.

19        In the same time frame, defendants were increasingly

20  urging the Court and Special Master to turn over more and more

21  monitoring in this case to CDCR, based on their development and

22  implementation of the data reporting mechanisms and their CQI

23  process.  They were conducting self-monitoring tours heavily

24  reliant on that data.  They were providing that data to the

25  Special Master during his ongoing monitoring routes, and the

Closing Argument - Plaintiff

1    deputy director was personally certifying, through a

2    court-ordered process, that segregation units were providing

3    required levels of mental healthcare to EOP prisoners, again

4    relying on their data.

5            In fact, the deputy director of the department and

6    defendant's counsel expressly linked CDCR's data to their claim

7    that CDCR didn't need any more psychiatrists and were providing

8    constitutionally adequate care without them in filings with the

9    Court in March and April of 2017.

10           And this Court was increasing pressure on defendants

11   to finally do whatever it took to fill their chronic

12   psychiatric staffing vacancies, giving defendants until October

13   2018 to do so.

14           Plaintiffs understood all of these efforts on

15   defendants parts to be part of a larger goal of concluding this

16   case through a termination motion, if necessary, even as they

17   were proceeding to negotiate with plaintiffs in the -- in the

18   workgroup process overseen by the Special Master as

19   sequestering and staffing allocation plans.

20           In that context, we discussed defendant's data

21   extensively in 2018, what it purported to show in terms of a

22   functional largely compliant mental health system, according to

23   defendants' representations of their evidence and their data.

24   We were on the brink of formally agreeing to those drastic

25   staffing reductions.  And all this time we, as plaintiffs'

1    counsel, absolutely trusted defendant's data, perhaps to our

2    chagrin.  The Special Master relied on that data, used it in

3    his monitoring tours, in his oversight of the CQI process and

4    in evaluating defendant's compliance with the EOP, ASU hub

5    certification process.  And that's precisely why Dr. Golding

6    testified that he submitted his special -- or his whistleblower

7    report, because our collective trust in data -- in defendants

8    and their data were fundamentally misplaced.

9         Defendants -- Dr. Golding's report identified serious

10   critical deficiencies in CDCR's data reporting and management

11   practices.  It affected not only their information but also

12   important issues of patient care and intentional recruitment of

13   psychiatrists.

14        The neutral expert largely confirms these claims that

15   defendants were providing seriously misleading data and

16   engaging in practices that systematically undermined the goal

17   of using accurate objective measures to demonstrate true mental

18   healthcare conditions in CDCR's prisons.

19        Defendants now admit that they changed or failed to

20   transparently state the true meaning of a number of key data

21   points that they have used to demonstrate compliance without

22   ever disclosing that information to this Court or the Special

23   Master.  That's true as to three categories of data here, but

24   also true as to other types of data that the Court has

25   addressed through other orders.  Defendant's unilateral

Closing Argument - Plaintiff

1   decisions to exclude EOP patients not on psychiatric

2   medications or housed in overflow units from their psychiatric

3   metrics as well as counting brief, nonconfidential contacts

4   with psychiatrists even through locked cell front doors as

5   fully complying evaluations for program guide purposes.

6           All of those data choices made by CDCR tended to show

7   compliance was better than it actually was, and we submit to

8   you in light of the evidence and the overarching context, that

9   was not a coincidence.  The evidence supports the inference

10  that defendants knowingly presented misleading compliance data

11  and/or failed to correct misleading data after learning of its

12  existence.

13          The evidence also shows that in late 2016 and early

14  2017, more than 20 years after the judgment and the appointment

15  of the Special Master here, their systems were still not in

16  place to monitor, track and fully disclose changes in business

17  rules to prevent a single person from reinterpreting how to

18  measure compliance with a critical program guide standard and

19  to prevent misleading charts and data from being disclosed to

20  the Special Master based on unreviewed and unchecked work of a

21  single person.  Additional remedies are needed here to ensure

22  defendants never again provide false or misleading information

23  to the Court the Special Master or plaintiffs.  They need to

24  rebuild the trust that is necessary to end oversight in this

25  longstanding case.

Closing Argument - Plaintiff

1           Turning to the evidence already considered by the

2      Court, the testimony shows as to the change in the timely

3      psychiatric metric from 30 to 45 days that defendants

4      intentionally increased that time frame for a period of over

5      five months in December through late April 2017 -- excuse me --

6      December 2016 through April 2017.  That's the exact time frame

7      the Special Master was evaluating their plan to fill their

8      chronic psychiatric vacancies.

9           Deputy Director Tebrock testified that that was done

10     in an effort to ease the demands of psychiatry in the field,

11     and it's no mistake and no coincidence that the single facility

12     that requested that change was operating with a 53 percent

13     psychiatric vacancy rate at the time, according to Plaintiffs'

14     Exhibit 182.

15          Defendants changed the timely psychiatric metric to be

16     more generous after a short phone call between Dr. Leidner and

17     Dr. Ceballos on December 5th, 2016.  Those psychologists

18     changed the metric without ever asking any headquarters

19     psychiatric person if a change was appropriate or consistent

20     with their -- their understanding of psychiatry's remedial

21     obligations in this case or of patient care standards.

22          It's true even though the evidence shows Dr. Leidner

23     had deferred two previous similar requests to change this

24     metric to Dr. Golding in the past, and both Dr. Leidner and

25     Dr. Ceballos were communicating with Dr. Golding about other

Closing Argument - Plaintiff

1    possible categories of EOP patients to exclude from that same

2    metric on that same day.

3            The uncontested evidence further shows Dr. Golding

4    complained in writing directly to Dr. Leidner and Dr. Ceballos

5    on March 22nd, 2017.  Plaintiffs' Exhibit 101 shows Dr. Golding

6    asked if the data had been changed, told Dr. Leidner and

7    Dr. Ceballos that the rule change violated the program guide

8    and asked whether they had told the Court or the Special Master

9    that they had changed the metric.

