```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF CALIFORNIA
 2                            --oOo--

 3   RALPH COLEMAN, ET AL.,      ) Docket No. 90-CV-520
                                 ) Sacramento, California
 4                  Plaintiff,   ) October 23, 2019
                                 ) 2:00 p.m.
 5             v.                )
                                 )
 6   GAVIN NEWSOM, ET AL.,       ) Re: Evidentiary Hearing
                                 ) Day 4
 7                  Defendants.  )

 8                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE KIMBERLY J. MUELLER
 9                  UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiff:    ROSEN BIEN GALVAN & GRUNFELD, LLP by
                           MS. LISA ADRIENNE ELLS
12                         MS. CARA ELIZABETH TRAPANI
                           MR. MICHAEL W. BIEN
13                         MS. JESSICA L. WINTER
                           101 Mission Street, 6th Floor
14                         San Francisco, CA 94105

15   For Dr. Golding and   STEWART & MUSELL
     Dr. Gonzalez:         MS. WENDY ELLEN MUSELL
16                         2200 Powell Street, Suite 440
                           Emeryville, CA 94104
17

18        (Appearances cont'd next page.)

19
     ALSO PRESENT:  KERRY WALSH
20                  SPECIAL MASTER LOPES (telephonically)

21             JENNIFER COULTHARD, RMR, CRR
                    Official Court Reporter
22                  501 I Street, Suite 4-200
                    Sacramento, CA 95814
23                  jenrmrcrr2@gmail.com
                       (312)617-9858
24

25        Mechanical Steno - Computer-Aided Transcription
```

```
 1    APPEARANCES (CONT'D)

 2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL
                                XAVIER BECERRA by
 3                              MS. ELISE OWENS THORN
                                1300 I Street, Suite 125
 4                              Sacramento, CA 94244
                                MR. ADRIANO HRVATIN
 5                              MR. KYLE ANTHONY LEWIS
                                455 Golden Gate Avenue
 6                              Suite 11000
                                San Francisco, CA 94102
 7
                                ROBINS KAPLAN, LLP
 8                              MR. ROMAN SILBERFELD
                                GLENN A. DANAS
 9                              2049 Century Park East, Suite 3400
                                Los Angeles, CA 90067-3208
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          SACRAMENTO, CALIFORNIA, WEDNESDAY, OCTOBER 23, 2019

 2                              --oOo--

 3      (In open court.)

 4          THE CLERK:  Calling civil case 90-520, Coleman, et al.

 5  v. Newsom, et al.  This is on for an evidentiary hearing, and

 6  today is day four.

 7          THE COURT:  All right.  Good afternoon.  Appearances

 8  just for the record for the plaintiffs.

 9          MS. ELLS:  Good afternoon, Your Honor; Lisa Ells,

10  Michael Bien, Cara Trapani, Jessica Winter for the plaintiff

11  class.

12          THE COURT:  Good afternoon to you.

13          MR. LEWIS:  Good afternoon, Your Honor, Kyle Lewis,

14  Roman Silberfeld, Glenn Danas, Adriano Hrvatin and Elise Thorn.

15          THE COURT:  Good afternoon to all of you.  And in the

16  audience, we have?

17          MS. MUSELL:  Good morning, Your Honor; Wendy Musell on

18  behalf of Drs. Golding and Gonzalez.

19          THE COURT:  And Dr. Golding is not present.  Is

20  Dr. Gonzalez present, just so it's clear?

21          MS. MUSELL:  Yes.  She's present in the courtroom,

22  Your Honor.

23          THE COURT:  All right.  All right.  In the courtroom,

24  Mr. Walsh is representing the Special Master, Mr. Kerry Walsh.

25          And the Special Master, Mr. Lopes, are you on the

1   telephone?

2           MR. LOPES:  I am, Your Honor.

3           THE COURT:  All right.  I am prepared to provide my

4   summary of how I size up the conclusions that are appropriate

5   based on the Golding proceedings, and it will take me some time

6   to do that, so I'm going to primarily read, explain as I go

7   along.  I've obviously done this on a pretty short time frame,

8   but I'm confident that this represents my core conclusions

9   based on what I've seen, heard, read, and considered.  And then

10  I will memorialize, as soon as I can, in a written order with

11  full record support.

12          I feel the need, given what has happened here, to step

13  way back and invoke the overarching reason that we are here in

14  this case.  And so I am going to just remind folks of what

15  judges before me have said.

16          "Whatever rights one may lose at the prison gates,

17  Eighth Amendment protections are not forfeited by one's prior

18  acts.  Mechanical deference to the findings of state prison

19  officials in the context of the Eighth Amendment would reduce

20  that provision to a nullity in precisely the context where it

21  is most necessary.  The ultimate duty of the federal court to

22  order that conditions of state confinement be altered where

23  necessary to eliminate cruel and unusual punishment is well

24  established."  The district judge who preceded me in one of his

25  remedial orders.

1    At this critical juncture, it bears repeating as that

2   same judge said in 2013, not so very long ago, that "The Eighth

3   Amendment violation in this action is defendant's severe and

4   unlawful mistreatment of prisoners with serious mental

5   disorders through grossly inadequate supervision of mental

6   healthcare."

7    Before that, in 2011, the Supreme Court had observed

8   "For years the mental healthcare provided by California's

9   prisons has fallen short of minimum constitutional requirements

10  and has failed to meet prisoners' basic health needs.  Needless

11  suffering and death have been the well-documented result."

12    Once an Eighth Amendment violation is found and

13  injunctive relief ordered, the focus shifts to remediation of

14  the serious deprivations that form the objective component of

15  the identified Eighth Amendment violation.  Remediation can be

16  accomplished by compliance with targeted orders for relief, as

17  the Court has issued here, or by establishing that the

18  violation has been remedied in another way.  The Court is aware

19  of that alternative, but here the Court is called on, this

20  Court, is called upon to make clear what should be patently

21  obvious, and that is that remediation may not be accomplished

22  by end runs and hiding the ball to create a false picture to

23  the Court.

24    This Court is so called because Dr. Golding, followed

25  by Dr. Gonzalez, just before defendants planned to submit a

1    staffing proposal seeking permission to very significantly

2    reduce the number of psychiatrists serving the mental health

3    population, a proposal plaintiffs indicate they were poised to

4    accept, Dr. Golding came forward.  Needless to say, the

5    plaintiffs' acceptance was withdrawn, and plaintiffs to this

6    day have made clear their trust has not been restored.

