1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:    (510) 280-2621

5  CLAUDIA CENTER – 158255
   AMERICAN CIVIL LIBERTIES UNION
6  FOUNDATION OF NORTHERN
   CALIFORNIA, INC.
7  39 Drumm Street
   San Francisco, California  94111-4805
8  Telephone:    (415) 621-2493

   MICHAEL W. BIEN – 096891
   JEFFREY L. BORNSTEIN – 099358
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LISA ELLS – 243657
   JENNY S. YELIN – 273601
   MICHAEL S. NUNEZ – 280535
   JESSICA WINTER – 294237
   MARC J. SHINN-KRANTZ – 312968
   CARA E. TRAPANI – 313411
   ROSEN BIEN
   GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
   Telephone:    (415) 433-6830

9  Attorneys for Plaintiffs

10

11                UNITED STATES DISTRICT COURT

12                EASTERN DISTRICT OF CALIFORNIA

13

14  RALPH COLEMAN, et al.,

15          Plaintiffs,

16      v.

17  GAVIN NEWSOM, et al.,

18          Defendants.

19

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING**

Judge:  Hon. Kimberly J. Mueller

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

In response to the Court's statements during its oral findings on October 23, 2019 and its Minutes of the same date, ECF No. 6365, Plaintiffs hereby submit their proposed certification process designed to assure the Court, going forward, that Defendants and their counsel's representations regarding data are fully transparent, accurate, and appropriately vetted prior to their submission to the Court, Special Master, or Plaintiffs. Plaintiffs met and conferred with Defendants numerous times, but were not able to come to an agreement regarding certification. Plaintiffs propose a two-step certification process applicable to all representations made regarding data and what that data means for this case, along with a meet-and-confer process for the parties to develop a list of key orders governing the case. These steps are necessary to fix the flaws in Defendants' data reporting practices laid bare by the Golding Report and associated evidentiary proceedings, and to seek to restore the trust in Defendants and their counsel necessary to move the remedial process forward and to bring this litigation to its appropriate conclusion.

I.     **TWO-STEP CERTIFICATION IS NEEDED TO ASSURE THE COURT, SPECIAL MASTER, AND PLAINTIFFS THAT DEFENDANTS' AND THEIR COUNSEL'S REPRESENTATIONS REGARDING DATA IS ACCURATE AND RELIABLE.**

Each time Defendants present data to the Court, the attorney responsible for the filing or submission and the official with personal knowledge of how the data was prepared must take responsibility for the representations. Accordingly, Plaintiffs propose a two-step process to ensure the fidelity, transparency, and accuracy of data-based representations to the Court, Special Master, and Plaintiffs. While the formality of the certifications may need to vary somewhat based on context, the fundamental components should include a verification by someone who knows and is responsible for the data, and a separate and independent verification by counsel sponsoring the data. The process should apply to all data presented to the Court, Special Master, and Plaintiffs, and to DSH Defendants and their counsel. Only with these safeguards in place can the knowing misrepresentations that led to and were revealed by the Golding Report and associated

1

1    evidentiary hearing be avoided in the future.

2        **A.    A Defendant Representative Sponsoring Data to the Court, Special
         Master, or Plaintiffs Must Be Required to Certify Several Aspects of the**
3        **Data.**

4        The first step of Plaintiffs' proposed process would include a certification by a

5    person most knowledgeable regarding any data representations made to the Court, Special

6    Master, or Plaintiffs.  In addition to attesting to its accuracy, that person would have to

7    identify for each data-based representation:

8        (1)    what the data purports to show;

9        (2)    how the data is related or responsive to court orders and/or the Program
10               Guide;

         (3)    the methodology, in detail, used to prepare and calculate the presented data,
11              including the applicable business rules where appropriate;

12       (4)    the source(s) of the data;

13       (5)    any categories of information or groups of people excluded from the reported
                measure, or other limitations not otherwise apparent[1]; and
14

         (6)    any changes made to the metric since the last time the data was used or
15              presented in this case, where appropriate.

