Xavier Becerra, State Bar No. 118517
Attorney General of California
Adriano Hrvatin, State Bar No. 220909
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Tyler V. Heath, State Bar No. 271478
Robert W. Henkels, State Bar No. 255410
Kyle A. Lewis, State Bar No. 201041
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

Roman M. Silberfeld, State Bar No. 62783
Glenn A. Danas, State Bar No. 270317
Robins Kaplan LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                    Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                    Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSALS FOR THE CERTIFICATION OF DATA**<br><br>Judge: The Hon. Kimberly J. Mueller |

**INTRODUCTION**

Plaintiffs have asked the Court to order Defendants to certify that all data filed with the Court, and all data reported and submitted to the Special Master and Plaintiffs, is accurate. On October 23, 2019, the Court ordered the parties to meet and confer, and to submit a statement outlining their respective proposals. (ECF Nos. 6365 & 6373.) The parties have not yet been able to identify and agree on a solution, however, and further work is required.

Defendants' goal, following the year-long investigation into Dr. Golding's allegations, is to ensure that the data and their reports based on data, are clearly and accurately presented to the

[3419376.1]   1

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

Court, the Special Master, and Plaintiffs. However, given the exceptionally large number of data points and the open questions regarding the methodology used to report data, Defendants urge the Court to provide the parties time to work with the Special Master to develop a certification system that will meaningfully address concerns regarding data accuracy and transparency. Plaintiffs' proposals do not allow the time and attention needed to achieve that goal.

I.   **THE SPECIAL MASTER AND HIS EXPERTS SHOULD OVERSEE THE PREPARATION OF ANY SELF-CERTIFICATION PROCESS, WITH INPUT FROM THE PARTIES AND FROM THOSE RESPONSIBLE FOR DEFENDANTS' DATA MANAGEMENT SYSTEMS.**

Defendants share the Court's concerns regarding data accuracy and transparency, and are committed to ensuring that the data is accurate, and that all stakeholders can understand it, use it, and feel confident relying on it. At the same time, every month, Defendants provide thousands of data points to the Court, the Special Master, and to Plaintiffs, and those data points cover a broad range of subjects for which there are numerous subject matter experts, numerous sources, and numerous methodologies used to generate the reports. An overbroad, poorly conceived, and premature rule requiring a one-size-fits-all certification threatens to impose unduly burdensome requirements on the statewide mental health delivery system, and all but guarantees that the parties, the Court, and the Special Master will need to revisit certification in the future to correct unintended consequences that could have been avoided if a more thoughtful process were followed from the beginning. Counsel in this case—both for Defendants and for Plaintiffs—are ill equipped to resolve these problems without the guidance and assistance of the Special Master.

The Court has already referred several data-related concerns to the Special Master and his team. (*See* ECF Nos. 6187 & 6242.) Defendants request that the creation of any self-certification process be similarly referred. While Defendants agree in principle with many of Plaintiffs' suggestions for self-certification, finding workable solutions that resolve their concerns, satisfy legal obligations, and help Defendants provide necessary mental health care will take time, effort, and sufficient input from the Special Master, who has not been party to these discussions to date. Also, as the Court is aware, the parties are involved in ongoing efforts to manage and collaborate data collection and reporting requirements across CDCR's various healthcare obligations. The other stakeholders involved with that data, including the *Plata* Receiver, may also be able to

[3419376.1]    2

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

provide insight and assistance with the creation of a functioning and successful certification process for the mental healthcare system. Defendants are eager to work with Plaintiffs, under the guidance of the Special Master, to identify solutions that will satisfy Plaintiffs' concerns.

## II. DEFENDANTS AGREE IN PRINCIPLE WITH MANY OF PLAINTIFFS' SUGGESTIONS, BUT ANY SELF-CERTIFICATION PROGRAM MUST BE TAILORED TO ACCOMMODATE VARIOUS CIRCUMSTANCES.

Plaintiffs demand that Defendants certify every data point submitted in this action, whether to the Court, the Special Master, or Plaintiffs, and that each data point include a certification that the data is accurate based on a two-step process that would include a certification by a person most knowledgeable about the data and a second Federal Rule of Civil Procedure 11-type certification by counsel that the data submitted is also accurate.

