XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
KYLE A. LEWIS, State Bar No. 201041
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
ROBERT W. HENKELS, State Bar No. 255410
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-73258
 Facsimile: (916) 324-5205f
 E-mail: Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Facsimile: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT

# FOR EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | Case No. 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DEFENDANTS' RESPONSE REGARDING PROPOSED REMEDIES FOLLOWING EVIDENTIARY HEARING** |
| v. | |
| **GAVIN NEWSOM, et al.,** | Judge: The Hon. Kimberly J. Mueller |
| Defendants. | |

## INTRODUCTION

Defendants are committed to furthering data accuracy and transparency, acknowledging their mistakes, and correcting the record wherever necessary in order to restore trust in their reporting of information on which the Court, the Special Master and Plaintiffs' counsel rely.

Defendants' proposed remedies, as set forth in both past filings and this brief, seek to rebuild trust by addressing past reporting errors and inconsistencies among the data processes and business rules of the California Department of Corrections and Rehabilitation (CDCR), promoting future reporting accuracy, and focusing on improving the Special Master and Plaintiffs' understanding of

CDCR's tracking and reporting systems. Defendants address as well Plaintiffs' brief on remedies and agree with their suggestions where appropriate. Defendants also point out those areas where the Plaintiffs' suggested remedies either do not achieve a beneficial purpose or unintentionally impede the delivery of mental health services to the patient population.

## REMEDIAL ACTIONS IDENTIFIED BY THE COURT

On October 23, 2019, the Court identified several topics it believed may be helpful in remediating some of the issues addressed during the Golding hearing, including:

1. A compendium of court orders
2. Enhanced training of Coleman specific requirements
3. A system with check and balances to catch errors
4. Correction of any filings that contain errors
5. Resumption of committee work within CDCR
6. Coordination between Mental Health Quality Management and CCHCS's Health Care Quality Management
7. Meaningful inclusion of Psychiatry in policy and decision making
8. Modification of the Electronic Health Record System (EHRS) to ensure data relevant to treatment is captured (directed to Special Master)
9. Clarification of psychiatric supervisor's role in direct patient care beyond 2009 staffing plan requirements
10. List of all committees (a request directed to Special Master)
11. Release note process
12. Better documentation of CDCR's webinars
13. Certification of filings
14. Coordination between Special Master and Receiver (this was directed to Special Master and Court)

Defendants are committed to taking action on these issues, and have begun do to so already. Indeed, as described below, Defendants have already taken concrete steps to implement the Court's recommendations, and are diligently working to create functional and durable solutions to

implement the remainder.

## I. DEFENDANTS' REMEDIAL PROPOSALS AND OTHER ACTIONS TO ADDRESS THE COURT'S STATEMENTS AND FINDINGS.

CDCR is eager to continue actions to further foster transparency in data operations and restore trust in its reporting. There are specific programs that CDCR would like to immediately restart to improve its data management and reporting. Mental health program reporting and its supporting methodologies will be transparent to not only the Court, the Special Master, and Plaintiffs, but also to all clinicians and mental health leadership.

### A. Remedial actions that CDCR has already taken regarding data and methodology issues.

Some of these actions have been previously reported to the Court in past filings, in open court or through the testimony of witnesses at the Golding hearing. They are listed here once again for the sake of completeness:

- **Re-start of the Mental Health Change Committee**

The draft policy and procedure was submitted to Dr. Diana Toche, Undersecretary, Health Care Services for review on November 7, 2019. Once the draft is finalized and approved, the Defendants will seek endorsement from the Special Master and next from the Plaintiffs. The committee will then begin meeting on a regular monthly basis.

- **Explaining the process for mental health staff's change requests for CDCR's data and reporting systems to Plaintiffs and the Special Master**

CDCR's Mental Health leadership team will be prepared to explain the process once the policy and procedure are approved.

- **Memo to the field regarding reporting confidential encounters appropriately**

A draft of this memorandum is routing internally within CDCR and to the Special Masters' team at CDCR headquarters and includes clarification about clinical encounters and confidentiality.

- **Changing the drop down box in EHRS regarding confidential/non-confidential contacts**

This item is on the November 18, 2019 agenda with the Clinical Leadership Advisory Committee

(CLAC). It is expected be ready to go live December 2, 2019 which is when the memo is expected to be distributed. A draft memo is routing internally and has not yet been presented formally to the Special Master and Plaintiffs, however it has been approved by headquarters monitors.

