1   DONALD SPECTER – 083925             MICHAEL W. BIEN – 096891
    STEVEN FAMA – 099641                JEFFREY L. BORNSTEIN – 099358
2   MARGOT MENDELSON – 268583           ERNEST GALVAN – 196065
    PRISON LAW OFFICE                   THOMAS NOLAN – 169692
3   1917 Fifth Street                   LISA ELLS – 243657
    Berkeley, California  94710-1916    JENNY S. YELIN – 273601
4   Telephone:   (510) 280-2621         MICHAEL S. NUNEZ – 280535
                                        JESSICA WINTER – 294237
5   CLAUDIA CENTER – 158255             MARC J. SHINN-KRANTZ – 312968
    AMERICAN CIVIL LIBERTIES UNION      CARA E. TRAPANI – 313411
6   FOUNDATION OF NORTHERN              ROSEN BIEN
    CALIFORNIA, INC.                    GALVAN & GRUNFELD LLP
7   39 Drumm Street                     101 Mission Street, Sixth Floor
    San Francisco, California  94111-4805  San Francisco, California  94105-1738
8   Telephone:   (415) 621-2493         Telephone:   (415) 433-6830

9   Attorneys for Plaintiffs

10

11                    UNITED STATES DISTRICT COURT

12                    EASTERN DISTRICT OF CALIFORNIA

13

14   RALPH COLEMAN, et al.,              Case No. 2:90-CV-00520-KJM-DB

15          Plaintiffs,                  **PLAINTIFFS' OPENING BRIEF
                                         REGARDING MENTAL HEALTH
16      v.                               CRISIS BED CONSTRUCTION AND
                                         UNMET BED NEED STUDY**
17   GAVIN NEWSOM, et al.,
                                         Judge:  Hon. Kimberly J. Mueller
18          Defendants.                  Date:   December 13, 2019
                                         Time:   10:00 a.m.
19                                       Crtrm.:  3, 15th Floor, Sacramento

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 2

I.   WILL THE REDUCED PLAN ALLOW DEFENDANTS TO TAKE ALL 73 UNLICENSED MHCBS OFFLINE AND STILL ACHIEVE COMPLIANCE WITH THE REMEDIAL REQUIREMENTS OF THIS CASE FOR ACCESS TO MHCB CARE? ................................................. 2

II.  DOES DEFENDANTS' CURRENT PLAN ADEQUATELY ACCOUNT FOR THE LICENSED MHCB BED NEED FOR THE MALE INMATE POPULATION?  DOES THIS PLAN ADEQUATELY ACCOUNT FOR A RECENT INCREASE IN MHCB REFERRALS FOR MALE INMATES? ............ 6

III. HOW DOES THE ANTICIPATED COMPLETION DATE OF NOVEMBER 2022 SQUARE WITH PRIOR TESTIMONY FROM FORMER DEPUTY DIRECTOR TEBROCK THAT COMPLETION OF THE 100 BED PROJECT WOULD TAKE A TOTAL OF FIVE YEARS, ONE YEAR FOR DESIGN COMPLETION AND FOUR YEARS  FOR CONSTRUCTION, PARTICULARLY IF THE 50 BED PROJECT IS NOT YET THROUGH THE DESIGN PHASE? ................................................. 7

IV.  WHAT IS THE SIGNIFICANCE OF AN INCREASE IN THE PERCENTAGE OF SUICIDES THAT OCCUR WITHIN THIRTY DAYS OF DISCHARGE FROM HIGHER LEVELS OF CARE? .................................. 12

V.   IS THERE A PRESSURE ON CLINICIANS NOT TO REFER CLASS MEMBERS TO HIGHER LEVELS OF CARE? .................................... 15

VI.  WHAT IS THE SIGNIFICANCE OF THE DECLINING INPATIENT POPULATION AT ATASCADERO STATE HOSPITAL AND COALINGA STATE HOSPITAL? ........................................................... 18

VII. ARE DEFENDANTS ACCURATELY REPORTING COMPLIANCE RATES WITH THE 24-HOUR TIMELINE FOR TRANSFER TO MHCB CARE AND, IN PARTICULAR, ARE THEY STARTING THE 24-HOUR CLOCK AT THE TIME REQUIRED BY THE REMEDIAL PLAN? .................. 22

VIII. THE COURT SHOULD ORDER THE SPECIAL MASTER TO CONDUCT AN UNMET BED NEEDS STUDY ........................................................ 24

CERTIFICATION .............................................................................................. 26

# INTRODUCTION

In its October 8, 2019 Order, the Court noted that it "has significant questions and concerns regarding defendants' current plan" to pursue construction of only one 50-bed Mental Health Crisis Bed ("MHCB") unit, at California Institution for Men ("CIM"), while putting on hold the plan to construct a second 50-bed unit at Richard J. Donovan Correctional Facility ("RJD").  Order, Oct. 8, 2019 ("Oct. 8, 2019 Order"), ECF No. 6312 at 4.  The Court asked the parties to provide further briefing regarding a series of issues Plaintiffs' counsel raised at the September 13, 2019 status conference.  *Id.* at 4-6. Defendants have the burden of showing that their plan can ultimately meet the permanent need for MHCB care throughout CDCR without use of the 73 unlicensed beds currently in use.  They have not met that burden, and indeed have not even stated definitively that the new CIM unit will be sufficient to meet long-term demand without continued reliance on unlicensed beds.

Defendants' decision to abandon the RJD project based on a single recent bed planning projection is short-sighted, because demand for crisis bed and other inpatient care fluctuates, and future spikes in demand are inevitable.  Given the historical pattern of extreme construction delays—and the fact that CDCR is already behind the original promised schedule for the CIM and RJD MHCB units—it will be impossible for CDCR to act quickly enough to bring sufficient licensed beds online when those future spikes occur. The decision is particularly short-sighted given that much of Defendants' "success" in improving compliance with the MHCB transfer requirement, as well as their recent bed projections suggesting they might need fewer beds than previously reported, appear to be direct outgrowths of Defendants' recent efforts to aggressively manage utilization of the higher levels of care, which have coincided with a skyrocketing suicide rate and a drastic increase in the number of suicides occurring after discharges from higher levels of care. Even if Defendants' planned future MHCB capacity were sufficient for achieving compliance with the Program Guide's 24-hour transfer requirement, it is not constitutionally adequate if it only does so at the cost of patient lives.

[3459867.5]

1   Defendants' recent improved compliance rates are also questionable given that they

2   are based on an erroneous trigger for the start time of the twenty-four hour transfer

3   requirement, in violation of the express terms of their own policy, which this Court has

4   adopted as part of the Program Guide.  The start time Defendants have been reporting

5   grants them an extra hour at the front end of the referral before the 24-hour clock starts

6   running.  The Court should not sanction Defendants' current reduced plan until the parties

7   and Special Master, and ultimately the Court, can assess the impact that Defendants'

8   unauthorized decision to use the wrong start time for the MHCB transfer clock has had on

9   the reported compliance rates and on MHCB access throughout the system.

10   Plaintiffs strongly support the Special Master's suggestion that an unmet bed need

11   study is necessary.  If Defendants contend that their plan to replace all unlicensed crisis

12   beds with the 50-bed CIM project will achieve a permanent remedy to the chronic shortage

13   in MHCB and inpatient care system-wide, they should also support such a study, so that

14   their plan can either be validated or appropriately modified to meet true long-term demand.

