XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
KYLE A. LEWIS, State BAR No. 201041
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
ROBERT W. HENKELS, State Bar No. 255410
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7318
  Fax:  (916) 324-5205
  E-mail:  Elise.Thorn@doj.ca.gov
Attorneys for Defendants

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone:  (310) 552-0130
  Fax:  (310) 229-5800
  E-mail:  RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO OCTOBER 8, 2019 ORDER** |

On October 8, 2019, the Court issued an order directing the parties to address certain issues Plaintiffs raised at the September 13, 2019 status conference regarding Defendants' mental health crisis bed plan and the status of remedial efforts related to staffing.  (ECF No. 6312 at 6-7.)  This submission addresses those issues, clarifies matters related to the provision of mental health care to patients needing crisis bed level of care, and provides an update on Defendants' efforts to achieve a staffing remedy that will satisfy the October 10, 2017 order.

1

1    I.    MENTAL HEALTH CRISIS BED UPDATE.

2        A.    The Addition of Fifty Licensed Crisis Beds Is Projected to Eliminate
              Defendants' Need to Use Unlicensed Crisis Beds to Provide Access to Crisis
3             Bed Level of Care.

4        Defendants presented a plan to add fifty licensed crisis beds at the California Institution for

5    Men (CIM) as a long-term solution to address the need for additional crisis beds in the southern

6    region of the state.  (ECF No. 5595 at 6-7 and 9/28/17 Tr. 55:13 – 56:25.)  Based on the current

7    population projections and the past year's actual bed usage, the California Department of

8    Corrections and Rehabilitation (CDCR) anticipates that the construction of the Mental Health

9    Crisis Facility at CIM will allow CDCR to eliminate the use of unlicensed beds to provide crisis

10   bed level of care.  If the population projections are accurate, the project, as currently approved, is

11   expected to permit Defendants to take all unlicensed crisis beds offline once the project is

12   completed in December 2022.

13       CDCR currently has fifty-four male unlicensed crisis beds (twenty at California State

14   Prison-Sacramento and thirty-four at the California Institution for Men) and 373 male licensed

15   crisis beds.  CDCR has nineteen female unlicensed crisis beds and ten licensed crisis beds at the

16   California Institution for Women, and twelve female licensed beds at the Central California

17   Women's Facility.[1]

18       In 2019, the highest census for the male crisis beds was 349 in September, far short of the

19   383 male licensed crisis beds available.  In comparison, the highest census for the male crisis bed

20   population in 2018 was 378 in January and the lowest was 224 in October.  The 2018 census did

21   not exceed the number of male licensed beds available at 383.  CDCR's use of female crisis beds

22   exceeded capacity in 2019.  The highest census was thirty-two inmate beds in June, which

23   exceeded the twenty-two available female licensed beds.  In 2018, the highest female crisis bed

24   census was twenty-one beds in July and August, and did not exceed the number of twenty-two

25   available licensed beds.  These census numbers support Defendants' current projection that the

26   fifty-bed unit at CIM will likely satisfy CDCR's need for crisis beds, and the decision to pause

27       [1] The capacity and census data referenced in this section is supported by the attached
     Declaration of Jay Powell.
28

2

1   the separate proposed construction project at Richard J. Donovan (RJD).  But until the CIM

2   project is complete, CDCR needs the unlicensed crisis beds, specifically at CIM, to maintain

3   transfer timelines for patients in the southern part of the state.  If the population drops, as

4   anticipated by the projections, CDCR will review whether unlicensed crisis beds can be taken off-

5   line before the completion of the licensed crisis bed unit at CIM.

6         The existence of surplus crisis beds for the male population in 2018 and 2019, CDCR's

7   improved compliance with transfer timelines to crisis beds over the same period of time, coupled

8   with Defendants' expectation that the system will have enough crisis bed capacity to meet

9   patients' needs with the addition of the fifty-bed unit at CIM, support the decision to pause the

10  RJD project.  Defendants' transfer timelines compliance has dramatically improved since 2017.

11  Between September 2018 and September 2019, CDCR's compliance with transfers of male

12  patients within twenty-four hours was 97.26 percent.  (Powell Decl. ¶ 6.)  Between March 2, 2019

13  and September 2, 2019, compliance with transfers of male patients to crisis beds increased to

14  98.26 percent.  (Id.)  Compliance with the transfer of female patients to crisis beds within

15  Program Guide timelines also improved since March 2019, 96.26 of the transfers took place

16  within twenty-four hours.  (Id.)

