

Transcript of the Testimony of:

# Kevin Kuich, M.D.

Coleman

v.

Newsom

September 19, 2019

Volume I

P: 877.771.3312 | F: 877.561.5538 | litivate.com

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3                         ---OOO---

 4      RALPH COLEMAN, et al.,          )
                                        )
 5                      Plaintiffs,  )
                                        )
 6              vs.                     ) CASE NO.
                                        ) 2:90-CV-00520-KJM-DB
 7                                      )
        GAVIN NEWSOM, et al.,           )
 8                                      )
                        Defendants.  )
 9      _____)

10

11

12                 DEPOSITION PROCEEDINGS OF

13                    KEVIN KUICH, M.D.

14              Thursday, September 19, 2019

15

16

17

18

19

20

21

22

23

24

25      Reported by Angie Diner, RMR, CRR, CSR 9581
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

```
 1   A P P E A R A N C E S :

 2

 3   FOR Plaintiffs:

 4   ROSEN BIEN GALVAN & GRUNFELD LLP
     BY:  LISA ELLS, Attorney at Law
 5        CARA TRAPANI, Attorney at Law
     101 Mission Street, 6th Floor
 6   San Francisco, California 94105
     415.433.6830
 7   Lells@rbgg.com

 8

 9

10   FOR Defendants:

11   OFFICE OF THE ATTORNEY GENERAL
     BY: ELISE OWENS THORN, Attorney at Law
12        KYLE LEWIS, Attorney at Law
     455 Golden Gate Avenue, Suite 11000
13   San Francisco, California 94102-7020
     (415) 510-3585
14   Elise.Thorn@doj.gov
     Kyle.lewis@doj.ca.gov
15

16

17

18

19

20

21

22

23

24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                          September 19, 2019

```
 1                            INDEX

 2

 3   DEPONENT:                                         PAGE:

 4    KEVIN KUICH, M.D.

 5   EXAMINATION BY MS. ELLS........................5

 6   EXAMINATION BY MS. THORN......................193

 7   FURTHER EXAMINATION BY MS. ELLS...............236

 8   FURTHER EXAMINATION BY MS. THORN..............251

 9   FURTHER EXAMINATION BY MS. ELLS...............253

10   FURTHER EXAMINATION BY MS. THORN .............254

11                            *****

12

13                     PLAINTIFF'S EXHIBITS

14   NO.              DESCRIPTION              MARKED

15
     Exhibit 1      DIVISION OF HEALTHCARE SERVICES  16
16                  MENTAL HEALTH PROGRAM
                    MANAGEMENT OVERVIEW UPDATED
17                  REVIEWED ON 6/29/18

18   Exhibit 2      ORDER FROM THE COLEMAN V.        19
                    NEWSOM CASE DATED
19                  SEPTEMBER 17TH, 2019

20   Exhibit 3      E-MAIL STRING OF TWO E-MAILS     50
                    DR. GOLDING ATTACHED AS EXHIBIT
21                  AA TO HIS REPORT FILED IN
                    FEDERAL COURT DATED TUESDAY,
22                  JULY 17TH, 2018 SUBJECT: CHCF
                    CLINIC MODEL
23
     Exhibit 4      DECLARATION OF KATHERINE         54
24                  TEBROCK IN SUPPORT OF
                    DEFENDANTS' RESPONSE TO THE
25                  SPECIAL MASTER'S REPORT ON THE
```

Kevin Kuich, M.D.                                        September 19, 2019

```
 1                     STAFFING AND THE IMPLEMENTATION
                       OF DEFENDANTS' STAFFING PLAN
 2
       Exhibit 5      E-MAIL FROM MELISSA BENTZ DATED    62
 3                    MAY 17TH, 2018 WITH ATTACHMENT
                      ENTITLED "CDCR PSYCHIATRY
 4                    STAFFING PROPOSAL"

 5     Exhibit 6      E-MAIL FROM MELISSA BENTZ DATED    62
                      SEPTEMBER 17TH, 2018 ENTITLED
 6                    "COLEMAN REVISED PSYCHIATRY
                      STAFFING REDUCTIONS"
 7
       Exhibit 7      DEFENDANTS' MONTHLY PSYCHIATRY     62
 8                    VACANCY REPORT FILED IN THE
                      DISTRICT COURT ON 10/31/18
 9
       Exhibit 8      E-MAIL FROM MELANIE GONZALEZ AT    89
10                    CDCR TO MICHAEL GOLDING AT CDCR
                      DATED WEDNESDAY, MARCH 22ND,
11                    2017

12     Exhibit 9      E-MAIL FROM DR. GOLDING TO        144
                      KATHERINE TEBROCK DATED
13                    JULY 2ND, 2018

14     Exhibit 10     E-MAIL FROM LAURA CEBALLOS AT     152
                      CDCR TO KEVIN KUICH, M.D. AND
15                    OTHERS, DATED JUNE 18TH, 2018

16     Exhibit 11     E-MAIL FROM DR. MICHAEL GOLDING   160
                      AT CDCR TO KEVIN KUICH AT CDCR
17                    DATED AUGUST 2ND, 2018,
                      ENTITLED "RE: MENTAL HEALTH
18                    CHANGE MANAGEMENT COMMITTEE"

19     Exhibit 12     E-MAIL FROM DR. GOLDING TO        183
                      KATHERINE TEBROCK DATED
20                    OCTOBER 24TH, 2017

21
                              *****
22
                         DEFENDANT'S EXHIBITS
23
       NO.              DESCRIPTION              MARKED
24
                           (NONE)
25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

1    BE IT REMEMBERED that on Thursday, September 19, 2019

2    commencing at the hour of 10:24 A.M. in the offices of

3    ROSEN BIEN GALVAN & GRUNFELD LLP, 101 Mission Street, 6th

4    Floor, San Francisco, California before me, ANGIE DINER,

5    a Certified Shorthand Reporter in and for the State of

6    California, personally appeared

7                        KEVIN KUICH, M.D.,

8    called as a witness herein, who, having been duly sworn,

9    was thereupon examined and interrogated as hereinafter

10   set forth.

11                        --o0o--

12                   EXAMINATION BY MS. ELLS

13   BY MS. ELLS:

14    Q.    Good morning, Dr. Kuich.  I'm Lisa Ells.  I'm an

15   attorney for the plaintiff class in the Coleman v. Brown

16   case.

17         Would everyone in the room please state their

18   name for the record?

19         MS. TRAPANI:  Cara Trapani for plaintiff.

20         MR. LEWIS:  Kyle Lewis, Office of the Attorney

21   General, for defendants.

22         MS. THORN:  Elise Thorn, Office of the

23   Attorney General, for defendants.

24         THE WITNESS:  Dr. Kevin Kuich.

25   BY MS. ELLS:

1    Q.    I want to run through a few ground rules about

2    depositions with you before we start so we understand

3    what we're doing here.  The first is that it's very

4    important that you answer every question verbally.  The

5    court reporter is accurately writing down what you say

6    and what I say, and if you nod your head or you point or

7    something, the court reporter isn't going to be able to

8    reflect that in the written record.

9         I'm also confirming that you're not represented

10   by counsel today.  Is that correct?

11   A.    Correct.

12   Q.    Okay.  And counsel for CDCR here may make

13   objections to the form of questions that I'm asking you.

14   They're not your counsel, so you should answer the

15   questions anyway.  I may rephrase the questions and have

16   you answer that, but you should nonetheless answer the

17   questions that are asked.  If I ask you a question that

18   you don't understand, please let me know.  I'd be happy

19   to rephrase it, provide you additional context, whatever

20   you need in order to answer.  Will you do that?

21   A.    Yes, I will.

22   Q.    Thank you.  If at any time you want to change an

23   answer or give detail on something you forgot on an

24   earlier answer, just let me know and we'll take the

25   opportunity to do that.  Is that understood?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    Yes.

2    Q.    Thank you.  Now, you've taken an oath to testify

3    under penalty of perjury today.  That means this

4    testimony is the same thing as if you were in a live

5    courtroom.  Do you understand that?

6    A.    Yes, I do.

7    Q.    And is there any reason, such as being on

8    medication or having poor sleep or not feeling well,

9    that you wouldn't be able to give your best testimony

10   here today?

11   A.    No.

12   Q.    Thank you.  We're going to be talking for a long

13   time.  There's an opportunity for breaks.  If you feel

14   like you need a break to gather your thoughts or because

15   you need to use the restroom, whatever it is, please let

16   me know and we'll accommodate you.  And obviously we'll

17   take a lunch break as well.  Is that okay with you?

18   A.    Yes, it is.

19   Q.    Thank you.  So I'd like to run through some

20   background information with you.  Could you state for

21   the record the name of your current employer and what

22   your title is?

23   A.    Sutter Healthcare, and my title is chief medical

24   officer.

25   Q.    Where is that located?

Kevin Kuich, M.D.                                      September 19, 2019

```
 1    A.     Kahi Mohala, K-a-h-i M-o-h-a-l-a.  It's in Ewa
 2    Beach in Hawaii.
 3    Q.     In Hawaii.  Thank you.  Before that, you worked
 4    for the California Department of Corrections And
 5    Rehabilitation?
 6    A.     Correct.
 7    Q.     How long did you work there?
 8    A.     My time on the books was six -- I believe six
 9    years.  I had left sometime in January of 2019, mid
10    January 2019, and started on August 1st, 2013.
11    Q.     Could you tell me what the positions you held
12    were, starting with the first one you held for CDCR?
13    A.     I was a staff psychiatrist working for
14    California Health Correction Facility, CHCF, in
15    Stockton.  Then I became a senior psychiatrist
16    specialist.
17    Q.     Could I interrupt for a moment?  Can you tell me
18    how long that first position was for?
19    A.     Approximately six months.
20    Q.     Go ahead.
21    A.     Then I transferred up to headquarters and I was
22    a senior psychiatrist specialist.
23    Q.     How long was that for?
24    A.     Probably about three years.
25    Q.     Do you remember approximately when you moved
```

Kevin Kuich, M.D.                                                    September 19, 2019

1  into your next role with CDCR?

2  A.    Somewhere around February of 2014 was the senior

3  psychiatrist specialist.

4  Q.    What was your role after that?

5  A.    Then I was the chief tele psychiatrist.

6  Q.    When did you start that role?

7  A.    It was after rollouts after the EHRS finished,

8  so it was -- so it was November 2017, I believe.

9  Q.    Could you describe for me what your duties were

10 as staff psychiatrist at CHCF?

11 A.    Certainly.  As a staff psychiatrist, I had

12 direct patient care.  I would see patients in the

13 inpatient unit, which was at MHCB; I would see patients

14 in the outpatient housing units; and I also did

15 consultation work as requested.

16 Q.    And could you then describe for me what you

17 did -- what your job duties were as a senior

18 psychiatrist specialist?

19 A.    Yes.  As a senior psychiatrist specialist, my

20 duties were quite varied.  They involved various work on

21 various committees, policy work, helping with

22 credentialing, and also helping with staffing.

23 Q.    Could you describe a little bit to me about what

24 you mean by helping with staffing?

25 A.    Helping with staffing was working to bring

Kevin Kuich, M.D.                                    September 19, 2019

1    people on board to CDCR, and that could be permanent

2    employees through interviews, that could be engaging in

3    the H-1B visa program, and that could also be working

4    with Management Solution, which was the staffing

5    company, local staffing company at that time.

6       Q.    And that would be a contracting type of --

7       A.    Contracting.

8       Q.    Did you have any insight into -- or scratch

9    that.

10             Did you have any role in determining what

11   resources individual institutions needed for psychiatry

12   in that position?

13      A.    In the specialist position, no.  I was more

14   responding to what the field was requesting.

15      Q.    And what do you mean by that?

16      A.    If the field indicated that they were short,

17   they maybe had resignations, terminations, vacations,

18   they would reach out and say, We're short, can you help

19   us out in some way.

20      Q.    So by that, when you say "the field," do you

21   mean individual institutions?

22      A.    Correct.  Individual institutions would reach

23   out and indicate that they have a shortage or they have

24   a need.

25      Q.    Was it typical for a particular person at that

Kevin Kuich, M.D.                                        September 19, 2019

1    institution to contact you about these issues?

2     A.    It would be varied.  Sometimes it could be the

3    chief of mental health.  Sometimes it could be the chief

4    psychiatrist.  Sometimes it could be someone in the

5    administration there.  It just depends on what their

6    relationship was and comfort level with interacting with

7    headquarter staff.

8     Q.    And when they contacted you about these issues,

9    what could you do in response?

10     A.    First I would want to get a sense of what's

11    going on, try to get a sense of why the resignation or

12    termination, how long the vacation, how long the

13    disability, so I knew what the need was; and then tried

14    to get a sense where the need was, whether it was

15    inpatient or outpatient.  And then I would be able to

16    make a more informed decision about what's the best

17    direction to try and help fill their need.

18     Q.    What things could you do to help fill their

19    need?

20         MS. THORN:  I'm going to object right now.

21    Beyond the scope of the issues identified in the

22    Court's September 17th order.  I mean, this is not by

23    way of background.  He can explain what his position

24    was.  You're getting into his day-to-day and stuff

25    like that, especially with respect to this position,

Kevin Kuich, M.D.                                      September 19, 2019

1    I think he testified on the dates, and that would

2    fall outside of the scope of the Court's inquiry.

3    BY MS. ELLS:

4     Q.    Go ahead, please.

5     A.    Could you repeat the question?

6     Q.    What could you do to address the issues that the

7    institutions were calling you with regarding psychiatry

8    staffing needs?

9     A.    If I knew that there was a permanent candidate

10   who either presented themselves through job fair or APA

11   convention booth or directly contacted us and I knew

12   that they had an interest in a certain region, I would

13   try to steer that candidate or provide information to

14   that candidate about that location.  If there wasn't a

15   permanent candidate that was available, I would look

16   into Management Solution, let them know what the need

17   was and what the time frame was.  Sometimes I would

18   interface with tele psychiatry, which I wasn't dealing

19   with at the time, to see if they had necessity resources

20   as well.

21    Q.    When you say Management Solution, you're talking

22   about the contractor that provided contract staff to

23   CDCR?

24    A.    Correct.  That is correct.

25    Q.    Did you have any involvement during this time

Kevin Kuich, M.D.                                    September 19, 2019

1    period in the design or rollout of the electronics --

2    the Electronic Health Records System?  And the acronym

3    that we discuss that is is EHRS.  Is that right?

4     A.    That is accurate.

5     Q.    Okay.  Could you describe your role during this

6    time frame in deploying EHRS?

7     A.    My role with the EHRS was to help design the

8    psychiatry portion in collaboration with the rest of the

9    system.  That role was -- it was interrupted on multiple

10   occasions because there was an active Coleman around at

11   the time, so I needed to go with the monitors to various

12   institutions.  So I would do a few weeks on the design

13   and then leave for a week or two and then come back, so

14   it was a process.

15          My involvement with the EHRS was when Cerner had

16   specific associates that were right at CDCR who were

17   engaging with us in discussions and actually building

18   certain parts of the system.  So there would be times

19   where I would work on the documentation piece.  There

20   would be other times where I would work on the power

21   forms, which are a series of orders.  And there were

22   other times that I would be dealing with bringing

23   everything together after they've built out modules and

24   ports.

25    Q.    Was anybody else from headquarters psychiatry

Page 13

Kevin Kuich, M.D.                                    September 19, 2019

1    involved in this process at that point?

2    A.    No.

3    Q.    Were other clinical staff from headquarters

4    involved?

5    A.    Yes.

6    Q.    How many would you say were, approximately?

7    A.    Five or six, probably, for mental health.

8    Q.    And were those all clinicians?

9    A.    Yes.

10   Q.    But none of them were psychiatrists except for

11   you?

12   A.    Correct.

13   Q.    Your next position you said was statewide chief

14   of tele psychiatry?

15   A.    (Nods head affirmatively.)

16   Q.    I believe you said you started that in October

17   or November of 2017; is that correct?

18   A.    Around that time.  It was when rollouts ended,

19   EHRS rollouts ended.

20   Q.    Can you describe your duties as the chief of

21   statewide tele psychiatry?

22   A.    They encompassed everything I was doing before

23   and then added tele psychiatry services.  The tele

24   psychiatry piece was managing the three tele psychiatry

25   hubs; it was recruiting and retaining tele

Kevin Kuich, M.D.                                September 19, 2019

1    psychiatrists; it was providing tele psychiatry services

2    to all the institutions and managing the technological

3    aspect of the system.  Also within that time frame I was

4    able to bring an additional hub on board at Fresno to be

5    able to provide more resources.

6    Q.    And while you were doing all of those tasks

7    related to tele psychiatry, you were continuing to do

8    the other tasks that you had previously performed as the

9    senior psychiatrist specialist?

10   A.    Correct.  And in addition, there were tasks on a

11   statewide level that were focused on trying to help make

12   the psychiatry systemwide more effective, more efficient

13   in what they do, and more collaborative amongst

14   themselves and the organization as well.

15   Q.    Part of your job was to manage where the tele

16   psychiatrists went and deploy the resources on the

17   ground, right?

18   A.    That is correct.

19   Q.    And was it part of your job to be aware of

20   whether institutions were able to provide psychiatry

21   care?

22   A.    Yes.

23   Q.    Were you also involved in deploying non-tele

24   psychiatrists within the institutions at this time?

25   A.    Yes, I was still involved with that.

Kevin Kuich, M.D.                                           September 19, 2019

1    Q.      And that continued from when you started your

2    previous position in 2014 through your role as the

3    statewide chief of psychiatry?

4    A.      Correct.

5    Q.      What was your level within the department when

6    you were a statewide chief of psychiatry?  Who did you

7    report to --

8    A.      I reported to Dr. Golding.

9    Q.      When you were the chief of psychiatry?

10   A.      Correct.

11   Q.      Did you ever report to anybody other than

12   Dr. Golding when you worked at headquarters?

13   A.      I reported to Greg Tarosoff, T-a-r-o-s-o-f-f.

14   Q.      And was Dr. Tarosoff a psychiatrist?

15   A.      Yes, he was.

16   Q.      I would like to introduce an exhibit.

17              (Plaintiff's Exhibit No. 1 was marked for

18                 identification.)

19   BY MS. ELLS:

20   Q.      Dr. Kuich, this is a document that's entitled

21   "Division of Healthcare Services Mental Health Program

22   Management Overview," and you'll see on the bottom right

23   that says "updated reviewed on 6/29/18."  Do you see

24   yourself in the left-hand column in this organizational

25   chart?

Kevin Kuich, M.D.                                          September 19, 2019

1    A.    I do.

2    Q.    What is your title on this organizational chart?

3    A.    Chief psychiatrist tele psychiatry north.

4    Q.    Is there a separate position for tele psychiatry

5    south?

6    A.    There had been a second position from -- that

7    was -- let me rephrase that.  That was the original

8    position of the chief tele psychiatrist who was located

9    in Rancho Cucamonga.  There was a decision made by

10   administration staff to have a northern chief and a

11   southern chief.  I don't know why there was that

12   decision, but there was a decision made.

13   Q.    Did anyone ever fill that role, to your

14   knowledge?

15   A.    No.

16   Q.    Were you essentially performing the functions of

17   both a tele psychiatry north and tele psychiatry south?

18   A.    Yes.

19   Q.    Chief tele psychiatrist?

20   A.    Yes.

21   Q.    Is that true for the entire time you were chief

22   psychiatrist of tele psychiatry?

23   A.    Yes.

24   Q.    This organizational chart has you reporting to

25   the deputy director of statewide mental health program,

Kevin Kuich, M.D.                                    September 19, 2019

1    Katherine Tebrock.  Is this accurate?

2     A.    Deputy Tebrock would sign my timecard after I

3    would hand ir in to Dr. Golding.  Deputy Tebrock did not

4    provide any supervision services for me, nor direction

5    specifically with regard to how I perform my tasks.

6     Q.    Did anyone ever tell you directly who you

7    reported to in the organization?

8     A.    No.  There was a tremendous -- there was many

9    discussions about the organizational chart and

10   organizational changes, and there was a proposed

11   organizational revision that was to happen, and it was

12   on hold.  And I don't know if it was changed or if it

13   was ever formally enacted in the time I was there.

14    Q.    So am I correct that you're inferring that you

15   were reporting to Dr. Golding because he's the person

16   who supervised you on a daily basis?

17    A.    Correct.

18    Q.    But organizationally you're not sure who you had

19   actually formally reported to?

20    A.    Correct.

21    Q.    Were there any psychiatrists at the department

22   at your same level?

23    A.    In -- when you speak of the department, I will

24   take that to mean at headquarters.

25    Q.    That's correct.  Were there any other chiefs of

Kevin Kuich, M.D.                                      September 19, 2019

1   any form of psychiatry at the headquarter level besides

2   you and Dr. Golding?

3    A.    No.

4    Q.    Am I understanding you correctly that part of

5   your job was to understand the staffing needs of

6   individual institutions and do your best to deploy

7   resources to provide psychiatry staffing at those

8   institutions?

9    A.    That is accurate.

10    Q.    Dr. Kuich, did you review anything in

11   preparation for this deposition today?

12    A.    I reviewed the executive summary of the neutral

13   expert; I reviewed my own deposition request indicating

14   what things would be available; and I reviewed what

15   documents I did have available to me that may or may not

16   be relevant to the issues at hand.

17    Q.    Did you review any court orders regarding the

18   purpose of this deposition today?

19    A.    I did.

20    Q.    I would like to mark this as Exhibit 2.

21              (Plaintiff's Exhibit No. 2 was marked for

22              identification.)

23   BY MS. ELLS:

24    Q.    Dr. Kuich, this document is an order from the

25   Coleman v. Newsom case, and the date at the top says

Page 19

Kevin Kuich, M.D.                                    September 19, 2019

1    September 17th, 2019.  Have you reviewed this order?

2     A.    I have reviewed this order.

3     Q.    Dr. Kuich, this order indicates that the Court

4    would like to hear your views on three topics that were

5    discussed in the neutral expert report that you

6    referenced that you have reviewed the executive summary

7    of.  You'll see at the top of page 2, the Court has

8    defined those topics as -- I'm quoting -- "Issue B:

9    Redefining 'monthly' to lengthen the intervals between

10   enhanced outpatient (EOP) appointments; Issue E:

11   Reporting of scheduled and missed appointments; and

12   Issue F:  Psychiatric supervisors acting as line staff."

13          I would like to ask you first about Issue F, and

14   that's the issue that the Court has defined "psychiatric

15   supervisors acting as line staff."  How familiar are you

16   with how individual -- were you -- let me start that

17   over.

18          How familiar were you, when you worked for CDCR

19   at the headquarters level, with how individual

20   institutions performed psychiatric patient care?

21    A.    Exquisitely.

22    Q.    Could you expand?

23    A.    In my role of training -- designing and training

24   and rolling out the EHRS, I visited almost every

25   institution in CDCR.  If I hadn't stepped foot on the

Kevin Kuich, M.D.                                    September 19, 2019

1    institution, I was on the phone with them or other means

2    of communication as part of their training and continued

3    support as they adapted this new EHRS system.

4    Q.    Did that involve discussing staffing needs with

5    psychiatrists at institutions?

6    A.    The training was focused on the EHRS training,

7    but the training was elbow, so there was plenty of time

8    to have all kinds of discussions with respect to the

9    EHRS there -- because of its complexity and because of

10   its significant changes of work flow, there were

11   conversations that came up with concerns about having

12   enough staff to complete these tasks in a timely manner.

13   Q.    How often would those issues come up?

14   A.    At least 50 percent of the time.

15   Q.    Were you ever contacted, separately from the

16   times when you were sitting with staff as part of the

17   EHRS rollout, about staffing needs at individual

18   institutions?

19   A.    Yes.  One of the benefits of doing the EHRS

20   rollout was having a personal relationship with my

21   colleagues.  One of the downsides was they knew who I

22   was and they felt very free to be able to reach out and

23   discuss their concerns or issues.

24   Q.    How free did they feel about that?  How often

25   did they contact you?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1   A.      Some quite free.  It could be weekly.  Others it

2   could be monthly.  It varied on the institution and it

3   varied on the individual.

4   Q.      But it was common, from what I understand your

5   testimony to be, for institutions to contact you with

6   staffing requests --

7   A.      Correct.

8   Q.      -- is that correct?

9   A.      That is correct.

10   Q.      Are you familiar with how individual

11   institutions performed psychiatric care and staffed that

12   care?  Were you familiar during this time frame?

13          MS. THORN:  So I'm going to lodge an objection

14   here.  This line of questioning goes beyond the scope

15   of the Court's direction under Issue F as set forth

16   in the Court's order, Exhibit 2.

17          MS. ELLS:  Foundational.

18   BY MS. ELLS:

19   Q.      Go ahead and answer.

20   A.      Would you please repeat the question.

21   Q.      Yes.  Would you have been familiar, from your

22   experiences that you just described, with whether

23   psychiatric supervisors ever performed patient care in

24   CDCR?

25   A.      Yes.

Kevin Kuich, M.D.                                        September 19, 2019

1    Q.    Could you describe how you became familiar with

2    that?

3    A.    I would see it happen during the EHRS rollouts

4    in the time I was there.  They were either -- it wasn't

5    at every institution, but it was quite a few of them

6    where they needed to be excused because they were taking

7    care of patients or they had a patient line to run.

8    Q.    And when you answered that question, you were

9    referring specifically to psychiatric supervisors; is

10   that correct?

11   A.    Correct.

12   Q.    So those supervisors when you were with them

13   would be interrupted from your training to perform

14   individual patient care?

15   A.    Correct.  It was one of the issues that made

16   some of the training difficult to roll out, because the

17   supervisors weren't as available as their counterparts

18   in mental health to be able to have unobstructed and --

19   unobstructed time and undivided attention to be able to

20   train their psychiatrists in the ways of the EHRS.

21   Q.    Is that because of their need to perform

22   individual patient care?

23   A.    In many instances, yes.

24   Q.    What kind of individual patient care did

25   psychiatric supervisors perform, to your knowledge?

Kevin Kuich, M.D.                                        September 19, 2019

 1          MS. THORN:  Objection.  Goes beyond the scope

 2     of the order.  Also, the defendants have stipulated

 3     that supervising psychiatrists perform, on occasion,

 4     the functions and duties of line staff psychiatrists.

 5          MS. ELLS:  These questions are meant to elicit

 6     how often they occurred and the deponent's knowledge

 7     of them.

 8     BY MS. ELLS:

 9      Q.    Go ahead and answer.

10      A.    Could you restate the question?

11          MS. ELLS:  Could you read the question back,

12     please.

13          (Whereupon, pending question read back.)

14          THE WITNESS:  They performed new patient,

15     inpatient, and outpatient consultations.  There were

16     some that would fill in for an absent psychiatrist

17     who was gone for sick reasons or what have you, and

18     there were others that, due to the lack of

19     psychiatrists, would have a more substantive role on

20     a daily basis.

21     BY MS. ELLS:

22      Q.    It sounds like you're describing some of these

23     psychiatrists having individual case loads.  Is that

24     correct?

25          MS. THORN:  Objection.  Leading.

Kevin Kuich, M.D.                                      September 19, 2019

```
 1          THE WITNESS:  I would say that is correct.
 2    BY MS. ELLS:
 3     Q.     Did supervisory staff, that you're aware of,
 4    ever have patient loads that were assigned to them?
 5     A.     There is.  There's one individual, actually, who
 6    had that, was in Central Valley, and I'm blanking on the
 7    name.  I apologize.  But this might, to help identify
 8    the person, has -- had left CDCR because of the
 9    tremendous amount of patient care that the supervisor
10    needed to do.  It was actually chief psychiatrist, and
11    eventually did return back to CDCR, but that was one of
12    the -- one of the issues that caused him to leave,
13    because it was just too much to manage.
14     Q.     You mentioned before that the way that you knew
15    that psychiatric supervisors were performing patient
16    care was because you were sitting with them at the
17    institutions and saw it happening; is that correct?
18     A.     That is correct.
19     Q.     You also mentioned earlier that sometimes
20    individual institutions would contact you asking for
21    additional resources.  Did anyone raise with you at that
22    point any notion that existing psychiatric supervisors
23    were performing line staff duties?
24     A.     There would be instances of times where, if the
25    chief or senior psychiatric supervising psychiatrist was
```

Page 25

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    talking with me, would indicate what they are doing to

 2    try to mitigate the issue.  I can't quantify how often

 3    that would happen, but it was frequent enough that I

 4    recall it one year later.

 5     Q.    And was it also frequent in your interactions

 6    with staff on the ground during the EHRS rollout?

 7     A.    Could you restate that?

 8     Q.    Yes.  You said just now, I believe -- and

 9    correct me if I'm wrong -- that it was relatively common

10    for you to hear from psychiatric supervisors, when they

11    contacted you, about the fact that they were also

12    performing individual patient care.  Is that accurate?

13     A.    That is accurate.

14     Q.    You've also testified earlier that when you went

15    to institutions and sat with staff, you saw psychiatric

16    supervisors being pulled away for the purpose of you

17    being there, in order to conduct individual patient

18    care.  Is that accurate?

19     A.    That is accurate.

20     Q.    Was that relatively common when you were on the

21    ground?

22     A.    It was relatively common.

23     Q.    Do you know if headquarters tracks how often

24    supervisors perform individual patient care in CDCR

25    prisons?
```

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    I'm not aware of that.

2    Q.    Do you know if they do or not?

3    A.    I do not know if CDCR does.  What I can say is

4    as the chief of tele psychiatry, in trying to manage and

5    allocate resources in the most judicious and fair way,

6    we would reach out to the institutions on a monthly

7    basis and we would find out what psychiatrists are

8    there, what psychiatrists are not, and even if chiefs or

9    seniors were having any kind of patient load as well.

10    Q.    What time frame would you say you were

11    contacting the institutions about that during?

12    A.    This had been a process that predated me, and I

13    continued that when I had taken on the role as chief

14    tele psychiatrist.  So I can't say when it started, but

15    certainly during my time as chief tele psychiatrist,

16    that was a continued process where we would have a

17    dedicated person from tele psychiatry reaching out to

18    each individual person by phone to be able to get an

19    accurate assessment because we found that the

20    information coming from human resources was delayed or

21    flawed and we could not get realtime information

22    adequate enough to be able to make a fair decision of an

23    allocation of a resource that is scarce.

24    Q.    So during your time as statewide chief of tele

25    psychiatry, you are aware that you or -- could you

Kevin Kuich, M.D.                                                September 19, 2019

1    clarify if somebody in your office did that task or if

2    you did that task of calling the institutions monthly?

3    A.      Somebody in my office did that task.

4    Q.      And would they report that to you?

5    A.      Yes.  It would be reported to me and it would be

6    reported to all the senior psychiatrists' supervisors in

7    tele psychiatry as well.  It was part of our regular

8    discussion that we would look at this, and as it changed

9    every month and as more institutions resource need, it

10   would be stratified and we would be able to utilize that

11   information to determine the best use of that resource

12   in terms of the highest need and the highest priority.

13   Q.      That sounds like triaging.  Is that correct?

14   A.      That would be accurate.

15   Q.      Could you describe for me why you needed to

16   triage resources?

17          MS. THORN:  Objection.  Vague as to the word

18   "triaging."  I don't know if you want to define that.

19   BY MS. ELLS:

20   Q.      Dr. Kuich, do you understand what I mean by

21   that?

22   A.      Triaging, I do understand that.  Would you like

23   me to --

24   Q.      You can answer the question.  If you need more

25   clarification, I'd be happy to provide it, though.

Kevin Kuich, M.D.                                          September 19, 2019

1    A.    I understand triaging -- as a medical physician

2    having trained at times in the emergency department,

3    there are a number of resources, and priorities need to

4    be chosen.  And that's actually what happened with

5    psychiatry staffing.  It occurred because we did not

6    have enough psychiatrists to perform the functions that

7    needed to be -- and it became an ongoing struggle with

8    being able to make certain institutions whole, sometimes

9    at the detriment of another institution that was fully

10   staffed.  There were times where we had to take tele

11   psychiatrists from institutions because there was

12   staffing needs in other places, so it was a zero sum

13   game.

14   Q.    And when these calls to the individual

15   institutions occurred on a monthly basis, was that at

16   your direction?

17   A.    That was something that, as I mentioned, had

18   preceded me, so I allowed that process to continue to

19   move forward.

20   Q.    And how confident were you in the results of

21   that process on a monthly basis?

22   A.    Quite.  The person that was calling had a very

23   good relationship and rapport with the people that were

24   there.  They also needed to report up -- the

25   institutions knew that -- how we were triaging things,

Kevin Kuich, M.D.                                          September 19, 2019

1    how we were prioritizing things.  So they wanted to make

2    sure that things were represented accurately so they

3    would be able to be in the mix in an appropriate way.

4      Q.    When you were involved in that process, was the

5    inquiry around all psychiatric need at the institutional

6    level or tele psychiatry need?

7      A.    It was all psychiatric need.  Tele psychiatry

8    was the way that gaps were filled.  Tele psychiatry

9    would serve functions where we couldn't recruit

10   psychiatrists to be able to work on site, and tele

11   psychiatry would often be requested in an emergency

12   situations to provide services at institutions where

13   there were limited to no psychiatrists.

14     Q.    Based on your knowledge, do you have an estimate

15   of how often supervisors performed line staff duties in

16   CDCR?

17     A.    This is a guesstimate, but I would say --

18           MS. THORN:  Objection.  Calls for speculation.

19   BY MS. ELLS:

20     Q.    Go ahead and answer.  You understand what an

21   estimate is, as opposed to something you don't actually

22   know about?

23     A.    Correct.

24     Q.    Please give me your best estimate.

25     A.    I would say less than 50 percent but more than a

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                        September 19, 2019

1    third.

2      Q.    Did you ever study how common it was for

3    supervisory psychiatrists to perform line staff duties?

4      A.    I did not take that study on.

5      Q.    And to your knowledge, nobody else studied that

6    at the headquarters level either?

7      A.    To my knowledge, correct, no one had looked into

8    it.  At the point at which it became more concerning,

9    when we realized it was fairly common and we knew that

10   the numerator and denominator of the data had

11   specifically excluded those people from providing

12   services, that's at which there was more internal

13   discussion amongst the psychiatry team about what is

14   being presented versus what is actually happening.

15     Q.    What numerator and denominator are you referring

16   to?

17     A.    This is in the productivity reports, performance

18   reports.

19     Q.    And the performance reports, did you look at

20   them?

21     A.    Yes.

22     Q.    What did you think about them?  Were they useful

23   to you?

24     A.    They were useful.  I think quality management

25   provides information to be able to enhance performance

Kevin Kuich, M.D.                                          September 19, 2019

1    and move the ball forward.  Quality management in mental

2    health not only provided the information, but mandated

3    the solution so it became a problem.

4     Q.    So it sounds to me you looked at that data out

5    of necessity.  Is that correct?

6     A.    Correct.

7     Q.    Could you describe to me your concern that you

8    articulated earlier about how the numerator and

9    denominator were utilized with that data?

10    A.    In terms of appointments seen and those kinds of

11    measures, there were certain data points that would be

12    brought in, and so those data points were specifically

13    looking at staff psychiatrists for completion.  And we

14    knew that there was senior psychiatrists and chief

15    psychiatrists that were also providing services, so the

16    concern was that there was a -- could be an appearance

17    that we were being highly productive but not including

18    everybody in there in terms of the numerator and

19    denominator.  It could provide the appearance of meeting

20    compliance timelines and meeting all requirements with a

21    limited number of staff, which could be used in a way to

22    say the staff that we have, although not enough, is

23    adequate to complete our compliance requirements.

24    Q.    And you're referring there to the number of line

25    staff that were being reflected in this data point and

Kevin Kuich, M.D.                                     September 19, 2019

1    triggering compliance data from the line staff numbers;

2    is that accurate?

3         MS. THORN:  Objection.  Leading.

4         THE WITNESS:  That is accurate.

5    BY MS. ELLS:

6    Q.    In your experience, why do supervising

7    psychiatrists perform direct patient care duties?

8    A.    Psychiatrists as physicians do have the

9    Hippocratic Oath to do the best we can for our patients.

10   There also are the mandates and the agreements that we

11   have as an organization in terms of the frequency of

12   visits and the content of the visits and other things

13   that we measure, such as MAPIP, that are relevant and

14   that are regularly evaluated at the local level and the

15   system level.

16   Q.    And why would supervisory psychiatrists need to

17   do that work?

18   A.    If there were -- I don't know how much you've

19   seen of the dashboard, and perhaps it's changed in the

20   time I've been away -- red, green and yellow.  You never

21   want it to be red.  And there were certain institutions,

22   if you were red, it was a problem.  And it was not the

23   sense of solving an organizational problem of why is it

24   red, do we have adequate custody resources to bring

25   patients out, do we have adequate office space to see

Kevin Kuich, M.D.                                    September 19, 2019

1    these patients in, do we have adequate schedulers and

2    all kinds of things, but more this is red and it's your

3    fault, so you better fix it by next month.

4          So it was less than a collaborative approach,

5    looking at the system issues that were causing a measure

6    to be red.  So someone in a leadership position is

7    always squeezed in that middle management, and they'll

8    do the best they can to try and change that red to a

9    yellow, or ideally to a green.  And in many instances,

10   that would be doing the task themselves.

11   Q.    Do supervisory staff perform important functions

12   in their roles as managers?

13   A.    Yes.

14   Q.    What are those tasks?

15   A.    Those tasks should be varied.  Obviously they

16   want to be a role model, first and foremost.  They want

17   to be supportive of their staff.  They want to ensure

18   there's appropriate training for the staff.  They want

19   to be able to provide appropriate feedback and

20   supervision about how a task is being done.  They're

21   also responsible for the deployment of resources at the

22   institution and managing any emergencies or other things

23   with respect to how staff can be utilized.  They're also

24   responsible for making processes efficient and

25   streamlined so that at least for the psychiatrists, that

Kevin Kuich, M.D.                                          September 19, 2019

1    their time is well spent on the right tasks to be able

2    to deliver the care that's needed.

3      Q.    Do supervisory psychiatrists perform any

4    mentoring or quality assurance tasks for the line staff

5    that they supervise?

6      A.    They should, yes.

7      Q.    And is that a core function of what they do?

8      A.    It should be a core function of what they do.

9    In some instances, because they had other duties to take

10   care of patients themselves, it was something that was

11   relegated to a chief of mental health or someone else

12   because they couldn't perform that task.

13     Q.    Are chiefs of mental health typically

14   psychiatrists?

15     A.    No.

16     Q.    In the circumstance you just described, you said

17   that sometimes the chiefs of the mental health, who are

18   not psychiatrists, would be evaluating the work and

19   mentoring psychiatrists; is that correct?

20         MS. THORN:  Objection.  This goes way beyond

21   the scope of the September 17, 2019, order under

22   Issue F or under any of the other issues.

23   BY MS. ELLS:

24     Q.    Go ahead and answer.

25     A.    There were some instances where the chief of

Page 35

Kevin Kuich, M.D.                                    September 19, 2019

1    mental health would provide explicit direction to

2    psychiatrists.  There would not be, to my knowledge,

3    specific directives to use a specific medication or

4    those kinds of things, but the general allocation of

5    psychiatrists, the general support of psychiatrists

6    oftentimes did fall on the chief of mental health.

7        Q.    In your experience, was that caused by

8    supervisory psychiatrists having to perform other types

9    of work that took away their ability to do that task?

10           MS. THORN:  Objection.  Leading.

11           THE WITNESS:  It could be related to the

12   psychiatrists having to do other tasks.  It could be

13   related to the absence of a leader at that

14   institution.  Those are probably the two most common

15   instances.

16   BY MS. ELLS:

17       Q.    Should supervisory psychiatrists perform

18   mentoring and quality assurance duties for the people

19   they manage?

20       A.    Absolutely.

21       Q.    If supervisors are required to perform line

22   staff duties, in your experience, would that affect

23   their ability to do the rest of their supervisory job?

24       A.    Yes, it would.

25       Q.    You testified earlier that the human resources

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                        September 19, 2019

1   data about staffing needs at individual institution was,

2   in your experience, delayed and flawed.  Could you

3   explain what you mean by that?

4    A.    Depending on how things were coded in human

5   resources would determine -- let me rephrase that.

6         Depending on how things were reported from human

7   resources could leave a question whether there was a

8   person physically there to perform services or not.  For

9   instance, if someone was disabled or on a temporary

10  medical leave, we may not know if they're able to

11  provide certain services at all, if they're totally

12  unavailable.  The time frame to get that data back from

13  human resources back down, it was not realtime in any

14  way, shape, or form.  When we did the tele psychiatry

15  phone calls, it was to get, realtime, how many boots do

16  you have on the ground, regardless of what their status

17  is.  How many people are seeing patients, that was the

18  basic question.  And that level of realtime accuracy was

19  not routinely -- I would say not even routine.  It was

20  not available through the HR data.

21   Q.    Do you know who was in charge of producing that

22  HR data that you looked at?

23   A.    I would get the data -- if it was available to

24  me, would be from Ms. Ponciano.

25   Q.    It sounds like you didn't routinely use that

Kevin Kuich, M.D.                                                    September 19, 2019

1    data in your job.  Is that accurate?

2    A.    Correct.

3    Q.    Did you ever complain to anyone about that data

4    and its inability to serve the purposes that you needed?

5    A.    Yes.

6    Q.    What did they tell you?

7    A.    I was reassured that the data was accurate and

8    it was realtime and there was nothing wrong with it.

9    Q.    Did they -- did they know that you were making

10   monthly phone calls -- pardon me.  Strike that.

11         Did anyone outside of psychiatry know that you

12   were making phone calls to find out about realtime

13   psychiatric need at the institutions?

14   A.    These reports were provided to Ms. Ponciano, and

15   as they preceded me, I don't know what her understanding

16   would have been how these reports were produced.

17   Q.    So it sounds like Ms. Ponciano knew that you

18   were conducting these monthly phone calls.

19   A.    Correct.  She at one point had instructed us to

20   stop doing those phone calls and assured us that her

21   group would be able to perform those phone calls.  It

22   sounded like a wonderful opportunity to be able to

23   utilize my at then tele psychiatry staff in a different

24   manner.  However, when we -- when Ms. Ponciano and

25   myself collaborated on another similar type of data,

Kevin Kuich, M.D.                                            September 19, 2019

```
 1   specifically for the PIPs, to determine staffing need

 2   for the PIPs, I was assured that her team would be able

 3   to take that on and that data would be readily

 4   available.  I saw perhaps maybe two reports in the time

 5   I was there.  That data was not readily available to me,

 6   although her team was doing it.

 7           So there was a concern, given that precedent,

 8   that having this information, which is much more crucial

 9   than the circumscribed PIP data, be available and

10   accurate.  I had no assurances that that would be the

11   case based on past behavior.

12   Q.    Did headquarters -- so you've testified that it

13   was relatively common for supervisors to be performing

14   line staff duties; is that accurate?

15   A.    That is accurate.

16   Q.    Did you tell headquarters staff about your

17   perception of how common that was?

18   A.    Could you define headquarter staff?

19   Q.    Anyone outside of the psychiatry department.

20   Katherine Tebrock; did you ever talk to her about how

21   common you thought it was, based on your understanding

22   and what was happening in the field, for supervisors to

23   be performing line staff duties?

24   A.    I'm sure at some point with Ms. Tebrock there

25   was that discussion.  I don't recall exactly when.
```

Page 39

Kevin Kuich, M.D.                                          September 19, 2019

1    Q.     Are you confident that conversation occurred?

2    A.     I'm confident that that conversation occurred in

3    some context, likely in a group meeting, not necessarily

4    a one-on-one context.

5    Q.     Anybody else from headquarter staff that you

6    might have conveyed that message to?  I mean somebody

7    outside of psychiatry.

8    A.     Likely Dr. Brizendine, as she would also be

9    involved with that.  And likely Ms. Ponciano as well.

10   Q.     Are you confident that those conversations

11   occurred at some point, even if you don't remember the

12   date?

13   A.     I'm confident in some group somewhere, those

14   were discussed that that had happened.

15   Q.     Were those topics that you ever raised with

16   them?

17   A.     That, I can't speak to.

18   Q.     But you -- you're confident you were in meetings

19   when this issue was raised?

20   A.     Those would be common issues that Dr. Golding

21   would raise.  And I generally was in meetings which

22   involved Dr. Golding as well.

23   Q.     Could you say what time frames those meetings

24   occurred in?  Would it have been in the time frame where

25   you were chief of tele psychiatry?

Kevin Kuich, M.D.                                          September 19, 2019

1    A.      Most likely chief of tele psychiatry and perhaps

2    maybe six months before that, that time frame.

3    Q.      Okay.

4    A.      I was just going to say there were many things

5    that, you know -- those were many concerns that were --

6    that were brought up, and likely they were brought up

7    also in the context of tele psychiatry.  I apologize for

8    bringing that in.  You know, as we looked at cell side

9    tele psychiatry and how frequently it was occurring,

10   that also became kind of one of these big, large issues

11   of do you realize how frequently this is happening,

12   because it's not captured accurately in any data that's

13   available.

14   Q.      Could you explain what you're talking about

15   there a little bit more?

16   A.      These types of conversations where there would

17   be questions about supervisors doing tasks and other

18   people -- other psychiatrists doing tasks in ways that

19   are unexpected or people aren't particularly aware of,

20   that -- those types of conversations would usually be

21   hand in glove.  And so my role as a chief tele

22   psychiatry -- those are discussions that would happen,

23   as well, to be able to provide information about how

24   frequently these types of things are happening and why,

25   usually brought up in the larger context of why are we

Kevin Kuich, M.D.                                        September 19, 2019

1    having to do cell side tele psychiatry, why does someone

2    on the ground have to be going to the cells, why aren't

3    these patients being brought out, is there an access

4    issue, there's a physical space issue, what's happening.

5    And those kind of discussions would be more of the, we

6    need information to know why is this happening so we can

7    address it and fix the choke point, if it's a particular

8    yard and a particular institution, maybe involving

9    particular staff that need retraining or some ability to

10   help organize their resources in a different way.

11    Q.    If you had more psychiatric staff on the ground,

12   would those problems have been lessened?

13    A.    Yes.

14    Q.    The neutral expert reviewed an analysis provided

15   by Angela Ponciano, who you referenced already.  She

16   provided analysis of five months of data from 2017 and

17   2018 that showed a very low number of EOP and CCCMS

18   appointments being conducted by supervisors.  She

19   calculated that it was only equivalent to 1.75 FTEs

20   systemwide for that entire five-month period.  Does that

21   seem accurate to you?

22        MS. THORN:  Objection.  Lack of foundation.

23   You have not established any personal knowledge from

24   this witness with respect to the report you're

25   referencing or the analysis you're referencing.

Kevin Kuich, M.D.                                                September 19, 2019

```
 1   BY MS. ELLS:
 2     Q.    Go ahead and answer that based on my
 3   representation.
 4     A.    Based on my experience of being with the people
 5   in the field and also talking with them through the EHRS
 6   and staffing matters, that number does seem rather low.
 7     Q.    How low would you estimate that it is?
 8   Significantly low?  A little bit low?  Do you have any
 9   estimate?
10     A.    I would say significantly low.  Certain
11   institutions are very well staffed, and I wouldn't
12   expect those supervisors or chiefs to be able to provide
13   any patient care services.  I can count them on one
14   hand.  The other institutions are the ones that are more
15   -- more need to be able to -- because they weren't the
16   bodies on the ground to be able to provide the services.
17           I don't know what time frame that data was
18   coming from, but I would make mention that prior to the
19   EHRS, all of that information about appointments and who
20   did it and all that was manually entered, so it was a
21   paper process.  So it would be interesting to me in an
22   academic sense to know what time frame were those
23   numbers pulled from, whether it was the EHRS or the
24   non-EHRS era.
25     Q.    The time frame was late 2017 through 2018, five
```

Kevin Kuich, M.D.                                    September 19, 2019

1   months of data in that time frame.  Would that change

2   anything about your testimony?

3        MS. THORN:  Objection.  Lack of foundation.

4        THE WITNESS:  So that would be the EHRS --

5   that would be the EHRS data, which would require the

6   psychiatrist to put that information in the system to

7   have it recorded.  The other thing that I would

8   mention in keeping with the paper system is there's

9   no one-to-one correlation between an appointment

10  order and a note actually documented, so.

11  BY MS. ELLS:

12   Q.    But just restating my question with respect to

13  this five months of data from 2017 -- late 2017, through

14  2018, which you've testified after rollout of EHRS,

15  Ms. Ponciano estimated that the total number of EOP and

16  CCCMS appointments conducted by supervisors for that

17  entire five-month period systemwide was 1.75 FTEs.

18   A.    Again, I would say that would be significantly

19  low.

20        And let me expand on the point I was trying to

21  make that I did not make.  Apologies.  In the EHRS, to

22  get that data would be coming from the check-in and

23  check-out information.  If a psychiatrist put a note in

24  the system and saw a patient but didn't put that in

25  there, it would show a significantly lower number than

Kevin Kuich, M.D.                                        September 19, 2019

1    what's actually happening.  If you look at the

2    complicated work flow of the EHRS, to put in ad hoc or

3    other orders so they show up in the EHRS scheduling

4    system -- and that is exactly what is counted.  It's not

5    counted one to one for an actual note.  It would be -- I

6    would suspect that there are more people that placed a

7    note in the system just to be able to take care of the

8    patient but did not place a scheduling order in the

9    system, thereby having the numbers skewed to the lower

10   end because it's an extra workload and extra burden, but

11   there's a note in the system to indicate that the

12   patient was seen by a supervisor.

13    Q.    You testified earlier that it was common during

14   your EHRS training rollout for supervisors to be taken

15   out of the training in order to provide line staff

16   functions.  Would that affect whether or not they -- the

17   supervisors understand how to use EHRS properly?

18         MS. THORN:  Objection.  Beyond the scope of

19   the September 17th order.

20   BY MS. ELLS:

21    Q.    Go ahead and answer.

22    A.    Yes.  There were several institutions where the

23   supervisors provided absolutely no training, despite

24   being provided extensive T for T training at

25   headquarters, which required me to go to those

Page 45

Kevin Kuich, M.D.                                                September 19, 2019

1    institutions and provide that training to the staff

2    psychiatrist because it was not provided accurately.

3      Q.    Were those -- in your experience, were the

4    supervising psychiatrists provided adequate training on

5    how to use EHRS?

6            MS. THORN:  Objection.  Beyond the scope of

7    the order.

8            THE WITNESS:  The training was providing them

9    with all the requirements that they needed to perform

10   their tasks.

11   BY MS. ELLS:

12     Q.    Are those tasks supervisory tasks or all

13   psychiatric tasks, including line staff tasks?

14     A.    They're, I would say, 95 percent all line tasks,

15   and 5 percent have to do with supervisory tasks.  In

16   that 5 percent, that would involve cosigning orders or

17   approving non-formulary medications or someone -- that

18   would require someone at a higher level to move that

19   process forward.

20     Q.    Do you feel that psychiatrists during the EHRS

21   rollout received adequate training on how to perform

22   this function of checking patients in and out that

23   reflects what appointments are actually captured in the

24   system?

25           MS. THORN:  I'm going to object that the

Kevin Kuich, M.D.                                        September 19, 2019

1    entire line of questioning regarding the training

2    under the EHRS that was done or not done does not in

3    any way address the questions the Court asked of this

4    witness under Issue F.

5            MS. ELLS:  Goes to the accuracy of

6    Ms. Ponciano's data according to how he knows.

7            MS. THORN:  Training does not go to

8    Ms. Ponciano's data.  Okay.  I've lodged my

9    objection.

10           THE WITNESS:  The scheduling portion of the

11   EHRS was -- throughout the rollout still was having

12   many refinements happening.  Scheduling orders

13   weren't going to certain places.  Things weren't

14   happening in a timely manner.  So there was ongoing

15   updates and other kinds of things -- excuse me --

16   that needed to occur with respect to the scheduling.

17   So what was originally placed in training manuals and

18   other things were definitely the bare bones, but then

19   as more scheduling components were added and

20   continued problems with scheduling, those refinements

21   might not have always made it to the line staff

22   level.

23   BY MS. ELLS:

24    Q.    And what about to the supervisory staff level?

25   Would it have made it to them?

Kevin Kuich, M.D.                                        September 19, 2019

1    A.    It should have made it to them.  We did have

2    regular trainings that were made available.  They

3    weren't mandatory.  So if they attended the training,

4    they would know what updates are happening in the EHRS.

5    Q.    Let's take a short break.  Maybe ten minutes.

6          (Whereupon, a break was taken.)

7    BY MS. ELLS:

8    Q.    Doctor, you testified earlier that you received

9    phone calls from individual institutions asking for

10   additional psychiatric resources.  Is that accurate?

11   A.    That is accurate.

12   Q.    How commonly did you get those phone calls?

13   A.    Several times a month.

14   Q.    Were there certain institutions that called you

15   more frequently than others?

16   A.    Yes.

17   Q.    Did you receive phone calls like that from most

18   of the institutions?

19   A.    Certainly the central valley institutions were

20   very common, Pelican Bay was very common.  Sometimes I

21   would receive requests from the CEO of the organization

22   or the Chief of Mental Health as well.

23   Q.    And they were always calling you asking for more

24   psychiatric resources specifically?

25   A.    Correct.

Kevin Kuich, M.D.                                    September 19, 2019

 1    Q.    And did you receive e-mails about things like

 2    that as well or just phone calls?

 3    A.    Mostly phone calls, but there were some e-mails.

 4    Q.    And would you say those were happening at about

 5    the same frequency or less frequent?

 6    A.    E-mails were probably less frequent.  I think

 7    people preferred to have the telephone call to be able

 8    to hear the angst in their voice to move the ball

 9    somewhat.

10    Q.    What type of angst were they expressing to you?

11    A.    Concern about being able to meet the needs of

12    the patient in a timely manner.  Concern for how they

13    would cover a particular yard or a particular level of

14    care given the absence.  And oftentimes it might also

15    involve a discussion about the dashboard numbers, kind

16    of where they are and why they're struggling.

17    Q.    Do you recall going with Dr. Golding to CHCF in

18    July of 2018?

19    A.    Yes, I do.

20    Q.    What was the purpose of that visit?

21    A.    Ms. Tebrock had tasked psychiatric -- well,

22    there were two times.  I believe the one that you're

23    referring to had to do with the EOP evaluation.

24         MS. ELLS:  I'll provide you with an exhibit

25    that may help you recall.

Kevin Kuich, M.D.                                    September 19, 2019

1              (Plaintiff's Exhibit No. 3 was marked for

2                    identification.)

3    BY MS. ELLS:

4     Q.    This is an e-mail string of two e-mails that

5    Dr. Golding attached as Exhibit AA to his report that

6    was filed in federal court.  These are e-mails dated

7    Tuesday, July 17th, 2018, both of them.  They are both

8    from Dr. Golding to you, and the subject for both is

9    "CHCF clinic model."

10             Go ahead and review this e-mail, and then I'd

11   like to ask you a couple questions about it.

12    A.    Yes.  The -- this -- this is helpful.  We had

13   also been there for the -- for the PIPs, as well, so

14   that's why I wanted to be sure which visit we were

15   talking about.

16    Q.    Great.  You recall this visit?

17    A.    I do recall the visit, yes.

18    Q.    And is Dr. Golding's e-mail an accurate

19   depiction of your visit?

20    A.    It is an accurate depiction.

21   Q.    Doctor, could you explain to me the purpose of

22   this visit?

23   A.    This was part of the clinic model tour that was

24   requested by Ms. Tebrock to specifically look at EOP

25   institutions and evaluate whether they currently have a

> Defendants object that 51:1-20 & Exhibit 3 are outside the scope of the September 17 Order.
>
> Plaintiffs respond that these are relevant to supervisors acting as line staff issue, per 51:7-52:21.

Page 50

Kevin Kuich, M.D.                                    September 19, 2019

1    clinic model or what are the barriers to implementing a

2    clinic model.

3          MS. THORN:  Objection.  This exhibit and line

4    of questioning does not appear to be within the scope

5    of the September 17 order.

6    BY MS. ELLS:

7     Q.     Doctor, I would like to refer you to the final

8    -- second-to-the-final page of the exhibit, the last

9    page that has narrative text.  In the second-to-last

10   paragraph, this e-mail says "Dr. Atkins," who I

11   understand is the -- was at that point the chief

12   psychiatrist at this facility.  Is that your memory?

13    A.     That is my memory, yes.

14    Q.     This says "Dr. Atkins fills in for her

15          psychiatrists and sees patients, like more than

16          half, about 60 percent of the chiefs and senior

17          supervisors across the state."

18          Do you recall speaking with Dr. Atkins about

19   whether she sees line staff -- or I mean, sorry, whether

20   she sees individual patients as a psychiatrist?

21    A.     Yes.

22    Q.     Was it her estimate that more than 50 percent,

23   about 60 percent, of the chiefs and senior supervisors

24   across the state also saw individual patients?

25    A.     That wouldn't -- Dr. Atkins likely wouldn't be

Page 51

Kevin Kuich, M.D.                                    September 19, 2019

1    in a position to speak to across the state.  At that

2    time, I believe we were just starting to have the chief

3    psychiatry -- I forgot what we called it, but kind of a

4    gathering of all of the chief psychiatrists across the

5    state.  That hadn't happened ever.  So that was just in

6    its gestation, to be able to have an ability to have all

7    the chief psychiatrists talk and find out what they're

8    doing.  So I don't think Dr. Atkins at that time would

9    have had that ability to speak with authority to state

10   -- at a statewide level, that that would be accurate.

11    Q.    Does this appear -- this appears to be

12   Dr. Golding's estimate, then.  Is that your read as

13   well?

14    A.    That's my read; correct.

15    Q.    Do you agree with his estimate that more than

16   half, about 60 percent, of the chiefs and senior

17   supervisors across the state fill in for their staff

18   psychiatrists and see patients?

19    A.    In my earlier estimate, I said about a third to

20   a half somewhere around there.  That would be about my

21   estimate.

22    Q.    Okay.  You mentioned that there was a summit of

23   sorts of chief psychiatrists.  Did that occur while you

24   were still at CDCR?

25    A.    Yes.

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    Did you attend that?

2    A.    I attended it and organized it.

3    Q.    At that meeting, did the chiefs of psychiatry

4    express anything about whether they and their

5    supervisors were seeing patients?

6    A.    I don't recall in that meeting, but that was the

7    discussion.  In that meeting, there was more of it being

8    the first time to be able to kind of have everyone come

9    together, recognize what the concerns are, what the

10   issues are, and use that as a forward -- format to be

11   able to have further discussions.

12   Q.    Was the need for additional psychiatrists one of

13   the topics at that?

14   A.    Yes.

15   Q.    And what did the chiefs generally say about

16   their need for psychiatrists?

17         MS. THORN:  Objection.  This is beyond the

18   scope of the September 17 order.

19   BY MS. ELLS:

20   Q.    Go ahead.

21   A.    Similar to their contacts that they've -- that I

22   had with them in the EHRS rollout and when they would

23   contact me, that there's a constant -- constant need for

24   psychiatrists of any ilk, whether they were

25   telepsychiatrist, on-site psychiatrist or contract

Defendants object to 54:6-20 & Exhibit 4 as calling for speculation and lacking foundation.

Plaintiffs respond that witness is testifying within personal knowledge of CDCR data reporting and familiarity with psychiatry practices and compliance efforts within the scope of Chief of Telepsychiatry position.  Foundation established at 54:21-55:10; 104:6-105:25; 242:16-244:20; 252:4-253:9.

Kevin Kuich, M.D.

1    psychiatrist.

2    Q.     So they would take anybody?

3    A.     They would take anybody.

4    Q.     I'd like to provide you with three more

5    documents.

6                (Plaintiff's Exhibit No. 4 was marked for

7                    identification.)

8    BY MS. ELLS:

9    Q.     This is a document that was filed in the

10   district court on March 30th, 2017.  It's entitled

11   "Declaration of Katherine Tebrock in Support of

12   Defendants' Response to the Special Master's Report On

13   the Status of Mental Health Staffing and the

14   Implementation of Defendants' Staffing Plan."

15          Could you please turn to page 9 of this, using

16   the pagination at the top of the document.  This is a

17   chart that's entitled "Mental health staff psychiatrist,

18   staffing versus compliance," and it's dated 2/23/2017."

19   Is that what you're looking at?

20   A.     Yes.

21   Q.     This document shows each institution's number of

22   allocated staff positions -- staff psychiatrist

23   positions -- excuse me -- what percentage of those

24   positions are vacant, and then reports on various

25   compliance indicators and their results.  Is that what

Kevin Kuich, M.D.                                            September 19, 2019

```
 1    it appears to you?

 2    A.    Yes.

 3    Q.    Are you familiar with these metrics that are

 4    reported here?

 5          MS. THORN:  So, objection.  Lack of

 6    foundation.

 7    BY MS. ELLS:

 8    Q.    Are you familiar with the metrics that appear

 9    here?

10    A.    I'm familiar with the metrics, yes.

11    Q.    Have you ever seen this document?

12    A.    No.

13    Q.    Now, in your terminology within CDCR, a staff

14    psychiatrist would be the same as a line psychiatrist,

15    right?

16    A.    Correct.

17    Q.    So you just testified that you've never seen

18    this chart, correct?

19    A.    Correct.

20    Q.    So you didn't review it before it was filed?

21    A.    Correct.

22    Q.    You didn't confirm that it was accurate,

23    according to your understanding of the institutions?

24    A.    Correct.

25          MS. THORN:  Objection.  Lack of foundation.
```

Page 55

Kevin Kuich, M.D.                                          September 19, 2019

1    BY MS. ELLS:

2       Q.    And do you know if any headquarters psychiatrist

3    looked at this charge, to your knowledge?

4           MS. TRAPANI:  Objection.  Lack of foundation.

5    BY MS. ELLS:

6       Q.    To your knowledge.

7       A.    I have no knowledge of a psychiatrist seeing

8    this and approving it.

9       Q.    So this document shows the number of staff

10   psychiatrists, the percentage of vacant staff

11   psychiatrist positions, and then shows a metric called

12   "timely psychiatry contacts" in the fifth column.  Does

13   the data on this chart, particularly in the "timely

14   psychiatric contacts" column, appear to be an accurate

15   depiction of the care that was being provided by the

16   number of staff psychiatrists reported in this chart in

17   January 2017?

18          MS. THORN:  Objection.  Lack of foundation.

19          THE WITNESS:  For the institutions that are

20   not heavily staffed, it seems higher than I would

21   expect.

22   BY MS. ELLS:

23      Q.    This chart's title says that it includes only

24   staff psychiatrists.  Is it your understanding that

25   assuming that these indicators are accurate, the

Kevin Kuich, M.D.                                      September 19, 2019

1    compliance numbers here reflect work done only by staff

2    psychiatrists?

3           MS. THORN:  Objection.  Lack of foundation.

4           THE WITNESS:  Given that there are seniors and

5    chiefs that provided work, I would say that it does

6    not solely represent staff psychiatrists.

7    BY MS. ELLS:

8     Q.    In the state's April 13th, 2017, brief about

9    staffing, that brief relies on this chart, and it

10   highlights a prison called SVSP.  Are you familiar with

11   that prison?

12    A.    Yes, I am.

13    Q.    The state said that this chart proves that SVSP

14   is performing well with only 5.8 staff psychiatrists and

15   with only 55 percent of the -- pardon me, and only

16   45 percent of their psychiatry positions unfilled.  To

17   your knowledge, does the 5.8 number accurately represent

18   the number of psychiatrists who were performing line

19   staff function at SVSP at the time?

20           MS. THORN:  Objection.  Lack of foundation.

21   Mischaracterizes the data and the evidence submitted

22   in support of both the filing and the statements in

23   the filing itself.

24   BY MS. ELLS:

25    Q.    Did you understand the question?

1    A.    Yes.  SVSP was always requesting additional

2    staff.  They, I believe, had utilized telepsychiatry

3    services, and it was -- because of their mission, it was

4    always difficult for them to complete tasks that needed

5    to be done.

6    BY MS. ELLS:

7    Q.    So does this data look accurate as to the

8    performance of SVSP's 5.8 staff psychiatrists?

9          MS. THORN:  Objection.  Lacks foundation.

10         THE WITNESS:  It seems to me to be on the high

11   side.

12   BY MS. ELLS:

13   Q.    As in overstating?

14   A.    As in overstating, correct.

15   Q.    Did SVSP, to your knowledge, ever request

16   additional resources because -- strike that.

17         Are you aware of as to whether SVSP's

18   supervisors ever performed line function duties?

19   A.    Yes.  I believe Dr. Gill who is the -- at least

20   was at the time, would do consultations on patients and

21   would see -- would see patients.  I don't know the

22   frequency, but I know that he was seeing patients.

23   Q.    And would that have been in the 2017 time frame,

24   do you know?

25   A.    I'd say it's highly likely.

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    The state also asserted in its briefs that rely

2    on this same chart and with Katherine Tebrock's

3    declaration about this chart, CDCR did not need any more

4    psychiatrists to comply with the program guide and

5    provide adequate care.  Would that have been your view

6    at the time?

7         MS. THORN:  Objection.  Lack of foundation.

8         THE WITNESS:  No.  They certainly had reached

9    out on multiple occasions, requesting additional

10   psychiatrists.  They did have several tele

11   psychiatrists.  I don't know if they were in that

12   time frame, but I know somewhere around that

13   time frame there was tele psychiatrists that were

14   working there as well.  And they did have

15   difficulties trying to kind of manage all of their --

16   all of their needs.

17   BY MS. ELLS:

18   Q.    Could I restate the question?

19   A.    Uh-huh.

20   Q.    I believe that you were talking just about SVSP.

21   Is that correct?

22   A.    That is correct.

23   Q.    Okay.  So the state's brief actually said that

24   overall in the system, the number of staff psychiatrists

25   in 2017 that were actually on the ground were a

Kevin Kuich, M.D.                                                    September 19, 2019

1    sufficient number to provide adequate care and comply

2    with the program guide.  Was that your understanding of

3    what was actually happening in the field?

4     A.    That was not my understanding.

5     Q.    Could you explain a little more about that?

6     A.    The field was having significant trouble trying

7    to make their regular contacts.  Some institutions,

8    again, did better than others, depending on -- San

9    Quentin, fully staffed.  That wasn't an issue.  Some of

10   the CCC institutions, very easy, fully staffed, not a

11   problem.  The other institutions that had MHCBs, PIPs or

12   EOPs had routinely had difficulties, especially those

13   with ad segs, had difficulties being able to make their

14   contacts in a regular manner.  Many of the contacts were

15   not made in a confidential office setting.  They were

16   cell side.  They were ad hoc.  So these numbers seem

17   rather high.

18          In terms of MAPIP, which is also on the chart,

19   this certainly was reflecting a point -- the MAPIP at

20   that time was reflecting a point in time.  It hadn't

21   rolled out to the larger, more detailed MAPIP.  So -- so

22   MAPIP is a series of measures that occur at -- baseline

23   at three months and annually.  These measures for MAPIP

24   were basically recorded within one year, did anything

25   happen.  And so it really did not hold to the true MAPIP

Kevin Kuich, M.D.                                                September 19, 2019

1  requirements or obligations, so I'm not surprised to see

2  those as significantly high as they are.

3     Q.    You discussed earlier a little bit about SVSP,

4  and you mentioned specifically a psychiatrist that you

5  recall or estimate his name to be Dr. Gill.  Is that

6  right?

7     A.    Correct.

8     Q.    Dr. Gill was a supervisor?

9     A.    He was -- I'm not sure if his title was senior

10 psychiatrist, supervisor or chief psychiatrist, but he

11 was --

12    Q.    A supervisor?

13    A.    -- a supervisor.

14    Q.    And, Doctor, MAPIP is a medication management

15 tool; is that right?

16    A.    Correct.

17    Q.    Just for the record.

18    A.    That's -- it addresses the required monitoring

19 to have a safe use of medications and medication

20 therapy.

21    Q.    And that's -- can a nondoctor perform that

22 function?

23       MS. THORN:  Objection.  Vague and ambiguous as

24 to "function."

25 BY MS. ELLS:

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    Can a nondoctor adequately assess medication

2   compliance and management for patients?

3    A.    No.  There were -- in the auditing of MAPIP,

4   there were nondoctors that would be able to count how

5   many widgets were completed, but that isn't the actual

6   clinical determination of what's needed.  MAPIP is a

7   bare minimum that's required to be able to ensure a

8   modicum of safety.  The clinical decision-making of a

9   psychiatrist involves encompassing that bare minimum,

10   but also going beyond that, based on individual patient

11   characteristics and needs.

12          MS. ELLS:  I would like to provide three more

13   documents at this point.

14                  (Plaintiff's Exhibit No. 5 was marked for

15                   identification.)

16                  (Plaintiff's Exhibit No. 6 was marked for

17                   identification.)

18                  (Plaintiff's Exhibit No. 7 was marked for

19                   identification.)

20   BY MS. ELLS:

21    Q.    So the court reporter has handed you three

22   documents.  Exhibit 5 is an e-mail from Melissa Bentz

23   dated May 17th, 2018, and it has a number of enclosures.

24   Is that accurate?

25    A.    That is accurate.

Defendants object that 63:4-8 & Exhibit 6 lack foundation. Plaintiffs respond that the original family of staffing orders governing psychiatry staffing vacancies and 2018 staffing proposal. 73:18-74:5. Further, testimony is offered to establish that CDCR did not include Dr. Kuich or other headquarters psychiatry staff this document, which is established by the face of the document. 73:4-15.

1    Q.    And it's entitled "CDCR Psychiatry Staffing

2    Proposal," correct?

3    A.    Correct.

4    Q.    Exhibit 6 is another e-mail from Melissa Bentz.

5    This one is dated September 17th, 2018, and this is

6    entitled "Coleman Revised Psychiatry Staffing

7    Reductions."  Is that what you're seeing?

8    A.    That is what I'm seeing, yes.

9    Q.    And Exhibit 7 is a document filed in the

10   district court on 10/31/18, and it is entitled

11   "Defendants' Monthly Psychiatry Vacancy Report."

12         And I would like you to flip to the second page

13   of that.  Do you see where it reflects -- where it

14   states that "the enclosed document is CDCR's Division of

15   Healthcare Services systemwide mental health program

16   allocated and filled psychiatry positions for

17   September 2018."  Do you see that?

18   A.    I do see that.

19   Q.    I'd like to talk to you first about Exhibit 5,

20   which is an e-mail from Melissa Bentz, attaching the

21   CDCR psychiatry staffing proposal.  Do you see your name

22   on this e-mail?

23   A.    I do not see my name.

24   Q.    Do you see the name of any headquarters

25   psychiatrist on this e-mail?

Defendants object to 63:9-18 & Exhibit 7 as lacking foundation.

Plaintiffs respond that foundation is established by familiarity with CDCR's reported staffing data. 36:25-37:24; 63:9-18.

Kevin Kuich, M.D.                                              September 19, 2019

1    A.    I do not see the name of any headquarters

2    psychiatrist on the e-mail.

3    Q.    Do you see any CDCR headquarters mental health

4    people that are not psychiatrists on this e-mail?

5    A.    Yes, I do.

6    Q.    Did you receive this e-mail by blind carbon copy

7    or any other mechanism that you're aware of?

8    A.    No.

9    Q.    The second page begins the enclosures, and it's

10   entitled "Proposals to achieve a more efficient and

11   effective mental health services delivery system, with

12   adjustments to unneeded psychiatry positions."

13         Go ahead and take a moment and then tell me if

14   you have seen this proposal before.

15   A.    I don't believe that I've ever received a copy

16   of this directly to me.

17   Q.    Did you have any role in developing this

18   proposal?

19   A.    Some of these subtitles, I would have

20   contributed or could have contributed to, such as

21   standardize the scheduling module -- model, rather,

22   implementing a clinical model.  Those were active

23   discussions among psychiatry to try and help use --

24   better use our resources.

25   Q.    There are a number of elements of this proposal

Kevin Kuich, M.D.                                September 19, 2019

1    that recommend reducing what CDCR called "unneeded

2    psychiatry positions."  Go ahead and take a look.  Take

3    your time.  Do you recall being consulted in the

4    development of the numbers of positions being -- that

5    CDCR recommended could be cut?

6     A.    There was a discussion that Ms. Ponciano had

7    with me about the eight positions for on-call coverage

8    because it involved telepsychiatry.  That was a

9    discussion that I was taken out of the chief of mental

10   health annual meeting, to be able to discuss what would

11   be -- what's being proposed.  A number was mentioned,

12   and I had concern that that number would be adequate in

13   terms of providing coverage for the entire state and

14   allowing for adequate redundancies for sick and those

15   kinds of things.  And I recall in that conversation I

16   was reassured that we just need to make a decision and

17   start here, and if it was determined that that wasn't

18   sufficient staffing, that we would be able to obtain

19   additional staffing to be able to provide that

20   telepsychiatry need.  So I do recall that discussion,

21   yes.

22    Q.    I'm going to return to that in a moment.

23          Do you recall being consulted about any of the

24   other reductions that are proposed in this document?

25   And, again, take your time, since you've never seen it

Kevin Kuich, M.D.                                      September 19, 2019

1    before.

2      A.    Our meetings were generally not clear meetings

3    with preplanned agendas.  We would have meetings where

4    we would be called into and we would be instructed on

5    what the plan was that was in place.

6      Q.    And are you talking about internal meetings?

7      A.    Internal meetings.

8      Q.    And when you say "we," who do you mean?

9      A.    Dr. Golding and myself.

10     Q.    So the two headquarters' chief psychiatrists?

11     A.    Correct.

12     Q.    And you described a series of meetings.  Who

13   were at those meetings, generally?

14     A.    Those would generally be Ms. Tebrock,

15   Ms. Ponciano, and Dr. Brizendine.

16     Q.    And correct me if I'm misstating this, but you

17   said that you were generally not provided with

18   documentation that was being discussed at that meeting,

19   in advance of that meeting.  Is that what you said?

20          MS. THORN:  Objection.  Misstates the

21   testimony.

22          MS. ELLS:  I'm asking him if that is what he

23   said.

24          MS. THORN:  Okay.  Objection.  Leading.

25          THE WITNESS:  Many -- it is not uncommon in

Kevin Kuich, M.D.                                    September 19, 2019

1   our meetings to have a -- perhaps a topic, but there

2   wasn't any clear agenda about what was to be

3   discussed, what decisions needed to be made, any

4   pre-work or pre-information to be able to kind of

5   review it before the meeting, especially when there

6   became issues with such high merit, such as staffing

7   or budgetary things or other kinds of more

8   complicated issues.

9   BY MS. ELLS:

10   Q.    So I'm going to rephrase the question in

11   deference to my colleague here.

12        Were you commonly provided with topics that were

13   going to be discussed, in advance of meetings with the

14   other headquarters leadership that you described?

15   A.    Not commonly.

16   Q.    Were you commonly provided with agendas for

17   those meetings?

18   A.    Not commonly.

19   Q.    Were you commonly provided with documents that

20   would be discussed during those meetings, in advance of

21   walking into the room?

22   A.    Not commonly.

23   Q.    Did you commonly receive the documents -- did

24   you commonly receive documents in the room at those

25   meetings, that you were expected to comment on?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    Yes.

2    Q.    Were some of those meetings about staffing

3    reductions?

4    A.    Yes.

5    Q.    But you were not provided with this proposal in

6    any of those meetings; is that correct?

7    A.    Not that I can recall.

8    Q.    Do you recall staffing meetings with those

9    members of the mental health leadership team where you

10   were asked to sign off on reductions of psychiatric

11   staffing on the spot?

12   A.    I don't recall those kinds of meetings.

13   Q.    Now let's circle back to the one topic that you

14   said from this proposal that you were consulted on,

15   which was the proposal to reduce overnight and weekend

16   crisis care allocations for staff psychiatrists

17   systemwide, and replace them with a telepsychiatrist

18   that would provide coverage for the entire state.  Is

19   that an accurate depiction of what the proposal was?

20   A.    That's accurate.

21   Q.    Could you tell me a little bit more about this

22   conversation with Ms. Ponciano where she discussed this

23   topic with you?

24   A.    There -- I was informed that there were these

25   positions that we wanted to be able to retain and allow

Kevin Kuich, M.D.                                                September 19, 2019

1    telepsychiatry to provide on-call services systemwide.

2    We had already had one on-call night psychiatrist, so we

3    had proof of concept that it was feasible and workable.

4    And so in whatever decisions were made in terms of staff

5    that didn't need to be made, there was a discussion that

6    there should be a certain number of staff retained so

7    that they could be in these on-call positions through

8    telepsychiatry.

9       Q.    And I believe you mentioned that Ms. Ponciano

10   raised this proposal with you by pulling you out of

11   another meeting.  Is that accurate?

12      A.    Correct.

13      Q.    Did Ms. Ponciano provide you with any

14   documentation about why eight was, in her opinion, the

15   correct number of tele psychiatrists?

16      A.    No.

17      Q.    Did Ms. Ponciano tell you what the basis for

18   that number was orally?

19      A.    There was -- there wasn't any mathematics in

20   terms of what that number was.  There was -- it seemed

21   more "back of a napkin" of here's an estimate.  And

22   certainly I knew what the one telepsychiatrist was doing

23   on call, and so I would have preferred to have an

24   ability to look at what that need would be, because

25   certain institutions are quite busy and other

Kevin Kuich, M.D.                                        September 19, 2019

1    institutions aren't, and so there would need to be some

2    ability to pair these individuals up so that they would

3    be able to complete the task appropriately and be

4    available to all the institutions that they're serving.

5    So there wasn't the ability to have that discussion nor

6    that reflection on whether eight is the accurate number.

7    Q.    Did you ask Ms. Ponciano for time to consider

8    this number?

9    A.    I said I had some concerns about the number.

10   And when I -- when I voiced the concerns, the response

11   back was that if this is not the correct number, we'll

12   be able to make it right in the end.

13   Q.    And did -- did Ms. Ponciano want your response

14   on the spot to whether or not this was an appropriate

15   number?

16   A.    Yes.

17   Q.    Were you given any time to think about it?

18   A.    No.

19   Q.    How long was this conversation, would you

20   estimate?

21   A.    Less than ten minutes, more than five.

22   Q.    What was your concern about whether or not eight

23   was a sufficient number of tele psychiatrists based on?

24   A.    The tele psychiatrists would be performing their

25   function in an office and they would have a number of

Kevin Kuich, M.D.                                    September 19, 2019

1    institutions that they would be receiving calls from.

2    The function of the telepsychiatrist is to be able to

3    physically see that patient, to have the patient brought

4    in to them and to be able to see that patient and to be

5    able to provide a mere equivalent of an in-person

6    evaluation.

7           Certain institutions have tremendous high needs

8    and have a -- would have a tremendous amount of time

9    required to be able to service that institution.  So

10   part of the larger discussion would be able to see --

11   excuse me -- what would be the institutions that a

12   particular person would serve that would allow them to

13   adequately respond to all of the calls that they would

14   be getting at the same time, because in this model, you

15   would be responding -- the telepsychiatrist that was on

16   call, as a prototype, was responding to six or seven

17   institutions.  So if you're getting three institutions

18   calling at the same time with an emergency, that one

19   psychiatrist would not be able to timely address the

20   emergencies in an appropriate way.

21          So there needed to be a detailed evaluation of,

22   could we pair up so that institutions that don't

23   typically have that many calls could be paired up with

24   an institution that has more calls.  And to that end,

25   you know, we were trying in telepsychiatry to elicit how

Kevin Kuich, M.D.                                          September 19, 2019

1    many calls do you get a night so we could be able to

2    come up with an estimate to be able to have a sense of,

3    you know, how busy is the telepsychiatrist going to be.

4      Q.    Could you have performed the analysis to

5    determine if, in your opinion, eight telepsychiatrists

6    was sufficient, if you had had time to do that analysis?

7      A.    Yes.

8      Q.    You said that Ms. Ponciano asked you or --

9    strike that.

10          You said that Ms. Ponciano told you that if

11   eight was an insufficient number of telepsychiatrists,

12   that you could get more; is that accurate?

13     A.    That is accurate.

14     Q.    Have you ever had an experience where you asked

15   Ms. Ponciano or anyone in mental health leadership to

16   add psychiatric positions, and they did so in a timely

17   fashion?

18     A.    I can think of no instances.

19     Q.    Can you think of any instances where you asked

20   for additional psychiatric staff, and eventually they

21   got around to it and added those allocations?

22     A.    We did have additional senior psychiatric

23   specialist added to headquarters psychiatry.

24     Q.    But not line psychiatrists?

25     A.    Not line psychiatrists.

Kevin Kuich, M.D.                                          September 19, 2019

1    Q.    Not psychiatrists that would see patients in the

2    field?

3    A.    Correct.

4    Q.    I'd like to ask you to turn to Exhibits 6 and 7

5    at this point.  So as discussed, Exhibit 6 is a e-mail

6    from Melissa Bentz dated September 17, 2018.  Could you

7    please review this document?

8          Are you copied on this document?

9    A.    I'm not copied on this document.

10   Q.    Are any other headquarters psychiatrists for

11   CDCR copied on this document?

12   A.    No.

13   Q.    Do you see other members of mental health

14   leadership that are not psychiatrists copied on this?

15   A.    Yes.

16   Q.    This document from Ms. Bentz requests -- strike

17   that.

18         This document from Ms. Bentz adds up the

19   reductions that CDCR was proposing in their 2018

20   staffing proposal, which you testified you did not see

21   before it was sent to plaintiffs and the special master.

22   Her last paragraph says there was a total reduction of

23   79 positions.  And you understand that to mean line

24   psychiatric positions?

25         MS. THORN:  Objection.  Lack of foundation.

Kevin Kuich, M.D.                                            September 19, 2019

1    BY MS. ELLS:

2    Q.    What do you understand that 79 positions to be?

3    A.    Line positions.  The court -- my understanding

4    is -- of the staffing requirements have to do with line

5    staff positions, not seniors or chief positions.

6    Q.    Please turn to Exhibit 7, the last page.  That's

7    ECF Page No. 5.  This is a chart titled "Division of

8    Healthcare Services, statewide mental health program

9    allocated and filled psychiatric" -- or "psychiatry

10   positions, September 2018."

11         That's the same month that Ms. Bentz sent her

12   e-mail; is that correct?

13   A.    I believe so, yes.

14   Q.    I'd like you to look at the column under the

15   header "allocated July 2018 "and "total."  At the

16   bottom, the number is 405.3.  Do you see that?

17   A.    I do.

18   Q.    And is your read of this chart that that number

19   includes both on-the-ground psychiatrists and

20   telepsychiatrists?

21   A.    It looks like that number does include both of

22   those classifications.

23   Q.    So in September 2018, when defendants were

24   proposing to cut 79 psychiatry positions, that was out

25   of a number of 405.3 that were allocated?

Kevin Kuich, M.D.                                    September 19, 2019

```
 1              MS. THORN:  Objection.  Lack of foundation.
 2    BY MS. ELLS:
 3     Q.     Is that accurate --
 4     A.     It does --
 5              MS. THORN:  Objection.  Lacks foundation.
 6    BY MS. ELLS:
 7     Q.     Is that accurate according to what you see in
 8    Exhibits 6 and 7?
 9              MS. THORN:  Objection.  Lack of foundation.
10              THE WITNESS:  It does appear -- that's a
11    complicated question.  Can you --
12    BY MS. ELLS:
13     Q.     Sure.  So Ms. Bentz's e-mail, Exhibit 6,
14    announces that CDCR's proposal is to reduce 79
15    psychiatry positions, and you understand that to be line
16    psychiatry positions, correct?
17     A.     Correct.
18     Q.     And this monthly vacancy report, which covers
19    the same time frame as Ms. Bentz's e-mail, shows that at
20    that time, there were 405.3 total allocated psychiatry
21    positions; is that correct?
22     A.     Yes, that is correct.
23     Q.     Okay.  So I will represent to you that that is
24    about -- that 79 is about 20 percent of 405.3.  Does
25    that seem reasonable to you?
```

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    Yes, that seems reasonable.

2    Q.    Did anyone ever ask you if it would be

3    appropriate to cut 20 percent of the allocated

4    psychiatry positions?

5    A.    No.

6    Q.    In your communications with psychiatrists at the

7    institutions, did they ever tell you that they were

8    overstaffed with psychiatrists?

9    A.    No institution would ever say they were

10   overstaffed.  They would be quite quiet.  Folsom was

11   amazingly quiet, as was San Quentin.

12   Q.    Was it more typical that the institutions would

13   call you, telling you that they didn't have enough

14   psychiatrists?

15   A.    Yes.

16   Q.    Did any institution ever tell you that it would

17   be appropriate to cut unfilled but allocated psychiatric

18   positions, that they just didn't need them?

19   A.    No -- no institution.

20   Q.    Do you ever recall speaking with Ms. Tebrock

21   about -- well, strike that.

22         Did you ever become aware that CDCR was

23   proposing to cut a significant number of psychiatric

24   staff?

25   A.    Not until it was essentially a fait accompli.

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    When would you say that was?

2    A.    Probably around September, because it was -- the

3    planning was October court date that we knew that there

4    needed to be things filed, so it was shortly before the

5    court date.

6    Q.    Okay.  So nobody prior to that in mental health

7    leadership asked you if it would be appropriate to

8    provide clinical care statewide with 20 percent fewer

9    allocated psychiatric positions?

10   A.    No.  And we generally weren't in those

11   discussions.  They were presented to us after they have

12   been discussed and completed.

13   Q.    Do you ever recall speaking with -- after you

14   became aware of this proposal to cut psychiatric staff,

15   do you ever recall speaking with anyone in mental health

16   leadership about concerns that that proposed cut did not

17   accurately reflect the role of supervising psychiatrists

18   in the performance of patient care in the institutions?

19   A.    I don't recall any individual meetings I had.

20   But, again, in the context of the larger meeting with

21   Dr. Golding that -- there were several occasions that

22   there were concerns mentioned of the dramaticness [sic]

23   of the cut.

24   Q.    And do you recall specifically discussing the

25   role of supervising psychiatrists and what they were

Page 77

Kevin Kuich, M.D.                                    September 19, 2019

1   performing in terms of patient care, when you were also

2   discussing those cuts?

3    A.    I don't believe so.  I think the cuts were so

4   significant that they caused a pivot to that number

5   rather than the details of the numerator and denominator

6   and all those other kinds of things.

7    Q.    So correct me if I'm wrong:  Your testimony is

8   that you had on multiple occasions been in meetings

9   where the issue of supervisors performing line staff

10  psychiatry functions was raised to leadership.  And do

11  you recall expressing concerns that the reductions in

12  psychiatry staff didn't take sufficient account of how

13  often supervisors were doing that work?

14       MS. THORN:  Objection.  Lack of foundation.

15       THE WITNESS:  Yes.  I think once we saw the

16  cuts, it put in sharper contrast the data that was

17  behind representing these as reasonable cuts, and

18  that was one slice of the conversation, among many.

19  BY MS. ELLS:

20   Q.    I'd like to discuss with you a couple of pieces

21  of this proposal.  Now, unfortunately, much of it is

22  unpaginated, so you'll see that about halfway through

23  this document there is a chart that is entitled -- I'm

24  sorry.  I'm referring to Exhibit 5 here.  There is a

25  chart entitled "Timely psychiatry contacts, 10/1/17

1    through 3/31/18," and it's further titled "CCCMS and EOP

2    from performance report last six months."

3         Do you see that?

4    A.    I do see that.

5    Q.    Are you familiar with the performance report

6    indicator called "Timely psychiatry contacts"?

7    A.    Yes.

8    Q.    What is it supposed to show?

9    A.    According to the program guide, certain levels

10   of care need to have contacts within a certain

11   time frame.  And so for CCCMS, that would be, I believe,

12   if my memory serves me correctly, within 90 days, that

13   there would be a regular -- a regular contact.  And so

14   any contact that happened from the last contact that's

15   within 90 days would be considered a timely psychiatry

16   contact for CCCMS.

17   Q.    Do you know if psychiatry contacts performed by

18   supervisors are included in this indicator?

19   A.    I don't know, but I would say that they would,

20   because, again, we're not looking at who performed the

21   service; we're just looking at was the widget performed,

22   was the task performed.  So -- and because we're just

23   looking at the ambulatory organizer in the EHRS, which

24   is the scheduling aspect, if that was a task that was

25   completed and it gets sent to scheduling, it shows that

Kevin Kuich, M.D.                                          September 19, 2019

1    was a task completed.

2    Q.    This chart shows that 100 percent of CCCMS

3    contacts at -- with psychiatrists at four prisons were

4    completed on time for six months.  Is it your

5    understanding that it's generally possible for an

6    institution to achieve 100 percent timeliness without

7    using any psychiatric staff?

8    A.    They wouldn't be able to have 100 percent

9    timeliness without psychiatric staff.

10   Q.    I'm sorry.  Excuse me.  Without supervisory

11   psychiatric staff contributing.

12   A.    For these institutions, it would be reasonable,

13   as they are small institutions with very small demand.

14   Q.    Okay.  Could you please turn to a chart that is

15   the third-from-the-last page.  It's called "Timely

16   psychiatry contacts from 10/1/17 through 3/31/18,

17   mainline CCCMS."  This chart shows systemwide data.  Is

18   that your understanding of this chart?

19        MS. THORN:  Objection.  Lack of foundation.

20        THE WITNESS:  Based on the number, if I'm

21   assuming measurements mean that -- the number of

22   contacts, a number in the hundreds of thousands would

23   indicate systemwide data, yes.

24   BY MS. ELLS:

25   Q.    So it's your understanding that the line that's

Kevin Kuich, M.D.                                    September 19, 2019

1    called "timely psychiatry contacts" captures all

2    psychiatry contacts occurring in this time frame for

3    mainline CCCMS class members?

4          MS. TRAPANI:  Objection.  Lack of foundation.

5          THE WITNESS:  That would be my understanding,

6    yes.

7    BY MS. ELLS:

8    Q.    This chart shows that 95 percent -- excuse me,

9    94 percent of all psychiatry contacts systemwide for

10   mainline CCCMS class members are occurring on time.  In

11   your experience, could that number on a systemwide basis

12   be achieved without supervisory staff performing some of

13   those contacts?

14         MS. THORN:  Objection.  Lack of foundation.

15         THE WITNESS:  Unlikely.

16   BY MS. ELLS:

17   Q.    Okay.  How unlikely would you say that is, based

18   on --

19         MS. THORN:  Objection.  Calls for speculation.

20   BY MS. ELLS:

21   Q.    -- based on your understanding of what

22   institutions were telling you about their staffing needs

23   and the role of supervisors in performing patient care?

24         MS. THORN:  Objection.  Lack of foundation and

25   calls for speculation.

Kevin Kuich, M.D.                                        September 19, 2019

```
 1         THE WITNESS:  I think it would be unlikely
 2   without additional resources, given the known
 3   resources on the ground.  And, again, the EHRS is not
 4   looking at what documentation was placed in the
 5   chart; it's just looking at, was a scheduling order
 6   checked in and checked out.  And so my point being is
 7   that you could have high compliance and actually have
 8   nothing done for the patient.
 9   BY MS. ELLS:
10    Q.     Do you think --
11    A.     Which likely goes against what we're trying to
12   accomplish.
13    Q.     All right.  If no psychiatry contacts that were
14   performed by supervisors were included in this measure,
15   do you think that compliance, based on your
16   understanding of what was happening in the institutions,
17   would be this high?
18    A.     No.
19    Q.     With the timeliness factor?
20         MS. THORN:  Objection.  Lack of foundation.
21   Calls for speculation.
22   BY MS. ELLS:
23    Q.     Could you repeat your answer?
24    A.     No.  I can repeat my answer.  My answer is no.
25   Q.     Thank you.  I appreciate that.
```

Kevin Kuich, M.D.                                    September 19, 2019

1        This chart also says that the average number of

2    days overdue for timely psychiatry contacts systemwide

3    was 2.6 days late.  So I read that to mean for the

4    6 percent that did not make it within the time frame,

5    they were 2.6 days late.  Is that your understanding as

6    well?

7        MS. THORN:  Objection.  Lack of foundation.

8    Calls for speculation.

9        THE WITNESS:  I don't know how that number was

10   calculated, so I -- it's hard for me to say.  It

11   does -- it is conceivable that it would be for the

12   6 percent, but, again, without trying to understand

13   where that comes from, to me, you know, an overdue

14   appointment should be very clear.  Average number

15   days overdue, if it was for the 6 percent, it should

16   indicate 6 percent.  I think there's ambiguity in how

17   this is presented, and I'm somewhat -- if I were a

18   manager looking at this, I'm not quite sure how I

19   would interpret it and how I would operationalize

20   reducing that average number of days overdue.

21   BY MS. ELLS:

22   Q.    Okay.  But nobody ever showed you this chart?

23   A.    No.

24   Q.    And you were not consulted about the data that

25   was provided to the special master in support of the

Kevin Kuich, M.D.                                          September 19, 2019

1    reduction in psychiatric positions that was being

2    proposed?

3      A.      Correct.

4            This data is, I would say, typical of some of

5    the data that gets presented, that it -- you glance at

6    it, it looks green, it looks great, but what actually

7    does it mean?  And so to me as an observer, it would be

8    great to say average days overdue which, what is in the

9    numerator, what is in the denom- -- what does that

10   number mean.  There is no context.  And this is similar

11   to how performance data is presented and this is similar

12   to how MAPIP data is presented, that oftentimes there's

13   no context and there's numbers and there's colors.  And

14   our reptilian brain responds to that, but it really is

15   much more meaningful and it just is -- sometimes things

16   are provided without context and it's puzzling.

17     Q.      The court reporter can correct me if I'm wrong,

18   but the first exhibit marked was the Court's

19   September 17th, 2019, order.  Is that correct?

20           THE REPORTER:  I would have to look at it.

21   BY MS. ELLS:

22     Q.      Could you turn to Exhibit 2, please.  Could you

23   turn to page 3.  So we've been discussing the Court's

24   concern articulated as Issue F, psychiatric supervisors

25   acting as line staff.  In lines 17 through 19 of this

Kevin Kuich, M.D.                                          September 19, 2019

1    document on page 3, using the numbering at the top -- I

2    guess it's the same as at the bottom -- the Court asks

3    your views, if any, about why the issue of supervisory

4    staff acting as line staff could not be resolved

5    successfully internally and prior to presentation of

6    misleading information to the Court and/or special

7    master.  What are your views on that?

8            MS. THORN:  Objection.  Lack of foundation.

9    And calls for speculation.

10            MS. ELLS:  And the Court's order speaks for

11    itself.

12            MS. THORN:  Well, if this witness -- it hasn't

13    been established that this witness has foundation,

14    has any personal knowledge regarding the data that

15    was submitted to the special master in connection

16    with the staffing proposals.

17            THE WITNESS:  I would think -- again, it is

18    not atypical that psychiatry would be presented with

19    information or a pathway or, this is what we're going

20    to do after it's been fully vetted by multiple people

21    and then final presents -- presents itself to us.  So

22    that would not be atypical in any way.

23            I think given the significance of the cuts

24    proposed, one would want to be very circumspect and

25    ensure that all the information is presented.  There

Kevin Kuich, M.D.                                    September 19, 2019

1    seemed to be, for whatever reason, a very hurried

2    approach to get this to the Court in a certain

3    time frame.  I don't know what was beyond that, but

4    it did seem that this was rather accelerated in terms

5    of how court preparation and court documents would go

6    prior to my -- prior to this instance.

7    BY MS. ELLS:

8     Q.     So if people had consulted with you about the

9    information and the proposal in the psychiatric staffing

10   reduction proposal that CDCR was presenting and

11   discussing with plaintiffs and the special master over

12   the summer of 2018, would you have told them that you

13   thought it was inappropriate?

14          MS. THORN:  Objection.  Calls for speculation.

15          THE WITNESS:  I would have.  It's a tremendous

16   reduction, and I would have been much more -- wanted

17   a much more detailed dive to look at what is it being

18   based on, is that factually correct, and is this the

19   right way to move forward.

20          We were also looking at ways to improve

21   psychiatry efficiency and all kinds of other things

22   to prevent the constant retention issues that we

23   have, to improve the culture, to make it a more

24   positive culture, to have psychiatrists want to be

25   here.  And unless this was founded on rock solid

Kevin Kuich, M.D.                                            September 19, 2019

1    information, which I would never have access to

2    because I didn't have any access to any of the

3    databases to do queries or anything -- it's all

4    provided, you know, after the fact.  I tend to be

5    somewhat detailed and circumspect when it involves

6    people's lives, whether they're going to have a job

7    or not.  And this seemed to be moving at a very rapid

8    pace and emerged, to my awareness, very quickly

9    before its timeline to be able to have it filed for

10   the Court.

11   BY MS. ELLS:

12    Q.    If you had had time and access to the

13   appropriate data, could you have raised your concerns to

14   the internal mental health leadership team before they

15   turned it over to the special master and the plaintiffs?

16   And by turned it over, I mean proposed these staffing

17   reductions and presented this particular plan with the

18   attached data.

19    A.    Having time and information, I would have gladly

20   provided input.  If that input would be received and

21   acted upon is another matter.

22    Q.    Do you have reason to think it wouldn't have

23   been if you had been provided the opportunity to give

24   input on this proposal?

25    A.    There have been many instances where I've

Kevin Kuich, M.D.                                            September 19, 2019

1    expressed concerns about various things, whether it's

2    conflicts of interest or the use of remote tele

3    psychiatrists, that took a tremendous amount of effort

4    to either get a hearing on and get resolution on, or it

5    just evaporated.

6    Q.    And when you say "get a hearing on," you mean be

7    able to discuss it internally?  Is that what you mean?

8    A.    Correct.  I apologize.  In the context of what

9    we're doing today, that was --

10   Q.    We're lawyers here.

11   A.    -- ambiguous.  I apologize.

12        MS. ELLS:  I think we can take a lunch break,

13   if that timing works for people.

14              (Whereupon, a lunch break was taken at

15              12:50 p.m.).

16   BY MS. ELLS:

17   Q.    Doctor, I'd like to talk to you now about the

18   second issue that the Court has identified as you

19   potentially having information about, which is -- she

20   calls it Issue B:  Redefining monthly to lengthen the

21   intervals between enhanced outpatient EOP appointments.

22        The program guide requires that a psychiatrist

23   shall evaluate enhanced EOP -- or enhanced outpatient

24   program inmates "at least monthly to address psychiatric

25   medication issues."  Is that consistent with your

Kevin Kuich, M.D.                                    September 19, 2019

1   understanding of the obligation?

2    A.    It is.

3    Q.    CDCR has admitted that prior to December 2016,

4   it used to use 30 days as the interval to measure that

5   monthly time period.  Is that your understanding of what

6   the program guide requirement means in practice, that

7   the monthly is 30 days?

8    A.    Correct.

9    Q.    In December 2016, CDCR admits that it changed

10  the business rule to allow for periods of longer than

11  30 days to pass between EOP psychiatric appointments

12  while still being counted as timely.  Were you aware of

13  that change?

14   A.    I was not aware of that change.

15   Q.    Did at some point you become aware of that

16  change?

17   A.    Yes, I did.

18   Q.    When did you become aware of that change?

19   A.    Probably summer to fall of 2018, maybe.

20         MS. ELLS:  Okay.  Here's a new exhibit.  This

21  is going to be marked as Exhibit 8.

22               (Plaintiff's Exhibit No. 8 was marked for

23               identification.)

24  BY MS. ELLS:

25   Q.    This is an e-mail from Melanie Gonzalez at CDCR

Kevin Kuich, M.D.                                          September 19, 2019

1   to Michael Golding at CDCR, and you are CC'd, along with

2   John Lindgren.

3   A.     (Nods head affirmatively.)

4   Q.     It's dated Wednesday, March 22nd, 2017.

5   A.     I guess it was earlier.  I apologize.

6   Q.     The subject is "Re: EOP compliance change from

7   30 days to 45 days."  Do you want to go ahead and take a

8   look at this e-mail.

9   A.     Uh-huh.

10   Q.     Have you had a chance to review?

11   A.     Yes, I have.

12   Q.     This e-mails says that you and Melanie

13   Gonzalez -- who is a psychiatrist in the headquarters of

14   CDCR as well; is that right?

15   A.     Currently a senior psychiatrist specialist.

16   Q.     And do you know if she was at the time, in March

17   of 2017?

18   A.     Yes, she was.

19   Q.     So the -- and that's headquarters level?

20   A.     (Nods head affirmatively.)

21   Q.     So the second paragraph here says that "Kevin

22   and I did look at the psychiatric contract rule

23   parameters last week and both agreed that 'then

24   routinely within one month, or 45 calendar days if that

25   is sooner, of the prior completion' does not make

Kevin Kuich, M.D.                                          September 19, 2019

1    sense."

2        Is that approximately when you discovered that

3    the parameter had been changed, about a week before this

4    March 22nd e-mail was sent?

5    A.    That would be consistent.  Dr. Gonzalez had done

6    some data analysis.  Part of helping with quality

7    management was to be able to look at these various

8    program reports, and so that was something that I had

9    been working with Dr. Gonzalez in -- in general, where

10   the program reports are, how do you pull the program

11   reports, you know, how do you review them, those kinds

12   of things.  So this is much, much sooner than my

13   recollection, but this is accurate.

14   Q.    How did you -- what made you think to look at

15   this particular psychiatric timeliness parameter in this

16   time frame?

17   A.    There was a tremendous focus on EOP at the time,

18   and there was also a push at -- I believe around that

19   time, to look at EOP individuals and see if they are

20   really in the right level of care.  And so that was a

21   systemwide push, not from psychiatry but from the

22   system, to be able to look at EOP patients specifically

23   and to find out, are we meeting their needs, can their

24   needs be met at a lower level of care.

25        There was also training at the same time that

Kevin Kuich, M.D.                                          September 19, 2019

1   Dr. John -- Dr. Jim Vess, psychologist, was doing as

2   well to be able to kind of help people understand levels

3   of care and which -- which would be the appropriate

4   level of care for a particular patient and how to

5   determine that.

6   Q.      And so what led you to look at this indicator?

7   A.      Because it had to do with EOP, it was looking at

8   all things related to EOP.  So that was certainly a

9   large focus at that time, so we were curious.

10  Q.      Was there something about it that made you want

11  to look at it more closely?  The indicator as you saw

12  it.

13  A.      There wasn't anything I recall inherently unique

14  about it, other than it was an indicator.  And typically

15  when I would work with Dr. Gonzalez with these types of

16  reports, it was my habit of going back and tracing the

17  reports back month by month to be able to kind of see

18  what changes has happened, because if there's something

19  drastic that has changed, then you want to know what

20  happened and be able to pinpoint it and track it back.

21          So there was this ability to look at the -- look

22  at the due dates, but we also -- it was also a fairly

23  common practice to be able to take that data and save it

24  in a PDF format or Excel or something so we had it.

25  Just if there was a change in data or we couldn't access

Kevin Kuich, M.D.                                    September 19, 2019

1   the database, there was something happening, we would

2   have a copy of it ourselves.

3    Q.    Did the -- in this time frame, did that indicate

4   or look strange to you at all?

5    A.    There did seem to be a significant improvement

6   in that time frame, and it was interesting why.  I liken

7   it to an improvement I noticed during a quality

8   management meeting having to do with, I believe, use of

9   nonformulary medications, that suddenly everyone who was

10  noncompliant became compliant, and we couldn't quite

11  figure out what happened.  And tracing it back, they had

12  changed the formula for that, and that resulted in a

13  better value, so.

14   Q.    How did you discover that the business rule had

15  been changed?

16   A.    The business rules -- there was a portion of the

17  program reports where the business rules were all laid

18  out, so we were in the habit of being able to understand

19  numerator and denominator and truly understand what it

20  represents.  And Dr. Gonzalez fortunately was very

21  gifted in the ability to look at that detail level and

22  realize the importance of that.

23   Q.    So did she sort of flag the issue for you and

24  then you looked as well, or how -- this e-mail says that

25  you both looked at the parameter -- or both looked at

Kevin Kuich, M.D.                                    September 19, 2019

1    the data.  Is that accurate?

2     A.    It is accurate.  I believe she did the first

3    pass.  At that time, I was still doing -- wearing

4    multiple hats, so -- and I wanted to encourage her to

5    look at those -- those metrics and measures and be

6    comfortable with it.  And so that was something that she

7    was not necessarily tasked with but had taken on, to be

8    able to kind of review those on a regular basis.  And

9    when she found something, she checked and said, Is

10   this -- you've done this.  Is this normal, not normal,

11   what is this.  And we sat and looked at it at that time.

12    Q.    What did you think about the change?  Is it

13   consistent with your understanding of what the program

14   guide requires?

15    A.    It is not consistent with what the program guide

16   requires.  And I think, you know, at most, a month would

17   have 31 days, so 45 seems to be a significant stretch

18   beyond that.  So the program guide is quite clear that

19   it needs to happen within a month, and so this seemed to

20   be a non-explainable change to the accounting that --

21   and we were never apprised of those kinds of changes as

22   they happened in the back end.  They just happened and

23   they show up.  And we just happened to be looking in the

24   right place when this showed up.

25    Q.    So no one notified you in advance of this

Kevin Kuich, M.D.                                    September 19, 2019

1    change?

2     A.     Correct.

3     Q.     And nobody told you after it had been changed,

4    that it had been changed either, right?

5     A.     Not to me.  I believe there was understanding --

6    and I don't know if it's in this -- in these documents,

7    but it looks like the rule -- it looks like Dr. Leidner

8    stated the rule changed in December.

9     Q.     And Dr. Leidner, is he a psychiatrist?

10     A.     He's a psychologist.

11     Q.     And what is his role?

12     A.     His role at the time was, he was basically the

13    keeper of the data.  So he would make sure that the data

14    flowed into the various databases correctly, and would

15    also run queries that would then pop up as the program

16    reports and various kinds of other reports.

17     Q.     So before, I believe it was Ms. Gonzalez

18    contacted Dr. Leidner -- confirm that here.  Excuse me.

19    On page 3 of this e-mail string, it looks like

20    Dr. Golding contacted Dr. Leidner on March 21st, 2017,

21    asking if something had changed.  Before that e-mail and

22    Dr. Leidner's response, had anyone told you that there

23    had been a change?

24     A.     No.  That wasn't a common practice.

25     Q.     So it would not be typical for you to know when

Kevin Kuich, M.D.                                    September 19, 2019

1    a psychiatry measure was being changed in terms of how

2    it was being reported?

3     A.    That would be accurate.

4     Q.    When you found out about this change, you've

5    testified that you thought it was an inappropriate

6    change; is that accurate?

7     A.    That is accurate.

8     Q.    Did you say anything to anyone inside CDCR about

9    your views about the change?

10    A.    I spoke within the psychiatry team that I had

11   concern about it.  And similar, in the larger meetings

12   that I mentioned where Dr. Golding would be in and we

13   would be in with other leadership, I'm sure there was an

14   opportunity there to say that as well.  But I don't

15   recall specifically the date or the context.

16    Q.    So you've testified that you told Dr. Golding --

17   is that right?  Excuse me.  That you told Dr. Golding

18   that you thought this was an inappropriate change?

19    A.    Yes.

20    Q.    Do you explicitly recall telling anyone outside

21   of the psychiatry team at headquarters that you thought

22   this change was wrong?

23    A.    I don't recall that I did.  I believe it was

24   more Dr. Golding and Dr. Gonzalez who moved it forward.

25   Not because I didn't think it was relevant or important

Kevin Kuich, M.D.                                    September 19, 2019

1    issue, but I was just tasked with other things.

2    Q.    Is there any other reason why you may have not

3    said anything about it to the mental health leadership?

4    A.    Generally, there has not been a positive

5    response.  Certainly when it comes to data, there is not

6    an open transparency about the data, being able to

7    access the data.  I had several instances before where I

8    requested data and I didn't get data; and even trying to

9    elicit Dr. Brizendine to help, still received no data.

10   So I think there wasn't really that -- history did not

11   dictate that spending that energy was useful.

12   Q.    Did you feel like if you had concerns about the

13   data and what it was showing, that you didn't have an

14   avenue outside of psychiatry to voice those concerns?

15   A.    I would say that's accurate, yes.

16   Q.    Did you ever ask anybody to change it back to

17   30 days?

18   A.    I did not ask anyone, but I believe it was asked

19   by either Dr. Golding and/or Dr. Gonzalez.

20   Q.    And did you agree that it should be changed

21   back?

22   A.    Absolutely.

23   Q.    Did you review individual patient-level data

24   about timeliness for EOP contacts in spring of 2017,

25   after the business rule had changed and before it was

Kevin Kuich, M.D.                                    September 19, 2019

1    changed back?

2    A.    It would have been in concert with working with

3    Dr. Gonzalez, so --

4    Q.    In that process, were you looking at individual

5    appointment time frames?

6    A.    That, I don't recall.  I know Dr. Gonzalez was

7    doing a pretty deep dive, and I don't know at what level

8    -- if it went to specific individual patients or if it

9    was still kind of in an aggregate.

10   Q.    Do you recall ever seeing -- let me step back.

11        Drs. Golding and Gonzalez told the neutral

12   expert that they saw data showing that some patients'

13   psychiatry appointments in this time frame were marked

14   as compliant when their next appointment was beyond

15   45 days and up to 60 days.  Do you ever recall seeing

16   anything like that?

17   A.    I don't recall seeing anything like that, but

18   that wouldn't surprise me.

19   Q.    Do you know why the business rule was changed in

20   December 2016?

21   A.    I don't.  We don't have a sense of when the

22   business rule was changed.  There's not a systemwide

23   notification that there's a change and this is the

24   reason why that particular rule was changed.  It's

25   certainly concerning, number one, having to do with

Page 98

Kevin Kuich, M.D.                                    September 19, 2019

1    psychiatry.  So you would hope that psychiatrists would

2    have some input or ability to reflect on it.

3           But also, number two, given -- in my entire time

4    at CDCR, data and doctors have been the most

5    important -- most important discussions all the time,

6    and so I think it would be very concerning because it

7    does impact on what a staffing model could be or how

8    many doctors we have to perform the tasks.  So it's

9    highly concerning.

10   Q.    Dr. Ceballos told the neutral expert that the

11   rule change was announced at a webinar, along with other

12   business rule changes.  Do you recall attending any such

13   webinar or other meeting where the rule change was

14   announced?

15   A.    No, but I probably know what she's referring to,

16   that there was a -- Dr. Leidner would have a weekly kind

17   of bugs and -- and -- discussion about things, and so

18   there would be various things he would do on that, and

19   so that's where those changes would be mentioned.

20          The people on that call are not necessarily all

21   the chiefs of mental health and people that would really

22   be able to appreciate that.  The people on that call

23   were more the data management people at the

24   institutions.  So wonderful to have it announced there,

25   but that's not the place where that information would

Kevin Kuich, M.D.                                    September 19, 2019

1   freely flow, for such a large change, to the larger

2   organization.

3       Q.    It sounds like that phone call was between

4   Dr. Leidner and institution staff.  Is that right?

5       A.    Yes.  The quality -- each institution would have

6   their quality management.  It would usually be a senior

7   psychologist specialist who would be involved with that.

8   It wouldn't be a psychiatrist.  They would be people

9   that would be managing quality management metrics and

10  data for their institution.  So that would be the

11  audience, so it would be very self-selected and very

12  well-defined audience for that particular change, had it

13  been announced there.

14      Q.    It sounds that meeting typically did not include

15  psychiatry.  Is that correct?

16          MS. THORN:  Objection.  Lack of foundation.

17  Calls for speculation by this witness.

18  BY MS. ELLS:

19      Q.    Were you ever on any of those phone calls?

20      A.    I have been on one or two of those phone calls

21  when I had a particular issue with regard to psychiatry.

22  So have I been?  Yes.  But that was not a regular call

23  that I had been on, for lack of time and lack of ability

24  to be present in several places at once.

25      Q.    To your knowledge, were any headquarter

Kevin Kuich, M.D.                                          September 19, 2019

1    psychiatrists routinely on those phone calls?

2         MS. THORN:  Objection.  Lack of foundation.

3    BY MS. ELLS:

4     Q.    To your knowledge?

5     A.    To my knowledge, no.

6     Q.    When you were on those phone calls in those

7    couple instances you mentioned, was -- do you recall if

8    there were significant numbers of institutional-level

9    psychiatrists on the phone?

10        MS. THORN:  Objection.  Lack of foundation and

11   calls for speculation.

12        THE WITNESS:  There were not.  The people on

13   the phone calls were people that were heavily

14   involved in data and data management at the

15   institutional level, and that would not include

16   psychiatrists.

17   BY MS. ELLS:

18    Q.    But it would typically be psychologists,

19   according to your testimony?

20    A.    Correct.

21        MS. THORN:  Same objection.

22   BY MS. ELLS:

23    Q.    And when -- those couple occasions where you did

24   attend those phone calls, were you invited to attend?

25   How did you attend?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                          September 19, 2019

1    A.    There was an issue that I needed to discuss or

2    could contribute to, and so I would be on those phone

3    calls, so I knew that was part of the discussion there.

4    The -- because I had the connection with, again, wearing

5    so many hats, I did have the ability to be on those

6    calls when they occurred.  Most of them involved data

7    management at a minutia level, sometimes involved SQL

8    programming, which did not really fit my particular

9    talents or interests at that time.

10    Q.    And just to be clear, you stated that you did

11    attend those calls on a few occasions.  On the occasions

12    that you did attend, you don't recall an announcement

13    that this rule had been changed?

14    A.    Correct.

15    Q.    And you were -- do you recall ever being invited

16    to one of those phone calls or informed that psychiatry

17    business rules were going to be discussed?

18    A.    No.

19    Q.    What is your -- go ahead.

20    A.    I was going to say, nor was I aware of any

21    meeting minutes or other things like that, that might

22    typically be sent out if someone is in absentia and

23    couldn't attend.

24    Q.    So you didn't routinely receive minutes about

25    those calls?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    Correct.

2    Q.    Do you know if anybody in headquarter psychiatry

3    received similar types of minutes?

4    A.    Not to my knowledge, no.

5    Q.    Are you aware if minutes like that ever existed?

6    A.    I've never seen minutes existing like that.

7    Q.    What's your understanding of the rationale for

8    the change?

9    A.    It's hard to understand the rationale for the

10   change, because the business rule is quite clear, within

11   one month, meaning any time within 30 to 31 days or

12   less.  EOP patients may require several visits, but

13   that's at minimum.  So I couldn't make quite heads or

14   tails -- even if someone was moving from an institution

15   that they were in transmit, they still could be seen.

16   So I was puzzled by that.

17         I think there likely was something having to do

18   with EHRS and maybe the encounter strategies that

19   created problems, but regardless, we were noncompliant

20   if that was how we were accounting for things.  So since

21   I can't speculate as to the reason why the change

22   happened, you know, it -- it does bear concern that I

23   don't know when these other documents, in terms of the

24   staffing plan, were in the progress of being made at

25   that time, but certainly it would be concerning that

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   that would create basis for an argument that would be
 2   used later.
 3     Q.    So speaking of that, I'd like you to turn to
 4   Exhibit 5, which is the Tebrock of Katherine -- sorry,
 5   the declaration of Katherine Tebrock.  Pardon me.  It's
 6   Exhibit 4.  The declaration of Katherine Tebrock that
 7   was filed with the court on 3/30/2017.  Could you please
 8   flip again to page 9?  This is the same chart that we
 9   were discussing earlier, entitled "Mental Health Staff
10   Psychiatric Staffing Versus Compliance."  And the date
11   on that is 2/23/2017.
12          Is it your understanding that this was the time
13   period in which the business rule lengthening the amount
14   of time between EOP contacts was in place?
15          MS. THORN:  Objection.  Calls for speculation.
16   And lack of foundation.
17   BY MS. ELLS:
18     Q.    I will tell you that defendants have stipulated
19   that this chart is within the time period and contains
20   the data that relied on the 45-day time period as
21   opposed to the 30-day time period for the EOP
22   psychiatric contacts.
23     A.    And I will say, based on the information that
24   was provided in one of the exhibits, where Dr. Leidner
25   had indicated that it changed in December, and that
```

Kevin Kuich, M.D.                                          September 19, 2019

1    e-mail was in March of 2017, that is consistent with --

2    that change would be consistent and be reflected in this

3    exhibit, so I would agree with you.

4     Q.    Were you aware that the timely psychiatric

5    contact data using this longer time frame was being

6    presented to the Court?

7     A.    No.

8     Q.    And once again, you've already testified to

9    this.  I just want to confirm.  Nobody ever asked you to

10    look at this chart?

11    A.    (Shaking head in the negative.)

12    Q.    Nobody ever asked you to give any input as --

13    I'm sorry.  Could you answer that last question?

14    A.    I was not provided with this chart nor asked to

15    provide input on this chart.

16    Q.    And looking at it right now and knowing what you

17    know about what this timely psychiatric contacts column

18    reflects, is this an accurate picture of reality in the

19    institutions about how timely those contacts were

20    occurring?

21        MS. THORN:  Objection.  Calls for speculation.

22    Lack of foundation.

23        THE WITNESS:  Neither with regard to the

24    timely psychiatry contacts or to what MAPIP was

25    currently measuring at that time.

Kevin Kuich, M.D.                                    September 19, 2019

1    BY MS. ELLS:

2    Q.      So you would say that neither of those were

3    accurate with respect to compliance?

4    A.      Correct.

5    Q.      Do you know if Ms. Tebrock was aware at the time

6    when she filed this that the timely psychiatric contacts

7    metric had been changed to lengthen the time between EOP

8    contacts while still counting them as compliant?

9    A.      I don't know that she was aware of that.  Mental

10   Health Quality Management certainly was a very -- in my

11   time was a very large, well-staffed operation which held

12   the data very close and was not very transparent on

13   their engagement and how they're presenting information.

14   Q.      And from that, do I understand correctly that

15   you're not sure if that information filtered up to

16   Ms. Tebrock in addition to not filtering down to you?

17   A.      Correct.

18   Q.      Okay.  Now, we've looked at the organizational

19   chart that's marked as Exhibit 1, and it shows you as

20   reporting directly to Ms. Tebrock; is that accurate?

21   A.      It does seem to show that, yes.

22   Q.      Did you ever have interactions with Ms. Tebrock

23   on a one-on-one basis in conducting your job as chief of

24   statewide telepsychiatry?

25   A.      The only time that there would be a one-on-one

Kevin Kuich, M.D.                                        September 19, 2019

```
1   was when I specifically requested that audience for a
2   particular issue that I had a concern about, whether it
3   was data related or telepsychiatry related.  But there
4   was no routine supervision or any kind of interaction
5   that would suggest that -- that Ms. Tebrock was my
6   direct supervisor.
7     Q.    And, in fact, you didn't understand before today
8   that she was your direct supervisor; is that correct?
9     A.    That is correct.
10    Q.    Now, you just said that you did have the
11  possibility of contacting Ms. Tebrock to set up a time
12  to discuss things with her one-on-one if you were
13  concerned about it.  Why did you not do that here?
14    A.    In this instance, Dr. Golding and Dr. Gonzalez
15  were very involved in all the level of detail, and
16  although I could add my voice to it, I didn't have the
17  level of detail that they were working on.  I was
18  working on other projects.
19    Q.    Are you aware of any pressures at the
20  institutional level that may have precipitated the
21  change in the data reporting?
22          MS. THORN:  Objection.  Calls for speculation.
23  And vague as to the data reporting.  It's vague,
24  data.  Reporting what data?  Specifically you're
25  still on Exhibit 4?
```

Kevin Kuich, M.D.                                    September 19, 2019

```
 1          MS. ELLS:  Thank you.  I will clarify.
 2          MS. THORN:  Thank you.
 3   BY MS. ELLS:
 4    Q.    Are you aware of any pressures at the
 5   institutional level that may have precipitated the
 6   change in the business rule between December 2016 and
 7   April 2017, when it was changed to be longer and then
 8   changed back to be 30 days again?
 9    A.    I wouldn't say anything out of the ordinary for
10   CDCR in the sense that EOP is constantly difficult to
11   manage and staff, EOP is difficult to provide service --
12   services to.  And certainly when EOP folks move from
13   institution to institution, it is very complicated to
14   try and keep them on track with their required
15   appointments.
16          So I don't know when the EOP training came on
17   that -- I don't recall that with Dr. Vess, if that was
18   around that time.  We also certainly have had our rash
19   of untoward patient events and suicides, and whether
20   there was something in there that might have sparked
21   something, I don't know.  But, again, that's not unusual
22   for CDCR to have a variety of issues to contend with.
23    Q.    Did the institutions pay attention to this
24   timely psychiatric contact metric and whether their
25   institutions showed compliant or not in this time frame?
```

Kevin Kuich, M.D.                                      September 19, 2019

1    A.    The institutions were very much -- again, I use

2    the term red, green, yellow.  They were very much into

3    the dashboard, very much into the metrics, very much

4    into how they're performing.  As quality management

5    started to take on even larger and larger proportions,

6    there were meetings that I attended where -- this was

7    beyond this time frame, but it gives you a sense of what

8    the -- what the feel of the institution, of the

9    organization was, that there would be blaming and

10   shaming that would happen when institutions didn't

11   comply.  Tremendous amount of pressure placed on the

12   institutions by the regional staff to be able to get

13   their metrics in the green.  And not always did that

14   effort to help the institution get in the green, look at

15   the actual weeds and the details; it just involved work

16   harder, work longer, get it done, I don't care how you

17   get it done.  So if you need a cell side appointment,

18   that's what you need to do.  If you need to do

19   something, that's what you need to do.  We need to go

20   from red to yellow or yellow to green.

21   Q.    And when you refer to a cell side -- did you say

22   a cell side appointment?

23   A.    Cell side appointment.

24   Q.    When you're using that phrase, are you referring

25   to a psychiatric evaluation that would be counted in

Kevin Kuich, M.D.                                    September 19, 2019

1    this metric, in the timely psychiatric contacts metric?

2     A.    Correct.

3     Q.    And so you mentioned a number of pressures the

4    institutions were under to increase their green levels

5    on these metrics.  Are you aware of any pressures at the

6    headquarters level that would have precipitated the

7    change between December 2016 to make this metric more

8    generous and back again in April of 2017?

9     A.    The only thing I can think of within that

10   time frame, that would be in the EHRS -- the EHRS paused

11   in November -- after the rollout in October of 2015 and

12   then they reinstituted somewhere in January or August.

13   So if there was a change in this rule affecting EOP, it

14   would be when there are new institutions coming online

15   with the EHRS and not as savvy or capable of handling

16   the scheduling system at that time.  So I -- that just

17   seems coincidental because that would be that

18   time frame, and I do know that institutions had a

19   tremendous amount of difficulty adapting to the EHRS in

20   every discipline, be it medical, nursing, dental --

21   dental not so much.  They have their own system, but --

22   and mental health.

23        And concerningly enough, the same people that

24   were involved in Mental Health Quality Management

25   metrics were heavily involved in the EHRS design,

Kevin Kuich, M.D.                                                September 19, 2019

1    rollout, and implementation.

2     Q.    Why is that concerning to you?

3     A.    Quality Management should inform and it

4    shouldn't drive.  And I think in CDCR's instance,

5    Quality Management drove information and drove change.

6    As opposed to saying this is what's happening, let's

7    you, institution, look and find out why this is not

8    happening in a way that should, but it's -- it's -- you

9    can play both sides of -- both sides of the fence.  And

10   when you can do that, you can come out with a relatively

11   favorable answer 100 percent of the time.

12    Q.    Did you receive any pressure to turn psychiatric

13   metrics, quote/unquote, yellow or red to green in this

14   time frame, at the headquarters psychiatric level?

15         MS. THORN:  Objection.  Exceeds the scope of

16   the September 17th order.

17         THE WITNESS:  There weren't any things at the

18   headquarter level that were specifically -- that I

19   recall that were specifically looking at that.  There

20   was an issue with consultation responses, I believe

21   it was, and that was an issue that I brought up

22   numerous times with Quality Management and the EHRS

23   folks, to say psychiatrists are actually performing

24   this function, but because of how the EHRS is

25   designed, we're not able to acknowledge that.  And so

Kevin Kuich, M.D.                                            September 19, 2019

1    multiple times of talking with Dr. Rekart and, I

2    believe, Dr. Ceballos on perhaps at least one

3    occasion, that this -- this is an issue that we can

4    resolve.  And eventually Dr. -- with Dr. Brizendine's

5    assistance, after we went through and interviewed

6    basically all institutions about why are you red,

7    they all said the same thing, that -- excuse me, that

8    they were completing it, but the system wasn't

9    recognizing it.  And that allowed a change to happen

10   at that point.

11          So undercounting did seem to get a response.

12   Overcounting did not seem to get a response.

13   BY MS. ELLS:

14    Q.    Can you think of any other instances of

15   overcounting that you raised concerns about to

16   headquarters leadership about these metrics?

17          MS. THORN:  Objection.  Exceeds the scope of

18   the 9/17 order.

19          THE WITNESS:  MAPIP certainly was one that --

20   MAPIP at that time on the dashboard was looking at

21   one measure happening within a year, so it was not

22   true to what MAPIP was.  And as we moved into the

23   EHRS era, we did have the ability to get realtime

24   data and be able to capture exactly so that we can

25   show that we are -- how well aligned we are with our

Kevin Kuich, M.D.                                        September 19, 2019

1    obligations and the expectations of the Coleman

2    monitors.  So I did bring up concerns with MAPIP and

3    how this was presented.  And when I was asked to

4    present that data, I would always place a footnote or

5    something to that effect to indicate that this is not

6    accurately representing what MAPIP is.

7    BY MS. ELLS:

8     Q.    Do you recall how long it took to -- first of

9    all, was that the -- was your concern about accuracy in

10   the MAPIP context that it was overrepresenting

11   compliance -- was that ever addressed?

12    A.    Eventually.

13    Q.    How long did it take?

14    A.    I would say a year to maybe 18 months.  The

15   information was presented, and I had mapped out every

16   field of where this information could come from, and

17   that was put in Excel spreadsheet and that was left with

18   Mental Health Quality Management.  And the overall

19   Quality Management for CDCR, which is different from

20   Mental Health Quality Management, they had other

21   priorities to get to.  And then they did eventually get

22   to it, and it was -- I believe, to the best of my

23   knowledge, it's representing nearly 100 percent

24   accurately now.

25    Q.    And when -- so you testified that that took

Kevin Kuich, M.D.                                      September 19, 2019

1    about a year before -- between when you identified this

2    issue with a different aspect of data and when it got

3    fixed.  For the time period when it was not fixed to

4    accurately reflect what was happening, did it show more

5    compliance than what was really happening on the ground?

6    A.    Yes.

7    Q.    And did you make that clear to the people you

8    were complaining to, that you felt it was

9    overrepresenting compliance, when you raised this issue?

10   A.    Yes.  And when I was asked to present the data

11   for a Coleman report by Ms. Ponciano, I did specifically

12   put that in a footnote, to indicate that this is not

13   representing MAPIP accurately; this is representing one

14   facet of MAPIP and should not be taken as indicative of

15   how well we're performing MAPIP.

16   Q.    Did you ever urge anybody to be more -- to more

17   clearly state that the MAPIP data was not reflective of

18   the true medication adherence requirements than a

19   footnote?

20   A.    There's footnote.  There were also discussions

21   about it and discussions in context of this larger group

22   that I mentioned, when we would bring up issues having

23   to do with how psychiatrists are performing and are

24   those measures accurate.  That was one of the ones that

25   I would always bring up, to say this isn't accurate, so

Kevin Kuich, M.D.                                              September 19, 2019

1    we can't -- we cannot make decisions that are going to

2    impact a system and an organization and individuals

3    based on data that is not accurate.

4    Q.    Did anyone -- returning back to this timely

5    psychiatric contact parameter and the time period when

6    it was changed in December 2016 to be more -- to allow

7    for a longer time frame between contacts, and when it

8    was changed back in April 2017.  You've already

9    testified that no one told you in advance or even

10   afterwards that the change in December 2016 was being

11   made.  Is that accurate?

12   A.    That is accurate.

13   Q.    Did anyone tell you in April 2017 that it had

14   been changed back?

15   A.    I -- when it was changed back, whenever it was,

16   I heard that from either Dr. Golding or Dr. Gonzalez,

17   because they remained kind of the focal points for that

18   particular issue.

19   Q.    But nobody beyond the QM team, for instance,

20   told you that the business rule had been changed back?

21   A.    Not that I'm aware of.

22   Q.    Do you recall anybody else in the mental health

23   leadership, outside of the psychiatric team at

24   headquarters, telling you that the rule had been changed

25   back?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    No.  And that would be unusual outside of the

2    headquarters or mental health team because that's --

3    Mental Health Quality Management is a tightly run and

4    tight-lipped portion of mental health.

5    Q.    Who runs that team?

6    A.    That's Dr. Laura Ceballos, also co-run by

7    Dr. John Rekart.  So Dr. Ceballos is kind of the

8    ultimate decider, and then Dr. Rekart, once he finished

9    his EHRS duties, then transitioned into more of the

10    Quality Management person.

11    Q.    Neither of those people are psychiatrists; is

12    that right?

13    A.    That's correct.

14    Q.    Are there psychiatrists on the headquarters QM

15    team?

16    A.    They are two.

17    Q.    And what role do they play, to your knowledge?

18    A.    Currently, one of them is making EHRS changes

19    for the system.  The other provides various -- does

20    various tasks.

21    Q.    Do you have any sense of how large the QM team

22    is total?

23          MS. THORN:  Objection.  Vague as to time.

24          THE WITNESS:  It's significantly larger than

25    psychiatry.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                                September 19, 2019

1    BY MS. ELLS:

2     Q.    And has that always been true?

3     A.    It's always been true.  And they've grown when

4    Dr. Golding has implored on multiple occasions to get

5    more psychiatry resources so that we can provide better

6    service and feedback to the field.  We would not get

7    those resources, but Mental Health Quality Management

8    would continue to add additional physicians.  So I would

9    say --

10    Q.    And you mean nonpsychiatric physicians?

11    A.    Nonpsychiatric physicians.  So I would say

12   there's probably more than 20 people that are involved

13   in QM at the various different levels.

14    Q.    And would you -- from what you just said, is

15   your testimony that the psychiatry voice on that group

16   got diluted over time as more people were added that

17   were not psychiatrists?

18         MS. THORN:  Objection.  Vague as to time.

19         THE WITNESS:  It was always a complicated

20   matter with psychiatry and Quality Management because

21   the psychiatrist and Quality Management report to

22   psychologists.  They didn't report to Dr. Golding or

23   myself.  So it became complicated at times and

24   conflictual at times for them to fulfill their roles.

25         I can speak to that because there was a

Kevin Kuich, M.D.                                    September 19, 2019

1    psychiatrist who -- Dr. Andrew Shultz-Ross, who

2    originally started as a Quality Management

3    psychiatrist and then moved over with the EHRS to

4    help me with the EHRS and moved over to psychiatry.

5    And the stories I -- that he would tell and the

6    experiences he would have made it very clear that

7    their allegiances were to and needed to be to

8    psychologists rather than psychiatrists.

9    BY MS. ELLS:

10    Q.    Meaning the allegiance was to the internal QM

11    team, which was headed by a psychologist?

12    A.    Correct.

13    Q.    Now, we've discussed this time period between

14    December 2016 and April 2017, when this timely

15    psychiatry contact indicator was lengthened and then

16    returned back to being 30 days.  Are you aware of any

17    quality control measures that were implemented

18    afterwards that would have prevented something like that

19    from happening in the first place?

20    A.    Any rule changes were programmed by Dr. Leidner

21    at the direction of somebody, and that somebody

22    generally would be either Dr. Rekart or Dr. Ceballos.

23    Dr. Leidner, I'm not aware would unilaterally make these

24    changes.  So there would have been some -- some

25    instruction or some direction to be able to make that

Kevin Kuich, M.D.                                          September 19, 2019

```
 1   change at that time, from someone that wasn't the person
 2   making the change.
 3     Q.    And since that time, since this metric was
 4   changed and then changed back at Dr. Golding's urging,
 5   are you aware whether the QM team has instituted any
 6   quality control measures to prevent data from being
 7   changed without -- to prevent data -- excuse me, to
 8   prevent business rules from being changed without wider
 9   distribution of that information?
10          MS. THORN:  Objection.  Calls for speculation.
11   Lack of foundation.
12          THE WITNESS:  I'm not aware of any oversight
13   changes.  In my exit interview with Deputy Tebrock, I
14   had made clear that it would be in the organization's
15   best interest to disband Mental Health Quality
16   Management due to its multiple conflicts and problems
17   and have the data managed by a third party that can
18   neutrally manage the data and already has oversight
19   and other kinds of things in process, meaning a party
20   that is not party to this suit, is just brokering
21   information.
22   BY MS. ELLS:
23     Q.    And during -- so you said that that was
24   conveyed -- that you conveyed that to Dr. Tebrock at
25   your exit.  So at the time that you left, that had not
```

Kevin Kuich, M.D.                                    September 19, 2019

1    occurred; is that correct?

2    A.      Correct.

3            MS. THORN:  Objection.  Lack of foundation.

4            THE WITNESS:  That is correct.  They remained

5    intact as of the day that I left.

6    BY MS. ELLS:

7    Q.      And you testified that you left in January of

8    2019; is that correct?

9    A.      Correct, middle of January 2019.

10   Q.      Do you have any reason -- do you have any

11   knowledge that that change has occurred since you left?

12   A.      I have heard that there have been some changes

13   in Quality Management, that some people are no longer

14   with Quality Management, which was a -- in my

15   estimation, a positive change.  That -- I don't know if

16   mental health still is the keeper of the data or if that

17   has been shifted to another department similarly skilled

18   within CDCR proper -- or CHC -- CCHES proper.  Sorry.

19   Q.      And by that, you mean the group that administers

20   the healthcare data, the CCHES?

21   A.      Yes.

22   Q.      So you said you have heard that people have left

23   the Quality Management group since you departed in

24   January of 2019, that you consider that a positive

25   change?

Kevin Kuich, M.D.                                          September 19, 2019

1    A.      Correct.

2    Q.      Why?  And by that, I mean, why do you consider

3    that a positive change?

4    A.      The Quality Management group was creating --

5    instead of informing, it was driving.  And Quality

6    Management informs; it doesn't drive.  And its dual role

7    with the EHRS and its role with reporting data up to the

8    monitors was problematic from day one.  And to be able

9    to have some chain of custody, some ability to be able

10   to verify that the data actually does represent what it

11   represents and everything can be transparently tracked

12   back and everyone is quite clear what the numerator and

13   denominator is, I feel that Mental Health Quality

14   Management has failed in that task.  And another portion

15   of CCHES that has done something similar should have the

16   ability to attempt to provide a bit of a separation from

17   that data and clinical things.

18          The data -- inaccurate data prevents the ability

19   to look at where the actual problems are and it prevents

20   the ability to get needed resources, not only in terms

21   of human resources, but also physical resources to be

22   able to address why things aren't happening on a regular

23   basis.  And so to have data that is over-representative

24   prevents that ability to look at what are the true

25   system issues, and it creates an unsustainable, false

Kevin Kuich, M.D.                                      September 19, 2019

1    premise that is problematic for the organization and for

2    the patients alike.

3    Q.    So the same court order that we were discussing

4    earlier, which is from September 17th, 2019 -- yes,

5    Exhibit 2.  So the same question that I asked you about

6    this issue about the time period where CDCR was

7    measuring psychiatry contacts within a 45-day frequency

8    rather than a 30-day frequency as they previously had,

9    as to that issue, do you have any additional views about

10   why this issue could not be resolved successfully

11   internally and prior to presentation of misleading data

12   to the Court in the forms of this chart that was filed

13   that we've discussed -- filed with the Court on

14   March 30th, 2017?

15   A.    My personal view is that mental health felt that

16   they were performing very well in many areas, that they

17   could police themselves with data, that they were a

18   structure, that they were sustainable, and the only

19   piece that was the problem was that there weren't enough

20   psychiatrists.  And so if there was some way to show

21   that with fewer psychiatrists we were meeting the

22   metrics, that final block would tumble and there would

23   be no basis for the lawsuit.

24         In -- I was going to --

25   Q.    Please continue.

1   A.    I was going to say, in my time, there were

2   various ways to try -- in my time at CDCR, there are

3   various ways to try and help engage psychiatrists.

4   Having MAs was a great option to see if some extra

5   support would help.  There was the misguided attempt at

6   trying to get telepsychiatrists remotely, who aren't

7   within the CDCR system, to be able to provide services.

8   Q.    When you say "remotely," all telepsychiatrists

9   are remote, so can you explain what you mean by that?

10  A.    These would be from a non-CDCR hub.  So they may

11  be functioning from a -- maybe a separate building

12  that's run by a separate contractor, or they could be

13  service -- providing services from their own physical

14  home.  So misguided in the sense that there isn't the

15  ability of monitoring the technology, monitoring the

16  integrity of the equipment, just monitoring in general.

17  So it creates a supervisory nightmare.

18        So there are all different ways of trying to

19  kind of address this, use of the .25 additional staffing

20  psychiatrists was -- you know, was an additional way.

21  Use of --

22  Q.    Did you have concerns about that?

23  A.    I did.

24  Q.    Could you explain what that proposal is?

25  A.    I did have concerns about that.  That was --

 1   historically, from what I had understood, that there had
 2   been these .25 positions, meaning that someone would be
 3   working for CDCR in a full-time position and then would
 4   provide .25, or one day extra, to be working at another
 5   institution.  So it's leveraging one body to basically
 6   do 1.25 of an FTE, full time equivalent.
 7          There were concerns and abuses in the past of
 8   that happening, and that was -- practice was disbanded.
 9   It was heavily lobbied for and it was re-implemented.
10   And in the implementation, I think the concern was -- is
11   that originally it was designed that these people doing
12   that additional work at a different institution would
13   provide services in an inpatient setting, meaning that
14   they wouldn't have other obligations to that .25
15   population in their regular workday.  But what had
16   rolled out was, they were seeing EOPs or they were
17   seeing other -- other populations in addition to the
18   inpatients, which impacted their day work.  And so there
19   was no ability to be able to put that conflict of
20   interest in front of the supervisor, that particular
21   individual.  So it can impact their work that they
22   normally should do on their -- usually four-day-a-week,
23   ten-hour job, working on that particular yard or that
24   particular place wherever they're working, because
25   they're managing an outpatient caseload.

 1          And so bringing that up on multiple occasions

 2    with Ms. Ponciano, with Dr. Brizendine, and eventually

 3    Deputy Tebrock, concerns that I had with the conflicts

 4    of interest, that it wasn't managed in the same way that

 5    outside employment is managed, with very clear

 6    memorandum, with very clear, distinct roles and

 7    responsibilities, clear contact for who that other job

 8    person is, so if there needed to be any kind of

 9    discussion and formal signature to be able to make that

10    happen.  None of those things were in place, and

11    consequently the .25 ended up being somewhat of a

12    boondoggle for certain institutions that were able to

13    lobby well and other things.  So it -- I was frustrated

14    by the misallocation of resources that were there.

15          We were fortunate and grateful to have visa

16    candidates as well to be able to come in.  Not all the

17    visa candidates ended up in positions and in

18    institutions that were most sorely needed of those

19    services.  So, again, there was kind of a misallocation

20    and a -- not utilizing individuals where they could be

21    best used and/or having conflicts in place that could

22    impact their -- their job.

23          So although I laud all the opportunities and

24    ability to think outside the box to provide this finite

25    resource, which is psychiatry, even the ways that it was

1    done, it just wasn't done well and it wasn't executed

2    well, so.

3    Q.    And do you feel like the change in the timely

4    psychiatry contact was reflective of pressures related

5    to that need to fill psychiatry positions and treat

6    patients?

7          MS. THORN:  Objection.  Lack of foundation.

8    And calls for speculation.

9          THE WITNESS:  I think we had -- I will speak

10   as -- in my role as chief telepsychiatrist.  We

11   heavily vetted the people that we employed, and we

12   made sure that they knew -- that they knew what to do

13   and they had appropriate skill level.  Other -- my

14   own interview when I came on to CDCR was bizarre at

15   best and really didn't --

16   BY MS. ELLS:

17   Q.    In what way?

18   A.    In what way?  I was asked to compare and

19   contrast SSRIs.  The toolbox of a psychiatrist is much

20   broader than that, and there weren't the ability to, you

21   know, ask questions about how are you going to manage

22   these situations.  It was very, very perfunctory in a

23   way to say if you have a license and you have a body,

24   you have a job.

25          Telepsychiatry was different because it was

Kevin Kuich, M.D.                                    September 19, 2019

1    beyond that and we were able to create comradery, we

2    were able to create collaboration, we were able to a

3    create a cohesive group that was able to recruit and

4    retain psychiatrists.  So although the machinations of

5    using .25s or other kinds of things, you know, are

6    novel, they don't address the true state of affairs, as

7    the environment is not a positive environment for

8    psychiatrists, and the psychiatrists that are selected

9    are done so in a very haphazard manner.

10    Q.    Okay.  Thank you.

11          Let's take a ten-minute break.

12          (Whereupon, a break was taken.)

13    BY MS. ELLS:

14    Q.    The third issue that the Court identified that

15    she wanted to hear your views about was what she called

16    Issue E, which is reporting of scheduled and missed

17    appointments.  From what you testified already, you have

18    extensive knowledge of the electronic health record

19    system based on your role as the psychiatrist involved

20    in its development and rollout; is that accurate?

21    A.    That is accurate.

22    Q.    Were you the primary psychiatrist involved in

23    that?

24    A.    Yes.

25    Q.    Could you describe your role in designing EHRS,

Kevin Kuich, M.D.                                        September 19, 2019

1    as a psychiatrist?

2     A.    My role is twofold:  One, to help create a work

3    flow that was acceptable to psychiatrists and conducive

4    to their ability to quickly and efficiently see

5    patients.  The second role was -- is to integrate that

6    flow in a collaborative manner with mental health in

7    general, given that it's one system and one type of

8    documentation to try and create the ability to have the

9    different work flows communicate with each other.  So in

10   that, there would be designing of power forms, which is

11   a note type that is a checkbox and a little more

12   confined; and creating template notes, which are a

13   little more freeform, like a blank piece of paper;

14   creating order sets, which are called power forms and --

15   I'm sorry, power plans, rather; and also creating just

16   different elements of the work flow in general to try

17   and help people get through from point A to point B as

18   efficiently and effectively as possible.

19    Q.    So is it accurate to say that your role in

20   designing EHRS was, on the one hand, as a psychiatrist,

21   to make sure that the pieces of EHRS that psychiatrists

22   would be using were workable to them; and the second

23   piece was to make sure that that piece regarding

24   psychiatry fit in with the overall system and worked

25   together?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                        September 19, 2019

1          MS. THORN:  Objection.  Information regarding

2    development of the EHRS is actually outside the scope

3    of the September 17th order.

4    BY MS. ELLS:

5     Q.    Go ahead.  Is that accurate?

6     A.    Yes, that would be accurate.

7     Q.    Dr. Ceballos told the neutral expert in the

8    neutral expert's -- as reported in the neutral expert's

9    report, that whenever a patient does not see a provider

10   as scheduled, the provider is supposed to mark in EHRS

11   that the appointment was not completed and then ask a

12   scheduler to reschedule the patient for a different

13   time.  Is that how EHRS was designed to work?

14    A.    The scheduling work flow was always moving and

15   changing, but that would be accurate.  What actually

16   happened on the actual realtime would be a variety of

17   things.  There would be instances where people would be

18   told by a scheduler or by someone else at the local

19   level, Just give us the names and then we'll just move

20   that appointment to another day.

21    Q.    So along those lines, Dr. Ceballos also told the

22   neutral expert, as reported in his report, that if the

23   provider just checks the patient in and out in EHRS,

24   whenever the patient is finally seen without requesting

25   that the original appointment be rescheduled, then the

Kevin Kuich, M.D.                                    September 19, 2019

1    original appointment will show as having been completed

2    as scheduled.  Is that right?

3     A.    Yes.  If the -- when you check in and out in the

4    -- what's called the ambulatory organizer, which is the

5    schedule, for all intents and purposes, that defaults to

6    the time that you check that box and check them in,

7    which would be today, now.  And then when you check them

8    out, it would default to that time you check them out,

9    which would be that time and now.  So unless someone

10   physically went in there and made changes to it, which

11   they can -- somewhat of a cumbersome process, but it can

12   be done -- it would reflect that date, whether that was

13   an accurate date or not.

14    Q.    So do you have any sense of how common this

15   practice of providers checking patients in and out

16   rather than formally requesting that the original

17   appointment be rescheduled -- do you have any sense of

18   how commonly that occurs in the field?

19    A.    It would be -- I would say it would be very

20   common to happen in the field.  The way that schedulers

21   are engaged in the EHRS is very different than it was on

22   paper.  What it was on paper, it could be an e-mail, it

23   could be a -- hey, here's a list, can you do this.  In

24   EHRS, everything has to be in order, and the schedulers

25   were basically told by mental health that they can't

Kevin Kuich, M.D.                                      September 19, 2019

1    order anything themselves; they have to have orders come

2    to them.  So the order would have to come with formatted

3    details and other kinds of things to instruct the

4    scheduler to do something, and the amount of time that

5    that takes and the amount of effort and clicks that that

6    takes to do that, for most people, they say, look, you

7    were seen, but let someone else figure it out.

8    Q.    The provider is the one who controls whether the

9    patient is checked in or out and/or who can request that

10   the original appointment can be rescheduled?  That's all

11   the provider's function, is that right, in EHRS?

12   A.    Correct.

13   Q.    In those instances when the patient has just

14   checked in and out whenever they were actually seen, the

15   data would reflect that they were seen at the original

16   appointment time even if they were actually seen later;

17   is that right?

18   A.    The time that they -- so if their appointment

19   time was 10 o'clock but they checked them in at 11

20   o'clock on that that day, it would show that checked in

21   at 11 and checked out at whatever time.

22   Q.    Okay.  And if they were checked in -- so I'm

23   going to read this to you again because I want to make

24   sure that I understand what you're saying --

25        MS. THORN:  Counsel, can you give me the page

Kevin Kuich, M.D.                                          September 19, 2019

```
 1   where you're reading from in your report?
 2         MS. ELLS:  Yes.  It's neutral expert report at
 3   page 74, using the ECF terminology.
 4         MS. THORN:  Thank you.
 5         MS. ELLS:  Numbering, I mean.  I'll show this
 6   to you as well because -- let me see.  Do you --
 7         MS. TRAPANI:  Do you want to introduce it?
 8         MS. ELLS:  I don't think we need to introduce
 9   it as an exhibit because it's so lengthy.
10   BY MS. ELLS:
11    Q.    But I will provide you a copy, Doctor, so that
12   you can look at what I'm referring to.  This is not the
13   ECF paginated.  Hold on.
14         Okay.  So the paragraph that I'm wondering about
15   is this top paragraph.  In the internal pagination of
16   the report, it is on page 69.  The ECF pagination for
17   the version that was filed, it's at page 74.  And it's
18   -- the ECF number -- the filed document is 6147.  And
19   the -- it's the first paragraph on the page.  It says
20   "Dr. Ceballos also stated" and then continues from
21   there.
22         Actually, I'll just read it in.  "Dr. Ceballos
23   also stated that when a patient does not show up for his
24   or her appointment and the provider does not ultimately
25   see the patient, the provider is supposed to enter into
```

Kevin Kuich, M.D.                                    September 19, 2019

1    EHRS that the appointment was not completed and then

2    request that the scheduler reschedule the patient for

3    another time."

4          And you've already testified that that is how

5    EHRS is designed to work; is that accurate?

6     A.    Yes.

7     Q.    Okay.  And then two sentences later there's a

8    sentence that begins "But if the provider instead simply

9    checks the patients in and out whenever the patient is

10   actually seen -- e.g., when the provider sees the

11   patient on the next day -- without requesting that the

12   original appointment be rescheduled, that original

13   appointment may be reflected as having been completed as

14   scheduled."

15         Is that accurate?

16    A.    That would be accurate.

17    Q.    And I -- do you agree -- I would characterize

18   that as a workaround.  Is that an accurate way of

19   talking about this second process?

20         MS. THORN:  Objection.  Vague and ambiguous.

21   Calls for speculation.

22   BY MS. ELLS:

23    Q.    Given your knowledge of how EHRS actually

24   functions and how it was designed to function, this

25   seems different from how it was designed to function,

Kevin Kuich, M.D.                                    September 19, 2019

1   this -- the sentence that begins "But if the provider

2   simply checks the patient in and out"?

3    A.    I -- I don't know from the background where

4   they're pulling the information from, because they could

5   pull out that date and the time that they were checked

6   in and checked out and -- even if it was on another day.

7   But if in fact it's been programmed in that they're only

8   looking for that appointment, then that would be

9   problematic because the provider is not going to say,

10  Hey, I actually saw them today, but the appointment was

11  left on my calendar and no one did anything with it and

12  I checked him in and checked him out.  And so that

13  wouldn't be a flaw in the system; that would be a flaw

14  in look at what data are you pulling.

15   Q.    Okay.

16   A.    If that makes sense.

17   Q.    Yes.

18         Would it be problematic to you as an

19  administrator if -- if this occurred, if that second

20  process that Dr. Ceballos describes is occurring?

21   A.    Yes.

22   Q.    Why would that be problematic?

23   A.    It would -- if -- all you would need to do is

24  make sure that the person was scheduled within the time

25  frames, and whenever you saw them it would show that

Kevin Kuich, M.D.                                          September 19, 2019

1    they were seen within time frames, and so that would be

2    inaccurate.

3    Q.    And would -- are you familiar with a performance

4    indicator called "appointments seen as scheduled?"

5    A.    Yes.

6    Q.    Do you know how that indicator functions, what

7    data it looks at?

8         MS. THORN:  Objection.  Lack of foundation.

9    Calls for speculation.

10        THE WITNESS:  I don't -- they -- everything is

11   contingent on the scheduling order.  So the

12   scheduling orders are very complicated and not user

13   friendly.  Instead of an appointment that says -- let

14   me give you an example.  If any of us go to the

15   doctor and we have our visit and the doctor says, I

16   want to see you back in three weeks, we go to the

17   receptionist when we pay our bill and we say the

18   doctor says he or she wants to see me in three weeks;

19   so they just do a three-week appointment.

20        In the EHRS, how it's billed, the receptionist

21   would have to say, are you CCC or are you EOP?  Are

22   you EOP ad seg?  are you EOP ad seg short-term

23   restricted -- right?

24   BY MS. ELLS:

25   Q.    Yeah.

Kevin Kuich, M.D.                                    September 19, 2019

1   A.    So it becomes excessively complicated, and so to

2   get folks, especially that -- because of the shortage,

3   that are moving from yard to yard, doing thing to thing,

4   they're not even going to get it accurately done.

5         So an appointment that's placed in there,

6   they're going to be happy that the appointment is in

7   there because they're not going to be able to understand

8   all the level of detail that needs to be put in to get

9   this order to actually make sense.  And if, in fact,

10  they're not looking at the check-in and check-out time

11  as the event of when that happened, but they're actually

12  looking at when was the order originally scheduled, then

13  we have tremendous amount of problems here, which would

14  overstate compliance by a significant amount.

15  Q.    Okay.  So Dr. Golding told the neutral expert,

16  as reported in the neutral expert report at ECF Page No.

17  70, which in your document, Doctor, would be page 65 of

18  the internal pagination -- the second paragraph from the

19  bottom says "Dr. Golding also contends that CDCR

20  schedulers move missed appointments to later dates

21  rather than marking those appointments as missed and

22  then rescheduling them.  This in turn increases the

23  appearance of compliance by decreasing the number of

24  missed appointments reported."

25        Are you familiar with that issue?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    I am familiar, having discussed that issue with

2    Dr. Golding, yes.

3    Q.    Could you tell me what that issue is?  Am I

4    correct that this is an EHRS -- this happens in EHRS?

5    A.    Correct.  But this is a unique EHRS issue.

6    Because the schedules -- because the scheduling orders

7    are so specific, that's apparently what has been built

8    in the background to determine compliance.  And so if

9    that order and -- and the -- the compliance is basically

10   done as kind of just-in-time compliance in a sense.  So

11   if they're supposed to be seen in 30 days, then it will

12   be scheduled within -- very close to within that 30-day

13   mark.  So if you miss it by a day or several days, you

14   could well be out of compliance.

15        And that's where this issue becomes a problem.

16   Instead of saying we -- we were supposed to have this

17   appointment within 30 -- within a month, so say 30 or

18   31 days, it happened at day 35.  If that first

19   appointment wasn't missed and then that second

20   appointment occurred, you're going to have that

21   time frame where it's somewhat squishy that, well, it

22   was kind of the same appointment, but it didn't happen

23   in the time frame.  And 30 days or 31 days seems very

24   clear, and I think how the scheduling system was

25   designed makes it very convoluted to the end user and --

Page 137

Kevin Kuich, M.D.                                    September 19, 2019

1    and complicated to the scheduler as well.

2         The schedulers had multiple meetings on a

3    regular basis -- I wasn't involved in them -- about

4    scheduling and how to do scheduling and how not to do

5    scheduling.  And scheduling was a constant topic

6    throughout all the institutions with mental health.

7    Specifically, medical chose a different scheduling model

8    and something that was a little broader, little more

9    general, and that seemed to be adapted in a way that has

10   not been nearly as problematic as mental health's choice

11   to move in their scheduling process.

12    Q.    So in this example that Dr. Golding gives where

13   a CDCR schedule has moved a miss appointment -- a missed

14   appointment, excuse me, to a later date but did not mark

15   that appointment as missed and then rescheduled it, do

16   you know, would that initial appointment -- excuse me.

17   Would that appointment be tallied in EHRS as having

18   occurred on the date it was originally scheduled or the

19   date it actually occurred?

20    A.    It would have been the date -- that's a good

21   question.  I -- how -- what they're pulling from that

22   is -- I'm not privy to all the details, and there's so

23   many changes and so many things happening with

24   scheduling.  Scheduling, in fact, was one of the things

25   that mental health -- because our mental health

Kevin Kuich, M.D.                                    September 19, 2019

1    scheduling was designed to be so complicated that they

2    needed to hold back updates to the Cerner system for

3    CDCR because of our scheduling difficulties.

4     Q.    And so in this same example where the scheduler

5    moved the appointment but did not ever mark it as missed

6    and then reschedule it, would that appointment show as

7    being missed at all?

8          MS. THORN:  Objection.  Vague and ambiguous.

9    Calls for speculation.

10         THE WITNESS:  There would have -- so I cannot

11   answer that directly because I would need to know

12   what it's pulling and what the code is looking at.

13   If the code was looking at, here was the last

14   appointment and here was this appointment and it was

15   too long, and they had some kind of calendar in the

16   background that was running, they would be able to

17   indicate that in fact it was past compliance.  If

18   there's not that --

19   BY MS. ELLS:

20    Q.    Setting aside whether or not it is within a

21   compliance period, would it show -- would that

22   appointment that is missed, that did not happen but that

23   is not formally marked as missed and then rescheduled --

24   if the provider sees that person anyway, will that

25   appointment ever be marked as missed?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    No.

2        MS. THORN:   Same objection.

3    BY MS. ELLS:

4    Q.    Is it problematic that that appointment in that

5    context would not be marked as missed?

6    A.    Yes.

7    Q.    Why?

8    A.    An appointment missed provides information and

9    allows the ability to ask the question why was it

10   missed, and that allows us to ask questions about

11   staffing, that allows us to ask questions about physical

12   space to do the appointment.  That allows us to ask

13   questions about access.  That allows us even to ask

14   questions about a particular staff member on a

15   particular yard on a particular day having a mental

16   health bias which might prevent or discourage someone

17   from showing up to an appointment or being brought out

18   of their cell to come to an appointment.  So on many

19   reasons, it would discourage the ability for the system

20   to self-reflect and self-correct and create a more

21   sustainable solution.

22   Q.    So that -- as an administrator, that is

23   something that you would care about?  It would matter to

24   you if you knew the total number of missed appointments?

25   A.    Absolutely.  I would be -- that would be a level

Kevin Kuich, M.D.                                          September 19, 2019

1    of granularity that I would welcome because it would
2    tell me is it a provider issue, it is a system issue,
3    where is the issue.  And maybe it's all the things, but
4    it would at least give me information to hunt in the
5    right field.
6    Q.    And would it matter to you if the system --
7    strike that.
8          When did you become aware of this issue that
9    appointments that are missed and held at a later time,
10   but never formally marked in EHRS as missed and
11   rescheduled, don't show up as being missed at all?  When
12   did you become aware of that issue?
13   A.    I can't think of a specific time when I became
14   aware of it.  I was aware of scheduling problem from the
15   get-go, from the beginning, because the scheduling
16   module is incredibly complicated, and how mental health
17   designed it makes it much more complicated.  I think in
18   the context of looking at some of the timelines and
19   those kinds of things, it started to bring larger
20   questions of where did this data come from and what's
21   the process.  And so that allowed us to ask -- begin to
22   ask questions.  When that time frame was, I can't say.
23   Q.    Is it possible to fix this problem in EHRS?
24   A.    In my opinion, yes.  What I had advocated for --
25   and it got somewhat of a reception, but it didn't seem

Kevin Kuich, M.D.                                    September 19, 2019

1    like it was a high priority.  And given that psychiatry

2    is somewhat of a motley crew with limited resources, we

3    couldn't always follow through on everything.  But it

4    was proposed -- actually, my proposal -- to have a

5    note -- the signing of a note trigger a popup box, which

6    would allow all the boxes to be checked in terms of what

7    kind of appointment, the length of time of the

8    appointment, all those kinds of things, so that it

9    actually is linked to a document as opposed to just a

10   scheduling order, and that we can actually go to

11   something and say this happened.  Because until they

12   signed -- as it was envisioned, until they signed the

13   note, they wouldn't be able to get that popup box which

14   would have all that information that would be pulled

15   from to say what appointment was it, when did it happen,

16   and all the level of detail that we need.

17    Q.    So that fix would have allowed for the system to

18   capture when the appointment actually happened, no

19   matter whether or not somebody formally marked an

20   initial appointment as being missed and rescheduled it,

21   or just moved it?

22         MS. THORN:  Objection.  Calls for speculation.

23   Lack of foundation.

24         THE WITNESS:  As -- and we -- yes, it would.

25   And as we worked through with Cerner to look at

Kevin Kuich, M.D.                                        September 19, 2019

1    various options, it seemed like that was the most

2    reasonable option.  They had a billing component in

3    there that we tried to use that was -- just wasn't

4    meeting our particular needs, but that would be a

5    way.  And that is a way that's already working in the

6    system and is functioning in a way to allow popup

7    boxes to occur to allow things to happen immediately.

8    So it wasn't some hypothesized process; it was

9    something that we actually have done in some, way,

10   shape or form.  It just would contain different

11   information.

12   BY MS. ELLS:

13   Q.    You've mentioned that you made that proposal to

14   address this issue and other problems with the

15   scheduling in EHRS.  Who did you make that proposal to?

16   A.    I believe that proposal was made to Dr. Rekart,

17   Dr. Ceballos.  I believe that proposal was at the time

18   when mental health changed committee, came into

19   fruition, came into being, which presented its own

20   separate set of challenges to have something like that

21   move on to actually be put into use.

22   Q.    It sounds like you've expressed your feeling

23   that it was difficult to get changes in EHRS actually

24   implemented that you were recommending.  Is that

25   accurate?

Kevin Kuich, M.D.                                                                                            2019

Defendants object to Exhibit 9 & 144:2-145:19 as outside scope of September 17, 2019 Order (ECF 6288).

Plaintiffs respond this pertains to Dr. Kuich's answer, in part, to the Court's questions at 3:16-19 of September 17, 2019 Order.

1    A.    That is accurate.

2    Q.    Okay.  I'd like to hand you an exhibit this is

3    Exhibit 9.

4            (Plaintiff's Exhibit No. 9 was marked for

5                identification.)

6    BY MS. ELLS:

7    Q.    So this document is an e-mail from Dr. Golding

8    to Katherine Tebrock dated July 2nd, 2018.  It is called

9    "Power plans EHRS," and Dr. Golding filed this as part

10   of his report to the Court and to the Plata receiver.

11   It's Exhibit U to that report.

12           So I'd like you to turn to page 2.  Does this

13   look like Dr. Golding's handwriting, to you, on this

14   document?

15   A.    Yes, it does.

16           MS. THORN:  I would just like to lodge an

17   objection that this exhibit and the questions

18   concerning the EHRS power plans as reflected in the

19   exhibit are beyond the scope of the September 17th

20   order.

21   BY MS. ELLS:

22   Q.    So, Doctor, on page 2, towards the top, it says

23   "Kevin Kuich says the following," and then there's a lot

24   of text after that.  Do you recognize this text as

25   something that you wrote?

Kevin Kuich, M.D.                                        September 19, 2019

1    A.     Yes, I do.  It is something that I wrote.

2    Q.     And where does the portion of the text that you

3    wrote begin and end?

4    A.     Items 1 through 7-A appear to be my writing.  I

5    can't speak for the "we have surveyed."

6    Q.     Okay.  But you're confident that --

7    A.     1 through 7-A is, yes.

8    Q.     That -- and what about the sentence at the very

9    beginning following the phrase Dr. -- sorry, "Kevin

10   Kuich says the following:"?  What about this phrase:

11   "We've had many instances of things not getting done or

12   occurring in a poor manner.  This is nothing new."  Is

13   that yours?

14   A.     That could very well be.  In a moment of

15   exacerbation, being frustrated by the situation, yes.

16   Q.     But are you confident that -- that the

17   enumerated items here, 1 through 7-A, are your

18   statements?

19   A.     Yes.

20   Q.     I'd like to direct you to Item 6.  Could you

21   please review that, as well as Item 7?

22   A.     Uh-huh.  We --

23   Q.     Okay.  Tell me when you're done.

24   A.     Okay.  Can I do Item 6 first and then --

25   Q.     Yes.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    Well, I guess it goes with -- into 7.

2    Q.    Let's go to Item 6.  First of all, could you

3    summarize what you're saying in Item 6, for the record?

4    A.    Certainly.  Would you like me to read that into

5    the record.

6    Q.    Sure.

7    A.    "When psychiatry change requests were placed in

8    the MH solution center ticket queue, they languished and

9    were not addressed.  It was promised they would be built

10   by MH," mental health, "but that never happened.

11   Finally, in around late fall 2017, mental health

12   released the change request to Cerner, who has been

13   building them out, this in the context of mental health

14   somehow able to build items that were of interest and

15   important to them."

16   Q.    And is the request that you describe -- or the

17   proposal that you described to modify the EHRS

18   scheduling component, including to address this issue of

19   missed appointments that aren't formally marked as

20   missed and rescheduled -- was that -- would that have

21   been something that you would have submitted to the

22   mental health solution center ticket queue?

23   A.    Those types of requests would be things that I

24   would submit to mental health solution center ticket

25   queue.  This particular instance did that not have that,

Kevin Kuich, M.D.                                      September 19, 2019

1    but that would be the -- these were other items, but

2    that would be the process by which it would be

3    presented.

4     Q.    Okay.  So you don't recall requesting this

5    particular modification to EHRS through this mental

6    health solution center ticket queue?

7     A.    Correct.

8     Q.    Did you formally propose it in any other way?

9     A.    In writing, to be able to -- these are the

10   possible solutions of things that we could do, that was

11   presented to mental health leadership.  And it did move

12   into discussions with a Cerner associate, Dr. Liedner.

13   I think Dr. Rekart may have been on a phone call now and

14   then.  And so it was a long, drawn-out process to get

15   Cerner's involvement and engagement to know which

16   direction we go in.

17    Q.    Did you feel like, as a psychiatrist who

18   intimately understood EHRS, that the changes that you

19   were recommending were treated as a priority by the

20   department?

21    A.    They were not treated as a priority.

22    Q.    Could you describe what you mean by that?

23    A.    These particular changes that were released in

24   late fall of 2017 had to do with known -- known bugs,

25   known problems, known issues with orders, other kinds of

Kevin Kuich, M.D.                                                September 19, 2019

1   things.  When you build the system out, you don't know

2   what it's going to look like until it hits the end user,

3   and then you get feedback and you realize, oh, that's

4   not working, or there's an upgrade or update to the

5   system and now that isn't working.  So these are changes

6   that were important to help with MAPIP compliance and

7   other things.

8         So those were approved by the larger committee

9   that was referred to as CLAC.  And CLAC, C-L-A-C, was

10  the multidisciplinary committee that change requests

11  were brought to.  And so once they're brought to that

12  committee and approved, then they either move internally

13  to have the change happen amongst -- with internal

14  resources, or it moves externally to Cerner, to be able

15  to have Cerner provide those resources.  These

16  particular changes, not all of them but a good number of

17  them, we did have the internal resources within mental

18  health to be able to make those changes.

19        Those changes sat in the mental health queue,

20  and sat and sat and sat and sat.  Psychiatry had no

21  resources to be able to build this out ourselves.

22  Again, we didn't have enough people, enough staff do

23  that.  Mental health proper had a tremendous number of

24  resources to be able to address things.  So these

25  psychiatry changes were apparently not prioritized

Kevin Kuich, M.D.                                    September 19, 2019

1   because there were other things that were being built by

2   mental health proper before this.  And it wasn't until

3   IT -- system IT, CDCR IT, got involved, in addition to

4   -- I believe Cerner got involved as well as, hey, what

5   is up with this.  I mean, this is just hanging out here.

6   Why is this happening?  They had various times where

7   they would clean up to make sure that things are moving

8   forward.

9           That brought it to the attention, and when that

10  brought it to the attention, it brought sufficient

11  momentum behind it to be able to have it relinquished

12  from mental health and the mental health BHRS team --

13  which, again, is not psychiatry -- then released that to

14  Cerner, and we were able to have it finally built.

15   Q.    Who was in charge of prioritizing those

16  projects?

17   A.    Dr. Rekart.

18   Q.    And, again, Dr. Rekart is a psychologist; is

19  that correct?

20   A.    Correct.

21   Q.    Did -- was there any oversight of Dr. Rekart's

22  prioritization decisions that you're aware of?

23   A.    No.  There eventually got to be some meetings

24  where there would be some very splashy kind of

25  PowerPoints and those kinds of things, where we would

Kevin Kuich, M.D.                                        September 19, 2019

1    look at priorities.  But early on in this time, there

2    weren't this kind of well-detailed and laid-out process

3    by which we determined what needs to get built and what

4    doesn't.

5       Q.    In the same time frame that you were discussing

6    in this e-mail and that we're just discussing right now,

7    where Dr. Leidner was in charge of sort of prioritizing

8    all the competing requests about EHRS, were either

9    issues raised by psychologists being addressed more

10   quickly?

11          MS. THORN:  Objection.  Lacks foundation.

12   Calls for speculation.

13          THE WITNESS:  It did seem that there were

14   other things that were being built out for psychology

15   sooner than the requests for psychiatry.

16   BY MS. ELLS:

17      Q.    And did you express any frustration about this

18   failure to prioritize what you believed to be important

19   changes to EHRS for psychiatrists?

20      A.    Regularly.

21      Q.    Who did you say that to?

22      A.    Dr. Rekart, Dr. Golding, probably Dr. Ceballos,

23   certainly Dr. Brizendine and Ms. Tebrock.

24      Q.    And you mentioned CLAC, which I believe you

25   described to be multidisciplinary committee that

Kevin Kuich, M.D.                                          September 19, 2019

1    determined what changes were to be made to EHRS.  Is

2    that accurate?

3     A.      That is accurate.

4     Q.      And is that committee outside of the mental

5    health department?  Was it?

6     A.      It is -- well, I speak of the time I was there.

7    It is and was.  It was composed of all the different

8    disciplines that interact in the EHRS:  Nursing, dental,

9    IT, pharmacy, mental health.  Originally mental health

10   had one representative, and that was Dr. Rekart.

11   Psychiatry didn't have its own seat at the table, so to

12   speak, so Dr. Rekart would make decisions on all mental

13   health issues, including psychiatry issues, whether to

14   advance them forward or support them.

15           The -- after some push, we were able to have

16   psychiatry recognized as a bona fide voting member,

17   because our issues and concerns weren't always brought

18   forward, and so that did help.  But interestingly, it

19   was shortly after that time when we became a bona fide

20   voting member and had the ability to present issues to

21   the larger system that -- it was shortly thereafter that

22   there was memo placed saying that mental health is

23   now -- it was from Dr. Ceballos, apparently under the

24   direction of Ms. Tebrock, that mental health will be

25   having a change -- their own internal change management

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1    committee so that changes to the EHRS would be brought

2    to that internal committee first before presented to the

3    larger committee, which is the ultimate committee to

4    determine if it -- if that change can occur in the

5    system and how it would occur.

6    Q.    Okay.   Introduce another exhibit here.

7              (Plaintiff's Exhibit No. 10 was marked for

8                  identification.)

9    BY MS. ELLS:

10   Q.    This document is an e-mail from Laura Ceballos

11   at CDCR to a number of people, and you are listed as one

12   of the recipients on the first line.   It's dated

13   June 18th, 2018.   This document was attached to

14   Dr. Golding's report as Exhibit S.   Is this the memo

15   that you're referring to from Dr. Ceballos at the

16   direction of Katherine Tebrock?

17   A.    This is the memo.   And it, at the time, felt so

18   heavy handed and egregious that I actually hung it in my

19   office so I could see it every single day.

20   Q.    Why did it feel egregious to you?

21   A.    It minimized the role of psychiatry.   There

22   weren't any discussions about how that could have any

23   impact.   There weren't any discussions about the

24   composition of the committee, how the committee would

25   run, what the prioritization was.   It was just

Kevin Kuich, M.D.                                           September 19, 2019

1    determined by edict that this is what was going to

2    happen, and it was shocking, to say the least.

3      Q.      And I believe it -- go ahead.

4      A.      And not shocking at the same time.

5      Q.      I believe you said that this memo came

6    relatively shortly after psychiatry got its own vote on

7    CLAC about what changes to EHRS would be made.  Is that

8    right?

9      A.      I believe it was around that time frame.

10     Q.      Okay.  So going back to CLAC and Drs. Rekart and

11   Leidner.  You testified that Dr. Leidner in this time

12   period was the person -- by the time period, I'm

13   referring back to your e-mail dated July 2nd, 2018,

14   which is Exhibit 9.  In this time frame that you're

15   discussing at Point 6 here, I believe that you said that

16   Dr. Leidner is the one who controlled all

17   prioritization.  Is that right?

18     A.      Dr. Leidner dealt with the data, and so he would

19   deal with data, data management, and those kinds of

20   inquiries.  Prioritization for the EHRS, which is

21   similar but different, it was done by Dr. Rekart.

22     Q.      And this mental health solutions center ticket

23   queue, who controlled that?  Is that something that

24   Dr. Rekart controlled, or what is that?

25     A.      It is -- when people in the field have an issue

Kevin Kuich, M.D.                                      September 19, 2019

1    with EHRS, they would submit a ticket and say this is

2    happening.  And so it may be a legitimate issue, may be

3    user error, but for whatever reason, they experienced a

4    difficulty, and so they present it.  And those -- there

5    was a -- just a general mental health queue that

6    everything went to, and then his team would kind of make

7    determinations about, you know, how we're going to

8    address it.

9    Q.    And when you say "his team," whose team do you

10   mean?

11   A.    That would be his team of psychologists.

12   Q.    Who is "he"?

13   A.    Dr. Rekart.

14   Q.    Dr. Rekart?

15   A.    Apologies.

16   Q.    Thank you.

17         And so Dr. Rekart would then determine which

18   resources to allocate to which change?

19   A.    The -- so there's two -- this is kind of

20   confusing.

21   Q.    Thank you.

22   A.    So the solution center queue is people in the

23   field that can have a request or say something is broken

24   or something is wrong.  And so -- so he and his team

25   would manage that queue.  Eventually we had our own

Kevin Kuich, M.D.                                    September 19, 2019

1    queue, at least when we started managing it, so it did

2    get separated, which --

3    Q.    And when you say "we," who do you mean?

4    A.    Psychiatry.  So that was fine.  So that's one

5    step.  The larger step is changes that need to be made

6    in the system.

7    Q.    Okay.

8    A.    And that is this -- what they call an RFC or

9    request for change process.  That is this larger CLAC

10   committee.  That involves physical changes to the system

11   that will impact every user.

12   Q.    Got it.

13   A.    And so that prioritization and the -- bringing

14   that up to that committee, once mental health had that

15   memo in -- what was it, June?  Yeah.  Then it had to go

16   through the mental health subcommittee first before it

17   could get to that larger committee.  So there are two

18   separate issues.  I hope that's clear.

19   Q.    Yes.  That's very helpful.

20         So the types of fixes that you were interested

21   in and pushing for would have gone initially to this

22   CLAC; is that right?

23   A.    Correct.

24   Q.    And it would be systemwide changes, including

25   changing the scheduling portion of EHRS to work better

Kevin Kuich, M.D.                                      September 19, 2019

1    and be more accurate; is that correct?

2     A.    That's correct.

3     Q.    And initially you said that Dr. Rekart was the

4    only one from mental health on that CLAC committee, but

5    then psychiatry got its own vote?

6     A.    Right.  I would be on -- be there, but I'm not a

7    voting member.  And so eventually I did become a voting

8    member.

9     Q.    And did you find that when Dr. Rekart was --

10   well, let me step back.  How would that committee decide

11   which changes got made?

12          MS. THORN:  Objection.  Vague and ambiguous.

13   Which committee, the larger --

14          MS. ELLS:  The CLAC.

15          MS. THORN:  Thank you.

16          THE WITNESS:  So CLAC committee, there would

17   be requests that would be put up through known

18   channels to say this is the problem and this is the

19   proposed solution.  And so that would then be brought

20   up in the committee -- I believe it was every Monday

21   -- and we would talk -- the person that would like

22   that change would -- would basically stump for it and

23   say, this is a change, this is the reason, this is

24   why.

25          All the disciplines would have input to be

Kevin Kuich, M.D.                                    September 19, 2019

1    able to kind of indicate, you know, that sounds good

2    or I'm concerned about that or, Hey, you know, we do

3    it this way and that could impact us if we do this.

4    So if there were any things that were a dead stop,

5    then it would be taken back and then there would be a

6    smaller committee to kind of look at it and see what

7    impact is this going to have.  If it was something as

8    simple as mental health needs a new order that no one

9    is going to see except mental health, it's like,

10   fine, have a new order, everyone is okay with it.

11        So it -- there would be varied levels of

12   discussion based on, you know, what the issue was.

13   BY MS. ELLS:

14    Q.    When Dr. Rekart was the only person from mental

15   health on CLAC, did he serve as a gatekeeper for

16   initiatives that you wanted to happen?

17    A.    Yes.

18    Q.    Did your ability to get changes before CLAC

19   improve once psychiatry got a vote on that committee?

20    A.    Yes.

21    Q.    Did you find that it was easier for the changes

22   that psychiatry wanted to be approved by CLAC once you

23   got -- once psychiatry got a vote on that committee?

24    A.    Yes.

25    Q.    And then relatively shortly thereafter, after

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1  the period in which psychiatry had a vote on CLAC,

2  you've testified -- and this memo from June 18, 2018,

3  Exhibit 10, shows -- that the process for getting

4  changes put before CLAC was brought in house to an

5  internal subcommittee within mental health; is that

6  right?

7   A.    That is correct.

8   Q.    Who was on that mental health subcommittee?

9   A.    The mental health subcommittee had a variety of

10  people.  So it was Michael and myself as a psychiatrist.

11   Q.    How many non-psychiatrists would you say are on

12  that committee?

13   A.    There's two psychiatrists and everybody else was

14  a non-psychiatrist.  And there were probably 15 people

15  maybe on the committee.

16   Q.    Was there ever a period where psychiatry had

17  more than two people on the committee?

18   A.    No.

19   Q.    Is the committee membership relatively static in

20  terms of the sheer number of committee members in your

21  time?

22   A.    It -- there wasn't a real well-defined -- it was

23  more of, what are the parliamentary rules, what are the

24  rules of engagement, you know, how many votes does it

25  take.  It was just more of kind of this seemingly ad hoc

Kevin Kuich, M.D.                                        September 19, 2019

1    thing to be making sure that changes were approved

2    before they went up in the larger direction.  So I can't

3    say if that membership changed or not, but what I can

4    say is that there were people on there that -- many that

5    were managers of nonclinical services, who were deciding

6    clinical issues and whether clinical change should

7    occur.

8     Q.    Could you look at the numbered Item 7 of what

9    you wrote in Exhibit 9.  I'll just read it for the

10   record:  "The consolidation of power continues with the

11   MH," mental health, "change management committee."

12   That's the committee that we've been discussing, right,

13   Doctor?

14    A.    Yes, correct.

15    Q.    And I'm quoting again:  "Which has moved from a

16   place to discuss changes to the MH EHRS process to a

17   group that votes whether to allow changes to move

18   forward to be heard at CLAC in the form of an RFC."  And

19   that is the request for change, the formal document that

20   would be put through for a vote; is that correct,

21   Doctor?

22    A.    Yes.

23    Q.    That's what RFC is.

24          Quoting again:  "It is a committee that has a

25   deficit of voting psychiatrists relative to

Kevin Kuich, M.D.                                    September 19, 2019

1    psychologists.  It is now impossible for psychiatry to

2    advance something to CLAC and heard by all the CCHCS

3    disciplines that would be unpopular with psychology."

4          Was that your experience with the mental health

5    change management committee?

6     A.    Yes.  It became very clear that issues that were

7    very important to psychiatry were of less priority to

8    the larger system.  And it was -- it just became

9    codified and institutionalized in this committee, a

10   process that had already been going on for years before.

11   That was just kind of the way things were, but now it

12   was now institutionalized and allowed.

13          MS. ELLS:  I would like to introduce another

14   exhibit.  This is Exhibit 11.

15               (Plaintiff's Exhibit No. 11 was marked for

16               identification.)

17   BY MS. ELLS:

18    Q.    This is an e-mail from Dr. Michael Golding at

19   CDCR to you, Kevin Kuich at CDCR -- Kuich, excuse me --

20   from August 2nd, 2018, entitled "Re: Mental health

21   change management committee."  And let me clarify:  The

22   top e-mail is from Dr. Golding to you, but it includes

23   an e-mail from you to him on the same date, August 2nd,

24   2018.  I'd like you to look at the portion of this that

25   you wrote.

Defendants object to 160:13-161:16 & Exhibit 11 as outside scope of September 17, 2019 Order (ECF 6288).

Plaintiffs respond this pertains to Dr. Kuich's answer, in part, to the Court's questions at 3:16-19 of September 17, 2019 Order.

Kevin Kuich, M.D.                                    September 19, 2019

1     A.      Uh-huh.

2     Q.      Which you sent at 11:12 a.m. on August 2nd,

3    2018.  Would you take a look at that?

4     A.      Yeah.  I remember writing this, and I remember

5    that --

6            MS. THORN:  Just a second, Doctor.  I'd like

7    to lodge an objection.  It's beyond the scope of the

8    September 17th order, the subject matter of the

9    e-mail as well any questions related and any

10   testimony related to the e-mail.  Thank you.

11   BY MS. ELLS:

12    Q.      Does this document, this e-mail that you wrote,

13   accurately exchange -- or accurately reflect your

14   experience attempting to get EHRS changes through the

15   mental health subcommittee?

16    A.      Yes.  And I remember this particular instance.

17    Q.      Could you talk about it a little bit?

18    A.      The change was to an IPOC, or an

19   Interdisciplinary Plan of Care, I-P-O-C, for one of our

20   inpatient settings, and it -- I didn't have any

21   particular issue with it.  It was certainly reasonable,

22   and psychiatrists don't have tremendous amount of

23   dealings with IPOC, so it's -- was a nonissue.  But what

24   was interesting to me is when it came to voting, there

25   were people, nonclinical people, who were voting for

Kevin Kuich, M.D.                                    September 19, 2019

1    this, and so I took the opportunity to ask one

2    individual, who is wonderfully kind and just a fabulous

3    human being -- wasn't singling them out in any way, but

4    just happened to be in my line of sight, and said, Can

5    you explain to me what an IPOC is, what it does, and why

6    this change is important.  And I just got stone silence.

7    And other people that were voting similarly had no

8    clinical skills or clinical acumen, but yet they were

9    voting on these things.

10         So it made me concerned that things are being

11    presented in front of these committees, that people are

12    voting on, and they had no idea what they're voting for.

13    So that made concern about the integrity of the

14    committee and the committee to really perform its

15    function, which is to be, you know, a reasonable

16    gatekeeper for things that, you know, can benefit staff

17    and patients alike.  And I think this kind of behavior

18    is relevant in the sense that this is the type of

19    environment that psychiatrists practice in day in and

20    day out, which affects retention, which affects

21    recruitment, which affects the ability to get

22    psychiatrists, which causes data to have to be massaged

23    in certain ways to allow information to be more

24    presentable to say we don't need psychiatrists so we can

25    get out of the lawsuit.  So it's part of the larger

Kevin Kuich, M.D.                                          September 19, 2019

1    iceberg.

2    Q.    Was it your experience in presenting psychiatry

3    changes that you or the psychiatry headquarters people

4    wanted -- was it your experience that people on this

5    committee who were not medically trained did not

6    understand some of the things that they were voting on?

7    A.    Correct.

8    Q.    Did they nonetheless vote on them?

9    A.    Yes, they did.

10   Q.    Did you find that things that you wanted done,

11   as a psychiatrist, and thought should be done in EHRS to

12   fix problems for psychiatry were not prioritized in that

13   committee?

14   A.    At this point, when the committee was done

15   without any input from psychiatry or discussion about

16   how this could work, it became so disheartening and

17   discouraging, that here we are again, we're doing the

18   same thing, it's the same pig but different lipstick, it

19   was -- it just got frustrating.  It was probably around

20   that time when my looking at -- I got -- I cannot

21   effectuate change in this organization.  I'm not heard,

22   I don't have a voice, and so why am I here.  And so I

23   looked elsewhere for employment.

24   Q.    So you also describe a couple of other issues in

25   this e-mail about this committee.  You reference that

Kevin Kuich, M.D.                                      September 19, 2019

1    there is no quorum requirement and that it's a loose

2    committee with unclear rules.  Can you describe what you

3    mean by those things?

4     A.    Yeah.  There is -- other committees are run very

5    tightly, there's a certain percentage of voting members

6    that have to be there, and there's kind of rules of

7    decorum and there's a process.  And this didn't seem to

8    have any process other than, these are the things we're

9    looking at and these are the things voting on, and let's

10    vote on them and move through.  So there wasn't a whole

11    lot of discussion, other kinds of things, and it was --

12    it was clear that changes that psychiatry would wish to

13    make are not going to get their hearing.

14     Q.    And was that your experience, that they did not

15    -- that changes that psychiatry wanted did not get a

16    fair hearing?

17     A.    There many changes that I did not bring to that

18    committee just because of what I saw happen and how I

19    saw them operate, that the amount of time it would take

20    to be able to present things relative to the time that

21    it would take to present to CLAC was -- it was -- it

22    just wasn't worth it.  I had other things to do and so I

23    did other things.

24     Q.    So you effectively gave up?

25     A.    I was highly discouraged and hopeless.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                                    September 19, 2019

1     Q.     Do you recall if -- we talked about some of the

2   problems with the scheduling module, including this

3   problem where appointments that are missed and held on a

4   later date, but never formally marked as missed and

5   rescheduled, are nonetheless counted as not being

6   missed.  Was that -- do you recall when you proposed to

7   fix that problem?  Do you recall if it would have been

8   in the period where CLAC had only representation by the

9   psychologist Dr. Rekart, or during the period where you

10  had a vote, or during the period where there was this

11  mental health subcommittee in house that vetted things

12  before they could go to CLAC?

13    A.     I would say it's probably in the middle time,

14  where there was CLAC involvement with separate roles.

15    Q.     Okay.  And do you recall if it was in the period

16  where psychiatry had a vote on that committee?

17    A.     I would imagine it was in that time frame.

18    Q.     But you're not sure?

19    A.     I'm -- yeah.

20    Q.     Okay.  The changes that you were recommending

21  for the scheduling portion of EHRS, did they ever get

22  made?

23    A.     Not that I'm aware of.  So there was discussion,

24  it seemed like there was buy-in and an understanding

25  that it could be helpful for all parties.  So -- but,

> Dr. Kuich has corrected his testimony at 165:13-14, in his October 8, 2019 corrections.

Kevin Kuich, M.D.                                        September 19, 2019

1    again, there just wasn't the psychiatry bandwidth to be

2    able to move them through.

3         This was also -- I don't know if it was at the

4    same time or before, but there was a push to -- because,

5    again, scheduling orders are sacrosanct.  They're

6    sacred.  The -- there was a push, because of scheduling

7    and how scheduling works and how important compliance

8    is, to mandate that everyone use power plans to use

9    scheduling orders.  Scheduling orders and power plans

10   are designed to fire, you know, within -- every 30 days,

11   for certain length of time for EOP and what have you,

12   and the problem with that --

13   Q.    Can I interrupt you for one minute?

14   A.    Absolutely.

15   Q.    When you say that they're designed to fire, do

16   you mean they are designed to create an appointment?

17   A.    Sorry.  Yes, apologies.  Designed to create an

18   appointment, to send fire to the scheduler, to send

19   something to the scheduler to say please schedule this

20   appointment.

21        And so because people weren't using the

22   scheduling -- not just psychiatry but mental health all

23   over the place, because it was so complicated, we're not

24   using scheduling appropriately, there was a huge push to

25   say, well, if you just do it right and you follow the

Kevin Kuich, M.D.                                         September 19, 2019

1   work flow and you do the power plans and you do the

2   scheduling orders, then everything would be fine and we

3   wouldn't have any problems.  And the problem -- and that

4   became quite a mantra and was quite a -- quite a

5   mountain to climb to help people to realize there's

6   another side to the story.  Power plans are very

7   complicated with the ways that the orders are sent,

8   based on where the patient is, and they also fire a

9   series of orders out.

10           The problem where that occurs is, as the

11   provider, you want to be able to see that patient in

12   front of you and say, you know what, I know I need to

13   see you in 30 days, but I'm worried about you, so I want

14   to see you in two weeks.  And the more you automate this

15   process to be able to make sure that compliance happens,

16   the more you take that control out of the clinician to

17   be able to determine what's clinically relevant for that

18   patient.  Program guidelines are the minimum

19   requirements.  And so if we're just following the

20   minimum standard, okay, maybe that's a way to do it, but

21   you would hope that we would looking at the patient's

22   best interest and finding that maybe they need an

23   appointment in three weeks rather than four.

24           So by using these power plans and the scheduling

25   orders and trying to mandate it -- which it never

Kevin Kuich, M.D.                                        September 19, 2019

1    happened, thank goodness -- it would create a whole

2    cascade of orders that patients may or may not need.

3    They may have seen -- the -- they might have seen me the

4    day before on an emergency situation, and now there's an

5    appointment that automatically got scheduled for next

6    Monday, and so I would sit with the patient and say, Why

7    are you here?  And they would say, I don't know, why are

8    you here.  And I'd say, I don't know.  The scheduling

9    order said we had to.

10          So it created this automation, which was

11   complicated.  And it was heavily lobbied for, I think

12   for now various reasons that are becoming more apparent.

13   But we were able to successfully say that that is not an

14   appropriately -- clinically appropriate work flow to

15   follow.

16    Q.    And when you say that it was -- your

17   understanding is it was proposed for reasons that are

18   now apparent, are you referring to the push to be

19   compliant that we've discussed today?

20    A.    Exactly.  That's exactly what I'm referring to.

21    Q.    One more question about the relationship between

22   the approval process for getting a change to EHRS that

23   affects psychiatry approved and then having it built.

24   Am I correct that the first step is to make it through

25   the gatekeeper; and then even if you make it through the

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

1    gatekeeper, there is no -- it is not guaranteed that

2    that will be built quickly?  Is that correct?

3     A.    That is correct.

4     Q.    So they're two separate queues, kind of; is that

5    right?

6     A.    (Nods head affirmatively.)

7     Q.    And so we've discussed this problem with getting

8    through the gatekeeper, various types of gatekeeper for

9    psychiatry or EHRS changes.  Once you made it through

10   that gatekeeper, was it your experience that your

11   psychiatry changes that had been approved were not

12   prioritized to get done?

13    A.    Once they're approved from CLAC or that

14   gatekeeper to say this is a change that is now

15   authorized, it goes one of two ways.  One way is it goes

16   internally and the other way is externally.  If it goes

17   externally, it goes into Cerner's -- C-e-r-n-e-r, their

18   queue for building.  If it goes internally, then it goes

19   into whatever department's queue that is in.

20           So the things that went into mental health's

21   queue for build, for psychiatry, languished.  And I

22   started to work with nursing and medical to see if they

23   would be willing to build out CLAC-approved changes

24   because they could do so in a more timely manager.  So

25   alliances were built to be able to try to get our

Kevin Kuich, M.D.                                    September 19, 2019

1   changes moved through as quickly as possible, outside of

2   mental health.

3    Q.    And for the projects that were put in the mental

4   health queue for psychiatry, was it your experience that

5   they were prioritized less than changes coming from

6   psychologists, for example?

7    A.    Yes.

8        MS. THORN:  Objection.  Lack of foundation.

9   Calls for speculation.

10  BY MS. ELLS:

11   Q.    And was it your experience that changes in this

12  mental health queue from psychiatry were prioritized

13  less than administrative changes in EHRS?

14        MS. THORN:  Same objection.

15        THE WITNESS:  Administrative changes?

16  BY MS. ELLS:

17   Q.    So correct me if I'm wrong that -- who were the

18  people that were asking for changes?  Psychologists,

19  we've discussed.  They wanted certain changes to EHRS.

20  Were there any other clinical disciplines that wanted

21  changes to EHRS, besides psychologists and

22  psychiatrists?

23   A.    Yes.  Medical, nursing, pharmacy.

24   Q.    But the ones that were within the mental health

25  queue?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                                September 19, 2019

1    A.    They would just be mental health, so would

2    either be psychiatry, psychology.

3    Q.    Okay.  Then that's -- you've answered my

4    question, then.

5          So turning back to this document, which we have

6    not marked as an exhibit but we've referred to numerous

7    times, the neutral expert report, ECF No. 6147.  On

8    page 74, which, Doctor, on your pagination is page 69,

9    Dr. Ceballos says that she was already aware, before

10   Dr. Golding's report, of the problem of appointments

11   being counted as having occurred as scheduled when

12   providers informally moved the appointments rather than

13   following the formal EHRS process.  Did you tell her

14   about this problem?

15   A.    No.

16   Q.    Okay.  So the same problem that we've been

17   discussing; Dr. Ceballos also said that this problem was

18   already being addressed through training.  Were you told

19   of any training like that?

20   A.    There was endless training.  So instead of

21   recognizing that a work flow is inefficient or a

22   particular form of documentation is cumbersome, there

23   was more of the, it's not our problem, it's your

24   problem.  And so there were letters of reprimand at

25   times written for people because they didn't do it in

Page 171

Kevin Kuich, M.D.                                          September 19, 2019

1    the way that it was done.

2         So instead of looking at -- in any system you

3    build, there's always going to be things that are

4    complicated and problematic, but I think because there

5    was so much effort and time and so much of -- apparently

6    put into scheduling, it became something that couldn't

7    be changed, and people's behavior had to change to adapt

8    to that.  So it was very unique and interesting, because

9    other things, there seemed to be a flexibility of

10   saying, you know, maybe we could do it this way or that

11   way, but scheduling had a tremendous inflexibility, so

12   much so that near the end of my time, there was a

13   meeting with -- I'm blanking on the medical receiver.

14   Q.    Clark Kelso?

15   A.    Yes, thank you.  Clark Kelso.  And -- and I'm

16   blanking on the dentist's name.

17   Q.    I can't help you with that.

18         MS. THORN:  I am too.

19         THE WITNESS:  Okay.  So -- but to basically

20   say we're -- all disciplines were brought in to say

21   scheduling is an issue, scheduling is a problem, and

22   scheduling needs to be unified scheduling, and we

23   can't have disciplines doing their own thing.

24         And so there was a coming together meeting

25   held by nursing -- chaired by nursing to be able to

Kevin Kuich, M.D.                                    September 19, 2019

1    find that a scheduling process that was reasonable.

2    And in that meeting, mental health seemed to be quite

3    -- quite, initially, quiet and then very eager to

4    propose the solution that everyone would be willing

5    to accept.  So it was a very strange meeting for

6    anyone that was in it.

7    BY MS. ELLS:

8     Q.     And what was the proposal?

9     A.     The proposal is acknowledging that scheduling

10   wasn't working well, so because mental health has such

11   experience and depth and breadth of knowledge in mental

12   -- in scheduling, mental health will come up with a

13   solution for the system, and we'll be happy to present

14   it to everyone when it's ready.  And that was not met

15   with squeals of joy by the other disciplines.

16    Q.     So that proposal was not adopted?

17    A.     That proposal was not adopted.

18    Q.     Am I understanding your testimony correctly

19   that -- so Dr. Ceballos said that this scheduling

20   problem that we've been talking about, where

21   appointments that are missed but held later, but are

22   never formally canceled and rescheduled are nonetheless

23   counted as having -- are not counted as being missed,

24   she -- Dr. Ceballos says that CDCR was training people

25   about that.  Is it your understanding that the preferred

Page 173

Kevin Kuich, M.D.                                                September 19, 2019

1    approach was to retrain people rather than fixing the

2    problem?

3      A.      Yes.

4      Q.      And was that something that you feel like was

5    specific to psychiatry changes, or was that a universal

6    kind of approach?

7      A.       Universal.  There was a lack of flexibility to

8    see that certain initial design elements or

9    anticipations of how something would work weren't

10   working and we needed to come up with a different way.

11   So the solution -- instead of coming up with an

12   alternative or something that would work better, it

13   would be just to train people more and more and more and

14   harder and harder and harder.

15          And where the rubber hit the road is, Cerner is

16   a software package, and as software packages upgrade, as

17   we know from our iPhones and various kinds of things,

18   suddenly there's things that you can't do.  And so this

19   tremendous inflexibility to look at the original design

20   created many issues and problems along the way that were

21   unanticipated and were hard to adapt to.

22          One example was the implementation of DSM-5

23   terminology.  So there was a huge push to use DSM-5

24   terminology for mental health.  The person that tested

25   that out was not a psychiatrist, and the end result of

Kevin Kuich, M.D.                                    September 19, 2019

1    that, once that change was rolled out, was that

2    psychiatrists could no longer associate a medicine with

3    the diagnoses and so they effectively couldn't

4    prescribe.  And that was actually found out during a

5    Coleman meeting, when I got -- my phone blew up and

6    said, "I can't write a prescription anymore.  What's

7    going on?"

8         I have no idea what's going on.  You tell me.

9         So multiple conversations back and forth, back

10   and forth, found out that this change was put forward.

11   It wasn't validated by a psychiatrist.  It wasn't tested

12   by a psychiatrist.  And the system became un --

13   dysfunctional, and the whole thing needed to be rolled

14   back until some ability to be able to find a way to have

15   DSM-5 diagnoses put in there, that didn't impact

16   psychiatry's work flow, could be implemented.  It was a

17   rather dramatic example right in front of the Coleman

18   monitors.

19        MS. ELLS:  Let's take a ten-minute break.

20        (Whereupon, a break was taken.)

21   BY MS. ELLS:

22    Q.    Doctor, I want to continue asking you some

23   questions about Issue E, which is reporting of scheduled

24   and missed appointments.  Are you familiar with the

25   performance report indicator called "appointments seen

1   as scheduled"?

2   A.    Yes.

3   Q.    What is it supposed to show, according to your

4   understanding of what that is?

5   A.    My understanding is if the appointment was

6   scheduled at a particular time, was -- were they seen at

7   that particular time.

8   Q.    Did you ever use that indicator in your work?

9   A.    I did, but it wasn't the indicator; it was one

10  of several.

11  Q.    So you would use it sometimes, though?

12  A.    Yes.

13  Q.    Do you know if other psychiatrists at the

14  headquarters level did as well?

15  A.    Dr. Gonzalez would.  I don't believe other

16  psychiatrists at the headquarters level would.

17  Sometimes there would be a field psychiatrist

18  supervisor, institutional supervisor or senior or chief,

19  that would be using that, but it's -- I think they were

20  much more focused on MAPIP and those kinds of things,

21  maybe, than other measures.

22  Q.    What did you use that for, that indicator?

23  A.    For me, it was more a measure of why -- are we

24  scheduling people for the appointments; and if they're

25  not being seen within that scheduled time frame, why.

Kevin Kuich, M.D.                                    September 19, 2019

1    So it was more of a point of question to say why is this

2    institution having more trouble than another

3    institution, and piecing that together with my numerous

4    and varied trips to all the institutions and talking to

5    people to try to kind of understand their physical plant

6    and their psychiatry staff and other elements that would

7    be required to make sure that that appointment happens.

8    Q.    So it sounds like it was a helpful management

9    tool to you.

10   A.    Uh-huh.

11   Q.    CCR has admitted that in 2016 it changed the

12   methodology for the "appointments seen as scheduled"

13   indicator, which had been -- which was defined on its

14   face as including all scheduled appointments.  It was

15   changed behind the scenes in the methodology to include

16   only appointments missed due to factors within CDCR's

17   control, and they did not update the definition that was

18   posted about what that indicator meant.  Because of

19   that, the indicator in this time period, in 2016 and

20   later, did not include any appointments that didn't

21   occur because a patient refused, because a patient

22   didn't show up for whatever reason, or due to a

23   scheduling error.  Were you aware of this issue?

24   A.    I was not.

25   Q.    Did anyone ever tell you that this had happened?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                        September 19, 2019

1    A.    No.  This is the first I believe I'm hearing it.

2    Q.    Are patient refusals common?

3    A.    Yes.

4    Q.    Are patient no shows common?

5    A.    Yes.

6    Q.    Would the data reported in the "appointments

7    seen as scheduled" indicator be materially different if

8    those occurrences were included in the denominator?

9          MS. THORN:  Objection.  Lack of foundation.

10   Calls for speculation.

11         THE WITNESS:  Yes.

12   BY MS. ELLS:

13   Q.    Would the data appear to be more or less

14   favorable to the department if they were included?  And

15   by "they," I'm referring to patient refusals and patient

16   no shows.

17         MS. THORN:  Objection.  Calls for speculation.

18   And lack of foundation.

19         THE WITNESS:  Less favorable.

20   BY MS. ELLS:

21   Q.    Dr. Golding estimated that CDCR's exclusion of

22   no shows, refusals, and scheduling errors from this

23   metric resulted in inaccurate reporting of approximately

24   95 percent of scheduled appointments having been seen as

25   scheduled when, in fact, it was really closer to

Kevin Kuich, M.D.                                    September 19, 2019

1    46 percent if all appointments had been included,

2    including the no shows, refusals, and scheduling errors.

3    Does that seem reasonably accurate to you?

4     A.    It would --

5          MS. THORN:  Objection.  Lack of foundation.

6    And calls for speculation.

7          THE WITNESS:  It would be a sizable number, I

8    would say.  Whether it's a 50 percent reduction, I

9    couldn't say, but it would be a significant number.

10   BY MS. ELLS:

11    Q.    So you've already stated that you were not

12   generally provided with notice or an opportunity to give

13   input when data reporting changes were made at the

14   headquarter's level; is that accurate?

15    A.    Yes.

16    Q.    Did the department's approach to data reporting

17   change in the years that you were with CDCR?

18    A.    It did.  One thing that I noticed is -- was with

19   the Coleman rounds.  So when I started doing the Coleman

20   tours, they -- each institution would be providing data,

21   their data, and that would be what was in the binders

22   for the monitors to review.  It changed in the way that

23   the institutions were no longer allowed to supply their

24   own data, that the data was supplied from headquarters.

25   And I remember it specifically because when I was on a

Kevin Kuich, M.D.                                        September 19, 2019

1   Coleman tours and that happened, several of the

2   institutions I was at expressed frustration that they

3   were having to speak to data or address data that they

4   weren't familiar with or otherwise it wasn't as -- they

5   weren't as close to the knowledge about that particular

6   information, but yet they were held accountable for it.

7    Q.    Did the staff at those institutions you're

8   referring to ever say that the data from headquarters

9   wasn't accurate according to their experience of what

10  was happening at that institution?

11   A.    I believe, if my memory does serve me correctly,

12  Corcoran did make that statement or something to that

13  effect, that they were concerned.

14   Q.    Did you have any concerns about this shift from

15  data at the institutional level to an increasing

16  reliance on headquarters' data?

17          MS. THORN:  Objection.  This goes beyond the

18  scope of the order.  Calls for speculation.

19          THE WITNESS:  Initial -- initially I embraced

20  it because it seemed like the monitors would be able

21  to see one standard and it would be easier for them

22  to kind of review things.  So on the face of it, it

23  makes sense to me.  But given what I've understood in

24  terms of what can happen to data when it's in a fewer

25  number of people's hands, it gives me great pause.

Kevin Kuich, M.D.                                          September 19, 2019

1    BY MS. ELLS:

2      Q.    Who was in charge of developing the performance

3    report data that -- are you talking about performance

4    report data in this -- the headquarters data, or is this

5    a broader category of headquarters data that you're

6    talking about?

7      A.    It encompasses performance data, but there's

8    other data elements that -- there's multiple binders

9    that are always sitting at the table when the Coleman

10   team comes through, so.

11     Q.    Who was in charge of developing performance

12   report data, including this appointment seen as

13   scheduled indicator, which is from the performance

14   report?

15         MS. THORN:  Objection.  Lacks foundation.

16         THE WITNESS:  My -- my assumption would be

17   that it would be --

18   BY MS. ELLS:

19     Q.    If you don't know the answer, feel free to say

20   you don't know the answer.

21     A.    I don't know.  I would say that it would be

22   people in mental health QM, and there's only three

23   people in there that would be involved in that.

24     Q.    And how confident are you that mental health QM

25   is in charge of the performance report indicators?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    Quite confident.

2    Q.    Is there anyone from psychiatry on that

3    three-person team that you described?

4    A.    No.

5    Q.    Do you have access, as a managing psychiatrist,

6    to mental health data about psychiatry?

7    A.    No.

8    Q.    Do you have any level of access?

9    A.    I have some level of access.

10    Q.    What is your level of access -- or what was?

11    Excuse me.

12    A.    Was, yes.  Now, none.

13          What were in the regular program reports that

14    managers would have available to them, I would have

15    access to.  So specific detailed information that I

16    really needed to know to help a particular institution

17    or a particular situation, I didn't have that ready

18    access to be able to pull something that wasn't already

19    pre-formatted.

20    Q.    Would additional access have helped you do your

21    job?

22    A.    Yes.

23    Q.    Why?

24    A.    It would enable me to look at the current

25    performance indicators, find a red flag or find an

Kevin Kuich, M.D.                                    September 19, 2019

1    anomaly, and to be able to track it down into its

2    various components so that I could be able to help the

3    institution address the change because I could identify

4    if it was a psychiatry performance issue, a physical

5    building issue, an access issue, what is it, and be able

6    to create a solution that would work for that particular

7    institution.  It's -- CCR is wonderfully homogenous and

8    not at the same time.  So each institution, based on

9    their patient population, the staff, even just the

10   attitudes and the personalities of the people working

11   there, required different solutions.  And so being able

12   to see a flag and have access to data to be able to

13   define all the variables related to that, for that

14   unique institution's situation, would be hugely

15   beneficial.

16   Q.    Did you ever ask mental health leadership for

17   more access to mental health data to help you do your

18   job?

19   A.    Yes.

20   Q.    This will be Exhibit 12.

21                (Plaintiff's Exhibit No. 12 was marked for

22                identification.)

23   BY MS. ELLS:

24   Q.    This is an e-mail from Dr. Golding to Katherine

25   Tebrock dated October 24th, 2017.  This document was

Defendants object to Exhibit 12 & 183:20-184:17 as outside scope of September 17, 2019 Order (ECF 6288).

Plaintiffs respond this pertains to Dr. Kuich's answer, in part, to the Court's questions at 3:16-19 of September 17, 2019 Order.

Kevin Kuich, M.D.                                    September 19, 2019

1    provided as part of Exhibit III to Dr. Golding's report

2    that he filed with the Coleman court and provided to the

3    Quada court.

4          You'll see at some point midway down the first

5    page, it says "Kevin said," and then there are a number

6    of things listed -- I'm sorry -- yeah.  And then there

7    are a number of things listed, and you'll see on the

8    next page, there's an e-mail from you that same day,

9    October 24th, 2017, to Dr. Golding.  Could you take a

10   look at those items, please, as well as the rest of the

11   e-mail string underneath your e-mail that was forwarded

12   to Dr. Golding.

13         MS. THORN:  I'm going to object to the

14   questioning on this exhibit and the issue of --

15   that's addressed in this e-mail as beyond the scope

16   of the September 17th order.

17         THE WITNESS:  Yes, I remember writing this.

18   BY MS. ELLS:

19    Q.    Can you describe the concerns that you were

20   expressing in this e-mail to Dr. Golding that was then

21   forwarded by Dr. Golding to Katherine Tebrock on October

22   24th, 2017?

23    A.    In the -- once the EHRS was rolled out, there's

24   always people that adapt quickly to it and other people

25   that struggle with it.  And in -- out of both of those

Kevin Kuich, M.D.                                        September 19, 2019

1    groups, there's some commonalities that I would keep

2    hearing, that they're struggling, that they're spending

3    a lot of time doing this or this is taking too much time

4    or this seems error prone.  And so I wanted to get a

5    sense of how long are these things taking.  If you have

6    a ten-hour day, you should be able to at least ten

7    patients.  Why -- why five?  You know, or why more?  Why

8    15?  I mean, what's -- what is one person doing that

9    another person isn't?

10          So I needed to get a sense of some of the things

11   of what psychiatrists are being asked to do in the

12   system and outside the system so I could get a sense of

13   how much time do things take and then use that large

14   block of time to say, okay, this seems to be taking an

15   inordinate amount of time; what can we do in terms of

16   design of the system to create something that's more

17   efficient and works better for them.

18          So I wanted to get a sense of what psychiatrists

19   are doing.  And all of that information, everything is

20   encoded.  Every keystroke is encoded in the Cerner

21   system.  So I needed to get a sense of how are they

22   spending their time in this system.  It would help

23   inform training and other things.  So this was

24   information that wasn't accessed to be able to find out,

25   because this level of detail is not what's covered in

Kevin Kuich, M.D.                                    September 19, 2019

1    our performance reports.  Our performance reports are,

2    did you make the appointment, did you do MAPIP, those

3    kinds of things.  So it's not the day-to-day, granular

4    what is this psychiatrist doing.

5    Q.    So the information that you were requesting here

6    is not information that you would have had access to

7    from your level of access to the performance reports?

8    A.    Correct.

9    Q.    And in your e-mail that's embedded in

10   Dr. Golding's e-mail, which was, again, forwarded to

11   Katherine Tebrock, you say "Hi, Michael.  Back in June."

12   Do you mean June 2017?

13   A.    Yes.

14   Q.    And is that -- you say that you met with Britt.

15   Do you mean Dr. Brizendine?

16   A.    Dr. Brizendine, yes.

17   Q.    And John Rekart, Dr. Rekart, and Steven

18   Cartwright, about accessing additional data that would

19   be helpful to you in your management of psychiatrists;

20   is that accurate?

21   A.    Yes, that's accurate.

22   Q.    And does e-mail string, which the initiating

23   e-mail is, at the very bottom on the last page,

24   June 21st, 2017, addressed to Steven Cartwright,

25   Brittany Brizendine, and John Rekart -- is that

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                                September 19, 2019

1    reflective of your initial attempts to get data to help

2    you do your job?

3     A.    Yes.  This was -- the June 21st meeting was a

4    follow-up to the meeting in which I was told I could use

5    Lighthouse, which is a Cerner product, to get this

6    information, and I couldn't.  So it was -- it was a bit

7    of a red herring in that sense.  There was not -- that

8    could not give me that information, so.

9     Q.    So is this June 21st e-mail intended to say,

10   Hey, we talked about my request for data, you told me I

11   could use Lighthouse, it's not working?  Is that

12   accurate?

13    A.    Right.  It's -- that -- in that discussion, when

14   I talked with Dr. Brizendine to say, Hey, you know,

15   I'm -- I need this -- I need this information and

16   Lighthouse isn't going to be working, she came in, had a

17   meeting with all of us and said, you know, what am I

18   looking for and these are the kind of elements.  So this

19   is a follow-up to that meeting, to basically say, Hey,

20   you know, although Lighthouse is useful, you know, these

21   are the things that I need to know, so what can I --

22   what can I do?  Because Dr. Brizendine had indicated

23   that that data would be available -- or could be made

24   available to me.

25    Q.    Okay.  And so by October 24, 2017, when you sent

Kevin Kuich, M.D.                                    September 19, 2019

1  this -- when you forwarded this string of requests about

2  your attempts to get data from Dr. Brizendine,

3  Dr. Rekart, and Mr. -- or Dr. Cartwright, is it safe to

4  assume that you had not yet received the data that you

5  were requesting -- the data access, excuse me, by

6  October 24th, 2017?

7  A.    Correct.  And then it was -- the suggestion was

8  made to add it into the QM data request queue, which was

9  a way to manage requests and those kinds of things.

10  But, again, it's just another way to -- another way to

11  put something someplace else.

12  Q.    And were you aware that Dr. Golding had elevated

13  your request to Katherine Tebrock for this information

14  in October of 2017?

15  A.    I -- he might have said that he had sent it.  We

16  would talk about various different things and he would

17  send off various different things, so it may have

18  happened, but I don't distinctly recall having that

19  conversation.

20  Q.    But were you aware that he was planning to

21  essentially elevate the issue and try and get you

22  access?

23  A.    Yes.

24  Q.    Okay.  And why did you not contact Katherine

25  Tebrock about this issue by yourself?

Kevin Kuich, M.D.                                             September 19, 2019

1    A.    It seemed Dr. Brizendine was involved in it, and

2    she was the -- maybe still is, the associate deputy.

3    Q.    Meaning second in command?

4    A.    Second in command.  So I -- if the second in --

5    I think Ms. Tebrock had other things on her plate, and

6    this didn't seem -- it seemed relevant to me, but not

7    worthy in the scope of her obligations and

8    responsibilities.  And I would think the second in

9    command would be able to make this happen.

10   Q.    And although you reported to Dr. Tebrock, you

11   now know, this wasn't the type of relationship where you

12   could ask her for things like this; is that accurate?

13   A.    Yes.

14         MS. THORN:  Objection.

15   BY MS. ELLS:

16   Q.    Was your concern about not having sufficient

17   access to data to do your job addressed after --

18   promptly after October 2017?

19   A.    I still didn't get the data.

20   Q.    Okay.  Could you turn to Exhibit 9 again.  And

21   this is the e-mail in which Dr. Golding has clipped in

22   information that you wrote to him, and sent it on to

23   Katherine Tebrock on July 2nd, 2018, so the year after

24   you initially requested access to this data.  Item No. 3

25   in the portion that you wrote on page 2, could you take

Kevin Kuich, M.D.                                          September 19, 2019

1    a look at that?

2    A.    Uh-huh.

3    Q.    Is this an accurate reflection of what happened

4    to your request for data that you needed to do your job?

5    A.    Yes.

6    Q.    And at any point before you left the department

7    in July -- I'm sorry, in January of 2019, did you

8    receive access to the data that you were requesting?

9    A.    I did not.

10   Q.    CDCR has stated that it corrected the definition

11   for the "appointment seen as scheduled" indicator to

12   accurately reflect the indicator's methodology, which

13   excludes certain appointments, including no shows,

14   patient refusals, and scheduling errors."  They say that

15   they corrected that methodology -- the definition to

16   accurately reflect that methodology on October 3rd,

17   2018, after reviewing Dr. Golding's allegations.  Is it

18   safe to say that you never heard that that change had

19   been made?

20   A.    Correct.

21   Q.    So as to this topic again about the -- take the

22   Court's phrasing again -- Issue E, reporting of

23   scheduled and missed appointments and the things that

24   we've been discussing on that topic, the Court again

25   wants to know your views about why this issue could not

Kevin Kuich, M.D.                                    September 19, 2019

 1  be resolved successfully internally and prior to

 2  presentation of misleading data, namely this

 3  "appointment seen as scheduled" indicator, to the

 4  special master and the Court.  Do you have any views on

 5  that?

 6       MS. THORN:  Objection.  Lack of foundation.

 7  And calls for speculation as to any testimony by this

 8  witness on that subject.

 9       THE WITNESS:  The data was an underpinning

10  rationale, from my perspective, of the staffing

11  proposal that was put forward, so it was not going to

12  be addressed.  And I would -- in my perception, I

13  think the hope was -- is that this would just move

14  through and everything would be fine, and everyone

15  was in agreement up until there were questions that

16  were raised.  And so I -- I can't imagine that it

17  would have been taken seriously or would have been

18  responded to in an expedient fashion, given the

19  matters before the Court.

20  BY MS. ELLS:

21   Q.    Doctor, were you aware that the "appointment

22  seen as scheduled" indicator, which was not clearly

23  defined to exclude many common reasons for appointments

24  being missed -- would it be surprising to you that that

25  was provided by defendants in support of their request

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                           September 19, 2019

1    to reduce line psychiatry by 20 percent?

2         MS. THORN:  Objection.  Lack of foundation.

3    Calls for speculation.

4         THE WITNESS:  It would not surprise me and it

5    would in line with precedent.

6    BY MS. ELLS:

7    Q.    Doctor, do any of the issues that we've been

8    discussing today have anything to do with your decision

9    to leave CDCR?

10   A.    Almost all of them.  CDCR provided me a

11   wonderful opportunity to do many things, to interface

12   with many people, to learn a electronic medical records

13   system, to expand tele psychiatry, to be able to engage

14   psychiatrists in a meaningful way throughout an entire

15   system; also to be able to provide services to a

16   population that oftentimes is there because of mental

17   health.  And I thoroughly enjoyed my interactions with

18   medical, with nursing, with dental, with IT, with

19   pharmacy.  And I was continually frustrated by mental

20   health.  I think I would love to see mental health be

21   able to change, it's amazing that we've been in this

22   lawsuit for over 20 years, and I -- I just don't see

23   change on the horizon.

24        I would be happy to return had -- if there was

25   the ability to have a psychiatry voice.  There's many

Kevin Kuich, M.D.                                    September 19, 2019

1   things that I know I had already started that I would

2   love to finish, and I feel I've got a good rapport and

3   relationship with the majority of people in mental

4   health, in psychiatry, and in the organization itself.

5   So I think I could be a positive agent for change, but,

6   unfortunately, I think the change that I would like to

7   bring about is not the change that prior

8   administrations, nor likely the current administration,

9   wishes to have occur.  So I will remain where I am for

10  this moment.

11        MS. ELLS:  Okay.  We don't have any more

12  questions for Dr. Kuich.

13                  EXAMINATION BY MS. THORN

14  BY MS. THORN:

15  Q.    Okay.  Dr. Kuich, I'm Elise Thorn.  We've worked

16  together in the past.

17  A.    Yes.

18  Q.    I have a few follow-questions to clarify some of

19  your statements that you made in response to Ms. Ells'

20  questions.

21        First of all, let's just talk about your access

22  to data.  Over the course of today, you talked about

23  different data sources and reports, whatnot.  A little

24  bit jumbled, but you talked about EHRS and your

25  involvement with the EHRS, and then also recently this

Kevin Kuich, M.D.                                    September 19, 2019

1   afternoon about your access to the performance reports.

2   And you mentioned that you used the performance reports,

3   along with other data, in doing your job.

4          Do you have you -- is that a yes?

5   A.    Sorry.  Yes.

6   Q.    Your access to the performance reports, how --

7   how do you access the performance reports and -- just

8   physically, technically?

9   A.    So that would be a link.  It was bookmarked on

10  my computer, so I would go into the bookmark, and there

11  would be all the performance reports that were there.

12  Q.    And isn't it true that you could drill down for

13  any performance report to the individual institution on

14  any indicator as well as patient-level data on any

15  indicator?

16  A.    You can.

17  Q.    And did you do that on occasion?

18  A.    On occasion I did.

19  Q.    Okay.  So when you were talking earlier about

20  not having access to data, was that specific to the

21  ability to run queries on the data, for example, through

22  Dr. Leidner, as he would run queries?  I'm just trying

23  to get a sense for what data you didn't have access to.

24  A.    Yes.  It's -- those datas, that -- those data

25  sets that would require a query to be able to access.

Kevin Kuich, M.D.                                        September 19, 2019

1    Also, there are other -- the performance reports were

2    pre-formatted, so they already were pulling in certain

3    bits of information.  I needed additional information

4    other than that.

5           So the only way that I could get them was to

6    query the database, which is a whole bunch of ones and

7    zeros, and if someone could -- and it's all out there,

8    and if someone could just put a query together and put

9    those things through, then I would be fine.

10   Q.    Did you ever submit a request for a data query

11   to Dr. Leidner that was refused?

12   A.    I don't believe I submitted a request to

13   Dr. Leidner.

14   Q.    Ever?

15   A.    I don't believe I did.  Given the context of not

16   having data that I'd already requested not come back, I

17   didn't see the point.

18   Q.    Were you a regular attendee at the monthly

19   Mental Health Quality Management meetings CDCR held?

20   A.    The monthly meetings that were in the conference

21   room?

22   Q.    I don't know.

23   A.    Yeah, not --

24   Q.    Are you familiar with something such as the

25   monthly Mental Health Quality Management meetings?

Kevin Kuich, M.D.                                                September 19, 2019

1    A.    I would present at those meetings.

2    Q.    Okay.  And who attended those meetings?

3    A.    Those were the Quality Management team, some

4    members of administration.  The regional staff would

5    generally be on the phone.  There might be invited

6    guests that are there.  Dr. Golding may or may not be

7    there.

8    Q.    And you said you presented at those meetings?

9    A.    Correct.

10    Q.    For example, on what types of information?

11    A.    The information that I was requested to present

12    on, and that that had to do MAPIP-related things,

13    non-formulary things.  Those were elements that were

14    determined within that year or within a certain

15    time frame that these are the targets or the focus that

16    would be discussed.

17    Q.    In the context of those meetings, would you --

18    if you had any question regarding what was happening at

19    a given institution, were you free to ask that question?

20    A.    And I did.

21    Q.    And would you get responses from those in

22    attendance?

23    A.    Sometimes.

24    Q.    With respect to the third issue Ms. Ells showed

25    you from the Court's order, the issue regarding

Kevin Kuich, M.D.                                                September 19, 2019

```
 1   appointments seen as scheduled, we talked about your
 2   familiarity with that -- that term and that performance
 3   report indicator.  Are you familiar with how that data
 4   is complied and then assimilated into the performance
 5   report?
 6    A.    No.  That is a level that only Dr. Leidner or
 7   Dr. Ceballos would know.
 8    Q.    And with respect to any data pulled from the
 9   performance report and presented to the special master
10   and -- or the Court in connection with the staffing
11   proposals, were you familiar with data that was compiled
12   in order to submit that report?
13    A.    I was familiar with the reports themselves, but
14   I didn't --
15    Q.    Specifically for the staffing proposals?
16    A.    No.  I did not see that specific data.
17    Q.    In connection with the staffing proposals, I
18   think you mentioned that you never saw an actual copy of
19   the staffing proposals.  Is that correct?
20    A.    There was -- when it was close to being
21   presented and it was in its basic final form, I believe
22   Dr. Golding had shown me a copy.
23    Q.    And when was that?
24    A.    It was probably days before it was presented.
25    Q.    And I believe you testified that you only were
```

Kevin Kuich, M.D.                                          September 19, 2019

1   involved with respect to the staffing proposals for

2   addressing the reduction in the level of psychiatry

3   needed for the crisis intervention teams.  Is that

4   correct?

5   A.    The -- the on -- what would be the on call --

6   using tele psychiatry for on call.

7   Q.    And you talked about a meeting with Ms. Ponciano

8   with respect to that?

9   A.    Yes.

10   Q.    Prior to your meeting with Ms. Ponciano, did you

11   have any meetings with anyone at mental health about the

12   staffing proposals?  Any of them.

13   A.    Not that I recall.

14   Q.    Did you ever have a meeting with Katherine

15   Tebrock and Dr. Golding regarding the staffing

16   proposals?

17   A.    There could have been a meeting about discussing

18   that there will be staffing proposals that will be

19   forthcoming and more information will be provided at the

20   appropriate time.

21   Q.    So you don't recall meeting with Katherine

22   Tebrock and walking through each of those staffing

23   proposals before they were submitted to the special

24   master and plaintiffs?

25   A.    I don't recall that.

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    But it could have happened?

2    A.    It's possible.  At some point in time, there

3    would have had to have been a question about what the

4    staffing proposals are and what it's based on, to be

5    able to assemble information.  So I don't know the

6    specific date or if that happened in that combined

7    format.

8    Q.    So it's possible, but you can't remember one way

9    or the other, an additional meeting other than the one

10   that was with Ms. Ponciano?

11   A.    Ms. Ponciano's, I remember explicitly because

12   that had to do with tele psychiatry and tele psychiatry

13   services, and I had to operationalize that.  Anything

14   else beyond that was not as -- wouldn't stick in my

15   memory as much because I wouldn't necessarily

16   operationalize it.

17   Q.    Okay.  Do you remember providing information or

18   some presentation at a "all-parties work group" with the

19   plaintiffs and the special master regarding the staffing

20   proposals in June of 2018?  Do you have any recollection

21   about that?

22   A.    I was in those meetings.  There's many things

23   that were discussed at various times, whether it was EOP

24   hub certs or other kinds of things.  And so could I have

25   been in a meeting where something was discussed?  It's

Kevin Kuich, M.D.                                        September 19, 2019

```
 1   possible.
 2   Q.    I would like to know if you recall it.
 3   A.    I don't recall it.
 4   Q.    So after your meeting with Ms. Ponciano where I
 5   believe you testified that you met with her to talk
 6   about the number of positions that would be needed.
 7   A.    Uh-huh.
 8   Q.    And you came up with eight; is that correct?
 9         MS. ELLS:  Objection.  Misstates testimony.
10   BY MS. THORN:
11   Q.    Okay.  So it's been a while, so just -- as I
12   recollect, you said that Ms. Ponciano pulled you out of
13   another meeting and said, We've got to come up with a
14   number.  And can you describe how you came up with that
15   number?
16         MS. ELLS:  Objection.  Misstates testimony.
17         THE WITNESS:  I didn't come up with a number.
18   I would have rather had time to --
19   BY MS. THORN:
20   Q.    So that's not my question.  The number is eight,
21   correct?
22   A.    That is the number that's in the staffing report
23   that I saw, yes.
24   Q.    Okay.  And after your meeting with Angela
25   Ponciano, you never saw that have staffing proposal?
```

Kevin Kuich, M.D.                                        September 19, 2019

1    That piece of it even?  Did you have any discussion with

2    anyone about that piece of the staffing proposals.

3     A.    I had a discussion with Dr. Golding to say

4    what -- what Ms. Ponciano is proposing seems somewhat

5    concerning, that I don't think we're going to be able to

6    -- if that's the number she's choosing, I see a

7    potential problem with that.

8     Q.    So it's your testimony that you had no input on

9    determining that number?

10    A.    She wanted a number and she had a number in her

11    head, and I wanted to have time to have input, real

12    input, not an ambush input.  And so I would say no.

13    Q.    Did you have any discussions with anyone at

14    mental health, including Katherine Tebrock or

15    Dr. Golding, about that number of psychiatrist positions

16    that would be needed for the -- I guess it's the after

17    hours?

18         MS. ELLS:  Objection.  Vague.

19         THE WITNESS:  No.  The number was determined,

20    and there was concern for what the number was.  And

21    since this proposal was already being put forward, it

22    didn't seem that there was time to find out all the

23    details needed to provide an accurate and responsible

24    number.

25    BY MS. THORN:

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    Were you involved in any meetings where the

2    staffing proposals were discussed after your meeting

3    with Ms. Ponciano, at any time between the -- the time

4    you met with Ms. Ponciano and, let's say, October 2018?

5         MS. ELLS:  Objection.  Asked and answered.

6         THE WITNESS:  I don't recall.

7    BY MS. THORN:

8    Q.    Do you recall any other details about your

9    discussions with Ms. Ponciano at that meeting?

10   A.    The discussions that I related, they are my

11   recollection of the discussion we had in that chief of

12   mental health meeting, when it was pulled out and asked

13   to -- here's the situation and the number was

14   determined.

15   Q.    And do you know the basis for that number?

16   A.    It seemed like it was pulled out of a hat.

17   Q.    So Angela Ponciano presented you with the

18   number eight, and you said sure?

19        MS. ELLS:  Objection.  Misstates testimony.

20        THE WITNESS:  It was apparent that a number

21   needed to be determined.  I don't know what the

22   urgency was or the priority was, but it seemed that

23   something Ms. Ponciano needed immediate decision on,

24   based on perhaps some report or filing that needed to

25   occur.  And I expressed my concern that that number

Kevin Kuich, M.D.                                    September 19, 2019

1   being proposed was not -- potentially was not

2   adequate, and I was reassured that if it wasn't, that

3   there would be additional resources that could be

4   found.  Given the presentation of the urgency of

5   making that decision, I had to take Ms. Ponciano at

6   her word.

7   BY MS. THORN:

8    Q.    When this deposition or prior to getting this --

9   strike that.

10           Did you speak with anyone to prepare for your

11  deposition today?

12   A.    We had a discussion about the elements of what

13  this would entail and how the deposition would go.  So,

14  yes, I did speak with Ms. Ells.

15   Q.    And when did you speak with Ms. Ells?

16   A.    Monday at 3:00 p.m.

17   Q.    This past Monday?

18   A.    Yes.

19   Q.    Prior to this Monday have you had any other

20  conversations with Ms. Ells or anyone from her law firm?

21   A.    No.

22   Q.    How long did your call last with Ms. Ells --

23  strike that.

24           Was that a telephone call?

25   A.    Telephone call.

Kevin Kuich, M.D.                                               September 19, 2019

1    Q.    Okay.  How long did the call last?

2    A.    90 minutes.  I was in the Home Depot parking

3    lot, so I was a bit distracted.

4    Q.    And did Ms. Ells ask you or inform you the

5    topics she would be asking you about at the deposition

6    today?

7    A.    Mentioned the three areas of concern, and also

8    generalities about the deposition and how, procedurally,

9    they occur.

10   Q.    Did she cover any specifics on the issues; for

11   example, the plaintiffs' positions and your positions

12   with respect to the issues raised today in the

13   deposition?

14   A.    No.

15   Q.    So you spoke for 90 minutes.  Did she ask you to

16   review any specific documents?

17   A.    No.

18   Q.    So you, I believe, testified this morning that

19   you reviewed some documents including the order that

20   we've been talking about today, the order that's been

21   marked as Exhibit 2.  Also, you stated that you reviewed

22   the executive summary of the Gibson Dunn report?

23   A.    Yes.

24   Q.    Did you review any other parts of the Gibson

25   Dunn report?

Kevin Kuich, M.D.                                    September 19, 2019

```
1    A.    No.  That's all I had time for.

2    Q.    Have you ever reviewed other parts of the Gibson

3  Dunn report?

4    A.    No.

5    Q.    Why not?

6    A.    Time.  I have a full-time job running a

7  hospital.  This lawsuit is not my full-time job anymore.

8  But I'm happy to contribute what I know if it helps to

9  move this process forward and help patients get care.

10   Q.    I believe you testified earlier that with

11 respect to who you reported to within CDCR mental

12 health, that no one ever told you who you were supposed

13 to report to, and so I'm just wondering if -- you just

14 inferred that you would report to Dr. Golding.  So at

15 the -- first of all, as the chief of telepsychiatry, did

16 you ever ask that question?

17   A.    No.  Doctor -- my predecessor, Dr. Captherian,

18 worked with Dr. Golding, reported to Dr. Golding.

19 Dr. Golding signed his time card.  Dr. Golding approved

20 time off.  So I was essentially moving into

21 Dr. Captherian's position, so.

22   Q.    You never asked?

23   A.    Never asked.  You would think someone who is

24 supervising would inform me and be able to do reports.

25 I believe there would be a 90-day assessment of my
```

Kevin Kuich, M.D.                                          September 19, 2019

1  performance.  So I would hope if someone was supervising

2  me, they would do that and identify themselves, but

3  apparently that didn't happen in this instance.

4  Q.    You testified earlier about your experience in

5  the institutions and your observations about supervising

6  psychiatrists and the work they undertook, including the

7  work of line staff psychiatrists.  And I just wonder if

8  you ever looked at any published data or available data

9  to actually confirm your suspicions and your

10  observations in the institutions.

11      MS. ELLS:  Objection.  He testified that there

12  was no such data to review.

13  BY MS. THORN:

14  Q.    Did you ever look at any data?

15  A.    There was not data to review.

16      And I would say, if I spent my time tracking all

17  these things down, it would have prevented me from

18  engaging the telepsychiatrists, coordinating with the

19  psychiatrists out in the field, and also working on the

20  EHRS, because that would have been a full-time job.

21  Q.    So do you agree, though, that part of the role

22  in the job duties, the official duties of supervising

23  psychiatrist, is to actually backfill those positions,

24  you know, to cover when they've got vacancies in their

25  institutions?  If that person is out sick or something,

Kevin Kuich, M.D.                                                September 19, 2019

1    you know, a clinician gets pulled off of doing one thing

2    and a supervisor is available, that that's actually part

3    of their -- their formal duties in the institutions?

4    A.      For managing unplanned absences, yes.  For

5    absences that are extensive and chronic, no.

6    Q.      So did you personally do any studies to

7    determine the percentage of the reasons for the coverage

8    that you observed in the field?

9    A.      If I had resources available to me, I certainly

10   could have called each institution and found that out.

11   Q.      But you didn't do that?

12   A.      I did not do that because I did not have

13   resources to do that.

14   Q.      Did you ask anyone at headquarters to do that

15   work?

16   A.      Who would I ask?

17   Q.      I'm just asking, did you ask anyone?

18   A.      There's no -- resources are not psychiatry's

19   resources.  Psychiatry shared an administrative

20   assistant -- headquarters psychiatry shared an

21   administrative assistant with telepsychiatry, so

22   headquarter psychiatry had half a person and

23   telepsychiatry had the other half of a person.  That is

24   the amount of staffing and support that psychiatry had

25   in headquarters.

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    Okay.  You testified earlier about HR data, that

2    it's delayed and flawed and something about coding.  And

3    I just want to know what HR data you were talking about.

4    That wasn't clear from your testimony.

5    A.    Data about why someone wouldn't be physically

6    working, so if they're on disability, if they're on

7    vacation, if they're on a leave of absence, those kinds

8    of things.  If they are on a work reassignment so they

9    could do some work but not other work, that data took a

10   long time to get to HR, it was not always accurate and

11   couldn't be relied upon.

12   Q.    And who at HR would you -- or who within CDCR

13   would provide that HR data to you?

14   A.    You would have to ask Ms. Ponciano.

15   Q.    So you would send her a request for that data?

16   A.    Yeah.  I wouldn't get it myself on any regular

17   basis.

18   Q.    But if you wanted that type of data, you would

19   send, what, an e-mail to Ms. Ponciano or call her?

20   A.    Right --

21   Q.    How would that work?

22   A.    -- would call or just ask or request.  Sometimes

23   I could have -- if it involved telepsychiatry, I could

24   have my telepsychiatry staff try to track it down

25   through their resource.

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.     And so did you personally ever make a comparison

2    between human resources data and what was going on in

3    the field?

4    A.     I don't believe I personally did.  But the

5    staff, I believe, had looked at what data we were

6    presented with and what we knew was factual.

7    Q.     And when you say "staff," who are you referring

8    to?

9    A.     Telepsychiatry administrative staff.  So we had

10   administrative support for the telepsychiatry system.

11   So because, again, I wore many hats, there weren't --

12   there weren't resources at headquarter psychiatry, so I

13   would -- I would utilize my telepsychiatrist to do

14   headquarters work at times because that's all I had

15   available to me.  So I would -- I would have to direct

16   them off of her own work to be able to do work that I

17   would need for a system, which I did not like to do, but

18   that was the only recourse that I had.

19   Q.     Earlier today Ms. Ells asked you about an

20   analysis that Ms. Ponciano did for the time period 2017

21   to 2018 reported in the neutral expert's report.  I

22   didn't ask for that page cite, but you stated that the

23   number of psychiatrists appeared rather low and that

24   some institutions are well staffed and others aren't.

25   And I just wondered what document you were referring to

1    with respect to the analysis.

2         MS. ELLS:  Objection.  Vague.  Which analysis

3    are you asking about, the one that I was referencing

4    or the one that he was referencing?

5         MS. THORN:  You referenced -- you referenced

6    from the neutral report -- neutral expert report an

7    analysis of psychiatry staffing from 2017 to 2018.

8         MS. ELLS:  Right.

9         MS. THORN:  And you said, Don't you think

10   that's a low number of psychiatrists?

11        And he said, It seems rather low.

12        MS. ELLS:  To correct the record, I also said

13   the analysis concluded that for the six-month period

14   in question, Ms. Ponciano concluded that all of the

15   psychiatry participation and patient care during the

16   six-month period in question resulted to only 1.25

17   FTEs total.  So that was the question that was

18   presented.

19        MS. THORN:  All right.

20   BY MS. THORN:

21   Q.   So do you -- are you aware of any analysis that

22   was done for psychiatry numbers for that time period?

23   A.   No.

24   Q.   Did you ever review any analysis?

25   A.   I would have loved to have seen it.

Kevin Kuich, M.D.                                    September 19, 2019

1    Q.    So your testimony today is based on just

2    Ms. Ells' statements?

3    A.    It's based on my -- my experience of what

4    seniors and chiefs are doing.  It's based on my personal

5    experience when I rolled out the EHRS and visited

6    multiple institutions.  It is based on my experience of

7    having them request staffing, whether that staffing is

8    contract registry staff or whether it's telepsychiatry

9    staff.  So in those multiple layers of interactions of

10   multiple different times, that forms the basis of my

11   assessment of work that they're doing as a staff

12   psychiatrist.

13   Q.    Okay.  So you weren't specifically today

14   referring to any certain document?

15   A.    No.

16   Q.    Do you have Exhibit 4 in front of you?

17   A.    Yes.

18   Q.    And I see that you've turned to page 9 of that

19   exhibit, which is the table you reviewed earlier today

20   in your testimony.  Up at the top it says "mental health

21   psychiatry staffing versus compliance."  Do you see

22   that?

23   A.    Yes.

24   Q.    All right.  Do you know who prepared this table

25   that's at page 9 of Exhibit 4?

Kevin Kuich, M.D.                                    September 19, 2019

```
 1    A.      I do not.

 2    Q.      Did you see it before today?

 3            MS. ELLS:  Objection.  Asked and answered.

 4            THE WITNESS:  I have not.

 5   BY MS. THORN:

 6    Q.      And do you know what data was pulled to or

 7   compiled to create the information set forth on this

 8   table?

 9    A.      I have suspicions of where this information came

10   from.

11    Q.      But do you know?

12    A.      I don't know.

13    Q.      Earlier you said that, I believe, in meetings

14   regarding data specifically regarding MAPIP issues, that

15   you would indicate in your presentations with a footnote

16   some limitations on MAPIP.  Is that consistent with what

17   you said earlier today?

18    A.      That's correct.

19    Q.      So if you could just look at footnote 3 on

20   page 9 of Exhibit 4 and read that.  If you could just

21   read it to yourself.

22    A.      That looks similar to a footnote that I would

23   provide.

24    Q.      Is that the same type of issue with MAPIP that

25   you were describing earlier today?
```

Kevin Kuich, M.D.                                    September 19, 2019

1   A.     Yes.

2   Q.     Let's go back to this table on page 9.  I

3   believe you also provided some information regarding

4   staffing at Salinas Valley State Prison, specifically

5   your conversation or observation of Dr. Gills'

6   performing consultations at Salinas Valley.

7   A.     Yeah, I believe -- I believe -- it is his

8   institution, and I believe that's the institution he was

9   at.

10   Q.     And so what type of consultation was he

11   performing when you were observing his work at Salinas

12   Valley?

13   A.     He would perform medication evaluations, second

14   opinions.

15   Q.     And how many times did you observe him

16   performing those duties?

17   A.     In the week that I was there for EHRS.  And,

18   actually, he's -- actually, he is at SATF, not Salinas

19   Valley.  So I would like the record to correct that.

20   Q.     Okay.  All right.

21          You've seen exhibits today from -- represented

22   to be from Dr. Golding's report.  Are you familiar with

23   Dr. Golding's report?

24   A.     I am --

25   Q.     When I say that, do you know what I'm talking

Kevin Kuich, M.D.                                    September 19, 2019

1    about?

2    A.    I know what you're talking about, yes.

3    Q.    And did you review his report?

4    A.    Did I review his report?  I did look at -- I

5    reviewed an early draft of his report.

6    Q.    When you say "early draft," does that mean

7    before the -- before the version he submitted to the

8    receiver in October?

9    A.    Yes.

10   Q.    When did you first review a draft of his report?

11   A.    I don't recall.

12   Q.    How many times did you review a draft of his

13   report?

14   A.    Once.

15   Q.    Did you provide him any feedback?

16   A.    Grammatical, which was my -- what I generally

17   served -- the purpose I served for Dr. Golding.

18   Q.    Did you recall when the first time you reviewed

19   his report or any --

20        MS. ELLS:  Objection.  He stated he only

21   reviewed it once.

22   BY MS. THORN:

23   Q.    Do you recall when?

24   A.    I don't recall when.

25   Q.    Did you -- before you saw a version of his

1    report, a draft of his report, did you have any

2    discussion with him about his preparation of the report?

3    A.    No.  He would tell me that there's various

4    information that he's collecting and various information

5    that he is curious about trying to learn more about.

6    Q.    Okay.  So I just -- because you saw the exhibits

7    from the reports, had you seen those exhibits before

8    today?

9    A.    Some of the exhibit, I wrote, so yes.  So -- and

10   yeah, so...

11   Q.    If I could draw your attention to Exhibit 5,

12   please.

13        MS. ELLS:  Are you referring to the staffing

14   proposal?

15        MS. THORN:  It is the staffing proposal, yes.

16   It's an e-mail from Ms. Bentz with the staffing

17   proposal attached.

18   BY MS. THORN:

19   Q.    And I would just like to have you look at one of

20   the pages Ms. Ells had you look at earlier today.  I

21   think it was page 13.  It has the table that's called

22   "Timely psychiatry contacts, October 1."  That's it,

23   yes.

24   A.    Okay.

25   Q.    So you're looking at the table Timely Psychiatry

1  Contacts, 10/1/17 to 3/31/18 for CCCMS and EOP, correct?

2  A.    Correct.

3          MS. ELLS:  Can I just clarify the record --

4  because these are unpaginated -- that this is the one

5  that lists four institutions.  Is that right?

6          MS. THORN:  That's correct.

7  BY MS. THORN:

8  Q.    It's got Calipatria, Centinela -- Centinela,

9  CVSP, and ISP; is that correct?  Do you see that?

10  A.    I do see that, yes.

11  Q.    Had you seen this table before today?

12  A.    No.

13  Q.    Do you know what data was compiled in order to

14  create this table?

15  A.    I assume they use the timely psychiatry contact

16  report, stratified it by CMS and the institutions, and

17  pulled a number out of there.  But I was not involved in

18  its creation, but that would be my assumption.

19  Q.    Okay.  Thank you.

20          And turning now to the third page from the end,

21  which is also a table, "Timely psychiatry contacts" for

22  the same period of time, "Mainline CCCMS."

23          Again, do you know who created this table?

24  A.    I do not.

25  Q.    Do you know what data was pulled or compiled to

1  present the data in this table?

2   A.    I do not.

3   Q.    Do you know the context in which this table was

4  presented?

5        MS. ELLS:  Objection.  He's testified he's

6  never read this report.

7  BY MS. THORN:

8   Q.    So you don't have any context for this -- these

9  numbers or this data set forth on this table?

10   A.    I would say, given that they're in a staffing

11  report, the context is, hey, we're great, we're green,

12  we don't need psychiatrists.

13   Q.    But -- that's what --

14   A.    But that would --

15   Q.    -- I was going to ask.

16   A.    -- be my assumption.

17   Q.    Okay.  Thank you.

18        If you could just look at Exhibit 6, please.

19   A.    Of course it's almost the last one.

20   Q.    Same thing happened to me.

21        Again, I just want to know -- I understand you

22  did not see this exhibit before today.  Is that correct?

23   A.    That's correct.

24   Q.    And so with respect to the information contained

25  in this e-mail that -- you don't know where it came from

Kevin Kuich, M.D.                                              September 19, 2019

1    or the data it's based on?

2          MS. ELLS:  Objection.  It's from Melissa

3    Bentz.  It's not data.

4    BY MS. THORN:

5     Q.    The -- the -- there are staffing ratio numbers

6    and information contained in this e-mail.  Do you know

7    the basis or the origin of the information used to

8    present this, those staffing ratio numbers?

9     A.    My understanding is that they were original

10   staffing ratios presented by the monitors or whomever.

11   And these may or may not be different from what those

12   contacts are.  These may in fact be keeping to those

13   ratios or may be proposing new ratios.  I don't know.

14    Q.    Assuming it says "ratio change," I suspect that

15   there's a request to change the ratio.

16          Looking at Exhibit 7, please.

17    A.    Uh-huh.

18    Q.    And if you could turn again to the last page of

19   Exhibit 7, page 5 of the -- at the top.  You see the

20   number?

21    A.    I'm sorry.  Which page?

22    Q.    The last page of the document.

23    A.    Okay.

24    Q.    Again, are you familiar with this document?

25    A.    From seeing it today, yes.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                          September 19, 2019

1    Q.    Did you review any report like this while you

2    were working for CDCR?

3    A.    No.  This is similar to a report that tele psych

4    would generate, but it would be somewhat different --

5    somewhat of a different format and have some different

6    numbers.  But this is a format similar to what tele

7    psych would provide.

8    Q.    And so you had no role in preparing this

9    document?

10    A.    No.  If there was telepsychiatry numbers, my

11    staff might have provided current telepsychiatry

12    numbers.  We would be asked at various times for

13    information and we do not look for, but we would comply

14    and we would provide information as requested.

15         One such example was looking at cell side

16    telepsychiatry and how often those visits actually

17    occurred.  And so we were asked to perform a survey to

18    find out how frequently that happened, so we did provide

19    that information as requested by Ms. Tebrock, to

20    Ms. Tebrock, so she had a good understanding of how

21    frequently it was occurring.  That would be a typical

22    example of how we would be providing data at -- at

23    request only.

24    Q.    I would like you to look at Exhibit 8, please,

25    which is the e-mail from Melanie Gonzalez to Dr. Golding

1   dated March 22, 2017.  At any time -- let's see.  So

2   prior to coming to headquarters, you testified that you

3   were a staff psychiatrist at CHCF?

4    A.    Correct.

5    Q.    And at any time while you were at CHCF, did you

6   have any discussion with psychiatrists regarding the

7   30-day requirement for contacts with EOP patients?

8    A.    When I was a staff psychiatrist there?

9    Q.    Correct, or when you were a supervising

10   psychiatrist.

11   A.    So I was never a supervising psychiatrist, but I

12   was a senior psychiatrist specialist.

13         When I was at Stockton, Stockton was lucky to

14   make it through the day and they were just grateful that

15   a patient could be seen.  So in terms of meeting metrics

16   and requirements, that really wasn't able to come into

17   play at Stockton for probably a year until after they

18   were open.

19   Q.    And so were you aware that the request to change

20   the 30-day -- every 30-day contact for EOP patients,

21   that that request came from psychiatrists at CHCF?

22         MS. ELLS:  Objection.  That's not a fact in

23   evidence.

24   BY MS. THORN:

25   Q.    Were you aware of that?

Kevin Kuich, M.D.                                        September 19, 2019

1    A.    I was not aware of that.

2    Q.    Okay.  And you didn't read the Gibson Dunn

3    report except for the executive summary, so you wouldn't

4    have read the section about that rule change in the

5    report, correct?

6    A.    Correct.

7          I wouldn't find it surprise -- I'm not surprised

8    to hear that if that request did in fact come from CHCF,

9    given their limited number of psychiatrists, their

10   inability to retain staff, and their inability to ever

11   be compliant, so change the rule and they might make it.

12   So I'm not surprised.  CHCF has had -- CHCF was one

13   institution where, for instance, visa candidates were

14   taken from their much-needed institution and placed into

15   another division that was easy to recruit and easy to

16   retain psychiatrists.  So CHCF has its own storied

17   history, yet still has a fond place in my heart.

18   Q.    Earlier you -- when you were talking about this

19   same issue, this change in the rule, I believe you

20   testified that when you were asked how did you discover

21   that there was a change in the business rules, and you

22   said all the rules were laid out for us.  And so I'm

23   wondering when you -- for -- when you said "us," do you

24   mean psychiatry or all CDCR staff?  What were you

25   referring to?

Kevin Kuich, M.D.                                        September 19, 2019

1          MS. ELLS:  Quickly, when you refer to a rule

2    change, we talked about a lot of those today.  Which

3    one are you talking about?

4          MS. THORN:  So particularly the 30-day rule

5    change that is reflected in Exhibit 8.

6          THE WITNESS:  So I would often use -- there

7    was a part in the program reports that would be

8    compliance rules.  And so because they were -- they

9    did have a tendency to change and move, and sometimes

10   people would ask questions of me and I needed to be

11   able to answer what is the current rule, I would

12   reference that grid and be able to drill down and

13   find out if we're talking about MHCBs or PIPs or CCC

14   or ad seg or what have you and be able to provide

15   some guidance to the institutions to help improve the

16   measure based on what the current definition is.

17   BY MS. THORN:

18   Q.    And where were those rules?  You said they were

19   laid out, so I just want to know --

20   A.    Yeah.  They were in the -- I believe they were

21   in the program -- the program reports.  It was one in --

22   I believe it was list of compliance rules.  And so

23   anything -- any numerator and denominator was listed

24   there.

25          I'm still taken that CHCF psychiatrists would

1    get a rule changed that would affect everybody and that

2    would go through -- I -- I -- I'm gobsmacked with this.

3    I'm -- I'm -- I'm actually shocked at how porous the

4    system is, that something so major could be brought by

5    folks that are obviously struggling and have such a

6    tremendous impact.  That says quite a bit about the

7    organization's sustainability and procedures.

8     Q.    Earlier you talked about the webinars that

9    Dr. Leidner held, and I believe you said that you

10    attended them twice.

11     A.    A few times.

12     Q.    A few times, okay.

13          In all of your time with CDCR, you only attended

14    them twice?

15     A.    Right.

16     Q.    And those are the weekly webinars?

17     A.    Weekly webinars.  They were usually scheduled at

18    other times that I had other meetings.

19     Q.    But you or one of your colleagues or someone

20    from your office could have attended -- if you had

21    wanted to ask a question and were available to go, you

22    certainly could have asked questions during those

23    webinars, correct?

24     A.    The webinars, yes.  The webinars were more

25    geared toward data, writing a query, data management,

Kevin Kuich, M.D.                                    September 19, 2019

1    those kinds of things.  So it wasn't at the level of

2    compliance rules or those kinds of things.  It was more

3    -- more operational, more functional, in the meetings

4    that I had been in and had experienced.

5    Q.    And so when you testified today about the nature

6    of the data issues that were resolved during those

7    webinars, you were only speaking to the two -- the

8    several that you attended?

9    A.    Correct.

10   Q.    And I believe your testimony was also that you

11   weren't aware of any -- any reports or information that

12   followed from those webinars, any notices to CDCR staff

13   regarding changes as a result of those webinars.

14   A.    No.  I don't --

15   Q.    Am I -- am I misunderstanding?

16   A.    No.  That's correct.  I don't remem- -- recall

17   seeing on today's webinars these were the things

18   discussed, these were the things resolved, something

19   like that, a minutes per se.

20   Q.    You're not aware of a website where the notes

21   regarding changes in the data -- data issues were

22   available to CDCR staff?

23   A.    No.  The -- all the intranet was never easy to

24   navigate and it -- there were always questions that

25   institutions had about where is something, because it

Page 224

Kevin Kuich, M.D.                                          September 19, 2019

1    was never clear -- in a way that was very easy to access

2    and clear.

3        Q.    How about updates to the EHRS?  How would you

4    get notice of that?

5        A.    Those -- those -- there would be updates on an

6    update page.  And most of those updates, I would be

7    aware of because I was part of the decision to make that

8    change.  If there were any updates that weren't part of

9    a formal process, I wouldn't know whether they made the

10   page or not, so...

11           Also, when CLAC would close out an issue, CLAC

12   would have their own organization-wide -- not mental

13   health specific, but organization-wide -- what do they

14   call them?  Not end notes but something like that, that

15   basically said this is the change and this is what

16   happened.  So there was the larger organizational piece

17   that went out to everybody in CDCR.

18       Q.    Including yourself?

19       A.    Correct.  Correct.

20       Q.    And was that with respect to EHRS only or all

21   data issues that were fixed?

22       A.    EHRS.

23       Q.    I think earlier you testified that the -- you

24   believe that the rule change, the 30 days to monthly or

25   not to exceed 45 days with respect to psychiatry

Page 225

Kevin Kuich, M.D.                                           September 19, 2019

1    contacts, was a result of pressures to make the metrics

2    more generous.  And just wondering what you based that

3    on, if that's speculation, since you weren't aware of

4    the change.

5    A.    I don't know what constituted the change, but --

6    and what the requests were and whether it had any direct

7    impact on the staffing proposal, but I -- I'm still

8    shocked that a change that is an obvious

9    contraindication to what is laid out in the program

10   guide was allowed to go through without vetting.

11   Q.    Are you familiar with Drs. Anand and Jahangiri

12   at CHCF?

13   A.    Yes.

14         THE REPORTER:  Can you spell those?  I'm

15   sorry.

16         MS. ELLS:  A-n-a-n-d, and Jahangiri is

17   J-a-h-a-n-g-i-r-i.

18         THE WITNESS:  Do you have Dr. Anand's first --

19   BY MS. THORN:

20   Q.    Karuna.  Dr. Karuna Anand.

21   A.    Karuna, okay.

22   Q.    K-a-r-u-n-a.

23   A.    I believe she was terminated from CDCR.  Okay.

24   I am familiar, yes.

25   Q.    I'm going to ask you questions now about the

Kevin Kuich, M.D.                                          September 19, 2019

1   discussion you had with Ms. Ells about CLAC.  And I

2   believe you testified that regarding the -- there was

3   the memo regarding the internal change committee that

4   was brought about and -- and can you clarify when that

5   happened?

6    A.    When the memo?

7    Q.    No, when the -- okay.  Strike that.  Let me just

8   get my thoughts.

9         All right.  So with respect to the mental health

10  internal change committee, do you know when that was

11  first initiated?

12   A.    The internal mental health change committee?

13   Q.    Right.  And I believe Ms. Ells called it a

14  subcommittee we were referring to.

15   A.    So the memo that is one of the exhibits here was

16  when it was -- it was a small --

17   Q.    It's an e-mail from Laura Ceballos dated

18  June 2018.

19        MS. THORN:  Exhibit 10.

20        MS. ELLS:  Exhibit 10, yes.

21        THE WITNESS:  So it -- I don't know the exact

22  date of when they started, but it was -- it was

23  shortly after this memo when those subcommittee

24  meetings began to occur.

25  BY MS. ELLS:

Kevin Kuich, M.D.                                          September 19, 2019

1    Q.     But you can't pin it down more closely than

2    that?

3    A.     I would have to access my CDC schedule, which is

4    longer.

5    Q.     Did CLAC originate in mental health or was it a

6    process from CHCCS?

7    A.     It was a CCHCS process, so it was a

8    multidisciplinary process that was begun by Dr. Peterson

9    prior to his retirement.  So it'd been around for quite

10   some time.

11   Q.     Exhibit 11, Exhibit MM from the Golding report.

12   A.     Okay.

13   Q.     I just want to ask you -- I believe you

14   testified earlier that requiring requested changes to go

15   through the subcommittee before it went on to CLAC

16   allowed the massaging of data to show compliance, so I

17   just need to follow up with that statement.

18        MS. ELLS:  Objection.  Misstates the

19   testimony.

20        THE WITNESS:  Yeah, I don't --

21   BY MS. THORN:

22   Q.     You don't recall saying that earlier today?

23   A.     No.

24        It's two different -- the subcommittee addresses

25   changes.  It doesn't address data.  So it's its own

1   separate beast, and they need to be -- although changes

2   to the EHRS affects what data can be pulled, that

3   subcommittee doesn't determine data.

4   BY MS. THORN:

5   Q.    Okay.  So how would the -- then maybe I was

6   confused.  Maybe you could clarify how -- I think maybe

7   you said the EHRS allows massaging of data.  I just want

8   to understand that.  You said -- you used that term, and

9   I want to understand what you meant by that.

10  A.    I would need to understand -- it would be great

11  if I could see what I said.

12  Q.    I'm sorry --

13  A.    I apologize.

14  Q.    I know.  So in your opinion, does the way in

15  which data is entered into EHRS or the way in which data

16  is pulled out and reported allow for the massaging of

17  data?

18  A.    Input equals output.  And so if you design an

19  interface, that's going to give some sense of what you

20  can get out of it.  But beyond that, the -- the ability

21  to -- I mean data is data.  It's just a point.  It's a

22  one.  It's a zero.  It's very discrete.  And so when

23  that data gets put into a database and a query is run

24  based on a rule, that's when there can be unusual

25  interpretations of something that's very discrete and

Kevin Kuich, M.D.                                         September 19, 2019

1    clear.

2    Q.    Is it your testimony that no psychiatrists were

3    part of the subcommittee, the mental health subcommittee

4    for the EHRS changes?

5    A.    No.  Myself and Dr. Golding were on that

6    subcommittee.

7    Q.    Okay.  Were there any other psychiatrists

8    involved in data issues for mental health?

9         MS. ELLS:  Just to clarify the record, I think

10   you may be talking about two separate concepts.  He

11   testified as to the mental health change committee,

12   which he's just clarified is about EHRS.  There is a

13   separate process about data that's not governed by

14   that committee.  Is that your testimony?

15        MS. THORN:  Okay.

16   BY MS. THORN:

17   Q.    So let's talk about resources, psychiatrists who

18   would be involved in looking at data issues for the

19   mental health program.  Was there any dedicated

20   psychiatrist in that role while you were with CDCR?

21   A.    No.  On this -- on the psychiatry -- on the

22   psychiatry side of the house, Dr. Gonzalez and myself

23   would look at data in the reports and those kinds of

24   things that were there.  So we weren't dedicated to

25   that.  We had plenty of other things to do.  But we had

Kevin Kuich, M.D.                                        September 19, 2019

1    an interest in that, and so we did explore the data in

2    that spirit of interest.

3           On the quality management side, there's two

4    psychiatrists that are there.  What they did, I do not

5    know, because they were directed by psychology.  To the

6    best of my knowledge, the one, at least when I left, was

7    working on making changes to the EHRS on behalf of

8    mental health, and the other one had helped with some of

9    the EHRS rollouts.  And then I have no idea what he was

10   tasked to do with that.

11    Q.    Who was that?

12    A.    Dr. Jack Gills was the one that helped with the

13   rollout briefly and then continued his role in quality

14   management.  What he does there, I don't know.  The

15   other is Dr. Jake Adams.  Dr. Adams has an affinity for

16   programming and those kinds of things.  And so when

17   Dr. Cartwright left, Dr. Adams was conscripted to be

18   able to have that higher level of knowledge to create

19   the mental health changes that have passed through the

20   change request process.

21    Q.    And Dr. Cartwright, that's Steven Cartwright?

22    A.    Steven Cartwright, correct, yes, who is now at

23   the juvenile -- whatever that division is.  Department

24   of Juvenile Justice?  I'm not sure.

25    Q.    With respect to the third issue, looking at

Kevin Kuich, M.D.                                    September 19, 2019

1    Exhibit 2, which is the Court's order, Ms. Ells asked

2    what your views were about -- let's see.  Your views

3    about the presentation about the staffing proposals.  I

4    believe you testified that the data was the underpinning

5    rationale of the staffing proposal, so was not going to

6    be addressed.  And so I just wanted to follow up on that

7    and just confirm that you did not see the data that was

8    the underpinning rationale of the staffing proposal.

9    Correct?

10    A.    Correct.

11          As we both experienced with CDCR, there tends to

12    be a flurry of activity and all kinds of things

13    happening, and then -- and then once that issue passes,

14    then we have a moment of calm until the next issue hits.

15    So...

16    Q.    Right.  So that just -- as far as the foundation

17    for your knowledge about the staffing proposals, you

18    weren't -- you didn't have that knowledge.  You weren't

19    involved in the creation of the staffing proposals --

20    A.    Right.

21    Q.    -- so you can't really speak to the data or the

22    reason for the data and the reason for the proposal?

23          MS. ELLS:  Objection.

24          THE WITNESS:  I can speak to my almost six

25    years in CDCR and the constant and relentless ability

Kevin Kuich, M.D.                                    September 19, 2019

1    to try and either hire enough psychiatrists or find a

2    way to not have enough psychiatrists, because they

3    would routinely indicate that that is the last leg of

4    this stool to be able to move out from under this

5    lawsuit.

6    BY MS. ELLS:

7     Q.    Sure.  So I -- I -- I -- that's fine.  I've

8    actually -- so I probably need to clarify my question.

9    I just want to know what your personal knowledge was

10   with the presentation of data for the staffing proposal.

11   So the fact that you didn't even see the staffing

12   proposal.  You said you didn't see the data for the

13   staffing proposal.  You had some input as to that one

14   issue with respect to the after hours staffing piece.

15   And so I'm just trying to clarify, you know, that the

16   statements you made regarding the staffing proposal or

17   the data for the staffing proposal are based on

18   something other than the actual proposal itself.

19         MS. ELLS:  Objection.  I showed him the

20   proposal and asked him to opine on it.

21   BY MS. THORN:

22    Q.    And you didn't see it before today?

23    A.    That was the whole -- I mean, that was the

24   proposal that was there.  I might have seen it before it

25   went out, a week before it went out to the Court, when

Page 233

Kevin Kuich, M.D.                                          September 19, 2019

1    it was all a fait accompli and it was done.  But in its

2    creation, did I have a significant hand and role in its

3    creation and pulling the data and understanding what the

4    data sources are, absolutely not.

5     Q.    And I think you said earlier today that you saw

6    it in October of 2018.

7     A.    Which would have been right before it was

8    presented or close to the time before it was presented.

9    I believe I had a -- I believe Dr. Golding had a copy of

10   it or a portion of it or something that was basically,

11   here it is and this is what's going to be presented, so

12   it was done by that time.

13    Q.    And are you aware that the copy you saw today

14   was not the final version of the staffing proposals that

15   were ultimately negotiated between parties?

16    A.    We never see what goes beyond -- it is a

17   mystery, and we oftentimes read about it in the court

18   documents, whatever happened.  So it's -- it is a

19   process that remains cloaked in darkness for psychiatry.

20    Q.    So you don't have the details regarding the

21   staffing proposal or the data underlying the staffing

22   proposal?

23    A.    Correct.

24    Q.    You don't have any information regarding how

25   CDCR submitted the data -- the staffing proposal to the

Kevin Kuich, M.D.                                    September 19, 2019

```
 1   special master or the Court?

 2    A.    No.

 3          MS. ELLS:  Objection.  The evidence shows that

 4   Melissa Bentz sent it to the special master team.

 5          MS. THORN:  I'm only asking about Dr. Kuich's

 6   personal knowledge, not Melissa Bentz's knowledge or

 7   what she did; just Dr. Kuich's.  That's why we're

 8   here today, so --

 9          MS. ELLS:  Right.

10          MS. THORN:  -- that's all I want to know.

11          MS. ELLS:  His personal knowledge is based on

12   today, me showing it to him for the first time.

13          MS. THORN:  Okay.

14   BY MS. THORN:

15    Q.    With respect to the submission of any data

16   regarding the EOP site contacts submitted to the special

17   master or the Court in 2017, specifically the Katherine

18   Tebrock declaration you looked at earlier, I think your

19   testimony was that you had not seen that before today.

20   Is that correct?

21    A.    Correct.

22    Q.    So you don't know and didn't have any

23   involvement with the preparation of the data provided in

24   that declaration or the submission of the data to the

25   Court or the special master?
```

Kevin Kuich, M.D.                                September 19, 2019

1     A.     Never.

2     Q.     You testified about that you're familiar with

3   the performance report indicator appointment seen as

4   scheduled.  Did you have any information or were you

5   involved with the submission of the appointment seen as

6   scheduled data to the special master or the Court in

7   connection with the staffing proposals?

8     A.     No.  I don't know the data.

9     Q.     Okay.

10          MS. THORN:  That's all I have.

11          MS. ELLS:  I have a couple of wrap-up

12   questions to clarify some questions that Ms. Thorn

13   presented.

14                FURTHER EXAMINATION BY MS. ELLS

15   BY MS. ELLS:

16    Q.    Ms. Thorn asked you if you had access to the

17   business rules for the performance reports, and you

18   testified that you could access that information through

19   a document; is that accurate?

20          MS. THORN:  Objection.  I was talking about

21   the actual performance reports themselves, not the

22   business ones.

23          MS. ELLS:  At one point you asked if he could

24   find the numerator or denominator for those rules

25   anywhere.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Kevin Kuich, M.D.                                    September 19, 2019

```
 1          MS. THORN:  I think I -- okay, I didn't use
 2     that terminology, but it was regarding your access
 3     to -- it wasn't specifically the business rules, but
 4     correct.
 5          MS. ELLS:  Okay.
 6          MS. THORN:  That's fine.
 7     BY MS. ELLS:
 8     Q.    Okay.  Do you ever recall seeing in that
 9     document that you referenced where you said you could
10     look at what those performance reports were based on --
11     do you recall ever seeing in that document anything
12     showing that the timely psychiatry contact metric had
13     been extended to 45 days?
14     A.    It was not something that I would follow on such
15     a regular basis to see it.  And my connection with those
16     compliance rules were really on an ad hoc basis when
17     institutions had a question.
18     Q.    Ms. Thorn asked you if you ever submitted a
19     request for the enhanced data that you testified you
20     needed to do your job properly, if you ever submitted
21     that kind of request to Dr. Leidner.  And you testified
22     that you did not; is that correct?
23     A.    The request of the information that I was
24     looking for to enhance the EHRS psychiatry experience,
25     that was not a -- that request was put forward to
```

1    Drs. Brizendine, Rekart, and Cartwright.  I don't

2    believe that that's the type of data that Dr. Leidner

3    runs, because it really doesn't serve a business purpose

4    in terms of complying with the court order.  He -- his

5    expertise was making sure that we were in compliance

6    with the court order and the program guide.  What I was

7    requesting was almost more of a work study.  And so that

8    would be more something from Cerner or someone that had

9    access to that kind of thing.  So it -- it wouldn't fall

10   in his typical purview, what kind of data he would pull.

11    Q.    And in any event, Dr. Rekart supervises

12   Dr. Leidner, correct?

13    A.    I believe Dr. Ceballos supervises Dr. Leidner,

14   but I -- I...

15    Q.    Let's look at the organizational chart.

16    A.    That, I don't know.

17    Q.    The print is so small, I can't find anything.

18          MS. TRAPANI:  I don't think he's on here.

19   BY MS. ELLS:

20    Q.    Dr. Leidner is below Brittany Brizendine in the

21   organizational chart, correct?

22          Dr. Leidner is not higher than Brittany

23   Brizendine, who is second in command of this department,

24   correct?

25    A.    That would be correct.

1    Q.    Okay.  Yeah.  Actually, could you turn to

2    Exhibit 1.  My colleague here has helped me and found

3    this.  You'll see in the fourth column, second down,

4    "Dr. Leidner."  Do you see him?

5    A.    This is the last page?

6    Q.    Yes, the last, 7 of 7.

7          If I may?

8    A.    Oh, here he is, yes.  Yes, I do see him.

9    Q.    And do you see above him John Rekart --

10   A.    Who he reports --

11   Q.    -- in terms of who he reports to?

12   A.    Yes, you would be correct.  He reports to John

13   Rekart according to this.

14   Q.    And John Rekart then reports to Laura Ceballos,

15   who reports to Dr. Brizendine, according to this

16   organizational chart, right?

17   A.    That's what I see as well.

18   Q.    So Ms. Thorn was asking you a series of

19   questions of when you became familiar with the staffing

20   proposal that was negotiated between the parties in

21   2018.  And you testified, and correct me if I'm wrong,

22   that the first time you recall ever seeing the document

23   that is Exhibit No. 5 was from Dr. Golding right before

24   you understood it was set to be finalized.  Is that

25   accurate?

Kevin Kuich, M.D.                                  September 19, 2019

1    A.    Yes.

2    Q.    And do you recall ever seeing a prior version

3    that was substantially similar to this before that?

4    A.    I couldn't -- these are similar headers, so I

5    couldn't tell what would have been changed if I saw a

6    prior version and how different it was.

7    Q.    Okay.  Do you recall seeing -- let's turn to

8    Exhibit 6, which is the e-mail from Melissa Bentz,

9    September 17th, 2018.  In this e-mail, Ms. Bentz says

10   "Please see the estimated reductions for the revised

11   psychiatry staffing proposals."

12        That's the first line of the e-mail.

13        And then the first line of the last paragraph

14   says "Thus there is a total reduction of 79.0

15   positions."

16        Before -- had you seen this e-mail before today?

17   A.    I don't believe so, no.

18   Q.    Were you aware that CDCR was preparing to cut 79

19   psychiatric positions before you saw this e-mail?

20        MS. THORN:  Asked and answered.  That's what

21   he testified earlier.

22        MS. ELLS:  That he wasn't aware?

23        MS. THORN:  That's right.

24        MS. ELLS:  I don't recall.

25        MS. THORN:  That's what he testified to.

Kevin Kuich, M.D.                                September 19, 2019

```
 1  │ BY MS. ELLS:
 2  │   Q.    Were you aware that the department was proposing
 3  │ to cut 79 total position?
 4  │   A.    I was aware that the department was proposing to
 5  │ cut positions, but I can't specifically say if I was
 6  │ aware that they we were going to cut 79.0 positions.
 7  │ But I was aware that the staffing proposal would have
 8  │ significant psychiatry cuts.
 9  │   Q.    Is this a higher impact in terms of cuts than
10  │ you had understood?
11  │        MS. THORN:  Objection.  Speculation.
12  │        THE WITNESS:  There -- we were told there
13  │ would be cuts.  We didn't know what the cuts would
14  │ be.  And this is a significant -- a significant
15  │ number.  And it could be a number that puts us at the
16  │ magical 90 percent mark.  I don't know.  I'm not able
17  │ to do the math at this time for what our positions
18  │ were then and what 79 positions less would have put
19  │ us at, and if we would meet the bar or not.
20  │ BY MS. ELLS:
21  │   Q.    I'll represent to you that defendants, in their
22  │ filing that attached this document, represented to the
23  │ Court that it would do exactly that, that it would put
24  │ the department in compliance with that 90 percent
25  │ marker.  Does that surprise you?
```

Page 241

Kevin Kuich, M.D.                                         September 19, 2019

1    A.      That does not surprise me.

2    Q.      And in terms of this staffing proposal that

3    we've been discussing, is it correct to say that you

4    have no recollection of asking -- anyone asking you for

5    input on the numbers of reductions of staff in that

6    proposal, except for that conversation with Angela

7    Ponciano about the eight telepsychiatrists?

8    A.      That was -- that eight telepsychiatrists, that

9    was the one that stuck in my head.  And I don't recall

10   any specific meeting about should be this number or that

11   number.  Generally, meetings were, this is what -- you

12   know, this is what's -- this is what we're going to do.

13   Q.      So nobody asked you what you thought, except for

14   that one conversation from Ms. Ponciano?

15   A.      Right, for that particular telepsychiatry.

16   Q.      Now I would like to turn your attention to

17   Exhibit 4, which is the declaration of Katherine

18   Tebrock.  So Ms. Thorn asked you a number of questions

19   about page 9, the chart that we discussed a number of

20   times.  She asked you if you had any idea what the

21   source of the data for this chart was, since you hadn't

22   seen it before.  Do you remember that testimony?

23   A.      I do remember.

24   Q.      Could you flip to page 3 of this same document

25   and look at paragraph 8.  I'll read to you what it says.

Kevin Kuich, M.D.                                           September 19, 2019

1    "CDCR's recent data on treatment to provide to the

2    Coleman class members shows that in many cases, despite

3    an institution staffing vacancy rate, inmates are

4    provided quality treatment at very high compliance

5    rates.  Exhibit 2, attached hereto, sets forth the

6    psychiatry staffing levels by institution for the period

7    August 1, 2016, through January 31, 2017, as well as

8    compliance percentages from the mental health

9    performance report for timely psychiatry contacts,

10   psychiatry continuity of care, and the medication

11   administration process improvement project."

12       Do you understand where the data on Exhibit 2

13   comes from that's page 9 in this chart?  Do you

14   understand where it comes from based on Ms. Tebrock's

15   statement here?

16    A.    Based on that information, yes, I think the

17   assertion of quality of care -- if quality of care means

18   providing an appointment, that certainly could be one

19   interpretation.  Quality of care, I would say is, are

20   you getting better, and our data does not measure that.

21    Q.    In terms of the data that's represented on this

22   chart on page 9 and based on the statement from

23   Ms. Tebrock's declaration here, is it your understanding

24   that the data in this chart, timely psychiatry contacts,

25   psychiatrist continuity of care, and MAPIP measures,

Kevin Kuich, M.D.                                    September 19, 2019

1    come from the mental health performance report?

2            MS. THORN:   Objection.   Lack of foundation.

3    Calls for speculation.   This witness has already

4    testified he hasn't seen this report, this chart, and

5    doesn't know where the data came from or who compiled

6    it.

7    BY MS. ELLS:

8    Q.       You're -- you are familiar with the mental

9    health performance report?

10   A.       Yes.

11   Q.       And you're familiar with the fact that it

12   contains metrics for timely psychiatry contacts?

13   A.       Yes.

14   Q.       Psychiatrist continuity of care?

15   A.       Yes.

16   Q.       And medication administration process

17   improvement project --

18   A.       Yes.

19   Q.       -- data?

20   A.       From the dashboard, yes.

21   Q.       Ms. Thorn had some questions for you about the

22   portion of your testimony where I was asking you about

23   Ms. Ponciano's estimate provided to the neutral expert

24   about how often supervising psychiatrists were providing

25   line staff treatment.   I would like to direct your

1    attention to page 75 of the neutral expert report.

2    That's the internal pagination.  The ECF pagination is

3    80; again, ECF No. 6147.  The last paragraph on this

4    page says that "her chart" -- and that's referring to

5    Ms. Ponciano -- "set forth below, tended to show a very

6    low number of appointments conducted by supervisors,

7    about 149 appointments per week, for the equivalent of

8    1.75 FTE systemwide, assuming 30-minute appointments."

9         And the chart on the following page is entitled

10   "November 2017 through March 2018 psychiatry

11   appointments for CCCMS and EOP."

12        And based on the context of this report, the

13   neutral expert is referring to that data in his

14   discussion about her estimate that 149 appointments per

15   week were conducted by psychiatrists for the time period

16   from November 2017 through March 2018.  149 appointments

17   systemwide in CDCR for all EOPs and CCCs is a low

18   number, right?

19   A.    It is a low number, yes.

20   Q.    Do you have any estimate of how many psychiatry

21   appointments are conducted for EOPs and CCCMS every week

22   total?

23   A.    I don't have an estimate.

24   Q.    Okay.  I'll direct your attention back to

25   Exhibit 4, page 3.  In this exhibit, which is

1   Ms. Tebrock's testimony to the Court in the form of a

2   declaration, at paragraph 6 she provides a chart that is

3   monthly psychiatry to patient contact.  And you'll see

4   on the right-hand column "total appointments 2016."  And

5   the total there is 27- -- or, sorry, 277,877.  Is it

6   your understanding that that -- does that seem about

7   right in terms of the number of appointments that

8   psychiatrists might have performed in 2016, based on

9   your experience?  Does that seem like a reasonable

10  estimate?

11   A.    What I can say is in 2016 is when the EHRS was

12  widely rolled out.  The EHRS rollout was significantly

13  complicated.  And as we know, the scheduling process to

14  be able to pull those appointments was flawed.  And so I

15  suspect that is a lower number than what I would expect,

16  just based on the people not doing the work flow and the

17  scheduling process not working.

18   Q.    So, if anything, this seems like it might be a

19  low number to you?

20   A.    To me, yes.

21   Q.    I'll represent to you that 277,877 appointments

22  divided by 52 for the number of weeks in the month would

23  equate to 5,343, rounding down, appointments with

24  psychiatrists per month in the system -- so per week.

25  About 53,000 per month.  In your experience, does it

1    seem likely to you that only 149 of those appointments,

2    of those 5,300 per week, were provided by supervisors?

3    A.    No, I think that's a low number.

4    Q.    Does it seem very low to you?

5    A.    It does seem quite low.  The -- this was also a

6    time where the inpatient units -- inpatients units are

7    not scheduled, so they had to provide scheduling --

8    what's called scheduling in arrears.  So after they

9    would see the patient, they would have to send a

10    schedule to the scheduler to say they saw them.  Because

11    an inpatient unit, you don't know what you're getting

12    into, you can't plan what your day is like.  It's very

13    variable.  And so that's a huge amount of appointments

14    that didn't get -- that occurred but didn't get into the

15    system because they didn't use the -- how the system

16    wants that entry point to occur.

17          And I know that because that was one of the main

18    reasons why I went down to CHCF PIP, because they

19    weren't entering appointments.  But I know they were

20    seeing patients and I know patients were getting taken

21    care of.  So, again, the system is creating problems

22    with showing what the reality is happening, and that was

23    particularly with scheduling.

24    Q.    And is that in the time frame of 2016 that that

25    chart from Ms. Tebrock's declaration is discussing?

Kevin Kuich, M.D.                                    September 19, 2019

1    A.    2016 -- it would be sometime in July or August

2    when we started the new 2016 rollouts for new

3    institutions.  So as those institutions went online,

4    there were more issues with trying to figure out what's

5    actually happening here.

6    Q.    And so the 2016 numbers in that declaration may

7    not have included a number of inpatient psychiatric

8    appointments in that --

9         MS. THORN:  Objection.  Lack of foundation.

10   Calls for speculation.

11        THE WITNESS:  I would say, based on my

12   knowledge of all the problems that there were in

13   using the scheduling and -- and the -- and my being

14   mandated to personally go down to CHCF PIP to be able

15   to enforce scheduling, I would say yes, that's a low

16   number, definitely, based on inpatient.  And

17   outpatient suffered similar problems, although

18   somewhat less so; but similar problems because you

19   had to use the correct order and the correct place at

20   the correct time to make the correct thing happen,

21   and human beings are less than precise.

22   BY MS. ELLS:

23   Q.    And is that something that -- is that a problem

24   that continued in EHRS after the 2016 time frame that

25   you were discussing?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

1        MS. THORN:  Objection.  Calls for speculation.

2   Lack of foundation.

3        THE WITNESS:  Yes.  The scheduling system was

4   an ongoing problem to get people to check people in,

5   check people out, make sure that they were there,

6   communicate appropriately to the scheduler.  So it

7   was an ongoing issue, as evidenced by the training

8   that was mentioned and all the other kinds of support

9   to make sure that people comply with the scheduling

10  work flow.

11  BY MS. ELLS:

12   Q.   So does it seem likely to you that that problem

13  may have caused an under-accounting of the contacts in

14  Ms. Ponciano's chart that was provided to the neutral

15  expert?

16       MS. THORN:  Objection.  Lack of foundation.

17  And calls for speculation.

18       THE WITNESS:  That certainly sounds reasonable

19  based on my understanding of the EHRS.

20  BY MS. ELLS:

21   Q.   You testified earlier, in response to a question

22  from Ms. Thorn, that Ms. Tebrock asked you to provide

23  data on the frequency of cell side psychiatry contact

24  systemwide.  What did that data show?

25   A.   The request was to look at telepsychiatry cell

 1  side.  And that data showed, in some institutions, up to

 2  50 percent of appointments are cell side.  Because of

 3  such a high number of cell side appointments, that was

 4  the reason why the new equipment was demoed at Stockton

 5  CHCF, because if we had to provide care in that

 6  environment, we at least wanted to do it in a

 7  HIPAA-compliant and as private of a way as possible.

 8  Q.    Were you concerned about the frequency of the

 9  cell side psychiatry contacts by telepsychiatrists that

10  you saw?

11  A.    Significantly so, to try and create a new

12  mechanism to be able to have it as a -- a better

13  experience.

14  Q.    And is it fair to say that if you had more

15  psychiatric -- psychiatrists, that that number of cell

16  front contacts with patients would have been fewer?

17        MS. THORN:  Objection.  Calls for speculation.

18  Lack of foundation.

19        THE WITNESS:  I would say the number of

20  on-site psychiatrists would make a difference, in

21  addition to custody access factors, in addition to

22  physical space, so all of those three things.  But

23  first and foremost would be the number of

24  psychiatrists, because the main reason why we have to

25  do this is we don't have enough psychiatrists.

Kevin Kuich, M.D.                                          September 19, 2019

```
 1              MS. ELLS:  Thank you.  I don't have anything
 2    more.
 3              MS. THORN:  Just two more.
 4                   FURTHER EXAMINATION BY MS. THORN
 5    BY MS. THORN:
 6      Q.    Just going right back to Gibson Dunn report at
 7    page 75 and 76.  You just answered some questions
 8    regarding Ms. Ponciano's analysis that she conducted
 9    after Dr. Golding submitted his report.  Were you
10    involved or did you discuss this analysis with anyone?
11      A.    No.
12      Q.    Have you ever seen this before today?
13      A.    No.
14      Q.    And do you have any information regarding the
15    nature of the data that was compiled to and that's
16    presented in the Figure 11 on page 81 of this report?
17      A.    I'm sorry.  Could you please restate that last
18    question?
19      Q.    Sure.  Do you have any information -- personal
20    knowledge or information about the nature of the data
21    that was compiled to create the table shown at
22    Figure 11?
23      A.    I have no information about how this particular
24    data was pulled.  Understanding the EHRS, I have a sense
25    of how it would have gotten pulled, which allows me to
```

Page 251

Kevin Kuich, M.D.                                            September 19, 2019

1    be able to provide some concern about that there was

2    data there actually to pull, and so it would create an

3    artificially low number.

4      Q.    Okay.  But you don't know actually the request

5    that was made to create the report?

6      A.    No.

7      Q.    And you understand that CDCR has the ability to

8    run ad hoc reports?

9      A.    Yes.

10     Q.    Okay.  And so that would depend on the nature of

11   the query that went in to pull the data, correct?

12     A.    Correct.

13     Q.    And so you don't know what that query was or the

14   underlying data that was pulled to present in this

15   report?

16     A.    That is correct.

17     Q.    You don't know the parameters or whether data

18   was excluded or included, for example, from different

19   levels of care or different programs?

20     A.    That is correct.

21     Q.    Okay.  And then also directing your attention

22   back to Exhibit 4, Ms. Tebrock's declaration.  I just

23   want to confirm -- Ms. Ells showed you a table 3 at

24   page 3 of the declaration, regarding psychiatry -- the

25   number of psychiatry appointments.  And, again, you

Kevin Kuich, M.D.                                    September 19, 2019

1   only -- you didn't have any involvement in compiling

2   this data or presenting this data to the Court in 2017?

3   A.     That is correct.

4   Q.     So you only know from what you're reading in

5   this document?

6   A.     I know from what I'm reading in this document,

7   and I also know what happened in that time frame in

8   2016, which would impact the data provided in this

9   document.

10          MS. THORN:  Okay.  Nothing further.

11          MS. ELLS:  One final question.

12               FURTHER EXAMINATION BY MS. ELLS

13   BY MS. ELLS:

14   Q.     I'm sorry.  This literally is the final

15   question.

16          Turning back to the Gibson Dunn report, internal

17   pagination page 75, ECF pagination 80.  Ms. Thorn asked

18   you if you had any idea what the data query used to

19   produce the data at Figure 11 and discussed in this

20   report was.  In the second-to-last paragraph on page 75,

21   the report says "She compiled the data by manually

22   searching in the system for appointments associated with

23   the name of each supervisor and chief."

24          Is that the kind of ad hoc query that Ms. Thorn

25   was discussing with you?

Kevin Kuich, M.D.                                                September 19, 2019

1    A.      That sounds like that would be an ad hoc query.

2    So that would be --

3    Q.      The problems that you discussed about not all

4    appointments being captured in the system, would that

5    affect the type of query that is run here?

6    A.      Significantly.

7    Q.      Thank you.

8              FURTHER EXAMINATION BY MS. THORN

9    BY MS. THORN:

10   Q.      Again, Dr. Kuich, you only have information

11   regarding this analysis on page 80 of the Gibson Dunn

12   report based on your reading of this today, correct?

13   A.      Page 80?

14   Q.      Right.  What Ms. Ells just read to you -- I'm

15   sorry.  Page 75.  That's from reading this as you sit

16   here today?

17   A.      Correct.

18   Q.      Okay.  Thank you.

19              (Proceedings concluded at 6:35 p.m.).

20

21

22

23

24

25

```
 1   US DISTRICT COURT OF CALIFORNIA

 2   EASTERN DISTRICT

 3

 4                    REPORTER'S CERTIFICATE

 5

 6        I, Angie Diner, CSR No. 9581, Certified

 7   Shorthand Reporter, certify:

 8        That the foregoing proceedings were taken before me

 9   at the time and place therein set forth, at which time

10   the witness was put under oath by me;

11        That the testimony of the witness, the questions

12   propounded, and all objections and statements made at the

13   time of the examination were recorded stenographically by

14   me and were thereafter transcribed;

15        That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17        Further, that a review of the transcript by the

18   deponent was requested;

19        I further certify that I am not a relative or

20   employee of any attorney of the parties, nor financially

21   interested in the action.

22        I declare under penalty of perjury under the laws

23   of the state of California that the foregoing is true

24   and correct.    Dated this 26th day of September, 2019

25   _____
```

Kevin Kuich, M.D.                                      September 19, 2019

1          DECLARATION UNDER PENALTY OF PERJURY

2          I, KEVIN KUICH, M.D., do hereby certify under

3    penalty of perjury that I have read the foregoing

4    transcript of my deposition taken on September 19, 2019;

5    that I have made such corrections as appear noted on the

6    Deposition Errata Page, attached hereto, signed by me;

7    that my testimony as contained herein, as corrected, is

8    true and correct.

9     Dated this _____ day of _____, 20 ____, at

10   _____, California.

11

12   _____

13    KEVIN KUICH, M.D.

14

15

16

17

18

19

20

21

22

23

24

25

Kevin Kuich, M.D.                                    September 19, 2019

```
 1              DEPOSITION ERRATA SHEET

 2    Page No._____  Line No._____

 3    Change:_____

 4    Reason for change:_____

 5    Page No._____  Line No._____

 6    Change:_____

 7    Reason for change:_____

 8    Page No._____  Line No._____

 9    Change:_____

10    Reason for change:_____

11    Page No._____  Line No._____

12    Change:_____

13    Reason for change:_____

14    Page No._____  Line No._____

15    Change:_____

16    Reason for change:_____

17    Page No._____  Line No._____

18    Change:_____

19    Reason for change:_____

20    Page No._____  Line No._____

21    Change:_____

22    Reason for change:_____

23    _____      _____

24     KEVIN KUICH, M.D.                Dated

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

**Exhibits**

**001 - KK**
3:15 16:17
106:19 239:2

**002 - KK**
3:18 19:20,21
22:16 84:22
122:5 204:21
232:1 243:5,12

**003 - KK**
3:20 50:1

**004 - KK**
3:23 54:6 104:6
107:25 211:16,
25 212:20
242:17 245:25
252:22

**005 - KK**
4:2 62:14,22
63:19 78:24
104:4 215:11
239:23

**006 - KK**
4:5 62:16 63:4
73:5 75:13
217:18 240:8

**007 - KK**
4:7 62:18 63:9
74:6 218:16,19

**008 - KK**
4:9 89:21,22
219:24 222:5

**009 - KK**
4:12 144:3,4
153:14 159:9
189:20

**010 - KK**
4:14 152:7
158:3 227:19,20

**011 - KK**
4:16 160:14,15
228:11

**012 - KK**
4:19 183:20,21

**-**

--o0o--
5:11

**1**

**1**
16:17 106:19
145:4,7,17
215:22 239:2
243:7

**1.25**
124:6 210:16

**1.75**
42:19 44:17
245:8

**10**
131:19 152:7
158:3 227:19,20

**10/1/17**
78:25 80:16
216:1

**10/31/18**
63:10

**100**
80:2,6,8 111:11
113:23

**101**
5:3

**10:24**
5:2

**11**
131:19,21
160:14,15
228:11 251:16,
22 253:19

**11:12**
161:2

**12**
183:20,21

**12:50**
88:15

**13**

215:21

**13th**
57:8

**149**
245:7,14,16
247:1

**15**
158:14 185:8

**17**
35:21 51:5
53:18 73:6
84:25

**17th**
11:22 20:1
45:19 50:7
62:23 63:5
84:19 111:16
122:4 129:3
144:19 161:8
184:16 240:9

**18**
113:14 158:2

**18th**
152:13

**19**
5:1 84:25

**1st**
8:10

**2**

**2**
19:20,21 20:7
22:16 84:22
122:5 144:12,22
189:25 204:21
232:1 243:5,12

**2.6**
83:3,5

**2/23/2017**
54:18 104:11

**20**
75:24 76:3 77:8
117:12 192:1,22

**2013**

8:10

**2014**
9:2 16:2

**2015**
110:11

**2016**
89:3,9 98:20
108:6 110:7
115:6,10 118:14
177:11,19 243:7
246:4,8,11
247:24 248:1,2,
6,24 253:8

**2017**
9:8 14:17 42:16
43:25 44:13
54:10 56:17
57:8 58:23
59:25 90:4,17
95:20 97:24
105:1 108:7
110:8 115:8,13
118:14 122:14
146:11 147:24
183:25 184:9,22
186:12,24
187:25 188:6,14
189:18 209:20
210:7 220:1
235:17 243:7
245:10,16 253:2

**2018**
42:17 43:25
44:14 49:18
50:7 62:23 63:5,
17 73:6,19
74:10,15,23
86:12 89:19
144:8 152:13
153:13 158:2
160:20,24 161:3
189:23 190:17
199:20 202:4
209:21 210:7
227:18 234:6
239:21 240:9
245:10,16

**2019**

5:1 8:9,10 20:1
35:21 84:19
120:8,9,24
122:4 190:7

**21st**
95:20 186:24
187:3,9

**22**
220:1

**22nd**
90:4 91:4

**24**
187:25

**24th**
183:25 184:9,22
188:6

**25**
123:19 124:2,4,
14 125:11

**25s**
127:5

**27-**
246:5

**277,877**
246:5,21

**2nd**
144:8 153:13
160:20,23 161:2
189:23

**3**

**3**
50:1 84:23 85:1
95:19 189:24
212:19 242:24
245:25 252:23,
24

**3/30/2017**
104:7

**3/31/18**
79:1 80:16
216:1

**30**
89:4,7,11 90:7

97:17 103:11
108:8 118:16
137:11,17,23
166:10 167:13
225:24

**30-day**
104:21 122:8
137:12 220:7,20
222:4

**30-minute**
245:8

**30th**
54:10 122:14

**31**
94:17 103:11
137:18,23 243:7

**35**
137:18

**3:00**
203:16

**3rd**
190:16

———————
**4**

**4**
54:6 104:6
107:25 211:16,
25 212:20
242:17 245:25
252:22

**405.3**
74:16,25 75:20,
24

**45**
57:16 90:7,24
94:17 98:15
225:25 237:13

**45-day**
104:20 122:7

**46**
179:1

———————
**5**

**5**

46:15,16 62:14,
22 63:19 74:7
78:24 104:4
215:11 218:19
239:23

**5,300**
247:2

**5,343**
246:23

**5.8**
57:14,17 58:8

**50**
21:14 30:25
51:22 179:8
250:2

**52**
246:22

**53,000**
246:25

**55**
57:15

———————
**6**

**6**
62:16 63:4 73:4,
5 75:8,13 83:4,
12,15,16
145:20,24
146:2,3 153:15
217:18 240:8
246:2

**6/29/18**
16:23

**60**
51:16,23 52:16
98:15

**6147**
132:18 171:7
245:3

**65**
136:17

**69**
132:16 171:8

**6:35**

254:19

**6th**
5:3

———————
**7**

**7**
62:18 63:9 73:4
74:6 75:8
145:21 146:1
159:8 218:16,19
239:6

**7-A**
145:4,7,17

**70**
136:17

**74**
132:3,17 171:8

**75**
245:1 251:7
253:17,20
254:15

**76**
251:7

**79**
73:23 74:2,24
75:14,24 240:18
241:3,18

**79.0**
240:14 241:6

———————
**8**

**8**
89:21,22 219:24
222:5 242:25

**80**
245:3 253:17
254:11,13

**81**
251:16

———————
**9**

**9**
54:15 104:8
144:3,4 153:14

159:9 189:20
211:18,25
212:20 213:2
242:19 243:13,
22

**9/17**
112:18

**90**
79:12,15 204:2,
15 241:16,24

**90-day**
205:25

**94**
81:9

**95**
46:14 81:8
178:24

———————
**A**

**A-N-A-N-D**
226:16

**a.m.**
5:2 161:2

**AA**
50:5

**ability**
36:9,23 42:9
52:6,9 69:24
70:2,5 92:21
93:21 99:2
100:23 102:5
112:23 121:9,
16,18,20,24
123:15 124:19
125:24 126:20
128:4,8 140:9,
19 151:20
157:18 162:21
175:14 192:25
194:21 229:20
232:25 252:7

**absence**
36:13 49:14
208:7

**absences**

207:4,5

**absent**
24:16

**absentia**
102:22

**absolutely**
36:20 45:23
97:22 140:25
166:14 234:4

**abuses**
124:7

**academic**
43:22

**accelerated**
86:4

**accept**
173:5

**acceptable**
128:3

**access**
42:3 87:1,2,12
92:25 97:7
140:13 182:5,8,
9,10,15,18,20
183:5,12,17
186:6,7 188:5,
22 189:17,24
190:8 193:21
194:1,6,7,20,23,
25 225:1 228:3
236:16,18 237:2
238:9 250:21

**accessed**
185:24

**accessing**
186:18

**accommodate**
7:16

**accompli**
76:25 234:1

**accomplish**
82:12

**account**

78:12

**accountable**
180:6

**accounting**
94:20 103:20

**accuracy**
37:18 47:5
113:9

**accurate**
13:4 18:1 19:9
26:12,13,18,19
27:19 28:14
33:2,4 38:1,7
39:10,14,15
42:21 48:10,11
50:18,20 52:10
55:22 56:14,25
58:7 62:24,25
68:19,20 69:11
70:6 72:12,13
75:3,7 91:13
94:1,2 96:3,6,7
97:15 105:18
106:3,20
114:24,25
115:3,11,12
127:20,21
128:19 129:5,6,
15 130:13
133:5,15,16,18
143:25 144:1
151:2,3 156:1
179:3,14 180:9
186:20,21
187:12 189:12
190:3 201:23
208:10 236:19
239:25

**accurately**
6:5 30:2 41:12
46:2 57:17
77:17 113:6,24
114:4,13 136:4
161:13 190:12,
16

**achieve**
64:10 80:6

**achieved**
81:12

**acknowledge**
111:25

**acknowledging**
173:9

**acronym**
13:2

**acted**
87:21

**acting**
20:12,15 84:25
85:4

**active**
13:10 64:22

**activity**
232:12

**actual**
45:5 62:5
109:15 121:19
129:16 197:18
233:18 236:21

**acumen**
162:8

**ad**
45:2 60:13,16
135:22 158:25
222:14 237:16
252:8 253:24
254:1

**Adams**
231:15,17

**adapt**
172:7 174:21
184:24

**adapted**
21:3 138:9

**adapting**
110:19

**add**
72:16 107:16
117:8 188:8

**added**

14:23 47:19
72:21,23 117:16

**addition**
15:10 106:16
124:17 149:3
250:21

**additional**
6:19 15:4 25:21
48:10 53:12
58:1,16 59:9
65:19 72:20,22
82:2 117:8
122:9 123:19,20
124:12 182:20
186:18 195:3
199:9 203:3

**address**
12:6 42:7 47:3
71:19 88:24
121:22 123:19
127:6 143:14
146:18 148:24
154:8 180:3
183:3 228:25

**addressed**
113:11 146:9
150:9 171:18
184:15 186:24
189:17 191:12
232:6

**addresses**
61:18 228:24

**addressing**
198:2

**adds**
73:18

**adequate**
27:22 32:23
33:24,25 34:1
46:4,21 59:5
60:1 65:12,14
203:2

**adequately**
62:1 71:13

**adherence**
114:18

**adjustments**
64:12

**administers**
120:19

**administration**
11:5 17:10
193:8 196:4
243:11 244:16

**administrations**
193:8

**administrative**
170:13,15
207:19,21
209:9,10

**administrator**
134:19 140:22

**admits**
89:9

**admitted**
89:3 177:11

**adopted**
173:16,17

**advance**
66:19 67:13,20
94:25 115:9
151:14 160:2

**advocated**
141:24

**affairs**
127:6

**affect**
36:22 45:16
223:1 254:5

**affecting**
110:13

**affects**
162:20,21
168:23 229:2

**affinity**
231:15

**affirmatively**
14:15 90:3,20
169:6

**afternoon**
194:1

**agenda**
67:2

**agendas**
66:3 67:16

**agent**
193:5

**aggregate**
98:9

**agree**
52:15 97:20
105:3 133:17
206:21

**agreed**
90:23

**agreement**
191:15

**agreements**
33:10

**ahead**
8:20 12:4 22:19
24:9 30:20
35:24 43:2
45:21 50:10
53:20 64:13
65:2 90:7
102:19 129:5
153:3

**aligned**
112:25

**alike**
122:2 162:17

**all-parties**
199:18

**allegations**
190:17

**allegiance**
118:10

**allegiances**
118:7

**alliances**
169:25

allocate
27:5 154:18

allocated
54:22 63:16
74:9,15,25
75:20 76:3,17
77:9

allocation
27:23 36:4

allocations
68:16 72:21

allowed
29:18 112:9
141:21 142:17
160:12 179:23
226:10 228:16

allowing
65:14

alternative
174:12

amazing
192:21

amazingly
76:11

ambiguity
83:16

ambiguous
61:23 88:11
133:20 139:8
156:12

ambulatory
79:23 130:4

ambush
201:12

amount
25:9 71:8 88:3
104:13 109:11
110:19 131:4,5
136:13,14
161:22 164:19
185:15 207:24
247:13

analysis
42:14,16,25

72:4,6 91:6
209:20 210:1,2,
7,13,21,24
251:8,10 254:11

Anand
226:11,20

Anand's
226:18

and/or
85:6 97:19
125:21 131:9

Andrew
118:1

Angela
42:15 200:24
202:17 242:6

ANGIE
5:4

angst
49:8,10

announced
99:11,14,24
100:13

announcement
102:12

announces
75:14

annual
65:10

annually
60:23

anomaly
183:1

anticipations
174:9

anymore
175:6 205:7

APA
12:10

apologies
44:21 154:15
166:17

apologize
25:7 41:7 88:8,
11 90:5 229:13

apparent
168:12,18
202:20

apparently
137:7 148:25
151:23 172:5
206:3

appearance
32:16,19 136:23

appeared
5:6 209:23

appears
52:11 55:1

appointment
44:9 83:14 98:5,
14 109:17,22,23
129:11,20,25
130:1,17
131:10,16,18
132:24 133:1,
12,13 134:8,10
135:13,19
136:5,6 137:17,
19,20,22
138:13,14,15,
16,17 139:5,6,
14,22,25 140:4,
8,12,17,18
142:7,8,15,18,
20 166:16,18,20
167:23 168:5
176:5 177:7
181:12 186:2
190:11 191:3,21
236:3,5 243:18

appointments
20:10,11 32:10
42:18 43:19
44:16 46:23
88:21 89:11
98:13 108:15
127:17 135:4
136:20,21,24
140:24 141:9

146:19 165:3
171:10,12
173:21 175:24,
25 176:24
177:12,14,16,20
178:6,24 179:1
190:13,23
191:23 197:1
245:6,7,8,11,14,
16,21 246:4,7,
14,21,23 247:1,
13,19 248:8
250:2,3 252:25
253:22 254:4

apprised
94:21

approach
34:4 86:2 174:1,
6 179:16

appropriately
70:3 166:24
168:14 249:6

approval
168:22

approved
148:8,12 157:22
159:1 168:23
169:11,13
205:19

approving
46:17 56:8

approximately
8:19,25 14:6
91:2 178:23

April
57:8 108:7
110:8 115:8,13
118:14

areas
122:16 204:7

argument
104:1

arrears
247:8

articulated

32:8 84:24

artificially
252:3

asks
85:2

aspect
15:3 79:24
114:2

assemble
199:5

asserted
59:1

assertion
243:17

assess
62:1

assessment
27:19 205:25
211:11

assigned
25:4

assimilated
197:4

assistance
112:5

assistant
207:20,21

associate
147:12 175:2
189:2

associates
13:16

assume
188:4 216:15

assuming
56:25 80:21
218:14 245:8

assumption
181:16 216:18
217:16

assurance
35:4 36:18

Kevin Kuich, M.D.                                                September 19, 2019

assurances
39:10

assured
38:20 39:2

Atkins
51:10,14,18,25
52:8

attached
50:5 87:18
152:13 215:17
241:22 243:5

attaching
63:20

attempt
121:16 123:5

attempting
161:14

attempts
187:1 188:2

attend
53:1 101:24,25
102:11,12,23

attendance
196:22

attended
48:3 53:2 109:6
196:2 223:10,
13,20 224:8

attendee
195:18

attending
99:12

attention
23:19 108:23
149:9,10 215:11
242:16 245:1,24
252:21

attitudes
183:10

attorney
5:15,20,23

atypical
85:18,22

audience
100:11,12 107:1

auditing
62:3

August
8:10 110:12
160:20,23 161:2
243:7 248:1

authority
52:9

authorized
169:15

automate
167:14

automatically
168:5

automation
168:10

avenue
97:14

average
83:1,14,20 84:8

aware
15:19 25:3 27:1,
25 41:19 58:17
64:7 76:22
77:14 89:12,14,
15,18 102:20
103:5 105:4
106:5,9 107:19
108:4 110:5
115:21 118:16,
23 119:5,12
141:8,12,14
149:22 165:23
171:9 177:23
188:12,20
191:21 210:21
220:19,25 221:1
224:11,20 225:7
226:3 234:13
240:18,22
241:2,4,6,7

awareness
87:8

**B**

back
13:13 24:11,13
25:11 37:12,13
68:13 69:21
70:11 92:16,17,
20 93:11 94:22
97:16,21 98:1,
10 108:8 110:8
115:4,8,14,15,
20,25 118:16
119:4 121:12
135:16 139:2
153:10,13
156:10 157:5
171:5 175:9,14
186:11 195:16
213:2 245:24
251:6 252:22
253:16

backfill
206:23

background
7:20 11:23
134:3 137:8
139:16

ball
32:1 49:8

bandwidth
166:1

bar
241:19

bare
47:18 62:7,9

barriers
51:1

based
30:14 39:11,21
43:2,4 62:10
70:23 80:20
81:17,21 82:15
86:18 104:23
115:3 127:19
157:12 167:8
183:8 199:4
202:24 211:1,3,

4,6 218:1
222:16 226:2
229:24 233:17
235:11 237:10
243:14,16,22
245:12 246:8,16
248:11,16
249:19 254:12

baseline
60:22

basic
37:18 197:21

basically
60:24 95:12
112:6 124:5
130:25 137:9
156:22 172:19
187:19 225:15
234:10

basis
18:16 24:20
27:7 29:15,21
69:17 81:11
94:8 104:1
106:23 121:23
122:23 138:3
202:15 208:17
211:10 218:7
237:15,16

Bay
48:20

Beach
8:2

bear
103:22

beast
229:1

began
227:24

begin
141:21 145:3

beginning
141:15 145:9

begins
64:9 133:8

134:1

begun
228:8

behalf
231:7

behavior
39:11 162:17
172:7

beings
248:21

believed
150:18

beneficial
183:15

benefit
162:16

benefits
21:19

Bentz
62:22 63:4,20
73:6,16,18
74:11 215:16
218:3 235:4
240:8,9

Bentz's
75:13,19 235:6

BHRS
149:12

bias
140:16

BIEN
5:3

big
41:10

bill
135:17

billed
135:20

billing
143:2

binders
179:21 181:8

bit
9:23 41:15 43:8
61:3 68:21
121:16 161:17
187:6 193:24
204:3 223:6

bits
195:3

bizarre
126:14

blaming
109:9

blank
128:13

blanking
25:6 172:13,16

blew
175:5

blind
64:6

block
122:22 185:14

board
10:1 15:4

bodies
43:16

body
124:5 126:23

bona
151:16,19

bones
47:18

bookmark
194:10

bookmarked
194:9

books
8:8

boondoggle
125:12

booth
12:11

boots
37:15

bottom
16:22 74:16
85:2 136:19
186:23

box
125:24 130:6
142:5,13

boxes
142:6 143:7

brain
84:14

breadth
173:11

break
7:14,17 48:5,6
88:12,14
127:11,12
175:19,20

breaks
7:13

briefly
231:13

briefs
59:1

bring
9:25 15:4 33:24
113:2 114:22,25
141:19 164:17
193:7

bringing
13:22 41:8
125:1 155:13

Britt
186:14

Brittany
186:25 238:20,
22

Brizendine
40:8 66:15 97:9
125:2 150:23
186:15,16,25
187:14,22 188:2

189:1 238:1,20,
23 239:15

Brizendine's
112:4

broader
126:20 138:8
181:5

broken
154:23

brokering
119:20

brought
32:12 41:6,25
42:3 71:3
111:21 140:17
148:11 149:9,10
151:17 152:1
156:19 158:4
172:20 223:4
227:4

Brown
5:15

budgetary
67:7

bugs
99:17 147:24

build
146:14 148:1,21
169:21,23 172:3

building
13:17 123:11
146:13 169:18
183:5

built
13:23 137:7
146:9 149:1,14
150:3,14 168:23
169:2,25

bunch
195:6

burden
45:10

business
89:10 93:14,16,

17 97:25 98:19,
22 99:12 102:17
103:10 104:13
108:6 115:20
119:8 221:21
236:17,22 237:3
238:3

busy
69:25 72:3

buy-in
165:24

_____

C

C-E-R-N-E-R
169:17

C-L-A-C
148:9

calculated
42:19 83:10

calendar
90:24 134:11
139:15

California
5:4,6 8:4,14

Calipatria
216:8

call
49:7 69:23
71:16 76:13
99:20,22 100:3,
22 147:13 155:8
198:5,6 203:22,
24,25 204:1
208:19,22
225:14

called
5:8 48:14 52:3
56:11 57:10
65:1 66:4 79:6
80:15 81:1
127:15 128:14
130:4 135:4
144:8 175:25
207:10 215:21
227:13 247:8

calling
12:7 28:2 29:22
48:23 71:18

calls
29:14 30:18
37:15 38:10,12,
18,20,21 48:9,
12,17 49:2,3
71:1,13,23,24
72:1 81:19,25
82:21 83:8 85:9
86:14 88:20
100:17,19,20
101:1,6,11,13,
24 102:3,6,11,
16,25 104:15
105:21 107:22
119:10 126:8
133:21 135:9
139:9 142:22
150:12 170:9
178:10,17 179:6
180:18 191:7
192:3 244:3
248:10 249:1,17
250:17

calm
232:14

canceled
173:22

candidate
12:9,13,14,15

candidates
125:16,17
221:13

capable
110:15

Captherian
205:17

Captherian's
205:21

capture
112:24 142:18

captured
41:12 46:23
254:4

captures
    81:1

Cara
    5:19

carbon
    64:6

card
    205:19

care
    9:12 15:21
    20:20 22:11,12,
    23 23:7,14,22,
    24 25:9,16
    26:12,18,24
    33:7 35:2,10
    43:13 45:7
    49:14 56:15
    59:5 60:1 68:16
    77:8,18 78:1
    79:10 81:23
    91:20,24 92:3,4
    109:16 140:23
    161:19 205:9
    210:15 243:10,
    17,19,25 244:14
    247:21 250:5
    252:19

Cartwright
    186:18,24 188:3
    231:17,21,22
    238:1

cascade
    168:2

case
    5:16 19:25
    24:23 39:11

caseload
    124:25

cases
    243:2

category
    181:5

caused
    25:12 36:7 78:4
    249:13

causing
    34:5

CC'D
    90:1

CCC
    60:10 135:21
    222:13

CCCMS
    42:17 44:16
    79:1,11,16 80:2,
    17 81:3,10
    216:1,22
    245:11,21

CCCS
    245:17

CCHCS
    160:2 228:7

CCHES
    120:18,20
    121:15

CCR
    177:11 183:7

CDC
    228:3

CDCR
    6:12 8:12 9:1
    10:1 12:23
    13:16 20:18,25
    22:24 25:8,11
    26:24 27:3
    30:16 52:24
    55:13 59:3 63:1,
    21 64:3 65:1,5
    73:11,19 76:22
    86:10 89:3,9,25
    90:1,14 96:8
    99:4 108:10,22
    113:19 120:18
    122:6 123:2,7
    124:3 126:14
    136:19 138:13
    139:3 149:3
    152:11 160:19
    173:24 179:17
    190:10 192:9,10
    195:19 205:11

208:12 219:2
    221:24 223:13
    224:12,22
    225:17 226:23
    230:20 232:11,
    25 234:25
    240:18 245:17
    252:7

CDCR's
    63:14 75:14
    111:4 177:16
    178:21 243:1

Ceballos
    99:10 112:2
    116:6,7 118:22
    129:7,21
    132:20,22
    134:20 143:17
    150:22 151:23
    152:10,15
    171:9,17
    173:19,24 197:7
    227:17 238:13
    239:14

cell
    41:8 42:1 60:16
    109:17,21,22,23
    140:18 219:15
    249:23,25
    250:2,3,9,15

cells
    42:2

center
    146:8,22,24
    147:6 153:22
    154:22

Centinela
    216:8

central
    25:6 48:19

CEO
    48:21

Cerner
    13:15 139:2
    142:25 146:12
    147:12 148:14,

15 149:4,14
    174:15 185:20
    187:5 238:8

Cerner's
    147:15 169:17

Certified
    5:5

certs
    199:24

chain
    121:9

chaired
    172:25

challenges
    143:20

chance
    90:10

change
    6:22 34:8 44:1
    89:13,14,16,18
    90:6 92:25
    94:12,20 95:1,
    23 96:4,6,9,18,
    22 97:16 98:23
    99:11,13 100:1,
    12 103:8,10,21
    105:2 107:21
    108:6 110:7,13
    111:5 112:9
    115:10 119:1,2
    120:11,15,25
    121:3 126:3
    146:7,12
    148:10,13
    151:25 152:4
    154:18 155:9
    156:22,23
    159:6,11,19
    160:5,21 161:18
    162:6 163:21
    168:22 169:14
    172:7 175:1,10
    179:17 183:3
    190:18 192:21,
    23 193:5,6,7
    218:14,15
    220:19 221:4,

11,19,21 222:2,
    5,9 225:8,15,24
    226:4,5,8 227:3,
    10,12 230:11
    231:20

changed
    18:12 28:8
    33:19 89:9 91:3
    92:19 93:12,15
    95:3,4,8,21 96:1
    97:20,25 98:1,
    19,22,24 102:13
    104:25 106:7
    108:7,8 115:6,8,
    14,15,20,24
    119:4,7,8
    143:18 159:3
    172:7 177:11,15
    179:22 223:1
    240:5

changing
    129:15 155:25

channels
    156:18

characteristics
    62:11

characterize
    133:17

charge
    37:21 56:3
    149:15 150:7
    181:2,11,25

chart
    16:25 17:2,24
    18:9 54:17
    55:18 56:13,16
    57:9,13 59:2,3
    60:18 74:7,18
    78:23,25 80:2,
    14,17,18 81:8
    82:5 83:1,22
    104:8,19
    105:10,14,15
    106:19 122:12
    238:15,21
    239:16 242:19,
    21 243:13,22,24

244:4 245:4,9
246:2 247:25
249:14

**chart's**
56:23

**CHC**
120:18

**CHCCS**
228:6

**CHCF**
8:14 9:10 49:17
50:9 220:3,5,21
221:8,12,16
222:25 226:12
247:18 248:14
250:5

**check**
130:3,6,7,8
249:4,5

**check-in**
44:22 136:10

**check-out**
44:23 136:10

**checkbox**
128:11

**checked**
82:6 94:9 131:9,
14,19,20,21,22
134:5,6,12
142:6

**checking**
46:22 130:15

**checks**
129:23 133:9
134:2

**chief**
7:23 9:5 11:3
14:13,20 16:3,6,
9 17:3,8,10,11,
19,21 25:10,25
27:4,13,15,24
32:14 35:11,25
36:6 40:25 41:1,
21 48:22 51:11
52:2,4,7,23

61:10 65:9
66:10 74:5
106:23 126:10
176:18 202:11
205:15 253:23

**chiefs**
18:25 27:8
35:13,17 43:12
51:16,23 52:16
53:3,15 57:5
99:21 211:4

**choice**
138:10

**choke**
42:7

**choosing**
201:6

**chose**
138:7

**chosen**
29:4

**chronic**
207:5

**circle**
68:13

**circumscribed**
39:9

**circumspect**
85:24 87:5

**circumstance**
35:16

**cite**
209:22

**CLAC**
148:9 150:24
153:7,10 155:9,
22 156:4,14,16
157:15,18,22
158:1,4 159:18
160:2 164:21
165:8,12,14
169:13 225:11
227:1 228:5,15

**CLAC-APPROVED**

169:23

**clarification**
28:25

**clarified**
230:12

**clarify**
28:1 108:1
160:21 193:18
216:3 227:4
229:6 230:9
233:8,15 236:12

**Clark**
172:14,15

**class**
5:15 81:3,10
243:2

**classifications**
74:22

**clean**
149:7

**clear**
66:2 67:2 83:14
94:18 102:10
103:10 114:7
118:6 119:14
121:12 125:5,6,
7 137:24 155:18
160:6 164:12
208:4 225:1,2
230:1

**clicks**
131:5

**climb**
167:5

**clinic**
50:9,23 51:1,2

**clinical**
14:3 62:6,8
64:22 77:8
121:17 159:6
162:8 170:20

**clinically**
167:17 168:14

**clinician**

167:16 207:1

**clinicians**
14:8

**clipped**
189:21

**cloaked**
234:19

**close**
106:12 137:12
180:5 197:20
225:11 234:8

**closely**
92:11 228:1

**closer**
178:25

**CMS**
216:16

**co-run**
116:6

**code**
139:12,13

**coded**
37:4

**codified**
160:9

**coding**
208:2

**cohesive**
127:3

**coincidental**
110:17

**Coleman**
5:15 13:10
19:25 63:6
113:1 114:11
175:5,17 179:19
180:1 181:9
184:2 243:2

**collaborated**
38:25

**collaboration**
13:8 127:2

**collaborative**
15:13 34:4
128:6

**colleague**
67:11 239:2

**colleagues**
21:21 223:19

**collecting**
215:4

**colors**
84:13

**column**
16:24 56:12,14
74:14 105:17
239:3 246:4

**combined**
199:6

**comfort**
11:6

**comfortable**
94:6

**command**
189:3,4,9
238:23

**commencing**
5:2

**comment**
67:25

**committee**
143:18 148:8,
10,12 150:25
151:4 152:1,2,3,
24 155:10,14,17
156:4,10,13,16,
20 157:6,19,23
158:12,15,17,
19,20 159:11,
12,24 160:5,9,
21 162:14
163:5,13,14,25
164:2,18 165:16
227:3,10,12
230:11,14

**committees**

9:21 162:11
164:4

common
22:4 26:9,20,22
31:2,9 36:14
39:13,17,21
40:20 45:13
48:20 92:23
95:24 130:14,20
178:2,4 191:23

commonalities
185:1

commonly
48:12 67:12,15,
16,18,19,22,23,
24 130:18

communicate
128:9 249:6

communication
21:2

communications
76:6

company
10:5

compare
126:18

comparison
209:1

competing
150:8

compiled
197:11 212:7
216:13,25 244:5
251:15,21
253:21

compiling
253:1

complain
38:3

complaining
114:8

complete
21:12 32:23

58:4 70:3

completed
62:5 77:12
79:25 80:1,4
129:11 130:1
133:1,13

completing
112:8

completion
32:13

completion'
90:25

complexity
21:9

compliance
32:20,23 33:1
54:18,25 57:1
62:2 82:7,15
90:6 104:10
106:3 113:11
114:5,9 136:14,
23 137:8,9,10,
14 139:17,21
148:6 166:7
167:15 211:21
222:8,22 224:2
228:16 237:16
238:5 241:24
243:4,8

compliant
93:10 98:14
106:8 108:25
168:19 221:11

complicated
45:2 67:8 75:11
108:13 117:19,
23 135:12 136:1
138:1 139:1
141:16,17
166:23 167:7
168:11 172:4
246:13

complied
197:4

comply
59:4 60:1

109:11 219:13
249:9

complying
238:4

component
143:2 146:18

components
47:19 183:2

composed
151:7

composition
152:24

computer
194:10

comradery
127:1

conceivable
83:11

concept
69:3

concepts
230:10

concern
32:7,16 39:7
49:11,12 65:12
70:22 84:24
96:11 103:22
107:2 113:9
124:10 162:13
189:16 201:20
202:25 204:7
252:1

concerned
107:13 157:2
162:10 180:13
250:8

concerningly
110:23

concerns
21:11,23 41:5
53:9 70:9,10
77:16,22 78:11
87:13 88:1
97:12,14 112:15

113:2 123:22,25
124:7 125:3
151:17 180:14
184:19

concert
98:2

concluded
210:13,14
254:19

conducive
128:3

conduct
26:17

conducted
42:18 44:16
245:6,15,21
251:8

conducting
38:18 106:23

conference
195:20

confident
29:20 40:1,2,10,
13,18 145:6,16
181:24 182:1

confidential
60:15

confined
128:12

confirm
55:22 95:18
105:9 206:9
232:7 252:23

confirming
6:9

conflict
124:19

conflicts
88:2 119:16
125:3,21

conflictual
117:24

confused

229:6

confusing
154:20

connection
85:15 102:4
197:10,17 236:7
237:15

conscripted
231:17

considered
79:15

consistent
88:25 91:5
94:13,15 105:1,
2 212:16

consolidation
159:10

constant
53:23 86:22
138:5 232:25

constantly
108:10

constituted
226:5

consultation
9:15 111:20
213:10

consultations
24:15 58:20
213:6

consulted
65:3,23 68:14
83:24 86:8

contact
11:1 21:25 22:5
25:20 53:23
79:13,14,16
105:5 108:24
115:5 118:15
125:7 126:4
188:24 216:15
220:20 237:12
246:3 249:23

contacted

11:8 12:11
21:15 26:11
95:18,20

contacting
27:11 107:11

contacts
53:21 56:12,14
60:7,14 78:25
79:6,10,17 80:3,
16,22 81:1,2,9,
13 82:13 83:2
97:24 104:14,22
105:17,19,24
106:6,8 110:1
115:7 122:7
215:22 216:1,21
218:12 220:7
226:1 235:16
243:9,24 244:12
249:13 250:9,16

contained
217:24 218:6

contend
108:22

contends
136:19

content
33:12

context
6:19 40:3,4
41:7,25 77:20
84:10,13,16
88:8 96:15
113:10 114:21
140:5 141:18
146:13 195:15
196:17 217:3,8,
11 245:12

contingent
135:11

continually
192:19

continue
29:18 117:8
122:25 175:22

continued
16:1 21:2 27:13,
16 47:20 231:13
248:24

continues
132:20 159:10

continuing
15:7

continuity
243:10,25
244:14

contract
12:22 53:25
90:22 211:8

contracting
10:6,7

contractor
12:22 123:12

contraindication
226:9

contrast
78:16 126:19

contribute
102:2 205:8

contributed
64:20

contributing
80:11

control
118:17 119:6
167:16 177:17

controlled
153:16,23,24

controls
131:8

convention
12:11

conversation
40:1,2 65:15
68:22 70:19
78:18 188:19
213:5 242:6,14

conversations
21:11 40:10
41:16,20 175:9
203:20

conveyed
40:6 119:24

convoluted
137:25

coordinating
206:18

copied
73:8,9,11,14

copy
64:6,15 93:2
132:11 197:18,
22 234:9,13

Corcoran
180:12

core
35:7,8

correct
6:10,11 8:6
10:22 12:24
14:12,17 15:10,
18 16:4,10
18:14,17,20,25
22:7,8,9 23:10,
11,15 24:24
25:1,17,18 26:9
28:13 30:23
31:7 32:5,6
35:19 38:2,19
48:25 52:14
55:16,18,19,21,
24 58:14 59:21,
22 61:7,16 63:2,
3 66:11,16 68:6
69:12,15 70:11
73:3 74:12
75:16,17,21,22
78:7 84:3,17,19
86:18 88:8 89:8
95:2 100:15
101:20 102:14
103:1 106:4,17
107:8,9 110:2
116:13 118:12

120:1,2,4,8,9
121:1 131:12
137:4,5 147:7
149:19,20
155:23 156:1,2
158:7 159:14,20
163:7 168:24
169:2,3 170:17
186:8 188:7
190:20 196:9
197:19 198:4
200:8,21 210:12
212:18 213:19
216:1,2,6,9
217:22,23
220:4,9 221:5,6
223:23 224:9,16
225:19 231:22
232:9,10 234:23
235:20,21
237:4,22
238:12,21,24,25
239:12,21 242:3
248:19,20
252:11,12,16,20
253:3 254:12,17

corrected
190:10,15

Correction
8:14

Corrections
8:4

correctly
19:4 79:12
95:14 106:14
173:18 180:11

correlation
44:9

cosigning
46:16

counsel
6:10,12,14
131:25

count
43:13 62:4

counted

120:1,2,4,8,9

45:4,5 89:12
109:25 165:5
171:11 173:23

counterparts
23:17

counting
106:8

couple
50:11 78:20
101:7,23 163:24
236:11

court
6:5,7 19:17
20:3,7,14 47:3
50:6 54:10
62:21 63:10
74:3 77:3,5
84:17 85:2,6
86:2,5 87:10
88:18 104:7
105:6 122:3,12,
13 127:14
144:10 184:2,3
190:24 191:4,19
197:10 233:25
234:17 235:1,
17,25 236:6
238:4,6 241:23
246:1 253:2

Court's
11:22 12:2
22:15,16 84:18,
23 85:10 190:22
196:25 232:1

courtroom
7:5

cover
49:13 204:10
206:24

coverage
65:7,13 68:18
207:7

covered
185:25

covers
75:18

create
104:1 127:1,2,3
128:2,8 140:20
166:16,17 168:1
183:6 185:16
212:7 216:14
231:18 250:11
251:21 252:2,5

created
103:19 168:10
174:20 216:23

creates
121:25 123:17

creating
121:4 128:12,
14,15 247:21

creation
216:19 232:19
234:2,3

credentialing
9:22

crew
142:2

crisis
68:16 198:3

crucial
39:8

Cucamonga
17:9

culture
86:23,24

cumbersome
130:11 171:22

curious
92:9 215:5

current
7:21 182:24
193:8 219:11
222:11,16

custody
33:24 121:9
250:21

cut

65:5 74:24 76:3,
17,23 77:14,16,
23 240:18
241:3,5,6

cuts
78:2,3,16,17
85:23 241:8,9,
13

CVSP
216:9

_____

D

daily
18:16 24:20

darkness
234:19

dashboard
33:19 49:15
109:3 112:20
244:20

data
31:10 32:4,9,11,
12,25 33:1 37:1,
12,20,22,23
38:1,3,7,25
39:3,5,9 41:12
42:16 43:17
44:1,5,13,22
47:6,8 56:13
57:21 58:7
78:16 80:17,23
83:24 84:4,5,11,
12 85:14 87:13,
18 91:6 92:23,
25 94:1 95:13
97:5,6,7,8,9,13,
23 98:12 99:4,
23 100:10
101:14 102:6
104:20 105:5
106:12 107:3,
21,23,24 112:24
113:4 114:2,10,
17 115:3 119:6,
7,17,18 120:16,
20 121:7,10,17,
18,23 122:11,17
131:15 134:14

135:7 141:20
153:18,19
162:22 178:6,13
179:13,16,20,
21,24 180:3,8,
15,16,24 181:3,
4,5,7,8,12 182:6
183:12,17
186:18 187:1,
10,23 188:2,4,5,
8 189:17,19,24
190:4,8 191:2,9
193:22,23
194:3,14,20,21,
23,24 195:10,16
197:3,8,11,16
206:8,12,14,15
208:1,3,5,9,13,
15,18 209:2,5
212:6,14
216:13,25
217:1,9 218:1,3
219:22 223:25
224:6,21 225:21
228:16,25
229:2,3,7,15,17,
21,23 230:8,13,
18,23 231:1
232:4,7,21,22
233:10,12,17
234:3,4,21,25
235:15,23,24
236:6,8 237:19
238:2,10 242:21
243:1,12,20,21,
24 244:5,19
245:13 249:23,
24 250:1
251:15,20,24
252:2,11,14,17
253:2,8,18,19,
21

database
93:1 195:6
229:23

databases
87:3 95:14

datas
194:24

date
19:25 40:12
77:3,5 96:15
104:10 130:12,
13 134:5
138:14,18,19,20
160:23 165:4
199:6 227:22

dated
50:6 54:18
62:23 63:5 73:6
90:4 144:8
152:12 153:13
183:25 220:1
227:17

dates
12:1 92:22
136:20

day
120:5 121:8
124:4,18 129:20
131:20 133:11
134:6 137:13,18
140:15 152:19
162:19,20 168:4
184:8 185:6
220:14 247:12

day-to-day
11:24 186:3

days
79:12,15 83:2,3,
5,15,20 84:8
89:4,7,11 90:7,
24 94:17 97:17
98:15 103:11
108:8 118:16
137:11,13,18,23
166:10 167:13
197:24 225:24,
25 237:13

dead
157:4

deal
153:19

dealing
12:18 13:22

dealings
161:23

dealt
153:18

December
89:3,9 95:8
98:20 104:25
108:6 110:7
115:6,10 118:14

decide
156:10

decider
116:8

deciding
159:5

decision
11:16 17:9,12
27:22 65:16
192:8 202:23
203:5 225:7

decision-making
62:8

decisions
67:3 69:4 115:1
149:22 151:12

declaration
54:11 59:3
104:5,6 235:18,
24 242:17
243:23 246:2
247:25 248:6
252:22,24

decorum
164:7

decreasing
136:23

dedicated
27:17 230:19,24

deep
98:7

default
130:8

defaults

130:5

**defendants**
5:21,23 24:2
74:23 104:18
191:25 241:21

**Defendants'**
54:12,14 63:11

**deference**
67:11

**deficit**
159:25

**define**
28:18 39:18
183:13

**defined**
20:8,14 177:13
191:23

**definition**
177:17 190:10,
15 222:16

**delayed**
27:20 37:2
208:2

**deliver**
35:2

**delivery**
64:11

**demand**
80:13

**demoed**
250:4

**denom-**
84:9

**denominator**
31:10,15 32:9,
19 78:5 93:19
121:13 178:8
222:23 236:24

**dental**
110:20,21 151:8
192:18

**dentist's**
172:16

**departed**
120:23

**department**
8:4 16:5 18:21,
23 29:2 39:19
120:17 147:20
151:5 178:14
190:6 231:23
238:23 241:2,4,
24

**department's**
169:19 179:16

**depend**
252:10

**depending**
37:4,6 60:8

**depends**
11:5

**depiction**
50:19,20 56:15
68:19

**deploy**
15:16 19:6

**deploying**
13:6 15:23

**deployment**
34:21

**deponent's**
24:6

**deposition**
19:11,13,18
203:8,11,13
204:5,8,13

**depositions**
6:2

**Depot**
204:2

**depth**
173:11

**deputy**
17:25 18:2,3
119:13 125:3
189:2

**describe**
9:9,16,23 13:5
14:20 23:1
28:15 32:7
127:25 146:16
147:22 163:24
164:2 184:19
200:14

**describes**
134:20

**describing**
24:22 212:25

**design**
13:1,7,12
110:25 174:8,19
185:16 229:18

**designed**
111:25 124:11
129:13 133:5,
24,25 137:25
139:1 141:17
166:10,15,16,17

**designing**
20:23 127:25
128:10,20

**detail**
6:23 93:21
107:15,17 136:8
142:16 185:25

**detailed**
60:21 71:21
86:17 87:5
182:15

**details**
78:5 109:15
131:3 138:22
201:23 202:8
234:20

**determination**
62:6

**determinations**
154:7

**determine**
28:11 37:5 39:1
72:5 92:5 137:8

152:4 154:17
167:17 207:7
229:3

**determined**
65:17 150:3
151:1 153:1
196:14 201:19
202:14,21

**determining**
10:10 201:9

**detriment**
29:9

**developing**
64:17 181:2,11

**development**
65:4 127:20
129:2

**diagnoses**
175:3,15

**dictate**
97:11

**difference**
250:20

**difficult**
23:16 58:4
108:10,11
143:23

**difficulties**
59:15 60:12,13
139:3

**difficulty**
110:19 154:4

**diluted**
117:16

**DINER**
5:4

**direct**
9:12 33:7 107:6,
8 145:20 209:15
226:6 244:25
245:24

**directed**
231:5

**directing**
252:21

**direction**
11:17 18:4
22:15 29:16
36:1 118:21,25
147:16 151:24
152:16 159:2

**directives**
36:3

**directly**
12:11 18:6
64:16 106:20
139:11

**director**
17:25

**disability**
11:13 208:6

**disabled**
37:9

**disband**
119:15

**disbanded**
124:8

**discipline**
110:20

**disciplines**
151:8 156:25
160:3 170:20
172:20,23
173:15

**discourage**
140:16,19

**discouraged**
164:25

**discouraging**
163:17

**discover**
93:14 221:20

**discovered**
91:2

**discrete**
229:22,25

discuss
13:3 21:23
65:10 78:20
88:7 102:1
107:12 159:16
251:10

discussed
20:5 40:14 61:3
66:18 67:3,13,
20 68:22 73:5
77:12 102:17
118:13 122:13
137:1 168:19
169:7 170:19
196:16 199:23,
25 202:2 224:18
242:19 253:19
254:3

discussing
21:4 77:24 78:2
84:23 86:11
104:9 122:3
150:5,6 153:15
159:12 171:17
190:24 192:8
198:17 242:3
247:25 248:25
253:25

discussion
28:8 31:13
39:25 49:15
53:7 65:6,9,20
69:5 70:5 71:10
99:17 102:3
125:9 157:12
163:15 164:11
165:23 187:13
201:1,3 202:11
203:12 215:2
220:6 227:1
245:14

discussions
13:17 18:9 21:8
41:22 42:5
53:11 64:23
77:11 99:5
114:20,21
147:12 152:22,
23 201:13

202:9,10

disheartening
163:16

distinct
125:6

distinctly
188:18

distracted
204:3

distribution
119:9

district
54:10 63:10

dive
86:17 98:7

divided
246:22

division
16:21 63:14
74:7 221:15
231:23

doctor
48:8 50:21 51:7
61:14 88:17
132:11 135:15,
18 136:17
144:22 159:13,
21 161:6 171:8
175:22 191:21
192:7 205:17

doctors
99:4,8

document
16:20 19:24
54:9,16,21
55:11 56:9 63:9,
14 65:24 73:7,8,
9,11,16,18
78:23 85:1
132:18 136:17
142:9 144:7,14
152:10,13
159:19 161:12
171:5 183:25
209:25 211:14

218:22,24 219:9
236:19 237:9,11
239:22 241:22
242:24 253:5,6,
9

documentation
13:19 66:18
69:14 82:4
128:8 171:22

documented
44:10

documents
19:15 54:5
62:13,22 67:19,
23,24 86:5 95:6
103:23 204:16,
19 234:18

downsides
21:21

draft
214:5,6,10,12
215:1

dramatic
175:17

dramaticness
77:22

drastic
92:19

draw
215:11

drawn-out
147:14

drill
194:12 222:12

drive
111:4 121:6

driving
121:5

drove
111:5

Drs
98:11 153:10
226:11 238:1

DSM-5
174:22,23
175:15

dual
121:6

due
24:18 92:22
119:16 177:16,
22

duly
5:8

Dunn
204:22,25 205:3
221:2 251:6
253:16 254:11

duties
9:9,17,20 14:20
24:4 25:23
30:15 31:3 33:7
35:9 36:18,22
39:14,23 58:18
116:9 206:22
207:3 213:16

dysfunctional
175:13

**E**

e-mail
50:4,10,18
51:10 62:22
63:4,20,22,25
64:2,4,6 73:5
74:12 75:13,19
89:25 90:8 91:4
93:24 95:19,21
105:1 130:22
144:7 150:6
152:10 153:13
160:18,22,23
161:9,10,12
163:25 183:24
184:8,11,15,20
186:9,10,22,23
187:9 189:21
208:19 215:16
217:25 218:6
219:25 227:17

240:8,9,12,16,
19

e-mails
49:1,3,6 50:4,6
90:12

e.g.
133:10

eager
173:3

earlier
6:24 25:19
26:14 32:8
36:25 45:13
48:8 52:19 61:3
90:5 104:9
122:4 194:19
205:10 206:4
208:1 209:19
211:19 212:13,
17,25 215:20
221:18 223:8
225:23 228:14,
22 234:5 235:18
240:21 249:21

early
150:1 214:5,6

easier
157:21 180:21

easy
60:10 221:15
224:23 225:1

ECF
74:7 132:3,13,
16,18 136:16
171:7 245:2,3
253:17

edict
153:1

effect
113:5 180:13

effective
15:12 64:11

effectively
128:18 164:24
175:3

13

effectuate
163:21

efficiency
86:21

efficient
15:12 34:24
64:10 185:17

efficiently
128:4,18

effort
88:3 109:14
131:5 172:5

egregious
152:18,20

EHRS
9:7 13:3,6,7,15
14:19 20:24
21:3,6,9,17,19
23:3,20 26:6
43:5,19,23 44:4,
5,14,21 45:2,3,
14,17 46:5,20
47:2,11 48:4
53:22 79:23
82:3 103:18
110:10,15,19,25
111:22,24
112:23 116:9,18
118:3,4 121:7
127:25 128:20,
21 129:2,10,13,
23 130:21,24
131:11 133:1,5,
23 135:20
137:4,5 138:17
141:10,23
143:15,23
144:9,18 146:17
147:5,18 150:8,
19 151:1,8
152:1 153:7,20
154:1 155:25
159:16 161:14
163:11 165:21
168:22 169:9
170:13,19,21
171:13 184:23
193:24,25

206:20 211:5
213:17 225:3,
20,22 229:2,7,
15 230:4,12
231:7,9 237:24
246:11,12
248:24 249:19
251:24

elbow
21:7

electronic
13:2 127:18
192:12

electronics
13:1

elements
64:25 128:16
174:8 177:6
181:8 187:18
196:13 203:12

elevate
188:21

elevated
188:12

elicit
24:5 71:25 97:9

Elise
5:22 193:15

Ells
5:12,13,14,25
12:3 16:19
19:23 22:17,18
24:5,8,11,21
25:2 28:19
30:19 33:5
35:23 36:16
43:1 44:11
45:20 46:11
47:5,23 48:7
49:24 50:3 51:6
53:19 54:8 55:7
56:1,5,22 57:7,
24 58:6,12
59:17 61:25
62:12,20 66:22
67:9 74:1 75:2,

6,12 78:19
80:24 81:7,16,
20 82:9,22
83:21 84:21
85:10 86:7
87:11 88:12,16
89:20,24 100:18
101:3,17,22
104:17 106:1
108:1,3 112:13
113:7 117:1
118:9 119:22
120:6 126:16
127:13 129:4
132:2,5,8,10
133:22 135:24
139:19 140:3
143:12 144:6,21
150:16 152:9
156:14 157:13
160:13,17
161:11 170:10,
16 173:7
175:19,21
178:12,20
179:10 181:1,18
183:23 184:18
189:15 191:20
192:6 193:11
196:24 200:9,16
201:18 202:5,19
203:14,15,20,22
204:4 206:11
209:19 210:2,8,
12 212:3 214:20
215:13,20 216:3
217:5 218:2
220:22 222:1
226:16 227:1,
13,20,25 228:18
230:9 232:1,23
233:6,19 235:3,
9,11 236:11,14,
15,23 237:5,7
238:19 240:22,
24 241:1,20
244:7 248:22
249:11,20 251:1
252:23 253:11,
12,13 254:14

Ells'
193:19 211:2

embedded
186:9

embraced
180:19

emerged
87:8

emergencies
34:22 71:20

emergency
29:2 30:11
71:18 168:4

employed
126:11

employees
10:2

employer
7:21

employment
125:5 163:23

enable
182:24

enacted
18:13

enclosed
63:14

enclosures
62:23 64:9

encoded
185:20

encompassed
14:22

encompasses
181:7

encompassing
62:9

encounter
103:18

encourage
94:4

end
45:10 70:12
71:24 94:22
137:25 145:3
148:2 172:12
174:25 216:20
225:14

ended
14:18,19
125:11,17

endless
171:20

energy
97:11

enforce
248:15

engage
123:3 192:13

engaged
130:21

engagement
106:13 147:15
158:24

engaging
10:2 13:17
206:18

enhance
31:25 237:24

enhanced
20:10 88:21,23
237:19

enjoyed
192:17

ensure
34:17 62:7
85:25

entail
203:13

enter
132:25

entered
43:20 229:15

entering

Kevin Kuich, M.D.                                                          September 19, 2019

247:19

**entire**
17:21 42:20
44:17 47:1
65:13 68:18
99:3 192:14

**entitled**
16:20 54:10,17
63:1,6,10 64:10
78:23,25 104:9
160:20 245:9

**entry**
247:16

**enumerated**
145:17

**environment**
127:7 162:19
250:6

**envisioned**
142:12

**EOP**
20:10 42:17
44:15 49:23
50:24 79:1
88:21,23 89:11
90:6 91:17,19,
22 92:7,8 97:24
103:12 104:14,
21 106:7
108:10,11,12,16
110:13 135:21,
22 166:11
199:23 216:1
220:7,20 235:16
245:11

**EOPS**
60:12 124:16
245:17,21

**equals**
229:18

**equate**
246:23

**equipment**
123:16 250:4

**equivalent**

42:19 71:5
124:6 245:7

**era**
43:24 112:23

**error**
154:3 177:23
185:4

**errors**
178:22 179:2
190:14

**essentially**
17:16 76:25
188:21 205:20

**established**
42:23 85:13

**estimate**
30:14,21,24
43:7,9 51:22
52:12,15,19,21
61:5 69:21
70:20 72:2
244:23 245:14,
20,23 246:10

**estimated**
44:15 178:21
240:10

**estimation**
120:15

**evaluate**
50:25 88:23

**evaluated**
33:14

**evaluating**
35:18

**evaluation**
49:23 71:6,21
109:25

**evaluations**
213:13

**evaporated**
88:5

**event**
136:11 238:11

**events**
108:19

**eventually**
25:11 72:20
112:4 113:12,21
125:2 149:23
154:25 156:7

**evidence**
57:21 220:23
235:3

**evidenced**
249:7

**Ewa**
8:1

**exacerbation**
145:15

**exact**
227:21

**EXAMINATION**
5:12 193:13
236:14 251:4
253:12 254:8

**examined**
5:9

**exceed**
225:25

**Exceeds**
111:15 112:17

**Excel**
92:24 113:17

**excessively**
136:1

**exchange**
161:13

**exclude**
191:23

**excluded**
31:11 252:18

**excludes**
190:13

**exclusion**
178:21

**excuse**
47:15 54:23
71:11 80:10
81:8 95:18
96:17 112:7
119:7 138:14,16
160:19 182:11
188:5

**excused**
23:6

**executed**
126:1

**executive**
19:12 20:6
204:22 221:3

**exhibit**
16:16,17 19:20,
21 22:16 49:24
50:1,5 51:3,8
54:6 62:14,16,
18,22 63:4,9,19
73:5 74:6 75:13
78:24 84:18,22
89:20,21,22
104:4,6 105:3
106:19 107:25
122:5 132:9
144:2,3,4,11,17,
19 152:6,7,14
153:14 158:3
159:9 160:14,15
171:6 183:20,21
184:1,14 189:20
204:21 211:16,
19,25 212:20
215:9,11
217:18,22
218:16,19
219:24 222:5
227:19,20
228:11 232:1
239:2,23 240:8
242:17 243:5,12
245:25 252:22

**exhibits**
73:4 75:8
104:24 213:21
215:6,7 227:15

**existed**
103:5

**existing**
25:22 103:6

**exit**
119:13,25

**expand**
20:22 44:20
192:13

**expect**
43:12 56:21
246:15

**expectations**
113:1

**expected**
67:25

**expedient**
191:18

**experience**
33:6 36:7,22
37:2 43:4 46:3
72:14 81:11
160:4 161:14
163:2,4 164:14
169:10 170:4,11
173:11 180:9
206:4 211:3,5,6
237:24 246:9,25
250:13

**experienced**
154:3 224:4
232:11

**experiences**
22:22 118:6

**expert**
19:13 20:5
42:14 98:12
99:10 129:7,22
132:2 136:15,16
171:7 210:6
244:23 245:1,13
249:15

**expert's**
129:8 209:21

Kevin Kuich, M.D.                                                    September 19, 2019

expertise
238:5

explain
11:23 37:3
41:14 50:21
60:5 123:9,24
162:5

explicit
36:1

explicitly
96:20 199:11

explore
231:1

express
53:4 150:17

expressed
88:1 143:22
180:2 202:25

expressing
49:10 78:11
184:20

Exquisitely
20:21

extended
237:13

extensive
45:24 127:18
207:5

externally
148:14 169:16,
17

extra
45:10 123:4
124:4

———————

F

fabulous
162:2

face
177:14 180:22

facet
114:14

facility

8:14 51:12

fact
26:11 87:4
107:7 134:7
136:9 138:24
139:17 178:25
218:12 220:22
221:8 233:11
244:11

factor
82:19

factors
177:16 250:21

factual
209:6

factually
86:18

failed
121:14

failure
150:18

fair
12:10 27:5,22
164:16 250:14

fairly
31:9 92:22

fait
76:25 234:1

fall
12:2 36:6 89:19
146:11 147:24
238:9

false
121:25

familiar
20:15,18 22:10,
12,21 23:1 55:3,
8,10 57:10 79:5
135:3 136:25
137:1 175:24
180:4 195:24
197:3,11,13
213:22 218:24
226:11,24 236:2

239:19 244:8,11

familiarity
197:2

fashion
72:17 191:18

fault
34:3

favorable
111:11 178:14,
19

feasible
69:3

February
9:2

federal
50:6

feedback
34:19 117:6
148:3 214:15

feel
7:13 21:24
46:20 97:12
109:8 121:13
126:3 147:17
152:20 174:4
181:19 193:2

feeling
7:8 143:22

felt
21:22 114:8
122:15 152:17

fence
111:9

fewer
77:8 122:21
180:24 250:16

fide
151:16,19

field
10:14,16,20
39:22 43:5 60:3,
6 73:2 113:16
117:6 130:18,20

141:5 153:25
154:23 176:17
206:19 207:8
209:3

figure
93:11 131:7
248:4 251:16,22
253:19

filed
50:6 54:9 55:20
63:9 77:4 87:9
104:7 106:6
122:12,13
132:17,18 144:9
184:2

filing
57:22,23 202:24
241:22

fill
11:17,18 17:13
24:16 52:17
126:5

filled
30:8 63:16 74:9

fills
51:14

filtered
106:15

filtering
106:16

final
51:7 85:21
122:22 197:21
234:14 253:11,
14

finalized
239:24

finally
129:24 146:11
149:14

find
27:7 38:12 52:7
91:23 111:7
156:9 157:21
163:10 173:1

175:14 182:25
185:24 201:22
219:18 221:7
222:13 233:1
236:24 238:17

finding
167:22

fine
155:4 157:10
167:2 191:14
195:9 233:7
237:6

finish
193:2

finished
9:7 116:8

finite
125:24

fire
166:10,15,18
167:8

firm
203:20

fit
102:8 128:24

five-month
42:20 44:17

fix
34:3 42:7
141:23 142:17
163:12 165:7

fixed
114:3 225:21

fixes
155:20

fixing
174:1

flag
93:23 182:25
183:12

flaw
134:13

flawed

27:21 37:2
208:2 246:14

flexibility
172:9 174:7

flip
63:12 104:8
242:24

Floor
5:4

flow
21:10 45:2
100:1 128:3,6,
16 129:14 167:1
168:14 171:21
175:16 246:16
249:10

flowed
95:14

flows
128:9

flurry
232:12

focal
115:17

focus
91:17 92:9
196:15

focused
15:11 21:6
176:20

folks
108:12 111:23
136:2 223:5

follow
142:3 166:25
168:15 228:17
232:6 237:14

follow-questions
193:18

follow-up
187:4,19

Folsom
76:10

fond
221:17

foot
20:25

footnote
113:4 114:12,
19,20 212:15,
19,22

foremost
34:16 250:23

forgot
6:23 52:3

form
6:13 19:1 37:14
143:10 159:18
171:22 197:21
246:1

formal
125:9 159:19
171:13 207:3
225:9

formally
18:13,19 130:16
139:23 141:10
142:19 146:19
147:8 165:4
173:22

format
53:10 92:24
199:7 219:5,6

formatted
131:2

forms
13:21 122:12
128:10,14
211:10

formula
93:12

forthcoming
198:19

fortunate
125:15

fortunately
93:20

forward
29:19 32:1
46:19 53:10
86:19 96:24
149:8 151:14,18
159:18 175:10
191:11 201:21
205:9 237:25

forwarded
184:11,21
186:10 188:1

found
27:19 94:9 96:4
175:4,10 203:4
207:10 239:2

foundation
42:22 44:3 55:6,
25 56:4,18 57:3,
20 58:9 59:7
73:25 75:1,5,9
78:14 80:19
81:4,14,24
82:20 83:7 85:8,
13 100:16
101:2,10 104:16
105:22 119:11
120:3 126:7
135:8 142:23
150:11 170:8
178:9,18 179:5
181:15 191:6
192:2 232:16
244:2 248:9
249:2,16 250:18

Foundational
22:17

founded
86:25

four-day-a-week
124:22

fourth
239:3

frame
12:17 13:6 15:3
22:12 27:10
37:12 40:24
41:2 43:17,22,

25 44:1 58:23
59:12,13 75:19
79:11 81:2 83:4
86:3 91:16 93:3,
6 98:13 105:5
108:25 109:7
110:10,18
111:14 115:7
137:21,23
141:22 150:5
153:9,14 165:17
176:25 196:15
247:24 248:24
253:7

frames
40:23 98:5
134:25 135:1

Francisco
5:4

free
21:22,24 22:1
181:19 196:19

freeform
128:13

freely
100:1

frequency
33:11 49:5
58:22 122:7,8
249:23 250:8

frequent
26:3,5 49:5,6

frequently
41:9,11,24
48:15 219:18,21

Fresno
15:4

friendly
135:13

front
124:20 162:11
167:12 175:17
211:16 250:16

fruition
143:19

frustrated
125:13 145:15
192:19

frustrating
163:19

frustration
150:17 180:2

FTE
124:6 245:8

FTES
42:19 44:17
210:17

fulfill
117:24

full
124:6

full-time
124:3 205:6,7
206:20

fully
29:9 60:9,10
85:20

function
35:7,8 46:22
57:19 58:18
61:22,24 70:25
71:2 111:24
131:11 133:24,
25 162:15

functional
224:3

functioning
123:11 143:6

functions
17:16 24:4 29:6
30:9 34:11
45:16 78:10
133:24 135:6

---

G

GALVAN
5:3

game
29:13

Kevin Kuich, M.D.                                                          September 19, 2019

gaps
  30:8

gatekeeper
  157:15 162:16
  168:25 169:1,8,
  10,14

gather
  7:14

gathering
  52:4

gave
  164:24

geared
  223:25

general
  5:21,23 36:4,5
  91:9 123:16
  128:7,16 138:9
  154:5

generalities
  204:8

generally
  40:21 53:15
  66:2,13,14,17
  77:10 80:5 97:4
  118:22 179:12
  196:5 214:16
  242:11

generate
  219:4

generous
  110:8 226:2

gestation
  52:6

get-go
  141:15

Gibson
  204:22,24 205:2
  221:2 251:6
  253:16 254:11

gifted
  93:21

Gill

58:19 61:5,8

Gills
  231:12

Gills'
  213:5

give
  6:23 7:9 30:24
  87:23 105:12
  129:19 131:25
  135:14 141:4
  179:12 187:8
  229:19

gladly
  87:19

glance
  84:5

glove
  41:21

gobsmacked
  223:2

Golding
  16:8,12 18:3,15
  19:2 40:20,22
  49:17 50:5,8
  66:9 77:21 90:1
  95:20 96:12,16,
  17,24 97:19
  98:11 107:14
  115:16 117:4,22
  136:15,19 137:2
  138:12 144:7,9
  150:22 160:18,
  22 178:21
  183:24 184:9,
  12,20,21 188:12
  189:21 196:6
  197:22 198:15
  201:3,15
  205:14,18,19
  214:17 219:25
  228:11 230:5
  234:9 239:23
  251:9

Golding's
  50:18 52:12
  119:4 144:13

152:14 171:10
  184:1 186:10
  190:17 213:22,
  23

Gonzalez
  89:25 90:13
  91:5,9 92:15
  93:20 95:17
  96:24 97:19
  98:3,6,11
  107:14 115:16
  176:15 219:25
  230:22

good
  5:14 29:23
  138:20 148:16
  157:1 193:2
  219:20

goodness
  168:1

governed
  230:13

Grammatical
  214:16

granular
  186:3

granularity
  141:1

grateful
  125:15 220:14

great
  50:16 84:6,8
  123:4 180:25
  217:11 229:10

green
  33:20 34:9 84:6
  109:2,13,14,20
  110:4 111:13
  217:11

Greg
  16:13

grid
  222:12

ground

6:1 15:17 26:6,
  21 37:16 42:2,
  11 43:16 59:25
  82:3 114:5

group
  38:21 40:3,13
  114:21 117:15
  120:19,23 121:4
  127:3 159:17
  199:18

groups
  185:1

grown
  117:3

GRUNFELD
  5:3

guaranteed
  169:1

guess
  85:2 90:5 146:1
  201:16

guesstimate
  30:17

guests
  196:6

guidance
  222:15

guide
  59:4 60:2 79:9
  88:22 89:6
  94:14,15,18
  226:10 238:6

guidelines
  167:18

_____

        H

H-1B
  10:3

habit
  92:16 93:18

half
  51:16 52:16,20
  207:22,23

halfway
  78:22

hand
  18:3 19:16
  41:21 43:14
  128:20 144:2
  234:2

handed
  62:21 152:18

handling
  110:15

hands
  180:25

handwriting
  144:13

hanging
  149:5

haphazard
  127:9

happen
  18:11 23:3 26:3
  41:22 60:25
  94:19 109:10
  112:9 125:10
  130:20 137:22
  139:22 142:15
  143:7 148:13
  153:2 157:16
  164:18 180:24
  189:9 206:3
  248:20

happened
  29:4 40:14 52:5
  79:14 92:18,20
  93:11 94:22,23
  103:22 129:16
  136:11 137:18
  142:11,18
  146:10 162:4
  168:1 177:25
  180:1 188:18
  190:3 199:1,6
  217:20 219:18
  225:16 227:5
  234:18 253:7

happening

25:17 31:14
39:22 41:11,24
42:4,6 45:1
47:12,14 48:4
49:4 60:3 82:16
93:1 111:6,8
112:21 114:4,5
118:19 121:22
124:8 138:23
149:6 154:2
180:10 196:18
232:13 247:22
248:5

**happy**
6:18 28:25
136:6 173:13
192:24 205:8

**hard**
83:10 103:9
174:21

**harder**
109:16 174:14

**hat**
202:16

**hats**
94:4 102:5
209:11

**Hawaii**
8:2,3

**head**
6:6 14:15 90:3,
20 105:11 169:6
201:11 242:9

**headed**
118:11

**header**
74:15

**headers**
240:4

**headquarter**
11:7 19:1 39:18
40:5 100:25
103:2 111:18
207:22 209:12

**headquarter's**

179:14

**headquarters**
8:21 13:25 14:3
16:12 18:24
20:19 26:23
31:6 39:12,16
45:25 56:2
63:24 64:1,3
67:14 72:23
73:10 90:13,19
96:21 110:6
111:14 112:16
115:24 116:2,14
163:3 176:14,16
179:24 180:8
181:4,5 207:14,
20,25 209:14
220:2

**headquarters'**
66:10 180:16

**heads**
103:13

**health**
8:14 11:3 13:2
14:7 16:21
17:25 23:18
32:2 35:11,13,
17 36:1,6 48:22
54:13,17 63:15
64:3,11 65:10
68:9 72:15
73:13 74:8 77:6,
15 87:14 97:3
99:21 104:9
106:10 110:22,
24 113:18,20
115:22 116:2,3,
4 117:7 119:15
120:16 121:13
122:15 127:18
128:6 130:25
138:6,25 140:16
141:16 143:18
146:10,11,13,
22,24 147:6,11
148:18,19,23
149:2,12 151:5,
9,13,22,24
153:22 154:5

155:14,16 156:4
157:8,9,15
158:5,8,9
159:11 160:4,20
161:15 165:11
166:22 170:2,4,
12,24 171:1
173:2,10,12
174:24 181:22,
24 182:6
183:16,17
192:17,20 193:4
195:19,25
198:11 201:14
202:12 205:12
211:20 225:13
227:9,12 228:5
230:3,8,11,19
231:8,19 243:8
244:1,9

**health's**
138:10 169:20

**healthcare**
7:23 16:21
63:15 74:8
120:20

**hear**
20:4 26:10 49:8
127:15 221:8

**heard**
115:16 120:12,
22 159:18 160:2
163:21 190:18

**hearing**
88:4,6 164:13,
16 178:1 185:2

**heart**
221:17

**heavily**
56:20 101:13
110:25 124:9
126:11 168:11

**heavy**
152:18

**held**
8:11,12 106:11

141:9 165:3
172:25 173:21
180:6 195:19
223:9

**helped**
182:20 231:8,12
239:2

**helpful**
50:12 155:19
165:25 177:8
186:19

**helping**
9:21,22,24,25
91:6

**helps**
205:8

**hereinafter**
5:9

**hereto**
243:5

**herring**
187:7

**hey**
130:23 134:10
149:4 157:2
187:10,14,19
217:11

**He's**
95:10

**high**
58:10 60:17
61:2 67:6 71:7
82:7,17 142:1
243:4 250:3

**higher**
46:18 56:20
231:18 238:22
241:9

**highest**
28:12

**highlights**
57:10

**highly**
32:17 58:25

99:1 164:25

**HIPAA-COMPLIANT**
250:7

**Hippocratic**
33:9

**hire**
233:1

**historically**
124:1

**history**
97:10 221:17

**hit**
174:15

**hits**
148:2 232:14

**hoc**
45:2 60:16
158:25 237:16
252:8 253:24
254:1

**hold**
18:12 60:25
132:13 139:2

**home**
123:14 204:2

**homogenous**
183:7

**hope**
99:1 155:18
167:21 191:13
206:1

**hopeless**
164:25

**horizon**
192:23

**hospital**
205:7

**hour**
5:2

**hours**
201:17 233:14

**house**

158:4 165:11
230:22

housing
9:14

HR
37:20,22 208:1,
3,10,12,13

hub
15:4 123:10
199:24

hubs
14:25

huge
166:24 174:23
247:13

hugely
183:14

human
27:20 36:25
37:4,6,13
121:21 162:3
209:2 248:21

hundreds
80:22

hung
152:18

hunt
141:4

hurried
86:1

hypothesized
143:8

---

I

I-P-O-C
161:19

iceberg
163:1

idea
162:12 175:8
231:9 242:20
253:18

ideally

34:9

identification
16:18 19:22
50:2 54:7 62:15,
17,19 89:23
144:5 152:8
160:16 183:22

identified
11:21 88:18
114:1 127:14

identify
25:7 183:3
206:2

III
184:1

ilk
53:24

imagine
165:17 191:16

immediately
143:7

impact
99:7 115:2
124:21 125:22
152:23 155:11
157:3,7 175:15
223:6 226:7
241:9 253:8

impacted
124:18

implementation
54:14 111:1
124:10 174:22

implemented
118:17 143:24
175:16

implementing
51:1 64:22

implored
117:4

importance
93:22

important

6:4 34:11 96:25
99:5 146:15
148:6 150:18
160:7 162:6
166:7

impossible
160:1

improve
86:20,23 157:19
222:15

improvement
93:5,7 243:11
244:17

in-person
71:5

inability
38:4 221:10

inaccurate
121:18 135:2
178:23

inappropriate
86:13 96:5,18

include
74:21 100:14
101:15 177:15,
20

included
79:18 82:14
178:8,14 179:1
248:7 252:18

includes
56:23 74:19
160:22

including
32:17 46:13
146:18 151:13
155:24 165:2
177:14 179:2
181:12 190:13
201:14 204:19
206:6 225:18

increase
110:4

increases

136:22

increasing
180:15

incredibly
141:16

indicating
19:13

indicative
114:14

indicator
79:6,18 92:6,11,
14 118:15
135:4,6 175:25
176:8,9,22
177:13,18,19
178:7 181:13
190:11 191:3,22
194:14,15 197:3
236:3

indicator's
190:12

indicators
54:25 56:25
181:25 182:25

individual
10:11,21,22
19:6 20:16,19
21:17 22:3,10
23:14,22,24
24:23 25:5,20
26:12,17,24
27:18 29:14
37:1 48:9 51:20,
24 62:10 77:19
97:23 98:4,8
124:21 162:2
194:13

individuals
70:2 91:19
115:2 125:20

inefficient
171:21

inferred
205:14

inferring

18:14

inflexibility
172:11 174:19

inform
111:3 185:23
204:4 205:24

informally
171:12

information
7:20 12:13
27:20,21 28:11
31:25 32:2 39:8
41:23 42:6
43:19 44:6,23
85:6,19,25 86:9
87:1,19 88:19
99:25 104:23
106:13,15 111:5
113:15,16
119:9,21 129:1
134:4 140:8
141:4 142:14
143:11 162:23
180:6 182:15
185:19,24
186:5,6 187:6,8,
15 188:13
189:22 195:3
196:10,11
198:19 199:5,17
212:7,9 213:3
215:4 217:24
218:6,7 219:13,
14,19 224:11
234:24 236:4,18
237:23 243:16
251:14,19,20,23
254:10

informed
11:16 68:24
102:16

informing
121:5

informs
121:6

inherently
92:13

Kevin Kuich, M.D.                                                          September 19, 2019

initial
138:16 142:20
174:8 180:19
187:1

initially
155:21 156:3
173:3 180:19
189:24

initiated
227:11

initiating
186:22

initiatives
157:16

inmates
88:24 243:3

inordinate
185:15

inpatient
9:13 11:15
24:15 124:13
161:20 247:6,11
248:7,16

inpatients
124:18 247:6

input
87:20,24 99:2
105:12,15
156:25 163:15
179:13 201:8,
11,12 229:18
233:13 242:5

inquiries
153:20

inquiry
12:2 30:5

inside
96:8

insight
10:8

instance
37:9 86:6
107:14 111:4
115:19 146:25

161:16 206:3
221:13

instances
23:23 25:24
34:9 35:9,25
36:15 72:18,19
87:25 97:7
101:7 112:14
129:17 131:13
145:11

instituted
119:5

institution
11:1 20:25 21:1
22:2 23:5 29:9
34:22 36:14
37:1 42:8 71:9,
24 76:9,16,19
80:6 100:4,5,10
103:14 108:13
109:8,14 111:7
124:5,12 177:2,
3 179:20 180:10
182:16 183:3,7,
8 194:13 196:19
207:10 213:8
221:13,14
243:3,6

institution's
54:21 183:14

institutional
30:5 101:15
107:20 108:5
176:18 180:15

institutional-level
101:8

institutionalized
160:9,12

institutions
10:11,21,22
12:7 13:12 15:2,
20,24 19:6,8
20:20 21:5,18
22:5,11 25:17,
20 26:15 27:6,
11 28:2,9 29:8,
11,15,25 30:12

33:21 38:13
43:11,14 45:22
46:1 48:9,14,18,
19 50:25 55:23
56:19 60:7,10,
11 69:25 70:1,4
71:1,7,11,17,22
76:7,12 77:18
80:12,13 81:22
82:16 99:24
105:19 108:23,
25 109:1,10,12
110:4,14,18
112:6 125:12,18
138:6 177:4
179:23 180:2,7
206:5,10,25
207:3 209:24
211:6 216:5,16
222:15 224:25
237:17 248:3
250:1

instruct
131:3

instructed
38:19 66:4

instruction
118:25

insufficient
72:11

intact
120:5

integrate
128:5

integrity
123:16 162:13

intended
187:9

intents
130:5

interact
151:8

interacting
11:6

interaction

107:4

interactions
26:5 106:22
192:17 211:9

Interdisciplinary
161:19

interest
12:12 88:2
119:15 124:20
125:4 146:14
167:22 231:1,2

interested
155:20

interesting
43:21 93:6
161:24 172:8

interestingly
151:18

interests
102:9

interface
12:18 192:11
229:19

internal
31:12 66:6,7
87:14 118:10
132:15 136:18
148:13,17
151:25 152:2
158:5 227:3,10,
12 245:2 253:16

internally
85:5 88:7
122:11 148:12
169:16,18 191:1

interpret
83:19

interpretation
243:19

interpretations
229:25

interrogated
5:9

interrupt
8:17 166:13

interrupted
13:9 23:13

interval
89:4

intervals
20:9 88:21

intervention
198:3

interview
119:13 126:14

interviewed
112:5

interviews
10:2

intimately
147:18

intranet
224:23

introduce
16:16 132:7,8
152:6 160:13

invited
101:24 102:15
196:5

involve
21:4 46:16
49:15

involved
9:20 14:1,4
15:23,25 30:4
40:9,22 65:8
100:7 101:14
102:6,7 107:15
109:15 110:24,
25 117:12
127:19,22 138:3
149:3,4 181:23
189:1 198:1
202:1 208:23
216:17 230:8,18
232:19 236:5
251:10

involvement
12:25 13:15
147:15 165:14
193:25 235:23
253:1

involves
62:9 87:5
155:10

involving
42:8

iphones
174:17

IPOC
161:18,23 162:5

ir
18:3

ISP
216:9

issue
20:8,10,12,13,
14 22:15 26:2
35:22 40:19
42:4 47:4 60:9
78:9 84:24 85:3
88:18,20 93:23
97:1 100:21
102:1 107:2
111:20,21 112:3
114:2,9 115:18
122:6,9,10
127:14,16
136:25 137:1,3,
5,15 141:2,3,8,
12 143:14
146:18 153:25
154:2 157:12
161:21 172:21
175:23 177:23
183:4,5 184:14
188:21,25
190:22,25
196:24,25
212:24 221:19
225:11 231:25
232:13,14
233:14 249:7

issues

11:1,8,21 12:6
19:16 21:13,23
23:15 25:12
34:5 35:22
40:20 41:10
53:10 67:6,8
86:22 88:25
108:22 114:22
121:25 147:25
150:9 151:13,
17,20 155:18
159:6 160:6
163:24 174:20
192:7 204:10,12
212:14 224:6,21
225:21 230:8,18
248:4

Item
145:20,21,24
146:2,3 159:8
189:24

items
145:4,17 146:14
147:1 184:10

it's
6:3 8:1 33:19
34:2 41:12 42:7
45:4,10 54:10,
18 58:25 63:1
64:9 79:1 80:5,
15,25 82:5
83:10 84:16
85:20 86:15
87:3 88:1 90:4
95:6 98:24 99:8
103:9 104:5
107:23 111:8
113:23 116:24
117:3 124:5
128:7 132:9,17,
19 134:7 135:20
137:21 139:12
141:3 144:11
148:2 163:18
171:23 173:14
179:8 180:24
186:3 187:11,13
188:10 192:21
199:2,4,8

200:11 201:8,16
208:2 211:3
215:16 216:8
217:19 218:1,2,
3 228:24,25
229:21,22
234:18 247:12

— J —

J-A-H-A-N-G-I-R-I
226:17

Jack
231:12

Jahangiri
226:11,16

Jake
231:15

January
8:9,10 56:17
110:12 120:7,9,
24 190:7 243:7

Jim
92:1

job
9:17 12:10
15:15,19 19:5
36:23 38:1 87:6
106:23 124:23
125:7,22 126:24
182:21 183:18
187:2 189:17
190:4 194:3
205:6,7 206:20,
22 237:20

John
90:2 92:1 116:7
186:17,25
239:9,12,14

joy
173:15

judicious
27:5

July
49:18 50:7
74:15 144:8

153:13 189:23
190:7 248:1

jumbled
193:24

June
152:13 155:15
158:2 186:11,
12,24 187:3,9
199:20 227:18

just-in-time
137:10

Justice
231:24

juvenile
231:23,24

— K —

K-A-H-I
8:1

K-A-R-U-N-A
226:22

Kahi
8:1

Karuna
226:20,21

Katherine
18:1 39:20
54:11 59:2
104:4,5,6 144:8
152:16 183:24
184:21 186:11
188:13,24
189:23 198:14,
21 201:14
235:17 242:17

keeper
95:13 120:16

keeping
44:8 218:12

Kelso
172:14,15

Kevin
5:7,24 90:21
144:23 145:9

160:19 184:5

keystroke
185:20

kind
23:24 27:9
41:10 42:5
49:15 52:3 53:8
59:15 67:4 92:2,
17 94:8 98:9
99:16 107:4
115:17 116:7
123:19 125:8,19
137:10,22
139:15 142:7
149:24 150:2
154:6,19 157:1,
6 158:25 160:11
162:2,17 164:6
169:4 174:6
177:5 180:22
187:18 237:21
238:9,10 253:24

kinds
21:8 32:10 34:2
36:4 47:15
65:15 67:7
68:12 78:6
86:21 91:11
94:21 95:16
119:19 127:5
131:3 141:19
142:8 147:25
149:25 153:19
164:11 174:17
176:20 186:3
188:9 199:24
208:7 224:1,2
230:23 231:16
232:12 249:8

knew
11:13 12:9,11
21:21 25:14
29:25 31:9
32:14 38:17
69:22 77:3
102:3 126:12
140:24 209:6

knowing

105:16

**knowledge**
17:14 23:25
24:6 30:14 31:5,
7 36:2 42:23
56:3,6,7 57:17
58:15 85:14
100:25 101:4,5
103:4 113:23
116:17 120:11
127:18 133:23
173:11 180:5
231:6,18
232:17,18 233:9
235:6,11 248:12
251:20

**Kuich**
5:7,14,24 16:20
19:10,24 20:3
28:20 144:23
145:10 160:19
193:12,15
254:10

**Kuich's**
235:5,7

**Kyle**
5:20

_____

**L**

**lack**
24:18 42:22
44:3 55:5,25
56:4,18 57:3,20
59:7 73:25 75:1,
9 78:14 80:19
81:4,14,24
82:20 83:7 85:8
100:16,23
101:2,10 104:16
105:22 119:11
120:3 126:7
135:8 142:23
170:8 174:7
178:9,18 179:5
191:6 192:2
244:2 248:9
249:2,16 250:18

**Lacks**

58:9 75:5
150:11 181:15

**laid**
93:17 221:22
222:19 226:9

**laid-out**
150:2

**languished**
146:8 169:21

**large**
41:10 92:9
100:1 106:11
116:21 185:13

**larger**
41:25 60:21
71:10 77:20
96:11 100:1
109:5 114:21
116:24 141:19
148:8 151:21
152:3 155:5,9,
17 156:13 159:2
160:8 162:25
225:16

**late**
43:25 44:13
83:3,5 146:11
147:24

**laud**
125:23

**Laura**
116:6 152:10
227:17 239:14

**law**
203:20

**lawsuit**
122:23 162:25
192:22 205:7
233:5

**lawyers**
88:10

**layers**
211:9

**leader**

36:13

**leadership**
34:6 67:14 68:9
72:15 73:14
77:7,16 78:10
87:14 96:13
97:3 112:16
115:23 147:11
183:16

**Leading**
24:25 33:3
36:10 66:24

**learn**
192:12 215:5

**leave**
13:13 25:12
37:7,10 192:9
208:7

**led**
92:6

**left**
8:9 25:8 113:17
119:25 120:5,7,
11,22 134:11
190:6 231:6,17

**left-hand**
16:24

**leg**
233:3

**legitimate**
154:2

**Leidner**
95:7,9,18,20
99:16 100:4
104:24 118:20,
23 150:7
153:11,16,18
194:22 195:11,
13 197:6 223:9
237:21 238:2,
12,13,20,22
239:4

**Leidner's**
95:22

**length**

142:7 166:11

**lengthen**
20:9 88:20
106:7

**lengthened**
118:15

**lengthening**
104:13

**lengthy**
132:9

**lessened**
42:12

**letters**
171:24

**let's**
68:13 111:6
127:11 146:2
164:9 175:19
193:21 213:2
220:1 230:17
232:2 238:15
240:7

**level**
11:6 15:11 16:5
18:22 19:1
20:19 30:6 31:6
33:14,15 37:18
46:18 47:22,24
49:13 52:10
90:19 91:20,24
92:4 93:21 98:7
101:15 102:7
107:15,17,20
108:5 110:6
111:14,18
126:13 129:19
136:8 140:25
142:16 176:14,
16 179:14
180:15 182:8,9,
10 185:25 186:7
197:6 198:2
224:1 231:18

**levels**
79:9 92:2 110:4
117:13 157:11

243:6 252:19

**leveraging**
124:5

**Lewis**
5:20

**license**
126:23

**Liedner**
147:12

**Lighthouse**
187:5,11,16,20

**liken**
93:6

**limitations**
212:16

**limited**
30:13 32:21
142:2 221:9

**Lindgren**
90:2

**lines**
84:25 129:21

**link**
194:9

**linked**
142:9

**lipstick**
163:18

**Lisa**
5:14

**list**
130:23 222:22

**listed**
152:11 184:6,7
222:23

**lists**
216:5

**literally**
253:14

**live**
7:4

Kevin Kuich, M.D.                                                    September 19, 2019

lives
  87:6

LLP
  5:3

load
  27:9

loads
  24:23 25:4

lobbied
  124:9 168:11

lobby
  125:13

local
  10:5 33:14
  129:18

located
  7:25 17:8

location
  12:14

lodge
  22:13 144:16
  161:7

lodged
  47:8

long
  7:12 8:7,18,23
  11:12 70:19
  113:8,13 139:15
  147:14 185:5
  203:22 204:1
  208:10

longer
  89:10 105:5
  108:7 109:16
  115:7 120:13
  175:2 179:23
  228:4

looked
  31:7 32:4 37:22
  41:8 56:3 93:24,
  25 94:11 106:18
  163:23 206:8
  209:5 235:18

loose

164:1

lot
  144:23 164:11
  185:3 204:3
  222:2

love
  192:20 193:2

loved
  210:25

low
  42:17 43:6,7,8,
  10 44:19 209:23
  210:10,11
  245:6,17,19
  246:19 247:3,4,
  5 248:15 252:3

lower
  44:25 45:9
  91:24 246:15

lucky
  220:13

lunch
  7:17 88:12,14

———————

**M**

M-O-H-A-L-A
  8:1

M.D.
  5:7

machinations
  127:4

made
  17:9,12 23:15
  47:21,25 48:1,2
  60:15 67:3 69:4,
  5 91:14 92:10
  103:24 115:11
  118:6 119:14
  126:12 130:10
  143:13,16 151:1
  153:7 155:5
  156:11 162:10,
  13 165:22 169:9
  179:13 187:23
  188:8 190:19

193:19 225:9
233:16 252:5

magical
  241:16

main
  247:17 250:24

mainline
  80:17 81:3,10
  216:22

major
  223:4

majority
  193:3

make
  6:12 11:16
  15:11 27:22
  29:8 30:1 43:18
  44:21 60:7,13
  65:16 70:12
  83:4 86:23
  90:25 95:13
  103:13 110:7
  114:7 115:1
  118:23,25 125:9
  128:21,23
  131:23 134:24
  136:9 143:15
  148:18 149:7
  151:12 154:6
  164:13 167:15
  168:24,25 177:7
  180:12 186:2
  189:9 209:1
  220:14 221:11
  225:7 226:1
  248:20 249:5,9
  250:20

makes
  134:16 137:25
  141:17 180:23

making
  34:24 38:9,12
  116:18 119:2
  159:1 203:5
  231:7 238:5

manage

15:15 25:13
27:4 36:19
59:15 108:11
119:18 126:21
154:25 188:9

managed
  119:17 125:4,5

management
  10:4 12:16,21
  16:22 31:24
  32:1 34:7 61:14
  62:2 91:7 93:8
  99:23 100:6,9
  101:14 102:7
  106:10 109:4
  110:24 111:3,5,
  22 113:18,19,20
  116:3,10 117:7,
  20,21 118:2
  119:16 120:13,
  14,23 121:4,6,
  14 151:25
  153:19 159:11
  160:5,21 177:8
  186:19 195:19,
  25 196:3 223:25
  231:3,14

manager
  83:18 169:24

managers
  34:12 159:5
  182:14

managing
  14:24 15:2
  34:22 100:9
  124:25 155:1
  182:5 207:4

mandate
  166:8 167:25

mandated
  32:2 248:14

mandates
  33:10

mandatory
  48:3

manner

21:12 38:24
47:14 49:12
60:14 127:9
128:6 145:12

mantra
  167:4

manually
  43:20 253:21

manuals
  47:17

MAPIP
  33:13 60:18,19,
  21,22,23,25
  61:14 62:3,6
  84:12 105:24
  112:19,20,22
  113:2,6,10
  114:13,14,15,17
  148:6 176:20
  186:2 212:14,
  16,24 243:25

MAPIP-RELATED
  196:12

mapped
  113:15

March
  54:10 90:4,16
  91:4 95:20
  105:1 122:14
  220:1 245:10,16

mark
  19:20 129:10
  137:13 138:14
  139:5 241:16

marked
  16:17 19:21
  50:1 54:6 62:14,
  16,18 84:18
  89:21,22 98:13
  106:19 139:23,
  25 140:5 141:10
  142:19 144:4
  146:19 152:7
  160:15 165:4
  171:6 183:21
  204:21

marker
241:25

marking
136:21

MAS
123:4

massaged
162:22

massaging
228:16 229:7,16

master
73:21 83:25
85:7,15 86:11
87:15 191:4
197:9 198:24
199:19 235:1,4,
17,25 236:6

Master's
54:12

materially
178:7

math
241:17

mathematics
69:19

matter
87:21 117:20
140:23 141:6
142:19 161:8

matters
43:6 191:19

meaning
103:11 118:10
119:19 124:2,13
189:3

meaningful
84:15 192:14

means
7:3 21:1 89:6
243:17

meant
24:5 177:18
229:9

measure
33:13 34:5
82:14 89:4 96:1
112:21 176:23
222:16 243:20

measurements
80:21

measures
32:11 60:22,23
94:5 114:24
118:17 119:6
176:21 243:25

measuring
105:25 122:7

mechanism
64:7 250:12

medical
7:23 29:1 37:10
110:20 138:7
169:22 170:23
172:13 192:12,
18

medically
163:5

medication
7:8 36:3 61:14,
19 62:1 88:25
114:18 213:13
243:10 244:16

medications
46:17 61:19
93:9

medicine
175:2

meet
49:11 241:19

meeting
32:19,20 40:3
53:3,6,7 65:10
66:18,19 67:5
69:11 77:20
91:23 93:8
99:13 100:14
102:21 122:21
143:4 172:13,24

173:2,5 175:5
187:3,4,17,19
198:7,10,14,17,
21 199:9,25
200:4,13,24
202:2,9,12
220:15 242:10

meetings
40:18,21,23
66:2,3,6,7,12,13
67:1,13,17,20,
25 68:2,6,8,12
77:19 78:8
96:11 109:6
138:2 149:23
195:19,20,25
196:1,2,8,17
198:11 199:22
202:1 212:13
223:18 224:3
227:24 242:11

Melanie
89:25 90:12
219:25

Melissa
62:22 63:4,20
73:6 218:2
235:4,6 240:8

member
140:14 151:16,
20 156:7,8

members
68:9 73:13 81:3,
10 158:20 164:5
196:4 243:2

membership
158:19 159:3

memo
151:22 152:14,
17 153:5 155:15
158:2 227:3,6,
15,23

memorandum
125:6

memory
51:12,13 79:12

180:11 199:15

mental
11:3 14:7 16:21
17:25 23:18
32:1 35:11,13,
17 36:1,6 48:22
54:13,17 63:15
64:3,11 65:9
68:9 72:15
73:13 74:8 77:6,
15 87:14 97:3
99:21 104:9
106:9 110:22,24
113:18,20
115:22 116:2,3,
4 117:7 119:15
120:16 121:13
122:15 128:6
130:25 138:6,
10,25 140:15
141:16 143:18
146:10,11,13,
22,24 147:5,11
148:17,19,23
149:2,12 151:4,
9,12,22,24
153:22 154:5
155:14,16 156:4
157:8,9,14
158:5,8,9
159:11 160:4,20
161:15 165:11
166:22 169:20
170:2,3,12,24
171:1 173:2,10,
11,12 174:24
181:22,24 182:6
183:16,17
192:16,19,20
193:3 195:19,25
198:11 201:14
202:12 205:11
211:20 225:12
227:9,12 228:5
230:3,8,11,19
231:8,19 243:8
244:1,8

mention
43:18 44:8

mentioned
25:14,19 29:17
52:22 61:4
65:11 69:9
77:22 96:12
99:19 101:7
110:3 114:22
143:13 150:24
194:2 197:18
204:7 249:8

mentoring
35:4,19 36:18

mere
71:5

merit
67:6

message
40:6

met
91:24 173:14
186:14 200:5
202:4

methodology
177:12,15
190:12,15,16

metric
56:11 106:7
108:24 110:1,7
119:3 178:23
237:12

metrics
55:3,8,10 94:5
100:9 109:3,13
110:5,25 111:13
112:16 122:22
220:15 226:1
244:12

MH
146:8,10
159:11,16

MHCB
9:13

MHCBS
60:11 222:13

Michael

90:1 158:10
160:18 186:11

mid
8:9

middle
34:7 120:9
165:13

midway
184:4

minimized
152:21

minimum
62:7,9 103:13
167:18,20

minute
166:13

minutes
48:5 70:21
102:21,24
103:3,5,6 204:2,
15 224:19

minutia
102:7

misallocation
125:14,19

Mischaracterizes
57:21

misguided
123:5,14

misleading
85:6 122:11
191:2

missed
20:11 127:16
136:20,21,24
137:19 138:13,
15 139:5,7,22,
23,25 140:5,8,
10,24 141:9,10,
11 142:20
146:19,20
165:3,4,6
173:21,23
175:24 177:16

190:23 191:24

mission
5:3 58:3

Misstates
66:20 200:9,16
202:19 228:18

misstating
66:16

misunderstanding
224:15

mitigate
26:2

mix
30:3

MM
228:11

model
34:16 50:9,23
51:1,2 64:21,22
71:14 99:7
138:7

modicum
62:8

modification
147:5

modify
146:17

module
64:21 141:16
165:2

modules
13:23

Mohala
8:1

moment
8:17 64:13
65:22 145:14
193:10 232:14

momentum
149:11

Monday
156:20 168:6

203:16,17,19

monitoring
61:18 123:15,16

monitors
13:11 113:2
121:8 175:18
179:22 180:20
218:10

month
28:9 34:3 48:13
74:11 90:24
92:17 94:16,19
103:11 137:17
246:22,24,25

monthly
20:9 22:2 27:6
28:2 29:15,21
38:10,18 63:11
75:18 88:20,24
89:5,7 195:18,
20,25 225:24
246:3

months
8:19 41:2 42:16
44:1,13 60:23
79:2 80:4
113:14

morning
5:14 204:18

motley
142:2

mountain
167:5

move
29:19 32:1
46:18 49:8
86:19 108:12
129:19 136:20
138:11 143:21
147:11 148:12
159:17 164:10
166:2 191:13
205:9 222:9
233:4

moved
8:25 96:24

112:22 118:3,4
138:13 139:5
142:21 159:15
170:1 171:12

moves
148:14

moving
87:7 103:14
129:14 136:3
149:7 205:20

much-needed
221:14

multidisciplinary
148:10 150:25
228:8

multiple
13:9 59:9 78:8
85:20 94:4
112:1 117:4
119:16 125:1
138:2 175:9
181:8 211:6,9,
10

mystery
234:17

―――――――

N

names
129:19

napkin
69:21

narrative
51:9

nature
224:5 251:15,20
252:10

navigate
224:24

necessarily
40:3 94:7 99:20
199:15

necessity
12:19 32:5

needed

10:11 13:11
23:6 25:10
28:15 29:7,24
35:2 38:4 46:9
47:16 58:4 62:6
67:3 71:21 77:4
102:1 118:7
121:20 125:8,18
139:2 174:10
175:13 182:16
185:10,21 190:4
195:3 198:3
200:6 201:16,23
202:21,23,24
222:10 237:20

negative
105:11

negotiated
234:15 239:20

neutral
19:12 20:5
42:14 98:11
99:10 129:7,8,
22 132:2
136:15,16 171:7
209:21 210:6
244:23 245:1,13
249:14

neutrally
119:18

Newsom
19:25

night
69:2 72:1

nightmare
123:17

nod
6:6

nods
14:15 90:3,20
169:6

non-cdcr
123:10

non-ehrs
43:24

Kevin Kuich, M.D.                                                          September 19, 2019

non-explainable
94:20

non-formulary
46:17 196:13

non-psychiatrist
158:14

non-psychiatrists
158:11

non-tele
15:23

nonclinical
159:5 161:25

noncompliant
93:10 103:19

nondoctor
61:21 62:1

nondoctors
62:4

nonetheless
6:16 163:8
165:5 173:22

nonformulary
93:9

nonissue
161:23

nonpsychiatric
117:10,11

normal
94:10

north
17:3,17

northern
17:10

note
44:10,23 45:5,7,
11 128:11
142:5,13

notes
128:12 224:20
225:14

notice
179:12 225:4

noticed
93:7 179:18

notices
224:12

notification
98:23

notified
94:25

notion
25:22

November
9:8 14:17
110:11 245:10,
16

number
29:3 32:21,24
42:17 43:6
44:15,25 54:21
56:9,16 57:17,
18 59:24 60:1
62:23 64:25
65:11,12 69:6,
15,18,20 70:6,8,
9,11,15,23,25
72:11 74:16,18,
21,25 76:23
78:4 80:20,21,
22 81:11 83:1,9,
14,20 84:10
98:25 99:3
110:3 132:18
136:23 140:24
148:16,23
152:11 158:20
179:7,9 180:25
184:5,7 200:6,
14,15,17,20,22
201:6,9,10,15,
19,20,24
202:13,15,18,
20,25 209:23
210:10 216:17
218:20 221:9
241:15 242:10,
11,18,19 245:6,
18,19 246:7,15,
19,22 247:3
248:7,16 250:3,

15,19,23 252:3,
25

numbered
159:8

numbering
85:1 132:5

numbers
33:1 43:23 45:9
49:15 57:1
60:16 65:4
84:13 101:8
210:22 217:9
218:5,8 219:6,
10,12 242:5
248:6

numerator
31:10,15 32:8,
18 78:5 84:9
93:19 121:12
222:23 236:24

numerous
111:22 171:6
177:3

nursing
110:20 151:8
169:22 170:23
172:25 192:18

                    O

oath
7:2 33:9

object
11:20 46:25
184:13

objection
22:13 24:1,25
28:17 30:18
33:3 35:20
36:10 42:22
44:3 45:18 46:6
47:9 51:3 53:17
55:5,25 56:4,18
57:3,20 58:9
59:7 61:23
66:20,24 73:25
75:1,5,9 78:14

80:19 81:4,14,
19,24 82:20
83:7 85:8 86:14
100:16 101:2,
10,21 104:15
105:21 107:22
111:15 112:17
116:23 117:18
119:10 120:3
126:7 129:1
133:20 135:8
139:8 140:2
142:22 144:17
150:11 156:12
161:7 170:8,14
178:9,17 179:5
180:17 181:15
189:14 191:6
192:2 200:9,16
201:18 202:5,19
206:11 210:2
212:3 214:20
217:5 218:2
220:22 228:18
232:23 233:19
235:3 236:20
241:11 244:2
248:9 249:1,16
250:17

objections
6:13

obligation
89:1

obligations
61:1 113:1
124:14 189:7

observation
213:5

observations
206:5,10

observe
213:15

observed
207:8

observer
84:7

observing
213:11

obtain
65:18

obvious
226:8

occasion
24:3 112:3
194:17,18

occasions
13:10 59:9
77:21 78:8
101:23 102:11
117:4 125:1

occur
47:16 52:23
60:22 143:7
152:4,5 159:7
177:21 193:9
202:25 204:9
227:24 247:16

occurred
24:6 29:5,15
40:1,2,11,24
102:6 120:1,11
134:19 137:20
138:18,19
171:11 219:17
247:14

occurrences
178:8

occurring
41:9 81:2,10
105:20 134:20
145:12 219:21

occurs
130:18 167:10

October
14:16 77:3
110:11 183:25
184:9,21 187:25
188:6,14 189:18
190:16 202:4
214:8 215:22
234:6

office
5:20,22 28:1,3
33:25 60:15
70:25 152:19
223:20

officer
7:24

offices
5:2

official
206:22

oftentimes
36:6 49:14
84:12 192:16
234:17

on-call
65:7 69:1,2,7

on-site
53:25 250:20

on-the-ground
74:19

one-on-one
40:4 106:23,25
107:12

one-to-one
44:9

ongoing
29:7 47:14
249:4,7

online
110:14 248:3

open
97:6 220:18

operate
164:19

operation
106:11

operational
224:3

operationalize
83:19 199:13,16

opine

233:20

opinion
69:14 72:5
141:24 229:14

opinions
213:14

opportunities
125:23

opportunity
6:25 7:13 38:22
87:23 96:14
162:1 179:12
192:11

opposed
30:21 104:21
111:6 142:9

option
123:4 143:2

options
143:1

orally
69:18

order
6:20 11:22
19:24 20:1,2,3
22:16 24:2
26:17 35:21
44:10 45:8,15,
19 46:7 51:5
53:18 82:5
84:19 85:10
111:16 112:18
122:3 128:14
129:3 130:24
131:1,2 135:11
136:9,12 137:9
142:10 144:20
157:8,10 161:8
168:9 180:18
184:16 196:25
197:12 204:19,
20 216:13 232:1
238:4,6 248:19

orders
13:21 19:17
45:3 46:16

47:12 131:1
135:12 137:6
147:25 166:5,9
167:2,7,9,25
168:2

ordinary
108:9

organization
15:14 18:7
33:11 48:21
100:2 109:9
115:2 122:1
163:21 193:4

organization's
119:14 223:7

organization-wide
225:12,13

organizational
16:24 17:2,24
18:9,10,11
33:23 106:18
225:16 238:15,
21 239:16

organizationally
18:18

organize
42:10

organized
53:2

organizer
79:23 130:4

origin
218:7

original
17:7 129:25
130:1,16
131:10,15
133:12 174:19
218:9

originally
47:17 118:2
124:11 136:12
138:18 151:9

originate

228:5

outpatient
9:14 11:15
20:10 24:15
88:21,23 124:25
248:17

output
229:18

over-representative
121:23

overcounting
112:12,15

overdue
83:2,13,15,20
84:8

overnight
68:15

overrepresenting
113:10 114:9

oversight
119:12,18
149:21

overstaffed
76:8,10

overstate
136:14

overstating
58:13,14

Overview
16:22

**P**

p.m
88:15 254:19

p.m.
203:16

pace
87:8

package
174:16

packages
174:16

pages
215:20

paginated
132:13

pagination
54:16 132:15,16
136:18 171:8
245:2 253:17

pair
70:2 71:22

paired
71:23

paper
43:21 44:8
128:13 130:22

paragraph
51:10 73:22
90:21 132:14,
15,19 136:18
240:13 242:25
245:3 246:2
253:20

parameter
91:3,15 93:25
115:5

parameters
90:23 252:17

pardon
38:10 57:15
104:5

parking
204:2

parliamentary
158:23

part
15:15,19 19:4
21:2,16 28:7
50:23 71:10
91:6 102:3
144:9 162:25
184:1 206:21
207:2 222:7
225:7,8 230:3

participation

210:15

**parties**
165:25 234:15
239:20

**parts**
13:18 204:24
205:2

**party**
119:17,19,20

**pass**
89:11 94:3

**passed**
231:19

**passes**
232:13

**past**
39:11 124:7
139:17 193:16
203:17

**pathway**
85:19

**patient**
9:12 20:20
22:23 23:7,14,
22,24 24:14
25:4,9,15 26:12,
17,24 27:9 33:7
43:13 44:24
45:8,12 49:12
62:10 71:3,4
77:18 78:1
81:23 82:8 92:4
108:19 129:9,
12,23,24 131:9,
13 132:23,25
133:2,9,11
134:2 167:8,11,
18 168:6 177:21
178:2,4,15
183:9 190:14
210:15 220:15
246:3 247:9

**patient's**
167:21

**patient-level**

97:23 194:14

**patients**
9:12,13 23:7
33:9,25 34:1
35:10 37:17
42:3 46:22
51:15,20,24
52:18 53:5
58:20,21,22
62:2 73:1 91:22
98:8 103:12
122:2 126:6
128:5 130:15
133:9 162:17
168:2 185:7
205:9 220:7,20
247:20 250:16

**patients'**
98:12

**pause**
180:25

**paused**
110:10

**pay**
108:23 135:17

**PDF**
92:24

**Pelican**
48:20

**penalty**
7:3

**pending**
24:13

**people**
10:1 29:23
31:11 36:18
37:17 41:18,19
43:4 45:6 49:7
64:4 85:20 86:8
88:13 92:2
99:20,21,22,23
100:8 101:12,13
110:23 114:7
116:11 117:12,
16 120:13,22
124:11 126:11

128:17 129:17
131:6 148:22
152:11 153:25
154:22 158:10,
14,17 159:4
161:25 162:7,11
163:3,4 166:21
167:5 170:18
171:25 173:24
174:1,13 176:24
177:5 181:22,23
183:10 184:24
192:12 193:3
222:10 246:16
249:4,5,9

**people's**
87:6 172:7
180:25

**percent**
21:14 30:25
46:14,15,16
51:16,22,23
52:16 57:15,16
75:24 76:3 77:8
80:2,6,8 81:8,9
83:4,12,15,16
111:11 113:23
178:24 179:1,8
192:1 241:16,24
250:2

**percentage**
54:23 56:10
164:5 207:7

**percentages**
243:8

**perception**
39:17 191:12

**perform**
18:5 23:13,21,
25 24:3 26:24
29:6 31:3 33:7
34:11 35:3,12
36:8,17,21 37:8
38:21 46:9,21
61:21 99:8
162:14 213:13
219:17

**performance**
31:17,19,25
58:8 77:18 79:2,
5 84:1 135:3
175:25 181:2,3,
7,11,13,25
182:25 183:4
186:1,7 194:1,2,
6,7,11,13 195:1
197:2,4,9 206:1
236:3,17,21
237:10 243:9
244:1,9

**performed**
15:8 20:20
22:11,23 24:14
30:15 58:18
72:4 79:17,20,
21,22 82:14
246:8

**performing**
17:16 25:15,23
26:12 39:13,23
57:14,18 70:24
78:1,9 81:12,23
109:4 111:23
114:15,23
122:16 213:6,
11,16

**perfunctory**
126:22

**period**
13:1 42:20
44:17 89:5
104:13,19,20,21
114:3 115:5
118:13 122:6
139:21 153:12
158:1,16 165:8,
9,10,15 177:19
209:20 210:13,
16,22 216:22
243:6 245:15

**periods**
89:10

**perjury**
7:3

**permanent**
10:1 12:9,15

**person**
10:25 18:15
25:8 27:17,18
29:22 37:8
71:12 116:10
119:1 125:8
134:24 139:24
153:12 156:21
157:14 174:24
185:8,9 206:25
207:22,23

**personal**
21:20 42:23
85:14 122:15
211:4 233:9
235:6,11 251:19

**personalities**
183:10

**personally**
5:6 207:6 209:1,
4 248:14

**perspective**
191:10

**Peterson**
228:8

**pharmacy**
151:9 170:23
192:19

**phone**
21:1 27:18
37:15 38:10,12,
18,20,21 48:9,
12,17 49:2,3
100:3,19,20
101:1,6,9,13,24
102:2,16 147:13
175:5 196:5

**phrase**
109:24 145:9,10

**phrasing**
190:22

**physical**
42:4 121:21

123:13 140:11
155:10 177:5
183:4 250:22

**physically**
37:8 71:3
130:10 194:8
208:5

**physician**
29:1

**physicians**
33:8 117:8,10,
11

**picture**
105:18

**piece**
13:19 14:24
122:19 128:13,
23 201:1,2
225:16 233:14

**pieces**
78:20 128:21

**piecing**
177:3

**pig**
163:18

**pin**
228:1

**pinpoint**
92:20

**PIP**
39:9 247:18
248:14

**PIPS**
39:1,2 50:13
60:11 222:13

**pivot**
78:4

**place**
45:8 66:5 94:24
99:25 104:14
113:4 118:19
124:24 125:10,
21 159:16
166:23 221:17

248:19

**places**
29:12 47:13
100:24

**plaintiff**
5:15,19

**plaintiff's**
16:17 19:21
50:1 54:6 62:14,
16,18 89:22
144:4 152:7
160:15 183:21

**plaintiffs**
73:21 86:11
87:15 198:24
199:19

**plaintiffs'**
204:11

**plan**
54:14 66:5
87:17 103:24
161:19 247:12

**planning**
77:3 188:20

**plans**
128:15 144:9,18
166:8,9 167:1,6,
24

**plant**
177:5

**Plata**
144:10

**plate**
189:5

**play**
111:9 116:17
220:17

**plenty**
21:7 230:25

**point**
6:6 14:1 25:22
31:8 32:25
38:19 39:24
40:11 42:7

44:20 51:11
60:19,20 62:13
73:5 82:6 89:15
112:10 128:17
153:15 163:14
177:1 184:4
190:6 195:17
199:2 229:21
236:23 247:16

**points**
32:11,12 115:17

**police**
122:17

**policy**
9:21

**Ponciano**
37:24 38:14,17,
24 40:9 42:15
44:15 65:6
66:15 68:22
69:9,13,17 70:7,
13 72:8,10,15
114:11 125:2
198:7,10 199:10
200:4,12,25
201:4 202:3,4,9,
17,23 203:5
208:14,19
209:20 210:14
242:7,14 245:5

**Ponciano's**
47:6,8 199:11
244:23 249:14
251:8

**poor**
7:8 145:12

**pop**
95:15

**population**
124:15 183:9
192:16

**populations**
124:17

**popup**
142:5,13 143:6

**porous**
223:3

**portion**
13:8 47:10
93:16 116:4
121:14 145:2
155:25 160:24
165:21 189:25
234:10 244:22

**ports**
13:24

**position**
8:18 10:12,13
11:23,25 14:13
16:2 17:4,6,8
34:6 52:1 124:3
205:21 241:3

**positions**
8:11 54:22,23,
24 56:11 57:16
63:16 64:12
65:2,4,7 68:25
69:7 72:16
73:23,24 74:2,3,
5,10,24 75:15,
16,21 76:4,18
77:9 84:1 124:2
125:17 126:5
200:6 201:15
204:11 206:23
240:15,19
241:5,6,17,18

**positive**
86:24 97:4
120:15,24 121:3
127:7 193:5

**possibility**
107:11

**posted**
177:18

**potential**
201:7

**potentially**
88:19 203:1

**power**
13:20 128:10,

14,15 144:9,18
159:10 166:8,9
167:1,6,24

**Powerpoints**
149:25

**practice**
89:6 92:23
95:24 124:8
130:15 162:19

**pre-formatted**
182:19 195:2

**pre-information**
67:4

**pre-work**
67:4

**preceded**
29:18 38:15

**precedent**
39:7 192:5

**precipitated**
107:20 108:5
110:6

**precise**
248:21

**predated**
27:12

**predecessor**
205:17

**preferred**
49:7 69:23
173:25

**premise**
122:1

**preparation**
19:11 86:5
215:2 235:23

**prepare**
203:10

**prepared**
211:24

**preparing**
219:8 240:18

preplanned
66:3

prescribe
175:4

prescription
175:6

present
100:24 113:4
114:10 151:20
154:4 164:20,21
173:13 196:1,11
217:1 218:8
252:14

presentable
162:24

presentation
85:5 122:11
191:2 199:18
203:4 232:3
233:10

presentations
212:15

presented
12:10 31:14
77:11 83:17
84:5,11,12
85:18,25 87:17
105:6 113:3,15
143:19 147:3,11
152:2 162:11
196:8 197:9,21,
24 202:17 209:6
210:18 217:4
218:10 234:8,11
236:13 251:16

presenting
86:10 106:13
163:2 253:2

presents
85:21

pressure
109:11 111:12

pressures
107:19 108:4
110:3,5 126:4

226:1

pretty
98:7

prevent
86:22 119:6,7,8
140:16

prevented
118:18 206:17

prevents
121:18,19,24

previous
16:2

previously
15:8 122:8

primary
127:22

print
238:17

prior
43:18 77:6 85:5
86:6 89:3 90:25
122:11 191:1
193:7 198:10
203:8,19 220:2
228:9 240:2,6

priorities
29:3 113:21
150:1

prioritization
149:22 152:25
153:17,20
155:13

prioritize
150:18

prioritized
148:25 163:12
169:12 170:5,12

prioritizing
30:1 149:15
150:7

priority
28:12 142:1
147:19,21 160:7

202:22

prison
57:10,11 213:4

prisons
26:25 80:3

private
250:7

privy
138:22

problem
32:3 33:22,23
60:11 122:19
137:15 141:14,
23 156:18
165:3,7 166:12
167:3,10 169:7
171:10,14,16,
17,23,24 172:21
173:20 174:2
201:7 248:23
249:4,12

problematic
121:8 122:1
134:9,18,22
138:10 140:4
172:4

problems
42:12 47:20
103:19 119:16
121:19 136:13
143:14 147:25
163:12 165:2
167:3 174:20
247:21 248:12,
17,18 254:3

procedurally
204:8

procedures
223:7

proceedings
254:19

process
13:14 14:1
27:12,16 29:18,
21 30:4 43:21

46:19 98:4
119:19 130:11
133:19 134:20
138:11 141:21
143:8 147:2,14
150:2 155:9
158:3 159:16
160:10 164:7,8
167:15 168:22
171:13 173:1
205:9 225:9
228:6,7,8
230:13 231:20
234:19 243:11
244:16 246:13,
17

processes
34:24

produce
253:19

produced
38:16

producing
37:21

product
187:5

productive
32:17

productivity
31:17

program
10:3 16:21
17:25 59:4 60:2
63:15 74:8 79:9
88:22,24 89:6
91:8,10 93:17
94:13,15,18
95:15 167:18
182:13 222:7,21
226:9 230:19
238:6

programmed
118:20 134:7

programming
102:8 231:16

programs
252:19

progress
103:24

project
243:11 244:17

projects
107:18 149:16
170:3

promised
146:9

promptly
189:18

prone
185:4

proof
69:3

proper
120:18 148:23
149:2

properly
45:17 237:20

proportions
109:5

proposal
63:2,21 64:14,
18,25 68:5,14,
15,19 69:10
73:20 75:14
77:14 78:21
86:9,10 87:24
123:24 142:4
143:13,15,16,17
146:17 173:8,9,
16,17 191:11
200:25 201:21
215:14,15,17
226:7 232:5,8,
22 233:10,12,
13,16,17,18,20,
24 234:21,22,25
239:20 241:7
242:2,6

proposals
64:10 85:16

Kevin Kuich, M.D.                                                      September 19, 2019

197:11,15,17,19
198:1,12,16,18,
23 199:4,20
201:2 202:2
232:3,17,19
234:14 236:7
240:11

**propose**
147:8 173:4

**proposed**
18:10 65:11,24
77:16 84:2
85:24 87:16
142:4 156:19
165:6 168:17
203:1

**proposing**
73:19 74:24
76:23 201:4
218:13 241:2,4

**prototype**
71:16

**proves**
57:13

**provide**
6:19 12:13 15:5,
20 18:4 19:7
28:25 30:12
32:19 34:19
36:1 37:11
41:23 43:12,16
45:15 46:1
49:24 54:4 59:5
60:1 62:12
65:19 68:18
69:1,13 71:5
77:8 105:15
108:11 117:5
121:16 123:7
124:4,13 125:24
132:11 148:15
192:15 201:23
208:13 212:23
214:15 219:7,
14,18 222:14
243:1 247:7
249:22 250:5
252:1

**provided**
12:22 32:2
38:14 42:14,16
45:23,24 46:2,4
56:15 57:5
66:17 67:12,16,
19 68:5 83:25
84:16 87:4,20,
23 104:24
105:14 179:12
184:1,2 191:25
192:10 198:19
213:3 219:11
235:23 243:4
244:23 247:2
249:14 253:8

**provider**
129:9,10,23
131:8 132:24,25
133:8,10 134:1,
9 139:24 141:2
167:11

**provider's**
131:11

**providers**
130:15 171:12

**providing**
15:1 31:11
32:15 46:8
65:13 123:13
179:20 199:17
219:22 243:18
244:24

**psych**
219:3,7

**psychiatric**
20:12,14,20
22:11,23 23:9,
25 25:15,22,25
26:10,15 30:5,7
38:13 42:11
46:13 48:10,24
49:21 56:14
68:10 72:16,20,
22 73:24 74:9
76:17,23 77:9,
14 80:7,9,11
84:1,24 86:9

88:24 89:11
90:22 91:15
104:10,22
105:4,17 106:6
108:24 109:25
110:1 111:12,14
115:5,23 240:19
248:7 250:15

**psychiatrist**
8:13,15,22 9:3,
5,10,11,18,19
11:4 15:9 16:14
17:3,8,19,22
24:16 25:10,25
27:14,15 44:6,
23 46:2 51:12,
20 53:25 54:1,
17,22 55:14
56:2,7,11 61:4,
10 62:9 63:25
64:2 69:2 71:19
88:22 90:13,15
95:9 100:8
117:21 118:1,3
126:19 127:19,
22 128:1,20
147:17 158:10
163:11 174:25
175:11,12
176:17 182:5
186:4 201:15
206:23 211:12
220:3,8,10,11,
12 230:20
243:25 244:14

**psychiatrists**
14:10 15:1,16,
24 18:21 21:5
23:20 24:3,4,19,
23 27:7,8 29:6,
11 30:10,13
31:3 32:13,14,
15 33:7,8,16
34:25 35:3,14,
18,19 36:2,5,8,
12,17 41:18
46:4,20 51:15
52:4,7,18,23
53:12,16,24
56:10,16,24

57:2,6,14,18
58:8 59:4,10,11,
13,24 64:4
66:10 68:16
69:15 70:23,24
72:24,25 73:1,
10,14 74:19
76:6,8,14 77:17,
25 80:3 86:24
88:3 99:1 101:1,
9,16 111:23
114:23 116:11,
14 117:17 118:8
122:20,21
123:3,20 127:4,
8 128:3,21
150:19 158:13
159:25 161:22
162:19,22,24
170:22 175:2
176:13,16
185:11,18
186:19 192:14
206:6,7,19
209:23 210:10
217:12 220:6,21
221:9,16 222:25
230:2,7,17
231:4 233:1,2
244:24 245:15
246:8,24
250:15,20,24,25

**psychiatrists'**
28:6

**psychiatry**
10:11 12:7,18
13:8,25 14:14,
21,23,24 15:1,7,
12,20 16:3,6,9
17:3,4,17,22
19:1,7 27:4,17,
25 28:7 29:5
30:6,7,8,11
31:13 37:14
38:11,23 39:19
40:7,25 41:1,7,
9,22 42:1 52:3
53:3 56:12
57:16 63:1,6,11,
16,21 64:12,23

65:2 72:23 74:9,
24 75:15,16,20
76:4 78:10,12,
25 79:6,15,17
80:16 81:1,2,9
82:13 83:2
85:18 86:21
91:21 96:1,10,
21 97:14 98:13
99:1 100:15,21
102:16 103:2
105:24 116:25
117:5,15,20
118:4,15 122:7
125:25 126:4,5
128:24 142:1
146:7 148:20,25
149:13 150:15
151:11,13,16
152:21 153:6
155:4 156:5
157:19,22,23
158:1,16 160:1,
7 163:2,3,12,15
164:12,15
165:16 166:1,22
168:23 169:9,
11,21 170:4,12
171:2 174:5
177:6 182:2,6
183:4 192:1,13,
25 193:4 198:2,
6 199:12
207:19,20,22,24
209:12 210:7,
15,22 211:21
215:22,25
216:15,21
221:24 225:25
230:21,22
234:19 237:12,
24 240:11 241:8
243:6,9,10,24
244:12 245:10,
20 246:3 249:23
250:9 252:24,25

**psychiatry's**
175:16 207:18

**psychologist**
92:1 95:10

100:7 118:11
149:18 165:9

**psychologists**
101:18 117:22
118:8 150:9
154:11 160:1
170:6,18,21

**psychology**
150:14 160:3
171:2 231:5

**published**
206:8

**pull**
91:10 134:5
182:18 238:10
246:14 252:2,11

**pulled**
26:16 43:23
142:14 197:8
200:12 202:12,
16 207:1 212:6
216:17,25
229:2,16
251:24,25
252:14

**pulling**
69:10 134:4,14
138:21 139:12
195:2 234:3

**purpose**
19:18 26:16
49:20 50:21
214:17 238:3

**purposes**
38:4 130:5

**purview**
238:10

**push**
91:18,21 151:15
166:4,6,24
168:18 174:23

**pushing**
155:21

**put**
44:6,23,24 45:2

78:16 113:17
114:12 124:19
136:8 143:21
156:17 158:4
159:20 170:3
172:6 175:10,15
188:11 191:11
195:8 201:21
229:23 237:25
241:18,23

**puts**
241:15

**puzzled**
103:16

**puzzling**
84:16

_____

**Q**

**QM**
115:19 116:14,
21 117:13
118:10 119:5
181:22,24 188:8

**Quada**
184:3

**quality**
31:24 32:1 35:4
36:18 91:6 93:7
100:5,6,9
106:10 109:4
110:24 111:3,5,
22 113:18,19,20
116:3,10 117:7,
20,21 118:2,17
119:6,15
120:13,14,23
121:4,5,13
195:19,25 196:3
231:3,13 243:4,
17,19

**quantify**
26:2

**Quentin**
60:9 76:11

**queries**
87:3 95:15

194:21,22

**query**
194:25 195:6,8,
10 223:25
229:23 252:11,
13 253:18,24
254:1,5

**question**
6:4,17 12:5
22:20 23:8
24:10,11,13
28:24 37:7,18
44:12 57:25
59:18 67:10
75:11 105:13
122:5 138:21
140:9 168:21
171:4 177:1
196:18,19 199:3
200:20 205:16
210:14,16,17
223:21 233:8
237:17 249:21
251:18 253:11,
15

**questioning**
22:14 47:1 51:4
184:14

**questions**
6:13,15,17 24:5
41:17 47:3
50:11 126:21
140:10,11,13,14
141:20,22
144:17 161:9
175:23 191:15
193:12,20
222:10 223:22
224:24 226:25
236:12 239:19
242:18 244:21
251:7

**queue**
146:8,22,25
147:6 148:19
153:23 154:5,
22,25 155:1
169:18,19,21

170:4,12,25
188:8

**queues**
169:4

**quickly**
87:8 128:4
150:10 169:2
170:1 184:24
222:1

**quiet**
76:10,11 173:3

**quorum**
164:1

**quote/unquote**
111:13

**quoting**
20:8 159:15,24

_____

**R**

**raise**
25:21 40:21

**raised**
40:15,19 69:10
78:10 87:13
112:15 114:9
150:9 191:16
204:12

**Rancho**
17:9

**rapid**
87:7

**rapport**
29:23 193:2

**rash**
108:18

**rate**
243:3

**rates**
243:5

**ratio**
218:5,8,14,15

**rationale**
103:7,9 191:10

232:5,8

**ratios**
218:10,13

**re-implemented**
124:9

**reach**
10:18,22 21:22
27:6

**reached**
59:8

**reaching**
27:17

**read**
24:11,13 52:12,
14 74:18 83:3
131:23 132:22
146:4 159:9
212:20,21 217:6
221:2,4 234:17
242:25 254:14

**readily**
39:3,5

**reading**
132:1 253:4,6
254:12,15

**ready**
173:14 182:17

**real**
158:22 201:11

**reality**
105:18 247:22

**realize**
41:11 93:22
148:3 167:5

**realized**
31:9

**realtime**
27:21 37:13,15,
18 38:8,12
112:23 129:16

**reason**
7:7 86:1 87:22
97:2 98:24

Kevin Kuich, M.D.                                                    September 19, 2019

103:21 120:10
154:3 156:23
177:22 232:22
250:4,24

**reasonable**
75:25 76:1
78:17 80:12
143:2 161:21
162:15 173:1
246:9 249:18

**reasons**
24:17 140:19
168:12,17
191:23 207:7
247:18

**reassignment**
208:8

**reassured**
38:7 65:16
203:2

**recall**
26:4 39:25
49:17,25 50:16,
17 51:18 53:6
61:5 65:3,15,20,
23 68:7,8,12
76:20 77:13,15,
19,24 78:11
92:13 96:15,20,
23 98:6,10,15,
17 99:12 101:7
102:12,15
108:17 111:19
113:8 115:22
147:4 165:1,6,7,
15 188:18
198:13,21,25
200:2,3 202:6,8
214:11,18,23,24
224:16 228:22
237:8,11 239:22
240:2,7,24
242:9

**receive**
48:17,21 49:1
64:6 67:23,24
102:24 111:12
190:8

**received**
46:21 48:8
64:15 87:20
97:9 103:3
188:4

**receiver**
144:10 172:13
214:8

**receiving**
71:1

**recent**
243:1

**recently**
193:25

**reception**
141:25

**receptionist**
135:17,20

**recipients**
152:12

**recognize**
53:9 144:24

**recognized**
151:16

**recognizing**
112:9 171:21

**recollect**
200:12

**recollection**
91:13 199:20
202:11 242:4

**recommend**
65:1

**recommended**
65:5

**recommending**
143:24 147:19
165:20

**record**
5:18 6:8 7:21
61:17 127:18
146:3,5 159:10
210:12 213:19

216:3 230:9

**recorded**
44:7 60:24

**records**
13:2 192:12

**recourse**
209:18

**recruit**
30:9 127:3
221:15

**recruiting**
14:25

**recruitment**
162:21

**red**
33:20,21,22,24
34:2,6,8 109:2,
20 111:13 112:6
182:25 187:7

**Redefining**
20:9 88:20

**reduce**
68:15 75:14
192:1

**reducing**
65:1 83:20

**reduction**
73:22 84:1
86:10,16 179:8
198:2 240:14

**reductions**
63:7 65:24 68:3,
10 73:19 78:11
87:17 240:10
242:5

**redundancies**
65:14

**refer**
51:7 109:21
222:1

**reference**
163:25 222:12

**referenced**

20:6 42:15
210:5 237:9

**referencing**
42:25 210:3,4

**referred**
148:9 171:6

**referring**
23:9 31:15
32:24 49:23
78:24 99:15
109:24 132:12
152:15 153:13
168:18,20
178:15 180:8
209:7,25 211:14
215:13 221:25
227:14 245:4,13

**refinements**
47:12,20

**reflect**
6:8 57:1 77:17
99:2 114:4
130:12 131:15
161:13 190:12,
16

**reflected**
32:25 105:2
133:13 144:18
222:5

**reflecting**
60:19,20

**reflection**
70:6 190:3

**reflective**
114:17 126:4
187:1

**reflects**
46:23 63:13
105:18

**refusals**
178:2,15,22
179:2 190:14

**refused**
177:21 195:11

**regard**
18:5 100:21
105:23

**region**
12:12

**regional**
109:12 196:4

**registry**
211:8

**regular**
28:7 48:2 60:7,
14 79:13 94:8
100:22 121:22
124:15 138:3
182:13 195:18
208:16 237:15

**regularly**
33:14 150:20

**Rehabilitation**
8:5

**reinstituted**
110:12

**Rekart**
112:1 116:7,8
118:22 143:16
147:13 149:17,
18 150:22
151:10,12
153:10,21,24
154:13,14,17
156:3,9 157:14
165:9 186:17,25
188:3 238:1,11
239:9,13,14

**Rekart's**
149:21

**related**
15:7 36:11,13
92:8 107:3
126:4 161:9,10
183:13 202:10

**relationship**
11:6 21:20
29:23 168:21
189:11 193:3

relative
159:25 164:20

released
146:12 147:23
149:13

relegated
35:11

relentless
232:25

relevant
19:16 33:13
96:25 162:18
167:17 189:6

reliance
180:16

relied
104:20 208:11

relies
57:9

relinquished
149:11

rely
59:1

remain
193:9

remained
115:17 120:4

remains
234:19

remem-
224:16

remember
8:25 40:11
161:4,16 179:25
184:17 199:8,
11,17 242:22,23

REMEMBERED
5:1

remote
88:2 123:9

remotely
123:6,8

repeat
12:5 22:20
82:23,24

rephrase
6:15,19 17:7
37:5 67:10

replace
68:17

report
16:7,11 20:5
28:4 29:24
42:24 50:5
54:12 63:11
75:18 79:2,5
114:11 117:21,
22 129:9,22
132:1,2,16
136:16 144:10,
11 152:14
171:7,10 175:25
181:3,4,12,14,
25 184:1 194:13
197:3,5,9,12
200:22 202:24
204:22,25
205:3,13,14
209:21 210:6
213:22,23
214:3,4,5,10,13,
19 215:1,2
216:16 217:6,11
219:1,3 221:3,5
228:11 236:3
243:9 244:1,4,9
245:1,12 251:6,
9,16 252:5,15
253:16,20,21
254:12

reported
16:8,13 18:7,19
28:5,6 37:6 55:4
56:16 96:2
129:8,22
136:16,24 178:6
189:10 205:11,
18 209:21
229:16

reporter

5:5 6:5,7 62:21
84:17,20 226:14

reporting
17:24 18:15
20:11 106:20
107:21,23,24
121:7 127:16
175:23 178:23
179:13,16
190:22

reports
31:17,18,19
38:14,16 39:4
54:24 91:8,10,
11 92:16,17
93:17 95:16
182:13 186:1,7
193:23 194:1,2,
6,7,11 195:1
197:13 205:24
215:7 222:7,21
224:11 230:23
236:17,21
237:10 239:10,
11,12,14,15
252:8

represent
57:6,17 75:23
121:10 241:21
246:21

representation
43:3 165:8

representative
151:10

represented
6:9 30:2 213:21
241:22 243:21

representing
78:17 113:6,23
114:13

represents
93:20 121:11

reprimand
171:24

reptilian
84:14

request
19:13 58:15
131:9 133:2
146:12,16
154:23 155:9
159:19 187:10
188:8,13 190:4
191:25 195:10,
12 208:15,22
211:7 218:15
219:23 220:19,
21 221:8 231:20
237:19,21,23,25
249:25 252:4

requested
9:15 30:11
50:24 97:8
107:1 189:24
195:16 196:11
219:14,19
228:14

requesting
10:14 58:1 59:9
129:24 130:16
133:11 147:4
186:5 188:5
190:8 238:7

requests
22:6 48:21
73:16 146:7,23
148:10 150:8,15
156:17 188:1,9
226:6

require
44:5 46:18
103:12 194:25

required
36:21 45:25
61:18 62:7 71:9
108:14 177:7
183:11

requirement
89:6 164:1
220:7

requirements
32:20,23 46:9
61:1 74:4

114:18 167:19
220:16

requires
88:22 94:14,16

requiring
228:14

reschedule
129:12 133:2
139:6

rescheduled
129:25 130:17
131:10 133:12
138:15 139:23
141:11 142:20
146:20 165:5
173:22

rescheduling
136:22

resignation
11:11

resignations
10:17

resolution
88:4

resolve
112:4

resolved
85:4 122:10
191:1 224:6,18

resource
27:23 28:9,11
125:25 208:25

resources
10:11 12:19
15:5,16 19:7
25:21 27:5,20
28:16 29:3
33:24 34:21
36:25 37:5,7,13
42:10 48:10,24
58:16 64:24
82:2,3 117:5,7
121:20,21
125:14 142:2
148:14,15,17,

21,24 154:18
203:3 207:9,13,
18,19 209:2,12
230:17

**respect**
11:25 21:8
34:23 42:24
44:12 47:16
106:3 196:24
197:8 198:1,8
204:12 205:11
210:1 217:24
225:20,25 227:9
231:25 233:14
235:15

**respond**
71:13

**responded**
191:18

**responding**
10:14 71:15,16

**responds**
84:14

**response**
11:9 54:12
70:10,13 95:22
97:5 112:11,12
193:19 249:21

**responses**
111:20 196:21

**responsibilities**
125:7 189:8

**responsible**
34:21,24 201:23

**rest**
13:8 36:23
184:10

**restate**
24:10 26:7
59:18 251:17

**restating**
44:12

**restricted**
135:23

**restroom**
7:15

**result**
174:25 224:13
226:1

**resulted**
93:12 178:23
210:16

**results**
29:20 54:25

**retain**
68:25 127:4
221:10,16

**retained**
69:6

**retaining**
14:25

**retention**
86:22 162:20

**retirement**
228:9

**retrain**
174:1

**retraining**
42:9

**return**
25:11 65:22
192:24

**returned**
118:16

**returning**
115:4

**review**
19:10,17 50:10
55:20 67:5 73:7
90:10 91:11
94:8 97:23
145:21 179:22
180:22 204:16,
24 206:12,15
210:24 214:3,4,
10,12 219:1

**reviewed**

16:23 19:12,13,
14 20:1,2,6
42:14 204:19,21
205:2 211:19
214:5,18,21

**reviewing**
190:17

**revised**
63:6 240:10

**revision**
18:11

**RFC**
155:8 159:18,23

**right-hand**
246:4

**road**
174:15

**rock**
86:25

**role**
9:1,4,6 10:10
13:5,7,9 16:2
17:13 20:23
24:19 27:13
34:16 41:21
64:17 77:17,25
81:23 95:11,12
116:17 121:6,7
126:10 127:19,
25 128:2,5,19
152:21 206:21
219:8 230:20
231:13 234:2

**roles**
34:12 117:24
125:6 165:14

**roll**
23:16

**rolled**
60:21 124:16
175:1,13 184:23
211:5 246:12

**rolling**
20:24

**rollout**
13:1 21:17,20
26:6 44:14
45:14 46:21
47:11 53:22
110:11 111:1
127:20 231:13
246:12

**rollouts**
9:7 14:18,19
23:3 231:9
248:2

**room**
5:17 67:21,24
195:21

**ROSEN**
5:3

**rounding**
246:23

**rounds**
179:19

**routine**
37:19 107:4

**routinely**
37:19,25 60:12
90:24 101:1
102:24 233:3

**rubber**
174:15

**rule**
89:10 90:22
93:14 95:7,8
97:25 98:19,22,
24 99:11,12,13
102:13 103:10
104:13 108:6
110:13 115:20,
24 118:20
221:4,11,19
222:1,4,11
223:1 225:24
229:24

**rules**
6:1 93:16,17
102:17 119:8
158:23,24

164:2,6 221:21,
22 222:8,18,22
224:2 236:17,24
237:3,16

**run**
6:1 7:19 23:7
95:15 116:3
123:12 152:25
164:4 194:21,22
229:23 252:8
254:5

**running**
139:16 205:6

**runs**
116:5 238:3

---

**S**

**sacred**
166:6

**sacrosanct**
166:5

**safe**
61:19 188:3
190:18

**safety**
62:8

**Salinas**
213:4,6,11,18

**San**
5:4 60:8 76:11

**sat**
26:15 94:11
148:19,20

**SATF**
213:18

**save**
92:23

**savvy**
110:15

**scarce**
27:23

**scenes**
177:15

schedule
130:5 138:13
166:19 228:3
247:10

scheduled
20:11 127:16
129:10 130:2
133:14 134:24
135:4 136:12
137:12 138:18
168:5 171:11
175:23 176:1,6,
25 177:12,14
178:7,24,25
181:13 190:11,
23 191:3,22
197:1 223:17
236:4,6 247:7

scheduler
129:12,18 131:4
133:2 138:1
139:4 166:18,19
247:10 249:6

schedulers
34:1 130:20,24
136:20 138:2

schedules
137:6

scheduling
45:3,8 47:10,12,
16,19,20 64:21
79:24,25 82:5
110:16 129:14
135:11,12
137:6,24 138:4,
5,7,11,24 139:1,
3 141:14,15
142:10 143:15
146:18 155:25
165:2,21 166:5,
6,7,9,22,24
167:2,24 168:8
172:6,11,21,22
173:1,9,12,19
176:24 177:23
178:22 179:2
190:14 246:13,
17 247:7,8,23

248:13,15
249:3,9

scope
11:21 12:2
22:14 24:1
35:21 45:18
46:6 51:4 53:18
111:15 112:17
129:2 144:19
161:7 180:18
184:15 189:7

scratch
10:8

searching
253:22

seat
151:11

second-to-last
51:9 253:20

second-to-the-final
51:8

section
221:4

seemingly
158:25

sees
51:15,19,20
133:10 139:24

seg
135:22 222:14

segs
60:13

selected
127:8

self-correct
140:20

self-reflect
140:20

self-selected
100:11

send
166:18 188:17
208:15,19 247:9

senior
8:15,22 9:2,17,
19 15:9 25:25
28:6 32:14
51:16,23 52:16
61:9 72:22
90:15 100:6
176:18 220:12

seniors
27:9 57:4 74:5
211:4

sense
11:10,11,14
33:23 43:22
72:2 91:1 98:21
108:10 109:7
116:21 123:14
130:14,17
134:16 136:9
137:10 162:18
180:23 185:5,
10,12,18,21
187:7 194:23
229:19 251:24

sentence
133:8 134:1
145:8

sentences
133:7

separate
17:4 123:11,12
143:20 155:18
165:14 169:4
229:1 230:10,13

separated
155:2

separately
21:15

separation
121:16

September
5:1 11:22 20:1
35:21 45:19
51:5 53:18 63:5,
17 73:6 74:10,
23 77:2 84:19

111:16 122:4
129:3 144:19
161:8 184:16
240:9

series
13:21 60:22
66:12 167:9
239:18

serve
30:9 38:4 71:12
157:15 180:11
238:3

served
214:17

serves
79:12

service
71:9 79:21
108:11 117:6
123:13

services
14:23 15:1
16:21 18:4
30:12 31:12
32:15 37:8,11
43:13,16 58:3
63:15 64:11
69:1 74:8
108:12 123:7,13
124:13 125:19
159:5 192:15
199:13

serving
70:4

set
5:10 22:15
107:11 143:20
212:7 217:9
239:24 245:5

sets
128:14 194:25
243:5

setting
60:15 124:13
139:20

settings
161:20

shaking
105:11

shaming
109:10

shape
37:14 143:10

shared
207:19,20

sharper
78:16

sheer
158:20

she's
99:15 201:6

shift
180:14

shifted
120:17

shocked
223:3 226:8

shocking
153:2,4

short
10:16,18 48:5

short-term
135:22

shortage
10:23 136:2

Shorthand
5:5

shortly
77:4 151:19,21
153:6 157:25
227:23

show
44:25 45:3 79:8
94:23 106:21
112:25 114:4
122:20 130:1
131:20 132:5,23

134:25 139:6,21
141:11 176:3
177:22 228:16
245:5 249:24

**showed**
42:17 83:22
94:24 108:25
196:24 233:19
250:1 252:23

**showing**
97:13 98:12
140:17 235:12
237:12 247:22

**shown**
197:22 251:21

**shows**
54:21 56:9,11
75:19 79:25
80:2,17 81:8
106:19 158:3
178:4,16,22
179:2 190:13
235:3 243:2

**Shultz-ross**
118:1

**sic**
77:22

**sick**
24:17 65:14
206:25

**side**
41:8 42:1 58:11
60:16 109:17,
21,22,23 167:6
219:15 230:22
231:3 249:23
250:1,2,3,9

**sides**
111:9

**sight**
162:4

**sign**
18:2 68:10

**signature**
125:9

**signed**
142:12 205:19

**significance**
85:23

**significant**
21:10 60:6
76:23 78:4 93:5
94:17 101:8
136:14 179:9
234:2 241:8,14

**significantly**
43:8,10 44:18,
25 61:2 116:24
246:12 250:11
254:6

**signing**
142:5

**silence**
162:6

**similar**
38:25 53:21
84:10,11 96:11
103:3 121:15
153:21 212:22
219:3,6 240:3,4
248:17,18

**similarly**
120:17 162:7

**simple**
157:8

**simply**
133:8 134:2

**single**
152:19

**singling**
162:3

**sit**
168:6 254:15

**site**
30:10 235:16

**sitting**
21:16 25:16
181:9

**situation**
145:15 168:4
182:17 183:14
202:13

**situations**
30:12 126:22

**six-month**
210:13,16

**sizable**
179:7

**skewed**
45:9

**skill**
126:13

**skilled**
120:17

**skills**
162:8

**sleep**
7:8

**slice**
78:18

**small**
80:13 227:16
238:17

**smaller**
157:6

**software**
174:16

**solely**
57:6

**solid**
86:25

**solution**
10:4 12:16,21
32:3 140:21
146:8,22,24
147:6 154:22
156:19 173:4,13
174:11 183:6

**solutions**
147:10 153:22
183:11

**solving**
33:23

**someplace**
188:11

**sooner**
90:25 91:12
150:15

**sorely**
125:18

**sort**
93:23 150:7

**sorts**
52:23

**sounded**
38:22

**sounds**
24:22 28:13
32:4 37:25
38:17 100:3,14
143:22 157:1
177:8 249:18
254:1

**source**
242:21

**sources**
193:23 234:4

**south**
17:5,17

**southern**
17:11

**space**
33:25 42:4
140:12 250:22

**sparked**
108:20

**speak**
18:23 40:17
52:1,9 117:25
126:9 145:5
151:6,12 180:3
203:10,14,15
232:21,24

**speaking**

**solving**
33:23

51:18 76:20
77:13,15 104:3
224:7

**speaks**
85:10

**special**
54:12 73:21
83:25 85:6,15
86:11 87:15
191:4 197:9
198:23 199:19
235:1,4,16,25
236:6

**specialist**
8:16,22 9:3,18,
19 10:13 15:9
72:23 90:15
100:7 220:12

**specific**
13:16 36:3 98:8
137:7 141:13
174:5 182:15
194:20 197:16
199:6 204:16
225:13 242:10

**specifically**
18:5 23:9 31:11
32:12 39:1
48:24 50:24
61:4 77:24
91:22 96:15
107:1,24
111:18,19
114:11 138:7
179:25 197:15
211:13 212:14
213:4 235:17
237:3 241:5

**specifics**
204:10

**speculate**
103:21

**speculation**
30:18 81:19,25
82:21 83:8 85:9
86:14 100:17
101:11 104:15

Kevin Kuich, M.D.                                    September 19, 2019

105:21 107:22
119:10 126:8
133:21 135:9
139:9 142:22
150:12 170:9
178:10,17 179:6
180:18 191:7
192:3 226:3
241:11 244:3
248:10 249:1,17
250:17

spell
226:14

spending
97:11 185:2,22

spent
35:1 206:16

spirit
231:2

splashy
149:24

spoke
96:10 204:15

spot
68:11 70:14

spreadsheet
113:17

spring
97:24

SQL
102:7

squeals
173:15

squeezed
34:7

squishy
137:21

SSRIS
126:19

staff
8:13 9:10,11
11:7 12:22 14:3
17:10 20:12,15

21:12,16 24:4
25:3,23 26:6,15
30:15 31:3
32:13,21,22,25
33:1 34:11,17,
18,23 35:4
36:22 38:23
39:14,16,18,23
40:5 42:9,11
45:15 46:1,13
47:21,24 51:19
52:17 54:17,22
55:13 56:9,10,
16,24 57:1,6,14,
19 58:2,8 59:24
68:16 69:4,6
72:20 74:5
76:24 77:14
78:9,12 80:7,9,
11 81:12 84:25
85:4 100:4
104:9 108:11
109:12 140:14
148:22 162:16
177:6 180:7
183:9 196:4
206:7 208:24
209:5,7,9 211:8,
9,11 219:11
220:3,8 221:10,
24 224:12,22
242:5 244:25

staffed
22:11 29:10
43:11 56:20
60:9,10 209:24

staffing
9:22,24,25 10:4,
5 12:8 19:5,7
21:4,17 22:6
29:5,12 37:1
39:1 43:6 54:13,
14,18 57:9 63:1,
6,21 65:18,19
67:6 68:2,8,11
73:20 74:4
81:22 85:16
86:9 87:16 99:7
103:24 104:10
123:19 140:11

191:10 197:10,
15,17,19 198:1,
12,15,18,22
199:4,19
200:22,25 201:2
202:2 207:24
210:7 211:7,21
213:4 215:13,
15,16 217:10
218:5,8,10
226:7 232:3,5,8,
17,19 233:10,
11,13,14,16,17
234:14,21,25
236:7 239:19
240:11 241:7
242:2 243:3,6

standard
167:20 180:21

standardize
64:21

start
6:2 9:6 20:16
65:17

started
8:10 14:16 16:1
27:14 109:5
118:2 141:19
155:1 169:22
179:19 193:1
227:22 248:2

starting
8:12 52:2

state
5:5,17 7:20
51:17,24 52:1,5,
9,17 57:13 59:1
65:13 68:18
114:17 127:6
213:4

state's
57:8 59:23

stated
95:8 102:10
132:20,23
179:11 190:10
204:21 209:22

214:20

statement
180:12 228:17
243:15,22

statements
57:22 145:18
193:19 211:2
233:16

states
63:14

statewide
14:13,21 15:11
16:3,6 17:25
27:24 52:10
74:8 77:8
106:24

static
158:19

status
37:16 54:13

steer
12:13

step
98:10 155:5
156:10 168:24

stepped
20:25

Steven
186:17,24
231:21,22

stick
199:14

stipulated
24:2 104:18

Stockton
8:15 220:13,17
250:4

stone
162:6

stool
233:4

stop
38:20 157:4

storied
221:16

stories
118:5

story
167:6

strange
93:4 173:5

strategies
103:18

stratified
28:10 216:16

streamlined
34:25

Street
5:3

stretch
94:17

strike
38:10 58:16
72:9 73:16
76:21 141:7
203:9,23 227:7

string
50:4 95:19
184:11 186:22
188:1

structure
122:18

struggle
29:7 184:25

struggling
49:16 185:2
223:5

stuck
242:9

studied
31:5

studies
207:6

study
31:2,4 238:7

Kevin Kuich, M.D.                                      September 19, 2019

stuff
11:24

stump
156:22

subcommittee
155:16 158:5,8,
9 161:15 165:11
227:14,23
228:15,24 229:3
230:3,6

subject
50:8 90:6 161:8
191:8

submission
235:15,24 236:5

submit
146:24 154:1
195:10 197:12

submitted
57:21 85:15
146:21 195:12
198:23 214:7
234:25 235:16
237:18,20 251:9

substantially
240:3

substantive
24:19

subtitles
64:19

successfully
85:5 122:10
168:13 191:1

suddenly
93:9 174:18

suffered
248:17

sufficient
60:1 65:18
70:23 72:6
78:12 149:10
189:16

suggest
107:5

suggestion
188:7

suicides
108:19

suit
119:20

sum
29:12

summarize
146:3

summary
19:12 20:6
204:22 221:3

summer
86:12 89:19

summit
52:22

supervise
35:5

supervised
18:16

supervises
238:11,13

supervising
24:3 25:25 33:6
46:4 77:17,25
205:24 206:1,5,
22 220:9,11
244:24

supervision
18:4 34:20
107:4

supervisor
25:9 45:12 61:8,
10,12,13 107:6,
8 124:20 176:18
207:2 253:23

supervisors
20:12,15 22:23
23:9,12,17,25
25:15,22 26:10,
16,24 28:6
30:15 36:21
39:13,22 41:17

42:18 43:12
44:16 45:14,17,
23 51:17,23
52:17 53:5
58:18 78:9,13
79:18 81:23
82:14 84:24
245:6 247:2

supervisory
25:3 31:3 33:16
34:11 35:3 36:8,
17,23 46:12,15
47:24 80:10
81:12 85:3
123:17

supplied
179:24

supply
179:23

support
21:3 36:5 54:11
57:22 83:25
123:5 151:14
191:25 207:24
209:10 249:8

supportive
34:17

supposed
79:8 129:10
132:25 137:11,
16 176:3 205:12

surprise
98:18 192:4
221:7 241:25
242:1

surprised
61:1 221:7,12

surprising
191:24

survey
219:17

surveyed
145:5

suspect
45:6 218:14

246:15

suspicions
206:9 212:9

sustainability
223:7

sustainable
122:18 140:21

Sutter
7:23

SVSP
57:10,13,19
58:1,15 59:20
61:3

SVSP's
58:8,17

sworn
5:8

system
13:2,9,18 15:3
21:3 33:15 34:5
44:6,8,24 45:4,
7,9,11 46:24
59:24 64:11
91:22 110:16,21
112:8 115:2
116:19 121:25
123:7 127:19
128:7,24 134:13
137:24 139:2
140:19 141:2,6
142:17 143:6
148:1,5 149:3
151:21 152:5
155:6,10 160:8
172:2 173:13
175:12 185:12,
16,21,22
192:13,15
209:10,17 223:4
246:24 247:15,
21 249:3 253:22
254:4

systemwide
15:12 42:20
44:17 63:15
68:17 69:1

80:17,23 81:9,
11 83:2 91:21
98:22 155:24
245:8,17 249:24

——————

T

T-A-R-O-S-O-F-F
16:13

table
151:11 181:9
211:19,24 212:8
213:2 215:21,25
216:11,14,21,23
217:1,3,9
251:21 252:23

tails
103:14

takes
131:5,6

taking
23:6 185:3,5,14

talents
102:9

talk
39:20 52:7
63:19 88:17
156:21 161:17
188:16 193:21
200:5 230:17

talked
165:1 187:10,14
193:22,24 197:1
198:7 222:2
223:8

talking
7:12 12:21 26:1
41:14 43:5
50:15 59:20
66:6 112:1
133:19 173:20
177:4 181:3,6
194:19 204:20
208:3 213:25
214:2 221:18
222:3,13 230:10
236:20

tallied
138:17

targets
196:15

Tarosoff
16:13,14

task
28:1,2,3 34:10,
20 35:12 36:9
70:3 79:22,24
80:1 121:14

tasked
49:21 94:7 97:1
231:10

tasks
15:6,8,10 18:5
21:12 34:14,15
35:1,4 36:12
41:17,18 46:10,
12,13,14,15
58:4 99:8
116:20

team
31:13 39:2,6
68:9 87:14
96:10,21
115:19,23
116:2,5,15,21
118:11 119:5
149:12 154:6,9,
11,24 181:10
182:3 196:3
235:4

teams
198:3

Tebrock
18:1,2,3 39:20,
24 49:21 50:24
54:11 66:14
76:20 104:4,5,6
106:5,16,20,22
107:5,11
119:13,24 125:3
144:8 150:23
151:24 152:16
183:25 184:21
186:11 188:13,

25 189:5,10,23
198:15,22
201:14 219:19,
20 235:18
242:18 249:22

Tebrock's
59:2 243:14,23
246:1 247:25
252:22

technically
194:8

technological
15:2

technology
123:15

tele
9:5 12:18 14:14,
21,23,24,25
15:1,7,15 17:3,
4,8,17,19,22
27:4,14,15,17,
24 28:7 29:10
30:6,7,8,10
37:14 38:23
40:25 41:1,7,9,
21 42:1 59:10,
13 69:15 70:23,
24 88:2 192:13
198:6 199:12
219:3,6

telephone
49:7 203:24,25

telepsychiatrist
53:25 68:17
69:22 71:2,15
72:3 126:10
209:13

telepsychiatrists
72:5,11 74:20
123:6,8 206:18
242:7,8 250:9

telepsychiatry
58:2 65:8,20
69:1,8 71:25
106:24 107:3
126:25 205:15

207:21,23
208:23,24
209:9,10 211:8
219:10,11,16
242:15 249:25

telling
76:13 81:22
96:20 115:24

template
128:12

temporary
37:9

ten
48:5 70:21
185:6

ten-hour
124:23 185:6

ten-minute
127:11 175:19

tend
87:4

tended
245:5

tendency
222:9

term
109:2 197:2
229:8

terminated
226:23

termination
11:12

terminations
10:17

terminology
55:13 132:3
174:23,24 237:2

terms
28:12 32:10,18
33:11 60:18
65:13 69:4,20
78:1 86:4 96:1
103:23 121:20

142:6 158:20
180:24 185:15
220:15 238:4
239:11 241:9
242:2 243:21
246:7

tested
174:24 175:11

testified
12:1 26:14
36:25 39:12
44:14 45:13
48:8 55:17
73:20 96:5,16
105:8 113:25
115:9 120:7
127:17 133:4
153:11 158:2
197:25 200:5
204:18 205:10
206:4,11 208:1
217:5 220:2
221:20 224:5
225:23 227:2
228:14 230:11
232:4 236:2,18
237:19,21
239:21 240:21,
25 244:4 249:21

testify
7:2

testimony
7:4,9 22:5 44:2
66:21 78:7
101:19 117:15
161:10 173:18
191:7 200:9,16
201:8 202:19
208:4 211:1,20
224:10 228:19
230:2,14 235:19
242:22 244:22
246:1

text
51:9 144:24
145:2

therapy
61:20

thing
7:4 44:7 110:9
112:7 136:3
159:1 163:18
172:23 175:13
179:18 207:1
217:20 238:9
248:20

things
11:18 19:14
29:25 30:1,2
33:12 34:2,22
36:4 37:4,6
41:4,24 47:13,
15,18 49:1
65:15 67:7 77:4
78:6 84:15
86:21 88:1
91:12 92:8 97:1
99:17,18 102:21
103:20 107:12
111:17 119:19
121:17,22
125:10,13 127:5
129:17 131:3
138:23,24
141:3,19 142:8
143:7 145:11
146:23 147:10
148:1,7,24
149:1,7,25
150:14 157:4
160:11 162:9,
10,16 163:6,10
164:3,8,9,11,20,
22,23 165:11
169:20 172:3,9
174:17,18
176:20 180:22
184:6,7 185:5,
10,13,23 186:3
187:21 188:9,
16,17 189:5,12
190:23 192:11
193:1 195:9
196:12,13
199:22,24
206:17 208:8
224:1,2,17,18
230:24,25

Kevin Kuich, M.D.                                      September 19, 2019

231:16 232:12
250:22

**third-from-the-last**
80:15

**Thorn**
5:22 11:20
22:13 24:1,25
28:17 30:18
33:3 35:20
36:10 42:22
44:3 45:18 46:6,
25 47:7 51:3
53:17 55:5,25
56:18 57:3,20
58:9 59:7 61:23
66:20,24 73:25
75:1,5,9 78:14
80:19 81:14,19,
24 82:20 83:7
85:8,12 86:14
100:16 101:2,
10,21 104:15
105:21 107:22
108:2 111:15
112:17 116:23
117:18 119:10
120:3 126:7
129:1 131:25
132:4 133:20
135:8 139:8
140:2 142:22
144:16 150:11
156:12,15 161:6
170:8,14 172:18
178:9,17 179:5
180:17 181:15
184:13 189:14
191:6 192:2
193:13,14,15
200:10,19
201:25 202:7
203:7 206:13
210:5,9,19,20
212:5 214:22
215:15,18
216:6,7 217:7
218:4 220:24
222:4,17 226:19
227:19 228:21
229:4 230:15,16

233:21 235:5,
10,13,14
236:10,12,16,20
237:1,6,18
239:18 240:20,
23,25 241:11
242:18 244:2,21
248:9 249:1,16,
22 250:17
251:3,4,5
253:10,17,24
254:8,9

**thought**
39:21 86:13
96:5,18,21
163:11 242:13

**thoughts**
7:14 227:8

**thousands**
80:22

**three-person**
182:3

**three-week**
135:19

**Thursday**
5:1

**ticket**
146:8,22,24
147:6 153:22
154:1

**tight-lipped**
116:4

**tightly**
116:3 164:5

**time**
6:22 7:13 8:8
10:5 12:17,19,
25 13:6,11
14:18 15:3,24
17:21 18:13
21:7,14 22:12
23:4,19 27:10,
15,24 33:20
35:1 37:12 39:4
40:23,24 41:2
43:17,22,25

44:1 52:2,8 53:8
57:19 58:20,23
59:6,12,13
60:20 65:3,25
70:7,17 71:8,14,
18 72:6 75:19,
20 79:11 80:4
81:2,10 83:4
86:3 87:12,19
89:5 90:16
91:16,17,19,25
92:9 93:3,6
94:3,11 95:12
98:5,13 99:3,5
100:23 102:9
103:11,25
104:12,14,19,
20,21 105:5,25
106:5,7,11,25
107:11 108:18,
25 109:7
110:10,16,18
111:11,14
112:20 114:3
115:5,7 116:23
117:16,18
118:13 119:1,3,
25 122:6 123:1,
2 124:6 129:13
130:6,8,9 131:4,
16,18,19,21
133:3 134:5,24
135:1 136:10
137:21,23
141:9,13,22
142:7 143:17
150:1,5 151:6,
19 152:17
153:4,9,11,12,
14 158:21
163:20 164:19,
20 165:13,17
166:4,11 172:5,
12 176:6,7,25
177:19 183:8
185:3,13,14,15,
22 196:15
198:20 199:2
200:18 201:11,
22 202:3 205:1,
6,19,20 206:16

208:10 209:20
210:22 214:18
216:22 220:1,5
223:13 228:10
234:8,12 235:12
239:22 241:17
245:15 247:6,24
248:20,24 253:7

**timecard**
18:2

**timeline**
87:9

**timelines**
32:20 141:18

**timeliness**
80:6,9 82:19
91:15 97:24

**timely**
21:12 47:14
49:12 56:12,13
71:19 72:16
78:25 79:6,15
80:15 81:1 83:2
89:12 105:4,17,
19,24 106:6
108:24 110:1
115:4 118:14
126:3 169:24
215:22,25
216:15,21
237:12 243:9,24
244:12

**times**
13:18,20,22
21:16 25:24
29:2,10 48:13
49:22 111:22
112:1 117:23,24
149:6 171:7,25
199:23 209:14
211:10 213:15
214:12 219:12
223:11,12,18
242:20

**timing**
88:13

**title**

7:22,23 17:2
56:23 61:9

**titled**
74:7 79:1

**today**
6:10 7:3,10
19:11,18 88:9
107:7 130:7
134:10 168:19
192:8 193:22
203:11 204:6,
12,20 209:19
211:1,13,19
212:2,17,25
213:21 215:8,20
216:11 217:22
218:25 222:2
224:5 228:22
233:22 234:5,13
235:8,12,19
240:16 251:12
254:12,16

**today's**
224:17

**told**
72:10 86:12
95:3,22 96:16,
17 98:11 99:10
115:9,20 129:7,
18,21 130:25
136:15 171:18
187:4,10 205:12
241:12

**tool**
61:15 177:9

**toolbox**
126:19

**top**
19:25 20:7
54:16 85:1
132:15 144:22
160:22 211:20
218:19

**topic**
67:1 68:13,23
138:5 190:21,24

topics
20:4,8 40:15
53:13 67:12
204:5

total
44:15 73:22
74:15 75:20
116:22 140:24
210:17 240:14
241:3 245:22
246:4,5

totally
37:11

tour
50:23

tours
179:20 180:1

tracing
92:16 93:11

track
92:20 108:14
183:1 208:24

tracked
121:11

tracking
206:16

tracks
26:23

train
23:20 174:13

trained
29:2 163:5

training
20:23 21:2,6,7
23:13,16 34:18
45:14,15,23,24
46:1,4,8,21
47:1,7,17 48:3
91:25 108:16
171:18,19,20
173:24 185:23
249:7

trainings
48:2

transferred
8:21

transitioned
116:9

transmit
103:15

transparency
97:6

transparent
106:12

transparently
121:11

Trapani
5:19 56:4 81:4
132:7 238:18

treat
126:5

treated
147:19,21

treatment
243:1,4 244:25

tremendous
18:8 25:9 71:7,8
86:15 88:3
91:17 109:11
110:19 136:13
148:23 161:22
172:11 174:19
223:6

triage
28:16

triaging
28:13,18,22
29:1,25

trigger
142:5

triggering
33:1

trips
177:4

trouble
60:6 177:2

true
17:21 60:25
112:22 114:18
117:2,3 121:24
127:6 194:12

Tuesday
50:7

tumble
122:22

turn
54:15 73:4 74:6
80:14 84:22,23
104:3 111:12
136:22 144:12
189:20 218:18
239:1 240:7
242:16

turned
87:15,16 211:18

turning
171:5 216:20
253:16

twofold
128:2

type
10:6 38:25
49:10 128:7,11
162:18 189:11
208:18 212:24
213:10 238:2
254:5

types
36:8 41:16,20,
24 92:15 103:3
146:23 155:20
169:8 196:10

typical
10:25 76:12
84:4 95:25
219:21 238:10

typically
35:13 71:23
92:14 100:14
101:18 102:22

**U**

Uh-huh
59:19 90:9
145:22 161:1
177:10 190:2
200:7 218:17

ultimate
116:8 152:3

ultimately
132:24 234:15

un
175:12

unanticipated
174:21

unavailable
37:12

unclear
164:2

uncommon
66:25

under-accounting
249:13

undercounting
112:11

underlying
234:21 252:14

underneath
184:11

underpinning
191:9 232:4,8

understand
6:2,18 7:5 19:5
22:4 28:20,22
29:1 30:20
45:17 51:11
57:25 73:23
74:2 75:15
83:12 92:2
93:18,19 103:9
106:14 107:7
131:24 136:7
163:6 177:5
217:21 229:8,9,

10 243:12,14
252:7

understanding
19:4 38:15
39:21 55:23
56:24 60:2,4
74:3 80:5,18,25
81:5,21 82:16
83:5 89:1,5
94:13 95:5
103:7 104:12
165:24 168:17
173:18,25
176:4,5 218:9
219:20 234:3
243:23 246:6
249:19 251:24

understood
6:25 124:1
147:18 180:23
239:24 241:10

undertook
206:6

undivided
23:19

unexpected
41:19

unfilled
57:16 76:17

unified
172:22

unilaterally
118:23

unique
92:13 137:5
172:8 183:14

unit
9:13 247:11

units
9:14 247:6

universal
174:5,7

unneeded
64:12 65:1

unobstructed
23:18,19

unpaginated
78:22 216:4

unplanned
207:4

unpopular
160:3

unsustainable
121:25

untoward
108:19

unusual
108:21 116:1
229:24

update
148:4 177:17
225:6

updated
16:23

updates
47:15 48:4
139:2 225:3,5,6,
8

upgrade
148:4 174:16

urge
114:16

urgency
202:22 203:4

urging
119:4

user
135:12 137:25
148:2 154:3
155:11

utilize
28:10 38:23
209:13

utilized
32:9 34:23 58:2

utilizing

125:20

V

vacancies
206:24

vacancy
63:11 75:18
243:3

vacant
54:24 56:10

vacation
11:12 208:7

vacations
10:17

vague
28:17 61:23
107:23 116:23
117:18 133:20
139:8 156:12
201:18 210:2

validated
175:11

valley
25:6 48:19
213:4,6,12,19

variable
247:13

variables
183:13

varied
9:20 11:2 22:2,3
34:15 157:11
177:4

variety
108:22 129:16
158:9

verbally
6:4

verify
121:10

version
132:17 214:7,25
234:14 240:2,6

versus
31:14 54:18
104:10 211:21

Vess
92:1 108:17

vetted
85:20 126:11
165:11

vetting
226:10

view
59:5 122:15

views
20:4 85:3,7 96:9
122:9 127:15
190:25 191:4
232:2

visa
10:3 125:15,17
221:13

visit
49:20 50:14,16,
17,19,22 135:15

visited
20:24 211:5

visits
33:12 103:12
219:16

voice
49:8 97:14
107:16 117:15
163:22 192:25

voiced
70:10

vote
153:6 156:5
157:19,23 158:1
159:20 163:8
164:10 165:10,
16

votes
158:24 159:17

voting
151:16,20 156:7

159:25 161:24,
25 162:7,9,12
163:6 164:5,9

W

walking
67:21 198:22

wanted
30:1 50:14
68:25 86:16
94:4 127:15
157:16,22
163:4,10 164:15
170:19,20
185:4,18
201:10,11
208:18 223:21
232:6 250:6

ways
23:20 41:18
86:20 123:2,3,
18 125:25
162:23 167:7
169:15

wearing
94:3 102:4

webinar
99:11,13

webinars
223:8,16,17,23,
24 224:7,12,13,
17

website
224:20

Wednesday
90:4

weeds
109:15

week
13:13 90:23
91:3 213:17
233:25 245:7,
15,21 246:24
247:2

weekend

68:15

weekly
22:1 99:16
223:16,17

weeks
13:12 135:16,18
167:14,23
246:22

well-defined
100:12 158:22

well-detailed
150:2

well-staffed
106:11

whatnot
193:23

whomever
218:10

widely
246:12

wider
119:8

widget
79:21

widgets
62:5

wishes
193:9

wondered
209:25

wonderful
38:22 99:24
192:11

wonderfully
162:2 183:7

wondering
132:14 205:13
221:23 226:2

word
28:17 203:6

wore
209:11

**work**
8:7 9:15,20,21
13:19,20 21:10
30:10 33:17
35:18 36:9 45:2
57:1,5 78:13
92:15 109:15,16
124:12,18,21
128:2,9,16
129:13,14 133:5
155:25 163:16
167:1 168:14
169:22 171:21
174:9,12 175:16
176:8 183:6
199:18 206:6,7
207:15 208:8,9,
21 209:14,16
211:11 213:11
238:7 246:16
249:10

**workable**
69:3 128:22

**workaround**
133:18

**workday**
124:15

**worked**
8:3 16:12 20:18
128:24 142:25
193:15 205:18

**working**
8:13 9:25 10:3
59:14 91:9 98:2
107:17,18
124:3,4,23,24
143:5 148:4,5
173:10 174:10
183:10 187:11,
16 206:19 208:6
219:2 231:7
246:17

**workload**
45:10

**works**
88:13 166:7
185:17

**worried**
167:13

**worth**
164:22

**worthy**
189:7

**wrap-up**
236:11

**write**
175:6

**writing**
6:5 145:4 147:9
161:4 184:17
223:25

**written**
6:8 171:25

**wrong**
26:9 38:8 78:7
84:17 96:22
154:24 170:17
239:21

**wrote**
144:25 145:1,3
159:9 160:25
161:12 189:22,
25 215:9

---
**Y**

**yard**
42:8 49:13
124:23 136:3
140:15

**year**
26:4 60:24
112:21 113:14
114:1 189:23
196:14 220:17

**years**
8:9,24 160:10
179:17 192:22
232:25

**yellow**
33:20 34:9
109:2,20 111:13

---
**Z**

**zeros**
195:7