DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION DISABILITY RIGHTS
PROGRAM
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 343-0762

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' RESPONSE TO MOTION TO INTERVENE BY CHRISTOPHER LIPSEY**<br><br>Judge: Hon. Kimberly J. Mueller<br>Date: December 20, 2019<br>Time: 10:00 a.m.<br>Crtrm.: 3, 15th Floor |

From the outset of this case nearly thirty years ago, Plaintiffs have argued (a) that conditions in Defendants' segregation units risk triggering or exacerbating serious mental illness among prisoners, and (b) that Defendants' inadequate monitoring of prisoners who are at risk of committing suicide leads to foreseeable and preventable deaths. Christopher Lipsey, a *Coleman* class member currently housed in a segregated housing unit at California State Prison–Corcoran, now moves to intervene on the grounds that Plaintiffs' concern about inadequate monitoring of prisoners in segregation has led them to ignore the deleterious effects that Defendants' "Guard One" system for tracking welfare checks may have on some prisoners' ability to sleep. But the history of this case shows the opposite. Plaintiffs have pressured Defendants, and continue to pressure Defendants, both to conduct frequent welfare checks of prisoners in segregation and to document these welfare checks in a manner that does not unreasonably interfere with prisoners' sleep.

Because Plaintiffs adequately represent Mr. Lipsey's interest in avoiding sleep deprivation caused by Guard One welfare checks, he is not entitled to intervene under Rule 24(a). Plaintiffs do not oppose Mr. Lipsey's motion for permissive intervention under Rule 24(b).

## BACKGROUND

"[P]lacing mentally ill inmates in administrative segregation or segregated housing exacerbates the underlying mental illness, induces psychosis, and increases the risk of suicide." *Coleman v. Wilson*, 1994 U.S. Dist. LEXIS 20786, at *71-72 (E.D. Cal. June 6, 1994). Since 1983, the American Correctional Association has recommended that correctional institutions mitigate this risk by "personally observ[ing]" all prisoners housed in administrative segregation units "at least every 30 minutes on an irregular schedule." Ex. 64 to Bien Termination Opp. Decl., ECF No. 4402, at 17-18 (reprinting American Correctional Association (ACA) Standard No. 4-4257 (4th Ed. 2003)); Decl. of Lindsay M. Hayes in Support of Pls.' Objs. to Defs.' Plan to Address Suicide Trends in ASUs, Oct. 31, 2006, ECF No. 2011, at ¶ 10.

By 2006, the Federal Bureau of Prisons and most state departments of corrections had implemented policies relating to thirty-minute welfare checks. *See* Decl. of Lindsay M. Hayes in Support of Pls.' Objs. to Defs.' Plan to Address Suicide Trends in ASUs, Oct. 31, 2006, ECF No. 2011, at ¶ 10. But the Defendants in this case refused to do so, even after the *Coleman* Special Master issued a report finding that nearly seventy percent of suicides occurring at CDCR institutions in 2004 involved prisoners in administrative segregation—a wildly disproportionate share in light of the fact that "only approximately five percent of CDCR prisoners were in ASUs at any given time." Attachment F to Defs.' Plan to Address Suicide Trends in ASUs, Oct. 2, 2006, ECF. No. 1990, at 31; Rpt. on Suicides Completed in 2004, May 9, 2006, ECF No. 1806, at 2. Defendants resisted conforming to the nationally recognized standard of thirty-minute welfare checks because of "the strain on thin custody resources it would entail." Special Master's Rpt. and Recommendations on Defs.' Plan to Prevent Suicides in Administrative Segregation, Dec. 18, 2006, ECF No. 2084, at 7. Defendants' resistance had nothing to do with concerns about the effect of welfare checks on prisoners' sleep. *Id.*

