1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:    (510) 280-2621

5  CLAUDIA CENTER – 158255
   AMERICAN CIVIL LIBERTIES UNION
6  FOUNDATION DISABILITY RIGHTS
   PROGRAM
7  39 Drumm Street
   San Francisco, California  94111-4805
8  Telephone:    (415) 343-0762

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

9
   Attorneys for Plaintiffs
10

11

12                 UNITED STATES DISTRICT COURT

13               EASTERN DISTRICT OF CALIFORNIA

14

15  RALPH COLEMAN, et al.,

16                 Plaintiffs,

17        v.

18  GAVIN NEWSOM, et al.,

19                 Defendants.

20

21

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF ALEXANDER
GOURSE IN SUPPORT OF
PLAINTIFFS' RESPONSE TO
MOTION TO INTERVENE BY
CHRISTOPHER LIPSEY**

Judge:   Hon. Kimberly J. Mueller
Date:    December 20, 2019
Time:    10:00 a.m.
Crtrm.:  3, 15th Floor

22

23

24

25

26

27

28

1    I, Alexander Gourse, declare:

2    1.    I am an attorney duly admitted to practice before this Court. I am an

3    associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

4    Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a

5    witness, I could competently so testify. I make this declaration in support of Plaintiffs'

6    Response to Motion to Intervene by Christopher Lipsey.

7    2.    Plaintiffs maintain a document management system that preserves incoming

8    and outgoing correspondence related to this case in their original form. The documents

9    reproduced in each of the attachments to this Declaration are preserved in this document

10   management system.

11   3.    Attached as **Exhibit A** is a true and correct copy of a July 9, 2014 letter from

12   Plaintiffs' counsel Krista Stone-Manista to Special Master Matthew A. Lopes, Jr., and

13   Defendants' counsel, regarding Defendants' implementation of the Guard One system.

14   4.    Attached as **Exhibit B** is a true and correct copy of a January 28, 2015

15   memorandum from Plaintiffs' counsel Thomas Nolan to Special Master Matthew A.

16   Lopes, Jr., regarding California State Prison-Los Angeles County, Lancaster. I have

17   redacted the letter to omit any patient identifiers.

18   5.    Attached as **Exhibit C** is a true and correct copy of a March 18, 2015

19   memorandum from Plaintiffs' counsel Lisa Ells to Special Master Matthew A. Lopes, Jr.,

20   regarding Kern Valley State Prison. I have redacted the letter to omit any patient

21   identifiers.

22   6.    Attached as **Exhibit D** is a true and correct copy of an August 31, 2015

23   email from Plaintiffs' counsel Michael W. Bien to Defendants' counsel regarding

24   implementation of the Guard One system at Pelican Bay State Prison.

25   7.    Attached as **Exhibit E** is a true and correct copy of an October 2015 email

26   exchange between Plaintiffs' counsel and Defendants' counsel regarding use of the Guard

27   One system at Pelican Bay State Prison.

28

[3472460.1]

1    8.    Attached as **Exhibit F** is a true and correct copy of a January 2018 email

2  exchange between Plaintiffs' counsel Steven Fama and Defendants' counsel Nicholas

3  Weber regarding use of the Guard One system at Pelican Bay State Prison.

4    9.    Attached as **Exhibit G** is a true and correct copy of a November 11, 2015

5  email from Plaintiffs' counsel Steven Fama to Defendants' counsel regarding use of the

6  Guard One system at High Desert State Prison.

7    10.    Attached as **Exhibit H** is a true and correct copy of a February 23, 2016

8  email from Plaintiffs' counsel Krista Stone-Manista to Defendants' counsel regarding use

9  of the Guard One system at Pleasant Valley State Prison.  I have redacted and removed the

10  attachment to the email to omit any patient identifiers.

11    11.    Attached as **Exhibit I** is a true and correct copy of a September and October

12  2017 email exchange between Plaintiffs' counsel Steven Fama and Defendants counsel

13  regarding use of the Guard One system at Central California Women's Facility.

14    12.    Attached as **Exhibit J** is a true and correct copy of an email from Plaintiffs'

15  Counsel Steven Fama to Defendants' counsel regarding use of the Guard One system at

16  Pelican Bay State Prison.  I have removed the attachment to the email to omit any patient

17  identifiers.

18    13.    On March 14, 2019, Plaintiffs' counsel Marc Shinn-Krantz sent a

19  memorandum to the Special Master, with courtesy copies to Defendants' counsel,

20  regarding the Richard J. Donovan Correctional Facility.  In this letter, Mr. Shinn-Krantz

21  wrote, in relevant part, that a class member had reported to Plaintiffs' counsel that "first

22  watch staff seem to purposefully bang the Guard One baton on cell doors to wake up

23  patients at night."  I have not attached Mr. Shinn-Krantz's memorandum to this

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

DECLARATION OF ALEXANDER GOURSE IN SUPPORT OF PLAINTIFFS' RESPONSE TO
MOTION TO INTERVENE BY CHRISTOPHER LIPSEY

[3472460.1]

1 │ Declaration because it contains extensive information that is confidential and subject to

2 │ protective orders, and that is not relevant to this Motion.

3 │     I declare under penalty of perjury under the laws of the United States of America

4 │ that the foregoing is true and correct, and that this declaration is executed at San Francisco,

5 │ California this 6th day of December, 2019.

6 │

7 │                     */s/ Alexander Gourse*

8 │                     Alexander Gourse

9 │

10 │

11 │

12 │

13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

[3472460.1]

# EXHIBIT A



ROSEN BIEN
GALVAN & GRUNFELD LLP

P.O. Box 390
San Francisco, California 94104-0390
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Krista Stone-Manista
Email:  kstone-manista@rbgg.com

July 9, 2014

<u>Via E-mail Only</u>

Matthew A. Lopes, Jr., Esq.
Special Master
Pannone Lopes & Devereaux LLC
317 Iron Horse Way, Suite 301
Providence, RI  02908

Katherine Tebrock
Chief Deputy General Counsel
California Department of Corrections and
Rehabilitation
Office of Legal Affairs
Katherine.Tebrock@cdcr.ca.gov

Jay Russell
Patrick McKinney
Elise Thorn
Christine Ciccotti
Office of the Attorney General, California
Department of Justice
Jay.Russell@doj.ca.gov
Patrick.Mckinney@doj.ca.gov
Elise.Thorn@doj.ca.gov
Christine.Ciccotti@doj.ca.gov

     Re:   *Coleman v. Brown*
          <u>Our File No. 489-3</u>

Dear Special Master Lopes, Mr. Russell, Mr. McKinney and Ms. Tebrock:

     Plaintiffs write regarding the CDCR's implementation of the Guard1 system in segregation units around the state.  We commend the Department's efforts to improve compliance with suicide prevention requirements, and acknowledge the importance of the Guard1 system.  However, we have received numerous reports from prisoners at different institutions that the manner in which the Guard1 units have been installed and are being used is having a very negative effect on the mental health of those housed in various segregation units.  We are concerned about the mental health decompensation expressed by these prisoners.  We write to describe the problems that have been reported and to request that CDCR take immediate steps to remedy them.

Matthew Lopes, Esq.
July 9, 2014
Page 2

We understand that the Guard1 system comprises a "pipe" or metal wand that is carried by correctional officers, and a sensor that is mounted on or near the cell doors in each segregation unit. In some segregation units, the "pipe" emits a loud beep each time it registers the sensor. Just as significant is the noise that is caused when the "pipe" comes into contact with the sensor. In many units, the sensors have apparently been mounted directly on or about the food ports of the cells doors. When correctional officers touch the "pipe" to sensors mounted in this way, a loud clanging noise occurs. The result is that prisoners are being awakened every 30 minutes all night long and every night since the installation of Guard1 systems in their housing units. The negative impact of this sleep deprivation on all inmates, and especially on mentally ill class members, cannot be overstated.

We believe, however, that amelioration of this problem is possible. First, our clients have reported that in at least some segregation units, there is no sound emitted when the pipe comes near the sensor, but only a light is present. We have also seen a silent "pipe" in use at VSP. We take this to mean that the "beep" is an optional setting that is not required for proper use of the Guard1 system, and Michael Stainer has reportedly confirmed that this is the case. Defendants should adopt a policy requiring that the system be used in silent mode at all times.

Second, we have also heard various reports that in at least some units, the sensors for the units have been mounted next to, but not directly on, the cell doors or food ports. This reportedly minimizes the clanging noise that occurs when the "pipe" comes into contact with the sensor. We have also heard that CDCR senior officials have suggested that perhaps a washer or mounting can be used to break the contact between the sensor and the metal of the door and thereby to minimize the clanging sound. For example, Lindsay Hayes reported recently that he heard no complaints about the clanging of the "pipe" from segregated prisoners at Mule Creek State Prison, where apparently the sensors have been mounted in a different and less intrusive manner.

