DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION DISABILITY RIGHTS
PROGRAM
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 343-0762

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO OCTOBER 8, 2019 ORDER** |
| v. | |
| GAVIN NEWSOM, et al., | Judge: Hon. Kimberly J. Mueller |
| Defendants. | Date: December 13, 2019<br>Time: 10:00 a.m. |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

I.    DEFENDANTS STILL HAVE NOT STATED WITH CERTAINTY THAT
      THE CIM PROJECT WILL BE SUFFICIENT, AND THEIR
      PROJECTIONS ARE BASED ON QUESTIONABLE ASSUMPTIONS ............... 2

II.   DEFENDANTS IGNORE HISTORICAL CONSTRUCTION DELAYS,
      AND HAVE NOT ADDRESSED HOW THEY WILL PERMANENTLY
      DECOMMISSION ALL UNLICENSED BEDS IF THEIR PROJECTIONS
      ARE WRONG ......................................................................................................... 8

III.  DEFENDANTS CANNOT WAIT TO TAKE STEPS TO STEM THE TIDE
      OF SUICIDES OCCURRING AFTER LEVEL OF CARE DISCHARGES ........... 9

IV.   WHETHER EXPLICIT OR NOT, DEFENDANTS' EFFORTS TO
      MANAGE UTILIZATION OF RESOURCES TO IMPROVE
      COMPLIANCE RATES HAVE CREATED PRESSURE ON CLINICIANS,
      AND DEFENDANTS MUST CONTINUE TO FILL DSH BEDS EVEN
      AFTER THE SPECIAL MASTER TURNS HIS ATTENTION
      ELSEWHERE ....................................................................................................... 11

V.    DEFENDANTS ADMIT THAT UNTIL AT LEAST JUNE 2019, THEIR
      MHCB TRANSFER DATA WAS BASED ON THE INCORRECT
      REFERRAL TIME, YET REFUSE TO ANALYZE THE IMPACT ON
      THEIR COMPLIANCE ........................................................................................ 12

VI.   THE SPECIAL MASTER SHOULD CONDUCT AN UNMET BED NEED
      STUDY, BUT THE COURT SHOULD REQUIRE DEFENDANTS TO
      IMPLEMENT THE STAFFING PLAN FULLY AND CONTINUE THE
      RJD PROJECT NOW ........................................................................................... 16

VII.  DEFENDANTS REMAIN FAR FROM COMPLIANT WITH THE
      COURT'S STAFFING ORDERS AND THEIR RECENT PROPOSALS
      WILL NOT ACHIEVE COMPLIANCE ............................................................... 17

CERTIFICATION ...................................................................................................... 19

[3469452.2]

# INTRODUCTION

Defendants ask this Court to sanction their decision not to move forward with the second 50-bed Mental Health Crisis Bed ("MHCB") project at Richard J. Donovan Correctional Facility ("RJD") based on their projections of lower future need, their recent increased compliance with the 24-hour transfer requirement, and their assurance that the 50-bed project at California Institution for Men ("CIM") is on track to be completed by the end of 2022.  Defendants' Response to October 8, 2019 Order ("Defs.' Resp."), ECF No. 6402, Nov. 27, 2019.

But those are all predicated on faulty assumptions.  Defendants have not provided any concrete evidence or analysis to establish that the 50-bed project alone will be sufficient to serve the need for MHCB care among the *Coleman* class, and that Defendants will be able to decommission use of all of their unlicensed and temporary MHCB and inpatient beds.  Regardless, their population projections are flawed, because they rely on the seriously mentally ill population decreasing proportionally with the total inmate population, when the opposite has been true over the last ten years.  And Defendants' historical pattern of construction delays seriously undermines Defendants' projected timeline for completing the CIM project, on which their promise to cease use of unlicensed crisis beds relies.

Moreover, the recently improved compliance rates Defendants tout are highly questionable—they are both based on an incorrect measure for starting the 24-hour clock, and they appear to have been achieved at least partially through Defendants' aggressive utilization management strategies, which have already had a tragic and significant impact on patients' lives and well-being.  While Defendants' non-opposition to the Special Master's proposed unmet bed need study is encouraging, their proposal to defer discussions regarding staffing and construction display a short-sightedness guaranteed to prolong court oversight in this case.  To prevent years more of delay once actual bed need is assessed, the Court should require Defendants to continue funding the RJD project during the pendency of the study, and to treat the massive psychiatry vacancies that

[3469452.2]

1  continue to plague this case with the urgency the issue warrants, rather than continuing to

2  push failed, piecemeal, and/or rejected proposals.

3  **I.      DEFENDANTS STILL HAVE NOT STATED WITH CERTAINTY THAT
         THE CIM PROJECT WILL BE SUFFICIENT, AND THEIR PROJECTIONS
4        ARE BASED ON QUESTIONABLE ASSUMPTIONS**

5          The Court's October 8, 2019 Order asked Defendants to answer directly the

6  question that they dodged at the September status conference:  whether "the reduced [50-

7  bed CIM] plan [will] allow defendants to take all 73 unlicensed MHCBs offline and still

8  achieve compliance with the requirements of this case for access to MHCB care."  Order,

9  Oct. 8, 2019, ECF No. 6312, at 5.  Defendants still have not done so.  They have not

10 provided any concrete analysis showing that their reduced plan will be sufficient to meet

11 ongoing crisis bed (much less inpatient) demand.  Instead, they continue to hedge and offer

12 only vague statements, claiming that they "anticipate[]" that the CIM project will be

13 sufficient, assuming "the population projections are accurate," and that the "current

14 projection" is that the reduced scope "will likely satisfy CDCR's need for crisis beds."

