XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
KYLE A. LEWIS, State Bar No. 201041
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
ROBERT W. HENKELS, State Bar No. 255410
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 510-3575
 Fax: (415) 703-5843
 E-mail: Robert.Henkels@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                        Plaintiffs,<br><br>       v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                        Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' REPLY TO PLAINTIFFS' OPENING BRIEF REGARDING MENTAL HEALTH CRISIS BED CONSTRUCTION AND UNMET BED NEED STUDY** |

The Court directed the parties to address certain issues raised by Plaintiffs at the September 13, 2019 status conference in opening briefs and to file responsive briefs in advance of the upcoming December 13, 2019 further status conference. (ECF No. 6312 at 6-7.) Plaintiffs and Defendants filed their respective opening briefs on November 27, 2019. (ECF Nos. 6401 & 6402.) Defendants submit this further brief in response to Plaintiffs' opening submission (ECF No. 6401).

1

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

## I. MENTAL HEALTH CARE BEDS.

### A. Based on Historical Trends and CDCR's Current Population Projections, Fifty New Crisis Beds Are Sufficient.

As addressed in Defendants' response to the Court's order, CDCR expects that its new fifty-bed construction project at California Institute for Men (CIM) will allow CDCR to eliminate the use of unlicensed crisis beds while still accommodating the needs of its patients. (Defs.' Resp. Br. Oct. 9, 2019 Order at 2-5.) CDCR originally requested authority for the construction of 100 new beds. However, as CDCR moved through the design phase for the full 100 beds, the population projections that forecast bed need, which use Court-ordered methodologies (*see, e.g.,* July 3, 2019 Order, ECF No. 6212 at 8), fell dramatically. (*See* Yelin Decl. Supp. Pls.' Op. Br. Ex. D.) The Legislature responded by placing the crisis bed construction project at the Richard J. Donovan Correctional Facility on hold. Assuming the accuracy of current projections, and given past actual use, the fifty-bed project should be sufficient to meet the needs of the population. (*See* Defs.' Resp. Br. at 2-3.)

Plaintiffs claim that Defendants' plan is unsupported by concrete evidence, is "problematic," "short-sighted," "myopic," and that it defies common sense. (Pls.' Op. Br. at 2-7.) But Defendants' construction plan is rooted in population projections prepared by an outside party by the Court's order. Defendants were directed to contract with John Misener of McManis Consulting to prepare population projections. (*See* ECF No. 5583 at 10.) Defendants rely on these Court-ordered population projections, and past actual bed use, when preparing CDCR's bed use plans. And while Plaintiffs suggest that Defendants must be absolutely certain about CDCR's mental-health population needs in the future, that is impossible.

Defendants' projections are based on the studies and experience of CDCR's clinicians and administrators. And despite calling the Court-ordered population projections into question, Plaintiffs do not argue that Defendants should disregard Court-ordered population projections, or past actual use. Nor do they otherwise describe a preferable, alternative measure to calculate future need for crisis beds. Instead, they claim that CDCR cannot keep the beds it has open, and they speculate that the need for inpatient care could dramatically increase. (*Id.* at 6-7.) But the

2

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

crisis and inpatient beds CDCR currently has temporarily offline due to physical damage or staffing shortages are minimal. As of November 2019, just three percent of crisis beds are temporarily offline, while the equivalent figure for Psychiatric Inpatient Beds is less than one percent. (*See* Yelin Decl. Ex. D.) Plaintiffs' speculation about large numbers of crisis beds being unavailable for use in the future fails to justify a $92.5 million construction project, and cannot support any relief or Court action.

In its March 2017 order, the Court determined that CDCR had an adequate number of inpatient beds to comply fully and permanently with the Program Guide's inpatient transfer timeframes. (ECF No. 5583 at 8-13.) As reflected in that order, the Court specifically relied on population projections from McManis Consulting and existing capacity when evaluating sufficiency. (*Id.* at 10-12.) Analogous evidence here supports the same conclusion. Ultimately, given the current population and the Court-ordered population projections, a decision to move forward on even more construction is premature. Defendants have made significant progress since 2017 to ensure the adequacy of bed space through a series of initiatives that improved their ability to admit patients as expeditiously as possible. (Defs.' Resp. Br. at 3-5.) Plaintiffs present no reliable evidence to suggest that progress cannot continue.

