```
 1                 IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
 2               BEFORE THE HONORABLE KIMBERLY J. MUELLER

 3     RALPH COLEMAN, et al.,

 4                    Plaintiffs,
       vs.                             Sacramento, California
 5                                     No. 2:90-CV-00520
                                       Friday, December 13, 2019
 6     GAVIN NEWSOM, et al.,           10:18 a.m.

 7                    Defendants.
       _____/
 8

 9                            --oOo--

10               REPORTER'S TRANSCRIPT OF PROCEEDINGS
                   THIRD QUARTERLY STATUS CONFERENCE
11
                              --oOo--
12
       APPEARANCES:
13
       For the Plaintiffs:      ROSEN BIEN GALVAN & GRUNFELD LLP
14                              MICHAEL BIEN
                                LISA ELLS
15                              CARA TRAPANI
                                JENNY YELIN
16                              Attorneys at Law
                                101 Mission Street, 6th Floor
17                              San Francisco, CA  94105-1738

18                              PRISON LAW OFFICE
                                STEVEN FAMA
19                              Attorney at Law
                                1917 5th Street
20                              Berkeley, CA  94710

21     (Appearances continued on page 2.)

22     Official Reporter:       KACY PARKER BARAJAS
                                CSR No. 10915, RMR, CRR, CRC
23                              501 I Street
                                Sacramento, CA  95814
24                              kbarajas.csr@gmail.com

25     Proceedings recorded by mechanical stenography.  Transcript
       produced by computer-aided transcription.
```

```
 1    APPEARANCES (Continued):

 2    For the Defendants:      DEPARTMENT OF JUSTICE
                               OFFICE OF THE ATTORNEY GENERAL
 3                             ELISE THORN
                               Attorney at Law
 4                             1300 I Street
                               Sacramento, CA  95814
 5
                               DEPARTMENT OF JUSTICE
 6                             OFFICE OF THE ATTORNEY GENERAL
                               KYLE LEWIS
 7                             Attorney at Law
                               455 Golden Gate Ave., Suite 11000
 8                             San Francisco, CA  94102

 9                             ROBINS KAPLAN LLP
                               ROMAN M. SILBERFELD
10                             Attorney at Law
                               2049 Century Park East, Suite 3400
11                             Los Angeles, CA  90067-3208

12                                  --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, FRIDAY, DECEMBER 13, 2019, 10:18 AM

2                                --oOo--

3          THE CLERK:  Calling civil case 90-0520, Coleman,

4    et al. versus Newsom, et al.  Your Honor, this matter is on

5    calendar for third quarterly status conference.

6          THE COURT:  All right.  Good morning.  Appearances,

7    please, for plaintiffs.

8          MR. BIEN:  Good morning, your Honor.  Michael Bien,

9    Lisa Ells, Steve Fama, Cara Trapani, and Jenny Yelin for

10   plaintiffs.

11         THE COURT:  All right.  Good morning to you all.

12         And for the defense?

13         MR. LEWIS:  Good morning, your Honor.  Kyle Lewis,

14   Roman Silberfeld, and Elise Thorn for defendants.

15         THE COURT:  Good morning to you.  You also have some

16   people present in the audience.

17         MR. LEWIS:  Rei Onishi from the Governor's Office.

18         THE REPORTER:  Counsel, use the microphone, please.

19         MR. LEWIS:  I'm sorry.  We have Rei Onishi from the

20   Governor's Office, Christine Ciccotti from DSH, Jerry Hessick

21   from CDCR, and Dr. Diana Toche.

22         THE COURT:  All right.  Their presence is

23   acknowledged.  This is on for a status.

24         Madam Court Reporter, is there a problem?

25         THE REPORTER:  I'm sorry, Judge.  It seems the mics

1    aren't working correctly.  Do you have the mics on?

2         THE COURT:  All right.  Make certain you're speaking

3    into a working microphone for the sake of the record.

4         We have quite a lot to talk about.  I've tried to

5    organize my thoughts to make this move as efficiently as

6    possible, and I'm taking account of what you've put in your

7    filings and the agenda I published.  I'm just going to work

8    through this one by one, and if we get to the end and there's

9    something we haven't covered, you'll have to let me know.

10        I actually want to start first with a very brief

11   discussion of coordination given the activity happening in that

12   sphere, and there's a lot of activity.  There are coordination

13   orders, but it's just clear they're very outdated at this

14   point.  And so the Court is contemplating updating coordination

15   orders to clarify what coordination means at this stage of the

16   case.  The Special Master and the Receiver have had a number of

17   discussions.  They met again yesterday.  My understanding is

18   that they will propose to this Court and the Plata Court a

19   proposed order.  And before the Court would adopt that, I would

20   hear from you.

21        So there's a lot going on there.  It's needed.  You'll

22   have a chance to weigh in.  I wanted to clarify what I

23   considered to be essential ground rules because, as part of the

24   discussion between the Special Master and the Receiver, I

25   understand there's been some discussion about, well, how do we

1    define what needs to be shared, what level of transparency

2    should there be, and just -- I just need to say for the record

3    I would assume that at this stage there will be full

4    transparency.  And if there is any doubt, if either side,

5    Special Master or Receiver, I have no control over the

6    Receiver.  But I would hope that if either side has a question

7    about whether or not something should be shared, it will be

8    shared.

9           We're at a stage where the players need to err on the

10   side of full transparency in sorting out what needs to be

11   shared and what not, if anything.  This is the public's

12   business.  This is the public's information.  So to the extent

13   I'm starting to hear about whether or not privilege should

14   interfere with the Receiver sharing information with the

15   Special Master, I do not understand.  And if really there is an

16   issue of privilege being asserted to protect any information

17   that may have implications for the Coleman case, we are going

18   to litigate that question because I cannot imagine that a

19   privilege claim should stand in the way of the plaintiffs and

20   this Court understanding fully just, for example, what might be

21   relevant to a suicide.

22          So simple ground rules, full transparency.  Err on the

23   side of full transparency if there's any doubt.  And no

24   privilege.

25          It doesn't prevent the assertion of a privilege, but

1    if someone's going to assert a privilege, think very hard about

2    that.  And ultimately, I expect to have to resolve privilege

3    claims.  I'll pay attention to the law, but we don't have time.

4    This case does not have time for bickering and technicalities.

5    So that's what I'll say about coordination.

6          Let's address the questions I posed in my order which

7    you now have briefed, and there I want to clarify some folks

8    are responding as if I have pointed my finger at the Receiver.

9    I have gone out of my way to not do that.  I do not have any

10   power over the Receiver.

11         What I have tried to suggest is that the defendants

12   here have not tended the line between Plata and Receiver.  The

13   defendants have not defended Coleman in the face of perhaps

14   well-meaning efforts, I'm assuming well-meanings efforts to

15   move Plata forward and perhaps assist this Coleman Court.

16         But as I've said many times, Coleman is a distinct

17   case, has its own needs, sometimes overlapping.  And so to the

18   extent there are defensive reactions because someone thinks I'm

19   pointing at the Receiver, that is not what I'm doing.  I am

20   pointing to the defendants and saying you've got to be alert to

21   Coleman as distinct, recognizing overlap.  If there are

22   efficiencies that can be achieved, fine.  And ultimately the

23   two cases will be blended as hopefully some day management

24   reverts fully to the state.

25         So I felt the need to clarify that given some of the

1   statements including in the plaintiffs' briefs.  I am needing

2   at this point clarification.  I'm confused by the defense

3   position that the fact that there's overlapping representation,

4   that is, an attorney in the Prison Law Office gets notice of

5   what's going on means the coordination has been properly and

6   timely disclosed to at least one of plaintiffs' counsel in

7   Coleman.  And perhaps I could ask you, Mr. Bien or Ms. Ells, do

8   you agree with that?  And if so, you know, the Prison Law

9   Office has been at the table.  I understand that.  But the

10  Court has not focused on that separately, and it tends to be

11  Ms. Ells or Mr. Bien or one of the other attorneys with your

12  firm who is speaking.

13          MR. BIEN:  Would you like me to respond?

14          THE COURT:  I would like to understand because I may

15  need to adjust my thinking about the Prison Law Office role

16  here if in fact the defendants see that as the linchpin for

