1  REICHMAN JORGENSEN LLP
   Shawna Ballard, State Bar No. 155188
2  Kate Falkenstien, State Bar No. 313753
   100 Marine Parkway, Suite 300
3  Redwood Shores, CA 94065
   Telephone: (650) 623-1401
4  Fax: (650) 623-1449
   Email: sballard@reichmanjorgensen.com
5         kfalkenstien@reichmanjorgensen.com
   *Attorneys for Plaintiff-Intervenor Christopher Lipsey*
6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10                   SACRAMENTO DIVISION

11

12

13  **RALPH COLEMAN, et al.,**          Case No. CIV S-90-0520 KJM DB P

                         Plaintiffs,    **PLAINTIFF-INTERVENOR**
14                                      **CHRISTOPHER LIPSEY'S**
                                        **MEMORANDUM OF POINTS AND**
15      v.                              **AUTHORITIES IN SUPPORT OF**
                                        **MOTION FOR TEMPORARY**
16  **GAVIN NEWSOM, et al.,**           **RESTRAINING ORDER**

17                       Defendants.    Judge:       Hon. Kimberly Mueller
                                        Action Filed:  April 23, 1990
18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

STATEMENT OF FACTS ................................................................................................. 1

I.    Guard One Causes Severe Sleep Deprivation. ................................................... 1

II.   Despite Hundreds Of Prisoner Complaints, Guard One's Severe Effects on Sleep Have Never Been Litigated by the *Coleman* Parties. ................................................ 4

    A.   CDCR Selected, Tested, and Deployed Guard One in Early 2013. ............... 4

    B.   Lipsey and Dozens of Other Prisoners Complained About Guard One Soon After Its Implementation, but the *Coleman* Parties Continued to Champion It. ................. 5

III.   Guard One Checks Are Not Preventing Suicides. ............................................. 7

IV.   Procedural Hurdles Have Denied Lipsey a Remedy and Required This TRO. .............. 8

ARGUMENT .................................................................................................................. 10

I.    Lipsey Is Likely to Succeed on the Merits of His Claims for Equitable Relief. ............. 10

    A.   Lipsey's Eighth Amendment Claim Will Likely Succeed on the Merits. ............. 11

    B.   Lipsey's State Constitutional Claim Will Likely Succeed on the Merits. ............. 14

II.   The Strength of Lipsey's Constitutional Claims Decides the *Winter* Analysis. ............. 16

III.   Lipsey Also Prevails Under the Ninth Circuit's Sliding Scale Approach. ................ 16

    A.   The Balance of Hardships Tips Sharply in Lipsey's Favor. ............................. 17

    B.   Sleep Deprivation Is an Irreparable Injury. ................................................. 17

    C.   An Injunction Is in the Public Interest Because It Also Helps Other Inmates Sleep. ..... 18

IV.   The Relief Sought Is the Narrowest That Will Remedy Lipsey's Injuries. ............... 19

V.    Lipsey Has No Practical Means for Relief Without a Temporary Restraining Order. ...... 19

CONCLUSION ............................................................................................................... 20

i

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1135 (9th Cir. 2011) ........................................................................17, 18

6

*Antonelli v. Sheahan*,
   81 F.3d 1422 (7th Cir. 1996) ...................................................................................12

7

8

*Battelle Energy All., LLC v. Southfork Sec., Inc.*,
   980 F. Supp. 2d 1211 (D. Idaho 2013) ....................................................................17

9

*Bernhardt v. L.A. Cty.*,
   339 F.3d 920 (9th Cir. 2003) ...................................................................................18

10

11

*Cal. Hosp. Ass'n v. Maxwell-Jolly*,
   776 F. Supp. 2d 1129 (E.D. Cal. 2011) ...................................................................18

12

13

*CI Games S.A. v. Destination Films*,
   No. 2:16-CV-05719-SVW-JC, 2016 WL 9185391 (C.D. Cal. Oct. 25, 2016) ........17

14

*Coleman v. Wilson*,
   912 F. Supp. 1282, 1316-17 (E.D. Cal. 1995) ....................................................4, 14

15

16

*Doe v. Kelly*,
   878 F.3d 710 (9th Cir. 2017)....................................................................................16

17

18

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ...................................................................................18

19

*Farmer v. Brennan*,
   511 U.S. 825 (1994).............................................................................................11, 14

20

21

*Giraldo v. Dep't of Corr. & Rehab.*,
   168 Cal. App. 4th 231 (2008)...................................................................................15

22

23

*Gonzalez v. Zika*,
   No. C 11-5561 CW PR, 2012 WL 4466584 (N.D. Cal. Sept. 26, 2012) .................18

24

25

*Grenning v. Miller-Stout*,
   739 F.3d 1235 (9th Cir. 2014)..................................................................................12

26

*Hampton v. Ayers*,
   No. CV 07-8130-RSWL MAN, 2011 WL 2565358 (C.D. Cal. June 2, 2011),
   report and rec. adopted, 2011 WL 2563246 (C.D. Cal. June 28, 2011) .................15

27

28

*Harper v. Showers*,
    174 F.3d 716 (5th Cir. 1999)..................................................................................12

*Harris v. Bd. of Supervisors*,
    366 F.3d 754 (9th Cir. 2004)..................................................................................17

*Harris v. Sexton*,
    No. 1:18-CV-00080-DAD-SAB, 2018 WL 6338730 (E.D. Cal. Dec. 5, 2018) .......12

*Inmates of the Riverside Cty. Jail v. Clark*,
    144 Cal. App. 3d 850 (Ct. App. 1983) ..................................................................14

*Jones v. Neven*,
    399 F. App'x 203 (9th Cir. 2010) ..........................................................................12

*Keenan v. Hall*,
    83 F.3d 1083 (9th Cir. 1996), opinion amended on denial of reh'g, 135 F.3d
    1318 (9th Cir. 1998)......................................................................................11, 12

*Lamon v. Pliler*,
    No. CIV-S-03-0423-FCD-CMK-P, 2006 WL 120088 (E.D. Cal. Jan. 12, 2006) ...................10

*Lipsey v. Norum*,
    No. 3:14-cv-02767-VC, 2019 WL 5079544 (N.D. Cal. Oct. 10, 2019), ECF
    No. 154..................................................................................................................18

*Matthews v. Holland*,
    No. 1:14-CV-1959-KJM-DB-P, 2018 WL 3642134 (E.D. Cal. July 31, 2018),
    report and rec. adopted, 2018 WL 4613125 (E.D. Cal. Sept. 26, 2018)................12

*McCain v. Stockton Police Dep't*,
    No. CIV S-10-3170 JAM, 2010 WL 5335637 (E.D. Cal. Dec. 20, 2010)................10

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)............................................................................16, 18

*Murillo v. Holland*,
    No. 1:15-CV-0266-KJM-DB-P, 2019 WL 1099836 (E.D. Cal. Mar. 8, 2019) .............5, 12, 13

*Oluwa v. Gomez*,
    133 F.3d 1237 (9th Cir. 1998)................................................................................19

*Power Balance LLC v. Power Force LLC*,
    No. SACV 10-1726 AG MLGX, 2010 WL 5174957 (C.D. Cal. Dec. 14, 2010)...................11

