# Exhibit K

# ASSOCIATION OF STATE CORRECTIONAL ADMINISTRATORS

**Executive Officers**

President
**Leann Bertsch**

Vice President
**John Wetzel**

Treasurer
**Colette S. Peters**

Past President
**Ashbel T. Wall, II**

**Regional Representatives**

Midwest
**Heidi Washington**

Northeast
**Scott Semple**

Southern
**Wendy Kelley**

Western
**Rick Raemisch**

Embargoed until 3pm on November 30, 2016
Contacts: George or Camille Camp 301-791-2722; gcamp@asca.net
Judith Resnik, 203-432-1447; judith.resnik@yale.edu

***Aiming to Reduce Time-In-Cell*: Correctional Administrators and Yale Law School's Liman Program Release New Report on Efforts to Reduce the Use of Isolation in State and Federal Prisons**

New Information from Prison Officials Reflects the National Consensus
on the Need to Reduce Reliance on Restricted Housing

A new report, jointly authored by the Association of State Correctional Administrators (ASCA) and the Arthur Liman Program at Yale Law School, reflects a profound change in the national discussion about the use of what correctional officials call "restrictive housing" and what is popularly known as "solitary confinement." Just published, *Aiming to Reduce Time-In-Cell* provides the only current, comprehensive data on the use of restricted housing, in which individuals are held in their cells for 22 hours or more each day, and for 15 continuous days or more at a time. The Report also documents efforts across the country to reduce the number of people in restricted housing and to reform the conditions in which isolated prisoners are held in order to improve safety for prisoners, staff, and communities at large.

The 2016 publication follows the 2015 ASCA-Liman Report, *Time-In-Cell*, which documented the use of restricted housing as of the fall of 2014. As ASCA explained then, "prolonged isolation of individuals in jails and prisons is a grave problem in the United States." Today, a national consensus has emerged focused on limiting the use of restricted housing, and many new initiatives, as detailed in the report, reflect efforts to make changes at both the state and federal levels.

The 2016 Report is based on survey responses from 48 jurisdictions (the Federal Bureau of Prisons, 45 states, the District of Columbia, and the Virgin Islands)—that held about 96% of the nation's prisoners convicted of a felony. That number excludes people held in most of the country's jails (housing hundreds of thousands of people), in most of the country's juvenile facilities, and in military and immigration facilities.

Tallying the responses, the new 2016 Report found that 67,442 prisoners were held, in the fall of 2015, in prison cells for 22 hours or more for 15 continuous days or more. The percentages of prisoners in restricted housing in federal and state prisons ranged from under 1%

to more than 28%. Across all the jurisdictions, the median percentage of the prison population held in restricted housing was 5.1%.

How long do prisoners remain in isolation? Forty-one jurisdictions provided information about the length of stay for a total of more than 54,000 people in restricted housing. Approximately 15,725 (29%) were in restricted housing for one to three months; at the other end of the spectrum, almost 6,000 people (11%) across 31 jurisdictions had been in restricted housing for three years or more.

The Report also chronicles efforts throughout the country and the world to reduce the use of restricted housing. In August of 2016, the American Correctional Association (ACA) approved new standards, calling for a variety of limits on the use of isolation, including a prohibition against placing prisoners in restricted housing on the basis of their gender identity alone. The standards also included provisions that pregnant women, prisoners under the age of 18, and prisoners with serious mental illness ought not be placed for extended periods of time in restricted housing. Further, in some jurisdictions, prison systems (sometimes prompted by legislation and litigation) have instituted rules to prevent vulnerable populations from being housed in restricted housing except under exceptional circumstances and for as short an amount of time as possible.

As the Report also details, several jurisdictions described making significant revisions to the criteria for entry, so as to limit the use of restricted housing, as well as undertaking more frequent reviews to identify individuals to return to general population, thereby reducing the number of people in restricted housing by significant percentages.

In short, while restricted housing once was seen as central to prisoner management, by 2016 many prison directors and organizations such as ASCA and the ACA have defined restricted housing as a practice to use only when absolutely necessary and for only as long as absolutely required. The goals of ASCA and the ACA are to formulate and to apply policies to improve the safety of institutions and communities by ensuring that the *separation* of individuals to promote safety and well-being need not be accompanied by *deprivation* of all opportunities for social contact, education, programming, and other activities.

As Leann K. Bertsch, President of ASCA, explained:

"What we are seeing is that prison systems are motivated to reduce the use of isolation in prisons and are actively putting into place policies designed to reduce the use of restrictive housing. Restricted housing places substantial stress on both the staff working in those settings as well as the prisoners housed in those units. Our highest priority is to operate institutions that are safe for staff and inmates and to keep communities to which prisoners will return safe."

For more information, please contact George and Camille Camp, Co-Executive Directors of ASCA, at 301-791-2722, and Judith Resnik, Arthur Liman Professor of Law at Yale Law School, at 203-432-1447. The full report may be downloaded, free of charge, at www.asca.net or https://www.law.yale.edu/centers-workshops/arthur-liman-public-interest-program/liman-publications.

# Aiming to Reduce Time-In-Cell:
# Reports from Correctional Systems on the Numbers of Prisoners in Restricted Housing and on the Potential of Policy Changes to Bring About Reforms

**Association of State Correctional Administrators**
**The Arthur Liman Public Interest Program, Yale Law School**

**November 2016**

**Association of State Correctional Administrators (ASCA)**

ASCA is the association of persons directly responsible for the administration of correctional systems. ASCA includes the heads of state corrections agencies, the Federal Bureau of Prisons, the District of Columbia Department of Corrections, and some large county jail systems. Founded in the 1950s, ASCA gained its current organizational structure in the 1980s. ASCA is premised on the belief that each represented correctional jurisdiction is unique in its own obligations, structures, and resources and that similarities of purpose, responsibilities, and challenges among member jurisdictions unite them in a quest for public safety, secure and orderly facilities, and professionalism.

**The Arthur Liman Public Interest Program, Yale Law School**

The Arthur Liman Public Interest Program was endowed to honor one of Yale Law School's most accomplished graduates, Arthur Liman, who graduated in 1957 and who personified the ideal of commitment to the public interest. Throughout his distinguished career, he demonstrated how dedicated lawyers, in both private practice and public life, can serve the needs of people and causes that might otherwise go unrepresented. The Liman Program was created in 1997 to continue the commitments of Arthur Liman by supporting lawyers, in and outside the academy, who are dedicated to public service in the furtherance of justice.

**Acknowledgements**

This report is based on a survey co-authored by ASCA and by the Liman Program at Yale Law School. The research and report teams were led by George and Camille Camp of ASCA and by Professor Judith Resnik, former Director Johanna Kalb and current Director Anna VanCleave of the Liman Program, former Senior Liman Fellow in Residence Sarah Baumgartel and current Senior Fellow Kristen Bell, all of Yale Law School. Olevia Boykin, Corey Guilmette, Tashiana Hudson, Diana Li, Joseph Meyers, Hava Mirell, and Jessi Purcell, current and former students at Yale Law School, conducted the research and drafted this report.

Thanks are due to all the jurisdictions that responded to the survey, and for their thoughtful comments and reviews received after drafts of the report were circulated in the winter of 2016 and in the summer of 2016. Yale Law School, the Liman Program, the Vital Projects Fund, and the Oscar M. Ruebhausen Fund at Yale Law School have generously supported this project. Special thanks are due to Skylar Albertson, Alison Gifford, and Bonnie Posick for expert editorial advice.

To download copies of this Report, please visit the website of the Liman Program at https://www.law.yale.edu/centers-workshops/arthur-liman-public-interest-program/liman-publications. This Report may be reproduced free of charge and without the need for additional permission. All rights reserved, 2016.

**Inquiries:**

George and Camille Camp
Co-Executive Directors of ASCA
gcamp@asca.net; ccamp@asca.net

Judith Resnik
Arthur Liman Professor of Law
Yale Law School
judith.resnik@yale.edu

**Table of Contents**

I.   LEARNING ABOUT ISOLATION IN PRISON                                    4
     A.   Collecting Data to Establish Baselines and Parameters: 2012-2015   4
     B.   Looking for Changes: 2015-2016                                     6
     C.   The Context: Demands for Change                                    8

II.  THE 2015 SURVEY'S DESIGN AND PURPOSES                                  15
     A.   Goals and Methods                                                 15
     B.   Research Challenges: Various Definitions of Restricted Housing
          and the Overlaps and Differences between the 2015 and 2016
          ASCA-Liman Reports                                                16

III. TYPES OF FACILITIES AND OF CELLS IN THE 2015 SURVEY                    17
     A.   Types of Facilities for which State-Wide Data Were Available      17
     B.   The Use of Single and of Double Cells                             19

IV.  THE NUMBERS AND PERCENTAGES OF PRISONERS IN RESTRICTED
     HOUSING: THE DATA FROM THE 2015 SURVEY                                 20
     A.   Counting and Comparing General and Restricted Populations         20
     B.   The Numbers and Percentages of Prisoners In-Cell for 16 to 21 Hours   24

V.   THE DURATION OF TIME INDIVIDUALS SPENT IN RESTRICTED HOUSING   26
     A.   Length of Time                                                    26
     B.   Length of Time by Classification of the Type of Restricted Custody   29

VI.  THE DEMOGRAPHICS OF RESTRICTED HOUSING                                 30
     A.   Gender                                                            30
     B.   Race and Ethnicity                                                35
     C.   Age Cohorts                                                       42
     D.   Vulnerable Populations: Mentally Ill, Pregnant, and Transgender Prisoners   48
          1.   Prisoners with Serious Mental Health Issues
               (according to each jurisdiction's own definition)           48
          2.   Pregnant Prisoners                                          54
          3.   Transgender Prisoners                                       55

VII. PLANNED OR PROPOSED POLICY CHANGES
     IN RESTRICTED HOUSING: 2013-2016                                      55
     A.   Reducing Placement in Restricted Housing:
          Narrowing Criteria for Entry and Creating Alternatives           56
     B.   Focusing on Release: Time Caps, Step-Down Programs, and
          Increased Oversight of Retention Decisions                       57
     C.   Mandated Time Out-of-Cell                                        58
     D.   Conditions: The Physical Environment and Programming             59
     E.   Staffing: Policies and Training                                  59

    **F.**   **Jurisdictions Seeking Substantial Reductions in Restricted Housing Use**    **60**
      **1. The Federal Prison System: Changes Recommended in the**
          **2016 Department of Justice Restricted Housing Report**    **60**
      **2. Colorado**    **62**
      **3. North Dakota**    **64**
      **4. Ohio**    **65**
      **5. South Carolina**    **66**
      **6. Utah**    **69**

**VIII.**      **REFLECTING ON EFFORTS TO REDUCE TIME-IN-CELL**    **71**


**ENDNOTES**


**APPENDICES**
  **Appendix A:**     **ASCA-Liman Restricted Housing Survey – Fall 2015**
  **Appendix B:**     **List of the Report's Charts and Tables**
  **Appendix C:**     **Jurisdictions' Definitions of Serious Mental Illness**

# I.    Learning about Isolation in Prison

This Report is the third in a series that examines what correctional officials in the United States call "restrictive housing" and what is known more generally as "solitary confinement." Working together, the Association of State Correctional Administrators (ASCA) and the Arthur Liman Program at Yale Law School have sought to understand the formal rules governing aspects of the segregation of prisoners in the United States; the numbers of individuals confined; the conditions under which they live; and the limits on the use of isolation.

Below, we provide a brief overview of prior ASCA-Liman work in this area, a description of this study, and a review of initiatives during the last few years aimed at producing significant reforms to reduce the numbers of people in restricted housing and the degrees of their isolation.

### A.    Collecting Data to Establish Baselines and Parameters: 2012-2015

Prison systems across the United States separate some prisoners from general population and put them into special housing units, typically with more isolating conditions. The reasons for doing so include the imposition of punishment ("disciplinary segregation"), protection ("protective custody"), and incapacitation (often termed "administrative segregation").

In *Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies*, published in 2013, we asked directors of state and federal corrections systems to provide their policies on administrative segregation, defined as removing a prisoner from general population to spend 22 to 23 hours a day in a cell for 30 days or more.[1] Administrative segregation was the form of confinement that we believed was the most common basis for segregation.

What we learned, based on responses from 47 jurisdictions, was that correctional policies made getting *into* segregation relatively easy, and few systems focused on getting people *out*. The criteria for entry were broad. Many jurisdictions permitted moving a prisoner into segregation if that prisoner posed a threat to institutional safety or a danger to self, staff, or other inmates. Constraints on decision-making were minimal; the kind of notice provided and what constituted a "hearing" varied substantially.

In 2014, the Liman Program and ASCA took the next step by asking correctional administrators more than 130 questions—this time about the numbers of people in restricted housing and the conditions under which they lived.[2] The overall focus was on a subset of restricted housing—"administrative segregation," while a few questions focused on all forms of restricted housing. Responses came from 46 jurisdictions (albeit not all jurisdictions answered all the questions). Published in 2015, the *Time-In-Cell* Report provided a unique multi-jurisdictional window into segregation.

A central question is about the numbers of individuals in segregation, regardless of the different names under which the practice goes. Before that Report, information on the number of prisoners held in restricted housing was a decade old or more; the figure often cited was 25,000.[3] The 2015 ASCA-Liman Report provided new information. What we learned from the 34

jurisdictions answering this question and housing about 73% of the more than 1.5 million people incarcerated in U.S. prisons, was that they reported a total of more than 66,000 people held in restricted housing as of the fall of 2014. Given that number, ASCA and Liman estimated that some 80,000 to 100,000 people were, in 2014, in restricted housing (however termed) in U.S. prisons—or about one in every six or seven prisoners.[4] Those figures, in turn, did not include jails, juvenile facilities, or immigration and military detention.

We also learned that prisoners in many jurisdictions across the country were required to spend 23 hours in their cells on weekdays and in many, 24 hours in their cells on weekends.[5] Jurisdictions reported that cells, sometimes holding two people, ranged in size from 45 to 128 square feet.[6]

Opportunities for social contact, such as out-of-cell time for exercise, visits, and programs, were limited, ranging from three to seven hours a week in many jurisdictions.[7] Phone calls and social visits could be as infrequent as once per month. A few jurisdictions provided more opportunities.[8] In most jurisdictions, prisoners' access to social contact, programs, exercise, and items kept in their cells, could be cut back as sanctions for misbehavior.[9]

Moreover, administrative segregation generally had no fixed endpoint, and several systems did not keep track of the numbers of continuous days that people remained in isolation. In the 24 jurisdictions reporting on this question, a substantial number indicated that prisoners remained in segregation for more than three years. As to release and reentry, in 30 jurisdictions tracking the numbers in 2013, a total of 4,400 prisoners were released directly from the isolation of administrative segregation to the outside community.[10]

Running administrative segregation units posed many challenges for prison systems. These problems—coupled with a surge of concerns about the negative impact of isolation on individuals—have created incentives for change. Prison directors cited prisoner and staff well-being, pending lawsuits, and costs as reasons to revise their practices. Some also commented that change was important because it was "the right thing to do."[11]

When releasing *Time-In-Cell*, ASCA stated that "prolonged isolation of individuals in jails and prisons is a grave problem in the United States."[12] As that press release also explained, "insistence on change comes not only from legislators across the political spectrum, judges, and a host of private sector voices, but also from the directors of correctional systems at both state and federal levels."[13]

*Time-In-Cell* provided a window into the prevailing practices and a baseline from which to assess whether the many efforts to limit isolation would have an impact. That Report made plain that segregation practices had become entrenched during the past 40 years, that many correctional systems sought to make changes, and that unraveling the structures producing so much isolation would require intensive work.

When released in September 2015, the *Time-In-Cell* Report became front-page news, reflecting the broad concern about these problems and the need for reform.[14] Much commentary followed, including several essays published by the Yale Law Journal Forum in January of 2016.

These comments analyzed the data in the Report, the need for reform, and the challenges entailed in making major changes.[15]

## B.    Looking for Changes: 2015-2016

In early October 2015, ASCA and Liman launched this follow-up study to gather national information on all forms of restricted housing, to learn what numbers of people were in that form of detention in the fall of 2015, and to see what changes were underway. The hope was twofold: that the numbers of people held in such settings were diminishing and that the conditions in restricted housing were improving by becoming less isolating.

This study relied again on asking the directors of prison systems to respond to questions. This time, a set of 15 questions focused on the people in any and all forms of what we termed restricted housing (or what is also termed "restrictive" housing). We queried 53 jurisdictions (all the states, the federal system, the District of Columbia, and the Virgin Islands), and 52 responded; the one jurisdiction not providing any information was the State of Maine. As detailed below, a few jurisdictions that did respond did not have answers to all the topics surveyed. For many questions, 48 jurisdictions had sufficiently detailed and consistent information on which to report,[16] and for each topic, we specify the number of responding jurisdictions.

We sought to learn about numbers and demographics—including race, gender identity, age, and mental health status. As the data set forth below reflect, those ambitions were made complex by the variety of different facilities under the control of state-wide correctional departments, the many terms used to denote segregating prisoners, the range of data kept, and the limited amount of data available. The jurisdictions surveyed did not all keep comparable data about how many hours, over how many days, prisoners were in their cells.

To enable cross-jurisdictional comparisons, we imposed a definition by describing restricted housing as the separation of prisoners from general population and in detention for 22 hours per day or more, for 15 or more continuous days, in single-cells or in double-cells. This survey did not inquire into whether jurisdictions regularly audited their facilities to learn if the parameters were consistently met. For example, we did not ask about what methods were used to ensure that individual prisoners were out of their cells for the time stipulated in rules, nor did we learn how often or for how long lockdowns occurred during which no prisoners were permitted to leave cells.

Further, if a jurisdiction provided for prisoners to spend 14.5 hours a week out-of-cell, or had no count of whether prisoners were held 15 days or more, that jurisdiction could have described itself as having no one in restricted housing, even as the jurisdiction understood itself *to have* a restricted-housing population. Therefore, and as noted below, in a few instances we included information provided by jurisdictions that required minor modifications of our 22-hour/15-days-or-more definition.

A preview of some of this Report's findings is in order. As of the fall of 2015, 67,442 people were held in restricted housing across the 48 jurisdictions that reported their numbers.[17] Relying on data on the United States and its territories from the Bureau of Justice Statistics, we looked at the total number of individuals confined in the 48 jurisdictions, and learned that these jurisdictions accounted for 96.4% of the total prison population in the United States.[18]

We then calculated the percentage of prisoners who were held in restricted housing across all of the jurisdictions which regularly kept data on the number of prisoners in restricted housing (22 hours a day/15 days or more). The focus was on state prisoners housed under state (not local) control. The percentages of prisoners held in different jurisdictions in restricted housing ranged from 0.5% (Hawaii, in-state only) to 28.3% (the Virgin Islands). The median was 5.1%.[19]

We also asked about the numbers of people held in segregation between 16 and 21 hours per day in their cells. Thirty-four jurisdictions responded about those populations. In 23 of those jurisdictions, we tallied a total of 16,455 additional prisoners in cells for 16 to 21 hours per day for 15 consecutive days or more.[20] In these 23 jurisdictions, the median so confined was 1.6% of their total populations.[21] (Eleven of the responding 34 jurisdictions reported that they did not hold prisoners in-cell for 16-21 hours per day for 15 consecutive days or more.)

Some of the reporting jurisdictions did not include information on all of the facilities directly under their control, and very few included information from county and municipal level facilities at which prisoners or pretrial detainees were held.[22] The dearth of information on county jails is important to underscore because counties were responsible, as of 2016, for 91% of the jails in the United States, and "11.4 million individuals pass through jail each year."[23] In short, through this survey, we have accounted for *at least* 67,442 individuals in restricted housing (22 hours a day/15 days or more) in the fall of 2015. When adding the 16,455 people confined 16 to 21 hours, a total of at least 83,897 prisoners were held in their cells for more than 16 hours a day for 15 days or more. Yet, given the data limitations, neither of these numbers includes all the people held in cell for either 16-hours or more or for 22-hours or more in all of the types of U.S. prison and jail facilities.

How long, in months and years, did prisoners spend in restricted housing? Forty-one jurisdictions—holding 54,382 prisoners—provided length-of-stay data. Of those prisoners, 15,725 people—or 29%—were in restricted housing from one month up to three months. Some 15,978 people—or 29%—were in restricted housing for three months up to one year. Another 13,041 prisoners—or 24%—were in restricted housing for a year or more. Of these, 2,976 people—5.5% of 54,382—had spent from three years to six years in restricted housing. Twenty-six jurisdictions reported holding some prisoners—a total of 2,933 people, or 5.4% of the 54,382—in restricted housing for six years or more.[24]

The survey also asked whether correctional systems were making policy-level changes to reduce the use of restricted housing. Forty-five jurisdictions reported on their policies, and many described proposed or recently implemented revisions. Jurisdictions reported policies revising the criteria for being placed in isolation to limit its use, increasing the oversight of restricted housing, expanded efforts at programming and rehabilitative services in restricted housing,

developing exit paths (sometimes called "step-down" programs), and imposing caps on the length of time spent in restricted confinement.

In addition to summarizing changes in policies, we provide descriptions of efforts reported by a few jurisdictions seeking to make substantial reductions in the use of restricted housing. We did not inquire into either the details or metrics of implementation, nor did we conduct case studies to learn about the effects, in practice, of the new policies described.

### C.    The Context: Demands for Change

As this study was underway, concerns about restricted housing intensified. In July 2015, President Barack Obama announced that he had directed the Attorney General of the United States to conduct a review of the use of solitary confinement in the federal prison system.[25] The review resulted in a report, *U.S. Department of Justice Report and Recommendations Concerning the Use of Restrictive Housing*, published in January of 2016. That monograph provided an overview of what the Justice Department termed "restrictive housing" practices in the federal system and proposals for reform.[26] In the same month, in a *Washington Post* op-ed entitled *Why we must rethink solitary confinement* and which cited the ASCA-Liman *Time-In-Cell* Report, the President stated:

> The Justice Department has completed its review, and I am adopting its recommendations to reform the federal prison system. These include banning solitary confinement for juveniles and as a response to low-level infractions, expanding treatment for the mentally ill and increasing the amount of time inmates in solitary can spend outside of their cells. These steps will affect some 10,000 federal prisoners held in solitary confinement—and hopefully serve as a model for state and local corrections systems. . . .[27]

The Justice Department's Report laid out several "Guiding Principles" and "Policy Recommendations." The recommendations included ending "the practice of placing juveniles in restrictive housing."[28] In addition, the Justice Department recommended against placing pregnant women in restrictive housing, and proposed banning the practice of using the status of LGBTI and gender non-conforming individuals as the sole basis for placement in restricted housing. Further, the Justice Department recommended that, absent special circumstances, seriously mentally ill prisoners ought not to be placed in restricted housing.[29] The Justice Department also urged the Federal Bureau of Prisons (BOP) to eliminate the use of disciplinary segregation as a sanction for "low level" offenses and to reduce the time that prisoners spend in restricted housing for other offenses.[30]

Further, the Justice Department recommended that prisoners be housed "in the least restrictive setting necessary" to ensure the safety of all; that placement be based on specific, "clearly articulate[d]" reasons; and that the placement of prisoners in restricted housing serve "a specific penological purpose."[31] The Justice Department further recommended that there be "a clear plan for returning the inmate to less restrictive conditions as promptly as possible;"[32] that each individual's placement in restricted housing be reviewed on a regular basis by a committee that includes medical and mental health professionals;[33] and that restricted housing policies

generally be regularly reviewed by a standing committee that consisted of "high-level correctional officials."[34] The Justice Department called for the BOP to implement these policies, to add "opportunities for out-of-cell time" and programming,[35] and to increase transparency in the use of restricted housing.[36]

In March of 2016, the President issued a Presidential Memorandum, "Limiting the Use of Restrictive Housing by the Federal Government;" he directed executive departments and agencies to implement the Justice Department's recommendations.[37] President Obama wrote that in light of "the urgency and importance of this issue, it is critical that DOJ accelerate efforts to reduce the number of Federal inmates and detainees held in restrictive housing and that Federal correctional and detention systems be models for facilities across the United States."[38]

These national efforts came in the context of work in many other venues, ranging from professional associations of correctional and health professionals to state and federal legislatures and courts, both in the United States and abroad. In 2014, the American Correctional Association (ACA), an umbrella organization comprised of correctional facilities' leaders from across the country, created a Restrictive Housing Ad Hoc Standards Committee to revise its model standards.[39] The co-chairs, Gary Mohr (the Director of the Ohio Department of Rehabilitation and Correction) and Rick Raemisch (Executive Director of the Colorado Department of Corrections) wrote in 2015 of the need for an overall reduction in the use of restricted housing; as they explained, "lengthy periods of 23 hours per day in confinement multiplies a problem"— rather than solving it.[40]

The ACA's Ad Hoc Committee released a draft report in the winter of 2016 and proposed precluding the use of restricted housing on the basis of gender identity alone,[41] for pregnant women,[42] and for juveniles under 18.[43] Further, the ACA Committee proposed heightened oversight and review of decisions to place and to keep individuals in restricted housing,[44] ending the placement of individuals with serious mental illnesses in restricted housing unless they presented a "clear and present danger" to staff or other prisoners that was not associated with their mental illness,[45] and avoiding direct release of prisoners into the community.[46] In January of 2016, the ACA held a hearing to discuss its proposed guidelines for the use of restricted housing.[47]

In August of 2016, the ACA approved recommendations from a revised report of its Ad Hoc Committee.[48] The ACA's new standards called for an end to the practice of placing prisoners in restricted housing on the basis of their gender identity alone.[49] The standards also included provisions that pregnant women,[50] prisoners under the age of 18,[51] and prisoners with serious mental illness not be placed in "extended restricted housing."[52]

In addition, the ACA's revised standards set forth provisions for increased oversight of decisions to place prisoners in restricted housing[53] and more frequent opportunities for review.[54] The new standards also called for more frequent mental and physical health evaluations and treatment for all prisoners in restricted housing,[55] and specialized training for staff working with prisoners in restricted housing.[56]

In terms of the physical conditions, the ACA 2016 standards stated that restricted housing should include "living conditions that approximate those of the general inmate population" with "all exceptions . . . clearly documented."[57] The 2016 Restrictive Housing Standards stated that facilities should make efforts to move prisoners out of restricted housing through step-down programs and measures to ensure that restricted housing prisoners not be released directly to the community.[58]

The ACA initiative built on ASCA-based reform proposals to make changes in restricted housing. In 2013, ASCA adopted guidelines on Restrictive Status Housing Policy that aimed to constrain the use of isolating settings.[59] In 2014, ASCA identified administrative segregation as one of the "top five critical issues" reported by correctional agencies,[60] and, as discussed above, ASCA and the Liman Program have been working for several years on a series of collaborative research projects on this issue. In addition, as of the fall of 2016, ASCA was revising its guidelines on restricted housing.

Other voices within corrections and beyond have also insisted on the need for change. Some of the focus has been on limiting the placement of any person in restricted housing, while other activities have centered on subpopulations with special needs.

In terms of the use of restricted housing in general, in the summer of 2015, a group of "correctional directors and administrators with first-hand experience supervising solitary confinement units in prisons across the United States" joined together to file an *amicus* brief in the United States Supreme Court.[61] They described the "debilitating" effects of solitary confinement and argued that the Constitution requires individualized classification before a person could be placed in such confinement.[62] Their views about the effects of isolation were echoed by a group of psychiatrists and psychologists, also calling for the Supreme Court to step in; these medical professionals highlighted the "scientific research" establishing the many harms imposed by prolonged solitary confinement.[63]

Health professionals, social scientists, and organizations concerned with prisoner well-being have likewise detailed the harms of isolating confinement and have argued that the practice lacks utility.[64] In addition, empirical work has found that solitary confinement has not been effective in reducing violence and promoting safety.[65] Reports on specific prison systems also documented how disabling isolation was for prisoners and for staff, and how it has not ensured the safety of the communities to which individuals return.[66] Certain forms of restrictive housing have drawn particular attention; for example, in the fall of 2016, The Marshall Project and National Public Radio published a joint investigative report documenting incidents of violence and murder between "double-celled" prisoners in restrictive housing.[67]

This growing body of literature and case law has shifted the understanding of restricted housing and produced many calls for it to end. One example comes from a report based on a colloquium that was convened by the John Jay College of Criminal Justice in October of 2015 to discuss ending the over-use of isolation.[68] The colloquium's purpose was to gather corrections agency heads and advocates together "to determine if consensus might be achievable about ways to reform the use of social isolation by coming to common agreement rather than resorting to litigation."[69] The result, *Solitary Confinement: Ending the Over-Use of Extreme Isolation in*

*Prison and Jail*, included a series of recommendations calling for alternatives to segregation such that segregation should be used only as a last resort; humane conditions in segregation, such as permission for family contact and programming; due process for admission into segregation and periodic review for those already in segregation; and limited use of segregation of vulnerable populations, such as juveniles, the elderly, and people with mental illnesses.[70]

State legislatures, municipal authorities, and courts have continued to consider, and sometimes to impose, curbs on restricted housing. In October of 2016, New Jersey enacted a statute (awaiting the governor's signature as of this writing) limiting the use of "isolated confinement" to no more than 15 consecutive days, and no more than 20 days during any 60-day period.[71] The law defined "isolated confinement" as "confinement of an inmate . . . in a cell or similarly confined holding or living space, alone or with other inmates, for approximately 20 hours or more per day, with severely restricted activity, movement, and social interaction."[72] The law also prohibited, with a few exceptions, isolated confinement for prisoners who are members of a vulnerable population, including pregnant women, those 21 or younger, those 65 or older, those perceived to be lesbian, gay, bisexual, transgender or intersex, and those with a mental illness, a developmental disability, a serious medical condition, or an auditory or visual impairment.[73]

As of the fall of 2016, other bills pending in Illinois,[74] Massachusetts,[75] and Rhode Island[76] aimed to limit the use of restricted housing for all prisoners. Settlements approved in 2015-2016 in class actions in California,[77] Indiana,[78] and New York[79] imposed substantial limits on the use of restricted housing in each of these states.

Other reform efforts have focused specifically on populations with special needs. A decade ago, the Bureau of Justice Statistics estimated that 56% of people in state prisons had some form of mental illness.[80] Given the research documenting how placing people with preexisting mental illness in isolating housing can increase the risk of psychiatric deterioration, violence, self-injury, and suicide,[81] the American Psychiatric Association has advised against segregating individuals with mental illness,[82] as has the American Public Health Association,[83] and the National Commission on Correctional Health Care.[84] Legislation has also called for screening individuals and imposing limits on isolation for individuals with mental illness.[85]

Reflecting these concerns, the resolutions of some lawsuits have provided that individuals with cognitive or mental impairment should not be placed in restricted housing, or only briefly if exigent circumstances exist.[86] Correctional officials have also altered their rules and programs. For example, in 2015, after a report released by Disability Rights Oregon (DRO) detailed harmful conditions at its "Behavioral Health Unit," the Oregon Department of Corrections announced an agreement with DRO restricting the use of solitary for the mentally ill.[87] In Pennsylvania, after the settlement in another lawsuit also brought by a disability rights group,[88] the Secretary of the Department of Corrections created new education programs for staff as part of a system-wide initiative on mental illness.[89]

Another area of particular attention is the use of isolation for juveniles. Limits have been put in place by legislation, court orders, local ordinances, and correctional policies.[90] For example, legislation restricting the placement of juveniles in isolation was enacted in 2016 in

Colorado,[91] and a bill has likewise been enacted in California.[92] In the spring of 2016, the Board of Supervisors of Los Angeles directed that county officials end placement of youth in isolated housing, except in very rare circumstances.[93]

In 2015, proposed legislation was before the Congress to curtail isolation for the few juveniles in the federal system.[94] Further, in response to an investigation by the Department of Justice, Ohio adopted a policy to end the placement of youth in solitary confinement.[95] The U.S. Attorney for the Southern District of New York intervened in a lawsuit, begun by detainees in 2012, against New York City; the case challenged the City's treatment of youth at Rikers Island. In 2015, New York City's mayor announced a plan that would end the use of solitary confinement for people 21 and younger.[96]

In addition to the focus on subpopulations, proposals at the federal level sought to improve information about the use of restrictive housing and to impose oversight across the various populations in restricted housing. In the fall of 2016, the National Institute of Justice (NIJ) published a volume on solitary confinement and awarded $1.4 million to the Vera Institute of Justice to study the use of restricted housing and step-down programs in prisons and jails and to "assess the impact" of working in restricted housing facilities on "mental, emotional, and physical well-being."[97] The grant provided for a study to conduct a national survey of state prison systems, akin to the ASCA-Liman Reports, that would also include a sampling of jails. Further, NIJ provided Vera with funds to review state administrative data on restricted housing placement and to do interviews with and surveys of prison administrators and corrections officers.[98] The Bureau of Justice Assistance also announced a grant of $2.2 million to fund the Vera Institute's Safe Alternatives to Segregation Initiative, which as of the fall of 2016, assisted several jurisdictions seeking to reduce their use of restricted housing and to create alternatives to solitary confinement.[99]

In the fall of 2016, major legislation was put forth in Congress to limit solitary confinement. Senator Dick Durbin, joined by Senators Chris Coons, Cory Booker, Patrick Leahy, and Al Franken, introduced the "Solitary Confinement Reform Act," a bill that would "reform the use of solitary confinement and other forms of restrictive housing" in Bureau of Prisons facilities.[100] The legislation seeks to mandate that placement in solitary confinement be limited to "the briefest term and the least restrictive conditions practicable," including at least four hours out-of-cell every day unless a prisoner "poses a substantial and immediate threat."[101] The bill would also prohibit the placement in solitary confinement of juveniles,[102] pregnant women,[103] prisoners with serious mental illness,[104] and prisoners with intellectual or physical disabilities,[105] unless the prisoner "poses a substantial and immediate threat" and "all other options to de-escalate" have been exhausted."[106] The proposed legislation would also prohibit the placement of "lesbian, gay, bisexual, transgender, intersex, or gender nonconforming" prisoners in solitary confinement based solely on their sexual or gender identity.[107]

Further, the bill would limit placement in administrative segregation to a maximum of 15 consecutive days, and 20 total days in a 60-day period, unless necessary to contain a "substantial and immediate threat."[108] The legislation would also mandate that correctional facilities allow prisoners in restricted housing to participate in programming "as consistent with those available in general population as practicable."[109] In addition, the 2016 Solitary Confinement Reform Act

proposed to ensure that "time served" during the investigation of an alleged offense be "credited" for disciplinary segregation and that "concurrent sentences" be imposed where more than one disciplinary violation arises from a single episode.[110] The bill also proposed "timely, thorough, and continuous" reviews of confinement, which would include "private, face-to-face interviews with a multidisciplinary staff committee," to determine if the conditions comply with the provisions and if continued confinement is necessary.[111]

The proposed Solitary Confinement Reform Act also would create a "Civil Rights Ombudsman" within the Bureau of Prisons.[112] The Ombudsman position, to be filled by the Attorney General of the United States, would have unrestricted access to the federal prison facilities and contract facilities.[113] The Ombudsman would meet regularly with the Director of the Bureau of Prisons to address civil rights concerns and to raise issues regarding solitary confinement policies and practices.[114] The bill would also require that prisons offer multiple internal mechanisms for prisoners to report violations of this legislation and any other civil rights violations.[115] Specifically, prisons would be required to offer at least two procedures for reporting violations to an entity outside of the facility and at least two procedures for confidentially reporting violations to the Ombudsman.[116] Each year, under the bill, the Ombudsman would be required to submit reports to both houses of Congress on its findings, the problems relating to civil rights violations, violations of the bill's provisions, and recommendations for change.[117] The Federal Bureau of Prisons, in turn, would be required to keep extensive data on solitary confinement, including its costs and the number of assaults in the general population and in the isolated population.[118] The legislation also proposed the creation of a national resource center that would coordinate activities among state, local, and federal prison systems to centralize research and data related to reducing the population of prisoners in solitary confinement.[119]

In short, what commentators have termed a "national consensus" in the United States to end the "over-use of extreme isolation in prisons"[120] has emerged. That consensus comports with recent developments in legal systems other than the United States and in international law that also aim to limit the use of isolation. In December 2015, the United Nations General Assembly unanimously adopted the United Nations Standard Minimum Rules for the Treatment of Prisoners, commonly known as the "Nelson Mandela Rules."[121] The Rules defined solitary confinement as being held for 22 hours or more a day for longer than 15 days without "meaningful human contact,"[122] and stated that "[s]olitary confinement shall be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review, and only pursuant to the authorization by a competent authority," and "shall not be imposed by virtue of a prisoner's sentence."[123] In addition, the rules provided that "solitary confinement should be prohibited in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures."[124] Further, the rules stipulated that "indefinite" and "prolonged solitary confinement"[125] should not be used, and that women and children should not be held in solitary confinement.[126]

Solitary confinement has also been the subject of several decisions by the European Court of Human Rights (ECtHR), which has analysed degrees of isolation and the duration in specific instances.[127] The ECtHR has considered whether such treatment violates Article 3 of the Convention for the Protection of Human Rights and Fundamental Freedoms, which prohibits

subjecting any person to "torture or to inhuman or degrading treatment or punishment," or violates Article 8's protection of family and private life.[128] In 2014, the Court found that although "a prisoner's segregation from the prison community does not in itself amount to inhuman treatment . . . substantive reasons must be given when a protracted period of solitary confinement is further extended."[129] In Norway in 2016, a lower court judge held that, under European and Norwegian law, a person convicted of killing dozens of people could not be placed in "social isolation" that cut off his contact with all others, aside from staff.[130]

During the past few years, several research initiatives have documented the use of restricted housing around the world. In 2008, for example, Sharon Shalev published *A Sourcebook on Solitary Confinement*, which examined the health effects of solitary confinement. She also discussed professional, ethical and human rights guidelines and codes of practice relating to the use of solitary confinement.[131] In 2011, Juan E. Méndez, the United Nations Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, issued a report and called for general principles to minimize the use of solitary confinement and to abolish the practice under certain circumstances.[132] The Special Rapporteur emphasized that "[t]he practice should be used only in very exceptional circumstances, as a last resort, for as short a time as possible." In 2015, the Prison Reform Trust, based in the U.K., published *Deep Custody: Segregation Units and Close Supervision Centres in England and Wales,*[133] which detailed the use of isolation there.

In 2016, U.N. Special Rapporteur Méndez, working with other institutions, published a report, *Seeing into Solitary: Review of the Laws and Policies of Certain Nations around the World with Regard to Solitary Confinement of Detainees*, written in collaboration with other organizations.[134] The report included results from surveys and a comparative analysis of solitary confinement practices in 34 jurisdictions; information came from Argentina, Austria, Brazil, China, the Czech Republic, England and Wales ("England"), Ethiopia, Finland, France, Germany, Guatemala, Hungary, Japan, Kenya, Kyrgyzstan, Mexico, New Zealand, Norway, Poland, Russia, South Africa, Turkey, Uganda, the United States of America, Uruguay, and Venezuela, as well as eight states within the United States: California, Colorado, Florida, Illinois, Maine, New York, Pennsylvania, and Texas.

