1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
2            BEFORE THE HONORABLE KIMBERLY J. MUELLER

3

4

5    RALPH COLEMAN, et al.,

6                   Plaintiff,
     vs.                              Sacramento, California
7                                     No. 2:90-CV-00520
     GAVIN NEWSOM, et al.,            Wednesday, February 26, 2020
8                                     10:08 a.m.
                    Defendant.
9    _____/

10

11

12                         --oOo--

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                  STATUS CONFERENCE

15                         --oOo--

16

17

18

19

20

21   Official Reporter:      KACY PARKER BARAJAS
                             CSR No. 10915, RMR, CRR, CRC
22                           501 I Street
                             Sacramento, CA  95814
23                           kbarajas.csr@gmail.com

24   *Proceedings recorded by mechanical stenography.  Transcript*
     *produced by computer-aided transcription.*

25

```
 1   APPEARANCES:

 2   For the Plaintiffs:      ROSEN BIEN GALVAN & GRUNFELD LLP
                              ALEXANDER R. GOURSE
 3                            Attorney at Law
                              ERNEST GALVAN
 4                            Attorney at Law
                              101 Mission Street, 6th Floor
 5                            San Francisco, CA  94105

 6   For the Defendants:      DEPARTMENT OF JUSTICE
                              OFFICE OF THE ATTORNEY GENERAL
 7                            TYLER V. HEATH
                              Attorney at Law
 8                            LUCAS L. HENNES
                              Attorney at Law
 9                            1300 I Street
                              Sacramento, CA  95814
10
                              DEPARTMENT OF JUSTICE
11                            OFFICE OF THE ATTORNEY GENERAL
                              KYLE LEWIS
12                            Attorney at Law
                              455 Golden Gate Ave., Suite 11000
13                            San Francisco, CA  94102

14   For the Potential        REICHMAN JORGENSEN LLP
     Intervenor               KATE M. FALKENSTIEN
15   Christopher Lipsey, Jr:  Attorney at Law
                              100 Marine Parkway, Suite 300
16                            Redwood Shores, CA  94065

17                                --oOo--

18

19

20

21

22

23

24

25
```

1      SACRAMENTO, CALIFORNIA, WEDNESDAY, FEBRUARY 26, 2020, 10:08 AM

2                            --oOo--

3           THE CLERK:  Calling civil case 90-520, Coleman versus

4      Newsom, et al.  This is on for a status conference regarding

5      motion for TRO.

6           THE COURT:  Good morning.  Appearances, please.

7           MR. GALVAN:  For plaintiffs' counsel, Alex Gourse and

8      Ernest Galvan.

9           THE COURT:  All right.  Good morning to each of you.

10          And for the potential intervenor.

11          MS. FALKENSTIEN:  Yes.  For the potential intervenor,

12     I'm Kate Falkenstien.

13          THE COURT:  All right.  Good morning, Ms. Falkenstien.

14          MR. LEWIS:  Good morning, your Honor.  For defendants,

15     Kyle Lewis.

16          MR. HENNES:  Good morning, your Honor.  Deputy

17     Attorney General Lucas Hennes.

18          MR. HEATH:  And good morning, your Honor.  Deputy

19     Attorney General Tyler Heath.

20          THE COURT:  All right.  Good morning to each of you.

21     I have several questions.  The TRO has achieved the purpose of

22     focusing me on this, and so I understand the need to do that

23     having been provided with the briefing here and some

24     supplemental information.

25          So first on the threshold permissive intervention

1   question, it is the case that that needs to be resolved

2   ultimately.  And my question is, should I resolve it formally

3   now?  And I'm inclined to do that and even signal a bench

4   order, although I see the suggestion in the defense briefing

5   that there might be informal mechanisms available without the

6   need for permissive intervention.  I think permissive

7   intervention is the route to intervention here, not just

8   because it's effectively unopposed but because that appears

9   proper under the rule.

