DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION FOUNDATION DISABILITY RIGHTS PROGRAM
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 343-0762

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' PROPOSED AGENDA ITEMS FOR FIRST QUARTERLY STATUS CONFERENCE**<br><br>Judge: Hon. Kimberly J. Mueller<br>Date: March 20, 2020<br>Time: 10:00 a.m.<br>Crtrm.: 3; 15th Floor |

# INTRODUCTION

The first quarterly status conference of 2020 is currently scheduled to take place on March 20, 2020 at 10:00 a.m. *See* Jan. 9, 2020 Minute Order, ECF No. 6442. In January 2020, the Court set several agenda items for the status conference and allowed the parties to "file proposed agenda items by close of business on March 2, 2020." Jan. 7, 2020 Order, ECF No. 6441 at 10. Accordingly, Plaintiffs propose the following agenda items for the upcoming status conference in addition to those items already identified by the Court.

## I. CDCR's Suicide Prevention Efforts

First, Plaintiffs request that the status conference address Defendants' suicide prevention practices and policies. In 2019, CDCR had an astronomical suicide rate of 30.3 suicides per 100,000 prisoners, an increase of 15% over the 2018 rate, and the highest rate on record since 1990. *See* Decl. of Cara E. Trapani in Supp. of Pls.' Proposed Agenda Items For First Quarterly Status Conf. ("Trapani Decl."), filed herewith, at ¶¶ 2-3; *see also* Pls.' Op. Br. Re: MHCB Construction & Unmet Bed Need Study, ECF No. 6401 at 12-13 (Nov. 27, 2019). The 2019 CDCR suicide rate is 44% higher than the last available national average for state prisons (the 2016 rate of 21 per 100,000). *See* Bureau of Justice Statistics, Mortality in State and Federal Prisons, 2001-2016 – Statistical Tables, February 2020, *available at* https://www.bjs.gov/content/pub/pdf/msfp0116st.pdf, *and* https://www.nimh.nih.gov/health/statistics/suicide.shtml. Nine of the 38 suicides that occurred in 2019 occurred at a single institution—California State Prison, Sacramento ("SAC"). Trapani Decl. at ¶ 4. There have been ten suicides at SAC since December 2018. *Id*. This is a crisis. CDCR sent a "Support Team" to SAC from February 18 through 20, 2020. *Id.* ¶ 5. During the visit, which members of the Special Master Team and Plaintiffs' counsel attended, a multidisciplinary team of CDCR's clinical and custodial leadership interviewed class members, clinicians, and custody staff regarding suicide prevention and staff safety. *Id*. CDCR identified numerous problems, including inadequate staffing, staff burnout, quality of clinical treatment, concerns about pressure to

lower class members' levels of care, maintenance and physical layout of the institution, staff responses to class members' reports of suicidality, and lack of training regarding internal policies. *Id.*

Plaintiffs agree with the Court's recent finding that CDCR's implementation of suicide prevention practices "is taking too long" and "must be moved forward expeditiously." Jan. 7, 2020 Order, ECF No. 6441 at 7-8. Even assuming CDCR's recent efforts at SAC will improve patient safety there, ongoing targeted attention must be paid to CDCR's skyrocketing suicide rate. One of Defendants' initiatives to improve timely access to crisis care is the implementation of Crisis Intervention Team (CITs). *See* Defs.' Resp. to Oct. 8, 2019 Order, ECF No. 6402 at 3-4 (Nov. 27, 2019). As of November 2019, Defendants had implemented CITs at 19 institutions. *See* Decl. of Laura Ceballos In Supp. of Defs.' Resp. to Oct. 8, 2019 Order, ECF No. 6402-2 at ¶ 4 (Nov. 27, 2019). Despite Defendants' continuous assurances that they are working on a "statewide crisis intervention team policy and procedure," *see id.* at 4, Defendants have yet to provide any proposed policy to Plaintiffs even though the CITs started rolling out in 2017.

For these reasons, Plaintiffs request that the Court require Defendants to provide an update to the Court at the first quarterly status conference regarding (1) CDCR's recent targeted suicide prevention efforts at SAC and any other institutions, (2) CDCR's plan to address and reduce the skyrocketing suicide rate, and (3) the status of CDCR's statewide CIT policy and the local operating procedures at any institution currently operating a CIT.

