DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION DISABILITY RIGHTS
PROGRAM
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 343-0762

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**NOTICE OF NEW CCHCS/CDCR MEDICAL OPERATIONS PROCEDURES RELATED TO COVID-19 PANDEMIC**<br><br>Judge: Hon. Kimberly J. Mueller |

Plaintiffs provide herein the Court with a CCHCS memo, dated March 18, 2020, titled "COVID 19 Pandemic - Medical Operations," attached hereto as **Exhibit A**.

In its March 17, 2020 Order regarding the March 20, 2020 quarterly status conference, ECF No. 6509, the Court directed the parties to provide an update on the coronavirus and its impact on various aspects of the case. *See* Order, ECF No. 6509 at 1-2 (Mar. 17, 2020). The Covid 19 Pandemic – Medical Operations memo describes measures CDCR is taking in light of the Covid 19 Pandemic. The memo also acknowledges that class members who require a higher level of medical care "to prevent or reduce the risk of morbidity or mortality" will continue to be transferred to outside hospitals to receive that care. *See* Ex. A at 3. By contrast, according to a March 16, 2020 DSH directive, attached hereto as **Exhibit B**, class members who require a higher level of mental health treatment to prevent or reduce the risk of morbidity or mortality will no longer have access to DSH's inpatient psychiatric hospitals for at least the next 30 days. *See* Ex. B at 1.

The Covid 19 Pandemic Medical Operations Memorandum raises important questions as to the apparent lack of any similar plan for the provision of mental health care for *Coleman* class members, including as to the following questions:

1. If a *Coleman* class member requires "isolation" under the CCHCS directive, where will the patient be housed, what mental health treatment will be provided, and how will it be provided?

2. If a *Coleman* class member requires "quarantine" under the CCHCS directive, where will the patient be quarantined, what mental health treatment will be provided, and how will it be provided?

3. Have group treatment and activities for *Coleman* class members been suspended? If so, what alternative therapies, treatment, activities, and programming are being provided and by whom?

4. *Coleman* class members in segregation units are required to receive a certain minimum number of out of cell hours for treatment and yard. Are those requirements being met in the LTRH, STRH, PSU, and EOP-ASU Hubs

units, given the restriction on group activities? If not, what additional therapies, treatments, activities, and programming are being provided to help class members cope in these dangerous solitary confinement units?

5. What is the plan for providing *Coleman* class members in low security ICF units with inpatient level of care? Where will the care be provided and who will provide it?

6. Have changes been made to the frequency of distribution of psychiatric medications to once or twice a day? Did CDCR Psychiatric leadership approve of the changes?

Plaintiffs' counsel was not consulted about the DSH policy in advance of its implementation. Nor has plaintiffs' counsel been consulted about any other changes to *Coleman* policies and procedures deemed necessary to address the Covid 19 Pandemic.

CDCR's ability to manage the challenges of the Covid 19 Pandemic for the health and safety of CDCR prisoners, staff, and the public is severely limited by the extreme level of overcrowding of *Coleman* class members in the system. The shortages of clinical and custody staff, as well as of treatment space and specialized beds, leave little or no margin to address this crisis. Whatever plan Defendants do develop for the *Coleman* class must include a rapid and major reduction in the number of prisoners requiring mental health services through various methods available to Defendants in this emergency.

DATED: March 19, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: /s/ *Michael W. Bien*
Michael W. Bien

Attorneys for Plaintiffs

2
NOTICE OF NEW CCHCS/CDCR MEDICAL OPERATIONS PROCEDURES RELATED TO COVID-19 PANDEMIC
[3514804.1]

# Exhibit A



# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| **Date:** | March 18, 2020 |
| **To:** | Chief Executive Officers<br>Chief Medical Executives<br>Chief Nurse Executives<br>Pharmacist In Charge<br>Chief Support Executives<br>Chief of Mental Health<br>Chief Dentists |
| **From:** | Steven Tharratt, MD, Director (*original signed by*)<br>Health Care Operations |
| **Subject:** | **COVID 19 Pandemic – Medical Operations** |

In response to the current coronavirus disease 2019 (COVID-19) pandemic, and out of an abundance of caution, California Correctional Health Care Services (CCHCS) is taking necessary precautions in an effort to reduce exposure to both patients and staff. This memorandum provides guidance on patient screening, isolation, quarantine, social distancing, and essential health care services.

**Screening on Entry into the Prison**

Immediately upon entry, all inmates must be screened for symptoms of influenza-like illness (ILI) including COVID-19. The inmate populations that must be screened include, but are not limited to, inmates entering via reception centers, receiving and release locations, fire camps, and returning from court, a higher level of care, or an offsite specialty appointment. The screening shall include:

1. Asking the following questions.
    a. Do you have a cough?
    b. Do you have a fever?
    c. Do you have difficulty breathing?
2. Measuring the patient's temperature.

Based on the outcome of the screening questions, temperature reading, and the nurse's clinical judgement, individuals shall be placed into either isolation or quarantine.

<u>Isolation</u>: Patients who answer "yes" to one or more of the screening questions and/or have a temperature above 100.4 must be isolated.

<u>Quarantine</u>: Patients who answer "no" to all of the screening questions must be quarantined for a period of 14 days.

### Screening within the Institution

Patients with ILI symptoms including possible COVID-19 should be screened in a manner that minimizes exposures to others. Strategies to be considered include, but are not limited to, screening primarily in the housing unit clinics, separate "ILI-only" clinics, spaces made available by modified programming or, if needed, the triage and treatment area (TTA). Patients with ILI symptoms shall be isolated. Individuals exposed to patients with ILI symptoms should be quarantined.

