UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No.: C01-1351 JST |
| vs. | ) |
| | ) |
| GAVIN NEWSOM , | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| | ) |

REMOTE DEPOSITION OF SCOTT KERNAN

March 26, 2020

2:05 p.m.

Berkeley, California

REMOTELY REPORTED BY:

Tammy Moon, CSR No. 13184, CRR, RPR

```
 1     APPEARANCES:

 2


 3     FOR PLAINTIFF (TELEPHONIC):

 4     PRISON LAW OFFICE
       BY:  DONALD SPECTER, ESQ.
 5     1917 Fifth Street
       Berkeley, California 94710
 6     510.280.2621
       Dspecter@prisonlaw.com
 7


 8     FOR DEFENDANT (TELEPHONIC):

 9     Hanson Bridgett LLP
       BY:  Paul B. Mello, Esq.
10     1676 No. California Blvd., Suite 620
       Walnut Creek, California 94596
11     925.746.8480
       Pmello@hansonbridgett.com
12


13     FOR DEFENDANT (TELEPHONIC):

14     OFFICE OF THE ATTORNEY GENERAL
       BY:  DAMON MCCLAIN, ESQ.
15     BY:  ADRIANO HRAVTIN, ESQ.
       455 Golden Gate Avenue, Ste 11000
16     San Francisco, California 94102-7020
       415.510.3577
17     Damon.mcclain@doj.ca.gov
       Adriano.hravtin@doj.ca.gov
18

19

20

21

22

23

24

25
```

```
 1                    INDEX TO EXAMINATION

 2                        SCOTT KERNAN

 3                  Thursday, March 26, 2020

 4            Tammy Moon CSR No. 13184, RPR, CRR

 5              WITNESS:   SCOTT KERNAN

 6

 7    EXAMINATION                                    PAGE

 8    By Mr. Specter                                 13, 80

 9    By Mr. Mello                                   42

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        try to mitigate the spread of the virus in the prisons.
2        And for that matter, in jails across the country.
3                  MR. SPECTER:
4          Q.   And to your knowledge, and I understand this is
5        to your knowledge, it's not -- I understand that the
6        department may be doing things that you don't know
7        about, but to your knowledge, do you know about the --
8        do you know of any immediate and bold steps other than
9        the one that -- the ones that were contained in the
10       governor's executive order?
11         A.   I -- I think that logistically the department
12       has taken a number of steps to try to mitigate that; the
13       screening of staff coming into the facility, the taking
14       of temperatures, and questioning.  It seems like a
15       reasonable step to me.
16                  The closing of programs, the closing of
17       visiting all of those things that the department has
18       done seem to me to be reasonable steps to try to
19       mitigate the problem.
20                  And then it just becomes a question, and again,
21       admittedly don't know, are they spreading people out
22       either through using the full capacity that they have,
23       considering releasing offenders that are soon to be
24       released, and addressing those people that are immune
25       comprised and might be in greater jeopardy than the rest

