```
1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
2             BEFORE THE HONORABLE KIMBERLY J. MUELLER


3


4


5     RALPH COLEMAN, et al.,

6                    Plaintiff,
      vs.                              Sacramento, California
7                                      No. 2:90-CV-00520
      GAVIN NEWSOM, et al.,            Friday, March 27, 2020
8                                      10:04 a.m.
                     Defendant.
9     _____/

10


11


12                        --oOo--

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14    TELEPHONIC SUPPLEMENTAL QUARTERLY STATUS CONFERENCE

15                        --oOo--

16


17


18


19


20


21    Official Reporter:       KACY PARKER BARAJAS
                               CSR No. 10915, RMR, CRR, CRC
22                             501 I Street
                               Sacramento, CA  95814
23                             kbarajas.csr@gmail.com

24    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
25
```

```
 1    APPEARANCES:  (All parties appearing by telephone.)

 2    For the Plaintiffs:      ROSEN BIEN GALVAN & GRUNFELD LLP
                               BY:  MICHAEL BIEN
 3                                  Attorney at Law
                                    LISA ELLS
 4                                  Attorney at Law
                                    JESSICA WINTER
 5                                  Attorney at Law
                                    MARC SHINN-KRANTZ
 6                                  Attorney at Law
                               101 Mission Street, 6th Floor
 7                             San Francisco, CA  94105

 8                             PRISON LAW OFFICE
                               BY:  DAVID SPECTER
 9                                  Attorney at Law
                                    STEVEN J. FAMA
10                                  Attorney at Law
                               1917 Fifth Street
11                             Berkeley, CA  94710

12    For the Defendants:      DEPARTMENT OF JUSTICE
                               OFFICE OF THE ATTORNEY GENERAL
13                             BY:  TYLER V. HEATH
                                    Attorney at Law
14                                  LUCAS L. HENNES
                                    Attorney at Law
15                                  ELISE THORN
                                    Attorney at Law
16                                  MONICA ANDERSON
                                    Attorney at Law
17                             1300 I Street
                               Sacramento, CA  95814
18
                               DEPARTMENT OF JUSTICE
19                             OFFICE OF THE ATTORNEY GENERAL
                               BY:  KYLE LEWIS
20                                  Attorney at Law
                                    ADRIANO HRVATIN
21                                  Attorney at Law
                               455 Golden Gate Ave., Suite 11000
22                             San Francisco, CA  94102

23                             ROBINS KAPLAN LLP
                               BY:  ROMAN M. SILBERFELD
24                                  Attorney at Law
                               2049 Century Park East, Suite 3400
25                             Los Angeles, CA  90067-3208
```

```
 1    APPEARANCES (Continued):

 2    Also Present:              Matthew Lopes, Special Master
                                 Jeff Metzner, Special Master Team
 3                               Henry Dlugacz, Special Master Team
                                 Kerry Walsh, Special Master Team
 4                               Kristina Hector, Special Master Team
                                 Mohamedu Jones, Special Master Team
 5
                                 Diane Toche, Undersecretary of Health
 6                               for State of California
                                 Joseph Bick, M.D.
 7
                                 Christine Ciccotti
 8                               Christopher Kent
                                 Antonina Raddatz
 9                               Attorneys at Law
                                 Department of State Hospitals
10
                                 Melissa Bentz
11                               Jennifer Neill
                                 Nick Weber
12                               Attorneys at Law
                                 California Department of Corrections
13
                                 Haven Gracey, Law Clerk
14

15                                    --oOo--

16

17

18

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, FRIDAY, MARCH 27, 2020, 10:04 AM

2                            --oOo--

3          THE CLERK:  Calling civil case 90-520, Coleman et al.

4    versus Newsom, et al.  This is on for a supplemental quarterly

5    status conference.

6          THE COURT:  Thank you, Ms. Schultz.  I'm going to call

7    the roll in just a moment based on who I understand is on the

8    phone, but first I want to make certain that our court reporter

9    is on the line and hearing everything well so far.  Could the

10   court reporter please identify herself.

11         (Court reporter confers with the Court.)

12         THE COURT:  All right.  Good morning, Ms. Barajas.

13   And the court reporter is instructed to let us know if she's

14   not able to hear anything as we proceed.

15         All right.  Let me call the roll for plaintiffs.

16   Mr. Bien?

17         MR. BIEN:  Here, your Honor.

18         THE COURT:  I understand the last Ms. Schultz knew,

19   Mr. Specter had not called in.  Is Mr. Specter on the line?

20         MR. SPECTER:  I'm here, your Honor.

21         THE COURT:  Mr. Specter is there.

22         MR. SPECTER:  Yes, your Honor.  That's me.

23         THE COURT:  All right.  Very good.  Mr. Fama.

24         MR. FAMA:  Good morning, your Honor.

25         THE COURT:  All right.  Mr. Fama is present.

1          Ms. Ells.

2          MS. ELLS:  Yes, your Honor.

3          THE COURT:  Ms. Winter.

4          MS. WINTER:  Good morning, your Honor.

5          THE COURT:  And Mr. Shinn-Krantz.

6          MR. SHINN-KRANTZ:  Yes.  Good morning, your Honor.

7          THE COURT:  Is there anyone else appearing for

8    plaintiffs?  I would ask Mr. Bien to let me know if he has

9    anyone else to identify.

10          MR. BIEN:  I don't think so, your Honor.  I think

11   everyone is identified.

12          THE COURT:  All right.  And Mr. Specter, is that your

13   understanding?

14          MR. SPECTER:  That's my understanding as well.

15          THE COURT:  Let me just ask, notwithstanding what

16   we've just heard, is anyone else appearing for plaintiffs?

