DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
RITA LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>GAVIN NEWSOM, et al.,<br><br>            Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**THREE JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>            Plaintiffs,<br><br>      v.<br><br>GAVIN NEWSOM,<br><br>            Defendants. | Case No. C01-1351 JST<br><br>**THREE JUDGE COURT**<br><br>**DECLARATION OF DONALD SPECTER IN SUPPORT OF PLAINTIFFS' REPLY BRIEF** |

[3520960.1]

I, Donald Specter, declare:

1.      I am a member of the Bar of this Court and co-counsel for Plaintiffs in both of the above-entitled actions.  I am also the Executive Director of the Prison Law Office.

2.      On March 26, 2020, I conducted a deposition of Scott Kernan, former Secretary of the California Department of Corrections and Rehabilitation.  Attached as **Exhibit A** are true and correct copies of pages 18, 26-27, 29, 30, 34-35, 37-38, 77 and 92 from that deposition.

3.      On March 30, 2020, I received an email from Roscoe Barrow, Chief Counsel for the California Correctional Health Care Services, and an attached Excel file entitled "COVID Risk Factors MH LOC."  Attached as **Exhibit B** are true and correct copies of both the email and the Excel file.  According to Mr. Barrow's email, the Receiver requested that the data in the Excel sheet be shared with me and my co-counsel.  As Mr. Barrow explained in his email, "[t]he data represents patient counts utilizing the condition/disease definitions from our dashboard stratified by mental health level of care."

4.      Attached hereto as **Exhibit C** is a true and correct copy of the CDCR, COVID-19 Preparedness website: April 1, 2020 Update, last accessed April 1, 2020, available at https://www.cdcr.ca.gov/covid19/.

5.      Attached hereto as **Exhibit D** is a true and correct copy of the CDCR/CCHCS COVID-19 Employee Status website: March 31, 2020 Update, last accessed April 1, 2020, available at https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in Sonoma County on April 1, 2020.

*/s/ Donald Specter*

DECLARATION OF DONALD SPECTER IN SUPPORT OF PLAINTIFFS' REPLY BRIEF

[3520960.1]

# EXHIBIT   A

1        Q.   For how long?

2        A.   Approximately ten years.

3        Q.   And do I remember correctly you were also at

4    Sac for a while?

5        A.   CSB Sacramento, yes, sir.  And Mule Creek State

6    Prison.

7        Q.   Both of those as wardens?

8        A.   Yes, sir.

9        Q.   And then you -- could you briefly describe the

10   positions you held at headquarters for me?

11       A.   Associate director.  Director.  Chief deputy

12   secretary.  Deputy director of Adult Institutions.

13   Under secretary of operations, and ultimately as

14   secretary from January 2016 to August 31, 2018.

15       Q.   So two and a half years.  Is that correct?

16       A.   Right around there, yes.

17       Q.   Okay.  And as secretary and possibly the

18   warden, but definitely as secretary, you were once

19   defendants in the Plata and Coleman case -- you were one

20   of the defendants in the Plata and Coleman cases.  Is

21   that correct?

22       A.   Yes.

23       Q.   And you and I have been on opposite sides of

24   litigation table, so to speak, for quite a while,

25   correct?

1    preserving objections here.  It's an incomplete

2    hypothetical, and it calls for speculation.

3         You can answer the question, Mr. Kernan.  I

4    don't need to tell you that.  You can do what you want.

5    I apologize.  Thank you.

6         THE WITNESS:  I think the mass humanity in the

7    dormitories and the lack of physical space presents a

8    particular problem during this crisis, if that answers

9    your question, Mr. Specter.

10        MR. SPECTER:

11   Q.   Could you elaborate, please -- elaborate on the

12   gravity of the crisis?

13   A.   The physical space in the prisons prevent

14   appropriate social distancing.  Shared bathroom

15   communals, laundry that is, you know, washed once a

16   week.

17        There's significant concerns in my mind of the

18   ability to prevent and mitigate the spread of disease

19   that undoubtedly in my mind will go through the prisons

20   given the -- you know, the close quarters that inmates

21   must live in.

22   Q.   In a radio interview with KQED, do you refer to

23   the situation in the prisons as "tinderbox"?  First of

24   all, did you -- did I accurately quote you from that

25   interview?

1        A.    Yes, sir.

2        Q.    And could you describe what you mean by that?

3        A.    I think I was -- even as inartful as it was, it

4    was not meant to be salacious.  It was simply meant to

5    suggest to the person I was talking to the gravity of

6    the situation in our state prisons and jails given the

7    COVID-19 virus.

8              My experience with other contagions over the

9    years, that is that the prisons are a prime location for

10   the spread of that.  And my concern that it will take

11   off like it is in New York and it's down in some of the

12   other countries -- that it will take off in the prisons

13   and create a significant health concern for the

14   offenders that we care for and the staff that work

15   there.

16       Q.    When you say "significant health concern," do

17   you include possibly death in that scenario?

18       A.    I -- I have to believe, given the aging

19   population in the prison system and those with other

20   healthcare issues, that the risk is heightened in the

21   prison setting versus the community setting.

22       Q.    You -- you understand that there have been

23   certain cruise ships that have had passengers with the

24   virus, correct?

25       A.    Yes, sir.

1          Q.   Do you have particular concerns about the risk

2     to that population?

3          A.   I guess I would say given my knowledge of the

4     COVID virus and the news reports that are going on is

5     that this is a highly, highly contagious disease.  That

6     we've already identified, as you have pointed out, you

7     know, one inmate and nine staff.

8               I think it's not -- if it's going to happen.

9     It's when it's going to happen that they're going to

10    have considerable more cases given the close proximity

11    of the inmate population as -- as we are describing in

12    these dorms across the system.

13         Q.   Do the dorms present a -- in your mind, do the

14    dorms present a greater risk than other types of housing

15    units that they have in CDCR?

