DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
RITA LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

MICHAEL W. BIEN – 096891
ERNEST GALVAN – 196065
LISA ELLS – 243657
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**THREE JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM,<br><br>　　　　Defendants. | Case No. C01-1351 JST<br><br>**THREE JUDGE COURT**<br><br>**SUPPLEMENTAL DECLARATION OF THOMAS HOFFMAN IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION** |

[35201053.1]

I, Thomas Hoffman, declare:

1. I provide this declaration in response to the State's discussion of public safety in their opposition brief filed on March 31, 2020, and the factual assertions in the Declaration of Jeffrey Green filed the same day.

2. During my time as DAPO Director, I worked with Mr. Green, and assigned Mr. Green to sensitive, high level administrative assignments, mentored him and encouraged him to promote within the Division leadership structure.  He served as part of my executive management team.  I must, however, respectfully disagree with the way his March 31, 2020 declaration characterizes my statements about the usefulness of the California Static Risk Assessment.  In addition, while Mr. Green's lengthy description of the current pre-parole process (the design of which I managed as Director) appears accurate as to the steps involved, it is presented in a way that gives the impression of a cumbersome process that cannot possibly accommodate the expedited releases necessary to prevent a massive COVID-19 outbreak in the prisons.  In my opinion, the process that we designed is not that cumbersome, but rather is flexible enough to accommodate a release program that includes not only the persons within 60-days of release that are in the State's current plan, but that could include people within 90, 120 and 180-days of release.  Finally, Mr. Green's description of the capacity of DAPO's supervision and programming resources leaves out the important and necessary option of reducing DAPO's caseload by discharging persons who are being unnecessarily maintained on parole with no benefit to public safety.  Below I will address each of these items in turn.

**SIGNIFICANCE OF RISK ASSESSMENT SCORES OF CURRENT CDCR POPULATION**

3. Mr. Green's declaration and the State's brief accuse me of misunderstanding the California Static Risk Assessment (CSRA) tool, its purpose and its limitations.  This is a strange accusation considering that the shift to a risk and needs focused supervision model, supported by an evidence based, validated risk assessment instrument that was implemented in way that was consistent with the findings and recommendations of

academic experts and practicing professionals all across this nation was first pursued in DAPO during my tenure. Furthermore, the working relationship and collaboration with the UCI Center for Evidence Based Corrections (who ultimately constructed the CSRA) was significantly strengthened and expanded during my tenure.  To this day, I am in routine contact with the leadership of the Center.  Pre-Parole Planning and COMPAS were both programs that I personally oversaw, encouraged and supported during my tenure.  Contrary to the declaration and brief, I did not say in my declaration that CDCR should simply release people based CSRA scores, or that CSRA scores are perfect predictions of whether a person will present a danger to public safety.

4. In Paragraph 8 of my principal declaration I refer to the CDCR's publicly released recidivism statistics to show the correlation between age and recidivism as measured by new convictions.  The point of this assertion is that the group most vulnerable to COVID-19 is also the group that tends to have the lowest recidivism rates, as measured by new convictions within three years of release.  The State appears to be asking the Court to ignore this data based on the assertion in Mr. Green's declaration that some people re-offend without getting caught, and therefore do not show up in the statistics on which the risk assessments are based.  This misunderstands the use of recidivism data to measure the differential in risk across demographic groups.  The comparison between older and younger groups is valid regardless of whether some people in both groups also offend without getting caught.  The purpose of risk assessment is to get useful information regarding the predictive power of factors like age in making decisions, as Mr. Green acknowledges in his declaration with regard to levels of parole supervision.  (Green Decl. Para. 50.)  The same thing applies to the CDCR in-custody population—the risk assessment tool shows that some segments of the population present a lower risk than other segments, especially based on age as the reports CDCR publish clearly confirm.

5. Nowhere in my principal declaration did I assert that CDCR should release people based on CSRA score alone.  On the contrary, as Mr. Green's declaration points out, CDCR has many more pre-release tools at its disposal, many of which I oversaw the

implementation of for this very reason, and in routine use to reduce risks to public safety presented by the 38,000 people currently released per year, tools that can also be used to reduce public safety risks presented by expedited releases.

