## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
     **Plaintiffs,**

     **vs.**                          No. 2:90-CV-0520 KJM DB

GAVIN NEWSOM, et al.,
     **Defendants.**


**SPECIAL MASTER'S REPORT ON THE CURRENT STATUS OF *COLEMAN* CLASS MEMBERS' ACCESS TO INPATIENT CARE IN THE DEPARTMENT OF STATE HOSPITALS**


On March 27, 2020, during a supplemental first quarterly telephonic status conference, the court directed the Special Master to file a status update on the transfer of *Coleman* class members into *Coleman* beds in Department of State Hospitals (DSH) facilities.  ECF No. 6546. In accordance with the court's order, the Special Master submits this report to the court.  At the time of this writing, there were eight inmates who had tested positive for the novel coronavirus (COVID-19) in California Department of Corrections and Rehabilitation (CDCR) prisons, six at California State Prison, Los Angeles County, one at California Institution for Men (CIM), and one at North Kern State Prison.[1]  CDCR reported 25 staff members had tested positive, the highest number being at CIM where there were 11 reported cases.[2]  DSH reported that 11 patients had been tested, five were pending results, and there were no confirmed cases.  For staff,

---

[1] Source: CDCR COVID-19 Tracker: https://www.cdcr.ca.gov/covid19/population-status-tracking/

[2] As of March 31, 2020, the following CDCR institutions reported staff who had tested positive for COVID-19: California State Prison/Sacramento (CSP/Sac), four cases; Folsom State Prison and Wasco State Prison, two cases; and California Health Care Facility; Salinas Valley State Prison; San Quentin State Prison; California Substance Abuse Treatment Facility and Valley State Prison each had one case.  The remaining staff cases were reported at: CDCR/CCHCS Worksite Location—Riverside County, Northern California Youth Correctional Center, and Richard A McGee Correctional Training Center—Galt with one case each.  Source: CDCR Website: https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/

DSH reported that one staff member had passed away after contracting the virus, a medical student had tested positive, and there were two additional self-reported cases that they had not yet confirmed with the California Department of Public Health.

**BACKGROUND**

Witnessing the dramatic worldwide spread of COVID-19 during the first months of the new year, the Special Master maintained frequent contact with both the *Coleman* parties and high-level CDCR officials. As a result of the rapidly developing situation and these consultations, the Special Master suspended all in-person *Coleman* monitoring activities, effective March 14, 2020, due to concerns related to the COVID-19 outbreak. The Special Master provided an update to the court on the status of the Twenty-Eighth Monitoring Round and mental health headquarters monitoring on March 20, 2020. ECF No. 6512.

During the first quarterly telephonic status conference held on March 20, 2020, the court directed the Special Master to convene a COVID-19 Pandemic Task Force ("COVID-19 Task Force") to work on issues affecting class members' access to mental health care. ECF No. 6513. The court also directed defendants to submit their draft plan for mental health programming during the COVID-19 pandemic by 4:00 p.m. that same day. *Id*. All other agenda items scheduled for discussion were deferred until March 27, 2020. *Id*.

Since its formation on March 20, 2020, the COVID-19 Task Force has held a total of eight large group meetings. Also held were three smaller group meetings. In addition to the Special Master and members of his staff, meeting participants included counsel for the parties and representatives from CDCR, DSH, and the Governor's office. A representative from the *Plata* Receiver's office and the *Armstrong* Court Expert were also in attendance.

One of the ongoing topics of discussion during COVID-19 Task Force meetings has been the issue of *Coleman* class member access to DSH hospitals.[3]  On March 16, 2020, the Special Master received a phone call from the director of DSH, Stephanie Clendenin, notifying him that DSH would be suspending admissions of *Coleman* class members to their hospitals.  A directive was subsequently issued suspending admissions and stating that DSH would not be discharging (i.e, returning to CDCR) any *Coleman* class members currently in DSH custody until the suspension was lifted "unless an emergency discharge is required for patients who cannot be safely maintained in DSH's unlocked dorm setting."  The suspension would remain in effect for 30 days, unless extended by the DSH director.  (*See*, Exhibit 1)

On March 17, 2020, chief legal counsel for DSH, Christine Ciccotti, notified plaintiffs' counsel, Michael Bien, about the DSH directive via email.  (*See*, Exhibit 2)  That same day, there was an exchange of emails between the two related to plaintiffs' questions regarding the current number of class members in DSH facilities, the rationale for DSH's decision, their admission and discharge policies for other classes of patients, and DSH's plans for patients with parole dates occurring within 30 days, among other issues. (See, Exhibit 3)

On March 17, 2020 and March 18, 2020, the Special Master participated in meetings by teleconference with Department of State Hospitals (DSH) Director Stephanie Clendenin and members of her staff.

On March 19, 2020, plaintiffs filed a Notice of New CCHCS/CDCR Medical Operations Procedures Related to COVID-19 Pandemic wherein they notified the court of the DSH directive suspending admissions and discharges of *Coleman* class members.  ECF No. 6511.  In their filing, plaintiffs noted that the March 18, 2020 memorandum that had been issued by

---

[3] *Coleman* class members are placed in DSH facilities pursuant to California Penal Code Section 2684.

CCHCS/CDCR, "COVID 19 Pandemic – Medical Operations," provided—in direct contrast to the DSH directive—that transfers to outside hospitals would continue for class members who required a higher level of medical care to "prevent or reduce the risk of morbidity and mortality."

On March 21, 2020, Ms. Ciccotti sent the Special Master and plaintiffs' counsel an email indicating that the Executive Order issued by Governor Newsom that day granted the director of DSH the authority to close admissions to *Coleman* class members.  (*See*, Exhibit 4)

Upon questioning by the Special Master during a COVID-19 Task Force meeting on March 24, 2020, Ms. Ciccotti stated that while admissions to DSH facilities continued to be suspended for *Coleman* class members, if a situation arose where CDCR was not meeting inpatient care transfer timelines, DSH would consider the admission of *Coleman* class members. She further stated that discharges of class members from DSH facilities also remained suspended unless there was "good cause," and that DSH was honoring class member parole dates.  This position was a softening from that set forth in DSH's March 16, 2020 directive, which stated that all admissions and discharges of *Coleman* class members would be suspended for 30 days, with the exception of discharges deemed an emergency for safety reasons.

DSH continued however to accept Offenders with a Mental Health Disorder (OMHD) from CDCR.  Inmates who meet OMHD criteria are mandated by California state law to receive mental health treatment at DSH hospitals when imposed by the Board of Parole Hearings as a special condition of parole.  According to counsel, DSH's position was that they were required by law to continue to accept OMHDs.

 As a result of the somewhat increased flexibility DSH now appeared to be showing in their position towards *Coleman* class member admissions and discharges, during a teleconference with defendants' counsel on March 26, 2020, the Special Master asked Ms.

Ciccotti to submit DSH's position in writing to ensure accuracy in his report to the court on the matter.  Later that same day, Ms. Ciccotti sent the Special Master an email clarifying DSH's position. (*See*, Exhibit 5)  In support of the decision to suspend admissions and discharges of *Coleman* class members, Ms. Ciccotti cited the March 21, 2020 Executive Order issued by Governor Newsom granting the director of DSH the authority to "issue directives waiving any provision or requirement of the Welfare and Institutions Code [and] any provision or requirement of the Penal Code that affects the execution of laws relating to care, custody, and treatment of persons with mental illness committed to or in the custody of the State Department State Hospitals."[4]

However, in a softening of DSH's position that all admissions of *Coleman* class members, without exception, would be suspended for 30 days, Ms. Ciccotti added that, "[i]f CDCR is unable to provide inpatient treatment to its inmates, DSH will collaborate with CDCR on solutions to those issues, and will carefully consider transferring clinically and custodially appropriate inmates, for whom CDCR can ensure they have been in environments determined to be as safe as possible from exposure to COVID-19."

During the supplemental first quarterly telephonic status conference held on March 27, 2020, the Special Master updated the court on the discussions regarding class member access to inpatient care in DSH facilities and the uncertainty that remained as a result of DSH's shifting position and what the implications were for *Coleman* class members' access to inpatient care in DSH facilities.  In response, the court directed the COVID-19 Task Force to continue to meet to address the issue and directed the Special Master to submit a report on those efforts.

---

[4] Cal. Executive Order N-35-20 (March 21, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.21.20-EO-N-35-20-text.pdf

The Special Master submits this report to update the court on the current status of *Coleman* class members' access to inpatient care in DSH hospitals during the COVID-19 pandemic.

## COVID-19 TASK FORCE EFFORTS ON ACCESS TO INPATIENT CARE IN DSH FACILITIES FOR *COLEMAN* CLASS MEMBERS

The next scheduled COVID-19 Task Force meeting following the supplemental first quarterly telephonic status conference occurred on March 28, 2020. Among the agenda items was access to higher levels of care for *Coleman* class members. CDCR provided updated census and waitlist data for the inpatient facilities and programs. DSH maintained its position that transfers of CDCR patients to DSH hospitals were suspended to mitigate the risk of COVID-19 infiltrating the hospitals. However, DSH again raised the possibility of transferring individual *Coleman* class members to DSH hospitals in extraordinary (and ill-defined) circumstances or in the event that there were no beds available in CDCR's psychiatric inpatient programs (PIPs) and indicated that CDCR and DSH were developing a clinical tool to determine the risk factor. DSH again reported that OMHDs were the only CDCR transfers still being accepted by DSH.

On March 30, 2020, the COVID-19 Task Force met to discuss, among other issues, access to higher levels of care, quality of care in the PIPs, updated census and waitlist data, and admissions and discharges from inpatient beds. CDCR reported that they continued to work on social distancing and the effect this had on out-of-cell and yard time. It was reiterated that any transfers to DSH would be considered on a case-by-case basis, but admissions remained suspended at present. Clarity was never provided regarding the criteria for a case-by-case determination. CDCR indicated that some transfers to inpatient care had already exceeded required timelines and that they would be classifying those instances as exceptions due to the COVID-19 pandemic.

The Special Master's experts raised concerns about the already inadequate treatment being provided in the PIPs and stated that any reduction in staff or services would exacerbate those problems.  Specific issues related to CSP/Sac that were discussed included programming in the locked units and referrals to inpatient beds.  CDCR reported that some units were quarantined, and they were also exploring adding unlicensed crisis beds.  CDCR was unable to provide much of the data concerning staffing, treatment hours and admissions and discharges and stated they would work to gather that information for the parties.

On March 31, 2020, the COVID-19 Task Force met to review the agenda from the preceding meeting and present any information not previously provided at that time.  DSH reported that they did not have a mechanism in place for the public to track COVID-19 cases in their facilities but reported no confirmed patient cases.  DSH was unable to provide the group with a protocol when a provider tested positive for the virus.  DSH was asked to provide copies of the updated pandemic, infection, and respiratory plans that were all referenced on DSH's website.  DSH reported that they were in the process of creating space for patient isolation if needed.  CDCR and DSH indicated that they were working collaboratively to develop a clinical tool to be used in determining if CDCR patients were safe to transfer to a DSH facility and would provide it to the Special Master and plaintiffs' counsel upon completion.  CDCR represented that they would be providing additional data on staffing and out-of-cell time for the PIPs the following day.

## IMPEDIMENTS TO INPATIENT CARE AT THE ACUTE AND INTERMEDIATE LEVELS OF CARE FOR *COLEMAN* CLASS MEMBERS

In the extensive history offered by the Special Master in his 2016 monitoring report on inpatient care, which need not be repeated here, he found that defendants needed to "develop enduring strategies and policies that will create and sustain a regular and effective process of

identifying those inmates in need of inpatient care, and who, once identified for such care, do not have to wait for long periods before actual placement into appropriate treatment programs" as part of the lasting solution to conclude the remedial process.  ECF No. 5448 at 24.

