DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>GAVIN NEWSOM, et al.,<br><br>   Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' RESPONSE TO APRIL 6, 2020 ORDER [ECF NO. 6580]**<br><br>Judge: Hon. Kimberly J. Mueller |

On April 6, 2020, the Court ordered the parties to file simultaneous briefing addressing two questions:

1. In light of the coronavirus pandemic, what are the constitutional minima required for physical safety for Coleman class members? Is six feet of physical distancing required by the Constitution? If not, why not and what is required?

2. Assuming some level of physical distancing is required by the Constitution, what additional steps, if any, must be taken to ensure that defendants continue to deliver to Coleman class members at a minimum the level of mental health care that has thus far been achieved in the ongoing remedial process in this case, focused on achieving the delivery of constitutionally adequate mental health care to the plaintiff class?

Apr. 6, 2020 Order, ECF No. 6580 at 2. Plaintiffs address these questions below.

**I.    The Constitutional Minima for Physical Safety of *Coleman* Class Members**

The Constitution requires that incarcerated persons be protected from substantial and known risks of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014). As the Three-Judge Court recognized, "the Eighth Amendment requires Defendants to take adequate steps to curb the spread of disease within the prison system." Apr. 4, 2020 Order, ECF No. 6574 at 8. "Thus far, the only way to stop [COVID-19's] spread is through preventative measures—principal among them maintaining physical distancing sufficient to hinder airborne person-to-person transmission." *Id*. An official demonstrates disregard of a risk by "failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Here, the list of reasonable measures to prevent the spread of COVID-19 is well delineated and largely undisputed by Defendants: physical distancing, washing hands, avoiding crowded places, and disinfecting.

At a minimum, the Constitution requires that CDCR follow the dictates of clinical and public health experts and promptly implement the measures needed to protect

*Coleman* class members from preventable suffering and death as a result of the COVID-19 pandemic. The Eighth Amendment prohibits prison officials from interfering with necessary clinically required protections. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). During this COVID-19 emergency, clinical and public health requirements must be top priority. Failure to heed clinical and public health requirements will lead to otherwise preventable suffering and death not only of *Coleman* class members, but of other persons who live and work in CDCR prisons, and of persons in the surrounding communities where CDCR clinical and custody staff live.

While "[c]reating physical distancing is uniquely difficult in a congregate environment like a prison," Apr. 4, 2020 Order, ECF No. 6574 at 9, "'crowding generates unsanitary conditions, overwhelms the infrastructure of existing prisons, and increases the risk that infectious diseases will spread,'" *id*. at 14 (quoting *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 931 (E.D. Cal./N.D. Cal. 2009)). Because CDCR continues to house the *Coleman* class in extremely crowded and unsanitary conditions, CDCR officials faced additional impediments and were required to move even more swiftly to follow the dictates of the public health experts and implement measures necessary to allow minimally adequate preventative measures. The Constitution requires more effort, not less, when there is a greater risk of harm caused by the very crowded conditions that Defendants have allowed to persist.

The Court also asked: "Is six feet of physical distancing required by the Constitution? If not, why not, and what is required?" The first answer is a qualified "yes." The second answer is contained in the qualifications to the "yes." CDCR must provide clinical and public health officials with the authority, resources, and space to implement the levels of physical distancing called for by the particular circumstances, and for particular vulnerable populations. For some incarcerated people in some circumstances, the distance may be six feet, as public health officials recommend for the general population moving about in the free world. For other people in other circumstances, the necessary distance may be more or less than six feet, and may include a solid barrier or

even negative air pressure. For purposes of virus transmission, "distance" includes other factors, such as the number of surfaces and objects that people must share with others, and how often such objects can be cleaned and/or sanitized. The Constitution requires that clinical and public health officials be provided with the ability to bring about the necessary safety and "distancing" for each population. What the Constitution *prohibits* are acts or omissions by CDCR that prevent clinical and public health officials from applying the right distancing approach to the right population. Such acts or omissions include leaving particular prisons or housing units so overcrowded that officials cannot implement the necessary distancing, or refusing to swiftly act to implement sufficient releases or transfers necessary to achieve the necessary distancing.

