XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
KYLE A. LEWIS, State Bar No. 201041
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7325
 Fax: (916) 324-5205
 E-mail: Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO COURT'S APRIL 6, 2020 ORDER**<br><br>Judge: The Hon. Kimberly J. Mueller |

## INTRODUCTION

Whether Defendants' response to the COVID-19 pandemic violates the Eighth Amendment of the U.S. Constitution cannot be evaluated by looking at just one factor alone, *i.e.,* the amount of physical distancing between inmates. Rather, the Eighth Amendment's deliberate indifference standard considers the totality of prison administrators' response to a potential harm or injury that demonstrates their subjective intent and whether their actions were "reasonable" in relation to the nature of the potential harm. Here, Defendants have taken a number of significant and bold steps to address the COVID-19 pandemic—and will continue to take further steps to address the daily evolving pandemic—and it is in this context that the constitutionality of their response must be

1

evaluated. Further, the COVID-19 pandemic imposes challenges across all disciplines within CDCR, but most notably the delivery of medical care. For this reason, and to avoid the risk of separate and possibly conflicting decisions pertaining to the delivery of medical care in CDCR's prisons in response to the COVID-19 pandemic, Defendants ask this Court to coordinate its efforts to determine of the adequacy of CDCR's actions to address the COVID-19 pandemic in conjunction with the District Court in *Plata v. Newsom, et. al.*, case no. 4:01-cv-01351-JST (N.D. Cal.). This coordination and collaboration will best focus the parties' and Court's efforts to ensure inmate and staff safety in CDCR's institutions during these unprecedented and challenging times.

**DEFENDANTS' RESPONSE TO ITEM NO. 1**

The Court's April 6, 2020, order directed Defendants to address the following questions: In light of the coronavirus pandemic, what are the constitutional minima required for physical safety for *Coleman* class members? Is six feet of physical distancing required by the Constitution? If not, why not and what is required? (ECF No. 6580 at 2.)

Six feet of physical distancing is not required under the Constitution. Moreover, physical distancing is only one factor to consider in the broader context of the totality of measures CDCR has taken and continues to take daily to address the COVID-19 pandemic.

The constitutional minima required to ensure the physical safety for *Coleman* class members in these unprecedented times must be evaluated in the context of the Eighth Amendment's prohibition of cruel and unusual punishment and the resulting claim for deliberate indifference to serious medical needs. The Eighth Amendment analysis requires both 1) objective proof that inmates face a substantial risk of serious harm, and 2) evidence of the defendant's state of mind about that substantial deprivation. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). When officials respond reasonably to a risk of harm, there is no Eighth Amendment violation even if the harm is not completely averted. *Id.* at 844.

Further, in terms of what constitutional minima are required to ensure the physical safety for *Coleman* class members (and all other inmates at CDCR's prisons), there is no one-approach-fits-all answer. Instead, the Constitution requires that Defendants take all reasonable steps under

2

Defs.' Resp. April 6, 2020 Order (2:90-cv-00520 KJM-DB (PC))

the circumstances, recognizing that each situation is different. This Court stated long ago that the constitutional minima can only be understood contextually, which includes balancing "common sense, and the clinical nature of the problem," with deference to prison administrators. *See Coleman v. Wilson,* 912 F.Supp. 1282, 1301 (1995). Expert-based standards are "helpful and relevant" to the Eighth Amendment analysis, but they do not set fixed constitutional benchmarks. *See Rhodes v. Chapman*, 452 U.S. 337, 348 n.13 (1981). *Hoptowit v. Ray*, 682 F.2d 1237, 1253-54 (9th Cir. 1982) (reversing injunction adopting American Medical Association standard because the district judge "failed to take into account the approach taken by the State").

