DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' RESPONSE TO APRIL 3, 2020 ORDER TO SHOW CAUSE REGARDING ACCESS TO THE DEPARTMENT OF STATE HOSPITALS**<br><br>Judge: Hon. Kimberly J. Mueller |

On April 3, 2020, the Court ordered Defendants to show cause "why this Court should not order defendants to promptly to admit *Coleman* class members to *Coleman*-designated inpatient beds in DSH consistent with the protocols established for admission of OHMDs to DSH facilities." April 3, 2020 Order ("DSH OSC"), ECF No. 6572 at 2. The same order permitted Plaintiffs to file a statement of position on the same question. *Id.*

No valid reason, legal or factual, permits Defendants to allow the Department of State Hospitals ("DSH") to privilege the rights of Offenders with a Mental Health Disorder ("OHMDs")[1] above those of the *Coleman* class. Defendants' position, as articulated at COVID-19 Task Force meetings and at the April 3, 2020 status conference, has been that OHMDs have a constitutional right to admission at DSH hospitals at the end of their term of incarceration. But it is undisputed that *Coleman* class members have an Eighth Amendment right to receive timely access to adequate inpatient psychiatric hospitalization. *See generally Coleman v. Wilson*, 912 F. Supp. 1282, 1308-09, 1314 (E.D. Cal. 1995); *see also Coleman v. Brown*, 938 F. Supp. 2d 955, 980-82 (E.D. Cal. 2013). It is equally undisputed that full and timely access to the 336 DSH beds reserved for *Coleman* class members' treatment is critically necessary to Defendants' ability to ever meet that constitutional obligation. *See* 2018 Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation ("2018 Inpatient Report"), ECF No. 5894 at 22 (finding "timely access to beds for all inmates who meet clinical and custodial requirements for placement at DSH-Atascadero, DSH-Coalinga, and PSH, is essential to the remedial process in the *Coleman* case."). As this Court has noted, closing off the DSH beds to class members will have a cascading effect throughout the system that threatens to undo any progress made on achieving compliance with this facet of the ongoing Eighth Amendment violation in this

---

[1] OHMDs were formerly known as Mentally Disordered Offenders ("MDOs"). For the purposes of this brief, these terms are used interchangeably.

1
PLAINTIFFS' RESPONSE TO APRIL 3, 2020 ORDER TO SHOW CAUSE REGARDING ACCESS TO THE DEPARTMENT OF STATE HOSPITALS

[3523812.7]

case. DSH OSC at 2; *see also* Special Master's Amended Report on the Current Status of *Coleman* Class Members' Access to Inpatient Care in the Department of State Hospitals ("Amended 2020 DSH Access Report"), ECF No. 6579, at 10.[2]

Nor is there any legitimate factual basis for DSH's articulated justification for refusing to provide class members with access to the Court-ordered hospital beds: that class members in need of psychiatric inpatient hospitalization can receive timely access to adequate inpatient care via CDCR's Psychiatric Inpatient Programs ("PIPs") without use of the DSH beds. At the April 3, 2020 status conference, Defendants made no attempt to disclaim or dispute the facts reported in the Special Master's Amended 2020 DSH Access Report showing that, as of last week, at least 39 patients were clinically and custodially approved for admission at DSH's inpatient hospitals under Defendants' own guidelines. Amended 2020 DSH Access Report at 16. Nor did any Defendant dispute the Special Master's findings that CDCR's PIPs are basically full, with more patients waiting for admission than those units can possibly hold and with increasing numbers of patients already exceeding court-ordered transfer timelines. *See* Amended 2020 DSH Access Report at 12. Simply put, all of the steps Defendants have taken over the last three years to provide class members with timely access to inpatient care are collapsing in real time and will only get worse in the coming weeks.

