1 | DONALD SPECTER – 083925
STEVEN FAMA – 099641
2 | MARGOT MENDELSON – 268583
PRISON LAW OFFICE
3 | 1917 Fifth Street
Berkeley, California  94710-1916
4 | Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' RESPONSE TO APRIL 3, 2020 ORDER TO SHOW CAUSE REGARDING ACCESS TO THE DEPARTMENT OF STATE HOSPITALS**

Judge:   Hon. Kimberly J. Mueller

[3520786.4]

I, Cara E. Trapani, declare:

1.    I am an attorney duly admitted to practice before this Court.  I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this declaration in support of Plaintiffs' Response to the April 3, 2020 Order to Show Cause Regarding Access to the Department of State Hospitals.

2.    On January 9–11, 2018, I attended the Special Master's monitoring tour of Atascadero State Hospital ("DSH-Atascadero") as part of his 2018 Inpatient Monitoring Round.  During the Special Master's monitoring tour, I visited various housing units in DSH-Atascadero, including Program V.

3.    I understand from information I learned during the monitoring tour that Program V is where the majority of *Coleman* class members are housed in DSH-Atascadero.  Program V includes an admissions unit (Unit 13) and five intermediate care treatment units (Units 30, 31, 32, 33, and 34).  In the admissions unit, staff members complete initial assessments of patients entering DSH-Atascadero and initiate behavioral stabilization before they enter the general population.  Unit 13 only includes single bed rooms that can be locked, both from the inside by the patient and from the outside by staff members.  All rooms in this admissions unit are designed to house one patient.  Additionally, it is my understanding and belief, based on information I learned during the monitoring tour, that there are multiple other admissions units like Unit 13 within DSH-Atascadero, and that each such unit can be locked off from the rest of the hospital.

4.    Attached hereto as **Exhibit 1** is a true and correct copy of the COVID-19 Information Update found on the Department of State Hospitals website, last accessed on April 8, 2020 at 9:18 AM, available at https://www.dsh.ca.gov/.  The post from April 3, 2020 lists various actions that DSH states that it has taken to prepare for COVID-19 and cites to guidance from the California Department of Public Health ("CDPH") and the Centers for Disease Control and Prevention ("CDC").

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' RESPONSE TO APRIL 3, 2020 ORDER TO SHOW CAUSE REGARDING ACCESS TO THE DEPARTMENT OF STATE HOSPITALS

[3520786.4]

5.      Attached hereto as **Exhibit 2** is a true and correct copy of a document entitled "COVID-19: Guidance for Skilled Nursing Facilities" issued by the Healthcare-Associated Infections Program, Center for Health Care Quality, of the California Department of Public Health.  The document was last accessed on April 8, 2020 at 9:19 AM and is available at:

https://www.cdph.ca.gov/Programs/CHCQ/HAI/CDPH%20Document%20Library/COVID.19_GuidanceFor_SNF_HAI%20WebinarFINAL_03.13.20.pdf.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of the California Department of Public Health Guidance about Novel Coronavirus (COVID-19) for California Prisons, last accessed on April 8, 2020 at 9:19 AM, available at:

https://www.cdcr.ca.gov/covid19/wp-content/uploads/sites/197/2020/03/R_CDPH-COVID-19-Guidance-for-Prisons-3.30.20.pdf?label=California%20Department%20of%20Public%20Health%20Guidance%20About%20Novel%20Coronavirus%20(COVID-19)%20for%20California%20Prisons&from=https://www.cdcr.ca.gov/covid19/memos/.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of the California Department of State Hospitals Enhanced Treatment Program ("ETP") Draft Policies and Procedures dated June 2019.  The document was last accessed on April 8, 2020 at 10:55 AM and is available at:

https://www.dsh.ca.gov/Legislation/docs/ETP_Updated_Draft_Policies_Procedures_June_2019.pdf).  Page 25 of the document (page 2 of 6 of the Policy Directive) includes a definition of an ETP Suite as a "locked patient room that includes a sink, commode and shower, to be utilized when a regular patient room is clinically contraindicated."

8.      Attached hereto as **Exhibit 5** is a true and correct copy of the California Department of State Hospitals, 2018 Annual Report, which is the most recent annual report DSH has made available to the public.  The document was last accessed on April 8, 2020 at 11:03 AM and is available at:

https://www.dsh.ca.gov/Publications/Reports_and_Data/docs/2018_Annual_Report.pdf.

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' RESPONSE TO APRIL 3, 2020 ORDER TO SHOW CAUSE REGARDING ACCESS TO THE DEPARTMENT OF STATE HOSPITALS

1  Page 12 of the 2018 Annual Report states that "[i]n Spring 2019, the first of three ETP

2  units at DSH-Atascadero will open.  Two additional 13-bed units will open at DSH-

3  Atascadero later in 2019, and one 10-bed unit at DSH-Patton is scheduled to open in

4  2020."

5       9.     Attached hereto as **Exhibit 6** is a true and correct copy of the CCHCS

6  Interim Guidance for Health Care and Public Health Providers Regarding COVID-19, last

7  revised April 3, 2020, which I received via email on April 6, 2020 from counsel for the

8  *Plata* plaintiffs, who is also co-counsel in this matter.

9       10.    Attached hereto as **Exhibit 7** is a true and correct copy of a memorandum

10 issued by Stephanie Clendenin, Director of DSH, on March 16, 2020.  The document was

11 last accessed on April 8, 2020 at 1:45 PM and is available at:

12 https://www.dsh.ca.gov/Treatment/docs/DSH_DIrector_Letter_re_Suspension_of_Colema

13 n_Admissions.pdf.

14      11.    On March 30, 2020, I attended a COVID-19 Task Force meeting in which

15 representatives for Defendants stated that at least one patient had been discharged from

16 DSH back to CDCR due to concerns that the patient could not be safely maintained at

17 DSH.

18      I declare under penalty of perjury under the laws of the State of California that the

19 foregoing is true and correct, and that this declaration is executed at Oakland, California

20 this 8th day of April, 2020.

21

22                              */s/ Cara E. Trapani*

23                              Cara E. Trapani

24

25

26

27

28

DECLARATION OF CARA E. TRAPANI IN SUPPORT OF PLAINTIFFS' RESPONSE TO APRIL 3, 2020 ORDER
TO SHOW CAUSE REGARDING ACCESS TO THE DEPARTMENT OF STATE HOSPITALS

[3520786.4]

# Exhibit 1



Contact Us     ⚙ Settings



      

About Us   Careers   Hospitals   Treatment   Protective Services   Publications   Search

# ▾ COVID-19 Information Update

## Important Health Information for Visitors to Atascadero State Hospital, Coalinga State Hospital, Metropolitan State Hospital, Napa State Hospital and Patton State Hospital

**To protect patients and staff from exposure to the coronavirus (COVID-19), normal visiting to all hospitals is prohibited until further notice, except for court-ordered evaluations, other legal matters, and end-of-life care. In the event of other special situations in which visitation may be considered, approval of the hospital's medical director would be required.**

**All approved visitors will be subject to a health screening.**

**Any illness that is spread from person to person can develop very quickly in a hospital environment. We appreciate your support of these efforts to protect the patients and staff.**

*Posted March 12, 2020*

## Protecting Patients and Staff at DSH Hospitals from COVID-19

DSH has been and continues to actively plan and prepare for COVID-19 across our system, following guidance from the California Department of Public Health, the Centers for Disease Control and Prevention, and other state and local partners. DSH is actively monitoring the rapidly changing situation so we can respond appropriately. Here are some of the actions the department has taken:

▸ In mid-March, DSH-Sacramento activated the department's Emergency Operation Center, and hospitals have activated their incident command centers and developed incident action plans to better communicate and coordinate our department's response efforts.

▸ Hospitals have updated their plans for infection control, respiratory protection, and pandemic response.

▸ Normal hospital visiting has been prohibited until further notice, except for court-ordered evaluations, other legal matters, or end-of-life care. In the event of other special situations in which visitation may be considered, approval of the hospital's medical director would be required. All approved visitors are subject to a health screening.

▸ All hospital employees are being screened for symptoms of COVID-19 as they arrive for work. Employees who do not pass the screening are sent home.

▸ Patients are being screened for symptoms prior to being admitted to our hospitals.

▸ Patients are being tested for COVID-19 when clinically indicated, to date no patients have tested positive for COVID-19.

▸ Spaces have been identified and prepared for isolating and treating patients who test positive for COVID-19.

▸ Patient social distancing measures have been implemented and regular patient

activities have been modified.

▸ Telework is available for positions that are eligible, to the extent that the department can still fulfill its critical essential services to the public.

▸ Admissions of certain categories of patients have been temporarily suspended. A list of those categories can be found on the DSH website under Treatment.

▸ Patients and employees have received, and continue to receive, information about how to protect themselves from COVID-19, including activities involving personal hygiene and social distancing.

▸ DSH programs including the statewide Conditional Release Program, the Los Angeles Community Based Restoration Program and Jail-Based Competency Programs have implemented modified programming to ensure continued delivery of effective treatment while adhering to social distancing guidelines.

▸ Members of the Executive Team serve as members of regional and national workgroups and associations with members from other state hospitals across the country. They are monitoring trends and best practices of our state hospitals and other healthcare systems who are planning, preparing and responding to COVID-19.

These actions and others by DSH are part of an ongoing process that will be continuously improved and strengthened by guidance from the California Department of Public Health, the Centers for Disease Control and Prevention, and other state and local partners.

*Published: April 3, 2020*

▸ **Videos**

▸ **DSH Diversion Program**

▸ **Open Data Portal**

▸ **Museums**

‣ **DSH Budget Information**

# Need Mental Health Services?

If you are experiencing a mental health crisis and need immediate assistance, please call "911" and explain the nature of your problem to the operator. For non-urgent mental health services, please contact your county mental health department.

# Accessibility Certification

The California Department of State Hospitals (DSH) website strives to be a model of accessibility that meets the access needs of any site visitor. DSH has implemented the strict guidelines set forth by the World Wide Web Consortium (W3C) and the US Department of Justice (DOJ). The website meets most of the W3C Web Content Accessibility Guidelines 2.1 (WCAG 2.1 - Priority 1, Priority 2, and most of Priority 3) and all of the DOJ Section 508 guidelines.

One of the pillars of accessible web design is using defaults and certain design elements that can be adjusted by the end user. This kind of design permits visitors to adjust font size, contrast, and customize other elements to meet their particular viewing needs. Information on some of our special access features, and how to work with custom settings are described on our accessibility page.

DSH signed Accessibility Certification





Gavin Newsom
*California Governor*

Website



## Stephanie Clendenin
*Director*

Director's Message



**Latest Tweets**

Tweets by @DSHRecruit

**Important Information**



Back to Top     Accessibility     DSH Employee Email     Email the Webmaster
Free Adobe Reader     Privacy Policy     Site Map

Copyright © 2020 State of California

# Exhibit 2

# COVID-19: Guidance for Skilled Nursing Facilities

## California Skilled Nursing Facilities
## March 13, 2020

Healthcare-Associated Infections Program
Center for Health Care Quality
California Department of Public Health



# COVID-19: Guidance for SNFs Webinar 3/13/20

**To see a full webinar including this guidance, visit https://youtu.be/gYNkUkrwu1c.**



# Objectives

- Describe what SNF need to do to prepare for COVID-19 to

  ➢ **Prevent and detect** the introduction of COVID-19 into facility

  ➢ **Prepare to receive and care for** residents with COVID-19

  ➢ **Prevent transmission** of COVID-19 within facility

- Review recommended personal protective equipment (PPE)

  ➢ Demonstrate safe donning and doffing sequences

  ➢ Explain fit-testing for N95 respirators



# Situation Update

- World Health Organization (WHO) declared COVID-19 a global pandemic

- Community transmission of COVID-19 is occurring in California

- Elderly SNF residents with chronic conditions at **higher risk for severe illness and death from COVID-19**

- Persons with COVID-19 who do not require acute care hospitalization may need ongoing care and monitoring in SNF

- SNF must prepare to safely care for individuals with suspected or confirmed COVID-19



# Prevent and Detect the Introduction of COVID-19 into the Facility



Case 2:90-cv-00520-KJM-SCR    Document 6589    Filed 04/08/20    Page 17 of 248

# Risk of COVID-19 Introduction and Spread in Long-term Care Facilities

- COVID-19 may be spread between

  ➢ Residents and visitors

  ➢ Residents and HCP

  ➢ Residents, HCP, and visitors

- Ill HCP and visitors are the most likely sources of introduction into the facility

  ➢ Take action now before widespread community transmission

  ➢ Implement visitor restrictions and enforce HCP sick leave policies



# Restrict Visitors

- Actively screen and restrict visitors with:

  ➤ Signs or symptoms of  respiratory infection (such as fever, cough, shortness of breath, or sore throat)

  ➤ Known contact with a person with suspected or confirmed COVID-19 infection

  ➤ International travel within the last 14 days to China, Iran, South Korea, Italy, Japan or other geographic area of concern identified by CDC (https://wwwnc.cdc.gov/travel/notices)

- Post signs "Do not enter until you are screened by staff member" at facility entrance

CDPH All Facilities Letter 20-22 (https://www.cdph.ca.gov/Programs/CHCQ/LCP/Pages/AFL-20-22.aspx)

CMS Memo, March 9, 2020 (PDF) (https://www.cms.gov/files/document/qso-20-14-nh-revised.pdf)



# In Lieu of Visits

- Offer alternative means of communication for people who would otherwise visit, such as virtual communications (phone or video-communication)

- Create/increase listserv communication to update families, such as advising not to visit

- Assign staff as primary contact to families for inbound calls, and conduct regular outbound calls to keep families up to date

- Offer a phone line with a voice recording updated at set times (such as daily) with the facility's general operating status, such as when it is safe to resume visits



# Educate Visitors if Allowed to Visit in Certain Situations

Instruct visitors to

- Perform hand hygiene at entry to the facility and before entering into a resident's room

- Follow respiratory hygiene and cough etiquette

  ➢ Use recommended personal protective equipment (PPE)

  ➢ Avoid touching surfaces as possible

  ➢ Limit movement within the facility and avoid common areas



# Post Visible Signs for Hand Hygiene and Cough Etiquette





# Healthcare Personnel Should <u>Not</u> Report to Work if Feeling Ill

- HCP must report symptoms to their supervisor and the person who oversees occupational health at the facility

- HCP who develop fever or respiratory symptoms while at work should
  - ➤ immediately put on a facemask
  - ➤ inform their supervisor
  - ➤ leave the workplace

- Sick leave policies should be non-punitive, flexible, and consistent with public health recommendations

- HCP are strongly encouraged to receive annual seasonal flu vaccine – it's not too late



# Educate Healthcare Personnel to:

- Adhere to infection prevention and control measures, including:
  - ➢ Hand hygiene
  - ➢ Selection and use of personal protective equipment (PPE)
  - ➢ Have HCP demonstrate competency with putting on and removing PPE.
- Educate both facility-based and consultant personnel (e.g., wound care, podiatry, barber) and volunteers including consultants (They often provide care in multiple facilities and can be exposed to or serve as a source of pathogen transmission)



# Detect COVID-19 in your Facility

- Perform active frequent monitoring of residents and HCP to promptly identify
  - ➢ Residents with new or worsening respiratory symptoms
  - ➢ HCP with new-onset of respiratory symptoms in the setting of residents with respiratory infection symptoms
- Report clusters of symptomatic residents to local public health
- Track suspect and confirmed respiratory infections using a line list (PDF)
(https://www.cdph.ca.gov/Programs/CHCQ/HAI/CDPH%20Document%20Library/RecommendationsForThePreventionAndControlOfInfluenzaNov2018_FINAL.pdf)
- Increase frequency of monitoring if widespread transmission is occurring in your community

**Stay tuned to your local health department for updates**



# Prepare to Receive and Care for Residents with Suspected or Confirmed COVID-19



# Identify Space and Staff NOW

- Identify  a separate area that can be used to cohort residents with confirmed COVID-19 infection such as on the same unit, wing, or building

- Identify a minimum number of HCP dedicated to care for residents with COVID-19

  – Perform N95 respirator fit-testing for designated staff if not already fit-tested

- Educate healthcare personnel to use recommended PPE, including proper donning and doffing PPE to avoid self contamination



# Prepare Infection Control Supplies

- Increase access to hand hygiene
  - ➤ Place alcohol-based hand sanitizer (with >60% alcohol) in
    - – Resident rooms (ideally both inside and outside of room)
    - – Care areas, such as therapy rooms
    - – Common areas, such as just outside of dining hall
  - ➤ Confirm all sinks are working and well-stocked with soap and paper towels for handwashing

- Acquire recommended personal protective equipment (PPE)
  - ➤ N95 respirators
  - ➤ Face shield or goggles for eye protection
  - ➤ Gowns and gloves
  - ➤ Facemasks



# Prevent Transmission of COVID-19 Within the Facility



# Patient Placement

- Most SNF do not have airborne isolation rooms
- Place resident with COVID-19 in single room or cohort with other COVID-19 patients with the door closed
- Cohort residents with confirmed COVID-19 infection on the same unit, wing, or building
- Minimize the number of persons entering room



# Use Recommended PPE for COVID-19

- Wear N95 respirator when collecting nasopharyngeal and oropharyngeal swab specimens

- For routine care, wear all recommended PPE, specifically
  ➢ Gown
  ➢ Gloves
  ➢ N-95 respirator whenever available* or facemask
  ➢ Eye protection

  *Use respirators based on availability; prioritize 1) fit-tested respirator, 2)respirator that has not been fit-tested, 3) expired respirator,  4) non-medical grade respirator. If no respirator is available, wear a facemask.



# Resident/Patient Movement

- Suspend large group activities and close communal dining areas

- Restrict residents with fever or acute respiratory symptoms to their room

- When they must leave the room, such as for medical transport, the resident should be provided with a facemask (if tolerated)

- Notify facilities prior to transferring a resident with an acute respiratory illness, including suspected or confirmed COVID-19, to a higher level of care



# Infection Prevention Strategies



# COVID-19 Prevention Strategies - Back to Basics



**Hand Hygiene**





**Personal Protective Equipment and Precautions**



**Cleaning and Disinfection**



# Basics of Infection Prevention Immediate Goals

- Emphasize that HCP
  - ➢ Perform consistent proper hand hygiene
  - ➢ Use appropriate PPE
  - ➢ Assure thorough and consistent environmental cleaning

- Educate residents, visitor and families to
  - ➢ Adhere to infection prevention measures
  - ➢ Advocate for infection prevention, such as reminding HCP and others to wash hands



# Hand Hygiene





# Perform Hand Hygiene

**Before**

- Patient contact
- Donning gloves
- Accessing devices
- Giving medication

**After**

- Contact with a patient's skin and/or environment
- Contact with body fluids or excretions, non-intact skin, wound dressings
- Removing gloves



# My 5 Moments for Hand Hygiene



# Efficacy of Hand Hygiene Products

- Use an alcohol-based hand rub routinely if hands are not visibly soiled
- Wash hands with soap and water when hands are visibly soiled, before and after eating, and after toileting
- During certain types of infection outbreaks, facility may allow only handwashing with soap and water



*less effective in presence of organic material

# COVID-19 Prevention Strategies- Back to Basics



**Hand Hygiene**



**Personal Protective Equipment and Precautions**



**Cleaning and Disinfection**



# Demo:  Safely Donning and Doffing PPE

## UCSF Health

https://www.youtube.com/watch?v=-sBNxli21n0&feature=emb_title



# Key Points for Donning and Doffing PPE

- Don before contact with the patient, ideally just before entering the room

- Use carefully – avoid contamination

- Remove and discard carefully, either at the doorway or immediately outside patient room; remove respirator outside room

- Immediately perform hand hygiene



# Sequence for Donning PPE

1. Gown first

2. Mask or respirator

3. Goggles or face shield

4. Gloves



# How to Don a Gown

- Select appropriate type and size

- Opening is in the back

- Secure at neck and waist

- If gown is too small, use two gowns
  - Gown #1 ties in front
  - Gown #2 ties in back







# How to Don a Mask

- Place over nose, mouth and chin
- Fit flexible nose piece over nose bridge
- Secure on head with ties or elastic
- Adjust to fit





# How to Don a Respirator

- **Select a fit tested respirator, preferably**
- Place over nose, mouth and chin
- Fit flexible nose piece over nose bridge
- Secure on head with elastic
- Adjust to fit
- Perform a fit check –
  - **Inhale – respirator should collapse**
  - **Exhale – check for leakage around face**





# How to Don Eye and Face Protection



- Position goggles over eyes and secure to the head using the ear pieces or headband

- Position face shield over face and secure on brow with headband

- Adjust to fit comfortably



# How to Don Gloves

- Don gloves last

- Select correct type and size

- Insert hands into gloves

- Extend gloves over isolation gown cuffs





# How to Safely Use PPE

- Keep gloved hands away from face

- Avoid touching or adjusting other PPE

- Remove gloves if they become torn; perform hand hygiene before donning new gloves

- Limit surfaces and items touched



# How to Safely Remove PPE

Recognize the "Contaminated" and "Clean" areas of PPE

- Contaminated
    - ➢ PPE areas likely to have been in contact with body sites, materials, or surfaces with infectious organisms
    - ➢ Includes the outside and front of PPE
- Clean
    - ➢ PPE areas that are not likely to have been in contact with the infectious organism
    - ➢ Includes the inside and the outside back of PPE



# Sequence for Removing PPE

1. Remove gloves

   - Perform hand hygiene

2. Remove gown

   - Perform hand hygiene

3. Remove face shield/ goggles

   - Perform hand hygiene

4. Remove mask or respirator

   - Perform hand hygiene



# Where to Remove PPE

- At doorway, before leaving patient room or in anteroom

- Remove respirator outside room, after door has been closed*

  *Ensure hand hygiene supplies are available at the points needed, either a sink or alcohol-based hand rub



# How to Remove Gloves (1)



- Grasp outside edge near wrist

- Peel away from hand, turning glove inside-out

- Hold in opposite gloved hand



# How to Remove Gloves (2)



- Slide ungloved finger under the wrist of the remaining glove

- Peel off from inside, creating a bag for both gloves

- Discard



# How to Remove Isolation Gown



- Unfasten ties

- Peel gown away from neck and shoulder

- Turn contaminated outside toward the inside

- Fold or roll into a bundle

- Discard

- Perform hand hygiene



# How to Remove Goggles or Face Shield



- Grasp ear or head pieces with ungloved hands

- Lift away from face

- Place in designated receptacle for reprocessing or disposal



# How to Remove a Respirator

- Remove outside the room or in the ante-room

- Lift the bottom elastic over your head first

- Then lift off the top elastic

- Discard

[CDC PPE Sequence (PDF)](https://www.cdc.gov/hai/pdfs/ppe/PPE-Sequence.pdf)
(https://www.cdc.gov/hai/pdfs/ppe/PPE-Sequence.pdf)





# How to Remove a Tied Facemask



- Remove at least 6 feet away from the patient/resident – at the door

- Untie the bottom, then top, tie

- Remove from face

- Discard





# Perform Hand Hygiene After All PPE Removed

- Perform hand hygiene immediately after removing PPE and preferably after each step

- Use alcohol-based hand rub or wash with soap and water

  Exception: If hands become visibly contaminated during PPE removal, wash hands with soap/water before continuing PPE removal



# Respirator and fit testing

- Ensure designated HCP are fit tested to the N95 respirator available in the SNF; can be within the past year

- Conduct fit testing using [OSHA-accepted fit test methods](https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134AppA)
  (https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134AppA)

- Fit-testing is one aspect of a respiratory protection program
  - ➤ CAL/OSHA will provide guidance for SNF to meet regulatory requirements



# COVID-19 Prevention Strategies- Back to Basics



**Hand Hygiene**



**Personal Protective Equipment and Precautions**



**Cleaning and Disinfection**



# Environmental/ Equipment Cleaning

- Limit the number of staff entering the room of resident with COVID-19

  ➢ Consider assigning staff nurse to do daily high-touch surface cleaning

- Follow routine environmental infection control procedures such as waste management, laundry, food service, and environmental cleaning

- Use dedicated medical equipment for patient care

- For non-disposable medical equipment, clean and disinfect according to manufacturer's instructions, including contact times

- All EPA-registered hospital-grade disinfectants can be used for COVID-19



# Resources

- For more information, see CDC guidance for nursing homes https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/prevent-spread-in-long-term-care-facilities.html , March 10, 2020

- For the most up-to-date infection control guidance for healthcare facilities, visit CDC coronavirus website at https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/index.html

- For general infection control training resources, please visit: https://www.cdc.gov/longtermcare/



# Questions?

For more information,
please contact any
HAIProgram@cdph.ca.gov



# Exhibit 3

## California Department of Public Health Guidance About

## Novel Coronavirus (COVID-19) for California Prisons

## March 24, 2020

The California Department of Public Health (CDPH) has developed guidance to assist California State prisons as they respond to the novel coronavirus disease 2019 (COVID-19) pandemic. Communicable disease in a prison setting poses a hazard to inmates, employees, and the community at large. It is essential that all possible steps be taken to prevent and control COVID-19 in California prisons. This guidance addresses non-clinical issues and does not address medical management issues such as decisions to test inmates for COVID-19. This is a rapidly evolving situation and CDPH will provide updated guidance as new information becomes available.

Correctional settings present unique challenges for control of communicable diseases such as COVID-19 because pathogens may be more easily transmitted in an institutional or congregate environment where people live in close proximity to others. If infected, inmates may be at increased risk for severe illness, particularly if they are older or immunocompromised or have chronic medical conditions (e.g., heart disease, diabetes, lung disease).

The following guidelines are complementary to the more general guidance provided by the Centers for Disease Control and Prevention for COVID-19 control in correctional settings, available at: https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html .

1. **Preventing, Decreasing, or Delaying the Introduction of COVID-19 into Facilities:**

COVID-19 will most likely be introduced into a prison from infected employees or inmates admitted from jails. After COVID-19 has been introduced into a facility it can then be spread to other facilities when infected inmates or staff move from one facility to another.

Public health interventions such as the following should be taken to prevent entry of COVID-19 into the prison setting:

- All staff should be educated about COVID-19, including signs and symptoms, and the need to stay home when sick.
- Educational signage should be posted throughout the facility.
- To the extent possible, non-essential persons, such as vendors, volunteers and visitors should not enter the prison.

COVID-19 Guidance for Prisons
March 24, 2020

- All non-inmates entering the facility should be assessed for symptoms (fever, cough, shortness of breath) by documented self-attestation, and temperature check with a no-touch thermometer.
- Non-inmates with symptoms of an acute respiratory infection should not enter the prison.
- All inmates entering a prison should be screened for symptoms (fever, cough, shortness of breath) of acute respiratory infection and by temperature check and should have medical evaluation prior to placement in any type of housing.
- All non-essential activities as identified by prison warden, such as tours and visits should be cancelled.
- Encourage telework when possible.
- Consider implementation of alternative methods of communication with inmates for classes, family visiting, and other group activities.

**2. Take steps to reduce likelihood of transmission in the prison setting:**

- ***Among employees:***
  - CDCR should comply with general guidance for protection of workers during the COVID-19 emergency provided by CalOSHA for healthcare workers at https://www.dir.ca.gov/dosh/coronavirus/Health-Care-General-Industry.html and for non-healthcare workers at https://www.dir.ca.gov/dosh/coronavirus/General-Industry.html.
  - Provide education and a means to practice proper hand hygiene, cough etiquette, and social distancing.
  - In the event that an employee becomes ill while at work in a prison, they should be immediately provided a surgical mask and sent home.
  - Employees who develop COVID-19 symptoms should remain at home until at least 3 days (72 hours) have passed since recovery defined as resolution of fever without the use of fever-reducing medications and improvement in respiratory symptoms (e.g., cough, shortness of breath); and, at least 7 days have passed since symptoms first appeared, whichever is longer, according to current CDC guidelines and guidance from CalHR. Current CDC guidance for discontinuation of home isolation is available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html. (Please note, this is different from guidance for other respiratory infections).
  - As part of routine measures for the respiratory season, existing signs should be visible that remind staff, visitors, and incarcerated individuals to practice good health habits that include handwashing, sneeze/cough into their elbow, put used tissues in a waste receptacle, and to wash

COVID-19 Guidance for Prisons
March 24, 2020

hands immediately after using tissues, as well as to maintain social distancing.

- ***Among Inmates:***
  - Educate inmates about general hygiene and preventive methods for reducing transmission of communicable diseases. Provide education and means to practice proper hand hygiene and cough etiquette. Ensure that all water supplies for hand washing allow flow of water for at least 20 seconds. Educate inmates about risk of transmission associated with close contact within 6 feet and encourage social distancing.
  - Encourage inmates to clean their personal cell environments and provide them with materials to allow them to do so.
  - Educate inmates about COVID-19 and encourage them to self-report symptoms of acute respiratory infection including fever, cough, and shortness of breath.
  - Provide surgical masks to residents with respiratory symptoms if they need to leave their cells.
  - At every medical encounter, including medical, dental and mental health clinics, screen patients for symptoms of COVID-19 infection.
  - Establish and maintain increased cleaning of common spaces, including tables, chairs, handrails, exercise equipment, etc.
  - Implement cleaning of mobility equipment (wheelchairs, etc.) used by elderly inmates.

  - Support Social Distancing by:

    - Wherever possible, movement, housing, and group activities of inmates should allow social distancing of 6 feet between each person. This would include movement from one area to another (such as to and from dining facilities), and in chow halls, classrooms, clinics, and housing. Total number of people gathered closely in a single area should not exceed CDC guidelines.

    - Waiting areas for clinics should be set up so that patients with respiratory symptoms and fever are separated from patients without such symptoms. The patients with respiratory symptoms should be wearing medical/surgical masks, and be at the appropriate social distance for isolation of a sick person from others of at least 6 feet.

    - Prioritize social distancing to ensure that high risk groups such as the elderly and those with underlying medical conditions are adequately distanced.

COVID-19 Guidance for Prisons
March 24, 2020

### 3. Additional Actions Once COVID-19 Has Entered a Facility

In the event that active or suspected cases of COVID-19 are present at the facility, the following are examples of actions that should occur:

- Facilities should take steps to isolate ill patients and quarantine exposed inmates. Ill patients should be separated by at least six feet from well inmates.
- All suspected cases of COVID-19 should be reported immediately to the facility's designated public health representative, as well as to the local health jurisdiction in which the facility is located.
  - Depending on the extent of transmission within the facility, cellmates of sick individuals will be separated to the extent possible until it is determined that those individuals are free of COVID-19 symptoms.
  - Ill patients with COVID-19 symptoms should be separated from their well cellmates and others for 72 hours until they have been fever-free without the use of fever-reducing medications and improvement in respiratory symptoms (e.g., cough, shortness of breath), **AND** 7 days have passed since symptoms have first appeared, whichever is longer. Current CDC guidance for discontinuation of home isolation is available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-in-home-patients.html.
- CDCR medical staff should make COVID-19 testing decisions based on clinical judgment and in consultation with CDCR public health staff. If testing capacity is limited, priority should be given to those for whom a positive test would change the course of action (such as those with the highest contacts).
- CDCR should consult with CDPH in implementing control measures. Interventions may include:
  - o Restricting movement of incarcerated individuals
  - o Suspending non-critical programming (such as education, self-help groups, and many prison jobs).
  - o Changing the way meals are provided to incarcerated individuals.
- Personal Protective Equipment (PPE) will be utilized by both staff and incarcerated individuals according to CDC guidelines and Cal/OSHA regulations, including specifically the Aerosol Transmissible Disease standard.
- Minimize transfers in and out of the prison to the extent possible.
- Restrict inmate transportation to only those outside appointments that are medically urgent or legally required. Cancel any elective appointments that are not urgent.

COVID-19 Guidance for Prisons
March 24, 2020

This is a rapidly evolving pandemic and new information is being learned daily. We ask that facilities stay up to date and monitor public health updates from:

- Local Public Health Department
- California Department of Public Health https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/nCOV2019.aspx
- California Department of Corrections and Rehabilitation http://intranet/ADM/DSS/hr/oew/Pages/Coronavirus-COVID-19.aspx
- US Centers for Disease Control and Prevention https://www.cdc.gov/coronavirus/2019-ncov/index.html

Please note: this fact sheet provides basic information only. It is not intended to take the place of medical advice, diagnosis or treatment.

Further information is available on:

CDCRNET, http://intranet/ADM/DSS/hr/oew/Pages/Coronavirus-COVID-19.aspx.

LifeLine, http://lifeline/Pages/Home.aspx, Coronavirus (COVID-19), which contains multiple links.

State of CA, Dept. of Social Services, Guidance for all adult and senior care program licensees: https://www.cdss.ca.gov/Portals/9/CCLD/PINs/2020/ASC/PIN%2020-04-ASC_Coronavirus_ASCFacilities.pdf

CDC, https://www.cdc.gov/coronavirus/2019-ncov/index.html

NYC Health, https://www1.nyc.gov/assets/doh/downloads/pdf/imm/guidance-for-congregate-settings-covid19.pdf

Cal/OSHA, Interim Guidance for Protecting Health Care Workers from Exposure to Coronavirus Disease (COVID-19), https://www.dir.ca.gov/dosh/coronavirus/Health-Care-General-Industry.html

Cal/OSHA, Aerosol Transmissible Disease Standard, https://www.dir.ca.gov/title8/5199.html

# Exhibit 4



California Department of
# State Hospitals

ENHANCED TREATMENT PROGRAM
DRAFT
POLICIES AND PROCEDURES
JUNE 2019

**Department of State Hospitals**
**Enhanced Treatment Program (ETP)**
**Draft Policies and Procedures**
**June 2019**

**Table of Contents**

Section 1 – Introduction

Section 2 – Admissions

1. Policy Directive 3700, Enhanced Treatment Program Admission and Initial Certification
2. Program Procedure ETP-OP-001, ETP Admission and Initial Certification Procedures

Section 3 – Services

1. Policy Directive 3704, Enhanced Treatment Program Treatment Planning
2. Program Procedure ETP-OP-100, ETP Treatment Planning
3. Policy Directive 3706, Enhanced Treatment Program Milieu Management Plan
4. Program Procedure ETP-OP-101, ETP Milieu Management Plan

Section 4 – Transition

1. Policy Directive 3702, Enhanced Treatment Program Ongoing Certification
2. Program Procedure ETP-OP-002, ETP Ongoing Certification
3. Policy Directive 3708, Enhanced Treatment Program Discharge and Transition
4. Program Procedure ETP-OP-300, ETP Discharge and Transition

Section 5 – Staffing

1. DSH-Atascadero ETP Proposed Schedule
2. DSH-Atascadero ETP Draft AM Shift Assignments
3. DSH-Atascadero ETP Sample Clinical Staff Assignment
4. DSH-Atascadero ETP Staff Assignment for Individual Care
5. DSH-Patton ETP Proposed Schedule
6. DSH-Patton ETP Sample Clinical Staff Assignment
7. DSH-Patton ETP Staff Assignment for Individual Care

Section 6 – Training

1. Program Procedure ETP-OP-205, ETP Training Procedure



California Department of

# State Hospitals

## Enhanced Treatment Program

## Section 1

## Introduction

# DSH ENHANCED TREATMENT PROGRAM
# DRAFT POLICIES AND PROCEDURES
# JUNE 2019

Assembly Bill 1340 (Achadjian, Statutes of 2014) authorized the Department of State Hospitals to establish and maintain pilot Enhanced Treatment Programs (ETPs), for the treatment of patients who are at high risk of most dangerous behavior, when safe treatment is not possible in a standard treatment environment. The goal of these pilot ETPs is to evaluate the effectiveness of concentrated, evidence-based clinical therapy and treatment in an environment designed to improve these patients' conditions and return them to the general patient population.

