1   XAVIER BECERRA                                    ROMAN M. SILBERFELD, State Bar No. 62783
    Attorney General of California                    GLENN A. DANAS, State Bar No. 270317
2   MONICA N. ANDERSON                                ROBINS KAPLAN LLP
    Senior Assistant Attorney General                   2049 Century Park East, Suite 3400
3   ADRIANO HRVATIN                                     Los Angeles, CA 90067-3208
    Supervising Deputy Attorney General                 Telephone:  (310) 552-0130
4   ELISE OWENS THORN, State Bar No. 145931             Fax:  (310) 229-5800
    TYLER V. HEATH, State Bar No. 271478                E-mail:  RSilberfeld@RobinsKaplan.com
5   KYLE A. LEWIS, State Bar No. 201041               Special Counsel for Defendants
    LUCAS HENNES, State Bar No. 278361
6   Deputy Attorneys General
      1300 I Street, Suite 125
7     P.O. Box 944255
      Sacramento, CA 94244-2550
8     Telephone:  (916) 210-7325
      Fax:  (916) 324-5205
9     E-mail:  Tyler.Heath@doj.ca.gov
    Attorneys for Defendants

10

11                      IN THE UNITED STATES DISTRICT COURT

12                    FOR THE EASTERN DISTRICT OF CALIFORNIA

13                            SACRAMENTO DIVISION

14

15  **RALPH COLEMAN, et al.,**                       2:90-cv-00520 KJM-DB (PC)

16                                  Plaintiffs,

17         v.                                        **DEFENDANTS' RESPONSE TO THE
                                                     COURT'S APRIL 3, 2020 ORDER TO
18                                                   SHOW CAUSE**

19  **GAVIN NEWSOM, et al.,**

20                                  Defendants.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................. 2

I.   The COVID-19 Pandemic Is Unprecedented. ........................................... 2

II.   COVID-19 Presents Unique Risks to DSH Due to Population and Design. .......... 3

III.   DSH's DECISION TO SUSPEND NEARLY ALL ADMISSIONS TO COMBAT COVID-19'S THREAT. ........................................................ 4

IV.   Referrals To DSH Are Not The Same As Medical Emergencies Treated at Community Hospitals. ............................................................. 6

V.   Offenders with Mental Health Disorders Present Different Issues than Coleman Class Members. ...................................................................... 7

VI.   CDCR and DSH Have Collaborated To Respond to COVID-19, Including By Stopping Transfers. ........................................................... 8

Argument ............................................................................................................... 9

I.   The Court's Order to Show Cause is Premature. ...................................... 9

A.   Direct Coordination among the Plata Court and Receiver, this Court and the Special Master, and the Parties in Both Plata and Coleman Is Necessary to Efficiently Respond to this Crisis. ...................... 9

B.   DSH's Temporary Suspension Is Not Inflexible and the COVID-19 Task Force Is the Best Setting to Monitor the Situation and Response Planning. ............................................................... 9

C.   The Court's April 6 Order and CDCR's Plan to Release Certain Inmates Is Not Fully Known and could Affect the Coleman class. .......... 11

II.   Defendants Are Protecting Patients During This Global Emergency While Providing Care Consistent with the Eighth Amendment. ................. 12

A.   The Governor and DSH's Director Took Executive Action to Respond to the COVID-19 Emergency Crisis and Protect Coleman Class Members. ................................................................ 12

B.   Defendants Have Acted Reasonably to Protect Class Members and Continue to Work to Provide Care. ................................................. 14

III.   OMHD Admissions Require An Assessment of Factors That Do Not Apply to Coleman Class Members. ................................................... 16

A.   CDCR Cannot Continue to Hold OMHDs in Prison. .......................... 16

B.   Releasing OMHDs to the Community Presents a Grave Public Safety Risk. ................................................................................... 17

C.   All Transfers into DSH Pose A Serious Risk of Transmission of COVID-19 to the DSH Patient Population. ....................................... 17

Conclusion ............................................................................................................. 18

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Berg v. Kincheloe*
5    794 F.2d 457 (9th Cir. 1986)...................................................................................................14

6

*Clement v. Gomez*
7    298 F.3d 898 (9th Cir. 2002)...................................................................................................14

8

*Coleman v. Brown*
    756 Fed. Appx. 677 (9th Cir. 2018) (finding the 1995 determination to be law
9    of the case) ..............................................................................................................................15

10

*Coleman v. Brown*
11    938 F.Supp.2d 955 (E.D. Cal. 2013).......................................................................................15

12

*Coleman v. Newsom*
    No. 290CV0520KJMDBP, 2019 WL 2996464 (E.D. Cal. July 9, 2019) ........................ *passim*
13

*Estelle v. Gamble*
14    429 U.S. 97 (1976)...................................................................................................................14

15

*Farmer v. Brennan*
16    511 U.S. 825 (1994).................................................................................................................14

17

*Jones v. Johnson*
    781 F.2d 769 (9th Cir. 1986)...................................................................................................12
18

*McGuckin v. Smith*
19    974 F.2d 1050 (9th Cir. 1992).................................................................................................14

20

*Noble v. Adams*
    646 F.3d 1138 (9th Cir. 2011).................................................................................................12
21

*Norwood v. Vance*
22    591 F.3d 1062 (9th Cir. 2010).................................................................................................12

23

*Peralta v. Dillard*
24    744 F.3d 1076 (9th Cir. 2014).................................................................................................15

25

*Procunier v. Martinez*
    416 U.S. 396 (1974).................................................................................................................13
26

