XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 210-7325
 Fax:  (916) 324-5205
 E-mail:  Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone:  (310) 552-0130
 Fax:  (310) 229-5800
 E-mail:  RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DECLARATION K. WARBURTON SUPPORTING OF DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE** |
| v. | |
| **GAVIN NEWSOM, et al.,** | Judge:    The Hon. Kimberly J. Mueller |
| Defendants. | |

I, K. Warburton, declare:

1.  I am the Medical Director and Deputy Director of Clinical Operations for the California Department of State Hospitals (DSH), a position I have held since approximately November 2011. I submit this declaration supporting Defendants' response to the Court's April 3, 2020 order to show cause. I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

1

Warburton Decl. Supp. Defs' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

2. I received my Doctor of Osteopathic Medicine in 2001 from Midwestern University, and completed my general adult psychiatry residency at Maine Medical Center. I also completed a fellowship in forensic psychiatry at the University of California, Davis. I am licensed to practice medicine by the Osteopathic Medical Board of California, and board certified in Forensic Psychiatry and General Adult Psychiatry by the American Board of Psychiatry and Neurology. I am also currently an Associate Professor of Clinical Psychiatry at the University of California, Davis, School of Medicine.

3. Before becoming DSH's Medical Director, I worked as a psychiatrist in a number of different settings inside and outside of DSH. For example, I was an attending psychiatrist for the Sacramento County Jail, attending psychiatrist at Napa State Hospital, acting Senior Psychiatrist at Napa State Hospital, and Chief of Forensic Psychiatry at Napa State Hospital.

4. As the Medical Director and Deputy Director of Clinical Operations, I oversee the development and delivery of all clinical and medical care within DSH, the implementation and evaluation of treatment protocols and policies, and communication with other systems and experts to understand current standards and best practices. I also oversee the clinical response to emergencies and crises experienced by DSH's hospitals, such as the recent COVID-19 pandemic. I am also familiar with the different types of patients DSH admits and treats and the general demographic characteristics of those patients, including, but not limited to, clinical acuity and medical comorbidity. I am also familiar with the general physical characteristics of DSH's hospitals, including the treatment and living environments for the different groups of patients, as well as the particular risks that those spaces pose when infectious diseases are introduced into the environment.

5. Since the COVID-19 pandemic started to present a threat to the wellness of DSH's staff, patients, and facilities, my work duties almost exclusively shifted to overseeing the clinical response to this emergency. This includes daily meetings with both the COVID-19 response team which was set up as a task force to focus on DSH's COVID-19 response. I meet twice daily (morning and evening) with my clinical leadership team—which is made up of my Associate Medical Director, Dr. Juan Carlos Arguello, my Statewide Chief Psychologist Dr. Susan

2

Warburton Decl. Supp. Defs' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

Velasquez, and my Assistant Deputy Director Robert Schaufenbil, as well as our staff manager Emilia Cottrell. This team is leading the statewide clinical response to the pandemic. We have divided the clinical response into three prongs: Medical Response (Dr. Arguello), Staff Communication and Support (Mr. Schaufenbil), and Treatment Provision (Dr. Velasquez), which we describe below to show the extent of DSH's efforts. I am involved in all of these efforts.

  a. The Medical Response includes researching the virus, including review of the California Department of Public Health (CDPH) and CDC guidance, attempts to obtain and optimize testing, policy and provision of personal protective equipment, development of nursing and physician protocols for quarantine/isolation of suspected cases, development and refinement of screening and masking protocols, regular consultation with other state hospital systems, and regular consultation with CDCR clinical leadership. The medical response is guided daily by our statewide medical directors council (comprised of the medical director from each hospital as well as infectious disease specialists and my assistant medical director for primary care). This group is meeting daily from noon-1 to discuss all of the listed issues, which are changing on a daily basis due to the nature of the pandemic, so that our response is current and effective.

  b. Our Staff Communication and Support prong is conducting remote meetings with clinical leadership around the state, as well as multiple weekly discipline specific remote meetings. These meetings are held across all three shifts (morning, evening, and night time on call). We gather questions, comments and concerns from the clinicians on the units, generate responses from our statewide executive leadership, and then provide those responses at the next remote meeting. We also post these responses on a website of information and resources that was developed for the pandemic response. This service is not just for the support of our clinical staff (which is extremely important), but also meant to reassure them and gather their valuable input into how to proceed during this state of emergency. We also set up a Peer Support Hotline staffed by my clinical leadership group to address questions, solicit information and provide support to our clinical staff on the ground.

  c. The Provision of Treatment group has evaluated how to safely provide treatment while maintaining safety. Recommendations made early by this group, and supported by DSH,

3

included cancelling all centralized treatment and sheltering our units in place at the hospitals. This group has developed a website of clinical resources for unit-based provision of care, which is available to DSH clinicians through our intranethttp://dshinsite.ca.gov/COVID-19/docs/PsychosocialTreatmentResourcesBrochure.pdf.  We are setting up a meeting to share these resources with our colleagues at CDCR.