10            In the same email, Dr. Golding expressly referenced

11    the fact that defendants were giving the Court data regarding

12    their staffing levels and their compliance.  He expressly

13    referenced the fact that defendants were, quote, "Looking at

14    EOP timely compliance between 8/1/2016 and 1/31/2017 and asked

15    if that data would use this new rule."  Nonetheless, instead of

16    fixing the data, Dr. Ceballos told Dr. Golding the change was

17    insignificant and that she didn't need to tell the Special

18    Master or the Court about it.

19            Dr. Golding also testified he complained directly to

20    Ms. Tebrock, the head of the department, in March 2017, but

21    that -- and he identified specifically that this category of

22    EOP compliance and the change was misleading.

23            Nonetheless, Ms. Tebrock sponsored this misleading

24    data in a declaration she filed on March 30th without

25    disclosing any of the limitations Dr. Golding was complaining

1    about.  That's at Plaintiffs' 182.

2              Defendants used that to support their claim that the

3    data showed that care was constitutional, despite a statewide

4    vacancy rate of more than 30 percent.  That's Plaintiffs' 181.

5              Defendants claimed they simply didn't need any more

6    psychiatrists at all.  Notably, Ms. Tebrock's chart, attached

7    to her declaration, uses the exact same time frame and the

8    exact same measure that Dr. Golding told Ceballos he was

9    concerned would be presented to the Court in his March 22nd,

10   2017 email.

11             Dr. Golding further testified that he continued to

12   complain about this unsubstantiated and unwarranted change in

13   April 12th and 13th to Ms. Tebrock, Dr. Ceballos and

14   Dr. Leidner.  And defendant stipulated that CDCR finally agreed

15   to change the rule back upon his demands on April 13th, 2017.

16   That's at ECF 6226.

17             That same day that they agreed to change the metric

18   back, defendants filed another brief in this court continuing

19   to reference and rely on the same manipulated data from

20   Ms. Tebrock's declaration using the 45 rather than 30-day time

21   frame.

22             Ms. Tebrock testified that she was not, quote, fully

23   aware of the change or its implications, until Dr. Golding

24   released his report.  That testimony is simply not credible.

25   Dr. Golding has testified to specific dates and times when he

1   informed her of the change and its import, knowing that CDCR

2   was planning to use this data in their filings.  The neutral

3   expert found at page 48 that in this same time frame,

4   Ms. Tebrock, quote, "Sent an email noting that the Governor's

5   Office had asked to explain in more detail what metrics can be

6   used to show that care by psychiatry is adequate."  This is all

7   after Dr. Golding testifies he told Ms. Tebrock of this problem

8   and before she filed her declaration using that data.  But at a

9   minimum, Ms. Tebrock knew that the data had been manipulated by

10  June 22nd, 2017.

11          As Plaintiffs' Exhibit 176 shows, by that date,

12  Ms. Tebrock had personally reviewed reports from two prisons as

13  part of her monthly court-ordered process of certifying that

14  segregation units housing EOP class members were complying with

15  the program guide.  Those prisons explicitly informed her in

16  documents she attached to her certification letter and that she

17  specifically referenced in her letter that the rule change on

18  April 24th, 2017, had dramatically affected their compliance.

19          One prison, CHCF, attached a chart showing her how for

20  every month the rule change was in place they appeared to be

21  compliant and how after the rule change was changed back, they

22  were out of compliance.

23          If this Court credits Ms. Tebrock's testimony that she

24  didn't know that the metric had been changed before June 22nd,

25  2017, there is no question she knew about it as of that date.

Closing Argument - Plaintiff

1    But nonetheless, even though her declaration was pending in

2    this court for five more months before the Court resolved the

3    pleadings it was involved in, in October 2017, she did nothing

4    to correct the declaration, and her attorneys did nothing to

5    change their representations based on that data.

6         In fact, more than 16 months later, when Dr. Golding

7    released his report, there is no question that Ms. Tebrock

8    still took no steps to correct that data in the record.

9         Moreover, Ms. Tebrock's declaration and the EOP ASU

10   hub certifications are not the only instances that defendants

11   used this misleading data, allowing for a more generous time

12   frame.

13        Dr. Ceballos testified that pursuant to the special

14   master's pretour monitoring request for the 27th round, which

15   is Joint Exhibit C, she provided performance reports, including

16   this metric, to the Special Master roughly two weeks in advance

17   of each tour.

18        The record reflects that the Special Master conducted

19   two tours of prisons from January 24th through 26th in 2017,

20   almost two months after Dr. Ceballos personally authorized

21   changing the metric to allow for 45 days.

22        She also testified that she was the one who would have

23   run the data and provided it to the special master a couple of

24   weeks before the tour, as his tour document requested.

25        There's no question that the business rule in place at

 1    the time of those two tours allowed for 45 days between EOP

 2    psychiatric contacts.

 3            The Special Master at the same time also requested

 4    that CDCR provide the methodology and business rules for each

 5    of their measures of compliance data submitted pursuant to his

 6    pretour document request.

 7            CDCR had the opportunity and the duty to respond

 8    truthfully to that request and to disclose its unilateral

 9    decision to change the business rule.  But CDCR not only failed

10    to disclose the change, it provided false and inaccurate

11    information about the business rule and methodology in response

12    to the Special Master's request.

13            Dr. Ceballos testified that the methodology

14    documentation she provided to the Special Master during the

15    27th round, which is found at Joint Exhibit D, reported that

16    the EOP timely psychiatry contact indicator was measuring 30

17    days, not 45 days, like the data that CDCR was actually using

18    in January 2017.

19            Dr. Ceballos is responsible for approving this change,

20    and she unquestionably knew in January 2017 that the timely

21    psychiatry contact performance report data that she gave to the

22    Special Master in his 27th round of monitoring used 45 days.

23    She didn't inform him of that, and she provided him methodology

24    that falsely told him that 30 days was still the rule in

25    effect.

1        This evidence is more than sufficient for this Court

2    to draw the inference that defendants acted knowingly in

3    presenting misleading data and/or in continuing to allow that

4    data to sit on the docket uncorrected after they knew that the

5    data was misleading.

6        As to the second issue the Court sought to address in

7    this evidentiary hearing, the "appointments seen as scheduled"

8    indicator, the evidence is uncontested that defendants changed

9    that metric, which had been defined to include all scheduled

10   appointments, to include only a subset of appointments in 2016.

11   While they made that change on the back end in their coding,

12   defendants admit they did not correct the public-facing

13   definition of the indicator to reveal that they were now

14   excluding whole swaths of appointments from this indicator.