7         Once Dr. Golding issued his report -- I've looked back

8    at the history of what's happened in this case.  The defendants

9    rushed in with a defense telling this Court that no

10   investigation was needed.  The Court, however, determined that

11   the seriousness of the allegations required a process to ensure

12   full, fair and transparent consideration of the allegations and

13   at that point just that, allegations.

14        The Court, again, through a deliberative process,

15   ultimately identified a neutral expert with unassailable

16   credentials to investigate and report without delegating to

17   that expert any of the Court's authority or responsibility to

18   ultimately resolve the questions Dr. Golding raised.

19        Based on the neutral's report and Dr. Golding's

20   report, the Court has now conducted its own further development

21   and evaluation of the record, including in the last week.  And

22   I have to say the proceedings, particularly the most recent

23   proceedings, have borne out in the Court's mind the necessity

24   of the approach it's taken, even though it has taken some time.

25        Since the neutral expert provided his report, which

1   helped focus the Court's exercise of its authority, the Court

2   has signaled more than once that defendants have had the

3   opportunity to come forward and come clean and not just by

4   acknowledging that problems have occurred.  And I do want to

5   acknowledge the steps that defendants have taken.

6          In fact, as of July 22nd, as the Court has

7   memorialized in an August 2019 order, the defendants have

8   admitted that misleading information was provided to the Court.

9   There are at least two court filings on the docket that embody

10  the acknowledgment that the redefinition of monthly in the

11  business rules resulted in the reporting of misleading data and

12  data reported in two separate filings.  The defendants

13  acknowledge the hub certification letters were based on data

14  generated with erroneous business rules.  Misleading

15  information was provided to the Court, make no mistake.

16         The defendants have had the opportunity to fully

17  cleanse and purge the record of misleading information.  They

18  have filed errata, some only as recently as the last week or

19  two.  There are objections pending I will resolve.  I'm not

20  going to resolve those from the bench today.  But I note that

21  at least some errata have been filed, some only very recently.

22  Most importantly, though, nothing has prevented defendants from

23  coming forward to provide a cogent, believable, supported,

24  full-blown explanation as to why misleading information was

25  provided.  And without an understanding of the why, a proper

1   solution simply cannot be identified.

2          At best, defendants have offered various explanations,

3   including in closing yesterday, of inadvertent errors, program

4   guide vagueness, innocent absences of system course correctors,

5   but it's because the defendants have not answered the

6   fundamental question of why, the Court has gone in search of it

7   herself.  I have reached the core conclusions I'm sharing with

8   the parties today and, again, my order in full will issue.  But

9   just to review the framing of the most recent proceedings, and

10  to review the neutral expert's conclusions, which, as I

11  signaled in a passing comment to Mr. Silberfeld yesterday were

12  essentially conclusions helped to focus the Court's own work,

13  it is ultimately for this Court to make the decisions called

14  for by Dr. Golding's report.  And while it is possible to find

15  some parts of the neutral expert's report that could be read as

16  exonerating defendants, I think it has to be said the neutral

17  expert himself did not let defendants off the hook.  Rather, he

18  pointed to serious examples of misleading information being

19  presented or apparently presented.

20          Wherever the neutral expert pointed to or suggested

21  that presentation of misleading data, the record now before the

22  Court bears out his observations and then some.  Just a few

23  examples:  The business rule change redefining monthly to

24  lengthen intervals between EOP appointments from 30 to 45 days.

25  That rule, while in effect, generated misleading data about

1    CDCR compliance with routine EOP evaluations.  That's the

2    neutral expert's report.

3            CDCR's reporting of timely psychiatry contacts

4    overstated CDCR's compliance with program guide timeline

5    requirements.  The data presented to the Court and the Special

6    Master was inconsistent with those requirements and made CDCR

7    reports appear more compliant with the program guide than it

8    actually was.

9            And thirdly, just among examples, CDCR should have

10   been aware many psychiatrists were not reporting whether visits

11   were nonconfidential.  Therefore, reports to the Special Master

12   and the Court were misleading because erroneously skewed

13   towards confidential evaluations.

14           To quote the neutral, "EHRS data on compliance with

15   program guide timelines for compliance with psychiatric

16   evaluations is potentially misleading because it includes

17   nonconfidential encounters."

18           So after review of that report, the Court narrowed the

19   focus for development of evidence to three areas to facilitate

20   reaching its own conclusions.  Everyone here knows those three

21   areas, the 30 to 45-day change, the monthly definition being

22   exploited, "appointments seen as scheduled" indicator and the

23   supervising psychiatrists acting as line staff.

24           I want to address my preparations for the hearings we

25   had last week.  Before hearing, as the parties know, the Court

1    did review quite a few documents, essentially a banker's box

2    full of documents claimed as confidential by defendants and not

3    provided to the neutral.  I had several in camera discussions

4    with defendants in assessing claims of confidentiality.  A

5    record has been created.  It will be sealed, but it's created.

6         Regarding the confidential documents, the defendants

7    have resisted at every turn any reliance by the Court on any

8    portion of any document covered by a claim of privilege.  As

9    I've said before in this courtroom, if the Court were to have

10   relied on any such document, I would have disclosed the

11   document to the plaintiffs for full and transparent

12   proceedings.

13        Having reflected on defendant's position, which has

14   been consistent, if hard fought, the Court declines to engage

15   the questions raised by the privilege claims more fully.

16        My general impression is that defendants have

17   overreached in a number of instances, while certain of their

18   claims might be sustained if not waived by the positions

19   defendants have taken during the Golding proceedings.

20        But to venture into that thicket would lead the Court

21   and all of us astray and be a litigation adventure of the kind

22   that I have been trying to discourage in this case while

23   recognizing the parties' rights to go there.

24        I am today making a record of my general conclusions

25   based on the review of those documents, and I'm doing so now in

1    summary form.  Nothing in the documents provided the Court is

2    the proverbial "smoking gun."  Nothing in the documents

3    supports a conclusion, including by inference, that anyone

4    involved in presenting misleading information to the Court

5    committed intentional fraud.  And I'm talking now about the

6    confidential documents specifically.  I'll come back to a more

7    general conclusion towards the end of my observations.