16       If Defendants use the same metric or metrics more than once to make

17   representations, they can reaffirm and rely on any earlier certification made by a person

18   _____

19   [1] This item includes limitations not obvious from the business rules or other
     methodological information.  For example, as identified in the Golding Report, and
20   confirmed by numerous witnesses during the evidentiary hearing, Defendants are well
     aware that many psychiatry appointments are never captured in EHRS in the first place.
21   *See, e.g.*, Oct. 15, 2019 Tr., ECF No. 6377 at 146:21-147:12, 149:3-13; Kuich Dep. 44:20-
     45:12, 142:3-24, 253:16-254:6, Sept. 19, 2019; PL-100, Dr. Michael Golding
22   Whistleblower CDCR Mental Health System Report at 140 (Oct. 3, 2018).  Consequently,
     metrics purporting to convey information related to the number or timing of psychiatry
23   appointments—including some of those provided by Defendants in support of their 2018
     Staffing Proposal—have significant known limitations that would not otherwise be
24   apparent from any description of the metrics' methodology or business rules.  *See. e.g*, PL-
     210, May 17, 2018 CDCR Psychiatry Staffing Proposal at 4 n.5, 30-31.  It also is not
25   apparent from the testimony that any description of the EOP Timely Psychiatry Contacts
     methodology or business rule would have made clear that EOP class members housed in
26   overflow units and/or not currently taking medications were excluded from that metric, or
     that brief non-confidential cell-front contacts with psychiatrists were included.  Defendants
27   should be required to disclose affirmatively those and any similar known limitations.

28

[3456115.10]  PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1    most knowledgeable (after confirming it is still accurate), to the extent any of the six items

2    have not changed since that earlier certification.  If Defendants have made any changes

3    since the last presentation of the data point, the certifier should be required to identify

4    those changes clearly and specifically.

5        To the extent Defendants contend that this certification requirement would be too

6    burdensome, Plaintiffs propose that for regularly produced metrics and data—like

7    Defendants' monthly data reports, inpatient waitlist and census reports, psychiatry vacancy

8    report, bed utilization report, and dashboard and performance report metrics—Defendants

9    complete one baseline certification addressing each of the six items above for every

10   reported metric.  After that, Defendants need attest only to the fundamental accuracy of the

11   data and to any changes made that would be necessary to ensure full transparency.  For ad

12   hoc reports or other reports not regularly produced, however, all steps of the certification

13   should be completed.  This process would ensure not only that Defendants had carefully

14   considered any data-based representations they are making, but also that the Court, Special

15   Master, and Plaintiffs would have the information necessary to understand fully exactly

16   what Defendants are presenting at all times.

17       Typically, a psychiatrist familiar with the data would be the appropriate individual

18   to sponsor psychiatry-related measures.  The certifying individual would not necessarily

19   have to be the chief psychiatrist, but that individual would have to have the ability to

20   understand the data, policy requirements and interactions, and applicable court orders.

21   Only a person with that comprehensive a view of the case, and many times a particular

22   scope of practice, would have the knowledge and understanding necessary to certify the

23   data at this first level.

24   **B.    Defense Counsel Have an Independent Duty Under Federal Rule of Civil
       Procedure 11, the Rules of Professional Conduct, this Court's Local
25     Rules, and Other Provisions of State Law to Ensure Representations to
       the Court Are Accurate.**

26

27       The second step in Plaintiffs' proposed certification process would apply to defense

28   counsel—from CDCR's Office of Legal Affairs, the California Attorney General's Office,

PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1  and DSH's counsel—who have special duties as officers of the Court.  In particular, as

2  noted by this Court's oral findings at the conclusion of the evidentiary hearing, Federal

3  Rule of Civil Procedure 11(b) requires that when an attorney provides a document or filing

4  to a court that relies on evidence or factual contentions, the attorney must certify to the

5  best of his or her knowledge, information, and belief, and based upon a reasonable inquiry,

6  that the factual contentions have evidentiary support.  *See* Oct. 23, 2019 Tr., ECF No. 6380

7  at 464-65; *see also* Order, ECF No. 6096 at 7 (Feb. 20, 2019) (referencing Defense

8  counsel's Rule 11 obligations).  Rule 11(b), therefore, requires any attorney sponsoring

9  data presented to the Court to have an understanding of what the data means before they

10 present the bare data or make representations based on that data.  As explained more fully

11 below, Defense counsel's Rule 11 obligations extend to documents presented to the

12 Special Master, as the Court's representative in this remedial monitoring system.[2]

13        Attorneys are also bound by professional and ethical rules that prevent the

14 presentation of misleading information to the Court, the Special Master, and Plaintiffs.