Specifically, Plaintiffs ask that, for each submission of data to the Court, the Special Master, or Plaintiffs, a person most knowledgeable "identify affirmatively: (1) what the presented data purports to show; (2) how the data is related or responsive to court orders and/or the Program Guide; (3) the methodology, in detail, used to prepare and calculate the presented data, including the applicable business rules where appropriate; (4) the source(s) of the data; (5) any categories of information or groups of people excluded from the reported measure, or any other limitations not otherwise apparent; and (6) any changes made to the metric since the last time the data was used or presented in the case, where appropriate." Plaintiffs then want an attorney from CDCR's Office of Legal Affairs or the Office of the Attorney General to certify under Rule 11 that the data is accurate.

Defendants agree in principle to a certification process for Court-ordered data where a person who is most knowledgeable explains and certifies what the presented data purports to show, the methodology used, the source of the data, and that the data provided accurately reflects the data stored in Defendants' data management systems. CDCR already proposed doing as much in the July 23, 2019 joint status report. (ECF No. 6226 at 33-34.) Defendants committed to taking all reasonable steps to make sure that all data submitted to the Court is accurate and agreed that for all performance-report data referenced in Court filings, a person most knowledgeable will certify that the source of the data, the methodology used to calculate the data,

[3419376.1]    3

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

and the reference to the data is an accurate representation of the underlying reported data. Defendants also committed to provide the methodology and take all reasonable steps to answer any questions the Special Master and Plaintiffs have about the data or methodology.

But Defendants do not agree that data accuracy requires a showing of how the reported data is related to Court orders or the Program Guide, or that Defendants should include with each report or data point an explanation for "any categories of information or groups of people excluded from the reported measure, or any other limitations not otherwise apparent." Defendants asked Plaintiffs in the meet-and-confer process to explain how such a metric would inform data accuracy and Plaintiffs were either unable or unwilling to provide that information. Further, an explanation of the methodology used to calculate the data in question would necessarily include what information was included in the data pull, which should provide enough information so that it is clear what data is being calculated and how.

Defendants already identify the orders and sections of the Program Guide under which information is reported to the Court, and Defendants have already agreed to "meet and confer under the guidance of the Special Master to discuss discrepancies in policy and data collection methodology," as well as to provide an explanation of "Defendants' processes for analyzing change requests to their compliance tracking systems." (ECF No. 6226 at 29-30.) While it is important for the parties to know and understand the remedial orders in this case, requiring a person who will often times not be an attorney to identify the relevance of data to any number of Court orders is not an appropriate requirement for those who are not legal counsel, and it is likely to cause unnecessary delays in producing data. This part of Plaintiffs' proposal would be especially problematic for data requests made during monitoring tours, when CDCR office technicians are tasked with pulling data on a moment's notice without opportunity to make any affirmative statements regarding data accuracy, and certainly without opportunity to create a personal certification as to the accuracy of a response to an ad hoc data request.

Furthermore, the certification requirements should be tailored to the various different reports and types of data production. The context of a data production or report, the nature of the data reported, and the complexity of particular reports should be considered in developing

[3419376.1]   4

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

certification requirements. And during the parties' meet-and-confer efforts, Plaintiffs appeared to agree that any workable certification process would necessarily vary depending on the context and type of report.

### A. Defendants' Reports.

Defendants produce voluminous amounts of data each month to the Special Master and Plaintiffs, but only file a small portion of the data with the Court. And the majority of the data and reports submitted to the Court, the Special Master, and Plaintiffs each month was not the subject of the neutral expert's investigation or implicated by Dr. Golding's allegations. Also, much of the data submitted directly to the Special Master is simply raw data, such as patient-level information, or the number of beds filled at a given institution. The nature of the data and the reports submitting data must be considered in developing an appropriate certification process for the various types of data and reporting. The one-size-fits-all proposal provided by Plaintiffs does not take into account the variety of reports, the intricacies of each of the reports, and the types of data they contain.