- **Memo regarding what constitutes a compliant psychiatry contact**

Part of the EHRS drop-down box project, this memo is about clinical encounters and ensuring confidentiality. CDCR plans to finalize and circulate a draft of this memo in November 2019.

- **Memo re-educating the field on the use of the Solution Center system**

A draft has been finalized and is in the process of being vetted internally prior to a review by the Special Master's team. Once the draft is finalized, it will be disseminated to the field.

- **Data Governance Meeting**

California Correctional Healthcare Services has developed a workgroup to discuss data governance policies. The purpose of the workgroup is to implement a data governance decision structure and to ensure the overall management of the availability, usability, reliability, integrity, and security of data. The members of this group will act as a governing body or steering committee, and will write a Charter outlining and defining the obligations and responsibilities of the committee. There have been three meetings thus far.

- **Process for review of performance report indicators to ensure methodologies, business rules, and definitions correspond with the data being gathered**

Defendants are committed to reviewing the indicators and their underlying methodologies and business rules with the Special Master and Plaintiffs.

- **Improved communication with the Special Master and his team**

The Deputy Director and headquarters mental health leadership team communicate regularly with the Coleman monitors and Coleman subject matter experts while at headquarters. Dr. Toche is also frequently in discussion with the Special Master and is organizing a formal process of communicating via scheduled calls with the Special Master to include an agenda for each call. The Deputy Director may periodically be invited on to these calls.

- **Greater Inclusion of Psychiatry in Decision Making**

Defendants are in the process of modifying their reporting structure to ensure that the chief

psychiatrist at each institution with Mental Health Crisis Beds (MHCB) reports to that institution's Chief Executive Officer (CEO) instead of Chief of Mental Health. Thus, for institutions with a chief psychiatrist, the chief psychiatrist will become a key member of the executive leadership team. Duty statements for the chief psychiatrist are being aligned with this new reporting structure to include new responsibilities as key members of the executive leadership team. Changes will also be made to the duty statements of the Chief of Mental Health with a crosswalk to the Program Guide to address this new reporting structure. Institutions without MHCB and which do not have a chief psychiatrist will have the highest ranking psychiatrist in the institution report to the CEO, even if a senior psychiatrist. If there are no seniors or chiefs at the institution, then the staff psychiatrist will report to the CEO. The Special Master endorsed this plan on November 4, 2019 and the Plaintiffs were informed of the impending changes during the Coleman Mission Change meeting on November 5, 2019.

Defendants also issued a policy memorandum requiring that both psychiatrists and primary clinicians to sign the treatment planning form following an Interdisciplinary Treatment Team meeting. This memo was issued on September 24, 2019, and an EHRS change occurred simultaneously to implement this process.

- **Initial Psychiatry Contact timeframes**

By November 30, 2019, Defendants will finalize a draft memorandum requiring an initial psychiatry evaluation for all mentally ill patients who newly arrive to a prison or mental health program. By performing a psychiatry evaluation shortly after their arrival, CDCR will ensure patients are seen promptly upon transfer.

- **Enhanced Outpatient Program (EOP) Patients Not on Meds**

A memo was issued to the field requiring that all EOP patients, not just those on medication, are seen by their psychiatrist at least once every 30 days.

**B.    CDCR'S additional proposed remedial actions.**

1. Proposed Integration of Mental Health Quality Management Data into California Correctional Healthcare System (CCHCS) Quality Management Data System.

Defendants propose merging CCHCS's and CDCR's Quality Management divisions in

order to provide transparency and trust in the data that forms the bases of CDCR's mental health reports. This is an important remedy to show that reports are accurate and generated from reliable data points.

CDCR will provide a greater explanation of how this will work, though the process is still being developed.

This has been the subject of coordination meetings among judges, the Plata Receiver and Special Master. Their discussions are continuing to ensure that Coleman requirements are met.

2. Review CDCR's current mental health data system with the Special Master and Plaintiffs.

CDCR will work with the Special Master to convene a workgroup to review the sources of all data, and the business rules and methodologies used to report the data.

This remedy will ensure that all stakeholders have the same base of knowledge of CDCR's data methodologies, and is the first step in restoring trust in CDCR's reporting. The workgroup will produce a master list of business rules and methodologies used to generate the various reports that are identified in Defendants' Data Certification Proposals.