15   The Court should order the Special Master to conduct an unmet bed need study for

16   inpatient care, including MHCBs, and should order Defendants to both continue funding

17   the 50-bed RJD project and prepare a long-range bed plan in the meantime to ensure a

18   permanent remedy will someday be within reach.

19   **ARGUMENT**

20   **I.    WILL THE REDUCED PLAN ALLOW DEFENDANTS TO TAKE ALL 73**
     **UNLICENSED MHCBS OFFLINE AND STILL ACHIEVE COMPLIANCE**
21   **WITH THE REMEDIAL REQUIREMENTS OF THIS CASE FOR ACCESS**
     **TO MHCB CARE?**
22

23   Defendants have not shown how they can deactivate all 73 unlicensed MHCBs

24   while achieving durable, full compliance with transfer requirements and also providing

25   constitutionally adequate crisis care.  Defendants have never stated definitively that they

26   will be able to deactivate all 73 existing unlicensed MHCBs in the system upon completion

27   of just the 50-bed CIM project, nor have they explained how permanent deactivation of the

28   unlicensed beds could be feasible.  Instead, they have provided only noncommittal

2

suggestions, while acknowledging the reality that bed needs fluctuate and adequate capacity in the short term may not remain adequate in the long term. *See* Suppl. to Defs.' Third Status Report on MHCB Construction, Aug. 2, 2019, ECF No. 6235, at 3 (failing to state whether all unlicensed male MHCBs could be taken offline if only the CIM project moves forward); Sept. 13, 2019 Hr'g Tr., ECF No. 6349, at 12:10-14 ("CDCR's expectation is that bringing on the 50 beds will be sufficient …. we believe that the licensed beds will be sufficient to satisfy the requirements under the Program Guide"); Defs.' Sixth Status Report on MHCB Construction, Oct. 28, 2019, ECF No. 6371 at 2 ("Defendants anticipate, based on current data and projections, that construction of the 50-bed unit at CIM will allow CDCR to limit its reliance on unlicensed crisis beds."); *see also* Aug. 26, 2019 Ltr. from Vivek Viswanathan, Chief Deputy Director, Department of Finance, to legislative committee members, attached as Exhibit 1 to Decl. of Dean L. Borg Supporting Defs.' Fourth Status Report ("DOF Letter"), Aug. 28, 2019, ECF No. 6256-1 at 5 (recognizing that "[a]lthough current male inpatient population levels do not currently indicate an immediate need for [the RJD] project, there has recently been a 38 percent increase in male inpatients," and reconsideration of the project may be necessary "[i]f this trend continues").

It is Defendants' burden to establish that they have achieved a permanent, durable remedy for access to crisis bed care. *See Coleman v. Brown*, 938 F. Supp. 2d 955, 960, 983 (E.D. Cal. 2013) (noting that "defendants have the burden of demonstrating" that a constitutional violation has been remedied, and holding, *inter alia*, that "[u]ntil the necessary number of mental health crisis beds are complete and operational …. [t]his aspect of the Eighth Amendment violation is ongoing"). The Court has repeatedly ordered that no unlicensed inpatient beds can be decommissioned unless it is clearly established that those beds will never be needed in the future to meet class members' need for timely access to crisis care. *See* Order, June 15, 2012, ECF No. 4199, at 5; *see also* Order, Dec. 9, 2016, ECF No. 5529, at 4 (citing 2012 Order); Sept. 13, 2019 Hr'g Tr., ECF No. 6349, at 20:11-12, 22:7-9. Defendants have never definitively claimed, much less

1  proffered any concrete evidence, that the one remaining planned 50-bed project will be

2  sufficient to meet the need for crisis care for males *and* females into the future, even if

3  current projections change, as they are likely to do.  *See* discussion in Section III, *infra*.

4  Nor have they indicated any current intention to make concerted efforts to reduce the

5  population of *Coleman* class members to ensure that the planned capacity, without the

6  unlicensed beds, can meet the needs of the class indefinitely.  *See* Oct. 8, 2019 Order at 4

7  (noting that Defendants acknowledge that population of seriously mentally ill in CDCR

8  has "not declined and may have continued to grow to some degree").

9      Defendants' failure to plan for adequate long-term crisis bed capacity is even more

10  problematic given that Defendants have recently proven unable to keep open even the

11  licensed beds they already have, resulting in multiple closures that are either of indefinite

12  length or last up to 18 months.  *See* Decl. of Jenny S. Yelin in Support of Pls.' Opening Br.

13  Regarding MHCB Construction and Unmet Bed Need Study ("Yelin Decl."), filed

14  herewith, at Ex. D (Nov. 1, 2019 letter from Nicholas Weber to Special Master Lopes re

15  Mission Changes), at 2-3 (noting that sixteen crisis beds were offline as of November 1:

16  ten at Salinas Valley State Prison (SVSP), which have remained closed since January 2019

17  and cannot reopen due to an inability to hire psychiatry staff, and six at Pleasant Valley

18  State Prison (PVSP), which closed due to severe roof damage and have been inactive since

19  February 2019); *id.*, Ex. J (Nov. 27, 2019 letter from Nicholas Weber to Special Master

20  Lopes re Mission Changes), at 1-2 (noting that the ten SVSP crisis beds remain deactivated

21  due to insufficient psychiatry staff until "TBD," the PVSP crisis beds taken offline in

22  February 2019 will remain deactivated until "Summer 2020," eleven crisis beds at CSP-

23  Sacramento (SAC) will be closed for five months in 2020 due to "ADA Retrofits," six

24  crisis beds at California Institution for Women (CIW) will be closed for six weeks in 2020

25  for the same reason, and thirteen inpatient beds in an acute care unit at the CMF PIP are

26  closed indefinitely due to insufficient psychiatry staff).

27      Staffing challenges and physical plant issues of the type that have forced

28  Defendants to reduce their available slate of crisis beds are very likely to continue,

[3459867.5]

1   especially given Defendants' recalcitrant failure to take available steps to improve their

2   ability to recruit and retain psychiatrists (or to reduce the size of the *Coleman* class through

3   appropriate population reduction measures if they truly cannot hire those needed

4   clinicians).  *See, e.g.*, Oct. 10, 2017 Order, ECF No. 5711, at 2-6 (giving Defendants one

5   year to comply with fifteen-year-old court-ordered psychiatrist staffing requirement

6   (June 13, 2002 Order, ECF No. 1383, at 4) and detailing Defendants' decades-long

7   inadequate staffing).  Indeed, Defendants' psychiatric staffing crisis continues to rage

8   unabated:  Defendants not only have failed to come into compliance with the Court-

9   ordered 90% fill rate, they are even farther from meeting the requirement than they were a

10  year ago.  *Compare* Sept. 2018 Psychiatric Vacancy Report, ECF No. 5991 at 5 (reporting

11  70% of psychiatry positions filled system-wide), *with* Sept. 2019 Psychiatric Vacancy

12  Report, ECF No. 6375 at 5 (reporting 68% of psychiatry positions filled system-wide).

13  Defendants' long term plan must account for these types of long-term unit closures, and

14  ensure that capacity in the rest of the system is still sufficient—without reliance on

15  unlicensed beds—to meet crisis bed demand permanently.

16      Abandonment of the RJD project is therefore short-sighted and unlikely to result in

17  enduring compliance with the remedial requirements for access to MHCB care.