17        In 2017, Defendants identified a series of obstacles to transferring patients to crisis beds

18  within twenty-four hours of referral along with a set of initiatives to improve their ability to admit

19  patients to crisis beds as expeditiously as possible.  (ECF No. 5680.)  The obstacles identified

20  included delayed clinical acceptance before admission of the patient to a crisis bed, and policies

21  that required a medical clearance before transport; administrative requirements or processes

22  unrelated to actual treatment of the patients (classification and parole representative workflows);

23  an increased demand for crisis beds that periodically outpaces the supply; delays in discharging

24  patients who no longer need crisis care; delays in referring patients who require longer term

25  inpatient care to an intermediate care facility or acute care; and lack of an  automated system for

26  tracking and reporting of referrals, admissions and discharges to crisis care.  (Id. at 5-6.)

27        The initiatives designed to improve timely access to crisis care enacted in 2017 include

28  crisis intervention teams, Dialectical Behavior Therapy, enhanced trainings for staff on clinical

3

1    evaluations and case formulations, increased after hours staffing, regionalized crisis beds to

2    reduce travel time, eliminating medical clearances, resolving transportation issues that delayed

3    the transfer in and out of crisis beds, and resolving medication and pharmacy issues.  (ECF No.

4    5680-10 at 7-8.)

5         As of November 26, 2019, nineteen institutions have implemented crisis intervention teams,

6    which included plans for onsite staff after hours, with two more scheduled for implementation in

7    the coming months.  (Ceballos Decl. ¶ 3.)  In addition, a statewide crisis intervention team policy

8    and procedure is currently under review by the Special Master.  (*Id.*)  While Dialectical Behavior

9    Therapy is offered at some programs, CDCR has not formalized a Dialectical Behavior Therapy

10   program.  (*Id.*)  Enhanced trainings for staff on clinical evaluations began in September 2016, and

11   CDCR continually offers training.  (*Id.*)  Case formulation training is under development.  (*Id.*)

12   On December 13, 2016, CDCR started to regionalize transfers and remove requirements for

13   medical clearances.  (*Id.*)  On September 18, 2018, CDCR also implemented via a policy directive

14   an escalation process for acceptance delays.  (*Id.*)  Finally, reports to allow for proactive

15   monitoring of transfer timelines were released March 9, 2018, and an oversight alerting process

16   utilizing these reports was implemented on April 2, 2018.  (*Id.*)  All of these combined efforts

17   have impacted MHCB transfer and admission timelines, which have gradually improved since

18   October 2018 to over ninety-eight percent of transfers compliant in October 2019.  (*Id.*)

19        Furthermore, contrary to Plaintiffs' suggestion, Defendants have not stopped referring

20   patients to crisis beds.  In 2017, CDCR referred 15,623 patients to crisis bed level of care; in

21   2018, CDCR referred 15,889 patients to crisis bed level of care; and in 2019, as of the end of

22   October, CDCR had referred 11,024 patients to crisis bed level of care.  (Powell Decl. ¶ 11.)

23   CDCR will continue to follow policy and refer patients to crisis beds who require that level of

24   care.

25        In addition to the successes achieved with the implementation of some of the 2017

26   initiatives, the parties are currently negotiating a policy that would allow CDCR greater flexibility

27   in the use of its inpatient beds.  CDCR first proposed revising its Psychiatric Inpatient Program

28   referral and admission policy to include language detailing the procedures to follow to flex crisis

4

1  beds for use as inpatient beds in 2018. The parties are still negotiating the terms of that policy in

2  the workgroup process. CDCR needs flexibility to respond to spikes in demand for different

3  levels of care as well as physical plant issues that may occasionally require the closure of crisis

4  bed units pending construction. Defendants are committed to developing policies that will

5  allocate resources in a way that maintains a flexible system that can react quickly to changes in

6  the demand for crisis beds, and ultimately ensure that a patient gets the bed appropriate to his or

7  her needs.