In December 2006, after the Court ordered Defendants to develop a plan to address the rising suicide rate in ASUs, Defendants issued a policy providing for welfare checks "of newly placed ASU inmates … at least every 30 minutes, at staggered intervals, for the first three weeks of ASU placement." Ex. D to Defs.' Resp. to Pls.' Objs. to Submitted Plan to Address Suicide Trends in ASUs, Dec. 1, 2006, ECF No. 2061. Plaintiffs objected to Defendants' policy insofar as it did not require welfare checks for prisoners housed in an ASU for longer than three weeks. *See* Pls.' Resp. to Special Master's Rpt. and Recommendations on Defs.' Plan to Prevent Suicides in Administrative Segregation and Request for Add'l Relief, Dec. 21, 2006, ECF No. 2097, at 5-7. But the Court provisionally approved Defendants' policy in spite of Plaintiffs' objections. *See* Order, Feb. 12, 2007, ECF No. 2139, at 2-3.

The December 2006 policy also required correctional officers to record and track welfare checks on a printed form. Problems with this documentation system emerged

quickly.  In May 2007, the Special Master reported that some correctional officers were "pre-filling the logs."  Special Master's Supp. Rpt. and Recommendations on Defs.' Plan to Prevent Suicides in Administrative Segregation, May 14, 2007, ECF No. 2210, at 5.  Others were "improperly recording start and end times of the welfare checks." *Id.* Although Defendants subsequently adopted another policy requiring (among other things) that custody supervisors provide "appropriate training" in response to discrepancies in the logs, *see* Ex. A to Defs.' Statement of Compliance Regarding Plan for 30-Minute Welfare Check Training, Aug. 6, 2007, ECF No. 2350, at 4-5, persistent documentation problems partially obscured Defendants' inconsistent execution of the checks themselves.  *See* Special Master's 25th Round Monitoring Rpt., Jan. 18, 2013, ECF No. 4298, at 38 (noting ongoing problems with welfare checks in ASUs).  On numerous occasions, prisoners who committed suicide in Defendants' administrative segregation units were already in a state of *rigor mortis* when their bodies were discovered, indicating that at least two to four hours had passed since a welfare check had last been conducted.  *See, e.g.*, Rpt. on Suicides Completed in CDCR in 2011, Jan. 25, 2013, ECF No. 4308, at 2-3; Rpt. on Suicides Completed in CDCR Jan. 1, 2012 to June 30, 2012, March 3, 2013, ECF No. 4376, at 3.

In May 2013, shortly after Plaintiffs filed a motion for enforcement alleging improper housing and treatment of class members in segregation, Defendants voluntarily altered their welfare-check policy to permit 30-minute checks beyond 21 days "when deemed necessary."  Decl. of Kathleen Allison, July 24, 2013, ECF No. 4713, at ¶ 37. Defendants also began installing the Guard One system in ASUs throughout the California prison system to "address concerns raised by the special master relating to the staggering of the 30-minute welfare checks," and to "allow better tracking [of welfare checks] by CDCR headquarters." *Id.* at ¶ 38.  The following year, on May 9, 2014, Defendants altered their welfare-check policy again to make welfare checks beyond 21 days mandatory for all prisoners in ASUs, SHUs, PSUs, and to require documentation of these checks using the Guard One system.  In January 2015, the Special Master recommended that Defendants "continue[] implementation and monitoring of the May 9 directive."

Special Master Rpt. on Suicide Prevention Practices, Jan. 14, 2015, ECF No. 5258, at 6. The Court adopted the Special Master's recommendation 16 days later. *See* Order, Feb. 2, 2015, ECF. No. 5271.  Neither the Special Master's recommendation nor the Court's order adopting it referred to Guard One.