While these physical solutions may solve parts of the problem, reports we have received from our clients and others demonstrate that there is also an urgent need for training of correctional officers regarding the proper use of the Guard1 system. For example, we have received reports from CIW, Corcoran State Prison, Kern Valley State Prison, CSP-Sacramento, Valley State Prison, and Salinas Valley State Prison regarding particular officers' use of the "pipe" in a manner that results in a particularly loud and abrasive clanging, above and beyond that required for the sensor to properly register. Prisoners in these segregation units have reported significant mental health deterioration in the units as a result of the ongoing sleep deprivation.

[1238574-1]

Matthew Lopes, Esq.
July 9, 2014
Page 3

We also understand that staff in at least some segregation units interpret the new rounding directives to require them to awaken prisoners every thirty minutes all night. For example, Michael Hersek, the Director of the Office of the State Public Defender wrote to Warden Chappell on June 24, 2014 and reported that, in addition to the noise problems described above, "some staff [in condemned units] interpret their duty to rouse the men every thirty minutes throughout the night." *See* Letter from M. Hersek, attached hereto. Mr. Hersek has not received a response to his letter and the problems reported by many prisoners on death row continue to be a significant concern. We also have received similar reports from other segregation units including but not limited to Corcoran SHU and CSP-Sacramento, all stating that first watch correctional officers are affirmatively awakening prisoners with bright flashing lights and/or by calling their names every thirty minutes throughout the night.

We urge CDCR to immediately take action to ensure implementation of the Guard1 system in a manner that enforces, rather than undermines, the system's valuable suicide-prevention goal. We ask that a statewide policy requiring silent use of the "pipe" during first watch be developed and implemented. We additionally ask that the installation of the sensors be reviewed in each segregation unit, and that where the sensors have been mounted directly on to the food ports and/or the cell doors, that they be moved or that a washer or padding be installed. In this regard, we suggest that perhaps the sensors at Mule Creek State Prison may be a model for a less-intrusive installation method. Finally, we ask that correctional officers working in segregation units be retrained on proper rounding techniques and use of the Guard1 system, and in particular, that affirmative steps be taken to ensure that officers are aware there is no requirement to awaken inmates every 30 minutes throughout the night. The Department should also investigate the reports that guards at some institutions are intentionally harassing prisoners in these units because they do not like the new system.

//

//

//

//

//

//

//

Matthew Lopes, Esq.
July 9, 2014
Page 4


        We fear from the widespread reports that we have received that the problems described above and the resulting sleep deprivation are causing a marked increase in mental health deterioration in CDCR's segregation units.  We trust that you share this concern and will work quickly to remedy these problems.

                                Sincerely,

                                ROSEN BIEN
                                GALVAN & GRUNFELD LLP

                                */s/ Krista Stone-Manista*

                        By:   Krista Stone-Manista


KSM:KSM
cc:     Co-counsel
        Nick Weber, CDCR Legal
        Michael Stone, CDCR Legal

# EXHIBIT B



ROSEN BIEN
GALVAN & GRUNFELD LLP

315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

# MEMORANDUM

> **CONFIDENTIAL –**
> **Subject to Protective Order**
> **In *Coleman v. Brown***

TO:         Special Master Matthew A. Lopes, Jr.
            *Coleman* Special Master Team

FROM:       Thomas Nolan

CC:         Elise Thorne, Christine Ciccotti, Nick Weber, Michael Stone
            *Coleman* Co-counsel

DATE:       January 28, 2015

RE:         **California State Prison-Los Angeles County, Lancaster (LAC)**
            **26th Round Monitoring Tour, February 3-5, 2015**
            *Coleman v. Brown*
            Our File No. 489-3

---

In preparation for this monitoring memorandum, Plaintiffs' counsel reviewed the 25th Monitoring Report of the Special Master ("25th Report"), materials from the 25th Round of monitoring (including the Management Information Report from that round), information relevant to CSP-Los Angeles County ("LAC" or "CSP-LAC") gathered in connection with the termination motion proceedings, suicide reports for suicides at LAC in recent years, the Lindsay Hayes Report filed on January 14, 2015, CDCR monthly data, DSH monthly data, class member correspondence, and other documents related to LAC.

## Overall Population and MHSDS Census

CSP-LAC's overall prison population as of January 14, 2015 was 3,513, a decrease of 424 from the population at the time of the 25th Round Monitoring Tour in May of 2012 (when the population was of 3,937).  *See* CDCR Weekly Report of

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 2

Population, January 14, 2015 and May 14, 2012.  The current population represents 152.7% of the institution's design capacity.  *See id.*

The MHSDS caseload at CSP-LAC is as follows (according to the November 14, 2014 HCPOP Monthly Data):

| Level of Care | Capacity | MHSDS Population | % of Capacity |
|---|---|---|---|
| CCCMS | 1,149 | 1,206 | 105% |
| EOP | 400 | 440 | 110% |
| **TOTAL** | | **1,646** | |

While the overall CSP-LAC population has declined since the 25th report, and also between the 24th and 25th report, the overall MHSDS census has not changed significantly since the 24th Report.  In fact, since the 25th Report, the EOP population has increased by 11.4%, from 395 in March of 2012 to 440 in November 2014.  In November 2014, MHSDS prisoners comprised 46.9% of the overall prison population at LAC.  *See* HCPOP Monthly Data.

## I.  <u>Staffing</u>

At the time of the 25th Round Monitoring Tour on June 4-7, 2012, CSP-LAC's chief psychiatrist position was vacant.  Half of the staff psychiatrist positions (5.5 of 11) were vacant.  *See* LAC 25th Round Management Report at p. 7.  There was also a high vacancy rate for recreational therapists (44.4%).  *Id.*

November 2014 Staffing Data indicates that the Chief Psychiatrist position is now filled, but that 4 out of 12 staff psychiatrist positions remain vacant (a vacancy rate of 33%), and that 4 out of 11 recreational therapist positions remain vacant.  *See* November Monthly Statistics, Items 1 and 2, Mental Health Institution Vacancies, By Institution, at p. 20.  The report also indicates that 8 out of 20 authorized social worker positions are vacant – a vacancy rate of 40%.  *Id.*

## II.  <u>Administrative Segregation Units (ASU)</u>

At the time of the last tour, the EOP ASU unit was located in A-Yard Building 4. The EOP ASU unit has since been moved to D-Yard Building 5. The new treatment building, originally designed for mainline EOPs and then modified for EOP ASU

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 3

treatment, has also opened.  Questions about the new treatment space are set forth below in their own section.

     **1.**     **Lindsay Hayes Concern About New ASU Arrivals Not Being Placed In Retrofitted Cells**:  In his January 2015 report, Lindsay Hayes indicates that although LAC had 21 retrofitted suicide-proofed cells in its three ASU units, new ASU arrivals "were being placed in any available cell within the three units."  *See* January 14, 2015 Hayes Report, Docket 5259, at 37.  Please report on whether this problem has been remedied.

     **2.**     **New STRH**:  Presumably, the new STRH unit has not yet opened in the stand-alone ASU, and CCCMS ASU prisoners are still housed in the A-5 CCCMS ASU (the old EOP ASU building).  Please confirm that this is the case.

What is the plan for activation of the STRH? What is the status of hiring for the program? What is the status for completing retrofits and modifications to the unit (electricity/cable, suicide resistant shelving, modifications to address auditory issues, restart chair/tether tables, misters, lights on yards, dip bars/pull-up bars)?

What is the status of the comprehensive suicide prevention training to be provided to custody officers in the designated STRH standalone units?

     **3.**     **EOP Lengths of Stay in ASUs:**  As of December 15, 2014, there were 113 EOP prisoners in ASU at CSP-Los Angeles County, and 58 (51.3%) had stays of 90 days or more.  Monthly Data, Enclosure 3, Segregation Lengths of Stay (December 15, 2014.)

**Case-by-Case (CBC) Reviews & Long-Term Segregated Case Conference (LTSCC)**:  Defendants' January 27, 2015 report on the CBC and LTSCC process indicates that, as of September 22, 2014, 70 ASU prisoners had been in segregation for more than 150 days.  Of those 70, 41 cases have been "resolved" (*i.e.*, no longer in ASU or have had CBC and LTSCC).  Twenty-five (25) of those 41 class members (61.0%) have been released from ASU.  This is a much smaller percentage as compared to most CDCR institutions.  Please investigate, including as to the status of the 16 class members who remain in ASU (and have now been in segregation for more than 300 days).