15 Defs.' Resp. at 2-3.

16         The problem is that Defendants' population projections are fundamentally flawed.

17 Defendants' bed planning projections for crisis bed care are predicated on an assumption

18 that MHCB "bed need is estimated to decrease throughout the forecast years due to the

19 projected annual decrease in the CDCR Total Male Population."  *See, e.g.*, Declaration of

20 Jenny S. Yelin in Support of Plaintiffs' Opening Brief re MHCB Construction and Unmet

21 Bed Need Study ("Yelin Decl."), ECF No. 6401-1, Nov. 27, 2019, Ex. F, at 47[1]; s*ee also

22 id.*, Ex. G, at 72.  In reality, decreases in the total male population in CDCR have not been

23 accompanied by concomitant decreases in the population of seriously mentally ill

24 individuals who most often require crisis bed care.  To the contrary, while the total CDCR

25 population decreased by nearly 25% between August 2009 and August 2019, the EOP

26

27 [1] Pagination references are to the ECF pagination, unless otherwise stated.

28

[3469452.2]

population has *increased* by more than 35%.  Declaration of Jenny S. Yelin in Support of Plaintiffs' Reply to Defendants' Response to Oct. 8, 2019 Order ("Yelin Reply Decl."), filed herewith, at ¶¶ 2-4.  While EOP patients constituted less than 3% of the CDCR population in 2009, they represented more than 5% of the prison population by August 2019.  *Id.*, ¶ 4.  Similarly, while the combined EOP and CCCMS population in 2009 was 20% of the total CDCR population, it now constitutes 28% of the total population.  *Id.*  The mental health population is thus both larger and more acute than it was a decade ago, and given Defendants' recent efforts to suppress usage of higher levels of care, including EOP care, *see* Yelin Decl. at ¶¶ 16-20, the current EOP population probably underrepresents the true degree of mental health needs in the prison population.  Furthermore, as the Special Master found in his most recent annual report on CDCR suicides, EOP patients commit suicide at a proportionally much higher rate than their percentage of the total population, so the increasingly higher percentage of EOP patients in CDCR suggests a future increased need for crisis bed care.  *See* Report on Suicides Completed in the CDCR January 1, 2014, December 31, 2014, March 29, 2016, ECF No. 5428 at 14-15 (noting EOP patients constituted 3.88% of the total CDCR inmate population, but 47.8% of the suicides were by EOP patients).  There is no evidence to suggest that future decreases in the total male population will be accompanied by decreases in the population of *Coleman* class members most likely to utilize crisis bed level of care, without Defendants adopting a targeted strategy toward population reduction, which they have so far not done.

Defendants' arguments based on the "surplus" capacity for crisis beds in 2018 and 2019 are also problematic.  *See* Defs.' Resp. at 2-3.  Defendants conveniently ignore their prior representations to the Legislature that they also plan to use some of the licensed CIM beds to "discontinue use of licensed beds at Patton State Hospital" for female *Coleman* class members, *see* Borg Decl. in Support of Defs.' 4th Status Report on MHCB Funding, ECF No. 6256-1, Aug. 28, 2019, Ex. 1, at 5, and their statements that the same beds may be "flexed" for male inpatient use.  *See, e.g.*, Sept. 28, 2017 Hr'g Tr., at 67:19-23; Sept. 13, 2019 Hr'g Tr., ECF No. 6349, at 11:14-19; *see also* Defs.' Resp. at 4-5.  Defendants

1  cannot use the beds for all of these purposes, decommission all unlicensed MHCBs and all

2  unlicensed inpatient beds, and be able to absorb spikes in demand, which are inevitable.

3  *See* Plaintiffs' Opening Brief re MHCB Construction and Unmet Bed Need Study ("Pls.'

4  Op. Br."), ECF No. 6401, Nov. 27, 2019 at 13, and citations therein.

5       In focusing on only the 2019 and 2018 census, Defendants also omit the fact that,

6  according to the single-day snapshot data Defendants provide monthly to the Plaintiffs and

7  Special Master, the male MHCB census exceeded the licensed capacity on at least two

8  occasions in 2017, and on at least one occasion exactly matched it with not a single bed to

9  spare.  Yelin Reply Decl. at ¶ 12 and Ex. D, E, F (Defendants' Management Information

10  Summary (MIS) reports show that on July 17, 2017, the male MHCB census was 399 (16

11  more patients than capacity of licensed beds); on September 25, 2017, the male MHCB

12  census was 385 (2 more patients than capacity of licensed beds); and on August 28, 2017,

13  the census was 383, the exact number of licensed MHCBs for males).

14       Moreover, while Defendants admit the female MHCB census has exceeded the

15  number of licensed beds in 2019, they represent that it never did so in 2018.  *See* Defs.'

16  Resp. 2.  But that claim is both meaningless and misleading.  Defendants had no

17  unlicensed female MHCB beds in 2018; the first time CDCR reported the availability of

18  the 19 unlicensed CIW beds was in January 2019.  *Compare* Defs' Census, Waitlist,

19  Transfer Timeline Report for January 2019, ECF No. 6090, at 9 (reporting 41 female

20  MHCBs), *with* Defs' Census, Waitlist, Transfer Timeline Report for December 2018, ECF

21  No. 6072, at 9 (reporting 22 female MHCBs).  Before this Court permitted Defendants to

22  open the 19 unlicensed female crisis beds on an emergency basis, the only reason the

23  female MHCB census did not exceed the number of licensed beds in 2018 is because

24  numerous female patients each month sat on a waitlist, most of them past Program Guide

25  timeframes, receiving no care.  *See, e.g.*, Defs.' Census, Waitlist, Transfer Timeline Report

26  for June 2018, ECF No. 5858, at 9 (reporting 15 women waiting for MHCB care, 11 of

27  them past Program Guide timeframes, and only 3 available beds); Defs.' Census, Waitlist,

28  Transfer Timeline Report for July 2018, ECF No. 5882, at 9 (reporting 9 women waiting

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO OCTOBER 8, 2019 ORDER

1  for MHCB care, 7 of them past Program Guide timeframes, and only 1 available bed);

2  Defs.' Census, Waitlist, Transfer Timeline Report for September 2018, ECF No. 5956, at 9

3  (reporting 17 women waiting for MHCB care, 13 of them past Program Guide timeframes,

4  and only 5 available beds).