Defendants have the ability to flexibly use their licensed correctional treatment center beds and assess their entire system in real time to adapt to new obstacles and trends. Under the supervision of the Special Master, the parties are currently negotiating a policy that would allow Defendants to flex beds between the various levels of inpatient care to maximize the use of all inpatient beds in the system. Defendants welcome the opportunity to work with the Special Master and Plaintiff to further improve this existing system. While Defendants will remain vigilant about the possible need for additional beds, further construction beyond the current fifty-bed project is not warranted based on current projections and evidence, and an order requiring an evidentiary hearing regarding this issue or mandating a new unmet bed need study is unnecessary. Defendants ask that the Court deny Plaintiffs' request and refer the matter to the workgroup process to improve and perfect the identification, referral, and bed utilization processes.

3

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

### B. Absent Additional Delay, the Fifty-Bed Construction Project at CIM Will Be Completed Within Defendants' Original Estimates.

Defendants acknowledge that complex and expensive construction projects often come with unexpected delays and complications. Plaintiffs chastise Defendants for such delays in the past. (*See* Pls.' Op. Br. at 7-8.) But Defendants' past also reflects an ability to accomplish these tasks despite significant barriers. (*See* ECF No. 5439 at 80 (Special Master praising CDCR in his Twenty-Sixth Round Monitoring Report for diligence in the face of unexpected delays when completing all court-ordered construction projects).)

Notwithstanding some delays (*see* Defs.' Resp. Br. at 5-6), Defendants currently expect to complete the fifty-bed project by December 22, 2022. (*Id.*) That timeframe is consistent with Defendants' initial estimate of completing the project by 2022. Plaintiffs do not present any reliable evidence that this timeframe is infeasible. And as ordered, Defendants will continue to provide monthly reports on the project to the Court. (*Id.*)

### C. Defendants Require More Time to Determine Whether There Is a Causal Connection Between Suicides and Crisis Bed Discharges.

Plaintiffs provide statistics purporting to indicate a significant rise in the number of suicides among patients recently discharged from higher levels of care. However, Plaintiffs provide no reliable evidence of a *causal* connection between the increase in suicides among patients recently discharged from higher levels of care and any of Defendants' bed utilization management practices. Regardless, Defendants are deeply concerned about the number of suicides by inmates and assertions that any rise in suicides within this group of patients is the result of inappropriate discharges from higher levels of care. This is why CDCR is taking steps to thoroughly analyze these deaths and to determine whether there is some common cause of post-discharge suicides. CDCR is committed to completing this important analysis, and to determining how best to address and prevent post-discharge suicides, including through further communication with Plaintiffs' counsel, the Special Master, and his suicide-prevention expert, Lindsay Hayes, who is currently touring CDCR's institutions to monitor his recommended suicide-prevention protocol.

4

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

CDCR is committed to reducing suicides and will take the steps necessary, with the guidance and collaboration of the Special Master's suicide-prevention expert, to meet this objective.

### D. There Is No Evidence of System-Wide Pressure to Reduce Referrals, and the Court Should Not Create Policy Based on Plaintiffs' Unsupported Allegations.

Defendants are unaware of any directives to pressure clinicians to avoid referrals and are working with the Special Master to improve the system-wide referral process. (Defs.' Resp. Br. at 7.) Plaintiffs argue the contrary (Pls.' Op. Br. at 15), but their claims are unsupported by reliable evidence, and instead rely on hearsay and conjecture, lacking the foundation necessary for this Court to make sound and supportable decisions concerning statewide policy.

Plaintiffs submit testimony from their counsel, Jenny Yelin, who testifies regarding twenty-eight suicide reports she reviewed. (Yelin Decl. ¶¶ 9-14.) According to Ms. Yelin, of these twenty-eight reports, the majority—she does not say how many—reflected at least a concern that the patient was "either inappropriately discharged from a higher level of care, or was not referred to or evaluated for a higher level of care even though such a referral or evaluation for referral was warranted, or both." (*Id.* ¶ 9.) Ms. Yelin does not testify that any of these tragedies were *caused* by the discharge or referral decision, or further specify the relationship. And she does not testify that any were caused by a *system-wide* directive to pressure clinicians, nor could she. Given that CDCR referred 11,024 patients to crisis beds as of the end of October 2019, Plaintiffs' broad statements do not demonstrate to a systemic effort to reduce referrals. (Powell Decl. ¶ 11, ECF No. 6402-1.)

Ms. Yelin also testifies that, based only on her review of notes from unidentified attorneys from her office, unidentified CDCR staff routinely expressed to the unidentified attorneys that they felt pressure from unidentified people at CDCR headquarters, and that those unidentified attorneys took contemporaneous notes that, we must presume, accurately described what the unidentified CDCR staff told them. (Yelin Decl. ¶¶ 16-20.) Defendants object to this testimony as hearsay and because it lacks foundation. But more importantly, Ms. Yelin's testimony is too conclusory to establish a valid inference of system-wide pressure and too vague to permit further investigation.