17  coordination.

18          MR. BIEN:  I'm not sure this is working.  It's not.

19          MS. ELLS:  It's not.

20          MR. BIEN:  Your Honor, we work closely with the Prison

21  Law Office.  But we have been for more than a decade serving as

22  lead counsel in Coleman, and we would not consider it adequate

23  notice to plaintiffs' counsel in Coleman that something was

24  provided to the Prison Law Office even though they are our

25  co-counsel in this case and do share responsibility.  I don't

1   think that, for example, Mr. Fama, who has now been doing the

2   Coleman work at the Prison Law Office, thought it was his

3   responsibility to bring to our attention or to the Special

4   Master's attention everything that happened in Plata that might

5   overlap with Coleman that may or may not have been provided to

6   us in some other way.

7          So I think we require -- first of all, we've never

8   understood that to be the means of providing us with

9   information, and number two is it's not adequate.  There's so

10  much stuff happening, and it needs to be direct.  You know,

11  when something implicates a Coleman policy or procedure or

12  program guide or even a court order, we need to be notified in

13  Coleman more directly.  And it's just too much -- it's just not

14  adequate notice.

15         I understand that we definitely are co-counsel, and

16  Prison Law Office is obviously competent and able.  We never

17  understood that to be their job, and I don't think they ever

18  understood that to be their job.  In fact, there is even --

19  again, I don't want to make too much of this, but there are

20  times when the PLO felt they could not fully share information

21  that they learned in Plata from Coleman -- with us in Coleman.

22         And to the extent that defendants or the Receiver

23  feels there needs to be an amendment or protective orders or

24  something to make the Court's concern go away, we would be glad

25  to do that.  In some cases -- I think Don and I were talking --

1    Don Specter and I were talking yesterday.  I don't think we

2    have that, a stipulation between Coleman and Plata that we have

3    in some other cases that says that any information provided in

4    one case can be used in the other case and vice versa.

5            We have that, for example, between Coleman and

6    Armstrong, and it just gets away from this issue which is, you

7    can imagine a law firm, how could I know something for one of

8    my cases and not be able to use it in another case when the

9    clients are all the same.  So we think this can be resolved

10   rather easily, to the extent that it is an obstacle, merely by

11   amending the protective orders to say this.

12           THE COURT:  All right.  Thank you for that

13   clarification.

14           Just checking, Mr. Fama, do you agree with everything

15   Mr. Bien has just said?

16           MR. FAMA:  Yes.

17           THE COURT:  All right.  So does the defense accept

18   that clarification at this point, it's not good enough to

19   communicate somehow with one person in the Prison Law Office to

20   achieve full communication and coordination with Coleman?

21           MR. SILBERFELD:  We do, your Honor.  We're pleased to

22   have the clarification.  Nevertheless, when counsel are listed

23   as counsel of record and, you know, we had a settlement

24   conference a few weeks back, and Mr. Specter took a significant

25   part of the lead in that conversation that lasted a full day.

1    So perhaps we're unclear about the exact roles and

2    responsibilities of each of the counsel involved on the Coleman

3    side, the plaintiffs' side.  But we accept the clarification.

4    We'll abide by it.

5         THE COURT:  All right.  The counsel that have

6    primarily spoken in court in this case are Mr. Bien, Ms. Ells,

7    and their colleagues.

8         MR. SILBERFELD:  Right.

9         THE COURT:  On the protective order, I acknowledge the

10   parties' agreement that no formal discovery is required, and so

11   I'm allowing the 60-day period to exchange information and will

12   look for a report ahead of the next status conference.  I would

13   specifically direct that in those discussions, perhaps you

14   start with the protective order question, and can you present a

15   protective order to the Court -- I realize we're heading into a

16   holiday season -- within 30 days?

17        MR. BIEN:  Definitely, your Honor.

18        THE COURT:  Does that work for you, Mr. Silberfeld?

19        MR. SILBERFELD:  Yes, your Honor.

20        THE COURT:  So clarify any protective order issues.

21   Those would be discovery protective order issues, not

22   predetermining whether or not anything gets filed under seal on

23   the Court's docket, and I would hope that those discussions

24   also would address the issues raised by the plaintiff in their

25   filing at docket number 6413, that is, the root cause analysis

1    that the defense have conducted.

2           Would the plaintiffs also contemplate that the point

3    person proposal would be discussed there with some proposal

4    coming forward to the Court?

5           MR. BIEN:  Yes.  And I understand that the Special

6    Master and the Receiver themselves are discussing that, but

7    I've been informed of that discussion by Special Master Lopes

8    from time to time and following it closely.

9           THE COURT:  All right.  Anything to say on point

10   person proposal?  I'm not ready to discuss it in depth and to

11   make any decisions today, but we can put that on the agenda for

12   the next status conference.  Does that work for you,

13   Mr. Silberfeld?

14          MR. SILBERFELD:  Yes, your Honor.

15          THE COURT:  All right.  I would also ask that those

16   discussions cover the plaintiffs' request -- I believe it's in

17   their remedial proposals -- for full access to the database.

18   So why is it not the case that there can be some provision for

19   the plaintiffs to be able to see directly what's going on with

20   that database?  So you should exhaust discussions along those

21   lines.

22          All right.  I believe that covers the specific

23   questions I asked the parties to address leading up to this

24   hearing.

25          MR. BIEN:  Your Honor, may I just update you on

1    something?  Excuse me.

2              THE COURT:  All right.

3              MR. BIEN:  Mr. Fama just pointed out that in the Plata

4    process they're discussing plaintiffs' counsel in Plata's

5    access to the RCA materials, and they're going to have meetings

6    about that.  So that issue is already under discussion in

7    Plata, and we will amend.  We'll join into that as to Coleman

8    too.

9              THE COURT:  All right.  Any objection to Coleman

10   plaintiffs joining that discussion?

11             MR. SILBERFELD:  Your Honor, as I understand it,

12   there's a meeting that's going to take place in January, and as

13   recently as this morning we endeavored to have the Coleman side

14   included in that meeting.  It was a Plata meeting only, and we

15   asked to expand it to include the Coleman people.

16             THE COURT:  All right.  So the Court will assume that

17   Coleman is at the table fully represented by the right

18   representatives going forward.

19             In terms of the renewed coordination, do the parties

20   have anything to say at this point about granting the Special

21   Master authority to hire his own data expert if he determines

22   and the Court approves his doing so?

23             MR. BIEN:  We think if Special Master Lopes thinks it

24   would be useful, it would be useful to have that expertise on

25   his team.

1          THE COURT:  For the defense, anything to say?

2          MR. LEWIS:  Yes, your Honor.  Defendants also agree

3    that it would be helpful.  Perhaps the Special Master could

4    examine some of the work that the Receiver had done to hire his

5    own data expert who is familiar with some of the systems given

6    that there is the QM piece that the Receiver has in CCHCS.  So

7    it could be there are some benefits for the Special Master

8    examining those contracts or things like that the Receiver has

9    using some of the same people.  But yes, we do believe it would

10   be helpful to bring someone on like that.

11         THE COURT:  All right.  Then you can expect to see a

12   court order following through, assuming the Special Master

13   makes a recommendation to me along those lines.  I have not

14   received a focused recommendation at this point, but I know

15   that's under discussion.

16         In terms of reporting channels and committees and

17   subcommittees and perhaps sub subcommittees, and sub sub

18   subcommittees, I would just say I have received information

19   from the defendants.  I've also received courtesy information

20   through Judge Tigar's chambers provided by the Receiver.

21   Overall, the lists are the same.  As of yesterday, there were

22   two new ones that the Court heard about, a statewide deputy

23   director's MH and RHE committees and a grand round lecture

24   series committee.  So I don't know if I've got the complete

25   list.  My bottom line questions are, are all of these

1    committees active committees?  What do they look like on an org

2    chart?  And how can this structure possibly fit with good

3    management, best management practices?  I don't know if there's

4    a management expert in the mix here, and I realize there can be