*Ramey v. Franco*,
    No. 2:16-CV-2107-JAM-CKD-P, 2017 WL 2473127 (E.D. Cal. June 8, 2017),
    report and rec. adopted, 2017 WL 3333959 (E.D. Cal. Aug. 4, 2017) ..................13

iii

*Rico v. Beard*,
No. 2:17-cv-1402-KJM-DB-P, 2019 WL 1036075 (E.D. Cal. Mar. 5, 2019) .....................7, 12

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009)........................................................................................10, 18

*Unknown Parties v. Johnson*,
No. CV-15-00250-TUC-DCB, 2016 WL 8188563 (D. Ariz. Nov. 18, 2016)...................16, 18

*Upshaw v. Alameda Cty.*,
377 F. Supp. 3d 1027 (N.D. Cal. 2019) ...................................................................................18

*Villery v. Beard*,
No. 1:15-CV-00987-DAD-BAM-PC, 2018 WL 6304410 (E.D. Cal. Dec. 3,
2018) .......................................................................................................................................18

*Vivid Entm't, LLC v. Fielding*,
956 F. Supp. 2d 1113 (C.D. Calif. 2013) ...............................................................................16

*Walker v. Schult*,
717 F.3d 119 (2d Cir. 2013)...................................................................................................12

*Williams v. Anderson*,
No. 1:10-CV-01250-SAB, 2015 WL 1044629 (E.D. Cal. Mar. 10, 2015)..............................13

*Wilson v. Beard*,
No. 1:15-cv-1424 KJM DB P, 2019 WL 1116201 (E.D. Cal. Mar. 11, 2019) ........................12

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...................................................................................................................16

*Womack v. Bakewell*,
No. CIV S-09-1431-KJM-P, 2009 WL 5206028 (E.D. Cal. Dec. 17, 2009)....................10, 11

**Statutes**

18 U.S.C. § 3626 ...............................................................................................................................19

Cal. Penal Code § 2600 ...............................................................................................................14, 15

**Other Authorities**

Cal. Const. art. I, § 17 ......................................................................................................................14

Local Rule 231(a)...............................................................................................................................19

Local Rule 231(b) ..............................................................................................................................20

Since 2014, Christopher Lipsey has sought to challenge the California Department of Corrections and Rehabilitation's cacophonous "welfare checks" on prisoners in segregated housing. To log a check, a guard must strike a seven-inch-long metal rod weighing nearly a pound—branded "The PIPE"—against a door-mounted tracking port. Guards routinely miss and strike cell doors, which are made of corrugated steel. Guards must repeat this routine for each prisoner in each restrictive housing unit every 30 minutes, 24 hours a day.

Sleep deprivation is universally recognized as a method of torture, held unconstitutional by longstanding precedent in this circuit. The purported purpose of Guard One checks is suicide prevention. But in six years of litigation across a variety of cases, CDCR has produced scant evidence that the checks work, and no evidence that they must be performed using Guard One.

In approximately August 2019, Mr. Lipsey was sentenced to a term in CSP-Corcoran's Secure Housing Unit ("SHU"), where he will continue to be subject to Guard One checks until at least March 2020. *See* Lipsey Decl., ¶ 3, 20; Ex. 3 to Lipsey Decl. In the hopes of finally getting a good night's sleep, Lipsey files this Motion for a Temporary Restraining Order to request that the Court enjoin the CDCR Secretary to:

1. Immediately decrease the frequency of nighttime welfare checks in Lipsey's housing unit to once per hour;

2. Promptly replace the Guard One system in Lipsey's housing unit with a logging system that does not create a significant risk of loud noise or sleep deprivation;

3. Alternatively, if Guard One's use is continued, disable the check-logging's beep during the First Watch each night.

Plaintiffs' class counsel takes no position on this motion, and Defendants' counsel did not respond regarding a possible stipulation.  *See* Falkenstien Decl., ¶¶ 7-13; Ex. N to Falkenstien Decl.

## STATEMENT OF FACTS

### I.     Guard One Causes Severe Sleep Deprivation.

The Guard One system has two components. The first, a seven-inch-long stainless steel bar called "The PIPE" (see figure 1), is carried by a guard on his or her rounds. *See* Ex. A to Falkenstien Decl. The second, a small steel disc called a "Memory Button," is mounted on a cell door. Ex. B to Falkenstien Decl. To record a check, a guard strikes The PIPE against the Memory Button. Most

1

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

prison doors are made of corrugated steel (see figure 2). Especially if a guard strikes the button too forcefully or misses the button entirely, the resulting metal-on-metal contact creates a loud clanging noise and sometimes the PIPE also emits a loud, high-pitched beep. Complaint in Intervention ("Int. Compl."), ECF No. 6389-5, ¶¶ 13-15; Lipsey Decl., ¶¶ 7-10. Because each individual cell must be checked, this risk of loud noise is repeated for each cell in a unit. Int. Compl., ¶¶ 12, 23; Lipsey Decl., ¶ 11-12. Additional noise, from clanging keys and loud footsteps, is created by the guard's movement through the unit each half-hour to conduct the checks. Int. Compl., ¶¶ 17, 21; Lipsey Decl., ¶ 11.





Figure 1 – Guard One's "The PIPE II"
(*See* Ex. C to Falkenstien Decl.)

Figure 2 - A typical Corcoran SHU cell door.
(*See* Ex. D to Falkenstien Decl.)

Guard One checks have caused and continue to cause Lipsey to suffer sleep deprivation. The noise from metal-on-metal strikes—both on his cell door and on other cell doors in his unit—awakens Lipsey repeatedly during the night. Int. Compl., ¶¶ 26-27; Lipsey Decl., ¶¶ 12-13. Lipsey typically alternates between nights with very little sleep—two to three hours, and broken up into smaller chunks by the checks—and nights where he is so sleep-deprived that he is able to sleep longer. Int. Compl., ¶ 27; Lipsey Decl., ¶ 14.  This cycle has now gone on for years. Int. Compl., ¶¶ 18-20, 25; Lipsey Decl., ¶ 15.  Before he was subjected to Guard One checks, Lipsey slept seven to eight hours per night. Int. Compl., ¶ 28; Lipsey Decl., ¶ 17.

Lipsey's chronic, severe sleep deprivation has caused physical damage and psychological deterioration, and it has aggravated his pre-existing mental illness. Lipsey's physical symptoms

2

resulting from sleep deprivation include headaches, dizziness, sudden fainting, tachycardia, blurred vision, changes in weight, and body cramps. Int. Compl., ¶ 29; Lipsey Decl., ¶ 18. His psychological symptoms include anxiety, mood swings, memory loss, and inability to concentrate. Int. Compl., ¶ 29; Lipsey Decl., ¶ 18. These effects, in turn, have contributed to problems with his personal relationships. Int. Compl., ¶ 30; Lipsey Decl., ¶ 19. And Lipsey has been formally diagnosed with schizoaffective disorder, which involves symptoms of both schizophrenia and depression. Int. Compl., ¶ 31; Lipsey Decl., ¶ 20; Ex. 1 to Lipsey Decl. His condition has grown worse as a result of his chronic sleep deprivation. Lipsey has suffered increased hallucinations, increased depression, and begun hearing voices. Int. Compl., ¶ 31; Lipsey Decl., ¶ 20. This suffering, in turn, has increased Lipsey's thoughts of self-harm and suicide. *Id.*

Lipsey's experiences are consistent with scientific research into sleep. Dr. Rafael Pelayo, a Clinical Professor of Sleep Medicine at Stanford University School of Medicine, has submitted a declaration reflecting his opinion that "Mr. Lipsey's allegations are consistent with his medical records and the literature on sleep deprivation." Pelayo Decl., ¶ 39. As Dr. Pelayo explains, "the levels of sleep Mr. Lipsey reports would lead to medical symptoms" and "worsen any neurological and psychiatric conditions." *Id.*, ¶¶ 32, 35-36. For example, "[l]ack of sleep is associated with impulsive behavior including suicidality," and the sleep deprivation "is likely playing a role in Mr. Lipsey's schizoaffective disorder, depression and overall behavior." *Id.*, ¶ 32. Dr. Pelayo also examined Mr. Jorge Rico, the plaintiff in the related *Rico v. Beard* lawsuit, and likewise found "symptoms of severe sleep deprivation" in Mr. Rico. *Id.*, ¶¶ 5, 37.