*Seeing into Solitary* found that "the practice of solitary confinement appears to be an established fixture of the prison systems in all the countries examined, with few signs that it will disappear from those systems any time soon."[135] The report identified a significant gap in many jurisdictions between "the law and the practice of solitary confinement," in that solitary confinement was imposed more often than the law authorized.[136] The reasons for placement in solitary confinement were found to be varied, and included both disciplinary and non-disciplinary reasons. The report noted that safeguards, access to legal counsel, and mandatory medical examinations that were available in many disciplinary segregation units were often lacking in non-disciplinary segregation units.[137] The report also noted that "some countries which have made the most consequential improvements on solitary confinement regimes, such as England and the United States, also tend to authorize some of the longest periods of solitary confinement for inmates."[138]

*Seeing into Solitary* also detailed efforts of some jurisdictions to improve conditions in solitary confinement, of other jurisdictions to establish appeals processes to challenge decisions to impose solitary confinement, and of many jurisdictions to prohibit or limit the use of solitary confinement for juveniles, women (mostly pregnant women), and mentally ill or disabled people.[139] The most common limitation that the report identified was on the length of time that a person may be placed in solitary confinement. Many jurisdictions permitted 30 days or less, although the limit was at times extended or ignored.[140] Further, "some countries, including highly developed nations with what may be viewed as enlightened approaches to certain aspects of solitary confinement, allow such confinement, whether for disciplinary or non-disciplinary purposes, and in theory or practice, to be extended either for extremely long periods, including years in some cases, or indefinitely."[141]

In sum, demands for change can be found around the world. Commitments to reform and efforts to limit or abolish the use of isolating confinement come from stakeholders and actors in and out of government. Documentation of the harms of isolation, coupled with its costs and the dearth of evidence suggesting that it enhances security, has prompted prison directors, legislatures, executive branch officials, and advocacy groups to try to limit reliance on restricted housing. Instead of being cast as the solution to a problem, restricted housing has come to be understood by many as a problem in need of a solution.[142]

## II.     The 2015 Survey's Design and Purposes

Three additional introductory comments are in order. First, we sketch the research methodology used in the questionnaire, which is reproduced in Appendix A. Second, we discuss the challenges of defining and of gathering data on restricted housing. Third, we explain the relationship of this study to the report, *Time-In-Cell*, published by ASCA and Liman in 2015.

### A.     Goals and Methods

ASCA and the Liman Program jointly developed a survey that was sent to the directors of state and federal correctional systems in the United States to learn about the use of restricted housing as of the fall of 2015. The goal was to understand as much as possible about the numbers of people separated from general prison populations and held for 22 hours or more, for 15 continuous days or more, in single or double cells.

To do so, the survey's 15 questions requested information on all forms of restricted housing within each of the jurisdictions. To understand the information provided, we sought to learn about the types of facilities—prisons, jails, juvenile or other specially organized institutions—a jurisdiction had, as well as for which facilities the jurisdiction could provide information on restricted housing. We also asked about the number of people in restricted housing; demographic information, including gender, race, and age; whether prisoners with serious mental illness were held in restricted housing; how long individuals were confined in restricted housing; and whether reforms were underway.

As in prior reports by ASCA and the Liman Program, the survey was distributed through ASCA to the 50 states, the Federal Bureau of Prisons, the District of Columbia and, in the summer of 2016, the Virgin Islands which requested that it also be included and then promptly provided information that was integrated thereafter.[143] We received responses from 52 jurisdictions (as noted, Maine did not respond). For a few questions, we compiled information from all the responses; more of the data come from the 48 jurisdictions providing detailed responses. Of these, not every jurisdiction responded to all questions.

Previews of this report were provided twice at ASCA meetings. After receiving initial responses in the fall of 2015, we presented an overview in January of 2016 at the ASCA mid-year meeting. We then followed up in the spring of 2016 to clarify responses as needed. At the summer 2016 ASCA meeting, a draft report was circulated and discussed. Thereafter, many jurisdictions offered comments, prompting additional revisions. Unless otherwise noted, all data provided come from the answers given by each jurisdiction, reporting about itself.

### B. Research Challenges: Various Definitions of Restricted Housing and the Overlaps and Differences between the 2015 and 2016 ASCA-Liman Reports

As the introduction explained, several caveats are in order about the goals, the data gathered, and the limits of this Report. The first concerns the focus of this work on "restricted housing" or "restrictive housing." As noted, the primary rationales relied upon by correction systems for using restricted housing are the perceived needs to protect, to discipline, or to prevent future harm. In addition to terms such as protective custody, disciplinary segregation, and administrative segregation, different systems use an array of other terms, such as "special housing units (SHU)," "security housing units (SHU)," and "special management units (SMU)."

In an effort to develop nationwide data that focused on all forms of restricted housing, the 2015 survey defined "restricted housing" as:

> separating prisoners from the general population and holding them in their cells for 22 hours per day or more, for 15 or more continuous days. The definition includes prisoners held in both single or double cells, if held for 22 hours per day or more in a cell, for 15 or more continuous days.[144]

Yet some jurisdictions indicated that the information they routinely collected did not easily fall within the parameters that we provided. Seven jurisdictions reported being unable to identify whether prisoners were in restricted conditions for more or less than the 15-day benchmark.[145] Other jurisdictions did not have clear information about the 22-hour measure; they described some forms of restricted housing that reduced the number of hours within cells to below 22 for at least one day of a week, or they had other questions about the definition.[146] We did as much follow-up as time would permit to enable this Report to be completed, we included as much of the information provided to us as we could, and we noted when information could include variations related to the specific questions asked.

Second, when gathering data on restricted housing and administrative segregation in 2014-2015 for the *Time-In-Cell* Report, we asked jurisdictions to tell us about the number of individuals in all forms of restricted housing, but did not provide a specific and separate definition in that question, except to indicate that it included disciplinary segregation, protective custody, and administrative segregation.[147] Further, the *Time-In-Cell* Report focused most of the 130 questions on the practices governing administrative segregation, and we instructed:

> For the purposes of this questionnaire, the term "administrative segregation" refers to separating prisoners from the general population, typically in cells (either alone or with cellmates), and holding them in their cells for most of the hours of the day for 30 days or more. Common terms for this type of confinement include administrative detention, intensive management, and restrictive housing. Please note that administrative segregation does not include punitive/disciplinary segregation or protective custody.[148]

In contrast, the 2015 survey focused specifically on restricted housing of all kinds. We asked about the numbers of prisoners held for at least 22 hours a day in their cells, and used those responses for our overall tallies.

When responding to the general question on restricted housing in the 2015 *Time-In-Cell* Report, 34 jurisdictions reported that, as of the fall of 2014, 66,000 people were held in restricted housing. Because those jurisdictions housed 73% of the country's prison population, ASCA and Liman estimated that 80,000 to 100,000 people were housed in isolation in the fall of 2014.

In short, the 2014 and 2015 surveys differed on a few dimensions. While in 2014, we did not specify the number of hours held in-cell beyond saying "most hours of the day," we did learn that in many jurisdictions individuals in restricted housing were held for 22-24 hours per day in-cell. In contrast, this 2015 survey gave the 22-hour benchmark. Further, in 2014, we asked about prisoners held in-cell for 30 days or more; in this 2015 survey, we asked about people held in-cell for 15 days or more. This 15-day marker was selected because it is used in many jurisdictions[149] as well as internationally as identifying what is considered to be prolonged or extended solitary confinement.[150] Moreover, because we learned in the *Time-In-Cell* Report that all of the jurisdictions reporting on administrative segregation held prisoners in cells for 19 hours or more and that 89% of the prisoners were in-cell 22 hours or more on weekdays and on weekends,[151] we used 22 hours as the marker for restricted housing and additionally sought more information on individuals placed in restricted housing for time intervals short of 22 hours.

## III.    Types of Facilities and of Cells in the 2015 Survey

### A.    *Types of Facilities for which State-Wide Data Were Available*

As discussed above, based on information provided in prior surveys, we knew that not all state-level correctional systems had information regarding the number of people held in restricted housing in every type of confinement facility within their state. Further, most state level agencies did not have authority over all of the detention facilities within their jurisdiction.

For example, while state governments most commonly operate prisons, separate local government agencies typically operate jails.[152]

Therefore, we asked jurisdictions to explain what they *did* know: we asked which types of facilities were included within their state-level correctional systems and if they had data regarding individuals held in restricted housing in each of the types of facilities under their control. [153] Some states had significant numbers of prisoners in county jails. Data about such prisoners has generally only been included if that jurisdiction had information about those held in the fall of 2015 in restricted housing and if that state's policies on restricted housing governed the local facilities.

In the survey, we asked if each jurisdiction's correctional system included prisons, jails, juvenile facilities, mental health facilities, privately-contracted facilities, special facilities for death sentenced prisoners, or any other types of facilities. Of the 52 jurisdictions responding, all ran prison systems except the District of Columbia, which administers its own jail system and relies on federal and privately-contracted facilities to house its prison population.[154] In total, 12 of the 52 responding jurisdictions reported that their correctional systems included jails, while 40 jurisdictions' correctional systems did not include jails.[155] As we learned from the responses, the relationship of jails to state prison systems is varied; some systems used jails in the sense of contracting to house prisoners in jails but did not have direct authority over them. Our focus was on rules imposed at the state-wide level.

In Table 1, we summarize the information from the 52 jurisdictions responding by type of facility.

**Table 1 – Types of Facilities Within State and Federal Corrections Systems (*n* = 52)**

| Facilities | Jurisdictions | Jurisdictions Collecting Restricted Housing Data |
|---|---|---|
| Prisons | 51 | 49 |
| Jails | 12 | 7[156] |
| Juvenile Facilities | 4 | 3 |
| Mental Health Facilities | 7 | 4 |
| Privately-Contracted Facilities | 21 | 15 |
| Special Housing for Death-Sentenced Prisoners | 2 | 2 |

As Table 1 indicates, we also asked jurisdictions if they had information on restricted housing for each category of facility that they identified as within their control in their systems.[157] Of the 51 jurisdictions with prisons in their correctional system, 49 reported on individuals in restricted housing in the prisons that they run directly, as distinguished from those run by private providers. Of the 12 jurisdictions whose systems included jails (nine states, the Virgin Islands, the Federal Bureau of Prisons, and the District of Columbia), seven had data on the use of restricted housing in their jails.[158]

The information provided on privately-contracted facilities was also limited. Nonetheless, we did identify 2,425 prisoners held in 15 jurisdictions in restricted housing in private facilities. Specifically, 21 reported that they have privately-contracted facilities in their correctional

system, and 15 provided information on restricted housing within those facilities. As of the fall of 2015, those 21 jurisdictions housed 942,248 prisoners in their total custodial population across all types of facilities, and 96,487—or about 10%—were housed in privately-contracted facilities. The 15 jurisdictions reporting on the use of restricted housing in privately-contracted facilities housed 85,701 prisoners, and 2.8% of that number—2,425 individuals—were reported to be in restricted housing.

The information provided on juveniles held in custody was minimal. Four responding jurisdictions indicated that their correctional systems included juvenile facilities.[159] Of these four jurisdictions, three provided data on the use of restricted housing in these juvenile facilities.

We also asked about other specialized facilities for subsets of prisoners. Some jurisdictions indicated that they had distinct facilities, while others referenced special units within facilities. Seven jurisdictions responded that they had separate institutions for the mentally ill.[160] Six jurisdictions reported that their data included facilities that they denoted as "Other" because they did not fall into the named categories we provided.[161]

In short, most of the information on restricted housing provided in this Report is about its use *in prisons*. Further, the "total" numbers provided in this Report do not include *all* the people who were, in the fall of 2015, held in restricted housing. For example, the numbers discussed in the demographic section on age cohorts in restricted housing were based almost entirely on information about adult prisons. As discussed, we have almost no information on juvenile facilities around the country.[162] Also, we know that millions of people are incarcerated in jails, that some jails have restricted housing, and that more than 90% of the jails are run at the county level. Yet, this Report has very little information on the number of individuals held in restricted housing within jails.

### B.  The Use of Single and of Double Cells

As noted, the survey's definition of restricted housing included individuals held for 22 hours or more, for 15 days or more, in single and double cells. The inclusion of double-celling mirrors the views of the Department of Justice, which noted in its 2016 Report that "[n]ot all segregation is truly 'solitary,' . . . . Many prison systems, including the [Federal Bureau of Prisons], often house two segregated inmates together in the same cell, a practice known as 'double-celling.'"[163]

For this survey, we asked jurisdictions, "How many prisoners, if any, (including both male and female, of every age)" in restricted housing "are housed in double cells?"[164] Among the 47 jurisdictions that responded to this question, 26 housed prisoners in double cells. Twenty-one of the 26 jurisdictions provided the number of prisoners confined in double cells, which totaled 17,460 prisoners. Five jurisdictions reported that they housed prisoners in double cells but were not able to provide a number.

## IV.     The Numbers and Percentages of Prisoners in Restricted Housing: The Data from the 2015 Survey

### A.     Counting and Comparing General and Restricted Populations

The survey asked jurisdictions to report on the number of men and women held in any form of restricted housing as of October 1, 2015. As noted, 48 jurisdictions described a total of 67,442 prisoners in restricted housing.[165] These 48 jurisdictions housed 96.4% of the total prison population in the United States and its territories,[166] as calculated by using data provided in a 2014 report by the Bureau of Statistics (BJS), which regularly provides the numbers of prisoners by jurisdiction.[167]

We also sought to gather baseline general population data directly from each jurisdiction, so as to understand what percent of prisoners *within* a jurisdiction were held in restricted housing. The 2015 survey asked each jurisdiction for its total custodial population, including prisoners in restricted housing and in the general population. In addition, we asked about the numbers of prisoners housed in different types of facilities, as detailed above.

First, we asked for the total number of prisoners housed in each jurisdiction. On this question, 52 jurisdictions provided information; the total custodial population reported by was 1,452,691 prisoners.[168] Forty-eight jurisdictions provided information on restricted housing populations; the total custodial population for the 48 jurisdictions for which we have restricted housing data was 1,437,276. This total accounts for prisoners held in-state (as compared to being sent to another jurisdiction); our operative assumption was that most states house almost all of their prisoners in-state. We know of exceptions, of which Hawaii is a prominent example.[169] For Hawaii, we used the in-state population when calculating the percentage of people held in restricted housing.

Second, we asked for the total number of prisoners housed in facilities for which the jurisdiction also had information on restricted housing. When we totaled the numbers from those answers, the custodial population *in facilities for which restricted housing data was reported*—at 1,387,161 prisoners—was slightly lower than the answers by these jurisdictions to the question of total custodial population—specifically, by 65,530 fewer individuals. That lower number reflects that some jurisdictions reported that they did not track data on individuals in restricted housing in *all* of their facilities.[170]

More details are in order to explain both the Table and Chart with asterisks and two double entries. In the 41 jurisdictions in which the total population numbers were the same for both inquiries, we used that number as the baseline to calculate the percentage of prisoners in restricted housing. In the seven jurisdictions that had some facilities for which they could not provide restricted housing information (i.e. jurisdictions for which the total population in facilities with restricted housing data was less than the total custodial population), we used the total population in facilities with restricted housing data to calculate the percentage of prisoners in restricted housing. In Table 2, below, we use an asterisk to note those jurisdictions.

Directors at the two jurisdictions that were (before the Virgin Islands reported its data) at the highest end—Louisiana and Utah—reached out to us after we had circulated a draft report in

the summer of 2016 to describe how calculations about their states could be different. Louisiana staff suggested that we should include state prisoners held in local jails—some 18,000—in the denominator and that we could extrapolate the number held in parish jails in restricted housing from a special audit conducted in August of 2016 that identified 314 people held in such confinement. Using those numbers, Louisiana would have had 8.2% of its prison population in restricted housing. Further, as discussed in more detail in Part VII, Utah reported making significant changes in how it authorized the use of restricted housing. As of August of 2016, the number of people in restricted housing in Utah was reported to have dropped from 912 (14% of the state prison population) to 380 (6% of the state prison population). The focus of our data was on the fall of 2015, but because these jurisdictions reached out specially to provide extra information, we included an added layer of data for Louisiana and Utah in Table 2 and Chart 1.

We provide a summary of the findings in Table 2 and Chart 1 below. The percentage of prisoners in restricted housing ranged from 0.5% (Hawaii, in-state only) to 28.3% (Virgin Islands). The Virgin Islands was also the jurisdiction reporting the smallest absolute number of prisoners in the total custodial population (491 prisoners). Across all the jurisdictions, the median percentage of the population held in restricted housing was 5.1%.

**Table 2 – Numbers and Percentages of Men and Women in Custodial Population in Restricted Housing by Jurisdiction (15 Consecutive Days or Longer, 22 Hours or More per Day) (*n* = 48)**[171]

| | Total Custodial Population | Total Custodial Population for Facilities Reporting RH Data | Population in Restricted Housing | Percentage in Restricted Housing |
|---|---|---|---|---|
| Alabama | 25,284 | 24,549* | 1,402 | 5.7% |
| Alaska | 4,919 | 4,919 | 352 | 7.2% |
| Arizona | 42,736 | 42,736 | 2,544 | 6.0% |
| California | 128,164 | 117,171* | 1,104[172] | 0.9% |
| Colorado | 18,231 | 18,231 | 217[173] | 1.2% |
| Connecticut | 16,056 | 16,056 | 128 | 0.8% |
| Delaware | 5,824 | 4,342* | 381 | 8.8% |
| D.C. | 1,153 | 1,153 | 95 | 8.2% |
| Florida | 99,588 | 99,588 | 8,103 | 8.1% |
| Georgia | 56,656 | 56,656 | 3,880 | 6.8% |
| Hawaii | 4,200 | 4,200 | 23 | 0.5% |
| Idaho | 8,013 | 8,013 | 404 | 5.0% |
| Illinois | 46,609 | 46,609 | 2,255 | 4.8% |
| Indiana | 27,508 | 27,508 | 1,621 | 5.9% |
| Iowa | 8,302 | 8,302 | 247 | 3.0% |
| Kansas | 9,952 | 9,952 | 589 | 5.9% |
| Kentucky | 11,669 | 11,669 | 487 | 4.2% |
| Louisiana | 36,511 | 18,515* (36,511) | 2,689 (3,003) | 14.5% (8.2%) |
| Maryland | 19,687 | 19,687 | 1,485 | 7.5% |
| Massachusetts | 10,004 | 10,004 | 235 | 2.3% |
| Michigan | 42,826 | 42,826 | 1,339 | 3.1% |
| Minnesota | 9,321 | 9,321 | 622 | 6.7% |
| Mississippi | 18,866 | 18,866 | 185 | 1.0% |
| Missouri | 32,266 | 32,266 | 2,028 | 6.3% |
| Montana | 2,554 | 2,554 | 90 | 3.5% |
| Nebraska | 5,456 | 5,456 | 598 | 11.0% |
| New Hampshire | 2,699 | 2,699 | 125 | 4.6% |
| New Jersey | 20,346 | 20,346 | 1,370 | 6.7% |
| New Mexico | 7,389 | 7,389 | 663 | 9.0% |
| New York | 52,621 | 52,621 | 4,498 | 8.5% |
| North Carolina | 38,039 | 38,039 | 1,517 | 4.0% |
| North Dakota | 1,800 | 1,800 | 54 | 3.0% |
| Ohio | 50,248 | 50,248 | 1,374 | 2.7% |

| Oklahoma | 27,650 | 27,650 | 1,552 | 5.6% |
|---|---|---|---|---|
| Oregon | 14,724 | 14,724 | 630 | 4.3% |
| Pennsylvania | 50,349 | 50,349 | 1,716 | 3.4% |
| South Carolina | 20,978 | 20,978 | 1,068 | 5.1% |
| South Dakota | 3,526 | 3,526 | 106 | 3.0% |
| Tennessee | 20,095 | 20,095 | 1,768 | 8.8% |
| Texas | 148,365 | 148,365 | 5,832 | 3.9% |
| Utah | 6,497 | 6,497 (6,112)[174] | 912 (380) | 14.0% (6%) |
| Vermont | 1,783 | 1,783 | 106 | 5.9% |
| Virgin Islands | 491 | 339* | 96 | 28.3% |
| Virginia | 30,412 | 30,412 | 854 | 2.8% |
| Washington | 16,308 | 16,308 | 274 | 1.7% |
| Wisconsin | 22,965 | 20,535* | 751 | 3.7% |
| Wyoming | 2,128 | 2,128 | 131 | 6.2% |
| BOP | 205,508 | 189,181* | 8,942 | 4.7% |
| *Across Jurisdictions* | 1,437,276 | 1,387,161 | 67,442 | 4.9% |

**Chart 1 – Percentages of Men and Women in Custodial Population in Restricted Housing by Jurisdiction (15 Consecutive Days or Longer, 22 Hours or More per Day) (*n* = 48)[175]**



### B. The Numbers and Percentages of Prisoners In-Cell for 16 to 21 Hours

As noted, our general definition of restricted housing was focused on people held in-cell for 22 hours or more per day for 15 continuous days or more. Given ongoing efforts to lower the number of hours in cells, we asked jurisdictions to provide information on prisoners who were held in their cells for less than 22 hours a day but nonetheless for most of each day. For example, California reported that it used forms of segregation that permit prisoners 10 hours per week out-of-cell, and distributed those 10 hours throughout the week such that on some days in a week, prisoners were allowed more than three hours out-of-cell. As a consequence, prisoners in these forms of segregation would not be included in California's restricted housing numbers.

Therefore, in addition to the 22 hours or more question, we inquired about two subsets: individuals in-cell for 20 to 21 hours per day and those in-cell for 16 to 19 hours per day. Thirty-four jurisdictions with a total custodial population (in facilities for which they tracked restricted housing data) of 788,871 prisoners responded to the questions about prisoners in cells in these different time periods. Eleven of the 34 jurisdictions answered that, in addition to the prisoners held in restricted housing for 22 or more hours, they held no prisoners in cell for 16-21 hours.

Of those responding, 23 jurisdictions reported an additional 11,827 prisoners held in-cell for 20 to 21 hours per day and 4,628 prisoners were held in-cell for 16 to 19 hours per day. In this subset of 23 jurisdictions, a total of 16,455 prisoners were held in-cell for 16 to 21 hours per day. Within these 23 jurisdictions, the percentage of prisoners held in-cell for 16 to 21 hours ranged from 0.03% (New Jersey) to 6.2% (California). In these 23 jurisdictions holding prisoners for 16 to 21 hours, a median of 1.6% of the total custodial population was held in-cell for 16 to 21 hours, as well as prisoners held in-cell for 22 hours or more.

In short, in addition to the 67,442 prisoners held in-cell 22 hours or more across the 48 responding jurisdictions represented in Table 2 and Chart 1, another 16,455 prisoners in 23 of those 48 jurisdictions were held in conditions that were also restricted, but not as limiting as the 22 hours reflected in Table 2 and Chart 1. When these two numbers are combined, a total of at least 83,897 prisoners were held in-cell for more than 16 hours per day, for 15 days or more.

**Table 3 – Numbers and Percentages of Men and Women in Custodial Population In-Cell for 16 or More Hours per Day and for 15 Consecutive Days or Longer by Jurisdiction (*n* = 34)**[176]

| | Total Custodial Population | 22 Hours or More | | 20-21 Hours | | 16-19 Hours | | Total 16-24 Hours | |
|---|---|---|---|---|---|---|---|---|---|
| Alaska | 4,919 | 352 | 7.2% | 0 | 0.0% | 0 | 0.0% | 352 | 7.2% |
| California[177] | 117,171 | 1,104 | 0.9% | 6,628 | 5.7% | 597 | 0.5% | 8,329 | 7.1% |
| Colorado | 18,231 | 217 | 1.2% | 202 | 1.1% | 99 | 0.5% | 518 | 2.8% |
| Connecticut | 16,056 | 128 | 0.8% | 186 | 1.2% | 381 | 2.4% | 695 | 4.3% |
| D.C. | 1,153 | 95 | 8.2% | 0 | 0.0% | 0 | 0.0% | 95 | 8.2% |
| Hawaii | 4,200 | 23 | 0.5% | 0 | 0.0% | 0 | 0.0% | 23 | 0.5% |
| Idaho | 8,013 | 404 | 5.0% | 0 | 0.0% | 0 | 0.0% | 404 | 5.0% |
| Indiana | 27,508 | 1,621 | 5.9% | 246 | 0.9% | 640 | 2.3% | 2,507 | 9.1% |
| Iowa | 8,302 | 247 | 3.0% | 213 | 2.6% | 0 | 0.0% | 460 | 5.5% |
| Kansas | 9,952 | 589 | 5.9% | 392 | 3.9% | 0 | 0.0% | 981 | 9.9% |
| Louisiana | 18,515 | 2,689 | 14.5% | 0 | 0.0% | 0 | 0.0% | 2,689 | 14.5% |
| Maryland | 19,687 | 1,485 | 7.5% | 0 | 0.0% | 0 | 0.0% | 1,485 | 7.5% |
| Massachusetts | 10,004 | 235 | 2.3% | 0 | 0.0% | 29 | 0.3% | 264 | 2.6% |
| Michigan | 42,826 | 1,339 | 3.1% | 0 | 0.0% | 0 | 0.0% | 1,339 | 3.1% |
| Mississippi | 18,866 | 185 | 1.0% | 0 | 0.0% | 0 | 0.0% | 185 | 1.0% |
| Missouri | 32,266 | 2,028 | 6.3% | 0 | 0.0% | 222 | 0.7% | 2,250 | 7.0% |
| Montana | 2,554 | 90 | 3.5% | 6 | 0.2% | 0 | 0.0% | 96 | 3.8% |
| Nebraska | 5,456 | 598 | 11.0% | 0 | 0.0% | 0 | 0.0% | 598 | 11.0% |
| New Hampshire | 2,699 | 125 | 4.6% | 44 | 1.6% | 0 | 0.0% | 169 | 6.3% |
| New Jersey | 20,346 | 1,370 | 6.7% | 6 | 0.0% | 0 | 0.0% | 1,376 | 6.8% |
| New Mexico | 7,389 | 663 | 9.0% | 0 | 0.0% | 175 | 2.4% | 838 | 11.3% |
| New York | 52,621 | 4,498 | 8.5% | 347 | 0.7% | 245 | 0.5% | 5,090 | 9.7% |
| North Carolina | 38,039 | 1,517 | 4.0% | 815 | 2.1% | 0 | 0.0% | 2,332 | 6.1% |
| North Dakota | 1,800 | 54 | 3.0% | 0 | 0.0% | 0 | 0.0% | 54 | 3.0% |
| Oklahoma | 27,650 | 1,552 | 5.6% | 20 | 0.1% | 0 | 0.0% | 1,572 | 5.7% |
| Oregon | 14,724 | 630 | 4.3% | 22 | 0.1% | 34 | 0.2% | 686 | 4.7% |
| Pennsylvania | 50,349 | 1,716 | 3.4% | 226 | 0.4% | 0 | 0.0% | 1,942 | 3.9% |
| South Dakota | 3,526 | 106 | 3.0% | 0 | 0.0% | 5 | 0.1% | 111 | 3.1% |
| Texas | 148,365 | 5,832 | 3.9% | 1,063 | 0.7% | 2,183 | 1.5% | 9,078 | 6.1% |
| Utah[178] | 6,497 | 912 | 14.0% | 122 | 1.9% | 0 | 0.0% | 1,034 | 15.9% |
| Virgin Islands | 339 | 96 | 28.3% | 0 | 0.0% | 1 | 0.3% | 97 | 28.6% |
| Virginia | 30,412 | 854 | 2.8% | 1,289 | 4.2% | 0 | 0.0% | 2,143 | 7.0% |
| Washington | 16,308 | 274 | 1.7% | 0 | 0.0% | 0 | 0.0% | 274 | 1.7% |
| Wyoming | 2,128 | 131 | 6.2% | 0 | 0.0% | 17 | 0.8% | 148 | 7.0% |

**Chart 2 − Percentage of Men and Women in Custodial Population In-Cell for 16 or More Hours per Day and for 15 Consecutive Days or Longer by Jurisdiction (n = 34)**



## V.    The Duration of Time Individuals Spent in Restricted Housing

We asked whether jurisdictions regularly gather, collect, or report information on each prisoner's length of stay in restricted housing. Fifty of the 53 jurisdictions we queried responded to this question.[179] Thirty-three jurisdictions stated that they did regularly gather information on length of stay.[180] The following 17 jurisdictions stated that they do not regularly track information on length of stay: Alabama, Alaska, Arkansas, Delaware, Florida, Illinois, Louisiana, Michigan, Missouri, Nebraska, Nevada, Oklahoma, Oregon, Pennsylvania, Rhode Island, West Virginia, and Wisconsin.[181]

### A.    Length of Stay

We also asked jurisdictions how many prisoners, as of October 1, 2015, had been in restricted housing for the following intervals: 15 days to one month; one month to three months; three months to six months; six months to one year; one year to three years; three years to six years; and over six years. Forty-one of the 53 jurisdictions we queried provided sufficiently detailed data on which to report.[182] The data are summarized in Table 4,[183] and endnotes indicate jurisdictions that reported length-of-stay data for some, but not all prisoners in restricted housing.

**Table 4 – Numbers of Prisoners in Restricted Housing by Length of Time and by Jurisdiction (*n* = 41)**

| | 15 days-1 mo. | 1-3 mo. | 3-6 mo. | 6 mo.-1 year | 1-3 years | 3-6 years | 6+ years |
|---|---|---|---|---|---|---|---|
| Alaska[184] | 124 | 74 | 49 | 60 | 43 | 5 | 0 |
| Arizona | 140 | 472 | 530 | 809 | 488 | 34 | 71 |
| California[185] | 23 | 106 | 177 | 181 | 270 | 168 | 154 |
| Colorado | 64 | 65 | 64 | 23 | 1 | 0 | 0 |
| Connecticut[186] | 19 | 20 | 23 | 17 | 22 | 7 | 13 |
| Delaware | 25 | 99 | 84 | 76 | 67 | 12 | 18 |
| District of Columbia | 33 | 51 | 6 | 5 | 0 | 0 | 0 |
| Florida | 2,026 | 3,254 | 1,327 | 741 | 401 | 195 | 159 |
| Hawaii | 21 | 2 | 0 | 0 | 0 | 0 | 0 |
| Idaho[187] | 55 | 91 | 49 | 55 | 21 | 3 | 1 |
| Indiana | 212 | 224 | 388 | 496 | 175 | 80 | 46 |
| Iowa | 97 | 80 | 30 | 24 | 16 | 0 | 0 |
| Kansas | 125 | 146 | 87 | 105 | 94 | 22 | 10 |
| Kentucky | 139 | 222 | 52 | 41 | 28 | 4 | 1 |
| Louisiana[188] | 327 | 551 | 334 | 302 | 450 | 221 | 0 |
| Maryland | 201 | 725 | 357 | 136 | 56 | 8 | 2 |
| Massachusetts[189] | 2 | 3 | 12 | 65 | 71 | 24 | 43 |
| Minnesota[190] | 102 | 308 | 103 | 47 | 7 | 0 | 0 |
| Mississippi | 3 | 21 | 29 | 41 | 69 | 17 | 5 |
| Montana[191] | 58 | 0 | 67 | 2 | 4 | 0 | 3 |
| Nebraska | 48 | 121 | 158 | 87 | 106 | 48 | 30 |
| New Jersey | 54 | 247 | 295 | 354 | 184 | 128 | 108 |
| New York[192] | 1,615 | 1,454 | 671 | 257 | 101 | 32 | 0 |
| North Carolina | 461 | 579 | 460 | 12 | 4 | 1 | 0 |
| North Dakota | 8 | 13 | 12 | 17 | 4 | 0 | 0 |
| Ohio[193] | 119 | 360 | 181 | 253 | 162 | 43 | 22 |
| Oklahoma | 169 | 270 | 206 | 270 | 490 | 77 | 70 |
| Oregon | 90 | 152 | 277 | 81 | 26 | 4 | 0 |
| Pennsylvania | 349 | 524 | 288 | 156 | 157 | 52 | 190 |
| South Carolina | 238 | 370 | 128 | 114 | 151 | 67 | 0 |
| South Dakota | 18 | 16 | 10 | 15 | 27 | 12 | 8 |
| Tennessee[194] | 89 | 239 | 222 | 353 | 500 | 166 | 205 |
| Texas | 109 | 204 | 277 | 537 | 1,840 | 1,278 | 1,587 |
| Utah | 233 | 169 | 173 | 125 | 166 | 35 | 11 |
| Vermont[195] | 17 | 3 | 2 | 0 | 0 | 0 | 0 |
| Virgin Islands | 14 | 12 | 15 | 23 | 17 | 10 | 5 |
| Virginia | 219 | 306 | 119 | 89 | 101 | 20 | 0 |
| Washington | 16 | 55 | 68 | 70 | 37 | 16 | 12 |
| Wisconsin | 278 | 285 | 88 | 60 | 36 | 4 | 0 |
| Wyoming | 8 | 30 | 24 | 59 | 9 | 0 | 1 |
| BOP | 1,690 | 3,802 | 1,449 | 929 | 731 | 183 | 158 |
| *Across Jurisdictions* | 9,638 | 15,725 | 8,891 | 7,087 | 7,132 | 2,976 | 2,933 |

The 41 responding jurisdictions provided length-of-stay data for 54,382 prisoners in restricted housing. We therefore identified length-of-time spent in restricted housing for 81% of the total restricted housing population described in this report.

According to the 41 responding jurisdictions, 18% of prisoners were in restricted housing for 15 days up to 30 days. Twenty-nine percent of the 54,382 prisoners—15,725 people—were in restricted housing for one month up to three months. Another 29% of the 54,382 prisoners—15,978 people—were in restricted housing for three months up to one year. Twenty-four percent of the 54,382 prisoners—13,041 people—were in restricted housing for one year or more.

Almost 6,000 people, comprising 11% of the population on which we have duration data for the length of time spent in restricted housing, were held in restricted housing three years or more, and about half of these were held in restricted housing for six years or more. Specifically, 32 jurisdictions reported housing 2,976 people for three years up to six years; this population constitutes 5.5% of the restricted housing population on which we have length-of-time data. Twenty-six jurisdictions reported holding 2,933 prisoners for six years or more, which is 5.4% of the population for which we had this kind of data. Chart 3 details this distribution.

**Chart 3 – Prisoners in Restricted Housing by Length of Time and by Percent of the 54,382 Prisoners for Which Length-of-Stay Data Were Provided ($n = 41$)**



### B. Length of Time by Classification of the Type of Restricted Custody

For each time period, we asked jurisdictions about prisoners held in protective custody, disciplinary custody, administrative segregation or any other classification that met our definition of restricted housing—prisoners separated from the general population and held in-cell for 22 hours per day or more, for 15 or more continuous days. If jurisdictions included prisoners under some "other" restricted housing classification, we asked for information about this classification; jurisdictions reported classifications such as death row, medical classifications, and intensive management units.[196]

Thirty-seven jurisdictions were able to provide data on prisoners' length of stay by classification.[197] These jurisdictions reported type-of-custody data for 50,036 prisoners in restricted housing and thus comprised roughly 74% of the 67,442 population that were reported to be in restricted housing as of the fall of 2015.

The majority of this subset of 50,036 prisoners were held in disciplinary or administrative segregation. Of the 50,036 prisoners reported by type of classification that put them into restricted housing 2,527 (5%) were classified as being held in protective custody; 14,809 (30%) were classified as being held in disciplinary custody; 23,997 (48%) were classified as being held in administrative segregation; and 8,681 (17%) were segregated for some other reason.

Prisoners who were held in disciplinary custody stayed there for shorter intervals than did prisoners held under other classifications. Of the prisoners in restricted housing for 15 days up to one month, 53% were in disciplinary custody. Of prisoners held for one month up to three months, 40% were classified as placed into restrictive housing for discipline.

Prisoners who were held for longer periods of time in restricted housing, particularly longer than six months, were more likely to be held in administrative segregation or "other" forms of restricted housing. Of prisoners who were in restricted housing for six months or longer in the jurisdictions providing data, 82%, or 14,847 prisoners, were housed in administrative segregation or some "other" form of restricted housing. Prisoners in disciplinary and protective custody accounted for 18% of those who spent longer than six months in restricted housing, whereas prisoners in administrative segregation accounted for 54% of those who spent longer than six months, and prisoners in "other" forms of restricted housing accounted for 28%. Chart 4 provides the details.

**Chart 4 – Prisoners in Restricted Housing by Length of Time and by Classification of the Type of Restrictive Custody (*n* = 37)**



## VI.    The Demographics of Restricted Housing

The survey asked jurisdictions to provide demographic data for their total custodial and restricted housing populations. Forty-three responding jurisdictions provided some information about gender, race, ethnicity, and age. A smaller number of jurisdictions provided information on people identified as transgender, as pregnant women, and as individuals labeled with mental health issues.

### A.    Gender

Forty-three jurisdictions provided sufficiently detailed data on men and 40 did so about women. Across the 40 jurisdictions that provided data on both genders, a higher number of men than women prisoners were confined in restricted housing.

The percentage held in restricted housing ranged from 29.3% of the male custodial population (95 out of 324 male prisoners) in the Virgin Islands and 14.7% of the male custodial population (2,583 out of 17,577 prisoners) in Louisiana[198] to approximately 0.6% of the male custodial population (22 out of 3,989) held in-state in Hawaii.[199] Across the 43 jurisdictions providing data, the median percentage of male prisoners in restricted housing was 5.3%. Jurisdiction-by-jurisdiction information is provided in Chart 5 and Table 5, below.

**Chart 5 – Percentage of Male Custodial Population in Restricted Housing ($n$=43)[200]**



**Table 5 – Number and Percentage of Male Custodial Population in Restricted Housing (*n*=43)[201]**

|  | Total Custodial Population | Restricted Housing Population | Percentage in Restricted Housing |
|---|---|---|---|
| Alabama | 23,062 | 1,382 | 6.0% |
| Alaska | 4,360 | 345 | 7.9% |
| Arizona | 38,764 | 2,452 | 6.3% |
| California | 111,996 | 1,079 | 1.0% |
| Colorado | 16,719 | 214 | 1.3% |
| Connecticut | 14,993 | 120 | 0.8% |
| Delaware | 4,119 | 378 | 9.2% |
| D.C. | 1,153 | 95 | 8.2% |
| Florida | 92,679 | 7,863 | 8.5% |
| Hawaii | 3,989 | 22 | 0.6% |
| Idaho | 7,001 | 389 | 5.6% |
| Indiana | 24,937 | 1,579 | 6.3% |
| Iowa | 7,575 | 242 | 3.2% |
| Kansas | 9,132 | 581 | 6.4% |
| Kentucky | 10,664 | 362 | 3.4% |
| Louisiana | 17,577 | 2,583 | 14.7% |
| Maryland | 18,736 | 1,454 | 7.8% |
| Massachusetts | 9,313 | 447 | 4.8% |
| Michigan | 40,625 | 1,321 | 3.3% |
| Minnesota | 8,674 | 602 | 6.9% |
| Mississippi | 17,516 | 180 | 1.0% |
| Missouri | 29,028 | 1,968 | 6.8% |
| Montana | 2,345 | 83 | 3.5% |
| Nebraska | 5,018 | 589 | 11.7% |
| New Jersey | 17,027 | 1,316 | 7.7% |
| New York | 50,189 | 4,410 | 8.8% |
| North Carolina | 35,228 | 1,476 | 4.2% |
| North Dakota | 1,582 | 53 | 3.4% |
| Ohio | 46,115 | 1,363 | 3.0% |
| Oklahoma | 24,722 | 1,519 | 6.1% |
| Oregon | 13,451 | 609 | 4.5% |
| Pennsylvania | 47,551 | 1,701 | 3.6% |
| South Carolina | 19,575 | 1,045 | 5.3% |
| South Dakota | 3,132 | 101 | 3.2% |
| Tennessee | 18,630 | 1,716 | 9.2% |
| Texas | 135,580 | 5,726 | 4.2% |
| Utah | 5,960 | 852 | 14.3% |
| Virgin Islands | 324 | 95 | 29.3% |
| Virginia | 28,059 | 824 | 2.9% |
| Washington | 15,172 | 273 | 1.8% |
| Wisconsin | 19,221 | 692 | 3.6% |
| Wyoming | 1,877 | 121 | 6.4% |
| BOP | 177,451 | 8,827 | 5.0% |
| *Across Jurisdictions* | 1,180,821 | 59,049 | 5.0% |

As the table and chart above reflect, a total of 59,048 men were reported confined in restrictive housing in the fall of 2015. As we detail below, smaller numbers and percentages of women prisoners were placed in restrictive housing. Specifically, across the 40 jurisdictions providing data for female prisoners that reported some numbers other than zero,[202] the jurisdiction reporting the highest percentage of female prisoners in restricted housing was Louisiana, where approximately 11.3% of its female custodial population (106 out of 938 prisoners) was in restricted housing.[203] The jurisdiction reporting the lowest percentage was Washington, where approximately 0.1% of the female custodial population (1 out of 1,136 prisoners) was in restricted housing. The total number of women reported in the data were 83,749, of whom 1,458 were in restrictive housing. The median percentage of female prisoners in restricted housing across these 40 jurisdictions was 1.6%. Jurisdiction-by-jurisdiction information is reported in Chart 6 and Table 6 below.