10          If I were to grant permissive intervention, it would

11  be for Mr. Lipsey.  And in terms of the number of Guard One

12  cases in front of the Court, it seems undisputed Mr. Lipsey is

13  the only member of the Coleman class who has a case pending

14  before this Court.  Is that correct, Ms. Falkenstien, as far as

15  you know?

16          MS. FALKENSTIEN:  Yes.  That's correct.  I represent

17  three of the six other plaintiffs, and I know that Mr. Suarez

18  and Mr. Rico are not members of the class.  I believe that the

19  three plaintiffs I don't represent are also not members of the

20  class.  So it's my understanding that Mr. Lipsey is the only

21  member.

22          THE COURT:  Is there anyone else who has a different

23  position on that point?

24          MR. HENNES:  No, your Honor.  That's our understanding

25  as well.

1            THE COURT:  All right.  Thank you, Mr. Hennes.

2    Mr. Gourse, Mr. Galvan?

3            MR. GOURSE:  And that is our understanding as well.

4            THE COURT:  All right.

5            And Ms. Falkenstien, I assume you wouldn't disagree

6    that, if permissive intervention would be granted, it would be

7    the limited intervention that the defense suggests in its

8    filing on December 6th.

9            MS. FALKENSTIEN:  In the sense that it would only be

10   as to the issue of the noisiness in Guard One and not other

11   issues in Coleman?

12           THE COURT:  Right.

13           MS. FALKENSTIEN:  Yes, I agree.  He doesn't have an

14   interest in being part of the rest of the proceedings in this

15   case.

16           THE COURT:  So concerning the particular order, the

17   2015 order mandating Guard One checks.

18           MS. FALKENSTIEN:  Yes.

19           THE COURT:  All right.

20           So just testing the defense position -- and is this

21   for you, Mr. Lewis or Mr. Hennes -- the suggestion is that the

22   issues raised by Mr. Lipsey's motion could be resolved

23   informally without intervention?

24           MR. LEWIS:  Your Honor, Mr. Hennes will be responding

25   on that.

1          THE COURT:  All right.

2          MR. HENNES:  And yes, your Honor, it's defendants'

3     position that the parties can collaborate as they have in the

4     past and resolve any issues in Coleman including the noise

5     level created by the Guard One system without the need for any

6     intervention, and it would be done informally.

7          THE COURT:  But that would be granting Ms. Falkenstien

8     and her clients, Mr. Lipsey at least, a place at the table for

9     those discussions?

10          MR. HENNES:  Your Honor, it's defendants' position

11     that Mr. Lipsey has a position at the table as a member of the

12     Coleman class.  In fact, he already has representation through

13     plaintiffs.

14          THE COURT:  Well, for that point, Mr. Gourse or

15     Mr. Galvan, is it a fair critique raised by Ms. Falkenstien and

16     Mr. Lipsey that, yes, he's a member of the Coleman class, but

17     given the range of issues being litigated there, that perhaps

18     the specific issue that Mr. Lipsey is raising hasn't gotten the

19     kind of laser focus it needs, and so having Mr. Lipsey as the

20     representative of a subclass may make some sense to get to the

21     bottom of this issue while recognizing that it's interconnected

22     with suicide prevention concerns, program guide requirements

23     and such?

24          MR. GOURSE:  So I'll say that we -- I think that we

25     have paid attention to this issue.  We are -- we have raised it

1   with the Special Master.  We have raised it with the

2   defendants.  We are not opposed to working with counsel for the

3   intervenor.  And I think that it -- our focus on the issue

4   could actually benefit from additional help from the

5   intervenor.

6           THE COURT:  So you haven't opposed intervention.  So

7   intervention may provide a seat at the table in a helpful way

8   from the plaintiffs?

9           MR. GOURSE:  Yes.  I think that's a fair

10  characterization.