**II.    Deficient Treatment and Conditions in Psychiatric Inpatient Programs**

Second, Plaintiffs request that the status conference address inadequate mental health care in CDCR's Psychiatric Inpatient Programs ("PIPs"). After the July 2017 Lift and Shift, where administrative control of the PIPs transferred from the Department of State Hospitals ("DSH") to CDCR, the Special Master found serious deficiencies in clinical staffing, therapeutic programming, and numerous other areas. *See, e.g.*, Special Master's Monitoring Report on CDCR's Mental Health Inpatient Care Programs (Aug. 30, 2018), ECF No. 5894 at 17 (Aug. 30, 2018) ("[S]taffing vacancies in multiple disciplines

across programs remained a significant impairment to providing appropriate care in inpatient settings."); *id.* at 27 ("Individual treatment was rarely offered or provided across inpatient programs, and where provided was either woefully inadequate, or not accurately tracked."); *id.* at 41 ("As with the acute care program, the hours offered to intermediate care patients were significantly lower than what was offered at the EOP level of care.").

Over two years have passed since Lift and Shift, and significant problems persist. Indeed, Plaintiffs' greatest concerns about Lift and Shift—that clinical staff would leave when CDCR took over for DSH, and that CDCR would impose new unnecessary and punitive custody restrictions that would interfere with treatment and undermine the therapeutic milieu of the inpatient hospital setting—have come to pass. Based on reports from class members and Plaintiffs' counsel's observations at several of the Special Master's 28th Round monitoring tours, the focus in the PIPs has shifted with the CDCR takeover of the inpatient hospital programs from a clinical perspective of providing treatment, to a custodial one where the most acutely ill patients are simply segregated and locked down without receiving the enhanced care they need. The amount of treatment offered does not meet minimum standards for the inpatient level of care and often falls far below the standards for the EOP level of care. PIP clinical staff have reported, and even documented in medical records, that they are discharging class members in need of inpatient care to EOP programs so that they can receive more treatment in that lower level of care than what is being provided in the PIPs. And the PIPs' staffing rates have plummeted precipitously since Lift and Shift. Not only do Defendants' staffing rates in the PIPs consistently fall abysmally short of this Court's order to limit to ten percent the vacancy rate among psychiatrists, psychologists, and social workers, they routinely are the lowest in the system. *See* Oct. 10, 2017 Order, ECF No. 5711 at 3; *see also, e.g.*, Defs.' Monthly Psychiatry Vacancy Report, ECF No. 6491 at 4 (Feb. 28, 2020) (reporting psychiatry vacancy rates of 47%, 58%, and 25%, respectively, at the CHCF PIP, CMF PIP, and SVSP PIP as of January 2020). Some of CDCR's PIP units, including units C5 and C6 at the SVSP-PIP and several units in P-Wing at the CMF-PIP, were promised to be

temporary only, but have been operating for nearly a decade with no plan to replace them on the horizon.  *See* Defs.' Ex Parte Request Re: Revised Long-Range Mental Health Bed Plan, ECF Nos. 4196 at 7 n.4 & 4196-2 at 4 (June 12, 2012).[1]  Defendants' suicide rate is sky high and quickly climbing, with many class members dying by suicide just after discharging from a PIP,[2] raising grave concerns about the treatment and discharge planning in those hospitals.

Defendants have failed to address these concerns with the urgency they are due.  For example, during the Special Master's tour of the CHCF-PIP in September 2019—which was convened after Plaintiffs raised reports from class members of a crisis-level lack of treatment there—Defendants committed to provide a written corrective plan with short-, medium-, and long-term solutions to the very serious issues identified during the tour.  Notwithstanding Plaintiffs' requests during and after the tour, Defendants have not produced any document identifying these goals six months later, or even outlined the basics of a plan to address the serious deficiencies that are endangering the lives of acutely ill class members in need of the highest level of mental health care in the system.