### Social Distancing

Social distancing strategies should be implemented as much as possible for all individuals; however, it is imperative social distancing be enforced for the most vulnerable patients including, but not limited to, <u>high risk 1, high risk 2, pregnant, and any other patient at high risk per clinical judgement</u>.

Provide information to all individuals about why their movements may be restricted to a greater degree than others (e.g., older adults and those with serious health conditions), and consider the implications of potential stigma and social isolation. Vulnerable populations should not be cohorted together. Cohorting of this population is not recommended as these patients are more susceptible to contracting and rapidly spreading the disease to other high-risk patients and are at high risk for developing serious complications or death related to the disease. For the most vulnerable patients delivery of meals and medications to the cell front should be considered if feasible.

General strategies for all individuals regardless of clinical risk will need to be tailored to the available space in the facility and the needs of the population and staff. While not all strategies will be feasible in all facilities, examples include:

- Maintaining a distance of six feet between individuals.
- Not congregating in groups of 10 or more individuals.
- Reassigning bunks to provide more space between individuals.
- Suspending group programs where participants are likely to be in close contact.
- Rearranging scheduled movements to minimize mixing of individuals from different housing areas.
- Suspending housing assignment changes unless necessary for health and safety.
- Providing meals inside the housing unit.
- Restricting recreation yard usage to a single housing unit per yard, where feasible.



Page 3 of 4

**Essential Health Care Services**

Hospital and Emergency Department Services

Hospital send outs should be limited to only those patients who require a higher level of care to prevent or reduce the risk of morbidity and mortality. Patients presenting with ILI symptoms that are manageable within our system capabilities should remain in our care. Symptomatic but stable patients should NOT be sent to emergency departments or community hospitals.

Specialty Services

Effective immediately, all elective procedures/surgeries shall be postponed, as well as onsite and non-essential offsite specialty medical appointments, until further notice. Use discretion in keeping only appointments that are absolutely necessary and consider telemedicine as an option as well. Examples of necessary specialty appointments include, but are not limited to, face-to-face oncology care for pre-chemotherapy planning, diagnostic colonoscopies for positive screening, and symptomatic patients that cannot wait several weeks for further evaluation and treatment. Patients who require frequent appointments outside the prison (such daily chemo or radiation therapy or transports to an offsite NTP) may require special housing accommodations and should wear a surgical mask if possible.

Primary Care Services

Health Care 7362 requests that require a face-to face encounter should be conducted in ways that minimize patient movement and exposure to others within the facility. If possible, during regular business hours, primary care teams should consider triaging patients complaining of ILI symptoms at cell front using appropriate Personal Protective Equipment (PPE). After regular business hours, 7362 screening for patients with ILI or COVID-19 symptoms shall be done at cell-front by a nurse. Transport to TTA shall be reserved for patients needing urgent or emergent care. Whenever patients with ILI symptoms must be transported outside their cell, the patient shall wear a surgical mask.

Non-essential primary care appointments with providers such as preventive health screenings, routine health care 7362 referrals, some chronic care visits, and other appointments that do not pose a risk of harm if delayed several weeks should be postponed.

Medications

Medications need to be converted to "Keep on Person" (KOP) where possible. If medications must be prescribed Nurse Administered or Direct Observation Therapy (NA/DOT), the regiment should be prescribed once or twice daily if possible. In addition to administering medications cell front or bedside for the most vulnerable patients, institutions should consider other situations where cell front medications can be given depending on staffing in order to reduce movement and the congregation of more than ten persons that does not allow social distancing.

The health and safety of all individuals within the institutions is a top priority. We believe taking these steps now is in the best interest of all. Please work together at the institution to operationalize the guidance provided above.

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA 95758

Cc: Renee Kanan, MD, MPH, Chief Quality Officer, Deputy Director of Medical Services
Barbara Barney-Knox, Deputy Director of Nursing (A), Statewide Chief Nurse Executive
Joseph Bick, MD, Director (A), Division of Health Care Services
Regional Health Care Executives
Regional Chief Nurse Executives
Regional Deputy Medical Executives
Deputy Directors

# Exhibit B



# Memorandum

**Date:** March 16, 2020

**Subject:** DEPARTMENT DIRECTIVE ON SUSPENSION OF PATIENT ADMISSIONS FROM THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR)

Pursuant to Governor Gavin Newsom's Proclamation of a State of Emergency dated March 4, 2020, the Director of the Department of State Hospitals issues this Directive in accordance with the Director's authority to execute laws relating to the care and treatment of persons with mental health disorders placed with the State Department of State Hospitals (DSH). To ensure that patients with mental health disorders currently in DSH's custody continue to receive the services and support that are threatened by disruptions caused by COVID-19, and to protect the health, safety and welfare of those patients, the Department is suspending admission of patients placed at DSH facilities pursuant to Penal Code section 2684 (*Coleman* patients).

All *Coleman* patients presently in DSH's custody will not be discharged until DSH rescinds the suspension of *Coleman* patient admissions, unless an emergency discharge is required for patients who cannot be safely maintained in DSH's unlocked dorm setting.

This suspension of *Coleman* patient admissions will remain in effect for 30 days, unless extended by the Director of the Department.

STEPHANIE CLENDENIN
Director

*"Caring Today for a Safe and Healthy Tomorrow"*