```
 1    have an opinion?  And it's okay not to.
 2              MR. SPECTER:  Are you asking for his medical
 3    opinion?
 4              MR. MELLO:  No.  I'm asking for his stock hard
 5    opinion.  He's already stated that he is not an expert
 6    but that he has a general understanding of the disease
 7    for which you got him to testify a lot about.
 8         Q.   So based upon the same questions, do you
 9    believe that there are things short of releasing people
10    from dorms that can be done to protect inmates in your
11    estimation --
12         A.   Yes, sir.
13         Q.   -- and medical training?  Do you have an
14    opinion one way or the other?
15         A.   I'm sorry.  I said yes, sir.
16         Q.   Okay.  What are they?
17         A.   I think there's probably a number of them, but
18    one could be spreading the bunks out in a particular
19    dorm by reducing some of the population.  For example,
20    if you had a hundred bed dorm today and you could move
21    50 inmates out and spread the inmates out in that dorm,
22    I think that would be a step.
23              You could empty out housing units and move
24    inmates as necessary that are sick and get them out of
25    the population.  I think there's a variety of things
```

1     that you potentially could do.  And I suspect, although
2     I don't have any direct knowledge, that the department
3     is trying to do that.
4          Q.   Okay.  So let's assume for purposes of -- that
5     some releases are going to occur, okay?  Can you
6     describe for me based upon -- maybe you don't know
7     currently, but the process of what went into
8     pre-released planning for inmates who did -- who were
9     not serving determinate sentences prior to their release
10    from CDCR when you were secretary?
11         A.   If I understand the question, you know, a risk
12    and needs assessments.  Setting them up with day
13    reporting centers or other programs within parole.
14    Alerting their parole officer.  Looking for job
15    placement.  Substance abuse, domestic violence training
16    for them.  A whole variety of -- if I'm understanding
17    your question, Mr. Mello, reentry efforts to try to make
18    individuals successful as they're transitioning to the
19    community.
20         Q.   And is that a lengthy process?  Is it -- how
21    hard is it for --
22              (Brief pause.)
23         A.   I don't know if everybody else is seeing that,
24    but you froze, Mr. Mello.  I can't hear you or see you.
25              MR. HRAVTIN:  Mr. Kernan, I can tell you that

1     the question is going to be --

2               MR. SPECTER:  Excuse me.  Paul's back.

3               MR. MELLO:  I'm back.

4               MR. SPECTER:  Thank you.

5               MR. MELLO:

6        Q.   Mr. Kernan, if CDCR were to release inmates, do
7     you believe that inmates who did not pose a risk to
8     public safety should be considered for release?

9        A.   I'm sorry.  I didn't quite --

10       Q.   If CDCR were to decide to release inmates as a
11    means to address the COVID-19 pandemic, do you believe
12    that only inmates who did not pose a risk to public
13    safety should be considered for release?

14              MR. SPECTER:  Objection as to the -- it's vague
15    as to the level of risk and public safety.

16              THE WITNESS:  I would say yes.  And I think
17    that's what the governor and the secretary and Mr.
18    Specter and hopefully the Attorney General's Office are
19    all -- all considering.

20              ==Nobody wants to put a high risk inmates that==
21    ==hasn't had appropriate preparole planning out on the==
22    ==street and flood our healthcare system and create more==
23    ==of a problem.==

24              So I think the direct answer to that question
25    is I don't think high-risk options makes any sense in

```
 1         Q.   Okay.  And again, we're just asking for your
 2    best judgment here.  And you have made clear that you
 3    are not part of the decisions.  These are just your
 4    opinions based on what you know, correct?
 5         A.   Yes, sir.
 6         Q.   If you believe -- if an inmate has an elevated
 7    risk of COVID-19, some of the things you have talked
 8    about, age, immune -- I can't say the word.
 9              So I'm not going to say it, heightened risk,
10    and that person also poses a significant risk to public
11    safety if released from prison, do you believe that
12    those types of inmates should be released from prison as
13    part of a program to address the COVID-19 pandemic?
14              MR. SPECTER:  Vague as to "heightened risk."
15              MR. MELLO:
16         Q.   You can answer.
17         A.   I would say generally no.  With the thought,
18    though, that if -- an offender even with that risk is
19    going to get out in the next 30, 60, 90 whatever -- you
20    know, the governor and the secretary determine that you
21    have to take that in consideration.  They're going to be
22    out there anyway.
23              ==But no, I don't think that we should be letting==
24    ==out people with high risk that are going to exacerbate==
25    ==the problem in the community.==
```

```
 1     understood that.
 2              MR. MELLO:  Understood.  Thank you.
 3              MR. SPECTER:  Understood.  Thanks for the
 4     disclosure.  And as I said, this time I'm releasing you
 5     from custody.
 6              THE WITNESS:  Thank you.  And I hope all of you
 7     remain safe in these terrible times.  My heart's with
 8     you.  Thank you very much.
 9              MR. MELLO:  Thank you.
10              MR. SPECTER:  Thank you.
11              (Exhibits 1-47 were marked for identification.)
12
13                    (TIME NOTED: 4:25 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3           I, SCOTT KERNAN, do hereby certify under

 4      penalty of perjury that I have read the foregoing

 5      transcript of my deposition taken on March 26, 2020;

 6      that I have made such corrections as appear noted on the

 7      Deposition Errata Page, attached hereto, signed by me;

 8      that my testimony as contained herein, as corrected, is

 9      true and accurate.

10

11           Dated this          day of         2020 at

12                               , California.

13

14

15

16                        SCOTT KERNAN

17

18

19

20

21

22

23

24

25
```