17          All right.  I'm going to try, as you can tell, this

18   triage approach to clarify the record as we go forward, and so

19   I plan to call on Mr. Bien for every question I may have for

20   the plaintiffs, and then he may tell me who is the person he's

21   deferring to.

22          Mr. Lewis, turning to the defense, Mr. Lewis, are you

23   present?

24          MR. LEWIS:  Good morning, your Honor.

25          THE COURT:  Mr. Silberfeld.

1            MR. SILBERFELD:  Yes, your Honor.  Good morning.

2            THE COURT:  Mr. Hrvatin.

3            MR. HRVATIN:  Yes, your Honor.  Good morning.

4            THE COURT:  Ms. Thorn.

5            MS. THORN:  Yes.  Present, your Honor.

6            THE COURT:  Mr. Heath.

7            MR. HEATH:  Yes, your Honor.  Good morning.

8            THE COURT:  Mr. Hennes.

9            MR. HENNES:  Yes.  Good morning, your Honor,

10   Lucas Hennes.

11            THE COURT:  And Ms. Anderson.

12            MS. ANDERSON:  Good morning, your Honor.

13            THE COURT:  So it's clear for the defense, I will call

14   on Mr. Lewis, and he may yield to anyone on his team.  Also

15   based on our experience last week, I will at some point ensure

16   that Ms. Neill, CDCR's counsel, has a chance to weigh in and

17   also Ms. Ciccotti, general counsel for Department of State

18   Hospitals.  But as we've reviewed in the past with our ground

19   rules, please wait for me to call on you.  I understand also we

20   have present the following -- I'm doing a roll call here --

21   Diana Toche.

22            MS. TOCHE:  Yes, your Honor.

23            THE COURT:  Undersecretary of Health for the State of

24   California.

25            Dr. Joseph Bick with CDCR.

1              DR. BICK:  Good morning.

2              THE COURT:  Good morning.

3              Ms. Ciccotti, general counsel for Department of State

4     Hospitals.

5              MS. CICCOTTI:  Yes, your Honor, I'm here.

6              THE COURT:  Christopher Kent, also counsel for State

7     Hospitals.

8              MR. KENT:  Yes, your Honor.  Good morning.

9              THE COURT:  And then Antonina Raddatz, also counsel

10    for State Hospitals.

11             MS. RADDATZ:  Present, your Honor.

12             THE COURT:  Melissa Bentz, counsel with CDCR.

13             MS. BENTZ:  Good morning, your Honor.

14             THE COURT:  Mr. Weber, counsel for CDCR.

15             MR. WEBER:  Good morning, your Honor.

16             THE COURT:  And Ms. Neill, I said your name a moment

17    ago, general counsel for CDCR present?

18             MS. NEILL:  Yes, good morning.

19             THE COURT:  Good morning to all of you.

20             The Court's Special Master is appearing

21    telephonically, as are all of us.  Mr. Lopes, you are present?

22             SPECIAL MASTER LOPES:  I am here, your Honor.

23             THE COURT:  All right.  Good morning, Mr. Lopes.  I

24    understand you have members of your team, and I would ask that

25    you identify them slowly and clearly by name.

1          SPECIAL MASTER LOPES:  Very good.  Mohamedu Jones,

2     Kerry Walsh, Kristina Hector, Jeff Metzner, Henry Dlugacz.

3          THE COURT:  All right.  And we have -- Ms. Schultz has

4     obtained the spellings of those names for the court reporter's

5     benefit, so we have those.

6          Is anyone else appearing from the Special Master's

7     team?

8          SPECIAL MASTER LOPES:  No, your Honor.

9          THE COURT:  All right.  And for the record, the

10    Court's law clerk, Haven Gracey, is appearing telephonically.

11    Ms. Gracey, you are hearing the proceedings?

12         MS. GRACEY:  I am, your Honor.

13         THE COURT:  All right.  We have members of the media

14    monitoring the hearing telephonically.  I'm not going to call

15    roll for them, but I'm just assuming that if any member of the

16    media is having connection issues, they will let Ms. Schultz

17    know through her email contact.

18         Is anyone appearing, either as counsel for either

19    party or present that has not been identified?  If so, please

20    speak up now.

21         All right.  I realize that all of you have many other

22    things to be attending to, but I believe it's important that we

23    check in in this status conference.

24         My agenda is as follows:  I'm going to make some very

25    brief opening comments.  I'm going to ask the Special Master if

1    he has any brief comments he would like to make.  I want to

2    review a few issues raised by the Coronavirus pandemic in the

3    Coleman case.  This is a Coleman-case-only phone call.  And

4    then I am going to touch, at the end of the agenda, on the

5    staff abuse question as related to the Armstrong case and the

6    protective order that may need to be approved by this Court.

7    And I will, at the end of the Coronavirus discussion, ask if

8    either party has other agenda items they wish to discuss with

9    the Court.  I believe we can be done by 11:00 a.m.

10          So just to make certain the parties know and anyone

11   monitoring those, I have been kept apprised by the Special

12   Master on a regular basis of the task force efforts.  At last

13   Friday's status, I directed the convening of a task force to

14   focus on Coronavirus pandemic issues as the highest priority

15   currently for the Coleman case class.

16          I understand that that task force has met.  It met the

17   afternoon following our last status.  The defense did provide a

18   proposed plan as the Court directed.  The task force met over

19   the weekend.  It has met several times this week often in

20   multiple-hour conference calls.  And so the Court acknowledges

21   that effort.  My understanding is that those discussions have

22   been constructive.  They have been focused on the issues, even

23   though there may not be full agreement, about everything that

24   should be done.