16         A.   Well, I mean, I think all inmates, even inmates

17    in cells that are, you know -- having to go to chow

18    halls or do other -- pill call or what have you, where

19    they're in close proximity to other inmates present a

20    greater level of risk.

21              And I say that with just based on my

22    experience, not based on any expert knowledge of it.  It

23    just strikes me that as Americans are being asked to

24    stay six feet apart that, you know, placing the bunks

25    and the dorms that I dealt with were very much closer

1      than that.

2              They share communal bathrooms.  You have got to

3      believe that the social distancing is almost impossible

4      for most of those inmates and the tight quarters only

5      exacerbate the problem.

6          Q.   In your opinion, tight quarters -- well, you

7      understand that in many institutions, prisoners are fed

8      in dining rooms, general dining rooms, where they

9      congregate, correct?

10         A.   Yes, sir.

11         Q.   And they sit at tables with about four stools

12     apiece?

13         A.   Yes, sir.

14         Q.   And those are less than six feet apart from

15     each other, are they not?

16         A.   Yes, sir.

17         Q.   Are you concerned about the transmission of the

18     disease in that area as well?

19         A.   You know, yes is the direct answer.  And, you

20     know, concerned with all my colleagues that are working

21     those prisons.  I mean, I think it's a bad situation for

22     both.

23         Q.   So you're concerned that the staff have no way

24     to keep social distance in that current condition as

25     well.  Is that correct?

1          You can answer.

2          THE WITNESS:  I'm sorry, Mr. Specter.  Would

3    you please repeat that.

4          MR. SPECTER:  I don't think I can.

5          (Record read.)

6          MR. MELLO:  Same objection so as not to

7    sidetrack you, Mr. Kernan.

8          THE WITNESS:  I guess the most responsive

9    answer is I just don't know, Don.  I -- I worry about

10   the time that is elapsing and what we're seeing, you

11   know, as this is coming across the country and

12   flattening the curve and all the things that are going

13   on the news; that decisions are being made now might

14   mitigate it two weeks from now.

15          But I -- again, with all directness, do not

16   know what the department is doing internally today to

17   mitigate the population issues across the system.

18          MR. SPECTER:

19     Q.    Secretary Kernan, do you believe that immediate

20   steps are warranted to reduce the population or spread

21   the population out in some way in order to reduce the

22   risk of harm?

23          MR. MELLO:  Same objections.

24          THE WITNESS:  I do, sir.  I think it's common

25   sense that we should be taking immediate, bold steps to

1    <mark>try to mitigate the spread of the virus in the prisons.</mark>

2    And for that matter, in jails across the country.

3         MR. SPECTER:

4         Q.   And to your knowledge, and I understand this is

5    to your knowledge, it's not -- I understand that the

6    department may be doing things that you don't know

7    about, but to your knowledge, do you know about the --

8    do you know of any immediate and bold steps other than

9    the one that -- the ones that were contained in the

10   governor's executive order?

11        A.   I -- I think that logistically the department

12   has taken a number of steps to try to mitigate that; the

13   screening of staff coming into the facility, the taking

14   of temperatures, and questioning.  It seems like a

15   reasonable step to me.

16        The closing of programs, the closing of

17   visiting all of those things that the department has

18   done seem to me to be reasonable steps to try to

19   mitigate the problem.

20        And then it just becomes a question, and again,

21   admittedly don't know, are they spreading people out

22   either through using the full capacity that they have,

23   considering releasing offenders that are soon to be

24   released, and addressing those people that are immune

25   comprised and might be in greater jeopardy than the rest

1    thousands of inmates without someplace to go in the

2    community, you know, a residence or other location and

3    without the appropriate support, is a dangerous thing.

4         So I don't think that what they're dealing with

5    is very easy, Mr. Specter, but I do think that reducing

6    the density is a very common sense in-the-moment kind of

7    issue.  And I'm hopeful that the governor and the

8    secretary are going to do that.

9         MR. SPECTER:

10   Q.   Okay.  You understand that people are released

11   on parole from the CDCR every day or every workday at

12   least, correct?

13   A.   Yes, sir.

14   Q.   And the latest figures I have were that they're

15   about -- in 2018, I believe, 38,000 some-odd people were

16   released from prison.  Is that around the number that

17   you have experienced while you were there?

18   A.   Well, when I was there, it got up to a hundred

19   thousand a year because of parole violations and

20   different aspects of the criminal justice system.  But

21   that sounds about right as I understand the current

22   parole numbers.

23   Q.   Right.  And you understand also that some of

24   those people -- some of those people are sentenced to

25   determinate terms, correct?

1      A.   Yes, sir.

2      Q.   And so when their parole day comes, they're

3   released regardless of whether they have parole plans in

4   place, correct?

5      A.   Yes, sir.

6      Q.   In terms of if you were recommending reduction

7   in the population of the -- well, strike that.

8           In your opinion, if -- there was a need to

9   reduce the population, and I think you may have said

10   this already, but do you agree that releasing people who

11   are going to be released anyway in the next six months

12   or a year is a reasonable group to look at in terms of

13   the population?

14           MR. MELLO:   "Reasonable" is vague.   It's an

15   incomplete hypothetical.   Calls for speculation.

16           THE WITNESS:   I -- I would say yes to that,

17   Mr. Specter.   I guess with the caveat that I understand

18   the balance that the governor and the secretary have in

19   protecting public safety in that just releasing people

20   is a challenging political thing.

21           I guess I would just say that this virus

22   strikes me as something that we've never dealt with

23   before.   It's scary.   Staff are scared, extra scared.

24   And I think that -- and hope that the governor will do

25   something to reduce the density in that prison

1    healthcare providers in community that it is even more

2    likely individuals will have less access to sufficient

3    medical and mental health services upon their early

4    release from DCR prisons?

5         A.   I think the obvious to that is yes, sir.

6         Q.   In the KQED article that Mr. Specter asked you

7    about, I believe there's a quote.  It says "it's a

8    tinderbox of potential infection as you go forward,

9    especially if you were just watching what's going on

10   around the world.  I know Italy and Brazil had serious

11   violence and escapes and murders in jails as a result of

12   COVID-19."

13              Does that sound like something you said to the

14   reporter from KQED?