**PRE-RELEASE PROCESS**

6. I led the design of the pre-release process that Mr. Green describes in Paragraphs 3-40 of his declaration. I am aware that the process has evolved since then, but the basic outline is the same. I understand and empathize with Mr. Green's "serious concerns" about the impact of expedited releases on this process. I note that Mr. Green, however, did not say that the process is not up to the task of handling expedited release, just that he has "serious concerns." The process that Mr. Green describes is not so cumbersome or inflexible that it cannot handle the expedited pace of releases necessary to prevent a massive COVID-19 outbreak inside the prisons.

7. The risk assessment step, which Mr. Green places at 270 days before parole, is based on survey tools that were designed to be simple to administer. As Mr. Green states, the CSRA is entirely automated, and the STATIC 99R takes up to 1 ½ hours to complete. As Mr. Green states, however, the STATIC 99R is used only for male sex offenders, along with the version for female sex offenders mentioned in Paragraph 7 of this declaration.

8. The Criminogenic Needs Assessment at between 180-210 days before parole uses the COMPAS tools that I brought into the department during my tenure. This is a valuable tool for assessment the parolee's need for services on release, and as Mr. Green states it takes about 1 ½ hours to complete.

9. The Release Program Study at between 180-210 days before release was already in place during my tenure at DAPO and provides a summary for the supervising agent. As Mr. Green states, it takes about 1 hour to complete.

10. The Transitional Case Management Program (90-120 days before parole) was expanded significantly during my tenure at DAPO and is important for connecting

parolees with available public benefits.  Mr. Green does not provide any time estimates for this process.  I estimate 1½ hours for each parolee.

11.  As Mr. Green states, the Out of State Transfer process (90-120 days before parole) is suspended during the COVID-19 emergency, but even if this casework is still happening, his estimate of about 1 hour per case appears accurate.  Most parolees, however, are not candidates and therefore would not require this work, even without the current suspension.

12.  Direct Placement of parolees into DAPO funded services (30-90 days before release) does not apply to all parolees, as DAPO does not provide such services to all parolees.  For those few fortunate people to whom DAPO does offer such services, Mr. Green's estimate of 3 hours of work per case seems plausible, though somewhat high.

13.  Prerelease Video Conferencing (30-90 days before release) is a new process as part of the realignment of supervision from parole to Post Release Community Supervision.  Although this process was not in place during my tenure, the estimate of 1 hour seems appropriate.  It only applies to persons being released to county supervision.

14.  The service of parole conditions and reporting instructions (30-90 days before release) has been a standard part of the pre-release process, and the estimate of 1 hour appears appropriate.

15.  All these workload estimates, (excluding the suspended Out of State Transfer process) total 6.5 hours for persons being released without any Direct Placement to DAPO funded services, and 9.5 hours for persons with Direct Placement.  For persons already within 180 days of release, the first three steps, or 4 hours of workload, have already been done, leaving a 2.5-hour workload for non-Direct Placement parolees, and 5.5 hours for Direct Placement parolees.  It is my opinion that such an additional workload is feasible and worthwhile to prevent a massive outbreak of COVID-19 in the prisons, and the resulting impact such an outbreak would have in the larger community.  According to its website, CDCR is already deploying "on-site multidisciplinary teams at each institution to expedite the pre-release coordination."  *See*

https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/. In addition, CDCR and DAPO have publicly announced the creation of strike teams to work overtime on this process. *See* https://www.cdcr.ca.gov/covid19/frequently-asked-questions-for-plan-on-expedited-release-and-increased-physical-space-within-state-prisons/.

**SUPERVISION CAPACITY**

16. Mr. Green describes the limitations of rehabilitative services and housing for parolees, and expressed concerns about overtaking resources. There is a key step that the State can and should take to make more resources available for parole supervision, and at the same time bring California into line with the evidence and research-based practices in parole supervision. I have been working with criminal justice stakeholders for several years to bring about a necessary reduction in the California parole caseload. California currently wastes a significant portion of its supervision resources on parolees who have been crime and violation free for significant periods, and for which the public sees no public safety benefit from continued supervision. In fact, the waste of supervision resources on long-term, low-risk parolees harms public safety by diverting resources that could be better spend on newly released individuals, and high-risk individuals already on parole.