Access to DSH beds is critical to achieving any lasting solution and concluding the remedial process in this case.  As the Special Master emphasized in his 2018 monitoring report on inpatient care, "timely access to beds for all inmates who meet clinical and custodial requirements for placement at DSH-Atascadero, DSH-Coalinga, and PSH, is essential to the remedial process in the *Coleman* case."  ECF No. 5894 at 22.

<u>DSH's Suspension of Admissions of *Coleman* Class Members</u>

As reported above, DSH closed admissions of *Coleman* class members to its hospitals on March 16, 2020, shutting off access to three of the more appropriate therapeutic milieus (DSH-Atascadero, DSH-Coalinga, and PSH) available to CDCR's patients who are clinically and custodially eligible for placement in the hospitals.

During meetings of the COVID-19 Task Force, notwithstanding multiple requests by the Special Master, his experts, and plaintiffs' counsel, it was never clearly stated by either CDCR or DSH that the decision to close DSH hospitals to members of the *Coleman* class was a joint decision developed by the two state agencies in consultation with each other.

Moreover, the two state agencies have not provided to the Special Master and plaintiffs' counsel a joint plan to collaboratively manage access to DSH hospitals during the COVID-19 pandemic.  As previously stated, during a meeting of the COVID-19 Task Force on March 31, 2020, defendants agreed to share with the Special Master and plaintiffs' counsel a clinical tool that the two agencies would use to make decisions regarding admissions to DSH hospitals on a case-by-case basis during the COVID-19 pandemic.

On April 1, 2020, defendants' counsel provided the Special Master and plaintiffs' counsel, via email, a written statement from DSH's medical director, Dr. Katherine Warburton, stating that it was her medical opinion "that the very real risk of widespread morbidity and mortality in our psychiatric population far outweighs risks of sheltering and caring for psychiatric acuity in place, except in extraordinary circumstances." (*See*, Exhibit 6) In addition, Dr. Warburton stated that it was also her medical opinion "that all movement within vulnerable institutions should be severely limited, including discharges" as a means of flattening the curve and slowing the spread of COVID-19 in their facilities.

Regarding future action, Dr. Warburton stated that once the extent of the of COVID-19 in both agencies' institutions was understood, she was prepared to work with Dr. Joseph Bick, Director, Division of Health Care Services, CDCR, and, Dr. Michael Golding, Statewide Chief of Psychiatry, CDCR to "open up a mutual process that includes pre/post transfer quarantine in order to eventually safely transfer patients."

Defendants' counsel also provided attached to the April 1, 2020 email the "CDCR-DSH COVID Clinical Transfer Tool" which had been discussed by Drs. Warburton and Bick, indicating it may evolve with the pandemic situation. (*See*, Exhibit 7)  The tool inquired about a patient's current symptomology and any fever during the prior seven days, whether the patient had access to adequate mental health services in the current location, whether the patient was transferring from an institution where staff or patients had tested positive, and in the case whether the patient had potentially been exposed to the individual testing positive, how long since exposure may have occurred, and when CDCR was notified regarding the individual who tested positive.  There were also additional inquiries regarding whether the patient had been in quarantine or isolation or had any underlying medical conditions which needed to be listed.

With April 16, 2020 fast approaching (14 days from the date this report) when the suspension will end, "unless extended by the Director of the Department," what is sorely missing and requires urgent attention by DSH and CDCR is their failure or refusal to offer  a plan to the Special Master and plaintiffs' counsel that will safely permit admissions after administration of appropriate COVID-19 testing/screening and/or quarantine (if clinically indicated) to the already identified patients who are eligible for admission to the hospitals today.

<u>Census and Pending Placements in Acute and Intermediate Care</u>

The discussion below shows while none of the acute or intermediate inpatient programs have yet reached full capacity, all are near capacity and within reach of running out of beds. While CDCR reported on March 30, 2020 that only three acute referrals and three intermediate referrals were out of compliance, experience shows that the numbers of available beds can reduce dramatically and the number of patients out of compliance can rapidly increase within a short period.

Today, CDCR's male low custody intermediate inpatient programs, where patients eligible for placement in DSH are most likely to be housed, currently have more patients pending bed availability/endorsements than there are available beds in those CDCR programs.  It is unclear that the normal rate of discharge will prevent CDCR from running out of beds within a short time frame if DSH remains closed to admissions after April 16, 2020.

At the request of the *Coleman* COVID-19 Task Force, on March 31, 2020, defendants provided their "Psychiatric Inpatient Programs Census and Pending List Report" dated March 30, 2020. (*See*, Exhibit 8) The report covered CDCR's PIPs at California Medical Facility (CMF-PIP), California Health Care Facility (CHCF-PIP), Salinas Valley State Prison (SVSP-

PIP), and DSH's Atascadero State Hospital (DSH-Atascadero), and Coalinga State Hospital

(DSH- Coalinga).

| Census and Pending Available Beds Chart as of March 30, 2020 | | | | | | |
|---|---|---|---|---|---|---|
| | Available Beds | Occupied | % Filled | Unoccupied Beds | Pending Availability/ Endorsement | Endorsed and Pending Transfer |
| DSH – Atascadero | 256 | 236 | 92% | 20 | 0 | 0 |
| DSH – Coalinga | 50 | 48 | 96% | 2 | 0 | 0 |
| PIP (non-condemned male acute) | 442 | 409 | 92.5% | 33 | 39 | 3 |
| PIP (non-condemned male intermediate high custody) | 720 | 686 | 95.2% | 34 | 80 | 15 |
| PIP (non-condemned male intermediate low custody) | 84 | 75 | 89% | 9 | 13 | 3 |
| SQ – PIP | 30 | 26 | 87% | 4 | 0 | 0 |
| CIW – PIP | 43 | 38 | 88% | 5 | 0 | 1 |

As shown in the table above, the report indicated that of the 256 designated *Coleman*

beds at DSH-Atascadero, 236 or 92 percent were occupied by members of the *Coleman* class.

None of the 20 unoccupied beds were redlined.[5]  No patient was pending bed

availability/endorsement, one patient was endorsed and pending inpatient program acceptance,

and none was pending transfer to DSH-Atascadero.

Regarding DSH-Coalinga, 48 beds, or 96 percent of the 50 available beds, were occupied

by *Coleman* patients.  Neither of the two unoccupied beds were redlined.  No *Coleman* patient

---

[5] Redlined beds are not available for occupancy for reasons determined by the inpatient facility.

was pending bed availability/endorsement, inpatient program acceptance, or transfer to a DSH-Coalinga bed.

According to the report, of the 442 non-condemned male acute beds available in the PIPs, 409 beds or 92.5 percent were filled. There were 33 empty beds; no bed was redlined. There were 39 patients referred to acute PIP beds and were pending bed availability/endorsement, three patients were endorsed and pending inpatient program acceptance, and five patients were accepted and were pending transfers to acute beds.

Regarding non-condemned male intermediate high custody beds, there were 720 available beds of which 686 beds or 95.2 percent were filled. None of the 34 empty beds was redlined. There were 80 patients referred to high custody PIP beds and were pending bed availability/endorsement, 15 patients were endorsed and pending inpatient program acceptance, and 11 patients were accepted and were pending transfers to intermediate high custody beds.

There were 84 available beds in the non-condemned male intermediate low custody PIP programs, of which 75 beds or 89 percent were filled. There were nine empty beds; none were redlined. There were thirteen patients referred to low custody PIP beds and pending bed availability/endorsement, three patients were endorsed and pending inpatient program acceptance, and one patient was accepted and was pending transfer to an intermediate low custody bed.

The PIP program for condemned patients at San Quentin State Prison had a bed capacity of 30 beds, of which 26 beds or 87 percent were filled. None of the four empty beds was redlined. No condemned patient was pending bed availability/endorsement, inpatient program acceptance, or transfer to a San Quentin PIP bed.

Regarding the female acute and intermediate care beds at the California Institution for Women (CIW-PIP), there were 43 beds available, of which 38 beds or 88 percent were filled. None of the five empty beds was redlined.  No female patient was pending bed availability/endorsement, one patient was endorsed and pending inpatient program acceptance, and none was pending transfer to a PIP bed.

These numbers show that with bed capacities at both the acute and intermediate levels very near full capacity, especially in the male inpatient programs, keeping 22 DSH beds empty, a number that will likely increase as patients are paroled, is not sustainable even in the short term when patients could be tested/screened for COVID-19 and quarantined, if needed, as a condition for transfer.  In addition, more DSH beds would be available if DSH allowed patients to be discharged back to CDCR when clinically appropriate (i.e., no longer in need of inpatient psychiatric care).  The COVID-19 testing/screening for such patients should be similar to the process that will be required for patients who would be newly admitted to DSH from CDCR.

Least Restrictive Housing

The least restrictive housing (LRH) offers a therapeutic milieu for treating patients who are clinically and custodially suitable for receiving treatment in an environment that is less punitive and more therapeutic, a model that is endorsed by both DSH and CDCR as appropriate for providing mental health treatment. DSH's three hospitals that treat *Coleman* class members are designed and function consistent with this model.

The Special Master observed in his 2018 Inpatient Care Report that "attention to patients' LRH before and after admission to inpatient care is necessary to providing appropriate care in the least restrictive setting, unless the placement is contraindicated for clinical and/or custodial reasons," pointing out that CDCR and DSH's policies required that patients that needed inpatient

treatment should be "placed in the least restrictive setting based on their LRH designation." ECF No. 5894 at 21.

In order for movement to the LRH to work effectively as an appropriate treatment milieu, there must be continuous movement of patients to their least restrictive housing including into beds at DSH-Atascadero and DSH-Coalinga, unless "specific defined clinical issues prevent them from being safely treated within their LRH designations." *Id.*

On March 30, 2020, defendants provided a report via email to the *Coleman* COVID-19 Task Force showing that of 110 patients in the PIPs with an "unlocked dorm" LRH, 39 patients or 35 percent were clinically referred to that LRH and thus were presently eligible for placement at DSH-Atascadero or DSH-Coalinga, which combined had 22 available empty beds on March 30, 2020.  (*See*, Exhibit 9)

**Patients Clinically Referred to LRH, as of March 30, 2020**

|  | Patients | Clinically referred and presently eligible for placement at DSH-Atascadero or DSH-Coalinga | Percentage | Available Beds |
|---|---|---|---|---|
| Patients in PIPs | 110 | 39 | 35% | 22 |

14



As previously reported, DSH had suspended admissions to their hospitals for *Coleman* class members, shutting off unlocked dorms to all eligible patients which could be extended after the first 30 days, even though the patients could be safely admitted into the DSH hospitals by being tested/screened for COVID-19 infection prior to physical admission.

The March 30, 2020 Psychiatric Inpatient Programs Census and Pending List Report indicated that large numbers of patients across the various psychiatric inpatient programs were outside their LRH designations.  Regarding CMF-PIP, of the 87 high custody single-celled patients in the program, 52 patients or 60 percent were outside their LRH.  Of the 60 high custody patients in multi-person cells at CMF-PIP, 26 patients or 43 percent were outside their LRH. Regarding the "locked dorms" CMF-PIP, 23 patients or 31 percent of 76 patients were outside their LRH.

At CHCF-PIP, 171 patients or 57 percent of the 302 high custody single-celled patients were outside their LRH.  Of 198 single celled high custody patients at SVSP-PIP, 81 patients or

41 percent were outside their LRH.  There were 39 patients in multi-person cells at SVSP-PIP, of which 15 patients or 38 percent were outside their LRH.