Courts all over the country have recognized that physical distancing is necessary to protect the lives and health of incarcerated persons, and have issued release orders grounded in part on findings that facilities cannot ensure physical distancing.[1]

The *Coleman* class contains several distinct populations in terms of COVID-19 risk, and in terms of housing. The *Coleman* class contains many people over age 65, and approximately half the class has co-morbidities that put them at particular risk for adverse COVID-19 outcomes.[2] As time passes, many *Coleman* class members will transition from

---

[1] *See, e.g.*, *Castillo v. Barr,* CV2000605TJHAFMX, 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) (granting TRO for release of detainees at Adelanto, California detention center in part because conditions of confinement took away ability to socially distance); *Basank v. Decker*, No. 20-cv-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020)(granting TRO for release of immigration pre-trial detainees in part because "[r]espondents could not represent that the detention facilities were in a position to allow inmates to remain six feet apart from one another, as recommended by the Centers for Disease Control and Prevention"); *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant because "[s]ocial distancing in a pretrial facility is nearly impossible for anyone who enters its doors, especially detainees"); *United States v. Colvin*, No. 3:19cr179 (JBA), 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (noting defendant's multiple health conditions, including diabetes, and "inability to practice effective social distancing and hygiene to minimize her risk of exposure" as reasons justifying her immediate release).

[2] According to March 30, 2020 data provided by the *Plata* Receiver, over 1,600 *Coleman* class members were over 65 and approximately 50% of the class had at least one risk factor for adverse COVID-19 Outcomes. Decl. of Don Specter In Supp. Of Pls.'

the at-risk groups to being actual COVID-19 patients, subject to isolation or quarantine. Indeed, more than half of the 19 incarcerated people who have tested positive to date are *Coleman* class members.[3] In addition, the *Coleman* class is housed in various ways, with a significant number of patients housed in dorms, and most of them in dorms crowded at or beyond their design capacity.[4] CDCR's crowded and double-bunked dorms, especially when they are housing medically vulnerable *Coleman* class members, fail by any measure to allow for even the hypothetical possibility of providing the recommended physical distancing, cleanliness, and other standards necessary to stop the spread of COVID-19.

The Constitution requires immediate action to achieve the following as to both the *Coleman* class and all other incarcerated persons. The following mitigation measures are taken from the concurrently filed declaration of Dr. Marc Stern. These mitigation measures or their equivalents are required given the present state of knowledge about COVID-19; more steps might be required in the future as we learn more about transmission:

1. Identification of those people who are at the highest risk for severe complications from the virus. Stern Decl. ¶ 13.
2. Immediate steps to ensure that such high-risk individuals are safety situated, either by releasing them, or ensuring that they are safely housed where they can best practice physical distancing. *Id.*
3. Immediate steps to downsize the population to the lowest number possible at each prison by release or transfer to a safe alternative. Priority should be

---

Emergency Mot., ECF No. 6559, Exh. B at 17 (listing 1,267 CCCMS individuals, 309 EOP individuals, and 27 individuals at higher levels of care, for a total of 1,603 *Coleman* class members aged 65 or over); *see also id.* (listing 13,492 CCCMS individuals, 3,565 EOP individuals and 724 individuals at higher levels of care, for a total of 17,718 of the 35,920 person class (49.5%), as "patients with at least 1 risk factor" for COVID-19).
[3] As of the time of this writing, 11 *Coleman* class members have tested positive: eight Enhanced Outpatient Program ("EOP") patients at CSP-Lancaster (LAC) and three Correctional Clinical Case Management System ("CCCMS") patients at California Institution for Men (CIM). Bien Decl. ¶ 2.
[4] Decl. Of Michael W. Bien In Supp. Of Pls.' Emergency Mot, ECF No. 6529,. ¶¶ 18-19

|   |   |   |
|---|---|---|
| | | given to releasing high-risk individuals and those in crowded dormitories. This process will create space to deal with the need for isolation and quarantine, and allow greater opportunities for physical distancing to slow the spread of the virus.  *Id.* ¶ 14. |
| | 4. | Immediate planning to address foreseeable changes in conditions, including a reduction in workforce (custody and healthcare staff) as workers respond to their personal needs (self-quarantine or isolation, care for ill relatives, staying at home with school-age children).  Such planning may require further population downsizing.  *Id.* ¶ 16. |