Defendants acknowledge that the risk of harm by COVID-19 is objectively serious. But according to guidelines published by various governmental health officials and organizations, there are *numerous* measures that Defendants can take (and have already taken) to slow, and hopefully minimize, the spread of COVID-19 within CDCR's 35 institutions. Physical distancing is only one of many measures recommended to slow the spread of COVID-19. *See*, *e.g.*, CDC's Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

In responding to the COVID-19 pandemic, CDCR is facing a number of constraints outside of CDCR's control. Those constraints include, but are not limited to, the time pressure to react quickly to ever-changing developments on a daily, if not hourly, basis; public safety; the safety of inmates and staff; space; staff availability; and the obligation to ensure that the inmates' other constitutional rights (such as the right to food, out-of-cell time, etc.) remain intact while implementing measures to address the COVID-19 pandemic. These constraints also impact Defendants' ability to facilitate physical distancing in CDCR's 35 institutions.

This Court, as a member of the Three Judge Court, is aware of the timely and aggressive measures that CDCR has taken under pressing and uncertain time constraints to address the COVID-19 pandemic—CDCR presented extensive evidence to the Three Judge Court at last week's hearing on Plaintiffs' motion seeking a further inmate release order. (ECF No. 6552.) The fact that physical distancing still varies in areas of CDCR's prisons does not render

3

Defs.' Resp. April 6, 2020 Order (2:90-cv-00520 KJM-DB (PC))

Defendants' conduct wanton or deliberatively indifferent. Even the guidelines of the CDC and the California Department of Public Health (CDPH) acknowledge that physical distancing will vary in prisons. *See* CDC's Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities[1], ("[physical distancing] strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities"); *see also* CDPH's COVID-19 Guidance for Prisons, dated March 24, 2020[2] ("*Wherever possible*, movement, housing, and group activities of inmates should allow social distancing of 6 feet between each person") (emphasis added).

Also, the CDC does not define physical distancing as keeping space between yourself and *everyone* else. Instead, the CDC defines physical distancing as keeping space between yourself and people "outside your household." *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html. While it is not possible to create separations in prisons to mirror the same kind of separate households that exist in the free world, CDCR has taken various steps to separate inmates in housing units from inmates in other housing units. Those steps include, but are not limited to, rearranging scheduled movements to minimize mixing of people from different housing areas and adjusting dining schedules where possible to allow for physical distancing. Also, no rehabilitative programs, group events, or in-person educational classes will take place until further notice. For inmates who live in dorms, CDCR is currently evaluating whether it is feasible to assign groups of approximately eight inmates to family-unit-type pods that are separated from other pods and mirror separate "households" of people who live together and have less or no exposure to inmates in other pods. This approach mirrors physical distancing guidelines for families and co-habitating groups in the community.

---

[1] Available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[2] Available at https://www.cdcr.ca.gov/covid19/wp-content/uploads/sites/197/2020/03/R_CDPH-COVID-19-Guidance-for-Prisons-3.30.20.pdf?label=California%20Department%20of%20Public%20Health%20Guidance%20About%20Novel%20Coronavirus%20(COVID-19)%20for%20California%20Prisons&from=https://www.cdcr.ca.gov/covid19/memos-guidelines-messaging/.

4

Defs.' Resp. April 6, 2020 Order (2:90-cv-00520 KJM-DB (PC))

CDCR has also taken far more steps to address the COVID-19 pandemic than any other state prisons system to date. For example, as of this filing, other large state prison systems in Florida, Michigan, New Jersey, and Texas have not released any inmates in response to the COVID-19 pandemic.[3] In addition, state prisons in Texas and Florida continue or have resumed the intake of new inmates. California has suspended admissions. *See* https://www.gov.ca.gov/2020/03/24/governor-newsom-issues-executive-order-on-state-prisons-and-juvenile-facilities-in-response-to-the-covid-19-outbreak/. And also in contrast to other states, California is in the process of accelerating the release of several thousand inmates. *See* https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/.

Finally, the separation of powers doctrine mandates that courts give deference to prison authorities to determine how best to ensure the physical safety of all inmates, including *Coleman* class members, particularly during times of crisis. *See, e.g., Sandin v. Conner*, 515 U.S. 472, 482-83 (1995) (observing that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment [in a prison]"). Therefore, the State should be given the opportunity to address these important issues without judicial interference.