Nor did Defendants dispute the Special Master's findings that CDCR's PIPs were failing to provide constitutionally adequate levels of inpatient care *before* COVID-19's onslaught, or the stark documentation of how much worse that care has gotten in just the last two weeks with the arrival of the novel coronavirus and the consequent dramatic deterioration of already deficient clinical staffing. *See* Amended 2020 DSH Access Report, ECF No. 6579 at 22-30 (providing point-in-time staffing and program information for PIPs), 34-35. That problem too will only get worse as the census in the PIPs rises, due

---

[2] Citations to the Amended 2020 DSH Access Report are to the ECF page numbers.

both to DSH's refusal to admit patients and to the predictable rise in the acuity and need for mental health services of class members caused by COVID-19 stressors, while clinical staffing in those units continues to plummet.  DSH's claim that the *Coleman* class has access to minimally adequate inpatient care without use of their Court-ordered hospital beds has no basis in fact.

Finally, DSH has asserted that cutting off class members' access to inpatient beds is necessary to stop the spread of COVID-19, citing guidance from the California Department of Public Health ("CDPH") and the Centers for Disease Control and Prevention ("CDC").  *See* Declaration of Cara Trapani ("Trapani Decl.") ¶ 4, Ex. 1 (DSH website).  But the CDPH has refused to permit other facilities treating vulnerable patients in California from rejecting people due to COVID-related concerns, even when patients are suspected or confirmed to have the virus.  *See* Trapani Decl. ¶ 5, Ex. 2 at 14–16 (CDPH COVID-19 Guidance for Skilled Nursing Facilities).  Instead, CDPH counsels those facilities to take reasonable steps to contain the virus while still providing patients with essential care.  *Id.*

Nor does CDPH's guidance for the California Department of Corrections and Rehabilitation ("CDCR") recommend, much less require, cutting off movement to outside facilities for urgent health care treatment.  *See* Trapani Decl. ¶ 6, Ex. 3.  The guidance focuses again on reasonable prevention and containment methods to curb the virus's spread in lieu of denying patients critically needed health care.  *Id.* at 1–5.  Consistent with these guidelines, under California Correctional Health Care Services' ("CCHCS") policy, *Coleman* class members who require a higher level of medical care than what can be provided within their institution will continue to be transferred to outside hospitals to receive that care.  *See* Declaration of Michael Bien in Support of Three-Judge Court Emergency Motion ("Bien Decl."), ECF No. 6529, ¶ 12, Ex. 2 at ECF page 31 (CCHCS March 20, 2020 Memo Re: COVID-19 Pandemic-Guidance Regarding Field Operations).  That includes patients suspected of having COVID-19.  Trapani Decl. ¶ 9, Ex. 6 at 24-25, 34 (CCHCS Interim Guidance states that patients suspected of having COVID-19 or under

quarantine are still permitted to be transported for medical or legal necessities, which include, as an example, mental health crisis). There is no meaningful distinction here between psychiatric hospitalization, which under the Program Guide is reserved for only the most acutely ill of *Coleman* class members, and medical hospitalization.

Similarly, the CDC's current guidance for correctional and detention facilities places no restrictions on transfers of people needing clinical care beyond recommending reasonable prevention and containment protocols, such as conducting screening and ensuring any receiving facility can isolate the patient if necessary. *See* Bien Decl., ECF No. 6529, ¶ 21, Ex. 7 at ECF page 113. According to its website, DSH already has those measures in place, presumably because it continues to admit OHMD discharged from CDCR on a weekly basis. Trapani Decl. ¶ 4, Ex. 1 at 2 (stating that DSH has identified and prepared spaces for isolating and treating COVID-19 infected patients, has screening protocols in place, and has updated its pandemic response and related plans).

Indeed, DSH has numerous units at its hospitals, including at DSH-Atascadero, that allow for single-celling of infected or potentially infected patients for the purposes of conducting screening, quarantining, isolation, and treatment. Trapani Decl. ¶¶ 2-3, 7-8 & Exs. 4-5 (describing availability of single-cell ETP suites in DSH). Additionally, as DSH's Director previously testified in this Court, DSH routinely leaves hundreds of beds—including entire wings—unoccupied at its hospitals, including at DSH-Atascadero and DSH-Coalinga. *See* Transcript of Jan. 23, 2017 Evidentiary Hearing, ECF No. 5552 at 22-25 (Ahlin testimony regarding 189 open beds at DSH-Coalinga and 91 at DSH-Atascadero). Those beds could be swiftly brought online for use in these exigent circumstances.