Senate Bill 85 (Committee on Budget, Statutes of 2015) requires the State Department of State Hospitals to submit written draft policies and procedures that will guide the operation of the Enhanced Treatment Program (ETP), including, but not limited to, admittance criteria, staffing levels, services to be provided to patients, a transition planning process, and training requirements, to the appropriate policy and fiscal committees of the Legislature and to the Joint Legislative Budget Committee.

This document contains the draft policies and procedures developed to guide the operation of the Enhanced Treatment Program and is current through June 2019. The draft Policy Directives were provided to employee bargaining units for 60-day review on February 15, 2019 and union representatives have had the opportunity to meet and discuss the policies. The California Office of Patient's Rights reviewed the Policy Directives and Program Procedures in December 2018 and their input was incorporated.

DSH previously submitted ETP draft policies and procedures in October 2017 as requested, in anticipation of the first ETP unit opening in 2018. Construction was unavoidably delayed, but now is underway. The first unit is expected to open in the Fall of 2019 therefore DSH has updated and is now resubmitting this document.



California Department of
# State Hospitals

## Enhanced Treatment Program

## Section 2

## Admissions

State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

| NUMBER | 3700 |
|---|---|
| TITLE | Enhanced Treatment Program Admission and Initial Certification |
| EFFECTIVE DATE | |
| SUPERSEDES | New |

## Policy Statement

The Department of State Hospitals' (DSH) Policy Directives (PDs) provide guidance to comply with laws, regulations, codes, etc. PDs are issued and signed by the Director. It is the policy of DSH to expand its continuum of care by establishing the Enhanced Treatment Program (ETP) for patients who are at high risk of most dangerous behavior and who may benefit from concentrated, evidence-based clinical therapy, structured milieu therapy and/or treatment aimed at reducing the risk of violent behavior, with the goal of returning the patient to a standard treatment environment. DSH is committed to providing treatment in the least restrictive environment.

## Purpose

The purpose of the ETP Admission and Initial Certification PD is to provide guidance on identifying and triaging patients appropriate for admission to the ETP.

## Responsibility

**Executive Sponsor:** Deputy Director Clinical Operations

**Process Owner:** Chief, Data Analytics, Treatment & Assessment, Clinical Operations

## Background

DSH is authorized to implement and operate a pilot ETP to treat patients at high risk of most dangerous behavior to determine whether more intensive care in a higher-security setting is an effective way to reduce violence. The budget provides for the construction of four units, totaling 49 beds.

State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

| Authority |
| --- |

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4005.1, 4027, and 4101

| Definitions |
| --- |

**Enhanced Treatment Program (ETP):**  A pilot program authorized under Health and Safety Code section 1265.9, aimed at treating patients at high risk of most dangerous behavior, who may benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

**Forensic Needs Assessment Panel (FNAP):**  A panel that consists of a Psychiatrist, a Psychologist, and a Medical Director, none of whom are involved in the patient's treatment or diagnosis at the time of the hearing or placement evaluation meetings.

**Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violence risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the ETP treatment team.

**Individualized Behavioral Plan:**  A type of behavioral plan developed by the treatment team in conjunction with the patient, to focus on changes patients and staff will make to create an environment that supports the patient in management of unsafe behaviors and progression towards safe conduct.

**Individualized Treatment Interventions**:  All interventions provided to the patient on the ETP that are determined to address patient specific risk factors for highest risk of violence.

**Most Dangerous Behavior:**  Includes aggressive acts that may cause substantial physical harm to others in an inpatient setting.

**Standard Treatment Environment:**  Any DSH state hospital setting outside of the ETP.

**Standard Violence Risk Assessment Methodologies:**  May include, but are not limited to, an analysis of past violence, delineation of static and dynamic violence risk factors, and utilization of valid and reliable violence risk assessment testing.

State of California – Health and Human Services Agency                                    Department of State Hospitals

# POLICY DIRECTIVE

**Treatment Team:**  The primary Psychiatrist, Psychologist, Clinical Social Worker, Rehabilitation Therapist, Registered Nurse, and Psychiatric Technician assigned to the patient on the ETP unit.

---

### Process

---

I.  **Who May Be Referred**

A patient may be referred for ETP treatment by a Psychiatrist or Psychologist from the standard treatment environment when all following conditions are met:

A.  The patient's treatment team has determined, utilizing standard violence risk assessment methodologies for clinically assessing violence risk, that the patient is at high risk for most dangerous behavior in a standard treatment environment.  A determination of a patient's high risk for most dangerous behavior should include a consideration of the severity, frequency, and intensity of a patient's past violent behavior.

B.  Reasonable attempts at providing individualized treatment interventions aimed at reducing the patient's risk for aggression have been attempted without success or it is determined by the patient's treatment team that the patient's aggressive behavior and high violence risk preclude staff's ability to provide interventions safely in the standard treatment environment.

C.  There is no existing contract or memorandum of understanding that provides alternative and clinically appropriate treatment outside of the Department of State Hospitals.

D.  The referring treatment team concludes that the patient does not have medical issues that would contraindicate treatment on the ETP.

E.  The referring treatment team has completed the ETP Referral Form DSH-9220 including, but not limited to, a rationale for ETP placement, current violence risk formulation, summary of violence history, and summary of treatment history and progress.

F.  The completed ETP Referral Form DSH-9220 has been submitted by the referring treatment team or facility to the FNAT Supervising Psychologist and the FNAT Supervising Psychologist has reviewed the ETP Referral Form DSH-9220, determined the referral includes all requisite information, and approved the referral for initial evaluation.

State of California – Health and Human Services Agency                                    Department of State Hospitals

# POLICY DIRECTIVE

## II.    Initial Evaluation

A. The FNAT Psychologist will conduct the initial evaluation of the referred patient to verify the need for treatment on an ETP. This initial evaluation shall be completed prior to a patient's placement into the ETP unless the FNAP determines that an emergency placement is necessary, in which case the initial evaluation shall be completed within three business days of placement in the ETP. The FNAT Psychologist's initial evaluation will include the following elements:

1. An interview of the patient's treatment team.
2. A review of the patient's medical record.
3. A review of the patient's history of violence.
4. A current violence risk level.
5. A recommendation about need for enhanced treatment.

## III.    FNAP 90-Day Placement Evaluation Meeting

A. The FNAP shall convene a placement evaluation meeting with the referring Psychiatrist or Psychologist, the patient, a Patients' Rights Advocate, and the FNAT Psychologist who conducted the initial evaluation, to determine whether the referred patient should be accepted for ETP treatment. The patient and Patients' Rights Advocate shall be notified at least 72 hours prior to the meeting as to the meeting's purpose, date, time, and location.

B. The notice to the patient, Patients' Rights Advocate and Conservator if applicable, shall include a written explanation of the reasons, including specific behaviors and incidents that are relied on by the FNAP in making the placement evaluation decision. Instructions shall also be provided as to how a patient may submit documents to the FNAP to consider in making their placement evaluation decision.

C. In the event a patient is unable to safely participate in the placement evaluation meeting in person, the referring hospital shall arrange for the patient to participate via an alternate modality, such as teleconference or telepresence.

D. This meeting shall be conducted prior to a patient's placement into the ETP, unless an emergency placement is necessary.

E. The FNAP shall review all material presented at the FNAP 90-Day Placement Evaluation Meeting and make a certification decision for 90 days of treatment in the ETP.

F. The patient will be accepted for ETP treatment if the FNAP determines the following criteria are met:

State of California – Health and Human Services Agency                                    Department of State Hospitals

# POLICY DIRECTIVE

1. The patient is considered at high risk of most dangerous behavior to staff or other patients;
2. Reasonable attempts at providing individualized treatment interventions aimed at reducing the patient's risk for aggression have been attempted without success or it is determined by the FNAP the patient's aggressive behavior and high violence risk preclude staff's ability to provide interventions safely in a standard treatment environment;
3. The patient does not have medical issues that would contraindicate treatment on the ETP; and
4. The referred patient has been triaged for ETP treatment, taking into consideration the number of ETP referrals across DSH, and the number of available ETP beds.

G. The FNAP will document their decision on the ETP Certification Form, DSH-9219 and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within three business days of the placement evaluation meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), and referring hospital transfer coordinator/designee.

H. The FNAT Supervisor will assign the patient to an FNAT Psychologist to conduct an in-depth violence risk assessment. The FNAT Supervisor will assign the patient to an FNAT Psychologist's treatment caseload. The FNAT Psychologists will have 20 calendar days to complete the risk assessment, except when it is an emergency placement. The FNAT Psychologist will identify dynamic risk factors that will be used in treatment planning.

## V.     Transfer of Patient

A. A patient who has been certified for the ETP must be transported to the ETP no later than 30 calendar days after the initial FNAP 90-day certification decision has been made.

## VI.     Triaging Procedure

A. In the event a referral is made, and the FNAP has determined that a 90-day certification is appropriate, the FNAP shall be provided the status of current ETP patients and possible vacancies. The FNAP shall make the decision to certify based on the violence risk level of the patient that was referred together with the clinical assessment of the current ETP milieu.

State of California – Health and Human Services Agency                          Department of State Hospitals

# POLICY DIRECTIVE

---

## Roles and Responsibilities

The FNAT Supervising Psychologist reviews the ETP referral form for completeness prior to the initial evaluation by the FNAT Psychologist.

The FNAT Psychologist conducts the initial evaluation of the referral from the patient's treatment team; participates in the FNAP 90-day Placement Evaluation Meeting; and completes the in-depth violence risk assessment.

The FNAP conducts the FNAP 90-day Placement Evaluation Meeting; reviews all information provided at the placement evaluation meeting; and provides written decisions regarding certification.

The Patients' Rights Advocate participates in the FNAP 90-day Placement Evaluation Meeting.

The Referring Psychologist or Psychiatrist participates in the FNAP 90-day Placement Evaluation Meeting.

---

## Approval

_____

STEPHANIE CLENDENIN                    Date
Director (A)

---

## References

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4143 and 4144
3. Title 9 of the California Code of Regulations, sections 4801-5100
4. Policy Directive 3702, Enhanced Treatment Program Ongoing Certification
5. Policy Directive 3706, Enhanced Treatment Program Milieu Management Plan
6. Policy Directive 3704, Enhanced Treatment Program Treatment Planning
7. Policy Directive 3708, Enhanced Treatment Program Discharge and Transition
8. ETP Referral Form DSH-9220
9. ETP Certification Form DSH-9219

State of California – Health and Human Services Agency                                      Department of State Hospitals

# POLICY DIRECTIVE

| Attachments |
|---|

    1.  ETP FNAP Certification Decision Notification Grid

California Department of
**State Hospitals**

**ETP FNAP Certification Decision Notification Grid**
Policy Directive 3700, Attachment 1

| Event | Timeframe | Notifier | Recipient |
|---|---|---|---|
| **FNAP 90-day Placement Evaluation Meeting** | Within 3 business days | FNAT Supervising Psychologist | Patient, Patients' Rights Advocate, Conservator (if applicable) & Referring Hospital |
| **FNAP One Year Placement Evaluation Meeting** | Within 24 hours | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **FNAP One Year Continuation Placement Evaluation Meeting** | Within 24 hours | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **Independent Medical Review Placement Evaluation Hearing** | Within 3 business days | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **FNAP 90-day Treatment Summary Review** | Within 3 business days | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |

# DEPARTMENT OF STATE HOSPITALS
# ENHANCED TREATMENT PROGRAM

**ETP OPERATING MANUAL**

**SECTION – Admission and Certification**

**PROGRAM PROCEDURE No. ETP-OP-001**

**SUBJECT:    ETP Admission and Initial Certification Procedures**

**Effective Date:      4/9/19**

This procedure is specific to the Enhanced Treatment Program (ETP).

I.   <u>PURPOSE</u>
     To provide clear procedures on identifying, referring, admitting and triaging patients appropriate for the ETP.

II.  <u>DEFINITIONS</u>

   A. **Enhanced Treatment Program (ETP):**  A pilot program authorized under Health and Safety Code section 1265.9, aimed at treating patients at high risk of most dangerous behavior, who are able to benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

   B. **Forensic Needs Assessment Panel (FNAP):**  A panel that consists of a Psychiatrist, a Psychologist, and a Medical Director none of whom are involved in the patient's treatment or diagnosis at the time of the hearing or placement evaluation meetings.

   C. **Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violence risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the ETP treatment team.

   D. **Individualized Behavioral Plan:**  A type of behavioral plan developed by the treatment team in conjunction with the patient, to focus on changes patients and staff will make to create an environment that supports the patient in management of unsafe behaviors and progression towards safe conduct.

   E. **Individualized Treatment Interventions**:  All interventions provided to the patient on the ETP that are determined to address patient specific risk factors for highest risk of violence.

   F. **Most Dangerous Behavior:**  Includes aggressive acts that may cause substantial physical harm to others in an inpatient setting.

G. **Psychopharmacology Resource Network Consult (PRN) Consult:** A thorough review of current and past psychopharmacological treatment by a Psychopharmacology Resource Network Psychiatrist followed by evidence-based recommendations.

H. **Standard Treatment Environment:** Any DSH state hospital setting outside of the ETP.

I. **Standard Violence Risk Assessment Methodologies:** May include, but are not limited to, an analysis of past violence, delineation of static and dynamic violence risk factors, and utilization of valid and reliable violence risk assessment testing.

J. **Treatment Team:** The primary Psychiatrist, Psychologist, Clinical Social Worker, Rehabilitation Therapist, Registered Nurse, and Psychiatric Technician assigned to the patient on the ETP unit.

III. ETP REFERRAL

A. A patient may be referred for ETP treatment when the following conditions are met:

1. A Psychiatrist or Psychologist from the treating DSH facility determines, utilizing standard violence risk assessment methodologies for clinically assessing violence risk, that the patient is at high risk for most dangerous behavior in a standard treatment environment. A determination of a patient's high risk for most dangerous behavior should include a consideration of the severity, frequency, and intensity of a patient's past violent behavior.

2. Reasonable attempts at providing individualized treatment interventions aimed at reducing the patient's risk for aggression have been attempted without success or it is determined by the patient's treatment team that the patient's aggressive behavior and high violence risk preclude staff's ability to provide interventions safely in the standard treatment setting.

3. There is no existing contract or memorandum of understanding that provides alternative and clinically appropriate treatment outside of the Department of State Hospitals.

4. The referring treatment team has completed a Psychopharmacology Resource Network (PRN) consult or has documented a justification for why the PRN consult was not completed and has made reasonable attempts to follow recommended interventions or has documented a reasonable rationale on why recommended interventions were not attempted.

5. The referring team concludes the patient does not have medical issues that would preclude safe treatment on the ETP.

6. The referring treatment team has completed the ETP Referral Form DSH-9220 including, but not limited to, a rationale for ETP placement, current violence risk formulation, summary of violence history, and summary of treatment history and progress.

IV. <u>REFERRING HOSPITAL ETP REFERRAL ROUTING</u>

A. Once the ETP Referral Form has been completed by the unit Psychologist or Psychiatrist, the form will be routed through Program Management who will review the form for completeness and adherence to the ETP referral and admissions criteria. Program Management will then route the referral to the Medical Director and/or Clinical Administrator for final determination whether the referral is necessary.

B. Once the referring hospital has determined the referral is necessary, the Referral Form DSH-9220 will be submitted to the FNAT Supervising Psychologist with specific contact information for the referring hospital transfer coordinator/designee responsible for coordinating meetings between the treatment team and FNAT Psychologist.

V. <u>FNAT REFERRAL REVIEW</u>

A. The FNAT Supervising Psychologist will forward the ETP referral to a FNAT Psychologist for an initial evaluation when the following conditions are met:

1. A completed ETP Referral Form is submitted by the referring treatment team or facility to the FNAT Supervising Psychologist.

2. The FNAT Supervising Psychologist has reviewed the ETP Referral Form and determined the referral includes all required information.

3. The FNAT Supervising Psychologist has notified the Patients' Rights Advocate and Conservator, if applicable, that the patient has been referred for an ETP placement evaluation.

4. The FNAT Supervising Psychologist will notify the referring hospital that the referral has been assigned for evaluation.

VI.    FNAT INITIAL EVALUATION

A. The FNAT Psychologist will conduct the initial evaluation of the referred patient to verify the need for treatment on an ETP.  The FNAT Psychologist's initial evaluation will include the following elements:

1.  An interview of the patient's treatment team.

2.  A review of the patient's medical record.

3.  A review of the patient's history of violence

4.  A current violence risk level

5.  A recommendation about need for enhanced treatment

B. The FNAT Psychologist will forward the completed initial evaluation to the FNAT Supervising Psychologist.

C. The FNAT Supervising Psychologist will notify the FNAP members and forward the referral documents and initial assessment to the FNAP members for their review.

D. The referring hospital will notify the patient that he/she has been referred to the ETP and a placement evaluation meeting will be scheduled; and will inform the FNAT Supervising Psychologist that the patient has been notified.

E. The FNAT Supervising Psychologist will then schedule the placement evaluation meeting and notify the FNAP members, referring hospital, Patients' Rights Advocate and Conservator, if applicable, at least 72 hours prior of the meeting's purpose, date, time and location.

F. The referring hospital will notify the patient of the placement meeting date and provide the patient with a written explanation of the reasons, including specific behaviors and incidents that were relied upon in making the recommendation. Such notice shall be provided to the patient, at least 72 hours prior to the meeting date, and contain instructions on how to submit documents for consideration by the FNAP during the placement evaluation meeting.

G. The referring hospital in coordination with the Patient's Rights Advocate will forward documents submitted by the patient for consideration by the FNAP to the FNAT Supervising Psychologist.

VII.    FNAP 90 DAY PLACEMENT EVALUATION MEETING

A. A FNAP 90 Day Placement Evaluation Meeting will be convened to determine if the referred patient should be accepted for ETP treatment.  The FNAP consists of a DSH-assigned Psychiatrist, Psychologist, and Medical Director.  This meeting

will also include the referring Psychiatrist or Psychologist, the patient, the Conservator (if applicable), the Patients' Rights Advocate, and the FNAT Psychologist who completed the initial evaluation.

B. In the event a patient is unable to safely participate in the placement evaluation meeting in person, the referring hospital shall arrange for the patient to participate via an alternate modality, such as teleconference or telepresence.

C. This meeting shall be conducted prior to a patient's placement into the ETP, unless an emergency placement is necessary.

D. The patient will be accepted for ETP treatment if the FNAP determines the following criteria are met:

   1. The patient is considered at high risk of most dangerous behavior to staff or other patients.

   2. Reasonable attempts at providing individualized treatment interventions aimed at reducing the patient's risk for aggression were attempted without success or it is determined by FNAP the patient's aggressive behavior and high violence risk preclude staff's ability to provide interventions safely in a standard treatment environment.

   3. The patient does not have medical issues that would preclude safe treatment on the ETP.

   4. The referred patient has been triaged for ETP treatment taking into consideration the number of ETP referrals across DSH and the number of available beds.

VIII.   FNAP CERTIFICATION NOTIFICATION AND IN-DEPTH VIOLENCE RISK ASSESSMENT

A. If the FNAP determines a patient does not meet ETP certification criteria, they will document this decision on the ETP Certification Form and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within three business days of the placement evaluation meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), and referring hospital transfer coordinator/designee.

B. If the FNAP determines a patient does meet ETP certification criteria, they will document this decision on the ETP Certification Form DSH-9219 and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within three business days of the placement evaluation meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), referring hospital transfer coordinator/designee and ETP hospital.

1. The FNAT Supervisor will assign the patient to an FNAT Psychologist to conduct an in-depth violence risk assessment. The FNAT Supervisor will assign the patient to an FNAT Psychologist's treatment caseload.

2. The patient will be certified for 90 days of treatment in the ETP. Within seven business days of the FNAP ETP certification, the referring hospital will complete an ETP Transfer e-Packet Checklist and provide the packet to the receiving ETP.

3. The FNAT will have 20 calendar days to complete the in-depth violence risk assessment. The assigned FNAT Psychologist may utilize telepresence to interview the patient and complete the evaluation. The FNAT Psychologist will identify dynamic risk factors that will be used in treatment planning.

4. The patient will be transferred to the ETP within 30 calendar days of the FNAP certification decision.

IX.    ETP ADMISSION

A. Upon admission to the ETP, each patient will receive a psychiatric, nursing and medical admission assessment, per the ETP hospital's current requirements.

B. The patient will be assigned to a milieu status in accordance with the ETP Milieu Management Plan.

C. Within 72 hours of admission, the FNAT will meet with the designated ETP treatment team to discuss the risk factors and design a treatment plan.

D. Following the 72-hour treatment team conference, the treatment team will meet with the patient weekly in treatment planning conferences to assess progress towards treatment goals.

E. The FNAT Psychologist will review the treatment plan no less than every 10 days and update the plan in collaboration with the treatment team as needed.

X.    EMERGENCY PLACEMENT AND CERTIFICATION PROCEDURE

A. Emergency Placement

1. In the event a patient presents an extremely high risk of dangerous behavior and cannot be safely treated in a standard treatment setting the FNAP may consider the patient for emergency placement.

2. The Executive Director (ED) of the referring hospital will contact the FNAT Supervising Psychologist and submit the ETP emergency placement packet.

3.  The FNAT Supervising Psychologist will notify the Patients' Rights Advocate and Conservator, if applicable, that the patient has been referred for emergency ETP placement.

4.  The five hospital EDs will convene to discuss the patient's case and circumstances to determine whether the respective patient's ED will advance the referral for emergency certification  consideration by the FNAP. If there are beds available for emergency placement, the patient shall be admitted into the ETP as soon as transportation arrangements can be made.

5.  If there are no beds available, the EDs will use the Monthly ETP Utilization Report containing information on patients nearing or currently eligible for discharge (if any). If the EDs determine that an emergency placement is appropriate, the EDs shall determine possible clinically appropriate patients for expedited transition/discharge to a standard treatment environment.  The EDs will make a recommendation to the FNAP on the most appropriate patients ready for expedited discharge.

6.  The FNAP will make a placement decision based on the nature of the emergency referral, the clinical assessment of the current ETP patients and potential vacancies in the ETP.

7.  If the FNAP determines that an emergency placement is appropriate, the FNAT Supervising Psychologist will notify the referring hospital and the ETP hospital. If there is an ETP bed available, transportation arrangements will be made as soon as possible.

8.  The referring hospital shall complete the ETP Transfer e-Packet Checklist prior to transport. The referring hospital shall hold a bed for the patient until the FNAP makes a certification decision (7 to 14 business days).

B.  Expedited Discharge From the ETP to a Standard Treatment Environment

1.  If a patient is identified by the FNAP for expedited discharge from the ETP to a standard treatment environment, the patient's aftercare plan will be completed as soon as possible and provided to the receiving hospital. The patient will be transported to the receiving hospital as soon as the aftercare plan and appropriate discharge documentation is completed and communicated to the receiving hospital.

2.  During the first 30 days following discharge, the ETP team will communicate regularly with the receiving treatment team to assist with the patient's transition. Following the initial 30 days, the teams will communicate as necessary to assist transition.

C.  Emergency Placement Admission and Treatment Planning

1.  Upon admission to the ETP, each patient will receive a psychiatric, nursing and medical admission assessment, per the ETP hospital's current requirements.

2.  The patient will be assigned to a milieu status in accordance with the ETP Milieu Management Plan.

3.  Upon admission, the FNAT will complete the initial evaluation and meet with the designated ETP treatment team to discuss the risk factors and design a treatment plan.

4.  Within seven business days of placement in an ETP and with a minimum of 72-hour notice to the patient, Patient's Rights Advocate and Conservator if applicable, the FNAP will conduct a placement evaluation meeting to determine if the patient clinically requires ETP treatment.

5.  The notice to the patient, Conservator if applicable and Patients' Rights Advocate shall include a written explanation of the reasons, including specific behaviors and incidents that are relied on the ETP recommendation. Instructions shall also be provided as to how a patient may submit documents to the FNAP to consider in making their placement evaluation.

6.  Following the 72-hour treatment team conference, the treatment team will meet with the patient weekly in treatment planning conference to assess progress towards treatment goals.

D.  Emergency Placement FNAP Certification Notification and In-Depth Violence Risk Assessment

1.  If the FNAP determines a patient does not meet ETP certification criteria, they will document this decision on the ETP Certification Form and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within three business days of the placement evaluation meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), referring hospital transfer coordinator/designee and ETP hospital.  If a patient is not certified for treatment in the ETP, the patient will be transported back to the referring hospital as soon as possible, but no later than 5 business days.

2.  If the FNAP determines a patient does meet ETP certification criteria, they will document this decision on the ETP Certification Form and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within three business days of the placement evaluation meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights

Advocate, Conservator (if applicable), referring hospital transfer coordinator/designee and ETP hospital.

a) The patient will be certified to the ETP for 90 days.

b) The FNAT Supervising Psychologist will assign the patient to an FNAT Psychologist to conduct an in-depth violence risk assessment. The FNAT Supervising Psychologist will assign the patient to an FNAT Psychologist's treatment caseload.

c) The FNAT Psychologist will complete the in-depth violence risk assessment within 7 business days of certification. The FNAT Psychologist will identify dynamic risk factors that will be used in treatment planning.



California Department of
# State Hospitals

**Enhanced Treatment Program**

**Section 3**

**Services**

State of California – Health and Human Services Agency                                    Department of State Hospitals

# POLICY DIRECTIVE

| NUMBER | 3704 |
|---|---|
| TITLE | Enhanced Treatment Program Treatment Planning |
| EFFECTIVE DATE | |
| SUPERSEDES | New |

## Policy Statement

The Department of State Hospitals' (DSH) Policy Directives (PDs) provide guidance to comply with laws, regulations, codes, etc. PDs are issued and signed by the Director. It is the policy of DSH to expand its continuum of care by establishing the Enhanced Treatment Program (ETP) for patients who are at high risk of most dangerous behavior and who may benefit from concentrated, evidence-based clinical therapy, structured milieu therapy and/or treatment aimed at reducing the risk of violent behavior, with the goal of returning the patient to a standard treatment environment. DSH is committed to providing treatment in the least restrictive environment.

## Purpose

The purpose of the ETP Treatment Planning PD is to provide guidance on treatment and planning procedures to encourage patient improvement and recovery and provide a process for creating and implementing a treatment plan with regular clinical review and reevaluation of progress towards placement back into a standard treatment environment.

## Responsibility

**Executive Sponsor:** Deputy Director, Clinical Operations

**Process Owner:** Chief, Data Analytics, Treatment & Assessment, Clinical Operations

## Background

DSH is authorized to implement and operate a pilot ETP to treat patients at high risk of most dangerous behavior to determine whether more intensive care in a higher-security setting is an effective way to reduce violence. The budget provides for the construction of four units, totaling 49 beds.

State of California – Health and Human Services Agency                                      Department of State Hospitals

# POLICY DIRECTIVE

| Authority |
| --- |

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4005.1, 4027, and 4101

| Definitions |
| --- |

**Clinical Indicators:**  Specific clinical signs and/or behaviors manifested by the patient that indicate illness or behavioral instability.

**Enhanced Treatment Program (ETP):**  A pilot program authorized under Health and Safety Code sections 1265.9 aimed at treating patients at high risk of most dangerous behavior, who may benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

**Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violence risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the ETP treatment team.

**Milieu Management Plan (MMP):**  A type of behavioral plan which includes the Milieu Status and Safety Communication Plan and is developed by the treatment team in conjunction with the patient, to focus on changes staff will make to create an environment that supports the patient in management of unsafe behaviors and progression towards safe conduct.

**Milieu Status:**  A determination of when a locked patient room door may be used as clinically indicated and is determined to be the least restrictive management intervention for the patient's care and treatment. Milieu Status 1, 2 and 3 will be used to communicate the status.
    Milieu status 3 – Unlocked patient room door
    Milieu status 2 – Locked patient room door at specific times
    Milieu status 1 – Locked ETP suite

**ETP Suite:**  A locked patient room that includes a sink, commode and shower, to be utilized when a regular patient room is clinically contraindicated. When a patient is in Milieu Status 1, the ETP Suite is not considered "seclusion" as defined in Health and Safety Code 1180.1(e). However, the ETP Suite may be utilized as a restraint or seclusion room when necessary.

**Treatment Team:**  The primary Psychiatrist, Psychologist, Clinical Social Worker, Rehabilitation Therapist, Registered Nurse, and Psychiatric Technician assigned to the patient.

State of California – Health and Human Services Agency                           Department of State Hospitals

# POLICY DIRECTIVE

| Process |
|---|

I.  Upon admission to an ETP, a FNAT Psychologist who is not on the patient's treatment team shall complete an in-depth violence risk assessment and, in conjunction with the ETP treatment team, make an individual treatment plan for the patient based on the assessment.

   A.  The individual treatment plan shall:
      1.  be in writing and developed in collaboration with the patient, when possible. The initial treatment plan shall be developed as soon as possible, but no later than 72 hours following the patient's admission. The comprehensive treatment plan shall be developed following a complete violence risk assessment, except during an emergency referral;
      2.  be based on a comprehensive assessment of the patient's physical, mental, emotional, and social needs, and focused on mitigation of violence risk factors; and
      3.  be reviewed and updated no less than every 10 days.

II.  **Individual Treatment Plan**

   A.  The individual treatment plan shall include, but is not limited to, all the following:
      1.  A statement of the patient's physical and mental condition, including all mental-health and medical diagnoses.
      2.  Prescribed medication, dosage, and frequency of administration.
      3.  Specific goals of treatment with intervention and actions that identify steps toward reduction of violence risk and observable, measurable objectives as documented in the MMP.
         a)  The MMP shall include:
            i.   Milieu Status - a determination as to whether it is clinically indicated to be the least restrictive treatment for the patient's room to be locked during certain times;
            ii.  goals a patient must achieve to move to less restrictive treatment; and
            iii. what mechanisms will be utilized by the treatment team to assist the patient in reaching those goals.
      4.  Identification of methods to be utilized, the frequency for conducting each treatment method, and the person(s) or discipline(s) responsible for each treatment method.
      5.  Documentation of the success or failure in achieving stated objectives.
      6.  Evaluation of the factors contributing to the patient's progress or lack of progress toward reduction of violence risk and a

State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

> statement of the multidisciplinary treatment decision for follow-up action.
>
> 7. An activity plan.
> 8. A plan for other services needed by the patient, such as care for medical and physical ailments, not provided by the treatment team.
> 9. Discharge criteria and goals for an aftercare plan in a standard treatment environment and a plan for post-ETP discharge follow-up.

## III.    ETP Treatment Team

A. An ETP patient shall receive treatment from a treatment team consisting of a psychiatrist, a psychologist, a nurse, a psychiatric technician, a clinical social worker, a rehabilitation therapist, and any other necessary staff who shall meet as often as necessary, (but no less than once a week) to assess the patient's response to treatment.

B. The staff shall observe and note any changes in the patient's condition, and the treatment plan shall be modified in response to the observed changes.

## IV.    Behavioral Health Assistance Module (BHAM)

A. The ETP BHAM module is an electronic dashboard that facilitates treatment pathways, the completion of forensically driven documentation, and ETP-related notifications. It also provides a platform for data collection.

B. The ETP treatment team shall develop the treatment plan using BHAM and the Lippincott Nursing Advisor. The treatment plan shall be prepared electronically in BHAM, printed, signed, and filed under the Treatment Plan tab in the patient's chart.

## V.    Treatment Services

A. The ETP treatment program shall include therapeutic, social, recreational, and vocational activities in accordance with the interests, abilities, and needs of the patients, including the opportunity for exercise.

State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

  B.  Treatment services provided may include but are not limited to:
       1.  Emotion Regulation
       2.  Substance Recovery
       3.  Criminogenic Risk Factors
       4.  Cognitive Impairment
       5.  Sensory Modulation
       6.  Behavior Principles
       7.  Cognitive Behavioral Therapy (CBT)
       8.  CBT for Psychosis (CBTp)
       9.  Medication Education
       10. Rehabilitation Therapy, including Recreation, Music, Art, and/or
           Occupational Therapy

## Roles and Responsibilities

The FNAT Psychologist reviews the referral and transfer documentation, participates in treatment team conference meetings, and regularly reviews the treatment plan revisions and updates.

The ETP Team Psychiatrist reviews the referral and transfer documentation, participates in treatment team conference meetings as lead, and regularly reviews the treatment plan revisions and updates.

The ETP Team Psychologist reviews the referral and transfer documentation, participates in treatment team conference meetings, and regularly reviews the treatment plan revisions and updates.

The Treatment Team reviews the referral and transfer documentation, participates in team conference meetings, documents the patient's progress towards meeting goals, and works in collaboration to create and maintain the MMP.

## Approval


_____
STEPHANIE CLENDENIN
Director (A)

# POLICY DIRECTIVE

| References |
| --- |

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4143 and 4144
3. Title 9 of the California Code of Regulations, sections 4801-5100
4. Policy Directive 3700, Enhanced Treatment Program Admission and Initial Certification
5. Policy Directive 3702, Enhanced Treatment Program Ongoing Certification
6. Policy Directive 3706, Enhanced Treatment Program Milieu Management Plan
7. Policy Directive 3708, Enhanced Treatment Program Discharge and Transition

# DEPARTMENT OF STATE HOSPITALS
# ENHANCED TREATMENT PROGRAM

**ETP OPERATING MANUAL**

**SECTION – Treatment Planning**

**PROGRAM PROCEDURE No. ETP-OP-100**

**SUBJECT:   ETP Treatment Planning**



**Effective Date:      4/9/19**

This procedure is specific to the Enhanced Treatment Program (ETP).

I.    <u>PURPOSE</u>

To provide clear procedures on treatment and planning procedures to encourage patient improvement and recovery and provide a process for creating and implementing a treatment plan with regular clinical review and reevaluation of placement back into a standard treatment environment. Treatment plans are developed and reviewed on a regular basis in collaboration with the patient.

II.    <u>DEFINITIONS</u>

A. **Clinical Indicators:**  Specific clinical signs and/or behaviors manifested by the patient that indicate illness or behavioral instability.

B. **Enhanced Treatment Program (ETP):**  A pilot program authorized under Health and Safety Code sections 1265.9 aimed at treating patients at high risk of most dangerous behavior, who are able to benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

C. **Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violence risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the ETP treatment team.

D. **Milieu Management Plan (MMP):**  A type of behavioral plan, which includes the Milieu Status and Safety Communication Plan and is developed by the treatment team in conjunction with the patient, to focus on changes staff will make to create an environment that supports the patient in management of unsafe behaviors and progression towards safe conduct.

E. **Milieu Status:**  A determination of when a locked patient room door may be used as clinically indicated and is determined to be the least restrictive management intervention for the patient's care and treatment. Milieu Status 1, 2 and 3 will be used to communicate the status.

Milieu status 3 – Unlocked patient room door
Milieu status 2 – Locked patient room door at specific times
Milieu status 1 – Locked ETP suite

F. **ETP Suite:**  A locked patient room that includes a sink, commode and shower to be utilized when a regular patient room is clinically contraindicated. When a patient is in Milieu Status 1, the ETP Suite is not considered "seclusion" as defined in Health and Safety Code 1180.1(e). However, the ETP Suite room may be utilized as a restraint or seclusion room when necessary.

G. **Safety Communication Plan:**  A document that is utilized to monitor and communicate the patients Milieu Status, peer contact parameters, number and type of on/off unit escorts, level of staff monitoring; nursing and other considerations.