*Toguchi v. Soon Hwang Chung*
27    391 F.3d 1051 (9th Cir. 2004).................................................................................................14

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Turner v. Safley*
    482 U.S. 78 (1987) .................................................................................12, 13

*Wilson v. Seiter*
    501 U.S. 294 (1991) .....................................................................................14

**STATUTES**

Cal. Pen. Code § 2963 ...................................................................................16

California Emergency Services Act ................................................................13

California Government Code
    § 8627 ........................................................................................................13
    § 8658 ........................................................................................................11

California Penal Code
    § 2684 ..........................................................................................................5
    § 2962(b) ......................................................................................................7
    § 2962(c) ......................................................................................................7
    § 2962(d)(1) ...............................................................................................17
    § 2962(e) ......................................................................................................7
    § 2962(e)(1) ...............................................................................................16

Lanterman-Petris-Short Act ............................................................................4

Welfare and Institutions Code § 1756 ............................................................5

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Eighth Amendment ...........................................................................2, 12, 15

**OTHER AUTHORITIES**

https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/ .......................3

https://www.cdcr.ca.gov/covid19/population-status-tracking/ .......................3

# INTRODUCTION

The world is facing uncertain and unique challenges not previously encountered by most people alive today.  COVID-19 is a global pandemic, and both the United States in general and California in particular are facing an increase in cases, hospitalizations, and death.  So severe is the threat that Governor Gavin Newsom issued a statewide "stay-at-home" mandate on March 19, 2020, along with a number of other protective measures.[1]  As much of the world is living under similar orders and facing uncertain futures as this virus spreads through the population, international, federal, state, and local officials are taking significant steps to combat it.

The California Department of State Hospitals (DSH), its employees, and its patients, including the 296 *Coleman* class members currently in its hospitals, face this same threat, heightened by the nature of its patient population and the nature of its treatment milieu.  DSH's hospitals are largely open dormitory designs that could facilitate the quick spread of COVID-19 in the population despite DSH's best protective measures.  A significant percentage of DSH's patients have medical conditions, mental illness, or are over the age of 60, and are therefore particularly susceptible to COVID-19's more severe symptoms, including death.  Accordingly, DSH took decisive actions to protect all of its patients and staff from the introduction of COVID-19 into its hospitals.  One such action included temporarily suspending intake of nearly all DSH patients, including *Coleman* class members.  The only patients still being transferred into DSH, Offenders with Mental Health Disorders (OMHDs), are inmates who have reached the end of their sentences but are statutorily required to be treated by DSH as a condition of their parole because of the severe risk to public safety were they to be released.

DSH did not choose to continue admission of one class of patients over members of the *Coleman* class.  Rather, due to legal requirements unique to OMHDs, unlike all other types of commitments, OMHDs cannot be maintained at CDCR or their current setting, while DSH suspends admissions.  The only other option for OMHDs is to be released to the community,

---

[1] All of California's actions can be found on the following website: https://www.gov.ca.gov/california-takes-action-to-combat-covid-19/.  The Governor issued numerous Executive Orders in direct response to combating COVID-19 and protecting California residents.  *See* https://www.gov.ca.gov/category/executive-orders/.

1

1   which exposes the public at large to an unacceptable risk of violent crime.  DSH suspended as

2   many transfers into its hospitals as possible to limit risks to all patients.  However, cognizant of

3   its obligations to *Coleman* class members and its CDCR partners, DSH remains ready to work

4   with CDCR to admit patients as necessary due to conditions in CDCR and if the two agencies are

5   able to take sufficient steps to guarantee the transfers are conducted as safely as possible.  DSH

6   and CDCR are collaborating daily to address this pandemic, and the Special Master and

7   Plaintiffs' counsel are involved, informed, and contribute to response measures through the

8   regular task-force meetings ordered by this Court.

9       The Court should not issue an order requiring DSH to admit *Coleman* class members, as

10   such an order would ignore the significant risk that increased transfers and admissions bring to

11   DSH's unique environment and vulnerable population, which includes *Coleman* class members.

12   It would also be premature given DSH's commitment to work with CDCR on transferring

13   patients if those transfers become necessary and based on the ongoing work of the COVID-19

14   task force, which was formed on March 20, 2020, and in which DSH continues to participate

15   actively with the Special Master, Plaintiffs, and all other Defendants.  DSH's actions are

16   consistent with its obligation to provide access to inpatient care as well as mental health policies

17   that govern the referral and admission of *Coleman* class members to its programs.  The COVID-

18   19 task force is the appropriate mechanism for further action and discussions.  Given the current

19   crisis and ongoing work to provide care to *Coleman* class members, DSH's temporary suspension

20   of admissions of *Coleman* class members is reasonable and necessary to prevent the spread of

21   disease and potential loss of life while DSH works to also comply with its obligations under the

22   Eighth Amendment.  The Court should discharge the order to show cause.

23                          **STATEMENT OF FACTS**

24   **I.    THE COVID-19 PANDEMIC IS UNPRECEDENTED.**

25       The spread of the novel coronavirus and its devastating viral disease, COVID-19, presents

26   an unprecedented and ever changing momentous challenge to the world.  Since being declared a

27   pandemic by the World Health Organization on March 11, 2020, COVID-19 has spread across

28   the globe, and its rate of infection and death are rapidly increasing every day.  The vast majority

2

of public health advice and directives have been to limit movement, shelter in place, and practice "social distancing," which is defined by the Center for Disease Control as "keeping space between yourself and other people outside of your home." (Defendants' Request for Judicial Notice (RJN), Exhibit A.) As part of the effort to slow the spread of the virus, California Governor Newsom issued a statewide shelter-in-place order on March 18, 2020—an order that remains in effect today. (RJN, Exhibit B.)