6. I am regularly consulting any and all resources I can find to get a better understanding of this insidious virus, how it spreads, and how we can protect our patients.  I study national and international data multiple times a day to review the disease curves and how my patients will be impacted.  The spread of this virus is silent and insidious—based on my research, DSH must continue to take affirmative steps to prevent the introduction of COVID-19 into our facilities.  If not, it will be too late to stop the spread of the virus in our facilities.  Based on my research, the current DSH hospital infrastructure makes DSH patients particularly vulnerable, as does their higher rates of morbidity.  My research has made me aware that introduction of this virus into our hospitals has the potential to cause devastating loss of life in our vulnerable patient population. My research has made me aware that the only way to prevent the spread of this highly-contagious virus, without ubiquitous and rapid point of care testing, is to prohibit movement as much as possible, and to mask as much as possible.

7. Currently, DSH treats the following types of patients: 1) those deemed incompetent to stand trial pursuant to California Penal Code section 1370; 2) those found not guilty by reason of insanity pursuant to Penal Code section 1026; 3) those deemed to be offender with mental disease pursuant to Penal Code sections 2962 and 2972; 4) patients that have been determined to be sexually violent predators pursuant to Welfare and Institutions Code Sections 6600. *et seq*.; 5) certain patients committed by civil courts for being a danger to themselves or others under the Lanterman-Petris-Short Act; 6) Wards from the CDCR Division of Juvenile Justice transferred to DSH for treatment pursuant to Welfare and Institutions Code Section 1756; and 7) inmates serving prison sentences who are transferred to DSH for treatment under Penal Code section 2684, which may include *Coleman* class members.

4

Warburton Decl. Supp. Defs' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

8. DSH facilities are not similar to acute medical care hospitals in the community. They are not designed to treat medical emergencies or psychiatric emergencies, such as those patients placed on a 72-hour hold for assessment under Welfare and Institutions Code section 5150 because they are a danger to themselves or others. DSH only provides routine primary care. Patients with more serious or emergent illnesses must be sent out to community hospitals.

9. Patients transferred to DSH from CDCR under Penal Code section 2684, also referred to as *Coleman* class patients, are only admitted to DSH to receive an intermediate level of mental health care. They are not patients in need of emergent mental health care, acute inpatient mental health care, or experiencing a psychiatric emergency. Under the memorandum of understanding and attendant policies agreed to by DSH and CDCR, which are monitored by the *Coleman* Special Master, patients must be both clinically and custodially eligible for treatment in DSH's unique open dormitory treatment setting, which allows for a substantial freedom of movement throughout the hospital units and other areas. This movement is currently being limited to prevent viral transmission.

10. In my research on COVID-19, and as I explained during the COVID-19 task force convened by the *Coleman* Court and Special Master, I have found no epicenter in the world where the consensus is anything other than that they wished they had limited movement earlier and more radically at the first signs of community spread. Medical personnel in the epicenters are uniformly urging others to learn from their mistake of delay. It is my medical opinion that the very real risk of widespread morbidity and mortality in our psychiatric population far outweighs risks of sheltering and caring for psychiatric acuity in place, except in extraordinary circumstances. Further, it is my medical opinion that all movement within vulnerable institutions should be severely limited, including discharges. The time to flatten the curve in our institutions is now and we don't have time to lose. Due to the amount of movement in psychiatric populations within CDCR, we believe the psychiatric population that we share with CDCR is extremely vulnerable to exposure.

11. DSH units are much larger than most other state hospitals, and most patients live in dormitory-style bedrooms with multiple other roommates. This makes the potential for

5

widespread transmission greater in our institutions, which is why a firm admission and discharge policy, as published by DSH's Director, makes sense.