15       That is a seriously misleading representation because

16   it tends to tell the public that something that is being

17   measured is entirely different than what is actually being

18   measured.  And the public-facing definition is what the public

19   and the Special Master presumably would have relied on,

20   especially given the name of this indicator was "appointments

21   seen as scheduled."

22       Defendants have stipulated at ECF 6226 that as a

23   result of their change, quote, "Data on the rate of patients

24   who missed scheduled appointments CDCR provided to the Special

25   Master, plaintiffs and the Court in connection with its 2018

1    staffing proposal was described in a manner that did not

2    accurately reflect the indicator's underlying methodology."

3           They have further stipulated in the same pleading that

4    this problem affected the data provided to the Special Master

5    and plaintiffs during the CQI evaluations and draft reports,

6    the data provided to the Special Master in connection with his

7    26th and 27th round of monitoring and defendant's clustering

8    proposal presented to the workgroup in 2018.

9           Defendants chock all of this up to an oversight.  They

10   claim it's a metric for internal use only, and so any

11   inaccuracies should be ignored.

12          But it's undisputed that the misleading data was

13   repeatedly provided to the Special Master and to plaintiffs'

14   counsel.  And the history in this case and the record here

15   shows it's more than a simple oversight.  It's part of a

16   pattern.

17          Dr. Ceballos testified that she sees her role in

18   overseeing quality management and developing and producing the

19   performance reports as assisting with internal self-reporting

20   and self-monitoring only.  She doesn't think about her

21   reporting in the context of providing or proving compliance or

22   guiding the Special Master's evaluations, even though she

23   personally designed CQI and oversees both that process and the

24   production of pretour documents to the Special Master.

25          Dr. Leidner also considers himself, quote, "just a

1   data guy." He doesn't think about the larger implications of

2   his reporting outside of CDCR.

3          But defendants, including some of the exact same

4   people from this QM team, have a history of being complicit in

5   efforts to use misleading or not fully transparent data to

6   substantiate their efforts to show compliance.

7          Dr. Leidner, in 2013, testified at the segregation

8   trial about one of his charts, the length-of-stay chart. He

9   created and produced it. And it purported to show how long

10  class members were in segregation. That report failed to

11  disclose that that time frame was reset any time someone was

12  admitted to a crisis bed or even moved cells within the same

13  segregation unit.

14         This Court told Dr. Leidner how misleading that chart

15  was, and Dr. Leidner agreed that it did not clearly disclose

16  that the clock was being reset. That's at Plaintiffs'

17  Exhibit 240.

18         Dr. Leidner knows that this Court and the Special

19  Master look at his reports; but, nonetheless, he did not make

20  sure his reporting was accurate and transparent. And that

21  failure to disclose tended to show better compliance.

22         And just two weeks ago, Dr. Leidner discovered he'd

23  accidentally changed the performance report indicator for the

24  EOP ad seg units in a way that expressly contradicted the

25  program guide. He didn't get permission to do so, and he

1  didn't even know he had done it until this Court made

2  defendants substantiate their assertion that that indicator had

3  not been changed.

4        And in 2017, we discovered that for years defendants

5  had apparently been using the time MHCB patients got on a

6  transport bus rather than the time that they arrived at a

7  hospital to measure their compliance with the program guide

8  timeline for crisis bed care.  Not disclosed.  Tended to show

9  better compliance.

10       Defendants have shown they do not take seriously this

11  Court's orders and the Special Master's role in overseeing

12  compliance.

13       CDCR's reporting, including this indicator, is

14  routinely and repeatedly provided to the Special Master.

15  Defendants directly use this metric to support their staffing

16  proposal and their clustering proposals, both of which were

17  referred to the workgroup setting for oversight and negotiation

18  overseen by the Special Master and at this Court's orders.

19       To pretend that these metrics are for internal use

20  only and, therefore, that it's not important to tell the

21  Special Master or Court what the reports are actually reporting

22  ignores the record in this case.

23       Furthermore, the Court heard testimony from numerous

24  witnesses:  Dr. Golding, Dr. Kuich, Dr. Rekart, Ms. Ponciano

25  that because of problems getting psychiatrists to use EHRS as

1    designed, not all appointments or contacts are even captured in

2    defendant's reporting in the first place.

3              Dr. Kuich testified that he repeatedly raised this

4    problem, suggested ways to fix it.  Defendants did not only fix

5    it [sic], they did not disclose the unreliability of their data

6    system and its inability to actually capture contacts.

7              These mistakes and errors that Dr. Golding brought to

8    light, and that defendants admit occurred, all tended to show

9    that mental healthcare for the Coleman class was better than it

10   actually was.

11             As to the final issue, supervisors acting as line

12   staff.  This Court heard testimony on defendant's practice of

13   including patient care duties performed by supervising

14   psychiatrists in their compliance numbers without disclosing

15   they do so.

16             They admit that supervisors do act as line staff,

17   particularly when institutions are poorly staffed.  They claim

18   they have no way to separate out or track how big a

19   contribution supervisors make to those compliance efforts, but

20   they also claim that it's not significant.

21             Both Dr. Golding and Dr. Kuich testified that they

22   gather this information every month as a matter of course.  Not

23   only does mental health leadership not want their data,

24   Ms. Ponciano instructed Dr. Kuich to stop gathering it even

25   though he told her it was necessary for him to do his job.

Closing Argument - Plaintiff

1          There's also evidence in the record that ad hoc data

2    Ms. Ponciano provided to the neutral expert but which she has

3    never provided to this Court or put in the record significantly

4    underestimated the true prevalence of supervisors providing

5    line staff care.  This was not consistent with Dr. Kuich and

6    Dr. Golding's knowledge of true conditions on the ground.

7          Ms. Ponciano is aware that multiple witnesses

8    testified that her ad hoc reporting would be affected by the

9    fact that defendants know that EHRS is not actually capturing

10   all contacts at all because psychiatrists regularly deviate

11   from the EHRS workflow, which Dr. Rekart testified results in

12   flawed data.

13         In their reporting to the Court and the Special

14   Master, defendants admit that they lump in direct patient care

15   work performed by psychiatrists toward their compliance

16   markers.