8         If there were unwritten directions to engage in

9    intentional fraud or the equivalent, the author left no trail.

10   Rather, the picture that emerges from the documents is

11   consistent with the picture emerging from the public record

12   completed here in open court.  It is the public record on which

13   the Court relies in making its findings and drawing its

14   conclusions here.

15        One minor note, I did have in camera discussions with

16   the defendants about one document in particular.  A portion of

17   that document the defendants agree is not subject to a claim of

18   privilege.  And that's a document that is currently identified

19   as CDCR crib 409 to 412.  And Ms. Thorn will know certainly

20   what I'm talking about.  I'm directing the defendants to file

21   the nonprivileged portion of that document with the plan that

22   it references because it may be relevant to what happens

23   following these proceedings.  And the plan it references is the

24   Healthcare Services Performance Improvement Plan, 2016 to 2018.

25   The Court may not be looking in the right places, but it hasn't

1    been able to find that plan on its own.

2            Relatedly, with respect to the record, I'm confirming

3    that I'm accepting the declarations of Mr. Onishi, Mr. Weber

4    and Ms. Bentz, in lieu of their live testimony.  That probably

5    is implicit from the way the proceedings wrapped up, but I'm

6    accepting the parties' stipulations and their declarations the

7    Court considers to be part of the record.

8            So I have findings and I first want to -- I felt it

9    necessary to consider the testimony of certain witnesses, and

10    so I'm going to provide summary assessments of witnesses before

11    I lead into conclusions based on the subject areas that the

12    hearing covered.  And I think it's part of the clarifying,

13    cleansing and purging that's required at this stage.

14            So first, Dr. Golding.  Based on Dr. Golding's

15    testimony, observing him, listening to him on the stand, I find

16    him credible.  I find his observations and conclusions overall

17    are well-founded.  He acknowledges there can be margins of

18    error.  He says he's not a stickler, but here there were

19    boundaries crossed that he could not countenance.  He's not a

20    data guy, and I don't think he held himself out to be a data

21    guy, but he did, looking at the totality of the record, call in

22    a team of people who do understand the data, and those persons'

23    analyses, and that includes Dr. Gonzalez's analysis of some of

24    what was going on informed Dr. Golding's conclusions.

25            The defendants suggest that Dr. Golding disagrees with

1    everyone.  Now, I don't know Dr. Golding apart from what I've

2    seen here in the courtroom and in his written report, so he may

3    well have a disagreeable streak.  I'm not here to make that

4    judgment.  But even if he does, I would just observe that

5    ofttimes it takes a difficult person to see a problem and to

6    right a wrong.

7          Dr. Golding may have a pro psychiatry bias.  That

8    would be understandable.  He is the defendant's own chief of

9    psychiatry.  That bias does not mean his report and his

10   testimony is stripped of value.  I have considered the question

11   because the defendants have argued that that bias is critical

12   in assessing his credibility, but I find still his testimony is

13   sound, his report is fundamentally sound.  There are a few

14   exceptions I'm going to get to and note for now.

15         Moreover, Dr. Golding is not alone in his assessment

16   of what's happened here, and I think the defendants'

17   characterization of his views does not fail to account for the

18   views of Dr. Gonzalez and Dr. Kuich.  Dr. Gonzalez's report and

19   Dr. Kuich's deposition, both in the record, are required

20   reading to understand the totality of the record before the

21   Court.  And I would say that Dr. Kuich's deposition is like

22   reading a good book, regardless of whose side you're on.  He

23   provides a very helpful narrative, explaining context in a way

24   that fits with the rest of the essential pieces of the evidence

25   here.  And he manages to interject colorful language that keeps

1    the reader's attention, such as being "gobsmacked" when he

2    sees, you know, dashboards turn from red to green or

3    understanding the reasons for that.  He talks about the

4    reptilian brain.  Required reading, I think, for everyone here.

5           So in terms of Dr. Golding's ultimate position when it

6    comes to the three areas that the Court probed through the

7    hearing on the 30 to 45 days, the key takeaways are psychiatry

8    was not consulted in advance, certainly not the second time

9    around.  Psychiatry learned only after investigating with

10   Drs. Gonzalez and Kuich doing much of the legwork trying to

11   figure out why those dashboards turned from red to green

12   dramatically overnight.

13          The Court notes that Dr. Golding continues to have

14   concerns about what he calls "disambiguation," precluding

15   proper analysis resulting from the merging of data from both

16   CCCMS and the EOP.  He may be right, but that's beyond the

17   Court's purview at this point.  At most, I would refer that

18   issue to the Special Master.

19          On the "appointments seen as scheduled" indicator,

20   while the defendants argue that indicator is not tied to the

21   Coleman program guide, Dr. Golding is correct that the Special

22   Master relies on information generated using that indicator in

23   conducting his monitoring.

24          While the indicator has revised, here as well

25   Dr. Golding believes it still does not allow reporting of

1     appointments that are missed.

2          I listened carefully, have thought about what

3     Dr. Ceballos has said, including her view that Dr. Golding

4     doesn't understand the data.  That may be, but given that the

5     processes have not been in place to make data methodology fully

6     transparent and understandable, including to the chief

7     psychiatrist, who is a key stakeholder, I'm not reaching

8     ultimate conclusions on that point.  Again, perhaps something

9     for the Special Master to get to the bottom of.

10         In terms of supervisors acting as line staff,

11    Dr. Golding's observations are well-founded.  Here, again,

12    they're bolstered by Dr. Kuich's very clear explanations for

13    the reasons that clear data matter.

14         It did matter to me to understand why Dr. Golding felt

15    unable to surface his concerns internally.  Courts generally

16    like exhaustion.  The Court wants to know that there's an

17    internal process for someone who has concerns to work through

18    those, and that would be the sign of a healthy organization.

19    But here, again, Dr. Golding's narrative is supported by

20    Dr. Gonzalez and Dr. Kuich.  And I'll get into that in a bit.

21    His explanation for providing the report to the receiver

22    instead of the Special Master, despite its implications for the

23    Coleman case, also make sense in context.

24         Where I'm not accepting Dr. Golding's conclusions,

25    just so it's clear, they're fairly minor, but they don't

1    materially -- and they don't materially affect my conclusions

2    here, I don't find support in the record for his strong belief

3    that the Governor's Office -- essentially his strong belief

4    that the Governor's Office directed the provision of misleading

5    data.  I have an observation about that, but I'm not accepting

6    his strong conclusion.