15 Attorneys owe a duty of candor to the courts and third parties as embodied in Rules 3.3

16 and 4.1 of the California Rules of Professional Conduct, which prohibit attorneys from

17 knowingly making, or failing to correct, false statements to a court or any third party.  Cal.

18

19 [2] In testimony to this Court, former Deputy Director Katherine Tebrock expressed the view
   that only data "submitted" directly to the Court needed correction, presumably because she
20 believed only court filings are subject to Rule 11.  Oct. 15, 2019 Tr., ECF No. 6377 at
   126:6-19.  But Rule 11(b) is not so narrow, and given the formal role the Special Master
21 performs as the Court's agent pursuant to Federal Rule of Civil Procedure 53 and the
   Order of Reference, Dkt. No. 640 (Dec. 11, 1995), there is no basis for limiting Rule 11(b)
22 in such a manner.  Nor have Defendants presented any support for their position in this
   respect.  And regardless, the Rules of Professional Conduct and Local Rule 180(e) clearly
23 do not limit counsel's obligations to only representations made directly to the Court in
   pleadings.  Indeed, if Defendants are correct that their obligations to provide transparent
24 and accurate data extend only to this Court directly, and not to the Special Master, the
   appropriate remedy would be for this Court to require all data Defendants provide to the
25 Special Master—including, for instance, the monthly data, EOP ASU hub reports, any
   future CQI data or reports, and pre-tour monitoring productions—to be filed directly with
26 the Court, not to force the Special Master (and Plaintiffs) to operate in a world in which
   they cannot be assured the data Defendants are presenting is accurate, transparent, and
27 trustworthy.

28

[3456115.10]      PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1  R. Prof. Conduct 3.3(a)(1), (3); 4.1.  And Rule 8.4 defines professional misconduct to

2  include engaging in conduct that involves "reckless or intentional misrepresentation" or

3  "that is prejudicial to the administration of justice."  Cal. R. Prof. Conduct 8.4(c), (d).

4  Rule 180(e) of the Local Rules of the Eastern District of California incorporates the

5  California Rules of Professional Conduct and further prohibits "attorneys admitted to

6  practice before th[e] Court" from "enag[ing] in any conduct that degrades or impugns the

7  integrity of the Court or in any manner interferes with the administration of justice."  *See*

8  *also* Cal. Bus. & Prof. Code §§ 6103, 6106 (authorizing State Bar to discipline attorneys

9  who violate the rules of conduct, including by engaging in acts of dishonesty).  These

10  duties bind the attorneys in this action to conduct reasonable inquiries into the information

11  they present to the Court, Special Master, and Plaintiffs to ensure they understand and can

12  vouch for their clients' data and reporting presentations before it is submitted (and to

13  correct false or misleading data once it is identified), and provide a further basis to impose

14  the second-level certification requirement given the breakdowns that have occurred in this

15  case to date.

16      Defense counsel have already shown they are capable of understanding and

17  explaining the basis of data provided to this Court.  In their October 10, 2019 filing

18  addressing changes made to their data reporting methodology regarding the ASU EOP hub

19  certification process (and attempting to correct their prior misrepresentations submitted to

20  the Court contending that the data in question was unaffected), Defendants included a

21  letter to the Special Master with a narrative description from Defense counsel transparently

22  explaining the methodological change and related limitations of their data.  *See* Defs'

23  Resp. to Paragraph 5 of Court's Sept. 17, 2019 Order, ECF No. 6330, Ex. A (Oct. 10,

24  2019).  That narrative description was sufficient to satisfy Rule 11 and could be used as a

25  model in the future of the type of information Defense counsel should provide to this Court

26  and the Special Master to confirm that they have appropriately investigated data prepared

27  by their clients to ensure its accuracy and transparency.

28      Notably, that same filing admitted that Defense counsel had not fully vetted their

[3456115.10]    PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1    prior statements to this Court, and promised remedial action. *Id.* at 2, 9 (apologizing for

2    prior misrepresentations and conceding the need to "tak[e] remedial steps, including

3    reaffirming with counsel and program staff the need to confirm the accuracy of all data,

4    particularly data reported to the Court, Special Master, or Plaintiffs or that is otherwise

5    used for patient care or compliance purposes"). Such an admission, coupled with the

6    findings at the evidentiary hearing, more than suffices to make clear the need for Defense

7    counsel's certifications separate and apart from those of their clients.