Defendants each month file nine separate standardized reports with the Court. An additional report is filed each month in the Three Judge Court proceedings, which includes the *Coleman* case. The certification process must be tailored to account for the presentation of data for each of the following nine separate standardized reports with the Court:

1. Department of State Hospitals (DSH) *Coleman* Patient Census and Waitlist Report;
2. CDCR Psychiatric Inpatient Programs *Coleman* Patient Census and Waitlist Report;
3. CDCR Mental Health Crisis Bed Patient Census and Waitlist Report;
4. Defendants' Psychiatric Inpatient Programs Census Report;
5. CDCR's Psychiatric Inpatient Timelines Compliance Report;
6. DSH's Psychiatric Inpatient Timelines Compliance Report;
7. CDCR Monthly Bed Utilization Report;
8. DSH Monthly Bed Utilization Report; and

[3419376.1]    5

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

        9.      Psychiatry allocation and vacancy reports.

Each month, Defendants also submit the following thirty-three standardized reports to the Special Master and Plaintiffs:[1]

    1.    Report to the Special Master on inpatient referral rejections and rescissions;

    2.    ASU EOP Hub Certification Reports;

    3.    PSU Certification Reports; and

    4.    Monthly Report submitted to the Special Master, which includes:

        a. Mental Health Executive Summary;

        b. Mental Institution Vacancy by Classification;

        c. Mental Institution Vacancies Summary by Classification;

        d. Mental Health Month to Month Registry Usage;

        e. Mental Health Six-Month Vacancy Summary;

        f. Mental Health Program Institution Vacancies-Summary by Classification;

        g. Statewide Mental Health Program Compliance Summary Report;

        h. Enhanced Outpatient Administrative Segregation Unit (EOP ASU) Case Manager Positions and Vacancies;

        i. Mental Health Hiring Progress Report;

        j. Mental Health Statewide Hire Tracking Summary -- Clinical Positions Only;

        k. Mental Health Telepsych Allocated and Filled Positions Report;

        l. Psychiatric Inpatient Program Staffing Data;

        m. DSH Staffing Data and CDCR Staffing Report;

        n. Reception Center Mental Health Screening Report;

        o. Reception Center Transfer Timelines Report;

        p. Continuous Length of Stay Counts for Mental Health Services Delivery Systems Patients in ASU, SHU, and PSU;

        q. EOP Inmates Waiting Transfers to PSU;

---

[1] Defendants also produce other reports to the Special Master and Plaintiffs on a regular basis, such as the Program Access Data Report.

[3419376.1]        6

    r. EOP ASU Hub Trends;

    s. Health Care Placement Oversight Program (HCPOP) Information Report, Summary of Mental Health Population by Institution and Level of Care (H-1);

    t. MHSDS Management Information Summary (MIS);

    u. Weekly EOP/Outpatient Psychiatric Program Report, Population and Census Reports;

    v. MHCB Referrals report;

    w. MHCB Stays report;

    x. MHCB Wait List;

    y. Mental Health Crisis Bed Reports;

    z. DSH Referrals for Transfer to Inpatient Programs Report;

    aa. DSH Monthly Report of CDCR Patients in DSH Hospitals, Summary of PC 2684s Report;

    bb. Milestone Credits Report;

    cc. Work Assignments Report; and

    dd. Out of Level Housing Report.

These thirty-three reports are not filed with the Court. Whether and to what extent each report requires a separate certification should be determined with the Special Master's assistance. And to the extent a certification is required, it should be tailored for the specific report it certifies.

  In addition to their standard monthly reports, Defendants provide data every month to the Special Master and Plaintiffs on an ad hoc basis. Ad hoc reporting is also used to respond to the Court's inquiries. The nature of the data reported on an ad hoc basis depends on the context, but Defendants have historically provided the Special Master with whatever data he requests as required under the Order of Reference. (ECF No. 640 at 5-6.) The order provides the Special Master with powers to "interview . . . staff, employees, and appointees of the [CDCR]" and "[t]o have unlimited access to the records, files, and papers maintained by defendants . . . includ[ing] all departmental, institutional, and inmate records, including but not limited to, central files, medical records, and mental health records." (*Id*.) To timely comply with such requests that

[3419376.1]   7

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

occur in the field, Defendants necessarily must forego a formal certification or validation process as envisioned by Plaintiffs. Defendants also work on a regular basis to respond to Plaintiffs' requests for data during workgroups and in advocacy letters. As with the monthly submittals that are not filed with the Court, whether and to what extent each of these reports or transmittals of data requires a separate certification should be reviewed with the Special Master, and a data validation or data accuracy process must be tailored to account for specific ad hoc reports and data requests, which include:

1. Data used to respond to Court inquiries;
2. Responses to the Special Master's requests for real-time data during monitoring tours;
3. Responses to Plaintiffs' requests for system-wide and institution data and patient-level data;
4. Data provided to the Special Master's experts (e.g., data provided to Employstats and Lindsay Hayes); and
5. Data provided during all parties' workgroups.