3. Business Rule Change Management Committee and Business Rule Prioritization Committee.

CDCR is finalizing policies and procedures to restart its change management and rule prioritization committees.

Defendants will present policies that provide the functions of each committee to the Special Master and Plaintiffs followed by a discussion to confirm that they understand the value and purpose of the committees. The goal of this remedy is to restore trust in CDCR's reporting practices, and provide accountability for future business rule changes.

4. Proposed Steps for Defendants to Certify the Data Utilized in Reporting.

Defendants' certification proposals filed on November 5, 2019, ECF no. 6384, contains Defendants' best assessment to date of the remedial steps on this subject.

5. Improved integration and communication among CDCR mental health leadership and field staff.

Defendants want to promote greater interaction between staff involved in administrative and clinical functions and provide a greater cross-functional understanding of department goals and Coleman court ordered requirements. To accomplish this goal, CDCR will involve clinical leadership in operational matters, and rebuild relationships with the mental health program leadership, enhance executive training for mental health leadership, and ensure that clinical leadership is included in committee memberships in high-level headquarters meetings that occur monthly as well as the leadership flash meetings that occur three times a week.

6. <u>Continuing commitment to correct the record where needed.</u>

The Court has specifically required that any data mistakes (or misrepresentations) in the record are corrected.

To date, defendants have taken the following steps to correct the record. Errata were filed on October 1, 2019, to correct Defendants March 2017 filings, ECF Nos. 5591, 5591-2, and 5601. (ECF No. 6302.) That Errata also corrected an erroneous footnote about the desert institutions in a version of Defendants 2018 Staffing Proposal filed as an attachment at ECF Nos. 5841 and 5841-2. (*Id.*) Finally, by letter dated October 10, 2019, from Nicholas Weber, Defendants corrected five ASU EOP Hub and PSU certifications made to the Special Master between January and May 2017. (ECF No. 6330.)

## II. ANALYSIS OF PLAINTIFFS' PROPOSED REMEDIAL MEASURES.

### A. Plaintiffs' Proposed Remedial Actions With Which Defendants Agree.

*Plaintiffs' Proposal A*. Moving Mental Health Care Data From Mental Health Headquarters to CCHCS's Quality Management Section.

The Court should proceed with Defendants' solution of moving mental health data to the California Correctional Health Care System's (CCHCS) Quality Management Section. Defendants agree that Mental Health Quality Management Data should be integrated into the CCHCS Health Care Quality Management unit. The exact scope of the integration and the operational details thereof should be referred to the Special Master with directions to work with the parties and issue a report by December 2019.

*Plaintiffs' Proposal B*. Continued Central Monitoring of Mental Health Headquarters By The Special Master Team.

Defendants do not oppose continued monitoring at CDCR Headquarters by the Special Master's team. His team's monitoring has fostered greater interaction with the Special Master's team and promoted greater mutual understanding and the transparency that all parties seek.

*Plaintiffs' Proposal D*. Revisiting the ASU EOP Hub and PSU Certification Process.

The Court should refer the issue of discussing the Administrative Segregation Unit (ASU) EOP Hub certification process to the All-Parties report on the effectiveness of the negotiated ASU EOP hub certification process. The parties should meet, under the guidance of the Special Master, to discuss any misunderstandings about the process Plaintiffs may have. Defendants have submitted monthly certifications under the process developed and implemented in 2014 and 2015, and disagree that wholesale restructuring is necessary.

The ASU EOP hub certification process was borne out of this court's April 10, 2014, order to "forthwith provide to the court and the Special Master monthly reports on whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care." (ECF no. 5131 at 73.)

On August 1, 2014, following extensive meet and confer between the Defendants, the Special Master, and the Plaintiffs, Defendants filed their "Plans and Policies Submitted in Response to April 10, 2014, and May 13, 2014 Orders." (ECF no. 5190.) The parties agreed that before submitting any monthly report, Defendants would first conduct baseline assessments of each ASU EOP Hub via in-depth on site evaluations. That process began on July 29, 2014, when a team of regional administrators toured each hub monthly for at least two months using the Continuous Quality Improvement Tool to conduct the audit. (*Id*. at 18-19.)

After the baseline audit was completed, Defendants began issuing monthly certifications. The monthly certifications are completed by the Deputy Director (formerly Dr. Belavich, then Katherine Tebrock, and now Dr. Daye) by reviewing the completed institutional reports from each ASU EOP hub institution as well as by reviewing a snapshot of monthly data.