18  Defendants have repeatedly told this Court that additional crisis bed capacity was

19  necessary in the Southern Region, where the RJD project is located, and have represented

20  that recruiting and retaining MHCB staff is easier in the geographical vicinity of RJD.

21  *See, e.g.*, Ponciano Decl. in Support of Defs.' Objs. to Hayes 3rd Re-Audit, ECF No. 6007-

22  1 at ¶ 6 (noting that RJD has the best "ability to recruit and retain staffing" and is

23  geographically close "to the patients most in need of crisis care," as it houses

24  "approximately 2249, but only has fourteen crisis beds available").  Pursuing the RJD unit

25  now would make it much less likely that Defendants would have to scramble to address

26  unexpected shortages in MHCB capacity in the future due to staffing issues.

27      Defendants must make an evidentiary showing, through an evidentiary hearing if

28  this Court deems it appropriate, that their current reduced 50-bed plan will be sufficient to

[3459867.5]

1  meet future need without use of the 73 existing unlicensed crisis beds that Defendants

2  routinely utilize today.  They have never done so, and indeed it appears self-evident that

3  they cannot.

4  **II.    DOES DEFENDANTS' CURRENT PLAN ADEQUATELY ACCOUNT FOR THE LICENSED MHCB BED NEED FOR THE MALE INMATE POPULATION?  DOES THIS PLAN ADEQUATELY ACCOUNT FOR A RECENT INCREASE IN MHCB REFERRALS FOR MALE INMATES?**

5

6

7         CDCR's current plan to build only a single 50-bed licensed unit at CIM does not

8  adequately account for the MHCB bed need for the male population.

9         Defendants currently operate 54 unlicensed crisis beds for males.  Defs.' Suppl.

10  Third Status Report, ECF No. 6235, at 3.  Even if Defendants intended to open the CIM

11  unit solely to replace those beds, they would be four beds short.  But that is not the plan.

12  Defendants have represented to the Court and the Legislature that they intend to use some

13  of the planned 50-bed unit at CIM to provide crisis care to females in order to deactivate

14  the 19-bed unlicensed unit at CIW.  *See id.*; DOF Letter at 5.  Defendants have also

15  informed the Legislature that they may use some of the CIM beds as female inpatient beds

16  "to be able to discontinue use of licensed beds at Patton State Hospital" for female CDCR

17  patients, although they have never sought permission to do so from this Court.  DOF Letter

18  at 5.  Moreover, Defendants have always represented that beds for both the RJD and CIM

19  projects would be designed to be used as "flex beds," meaning they could be used for any

20  level of inpatient care (MHCB, acute, or ICF), not just for crisis care.  *See* Sept. 28, 2017

21  Hr'g Tr., at 67:19-23; Sept. 13, 2019 Hr'g Tr., ECF No. 6349, at 11:14-19.  As such,

22  Defendants may well be intending to also rely on the new 50 licensed beds slated for CIM

23  to take down some of CDCR's numerous unlicensed inpatient hospital beds—of which

24  there are 70 in California Medical Facility (CMF) PIP's L1 unit alone.

25         CDCR's plan defies common sense.  Absent a significant and *permanent* reduction

26  in the population of patients requiring MHCB and other inpatient care, CDCR cannot

27  feasibly replace the 54 current unlicensed MHCBs for males, much less decommission any

28  of the unlicensed male inpatient beds, with a single 50-bed licensed unit in which at least

6

[3459867.5]

1  19 beds will be serving female patients, rendering them unavailable to male patients. As

2  Defendants admit, trends in bed needs fluctuate frequently and projections are routinely

3  inaccurate. In the six month period before Defendants reported to the Legislature that they

4  no longer needed the RJD beds, male referrals to inpatient care dramatically increased by

5  38 percent. DOF Letter at 5. This increase occurred despite forecasts in the Spring 2019

6  and Fall 2018 Population Projections indicating that MHCB bed need would go down, not

7  up, this year. Yelin Decl., Ex. F (Mental Health Bed Need Study, January 29, 2019), at 3;

8  *id.*, Ex. G (Mental Health Bed Need Study, May 10, 2019), at 3.[1] Making a long-term

9  decision to abandon the RJD beds based on a projected short-term decrease in male

10 demand for crisis beds is therefore problematic—projected patterns routinely do not come

11 to pass, as this Court and Defendants well know. *See* Section III, *infra*.

12        As discussed more fully below, reducing the scope of the project to only the 50-bed

13 CIM unit is myopic, and unlikely to result in a permanent remedy. When inevitable spikes

14 in need occur, the system must be able to meet that need, without resorting again to long-

15 term use of "temporary" unlicensed beds or launching a new multi-year construction

16 project from scratch that will only serve to prolong federal oversight in this case.

17 **III.    HOW DOES THE ANTICIPATED COMPLETION DATE OF NOVEMBER
          2022 SQUARE WITH PRIOR TESTIMONY FROM FORMER DEPUTY
18        DIRECTOR TEBROCK THAT COMPLETION OF THE 100 BED
          PROJECT WOULD TAKE A TOTAL OF FIVE YEARS, ONE YEAR FOR
19        DESIGN COMPLETION AND FOUR YEARS FOR CONSTRUCTION,
          PARTICULARLY IF THE 50 BED PROJECT IS NOT YET THROUGH
20        THE DESIGN PHASE?**

21        Defendants' historical pattern of construction delays and canceled projects indicates

22 the November 2022 completion date is not realistic.

23        Repeatedly throughout the history of this case, Defendants have promised

24 construction to remedy shortfalls in capacity and then failed to complete the projects

25 timely or abandoned them altogether. *See Plata v. Brown*, 563 U.S. 493, 528 (2011); *see*

26 _____

27 [1] Defendants generally provide the Fall projections to Plaintiffs and the Special Master in
January of the following year, so Plaintiffs expect to receive the Fall 2019 projections in a
matter of weeks.

28

[3459867.5]

also Twenty-Sixth Round Monitoring Report of the Special Master, May 6, 2016, ECF No. 5439, at 75-83 (noting that the planned California Men's Colony (CMC) MHCB unit had been in the works since 2006, and that as of 2015, all construction projects, including that one, were finally completed); Twenty-Fifth Round Monitoring Report of the Special Master, Jan. 18, 2013, ECF No. 2520, at 39 (50-bed MHCB unit at CMC was "significantly delayed").

Even in the absence of this history, Defendants' "anticipated" November 2022 completion date, see Sept. 13, 2019 Hr'g Tr., ECF No. 6349, at 14:8-9, appears eminently unrealistic. Former Deputy Director Tebrock testified in September 2017 that the design process alone, which was already under way at that point, would take "approximately a year" to complete and that "the bid and build phases of the project" would take another four years. Sept. 28, 2017 Hr'g Tr., 56:22-25. She also testified that it was not possible to accelerate the process because "to do that, we would need to go back to the legislature to get a different type of authorization for that construction. And, in fact, we've determined that it would slow the process down considerably and add additional time to do that." Id. at 57:3-7.