8        Defendants are committed to refining inpatient bed plans to eliminate the use of unlicensed

9  beds. Defendants require additional time to address the issue of deactivating the unlicensed

10  inpatient beds at unit L-1 at the California Medical Facility and look forward to collaborating

11  with the Special Master and Plaintiffs on a workable long-term solution.

12        **B.    CDCR's Timeline for Completion of the CIM Project is Consistent with
           the Prior Reported Estimated Date for Completion.**

13

14        Plaintiffs question CDCR's representations that the CIM project will be completed by 2022,

15  citing former Deputy Director Tebrock's 2017 description of the proposed plan to expand the

16  number of licensed crisis beds in its system. (9/13/19 Tr. 16:23 – 17:4.) Former Deputy Director

17  Tebrock's 2017 testimony clearly identified the proposed CIM project as a long-term solution to

18  address the need for access to crisis care. (9/28/17 Tr. 55:13 – 56:25.) Former Deputy Director

19  Tebrock also testified that the initial design phase would take "approximately" one year to

20  complete. (*Id*. at 56:22-25.) Former Deputy Director Tebrock forecasted a five-year timeline for

21  the project at a time when the funding was not yet in place. That timeline is intact and, contrary

22  to Plaintiffs' interpretation, Former Deputy Director Tebrock's testimony is consistent with

23  CDCR's representations that it expects the CIM project to be completed by 2022.

24        The standard design and construction schedule for a project of the size and complexity of

25  the Mental Health Crisis Facility (MHCF) project is approximately four to five years. (Borg

26  Decl. ¶ 3.) This standard schedule is divided between two to two-and-a-half years of design

27  (including State Fire Marshal approval and general contractor bidding) and two to two-and-a-half

28  years of construction. (*Id.*) The design phase of this project has been delayed. Initially, the

5

1   contract with the design consultant Hellmuth, Obata and Kassebaum was executed in June 2018,

2   approximately three-to-four months later than anticipated.  (*Id*. ¶ 4.)  An additional delay

3   occurred between June and October 2019 to address concerns from the Legislature over the

4   preliminary plans and the project's cost.  (*Id*.)  Notwithstanding the delays, CDCR anticipates

5   State Fire Marshal approval in September 2020 and the construction contract to be awarded in

6   December 2020.  (*Id*. ¶ 5.)  Absent further delays, the project will be completed by December 22,

7   2022, well within the projected twenty-four-month construction plan.  (*Id*.)

8       As ordered, CDCR will continue to report monthly to the Court on the progress of the

9   project and identify any anticipated delays.  (*Id*. ¶ 5.)

10      **C.    Defendants Require Time to Fully Analyze the Issue of Whether There is a
        Causal Connection Between the Crisis Bed Discharges and the Increased

11      Suicide Rate.**

12      Plaintiffs question Defendants' compliance with access to inpatient care and attempt to tie

13  the lack of crisis beds and crisis bed discharges to an increase in the suicide rate.  (ECF No. 6268

14  at 3-4 & 9/13/19 Tr. 17:23 – 18:17.)  CDCR remains firmly committed to identifying and

15  addressing factors that cause an increased risk of suicide.  But Plaintiffs present no analysis, let

16  alone facts, to show a causal link between access to inpatient care and the suicide rate, which has

17  been steadily increasing for years, both within CDCR and across the country.

18      At the September 13, 2019 status conference, Plaintiffs speculated that unspecified

19  utilization management techniques are one of the causes of the increasing suicide rate.  (9/13/19

20  Tr. 17:23 – 18:17.)  Plaintiffs rely on vague references to alleged statements made by unidentified

21  clinicians that they feel pressure not to refer patients to higher levels of care (*id*. at 18:15-23), but

22  such vague references have no indicia of reliability and in any case do not support generalizations

23  regarding system-wide care.  CDCR continues to implement recommendations submitted by the

24  Special Master's suicide prevention expert, Lindsay Hayes, to improve requirements for follow-

25  up care for patients discharged from crisis level of care.  (ECF No. 5994 at 20-21.)  Mr. Hayes

26  monitors CDCR's compliance with these requirements.  (*Id*. at 3.)  Further, Defendants are taking

27  steps to analyze several potential commonalities among completed suicides to determine if there

28  is a causal connection between discharges from crisis level of care and suicide rate and what steps

6

1   can be taken to decrease risk of suicide during specific events, such as discharge from a mental

2   health crisis bed.  However, such an analysis will take time to ensure that Defendants make

3   educated decisions on how best to improve existing suicide prevention practices.