Plaintiffs have raised concerns about the implementation of Guard One on numerous occasions since Defendants' began using the system.  On July 9, 2014, Plaintiffs wrote a letter to Defendants and the Special Master requesting "immediate steps to remedy" class members' noise complaints about Guard One at CIW, CSP–Corcoran, and Kern Valley State Prison, among other institutions.  *See* Krista Stone-Manista to Matthew A. Lopes, Jr. et al., July 9, 2014 (Exhibit A to Gourse Decl.).  Plaintiffs explained in this letter that "[t]he negative impact of … sleep deprivation on all inmates, and specially mentally ill class members, cannot be overstated[,]" and requested that Defendants ameliorate the problem by making several changes in the way Guard One was being used.  These changes had successfully reduced noise from Guard One checks at Mule Creek State Prison, and Plaintiffs requested that they be adopted at other CDCR institutions to ensure that Guard One "enforces, rather than undermines, the system's valuable suicide-prevention goal." *Id.*  Plaintiffs subsequently asked the Special Master to investigate and report on whether Guard One was being implemented at other institutions in a way that was disruptive to prisoners' sleep.  *See, e.g.*, Thomas Nolan, Pre-Tour Monitoring Memorandum to Special Master Matthew A. Lopes, Jr., Jan. 28, 2015, at 7 (Exhibit B to Gourse Decl.); Lisa Ells, Pre-Tour Monitoring Memorandum to Special Master Matthew A. Lopes, Jr., March 18, 2015, at 2-3 (Exhibit C to Gourse Decl.).

During the second half of 2015, Plaintiffs repeatedly pressured Defendants to mitigate the noise caused by Guard One welfare checks in the SHU at Pelican Bay State Prison.  On August 31, 2015, Plaintiffs wrote to Defendants and the Special Master about the "increasingly dangerous situation" arising from correctional officers' misuse of the Guard One system in the PBSP SHU.  Michael W. Bien to Elise Thorn, et al., August 31, 2015 (Exhibit D to Gourse Decl.).  Among other things, this letter demanded that the PBSP

4
PLAINTIFFS' RESPONSE TO MOTION TO INTERVENE BY CHRISTOPHER LIPSEY

[3470686.4]

1  Warden "assert control over custody staff in the SHU," who were "intentionally
2  awakening each and every prisoner in the SHU every 30 minutes" in an effort to
3  "undermine the implementation" of Defendants' welfare-check policy.  *Id.*
4       Plaintiffs subsequently met with the Special Master and Defendants numerous
5  times—including during an overnight tour of the PBSP SHU to assess the noise problems
6  there—to negotiate a remedy for the class members at PBSP who had complained about
7  sleep deprivation.  *See, e.g.*, Correspondence between Michael Bien, Steven Fama, and
8  Defendants' counsel, Oct. 21-25, 2015 (Exhibit E to Gourse Decl.).  Some, though not all,
9  of the changes Plaintiffs requested were implemented.  One of the Special Master's
10 experts, Lindsay Hayes, subsequently found that these changes—including use of Guard
11 One's "silent mode," wherein a light rather than a beeping sound notifies the custody
12 officer that his or her check has been registered—had led to "some reduction in the noise
13 level" since his prior observations of the SHU at PBSP.  *See* Lindsay M. Hayes, Second
14 Re-Audit and Update of Suicide Prevention Practices, Sept. 7, 2017, ECF No. 5672, at
15 160.  Notably, Mr. Hayes reported that he spoke with "numerous" prisoners about Guard
16 One during his tour of the PBSP SHU, and that "there were few, if any, complaints about
17 noise."  *Id.*
18      Nevertheless, over the course of the parties' negotiations, it also became clear that
19 certain structural features of the PBSP SHU—namely, the design of the pod doors—would
20 limit the effectiveness of additional noise-reduction measures that had been effective at
21 other institutions.  As a result, Plaintiffs stipulated to a modification of the Court's prior
22 order, to permit Guard One welfare checks to be performed only once per hour at the
23 PBSP SHU between 10:00 p.m. and 6:00 a.m., instead of the usual twice per hour.  *See*
24 Amended Stipulation and Order, Sept. 1, 2016, ECF No. 5487.  When Plaintiffs
25 subsequently received complaints that Defendants had resumed twice-hourly checks
26 during these hours, they wrote to Defendants demanding that the checks be limited to once
27 per hour.  *See* Steven Fama to Nick Weber, et al., Jan. 2, 2018 (Exhibit F to Gourse Decl.).
28