**30-Day Reviews**:  Please also investigate the adequacy of the 30-day reviews conducted for EOP inmates in the EOP ASU for more than 90 days.

Several EOP Prisoners have had extraordinarily long lengths of stay in segregation (in some cases including SHU terms).  The EOP ASU longest-stay cases still at CSP-

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 4

LAC as of January 27, 2015, include the following 6 cases. **Please investigate the level of functioning and reason for continued segregation confinement of these individuals**:



4.      **CCCMS ASU Lengths of Stay:**  As of December 15, 2014, there were 108 CCCMS prisoners in ASU at CSP-LAC, and 65 of the CCCMS prisoners in ASU (60.2%) had stays of 90 days or greater.  Monthly Data, Enclosure 3, Segregation Lengths of Stay (December 15, 2014.)

Plaintiffs are particularly concerned about the CCCMS prisoner with the longest stay in ASU, ███████████████  In January of 2013, plaintiffs' expert Dr. Pablo Stewart interviewed ██████████ █  had been downgraded from EOP level of care in November 2012, shortly after he was placed into administrative segregation.  Dr. Stewart noted at the time that he interviewed ████████ in early 2013, ████████ was very manic and that his records reflected a history of suicide attempts, including some serious attempts.  Dr. Stewart was surprised that ████████ was not on anti-psychotic medication and felt that ████████ needed EOP level of care.

██████████ **is now the longest-stay CCCMS ASU prisoner, with a total stay of 798 days in ASU.  Plaintiffs request that one of the court experts meet with** ██ ████████████ **to assess whether he needs a higher level of care at this time.**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 5

Also, we request an explanation for █████████ extraordinarily long stay in segregation, now more than two full years.

**5.    Low EOP ASU Treatment Hours Received**: When he toured the LAC EOP ASU unit in 2013, Dr. Stewart was concerned about low EOP treatment hours.  Data indicated that between November 2012 and January 2013, EOP ASU prisoners were actually attending only 6.35 hours/week.  Stewart Termination Declaration (Docket 4381) ¶ 323 on p. 112.

At the time of the 25th Report, the monitors found that the EOP ASU program provided primary case manager contacts in a confidential setting only 49 percent of the time.  25th Report at 333.  The 25th report stated that EOP ASU prisoners were offered only 10 hours/week of treatment 57 percent of the time.  *Id.*

In the 25th Round, the LAC Management Report indicated that 26% of patients in the EOP ASU unit refused more than 50% of their treatment and that these individuals received daily Primary Clinician contacts as required only 34% of the time.

How many treatment hours are currently being scheduled, offered and attended in the EOP ASU?  Please provide an update regarding the treatment refusal situation.

**6.    New EOP ASU Treatment Facility – Comparison of Colorado-Style Tables, Restart Chairs and CDCR Cages**: The new EOP ASU treatment space is now open on D-Yard.  Plaintiffs are interested in the monitors' report on the new program.

One concern about the new program is the adequacy of escorts from D-5 to the treatment space.  Are there currently adequate escort staff?  Are escorts to the treatment area impacted when there are lockdowns?  How often is D-Yard at LAC locked down?

The new program may be unique, in that it has treatment rooms containing **three different types of restraint systems** for group treatment rooms.  There are two group treatment rooms using the first type – the standard CDCR cage or "treatment module." Two more new group treatment rooms have "restart" chairs that are the type used in New York State.  Finally, two more treatment rooms have tethered tables used in Colorado. Plaintiffs have heard that the final type – the Colorado tables – is preferred by treatment staff because they are the most school-like, and the desks provide good workspaces for prisoners.  However, Plaintiffs have also heard that custody staff members do not like the Colorado tables and want them eliminated because they do not want to bend down to shackle them to the tables.

[1515139-1]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 6

Please investigate how patients, clinicians and custody officers experience the different treatment options and report on the advantages and disadvantages of each.

7.    **EOP ASU High Refusals Rate:**  In the 25th Round, the LAC Management Report indicated that 26% of patients in the EOP ASU unit refused more than 50% of their treatment and that these individuals received daily Primary Clinician contacts as required only 34% of the time.  Please report on this issue and whether these problems continue in the new and (hopefully significantly) improved treatment space.

8.    **ASU Program for CCCMS Prisoners**

**Entertainment Appliances:** In past tours, the A-4 (EOP ASU) and A-5 (CCCMS ASU) units reportedly did not have any entertainment appliances, because they reportedly did not have working electrical outlets in the cells.  The EOP ASU has been moved to D-5 and the CCCMS ASU has been moved to A-4, at least until the new STRH opens in the stand-alone ASU building.  Are hand crank radios (or other alternative, such as TVs on the tiers) currently provided in the ASU?

**Lack of Groups:** In the 25th round report, the monitors found no group therapy was being provided to CCCMS ASU prisoners and that only 18 percent of PC contacts took place in a confidential setting.  Please report on the current status of these issues.

9.    **EOP ASU HUB Certification Review Concerns**

**Safety Cell Placements for New Arrivals:** At the time of ASU hub certification tour and report on August 18, 2014, the reviewers noted that there were two EOP ASU prisoners in the unit who had been there for less than 72 hours and that neither was housed in a retrofitted cell or double celled.  LAC EOP Hub Certification Report #1 at p. 4.  Please investigate whether this serious problem continues.

**Issues with Groups and Access to Yard:** The same August 2014 EOP ASU report found that only one-half of the inmates in the EOP ASU unit received 10 hours a week of yard in July 2014.  *Id.* at 4.  Please investigate and report on the amount of yard being provided to EOP ASU prisoners.

The same August 2014 EOP ASU hub certification visit report indicated that "*During the I/P group interviews, I/Ps uniformly stated that frequently their groups are cut short by as much as a half hour, and one of the group interviews started 30 minutes late.  Several groups observed started late. Also, during the I/P interviews, I/Ps stated that they must choose to attend either the treatment group or yard time.*"  *Id.* at 5.  Please

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 7


report on these problems as well.  How long do scheduled groups actually last?  If they are cut short, how frequently does this happen and why does this happen?

**10.** **Guard One**:  Is Guard One installation complete in all ASU units at LAC? Are there noise-related complaints or concerns regarding use of the devices?


## III.    Mental Health Crisis Beds (MHCBs) and Alternative Placements

**Alternative Placements:** Dr. Stewart found that cells 121-126 in the A-4 EOP ASU unit were being used as alternative placements for suicidal prisoners.  Docket 4381 ¶ 228 on p. 81.  Does this use of these rooms continue now that the A-4 unit is a CCCMS ASU unit?

Lindsay Hayes also found these cells were still being used for alternative placements during his visit on November 12-13, 2013.  *See* Hayes Report, Docket 5259, at 37.  Mr. Hayes also noted that LAC was using cells in D facility, Building 1 (one of two mainline EOP units on D-Yard) cells 101-105 for alternative placements and **that these cells are not suicide-resistant.**  Dr. Stewart obtained reviewed data showing that for the roughly seven-month period between May 19, 2012 and December 27, 2012, CSP-LAC held 291 individuals in alternative placements while they waited for an MHCB bed, with 121 of those placements lasting for more than 24 hours.  *Id.* ¶ 230 on p. 82.

Please investigate and report on whether these cells are still being used for alternative placements and the status of retrofitting.

**MHCB Bed Management**: The 25th Report noted there were 357 referrals to the 12-bed MHCB unit, with 66% resulting in admission.  25th Report at 331.  Fifty-seven percent of all MHCB admissions had lengths of stay exceeding ten days; 33% of these extended stays were attributable to inpatient referrals awaiting a bed.  *Id.*  There were 339 reported alternative MHCB placements.  The average length of stay was 2 days.  *Id.*

Recent data indicates that MHCB management problems continue.  For December 2014, there were 30 MHCB admissions at CSP-LAC; 15 had stays of greater than 10 days.  CDCR Monthly Data, December 2014, Enclosure 6, Inpatient Psychiatric Aging Report, MHCBs.  Among those fifteen, there were six discharges to a segregation unit and nine discharges to DSH, including one individual who was in the MHCB for 54 days and another for 45 days.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 8

A significant proportion of LAC MHCB referrals do not result in MHCB placement.  According to the Summary of MHCB Transfers, Rescinds and Internal Admission (Enclosure 20, November 2014), during November 2014 at LAC there were 42 MHCB referrals.  Eighteen (18) of those referrals never resulted in MHCB placement (along with 12 transfers to an external MHCB and 12 internally admitted).