5        Regardless, Defendants' alleged "surplus" in the last two years does not come close

6  to the excess capacity that would result if Defendants followed the Court's

7  recommendation and adopted the 80% occupancy standard used in community inpatient

8  hospitals.  *See* Order, Mar. 24, 2017, ECF No. 5583 at 14.[2]  As discussed further in

9  Plaintiffs' Opening Brief, Defendants should at the very least continue to fund and design

10  the RJD project so that if their projections are inaccurate, they will be positioned to meet

11  demand, with enough open beds to handle unexpected surges of demand, without years

12  more of delay.  *See* Pls.' Op. Br. at 7-8.

13        While Defendants' compliance rates with the 24-hour transfer requirement have

14  improved significantly in the last two years, Plaintiffs have expressed serious concerns that

15  Defendants have achieved those improvements at substantial cost to the *Coleman* class,

16  through aggressive utilization management techniques that have resulted in failures to refer

17  patients needing higher levels of care or clinically inappropriate discharges.  *See* Pls.' Op.

18  Br. at 14-20.  Defendants suggest that a variety of initiatives—including the

19  implementation of Crisis Intervention Teams (CITs) at nineteen institutions—have

20  improved their transfer timeline compliance by reducing MHCB referrals for patients who

21  do not actually need MHCB care.  *See* Defs.' Resp. at 3-4.  Defendants also claim that "a

22  statewide crisis intervention team policy and procedure is currently under review by the

23  Special Master."  *Id.* at 4.  But Defendants have never presented any data or evidence to

24  show that their crisis intervention teams have eliminated largely unnecessary MHCB

25  —————————————

26  [2] In September 2019, when the crisis bed census peaked in 2019, 91% of the male licensed
27  crisis beds were occupied.  Defs.' Resp. at 2.  In January 2018, when the crisis bed census
peaked in 2018, 99% of the licensed crisis beds were occupied.  *Id.*

28

1    referrals in order to clear clogs in the system and allow for the higher compliance rates.  In

2    fact, during the two year period in which the CITs have been in place, the suicide rate has

3    continued to skyrocket, implying that efforts to reduce "unnecessary" MHCB admissions

4    have also eliminated ones that were necessary.  *See* Yelin Decl. at ¶¶ 2-6.  And despite

5    promising during workgroup meetings since 2017 that they would share a written policy

6    regarding how CITs are staffed and operate in practice, Defendants have never done so,

7    and Plaintiffs and the Special Master have discovered during recent monitoring tours that

8    in some institutions, CITs consist of a single clinician, not a multi-disciplinary team as

9    Defendants originally described.  Yelin Reply Decl. at ¶¶ 5-6.

10        Before Plaintiffs, the Special Master, and the Court are able to analyze fully

11   Defendants' statewide approach to CITs and whether they are inappropriately suppressing

12   necessary MHCB referrals—through the Unmet Bed Need Study discussed below, or some

13   other mechanism—Defendants should not be permitted to abandon the RJD project.

14        In addition to the CITs, Defendants describe multiple initiatives promised in 2017

15   that are at various stages of fruition.  But Defendants' own data suggests that their

16   improved compliance with the 24-hour transfer requirement is due less to these

17   administrative changes than the fact that Defendants appear to be restricting utilization of

18   crisis beds.  Defendants note that in 2017, CDCR referred 15,623 patients to crisis bed

19   level of care, and slightly more in 2018, at 15,889 .  *Id.*; *see also* Declaration of Jay Powell

20   in Support of Defs.' Resp. to Oct. 8, 2019 Order ("Powell Decl."), ECF No. 6402-1, at ¶

21   11.  "[I]n 2019, as of the end of October, CDCR had referred 11,024 patients to crisis bed

22   level of care."  *Id.*  In 2017 and 2018, Defendants referred an average of 1,302 and 1,324

23   patients per month, respectively.  Yelin Reply Decl. at ¶ 7.  In 2019, according to the data

24   reported in Defendants' brief, the monthly average decreased by 200 or more patients per

25   month, to 1,102 monthly referrals, a 17% decrease from the year prior.  *Id.*  And the data

26   Defendants produce to the Special Master and Plaintiffs monthly regarding MHCB

27   referrals that is generated directly from EHRS, rather than from the HCPOP Referrals and

28   Endorsement Tracking ("HEART") system, is different and shows an even starker

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO OCTOBER 8, 2019 ORDER

decrease in referrals in 2019—an average of 1,055 MHCB referrals monthly, down from 1,318 monthly in 2018, so a 20% decrease.[3]  *Id.*, ¶ 8.  Nor is it likely that the final two months of the year will bring 2019's referral totals anywhere near to the levels of the two prior years—in fact, historically, MHCB referrals have gone down in the last two months of the year, and generally peak in the summer months.  *Id.*, ¶ 9.