5

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

1    Finally, Plaintiffs point to the recent decrease in CDCR's Enhanced Outpatient Program
2  population, which they attribute to Defendants' recent bed utilization strategies. (Pls.' Op. Br. at
3  18.) And while Plaintiffs acknowledge that Defendants' efforts are "hypothetically positive,"
4  they also assume that these efforts necessarily mean that patients cannot receive the treatment
5  they require. (*Id.*) Again, however, this allegation is unsupported conjecture.

6    Defendants' clinicians must be able to make proper clinical decisions based on appropriate
7  clinical criteria. CDCR and the Department of State Hospitals (DSH) continue to work with the
8  Special Master to develop statewide policies and procedures to help clinicians make the
9  appropriate diagnostic decisions. (Defs.' Resp. Br. at 7.) If there is any pressure on clinicians to
10 make an inappropriate referral or otherwise not make a proper referral, Defendants—and the
11 Special Master—need to know about it and agree that action is required. But the investigation,
12 evaluation, and solution must complement, and coincide with, Defendants' efforts to identify
13 CDCR's mental-health population with the Special Master. Defendants' overarching goal is to
14 emplace a durable a process for identification, referral and transfer of CDCR inmates to inpatient
15 care that operate effectively throughout the prison system. Defendants are committed to working
16 with the Special Master toward creating a sustainable mental-health delivery system for patients.

17  **E.    The Number of Referrals to Atascadero State Hospital (ASH) and
            Coalinga State Hospital (CSH) Fluctuate, and Defendants Will Continue to
18          Work with the Special Master to Create a Durable Referral Process.**

19    At the last status conference, Plaintiffs criticized Defendants for low vacancy rates for beds
20 at ASH and CSH. (9/13/19 Tr. 19:20-25.) Plaintiffs now chastise Defendants for the currently
21 high vacancy rates for beds at ASH and CSH. (Pls.' Op. Br. at 18-22.) At the status conference,
22 Plaintiffs asserted that the low vacancy rate was a "canary in the coal mine" regarding unmet
23 need. (9/13/19 Tr. 19:20-25.) And now Plaintiffs assert that a supposedly high vacancy rate is
24 evidence of "serious flaws" in the mental health delivery system. (Pls.' Op. Br. at 20.) Plaintiffs'
25 arguments regarding the causes or significance of these fluctuations not only are internally
26 contradictory, but also are conclusory and lack foundation.

27    DSH's bed vacancy rates fluctuate for various reasons. But as DSH's records reflect, the
28 bed use at ASH and CSH is directly correlated to the number of referrals from CDCR. (*See, e.g.,*

6

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

Hendon Decl. Ex. A.) As the numbers of referrals increase, so too does DSH's census. (*Id.*) Correspondingly, as the overall numbers of CDCR patients referred to inpatient facilities decreased, so too did the DSH census, as a percentage of the overall need. (*Id.*; ECF Nos. 6004, 6046, 6072, 6090, 6110, 6128, 6152 & 6198). The evidence thus does not suggest that either CDCR or DSH are creating any barriers or obstacles to treatment at ASH or CSH once the referral is made. And indeed, the data suggests the opposite. As Plaintiffs concede, there has been a dramatic increase in referrals to DSH. (Hendon Decl. Ex. A) And DSH has responded commendably: DSH has admitted all *Coleman* patients since July 2017 in a shorter timeframe than is required for intermediate care admissions under the Program Guide. (*Id.* ¶ 5.) Defendants have also worked closely together to manage this spike in referrals in 2019, admitting 42 patients in July, 95 patients in August (over double the number of patients from August 2018), 61 patients in September, and 76 patients in October—all within the timeframes. (*Id.* at Ex. A.)

Plaintiffs' argue that fluctuations in vacancy rates are due to Defendants' work with the Special Master, and that Defendants will again necessarily let beds sit underutilized in the future. (Pls.' Op. Br. at 20.) This argument however overlooks sustained continual referrals to DSH since the lift and shift, with an average of 51 referrals per months, including as many as 92 referrals in September 2019. (Hendon Decl. Ex. A.) With the goal of achieving durability, Defendants have already submitted a draft template for local operating procedures covering these matters to the Special Master and Plaintiff for review and negotiation. (Defs.' Resp. Br. at 8.) Defendants ask that the Court allow this process to continue, rather than allow this issue to flow down a path of protracted litigation.[1]

---

[1] Plaintiffs appear to make a final factually unsupported and theoretical argument regarding an arbitrary number of patients housed outside their Least Restrictive Housing (LRH) designation. The LRH process was designed to ensure patients are placed in clinically appropriate settings. Plaintiffs' focus on the percentage of patients outside of LRH is a red herring—patients are treated in the setting that is clinically appropriate for them based upon their presentation, which should always be the focus of referrals to inpatient care settings. This baseless argument fails and requires no further Court attention.