5    some subjectivity in that area; but it just looks to me as if

6    there are spider webs running everywhere that can only clutter

7    communication and impede good communication.

8              I don't know if you have anything to say about that

9    right now, Mr. Lewis?

10             MR. LEWIS:  Yes, your Honor.  Very briefly, that list

11   was meant to be as inclusive as possible, your Honor.  So it

12   does include all groups that we were aware of at the time that

13   we filed it.  You are correct that additional groups have been

14   identified.  It is not a static list.  It will ebb and flow as

15   committees are stood up and then disbanded to address certain

16   things.  That's why there's work groups on there and things

17   like that.  So defendants took to heart your question about

18   identifying all of the committees and subcommittees, and that's

19   why the list is so large.

20             They are not all active at one time.  They do stand up

21   and stand down as needed.  We would have to get more

22   information to the Court about that.  But yes, we do understand

23   that it does look like there's a lot, and CDCR takes that very

24   seriously about its management practices.  But if there's a way

25   to possibly refine those committees, CDCR will definitely look

1    into that and work the committee process and the work group

2    process towards the goal of getting, you know, the

3    constitutionally compliant system.

4          THE COURT:  I'd like a further update on that at the

5    next status, just if there's a move towards simplification in

6    terms of eliminating cross-cutting and multiple lines of

7    communication.  I mean, I've heard something about committees

8    where a meeting is scheduled and then canceled at the last

9    minute.  I think this is -- it may be that this notion of

10   committees is getting in the way of clear communication.

11         MR. LEWIS:  We're looking at it, your Honor.  And some

12   committees are kind of -- they are the result of either program

13   guides or things that happen in the case, so we'll make sure to

14   brief that up as well.

15         THE COURT:  Well, if there needs to be an amendment to

16   the program guide, let me know.

17         MR. LEWIS:  Yes, your Honor.

18         THE COURT:  All right.  So we'll just put that on the

19   agenda for next time for a further update as people step back

20   and think about what the best management practices and

21   structures are here.

22         Anything to say on this point, Mr. Bien or Ms. Ells?

23         MR. BIEN:  Yes, your Honor.  I think that at this

24   point we strongly suggest that the Special Master and the Court

25   consider what functions can appropriately be moved towards the

1    Receivership beyond what is already delegated to the

2    Receivership.  I think that what emerged from the trial to us,

3    and obviously the Court hasn't issued her order at this point,

4    but we all heard the testimony.  It really had to do with a

5    weakness on the mental health side in terms of management and

6    leadership and some strength on the Plata side, on the medical

7    side.

8           And I think as we move forward, there's been a lot of

9    transition on the mental health side, new people, but I think

10   it's an opportune moment to consider what functions can

11   appropriately be delegated now and assuming we're going to come

12   up with a good system so that the Coleman court and the Special

13   Master and plaintiffs' counsel will know what's happening and

14   be involved.

15          But the more important question is, to move the remedy

16   forward, I think the structure and the experience and the

17   management skills of the Receiver should be taken advantage of

18   rather than trying to create something, you know, from where we

19   are right now in Coleman managementwise.  I'm not saying

20   everything, but I think that to the extent we can take

21   advantage of the structure and management skills that exist, we

22   should consider that, and we're really recommending that we

23   look at each function and see whether or not it can really be

24   delegated in an appropriate way where we're confident in the

25   information and compliance with Coleman court orders but taking

1   advantage of those skills and experience.

2          THE COURT:  Is that related to data collection and

3   reporting primarily or more general?

4          MR. BIEN:  No.  I think we should look at it more

5   broadly.  For example, despite what defendant said in their

6   pleading, the Plata Receiver does not have control of hiring.

7   He has some functions in hiring, but most of the hiring

8   responsibility for psychiatrists is outside of his purview.  He

9   made that clear in our meeting.

10         So things like that.  I'm not saying everything.  I'm

11  just saying there are certain things that we're going to

12  function better if we really delegate them.  He is no longer

13  doing construction, for example.  He monitors construction.

14  He's no longer responsible for construction.

15         So, you know, I think we need to look at what issues

16  the Receivership can do, and of course, they have to be ready

17  and willing and able to take them on.  But I think there are

18  some strong people there, some overlapping functions.  And we

19  have a single group of patients, you know, that we're concerned

20  about, so whatever works --

21         THE COURT:  Overlapping.

22         MR. BIEN:  Overlapping group.  That whatever can get

23  them to constitutional care effectively and rapidly is what

24  we're focused on and I know that the Court is focused on.  We

25  think that there's probably more rather than less that can be

1   delegated to the Receivership, again, once we resolve the

2   problem of communication which we think is going to be resolved

3   pretty easily.

4          THE COURT:  If the parties jointly ultimately reach a

5   proposal, of course the Court will seriously consider that.

6   What would be important to this Court would be that every

7   member of the Receiver's team certifies that they have read

8   everything in Coleman because it has not been their job to do

9   that, quite frankly, and that's where the mental health side's

10  not standing up for Coleman has been a problem.

11         And it may be that there's a joint structure so it's

12  Receiver/Special Master side by side over whatever it is that's

13  delegated to help ensure that Coleman doesn't get lost in the

14  process.  And then also understanding what that means for a

15  remediation.  What if Coleman is actually ready for termination

16  before Plata, would that get in the way of Coleman's

17  termination?

18         Anything to say on this point, Mr. Silberfeld,

19  Mr. Lewis, Ms. Thorn?

20         MR. LEWIS:  Your Honor, defendants accept that the

21  Receiver does have certain functionalities which would be

22  helpful here perchance, so definitely we would support that.

23         And in the data piece that your Honor had mentioned,

24  we had mentioned earlier the Special Master getting a data

25  expert would be good, particularly to understand someone maybe

1    using the Receiver's previous data expert or data management

2    firm that they used to understand some of the methodologies and

3    things like that that go into CDCR's data reporting practices

4    would be helpful.  So that would be an example of that kind of

5    integration that we would support.

6         THE COURT:  All right.  Well, nothing's off the table

7    in terms of moving the case forward properly.  My order is in

8    final draft.  I just have taken time to make certain I'm also

9    citing to the record in more detail than I did in my bench

10   pronouncement.  It's essentially consistent with the bench

11   pronouncement.  It takes account of a little bit that's

12   happened since then.

13        Does the Receiver have the ability to insist that the

14   state allocate $92.5 million to build facilities for MHCBs?

15        MR. LEWIS:  Your Honor, I don't believe so, but that

16   would be briefing we could do later if the Court desires.

17        THE COURT:  If his powers extend to that kind of

18   question, that would be particularly important.

19        MR. LEWIS:  Yes, your Honor.  But it does also

20   illustrate there are two different systems, as you know, and

21   there's reasons for why defendants have that position as to the

22   RJD project.

23        THE COURT:  Yeah.  We'll talk about that a little bit

24   more in just a moment.

25        Just on coordination, I wanted to highlight what I

1   want to do at the very end is review the primary areas, the

2   seven general goals that relate to whether or not Coleman can

3   terminate, and so I will just do a wrap-up along those lines.

4          But on coordination, it's also essential that

5   whatever's happening with EHRS receive special attention and

6   this -- the defense briefing about EHRS and the heart system, I

7   don't need to go there in detail today, but again I would just

8   caution the parties not to -- and the defendants in particular

9   not to make changes before full sharing with all affected

10  parties including the Coleman plaintiffs and the Special

11  Master, and if needed, obtaining this Court's approval.  I just

12  note the number of improvements including in the EHRS system

13  that the defendants report are in progress.

14         MR. LEWIS:  Yes, your Honor.  The system is coming

15  online and has greater functionality now, so that is starting

16  to kind of spread out to other functions that CDCR is reporting