Many other inmates have corroborated Lipsey's claims through accounts of their own Guard One-induced sleep deprivation. Steve Corotan reported, of his confinement in KVSU ASU—where Lipsey was housed prior to his formal sentencing to the Corcoran SHU—that "[o]n average I have been able to sleep 4 hours a night and am awakened about 5 times." Corotan Decl. Mr. Corotan complained of "headaches, blurry vision, and other physical ailments." *Id.*; *see also* Murillo Decl. Cesar Francisco Villa confirms similar conditions in the Corcoran SHU, where Lipsey is currently incarcerated. Villa Decl. Nick Denham, who was housed in CTF-Soledad ASU, described a typical night: "I go to sleep at 8-8:30 pm only to be woken up at 10:14 pm[,] again at 10:45[,] 12:20 am to

3

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

finally giving up on sleep at 2 am . . . ." Denham Decl. Mr. Denham declared that when he complained to guards, one responded, "It's metal on metal[.] What do you expect me to do[?]" *Id.* And Joseph Hernandez, who has experienced Guard One checks in at least five separate housing units run by CDCR, described a common pattern:

> I would lie awake until past midnight waiting to fall asleep because the half an hour [checks] wouldn't allow me enough time to do so. (2) When I was able to fall asleep I would constantly be startled awake by the [checks] like clock-work. (3) Every time I was awaken[ed], I'd find it harder to fall asleep because I was just waiting to be awaken[ed] again.

Hernandez Decl. Mr. Hernandez reported symptoms including "anxiety and irregular heartbeats," and estimated his nightly sleep at "about three hours." *Id.*

## II.    Despite Hundreds Of Prisoner Complaints, Guard One's Severe Effects on Sleep Have Never Been Litigated by the *Coleman* Parties.

### A.    CDCR Selected, Tested, and Deployed Guard One in Early 2013.

In 2013, CDCR faced mounting pressure to control suicide rates in its prisons. *See, e.g.*, Order, ECF No. 4319 (Jan. 3, 2013). In response, it deployed Guard One. Allison Decl. at 14, ECF No. 4713 (Aug. 24, 2013) ("2013 Allison Decl.") (informing the Court that "CDCR [had] acquired an electronic monitoring system called Guard One[.]"). CDCR hoped the new system would ensure that guards completed safety/welfare checks on prisoners in restrictive housing. *Id.* CDCR had previously instituted a policy of conducting such checks in 2007, but a 2011 analysis concluded that guards often failed to complete the checks as required. Order at 2, ECF No. 2139 (Feb. 12, 2007); Mem. re: CDCR Suicide Prevention Consultation, ECF No. 4350-1 (Aug. 16, 2011) (calculating that 16% of suicides in 2010 "involved inmates who were found with either rigor mortis and/or the review determined that cell checks were not performed as required").

A close reading of 2013 court filings and other documents makes three things clear about the decision to adopt Guard One. First, CDCR—not this Court or the *Coleman* plaintiffs—chose Guard One as its new check-logging tool. 2013 Allison Decl. at 14. To be sure, the *Coleman* plaintiffs sought 30-minute checks, and more careful logging of those checks. But as late as mid-2014, this Court had not yet mandated *any* 30-minute check protocol, let alone required Guard One.

4

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

*See* Order at 64, ECF No. 5131 (Apr. 10, 2014) ("By minute order issued July 26, 2013, the court dropped consideration of issues related to inmate suicide without prejudice to their renewal, if appropriate, following a report from the Suicide Prevention/Management Work Group. That order stands."). CDCR selected Guard One of its own accord. Second, CDCR—of its own accord—conducted a pilot study at CSP-Centinela before expanding use of Guard One to other prisons. 2013 Allison Decl. at 14. While the rationale for that expansion was "to address concerns raised by the special master related to the staggering of the 30-minute welfare checks," *id.*, neither the special master nor the Court mandated the expansion of Guard One to other systems. Third, nothing suggests that CDCR vetted any alternative system for logging checks. Alternatives to Guard One include RFID tracking, GPS tracking, barcodes and scanners, and video recording. *See, e.g.*, Exs. E-G to Falkenstien Decl. Yet neither court filings nor other public documents give any indication that CDCR tested or even considered such alternatives.

   B.   <u>Lipsey and Dozens of Other Prisoners Complained About Guard One Soon After Its Implementation, but the *Coleman* Parties Continued to Champion It.</u>

   Lipsey was first subject to Guard One checks in May 2013. Int. Compl., ¶ 18; Lipsey Decl., ¶¶ 15-16. He soon complained about the system's noise and effect on his sleep, and exhausted his administrative remedies in October. *See* Int. Compl., ¶¶ 33-34; Ex. A to Lipsey Decl. Lipsey filed suit challenging Guard One in 2014, while in the Administrative Segregation Unit ("ASU"). *See Lipsey v. Norum*, No. 2:18-cv-00362 (E.D. Cal.).

   Lipsey was not alone—many other Pelican Bay prisoners raised formal concerns about Guard One. According to internal CDCR emails, Pelican Bay knew of 87 *appeals* of administrative complaints filed about Guard One from implementation to September 2015. Ex. H to Falkenstien Decl. Not all administrative complainants appeal adverse first-level rulings, and nineteen of the appeals were group appeals. Overall, over a hundred Pelican Bay prisoners had likely complained about Guard One by 2015, and possibly far more. Hundreds of prisoners also complained about Guard One at other prisons. *See, e.g., Murillo v. Holland*, No. 1:15-CV-0266-KJM-DB-P, 2019 WL 1099836, at *5 (E.D. Cal. Mar. 8, 2019) (concluding that "a cautious estimate is that 100 inmates at [California Correctional Institute] submitted appeals regarding the sleep disruption

5

1    caused by the Guard One checks between June and September 2014").

2           The *Coleman* class counsel did not call the Court's attention to the sleep deprivation issue

3    in any filing prior to 2015. This is likely because—as CDCR has already admitted in related cases—

4    the class representatives were not subject to the checks. *See* Ex. I to Falkenstien Decl. (defendants

5    in related case admitting that prior to the February 2015 Order, no *Coleman* class representative

6    was "ever housed in a unit where the Guard One system was thereafter used by CCR"). And since

7    2015, only one class representative has spent any time at all in a unit subject to the checks, and then

8    only for one night. *See* Joint Stipulation of Facts, ECF No. 199, *Lipsey v. Norum*, No. 2:18-cv-

9    00362-KJM-DB (Oct. 24, 2019). In addition to their lack of representation in the class, Lipsey and

10   other class members actually affected by the policy did not receive any notice about Guard One's

11   deployment or expansion. CDCR also did not call the Court's attention to the sleep deprivation

12   issue in any litigation document. Indeed, sleep deprivation was never raised in the litigation leading

13   up to the first Expert's Audit in January 2015.