**Chart 6 – Percentage of Female Custodial Population in Restricted Housing (*n*=40)[204]**



**Table 6 – Number and Percentage of Female Custodial Population in Restricted Housing (*n*=40)**

| | Total Custodial Population | Restricted Housing Population | Percentage in Restricted Housing |
|---|---|---|---|
| Alabama | 1,487 | 20 | 1.3% |
| Alaska | 559 | 10 | 1.8% |
| Arizona | 3,972 | 92 | 2.3% |
| Colorado | 1,512 | 3 | 0.2% |
| Connecticut | 1,063 | 8 | 0.8% |
| Delaware | 223 | 3 | 1.3% |
| Florida | 6,909 | 240 | 3.5% |
| Hawaii | 738 | 1 | 0.1% |
| Idaho | 1,012 | 15 | 1.5% |
| Indiana | 2,571 | 42 | 1.6% |
| Iowa | 727 | 5 | 0.7% |
| Kansas | 820 | 8 | 1.0% |
| Kentucky | 1,005 | 20 | 2.0% |
| Louisiana | 938 | 106 | 11.3% |
| Maryland | 951 | 31 | 3.3% |
| Massachusetts | 691 | 16 | 2.3% |
| Michigan | 2,201 | 18 | 0.8% |
| Minnesota | 647 | 20 | 3.1% |
| Mississippi | 1,350 | 5 | 0.4% |
| Missouri | 3,238 | 60 | 1.9% |
| Nebraska | 438 | 9 | 2.1% |
| New Jersey | 722 | 54 | 7.5% |
| New York | 2,432 | 88 | 3.6% |
| North Carolina | 2,811 | 41 | 1.5% |
| North Dakota | 218 | 1 | 0.5% |
| Ohio | 4,133 | 11 | 0.3% |
| Oklahoma | 2,928 | 33 | 1.1% |
| Oregon | 1,273 | 21 | 1.6% |
| Pennsylvania | 2,798 | 15 | 0.5% |
| South Carolina | 1,403 | 23 | 1.6% |
| South Dakota | 394 | 5 | 1.3% |
| Tennessee | 1,465 | 52 | 3.5% |
| Texas | 12,785 | 106 | 0.8% |
| Utah | 537 | 60 | 11.2% |
| Virgin Islands | 15 | 1 | 6.7% |
| Virginia | 2,353 | 30 | 1.3% |
| Washington | 1,136 | 1 | 0.1% |
| Wisconsin | 1,313 | 59 | 4.5% |
| Wyoming | 251 | 10 | 4.0% |
| BOP | 11,730 | 115 | 1.0% |
| *Across Jurisdictions* | 83,749 | 1,458 | 1.7% |

### B.    Race and Ethnicity

The survey asked for race and ethnicity data for both the total custodial and the restricted housing populations of men and women. Jurisdictions were asked to provide information in five categories: White, Black, Hispanic, Asian, and Other.[205]

Among the 43 jurisdictions reporting on men, Black prisoners comprised 45% of the restricted housing population, as compared to comprising 40% of the total of all of the male custodial population in those jurisdictions. In 31 of the 43 reporting jurisdictions, the male restricted housing population contained a greater percentage of Black prisoners than did the total male custodial population in each of those jurisdictions.

Hispanic prisoners comprised 21% of the restricted housing population, as compared to 20% of all of the total custodial population. In 22 of 43 reporting jurisdictions, the male restricted housing population contained a greater percentage of Hispanic prisoners than did the total male custodial population in each of those jurisdictions.[206] In 36 of the 43 jurisdictions, the male restricted housing population contained a smaller percentage of White prisoners than in the total male custodial population. As detailed below, jurisdictions reported a small percentage of Asian prisoners in their general prison population and a smaller percentage in their population in restricted housing. The "Other" category (which could include members of Indian Tribes, American Samoans, and other groups) was small and comparable in size in the general and in the restricted housing populations.

Chart 7 displays and compares these percentages; Table 7 lists by jurisdictions the number of male prisoners in the general population and in restrictive housing by race/ethnicity. Table 8 compares the percent of all male prisoners to those by race and ethnicity in restrictive housing.

**Chart 7 – Demographic Percentage Composition of Total Male Custodial Population and Male Restricted Housing Population (*n* = 43)**



**Table 7 – Demographic Composition of Total Male Custodial Population and of Male Restricted Housing Population (n = 43)**

| | Total Male Custodial Population | | | | | | Male Restricted Housing Population | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | His-panic | Asian | Other | *Total* | White | Black | His-panic | Asian | Other | *Total* |
| Alabama | 8,901 | 14,063 | 0 | 2 | 96 | 23,062 | 423 | 955 | 0 | 0 | 4 | 1,382 |
| Alaska | 2,011 | 464 | 128 | 38 | 1,719 | 4,360 | 165 | 28 | 9 | 5 | 138 | 345 |
| Arizona | 14,762 | 5,431 | 15,932 | 152 | 2,487 | 38,764 | 647 | 388 | 1,210 | 7 | 200 | 2,452 |
| California | 24,486 | 32,905 | 46,508 | 1,200 | 6,897 | 111,996 | 95 | 34 | 931 | 0 | 19 | 1,079 |
| Colorado | 7,551 | 3,137 | 5,357 | 176 | 498 | 16,719 | 81 | 31 | 92 | 0 | 10 | 214 |
| Connecticut | 4,735 | 6,322 | 3,826 | 73 | 37 | 14,993 | 27 | 68 | 23 | 2 | 0 | 120 |
| Delaware | 1,538 | 2,404 | 167 | 7 | 3 | 4,119 | 110 | 249 | 19 | 0 | 0 | 378 |
| D.C. | 24 | 1,041 | 64 | 3 | 21 | 1,153 | 2 | 89 | 3 | 0 | 1 | 95 |
| Florida | 35,474 | 45,122 | 11,770 | 13 | 300 | 92,679 | 2,181 | 4,639 | 1,021 | 0 | 22 | 7,863 |
| Hawaii | 934 | 175 | 99 | 755 | 2,026 | 3,989 | 5 | 0 | 0 | 2 | 15 | 22 |
| Idaho | 5,243 | 198 | 1,095 | 33 | 432 | 7,001 | 285 | 11 | 64 | 3 | 26 | 389 |
| Indiana | 14,750 | 8,800 | 1,160 | 49 | 178 | 24,937 | 831 | 645 | 96 | 0 | 7 | 1,579 |
| Iowa | 4,894 | 1,978 | 513 | 64 | 126 | 7,575 | 132 | 70 | 35 | 1 | 4 | 242 |
| Kansas | 5,073 | 2,802 | 1,005 | 82 | 170 | 9,132 | 253 | 220 | 86 | 2 | 20 | 581 |
| Kentucky | 7,446 | 2,890 | 187 | 24 | 117 | 10,664 | 253 | 100 | 6 | 0 | 3 | 362 |
| Louisiana | 4,679 | 12,826 | 39 | 22 | 11 | 17,577 | 586 | 1,991 | 4 | 2 | 0 | 2,583 |
| Maryland | 4,075 | 11,443 | 605 | 47 | 2,566 | 18,736 | 408 | 966 | 52 | 2 | 26 | 1,454 |
| Massachusetts | 4,002 | 2,655 | 2,417 | 127 | 112 | 9,313 | 167 | 157 | 110 | 7 | 6 | 447 |
| Michigan | 17,509 | 22,006 | 322 | 112 | 676 | 40,625 | 383 | 912 | 8 | 0 | 18 | 1,321 |
| Minnesota | 3,930 | 3,154 | 585 | 231 | 774 | 8,674 | 171 | 271 | 41 | 8 | 111 | 602 |
| Mississippi | 5,533 | 11,763 | 152 | 36 | 32 | 17,516 | 37 | 143 | 0 | 0 | 0 | 180 |
| Missouri | 17,512 | 10,810 | 539 | 55 | 112 | 29,028 | 1,011 | 916 | 32 | 2 | 7 | 1,968 |
| Montana | 1,758 | 60 | 0 | 6 | 521 | 2,345 | 51 | 4 | 0 | 0 | 28 | 83 |
| Nebraska | 2,757 | 1,362 | 634 | 41 | 224 | 5,018 | 306 | 135 | 108 | 6 | 34 | 589 |
| New Jersey | 3,805 | 10,160 | 2,689 | 95 | 278 | 17,027 | 244 | 827 | 227 | 5 | 13 | 1,316 |
| New York | 12,138 | 25,097 | 11,321 | 235 | 1,398 | 50,189 | 765 | 2,459 | 1,052 | 4 | 130 | 4,410 |
| North Carolina | 12,881 | 19,586 | 1,697 | 109 | 955 | 35,228 | 378 | 992 | 48 | 4 | 54 | 1,476 |
| North Dakota | 1,051 | 125 | 97 | 8 | 301 | 1,582 | 23 | 9 | 8 | 0 | 13 | 53 |
| Ohio | 23,364 | 21,276 | 1,189 | 60 | 226 | 46115 | 536 | 781 | 41 | 1 | 4 | 1363 |
| Oklahoma | 13180 | 6893 | 1889 | 75 | 2,685 | 24,722 | 647 | 529 | 148 | 3 | 192 | 1,519 |
| Oregon | 9,859 | 1,270 | 1,787 | 193 | 342 | 13,451 | 430 | 70 | 78 | 3 | 28 | 609 |
| Pennsylvania | 18,879 | 23,322 | 5,032 | 128 | 190 | 47,551 | 498 | 1,024 | 169 | 2 | 8 | 1,701 |
| South Carolina | 6,427 | 12,551 | 408 | 19 | 170 | 19,575 | 254 | 769 | 10 | 2 | 10 | 1,045 |
| South Dakota | 1,888 | 236 | 140 | 10 | 858 | 3,132 | 37 | 7 | 4 | 0 | 53 | 101 |
| Tennessee | 9,338 | 8,785 | 438 | 43 | 26 | 18,630 | 1,034 | 643 | 32 | 4 | 3 | 1,716 |
| Texas | 41,626 | 46,765 | 46,460 | 434 | 295 | 135,580 | 1,427 | 1,418 | 2,866 | 3 | 12 | 5,726 |
| Utah | 3,881 | 404 | 1,116 | 183 | 376 | 5,960 | 418 | 57 | 288 | 27 | 62 | 852 |
| Virgin Islands | 5 | 227 | 92 | 0 | 0 | 324 | 4 | 72 | 19 | 0 | 0 | 95 |
| Virginia | 9,884 | 17,314 | 730 | 107 | 24 | 28,059 | 274 | 530 | 16 | 2 | 2 | 824 |
| Washington | 9,083 | 2,815 | 1,960 | 539 | 775 | 15,172 | 135 | 41 | 82 | 7 | 8 | 273 |
| Wisconsin | 8,487 | 8,068 | 1,871 | 194 | 601 | 19,221 | 223 | 354 | 88 | 3 | 24 | 692 |
| Wyoming | 1,415 | 104 | 242 | 7 | 109 | 1,877 | 72 | 9 | 20 | 0 | 20 | 121 |
| BOP | 44,695 | 64,576 | 62,669 | 2,523 | 2,988 | 177,451 | 2,280 | 3,154 | 3,015 | 57 | 321 | 8,827 |
| *Across Jurisdictions* | 431,463 | 473,385 | 234,931 | 8,310 | 32,732 | 1,180,821 | 18,289 | 26,767 | 12,161 | 178 | 1,666 | 59,049 |

**Table 8 – Demographic Percentage Composition of Total Male Custodial Population and of Male Restricted Housing Population (*n* = 43)**

| | Total Male Custodial Population | | | | | Male Restricted Housing Population | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Asian | Other | White | Black | Hispanic | Asian | Other |
| Alabama | 39% | 61% | 0% | 0% | 0% | 31% | 69% | 0% | 0% | 0% |
| Alaska | 46% | 11% | 3% | 1% | 39% | 48% | 8% | 3% | 1% | 40% |
| Arizona | 38% | 14% | 41% | 0% | 6% | 26% | 16% | 49% | 0% | 8% |
| California | 22% | 29% | 42% | 1% | 6% | 9% | 3% | 86% | 0% | 2% |
| Colorado | 45% | 19% | 32% | 1% | 3% | 38% | 14% | 43% | 0% | 5% |
| Connecticut | 32% | 42% | 26% | 0% | 0% | 23% | 57% | 19% | 2% | 0% |
| Delaware | 37% | 58% | 4% | 0% | 0% | 29% | 66% | 5% | 0% | 0% |
| D.C. | 2% | 90% | 6% | 0% | 2% | 2% | 94% | 3% | 0% | 1% |
| Florida | 38% | 49% | 13% | 0% | 0% | 28% | 59% | 13% | 0% | 0% |
| Hawaii | 23% | 4% | 2% | 19% | 51% | 23% | 0% | 0% | 9% | 68% |
| Idaho | 75% | 3% | 16% | 0% | 6% | 73% | 3% | 16% | 1% | 7% |
| Indiana | 59% | 35% | 5% | 0% | 1% | 53% | 41% | 6% | 0% | 0% |
| Iowa | 65% | 26% | 7% | 1% | 2% | 55% | 29% | 14% | 0% | 2% |
| Kansas | 56% | 31% | 11% | 1% | 2% | 44% | 38% | 15% | 0% | 3% |
| Kentucky | 70% | 27% | 2% | 0% | 1% | 70% | 28% | 2% | 0% | 1% |
| Louisiana | 27% | 73% | 0% | 0% | 0% | 23% | 77% | 0% | 0% | 0% |
| Maryland | 22% | 61% | 3% | 0% | 14% | 28% | 66% | 4% | 0% | 2% |
| Massachusetts | 43% | 29% | 26% | 1% | 1% | 37% | 35% | 25% | 2% | 1% |
| Michigan | 43% | 54% | 1% | 0% | 2% | 29% | 69% | 1% | 0% | 1% |
| Minnesota | 45% | 36% | 7% | 3% | 9% | 28% | 45% | 7% | 1% | 18% |
| Mississippi | 32% | 67% | 1% | 0% | 0% | 21% | 79% | 0% | 0% | 0% |
| Missouri | 60% | 37% | 2% | 0% | 0% | 51% | 47% | 2% | 0% | 0% |
| Montana | 75% | 3% | 0% | 0% | 22% | 61% | 5% | 0% | 0% | 34% |
| Nebraska | 55% | 27% | 13% | 1% | 4% | 52% | 23% | 18% | 1% | 6% |
| New Jersey | 22% | 60% | 16% | 1% | 2% | 19% | 63% | 17% | 0% | 1% |
| New York | 24% | 50% | 23% | 0% | 3% | 17% | 56% | 24% | 0% | 3% |
| North Carolina | 37% | 56% | 5% | 0% | 3% | 26% | 67% | 3% | 0% | 4% |
| North Dakota | 66% | 8% | 6% | 1% | 19% | 43% | 17% | 15% | 0% | 25% |
| Ohio | 51% | 46% | 3% | 0% | 0% | 39% | 57% | 3% | 0% | 0% |
| Oklahoma | 53% | 28% | 8% | 0% | 11% | 43% | 35% | 10% | 0% | 13% |
| Oregon | 73% | 9% | 13% | 1% | 3% | 71% | 11% | 13% | 0% | 5% |
| Pennsylvania | 40% | 49% | 11% | 0% | 0% | 29% | 60% | 10% | 0% | 0% |
| South Carolina | 33% | 64% | 2% | 0% | 1% | 24% | 74% | 1% | 0% | 1% |
| South Dakota | 60% | 8% | 4% | 0% | 27% | 37% | 7% | 4% | 0% | 52% |
| Tennessee | 50% | 47% | 2% | 0% | 0% | 60% | 37% | 2% | 0% | 0% |
| Texas | 31% | 34% | 34% | 0% | 0% | 25% | 25% | 50% | 0% | 0% |
| Utah | 65% | 7% | 19% | 3% | 6% | 49% | 7% | 34% | 3% | 7% |
| Virgin Islands | 2% | 70% | 28% | 0% | 0% | 4% | 77% | 20% | 0% | 0% |
| Virginia | 35% | 62% | 3% | 0% | 0% | 33% | 64% | 2% | 0% | 0% |
| Washington | 60% | 19% | 13% | 4% | 5% | 49% | 15% | 30% | 3% | 3% |
| Wisconsin | 44% | 42% | 10% | 1% | 3% | 32% | 51% | 13% | 0% | 3% |
| Wyoming | 75% | 6% | 13% | 0% | 6% | 60% | 7% | 17% | 0% | 17% |
| BOP | 25% | 36% | 35% | 1% | 2% | 26% | 36% | 34% | 1% | 4% |
| *Across Jurisdictions* | 37% | 40% | 20% | 1% | 3% | 31% | 45% | 21% | 0% | 3% |

As noted, 40 jurisdictions responded on gender, and that group also provided information about race for their female custodial populations. Among these 40 responding jurisdictions, Black prisoners constituted 24% of the total female custodial population and 41% of the female restricted housing population. In 33 of the 40 reporting jurisdictions, the female restricted housing population contained a greater percentage of Black prisoners than were in each of the jurisdictions reporting on the total female custodial population.

In 16 of 40 reporting jurisdictions, the female restricted housing population contained a greater percentage of Hispanic prisoners than the total female custodial population.[207] In 34 of the 40 jurisdictions, the female restricted housing population contained a smaller percentage of White prisoners than the total female custodial population. Again, the percentages of Asian and of prisoners termed "Other" were small and roughly comparable in both general and restricted housing populations. Chart 8 and Tables 9 and 10 provide the details.

**Chart 8 – Demographic Percentage Composition of Total Female Custodial Population and Female Restricted Housing Population (*n* = 40)**



**Table 9 – Demographic Composition of Total Female Custodial Population and Female Restricted Housing Population (*n* = 40)**

| | Total Female Custodial Population | | | | | | Female Restricted Housing Population | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Asian | Other | *Total* | White | Black | Hispanic | Asian | Other | *Total* |
| Alabama | 964 | 517 | 0 | 0 | 6 | 1,487 | 10 | 10 | 0 | 0 | 0 | 20 |
| Alaska | 286 | 30 | 10 | 1 | 232 | 559 | 7 | 1 | 0 | 0 | 2 | 10 |
| Arizona | 2,109 | 353 | 1,097 | 21 | 392 | 3,972 | 33 | 20 | 31 | 0 | 8 | 92 |
| Colorado | 810 | 217 | 407 | 14 | 64 | 1,512 | 2 | 1 | 0 | 0 | 0 | 3 |
| Connecticut | 579 | 291 | 179 | 5 | 9 | 1,063 | 3 | 5 | 0 | 0 | 0 | 8 |
| Delaware | 140 | 76 | 6 | 1 | 0 | 223 | 0 | 3 | 0 | 0 | 0 | 3 |
| Florida | 4,456 | 2,078 | 352 | 2 | 21 | 6,909 | 103 | 121 | 15 | 0 | 1 | 240 |
| Hawaii | 201 | 19 | 10 | 116 | 392 | 738 | 0 | 0 | 0 | 0 | 1 | 1 |
| Idaho | 807 | 14 | 106 | 1 | 84 | 1,012 | 12 | 1 | 0 | 0 | 2 | 15 |
| Indiana | 2,082 | 395 | 54 | 3 | 37 | 2,571 | 22 | 15 | 4 | 0 | 1 | 42 |
| Iowa | 549 | 126 | 29 | 6 | 17 | 727 | 3 | 2 | 0 | 0 | 0 | 5 |
| Kansas | 551 | 153 | 80 | 9 | 27 | 820 | 0 | 3 | 3 | 0 | 2 | 8 |
| Kentucky | 866 | 123 | 5 | 0 | 11 | 1,005 | 17 | 3 | 0 | 0 | 0 | 20 |
| Louisiana | 475 | 461 | 0 | 1 | 1 | 938 | 45 | 61 | 0 | 0 | 0 | 106 |
| Maryland | 389 | 355 | 10 | 0 | 197 | 951 | 15 | 13 | 0 | 0 | 3 | 31 |
| Massachusetts | 460 | 103 | 56 | 0 | 72 | 691 | 9 | 4 | 2 | 0 | 1 | 16 |
| Michigan | 1,272 | 877 | 5 | 5 | 42 | 2,201 | 10 | 8 | 0 | 0 | 0 | 18 |
| Minnesota | 380 | 107 | 30 | 10 | 120 | 647 | 10 | 6 | 0 | 1 | 3 | 20 |
| Mississippi | 768 | 566 | 9 | 4 | 3 | 1,350 | 1 | 4 | 0 | 0 | 0 | 5 |
| Missouri | 2,567 | 545 | 88 | 13 | 25 | 3,238 | 31 | 29 | 0 | 0 | 0 | 60 |
| Nebraska | 293 | 66 | 39 | 2 | 38 | 438 | 3 | 3 | 2 | 0 | 1 | 9 |
| New Jersey | 289 | 316 | 99 | 10 | 8 | 722 | 13 | 33 | 8 | 0 | 0 | 54 |
| New York | 1,160 | 886 | 291 | 13 | 82 | 2,432 | 25 | 45 | 18 | 0 | 0 | 88 |
| North Carolina | 1,820 | 852 | 51 | 6 | 82 | 2,811 | 17 | 22 | 0 | 0 | 2 | 41 |
| North Dakota | 137 | 5 | 10 | 0 | 66 | 218 | 0 | 0 | 0 | 0 | 1 | 1 |
| Ohio | 3,050 | 1,022 | 37 | 10 | 14 | 4,133 | 7 | 4 | 0 | 0 | 0 | 11 |
| Oklahoma | 1,856 | 470 | 133 | 7 | 462 | 2,928 | 7 | 10 | 5 | 0 | 11 | 33 |
| Oregon | 1,065 | 94 | 58 | 15 | 41 | 1,273 | 15 | 1 | 2 | 0 | 3 | 21 |
| Pennsylvania | 1,822 | 766 | 182 | 8 | 20 | 2,798 | 3 | 10 | 1 | 0 | 1 | 15 |
| South Carolina | 875 | 490 | 18 | 0 | 20 | 1,403 | 15 | 8 | 0 | 0 | 0 | 23 |
| South Dakota | 207 | 8 | 8 | 1 | 170 | 394 | 3 | 0 | 0 | 0 | 2 | 5 |
| Tennessee | 1,052 | 381 | 20 | 5 | 7 | 1,465 | 29 | 22 | 1 | 0 | 0 | 52 |
| Texas | 6,159 | 3,495 | 3,057 | 28 | 46 | 12,785 | 18 | 55 | 33 | 0 | 0 | 106 |
| Utah | 389 | 15 | 80 | 19 | 34 | 537 | 38 | 0 | 12 | 5 | 5 | 60 |
| Virgin Islands | 0 | 13 | 2 | 0 | 0 | 15 | 0 | 1 | 0 | 0 | 0 | 1 |
| Virginia | 1,438 | 883 | 19 | 10 | 3 | 2,353 | 12 | 18 | 0 | 0 | 0 | 30 |
| Washington | 726 | 127 | 146 | 46 | 91 | 1,136 | 0 | 1 | 0 | 0 | 0 | 1 |
| Wisconsin | 885 | 305 | 38 | 8 | 77 | 1,313 | 29 | 22 | 4 | 0 | 4 | 59 |
| Wyoming | 200 | 9 | 21 | 1 | 20 | 251 | 7 | 0 | 2 | 0 | 1 | 10 |
| BOP | 4,650 | 2,756 | 3,738 | 279 | 307 | 11,730 | 39 | 39 | 31 | 2 | 4 | 115 |
| *Across Jurisdictions* | 48,784 | 20,365 | 10,580 | 680 | 3,340 | 83,749 | 613 | 604 | 174 | 8 | 59 | 1,458 |

**Table 10 – Demographic Percentage Composition of Total Female Custodial Population and Female Restricted Housing Population ($n = 40$)**

| | Total Female Custodial Population | | | | | Female Restricted Housing Population | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | Hispanic | Asian | Other | White | Black | Hispanic | Asian | Other |
| Alabama | 65% | 35% | 0% | 0% | 0% | 50% | 50% | 0% | 0% | 0% |
| Alaska | 51% | 5% | 2% | 0% | 42% | 70% | 10% | 0% | 0% | 20% |
| Arizona | 53% | 9% | 28% | 1% | 10% | 36% | 22% | 34% | 0% | 9% |
| Colorado | 54% | 14% | 27% | 1% | 4% | 67% | 33% | 0% | 0% | 0% |
| Connecticut | 54% | 27% | 17% | 0% | 1% | 38% | 63% | 0% | 0% | 0% |
| Delaware | 63% | 34% | 3% | 0% | 0% | 0% | 100% | 0% | 0% | 0% |
| Florida | 64% | 30% | 5% | 0% | 0% | 43% | 50% | 6% | 0% | 0% |
| Hawaii | 27% | 3% | 1% | 16% | 53% | 0% | 0% | 0% | 0% | 100% |
| Idaho | 80% | 1% | 10% | 0% | 8% | 80% | 7% | 0% | 0% | 13% |
| Indiana | 81% | 15% | 2% | 0% | 1% | 52% | 36% | 10% | 0% | 2% |
| Iowa | 76% | 17% | 4% | 1% | 2% | 60% | 40% | 0% | 0% | 0% |
| Kansas | 67% | 19% | 10% | 1% | 3% | 0% | 38% | 38% | 0% | 25% |
| Kentucky | 86% | 12% | 0% | 0% | 1% | 85% | 15% | 0% | 0% | 0% |
| Louisiana | 51% | 49% | 0% | 0% | 0% | 42% | 58% | 0% | 0% | 0% |
| Maryland | 41% | 37% | 1% | 0% | 21% | 48% | 42% | 0% | 0% | 10% |
| Massachusetts | 67% | 15% | 8% | 0% | 10% | 56% | 25% | 13% | 0% | 6% |
| Michigan | 58% | 40% | 0% | 0% | 2% | 56% | 44% | 0% | 0% | 0% |
| Minnesota | 59% | 17% | 5% | 2% | 19% | 50% | 30% | 0% | 5% | 15% |
| Mississippi | 57% | 42% | 1% | 0% | 0% | 20% | 80% | 0% | 0% | 0% |
| Missouri | 79% | 17% | 3% | 0% | 1% | 52% | 48% | 0% | 0% | 0% |
| Nebraska | 67% | 15% | 9% | 0% | 9% | 33% | 33% | 22% | 0% | 11% |
| New Jersey | 40% | 44% | 14% | 1% | 1% | 24% | 61% | 15% | 0% | 0% |
| New York | 48% | 36% | 12% | 1% | 3% | 28% | 51% | 20% | 0% | 0% |
| North Carolina | 65% | 30% | 2% | 0% | 3% | 41% | 54% | 0% | 0% | 5% |
| North Dakota | 63% | 2% | 5% | 0% | 30% | 0% | 0% | 0% | 0% | 100% |
| Ohio | 74% | 25% | 1% | 0% | 0% | 64% | 36% | 0% | 0% | 0% |
| Oklahoma | 63% | 16% | 5% | 0% | 16% | 21% | 30% | 15% | 0% | 33% |
| Oregon | 84% | 7% | 5% | 1% | 3% | 71% | 5% | 10% | 0% | 14% |
| Pennsylvania | 65% | 27% | 7% | 0% | 1% | 20% | 67% | 7% | 0% | 7% |
| South Carolina | 62% | 35% | 1% | 0% | 1% | 65% | 35% | 0% | 0% | 0% |
| South Dakota | 53% | 2% | 2% | 0% | 43% | 60% | 0% | 0% | 0% | 40% |
| Tennessee | 72% | 26% | 1% | 0% | 0% | 56% | 42% | 2% | 0% | 0% |
| Texas | 48% | 27% | 24% | 0% | 0% | 17% | 52% | 31% | 0% | 0% |
| Utah | 72% | 3% | 15% | 4% | 6% | 63% | 0% | 20% | 8% | 8% |
| Virgin Islands | 0% | 87% | 13% | 0% | 0% | 0% | 100% | 0% | 0% | 0% |
| Virginia | 61% | 38% | 1% | 0% | 0% | 40% | 60% | 0% | 0% | 0% |
| Washington | 64% | 11% | 13% | 4% | 8% | 0% | 100% | 0% | 0% | 0% |
| Wisconsin | 67% | 23% | 3% | 1% | 6% | 49% | 37% | 7% | 0% | 7% |
| Wyoming | 80% | 4% | 8% | 0% | 8% | 70% | 0% | 20% | 0% | 10% |
| BOP | 40% | 23% | 32% | 2% | 3% | 34% | 34% | 27% | 2% | 3% |
| *Across Jurisdictions* | 58% | 24% | 13% | 1% | 4% | 42% | 41% | 12% | 1% | 4% |

### C.    Age Cohorts

The survey asked jurisdictions to provide age data for their male and female total custodial and restricted housing populations. We asked about individuals in three cohorts: under 18 years old, between 18 and 49 years old, and 50 years and older. We sought to understand the distribution of age cohorts within restricted housing populations and to compare the age of individuals in restricted housing to the age of those in the general population.

Across the 43 responding jurisdictions, males under 18 years old made up approximately 0.1% of both the total custodial and the restricted housing populations. Among reporting jurisdictions, males between the ages of 18 and 49 comprised 79.6% of the total custodial population and 89.1% of the restricted housing population. Males 50 and older comprised 20.3% of the total custodial population and 10.7% of the restricted housing population.

In the 43 responding jurisdictions, approximately 5.9% (78 of 1,326) of male prisoners under 18 years old were in restricted housing. Approximately 5.6% (52,636 of 939,886) of male prisoners 18-49 were in restricted housing, while 2.6% (6,335 of 239,609) of male prisoners 50 and older were in restricted housing. We provide the jurisdiction-by-jurisdiction information in Chart 9 and Tables 11 and 12.

**Chart 9 – Age Cohorts of Male Total Custodial Population and of Male Restricted Housing Population (*n* = 43)**



**Table 11 – Age Cohorts of Male Total Custodial Population and of Male Restricted Housing Population (*n* = 43)**

| | Total Male Custodial Population | | | | Male Restricted Housing Population | | | |
|---|---|---|---|---|---|---|---|---|
| | Under 18 | 18-49 | 50+ | Total | Under | 18-49 | 50+ | Total |
| Alabama | 11 | 17,748 | 5,303 | 23,062 | 0 | 1,204 | 178 | 1,382 |
| Alaska | 67 | 3,418 | 875 | 4,360 | 15 | 262 | 68 | 345 |
| Arizona | 75 | 32,005 | 6,684 | 38,764 | N/A | 2,228 | 224 | 2,452 |
| California | 0 | 86,179 | 25,817 | 111,996 | 0 | 962 | 117 | 1,079 |
| Colorado | 1 | 13,302 | 3,416 | 16,719 | 0 | 199 | 15 | 214 |
| Connecticut | 91 | 12,768 | 2,134 | 14,993 | 0 | 102 | 18 | 120 |
| Delaware | 4 | 3,217 | 898 | 4,119 | 0 | 333 | 45 | 378 |
| D.C. | 22 | 968 | 163 | 1,153 | 0 | 84 | 11 | 95 |
| Florida | 138 | 71,814 | 20,727 | 92,679 | 34 | 6,931 | 898 | 7,863 |
| Hawaii | 0 | 3,212 | 777 | 3,989 | 0 | 22 | 0 | 22 |
| Idaho | 13 | 5,616 | 1,372 | 7,001 | 1 | 344 | 44 | 389 |
| Indiana | 6 | 20,601 | 4,330 | 24,937 | 0 | 1,440 | 139 | 1,579 |
| Iowa | 6 | 6,179 | 1,390 | 7,575 | 0 | 228 | 14 | 242 |
| Kansas | 111 | 7,263 | 1,758 | 9,132 | 0 | 533 | 48 | 581 |
| Kentucky | 0 | 8,433 | 2,231 | 10,664 | 0 | 341 | 21 | 362 |
| Louisiana | 13 | 12,584 | 4,980 | 17,577 | 2 | 2,172 | 409 | 2,583 |
| Maryland | 3 | 15,356 | 3,377 | 18,736 | 0 | 1,368 | 86 | 1,454 |
| Massachusetts | 0 | 6,875 | 2,438 | 9,313 | 0 | 401 | 46 | 447 |
| Michigan | 86 | 31,761 | 8,778 | 40,625 | 0 | 1,207 | 114 | 1,321 |
| Minnesota | 10 | 7,370 | 1,294 | 8,674 | 3 | 563 | 36 | 602 |
| Mississippi | 27 | 14,491 | 2,998 | 17,516 | 0 | 169 | 11 | 180 |
| Missouri | 7 | 23,310 | 5,711 | 29,028 | 2 | 1,769 | 197 | 1,968 |
| Montana | 0 | 1,704 | 641 | 2,345 | 0 | 71 | 12 | 83 |
| Nebraska | 12 | 4,118 | 888 | 5,018 | 1 | 529 | 59 | 589 |
| New Jersey | 5 | 14,215 | 2,807 | 17,027 | 0 | 1,186 | 130 | 1,316 |
| New York | 85 | 40,455 | 9,649 | 50,189 | 0 | 4,101 | 309 | 4,410 |
| North Carolina | 348 | 28,056 | 6,824 | 35,228 | 4 | 1,364 | 108 | 1,476 |
| North Dakota | 0 | 1,339 | 243 | 1,582 | 0 | 50 | 3 | 53 |
| Ohio | 31 | 37,771 | 8,313 | 46,115 | 0 | 1,297 | 66 | 1,363 |
| Oklahoma | 7 | 19,851 | 4,864 | 24,722 | 1 | 1,380 | 138 | 1,519 |
| Oregon | 0 | 10,483 | 2,968 | 13,451 | 0 | 571 | 38 | 609 |
| Pennsylvania | 19 | 37,878 | 9,654 | 47,551 | 0 | 1,464 | 237 | 1,701 |
| South Carolina | 30 | 16,004 | 3,541 | 19,575 | 1 | 976 | 68 | 1,045 |
| South Dakota | 0 | 2,559 | 573 | 3,132 | 0 | 94 | 7 | 101 |
| Tennessee | 9 | 15,037 | 3,584 | 18,630 | 7 | 1,472 | 237 | 1,716 |
| Texas | 44 | 107,071 | 28,465 | 135,580 | 3 | 4,854 | 869 | 5,726 |
| Utah | 1 | 4,732 | 1,227 | 5,960 | 1 | 767 | 84 | 852 |
| Virgin Islands | 0 | 236 | 88 | 324 | 0 | 76 | 19 | 95 |
| Virginia | 8 | 21,858 | 6,193 | 28,059 | 0 | 692 | 132 | 824 |
| Washington | 0 | 12,152 | 3,020 | 15,172 | 0 | 246 | 27 | 273 |
| Wisconsin | 35 | 15,613 | 3,573 | 19,221 | 3 | 622 | 67 | 692 |
| Wyoming | 1 | 1,422 | 454 | 1,877 | 0 | 115 | 6 | 121 |
| BOP | 0 | 142,862 | 34,589 | 177,451 | 0 | 7,847 | 980 | 8,827 |
| *Across Jurisdictions* | 1,326 | 939,886 | 239,609 | 1,180,821 | 78 | 52,636 | 6,335 | 59,049 |

**Table 12 – Age Cohorts by Percentage of Male Total Custodial Population and of Male Restricted Housing Population (*n* = 43)**

|  | Total Male Custodial Population | | | Male Restricted Housing Population | | |
|---|---|---|---|---|---|---|
|  | Under 18 | 18-49 | 50+ | Under 18 | 18-49 | 50+ |
| Alabama | 0% | 77% | 23% | 0% | 87% | 13% |
| Alaska | 2% | 78% | 20% | 4% | 76% | 20% |
| Arizona | 0% | 83% | 17% | 0% | 91% | 9% |
| California | 0% | 77% | 23% | 0% | 89% | 11% |
| Colorado | 0% | 80% | 20% | 0% | 93% | 7% |
| Connecticut | 1% | 85% | 14% | 0% | 85% | 15% |
| Delaware | 0% | 78% | 22% | 0% | 88% | 12% |
| D.C. | 2% | 84% | 14% | 0% | 88% | 12% |
| Florida | 0% | 77% | 22% | 0% | 88% | 11% |
| Hawaii | 0% | 81% | 19% | 0% | 100% | 0% |
| Idaho | 0% | 80% | 20% | 0% | 88% | 11% |
| Indiana | 0% | 83% | 17% | 0% | 91% | 9% |
| Iowa | 0% | 82% | 18% | 0% | 94% | 6% |
| Kansas | 1% | 80% | 19% | 0% | 92% | 8% |
| Kentucky | 0% | 79% | 21% | 0% | 94% | 6% |
| Louisiana | 0% | 72% | 28% | 0% | 84% | 16% |
| Maryland | 0% | 82% | 18% | 0% | 94% | 6% |
| Massachusetts | 0% | 74% | 26% | 0% | 90% | 10% |
| Michigan | 0% | 78% | 22% | 0% | 91% | 9% |
| Minnesota | 0% | 85% | 15% | 0% | 94% | 6% |
| Mississippi | 0% | 83% | 17% | 0% | 94% | 6% |
| Missouri | 0% | 80% | 20% | 0% | 90% | 10% |
| Montana | 0% | 73% | 27% | 0% | 86% | 14% |
| Nebraska | 0% | 82% | 18% | 0% | 90% | 10% |
| New Jersey | 0% | 83% | 16% | 0% | 90% | 10% |
| New York | 0% | 81% | 19% | 0% | 93% | 7% |
| North Carolina | 1% | 80% | 19% | 0% | 92% | 7% |
| North Dakota | 0% | 85% | 15% | 0% | 94% | 6% |
| Ohio | 0% | 82% | 18% | 0% | 95% | 5% |
| Oklahoma | 0% | 80% | 20% | 0% | 91% | 9% |
| Oregon | 0% | 78% | 22% | 0% | 94% | 6% |
| Pennsylvania | 0% | 80% | 20% | 0% | 86% | 14% |
| South Carolina | 0% | 82% | 18% | 0% | 93% | 7% |
| South Dakota | 0% | 82% | 18% | 0% | 93% | 7% |
| Tennessee | 0% | 81% | 19% | 0% | 86% | 14% |
| Texas | 0% | 79% | 21% | 0% | 85% | 15% |
| Utah | 0% | 79% | 21% | 0% | 90% | 10% |
| Virgin Islands | 0% | 73% | 27% | 0% | 80% | 20% |
| Virginia | 0% | 78% | 22% | 0% | 84% | 16% |
| Washington | 0% | 80% | 20% | 0% | 90% | 10% |
| Wisconsin | 0% | 81% | 19% | 0% | 90% | 10% |
| Wyoming | 0% | 76% | 24% | 0% | 95% | 5% |
| BOP | 0% | 81% | 19% | 0% | 89% | 11% |
| *Across Jurisdictions* | 0% | 80% | 20% | 0% | 89% | 11% |

As noted above, we sought to understand the percentage of each age cohort in the restricted housing population and to compare the numbers by age cohort in the general population and in the restricted population. Among the 40 jurisdictions providing data for female prisoners in restricted housing, none reported any female prisoners under the age of 18 in restricted housing. These jurisdictions reported that female prisoners between the ages of 18 and 49 comprised 84.4% of the total custodial population and 92.2% of the restricted housing population. Jurisdictions reported that women 50 years and older comprised 15.4% of their total custodial populations, and 7.8% of the restricted housing population. Across the 40 responding jurisdictions, 1.9% (1,345 of 70,710) of female prisoners 18-49 were held in restricted housing; 0.9% (113 of 12,895) of female prisoners 50 and older were held in restricted housing. Chart 10 and Tables 13 and 14 provide the details.