11          THE COURT:  The Ashker settlement, I don't know how

12  familiar you are.  You're familiar with the Ashker settlement,

13  Ms. Falkenstien?

14          MS. FALKENSTIEN:  To some degree.  I know what it is,

15  but I'm not deeply familiar with the details.

16          THE COURT:  It addressed issues including Guard One in

17  the context of a settlement without intervention, but

18  regardless, it may be that narrow permissive intervention makes

19  some sense here.

20          Let me ask questions about the substance of the TRO,

21  assuming for the sake of argument that I am going to grant

22  permissive intervention, but I'll formalize that decision in a

23  written order if in fact I confirm it.  So first with regard to

24  Mr. Lipsey, if in fact he is in the SHU at Corcoran, isn't that

25  a violation?  And is it instead that, as the Special Master has

1    attempted to determine, if he's in long-term restricted

2    housing, then there's not a threshold Coleman violation?  Has

3    anyone checked on Mr. Lipsey's exact status?  He says he has

4    schizoaffective disorder.  The briefing says he's in SHU, but

5    there may be some definitional problem here where in fact he's

6    not in SHU.

7         MR. GOURSE:  I think that's correct.  Our

8    understanding is that he's in the LTRH.  If he were in the SHU,

9    that -- I believe that that would be a violation.  So my

10   understanding is that he is in the LTRH at Corcoran.

11        THE COURT:  So Ms. Falkenstien, do you accept that

12   that may be a definitional issue here?  Do you understand the

13   difference between LTHR and SHU?

14        MS. FALKENSTIEN:  As far as I knew, he was in SHU.

15   When I addressed letters to him, his address is in the SHU.

16   His housing records indicate the SHU.  I'm not familiar with

17   the distinction, if it's just a difference in the naming, but

18   he's being held in the unit at Corcoran with people in the SHU.

19        THE COURT:  Does the defense have something to say

20   about this, Mr. Hennes?

21        MR. HENNES:  Yes, your Honor.  We actually did check

22   with our cohorts at CDCR, and he is currently housed in

23   long-term restricted housing per his status as a CCCMS

24   inmate.

25        THE COURT:  All right.  So this is a reason we need

1    the record as to the complexity of this case and how much water

2    there is under the bridge and care being taken, so I'm going to

3    assume at this point there's not a threshold Coleman class

4    violation based on his current placement.  But Ms. Falkenstien,

5    that will be for you to work to understand better.

6         MS. FALKENSTIEN:  Yes.

7         THE COURT:  And I think all counsel here would help

8    you understand the distinction between SHU and long-term

9    restricted housing.  Because if he's correct about his

10   diagnosis and if he's in SHU, the Court understands he should

11   have been transferred to a PSU a long time ago, right,

12   Mr. Hennes?

13        MR. HENNES:  That's correct, your Honor, or to a LTRH,

14   yes.

15        THE COURT:  All right.

16        MR. HENNES:  Which he is in.

17        THE COURT:  So certain conditions require transfer to

18   facilities in the Sacramento area, correct?

19        MR. HENNES:  That's correct, your Honor.  That's for

20   EOP inmates, if my understanding is correct, and Mr. Lipsey is

21   not an EOP inmate.

22        THE COURT:  Agree with that, Mr. Galvan and

23   Mr. Gourse?

24        MR. GOURSE:  Our understanding is that he is CCCMS.

25        THE COURT:  All right.  So in terms of the proposals

1  that plaintiff -- that Ms. Falkenstien has floated in her

2  briefing, for both the plaintiffs and defendants, help me

3  understand is anything off the table based on program guide

4  requirements or any other considerations?  So the proposals

5  include immediate decrease in frequency, as has been allowed at

6  Pelican Bay to once per hour, prompt replacement of Guard One

7  with a check logging system without noise or sleep deprivation.

8  Beeping silenced.  Under the program guide, shouldn't the

9  beeping be turned off in any event overnight?