For these reasons, it may be necessary to revisit and/or reverse the decision to transfer control of the PIPs from DSH to CDCR.  Plaintiffs request that the Court require Defendants to provide a comprehensive report to the Court at the first quarterly status conference regarding their current and future plans to improve conditions and treatment in the PIPs.

**III.    Staff Misconduct Against *Coleman* Class Members**

Third, Plaintiffs request that the status conference address the endemic violent and abusive staff misconduct against *Coleman* class members statewide, and especially at high

---

[1] Defendants have not responded to Plaintiffs' recent inquiries about CDCR's intent to continue using temporary PIP beds.

[2] *See* Pls.' Resp. to Suppl. to Defs.' Third Status Report on Construction of 100 Mental Health Crisis Beds, ECF No. 6251 at 4 (Aug. 23, 2019); Decl. of Jenny S. Yelin in Supp. of Pls.' Resp. to Defs.' Suppl. to Third Status Report on Construction of 100 Mental Health Crisis Beds, ECF No. 6251-1 ¶¶ 4 (Aug. 23. 2019).

security prisons like Richard J. Donovan Correctional Facility ("RJD"). On February 28, 2020, Plaintiffs' counsel in the coordinated case *Armstrong v. Newsom*, N.D. Cal. Case No. C94 2307 CW, filed a Motion to Stop Defendants from Assaulting, Abusing and Retaliating Against People with Disabilities at R.J. Donovan Correctional Facility ("Motion"), *available at* https://ecf.cand.uscourts.gov/doc1/035119014342; *see also* Pls.' Notice of Filing in Coordinated Case, ECF No. 6492 (Mar. 2, 2020). The Motion is supported by over 50 declarations of incarcerated people, deposition excerpts of CDCR and Office of Inspector General ("OIG") officials, an expert declaration, and CDCR internal documents confirming longstanding awareness of deep-seated and pervasive violence at RJD. The Motion details countless disturbing accounts of staff misconduct perpetrated against vulnerable incarcerated people, including numerous *Coleman* class members, as well as retaliation against mental health clinicians who spoke up about the abuse. The evidence suggests that these problems are prevalent statewide, including at multiple institutions that have already implemented the Custody Mental Health Partnership Plan ("CMHPP"). *See, e.g.*, Mot. at 40-42.

Despite being aware for months of Plaintiffs' intent to seek information regarding staff misconduct against *Coleman* class members, Defendants have failed to produce any informal discovery of investigative files related to allegations of staff misconduct at RJD. Plaintiffs have proposed a protective order in an attempt to alleviate Defendants' concerns regarding disclosure of confidential information, but Defendants have yet to respond. This is inexplicable—as defense counsel in *Armstrong* have already agreed to a virtually identical protective order and produced similar information in that case—not to mention inconsistent with this Court's call for "full transparency" in the wake of the Golding Report proceedings. Jan. 7, 2020 Order, ECF No. 6441 at 2. If Defendants continue to block Plaintiffs' requests for documents related to staff misconduct against *Coleman* class members and continue to operate in a non-transparent manner about the serious and pervasive violence against class members, Plaintiffs will have no choice but to pursue motion practice and/or seek formal discovery to effectuate their clients' rights.

Accordingly, Plaintiffs request that the Court require Defendants to provide an update to the Court at the first quarterly status conference regarding CDCR's current and future plans to address pervasive violent staff misconduct at RJD and elsewhere, and to address Defendants' ongoing refusal to provide requested documents concerning violence perpetrated by CDCR employees against class members.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court include CDCR's suicide prevention efforts, deficient treatment and conditions in CDCR's psychiatric inpatient hospitals, and staff misconduct, in addition to the agenda items set forth in the Court's January 7, 2020 Order and any other issues the Court deems appropriate, to its agenda for the March 20, 2020 quarterly status conference.

## CERTIFICATION

The undersigned counsel for Plaintiffs certifies that they have reviewed the following relevant court orders: Jan. 9, 2020 Minute Order, ECF No. 6442; Jan. 7, 2020 Order, ECF No. 6441; Oct. 10, 2017 Order, ECF No. 5711.

DATED:  March 2, 2020                     Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Cara E. Trapani*
     Cara E. Trapani

Attorneys for Plaintiffs