25          I just want to say, based on those reports from the

1   Special Master, I am satisfied that no one is fiddling while

2   Rome burns.  The other observation I would make, however, that

3   the fire here is invisible, at least in its early stages, and

4   the prisons and the mental health units within those prisons

5   are like dense cities, and so that is why I understand you are

6   focusing in the way you are, and the Court is staying in touch

7   with you to ask for further status reports.  And I will ask the

8   task force to remain available and meeting as needed, either as

9   convened by the Special Master as directed by the Court or as

10  directed by any party.

11        To mix my metaphors, I'm drawing from my own rural

12  background.  I would just say it's -- I can't help but think

13  that there may be a barn loaded with fresh hay before it's

14  dried creating the potential for spontaneous combustion.  I

15  think what we're seeing elsewhere in this country, in

16  California, can't lead to any other conclusion, and the

17  question is can we stay ahead of the Coronavirus pandemic which

18  is advancing throughout the state and in the central valley

19  where many of the prisons including the mental health care

20  class is located.

21        I understand that the California correctional health

22  care system has issued guidance -- I believe that's in the

23  record -- of either this case or the three-judge court case.  I

24  understand that a mental health plan for the Coleman class was

25  finalized earlier this week.  It may be Wednesday of this week.

1   I'll ask the Special Master to correct me on that if he knows

2   otherwise.  And that is a plan that will be tailored as needed

3   going forward.  I am going to request that the Special Master

4   provide a copy of that plan so it can be filed on the docket.

5   It memorializes again the good work that the parties have been

6   doing.  It's a place in time, and the Court understands that it

7   may be tailored as tiers in the California correctional health

8   care system's guidance on that.

9        I also understand that the Court has now received -- I

10  acknowledge receipt of a stipulation regarding telepsychiatry.

11  As the parties know, that has been a longstanding issue in this

12  case unresolved.  I appreciate that there is now before me a

13  stipulation.  I plan to sign it later today.  And

14  telepsychiatry clearly can play a role, and it can be tailored

15  as needed for as long as the Coronavirus pandemic limits a more

16  face-to-face access with inmates in the Coleman class.  And I

17  would encourage the parties to continue looking at all ways to

18  maintain contact with Coleman class members including by video

19  conferencing to the extent available.

20       That's an update on what I understand as to where we

21  are, and while it appears responsible, the Court is concerned

22  that we need to keep the focus on and keep moving promptly

23  forward to try to get ahead of that spontaneous combustion

24  situation that I think at this point without further data we

25  have to assume is likely to occur.

1    Let me ask Mr. Lopes, Special Master Lopes, would you

2    like to make a report either elaborating what I've said,

3    sharing additional information, or correcting me if I got

4    anything wrong?

5    SPECIAL MASTER LOPES:  You did a wonderful job, your

6    Honor, and I don't have much to offer.  Yes, the final plan

7    was -- the final mental health plan was given to us on

8    March 25th, and there is an agreement amongst the parties that

9    any updates would be shared with us as well.

10    And you also touched upon the point that we've had six

11    meetings over the course of the week, and we had -- the focus

12    was largely around the emergency COVID plan provided by CDCR.

13    But we also did discuss wide-ranging issues including treatment

14    that would be provided in locked units, transfers to higher

15    levels of care, out-of-cell time, social distancing, treatment

16    in the hospitals, or I should say the DSH plan to reduce, if

17    not suspend, transfers into their hospitals, treatment in PIP

18    units, and all forms of treatment that could be provided in

19    locked units as well.  I believe that this was a solid

20    coordination effort as well.

21    We had representatives from the Receiver's office on

22    nearly all our calls, Ed Swanson, the Armstrong court expert

23    participated in our calls as well.  In addition to CDCR's

24    emergency mental health COVID plan, we received yesterday a

25    five-tier plan from CDCR's Division of Adult Institutions

1  regarding pandemic operations.  We also learned about CDCR and

2  CCHCS's newly unveiled patient testing tracker which will

3  update information on positive test results as they occur, and

4  it's outward facing.  It's open to the public.

5         We also heard about CDCR's department operations

6  center which is currently operating and providing information

7  daily.  Overall, as you said, your Honor, the meetings have

8  been positive and very constructive with an eye towards having

9  everyone roll up their sleeves to provide meaningful

10  information in a way that was collaborative.

11         On a completely separate track, there were meetings,

12  small group meetings that the larger group was not a part of.

13  There were two meetings to discuss population reduction

14  measures.  The first was on March 23rd, and that meeting

15  included Secretary Ralph Diaz, General Counsel Jennifer Neill,

16  Chief Deputy of Legal Affairs Secretary Kelly Evans, Mr. Bien,

17  Mr. Specter, Ms. Ells, myself, and Mr. Jones.  In that meeting

18  there was a discussion about any number of possibilities, ways

19  in which to reduce the population.  In the end, the Governor's

20  Office -- or excuse me, the Governor's representative shared

21  with us that there would be an announcement that would be made

22  imminently, which was made, that admission to the reception

23  centers would be suspended from the counties in short order.

24         The representatives of the Governor's Office suggested

25  that there were other measures being looked at, but that was as

1   far as they could go, and plaintiffs artfully outlined a number

2   of considerations for the Governor's Office to consider.

3   Representatives were more than gracious and said they would and

4   that no promises were given.

5          We had a short call the next day, March 24th, and in

6   that call plaintiffs let Chief Deputy Legal Affairs Secretary

7   Evans know that, while the measures that were about to take

8   place in terms of suspending admissions into reception centers,

9   it was a positive development.  It may not have gone far

10  enough, and a motion for population cap would be filed within

11  the next day or two.  But those meetings again were -- there

12  were two of them.  They were separate and apart from the large

13  group meetings.