15        A.   Yes, sir.

16        Q.   Okay.  Do you think CDCR's prisons are

17   comparable to jails in Brazil?

18              MR. SPECTER:  Vague as to "comparable."

19              THE WITNESS:  I don't know if I would say

20   they're comparable, Mr. Mello.  I would just say that --

21   you know, as it relates to confined quarters, there's

22   some general consistencies in any detention facility no

23   matter where it is in the world that are consistent with

24   -- you know, the same kind of things we deal with here

25   in California.

1    entire question.  Could you repeat it?

2          Q.   I'm sorry.  Maybe I should go about this a

3    different way.  In the best of all possible worlds,

4    everybody coming out of prison would have a parole plan

5    that applies for their medical and mental health needs

6    as well as their housing needs, right?

7          A.   Yes.

8          Q.   That doesn't happen in today's prison system in

9    California, correct?

10         A.   Not for everybody, no.

11         Q.   But they're still released, correct?

12         A.   Yes.

13         Q.   And people are still released even though they

14   may have HIV or other contagious diseases, correct?

15         A.   Yes.

16         Q.   Regardless of whether they have a parole plan

17   or not, correct?

18         A.   Yes.

19         Q.   That's all I have, Paul.

20              MR. MELLO:  I have nothing further.  Madame

21   court reporter, I will try to get you those

22   declarations, those exhibits.

23              And I thank Mr. Kernan for his time.

24              We definitely want a transcript.

25              Don, you're picking that up?

E X H I B I T   B

| | |
|---|---|
| **From:** | Barrow, Roscoe@CDCR <Roscoe.Barrow@cdcr.ca.gov> |
| **Sent:** | Monday, March 30, 2020 1:45 PM |
| **To:** | Donald Specter; Sara Norman; Steve Fama; Alison Hardy; Rana Anabtawi; Sophie Hart; Alayna O'Bryan; Michael W. Bien; Lisa Ells; Jessica Winter; Kyle.Lewis@doj.ca.gov; RSilberfeld@RobinsKaplan.com; Stafford, Carrie@CDCR; Scofield, Bryant; Damon.McClain@doj.ca.gov; Nasstaran.Ruhparwar@doj.ca.gov; Paul B. Mello; Samantha Wolff; Matt Lopes; Ed Swanson |
| **Cc:** | Clark Kelso; Toche, Diana@CDCR; Richard Kirkland; Tharratt, Steven@CDCR |
| **Subject:** | Risk Factors for Adverse COVID-19-Related Outcomes by MH Level of Care |
| **Attachments:** | COVID Risk Factors  MH LOC.xlsx |
| **Sensitivity:** | Confidential |

The Receiver has asked that I share the attached file with you.

The data represents patient counts utilizing the condition/disease definitions from our dashboard stratified by mental health level of care.  Some of these conditions may represent increased risk of severe COVID-19 morbidity/mortality.  The most significant risk factors based on our current understanding of the disease appear to include age, underlying lung and cardiovascular disease (and probably obesity and smoking history).  Additional refinement of the selection criteria would need to better define some medical subsets such as "poorly" controlled diabetes or "significant" cardiovascular disease.

If you have any questions, please do not hesitate to contact me.  Thank you very much.

**Roscoe Barrow**
Chief Counsel
California Correctional Health Care Services
CCHCS Office of Legal Affairs; Building D
P.O. Box 588500
Elk Grove, CA 95758

916-691-6633 Office
916-956-7467 Cell
916-691-6172 Fax
Roscoe.Barrow@cdcr.ca.gov



**CONFIDENTIALITY NOTICE**: This communication with its contents may contain confidential and/or legally privileged information.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act.  If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**DO NOT FORWARD THIS E-MAIL WITHOUT THE EXPRESS PERMISSION OF THE SENDER**

## Risk Factors for Adverse COVID-19 Outcomes by Mental Health Level of Care

### California Prison Inmate Population

*Data as of March 30, 2020*

| Level of MH Care | Summary Data | | | Patient Counts by Risk Factor | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Patients with at least 1 Risk Factor | Total Patients in Level of Care | Percent of Patients with at least 1 Risk Factor | Age (65+) | Asthma | COPD | BMI (40+) | Cancer | Hyper-tension | Cerebro-vascular Disease | Coronary Artery Disease | Diabetes | Dialysis | ESLD | Immuno-suppressed | Pregnancy |
| GP | 27,329 | 84,640 | 32% | 3,985 | 7,977 | 1,519 | 2,044 | 1,945 | 15,825 | 554 | 1,587 | 4,946 | 129 | 2,487 | 720 | 16 |
| CCCMS | 13,492 | 27,442 | 49% | 1,267 | 5,159 | 1,212 | 1,241 | 842 | 7,496 | 324 | 937 | 2,703 | 41 | 1,322 | 389 | 4 |
| EOP | 3,565 | 6,910 | 52% | 309 | 1,277 | 303 | 253 | 193 | 2,101 | 87 | 245 | 830 | 3 | 376 | 81 | 2 |
| MH HLOC | 724 | 1,568 | 46% | 27 | 290 | 37 | 36 | 29 | 418 | 27 | 48 | 122 | NULL | 55 | 18 | NULL |
| All Levels of Care | 45,110 | 120,560 | 37% | 5,588 | 14,703 | 3,071 | 3,574 | 3,009 | 25,840 | 992 | 2,817 | 8,601 | 173 | 4,240 | 1,208 | 22 |

E X H I B I T   C

# COVID-19 Preparedness

(para español, haga clic aquí (https://www.cdcr.ca.gov/covid19/preparacion-covid-19/). Las traducciones al español se proporcionan dentro de las 24 horas de una actualización)