17. DAPO can and should immediately audit the existing parole population to identify all persons who can be immediately discharged from parole. This population reduction will allow agents to focus on newly released people. Recent estimates are that many people currently under DAPO control will meet this threshold and therefore could be discharged. Reducing the parole population in safe and evidence-based manner is necessary so that DAPO will have the staffing and program capacity to effectively evaluate, supervise and provide services to persons released under a COVID-19 plan.

18. Research demonstrates that persons who have been violation and crime free for the first six months of supervision present an extremely low risk for future offenses. DAPO can and should immediately discharge from parole all persons who have served the

initial 180 days without a violation or the commission of a new offense, unless the person does not consent to discharge, or unless DAPO can objectively demonstrate that the parolee should be retained on parole based on current behavior showing a likelihood that they parolee will be involved in a violent crime absent continued supervision and monitoring. Discharging parolees from supervision at 180 days is already authorized under Section 3001 of the Penal Code. This release policy is based on evidence that persons who are violation-free and crime free during the initial six months are very unlikely to recidivate, regardless of commitment offense. This includes persons released from life sentences. The evidence shows that persons paroled from life sentences are more likely to successfully reintegrate into society than all other populations released from prison, due in part to their age. This fact is supported by the recidivism data CDCR itself publishes.

19. Discharging compliant parolees would free up resources not only for expedited releases, but also for reducing agent caseloads, and allowing a transition from the current "specifications" model of parole supervision to an individual casework model. The "specifications" model simply encourages parole agents to "check the boxes" for a certain number of contacts, drug tests, etc. Conversely, the casework model encourages the parole agent to thoughtfully develop a supervision strategy that is individual specific and evaluated on the basis of the strategies ability to improve the likelihood the person will successfully reintegrate into society, not in the swift and harsh recognition of his/her missteps and failures as is so often the case today. Evidence shows that personalized reintegration strategies built around a reward and incentive-based program that are strengthened by a shared commitment to develop informed relationships between agents and people under their control significantly improves outcomes and promotes public safety.

20. Mr. Green expresses concern about the county probation caseloads for persons released to county supervision. Counties, like DAPO, are also carrying too many people on continued supervision well past the point of any public safety benefit. County

probation departments can reduce their caseloads by also discharging from supervision all persons who have served the initial 180 days without a violation or new crime unless the person does not consent to discharge, or unless the supervising agency can objectively demonstrate that the person should be retained on supervision based on current behavior showing a likelihood that they will be involved in a violent crime absent continued supervision and monitoring. Discharging persons from county supervision is already authorized by Section 3456 of the Penal Code. Governor Newsom's proposed budget for the next fiscal year already includes significant probation reform, to include reducing the terms of probation for convicted offenders. *See* http://www.ebudget.ca.gov/2020-21/pdf/BudgetSummary/PublicSafety.pdf, at pages 141.

21. CDCR and DAPO can take additional steps to ensure successful expedited releases. For example, CDCR can and should modify the requirement that newly released prisoners must report to the parole office within 48 hours. This requirement does not work when prisoners must travel across the state, during times of reduced mass transit service. Instead reporting times should be set based on the distance the parolee must travel and provide a realistically achievable mechanism (state funded transportation to the DAPO office) that this requirement can be realistically met by the person being released from an institution. Ensuring people safely and promptly are united with the Agent in charge of their supervision will improve outcomes and public safety in our communities. DAPO's COVID-19 announcement addresses changes to routine reporting requirements, but not this initial 48-hour reporting deadline. *See* https://www.cdcr.ca.gov/covid19/division-of-adult-parole-operations/. It is my opinion that DAPO has the ability to address this challenge, and has already done so, as shown by the transportation section of its recently updated website page on expedited releases. *See* https://www.cdcr.ca.gov/covid19/frequently-asked-questions-for-plan-on-expedited-release-and-increased-physical-space-within-state-prisons/

22. CDCR and DAPO can also take steps to reduce the risks of homelessness by increasing the availability of housing subsidies, and replacing the "gate money" frozen at

$200 since the 1970s with a larger and more realistic amount delivered in ways that channel the money toward housing.

23. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Folsom, California this 1st day of April, 2020.

*/s/ Thomas Hoffman*
Thomas Hoffman

1 | $200 since the 1970s with a larger and more realistic amount delivered in ways that
2 | channel the money toward housing.

23. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Folsom, California this 1st day of April, 2020.

*Thomas Hoffman* (signature)
Thomas Hoffman