**Least Restrictive Housing (LRH), as of March 30, 2020**

|  | Patients | Outside their LRH | Percentage |
|---|---|---|---|
| CMF – PIP high custody single-celled | 87 | 52 | 60% |
| CMF – PIP high custody multi-person cell | 60 | 26 | 43% |
| CMF – PIP locked dorms | 76 | 23 | 31 |
| CHCF – PIP | 302 | 171 | 57% |
| SVSP – PIP | 198 | 81 | 41% |



Appropriate treatment at their LRH was elusive for many *Coleman* patients before the onset of the COVID-19 pandemic, which has been further exacerbated by DSH's decision to close admissions to its hospitals, apparently without a joint plan with CDCR of how to effectively determine which eligible patients could be safely admitted to a hospital without exposing other patients and staff to COVID-19, using available screening methods presently in place for staff entering the hospitals and/or approved testing methods available to CDCR and DSH. Again, as stated above, the least restrictive housing (LRH) offers a therapeutic milieu for treating patients who are clinically and custodially suitable for receiving treatment in an environment that is less punitive and more therapeutic, a model that is endorsed by both DSH and CDCR as appropriate for providing mental health treatment and needs to remain in the continuum of care available to the *Coleman* class.

<u>Inadequate Care at CHCF-PIP, CMF-PIP, and SVSP-PIP</u>

Providing adequate treatment to *Coleman* class members housed in the PIPs has long posed serious challenges, first to DSH and then to CDCR after Lift and Shift and have been reported in both the 2016 and 2018 Inpatient Reports of the Special Master, and were found to continue to exist in the preliminary findings that have been reported by his experts and monitors to the Special Master following their most recent site visits.

In the period preceding the onset of the COVID-19 pandemic, staffing vacancies and the lack of appropriate treatment at CHCF-PIP, CMF-PIP, and SVSP-PIP were known to CDCR, the Special Master and plaintiffs' counsel to have seriously limited what mental health care was available to patients in these programs. These conditions, which can best be described as institutional program failures, led to the formation of workgroups for CHCF-PIP and CMF-PIP, which included members of the Special Master's team, and is discussed in detail below.

The Special Master's experts and monitors have completed site visits to all of CDCR's PIPs and have submitted their reports to the Special Master for his review.  Issues facing the PIPs regarding care provided to patients for purposes of this report are focused on CHCF-PIP, CMF-PIP, and SVSP-PIP.  The Special Master's experts and monitors toured CHCF-PIP during September 17, 2019 to September 19, 2019 and again during March 10, 2020 to March 12, 2020; CMF-PIP during December 3, 2019 to December 6, 2019; and SVSP-PIP during December 3, 2019 to December 6, 2019.

Across these three PIPs, the Special Master's experts and monitors have reported that these PIPs were struggling to provide adequate care to acute and intermediate patients.  There were significant functional vacancies in psychiatry, psychology, and social work; clinical structured therapeutic activities offered were minimal; the out-of-cell time offered maximum custody patients did not meet requirements; and there was not regular access to individual treatment available to patients.  Required attendance at IDTTs was not consistently achieved, LRH was not consistently addressed in IDTTs, and treatment planning for patients was problematic across the PIPs.

Following the first site visit to CHCF-PIP during September 17, 2019 to September 19, 2019, it appears that CDCR and CCHCS established a joint CHCF-PIP Workgroup to address problems related to providing adequate care in the PIP.  The Special Master became aware of the existence of the CHCF-PIP Workgroup several months after it commenced this work, documentation of which was subsequently provided to him indicated was as early as November 2019.  At the direction of the Special Master, as part of the coordination process, his mental health headquarters monitoring team joined the CHCF-PIP Workgroup and attended its meetings

beginning on February 27, 2020.  The CHCF-PIP Workgroup identified, among other things, and had begun developing, remedial action plans regarding:

- implementing effective treatment for maximum-security custody patients;
- instituting effective morning huddles;
- improving treatment and discharge planning;
- developing and instituting a model intermediate program in one program unit that could be extended throughout the PIP;
- assessing current clinical staffing;
- modifying clinical staff work hours to improve IDTT attendance;
- assessing available physical plant and equipment;
- increasing custody resources and supervision in the maximum-security custody housing units; and expanding work assignments for PIP patients.

In addition, as part of the coordination process, the Special Master's mental health headquarters monitoring team participated in the joint CDCR/CCHCS CMF-PIP Workgroup from its inception, attending its site visit at the CMF-PIP during February 18 to February 20, 2020, and attending subsequent meetings.  The CMF-PIP Workgroup developed an emergency action plan with identified resources to augment the total hours of group activities offered to patients at CMF-PIP from four to six hours of recreational groups only, with more treatment groups comprising eight additional hours of clinical structured therapeutic activities in acute units and seven to eight hours of clinical structured therapeutic activities in intermediate units. In the high custody 64-bed unit, an additional ten hours of clinical structured therapeutic activities would be offered.  The emergency action plan also included a plan for custody staff to offer two hours of yard time per day to each unit in the CMF-PIP.

Plaintiffs' counsel was kept informed about the activities of the workgroups through regular briefings by the Special Master and his team.  With the onset of the COVID-19 pandemic, the activities of both the CHCF-PIP Workgroup and CMF-PIP Workgroup have been placed on hold.

On March 31, 2020, in response to the request of the *Coleman* COVID-19 Task Force, defendants provided a point-in-time staffing and program information for CHCF-PIP, CMF-PIP, and SVSP-PIP for March 30, 2020.  (*See*, Exhibit 10) This information indicated that available staffing and programming in these three PIPs have been severely compressed by the COVID-19 pandemic.

**PIP Staffing as of March 30, 2020**

| CHCF-PIP | Percentage of Allocated Positions Available |
|---|---|
| Psychiatrists | 48% |
| Psychologists | 48% |
| Social Workers | 54% |
| Rehabilitation Therapists | 66% |

| CMF-PIP | Percentage of Allocated Positions Available |
|---|---|
| Psychiatrists | 19% |
| Psychologists | 25% |
| Social Workers | 29% |
| Rehabilitation Therapists | 22% |

| SVSP-PIP | Percentage of Allocated Positions Available |
|---|---|
| Psychiatrists | 60% |
| Psychologists | 70% |
| Social Workers | 50% |
| Rehabilitation Therapists | 66% |

On April 1, 2020, defendants provided updated information regarding staffing and programing at the three PIPs as point-in-time information that they anticipated will change from day-to-day depending on numerous factors.  (*See*, Exhibit 11) The updated information showed

the number of positions allocated to each of the three PIPs, the total number of positions filled, and the number of staff who called out on April 1, 2020. Defendants indicated that the staffing information was intended to show the impact of COVID-19 on staffing and programming at those PIPs. Defendants explained that the staffing "numbers are independent of one another and will not reflect the fill rate as reported to the Court."

Defendants also provided a summary of the mental health services provided at each of the three PIPs on April 1, 2020.

<u>CHCF-PIP</u>

According to the report, on March 30, 2020, 48 percent of the allocated positions for psychiatrists and psychologists were available to the CHCF-PIP to provide treatment to patients. Regarding social workers and recreational therapists, 54 percent of allocated staff for social workers and 66 percent for rehabilitation therapists were available to provide treatment.

Defendants indicated that they did not have updated information on the nature of programs that were being provided to patients in the CHCF-PIP.

In the April 1, 2020 update, defendants reported that of 33 allocated psychiatry positions, 20 positions or 61 percent were filled. One psychiatrist scheduled to work on April 1, 2020 called out. Regarding psychology, defendants reported that of the 29 allocated positions 20 or 69 percent were filled. Five psychologists scheduled to work on April 1, 2020 called out. The information provided for social workers indicated that 22 or 67 percent of the 33 allocated positions were filled, and four social workers called out on April 1, 2020. A total of 29 or 91 percent of the 32 allocated rehabilitation therapist positions were filled. Six rehabilitation therapists called out on April 1, 2020.

| CHCF-PIP | Allocated Staffing Positions | Actual Number Filled | Percentage Filled | Called Out |
|---|---|---|---|---|
| Psychiatrists | 33 | 20 | 61% | 1 |
| Psychologists | 29 | 20 | 69% | 5 |
| Social Workers | 33 | 22 | 67% | 4 |
| Rehabilitation Therapists | 32 | 29 | 91% | 6 |



Defendants reported that one unit at CHCF-PIP had been placed on Droplet Precaution Quarantine; the remaining 16 units have been directed to offer full-service programming while maintaining social distancing.  No information was provided regarding actual programming offered in the 16 units not quarantined at CHCF-PIP on April 1, 2020.

Regarding treatment in the quarantined unit, defendants reported that three patients were in isolation on that unit.  These patients were permitted cell-front contacts and have full access to

safety/emergency programming and showers.  They were offered showers after all other patients had completed their showers.

The remaining patients in the unit were allowed to program normally but in smaller group sizes of about five patients to permit appropriate social distancing.

### CMF-PIP

On March 30, 2020, 19 percent of the allocated positions of psychiatrists, 25 percent of psychologists, 29 percent of social workers and 22 percent of rehabilitation therapists were available to provide treatment in the CMF-PIP.  According to defendants, there were four clinicians designated to conduct rounds on all patients each day.  In addition, the program had prioritized out-of-cell individual contacts and emergent and urgent patients were seen daily. Moreover, defendants reported that in-cell activities and some modified dayroom activities were also provided.  The report indicated that admissions to or discharges from the CMF-PIP were occurring.

In the CMF-PIP, defendants reported that of 32 allocated psychiatry positions, 16.5 positions or 52 percent were filled.  Five psychiatrists scheduled to work on April 1, 2020 called out.  In psychology, defendants reported that of the 27.5 allocated positions 17 or 62 percent were filled.  Ten psychologists scheduled to work on April 1, 2020 called out.  The information provided for social workers indicated that 21.75 or 79 percent of the 27.5 allocated positions were filled, and seven social workers called out on April 1, 2020.  A total of 25 or 93 percent of the 27 allocated rehabilitation therapist positions were filled.  Twelve rehabilitation therapists called out on April 1, 2020.

| CMF-PIP | Allocated Staffing Positions | Actual Number Filled | Percentage Filled | Called Out |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Psychiatrists | 32 | 16.5 | 52% | 5 |
| Psychologists | 27.5 | 17 | 62% | 10 |
| Social Workers | 27.5 | 21.75 | 79% | 7 |
| Rehabilitation Therapists | 27 | 25 | 93% | 12 |



Defendants reported that a supervisor conducted rounds in all units at CMF-PIP daily and made the clinical assignments.  Initial and discharge IDTTs were reported to be occurring regularly, while routine IDTTs were being conducted as staff were able to do so.  In addition, rehabilitation therapists conducted daily rounds and provided in-cell interior activities to patients. Patients were also offered approximately three hours of unstructured out-of-cell therapeutic activities daily.

SVSP-PIP

Regarding the SVSP-PIP, defendants reported that of the allocated positions, 60 percent of psychiatrists, 70 percent of psychologists, 50 percent of social workers, and 66 percent of rehabilitation therapists were available to provide treatment on March 30, 2020.

Defendants reported that individual contacts, structured therapeutic activities, and IDTTs occurred on March 30, 2020 with appropriate social distancing observed.  In addition, limited yard and dayroom were offered to patients to allow for social distancing.  All community dining activities have been halted.