## II.  Additional Steps Necessary for Delivery of Mental Health Care

The *Coleman* class was *not* receiving mental health care at the minimally adequate level required by the Constitution before COVID-19.  *See, e.g.*, Apr. 4, 2020 Order, ECF No. 6574 at 15 ("It is undisputed that the delivery of [mental health] care, to date, remains below constitutional minima.") (Mueller, J. concurring).  And CDCR's woeful response to the pandemic, beginning in March 2020, has made conditions far worse for the *Coleman* class.  The population reduction measures instituted by Defendants to date have not been targeted to the medically vulnerable and were too late and too small to significantly reduce the crowded dorms.  *See* Decl. of Michael W. Bien filed herewith ("Bien Decl"), ¶ 22 & Exh. 20.

Defendants permitted the Department of State Hospitals on March 16, 2020 to deny admittance to inpatient psychiatric hospitalization to *Coleman* class members in need of ICF hospitalization without any plan in place to substitute additional psychiatric hospital resources.  *See* Special Master's Amended Report on the Current Status of the *Coleman* Class Members' Access to Inpatient Care in the Department of State Hospitals ("Amended 2020 DSH Access Report"), ECF No. 6579, at 8 (Apr. 6, 2020).  To date, Defendants have refused to reopen DSH to *Coleman* class members under any conditions.  *See* Apr. 3, 2020 Order, ECF No. 6572 at 2; Amended 2020 DSH Access Report at 10, 31.

Defendants' primary response to COVID-19 has been to reduce and restrict group

treatment and transfers to higher levels of mental health care within CDCR prisons, even though they lack any concomitant plan to provide enhanced treatment to class members needing inpatient treatment who are stuck in EOP and general population units instead. If Defendants' current plan[5] moves forward, patients in need of inpatient psychiatric hospitalization will no longer transfer to an outside Mental Health Crisis Bed ("MHCB") or Psychiatric Inpatient Unit ("PIP") unless they make it through a many-leveled veto process required before any such transfer can occur—even from institutions without a crisis bed unit or PIP. Bien Decl. ¶ 8 & Exh. 7. The best case scenario for those acutely ill patients who by definition cannot function at lower levels of care will instead be to receive treatment in temporary mental health units that do not currently exist, where clinical staff of undefined levels are expected to follow treatment guidelines Defendants have not even begun to develop. *See id.*.

While mental health treatment in the PIPs is not currently at constitutional levels, *see* Amended 2020 DSH Access Report at 29, restrictions on access to the PIPs for patients in need of psychiatric hospitalization makes a bad situation even worse. Defendants recognize that "[m]ental health patients are at increased risk for escalation in depression, anxiety, panic attacks, psychomotor agitation, psychotic symptoms, delirium, and suicidality during this COVID-19 pandemic." Defs.' Plan Addressing COVID-19 Pandemic, ECF No. 6535 at 5 (Mar. 27, 2020). As the virus progresses, the demand for mental health treatment from both class members and people outside the class will *increase* at the same time that staffing levels *decrease* due to staff illness and other factors.

---

[5] It is unclear how Defendants' current plan interacts with their prior COVID triage plan, which provided for a tiered approach to mental health programming and services depending on how severely staffing levels at a given institution or program are affected by COVID. *See generally* Defs.' Plan Addressing COVID-19 Pandemic, ECF No. 6535 (Mar. 27, 2020). But that policy too provided for elimination of essentially all groups and other out of cell treatment and programming by the third tier, and severe if not total prohibitions on transfers to higher levels of care. *Id.* at 15-17.