**DEFENDANTS' RESPONSE TO ITEM NO. 2**

The Court's April 6, 2020 order also directed Defendants to address the following question: Assuming some level of physical distancing is required by the Constitution, what additional steps, if any, must be taken to ensure that Defendants continue to deliver to *Coleman* class members at a minimum the level of mental health care that has thus far been achieved in the ongoing remedial process in this case, focused on achieving the delivery of constitutionally adequate mental health care to the plaintiff class? (ECF No. 6580 at 2.)

///

---

[3] The information can be found here: For Florida: http://www.dc.state.fl.us/comm/covid-19.html and http://www.dc.state.fl.us/comm/press/main/04-03-Intake.html; for Michigan: https://www.wzzm13.com/article/news/health/coronavirus/how-michigans-prison-system-is-addressing-a-rising-covid-19-case-count/69-3da0144d-7571-49e5-81b6-af89815cefa7; for New Jersey: https://www.njspotlight.com/2020/04/covid-19-behind-bars-will-releasing-at-risk-inmates-select-others-keep-lid-on-potential-crisis/; and for Texas: https://www.tdcj.texas.gov/covid-19/index2.html.

5

Defs.' Resp. April 6, 2020 Order (2:90-cv-00520 KJM-DB (PC))

**I.   ALTHOUGH THE CONSTITUTION DOES NOT REQUIRE SOME SPECIFIC LEVEL OF PHYSICAL DISTANCING, DEFENDANTS HAVE PROACTIVELY TAKEN STEPS TO ENSURE CONTINUED DELIVERY OF MENTAL HEALTH CARE TO CDCR'S PATIENTS DURING THE COVID-19 PANDEMIC WHILE ALSO REDUCING POPULATION DENSITY AND LIMITING MOVEMENT.**

The Constitution does not mandate six feet of physical distancing to keep *Coleman* class members safe. Nonetheless, recognizing the COVID-19 pandemic's potential impacts upon all aspects of prison operations, Defendants have taken various actions to ensure that *Coleman* class members continue receiving mental health care services. Working independently on some measures, and with the Special Master and Plaintiffs on other measures in the COVID-19 Task Force, Defendants are striving to provide *Coleman* class members with appropriate mental health care services, while setting conditions to dramatically reduce COVID-19 transmission risks to the inmate and staff populations. Three central goals guide CDCR's statewide mental health program operations during this pandemic: 1) preserving life; 2) stabilizing acute mental health deterioration; and 3) providing coping skills to the mental health populations. (ECF No. 6535 at 5.) Steadfast in these objectives, Defendants have proactively taken the following steps to facilitate, among other things, the continued delivery of mental health services to *Coleman* patients under the present extraordinary and unprecedented circumstances.

**A.   Specialized COVID-19 Mental Health Delivery Guidelines & Tiered Response Plan.**

On March 25, 2020, CDCR's mental health program leadership issued a memorandum titled "COVID-19 – Mental Health Delivery of Care Guidance," which provides institutional guidance and a four-tiered response plan to ensure continued mental health care to all Mental Health Services Delivery System (MHSDS) inmate-patients. (ECF 6535 at 10.) First proposed by Defendants to the COVID-19 Task Force, a body established by this Court and led by the Special Master, this plan was reviewed and discussed with all stakeholders. As a dynamic approach to the provision of mental health services during this evolving pandemic, each tier corresponds to an institution's staffing and operational circumstances, providing real-time flexibility so that institutions can adjust their mental health programming based on existing conditions. For example, tier one provides guidelines to institutions operating close to MHSDS

6

Program Guide requirements, while tier four provides guidelines to institutions with substantially decreased resources. (*Id.*)