Additionally, DSH reserves the right to continue to discharge *Coleman* patients back to CDCR if in DSH's opinion "emergency discharge is required for patients who cannot be safely maintained in DSH's unlocked dorm setting." Trapani Decl. ¶ 10, Ex. 7 (DSH Memorandum dated March 16, 2020). Prior to discharging CDCR claims to ensure "medical clearance of any patient prior to transport." *Id.* DSH has made use of this

4

[3523812.7]

discretion and, since the start of the COVID-19 pandemic, has discharged at least one patient from DSH back to CDCR, citing concerns that the patient could not be safely maintained. *See* Trapani Decl. ¶ 11. If DSH determines that a patient cannot safely be maintained in an unlocked dorm setting, it is unclear why the patient could not "shelter in place" in a single-cell unit within the same DSH facility. This example, along with DSH's continual acceptance of MDOs, clearly demonstrates that its exclusion of *Coleman* class members is pretextual rather than based on sound public health recommendations.[3] The manner in which DSH has continued to admit and discharge patients—when it chooses to—is evidence that it can safely apply public health guidelines to its physical plant when continuing to accept *Coleman* class members.

In sum, there is no valid reason—legal or otherwise—this Court should allow Defendants to permit DSH to continue refusing to treat *Coleman* class members in the currently vacant Court-ordered hospital beds expressly reserved for their use. The OHMD patients whom DSH continues to admit for treatment of their severe mental health conditions were, one day before their arrival and before their legal status changed, the exact same class members they are now seeking to exclude, consistent with DSH's longstanding historical trend of refusing to treat *Coleman* class members whenever it believes it can. *See* Transcript of Jan. 23, 2017 Evidentiary Hearing, ECF No. 5552, at 56-57 (Ahlin testimony that class members previously excluded from DSH-Atascadero are admitted the day their legal status changes to MDO); *see also id.* at 98 (Warburton testimony that there is no meaningful distinction between MDOs and class members, who

---

[3] DSH's unilateral policy is especially concerning because of the discretion that the organization reserves for itself—given its established history of excluding *Coleman* class members from its hospitals. Because the determination of if a patient can be "safely maintained in DSH's unlocked dorm setting" is entirely within DSH's discretion, DSH will be able to start clearing out its *Coleman* designated beds without any oversight or approval from the Special Master or the Court. *See* Trapani Decl. ¶ 10, Ex. 7 at 1. The 30 day policy, even if not extended, will likely have significant long-term consequences, given Defendants' long history of failing to refer patients to available DSH beds unless under direct pressure from the Court or Special Master to do so. *See, e.g.*, Aug. 30, 2018 Special Master's Report on Mental Health Inpatient Care Programs, ECF No. 5894, at 15-16.

are "the same population but for their sentencing date"); *see also* May 25, 2016 Special Master's Monitoring Report on the Mental Health Inpatient Care Programs, ECF No. 5448, at 22–40 of 371 (detailing DSH history of refusal to admit class members, and noting on pages 39-40 that the "barriers which defendants claim prevent admission of *Coleman* class members into designated beds at DSH-Atascadero are not new; they are merely recycled under a different terminology every few years"); Amended Special Master 2020 DSH Report, ECF No. 6579 at 31-32 (noting history of DSH intransigence). The constitutional rights of those class members to timely access to adequate inpatient care indisputably cannot be satisfied by the CDCR PIPs. DSH itself states that it has in place protocols and physical space to safely manage the risk of COVID-19's spread while continuing to admit patients who urgently need treatment in their hospitals. Those risk management steps are what the CDC, CDPH, and CCHCS recommend for urgently necessary health care like inpatient psychiatric hospitalization—not a total denial of that care, like DSH's current approach. This Court should order DSH to resume admissions and discharges of *Coleman* class members, consistent with the protocols it has developed for admission of OHMDs.

DATED: April 8, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Lisa Ells*
    Lisa Ells

Attorneys for Plaintiffs