H. **Treatment Team:**  The primary Psychiatrist, Psychologist, Clinical Social Worker, Rehabilitation Therapist, Registered Nurse and Psychiatric Technician assigned to the patient.

III.   ETP TREATMENT TEAM

An ETP patient shall receive treatment from a treatment team consisting of a psychiatrist, a psychologist, a nurse, a psychiatric technician, a clinical social worker, a rehabilitation therapist, and any other necessary staff who shall meet as often as necessary, but no less than once a week, to assess the patient's response to treatment.

IV.   INITIAL (72-HOUR) TREATMENT PLAN

A. The FNAT Psychologist assigned to the patient will meet with the designated ETP treatment team to discuss the risk factors and design an initial treatment plan within 72 hours of admission.

B. The initial treatment plan will use information from the initial and in-depth violence risk assessment, ETP Referral Form, Psychiatric Admission Assessment, Medical Admission Assessment and Nursing Admission Assessment.

V.   COMPREHENSIVE (WEEKLY) TREATMENT PLAN

A. The treatment team will meet with the patient weekly in a treatment team conference to assess progress towards treatment goals.

B. The Weekly Treatment Plan will be reviewed and updated weekly by the patient's treatment team to reflect a patient's progress, or lack of, towards treatment goals.

C. The FNAT Psychologist will review the weekly treatment plan no less than every 10 days.

D. The ETP Team Psychiatric Technician/Registered Nurse will:

      1.   Schedule the patient for each weekly treatment team conference.

      2.   Update the Treatment Plan following each treatment team conference.

## VI.    <u>TREATMENT PLAN</u>

A.   The individual treatment plan shall be in writing, developed in collaboration with the patient, when possible, and be based on a comprehensive assessment of the patient's physical, mental, emotional, and social needs, and focused on mitigation of violence risk factors.

B.   The individual treatment plan shall include, but is not limited to, all of the following:

   1.   A statement of the patient's physical and mental condition, including all mental health and medical diagnoses.

   2.   Prescribed medication, dosage, and frequency of administration.

   3.   Specific goals of treatment with interventions and actions that identify steps toward reduction of violence risk and observable, measurable objectives as documented in the MMP.

      a)   The MMP shall include:

          i.   Milieu Status - A determination as to whether it is clinically indicated to be the least restrictive treatment for the patient's room to be locked during certain times

         ii.   Goals a patient must achieve in order to move to less restrictive treatment

        iii.   What mechanisms will be utilized by the treatment team to assist the patient in reaching those goals

   4.   Identification of methods to be utilized, the frequency for conducting each treatment method, and the person, or persons, or discipline, or disciplines, responsible for each treatment method.

   5.   Documentation of the success or failure in achieving stated objectives.

   6.   Evaluation of the factors contributing to the patient's progress or lack of progress toward reduction of violence risk and a statement of the treatment team decision for follow-up action.

   7.   An activity plan.

   8.   A plan for other services needed by the patient, such as care for medical and physical ailments, which are not provided by the treatment team.

9. Discharge criteria and goals for an aftercare plan in a standard treatment environment and a plan for post-ETP discharge follow up.

VII. BEHAVIORAL HEALTH ASSISTANCE MODULE (BHAM)

A. The ETP BHAM module is an electronic dashboard that facilitates treatment pathways, the completion of forensically driven documentation, and ETP-related notifications. It also provides a platform for data collection.

B. The ETP treatment team shall develop the treatment plan using BHAM and the Lippincott Nursing Advisor.The treatment plan shall be prepared electronically in BHAM, printed, signed and filed under the Treatment Plan tab in the patient's chart.

VIII. TREATMENT SERVICES

A. The ETP treatment services shall include therapeutic, social, recreational, and vocational activities in accordance with the interests, abilities, and needs of the patients, including the opportunity for exercise.

B. Treatment services provided may include, but are not limited to:
1. Emotion Regulation
2. Substance Recovery
3. Criminogenic Risk Factors
4. Cognitive Remediation
5. Sensory Modulation
6. Behavior Principles
7. Cognitive Behavioral Therapy (CBT)
8. CBT for Psychosis (CBTp)
9. Medication Education
10. Rehabilitation Therapy, including Recreation, Music, Art, and/or Occupational Therapy

State of California – Health and Human Services Agency                                  Department of State Hospitals

# POLICY DIRECTIVE

| NUMBER | 3706 |
|---|---|
| TITLE | Enhanced Treatment Program Milieu Management Plan |
| EFFECTIVE DATE | |
| SUPERSEDES | New |

## Policy Statement

The Department of State Hospitals' (DSH) Policy Directives (PDs) provide guidance to comply with laws, regulations, codes, etc. PDs are issued and signed by the Director. It is the policy of DSH to expand its continuum of care by establishing the Enhanced Treatment Program (ETP) for patients who are at high risk of most dangerous behavior and who may benefit from concentrated, evidence-based clinical therapy, structured-milieu therapy, and/or treatment aimed at reducing the risk of violent behavior, with the goal of returning the patient to a standard treatment environment. DSH is committed to providing treatment in the least restrictive environment.

## Purpose

The purpose of the ETP Milieu Management Plan PD is to provide guidance on establishing procedures that create a safe environment where effective therapy can be provided within the least restrictive environment.

## Responsibility

**Executive Sponsor:** Deputy Director, Clinical Operations

**Process Owner:** Chief, Data Analytics, Treatment & Assessment, Clinical Operations

## Background

DSH is authorized to implement and operate a pilot ETP to treat patients at high risk of most dangerous behavior to determine whether more intensive care in a higher-security setting is an effective way to reduce violence. The budget provides for the construction of four units, totaling 49 beds.

State of California – Health and Human Services Agency                                           Department of State Hospitals

# POLICY DIRECTIVE

## Authority

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4005.1, 4027, and 4101

## Definitions

**Clinical indicators:**  Specific clinical signs and/or behaviors manifested by the patient that indicate illness or behavioral instability.

**Enhanced Treatment Program** (**ETP**):  A pilot program authorized under Health and Safety Code sections 1265.9 aimed at treating patients at high risk of most dangerous behavior, who may benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

**Forensic Needs Assessment Panel (FNAP):**  A panel that consists of a Psychiatrist, a Psychologist, and a Medical Director, none of whom are involved in the patient's treatment or diagnosis at the time of the hearing or placement evaluation meetings.

**Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violence risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the treatment team.

**Milieu Management Plan (MMP):**  A type of behavioral plan which includes the Milieu Status and Safety Communication Plan and is developed by the treatment team in conjunction with the patient, to focus on changes staff will make to create an environment that supports the patient in management of unsafe behaviors and progression towards safe conduct.

**Milieu Status:**  A determination of when a locked patient room door may be used as clinically indicated and is determined to be the least restrictive management intervention for the patient's care and treatment. Milieu status 1, 2 and 3 will be used to communicate the status.

      Milieu status 3 - Unlocked patient room
      Milieu status 2 – Locked patient room door at specific times
      Milieu status 1 – Locked ETP suite

**ETP Suite:**  A locked patient room that includes a sink, commode and shower, to be utilized when a regular patient room is clinically contraindicated. When a patient is in Milieu Status 1, the ETP Suite is not considered "seclusion" as defined in Health and Safety Code 1180.1(e). However, the ETP Suite may be utilized as a restraint or seclusion room when necessary.

State of California – Health and Human Services Agency                          Department of State Hospitals

# POLICY DIRECTIVE

**Safety Communication Plan:** A document that is utilized to monitor and communicate the patient's Milieu Status, peer contact parameters, number and type of on/off unit escorts, level of staff monitoring; nursing and other considerations.

**Treatment Team:** The primary Psychiatrist, Psychologist, Clinical Social Worker, Rehabilitation Therapist, Registered Nurse and Psychiatric Technician assigned to the patient.

## Process

I.     **Determining the Patient's Initial Milieu Status**

A. Prior to admission, the treatment team and FNAT Psychologist will meet to review the available documentation pertaining to risk-management of the patient's aggression.
   1. The treatment team will identify any pre-existing medical condition(s) or physical disabilities that would place the patient at greater medical or physical risk during Milieu Status 1/ETP Suite or Milieu Status 2 periods.
   2. The treatment team will identify history of trauma, sexual, or physical abuse that may place the patient at greater psychological risk during Milieu Status 1/ETP Suite or Milieu Status 2 periods.

B. The treatment team Psychiatrist or, in their absence, the treatment team Psychologist, will interview the patient upon admission to the ETP and develop the initial admission MMP including the determination of the patient's Milieu Status and shall complete the Safety Communication Plan.

C. The patient may be admitted into Milieu Status 1, 2, or 3 as determined by the ETP treatment team psychiatrist or psychologist based on his/her review of the documentation and interview with the patient.

D. The treatment team shall communicate to the patient his/her milieu status prior to the end of the admission day. The treatment team shall discuss the unsafe behaviors, expected patient behavior and supports in place to assist the patient to progress towards a less restrictive Milieu Status.

II.    **Determining Changes to The Patient's MMP**

A. The patient's Milieu Status will be reviewed at shift changes, morning meetings, and treatment planning conferences.

B. The treatment team shall update the Safety Communication Plan when changes are made to the patient's MMP.

State of California – Health and Human Services Agency                                Department of State Hospitals

# POLICY DIRECTIVE

C. Progress through Milieu Status 1, 2, and 3 is not necessarily sequential.

D. The timeframe for a patient's progression to a less restrictive milieu status or reversion to a more restrictive milieu status shall be determined by the treatment team, individualized to each patient, based on individualized behavioral anchors, and documented in the MMP.

E. A patient may be moved from a more restrictive to a less restrictive Milieu Status or from a less restrictive to a more restrictive Milieu Status based on his/ her behavior during the designated period.

F. If new behaviors emerge, changes in Milieu Status may be delayed until the treatment team is able to provide input.

G. A patient's progress towards achieving his/ her MMP goals will be assessed by nursing staff at least one time per shift and documented and communicated at each change of shift.

## III.   Documenting Changes to The Milieu Status

A. When it has been determined that a patient has successfully met the goals of his/her MMP or has regressed in meeting the goals of his/her MMP, changes shall be noted in the Milieu Management and Safety Communication Plans. The changes shall be included in the treatment team conference meetings and made available to all staff.
B. The treatment team shall communicate with the patient, any changes to his/her milieu status, and discuss the unsafe behaviors, expected patient behavior and supports in place to assist the patient to progress towards a less restrictive Milieu Status.

## IV.   Milieu Status

A. Milieu Status 3 – Unlocked Patient Room Door
1. Behavioral Anchors/Clinical Indicators will be individualized and may include but are not limited to the following types of behaviors:
   a) Patient can safely manage his/her behavior(s) in the Milieu.
   b) Preparing to transition out of the ETP.
2. Monitoring
   a) Rounds at least four times each hour at irregular intervals.
   b) Each patient room shall allow visual access by staff 24 hours per day.

B. Milieu Status 2 – Locked Patient Room Door at Specific Times
1. Behavioral Anchors/Clinical Indicators will be individualized and may include, but are not limited to the following types of behaviors:
   a) Uncooperative in following unit rules in a manner that endangers the safety of others

# POLICY DIRECTIVE

      b) Patient not able to safely modulate emotions and behaviors that may lead to physical aggression.

      c) Patient not able to respect personal space when prompted.

      d) Patient threatens physical violence against staff or peers.

2. Monitoring

      a) Rounds at least four times each hour at irregular intervals.

      b) Each patient room shall allow visual access by staff 24 hours per day.

C. Milieu Status 1 – Locked ETP Suite

1. Behavioral Anchors/Clinical Indicators will be individualized and may include but are not limited to the following behaviors:

      a) Unable to safely interact with peers or staff.

      b) Provoking others to engage in physical violence.

2. Monitoring

      a) Rounds at least four times each hour at irregular intervals.

      b) Each patient room shall allow visual access by staff 24 hours per day.

## V.    Locked Door Considerations

A. Milieu Status 1/ETP Suite or Milieu Status 2 shall be implemented with an approved MMP when the locked door is the least restrictive option.

B. Use of a locked door shall not act as a barrier to the provision of safe and appropriate care and treatment.

C. Staff shall not threaten the use of a locked environment to attempt to gain compliance from a patient.

D. A patient in a locked room retains all his/her rights unless a denial-of-rights is completed per hospital policy.

## VI.    Staff Training

A. All ETP staff will be trained on the MMP and their role in the implementation of the Milieu Management System.

## Roles and Responsibilities

The FNAT Psychologist reviews the referral and transfer documentation, participates in treatment team conference meetings, and regularly reviews the treatment plan revisions and updates. The FNAT Psychologist is not part of the treatment team.

State of California – Health and Human Services Agency                                    Department of State Hospitals

# POLICY DIRECTIVE

The ETP Team Psychiatrist reviews the referral and transfer documentation, interviews the patient upon admission, and develops the initial admission MMP and Safety Communication Plan.

The ETP Team Psychologist, in the absence of the ETP Team Psychiatrist, reviews the referral and transfer documentation, interviews the patient upon admission, and develops the initial admission MMP and Safety Communication Plan.

The Treatment Team reviews the referral and transfer documentation, participates in team conference meetings, documents the patient's progress towards meeting goals, and works in collaboration to create and maintain the MMP.

## Approval

_____          _____
STEPHANIE CLENDENIN                          Date
Director (A)

## References

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4143 and 4144
3. Title 9 of the California Code of Regulations, sections 4801-5100
4. Policy Directive 3700, Enhanced Treatment Program Admission and Initial Certification
5. Policy Directive 3702, Enhanced Treatment Program Ongoing Certification
6. Policy Directive 3704, Enhanced Treatment Program Treatment Planning
7. Policy Directive 3708, Enhanced Treatment Program Discharge and Transition
8. Safety Communication Plan

# DEPARTMENT OF STATE HOSPITALS
# ENHANCED TREATMENT PROGRAM

**ETP OPERATING MANUAL**

**SECTION – Treatment Planning**

**PROGRAM PROCEDURE No. ETP-OP-101**

**SUBJECT:    ETP MILIEU MANAGEMENT PLAN**

**Effective Date:      4/9/19**

This procedure is specific to the Enhanced Treatment Program (ETP).

I.    <u>PURPOSE</u>

To create a safe environment for Enhanced Treatment Program (ETP) staff and patients where effective therapy can be provided within the least restrictive environment.

II.    <u>DEFINITIONS:</u>

A. **Clinical indicators:**  Specific clinical signs and/or behaviors manifested by the patient that indicate illness or behavioral instability.

B. **Enhanced Treatment Program** (**ETP**):  A pilot program authorized under Health and Safety Code sections 1265.9 aimed at treating patients at high risk of most dangerous behavior, who are able to benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

C. **Forensic Needs Assessment Panel (FNAP):**  A panel that consists of a Psychiatrist, a Psychologist, and a Medical Director, none of whom are involved in the patient's treatment or diagnosis at the time of the hearing or placement evaluation meetings.

D. **Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violence risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the treatment team.

E. **Milieu Management Plan (MMP):**  A type of behavioral plan which includes the Milieu Status and Safety Communication Plan and is developed by the treatment team in conjunction with the patient, to focus on changes staff will make to create an environment that supports the patient in management of unsafe behaviors and progression towards safe conduct.

F.  **Milieu Status:**  A determination of when a locked patient room door may be used as clinically indicated and is determined to be the least restrictive management intervention for the patient's care and treatment. Milieu status 1, 2 and 3 will be used to communicate the status.

Milieu status 3 – Unlocked patient room door
Milieu status 2 – Locked patient room door at specific times
Milieu status 1 – Locked ETP suite

G.  **ETP Suite:** A locked patient room that includes a sink, commode and shower, to be utilized when a regular patient room is clinically contraindicated. When a patient is in Milieu Status 1, the ETP Suite is not considered "seclusion" as defined in Health and Safety Code 1180.1(e). However, the ETP Suite room may be utilized as a restraint room when necessary.

H.  **Safety Communication Plan (SCP):**  A document that is utilized to monitor and communicate the patient's Milieu Status, peer contact parameters, number and type of on/off unit escorts, level of staff monitoring; nursing and other considerations.

I.  **Treatment Team:** The primary Psychiatrist, Psychologist, Clinical Social Worker, Rehabilitation Therapist, Registered Nurse and Psychiatric Technician assigned to the patient.

III.    <u>MILIEU STATUS</u>

A.  Patients move through the milieu on the ETP based on their MMP. The three milieu statuses are defined as:

1.  Milieu Status 3 – Unlocked Patient Room Door
    a)  Behavioral Anchors/Clinical Indicators will be individualized and may include, but are not limited to the following types of behaviors:
        i.   Patient is able to safely manage his/her behavior(s) in the Milieu.
        ii.  Preparing to transition out of the ETP.
    b)  Monitoring:
        i.   Rounds at least four times each hour at irregular intervals.
        ii.  Each patient room shall allow visual access by staff 24 hours per day.

2.  Milieu Status 2 - Locked Patient Room Door at Specific Times
    a)  Behavioral Anchors/Clinical Indicators will be individualized and may include, but are not limited to the following types of behaviors:
        i.   Uncooperative in following unit rules in a manner that endangers the safety of others.
        ii.  Patient not able to safely modulate emotions and behaviors that may lead to physical aggression.
        iii. Patient not able to respect personal space when prompted.
        iv.  Patient threatens physical violence against staff or peers.

b) Monitoring:
    i. Rounds at least four times each hour at irregular intervals.
    ii. Each patient room shall allow visual access by staff 24 hours per day.

3. Milieu Status 1 - Locked ETP Suite
The ETP Suite is not seclusion or restraint and is considered a treatment level of care.
    a) Behavioral Anchors/Clinical Indicators will be individualized and may include, but are not limited to the following types of behaviors:
        i. Unable to safely interact with peers or staff.
        ii. Provoking others to engage in physical violence.
    b) Monitoring:
        i. Rounds at least four times each hour at irregular intervals.
        ii. Each patient room shall allow visual access by staff 24 hours per day.

B. Locked Door Considerations:

1. Milieu Status 1/ETP Suite or Milieu Status 2 shall be implemented in conjunction with an approved MMP and SCP when the locked door is the least restrictive option.

2. Use of the locked door must never act as a barrier to the provision of safe and appropriate care, treatments, and other interventions to meet the needs of patients.

3. Staff shall not threaten the use of locked door in an attempt to gain compliance from a patient.

4. A patient in a locked room retains all of his/her rights. The hospital promotes preservation of the patient's safety and maintenance of a patient's dignity while in a locked room. A denial of any right while in a locked room shall require the initiation of the Denial of Rights procedure. Each ETP hospital shall maintain a Denial of Rights policy and procedure.

5. Locked door shall not be used under the following circumstances:
    a) The patient meets criteria for restraint and/or seclusion (i.e. imminently dangerous)
    b) The patient exhibits self-harm behaviors/suicidal ideation (note: the patient's history of self-harm/suicidal ideation/suicide attempt does not preclude use).
    c) For staff convenience.

IV.    <u>DETERMINING THE PATIENT'S INITIAL MILIEU STATUS</u>

    A. Prior to admission, the Treatment Team and FNAT Psychologist will:

        1. Identify and consider any pre-existing medical condition(s) or any physical disabilities that would place the patient at greater medical or physical risk during Milieu Status 1/ETP Suite or Milieu Status 2 periods.

        2. Identify and consider history of trauma, sexual, or physical abuse that may place the patient at greater psychological risk during Milieu Status 1/ETP Suite or Milieu Status 2 periods.

        3. Develop an initial MMP draft, including a recommendation of what Milieu Status the patient should be placed in, and the initial SCP draft for admission.

    B. Prior to the end of the admission day, the treatment team Psychiatrist or, in their absence, the treatment team Psychologist, will interview the patient, finalize the initial MMP and complete the initial SCP in consultation with other ETP staff as needed.

    C. The patient may be admitted into any of the three Milieu Statuses. The individualized behavioral anchors identified by the treatment team and FNAT Psychologist will be utilized to determine the patient's initial Milieu Status.

    D. The treatment team will communicate to the patient their Milieu Status prior to the end of the admission day. If the patient is placed on Milieu Status 1 or 2, the treatment team will describe the unsafe behaviors, expected patient behavior and the supports in place to assist the patient to progress toward safe conduct and a less restrictive Milieu Status. This information will be documented in the MMP and Patient Education Log.

V.    <u>DETERMINING AND DOCUMENTING CHANGES TO PATIENT'S MILIEU STATUS</u>

    A. Patients are not required to sequentially progress through all Milieu Statuses.

    B. Based on the patient's behavior within the designated timeframe, the treatment team may move the patient from a more restrictive to a less restrictive Milieu Status or from a less restrictive to a more restrictive Milieu Status.

    C. If new behaviors emerge, changes in Milieu Status may be delayed until the treatment team is able to provide input.

    D. The treatment team will determine the timeframe for the patient's successful progression to a less restrictive Milieu Status, or reversion to a more restrictive Milieu Status. This determination will be individualized for each patient based on individualized behavioral anchors and documented in the MMP.

E. The treatment team will include a plan for progression and regression within and between milieu statuses in the MMP.

F. If a patient is placed in restraint or seclusion, the treatment team will review and update the MMP the next business day.

G. The treatment team, or in their absence the shift lead/designee, shall update the SCP to coincide with changes to the MMP, in consultation with other ETP staff as needed (e.g. HPO, supervisors, etc.).

H. The SCP is not part of the patient chart and the most current version will be kept in the Shift Change binder. The Program Office shall retain electronic copies of the outdated SCPs for the length of the ETP Pilot.

I. MMP Notes related to each patient's identified behavioral anchors/clinical indicators will be reviewed and the average score for those individualized behavioral anchors/clinical indicators will be reviewed and scored daily for the previous 24-hour period using the MMP Clinical Review Sheet.

J. During normal business hours, the patient's MMP will be reviewed during the Clinical Morning Meeting. Outside of normal business hours, the MMP will be reviewed by the Shift Lead/designee, any available clinicians and level of care during the AM shift.

K. The MMP Clinical Review Sheet will be submitted to the Unit Supervisor for review. Upon approval, the Unit Supervisor will submit the MMP Clinical Review Sheet to Program Management for processing and retention for the duration of the pilot. A copy of the MMP Clinical Review Sheet will be kept in the Kardex binder.

L. The MMP will be documented in the patient chart.

   1. During normal business hours:
      a) When it is determined that a patient has successfully met the goals of their MMP, the treatment team shall make changes to a less restrictive Milieu Status per the MMP and indicate the changes on the SCP. The changes shall be documented in the patient chart via an Interdisciplinary Note and communicated to the patient.
      b) When it is determined that a patient has regressed in meeting the goals of their MMP, the treatment team shall make changes to a more restrictive Milieu Status as indicated per the MMP and update any changes on the SCP. The changes shall be documented in the patient chart via an Interdisciplinary Note and communicated to the patient.

   2. Outside normal business hours:
      a) When it is determined that a patient has successfully met the goals of their Milieu Management Plan, the Shift Lead, in collaboration with the

Program Officer of the Day (POD) or designee shall make changes to a less restrictive Milieu Status per the MMP and update any change on the SCP. The patient's Milieu Status shall be re-evaluated by the treatment team the next business day. The changes shall be documented in the patient chart via an Interdisciplinary Note and communicated to the patient.

b) When it is determined that a patient has regressed in meeting the goals of their MMP, the Shift Lead, in collaboration with the Program Officer of the Day (POD) or designee, shall make changes to a more restrictive Milieu Status per the MMP and update any change on the SCP. The patient's Milieu Status shall be re-evaluated by the Treatment Team the next business day. The changes shall be documented in the patient chart via an Interdisciplinary Note and communicated to the patient.

VI.    PROGRESS RATING SCALE

A.  A Progress Rating Scale will be used to document a patient's progression or regression through their Milieu Status. The scale is as follows:

1.  0/Not Applicable – No maladaptive behavior exhibited i.e. patient slept through the night with no issue. This score does not count for or against the patient's progress towards meeting goals.

2.  1/Never – Patient has been offered treatment related to the objective but declines to participate and/or engage in treatment to address this objective at this time.

3.  2/Rarely – Patient has been introduced to concepts or skills related to the objective. Patient is not applying treatment concepts and/or does not seem to understand how they relate to this objective at this time.

4.  3/Sometimes– Patient has been introduced to concepts or skills related to the objective and can either verbally repeat concepts or behaviorally mimic staff members demonstrating the skill (i.e., staff takes deep breaths, patient takes deep breaths). At this level, patient does not demonstrate use of skill or ability to integrate concepts into his/her daily life without prompting.

5.  4/Often – With prompting by staff, patient can demonstrate use of skills learned related to this objective.

6.  5/Always– Patient uses skills learned related to this objective in his daily life with minimal or no prompting from staff.

VII.    TRAINING

All ETP staff shall be trained and aware of their role in the milieu management system.



California Department of

# State Hospitals

## Enhanced Treatment Program

## Section 4

## Transition

State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

| NUMBER | 3702 |
|---|---|
| TITLE | Enhanced Treatment Program Ongoing Certification |
| EFFECTIVE DATE | |
| SUPERSEDES | New |

## Policy Statement

The Department of State Hospitals' (DSH) Policy Directives (PDs) provide guidance to comply with laws, regulations, codes, etc. PDs are issued and signed by the Director. It is the policy of DSH to expand its continuum of care by establishing the Enhanced Treatment Program (ETP) for patients who are at high risk of most dangerous behavior and who may benefit from concentrated, evidence-based clinical therapy, structured milieu therapy and/or treatment aimed at reducing the risk of violent behavior, with the goal of returning the patient to a standard treatment environment. DSH is committed to providing treatment in the least restrictive environment.

## Purpose

The purpose of the ETP Ongoing Certification PD is to provide guidance on identifying and triaging patients appropriate for ongoing certification and continued treatment in the ETP.

## Responsibility

**Executive Sponsor:** Deputy Director, Clinical Operations

**Process Owner:** Chief, Data Analytics, Treatment & Assessment, Clinical Operations

## Background

DSH is authorized to implement and operate a pilot ETP to treat patients at high risk of most dangerous behavior to determine whether more intensive care in a higher-security setting is an effective way to reduce violence. The budget provides for the construction of four units, totaling 49 beds.

State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

| Authority |
|---|

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4005.1, 4027 and 4101

| Definitions |
|---|

**Enhanced Treatment Program (ETP):**  A pilot program authorized under Health and Safety Code sections 1265.9 aimed at treating patients at high risk of most dangerous behavior, who may benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

**Forensic Needs Assessment Panel (FNAP):**  A panel that consists of a Psychiatrist, a Psychologist, and a Medical Director, none of whom are involved in the patient's treatment or diagnosis at the time of the hearing or placement evaluation meetings.

**Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violence risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the ETP treatment team.

**Individualized Behavioral Plan:**  A type of behavioral plan developed by the treatment team in conjunction with the patient, to focus on changes the patient and staff will make to create an environment that supports the patient in management of unsafe behaviors and progression towards safe conduct.

**Individualized Treatment Interventions:**  All interventions provided to the patient on the ETP that are determined to address patient specific risk factors for highest risk of violence.

**Most Dangerous Behavior:**  Includes aggressive acts that may cause substantial physical harm to others in an inpatient setting.

**Standard Treatment Environment:**  Any DSH state hospital setting outside of the ETP.

**Standard Violence Risk Assessment Methodologies:**  May include, but are not limited to, an analysis of past violence, delineation of static and dynamic violence risk factors, and utilization of valid and reliable violence risk assessment testing.

**Treatment Team:**  The primary Psychiatrist, Psychologist, Clinical Social Worker, Rehabilitation Therapist, Registered Nurse and Psychiatric Technician assigned to the patient.

State of California – Health and Human Services Agency                                    Department of State Hospitals

# POLICY DIRECTIVE

| Process |
| --- |

## I.    FNAP One-Year Placement Evaluation Meeting

A.    Prior to the expiration of the 90-Day Certification, the FNAP must convene a FNAP One-Year Placement Evaluation Meeting with a Psychologist from the patient's treatment team, a Patients' Rights Advocate, the patient, and the FNAT Psychologist who performed the in-depth violence risk assessment.

B.    A minimum of 72-hour notice of the meeting must be provided to the patient, Patients' Rights Advocate, Conservator (if applicable), and the ETP hospital.

C.    Notice to the patient, Patients' Rights Advocate and Conservator (if applicable) shall include a written explanation of the reasons, including specific behaviors and incidents that are relied on for the continued placement in the ETP. Instructions shall also be provided as to how a patient may submit documents to the FNAP to consider in making their placement evaluation.

D.    In the event a patient is unable to safely participate in the placement evaluation meeting in person, the referring hospital shall arrange for the patient to participate via an alternate modality, such as teleconference or telepresence.

E.    During the placement evaluation meeting, the FNAP shall consider all clinical progress reports from the FNAT Psychologist and the patient's ETP treatment team, which may include any reduction in the patient's risk for aggression, as well as any relevant information provided by the patient or the Patients' Rights Advocate.

F.    The FNAP shall review all material presented at the FNAP One-Year Placement Evaluation Meeting and determine whether the patient clinically requires continued treatment in the ETP or may be transferred to a standard treatment environment.

G.    If the FNAP determines that the patient is clinically appropriate to be transferred to a standard treatment environment, the referring hospital transfer coordinator/designee shall work with the ETP treatment team and the referring hospital to identify an appropriate placement.

H.    If the FNAP determines that the patient clinically requires continued treatment in the ETP, the patient shall be certified for further ETP placement of up to one year.

State of California – Health and Human Services Agency                                         Department of State Hospitals

# POLICY DIRECTIVE

I.   The FNAP will document this decision on the ETP Certification Form, DSH-9219 and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, no later than 24 hours after the One-Year Placement Evaluation Meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), the referring hospital transfer coordinator/designee, and the ETP hospital.

## II.   FNAP One-Year Continuation Placement Evaluation Meeting

A.   Prior to the expiration of the one-year certification, the FNAP must convene a FNAP One-Year Continuation Placement Evaluation Meeting with the patient's treatment team, Patients' Rights Advocate, patient and the FNAT Psychologist who performed the in-depth violence risk assessment.

B.   A minimum of 72-hour notice of the meeting must be provided to the patient, Patients' Rights Advocate, Conservator (if applicable) and the ETP hospital.

C.   Notice to the patient, Patients' Rights Advocate and Conservator if applicable, shall include a written explanation of the reasons, including specific behaviors and incidents that are the basis for continued placement in the ETP. Instructions shall also be provided as to how a patient may submit documents to the FNAP to consider in making their placement evaluation.

D.   In the event a patient is unable to safely participate in the placement evaluation meeting in person, the referring hospital shall arrange for the patient to participate via an alternate modality, such as teleconference or telepresence.

E.   During the placement evaluation meeting, the FNAP shall consider all clinical progress reports from the FNAT Psychologist and the patient's ETP treatment team, which may include any reduction in the patient's risk for aggression, as well as any relevant information provided by the patient or the Patients' Rights Advocate.

F.   The FNAP shall review all material presented at the placement evaluation meeting and determine whether the patient clinically requires continued treatment in the ETP, or whether the patient may be transferred to a standard treatment environment.

G.   If the FNAP determines that the patient is clinically appropriate to be transferred to a standard treatment environment, the referring hospital transfer coordinator/designee shall work with the ETP treatment team and the referring hospital to identify an appropriate placement.

State of California – Health and Human Services Agency                                                  Department of State Hospitals

# POLICY DIRECTIVE

H.  If the FNAP determines that the patient clinically requires continued treatment in the ETP, the patient's case shall be referred outside of the Department of State Hospitals to a Forensic Psychiatrist or Psychologist for an independent medical review as to the patient's overall treatment plan and the need for ongoing ETP treatment as described below.

I.  The FNAP will document this decision on the ETP Certification Form and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, no later than 24 hours after the One-Year Continuation Placement Evaluation Meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), the referring hospital transfer coordinator/designee and the ETP hospital. If a referral is being made to the Forensic Psychiatrist or Psychologist to conduct an independent review, the notice of the placement evaluation meeting decision shall also include a notice of the referral and instructions for the patient to submit information to the Forensic Psychiatrist or Psychologist that will be conducting the independent review.

III.  **Independent Medical Review Placement Evaluation Hearing**

If the FNAP determines that the patient requires continued treatment in the ETP beyond the expiration of the one-year certification, the following shall happen:

A.  The FNAT Supervising Psychologist shall provide all relevant patient's medical and psychiatric documents and records, along with any additional information submitted by the patient, to the Independent Forensic Psychiatrist or Psychologist conducting the independent medical review, within five business days from the date of the FNAP's written decision.

B.  The Independent Forensic Psychiatrist or Psychologist conducting the independent medical review shall coordinate with the FNAT Supervising Psychologist to schedule the hearing within 14 days of receipt of the patient's medical and psychiatric documents and records.

C.  The FNAT Supervising Psychologist shall ensure the patient, Patients' Rights Advocate, Conservator (if applicable) and ETP hospital have received written notification of the hearing.

D.  The notice must:
1.  Be provided a minimum of 72 hours in advance of the hearing;
2.  Advise the patient of his or her right to have a hearing, or to waive it;

State of California – Health and Human Services Agency                                                Department of State Hospitals

# POLICY DIRECTIVE

3. Advise the patient of his or her right to assistance of a Patients' Rights Advocate or staff member at the hearing; and

4. Require the attendance of at least one FNAP member who made the decision that the patient needs continued treatment in the ETP beyond the original one-year certification.

E. The FNAT Supervising Psychologist shall also provide a minimum of 72-hour notice to any individual whose presence is requested by the Forensic Psychiatrist or Psychologist conducting the independent medical review to help assess the patient's overall treatment plan and the need for ongoing ETP treatment.

F. If the patient waives his or her right to a hearing, the Forensic Psychiatrist or Psychologist conducting the independent medical review shall inform the FNAP whether the patient should be certified for ongoing ETP treatment.

G. If the patient does not waive his or her right to a hearing, he or she shall be provided with the following:

1. An opportunity to present information, statements, or arguments, either orally or in writing, to show that the information relied on for the FNAP's determination for ongoing treatment is erroneous, or any other relevant information.

2. If the patient elects to have the assistance of a Patients' Rights Advocate or a staff person, the requested person may provide assistance to the patient regarding the presentation of information identified in paragraph G.1. above, whether or not the patient is present at the hearing, unless the Forensic Psychologist or Psychiatrist conducting the hearing finds good cause why the requested person should not be present. If a staff member is selected by the patient, their role solely is limited to assisting with understanding the process and facilitating patient input.

H. The conclusion reached by the Forensic Psychiatrist or Psychologist who conducts the independent medical review shall be in writing and provided to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, no later than 3 business days after the Independent Medical Review Placement decision, provide a copy of the written decision to the patient, Patients' Rights Advocate, Conservator (if applicable), the referring hospital transfer coordinator/designee and the ETP hospital.

I. If the Forensic Psychiatrist or Psychologist who conducts the independent medical review concludes that the patient requires ongoing ETP treatment, the patient shall be certified for further treatment for an additional year.

State of California – Health and Human Services Agency                      Department of State Hospitals

# POLICY DIRECTIVE

J. If the Forensic Psychiatrist or Psychologist who conducts the independent medical review determines that the patient no longer requires ongoing ETP treatment, the referring hospital transfer coordinator/designee shall work with the ETP treatment team and referring hospital to identify appropriate placement and transfer the patient within 30 days of determination.

## IV.    FNAP 90-Day Treatment Summary Review

A. When a patient has been certified for one year, the FNAP must review his or her treatment summary at least every 90 days to determine whether the patient continues to require treatment in the ETP.

B. This decision must be in writing and provided within three business days of the review to the patient, Patients' Rights Advocate, patient's Conservator (if applicable) and the patient's treatment team.