As of April 8, 2020, 62 California Department of Corrections and Rehabilitation (CDCR) staff and 25 inmates had tested positive.[2] To date, however, no DSH patients have tested positive for COVID-19. (Hendon Decl. ¶ 14.)

One of COVID-19's most insidious traits is its ability to be transmitted through asymptomatic carriers. According to health experts, a significant number of people may have contracted COVID-19 and not present symptoms for several days, if at all. (Bick Decl. ¶ 3.) In addition, testing for COVID-19 remains limited in availability and is therefore not widely available for testing asymptomatic individuals at this time. (Bick Decl. ¶ 3.) This poses serious challenges to all efforts to constrain the spread of the virus, including those by DSH. (Warburton Decl. ¶ 17.)

## II.   COVID-19 PRESENTS UNIQUE RISKS TO DSH DUE TO POPULATION AND DESIGN.

DSH's hospitals and population are particularly susceptible to COVID-19 and its more extreme symptoms and death. In fiscal year 2018-2019, DSH's average daily census was 6,122 in its five hospitals. (Hendon Decl. ¶ 8.) Treatment is provided to *Coleman* class members at three hospitals: 1) up to 256 male patients at DSH-Atascadero; 2) up to 50 male patients at DSH-Coalinga; and 3) up to 30 female patients at DSH-Patton. (*Id*.) While all three of these hospitals vary to some degree in design, generally all three of these hospitals provide their treatment to *Coleman* patients—and most other patients—in unlocked dormitory settings, where the patients are allowed to move about freely in their units and through the hospitals with some restrictions. (*Id*.) Due to COVID-19, that movement in the hospitals has been restricted. (Warburton Decl. ¶¶

---

[2] *See, website* https://www.cdcr.ca.gov/covid19/population-status-tracking/ and https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/ (last accessed April 8, 2020.)

3

Defs.' Resp. April 3, 2020 OSC (2:90-cv-00520 KJM-DB (PC))

9, 15.)  However, DSH's units still operate as 24 hour a day, 7 days a week, licensed inpatient unit with four patient unlocked dorm rooms, which may lead to a significant potential for widespread transmission of COVID-19 in DSH.  (Warburton Decl. ¶ 11; Hendon Decl. ¶ 10.)

In addition, due to the susceptibility of DSH's hospitals to widespread infection, its population is potentially more susceptible to severe disease and death than is the general population.  Over 1,500 of DSH's patients, or nearly twenty percent of the patients at its five hospitals, are sixty years of age and older.  (Hendon Decl. ¶ 12.)  DSH's population also includes patients with underlying medical conditions, and even DSH's younger population is at greater risk because individuals with serious mental illness typically have a significantly higher risk of morbidity and mortality than the general population.  (*Id*.)  All of these characteristics increase the potential for widespread illness and loss of life.  (Warburton Decl. ¶ 12.)

## III.  DSH's DECISION TO SUSPEND NEARLY ALL ADMISSIONS TO COMBAT COVID-19'S THREAT.

Due to the risk presented by COVID-19 in general and specifically to DSH's patients, DSH took swift action to protect all of its patients, including *Coleman* class members, and staff.  One of the steps was to decrease the possibility that COVID-19 would be introduced into the population by suspending admissions.[3]  Currently, DSH provides treatment to seven main classes of patients: 1) those deemed incompetent to stand trial; 2) those found not guilty by reason of insanity; 3) those deemed to be Offenders with Mental Health Disorders (OMHDs); 4) patients that have been determined to be sexually violent predators; 5) patients committed by civil courts for being a danger to themselves or others under the Lanterman-Petris-Short Act; 6) wards from

---

[3] DSH took a number of other actions, including but not limited to activating its centralized Emergency Operation Center to direct its response, updated hospital plans for infection control, respiratory protection and pandemic response, suspended most visitation, implemented employee screening, identified and prepared isolation spaces, provided information to staff and patients on how to protect themselves, and meet with regional and national workgroups and associations of state hospitals across the country.  (Hendon Decl. at ¶ 14a-11h.) It also has a clinical response divided into three prongs:  1) a Medical Response prong that researches the virus and public health guidance, works to optimize testing, policies, protective equipment, and developing nursing and physician protocols; 2) a Staff Communication and Support prong that meets with clinical leadership to gather and answer questions, provide support, and gather input from the field; and 3) a Provision of Treatment prong that evaluates how to safely provide treatment.  (Warburton Decl. ¶ 5.)

4

1   the CDCR Division of Juvenile Justice transferred to DSH for care pursuant to Welfare and

2   Institutions Code section 1756; and 7) inmates serving prison sentences who are transferred to

3   DSH for treatment under Penal Code section 2684, also known as *Coleman* class members.

4   (Hendon Decl. ¶ 7; Warburton Decl. ¶ 7.)  Throughout the week of March 16 and 23, 2020, DSH

5   suspended admissions of six of these seven classes of patients, including the *Coleman* class

6   members.  (Hendon Decl. ¶ 14f; ECF No. 6565 at 2.)