12. Individuals living with serious mental illnesses, including DSH's approximately 6,000 patients, have much higher rates of morbidity and mortality than the general populations, making the potential for widespread loss of life in our institutions much greater.

13. To prevent the spread of COVID-19, public health officials, including the expertise of the Centers for Disease Control, have ordered most states to shelter-in-place unless an individual provides an essential service. Individuals have also been ordered to limit their movement outside of the home except for obtaining essential services such as food and healthcare.

14. I am in regular contact with my colleagues in other states. We are sharing best practices, protocols and information. Through this regular contact I am aware that other states, such as Pennsylvania, Florida and Oregon have stopped or significantly suspended admission to their state hospitals.

15. To prevent the introduction of COVID-19, DSH has implemented a number of measures, including, but not limited to, screening all staff, restricting visitation, suspending admissions of most all patient types that we are legally able to, reducing movement throughout each facility, adapting treatment to be delivered on unit, educating patients and staff about social distancing, updating specific hospital pandemic response plans, and activating DSH's Emergency Command Center. Through all of these efforts, and more, DSH is trying to be responsive to the needs of all our patients and staff and prevent the introduction of COVID-19 into our staff and patient population in order to prevent illness and death. This level of extreme and radical intervention is required to prevent widespread loss of life.

16. Given the rate at which this virus can spread, the high rates of mortality that arise from it, the ability to spread it without being symptomatic, the heightened vulnerability of our patients, the physical layout of our hospitals, the present lack of a rapid point of care test, and what I have learned from studying other points of outbreak, it is my medical opinion that movement in and out of DSH's hospitals must be stopped to the greatest extent possible.

6

Warburton Decl. Supp. Defs' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

17.    Throughout the suspension of transfers into DSH, I have been in close contact with our CDCR counterparts. Specifically, I have been having regular conversations with Dr. Joseph Bick, Director of Division of Health Care Services, and Dr. Michael Golding, CDCR Chief Psychiatrist. Dr. Golding and I have had a close working relationship for many years and have never, to my recollection, disagreed on proper clinical course for a patient. I trust his clinical judgement completely. While newer in his role, I would estimate that Dr. Bick and I have been communicating 3-4 times per week since the first signs of the pandemic. We've discussed everything from staff screening to patient movement to testing protocols. For example, early in the response Dr. Bick attended my daily statewide meeting with the hospital medical directors to explain the CDCR testing protocol, which we adopted the next day. We've discussed when it will be safe to move patients between our systems on multiple occasions and discussed methodologies to reduce risk. We have consistently agreed that when point-of-care testing is available, we will be able to ensure safe movement. He and I have spoken often, including nights and weekends, about our shared fears and responses to potential scope of the pandemic. We have discussed situations in which a patient transfer, although not advisable under the current circumstance, would be considered as an appropriate transfer. We also discussed a screening tool to use in those circumstances to help mitigate, but not eliminate, the risk of transferring in an outside patient. This tool includes a risk assessment, clinical consultation, and development of an individualized quarantine plan for each patient. It is my understanding that my CDCR colleagues agree that these transfers should only be considered when absolutely necessary.

18.    DSH currently continues to admit one small class of patients known as offenders with mental health disorders. These patients are former inmates who meet the requirements to be released from prison, but a condition of their parole is that they receive treatment from DSH to treat their "severe mental health disorder." It is my understanding that DSH does not have the power to suspend admissions of these patients. Accordingly, since we do not currently have the ability to test these individuals for COVID-19, we are quarantining this small group of patients for fourteen days upon admission, in the limited number of single person rooms available. We only have very limited capacity to admit more than this small group and still maintain our ability

7

Warburton Decl. Supp. Defs' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

to properly quarantine. If there was any legal mechanism to hold all transfers, it is my medical opinion that this should be done, to mitigate introduction and transmission of the virus into our extremely vulnerable institutions.

19. The threat of COVID-19 in the world and DSH's population, as well as the medical advice on how best to prevent its spread is changing by the minute. My colleagues and I at DSH continue to monitor the best medical advice on how to respond and protect all of DSH's patients. We will continue to discuss with our CDCR colleagues our collective response and actions.

I declare under penalty of perjury that the information in this declaration is try to the best of my knowledge. Executed on April 8, 2020, Sacramento, California.

_____
K. Warburton
*Original Signature Retained by Attorney*

CF1997CS0003

8

Warburton Decl. Supp. Defs' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))