17         And Defendants Kuich and Golding testified that they

18   raised those concerns in the context of the 2018 staffing

19   negotiations.  CDCR leadership not only didn't take their

20   concerns seriously, they cut them out of the development of

21   that staffing proposal.  They never consulted them.  They never

22   allowed them to study the effects of the proposed numbers of

23   reductions.  They never even sent them a copy.  They just

24   talked them through the methodology at a high level.

25         The Court should note for the record that neither

Closing Argument - Plaintiff

1   Dr. Kuich nor Dr. Golding were copied on any iteration of this

2   proposal sent to the Special Master or plaintiffs, even though

3   numerous other mental health headquarters people were.  That's

4   demonstrated by Plaintiffs' Exhibits 210, 212, 214, 215 and

5   216.

6         The only time Dr. Kuich was ever consulted, it was

7   about a single discrete item in the proposal.  He testified

8   that Ms. Ponciano pulled him out of a meeting, presented him

9   with a number that she came up with, gave him no time to

10  consider or evaluate it or study it, and asked him to agree it

11  was appropriate, all in the span of a 5 to 10-minute

12  conversation.  And that's the full extent of defendant's

13  consultation with their headquarters psychiatrists about that

14  staffing proposal; although, of course, plaintiffs assumed that

15  those psychiatrists were in agreement with the proposal and

16  with the conclusion that CDCR could provide adequate care with

17  20 percent fewer allocated psychiatrists.  Both Dr. Kuich and

18  Dr. Golding testified that they expressly and strongly

19  disagreed with that position.

20        Ms. Ponciano --

21        THE COURT:  You're at 27 minutes.  I can equalize

22  things if you're close to wrapping up.

23        MS. ELLS:  If I could have five more minutes.

24        THE COURT:  All right.  So the defense will have five

25  additional as well.

Closing Argument - Plaintiff

1          MS. ELLS:  Thank you.

2          Ms. Ponciano reported to ad hoc analysis that she

3    claims showed that the addition of psychiatric staff did not

4    have a significant impact, but the charts that she pointed to

5    at Joint Exhibit O, at 31 and 32, simply show the number of

6    contacts that class members are getting in a system operating

7    with less than 70 percent of the psychiatrists defendants claim

8    in their own plan that they need.  It doesn't say anything

9    about how much care those patients actually need or what care

10   psychiatrists in a fully staffed prison system would actually

11   provide.

12         Moreover, those charts are beside the point.  The

13   point is, is that defendants routinely provide compliance data,

14   including on the prior page of that exact same exhibit at

15   page -- at 30, which shows their compliance numbers in this

16   case showing that routine, timely psychiatric contacts for

17   CCCMS patients were 94 percent.  But they don't ever indicate

18   that those numbers could not be achieved without significant

19   and routine reliance on supervisors.  It does not demonstrate

20   that fewer line staff are needed.  And that's not the only

21   document affected by this omission.

22         Ms. Tebrock's chart, at Plaintiffs' 182 filed with

23   this Court is specifically titled "Mental Health Staff

24   Psychiatrist Staffing Versus Compliance."  That chart lists

25   staff psychiatry staffing vacancies and compliance indicators

Closing Argument - Plaintiff

1    and insinuates that the compliance numbers come from care

2    provided by the number of staff psychiatrists that they show

3    are filled.

4          Defendants testified they have no ability to separate

5    out those numbers, and that is necessarily what that chart

6    shows.  It is a literal attempt to tell this Court the existing

7    number of staff psychiatrists is reasonable and specifically

8    responsible for those compliance numbers, and that is false.

9          This Court must consider remedies.  They must -- this

10   Court must move the data out of mental health headquarters into

11   a receiver or other independent entity.  We agree this Court is

12   acting appropriately to be careful to ensure that process is

13   fully transparent and is subject to monitoring and careful

14   oversight, but it cannot contain the same people moved over to

15   the receiver that have been providing the reporting to date.

16   That simply won't rebuild trust.  Plaintiffs and the Special

17   Master need to be able to fully challenge and test that data

18   and information.

19         Moreover, defendants should be required to provide

20   certifications from both their lawyers and their subject matter

21   experts for all data every single time it's presented to the

22   Court or Special Master or plaintiffs.  They should attest in a

23   clear, transparent manner about what the data is, how it was

24   gathered, and that it is an accurate depiction of reality.

25   Their lawyers should also testify that they are taking adequate

1    steps to ensure that false or misleading information is not

2    presented.  Those lawyers have a duty and they clearly, as of

3    the filing of last week, are not taking that duty sufficiently

4    seriously enough.

5          The EOP hub data was represented to this Court by CDCR

6    lawyers and the Attorney General's Office as having not been

7    affected when, in fact, it was.

8          This Court must also revisit the EOP ad seg hub and

9    PSU self-certification process.  This is a critical remedy

10   borne out of proof in 2013 that segregation is dangerous and

11   harmful to the mental healthcare of prisoners and especially to

12   EOP class members.

13         This Court ordered the defendants to ensure program

14   guide protections, including timely psychiatry contacts and

15   other program guide requirements are provided to EOPs and

16   ordered them to stop housing EOPs in units that cannot do so.

17         While we continue to maintain that conditions in

18   segregation, including both mental healthcare and custodial

19   practices that interfere with that care are dangerous and

20   unconstitutional, at a minimum.  This proceeding has

21   demonstrated that self-certification is a failure and must be

22   revisited.  It's entirely reliant on defendant's data and their

23   own internal assessment of what that data means.  It's a black

24   box, occurs months after the fact and the defendants routinely

25   leave units open that failed their own certification criteria

Closing Argument - Plaintiff

1    if they can find an excuse to do so.

2            Defendants cannot be trusted to present and analyze

3    their data in a fair, transparent manner.  This Court needs to

4    revisit that remedy, as it's entirely dependent on defendants

5    and their data, which this Court now knows cannot be trusted.

6            Finally, plaintiffs' counsel needs access to

7    information and transparency.  And that needs to happen at an

8    increased rate as opposed to what has been happening in this

9    case.  We have an independent obligation to our class to

10   understand actual conditions on the ground.  Data alone can be

11   deceptive, as we all now know.  It does not measure quality.

12   It cannot capture conditions that class members are

13   experiencing in the institutions on the ground.

14           THE COURT:  All right.  All right.  That would leave 3

15   minutes out of about 35 for rebuttal.  So Mr. Silberfeld, you

16   may have 35 minutes.