7          I also can't get to the bottom of Dr. Golding's belief

8    that Ms. Tebrock told him that his telling her of fraud was

9    sufficient to quote/unquote unburden himself because she's an

10   officer of the court, based on the current record.  Ms. Tebrock

11   denies saying that.  It may be that attorneys use language in a

12   certain way that means something else to others not in the

13   attorney's discipline.  Apart from that cautionary observation,

14   I'm not feeling the need to resolve that question.

15         In terms of other key witnesses, I'm not going to

16   cover every witness here today, but I do want to give a sense

17   of how I size up testimony.  And I can't say that I take great

18   pleasure in doing this, but I think it's a part of my job at

19   this stage, given what the Court has heard and seen.

20         So first, Ms. Tebrock.  On the one hand, I don't find

21   Ms. Tebrock not credible, but I found her testimony ultimately

22   disappointing for the lack of full acceptance and the absence

23   of leadership that it displayed, given her obvious intelligence

24   and her significant abilities.  And the Court has no reason to

25   disbelieve that she loved and cared about her job.

1          Perhaps she, as others, I believe, perhaps she is/was

2     a victim of bureaucratic dysfunction and not given adequate

3     training and support to manage in a very complex environment,

4     but Ms. Tebrock signed key declarations in this case in the

5     relevant time period, and she did not ask anyone to correct any

6     reports or filings she made to this Court after becoming aware

7     of Dr. Golding's report.  She did testify last week in this

8     Court that if given the chance, she would correct, but that

9     comes across as more than a day late and many, many dollars

10    short.

11         The Court, as it has noted, has provided the

12    defendants the chance many months now to correct the record,

13    and so the chance has been provided.

14         I also find Ms. Tebrock's handling of the staffing

15    proposal inexplicably constrained, as if designed to preclude

16    meaningful input from psychiatry, and it informs the Court's

17    disappointment.

18         The defense argues that Ms. Tebrock was, at all times,

19    available to Dr. Golding; but as I've signaled, I find her

20    carefully curing interactions with him lacking.  I'm not saying

21    that was the sum total of her interactions, but she was a

22    leader in that department.  In particular, her explanation of

23    the need to keep the precise wording of court documents close

24    to the vest and controlled by lawyers alone is completely

25    unsatisfactory to this Court, and that verges on a part of the

1    foundation of how misleading information got to the Court.

2          Dr. Ceballos.  As the plaintiffs point out,

3    Dr. Ceballos, the psychologist, designed CQIT, the tool central

4    to defendants demonstrating they are in compliance with Coleman

5    court orders; and, yet, her testimony betrayed little to no

6    appreciation for the letter or the spirit of those orders.

7          She maintained, for the bulk of her testimony, a false

8    distinction between internal and external data and seemed to

9    think of her role as a limited role of just being a clinician.

10         The Special Master has considered her in the past a

11   key contact.  I raised that with her, a person they assumed

12   would report changes affecting the substance of Coleman to

13   them.  But as the record documents, when Dr. Golding asked her

14   initially, Dr. Ceballos said the Court had not been notified of

15   the 30 to 45-day change and said, "Well, we don't inform the

16   Court about every change, only major changes that have

17   significant impact."  And Dr. Ceballos has been consistent in

18   her testimony that she thought the change fell within the

19   program guide's requirement of monthly and that this was purely

20   a decision to help the field improve patient continuity of care

21   and quote/unquote "very clearly within the policy

22   requirements," but her clarity on that point is -- goes too

23   far.  And given her significant role and her significant

24   contact position with the Special Master's Office, it is --

25   it's fair for the Special Master, if he so decides.  It's for

1    him ultimately to decide.  But if the trust previously placed

2    on Dr. Ceballos is out the window, it would be believable and

3    hard to imagine that it could be restored.

4         The Court believes the change from 30 to 45 days is a

5    material change because it affected reporting to the Special

6    Master and, therefore, the Court.

7         Dr. Leidner, plaintiffs argue that Dr. Leidner cannot

8    claim ignorance of the context in which he works or worked.

9    Having testified in the 2013 termination proceedings before the

10   Court, they also point to his belated discovery of an error or

11   not even his own discovery of an error with respect to the PIP

12   indicator.  While both are true, in this respect I -- I do not

13   accept the plaintiff's assessment of Dr. Leidner.  I see him,

14   although a psychologist, in a more positive light.

15        Given that the record suggests he was working at the

16   direction of others, working diligently in a dysfunctional

17   system, he should have been more aware.  He was working

18   diligently while making human errors, but he was not the key

19   decision-maker, as the Court sees it, with respect to the

20   matters that the Court has probed here.

21        In a properly designed structure with proper

22   supervision, it appears to this Court that Dr. Leidner could,

23   even today, continue to play an important role, given his

24   significant skills.

25        And as importantly, as someone who assesses

1    credibility, the Court believes Dr. Leidner distinguished

2    himself here by exhibiting a conscience on the stand.  He

3    understands he made mistakes, and he didn't seem to shrink from

4    accepting that and explaining that, in fact, he had.

5            So make no mistake here, Dr. Leidner did not depart

6    his position in CDCR Mental Health based on anything the Court

7    has observed about his role as related to the Golding

8    proceedings.

9            Those are the witnesses whose testimony I'm sharing my

10   assessment of at this point in time.  And therefore, I'm going

11   to move on to my conclusions regarding the substantive areas

12   covered by the proceedings.

13           So the 30 to 45 days, you've already heard me say

14   this, but that change was a material change inconsistent with

15   the program guide as implemented through a long period of

16   practice.  It should have been thoroughly vetted before any

17   implementation.

18           While the defendants argue the change was prompted by

19   a request from the field to improve continuity of care, that

20   does not go far enough to explain the change, I believe.  The

21   requests did come from the field, a medication admin at CHCF,

22   and there was apparently some relief provided to psychiatrists

23   seeing patients.  They could go on vacation and still see the

24   same patient in a reasonable time frame, as the folks who made

25   the change saw it at the time.  But the request went nowhere

1    the first time because Dr. Golding did not approve it.