8          Defense counsel have an affirmative obligation to this Court to ensure they are

9    presenting data only when they have confirmed it is accurate and transparent. The recent

10    evidentiary proceeding, as well as Defense counsel's October 10, 2019 admission that they

11    had not appropriately vetted representations regarding their data practices in prior

12    pleadings, make clear additional remedial action is needed to confirm affirmatively

13    Defense counsel's compliance with their duties as officers of the court. Defense counsel

14    are now unquestionably on notice generally as to how their Rule 11 and professional

15    obligations apply in this case, as well as the dangers in failing to understand fully data

16    representations made by their clients. Going forward, this second certification step is

17    necessary as a fail-safe to ensure accurate and reliable reporting to the Court. Specifically,

18    Defense counsel should be required, like the certification already required by this Court's

19    November 6, 2017 Order based on a narrower set of transgressions, *see* Order, ECF No.

20    5726 at 9-10 (Nov. 6, 2017), to include in every pleading or data-sponsoring document a

21    paragraph explaining that they have performed a reasonable investigation into the data and

22    representations made in those documents, and confirming that the data and representations

23    are accurate.[3]

24    _____

[3] As Defendants have noted in the meet and confer process, Plaintiffs' counsel have the
25    same general set of obligations to the Court. For that reason, Plaintiffs routinely include
declarations explaining the methodology used in their data representations when filed with
26    the Court. *See. e.g.*, Decl. of Jenny S. Yelin ISO Plfs' Resp. to Defs' Supplement to Third
Status Report on Funding for 100 MHCBs, ECF No. 6251-1, ¶¶ 3, 5, 7 (Aug. 23, 2019);
27    Decl. of Krista Stone-Manista ISO Plfs' Br. Re: Obstacles to Timely MHCB Access, ECF
(footnote continued)

28

[3456115.10]    PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1

**C.**       **The Scope of the Required Certifications Must Include Documents Submitted to the Special Master and Plaintiffs During All Aspects of the Remedial Process Where Defendants Use the Data to Show Compliance.**

2

3       The two-step certification process described above should not apply only to Court

4 filings, but also to any and all data provided directly to the Court, to the Court through the

5 Special Master, and to Plaintiffs. Rule 11's plain text requires as much, in addition to the

6 Rules of Professional Conduct and this Court's Local Rules. *See* Fed. R. Civ. Pro. 11(b)

7 (applying to "pleading[s], written motion[s], or other paper[s]" provided to the court); *see*

8 *also* Cal. R. Prof. Conduct 3.3(a)(1), (3), 4.1, & 8.4; E.D. Cal. L. Rule 180(e).

9       As a preliminary matter, the Order of Reference defining the Special Master's

10 duties and empowering him to carry those duties out states that the Special Master must

11 "monitor defendants' implementation of and compliance with any remedial plan" and

12 "prepare and file with the court periodic reports assessing defendants' compliance with

13 such remedial plan," and may "make requests related to the performance of his duties,

14 including requests for the compilation or communication of oral or written information."

15 Order of Reference, ECF No. 640 at 4-6 (Dec. 11, 1995). To effectuate these duties as an

16 adjunct of the Court—which simply does not have the capacity to undertake these

17 activities on its own—the Special Master must be able to rely on accurate representations

18 of compliance from Defendants, which include accurate data-based representations. *See*

19 *Halderman v. Pennhurst State Sch. & Hosp.*, 612 F.2d 84, 111-12 (3d Cir. 1979), *rev'd on*

20 *other grounds*, 451 U.S. 1 (1981) (explaining that Rule 53 permits very broad authority to

---

21 No. 5678, ¶¶ 6-9 & Exs. A-E (Sept. 13, 2017); Decl. of Jessica Winter ISO Plfs' Suppl'l

22 Br. in Resp. to Court's Dec. 9, 2016 Order Re: Inpatient Access, ECF No. 5542-1, ¶¶ 12, 13, 23-25 (Jan. 13, 2017). In any event, the evidentiary hearing and record in this case

23 have revealed reasons this Court may rationally decide to impose a certification requirement upon Defense counsel only, namely that Plaintiffs' counsel have not been