The Court should allow for the development of a thoughtful and comprehensive certification process and look forward to working with Plaintiffs and the Special Master to develop such a process.

**III. DSH'S DATA REPORTING WAS NOT IMPLICATED BY DR. GOLDING'S ALLEGATIONS, NOR IS THERE ANY EVIDENCE THAT DSH HAS SUBMITTED MISLEADING DATA.**

While DSH stands behind its submissions and is committed to providing accurate and transparent data, it was not clear from the proceedings surrounding Dr. Golding's allegations that DSH would be required to propose and commit to a specific certification process for the data it submits to the Court, the Special Master, or Plaintiffs. Dr. Golding's allegations did not call into question any data or information submitted by DSH to the Court, Special Master, and Plaintiffs. DSH was also not an active participant in any of the proceedings regarding Dr. Golding's allegations, including, but not limited to, the neutral expert's investigation and the Court's evidentiary hearing. And the neutral expert made no findings and no evidence was presented

[3419376.1]    8

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

during the evidentiary hearing that DSH data was presented in a misleading manner. Nonetheless, on October 29, 2019, Plaintiffs communicated, for the first time, that their proposal includes a requirement that DSH also certify every piece of data it submits in this action.

Defendants' July 23, 2019 certification proposal and response to Plaintiffs' proposal was limited to certifying CDCR's data. (ECF No. 6226 at 32-35.) The same was true for Defendants' assertion in their August 29, 2019 response that "CDCR was still committed to its July 23, 2019 certification process." (ECF No. 6257 at 12.) Although Plaintiffs did not explicitly exclude DSH from their certification proposal, their proposal always strongly implied that it was limited to CDCR. Plaintiffs' proposal focused on the Administrative Segregation Unit Enhanced Outpatient Program and Psychiatric Services Unit hub certifications and a requirement that CDCR's Chief Psychiatrist certify any data regarding psychiatry. (ECF No. 6226 at 32-33, 34-35.)

Plaintiffs first provided notice that they wanted a certification process for DSH during the October 28, 2019 meet-and-confer process following the conclusion of the October 15 and 16, 2019 evidentiary hearing. This only provided DSH two days to consider Plaintiffs' vague and then still unwritten proposal. The two-days' notice, or the seven provided by the Court's minute order, did not give DSH sufficient time to develop an appropriate certification process for all of its mandatory reporting to the Court and other data reported to the Special Master on a monthly or ad hoc basis. Defendants requested additional time for DSH to consider the certification proposals in the context of their reporting, but Plaintiffs refused to allow DSH that time or stipulate to an extension beyond today's November 5, 2019 filing deadline.

DSH does not object to providing some level of certification of the information provided in its monthly reports. But as a party not involved in the litigation concerning Dr. Golding's allegations, which only concerned CDCR, DSH should not be required to develop a certification process at the eleventh hour and without sufficient time to consider what an appropriate certification process should entail beyond what it already provides for its monthly reports, data productions, and responses to ad hoc requests for data.[2]

---

[2] Likewise, data contained in the Health Care Placement Oversight Program (HCPOP) Information Report produced monthly to the Special Master by California Correctional Health

[3419376.1]                                                9

### IV. PLAINTIFFS' PROPOSAL FAILS TO TAKE INTO ACCOUNT SAFEGUARDS AND VARIABLES RELATED TO DEFENDANTS' DATA REPORTING.

Plaintiffs first proposed self-certification in their May 2019 response to the neutral expert's report. (ECF No. 6170.) But Plaintiffs never presented Defendants with a written proposal detailing or even outlining the elements of the proposal they now urge the Court to adopt. During the meet-and-confer process, it became clear to Defendants that Plaintiffs had not considered all of the ramifications of their proposed certification process. For example, how will data not submitted through counsel be certified and how will on-demand reports requested during monitoring at local institutions be certified? Also, although Plaintiffs claim that self-certification is required to establish trust, they have not accounted for existing data validation processes. Defendants urge the Court to consider a more thoughtful approach to the development of enhanced data certification and that the Special Master and his team guide the discussion.