According to Plaintiffs' October 21, 2019, objection to Defendants' Response to Paragraph

5 of the court's September 17, 2019, order, Plaintiffs believe that CDCR must be ninety percent compliant with twenty-three indicators, including timely psychiatry contacts, in order to certify an ASU EOP Hub. (See ECF no. 6360 at 3, and Decl. of Cara Trapani In Support of Plaintiffs' Objection, ECF no. 6360-1 at 2, 11.) Plaintiffs attach an email from Nicholas Weber to the Special Master and Plaintiffs, dated July 29, 2014, providing a document, the ASU EOP Hub Certification Audit Instructions, that states that each ASU EOP hub "program must meet a threshold of 90% in each area" in order to certify. (*Id.* at 11.)

Defendants dispute this interpretation of the hub certification process and believe Plaintiffs' reliance on a document provided in advance of the baseline audits is misplaced. Defendants have openly discussed the current monthly certification process with the Plaintiffs and the Special Master – a process which has been consistent since late 2014. Defendants are willing to discuss the process with the Plaintiffs again, but plaintiffs have been well aware from policy meetings in 2015 and 2016 that the certification process was revised to require 90% compliance with only five of the performance report indicators.

Finally, with respect to the Psychiatric Services Unit (PSU) certification process, Defendants would note that the process is not court ordered. Defendants voluntarily began that process to align, in part, with the ASU EOP Hub certification process in 2017. Defendants are willing to discuss this process as part of the workgroup as well, but the court's April 10, 2014 order only required certification of the ASU EOP hubs, not the PSUs.

Defendants welcome the opportunity to make the certification process more transparent and trustworthy and defendants believe their proposals above regarding business rule review/validation and data management practices positively affect the Hub certification process.

### B. **Plaintiffs' Proposals that are Unworkable, Overbroad, or Not Responsive to a Court Finding or Identified Concern.**

*Plaintiffs' Proposal C.* Increasing Plaintiffs' and The Special Master's Access to Data And Improving Transparency of Defendants' Provision of Mental Health Care.

Defendants agree that Plaintiffs and the Special Master should understand what data is measured by Defendant's performance report system and how the data is generated. This proposed

1 remedy is addressed by Defendants commitment to meet and confer with the Plaintiffs and Special Master and to transfer control of CDCR's mental health Quality Management division to CCHCS. Accordingly, the Court should formally order the parties to engage in a process to improve transparency and increase Plaintiffs' and the Special Master's access to data including the requirement to merge CDCR and CCHS's Quality Management divisions.

To the extent that Plaintiffs request access to the performance report mental health data systems, Defendants believe that such an expansion is untimely because it should necessarily follow the merger of CDCR and CCHCS's Quality Management divisions. Post-merger, the system will be under CCHCS's control, and Defendants would defer to CCHCS to determine the best way to provide transparent and meaningful data to the Plaintiffs.

Defendants oppose Plaintiffs' request to conduct more direct monitoring of Defendants compliance with the court's orders. As the court has previously stated, the Plaintiffs should file formal motion to make such a request. In either event, such monitoring is inconsistent with the direction this court has taken – that is it is the duty of the Special Master to assess compliance. If there are areas the Court believes require monitoring, the solution is not to add a separate set of monitors, but to use the ones the Court already has appointed for that purpose. Should the Court require additional items to be monitored, the Court should order its Special Master to monitor and report back timely on his findings and recommendations.

The Special Master has the power to access and review CDCR's data and information and to observe and report on EHRS workflows and how staff interacts with data systems. CDCR will cooperate with any request by the Special Master to monitor workflows and staff interaction with the EHRS. In addition, CDCR has already granted the Special Master access to their performance report system for monitoring purposes. The Special Master is invited to monitor the system and has been invited to monitor it since he was provided access to the system years ago.

In addition, access to monitoring tours has always been the responsibility of the Special Master. Plaintiffs' request to attend more tours should be directed to the Special Master and any approval to expand Plaintiffs' observations of the Special Master's work, as has occured in the past, should be discussed with Defendants after they have an opportunity to provide input. But this

DEFENDANTS' RESPONSE REGARDING
PROPOSED REMEDIES FOLLOWING
EVIDENTIARY HEARING

proposed remedy goes beyond what is contemplated by the court to address data integrity. Access to more tours goes far beyond curing data analytics issues.