As of October 28, 2019, "the State Public Works Board [had] approved the preliminary plans for the CIM project … [and] CDCR [was] working with architect Hellmuth, Obata & Kassabaum on the preparation of the working drawings for the project." Sixth Status Report, ECF No. 6371, at 3. CDCR expected the architecture firm to "provide a 50% working drawings deliverable to CDCR for review in December 2019." Borg Decl. re Sixth Status Report, ECF No. 6371-1, at ¶ 5. As of November 27, 2019, nothing had changed regarding the project's status. Defs.' Seventh Status Report on Funding for the Construction of 100 MHCBs, ECF No. 6399, Nov. 27, 2019, at 2-3. Assuming that deliverable deadline for the drawings is met, the design phase Ms. Tebrock described will not be completed until sometime in 2020 at the earliest, well past the 2018 timeframe Ms. Tebrock promised, and leaving only two years to complete construction if Defendants are to meet the promised 2022 activation date. Given that the design phase has

[3459867.5]

taken well over two years (assuming that phase does in fact complete in 2020 as currently projected), it is safe to assume that Ms. Tebrock's promise that construction would take an additional four years puts Defendants' far beyond the 2022 date assuming the best of outcomes, unless CDCR has identified another mechanism to accelerate the construction—which it could not in 2017.  That is even more true given CDCR's historical pattern of construction delays, including the nine-year saga that finally resulted in completion of the 50-bed CMC unit.  Special Master's 26th Round Monitoring Report, ECF No. 5439, at 75-83.  In fact, Defendants' November 27, 2019 Mission Change letter to the Special Master concedes that the crisis bed unit at PVSP remains closed because "CDCR [has been] working to identify a vendor certified to make the repairs" necessary to the damaged building, yet "[n]one are available in California."  Yelin Decl., Ex. J at 2.  The fact that the construction industry in California is so impacted that Defendants cannot even locate a contractor to repair a six bed unit casts additional doubt on Defendants' ability to contract with a company to complete construction of the CIM unit by November 2022, even if the design phase concludes in the next six to twelve months.

Plaintiffs are particularly concerned about Defendants' decision not to pursue the RJD project simultaneously with the CIM project on the basis of the short-term crisis bed need projected in the Spring 2019 bed need study.  Sixth Status Report, ECF No. 6371, at 3-4 ("As reported in Defendants' initial status report on May 28, 2019, CDCR's Spring 2019 bed projections forecasted a decrease in the need for additional crisis beds reflected in 2017 budget proposals.  Defendants will continue to monitor bed needs based on projections and the patient census.  If projections and anticipated bed needs change, Defendants will request additional resources through the legislative process."); *see also* DOF Letter at 5 ("Although current male inpatient population levels do not currently indicate an immediate need for this project, there has recently been a 38 percent increase in male inpatients.  If this trend continues, it may be necessary for the Administration to resume this project, after reengaging with your staff.").  Defendants' bed plan projections are fundamentally flawed, and very likely to underestimate future need, because they are

9

[3459867.5]

1    based on a presumption that decreases in the total population of male inmates in CDCR

2    also translates to concomitant decreases in the population of male inmates requiring

3    MHCB care; as Defendants acknowledged at the September 13, 2019 hearing, that has not

4    so far been the case.  Yelin Decl. at ¶ 29; *id.*, Ex. G at 14 (Mental Health Bed Need Studies

5    include note that the need for crisis beds "is estimated to decrease throughout the forecast

6    years due to the projected annual decrease in the CDCR Total Male Population"); Oct. 8,

7    2019 Order at 4 ("Defendants acknowledged at hearing that the population of seriously

8    mentally [ill] inmates in California's prisons has not declined and may have continued to

9    grow to some degree.").

10         Defendants' own statements acknowledge the fluctuating nature of bed need, and

11   the current demand for inpatient care—with censuses skyrocketing to record levels—

12   indicates the foolishness of making long-term construction decisions based on short term

13   fluctuations in projected need.  As of the end of October 2019, 24 men awaited admission

14   to the seven available beds set aside for male *Coleman* class members in DSH; an

15   additional 122 patients awaited admission to CDCR's PIP beds, which list a system-wide

16   capacity of **negative 3**.  Defs' Census, Waitlists, and Transfer Timelines for Compliance

17   Reports for Inpatient Mental Health Care ("Nov. 2019 Inpatient Census Report"), Nov. 15,

18   2019, ECF No. 6394 at 5, 7.  These numbers make starkly apparent that the system is

19   currently in the midst of a massive spike in demand for inpatient care for male class

20   members that Defendants are ill equipped to meet.  The Court has ordered that

21   "[u]ltimately, [] it is defendants' responsibility to maintain an adequate capacity of

22   inpatient mental health beds in order to meet their constitutional obligation to provide a

23   system of ready access to adequate [mental health] care," and has expressed concerns

24   about Defendants' short-sighted decision to plan based on a 90-percent occupancy

25   standard that fails to provide any cushion to absorb sudden spikes in demand of the sort

26   that are occurring right now—and that have occurred numerous times over the course of

27   this case.  Order, Mar. 24, 2017, ECF No. 5583 at 14 (citations omitted) (encouraging

28   Defendants to "seriously consider using an 80 or 85 percent occupancy standard for bed

planning purposes going forward to avoid any shortfall in capacity" consistent with the standard used in other inpatient systems).

Indeed, it is well documented in this case that projections are not stable over time and tend to undercount true need; Plaintiffs and the Court have urged Defendants numerous times over the years to plan for that fact, but they still fail to do so. *See, e.g.*, Order, Oct. 8, 2019 at 4 (recognizing that "it cannot be denied that, historically, deficient bed planning has plagued this case and been a bar to movement in the right direction"); Order, Dec. 9, 2016, ECF No. 5529 at 4-5 (stating that "the court is dismayed by defendants' suggestion that spikes in demand for inpatient care could somehow, at this point, be completely unforeseen,'" and asking parties to brief if CDCR should "include in their bed need projections and construction or bed utilization planning some amount of excess inpatient capacity that is available at all times to address spikes in demand without delaying access to inpatient care for any *Coleman* class member"); Pls.' Suppl. Br. in Response to Court's Dec. 9, 2016 Order Re Inpatient Access, Jan. 13, 2017, ECF No. 5542, at 17-19 (explaining bed projection methodology, and noting that Defendants use a 90% occupancy standard for inpatient programs instead of the 80% standard used in the community, which makes the system "less able to respond to fluctuations in demand" and that "systemic and longstanding delays in access to higher levels of care artificially depress the referral numbers on which the [projections] are based," thereby leading to a lower-than-actual projected need); *id.* at 20-21 (recognizing that "[a]s the Court has noted, Defendants concede that spikes are predictable and expected, so Defendants should be able to plan for them," by ensuring "a certain level of 'excess' bed space").

Defendants' currently planned construction, even if it is completed on the originally anticipated schedule—a virtual impossibility given CDCR's track record and the slippage to date—is very unlikely to keep up with the ever growing needs of the massive, and increasingly more acutely ill, *Coleman* class. Defendants have not offered any evidence that completion of the lone 50-bed CIM project will allow them to achieve *permanent* compliance with MHCB access and transfer requirements. If, as has historically been the

11

[3459867.5]

1   case, MHCB demand increases again in future years, despite current projections,

2   Defendants will be unable to react quickly enough to bring more beds online. *See* Nov.

3   2019 Inpatient Census Report, ECF No. 6394, at 5, 7 (showing current surge in inpatient

4   demand, and system's inability to meet increased demand with current capacity); DOF

5   Letter at 5 (noting 38% increase in male inpatient referrals between March and August

6   2019). Rather than wait for an inevitable spike in MHCB demand to reoccur, forcing

7   either continued reliance on unlicensed beds or starting from scratch on another multi-year

8   design process, Defendants should both revive the 50-bed RJD project and adopt the

9   Court's suggestions to use a lower occupancy standard and plan for "excess" capacity to be

10  available to meet demand in the long-term.