4        CDCR continues to dedicate significant time and resources to address its suicide prevention

5   obligations.  It has taken several proactive steps to evaluate its current practices and is actively

6   engaged in evaluating its safety planning tool, preparing to provide its clinicians with enhanced

7   training on preparing suicide plans, and automating its process to discharge custody check sheets.

8   Given these ongoing improvements and the continuing effort to analyze all potential

9   commonalities among completed suicides, Defendants request the opportunity to fully analyze

10  whether there is any causal connection between patients' crisis bed admissions and discharges

11  and suicides.

12       **D.    Plaintiffs Provide No Evidence to Support the Contention that Clinicians
             Statewide Cannot Refer Class Members to Higher Levels of Care.**

13

14       At the last status conference, Plaintiffs told the Court that they hear reports from clinicians

15  saying they feel pressure not to refer patients to higher levels of care.  (9/13/19 Tr. 18:17-21.)

16  And they argued that that the vacancy rates for beds at Atascadero State Hospital (ASH) and

17  Coalinga State Hospital (CSH) are a "canary in the coal mine."  (*Id.* at 19:20-25.)  Defendants are

18  not aware of any directive to or other pressure on clinicians to avoid referring patients against

19  their clinical judgment, and Defendants have implemented policies to avoid such a result.

20       Working with the Special Master, CDCR and DSH continue to develop state-wide policies

21  and procedures to help clinicians make the appropriate diagnostic decisions.  (Ceballos Decl. ¶ 3.)

22  Beginning in 2016, for example, Defendants began providing enhanced training for its staff on

23  clinical evaluations and continues to develop additional programs today.  (*Id.*)  Defendants have

24  also developed a crisis intervention team policy, with 19 of its institutions having implemented

25  their own local crisis intervention teams as of November 26, 2019.  (*Id.*)  Defendants' statewide

26  policy is currently under review by the Special Master.  (*Id.*)  And Defendants look forward to

27  continuing to work with the Special Master and Plaintiffs on improving these state-wide policies.

28

Also, Plaintiffs' statements regarding the vacancy of beds at ASH and CSH are not correct. As of November 16, 2019, all beds designated for *Coleman* class members at ASH and CSH are filled. (*Id*. ¶ 4.) In July 2019, CDCR took affirmative action and reinitiated its focus on transfers to state hospitals. (*Id.*) The effort included daily and close monitoring of all unlocked dorm eligible patients within the inpatient beds by headquarters staff, and drafting of a local operating procedure template and oversight plan for each inpatient facility for long term sustainability. (*Id.*) As of November 2019, this local operating procedure is under review and negotiation with the Special Master and Plaintiffs. (*Id.*) But at the very least, the renewed focus has corrected any prior oversights regarding available and unused beds, and Defendants look forward to providing further information on these efforts to the Court, the Special Master, and Plaintiffs at the December 13, 2019 status conference.

E. **Defendants Appropriately Revised the System that Tracks and Reports Compliance with the 24-Hour Timeline for Transfers to Mental Health Crisis Bed Level of Care to Stop the Transfer Timeline When a Patient is Placed in a Crisis Bed.**

In 2017, the Court determined that the Program Guide did not support Defendants' long-standing practice of excluding transportation time from the twenty-four-hour transfer timeline. (ECF No. 5710 at 16.) In response, CDCR changed the way it measures compliance with the twenty-four-hour timeline by stopping the clock when the patient is placed in a crisis bed. (Powell Decl. ¶ 8.) Plaintiffs now argue that the use of an email to notify HCPOP and start the referral process and timeline is improper. As previously explained to Plaintiffs and the Special Master, CDCR is in the process of updating the email system to an EHRS notification system that once fully implemented, will provide real-time notice of all referrals. (*Id*. ¶ 10.)