1   Since the PBSP SHU negotiations, Plaintiffs have continued to pressure Defendants
2   to reduce noise from Guard One in segregation units throughout the CDCR system. *See,*
3   *e.g.*, Steven Fama to Nick Weber, et al., Nov. 11, 2015 (Exhibit G to Gourse Decl.); Krista
4   Stone-Manista to Nick Weber, et al., Feb. 23, 2016 (Exhibit H to Gourse Decl.); Steven
5   Fama to Nick Weber, et al., Sept. 26-Oct. 13, 2017 (Exhibit I to Gourse Decl.); Steven
6   Fama to Nick Weber, et al., Feb. 12, 2018 (Exhibit J to Gourse Decl.); Gourse Decl. ¶ 13
7   (describing March 14, 2019 memorandum from Plaintiffs' counsel to the Special Master
8   raising a class member's complaint about Guard One).

## ARGUMENT

### I. MR. LIPSEY IS NOT ENTITLED TO INTERVENE UNDER RULE 24(a) BECAUSE PLAINTIFFS ADEQUATELY REPRESENT THE INTERESTS HE SEEKS TO PROTECT

To qualify for intervention of right under Rule 24(a), Mr. Lipsey bears the burden of establishing (1) that his application is timely; (2) that he has "a significantly protectable interest relating to the property or transaction that is the subject of the action"; (3) that he is "situated such that the disposition of the action may impair or impede [his] ability to protect that interest"; and (4) that his interest is not adequately represented by the existing parties. *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003). "Failure to satisfy any one of the requirements is fatal to the application[.]" *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir. 2009). In cases like this one, "[w]here the party and the proposed intervenor share the same 'ultimate objective,' a presumption of adequacy of representation applies, and the intervenor can rebut that presumption only with a 'compelling showing' to the contrary." *Id.* at 951.

Mr. Lipsey has not made such a showing here. He argues that Plaintiffs are "demonstrably unwilling to make [his] arguments against the [welfare] checks[.]" Mot. at 7. But "[o]ne party need not advance the identical argument of another in order to adequately represent its interests." *United States v. City of Chicago*, 796 F.2d 205, 211 (7th Cir. 1986). In any event, the allegations Mr. Lipsey presents in support of this argument are plainly insufficient. Plaintiffs' alleged failure to object to a recommendation

from the Special Master that did not even refer to Guard One is hardly compelling evidence of their unwillingness to advocate for limits on Defendants' use of the system. Indeed, Mr. Lipsey admits that Plaintiffs *did* advocate for and agree to limits on the use of Guard One at PBSP, and Plaintiffs have presented extensive evidence of their efforts to stop Defendants' abuses of the system at other institutions as well.

Mr. Lipsey's reliance on an ambiguous June 2017 email exchange between Kate Falkenstien and Steven Fama is similarly unpersuasive. In that exchange, Ms. Falkenstien does not identify herself as counsel for a *Coleman* class member or inquire about the possibility of obtaining help for her client through *Coleman*. She states only that she is "working on a case about the Guard One system," and asks if Mr. Fama would be willing to provide a "perspective" on Guard One. Mr. Fama's response to this open ended question—that, in his view, Guard One-documented security checks were "no longer an active issue in the Coleman case"—cannot possibly be compelling evidence of Plaintiffs' unwillingness or inability to represent Mr. Lipsey's interests. Ms. Falkenstien didn't ask whether Plaintiffs were willing to represent Mr. Lipsey's interests—or anyone else's interests, for that matter. And Mr. Fama's *description* of Guard One checks as "no longer an active issue in Coleman" says nothing about Plaintiffs' willingness or ability to make those checks an "active" issue again in the future. *Cf. Prete v. Bradbury*, 438 F.3d 949, 957 (2006) (speculation that "budget constraints" might prevent party from raising proposed-intervenor's claims not sufficient to establish inadequate representation). Notably, when Plaintiffs *did* receive complaints about Guard One from class members later in 2017, Mr. Fama himself promptly demanded that Defendants investigate and resolve the underlying problem. *See* Ex. J to Gourse Decl., at 3.