What was the average length of stay in alternative cells during this monitoring period, as well as the range of lengths of stay?  Are staff accurately documenting and reporting on the use of all alternative cells, including holding cells (e.g. showers), for purposes of tracking MHCB demand?  Are staff contacting HCPOP to facilitate transfer to MHCBs at other institutions when required?

The 25th Report noted problems with restraint and seclusion logs in the MHCB. 25th Report at 334.  Have those problems been resolved?

IV.     **DMH Access and Referral Process:**

The 25th Report noted that "timely transfers to all DSH acute and intermediate care was not consistently achieved during the reporting period" and that "on return from DSH, specific treatment recommendations were not routinely addressed in treatment plans." 25th Report at 329.

The 25th Report also found problems with the 7388B process, noting among various problems that "inmates who met objective indicators were not consistently identified" for DSH referral, that "subjective factors were underutilized," and that reasons for not referring were "not always stated or were inadequate."  *Id*. at 330-331.

Please review recent referrals to DSH ICF and acute care for compliance with the timeliness requirements for referrals.  *See* Program Guide 12-1-16 (30 days from referral and 5 days from IDTT identification of need to referral for ICF, and for APP 10 days from referral plus 2 days from IDTT identification of need to referral; transfer within 72 hours of bed assignment).

V.   **Suicide Prevention:**

The last reported LAC suicide was the ██████████ Suicide of ██████████ ██████ .  The CDCR suicide report on his death raised concerns about (1) improper delays in transferring him to a higher level of care given his mounting deterioration in

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 9


ASU, (2) inconsistent and clearly erroneous documentation in his medical record (a clinician note in his medical record incorrectly noted he was treatment compliant and went to yard when he was refusing all medication and would not leave his cell), and (3) failures of nursing staff to refer him for medication non-compliance.  Please investigate the institution's efforts to remedy these problems.  Lindsay Hayes also looked at this suicide and found some serious issues not addressed in the CDCR Suicide Review, including discussion of other possible precipitating factors (e.g., increasing paranoia, AH, and noncompliance with psychotropic medication), a deficient Suicide Risk Evaluation, as well as missed and problematic daily psych tech rounds.

The Lindsay Hayes Report on LAC also found problems with the documentation of observations of suicidal prisoners by nursing staff:  "staff were using a form that contained pre-printed 15 minute intervals."  *See* 1/14/15 Hayes Report (Docket 5259) at 37.  He also found that "staff had not documented any observation of an inmate on suicide precaution for over one hour, from 9:30 am to 10:30 am."  *Id.*  He also found that custody officers in the CCCMS ASU unit were aware of the requirement to conduct staggered 30-minute rounds for individuals in their first 21 days using Guard One, but were not aware of the duty to conduct 30-minute rounds of all ASU inmates.  *Id.*  Instead, they were documenting 60-minute custody checks of all ASU inmates.  *Id.*

Please investigate whether these issues have been remedied.

Lindsay Hayes also noted that clinical staff had not received annual suicide prevention block training.  *Id*. at 39.  Please check on the current status of such training.


## VI.    **EOP and CCCMS Programs**:

The 25th Report noted that there had been an increase in the institution's population of more severely mentally ill individuals due to Realignment.  25th Report at 334.  The EOP program at LAC is now larger than ever with 440 patients.   The 25th Report noted problems with correctional counselors' attendance at IDTTs.  *Id*. at 334.

1.    **Treatment and office space for mainline EOPs**:  The new EOP ASU treatment unit was initially intended to provide treatment and office space for the mainline D-Yard EOP program.  That program has grown considerably since the monitors last visited CSP-LAC, but there were some problems with lack of treatment space even with fewer EOP prisoners.  Please report on the adequacy of treatment space for the mainline EOP program on D-Yard.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 10

Between November 2012 and January 2013, mainline EOP prisoners attending only 3.82 hours/week of treatment.  Stewart Termination Declaration (Docket 4381) ¶ 323 on p. 112.  How many treatment hours are currently being scheduled, offered and attended to EOP prisoners?

2.      **C-Yard EOP SNYs**:  When Dr. Stewart visited LAC in January 2013, there was a new, poorly resourced group treatment program on C-Yard for the EOP prisoners waiting to transfer to an appropriate SNY EOP placement.  This problem appears to persist.  *See* 9/23/14 M. Mendelson-N. Weber Email; 9/12/14 M. Mendelson-N. Weber Email (**Appendix A**).  How many EOPs are there currently on the C-Yard SNY yard?  How much treatment are they receiving?  What is the staffing for the program?  Is the treatment adequate and meaningful?  Please review this program.

3.      **D-Yard EOP Exercise Access**:  We received reports last summer that D-Yard General population prisoners were receiving as little as two (2) hours/week of exercise time due to general staffing shortages.  See 8/13/14 M. Mendelson Email (**Appendix B**).  Please report on exercise availability for EOP prisoners on C-Yard, D-Yard and in the EOP ASU unit.

VII.    **Individual Class Member Issues:**

Plaintiffs request that the monitors check on the following individual prisoners who have reported:

1.      ███████████████████      As noted above, ███████████ has been in the CCCMS ASU program at LAC for more than 2 years.  When Dr. Stewart visited him in January of 2013, he felt ██████████ should be receiving care at the EOP level of care. Please review his clinical condition, the reasons for his long retention in ASU.  He appears to be receiving additional RVRs in ASU, possibly due to the lack of adequate mental health care.

2.      **EOP SNY Class Members on C-Yard**: Plaintiffs wrote to defendants in September 2014 about two EOP SNY class members on C-Yard waiting for extended periods of time for placement in a formal EOP program.  (Appendix A hereto.)  Please investigate the current clinical condition and the treatment being afforded any long-term EOP SNY cases on C-Yard at the time of the visit.

3.      ███████████████████ ██: ████████████ is in the EOP ASU at Lancaster ███
██████████████████████████████████████████

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 11


████████████████ but for some reason does not appear on the EOP ASU tracking
data for CSP-LAC.  Please assess his clinical condition, his possible need for a higher
level of care, and the reasons for his continued placement in ASU.  We understood that
he was endorsed to a Level III EOP SNY████████.


## VIII.   Use of Force Issues:

Plaintiffs request that the Special Master review and report on implementation of
CDCR's changes to Use of Force policies, procedures, and regulations. How many Use
of Force/Health Care Staff Use of Force reports were generated for *Coleman* class
members during the reporting period (DOM §§ 51020.17, 51020.17.6)?  Do the reports
appropriately document whether de-escalation ("cool-down") strategies were used and
the result?  Do mental health staff reports document the inmate's ability to comply with
or understand orders and document the timeline for the assessment and clinical
intervention (DOM § 51020.17.6)?   Plaintiffs request information on the adequacy of the
assessments and clinical interventions for Use of Force incidents regarding class
members.

Plaintiffs request a review of implementation of the policy (including training)
prohibiting use of chemical agents, absent high-level authorization, in controlled Use of
Force incidents where the inmate is housed in an MHCB, PIP, OHU, PSU, or EOP ASU,
or where the inmate does not possess the ability to understand orders, has difficulty
complying due to mental health issues, or is at increased risk of decompensation resulting
from such Use of Force (DOM § 51020.15.3).

Plaintiffs request a review of implementation of the policy (including training)
clarifying that controlled Use of Force incidents do not require full cell extraction, such
as where medication administration or treatment may be completed without removing the
inmate from the cell (DOM § 51020.12.1).

Plaintiffs request a review of the application of the modified definition of
"imminent threat" warranting immediate Use of Force (DOM § 51020.4) (including
training).

Plaintiffs request a review of implementation (including training) of the amended
policy on use of handheld batons (DOM § 51020.5).

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 12

Plaintiffs request a review of implementation (including training) of the new guidelines for use of OC spray.

Plaintiffs request a review of the modified institutional Use of Force incident review and reporting processes (DOM §§ 51020.17, 51020.19.5, 51020.19).

Finally, Plaintiffs request that the Special Master team review a representative sample of video recordings showing controlled Uses of Force incidents involving *Coleman* class members at the institution, and report on any relevant findings.

**IX.**     **Management Cell Status**

Since the CDCR moratorium on use of management cell status for all *Coleman* class members (August 14, 2014 CDCR Memorandum), have any class members been placed on management cell status at the institution? If so, how many and in which unit(s)?

**X**.     **Rules Violations (RVRs)**:

Are mental health assessments done for RVRs imposed for MHCB prisoners, EOP prisoners, and CCCMS prisoners, as consistent with existing RVR policies and procedures?