As such, Defendants' claim that they have "not stopped referring patients to crisis beds" is only somewhat true, because referrals have indeed plummeted this year, which allowed Defendants to largely comply with transfer timelines but at the cost of human life, as reflected in the outrageously high suicide rate this year.  *See* Defs.' Resp. at 4; *cf.* Yelin Reply Decl. at ¶ 14 (in one 2019 suicide, Defendants' suicide case reviewer found clinician failed to refer patient reporting suicidal feelings and anxiety to crisis bed after four-minute evaluation, and reviewer recommended Quality Improvement Plan to address this deficiency); *id.* at ¶ 15 (in another 2019 suicide, Defendants' suicide case reviewer found that patient's MHCB referral was rescinded a few days prior to his suicide despite months of decompensation, and that patient was not re-referred despite telling his clinician he believed staff wanted him to kill himself during five-day follow-up contact the day before his suicide, and reviewer recommended Quality Improvement Plan to address this deficiency).  Defendants also have made clear that they currently have no concrete plan to eliminate their use of temporary and unlicensed inpatient beds.  Defs.' Resp. at 5.  The Court should not sanction their reduced MHCB construction plan until the Special Master and parties can assess the actual long-term need for those levels of care through the Unmet

---

[3] The MHCB referral numbers reported in Defendants' brief were generated from HEART, HCPOP's database.  Powell Decl., ¶ 11.  Plaintiffs extracted the MHCB referral numbers discussed above from the MHCB Referrals Report that is included as Enclosure 7a in Defendants' monthly data production to the Special Master and Plaintiffs.  Yelin Reply Decl. at ¶ 8.  Defendants generate that report directly from EHRS.  *Id.*  The numbers of referrals Defendants have reported in Enclosure 7a as part of their monthly data production do not equal the HEART-generated numbers in Defendants' brief, and it is not apparent to Plaintiffs why the two databases produce different referral totals.  *Id.*  This data discrepancy further undermines the trustworthiness of Defendants' MHCB data.  *See* discussion in Section V, *infra*.

[3469452.2]

1    Bed Need Study discussed below.

2    **II.    DEFENDANTS IGNORE HISTORICAL CONSTRUCTION DELAYS, AND HAVE NOT ADDRESSED HOW THEY WILL PERMANENTLY DECOMMISSION ALL UNLICENSED BEDS IF THEIR PROJECTIONS ARE WRONG**

3

4            Defendants' statement that the timeline forecast by former Deputy Director Tebrock

5    for completion of the CIM project "is intact" would be encouraging if it were supported by

6    historical patterns or a concrete plan, but it is not.  Defs.' Resp. at 5.  Defendants'

7    projection is predicated on assuming every single best case scenario possible will occur.

8    First, although Defendants state that construction can normally be expected to take two to

9    two-and-a-half years to complete, they assume in their projection that it will take two.  *Id.*

10   at 5-6.  And they assume that the project will encounter no delays or other snags.  *Id.* at 6.

11   But in fact, Defendants acknowledge that the project has already been significantly

12   delayed, making their assumption of no further delays entirely suspect.  *See id.* at 5-6.

13   Indeed, Defendants represented at the September 13, 2019 hearing that the project's

14   anticipated completion date was November 2022, *see* Sept. 13, 2019 Hr'g Tr., ECF No.

15   6349, at 14:8-9.  By the time of their November 27 filing, that projection had already been

16   pushed out by a month, to "December 22, 2020."  Defs.' Resp. at 6.

17           It seems very unlikely, given CDCR's lengthy history of extremely delayed

18   construction projects and its recent admission that it cannot identify available contractors

19   even to retrofit its existing stock of MHCBs, that the project will proceed "absent further

20   delays."  *Id.*; Pls.' Op. Br. re MHCB Construction and Unmet Bed Need Study ("Op. Br.")

21   at 7-8 (and citations therein); Yelin Decl., Ex. J, at 2 (noting that PVSP MHCB unit

22   remains closed because despite efforts to identify a contractor to repair the building,

23   "[n]one are available in California").  That is particularly true since Defendants' timeline

24   only allows three months for construction vendor bidding and contracting in an

25   environment where available and qualified contractors are apparently difficult to identify.

26   Defs.' Resp. at 6; Borg Decl. in Support of Defs.' Resp. to Oct. 8, 2019 Order ("Borg

27   Decl."), ECF No. 6402-3, Nov. 27, 2019, at ¶ 5 (contract award process is anticipated to

28

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO OCTOBER 8, 2019 ORDER

[3469452.2]

1    occur between September and December 2020).

2        Defendants' filing also entirely ignores the possibility that their bed planning

3    projections are wrong, and fails to address how they will decommission all unlicensed

4    crisis beds (let alone unlicensed inpatient beds) if demand exceeds their current

5    expectations. Given that Defendants admit that under even the best case scenario a major

6    construction project takes "approximately four to five years," *see* Defs. Resp. at 5, if after

7    completion of the Special Master's unmet bed need study it is clear that additional licensed

8    crisis bed and/or flex inpatient bed capacity is required, it would be many more years

9    before Defendants would be able to bring sufficient licensed beds online and permanently

10   deactivate all unlicensed beds.

11   **III.    DEFENDANTS CANNOT WAIT TO TAKE STEPS TO STEM THE TIDE
          OF SUICIDES OCCURRING AFTER LEVEL OF CARE DISCHARGES**

12

13       Defendants' interest in conducting an analysis "to determine if there is a causal

14   connection between discharges from crisis level of care and suicide rate" is laudable, given

15   that there appears to be at least a very strong correlation, and likely a causal relationship,

16   between recent discharges and suicides in recent years. *See* Op. Br. at 16-17; Yelin Decl.