7

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

**F. Defendants Accurately Report Compliance with the 24-Hour Timeline for Transferring Patients to MHCB, and Plaintiffs' Concerns Will Be Addressed in Pending EHRS Improvements.**

CDCR has been reporting MHCB transfer times measured from the time that a clinician sends an email message to the Health Care Placement Oversight Program (HCPOP) requesting a Mental Health Care Bed (MHCB) assignment. (Defs.' Resp. Br. at 8-11.) Plaintiffs, the Court, and the Special Master have been aware of this since 2017, and have raised no concerns about it until now. (*Id.* at 9.) Moreover, Defendants are in the process of further improving this system, such that the 24-hour timeline that would begin to run automatically as soon as the clinician changes the patient's level of care to MHCB in the Electronic Health Record System (EHRS) and eliminates the additional step of sending an email to HCPOP. (*Id.*) These approaches provide the best measure available of the extent to which CDCR is complying with the 24-hour MHCB transfer timeline.

Plaintiffs insist that CDCR has been reporting misleading data because its MHCB referral process does not start the running of the 24-hour transfer timeline "upon clinical determination a MHCB is required," as stated in the Program Guide. (Pls.' Op. Br. at 22-24 (quoting 2018 Program Guide, ECF No. 5864-1 at 511).) Plaintiffs contend that Defendants have a policy that provides clinicians up to one hour to contact HCPOP after making their clinical determination, and in so doing, gives CDCR an extra hour to transfer patients while still reporting themselves as compliant with the 24-hour transfer requirement. (*Id.* at 23.) Plaintiffs' argument, however, is unreasonable, speculative, and will be mooted by the system improvements now being implemented.

Defendants cannot reasonably determine when a clinical determination occurs, as it is a subjective occurrence in the clinician's mind. Such a subjective occurrence cannot be tracked. Under the current system, clinicians have one hour from the time of their clinical determination to reach out to HCPOP to request a crisis bed. There is no evidence that clinicians use this time for an improper purpose or to skew reporting. To the extent that there are concerns about the difference of time associated with entering data in EHRS and sending an email to HCPOP, they will be addressed once CDCR finishes fielding the system improvements that will automatically

8

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

begin running the 24-hour clock when the level of care is changed in EHRS. At this stage, the Court need not issue any further order.

## II. PLAINTIFFS HAVE NOT DEMONSTRATED A NEED FOR AN UNMET BED NEED STUDY FOR CRISIS AND INPATIENT CARE.

Plaintiffs argue for a sustainable bed-planning policy. (Pls.' Op. Br. at 25.) Defendants agree that a focused review of the referral, admissions, and discharge process for inpatient care or crisis level of care would be appropriate and helpful. (Defs.' Resp. Br. at 11.) But an unmet bed needs study is unnecessary because the parties have already conducted such studies, including the Unidentified Needs Assessment (UNA) of 2005, the Mental Health Assessment and Referral Project (MHARP) of 2009-2010, and the Assessment and Referral Project of 2011. (ECF No. 5448 at 23.) Following the 2011 assessment, Defendants, under the guidance of the Special Master, devised the "sustainable process," a self-monitoring process to ensure that inmates in need of inpatient care were timely identified, referred, and transferred to such care. (*Id.* at 24.) To the extent that Plaintiffs contend that the sustainable process does not adequately assess the bed needs of CDCR's mental-health population, then that process must be examined, not an entirely new time- and resource-consuming bed study performed. Defendants recommend that, rather than conduct an entirely new study, the parties and the Special Master carefully review and assess that sustainable process. Where warranted, that process should be amended and improved. As previously described, this assessment should take precedence over all other discussions, such as staffing and construction. (*Id.*)

///

///

9

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))

**CERTIFICATION**

Defendants' counsel certifies that he reviewed the following orders relevant to this filing: ECF No. 1383, ECF No. 5583, ECF No. 5710, ECF No. 5711, and ECF No. 6312.

Dated:  December 9, 2019

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

/s/ *Robert W. Henkels*

ROBERT W. HENKELS
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003
14304343

10

Defs.' Reply Brief re Oct. 8, 2019 Order (2:90-cv-00520 KJM-DB (PC))