17  on and things like that.

18         THE COURT:  Well, just before anything material is

19  finalized, it ought to be shared.  And if plaintiffs have

20  access to the database, that will help in terms of a

21  cross-check.

22         MR. LEWIS:  Defendants completely understand and take

23  to heart your comments regarding transparency and will do so.

24         THE COURT:  On the 50 MHCB question, my bottom line

25  question here is should I set this for focused argument?  Do

1   the parties submit on the filings you've now made?  I see one

2   proposal to refer this to the work group.  I'm starting to

3   become concerned how much is referred to the Special Master

4   and/or the work group.  What's the parties' position?  Do I

5   have everything I need at this point to just make a decision?

6         And for the plaintiffs, I can't order the Legislature

7   to allocate money.  So what's your view on what I do with the

8   briefing before me?

9         MS. ELLS:  We do think that you have everything before

10  you that you need.  It's been very carefully briefed by both

11  sides at this point.  Of course we're always happy to have

12  argument if you feel that would be helpful, but we do think

13  that it is ready for you to decide.

14        I will also say that this process has made very

15  apparent that there's other aspects of long-term bed planning

16  that remain unresolved.  It's also -- and that includes the

17  significant numbers of unlicensed and temporary inpatient beds

18  that defendants represented would be decommissioned as part of

19  their long-term bed plan that was adopted by this Court.  There

20  is no plan for any of that, and that's another thing that is

21  concerning to us.  So we think there are a number of aspects of

22  bed planning that need attention from this Court and that need

23  attention specifically from defendants as part of their process

24  toward a durable remedy.

25        MR. LEWIS:  Your Honor --

1          THE COURT:  Mr. Lewis, and on this, would you agree to

2     specific reporting on time lines for decommissioning unlicensed

3     MHCBs?

4          MR. LEWIS:  Your Honor, if I could back up one minute.

5     The big issues defendants have here, and I just want to

6     clarify --

7          THE REPORTER:  Counsel, could you slow down a little

8     bit, please.

9          MR. LEWIS:  -- the bed plan right now would end with a

10    total of 425 licensed MHCB beds.  Over the last 18 months the

11    average MHCB census was 292.  At no time has it exceeded more

12    than 378.  So defendants are in possession of no information

13    that says that their projections for that 425-bed need are

14    wrong.  As the Court's aware, we're using a court sanctioned --

15         THE COURT:  I've read all that briefing.  This is not

16    argument on the briefing.  I've read it all.

17         MR. LEWIS:  Yes, your Honor.  So based on that,

18    defendants -- I can't speak right now as to the time line of

19    when the unlicensed beds are going to be decommissioned, but I

20    do know that everything else is moving forward as planned.

21         THE COURT:  But my question is not today, but one

22    thing plaintiffs have requested is specific reporting on time

23    lines for decommissioning.  Any objection to doing that?

24         MR. LEWIS:  Your Honor, perhaps this is something that

25    we could pick up at the next status conference so that I could

1   go back and assess how that's going.

2          THE COURT:  What about you take the position that

3   there's no need to correct any past reports; is that correct?

4          MR. LEWIS:  That's correct, your Honor.  Those reports

5   are in the past.  Defendants are trying to, as I've said

6   before, look forward, and the way forward is our other

7   reporting requirements that we are meeting.

8          And then the way that EHRS is coming online, there are

9   work groups going on right now with the Special Master to

10  finalize policies as to EHRS reporting of MHCB use and

11  referrals.  And we'll bring the plaintiffs in on that.  So

12  there's going to be great moves forward in the near future that

13  will bring clarity as to MHCB reporting.

14         There's no real need to go back in time and look at

15  the system which plaintiffs, by the way, knew about because it

16  was announced via declaration by Ms. Tebrock in 2017 that the

17  email was the way it was being counted.  So this is nothing

18  new.

19         THE COURT:  All right.  Well, I'm going to submit the

20  matter on the briefing, and I'll issue some kind of order.  And

21  I'll let you know if we're going to talk about this at the next

22  status.

23         So relatedly, clarify for me, I thought I had heard

24  something suggesting the defendants agree that an unmet bed

25  needs study actually does make sense, but that's not what the

1   briefing says.

2        MR. LEWIS:  No, your Honor.  The defendants do not

3   believe that an unmet needs bed study is needed at this time.

4        THE COURT:  So you want the sustainable process --

5        MR. LEWIS:  Yes, your Honor.

6        THE COURT:  -- to review where things are?

7        MR. LEWIS:  And if I could clarify our briefing on

8   this point.  Starting at the settlement conference that we had

9   with Judge Drozd a few weeks ago, there was a great dialog that

10  opened between the defendants and the Special Master about the

11  sustainable process.  Over the ensuing weeks, defendants have

12  gotten a better understanding -- have a better now

13  understanding of what the Special Master's issues were, and

14  they agree that there are some issues with the sustainable

15  process that need to be refined.  And they want to talk with

16  the Special Master about how to do that and work that process

17  through before jumping to an unmet needs assessment.

18        That would take up to a year, would take a lot of

19  resources and people off what could be a system that we could

20  refine.  We could look at sustainable process and assess how

21  that can be refined.  And actually, Dr. Toche is here, and

22  she's quite passionate about this.  If you would like to ask

23  Dr. Toche about this, she could also talk about this.

24        THE COURT:  Well, let me ask a few other questions.

25        So Mr. Silberfeld, you agree with this position?

1          MR. SILBERFELD:  Yes, your Honor.

2          THE COURT:  So why is this using the sustainable

3   process, whatever that is, and I don't know that I have time to

4   get to the bottom of it today, but the defendants do say that

5   your position is this is the highest priority?

6          MR. LEWIS:  Yes, your Honor.

7          THE COURT:  All right.  So if this is a high priority

8   and there's a process there that's more effective and efficient

9   than an unmet bed needs study, why not let that play out first?

10         MS. ELLS:  I'll take this.  Your Honor, I think it's

11  confusing that on the one hand defendants are telling you there

12  are plenty of beds.  On the other hand, they're telling you

13  that -- to disregard their numbers regarding compliance with

14  the program guide time lines because they were not accurate,

15  they're going to be accurate soon, okay?  And on the third hand

16  they're telling you that they understand that their process for

17  ensuring that people appropriately receive inpatient care isn't

18  working and that they're trying to fix it.

19         I will point you to the last two Special Master

20  reports where he found and told them twice that their

21  sustainable process was not working.  It's been many, many

22  years of a broken system, and this Court has adopted those

23  findings multiple times.  The system is broken.  The only

24  reason that referrals are happening right now to the ASH and

25  Coalinga beds is because literally the Special Master's team is

1    sitting next to them in headquarters holding their hands to

2    make it happen.  And that is what pushed -- I mean, if you look

3    at the numbers, when the Special Master was monitoring LRH with

4    them on the ground in the PIPs in August and September of 2017,

5    ASH was at 230.  When he left three months later, ASH was below

6    200.  For the rest of that year, for the rest of 2018, more

7    than a hundred ASH beds empty.

8              THE COURT:  I've reviewed the briefing on that

9    point.

10             MS. ELLS:  Okay.

11             THE COURT:  I understand your position, and we'll talk

12   a little bit more about that in a bit.

13             MS. ELLS:  Yeah.  And the larger point is that, in

14   addition to all of this, there is also this very significant

15   concern that there is significant unmet need, and that people

16   in the field, clinicians in the field know that they are not

17   referring people that should be referred.  And they are

18   reporting things like artificial, not clinically driven time

19   lines to get people out of higher levels of care.  They are

20   reporting understanding that they are supposed to look to take

21   people off the EO caseload, not to refer them higher.  You're

22   seeing the trends in the suicides.

23             It's a very dramatic trend in the suicide case reports

24   that tells the entire story here, that the system is currently

25   in a process of depressed identification of unmet need.  The

1    sustainable process has been broken for at least two Special

2    Master monitoring tours, and so far as I'm understanding of the

3    current round, it's not improved.  And that's why defendants