14          For two years after its initial deployment, CDCR's use of Guard One remained entirely

15   voluntary. Then, in February 2015, this Court incorporated the system into its ongoing

16   administration of *Coleman*. Order, ECF No. 5271 (Feb. 3, 2015). There is no evidence in the

17   relevant documents that the Expert, the Special Master, or the Court had been informed of the noise

18   issue by CDCR or the *Coleman* plaintiffs. The Court's Order did not mention Guard One at all, but

19   mandated CDCR's compliance with the recommendations of the Special Master's Report. *Id.* at 3.

20   The Report also did not discuss Guard One explicitly, only mandating "continued implementation

21   and monitoring" of 30-minute welfare checks in ASUs, SHUs, and Condemned Units. Special

22   Master's Report at 6, ECF No. 5258 (Jan. 14, 2015). Only the Expert's Audit explicitly mentioned

23   Guard One, calling its expansion "a significant and commendable policy change." An Audit of

24   Suicide Prevention Practices in the Prisons of the California Department of Corrections and

25   Rehabilitation, ECF No. 5259 (Jan. 14, 2015). The Expert's Audit is very thorough—running over

26   225 pages—but does not mention the noise issue once.

27          Guard One's noise issue was apparently first brought to the Court's attention nearly a year

28   after the February Order. In December 2015, the Court approved a stipulation of the *Coleman*

6

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1    parties that, in response to many noise complaints, the frequency of nighttime Guard One checks

2    in the Pelican Bay SHU would be reduced to once per hour. Order, ECF No. 5393 (Sept. 1, 2016).

3    The Court made that reduction permanent in June 2016. Order, ECF No. 5467, (June 30, 2016).

4    The stipulation also required that the nighttime beeping be turned off. Lipsey nevertheless continues

5    to be subjected to the beeping in Corcoran. Int. Compl., ¶ 15; Lipsey Decl., ¶ 10.

6          Prisoners have continued to challenge Guard One since this Court required its use. In the

7    last five months of 2015, internal emails reveal that Pelican Bay received 82 more Guard One

8    complaints, 21 of which were group appeals. Ex. J to Falkenstien Decl. In addition to Lipsey's

9    lawsuit, at least five other plaintiffs have challenges to Guard One pending before this Court.[1]

10   **III.    Guard One Checks Are Not Preventing Suicides.**

11         All available public information suggests that Guard One checks do not prevent suicides.

12   Since this Court's 2015 Order incorporating Expert Hayes' recommendations, he has conducted

13   three re-audits of suicide prevention in CDCR prisons. None of the re-audits report *a single instance*

14   of a Guard One check *actually preventing a suicide*. To the contrary, the re-audits reveal that Guard

15   One is failing to prevent many suicides. From 2015 to 2017, at least 30 suicides were effectuated

16   in "Restrictive Units," which generally correspond to those subject to Guard One checks. Third Re-

17   Audit at 36, ECF No. 5993-1 (Nov. 5, 2018). During the most recent re-audit period, two of those

18   occurred in CSP-Corcoran, where Lipsey is currently incarcerated, despite that prison's timely

19   check completion rate of 99 percent. *Id.* at 94, 96-101. Overall, Hayes reported 10 suicides in

20   restrictive units for 2016. *Id.* at 36. This figure suggests California solitary confinement has an

21   annual suicide rate well above 120 per 100,000.[2] If California solitary were a state, in other words,

22   it would have among the highest suicide rates in the country.

23         [1] *Suarez v. Beard*, No. 2:18-cv-0340 KJM DB P; *Wilson v. Beard*, No. 1:15-cv-1424 KJM

24   DB P; *Murillo v. Holland*, No. 1:15-cv-0266 KJM DB P; *Rico v. Beard*, No. 2:17-cv-1402-KJM-DB-P; *Matthews v. Holland*, No. 1:14-cv-01959-SKO.

25         [2] In 2016, California reported that 8,329 prisoners were housed in eight categories of

26   segregated housing: the Administrative Segregation Unit, "Condemned" Housing, Enhanced
     Outpatient Program ASU Hub, Long-Term Restricted Housing, Non-Disciplinary Segregation

27   Unit, Psychiatric Services Unit, Security Housing Unit, Security Housing Unit at Pelican Bay State
     Prison, and Short-Term Restricted Housing. Not all these units are considered "restrictive," so 120

28   per 100,000 is the lower bound of the Guard One suicide rate. The real rate could be considerably
                                                                                    (continued…)

7

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1    Guard One's failure is part of a broad trend. In 2018, the suicide rate in California prisons

2    was the highest since at least 2006. Ex. L to Falkenstien Decl. The California rate of 26.3 suicides

3    per 100,000 inmates exceeds both the average rate in other states, 20 per 100,000, and in federal

4    prisons, 14.7 per 100,000. *Id.* Nor was 2018 an outlier. The suicide rate for 2019 is on track to be

5    even higher. *Id.* And from 2001 to 2014, "twice as many people killed themselves in California

6    cells than in the entire federal system, which contains more prisons and inmates." *Id.*

7    One reason Guard One fails to prevent suicides is guard noncompliance. Mr. Hayes

8    anticipated this problem in his first Audit. "[T]he technology . . . cannot assure that staff are

9    actually observing the interior of each cell to verify the inmate's well-being." First Audit, ECF No.

10   5259, at 14 n.15 (Jan. 14, 2015). This concern is validated by a grisly fact: for at least five of the

11   thirty suicides effectuated from 2015 to 2017 in restrictive units, rigor mortis had set in by the time

12   the corpse was discovered *even though the Guard One system recorded intervening checks finding*

13   *no problem*. *See*, *e.g.*, Third Re-Audit at 45, ECF No. 5993-1 (Nov. 5, 2018) ("[T]he inmate was

14   discovered rigid, with signs of rigor mortis and displayed a pale and bluish face, bluish

15   bruise/discolored areas on his shoulders, upper torso, upper/lower back, arms and feet."). As Mr.

16   Hayes himself makes clear, this means a guard recorded the inmate as safe after he had already

17   hung himself—rigor mortis generally requires at least 35 minutes to set in. *Id.*

18   Another cause of Guard One's failure is its routine nature. Inmates learn and anticipate the

19   check schedule. Most suicides in CDCR prisons, and particularly in restrictive housing, are

20   effectuated by hanging. *Id.* (reporting method for each suicide). Hanging causes death rapidly and

21   at a very high rate. *See* Ex. M to Falkenstien Decl. ("Hanging is a particularly lethal method of

22   suicide with an estimated fatality rate of over 70%. In contrast to overdose there is little opportunity

23   to change one's mind as death generally occurs rapidly after suspension."). Suicidal prisoners, in

24   short, have ample time to hang themselves during the period between checks.

25   **IV.    Procedural Hurdles Have Denied Lipsey a Remedy and Required This TRO.**

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28   higher. For these and other statistics on California solitary, see Exhibit K to the Falkenstien Declaration.

8

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

When Lipsey filed his *Lipsey v. Norum* lawsuit in 2014, he was incarcerated in the Pelican Bay ASU. Over the course of the next three years, Lipsey was subject to Guard One checks in many different prison units, including the Pelican Bay ASU, Corcoran SHU, California Men's Colony ASU, and Folsom Psychiatric Services Unit.