**Chart 10 – Age Cohorts of Female Total Custodial Population and of Female Restricted Housing Population ($n = 40$)**



**Table 13 – Age Cohorts of Female Total Custodial Population and of Female Restricted Housing Population (*n* = 40)**

| | Total Female Custodial Population | | | | Female Restricted Housing Population | | | |
|---|---|---|---|---|---|---|---|---|
| | Under | 18-49 | 50+ | Total | Under | 18-49 | 50+ | Total |
| Alabama | 0 | 1,231 | 256 | 1,487 | 0 | 19 | 1 | 20 |
| Alaska | 49 | 468 | 42 | 559 | 0 | 10 | 0 | 10 |
| Arizona | 3 | 3,461 | 508 | 3,972 | N/A | 87 | 5 | 92 |
| Colorado | 0 | 1,327 | 185 | 1,512 | 0 | 3 | 0 | 3 |
| Connecticut | 2 | 917 | 144 | 1,063 | 0 | 8 | 0 | 8 |
| Delaware | 0 | 192 | 31 | 223 | 0 | 3 | 0 | 3 |
| Florida | 5 | 5,683 | 1,221 | 6,909 | 0 | 227 | 13 | 240 |
| Hawaii | 0 | 638 | 100 | 738 | 0 | 1 | 0 | 1 |
| Idaho | 2 | 893 | 117 | 1,012 | 0 | 11 | 4 | 15 |
| Indiana | 0 | 2,286 | 285 | 2,571 | 0 | 37 | 5 | 42 |
| Iowa | 1 | 631 | 95 | 727 | 0 | 4 | 1 | 5 |
| Kansas | 15 | 705 | 100 | 820 | 0 | 8 | 0 | 8 |
| Kentucky | 0 | 878 | 127 | 1,005 | 0 | 18 | 2 | 20 |
| Louisiana | 0 | 733 | 205 | 938 | 0 | 93 | 13 | 106 |
| Maryland | 0 | 797 | 154 | 951 | 0 | 31 | 0 | 31 |
| Massachusetts | 0 | 584 | 107 | 691 | 0 | 13 | 3 | 16 |
| Michigan | 2 | 1,809 | 390 | 2,201 | 0 | 15 | 3 | 18 |
| Minnesota | 0 | 567 | 80 | 647 | 0 | 17 | 3 | 20 |
| Mississippi | 0 | 1,157 | 193 | 1,350 | 0 | 5 | 0 | 5 |
| Missouri | 1 | 2,856 | 381 | 3,238 | 0 | 57 | 3 | 60 |
| Nebraska | 0 | 379 | 59 | 438 | 0 | 9 | 0 | 9 |
| New Jersey | 0 | 605 | 117 | 722 | 0 | 52 | 2 | 54 |
| New York | 3 | 2,028 | 401 | 2,432 | 0 | 84 | 4 | 88 |
| North | 44 | 2,355 | 412 | 2,811 | 0 | 39 | 2 | 41 |
| North Dakota | 0 | 202 | 16 | 218 | 0 | 1 | 0 | 1 |
| Ohio | 1 | 3,678 | 454 | 4,133 | 0 | 11 | 0 | 11 |
| Oklahoma | 2 | 2,512 | 414 | 2,928 | 0 | 32 | 1 | 33 |
| Oregon | 0 | 1,071 | 202 | 1,273 | 0 | 19 | 2 | 21 |
| Pennsylvania | 1 | 2,317 | 480 | 2,798 | 0 | 14 | 1 | 15 |
| South | 1 | 1,181 | 221 | 1,403 | 0 | 21 | 2 | 23 |
| South Dakota | 0 | 360 | 34 | 394 | 0 | 5 | 0 | 5 |
| Tennessee | 3 | 1,267 | 195 | 1,465 | 0 | 38 | 14 | 52 |
| Texas | 6 | 10,954 | 1,825 | 12,785 | 0 | 100 | 6 | 106 |
| Utah | 0 | 494 | 43 | 537 | 0 | 56 | 4 | 60 |
| Virgin Islands | 0 | 11 | 4 | 15 | 0 | 1 | 0 | 1 |
| Virginia | 0 | 1,960 | 393 | 2,353 | 0 | 27 | 3 | 30 |
| Washington | 0 | 970 | 166 | 1,136 | 0 | 1 | 0 | 1 |
| Wisconsin | 3 | 1,095 | 215 | 1,313 | 0 | 58 | 1 | 59 |
| Wyoming | 0 | 213 | 38 | 251 | 0 | 10 | 0 | 10 |
| BOP | 0 | 9,245 | 2,485 | 11,730 | 0 | 100 | 15 | 115 |
| *Across Jurisdictions* | 144 | 70,710 | 12,895 | 83,749 | 0 | 1,345 | 113 | 1,458 |

**Table 14 – Age Cohorts by Percentage of Female Total Custodial Population and of Female Restricted Housing Population (*n* = 40)**

|  | Total Female Custodial Population | | | Female Restricted Housing Population | | |
|---|---|---|---|---|---|---|
|  | Under 18 | 18-49 | 50+ | Under 18 | 18-49 | 50+ |
| Alabama | 0% | 83% | 17% | 0% | 95% | 5% |
| Alaska | 9% | 84% | 8% | 0% | 100% | 0% |
| Arizona | 0% | 87% | 13% | 0% | 95% | 5% |
| Colorado | 0% | 88% | 12% | 0% | 100% | 0% |
| Connecticut | 0% | 86% | 14% | 0% | 100% | 0% |
| Delaware | 0% | 86% | 14% | 0% | 100% | 0% |
| Florida | 0% | 82% | 18% | 0% | 95% | 5% |
| Hawaii | 0% | 86% | 14% | 0% | 100% | 0% |
| Idaho | 0% | 88% | 12% | 0% | 73% | 27% |
| Indiana | 0% | 89% | 11% | 0% | 88% | 12% |
| Iowa | 0% | 87% | 13% | 0% | 80% | 20% |
| Kansas | 2% | 86% | 12% | 0% | 100% | 0% |
| Kentucky | 0% | 87% | 13% | 0% | 90% | 10% |
| Louisiana | 0% | 78% | 22% | 0% | 88% | 12% |
| Maryland | 0% | 84% | 16% | 0% | 100% | 0% |
| Massachusetts | 0% | 85% | 15% | 0% | 81% | 19% |
| Michigan | 0% | 82% | 18% | 0% | 83% | 17% |
| Minnesota | 0% | 88% | 12% | 0% | 85% | 15% |
| Mississippi | 0% | 86% | 14% | 0% | 100% | 0% |
| Missouri | 0% | 88% | 12% | 0% | 95% | 5% |
| Nebraska | 0% | 87% | 13% | 0% | 100% | 0% |
| New Jersey | 0% | 84% | 16% | 0% | 96% | 4% |
| New York | 0% | 83% | 16% | 0% | 95% | 5% |
| North | 2% | 84% | 15% | 0% | 95% | 5% |
| North Dakota | 0% | 93% | 7% | 0% | 100% | 0% |
| Ohio | 0% | 89% | 11% | 0% | 100% | 0% |
| Oklahoma | 0% | 86% | 14% | 0% | 97% | 3% |
| Oregon | 0% | 84% | 16% | 0% | 90% | 10% |
| Pennsylvania | 0% | 83% | 17% | 0% | 93% | 7% |
| South | 0% | 84% | 16% | 0% | 91% | 9% |
| South Dakota | 0% | 91% | 9% | 0% | 100% | 0% |
| Tennessee | 0% | 86% | 13% | 0% | 73% | 27% |
| Texas | 0% | 86% | 14% | 0% | 94% | 6% |
| Utah | 0% | 92% | 8% | 0% | 93% | 7% |
| Virgin Islands | 0% | 73% | 27% | 0% | 100% | 0% |
| Virginia | 0% | 83% | 17% | 0% | 90% | 10% |
| Washington | 0% | 85% | 15% | 0% | 100% | 0% |
| Wisconsin | 0% | 83% | 16% | 0% | 98% | 2% |
| Wyoming | 0% | 85% | 15% | 0% | 100% | 0% |
| BOP | 0% | 79% | 21% | 0% | 87% | 13% |
| *Across Jurisdictions* | 0% | 84% | 15% | 0% | 92% | 8% |

### D. Vulnerable Populations: Mentally Ill, Pregnant, and Transgender Prisoners

Concerns have been raised about especially vulnerable individuals. The information that we obtained about juveniles (described as individuals under 18 years of age) is discussed above, in the context of age cohorts. Here, we turn to other vulnerable populations, specifically the mentally ill, pregnant women, and transgender individuals.[208]

### 1. Prisoners with Serious Mental Health Issues (according to each jurisdiction's own definition)

The view that the "seriously mentally ill" (SMI) ought not to be in restricted housing is widely shared and longstanding. In 1995, a federal judge concluded that placing seriously mentally ill prisoners into what he termed "solitary confinement" violated their Eighth Amendment rights.[209]

In the last few years, legislation in some jurisdictions, class action settlements, and policies in the federal prison system[210] and in some states have prohibited or limited correctional facilities' authority to put seriously mentally ill individuals in restricted housing.[211] As discussed above, the American Correctional Association (ACA) approved new standards on restricted housing,[212] including recommendations that prisoners with serious mental illness not be placed in "Extended Restrictive Housing."[213] The 2016 ACA Standards also called for all prisoners to be evaluated by a mental health provider within seven days of their placement in restricted housing.[214] Further, the ACA standards stated that prisoners with diagnosed behavioral health disorder in restricted housing for 22 hours a day or more be assessed by a mental health provider "at least every 30 days," and prisoners without such a diagnosis is assessed every 90 days.[215] In addition, the ACA standards call for all prisoners in restricted housing to be visited by mental health staff weekly and by health care personnel daily.[216] The Department of Justice has similarly altered its standards to make it clear that seriously mentally ill individuals should generally not be placed in restricted housing.[217]

Yet how jurisdictions defined what constituted "serious mental illness" varied widely. The 2015 survey made plain that correctional agencies do not have a uniform definition of either "mental illness" or "serious mental illness." We did not impose a definition when surveying but instead invited each jurisdiction to provide its own definition of a "serious mental health issue" and to provide data on the numbers of people with such mental health issues in restricted housing.

Forty jurisdictions provided definitions. Five other jurisdictions provided data on the use of restricted housing for prisoners with mental health issues without providing a corresponding definition of "serious mental health issue."[218] Seven of the 40 jurisdictions that provided a definition did not provide data on prisoners with mental health issues.[219]

Some jurisdictions' definitions had a narrower range than others. A sense of the variation is apparent from a few examples. The District of Columbia limited its definition to Axis I diagnoses under the Diagnostic and Statistical Manual of Mental Disorders (DSM-4).[220] Iowa included "chronic and persistent mental illnesses in the following categories: § Schizophrenia

§ Recurrent Major Depressive Disorders § Bipolar Disorders § Other Chronic and Recurrent Psychosis § Dementia and other Organic Disorders." Mississippi defined "serious mental illness" as "a diagnosable disorder of thought, mood, perception, orientation, or memory that significantly impairs a person's judgment, behavior, capacity to recognize reality, and/or ability to meet the ordinary demands of life currently or at any time during the past year." Vermont's definition included a "disorder of thought, mood, perception, orientation, or memory as diagnosed by a qualified mental health professional, which substantially impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life and which substantially impairs the ability to function within the correctional setting or any developmental disability, traumatic brain injury or other organic brain disorder, or various forms of dementia or other neurological disorders, as diagnosed by a qualified mental health professional, which substantially impairs the ability to function in the correctional setting." In Appendix C, we provide additional details of the various definitions for "serious mental health issue" or "serious mental illness" that were provided by the responding jurisdictions.

Seeking to understand the placement of mentally ill people in restricted housing, we asked jurisdictions to provide the number of people in the total population with mental illness, as well as the number of prisoners with mental illness in restricted housing, by race and gender. Jurisdictions varied in their ability to provide data in this detail. Thirty-four jurisdictions[221] provided data about male prisoners with mental illness. These jurisdictions reported a total of 54,025 male prisoners with serious mental health issues in their general prison populations, and a total of 5,146 male prisoners with serious mental health issues held in restricted housing. The 32 jurisdictions responding on women prisoners reported a total of 9,573 female prisoners with serious mental health issues, and a total of 297 female prisoners with serious mental health issues in restricted housing. We provide the jurisdiction-by-jurisdiction information in Tables 15 and 16 below.

Given the variation in definitions, we did not create a chart comparing percentages of mentally ill prisoners in restricted housing; any variation may reflect broader or narrower definitions of "serious mental health issue." Rather, we report on the total number of men and of women (with information on race and ethnicity where available) whom jurisdictions identified as of the fall of 2015 as having such mental health issues and whether these individuals were housed in general population or in restricted housing.

**Table 15 – Male Prisoners with a Serious Mental Health Issue (Variously Defined) in Restricted Housing ($n = 34$)**

| | Male Custodial Population | Male Custodial Population with Serious Mental Health Issues | Percentage of Male Custodial Population with Serious Mental Health Issues | Male Custodial Population with Serious Mental Health Issues in Restricted Housing | Percentage of Male Custodial Population with Serious Mental Health Issues in Restricted Housing |
|---|---|---|---|---|---|
| Alabama | 23,062 | 573 | 2.5% | 53 | 9.2% |
| Colorado | 16,719 | 1,302 | 7.8% | 8 | 0.6% |
| Connecticut | 14,993 | 419 | 2.8% | 11 | 2.6% |
| District of Columbia | 1,153 | 89 | 7.7% | 1 | 1.1% |
| Florida | 92,679 | 10,442 | 11.3% | 1,283 | 12.3% |
| Idaho | 7,001 | 525 | 7.5% | 71 | 13.5% |
| Iowa | 7,575 | 1,972 | 26.0% | 87 | 4.4% |
| Kansas | 9,132 | 1,999 | 21.9% | 294 | 14.7% |
| Kentucky | 10,664 | 1,849 | 17.3% | 98 | 5.3% |
| Louisiana | 17,577 | 1,583 | 9.0% | 612 | 38.7% |
| Maryland | 18,736 | 435 | 2.3% | 69 | 15.9% |
| Massachusetts | 9,313 | 677 | 7.3% | 21 | 3.1% |
| Minnesota | 8,674 | 874 | 10.1% | 98 | 11.2% |
| Mississippi | 17,516 | 274 | 1.6% | 7 | 2.6% |
| Missouri | 29,028 | 4,191 | 14.4% | 600 | 14.3% |
| Nebraska | 5,018 | 1,455 | 29.0% | 250 | 17.2% |
| New Jersey | 17,027 | 217 | 1.3% | 1 | 0.5% |
| New Mexico | 6,613 | 111 | 1.7% | 0 | 0.0% |
| New York | 50,189 | 2,087 | 4.2% | 59 | 2.8% |
| North Carolina | 35,228 | 320 | 0.9% | 34 | 10.6% |
| North Dakota | 1,582 | 83 | 5.2% | 3 | 3.6% |
| Ohio | 46,115 | 3,288 | 7.1% | 97 | 3.0% |
| Oklahoma | 24,722 | 1,618 | 6.5% | 141 | 8.7% |
| Oregon | 13,451 | 2,764 | 20.5% | 163 | 5.9% |
| Pennsylvania | 47,551 | 3,468 | 7.3% | 23 | 0.7% |
| South Carolina | 19,575 | 2,632 | 13.4% | 319 | 12.1% |
| South Dakota | 3,132 | 128 | 4.1% | 14 | 10.9% |
| Tennessee | 18,630 | 490 | 2.6% | 27 | 5.5% |
| Texas | 135,580 | 1,275 | 0.9% | 0 | 0.0% |
| Utah | 5,960 | 2,646 | 44.4% | 486 | 18.4% |
| Virgin Islands | 324 | 25 | 7.7% | 22 | 88.0% |
| Washington | 15,172 | 2,458 | 16.2% | 82 | 3.0% |
| Wisconsin | 19,221 | 1,388 | 7.2% | 90 | 6.5% |
| Wyoming | 1,877 | 368 | 19.6% | 22 | 6.0% |

**Table 16 – Female Prisoners with a Serious Mental Health Issue (Variously Defined) in Restricted Housing (*n* = 32)**

| | Female Custodial Population | Female Custodial Population with Serious Mental Health Issues | Percentage of Female Custodial Population with Serious Mental Health Issues | Female Custodial Population with Serious Mental Health Issues in Restricted Housing | Percentage of Female Custodial Population with Serious Mental Health Issues in Restricted Housing |
|---|---|---|---|---|---|
| Alabama | 1,487 | 93 | 6.3% | 5 | 5.4% |
| Colorado | 1,512 | 565 | 37.4% | 0 | 0.0% |
| Connecticut | 1,063 | 28 | 2.6% | 0 | 0.0% |
| Florida | 6,909 | 2,258 | 32.7% | 69 | 3.1% |
| Idaho | 1,012 | 100 | 9.9% | 4 | 4.0% |
| Iowa | 727 | 294 | 40.4% | 3 | 1.0% |
| Kansas | 820 | 435 | 53.0% | 8 | 0.2% |
| Louisiana | 938 | 274 | 29.2% | 36 | 13.1% |
| Maryland | 951 | 14 | 1.5% | 0 | 0.0% |
| Massachusetts | 691 | 83 | 12.0% | 3 | 3.6% |
| Minnesota | 647 | 95 | 14.7% | 2 | 2.1% |
| Mississippi | 1,350 | 2 | 0.1% | 0 | 0.0% |
| Missouri | 3,238 | 979 | 30.2% | 30 | 3.1% |
| Nebraska | 438 | 216 | 49.3% | 7 | 3.2% |
| New Jersey | 722 | 34 | 4.7% | 0 | 0.0% |
| New Mexico | 776 | 0 | 0.0% | 0 | 0.0% |
| New York | 2,432 | 199 | 8.2% | 1 | 0.5% |
| North Carolina | 2,811 | 62 | 2.2% | 3 | 4.8% |
| North Dakota | 218 | 19 | 8.7% | 0 | 0.0% |
| Ohio | 4,133 | 707 | 17.1% | 4 | 0.6% |
| Oklahoma | 2,928 | 387 | 13.2% | 6 | 1.6% |
| Oregon | 1,273 | 659 | 51.8% | 19 | 2.9% |
| Pennsylvania | 2,798 | 681 | 24.3% | 3 | 0.4% |
| South Carolina | 1,403 | 540 | 38.5% | 18 | 3.3% |
| South Dakota | 394 | 17 | 4.3% | 2 | 11.8% |
| Tennessee | 1,465 | 38 | 2.6% | 2 | 5.3% |
| Texas | 12,785 | 80 | 0.6% | 0 | 0.0% |
| Utah | 537 | 375 | 69.8% | 52 | 13.9% |
| Virgin Islands | 15 | 1 | 6.7% | 0 | 0.0% |
| Virginia | 2,353 | 0 | 0.0% | 0 | 0.0% |
| Washington | 1,136 | 274 | 24.1% | 1 | 0.4% |
| Wisconsin | 1,313 | 387 | 29.5% | 23 | 5.9% |
| Wyoming | 251 | 112 | 44.6% | 4 | 3.6% |

We also sought to learn about the intersection of race, ethnicity, gender, and mental health. Thirty-three jurisdictions provided information about male prisoners, and 30 jurisdictions provided information about women prisoners. [222] The jurisdiction-by-jurisdiction information is detailed in Tables 17 and 18 below.

**Table 17 – Male Prisoners with a Serious Mental Health Issue by Race and Ethnicity (*n* = 33)**

| | White | Black | Hispanic | Asian | Other | Total |
|---|---|---|---|---|---|---|
| Alabama | 225 | 343 | 0 | 0 | 5 | 573 |
| Arizona | 807 | 334 | 433 | 6 | 72 | 1,652 |
| California | 2,259 | 3,053 | 1,976 | 75 | 499 | 7,862 |
| Colorado | 683 | 281 | 286 | 7 | 45 | 1,302 |
| Connecticut | 181 | 153 | 82 | 1 | 2 | 419 |
| District of Columbia | 2 | 83 | 3 | 0 | 1 | 89 |
| Florida | 4,211 | 5,010 | 1,193 | 2 | 26 | 10,442 |
| Idaho | 439 | 21 | 37 | 1 | 27 | 525 |
| Indiana | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa | 1,452 | 394 | 88 | 5 | 33 | 1,972 |
| Kansas | 1,217 | 583 | 155 | 10 | 34 | 1,999 |
| Kentucky | 1,330 | 421 | 14 | 2 | 82 | 1,849 |
| Louisiana | 549 | 1,032 | 1 | 1 | 0 | 1,583 |
| Maryland | 159 | 252 | 8 | 0 | 16 | 435 |
| Minnesota | 506 | 267 | 0 | 19 | 82 | 874 |
| Mississippi | 90 | 182 | 0 | 0 | 2 | 274 |
| Missouri | 2,969 | 1,156 | 46 | 4 | 16 | 4,191 |
| Nebraska | 973 | 297 | 113 | 6 | 66 | 1,455 |
| New Jersey | 63 | 116 | 36 | 0 | 2 | 217 |
| New Mexico | 26 | 5 | 74 | 0 | 6 | 111 |
| New York | 559 | 1,037 | 427 | 11 | 53 | 2,087 |
| North Carolina | 153 | 134 | 10 | 4 | 19 | 320 |
| North Dakota | 60 | 6 | 0 | 2 | 15 | 83 |
| Ohio | 2,007 | 1,209 | 53 | 3 | 16 | 3,288 |
| Oklahoma | 966 | 434 | 51 | 2 | 165 | 1,618 |
| Oregon | 2,291 | 230 | 146 | 29 | 68 | 2,764 |
| Pennsylvania | 1,677 | 1,485 | 282 | 7 | 17 | 3,468 |
| South Carolina | 1,128 | 1,455 | 24 | 3 | 22 | 2,632 |
| South Dakota | 83 | 7 | 2 | 0 | 36 | 128 |
| Utah | 1,912 | 151 | 402 | 57 | 124 | 2,646 |
| Virgin Islands | 3 | 16 | 6 | 0 | 0 | 25 |
| Wisconsin | 692 | 528 | 117 | 9 | 42 | 1,388 |
| Wyoming | 284 | 18 | 44 | 1 | 21 | 368 |

**Table 18 – Female Prisoners with a Serious Mental Health Issue by Race and Ethnicity ($n = 30$)**

|  | White | Black | Hispanic | Asian | Other | Total |
|---|---|---|---|---|---|---|
| Alabama | 60 | 33 | 0 | 0 | 0 | 93 |
| Arizona | 196 | 54 | 70 | 1 | 29 | 350 |
| California | 71 | 76 | 62 | 4 | 17 | 230 |
| Colorado | 291 | 81 | 162 | 5 | 26 | 565 |
| Connecticut | 13 | 11 | 4 | 0 | 0 | 28 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida | 1,509 | 630 | 116 | 0 | 3 | 2,258 |
| Idaho | 82 | 0 | 11 | 0 | 7 | 100 |
| Iowa | 215 | 59 | 13 | 2 | 5 | 294 |
| Louisiana | 151 | 123 | 0 | 0 | 0 | 274 |
| Maryland | 8 | 6 | 0 | 0 | 0 | 14 |
| Minnesota | 52 | 22 | 0 | 1 | 20 | 95 |
| Mississippi | 2 |  | 0 | 0 | 0 | 2 |
| Missouri | 785 | 150 | 34 | 4 | 6 | 979 |
| Nebraska | 141 | 35 | 20 | 0 | 20 | 216 |
| New Jersey | 17 | 12 | 2 | 2 | 1 | 34 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 |
| New York | 62 | 111 | 22 | 2 | 2 | 199 |
| North Carolina | 37 | 23 | 0 | 0 | 2 | 62 |
| North Dakota | 17 | 0 | 0 | 0 | 2 | 19 |
| Ohio | 510 | 187 | 8 | 1 | 1 | 707 |
| Oklahoma | 246 | 82 | 11 | 1 | 47 | 387 |
| Oregon | 554 | 49 | 23 | 8 | 25 | 659 |
| Pennsylvania | 432 | 201 | 37 | 2 | 9 | 681 |
| South Carolina | 366 | 161 | 6 | 0 | 7 | 540 |
| South Dakota | 12 | 0 | 0 | 0 | 5 | 17 |
| Utah | 283 | 8 | 52 | 7 | 25 | 375 |
| Virgin Islands | 0 | 1 | 0 | 0 | 0 | 1 |
| Wisconsin | 242 | 108 | 12 | 0 | 25 | 387 |
| Wyoming | 92 | 5 | 8 | 0 | 7 | 112 |

## 2. Pregnant Prisoners

We asked specifically about pregnant women in general prison populations and in restricted housing. Of the 33 jurisdictions that had sufficiently detailed and consistent information on which to report,[223] 10 said that, as of the fall of 2015, no pregnant prisoners were in their total custodial population.[224] The remaining 23 jurisdictions, listed below in Table 19, reported that within their general populations as of the fall of 2015, they counted a total of 396 pregnant women prisoners. Nineteen jurisdictions reported that they had no pregnant prisoners in restricted housing. The remaining four jurisdictions—Delaware, Florida, Kentucky and North Carolina—reported holding a total of five pregnant prisoners in restricted housing.

**Table 19 – Pregnant Prisoners in Restricted Housing (*n* = 23)**

|  | Women in Total Custodial Population | Pregnant Women in Total Custodial Population | Pregnant Women in Restricted Housing |
|---|---|---|---|
| Alabama | 1,487 | 9 | 0 |
| Arizona | 3,972 | 27 | 0 |
| Colorado | 1,512 | 18 | 0 |
| Connecticut | 1,063 | 23 | 0 |
| Delaware | 223 | 6 | 1 |
| Florida | 6,909 | 52 | 2 |
| Hawaii | 738 | 2 | 0 |
| Kansas | 820 | 4 | 0 |
| Kentucky | 1,005 | 34 | 1 |
| Maryland | 951 | 2 | 0 |
| New Jersey | 722 | 3 | 0 |
| New York | 2,432 | 11 | 0 |
| North Carolina | 2,811 | 35 | 1 |
| Ohio | 4,133 | 14 | 0 |
| Oklahoma | 2,928 | 8 | 0 |
| Oregon | 1,273 | 9 | 0 |
| Pennsylvania | 2,798 | 16 | 0 |
| South Carolina | 1,403 | 16 | 0 |
| South Dakota | 394 | 8 | 0 |
| Texas | 12,785 | 88 | 0 |
| Utah | 537 | 5 | 0 |
| Virginia | 2,353 | 3 | 0 |
| Wyoming | 251 | 3 | 0 |

### 3. Transgender Prisoners

We asked about transgender prisoners in the general population and in restricted housing. Of the 33 jurisdictions providing data on transgender prisoners,[225] 10 reported having no transgender prisoners in their total custodial population. The remaining 23 jurisdictions reported a total of 754 transgender prisoners in their prison systems. Of these, eight jurisdictions reported that no transgender prisoners were in restricted housing. In the 15 jurisdictions that had transgender prisoners in their restricted housing population, we tallied a total of 55 transgender prisoners in restricted housing.[226] In sum, of the 754 transgender prisoners reported by 33 jurisdictions, 55 (7.3%) were reported to be housed in restricted housing.

## VII.    Planned or Proposed Policy Changes in Restricted Housing: 2013-2016

In ASCA-Liman's prior 2015 *Time-In-Cell* Report, 40 jurisdictions reported that they had reviewed their policies and practices of administrative segregation within the prior three years, that is, between 2011 and 2014. Many discussed efforts to make changes, including by reducing isolation, using less restrictive means of confinement, improving mental health services, and adding staff training.[227]

For this 2016 Report, we asked jurisdictions to report policies implemented or plans to revise policies on restricted housing, and we focused on the time period between 2013 and the fall of 2015. Thereafter, at the request of some correctional administrators, ASCA-Liman circulated a follow-up questionnaire in March of 2016 to inquire about any more recent changes. Some jurisdictions provided additional information, including after the August meeting, and thus this discussion includes materials received through the early fall of 2016.

We specifically inquired about changes in policies regarding restricted housing related to the "criteria for entry to restricted housing," "criteria for release to restricted housing," "oversight in restricted housing," "mandated time out-of-cell for restricted housing prisoners," "programming in restricted housing," "opportunities for social contact in restricted housing," "physical environment of restricted housing," "programming for mentally ill prisoners who have been in restricted housing," "policies or training related to staffing of restricted housing," and "other." We also asked jurisdictions to send the underlying policies related to placement in restricted housing. We did not ask questions about the reasons for changes, but as reflected in answers, some revisions to policies have come in the wake of litigation and legislative mandates.

Jurisdictions' responses to these policy questions included varying levels of detail. Further, we did not provide or ask for measures of implementation, such as whether revised entry criteria had resulted in a decline in the number of entrants or whether increased out-of-cell time opportunities were used in practice. Thus, we know how correctional systems *described* their efforts, but we do not have independent metrics of the impact of changes made.

Of the 53 jurisdictions surveyed, 45 provided responses to these questions.[228] Twelve of these 45 jurisdictions provided copies of policies or court-based settlement agreements as well.[229] A few jurisdictions responded with reports of reduced populations in restricted housing or with other kinds of information. Several jurisdictions that reported policy changes later

provided additional information.

Most of the responding corrections departments reported making or considering policy changes. Areas of revision included narrowing the criteria for entry; creating different forms of restricted housing; developing alternative housing options that removed individuals from the general population, but without such restrictive conditions; increasing oversight over the process of deciding who is to be placed in restricted housing; and creating pathways for release or limits on the time to be spent in restricted housing. Several jurisdictions reported that, for those people remaining in segregation, they sought to diminish the degrees of isolation by increasing out-of-cell time; improving access to programs, education, work, and exercise; and creating opportunities for social interaction with people in and outside of prison. In terms of the process for making changes, some jurisdictions reported that they had consulted with outside institutions—from prisoner and disability advocacy groups to organizations such as the Vera Institute of Justice—in their planning efforts.[230]

Below, we first provide an overview of what correctional systems reported they were trying to do to reduce their use of long-term isolation. We then describe changes underway in the federal system at the direction of the U.S. Department of Justice and in five states, all of which were putting into place new policies focused on reducing the use of restricted housing. We detail the proposals in the DOJ report on restricted housing that the March 2016 Presidential order indicated should be implemented within 180 days.[231] Thereafter, we provide information from five states—Colorado, North Dakota, Ohio, South Carolina, and Utah—that indicated that they were making substantial changes in restricted housing policies and procedures.

## A.     Reducing Placement in Restricted Housing: Narrowing Criteria for Entry and Creating Alternatives

Many jurisdictions reported changing the criteria for placement in restricted housing. For example, Colorado stated that it no longer allowed "female or youthful offenders" to be placed into "Restricted Housing – Maximum Security Status."[232] Texas reported that members of what it called the "Texas Mafia" were "no longer placed in restrictive housing based solely on their affiliation." California reported many changes in restricted housing policies, including no longer placing prisoners in restricted housing "solely based" on gang membership.[233] Pennsylvania reported that it had "eliminated self-injurious behaviors, self-mutilation, other forms of self-injury, and behaviors associated with these sentinel events from the list of rule violations that could lead to segregation or other types of informal sanctions."[234] A few of these states have also been involved with litigation regarding restricted housing prisoners, and some of the changes interact with provisions of settlement agreements.

Other jurisdictions described taking steps to alter criteria for placement in restricted housing. North Dakota said that it was in the "process of [a] policy review related to using restrictive housing as a last resort." South Dakota stated that it was revising the criteria for placement in restricted housing "to be based on more clearly defined violent/dangerous behaviors." Utah, as detailed below in Part VII, changed both the criteria for placement and created an individualized review process for each prisoner in restricted housing.

Along with narrowing criteria for entry to restricted housing, some jurisdictions explained that they were seeking ways to divert prisoners from restricted housing, while also removing prisoners from the general population. Ohio, for example, reported that it planned to expand what it termed "Limited Privilege Housing," described as "a non-restrictive housing alternative" for some individuals who would otherwise have been placed in restrictive housing. Oregon stated that it was revising policies to allow "low level" misbehavior to be addressed through some alternative to restricted housing. New York (another jurisdiction in which major litigation related to these issues was resolved in 2016) stated that it was planning "[a]lternative programming units," including drug and alcohol treatment programs and step-down programs, "to reduce the number of inmates being held in restrictive housing." Pennsylvania related that it had recently developed several diversionary treatment units. Texas reported expanding its "Mental Health Therapeutic Diversion Program" to 420 beds.

### B.    Focusing on Release: Time Caps, Step-Down Programs, and Increased Oversight of Retention Decisions

Many jurisdictions reported having implemented or planning to change criteria and procedures for release from restricted housing or to the oversight of decisions to continue to house individuals in restricted housing. Reported efforts included placing limits on the amount of time in segregation, implementing structured programs to transition prisoners back to the general population ("step-down" or "step-up" programs), and increasing oversight or reviews of prisoners who were placed in segregation.

A few jurisdictions reported imposing a limit on the total time prisoners could spend in at least some forms of restricted housing. For example, Colorado described a 12-month limit on placement in Maximum Security restricted housing, which could be extended if "approved by the director of Prisons as well as the deputy executive director, and . . . based upon documented exigent circumstances." South Dakota stated that it has made changes to "Disciplinary Segregation to reduce maximum duration in disciplinary segregation."[235] Ohio reported that it had adopted a policy under which prisoners in "long-term restrictive housing (Level 5 or 4B)" were to be presumptively released after a set period of time unless they were found to "have committed an offense so dangerous it exempts them from this policy." Under Ohio's plan, prisoners in the most restrictive housing environment were presumptively downgraded to a lower level of restriction after 90 days, after which they were presumptively released to a lower restriction level after 15 months.

Several jurisdictions referenced implementing step-down or similar programs that create a series of stages to facilitate the transition of individuals from restricted housing back to the general population.[236] For example, South Carolina (discussed in greater detail below) reported that it had implemented a minimum year-long step-down program for prisoners requiring "intensive management," and a minimum six-month-long step-down program for prisoners who commit less serious infractions. The Virginia Department of Corrections described its efforts at implementing "Steps to Achieve Reintegration" (STAR), a program for prisoners who refused to leave segregated housing "because of their fear of living with others"[237] so as to equip prisoners with "skills to safely enter [general] population housing."[238] Utah (also detailed below) created a

tiered program aimed at moving people from restricted housing to general population within a year or less.

Several jurisdictions reported adding reviews of decisions to keep individuals in restricted housing. For example, New Jersey described the formation of a committee to conduct "a formal review of each inmate" housed in a management control unit (MCU) every three months "to determine whether an inmate's release from MCU is appropriate."[239] Oregon stated that it was implementing a "90-day review process" to ensure prisoners do not remain segregated longer than necessary.

A few jurisdictions described adding new administrative positions at various levels to oversee their restricted housing programs and units. New York said that it had "added an Assistant Commissioner position for oversight."[240] South Dakota reported that it added the position of "Restrictive Housing Manager" in order "to oversee the development and maintenance of the level program and to ensure institutional compliance with new policy changes regarding restrictive housing." Pennsylvania reported "many systemic changes to the ways mental health services are provided to state inmates housed in various types of restricted housing units," including reorganizing the central office responsible for mental health care and augmenting oversight to enhance "the delivery of mental health services." Utah added a new committee, the Placement/Advancement Review Board, to consider each prisoner in restricted housing on a regular basis.

Another form of oversight can come from improving data collection. A few jurisdictions described changing their information tracking systems. For example, Illinois explained that its Department of Corrections regulations were revised to require creation of a new file for each person in restricted housing to track "all relevant documentation pertaining to the administrative detention placement."[241]

Jurisdictions have also sought to prevent the release of individuals from segregation directly to the community. *Time-In-Cell* described 30 jurisdictions that, as of 2013, reported that 4,400 people had been released to their communities without any transition from isolation.[242] A few jurisdictions responding to the 2015 survey described taking steps to prohibit or discourage the direct release of individuals from restricted housing to the outside world. Connecticut stated that it prohibited release of prisoners to the community directly from administrative segregation. Similarly, Colorado policy required the Department to "make every attempt to ensure offenders will not release directly to the community from Restrictive Housing Maximum Security Status" and to do so by considering transition in the 180 days preceding release to the community.

## C.    *Mandated Time Out-of-Cell*

Another strategy described by several jurisdictions was mandating a certain number of hours per day or week that prisoners in segregation would spend outside of their cells. Several jurisdictions reported reforming policies to increase time out-of-cell for prisoners removed from the general population.[243]

For example, Ohio stated that it had a pilot program to provide "10 hours out-of-cell time for structured activity and 10 hours out-of-cell time for unstructured activity for severely mentally ill prisoners who must be held in restrictive housing for safety reasons." Pennsylvania stated that prisoners in particular segregated units were scheduled for a minimum of 20 hours of out-of-cell activity per week. California noted that certain segregated prisoners were granted either 15 or 20 hours out-of-cell per week. Utah related increasing mandated time out-of-cell per week.

### D.    Conditions: The Physical Environment and Programming

In addition to criteria for entry to and release from restricted housing, jurisdictions reported revisiting conditions *within* restricted housing. Oregon, for example, reported that it created a "blue room" in its Intensive Management Unit in one prison, where images of nature were projected onto the walls. South Dakota described several changes, including building "outdoor recreation enclosures," installing windows to provide additional natural light to prisoners, and installing televisions outside of cells, so that segregated prisoners could watch "news/weather channel" during "the daytime hours."