10          MR. GOURSE:  Yes, your Honor.

11          THE COURT:  Is there a violation there?

12          MR. GOURSE:  Yes, your Honor.

13          THE COURT:  Do you concede that, Mr. Hennes, that

14  there's -- if the beeping is occurring during the nighttime

15  hours, as defined in the program guide, that's a violation?

16          MR. HENNES:  Yes.  That's our understanding, your

17  Honor.

18          THE COURT:  So has the defense taken any steps to get

19  to the bottom of that violation and correct it at this point in

20  time?

21          MR. LEWIS:  Your Honor, since we did have such a short

22  time on this, I cannot answer that we have investigated this

23  particular issue at that prison.  At other prisons I've been to

24  to see Guard One happening in the nighttime hours, it hasn't

25  been beeping.  So we are looking into this issue.  But I know

1   that at prisons that I've been to it is not being used, the

2   sound is not being used at night, but we are checking into this

3   specific instance.

4          THE COURT:  All right.  The record appeared to be

5   devoid of information other than that being reported by

6   Mr. Lipsey particularly at Corcoran.

7          MR. LEWIS:  That's correct, your Honor.  And because

8   of the short time line, we weren't able to get the information

9   that perhaps would have answered that question.

10         THE COURT:  All right.  How much longer will it take

11  you to get to the bottom of that?

12         MR. LEWIS:  Your Honor, we could probably have that

13  answer relatively shortly, in a matter -- in a week or so about

14  what is going on out there at that particular institution for

15  this narrow factual issue.

16         THE COURT:  All right.  Then I am going to direct the

17  defense to provide the Court, plaintiffs, and Ms. Falkenstien

18  with that information within seven days.

19         MR. LEWIS:  Yes, your Honor.  What we'll do is we'll

20  check with the facility and make sure that it's off, and so

21  we'll provide a declaration from the appropriate individual

22  saying that it's off or on.

23         THE COURT:  All right.

24         One of the prior communications from plaintiffs'

25  counsel pointed out that earplugs would help.  Is that -- has

1   Mr. Lipsey requested earplugs, and would that be an immediate

2   solution?

3          MS. FALKENSTIEN:  I have talked with my client about

4   earplugs.  The concern with earplugs is that, if he wears them,

5   then he can't hear obviously other noise that he needs to hear

6   in the night, and his fear is that sometimes at night there are

7   unexpected like checks where everyone has to line up.  And if

8   he has earplugs in, he doesn't hear the order to line up during

9   the night, and then he gets written up for a rules violation;

10  or he's afraid that the guards might use physical force not

11  knowing that he couldn't hear them.  So he's afraid to be

12  completely unable to hear during the night by wearing earplugs

13  essentially.

14         MR. GOURSE:  I'll just add that that seems like an

15  unreasonable reaction from the defendants if they are punishing

16  him for attempting to adapt to their system for checks by

17  having earplugs.  If they're punishing him for that, I think

18  that that's unacceptable.

19         THE COURT:  I think, assuming earplugs are off the

20  table, recognizing the concerns that Mr. Lipsey has raised, I'm

21  inclined to grant permissive intervention, direct the parties

22  to meet and confer in the next week and see if they can reach

23  some agreement that addresses Mr. Lipsey's concerns.  That's

24  where I'm heading.

25         So Mr. Lewis, did you have a response to that?

1       MR. LEWIS:  Yes, your Honor.  In light of some of the

2   other deadlines that we have coming up getting ready for status

3   conference and everything, that may be a little too short of a

4   time frame.  Defendants are not opposed at all to meeting and

5   conferring about this, but that time line right there may be a

6   little difficult.  We would like to do a little more factual

7   investigation on this, and also I would say that plaintiffs'

8   counsel's comment was kind of a very hypothetical.  We don't

9   know what's going on out there in terms of earplugs.  All we

10  have is Mr. Lipsey's allegations, so we do need some time to

11  research that.  And we have no problem meeting and conferring

12  with plaintiffs and Special Master about ways to improve this

13  if it's necessary.