14         I do not -- I don't want to put on the record current

15  numbers.  I believe CDCR may have better figures as of today as

16  to the number of individuals who have been tested and those who

17  are positive.  Earlier in the week it was clear that nearly --

18  it was climbing towards 200 inmates may have been tested, and

19  at that time only one positive result was reported.

20         Again, your Honor, I would say that the -- I think you

21  said it best, there was no one fiddling while Rome burned.

22  Everyone worked collaboratively.  The meetings took place, and

23  every consideration could have been given by every group

24  member.  Everyone was sharing information.  There weren't any

25  disputes that I can recall, and it was a -- it was a really

1    solid, collaborative effort.

2         I'm sure that many walked away feeling like more could

3    have been done, but in that short period of time, people were

4    working every day.  And outside of the formal meetings that

5    took place, there were any number of calls and conference calls

6    that occurred.  I was in regular contact with plaintiffs'

7    counsel, defendants' counsel, Governor's Office, Secretary

8    Diaz, Undersecretary Toche, and I talked and communicated daily

9    multiple times sometimes.  So as much as could have been done

10   in that forum, as much as we could have done, I believe that we

11   did.

12        THE COURT:  All right.  Thank you Special Master

13   Lopes.  If either party disagrees with that summary, they can

14   share with the Court their thoughts at the end of our

15   discussion of the Coronavirus issue.  Is it my understanding,

16   Special Master Lopes, that the one inmate who has tested

17   positive in Los Angeles County is in the Coleman class a

18   participant in enhanced outpatient programming?

19        SPECIAL MASTER LOPES:  It is my understanding that the

20   individual is in that category, your Honor, as an EOP inmate

21   and may also have Armstrong class concerns as well.

22        THE COURT:  All right.  Armstrong is the case

23   proceeding before Judge Wilken.

24        So let's turn now to Coronavirus.  Here are the issues

25   I would like to hear briefly from the parties on, to the extent

1    it may inform further work by the task force.  And again, so

2    that it's clear, this is a Coleman-only discussion.  There is

3    no motion pending before the three-judge court that will be

4    heard next week, and this Court is focused only on measures

5    apart from population reduction as relevant to Coleman.  And

6    assuming all of the Coleman orders are previously in place, the

7    Coronavirus has not suspended the requirements of the

8    constitution, even if emergency measures are needed to tailor

9    compliance.

10          So first on testing, Mr. Lewis, is the Court correct

11   in understanding that the one inmate who has tested positive is

12   an EOP participant?  And secondly, can you update the Court on

13   CDCR's plans for testing?  Is it prioritizing the mental health

14   population as a vulnerable population?  Does it have the

15   capacity to test everyone in the mental health population,

16   Mr. Lewis?

17          MR. LEWIS:  Good morning, your Honor.  According to

18   the information I have, the only inmate that has tested

19   positive is that individual at CSP-LAC.  That is as of

20   yesterday, and I do believe that that person is an EOP class

21   member.  I do not have any information about that individual's

22   Armstrong connection.

23          As for testing, your Honor, CDCR does not have the

24   ability right now to test the entire mental health class.

25   That's what I understand.  It takes it very seriously and has a

1    variety of measures in place in conjunction with CCHCS about

2    how it will do its testing and how it will move forward, what

3    happens when a person's identified, quarantined, et cetera,

4    things like that.  To answer your question, I do not understand

5    that they have the ability to test all mental health class

6    inmates.

7             THE COURT:  And all testing is being conducted by

8    CCHCS?

9             MR. LEWIS:  Correct, your Honor, with competent

10   medical officials.

11            THE COURT:  Do you know, has CCHCS identified as a

12   subset of the Coleman class as priority for testing?

13            MR. LEWIS:  No, your Honor.  I have no information

14   regarding that.

15            THE COURT:  All right.  Let me review issues with the

16   defense first, and then Mr. Bien, I'll ask you if the plaintiff

17   has anything to say.  With regard to the issue of transfers to

18   Coleman beds in Department of State Hospitals, Special Master

19   Lopes referenced that issue.  I understand there's no

20   resolution currently, but there are beds available in

21   Department of State Hospitals identified as Coleman beds.

22   Currently transfers are suspended in light of the pandemic.  Is

23   there any update from you, Mr. Lewis?  And then I would call on

24   Ms. Ciccotti if she has anything to add.

25            The Court's particular question is is testing of folks

1   who would qualify for transfer into those beds being considered

2   as a possibility to allow them to transfer and address their

3   specific needs and avoid a worsening of a mental health

4   condition, Mr. Lewis?

5           MR. LEWIS:  Yes, your Honor.  The department is

6   interested in all options for making sure that it keeps the

7   population safe and if there are transfers that would happen.

8   Right now DSH's policy is in effect, so I do not know if there

9   is actual testing going on or if there's perceived testing to

10  be done as to that population.  We do have available, if you

11  would like, more detail, your Honor.  Dr. Bick, who is one of

12  the major people at CDCR running these operations and has a lot

13  to speak about with testing, if you would like to, I would make

14  him available if you would like to hear from him, your Honor.

15          THE COURT:  All right.  I did acknowledge Dr. Bick

16  earlier.  Can you, in a very concise summary, provide the

17  current status of the potential for testing Coleman class

18  members who qualify for transfer into DSH beds, Dr. Bick?

19          DR. BICK:  Yes.  Good morning, your Honor.  And I

20  would just say that I'm currently serving as the director of

21  Health Care Services for CDCR which encompasses mental health

22  and dental.  My training is as an internist specializing in

23  infectious diseases, and I've been working in prison health

24  care for the last 27 years as medical director at CMF in

25  Vacaville.  I'm also involved in international prison health

1   work, and I've served as a federal court-appointed medical

2   expert in a class action lawsuit in Alabama.  I started in my

3   current capacity in January as the director of mental health

4   and dental programs.