## April 1, 2020

- *As of April 1, 2020, six incarcerated persons at California State Prison-Los Angeles County, one incarcerated person at North Kern State Prison, and one incarcerated person at California Institution for Men in Chino have tested positive for COVID-19. See CDCR and CCHCS Patient Testing Tracker (https://www.cdcr.ca.gov/covid19/population-status-tracking/) for the latest testing and case information for the incarcerated population.*

- *There are currently 25 CDCR/CCHCS employees who have tested positive for COVID-19. See the CDCR/CCHCS COVID-19 Employee Status webpage (https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/) for a breakdown by location.*

- *CDCR has announced its plan to further protect staff and inmates (https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/) from the spread of COVID-19 in state prisons.*
  - *CDCR will expedite the transition to parole for eligible inmates who have 60 days or less to serve on their sentences and are not currently serving time for a violent crime as defined by law, a person required to register under PC 290 (sex offenses), or domestic violence.*
  - *Plan will create increased capacity and space to help with inmate movement, physical distancing, isolation efforts*
  - *The plan also includes making more use of the state's private and public Community Correctional Facilities, as well as maximizing open spaces in prisons, such as gymnasiums, to increase capacity and inmate movement options.*

- *Federal Receiver J. Clark Kelso released a video message (https://www.cdcr.ca.gov/insidecdcr/2020/03/31/message-to-all-cdcr-cchcs-staff-from-receiver-j-clark-kelso/) to all CCHCS and CDCR staff.*

- *CDCR and CCHCS have launched an internal patient registry to assist institutions in monitoring patients with suspected or confirmed COVID-19. The COVID-19 Registry also tracks all individuals by risk. The registry is updated twice daily and draws from multiple data sources, including the electronic health record system, claims data, and the Strategic Offender Management System to compile risk factor data. This registry also includes release date information for each individual, in the event that individuals are to be considered for early release during the pandemic. This tool is not publically available as it contains personal health care information protected by medical privacy laws.*

Executives and staff at CDCR and CCHCS are working closely with infectious disease control experts to minimize the impact of COVID-19 on our operations. To ensure we are ready to immediately respond to any COVID-19 related incident, CDCR and CCHCS activated the Department Operations Center (DOC) in order to be fully prepared to respond to any departmental impacts resulting from COVID-19.

CDCR and CCHCS are dedicated to the safety of everyone who lives in, works in, and visits our state prisons. We have longstanding outbreak management plans in place to address communicable disease outbreaks such as influenza, measles, mumps, norovirus, and varicella, as well as preparedness procedures to address a variety of medical emergencies and natural disasters.

Public safety is a top priority for CDCR, as is the health of our community. The department has been diligent in implementing proactive efforts to ensure health and safety, including recent actions to limit the risks and spread of COVID-19. Examples include limiting all non-essential or emergency transportations between CDCR facilities; screening all who enter the prisons; and suspending visits by the public. As a further protective measure, Governor Newsom issued an executive order (https://www.gov.ca.gov/2020/03/24/governor-newsom-issues-executive-order-on-state-prisons-and-juvenile-facilities-in-response-to-the-covid-19-outbreak/) recently directing CDCR to temporarily halt the intake of inmates and youth into the state's 35 prisons and four youth correctional facilities. We are continuously evaluating and implementing

proactive measures to help prevent the spread of COVID-19 and keep our CDCR population and the community-at-large safe.

## BELOW IS AN OVERVIEW OF STEPS WE ARE TAKING REGARDING COVID-19

### Expedited release and plan to increase space within institutions

On March 31, CDCR announced its plan to further protect staff and inmates (https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/) from the spread of COVID-19 in state prisons.

CDCR will expedite the transition to parole for eligible inmates who have 60 days or less to serve on their sentences and are not currently serving time for a violent crime as defined by law, a person required to register under Penal Code 290, or domestic violence.

The plan will create increased capacity and space to help with inmate movement, physical distancing, and quarantine and isolation efforts for positive COVID-19 cases.

The plan also includes making more use of the state's private and public Community Correctional Facilities, as well as maximizing open spaces in prisons, such as gymnasiums, to increase capacity and inmate movement options.

For frequently asked questions on this plan, visit our FAQ page here (https://www.cdcr.ca.gov/covid19/frequently-asked-questions-for-plan-on-expedited-release-and-increased-physical-space-within-state-prisons/).

### Expanded precautions at institutions and office locations

All staff and visitors entering CDCR correctional institutions will undergo a touchless temperature screening prior to entering the facility. This is in addition to the ongoing verbal symptom screening. This applies to CDCR state prisons and community correctional facilities. For guidance on this implementation, see the COVID-19 Facility Entrance Screening.

CDCR and CCHCS have implemented mandatory verbal screening for every person entering **any** work location, in line with screenings in place at prisons since March 14.

Those attempting to enter a state prison or office building at any time are required to verbally respond if they currently have new or worsening symptoms of a respiratory illness. If the individual's response is that they are experiencing symptoms, they will be restricted from entering the site that day.

All CDCR institutions have been instructed to conduct additional deep-cleaning efforts in high-traffic, high-volume areas, including visiting and health care facilities. Those in the incarcerated population identified as assisting with cleaning areas of the institution have received direct instruction on proper cleaning procedures in order to eliminate coronavirus.

On March 11, all CDCR institutions were instructed to order additional hand sanitizer dispenser stations. The purchased dispensers have begun arriving at the institutions and are being placed inside institution dining halls, work change areas, housing units, and where sinks/soap are not immediately available. These dispensers will contain the type of alcohol-based hand sanitizer recommended by the Centers for Disease Control and Prevention to help eliminate coronavirus.

Additional dispensers may be placed in high-need areas where they can be monitored for safety and security of the institution.

Staff have been granted permission to carry up to two ounces of personal-use hand sanitizer. The incarcerated population is being provided extra soap when requested and hospital-grade disinfectant that meets CDC guidance for COVID-19.