Defendants reported that regarding SVSP-PIP, of ten allocated psychiatry positions, six positions or 60 percent were filled.  No psychiatrist scheduled to work on April 1, 2020 called out.  For psychology, defendants reported that of the ten allocated positions nine or 90 percent were filled.  Three psychologists scheduled to work on April 1, 2020 called out.  The information provided for social workers indicated that seven or 70 percent of the ten allocated positions were filled, and two social workers called out on April 1, 2020.  A total of seven or 70 percent of the ten allocated rehabilitation therapist positions were filled.  Two rehabilitation therapists called out on April 1, 2020.

| SVSP-PIP | Allocated Staffing Positions | Actual Number Filled | Percentage Filled | Called Out |
|---|---|---|---|---|
| Psychiatrists | 10 | 6 | 60% | 0 |
| Psychologists | 10 | 9 | 90% | 3 |
| Social Workers | 10 | 7 | 70% | 2 |
| Rehabilitation Therapists | 10 | 7 | 70% | 2 |



Defendants further reported that several SVSP-PIP staff that called out this week had subsequently informed supervisors that they had resolved the issues that required them to call out and expected to return to work next week.

It was reported that the clinical contacts in IDTTs scheduled for April 1, 2020 occurred as scheduled.  The estimated number of hours of clinical out-of-cell activities offered to patients on April 1, 2020 was 1.4 hours.  Group sizes were reduced to permit adequate social distancing; some groups scheduled for April 1, 2020 were canceled due to staffing shortages.  On April 1, 2020, defendants reported that CMF-PIP offered 1.5 hours of yard, and one hour of dayroom to each patient excluding those designated as maximum-security.  SVSP-PIP indicated that they had no additional capacity to increase the number of groups being offered as an offset to the smaller number of patients permitted in each group.

The staffing and programming information presented by defendants and discussed above show that mental health care in these inpatient programs have been further compressed by the COVID-19 pandemic and the treatment available for *Coleman* class members has further

declined, and requires CDCR to take proactive actions to ameliorate a constantly evolving and probably worsening situation with input from the Special Master's experts and monitors and plaintiffs' counsel.

Appropriate and timely referrals and transfers to higher levels of care, including acute and intermediate levels of care, and providing adequate treatment at those levels of care are important tools of suicide prevention.

Approximately 71 percent of the 38 inmate suicides during 2019, an unprecedented number that was the highest since 2006, were participants in the MHSDS.  Inmates who are participants in the MHSDS are particularly vulnerable to the COVID-19 pandemic due to both co-existing medical illness and impaired behaviors.

In his forthcoming report, the Special Master's suicide prevention expert will report that 11 of 38 or almost 30 percent of inmate suicides during 2019 involved inmates dying within nine days of expressing suicidal ideation and/or self-harm behavior and the resulting clinical assessments did not recommend and/or rescinded orders for a higher level of care.  These 11 cases were later found by CDCR to have received inadequate assessments and/or treatment that was contributory to the inmate's subsequent suicide. Eight (8) of the 11 suicides took place between 0 and 3 days of the mental health referral.

As discussed in this report, CDCR's PIPs are not providing adequate mental health care to patients, and the care that is being provided has been further constricted by the COVID-19 pandemic.

During 2019, CDCR reported that 9 of 38 or 24 percent of the inmate suicides occurred within 90 days of discharge from either a MHCB or PIP, with six of the deaths occurring within five days of discharge.  These cases raise the possibility that some discharges from higher levels

of care were premature.  Five of these suicides occurred following discharge from the PIPs, with timeframe from discharge to suicide in a CDCR facility of 8, 22, 23, 26, and 84 days.  There is also a need for a level of practical cooperation and coordination between CDCR and DSH that is presently lacking as is discussed below.  It is clear that with staffing shortages appropriate care cannot be provided in the PIPs.

<u>LACK OF A COORDINATED EFFORT BETWEEN CDCR AND DSH</u>

The COVID-19 Task Force efforts have highlighted the lack of coordinated planning between the two entities responsible for the treatment, well-being, and safety of *Coleman* class members.  Historically, the relationship between CDCR and DSH has always been complicated and has been documented for over 14 years.  The assumption of responsibility for the delivery of acute and intermediate levels of care by CDCR, due to the strained relationship between the two agencies, was also contemplated long before the completion of "lift and shift" in 2017.

This labored relationship was documented by the Special Master in 2007 when he reported that "[t]he proposed divorce of CDCR and DMH[6] is a concept that possesses possible advantages and grave danger.  The association of the two agencies has long been a difficult one." ECF No. 2133 at 15.  A little more than seven months later, the Special Master again referenced the desire of CDCR to distance itself from DSH and stated that "[t]he report expressed deep concern over the proposed separation between CDCR and DMH.  While the relationship between DMH and CDCR has long been troubled, CDCR has absolutely no track record of providing inpatient mental health treatment to severely mentally ill inmates."  ECF No. 2432 at 5.

Over 14 years later, this same concept of CDCR assuming the responsibility for acute and intermediate care was again reported on by the Special Master.

---

[6] The Department of State Hospitals was formerly known as the Department of Mental Health.

> This prospective shift was conceived to improve patient access
> by streamlining the existing process of referral, acceptance,
> transfer, and admission of seriously mentally ill CDCR inmates
> to inpatient care at DSH programs.  ECF No. 5448 at 11.

Lift and shift was officially implemented in July 2017 with DSH only maintaining 336

total inpatient beds for CDCR inmates at Atascadero State Hospital, Coalinga State Hospital and

Patton State Hospital after the divorce was finally complete – albeit not entirely.

Access to inpatient beds in DSH has also been plagued by barriers and delays.  The court

has expressed its frustration repeatedly and took the drastic step of joining the director of DMH

as a defendant in the case to more effectively put the department under the supervision of the

court.  ECF No. 1855 at 2.  In another order dated March 31, 2009, the court expressed its

displeasure with the lack of access to DSH beds,

> However, DMH officials took an intractable position with respect
> to the use of Atascadero State Hospital (ASH) and Coalinga State
> Hospital (CSH) for any part of necessary solutions. . . . The Court
> is encouraged by the initial report from the special master in all
> aspects with the exception of DMH's position on the use of ASH
> and CSH.  Such intransigence is not new to this litigation, but it
> must change. ECF No. 3556 at 2-3.

The Special Master continued to report on the delays in access to DSH beds as recently as

2016 when he reported,

> This prospective shift was conceived to improve patient access by
> streamlining the existing process of referral, acceptance, transfer,
> and admission of seriously mentally ill CDCR inmates to inpatient
> care at DSH programs.  Referred to informally by CDCR officials
> as a "lift and shift," the new approach was envisioned as a permanent
> solution to the longstanding cycle of backed-up admissions of *Coleman*
> class members into inpatient beds at DSH programs and the resulting
> surges of long waitlists for patients who are so seriously mentally ill
> as to require inpatient care.  This concerning and recurring pattern needs
> to be brought to an end.  ECF No. 5448 at 14-15.

Tailoring the delivery of court-ordered inpatient treatment to *Coleman* class members during this pandemic requires enhanced coordination as to how to best allocate scarce hospital beds across the system. When making decisions about the *Coleman* hospital beds operated by DSH, consideration should be given to the affect any continued closure has on CDCR's ability to provide inpatient treatment in the already struggling PIPs.

Denying *Coleman* class members access to DSH beds does not eliminate the problem, it only leaves the already struggling PIPs to deal with the fallout.

Sometimes a crisis can serve to breakdown even longstanding divisions between agencies as they work together to combat a threat to the public good and the inmate-patients they are jointly tasked with serving. Or, the already existing fissures can fully crack under the pressure of the crisis. DSH's shifting position about under what circumstances it would consider opening its beds to the *Coleman* class, lends hope that DSH and CDCR will together rise to occasion to overcome these historical divisions in a time of crisis.

The Special Master and all parties recognize that CDCR and DSH are operating in an emergency situation and there is no prefabricated plan to account for all possible situations that will arise during this crisis. However, when one party comes to the conversation with a predetermined answer, and that answer is a definitive no, it has a chilling effect on the other parties who are attempting to think outside of the box together in an effort to provide treatment to the most vulnerable population. As previously stated, DSH has since acknowledged that a plan was being formulated that would allow the admission of *Coleman* class members to DSH facilities during this crisis and had provided the parties with the CDCR/DSH COVID Clinical Transfer Tool formulated through the collaborative efforts of CDCR and DSH.

## COVID-19 TASK FORCE SUCCESSES

The public health crisis brought about by the COVID-19 pandemic, has created turmoil in correctional systems around the country and CDCR is no exception.  Inmates and staff alike are in close proximity at a time when physical distancing is a primary tool recommended to limit contagion.  The treatment provided to people with mental illness relies heavily on confidential contact, group therapy, and transfer of people to higher levels of care when indicated.  How best to maintain adequate treatment, adapted to the current crisis, is a complex undertaking.  Despite these pressures, the participants in the COVID-19 Task Force worked collaboratively and achieved many successes.  The following is a list of some of those successes; it also includes actions taken during the COVID-19 Task Force's tenure which were discussed and/or shared with the group.  Defendants have:

- Suspended intake of all incarcerated persons into state facilities for 30 days, which could be extended an additional 60 days.

- Directed the release of inmates within 60 days of parole so long as they were not convicted of a violent felony or domestic violence.

- Directed the transfer of asymptomatic inmates who were housed in the following dorms into prisons who had unoccupied buildings or space: (1) Chuckawalla Valley State Prison would move 100 to 150 inmates housed in dorms to Ironwood State Prison; (2) Substance Abuse Treatment Facility and California Rehabilitation Center would each relocate 192 inmates to California State Prison, Corcoran.

- Suspended transfers of out-of-state parolees and inmates into California under interstate compact agreements until the end of April 2020.

- Created and released the COVID-19 tracker.

- Activated the Department Operations Center to act as central command.

- Refined CDCR's COVID-19 Emergency Plan to address the provision of mental health services as mental health and custody staffing levels and the need for isolation and quarantine of inmates change.

- Developed means to enhance social connection of inmates in the MHSDS with their families and community support systems.

- Developed additional methods of combating social isolation and decompensation of the inmates in the MHSDS, with particular focus on those in locked units.

As a group, the task force analyzed census and waitlist data for PIPs and DSH.

The problem of how to maintain inmates' access to the full complement of inpatient psychiatric treatment when needed is one area where further works remains.

## CONCLUSION

CDCR and DSH, their leadership, their staff, and the *Coleman* patients they serve, are facing a public health crisis caused by the COVID-19 pandemic. The scope of the problem within CDCR and DSH is not yet fully known. Staff are putting themselves in harm's way on a daily basis to provide treatment for their patients, and leadership is working diligently to manage an evolving challenge.

Some of the primary building-blocks of an adequate mental health care delivery system, especially in the PIPs, were severely strained prior to the unexpected onslaught of the crisis. This put leadership at a disadvantage as they seek to address the far-ranging impact of COVID-19 on the mental health service delivery system. Defendants' long-standing, pervasive struggles to provide adequate inpatient care in the PIPs were highlighted in the Special Master's 2016 and 2018 reports on inpatient treatment.

Recent monitoring tours showed continued problems, and in some instances, a deteriorated situation in the PIPs. Already inadequate staffing levels and insufficient access to structured out-of-cell activities have only worsened since onset of the COVID-19 pandemic. Of further concern is that, during 2019, CDCR reported that almost one quarter of inmate suicides occurred within 90 days of discharge from a MCHB or PIP. The future will likely bring

increased isolation and quarantine of inmates, and fewer available staff in the PIPs. This will further raise the importance of access to DSH beds for inpatient care.