This will surely exacerbate Defendants' ongoing suicide crisis.[6]

Almost three-quarters of the record high number of suicides in 2019 were of *Coleman* class members and a quarter of the people who died by suicide had been treated in an inpatient bed in the months before their deaths and then discharged just prior to their suicides, and another quarter likely needed some form of inpatient care but were never transferred to an inpatient setting to receive it before they killed themselves. Amended 2020 DSH Access Report at 29-30.

Defendants' most extreme response has been at its most dangerous prison, California State Prison, Sacramento ("SAC"), which houses 1,309 class members including 751 EOPs, 172 of whom are in the Psychiatric Services Unit ("PSU") and another 64 in the EOP Administrative Segregation Unit ("ASU"), and where any and all external transfers to MCHB, Intermediate Care Facility ("ICF"), and Acute Psychiatric Program ("Acute") levels of care have been suspended since March 25, 2020. *See* Bien Decl. ¶¶ 25-26 & Exhs. 21-22; *see also* Amended 2020 DSH Access Report at 51. As of March 28, 2020, the entire SAC institution stopped running mental health groups, and individual clinical contacts were reportedly occurring once per week at patients' cell-front. Bien Decl. ¶ 27 & Exh. 23. Although SAC continues to admit patients to its MHCB internally, the capacity is only 33 beds, many of which are unlicensed. *Id.*

As of March 31, 2020, 18 SAC patients had pending PIP referrals, seven of which are past timeframes. Bien Decl. ¶ 28 & Exh. 24. Due to bed shortages, some of those acutely ill people are suffering in SAC's extremely dangerous segregation units. Bien Decl. ¶ 27 & Exh. 23. Nine suicides occurred at SAC in 2019 and eight of the nine were at the EOP level of care; six of the nine suicides were in EOP segregation units. Bien Decl. ¶ 24. Four of the nine suicides involved discharges from psychiatric hospitalization in a

---

[6] In 2019, CDCR had an astronomical suicide rate of 30.3 suicides per 100,000 prisoners, an increase of 15% over the 2018 rate, and the highest rate on record in this case. *See* Corrected Decl. of Cara E. Trapani In Supp. Of Pls.' Proposed Agenda Items for First Quarterly Status Conf., ECF No. 6495, ¶¶ 2-3 (Mar. 3, 2020).

crisis bed or PIP within a few weeks and as little as five hours before the death. *Id.*

Finally, despite the well-known harms of segregation on people with serious mental illness, *see, e.g.*, *Coleman v. Brown,* 28 F. Supp. 3d 1068, 1095 (E.D. Cal. 2014), Decl. of Craig Haney in Supp. of Pls.' Emergency Mot. ("Haney Decl."), ECF No. 6526, ¶ 16, Defendants' response to the pandemic has resulted in increased use of solitary confinement-like conditions, and decreased mental health treatment and access to yard, family visiting and other activities. *See* Defs.' Plan Addressing COVID-19 Pandemic, ECF No. 6535 at 4 (Mar. 27, 2020). Indeed, it is Plaintiffs' understanding that most group therapy has ceased system wide, and that most, if not all, clinical contacts are now occurring cell-front in high security units, to the extent they are occurring at all. Bien Decl. ¶ 8.

On April 7, CDCR imposed a COVID-19 Mandatory 14-Day Modified Program, restricting even more programming, treatment and activities at all prisons. Bien Decl. ¶ 18 & Exh 17. Defendants' COVID-19 strategy, including the lockdown, will certainly increase the demand for mental health services from the whole population and exacerbate existing psychiatric symptoms and referrals for higher levels of care, including inpatient psychiatric hospitalization for the *Coleman* class. *See* Haney Decl. ¶¶ 11-16.