To the extent possible, the tiered plan directs that institutions follow current Program Guide policies and procedures including clinical contacts, group and treatment requirements, emergent and urgent referral processes, crisis intervention, suicide prevention, and inpatient referrals, among others. (ECF No. 6535 at 10-14.) These guidelines, developed with the input of the Special Master and Plaintiffs during initial Task Force meetings, strike a delicate balance between providing mental health treatment and minimizing the risk of COVID-19 exposure to both patients and staff during the worldwide pandemic, consistent with various strategies recommended by public health professionals. (ECF No. 6535 at 4-9.) For example, these guidelines direct that individual clinical contacts and Interdisciplinary Treatment Teams shall continue while maintaining physical distancing; groups shall continue but may be reduced in size in order to adhere to physical distancing standards, and larger classrooms or vocational space may be used as alternative locations; patients in COVID-19 isolation and/or quarantine will not attend groups but shall be provided with therapeutic treatment packets, workbooks, and other in-cell activities and shall receive daily rounds by mental health staff; and psychiatry encounters may be via telepsychiatry, utilizing WebEx or Citrix. (*Id.*)

Further demonstrating their commitment to providing services to the patient population if institutions are unable to continue group programming due to physical distancing considerations, mental health staff will conduct increased rounds to check on inmates in their cells and to increase cell-side therapeutic activities. (*Id.* at 5-6.) Recognizing the importance of patient education, particularly during a time of potential increased mental stress, providers are also directed to keep patients informed regarding changes in mental health services that may result from the pandemic's operational impacts. (*Id.* at 7.) Additionally, Defendants are actively exploring the expanded use of telepsychiatry by CDCR providers, thus expanding the pool of resources for patient services while also reducing patient and staff COVID-19 transmission risks. (*Id.* at 8-9.)

///

7

Defs.' Resp. April 6, 2020 Order (2:90-cv-00520 KJM-DB (PC))

**B.    COVID-19 Temporary Transfer Guidelines & Workflow.**

Operating within the framework of the COVID-19 Task Force established by the Court, Defendants are actively working with the Special Master and his experts to develop guidelines for temporary transfers of inmate-patients should they need a higher level of mental health care. During numerous meetings over the past week, including just yesterday, CDCR clinicians evaluated and revised CDCR's proposed guidelines with the Special Master, then discussed the with Plaintiffs.  According to clinicians, the guidelines are meant to supplement the March 25, 2020 "COVID-19 – Mental Health Delivery of Care Guidance" document, and provide institutions with further guidance should a patient need a higher level of care.  Further, if a patient requires emergency inpatient care to prevent serious harm to self or others or to address serious mental health decompensation, referrals to Mental Health Inpatient care shall continue.  The clinicians' guidelines identify four transfer options, which balance the patient's need for a higher level of care with the consideration of decreasing movements and transfers throughout CDCR to prevent the risk COVID-19 transmission.  CDCR clinicians report that, when approved, they will distribute these standardized transfer guidelines to ensure that *Coleman* class members receive necessary and adequate mental health care throughout CDCR's institutions.

**C.    COVID-19 Emergency Mental Health Treatment Guidance.**

To ensure continued delivery of mental health services to *Coleman* class members, CDCR clinicians also report that they are developing an emergency mental health treatment guidance for CDCR institutions.  Building from transfer options delineated in the Mental Health Delivery of Care Guidance, discussed above, the document will provide guidance to institutions regarding the operation of mental health units and other treatment modalities to inmates at their current institution during the COVID-19 pandemic.  Clinicians will present this document to the Special Master's experts shortly for constructive discussion and eventual presentation to Plaintiffs in the COVID-19 Task Force.