C. If the FNAP determines that the patient is clinically appropriate to be transferred to a standard treatment environment, the referring hospital transfer coordinator/designee shall work with the ETP treatment team and referring hospital to identify appropriate placement. The transfer must occur within 30 days of the decision.

## V.    FNAP Review of Referral for Discharge by Patient's Treatment Team

A. A patient's treatment team may make a referral to discharge an ETP patient upon a determination that a patient no longer requires ETP treatment. The recommendation must be made to the FNAP or FNAT Supervising Psychologist, who shall review the patient's medical and psychiatric records, as well as all relevant material upon which the patient's treatment team made the determination.

B. The FNAT Supervising Psychologist shall convene a placement evaluation meeting with a minimum of 72-hour notice of the meeting to the patient, the Patients' Rights Advocate, patient's Conservator (if applicable) and the ETP hospital.

C. The FNAP will document their decision on the ETP Certification Form and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within 24 hours of the placement evaluation meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), referring hospital transfer coordinator/designee and ETP hospital.

State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

D. If the FNAP decides the patient no longer requires ETP treatment, the referring hospital transfer coordinator/designee will work with the ETP treatment team and referring hospital to identify appropriate placement. The transfer must occur within 30 days of the decision.

## Roles and Responsibilities

The FNAT Supervising Psychologist ensures 72-hour and placement evaluation meeting notices and decisions are provided to the patient, Patients' Rights Advocate, referring hospital, and ETP hospital; convenes the FNAP placement evaluation meetings and summary review meetings; and provides all relevant information to the FNAP.

The FNAT Psychologist participates in FNAP placement evaluation meetings and summary review meetings.

The FNAP conducts placement evaluation meetings; reviews all information provided at the placement evaluation meeting; provides written decisions regarding certification; conducts summary review meetings; and provides the written decision.

The Patients' Rights Advocate participates in FNAP placement evaluation meetings and assists the patient during certification meetings regarding extending ETP placement.

## Approval

_____          _____
STEPHANIE CLENDENIN                          Date
Director (A)

## References

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4143 4144, 5370.2, and 5510
3. Title 9 of the California Code of Regulations, sections 4801-5100
4. Policy Directive 3700, Enhanced Treatment Program Admission and Initial Certification
5. Policy Directive 3704, Enhanced Treatment Program Treatment Planning
6. Policy Directive 3706, Enhanced Treatment Program Milieu Management Plan
7. Policy Directive 3708, Enhanced Treatment Program Discharge and Transition

State of California – Health and Human Services Agency                                    Department of State Hospitals

# POLICY DIRECTIVE

      8.  ETP Certification Form, DSH-9219

## Attachments

      1.  ETP FNAP Certification Decision Notification Grid



California Department of
# State Hospitals

**ETP FNAP Certification Decision Notification Grid**
Policy Directive 3702, Attachment 1

| Event | Timeframe | Notifier | Recipient |
|---|---|---|---|
| **FNAP 90-day Placement Evaluation Meeting** | Within 3 business days | FNAT Supervising Psychologist | Patient, Patients' Rights Advocate, Conservator (if applicable) & Referring Hospital |
| **FNAP One Year Placement Evaluation Meeting** | Within 24 hours | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **FNAP One Year Continuation Placement Evaluation Meeting** | Within 24 hours | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **Independent Medical Review Placement Evaluation Hearing** | Within 3 business days | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **FNAP 90-day Treatment Summary Review** | Within 3 business days | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |

# DEPARTMENT OF STATE HOSPITALS
# ENHANCED TREATMENT PROGRAM

**ETP OPERATING MANUAL**

**SECTION – Admission and Certification**

**PROGRAM PROCEDURE No. ETP-OP-002**

**SUBJECT:     ETP Ongoing Certification**

**Effective Date:     4/9/19**

This procedure is specific to the Enhanced Treatment Program (ETP).

I.     PURPOSE

       To provide clear procedures for ongoing certification and continued treatment in the ETP.

II.    DEFINITIONS

       A. **Enhanced Treatment Program (ETP):**  A pilot program authorized under Health and Safety Code sections 1265.9 aimed at treating patients at high risk of most dangerous behavior, who are able to benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

       B. **Forensic Needs Assessment Panel (FNAP):**  A panel that consists of a Psychiatrist, a Psychologist, and a Medical Director none of whom are involved in the patient's treatment or diagnosis at the time of the hearing or placement evaluation meetings.

       C. **Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violence risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the ETP treatment team.

       D. **Individualized Behavioral Plan:**  A type of behavioral plan developed by the treatment team in conjunction with the patient, to focus on changes the patient and  staff will make to create an environment that supports the patient in management of unsafe behaviors and progression towards safe conduct.

       E. **Individualized Treatment Interventions:**  All interventions provided to the patient on the ETP that are determined to address patient specific risk factors for highest risk of violence.

       F. **Most Dangerous Behavior:**  Includes aggressive acts that may cause substantial physical harm to others in an inpatient setting.

G. **Standard Treatment Environment:**  Any DSH state hospital setting outside of the ETP.

H. **Standard Violence Risk Assessment Methodologies:**  May include, but are not limited to, an analysis of past violence, delineation of static and dynamic violence risk factors, and utilization of valid and reliable violence risk assessment testing.

I. **Treatment Team:**  The primary Psychiatrist, Psychologist, Clinical Social Worker, Rehabilitation Therapist, Registered Nurse and Psychiatric Technician assigned to the patient.

III.    FNAP ONE YEAR PLACEMENT EVALUATION MEETING

A. Prior to the expiration of the 90 day certification, the FNAP must convene a FNAP One Year Placement Evaluation Meeting with a Psychologist from the patient's treatment team, a Patients' Rights Advocate, the patient, Conservator, if applicable and the FNAT Psychologist who performed the in-depth violence risk assessment.

1. At least 14 days prior to the expiration of the 90 day certification, the FNAT Supervising Psychologist shall identify an FNAP and advise them of the upcoming placement evaluation meeting. The FNAT Supervising Psychologist will also notify the patient's treatment team and assigned FNAP Psychologist of the upcoming placement evaluation meeting.

2. The FNAT Supervising Psychologist will ensure a minimum of 72-hour notice of the placement evaluation meeting is provided to the ETP hospital, the Patients' Rights Advocate and Conservator, if applicable. The ETP hospital shall advise the patient of the meeting date and inform the patient that any documents he/she wishes to submit to the FNAP for consideration must be submitted no later than one business day before the placement evaluation meeting date.

3. Notice to the patient and Patients' Rights Advocate shall include a written explanation of the reasons, included behaviors and incidents that are relied on by the FNAP for continued placement on the ETP.  Instructions shall also be provided as to how a patient may submit documents to the FNAP to consider in making their placement decision.

4. In the event a patient is unable to safely participate in the placement evaluation meeting in person, the ETP shall arrange for the patient to participate via an alternate modality, such as telepresence or teleconference.

5. The ETP Treatment Team in collaboration with the FNAT Psychologist will prepare a treatment plan that will include an updated risk summary and a recommendation for transfer to a standard treatment setting or ongoing ETP treatment at least 7 days prior to the placement evaluation meeting.

6. During the treatment placement evaluation meeting the FNAP shall consider all progress reports from the FNAT Psychologist and the patient's ETP Treatment Team as to the reduction in the patient's risk for aggression. The FNAP shall also consider any relevant information provided by the patient or the Patients' Rights Advocate.

7. If the FNAP determines that the patient is ready to be transferred to a standard treatment environment, the referring hospital transfer coordinator/designee will work with the ETP Treatment Team and referring hospital to identify appropriate placement within the referring hospital.

8. If the FNAP determines that the patient clinically requires continued treatment in the ETP, the patient shall be certified for further ETP placement of up to one year.

9. The FNAP will document this decision on the ETP Certification Form DSH-9219 and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within 24 hours of the placement evaluation meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), the referring hospital transfer coordinator/designee and the ETP hospital.

IV.    <u>FNAP ONE YEAR CONTINUATION PLACEMENT EVALUATION MEETING</u>

A. Prior to the expiration of the one-year certification, the FNAP must convene a FNAP One Year Continuation Placement Evaluation Meeting with the patient's treatment team, a Patients' Rights Advocate, the patient, Conservator, if applicable, and the FNAT Psychologist who performed the in-depth violence risk assessment.

1. At least 14 days prior to the expiration of the One year certification the FNAT Supervising Psychologist shall identify an FNAP and advise them of the upcoming placement evaluation meeting. The FNAT Supervising Psychologist will also notify the patient's treatment team and assigned FNAT Psychologist of the upcoming placement evaluation meeting.

2. The FNAT Supervising Psychologist will ensure a minimum of 72-hour notice of the placement evaluation meeting is provided to the ETP hospital, the Patients' Rights Advocate and Conservator, if any. The ETP hospital shall advise the patient of the placement evaluation meeting date and inform the patient that documents he/she wants to submit to the FNAP for consideration must be submitted no later than one business day before the placement evaluation meeting date.

3. Notice to the patient, Patients' Rights Advocate and Conservator if applicable, shall include a written summary of the behaviors and incidents that will be considered by the FNAP in making the certification evaluation.

Instructions shall also be provided as to how a patient may submit documents to the FNAP to consider in making their placement evaluation.

4. In the event a patient is unable to safely participate in the placement evaluation meeting in person, the ETP shall arrange for the patient to participate via an alternate modality such as telepresence or teleconference.

5. The ETP Treatment Team in collaboration with the FNAT Psychologist will prepare a treatment plan that will include an updated risk summary and a recommendation for transfer to a standard treatment setting or ongoing ETP treatment at least 7 days prior to the placement evaluation meeting.

6. During the placement evaluation meeting the FNAP shall consider all progress reports from the FNAT Psychologist and the patient's ETP treatment team as to the reduction in the patient's risk for aggression. The FNAP shall also consider any relevant information provided by the patient or the Patients' Rights Advocate.

7. The FNAP shall review all material presented at the placement evaluation meeting and determine whether the patient clinically requires continued treatment in the ETP, or whether the patient may be transferred to a standard treatment environment.

8. If the FNAP determines that the patient is ready to be transferred to a standard treatment environment, the referring hospital transfer coordinator/designee will work with the ETP treatment team and referring hospital to identify appropriate placement within the referring hospital.

9. If the FNAP determines that the patient clinically requires continued treatment in the ETP, the patient's case shall be referred outside of the Department of State Hospitals to a Forensic Psychiatrist of Psychologist for an independent medical review as to the patient's overall treatment plan and the need for ongoing ETP treatment as described below.

10. The FNAP will document this decision on the ETP Certification Form DSH-9219 and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within 24 hours of the placement evaluation meeting, provide a copy of the FNAP ETP Certification form to the patient, Patients' Rights Advocate, Conservator (if applicable), the referring hospital transfer coordinator/designee and the ETP hospital. If a referral is being made to the forensic Psychiatrist or Psychologist to conduct an independent review, the notice shall include instructions for the patient to submit information to the Forensic Psychiatrist or Psychologist that will be conducting the independent review.

V.   <u>INDEPENDENT MEDICAL REVIEW PLACEMENT EVALUATION MEETING</u>

A. If the FNAP determines the patient requires continued treatment in the ETP beyond the expiration of the one-year certification the following shall happen:

1. The FNAT Supervising Psychologist shall provide all relevant patient's medical and psychiatric documents and records, along with any additional information submitted by the patient, to the independent Forensic Psychiatrist or Psychologist conducting the independent medical review, within five business days from the date of the FNAP's decision.

2. The Forensic Psychologist or Psychiatrist conducting the independent medical review shall provide the FNAT Supervising Psychologist with a written notice of the date and time for a hearing within 14 days upon receipt of the patient's medical and psychiatric documents and records.

3. The notice must:

    a) Be provided at least 72 hours in advance of the hearing;

    b) Advise the patient of his or her right to have a hearing, or to waive it;

    c) Let the patient know of his or her right to assistance from a Patients' Rights Advocate or staff member at the hearing;

    d) Require the attendance of at least one FNAP member who made the decision that the patient needs continued treatment in the ETP beyond the original one-year certification.

4. The FNAT Supervising Psychologist will coordinate with the independent evaluator to schedule the hearing.

5. The FNAT Supervising Psychologist shall ensure the patient, Patient's Rights Advocate and Conservator, if applicable, have received notification of the hearing.

6. The FNAT Supervising Psychologist shall also provide a minimum of 72-hour notice to any individual whose presence is requested by the Forensic Psychiatrist or Psychologist to help assess the patient's overall treatment plan and need for ongoing ETP treatment.

7. If the patient waives his or her right to a hearing, the Forensic Psychiatrist or Psychologist conducting the independent medical review shall inform the FNAP whether the patient should be certified for ongoing ETP treatment.

8. If the patient does not waive his or her right to a hearing the patient shall be provided with the following:

9. An opportunity for the patient to present information, statements, or arguments, either orally or in writing, to show either that the information relied on for the FNAP's determination for ongoing treatment is erroneous, or any other relevant information

10. If the patient elects to have the assistance of a Patients' Rights Advocate or staff person, the requested person may provide assistance to the patient regarding the presentation of information identified in paragraph VA9 above, whether or not the patient is present at the time of hearing, unless the Forensic Psychiatrist or Psychologist finds good cause why the requested person should not be present.

11. The conclusion reached by the Forensic Psychiatrist or Psychologist who conducts the independent medical review shall be in writing and provided to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist shall provide written notice of the decision to the patient, Patients' Rights Advocate, the ETP hospital and the referring hospital within three business days of conclusion of the hearing.

12. If the Forensic Psychiatrist or Psychologist concludes that the patient requires ongoing ETP treatment, the patient shall be certified for an additional year.

13. If the Forensic Psychiatrist or Psychologist determines that the patient no longer requires ongoing ETP treatment, the referring hospital transfer coordinator/designee shall work with the referring hospital and ETP treatment team to identify appropriate placement in the referring hospital and transfer the patient within 30 days.

VI. FNAP 90 DAY TREATMENT SUMMARY REVIEW

A. When a patient has been certified for one year, the FNAP must review his or her treatment summary at least every 90 days to determine whether the patient continues to require treatment in the ETP.

1. At least 14 days prior to the due date, the FNAT Supervising Psychologist shall identify an FNAP and advise them the upcoming 90 Day Summary Review Meeting needs to be scheduled. The FNAT Supervising Psychologist will also notify the patient's treatment team and assigned FNAT Psychologist of the summary review meeting.

2. The FNAT Supervising Psychologist will schedule the summary review meeting and notify the FNAP and FNAT of the date and time.

3. The ETP Treatment Team in collaboration with the FNAT Psychologist will prepare a treatment plan that will include an updated risk summary and a recommendation for transfer to a standard treatment setting or ongoing ETP treatment at least 7 days prior to the summary review meeting.

4. The FNAP will document this decision on the ETP Certification Form DSH-9219 and provide it to the FNAT Supervising Psychologist. The FNAT Supervising Psychologist will, within 3 business days of the summary review meeting, provide a copy of the FNAP ETP Certification form to the patient,

Patients' Rights Advocate, Conservator (if applicable), the referring hospital transfer coordinator/designee and the ETP hospital.

5. If the FNAP determines that the patient is ready to be transferred to a standard treatment environment, the referring hospital transfer coordinator/designee will work with the ETP treatment team and referring hospital to identify an appropriate placement within the referring hospital.

Attachment 1: ETP FNAP Certification Decision Notification Grid



State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

| NUMBER | 3708 |
|---|---|
| TITLE | Enhanced Treatment Program Discharge & Transition |
| EFFECTIVE DATE | |
| SUPERSEDES | New |

## Policy Statement

The Department of State Hospitals' (DSH) Policy Directives (PDs) provide guidance to comply with laws, regulations, codes, etc. PDs are issued and signed by the Director. It is the policy of DSH to expand the continuum of care by establishing the Enhanced Treatment Program (ETP) to provide treatment to patients who are at high risk of most dangerous behavior and who may benefit from concentrated, evidence-based clinical therapy, structured milieu therapy and/or treatment aimed at reducing the risk of violent behavior, with the goal of returning the patient to a standard treatment environment. DSH is committed to providing treatment in the least restrictive environment.

## Purpose

The purpose of the ETP Discharge and Transition PD is to provide guidance on identifying patients who can be discharged to a standard treatment environment and the procedures that will be used to transition the patient to his or her referring hospital.

## Responsibility

**Executive Sponsor:** Deputy Director, Clinical Operations

**Process Owner:** Chief, Data Analytics, Treatment & Assessment, Clinical Operations

## Background

DSH is authorized to implement and operate a pilot ETP to treat patients at high risk of most dangerous behavior to determine whether more intensive care in a higher-security setting is an effective way to reduce violence. The budget provides for the construction of four units, totaling of 49 beds.

State of California – Health and Human Services Agency                           Department of State Hospitals

# POLICY DIRECTIVE

| Authority |
| --- |

1. Health and Safety Code section 1265.9
2. Welfare and Institutions Code sections 4005.1, 4027, and 4101

| Definitions |
| --- |

**Enhanced Treatment Program (ETP):** A pilot program authorized under Health and Safety Code section 1265.9 aimed at treating patients at high risk of most dangerous behavior, and who may benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

**Forensic Needs Assessment Team (FNAT):** A panel of Psychologists with expertise in forensic assessment or violent risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the ETP treatment team.

**Forensic Needs Assessment Panel (FNAP):** A panel that consists of a Psychiatrist, a Psychologist, and a Medical Director, none of whom are involved in the patient's treatment or diagnosis at the time of the hearing or placement meetings.

**Standard Treatment Environment:** Any DSH state hospital setting outside of the ETP.

**Transition Plan:** Coordination between the ETP treatment team and the receiving treatment team on the transition of a patient throughout their stay and when determined as ready for discharge by the FNAP.

**Aftercare Plan:** A written plan describing those services and goals that should be provided to a patient following discharge, transfer, or release from an ETP to enable the patient to maintain stabilization or achieve an optimum level of functioning at the referring hospital.

| Process |
| --- |

I.    **Who May Be Discharged**

    A. A patient in the ETP may be discharged following an FNAP determination that the patient no longer requires treatment on the ETP. The FNAP shall base their decision on the following:

        1. Clinical progress reported by the FNAT Psychologist and/or the patient's treatment team indicating a reduction of the patient's

State of California – Health and Human Services Agency                                                Department of State Hospitals

# POLICY DIRECTIVE

        risk of aggression.

2. A determination that the patient is inappropriate for continued treatment on an ETP.
3. The identification of new issues that preclude the patient's treatment on an ETP.
4. A determination by the Independent Psychologist or Psychiatrist's Medical Review.

## II.   Discharge to The Referring Hospital

A. When the FNAP determines that the patient no longer clinically requires treatment in the ETP, the referring hospital transfer coordinator/designee shall work with the ETP treatment team and the referring hospital to identify appropriate placement.

B. Upon notice of the discharge decision the following steps shall be taken:

1. The referring hospital will, within two days of receiving the pending transfer notification, provide the ETP transfer coordinator/designee with the contact information of the receiving program management and unit treatment team;
2. The ETP hospital program management and the referring hospital program management will ensure the transition and aftercare process is completed and determine the exact date of transfer;
3. A written aftercare plan shall be developed via a treatment team process in collaboration with the FNAT Psychologist; and
4. The patient shall be transferred within 30 days of the FNAP's decision.

## III.   Aftercare Planning

A. An aftercare plan for a standard treatment environment shall be developed, describing those services that should be provided to a patient following discharge, transfer, or release from an ETP to enable the patient to maintain stabilization or achieve an optimum level of functioning at the referring hospital.

B. The ETP Treatment Team Clinical Social Worker shall be responsible for ensuring that the aftercare plan has been completed and documented in the patient's health record.

C. Individualized assessment and aftercare planning begins at admission and continues throughout a patient's stay on the ETP.

State of California – Health and Human Services Agency                                    Department of State Hospitals

# POLICY DIRECTIVE

D.  A copy of the patient's aftercare plan shall be provided to the patient prior to discharge.

## Roles and Responsibilities

The FNAT Supervising Psychologist convenes the FNAP placement evaluation meetings and summary review meetings; provides relevant information to the FNAP; and notifies the FNAT Psychologist and ETP treatment team of a discharge decision.

The FNAT Psychologist participates in the placement evaluation meetings; works in collaboration with the treatment team to develop the transition and aftercare plans; and participates in meetings with the referring hospital to review the aftercare plan and discuss treatment recommendations.

The FNAP conducts placement evaluation meetings; reviews all information provided by the FNAT psychologist, ETP treatment team, patient, and Patients' Rights Advocate (when applicable); and provides written placement decisions.

## Approval

_____
STEPHANIE CLENDENIN                    Date
Director (A)

## References

1.  Health and Safety Code section 1265.9
2.  Welfare and Institutions Code sections 4143 4144, and 5510
3.  Title 9 of the California Code of Regulations, sections 4801-5100
4.  Policy Directive 3700, Enhanced Treatment Program Admission and Initial Certification
5.  Policy Directive 3702, Enhanced Treatment Program Ongoing Certification
6.  Policy Directive 3706, Enhanced Treatment Program Milieu Management Plan
7.  Policy Directive 3704, Enhanced Treatment Program Treatment Planning

## Attachments

State of California – Health and Human Services Agency                    Department of State Hospitals

# POLICY DIRECTIVE

1. ETP FNAP Certification Decision Notification Grid



California Department of
# State Hospitals

**ETP FNAP Certification Decision Notification Grid**
Policy Directive 3708, Attachment 1

| Event | Timeframe | Notifier | Recipient |
|---|---|---|---|
| **FNAP 90-day Placement Evaluation Meeting** | Within 3 business days | FNAT Supervising Psychologist | Patient, Patients' Rights Advocate, Conservator (if applicable) & Referring Hospital |
| **FNAP One Year Placement Evaluation Meeting** | Within 24 hours | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **FNAP One Year Continuation Placement Evaluation Meeting** | Within 24 hours | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **Independent Medical Review Placement Evaluation Hearing** | Within 3 business days | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |
| **FNAP 90-day Treatment Summary Review** | Within 3 business days | | Patient, Patients' Rights Advocate, Conservator (if applicable), Referring Hospital & ETP Hospital |

# DEPARTMENT OF STATE HOSPITALS
# ENHANCED TREATMENT PROGRAM

**ETP OPERATING MANUAL**

**SECTION – Discharge and Transition**

**PROGRAM PROCEDURE No. ETP-OP-300**

**SUBJECT:    ETP Discharge and Transition**

**Effective Date:    4/9/19**

This procedure is specific to the Enhanced Treatment Program (ETP).

I.    <u>PURPOSE</u>
To provide clear procedures on transition and discharge of a patient from the ETP.

II.    <u>DEFINITIONS</u>

A.    **Enhanced Treatment Program (ETP):**  A pilot program authorized under Health and Safety Code section 1265.9 aimed at treating patients at high risk of most dangerous behavior, and who are able to benefit from concentrated, evidence-based clinical therapy, structured milieu and/or treatment with the goal of reducing the risk of violent behavior in a standard treatment environment.

B.    **Forensic Needs Assessment Team (FNAT):**  A panel of Psychologists with expertise in forensic assessment or violent risk assessment, each of whom are assigned an ETP case or group of cases and are not part of the ETP treatment team.

C.    **Forensic Needs Assessment Panel (FNAP):**  A panel that consists of a Psychiatrist, a Psychologist, and a Medical Director none of whom are involved in the patient's treatment or diagnosis at the time of the hearing or placement meetings.

D.    **Standard Treatment Environment:**  Any DSH state hospital setting outside of the ETP.

E.    **Transition Plan:**  Coordination between the ETP treatment team and the receiving treatment team on the transition of a patient throughout their stay and when determined as ready for discharge by the FNAP.

F.    **Aftercare Plan:**  A written plan describing those services and goals that should be provided to a patient following discharge, transfer, or release from an ETP for the purpose of enabling the patient to maintain stabilization or achieve an optimum level of functioning at the referring hospital.

III.    WHO MAY BE DISCHARGED

    A.  A patient in the ETP may be discharged following an FNAP determination that the patient no longer requires treatment on the ETP.  The FNAP shall base their decision on the following:

        1.  Clinical progress reported by the FNAT Psychologist and/or the patient's treatment team indicating a reduction of the patient's risk of aggression.

        2.  A determination that the patient is inappropriate for continued treatment on an ETP.

        3.  The identification of new issues that preclude the patient's treatment on an ETP.

        4.  A determination by the Independent Psychologist or Psychiatrist's Medical Review.

    B.  If the FNAP determines that the patient is ready to be transferred to a standard treatment setting, the referring hospital transfer coordinator/designee shall work with the ETP treatment team and the referring hospital to identify an appropriate placement in the referring hospital.

    C.  The FNAP decision shall be in writing and provided as described in the ETP FNAP Certification Decision Notification Grid (Attachment 1).

IV.    DISCHARGE TO THE REFERRING HOSPITAL

    A.  Once the FNAP decertifies the patient from the ETP, the FNAT Supervising Psychologist will notify the referring hospital of the FNAP decision as outlined in the ETP FNAP Certification Decision Notification Grid (Attachment 1).

    B.  Within two business days of this notification, the referring hospital will provide the ETP transfer coordinator/designee contact information for the referring hospital's receiving treatment team and program management.

    C.  The ETP Unit Supervisor (US)/designee will ensure the ETP Discharge e-Packet Checklist is complete and delivered to the ETP program management and the referring hospital's program management within seven days of the decision, unless it is an expedited discharge.

    D.  The patient and the patient's medical record will be physically transferred to the referring hospital within 30 days of decertification. The patient shall receive a copy of the written aftercare plan prior to discharge.

V.    TRANSITION TO THE REFERRING HOSPITAL

A. The patient will be included in the transition planning when the ETP treatment team determines this information is clinically appropriate.

B. The ETP treatment team will work with the ETP Program Assistant/designee to ensure a transition process is completed.

C. The ETP Program Director/designee will notify the ETP Clinical Administrator and the ETP transfer coordinator/designee that the patient has been decertified, clinically indicating transition back to the referring hospital. The ETP Program Director/designee will provide the ETP Clinical Administrator and ETP transfer coordinator/designee with the tentative clinical transitional time frame.

D. The ETP Program Assistant will schedule a teleconference between the ETP treatment team and the referring hospital treatment team.

   1. The ETP treatment team, in collaboration with the FNAT Psychologist, shall complete the aftercare plan.

   2. The ETP Program Assistant shall send the completed aftercare plan to the referring hospital treatment team two (2) business days prior to the teleconference for their review.

E. The ETP treatment team will provide the receiving treatment team with an overview of the patient's current treatment plan, inform them of the patient's progress, discuss the aftercare plan and discuss recommendations/suggestions. This discussion shall include a plan for post-ETP follow up.

F. The ETP transfer coordinator/designee, ETP hospital program management and the referring hospital program management will ensure the transition  and aftercare process is completed and determine the exact date of transfer, no later than 30 days following the FNAP decision

VI.   <u>AFTERCARE PLANNING</u>

A. Individualized assessment and aftercare planning begins at admission and continues throughout a patient's stay on the ETP.

B. A written aftercare plan for a standard treatment environment shall be developed by the treatment team in collaboration with the FNAT Psychologist prior to or at the time of discharge, transfer or release from an ETP.

   1. A written aftercare plan shall describe those services and goals that should be provided to a patient following discharge, transfer or release from an ETP for the purpose of enabling the patient to maintain stabilization or achieve an optimal level of functioning.

   2. Prior to or at the time of the discharge, transfer or release from an ETP, each patient shall be evaluated concerning the patient's need for aftercare services. This evaluation shall consider the patient's potential housing,

probable need for continued treatment, social services and need for continued medical and mental health care.

3. Aftercare plans shall include, but shall not be limited to, arrangements for medication administration and follow-up care.

4. The ETP Treatment Team Clinical Social Worker shall be responsible for ensuring that the aftercare plan has been completed and documented in the patient's health record.

5. The patient shall receive a copy of the patient aftercare plan prior to discharge.





# California Department of
# State Hospitals

## Enhanced Treatment Program

## Section 5

## Staffing

**Department of State Hospitals – Atascadero**
P.O. Box 7001
Atascadero, CA 93423-7001



# DSH-ATASCADERO ETP PROPOSED SCHEDULE

0645-0700 – NOC / AM Shift Change
0700-0745 – Lab Draws
0700-0800 – Medications
0745-0830 – Breakfast and Search of Person
0800-0830 – SPT, US, TX Team Morning Meeting
0800-0830 – Showers / Shaves
0830-0900 – Therapeutic Community in Day Room
0900-0945 - Team
0900-0945 – Security Check of Patient's Property / ADL time in rooms for Pts.
0945-1040 – TX Session 1
1050-1140 – TX Session 2
1140-1200 - Quiet Time or Courtyard
1145-1200 – Medications
1200-1245 – Lunch and Search of Person
1330-1345 – Quiet Time or Courtyard
1345-1430 – TX Session 3
1430-1515 – Quiet Time
1445-1515 – AM / PM Shift Change
1530-1620 – TX Session 4
1630-1645 – Count
1630-1700 - Medications
1700-1745 – Showers / Shaves
1745-1830 – Dinner and Search of Person
1830-1900 – Therapeutic Community in Day Room
1900-1945 – Courtyard
1900-1945 – RT facilitated Group Activity
1900-1945 – Security Check of Patient's Property
2000-2100 – Medications
2100 – Bed Time
2300 – PM / NOC Shift Change

**\*Schedule subject to change as needed.**

*"Caring Today for a Safe and Healthy Tomorrow"*

## DSH-Atascadero ETP **DRAFT** AM Shift Assignments 0645-1515

| SPT | | HPO1 | | HPO2 | |
|---|---|---|---|---|---|
| **Time** | **Task** | **Time** | **Task** | **Time** | **Task** |
| 0645-0700 | Shift Change | 0600-0645 | Rounds | 0600-0645 | Rounds |
| 0700-0800 | Scheduling | 0645-0700 | Shift Change | 0645-0700 | Shift Change |
| 0800-0830 | Morning Meeting | 0700-0900 | Dayroom Coverage | 0700-0745 | Labs |
| 0830-0900 | Ther. Community | 0830-0900 | Ther. Community | 0745-0830 | Meal/Searches |
| 0900-1000 | Security Inspections | 0900-0945 | Team Escorts | 0830-0900 | Ther. Community |
| 1000-1200 | Rounds/Relief | 0945-1015 | Rounds | 0900-0945 | Room Searches |
| 1200-1300 | Meal Break | 1015-1050 | Podiatry Escort | 0945-1040 | Group Coverage |
| 1300-1400 | PT4 Relief | 1050-1140 | Group Coverage | 1040-1200 | Rounds |
| 1400-1445 | Documentation | 1140-1200 | Courtyard | 1200-1315 | Dayroom Coverage |
| 1445-1515 | Shift Change | 1200-1245 | Pt. Lunch/Searches | 1315-1330 | Clinic Escort |
| | | 1245-1345 | Rounds | 1330-1345 | Courtyard |
| | | 1345-1400 | Group Coverage | 1345-1400 | Rounds |
| **RN** | | **RN2** | | **RN3** | |
| Time | Task | Time | Task | Time | Task |
| 0645-0700 | Shift Change | 0645-0700 | Shift Change | 0645-0700 | Shift Change |
| 0700-0745 | Labs | 0700-0800 | Documentation | 0700-0830 | Dayroom Coverage |
| 0745-0830 | Pt. Meal/Searches | 0800-0830 | Shaves | 0830-0900 | Ther. Community |
| 0830-0900 | Ther. Community | 0830-0900 | Ther. Community | 0900-0945 | Room Searches |
| 0900-0945 | Team Escorts | 0900-1100 | Rounds/Emerg. Responder | 1000-1100 | Meal Break |
| 1015-1100 | Podiatry Escort | 1100-1200 | Meal Break | 1100-1300 | Rounds/Emerg. Responder |
| 1100-1300 | A/V Monitoring | 1200-1500 | Dayroom Coverage | 1330-1345 | Courtyard |
| 1300-1400 | Meal Break | 1445-1515 | Shift Change | 1345-1445 | Documentation |
| 1400-1445 | Documentation | | | 1445-1515 | Shift Change |
| 1445-1515 | Shift Change | | | | |
| | | | | | |

DSH-Atascadero ETP **DRAFT** AM Shift Assignments 0645-1515

| PT1 | | PT2 | | PT3 | |
|---|---|---|---|---|---|
| **Time** | **Task** | **Time** | **Task** | **Time** | **Task** |
| 0645-0700 | Shift Change | 0645-0700 | Shift Change | 0645-0700 | Shift Change |
| 0700-0830 | Dayroom Coverage | 0700-0900 | A/V Monitoring | 0700-0800 | Medication Assist |
| 0830-0900 | Ther. Community | 0900-0945 | Team Escorts | 0800-0830 | Showers |
| 0900-0945 | Documentation | 0945-1040 | Group Coverage | 0830-0900 | Ther. Community |
| 0945-1045 | Meal Break | 1100-1200 | Meal Break | 0900-1100 | A/V Monitoring |
| 1050-1140 | Group Coverage | 1200-1300 | Documentation | 1100-1140 | Documentation |
| 1145-1200 | Medication Assist | 1300-1500 | Rounds/Emerg. Responder | 1140-1200 | Courtyard |
| 1200-1245 | Pt. Lunch/Searches | 1445-1515 | Shift Change | 1200-1300 | Meal Break |
| 1300-1500 | A/V Monitoring | | | 1315-1330 | Clinic Escort |
| 1445-1515 | Shift Change | | | 1345-1430 | Group Coverage |
| | | | | 1445-1515 | Shift Change |

| PT4 | |
|---|---|
| **Time** | **Task** |
| 0645-0700 | Shift Change |
| 0700-0930 | Medication Pass |
| 0930-1100 | Inventory/Review Dr.'s Orders |
| 1100-1300 | Medication Pass |
| 1300-1400 | Meal Break |
| 1400-1445 | Doc Review |
| 1445-1515 | Shift Change |
| | |
| | |

State of California-Health and Human Services Agency                     Department of State Hospitals

**DSH Clinical Staff Assignment**
**ETP-Atascadero**
**Shift 0800-1630 Mon-Fri**

| | | |
|---|---|---|
| 0800-0830 | **Morning Meeting** | **Treatment Team** |
| 0830-0900 | **TC in dayroom** | **Treatment Team** |
| 0900-0945 | **Team/PRN Team** | **Treatment Team** |
| 0945-1040 | **Tx Group and/or 1 on 1 Therapy** | **Treatment Team** |
| 1050-1140 | **Tx Group and/or 1 on 1 Therapy** | **Treatment Team** |
| 1200-1300 | **Meal Break** | **Treatment Team** |
| 1300-1345 | **Documentation** | **Treatment Team** |
| 1300-1345 | **Sick Call/Documentation** | **Tx Team RN** |
| 1345-1430 | **Tx Group and/or 1 on 1 Therapy** | **Treatment Team** |
| 1445-1515 | **AM / PM shift change** | **Treatment Team** |
| 1530-1620 | **Tx Group and/or 1 on 1 Therapy** | **Treatment Team** |
| 1900-1945 | **Dayroom activity - this may be movie/TV time or an event facilitated by the RT** | **Rehabilitation Therapist** |

**\*Schedule subject to change as needed.**

State of California Health and Human Services Agency                                    Department of State Hospitals

**DSH-Staff Assignment for Individual Care**
**ETP-Atascadero**

Clinical Review (Print):        RN1
Clinical Review (Signature):
Shift Lead: SPT
Med Person: PT2