7        The admissions of *Coleman* class members were suspended under Penal Code section 2684,

8   which states that the "director of the appropriate department who shall evaluate the prisoner to

9   determine if he or she would benefit from care and treatment in a state hospital" and if "the

10   director . . . so determines, the superintendent of the hospital shall receive the prisoner and keep

11   him or her until in the opinion of the superintendent the person has been treated to the extent that

12   he or she will not benefit from further care and treatment in the state hospital."  (ECF No. 6565 at

13   36.)  After discussion with CDCR, and as reported by the Special Master, DSH Director

14   Stephanie Clendenin gave notice of the anticipated suspension on March 16, 2020.  (ECF No.

15   6565 at 3.)  This action was taken in compliance with the Court's March 8, 2017 order requiring a

16   direct phone call for an emergency reduction in the number of inpatient beds.  (ECF No. 5573 at

17   3-4.)  DSH counsel also notified Plaintiffs' counsel of the decision.  (ECF No. 6565 at 3, 38.)

18        DSH suspended the transfer of patients into and out of its hospitals to protect all of DSH's

19   patients, including the *Coleman* class, and prevent the potential loss of life from COVID-19.

20   (Warburton Decl. ¶¶ 9, 15.)  According to DSH's medical director, the risk in moving patients of

21   widespread morbidity and mortality in DSH's population far outweighs the risk of *Coleman*

22   patients sheltering in place at their existing CDCR facility.  (*Id*. at ¶ 10.)  This advice is consistent

23   with the advice given to the public at large by public health officials and the Centers for Disease

24   Control.  (*Id*. at ¶ 13.)  Moreover, DSH's decision is consistent with the actions taken by other

25   state hospital systems to significantly decrease admissions, including Pennsylvania, Florida, and

26   Oregon.  (*Id*. ¶ 14.)  Similarly, several counties are not accepting discharges from DSH or

27   allowing transfers for out-to-court purposes.  (Hendon Decl. ¶ 20.)  As California  residents are

28   sheltering in place, so too should *Coleman* class members, for their own protection.

5

Despite DSH's suspension of most patient admissions, it is cognizant of its responsibilities to its patients and to this Court. As the Special Master's report recognizes, DSH informed the task force that it is continuing to communicate with CDCR to address the mental health needs of the *Coleman* class. (ECF No. 6565 at 49; Warburton Decl. ¶ 17.) DSH reassured the task force that if CDCR is unable to provide inpatient treatment to its inmates, DSH will collaborate with CDCR to devise solutions to those issues and will carefully consider transferring clinically and custodially appropriate inmates that are as safe as possible to transfer. (ECF No. 6565 at 49.) To that end, DSH's medical director is in close contact with CDCR leadership, discussing situations under which to consider transfer and developing a tool to evaluate the safety of each patient for transfer in light of public health. However, due to COVID-19's unique characteristics and the limitations on testing, the risk can be reduced, but not eliminated. (Warburton Decl. at ¶¶ 15-16.)

DSH's proposed approach is similar to one currently being proposed by CDCR, worked on with the Special Master's team, and discussed in the task force. (ECF No. 6586 at 10.) Under that policy, CDCR would significantly limit transfers to levels of care at other institutions, including at the Psychiatric Inpatient Programs, with some exceptions. (Bick Decl. ¶ 5.) DSH's continued vigilance is warranted and so far is working—DSH has yet to have a patient test positive for the virus. (Hendon Decl. ¶ 13.)

## IV.    REFERRALS TO DSH ARE NOT THE SAME AS MEDICAL EMERGENCIES TREATED AT COMMUNITY HOSPITALS.

*Coleman* patients transferred to DSH are not in need of emergent care. *Coleman* class members are admitted to DSH to receive an intermediate level of care, and typically must be admitted within 30 days of referral. (Warburton Decl. ¶ 9; ECF No. 6864-1, Program Guide 12-1-14 to 12-1-16.) They are not patients in need of emergent mental health care, acute inpatient mental health care, or experiencing a psychiatric emergency. (Warburton Decl. ¶ 9.) DSH does not provide care for medical or psychiatric emergencies. DSH only provides routine primary medical care, and most patients presenting with serious or emergent illnesses must be sent out to a community hospital. (*Id.*) DSH is not treating the equivalent of a psychiatric heart attack, it is instead treating patients who have been stabilized in an acute care setting and need continued

inpatient treatment to reach their treatment goals so they may be safely discharged to an outpatient setting.

## V.    OFFENDERS WITH MENTAL HEALTH DISORDERS PRESENT DIFFERENT ISSUES THAN COLEMAN CLASS MEMBERS.

Some inmates who have served their prison term but are so dangerous as a result of their mental disorder that they cannot safely be paroled into the community, are instead referred and admitted to DSH.  The OMHD commitment was created to provide a mechanism to detain and treat inmates with a severe mental health disorder who reach the end of a determinate prison term and are dangerous to others as a result of a severe mental health disorder.  (DiCiro Decl. ¶ 7.) The designation only applies to inmates convicted of specific violent crimes—including voluntary manslaughter, mayhem, and other crimes identified in the statute—and sentenced to a determinate term of imprisonment.  Cal. Pen. Code § 2962(e).  To be classified as an OMHD, an inmate must have a severe mental health disorder that was one of the causes or an aggravating factor in the commission of his convicted offense.  Cal. Pen. Code § 2962(b).  The inmate must also have been in treatment for the severe mental health disorder for at least 90 days within the year prior to his parole or release.  Cal. Pen. Code § 2962(c).