17           MR. SILBERFELD:  Thank you, Your Honor.

18           If I could just fire up my presentation materials

19   here.

20           While Mr. Heath is doing that, Your Honor, I just

21   wanted to let you know that this presentation was shared with

22   plaintiffs' counsel yesterday.  And while they disagree with

23   everything in it, they don't object to any of it.

24           THE COURT:  All right.

25           And I have not received a copy, so I'm looking on the

Closing Argument - Defendant

1   screen.

2           MR. SILBERFELD:  Yes, Your Honor.

3           THE COURT:  All right.

4               CLOSING ARGUMENT ON BEHALF OF DEFENDANT

5           MR. SILBERFELD:  Let me begin with an overview of this

6   culmination of a year-long process that began a year ago with

7   the issuance of Dr. Golding's report.  Then, since and now, the

8   defendants remain committed completely to providing

9   constitutionally compliant care and providing information to

10  the Court and the Special Master that is accurate, transparent

11  and testable.

12          I want to talk a little bit about the background and

13  context of how we got to this point.  I want to talk about some

14  commitments that the defendants have made and offered to make,

15  which were not mentioned at all in the presentation by

16  plaintiffs' counsel.

17          I want to talk a little bit about the neutral expert

18  findings.  I want to pose what I think are the key questions to

19  be answered in this hearing, some of which the Court has asked

20  most if not all of the witnesses.  And then I want to provide a

21  bit about what I think a fair appraisal of the evidence shows

22  the answers to those questions to be.  Let me begin with the

23  commitment to transparency that the defendants have.

24          In the summer of this year, after acknowledging that

25  mistakes were made, something that the defendants have not

Closing Argument - Defendant

1    walked back from at all since that time, a commitment was made

2    to renewed transparency and accuracy.  And in ECF 6226, in

3    July, in a joint status report, the defendants told the Court

4    and the plaintiffs and the Special Master that they remain

5    committed to seven key concepts intended to address the very

6    issues that bring us here.

7            The first was to avoid issues with the tracking and

8    reporting of data and the mischaracterization of methodologies.

9    CDRC will meet and confer with plaintiffs under the guidance of

10   the Special Master to review the definitions and methodologies

11   CDCR uses to report data related to program guide requirements

12   or CQIT.  The parties would meet and confer further about

13   discrepancies in policies and data collection methodology.

14           The defendant's further committed to meet with

15   plaintiffs and the Special Master to explain CDCR's processes

16   for analyzing change requests to their compliance tracking

17   system, and there was to be a discussion about the mental

18   health change management committee as well.

19           In July, CDCR committed to issue a memo to the field

20   reminding psychiatrists of their duty to report the

21   confidentiality of patient encounters appropriately and how to

22   use the various systems to report that.

23           CDCR committed to review with the Special Master the

24   issue of how to track nonconfidential encounters initiated by

25   psychiatrists and whether those contacts should be, under

Closing Argument - Defendant

1   circumstances, counted towards compliance or not.

2           The defendants further committed to have processes in

3   place to ensure data system accuracy.  Report users who

4   identify an error or discrepancy were encouraged by this

5   commitment to report that error to CDCR's solution center

6   system.

7           CDCR committed to provide a memorandum to the field

8   re-educating the staff regarding the solution center system.

9           And lastly, in July, CDCR committed to providing to

10   the plaintiffs and the Special Master any additional data,

11   including the methodology used to calculate the data that they

12   request that is available to satisfy any concerns with the

13   proposal having to do with staffing.  That has been on hold now

14   for some time.

15           Importantly, also in July, CDCR told this Court and

16   the Special Master and the plaintiffs that they remain

17   committed to its self-certification proposal with regard to any

18   future court filings and agreed to provide a person most

19   knowledgeable, who may or may not be CDCR's chief psychiatrist,

20   to certify the source of the data, the methodology used to

21   calculate the data, and the reference to the data that it is an

22   accurate representation of the underlying reported information.

23           The defendants believe that this proposal would ensure

24   that the parties, the Court and the Special Master understand

25   precisely what the defendant's data is reporting, a problem

Closing Argument - Defendant

1    brought out in the course of this hearing that we had last

2    week.

3              But that wasn't all the defendants committed to.  In

4    late August, in ECF 6257, the defendants made further

5    commitments.  The Court had expressed some concerns with regard

6    to the use of the EHRS system, and CDCR agreed and committed to

7    a process of eliminating this default confidentiality setting

8    for psychiatry and primary clinician contacts in EHRS.  That is

9    currently pending.

10             In addition, CDCR's submitted to the Court that it's

11   in the process of working with the CCHCS to create a data

12   governance policy, the intent of which is to manage the

13   availability, usability, reliability, integrity and security of

14   the data.

15             In August, the defendants also committed to restart

16   the mental health change management committee, which the Court

17   heard about through the testimony of Dr. Toche.

18             The Court was concerned, as were the defendants, about

19   a lack of communication with the Special Master.  And in

20   August, CDCR committed to acknowledging that fact and notifying

21   the Special Master and plaintiffs regarding business rule

22   changes that materially alter the way compliance with program

23   guide requirements are measured before any such rule change is

24   implemented.

25             CDCR, in addition, agreed to work with the Special

Closing Argument - Defendant

1    Master and plaintiffs to determine the best way to keep them

2    informed of relevant updates to the performance report.  And

3    CDCR committed to issue internal guidance to all CDCR mental

4    health administrators, further clarifying which business rule

5    changes must be processed or provided, rather, to the Special

6    Master and plaintiffs before implementation.

7            In late August, the defendants, the Special Master,

8    the PLATA receiver, and the plaintiffs met to discuss the

9    defendant's proposal to improve data management, integrity,

10   transparency and analytics by integrating the mental healthcare

11   data into the system used for all healthcare data at CDCR.

12   This is the CCHCS quality management proposal that the Court

13   heard about last week from Dr. Toche as well.

14           Defendants intend to further pursue this idea with the

15   Special Master and with plaintiffs largely because the data

16   from CCHCS is widely trusted and recognized for its integrity.

17   That is the purpose of that exercise.

18           So the defendants have done much to address the

19   mistakes that have been made and have been acknowledged.  And

20   this Court, over the course of the last year, has spent a great

21   amount of time and energy addressing these issues.  And I want

22   to turn now to what Gibson Dunn & Crutcher did in its neutral

23   exert report that was directed by the Court.