2         The second time, at a critical time with respect to

3    one of the Special Master's monitoring rounds, the request

4    sailed through without any checking with psychiatry.  And,

5    again, it did materially affect reporting to the Special

6    Master.

7         Specifically the rule change affected a period where

8    the Special Master had been tasked with receiving monthly

9    updates on the status of defendant's implementation of their

10   staffing plan and filing a stand-alone report on the status of

11   mental health staffing and, again, implementation of that plan.

12        So here I find plaintiff's suggestion the Court draw

13   an inference of willfulness is quite persuasive.  At a minimum,

14   it's a matter of willful blindness or reckless indifference,

15   given the context in which the decision was made.

16        In terms of appointments seen as scheduled, here there

17   was a descriptor.  The Court got clarity on this issue during

18   the hearings.  The descriptor was not changed to track changes

19   to code, and Dr. Leidner fixed it once the error was

20   identified.  It appears to the Court the error in not updating

21   was unintentional, but plaintiffs are correct that the

22   descriptor is what's public facing, and so critical to

23   transparency.  This kind of error needs a system to catch it

24   promptly, if it happens at all.  I question the correction that

25   was made in October of 2018, but it was made through the wrong

1    kind of identification of the error in the first place.

2              The Court has the very strong impression at this point

3    in time that the real problem is that the failure to modify

4    coding or the EHR system more broadly to capture data relevant

5    to treatment, that is the real problem that must be fixed.

6              And the defendants simply are not correct in believing

7    that missed appointments are not relevant to patient care.  And

8    here, again, Dr. Kuich's deposition includes a good explanation

9    of why properly tracking missed appointments is relevant.  Such

10   tracking contributes to qualitative analysis, which could

11   include identification of a number of trends and patterns at a

12   local institution that currently simply are not available

13   without a very detailed manual tracking, if that occurs.  Here

14   as well, I'm going to refer that issue to the Special Master

15   for some more work along the lines that has already begun.

16             With respect to the appointments seen as scheduled, I

17   do want to credit Dr. Toche's testimony concerning remedial

18   measures to be explored and taken, assuming transparency and

19   full communication with the Special Master and the Court going

20   forward.  And there's much more to be done to assure that.

21   I'll talk about that in just a moment.

22             The third area, supervising psychiatrists acting as

23   line staff.  Here defendants contend that Ms. Ponciano's

24   analysis was not intended to show how much supervisor time was

25   required but, instead, to ascertain how much clinical time, how

1    many line staff going forward was required in the field.  But

2    here as well, I conclude defendant's argument misses the point

3    or at least the full point.

4         Ms. Ponciano's analysis masked the time that

5    supervisors spent providing line care and yielded a number that

6    was significantly understated.  And here it appears Golding did

7    attempt to surface the issue -- Dr. Golding attempted to

8    surface the issue at meetings where he was representing

9    psychiatry.  Here Dr. Golding and Dr. Kuich disagree on the

10   percentage of time that supervisors spend providing line care.

11   I don't think anyone disagrees that some provision of line care

12   is appropriate and not out of line, but Dr. Golding estimates

13   it's 50 percent.  Dr. Kuich estimates a third to a half of

14   their time.  But regardless of what range the Court credits,

15   supervisors have clinical responsibilities far in excess of

16   those contemplated by the 2009 staffing plan.

17        I would note that Ms. Ponciano testified that the

18   results of her analysis showed that if supervisor contacts were

19   removed from timely CCCMS contacts, it would have shown that

20   those patients were being seen on average .98 times every 90

21   days rather than 1.07 times every 90 days.  That analysis was

22   not shared with the Court or the Special Master prior to these

23   proceedings.

24        Ultimately, with respect to this indicator, here

25   again, I think Dr. Kuich provides a narrative that rings true.

1    "Psychiatrists were practicing in an environment that, among

2    other things, causes data to have to be massaged in certain

3    ways to allow information to be more presentable to say we

4    don't need psychiatrists so we can get out of the lawsuit."

5         He testified, "The more you automate this process to

6    make sure that compliance happens, the more you take control

7    out of the clinician to be able to determine what's clinically

8    relevant for that patient."  And that approach runs counter to

9    a key principle articulated in this case since the very

10   beginning, since 1995 at least, and that is, "In order to

11   provide inmates with access to constitutionally adequate mental

12   healthcare, defendants must employ mental health staff in

13   sufficient numbers to identify and treat, in an individualized

14   manner, those treatable inmates suffering from serious mental

15   disorders."  That's this case, 1995.

16        There's some backdrop concerns that emerged for the

17   Court, and I'll just touch on those because they inform the

18   Court's answer to the "why" question.  I do think -- I know

19   there's this:  Well, it's psychologist versus psychiatrists,

20   and I'm trying to rise above that, as I think everyone here

21   must.  But I think the record as a whole does support the

22   conclusion that psychiatrists were marginalized to the point

23   where their input carried insufficient weight in the

24   decision-making process.  It doesn't mean they had to win, but

25   they had to be meaning fully consulted.  They are the ones who

1    take the hippocratic oath.

2          And so Ms. Tebrock's, with Ms. Brizendine's reading

3    bullet points to Dr. Golding, never showing him the staffing

4    report before it's finalized, asking him to sign something that

5    he could not, it just doesn't cut it.

6          Ms. Ponciano pulling Dr. Kuich out of another meeting

7    for, as he estimates, about five minutes to run some numbers by

8    him without giving him context, full information or time to

9    evaluate numbers she was putting together to support the

10   staffing proposal.  He expressed general concerns.  That was

11   it.  Ms. Ponciano could say honestly she talked with him.

12   That's not a meaningful discussion of the sort that should be

13   occurring.

14         Ms. Tebrock and Ms. Brizendine, if not Ms. Ponciano as

15   well, asked Dr. Golding and his team to stop with their own

16   monthly staffing tracking.  They were tracking information that

17   CDCR has said could not be tracked.  They were asked to stop

18   doing that.  So marginalization of psychiatry is a backdrop.  I

19   heard Dr. Toche say she's aware of an issue there.  I don't

20   know how she defines it, but she's aware of an issue and she's

21   working on it, and I credit her with that.

22         A second backdrop is what can only be described as

23   significant bureaucratic dysfunction and negative messaging

24   preventing internal reporting or hearing internal reports when

25   key persons attempt to make them.