24 shown to have sponsored materially misleading data representations to the Court. *See also* Three-Judge Court Order, ECF No. 4541, at 42 n.32 (Apr. 11, 2013) (noting concerns

25 regarding Defendants' compliance with Rule 11 obligations, and citing Order, ECF No. 4335 (Feb. 13, 2013)); Order, ECF No. 4539 at 9-22 (Apr. 5, 2013) (concluding counsel

26 for Defendants had violated California Rules of Professional Conduct). Nonetheless, Plaintiffs' counsel are happy to certify any data they present to the Court according to the

27 above process they request for Defense counsel, should this Court so desire.

28

7

[3456115.10]

1  be delegated to special masters and that such masters are authorized to act as necessary to

2  effectuate their court-designated roles).  In addition, the Court is empowered to require

3  Defendants to treat the Special Master as its adjunct, with the same duties flowing to the

4  Special Master that flow to the Court.  *Cf. Cobell v. Norton*, 213 F.R.D. 48, 53-57, 59-62

5  (D.D.C. 2003) (affirming Special Master's recommendation to issue sanctions under

6  Federal Rule of Civil Procedure 37 against governmental entities in light of their frivolous

7  privilege claims, among other assertions, to the Special Master; and reaffirming the

8  entities' professional responsibilities to the Special Master as an adjunct of the Court

9  authorized by the order of reference to undertake the resolution of discovery matters and to

10 exercise the authority necessary to carry out those duties); *see also* Three-Judge Court

11 Order, ECF No. 4541 at 42 n.32 (Apr. 11, 2013) ("Although it should go without mention,

12 it bears repeating that both the Receiver and Special Master are officers of the Court and

13 thus deserve the same deference that the parties would provide to this Court directly," and

14 citing *Brown v. Plata*, 563 U.S. 493 (2011) in support); Order, ECF No. 4335 at 2 (Feb.

15 13, 2013).  Accordingly, and consistent with Plaintiffs' requested remediation in pre-trial

16 filings and closing argument, the recent evidentiary hearing has shown that certification is

17 needed for all data Defendants use and rely on to convey their level of compliance with

18 their obligations to adequately treat class members, including data not currently filed with

19 the Court such as the monthly data, CQI data and reports, and pre-tour productions to the

20 Special Master, as well as data used to support Defendants' position in negotiations.  *See*

21 Jt. Status Report Following June 10, 2019 Status Conference, ECF No. 6226, at 33-34

22 (July 23, 2019); Oct. 22, 2019 Tr., ECF No. 6379 at 409:19-410:7.

23      A prime example of the need for the latter is Defendants' presentation of their

24 staffing proposal in the workgroups and the extensive negotiations between the parties,

25 overseen by the Special Master, regarding that proposal.  The import of this proposal

26 became clear during the evidentiary hearing, as it was premised in significant part on

27 misleading representations regarding the extent to which CDCR institutions relied on

28 psychiatry supervisors to perform line staff functions.  Defendants then provided, through

[3456115.10]

PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1    their counsel, multiple rounds of additional data to assuage Plaintiffs' concerns about their

2    proposal during the course of the negotiations.  Those misrepresentations formed the crux

3    of a proposal designed to close the psychiatry staffing chapter of this case.  The data

4    underlying the proposal, therefore, was critical to understanding whether the proposed

5    staffing remedy was appropriate.  In the future, Defendants and their counsel must

6    understand and accurately convey the meaning of their representations, even when those

7    representations are made in workgroups rather than Court filings.  Anything less will

8    permanently impair the workgroup process, which is central to the remediation of this

9    case.  *See* Order, ECF No. 5794 at 8 (Feb. 21, 2018) (identifying "the All-Parties

10    Workgroup and subgroups" as key to "the end of federal court oversight").

11        And although the evidentiary hearing largely focused on Defendants' performance

12    report data, the record makes clear that Defendants' other data and reporting practices have

13    also routinely lacked transparency as to what they were in fact measuring.  For instance,

14    Defendants changed their methodology for measuring MHCB transfer timelines in a

15    manner that conflicted with the Program Guide and overrepresented compliance, without

16    ever making that change clear to Plaintiffs or the Court.  *See* Pls' Opening Br. Re:

17    Obstacles to Timely Access to Mental Health Crisis Beds, ECF No. 5677 at 20-24 (Sept.

18    13, 2017); Winter Decl. ISO Pls' Opening Br. Re: Obstacles to Timely Access to MHCBs,

19    ECF No. 5679 at ¶¶ 8-9 & Exs. C-D.  Plaintiffs discovered the change many years after it

20    took effect, and at that point alerted the Court and Special Master, which resulted in an

21    order that was upheld on appeal barring Defendants from using the undisclosed (and

22    inappropriate) methodology.  *See* Pls' Reply to Defs' Br. on Obstacles to Full Compliance

23    with Program Guide Transfer Timelines for Crisis Beds, ECF No. 5686 at 13, 15-16 (Sept.

24    19, 2017); Order, ECF No. 5710 (Oct. 10, 2017); Mandate, Ninth Cir. Case No. 17-17328,

25    ECF No. 6094 (Feb. 14, 2019).  Additionally, this Court determined during the segregation

26    trial in 2013 that Defendants' segregation length of stay reporting was seriously misleading

27    in that it purported to represent a class members' total length of stay in segregation when

28    in fact the report reset that stay to zero every time, for example, a class member was

9

1  admitted to a crisis bed, moved cells within a segregated unit, or changed levels of care.

2  *See* PL-240, Reporter's Tr. at 2590-2643 (Dec. 4, 2013); Order, ECF No. 5131 at 56 n.39

3  (Apr. 10, 2014).

4        Indeed, a broader certification requirement is already in place as to the PSU and

5  EOP ASU hub certifications, which are not filed with the Court.[4]  Defendants are well

6  aware of this obligation. *See, e.g.*, Plfs' Resp. to Neutral Expert Report, ECF No. 6170 at

7  48.  Nevertheless, as revealed at the evidentiary hearing, Defendants apparently were not

8  fully aware of the meaning of this requirement or did not take it sufficiently seriously.

9        Many of the disputes in this case are resolved through procedures delegated to the

10  Special Master that do not directly involve the Court, and a substantial portion of the

11  remedial work undertaken by the Special Master includes monitoring tours that rely in

12  significant part on pre-tour data productions.  During the meet and confer process,

13  Defendants expressed concern that the certifications necessary for full transparency and

14  accuracy of data reporting, as outlined above, would be too burdensome and will cause

15  delay.  They also expressed concern that the certification process cannot be operationalized

16  on the fly during tours when the Special Master and his team ask for data updates.  But the

17  fact that the form of the certification requirements Plaintiffs request may vary somewhat in

18  different contexts is no reason not to require certification in the first instance.

19        For example, for a pre-tour production of data to the Special Master, the

20  headquarters official assigned to produce the information should certify that data as it is

21  provided.  This is not a substantial deviation from the existing pre-tour document request

22  from the Special Master, which includes a requirement for Defendants to provide the

23  methodology underlying any reporting or data they provide in response to his

24  documentation request, even if it is not clear from the testimony at the evidentiary hearing

---

25  [4] As noted in Plaintiffs' brief on remedies, Plaintiffs dispute the efficacy and
26  appropriateness of the EOP ASU self-certification process after the recent evidentiary
    hearing, and ask to revisit that failed remedy as part of the needed remediation. *See* Plfs'
27  Proposed Remedies Following Evid. Hearing, ECF No. 6374, at 15-16 (Oct. 30, 2019).

28

[3456115.10]

PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1  that Defendants took sufficient steps to make sure that requirement was accurately met.

2  *See* Joint Ex. C (Special Master's 27th Monitoring Round Document Request); Joint Ex. D

3  (sample methodology provided by Dr. Ceballos to the Special Master in response to 27th

4  Monitoring Round Document Request); Oct. 16, 2019 Tr., ECF No. 6378 at 275:8-277:9;

5  (admission by Dr. Ceballos that in January 2017, in response to the Special Master's 27th

6  Monitoring Round Request, she did not describe accurately the methodology for

7  calculating timely psychiatry contacts for any EOP units); *see also id.* at 305:16-306:7

8  (admission by Dr. Ceballos that she did not confirm the methodology used to report CQIT

9  data).  The data provided in these pre-tour productions is critical, as it is incorporated into

10  the Special Master's monitoring reports, the comprehensive works presented to the Court

11  and public regarding the functioning of CDCR's mental health services system.  Indeed,

12  the Special Master's reports are automatically adopted as the Court's own factual findings

13  when no party files any objections.  *See* Order of Reference, ECF No. 640 at 8.