As Plaintiffs are aware, CCHCS has a multi-layered data-validation process for the Electronic Health Record System (EHRS) and its Dashboard. (Ct.'s Tr. at 357:21 358:4, Oct. 16, 2019; *Plata* ECF No. 3008 at 21.) The EHRS data reported in *Coleman* is also subject to that data-validation process. In addition to the EHRS data, data filed with the Court as part of the monthly inpatient reports and CDCR's Bed Utilization Report are subject to a multi-layered data-validation process by the Health Care Placement Oversight Program (HCPOP), which is under CCHCS. That process should also be included as part of the larger discussion on data and reporting accuracy.

Defendants do not yet know what level of validation the Special Master and Plaintiffs will propose to restore trust in CDCR's data. If Plaintiffs only want CDCR to certify that reported data is an accurate representation of the data entered into the various data sources gathered in the data warehouse, Defendants might be able to provide such a certification with little or no further discussion. But to the extent Plaintiffs believe more is required, the parties must have the opportunity to engage in more thorough discussions with the Special Master to develop an

---

Care Services was not called into question by Dr. Golding's allegations. Moreover, CCHCS staff already employ processes to validate the data in this report. The Court should assess whether HCPOP reporting should be included in a separate data certification process.

[3419376.1]   10

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

appropriate and reasonable process. Furthermore, as one means to ensure greater data accuracy going forward, the parties have proposed integrating CDCR's Mental Health Quality Management section into the CCHCS Health Care Quality Management section. This proposal is still being developed among the various stakeholders and has not been fully presented to the Court. CDCR cannot agree to a certification process now that may bind CCHCS staff in the future without thorough discussion among the *Plata* Receiver, his staff, the parties, and the Special Master.

### V. DEFENDANTS CANNOT CERTIFY INDIVIDUAL DATA ENTRIES AS ACCURATE.

CDCR and DSH employ thousands of staff who enter medical, mental health, and housing data that is reported in Defendants' monthly reports filed with the Court and submitted to the Special Master and Plaintiffs. CDCR and DSH work to train staff to enter information correctly and medical staff are under a duty to document accurately patient care in medical records. *See e.g.*, Cal. Bus. & Prof. Code § 2266 (the failure of a physician and surgeon to maintain adequate and accurate records relating to the provision of services to their patients constitutes unprofessional conduct). However, errors can and do occur, and no one person—or group of people—can know of or account for data entry errors in organizations as large as CDCR and DSH. (*See*, *e.g.*, D. Leidner Decl. ¶ 8, Nov. 20, 2018, ECF No. 6012-3 (CDCR maintains an extensive and complex data collection and reporting system, and its mental health performance reports are comprised of millions of data points entered by thousands of CDCR mental health professionals statewide).)

Any order requiring Defendants to certify that each entry in the medical record and each data point entered by staff concerning correctional and housing data would require the impossible. But what Defendants can do, as suggested above, is meet and confer with the Special Master and Plaintiffs concerning a reasonable certification that can be provided for each of the standard monthly reports that Defendants submit and attempt to reach an agreement on the parameters that would govern certification of ad hoc requests and monthly reporting.

//

//

[3419376.1]   11

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

## VI. DEFENDANTS CANNOT CERTIFY DATA THAT IS NOT VALIDATED BEFORE IT IS SUBMITTED TO THE SPECIAL MASTER.

The Special Master is entitled to request and receive data and information from Defendants on an ad hoc basis. (ECF No. 640 at 5-6.) Defendants routinely provide the Special Master team with data in the form of patient charts, program information, and other reports during the course of regular monitoring tours and during other institutional and headquarters monitoring. A requirement that all such data be certified as accurate before submission to the Special Master (and Plaintiffs for tours where they are invited to observe) would hamper Defendants' ability to meet the Special Master's on-the-spot demands.