Plaintiffs also request a list of all class members by level of care and location each month. Defendants provide roster data to plaintiffs anytime they request it, but this marks the first instance that Plaintiffs have requested such an expansive list.

Additionally, Plaintiffs request for access to CDCR's custody data systems are not reasonably related to the court's identified remedial areas. Plaintiffs' counsel seek access to custody data systems that are not implicated by the Golding report. These custody data systems, ERMS and SOMS, involve the security and safety of inmates and the institution as they contain sensitive bed movement and location information. For these reasons, and a host of others, Defendants object to such access for the following practical, policy and legal reasons.

SOMS and ERMS are the heart of CDCR's inmate tracking and security system. Access to SOMS or ERMS provides not just the institution where the inmate is housed, but the housing unit, cell number, and bed number. SOMS and ERMS provide detailed inmate movement data, including daily schedules of each inmate, appointments, and work assignments. Defendants have serious concerns about the disclosure of this type of security data on this magnitude to Plaintiffs' counsel. SOMS and ERMS access also has the potential to provide the user with access to confidential inmate information, including lists of enemies or potential enemies, and known associates and security threat groups within CDCR. Some of the data available in SOMS or ERMS includes comprehensive risk assessments, information on sex crimes, names of victims, court documents, probation reports, and third party names or addresses. Misuse of this information, even inadvertently, can lead to harm, or even death, to staff and other inmates.

Additionally, the system is far more complex that an electronic medical record viewed as an auditor. SOMS is a live system with many functions that requires technical expertise to understand and navigate. SOMS access is restricted. In the rare case that non-CDCR employees have access, they are also state employees or contractors who access it for legitimate security reasons. Finally, the information contained in SOMS and ERMS goes far beyond that needed for Coleman. Users of SOMS and ERMS could access inmate information on non-class members.

*Plaintiffs' Proposal E.* Posting Notice of The Court's Remedial Order And Requiring Training to Ensure Defendants And Their Counsel Are Aware of Their Remedial Obligations.

Defendants agree that they ought to be aware of the court's orders, generally, however, the scope of Plaintiffs' particular proposal is unclear. Defendants are aware of their remedial obligations, and do not require training concerning it. As part of its proposed review of all business rules, field staff will be further trained regarding the rules and any future changes.

**OTHER MATTER AND FINAL OBSERVATIONS**

Plaintiffs' Section III, "The Court Should Refer Additional Issues to The Workgroup."

Plaintiffs' are concerned by (1) evidence in the Neutral Expert Report that CDCR excludes from compliance metrics all data points relating to EOP patients in "overflow" housing, and (2) evidence from Dr. Golding's Report that CDCR measures compliance with its Medication Administration Process Improvement Program ("MAPIP") in misleading ways that have yet to be corrected.

Defendants have stated they are "open and willing to address the issues raised in Plaintiffs' July 3, 2019 letter with Plaintiffs, the Special Master, and if appropriate, the Court." Joint Status Report, ECF no. 6226 at 60 (July 23, 2019).

B. Final Observations

Plaintiffs overstate in their brief the extent to which the Court found that defendants provided misleading information to the court and/or the Special Master. Tr at 464:9-10. (ECF no. 6374 at Page 11:24-27.)

Plaintiffs argue that CDCR must develop methodologies to measure and track compliance for all Program Guide requirements. Yet, there has never been a requirement that defendants develop methodologies and reports that cover every Program Guide requirement. That has never been up to defendants, but is in instead within the purview of the Special Master who monitors and reports on Defendants' compliance. "The Special Master's task is to measure the State's compliance with any remedial plan that this court may order." (Order of Reference, Dkt. 640 at 4.)

## CONCLUSION

Defendants again underscore their deep commitment to furthering transparency, acknowledging their mistakes, correcting the record, and restoring trust in reporting. Their proposed remedial measures demonstrate that commitment.

Defendants welcome the opportunity to demonstrate CDCR's data management practices and improvements as the case moves forward. CDCR and counsel are committed to considering any other ideas from the court, OSM or plaintiffs to further improve data accuracy.

DATED: November 13, 2019　　　　　　　ROBINS KAPLAN LLP

　　　　　　　　　　　　　　　　　　　　By: /s/ *Roman M. Silberfeld*
　　　　　　　　　　　　　　　　　　　　　　ROMAN M. SILBERFELD
　　　　　　　　　　　　　　　　　　　　　　*Special Counsel for Defendants*