11      And in the meantime, the Court should closely monitor Defendants' progress with

12  the CIM project, given historical patterns and the clear need for those beds. As Plaintiffs

13  requested in their August 23, 2019 filing, the Court should order Defendants to provide

14  detailed reports regarding the project's status, including "the reasons for and persons or

15  agencies responsible for [any] delays," to make sure those beds stay on track. *See* Pls.'

16  Response to Suppl. to Defs.' 3rd Status Report on Funding for Construction of MHCBs,

17  Aug. 23, 2019, ECF No. 6251 at 9, and Orders cited therein.

18  **IV.   WHAT IS THE SIGNIFICANCE OF AN INCREASE IN THE**
19  **PERCENTAGE OF SUICIDES THAT OCCUR WITHIN THIRTY DAYS OF**
    **DISCHARGE FROM HIGHER LEVELS OF CARE?**

20      The currently skyrocketing suicide rate, and the high rate of suicides completed

21  after discharges from higher levels of care, suggests CDCR is not providing adequate

22  access to clinically appropriate care to the *Coleman* class, and that Defendants' aggressive

23  efforts to scrutinize the number of people receiving higher levels of care for compliance

24  purposes have resulted not only in patients suffering in lower levels of care than are

25  needed, but also death.

26      The suicide rate in CDCR has increased steadily year-over-year for the last six

27  years. The 2019 rate per 100,000 inmates as of November 25, 2019 is 30.2: The highest

28  rate since 1990. Yelin Decl. at ¶ 2; Report on Suicide Prevention and Response within the

[3459867.5]

California Department of Corrections and Rehabilitation, October 1, 2019 ("2018 Suicide Report"), *available at* https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2018-SB-960.pdf, at 7.  The 2018 rate of 26.3 was previously the highest on record, and the 2019 rate is on track to be 15% higher.  *Id.*  Even if there are no more suicides for the rest of 2019, the annual rate per 100,000 inmates would still be 28.2, seven percent higher than the 2018 rate; given that there are still several more weeks in the year, it is unfortunately very likely that the 2019 rate will significantly exceed the 2018 rate by year's end.  Yelin Decl. at ¶ 2.  Despite focused attention and effort from Plaintiffs, the Special Master, his suicide prevention expert Lindsay Hayes, and most recently the Legislature, Defendants have failed to implement adequate measures to curb the tragic explosion in suicides in CDCR.

In 2017, the California State Auditor issued a report concluding that CDCR "failed to provide the leadership and oversight necessary to ensure that its prisons follow its policies related to inmate suicide prevention and response."  California Department of Corrections and Rehabilitation: It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides, Report 2016-131, California State Auditor, *available at* https://www.auditor.ca.gov/pdfs/reports/2016-131.pdf, at 1-6.  The report identified a number of specific system-wide deficiencies, and recommended that the Legislature more closely monitor CDCR's suicide prevention program.

In response to the Auditor's scathing Report, in 2018, the Legislature passed and former Defendant Governor Brown signed SB 960, a bill requiring CDCR to submit to the Legislature an annual report on its "efforts to respond to and prevent suicides and attempted suicides among inmates."  Cal. Penal Code § 2064.1(a).  Comments from Senator Connie Leyva, the author and sponsor of the bill, stated: "The disturbing findings in the State Auditor's report underscore the greater need for transparency, training and overall focus on inmate suicides."  Senate Third Reading, Public Safety Committee Analysis, April 23, 2018, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB960.

[3459867.5]

CDCR submitted its first report pursuant to SB 960 on October 1, 2019. *See* 2018 Suicide Report. The Report notes that suicides in CDCR have "steadily increased over the last four years in California's state prisons," and admits that CDCR "struggles to complete [Suicide Risk Evaluations] with consistently high quality," struggles to meet "quality standards set by the Statewide Mental Health Program through improved training and the use of quality improvement tools and audits" for treatment plans for patients in crisis beds, which are required to occur within 72 hours of admission, and "needs improvement" in achieving high rates of suicide prevention and response training for medical and mental health staff. *Id.* at 1-2.

Yet while acknowledging what amount to major flaws in their suicide prevention program, CDCR's report deflects responsibility for its continually rising suicide rate, instead implying that its rate is simply a result of "[s]uicide [] reaching epidemic levels in many parts of the country." *Id.* at 1.

In fact, the recent spike in suicides appears to be due in part to—or at least is strongly correlated with—Defendants' aggressive efforts to manage utilization of higher levels of care, such as MHCBs, to improve their rates of compliance with Program Guide timelines under pressure from the Court. In the last four years, there has been a significant spike in the number and percentage of CDCR suicides that occurred within 30 days of discharge from a higher level of care. While in 2015 there were only two suicides out of a total of 24, or 8 percent, in which the patients had been discharged from a higher level of care within the prior 30 days, by 2018, that percentage had more than doubled—seven of the total of 34 suicides, or 21%, occurred after a recent level of care drop. Yelin Decl. at ¶¶ 4-6. That dramatic upward trend has continued this year: In 2019, nine of the 34 suicides that have occurred thus far, or 26%, involved discharges within the prior 30 days – more than triple the percentage of just four years ago. *Id.*, ¶ 4.

Tragically, it appears that Defendants' efforts to shorten lengths of stay in higher levels of care and other utilization management initiatives, as discussed further *infra*, have had the effect of discouraging referrals and admissions to inpatient programs, while also

14

[3459867.5]

increasing the overall rate of suicides throughout CDCR.  CDCR's annual suicide rate for recent years would be drastically lower but for the large number of suicides committed by patients shortly after their clinicians lowered their level of mental health care: Excluding those cases would have resulted in a 2017 suicide rate of 19.8 per 100,000 rather than 23.6 per 100,000 – i.e., 16% lower; a 2018 rate of 20.9 rather than 26.3 – or 21% lower; and in 2019 (thus far), the rate would have been 22.1 rather than 30.2—or 29% lower.  *Id.* at ¶ 7.

This tragic rise in suicides shortly after discharge strongly indicates that Defendants are failing to provide adequate access to appropriate care for patients in crisis, and indeed throughout their levels of care.  Any assessment of the adequacy of Defendants' current construction plans must account for this fact, which also strongly supports the necessity of an unmet bed need study, as discussed further below.

## V.     IS THERE A PRESSURE ON CLINICIANS NOT TO REFER CLASS MEMBERS TO HIGHER LEVELS OF CARE?

The same utilization management efforts that have resulted in abrupt discharges from higher levels of care for patients whose subsequent suicides prove their discharges were not clinically appropriate have also resulted in a parallel trend of clinical staff failing to refer patients to higher levels of care when indicated, with similarly fatal consequences.