1. **Defendants' HEART Application Triggers the MHCB Transfer Timeline When HEART Receives an E-mail from the Referring Clinician.**

Defendants file a capacity, census, and waitlist snapshot report with the Court each month and provide HCPOP Endorsement and Referrals Tracking (HEART)-based data for crisis bed referrals and admissions. (*See* ECF No. 6394 at 9.) Between September 2015 and June 2019, the HEART program began tracking an inmate's referral, transfer, and placement in a crisis bed,

8

using the receipt of an email from the referring clinician requesting assignment of a crisis bed to start the transfer timeline.  (Powell Decl. ¶ 9.)   Defendants disclosed this process to the Court, the Special Master, and Plaintiffs in 2017.  (ECF No. 5680-10.)  Plaintiffs now allege that HEART utilizes incorrect start times, or triggers, when calculating the transfer timeline.  Plaintiffs are mistaken.  The parties thoroughly discussed the crisis bed referral and transfer process in 2017 workgroups and in Court filings.  HEART's transfer timeline is triggered when HCPOP receives an email from the clinician referring a patient to the crisis bed.  (Powell Decl. ¶ 9.)

In 2018, HCPOP implemented an automated notification of crisis bed referrals based on EHRS data.  With the EHRS notification system, the HEART transfer timeline starts when HCPOP receives an EHRS order for crisis bed level of care.  (*Id*. ¶ 10.)  Once a clinician determines that a patient needs crisis bed level of care, the clinician enters a level-of-care change in EHRS, which is immediately and automatically sent to the HEART program as a referral notification.  All referral information, including patient information, referral date and time, referring institution, and the patient's level of care, are automatically populated in HEART.  (*Id.*)

HCPOP staff continue to accept emailed referral notifications as the new automated process is validated, in which case HCPOP staff manually enter referral details.  (*Id.*)  This dual notification process is temporary as HCPOP and CDCR Mental Health validate the accuracy of the automated notification system from EHRS and complete phase II of the project, which includes automatic notification of referrals and rescissions from EHRS to HEART.

HCPOP records the final disposition of all referrals (i.e., transferred, internally admitted, rescinded) in HEART.  (*Id.*)  Transfer timeline compliance is tracked and monitored based on the date and time the referral is received and the date and time of final disposition, when a patient arrives at the crisis bed unit.  (ECF No. 5680-10 at 4 & ¶ 13.)

In January 2018, CDCR implemented its MHCB referrals report, which tracks the crisis bed timeline beginning when clinicians issue the first order in EHRS and ends when the patient arrives at the crisis bed—a methodology consistent with the Court's October 10, 2017 order and the Program Guide.  (ECF No. 5710.)  The EHRS order methodology provides closer to real time tracking of the crisis bed transfer timeline as the provider is required to enter the EHRS order

9

1   when he or she identifies the need for a crisis bed referral.  This approach should not be a surprise

2   to Plaintiffs, the Special Master, or the Court—in their September 13, 2017 filing, Defendants

3   reported their plan to move towards EHRS-order triggers for HCPOP.  (ECF No. 5680-10 at 5.)

4   There was no objection.

5       In March 2018, HCPOP began to align HEART with EHRS to transition from email

6   notification to an automatic notice of a referral when the clinician enters the order for a referral in

7   EHRS.  (Powell Decl. ¶ 11.)  The transition requires validation of the new system and data

8   sharing, and that project is ongoing.  (*Id.*)  CDCR will provide further information regarding the

9   status of this project at the December 13, 2019 status conference.

10      **2.      CDCR's Referral Plans Going Forward.**

11      In June 2019, the EHRS order data began auto-populating in HCPOP's HEART program.

12   (Powell Decl. ¶ 10.)  Although the referral orders are now auto-populating in HEART, HCPOP

13   continues to receive clinicians' email notifications of crisis bed referrals.  (*Id.* ¶ 11.)  HCPOP

14   will continue to receive dual notice of referrals until the validation process described above is

15   complete.  (*Id.*)  In either case, HCPOP triggers the start time for the twenty-four-hour timeline

16   based on whichever form of information they receive first.  (*Id.*)

17      CDCR's plans to have the EHRS automatically transmit clinicians' requests for crisis beds

18   to HCPOP when clinicians enter referrals in patients' electronic health records will give HCPOP

19   with real-time access to the list of pending referrals, which will eliminate the time it takes staff to

20   manually create lists each day for crisis-bed referrals and expedite the referral process.