Plaintiffs have repeatedly pushed Defendants to implement Guard One in a way that minimizes disruptions of prisoners' sleep. Plaintiffs raised this issue with the Special Master as recently as March of this year, *see* Gourse Decl. ¶ 13, and Plaintiffs have pushed Defendants to mitigate the noise associated with Guard One at each of the institutions where Mr. Lipsey alleges that he has experienced Guard One checks, *see* Ex. A to Gourse

7

Decl., at 2 (CSP–Corcoran); Exs. D, E, F, G, and J to Gourse Decl. (PBSP). Mr. Lipsey evidently disagrees with the tactical choices Plaintiffs have made in negotiating with Defendants to secure their cooperation in implementing a system for documenting welfare checks that does not deprive prisoners of sleep. But tactical disagreements "rooted in style and degree, not the ultimate bottom line," are not enough to establish inadequate representation for purposes of Rule 24(a). *Perry*, 587 F.3d at 949; *see also Jenkins by Jenkins v. State of Mo.*, 78 F.3d 1270, 1292 (8th Cir. 1996) (affirming denial of post-judgment motion to intervene in school desegregation action premised on "disagreements over the details of the remedy").

Mr. Lipsey also argues that he is not adequately represented because only one of the five original class representatives is still incarcerated, and because that individual is not currently housed in a unit where Guard One checks are used. Mot. at 7-8. But this argument presumes a standard for adequate representation far more rigid than the law requires, and that would be unworkable in cases like this one, where prisoners cycle in and out of segregation units in a matter of days, weeks, or months. If Plaintiffs' representation were deemed inadequate each time the class representative was transferred out of a segregation unit, the efficiency and judicial-economy-enhancing functions of representative litigation would disappear.

What matters is "how the [intervenor's] interest compares with the interests of the existing parties," and whether the intervenor and an existing party share "the same ultimate objective" in the lawsuit. *Arakaki*, 324 F.3d at 1086; *Perry*, 587 F.3d at 950-51. The class representative in this case clearly shares Mr. Lipsey's interest and ultimate objective in ensuring that conditions in Defendants' segregation units do not unreasonably deprive class members of sleep. Although the class representative is not currently subject to Guard One checks, he has been in the past (as Mr. Lipsey admits) and he could be again at any time. The fact that the class representative is not currently housed under precisely the same conditions as Mr. Lipsey is not enough for his representation to be deemed inadequate.

1  Because Mr. Lipsey has not shown that he is inadequately represented in this case,
2  the court should deny his motion to intervene as of right under Rule 24(a).

## II. PLAINTIFFS DO NOT OPPOSE PERMISSIVE INTERVENTION UNDER RULE 24(b)(1)(B)

Mr. Lipsey also argues that he should be permitted to intervene under Rule 24(b), which does not require a showing of inadequate representation. Plaintiffs agree with Mr. Lipsey that his claim shares the requisite "factual and legal overlap with this action," Mot. at 13, and Plaintiffs do not oppose his intervention to further protect his interest in avoiding sleep deprivation caused by Guard One checks—an interest that he shares with the class representative and other class members.

## CONCLUSION

Mr. Lipsey is not entitled to intervene under Rule 24(a) because he is adequately represented in this action. Plaintiffs do not oppose Mr. Lipsey's motion for permissive intervention under Rule 24(b).

DATED: December 6, 2019                Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Alexander Gourse*
     Alexander Gourse

Attorneys for Plaintiffs