Do hearing officers appropriately consider (and document consideration) of the mental health assessments? Do hearing officers appropriately consider the mental health assessments in determining whether to dismiss the RVR where the mental health assessment shows that the behavior at issue was a manifestation of mental illness? Do hearing officers appropriately consider the mental health input in deciding whether and how to mitigate the punishment?

What, if any, connection is made between the adjudication of RVRs and modification to respective class members' treatment plans?

In determining assessment of a possible SHU/PSU term, does the Institutional Classification Committee appropriately consider mental health input, including whether mental illness contributed to the RVR behavior and whether mental health factors should be considered in assessing the punishment?

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 13


What steps are planned at the institution in light of the findings in the Special Master's report on the implementation of RVR procedures?


## XI.    Hecker Issues:

**1.    Heat Alerts**: Class members at LAC consistently reported that they did not receive any programming on heat alert days.  At the QI tour in June 2013, staff reported that the policy is that EOP prisoners can go to the gym, but there is no alternative accommodation provided to CCCMS prisoners.

CDCR's 2014 Heat Plan policy requires that "to ensure that heat-risk IPs get equal access to programs, services, and activities" during heat alerts, institutions shall "include in their plan what reasonable accommodations for heat-risk IPs will be provided on each facility" and that "the accommodations provided shall be memorialized in the institution's Daily Activity Report."

LAC's April 2014 local operating procedure (Section 54060.4) says that if a heat-risk inmate patient is unable to participate "in the mandated minimum recreation program time; they shall be afforded the opportunity to participate in their housing unit's day-room activities, or their respective Facility's Gymnasium can be utilized to provide the mandated recreation time."  See p. 11.  Are these alternative dayroom or gym options being provided? Is someone keeping track of whether an inmate is unable to participate in the "mandated minimum recreation program time"? Are those alternatives only being provided if someone determines that a prisoner is below the minimum mandated recreation time, or are the alternatives provided any time there is a heat alert?  Are any accommodations being logged as required?

**2.    Job/Program Assignments**:  The assignment data provided by Defendants in February 2014 showed that non-MHSDS prisoners were more than five times more likely to have a job/program assignment than EOP prisoners. The gap between EOP prisoners and non-MHSDS prisoners was well above average for CDCR institutions.  For example, approximately 5% of EOP prisoners were assigned to a job, compared to approximately 40% of non-MHSDS prisoners.

Similarly, approximately 0.7% of EOP prisoners were assigned to education (and an additional 8.9% in the Voluntary Education Program), whereas 10.2% of non-MHSDS prisoners were in education (and an additional 18% in the voluntary education program). This may be because, as of June 2013 QI tour, all classrooms on EOP yard were being

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 14

used for treatment, which may prevent EOP prisoners from participating in education at LAC.

No EOP prisoners were assigned to a PIA job, compared to 4.4% of the non-MHSDS population.  This may be because, as of June 2013 QI tour, PIA is on A and C yards and EOP is on D yard. Are EOP prisoners denied access to PIA jobs?

On March 3, 2014, CDCR issued a memo requiring IDTTs to start evaluating EOP prisoners regarding their ability to participate in program assignments.  Have these new procedures regarding the evaluation of EOP inmates for program assignment been implemented and have relevant staff been trained? Are EOP prisoners being cleared for participation in programs? Are EOP class members being "cleared" solely for a job or education, or are IDTTs making more specific determinations about whether a prisoner should be cleared for interaction with GP inmates more generally, such as at chapel, visiting, yard, etc.?

**3.     Milestone Credits:** On May 23, 2014, CDCR issued new regulations providing that EOP prisoners should receive milestones credits for participation in EOP groups.  The regulations provide that if "inmates participate and successfully complete a minimum of 80 percent of all required group module treatment sessions in accordance with their mental health treatment plan within a 6-month period," they will receive two weeks of milestone credits (sentence reduction credits).

Have counselors and other relevant staff been trained about how to evaluate and award these credits? How are staff determining whether a class member successfully completed 80 percent of required group sessions? Are staff taking into account only what sessions were actually offered, and taking into account modified treatment schedules? Do the data provided for the institution indicate that EOP prisoners are now receiving milestones credits?  Are class members receiving 128G chronos that notify them that they have earned credits for their participation in groups?

**4.     Out of Level Housing**:  Do the data provided in Tab M indicate that CCCMS or EOP prisoners are being housed at higher security levels at a higher rate than non-MHSDS prisoners?  If so, what steps is the institution taking to ensure that class members are being rehoused at the appropriate security levels?

LAC has a Level I minimum support facility (Facility M).  Are Coleman class members (or prisoners needing psychiatric medications specifically) excluded from this facility? Are medications distributed to prisoners at this facility?

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
Memo To: Special Master Matthew A. Lopes and Coleman Special Master Team
January 28, 2015
Page 15


   **5.    Grievance Procedures:**  Have staff tasked with responding to ADA
appeals been trained that requests for accommodation or claims of disability
discrimination from prisoners with psychiatric disabilities should be answered through
the form 1824 process, and not screened out? Can appeals staff provide examples of such
appeals that have received responses?

   **6.    Reentry Services:**  LAC now has a reentry hub on Facility C, but EOP
prisoners are excluded from the reentry hub. Are EOP prisoners receiving the same
reentry programming as prisoners who participate in the reentry hubs? Are all Coleman
class members who are paroling being approached and assisted with benefit applications?

[1515139-1]

# EXHIBIT C



ROSEN BIEN
GALVAN & GRUNFELD LLP

P.O. Box 390
San Francisco, California 94104-0390
T: (415) 433-6830 ▪ F: (415) 433-7104 ▪ E: info@rbgg.com
www.rbgg.com

Lisa Ells
Email: LElls@rbgg.com

## MEMORANDUM

> **PRIVILEGED AND**
> **CONFIDENTIAL**
>
> **SUBJECT TO**
> **PROTECTIVE ORDER**

TO:       Special Master Matthew A. Lopes, Jr.
          *Coleman* Special Master Team

FROM:     Lisa Ells

CC:       Nick Weber, Russa Boyd, Elise Thorn, Christine Ciccotti

DATE:     March 18, 2015

RE:       *Coleman v. Brown*
          **Kern Valley State Prison (KVSP) 26th Round Monitoring Tour,**
          **March 24-26, 2015**
          Our File No. 0489-3

---

### 1.    Population and Staffing

Since the Special Master's 25th Round visit, KVSP's overall population has declined by 12% from 4,184 to 3,722 as of March 4, 2015. The mental health population has remained basically unchanged, dropping very slightly from 1,426 to 1,398 as of January 9, 2015. Both KVSP's EOP and CCCMS programs are overcrowded, at 135% and 127% of capacity respectively.

Review of the staffing data for January 2015 shows that KVSP lacks adequate staffing in key clinical positions, and relies heavily on registry staff to cover vacant staff psychiatrist positions. KVSP has been unable to fill 8 out of 9 staff psychiatrist positions for at least the last 6 months, and its reliance on registry staff to cover those empty positions has ranged from 5.06 and the current 6.8 registry positions. Additionally, one of the 2 KVSP chief psychologist positions has been vacant for at least 6 months and not filled by registry. Finally, it appears that KVSP lost a rec therapist recently, bringing their vacancy rate to 50% with no registry offset. We request that the monitoring team review the impact that these staffing problems have on the provision of mental health care.

[2644057-2]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
Memo To:  Special Master Matthew A. Lopes, Jr.
**KVSP 26th Round Pre-Tour Memo, March 24-26, 2015**

March 18, 2015
Page 2

2.      **Treatment Space**

In the Management Report for the 25th Round of Monitoring, KVSP stated that the lack of confidential treatment space for one-to-one and group treatment "remain[ed] the same" primary obstacle to the provision of mental health care as "they always had been" for the institution.  KVSP Management Report at 1-2.  Has the situation improved at all?

3.      **Mental Health Crisis Beds (MHCB)**

Lindsay Hayes noted during his recent tour that all KVSP MHCB patients were in safety smocks, including patients on a step-down level.  CDCR reported that it would be addressing the issue promptly.  We also understand that the temperature in the MHCB cells can be extremely cold.  Have these issues been addressed?

One class member, ███████████████, was admitted to KVSP's crisis bed unit ███████████████████████████████████████████████████████████ *See* ███████████████████████████████ As of the date of this memo, he does not appear to have been referred to DSH and remains at KVSP.  Was ████████ reviewed for a higher level of care?  Has he been admitted again since January?  Does his treatment plan adequately address the chronic admissions to crisis beds?

4.      **ASU**

**Case-by-Case Reviews.**  Our count shows that as of February 24, 2015, the number of greater-than-150-days MHSDS KVSP ASU inmates had increased substantially since September 22, 2014, from 26 to 45.  The number of CCCMS class members in ASU for over 150 days is almost one-third of the total number of CCCMS in seg overall (43 out of 150).