17   at ¶¶ 4-7 (noting that percentage of suicides occurring after discharges from higher levels

18   of care has more than tripled in the last four years, and that the suicide rates in 2017, 2018,

19   and 2019 would have been 16-29% lower but for the suicides occurring after recent

20   discharges).[4]

21   _____

22   [4] Defendants are wrong that "Plaintiffs present no analysis, let alone facts, to show a causal
     link between access to inpatient care and the suicide rate" and that Plaintiffs'
23   vague references" regarding pressure on clinicians "have no indicia of reliability." Defs.'
     Resp. at 6. Plaintiffs presented an analysis, including facts taken directly from patients'
24   medical records, of the effect of abrupt level of care changes on the suicide rate, and
     presented facts regarding statements made by Defendants' own clinicians about pressure
25   not to utilize higher levels of care. Yelin Decl. at ¶¶ 4-7. 16-20. Plaintiffs also presented
     an analysis of the individual Final Suicide Reports Defendants themselves produce after
26   each suicide, which showed that in the majority of 2019 suicides for which reports have
     thus far been generated, Defendants' own case reviewers included at least one Quality
27   Improvement Plan designed to address concerns that the patient was either inappropriately
     discharged from a higher level of care or was not referred to or evaluated for a higher level
28   (footnote continued)

1    But Defendants' vague requests for "time" to complete such an analysis before

2  taking any concrete steps other than those they have already implemented—none of which

3  has succeeded in stemming the rising tide of suicides thus far—is simply unacceptable.

4  Defs.' Resp. at 7.  People are dying now.  Even if there are no more suicides for the rest of

5  the year, the 2019 suicide rate will be 27.1, the highest on record in this case.[5]  Yelin Reply

6  Decl. at ¶ 10.  Given the repeated reports from the Special Master's suicide prevention

7  expert, Linsday Hayes, finding Defendants have failed to properly implement his

8  recommendations, coupled with the State Auditor's recent report identifying system-wide

9  deficiencies and leadership failings, it is clear that Defendants' efforts to date are

10  insufficient.  *See* The Third Re-Audit and Update of Suicide Prevention Practices in the

11  Prisons of the CDCR, Lindsay M. Hayes, Nov. 5, 2018, ECF No. 5994; California

12  Department of Corrections and Rehabilitation: It Must Increase Its Efforts to Prevent and

13  Respond to Inmate Suicides, Report 2016-131, California State Auditor, *available at*

14  https://www.auditor.ca.gov/pdfs/reports/2016-131.pdf.  Defendants must act now to

15  "improve existing suicide prevention practices," including by prioritizing their

16  comprehensive analysis of the relationship between crisis bed discharges—which should

17  be expanded to include recent discharges all from levels of care, including inpatient

18  discharges, discharges from EOP to CCCMS, and discharges from the MHSDS

19  altogether—and suicides.

20    CDCR has already conducted part of this analysis, by reviewing each 2019 suicide.

21  Defendants own suicide case reviewers have concluded that Defendants' decisions to

22  discharge patients from higher levels of care, and their failures to refer patients requiring

23  more intensive treatment to higher levels of care, contributed to the majority of suicides in

_____

25  of care even though such a referral or evaluation for referral was warranted, or both.  *Id.*,
¶¶ 9-14.

26  [5] Plaintiffs' Opening Brief erroneously stated that the rate per 100,000 would be 28.2 even
if there are no more suicides in 2019. This was a typographical error.  The correct number

27  is 27.1, making this year's rate three percent higher than 2018's assuming no additional
suicides occur this year, which is unlikely.

28

[3469452.2]

1    2019. Yelin Decl. at ¶ 9. There is no reason that Defendants cannot complete a

2    comprehensive analysis now and make immediate changes to their suicide prevention

3    program, including by changing the new utilization management strategies that appear

4    directly linked to the rising suicide rate.

5    **IV.    WHETHER EXPLICIT OR NOT, DEFENDANTS' EFFORTS TO MANAGE
         UTILIZATION OF RESOURCES TO IMPROVE COMPLIANCE RATES
6        HAVE CREATED PRESSURE ON CLINICIANS, AND DEFENDANTS
         MUST CONTINUE TO FILL DSH BEDS EVEN AFTER THE SPECIAL
7        MASTER TURNS HIS ATTENTION ELSEWHERE**

8        It is disingenuous for Defendants to claim that they "are not aware of any directive

9    to or other pressure on clinicians" to restrict patient usage of higher levels of care. Defs.'

10   Resp. at 7. Defendants, like Plaintiffs, have attended numerous Special Master monitoring

11   tours this year, and their own CQIT tours in 2018, in which their own clinicians reported

12   these concerns. *See* Yelin Decl. at ¶¶ 16-20. Just this past week, clinicians at one of

13   CDCR's inpatient programs routinely discussed discharge with patients in their initial

14   treatment team meetings, and patients in a group interview stated that they had been told

15   that the ICF program had a six month time limit. Yelin Reply Decl. at ¶ 13. And the most

16   obvious—and downright catastrophic— evidence of this pressure is Defendants' own

17   reviews of suicides committed in CDCR in 2019, in which Defendants' reviewers

18   concluded that discharges from or failures to refer to higher levels of care were responsible

19   at least in part for the majority of this year's suicides and required corrective actions.