4    are telling you that they're working on it right now.

5           But we understand, and we're in a process of looking

6    at how many beds defendants need.  Literally today they're at

7    negative numbers of beds for the inpatient levels of care, and

8    that includes like over 300 unlicensed and temporary beds that

9    are not appropriate for long-term use and that they understand

10   are not appropriate for long-term use.  So we're talking about

11   unmet need at the same time that they're assuring you that

12   there's plenty of beds, and there's a fundamental disconnect

13   there.  If they --

14          THE COURT:  Here's my question.  Do I have enough

15   information to just decide this question before me in

16   consultation with the Special Master?  I think this is the

17   issue raised by the question of whether an unmet bed need study

18   or exhaustion of the sustainable process is a very high

19   priority.  So can I just decide this between now and the next

20   status, Mr. Lewis?

21          MR. LEWIS:  Your Honor, defense would ask that the

22   defendants be allowed to speak with the Special Master before

23   you issue that order, and we ask that you maybe push this to

24   the next status conference so that we can use the intervening

25   period to continue these discussions.

1          There have been three bed need studies done in the

2     past that generated the sustainable process that was jointly

3     developed.  So it's an existing tool that the parties jointly

4     developed.  The best use of the resources would be to see how

5     to fix that.  Now that defendants have a greater understanding

6     of what the Special Master's issues are, they would like the

7     next few months to talk with the Special Master about that to

8     see if they can revise that process before your Honor issues a

9     further study or examines this issue further.

10          THE COURT:  And the plaintiffs would oppose that

11     request?

12          MS. ELLS:  Yeah, your Honor.  I mean, the unmet needs

13     study, I attended the last unmet needs study tour, and they

14     are -- that process is the process of the Special Master and

15     headquarters people sitting down at the institutions and

16     training them on how to create referrals.  That is what the

17     sustainable process is.  They tried to do it themselves, and it

18     has not worked.  And they essentially need a retraining.  And

19     that's what that process looks like.  So the quickest way to

20     ensure that people get the appropriate amount of care and that

21     clinicians understand they should be referring people is by

22     doing the unmet need process.

23          THE COURT:  All right.  I'm going to take these

24     arguments under submission and consult with the Special Master

25     and let you know if I'm going to make a decision before the

1    next status.

2            MR. LEWIS:  If I may add one more thing, the

3    sustainable process itself is not even current because it needs

4    to be updated to account for certain things that have come up

5    like the LRH process and things like that.  So defendants

6    acknowledge that it needs to be refined, and it is the updating

7    that will help address some of the LRH needs and things like

8    that.  And that's what they would like to continue the

9    discussions with the Special Master about that have been so

10   positively started recently.

11           MS. ELLS:  Your Honor, if I could make one very short

12   comment.

13           THE COURT:  All right.

14           MS. ELLS:  The opportunity to address the LRH problem

15   happened in the summer of 2017 when the Special Master and his

16   team sat down at every PIP and taught them the LRH process.  It

17   clearly did not take, but that is where we are.  Hoping and

18   praying that two years later, two and a half years later it's

19   just going to magically fix itself is not realistic.

20           THE COURT:  All right.  There's a dispute I need to

21   resolve.  I heard the request for the Court to hear from

22   Dr. Toche.  If I want to know from her, I'll provide the

23   opportunity for the filing of a declaration.

24           MR. LEWIS:  Thank you, your Honor.

25           THE COURT:  All right.  In terms of staffing, a

1    long-deferred issue at this point, I see the request from the

2    defendants and the suggestion that they're continuing to work

3    on revising the plan, developing proposed revisions to the

4    plan.  I think the best way to focus this issue now is to set a

5    date, to reset the date I had originally set for October of

6    2018.  And if there's motion practice in connection with that,

7    a long-deferred hearing, there could be motion practice.  But I

8    think we're ready now to refocus on that question.

9         So my suggestion would be to set a date for compliance

10   with staffing requirements under the Court's October 10th,

11   2017, order and set it for sometime next spring.  So -- and

12   then people can say whatever they want to say at that point.

13        Have we set our dates for 2020 yet for our quarterly

14   status?  I'm not seeing it on mine.

15        MS. ELLS:  I don't believe so, your Honor.

16        MR. LEWIS:  I don't believe so, your Honor.

17        THE COURT:  So I'm just taking account of that.  What

18   if we said for our first quarterly status in 2020 March 19th?

19   That will help me set the date for the staffing hearing.  I'm

20   sorry.  I mean March 20th.  Does that work, March 20th?  Let's

21   just say that's the date.  And then I'll set the date for the

22   staffing, can we say April 23rd at 10:00 a.m.?  All right.

23        I wanted to talk about items referred to the Special

24   Master.  The plaintiffs at one point raised that as an issue.

25   I am aware of a number of matters referred to the Special

1  Master.  My thought is that we could do a comprehensive review

2  at our next status now set for March of 2020.  And by that time

3  I would ask the Special Master in the first instance to provide

4  the parties with a comprehensive list of all matters, when they

5  were referred, what the status is, and we can review those

6  matters and any position of the parties in March.

7       But specifically I wanted to call up for today items

8  referred related to the program guide process.  I deferred

9  ruling on the request for additional time to February 14th of

10  2020 given the justifications for the request, and I said I

11  would discuss that issue today.  Some of the issues raised in

12  the request for extension of time are being addressed, I

13  believe, through coordination at least globally.

14       I also note repeated references to new policies that

15  the defense is working on with respect to a CIT, use of

16  inpatient beds, local operation proceedings, would those call

17  for amendments to the program guide or addenda to the program

18  guide?

19       MR. LEWIS:  Your Honor, I think as to the CIT, it may

20  be an addenda, but I know that those are active issues that are

21  being worked with the Special Master.  So I don't want to make

22  any statements and hem anything into certainty at this point.

23  But I do know that there are ongoing conversations about

24  particularly CIT.  I've even been briefed up on that recently,

25  so --

1          THE COURT:  Has full information now been provided to

2     the plaintiffs?  I believe the plaintiffs indicated they had

3     not received proposal language.

4          MR. LEWIS:  No, your Honor, not on all of them.

5          THE COURT:  So to the extent there's fluidity in the

6     program guide, that has to be taken account of in -- I mean,

7     this is why we need a process for regular updates.  I don't

8     know that I have a choice at this point but to approve the

9     extension of time requested, February 14th, but it does not

10    mean that I'm accepting what at one point appeared to be a path

11    of integrating the program guide into the HC DOM, but I can't

12    tell if that's the path the defendants are on at this point.

13          Can you tell me, Mr. Lewis?

14          MR. LEWIS:  Your Honor, I know that that's actually

15    one of the issues that is being discussed, so I don't know if

16    that's the path it's going to end at.  I know that that's part

17    of the negotiations that are going on.

18          THE COURT:  So at this point, for the plaintiffs, any

19    reason not to approve the extension request through February

20    14th of 2020 with the Court's cautionary words?

21          MS. ELLS:  No.  We agree with that time frame.

22          THE COURT:  All right.  Is this also related to

23    Mr. Bien's earlier comments about delegation to the Receiver?

24    Is that comment implicated by any proposed process for regular

25    updates to the program guide, or does it implicate a proposed

1    update process?

2              MS. ELLS:  I would have to think about that more

3    fully, but I can't think of any way that it does right now.

4              THE COURT:  All right.  Well, I will approve the

5    request for an extension of time retroactively to

6    February 14th, but I will include some language in the approval

7    just memorializing my concerns about why the request was need

8    in the first place because I think it discloses yet another

9    example of a lack of full transparency.  But that's water under

10   the bridge.

11             In terms of the remaining disputes about the contents

12   of the list of custodial remedial measures to be appended to