Counsel was appointed in July 2017. *See* Order Appointing Counsel, ECF No. 141, *Lipsey v. Norum* (July 19, 2017). When Lipsey's Second Amended Complaint in that case was filed in November 2017, Lipsey was incarcerated in the Corcoran SHU. But by March 2018—before counsel could have prepared[3] and the Court could have adjudicated a Motion for a Preliminary Injunction—Lipsey was released from the SHU again.

Lipsey returned to the Corcoran SHU in August 2019. Lipsey Decl., ¶¶ 3, 20; Ex. 3 to Lipsey Decl. At that time, his injunctive claims in *Lipsey v. Norum* were still live. Defendants had filed a Motion to Dismiss those claims in January 2018, and a request for a ruling on the Motion to Dismiss in October 2018. *See* Dkts. 154, 171, *Lipsey v. Norum*. The Court had requested additional briefing on the motion to dismiss in March 2019, which the parties provided in April and May. *See* Dkts. 176, 178, 184, 185, *Lipsey v. Norum*. In that briefing, the parties contested whether Lipsey could pursue injunctive claims through an independent lawsuit or was required to intervene in this case.

When Lipsey was reassigned to the Corcoran SHU in August 2019, counsel began to prepare a Motion for a Preliminary Injunction. However, on October 10, 2019, Judge Barnes issued her Findings and Recommendations on the Motion to Dismiss, recommending dismissal of Lipsey's injunctive claims because of his membership in the *Coleman* class. *See* ECF No. 197, *Lipsey v. Norum*. Lipsey's plan to file a Motion for a Preliminary Injunction in *Lipsey v. Norum* was thus no longer viable.[4]

Lipsey therefore moved to intervene in this case in order to ensure a venue to seek emergency injunctive relief during his SHU term. *See* ECF No. 6389 (Nov. 14, 2019). Lipsey intended to wait

---

[3] Counsel is not permitted to speak to Mr. Lipsey on the phone when he is incarcerated in a SHU or ASU, requiring slow-moving communication by written letter to assemble the facts for any legal filing. *See* Falkenstien Decl., ¶ 6.

[4] Lipsey objected to the Findings and Recommendations, but the Court has not yet ruled on his objections. *See* ECF No. 200, *Lipsey v. Norum* (Oct. 24, 2019).

9

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1    for the Court to adjudicate the Motion to Intervene before filing his Motion for a Preliminary

2    Injunction. However, the Motion to Intervene remains pending and Lipsey may be released from

3    the SHU as early as March 2020. Lipsey Decl., ¶ 20. Lipsey thus files this Motion for a Temporary

4    Restraining Order so that his claims may be adjudicated before they are once again mooted by his

5    release from the SHU.

6    **ARGUMENT**

7        "[R]equests for temporary restraining orders are governed by the same general standards

8    that govern the issuance of a preliminary injunction." *Lamon v. Pliler*, No. CIV-S-03-0423-FCD-

9    CMK-P, 2006 WL 120088, at *1 (E.D. Cal. Jan. 12, 2006). These standards require the moving

10   party to show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm

11   in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

12   injunction is in the public interest." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009)

13   (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The criteria

14   traditionally are treated as alternative tests" such that "a court may issue a preliminary injunction

15   if the moving party demonstrates '*either* a combination of probable success on the merits and the

16   possibility of irreparable injury *or* that serious questions are raised and the balance of hardships

17   tips sharply in his favor.'" *McCain v. Stockton Police Dep't*, No. CIV S-10-3170 JAM, 2010 WL

18   5335637, at *1 (E.D. Cal. Dec. 20, 2010) (quoting *Martin v. Int'l Olympic Comm.,* 740 F.2d 670,

19   675 (9th Cir.1984)). In other words, "[t]he two formulations represent two points on a sliding scale

20   with the focal point being the degree of irreparable injury shown." *Womack v. Bakewell*, No. CIV

21   S-09-1431-KJM-P, 2009 WL 5206028, at *1 (E.D. Cal. Dec. 17, 2009).

22       Mr. Lipsey prevails under either formulation. He is likely to succeed on the merits of two

23   distinct constitutional claims, and the public interest favors protecting him from unconstitutional

24   sleep deprivation rather than continuing a misguided, ineffective attempt to reduce inmate suicides.

25   Lipsey, moreover, is subject to ongoing sleep deprivation; his suffering and the ensuing health

26   effects are irreparable harms that tilt the balance of hardships decisively in his favor.

27   **I.    Lipsey Is Likely to Succeed on the Merits of His Claims for Equitable Relief.**

28

10

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1    Likelihood of success on the merits is the most important factor of the legal test. *Womack*,

2    2009 WL 5206028, at *1. Lipsey has asserted injunctive claims under the United States and

3    California Constitutions. Likelihood of success on either one of these claims is enough for

4    preliminary relief. *Power Balance LLC v. Power Force LLC*, No. SACV 10-1726 AG MLGX, 2010

5    WL 5174957, at *2 (C.D. Cal. Dec. 14, 2010).

6    A.  Lipsey's Eighth Amendment Claim Will Likely Succeed on the Merits.

7    "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate

8    violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (quotation

9    omitted). CDCR officers are deliberately indifferent if they are "aware of facts from which the

10   inference could be drawn that a substantial risk of serious harm exists," and "also draw the

11   inference." *Id.* at 837.

12   Applying these standards, three straightforward questions establish Lipsey's high chance of

13   success on the merits. First, is prolonged sleep deprivation, by means of excessive noise, a serious

14   harm under the Eighth Amendment? This Court, other district courts, the Ninth Circuit, and several

15   other circuits all agree: sleep deprivation is a serious, unconstitutional harm. Second, are the Guard

16   Once checks so loud and frequent that they pose a substantial risk of sleep deprivation? World-

17   renowned sleep experts, numerous inmates, and common sense all agree: intermittent loud noises

18   throughout the night can seriously disrupt sleep. Third and finally, are the official-capacity

19   Defendants aware of the substantial risk posed by Guard One? Lipsey's litigation, along with

20   dozens of prisoner complaints over the last seven years, establishes such knowledge.

21   *1.  Sleep Deprivation Is a Serious, Unconstitutional Harm as a Matter of Law.*

22   The Ninth Circuit has repeatedly held that sleep deprivation or exposure to excessive noise

23   in prisons gives rise to an Eighth Amendment claim. For example, in *Keenan*, an inmate "alleged

24   that at all times of day and night inmates were 'screaming, wailing, crying, singing, and yelling,'

25   often in groups, and that there was a 'constant, loud banging.'" *Keenan v. Hall*, 83 F.3d 1083, 1090

26   (9th Cir. 1996), opinion amended on denial of reh'g, 135 F.3d 1318 (9th Cir. 1998). The Ninth

27   Circuit held that this claim survived summary judgment, because "[p]ublic conceptions of decency

28   inherent in the Eighth Amendment require that [inmates] be housed in an environment that, if not

11

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1  quiet, is at least reasonably free of excess noise." *Id.* (quoting *Toussaint v. McCarthy*, 597 F. Supp.

2  1388, 1397, 1410 (N.D. Cal. 1984) (second alteration in original)). Likewise, in 2010, when an

3  inmate sued over the "noise from a light fixture" in his cell, the Ninth Circuit held that "excessive

4  noise" in prisons was illegal under clearly established law (including *Keenan*) and reversed

5  summary judgment on qualified immunity. *Jones v. Neven*, 399 F. App'x 203, 205 (9th Cir. 2010).