Other jurisdictions described efforts to increase programming opportunities for prisoners in restricted housing, sometimes in groups. New Jersey stated that it planned to build modules for programming in administrative segregation units. Missouri described its new "reintegration unit" for people in restricted housing, which had additional programming. Texas reported on programs allowing administratively segregated prisoners to "participate in group recreation and group treatment."

Several jurisdictions mentioned using "security desks" or "security chairs," which physically restrain prisoners to enable them to sit together in small groups and share in programs or activities. For example, South Dakota described its step-down program as incorporating "out-of-cell group programming." Some jurisdictions, including South Dakota, related installing security desks to permit small group activities. Washington reported that security chairs installed in its Intensive Management Unit classrooms enabled "up to eight offenders at a time [to] interact with other offenders and staff facilitators while participating in programming." Nebraska planned to install such chairs to allow some segregated prisoners to have congregate programming.

### E.    Staffing: Policies and Training

As the *Time-In-Cell* Report detailed, the staffing of restricted housing units poses challenges for both institutions and individual correctional officers.[244] In the 2015 survey, we returned to these issues to learn about policy changes focused on staff, and several jurisdictions described focusing on these issues. For example, New Jersey reported that it had established a special training module for restricted housing staff. Pennsylvania stated that it had added training for employees who work with seriously mentally ill prisoners and for employees who staff restricted housing units. Utah said that it had completed a new policy to direct particular training for officers working in restricted housing facilities. The District of Columbia reported that it did not permit officers with less than 18 months of experience to work in these special units.

Wisconsin stated that it rotated staff out of restricted housing units every 14 weeks and that restricted housing staff received special training in subjects including suicide prevention and professional communication.

### F.    Jurisdictions Seeking Substantial Reductions in Restricted Housing Use

We asked all jurisdictions to provide additional information on efforts to reform restricted housing. Below, we provide brief descriptions of changes, drawn from reports provided by the Department of Justice (DOJ) and from five states—Colorado, North Dakota, Ohio, South Carolina, and Utah—all of which describe themselves as seeking to achieve major shifts in the use of restricted housing.

### 1. The Federal Prison System: Changes Recommended in the 2016 Department of Justice Restricted Housing Report

As noted at the outset, the Justice Department issued a report in January of 2016 that included numerous specific recommendations for changes in how the federal government handles restricted housing.[245] That month, the President discussed the findings of the report and the harms of "solitary confinement," and called for the practice to be "limited, applied with constraints and used only as a measure of last resort."[246] In March of 2016, the President issued a Presidential Memorandum, "Limiting the Use of Restrictive Housing by the Federal Government,"[247] that directed prompt implementation of the DOJ's recommendations by the Justice Department, which was required to rewrite many of its policies. Below we summarize some of the major changes recommended by the DOJ report.[248]

The DOJ organized its mandates under certain "Guiding Principles" followed by "Policy Recommendations."[249] Central changes included limiting the placement of juveniles, pregnant women, and seriously mentally ill individuals in restricted housing, absent exigent circumstances, and banning the use of restricted housing for lesbian, gay, bisexual, transgender, intersex, and gender nonconforming individuals, where such placement is based solely on sexual or gender identity. The Justice Department also mandated the use of the least restrictive alternative, revised the in-prison infractions that could result in placement in restricted housing, and lowered the numbers of days individuals could spend in restricted housing. Thus, the DOJ called for the BOP to end the practice of placing juveniles (defined as "those adjudicated as juveniles, and those under age 18 who were convicted and sentenced as adults") in restricted housing, except as a "temporary response to a behavioral issue that poses a serious and immediate risk to any individual."[250]

A change with a wider application was the goal that all prisoners be housed "in the least restrictive setting necessary" to ensure their safety and that of others.[251] The DOJ stated that correctional systems "should always be able to clearly articulate the specific reason(s)" for placement in restricted housing, that these reasons should be supported by "objective evidence," and that prisoners should remain in restricted housing "no longer than necessary to address the specific reason(s) for placement."[252] The DOJ also called for initial and ongoing reviews of any placement in restricted housing and recommended that, for every prisoner, correctional staff develop "a clear plan for returning the inmate to less restrictive conditions as promptly as possible."[253] Further, to divert individuals placed in protective custody, the DOJ recommended

that the Bureau of Prisons expand its use of "Reintegration Housing Units," which allow certain prisoners to be removed from the general population but continue to live in conditions less restrictive than solitary confinement.[254]

The DOJ recommended that prisoners not be sent to restricted housing as sanctions for certain kinds of misbehaviors, organized in the federal system by "levels." Thus, a low level offense would no longer result in a sanction of disciplinary segregation, and a moderate level offense would not result in a sanction of disciplinary segregation for a first violation or more than 15 days of segregation for a subsequent violation. Previously, moderate offenses could have resulted in 90 days for the first violation or 180 days for a subsequent violation.[255]

The DOJ also called for significant reductions to the time prisoners could be held in restricted housing for disciplinary infractions. For example, the DOJ urged that the maximum time a prisoner be placed in disciplinary segregation for the most serious category of offense be reduced from 365 days for a first offense and 545 days for a subsequent offense to 60 days for a first offense and 90 days for a subsequent offense.[256]

The DOJ also urged that, whenever possible, the BOP seek "to avoid releasing inmates directly from restrictive housing back to the community."[257] To implement this goal, the DOJ recommended revising policies to discourage placing prisoners in restricted housing near the end of their prison terms and to consider releasing prisoners from segregation beginning 180 days before the end of their sentences, if that movement could be done safely.[258]

Like some other jurisdictions, the DOJ recommended changes that would increase total time out-of-cell for individuals in restricted housing. According to the DOJ's recommendations, wardens should be directed to "develop individualized plans for maximizing out-of-cell time for restrictive housing inmates."[259] The DOJ also reported that the BOP was revising its rules governing the use of "secure programming chairs" and "intends to purchase 610 of these chairs" to allow "in-person educational and mental health programming in a less restrictive manner than currently used."[260]

For mentally ill prisoners, the DOJ recommended additional investment to hire mental health staff and expand diversion programs. Under these recommendations, the BOP would create "108 additional psychology positions," which would allow the BOP to "dedicate at least one staff psychologist to each" restricted housing unit.[261] The DOJ also recommended expanded use of "secure mental health units" to divert seriously mentally ill prisoners from solitary confinement into "less restrictive housing."[262] To this end, the DOJ recommended that the BOP "expand its network of residential mental health treatment programs" with the goal of "building sufficient capacity to divert inmates with [serious mental illness] from all forms of restrictive housing . . . whenever it is clinically appropriate and feasible to do so."[263]

The DOJ recommended some measures to increase oversight of the use of restricted housing, including initial and ongoing reviews of a prisoner's placement in restricted housing by "a multi-disciplinary staff committee" which would include institutional leadership and medical and mental health professionals.[264] The DOJ also recommended that the BOP publish monthly system-wide restricted housing data on its external website (to allow the public to track the

number of prisoners in federal restricted housing) and upgrade its data-collection software.[265] (As noted in the introductory materials, in the fall of 2016, several senators introduced a Solitary Confinement Reform Act which, if enacted, would have requirements additional to those outlined above.

### 2. Colorado

According to an article by Rick Raemisch, Director of the Colorado Department of Corrections (CDOC) and Kellie Wasko, Deputy Director of the CDOC, efforts to reduce the use of profound isolation were initiated in Colorado by Tom Clements, who served as the Executive Director of the CDOC from 2011 until 2013. Director Clements was murdered by a person who was released into the community directly from a CDOC restricted housing unit. In 2011, about 1,500 people (7% of the state's prison population) were in restricted housing. Under Director Clements, the population was reduced to 700 people.[266] At that time, 49% of those released went directly to the outside community.

When Rick Raemisch, who had previously served as the Director of Corrections in Wisconsin, assumed the leadership of Colorado's correction system in 2013, he sought to continue to limit the use of isolation. Raemisch and Wasko reported that, as of the spring of 2016, policy changes had produced a 67% reduction in CDOC's restricted housing population. As the data in Section IV indicated, in the fall of 2015, Colorado recorded 217 people, or 1.2% of its population, in restricted housing.

CDOC reported that it used what it termed a "progressive Management (Step down) Process," to provide prisoners with social contact within a highly structured and controlled close custody environment.[267] New units—the Close Custody Management Control Unit (MCU) and Close Custody Transition Unit (CCTU)—were "designed specifically to assist offenders with pro-social stabilization and cognitive intervention programming" before these individuals could enter the general population.[268] The CDOC system required that prisoners in these two units have Behavior Modification Plans, designed, implemented, and monitored by a multidisciplinary team.[269]

CDOC stated that individuals assigned to the MCU were allowed out of their cells for a minimum of four hours per day, seven days per week and that prisoners could be in groups along with several other prisoners when out-of-cell.[270] MCU prisoners could participate in recreational, social, and programming activities, including a minimum of three hours of indoor or outdoor recreation each week. Every 30 days, CDOC reviewed the mental health and management plans for such individuals.[271] According to Raemisch and Wasko, CCTU prisoners were permitted outside their cells six hours per day, seven days per week, in a group of 16 or fewer prisoners.[272] CCTU prisoners were required to participate in the program "Thinking for a Change," described as aiming to increase awareness of and alter criminal thought processes, promote positive peer interactions, and improve problem-solving skills.[273]

Raemisch and Wasko described the most restrictive offender management status— Maximum Security Status (MSS)—as reserved for prisoners who had "demonstrated through their behavior that they pose a significant risk to the safety of staff and other offenders."[274] The length of time spent in the Maximum Security unit was reported not to exceed 12 months.[275]

Those prisoners were permitted one hour a day, five days a week out of their cells and monthly out-of-cell "meaningful contact" visits with case managers and mental health clinicians.[276]

Further, CDOC described installing restraint tables (which, as noted, some jurisdictions describe as "security chairs") to facilitate group programming in the Maximum Security Units.[277] After three months of good behavior, CDOC stated that Maximum Security prisoners could earn a television in their cell.[278] In the fall of 2015, CDOC reported three women in restricted housing. In its spring 2016 report, CDOC stated that it has adopted policies prohibiting the placement of female or youthful offenders into Maximum Security Restrictive Housing status.[279]

The question of the treatment of the mentally ill has drawn attention from the state legislature as well as from CDOC, which helped to shape legislation reducing isolation for mentally ill offenders. In June 2014, Governor John Hickenlooper signed Senate Bill 14-064,[280] which prohibits the placement of seriously mentally ill prisoners (SMI) in "long-term isolated confinement except when exigent circumstances are present."[281] Before this legislation was enacted, CDOC reported that in 2014 all prisoners with SMI had been evaluated and "moved out of administrative segregation to either a Residential Treatment Program or a general population setting."[282] SMI prisoners in the residential treatment units were, according to Colorado, permitted to leave their cells for 10 hours of structured therapeutic interventions and 10 hours of non-structured recreational programming each week.[283] Again, CDOC said it relied on restraint tables, which accommodate up to four prisoners, for group interactions with therapists and clinicians.[284]

CDOC described using screenings of prisoners upon entry to prison in order to identify individuals with serious mental illness.[285] Further, if prisoners violated prison rules, assessing committees were charged with determining whether mental illness contributed to the person's committing a violation; if so, the person was to be assigned to a Residential Treatment Program that entailed significant restrictions on time out-of-cell but was not the same kind of management control unit to which non-mentally ill violators were assigned.

Like other departments, CDOC reported that some individuals who had been in profound isolation had difficulty leaving it.[286] CDOC described its Divisions of Clinical Services and Prison Operations staff as developing programs to encourage individuals to leave their cells; initiatives including having dogs in treatment groups, constructing de-escalation rooms with soothing music, and art therapy classes.[287]

CDOC characterized these policy changes as successful, reporting that the two facilities with Residential Treatment Programs have experienced significant declines in forced cell entries and in prisoner-on-staff assaults.[288] CDOC explained that its senior executives provided weekly messages to the entire department to describe ongoing reforms, explain their rationale, and invite feedback. Further, Raemisch and Wasko described giving management teams at the facility level the autonomy to determine what methods to use to engage staff in and gain their commitment to change.[289] CDOC also reported that there were no suicides in restricted housing in 2015.[290] The average length of time spent in restricted housing by CDOC prisoners was approximately 7.5 months.[291]

### 3. North Dakota

Reports of reforms in the North Dakota Department of Correction and Rehabilitation (ND-DOCR) come from its director, Leann Bertsch, whose essay, *The History of Restricted Housing at the ND-DOCR*, details the evolution of using segregation from the era of "dark cells" where no light could reach prisoners to modern-day segregation.[292] She described the expanding use of segregation despite the absence of any "apparent correlation between institutional violence, escapes, weapons, or riots that would account for" that increase.[293] Thus, North Dakota has identified segregation as a *problem* to be solved and outlined how the Department aimed to reduce dramatically its reliance on isolation.[294] In a March 2016 discussion of "strategic planning" to reduce segregation, the Department listed what segregation "can't do," (improve institutional behavior, reduce violence or recidivism) and what segregation had been "proven to do" (increase violence, aggression, self-harm, psychosis, and other physical and mental health harms in men who have spent time there).[295]

Thus, the aim was to use the least "restrictive housing level,"[296] and the new "goal of segregation" was "to separate, assess, and equip people to function at a reduced risk to themselves, the institution, and others."[297] ND-DOCR's strategy was to "divert people from segregation and strictly limit the types of behaviors that can result in segregation."[298]

At the front end, ND-DOCR reported that it had limited the behaviors that could result in placement[299] and had encouraged alternative interventions, such as increasing monitoring in general population or restricting prisoners within their general population cells, so as to use segregation as a last resort.[300]

The ND-DOCR also implemented reforms to reduce the population in their restricted housing units. Leadership identified over 30 people in the Administrative Segregation Unit who no longer required restricted housing, and moved them into a new Administrative Transition Unit (ATU) to prepare them for the transition to general population.[301] People housed in the new ATU were permitted more opportunities for social interaction and special programming to help them prepare for the return to general population.[302] The Special Assistance Unit (SAU), the housing unit for people with mental illness, also expanded opportunities for socialization by allowing its residents to engage in group treatment and to spend days visiting the general population floor.[303] The SAU also created a new transition floor, with supportive services, to help improve reentry outcomes for this population.[304]

In addition, through a psychological assessment process, the ND-DOCR identified the "most acutely impulsive and dangerous people" in their restricted housing units.[305] These people were assigned behavior management plans to help them develop the skills and behaviors needed to transition out of restricted housing. For those remaining in restricted housing, these plans "have increased the amount of interaction, out-of-cell time, enrichment, and reinforcement . . . ." All new admissions to Administrative Segregation are assessed immediately by a multi-disciplinary team and provided with a personalized behavior management plan that indicates what progress is necessary to begin the transition out of restricted housing.[306]

Like Colorado, North Dakota indicated that it sought to engage correctional officers in all stages of program development, which included surveying staff to identify perceived problems,

educating correctional officers about the psychological and physical harms of solitary confinement, and stressing rehabilitation as a means of achieving security within facilities.[307]

Since implementing these reforms, North Dakota's DOCR reported that it has reduced its segregated population from 82 prisoners in April 2015 to 27 in April 2016.[308] Director Bertsch highlighted staff support[309] and prisoner reports of more positive exchanges with staff.[310] North Dakota also reported a reduction in the use of force[311] and no increase in incidents of violence since shifting its approach.[312]

### 4. Ohio

In the fall of 2015, ODRC described a "[m]ajor overhaul of the entire system as part of a comprehensive reform." In a May 2016 Executive Briefing by staff to Director Gary Mohr, the ODRC outlined reforms at three facilities—the Grafton Correctional Institution (GCI), the Belmont Correctional Institution, and the Ohio State Penitentiary.[313] Those efforts were part of making "a substantive change to our entire disciplinary process and the types/kinds of sanctions we use to address inmate misbehavior."[314]

According to the Department, the GCI has converted half of its Special Management Unit (SMU) cells into Limited Privilege Unit (LPU) cells, for use by prisoners who are deemed not to pose "a significant threat to the safety and security of the facility."[315] These prisoners are given "more out-of-cell time, access to telephones and email, as well as additional recreational time activities."[316] Most significantly, prisoners on LPU were offered the opportunity to gain early release from restricted housing by participating in pro-social structured and unstructured activities.[317] The Department reported that these activities included programming on problem-solving, community service, recovery, anger management, and mental and physical wellness. The Department enabled LPU prisoners to attend these programs in general population classrooms and to leave the unit for mental health and medical appointments.[318]

Ohio reported that, at its Belmont Correctional Institution (BeCI), it launched a pilot program on "alternative disciplinary sanctions" adapted from the HOPE Model (Hawaii Opportunity Probation with Enforcement).[319] The premise of the model, which Ohio adapted to fit the corrections environment, is that violations should result in sanctions that are prompt, proportionate to the severity of the offense, and take into consideration the individual behavioral history of the prisoner.[320]

In addition to adopting the HOPE Model, BeCI introduced other reforms intended to reduce the population in restricted housing, including new pro-social programming, congregate activities, and targeted case planning.[321] BeCI also introduced new programming to address the specific needs of prisoners with mental illness, including group psychotherapy, medication education, and programs promoting adjustment.[322]

BeCI also introduced alternative sanctions to reduce reliance on restricted housing, such as imposing bunk restrictions, commissary restrictions, and personal electronics restrictions.[323] Like North Dakota, Ohio's BeCI has reassessed its response to certain offenses that previously would have led to placement in restricted housing.[324] Instead of placing "Rule 39" violators in restricted housing—that is, prisoners who use or possess drugs and alcohol—BeCI has created

special "Rule 39 Unit" dormitories.[325] No individual is placed in restricted housing until a third positive drug test.[326] Ohio also explained that, while at first it put all prisoners who tested positive for substance use in the same unit, concerns emerged that placing casual users with addicts encouraged drug use. As a result, BeCI redesigned the unit to create two different tracks: a disciplinary track for more addicted users, and a programming track for casual users.[327]

The Department described efforts at Ohio State Penitentiary (OSP) to alter criteria for releasing prisoners from restricted housing. OSP houses the system's most dangerous prisoners, and as of April 1, 2016, there were 335 prisoners in this facility housed in extended restricted housing.[328] Ohio reported that in the fall of 2015, it instituted a new policy, under which each prisoner's security level is presumptively reduced within a set time period, with the exception of prisoners who committed "very serious" offenses such as "murdering another inmate" or "taking a staff member hostage."[329] Absent such circumstances, however, Ohio reported that each prisoner is given an individually-tailored Behavior Management Plan (BMP) that specifies the maximum time that the prisoner will spend in each restricted housing status.[330] Each status brings increased privileges and prisoners can accelerate their progress through the levels by demonstrating pro-social behaviors and participating in programs.[331]

For those prisoners who were ineligible for presumptive reduction, the Department reported that OSP had "developed a separate management strategy based on good conduct, increased quality of life, and social interaction."[332] For these prisoners, Ohio reported increasing out-of-cell time by 30 minutes, five days a week; increasing telephone access from 30 minutes a month to two hours per month; and increasing the number of permitted visits from two to three per month.[333] In addition, OSP reported that it offered prisoners the ability to have a tablet in-cell and to email and download games through a kiosk in the unit; the ability to purchase a keyboard for in-cell and congregate programming; and the opportunity to participate in a monthly incentive program to earn more privileges.[334] Ohio reported that these prisoners are evaluated annually for release, with consideration given to recent behavior and programmatic involvement.[335]

Ohio also reported efforts to update its data collection system to monitor its prisoners' placements. As of May 2016, Ohio was seeking weekly updates from its facilities on prisoners in restricted housing.[336] Ohio reported that it had reduced the use of restricted housing and that violence had likewise fallen. Belmont Correctional Institution described a 90% reduction in the use of restricted housing since 2010, coupled with a 25% reduction in the violence rate since 2014.[337] Ohio's leadership reported that "there is cause to believe that these reforms have made [their] prison[s] safer."[338]

### 5. South Carolina

South Carolina provided policies on entry into, activities in, and oversight of restricted housing.[339] To reduce the use of restricted housing, South Carolina's Department of Corrections (SCDC) adopted a Step-Down Program (SDP) "to create a pathway for offenders to 'step down' from the Restricted Housing Unit (RHU) to general population in a manner that maintains public, staff, and offender safety, while also reducing their criminogenic risk factors."[340]

Director Bryan Stirling provided materials tracking the number of prisoners in Restricted Housing from 2012 to March of 2016. The total "lockup" numbers in 2012 were 1,691 (including 1,251 individuals described as non-mentally ill and 420 people termed "mentally ill"). In March of 2016, the total number was 755, of which 266 were "mentally ill."[341]

SCDC launched its Step-Down initiative at McCormick Correctional Institution in June 2015 and, by March of 2016, reported that the program had expanded to 17 of the state prison system's 26 facilities.[342] SCDC explained that prisoners accepted into the Step-Down program are divided into two categories: Intensive Management (IM) and Restrictive Management (RM). IM prisoners were those with "the potential for extreme and deadly violence that have been a threat to the physical safety of other inmates or staff at one time."[343] RM prisoners, by contrast, were individuals who were "continually" placed in restricted housing due to "poor adjustment in general population" but who "do not pose a deadly threat to staff or inmates."[344]

SCDC reported that prisoners in the IM program had to complete a minimum yearlong, three-phase program before rejoining the general population.[345] The program's timeframe could be extended if the individual had "disciplinary infractions or poor adjustment."[346] Like most step-down programs, prisoners received incremental privileges as they progressed. In the most restrictive Phase I, prisoners were granted certain privileges, referred to as "Phase I incentives," which include out-of-cell time each day from 8:00 a.m. until 4:00 p.m.; lunch in the cafeteria (breakfast and dinner were provided in-cell); and recreation time in the gym twice a week.[347]

Phase I was designed to span at least three months, during which time prisoners were required to participate in programming.[348] To advance to Phase II, prisoners could not be involved in assaultive behavior during the time they were in Phase I.[349] In Phase II, incentives included out-of-cell time from 8:00 a.m. to 6:00 p.m.; lunch and dinner in the cafeteria; and the ability to have one visit per month even if on visitation restriction.[350] To advance from Phase II, prisoners were required to meet all Phase I requirements, complete an additional 90 days of programming, demonstrate "openness to constructive feedback" and "[d]emonstrate management and control of impulsive behavior."[351] Prisoners who successfully completed Phase II could move to Phase III. In Phase III, incentives included out-of-cell time from 5:30 a.m. to 8 p.m.; job assignments outside of their dorm; all meals in the cafeteria; and two visits per month, if on visitation restriction.[352] After six months in Phase III, prisoners were to be considered for placement in general population.[353]

As South Carolina staff also explained, the Phase I incentives were automatic when a prisoner entered the program; if a prisoner misbehaved repeatedly, that prisoner would be required to repeat the first phase or be returned to restricted housing, and thereafter, be able to start the step-down program again.

SCDC explained that the RM program was similar to the IM program, but ran for six months rather than a year.[354] RM prisoners had more incentives earlier, more recreation time each week, more visitation opportunities, and more out-of-cell opportunities.[355] For example, in Phase I, incentives in the RM program included schooling for prisoners who did not have their high school diploma, three visits per month, and job assignments.[356]

SCDC's Step-Down Program also included educational programming. If accepted to the SDP, prisoners were to be screened for completion of a GED or high school diploma. Prisoners who had not obtained either were enrolled in education courses beginning in Phase III (IM) or Phase II (RM).[357] If prisoners had not completed educational requirements by the end of the SDP, they continued their education upon return to general population.[358]

SCDC described its Step-Down Program as including a wide array of classes, such as art and music, philosophy, creative writing, foreign languages, and some other life-skills programs, as well as anger management, managing anxiety and depression, and budgeting for individuals and families.[359] Upon graduation from the Step-Down Program, prisoners had restrictions on canteen, telephone, and visitation privileges lifted.[360] Further, prisoners were given the option of transferring to other programs within SCDC or remaining to become a facilitator for incoming prisoners in the Step-Down Program.[361]

In terms of program administration, decisions on prisoner movement through the steps were made by the SDP Review Team, which consisted of a Warden or his/her designee, the SDP unit manager, the SDP caseworker, and a mental health counselor.[362] SCDC reported that for prisoners who did not advance, the team informed them of what was required to do so.[363]

Further, if any prisoner was found to have committed a serious, major disciplinary infraction or refused to participate in any part of the program, that prisoner could be returned to the previous phase, as decided by the SDP Review Team. Consideration was given to time spent in restricted housing, the reason the prisoner was originally placed in restricted housing, the prisoner's mental health status, his/her risk level, his/her willingness to participate in the program, and the safety and security of staff and other prisoners.[364]

Issues of mental illness have been a part of the concerns of the SCDC, which on January 12, 2015, entered into a settlement with Protection and Advocacy for People with Disabilities, Inc., and agreed to improve conditions for mentally ill prisoners incarcerated at the SCDC.[365] In 2015, the Department agreed to seek $8.6 million in funding for three years to increase the number of mental health personnel and to improve facilities. Some planned facility improvements included adding a recreation yard to the Behavioral Management Unit, cordoning off a Crisis Intervention Unit for prisoners arriving with or developing a condition that warrants an immediate response, and adding cameras in cells for monitoring/surveillance.[366] The Department was also developing a program for screening and evaluating prisoners to identify those in need of mental health care, as well as a training curriculum that included crisis-intervention training for staff.[367]

The Step-Down Program operated in the context of the SCDC policies governing restricted housing. For example, prisoners classified as "Level 1" Substantiated Security Risk (SSR), who were permitted to exercise outside of cells five days a week, one hour per day,[368] were to be "restrained according to their status; and "strip-searched prior to being removed from their cell and at the conclusion of exercise," for most levels.[369] SCDC policy also encourages an "in-cell exercise program"—providing directions on forms of exercise inside cells and to be distributed to prisoners in any form of restricted housing.

### 6. Utah

Utah revised its rationale for restricted housing in 2016, according to the Director of the Division of Institutional Operations, Jerry Pope, who was charged by Executive Director Rollin Cook to oversee changes but, prior to the adoption of its 2016 policy, Director Pope described, restricted housing was a way to warehouse people whom the prison viewed as problems. In contrast, Utah has changed that approach to limit the reasons for placement in restricted housing and to develop a program for those placed in restricted housing to move back to the general population as soon as possible. As Director Pope explained, this new approach was "the right thing to do," especially because most people in restricted housing would eventually be released back into the community.[370]

The 2016 policy, promulgated in January,[371] was finalized after consultation with the American Civil Liberties Union of Utah (ACLU), the Disability Law Center of Utah, and Utah Prisoners Advocate Network.[372] The 2016 policy statement explained that its purpose was to provide the "procedure, rationale and guidelines for the management and operation of Restricted Housing," which was that "when circumstances make it necessary to place an inmate in Restricted Housing that a structured, progressive program be available that creates an opportunity for an inmate to progress out of Restricted Housing to general population within 12 months."[373]

The policy's "Vision Statement" described a commitment to "becoming industry leaders in restricted housing management" that fostered "positive change."[374] The "Mission Statement" explained that the "team will provide inmates with opportunities for education, mental health, programming, recreation, religious services, and visiting in a safe, secure, and cost-effective environment," that encouraged "transition to less restrictive housing through a structured and progressive program."[375] Director Pope reported that staff posted the Mission Statement and Vision Statement on placards in each unit in order to raise and maintain awareness about changes to restricted housing.[376]

Central to the new policy was an individualized review of decisions to move people in and out of restricted housing. This review also narrowed the criteria for placement in restricted housing. To do so, the 2016 policy created an "Objective Review Panel" to conduct an initial review of each individual placed in restricted housing.[377] Thereafter, a multi-disciplinary team (the Placement/Advancement Review Board) was to have a weekly review of each person placed in restricted housing to determine whether he or she met—and continued to meet—specified criteria for restricted housing.[378]

The Placement/Advancement Review Board was initially planned to include several correctional officials, including the Division Director, the Director of Inmate Placement Programs, wardens, deputy wardens, and captains from the Central Utah Correctional Facility and Utah State Prison, as well as a "qualified health professional," a representative of the ACLU, and a representative of the Utah Disability Law Center."[379] Thereafter, the staff determined that confidentiality concerns precluded the outside organizations from having relevant information, and decided instead to conduct an "annual policy review" with those organizations.[380]

The criteria for placement were revised to provide that the bases for placement in restricted housing included, but were not limited to, "Security Threat Group activity," "riot," "serious safety concerns," and "involvement in a serious threat to life, property, staff or to the orderly operation of a unit or facility."[381] The policy provided that if the Placement/Advancement Review Board deemed that an individual was inappropriately housed in restricted housing, the individual "shall be referred to his/her respective Offender Management Review for reassessment and proper housing."[382]

Further, under the 2016 policy, individuals placed in restricted housing were to have a mental health assessment within 72 hours, and receive a review by the Placement/Advancement Review Board within 10 days.[383] Further, if a prisoner was found to have a serious mental illness, that person "shall be moved to a mental health treatment unit."[384]

As Director Pope reported to us, Utah's first step was to complete an evaluation of every prisoner in restricted housing. After that review, the Department concluded that many individuals should be moved out or, for those with serious mental health needs, transferred to a mental health unit. As of the fall of 2016, implementation was underway to provide for what has come to be known as "ten and ten" in the mental health unit—10 hours of time out-of-cell for mental health treatment and an additional 10 hours out-of-cell per week for other activities.

In addition to reviewing why a person was initially placed in restricted housing, Utah's 2016 policy provided means, through its "Step-Up Tier Program," for people to leave restricted housing. As its title reflected, the policy was designed to return people to general population within one year; it also allowed for an earlier return if an individual successfully completed the steps earlier.[385]

Under this policy, a prisoner in restricted housing was to begin at Tier 1, with a "minimum of 5 hours out-of-cell each week," as well as "in-cell programming, in-cell education, volunteer work, . . . [and] individual mental health counseling."[386] Further, prisoners "on Tier 1 with little or no contact with other individuals" were to be "monitored daily by medical staff and at least once a week by mental health staff."[387]

After 45 days, a prisoner so confined could, after a review, be advanced to Tier 2, where he or she would become eligible for two-cell recreation at 5-10 hours per week, as well as work opportunities, "group education," and "group programming."[388] After another review at 120 days, a prisoner could advance to Tier 3, in which "quad cell recreation" is permitted out-of-cell for 10 to 14 hours per week.[389] Security desks were installed for education and group therapy, and recreation center enclosures were also added to allow more time out-of-cell.[390] The policy permitted visiting and phone privileges based on a reward system, and provided that all visits be conducted through a barrier.[391] After another 150 days, another review could make a prisoner eligible for a return to the general population.[392]

The 2016 policy also included a provision that prioritized staff working in Restricted Housing units for "Crisis Intervention Training."[393] Utah reported that all custody staff received two hours of in-service training on restricted housing.[394] In addition, Utah revised its data collection system to track information on restricted housing. Those changes were underway as of

this writing. The state's Research and Planning Bureau was identifying metrics based on the guiding principles of the new restricted housing policy in order to generate quarterly reports that would help determine the effectiveness of the restricted housing program and provide bases for modifying the program as well.[395]

Utah further explained that, had it answered the 2015 survey with data from the summer of 2016, its numbers would have been different. Rather than 14% of its population in restricted housing, 6% were in-cell for 22 hours or more (380 out of 6,112, of whom seven (1.6%) were women). Further, 268 people were in-cell for 20-21 hours, resulting in a total of 648 or 10.6% of the population confined in those settings.[396] In addition, Utah had detailed information on the demographics of the populations.[397] In short, as a result of these substantive policy changes, the number of prisoners in restricted housing dropped from 912 in the fall of 2015 to 380 in August, 2016, with another 268 prisoners in-cell for 20-21 hours.

## VIII.     Reflecting on Efforts to Reduce Time-In-Cell

In the course of conducting this research and writing this Report, correctional administrators repeatedly contacted us to discuss their efforts to reduce the numbers of persons confined in restricted housing. In addition, many Directors stressed the efforts to shift from the 22 or more hours in-cell model to forms of restrictions that provided more time out-of-cell. Indeed, as this Report was circulated in draft, system administrators sought us out to explain how the numbers detailed were out of date, for they had succeeded in reducing restricted housing prison populations from the levels described here.

These efforts reflect the profound shift that has occurred in the last few years, since ASCA and Liman began this series of research projects. While once restricted housing was seen as central to prison management, by 2016 many prison directors and organizations such as the ACA and ASCA had defined restricted housing as a practice to use as little as possible for as short a duration as possible. Moreover, the large numbers of people in restricted housing are enduring conditions that are harmful not only to them, but also to staff and the communities to which prisoners will return. Indeed, some prison administrators are "abolitionists," in the sense that they would—if they could—end solitary confinement and find methods to ensure that no person remain for more than 15 days in 22-in-cell hours continuously.

Yet, as the data in this Report reflect, unraveling the practices of isolation requires sustained work. This Report identified 67,442 prisoners in restricted housing and that number, as noted at the outset, excludes most jails in the United States. Some 5,909 prisoners in 32 jurisdictions have been kept in-cell for 22 hours a day or more for three years or more. Yet the Nelson Mandela Rules—formulated with input from U.S. correctional officials—call more than 15 days a form of prolonged isolation that should be understood as degrading and inhumane treatment.

Moreover, a question emerges about why 22 hours or more should be definitional of isolation. The question is whether a move to 21 (rather than 22) hours in-cell responds to alleviate the harms of isolation. Equally important is the length of time a person is subjected to isolating conditions, and how to assess the number of hours in-cell within the context of the

length of time confined in that manner. How many hours in continual confinement in a cell for how many days should be seen as impermissible? Moreover, prisoners may be held in their cells for days (if not 15 consecutive days) for 22 hours or more. Further, in many systems, the small amount of time out-of-cell that is permitted is spent in enclosed cubicles, sometimes without any natural light.

In short, neither a shift to 21 hours nor time out-of-cell in very tight spaces responds to the goals—expressed by ASCA, the ACA, among many others—of changing the conditions of confinement in significant ways. Thus, at its core, the issue is whether—as the proposed 2016 Senate solitary confinement reform legislation reflects—the isolation denoted by solitary confinement should be ended. Doing so would reflect that the *separation* of individuals to promote safety and well-being need not be accompanied by *deprivation* of all opportunities for social contact, education, programming, and other activities.

We return as we began—to the larger context. From the inception of this joint work by ASCA and Liman, we have always understood that isolation ought not itself be understood "in isolation." Restricted housing practices are on a continuum with the placement of prisons in rural settings, far from the homes of many of the prisoners and imposing difficulties in having both able staff and volunteers, as well as regular visits by family members.

As the nation revisits its decades of over-incarceration, it must address restricted housing in the context of prison policies and criminal justice practices in general. This Report makes plain that correctional leaders in many jurisdictions are reconsidering their own systems, and joining with prisoners, their families, advocates, and members of all branches of government, the academy, and many others—who are seeking to achieve lasting changes in the use of incarceration itself.

**Endnotes**

---

[1] Hope Metcalf, Jamelia Morgan, Samuel Oliker-Friedland, Judith Resnik, Julia Spiegel, Haran Tae, Alyssa Work & Brian Holbrook, *Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies*, YALE LAW SCHOOL ARTHUR LIMAN PUBLIC INTEREST PROGRAM (June 2013) [hereinafter ASCA-Liman 2013 *Administrative Segregation Policies*], https://www.law.yale.edu/system/files/area/center/liman/document/Liman_overview_segregation_June_25_2013_TO_POST_FINAL(1).pdf.

[2] Sarah Baumgartel, Corey Guilmette, Johanna Kalb, Diana Li, Josh Nuni, Devon Porter & Judith Resnik, *Time-In-Cell: The ASCA-Liman 2014 National Survey of Administrative Segregation in Prison*, YALE LAW SCHOOL ARTHUR LIMAN PUBLIC INTEREST PROGRAM 54-57 (Aug. 2015) [hereinafter *Time-In-Cell*], https://www.law.yale.edu/system/files/documents/pdf/asca-liman_administrative_segregation_report_sep_2_2015.pdf.

[3] Daniel P. Mears, *Evaluating The Effectiveness of Supermax Prisons*, URBAN INSTITUTE (March 2006), http://www.urban.org/research/publication/evaluating-effectiveness-supermax-prisons; see also *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring).

[4] *Time-In-Cell*, *supra* note 2, at 3.

[5] *Id.* at 37-38.

[6] *Id.* at 39.

[7] *Id.* at 43-49.

[8] *Id.* at 44-46.

[9] *Id.* at 49.

[10] *Id.* at 29-30.

[11] The ASCA-Liman Report relied on answers from those who run prisons. In the fall of 2015, the Bureau of Justice Statistics (BJS) released a survey drawn from another source—prisoners. See Allen J. Beck, *Use of Restrictive Housing in U.S. Prisons and Jails, 2011-12*, BUREAU OF JUSTICE STATISTICS (Oct. 2015), http://www.bjs.gov/content/pub/pdf/urhuspj1112.pdf [hereinafter Beck, *Use of Restrictive Housing*]. Based on responses during 2011-2012 from 91,177 prisoners in 233 state and federal prisons and in 357 jails, BJS found that almost 20% of those prisoners and detainees had been held in restricted housing within the prior year. The individuals more likely to have been placed in restricted housing were younger, lesbian, gay, bisexual, or mentally ill, and without a high school diploma. The BJS study found that expansive use of restricted housing correlated with institutional disorder, such as gang activity and fighting, rather than with calmer environments. *Id.* at 1.

[12] *New Report on Prisoners in Administrative Segregation Prepared by the Association of State Correctional Administrators and the Arthur Liman Public Interest Program at Yale Law School*, ASSOCIATION OF STATE CORRECTIONAL ADMINISTRATORS (Sept. 2015), http://www.asca.net/system/assets/attachments/8895/ASCA%20LIMAN%20Press%20Release%208-28-15.pdf?1441222595.

[13] *Id.*

[14] *See, e.g.*, Jess Bravin, *Study Fuels Doubts Over Solitary Jailing,* WALL STREET JOURNAL, A3 (Sept. 3, 2015); Ray Hardman, *New Yale Survey Estimates Nearly 100,000 in Solitary Confinement in the U.S.*, WNPR (Sept. 2, 2015), http://wnpr.org/post/new-yale-survey-estimates-nearly-100000-solitary-confinement-us#stream/0; Timothy Williams, *Prison Officials Join Movement to Curb Solitary Confinement*, N.Y. TIMES (Sept. 2, 2015), http://www.nytimes.com/2015/09/03/us/prison-directors-group-calls-for-limiting-solitary-confinement.html; Dana Liebelson, *97 Percent of DC's Prisoners in One Type of Solitary Confinement are Black*, HUFFINGTON POST (Sept. 2, 2015), http://www.huffingtonpost.com/entry/solitary-confinement-prison-report_us_55e71effe4b0aec9f3556937; Tony Mauro, *Prison Officials Push to Reduce Number of Inmates in Isolation*, THE NATIONAL LAW JOURNAL (Sept. 2, 2015), http://www.nationallawjournal.com/id=1202736243843/Prison-Officials-Push-to-Reduce-Number-of-Inmates-in-Isolation?slreturn=20160924232512; Simon McCormack, *Even Prison Officials Want to Curb Solitary Confinement*, HUFFINGTON POST (Sept. 3, 2015), http://www.huffingtonpost.com/entry/prison-officials-solitary-confinement_us_55e8530ce4b0 c818f61ace30; Gregory Korte, *Obama Restricts Use of Solitary Confinement*, USA TODAY (Jan. 25, 2016), http://www.usatoday.com/story/news/politics/2016/01/25/obama-restricts-use-solitary-confinement/79327230/; Daniela Altimari, *Report: Fewer State Prisoners Held in Solitary Confinement*, HARTFORD COURANT (Sept. 4, 2015), http://www.courant.com/politics/hc-solitary-confinement-0905-20150904-story.html.