14      THE COURT:  All right.  Well, in the declaration you

15  file within the next week, just let me know what you reasonably

16  can, what you found out about whether or not the alarms are

17  being silenced overnight.  But also just if there's some easy

18  interim fix to the provision of earplugs that addresses

19  Mr. Lipsey's concerns.

20      MR. LEWIS:  Yes, your Honor.

21      THE COURT:  Or persuades him they're not realistic

22  concerns, let me know that as well.

23      MR. LEWIS:  Very well, your Honor.

24      THE COURT:  All right.  In terms of systemwide

25  concerns, the plaintiff says there are 87 appeals raising

1    concerns about Guard One.  Have the defendants compiled

2    information on appeals?  Is there a systemwide concern here?

3              MR. LEWIS:  One minute, your Honor.

4              MR. HENNES:  Your Honor, we're familiar with a number

5    of appeals, mostly individual lawsuits that are before you

6    already involving the Guard One system.  However, from our

7    limited ability to review the information about other Guard One

8    complaints, it appeared to us that the Guard One complaints

9    specifically about noise caused by the checks themselves has

10   been decreasing steadily since 2015.  Then that's the best

11   we've got right now, but we could also do further investigation

12   into that question.

13             THE COURT:  And your numbers go up to September 2015;

14   is that correct, Ms. Falkenstien?

15             MS. FALKENSTIEN:  For the number of grievances?  Well,

16   the information I have, I guess I have a few different sources

17   of information.  One is that from discovery in Suarez of

18   internal emails at CDCR I know that there were about a hundred

19   complaints within the first six months after the system was

20   introduced at Pelican Bay.  I know the Court mentioned in a

21   Murillo decision that there were about a hundred complaints at

22   CCI, and I have received dozens, I would say around 50 letters

23   from various inmates about their concerns because of my

24   involvement with these cases.  So that's kind of the limited

25   information I have.

1        THE COURT:  The defendants can compile systemwide

2   information.  Is it computerized in a way that you can generate

3   a report somewhat easily?

4        MR. HENNES:  I wouldn't say easily, your Honor.  The

5   way that, you know, CDCR conducts its grievances, they're

6   categorized in very broad-based categories, and I don't believe

7   Guard One noise is one such category.  That would probably be

8   under living conditions which is an extremely broad category

9   and includes a whole host of other possible allegations that

10  inmates may be making in the grievance process.

11       THE COURT:  There are the subsets of Coleman class and

12  non-Coleman class as well?

13       MR. HENNES:  Of course.  But even within those

14  limitations, and I assume Ms. Falkenstien would be referring to

15  inmate grievances by all inmates in restricted housing, not

16  just Coleman class members of course because they're all

17  subjected to the welfare check system.  So it would be

18  difficult to get that information quickly.

19       THE COURT:  All right.  Well, I think ultimately we'll

20  want to get to the bottom of that, but that's -- that also

21  supports granting permissive intervention to allow some focus

22  but in the context of working with plaintiffs' counsel to

23  understand the context fully and taking account of the orders

24  this Court has issued.

25       Just checking, do the parties have positions they want

1    to share with the Court at this point?  I've reviewed the

2    record with respect to the use of Guard One tracking whether or

3    not guards are conducting the 30-minute checks or if there's an

4    exception and a check every hour.  Do the parties have

5    positions at this point on whether or not Guard One is

6    effective in preventing suicides?  There are numbers.  I mean,

7    on the one hand the Court has expressed concern about the

8    continuing high rates, spikes in suicides.  But looking at

9    restricted housing unit suicides, there's at least a percentage

10   decrease apparently.  I don't know that the data allows the

11   Court to reach any conclusion tying the use of Guard One to

12   suicide rate at this point.  But what's the plaintiffs'

13   counsel's position on that point?