5           To answer your specific questions, testing of inmate

6   patients is being done consistent with recommendations from the

7   Centers for Disease Control and the California Department of

8   Public Health which currently involves testing symptomatic

9   people who present with symptoms that are what we call

10  influenza-like illness.  Routine testing of asymptomatic people

11  is not happening right now for a variety of reasons.  That will

12  change going forward, and there -- as of yesterday and the day

13  before, there were some new FDA-approved testing kits that we

14  hope will soon be broadly available that could be used in the

15  capacity that you're referring to.

16          THE COURT:  All right.  Thank you, Dr. Bick.  And

17  recognizing the importance of following closely the best public

18  health advice, are you able to represent to the Court at this

19  time that those who qualify for transfer into Coleman beds at

20  Department of State Hospitals would be considered high priority

21  for testing as it becomes available?

22          DR. BICK:  Yes.

23          THE COURT:  All right.  That's helpful.  And how soon

24  could that testing occur based on what you know, whether or not

25  the patients are symptomatic or not?

1      DR. BICK:  It's not currently available outside of

2   some university settings have developed their own in-house

3   testing methods.  It's not currently commercially available to

4   anyone else, and so although as of this morning in fact I was

5   speaking with a company that is manufacturing these devices,

6   they said they're first starting to ship in mid-April, and it

7   would be first come, first served.

8      THE COURT:  All right.  Thank you for that.  At this

9   point I would contemplate this is a reason to keep the task

10   force convened and available to discuss and reach agreement, if

11   possible, on testing of Coleman class members symptomatic or

12   not to determine the advisability of transferring them into

13   those empty beds at Department of State Hospitals.

14      Mr. Bien, anything to say about testing or the

15   transfer issue?

16      MR. BIEN:  Yes, your Honor.  We are very concerned

17   with this issue of access to inpatient psychiatric beds at both

18   DSH and in CDCR.  Late yesterday we learned after the task

19   force meeting that because of a positive test of a staff member

20   at Sac, a decision had been made to cease transfers of Sac

21   mental health patients within CDCR to higher levels of care.

22   As your Honor may know or may not, Sac has been a very troubled

23   institution.  It has EOP segregation units, one called the PSU

24   and one called the EOP ad seg, that have had a record number of

25   suicides in those units in the last year, so we're very

1  concerned that those patients now have no access to any

2  inpatient psychiatric care.

3       This is another reason that the task force needs -- in

4  our opinion, needs to keep on meeting.  These issues are going

5  to keep on coming up which is -- they're difficult questions

6  that CDCR is dealing with as the virus spreads, and so again,

7  we're very concerned about access to inpatient psychiatric care

8  especially for, you know, people who have an urgent need and

9  then people who have a -- the DSH beds would be for people who

10  need a longer term of ICF care, but we have lots of people in

11  both those categories and, as the stress and anxiety of the

12  virus is just going to make things, you know, more difficult

13  and the need for that level of care more pressing.  So I think

14  the balancing of trying to reduce the spread of the virus by

15  carefully watching who is transferred where with access to a

16  level of care that's not available in people's housing units,

17  that is the challenge.  I think we need to be closely watching

18  that.  We appreciate the help of the Special Master and his

19  team in helping defendants address those difficult questions.

20       THE COURT:  All right.  Understood.  And the Court

21  would stay the broader issue of inpatient psychiatric care as

22  being something referred to the task force for ongoing

23  emergency discussion.

24       Let me ask Ms. Ciccotti, I don't know if Dr. Bick's

25  report covered anything you would have the Court hear.  Is

1    there anything you want to say about transfers into Department

2    of State Hospitals at this point?

3            MS. CICCOTTI:  Thank you, your Honor.  This is

4    Christine Ciccotti from DSH.  I think the only thing that I

5    would add is that we're just seeking to continue to communicate

6    and collaborate with CDCR to ensure that, if they need that

7    access to inpatient care, if they reach that point where

8    they're unable to provide it, that we would, you know, continue

9    those communications and try to find a way to identify patients

10   who could be safely transferred.

11           We have no positive patients at this time, and we're

12   really trying to, you know, maintain the safety of our existing

13   over 6,000 patients by suspending admissions, but we will work

14   with CDCR as needed to address the demands for inpatient care.

15           THE COURT:  All right.  All right.  Thank you for

16   that.

17           I would note we should acknowledge, even though at

18   this point there's one inmate, without comprehensive testing

19   systemwide of mental health inmates, there's only one who has

20   tested positive.  Multiple staff members within the prisons

21   have including, as I understand it, at least one therapist who

22   was conducting a group session with Coleman class members in

23   mid-March.  Do I understand that correctly, Mr. Lewis?

24           MR. LEWIS:  Yes, your Honor, Kyle Lewis.  That is

25   correct, your Honor.

1          THE COURT:  All right.  So again, symptoms are not

2     enough for us to feel confident that we've identified who is

3     going to be affected, particularly in the next several days and

4     weeks.

5          Let me ask about group therapy and specifically EOP

6     level of care.  Mr. Lewis, do you have anything to update the

7     Court with respect to how group therapy is being conducted?  I

8     understand it's curtailed, but are there specific plans?  And

9     perhaps it's in the mental health plan that will be appearing

10    on the Court's docket soon, but what is the status of group

11    therapy?

12         MR. LEWIS:  Yes, your Honor, Kyle Lewis.  Group

13    therapy, the department intends to continue programming

14    including group therapy mindful of the social distancing

15    concerns that have obviously become the norm now.