CDCR and CCHCS have been actively monitoring and assessing institutions to ensure staff have an adequate supply of personal protective equipment to immediately address any potential COVID-19 exposures, and to protect staff and incarcerated people. The workgroup will continue to collaborate and maintain open lines of communication with the Governor's Office of Emergency Services to identify any deficiencies and ensure adequate supplies are available at each institution on an ongoing basis.

**California Prison Industry Authority production**

In an effort to help prevent the spread of COVID-19, the California Prison Industry Authority (CALPIA) has begun producing hand sanitizer for use by both staff and the incarcerated population.

CALPIA is producing two types of hand sanitizer: *Cleanse,* which contains alcohol, and *Cleanse – AF* (Alcohol Free) which contains the active ingredient Benzalkonium Chloride. The alcohol-based hand sanitizer will be used in the sanitizer dispenser stations being directed into housing units, dining halls, work change areas, and other areas where sinks and soap are not immediately available. The non-alcohol based product is being produced for future needs.

The hand sanitizer is being made available to CDCR and CCHCS facilities and locations.  If CALPIA's inventory exceeds the needs of those two departments, CALPIA will make the product available to other state agencies.

CALPIA worked with the California Department of Public Health and within two weeks was able to acquire the necessary licensing for relabeling, repackaging, and mixing.

CALPIA has already started delivering the bottles to CDCR facilities.

The production of the materials will occur at CALPIA's Chemical Enterprise located at the California State Prison, Los Angeles County.

**Screening incarcerated population on entry into prisons**

All incarcerated persons received into a Reception Center institution are placed into an automatic 14-day quarantine for monitoring. For more on CDCR and CCHCS quarantine protocols, visit our COVID-19 Status (https://gcc01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.cdcr.ca.gov%2Fcovid19%2Fcdcr-cchcs-covid-19-status%2F&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C0%7C637207840984514096&sdata=%2Fr1fOjVQFht%2FiygQmZjeoRWHN0cakc2DcSvPyp9mCFQ%3D&reserved=0) webpage.

Immediately upon entry, all inmates are screened for symptoms of influenza-like illness (ILI) including COVID-l9. The inmate populations that must be screened include, but are not limited to, those entering via reception centers, receiving and release locations and fire camps, and returning from court, a higher level of care, or an offsite specialty appointment.

The screening shall include asking an individual if they have a cough, fever, and/or difficulty breathing, and taking their temperature. Based on the screening questions, temperature reading, and health care staff's clinical judgement, the individual will either be placed in isolation, quarantine or other housing.

**Social distancing**

CDCR has implemented several practices to encourage "social distancing," which is a strategy recommended by public health officials to stop the spread of contagious diseases. Social distancing requires the creation of physical space between individuals, minimizing gatherings, and ensuring space between individuals when events or activities cannot be modified, postponed, or canceled. Achieving space between individuals of approximately six feet is advisable.

The incarcerated population has received information about social distancing, and staff and inmates are practicing social distancing strategies where possible, including limiting groups to no more than 10, assigning bunks to provide more space between individuals, rearranging scheduled movements to minimize mixing of people from different housing areas, encouraging social distancing during yard time, and adjusting dining schedules where possible to allow for social distancing and additional cleaning and disinfecting of dining halls between groups.

**Transportation/Receiving and Release protocols**

Effective March 24, CDCR will suspend intake of all incarcerated persons into both adult state prison and Division of Juvenile Justice facilities for a minimum of 30 days. California Governor Gavin Newsom issued an Executive Order (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.gov.ca.gov%2F2020%2F03%2F24%2Fgovernor-newsom-issues-executive-order-on-state-prisons-and-juvenile-facilities-in-response-to-the-covid-19-outbreak%2F&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d 7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C1%7C637207840984524088& sdata=K1qcU0GPI8DnmF8fTLT5pNk2ZV9TlhVf4cMYAeZ6qss%3D&reserved=0) directing CDCR to suspend intake into state correctional facilities for 30 days. All persons convicted of felonies shall be received, detained, or housed in a jail or other facility currently detaining or housing them for that period. The order allows Secretary Diaz to grant one or more 30-day extensions if suspension continues to be necessary to protect the health, safety, and welfare of inmates and juveniles in CDCR's custody and staff who work in the facilities.

CDCR has suspended transfers of inmates into the Male Community Reentry Program (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.cdcr.ca.gov%2Frehabilitation%2Fmcrp%2F&data=02%7C01%7CDan a.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d7d127c0c3%7C0662477dfa0c4556a8f 5c3bc62aa0d9c%7C0%7C0%7C637207840984524088&sdata=TUbKWRsQ%2BUUOazKP%2FW wNSQ62HNe3jYqPcdoLYGg2pHM%3D&reserved=0) (MCRP), the Custody to Community Transitional Reentry Program (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.cdcr.ca.gov%2Fadult-operations%2Fcustody-to-community-transitional-reentry-program%2F&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d 7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C0%7C637207840984534085& sdata=6QxnVgYRFZEpkzr53XrFQKlPGrN7izJffrZIs1I9aTA%3D&reserved=0) (CCTRP), and the Alternative Custody Program  (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.cdcr.ca.gov%2Fadult-

operatio̶n̶s̶... (garbled link text) ...e924c1 00f6708d7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C0%7C637207840984 534085&sdata=LOmec3UwbZNH6nLMVKBDJ6SBGycVBA7lMvLxdddfPkE%3D&reserved=0) (ACP) through April 6,2020. CDCR has taken this step to limit potential exposure of staff to COVID-19 during inmate transfers to the community. Additionally, as part of this program, incarcerated persons remain under the jurisdiction and responsibility of CDCR, to include providing any required medical attention. Releasing incarcerated persons to these programs could potentially expose them to COVID-19 in the community which would require their transfer back to an institution for medical care for non-emergent health care needs, increasing risk for potential exposure within our institutions.

CDCR has also suspended transfers of inmates to the Conservation Camp program until further notice. Inmate transfers previously initiated under the approved guidelines, who are currently on layover, will be moved to their final destination.