As the Special Master has previously reported, access to DSH beds is central to providing appropriate inpatient intermediate care to *Coleman* patients who are eligible for placement in unlocked dorms as their LRH. During the course of this case, DSH has not fully coordinated with CDCR to achieve this goal. While it is not disputed that the COVID-19 pandemic is an emergent circumstance outside the control of the two agencies, it is unclear that the decision to close admissions to DSH-Atascadero and DSH-Coalinga was collaboratively made.  Whatever the appropriateness of any given decision may be, it is imperative that the two agencies make joint decisions to maximize the efficient use of inpatient beds across the system for the *Coleman* class.

Neither staff working in the field, nor any individual prison or agency can meet the challenge alone, and neither can *Coleman* class members who need hospital-level care. It is imperative that the two agencies develop a joint plan to safely admit *Coleman* class members to the DSH hospitals after the initial 30 days of the suspension of admissions ends on April 16, 2020. That a plan will change in reaction to changed circumstances does not obviate the need to develop one. A changing situation makes a structure from which to work all the more important. Such a structure, for example, might have allowed for DSH and CDCR to act more proactively to screen and transfer patients to ASH before the full impact of the COVID-19 crisis hit.

The Special Master shall continue to address the spectrum of issues regarding access to and the provision of adequate treatment to *Coleman* patients at the acute and intermediate levels of care in the COVID-19 Task Force during its tenure, or through the All-Parties Workgroup process, or as directed by the court.  Some of the impediments facing defendants regarding acute and intermediate care for *Coleman* class members are longstanding and others have evolved or

worsened as a result of the COVID-19 pandemic but must be sustainably remediated for defendants to provide appropriate to *Coleman* patients at those levels of care.

Defendants are making difficult decisions on an ongoing basis. They must balance one potential harm against another, without knowing how this pandemic will develop. This only serves to heighten the need for inter-agency coordination so that resources can be brought to bear effectively.

Respectfully submitted,

/s/

_____

Matthew A. Lopes, Jr.
Special Master

Exhibit 1

Case 2:90-cv-00520-KJM-DB   Document 6565   Filed 04/02/20   Page 36 of 69



# Memorandum

**Date:**     March 16, 2020

**Subject:**  DEPARTMENT DIRECTIVE ON SUSPENSION OF PATIENT
ADMISSIONS FROM THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION (CDCR)

Pursuant to Governor Gavin Newsom's Proclamation of a State of
Emergency dated March 4, 2020, the Director of the Department of State
Hospitals issues this Directive in accordance with the Director's authority
to execute laws relating to the care and treatment of persons with mental
health disorders placed with the State Department of State Hospitals
(DSH).  To ensure that patients with mental health disorders currently in
DSH's custody continue to receive the services and support that are
threatened by disruptions caused by COVID-19, and to protect the health,
safety and welfare of those patients, the Department is suspending
admission of patients placed at DSH facilities pursuant to Penal Code
section 2684 (*Coleman* patients).

All *Coleman* patients presently in DSH's custody will not be discharged
until DSH rescinds the suspension of *Coleman* patient admissions, unless
an emergency discharge is required for patients who cannot be safely
maintained in DSH's unlocked dorm setting.

This suspension of *Coleman* patient admissions will remain in effect for 30
days, unless extended by the Director of the Department.

STEPHANIE CLENDENIN
Director

*"Caring Today for a Safe and Healthy Tomorrow"*

Exhibit 2

**From:** Ciccotti, Christine@DSH-S <Christine.Ciccotti@dsh.ca.gov>
**Sent:** Tuesday, March 17, 2020 12:06 PM
**To:** Walsh Kerry F. <kwalsh@pldlaw.com>; Michael W. Bien <MBien@rbgg.com>; Steven Fama <sfama@prisonlaw.com>; Lisa Ells <LElls@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Barretto, Jennifer@CDCR <Jennifer.Barretto@cdcr.ca.gov>; Fouch, Adam@CDCR <Adam.Fouch@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Price, Rodney@CDCR <Rodney.Price@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Hessick, Jerome@CDCR <Jerome.Hessick@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Elise.Thorn@doj.ca.gov; Tyler.Heath <Tyler.Heath@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>; Lopes Matthew <mlopes@pldlaw.com>; Jones Mohamedu <mjones@pldlaw.com>
**Cc:** Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Clendenin, Stephanie@DSH-S <Stephanie.Clendenin@dsh.ca.gov>; Price, Stirling@DSH-S <Stirling.Price@dsh.ca.gov>; Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>
**Subject:** DSH Suspension of Coleman Patient Admissions

Good Morning,

Attached please find a directive issued by the DSH Director suspending admission of *Coleman* patients to DSH facilities for 30 days, at which time the need will be reassessed. *Coleman* patients currently in DSH's custody also will not be discharged until DSH rescinds the suspension of *Coleman* patient admissions, unless an emergency discharge is required for patients who cannot be safely maintained in DSH's unlocked dorm setting, or for those with parole dates in the next 30 days.

Thank you,

Christine

Christine M. Ciccotti
Chief Counsel/Deputy Director
Legal Division
Department of State Hospitals
1600 9th Street
Sacramento, CA
Office: (916) 651-5676
Christine.Ciccotti@dsh.ca.gov

# Exhibit 3

**From:** Ciccotti, Christine@DSH-S <Christine.Ciccotti@dsh.ca.gov>
**Sent:** Tuesday, March 17, 2020 6:10 PM
**To:** Michael W. Bien <MBien@rbgg.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Lisa Ells <LElls@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Barretto, Jennifer@CDCR <Jennifer.Barretto@cdcr.ca.gov>; Fouch, Adam@CDCR <Adam.Fouch@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Price, Rodney@CDCR <Rodney.Price@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Hessick, Jerome@CDCR <Jerome.Hessick@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Elise.Thorn@doj.ca.gov; Tyler.Heath <Tyler.Heath@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>; Lopes Matthew <mlopes@pldolaw.com>; Jones Mohamedu <mjones@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Kelso, Clark@CDCR <Clark.Kelso@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>
**Cc:** Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Clendenin, Stephanie@DSH-S <Stephanie.Clendenin@dsh.ca.gov>; Price, Stirling@DSH-S <Stirling.Price@dsh.ca.gov>; Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>
**Subject:** RE: DSH Suspension of Coleman Patient Admissions [IWOV-DMS.FID6429]

Good Afternoon Mike,

Your questions and our responses are below:

1. What is the current census of 2684's in DSH facilities?  Please provide information for men and women and by facility as of March 16.
    As of March 16, 2020:
    >    DSH-Atascadero – 241 males
    >    Coalinga – 48 males
    >    Patton – 13 females
    Total Census:  302 patients of maximum census of 336

2. What is the public health care rationale for suspending admissions and (most) discharges of 2684's to DSH facilities?
    The President of the United States has declared a national emergency and on March 4, 2020, the Governor declared a state of emergency in California, both due to the public health threat of COVID-19.  Further, the U.S. District Court for the Eastern District of California has also recognized the public health crisis with the issuance of General Order 611.  There is a universal recognition of the need to take precautions to reduce the possibility of exposure to the virus and slow the spread of disease.

    The public health justification of suspending additional *Coleman* admissions to DSH is due to the particular vulnerability of DSH patients to COVID-19, including DSH's elderly population (many with underlying chronic medical conditions), a high percentage of patients with complex medical co-

morbidities, and its skilled nursing facility populations.  DSH has over 1,500 patients ages sixty and older within its state hospital facilities. This represents over 20% of DSH's total patient population in its five state hospitals. Even DSH's younger patient population is at high-risk. Individuals with serious mental illness typically have a 20% higher risk of morbidity and mortality than the general population.  DSH facilities are licensed inpatient, and locked facilities that operate 24-hours, 7 days a week, with high patient density on units and shared rooms, dining and bathroom facilities, making the population especially at risk for rapid transmission of COVID-19 due to an inability to create social distancing.  If infected with COVID-19, these patients are at increased risk of serious illness and death. To date, DSH has taken significant measures to protect its facilities from the introduction of COVID-19.  It has cancelled patient visitors, except in limited instances such as court required evaluations and legal visits, and end-of-life situations.  It is screening any approved visitors and contractors for signs and symptoms of respiratory illness, contact with person under investigation or confirmed for COVID-19, or any recent travel to restricted countries. Additionally, all staff are being screened for these same criteria. However, new admissions to DSH hospitals, which come from all over the state, and the transports that carry them are an additional area of risk for introduction of COVID-19 to DSH facilities.  In order to prevent the introduction or transmission of COVID-19, DSH is suspending *Coleman* patient admissions into or discharges from its facilities, for a period of 30 days, to reduce risk to DSH and CDCR facilities for the introduction of COVID-19. This would be reassessed at 30 days and until risk of transmission into the DSH facilities is lessened.

3. Have other outside hospitals refused to accept CDCR patients in need of medical hospitalization?
   All CDCR patients who will be referred for admission to DSH facilities during the suspension will continue to have access to mental health care at CDCR facilities.  No *Coleman* patient is being denied mental health care.

4. Has DSH also suspended admissions and discharges of other categories of patients, such as SVP's, MDO's, IST's, NGRI's?   Why or why not?
   DSH has suspended admissions of LPS patients, and anticipates suspension of SVP admissions tomorrow.  DSH is reviewing the additional patient commitment types it admits and its authority and the need for suspension of all patient admissions to continue to reduce the risk of introduction or transmission of COVID-19.  DSH will notify impacted stakeholders if those additional suspensions occur.

5. If a patient is otherwise ready for discharge from a DSH facility, what is the public health rationale for retaining the patient in an expensive hospital bed?
   DSH will limit discharges for the next 30 days to minimize potential transmission of COVID-19 to the receiving facility.  As many counties in California are now sheltering in place, so too must DSH.

6. What plans has DSH made for patients whose parole date occurs within the
   next 30 days?
   DSH will honor those with parole dates in the next 30 days.

7. What consideration has DSH made as to the needs for CDCR patients who
   require inpatient psychiatric hospitalization at a DSH facility?
   These patients continue to have access to inpatient hospitalization at CDCR.

8. What is the public health justification for preserving the right to discharge
   some 2684's (those who DSH prefers to send to CDCR)?
   As an inpatient facility DSH does not have cells, nor the ability to isolate
   violent patients other than if they qualify for seclusion or restraint.  DSH must
   maintain the safety and security of its facilities.  If a patient engages in
   violence or other measures that necessitate an emergency return, as is done
   under existing policy, DSH will return those patients to CDCR.  In that event,
   DSH is no longer the least restrictive inpatient housing for those patients.  If
   an emergency return is required, DSH will ensure medical clearance of any
   patient prior to transport.

The Court's March 7, 2017 Order requires defendants to consult with the Special Master
immediately upon learning of the need to make any changes, additions, or reductions in
the number and/or use of inpatient beds in an emergency situation.  Per that Order, we
telephonically notified the Special Master of the emergency suspension of
admissions.  Additionally, the Court approved exceptions for patients not transferred to
intermediate care beds within the Program Guide timeframes due to unusual
circumstances outside Defendants' control, and the World Health Organization's
declaration of the COVID-19 outbreak as a pandemic most certainly qualifies for this
exception.

We are all working to manage a very challenging time for the State and our primary goal
is keeping our patients safe and well.  We will continue to prioritize patient safety with
our partners in CDCR as we manage through this crisis.