Staffing shortages plagued the delivery of mental health services before the pandemic and are only getting more dire. *Cf.* Oct. 8, 2019 Order, ECF No. 6312, at 6-7. Numerous CDCR staff, including psychiatrists, psychologists, social workers, and rehabilitation therapists, have fallen ill or "called out" due to the pandemic, exacerbating preexisting clinical staffing shortages, especially in the already "severely strained" PIPs. *See, e.g.*, Amended 2020 DSH Access Report at 22-30, 34. Defendants' tiered plan for triaging mental health services and programming reflects Defendants' reasonable anticipation that clinical and custody staffing will plummet further.

In response to the Court's second question, given these current realities, it is simply not possible for Defendants to provide even the inadequate level of mental health care that existed in February 2020 under these conditions. While there are steps that may be taken to mitigate the harm to the *Coleman* class, it is inevitable that the pandemic will result in a

denial of minimally adequate mental health care and cause unnecessary and avoidable pain, suffering and even death unless the population is swiftly reduced. The following measures, if rapidly implemented, will tend to lessen the harm.

### 1. Transfer Medically Vulnerable to Locations Where Necessary Mental Health Care Is Possible.

First, Defendants should be ordered to transfer medically vulnerable *Coleman* class members from their current dangerous prisons to locations where they can be both safely housed and received necessary mental health care. As the Three-Judge Court observed, the *Plata* court's 2013 Valley Fever Order offers a roadmap for just such action. *See* Apr. 4, 2020 Order, ECF No. 6574 at 9-10.[7] Because these transfers do not involve the same public safety decision-making required for a full release from custody to parole, they can be made without most of the delay of pre-release planning and securing of housing and reentry transportation and services.

As part of this process, the Court should order Defendants to identify additional resources for inpatient psychiatric hospitalization and promptly transfer patients to those beds. Not only should DSH be required to rescind its suspension of admissions and discharges from its existing programs for *Coleman* patients but it should be required to identify and make available additional beds throughout its five hospitals. In addition, Defendants should be required to identify and secure additional inpatient psychiatric hospital capacity in California and transfer *Coleman* patients in need of hospitalization to those beds.

---

[7] Defendants also have ample authority to authorize such releases on their own. California Government Code 8658 allows Defendants to make temporary emergency transfers to safety of medically vulnerable class members to locations where the risk of contracting Covid-19 is substantially reduced. The Governor also has power to grant a reprieve from sentence under Article V, Section 8(a) of the California Constitution. Finally, sections 62010.3.1 and 62010.3.2 of CDCR's Department Operations Manual ("DOM") authorizes Headquarters staff, Wardens, Chief Deputy Wardens to "sign orders for removal of inmates in time of specified disasters and/or temporary community release." *See* https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2019/07/Ch_6_2019_DOM.pdf (last visited Apr. 8, 2020).

### 2. Transfers for Enhanced Outpatient Program Level of Care

Second, Defendants should be ordered to remedy the current serious deficiencies in the provision of mental health care to patients in the EOP level of care by identifying additional resources for this level of care and promptly transferring appropriate patients to those locations. Defendants should be required to identify and secure additional resources that could rapidly be made available for *Coleman* patients, including identifying what additional staffing, security or other resources would be necessary and the date when patients could begin to be transferred.

### 3. Modifications to Policy and Practice

Third, Defendants should be ordered to modify their existing policy and practice in the following ways: (1) expand telemedicine to psychologists and social workers by using tablets or phones, consistent with Governor Newsom's directive loosening all restrictions of the provision of telehealth to expand treatment in the face of the COVID-19 crisis, *see* Bien Decl. ¶ 6 & Exh. 5; (2) modify transfers to higher level of care policy to permit appropriate access; (3) expand phone and mail and email privileges by adding the use of cell phones or tablets; (4) provide entertainment devices to all persons in segregation units, quarantine units and isolation units, PSU and PIPs to mitigate the dangers of isolation; (5) provide a 90-day supply of medications upon discharge and increase "gate money" to $1000 from $200 in light of pandemic conditions in the free world. *See* Bien Decl. ¶ 29.

DATED: April 8, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Michael W. Bien*
Michael W. Bien

Attorneys for Plaintiffs