**D.    Population Measures Impacting the *Coleman* Class.**

Defendants have also taken unprecedented measures to address overall population density concerns within CDCR's institutions that also directly impact the *Coleman* class.  On March 24,

8

2020, Governor Newsom temporarily suspended all CDCR intake from California county jails for 30 days, which, absent any other measures, will result in a net population reduction of approximately 3,000 inmates. *See* https://www.gov.ca.gov/2020/03/24/governor-newsom-issues-executive-order-on-state-prisons-and-juvenile-facilities-in-response-to-the-covid-19-outbreak/. Furthermore, on March 31, 2020, CDCR Secretary Diaz ordered the Department to expedite the transition to parole of approximately 3,500 non-violent male and female inmates who are within 60 days of their release date. *See* https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/. According to CDCR's Division of Adult Institutions, while not specifically intended to address mental health treatment needs of *Coleman* class members, these measures will reduce the number of MHSDS patients in CDCR and held improve the Department's ability to provide appropriate treatment for its other patients during the pandemic.

     **E.**    **Mandatory 14-Day Modified Program for All CDCR Institutions.**

Most recently, CDCR initiated a statewide institutional modified program intended to benefit all inmates and staff, including *Coleman* class members. Effective April 8, 2020, all CDCR institutions will implement a mandatory 14-day modified program to reduce the risk of staff and inmate exposure to and spread of COVID-19. *See* https://www.cdcr.ca.gov/covid19/wp-content/uploads/sites/197/2020/04/COVID19-Modified-Program.pdf. During this modified program, inmates will have access to certain activities and services, including phone calls, ducats to mental health groups and individual clinical appointments, recreational yard time, law library, educational materials, health care services, and medications, subject to appropriate physical distancing guidelines. Staff are also directed to conduct additional rounds and spot check of inmates to reduce self-harm attempts. While this modified program does not specifically address *Coleman* class members' mental health treatment needs—CDCR must take into account the needs of all inmates in its custody—it minimizes disruption of inmates' daily routines, thereby providing them with greater stability and curtailing escalation of depression or anxiety that could arise during the pandemic. Combined with increased custodial and clinical staff rounding, this modified program promotes the physical and mental well-being of all inmates, and further

9

Defs.' Resp. April 6, 2020 Order (2:90-cv-00520 KJM-DB (PC))

demonstrates Defendants' sustained proactive efforts to efficiently manage prison operations in this crisis. (*Id.*; ECF No 6535 at 5-6.)

**CONCLUSION**

The Constitution requires that "reasonable" steps be taken to mitigate the risk of an objectively serious harm. No single measure taken in response can be considered constitutional or unconstitutional alone and in a vacuum; instead, prison officials' actions must be viewed in the context of the harm and the totality of their response. This is why the Court should coordinate its consideration of CDCR's COVID-19 response with *Plata*, as the *Plata* Receiver controls the provision of medical care to CDCR's inmates.[4] The Constitution does not require six feet of physical distancing, and Defendants have taken, and are presently taking, a host of proactive measures to mitigate against the risk of harm posed by the COVID-19 pandemic. These efforts will ensure that CDCR continues to provide mental health care services to *Coleman* class members under these extraordinary and unprecedented conditions.

Dated: April 8, 2020                                  Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

*/s/ Kyle Lewis*
KYLE LEWIS
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003
FINAL Defendants' Response to Court's April 6, 2020 Order.docx

---

[4] The Court ordered Defendants to respond to its questions with less than 48-hours' notice. If the Court intends to rule on the adequacy of Defendants' response to the COVID-19 pandemic to date, or the constitutionality of a six-foot physical distancing requirement, Defendants request that the Court issue a formal briefing schedule providing a fair and adequate opportunity for Defendants to fully address these important issues of first impression. *See Barona Group of Captain Grande Band of Mission Indians v. Am. Mgmt. & Amusement, Inc.*, 824 F.2d 710, 721-22 (9th Cir. 1987), amended by 840 F.2d 1394, 1405-06 (9th Cir. 1988) ("While District Courts have inherent power to control their dockets, such authority must not deprive a litigant of due process of law within the meaning of the Fifth and Fourteenth Amendments of the U.S. Constitution."); *see also Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner").

10

Defs.' Resp. April 6, 2020 Order (2:90-cv-00520 KJM-DB (PC))