NOC Shift 2300-0700                              HPO Shift 2200-0600

| Task | SPT | PT1 | RN1 | HPO1 | HPO2 |
|---|---|---|---|---|---|
| A/V Monitor *2 hr. blocks* | | 2300-0100 0300-0500 | 0100-0300 0500-0700 | | |
| Documentation | 0500-0600 | 0600-0645 | 2400-0100 | | |
| Early Med Assist | 0600-0700 | | | | |
| Security Inspection & AED Log | 0100 | | | | |
| NOC Audit | | | 2315 | | |
| Chart Stuffing | | 0100 | | | |
| Lab Prep | | | 0400 | | |
| Rounds | | 0100-0300 0500-0700 | 2300-0100 0300-0500 | 2200-2400 0200-0400 | 2400-0200 0400-0600 |
| Shift Change | 2300 0645 | 2300 0645 | 2300 0645 | 2300 | 2300 |
| Emergency Flow Sheet *1 LOC + 1 backup* | X | | | | |
| Off Unit Emergency Responder | | 0100-0300 0500-0700 | 2300-0100 0300-0500 | | |

**Schedule subject to change as needed**

**Department of State Hospitals – Patton**
3102 E. Highland Avenue
Patton, CA 92369



# DSH-PATTON ETP PROPOSED SCHEDULE

0630-0645 – NOC / AM Shift Change (All nursing NOCs and AM's except 1:1 staff)
0645-0700 – Wake-up/contraband search (PT1, PT2, PT3, RN3, HPO1, HPO2)
0700-0730 – Labs, Vital Signs, Accu checks, Treatments (RN1, RN2, RN3, HPO2)
0700-0730 – Medication Pass (PT1, PT2, PT3, PT4, HPO1)
0730-0800 – Showers/ADLs (PT1, PT2, PT3, RN3, HPO1, HPO2)
0800-0830 – Breakfast (PT2, PT3, RN2, RN3, HPO2)
0800-0830— Morning Meeting (SPT, US, HSS, Clinical Staff, HPO1, PT1, PT4, RN1)
0830-0900 – Therapeutic Community in Day Room (US, SPT, HPO1, HPO2, Clinical Staff)
0830-0900— Documentation (PT1, PT2, PT3, RN1, RN2, RN3)
0900-0930 - Treatment Conferences (PT4, RN1, Clinical Staff)
0900-0930— Sick Call with MD (RN2, RN3)
0900-0915 – Specials/Ice/Hot Water (PT1, PT2, PT3, HPO1, HPO2)
0930-0945 – Courtyard (PT1, PT2, HPO1, HPO2)
0945-1045 - Group 1 (PT1, RN3, Clinical, HPO1, HPO2) *PT2,PT3, RN1 @ Lunch 10-11*
1045-1100— Break (PT1, RN3, HPO1, HPO2)
1100 -1200 -Group 2 (PT2, PT3, HPO1, HPO2, Clinical Staff)
*PT1, PT4, RN2, RN3 @Lunch 11-12*
1200-1215 – Contraband Search (PT1, PT2, PT3, HPO1, HPO2)
1200-1230—Vital Signs, Treatments, Accu Checks (RN1, RN2, RN3, HPO2)
1215-1230 – Count Time (SRPT, PT1, PT2, PT3, RN3, HPO1, HPO2)
1230-1300 – Medication/Lunch (PT1, PT2, PT3, PT4, RN3, HPO1, HPO2)
1300-1315 – Specials/Ice/Hot Water (PT1, PT2, PT3, HPO1, HPO2)
1315-1330 – Courtyard (PT1, PT2, PT3, HPO1, HPO2)
1330-1430 - Group 3 (PT1, PT2, PT3, HPO1, HPO2)
1430-1500 – Shift Change (All Nursing AM/PM, Clinical, US, HSS, HPO)
1500-1600 – Group 4 (Clinical Staff, HPO1, HPO2,)
1600-1700 – Structured Leisure (PT2, PT3, RN2, RN3, HPO1, HPO2)
1600-1630 – Treatment Team Meeting (SRPT, RN1, PT1, PT4, HSS, Clinical, US, HPO)
1700-1715 – Count/Contraband Search (PT1, PT2, PT3, RN3, HPO1, HPO2)
1715-1745 –Treatments, Vital Signs, Accu Checks (RN1, RN2, RN3, HPO1)
1715-1745 – Medications (PT1, PT3, PT4, HPO2)
1745–1815- Dinner (PT2, PT4, RN2, RN3, HPO1, HPO2) *PT1, PT3, RN1 @Lunch 18-1900*
1815-1830-Specials/Ice/Hot water (PT2, RN2, RN3, HPO1, HPO2)
1815-1830-Courtyard (PT2, PT4, RN3, HPO1, HPO2)
1830-1900-Showers, ADLs (PT2, PT4. RN2, RN3, HPO1, HPO2)
1900-1930-Vital Signs, Treatments, Accu Checks (PT1, RN1, RN2) *PT2, RN3 @Lunch 19-20*
1930–2000- Medication (PT1, PT3, RN1, HPO1, HPO2) *RN2 @Lunch 1930-2030*
2000-2100-Unstructured Leisure Activity (PT2, PT3, RN3, HPO1, HPO2)
2100-2130-Count/Contraband Search (SRPT, PT1, PT2, PT3, RN3, HPO1, HPO2)
2130-2200-Quiet/Reflection Time (PT1,PT2, PT3, RN3, HPO1, HPO2)
2200-Lights out
2200-2245-Documentation, debriefing, (All nursing except 1:1 staff, HPO1)
2245-2300-PM/NOC Shift Change (All Nursing except 1:1 staff, HPO2)
**\*Schedule subject to change as needed.**

DSH- Clinical Staff Assignment
ETP-Patton

**Shift 0700-1730**

| 0700 | Documentation/Review of Referrals/Planning | Treatment Team |
|---|---|---|
| 0800-0830 RN1 | **Morning Meeting** | **SPT, US, HEE, Clinical Staff, HPO1, PT1, PT4,** |
| 0830-0900 | **TC** | **Clinical Team, HPO 1, HPO2, US, SPT** |
| 0900-0930 | **Treatment Team Conferences** | **PT4, RN1, Clinical Staff** |
| 0945-1045 | **Group Session 1 and/or 1 on 1 Therapy** | **PT1, RN3, Clinical, HPO1, HPO2** |
| 1100-1200 | **Group Session 2 and/or 1 on 1 Therapy** | **PT2, PT3, HPO1, HPO2, Clinical Staff** |
| 1300-1330 | **Caseload Check-in** | **Treatment Team** |
| 1330-1430 | **Group Session 3 and/or 1 on 1 Therapy** | **PT1, PT2, PT3, HPO1, HPO2, Clinical Staff** |
| 1430-1500 | **Shift Change** | **All Nursing AM/PM, Clinical, US, HSS, HPO** |
| 1500-1600 | **Group Session 4 and/or 1 on 1 Therapy** | **Clinical Staff, HPO1, HPO2** |
| 1600-1700 | **Structured Leisure Activity** | **RT** |
| 1600-1630 | **Treatment Team Meeting** | **SRPT, RN1, PT1, PT4, HSS, Clinical, US, HPO** |
| 1630-1730 | **Documentation/Case Management** | **Clinical** |

*Schedule subject to change as needed.

Case 2:90-cv-00520-KJM-SCR    Document 6509    Filed 04/08/20    Page 152 of 248

**DSH Staff Assignment for Individual Care**
**ETP-Patton**

| AM Shift 0630-1500 | US, SRN, HPO SGT<br>Shift Lead: SPT<br>Med Person: PT4 | | Meal: 1230<br>Meal:1100 | | Shift Lead Relief: PT4<br>Med Relief: SPT | | | Date: | |
|---|---|---|---|---|---|---|---|---|---|
| **Staff** | **RN1** | **RN2** | **RN3** | **PT1** | **PT2** | **PT3** | **SPT** | **HPO1** | **HPO2** |
| Meal Break | 1000 | 1100 | 1100 | 1100 | 1000 | 1000 | 1100 | Shift:<br>HPO may be pulled for escorts/emergency | |

| | RN1 | RN2 | RN3 | PT1 | PT2 | PT3 | SPT | HPO1 | HPO2 |
|---|---|---|---|---|---|---|---|---|---|
| Shift Change | x | x | x | x | x | x | x | x | X |
| Medications Labs | Treatments/ Vital Signs 0700 1200 | Accuchec k/Labs 0700 1200 | Vital Signs/Trea tments 0700 1200 | Medline 0700 | Medline 0700 1230 | Medline 0700 1230 | | Medline 0700 | |
| Patient Meals | | Breakfast 0800 Lunch 1230 | Breakfast 0800 Lunch 1230 | | Breakfast 0800 Lunch 1245 | Breakfast 0800 Lunch 1245 | | | Breakfast |
| Morning Meeting | 0800 | | | 0800 | | | | 0800 | |
| Therapeutic Community | | | | | | | 0830 | 0830 | 0830 |
| Room/Body Searches | | | | 0645 1200 | 0645 1200 | 0645 1200 | | 0645 1200 | 0645 1200 |
| Rounds/Q15/ Security Checks/ Emergency Equipment check (assigned as needed by SPT) | | | | | | | X PT4 to cover rounds while SPT on Lunch. | | |
| TX Group Coverage | | Tx. Conferenc e with PT4 | Group1 0945 | Group1 0945 Group3 1330 | Group2 1100 Group3 1330 | Group2 1100 | | Group1 0945 Group2 1100 Group3 1330 | Group1 0945 Group2 1100 Group3 1330 |
| Courtyard | | | | 0930 1315 | 0930 1315 | 1315 | | 0930 1315 | 0930 1315 |
| Showers/ADLS | | | 0730 | 0730 | 0730 | 0730 | | 0730 | 0730 |
| Flow Sheets | | | 1230 | | | 0800 | | | |
| Escorts | | | 0800 EKG | | | 1330 Dental | | | |
| Specials/Ice/ Hot Water | | | | 0900 | 0900 | 0900 | | 0900 | 0900 |
| AV Monitoring | 0900-1100 | 1100-1300 | | 0700-0900 | | 1300-1500 | | | |

SAMPLE



California Department of

# State Hospitals

## Enhanced Treatment Program

## Section 6

## Training

**DEPARTMENT OF STATE HOSPITALS**
**ENHANCED TREATMENT PROGRAM**

**ETP OPERATING MANUAL**

**SECTION – Program Operations**

**PROGRAM PROCEDURE No. ETP-OP-205**

**SUBJECT:    ETP Training Procedure**

**Effective Date:      XXXX**

This procedure is specific to the Enhanced Treatment Program (ETP).

I.    PURPOSE

To outline a system for training the staff who are assigned to work on or float to any ETP unit.

The focus of treatment on the ETP is to address the risk factors of each patient that are placing him/her at the highest risk for violence.  Staff training in treatment modalities and intervention strategies for this population are an important component of successful implementation of the ETP.

II.    INITIAL TRAINING

Staff assigned to work on the ETP will receive intensive training prior to the opening of each unit. Training topics include:

  A.  Introduction to ETP Philosophy and Culture: An overview of the ETP history, design, philosophy, and treatment approaches.

  B.  Team Building: The ETP includes newly formed units and treatment teams. Building unit teams with a shared purpose is a critical component of working effectively with patients who have a high risk for violence.

  C.  Trauma Informed Care (TIC): *"TIC is a strengths-based framework that is grounded in an understanding of and responsiveness to the impact of trauma, that emphasizes physical, psychological, and emotional safety for both providers and survivors, and that creates opportunities for survivors to rebuild a sense of control and empowerment."*-Substance Abuse and Mental Health Services Administration

  D.  Positive Psychology: Positive psychology is the scientific study of what makes life most worth living.

E.  Motivational Interviewing (MI): MI is a patient centered method for enhancing intrinsic motivation to change health behavior by exploring and resolving ambivalence.

F.  Sensory Modulation: Training addresses collaborative, meaningful, trauma informed, recovery focused, sensory supportive treatment approaches.

G.  Criminogenic Risk Factors: ETP staff will be trained in Changing Lives Changing Outcomes, an evidence-based treatment that addresses mental illness, criminal thinking, and the relationship between the two.

H.  Dialectical Behavioral Therapy (DBT) Informed Skills: DBT is an evidenced based treatment that treats emotion dysregulation. The goal of Emotion Regulation treatment on the ETP is assist patients in learning how to manage their emotions without the use of violence, as well as support the efforts of the treating team and staff to reduce violence on the unit.

I.  De-escalation/Therapeutic Options (TO): Training addresses de-escalation techniques and skills to utilize when patients become emotionally dysregulated.

J.  Therapeutic Strategies and Interventions (TSI): TSI addresses how to intervene with patients in a therapeutic manner when patients start to escalate, and additional steps to take if hands-on interventions are needed.

K.  Transdisciplinary Approach: A team based model of care, with all disciplines viewed as having an equally important role in the patient's treatment and each team member having expanded knowledge of the role that each discipline plays on the team. Members of a transdisciplinary team achieve service integration by consulting one another. They do not abandon their discipline, but blend specific skills with other team members to focus on achieving integrated outcomes.

L.  Discipline Specific: Each staff discipline represented in the ETP team will teach the ETP staff what their job and function on the ETP will be, to enhance teamwork and collaboration.

M.  Social Skills and Support: Staff will learn how to assist patients in developing skills to appropriately interact with others.

N.  Substance Recovery Treatment: Staff will be trained in integrated, stage based, and evidence-based substance recovery treatment and assessment for patients with a substance use disorder diagnosis referred to the ETP.

O.  Patient's Rights: The Patient's Right's Advocate assigned to the ETP will provide an overview training on patient's rights.

P.  Behavioral Concepts: Staff will receive training in behavioral concepts and techniques to use in treatment planning with patients at high risk for violence.

Q. Milieu Management and Safety Communication Plan: Staff will become familiar with these two components of behavioral treatment planning, developed by the treatment team in conjunction with the patient, to create an environment that supports the patient in managing unsafe behaviors and progressing toward safe conduct.

R. Cognitive Remediation and Social Cognition: Cognitive remediation includes a variety of treatments that target social cognition, attention, memory, executive functioning, and language abilities.

S. Behavioral Health Assistance Module (BHAM): The ETP BHAM module is an electronic dashboard that facilitates treatment pathways, the completion of forensically driven documentation, and ETP-related notifications. It also provides a platform for data collection.

T. Hands On: Hands-on practical application training for staff assigned to the ETP will be provided. Topic areas are included in Attachment A.

III.   MAKEUP/MANDATORY TRAINING FOR ASSIGNED STAFF

A. The courses listed below are mandatory ETP training. If staff assigned to the ETP miss any of these training days, they will need to make up the class. Staff on-boarding after the activation of the unit will be required to complete the mandatory training.

1. Philosophy/Positive Psychology/TIC/Transdisciplinary Approach (half day)
2. BHAM (half day)
3. Milieu Management Plan
4. TO/TSI
5. Patients Rights
6. Operational Processes: Unit procedures including escorting, door and food port use, audio/visual monitoring, emergency response, and non-contact interview room use.
7. Clinicians - Overview of Motivational Interviewing, DBT-informed skills, and background and implementation of the Changing Lives Changing Outcomes treatment program.

IV.   FLOAT STAFF ORIENTATION

A. Staff who float to or work overtime on an ETP unit will be required to review a 60-minute video prior to working their first shift. This video will cover:

1. Overview/History of the ETP
2. Philosophy
3. ETP unit structural layout
4. Milieu management
5. Patient movement

V.   NEW EMPLOYEE ORIENTATION (NEO)

A. The float orientation video will be used in NEO to introduce all staff to the ETP so they will be available to float to the ETP units.

VI.    ONGOING/ANNUAL TRAINING

A. ETP staff will attend hospital required annual training.

B. Additional ETP-specific annual training will be determined during the first year of program implementation and adjusted based on ongoing program evaluation.

Cross Reference(s):
AB 1340 - Achadjian. Enhanced Treatment Programs

**Enhanced Treatment Program**

**Procedure ETP-OP-205: Training Procedure**

**Attachment A – Hands-On Training**

A. Admissions
   1. AB1340
   2. Placement Timeline:
      a. 90 Day Placement
      b. One-Year Placement
      c. One Year Continuation Placement
      d. Independent Review
      e. 90 Day Treatment Summary Review
      f. Emergency Placement
   3. Admission Process:
      a. Site specific procedure
      b. Receiving patient from R&R
      c. Direct admit process
      d. Timeframe for preparing initial Milieu Management Plan (MMP) & Safety Communication Plan
B. Patient Orientation
   1. Initial Team
   2. New Admission Orientation (NAO) Groups
   3. Patient Orientation Handbook
C. Discharge
   1. Utilization Management
   2. Transition Plan
   3. After care Plan
   4. Options for Discharge
D. Discipline Specific Documentation and Processes
   1. LOC Documentation
      a. RN documentation
      b. RN sick call/Team RN
      c. PT documentation
      d. Team recorder
   2. Rehabilitation Therapist Documentation
   3. Social Work Documentation
   4. Psychologist and Forensic Needs Assessment Team (FNAT) Documentation
   5. Psychiatrist Documentation
E. BHAM

    1. Training for Trainers
    2. Training for Non-ETP Staff
F. Escorting/On & Off Unit/Courtyard
    1. Review Escorting Program Procedure
    2. On Unit Escort—Practice (various escort scenarios)
        a. Lockers
        b. Meals
        c. Non-contact room
        d. Groups
        e. Courtyard
        f. Sick call
        g. MMP specific procedures i.e. enemy, limited interaction with peers
        h. Phones
        i. Activities of daily living
        j. Showers
        k. Shaves
    3. Off Unit Escort
        a. Admission escort
        b. Visiting escort
        c. Site specific ETP visiting procedure
G. A/V Monitoring
H. Emergency Response
    1. Medical Emergency
        a. Site specific emergency procedure
        b. Alarm response procedure
        c. Review staff responses on unit i.e. while in group or assigned to other tasks
        d. Review off unit staff direction during emergencies
        e. Review crime scene procedures and protocol
        f. Post incident review of medical emergency
    2. Fire Drill
        a. Review fire plan Administrative Directive (AD)
        b. Simulate evacuation with 13 patients in various milieu statuses
    3. Pepper Spray & Decontamination
        a. Review Nursing Procedure (NP) on care of the patient exposed to pepper spray
        b. Review police directive on use of chemical agents
    4. Competency Test
I. MMP/SCP/Incentive Plan/Behavior Plan
    1. MMP
    2. SCP
    3. Incentive Plan
    4. Behavior Plan

     5.  Competency Test

J.  Doors/Food Ports/Meals/Meal Count

     1.  Door and Food Port Program Procedure

     2.  Door and Food Port Operation

     3.  Sanitation

     4.  Door and Food Port Scenarios

K.  Shift Change/TC/Groups (mall, supplemental, leisure)

     1.  Milieu Management (review skills for interacting with patients during Therapeutic Community (TC), groups & leisure activities)

     2.  Staff Involvement (groups and group coverage)

     3.  PM/NOC Patient Treatment (engaging with patients in locked door status)

L.  Search of Person & Property/Lockers/Mail/Phone Use

     1.  Therapeutic Approach to Searches

     2.  Police Perspective on Searches

M.  Unit/Security Awareness

N.  SIR Documentation in WaRMSS

     1.  Review PowerPoint Presentation

     2.  Review Video

     3.  Practice Entering SIR Data into WaRMSS

O.  A Day in the Life of the ETP

# Exhibit 5

The California Department of State Hospitals

# 2018 Annual Report

**Safety, Treatment, Responsibility, Empowerment, Respect, and Communication**







California Department of
**State Hospitals**

# Vision
*Caring Today for Safe and Healthy Tomorrow.*

# Mission
*To provide evaluation and treatment in a safe and responsible manner, by leading innovation and excellence across a continuum of care and settings.*

# Goals
*Safe Environment. Organizational and Operational Excellence. Innovative Treatment and Forensic Evaluation. Integrated Behavioral Health System.*

# Values
*Safety. Treatment. Responsibility. Empowerment. Respect. Communication.*



# Table of Contents

| | |
|---|---|
| Director's Message | **4** |
| Department Overview | **6** |
| Increase in Incompetent to Stand Trial Patients and the Creation of the DSH Diversion Program | **10** |
| Workplace Violence Prevention | **12** |
| Budget and Legislation Highlights 2017–18 | **13–14** |
| DSH Patient Demographics | **14–15** |



**View This Annual Report Online!**
For an electronic, ADA-compliant version of this document, please visit:
http://www.dsh.ca.gov/Publications/Reports_and_Data/default.aspx



**STEPHANIE CLENDENIN**
*Acting Director of the Department of State Hospitals*

# Director's Message

To improve the lives of our patients, it is not enough to strive for excellence in our daily tasks. We must move toward a vision of the future. For this reason, last year DSH re-examined the Department's Vision, Mission, Goals and Values. These are the principles by which DSH will navigate into the future. Collectively they are our guiding lights as we advance. (See the revised version of the DSH principles on page 2 of this publication.)

During this process, we learned several things. We saw that DSH's Vision and Mission remain true and unchanged. We discovered that the Goals and Values needed to be revisited. Re-examining these principles also reminded us that they are more than just words on a page. They connect us to each other, our patients, our stakeholders and to the tasks at hand.

It was for both our patients and our employees that we took a fresh look at our Vision, Mission, Goals and Values for the future. They guide us as we make our hospitals safer and more caring places for the thousands of patients we serve each year.

As a Department, and as individual employees, we have a huge impact on the lives of Californians who suffer from mental illness. We are the nation's largest state inpatient mental health hospital system. In 2017–18, we cared for almost 12,000 patients with serious mental health challenges—far more than any other state hospital system nationwide.

We have a very positive, caring and compassionate team doing this work. I've experienced this while visiting our five hospitals and spending time on the units and also while walking through our office in Sacramento. I see every day the passion we have for our work. I appreciate our entire workforce for their commitment to patient care.

By striving each day toward our Vision and our Mission, we change DSH for the better. Our patients benefit from improvements in their evaluations and treatments. Our patients and staff benefit from a safer work environment. And all Californians benefit when DSH uses public funds wisely and responsibly to treat California's most vulnerable and challenging mentally ill patients across a continuum of care.



**PATIENTS**

# 12,000

In 2017–18, we cared for
almost 12,000 patients
with serious mental health
challenges—far more than
any other state hospital
system nationwide.

# Department Overview

The Department of State Hospitals (DSH) was created by the Budget Act of 2012–13, which eliminated the Department of Mental Health and reorganized its functions. Under the reorganization, DSH was authorized to manage the system of state hospitals throughout California while other functions were transferred to other departments.



**DSH oversees five state hospitals, which are all licensed by the California Department of Public Health and must meet or exceed regulatory standards to continue providing care. These facilities provide mental health services to patients referred to them by a county court, a prison or a parole board. The department is dedicated to providing effective treatment every day in a safe environment and a fiscally responsible manner.**



**The five hospitals are:**

## DSH—Atascadero

DSH—Atascadero in San Luis Obispo County opened in 1954. It was the first state hospital of the postwar building program and the first hospital of its kind in the United States, built as one complex devoted to the treatment of forensic patients. The hospital has more than 1,800 employees and is the third largest employer in San Luis Obispo County. Through its partnership with Cuesta College, the hospital has developed one of the top training programs for psychiatric technicians in California.

## DSH—Coalinga

DSH—Coalinga in Fresno County opened in 2005. It is a self-contained psychiatric hospital with a security perimeter. The hospital is the sixth largest employer in Fresno County with more than 2,000 employees. The hospital has partnerships with West Hills College—Coalinga, West Hills College—Lemoore, Fresno City College and California State University, Fresno. These academic partnerships provide the hospitals with hundreds of staff each year.

## DSH—Metropolitan

Located in Norwalk, DSH—Metropolitan opened in 1916. The hospital is an open campus with a secure perimeter around patient housing. More than 1,500 employees work at the hospital, which is the city's second largest employer. The hospital partners with various colleges and universities throughout Southern California including: Cypress College, Mt. San Antonio College, American University of Health Science, California State University—Dominguez Hills, West Coast University, CNI College, Azusa Pacific University, University of Southern California and California State University in Long Beach. The grounds include the Metropolitan State Hospital museum which opened during the facility's centennial year.

## DSH—Napa

This was the first hospital in California devoted entirely to the treatment of mental illness. It opened on November 15, 1875. More than 2,000 people work at DSH—Napa. The hospital has a partnership with both Napa Valley College and Solano Community College to provide psychiatric technicians and associate degree nurses to the hospital. Other academic partners include: Los Medino College, California State University (CSU) East Bay, CSU Sacramento, University of California (UC) Berkeley, and UC Davis. The department leases several buildings on the hospital grounds to community service businesses and providers of mental health services.

## DSH—Patton

Opening in 1893, DSH—Patton was the first mental health facility in Southern California. More than 2,000 employees work at the hospital. The hospital partners with San Bernardino Valley College and Hacienda La Puente Adult Education, to provide the hospital with hundreds of trained staff. Registered nurses, psychiatrists, physicians, psychologists, social workers, rehabilitation therapist and students from a wide range of other healthcare-related disciplines from area colleges complete their clinical rotations at this hospital. The Patton State Hospital Museum is located on hospital grounds and celebrates the facility's long history.

# Jail-Based Programs



## JBCT | Jail-Based Competency Treatment

Begun in 2011 as a pilot program, JBCT programs treat patients who are Incompetent to Stand Trial inside of a special unit of the jail so that they do not have to await admission to a state hospital. In 2018, there were county or regional programs in a growing number of counties including: Mariposa, Riverside, Sacramento, San Bernardino, San Diego, Sonoma, and Stanislaus.

## AES | Admission, Evaluation, and Stabilization

To increase capacity for the assessment and treatment of incompetent patients, DSH established an AES Center in the Kern County jail. Patients admitted to the AES Center receive a full evaluation upon admission to determine the degree of competency restoration required before they are transferred to a state hospital. The center treats short-term patients and discharges them back to the referring county directly.

In addition to overseeing state hospitals, DSH is responsible for a growing number of programs located within county jails across the state. Some of these jail-based programs treat patients before or instead of them going to a state hospital while others treat patients as they transition out of a state hospital setting.

In response to the growing number of referrals for competency restoration services, DSH has created programs outside of state hospitals that require county partnerships and focus only on competency restoration — not other mental health treatment.

# Community-Based Programs

## Conditional Release Programs (CONREP)

# 621 PATIENTS

DSH manages a statewide system of community-based services which treat patients with the following commitment types: Not Guilty by Reason of Insanity, Incompetent to Stand Trial, Mentally Disordered Offenders, and some parolees who have been released to outpatient status. These programs oversaw an average of 621 patients daily in 2017–18.

CONREP patients receive an intensive regimen of treatment and supervision that includes individual and group contact with clinical staff, random drug screenings, home visits, substance abuse screenings and psychological assessments. The Department has performance standards for these services which set minimum treatment and supervision levels for patients in the program. Each patient is evaluated and assessed while they are in the state hospital, upon entry into the community, and throughout their CONREP treatment.

## Los Angeles Community-Based Restoration of Competency Program

# 150 BEDS

In July 2018 DSH, in partnership with Los Angeles County, began to provide up to 150 beds in community-based restoration of competency programs in Los Angeles County.

This program provides restoration of competency services to individuals deemed incompetent to stand trial on felony charges in community settings when a judge determines it is safe to do so. The program provides services across several levels of care and is modeled upon Los Angeles County's successful community-based program for individuals found incompetent to stand trial on misdemeanor charges.

# Increase in Incompetent to Stand Trial Patients and the Creation of the DSH Diversion Program

## DSH Increase in Incompetent to Stand Trial (IST) Patients



**Referrals**
(Average Number of County Referrals Per Month}

**Pending Placements**
(Average Number of Patients on Pending Placement List)

**Over the past several years, DSH has worked to address the growing number of referrals of patients who are Incompetent to Stand Trial.** DSH's approach to this issue has focused on three key components: expanding capacity, increasing efficiencies of the system and researching the demand.

DSH has expanded its capacity by 870 beds in state hospitals, jail-based and community-based treatment programs in the past six years. DSH continues its efforts to address the growth by expanding community-based treatment options in Los Angeles County. At the same time, DSH has created more effective treatments for patients to reduce their average length of stay.

DSH's research with the University of California, Davis, is helping us better understand the conditions that bring these patients to its hospitals. The research indicates that almost half of the IST patient referrals were unsheltered homeless individuals at the time of their arrest.

This data suggests that, instead of seeking or being offered treatment in the community, individuals with serious mental illness are being introduced into the criminal justice system because of crimes associated with untreated symptoms of psychosis or chronic homelessness. As part of the effort to address this issue, Governor Jerry Brown signed AB 1810 (Committee on Budget, Chapter 34) and SB 215 (Beall, Chapter 1005) which created a pretrial diversion program for individuals with certain mental health disorders and authorized DSH to solicit proposals and contract with counties for the development of felony diversion programs.

## DSH Diversion Program

The DSH Diversion Program is a collaboration between DSH and county governments to develop or expand diversion programs for individuals with serious mental illness who face felony charges and could be determined to be Incompetent to Stand Trial (IST). The IST Diversion Program provides funding to counties to support community mental health treatment and other services for these individuals.

The goal of the DSH Diversion Program is to provide long-term community mental health treatment and to avoid criminal charges and institutionalization when a judge deems it safe and appropriate to do so.

By law, individuals charged with the following felony crimes are not eligible for diversion:

- Rape, murder or involuntary manslaughter;
- Sexual abuse of a child or a lewd or lascivious act on a child;
- Assault with intent to commit rape, sodomy, or oral copulation.

The three-year program is funded for $100 million, of which $99.5 million is being awarded to counties. The remaining funds are for program support.

The majority of funding ($91 million) is available for the 15 counties that refer the greatest number of ISTs to DSH: Alameda, Contra Costa, Fresno, Kern, Los Angeles, Riverside, Sacramento, San Bernardino, San Diego, San Joaquin, Santa Barbara, Santa Clara, Solano, Sonoma, and Stanislaus. A smaller portion of the funding ($8.5 million) is available to other counties.

During the first six months of the program, DSH met with county stakeholders and partners and obtained a letter of interest from all 15 counties to begin the process of awarding the first round of funding. Additionally, it released a Request for Application for other counties to apply for the $8.5 million.



# Workplace Violence Prevention

**Preventing workplace violence is a top priority for DSH. Each hospital in DSH has health and safety teams who, under the leadership of the DSH Statewide Quality Improvement Program, took significant steps to improve employee safety and prevent workplace violence.**

All hospitals updated hospital Injury and Illness Prevention Plans (IIPP). Hospital safety committees, which are required to meet at least four times annually, reviewed the hospital plans. Hospital health and safety officers then prepared a revised IIPP for approval by the safety committee and the hospital's executive team members.

In addition to these updates, new plans and training were launched at each hospital. The first training in the new Workplace Violence Prevention Plan for DSH hospitals concluded in Spring 2018. A new DSH policy directive formally established the statewide Workplace Violence Prevention Program and described the major activities designed to reduce the risk of workplace violence. Policy Directive 8400 was intended to guide managers and employees with the development, implementation, improvement and monitoring of policies and tools to create a safer workplace. Those tools included the Employee Code of Safe Practices, Injury and Illness Prevention Plan, and Workplace Violence Prevention Plan. In addition, the policy required hospitals to conduct, at least annually, a security and safety assessment.

DSH's activities to prevent workplace violence and comply with California's Department of Industrial Relations, Division of Occupational Safety and Health (CalOSHA) Violence Prevention in Health Care regulations were coordinated by the statewide Workplace Violence Prevention Steering Committee.

## Patient Aggression

In addition to policies and planning, DSH also tracked and analyzed data on acts of aggression by patients throughout the year. Annually, DSH uses this data to produce an analytical report, called the Violence Report. With the data DSH has learned more about repeatedly violent patients and how to treat them. More than 75 percent of DSH patients commit no acts of violence. Among those who are aggressive and assaultive, a very small number — less than 200 patients — are responsible for more than 35 percent of all aggressive acts in the hospitals. This data from our five hospitals assisted us in developing a new program to improve safety — the Enhanced Treatment Program.

## Enhanced Treatment Program (ETP)

To more safely treat patients with a high-risk of violence, DSH is constructing special treatment units as part of an ETP. During the last year, DSH began building a 13-bed ETP unit at DSH—Atascadero. The ETP will provide a more secure setting for the treatment of patients with a demonstrated and sustained risk of aggressive, violent behavior toward other patients and staff. In Spring 2019, the first of three ETP units at DSH—Atascadero will open. Two additional 13-bed units will open at DSH—Atascadero later in 2019, and one 10-bed unit at DSH—Patton is scheduled to open in 2020.



# Budget and Legislation Highlights 2017–18

 ## Budget Highlights

The DSH budget for FY 2017–18 totaled $1.4 billion, a decrease of $181 million over the previous budget. The position authority for the year was 10,850 positions, a decrease of 1,910 from the previous year. These decreases represented the transfer of three psychiatric programs, located inside of state prisons, to the authority of the California Department of Corrections and Rehabilitation, which became effective on July 1, 2017.

DSH continues to seek solutions to address the significant growth in its patient population. State hospitals have maximized their bed capacity and the number of patient referrals continues to increase, especially for individuals found Incompetent to Stand Trial (IST). To that end, the 2017–18 budget included funding for the following projects:

DSH—Metropolitan Activation of Building and Patient Movement: New state funds allowed for the renovation and preparation of a building on the grounds where Lanerman-Petris-Short (LPS) patients can be transferred. This will make more beds available for forensic patients, primarily ISTs, at the hospital when construction of security infrastructure is completed in 2019.

Jail-Based Competency Treatment (JBCT) Program Expansion and Establishment of New Programs: Funds were also made available for DSH to further expand its JBCT programs in Northern and Central California. Additionally, the department continued working with counties interested in creating their own JBCT program or joining a regional program.

 ## Legislation Highlights

### Assembly

**AB 1810 (Committee on Budget, Chapter 34) Health Trailer Bill**

This bill created a pretrial diversion program for felony and misdemeanor defendants with certain mental health disorders and authorized DSH to solicit proposals and contract with counties for the development of diversion programs for individuals who are or have the potential to be found incompetent to stand trial on felony charges. This bill also authorized a court to determine that an IST defendant has regained competency prior to admission into a DSH facility. It allows a contracted entity to provide restoration of competency services in the community so that individuals may be declared competent and the entity may file a report on competency to the court.

**AB 2661 (Arambula, Chapter 821) Mental health: sexually violent predators**

This bill clarified that Sexually Violent Predators (SVP) subsequent conviction for a non-sexually violent offense while in custody does not change the county of jurisdiction over any previous or pending SVP petition. The SVP jurisdiction remains the county where the person was convicted of the sexually violent offense resulting in the prison commitment. The bill also clarifies that, if a person is convicted of a subsequent sexually violent offense while in either prison or a state hospital, a petition for commitment as a sexually violent predator shall be filed in the county in which the sexually violent offense occurred.

## Senate

### SB 215 (Beall, Chapter 1005) Diversion: Mental Disorder

This bill amends AB 1810 (Committee on Budget, Chapter 34, Statute of 2018) by categorically excluding defendants charged with specific serious and violent offenses from qualifying for a mental health diversion program. It requires the court to conduct a hearing to determine whether restitution is owed to any victim because of the diverted offense. If restitution is owed, it shall be paid during the period of diversion. A defendant's inability to pay restitution shall not be grounds to deny diversion or to find that the defendant has failed to comply with the terms of diversion.

### SB 931 (Hertzberg, Chapter 428) Conservatorships: Custody Status

This bill clarifies that the professional person in charge of providing mental health treatment at a county jail, or designee, may recommend Lanterman-Petris-Short (LPS) conservatorship, if certain conditions are met, for a person who is not an inpatient in treatment at the facility.