Before an inmate serving a determinate sentence reaches his Minimum Eligible Release Date (MERD) from CDCR, the inmate is evaluated by the CDCR OMHD Assessment Unit to determine if he meets the above criteria for inclusion in the OMHD program.  (DiCiro Decl. ¶ 8.) The CDCR Chief Psychiatrist at the inmate's housing institution reviews each such evaluation and certifies that the inmate meets the OMHD criteria.  (Id. at ¶ 10.)  Meanwhile, a DSH evaluator independently evaluates each inmate identified by CDCR as meeting the OMHD criteria.  (Id. at ¶ 9.)  The Board of Parole Hearings (BPH) evaluates all such inmates, resolves any disagreement between the CDCR and DSH evaluations, and ultimately sends approved OMHDs to DSH to serve their parole term.  (Id. at ¶¶ 10-13.)  The BPH decision may be based on a hearing, if the inmate wishes, and the inmate may also appeal that decision to a state court, any

7

of which may determine that the inmate does not meet OMHD criteria and should be released into the community on state parole.  (*Id.* at ¶¶ 12-13.)

OMHDs need to receive mental health services while on parole and are considered a high public safety risk if their severe mental disorder is left untreated.  (DiCiro Decl. ¶ 7.)  OMHDs released from the hospital to the community also have a higher rate of recidivism than other commitment types, with most re-arrests occurring in the first year after release.  (*Id.* at ¶ 15.)

## VI.     CDCR AND DSH HAVE COLLABORATED TO RESPOND TO COVID-19, INCLUDING BY STOPPING TRANSFERS.

As April 8, 2020, CDCR has 25 inmates and 62 staff with COVID-19 infections.[4]  As reported to the Three Judge Court on April 1, 2020 and April 2, 2020, and in a response filed today to this Court's April 6, 2020 order (ECF No. 6580), CDCR has stopped transfers and movement at some of its impacted institutions and taken other additional measures to safeguard inmates, including *Coleman* class members.  (ECF No. 6586.)

CDCR is currently enhancing its plan to address COVID-19 by moving to significantly limit  transfers to other prisons, including the Psychiatric Inpatient Programs (PIPs) and outside hospitals, other than as clinically required for specific emergencies in alignment with expert guidance, and input from the Special Master's psychiatric experts.  (Bick Decl. ¶ 5; Warburton Decl. ¶ 17.)  CDCR is also developing a plan to provide all appropriate mental health care to patients at their current institutions, rather than transferring inmates between institutions when their indicated level of care changes.  (Bick Decl. ¶ 6.)

DSH has actively participated in the COVID-19 task force meetings, collaboratively responding to questions, explaining its response, and pledging to work with CDCR to provide access to inpatient care as needed and if possible.  (Warburton Decl. ¶¶ 10, 17 and 19.)  DSH continues to work closely with its CDCR mental health colleagues to identify situations in which a patient transfer, although inadvisable under the current circumstances, is absolutely critical, and

---

[4] *See, website* https://www.cdcr.ca.gov/covid19/population-status-tracking/ and https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/ (last accessed April 8, 2020.)

they have together developed a screening tool to use in those circumstances to help mitigate the

risk of transferring in an outside patient.  (*Id.* at ¶ 16.)

## ARGUMENT

**I.    THE COURT'S ORDER TO SHOW CAUSE IS PREMATURE.**

> **A.    Direct Coordination among the *Plata* Court and Receiver, this Court and the Special Master, and the Parties in Both *Plata* and *Coleman* Is Necessary to Efficiently Respond to this Crisis.**

The threat of COVID-19 is not specific to the *Coleman* or *Plata* cases.  Rather, it presents

risks to all CDCR inmates, and it impacts both mental health and medical care.  CDCR's mental

health care and medical care staff are making important decisions under the supervision of the

Special Master and the *Plata* Receiver.  The two continue to coordinate their efforts as they work

together on a daily basis to protect and treat inmates.

Given the clear cross-over issues that exist between *Plata* and *Coleman* at this unique time,

Defendants request more coordination between the two courts.  Whatever this Court does will

impact the Receiver and class members in *Plata*, and vice versa.  To efficiently address this

pandemic and efficiently address inmates' needs, coordination is key, not litigation or

inconsistent or duplicative effort across various courts.

> **B.    DSH's Temporary Suspension Is Not Inflexible and the COVID-19 Task Force Is the Best Setting to Monitor the Situation and Response Planning.**

A Court order requiring DSH to adopt a process applicable to OMHDs is premature.  The

Court already has in place a mechanism to monitor Defendants' response to the COVID-19

pandemic.  It is two-fold: 1) the Special Master's powers to request and receive information and

speak to Defendants' employees and, if necessary, recommend actions to the Court (ECF No. 640

at 4-6); and 2) the regular meetings of the COVID-19 task force that the Court ordered the Special

Master to convene as needed (ECF No. 6565 at 2), and the input the Special Master is providing

to Defendants on the plans they are developing.  Through these mechanisms, the Court and the

Special Master can monitor Defendants' plans and response to COVID-19, as Defendants respond

to the crisis and work to provide inpatient care to its patients.  Defendants have fully participated

1   in these meetings, shared their plans, and discussed the details of those plans with the Special

2   Master and parties, and they have answered questions from Plaintiffs' counsel and the Special

3   Master's team.  While the Special Master's report expressed ongoing concern about DSH's

4   response to COVID-19, it also listed a large number of accomplishments since the start of the task

5   force and suggested that continued collaboration and work in the task force is the best approach

6   going forward.  (ECF No. 6565 at 31-33.)

7        DSH's suspension of admissions for most of its admissions is also temporary, and it

8   provides flexibility should the transfer of *Coleman* class members become necessary and be

9   accomplished safely.  This flexibility was expressed several times by DSH during the COVID-19

10   task forces, and DSH and CDCR made clear that its representatives are in almost daily contact.