24           As the Court knows well, Gibson Dunn spent four months

25   analyzing and investigating seven issues.  They looked at in

Closing Argument - Defendant

1    excess of 12,000 documents that were received and reviewed,

2    they did in depth oral and written briefings, and they

3    interviewed witnesses themselves.  And importantly, they

4    analyzed data independently of any reports that were provided

5    to them or any information and data that was provided to them

6    by CDCR.

7            Gibson Dunn, and now this Court, have tried to answer

8    the following questions, both in the neutral expert report and

9    in the hearing that we had last week.  And the first very

10   simple question is what happened?  How did it start?  Why did

11   it happen?  Did anyone intend to mislead anyone else?  Was the

12   Court or was the Special Master actually misled?  Has the issue

13   been fixed?  And what can be done to prevent a recurrence in

14   the future?  Those are the key questions in both the neutral

15   expert report and the work they did over the course of four

16   months and the focus of the hearing that we had last week with

17   witnesses.

18           Now, the neutral expert found these key things to be

19   true:  One is that there was no intent on the part of the

20   defendants to mislead the Court or the Office of the Special

21   Master.  Gibson Dunn found that there was no basis for an

22   evidentiary hearing but, nevertheless, we've had one and

23   specifically --

24           THE COURT:  Well, the Court never delegated its

25   authority to Gibson Dunn.  I think that's clear from the

Closing Argument - Defendant

1    record, but just to make certain you're clear about that.

2         MR. SILBERFELD:  I am clear about that --

3         THE COURT:  All right.

4         MR. SILBERFELD:  -- but they offer that conclusion

5    nonetheless.

6         And then with respect to the three issues that

7    concerned us here last week, for Issue B, having to do with the

8    change in the definition of monthly, they found that that

9    change was not material.  And they so found largely because it

10   only existed for a period of four months and was reversed.

11        On the question of the appointments seen as scheduled,

12   they did find that the description of that indicator was

13   misleading, but it was not intentionally so.  And they also

14   found, we'll talk about this in a moment, that the indicator,

15   in fact, worked as designed.

16        And for Issue F, having to do with supervisors seeing

17   patients, they found in their neutral expert report that the

18   Office of the Special Master, the parties and everyone who's

19   been involved in this longstanding case knew well that

20   supervisors saw patients in patient care.  They concluded,

21   Gibson Dunn did, that there was no effect on the Office of the

22   Special Master and his view of the staffing data.  And I think

23   the rationale there largely was that the Special Master made

24   his own judgments and looked at information independently.

25        And importantly, with regard to this particular

1    finding, the neutral expert found that across the entire

2    system, across all of CDCR, supervisors' roles in patient care

3    were not sufficiently high to impact the staffing assessment by

4    the Court or the Special Master.

5            So let's talk about this in a little bit more detail.

6            On the question of the change of definition of

7    monthly, it is clear, both from the neutral expert report and

8    the evidence taken here, that that change came from the field.

9    It came first from the field in a 2015 request and then once

10   again in 2016 in December.

11           It is clear from both the neutral expert report and

12   the consistent testimony of all the witnesses that came before

13   you last week that the reason and rationale for this change was

14   a better continuity of care for patients so that when

15   psychiatrists were away, a patient wouldn't be seen by a

16   different physician than he or she was used to seeing.

17           It's clear from both the neutral expert report and the

18   evidence here that this change existed for a grand total of

19   perhaps four or five months.  And when it was noticed and when

20   it was reported, it was changed.

21           And notably, when the initial concerns were raised

22   about this internally, the same process that is criticized is

23   the process that was used to change the rule back.  In other

24   words, there was no particular consult with the Special Master

25   about this or the Court about this, but there was no

1    consultation with the Special Master or the Court when the rule

2    was changed back for the four months or so that it existed.

3         On appointments seen as scheduled, the neutral expert

4    found, and this is important, I think, based upon their fair

5    assessment of all the evidence that they saw, that this

6    indicator was, in fact, an internal indicator only, and it was

7    changed and created to match.  And the Court heard this in the

8    evidence that was presented last week.  It was changed to match

9    the PLATA receiver dashboard.

10         Now, in the same way that the monthly change came from

11   the field, this change came in order to have this particular

12   indicator harmonize with the PLATA receiver dashboard.  Neither

13   of these changes were made for the purpose of misleading

14   anyone, providing knowingly wrong information to the Court or

15   the Special Master.  This was done for a typical and routine

16   business purpose, having nothing whatsoever to do with

17   massaging or improving the quality of the data that was

18   provided either to the Special Master, to the plaintiffs or to

19   this Court.

20         And the neutral expert found as well that the purpose

21   of this indicator was to measure what the Court heard last

22   week, that is, appointments that were missed due to CDCR

23   controlled factors.  What the indicator was intending to

24   measure, which is what the evidence presented here showed,

25   without contradiction, by the way, was that CDCR was trying to

Closing Argument - Defendant

1    know how well its services were being delivered to patients

2    and, therefore, it didn't matter whether a patient didn't show

3    up or canceled.  What mattered for this indicator was whether

4    or not, through some factor that was within CDCR's control,

5    patients were not being served as they should have been.

6              The neutral expert also found that this particular

7    indicator was not program guide related, nor was it relied upon

8    by the Office of the Special Master.

9              Again, if the point was, let's mislead the Court,

10   let's violate the program guide, let's mislead the plaintiffs,

11   let's mislead the Special Master, this is not the way to have

12   done that.  And it wasn't done for that purpose, and the

13   neutral expert so found specifically.

14             Now, it is the case that this was included in one

15   footnote in a draft staffing proposal filed with the Court

16   after the error in the footnote was discovered.  But notably,

17   the document in which that information was contained had to do

18   with the desert institutions changing staffing and that,

19   nevertheless, was approved not withstanding the omission of

20   this information, which had no particular role in that rule

21   change having come about.

22             The third area, supervisors seeing patients.  The

23   neutral expert found, as the Court heard in the evidence last

24   week, that everyone knows this occurs and that there are

25   actually good and sufficient reasons to have supervisors seeing

Closing Argument - Defendant

1    patients.  It's not only good for them, it's not only good for

2    the patients, but it helps the delivery of care when the need

3    arises.