1        So while Dr. Golding may have put a target on

2    Ms. Tebrock's back, the context that he describes and for which

3    she had responsibility as a leader is concerning.  He had the

4    impression, credibly, that he was not able to speak to the

5    Special Master.  That was the impression that was corrected

6    after his report was filed.

7        He credibly said he was told to wait to talk about his

8    staffing concerns until some date after the staffing report was

9    planned for filing with the Court.

10       He provided -- he went as far as to provide his report

11   to the receiver for clearly articulated reasons that signaled

12   his concern about reporting it up through the Coleman chain of

13   command.

14       Dr. Kuich here as well describes multiple instances

15   where he says he just gave up on trying to report, on trying to

16   make changes that he saw as necessary because they were never

17   heard.

18       Dr. Ponciano, she may be a very diligent public

19   servant, and she's credible in her testimony as far as it goes,

20   but she is in administration.  She oversees operations and

21   labor negotiations, and that's the person who was tasked with

22   coming up with the numbers of psychiatrists to hire and to cut

23   and did not have the full knowledge base to reach a meaningful

24   conclusion that satisfies the Coleman Court requirements.

25       A third backdrop, the boundaries that should be in

1    place between PLATA and Coleman, despite their overlaps, were

2    not being policed.  And I'm just talking about the Coleman side

3    of the house.  So the "appointments seen as scheduled"

4    indicator was adopted, an indicator developed by the receiver's

5    team without any tailoring.  The receiver's team makes changes

6    to healthcare business rules that affect mental healthcare

7    indicators, and it's the receiver's team running validation on

8    code.

9           I'm not pointing at the receiver as the source of a

10   problem here.  It's for mental health.  It's for the Coleman

11   side of the house to push back and maintain the line.  And in

12   many instances, it appears that has not happened.

13          Mental health QM was heavily involved in development

14   of the EHRS, and many of psychiatry's requests for a solution

15   to critical scheduling problems linked to diagnosis and

16   prescriptions have not been incorporated into EHRS.  EHRS is

17   not tailored, as far as the Court can tell, to the mental

18   health concerns in the Coleman case; examples being that a

19   person who enters data can self-select their own title, doesn't

20   allow tracking of key treatment data.  And it's not clear to

21   this Court that psychiatrists, who are relied upon to enter

22   data, were ever fully properly trained.  I've heard the defense

23   say they acknowledge a need for more training.  I think it

24   might need to be a more robust process than sending memos to

25   the field.

1      Another backdrop I would just observe, it appears to

2   the Court there's a proliferation of committees and

3   subcommittees.  I realize some of them are on hold, but there

4   are committees, there are subcommittees, there are mental

5   health subcommittees, receiver committees, the webinars.

6   Dr. Toche at least has acknowledged the limitations of the

7   webinars that were being held.

8      And there's a clear system in place for improving

9   transparency with respect to coding changes, but I am asking

10  for a list, just so you know, from the Special Master and the

11  receiver, so I can see what all the committees are, even if

12  they've been put on hold, to try to understand the structure.

13  I think the structure does not support the goals of the Coleman

14  case currently.  So the fundamental question of why, which

15  informs what the solutions here must be.

16      I think there was a laser focus.  The defendants

17  adopted a laser focus on an effort to obtain termination of

18  Court supervision, which led to a stark "ends justifying the

19  means" scenario, and it appears that they lost complete sight

20  of the reasons that remediation has been required in this case

21  for some time.

22      Mr. Bien asked the one question going to the heart of

23  that, that issue of Dr. Toche.  She was not prepared for it, to

24  her credit.  She said she needed to think about it, and I do

25  believe her that she will think about it and be thoughtful in

1   solutions that she may propose going forward.  But it should be

2   clear to everyone here -- and this Court has not felt the need

3   to say it, but legal cases are not just words on a piece of

4   paper, and I think it needs to be said at this point in time

5   legal cases have hearts and souls.  And there was never a

6   question in this Court's mind but that the predecessor judge,

7   Judge Karlton, put his heart and his soul into this case, as

8   reflected in his orders, which stand today.  And this case

9   cries out for every single player to consult their hearts daily

10  and keep their eyes daily on those souls who are the mentally

11  ill housed behind bars in this state who have the absolute,

12  undeniable right to adequate treatment and care,

13  constitutionally adequate care.

14          So how did the defendants lose sight?  I do think

15  timing played a role, awareness of Special Masters' rounds, I

16  think the end of a prior governor's term.  There's no evidence,

17  I repeat, that anyone in the Governor's Office ever instructed

18  any player to mislead, but the neutral expert's report does

19  capture an interaction that I think provides some insight.

20          In March of 2017, Ms. Tebrock sent an email noting

21  that the Governor's Office had asked to explain in more detail

22  what metrics can be used to show that the care by psychiatry is

23  adequate.  What metrics can be used to show that the care by

24  psychiatry is adequate.  I think when a Governor's Office asks

25  those who work for it in the agencies to jump, it is natural

1    that those in the agencies may say "How high?"  On the one

2    hand, I believe there was attention to data and an effort to

3    review the data and to make certain it was data generated from

4    the data warehouse ultimately through the Coleman indicators,

5    but with the direction that the job was to show that care was

6    adequate.  So the chosen method to lay groundwork for

7    litigation.

8         Ms. Tebrock's explanation of the need for lawyers to

9    wordsmith the court documents as a reason for not showing the

10   staffing report to Dr. Golding exposes that "ends justifying

11   the means" approach, as opposed to engaging in responsible

12   problem solving.  I think it's fair to say that litigation

13   trumped substantive compliance.  And so far, at least, that

14   road has not worked for the defendants.

15        It's not for this Court to tell either party how to

16   litigate its case, if it chooses litigation, and if it believes

17   it has that right, but I would just make an observation that

18   given the litigation results to date, following that road has

19   exacted a steep, steep price.  And that price is at the cost of

20   the plaintiff class.

21        Other examples?  Getting the dashboards from red to

22   green.  And here, again, Dr. Kuich provides a narrative

23   explanation that pulls it together, having heard the other

24   testimony in the case.  His observation, someone who's left the

25   department:  "Mental health felt that they were performing very

1    well in many areas, that they could police themselves with

2    data" -- that echos Dr. Ceballos's testimony -- "that they were

3    a structure.  That they were sustainable.  And the only piece

4    that was the problem was that there weren't enough

5    psychiatrists.  And so if there was some way to show that with

6    fewer psychiatrists we were meeting the metrics, that final

7    block would tumble, and there would be no basis for the

8    lawsuit."  If dashboards turn from red to green, it helps

9    demonstrate there's no need for the lawsuit.