14  Certification is therefore necessary at this level of data production, even if in a slightly less

15  formal form (e.g., not accompanied by a declaration under penalty of perjury) than what is

16  required for a court filing.

17       Another example of data that should be certified, but may be done so in a less

18  formal manner, is on-the-spot data provided by institution-level officials in response to the

19  Special Master's ad hoc requests during monitoring tours.  Because of the nature of the

20  inquiry and the necessarily short timeframe for response, Defendants may not be able to

21  prepare a written statement ahead of time explaining the data and methodology used to

22  generate it.  Instead, Defendants could make the sponsor of the data available to the

23  Special Master, with the understanding that that person could provide the necessary

24  information to substantiate the data if appropriate.

25       At the very least, if the parties disagree as to the particulars required for

26  certification in a specific context, they can meet and confer to work out that disagreement,

27  subject to Special Master's determination of what is appropriate.

28       The certifications proposed above should be included or made available with

11

PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1  respect to any data representation from Defendants intended to show their relative level of

2  constitutional compliance as to the provision of mental health care in Defendants'

3  institutions.

4       **D.    The Responsibility to Certify that Data Is Reliable and Presented**
         **Accurately Runs to DSH Defendants and Their Counsel as well.**
5

6       Contrary to Defendants' assertions, DSH Defendants and their attorneys should not

7  be excluded from the two-step certification process.  The DSH Defendants have been in

8  this case for many years, and they are represented before this Court by many of the same

9  attorneys in the Attorney General's Office.  The same need for accuracy and reliability

10  applies to data presented by DSH, as recent instances evidence.

11       For example, in filings related to inpatient transfer timelines, Plaintiffs objected that

12  DSH Defendants had unilaterally stripped from their monthly reporting two exhibits that

13  would provide a "day-to-day accounting of patient movement through the system" and

14  "trends over time [and] compliance with the Program Guide's 72-hour transfer

15  requirement for inpatient care."  Plfs' Resp. & Obj. to Defs' Proposed Reports for

16  Inpatient Mental Health Care, ECF No. 5582 at 3 (Marc. 23, 2017); *see also* Order, ECF

17  No. 5610 at 10 n.4 (Apr. 19, 2017) (noting Defendants' changed reporting practices and

18  stating that the information Defendants were still willing to provide "represents at best a

19  partial snapshot of information relevant to remediation of these matters and the additional

20  templates plaintiffs seek would appear to be most useful to defendants as an aid in

21  identification and targeted remediation of any ongoing non-compliance with Program

22  Guide timelines").

23       Similarly, counsel for DSH have in the past apparently been unaware of case-

24  related requirements.  *See* Order, ECF No. 5726 at 9 (Nov. 6, 2017) (noting two separate

25  filings where DSH failed to acknowledge or address applicable court orders).  On August

26  5, 2015, the Court issued an order targeted precisely at this problem, stating that DSH

27  "officials have not taken steps to familiarize themselves with the history of this litigation

28  concerning elimination of waitlists for access to inpatient mental health care."  Order, ECF

[3456115.10]

PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1  No. 5333 at 2 (Aug. 5, 2015).  The Court made clear that DSH Defendants have the

2  "responsibility to ensure that all individuals tasked with implementation of remedial plans

3  presented to and approved by the court are familiar and in compliance with those plans and

4  the court's orders thereon." *Id.*  Due to the DSH officials' lack of familiarity with

5  applicable remedial requirements, the Court held a status conference and ordered that the

6  "officials . . . be prepared to certify under oath that they ha[d] read" the applicable plans,

7  the Special Master's reporting on them, and court orders addressing those plans. *Id.* at 3-4;

8  *see* Tr., ECF No. 5342 at 3-10 (Aug. 20, 2015).