Defendants are willing to meet and confer with the Special Master and Plaintiffs to develop a certification process that would allow Defendants to certify that the data in CDCR and DSH's patient files and in their systems accurately represents the data entered by staff. With respect to reports generated from such data, Defendants are likewise willing to work with the Special Master and Plaintiffs to develop a process for ad hoc reporting that would allow Defendants to certify that such reports accurately depict what they purport to depict, and that they accurately and completely represent the underlying data entered by staff.

## VII. PLAINTIFFS' PROPOSALS FOR COUNSELS' CERTIFICATION EXCEED RULE 11.

The second step of Plaintiffs' proposed two-step certification requires an attorney for Defendants to certify that the report meets the requirements of Federal Rule of Civil Procedure 11(b). According to Plaintiffs, this means that whenever counsel presents data to the Court or the Special Master, as the Court's representative, the attorney must certify that he or she understands what the data means and that the representations based on the data "actually line up with what the data means." While Defendants remain committed to providing accurate and transparent data, Plaintiffs' proposal improperly expands counsels' obligations under Rule 11 and effectively turns Defendants' counsel into testifying witnesses.

Rule 11(b), Federal Rules of Civil Procedure, states:
    (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the

[3419376.1]    12

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

> best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Rule 11 does not apply to reports and data transmitted to the Special Master and Plaintiffs through Defendants' counsel. *See Christian v. Mattel, Inc.,* 286 F.3d 1118, 1131 (9th Cir. 2002) (district court order vacated where court may have improperly considered extra-pleadings conduct as basis for Rule 11 sanctions, noting that "Rule 11 sanctions are limited to "paper[s]" signed in violation of the rule, and that conduct in depositions, discovery meetings of counsel, oral representations at hearings, and behavior in prior proceedings do not fall within the ambit of Rule 11); *Jackson v. Law Firm of O'Hara, Ruberg, Osborne & Taylor*, 875 F.2d 1224, 1229 (6th Cir. 1989) (Rule 11 "relates to papers filed in court by an attorney, not to questionable attorney conduct in general"); Wright, Miller & Kane, *Federal Practice and Procedure* 221 (1989 Supplement). Rather, Rule 11's focus is narrow, and relates to a specific act—the signing of a document to be filed with the court. *Christian,* 286 F.3d at 1131; *Jackson*, 875 F.2d at 1229. And it ensures that an attorney's signature on any such document constitutes its own certification, showing to the court that the attorney, by signing the pleading or other court paper, believes on the basis of reasonable inquiry that there is a reasonable basis in law and fact for the position taken, and that the paper is not filed for an improper purpose. *Id.*

[3419376.1]   13

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))

Defendants' counsel agree that Rule 11 applies with respect to every document they submit to this Court. And Defendants' counsel agree that their signature constitutes its own certification that, on the basis of a reasonable inquiry, there is a reasonable basis in law and fact for the position taken regarding each submission, and that the submission is not filed for an improper purpose. But Defendants are troubled by Plaintiffs' attempts to expand the scope and application of Rule 11. Defendants' counsel are not experts in data management, or in the mental health care industry, and can only rely on a reasonable inquiry with their clients when submitting data to this court. Defendants agree and acknowledge that existing law places considerable obligations on them with respect to every Court filing. Plaintiffs' efforts to expand those obligations are both unnecessary and unwarranted.

**CONCLUSION**

Defendants are committed to accurate and transparent data reporting and agree in principle with a certification requirement. But the development of a certification process for the numerous monthly reports, monthly data productions, and ad hoc data requests should not be thoughtlessly rushed to completion. To the contrary, the parties and the Special Master should carefully determine whether, and how best, to certify the various types of reports and data productions after considering the varying nature of the data reported, the complexity of the different reports, and the specific reporting context.

Dated November 5, 2019

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

/S/ ELISE OWENS THORN
Elise Owens Thorn
Deputy Attorney General
*Attorneys for Defendants*

[3419376.1]    14

Defs.' Resp. Pls.' Data Cert. Proposals (2:90-cv-00520 KJM-DB (PC))