Defendants' own suicide reviewers have concluded, in the majority of final 2019 suicide reports completed to date, that inappropriate discharges and/or failures to refer to higher levels of care likely contributed to the individual's suicide, and warranted corrective Quality Improvement Plans.  Yelin Decl. at ¶¶ 9-14.  In many of the cases, the failures by clinical staff to even consider a referral for more intensive care violated Defendants' own directives under the sustainable process, or otherwise reflected an egregious failure of clinical judgment—in the opinion of CDCR's own suicide case reviewer—given the patient's symptoms, and strongly suggest that clinical staff are discounting their own clinical intuition due to perceived pressure to restrict use of higher levels of care.  *See, e.g., id.* at ¶ 10 (review found that patient was discharged from MHCB a few weeks prior to death, even though symptoms suggested he should have been referred to higher level of

1    care, and a treatment plan a week prior to death indicated that higher level of care was

2    warranted, yet his treatment team did not recommend referral); *id.* at ¶ 11 (shortly before

3    suicide, patient was flagged under the sustainable process for having more than three

4    MHCB admissions in prior six months, but IDTT did not document consideration of

5    whether a higher level of care was needed or a justification for not making a referral); *id.* at

6    ¶ 12 (documentation in the weeks prior to patient's suicide indicated that clinical staff did

7    not consider referral to inpatient care, despite increasing acuity of symptoms, and no

8    improvement of patient's condition at EOP level of care); *id.* at ¶ 13 (during suicide

9    evaluation the day prior to suicide, clinician did not consider a higher level of care despite

10   obvious signs of imminent risk); *id.* at ¶ 14 (at IDTT held three weeks before patient's

11   suicide, IDTT failed to provide any justification for decision not to refer patient to higher

12   level of care even though he met criteria for consideration of inpatient care under the

13   sustainable process standards).

14           In fact, the most recent CDCR suicide, which occurred just days ago on

15   November 23, 2019, is a particularly tragic example of Defendants' failure to treat patients

16   in a clinically appropriate level of care.  The patient presented at the Triage and Treatment

17   Area of his institution three days prior to his suicide with auditory hallucinations, and the

18   on-call psychiatrist then referred him to a crisis bed and put him in alternative housing on

19   suicide watch.  *Id.* at ¶ 15.  The next day, this patient was returned to his housing unit from

20   alternative housing without being admitted to a crisis bed, after a clinician concluded his

21   suicide risk was low in a non-confidential cell-front contact.  *Id.*  As part of a mandatory

22   five-day follow-up visit in the patient's housing unit the next day, that same clinician

23   performed a second non-confidential cell-front suicide evaluation because of a "lack of

24   custody in the building" and determined that no further action was required.  *Id.*  The

25   patient killed himself the next day, two days after his crisis bed referral was apparently

26   rescinded.  *Id.*

27           Moreover, Plaintiffs' counsel have thus far attended tours of five prisons and the

28   CHCF PIP as part of the Special Master's 28th Round monitoring tours in 2019, and

16

[3459867.5]

attended several CQIT tours in 2018.  *Id.* at ¶ 16.  Staff at these tours routinely express feeling pressure to not refer patients they believe need more intensive mental health treatment for higher levels of care or to otherwise reduce patients' use of those beds.  *Id.* Plaintiffs have found similar statements in patients' medical records, including references to artificial time limits on lengths of stays in EOP and inpatient programs.  *Id.*; *see also, e.g.*, *id.* at ¶ 17 (clinicians at SAC reported at May 2019 Special Master tour that they perceive pressure from headquarters to move EOP patients down to CCCMS, even though they know that some of those patients would not be able to function at CCCMS level of care); *id.* at ¶ 18 (at April 2019 monitoring tour of CSP-Corcoran (COR), the chief of mental health reported that clinical staff at the institution wait too long to refer patients needing higher levels of care, a patient observed in the MHCB had recently been discharged from CHCF-PIP with the understanding that he would receive more treatment in COR's EOP segregation unit than in CHCF-PIP's inpatient program, clinical staff in the LTRH and CCCMS programs reported rampant pressure to keep patients who need EOP care at CCCMS level of care, and LTRH clinicians stated that they did not bother raising the level of care for CCCMS patients anymore because clinical staff at SAC, where the patients would be sent for PSU treatment, would just lower the patients' level of care and send them right back); *id.* at ¶ 19 (at April 2019 Special Master tour of CSP-Los Angeles County (LAC), EOP clinicians had practice of discussing with every EOP patient a plan to discharge them to CCCMS, beginning with the initial IDTT); *id.* at ¶ 20 (during August 2018 CQIT tour, members of SVSP clinical staff stated that CDCR headquarters staff instructed them to review the medical records of 100 patients for possible removal from the EOP program, and supervisors on one yard instructed case managers to "go after the low hanging fruit" and to remove at least one to two patients per week from the program; *id.* at ¶ 30, Ex. H, at 4 (September 14, 2018 letter from Defendants' counsel (omitting attachments containing patient identifiers) admitting that CDCR headquarters instructed SVSP—as well as CMF—to undergo a utilization review process of the EOP population, and explaining other measures CDCR has implemented to "ensur[e] the right patient is

1    placed in the right bed," including directing clinicians to focus on level of care reviews);

2    *id.* at ¶ 31, Ex. I (April 8, 2019 letter from Thomas Nolan to Defendants (omitting

3    attachments containing patient identifiers) describing several examples of class members

4    in inpatient care who were inappropriately discharged or whose medical records reflect

5    clinicians' perception that there is a six month time limit on stays in ICF level of care).

6        These pressures, whether express or implied and intended or not, have a significant

7    impact on the treatment available to the *Coleman* class, with often dire consequences.  *See*

8    Section, IV, *supra*.  It is almost certainly no coincidence that during the time period when

9    suicides occurring shortly after level of care drops began increasing sharply, and

10   Defendants' emphasis on utilization management strategies (as described above) became

11   heightened, CDCR's EOP population dropped precipitously, after years of unrelenting

12   growth.  In fact, when Defendants began employing their current utilization management

13   techniques approximately two years ago, the EOP population not only stopped growing but

14   reversed course and sharply plunged.  Yelin Decl. at ¶ 21.  Indeed, Defendants have cut

15   approximately 1,200 men from the EOP level of care (roughly 16%) alone in just over two

16   years.  *Id.*

17       Defendants' efforts to use the system's resources more efficiently, while

18   hypothetically positive, has resulted in class members not receiving the treatment they

19   require.  While these techniques have allowed Defendants to increase their rate of

20   compliance with the MHCB (and inpatient) transfer timelines, the cost of doing so—in the

21   form of patient lives—entirely negates that achievement.  Defendants cannot achieve

22   permanent constitutional compliance unless the system's capacity, including its crisis bed

23   capacity, is sufficient to allow for timely transfers and clinically appropriate lengths of

24   treatment.

25   **VI.   WHAT IS THE SIGNIFICANCE OF THE DECLINING INPATIENT**
         **POPULATION AT ATASCADERO STATE HOSPITAL AND COALINGA**
26       **STATE HOSPITAL?**

27       Through the history of this case, a clear pattern has emerged that establishes that

28   Defendants' chronic underutilization of available DSH beds suppresses the true need for

18

[3459867.5]

1  inpatient beds, including at the MHCB level of care.

2      CDCR's referrals to Atascadero State Hospital (ASH) and Coalinga State Hospital

3  (CSH) have increased in the months since Defendants represented to the Court at the

4  September status conference that "it's true that the referrals to those inpatient programs

5  have decreased and so there are empty beds there." Sept. 13, 2019 Hr'g Tr., ECF No.