21      **3.      There Is No Basis for CDCR to Retroactively Report Crisis Bed
           Transfer Times.**

22

23      Plaintiffs suggest that because CDCR has developed a more technologically advanced

24   method of measuring the crisis bed start time, any data generated prior to the implementation of

25   EHRS is misleading.  Plaintiffs' argument is not supported by any evidence that the reporting

26   generated to date is wrong or misleading.  As Defendants reported and acknowledged in 2017,

27   CDCR for years calculated the stop time for crisis bed transfers to outside institutions when the

28

1    patient was placed on transport.  The monthly transfer timeline reports filed with the Court are

2    based on the corrected measurement under the Court's 2017 order.  (Powell Decl. ¶ 8.)

3         Also, Defendants have developed a report that measures the correct start and end time for

4    referrals and have been providing it to the Special Master and Plaintiffs as part of the monthly

5    *Coleman* report since 2018.  (Ceballos Decl. ¶ 5.)  The MHCB Referrals report provides monthly

6    data of all patients referred and admitted to a crisis bed in a given period of time and provides

7    data on how long each transfer took.  (*Id.*)

8    **II.    NEED FOR UNMET BED NEED STUDY FOR CRISIS AND INPATIENT CARE.**

9         Defendants disagree with Plaintiffs that the status of inpatient and crisis bed referrals

10   warrant an unmet needs assessment.  Despite this disagreement, Defendants are not opposed to a

11   focused review of the referral and admissions process for inpatient care or crisis level of care.

12   Any focused review should take precedence over other discussions, such as staffing or

13   construction, as the result of the review will likely inform those discussions and should include, in

14   addition to a review of whether there are patients that should have been referred to a higher level

15   of care, a review of whether the referrals that occurred were clinically appropriate.  To fully

16   assess whether there is an unmet bed need, the assessment must also include a review of inpatient

17   discharges to determine if patients are being discharged to lower levels of care in a timely

18   manner.  In any event, the assessment should provide Defendants with targeted and durable

19   criteria to meet the objective of providing patients' access to inpatient and crisis level of care

20   under current policy.

21   **III.   STATUS OF CDCR'S STAFFING PLAN.**

22        CDCR continues to work to implement the portions of its staffing plan the Court approved

23   in October 2017 and most recently updated in January 2018.  Defendants would also like the

24   opportunity to work through proposals that address adjustments to the 2009 Staffing Plan.

25   Attached as Exhibit A is CDCR's status update on staffing, which reflects CDCR's continued

26   efforts to examine how best to address its staffing challenges.

27

28

1

2   Dated:  November 27, 2019                    Respectfully submitted,

3                                               XAVIER BECERRA
                                                Attorney General of California
4                                               ADRIANO HRVATIN
                                                Supervising Deputy Attorney General
5
                                                /s/ Elise Owens Thorn
6                                               ELISE OWENS THORN
                                                Deputy Attorney General
7                                               Attorneys for Defendants

8   CF1997CS0003

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Resp. Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

# Exhibit A

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



November 27, 2019


Special Master Matthew A. Lopes. Jr.
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

*Coleman* Plaintiffs' Counsel
Rosen Bien Galvan & Grundfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105


*VIA EMAIL ONLY*


Dear Special Master Lopes and *Coleman* Plaintiffs' Counsel:

I write regarding the court's October 8, 2019 order, ECF No. 6312, that requires an update on the status of CDCR's remedial efforts related to compliance with the October 10, 2017 order, ECF No. 5711.

Adequate staffing is critical to ensuring that Defendants can provide high-quality care to patients. Although the parties have not had in-depth discussions regarding psychiatry staffing since before the release of Dr. Golding's report in October 2018, the California Department of Corrections and Rehabilitation (CDCR) has continued its examination of innovative ways to address its staffing challenges.

    1.  Staffing Initiatives Previously Implemented

CDCR and California Correctional Health Care Services (CCHCS) have worked together to improve recruitment and retention through the following steps previously presented to the Special Master and Plaintiffs' counsel:

- In 2016, in an effort to recruit more psychiatrists, CDCR modified the on-call compensation options for staff to include cash compensation. Previously psychiatrists only received compensated time off for the hours spent as the on-call psychiatrist. The modification to allow cash compensation provides an additional incentive to stay with CDCR. In 2016, CDCR also authorized dual appointment, which allows current psychiatrists to be hired at another institution on a 0.25 time basis. This provides the

psychiatrist with additional opportunity to increase their salary and provides part-time coverage at the institutions.