Has KVSP committed the resources necessary to complete the case-by-case reviews in a timely manner?  Also, is KVSP conducting additional case-by-case reviews on a rolling basis for the longest-ASU-stay class members moving forward?

**ASU Program.**

Plaintiffs have heard from numerous class members that staff in KVSP's ASU units are loudly banging the Guard One wands against the cells at night  It appears from these letters that the Guard One sensors may have been incorrectly installed directly onto the

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**
Memo To:  Special Master Matthew A. Lopes, Jr.
**KVSP 26th Round Pre-Tour Memo, March 24-26, 2015**

March 18, 2015
Page 3

cell doors, exacerbating the noise from the wand.  Plaintiffs request the Special Master team speak to class members and staff in the ASU about this issue and determine whether the improper installation and implementation of the Guard One system have been corrected.

5.      **EOP Program in C8**

Plaintiffs have received complaints from numerous class members in recent months of staff misconduct in C8 (EOP GP).  The behavior complained of includes subjecting all class members to strip searches after they return from morning yard, threats to drop EOP class members to CCCMS level of care if they do not cooperate, abusive cell searches and destruction of property, and verbal and physical harassment.  Plaintiffs ask the Special Master team to investigate this situation, including speaking with class members in this unit.

6.      **RVRs**

Plaintiffs request that the Special Master team review RVR No.  which was issued against an EOP class member. _____ for _____" for an incident on _____ when _____ was engaged in self-mutilation while alone in his cell.

# EXHIBIT D

| | |
|---|---|
| **From:** | Michael W. Bien |
| **To:** | Elise Thorn; Katherine Tebrock (Katherine.Tebrock@cdcr.ca.gov); Nick Weber; Russa Boyd |
| **Cc:** | Patrick McKinney; Steve Fama; Sara Norman; Jules Lobel (jill4@pitt.edu); Benjamin Rice; Coleman Special Master Team; Coleman Team - RBG Only |
| **Subject:** | Coleman - PBSP SHU Guard One Implementation Problems: Urgent! [IWOV-DMS.FID6429] |
| **Date:** | Monday, August 31, 2015 4:38:15 PM |
| **Importance:** | High |

We write to raise very serious and emergent concerns regarding the recent implementation of the Guard One system in the Pelican Bay State Prison SHU.  We received correspondence today indicating that at least one prisoner is on an active hunger strike and that a group hunger strike is planned.  The Warden at PBSP must assert control over custody staff in the SHU and their efforts to undermine the implementation of this CDCR policy.

We have received multiple credible reports from multiple prisoners that custody officers in the SHU are intentionally awakening each and every prisoner in the SHU every 30 minutes through not only aggressive use of the Guard One wand system and excessive stomping/key jingling noise throughout the rounding, but also by repeatedly slamming the door to the Pod, and shining their flashlights into every prisoner's eyes.  We have also received several credible reports that multiple prisoners have required medical attention due to the resulting effects of sleep deprivation and that many others are experiencing severe psychological distress.  As you know, CDCR has experienced resistance to the implementation of welfare checks and Guard One in other prisons and segregation units, which appears to have been successfully addressed by supervisors at those locations, including death row.

PBSP either lacks adequate custody staffing or as part of the job action, they are so contending that they are unable to carry out the rounding requirement while maintaining basic regular programs in the SHU.  We are reliably informed that yard time, canteen, mail, and shower opportunities have been severely curtailed since the implementation of Guard One, and that prisoners are being told this is due to the lack of staff available for any activities other than the completion of welfare checks.  We are also informed that access to basic hygiene supplies (shavers) and to clean laundry has been interrupted due to the alleged shortages in staffing resulting from Guard One implementation.  We ask that you urgently review the impact that the Guard One implementation has had on the regular PBSP program and that any necessary staffing adjustments be made immediately.  Correctional officers have made clear that they are forced to restrict these other activities on the Unit as a result of Coleman requiring them to do Guard One rounds.  Other forms of retaliation have been a new policy to restrict ventilation on the unit by closing the door to the yard.

Finally, we ask that the apparent campaign of misinformation  on the part of PBSP's custody staff immediately end.  We have received multiple and consistent reports that custody staff is telling prisoners that Coleman counsel are specifically responsible for the implementation of the Guard One system in the PBSP SHU and for the harms that prisoners in the SHU are

experiencing as a result of the misuse of the system, and that their complaints about the system can only be addressed by us and not through the normal grievance process. Encouraging prisoners to write to us rather than to use CDCR's grievance process reduces command staff's and headquarters' access to information about conditions in the SHU and hinders your ability to monitor and correct these serious concerns. We will, of course, respond to inmate correspondence, but we continue to encourage prisoners to use 602's and medical grievances to complain about the deprivations they are suffering in the sHU.

As you are well aware, Guard One was CDCR's chosen method to implement a long-standing requirement of regular welfare checks in CDCR's segregation system. We certainly did not ask for, and we most strongly object to, the retaliatory and dangerous manner in which PBSP staff have chosen to implement this valuable tool in the SHU.

Thank you for your immediate attention to what appears to be an increasingly dangerous situation. Conditions in the SHU, even when it operates routinely, are very difficult for human beings to tolerate. Whether or not the conditions cause permanent harm will be decided by the *Ashker* court. CDCR has now substantially worsened conditions in the SHU by its mismanagement of the implementation of Guard One.

Michael Bien

ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
mbien@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

# EXHIBIT E

| From: | Steven Fama |
|---|---|
| To: | Nick Weber; Michael W. Bien; Patrick McKinney; Elise Thorn; Christine Ciccotti |
| Cc: | Coleman Special Master Team; Coleman Team - RBG Only; Matt Lopes; Jonelie Navarro; Kerry Walsh; Mohamedu Jones; Sara Norman |
| Subject: | RE: Coleman: PBSP SHU Guardian One Welfare Checks [IWOV-DMS.FID6429] |
| Date: | Sunday, October 25, 2015 8:55:35 AM |

Hi Nick,

Thank you for the information provided, including the scaling back of Second and Third Watch Guard One checks to once-per-hour to reduce program interruptions. However, the report regarding the "average" noise level recorded over 24 hours in a Pelican Bay D-SHU cell misses the mark. The problems caused by noise from Guard One checks – the interruption of sleep – occurs during First Watch. More specifically, it is the <u>periodic</u> (twice-hourly) checks, including the opening and closing of pod doors, that causes noise said to be much louder that otherwise experienced during First Watch, thus caused people to be awakened. In these circumstances, the average noise level over a 24-hour period is of marginal if any relevance. Even a First Watch or hourly average sound levels would mask the significance of twice-hourly peaks in noise.

Please provide the dosimeter readings obtained for the eight hours comprising the First Watch. Please also provide the D-SHU unit, pod, and cell number where the readings were made, and the Guard One data for that cell (or the immediately adjacent cell, if the cell with the dosimeter was not checked because it was empty) corresponding to the Watch during which sound levels were recorded, so that we can calibrate and compare the noise levels to and with the checks. Finally, please verify that the cell used to obtain readings was in a unit in which Guard One checks where done in all pods during the First Watch, so that we can be sure that all six pod doors in the unit were opened and closed twice each hour.

Thanks,

Steve

**From:** Weber, Nicholas@CDCR [mailto:Nicholas.Weber@cdcr.ca.gov]
**Sent:** Friday, October 23, 2015 11:07 AM
**To:** Steven Fama; Michael W. Bien; McKinney, Patrick@CDCR; Elise Thorn; Christine Ciccotti
**Cc:** Coleman Special Master Team; Coleman Team - RBG Only; 'mlopes@pldw.com' (mlopes@pldw.com); 'JNavarro@pldw.com' (JNavarro@pldw.com); 'kwalsh@pldw.com' (kwalsh@pldw.com); Jones, Mohamedu
**Subject:** RE: Coleman: PBSP SHU Guardian One Welfare Checks [IWOV-DMS.FID6429]

All,

CDCR conducted a staffing assessment and noise assessment of the Pelican Bay State Prison (PBSP) Segregated Housing Unit Security/Welfare Check Procedure utilizing the Guard One system.

Following a site visit, CDCR determined that an appropriate remedy to address complaints regarding difficulty accessing programs, yard, and shower is to reduce the frequency of Security/Welfare Checks during second and third watch from 30 minute checks to hourly checks. Based on the physical design allowing for unrestricted inmate movement within the pods, frequent

Security/Welfare Checks hamper the ability of inmates to participate in programs, yard, and shower. By reducing the frequency of the checks to once an hour, inmates will continue to have unrestricted access to programs.   Additional staff will not be effective to allow for both programing and 30-minute checks as *any* staff presence in the pod inhibits the ability of inmates to have unrestricted movement.   Furthermore, reducing the checks to hourly is appropriate given the historically low suicide rate.