20   Yelin Decl. at ¶¶ 9-14; *see also* Yelin Reply Decl. at ¶ 14-15.

21       Even if the clear tacit pressure to suppress demand artificially for higher levels of

22   care were not enough, Defendants admit they explicitly directed a "utilization review" of

23   EOP patients at SVSP (and CMF) in 2017-2018, in which CDCR Headquarters staff

24   communicated recommendations to institution staff about the appropriate level of care for

25   patients. Yelin Decl., Ex. H at 3. Headquarters staff recommended that SVSP review and

26   consider lowering the level of care for 57 out of 100 EOP patients, and the institution

27   proceeded to drop twenty-two of those patients to CCCMS. *Id.* at 1. Defendants admit

28   that SVSP clinicians understood Headquarters staff to be directing them "to remove one-

[3469452.2]

1    hundred patients for [sic] the EOP level of care," although Defendants claim that

2    understanding was erroneous. *Id.* at 3.

3        Moreover, Defendants admit that although "all beds designated for Coleman class

4    members at ASH and CSH are filled" as of November 16, 2019, that occurred due to

5    CDCR's "reinitiat[ing] its focus on transfers to state hospitals" in July 2019 – precisely

6    when the Special Master embedded a team of monitors in CDCR Headquarters and began

7    working with Defendants directly and specifically on addressing their failures to comply

8    with the least restrictive housing protocols, leading to huge numbers of vacant DSH beds.

9    Defs.' Resp. at 8; Yelin Decl. at ¶¶ 22-24.  Defendants claim that "the renewed focus has

10   corrected any prior oversights regarding available and unused beds."  Defs.' Resp. at 8.

11   Unfortunately, historical patterns suggest that as soon as the Special Master and Court turn

12   their attention to other remedial matters, as they must do, Defendants will again let the

13   *Coleman*-designated DSH beds sit vacant.  Yelin Decl. at ¶ 24; Special Master's

14   Monitoring Report on the Mental Health Inpatient Programs for Inmates of CDCR, May

15   25, 2016 ("Special Master 2016 Inpatient Report"), ECF No. 5448 at 24-40.  Defendants

16   cannot pronounce victory until they have demonstrated a sustained track record of moving

17   patients to DSH beds *on their own,* without direct oversight by the Special Mater or threat

18   of contempt by the Court.

19   **V.    DEFENDANTS ADMIT THAT UNTIL AT LEAST JUNE 2019, THEIR**
          **MHCB TRANSFER DATA WAS BASED ON THE INCORRECT**
20        **REFERRAL TIME, YET REFUSE TO ANALYZE THE IMPACT ON**
          **THEIR COMPLIANCE**
21
22        Defendants claim that "Plaintiffs are mistaken" that Defendants' MHCB transfer

23   timelines are calculated using the incorrect start time.  Defs.' Resp. at 9.  Yet Defendants

24   also admit that at least until June 2019, they used the email notification to HCPOP as the

25   trigger for the 24-hour clock, even though their MHCB referral policy—explicitly

26   incorporated into the Program Guide—requires that the 24 hours start "upon clinical

27   determination a MHCB is required," and allows the HCPOP email to be sent one hour

28   later. *Id.* at 8-9; Powell Decl. at ¶ 9; 2018 Program Guide, ECF No. 5864-1 at 511.  That

---

12

[3469452.2]

1    means that the data they have reported to this Court every month through at least June

2    2019 overstates their compliance with the Program Guide to an unknown degree. Yet

3    Defendants refuse to evaluate how significant their decision to permit themselves an extra

4    hour of compliance time is, much less to correct their filings with the Court.

5    Unfortunately, Defendants' reliance on misleading data is par for the course in this case.

6         Compounding the confusion is the apparent fact that Defendants' reporting to the

7    Special Master and Court regarding MHCB referrals uses two different data sources,

8    which themselves start the clock at two different trigger points. Defendants' MHCB

9    Referrals Report, which is provided to the Special Master and Plaintiffs as part of the

10   monthly data production (but not filed with the Court), uses the correct start time for the

11   24-hour clock based on the clinical note in EHRS. *See* Defs.' Resp. at 9. Notably, this is

12   the only report that Defendants claim under penalty of perjury uses the "correct start and

13   end time for referrals." *See id.* at 11; *see also* Ceballos Decl. ¶ 6. That is because

14   Defendants' other data reporting, including the MHCB census and waitlist data filed with

15   the Court and the monthly HCPOP MIS report, is generated from HEART, a different data

16   source. Yelin Reply Decl., Ex. C. Defendants acknowledge that until June 2019, HEART

17   tracked the start time "using the receipt of an email from the referring clinician requesting

18   assignment of a crisis bed," meaning that the reports generated from HEART provided

19   Defendants with at least a one hour cushion during which to count a transfer as compliant.

20   Defs.' Resp. at 9. Because Defendants understand that this data reporting practice does not

21   comply with the Program Guide or their own policies, they aver only that the reports based

22   on HEART use "the corrected measurement under the Court's 2017 order"—*i.e.*, the

23   correct *end time*—instead of claiming that the *start time* for the MHCB transfer timeline is

24   correct also, because it is not. *See id.* at 10-11; *see also* Powell Decl. ¶ 8.

25        While the extra one hour between the clinical determination and the email to

26   HCPOP is significant in its own right and clearly contrary to the Program Guide, in reality,

27   Plaintiffs' analysis of the miniscule sample of MHCB transfers Defendants provided as

28   part of the MHCB exceptions negotiations showed that the cushion is likely to often be

1    much longer, as clinicians do not in practice always send the email to HCPOP within the

2    hour permitted by policy after the clinical referral.  *See* Yelin Decl., Ex. E.  Notably,

3    Defendants do not contest the accuracy of Plaintiffs' analysis, or contend that there was

4    some reason this same deficiency would not be likely to infect their data more broadly.  In

5    short, it is uncontested that multiple reports produced by Defendants to the Court and

6    Special Master are fundamentally unreliable at least through June 2019 and over-report

7    compliance to an unknown degree.