13   the program guide, I acknowledge receipt of the Special

14   Master's request for a ten-day extension of time.  At this

15   point I'm approving that extension request, but I also am

16   generally going to send the message that I may be less generous

17   when it comes to approving extension requests in the future.

18   While on the one hand I want to make certain that discussions

19   and meet and confers are fully exhausted, at some point

20   deadlines do focus minds, and that may need to be a direction

21   we move in.

22             Any other comments about matters referred to the

23   Special Master that any party thinks we need to discuss today,

24   Ms. Ells?

25             MR. BIEN:  Your Honor, one issue that looms that we're

1    hoping could be resolved is the remaining dispute about

2    telepsych that you recall was set for a full trial just a year

3    and a couple months ago.  We expect that the Ninth Circuit is

4    going to, based on the oral argument, dismiss the appeal and

5    send it back to you.  Whether they grant the appeal or deny it,

6    it would be the same outcome of a trial.  We think that we're

7    very close to resolving all issues on telepsych, but have yet

8    to be provided with any proposal whatsoever.

9            So we would like to be in part of the negotiations,

10   have a focused time frame, and finish them.  I don't understand

11   why we can't just finish it.  So I don't want to talk about the

12   negotiations before the Court only to say that I think it would

13   be a tremendous waste of our resources and your resources to

14   have a trial about something when the parties are so close to

15   resolution.

16           THE COURT:  Well, I was going to get to that in terms

17   of looking at the seven broad areas, not including CQIT,

18   because staffing is clearly one of those broad areas that needs

19   to be fully addressed and fixed for remediation to be

20   completed.  I understand there's another settlement conference

21   with Judge Drozd on January 17th.

22           MR. BIEN:  Yes, your Honor.

23           THE COURT:  And my question there was going to be

24   could that provide a forum for focusing on telepsychiatry with

25   the parties meeting and conferring and going into that session

1    with focused proposals and disputes narrowed?

2          MR. LEWIS:  Yes, your Honor.  I can say that it was

3    broached at the last status or settlement conference, and I

4    think there has been some positive movement and talks about

5    this issue; and I believe that would be a very good use of

6    Judge Drozd's time.

7          THE COURT:  Does that work for you, Mr. Bien?

8          MR. BIEN:  Yes, your Honor.

9          THE COURT:  All right.  Then that will be the

10   direction, that this be a priority at your settlement

11   conference with Judge Drozd.  I'll make certain he knows that

12   that's this Court's request while respecting his authority to

13   run that settlement conference as he sees fit.

14         Anything else on referral of matters to the Special

15   Master, Mr. Bien, Ms. Ells?

16         MR. BIEN:  No, your Honor.

17         THE COURT:  I note that the parties have submitted a

18   stipulation and proposed order regarding CCHCS's medication

19   adherence policy requesting 60 more days to come to an

20   agreement regarding monitoring.  My questions are these, if you

21   can answer them today.  Is CDCR developing a QM process for

22   this policy?  Does someone here know?  And if so, how does that

23   intersect with the Special Master's general monitoring

24   responsibilities?  Is there anyone prepared to respond to that?

25         MR. LEWIS:  Your Honor, I don't think we are prepared

1    to respond on that issue just quite yet.

2         THE COURT:  The proposal here is to clarify a Receiver

3    policy, right?

4         MR. LEWIS:  Yes, your Honor.

5         THE COURT:  So is that being jointly submitted to the

6    Plata court and this Court?

7         MR. LEWIS:  I believe it would be, your Honor.  I

8    understand there are meetings that are starting up about this

9    issue or that have been going on about this issue and

10   continuing.  But as to the QM piece, I'm not sure.

11        THE COURT:  Has psychiatry been at the table with

12   respect to this policy?

13        MR. LEWIS:  Yes, your Honor.

14        THE COURT:  So for the plaintiffs, do you have any

15   understanding of the responses to my question?

16        MS. ELLS:  I haven't looked at this in a while, your

17   Honor, to be fair, but my memory was is that we had come to a

18   place where the receiver policy was going to have a clarifying

19   memo as it applied to mental health.  And if I recall

20   correctly, there were certain aspects of how it would be

21   monitored in the field.

22        So first of all, I think this policy, although both

23   parties and the Special Master have agreed to it, have not been

24   issued to the field so far as I know.  And so the remaining

25   questions that were being worked through by the parties -- and

1    plaintiffs had provided some questions around this -- were how

2    it could be monitored including modifications that may need to

3    be made to the electronic medical records system in order to

4    make it possible to track compliance.

5              So I think that I'm not sure what's happening on

6    defendants' end since then since it has been about a month, but

7    we were planning to engage with the Special Master in a process

8    where things would be essentially worked out, and we would come

9    to an agreement on what would be happening in EHRS and how it

10   would be measured if that provides clarification to the Court.

11             And my understanding is the Special Master would still

12   be monitoring it.  I don't think there was any question about

13   that, but in order for it to be monitorable of both, there

14   needed to be some changes made on defendants' side about how

15   exactly to implement the procedure.

16             THE COURT:  May I ask that the parties within seven

17   days just supplement the stip and proposed order with full

18   answers to my questions.  That is, is CDCR developing its own

19   QM process for this policy?  Does CDCR agree with Ms. Ells'

20   representation clarifying how this would intersect with the

21   Special Master's general monitoring, and is this in fact a

22   joint request?  Is it going to the Plata court as well?

23             MR. LEWIS:  Very well, your Honor.

24             THE COURT:  All right.  I want to talk about the

25   Special Master's monitoring going forward, but first I do want

1    to review the seven general goals for defendants to meet

2    compliance.  We've covered on a number -- we've covered a

3    number of them already, but I just want to put our discussions

4    in this context because these goals are critical.

5            First, reevaluation and updating of CDCR's suicide

6    prevention policies and practices.  Here the briefing

7    references the defendants' own.  I gather it's an internal

8    analysis that's ongoing currently.

9            MR. LEWIS:  That is correct, your Honor.

10           THE COURT:  So is that being coordinated with

11   Mr. Hayes, the Special Master's expert in this area?

12           MR. LEWIS:  Yes, your Honor, I believe it is, if I'm

13   getting the right one right.

14           THE COURT:  It could be a fool's errand to not closely

15   coordinate with Mr. Hayes and make certain that he's providing

16   input at least on methodology and analysis.

17           MR. LEWIS:  Yes, your Honor.  I know there have been

18   from very fruitful conversations with Mr. Hayes.

19           THE COURT:  All right.  My plan would be to direct the

20   Special Master to -- is there more I need to know?

21           MR. LEWIS:  I think we're okay, your Honor.  Sorry.

22           THE COURT:  I'm going to direct the Special Master to

23   direct that Mr. Hayes' next report include recommendations for

24   each specific step defendants must take to implement items that

25   remain complete and also provide a date by which the fifth

1    reaudit round will commence which would provide the basis for

2    ordering specific compliance.  So those are my tentative plans.

3           Any comments on that Ms. Ells, Mr. Bien?

4           MS. ELLS:  That seems appropriate, your Honor.

5           THE COURT:  Anything further, Mr. Lewis?

6           MR. LEWIS:  Nothing, your Honor.

7           THE COURT:  All right.  In terms of transfer to higher

8    levels of care, there's timely transport to inpatient care,

9    timely transfer to MHCBs.  There's the issue of an unmet needs

10    study which I will address as we've discussed.

11           In terms of transfer to inpatient care, my plan right

12    now is to direct defendants to continue filing monthly reports.

13    That allows the calculation of possible fines.  I'm going to

14    keep during deferring an ultimate decision on those.  It

15    appears that approach is overall working.

16           Any comment on that plan, Ms. Ells, Mr. Bien?

17           MS. ELLS:  No, your Honor.

18           THE COURT:  Mr. Lewis?

19           MR. LEWIS:  Nothing, your Honor.

20           THE COURT:  On timely transfer to MHCBs, I see the

21    issue the parties have teed up.  I've indicated I'm submitting

22    the questions later to MHCBs, and I'll address the 24-hour,

23    25-hours-or-more issue in resolving what's before me.

24           Anything more on that, Mr. Bien, Ms. Ells?

25           MS. ELLS:  No, your Honor.