6  And in 2014, the Ninth Circuit again reversed dismissal of a case about sleep deprivation caused

7  by excessive light in a prison cell. *Grenning v. Miller-Stout*, 739 F.3d 1235, 1239 (9th Cir. 2014).

8  The court held that excessive lighting which caused sleeping problems could present an Eighth

9  Amendment violation. *Id.*

10      Other circuit courts have repeatedly come to the same conclusion. For example, the Fifth

11  Circuit reversed dismissal of an Eighth Amendment claim based on sleep deprivation, noting that

12  "sleep undoubtedly counts as one of life's basic needs." *Harper v. Showers*, 174 F.3d 716, 720 (5th

13  Cir. 1999). Similarly, the Second Circuit reversed dismissal of an analogous claim, because "sleep

14  is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth

15  Amendment." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013) (collecting cases). And the

16  Seventh Circuit likewise reversed dismissal of a sleep deprivation claim, noting that noise that

17  "occurred every night, often all night, interrupting or preventing his sleep" would give rise to an

18  Eighth Amendment claim. *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996).

19      In related cases concerning the sleep deprivation caused by Guard One, this Court has

20  repeatedly concluded that the existing case law was enough to clearly establish a right to be free

21  from excessive noise and sleep deprivation. *See, e.g.*, *Rico v. Beard*, No. 2:17-CV-1402-KJM-DB-

22  P, 2019 WL 1036075, at *4 (E.D. Cal. Mar. 5, 2019); *Murillo v. Holland*, No. 1:15-CV-0266-KJM-

23  DB-P, 2019 WL 1099836, at *12 (E.D. Cal. Mar. 8, 2019); *Matthews v. Holland*, No. 1:14-CV-

24  1959-KJM-DB-P, 2018 WL 3642134, at *5 (E.D. Cal. July 31, 2018), report and rec. adopted, 2018

25  WL 4613125 (E.D. Cal. Sept. 26, 2018); *Wilson v. Beard*, No. 1:15-CV-1424-KJM-DB-P, 2019

26  WL 1116201, at *6 (E.D. Cal. Mar. 11, 2019); *Harris v. Sexton*, No. 1:18-CV-00080-DAD-SAB,

27  2018 WL 6338730, at *1 (E.D. Cal. Dec. 5, 2018). Other district court decisions further bolster this

28  conclusion. *See, e.g.*, *Williams v. Anderson*, No. 1:10-CV-01250-SAB, 2015 WL 1044629, at *10

12

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

(E.D. Cal. Mar. 10, 2015) (finding it clear that "subjecting Plaintiff to excessive noise causing sleep deprivation for several months would pose a substantial risk of serious harm"); *see also Ramey v. Franco*, No. 2:16-CV-2107-JAM-CKD-P, 2017 WL 2473127, at *2 (E.D. Cal. June 8, 2017), report and rec. adopted, 2017 WL 3333959 (E.D. Cal. Aug. 4, 2017).

> ### 2. *Guard One Creates a Substantial Risk of Sleep Deprivation.*

The second question is whether the Guard One system creates a substantial risk of sleep deprivation. Lipsey's testimony is clear: he cannot sleep through the Guard One checks. Lipsey Decl., ¶¶ 12-14. Just during his present term of solitary confinement, he has actually suffered an unconstitutional harm, on an ongoing basis, 24 hours a day, for than six months. This sleep deprivation is a predictable consequence of Guard One's flawed design. Most prison doors are made of corrugated steel, the PIPE is a heavy steel bar, and guards are often rushed, tired, crabby, or impatient. It only takes one hard or misplaced swing of The PIPE to make a racket. Even assuming guards are well-intentioned, there are 60 chances per hour for something to go wrong in a 30-cell unit—not good odds.

Lipsey's experience is confirmed by overwhelming evidence that Guard One checks are causing ongoing, severe sleep deprivation to many other CDCR prisoners. *See supra* pp. 5-7. Over the past five years, hundreds of prisoners throughout the CDCR system have filed administrative complaints about Guard One. *See* Exs. H, J to Falkenstien Decl. These complaints help to confirm Lipsey's testimony. *See, e.g.*, *Murillo*, 2019 WL 1099836, at *5 (giving weight to the fact that approximately "100 inmates at [California Correctional Institute] submitted appeals regarding the sleep disruption caused by the Guard One checks between June and September 2014"). Their accounts of sleep deprivation have been assessed and verified by renowned sleep experts. *See* Pelayo Decl. And their accounts of sleep deprivation make sense—sleep science and daily experience both support the idea that loud, intermittent, nighttime noise can deprive many people of sleep. Lipsey, as a prisoner subject to the same Guard One checks, is clearly being exposed to "a substantial risk of serious harm."

> ### 3. *Secretary Diaz Is Aware of Guard One's Risks.*

13

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

When a prisoner seeks injunctive relief, the final question whether Defendants' indifference is "deliberate" is "'determined in light of the prison authorities' current attitudes and conduct': their attitudes and conduct at the time suit is brought and *persisting thereafter*." *Farmer*, 511 U.S. 845 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)) (emphasis added). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]" *Id.* at 842. And a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* In cases like this one seeking injunctive remedies for ongoing problems, *Farmer*'s subjective requirement is easily satisfied: the litigation itself gives defendants the requisite knowledge. *See, e.g.*, *Coleman v. Wilson*, 912 F. Supp. 1282, 1316-17 (E.D. Cal. 1995) (relying upon awareness of the lawsuit and litigation documents to show the defendants' deliberate indifference). In short, the subjective inquiry mandated by *Farmer* does not mean that to win a prospective injunction Lipsey must show retrospective knowledge before the lawsuit was filed. *Farmer*'s subjective inquiry aims only to limit injunctions against state entities to cases where a harm is continuing. *Id.* at 846 ("[T]o establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard [of an objectively intolerable risk of harm] during the remainder of the litigation and into the future.").

Here, the harm is continuing and will continue absent an injunction because CDCR has taken the position in parallel litigation that Guard One checks are mandated by the February 2015 Order re: Defs.' Mot. to Dismiss, *Lipsey v. Norum,* ECF No. 154 (Oct. 10, 2019). Nothing less than another court order will cause CDCR to reverse course.

B. Lipsey's State Constitutional Claim Will Likely Succeed on the Merits.

Lipsey is also likely to succeed on the merits of his state constitutional claim. California's constitution bars "[c]ruel or unusual punishment." Cal. Const. art. I, § 17. "In assessing the 'standards of decency' which are essential to" this analysis, "California courts should look chiefly to California standards and institutions for their guideposts." *Inmates of the Riverside Cty. Jail v. Clark*, 144 Cal. App. 3d 850, 859 (Ct. App. 1983). In assessing California standards, courts have found California Penal Code Section 2600 "significant." *Id*. That statute provides that "[a] person

14

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1  sentenced to imprisonment in a state prison or to imprisonment . . . may during that period of

2  confinement be deprived of such rights, and *only such rights*, as is reasonably related to legitimate

3  penological interests." Cal. Penal Code § 2600 (emphasis added).[5]

4      Here, Lipsey is likely to succeed in showing that sleep deprivation caused by Guard One

5  checks is not "reasonably related to legitimate penological interests" and thus violates California

6  standards of decency. There is no evidence that Guard One checks prevent suicides. *See supra*, pp.