[15] *See Collection of Reactions to Time-In-Cell*, YALE LAW JOURNAL FORUM, Vol. 125 (Jan. 15, 2016). Essays include Reginald Dwayne Betts, *Only Once I Thought About Suicide*, http://www.yalelawjournal.org/forum/only-once-i-thought-about-suicide; Alex Kozinski, *Worse than Death,* http://www.yalelawjournal.org/forum/worse-than-death; Jules Lobel, *The Liman Report and Alternatives to Prolonged Solitary Confinement,* http://www.yalelawjournal.org/forum/alternatives-to-prolonged-solitary-confinement; Ashbel T. (A.T.) Wall, *Time-In-Cell: A Practitioner's Perspective*, http://www.yalelawjournal.org/forum/Time-In-Cell-a-practitioners-perspective; Marie Gottshalk, *Staying Alive: Reforming Solitary Confinement in U.S. Prisons and Jails*, http://www.yalelawjournal.org/forum/reforming-solitary-confinement-in-us-prisons-and-jails; and Judith Resnik, Sarah Baumgartel, and Johanna Kalb, *Time-In-Cell: Isolation and Incarceration*, http://www.yalelawjournal.org/forum/Time-In-Cell-isolation-and-incarceration.

[16] The four jurisdictions whose reports were limited in many areas were Arkansas, Nevada, Rhode Island, and West Virginia. Additional details are provided *infra* note 165.

[17] Unless otherwise indicated, data about jurisdictions came from jurisdictions' responses to the initial ASCA-Liman survey and follow-up questions. The initial report was circulated in the fall of 2015. States responded and provided follow-up information through the summer of 2016. All data reflects the prison population as of October 1, 2015 unless otherwise noted.

[18] *See infra* Section IV.A.

[19] *Id.*

[20] *See infra* Section IV.B.

[21] *Id.*

[22] A few jurisdictions did provide information on jail facilities. For example, the information from the District of Columbia exclusively concerns the municipal facility that it operated. As noted, Louisiana asked for inclusion of parish jail population numbers on some measures. *See infra* Section IV.A.

[23] Sallie Clark, *Five Voices on Reforming the Front End of Justice: Where the Buck—$93 Billion a Year—Stops*, MARSHALL PROJECT (July 18, 2016), https://www.themarshallproject.org/2016/07/17/five-voices-on-reforming-the-front-end-of-justice?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_term=newsletter-20160717-542#.LaAES0RVz. Clark wrote in her capacity as President of the National Association of Counties.

Jails also have restricted housing; the 2015 report by the Bureau of Justice Statistics, relying on surveys from more than 90,000 prisoners in 233 state and federal prisons and 357 jails, found that almost 20% of the respondents described being held in restricted housing within the year before the survey. *See* Beck, *Use of Restrictive Housing*, *supra* note 11, at 1.

[24] See *infra*, Section V.A and Chart 3.

[25] Peter Baker & Erica Goode, *Critics of Solitary Confinement Are Buoyed as Obama Embraces Their Cause*, N.Y. TIMES (July 21, 2015), http://www.nytimes.com/2015/07/22/us/politics/critics-of-solitary-confinement-buoyed-as-obama-embraces-cause.html?rref=collection%2Ftimestopic%2FSolitary%20Confinement.

[26] DEPARTMENT OF JUSTICE, REPORT AND RECOMMENDATIONS CONCERNING THE USE OF RESTRICTIVE HOUSING (Jan. 2016) [hereinafter DOJ RESTRICTIVE HOUSING 2016 REPORT], https://www.justice.gov/dag/file/815551/download. That work relied for some aspects of its discussion on data from the ASCA-Liman Report, *Time-In-Cell*.

[27] Barack Obama, *Why We Must Rethink Solitary Confinement*, WASH. POST (Jan. 25, 2016), https://www.washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016.

01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html.

[28] DOJ RESTRICTIVE HOUSING 2016 REPORT, *supra* note 26, at 114.

[29] *Id*. at 99-102.

[30] *Id*. at 109-10.

[31] *Id*. at 94.

[32] *Id*. at 95.

[33] *Id*.

[34] *Id.* at 95.

[35] *Id*. at 116.

[36] *Id.* at 117.

[37] Presidential Memorandum on Limiting the Use of Restrictive Housing by the Federal Government from President Barack Obama to the Heads of Executive Departments and Agencies (Mar. 1, 2016) [hereinafter Presidential 2016 Memorandum on Limiting Restrictive Housing], https://www.whitehouse.gov/the-press-office/2016/03/01/presidential-memorandum-limiting-use-restrictive-housing-federal.

[38] *Id.*

[39] Gary Mohr & Rick Raemisch, *Restrictive Housing: Taking the Lead*, 77 CORRECTIONS TODAY (Mar. 2015), ttp://www.aca.org/aca_prod_imis/Docs/Corrections%20Today/2015%20Articles/March%202015/ Guest%20Editorial.pdf. Other correctional leaders shared this concern. *See, e.g.,* Jeri Zeder, *Thinking Outside the Box*: *How a prison manager changed his mind about solitary confinement*. NORTHEASTERN LAW MAGAZINE (Summer 2016).

[40] Mohr & Raemisch, *Restrictive Housing: Taking the Lead*, *supra* note 39, at 2.

[41] *New Standard 7*, in ACA RESTRICTIVE HOUSING PROPOSED STANDARDS, AMERICAN CORRECTIONAL ASSOCIATION (Approved Aug. 2016), http://online.wsj.com/public/resources/documents/Restrictive_housing.pdf.

[42] *Id.*, *New Standard 5*.

[43] *Id.*, *New Standard 6*.

[44] *ACA Restrictive Housing Standard 4-4250 & 4-4253*, STANDARDS FOR ADULT CORRECTIONAL INSTITUTIONS, AMERICAN CORRECTIONAL ASSOCIATION (4th ed. 2003).

[45] ACA RESTRICTIVE HOUSING PROPOSED STANDARDS, *supra* note 41, *New Standard 2*.

[46] *Id.*, *New Standard 1*.

[47] *Restrictive Housing Standards Open Hearing*, AMERICAN CORRECTIONAL ASSOCIATION (Jan. 19, 2016), http://online.wsj.com/public/resources/documents/Restrictive_housing.pdf. Individuals and organizations providing comments included the Liman Program, the American Civil Liberties Union, and law professors; these statements commended the work that has been done and called for more specificity. See Letter from American Civil Liberties Union to American Correctional Association Standards Committee (Jan. 15, 2016), http://online.wsj.com/public/resources/documents/Restrictive_housing.pdf; Letter from Judith Resnik, Sarah Baumgartel & Johanna Kalb, Arthur Liman Public Interest Program, Yale Law School, to American Correctional Association Standards Committee (Jan. 19, 2016), https://www.law.yale.edu/system/files/area/center/liman/liman_comments_on_aca_restrictive_housing_st andards_jan_19_2016_final.pdf; Letter from Margo Schlanger, Professor, University of Michigan, on behalf of Law Professors, to American Correctional Association Standards Committee (Jan. 15, 2016), http://online.wsj.com/public/resources/documents/Restrictive_housing.pdf. In addition, several people spoke at the hearing, including Sarah Baumgartel and Judith Resnik, on behalf of the Liman Program.

[48] ACA RESTRICTIVE HOUSING STANDARDS, AMERICAN CORRECTIONAL ASSOCIATION (Approved Aug. 2016), ttp://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Standards/Restrictive_ Housing_Committee/ACA_Member/Standards_and_Accreditation/Restrictive_Housing_Committee/Rest rictive_Housing_Committee.aspx?hkey=458418a3-8c6c-48bb-93e2-b1fcbca482a2 [Hereinafter ACA Restrictive Housing Standards 2016.]

[49] *Id*., ACA Restrictive Housing Standards 2016, 4-RH-0035; *id.*, ACA Restrictive Housing Standards 2016, 4-ALDF-RH-027.

[50] *Id.,* ACA Restrictive Housing Standards 2016, 4-RH-0033; *id.*, ACA Restrictive Housing Standards 2016, 4-ALDF-RH-024.

[51] *Id*., ACA Restrictive Housing Standards 2016, 4-RH-0034; *id.*, ACA Restrictive Housing Standards 2016, 4-ALDF-RH-025.

[52] *Id.*, ACA Restrictive Housing Standards 2016, 4-RH-0031; *id.*, ACA Restrictive Housing Standards 2016, 4-ALDF-RH-028. Extended Restrictive Housing was defined as "[h]ousing that separates the offender from contact with general population while restricting an offender/inmate to his/her cell for at least 22 hours per day and for more than 30 days for the safe and secure operation of the facility." *Id.* at 3. Serious Mental Illness was defined as "Psychotic Disorders, Bipolar Disorders, and Major Depressive Disorder; any diagnosed mental disorder (excluding substance use disorders) currently associated with serious impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living and requires an individualized treatment plan by a qualified mental health professional(s)" *Id.* Additional discussion of the 2016 ACA Restrictive Housing Standards related to mental illness is provided below. See *infra* note 55.

[53] Removal from general population "will be approved, denied, or modified within 24 hours by an appropriate and higher authority who is not involved in the initial placement." *Id*., ACA Restrictive Housing Standards 2016, 4-RH-0002; *Id.*, ACA Restrictive Housing Standards 2016, 4-ALDF-RH-002.

[54] "The purpose for placement of inmates in Restrictive Housing is reviewed by a supervisor every seven days for the first 60 days and at least every 30 days thereafter." *Id*., ACA Restrictive Housing Standards 2016, 4-ALDF-RH-004.

[55] The amended standards now recommend that prisoners be evaluated by a mental health care professional at least every 30 days, considerably increasing the frequency of mental health assessments from the previous policy, which only provided for an evaluation once every three months. *Id*., ACA Restrictive Housing Standards 2016, 4-RH-0010. The amended standards also called for all prisoners in restricted housing to be visited by mental health staff weekly and by health care personnel daily. *Id*., ACA Restrictive Housing Standards 2016, 4-RH-0012; *Id.* ACA Restrictive Housing Standards 2016, 4-ALDF-RH-0029.

[56] *Id.*, ACA Restrictive Housing Standards 2016, 4-RH-0013.

[57] *Id.*, ACA Restrictive Housing Standards 2016, 4-RH-0004. Further, Standard 4-RH-0006 detailed that cells should measure at least 80 square feet. Additionally, Standard 4-RH-0005 states that restrictive housing units should provide outdoor exercise areas. *Id.*

[58] The new standards recommend that prisoners be offered step-down programs, including opportunities for increasing out-of-cell time, group interaction, and programming opportunities in order "to facilitate the reintegration of the inmate into general population or the community." *Id*., ACA Restrictive Housing Standards 2016, 4-RH-0032. The ACA also now recommends that detention facilities "attempt to ensure offenders are not released directly into the community from Restrictive Housing" and take precautions

when direct release is imminent, including developing an individualized "release plan" and notifying local law enforcement. *Id.*, ACA Restrictive Housing Standards 2016, 4-RH-0030.

[59] *Restrictive Status Housing Policy Guidelines*, ASSOCIATION OF STATE CORRECTIONAL ADMINISTRATORS (Aug. 9, 2013), http://www.asca.net/system/assets/attachments/6145/B.%20ASCA%20 Restrictive%20Status%20Housing%20Policy%20Guidelines-Final%2008092013.pdf. The thirteen guidelines, endorsed August 9, 2013, can also be found in the Liman volume, *Isolation and Reintegration: Punishment Circa 2014*, YALE LAW SCHOOL ARTHUR LIMAN PUBLIC INTEREST PROGRAM 88 (Jan. 6, 2015), https://www.law.yale.edu/system/files/area/center/liman/document/Liman_Colloquium_201 4_Isolation_and_Reintegration_Punishment_Circa_2014_revised_Jan_8_2015.pdf.

[60] *Agencies' Top Five Critical Issues, 2014*, ASSOCIATION OF STATE CORRECTIONAL ADMINISTRATORS (June 2014), http://www.asca.net/system/assets/attachments/7363/ASCA-Critical%20issues-6-14-2014%20V4.pdf.

[61] *See* Brief of Amici Curiae Corrections Experts in Support of Petitioner at 6-7, *Prieto v. Clarke*, 136 S. Ct. 319 (2015) (No. 15-21). The group included Reginald A. Wilkinson, the former director of Ohio's Department of Rehabilitation and Corrections and of both ASCA and the American Correctional Association.

[62] *Prieto v. Clarke*, 780 F.3d 245 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 319 (2015).

[63] *See* Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of the Petitioner at 3, *Prieto v. Clarke*, 136 S. Ct. 319 (2015) (No. 15-21).

[64] *See, e.g.*, Cyrus Ahalt & Brie Williams, *Reforming Solitary-Confinement Policy—Heeding a Presidential Call to Action*, 374 NEW ENG. J. MED. 1704 (2016). A recent review of two meta-analyses of various studies challenged the view that isolation has been demonstrated to be especially harmful. Robert D. Morgan, Paul Gendreau, Paula Smith, Andrew L. Gray, Ryan M. Labrecque, Nana MacLean, Stephanie A. Van Horn, Angelea D. Bolanos, Ashley B. Batastini & Jeremy Mills, *Quantitative Syntheses of the Effects of Administrative Segregation on Inmates' Well-Being*, 22 PSYCHOLOGY, PUBLIC POLICY, AND LAW, 439 (2016), http://dx.doi.org/10.1037/law0000089. That paper argued that its review of several studies of administrative segregation (defined as 23 hours or more in a cell but without a duration specified) did not produce solid evidence of that population suffering "lasting emotional damage." Rather, the analysis argued that the population was as harmed as were prisoners held in "routine incarceration*." Id.* The paper argued that a lack of data on prisoners in general and on individuals' mental and physical health before incarceration, as well as questions about how to measure over-reporting and under-reporting of injuries, hampered the ability to identify particular harms (if imposed) by restricted housing. *Id.*

[65] Andrea D. Lyon & Mark D. Cunningham, *"Reason Not the Need": Does the Lack of Compelling State Interest in Maintaining a Separate Death Row Make It Unlawful?*, 33 AM. J. CRIM. L. 1, 4-5 (2005); *see also* Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Wasted Resources and Gratuitous Suffering: The Failure of a Security Rationale for Death Row*, 22 PSYCHOL. PUB. POL'Y & L. 185 (2016); Marah Stith McLeod, *Does the Death Penalty Require Death Row? The Harm of Legislative Silence*, 77 OHIO STATE L.J. 525 (2016). See also Celina Aldape, Ryan Cooper, Katie Haas, April Hu, Jessica Hunter, Johanna Kalb, Shelle Shimizu & Judith Resnik, *Rethinking "Death Row": Variations in the Housing of Individuals Sentenced to Death*, YALE LAW SCHOOL ARTHUR LIMAN PUBLIC INTEREST PROGRAM (July 2016). That report discussed the experiences in three jurisdictions where individuals

sentenced to death row were not housed in isolation but placed either in a separated but shared area with others who had capital sentences or with other prisoners.

[66] *See, e.g*, Burke Butler, Matthew Simpson & Rebecca L. Robertson, *A Solitary Failure: The Waste, Cost and Harm of Solitary Confinement*, ACLU of TEX. (2015), http://www.aclutx.org/2015/02/05/a-solitary-failure; *Boxed In: The True Cost of Extreme Isolation in New York's Prisons*, N.Y. CIVIL LIBERTIES UNION (2012), http://www.nyclu.org/files/publications/nyclu_boxedin_final.pdf.

[67] Joseph Shapiro & Christine Thompson, *The Deadly Consequences of Solitary with a Cellmate,* THE MARSHALL PROJECT (March 24, 2016), https://www.themarshallproject.org/2016/03/24/the-deadly-consequences-of-solitary-with-a-cellmate#; Joseph Shapiro & Christine Thompson, *Doubling Up Prisoners in 'Solitary' Creates Deadly Consequences*, NATIONAL PUBLIC RADIO (March 24, 2016), http://www.npr.org/2016/03/24/470824303/doubling-up-prisoners-in-solitary-creates-deadly-consequences.

[68] *See* Martin Horn & Ann Jacobs, *Solitary Confinement: Report on a Colloquium to Further a National Consensus on Ending the Over-Use of Extreme Isolation in Prisons*, JOHN JAY COLLEGE OF CRIM. JUSTICE (2016) [hereinafter "*Solitary Confinement Report 2016*"].

[69] *Id.* at 1.

[70] *Id.* at 30-33.

[71] S.B. 51, 217th Leg. Sess. (N.J. 2016), "An Act concerning restrictions on isolated confinement in correctional facilities and supplementing Title 30 of the Revised Statutes," § (4) (a) (9). The limit on isolated confinement to no more than 15 consecutive days, and to no more than 20 days during any 60-day period, does not apply during a facility-wide lock down. *Id.*

[72] *Id*. at § 3.

[73] *Id*. at §§ 3, 4b.

[74] H.B. 5417, 99th G.A. (Ill. 2016). The proposed bill would limit solitary confinement to no more than five consecutive days and five total days during a 150-day period. The bill was introduced on February 9, 2016 and, as of October 2016, remained pending.

[75] S. 1255, 189th Gen. Ct. (Mass. 2015). The bill was introduced on April 15, 2015 and accompanied a study order in the Senate on June 23, 2016, when it was replaced by S.2362, which remained pending as of October 2016.

[76] H.B. 7481, Jan. 2016 Leg. Sess. (R.I. 2016). The bill would limit solitary confinement to no more than 15 consecutive days, with no more than 20 days within a 60-day period. The bill was introduced on February 5, 2016 and remained pending as of October 2016.

[77] Order Granting Final Approval of Class Action Settlement Agreement, Ashker v. Governor of California, No. C09-05796 CW (N.D. Cal. Jan. 26, 2016), ECF No. 488. http://www.clearinghouse.net/chDocs/public/PC-CA-0054-9001.pdf. The settlement imposed limits on the amount of time that prisoners may be confined in the Security Housing Unit at Pelican Bay State Prison, one of the state's maximum security prisons; provided for review of prisoners then in security housing units on the basis of gang affiliation within 12 months of the settlement agreement; and set forth

a presumption that all prisoners detained in Security Housing Units for more than 10 years would be moved into the general population. *See also* Ian Lovett, *California Agrees To Overhaul Use of Solitary Confinement*, N.Y. TIMES (Sept. 1, 2015), http://www.nytimes.com/2015/09/02/us/solitary-confinement-california-prisons.html.

[78] Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Correction, No. 1:08-CV-01317-RLYJMS, (S.D. Ind. Mar. 24, 2016), ECF No. 508; Stipulation To Enter into Private Settlement Agreement Following Notice to the Class and Fairness Hearing, Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Correction, No. 1:08-CV-01317-RLYJMS (S.D. Ind. Jan. 27, 2016), ECF No. 496. The agreement prohibited, with some exceptions, the placement of mentally ill prisoners in restricted housing and provided standards for the minimum adequate treatment of those prisoners, including provision of recreation, showers, additional out-of-cell time, and therapeutic programming.

[79] Opinion and Order, *Peoples v. Anthony Annucci*, No. 11-cv-2694 SAS (S.D.N.Y. Mar. 31, 2016), ECF No. 329. The court wrote, "Solitary confinement is a drastic and punitive designation, one that should be used only as a last resort and for the shortest possible time to serve the penal purposes for which it is designed." The Settlement Agreement included reforms to limit the frequency and duration of solitary confinement, including a detailed modification of the Department's guidelines for restricted housing sentencing aimed at limiting the length of restricted housing sentences, alternatives to restricted housing programs designed to address causes of disciplinary issues, and increased opportunities for prisoners to earn sentence reductions and lesser restricted housing sanctions.

The settlement also provided greater protections for vulnerable populations such as prisoners with special needs, juvenile prisoners, and prisoners in need of substance abuse treatment, while continuing a "presumption against restricted housing for pregnant inmates." The settlement also mandated improvements to the conditions of confinement in restricted housing, including the abolishment of the "loaf," a food product previously served to those in solitary; increased movement privileges based on good behavior; increased phone privileges; improved library services; access to correspondence courses and radio programing; and increased access to mental health consultations and treatment.

[80] Doris J. James & Lauren E. Glaze, *Mental Health Problems of Prison and Jail Inmates*, BUREAU OF JUSTICE STATISTICS (2006), http://www.bjs.gov/content/pub/pdf/mhppji.pdf.

[81] *See, e.g.*, Ahalt & Williams, *supra* note 64; Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124, 130 (2003); Craig Haney, *The Social Psychology of Isolation: Why Solitary Confinement Is Psychologically Harmful*, 181 PRISON SERVICE JOURNAL 12 (2009); Arthur J. Lurigio, Craig Haney, Joanna Weill, Shirin Bakhshay & Tiffany Lockett, *Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful*, 96 PRISON JOURNAL 126 (Jan. 2016); *see also Callous and Cruel: Use of Force Against Inmates with Mental Disabilities in US Jails and Prisons*, HUMAN RIGHTS WATCH (May 12, 2015), https://www.hrw.org/report/2015/05/12/callous-and-cruel/use-force-against-inmates-mental-disabilities-us-jails-and.

[82] "Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize

access to clinically indicated programming and recreation for these individuals." *Position Statement on Segregation of Prisoners with Mental Illness*, AMERICAN PSYCHIATRIC ASSOCIATION (Dec. 2012), http://www.dhcs.ca.gov/services/MH/Documents/2013_04_AC_06c_APA_ps2012_PrizSeg.pdf. *See also Solitary Confinement (Isolation)*, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (Apr. 2016) [hereinafter NCCHC, *Solitary Confinement*] (stating that it is "well established that persons with mental illness are particularly vulnerable to the harms of solitary confinement" and that "[j]uveniles, mentally ill individuals, and pregnant women should be excluded from solitary confinement of any duration").

[83] *See Solitary Confinement as a Public Health Issue*, AMERICAN PUBLIC HEALTH ASSOCIATION, https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/14/13/30/solitary-confinement-as-a-public-health-issue; *see also* Psychiatric Services in Correctional Facilities, 3d ed. 2016, https://www.appi.org/Psychiatric_Services_in_Correctional_Facilities_Third_Edition.

[84] *See* NCCHC, *Solitary Confinement*, *supra* note 82.

[85] *See, e.g.*, MASS. GEN. LAWS ch. 127, § 39A(b) (2015) (requiring the Department of Corrections to screen for mental illness and prohibiting the segregation of an individual diagnosed with a serious mental illness for more than 30 days absent exigent circumstances).

[86] *See, e.g.*, Stipulation, *Peoples v. Fischer*, No. 11-CV-2694 (S.D.N.Y. Feb. 19, 2014), ECF No. 124, at 3-4 § 2(C)(1) (providing that cognitively impaired individuals were not to be put in isolation); *Parsons v. Ryan*, 754 F.3d 657, 690 (9th Cir. 2014) (affirming the district court's order that the Arizona Department of Corrections be required to develop and implement a plan to remedy, among other things, its constitutionally deficient solitary confinement policy governing prisoners with serious mental illness). The revised ADC policy required that prisoners with mental illness had a minimum of 19 hours a week outside the cell, and this time was to include mental health treatment and other programming. Stipulation, *Parsons v. Ryan*, No. 12-00601-PHXDJH (D. Ariz. Oct. 14, 2014), ECF No. 1185; *see also Arizona Agrees to Major Improvements in Health Care, Crucial Limits on Solitary Confinement in Landmark Settlement*, AMERICAN CIVIL LIBERTIES UNION (Oct. 14, 2014), https://www.aclu.org/news/arizona-agrees-major-improvements-prison-health-care-crucial-limits-solitary-confinement.

In January of 2016 the Indiana Department of Corrections announced a settlement with the ACLU regarding the treatment of mentally ill individuals; included was a prohibition on the use of solitary confinement for people with mental illness. The settlement came in response to an order from the U.S. District Court for the Southern District of Indiana to create a policy to improve conditions for mentally ill individuals. Stipulation, *Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Correction*, No. 1:08-CV-01317-TWP, (S.D. Ind. Dec. 31, 2012), ECF No. 496.

[87] *Memorandum of Understanding Between the Oregon Department of Corrections and Disability Rights Oregon*, OREGON DEPARTMENT OF CORRECTIONS (2016), http://media.oregonlive.com/pacific-northwest-news/other/DRO-DOC-MOU-2016.pdf.

[88] *JH v. Dallas*, No. 1:15-cv-02057-SHR (M.D. Pa. Oct. 2016).

[89] *Pennsylvania Corrections Department Reaches Milestone in Crisis Intervention Team Training*, PENNSYLVANIA DEPARTMENT OF CORRECTIONS (May 02, 2016), http://www.prnewswire.com/news-releases/pennsylvania-corrections-department-reaches-milestone-in-crisis-intervention-team-training-300260260.html. *See also* Settlement Agreement, *Disability Rights Network of Pennsylvania v. Wetzel*, No. 1:13-CV-00635-JEJ (M.D. Pa. Jan. 9, 2015), ECF No. 59.

In New Mexico, a previously incarcerated man suffering from bipolar disorder reached a settlement of $750,000 with a county facility that, he alleged, had denied him medication and neglected him when he was placed in solitary confinement. *See* Stipulated Order Granting Unopposed Motion to Dismiss All Claims With Prejudice, *Faziani v. Sierra County Board of County Commissioners*, No. 1:2014cv00592 (D.N.M. Dec. 2015), ECF No. 122; Dan Schwartz, *$750K Settlement Reached in Solitary Confinement Suit*, SANTA FE NEW MEXICAN (Dec. 23, 2015), http://www.santafenewmexican.com/news /local_news/k-settlement-reached-in-solitary-confinement-suit/article_67a5526e-a992-11e5-8656-0f0b22 5140de.html.

[90]  *See Model Juvenile Justice Stop Solitary Act*, AMERICAN CIVIL LIBERTIES UNION, https://www.aclu.org/files/assets/6%20Model%20Juvenile%20Justice%20Stop%20Solitary%20Act.pdf; *see also* Mikah Owen & Jeffrey Goldhagen, *Children and Solitary Confinement: A Call to Action*, 137 PEDIATRICS (Apr. 5, 2016).

[91]An Act Concerning the Use of Seclusion on Individuals, H.B. 16-1328 (Colo. May 2016).

[92]  An Act To Add Section 208.3 to the Welfare and Institutions Code, Relating to Juveniles, S.B. 1143, (Cal. Mar. 29, 2016, enacted August 25, 2016 and signed by the Governor September 27, 2016), http://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160SB1143.

[93]  *Statement of Proceedings*, LOS ANGELES BOARD OF SUPERVISORS (May 03, 2016), http://file.lacounty.gov/bos/sop/cms1_243824.pdf.

[94]  S. 2123, 114th Cong. § 212 (2015).

[95]*Justice Department Settles Lawsuit Against State of Ohio To End Unlawful Seclusion of Youth in Juvenile Correctional Facilities*, U.S. DEPARTMENT OF JUSTICE (May 21, 2014), https://www.justice.gov/opa/pr/justice-department-settles-lawsuit-against-state-ohio-end-unlawful-seclusion -youth-juvenile.

[96]  A group of detainees filed a class action against New York City alleging a "pattern of brutality" at Rikers Island. Amended Complaint at 2, *Nunez v. City of New York*, No. 11-cv-5845 (S.D.N.Y. May 24, 2012). In December 2014, the U.S. Attorney for the Southern District of New York intervened in the class action. United States' Proposed Complaint-in-Intervention, *Nunez v. City of New York*, No. 11-cv-5845 (S.D.N.Y. Dec. 18, 2014).

In October of 2015, the parties entered into a consent decree which had included a prohibition on solitary confinement for people under the age of 18 and restrictions on the use of solitary confinement for 18-year-olds; the consent judgment did not include a ban on solitary confinement for people ages 21 and under. Consent Judgment at 44, *Nunez v. City of New York*, No. 11-cv-5845 (S.D.N.Y. Oct. 21, 2015).

In January 2015, New York City's mayor announced a plan to end—by January of 2016—the use of solitary confinement for people ages 21 and younger. *See* Michael Winerip & Michael Schwirtz, *Rikers to Ban Isolation for Inmates 21 and Younger*, N.Y. TIMES (Jan. 13, 2015), http://www.nytimes.com/2015/01/14/nyregion/new-york-city-to-end-solitary-confinement-for-inmates-21-and-under-at-rikers.html. However, in July 2016, the *New York Times* reported that the New York City Department of Correction continued to hold 21-year-olds in solitary confinement. Michael Winerip & Michael Schwirtz, *"Time in the Box": Young Rikers Inmates, Still in Isolation*, N. Y. TIMES (July 8, 2016), http://www.nytimes.com/2016/07/08/nyregion/rikers-island-solitary-confinement.html.

[97] NATIONAL INSTITUTE OF JUSTICE, *Restrictive Housing in the U.S.: Issues, Challenges, and Future Directions* (2016), https://www.ncjrs.gov/pdffiles1/nij/250315.pdf*; Projects Funded Under Fiscal Year 2016 Solicitations.* NATIONAL INSTITUTE OF JUSTICE (September, 2016), http://www.nij.gov/funding/awards/Pages/2016.aspx#.

[98] *Id.*

[99] *Justice Department Awards Over $6.3 Million to Study Effects of Incarceration,* DEPARTMENT OF JUSTICE, OFFICE OF JUSTICE PROGRAMS, OFFICE OF COMMUNICATIONS (September 26, 2016), http://ojp.gov/newsroom/pressreleases/2016/ojp09262016_2.pdf.

[100] Solitary Confinement Reform Act, S.3432, 114th Cong. (2d Sess. 2016) [hereinafter SCRA 2016].

[101] SCRA 2016, S.3432, § 2(b)(1)(A)

[102] SCRA 2016, S.3432, § 2(b)(4)(A)

[103] SCRA 2016, S.3432, § 2(b)(4)(B)

[104] *Id.*

[105] *Id.*

[106] SCRA 2016, S.3432, § 2(b)(1)(A)(i)-(ii); S.3432(b)(4)(A)(i)-(ii)

[107] SCRA 2016, S.3432, § 2(b)(4)(C)

[108] SCRA 2016, S.3432, § 2(b)(5)(A)(ii)(I)-(II)

[109] SCRA 2016, S.3432, § 2(b)(1)(C)

[110] SCRA 2016, S.3432, § 2(b)(5)(C)-(D)

[111] SCRA 2016, S.3432, § 2(b)(8)(B)(i)-(iii)

[112] SCRA 2016, S.3432, § 2(e)(1)

[113] SCRA 2016, S.3432, § 2(e)(6)

[114] SCRA 2016, S.3432, § 2(e)(8)

[115] SCRA 2016, S.3432, § 2(e)(3)

[116] SCRA 2016, S.3432, § 2(e)(3)(A)-(B)

[117] SCRA 2016, S.3432, § 2(e)(7)(A)-(B)

[118] SCRA 2016, S.3432, § 5(d)(2)

[119] SCRA 2016, S.3432, § 6(b)

[120] *Solitary Confinement Report* 2016, JOHN JAY COLLEGE OF CRIM. JUSTICE, *supra* note 68.

[121] United Nations Standard Minimum Rules for the Treatment of Prisoners (Nelson Mandela Rules), U.N. ESC Committee on Crime Prevention and Criminal Justice, 24th Sess., U.N. Doc. E/CN.15/2015/L.6/Rev.1 (May 22, 2015) [hereinafter Nelson Mandela Rules], http://www.unodc.org/documents/commissions/CCPCJ/CCPCJ_Sessions/CCPCJ_24/resolutions/L6_Rev1/ECN152015_L6Rev1_e_V1503585.pdf; *see also General Assembly Adopts 64 Third Committee Texts Covering Issues Including Migrants, Children's Rights, Human Rights Defenders*, UNITED NATIONS (Dec. 17, 2015), http://www.un.org/press/en/2015/ga11745.doc.htm.

[122] Nelson Mandela Rules, *supra* note 121 (Rule 44).

[123] *Id.* (Rule 45(1)).

[124] *Id.*

[125] *Id.* (Rule 43(1)).

[126] *Id.* (Rule 45(2)).

[127] *Factsheet on Detention Conditions and Treatment of Prisoners*, EUROPEAN COURT OF HUMAN RIGHTS (Apr. 2016), http://www.echr.coe.int/Documents/FS_Detention_conditions_ENG.pdf.

[128] Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 221 (entered into force Sept. 3, 1953).

[129] *Öcalan v. Turkey* (No. 2), App. No. 462221/99, Eur. Ct. H.R. (2005).

[130] *Breivik v. Ministry of Justice*, Oslo District Court (Nor.), No. 15-107496TVl-OTIR/02 (Apr. 20, 2016) (appeal pending), https://www.domstol.no/contentassets/cd518ea4a48d4f8fa2173db1b7a4bd20/dom-i-saken-om-soningsforhold---15-107496tvi-otir---abb---staten-eng.pdf.

Other national initiatives included the proposal by the Prime Minister of Canada to implement a series of recommendations banning solitary confinement for prisoners in federal detention. *See Trudeau Calls for Ban on Long-Term Solitary Confinement in Federal Prisons*, GLOBE & MAIL (Nov. 15, 2015), http://www.theglobeandmail.com/news/national/trudeau-calls-for-implementation-of-ashley-smith-inquest-recommendations/article27256251.

[131] Sharon Shalev, *A Sourcebook on Solitary Confinement*, MANNHEIM CENTRE FOR CRIMINOLOGY, LONDON SCHOOL OF ECONOMICS (2008), www.solitaryconfinement.org/sourcebook.

[132] Juan E. Méndez, *Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment* (Aug. 2011), http://solitaryconfinement.org/uploads/SpecRapTortureAug2011.pdf.

[133] Sharon Shalev & Kimmett Edgar, *Deep Custody: Segregation Units and Close Supervision Centres in England and Wales*, PRISON REFORM TRUST (Oct. 2015), http://solitaryconfinement.org/uploads/DeepCustodyShalevAndEdgar.pdf

[134] *Seeing into Solitary: Review of the Laws and Policies of Certain Nations around the World with Regard to Solitary Confinement of Detainees* (2016), on behalf of Professor Juan E. Méndez, United Nations Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment; in collaboration with Weil Gotshal & Manges LLP, the Cyrus R. Vance Center for International Justice, and the American University Washington College of Law Center for Human Rights & Humanitarian Law's Anti-Torture Initiative, http://www.weil.com/~/media/files/pdfs/2016/un_special_report_solitary_confinement.pdf. [hereinafter *Seeing into Solitary* (2016)].

[135] *Id.* at 21.

[136] *Id.*

[137] *Id.*

[138] *Id.* at 22.

[139] *Id.* at 22.

[140] *Id.*

[141] *Id.*

[142] *See* Leann K. Bertsch, *The History of Restricted Housing at the ND-DOCR* (Mar. 15, 2016) (unpublished manuscript).

[143] In the original distribution of the survey, the only territory included was the District of Columbia. When we presented a draft of the report at the 2016 ASCA summer meeting, the Virgin Islands requested to participate. We then sent questionnaires to Guam and Puerto Rico, which are the other territories that are members of ASCA; these jurisdictions did not respond.

[144] *See* Appendix A, ASCA-Liman Survey of Extended Restricted Housing (Fall 2015).

[145] For example, seven jurisdictions (Alabama, Arizona, Idaho, Kentucky, Massachusetts, Montana, and Vermont) told us that, while they tracked whether prisoners were held in a cell for 22 hours per day or more, they did not track the numbers of days for which a person was held under those conditions. Vermont indicated that the changes to its database system made it difficult to retrieve this data but that moving forward, it will be able to determine the length of days in-cell that average 22 hours per day.

In five of these seven (Alabama, Idaho, Kentucky, Montana, and Vermont), we included responses with the caveat that numbers from these jurisdictions may include prisoners who were in-cell for 22 or more hours a day but for less than 15 days. Responses from Arizona and Massachusetts to questions about prisoners' length of stay enabled us to derive the number of individuals falling within the 22-hour/15-day definition.

[146] For example, California reported that most of its segregated environments permitted prisoners at least 10 hours per week out-of-cell and distributed those 10 hours throughout the week such that several days a week, prisoners were allowed more than three hours out-of-cell at a time. Therefore, on some days, these prisoners were in-cell for less than 22 hours. California did not include prisoners in these units when tallying the number in the category of 22 hours or more for 15 or more consecutive days. After exchanges

with that state's correctional staff, we have identified and grouped prisoners in categories that are detailed in Table 3. *See also infra* note 177.

A few other states also raised questions about the definition while responding. Iowa indicated that it could not confirm that all of the prisoners included in its reported total number of prisoners in restricted housing were in cells for 22 hours or more. Washington also said it could not confirm that the definition it used matched the one that we provided. With these caveats, we included information as reported from these states.

[147] *Time-In-Cell*, *supra* note 2, at 14.

[148] *Id.* at 11.

[149] At least one jurisdiction reported that it defined restricted housing as 22 hours or more in-cell for 30 days or more, rather than 15 days or more. Colorado stated:

> "Although the submission of the survey applies the LIMAN-ASCA definition of ERH of 15 or more continuous days, Colorado's definition of Extended Restrictive Housing matches that of ASCA-PBMS: Extended Restrictive Housing—Placement in housing that separates the offender from contact with general population while restricting an offender/inmate to his/her cell for 22 hours per day and for 30 days or longer for the safe and secure operation of the facility. Colorado does not consider 15 days being the window for extended restrictive housing. All offenders under policy and direction from executive staff are required to be removed from disciplinary segregation or removal from population by the 30th day, regardless of the reason for placement in the restrictive housing environment. The only exceptions are those offenders that are placed in our Restrictive Housing Maximum Security Status (formerly known as Administrative segregation)."

ASCA-Liman Survey: Colorado Follow-up Response, March 2016 at 8.

[150] The United Nations Standard Minimum Rules for the Treatment of Prisoners which are, as noted, known as the "Nelson Mandela Rules," defined "prolonged solitary confinement" as the placement of "prisoners for 22 hours or more a day without meaningful human contact" for "a time period in excess of 15 consecutive days." Nelson Mandela Rules, *supra* note 121.

[151] *Time-In-Cell*, *supra* note 2, at 38.

[152] Typically, prisons house sentenced prisoners, serving one year or more for a felony conviction, while jails house pretrial detainees or people sentenced pursuant to misdemeanor convictions. However, variation exists. For example, Louisiana reported that "nearly 18,000 state prisoners" were held in "local jails in Louisiana" (and that the state did "not have access to specific numbers" of those prisoners held in restricted housing.) Conversely, some states such as Rhode Island operate unified systems, which include both jails and prisons. The numbers that California Department of Corrections and Rehabilitation provided were for prisons only. California's Realignment policy has expanded the number of people held in county jails rather than in state prisons.