14          MR. GOURSE:  Our position on that is that 30-minute

15   welfare checks are an essential safety measure.  Guard One is a

16   mechanism for logging those, and there have been problems in

17   the past with the logging to confirm that the 30-minute welfare

18   checks were actually being conducted.  But if there's another

19   system for documenting those and ensuring that defendants

20   actually conduct 30-minute welfare checks, then the plaintiffs

21   are open to considering it.

22          THE COURT:  Mr. Lewis or whoever is the right person,

23   do you agree that the focus should be on the regular, the

24   30-minute welfare checks consistent with the American

25   Correctional Association standard?  It's not so much the

1    specific tool that's critical here.

2            MR. HENNES:  That's correct, your Honor.  Defendants

3    believe that the Guard One system is to ensure accountability

4    for those 30-minute welfare checks which are important, and

5    this is why the Coleman court has been monitoring that

6    compliance and the ongoing monitoring continues.

7            Your Honor, defendants would also like to point out

8    just with respect to the permissive intervention issue that

9    Mr. Lipsey's own motion mentions that he's going to be released

10   from restricted housing within a matter of weeks.  I'm not sure

11   it makes sense for Mr. Lipsey to intervene in a case where his

12   issues will be moot in three weeks.

13           THE COURT:  Your response to that, Ms. Falkenstien?

14           MS. FALKENSTIEN:  So I'm not certain that Mr. Lipsey

15   will be released in early March.  What he has told me is that

16   he could be released as soon as March 10th, that he has other

17   pending rules violation reports that he's not sure how those

18   will be resolved, and they could potentially lead to additional

19   terms in restricted housing.  But yes, it's possible that he

20   would be released somewhat soon.  I think that the terms of the

21   SHU being, you know, a yearish in many of these cases has

22   caused this exact problem with defendants asserting mootness

23   repeatedly.  This happened to Rico and Suarez and Lipsey

24   multiple times, and I think it's also happened to the other

25   people who have sued who I don't represent.

1    And the issue never gets adjudicated on the merits

2    because every time that someone attempts to go through the

3    procedural motions of internal administrative grievances,

4    getting a lawyer who understands the facts well enough to file

5    say a complaint or a complaint in intervention, filing for

6    intervention, having intervention granted, it's too late.

7    So I filed a lot of briefing on the mootness question

8    in the related cases.  I think this is a situation that's

9    capable of repetition but evading review and that the evidence

10    of that, as to Mr. Lipsey in particular, I think is currently

11    pending on an objection to findings and recommendations before

12    the Court.

13    THE COURT:  Is that issue fully briefed, the defense

14    position on the capable of repetition evading review issue in

15    these other cases?  Can any defense attorney here today say?

16    MR. HENNES:  One moment, your Honor.

17    MR. LEWIS:  Your Honor, I had attempted to find out

18    the status of all the Guard One cases before the Court.  I

19    don't have the summaries fully complete yet.  But on this

20    issue, I would just point out defendants have absolutely no

21    problem working with the Special Master and the plaintiffs to

22    address the concerns raised regarding Guard One.  It's just

23    where we're wondering about whether or not the intervention

24    would be appropriate given that he may be no longer subject to

25    this within a few weeks.

1          THE COURT:  I understand that position.

2          MR. LEWIS:  We really want to work on it.  If it needs

3     to be worked on, clearly we would be working with the Special

4     Master and plaintiffs.  If this issue of Guard One needs to be

5     worked on, it's something we wholeheartedly support.

6          THE COURT:  With Ms. Falkenstien at the table?

7          MR. LEWIS:  My only concern on that is that her client

8     essentially won't have a harm within a few weeks, and I don't

9     think it is evading review.  I think it is a situation --

10     without having done any factual details on this, this is

11     something the Special Master and the plaintiffs, there was an

12     agreement about this.  There's been extensive monitoring of it,

13     extensive observations of it, so this is something that I think

14     can be worked out via another process without having an

15     intervention or Ms. Falkenstien at the table.