16    Programmatically, as long as an institution has sufficient

17    staff and has no quarantines in place or anything like that,

18    the programming will continue.  And you're correct, they are

19    addressed within the plan that your Honor has mentioned.  It's

20    also a proactive plan that kind of looks forward and tries to

21    anticipate things but also has to understand that the situation

22    is constantly evolving.  So while CDCR is making every effort

23    to make sure groups such as EOP groups continue, it has to be

24    flexible, and that's what the plan with its multiple tiers

25    envisions.

1        THE COURT:  All right.  Anything to say on that point,

2   Mr. Bien?

3        MR. BIEN:  Yes.  I mean, it's apparent that in various

4   programs already, you know, group therapy has been

5   substantially reduced, and it's apparent that -- to us that the

6   most important thing in the short term is preventing the spread

7   of the virus, saving lives that way, and then figuring out what

8   it is that can be offered to patient -- mental health patients

9   in lieu of the group treatment and other treatments that may

10  not be possible, you know, as restrictions increase in the

11  prisons.

12        Some of the facilities are unable to have locations

13  where there can be a sufficient social physical separation

14  safely around groups, and I think in the locked units, the

15  segregation units were particularly concerned that groups have

16  been canceled or curtailed and then what it is that we're going

17  to bring in instead.  And I think we've been working with CDCR

18  to encourage them to identify people that can be released from

19  segregation as soon as possible, to bring in additional

20  entertainment devices such as radios, TVs, reading materials,

21  any kind of stimulation as the -- if in fact the group therapy

22  can't be given in a particular unit.

23        And we had some positive responses from Department of

24  Adult Institutions towards the end of our process in fact

25  meeting yesterday that they are working hard on trying to

1    address the situation for mental health patients in

2    segregation.  It's a challenge.  Some of these segregation

3    units don't have electricity available.  Some of them have

4    electricity, but the connection to the cable TV doesn't work.

5    But again, people are working on that.  But I would say that's

6    my biggest concern in terms of a small part of the EOP

7    population that is in these very dangerous conditions,

8    especially as treatment is restricted.

9         And back again, this has been a troubled institution

10   very recently, nine suicides last year, and now it has no

11   access even to MHCB care.  So again this is the kind of place

12   where we really need to focus.

13        THE COURT:  Is the task force an appropriate forum for

14   maintaining that focus with the understanding it will continue?

15        MR. BIEN:  I think so.  And I think as we continue,

16   there may be a need not only to look at the statewide practices

17   which are obviously very important that they're in place and

18   updated but also that we address what's going on at particular

19   institutions.  So I would encourage within the next few days

20   that we set up maybe perhaps a smaller group that could set up

21   a phone call with leadership at Sac to discuss what's actually

22   going on there and when some access to MHCB's and inpatient

23   care can be restored.

24        THE COURT:  All right.  Any objection to that

25   proposal, Mr. Lewis?

1          MR. LEWIS:  No, your Honor.

2          THE COURT:  All right.  I will ask Mr. Lopes, Special

3    Master Lopes, to follow up on that suggestion.

4          Mr. Bien, just so I understand, have plaintiffs

5    identified a list of Coleman class members they believe are

6    eligible for early release based on being close to time served,

7    for example?

8          SPECIAL MASTER LOPES:  We do not have a list

9    ourselves.  We know that the essential list could be created

10   based on CDCR's data systems which allow for identification of

11   prisoners by their mental health status, by their age, which is

12   another risk factor, by their disability code, mental health

13   code, for example, EOP, and also cross-referencing any medical

14   conditions, high-risk medical and of course also their

15   sentence, their release date, and a risk assessment that has

16   been performed on all CDCR prisoners at this time.  So such a

17   list can and should be created in our opinion.  If it hasn't

18   already, it could be done quite -- as we understand, that kind

19   of list could be created institution by institution or

20   systemwide, and class members in those categories could be

21   promptly identified.  Some of them, your Honor, have been

22   granted parole and are awaiting release.  There's a period of

23   time after the parole hearing where the Governor's Office has

24   an opportunity to review.  There are people at all stages that

25   could be accelerated for release, and others who have a release

1  date that's, you know, six months off or 12 months off could

2  also be identified.

3       THE COURT:  All right.  At this point I would defer

4  that discussion, as related to the Coleman class, to the task

5  force, but I -- if any information develops regarding such a

6  list as relevant to Coleman, the parties know how to let me

7  know.

8       Let me ask specifically about EOP level of care, and

9  for you, Mr. Lewis, this would be the question.  Are any of

10  those assigned to enhanced outpatient care levels eligible for

11  transfer to some site where social distancing rules can be

12  observed?

13       MR. LEWIS:  Your Honor, as I understand it, you're

14  asking about the EOP class being able to transfer to a

15  location?

16       THE COURT:  Correct.

17       MR. LEWIS:  Your Honor, given the size of the EOP

18  class numbering 6,000 to 7,000, I don't have that information

19  readily available.  I apologize.  But I do know CDCR is taking

20  all measures to make sure that social distancing is being

21  emplaced at various locations.  In the groups, they're going to

22  50 percent day room use, 50 percent yard time, et cetera, to

23  allow inmate population the space that is required and needed.

24  They're taking a large number of proactive measures to support

25  the social distancing.