Department of State Hospitals and CDCR/CCHCS will not transfer patients between the two mental health treatment agencies for the next 30 days. All appropriate health care services will be provided to the patient by the current housing agency.

All Interstate Compact Agreement transfers of out-of-state parolees and inmates to California will cease for 30 days.

To mitigate workload when non-essential movement resumes, this cancellation of all non-essential inmate movement impacts movement only; classification committees and review processes will move ahead as normal.

While it's required to have three staff members to make a quorum, it is only required, during this unique time, to have two staffers physically present in the committee room with the remaining committee member joining by call. All present in the room should practice social distancing.

**Visiting**

As part of CDCR's COVID-19 prevention efforts, normal visiting at adult and juvenile facilities is canceled statewide until further notice based on California Department of Public Health guidance for mass gatherings. This includes overnight family visits and Division of Juvenile Justice visiting.

Institutions have been instructed to find opportunities to allow increased phone access for the incarcerated population so they may keep in touch with their support system, while also practicing social distancing and other infectious disease safety protocols.

At this time, legal/attorney visits are being held for urgent needs only. Hospice visits will no longer be held until further notice. Marriages will be postponed; those affected are encouraged to work with the institution's Community Resource Manager regarding rescheduling for a later date.

CDCR's inmate telephone network provider Global Tel Link (GTL) has offered the adult incarcerated population three days of free phone calls each week through the end of April. There is no limit on the number of calls; however, each institution may limit time to accommodate need. The following days are designated for free calling:

Week 1: March 31, April 1, April 2

Week 2: April 7, 8, 9

Week 3: April 14, 15, 16

Week 4: April 21, 22, 23

Week 5: April 28, 29, 30

CDCR's electronic messaging provider for the incarcerated population, JPay, is providing reduced-priced emails to those incarcerated at the pilot institutions and free emails for those inmates who cannot afford it. The five pilot sites that currently have the technology include: High Desert State Prison, Kern Valley State Prison, California Institution for Women, Central California Women's Facility, and Substance Abuse Treatment Facility. At some of these institutions, only certain yards currently have this technology. Details will be provided to the incarcerated population at the institutions.

The youth within the Division of Juvenile Justice already receive free phone calls and have begun using free Skype video calls for visiting.

**Rehabilitative programs and volunteers**

Non-CDCR/CCHCS/CALPIA staff will not be permitted to enter state prison until further notice. This includes people who enter state prison as volunteers, or to facilitate rehabilitative programs. Paid union representatives, and Inmate Ward Labor (IWL) staff will be permitted. CalVet representatives and contractors who work with institution staff to conduct interviews and provide forensic evaluations for incarcerated veterans to receive federal disability benefits for themselves and their families pursuant to Senate Bill 776 will also be permitted.

No rehabilitative programs, group events, or in-person educational classes will take place until further notice. At this time, all tours and events have been postponed, and no new tours are being scheduled.

**Education**

The Office of Correctional Education is working with institution principals, library staff, and teachers to provide in-cell assignments where possible in order for students to continue their studies, legal library access and educational credit-earning opportunities.

For those in our incarcerated population who need supplementary academic support, CDCR has encouraged Disability Placement Program, Developmental Disability Program, and Every Student Succeeds Act staff to coordinate with the institution instructor to provide additional assistance to enrolled students where possible.

Standardized testing has stopped until further notice, although we are encouraging education staff to continue to engage their students as much as possible to stay focused on their rehabilitation and positive programming during this time.

Recreation and Law Library Services will continue to be available to the incarcerated population even if physical access is restricted due to safety and security measures.

**Religious programs**

CDCR recognizes the importance of religion in the daily life and spiritual growth of incarcerated people. Unfortunately, the department has limited group religious programming for upcoming holidays such as Ramadan, Passover, and Easter. These services will be provided as in-cell services as an alternative. CDCR will provide the appropriate Ramadan and Passover daily meals to allow incarcerated people to observe their religious meal traditions, including appropriately beginning and breaking their Ramadan fast.

Chaplains will conduct individual religious counseling as appropriate while maintaining social distancing, and CDCR is working to provide televised religious services to the population.

**Health care services**

The health and safety of our population is of critical importance to CDCR and CCHCS. While our agency is working together to prepare for and respond to COVID-19, we will continue to provide urgent health care services. To reduce risks to both patients and staff, inmate movement will be minimized. In addition, some specialty and routine care may be delayed as a result of both internal redirections and external closures. All cancelled appointments will be rescheduled as soon as safely possible. Health care staff will continue to see and treat patients through the 7362 process and those with flu-like symptoms will be tested for COVID-19 as appropriate.

On March 20, CCHCS issued COVID-19: Interim Guidance for Health Care and Public Health Providers. This document provides clinical guidelines to health care providers in response to COVID-19 cases in the California prison system. View guidelines distributed to institution staff on March 20, 2020. (https://www.cdcr.ca.gov/covid19/wp-content/uploads/sites/197/2020/03/R_CCHCS-COVID-19-Interim-Guidance-3.19.2020.pdf?label=COVID-19:%20Interim%20Guidance%20for%20Health%20Care%20and%20Public%20Health%20Providers%20&from=https://www.cdcr.ca.gov/covid19/memos/)

CDCR and CCHCS have launched an internal patient registry to assist institutions in monitoring patients with suspected or confirmed COVID-19. The COVID-19 Registry also tracks all individuals by risk.  The registry is updated twice daily and draws from multiple data sources, including the electronic health record system, claims data, and the Strategic Offender Management System to compile risk factor data.  This registry also includes release date information for each individual, in the event that individuals are to be considered for early release during the pandemic. This tool is not publically available as it contains personal health care information protected by medical privacy laws.