Best,

Christine


Christine M. Ciccotti
Chief Counsel/Deputy Director
Legal Division
Department of State Hospitals
1600 9th Street
Sacramento, CA
Office: (916) 651-5676
Christine.Ciccotti@dsh.ca.gov

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Tuesday, March 17, 2020 10:43 AM
**To:** Ciccotti, Christine@DSH-S <Christine.Ciccotti@dsh.ca.gov>; Kerry F. Walsh <kwalsh@pldolaw.com>; Steve Fama <sfama@prisonlaw.com>; Lisa Ells <LElls@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Barretto, Jennifer@CDCR <Jennifer.Barretto@cdcr.ca.gov>; Fouch, Adam@CDCR <Adam.Fouch@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Price, Rodney@CDCR <Rodney.Price@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Hessick, Jerome@CDCR <Jerome.Hessick@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Laura Ceballos <laura.ceballos@cdcr.ca.gov>; Matt Lopes <mlopes@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Clark Kelso (Clark.Kelso@cdcr.ca.gov) <Clark.Kelso@cdcr.ca.gov>; diana.toche@cdcr.ca.gov
**Cc:** Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Clendenin, Stephanie@DSH-S <Stephanie.Clendenin@dsh.ca.gov>; Price, Stirling@DSH-S <Stirling.Price@dsh.ca.gov>; Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>
**Subject:** RE: DSH Suspension of Coleman Patient Admissions [IWOV-DMS.FID6429]


## [EXTERNAL E-MAIL]

Christene

Plaintiffs have questions about DSH's plan:

1.  What is the current census of 2684's in DSH facilities?  Please provide information for men and women and by facility as of March 16.

2.  What is the public health care rationale for suspending admissions and (most) discharges of 2684's to DSH facilities?

3.  Have other outside hospitals refused to accept CDCR patients in need of medical hospitalization?

4.  Has DSH also suspended admissions and discharges of other categories of patients, such as SVP's, MDO's, IST's, NGRI's?   Why or why not?

5.  If a patient is otherwise ready for discharge from a DSH facility, what is the public health rationale for retaining the patient in an expensive hospital bed?

6.  What plans has DSH made for patients whose parole date occurs within the next 30 days?

7.  What consideration has DSH made as to the needs for CDCR patients who require inpatient psychiatric hospitalization at a DSH facility?

8.  What is the public health justification for preserving the right to discharge some 2684's (those who DSH prefers to send to CDCR)?

We continue to object to the plan and remind defendants that access to inpatient psychiatric hospitalization may not be restricted without approval of the Court.

Michael Bien

ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street
Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
mbien@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** Ciccotti, Christine@DSH-S <Christine.Ciccotti@dsh.ca.gov>
**Sent:** Tuesday, March 17, 2020 9:06 AM
**To:** Kerry F. Walsh <kwalsh@pldolaw.com>; Michael W. Bien <MBien@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Lisa Ells <LElls@rbgg.com>; Melissa Bentz <Melissa.Bentz@cdcr.ca.gov>; Barretto, Jennifer@CDCR <Jennifer.Barretto@cdcr.ca.gov>; Fouch, Adam@CDCR <Adam.Fouch@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Price, Rodney@CDCR <Rodney.Price@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Hessick, Jerome@CDCR <Jerome.Hessick@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Laura Ceballos <laura.ceballos@cdcr.ca.gov>; Matt Lopes <mlopes@pldolaw.com>; Mohamedu Jones <mjones@pldolaw.com>
**Cc:** Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Clendenin, Stephanie@DSH-S <Stephanie.Clendenin@dsh.ca.gov>; Price, Stirling@DSH-S

<Stirling.Price@dsh.ca.gov>; Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>
**Subject:** DSH Suspension of Coleman Patient Admissions

Good Morning,

Attached please find a directive issued by the DSH Director suspending admission of *Coleman* patients to DSH facilities for 30 days, at which time the need will be reassessed.  *Coleman* patients currently in DSH's custody also will not be discharged until DSH rescinds the suspension of *Coleman* patient admissions, unless an emergency discharge is required for patients who cannot be safely maintained in DSH's unlocked dorm setting, or for those with parole dates in the next 30 days.

Thank you,

Christine

Christine M. Ciccotti
Chief Counsel/Deputy Director
Legal Division
Department of State Hospitals
1600 9th Street
Sacramento, CA
Office: (916) 651-5676
Christine.Ciccotti@dsh.ca.gov

Exhibit 4

**From:** Ciccotti, Christine@DSH-S <Christine.Ciccotti@dsh.ca.gov>
**Sent:** Saturday, March 21, 2020 11:24 PM
**To:** Walsh Kerry F. <kwalsh@pldolaw.com>; 'Michael W. Bien' <MBien@rbgg.com>; 'Steven Fama' <sfama@prisonlaw.com>; 'Lisa Ells' <LElls@rbgg.com>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Barretto, Jennifer@CDCR <Jennifer.Barretto@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Hessick, Jerome@CDCR <Jerome.Hessick@cdcr.ca.gov>; Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>; Elise.Thorn@doj.ca.gov; Tyler.Heath <Tyler.Heath@doj.ca.gov>; 'Kyle Lewis' <Kyle.Lewis@doj.ca.gov>; 'Adriano Hrvatin' <Adriano.Hrvatin@doj.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>; Lopes Matthew <mlopes@pldolaw.com>; Jones Mohamedu <mjones@pldolaw.com>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>
**Cc:** Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Clendenin, Stephanie@DSH-S <Stephanie.Clendenin@dsh.ca.gov>; Price, Stirling@DSH-S <Stirling.Price@dsh.ca.gov>; Hendon, Catherine@DSH-S <catherine.hendon@dsh.ca.gov>; Bachman, Ellen@DSH-S <Ellen.Bachman@dsh.ca.gov>
**Subject:** RE: DSH Suspension of Coleman Patient Admissions

Good Evening,

Tonight the Governor issued an Executive Order granting the Director of the Department of State Hospitals the authority to waive any provision of the Welfare and Institutions Code or Penal Code to the extent necessary as it relates to the care, custody, and treatment of persons with mental illness committed to DSH, in order to mitigate the effects of COVID-19.

https://www.gov.ca.gov/wp-content/uploads/2020/03/3.21.20-EO-N-35-20-text.pdf

This grants our Director the ability to suspend all patient admissions and discharges, amongst other powers, so we can safely keep our patients in place and try to prevent the introduction or reduce the transmission of this virus within our hospitals.  We will be issuing directives to that effect as to other patient commitments, as appropriate and necessary, in the coming days.

Best,

Christine
Christine M. Ciccotti
Chief Counsel/Deputy Director
Legal Division
Department of State Hospitals
1600 9th Street
Sacramento, CA
Office: (916) 651-5676
Christine.Ciccotti@dsh.ca.gov

# Exhibit 5

**From:** Ciccotti, Christine@DSH-S <Christine.Ciccotti@dsh.ca.gov>
**Sent:** Thursday, March 26, 2020 5:41 PM
**To:** Lopes Matthew <mlopes@pldolaw.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Jones Mohamedu <mjones@pldolaw.com>
**Cc:** Tyler.Heath <Tyler.Heath@doj.ca.gov>; Elise.Thorn@doj.ca.gov; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; 'Michael W. Bien' <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; 'Steven Fama' <sfama@prisonlaw.com>
**Subject:** DSH Statement on Suspension of Coleman Patient Admissions

Good Afternoon Matty,

On March 16, 2020, in accordance with her authority under Penal Code Section 2684, the DSH Director issued a directive suspending admission of *Coleman* patients to DSH facilities for 30 days, at which time the need will be reassessed. *Coleman* patients currently in DSH's custody would also not be discharged until DSH rescinds the suspension of *Coleman* patient admissions, unless an emergency discharge is required for patients who cannot be safely maintained in DSH's unlocked dorm setting, or for those with parole dates in the next 30 days. At the time of the suspension DSH had a census of 302 *Coleman* patients and maintains a maximum of 336 beds.

On March 21, 2020, the Governor issued an Executive Order granting the Director of DSH the authority to waive any provision of the Welfare and Institutions Code or Penal Code to the extent necessary as it relates to the care, custody, and treatment of persons with mental illness committed to DSH, in order to mitigate the effects of COVID-19.

https://www.gov.ca.gov/wp-content/uploads/2020/03/3.21.20-EO-N-35-20-text.pdf

That Order affirmed our Director's ability to suspend all patient admissions and discharges, amongst other powers, so we can safely keep our patients in place and seek to prevent the introduction of this virus within our hospitals. Within days of that order, DSH suspended admissions of 5 of the 6 different types of patients it admits to its over 6,000 beds throughout 5 state hospitals.

On March 24, 2020, the Governor issued an Executive Order granting CDCR the authority to waive the Penal Code and suspend intake in to CDCR prisons for 30 days. As a result, similar to the steps DSH has taken, CDCR suspended all admissions to its prisons from county custody. On March 25, 2020 CDCR further suspended transfers to its own intermediate care Psychiatric Inpatient Programs from CSP-Sac due to exposure to a clinician who tested positive.

As a result of these series of events, as CDCR is doing, DSH seeks to maintain its suspensions of *Coleman* admissions at this time through April 16, 2020.

Nonetheless, these are very fluid times, and DSH is continuing to communicate with its partners at CDCR to address the mental health needs of the *Coleman* class. If CDCR is unable to provide inpatient treatment to its inmates, DSH will collaborate with CDCR

on solutions to those issues, and will carefully consider transferring clinically and custodially appropriate inmates, for whom CDCR can ensure they have been in environments determined to be as safe as possible from potential exposure to COVID-19.

At this time, DSH has no patients confirmed positive for COVID-19 and is taking all measures it can to mitigate the risk of introduction or transmission of the virus and protect its fragile patient population.

Thank you,

Christine


Christine M. Ciccotti
Chief Counsel/Deputy Director
Legal Division
Department of State Hospitals
1600 9th Street
Sacramento, CA
Office: (916) 651-5676
Christine.Ciccotti@dsh.ca.gov

Exhibit 6

**From:** Kyle Lewis <Kyle.Lewis@doj.ca.gov>
**Sent:** Wednesday, April 1, 2020 2:50 PM
**To:** Lopes Matthew <mlopes@pldolaw.com>; Walsh Kerry F. <kwalsh@pldolaw.com>
**Cc:** Christine Ciccotti (Christine.Ciccotti@dsh.ca.gov) <Christine.Ciccotti@dsh.ca.gov>; Nina Raddatz
<Antonina.Raddatz@dsh.ca.gov>; Kris Kent <Kristopher.Kent@dsh.ca.gov>;
'katherine.warburton@dsh.ca.gov' <katherine.warburton@dsh.ca.gov>; 'Bick, Joseph@CDCR'
<Joseph.Bick@cdcr.ca.gov>; Toche, Diana@CDCR (Diana.Toche@cdcr.ca.gov)
<Diana.Toche@cdcr.ca.gov>; Daye, Eureka@CDCR <Eureka.Daye@cdcr.ca.gov>; Elise Thorn
<Elise.Thorn@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Lucas Hennes
<Lucas.Hennes@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Bentz, Melissa@CDCR
<Melissa.Bentz@cdcr.ca.gov>; 'Weber, Nicholas@CDCR' <Nicholas.Weber@cdcr.ca.gov>;
jennifer.neill@cdcr.ca.gov; michael.golding@cdcr.ca.gov
**Subject:** Coleman COVID-19 Task Force -- DSH Statement on Patient Movement and Clinical Transfer
Tool

Matty,

Below is DSH's statement addressing concerns on patient movement in the current
environment.  I have also attached the CDCR-DSH COVID Clinical Transfer Tool that has been
discussed by Drs. Warburton and Bick.  This tool may evolve with the pandemic situation.

Regards,
Kyle

----------

As discussed during recent COVID-19 Task Force meetings, DSH has grave concerns about all
patient movement.   As stated by DSH's Medical Director, there is no epicenter in the world
saying anything other than they wished they'd limited movement earlier and more radically at
the first signs of community spread.  Medical personnel in the epicenters are uniformly
urging others to learn from their mistake of delay.  It is the opinion of DSH's Medical Director
that the very real risk of widespread morbidity and mortality in our psychiatric population far
outweighs risks of sheltering and caring for psychiatric acuity in place, except in extraordinary
circumstances.  Further, it is her medical opinion that all movement within vulnerable
institutions should be severely limited, including discharges.  The time to flatten the curve in
our institutions is now and we don't have time to lose. It is irresponsible to miss this
opportunity to slow the spread of COVID-19 in our institutions.