### SB 1187 (Beall, Chapter 1008) Competence to Stand Trial

This bill reduced the maximum term for felony IST competency restoration from three years to two years. It also allows a person committed to a facility pending the restoration of mental competence to earn credits against a sentence imposed for the underlying criminal case, requires a court to appoint a director of a regional center to examine the person to determine if they have a developmental disability, requires a regional center director to provide reports to the committing court for IST defendants with developmental disabilities who are placed on outpatient status, and deletes the requirement that a defendant be returned to court for a hearing if they are still incompetent after 18 months.

# DSH Patient Demographics



- ● **89%** Forensic
- ● **11%** Civil

**Commitments**

- ● **86%** Male
- ● **14%** Female

**Gender**



**Top 10 Counties By Patient Count**
(State Hospital and Jail-Based Treatment)

- ● **27.0%** Los Angeles
- ● **7.8%** San Diego
- ● **6.1%** San Bernardino
- ● **4.9%** Sacramento
- ● **4.3%** Riverside
- ● **4.3%** Santa Clara
- ● **4.0%** Orange
- ● **3.2%** Fresno
- ● **3.1%** Alameda
- ● **2.9%** San Francisco
- ● **32.4%** All Others



**Ethnicity**
- 42% White
- 26% Black
- 24% Hispanic
- 4% Asian
- 4% Other

**Age**
- 52% Ages 41–64
- 35% Ages 21–40
- 12% Ages 65+
- 1% Ages 18–20

**Diagnosis**
- 39% Schizophrenia
- 24% Schizoaffective
- 15% Paraphilias
- 7% Unspecified Psychosis
- 5% Bipolar Disorder
- 2% Depressive Disorder
- 8% All Other

**Patients Commitment Types**
- 22% Incompetent to Stand Trial (IST)
- 20% Not Guilty By Reason of Insanity (NGI)
- 18% Mentally Disordered Offender (MDO)
- 18% PC 2684 (CDCR)
- 13% Sexually Violent Predator (SVP)
- 9% Lanterman-Petris Short (LPS)

## Patient Population (FY 2017–18)



- State Hospital Only
- CONREP
- JBCT Only

Average Daily Census: 6,084 / 621 / 227
Patient Served: 10,690 / 831 / 1,235

### Summary

In 2017–18, DSH cared for nearly 12,000 patients. Most of the patients are forensic commitments, with only 9% civilly committed and most were male and between 41 and 64 years old. The most common diagnosis among DSH patients was schizophrenia or schizoaffective disorder.

www.dsh.ca.gov



# Exhibit 6

# COVID-19:  Interim Guidance for
# Health Care and Public Health Providers



## Public Health Nursing Program

## Version 2.0



**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

# Table of Contents

**ACRONYM LIST** ................................................................................................................ 5

**RECORD OF CHANGES** .................................................................................................. 6

**INTRODUCTION** ............................................................................................................... 7

**CLINICAL MANIFESTATIONS / CASE PRESENTATION OF COVID-19** ...................... 7

**DIFFERENTIAL DIAGNOSIS** ......................................................................................... 8

**DIAGNOSTIC TESTING** ................................................................................................. 9

    FIGURE 1: ALGORITHM FOR RESPIRATORY VIRAL TESTING IN SYMPTOMATIC
PATIENTS .............................................................................................................................. 10

    RAPID INFLUENZA CLINICAL LABORATORY IMPROVEMENT AMENDMENTS (CLIA)
WAIVED DIAGNOSTIC TEST (RIDT) ................................................................................... 11

    COVID-19 TESTING .............................................................................................................. 11

        PRECAUTIONS FOR SPECIMEN COLLECTION: .......................................................... 12

    OTHER DIAGNOSTICS ......................................................................................................... 13

**TREATMENT** .................................................................................................................. 13

**TRANSMISSION** ............................................................................................................. 14

**COVID-19 RELATED PUBLIC HEALTH DEFINITIONS** ................................................ 16

    TABLE 1: CASE DEFINITIONS ............................................................................................ 16

    TABLE 2: NON-CASE DEFINITIONS ................................................................................... 16

    OUTBREAK OF COVID-19 ................................................................................................... 17

    ISOLATION ............................................................................................................................. 17

    QUARANTINE ........................................................................................................................ 17

    COHORTING ........................................................................................................................... 18

    PROTECTIVE SHELTER IN PLACE ..................................................................................... 18

    MEDICAL HOLD ..................................................................................................................... 18

    END OF AN INFLUENZA OUTBREAK ................................................................................. 18

    END OF A COVID-19 OUTBREAK ....................................................................................... 18

**INITIAL NOTIFICATIONS** ............................................................................................. 18

**REPORTING** .................................................................................................................. 19

**COVID-19 INFECTION CONTROL PRECAUTIONS** ..................................................... 20

    TABLE 3: STANDARD, AIRBORNE, AND DROPLET PRECAUTIONS PPE .............................. 20

**PPE SCENARIOS FOR ILI, INFLUENZA, and COVID-19** ............................................ 20

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

STAFF PPE FOR ILI / SYMPTOMATIC PATIENT ......................................................... 21

STAFF PPE FOR SUSPECTED AND CONFIRMED COVID-19 CASE ........................... 21

STAFF PPE FOR CONFIRMED INFLUENZA CASE ...................................................... 21

STAFF PPE FOR SURVEILLANCE OF ASYMPTOMATIC CONTACT OF A CASE .................... 21

PPE FOR CONTACT OF A CONTACT ........................................................................ 21

N95 SHORTAGE GUIDANCE .................................................................................... 22

TABLE 4. RECOMMENDED PERSONAL PROTECTIVE EQUIPMENT (PPE) FOR
INCARCERATED/DETAINED PERSONS AND STAFF IN A CORRECTIONAL FACILITY
DURING THE COVID-19 RESPONSE* ...................................................................... 23

**CONTROL STRATEGY FOR SUSPECTED AND CONFIRMED CASES OF COVID-19
.................................................................................................................... 24**

ILI CASE AND OUTBREAK IDENTIFICATION .......................................................... 24

CHECKLIST FOR IDENTIFYING COVID-19 SUSPECTS .............................................. 24

ILI/ SUSPECTED COVID-19 STRATEGIC CONTROL STEPS ....................................... 24

ISOLATION ............................................................................................................ 25

MEDICAL HOLD ..................................................................................................... 27

CONTACT INVESTIGATION .................................................................................... 28

MONITORING PATIENTS WITH SUSPECTED OR CONFIRMED COVID-19 ............... 29

RESPONSE TO A COVID-19 OUTBREAK ................................................................. 30

CRITERIA FOR RELEASE FROM ISOLATION CONFIRMED COVID-19 CASES ........... 31

CRITERIA FOR RELEASE FROM ISOLATION CONFIRMED **INFLUENZA** CASES ........ 32

FIGURE 2: ISOLATION REQUIREMENTS OF PATIENTS WITH SUSPECT COVID-19 CASE
.......................................................................................................................... 33

**CONTROL STRATEGIES FOR CONTACTS TO CASES OF COVID-19 ........................ 33**

SURVEILLANCE OF ASYMPTOMATIC CONTACTS OF COVID-19 CASES ................... 33

QUARANTINE ........................................................................................................ 34

PATIENT SURVEILLANCE WHILE IN QUARANTINE ................................................ 35

RELEASE FROM QUARANTINE .............................................................................. 36

PAROLE AND DISCHARGE TO THE COMMUNITY DURING A COVID-19 OUTBREAK ........ 36

**CONTROL STRATEGY FOR CONTACTS TO CONTACTS ............................................ 37**

**STAFF AND VISITOR PRECAUTIONS AND RESTRICTIONS DURING THE
PANDEMIC ................................................................................................ 37**

RESPIRATORY HYGIENE AND COUGH ETIQUETTE ................................................ 38

**ENVIRONMENTAL INFECTION CONTROL .............................................................. 38**

CLEANING SPACES WHERE COVID-19 CASES SPENT TIME ...................................................... 39

**RESOURCES** .................................................................................................................... **41**

**REFERENCES** .................................................................................................................. **41**

**APPENDIX 1: CORONAVIRUS DISEASE 2019 (COVID-19) CHECKLIST** ................... **43**

**APPENDIX 2: DROPLET PRECAUTIONS CHECKLIST** ...................................................... **44**

**APPENDIX 3: HOW TO DOFF AND DON PPE** ....................................................................... **45**

**APPENDIX 4: HOW TO ORDER RAPID INFLUENZA DIAGNOSTIC TESTING IN
THE EHR** ............................................................................................................................. **48**

**APPENDIX 5: COVID-19 CASE AND CONTACT SHAREPOINT REPORTING TOOL**
........................................................................................................................................... **49**

DAILY COVID-19 CASE & CONTACT LINE LIST REPORTING IN SHAREPOINT ................... 49

CASE DEFINITIONS TO GUIDE REPORTING ........................................................................ 49

REPORTING REQUIREMENTS ............................................................................................... 49

REPORTING IN SHAREPOINT ............................................................................................... 50

DATA DICTIONARY ............................................................................................................... 57

   COVID-19 CASES SUSPECTED AND CONFIRMED .......................................................... 57

   COVID-19 CONTACTS ...................................................................................................... 59

REQUESTING ACCESS TO THE COVID-19 SHAREPOINT ..................................................... 60

**APPENDIX 6: COVID-19 INDEX CASE - PATIENT CONTACT INVESTIGATION
TOOL** .................................................................................................................................. **61**

**APPENDIX 7: COVID-19 INDEX CASE - PATIENT INTERVIEW CHECKLIST** .......... **62**

INTERVIEW CHECKLIST ....................................................................................................... 63

**APPENDIX 8: EMPLOYEE CASE VERIFICATION AND CONTACT INVESTIGATION**
........................................................................................................................................... **64**

**APPENDIX 9: MEMO TEMPLATE FOR NOTIFICATION OF COVID-19 CASES AND
CONTACTS RELEASED TO THE COMMUNITY** .................................................................... **65**

**APPENDIX 10: COVID-19 POWERFORM INSTRUCTIONS; SCREENING,
ISOLATION, AND QUARANTINE SURVEILLANCE** .............................................................. **66**

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## ACRONYM LIST

| | |
|---|---|
| AHRQ | Agency for Healthcare Research and Quality |
| AIDS | Acquired Immune Deficiency Syndrome |
| AOD | Administrative Officer of the Day |
| AIIR | Airborne infection isolation room |
| BMI | Body Mass Index |
| CCHCS | California Correctional Health Care Services |
| CDC | Centers for Disease Control and Prevention |
| CDCR | California Department of Corrections and Rehabilitation |
| CDPH | California Department of Public Health |
| CLIA | Clinical Laboratory Improvement Amendments |
| CME | Chief Medical Executive |
| CNE | Chief Nurse Executive |
| COVID-19 | Coronavirus Disease 2019 |
| DON | Director of Nurses |
| EHRS | Electronic Health Record System |
| EPA | Environmental Protection Agency |
| HCP | Heath Care Personnel |
| HCW | Health Care Worker |
| HIV | Human Immunodeficiency Virus |
| HLOC | Higher Level of Care |
| ICN | Infection Control Nurse |
| ILI | Influenza-like illness |
| LHD | Local Health Department |
| MDI | Metered-dose Inhalers |
| NCPR | Nurse Consultant Program Review |
| NIOSH | National Institute for Occupational Safety and Health |
| NP | Nasopharyngeal |
| OSHA | Occupational Safety and Health Administration |
| OEHW | Office of Employee Health and Wellness OEHW |
| OP | Oropharyngeal |
| PPE | Personal protective equipment |
| PAPR | Powered air purifying respirator |
| PORS | Preliminary Report of Infectious Disease or Outbreak form |
| PHB | Public Health Branch |
| PHN | Public Health Nurse |
| PhORS | Public Health Outbreak Response System |
| QM | Quality Management |
| RIDT | Rapid Influenza Diagnostic Test |
| RSV | Respiratory syncytial virus |
| RT-PCR | Reverse Transcription Polymerase Chain Reaction |
| RTWC | Return to Work Coordinator |
| TAT | Turnaround time |
| URI | Upper Respiratory Infection |
| VCM | Viral Culture Media |
| WHO | World Health Organization |

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## RECORD OF CHANGES

**Version 2.0 Changes:**

Diagnostic Testing includes updated lab test names, ordering instructions for Coronavirus Disease 2019 (COVID-19) and rapid influenza point of care testing, new stability data, Saturday pick-ups, and a new testing algorithm.

The Treatment section was expanded.

Transmission information was updated to highlight possible asymptomatic shedding.

A definition was added for the end of a COVID-19 outbreak.

Updated isolation and quarantine distancing to include space shortages.

Additional clarification was added regarding reporting and notifications.

Additional PPE scenarios were added.

The General Infection Control Precautions section was updated to include supply shortage strategies.

Expanded Contact Investigation section.

Evaluation and Treatment Algorithm for suspect and confirmed COVID-19 patients.

The criteria for release from isolation was changed to require COVID-19 laboratory testing based on updated CDC guidance.

The guidance for when patients are paroling during the outbreak has been expanded.

Environmental control guidance has been expanded.

**This document serves to provide INTERIM guidance for the clinical management of SARS-CoV-2 virus pandemic at CDCR facilities.  Due to the quickly changing guidelines from the Centers for Disease Control (CDC), the World Health Organization (WHO), and other scientific bodies, information may change rapidly and will be updated in subsequent versions.  Revision dates are located at the bottom left of the document.  Substantive changes will be posted to the website if occurring before release of updated versions.**

This guidance supersedes the COVID-19 Interim Guidance for Health Care and Public Health Providers, Document 1.0.

This guidance supersedes the 2019 Seasonal Influenza Guidance except where noted.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## INTRODUCTION

Coronaviruses are a large family of viruses that are common in many different species of animals; some coronaviruses cause respiratory illness in humans. COVID-19 is caused by the novel (new) coronavirus SARS-CoV-2. It was first identified during the investigation of an outbreak in Wuhan, China, in December 2019. Early on, many ill persons with COVID-19 were linked to a live animal market indicating animal to person transmission. There is now evidence of person to person spread, as well as community spread (i.e., persons infected with no apparent high risk exposure contact). On March 11, 2020, the WHO recognized COVID-19 to be a pandemic.

## CLINICAL MANIFESTATIONS / CASE PRESENTATION OF COVID-19

People with COVID-19 generally develop signs and symptoms, including respiratory symptoms and fever, 5 days (average) after exposure, with a range of 2-14 days after infection.

**Typical Signs and Symptoms**
- **Common:** Fever, dry cough, fatigue, shortness of breath.
- **Less common:** sputum production, sore throat, headache, myalgia or arthralgia, chills.
- **<5% occurrence:** nausea, vomiting, diarrhea, nasal congestion
- **Note:** 50% of cases are afebrile at time of testing, but develop fever during the course of the illness.  Therefore, patients may not be febrile at initial presentation.

**Mild to Moderate Disease**
Approximately 80% of laboratory confirmed patients have had mild to moderate disease, which includes non-pneumonia and pneumonia cases.  Most people infected with COVID-19 related virus have mild disease and recover.

**Severe Disease**
Approximately 14% of laboratory confirmed patients have severe disease (dyspnea, respiratory rate $\geq$30/minute, blood oxygen saturation $\leq$93%, and/or lung infiltrates >50% of the lung field within 24-48 hours).

**Critical Disease**
Approximately 6% of laboratory confirmed patients are critical (respiratory failure, septic shock, and/or multiple organ dysfunction/failure).
Older patients and patients with co-morbid conditions (see list below) are at higher risk of mortality and morbidity with COVID-19.

**COVID-19: Interim Guidance for**
**Health Care and Public Health Providers**

| Persons at High Risk for Severe Morbidity and Mortality from COVID-19 Disease* | |
|---|---|
| Age >65 | Most important risk factor and risk increases with each decade |
| Diabetes | All carry increased risk if uncontrolled |
| Hypertension | |
| Cardiovascular disease | |
| Chronic lung disease or moderate to severe asthma | |
| Chronic Kidney Disease | ESRD/Hemodialysis and End Stage Liver Disease carry increased risk |
| Liver Disease/Cirrhosis | |
| Cerebrovascular disease | |
| Cancer | |
| Immunocompromised patients | Transplants, immune deficiencies, HIV, Prolonged use of corticosteroids, chemotherapy or other immunosuppressing medications |
| Severe obesity (Body mass index [BMI] > 40) | |
| Pregnancy | |
| Patients with multiple chronic conditions | |
| Consider those patients categorized as High Risk in the Quality Management (QM) Master Registry QM Master Registry.  For more information on the risk definitions for each condition, see: Clinical Risk Condition Specifications | |
| *Quality Management has released a COVID-19 Registry and Patient Risk Assessment Tool. The COVID-19 registry lists every patient at a specific institution and indicates which risk factors apply to each patient.  **The registry is updated twice daily** and draws from multiple data sources, including the electronic health record system, claims data, and the Strategic Offender Management System (SOMS) to compile risk factor data.  This tab of the registry also includes release date information for each individual, in the even that patients are considered for early release during the pandemic.  Please refer to the COVID-19 Registry. | |

## DIFFERENTIAL DIAGNOSIS

All patients presenting with influenza-like illness (ILI) should be tested using the approach detailed below.  Fevers can be intermittent or absent.  Dyspnea is not always perceived.  Hence, a low threshold for identifying ILI, especially for those with cough, should be enacted.

Influenza is currently still widespread in California. The Respiratory syncytial virus (RSV) season generally coincides with that of influenza. Regardless of the known disease signs, symptoms, and epidemiology that may distinguish influenza or other viral respiratory infections from COVID-19, **no clinical factors can be relied upon to rule out COVID-19** and laboratory testing is required.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

When influenza is no longer prevalent in the community, it is less likely to be the cause of ILI. Until California Department of Public Health (CDPH) downgrades influenza transmission to "sporadic" for the region where your institution is located, assume influenza is prevalent (see CDPH Weekly Influenza Report). In 2019, influenza remained widespread through early April, regional in mid-April, and sporadic in May

RSV testing is indicated if it will affect clinical management. Consider testing for RSV in vulnerable populations, including those with heart or lung disease, bone marrow and lung transplant recipients, frail older adults, and those with multiple underlying conditions.

Please refer to the California Correctional Health Care Services (CCHCS) Public Health Branch Influenza Guidance Document for further direction on Influenza diagnosis and management and the California Department of Public Health's webpage on Influenza and other respiratory pathogens.

## DIAGNOSTIC TESTING

Testing for influenza and the virus that causes COVID-19 is important for establishing the etiology of ILI. **During the COVID-19 pandemic, testing for respiratory pathogens shall be ordered by providers as part of the evaluation of <u>all</u> patients with ILI.** See Figure 1 for the testing algorithm and more details in the text below.

To be inclusive of the need for testing with both influenza and COVID-19 in the differential, ILI can be defined by having a fever >100ºF, OR cough OR unexplained/new dyspnea.

Two approaches can be taken to testing: concurrent COVID-19 and influenza testing; or a tiered approach using a point of care influenza test followed by COVID-19 testing if the influenza test is negative.

**The following patients should be tested immediately for COVID-19:**

- Patients who are close contacts of confirmed cases (should be in quarantine) who develop any symptoms of illness, even if mild or not classic for COVID-19. Such symptoms include: chills without fever/subjective fever, severe/new/unexplained fatigue, sore throat, myalgia, arthralgia, gastrointestinal symptoms (Nausea/Vomiting/Diarrhea/loss of appetite), upper respiratory infection (URI) symptoms like nasal/sinus congestion and rhinorrhea, and loss of the sense of smell or taste.

<u>Patients without symptoms do not need testing at this time.</u> This guidance may change with emerging science.

Clinicians should use their judgment in testing for other respiratory pathogens.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## FIGURE 1: ALGORITHM FOR RESPIRATORY VIRAL TESTING IN SYMPTOMATIC PATIENTS



Close contact of a confirmed COVID-19 case

Any patient, including those newly transferred to the institution

Place in quarantine

Does the patient have Cough **and/or** Fever (>100F) **and/or** Shortness of Breath

Testing for COVID-19 in asymptomatic patients who are not close contacts of a confirmed COVID-19 case is not currently recommended

Does the patient have any of the Expanded COVID-19 symptoms? (see box below)

Is Rapid Influenza test (CLIA waived) available onsite, and is influenza prevalent?

Perform Rapid Influenza test

Remove from quarantine if 14 days since contact with COVID-19 case and patient does not develop any of the above symptoms

Obtain Influenza A and B PCR testing

Rapid Test Results?

Obtain COVID-19 testing Additional testing as clinically indicated

Place patient in isolation (droplet precautions) Treat for Influenza. COVID-19 unlikely.

Place in isolation (negative pressure if available, droplet if not) while awaiting results

Manage according to test results

**Expanded COVID-19 symptoms (for COVID-19 contacts)**
Test for COVID-19 if the patient develops any of the following:
- Cough,
- Fever (>100F)
- Shortness of Breath
**OR ANY** of the following:
- Chills without Fever,
- Subjective Fever,
- Severe/New/Unexplained Fatigue,
- Sore Throat,
- Myalgia,
- Arthralgia,
- Gastrointestinal Symptoms (N/V/D)
- URI Symptoms: congestion, rhinorrhea
- Loss of appetite,
- Loss of sense of smell or taste

**Test Information**
COVID-19 Testing
SARS Coronavirus with CoV-2 RNA, Qualitative Real-Time RT-PCR Test Code 39444; Test Specimen nasopharyngeal and/or oropharyngeal swab
Influenza Testing
Influenza A/B RNA, Qual, PCR; Test Code 16086; Test Specimen nasopharyngeal swab
Influenza A and B and RSV RNA
Qual Real Time PCR; Order Test Code 91989; Test Specimen Nasal or nasopharyngeal swab

**NOTE:** Full Personal Protective Equipment (PPE) required when obtaining specimen, to include N95 mask, eye protection, gown and gloves

*Note: Guidelines cannot replace personalized evaluation and management decisions based on individual patient factors*

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## RAPID INFLUENZA CLINICAL LABORATORY IMPROVEMENT AMENDMENTS (CLIA) WAIVED DIAGNOSTIC TEST (RIDT)

Please refer to RIDT ordering instructions.

While influenza remains prevalent, rapid test kits for point of care influenza testing may be used to quickly identify influenza infections. Patients with influenza or a respiratory ailment of another etiology are unlikely to be co-infected with COVID-19 related virus. Therefore, COVID-19 testing is unnecessary if influenza is confirmed.

1. If RIDT is available at your facility and influenza prevalence is high, test symptomatic patients.

   a. RIDT is only useful for ruling in influenza when prevalence is high.  When the CDPH specifies that **influenza transmission has downgraded to "sporadic" for your institution's geographic area, DO NOT USE the RIDT tests** any longer and instead use only the reverse transcription polymerase chain reaction (RT-PCR). CDPH Weekly Influenza Report

   b. Headquarters Public Health Branch (PHB) will send notification of when RIDT is no longer useful due to decreased prevalence in your geographic area.

2. Due to unreliable sensitivity, if the RIDT result is negative, further testing is always indicated. Order the influenza A/B RNA Qualitative PCR and COVID-19 RNA Qualitative PCR (see below).

## COVID-19 TESTING

**IMPORTANT: COVID-19 RT-PCR testing should be ordered as "ASAP".**  Please do not order as "routine" (delays one week) or "STAT" (will not process).   Please refer to the COVID-19 Testing Fact Sheet on Lifeline.

CDC recommends that specimens should be collected as soon as possible once a suspect case is identified, regardless of the time of symptom onset.

For initial diagnostic testing for COVID-19, **the preferred specimen is a nasopharyngeal (NP) swab**. Only one swab is needed and the NP specimen has the best sensitivity. Oropharyngeal (OP) swabs may also be obtained. NP or OP swabs should be collected in a Viral Culture Media (VCM) tube (green-cap provided by Quest). E-swabs (system kit with swab collection and medium all-in-one) may be used if VCM is not available.

**Testing both NP and OP further increases sensitivity**.  If collecting both a NP and OP swab, they both can be put in the same VCM tube. When testing supplies/swabs are in short supply, test using only one NP specimen.

**Please note**: Use a separate order and collect a separate specimen for each viral test being conducted (e.g., one or two swabs for influenza, and one or two swabs for SARS-CoV-2 RT-PCR).

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

Patients may self-swab. The patient should be educated that NP is best, however, if NP is too challenging, a nares samples may be collected. ONLY FOAM SWABS can be used for NARES collection: for example: Puritan 6' Sterile Standard Foam Swab w/ Polystyrene Handle.

**Nares Collection instructions**: Use a single foam swab for collecting specimens from both nares of a symptomatic patient. Insert foam swab into 1 nostril straight back (not upwards). Once the swab is in place, rotate it in a circular motion 2 times and keep it in place for 15 seconds. Repeat this step for the second nostril using the same swab. Remove foam swab and insert the swab into an acceptable viral transport medium listed in this guide.

**NP Swab Technique**: Insert the swab into one nostril parallel to the palate, gently rotating the swab inward until resistance is met at the level of the turbinates; rotate against the nasopharyngeal wall (approximately 10 sec) to absorb secretions.

**Please note:** Sputum inductions are not recommended as a means for sample collection.

Quest is accepting specimens for SARS-CoV-2 RNA, Qualitative Real-Time RT-PCR testing (Enter "covid" into the order search menu and choose: "**CoV-2 RNA Qual RT-PCR**" in Cerner; Quest Test Code: **39444**). ***Order as "ASAP".***

1. Samples can be sent to Quest Monday through Saturday. There is NO Sunday pick up.

2. Preferred specimen: NP swab or OP swab collected in, VCM medium (green-cap) tube. If collecting two swabs, both can be put in one transport medium tube.

3. Separate NP/OP Swab: Collect sample using a separate NP or OP swab for other tests (i.e., influenza test) requiring NP or OP swab. DO NOT COMBINE swabs in one tube for both COVID-19 and influenza test.

4. Storage and Transport: COVID-19 specimens are stable at room temperature (not >77ºF) or refrigerated (35.6ºF between 46.4ºF) for 5 days.

5. Frozen (-20ºC or -68ºF) specimens are stable for 7 days.

6. Follow standard procedure for storage and transport of refrigerated samples.

7. Cold packs/pouches must be utilized if samples are placed in a lockbox.

8. COVID-19 is not a STAT test and a STAT pick-up cannot be ordered.

9. Turnaround time (TAT), published as 3-4 days, may be delayed initially due to high demand

Testing policy may change as CDC recommendations change. See: CDC Guidelines for Collecting, Handling and Testing Clinical Specimens

PRECAUTIONS FOR SPECIMEN COLLECTION:
- When collecting diagnostic respiratory specimens (e.g., NP swab) from a possible COVID-19 patient, the Heath Care Personnel (HCP) in the room should wear an N-95 respirator, eye protection, gloves, and a gown during collection HCP present during the procedure

**COVID-19: Interim Guidance for**
**Health Care and Public Health Providers**

should be limited to only those essential for that patient's care and procedure support. Specimen collection should be performed in a normal examination room with the door closed.

- Clean and disinfect procedure room surfaces promptly as described in the environmental infection control section of the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings

## OTHER DIAGNOSTICS

Chest X-ray, CT scans, and lab testing (e.g., CBC, D-Dimer, CRP and Procalcitonin) are generally used in the inpatient setting and found to assist in prediction of progression to respiratory failure.

## TREATMENT

While certain medications show the potential to have modest benefit, at this point the treatment of COVID-19 is largely supportive. Key treatment considerations are below:

- <u>Oxygen</u>: use if needed to maintain O$_2$ saturation at or above 92% or near baseline.

  *Note: the use of **routine nasal cannula or face tent is preferred** to high-flow nasal cannula as the latter has the potential to aerosolize respiratory droplets.*

- <u>Analgesia and antipyretics</u>: consider acetaminophen and/or NSAIDs if needed and not contraindicated.

  *Note: there have been theoretical concerns about the use of NSAIDs for fever or pain in COVID-19, however clinical data have not demonstrated an increased risk of adverse outcomes and the WHO has clarified that is does not recommend against NSAID use in patients with COVID-19.*

- <u>Bronchodilators</u>: if bronchodilators are needed (i.e. reactive airway disease or wheezing and respiratory distress), <u>nebulized medications should be avoided given the potential to aerosolize the virus</u>; **metered-dose inhalers (MDIs) are preferred** and older clinical data suggest equivalence between MDIs and nebulized medications in patients who are able to use them.

- <u>IV fluids</u>: IVFs are not needed for most patients but dehydration can occur due to nausea and vomiting or lack of appetite. Those in need for IVF due to inability to take oral hydration or in suspected sepsis should immediately be transferred to a higher level of care (HLOC).

- <u>Corticosteroids</u>: many patients in China received steroids for severe COVID-19, however the clinic benefit of steroids is not clear and there is data for other respiratory pathogens suggesting prolonged viral shedding in patients receiving steroids; **currently steroids are not recommended** and most US providers are not using them unless clinically indicated for another reason.

- <u>Antivirals</u>:

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

○ Hydroxychloroquine: favorable toxicity profile, demonstrates potent *in vitro activity* but currently has <u>limited clinical data</u> (below); if no contraindications, providers could consider using hydroxychloroquine to treat COVID-19 in patients with lower respiratory tract infections <u>requiring hospitalization</u> (as some other health systems are doing).

  ▪ Dose: 400mg PO q12 x2 on day one, then 200mg PO q12 on days 2-5

  ▪ Dosing in renal dysfunction: no adjustment

  ▪ Pregnancy/lactation: no known risk in limited human data

  ▪ Adverse effects: QTc prolongation, hemolytic anemia in those with G6PD deficiency, increased risk of hypoglycemia in patients with diabetes on glucose-lowering agents

  *Note: a retrospective study of 26 patients receiving hydroxychloroquine (with or without azithromycin for bacterial superinfection) compared to 16 untreated controls in patients with COVID-19 showed shortened viral shedding but 6 patients in the treatment arm were dropped due from the analysis with poor outcomes (death, transfer to ICU, no follow up) and clinical outcomes have not been reported.*

  *Note: chloroquine suspected to have similar activity but availability is limited*

○ Lopinavir/ritonavir (Kaletra): showed no improvement in clinical outcomes or the duration of viral shedding in a placebo controlled trial of patients with severe COVID-19.

○ Remdesivir: experimental IV therapy (not FDA approved) that showed no efficacy against Ebola but does have potent *in vitro* activity against SARS-CoV-2; is currently only available through a compassionate use protocol and as part of a phase II clinical trial.

## TRANSMISSION

The virus is thought to spread mainly from person-to-person via infected droplets. This direct transmission occurs between people who are in close proximity with one another (within 3.6 feet). The policy for 6 foot distancing has been adopted to be conservative. When an infected individual breathes, coughs, or sneezes, infectious respiratory droplets land in the mouths, noses or airways of people who are nearby.

The virus is highly transmissible, even when only having mild symptoms. Viral shedding is highest around the time of symptom onset.

More evidence is emerging regarding asymptomatic transmission. Studies have demonstrated viral shedding 1 to 3 days prior to symptom onset. Among patients infected with COVID-19 who were asymptomatic at the time of testing, the mean time to symptom development was 3 days. Further, among patients whose infection has resolved, viral shedding may continue for two or more weeks after recovery. Transmission from asymptomatic individuals has been demonstrated

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

and may be responsible for 6-13% of COVID-19 cases. The infectious period for this virus is now considered to be 48 hours prior to symptom onset.

Airborne transmission (virus suspended in air or carried by dust that may be transported further than 6 feet from the infectious individual) is a possible mode of transmission, but not currently thought to be a major driver of the pandemic However, aerosol generating procedures will cause significant airborne transmission.

Contact transmission is when a person becomes infected with the COVID-19 virus by touching a contaminated surface (fomite) or person, and then touching their own mouth, nose, or their eyes. Research shows longevity of viable virus particles on fomites, but infectiousness of this modality is unclear at this time

Fecal shedding during and after symptom resolution has been found; however, the infectiousness of the fecal viral particles is unclear.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## COVID-19 RELATED PUBLIC HEALTH DEFINITIONS

### TABLE 1: CASE DEFINITIONS

| | |
|---|---|
| **CONFIRMED COVID-19 CASE** | A positive laboratory test for the virus that causes COVID-19 in at least one respiratory specimen. The tests no longer need to be confirmed by CDC |
| **CONFIRMED INFLUENZA CASE** | A positive point-of-care or laboratory test for influenza virus in a respiratory specimen in a patient with influenza-like illness |
| **SUSPECTED COVID-19 / INFLUENZA CASE**<br><br>HIGH SUSPECT | **HIGH SUSPECT**: Any fever, respiratory symptoms, or evidence of a viral syndrome in a patient who had close (within 6 feet and prolonged [generally ≥30 minutes]) contact with a confirmed case of COVID-19 within 14 days of onset<br><br>**OR**<br><br>Linkage to a high risk group defined by public health during an outbreak (for example: an affected dorm, housing unit, or yard) but without a test result for COVID-19 |
| **SUSPECTED COVID-19 / INFLUENZA CASE**<br><br>LOW SUSPECT | **LOW SUSPECT**: Fever **OR** cough **OR** shortness of breath (dyspnea) with evidence of a viral syndrome (ILI) of unknown etiology in a person without test results for COVID-19 or influenza and without high-risk exposure |

### TABLE 2: NON-CASE DEFINITIONS

| | |
|---|---|
| **ASYMPTOMATIC CONTACT OF COVID-19** | A person without symptoms who has had close (within 6 feet and prolonged [generally ≥30 minutes]) contact with a confirmed COVID-19 case<br><br> **OR**<br><br>Direct contact with secretions with a confirmed case of COVID-19 within the past 14 days, who has had no symptoms of COVID-19 AND who has had no positive tests for COVID-19 |
| **ASYMPTOMATIC CONTACT OF INFLUENZA** | A person who has had close contact (within 6 feet) with an infectious influenza case within the past five days |
| **CONTACT OF A CONTACT** | The contact of an asymptomatic contact is NOT to be included in the exposure cohort. The patient does not need to wear a mask.  Health care workers do not need PPE |

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## OUTBREAK OF COVID-19

Two or more confirmed cases of COVID-19 in patients with symptom onset dates within 14 days of each other in the same housing unit OR at least one confirmed case of COVID-19 in a patient with epidemiological linkage (e.g., close contact during infectious period) to another confirmed COVID-19 case in a patient or a staff member at the same institution.

| CLOSE CONTACT | Within 6 feet and prolonged [generally ≥30 minutes]) contact with a confirmed case of COVID-19 within 14 days of onset |
|---|---|
| | Examples: |
| | – Occupying the same 2-4 bed unit as the infected case |
| | – Occupying adjacent beds in a large ward with the infected case |
| | – Sharing indoor space, e.g., classroom, friends, groups, yard, or shower |
| | – Exposure to the infected case in an entire housing unit(s) where the infected case was housed while infectious |
| | – Being directly coughed or sneezed upon (even though may be transient encounter) |
| | – Inmate worker/volunteer caring for a patient with COVID-19 without PPE |
| | – Resident transferring from a facility with sustained COVID-19 transmission in the last 14 days |

## ISOLATION

Separation of ill persons who have a communicable disease (confirmed or suspected) from those who are healthy. People who have different communicable diseases (e.g., one patient with COVID-19 and one with influenza), or who may have different diseases should not be isolated together. Isolation setting depends on the type of transmission-based precautions that are in effect. For airborne precautions, an airborne infection isolation room (AIIR) is the ideal setting; a private room with a solid, closed door is an alternative. Precautionary signs and PPE appropriate to the level of precautions should be placed outside the door to the isolation room.