11   They have discussed the appropriate instances in which transfers would be considered and

12   developed a preliminary screening tool to use and minimize the unavoidable risk presented by

13   patient transfers as they become necessary.  To the extent the Special Master's report suggests the

14   Defendants develop a more specific plan, it is more appropriate for that plan to be developed by

15   the agencies with input by the Special Master, particularly given the changing situation and

16   flexibility needed to respond to this crisis.

17        In addition, CDCR is in the process of creating their own plans to substantially limit the

18   transfer of all inmates—including *Coleman* class members—between CDCR's institutions and to

19   provide treatment in place to limit the risk of transmitting disease as much as possible.  CDCR's

20   mental health, medical, and correctional staff are working collaboratively with the Special

21   Master's experts to finalize these plans, which have the potential to affect any transfer of

22   *Coleman* class members to DSH.

23        This situation is constantly changing and Defendants must make difficult and swift

24   decisions to protect their staff, patients and inmates, including the *Coleman* class.  The COVID-

25   19 task force is the best place to monitor those decisions and provide the flexibility needed in this

26   crisis situation.

27

28

**C.   The Court's April 6 Order and CDCR's Plan to Release Certain Inmates Is Not Fully Known and could Affect the *Coleman* class.**

The Court's April 6, 2020 order regarding social distancing might produce information or result in requirements in tension with the Court's proposed order.  Similarly, the actions already taken by CDCR to release certain inmates may affect any transfer of patients to DSH.  As discussed in the Three Judge Court proceedings, CDCR Secretary Diaz exercised his authority under California Government Code section 8658 to parole inmates that CDCR has determined would not pose an undue risk to public safety.  (ECF No. 6552 at 13.)  Under that action, inmates "with 60 days or less remaining on their sentence (as of March 30, 2020) who are not serving a current term for a violent felony, or for a domestic violence offense, and are not required to register as a sex offender will have their release to parole or PRCS accelerated under Secretary Diaz's direction."  (*Id.*)  The full impact of that decision on the *Coleman* class's size and the future impact of any reduction is presently unknown.

In addition, the Court's April 6, 2020 order asked the parties to answer two specific questions:  "1) In light of the coronavirus pandemic, what are the constitutional minima required for physical safety for *Coleman* class members?  Is six feet of physical distancing required by the Constitution?  If no, why not and what is required?" And "Assuming some level of physical distancing is required by the Constitution, what additional steps, if any, must be taken to ensure that defendants continue to deliver to *Coleman* class members at a minimum the level of mental health care that has thus far been achieved in the ongoing remedial process in this case, focused on achieving the delivery of constitutionally adequate mental health care to the plaintiff class?"  (ECF No. 6580 at 2.)  The Court's actions based on the information provided may impact the need or ability to transfer *Coleman* class members to DSH.  As discussed above, DSH has an open dormitory environment with limited isolation space.  Requiring DSH to introduce more patients and risk of disease into its hospital dorm settings is contrary to the Court's concerns in the April 6 order, and any future orders stemming from the April 6 order will likely impact the transfer of inmates to DSH.

## II.   DEFENDANTS ARE PROTECTING PATIENTS DURING THIS  GLOBAL EMERGENCY WHILE PROVIDING CARE CONSISTENT WITH THE EIGHTH AMENDMENT.

### A.   The Governor and DSH's Director Took Executive Action to Respond to the COVID-19 Emergency Crisis and Protect *Coleman* Class Members.

The law is clear—"judges and juries must defer to prison officials' expert judgments" on matters of safety and security (*Norwood v. Vance*, 591 F.3d 1062, 1066-1067, 1070 (9th Cir. 2010) (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)); as well as on issues regarding the "nature and extent of medical treatment."  *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986), overruled on other grounds by *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc). Thus, the Ninth Circuit has recognized that in some circumstances constitutional rights can exist in tension with each other.  *See Norwood*, 591 F.3d at 1070 (recognizing that the temporary denial of outdoor exercise due to safety concerns is reasonable); *Noble v. Adams*, 646 F.3d 1138, 1142–43 (9th Cir. 2011) (as amended) (a post-riot lockdown of prison that resulted in denial of the plaintiff's Eighth amendment right to exercise was reasonable because prison officials have a duty to keep inmates safe).  Defendants' briefing before the Three Judge Court in response to Plaintiffs' motion to reduce the patient population made clear that the Court should give deference to the Governor and state officials during this pandemic, which requires fast action and difficult choices by those who are closest to it—here, CDCR and DSH's officials.

The separation of powers is one of the core principles upon which our federal and state governments are built.  This constitutional construct mandates that the three branches of government–executive, legislative, and judicial–remain separate and not otherwise infringe upon the authority of one another.  As it relates to prisons, the Supreme Court has aptly observed that "'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform,'" recognizing that "running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly *within the province of the legislative and executive branches of government*."  *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974) overruled on other grounds in *Thornburgh v. Abbott*, 490 U.S. 401 (1989))) (emphasis added).  Critically, the Supreme Court has held that "[p]rison administration is, moreover, a task that has been

12

1    committed to the responsibility of those branches, and *separation of powers concerns counsel a*

2    *policy of judicial restraint.*  Where a state penal system is involved, federal courts have, as we

3    indicated in *Martinez*, additional reason to accord deference to the appropriate prison authorities."

4    *Id.* at 85.  These separation of powers interests are particularly salient when the executive branch

5    is responding in real time to a global pandemic with no precedent.