4            The neutral expert found, and I think the Court heard

5    in the evidence last week, that the frequency and amount that

6    supervisors see patients varies from institution to

7    institution.  And notably, the neutral expert found that this

8    particular finding that supervisors see patients, was not a

9    material factor in the staffing data planning or ratios and

10   failing to provide supervisor information broken out where

11   supervisors saw patients separately was not a material omission

12   by the defendants.  That's what the neutral expert found.

13           And of course, the rationale behind this one is like

14   the others, quite simple and straightforward.  The measurement

15   that was being taken here was not to try to answer the question

16   of how many patients are being seen by supervisors and how many

17   patients are being seen by line staff.  The evidence in the

18   case, Dr. Golding's testimony aside for the moment, we'll get

19   to his testimony in a moment, the evidence in the case is that

20   this measurement was to measure something completely different

21   for the purposes of the staffing proposal.  It was intended to

22   measure what number of line staff psychiatrists would be needed

23   to adequately care for the patient population going forward,

24   based upon the number of hours of patient care needed in the

25   past.  And that's the exact question that the staffing proposal

1    was intended to answer.

2          And it fundamentally didn't matter and would have

3    mischaracterized the data had there been a breakout between

4    supervisors seeing patients and line staff seeing patients.

5    This was not a question -- and none of the evidence suggests

6    this -- this was not a question of whether supervisors had

7    enough time to supervise.  This was a patient care question,

8    and it was answered in the appropriate way.

9          The Court knows well and doesn't need me to list for

10   it some of the guides that judges and juries use to evaluate

11   evidence, but there is contested evidence here, and I think

12   it's worth talking for a moment about some of the factors that

13   certainly affect a fair appraisal of the evidence in this case.

14   One of them, of course, is whether the witness has actual

15   specific personal knowledge of what they testified to.  I think

16   a fair appraisal of the evidence is that the witnesses that

17   were called from the defendants, with the exception of

18   Dr. Golding, knew well what they were talking about.  And in

19   contrast to that, in large part, Dr. Golding was speculating

20   about things that might have been, that he might have

21   understood incompletely or incorrectly, and I think it's always

22   important for the Court to have the credibility of witnesses in

23   mind.

24         There's clearly a tension here in this system between

25   Dr. Golding on the one hand and the nonpsychiatrist

1    professionals at CDCR.  I think that's palpable from the

2    evidence that was presented last week.  And Dr. Golding, I

3    think, fairly clearly evidences both a bias and a personal

4    agenda about his views as they relate to not just these three

5    issues but the other issues contained in the 161 pages where he

6    makes allegations that far exceed the seven that were

7    originally assigned to Gibson Dunn or the three that we talked

8    about last week.

9          But the Court is ultimately going to make its decision

10   based on the great weight of the evidence, and I think that the

11   great weight of the evidence tips very clearly in favor of the

12   defendants here and their explanations.

13         Ms. Tebrock testified to this Court that she was

14   always open and available to Dr. Golding if he had complaints.

15   She testified that she asked for his detailed report or

16   information that he had criticisms about, and he refused to

17   give it to her.

18         Ms. Brizendine -- Dr. Brizendine also testified that

19   she works with Dr. Golding, she's open and available to him,

20   and she encouraged, as did Ms. Tebrock, Dr. Golding, if he had

21   concerns, to come to them or to come to the Special Master as

22   well.

23         And Dr. Golding had an explanation in his testimony

24   for why he thought he couldn't talk to the Special Master.  I

25   think that was fairly easily belied by the number of contacts

1    that he has had with the Special Master, at least in the years

2    of concern here, 2017 and 2018.

3           Dr. Golding, interestingly, testified that he began to

4    collect all this data that resulted in his report in 2017 but

5    never once shared it with either Ms. Tebrock or Dr. Brizendine

6    or, for that matter, anyone else.  And in contrast to some of

7    the things I want to talk about with regard to Dr. Golding's

8    testimony, the Court heard from Ms. Ceballos, who acknowledged

9    her mistake.  Not something that any of us I think do easily,

10   but she acknowledged her error.  She acknowledged what she

11   should have done which she didn't do and, notably, she fixed

12   the monthly problem within a matter of months.

13          Dr. Leidner came here and perhaps was one of the most

14   credible people to testify because he, too, had to testify

15   about something difficult.  And the difficult thing he had to

16   testify about was admitting that he, too, had made a mistake,

17   made a few, actually.  And he explained those to the Court, and

18   I think his testimony is highly credible and believable and

19   should be given great weight.  The fact that Dr. Leidner is

20   gone from this system is a tremendous loss, not only to the

21   system but to all the patients who are served by it.

22          And you heard Dr. Toche come and testify about the

23   remedies that she is working on.  I think her testimony was,

24   again, credible, consistent, and helpful to the Court in making

25   its decision.

Closing Argument - Defendant

1        And in contrast to that, we have Dr. Golding.  I have

2   two thoughts about Dr. Golding's testimony.  One is, much of it

3   is baseless and part of it is reckless.  The baseless part is

4   that Dr. Golding just about disagrees with everyone and

5   everything about everything.

6        When I asked him about Dr. Mann agreeing that the

7   change in the definition of "monthly" was appropriate in

8   January of 2017, he disagreed with his own colleague and said,

9   "Dr. Mann was wrong, absolutely."  That's a direct quote.

10       When I asked him to agree with me that the idea to

11  change that definition had come from the field rather than from

12  CDCR headquarters, he says, "I don't agree."

13       When I said to him, "Do you agree that the purpose of

14  the change had to do with continuity of care," his answer was

15  "False."

16       When I asked him "Do you agree with me that the

17  program guide requirement of monthly was never changed, that

18  is, a patient gets seen monthly in the course of a year," his

19  answer was "False."

20       When I talked to him about the "appointments seen as

21  scheduled" indicator, having been limited to those factors

22  within CDCR's control, he said, "Well, that's false in a number

23  of ways."

24       And when I asked him to agree with me that the purpose

25  of that change in the indicator was to match the PLATA

1    receiver's dashboard, he said that was false.

2            I think that the great weight of the evidence shows

3    that Dr. Golding has a bias, has an agenda.  It has to do with

4    this tension between psychiatrists and psychologists within the

5    agency.  And I think that his allegations and the manner and

6    demeanor of his testimony suggest that he is simply not to be

7    credited here.  And that's the baseless part.