10        Before turning to some overarching conclusions, I just

11   want to note, the Court has often thought that there's some

12   irony, given the structure of this case, that defendants have

13   so often resorted to litigation.  The Special Master approach,

14   carefully constructed by my predecessor actually moderates

15   court intervention into defendant's own efforts to remediate,

16   in contrast to a receivership.

17        And so, arguably, it's more respectful and more

18   hopeful that defendants can figure this out on themselves -- by

19   themselves.  It does mean that the Court relies on defendants'

20   representations to the Court.  And so if the approach of using

21   a Special Master has, in some way, contributed to the problems

22   here, there is at least irony, if not a need to revisit the

23   structure because at this point, as the parties now know, the

24   Court cannot help but conclude that the status of defendant's

25   representations is in doubt.

1          So the overarching conclusions.  In determining

2    whether there has been fraud on the Court, the relevant inquiry

3    is whether the conduct at issue harmed the integrity of the

4    judicial process.  Most fraud on the Court cases involve a

5    scheme by one party to hide a key fact from the Court and the

6    opposing party.  It's a high standard.  The Court does not find

7    the kind of scheme necessary for fraud satisfied here.

8          Plaintiffs, I listened carefully yesterday --

9    plaintiffs urged instead that the Court find that defendants

10   acted knowingly in presenting misleading information.

11         The defendants argue that the Court took no action,

12   based on incorrect data.  The Court did not approve the

13   staffing plan, they say, but that is because it blew up in the

14   face of Dr. Golding's report followed by Dr. Gonzalez's report.

15   And that is thanks to Dr. Golding.

16         It is the case that the Special Master, an arm of the

17   Court, has received data and relied on it in monitoring rounds.

18         It is the case that documents, including hub

19   certification letters, have been filed with the Court.  And

20   that means -- again, it should not need repeating, but any

21   document filed with the Court is covered by Federal Rule of

22   Civil Procedure 11, 11(b), which provides that the attorney or

23   other person presenting certifies that to the best of the

24   person's knowledge, information and belief, formed after an

25   inquiry reasonable under the circumstances, it is not being

1    presented for any improper purpose, including needlessly

2    increasing the cost of litigation.

3          And, as relevant here, the factual contentions have

4    evidentiary support.  And documents residing on the Court's

5    docket, there are thousands of such documents in this case, as

6    the parties know.

7          Even if the Court has not expressly acknowledged it, a

8    document residing on the Court's docket is a tangible thing.

9    It is not merely bits of Os and 1s.  It is not a digital

10   remnant.  And Rule 11 violations are sanctionable.  I'm not

11   going there at this point in time, as you'll hear, but

12   plaintiffs' characterization is well taken, piecing together

13   the evidence and drawing reasonable inferences from the

14   totality of the record before the Court.  And so at this point

15   in time, I am prepared to adopt their naming of the defendant's

16   collective provision of misleading information to the Court.

17   They have engaged in knowing presentation of misleading

18   information.

19          That said, there are hopeful signs.  And before

20   turning to remedies, I want to acknowledge those.  Dr. Toche

21   presents as a hopeful sign for the future.  She has not just

22   arrived on the scene, but she has concrete plans.  Her presence

23   here in this courtroom demonstrated her ability to listen, to

24   hear what others are saying.  As I said, I have no doubt that

25   she is thinking about how to respond to Mr. Bien's question.

1    She is looking at structural issues.  And so I look forward to

2    hearing what her input may be on any proposal to revive the

3    change committee, the monthly prioritization committee and how

4    that dovetails with CLAC and mental health QM and receiver QM

5    and whatever else is out there; her description of the release

6    note process, formalizing what was going on through very

7    informal webinars; perhaps well-meaning webinars, but not

8    documented in any way that was transparent.  It sounds to me as

9    if there's a hopeful process there.

10         There is a new administration, and with any new

11   administration comes the chance to turn over a new leaf.  I

12   have acknowledged Ms. Evans' presence in the courtroom in the

13   past.  She is not a witness.  There was no need to have her as

14   a witness.

15         But Ms. Evans and her boss have an opportunity here, I

16   believe, to step into the breach and to take the lessons from

17   what has occurred and move forward in a way that really can

18   bring this case to a conclusion.

19         When I first inherited this case, I naively said I

20   thought we were on a glide path.  We have not been on a glide

21   path, and I'm not going to repeat that image, but I do hope

22   that in the lifetime of this judge as an active judge that this

23   case might come to conclusion.  And I don't rule that

24   possibility out, but it has to be because people have learned

25   the lessons from the mistakes and understand the reasons.

1          Another hopeful sign, that there is a renewed effort

2    to coordinate between the Special Master in Coleman and the

3    Receiver in PLATA with the judges at the table.  There has been

4    one meeting with some positive signs, and there will be more

5    such meetings and the Court will be thinking very deliberately

6    about how to structure coordination going forward.

7          I would caution that no one should rush into the

8    breach before this Court approves any new plan for improved

9    data collection analysis and reporting.  I've asked the Special

10   Master to work on that issue.  I'm going to ask him to speed up

11   his report back to me.  I had given him initially six months.

12   I believe our December status will occur before the six-month

13   period runs.  I want this issue on the agenda for our December

14   status.

15         If the PLATA receiver is the service provider, given

16   the past coordination and the creation of the data warehouse,

17   if that receiver is the service provider for data, it has to be

18   understood this Court and its Special Master are the client,

19   and the client is going to negotiate and make certain that the

20   Coleman class and its interests are served.  I, of course, will

21   look to the parties to weigh in on that.

22         Hopeful signs don't preclude the need for remedies.

23   The plaintiffs have identified a series of remedies.  It

24   appears to the Court that the parties agree on certification.

25   The Court has previously required certification.  I believe I

1    heard Mr. Silberfeld say the defendants are willing to certify.

2            I direct the parties to meet and confer on this

3    question and to present to the Court within 7 days a proposal

4    or their competing proposals for certification.