9         In addition, Rule 11 and the other ethical obligations discussed above apply equally

10  to the attorneys representing DSH Defendants.  If Defense counsel present DSH's data to

11  the Court or Special Master, as they routinely did during the 2018 workgroup negotiations

12  concerning DSH's proposed staffing plan, they must understand it and should be capable

13  of certifying their knowledge of that data.  Presumably, then, a representative from DSH

14  who has personal knowledge of the data would have to explain to an attorney what the data

15  means, how it is generated, and what it is intended to show.  Fundamentally, the dialogue

16  between DSH officials and the attorneys representing them should be the same in DSH and

17  CDCR with respect to data reporting.  To the extent Defense counsel has not in the past

18  been fully aware of the import and substance of data they reported to the Court on behalf

19  of DSH, the recent proceedings evidence precisely why this sort of certification is required

20  for data representations made by all Defendants.

21         This Court should make clear to DSH Defendants and their counsel that they have

22  the same duties of accurate reporting and full transparency as does CDCR and order that

23  they also adhere to the two-step verification process.

24  **II.    THE COURT SHOULD ORDER DEFENDANTS TO PREPARE A LIST OF
         KEY APPLICABLE COURT ORDERS IN THIS CASE, TO FACILITATE**

25  **CERTIFICATION AND UNDERSTANDING OF CASE OBLIGATIONS
         GOING FORWARD.**

26

27         Plaintiffs have proposed to Defendants a meet and confer process to develop a list

28  of key applicable orders in this case.  The Court has referred in the past to the need for

[3456115.10]

1    such a list, and has done so in the context of ordering the parties to certify in their briefs

2    the orders they have read in preparing those briefs.  *See* Order, ECF No. 5726 at 10 (Nov.

3    6, 2017).  Specifically, the Court explained:

> It should not have to be said: All parties to this action and their counsel must
> be fully familiar with the remedial plans and court orders in this case. To that
> end, going forward each brief filed by any party shall be accompanied by
> counsel's certification that they have read all court orders relevant to any
> issue addressed in such brief, including a list of those orders. The court
> suggests to the parties they may wish to develop a comprehensive agreed-
> upon list of controlling orders by subject area, for ease of reference in the
> required certifications.

9    *Id.*  At the time, the Court cited five separate instances in which Defendants had submitted

10    filings that failed to acknowledge or reference relevant and applicable Court orders in this

11    case.  *See id.* at 9-10.[5]

12        During its bench ruling following the recent evidentiary hearing, the Court once

13    again referenced the need for a comprehensive list of applicable court orders that govern

14    this case.  Oct. 23, 2019 Tr., ECF No. 6380 at 468.  Creating that list now would facilitate

15    a comprehensive and mutual understanding of case-related requirements going forward,

16    along with a functional certification system.

### CONCLUSION

18        For the foregoing reasons, and in light of the recent evidentiary proceedings,

19    Plaintiffs respectfully request that the Court order Defendants to adhere to the two-step

20    certification process described above, and that the parties meet and confer to develop a list

21    of key orders in this case.

### CERTIFICATION

23        In preparing this brief, Plaintiffs' counsel reviewed the following relevant orders

24    entered in this case: ECF No. 6365 (Oct. 23, 2019); ECF No. 6096 (Feb. 20, 2019); ECF

---

[5] In response to the Court's orders addressing one of these instances, DSH reported that it had developed "an internal tracking document outlining the [Court's remedial] orders and connecting them to particular [DSH] policies and procedures."  Decl. of George Maynard in Resp. to Aug. 15, 2015 & Aug. 21, 2015 Orders, ECF No. 5346, ¶ 3 (Aug. 21, 2015).

PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING

1  No. 5794 (Feb. 21, 2018); ECF No. 5726 (Nov. 6, 2017); ECF No. 5710 (Oct. 10, 2017);

2  ECF No. 5610 (Apr. 19, 2017); ECF No. 5333 (Aug. 5, 2015); ECF No. 5131 (Apr. 10,

3  2014); ECF No. 4541 (Apr. 11, 2013); ECF No. 4539 (Apr. 5, 2013); ECF No. 4335 (Feb.

4  13, 2013); Dkt. No. 640 (Dec. 11, 1995).

5

6  DATED:  November 5, 2019                Respectfully submitted,

7                                          ROSEN BIEN GALVAN & GRUNFELD LLP

8                                          By:  */s/ Jessica Winter*

9                                               Jessica Winter

10                                         Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[3456115.10]

PLAINTIFFS' CERTIFICATION PROPOSAL IN RESPONSE TO COURT'S OCTOBER 23, 2019 BENCH RULING