6  6349, at 23:20-22. After sustained periods of high utilization of both ASH and CSH in

7  2017 when Defendants were at risk of contempt for failing to meet inpatient transfer

8  timelines and the Special Master was engaged in focused monitoring of Defendants' Least

9  Restrictive Housing (LRH) processes in the Psychiatric Inpatient Programs (PIPs), the

10  census at ASH in particular began to quickly drop as Defendants, the Special Master, and

11  the Court once again turned their focus to other issues in the case. Yelin Decl. at ¶ 24; *see

12  also* Order, Apr. 19, 2017, ECF No. 5610, at 13 (threatening contempt); Special Master's

13  Report on Mental Health Inpatient Care Programs, ECF No. 5894 (Aug. 30, 2018) at 15-

14  16.

15      The ASH census in October 2017, just after completion of the Special Master's

16  focused LRH tours in August and September of that year, was 230; similarly, the

17  percentage of patients held in higher custody inpatient settings than their least restrictive

18  housing designation required was below 50%—an achievement that has not been repeated

19  since. Yelin Decl. at ¶ 24. Those gains would not hold, as historically they have not after

20  this Court and the Special Master began focusing on other aspects of the remedy. By

21  January 2018, the ASH census was below 200, and the percentage of patients above their

22  LRH was well above 50% again, where it has remained since. *Id.* Between July 2018

23  through July 2019, roughly 100 ASH beds—and often many more—sat empty each and

24  every month. *Id.* Indeed, from January through June 2019, the ASH census was never

25  higher than 137 despite the fact that 256 beds are reserved for class members by Court

26  order. *Id.* Percentages of class members held in higher custody inpatient programs than

27  their LRH designation required hovered at or near 60% for several of the months during

28  this time frame, *id.*, and only 37 out of 50 beds reserved for class members at CSH were

1  being utilized in June 2019.  *Id.*

2  Since then, Defendants' utilization of ASH and CSH have suddenly markedly

3  improved starting in the late summer.  The ASH census has risen dramatically from 150 to

4  255 between July and October 2019, and the CSH census has similarly increased from 36

5  to 41.  *Compare* Defs.' July 2019 Inpatient Census, Waitlists, and Transfer Timelines

6  Report, Aug. 15, 2019, ECF No. 6245 at 12-13, *with* Defs.' Oct. 2019 Inpatient, Census,

7  Waitlists, and Transfer Timelines Report, Nov. 15, 2019, ECF No. 6394 at 12-13.  But, as

8  they always have been throughout the history of this case, Defendants' recent gains can be

9  traced directly to focused attention and handholding on the part of the Special Master that

10  masks serious flaws in Defendants' system.

11  It is not a coincidence that Defendants' utilization of ASH and CSH markedly

12  improved just after the Special Master began a period of embedment in CDCR's

13  headquarters as part of his monitoring efforts in July 2019, which remains ongoing.  Yelin

14  Decl., ¶ 22.  As part of that effort, the Special Master team focused significant attention on

15  working with headquarters clinicians to review LRH determinations for ICF and acute

16  class members and to encourage referrals to ASH, after months of significant

17  underutilization, and to encourage PIP clinicians to follow their own LRH review

18  procedures in an attempt to improve patient flow through the system.  *Id.*  While those

19  focused efforts by the Special Master team appear to be paying dividends in terms of rising

20  ASH and CSH numbers, Plaintiffs are convinced that, after the Special Master and this

21  Court once again necessarily turn to other aspects of the remedy, Defendants will again

22  allow the beds to sit underutilized in the future.

23  This is an established pattern in this case that will inevitably recur.  Special

24  Master's Monitoring Report on the Mental Health Inpatient Programs for Inmates of

25  CDCR, May 25, 2016 ("Special Master 2016 Inpatient Report"), ECF No. 5448 at 24-40

26  (detailing long history of Defendants' failure to refer patients to low custody DSH beds,

27  except when ordered to do so by the Court, and explaining that when CDCR does not

28  utilize those beds, "the system for timely admissions is upset and bed admissions

20

[3459867.5]

1   throughout [the inpatient programs] quickly become backed-up, with surging waitlists"

2   and "another seriously mentally ill person is not receiving the care he needs"); *see also*

3   Special Master's Monitoring Report on the Mental Health Inpatient Programs for Inmates

4   of the CDCR, Aug. 30, 2018, ECF No. 5894 at 22 (referencing 2016 report, noting that the

5   problems with usage of DSH beds "persisted through the writing of this report," and

6   asserting that "[m]aintaining a system that facilitates patient movement through the various

7   programs available to CDCR inmates is likely to prevent repeating the previous cycles of

8   inpatient waitlists while providing appropriate care to patients at their least restrictive

9   setting").

10       Defendants' repeated pattern of failing to move patients into the *Coleman*-

11  designated DSH beds contributes to a suppression of actual need for inpatient care,

12  including MHCB care.  When the system "become[s] backed-up, with surging waitlists,"

13  clinicians are less likely to refer patients who require a higher level of care, because their

14  referrals are not likely to end up in admissions, which in turn leads to underestimates of

15  projected bed need.  *See* Special Master 2016 Inpatient Report at 36; *see also* Decl. Pablo

16  Stewart, M.D., in Supp. of Pls.' Br. on Evid. Hr'g Re: Order to Show Cause Why Empty

17  DMH Beds Cannot Be Filled with CDCR Inmates & in Supp. of Add'l Relief, ECF No.

18  4055, at ¶¶ 52-115; *see also, e.g.*, *id.* at ¶¶ 42-51.  When the Special Master has in the past

19  conducted unmet bed need studies, such as the Mental Health Assessment and Referral

20  Project ("MHARP") of 2009-2010, he has discovered that massive numbers of *Coleman*

21  class members required inpatient care—far more than the numbers accounted for in

22  CDCR's bed planning projections.  Special Master 2016 Inpatient Report at 29.

23       As discussed more fully above, so long as the *Coleman* class remains as large and

24  as sick as it currently is, future spikes in the need for inpatient care are inevitable, and

25  CDCR must maintain adequate capacity to meet long-term need for every level of care.

26  But it also must continue to refer patients to DSH—even when the Court's and Special

27  Master's attention are focused elsewhere—to ensure that beds are available throughout the

28  system at all levels of care for all patients who need them, and actual need is not artificially

[3459867.5]

1    suppressed.  Otherwise, as the Special Master recognized, "failure to provide access to

2    inpatient care will remain the barrier between defendants and termination of court

3    oversight of this matter."  Special Master 2016 Inpatient Report at 40.

4    **VII.    ARE DEFENDANTS ACCURATELY REPORTING COMPLIANCE RATES
         WITH THE 24-HOUR TIMELINE FOR TRANSFER TO MHCB CARE
5         AND, IN PARTICULAR, ARE THEY STARTING THE 24-HOUR CLOCK
         AT THE TIME REQUIRED BY THE REMEDIAL PLAN?**

6

7         Defendants have been inaccurately reporting when MHCB referrals start, calling

8    into question their transfer timeline compliance.  Plaintiffs learned, during the process of

9    negotiating exceptions to the MHCB transfer timeline with Defendants during the Summer

10   of 2019, *see* Joint Submission of Addendum to MHCB Referral, Rescission, Discharge

11   Policy, Aug. 30, 2019, ECF No. 6261-1, that Defendants have been reporting their

12   compliance with the transfer timeline to this Court and the Special Master based on a later

13   start time than what is required by the Program Guide and Defendants' own policies.