- In 2017, CDCR/CCHCS increased registry rates at most institutions. Registry rates were increased again in September 2019 to $316 per hour at most institutions. Those institutions that did not receive an increase remain at a registry rate of $265.

- CDCR has also implemented a psychiatric fellowship program to allow licensed post-graduate residents to treat inmates, while also learning the concepts and practices of psychiatry within a prison setting.

- In 2017, CCHCS began to recruit psychiatric nurse practitioners (PNPs) who, under the supervision of a psychiatrist, are able to provide direct patient care. At the same time, CCHCS begun hiring medical assistants (MAs) to assist psychiatrists with their work, based on the scope of each classification.

- In early 2018, a Mental Health Clinical Academy was activated. This onboarding program provides incoming staff with a broader perspective of the entire system and a uniform approach on policies, procedures, and expectations so they are better prepared to work in a correctional setting.

At this time, it is difficult to ascertain the cumulative effect of these various recruitment and retention programs initiated by CDCR. Regardless, CDCR remains committed to assessing the impact of these initiatives and to identifying, hiring, and retaining qualified mental-health clinicians. CDCR looks forward to exploring this topic further with the Special Master and Plaintiffs.

2. New or Revised Proposals

While these prior recruitment and retention initiatives are important, CDCR recognizes these changes alone are not enough to bring CDCR into compliance with the Court's October 10, 2017 order. CDCR has therefore taken the below steps to increase recruitment of psychiatry staff and requests the opportunity to meet with Plaintiffs and the Special Master to discuss additional staffing-related proposals.

a) Targeted Recruitment of Psychiatrists and Advertising for Mental Health Positions

For several years, CCHCS, with input from Mental Health, has been actively recruiting psychiatrists. One way this has been done is through targeted marketing and participation at various events throughout the state every year, including career fairs, American Psychiatric Association meetings, psychiatric conferences, and articles/recruitment information in psychiatric journals. CCHCS has recently employed Merritt Hawkins, a renowned physician recruiter, to assist in revamping the psychiatry marketing materials, as well as provide other recruiting services. While this contract is relatively new, CCHCS and CDCR hope to soon see positive outcomes from the work undertaken by Merritt Hawkins.

Special Master Matthew A. Lopes. Jr.
*Coleman* Plaintiffs' Counsel

In addition to working with Merritt Hawkins, CCHCS has contracted with Wallrich Associates Integrated Marketing Communications to revise the recruitment advertising material to depict Mental Health as a choice employer. The goal of this contract is to revise the perception of Mental Health in the community. While the idea of targeted recruitment and advertisement are not new, Mental Health hopes the revamp and assistance from Merritt Hawkins and Wallrich Associates Integrated Marketing Communications will increase psychiatry hiring.

    b)  Creation of a Comprehensive and Understandable Website to Assist Applicants

The application process for psychiatrists can be confusing and there is currently no single source of information to assist with any questions that arose. In response, CCHCS, with input from Mental Health, decided to create a single landing page for applicants that will provide the information needed to complete the application process in an easy to use webpage.

    c)  Focused Recruitment of Retired Annuitants

In addition to focusing on recruiting new psychiatrists, CCHCS is also developing a marketing strategy to recruit retired annuitants. CDCR hopes that focusing on this previously underused resource may fill additional psychiatry positions.

    d)  Retention Initiatives

Retention initiatives have also been put in place, such as access to weekly continuing education for psychiatrists to foster a more academic and unified environment. CCHCS has reorganized the psychiatry chain of command at institutions. This change has the most senior psychiatrist reporting directly to the Chief Executive Officer, instead of the Chief of Mental Health. Such a change in the institutional structure will ensure inclusion of the most senior psychiatrist as a key member of the executive leadership team at each institution.

    e)  Implementation of a Clinic Model

The implementation of a clinic model, where possible, would be one of the most effective ways to improve job satisfaction and increase the efficiency of psychiatrists. CDCR is looking at what concrete steps must be taken to implement this proposal and will have a plan to share with Plaintiffs and the Special Master in the coming months.