CDCR conducted a noise reading by placing a dosimeter on a sink in an empty Facility D cell for 24 hours.  The readings taken from the dosimeter are not consistent with the anecdotes reported to Plaintiffs' counsel.  In fact, noise readings on the unit have actually decreased from readings taken when the Guard One system was not being utilized.  We have confirmed that Security/Welfare Checks utilizing Guard One occurred pursuant to CDCR policy/procedure during the assessment.  The readings showed the average accumulated noise exposure was .57 decibels.  In December 2014, the California Department of Public Health Environmental Health Services section randomly selected numerous units with Facilities C and D to conduct noise level reviews.  During that review, which occurred prior to the use of the Guard One system, dosimeter readings did not identify noise levels above .70 decibels.

CDCR has confirmed that silent wands are used during first watch and that the Guard One sensor is placed between the doors.  These steps minimize disturbances that may occur during first watch.

To address complaints of noise caused by the locking mechanism on the pod door, CDCR is conducting an assessment of the locking mechanism. Staff is onsite at PBSP this week and we will report back once the assessment has been completed.


Nick Weber
Attorney

Department of Corrections & Rehabilitation
Healthcare Legal Team
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
Office (916) 323-3202
Fax (916) 322-9696

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Steven Fama [mailto:sfama@prisonlaw.com]
**Sent:** Wednesday, October 21, 2015 3:59 PM
**To:** Michael W. Bien; Weber, Nicholas@CDCR; McKinney, Patrick@CDCR; Elise Thorn; Christine Ciccotti
**Cc:** Coleman Special Master Team; Coleman Team - RBG Only; Jules Lobel
**Subject:** RE: Coleman: PBSP SHU Guardian One Welfare Checks [IWOV-DMS.FID6429]

Following up on Mike Bien's email below, I ask that you be prepared to discuss at next week's meetings (1) the provision of adequate ear-plugs on request to Pel Bay SHU prisoners (are they provided, and if not, why not), and (2) a two day / two night (first watch) visit to the Pel Bay SHU in the next 30-days by one of plaintiffs' class counsel – I think such a visit is necessary and hereby request it.

Thank you,

Steven Fama
Staff Attorney
Prison Law Office

**From:** Michael W. Bien [mailto:MBien@rbgg.com]
**Sent:** Wednesday, October 21, 2015 3:12 PM
**To:** Nick Weber; Patrick McKinney; Elise Thorn; Christine Ciccotti (Christine.Ciccotti@doj.ca.gov)
**Cc:** Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama; Jules Lobel (jll4@pitt.edu)
**Subject:** Coleman: PBSP SHU Guardian One Welfare Checks [IWOV-DMS.FID6429]

Counsel

We continue to receive complaints from prisoners and their advocates about the implementation of welfare checks in the PBSP SHU.  Attached is another batch we received today.  We also understand that recent interviews at PBSP by the *Ashker* team established that there were numerous current complaints about sleep deprivation—the problems continue!

Has additional custodial staffing been provided to PBSP SHU, as discussed at our last meeting in Sacramento, to address the staffing shortage caused by the new rounding requirements?

What have you determined about efforts to quiet the electronic doors?  Have you analyzed the option of leaving the pod doors open during third watch?

Have you investigated the other issues we raised such as ventilation being restricted, grievances being interfered with, retaliation for raising complaints?

Michael Bien

ROSEN BIEN GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
mbien@rbgg.com

www.rbgg.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

# EXHIBIT F

| | |
|---|---|
| **From:** | Steven Fama |
| **To:** | Nick Weber |
| **Cc:** | Elise Thorn; Christine.Ciccotti@doj.ca.gov; Danielle OBannon; Mohamedu Jones; Walsh, Kerry F.; Jonelie Navarro; Coleman Team - RBG Only; Molly Petchenik; Katie Tertocha; Sara Norman |
| **Subject:** | Re: Coleman Query: demand that twice-hourly Guard One checks cease at Pelican Bay SHU |
| **Date:** | Monday, January 8, 2018 4:08:38 PM |

Thank you for this information Nick. If I have any further concerns I will let you know.

— Steve

Sent from my iPhone

On Jan 8, 2018, at 10:46 AM, Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov> wrote:

> Steve,
>
> PBSP currently conducts hourly first watch security/welfare checks within the SHU facility, regardless of the reason the inmate was placed in the housing unit. Checks were completed twice hourly during first watch within the SHU for inmates on ASU overflow status, however, that error was corrected on October 11, 2017.
>
>
> Nick Weber
> Attorney
> Department of Corrections & Rehabilitation
> 1515 S Street, Suite 314S
> Sacramento, CA 95811-7243
> (916) 323-3202
>
>
> CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.
>
>
> **From:** Steven Fama [mailto:sfama@prisonlaw.com]
> **Sent:** Tuesday, January 02, 2018 12:41 PM
> **To:** Weber, Nicholas@CDCR; Elise Thorn; Christine.Ciccotti@doj.ca.gov; Danielle OBannon
> **Cc:** Jones, Mohamedu; Walsh, Kerry F.; JNavarro@pldw.com; Coleman Team - RBG Only; Molly Petchenik; Katie Tertocha; Sara Norman
> **Subject:** Coleman Query: demand that twice-hourly Guard One checks cease at Pelican Bay SHU

Dear Nick,

Plaintiffs write because we recently learned that CDCR conducts twice-hourly Guard One checks at the Pelican Bay SHU, and we demand that CDCR immediately stop these twice-hourly checks.

A Stipulated Order filed September 1, 2016 (copy attached) provides that Guard One checks are to be conducted but once per hour during First Watch "at Pelican Bay SHU."

Despite this Order, CDCR in recent months, we have recently learned, has conducted twice-hourly Guard One checks at the Pelican Bay SHU if the people confined at the SHU are classified as administrative segregation overflow.   Please see the attached October 2017 first level appeal response, which confirms the practice.   We received information last month indicating that the practice continue.

As I assume you ill agree, the agreed-on Order limiting Guard One checks during First Watch to once per hour at the Pelican Bay HU was based largely on the unique physical plant design of the buildings, including the small –sized pods and other elements that enhance rather than dampen noise.  The Order limiting First Watch Guard One checks to once-per-hour had nothing at all to do with the classification status of the people being checked.  As such, the Order limiting Guard One First Watch checks to one per hour applies to all housed at the SHU who are checked, including those considered administrative segregation.

Please let us know promptly that all First Watch Guard One checks at the Pelican Bay SHU will be and are limited to one per hour.  If this will not be done, please explain.

Thank you in advance for your anticipated prompt response regarding this matter.

Sincerely,

Steven Fama
Staff Attorney
Prison Law Office

EXHIBIT G

| | |
|---|---|
| **From:** | Steven Fama |
| **To:** | Nick Weber; Elise Thorn |
| **Cc:** | Mohamedu Jones; Kerry Walsh; Jonelie Navarro; Coleman Team - RBG Only; Nora Searle; Alex Kennedy |
| **Subject:** | Coleman Query: Guard One at HDSP Z-unit |
| **Date:** | Wednesday, November 11, 2015 8:44:21 AM |

Dear all at CDCR and DOJ:

A prisoner in HDSP's "Z" (stand-alone) unit writes that he has been subjected to what is described as the Guard One "bang 'n beep" for two months, causing interrupted sleep and other problems.  He states that even if the silent mode is used during first watch – and he indicates it is not, having heard an officer state that the beep cannot be turned off – it makes very little difference because sleep is interrupted by the noise from the metal-on-metal contact of the Guard One pipe against the sensor at each cell door.   He also indicates that earplugs are not made available.

Please respond to the concerns raised regarding Guard One in the HDSP Z-unit, including placement of sensors on metal doors and the resulting noise, use of silent mode during first watch, and the availability of ear plugs for prisoners in the unit.

Thank you for your anticipated prompt response regarding this matter.