8         Defendants' claim that they were somehow transparent with the Court, Special

9    Master, and Plaintiffs about using the HCPOP email as the start time is disingenuous.

10   Defendants cite to a 2017 Declaration from Former Deputy Director Katherine Tebrock as

11   evidence that they informed the parties and the Court about their non-compliant policy.

12   *See* Defs.' Resp. at 9 (citing ECF No. 5680-10).  Buried four pages into an eleven page

13   declaration, Ms. Tebrock stated:

14            Once a clinician makes the determination a patient needs crisis
             bed level of care, they enter a level of care change in to the
15            Electronic Health Record System, and send an e-mail to
             HCPOP notifying them of the need for crisis bed placement.
16            The HCPOP Classification Staff Representative enters all
             referrals it receives from the institutions in HEART, recording
17            the patient's CDCR number, the date and time of the referral,
             the referring institution, the reason for the referral, and the
18            patient's prior level of care. …Transfer timeline compliance is
             tracked and monitored based on the date and time the referral is
19            received and the date and time of final disposition.

20         Decl. of K. Tebrock in Supp. Defs.' Brief on Transfers to Crisis Beds, ECF No.

21   5680-10, Sept. 13, 2017, at ¶ 13.  This "disclosure" was neither comprehensible nor

22   transparent.  First, the phrasing of the paragraph makes it sound as though the act of

23   "send[ing] an e-mail to HCPOP" occurs simultaneously with the entry of the level of care

24   change in EHRS, and is vague about whether the transfer timeline compliance is tracked

25   based on the level of care change or the e-mail.  Second, neither the parties nor the Court

26   were focused on whether Defendants were accurately tracking the *start* time of MHCB

27   referrals in September 2017, because they were focused on Defendants' unilateral decision

28   to modify the *end* time of the transfer timeline in violation of the Program Guide.  *See*

14

[3469452.2]

1   Order, ECF No. 5710, Oct. 10, 2017, at 14-16.  The operative policy that prohibited

2   Defendants from measuring the timeline based on the HCPOP email was not part of the

3   negotiations or the litigation that led to the Court's October 10 Order.  Plaintiffs, the

4   Special Master, and the Court could not have been expected to understand from this

5   oblique reference buried in voluminous pleadings focused on entirely different issues that

6   Defendants had unilaterally decided to use a different starting time than what their policy

7   dictated, much less that Defendants had received approval for this significant departure

8   from the requirements.

9        While Defendants' plan to transition to having EHRS level of care changes auto-

10  populate in EHRS and transition away from the e-mail referral process is positive,

11  Defendants do not provide a timeline for when the validation process needed to complete

12  that transition will be finished.  *See* Defs'. Resp. at 10.  More importantly, though,

13  Defendants refuse to consider conducting an analysis of their retroactive data reporting to

14  the Court and Special Master to assess the impact of their decision to describe their

15  transfer compliance in key reports using a starting point that violates the Program Guide.

16  *Id.* at 10-11.  The Court has made it clear that the record in this case must be accurate, and

17  that known data omissions, misrepresentations, or inaccuracies should be corrected.  *See*

18  October 23, 2019 Tr., ECF No. 6365; Order, August 14, 2019, ECF No. 6242 at 6 (noting

19  Defendants' "obligation to correct the record, which must satisfy the highest levels of

20  integrity" regardless of whether the inaccuracies are material or will have an impact in the

21  future).

22        There is no reason that obligation does not apply to Defendants' MHCB transfer

23  compliance data that was derived from the incorrect start time.  Given Defendants'

24  repeated boasting of their increased timeline compliance rates, *see* Defs.' Resp. at 3, 4, and

25  their unwillingness to continue the RJD project based on the compliance rates, it is

26  imperative that the parties, the Special Master, and the Court have an accurate and full

27  picture of Defendants' compliance using the measures required by their policy and the

28  Program Guide.

15

[3469452.2]

**VI.   THE SPECIAL MASTER SHOULD CONDUCT AN UNMET BED NEED STUDY, BUT THE COURT SHOULD REQUIRE DEFENDANTS TO IMPLEMENT THE STAFFING PLAN FULLY AND CONTINUE THE RJD PROJECT NOW**

Plaintiffs are pleased that Defendants do not oppose the Special Master's suggestion that he conduct an unmet bed need study. Defs.' Resp. at 11. And Plaintiffs do not oppose Defendants' position that such a study should include a thorough review by the Special Master's experts about whether "referrals that occurred" were clinically appropriate and whether "patients are being discharged to lower levels of care in a timely manner," so that the Special Master can do a complete and thorough assessment of true long-term need. *Id.* Defendants' proposal that such a study take "precedence over other discussions, such as staffing or construction" makes little sense, though, if Defendants are truly committed to achieving a durable remedy. *Id.* Even on the most streamlined timeline, Defendants admit that designing and constructing a crisis bed unit takes approximately four to five years. *Id.* at 5; *see also* Borg Decl. at ¶ 3. As discussed above, history suggests that such a project is likely to take significantly longer; Defendants' admission that they cannot presently identify available contractors further belies their predictions about the timeline for completion of the CIM project. Yelin Decl., Ex. J, at 2 (noting that CDCR has been unable to find a contractor to repair the Pleasant Valley State Prison crisis bed unit, because "[n]one are available in California").

Similarly, as discussed further *infra*, Defendants have so far failed to come close to complying with the seventeen year old clinical staffing order, *see* Order, June 13, 2002, ECF No. 1383, at 4, and the Court's last deadline to do so came and went a more than year ago with zero progress, which Defendants acknowledge. Oct. 10, 2017 Order, ECF No. 5711, at 2-6; Pls.' Op. Br. at 7 and citations therein; *see also* Defs.' Resp., Ex. A at 5 (noting that CDCR continues to look for ways "to achieve compliance with the Court's October 10, 2017 order").