```
 1              THE COURT:  Mr. Lewis?

 2              MR. LEWIS:  No, your Honor.

 3              THE COURT:  On ASU EOP hub certification, I would like

 4    to understand from the parties what's happening with that

 5    process.  Is EOP ASU hub certification moving the defendants

 6    toward compliance with the program guide requirements for EOP

 7    levels of care?  What's the -- can you tell me anything at this

 8    point?

 9              Now the data reliability issues, so to the extent I'm

10    going to order remedies, they will undoubtedly cover this area

11    as well.  Is there more I should be thinking about right now or

12    that the parties should be thinking about or I should direct

13    the parties to think about in this area?

14              MR. LEWIS:  Defendants believe that the current

15    process is helpful and does not believe that it should be

16    changed at this time.

17              THE COURT:  Mr. Bien, Ms. Ells?

18              MS. ELLS:  Your Honor, as you know, we think it is a

19    deeply broken process.  It is completely reliant upon

20    self-reporting.  Just yesterday we received the EOP ASU hub

21    certifications for the month of July, and we have received

22    nothing since then.  So it is completely separated from any

23    reality of what is happening on the ground.  We don't receive

24    any information except the minimal roll-up that defendants

25    provide.  Again, it's entirely based on their own self-report
```

1    which we know from the trial is not necessarily reliable.

2         And we also think, from what we are understanding

3    about how the Special Master's tours are going to date, that

4    there are a significant number of problems that remain.  There

5    are confidentiality and space problems at a number of

6    segregation units that prevent appropriate care.  There are

7    also a number of problems in the other segregation units that

8    we are concerned about.  So we don't think that this issue is

9    closed at all.

10        We also, of course, remain very concerned about the

11   use of therapeutic treatment modules without any serious

12   individualization of that utilization particularly with respect

13   to moving people into the ability to function in a

14   nonsegregated setting.  So we have a number of concerns about

15   this area.

16        THE COURT:  All right.  Let's put this on the March

17   status, and I'll ask for a joint statement or competing

18   statements more fully briefing me on this question and where

19   you all are with it come March.

20        There's also bed and treatment center planning and

21   construction.  I'm going to address the MHCB's issue,

22   unlicensed beds and planned construction in an order I will

23   issue.  We've talked about staffing.  We have that date set,

24   and you're going to talk about telepsychiatry at your next

25   settlement conference with Judge Drozd.

1          On custody collaboration, the defendants currently

2     should be on track to certify to the Special Master that

3     deadlines in the October 8th update have been met or that tasks

4     are ongoing.  And if not, explain why not.  So the Court will

5     pay attention to that April 30th, 2020, deadline and consider

6     whether or not compliance orders are needed after that.

7          On EHRS, or as Ms. Ells says, EHRS, now that I know

8     that's how you say that correctly, here I think there does need

9     to be special focus, given what came out of the hearing, and so

10    my question would be why should I not direct the defendants to

11    provide a plan for updates to meet the needs of psychiatry and

12    mental health, provide a plan jointly to the Receiver and the

13    Special Master.  This is an area they're discussing with

14    respect to coordination and to do that within three months, and

15    then we can also return to this at the next status.

16         Does that work for you, Mr. Lewis?

17         MR. LEWIS:  My one concern about this, your Honor, is

18    given the ongoing discussions that are going on about

19    integration, the plan may be premature, and I would worry that

20    it may -- I don't want to say gum up the works, but it may have

21    cross-purposes with whether coordination meetings and

22    discussions may be going on.  So I think a plan at this point

23    may be a little premature in light of those discussions.

24         THE COURT:  How does this Court get the information it

25    needs to be satisfied that things are heading in the right

1   direction given the serious problems identified at the hearing?

2          MR. LEWIS:  There are coordination meetings that go on

3   regularly, and also there is the process -- the plaintiffs and

4   defendants are going to be discussing obviously the integration

5   issues in quite detail.  I think with those coordination

6   meetings, those kind of help allay any fears so the Court

7   actually gets the view of where things are going and how

8   they're proceeding.

9          But for a plan at this current moment, I think the

10   plan and in the next few months may be a little premature given

11   the ongoing communications and the ones that are going to start

12   up.

13          THE COURT:  Ms. Ells, the option would be full updates

14   on this question by the time of our next status.

15          MR. BIEN:  Your Honor, the meetings that we jointly

16   agreed to with defendants really did not contemplate diving

17   into the electronic medical records or those issues.  We're

18   trying just to understand the structure of the Receivership and

19   how mental health is supervised in that structure which has

20   been valuable, and we have some additional questions.

21          I do think that the issue that emerged in the hearings

22   should -- requires a plan.  What we heard was that, you know,

23   mental health priorities for medical record changes have not

24   necessarily been addressed in a timely manner, and to the

25   extent they're sitting in a backlog or haven't been identified,

1    I think it would be useful to have a time line and a process,

2    you know, who is responsible for it, how does it get raised.

3    It's one of the fundamental issues that remains to be resolved.

4    So we think having a plan would force defendants to assign

5    someone to it and gather the information and start moving

6    forward.  So we think that would be a good recommendation and

7    order for this Court.

8             THE COURT:  So proposed plan by the next status?

9             MR. BIEN:  Yes, your Honor.

10            MR. LEWIS:  Your Honor, if I may.

11            THE COURT:  You may.  I am very concerned that, if

12   this is pushed off, things happen in the meantime that really

13   do not --

14            MR. LEWIS:  Absolutely, your Honor.

15            THE COURT:  -- resolution.

16            MR. LEWIS:  So perhaps defendants can provide a status

17   report to your Honor before the next status conference as to

18   how -- this issue, and then we can address this at the status

19   conference about a further plan that may be needed.

20            THE COURT:  Why is that not buying time during which

21   confusion and delay could reign?

22            MR. LEWIS:  Well, that could allow the defendants to

23   show you what has been happening and put it in a more concrete

24   form for your Honor so that then you can see, okay, is a plan

25   needed at this point.  So we can say, hey, here's how the

1   process works.  Here's what's going on.

2          THE COURT:  So are you saying there are coordination

3   meetings with all the players present where this is being

4   discussed?

5          MR. LEWIS:  I don't believe there are, your Honor.

6          THE COURT:  All right.  I believe the parties need to

7   meet and confer.  The defense can take the lead.  I think there

8   needs to be something that looks pretty much like a proposed

9   plan by the time of the March status conference.  And if for

10  some reason you think you can't propose that, then you can let

11  me know.  And the plaintiffs, if you can't come together around

12  some proposed plan, then the plaintiffs can tell me what they

13  think a plan should look like based on what they know which

14  hopefully by that time will be much more.

15         So I'll put in writing in an order clarifying what

16  that direction means, but it really means proposed plan by the

17  March 2020 status.

18         On CQIT, what is the defense plan at this point?  Is

19  the plan to restart CQIT implementation as soon as outstanding

20  data issues are resolved?  Is there a date on the calendar?

21  What is the thought?

22         MR. LEWIS:  There is a plan to restart it once we get

23  the data issues, but there's no date, your Honor, no date

24  set.

25         THE COURT:  Is there a thought about when that might

1   be currently?

2           MR. LEWIS:  If I may have a minute, your Honor.

3           (Discussion held off the record.)

4           MR. LEWIS:  Your Honor, given its tie-in with the

5   data, defendants haven't been able to assess that and meet with

6   the appropriate parties.  As you know, the evidentiary hearing

7   called into question some of those issues and delayed it.  So

8   once the data piece and the buy-in from all the parties all the

9   data being reliable, then CQIT can restart.

10          THE COURT:  All right.  We'll talk more about that in

11  March --

12          MR. LEWIS:  Yes, your Honor.

13          THE COURT:  -- and see where we are at that.

14          MR. LEWIS:  Your Honor, this is an important issue to

15  defendants, and they do want to get this one clarified.

16          THE COURT:  Clarified in what way?

17          MR. LEWIS:  Get it moving again.

18          THE COURT:  All right.  Understood.

19          So finally, I just want to talk about the Special

20  Master's monitoring plans.  And the defense can briefly respond

21  if they'd like today.  But the plaintiffs have argued that

22  there's compliance when defendants are under a microscope, and

23  then when the microscope moves, either the Court's attention or

24  the Special Master's attention, the toothpaste in the tube

25  moves around.  And so the Special Master has been conducting