7  7-8. Substantial evidence suggests that many guards rush through pro-forma checks without

8  stopping long enough to observe whether something is obviously wrong in a given cell. *See*, *e.g.*,

9  ECF No. 5993-1 at 45 ("[T]he inmate was discovered rigid, with signs of rigor mortis and displayed

10  a pale and bluish face, bluish bruise/discolored areas on his shoulders, upper torso, upper/lower

11  back, arms and feet."). This Court can order checks, but it cannot accompany each guard on each

12  of 48 daily rounds to ensure they are being attentive. And even when guards do complete the checks

13  as ordered, suicidal prisoners have ample time to commit suicide between checks. These practical

14  shortcomings mean that the checks do not further penological interests.

15      Furthermore, even if checking on inmates serves a legitimate interest, there is no need for the

16  Guard One system in particular. There are ample, quiet alternatives to Guard One. For example,

17  Trackforce VALIANT logs checks using geolocation or near field communication. *See* Ex. E to

18  Falkenstien Decl. Kugadi uses GPS and RFID technology. *Id.*, Ex. F. And QR-Patrol gives the

19  option to use NFC, QR-style barcodes, or geolocation beacons. *Id.*, Ex. G. CDCR could also install

20  video cameras that record guards' routes, and audit them for guard compliance. Indeed, modern

21  cameras can even automatically detect movement and identify the individuals without the need for

---

22      [5] In contrast to federal law, California law does not require deliberate indifference. In fact,

23  the CDCR Secretary in his official capacity—also a defendant here—has himself argued as much.
   *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 241 (2008). "[T]he 'deliberate

24  indifference' test," CDCR argued, "is 'purely a creature of federal law'" and is not an element of
   the California "constitutional provision against the infliction of cruel or unusual punishment." *Id.*

25  CDCR went so far as to assert that allegations of deliberate indifference raised under the state
   constitution should be dismissed for failure to state a claim. *Id.* While some cases discuss deliberate

26  indifference when plaintiffs have brought state constitutional claims, this is because plaintiffs tend

27  to bring cruel and unusual punishment claims under both constitutions, not because the standards
   are identical. *E.g. Hampton v. Ayers*, No. CV 07-8130-RSWL MAN, 2011 WL 2565358, at *26

28  (C.D. Cal. June 2, 2011), report and rec. adopted, 2011 WL 2563246 (C.D. Cal. June 28, 2011).

15

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1    manual review of the video. *See id.*, Ex. O. None of these alternatives require metal-on-metal

2    contact to log a check.[6] Under the California Constitution, these alternatives demonstrate that sleep

3    deprivation is not reasonably related to the penological interest in welfare checks.

4    **II.    The Strength of Lipsey's Constitutional Claims Decides the *Winter* Analysis.**

5           "If plaintiffs 'show that a constitutional rights claim is likely to succeed, the remaining

6    preliminary injunction factors weigh in favor of granting an injunction.'" *Unknown Parties v.*

7    *Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *2 (D. Ariz. Nov. 18, 2016)

8    (quoting *Vivid Entm't, LLC v. Fielding*, 956 F. Supp. 2d 1113, 1136 (C.D. Calif. 2013), clarified

9    on denial of reconsideration*, No. CV-15-00250-TUC-DCB, 2017 WL 467238 (D. Ariz. Jan. 3,

10   2017), aff'd sub nom. *Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017). First, "[i]n the Ninth Circuit 'the

11   deprivation of constitutional rights unquestionably constitutes irreparable injury.' *Id.*

12   (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). "This is because 'constitutional

13   violations cannot be adequately remedied through damages and therefore generally constitute

14   irreparable harm.'" *Id.* (quoting *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046,

15   1059 (9th Cir. 2009)). Second, "[i]n the Ninth Circuit, 'it is always in the public interest to prevent

16   the violation of a party's constitutional rights.'" *Id.* (quoting *Melendres*, 695 F.3d at 1002). And

17   third, "[t]he government cannot be harmed . . . from an injunction that merely ends an

18   unconstitutional practice." *Id. Melendres*, *American Trucking*, and *Johnson* (as affirmed by *Kelly*)

19   are binding authority. *Melendres* dealt with unlawful detention, 695 F.3d at 1000, and

20   *Johnson/Kelly* dealt specifically with sleep deprivation, 2016 WL 8188563, at *7-9. The Court need

21   not consider the remaining *Winter* factors one by one to grant a temporary restraining order so long

22   as it finds Lipsey likely to succeed on one of his constitutional claims.

23   **III.    Lipsey Also Prevails Under the Ninth Circuit's Sliding Scale Approach.**

24          In the alternative, even if Lipsey were *not* likely to succeed on the merits, the Court could

25   still grant a temporary restraining order if it found "serious questions going to the merits" and

26   concluded that "the balance of hardships tips sharply in [his] favor," so long as he "also shows that

27   _____

28          [6] Lipsey is agnostic as to which specific system replaces Guard One, so long as the Court
     requires that it not cause sleep deprivation and monitors compliance.

16

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

there is a likelihood of irreparable injury and that the injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1135 (9th Cir. 2011). "'Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits.'" *CI Games S.A. v. Destination Films*, No. 2:16-CV-05719-SVW-JC, 2016 WL 9185391, at *11 (C.D. Cal. Oct. 25, 2016) (quoting *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)). Even if the Court finds Lipsey has not shown a probability of success, he has at the least raised serious questions that suggest a fair chance of success at trial. That showing, along with the other factors, justifies a temporary restraining order.

A. The Balance of Hardships Tips Sharply in Lipsey's Favor.

Lipsey's hardship is acute. He is being deprived of sleep on an ongoing basis, to the point that it has caused physical symptoms. Lipsey Decl., ¶ 18. Lipsey also suffers from schizoaffective disorder, which is aggravated by loss of sleep. *Id.*, ¶ 20; Pelayo Decl., ¶ 32. And sleep deprivation tends to compound the horrific psychological effects of long-term solitary confinement. Lipsey is locked in a concrete cage 22.5 hours a day. Such an environment is particularly challenging when subject to severe sleep deprivation and dogged by mental illness.

In contrast, CDCR's hardship is slight. The Ninth Circuit has written that, "faced with a conflict between financial concerns and preventable human suffering, the court has little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (internal quotation and alterations omitted). If Lipsey's request for an injunction is granted, CDCR will incur the cost of replacing Guard One in one SHU with a quieter logging system. And it would cost the CDCR nothing—indeed, save it money on labor costs—to reduce the frequency of checks at night. These hardships do not outweigh the physical and psychological harm to Lipsey from sleep deprivation.

B. Sleep Deprivation Is an Irreparable Injury.

For the purposes of preliminary injunctive relief, a harm is irreparable when it "cannot be undone by an award of compensatory damages." *Battelle Energy All., LLC v. Southfork Sec., Inc.*, 980 F. Supp. 2d 1211, 1220 (D. Idaho 2013) (citing *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.1988)). To obtain a temporary restraining order, Lipsey must establish that

17

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1    such a harm is "likely." *Cottrell*, 632 F.3d at 1131.