[153] We asked: Please indicate the facilities for which you have data on the use of Extended Restricted Housing (check all that apply). We did not define "types of facilities" but provided the list included in Table 1 and a category of "Other" where responders could specify any other type of facility.

[154] According to the website of the Department of Corrections for the District of the Columbia, the majority of male inmates housed in the D.C. jail "are awaiting adjudication of cases or are sentenced for misdemeanor offenses." *Correctional Facilities*, D.C. DEPARTMENT OF CORRECTIONS, http://doc.dc.gov/page/correctional-facilities. Individuals convicted in D.C. and serving longer sentences are housed at the Correctional Treatment Facility, a private facility operated by the Corrections Corporation of America that is an annex to the jail, while sentenced felons are transferred to the Federal Bureau of Prisons. *Id.*

[155] Those 12 jurisdictions were Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Kansas, Louisiana, Mississippi, Rhode Island, Vermont, the Virgin Islands, and the Federal Bureau of Prisons. Vermont indicated that it operates a combination of prisons for sentenced prisoners and jails for detainees, in which offenders are housed jointly.

[156] As discussed, Louisiana data were not included in this number; in August of 2016 that jurisdiction obtained information on the number of prisoners in restrictive housing in local jails, but in response to the survey as noted in the fall of 2015, Louisiana replied that it did not collect such information routinely.

[157] We did not define control.

[158] Those seven jurisdictions that had restrictive housing data on the jails in their correctional system were Connecticut, Delaware, District of Columbia, Hawaii, Idaho, Vermont, and the Virgin Islands. Vermont reported that information on restricted housing prior to 2016 was limited, but that it was making changes and would be better able to provide more detailed information about restricted housing in the future. In the meantime, Vermont reported that it was maintaining and aggregating manual reports.

In the follow-up exchanges in the summer of 2016, Louisiana reported that it housed some 18,000 prisoners in state jails and that it had done a special audit in the summer of 2016, and identified 314 people in restricted housing as of that date. Louisiana also indicated that it did not control conditions in jails but that if its prisoners were in need of restricted housing conditions, those prisoners would be returned to the state prisons.

[159] These jurisdictions were Arizona, Kansas, North Carolina, and the Federal Bureau of Prisons. The Federal Bureau of Prisons reported that juveniles are housed in a special facility that is a "community contract facility," which is not a prison. According to the Federal Bureau of Prisons website, 58 juveniles are housed in this facility. *Generate Inmate Population reports,* FEDERAL BUREAU OF PRISONS, https://www.bop.gov/about/statistics/population_statistics.jsp. The Federal Bureau of Prisons did not provide information on the use of restricted housing in its juvenile facilities. The other three jurisdictions with juvenile facilities did.

Section VI of this Report discusses in greater detail the number of individuals under the age of 18 reported to be held in restricted housing. The number of juveniles held in restricted housing reported by Arizona, Kansas, and North Carolina in that section reflect the total number in both juvenile and adult correctional facilities, while other jurisdictions' reported totals do not include juvenile facilities.

[160] Those seven jurisdictions reporting separate facilities for the mentally ill were Arizona, California, Colorado, Kansas, Texas, Wisconsin, and the Virgin Islands. Both Montana and the Federal Bureau of Prisons have special units within facilities for mentally ill and for death-sentenced prisoners. The majority of federal death-sentenced prisoners are housed at Terre Haute USP, a high security penitentiary. *Find an*

*Inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc. Arizona and Oklahoma also reported specialized facilities for death-sentenced prisoners.

[161] Examples of "other" types of facilities that jurisdictions reported include county correctional facilities, jail contracting facilities, medical facilities, and transitional work programs.

[162] For information on juvenile facilities, see Sarah Hockenberry, *Juveniles in Residential Placement, 2013*, JUVENILE JUSTICE STATISTICS NATIONAL REPORT SERIES (May 2016), http://www.ojjdp.gov/pubs/249507.pdf. For information on the use of restricted housing in juvenile facilities, see *Growing Up Locked Down: Youth in Solitary Confinement in Jails and Prisons Across the United States*, HUMAN RIGHTS WATCH & ACLU (2012), https://www.aclu.org/sites/default/files/field_document/us1012webwcover.pdf.

[163] *See* DOJ RESTRICTIVE HOUSING 2016 REPORT, *supra* note 26, at 3. That report "define[d] 'restrictive housing' as any type of detention that involves three basic elements: removal from the general inmate population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another inmate; and inability to leave the room or cell for the vast majority of the day, typically 22 hours or more." *Id*.

[164] Due to the way we phrased the survey question, we did not obtain information about how many of these prisoners had bunkmates and how many were alone in a double cell. Nor did we gather information on the sizes and conditions of the double cells in any given jurisdiction as compared with the sizes and conditions of single cells. For articles on the practice of double-celling, *see supra* note 67.

[165] Arkansas, Rhode Island, and West Virginia did not provide information about the number of prisoners in restricted housing. Nevada provided information that was facility-specific; that information is not included in this section because the answers to sub-numbers for each facility did not match the total for that facility.

As noted earlier, Rhode Island gave us the following clarification about its data: "Currently the structure of our data systems does not allow for us to extract data on the Restrictive Housing population in an aggregate manner. In some cases, this data is tracked manually which allows us to determine the status of individual inmates, but makes it impossible to aggregate data on all inmates in this status. Therefore we are unable to provide data on our restrictive housing population at this time. RIDOC is working to rectify this problem but it requires significant IT programming changes which will take some time to complete."

[166] According to the Bureau of Justice Statistics (BJS), the five jurisdictions not included in our data for this section accounted for 42,908 prisoners, or 2.7% of the total custodial population in the United States in 2014. E. Ann Carson, *Prisoners in 2014*, BUREAU OF JUSTICE STATISTICS 3 Tbl.2 (Sept. 2015), http://www.bjs.gov/content/pub/pdf/p14.pdf. Specifically, Arkansas housed 17,874 prisoners; Rhode Island housed 3,359 prisoners; West Virginia had 6,896 prisoners; Nevada housed 12,537 prisoners; and Maine housed 2,242 prisoners. *Id.* Additionally, the four territories not included in our data for this section accounted for 13,468 prisoners. *Id.* at 32 app. tbl.7. Specifically, American Samoa housed 212 prisoners; Guam housed 754 prisoners; the Commonwealth of the Northern Mariana Islands housed 175 prisoners; and Puerto Rico housed 12, 327 prisoners. *Id.*

[167] *Id.* at 3 tbl.2. The most recent available BJS data, as of October 2016, were gathered in 2014; our survey asked about total custodial and restricted housing populations as of the fall of 2015.

[168] The total custodial population of the 52 responding jurisdictions rises to 1,470,687 if we include the nearly 18,000 state prisoners that Louisiana, as noted, asked that we count, although they were held in jails. We have separately noted this request and incorporated it in several parts with the caveat that Louisiana did not regularly track information on the use of restricted housing in the parish jails over which it had no direct control.

[169] Hawaii reported a total of 4,200 prisoners in-state, and an additional 1,388 prisoners out-of-state. The out-of-state prisoners were not included in this report, as Hawaii did not provide information on restricted housing for its out-of-state prison population.

[170] *See supra* note 165.

[171] Alabama indicated that it was unable to provide restricted housing data for privately-contracted facilities, which accounted for 735 prisoners. Thus, Alabama reported a total custodial population of 25,284 prisoners, but a total of 24,549 prisoners in facilities for which the state could provide data in response to the survey. California reported a total custodial population of 128,164 prisoners, but a total of 117,171 prisoners for which it could provide data. Delaware stated that it was unable to provide restricted housing data for "detentioners," which it defined as individuals detained while awaiting sentencing; Delaware reported a total custodial population of 5,824 prisoners, but a total of 4,342 prisoners for which it could provide data.

Louisiana indicated in the fall of 2015 that it was unable to provide restricted housing data for prisoners housed in local jails, which accounted for almost 18,000 prisoners. Thus, Louisiana reported a total custodial population of 36,511 prisoners, and a total of 18,515 prisoners for which it could provide data. As noted above, in the late summer of 2016, Louisiana conducted an audit and identified 314 prisoners in those local jails that were in restricted housing, and asked that we assume the same number of people were held in restricted housing in the fall of 2015 and include that number in the percentage calculation. Utah likewise reached out to us in the late summer of 2016. Utah provided updated information for the summer of 2016 because it had revised its policies to change the way placements in restricted housing were made and to review those so confined. We describe these changes in Part VII; we also have added a second bar in Chart 1 for Louisiana to reflect different denominators and for Utah to reflect the decline in numbers. *See also infra* note 178.

Wisconsin indicated that it was unable to provide restricted housing data for prisoners in mental health facilities or minimum-security correctional centers. Thus, Wisconsin reported a total custodial population of 22,965 prisoners and a total of 20,535 prisoners for which it could provide data. The Federal Bureau of Prisons stated that the total custodial population included prisoners housed in "community corrections" facilities, such as halfway houses and home confinement. Excluding these facilities, BOP reported a total custodial population of 205,508 prisoners, but a total of 189,181 prisoners for which restricted housing data would be relevant.

Arkansas, Rhode Island, West Virginia, and Nevada are not included in Table 2 and Chart 1. *See* note 165, *supra.* For instance, as noted there, Rhode Island gave us the following clarification about its data: "Currently the structure of our data systems does not allow for us to extract data on the Restrictive Housing population in an aggregate manner. In some cases, this data is tracked manually which allows us to determine the status of individual inmates, but makes it impossible to aggregate data on all inmates in this status. Therefore we are unable to provide data on our restrictive housing population at this time. RIDOC is working to rectify this problem but it requires significant IT programming changes which will take some time to complete."

In addition, some jurisdictions provided answers to a few questions that did not match up completely with others, and hence there are minor variations between this section and discussions of other questions in the survey. In two states, the number provided for the total restricted housing population and the numbers provided regarding demographic composition differed slightly. Alaska reported 352 prisoners in restricted housing when asked for the total restricted housing population, but in response to later questions about the demographic composition and length of time spent by prisoners in restricted housing, Alaska provided numbers that totaled to 355 prisoners. Kentucky reported 487 prisoners in restricted housing when asked for the total restricted housing population; in response to demographic questions, Kentucky provided numbers that totaled more than 100 less—382 prisoners. Montana also presented a difference in the total numbers and the demographic composition, but indicated that seven prisoners were housed in "off-site" detention, for which the jurisdiction was unable to provide demographic data. We included the data as reported for each segment, and we flagged these limitations throughout.

[172] In September of 2016, the California Department of Corrections and Rehabilitation (CDCR) corrected this number from 1,079 to 1,104 prisoners in restricted housing as of September 30, 2015. CDCR also reported that as of August of 2016, the number had decreased to 427 prisoners. In addition to these 1,104 prisoners who were held in-cell for 22 or more hours for 15 consecutive days or more, California held 7,225 prisoners in other types of segregated housing. These prisoners are counted in Table 3 in response to our question for the numbers of prisoners held between 16-19 and 20-21 hours.

[173] Colorado reported using "restricted housing" to describe prisoners housed under two conditions, which were formerly known as punitive segregation and administrative segregation; prisoners in both conditions are included in its restricted housing number. Colorado reported that more than 50 of the prisoners in its total number of prisoners in restricted housing referred to those in punitive segregation, which meant that such individuals were held for a maximum of 15 to 30 days.

[174] As noted, Utah provided updated information reflecting policy changes that went into effect in 2016. Thus, it gave new data on its total custodial population and on its new rules aimed at lowering the number of prisoners held in-cell for 22 hours or more.

[175] As noted for Table 2, in the summer of 2016, Louisiana requested that the numbers and percent be recalculated because the denominator should include prisoners held in local jails – which were not directly under the control of the state level department. Earlier, Louisiana had noted that about 18,000 people were in held in local jails and also noted that the state did not have information on the numbers in those jails held in restricted housing. Thus, we have retained the original data from the fall and have as well, at the request of the jurisdiction, also revised the equation through adding a second bar to include the nearly 18,000 people held in the summer of August 2016 in jails, as well as the 314 prisoners that the state identified as in restricted housing through a special audit of those jails in August 2016.

Utah likewise reached out to us and provided updated information for the summer of 2016 because it had revised its policies to change the way placements in restricted housing were made and to review those so confined. We describe these changes in Part VII; also added is a second bar for Utah to reflect how the numbers decreased.

[176] Alabama, Arizona, Arkansas, Delaware, Florida, Georgia, Illinois, Kentucky, Minnesota, Nevada, Ohio, Rhode Island, South Carolina, Tennessee, Vermont, West Virginia, Wisconsin, and the Federal Bureau of Prisons participated in the survey, but are not included in Table 2 and Chart 2 because they did not provide information about the number of prisoners in-cell for 16-19 or for 20-21 hours. As noted

earlier in footnote 165, Rhode Island gave us the following clarification about their data: "Currently the structure of our data systems does not allow for us to extract data on the Restrictive Housing population in an aggregate manner. In some cases, this data is tracked manually which allows us to determine the status of individual inmates, but makes it impossible to aggregate data on all inmates in this status. Therefore we are unable to provide data on our restrictive housing population at this time. RIDOC is working to rectify this problem but it requires significant IT programming changes which will take some time to complete."

Iowa is included because it reported numbers for those in-cell from 20-21 hours; Iowa later indicated that it was unable to confirm that the numbers it provided for restricted housing were limited to prisoners who had been in-cell for more than 22 hours per day.

[177] California informed us that it had a total of 8,329 prisoners in its eight forms of segregated housing. These eight forms include the Administrative Segregation Unit, "Condemned" Housing, Enhanced Outpatient Program ASU Hub, Long-Term Restricted Housing, Non-Disciplinary Segregation Unit, Psychiatric Services Unit, Security Housing Unit, Security Housing Unit at Pelican Bay State Prison, and Short-Term Restricted Housing. Of these, the 1,104 prisoners in the Security Housing Unit at Pelican Bay State Prison meet our definition of restricted housing. The 597 prisoners categorized as "condemned" are housed in two forms of housing, Grade A and Grade B. The history of Pelican Bay State Prison is detailed in Keramet Reiter, 23/7: PELICAN BAY PRISON AND THE RISE OF LONG-TERM SOLITARY CONFINEMENT (2016)

Using definitions of housing categories provided by the California Department of Corrections and Rehabilitation (CDCR), prisoners in Grade A housing would fall under the 16-19 hours category. In Grade B housing, some prisoners would fall under the 16-19 hours category while others would fall under the 20-21 hours category. Because CDCR did not provide a breakdown of how many of the 597 condemned prisoners were in each grade, we included all 597 prisoners in the 16-19 hours per day category. We included the 6,628 prisoners in the remaining six forms of housing in the 20-21 hours category. In some of these forms of housing, prisoners are held in-cell for 22 or more hours a day at least some days of the week. For example, in the Administrative Segregation Unit, Non-Disciplinary Segregation Unit, and Security Housing Unit (not in Pelican Bay), CDCR reported: "Inmates . . . are offered a minimum of 10 hours of outside exercise per week. The 10 hours of outside exercise are distributed throughout the week such that at least three days a week, inmates are allowed more than three hours out-of-cell at a time." Thus, during the remaining days of the week, the prisoners in these housing units may be in-cell for 22 or more hours a day.

[178] As noted, we reflected how Utah's numbers would have looked, were data reported as of the summer of 2016, in Table 2 and in Chart 1. Here and elsewhere in this Report, we note the efforts Utah has undertaken to make changes. Utah informed us that as of the summer of 2016, it had 380 people in-cell for 22 hours or more, 268 in-cell for 20-21 hours, and 648 people in-cell for 16-24 hours, for a total of 10.6% (of the 6,112 prisoners in its total custodial population at the time) in restricted housing.

[179] Maine, Georgia, and New Hampshire did not respond to the question of whether they regularly gather information on length-of-stay in restricted housing.

[180] In responding to whether it regularly tracked the amount of time that prisoners spend in restricted housing, the Federal Bureau of Prisons stated that it keeps monthly reports, and that "[t]here is a publication that tracks aggregate reports at the individual facility level. They can compile this type of data

and did for the data in this report, but this is not something they regularly do." ASCA-Liman Survey: Federal Bureau of Prisons Follow-up Response, May 2016 at 9.

[181] Oregon and Wisconsin indicated that they planned to begin regularly tracking the amount of time that prisoners spend in restricted housing. Further, as noted earlier, Rhode Island asked we provide the clarification that: "Currently the structure of our data systems does not allow for us to extract data on the Restrictive Housing population in an aggregate manner. In some cases, this data is tracked manually which allows us to determine the status of individual inmates, but makes it impossible to aggregate data on all inmates in this status. Therefore, we are unable to provide data on our restrictive housing population at this time. RIDOC is working to rectify this problem but it requires significant IT programming changes which will take some time to complete."

[182] New Mexico and Nevada provided numbers of people who spent various periods of time in restricted housing, but we did not report these numbers due to inconsistencies in the information provided. Ten states did not provide numbers on the amount of time that prisoners spent in restricted housing: Alabama, Arkansas, Georgia, Illinois, Maine, Michigan, Missouri, New Hampshire, Rhode Island, and West Virginia.

[183] Of the 17 jurisdictions that did not regularly track length-of-stay data, the following nine jurisdictions did provide length-of-stay data based on a specific review in Fall, 2015: Alaska, Florida, Delaware, Louisiana, Nebraska, Oklahoma, Oregon, Pennsylvania, and Wisconsin. All 34 jurisdictions that did regularly track length-of-stay data, provided length-of-stay data for Fall, 2015, but one of those jurisdictions (New Mexico) is not reported here due to different kinds of information inconsistencies.

[184] The total number of prisoners (355) that Alaska reported to be in restricted housing was greater than the number of prisoners (352) for which Alaska provided length-of-stay data.

[185] The numbers reported here for California included only prisoners housed in Security Housing Units in Pelican Bay State Prison and did not include prisoners housed in other types of segregation. *See supra* note 177. Further, the total number of prisoners (1,104) that California reported to be in the Security Housing Unit in Pelican Bay was greater than the number of prisoners (1,073) for which California reported length-of-stay data. *See supra* note 172.

[186] The total number of prisoners (128) that Connecticut reported to be in restricted housing was greater than the total number of prisoners (121) for which Connecticut reported length-of-stay data. The difference was likely due to the fact that Connecticut reported length-of-stay data for male prisoners in restricted housing and not for female prisoners in restricted housing.

[187] The total number of prisoners (404) that Idaho reported to be in restricted housing was larger than the total number of prisoners (275) for which Idaho provided length-of-stay data.

[188] As noted, Louisiana reported that it had begun keeping length-of-stay information in May 2012, and thus information was not available for prisoners held in restricted housing for more than three years. Further, the total number of prisoners (2,689) that Louisiana reported to be in restricted housing was larger than the total number of prisoners (2,185) for which Louisiana provided length-of-stay data.

[189] The total number of prisoners (235) that Massachusetts reported to be in restricted housing was greater than the total number of prisoners (220) for which Massachusetts provided length-of-stay data.

[190] The total number of prisoners (622) that Minnesota reported to be in restricted housing was larger than the total number of prisoners (567) for which Minnesota provided length-of-stay data. Minnesota provided length-of-stay information for only those prisoners held in disciplinary segregation and reported that length-of-stay data for administrative segregation was not available electronically.

[191] The total number of prisoners (134) that Montana reported to be in restricted housing was greater than the total number of prisoners (90) for which Montana provided length-of-stay data. Montana reported that it could not provide information on prisoners held in "off-site" facilities.

[192] New York provided the number of people who were in restricted housing for zero days up to 30 days (rather than 15 up to 30 days), and the number of people who were in restricted housing for three years or more (rather than distinct categories for three up to six years, and for six years or more). Further, the numbers provided by New York for length of stay excluded 368 prisoners, whom the state reported were kept in separate "Keep Lock" units for which it reported that it could not retrieve length-of-stay data.

[193] The total number of prisoners (1,374) that Ohio reported to be in restricted housing was greater than the total number of prisoners (1,140) for which Ohio had length-of-stay data. Ohio added explanations about its reported numbers, including that it had excluded data from the Offender Tracking System used by the state due to its concern about accuracy. Ohio also reported that it did not house prisoners in protective custody in restricted housing and that it did not have "disciplinary custody." Instead Ohio provided data from its Local Control Units for the disciplinary custody section; those units were "a form of extended restricted housing which may be used for disciplinary or pre-transfer detention to a higher security level when the inmate's continued presence in general population is likely to disrupt orderly operations." *See* ASCA-Liman Survey: Ohio Follow-up Response, November 4, 2015 at 4.

[194] The total number of prisoners (1,768) that Tennessee reported to be in restricted housing was greater than the total number of prisoners for which Tennessee reported it had length-of-stay data (1,774).

[195] The total number of prisoners (106) that Vermont reported to be in restricted housing was greater than the total number of prisoners (22) for which Vermont reported it had length-of-stay data.

[196] "Other" was a category that jurisdictions noted and had varied responses to what it referenced. In several jurisdictions, "Other" referred to maximum security units or death row. In Florida, "Other" referred to Close Management I, Close Management II, Maximum Management, and Death Row. In Louisiana, "Other" referred to Death Row and Medical Segregation. In Montana, "Other" referenced Maximum Security. In Nebraska, "Other" was noted for prisoners sentenced to death. In Oklahoma, "Other" referred to death-sentenced prisoners. In Washington, "Other" referred to "max custody" prisoners.

In addition, "Other" was used for special housing units, specific administrative segregation units, or special handling units for safety and security concerns. For the Federal Bureau of Prisons, "Other" referred to Florence ADMAX and SMU Units. In Indiana, "Other" referred to Department Wide Administrative Segregation. In Oregon, "Other" referred to the Intensive Management Unit, the Behavioral Housing Unit, and the Special Housing Unit. In Texas, "Other" referred to a Special Housing Unit at the women's prison that combined administrative segregation, the behavioral management unit, and an intensive management unit. In the District of Columbia, "Other" referred to High Profile, Total Separation, Special Handling, and Risk of Abusiveness. In New Jersey, "Other" referred to MCU and Rule 30 prisoners. Rule 30 prisoners are prisoners from county jails transferred to State Correctional Facilities due to medical or security reasons. In Pennsylvania, "Other" referred to an Intensive

Management Unit, a maximum-custody program unit that housed prisoners who have demonstrated behaviors that present serious management concerns. In New York, "Other" referred to pending protective custody, pending disciplinary hearing, special watches (contraband and/or mental health), and pending investigation. In Virginia, "Other" referred to intensive management and special management. In Wisconsin, "Other" referred to Temporary Lock-up and controlled separation. In Wyoming, "Other" referred to the Reintegration Program.

[197] The 37 jurisdictions that provided length of stay data by type of custody were: Alaska, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Minnesota, Mississippi, Montana, Nebraska, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, Wisconsin, Wyoming, Federal Bureau of Prisons, and the Virgin Islands.

[198] The percentage of men held in restricted housing in Louisiana was calculated from the data that Louisiana provided in the fall of 2015. The information provided subsequently by Louisiana in the summer of 2016 did not include data delineating populations by gender.

[199] The total custodial population (male and female) of 4,727 provided by Hawaii described in this section did not match the total custodial population of 4,200 provided by Hawaii for other sections of this report.

[200] For Chart 5 and Table 5, the "Total" category was calculated by adding the numbers for the total population in restricted housing in all of the responding jurisdictions and dividing that by the numbers for the total custodial population added together from all of the responding jurisdictions. Thus, this number is the percentage of the total prisoners in all 43 responding jurisdictions who were in restricted housing.

[201] The data provided in Table 5 require explanation. Some jurisdictions provided numbers for the total custodial population in response to the questions on demographic information that were not consistent with numbers provided in other segments. Other jurisdictions included individuals relying on a somewhat different definition of restricted housing.

Specifically, the total custodial population (male and female) of 17,749 provided by New Jersey in response to the questions on demographic information did not match the total custodial population provided by New Jersey for other sections of this report. The same was true for Hawaii. *See supra* note 199. Additionally, both Arizona and Massachusetts reported that they could not provide race and ethnicity data based on the restricted housing definition of the survey, which asked about prisoners in cells for 22 hours or more a day for more than 15 continuous days. The data these two jurisdictions provided on race and ethnicity included individuals housed in-cell for 22 hours or more per day, some of whom may have been held in restricted housing for less than 15 days. In terms of age, California did not provide data about prisoners under the age of 18 in their numbers for the total custodial population and in the restricted housing population.

[202] We discuss only jurisdictions that reported at least one woman in restricted housing. Thus, for example, California was not listed because it reported it had no women in-cell for 22 hours or more for 15 consecutive days or more. California reported that it held 186 women in-cell for 20-21 hours.

[203] The data about the number of women in restricted housing in Louisiana comes from data that Louisiana provided in the fall of 2015, which included gender delineations. Once again, these data are

from materials focused on prisons provided by Louisiana, as the data given in the summer of 2016 about state prisoners housed in jails did not delineate the numbers by gender.

[204] As noted for the purposes of Chart and Table 6, we included only jurisdictions that reported a non-zero number of women in restricted housing.

[205] The survey did not define the "Other" category, but jurisdictions were asked to specify what they included, and often listed in the "Other" category were Alaskan Native, Hawaiian, Native American, Pacific Islander, as well as a description of "Unknown."

[206] Alabama was not included for the Hispanic category for men because it did not use Hispanic as a category for tracking individuals.

[207] Alabama was not included for the Hispanic category for women because it did not use Hispanic as a category for tracking individuals.

[208] This list is not an exhaustive list of the vulnerable populations in prison. For example, there are also elderly prisoners, prisoners with mental or physical disabilities, prisoners with serious medical conditions, and prisoners with auditory or visual impairments.

[209] *See Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995) ("[P]lacing [certain mentally ill prisoners] in the SHU [or solitary] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences severe enough, that we have no hesitancy in finding that the risk is plainly unreasonable.") (internal quotations omitted). More recently, Justice Kennedy discussed the literature on solitary confinement causing mental illness. *See Davis v. Ayala*, 135 S. Ct. 2187, 2208-2210 (2015) (Kennedy, J., concurring).

[210] DOJ RESTRICTIVE HOUSING 2016 REPORT, *supra* note 26, at 46.

[211] *See* COLO. REV. STAT. ANN. § 17-1-113.8(1) (West 2015); MASS. GEN. LAWS ANN. ch. 127 § 39A(b) (West 2015). *See also* Settlement Agreement, *Disability Rights Network of Pennsylvania v. Wetzel*, No. 1:13-CV-00635 (M.D. Pa. Jan. 5, 2015).

[212] *See* ACA Restrictive Housing Standards 2016, *supra* note 48.

[213] *Id.*, ACA Restrictive Housing Standards 2016, 4-RH-0031; *id.*, Standard 4-ALDF-RH-028.

[214] *Id.*, ACA Restrictive Housing Standards 2016, 4-RH-0010.

[215] *Id.*

[216] *Id.*, ACA Restrictive Housing Standards 2016, 4-ALDF-RH-0029

[217] DOJ RESTRICTIVE HOUSING 2016 REPORT, *supra* note 26, at 99-101.

[218] The five jurisdictions that provided data about prisoners with "serious mental illness" but did not include a definition of "serious mental illness" were Idaho, New Mexico, North Carolina, the Virgin Islands, and Washington.

[219] Georgia, Hawaii, Montana, New Hampshire, Rhode Island, West Virginia, and the Federal Bureau of Prisons were the seven jurisdictions that provided a definition of "serious mental health issue" but did not provide data on mentally ill prisoners. Illinois and Massachusetts each provided a total number of prisoners with serious mental health issues, but did not provide data on prisoners with serious mental health issues by race. Rhode Island provided the total number of male and female prisoners with serious mental health issues, but did not provide numbers of prisoners with serious mental health issues by race or provide data on the number of prisoners with serious mental health issues in restricted housing. As noted earlier, Rhode Island asked us to note: "Currently the structure of our data systems does not allow for us to extract data on the Restrictive Housing population in an aggregate manner. In some cases, this data is tracked manually which allows us to determine the status of individual inmates, but makes it impossible to aggregate data on all inmates in this status. Therefore, we are unable to provide data on our restrictive housing population at this time. RIDOC is working to rectify this problem but it requires significant IT programming changes which will take some time to complete."

[220] The American Psychiatric Association updated the Diagnostic and Statistical Manual (DSM) in 2013 and published DSM-5 to replace DSM-4. Some of the language in the DSM-4 was changed, and some terms were no longer used in DSM-5.

As noted, our survey did not specify a definition of serious mental illness. In response to our question asking for each jurisdiction's own definition of a "serious mental health issue," some jurisdictions referenced DSM-4 and others DSM-5. Specifically, the District of Columbia, Pennsylvania, and South Dakota referred to DSM-4, and Kentucky, Maryland, Massachusetts, and Nebraska referred to DSM-5. A few jurisdictions (Colorado, Illinois, Montana, New York, Ohio, Tennessee, and Utah) mentioned "DSM" but did not specify an edition. The remaining jurisdictions that reported definitions did not refer directly to the DSM.

[221] Jurisdictions were excluded from Table 15 (Male Prisoners with a Serious Mental Health Issue) and Table 16 (Female Prisoners with a Serious Mental Health Issue) if those jurisdictions provided no data about prisoners with "serious mental illness" either in their total custodial population, in restricted housing, or both. The two jurisdictions that provided no data about prisoners with "serious mental illness" in their total custodial population were Hawaii and New Hampshire. The four jurisdictions that provided no data about prisoners with "serious mental illness" in restricted housing were Arizona, California, Indiana, and Rhode Island. California informed us that it did not do so because it did not segregate such persons in "Restricted Housing." The nine jurisdictions that provided no data about prisoners with "serious mental illness" in both their total custodial population and their restricted housing population were Alaska, Arkansas, Delaware, Georgia, Michigan, Montana, Nevada, and West Virginia, and the Federal Bureau of Prisons. As noted earlier, Rhode Island asked us to note: "Currently the structure of our data systems does not allow for us to extract data on the Restrictive Housing population in an aggregate manner. In some cases, this data is tracked manually which allows us to determine the status of individual inmates, but makes it impossible to aggregate data on all inmates in this status. Therefore, we are unable to provide data on our restrictive housing population at this time. RIDOC is working to rectify this problem but it requires significant IT programming changes which will take some time to complete." Vermont noted that changes in its database system prevented it from being able to report on this measure. As of the summer of 2016, Vermont had resumed data collection and aimed to be able to answer questions such as this in the future.

In several other instances, number mismatches resulted in exclusion from tables. For example, Vermont was excluded from Tables 15 and 16 because of number mismatches concerning its total

custodial population. The District of Columbia was excluded from Table 16 (Female Prisoners with a Serious Mental Health Issue) because it did not provide data regarding female prisoners with serious mental illness. Illinois was excluded from Table 15 (Male Prisoners with a Serious Mental Health Issue) and Table 16 (Female Prisoners with a Serious Mental Health Issue) because the state did not provide data on the total custodial population in the demographics section of the report. Kentucky was excluded from Table 16 (Female Prisoners with a Serious Mental Health Issue) because they reported more women with "serious mental illness" in restricted housing than total women in restricted housing. Kentucky reported 34 women with serious mental illness in restricted housing and 20 women with serious mental illness in its total restricted housing population.

[222] The jurisdictions excluded from Table 17 (Male Prisoners with a Serious Mental Health Issue by Race and Ethnicity) and Table 18 (Female Prisoners with a Serious Mental Health Issue by Race and Ethnicity) were those that did not provide data about prisoners with "serious mental illness" intersecting with race/ethnicity. That group of 19 included Alaska, Arkansas, Delaware, Georgia, Hawaii, Illinois, Massachusetts, Michigan, Montana, New Hampshire, Nevada, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, and the Federal Bureau of Prisons.

Indiana was excluded from Table 18 (Female Prisoners with a Serious Mental Health Issue by Race and Ethnicity) because the number of prisoners with mental illness by race that it reported did not match the total number of prisoners with mental illness that the state provided. Indiana reported that it detained two prisoners with serious mental illness and had data by race, but gave a total number of zero. Kansas and Kentucky were excluded from Table 18 because these two jurisdictions reported more women with "serious mental illness" in restricted housing than total women in restricted housing. Kansas reported 16 women with serious mental illness in restricted housing and eight women with serious mental illness in its total restricted housing population. Kentucky reported 34 women with serious mental illness in restricted housing and 20 women with serious mental illness in its total restricted housing population.

Vermont indicated that due to its database changes, it was unable to provide demographic information in response to the survey. However, with the new database system, Vermont reported that it would be able to provide information on gender, medical and mental health status, race, and ethnicity, as well as on self-harming behaviors in the future.

[223] Seven jurisdictions provided some data about pregnant prisoners but were not included because the data was not sufficiently detailed to report. Specifically, Illinois, Montana, New Mexico, and Vermont provided mismatched numbers concerning the number of women in their total custodial population. Massachusetts did not provide the number of pregnant prisoners in its total custodial population. Minnesota provided an average number of pregnant prisoners, but did not provide the exact number of pregnant prisoners in its total custodial population. Wisconsin reported that it housed five pregnant prisoners in its total custodial population, but it did not provide the number of pregnant prisoners held in restricted housing.

[224] The ten jurisdictions that reported no pregnant prisoners in their total custodial population were the District of Columbia, Indiana, Iowa, Louisiana, Mississippi, New Hampshire, North Dakota, Tennessee, Washington, and the Virgin Islands.

[225] Illinois reported 10 transgender prisoners in restricted housing but reported that they do not track the number of transgender prisoners in their total custodial population. Massachusetts reported one

transgender prisoner in restricted housing but did not report the number of transgender prisoners in its total custodial population.

[226] The jurisdictions that reported transgender prisoners in restricted housing were: Arizona (5 prisoners), Colorado (1 prisoner), the District of Columbia (1 prisoner), Florida (1 prisoner), Kentucky (1 prisoner), Louisiana (2 prisoners), Maryland (1 prisoner), New Hampshire (1 prisoner), New Jersey (1 prisoner), New York (10 prisoners), Ohio (2 prisoners), Oregon (3 prisoners), Pennsylvania (5 prisoners), Texas (19 prisoners), and Washington (2 prisoners).

[227] *Time-In-Cell, supra* note 2, at 55-56.

[228] The jurisdictions that did not reply to this set of questions were Arkansas, Louisiana, Maine, Massachusetts, Michigan, New Hampshire, the Virgin Islands, and West Virginia.

[229] Alaska, Illinois, Indiana, Kentucky, Montana, North Dakota, Washington, Wisconsin, Ohio, D.C., and Virginia provided some policies governing the use of restricted housing. New York directed us to a recently approved settlement agreement.

[230] For example, Oregon reported that in "March 2015, we were selected as one of five correctional systems across the country to participate in the Vera Institute's Safe Alternatives to Segregation Initiative. As part of the grant, we are receiving up to two years of technical assistance focused on analyzing our use of segregated housing and developing recommendations for its safe reduction, as well as initial assistance with implementation of those recommendations." Washington stated that it had consulted a national expert on solitary confinement. In its update in the summer of 2016, Louisiana's Director also indicated the state had been working with The Pew Charitable Trusts on issues related to incarceration.

[231] Presidential 2016 Memorandum on Limiting Restrictive Housing, *supra* note 37.

[232] Rick Raemisch & Kelli Wasko, *Open the Door—Segregation Reforms in Colorado, Part 2 of 3*, COLORADO DEPARTMENT OF CORRECTIONS (Jan. 11, 2016), http://www.corrections.com/news/article/42046-open-the-door-segregation-reforms-in-colorado.

[233] *See also* Settlement Agreement, *Ashker v. Governor of California*, No: 4:09-cv-05796-CW (N.D. Cal. Sept. 1, 2015) at *4.

[234] These changes were also related to litigation involving a challenge to the use of isolation for the seriously mentally ill. *See Disability Rights Network of Pennsylvania v. Wetzel*, Civil Case No. 1:13-CV-00635 (M.D. Pa. Jan. 5, 2015).

[235] This limit on duration appeared to apply to disciplinary segregation, but not to other forms of restricted housing.

[236] Alaska, Arizona, Connecticut, Illinois, New Jersey, North Carolina, Oklahoma, South Carolina, Virginia, and Washington, among others, reported implementing or modifying a form of step-down program for return from segregation to the general prison population.

[237] Virginia Department of Corrections, Local Operating Procedure 830.A, effective December 1, 2013.

[238] *Id.* Virginia stated that the program had included 485 individuals since it began in 2013, and that it had an 85% success rate, measured in people returned to the general population.

[239] New Jersey Survey response to Question 14, May 12, 2016.

[240] New York Survey response to Question 14, May 12, 2016.

[241] Illinois Department of Corrections, Administrative Directive 05.12.101, effective May 1, 2014, at 2.

[242] *Time-In-Cell*, *supra* note 2.

[243] Jurisdictions that reported adopting or planning policies that required a certain number of hours out-of-cell per day or week included California, Colorado, Ohio, Utah, and Washington.

[244] *Time-In-Cell, supra* note 2, at 50-51.

[245] The report also included 50 "Guiding Principles" intended to serve as "best practices for correctional facilities within the American criminal justice system." DOJ RESTRICTIVE HOUSING 2016 REPORT, *supra note* 26, at 94.

[246] Obama, *Why We Must Rethink Solitary Confinement*, (Jan. 25, 2016), *supra* note 27.

[247] Presidential 2016 Memorandum on Limiting Restrictive Housing, *supra* note 37.

[248] The DOJ also recommended various procedural changes for investigating and reporting alleged disciplinary violations and for segregation of prisoners during disciplinary investigations. DOJ RESTRICTIVE HOUSING 2016 REPORT, *supra note* 26, at 96-97.

[249] DOJ RESTRICTIVE HOUSING 2016 REPORT, *supra* note 26, at 94, 104.

[250] *Id.* at 114 (internal quotations omitted). The federal prison system has few juveniles within the system.

[251] *Id.* at 105.

[252] *Id.* at 94-95.

[253] *Id.* at 95.

[254] *Id.* at 110. In one such unit in Louisiana, for example, prisoners live, work, and receive programming in their unit, while spending approximately 16 hours out of their cells per day. *Id.*

[255] *Id.* at 109-10.

[256] *Id.* at 110.

[257] *Id.* at 106-07.

[258] *Id.*

[259] *Id.* at 116.

[260] *Id.*

[261] *Id.* at 113.

[262] *Id.* at 112.

[263] *Id.* at 113.

[264] *Id.* at 95.

[265] *Id.* at 117.

[266] Raemisch & Wasko, *supra* note 232, at 2.

[267] *Id.* at 4.

[268] *Id.*

[269] *Id.* at 9.

[270] *Id.* at 5.

[271] *Id.* at 5.

[272] *Id.* at 6.

[273] *Id.* at 6.

[274] *Id.* at 4.

[275] *Id.* at 5.

[276] *Id.* at 5.

[277] *Id.* at 12.

[278] *Id.* at 5.

[279] *Id.* at 9. In June of 2016, Colorado enacted a bipartisan bill, HB 1328, which limited the placement of juveniles in solitary confinement to four hours, except in emergency situations and with the approval of a physician and a mental health professional. A court order was required to keep a child in solitary confinement for more than eight hours. The bill further required the Colorado Department of Youth Corrections to document its use of solitary confinement and to make regular reports to an oversight board. HB 16-1328 (Colo. 2016).