16          THE COURT:  All right.  Well, I'll let you know if I

17     need further briefing on the argument Ms. Falkenstien has just

18     summarized in making a final decision on permissive

19     intervention.

20          Just finally for you, Ms. Falkenstien, before I hear

21     any wrap-up argument any of you would like to make, is it

22     possible that you are considering taking on the other cases in

23     which the plaintiffs are proceeding pro se, or would you be

24     amenable to appointment if the Court requested you to take

25     those cases?

1        MS. FALKENSTIEN:  So I have talked to all three of

2   those -- I mean, written letters with all three of those

3   inmates, and they have requested that I represent them.  I

4   would have to talk to other people at my firm.  I do think it

5   would need to be through an appointment in order to ensure

6   access to the program that pays for costs and things like that

7   for pro bono cases, which is what I have access to for my three

8   existing clients.  So I haven't taken on those cases just

9   independently of that program.

10        If the Court were interested in appointing me, I would

11   just need to discuss that with some partners at my firm.  I'm

12   an associate.

13        THE COURT:  All right.  I'm inclined to do that, but

14   I'll let you know in writing if I'm making that request.

15        MS. FALKENSTIEN:  Okay.  Thank you.

16        THE COURT:  All right.  So any wrap-up argument at

17   this point?  We could start with the defendants, and then

18   Ms. Falkenstien could have the last word.

19        Mr. Hennes.

20        MR. HENNES:  Nothing further from defendants, your

21   Honor.

22        THE COURT:  All right.  Anything from the plaintiffs?

23        MR. GOURSE:  Nothing further from the plaintiffs, your

24   Honor.

25        THE COURT:  Ms. Falkenstien.

1          MS. FALKENSTIEN:  I guess the only thing I would like

2    to respond to is the suggestion that this could be worked out

3    among the existing parties without my involvement or

4    Mr. Lipsey's involvement.  I do think that's essentially been

5    what's going on for the past six years, and empirically it has

6    not led to any focus on Mr. Lipsey's concerns.  He filed his

7    lawsuit in 2014.  It's not as though they only knew about this

8    when I filed the TRO a few -- you know, a week or two ago.

9    These issues through the lawsuits that all of these people have

10   filed have been on the radar, but nothing has happened.

11          I understand there's a lot of complexity around the

12   policies in these cases, but I do think that someone needs to

13   represent these particular concerns that hundreds of inmates

14   have and that I think are very serious, that awakening someone

15   every 30 minutes has very serious mental and psychological and

16   physical consequences as supported by a renowned sleep doctor

17   at Stanford who submitted a declaration in support of the TRO.

18          So I think that just having a discussion between two

19   parties that have so far not shown a particular focus on this

20   issue is not sufficient, that Lipsey has constitutional claims

21   that have no forum currently because they have been dismissed

22   in his independent lawsuit pending the review of the findings

23   and recommendations that they were recommended to be dismissed.

24   There's no current forum for his concerns to be heard and his

25   constitutional claims to be ruled upon.  We don't just need a

1    discussion.  We need a place where his claims can actually be

2    adjudicated with counsel representing him and his interests in

3    particular.

4              THE COURT:  All right.  I understand that position.

5              All right.  I think I have what I need.  I'll issue

6    something as promptly as I can, and I'll look for a defense

7    filing within seven days.

8              MR. LEWIS:  Yes, your Honor.

9              THE COURT:  All right.  Thank you very much.

10             MR. HENNES:  Thank you, your Honor.

11             MR. GOURSE:  Thank you, your Honor.

12             THE CLERK:  Court is in recess.

13             (The proceedings adjourned 10:35 a.m.)

14                          --oOo--

15    I certify that the foregoing is a correct transcript from the

16    record of proceedings in the above-entitled matter.

17                          /s/ Kacy Parker Barajas

18                          _____
                            KACY PARKER BARAJAS
19                          CSR No. 10915, RMR, CRR, CRC

20

21

22

23

24

25