1          In addition, your Honor, as the Special Master noted,

2     the Governor has emplaced an executive order that will restrict

3     admission into CDCR.  So that will essentially stop 3,000

4     inmates a month from coming in, and then with the normal

5     discharge rate, that's 3,000 inmates going out.  So in a 30-day

6     period, you are looking at a reduction of approximately 6,000

7     inmates across the entire system.  So that will assist with the

8     social distancing that we're talking about.  But in terms of

9     the specific EOP class, I don't have that information, your

10    Honor.

11         THE COURT:  Can you say given the percentages you've

12    just shared with the percentage of day room use, the discharges

13    and no new admittance, will that -- are you saying within 30

14    days that gets the Coleman class to a level where social

15    distancing protocols can be observed in all respects, and is

16    that only in 30 days?

17         MR. LEWIS:  Your Honor, I'm not sure about the exact

18    time line.  I know that these are all issues being worked in

19    real time.  So I think this is just another measure that the

20    secretary and the Governor are looking at to create the

21    conditions for the social distancing to exist.  I believe it's

22    obvious that 6,000 less inmates, because of this measure, will

23    result in greater ability to do social distancing, but I can't

24    say how long it's going to take or what facilities would be

25    impacted, et cetera, because I haven't identified where those

1    inmates would be going, where they're not going to, et cetera,

2    given that the prison system has over 30 prisons.  So I

3    apologize, your Honor.  I don't have the answer to that

4    question.

5         THE COURT:  You don't need to apologize.  I'm just

6    asking questions for my edification and to the extent it helps

7    you all understand what the Court is thinking.  I do think

8    data, to the extent the defense has the data that allows

9    drilling down, that could be critical to ensuring that the best

10   public health advice is being followed.  And as I intimated at

11   the beginning of the call, I don't think we have 30 days, but

12   I'm not contemplating any order apart from the staff -- the

13   task force will keep meeting.

14        Let me ask Special Master Lopes, do you have anything

15   to add on anything we've just reviewed, testing, transfers to

16   Coleman beds in DSH, group therapy, EOP?

17        SPECIAL MASTER LOPES:  Yes, your Honor.  Thank you.  I

18   wanted to first go back to the emergency plan that the

19   defendants provided us with, and I'm not sure that I said that

20   there was extensive -- there were extensive discussions around

21   suicide prevention initiatives, and that is a very important

22   topic.  And if I did not raise that in my summary, then I

23   should have because we did spend an awful lot of time on

24   suicide prevention efforts that are critical in times like

25   these.

1          The only other thing I would add, your Honor, just for

2    clarification, Dr. Bick gave a nice overview on who was tested,

3    but Dr. Bick is working with CDCR.  Then Ms. Ciccotti gave her

4    representation from the Department of State Hospitals.  I'm

5    deeply concerned about the suspension of admissions to DSH

6    hospitals, and while DSH seemed to soften their position later

7    in the week after a few work group meetings saying -- you know,

8    I don't want to restate what Ms. Ciccotti just said about

9    willingness to work with CDCR.  We've also been told that there

10   is a pretty large wait list for people needing higher levels of

11   care.  Now that wait list may not always be for the DSH

12   hospitals.  It's really unclear to me.  But at the time of the

13   suspension, there was still a wait list for -- that we knew

14   about, it wasn't terribly large, but it was still important --

15   for hospital beds.  And I don't really believe that without the

16   Court's direction it will be easy, if achievable at all, for me

17   to get a meaningful dialogue with the Department of State

18   Hospitals around moving people into those hospitals at this

19   time.

20          And so while I recognize that this is an emergency

21   situation, I recognize that the director has wide-ranging

22   discretion.  I recognize that there are no patients today who

23   are -- who have tested positive in the Department of State

24   Hospitals.  I know from things that I've read or talked to the

25   Receiver about that, if someone has an urgent need like a heart

1   attack, they'll find a way to get somebody into a bed and

2   treated.  And for these who -- for those individuals who are

3   suffering and in pain and in need of that higher level

4   resource, I fear that they won't be able to get it.

5          So while I did notice a softening of a position in

6   later meetings this week, I am still concerned, and I do not

7   know that I will have an ability to provide you with an

8   appropriate update unless I can get further direction because

9   I'm not sure that CDCR is going to ring the bell that's

10  necessary to open the door to the state hospitals without one.

11         THE COURT:  All right.  Thank you Special Master Lopes

12  for clarifying that point.  Is your suggestion that this be the

13  highest priority item for the task force with the Court

14  requesting an update by early next week, something like that?

15         SPECIAL MASTER LOPES:  Yes.

16         THE COURT:  All right.  Any objection to that

17  approach, Mr. Bien?

18         MR. BIEN:  No, your Honor.  But I guess I also want to

19  make sure that we understand more about any restrictions on

20  access also to the CDCR PIPs and MMHCB's.

21         THE COURT:  All right.  Mr. Lewis, any objection to

22  that being a high priority item with a report back to the Court

23  early next week?

24         MR. LEWIS:  No, your Honor.  But I would just say that

25  these are issues that are envisioned by CDCR's plan that is

1    continually evolving, and to the extent that the right people

2    will be on that task force to address those issues, we're

3    interested in letting everyone know what CDCR's plan is, but

4    this is, as I say again, an evolving situation.  And there is a

5    lot of coordination going on between CDCR and DSH, so this is

6    not something that is just not being considered.  There are

7    conversations about this daily, and we will be glad to talk

8    about that more in the task force.

9         THE COURT:  All right.  Recognizing the good work that

10   has been done but also what the Special Master has just

11   signaled, what I'm -- I'm not ordering anything other than that

12   the task force continue to meet, that it make transfers into

13   Coleman beds in Department of State Hospitals a high priority

14   along with discussions of the PIPs and MHCB beds.  And so I'll

15   ask the Special Master to tell me when he can get something to

16   me, but I'm thinking about early next week Monday, Tuesday,

17   Wednesday.

18        All right.  I have nothing else at this point to

19   highlight with respect to the Coronavirus pandemic and its

20   import for the Coleman class in the California state prisons.