**Dental care**

The California Dental Association recommends that all non-urgent dental care be suspended for the next 14 days. Effective immediately and until further notice, dental treatment shall be limited to Dental Priority Classification (DPC) 1 conditions (urgent care). For more information on what qualifies as urgent care, view HCDOM 3.3.5.4 (https://gcc01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fcchcs.ca.gov%2Fwp-content%2Fuploads%2Fsites%2F60%2FHC%2FHCDOM-ch03-art3.5.4.pdf&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C1%7C637207840984544076&sdata=32JMHUCxD1BMpHxflLgoCWd9lkcCakt9D9QfSGWqPFg%3D&reserved=0).

**Specialty care appointments**

In order to reduce risk to patients and staff, all non-essential offsite specialty appointments will be re-scheduled to a later time. Telemedicine appointments will continue at this time.

## Board of Parole Hearings/Parole suitability hearings

All in-person Board of Parole Hearings (BPH) adult parole suitability hearings are postponed for a minimum of 60 days. BPH is working to develop a process for conducting parole hearings by videoconference for all participants to attend, including incarcerated persons, attorneys, commissioners, and victims/victims next-of-kin. That process is expected to be in place by mid-April, per the Governor's Executive Order (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.gov.ca.gov%2F2020%2F03%2F24%2Fgovernor-newsom-issues-executive-order-on-state-prisons-and-juvenile-facilities-in-response-to-the-covid-19-outbreak%2F&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d 7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C1%7C637207840984544076& sdata=bKbYLUqwNc3%2FP9%2Fw%2FuK04kBuOYlR6LjFP%2F6H6uBRQrc%3D&reserved=0).

Board of Juvenile Hearings proceedings will take place as scheduled via video conference only. Go to the Board website for more information. https://www.cdcr.ca.gov/juvenile-justice/juvenile-parole-board/ (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.cdcr.ca.gov%2Fjuvenile-justice%2Fjuvenile-parole-board%2F&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d7d1 27c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C0%7C637207840984554073&sdat a=i%2FP%2F76ZpNHbLKipVcF4iFzbJi7mkldzbFlkQsk3rP3k%3D&reserved=0)

## Division of Adult Parole Operations

The Division of Adult Parole Operations (DAPO) is committed to the safety of the community, staff, and those in its care. Given the increased risk associated with the use of mass/public transportation and those under parole supervision deemed a high-risk population (older adults and those with known serious chronic medical conditions), DAPO will make some operational changes to support both staff and the individuals under their care and supervision, including suspending lobby traffic except for initial parole interviews and emergencies, and suspending office visits for those age 65 and older and/or with chronic medical conditions.

All parolees' conditions of parole remain in place, with the exception of the items listed above. DAPO administrators and supervisors will assess all measures being implemented and adjust, modify, or waive required specifications as appropriate. Any questions parolees may have related to COVID-19 prevention efforts should be directed to their Parole Agent. Learn more here (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.cdcr.ca.gov%2Fcovid19%2Fdivision-of-adult-parole-operations%2F&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708 d7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C0%7C637207840984554073 &sdata=oKcA3WPjx9T3e8uMvYuzuiXyJEiAi%2BW7VevmFtxaCPQ%3D&reserved=0).

## Modified Community Correctional Facilities and Community Reentry Programs

CDCR's in-state contract facilities are conducting verbal screenings of staff and participants who enter the facilities. Those attempting to enter one of these facilities are required to verbally respond if they currently have symptoms of a respiratory illness.

Visiting has also been halted at these facilities until further notice.

CDCR is committed to continuing education programs and limiting the impact our COVID-19 response has on positive rehabilitative programming for our Community Reentry Programs. Rehabilitative programs at the reentry facilities will continue with modifications made to class sizes to encourage social distancing, with some potential program closures.

At this time, participants are generally restricted from leaving the facilities outside of mandated legal reasons, urgent medical needs, if they are employed in the community, or for critical reentry services related to those within 30-45 days of release.

Participants age 65 or older are only eligible for passes to go out in the community for emergency situations only.

Visiting has been canceled at the Community Prisoner Mother Program (CPMP) in line with recommendations from public health officials and the cessation of visiting at CDCR locations statewide. This includes scheduled off-site visits for children residing at CPMP with their mothers. Family members may continue to drop approved items such as diapers, wipes, baby food and baby snacks (for children under 1), during normal visiting hours even during closure. CPMP staff are diligently working to ensure the mothers' and children's needs are met and supplies are readily available with a surplus where needed. They are working closely with community healthcare providers and medical staff at nearby California Institution for Women to keep all required appointments for mothers and children.

**Division of Juvenile Justice**

While physical visits have been suspended, beginning March 26, the Division of Juvenile Justice (DJJ) will be providing free Skype virtual video visits to youth for approved visitors, starting at the Pine Grove Youth Conservation Camp in Amador County. DJJ is working to provide this service to youth at other facilities soon. Directions for approved visitors to download the free Skype for Business App on their smartphone or computer will be posted on the DJJ homepage (https://www.cdcr.ca.gov/juvenile-justice/) in English and Spanish. There is no cost to create an account. The Skype application and a valid email address is all that is needed.

Directions will be posted around the DJJ facilities so that youth can share the information with their support system.

Effective March 18, no volunteers will be allowed to enter DJJ until further notice. All volunteer programs are postponed. Innovative Grant programs may continue, if grantees are able. When entering, all staff, volunteers and visitors will be given the same verbal health screenings in place at other state institutions.

The California Education Authority is continuing high school classes for youth in DJJ, while practicing social distancing (https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Gathering_Guidance_03.11.20.pdf).

We also encourage letter writing as a way to stay in touch and are increasing the number of postage stamps available to youth.

Board of Juvenile Hearings proceedings will take place as scheduled via videoconference only. Go to the Board website for more information: https://www.cdcr.ca.gov/juvenile-justice/juvenile-parole-board/ (https://www.cdcr.ca.gov/juvenile-justice/juvenile-parole-board/)

For the latest on steps CDCR is taking to protect youth from COVID-19, visit the DJJ webpage here (https://www.cdcr.ca.gov/juvenile-justice/).