Due to the amount of movement in psychiatric populations, we believe the psychiatric
population that we share with CDCR is extremely vulnerable.  Nonetheless, DSH trusts the
clinical abilities and judgment of our partners at CDCR in Dr. Bick and Dr. Golding
and DSH believes that moving forward, once we understand the extent of COVID-19 in our
facilities, we will be able to open up a mutual process that includes pre/post transfer
quarantine in order to eventually safely transfer patients.  But right now, and we can't stress
this enough, we are in a state of emergency, operating around the clock to try to prevent

widespread loss of life and suspending all possible admissions, including *Coleman* patients, as much as feasible is necessary to this end.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Exhibit 7

## CDCR/DSH COVID Clinical Transfer Tool

1. Has the patient had a fever above 100.4 degrees in the last 7 days?
2. Has the patient had their temperature checked every day?
3. What is the patient's temperature today?
4. Does the patient have a cough?
5. Does the patient have shortness of breath?
6. Does the patient have access to adequate mental health services in the current location?
7. Is the patient appropriate for DSH placement?
8. Is the patient transferring from an institution that had a staff or patient test positive for COVID-19?
9. If so, was the patient potentially exposed to the staff or patient who tested positive?
10. If so, how long has it been since the exposure?
11. If so, when was CDCR notified of the staff or patient who tested positive at that institution?
12. If so, has the patient been in quarantine or isolation?

    a. If so, when was the patient placed in quarantine or isolation?
    b. How long was the patient placed in quarantine or isolation?
    c. Was the patient continuously held in quarantine or isolation?

13. Does the patient have any underlying medical conditions?

14. If, yes list the medical conditions_____
_____

Exhibit 8

Monday, 3/30/2020

Time: 04:31 PM

**PSYCHIATRIC INPATIENT PROGRAMS CENSUS AND PENDING LIST REPORT AS OF 03/30/2020**

| Facility | Bed Capacity | Beds Occupied | | Beds Redlined | Pending List | |
|---|---|---|---|---|---|---|
| **Male Acute Care Programs** | | | | | | |
| PIP-Vacaville | 218 | No Score: | 3 | | Pending Bed Availability/Endorsement: | 16 |
| | | Level I: | 13 | | Endorsed & Pending Inpatient Program | 2 |
| | | Level II: | 44 | | *Accepted & Pending Transfer:* | 1 |
| | | Level III: | 31 | | | |
| | | Level IV | 104 | | | |
| | | **Total Census:** | **195** | 0 | | |
| PIP-Stockton | 224 | No Score: | 8 | | Pending Bed Availability/Endorsement: | 23 |
| | | Level I: | 15 | | Endorsed & Pending Inpatient Program | 1 |
| | | Level II: | 55 | | *Accepted & Pending Transfer:* | 4 |
| | | Level III: | 24 | | | |
| | | Level IV | 112 | | | |
| | | **Total Census:** | **214** | 0 | | |
| DSH-Atascadero | 0 | No Score: | 0 | | Pending Bed Availability/Endorsement: | 0 |
| | | Level I: | 0 | | Endorsed & Pending Inpatient Program | 0 |
| | | Level II: | 0 | | *Accepted & Pending Transfer:* | 0 |
| | | Level III: | 0 | | | |
| | | Level IV | 0 | | | |
| | | **Total Census:** | **0** | 0 | | |
| **Totals for Male Acute** | **442** | | **409** | **0** | | |
| **Male Intermediate Care Facility (High Custody) Programs** | | | | | | |
| PIP-Stockton | 310 | No Score: | 3 | | Pending Bed Availability/Endorsement: | 20 |
| | | Level I: | 10 | | Endorsed & Pending Inpatient Program | 4 |
| | | Level II: | 52 | | *Accepted & Pending Transfer:* | 1 |
| | | Level III: | 26 | | | |
| | | Level IV | 211 | | | |
| | | **Total Census:** | **302** | 0 | | |
| | | *Total out of LRH:* | *171* | | | |
| PIP-Vacaville | 94 | No Score: | 2 | | Pending Bed Availability/Endorsement: | 30 |
| | | Level I: | 5 | | Endorsed & Pending Inpatient Program | 2 |
| | | Level II: | 22 | | *Accepted & Pending Transfer:* | 1 |
| | | Level III: | 13 | | | |
| | | Level IV | 45 | | | |
| | | **Total Census:** | **87** | 0 | | |
| | | *Total out of LRH:* | *52* | | | |
| PIP-Vacaville Multi-person Cells | 70 | No Score: | 1 | | Pending Bed Availability/Endorsement: | 6 |
| | | Level I: | 0 | | Endorsed & Pending Inpatient Program | 5 |
| | | Level II: | 14 | | *Accepted & Pending Transfer:* | 2 |
| | | Level III: | 10 | | | |
| | | Level IV | 35 | | | |
| | | **Total Census:** | **60** | 0 | | |
| | | *Total out of LRH:* | *26* | | | |

**PSYCHIATRIC INPATIENT PROGRAMS CENSUS AND PENDING LIST REPORT AS OF 03/30/2020**

| Facility | Bed Capacity | Beds Occupied | | Beds Redlined | Pending List | |
|---|---|---|---|---|---|---|
| PIP-Salinas Valley | 202 | No Score: | 1 | | Pending Bed Availability/Endorsement: | 16 |
| | | Level I: | 5 | | Endorsed & Pending Inpatient Program | 4 |
| | | Level II: | 27 | | *Accepted & Pending Transfer:* | 3 |
| | | Level III: | 25 | | | |
| | | Level IV | 126 | | | |
| | | PC 1370: | 12 | | | |
| | | WIC 7301: | 2 | | | |
| | | **Total Census:** | **198** | 0 | | |
| | | *Total out of LRH:* | *81* | | | |
| PIP-Salinas Valley Multi-person Cells | 44 | No Score: | 0 | | Pending Bed Availability/Endorsement: | 8 |
| | | Level I: | 1 | | Endorsed & Pending Inpatient Program | 0 |
| | | Level II: | 7 | | *Accepted & Pending Transfer:* | 4 |
| | | Level III: | 5 | | | |
| | | Level IV | 26 | | | |
| | | PC 1370: | 0 | | | |
| | | WIC 7301: | 0 | | | |
| | | **Total Census:** | **39** | 0 | | |
| | | *Total out of LRH:* | *15* | | | |
| **Totals for Male ICF High Custody** | **720** | | **686** | ***0*** | | |
| **Male Intermediate Care Facility (Low Custody) Programs** | | | | | | |
| PIP-Vacaville Dorms | 84 | No Score: | 0 | | Pending Bed Availability/Endorsement: | 13 |
| | | Level I: | 5 | | Endorsed & Pending Inpatient Program | 3 |
| | | Level II: | 22 | | *Accepted & Pending Transfer:* | 1 |
| | | Level III: | 15 | | | |
| | | Level IV | 33 | | | |
| | | **Total Census:** | **75** | 0 | | |
| | | *Total out of LRH:* | *23* | | | |
| DSH-Atascadero | 256 | No Score: | 0 | | Pending Bed Availability/Endorsement: | 0 |
| | | Level I: | 29 | | Endorsed & Pending Inpatient Program | 1 |
| | | Level II: | 131 | | *Accepted & Pending Transfer:* | 0 |
| | | Level III: | 29 | | | |
| | | Level IV | 47 | | | |
| | | **Total Census:** | **236** | 0 | | |
| DSH-Coalinga | 50 | No Score: | 0 | | Pending Bed Availability/Endorsement: | 0 |
| | | Level I: | 2 | | Endorsed & Pending Inpatient Program | 0 |
| | | Level II: | 24 | | *Accepted & Pending Transfer:* | 0 |
| | | Level III: | 9 | | | |
| | | Level IV | 13 | | | |
| | | **Total Census:** | **48** | 0 | | |
| **Totals for Male ICF Low Custody** | **390** | | **359** | **0** | | |

**PSYCHIATRIC INPATIENT PROGRAMS CENSUS AND PENDING LIST REPORT AS OF 03/30/2020**

| Facility | Bed Capacity | Beds Occupied | | Beds Redlined | Pending List | |
|---|---|---|---|---|---|---|
| | | | | | **Male Programs** | |
| PIP-San Quentin | 30 | **Total Census:** | **26** | **0** | Pending Bed Availability/Endorsement: | 0 |
| | | | | | Endorsed & Pending Inpatient Program | 0 |
| | | | | | *Accepted & Pending Transfer:* | 0 |
| PIP-San Quentin Non-condemned | 10 | No Score: | 0 | | Pending Bed Availability/Endorsement: | 0 |
| | | Level I: | 0 | | Endorsed & Pending Inpatient Program | 0 |
| | | Level II: | 0 | | *Accepted & Pending Transfer:* | 0 |
| | | Level III: | 1 | | | |
| | | Level IV: | 1 | | | |
| | | **Total Census:** | **2** | 0 | | |
| **Totals for Male ICF/Acute** | **40** | | **28** | **0** | | |
| | | | | | **Female Programs** | |
| DSH-Patton | 30 | No Score: | 0 | | Pending Bed Availability/Endorsement: | 0 |
| | | Level I: | 5 | | Endorsed & Pending Inpatient Program | 0 |
| | | Level II: | 8 | | *Accepted & Pending Transfer:* | 0 |
| | | Level III: | 1 | | | |
| | | Level IV: | 1 | | | |
| | | **Total Census:** | **15** | 0 | | |
| PIP-California Institution for Women | 43 | No Score: | 5 | | Pending Bed Availability/Endorsement: | 0 |
| | | Level I: | 5 | | Endorsed & Pending Inpatient Program | 1 |
| | | Level II: | 10 | | *Accepted & Pending Transfer:* | 0 |
| | | Level III: | 2 | | | |
| | | Level IV: | 15 | | | |
| | | WIC 7301: | 1 | | | |
| | | **Total Census:** | **38** | 0 | | |
| | | *Total out of LRH:* | *6* | | | |
| **Totals for Female ICF/Acute** | **73** | | **53** | **0** | | |
| | | | | | **Total Inpatient Program Capacity and Census - Male and Female** | |
| **GRAND TOTALS** | **1665** | | **1535** | **0** | Pending IRU Review: | 8 |
| | | | | | Pending LRH Determination: | 8 |
| | | | | | Pending Bed Availability/Endorsement: | 132 |
| | | | | | Endorsed & Pending Inpatient Program | 23 |
| | | | | | Accepted & Pending Transfer: | 17 |
| | | | | | **Total Pending:** | **188** |
| | | | | | **APP Referrals Outside Compliance:** | **3** |
| | | | | | **ICF Referrals Outside Compliance:** | **5** |

**Note:** *3 APP outside compliance are pending 2 medical holds and 1 COVID-19 exceptions; 5 ICF outside compliance are pending COVID-19 exceptions.*

Exhibit 9

**From:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>
**Sent:** Monday, March 30, 2020 3:56 PM
**To:** Lisa Ells <LElls@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Hessick, Jerome@CDCR <Jerome.Hessick@cdcr.ca.gov>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Daye, Eureka@CDCR <Eureka.Daye@cdcr.ca.gov>; Christine Ciccotti <Christine.Ciccotti@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Cooper, Angelyne <acooper@pldlaw.com>; Brian Main <psydocmain@gmail.com>; cradavsky@gmail.com; hdlugacz@blhny.com; James DeGroot <upcjdegroot@gmail.com>; Metzner, Jeffrey <jeffrey.metzner@cuanschutz.edu>; Karen Rea <karenrea01@gmail.com>; dockc99@aol.com; Walsh Kerry F. <kwalsh@pldlaw.com>; Hector Kristina <khector@pldlaw.com>; Lindsay Hayes <lhayesta@msn.com>; McClendon-Hunt, LaTri-c-ea <lmcclendonhunt@pldlaw.com>; Lopez, Lana L. <llopez@pldlaw.com>; maria@drmariamasotta.com; Lopes Matthew <mlopes@pldlaw.com>; Jones Mohamedu <mjones@pldlaw.com>; mperrien@aol.com; harconwil@gmail.com; Gribbin Rachel <rgribbin@pldlaw.com>; Costa Regina <rcosta@pldlaw.com>; Rod Hickman Gmail <rqhickman@gmail.com>; Raffa Steven <sraffa@pldlaw.com>; trougeux@hotmail.com; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>
**Subject:** Coleman - Inpatient Census and Waitlist Report/Out of ULD LRH

All,

Attached is a point in time census and wait list report generated on March 29, 2020.