## QUARANTINE

The separation and restriction of movement of well persons who may have been exposed to a communicable disease. Quarantine facilitates the prompt identification of new cases and helps limit the spread of disease by preventing new people from becoming exposed. In CDCR, patients who are quarantined are not confined to quarters, but they do not go to work or other programs. They may go to the dining hall as a group and go to the yard as a group, but not mix with others who are not quarantined. Social distancing between quarantined individuals should be implemented when at all possible.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## COHORTING

Cohorting is the practice of grouping together patients who are infected with the same organism to confine their care to one area and prevent contact with other patients. It also can conserve respirator use in times of shortage. Cohorts are created based on clinical diagnosis, <u>microbiologic confirmation when available</u>, epidemiology, and mode of transmission of the infectious agent. When single patient rooms are not available, patients with a confirmed viral respiratory pathogen may be placed in the same room.

For more information on cohorting of isolated patients, CDC currently refers to the following: 2007 Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settingspdf icon, or https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirators-strategy/conventional-capacity-strategies.html

## PROTECTIVE SHELTER IN PLACE

During the COVID-19 pandemic, CCHCS institutions may implement additional measures to protect vulnerable patients who are at increased risk for severe COVID-19 disease (e.g., single-cell or protected housing area, limited movement, separate dining and yard time, and telemedicine services). Patients in protective shelter in place should be educated regarding their risk and how to protect themselves, early symptom recognition and request for medical attention, and the availability of testing for COVID-19. These patients are not on quarantine and do not need daily symptom surveillance rounds.

## MEDICAL HOLD

Prohibition of the transfer of a patient to another facility except for legal or medical necessity. In CDCR, medical holds are employed for both isolation and quarantine.

## END OF AN INFLUENZA OUTBREAK

- An influenza outbreak ends when there are no new cases in the housing unit for 5-7 days since the onset of symptoms in the last identified new case. Refer to CCHCS Influenza Guidance Document, 2019 Influenza Guidance.

## END OF A COVID-19 OUTBREAK

- A COVID-19 outbreak ends when there are no new cases in the housing unit for 14 days since the onset of symptoms in the last identified new case.

## INITIAL NOTIFICATIONS

- If health care or custody staff become aware of or observe symptoms consistent with COVID-19 (e.g., fever, cough, or shortness of breath) in a patient, staff person, or visitor to the institution, they should immediately notify the Public Health Nurse (PHN) or PHN alternate (often the Infection Control Nurse[ICN]).
  - o For employee exposures, please refer to Health Care Department Operations Manual (HCDOM) section on Employee Exposure Control.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

- When a patient with fever or cough or shortness of breath is identified, institutional processes for notification to the PHN or PHN alternated must be established for ongoing surveillance and reporting.

- Laboratory confirmed COVID-19 cases and suspect cases of COVID-19 shall immediately be reported to the PHN or PHN alternate by phone or Electronic Health Record System (EHRS) messaging.

- A patient with symptoms consistent with COVID-19 should be immediately referred to a provider for evaluation.

- If a patient has a confirmed case of COVID-19, the PHN, ICN, or designee should immediately notify institutional leadership, including the Chief Executive Officer (CEO), Chief Medical Executive (CME), Chief Nurse Executive (CNE), Warden, and Public Information Officer (PIO).

- Institutional leadership is responsible for notifying the Office of Employee Health and Wellness (OEHW) and Return to Work Coordinator (RTWC) of the possibility of employees exposed to COVID-19 related virus.

## REPORTING

The PHN or PHN alternate is responsible for reporting of respiratory illness and outbreaks to the PHB and the local health department (LHD).

- Single or hospitalized cases of COVID-19, outbreaks of ILI, and influenza should be reported to the PHB via the Public Health Outbreak Response System (PHoRS) http://pors/. Single cases of lab-confirmed influenza and single cases of ILI that result in hospitalization or death should be reported to PhORS.

- Confirmed COVID-19 cases should be immediately reported by telephone to the LHD. Outbreaks of COVID-19 should also be immediately reported to the LHD. Follow usual guidelines for reporting influenza to the LHD. CCHCS Influenza Guidance Document 2019 on Lifeline. See Appendix 11 for a LHD contact list.

- Notify CCHCS PHB immediately at CDCRCCHCSPublicHealthBranch@cdcr.ca.gov if there are significant developments at the institution (e.g., first time the institution is monitoring one or more contacts, first confirmed case at the institution, or first COVID-19 contact investigation at the institution.)

- The following events require same-day reporting to the COVID-19 SharePoint: https://cdcr.sharepoint.com/sites/cchcs_ms_phos. No report is needed if there are no new cases/contacts and no significant updates to existing cases/contacts.

  - **All new suspected and confirmed COVID-19 cases.**

  - **All new COVID-19 contacts.**

  - For previously reported cases: new lab results, new symptoms, new hospitalizations, transfers between institutions, discharges/paroles, releases from isolation, and deaths.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

- For previously reported contacts of cases: new exposures, transfers between institutions, discharges/paroles, and releases from quarantine.

- Refer to the COVID-19 Case and Contact SharePoint Reporting tool (Appendix 5) for step-by-step instructions on using the tool and definitions.

## COVID-19 INFECTION CONTROL PRECAUTIONS

As a general principle, at all times, staff and inmates should practice standard precautions and staff should be familiar with the different types of transmission-based precautions needed to protect themselves and perform their duties. See Table 3.

### TABLE 3: STANDARD, AIRBORNE, AND DROPLET PRECAUTIONS PPE



Types of Transmission-Based Precautions

*Due to shortages, Gowns will be reserved for specific procedures, e.g., aerosol generating and, transport of patients with respiratory symptoms.*

*** Due to shortages, N-95 respirators will be reserved for aerosol generating procedures, procedures generating splashes and sprays, procedures that are very close and involve prolonged exposure to a COVID-19 case, and vehicular transport of patients with respiratory symptoms*

## PPE SCENARIOS FOR ILI, INFLUENZA, and COVID-19

This section describes the PPE recommended for several of the patient-care activities being conducted by staff. See Table 4 "Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional Facility during the COVID-19 Response."

During this time period, when there may be a shortage of some PPE supplies, consult Table 4 for suggested alternatives. When the recommendation is for a N95, surgical/procedure masks are acceptable alternative when the supply chain of respirators cannot meet the demand. The available N95 respirators should be prioritized for procedures that pose a high risk to staff. These procedures or activities include the following:

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

- **Procedures with splashes and sprays**
- **Aerosol generating procedures (anyone in the room)**
- **Procedures where very close or prolonged exposure to a COVID-19 case**
- **CDCR staff engaged in vehicle transport of patients with respiratory symptoms**

## STAFF PPE FOR ILI / SYMPTOMATIC PATIENT

**Patients presenting with ILI should be considered infectious for COVID-19 until proven otherwise. Standard, contact, droplet, and airborne precautions, plus eye protection are recommended for any patient with ILI symptoms.** A N95 Respirator, gloves, gown, face shield or other eye protection are recommended. A N95 is preferred, however, based on potential supply shortages, surgical/procedure masks are an acceptable alternative when the supply chain cannot meet the demand. During this time, available N95s and gowns should be prioritized for health care workers (HCW) engaged in procedures that are likely to generate respiratory aerosols or HCWs and custody engaged in vehicle transport.

## STAFF PPE FOR SUSPECTED AND CONFIRMED COVID-19 CASE

**Standard, contact, droplet, and airborne precautions, plus eye protection are recommended for any patient with suspected or confirmed COVID-19 infection**. A N95 Respirator, gloves, gown, face shield or other eye protection are the recommended PPE. A N95 is preferred, however, based on potential supply shortages, surgical/procedure masks are an acceptable alternative when the supply chain cannot meet the demand. During this time, available N95s and gowns should be prioritized for HCWs engaged in procedures that are likely to generate respiratory aerosols or HCWs and custody engaged in vehicle transport.

## STAFF PPE FOR CONFIRMED INFLUENZA CASE

**Standard, contact, and droplet precautions are recommended for patients with <u>confirmed influenza</u>**. A surgical/procedure mask, gloves, and gown are the recommended PPE. During this time, if there is a shortage of gowns, gowns should be prioritized for HCWs engaged in procedures that are likely to generate respiratory aerosols or HCWs and custody engaged in vehicle transport.

## STAFF PPE FOR SURVEILLANCE OF ASYMPTOMATIC CONTACT OF A CASE

**Standard, contact, and droplet precautions are recommended.** A surgical/procedure mask, eye protection, and gloves are the recommended PPE.

## PPE FOR CONTACT OF A CONTACT

**Standard precautions** are sufficient for the patient who is a contact of a contact.

For further information on standard, contact, and airborne precautions:
Refer to HCDOM, Chapter 3 Article 8, Communicating Precautions from Health Care Staff to Custody Staff and
https://www.cdc.gov/coronavirus/2019-ncov/infection-control/infection-prevention-control-faq.html

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## N95 SHORTAGE GUIDANCE

- N95 and other disposable respirators should not be shared by multiple HCW.

- Existing CDC and National Institute for Occupational Safety and Health (NIOSH) guidelines recommend a combination of approaches to conserve supplies while safeguarding health care workers in such circumstances. https://www.cdc.gov/niosh/topics/hcwcontrols/recommendedguidanceextuse.html and https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirators-strategy/index.html

    o **Extended use** refers to the practice of wearing the same N95 respirator for repeated close contact encounters with several different patients, without removing the respirator between patient encounters. Extended use is well suited to situations wherein multiple patients with the same infectious disease diagnosis, whose care requires use of a respirator, are cohorted (e.g., housed on the same hospital unit). HCP remove only gloves and gowns (if used) and perform hand hygiene between patients with the same diagnosis (e.g., confirmed COVID-19) while continuing to wear the same eye protection and respirator.

    o **Re-use** refers to the practice of using the same N95 respirator by one HCW for multiple encounters with different patients but removing it after each encounter. Restrict the number of reuses to the maximum recommended by the manufacturer or to the CDC recommended limit of no more than five uses per device.

    o To maintain the integrity of the respirator, it is important for HCP to hang used respirators in a designated storage area or keep them in a clean, breathable container such as a paper bag between uses. It is not recommended to modify the N95 respirator by placing any material within the respirator or over the respirator. Modification may negatively affect the performance of the respirator and could void the NIOSH approval.

    o All reusable respirators, must be cleaned and disinfected according to manufacturer's reprocessing instructions prior to re-use.

- Examples of N95 alternatives:

    o Powered air-purifying respirator (PAPR) which is reusable and has a whole/partial head and face shield breathing tube and battery operated blower and particulate filters, can be used if available.  Loose fitting PAPRs do not require fit-testing and can be worn by people with facial hair. Do not use in surgical settings.

    o N95 respirators or respirators that offer a higher level of protection should be used (instead of a facemask) when performing or present for an aerosol-generating procedure.  Such procedures should be prioritized in times of N95 shortages, and extended wear not employed.

When the supply chain is restored, staff should adhere to the PPE recommendations for specific transmission-based precaution.



# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

**TABLE 4. RECOMMENDED PERSONAL PROTECTIVE EQUIPMENT (PPE) FOR INCARCERATED/DETAINED PERSONS AND STAFF IN A CORRECTIONAL FACILITY DURING THE COVID-19 RESPONSE\***

| Classification of Individual Wearing PPE | N95 respirator | Surgical mask | Eye Protection | Hand Hygiene or Gloves (if contact) | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of a COVID-19 case) | Apply face masks for source control as feasible based on local supply, especially if housed as a cohort | | | | |
| Incarcerated/detained persons who are confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19. | | ✓ | | | |
| Incarcerated/detained persons in a work placement handling laundry or used food service items from a COVID-19 case or case contact. | | | | ✓ | ✓ |
| Incarcerated/detained persons in a work placement cleaning areas where a COVID-19 case has spent time. | Additional PPE may be needed based on the product label. | | | ✓ | ✓ |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of a COVID-19 case (but not performing temperature checks or providing medical care). | | ✓ | ✓ | ✓ | |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons. | | ✓ | ✓ | ✓ | |
| Staff having direct contact with symptomatic persons or offering medical care to confirmed or suspected COVID-19 cases. | | ✓** | ✓ | ✓ | |
| Persons accompanying any patients with respiratory symptoms in a transport vehicle. | ✓ | | ✓ | ✓ | ✓ |
| Staff present during a procedure on a confirmed or suspected COVID-19 case that may generate respiratory aerosols and other procedures (e.g. COVID-19 testing, CPR, etc.) or high contact patient care (bathing, etc.). | ✓ | | ✓ | ✓ | ✓ |
| Staff handling laundry or used food service items from a COVID-19 case or case contact | | | | ✓ | ✓ |
| Staff cleaning an area where a COVID-19 case has spent time. | Additional PPE may be needed based on the product label. | | | ✓ | ✓ |

\* Table created using recommendations from the Centers for Disease Control and Prevention "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities", March 23, 2020.

\*\* A NIOSH-approved N95 is preferred. However, based on local and regional situational analysis of PPE supplies, face masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## CONTROL STRATEGY FOR SUSPECTED AND CONFIRMED CASES OF COVID-19

### ILI CASE AND OUTBREAK IDENTIFICATION

Currently, influenza and COVID-19 are prevalent. When patients from facilities are transferred from a facility with known influenza or COVID-19, they will not require quarantine unless notified by the sending facility that the patient has had a potential exposure. Incoming patients with a potential exposure should be quarantined for 14 days.

In new seasons, screening for ILI should begin as soon as seasonal influenza or COVID-19 is identified in any correctional facility. Patients should be triaged as soon as possible upon arrival to a facility (right after leaving the transportation bus) for symptom assessment prior to allowing patients to gather together in groups. If a patient presents with ILI symptoms, place a surgical facemask on the patient and isolate them until a health care provider can clinically assess and evaluate them.

For the control strategy for confirmed cases of influenza, see CCHCS Seasonal Influenza Infection Prevention and Control Guidance

### CHECKLIST FOR IDENTIFYING COVID-19 SUSPECTS

☐ Examine test results provided by laboratory looking for positive COVID-19 and other communicable diseases requiring public health action.

☐ Examine COVID-19 tests ordered in the last 24 hours to identify patients with ILI.

☐ Examine TTA logs for patients who had respiratory symptoms.

☐ Coordinate with Utilization Management (UM) nurse on patients who are out to medical with ILI/pneumonia.

☐ Review the daily movement sheet to identify patients that may have been sent out for HLOC due to ILI/respiratory symptoms.

☐ Attend daily Patient Care (PC) clinic huddles, as time permits, to identify any patients being seen that day with complaints of ILI symptoms.

☐ Establish a sustainable process by which Public Health and Infection Control staff are notified of patients that are put on precautions for ILI after hours.

### ILI/ SUSPECTED COVID-19 STRATEGIC CONTROL STEPS

• Immediately mask patients when COVID-19 is suspected. Surgical or procedure masks are appropriate for patients. If there is a shortage of surgical/procedure masks, have the patients use tissue when coughing and/or cloth/bandana.

• Patients should be placed in AIIR as soon as possible (can order in EHRS). If AIIR is not immediately available, the patient shall be placed in a private room with the door closed.

# COVID-19: Interim Guidance for
## Health Care and Public Health Providers

Appropriate signage indicating precautions and required PPE to enter should be visible outside the patient's room.

- Standard, contact, and airborne precautions plus eye protection should be implemented immediately (see Infection Control Precautions and PPE Scenarios). HCW should use a surgical/procedure mask, unless N95 respirators are in abundant supply.

- When possible, assign dedicated health care staff to provide care to suspected or confirmed cases.

- Ensure staff caring for or transporting patients with respiratory symptoms meeting criteria for suspected COVID-19 utilize appropriate PPE: Use procedure/surgical masks, unless N95 respirator or PAPR are in abundant supply, gloves, gown, and face shield covering sides and front of face or goggles. In times of respirator shortages

- Limit movement of designated staff between different parts of the institution to decrease the risk of staff spreading COVID-19 to other parts of the facility.

- Patients shall only be transported for emergent medically necessary procedures or transfers, and shall wear a surgical or procedure mask during transport. During vehicle transport, custody or HCW will use an N-95 mask for symptomatic patients. Limit number of staff that have contact with suspected and/or confirmed cases.

  - Assess and treat as appropriate soon-to-be released patients with suspected COVID-19 and make direct linkages to community resources to ensure proper isolation and access to medical care. Notify LHD of patients to be released who have suspect or confirmed cases and are still isolated. Case patients should not be released without the coordination of CDCR discharge planning and LHD guidance. See the "Parole and Discharge to the Community during a COVID-19 Outbreak" section of this document.

  - Once COVID-19 has been ruled out, airborne precautions can be stopped. Follow the CCHCS Influenza Guidance document for general ILI and Influenza management. http://lifeline/HealthCareOperations/MedicalServices/PublicHealth/Influenza/Ca-Seasonal-influenza-Guidance.pdf

## ISOLATION
Promptly separate patients who are sick with fever or lower respiratory symptoms from well-patients. Patients with these symptoms should be isolated until they are no longer infectious and have been cleared by the health care provider.

- The preference is for isolation in a negative pressure room; second choice would be isolation in private room with a solid, closed door.

- When a negative pressure room or private, single room is not available, cohorting symptomatic patients who meet specific criteria is appropriate (see below). Groups of symptomatic patients can be cohorted in a separate area or facility away from well-patients. Possible areas to cohort patients could be an unused gym or section of a gym or chapel. When it is necessary to cohort patients in a section of a room or area with the general population of well-patients (e.g., dorm section) there should be at least 6 feet (3.6 feet minimum for severe space shortages) between

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

the symptomatic patients and the well patient population. Tape can be placed on the floor to mark the isolation section with a second line of tape 6 feet away to mark the well-patient section which can provide a visual sign and alert well-employees and patients to remain outside of the isolation section unless they are wearing appropriate PPE.

**In order of preference, individuals under medical isolation should be housed:**

- Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully

- Separately, in single cells with solid walls but without solid doors

- As a cohort, in a large, well-ventilated cell with solid walls and a solid door that closes fully. Employ social distancing strategies.

- As a cohort, in a large, well-ventilated cell with solid walls but without a solid door. Employ social distancing strategies.

- As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)

- As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies.   Use tape to mark off safe distances between patients.

- Safely transfer individual(s) to another facility with available medical isolation capacity in one of the above arrangements.

  - (NOTE – Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

- If the ideal choice does not exist in a facility, use the next best alternative.

**If the number of confirmed cases exceeds the number of individual medical isolation spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19.** Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable, make all possible accommodations to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)

- Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.

**Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:

- **Cover** their mouth and nose with a tissue when they cough or sneeze.

- **Dispose** of used tissues immediately in the lined trash receptacle.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

- **Wash hands** immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

  - Patients with ILI of unknown etiology should be isolated alone. If they cannot be isolated alone, they should be isolated with other sick patients from the same housing unit or other sick ILI patients of unknown etiology.  When cohorting ILI patients, if at all possible, separate patients 6 feet from each other, with 3.6 feet minimum if space is limited.

  - Patients with confirmed COVID-19 or influenza can safely be isolated in a cohort with other patients who have the same confirmed diagnosis.

- Correctional facilities should review their medical isolation policies, identify potential areas for isolation, and anticipate how to provide isolation when cases exceed the number of isolation rooms available.

- If possible, the isolation area should have a bathroom available for the exclusive use of the identified symptomatic patients. When there is no separate bathroom available, symptomatic patients should wear a surgical or procedure mask when outside the isolation room or area, and the bathroom should be sanitized frequently.

- A sign should be placed on the door or wall of an isolation area to alert employees and patients. All persons entering the isolation room or areas need to follow the required transmission-based precautions.

- When possible, assign dedicated health care staff to provide care to suspected or confirmed cases.

- If a patient with ILI or confirmed COVID-19 or influenza must be moved out of isolation, ensure a surgical or procedure mask is worn during transport. Staff shall wear an appropriate respirator (or surgical mask in times of shortage) during transport of these patients.

- Facilities should also ensure that plans are in place to communicate information about suspect and confirmed influenza cases who are transferred to other departments (e.g., radiology, laboratory) or another prison or county jail.

## MEDICAL HOLD

When a patient with a **suspected case of COVID-19 is identified**

- The patient should be isolated and placed on a medical hold.

- All patients housed in the same unit, and any other identified close contacts, should be placed on a medical hold as part of quarantine measures.

- If the contact with the case that occurred was a very high risk transmission, consideration can be given to a preliminary contact investigation as if it was a confirmed case, time and resources permitting.

- Separate and isolate any symptomatic contacts.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

- Initiate surveillance measures detailed in the surveillance section.

  Any persons identified through the contact investigation to have symptoms, should be immediately reported to the headquarters PHB: CDCRCCHCSPublicHealthBranch@cdcr.ca.gov , and immediately isolated and masked.

- **If COVID-19 case is confirmed, initiate a contact investigation.**

## CONTACT INVESTIGATION

Contact investigation for suspected COVID-19 cases should not be initiated while Influenza and COVID-19 test results are pending, except in consultation with the PHB (e.g., highly suspicious suspect case or multiple suspect cases with known contact to a confirmed case).

A contact investigation should be conducted for all underlined confirmed cases of COVID-19.

- Determine the dates during the case-patient's infectious period during which other patients and staff may have been exposed (from 2 days [48 hours] prior to the date of symptom onset to the date the patient was isolated).
- Interview the case-patient to identify all close contacts based on exposure (within 6 feet for $\geq$30 minutes) during the infectious period
  o Identify all activities and locations where exposure may have occurred (e.g., classrooms, group activities, social activities, work, dining hall, day room, church, clinic visits, yard, medication line, and commissary line).
  o Determine the case-patient's movement history, including cell/bed assignments and transfers to and from other institutions or outside facilities.
  o Identify close contacts associated with each activity and movement.
- Use the COVID-19 Contact Investigation Tool (Appendix 6) and the Index Case-Patient Interview Checklist (Appendix 7) and to guide and document the interview and identification of the case-patient's close contacts.
- Determine the last date of exposure for each of the contacts for the purpose of placing them in quarantine for a full incubation period (14 days). If a contact is subsequently exposed to another confirmed COVID-19 case, the quarantine period should be extended for another 14 days after the last exposure.
- Initiate and submit a contacts line list to the PHB in the COVID-19 SharePoint. https://cdcr.sharepoint.com/sites/cchcs_ms_phos (see Reporting section above).
- Use the COVID-19 SharePoint contacts line list to track the date of last exposure, date the quarantine began, and the end date for quarantine.
- Asymptomatic contacts should be monitored for symptoms two times daily, unless severe staffing or resource issues necessitate once daily (see Management of Asymptomatic Contacts of COVID-19 below).
- Any contact who develops symptoms consistent with COVID-19 should be immediately isolated (see Isolation above).

Institutional leadership is responsible for notifying the OEHW and RTWC of the possibility of employees exposed to COVID-19.

**COVID-19: Interim Guidance for**
**Health Care and Public Health Providers**

## MONITORING PATIENTS WITH SUSPECTED OR CONFIRMED COVID-19

- Patients with suspected COVID-19  require a minimum of twice daily nursing assessment, including, but not limited to:

  - Temperature monitoring

  - Pulse oximeter monitoring

  - Blood pressure checks

  - Respiratory rate and heart rate

- Monitor patients for complications of COVID-19 infection, including respiratory distress and sepsis:

  - Fever and chills

  - Low body temperature

  - Rapid pulse

  - Rapid breathing

  - Labored breathing

  - Low blood pressure

  - Low oxygen saturation (highest association with the development of pneumonia)

  - Altered mental status or confusion

Patients with abnormal findings should be immediately referred to a provider for further evaluation.

- Keep in mind the risk factors for severe illness: older age and those with medical conditions described in the High Risk Conditions section of the document.

- Patients tend to deteriorate rapidly and may occur after a day of feeling better. Typical evolution of severe disease (based on analysis of multiple studies by Arnold Forest)

  - Dyspnea ~6 days post exposure.

  - Admission after ~8 days post exposure.

  - ICU admission/intubation after ~10 days post exposure.

  - This timing may be *variable* (some patients are stable for several days, but subsequently deteriorate rapidly)

  - Please refer to the COVID-19 Monitoring Registry which tracks patients either confirmed or suspected of COVID-19 infection.  The COVID-19 Monitoring Registry helps health care staff stay apprised of COVID-19 testing results and ensure that rounding is occurring as required across shifts, as well flags certain symptoms, such as fever.

**See algorithm on the following page regarding evaluation of suspect COVID-19 cases**

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## Evaluation of COVID-19 Suspect Patients



## RESPONSE TO A COVID-19 OUTBREAK

When one or more laboratory confirmed cases of COVID-19 have been reported, surveillance should be conducted throughout the institution to identify contacts. The institutional PHN and NCPR will confer and implement the investigation. A standardized approach to stop COVID-19

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

transmission is necessary by identifying people who have been exposed to a laboratory confirmed COVID-19 case.

**Containment:** Stopping transmission will require halting movement of exposed patients. The goal is to keep patients who are ill or who have been exposed to someone who is ill from mingling with patients from other areas of the prison, from food handling and duties in healthcare settings. Close as many affected buildings/units as needed to confine the outbreak. Remind patients not to share eating utensils, food or drinks. Stop large group meetings such as religious meetings and social events. Patients who are housed in the same affected building/unit may have pill line or yard time together.

**Communication within the Institution:** Establish a central command center to include CME, PHN, CNE, Director of Nurses (DON), ICN, Warden and key custody staff. Call for an Exposure Control meeting with the Warden, CME, Facilities Captains, Department Heads and Employee Union Representatives to inform them of outbreak, symptoms of disease, number of patients affected and infection control measures.

**Reporting and Notification:** As soon as outbreak is suspected, contact your Statewide Public Health Nurse Consultant by telephone or email within 24 hours. Complete the Preliminary Report of Infectious Disease or Outbreak form (PORS). Report outbreak by telephone to the Local Health Department as soon as possible to assist with contact investigation, if needed. If your facility is considering halting all movement in and out of your institution, please consult with the PHB warmline at (916) 691-9901.

**Tracking:** For the duration of the outbreak, collect patient information systematically to ensure consistency in the data collection process. Assign back up staff for days off, to be responsible for tracking cases and reporting.

## CRITERIA FOR RELEASE FROM ISOLATION CONFIRMED COVID-19 CASES

1. Individuals with asymptomatic or symptomatic laboratory confirmed COVID-19 under isolation, considerations to discontinue Transmission-Based Precautions include:

   a. Negative results of an FDA Emergency Use Authorized molecular assay for COVID-19 from at least two consecutive N/P specimens collected ≥24 hours apart (total of 2 negative specimens).

2. **In cases where there is severe shortage of testing materials/swabs, then the clinical criteria designed for community home isolation may be used**:

   i. At least 7 days\*\*(**minimum**) from after the onset of symptoms **AND**

   ii. At least 72 hours after resolution of fever without use of antipyretic medication **AND**

   iii. Improvement in illness signs and symptoms; *whichever is longer*

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

3. **CMEs may choose to lengthen the criteria time for symptom resolution to 14 days or beyond at their discretion.

4. Given studies showing prolonged shedding after resolution of symptoms, all patients should wear a surgical mask after release.

Resolution of cough, is not necessary, however people with residual cough should always wear a mask once released, until completely without cough.

Check for updates: https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html

CRITERIA FOR RELEASE FROM ISOLATION CONFIRMED **INFLUENZA** CASES
Remain in isolation for 7 days from symptom onset and 24 hours after resolution of fever and respiratory symptoms

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

FIGURE 2: ISOLATION REQUIREMENTS OF PATIENTS WITH SUSPECT COVID-19 CASE

## Release From Isolation of COVID-19 Suspect Patients



If testing is negative, but there is strong clinical suspicion of COVID-19 (false negative), Treat patient as a confirmed case.

## CONTROL STRATEGIES FOR CONTACTS TO CASES OF COVID-19

### SURVEILLANCE OF ASYMPTOMATIC CONTACTS OF COVID-19 CASES

Patients with exposure to a confirmed or suspected COVID-19 case shall be placed in quarantine. If a suspected COVID-19 case tests negative for COVID-19 and clinicians release the suspected patient from COVID-19 protocols, quarantined patients should also be released.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## QUARANTINE

The criteria for imposing quarantine in a correctional facility will remain a dynamic process with possible re-direction and re-strategizing of disease control efforts based on recommendations from the LHD, CDPH, CCHCS PHB and CME. **Quarantine should be implemented for patients who are contacts to a COVID-19 case and are not ill.**

- Quarantined patients shall be placed on medical hold.

- Transport of patients in quarantine should be limited. If transport becomes necessary, assign dedicated staff to the extent possible. Patients under quarantine, and those transporting quarantined patients, must use appropriate PPE (quarantined patient should wear a surgical or procedure mask, transport staff should wear an N-95 respirator or other approved respirator or a surgical/procedure mask in N95 shortage.)

- Quarantine does not include restricting the patient to his own cell for the duration of the quarantine without opportunity for exercise or yard time. Quarantined patients can have yard time as a group but should not mix with patients not in quarantine.

- Nursing staff are advised to conduct twice daily surveillance on quarantined patients for the duration of the quarantine period to identify any new cases. The minimum surveillance frequency is once per day if severe staffing or resource shortages occur. If new case(s) are identified, the symptomatic patient must be masked, isolated and evaluated by a health care provider as soon as possible.

- Quarantined patients may be given meals in the chow hall as a group;
  - If they do not congregate with other non-quarantined patients,
  - are the last group to get meals, and
  - the dining room can be cleaned after the meal.
  - If these parameters cannot be met in the chow hall, the patients shall be given meals in their cells.

Movement in or out of the quarantined area should be restricted for the duration of the quarantine period. When transport and non-essential movement is allowed, limit patient transports outside of the facility, permitting transport only for medical or legal necessity (e.g., specialty clinics, outside medical appointments, mental health crisis, or out-to-court) and with 3 days of surveillance recommended after exit from the possible exposure. Out-to-court and medical visits should be evaluated on a case by case basis. With CME or CME designee approval, a quarantined or held patient may keep the necessary appointments or transfers provided that the court, medical provider and/or clinic have been notified the patient is in quarantine or was on hold for ILI exposure and they have agreed to see the patient.

Follow the guidance regarding spacing and rooms in the Isolation section of this document.

To reduce the number of health care staff potentially exposed to any new cases of influenza, limit the number of health care staff (when possible) who interact with quarantined patients.

- In the event of a more severe outbreak, involving multiple suspected or confirmed cases or involving neighboring community, visitor entry and patient visits for well patients may be greatly restricted or even temporarily halted, if necessary.

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

- If one or more patients in quarantine develops symptoms consistent with COVID-19 infection, follow recommendations for isolation for ill patient(s). Separate the ill-quarantined patients from the well-quarantined patients immediately.

### PATIENT SURVEILLANCE WHILE IN QUARANTINE

Correctional nursing leadership is responsible for assigning nursing teams to conduct surveillance to identify new suspected cases. Surveillance rounds and the evaluation of well patients who have been exposed must be done in all housing units that have housed one or more patients with suspected or confirmed COVID-19.

- All quarantined patients shall be evaluated on a twice daily basis, including weekends and holidays.  If staff or resource shortages are severe, once a day testing is the minimum.

- Using the new COVID-19 electronic Surveillance Rounds form tool in EHRS, The COVID-19 Screening Powerform see instructions in the appendix and instructional webinar http://10.192.193.84/Nursing/EHRS/COVID19-Doc-Orders/Webinar.html.  Temperatures and any symptoms must be recorded to identify illness (temperature > 100°F [37.8°C], cough).  List symptoms (see below list) not on the EHRS tool checklist in the free text box:

  - Note influenza (and other microorganism) surveillance still uses the "Surveillance Round" in EHRS (Adhoc > All Items > CareMobile Nursing Task > Surveillance Round)
  - The only vital sign for quarantine is the temperature
  - Keep a very low threshold for symptoms, including those listed below.  Any symptoms of illness necessitates a provider evaluation:
    - Chills without fever or subjective fever
    - Severe/New/Unexplained fatigue
    - Malaise (difficult to describe unpleasant feeling of being ill)
    - Sore throat
    - Myalgia or Arthralgia
    - Gastrointestinal symptoms such as: nausea, vomiting, diarrhea, or loss of appetite
    - URI symptoms such as nasal or sinus congestion and rhinorrhea
    - Loss of sense of smell or taste

- Patients with symptoms should be promptly masked and escorted to an isolation designated clinical area for medical follow up as soon as possible during the same day symptoms are identified, including weekends and holidays.

- Educate all patients about signs and symptoms of respiratory illness, possible complications, and the need for prompt assessment and treatment. Instruct patients to report respiratory symptoms at the first sign of illness.  See patient education handouts on the CCHCS Coronavirus Webpage.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

- Surveillance may uncover patients in housing units with upper respiratory symptoms, without fever and who do not meet the case presentation for COVID-19. Consult with the treating provider and/or CME to determine if these patients should be isolated.

- Each correctional facility should ensure the PHN (or designee) is aware of any patients with ILI, and any suspected or confirmed COVID-19 cases. PHNs should be notified by phone and via the EHRS Message Center.

- The *7362 Patient-Generated Request for Care System* should not be relied on for alerting clinicians of symptomatic patients in housing units under quarantine. New patients with ILI symptoms must be assessed daily, treated, and isolated as soon as possible to prevent further spread of influenza in the facility.

## RELEASE FROM QUARANTINE

For COVID-19, the period of quarantine is 14 days from the last date of exposure of a confirmed case, because 14 days is the longest incubation period seen for similar coronaviruses. Someone who has been released from COVID-19 quarantine is not considered a risk for spreading the virus to others because they have not developed illness during the incubation period. **Quarantine must be extended by 14 days for every new exposure.**

Check for updates From CDC:
https://www.cdc.gov/coronavirus/2019-ncov/faq.html#basics

## PAROLE AND DISCHARGE TO THE COMMUNITY DURING A COVID-19 OUTBREAK

**Stay in communication with partners about your facility's current situation.**
- State, local, territorial, and/or tribal health departments

**Incorporate screening for COVID-19 symptoms and a temperature check into general release planning.**
- Screen all paroling individuals for COVID-19 symptoms and perform a temperature check. Refer to the COVID-19 Screening Powerform Appendix 10.
  - If an individual does not clear the screening process, follow the protocol for a suspected COVID-19 case - including putting a face mask on the individual, immediately placing them under medical isolation, and evaluating them for possible COVID-19 testing.
- Individuals who parole before Isolation or Quarantine are over:
  - Notify the LHD and coordinate with discharge planning.
    - Use the Case-Contact Notification Form (Appendix 9 ) for release of a person with exposure to a confirmed or suspected case or a suspected or confirmed case to the community).
  - Discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning.
    - Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

**COVID-19: Interim Guidance for**
**Health Care and Public Health Providers**

- ▪ Before releasing an incarcerated/detained individual with COVID-19 symptoms to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation, or contact local public health to explore alternate housing options.
  - o Community facilities with limited onsite medical isolation, quarantine, and/or healthcare services should coordinate closely with state, local, tribal, and/or territorial health departments when they encounter a confirmed or suspected case, in order to ensure effective medical isolation or quarantine, necessary medical evaluation and care, and medical transfer if needed. See CDC's webpage on: Facilities with Limited Onsite Healthcare Services section.

## CONTROL STRATEGY FOR CONTACTS TO CONTACTS

The CDC does **not** recommend testing, symptom monitoring, quarantine, or special management for people exposed to asymptomatic people who have had high-risk exposures to COVID-19, e.g., Contacts to Contacts.