6        Defendants recognize the Court's duty to review Defendants' decisions as they may affect

7    the Plaintiff class.  However, the Court's order to show cause does not give sufficient deference

8    to the Governor, CDCR, and DSH officials in responding to public health emergencies at a

9    moment of peril unrivaled in our lives.  Under the California Emergency Services Act, the

10    Legislature centralized authority to respond to state emergencies within the Governor and

11    Governor's Office of Emergency Services.  In this emergency, the Governor has "complete

12    authority over all agencies of the state government … and all police power vested in the state,"

13    Cal. Gov. Code § 8627, and he may exercise his emergency authority to "suspend any statute

14    prescribing the procedure for conduct of state business, or the orders, rules, or regulations of any

15    state agency." *Id.* § 8571.

16        The Governor and DSH's Director have exercised their authority to respond to the threat

17    presented by COVID-19, and the Court should afford them sufficient deference to exercise that

18    authority and take appropriate precautionary measure to protect DSH and CDCR's patients and

19    staff, as well as the broader community.  DSH and CDCR are uniquely qualified due to their

20    knowledge of their patients, their physical plants, and how those interact with this dangerous

21    disease, and they have determined that the best way to protect patients from COVID-19 is

22    through a limitation of movement and other actions.  In these circumstances, members of the

23    state's executive branch are owed discretion to make proactive and informed decisions, based

24    upon sound clinical input, to limit the impact of this disease, including on *Coleman* class

25    members, and to rely on the COVID-19 task force and work being already being done with

26    Special Master oversight.

27

28

**B.    Defendants Have Acted Reasonably to Protect Class Members and Continue to Work to Provide Care.**

The state's discretion is paramount when faced with an emergency.  COVID-19 is an emergency not encountered by modern society, much less by state correctional and mental health agencies.  Here, Defendants are faced with the duel tasks of protecting their patients and staff from a potentially deadly disease that can be asymptomatic in some patients by preventing its spread while providing mental health care to those patients.

Prison officials and physicians violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act with deliberate indifference to an inmate's serious medical needs.  *Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference exists when a prison official knows an inmate faces a substantial risk of serious harm to his or her health, but fails to take reasonable steps to avoid that risk.  *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Toguchi v. Soon Hwang Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).  "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of harm exists,' but that person 'must also draw the inference.'"  *Toguchi*, 391 F.3d at 1057 (quoting *Farmer*, 511 U.S. at 837).  Prison officials do not violate the constitution where they respond reasonably, even if the response does not successfully avoid the risk.  *See Farmer*, 511 U.S. at 844–45; *see generally Berg v. Kincheloe*, 794 F.2d 457, 462 (9th Cir. 1986).

"The requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)).  However, when determining the prison officials' subjective intent, it may be important to balance the "competing tensions" between "the prisoners' need for medical attention and the government's need to maintain order and discipline."  *Clement v. Gomez*, 298 F.3d 898, 905 n.4 (9th Cir. 2002) (acknowledging that a

14

1    violent prison fight that resulted in restricted movement was a "competing tension" with the need

2    to decontaminate plaintiff from pepper spray, and would be important in resolving the issue of

3    subjective intent).[5]

4         In the face of this crisis, Defendants are taking decisive and necessary action.  DSH

5    suspended transfers of most of its patients because of the overwhelming risk that introduction of

6    COVID-19 presents if introduced into its hospitals.  That action was taken to protect *Coleman*

7    class members in DSH as well as its other patients and staff.

8         At the same time, DSH remains committed to work with their CDCR partners on a plan to

9    transfer appropriate patients if it becomes necessary and can be accomplished safely.  Moreover,

10    CDCR continues to work to provide patients appropriate mental health care in its institutions.

11    One element of that is CDCR's "COVID-19 – Mental Health Delivery of Care Guidance," which

12    provides guidance and a tiered-response to provide care based on a number of factors.  (ECF 6535

13    at 10.)  The guidelines were developed with the input of the Special Master and Plaintiffs during

14    the Task Force meetings, and work to strike a balance between providing required care and

15    minimizing COVID-19 risk.  (*Id*. at 4-9.)  And it accounts for providing care at different levels of

16    available resources.  (*Id*. at 10.)  CDCR clinicians also "report they are developing an emergency

17    mental health treatment guidance for CDCR institutions."  (ECF No. 6586 at 8.)  "The document

18    will provide guidance to institutions regarding the operation of mental health units and other

19    treatment modalities to inmates in their current institution during the COVID-19 pandemic."  (*Id*.)

20    CDCR clinicians plan to present the plan to the Special Master for discussion and eventually

21    present it to the Plaintiffs in the COVID-19 Task Force.  (*Id*.)  Defendants are responding to an

22         [5] Defendants recognize that "[i]n 1995, the court found defendants in violation of their
Eighth Amendment duty to provide California's seriously mentally ill prison inmates with access

23    to adequate mental health care."  *Coleman v. Newsom*, No. 290CV0520KJMDBP, 2019 WL
2996464, at *1 (E.D. Cal. July 9, 2019) (*citing Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. Cal.

24    1995)).  Since that time, it has declined to revisit that determination because "once an Eighth
Amendment violation is found and injunctive relief ordered, the focus shifts to remediation of the

25    serious deprivations that formed the objective component of the identified Eighth Amendment
violation."  *Coleman v. Brown*, 938 F.Supp.2d 955, 988 (E.D. Cal. 2013); *See also Coleman v.*

26    *Brown,* 756 Fed. Appx. 677, 679 (9th Cir. 2018) (finding the 1995 determination to be law of the
case).  However, the impact of a pandemic on the delivery of mental health services was not

27    contemplated in the court's original or subsequent determinations, and it is within the court's
discretion to reconsider the law of the case when new evidence is presented.  *Peralta v. Dillard,*

28    744 F.3d 1076, 1088-1089 (9th Cir. 2014).