8            Let me get to the reckless part.  The reckless part is

9    that his allegations, as unfounded as they are, have cost this

10   Court and the parties a year of work when much has been placed

11   on hold.  It has resulted in -- and you've seen the effects

12   here on the witness stand of the personal attacks that

13   Dr. Golding's allegations have meant to some of the people who

14   came here.  And it's resulted in the loss of key people, such

15   as Dr. Leidner, who is a fine public servant and deserved

16   better than this.

17           So the evidence here, completely consistent with the

18   findings of the neutral expert, are that there has been no

19   intentional misleading of this Court or the Office of the

20   Special Master, no knowing and intentional provision of wrong

21   information.  That's what the neutral expert found.  That's

22   what the evidence here has shown.

23           Moreover, none of the at-issue data -- and we're only

24   talking about these three issues.  Counsel for the plaintiff

25   went a little bit beyond those.  I won't.  None of the at-issue

Closing Argument - Defendant

1   data submitted to the Court or the Special Master led to wrong

2   findings.  No act was taken at any time that resulted from the

3   provision of this information.

4        Of course, Issue B and Issue E have long since been

5   corrected.  Issue F is not inaccurate.  It actually measures

6   what the indicator was intended to measure.  And internal

7   decision-making protocols have been addressed, and the Court

8   heard about this from the testimony of Dr. Toche.  And, in the

9   various commitments I started with, the Court has heard that

10  CDCR is prepared to make yet other commitments that I've

11  described.  So in terms of remedies, I tried to write down what

12  Ms. Ells spoke about, and some of these things are things that

13  the defendants not only are willing to do but have offered to

14  do.

15       CDCR has taken action, as I described at the beginning

16  of these remarks, to demonstrate transparency in data operation

17  and to restore trust among the parties.

18       Dr. Toche testified that CDCR has fostered greater

19  communication and access among people involved internally.  And

20  there is in the works an effort to finalize policies and

21  procedures to restart the change management committee.

22       And lastly, and perhaps most importantly, this

23  proposed integration of the mental health quality management

24  data into CCHCS quality data system may provide, in large

25  measure, some of the assurances that the Court and the parties

Closing Argument - Defendant

1    are entitled to and the Special Master is entitle to, in terms

2    of the accuracy of information.  And the Court may recall that

3    Dr. Toche described this aspect as this double validation

4    process that exists.

5         I think a fair appraisal of the evidence and the

6    commitments that the defendants have not only made themselves

7    but have offered to make are sufficient and that no further

8    action by this Court is necessary beyond the commitments that I

9    have described and that the parties are already in the process

10   of undertaking.  And for those reasons I think that the Court

11   should take no further action beyond a furtherance of these

12   efforts between the parties and the Special Master and the

13   Court.  Thank you, Your Honor.

14        THE COURT:  All right.  Thank you.  Ms. Ells, three

15   more minutes.

16        MS. ELLS:  Thank you, Your Honor.

17        What I've just heard from defendants confirms to me

18   that defendants do not recognize or acknowledge the need to be

19   transparent and clear with the Court and Special Master about

20   data that they provide.  They minimize all of the undisputed

21   times that defendants admit that they provided misleading data

22   to the Court and Special Master.  They admit all of those

23   times.  They take no responsibility for them.  They minimize

24   them at every turn.

25        All of the statements that they relied on from the

Closing Argument - Defendant

1    neutral expert report about the Court or Special Master not

2    relying or not caring about the data, there is absolutely no

3    evidence to back any of those claims up.  If defendants could

4    substantiate those findings, as they needed to do with

5    evidence, they should have done so.

6            They also did not rebut any of the evidence that

7    Ms. Tebrock and Dr. Ceballos both knew that they had provided

8    false data to this Court in the 30 to 45-day time change, and

9    they never made any steps to correct it.

10           In fact, Dr. Ceballos gave methodology to the Special

11    Master that explicitly told him that she was using 30 days for

12    the data that she provided.  They make no effort to rebut any

13    of that.

14           The only reason that there was no reliance, as they

15    seem to insinuate is necessary here, is because of the

16    whistleblower report itself.  Plaintiffs and the Special Master

17    were literally days, maybe even minutes away from submitting a

18    stipulation to this Court that I expect this Court likely would

19    have signed that would have reduced psychiatry vacancies.  The

20    only thing that prevented that was this whistleblower report.

21           As to their attacks on Dr. Golding, they call him

22    baseless and reckless.  The neutral expert largely corroborated

23    all of the instances in which he reported that data has been

24    misleading.  The report has led to multiple changes within CDCR

25    and corrective court orders on numerous occasions separate and

1    apart from this evidentiary hearing.

2              They claim that Michael Golding, Dr. Golding, could

3    have told the Special Master at any point.  His testimony that

4    he felt that he could not tell the Special Master was

5    corroborated by Dr. Kuich.  It was substantiated by interviews

6    with other psychiatrists in the department conducted by the

7    neutral expert at page 16 of his report.  And the claim that he

8    is an outlier with an agenda ignores the fact that both

9    Dr. Kuich and Dr. Gonzalez largely corroborated and supported

10   his version of events.

11             The fact is, Dr. Golding is not an outlier, he's not

12   crazy, he's not saying things that aren't true.  He's been

13   corroborated over and over again.  There needs to be corrective

14   action taken in this case to prevent the types of things that

15   he told us were happening that we didn't know were happening

16   from ever happening again.  And that is the only way this Court

17   should ever trust anything that defendants report in terms of

18   compliance data again.  Thank you.

19             THE COURT:  All right.  That concludes the parties'

20   closing statements.  And so once I wait to see if Dr. Gonzalez

21   files something, then the matter would be submitted.

22             So I'll see you now tomorrow afternoon for my

23   summation.  Thank you.

24             (Concluded at 3:24 p.m.)

25

1              C E R T I F I C A T E

2

3        I certify that the foregoing is a true and correct

4    transcript of the record of proceedings in the above-entitled

5    matter.

6

    /s/ JENNIFER L. COULTHARD            October 30, 2019

7                                              DATE

8

9    JENNIFER L. COULTHARD, RMR, CRR
     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25