5            And I would ask -- in the past I've asked that the

6    defendant certify that they've read past orders.  I still

7    believe that's important because there's turnover.  It's a long

8    docket.  There should be a bible at this point of court orders

9    that are the law of the case that every person working on this

10   case should read.  And that's separate from the program guide,

11   which is the bible for remediation.  But to understand

12   remediation, as I signaled at the beginning, persons need to

13   understand the history of this case.

14           The parties can let me know what kind of

15   certification, if any, apart from what is expected of officers

16   of the court and public servants can convey to this Court that

17   the players appreciate the big picture and are not losing sight

18   of the real people behind this case and the reason for the

19   ordered injunctive relief and the reason remediation is being

20   required.

21           In terms of plaintiff's other proposed remedies, I'm

22   directing that they memorialize those in a brief.  It can be a

23   summary brief to be filed within 7 days.  Defendants shall

24   respond within 14 days with any opposition.  The parties are

25   free to meet and confer.  I am prepared to order remedies.  And

1      I'm willing to very seriously consider plaintiff's proposed

2      remedies because, fundamentally, plaintiffs are correct that

3      this is the time to effect a sea change, to make certain that

4      no court is back here again at any time in the future.

5              I will plan to issue a remedial order before December.

6      If I need to hear from the parties before I do that, I'll set a

7      special hearing.

8              The targeted remediation called for by these

9      proceedings will allow a long, delayed return to the big

10     picture and the proper focus, a laser focus on quality of care

11     for the patient population.  Nothing has prevented working on

12     that while these Golding proceedings have proceeded on a

13     parallel track.  It is the case that a focus on the quality of

14     care for the patient population is what will guide defendant's

15     true relief from court oversight.

16             And once again, in closing, I just want to put in

17     perspective how important it is to maintain the proper focus,

18     however it may be maintained.  This is the second time in less

19     than 10 years that defendants have embarked on a litigation

20     strategy that delayed and frustrated compliance with staffing

21     requirements.  It was 10 years ago that defendants themselves

22     submitted their 2009 staffing plan to this Court followed by a

23     budget change proposal to the California Legislature to

24     quote/unquote fully implement the staffing model described in

25     that plan.

1        The budget change proposal described the critical

2   flaws in defendant's prior staffing model and represented that

3   the 2009 staffing plan identifies appropriate staffing levels

4   to meet constitutional standards.

5        Still today, psychiatrist staffing vacancies hover at

6   the 30 percent mark.  The Court has heard many times the

7   explanation of supply and demand.  There's insufficient supply,

8   particularly given the location where psychiatrists must serve,

9   to meet the needs of the plaintiff class.  But these hearings

10  have provided additional explanations and contributors to the

11  challenge in identifying psychiatrists, I believe, including an

12  uninviting dysfunctional workplace that does not value the

13  essential treatment perspectives that psychiatrists have to

14  offer and creates an atmosphere where morale is low.  And so

15  where a change from 30 to 45 days might provide a modicum of

16  relief against that backdrop to solve that problem, here it was

17  misguided and a symptom of an approach marked by a quick,

18  really unthinking fix and applying a very tiny bandage to a

19  festering wound while the infection spreads throughout the

20  body.

21       So, for now, defendants must come to term with the

22  substance of the staffing plan, involve all key stakeholders in

23  working with the proper focus to satisfy it.  The Court

24  believes that is not a litigation focus.

25       And to continue to relitigate or to turn to data in an

1    effort to create reports, to provide metrics that make it look

2    as if the goal is being met, is, itself, a form of insanity.

3         If, after addressing the problems these hearings have

4    exposed, it really is the case the defendants honestly believe

5    that the staffing plan needs to be monitored, their staffing

6    plan, which the Court has adopted, the defendants have the

7    option, as they always have had, of approaching the Court,

8    seeking a modification, explaining in full what the problems

9    are.  Any such request would need to be properly justified,

10   honestly supported.  It could be, once again, supported by the

11   plaintiffs if they are able to regain their trust with proper

12   remedies following these proceedings.  Nothing would prevent

13   the defendants coming forward with a more transformational

14   option.  I realize it can be hard to think that way, but one

15   hint of a transformational option was put forth by Judge

16   Karlton in 2014, and the Court wants to read that into the

17   record once again.  "California is not alone in criminalizing

18   mental illness," he observed.  He was quoting a published

19   article, actually, from a newspaper, but he adopted the

20   perspective.  "We've systematically shut down all of the mental

21   health facilities, so the mentally ill have nowhere else to go.

22   The prison system has become the de~facto mental health

23   hospital."

24        The mental health population numbers have risen since

25   the time the Court has assumed responsibility for this case.

1          It is this Court's view, as Judge Karlton observed,

2     that many of the problems giving rise to this suit and the

3     ongoing efforts at remediation arise from the inevitable

4     tensions created by the distinct needs of custody supervision

5     and the distinct need for mental healthcare.

6          If there is a transformational and realistic

7     alternative to the prison as de~facto mental health hospital,

8     this Court is all ears.  At the same time, I'm not a dreamer.

9     And so in the meantime, it is the staffing plan in the context

10    of the program guide that charts the way forward and must be

11    put front and center.  Data must be fixed, and it must be fixed

12    so that it serves the policies set by this case, not the other

13    way around.  The policies must not be drained of meaning to fit

14    a square peg in a round hole.  And the data must be fixed with

15    the key stakeholders at the table.  It must be, as Dr. Toche

16    recognizes, checked and double checked.  The data must be

17    pulled together, gathered and collected in a form that allows

18    the defendants ultimately, when they truly can, accurately to

19    demonstrate to the Court that the Constitution is finally

20    satisfied.

21         Those are my observations today.  I will issue an

22    order memorializing them with greater explanation and record

23    support.  I will look for your filings as directed, and I will

24    see you in December, if not before.  Thank you very much.

25         THE CLERK:  Court is adjourned.

1      (Concluded at 3:12 p.m.)

2

3                    C E R T I F I C A T E

4

5      I certify that the foregoing is a true and correct

6   transcript of the record of proceedings in the above-entitled

7   matter.

8
    _/s/ JENNIFER L. COULTHARD_              October 30, 2019
9                                                DATE

10

11  JENNIFER L. COULTHARD, RMR, CRR
    Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25