14        The operative policy that governs measuring the 24-hour timeline, a December 23,

15   2014 Memorandum entitled "Transfer of Inmates to and from Mental Health Crisis Beds,"

16   makes clear that "[t]he 24 hour MHCB transfer timeline begins upon *clinical*

17   *determination* a MHCB is required," (emphasis added) and that the clinician must then

18   communicate to HCPOP, CDCR's Health Care Placement Oversight Program "[w]ithin

19   one hour of [the] clinical determination" of the need for the MHCB assignment.  2018

20   Program Guide, ECF No. 5864-1 at 511.  A subsequent September 4, 2015 Memorandum

21   entitled "Mental Health Crisis Bed Referral Notification" clarifies the requirement that the

22   HCPOP contact occur "within one hour of clinical determination an MHCB is required"

23   and specifies that the memorandum "does not supersede" the December 23, 2014 memo

24   requiring the timeline to start upon clinical determination.  *Id.* at 339.  Both policies have

25   now been incorporated by reference into the Program Guide.  *Id.* at 339, 511.

26        Despite this clear requirement that Defendants count the 24-hour timeline from the

27   time the clinician determines a patient requires MHCB care, Defendants have instead

28   based the transfer timeline information they report to the Court in the monthly Mental

PLS.' OPENING BRIEF RE MENTAL HEALTH CRISIS BED CONSTRUCTION AND
UNMET BED NEED STUDY

Health Crisis Bed *Coleman* Patient Census and Waitlist Report as well as in the MIS Report produced to the Special Master and Plaintiffs as part of their monthly data on the time the clinician sends the email to HCPOP requesting a MHCB bed assignment.  *See* Yelin Decl. at ¶ 26, Ex. E (Nov. 12, 2019 letter regarding use of HCPOP email to calculate transfer timelines).  Because, per Defendants' own policy, CDCR clinicians have an hour to send that email *after* the clinician determines crisis bed care is necessary, Defendants have essentially given themselves an extra hour to transfer patients while still reporting themselves as compliant with the 24 hour transfer requirement.  *Id.*, Ex. E at 1.

In reality, this cushion may often be significantly more than one hour.  *Id.* at 4. During the exceptions negotiations process, Defendants provided Plaintiffs and the Special Master with patient-level information about proposed exceptions for a period of several months.  *Id.*  Those exceptions constituted approximately 2% of the total number of MHCB transfers throughout that period.  *Id.*  Of the approximately 5-10 exceptions Defendants claimed per month during this period, Plaintiffs identified several examples of patients who were referred to MHCB care by their clinicians, according to documentation in the Electronic Health Record System (EHRS), hours before the email to HCPOP, and therefore hours before Defendants considered the 24-hour clock to start ticking.  *See id.* (some patients' EHRS records showed referrals four or nine hours prior to the start time of the 24 hour clock).  Because Plaintiffs only examined the small number of MHCB transfers for which Defendants were claiming an exception (approximately 2% of all MHCB transfers), it is probable that the issue is more widespread.

While Defendants have admitted that their calculation of MHCB transfer compliance is based on the incorrect start time, they assert that they have not identified evidence of systemic issues of delays between the clinical referral/level of care change in EHRS and the email to HCPOP.  *Id.*  Yet Defendants do not appear to have conducted any system-wide analysis to assess whether their compliance rate with the twenty-four hour requirement differs if the additional time before the HCPOP email is counted as part of the twenty-four hours, or if the much longer delays Plaintiffs identified when reviewing the

23

1  proposed exceptions are more widespread.  *Id.*  Plaintiffs have requested that Defendants

2  both conduct such an analysis and correct the misleading and potentially seriously errone-

3  ous data that has been presented to the Special Master and filed with this Court to date that

4  relies on the wrong starting point.  *Id.*  Defendants have not yet responded to that request.

5      Until the parties and the Special Master have completed an analysis of the impact

6  Defendants' misleading reporting decision has had on their reported compliance rates, it

7  will not be possible to assess whether Defendants' current 50-bed proposal will be

8  sufficient to meet all demand for MHCB care, while complying with the 24-hour transfer

9  requirement.  While Defendants have announced that they will transition to using the

10  EHRS level of care change documentation as the starting point for calculating the

11  timeframe at some point in the future, *see id.*, their current compliance rates (and all of

12  their reporting to this Court to date) are based on a rule that does not comply with the

13  Program Guide, and may well be contributing to an inaccurate picture of the actual need

14  for crisis bed care in the system.

15  **VIII.  THE COURT SHOULD ORDER THE SPECIAL MASTER TO CONDUCT
        AN UNMET BED NEEDS STUDY**

16

17      Plaintiffs strongly agree with the Special Master that an unmet bed need study of

18  the kind conducted more than once to date in this case is required to determine whether

19  there is unmet need for EOP, MHCB, and inpatient care among the *Coleman* population.

20  *See* Oct. 8, 2019 Order at 6.  As discussed above, there is significant evidence that

21  Defendants are not appropriately evaluating and referring class members needing more

22  intensive mental health treatment to higher levels of care when warranted, and that class

23  members are suffering and dying at unprecedented rates as a result.

24      Defendants' decision to abandon the RJD project and their suggestion that they will

25  be able to achieve permanent compliance with this Court's remedial measures—including

26  the relevant transfer timelines—without the 73 unlicensed MHCBs currently in use (not to

27  mention the many unlicensed inpatient beds) is greatly concerning and displays a lack of

28  foresight that is likely to prevent ending federal oversight of the system in the near term.

[3459867.5]

1  As the Court recognized, "it cannot be denied that, historically, deficient bed planning has

2  plagued this case and been a bar to movement in the right direction." *Id.* at 4.

3        If Defendants are confident that the 50-bed CIM project is sufficient to meet all

4  future need for MHCB care and that they will be able to decommission all unlicensed

5  inpatient beds—not just the MHCB beds—currently in use, they should welcome the

6  opportunity for an unmet bed need study to confirm the viability of their long-term

7  construction plan to the Court, Special Master, and Plaintiffs.  All parties and this Court

8  must be confident that Defendants' bed planning for the future of this case is sustainable,

9  so that the cycle of spikes in need, bed shortages, and delayed construction schedules that

10 has plagued this case since its inception can finally end.  In the meantime, Defendants

11 should be required to continue funding the 50-bed RJD project until it is manifestly clear

12 those beds are truly not needed, in order to prevent additional years of delay.  At the very

13 least, the Court should consider holding an evidentiary hearing so that Defendants can

14 present evidence—if any exists—to justify abandonment of the RJD project.  Defendants

15 should also be required to begin the process of developing a bed plan that will incorporate

16 the findings of the unmet need study so that the parties and Court can be confident

17 Defendants are appropriately planning for a future where federal oversight is one day

18 unnecessary.

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

[3459867.5]

1

**CERTIFICATION**

2      Plaintiffs' counsel certifies that she reviewed the following orders relevant to this

3 filing: ECF No. 1383, ECF No. 4199, ECF No. 5529, ECF No. 5542, ECF No. 5583, ECF

4 No. 5610, ECF No. 5711, ECF No. 5860, and ECF No. 6312.

5

6 DATED:  November 27, 2019          Respectfully submitted,

7                                   ROSEN BIEN GALVAN & GRUNFELD LLP

8                                   By:  */s/ Jenny S. Yelin*

9                                        Jenny S. Yelin

10                                  Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLS.' OPENING BRIEF RE MENTAL HEALTH CRISIS BED CONSTRUCTION AND
UNMET BED NEED STUDY

[3459867.5]