A key part of the clinic model is ensuring that psychiatrists are able to remain in the clinic, instead of spending valuable time searching for patients who have refused their appointments. Therefore, in conjunction with the clinic model, CDCR would like to discuss various options for improving patient attendance at psychiatric contacts.

    f)  Adjustments to the 2009 Staffing Proposal

CDCR would also like the opportunity to discuss a number of proposals to adjust portions of the 2009 Staffing Plan. Of these, there are two proposals that could be discussed with Plaintiffs and the Special Master soon: 1) application of the staffing ratio for psychiatrists in the Clinical Correctional Case Management System (CCCMS) to patients who require psychiatric care and 2)

Special Master Matthew A. Lopes. Jr.
*Coleman* Plaintiffs' Counsel

the elimination of the psychiatry crisis intervention positions in the 2009 Staffing Plan and re-allocation of some positions to nighttime telepsychiatry coverage for on-call and Crisis Intervention Team (CIT) calls.

> (1) Application of the Staffing Ratio for Psychiatrists in the CCCMS to Patients Who Require Psychiatric Care

In a prior proposal discussed with the Special Master and Plaintiffs, CDCR asked to apply the ratio for psychiatrists in CCCMS to those who are on psychiatric medication. The Program Guide requires that "[e]ach CCCMS inmate-patient on psychiatric medication… be reevaluated by a psychiatrist a minimum of every 90 days." (Program Guide at 12-3-11.) Despite the limitation in the Program Guide that only patients on medication need to routinely see a psychiatrist, CDCR has historically applied the ratio set forth in the 2009 Staffing Plan to all CCCMS patients. After months of negotiations, the parties had tentatively agreed that CDCR apply the 2009 staffing ratio to the number of CCCMS patients that fell into the following four categories:

1.  CCCMS patients currently on psychotropic medication;
2.  CCCMS patients who have been at the CCCMS level of care for less than three months;
3.  CCCMS patients who had previously been prescribed psychotropic medication, but have been off of the medication for less than six months; and
4.  CCCMS patients who, in the opinion of their treating psychiatrist, could benefit from medication but have refused medication.

After further internal discussions, CDCR requests to revisit this proposal and include two additional categories:

5.  An initial psychiatry contact for a CCCMS patient who is not on medication after being moved from a higher level of care.
6.  annual psychiatry contact for all CCCMS patients, regardless of whether the patient is on medication, prior to their annual IDTT.

In addition, CDCR believes that category two should be expanded to encompass all CCCMS patients who have been at the CCCMS level of care for less than sixth months. CDCR is prepared to fully and transparently discuss any data and the associating methodologies that may be provided to Plaintiffs and the Special Master to understand this proposal. An agreement on this proposal would right size the psychiatry allocation at the CCCMS level of care to the patients who require psychiatric care.

> (2) Elimination of the Psychiatry Crisis Intervention Positions in the 2009 Staffing Plan and Re-Allocation of Some Positions to Nighttime Telepsychiatry Coverage for On-Call and Crisis Intervention Team (CIT) Calls.

The second proposal regarding the reallocation of some positions to telepsychiatry coverage has also been previously discussed with the Special Master and Plaintiffs. However, Dr. Golding's report did raise some concerns regarding the number of psychiatrists that would need to be reallocated to nighttime telepsychiatry coverage. Given this, CDCR continues internal discussions

Special Master Matthew A. Lopes. Jr.
*Coleman* Plaintiffs' Counsel

to work out the details of the CIT proposal, but anticipates being ready for discussion in the new year.

3.  Conclusion

CDCR recognizes the critical importance of improving both recruitment and retention of psychiatry staff for patient care.  The proposals above will help CDCR achieve compliance with this goal.  CDCR requests the opportunity to discuss these proposals within the next 60 days, as well as any other proposals that Plaintiffs or the Special Master may have, to improve psychiatry fill rates.  CDCR will also strive to answer any questions that may arise in these discussions and provide the methodology for any data provided to ensure full transparency in the workgroup process.  As always, CDCR will continue to look for new ways to recruit and retain psychiatry staff and will augment the above proposals as need be to achieve compliance with the Court's October 10, 2017 order and best serve the patient population.

Sincerely,

*/s/ Jerome A. Hessick*

Jerome A. Hessick
Assistant General Counsel
Office of Legal Affairs
California Department of Corrections and Rehabilitation