Sincerely,

Steven Fama
Staff Attorney
Prison Law Office

# EXHIBIT H

| From: | Krista Stone-Manista |
|---|---|
| To: | Nick Weber |
| Cc: | Elise Thorn; Christine Ciccotti (Christine.Ciccotti@doj.ca.gov); Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama |
| Subject: | Coleman - Group Appeal re Guard One at Pleasant Valley [IWOV-DMS.FID6429] |
| Date: | Tuesday, February 23, 2016 5:37:12 PM |
| Attachments: | Coleman, Group Appeal re PVSP Guard One, 1-4-16.pdf |

Dear Nick and all,

I write to share the attached group appeal filed on January 4, 2016, by 26 prisoners in the PVSP STRH regarding the implementation of Guard One there, and to ask that CDCR review this issue. The filer of the group appeal, █████████████████ has reported to us in detail about what seems to be unusually loud clanging associated with the Guard One wand in the unit. (We are sharing this information and the attached appeal with his permission.)

The root of the problem appears to be that the sensors were installed directly on the cell doors at PVSP. My understanding is that this type of installation caused problems with excessive banging noise at other prisons and has been remedied elsewhere. While the relief requested in the appeal (discontinuation of Guard One) is not the answer, it seems from our past experiences with similar complaints that the effects of Guard One in this unit can likely be remedied with appropriate physical plant modifications and/or staff training on minimization of the wand "banging" noise.

Thank you for your prompt attention to this issue, which appears to be causing significant distress to a large number of class members in the STRH at PVSP.

Regards,

Krista

**Krista Stone-Manista**

ROSEN BIEN GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor

San Francisco, CA 94105

(415) 433-6830

KStone-Manista@rbgg.com

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE: As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States

federal tax laws.

# EXHIBIT I

| | |
|---|---|
| **From:** | Weber, Nicholas@CDCR |
| **To:** | Steve Fama; Elise Thorn; Christine.Ciccotti@doj.ca.gov; Thomas Gilevich |
| **Cc:** | Mohamedu Jones; Walsh, Kerry F.; Jonelie Navarro; Coleman Team - RBG Only; Molly Petchenik; Joseph Bear |
| **Subject:** | RE: Coleman Query: CCWF Building 504 (and elsewhere?) not using silent pipe for First Watch Guard One checks |
| **Date:** | Friday, October 13, 2017 1:18:20 PM |

Hi Steve,

CCWF confirms that they received two silenced pipes from HQ and have been using a silenced pipe since September 27, 2017.  CCWF's Facility Captain spoke to ASU staff who confirmed they are using the silenced pipe.  Additionally, CCWF staff spoke to two condemned inmates who often speak on behalf of the condemned population.  They told staff that the pipes had been silent for about two weeks now.  CCWF will reiterate expectations that first watch pipes must be silent but at this time they are unaware of any beeping pipes used during first watch since late September.

Nick Weber

Attorney

Department of Corrections & Rehabilitation

1515 S Street, Suite 314S

Sacramento, CA  95811-7243

(916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Steven Fama [mailto:sfama@prisonlaw.com]
**Sent:** Friday, October 13, 2017 11:49 AM
**To:** Weber, Nicholas@CDCR; Elise Thorn; Christine.Ciccotti@doj.ca.gov; Gilevich, Thomas@CDCR
**Cc:** Jones, Mohamedu; Walsh, Kerry F.; JNavarro@pldw.com; Coleman Team - RBG Only; Molly Petchenik; Joseph Bear
**Subject:** RE: Coleman Query: CCWF Building 504 (and elsewhere?) not using silent pipe for First Watch Guard One checks

Hi Nick,

In a  letter dated 10/5/17, a resident of CCWF Building 504 states that officers were still using a beeping "pipe" for First Watch Guard one checks, despite my report to her, based on your email below, that the problem would be resolved via the overnighting of new pipes on  9/27/17.  The resident also says that an officer uses a beeping pipe with a piece of tape wrapped around it, but that the tape does not muffle the sound and sleep is thus interrupted.

Could you please check on this and let us know?

Thanks,

Steve

Steven Fama
Staff Attorney
Prison Law Office

---

**From:** Weber, Nicholas@CDCR [mailto:Nicholas.Weber@cdcr.ca.gov]
**Sent:** Wednesday, September 27, 2017 10:20 AM
**To:** Steven Fama <sfama@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>;
Christine.Ciccotti@doj.ca.gov; Gilevich, Thomas@CDCR <Thomas.Gilevich@cdcr.ca.gov>
**Cc:** Jones, Mohamedu <MJones@pldw.com>; Walsh, Kerry F. <KWalsh@pldw.com>;
JNavarro@pldw.com; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Molly
Petchenik <molly@prisonlaw.com>; Joseph Bear <joseph@prisonlaw.com>
**Subject:** RE: Coleman Query: CCWF Building 504 (and elsewhere?) not using silent pipe for First
Watch Guard One checks

Steve,

This issue appears to be due to some faulty hardware that we are in the process of swapping out.
The wand pipe was observed to randomly beep at night but when placed in the dock it reset itself.
The problem apparently has reoccurred.  The first watch sergeant observed Guard One rounds last
night at CCWF and determined the pipe was still making noise.  CCWF is looking for a spare silent
pipe on site and headquarters will overnight new silent pipes today.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
Office (916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain
confidential and/or legally privileged information. It is solely for the use of the intended
recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate
applicable laws including the Electronic Communications Privacy Act. If you are not the
intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Steven Fama [mailto:sfama@prisonlaw.com]
**Sent:** Tuesday, September 26, 2017 3:25 PM

**To:** Weber, Nicholas@CDCR; Elise Thorn; Christine.Ciccotti@doj.ca.gov; Gilevich, Thomas@CDCR
**Cc:** Jones, Mohamedu; Walsh, Kerry F.; JNavarro@pldw.com; Coleman Team - RBG Only; Molly Petchenik; Joseph Bear
**Subject:** Coleman Query: CCWF Building 504 (and elsewhere?) not using silent pipe for First Watch Guard One checks

Dear Nick and all at CDCR / DOJ,

In letters received this month and last, a resident of CCWF Building 504 – which I believe houses Ad Seg and condemned prisoners – states that officers are not using the silent Guard One pipe during First Watch, with resulting interruptions of sleep, etc.   As I recall, use of the Guard One silent pipe was a requirement of the safety check program.  In fact, an administrative appeal regarding use of a non-silent Guard One pipe during First Watch in Building was filed last year (Log no. 16-01987); I have received copies of what appear to be copies of that appeal, including first and second level responses.  The 12/5/16 first level response to that appeal stated that staff will only use a silent pipe on First Watch when doing Guard One; the 2/22/17 second level appeal response is in accord.  Despite the appeal responses, a beeping pipe is apparently now being regularly used (my understanding is that it is used every night).

Please respond to the following:

> Please review, and determine what is happening and if as I am informed a non-silent Guard One pipe is being used during First Watch in Building 504 at CCWF, please both explain and have that stopped, and let me know.

> Further, if a non-silent Guard One pipe is being used during First Watch in CCWF Building 504, please determine if this is isolated to that building at CCWF, and please let me know that as well.

Thank you in advance for your anticipated prompt response to these queries.

Steve

Steven Fama

Staff Attorney
Prison Law Office

# EXHIBIT J

| From: | Steven Fama |
|---|---|
| To: | Nick Weber; Elise Thorn; Christine.Ciccotti@doj.ca.gov; Danielle OBannon; Matt Lopes; Mohamedu Jones; Walsh, Kerry F.; Jonelie Navarro |
| Cc: | Coleman Team - RBG Only; Sara Norman; Margot Mendelson; Katie Tertocha |
| Subject: | Coleman query: First Watch Guard One checks at Pelican Bay SHU |
| Date: | Monday, February 12, 2018 3:08:25 PM |
| Attachments: | Pel Bay Guard One appeal response.pdf |

Dear Nick and all,

A person incarcerated in the Pelican Bay C-SHU facility has recently written that there are continuing problems with numerous different officers  making substantial noise during First Watch Guard One checks, thus repeatedly interrupting sleep.  Previously, I'd received an administrative appeal response stating that Guard One "Button[s]" in that C-SHU are located on pipe chase doors that are "hollow inside" (see page 3 of the attached appeal), meaning that any touching of the Guard One wand (or pipe) to a button (sensor) amplifies or reverberates noise.

I seem to recall that there was one or more prisons that similarly had problems with Guard One buttons or sensors being placed on hollow doors or similar locations that caused noise to be amplified, and that CDCR re-located the sensors to reduce noise.

Can you please look into and report back regarding the concern about continuing problems with numerous different officers  making substantial noise during First Watch Guard One checks in the Pelican Bay C-SHU facility?  As part of that, please explore and respond to the concern about the placement of the Guard One sensor on a door that is hollow inside, and whether the sensor can be re-located to reduce amplification of the noise.

Thank you in advance for your anticipated response to these requests.

Sincerely,

Steven Fama
Staff Attorney
Prison Law Office