The Court should not allow Defendants to further defer their compliance with staffing requirements, and should similarly require Defendants to continue the design and

[3469452.2]

1  construction of the RJD facility during the pendency of the unmet bed need study.  If

2  progress on either of those initiatives is deferred, it will be nearly impossible for

3  Defendants to move swiftly enough to make up the lost time.  If Defendants sincerely want

4  to end court oversight by achieving permanent compliance with remedial requirements,

5  they should invest the resources now to ensure adequate staffing and treatment space—

6  otherwise, they will be in a perpetual cat and mouse game and will not be able to meet

7  actual demand when, as it always has in the past, the study shows that Defendants' short

8  term bed planning projections have been undercounting the population of patients likely to

9  require crisis bed and inpatient care into the future.

10        Moreover, the Court should order that the unmet bed need study include a review of

11  whether individuals needing EOP level of care are being appropriately identified and

12  referred.  Defendants have reduced the size of the male EOP population by 16% in the last

13  two years, discharging approximately 1,200 men from that level of care since August

14  2017.  Yelin Decl. at ¶ 21.  Clinicians have recently reported during Special Master and

15  CQIT tours feeling pressure to discharge patients from EOP (or not to refer class members

16  needing that level of care), and CDCR Headquarters staff have explicitly recommended

17  that some institutions review patients for removal from EOP.  *See id.* at ¶¶ 16-20 and Ex.

18  H.  In order to obtain a complete picture of whether Defendants are appropriately and

19  adequately serving the needs of the *Coleman* class, the Special Master should review

20  whether Defendants' utilization management efforts in recent years have artificially

21  suppressed true demand for EOP level of care.

22  **VII.    DEFENDANTS REMAIN FAR FROM COMPLIANT WITH THE COURT'S**
          **STAFFING ORDERS AND THEIR RECENT PROPOSALS WILL NOT**
23          **ACHIEVE COMPLIANCE**

24        Although the Court addressed Defendants' lack of progress toward compliance with

25  its staffing orders at the September 13, 2019 status conference and in its October 8, 2019

26  Order, *see* ECF No. 6312 at 6-7, and invited the parties and the Special Master to discuss

27  staffing issues in the Workgroup, Plaintiffs did not receive any proposals or even an update

28  from Defendants regarding telepsychiatry or any other staffing issue until November 28,

1   2019 (Thanksgiving Day), after Defendants filed their Opening Brief and attached the

2   same letter regarding their recent efforts to comply with the Court's October 10, 2017

3   staffing order.  *See* Defs.' Resp., Ex. A.  The parties have not addressed staffing issues in

4   the Workgroup since the September status conference, and Plaintiffs were unable to

5   provide any meaningful response in their Opening Brief (ECF No. 6401) regarding

6   Defendants' remedial efforts on staffing without any update or concrete proposal from

7   Defendants.[6]

8          Unfortunately, Defendants' eleventh hour update provides little assurance that

9   Defendants are any closer to achieving compliance with the October 10, 2017 Order.

10  Their letter describes several proposals, all of which are two to four years old, and admits

11  that "it is difficult to ascertain the cumulative effect of these various recruitment and

12  retention programs."  Defs.' Resp., Ex. A at 15.  In fact, as Plaintiffs' noted in their

13  November 27, 2019 Opening Brief, Defendants are now even less compliant with the

14  Court-ordered 90% psychiatry fill rate than they were in 2018.  Op. Br. at 7.

15         The "[n]ew or [r]evised [p]roposals" outlined in Defendants' letter, Defs.' Resp.,

16  Ex. A, at 15-18, appear to be more of the same tinkering around the margins of the

17  problem that have failed to yield any meaningful progress toward compliance in the past.

18  Most of the initiatives are minor modifications to Defendants' recruitment and marketing

19  strategies for psychiatrists, without addressing any of the necessary adjustments in salary,

20  compensation, or working conditions that would make the job any more palatable.  *Id.*, at

21  15-16.  Finally, Defendants appear to be hoping that Plaintiffs will voluntarily accept some

22  of the same proposed reductions in psychiatry staffing that the parties had been discussing

23  in 2018, before the Golding report came to light.  *Id.* at 16-18.  Knowing what Plaintiffs

24  know now, that simply will not happen.  Nor have Defendants ever responded to Plaintiffs'

25

26  [6] Plaintiffs also note that while this Court referred the unresolved issue of DSH's staffing
    formula to the workgroup, ECF No. 6312 at 7, Plaintiffs have not received any proposal,
27  nor have substantive discussions commenced.

28

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO OCTOBER 8, 2019 ORDER

[3469452.2]

1  letter noting that they have failed to allocate, much less hire, the supervisory psychiatrists

2  required by the Court-ordered 2009 staffing plan.  It is clear Defendants have no plan to

3  close the 21% gap between their present fill rate for line psychiatrists of 69%, *see* ECF No.

4  6400, and the Court-ordered minimum of 90%, much less to comply with their obligations

5  to provide sufficient numbers of supervisory psychiatrists.

6  **CERTIFICATION**

7       Plaintiffs' counsel certifies that she reviewed the following orders relevant to this

8  filing: ECF No. 1383, ECF No. 5583, ECF No. 5710, ECF No. 5711, ECF No. 6242, and

9  ECF No. 6312.

10

11  DATED:  December 9, 2019      Respectfully submitted,

12        ROSEN BIEN GALVAN & GRUNFELD LLP

13

14        By:  /s/ Jenny S. Yelin

15        Jenny S. Yelin

16        Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

19