1    monitoring at headquarters.  Currently given the structure, his

2    staff resources, his resources, headquarters monitoring, all

3    parties work group, monitoring in the field, and coordination

4    with the Receiver, that overtaxes his current resources.

5            So I want to hear briefly today from the parties is

6    the way forward to increase the Special Master's resources so

7    that his team can really do all of those things effectively, at

8    least for this critical period of time.  That is, headquarters

9    monitoring, I think the parties agree that's very useful, but

10   it can undercut or prevent full monitoring in the field.  And

11   then talk about a super committee, all parties work group,

12   essential process, and as I said, coordination with the

13   Receiver which may lead to additional responsibilities of the

14   Special Master.  This Court currently thinks it should, but I'm

15   holding off on reaching final conclusions.

16           So I believe that it may be necessary to increase the

17   Special Master's -- the size of the team and the duties, and

18   there's a cost associated with that.  So any thoughts?

19           MR. LEWIS:  Your Honor, the Special Master's input has

20   been very valuable, particularly at headquarters, but it's not

21   something that will continue on forever.  Defendants have to

22   learn how to basically function without the Special Master

23   monitoring their actions.  I don't think it's necessary to

24   increase the size of the program or the Special Master's team

25   now given some of the positive effects that we've seen coming

1    out.  Those can continue, and in fact I think the Special

2    Master can learn to -- has been learning to use his resources

3    appropriately both for all his many duties.

4         The parties recognize -- I think defendants recognize,

5    as your Honor's pointed out, there's a lot of committees, a lot

6    of meetings, stuff like that, there's ways to get efficiencies

7    within those that everyone can move forward with the current

8    staffing levels, particularly with the Special Master being at

9    headquarters.  So I don't think at this time the Special

10   Master -- additional staffing is needed because what we're

11   having right now is working and producing positive results and

12   won't be there forever.

13        THE COURT:  What about trade-offs with monitoring in

14   the field?

15        MR. LEWIS:  Your Honor, I think the monitoring in the

16   field has produced its own good results, and when we have

17   conversations, I mean, there's been a great period of

18   conversations that are starting now that I think you get the

19   right people talking to each other.  If we can see how that's

20   playing out and does that have the effects such that the

21   monitoring in the field doesn't need to be as robust or that

22   it's being done more by CDCR staff working with a smaller

23   contingent with Special Master staff, that's something that I

24   think the defendant -- we would enjoy.  They would like that,

25   the ability to show that they can do that.

1          THE COURT:  Your thoughts, Mr. Bien or Ms. Ells?

2          MR. BIEN:  Yes, your Honor.  We think that the most

3    important function of the Special Master is to monitor in the

4    field and to report on what's really happening on the ground

5    and that we understand that at the current staffing levels

6    that's almost impossible to complete.  So we think that his

7    request for additional resources, you know, should be granted.

8          We also think that in the long haul the current

9    situation that we find ourselves in where the Special Master

10   has to spend time in headquarters, in addition to doing

11   monitoring, you know, hopefully will lead to more efficiency,

12   but we think that efficiency will come when more issues are

13   delegated through coordination to the Plata Receivership.

14         We think that, you know, it's ironic that defendants

15   are saying that they're not ready to do CQIT at the same time

16   they're saying the Special Master shouldn't do field monitoring

17   but should wait for them.  Right now I think there's a

18   desperate need for monitoring in the field, and the Special

19   Master has that expertise and ability to do that and to

20   continue the reports that are so critical.

21         The headquarters function of course is also critical

22   at this moment, so I think he needs more resources.

23         THE COURT:  All right.  Well, let me think about that.

24   I have no -- I've told the Special Master this.  I have no

25   desire to have my own bureaucracy, and I certainly did not want

1    a semipermanent, you know, team.  But this is a critical time,

2    and so I believe I'm going to ask the Special Master to make a

3    very specific proposal to address what are current needs that

4    may be needs for six months or 12 months with no plan that this

5    is a permanent addition to the Special Master's team.  As you

6    can tell from my questioning, I do think to make certain that

7    we're covering all the bases that need to be covered right now

8    and to actually facilitate the transition that Mr. Lewis is

9    signaling the defendants want, I think he will need additional

10   resources.

11        But we'll make transparent a proposal and give the

12   parties a chance to comment on that.  But I'll get something

13   out very soon because I think now is the time for additional

14   attention as a kind of strike force effect to get things back

15   in shape.

16        All right.  I have nothing else.  Anything further

17   that any party thinks we need to address, Ms. Ells, Mr. Bien?

18        MR. BIEN:  Can you give us just one minute, your

19   Honor.

20        THE COURT:  All right.  The defense may consult if

21   they would like to consult.

22        (Discussion held off the record.)

23        THE COURT:  All right.  Mr. Bien.

24        MR. BIEN:  Your Honor, in terms of -- I've been

25   suggesting that we consider moving things to the Receivership

1    that are possible to move.  One of your comments was that, you

2    know, you would only feel comfortable if all the Receiver's

3    staff read all the Coleman orders and were responsible for

4    them.  We think that what we're trying to discuss, both the

5    Special Master and the Receiver staff and what we hope to

6    achieve through our discussions in the next 60 days by finding

7    out more information, is that there will be people responsible

8    for tracking Coleman compliance and Coleman orders so that

9    everyone in the Receivership doesn't have to be, you know,

10   fully cognizant of everything in the mental health side.  That

11   should be really, you know, the job of the mental health

12   people, Special Master team, and plaintiffs' counsel too along

13   with defendants and their lawyers to make sure that mental

14   health and Coleman orders are taken into account.  But we do

15   think that with transparency with the Plata process and

16   information sharing we can get to that point.

17        We also think it's important, as the Court said in its

18   statement from the bench after the hearing, when Ms. Toche was

19   cross-examined about the issue of mental health need and we

20   talked about the issue of whether or not CDCR staff and

21   employees and officials are aware of Coleman orders, I think

22   that's the primary place we should be focusing.  Does CDCR

23   require its officials to understand Coleman, to understand

24   they're actually court orders and not just plans and policies,

25   and I think that's really where the focus should be.

1          And I don't want to set up some obstacle to the

2    Receivership accepting more responsibility.  Because I think as

3    the Court correctly pointed out, they haven't done anything

4    wrong.  I think the responsibility is on the mental health side

5    and CDCR's side, and also I take some responsibility,

6    plaintiffs' counsel.  We have to watch more carefully what's

7    happening as things are coordinated and make sure that they're

8    done appropriately.

9          THE COURT:  All right.  I'll keep an open mind on that

10    question.  It may be the Receiver staff.  And again, all I'm

11    saying is I'm not making any findings about what the Receiver

12    did.  It's not my job.  That is not my person or my operation.

13    It may be sufficient that Receiver staff is trained to stop and

14    ask the question, could this have any implications in Coleman?

15    Should I take time to be certain I know the answer to that

16    question?  That may be sufficient.

17          All right.  Mr. Lewis, Mr. Silberfeld?

18          MR. LEWIS:  Yes, your Honor.  I have one very brief

19    thing.  In regards to telepsychiatry policy, while we may be

20    referring it to magistrate -- I'm sorry -- to Judge Drozd for

21    further settlement conference, defendants will be continuing

22    their conversations with the Special Master.  They were very

23    fruitful conversations, and we look forward to continuing those

24    before that settlement conference to try to work that issue out

25    further.  So we won't be relying fully on the settlement

1    conference.  We will definitely keep open lines of

2    communication on things like say telepsychiatry, CQIT, and

3    other important issues.

4            THE COURT:  All right.  It does sound as if you do

5    your homework before the settlement conference, it will be the

6    most productive.

7            MR. LEWIS:  Absolutely, your Honor.

8            THE COURT:  All right.  Very well.  I'll issue

9    something memorializing the key points that we've discussed.

10   I'll see you in March and April and hear other updates in the

11   meantime.  Thank you very much.

12           MR. LEWIS:  Thank you.

13           MR. BIEN:  Thank you.

14           (The proceedings adjourned 11:42 a.m.)

15                        --oOo--

16   I certify that the foregoing is a correct transcript from the

17   record of proceedings in the above-entitled matter.

18                        /s/ Kacy Parker Barajas

19                        _____
                          KACY PARKER BARAJAS
20                        CSR No. 10915, RMR, CRR, CRC

21

22

23

24

25