2        A violation of Lipsey's constitutional rights is necessarily an irreparable harm. "It is well

3    established that the deprivation of constitutional rights 'unquestionably constitutes irreparable

4    injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation omitted). And the

5    resulting physical and psychological harm is also irreparable. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935

6    F.3d 757, 797 (9th Cir. 2019) (finding that "severe, ongoing psychological distress" constituted

7    irreparable harm); *Villery v. Beard*, No. 1:15-CV-00987-DAD-BAM-PC, 2018 WL 6304410, at

8    *20 (E.D. Cal. Dec. 3, 2018) (finding that "medical and mental health injur[i]es" due to prison

9    policies constituted irreparable harm). Similarly, courts in this circuit have found sleep deprivation

10   an irreparable harm. *See, e.g.*, *Upshaw v. Alameda Cty.*, 377 F. Supp. 3d 1027, 1033 (N.D. Cal.

11   2019); *Johnson*, 2016 WL 8188563, at *15; *Gonzalez v. Zika*, No. C 11-5561 CW PR, 2012 WL

12   4466584, at *10 (N.D. Cal. Sept. 26, 2012).

13       Moreover, Defendants have argued in parallel litigation that Lipsey's claims for damages

14   are barred by qualified immunity. While Lipsey disagrees, the magistrate judge agreed with

15   defendants as to checks conducted after 2015—that is, the harm Lipsey is currently experiencing.

16   *Lipsey v. Norum*, 2019 WL 5079544, at *5 (E.D. Cal. Oct. 10, 2019). Where an immunity renders

17   a plaintiff unable to recover damages, the injury is irreparable for the purpose of prospective

18   injunctive relief. *See, e.g.*, *Cal. Hosp. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1158 (E.D.

19   Cal. 2011) (finding irreparable harm where Eleventh Amendment barred damages).

20   C.   An Injunction Is in the Public Interest Because It Also Helps Other Inmates Sleep.

21       The public interest inquiry concerns the effect on non-parties. *Bernhardt v. L.A. Cty.*, 339

22   F.3d 920, 931 (9th Cir. 2003). When an injunction "is narrow, limited only to the parties, and has

23   no impact on non-parties," the public interest is "at most a neutral factor." *Selecky*, 586 F.3d at

24   1138–39 (9th Cir. 2009) (quotation omitted). Here, the only impacted non-parties are the other

25   prisoners in Lipsey's housing unit. But the injunction will have a *positive* impact on their sleep.

26   Ample alternatives are available to ensure ongoing welfare checks.  *See supra* pp. 15-16. And, as

27   Guard One checks are not preventing suicides in the first place, *see supra* pp. 7-8, a slight reduction

28   in check frequency will not increase the suicide rate. An injunction is therefore in the public interest.

18

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

**IV.    The Relief Sought Is the Narrowest That Will Remedy Lipsey's Injuries.**

The Prison Litigation Reform Act requires that relief (1) be "narrowly drawn" (2) "extend[] no further than necessary to correct the violation of the right," and (3) be "the least intrusive means necessary to correct the violation of the right." *Oluwa v. Gomez*, 133 F.3d 1237, 1240 (9th Cir. 1998); *see also* 18 U.S.C. § 3626. Lipsey's requested relief meets these requirements.

First, less frequent checks using a quieter logging system constitute a narrowly drawn solution. At this preliminary stage, Lipsey does not request elimination of the checks. He requests only narrow relief to increase his odds of a full night's sleep, applied only to his own unit.

Second, the requested relief extends no further than necessary. Lipsey's sleep deprivation is caused both by use of the Guard One tool and the frequency of the checks. The Guard One PIPE creates a substantial risk of loud noise every time a correctional officer swings it at a button mounted on a steel door. And any tracking system would still risk sleep deprivation if carried out twice an hour, because guards also create noise moving through the unit, and the knowledge that another check is less than thirty minutes away makes it hard to fall asleep.

Finally, the requested relief is the least intrusive means necessary to preserve Lipsey's rights. While more training for guards may also be appropriate, the ongoing failure of the checks to prevent suicides shows that attempting to change the application of the policy is not enough. Guards continue to rush through checks inattentively despite five years of criticism by the *Coleman* Expert. Neither the Expert nor this Court can accompany each guard on each round. As such, a change at the level of the policy, not just its application, is necessary.

**V.    Lipsey Has No Practical Means for Relief Without a Temporary Restraining Order.**

This Court's local rules add two additional requirements for a temporary restraining order. First, the Court requires that the movant make reasonable efforts to give notice to affected parties. *See* Local Rule 231(a).  Both parties were informed.  Falkenstien Decl., ¶¶ 7-13.  Defendants did not respond.  *Id.*, ¶¶ 7, 11-13.  Plaintiffs stated they would "not take any position on" this motion. *Id.*, ¶ 10, Ex. N to Falkenstien Decl.

Second, "the Court will consider whether the applicant could have sought relief by motion for preliminary injunction at an earlier date" instead of seeking a temporary restraining order. *See*

19

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

1  Local Rule 231(b). Lipsey has been incarcerated in the SHU since August 2019, and it was his

2  intention to seek a preliminary injunction in the fall rather than asking for a temporary restraining

3  order now. However, procedural hurdles have unfortunately led to a situation in which this motion

4  has become Lipsey's only viable route to having his claims adjudicated. When counsel had nearly

5  finished preparing Lipsey's motion for a preliminary injunction in *Lipsey v. Norum*, Judge Barnes

6  issued Findings and Recommendations dismissing his injunctive claims in that case. Lipsey

7  promptly pursued his available options to find a forum in which to seek a preliminary injunction:

8  he objected to the Findings and Recommendations and filed a Motion to Intervene in this case. He

9  then attempted to wait for a ruling on those filings before seeking emergency injunctive relief.

10  However, because terms in the SHU are necessarily time-limited, the Court may not be able to

11  adjudicate Lipsey's motions during his SHU term. Now, Lipsey may be released from the SHU as

12  soon as March 2020, yet the Court has still not been presented with his claims.

13      Lipsey has been subject to Guard One checks since 2014. He has been seeking a remedy for

14  his sleep deprivation for almost six years. Yet, because of his SHU terms have not been continuous

15  for the entire six-year period, his claims have repeatedly been mooted by temporary release to the

16  general population. It is time that Lipsey's claims are heard on the merits, before they are mooted

17  once again. Lipsey faces severe health consequences from his sleep deprivation, and procedural

18  bars should not hide that suffering from public view and legal review.

19                          **CONCLUSION**

20      In the nearly six years since Lipsey filed his first complaint, he has spent more than one

21  thousand nights subject to more than ten thousand Guard One checks. Preliminary relief is

22  warranted to halt Mr. Lipsey's ongoing, unconstitutional suffering while his case proceeds.  Lipsey

23  thus respectfully requests a temporary restraining order requiring (1) an immediate decrease in the

24  frequency of nighttime welfare checks in the SHU to once per hour; and (2) prompt replacement of

25  the Guard One system in his unit at the Corcoran SHU with a check-logging system that does not

26  create a significant risk of loud noise or sleep deprivation. In the alternative, he requests (3) that

27  Guard One's beeping at least be silenced during sleeping hours.

28

20

Lipsey's Mem. Supp. Mot. for TRO (CIV S-90-0520 KJM DB P)

Dated: February 14, 2020                      Respectfully submitted,

/s/ Kate Falkenstien

REICHMAN JORGENSEN LLP
Shawna L. Ballard (SBN 155188)
Kate Falkenstien (SBN 313753)
100 Marine Parkway, Suite 350
Redwood Shores, California 94065
Telephone: (650) 623-1401
Fax: (650) 623-1449
sballard@reichmanjorgensen.com
kfalkenstien@reichmanjorgensen.com

*Attorneys for Plaintiff-Intervenor Christopher*
*Lipsey*