[280] COLO. REV. STAT. § 17-1-113.8 (2014).

[281] *Id.* The law did not define long-term isolated confinement.

[282] Raemisch & Wasko, *supra* note 232, at 6.

[283] *Id.* at 7.

[284] *Id.*

[285] *Id.* at 5.

[286] *Id.* at 8.

[287] *Id.*

[288] *Id.* at 9. At San Carlos Correctional Facility, forced cell entries in the last year declined by 77%, while offender-on-staff assaults declined by 46%. In Centennial Correctional Facility, forced cell entries in the last year declined by 81%, while offender-on-staff assaults were reduced by 50%. *Id.*

[289] *Id.* at 10-11.

[290] *Id.* at 12.

[291] *Id.* at 12.

[292] Bertsch, *History of Restricted Housing*, *supra* note 142.

[293] *Id.* at 3.

[294] Administrative Segregation Unit Redesign 1 (March 8, 2016).

[295] *Id.*

[296] *Id.*

[297] Bertsch, *History of Restricted Housing*, *supra* note 142, at 4.

[298] *Id.*

[299] Leann K. Bertsch, *Humanity in North Dakota: Learning from Norway to Make Better Neighbors, Not Better Prisoners*, presented at the conference, International and Interdisciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh School of Law (Apr. 16, 2016) (unpublished manuscript) [hereinafter Bertsch, *Humanity in North Dakota*]. According to Director Bertsch and reflected in the policies provided, North Dakota revised the list of behaviors that permitted placement in administrative segregation to "Level III infractions," which included (1) homicide; (2) escape from a maximum- or medium-custody facility; (3) taking hostages; (4) "assault or battery on staff which causes significant bodily injury or exposure to a biological contaminate, to include aggravated assault or predatory behavior resulting in sexual assault;" (4) "assault or battery on an inmate which causes significant intentional bodily injury or exposure to a biological contaminate, to include aggravated sexual assault or predatory behavior resulting in sexual assault;" (5) arson; (6)"inciting or participation in riots, work strikes, or disturbances;" and (7) "trafficking/smuggling contraband" into a maximum- or medium-security facility. *See* ASCA-Liman Survey: North Dakota Response with Statement of Policy,

*Segregation Placement Strategic Planning* at 1-2 (March 8, 2016). In addition, those policies also noted a few other offenses, including possession of guns or knives, and of behaviors that could put someone into segregation but only if evidence existed of the need to do so and the reasons for doing so. Discussed were "24 hour placements," and efforts to understand tiered options. *Id.*

[300] *Id.* at 15.

[301] *Id.* at 4.

[302] *Id.*

[303] *Id.*

[304] *Id.*

[305] *Id.*

[306] *Id.*

[307] Bertsch, *Humanity in North Dakota*, *supra* note 299, at 20.

[308] *Id.* at 21.

[309] According to Director Bertsch, staff described more friendly interactions with prisoners, reportedly saying things like: "I used to hate working down here when all we did was fight with these guys—this is so much better," and "I actually feel like we are rehabilitating people, not just locking them up and hoping they don't do the same thing again." *Id.* at 23.

[310] Prisoners have had similar reactions: "Staff just used to rush past my door. Now they stop and talk and I'm seeing they're kind of like us, I mean, we're the same," and "I'm learning to be more understanding of the officers, like, I don't take it so personal when they forget something I asked for." *See id.* at 22-26 (describing results and reactions from staff, wardens, and prisoners).

[311] *Id.* at 27.

[312] Bertsch, *History of Restricted Housing*, *supra* note 142, at 4.

[313] Memorandum from Brian Wittrup, Chief, Bureau of Classification, to Gary Mohr, Director, Ohio Dep't of Rehabilitation & Correction 1 (May 12, 2016).

[314] *Id.*

[315] *Id.* at 2.

[316] *Id.*

[317] *Id.*

[318] *Id.*

[319] *Id.* at 3.

[320] *Id.*

[321] *Id.* at 4.

[322] *Id.*

[323] *Id.* at 5.

[324] *Id.*

[325] *Id.*

[326] *Id.* at 6.

[327] *Id.* at 5-6.

[328] *Id.* at 7.

[329] *Id.*

[330] *Id.*

[331] *Id.* at 8.

[332] *Id.*

[333] *Id.* at 9.

[334] *Id.*

[335] *Id.* at 9-10.

[336] *Id.* at 1.

[337] *Id.* at 6.

[338] *Id.*

[339] SCDC, *Operating Policy 22.38; South Carolina, Step-Down Program*, November 5, 2015, http://www.doc.sc.gov/pubweb/policy/OP-22-38.htm1479337241122.pdf [hereinafter SCDC, *Step-Down Program*].

[340] *Id.* at 1.

[341] SCDC, *Inmates Housed in Restricted Housing on the Following Dates by Institution and Mental Health Status, from December 2012-March 2016*. In a follow-up in August of 2016, Director Stirling detailed the 15 subcategories for a "mental health classification," which included substance abuse and

major mental illness, and detailed the breakdown of the population of the prisons with various kinds of mental health problems.

[342] Daniel J. Gross, *Prisons work to limit use of solitary confinement*, HERALD J. OF SPARTANBURG (Apr. 24, 2016), http://www.thestate.com/news/local/crime/article73689037.html.

[343] SCDC, *Step-Down Program*, *supra* note 339, at 3.

[344] *Id.*

[345] *Id*. at 4.

[346] *Id.*

[347] *Id.* at 4, 7. In a follow-up email with Director Stirling, SCDC explained that the incentives are automatically provided at each phase, but a prisoner showing "chronic negative behavior" would be required to repeat the phase or be placed back in restricted housing.

[348] *Id.* at 4.

[349] *Id.*

[350] *Id.* at 6.

[351] *Id.* at 4-5.

[352] *Id.* at 6.

[353] *Id.* at 6-7.

[354] *Id.* at 5.

[355] *Id.* at 7.

[356] *Id.*

[357] *Id*. at 8.

[358] *Id.*

[359] *Id.*

[360] *Id.* at 7.

[361] *Id.*

[362] *Id.*

[363] *Id.*

[364] *Id.*

[365] *See* Settlement Agreement, *T.R. v. South Carolina Department of Corrections*, No. 4855-6615-1984 v.8 (May 31 2016), http://www.pandasc.org/wp-content/uploads/2016/06/Settlement-Agreement-May-31-2016.pdf; Term Sheet, *T.R. v. South Carolina Department of Corrections*, No. 4855-6615-1984 v.8 (Jan. 12, 2015) [hereinafter SCDC Term Sheet], http://ftpcontent4.worldnow.com/wistv/pdf/SCDCtermsheet.pdf; *see also* Tim Smith, *Agreement Reached to Reform SC Prison Treatment of Mentally Ill*, GREENVILLE NEWS (Jan. 16, 2015),http://www.thestate.com/news/local/article13937666.html.

[366] *See* SCDC Term Sheet, *supra* note 365, at 12-13.

[367] *See id.* at 1.

[368] SCDC, *Step-Down Program*, *supra* note 339, § 25.

[369] *Id.*

[370] Phone conversation with Utah Director of the Division of Institutional Operations Jerry Pope (Sept. 9, 2016).

[371] See General Order No. DIOGO 16-001, FCO7 Restricted Housing, issued by Utah Division of Institutional Operations (Jan. 19, 2016) [hereinafter Utah FC07 Restricted Housing Order 2016].

[372] See Letter from Utah Director of the Division of Institutional Operations Jerry Pope to Co-Executive Director of ASCA George Camp, Re: Restricted Housing Update (Aug. 25, 2016) [hereinafter Pope Restrictive Housing Update 2016.]

[373] See Utah FC07 Restricted Housing Order 2016, *supra* note 371, §§ 01.01, 01.03.

[374] *Id.*, § 02.01.

[375] *Id*., § 02.02.

[376] Phone conversation with Director Pope (Sept. 9, 2016), *supra* note 370.

[377] *See* Utah FC07 Restricted Housing Order 2016, *supra* note 371, § 03.01.

[378] *Id.*, § 03.02.

[379] *Id.*

[380] Phone conversation with Director Pope (Sept. 9, 2016), *supra* note 370; Pope Restrictive Housing Update 2016, *supra* note 372.

[381] Section 03.06(B) of the Utah FC07 Restricted Housing Order 2016 provides that "Behaviors that may result in an inmate being placed in Restricted Housing may include, but are not limited to: 1) involvement in a serious threat to life, property, staff or other inmates, or to the orderly operation of a unit or facility; 2) escape/attempted escape; 3) riot; 4) fight with serious injuries, weapons used, or group of three or more

participants; 5) Security Threat Group activity; 6) homicide; 7) assault on staff; 8) serious assault on inmate; 9) serious safety concerns; and/or 10) scores based on assessment for Level 2 housing."

[382] *Id.*, § 03.01(B).

[383] Utah FC07 Restricted Housing Order 2016, *supra* note 371, § 03.03. In a written summary of the changes, Utah reported doing such reviews generally within 24 hours. *See* Pope Restrictive Housing Update 2016, *supra* note 372.

[384] Utah FC07 Restricted Housing Order 2016, *supra* note 371, § 03.04.

[385] *Id.*, § 04.05.

[386] *Id.*, § 04.02.

[387] *Id.*, § 03.04, (B)(1).

[388] *Id.*, § 04.03.

[389] *Id.*, § 04.04.

[390] *See* Pope Restrictive Housing Update 2016, *supra* note 372.

[391] Utah FC07 Restricted Housing Order 2016, *supra* note 371, § 04.06.

[392] *Id.*, §§ 03.03, 04.04.

[393] *Id.*, § 06.01.

[394] *See* Pope Restrictive Housing Update 2016, *supra* note 372.

[395] Utah FC07 Restricted Housing Order 2016, *supra* note 371, § 06.02.

[396] *See* Pope Restrictive Housing Update 2016, *supra* note 372.

[397] *Id.* Utah reported that of the 380 people kept in-cell 22 or more hours per day, 373 were men and seven were women. Utah also reported 683 people in units labeled as restricted housing but not necessarily in-cell 22 hours or more. Of these 683 people, 611 were men between the ages of 18 and 49, 65 were men over the age of 50, and seven were women between the ages of 18 and 49. Of the men in units labeled as restricted housing but not necessarily in-cell 22 hours or more, 47% were White, 34% were Hispanic, 7% were Black, 4% were Asian, and 8% were Other. The total male custodial population was 64% White, 20% Hispanic, 7% Black, 3% Asian, and 6% Other. Of the women in units labeled as restricted housing but not necessarily in-cell 22 hours or more, 57% were White, 43% were Hispanic, and zero were Black, Asian, or Other. The total female custodial population was 75% White, 13% Hispanic, 2% Black, 3% Asian, and 7% Other. Utah also reported that there were 367 men in its custodial population who had a "serious mental health issue" and that 71 of them were in restricted housing units. There were 57 women in Utah's custodial population who had a "serious mental health issue" and none of them were in a restricted housing unit.

**Appendix A: ASCA-Liman Restricted Housing Survey – Fall 2015**

This survey aims to provide a national picture of the number of people in all forms of extended restricted housing, the length of their stay, and information on jurisdictions' policies in terms of changes underway or recently completed.

**For purposes of this survey, "Extended Restricted Housing" is defined as separating prisoners from the general population and holding them in their cells for 22 hours per day or more, for 15 or more continuous days. The definition includes prisoners held in both single- or double-cells, if held for 22 hours per day or more in a cell, for 15 or more continuous days.**

This survey requests information regarding all prisoners in your jurisdiction's correctional facilities, including both sentenced prisoners and pre-trial detainees. The goal is to have information on all of the facilities for which you have data on extended restricted housing, including facilities operated by private entities on behalf of the State, if that information is available. Therefore, in the first questions, we ask you to identify all the facilities in your jurisdiction—and then to identify all the facilities for which you have accessible data on the use of extended restricted housing.

Please answer all the questions with information about your jurisdiction that is current as of on or about **October 1, 2015.**

Please complete and return this survey by October 19, 2015.

1) **Please indicate the jurisdiction for which you are filling out the survey:**
   _____

2) **Does your correctional system include the following facilities (check all that apply)?**
   Prisons                 Jails              Juvenile facilities
   Mental health facilities            Privately-contracted facilities
   Separate facilities for death-sentenced prisoners      Other (please specify) ___

3) **Please provide the total custodial population for all facilities in your system as identified in Question 2 (for example, if you indicated in Question 2 that your system includes prisons, jails, juvenile facilities, and mental health facilities, you would provide the total custodial population for those four types of facilities).**

4) **Please indicate the facilities for which you have data on the use of Extended Restricted Housing (check all that apply).**
   Prisons                 Jails                    Juvenile facilities
   Mental health facilities            Privately-contracted facilities
   Separate facilities for death-sentenced prisoners      Other (please specify) ____

Below are a series of questions about Extended Restricted Housing for the facilities that you identified in Question 4. We understand that you may not be able to answer all questions for all types that you identified in Question 4. (For example, you may have data on demographics or mental health for people in extended restricted housing in prisons but not in jails.)  Please provide the information that you do have. After each question, you will be asked to indicate which types of facilities are included in your responses to that question.

5) **Please provide the total custodial population (including men and women) in each type of facility identified in Question 4.  (For example, if you indicated in Question 4 that you have data on the use of Extended Restricted Housing in prisons, jails, and juvenile facilities, you would provide the custodial population in these three types of facilities.)**

   Prisons _____        Jails _____        Juvenile facilities _____

   Mental health facilities _____ Privately-contracted facilities _____

   Separate facilities for death-sentenced prisoners _____    Other (please specify) _____

6) **Please provide the total custodial population (including men and women) in Extended Restricted Housing for all facilities identified in Question 4 (For example, if you indicated in Question 4 that you have data on the use of Extended Restricted Housing in prisons, jails, and juvenile facilities, you would provide the total custodial population in Extended Restricted Housing for each of these three types of facilities.)**

   Prisons _____        Jails _____        Juvenile facilities _____

   Mental health facilities _____ Privately-contracted facilities _____

   Separate facilities for death-sentenced prisoners _____    Other (please specify) _____

7) **Demographic Information**
   Part I of the table requests information on the total custodial population for all facilities that you identified in Question 4.
   Part II of the table requests information regarding the number of prisoners in Extended Restricted Housing in those facilities.

| | White | Black | Hispanic | Asian | Other | Total | Specify the groups included in "Other" |
|---|---|---|---|---|---|---|---|
| **I. Total Prisoners** | | | | | | | |
| Male (under 18 years old) | | | | | | | |
| Male (18-49 years old) | | | | | | | |
| Male (50 years or older) | | | | | | | |
| | | | | | | | |
| Female (under 18 years old) | | | | | | | |
| Female (18-49 years old) | | | | | | | |
| Female (50 years or older) | | | | | | | |
| **Total** | | | | | | | |
| **II. Prisoners in Extended Restricted Housing** | | | | | | | |
| Male (under 18 years old) | | | | | | | |
| Male (18-49 years old) | | | | | | | |
| Male (50 years or older) | | | | | | | |
| | | | | | | | |
| Female (under 18 years old) | | | | | | | |
| Female (18-49 years old) | | | | | | | |
| Female (50 years or older) | | | | | | | |
| **Total** | | | | | | | |

8) **How many prisoners, if any, (including both male and female, of every age) in Extended Restricted Housing are housed in double cells?**

**9) Mental Health Status**

| | White | Black | Hispanic | Asian | Other | Total | Specify the groups included in "Other" |
|---|---|---|---|---|---|---|---|
| **I. Total Prisoners Identified as Having a Serious Mental Health Issue** | | | | | | | |
| Male | | | | | | | |
| Female | | | | | | | |
| **II. Prisoners in Extended Restricted Housing Identified as Having a Serious Mental Health Issue** | | | | | | | |
| Male | | | | | | | |
| Female | | | | | | | |

**10) How many transgender prisoners or pregnant prisoners are in Extended Restricted Housing?**

| | Pregnant | Identified as Transgender |
|---|---|---|
| **I. Total Prisoners** | | |
| | | |
| **II. Prisoners in Extended Restricted Housing** | | |

**11) Please provide the total number of prisoners, if any, who as of October 1, 2015 are not in Extended Restricted Housing as defined in this survey, but who have been segregated from the general population and held in cell (either in single- or double-cells) for the following periods:**

| | Number of Male and Female Prisoners |
|---|---|
| **16-19 hours per day** | |
| **20-21 hours per day** | |

**12) Do you regularly gather, collect, or report information on each prisoner's length of stay in Extended Restricted Housing?**

**13) Types of Extended Restricted Housing— Please provide the number of prisoners held in each type of Extended Restricted Housing for the specified period. Include both male and female prisoners.**

| Continuous/ Consecutive Days | Protective Custody | Disciplinary Custody | Administrative Segregation | Other Form of Restricted Housing | Total |
|---|---|---|---|---|---|
| 15 days up to 1 month | | | | | |
| 1 month up to 3 months | | | | | |
| 3 months up to 6 months | | | | | |
| 6 months up to 1 year | | | | | |
| 1 year up to 3 years | | | | | |
| 3 years up to 6 years | | | | | |
| 6 year or more | | | | | |

If the data includes prisoners in the "Other" form of Extended Restricted Housing category, please specify the type of Extended Restricted Housing _____.

**14) Changes to Restricted Housing**

From January 1, 2013 through October 1, 2015, has your jurisdiction changed any of its policies regarding Restricted Housing?
If so, please select the appropriate category. Please explain the change in policy and, if possible, email a copy of the relevant policies . . . .

Criteria for entry to Extended Restricted Housing ___
Oversight in Extended Restricted Housing ___
Criteria for release from Restricted Housing ___
Mandated time out of cell for Restricted Housing prisoners ___
Programming in Restricted Housing ___
Opportunities for social contact in Restricted Housing ___
Policies or training related to staffing of Restricted Housing ___
Physical environment of Restricted Housing___
Programming for mentally ill prisoners who have been in Restricted Housing ___
Other _____

Please explain _____

**15) Proposed Changes to Restricted Housing**

Is your jurisdiction planning any changes to its policies regarding Restricted Housing?
If so, please select the appropriate category and explain the contemplated change in policy.

Criteria for entry to Restricted Housing ___

Oversight in Extended Restricted Housing ___
Criteria for release from Restricted Housing ___
Mandated time out of cell for Restricted Housing Prisoners ___
Programming in Restricted Housing ___
Opportunities for social contact in Restricted Housing ___
Policies or training related to staffing of Restricted Housing ____
Physical environment of Restricted Housing___
Programming for mentally ill prisoners who have been in Restricted Housing
_____
Other _____

Please explain _____

**16) We may have follow-up questions to clarify the information reported in this survey. Please provide the name, contact information, and title for the person to whom such questions should be directed.**

## Appendix B: List of the Report's Charts and Tables

### CHARTS

| | |
|---|---|
| Chart 1 | Percentages of Men and Women in Custodial Population in Restricted Housing by Jurisdiction (15 Consecutive Days or Longer, 22 Hours or More per Day) |
| Chart 2 | Percentage of Men and Women in Custodial Population In-Cell for 16 or More Hours per Day and for 15 Consecutive Days or Longer by Jurisdiction |
| Chart 3 | Prisoners in Restricted Housing by Length of Time and by Percent of the 54,382 Prisoners for Which Length-of-Stay Data Were Provided |
| Chart 4 | Prisoners in Restricted Housing by Length of Time and by Classification of the Type of Restrictive Custody |
| Chart 5 | Percentage of Male Custodial Population in Restricted Housing |
| Chart 6 | Percentage of Female Custodial Population in Restricted Housing |
| Chart 7 | Demographic Percentage Composition of Total Male Custodial Population and Male Restricted Housing Population |
| Chart 8 | Demographic Percentage Composition of Total Female Custodial Population and Female Restricted Housing Population |
| Chart 9 | Age Cohorts of Male Total Custodial Population and of Male Restricted Housing Population |
| Chart 10 | Age Cohorts of Female Total Custodial Population and of Female Restricted Housing Population |

### TABLES

| | |
|---|---|
| Table 1 | Types of Facilities Within State and Federal Corrections Systems |
| Table 2 | Numbers and Percentages of Men and Women in Custodial Population in Restricted Housing by Jurisdiction (15 Consecutive Days or Longer, 22 Hours or More per Day) |
| Table 3 | Numbers and Percentages of Men and Women in Custodial Population In-Cell for 16 or More Hours per Day and for 15 Consecutive Days or Longer by Jurisdiction |
| Table 4 | Numbers of Prisoners in Restricted Housing by Length of Time and by Jurisdiction |
| Table 5 | Number and Percentage of Male Custodial Population in Restricted Housing |

Table 6        Number and Percentage of Female Custodial Population in Restricted Housing

Table 7        Demographic Composition of Total Male Custodial Population and of Male
               Restricted Housing Population

Table 8        Demographic Percentage Composition of Total Male Custodial Population and of
               Male Restricted Housing Population

Table 9        Demographic Composition of Total Female Custodial Population and Female
               Restricted Housing Population

Table 10       Demographic Percentage Composition of Total Female Custodial Population and
               Female Restricted Housing Population

Table 11       Age Cohorts of Male Total Custodial Population and of Male Restricted Housing
               Population

Table 12       Age Cohorts by Percentage of Male Total Custodial Population and of Male
               Restricted Housing Population

Table 13       Age Cohorts of Female Total Custodial Population and of Female Restricted
               Housing Population

Table 14       Age Cohorts by Percentage of Female Total Custodial Population and of Female
               Restricted Housing Population

Table 15       Male Prisoners with a Serious Mental Health Issue (Variously Defined) in
               Restricted Housing

Table 16       Female Prisoners with a Serious Mental Health Issue (Variously Defined) in
               Restricted Housing

Table 17       Male Prisoners with a Serious Mental Health Issue by Race and Ethnicity

Table 18       Female Prisoners with a Serious Mental Health Issue by Race and Ethnicity

Table 19       Pregnant Prisoners in Restricted Housing

## Appendix C: Jurisdictions' Definitions of Serious Mental Illness

|  | **Definition** |
|---|---|
| Alabama | "Mental Disorder. A mental disorder is a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning. Mental disorders are usually associated with significant distress or disability in social, occupational, or other important activities. An expectable or culturally approved response to a common stressor or loss, such as the death of a loved one, is not a mental disorder. Socially deviant behavior (e.g., political, religious, or sexual) and conflicts that are primarily between the individual and society are not mental disorders unless the deviance or conflict results from a dysfunction in the individual." |
| Arizona | "[T]hose inmates who possess a qualifying mental health diagnosis and a severe functional impairment directly relating to their mental illness."  It also includes those inmates who were deemed SMI in the community, but who do not necessarily meet the criteria in our system. SMI inmates are not housed in detention; they are grouped together in Restrictive Status Housing using a step program for out of cell time and privileges." |
| Colorado | "The current diagnosis of any of the following DSM diagnoses accompanied by the P-code qualifier of M, denoting the presence of a major mental disorder: schizophrenia, schizoaffective disorder, delusional disorder, schizophreniform disorder, brief psychotic disorder, substance-induced psychotic disorder (excluding intoxication and withdrawal), unspecified schizophrenia spectrum and other psychotic disorder (previously psychotic disorder not otherwise specified), major depressive disorders, and bipolar disorders. Offenders, regardless of diagnosis, indicating a high level of mental health needs based upon high symptom severity and/or high resource demands, which demonstrate significant impairment in their ability to function within the correctional environment." Colorado does NOT allow offenders with Serious Mental Illness to remain in Restricted Housing over 30 days. |
| Connecticut | "Inmates that are assessed by Mental health staff as having a mental health score of level 4 or 5. MH5 Assessment: Crisis level mental disorder (acute conditions, temporary classification). Requires 24 hour nursing care. MH4 Assessment: Mental Health disorder severe enough to require specialized housing or ongoing intensive mental health treatment; usually on psychotropic medications." |

| District of Columbia | "People with DSM 4 Axis I disorders." |
|---|---|
| Florida | "For the purpose of responding to these questions, the following definitions are provided: S-3 inmates are those that show impairment in adaptive functioning due to a diagnosed mental disorder. The S-4, S-5, and S-6 grades indicate severe impairment in adaptive functioning that is associated with a diagnosed mental disorder and require inpatient mental health treatment in a transitional care unit (TCU), a crisis stabilization unit (CSU), or the Correctional Mental Health Treatment Facility (CMHTF). Admission to a CMHTF requires judicial commitment." |
| Georgia | "Offenders who have been diagnosed with a serious mental illness by a mental health professional and have a mental health level 3 or 4 classification profile." |
| Hawaii | "A diagnosable mental disorder characterized by alternation in thinking, mood, or impaired behavior associated with distress and/or impaired functioning: primarily inclusive of schizophrenia, severe depression and bipolar disorder, and severe panic disorder, obsessive compulsive disorder, and post-traumatic stress disorder." |
| Illinois | "A person shall be considered to be 'Seriously Mentally Ill' ('SMI') if he or she, as a result of a mental disorder as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders ('DSM') of the American Psychiatric Association, exhibits impaired emotional, cognitive, or behavioral functioning that interferes seriously with his or her ability to function adequately except with supportive treatment or services. These individuals also must either currently have, or have had within the past year, a diagnosed mental disorder, or must currently exhibit significant signs and symptoms of a mental disorder. A diagnosis of alcoholism or drug addiction, developmental disorders, or any form of sexual disorder shall not, by itself, render an individual seriously mentally ill. The combination of either a diagnosis or significant signs and symptoms of a mental disorder and an impaired level of functioning, as outlined above, is necessary for one to be considered Seriously Mentally Ill." |
| Iowa | "Serious mental illness is defined as chronic and persistent mental illnesses in the following categories: § Schizophrenia § Recurrent Major Depressive Disorders § Bipolar Disorders § Other Chronic and Recurrent Psychosis § Dementia and other Organic Disorders" |
| Kansas | "Mental Health Levels 3-7 and anyone under behavioral healthcare with medication" |

| | |
|---|---|
| Kentucky | "Serious Mental Illness means a current diagnosis by a Department of Corrections psychological or psychiatric provider or a recent significant history of any of the following DSM-V (or most current revision thereof) diagnoses: Schizophrenia, Delusional Disorder, Schizophreniform Disorder, Schizoaffective Disorder, Brief Psychotic Disorder, Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal), psychotic disorder Not Otherwise Specified, Bipolar I and Bipolar II disorders or a current diagnosis by a Department of Corrections psychological or psychiatric provider of a serious personality disorder that includes breaks with reality and results in significant functional impairment, or a current diagnosis by a Department of Corrections psychological or psychiatric providers of either an intellectual disability, a neurodevelopmental disability, or an amnestic or neurocognitive disorder that results in significant functional impairment. Per CPP 13.13" |
| Maryland | "In our manual, we use SMI to mirror the meaning defined in COMAR10.21.17.02 and in accordance with the most recent edition of the Diagnostic and Statistical Manual. These diagnoses include psychotic disorders, major mood disorders, and specifically identified personality disorders. These disorders would be: Schizophrenic disorder; Major Affective disorder; Other psychotic disorder; Borderline schizotypal personality disorder with the exclusion of an abnormality that is manifested only to be repeat criminal or otherwise antisocial conduct." |
| Massachusetts | "The designation of SMI indicates the presence of nine mental illness from DSM 5 which are serious psychotic or mood disorders. In addition, serious character pathology which results in depressive or psychotic episodes, intellectual disabilities or other disorders that result in significant functional impairment may be designated as SMI." |
| Minnesota | "The adult: (i) has a diagnosis of schizophrenia, bipolar disorder, major depression, schizoaffective disorder, or borderline personality disorder; (ii) indicates a significant impairment in functioning; and (iii) has a written opinion from a mental health professional, in the last three years, stating that the adult is reasonably likely to have future episodes requiring inpatient or residential treatment, of a frequency described in clause (1) or (2), unless ongoing case management or community support services are provided" |
| Mississippi | "Serious mental illness is a diagnosable disorder of thought, mood, perception, orientation, or memory that significantly impairs a person's judgment, behavior, capacity to recognize reality, and/or ability to meet the ordinary demands of life currently or at any time during the past year." |

| | |
|---|---|
| Missouri | "Serious mental health offenders included all of our MH scores of 3, 4, and 5 which are defined below. MH5: Offenders requiring frequent mental health contacts, psychotropic medications and a structured living unit in a correctional institution. MH4: Offenders requiring intensive or long-term inpatient or residential psychiatric treatment at a social rehabilitation unit or special needs unit OR requires frequent psychological contacts and psychotropic medications to be maintained in a general population setting. MH3: Offender requires regular psychological services and/or psychotropic medication (or psychiatric monitoring)." |
| Montana | "<u>Serious Mental Illness</u>—a clinical disorder of thought, mood or anxiety included under Axis I of the DSM, *e.g.*, schizophrenia, major depression, bi-polar disorder, PTSD, or panic disorder, and inmates who were previously diagnosed with such mental illness, unless there is certification in the record that the diagnosis has been changed or altered as a result of a subsequent mental health evaluation by a licensed mental health professional. It does not include personality disorders, *i.e.*, borderline, antisocial, or paranoid personality disorders." |
| Nebraska | "Serious Mental Health Needs—defines patients with basic psychotic disorders or mood disorders, those who self-injure, the aggressive mentally ill, those with post-traumatic stress disorders, and suicidal inmates. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning. Mental Illness (MI)—defined as it is referenced by the DSM-5. A syndrome characterized by clinically significant disturbance in an individual's cognition, emotional regulation or behavior that reflects a dysfunction in the psychological, biological, or developmental process underlying mental functioning. Mental illness is usually associated with significant distress or a disability in social, occupational, or other important activities." |
| New Hampshire | "Defined by policy #6.31. This policy can be found on the NH-DOC website: http://www.nh.gov/nhdoc/policies/documents/6-31.pdf |
| New Jersey | "NJDOC defines it as any inmate having a mental health problem which impairs the functioning of the inmate to the extent which the MH clinical team determines that treatment warrants admission to a mental health unit. The below mentioned numbers represent the total number of inmates in the mental health units for both males and females. It incorporates those on the SU, RTU and TCU units." |
| New York [recheck] | "New York Correction Law states: An inmate has a serious mental illness when he or she has been determined by a mental health clinician |

| | |
|---|---|
| | to meet at least one of the following criteria: (i) he or she has a current diagnosis of, or is diagnosed at the initial or any subsequent assessment conducted during the inmate's segregated confinement with, one or more of the following types of Axis I diagnoses, as described in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, and such diagnoses shall be made based upon all relevant clinical factors, including but not limited to symptoms related to such diagnoses: (A) schizophrenia (all sub-types), (B) delusional disorder, (C) schizophreniform disorder, (D) schizoaffective disorder, (E) brief psychotic disorder, (F) substance-induced psychotic disorder (excluding intoxication and withdrawal), (G) psychotic disorder not otherwise specified, (H) major depressive disorders, or (I) bipolar disorder I and II; (ii) he or she is actively suicidal or has engaged in a recent, serious suicide attempt; (iii) he or she has been diagnosed with a mental condition that is frequently characterized by -s with reality, or perceptions of reality, that lead the individual to experience significant functional impairment involving acts of self-harm or other behavior that have a seriously adverse effect on life or on mental or physical health; (iv) he or she has been diagnosed with an organic brain syndrome that results in a significant functional impairment involving acts of self-harm or other behavior that have a seriously adverse effect on life or on mental or physical health; (v) he or she has been diagnosed with a severe personality disorder that is manifested by frequent episodes of psychosis or depression, and results in a significant functional impairment involving acts of self-harm or other behavior that have a seriously adverse effect on life or on mental or physical health; or (vi) he or she has been determined by a mental health clinician to have otherwise substantially deteriorated mentally or emotionally while confined in segregated confinement and is experiencing significant functional impairment indicating a diagnosis of serious mental illness and involving acts of self-harm or other behavior that have a serious adverse effect on life or on mental or physical health." |
| North Dakota | "Our psychiatrist determined the below diagnoses for the definition of 'Serious Mental Health Issue.'<br><br>Any psychotic disorder to include references to the below:<br><br>• Schizophrenia<br>• Schizoaffective<br>• Schizophreniform<br>• Brief Psychotic<br>• Any reference to thought disorder<br>• Any Bipolar Disorder<br>• Major Depressive Disorder, Severe (with or without psychotic features) |

| | |
|---|---|
| | • Borderline Personality Disorder" |
| Ohio | "Adults with a serious mental illness are persons who are age eighteen (18) and over, who currently or at any time during the past year, have a diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet diagnostic criteria specified within the most current Diagnostic and Statistical Manual of Mental Disorders and that has resulted in functional impairment which substantially interferes with or limits one or more major life activities. These disorders have episodic, recurrent, or persistent features; however, they vary in terms of severity and disabling effects." |
| Oklahoma | "Offenders diagnosed as having mental illness, who require medication and who cycle in and out of stable functioning and Offenders with serious cognitive impairment due to developmental disorders, traumatic brain injury or medical illness and offenders who because of their mental illness require 24X7 monitoring and special housing." |
| Oregon | "We included inmates who are coded as MH2 or MH3 in our system. The definitions can be found here: http://www.oregon.gov/doc/OPS/HESVC/docs/policies_procedures/Section_G/PG04%20Basic%20Mental%20Health%20Services%202014.pdf " |
| Pennsylvania | "Inmates determined by the Psychiatric Review Team (PRT) to have a current diagnosis or a recent significant history of any of the DSM-IV-TR diagnoses: a. Schizophrenia (all types) b. Delusional Disorder c. Schizophreniform Disorder d. Schizoaffective Disorder e. Brief Psychotic Disorder f. Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal) g. Psychotic Disorder Not Otherwise Specified h. Major Depressive Disorders i. Bipolar I and II" |
| Rhode Island | "Per our Director of Behavioral Health: A serious mental illness is defined as a mental disorder that causes "substantial functional impairment (i.e., substantially interfered with or limited one or more major life activities). Such disorders as Schizophrenia, Paranoid and other psychotic disorders, Bipolar disorders (hypomanic, manic, depressive, and mixed), Major Depressive disorders (single episode or recurrent), Schizoaffective disorders (bipolar or depressive), Borderline Personality disorder and Schizotypal Personality disorder." |
| South Carolina | "For this section we included inmates with any SCDC mental health classification indicating mental illness which ranges from stable (mentally ill but not requiring treatment) to hospitalization. Inmates with a SCDC mental health classification of substance abuse or intellectual disabilities/delays were not included in this group." |

| | |
|---|---|
| South Dakota | "The criteria for participation in the comprehensive assistance with recovery and empowerment (CARE) program are used to identify severely mentally ill inmates. 46:20:31:01. Eligibility criteria. To be eligible for CARE services the client must be 18 years of age or older and must meet the following SMI criteria: (1) The client must meet at least one of the following: (a) The client has undergone psychiatric treatment more intensive than outpatient care and more than once in a lifetime, such as, emergency services, alternative residential living, or inpatient psychiatric hospitalization; (b) The client has experienced a single episode of psychiatric hospitalization with an Axis I or Axis II diagnosis per the DSM-IV pursuant to subdivision 46:20:18:01(13); (c) The client has been treated with psychotropic medication for at least one year; or (d) The client has frequent crisis contact with a community mental health center, or another mental health provider, for more than six months as a result of a mental illness; and (2) The client must meet at least three of the following criteria: (a) The client is unemployed or has markedly limited job skills or poor work history; (b) The client exhibits inappropriate social behavior which results in concern by the community or requests for mental health or legal intervention; (c) The client is unable to obtain public services without assistance; (d) The client requires public financial assistance for out-of-hospital maintenance or has difficulty budgeting public financial assistance or requires ongoing training in budgeting skills or needs a payee; (e) The client lacks social support systems in a natural environment, such as close friends and family, or the client lives alone or is isolated; or (f) The client is unable to perform basic daily living skills without assistance." |
| Tennessee | "According to Tennessee Department of Correction policy: Serious Mental Illness is a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality or cope with the ordinary demands of life within the correctional environment and is manifested by substantial impairment or disability. Serious mental illness requires a diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet diagnostic criteria specified within the most current Diagnostic and Statistical Manual (DSM) or their International Classification of Disease (ICD) equivalent (and subsequent revisions) in accordance with an individualized treatment plan." |
| Texas | "Serious Mental Health Issue includes offenders receiving inpatient mental health services." |
| Utah | "If the offender had a DSM Axis I or II mental health diagnosis." |
| Vermont | "Seriously Functionally Impaired Designation per 28 V.S.A. Subsection |

| | |
|---|---|
| | 906(1): (A) A disorder of thought, mood, perception, orientation, or memory as diagnosed by a qualified mental health professional, which substantially impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life and which substantially impairs the ability to function within the correctional setting. (B) A developmental disability, traumatic brain injury or other organic brain disorder, or various forms of dementia or other neurological disorders, as diagnosed by a qualified mental health professional, which substantially impairs the ability to function in the correctional setting." |
| Virginia | "VADOC uses mental health codes that indicate level of functioning and not diagnoses—26% of VADOC's total offender population maintain a mental health code." |
| Washington | "All offenders who meet the criteria for the Active Treatment Group AND who have had one Mental Health or Psychiatry encounter coded with a Serious Mental Illness (SMI) diagnosis code in the 6 months prior to the report end date." |
| West Virginia | "WVDOC uses NCCHC definition of SMI which states that those individuals that have basic psychotic or mood disorders (manic, depressive, self-injurious, PTSD, suicidal), would be classified as having Serious Mental Illness." |
| Wisconsin | "Our definition of 'Serious Mental Health Issue' includes the following:<br><br>MH-2A - Inmates with serious mental illness based on Axis I conditions<br><br>A. Inmates with a current diagnosis of, or are in remission from, the following conditions:<br>• Schizophrenia (all sub types)<br>• Delusional disorder<br>• Schizophreniform disorder<br>• Schizoaffective disorder<br>• Psychosis NOS<br>• Major depressive disorders<br>• Bipolar disorder 1 & 2<br>B. Inmates with current or recent symptoms of the following conditions:<br>• Brief psychotic disorder<br>• Substance induced psychotic disorder<br>C. Inmates with head injury or other neurologic impairments that result in behavioral or emotional control.<br>D. Inmates with chronic and persistent mood or anxiety disorders or other conditions that lead to significant functional disability.<br><br>MH-2B - Inmates with serious mental illness based on Axis II |

| | |
|---|---|
| | conditions<br><br>A. Inmates with a primary personality disorder that is severe, accompanied by significant functional impairment, and subject to periodic decompensation (i.e. psychosis, depression, or suicidality).<br><br>Note: Those who qualify for both MH-2A and MH-2B are coded MH-2A." |
| Wyoming | "Schizophrenia (all sub types) • Delusional disorder • Schizophreniform disorder• Schizoaffective disorder • Psychosis NOS • Major depressive disorders • Bipolar disorder 1 & 2" |
| Federal Bureau of Prisons | "Inmates with current or recent symptoms of the following conditions:<br>   • Brief psychotic disorder<br>   • Substance induced psychotic disorder" |
| Virgin Islands | "Severe mental illness is characterized by one or more of the following:<br>   • cognitive impairment,<br>   • a break with reality, including hallucinations and/or delusions. These symptoms may be acute or chronic in their presentation, cause functional impairment, and could pose a threat to the patients safety in the general population in a correctional setting." |