21   I'm not inviting any motion practice, but obviously the parties

22   know how to file motions with this Court.  And just so it's

23   clear, the Court is remaining open for consideration of motions

24   and respectively 24-7.

25        Let me just ask if there are any final, concise

1  wrap-up comments from first Mr. Bien, then Mr. Lewis, and then

2  I would acknowledge Ms. Neill and Ms. Ciccotti in case they

3  have anything to add before we talk briefly about the staff

4  abuse question as related to the Armstrong case in the Northern

5  District.

6        Mr. Bien.

7        MR. BIEN:  Yeah.  Could I call on Mr. Specter to

8  address an issue?

9        THE COURT:  All right.  Mr. Specter.

10       MR. SPECTER:  Thank you, your Honor.  This is

11 Don Specter.  I just want to correct -- or correct a statement

12 made by Mr. Lewis about the effect that the Governor's

13 proclamation stopping intake to the CDCR will have on the

14 inmate population.  The stopping intake will not -- will only

15 reduce the population to the extent people are discharged.  So

16 if approximately 3,000 people a month are discharged on parole,

17 then the population will only be reduced by that amount in that

18 30-day period, not 6,000 people as Mr. Lewis mentioned.

19       In addition, since most of the -- or many of the

20 issues that the Court is concerned about have been in the

21 prisons other than the reception centers, the restriction on

22 intake will have a limited, if any, impact on those

23 institutions as well.  Thank you.

24       THE COURT:  All right.  Anything further from the

25 plaintiffs?

1          MR. BIEN:  No, your Honor.

2          THE COURT:  All right.  Mr. Lewis, anything from the

3    defendants including any brief response you may have to

4    Mr. Specter's comment?

5          MR. LEWIS:  Yes, your Honor.  Thank you.  As to the

6    Governor's executive order involving intake, the numbers are

7    there.  The numbers will stop.  It will cause real increases

8    within the density of the population, the numbers.  I'm not

9    going to get into numbers today, but I will say that it is

10   undeniable that turning off inmates coming into prison and then

11   still discharging persons will lead to lower density and will

12   lead to greater opportunities for social distancing.

13          The only comment I would make is that every single

14   action that the department is taking at this time is in direct

15   response to helping prevent the spread of COVID and keep its

16   population, the community, and its own staff safe.  So there is

17   a very high priority being placed on COVID, but there's also a

18   very high priority being placed on the needs of the mental

19   health population.  Paramount, telepsychiatry is playing a huge

20   role in this, and the department and the clinicians want to

21   continue and are intending to continue giving care to their

22   patients; and everything is focused on that with the same idea

23   of preventing the spread of COVID.  So all of the operations

24   and all of the actions that we're describing are solely focused

25   on that while still maintaining appropriate care for the

1    Coleman class members.  Thank you, your Honor.

2          THE COURT:  All right.  Ms. Neill, anything to add?

3          MS. NEILL:  No, your Honor.  Thank you.

4          THE COURT:  Ms. Ciccotti?

5          MS. CICCOTTI:  No, thank you.

6          THE COURT:  All right.  Finally, on the staff abuse

7    issue, I've reviewed the plaintiffs' filing.  My question for

8    the parties is is there any reason I should not order either a

9    stipulated protective order or your separate proposed

10   protective orders to be filed with the Court within seven days?

11         For the plaintiffs, Mr. Bien, are you covering this?

12         MR. BIEN:  Yes, your Honor.  I agree with that.  I'm

13   hopeful that we can reach an agreement with defendants.  We had

14   some breakthroughs yesterday, and I'm hoping that within seven

15   days we will have a single proposal to you.  If not, I would

16   appreciate the opportunity to -- for us to just file our two

17   separate versions.

18         THE COURT:  That work for you, Mr. Lewis?

19         MR. LEWIS:  Your Honor, I'll defer to Tyler Heath of

20   my office on this particular issue.

21         THE COURT:  All right.  Mr. Heath.

22         MR. HEATH:  Your Honor, I think seven days should

23   hopefully give us the opportunity to work out an agreeable

24   protective order for these documents, and if not, yes, we can

25   then provide our own separate protective orders.

1        THE COURT:  All right.  Very good.  The docket will

2   reflect that you have seven days to either file a stipulation

3   or your separate proposals.

4        Finally, just so we have the correct copy of the

5   defendants' mental health plan, I have something that is a

6   March 25th, 2020, memo with a chart attached.  But to make

7   certain that I'm filing on the docket or whatever is filed on

8   the docket is the correct version, Mr. Lewis, may I direct you

9   to file within the hour the defendants' mental health plan in

10  effect as of March 25th?

11       MR. LEWIS:  Certainly, your Honor, we'll do so.

12       THE COURT:  All right.  Very good.

13       Again, thank you all.  I am heartened by the

14  collaboration, and I believe the task force is achieving its

15  intended purpose.  I will look for a report on the DSH beds and

16  mental health crisis beds by early next week, and I will

17  communicate with you as needed through the Special Master.  So

18  thank you very much.

19       At this point I will confer with the Special Master to

20  determine whether or not we need another status like this next

21  Friday or if we can maintain the date I've currently set for

22  two weeks from now.  So stay tuned on that front.  Thank you

23  all.  We're adjourned.

24       (The proceedings adjourned at 11:05 a.m.)

25                        --oOo--

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3                           /s/ Kacy Parker Barajas

4                           _____
                            KACY PARKER BARAJAS
                            CSR No. 10915, RMR, CRR, CRC

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25