## Construction projects

On March 20, 2020, CDCR suspended large-scale construction projects located within the secure perimeter of CDCR facilities. Limited construction activities are continuing as necessary to make work areas safe and protect construction areas from deterioration during the suspension. While the construction industry overall has been identified as an essential business/service under Executive Order E-33-20, the interest of CDCR as a construction owner is unique. Construction occurring at facilities under CDCR jurisdiction impacts the health and safety of thousands of employees and persons incarcerated in youth and adult institutions. The action to suspend large-scale construction projects was consistent with earlier preventive actions, such as the cancelation of visiting and volunteer entries statewide, and seeks to reduce and minimize the number of non-CDCR employees that enter CDCR institutions on a daily basis. These decisions are not made lightly, and are taken with the safety of all who work in, live in, and visit our facilities in mind.

## Peace officer hiring and academies

Written peace officer exams are suspended until April 6, 2020. The health and safety of our staff, cadets, and candidates is a top priority. CDCR is taking all the available precautions to ensure a safe and healthy environment. These precautions include regular office cleanings, hand sanitizer/gloves when applicable, reduced testing and physical fitness group sizes, and social distancing.

The Basic Correctional Officer Academy (BCOA) that is currently underway has been accelerated to allow graduation to move from May 1, 2020, to April 7, 2020. The BCOA scheduled to start Tuesday, March 24, will be postponed for at least 30 days.

## Population communication

CDCR Secretary Ralph Diaz will be releasing regular video message updates directly to the incarcerated population. You can see the latest message from March 25 here (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fvimeo.com%2F400758862%2F824c4cf567&data=02%7C01%7CDana.Sim as%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d7d127c0c3%7C0662477dfa0c4556a8f5c3b c62aa0d9c%7C0%7C1%7C637207840984564065&sdata=rGtZkMRcnQN1Y5CBJdpiW27scQ3M LaG3NKEzNHib0PA%3D&reserved=0).

Wardens, captains, public information officers, and other institution executives have been instructed to meet with their respective Inmate Advisory Councils either individually or in small groups where social distancing can be maintained. This is to encourage an open line of communication between the incarcerated population and the institution leaders in charge of their care in order to quickly and efficiently meet their needs.

To keep members of our population informed, we have created and distributed fact sheets and posters in both English and Spanish that provide education on COVID-19 and precautions recommended by CDC, which expand upon those advised during cold and flu season. We have also begun streaming CDC educational videos on the CDCR Division of Rehabilitative Programs inmate television network and the CCHCS inmate health care television network. Learn more here (https://gcc01.safelinks.protection.outlook.com/? url=https%3A%2F%2Fwww.cdcr.ca.gov%2Fcovid19%2Fpopulation-

communication%2F80data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100
f6708d7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C0%7C63720784098456
4065&sdata=LQUKzZExIzF0YcnEHrTdezSZLSUkAA%2FulwfKSVIIDYI%3D&reserved=0).

Additionally, we are providing regular department updates regarding COVID-19 response to the Statewide Inmate Family Council and all institutional Inmate Family Councils who serve the family and friends of the incarcerated population to ensure they are aware of the steps the department is taking to protect their loved ones housed in our institutions.

**Communication and guidance to staff**

CDCR Secretary Ralph Diaz will be releasing regular video message updates directly to CDCR staff. You can see the latest message from March 25 here (https://gcc01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fvimeo.com%2F400756098%2F8d895b053b&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C1%7C637207840984574058&sdata=YiKdJAZUjC0D8l8k8dzGDVtRisPci%2B8QocgA8OCfLKs%3D&reserved=0).

Federal Receiver J. Clark Kelso released a video message (https://www.cdcr.ca.gov/insidecdcr/2020/03/31/message-to-all-cdcr-cchcs-staff-from-receiver-j-clark-kelso/) to all CCHCS and CCHCS staff.

Only in-service training (IST) for range, weapons, and chemical agents qualifications and training shall continue as long as social distancing can be achieved. All other IST has been postponed until July.

We have worked continuously to keep staff informed of the evolving situation, including creating internal and external webpages with health-related information from CDC and California Department of Public Health on how they can protect themselves against COVID-19. We have also provided staff with California Department of Human Resources (CalHR) updates on personnel and work-related questions specific to the COVID-19 issue.

CDCR and CCHCS care for the health and wellness of its workforce and have been working to accommodate those who have been impacted by this evolving situation. We will continue to work diligently with CalHR and labor organizations on how we can best keep our workforce protected and provide for the safety and security of our institutions.

For more employee resources related to COVID-19, see our webpage here: https://www.cdcr.ca.gov/covid19/information/ (https://gcc01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.cdcr.ca.gov%2Fcovid19%2Finformation%2F&data=02%7C01%7CDana.Simas%40cdcr.ca.gov%7Cb289a7c86e924c100f6708d7d127c0c3%7C0662477dfa0c4556a8f5c3bc62aa0d9c%7C0%7C0%7C637207840984574058&sdata=CtPoh6zi3sKjB5BJ8ZhWCIZZRWfvC8B9zqL%2Ffr6ZmMQ%3D&reserved=0).

# E X H I B I T   D

# CDCR/CCHCS COVID-19 Employee Status

**Updated 5:10 p.m. Tuesday, March 31, 2020**
*Staff information is self-reported*

| Locations | Staff Confirmed |
| --- | --- |
| California Health Care Facility | 1 |
| California Institution for Men | 11 |
| California State Prison, Sacramento | 4 |
| CDCR/CCHCS Worksite Location—Riverside County | 1 |
| Folsom State Prison | 1 |
| Northern California Youth Correctional Center | 1 |
| Richard A McGee Correctional Training Center—Galt | 1 |
| Salinas Valley State Prison | 1 |
| San Quentin State Prison | 1 |
| Substance Abuse Treatment Facility and State Prison, Corcoran *please note this is a separate facility from Corcoran State Prison* | 1 |
| Wasco State Prison | 2 |
| TOTAL | 25 |