Additionally, below is a point in time table showing the number of patients with an Unlocked Dorm LRH and, of those, the number of patients who are clinically referred at this time to that LRH. Not reflected in that table are ten PIP patients who recently arrived in a bed but have not been clinically reviewed as of this writing.

| Location | Total ULD LRH | Clinically Cleared for ULD |
|---|---|---|
| Waitlist (Male) | 13 | 7 |
| Acute (Step Down) | 7 | 4 |
| CHCF PIP | 33 | 8 |
| CMF PIP | 31 | 12 |
| SVSP PIP | 26 | 8 |
| SUBTOTAL | 110 | 39 |
| CIW PIP | 6 | 0 |
| TOTAL | 116 | 39 |

*Clinical clearance is completed via IRU for those on the waitlist or via the PIP IDTT for those patients in a bed.

Nick Weber
Attorney

Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
(916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Exhibit 10

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Tuesday, March 31, 2020 3:19 PM
**To:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Lisa Ells <LElls@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Hessick, Jerome@CDCR <Jerome.Hessick@cdcr.ca.gov>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Daye, Eureka@CDCR <Eureka.Daye@cdcr.ca.gov>; Christine Ciccotti <Christine.ciccotti@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Fouch, Adam@CDCR <Adam.Fouch@cdcr.ca.gov>; Flores, Marcie@CDCR <Marcie.Flores@cdcr.ca.gov>; Barney-Knox, Barbara@CDCR <Barbara.Barney-Knox@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>; Cooper, Angelyne <acooper@pldolaw.com>; Medlin, Braxton H. <bmedlin@pldolaw.com>; Brian Main <psydocmain@gmail.com>; <cradavsky@gmail.com>; <hdlugacz@blhny.com>; James DeGroot <upcjdegroot@gmail.com>; Metzner, Jeffrey <jeffrey.metzner@cuanschutz.edu>; Sorah, Joseph P. <jsorah@pldolaw.com>; Kahlil Johnson <kjohnson@kahliljohnsonpsychiatry.com>; Karen Rea <karenrea01@gmail.com>; <dockc99@aol.com>; Walsh Kerry F. <kwalsh@pldolaw.com>; Hector Kristina <khector@pldolaw.com>; L Hayes <lhayesta@msn.com>; McClendon-Hunt, LaTri-c-ea <lmcclendonhunt@pldolaw.com>; Lopez, Lana L. <llopez@pldolaw.com>; <maria@drmariamasotta.com>; Lopes Matthew <mlopes@pldolaw.com>; Jones Mohamedu <mjones@pldolaw.com>; <mperrien@aol.com>; <harconwil@gmail.com>; Gribbin Rachel <rgribbin@pldolaw.com>; Costa Regina <rcosta@pldolaw.com>; Rod Hickman <rqhickman@gmail.com>; <trougeux@hotmail.com>; Tavares, Zelia M <ztavares@pldolaw.com>
**Subject:** Coleman: Functional Fill Rates at PIPs as of 3/30/2020

All,

Below are the functional fill rates for the CMF, SVSP, and CHCF PIPs for yesterday, March 30th, as well as a summary of the mental health services provided at CMF and SVSP for that day. Please note that all of this information is point in time and will change from day to day based on numerous factors.

**CMF PIP:**
Functional fill rate:
RTs: 22%
Social Workers: 29%
Psychologists: 25%
Psychiatrists: 19%

Four designated clinicians round all patients daily. Out of cell individual contacts are prioritized with emergent and urgent patients seen daily. Admissions and discharges are occurring. RTs round every unit daily. In-cell activities and some modified floor activities are provided. For example, RTs are walking tiers with instruments and playing music, as well as bingo.

**SVSP PIP:**
Functional fill rate:
RTs: 40%

Social Workers:  50%
Psychologists: 70%
Psychiatrists:  60%

Groups, IDTTs, and individual contacts occurred on 3/30/2020 with social distancing. No social dining. Limited yard and dayrooms to allow for social distancing.

**CHCF PIP:**
Functional fill rate:
RTs:  66%
Social Workers:  54%
Psychologists:  48%
Psychiatrists:  48%

We will provide point in time information for the other PIPs once it has been collected.

Respectfully,

*Melissa C. Bentz*

Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email:   Melissa.Bentz@cdcr.ca.gov
Office Phone: (916) 324-7177
Cell Phone: (916) 628-5385
Fax: (916) 327-5306

ATTORNEY CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

Exhibit 11

**From:** Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Sent:** Wednesday, April 1, 2020 7:20 PM
**To:** Lisa Ells <LElls@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Donald Specter <dspecter@prisonlaw.com>; Cooper, Angelyne <acooper@pldolaw.com>; Medlin, Braxton H. <bmedlin@pldolaw.com>; Brian Main <psydocmain@gmail.com>; cradavsky@gmail.com; hdlugacz@blhny.com; James DeGroot <upcjdegroot@gmail.com>; Metzner, Jeffrey <jeffrey.metzner@cuanschutz.edu>; Sorah, Joseph P. <jsorah@pldolaw.com>; Kahlil Johnson <kjohnson@kahliljohnsonpsychiatry.com>; Karen Rea <karenrea01@gmail.com>; dockc99@aol.com; Walsh Kerry F. <kwalsh@pldolaw.com>; Hector Kristina <khector@pldolaw.com>; L Hayes <lhayesta@msn.com>; McClendon-Hunt, LaTri-c-ea <lmcclendonhunt@pldolaw.com>; Lopez, Lana L. <llopez@pldolaw.com>; maria@drmariamasotta.com; Lopes Matthew <mlopes@pldolaw.com>; Jones Mohamedu <mjones@pldolaw.com>; mperrien@aol.com; harconwil@gmail.com; Gribbin Rachel <rgribbin@pldolaw.com>; Costa Regina <rcosta@pldolaw.com>; Rod Hickman <rqhickman@gmail.com>; trougeux@hotmail.com; Tavares, Zelia M <ztavares@pldolaw.com>
**Cc:** Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Kyle Lewis <Kyle.Lewis@doj.ca.gov>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Daye, Eureka@CDCR <Eureka.Daye@cdcr.ca.gov>; Christine Ciccotti <Christine.ciccotti@dsh.ca.gov>; Raddatz, Antonina@DSH-S <Antonina.Raddatz@dsh.ca.gov>; Kent, Kristopher@DSH-S <Kristopher.Kent@dsh.ca.gov>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; Flores, Marcie@CDCR <Marcie.Flores@cdcr.ca.gov>; Barney-Knox, Barbara@CDCR <Barbara.Barney-Knox@cdcr.ca.gov>; Ceballos, Laura@CDCR <Laura.Ceballos@cdcr.ca.gov>; Mehta, Amar@CDCR <Amar.Mehta@cdcr.ca.gov>; Fouch, Adam@CDCR <Adam.Fouch@cdcr.ca.gov>; Stafford, Carrie@CDCR <Carrie.Stafford@cdcr.ca.gov>
**Subject:** Coleman: PIP Staffing and MH Program Information- 4/1/2020

All,

Below is staffing information for the CMF, SVSP, and CHCF PIPs for today, April 1, 2020. The information includes the number of positions allocated to the PIP, the total number of positions filled, and the number of people who called out today. This information is meant to show the impact of COVID on staffing. Thus, the numbers are independent of one another and will not reflect the fill rate as reported to the Court. We do not have staffing numbers specific to the CIW and SQ PIP as the allocations are part of the total institution allocation and not separated out like the allocations for the CHCF, SVSP, and CMF PIPs. A summary of the mental health services provided for all of the PIPs is also included below. All information contained in this email is point in time and will change from day to day based on numerous factors.

**CHCF PIP**
Psychiatry:  33 allocated, 20 filled, 1 call out today
Psychology:  29 allocated, 20 filled, 5 call outs today
Social Worker:  33 allocated, 22 filled, 4 call outs today
RT:  32 allocated, 29 filled, 6 called out today

Summary of program:

One unit on Droplet Precaution Quarantine; 3 patients in isolation on that unit, with others allowed to program as usual, albeit with social distancing in place (smaller group sizes - 5 patients max).  The 3 patients in isolation have cell-front contacts, and access to safety/emergency programming and showers (showering last, after other patients are done).  The other 16 units are directed to provide full-service programming, with social distancing in place.

**CMF PIP**
Psychiatry:  32 allocated, 16.5 filled, 5 call outs
Psychology:  27.5 allocated, 17 filled, 10 call outs
Social Worker:  27.5 allocated, 21.75 filled, 7 call outs,
RT:  27 allocated, 25 filled, 12 call outs

Summary of program:
All units rounded by a supervisor daily to triage and make clinical assignments. RT rounds daily with in-cell and tier activities. Approximately 3 hours unstructured out of cell time per day. Initial and discharge IDTTs occurring regularly and routine IDTTs are conducted as able.

**SVSP PIP**
Psychiatry:  10 allocated, 6 filled, 0 call outs
Psychology:  10 allocated, 9 filled, 3 call outs
Social Worker:  10 allocated, 7 filled, 2 call outs
RT:  10 allocated, 2 call outs
Several MH staff with child care or other family care issues have told us they have a resolution in place for next week and should return to work.

Summary of program:
PIP offered 1.5 hours of yard, 1 hour of dayroom per inmate (except MAX custody). Estimated clinical out of cell hours for today is 1.4. Group sizes are reduced to 9 patients for social distancing; however, some groups were cancelled due to staffing shortages. No capacity to increase the number of groups being offered at this time to offset the decreased size of each group. Clinical contacts and IDTTs occurring today.

**CIW PIP**
Summary of program:
One group per day is being offered with reduced number and social distancing. In cell packets given to patients where previous groups were scheduled. There is no dayroom currently running. An estimated 3-4 hours of out of cell time is provided, which includes additional yard time. Individual services continue as usual. IDTTs are being help in abstentia. Prior to the IDTT, the PC develops a plan with the patient and then coordinates with the remaining team members during the IDTT.

**SQ PIP**
Staffing- one psychologist has been out for two weeks as a result of COVID related issues.

Summary of program:
Acute offered 2 hours clinical group and 1.25 yard today. ICF offered 2.7 hours of clinical group and 1.25 of yard.

Respectfully,

*Melissa C. Bentz*

Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email:   Melissa.Bentz@cdcr.ca.gov
Office Phone: (916) 324-7177
Cell Phone: (916) 628-5385
Fax: (916) 327-5306

ATTORNEY CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO
NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE
AUTHOR.