## STAFF AND VISITOR PRECAUTIONS AND RESTRICTIONS DURING THE PANDEMIC

See COVID-19: Infection Control for Health Care Professionals

- • Correctional facilities should have signage posted at entry points in English and Spanish alerting staff and visitors that if they have fever and respiratory symptoms, they should not enter the facility.

- • Visitor web sites and telephone services are updated to inform potential visitors of current restrictions and/or closures before they travel to the facility.

- • Instruct staff to report fever and/or respiratory symptoms at the first sign of illness.

- • Staff with respiratory symptoms should stay home (or be advised to go home if they develop symptoms while at work). Ill staff should remain at home until they are cleared by their provider to return to work.

- • Advise visitors who have fever and/or respiratory symptoms to delay their visit until they are well.

- • Consider temporarily suspending visitation or modifying visitation programs, when appropriate.

- • Visitor signage and screening tools are available from the CCHCS PHB and can be distributed to visiting room staff.

- • Initiate other social distancing procedures, if necessary (e.g., halt volunteer and contractor entrance, discourage handshaking).

- • Post signage and consider population management initiatives throughout the facility encouraging vaccination for influenza.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## RESPIRATORY HYGIENE AND COUGH ETIQUETTE

- Post visual alerts in high traffic areas in both English and Spanish instructing patients to report symptoms of respiratory infection to staff.

- Encourage coughing patients with respiratory symptoms to practice appropriate respiratory hygiene and cough etiquette (e.g. cover your cough, sneeze into your sleeve, use a tissue when available, dispose of tissue appropriately in designated receptacles, and hand hygiene).

    - Additionally, coughing patients should not remain in common or waiting areas for extended periods of time and should wear a surgical or procedure mask and remain 6 feet from others.

- Ensure that hand hygiene and respiratory hygiene supplies are readily available.

- Encourage frequent hand hygiene.

## ENVIRONMENTAL INFECTION CONTROL

- Routine cleaning and disinfection procedures should be used. Studies have confirmed the effectiveness of routine cleaning (extraordinary procedures not recommended at this time).

- CellBlock 64 is effective in disinfecting for COVID-19 related virus.

- After pre-cleaning surfaces to remove pathogens, rinse with water and follow with an EPA-registered disinfectant to kill coronavirus. Follow the manufacturer's labeled instructions and always follow the product's dilution ratio and contact time. (for a list of EPA- registered disinfectant products that have qualified for use against SARS-CoV-2, the novel coronavirus that causes COVID-19, go to: https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2

- If an EPA-registered disinfectant is not available, use a fresh chlorine bleach solution by mixing 5 tablespoons (1/3 cup) bleach per gallon water or 4 teaspoons bleach per quart of water.

- Focus on cleaning and disinfection of frequently touched surfaces in common areas (e.g., faucet handles, phones, countertops, bathroom surfaces).

- If bleach solutions are used, change solutions regularly and clean containers to prevent contamination.

- Special handling and cleaning of soiled linens, eating utensils and dishes is not required, but should not be shared without thorough washing.

- Linens (e.g., bed sheets and towels) should be washed by using laundry soap and tumbled dried on a hot setting. Staff should not hold laundry close to their body before washing and should wash their hands with soap and water after handling dirty laundry.

- Follow standard procedures for Waste Handling.

For further sanitation information please refer to HCDOM, Chapter 3, Article 8 - Communicating Precautions from Health Care Staff to Custody Staff.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## CLEANING SPACES WHERE COVID-19 CASES SPENT TIME

- **Thoroughly clean and disinfect all areas where the confirmed or suspected COVID-19 case spent time. Note – these protocols apply to suspected cases as well as confirmed cases, to ensure adequate disinfection in the event that the suspected case does, in fact, have COVID-19. Refer to the Definitions section for the distinction between confirmed and suspected cases.**

  o Close off areas used by the infected individual. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions), before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.

  o Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).

- **Hard (non-porous) surface cleaning and disinfection**

  o If surfaces are dirty, they should be cleaned using a detergent or soap and water prior to disinfection.

  o For disinfection, most common EPA-registered household disinfectants should be effective. Choose cleaning products based on security requirements within the facility.

    ▪ Consult a list of products that are EPA-approved for use against the virus that causes COVID-19external icon. Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

    ▪ Diluted household bleach solutions can be used if appropriate for the surface. Follow the manufacturer's instructions for application and proper ventilation, and check to ensure the product is not past its expiration date. Never mix household bleach with ammonia or any other cleanser. Unexpired household bleach will be effective against coronaviruses when properly diluted. Prepare a bleach solution by mixing:

      – 5 tablespoons (1/3 cup) bleach per gallon of water or
      – 4 teaspoons bleach per quart of water

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

- **Soft (porous) surface cleaning and disinfection**

  o For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:

    ▪ If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.

    ▪ Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19external icon and are suitable for porous surfaces.

- **Electronics cleaning and disinfection**

  o For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.

    ▪ Follow the manufacturer's instructions for all cleaning and disinfection products.

    ▪ Consider use of wipeable covers for electronics.

    ▪ If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

- **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE CHART)

- **Food service items.** Cases under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed with **hot water or in a dishwasher**. Individuals handling used food service items should clean their hands after removing gloves.

- **Laundry from a COVID-19 cases can be washed with other individuals' laundry.**

  o Individuals handling laundry from COVID-19 cases should wear disposable gloves, discard after each use, and clean their hands after.

  o Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

- o Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items **using the warmest appropriate water setting for the items and dry items completely**.

- o Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

- **Consult cleaning recommendations above to ensure that transport vehicles are thoroughly cleaned after carrying a confirmed or suspected COVID-19 case.**

## RESOURCES

For additional COVID-19 information refer to the following internal and external resources:
**CCHCS:** COVID-19 Lifeline Page
**CDC Websites**:

https://www.cdc.gov/coronavirus/2019-nCoV/hcp

https://www.cdc.gov/coronavirus/2019-ncov/hcp/hcp-personnel-checklist.html

https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html

## REFERENCES

1. Influenza and Other Respiratory Viruses Weekly Report. California Influenza Surveillance Program.
   https://www.cdph.ca.gov/programs/cid/dcdc/cdph%20document%20library/immunization/week2019-2009_finalreport.pdf
2. CDC Tests for COVID-19: https://www.cdc.gov/coronavirus/2019-ncov/about/testing.html
3. Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19): https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html
4. Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings:
   https://www.cdc.gov/coronavirus/2019-ncov/infection-control/control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fhcp%2Finfection-control.html
5. California Department of Corrections and Rehabilitation California Correctional Health Care Services, Health Care Department Operations Manual. Chapter 3, Article 8; 3.8.8: Communication Precautions from Health Care to Custody Staff.
   http://lifeline/PolicyandAdministration/PolicyandRiskManagement/IMSPP/HCDOM/HCDOM-Ch03-art8.8.pdf
6. Recommended Guidance for Extended Use and Limited Reuse of N95 Filtering Facepiece Respirators in Healthcare Settings:
   https://www.cdc.gov/niosh/topics/hcwcontrols/recommendedguidanceextuse.html

**COVID-19: Interim Guidance for**
**Health Care and Public Health Providers**

7. United States Department of Labor, Occupational Safety and Health Administration
https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.134

8. Public Health Outbreak Response System (PhORS) http://phuoutbreak/

9. Interim Guidance for Discontinuation of Transmission-Based Precautions and Disposition of Hospitalized Patients with COVID-19 https://www.cdc.gov/coronavirus/2019-ncov/hcp/disposition-hospitalized-patients.html

10. Centers for Disease Control Coronavirus Disease 2019 (COVID-19) Healthcare Professionals: Frequently Asked Questions and Answers
https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html

11. Centers for Disease Control Coronavirus Disease 2019 (COVID-19) Healthcare Professionals: Frequently Asked Questions and Answers About: **When can patients with confirmed COVID-19 be discharged from the hospital?**
https://www.cdc.gov/coronavirus/2019-ncov/faq.html#basic

12. List N: Disinfectants for Use Against SARS-CoV-2: https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2

13. Dr. David Sears, UCSF Clinical Guidelines for Evaluation and Treatment of Suspected and Confirmed Cases of COVID-19 in Correctional Facilities

14. Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities  https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

15. Forst, Arnold, COVID-19 (SARS-CoV-2) epidemic www.louisvillelectures.org/imblog/2020-coronavirus/forest-arnold

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## APPENDIX 1: CORONAVIRUS DISEASE 2019 (COVID-19) CHECKLIST

| | 1. RECOGNITION, REPORTING, AND DATA COLLECTION | |
|---|---|---|
| | a. | Be on alert for patients presenting with fever or symptoms of respiratory illness. |
| | b. | Report suspect cases to institutional leadership, local health department, and the Public Health Branch. |

| | 2. INFECTION PREVENTION AND CONTROL MEASURES | |
|---|---|---|
| | a. | Isolate symptomatic patients immediately in airborne infection isolation room (AIIR). Implement Standard, Contact, and Airborne Precautions, plus eye protection. |
| | b. | Educate staff & patients about outbreak. Emphasize importance of hand hygiene, respiratory etiquette, and avoiding touching eye, nose, or mouth. Post signage about the outbreak in high traffic areas. |
| | c. | Increase available of hand hygiene supplies in housing units and throughout the facility. |
| | d. | Separate patients identified as contacts from other patients and implement quarantine as appropriate. |
| | e. | Increase cleaning schedule for high-traffic areas and high-touch surfaces (faucets, door handles, keys, telephones, keyboards, etc.). Ensure available cleaning supplies. |

| | 3. CARING FOR THE SICK | |
|---|---|---|
| | a. | Implement plan for assessing ill patients. Limit number of staff providing care to ill patients, if possible. |
| | b. | Ensure Personal Protective Equipment is available and accessible to staff caring for ill patients. |

| | 4. POSSIBLE ADMINISTRATIVE CONTROLS DURING OUTBREAKS | |
|---|---|---|
| | a. | Institute screening for respiratory symptoms. |
| | b. | Encourage patients to report respiratory illness. |
| | c. | Halt patient movement between affected and unaffected units. |
| | d. | Screen for respiratory illness in patient workers in Food Service and Health Services; exclude from work if symptomatic. |
| | e. | Minimize self-serve foods in Food Service (e.g., eliminate salad bars). |
| | f. | Do controlled movement by unit to chow hall (cleaning between units), or feed on the units. |
| | g. | Temporarily discontinue group activities, e.g., recreation, chapel, activity therapy groups, education. |
| | h. | Schedule daily status meetings involving custody and medical leadership; other stakeholders should attend as appropriate. |
| | i. | Do controlled movement by unit to pill line, or administer medication on the units. |
| | j. | Encourage ill staff to stay home until symptoms resolve and/or they are cleared to return to work by their provider. |
| | k. | Post visitor notifications regarding outbreak. Advise visitors with respiratory symptoms to not enter the facility (If large outbreak, consider suspending visits). |
| | l. | During large outbreaks, consider halting patient movement in and out (in consultation with local health department). |

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## APPENDIX 2: DROPLET PRECAUTIONS CHECKLIST

| CONTROL MEASURE | INDICATED | ADDITIONAL INFORMATION |
|---|---|---|
| Hand Washing | Yes | • After touching contaminated items, after removing gloves.<br>• Between Inmate/Patient contact. |
| Personal Protective Equipment (PPE) | Yes | • Follow Standard Precautions Guideline.<br>• Don mask upon entry into patient room. |
| Single Cell | Yes | • A single Inmate/Patient room. |
| Housing | Yes | • Place together those who are infected with the same pathogen. |
| Sanitation | Yes | • Instruct and encourage Inmate/Patient to practice frequent hand hygiene.<br>• Instruct patient on respiratory etiquette. |
| Laundry | Yes | • Do not shake items or handle laundry in any way that may aerosolize infectious agents.<br>• Avoid contact of one's body and personal clothing with the soiled items being handle.<br>• Contain soiled items in a laundry bag or designated bin. |
| Activities | Yes | • Patient must wear mask upon existing his or her cell.<br>• Permit routine showering, last one then disinfect. |
| Inmate Hygiene | Yes | • Instruct and encourage Inmate/Patient to practice frequent hand hygiene.<br>• Instruct patient on respiratory etiquette. |
| Transports | Yes | • Limit transport on patients on contact precautions to essential purposes such as diagnostic and therapeutic procedures that cannot be performed in the Inmate/Patient's room.<br>• When transport is necessary, using appropriate barriers on the Inmate/Patient.<br>• Staff in close contact (less than 3 feet) should wear surgical mask. |

Revised 10/18

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

### APPENDIX 3: HOW TO DOFF AND DON PPE

## Sequence* for Donning PPE

- Gown first
- Mask or respirator
- Goggles or face shield
- Gloves

***Combination of PPE will affect sequence – be practical**

PPE Use in Healthcare Settings

CDC

## How to Don a Mask

- Place over nose, mouth and chin
- Fit flexible nose piece over nose bridge
- Secure on head with ties or elastic
- Adjust to fit



PPE Use in Healthcare Settings

CDC

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## How to Don a Gown

- Select appropriate type and size
- Opening is in the back
- Secure at neck and waist
- If gown is too small, use two gowns
  - Gown #1 ties in front
  - Gown #2 ties in back

PPE Use in Healthcare Settings

## How to Don a Particulate Respirator

- Select a fit tested respirator
- Place over nose, mouth and chin
- Fit flexible nose piece over nose bridge
- Secure on head with elastic
- Adjust to fit
- Perform a fit check –
  - Inhale – respirator should collapse
  - Exhale – check for leakage around face



PPE Use in Healthcare Settings

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## How to Don Eye and Face Protection

- Position goggles over eyes and secure to the head using the ear pieces or headband
- Position face shield over face and secure on brow with headband
- Adjust to fit comfortably



PPE Use in Healthcare Settings

## How to Don Gloves

- Don gloves last
- Select correct type and size
- Insert hands into gloves
- Extend gloves over isolation gown cuffs



PPE Use in Healthcare Settings

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## APPENDIX 4: HOW TO ORDER RAPID INFLUENZA DIAGNOSTIC TESTING IN THE EHR

The Influenza A&B Rapid Test Point of Care (POC) order and documentation have been placed into the Cerner EHRS production domain.

Once ordered a task fires to the "Scheduled Patient Care" tab of the task list and is linked to the corresponding documentation for capturing results. These orders are not schedulable, therefore staff shall complete the test at point of care or upon order by the provider.

Screen shots below reference the order that shall be placed and the task that fires as a result. Document the results of the new Influenza A&B Rapid Test POC that is being ordered by providers.





**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## APPENDIX 5: COVID-19 CASE AND CONTACT SHAREPOINT REPORTING TOOL

### DAILY COVID-19 CASE & CONTACT LINE LIST REPORTING IN SHAREPOINT

During the COVID-19 pandemic, the California Correctional Health Care Services (CCHCS) institutions shall report to the Public Health Outbreak Surveillance COVID-19 SharePoint **all cases of COVID-19 among patients (suspected and confirmed) and all patients identified as contacts to confirmed cases**. *Seven days a week, including holidays,* same-day reporting is required for newly identified cases and contacts, and for significant updates to existing cases or contacts. No report is needed if there are no new cases/contacts and no significant updates to existing cases/contacts.

### CASE DEFINITIONS TO GUIDE REPORTING

**CONFIRMED COVID-19 CASE**

A positive laboratory test for the virus that causes COVID-19 in at least one respiratory specimen.

**SUSPECTED COVID-19 CASE**

HIGH SUSPECT: Any fever, respiratory symptoms, or evidence of a viral syndrome in a patient who had close (within 6 feet and prolonged [generally ≥30 minutes]) contact with a confirmed case of COVID-19 within 14 days of onset **OR** linkage to a high risk group defined by public health during an outbreak (for example: an affected dorm, housing unit, or yard) but without a test result for COVID-19.

LOW SUSPECT: Fever or cough or shortness of breath (dyspnea) with evidence of a viral syndrome (ILI) of unknown etiology in a person without test results for COVID-19 or influenza and without high-risk exposure.

**ASYMPTOMATIC CONTACT OF COVID-19**

A person who has had close (within 6 feet and prolonged [generally ≥30 minutes]) contact with a <u>confirmed</u> case of COVID-19 **OR** direct contact with secretions with a confirmed case of COVID-19 within the past 14 days, who has had no symptoms of COVID-19 and who has had no positive tests for COVID-19.

**OUTBREAK OF COVID-19**

Two or more confirmed cases of COVID-19 in patients with symptom onset dates within 14 days of each other in the same housing unit **OR** at least one confirmed case of COVID-19 in a patient with epidemiological linkage (e.g., close contact during infectious period) to another confirmed COVID-19 case in a patient or a staff member at the same institution.

### REPORTING REQUIREMENTS

Confirmed COVID-19 cases should be immediately reported to the Local Health Department (LHD). Outbreaks of COVID-19 should also be immediately reported to the LHD. Notify the CCHCS PHB immediately at CDCRCCHCSPublicHealthBranch@cdcr.ca.gov if there are significant developments at the institution (e.g., first time the institution is monitoring one or more

**COVID-19: Interim Guidance for**
**Health Care and Public Health Providers**

contacts, first confirmed case at the institution, first COVID-19 contact investigation at the institution).

The following events require <u>same-day</u> reporting to the COVID-19 SharePoint:

https://cdcr.sharepoint.com/sites/cchcs_ms_phos

- **All new suspected and confirmed COVID-19 cases.**
- **All new COVID-19 contacts.**
- For previously reported cases: new lab results, new symptoms, new hospitalizations, transfers between institutions, discharges/paroles, releases from isolation, deaths.
- For previously reported contacts: new exposures, transfers between institutions, discharges/paroles, releases from quarantine.

No report is needed if there are no new cases/contacts and no significant updates to existing cases/contacts.

## REPORTING IN SHAREPOINT

https://cdcr.sharepoint.com/sites/cchcs_ms_phos Click on your institution.



**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

Each institution has a home page with a navigation panel on the left.



To access the CASES line list, click on **CV19 Cases Suspected & Confirmed**. To access the CONTACTS line list, click on **CV19 Contacts**. This guide applies to both the CASES and CONTACTS line lists.

To add a new patient to a line list, click on **New**



**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

A new record (data entry form) will open on the right.



Scroll through the form to enter data. Brief instructions are provided below the form fields. Refer to the **Data Definitions** section on page 9 for detailed instructions for each field in the CASES and CONTACTS line lists. Click on **Save** at the bottom of the form to add the report to the line list.



# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

Saving the form adds the report to the line list.



To enter updated information after saving the form, click on the row [1] to select the record in the line list, then click on **Edit** [2] to re-open the form.



# COVID-19: Interim Guidance for Health Care and Public Health Providers

Enter your new information (e.g., diagnostic test, isolation dates) and click on **Save** (as above).



To edit a record directly in the line list, you can also click on **Quick Edit**.



## COVID-19: Interim Guidance for
## Health Care and Public Health Providers

Use the scroll bar [1] to move across the line list. Clicking on any field [2] will highlight it and enable an update to be entered. You can also cut and paste from an Excel spreadsheet into a blank row [3] in SharePoint (e.g., to add a list of CDCR numbers to initiate reports for new patients).



After entering new information into the line list, click on **Exit Quick Edit** to save the update.



# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

To share a link to an individual case report (e.g., to communicate with other health staff in the institution), select the record by clicking on it [1] and then click on **Share** [2].



A link to the case or contact report can be sent by entering an email address in the pop-up [1] or by clicking on **Copy Link** [2] and pasting the generated link into a separate email thread.



# COVID-19: Interim Guidance for
## Health Care and Public Health Providers

Click on **Export to Excel** [1] to create a copy of your CASES or CONTACTS line lists into a spreadsheet that can be saved for other non-reporting activities. Click on **Open** or **Save** [2] to view or save the spreadsheet in Excel.



## DATA DICTIONARY

### COVID-19 CASES SUSPECTED AND CONFIRMED

| Field | Definition / Instruction |
|---|---|
| Date of Report | Date that the suspect or confirmed case-patient was initially reported. This field is auto-populated and should not be edited. |
| Reporting Institution | The default value (auto-populated) is the hub institution. If the patient is at a Community Correctional Facility (CCF), select the CCF from the drop-down menu. |
| CDCR number<br>Patient last name<br>Date of birth | In addition to the CDCR number, enter the patient's last name and date of birth. These are needed for PHB identification if the CDCR number is entered in error. Enter the birth date in M/D/YYYY format. |
| Housing assignment yard<br>Housing assignment building<br>Housing assignment tier<br>Housing assignment cell bed bunk | Enter the patient's housing location (optional, for institutional use). Usually, the cell bed or number is a 3-digit number. In some cases it may be followed by a single letter representing upper or lower bunk (U or L). |

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

| Field | Definition / Instruction |
| --- | --- |
| COVID-19 test for diagnosis | Select an option from the drop-down list to record the result or status of the COVID-19 test used for diagnosis. Sometimes NP and OP swabs may be collected and tested separately. If ANY specimens tested positive, select Positive. If ALL specimens tested negative, select Negative. |
| Influenza RT-PCR test | Did the patient have the RT-PCR test for influenza? Select the result or status from the drop-down list. |
| Influenza rapid test | Did the patient have the rapid test for influenza? Select the result or status from the drop-down list. |
| Other respiratory pathogens | Did the patient test positive for any other respiratory pathogen besides COVID-19 or influenza? Select and option from the drop-down list. |
| Specify other resp pathogen(s) | If the patient tested positive for another respiratory pathogen, enter the pathogen(s) in the text box. |
| Symptoms | Select all symptoms that apply at any time during this illness from the drop-down list. |
| Date of symptom onset | Enter the first date that the patient had any of the symptoms checked above. Enter the date in M/D/YYYY format. |
| Date of symptom resolution | Enter the last date that the patient had any of the symptoms checked above. Enter the date in M/D/YYYY format. |
| Close contact | In the 14 days prior to symptom onset, did the patient have close contact with a confirmed case of COVID-19? Refer to the current COVID-19 guidance for definitions of close contact. Select an option from the drop-down list. |
| Cluster of influenza like illness | Is the patient linked to a cluster of influenza like illness? Select a response from the drop-down list. |
| Patient hospitalized (outside hospital) | Has the patient been hospitalized at an outside hospital for this illness? Select an option from the drop-down list. |
| Isolation status | Select the patient's current isolation status (e.g., alone in AIIR, at an outside hospital, released from isolation) from the drop-down list. |
| Date isolation began | Enter the date the patient was isolated. Enter the date in M/D/YYYY format. |
| Date released from isolation | Enter the date the patient was released from isolation (M/D/YYYY). Enter the date in M/D/YYYY format. |
| Release from isolation criteria for COVID-19 | Check all that apply to indicate the criteria the patient met to be released from isolation or indicate the patient does not currently meet any criteria for release from isolation. |
| Case closed | Check if the case has been closed (i.e., the patient is no longer an active case in your institution). |

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

| Field | Definition / Instruction |
|---|---|
| Reason for closing case | If the case has been closed, select all reasons that apply from the drop-down list (e.g., the patient was ruled out for COVID-19, recovered, died, or was transferred or released). |
| Transfer institution | If the patient was transferred to another institution or CCF before the case was closed, select the institution or CCF from the drop-down list. |
| Date case closed | Enter the date that the case was closed in M/D/YYYY format. |
| Modified | Auto-populated date and time of the most recent edit/update to the report. This date/time cannot be edited by the user. |
| Modified by | Auto-populated user who last edited the report. This entry cannot be edited by the user. |

## COVID-19 CONTACTS

| Field | Definition / Instruction |
|---|---|
| Date of report | Date that the contact to a confirmed case of COVID-19 was initially reported. This field is auto-populated and should not be edited. |
| Reporting institution | The default value (auto-populated) is the hub institution. If the patient is at a Community Correctional Facility (CCF), select the CCF from the drop-down menu. |
| CDCR number Patient last name Date of birth | In addition to the CDCR number, enter the patient's last name and date of birth (M/D/YYYY). These are needed for PHB identification if the CDCR number is entered in error. Enter the birth date in M/D/YYYY format. |
| Housing assignment yard Housing assignment building Housing assignment tier Housing assignment cell bed bunk | Enter the patient's housing location (optional, for institutional use). Usually, the cell bed or number is a 3-digit number. In some cases it may be followed by a single letter representing upper or lower bunk (U or L). |
| Quarantine reason | Select all reasons that apply to the current quarantine from the drop-down list. Use "close contact" as defined by the current COVID-19 guidance. |
| Date of last exposure | This date is used to calculate the end of the quarantine period. This value must be updated if the patient is re-exposed to COVID-19. Enter the date in M/D/YYYY format. |
| Quarantine start date | Enter the earliest date that the patient was placed on quarantine. Enter the date in M/D/YYYY format. |
| Quarantine end date | Enter the anticipated (future) or actual (past) end date of the quarantine for this patient. Enter the date in M/D/YYYY format. |
| Type of quarantine | How is (or was) the patient being quarantined. Select an option from the drop-down list. |
| Reason quarantine ended | Select all options that apply for reason(s) the patient's quarantine ended (e.g., the patient completed the quarantine without re-exposure, developed symptoms [i.e., suspect case], transferred) from the drop-down list. |

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

| Field | Definition / Instruction |
|---|---|
| Transfer institution | If the patient transferred to another CDCR institution or CCF before completing quarantine, select the institution or CCF from the drop-down list. |
| Modified | Auto-populated date and time of the most recent edit/update to the report. This date/time cannot be edited by the user. |
| Modified by | Auto-populated user who last edited the report. This entry cannot be edited by the user. |

## REQUESTING ACCESS TO THE COVID-19 SHAREPOINT

1. Each person who needs access must individually fill out a Secure Area Access Form.

   a. This form may not be completed on the behalf of another person.

   b. The form is located at http://cchcssites/SitePages/NewSecureRequest.aspx

   c. The name of the SharePoint is PH Outbreak Surveillance.

2. The delegated approver for the institution submit the name(s) of the person(s) requesting access to the SharePoint Team by email.

   a. The CNE for each institution has been delegated the authority to approve users from their institution. If the CNE is not available, the Public Health Branch can delegated the authority to another supervising nurse or to the PHN.

   b. The email address for the SharePoint team is m_SharePointTeam@cdcr.ca.gov.

3. Verify access by visiting the URL for the SharePoint: https://cdcr.sharepoint.com/sites/cchcs_ms_phos.

# COVID-19: Interim Guidance for Health Care and Public Health Providers

## APPENDIX 6: COVID-19 INDEX CASE - PATIENT CONTACT INVESTIGATION TOOL

**COVID-19 Case-Patient Contact Investigation Tool**

Institution:

Interviewer:

Interview Date:

| | | |
|---|---|---|
| CDCR# | | |
| Last Name | | |
| First Name | | |
| DOB | | |
| Nicknames / aliases | | |

**Symptom onset date:**
- ☐ Cough (new onset/worsening of chronic cough)
- ☐ Shortness of breath (dyspnea)
- ☐ Fever >100.4 °F (38 °C)
- ☐ Subjective fever (felt feverish)
- ☐ Other symptoms

Date isolated:

Diagnostic specimen date:

**Infectious period dates (from/to):**
(from 2 days prior to symptom onset to isolation date)

**Locations during infectious period (housing, out to hospital, other)**

| Yard / Facility | Building | Cell/Bed | Dates |  |
|---|---|---|---|---|
| | | | From | To |
| | | | | |

**Case-patient activities and close contacts during infectious period**

| Activity* | Location | Indoors (Yes/No) | First Date | Last Date | Time Spent / Day | # Contacts Identified | # Contacts developed symptoms | # Contacts Isolated | # Contacts COVID-19 Positive | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Housing close contacts (cells/bunks within 6 feet) | | | | | | | | | | |
| | | | | | Totals | | | | | |

* Examples: work, vocational, education, dining, library, groups, appointments (medical, dental, mental health, legal), religious, day room, recreational, socializing, visiting

v. 4/1/2020

**COVID-19: Interim Guidance for**
**Health Care and Public Health Providers**

## APPENDIX 7: COVID-19 INDEX CASE - PATIENT INTERVIEW CHECKLIST

Prior to the index case-patient interview, a review of the case presentation or physician conference should take place. The interviewer should be prepared to gather a detailed account of the case-patient's movements and activities during their infectious period to identify individuals who had close contact (within 6 feet and prolonged [generally ≥30 minutes]) with the patient or direct contact with any of the patient's secretions during the infectious period (from 2 days prior to symptom onset to isolation).

The index case-patient interview should take place as soon as possible after laboratory confirmation. If the patient is at an outside hospital, coordination with the local health department (LHD) or hospital should occur, to ensure timely completion of the interview so that close contacts can be identified and placed on quarantine.

Use the COVID-19 Index Case-Patient Contact Investigation Tool and this Interview Checklist to guide and document the interview. Initiate the contacts line list in the COVID-19 SharePoint:

**Interview Objectives**

- Confirmation of medical information (e.g., symptoms and onset date)
- Determination of the infectious period
- Determination of where the patient spends time
- Identification of all close contacts during the infectious period
- Providing patient education and answering the patient's questions
- Conveying the importance of sharing information about close contacts to help stop the spread

**Pre-Interview Activities**

- Review medical record and consult with physician as necessary for case presentation
- Establish a preliminary infectious period
- Collect housing, movement history, and work or program assignments from SOMS
- Determine if the patient is expected to be released from CDCR within the next 30 days
- Arrange interview time, space, and interpreter, if needed

**Defining the Infectious Period**

The infectious period during which others may have been exposed to COVID-19 starts 1 day before the onset of symptoms and ends when the patient was isolated or hospitalized at an outside facility.

# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

## INTERVIEW CHECKLIST

**Personal Information**

☐  Full name
☐  Aliases

**Symptoms / Onset Date**

☐  Cough (new onset or worsening)
☐  Shortness of breath (dyspnea)
☐  Fever >100.4°F (38°C)
☐  Subjective fever (felt feverish)
☐  Other symptoms

**Contact Information**

Identify and list contacts exposed for each group and activity. Document approximate duration of exposure during the activity.

**Friends and Family**

☐  Friends the patient spends the most time with
☐  Cell/dorm mates patient spends the most time with
☐  Family visits
☐  Visitors

**Routine Activities and Assignments**

☐  Work
☐  Vocational training
☐  Educational classes
☐  Dining areas
☐  Library time
☐  Group activities
☐  Regular appointments (medical, dental, legal)
☐  Committee presentation
☐  Religious, worship or spiritual activities
☐  TV room / day room
☐  Exercise
☐  Sports team participation
☐  Other

**Notes**

Any other relevant information

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## APPENDIX 8: EMPLOYEE CASE VERIFICATION AND CONTACT INVESTIGATION

**COVID-19 Patient Positive Verification and Contact Investigation**

**PART 1 Initial steps to determine valid COVID -19 CASE**
**Notification to employee, health to begin an investigation**

1. **Receive Notification from institution(s), name and contact information of suspected positive COVID-19 patient.**

2. **Nurse Consultant gathers available information on the patient**
   a. Nurse Consultant contacts the patient for interview
      i. Patient provides evidence of Positive test if available
      ii. Patient provides dates of symptom onset
      iii. Patient provides the dates of the work schedule.
   b. Determine initial dates of the infectious period
      i. Review patient interview
   c. Contact the local Public Health Department to determine positive status if needed
      i. Confirm the status of Patients test
      ii. Refine infectious period if necessary

3. **Determine if this referral is a valid positive case for COVID-19**
   a. Verified positive continue on as a case
   b. Verified negative; conclude the investigation

**PART 2     VERIFIED POSITIVE COVID-19 CASE**

1. **Develop plan for investigation**
   a. Prepare contacts list based on the refined infectious period
   b. Prioritize contacts
   c. Conduct contact assessments

2. **Determine need to expand or conclude an investigation based on evaluation of the information gathered.**
   a. Expand investigation
      i. Repeat steps in Part 1 (steps 1-3 for each contact)
   b. Conduct contact assessments
      i. Complete all report forms and forward to appropriate staff.

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## APPENDIX 9: MEMO TEMPLATE FOR NOTIFICATION OF COVID-19 CASES AND CONTACTS RELEASED TO THE COMMUNITY

**State of California**
**Department of Corrections and Rehabilitation**

## Memorandum



Date     :

To     :     Local Health Officer: _____
             OR Designee: _____
             Local Heath Jurisdiction: _____
             Fax # or email: _____

Subject: **COVID-19 Contact or Case (Confirmed or Suspected)**

The person identified below was or will be ☐ *transferred*
☐ *paroled*
☐ *released to post-release community supervision (PRCS)*
to your institution/region on _____ (Date).

☐ The person is a **contact** to a confirmed case of COVID-19. The last date of exposure was _____ (Date). The incubation period will end on _____ (Date).

☐ The person has a ☐ *confirmed* **case of COVID-19.**
                    ☐ *suspected*

    The date of symptom onset was _____ (Date).

    Symptoms   ☐ *have improved.*   ☐ *have not improved.*

    ☐ Fever resolved w/out antipyretics on _____ (Date).

    ☐ The patient subsequently tested negative for COVID-19 on _____ (Date/s).

Identifying information for the person:

Name (Last, First): _____   Date of Birth: _____
Soc Sec #: ____-____-_____     CDCR #: _____
Address and phone (if available): _____

If paroled or released to PRCS, contact info for parole or probation officer:

_____

For further information contact:
Institution: _____
Name of Public Health Nurse or Designee: _____
Phone Number: _____   Fax Number: _____

*March 2020*                                         *Page 1 of 1*

**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

## APPENDIX 10: COVID-19 POWERFORM INSTRUCTIONS; SCREENING, ISOLATION, AND QUARANTINE SURVEILLANCE

ORDERING PATHWAY: Adhoc > All Items > CareMobile Nursing Task > Surveillance Round

1. COVID-19 Screening Powerform



# COVID-19: Interim Guidance for
# Health Care and Public Health Providers

2. COVID-19 Isolation Surveillance Rounding twice a day for 10 days and COVID-19 Quarantine Surveillance Rounding twice a day for 14 days.



3. Once these orders are placed, it will trigger a task for the nurse to complete the appropriate Surveillance Rounding Powerform. These powerforms are currently viewable in the Adhoc folder under Nursing Forms in PROD.

COVID-19 Quarantine Surveillance Rounding



**COVID-19: Interim Guidance for
Health Care and Public Health Providers**

COVID-19 Isolation Surveillance Rounding



# Exhibit 7



# Memorandum

**Date:**       March 16, 2020

**Subject:**    DEPARTMENT DIRECTIVE ON SUSPENSION OF PATIENT
ADMISSIONS FROM THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION (CDCR)

Pursuant to Governor Gavin Newsom's Proclamation of a State of
Emergency dated March 4, 2020, the Director of the Department of State
Hospitals issues this Directive in accordance with the Director's authority
to execute laws relating to the care and treatment of persons with mental
health disorders placed with the State Department of State Hospitals
(DSH).  To ensure that patients with mental health disorders currently in
DSH's custody continue to receive the services and support that are
threatened by disruptions caused by COVID-19, and to protect the health,
safety and welfare of those patients, the Department is suspending
admission of patients placed at DSH facilities pursuant to Penal Code
section 2684 (*Coleman* patients).

All *Coleman* patients presently in DSH's custody will not be discharged
until DSH rescinds the suspension of *Coleman* patient admissions, unless
an emergency discharge is required for patients who cannot be safely
maintained in DSH's unlocked dorm setting.

This suspension of *Coleman* patient admissions will remain in effect for 30
days, unless extended by the Director of the Department.

STEPHANIE CLENDENIN
Director

*"Caring Today for a Safe and Healthy Tomorrow"*