15

1   unprecedented threat to patient safety while trying to provide care—Defendants have a plan and

2   should be allowed to execute and adjust the plan as necessary without unnecessary

3   micromanagement by Plaintiffs or the Court.

4   **III.   OMHD ADMISSIONS REQUIRE AN ASSESSMENT OF FACTORS THAT DO NOT APPLY
        TO *COLEMAN* CLASS MEMBERS.**

5

6       The Court's order to show cause noted that "DSH is continuing to admit [OMHDs]" while

7   closing admissions to *Coleman* class members.  (ECF No. 6572.)  The Court expressed concern

8   that "the rights of OMHDs, constitutional or otherwise, [are being] prioritized over the

9   constitutional rights of *Coleman* class members."  (*Id.* at 2.)  DSH is not prioritizing any inmates'

10  constitutional rights.  OMHD admissions to DSH are based on several factors that do not apply to

11  *Coleman* class members and represent a necessity based on a balance of three competing

12  interests: the lack of legal authority for CDCR to retain OMHDs in prison, the potentially grave

13  public safety implications of releasing OMHDs on parole, and the public health considerations of

14  *any* transfer of patients to DSH.

15      **A.   CDCR Cannot Continue to Hold OMHDs in Prison.**

16      OMHDs are, by definition, inmates serving a *determinate* sentence who have reached the

17  end of that sentence and now must be released from prison.  Cal. Pen. Code § 2962(e)(1).

18  OMHDs can only be held past this date by CDCR if approved by the Board of Parole Hearings

19  for evaluations as a potential OHMD after a showing of good cause.  Cal. Pen. Code § 2963.

20  Although DSH may keep OMHDs beyond their parole discharge date, that authority is based on a

21  civil commitment, which must be requested by the county district attorney annually.  (DiCiro

22  Decl. ¶ 14.)  DSH is thus faced with a different calculus for OMHDs when considering whether

23  their transfer from CDCR may be denied—while *Coleman* class members denied transfer into

24  DSH facilities will be retained in CDCR custody, OMHDs will instead go directly to the

25  community.  (*Id.* at ¶ 6.)

26

27

28

**B.    Releasing OMHDs to the Community Presents a Grave Public Safety Risk.**

As part of the OMHD evaluation process, both CDCR and DSH certify that the inmate in question "represents a substantial danger of physical harm to others." Cal. Pen. Code § 2962(d)(1). Placing such individuals in the community would be directly contrary to the State's responsibility to protect public safety. This concern is not hypothetical; OMHDs released directly to parole re-offend at the highest rate among parolees, and the majority of these new crimes occur within the first year. (DiCiro Decl. ¶ 15.) In a five-year span, over half of OMHDs released into the community from DSH were arrested for new offenses. (*Id.*)

**C.    All Transfers into DSH Pose A Serious Risk of Transmission of COVID-19 to the DSH Patient Population.**

Balanced against this threat to public safety is the very real and immense public health threat posed by *any* transfer into DSH. DSH doctors and other medical experts have determined that any transfer into DSH poses a threat of transmission of COVID-19 to its patient population, which is uniquely susceptible to the virus due to its demographics and the design of DSH's facilities. (Warburton Decl. ¶ 16; Hendon Decl. ¶¶ 8-9.) Because COVID-19 is known to spread asymptomatically, and testing for asymptomatic people is not widely available at this time, it cannot be assumed that patients can be safety transferred, even if they are not exhibiting symptoms. (Warburton Decl. ¶ 16.)

DSH's dilemma, then, is that accepting any new transfers could lead to the spread of COVID-19 in their patient population and result in patient deaths, while refusing to accept OMHDs will result in the release of individuals known to pose a threat of physical danger to the general public. If DSH could prevent *all* transfers, it would do so. The balance that DSH has struck is to accept those few OMHDs who BPH cannot hold, as well as *Coleman* patients who cannot receive adequate mental health treatment from CDCR in their current institution. DSH does not deny that *Coleman* patients have a constitutional right to timely access to mental health care, but in the face of the current pandemic, DSH determined that the best means of protecting the health and safety of *all* of its patients, including *Coleman* class members currently housed in

17

DSH beds, is to temporarily halt as many admissions as possible. Any order directing DSH to admit additional inmate patients would pose a very real risk of infection and fatality to every patient in DSH's facilities. (Warburton Decl. ¶ 16.) *Coleman* patients' constitutional rights to access to mental health care are protected by ensuring they remain safely housed at CDCR with continued care provided in place.

## CONCLUSION

The Court should discharge the order to show cause—this is not a time for needless and misdirected litigation and Defendants have addressed the Court's questions. Instead, DSH and its CDCR colleagues prefer to focus their efforts and resources on protecting the inmate patients under their charge during this unprecedented and emergency pandemic.

Dated:  April 8, 2020                          Respectfully Submitted,

                                               XAVIER BECERRA
                                               Attorney General of California
                                               ADRIANO HRVATIN
                                               Supervising Deputy Attorney General

                                               /s/ Tyler V. Heath

                                               TYLER V. HEATH
                                               Deputy Attorney General
                                               *Attorneys for Defendants*

CF1997CS0003
FINAL OSC RESPONSE

18