XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7325
 Fax: (916) 324-5205
 E-mail: Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>　　　　　　　　　　　　Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF C. HENDON IN SUPPORT OF DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE** |

I, C. Hendon, declare:

1. I am currently employed by the California Department of State Hospitals (DSH) as the Deputy Director for Hospital Strategic Planning and Implementation. I have held this position since December 2018. I submit this declaration to support Defendants' responses to the Court's April 3, 2020 order to show cause. I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

1

2.     Before being named Deputy Director, I served in a number of other positions at DSH, including as the Enterprise Application Operations Director, Chief of Office of Information and Logistics, Director of the Project Management Office, and a project manager.

3.     I received a Bachelor of Arts in psychology from the University of California, Davis, and a Masters of Arts in Counseling Psychology from California State University, Sacramento.

4.     In my current position as Deputy Director, I oversee key functions supporting DSH's hospital operations, including, but not limited to, patient referral processing, system-wide admission coordination, data analytics, and policy and regulation development.  I also oversee a portion of bed management in a collaborative process between DSH facilities, as well as between the California Department of Corrections and Rehabilitation (CDCR) and DSH.  Specifically, I facilitate bed activation and planning, and oversee census and patient movement tracking and reporting.  I also manage the development of patient population projections for capacity and other planning.

5.     Based on my DSH experience, I have knowledge of, among other things, DSH's patient population and admission types, facility design and capacity, and admission and discharge processes.  Moreover, I work closely with CDCR regarding the referral, admission, and discharge of CDCR inmate patients to and from DSH under California Penal Code section 2684.  That Penal Code section provides for CDCR to refer patients to DSH for treatment and for the Director of DSH, in her discretion, to accept the patient for treatment.  I am familiar with the Memorandum of Understanding agreed to between CDCR and DSH and the associated policies and procedures, which govern the transfer of CDCR patients to DSH for care.

6.     Now, as DSH responds to the COVID-19 crisis, my duties include actively participating in the planning for the suspension of admissions and discharges, operationalizing COVID-19 responses to preadmission processes for the small number of admissions that must still occur, and tracking key metrics to assess the impact of operational changes.

7.     Currently, DSH treats the following types of patients: 1) those deemed incompetent to stand trial pursuant to Penal Code section 1370; 2) those found not guilty by reason of insanity pursuant to Penal Code section 1026; 3) those deemed to be offender with mental disease

2

1  pursuant to Penal Code sections 2962 and 2972;  4) patients that have been determined to be
2  sexually violent predators pursuant to Welfare and Institutions Code section 6600 *et seq*.; 5)
3  certain patients committed by civil courts for being a danger to themselves or others under the
4  Lanterman-Petris-Short Act; 6) patients referred by the Department of Juvenile Justice; and 7)
5  inmate patients serving prison sentences who are transferred to DSH for treatment under Penal
6  Code section 2684, also known as *Coleman* class members.

7      8.    DSH provides an intermediate level of care for patients transferred from CDCR under
8  Penal Code section 2684.

9      9.    DSH has five hospitals.  In fiscal year 2018-2019, DSH served 11,753 patients in its
10  state hospitals and jail-based facilities, with an average daily census of 6,122 and 290,
11  respectively.  DSH employs nearly 12,000 staff.  It provides treatment to *Coleman* class members
12  at three hospitals.  It provides care for up to 256 male patients at DSH-Atascadero, up to 50 male
13  patients at DSH-Coalinga, and up to 30 female patients at DSH-Patton.  All three of these
14  hospitals treat *Coleman* patients, mostly in unlocked dormitory settings, where the patients move
15  about freely in their units and throughout the hospitals, with some restrictions based on hospital
16  physical design or patient factors.  There are typically four patients assigned to a dorm room and
17  often less than six feet between beds. For example, female Patton units are between three and four
18  feet apart.

19      10.    DSH facilities are licensed inpatient facilities that operate around the clock (24-hours
20  every day), with high patient density in units and shared rooms, dining and bathroom facilities,
21  making the population especially at risk for rapid transmission of COVID-19. The structural and
22  practical design of DSH's facilities make it difficult to create social distancing.  The hospitals
23  also include open space for patient recreation, nursing stations, clinician offices, group space, and
24  other clinical space.  All of the hospitals vary in design to some extent.  For example, DSH-
25  Atascadero and DSH-Coalinga have large buildings with expansive patient common areas,
26  whereas DSH-Patton is designed more like a campus with multiple smaller buildings.  If a patient
27  is infected with COVID-19, these conditions in DSH facilities will expose patients and staff to an
28  increased risk of serious illness and death.

3

Decl. C. Hendon Supp. Defs.' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

1        11.    As of April 6, 2020, the Coleman census and bed capacity numbers are 234 of 256 filled at Atascadero, 48 of 50 filled at Coalinga, and 14 of 30 filled at Patton.  The average number of weekly discharges and admissions of *Coleman* class members over the last several months illustrates that if DSH were to admit and discharge *Coleman* patients during this crisis, the movement would constitute a significant number of persons coming into and out of DSH. For example, in February 2020 the average number of weekly admissions from DSH-A, DSH-P and DSH-C was 13.5. The average weekly discharges that month was 14. In March 2020, the average number of weekly admissions was 9 and the average number of weekly discharges was 7.75.  A copy of a spread sheet called *Coleman* Average Weekly Admissions by Month – August 2019 through March 2020 is attached as Exhibit A.

        12.    I am informed and understand, based on reports by public health officials and consultation with medical experts, that there are a number of demographic and health characteristics that make certain people more susceptible to the more serious symptoms of COVID-19, including hospitalization and death.  DSH patients are particularly vulnerable to COVID-19 due to their elderly age, many with underlying chronic medical conditions.  A high percentage of DSH patients also have complex medical co-morbidities, and a portion of the patient population is housed in skilled nursing facilities.  At DSH, over 1,500 patients, almost 25 percent of the patients in its five hospitals, are sixty or older.  But DSH's younger population is also at risk because individuals with serious mental illness typically have a 20 percent higher risk of morbidity and mortality than the general population.

        13.    At this time, no DSH patient has tested positive for COVID-19.

        14.    DSH is actively working to plan and prepare for COVID-19 across our system, following guidance from the California Department of Public Health, the Centers for Disease Control and Prevention, and other state and local partners. DSH is actively monitoring the rapidly changing situation so we can respond appropriately.  Under these emergency circumstances, DSH has taken the following steps:

4

Decl. C. Hendon Supp. Defs.' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

      a.    In mid-March, DSH activated DSH's Emergency Operation Center, and hospitals activated their incident command centers and developed incident action plans to better communicate and coordinate DSH's response efforts.

      b.    DSH hospitals updated their plans for infection control, respiratory protection, and pandemic response.

      c.    DSH prohibited normal visiting until further notice, except for court-ordered evaluations, other legal matters, or end-of-life care. If other special situations warrant visitation, the hospital medical director must approve the visitation request. All approved visitors are subject to a health screening.

      d.    All hospital employees are being screened as they arrive for work. Employees who do not pass the screening are sent home.

      e.    DSH has identified spaces and prepared them for isolating patients with symptoms.

      f.    DSH suspended the admission of six of seven categories of patients (as described in paragraph 7 above). For those few patients that DSH does not have the power to suspend admission into its facilities, those patients are receiving specialized screening.

      g.    DSH patients and employees have received, and continue to receive, information about how to protect themselves from COVID-19, including activities involving personal hygiene and social distancing.

      h.    Members of DSH's Executive Team are members of regional and national workgroups and associations with members from other state hospitals across the country. They are monitoring trends and best practices of our state hospitals and other healthcare systems who are planning, preparing, and responding to COVID-19.

15. Due to the design of DSH's hospital setting, DSH has taken a number of steps to enforce social distancing and to limit movement to help minimize the risk of COVID-19's introduction to DSH's patient population, let alone manage the spread of infection.

16. DSH needs to ensure patients under its care receive the services and support threatened by disruptions caused by COVID-19, as well as protect the health, safety, and welfare

5

Decl. C. Hendon Supp. Defs.' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

of patients. DSH took prompt action to protect the lives of its patients by mitigating the risk of introducing COVID-19 with plans to limit the number of admissions and discharges. DSH assessed its authority for issuing directives to temporarily suspend admissions and discharges of patients. DSH concluded that statutes, coupled with Executive Orders issued by the Governor, gave DSH the authority necessary to mitigate the risk of spreading COVID-19 in this manner.

17.   In addition to limiting admissions, limiting discharges was also aimed at protecting patients from COVID-19. By suspending discharges, DSH is complying with the Governor's "Shelter in Place" Directive. Many of DSH's patients discharge to the courts and in the process are discharged to jails. Patients can also be discharged to the community, however, many of DSH's patients come from a background of homelessness, especially the IST population (nearly 50% of ISTs were homeless at the time of arrest).  Keeping DSH patients in place ensures they are safe and not returned to the street. Suspending discharges will help assist in stopping the flow of people from one institution to another institution thereby reducing the potential of spreading COVID-19.

18.   DSH thoughtfully planned for each commitment type, assessing the risk to the system, potential impacts, and options for patients to receive care in their current setting. DSH issued a directive for each commitment type it decided to temporarily suspend. These are located on the DSH website here: https://www.dsh.ca.gov/Treatment/index.html. These directives also allow for exceptions, to allow for transfers when absolutely necessary. This allows for evaluation on a case-by-case basis and is not an absolute one-size-fits-all approach. DSH remains committed to maintaining the safety and protecting the lives of patients in its care. This is not intended to be a long-term solution and will be regularly evaluated.

19.   DSH's hospitals, including those that hold *Coleman* class members, have limited space for isolation and individual quarantine.  DSH hospitals have designated and created spaces to isolate patients who are infected or who exhibit symptoms consistent with COVID-19. However, due to the limited amount of space, it needs to limit the risk of introducing COVID-19 into the patient population because its isolation space may become quickly overwhelmed.

6

Decl. C. Hendon Supp. Defs.' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

20. Several California counties are not accepting DSH discharges of patients who are committed because they are incompetent to stand trial and not guilty by reason of insanity. For example, Alameda and Fresno counties are not accepting patients who are incompetent to stand trial, while Los Angeles, Riverside, San Bernardino, and Ventura counties are not accepting any patients scheduled to be out to court.

I declare under penalty of perjury that the information in this declaration is true and correct to the best of my knowledge. Executed on April 8, 2020, 2020, Sacramento, California.

                ___//s// Catherine Hendon_____
                C. Hendon, M.A., Deputy Director

CF1997CS0003
Hendon Declaration

7

Decl. C. Hendon Supp. Defs.' Resp. OSC  (2:90-cv-00520 KJM-DB (PC))

# Exhibit A

State of California                                                                                             GAVIN NEWSOM, GOVERNOR

**DIVISION OF HOSPITAL STRATEGIC PLANNING AND IMPLEMENTATION**

Research, Evaluation, and Data

1600 Ninth Street, Room 420

Sacramento, CA 95814



## Coleman Average Weekly Admissions by Month

Report Date: 4/7/2020

| Month | Average Weekly Admissions | | | | Average Weekly Discharges | | | |
|---|---|---|---|---|---|---|---|---|
| | Atascadero | Coalinga | Patton | **Total** | Atascadero | Coalinga | Patton | **Total** |
| August 2019 | 20.25 | 4.75 | 0.50 | **25.50** | 9.75 | 1.75 | 0.00 | **11.50** |
| September 2019 | 10.25 | 2.00 | 1.25 | **13.50** | 4.25 | 2.50 | 0.50 | **7.25** |
| October 2019 | 13.40 | 3.20 | 0.40 | **17.00** | 6.80 | 4.20 | 0.00 | **11.00** |
| November 2019 | 6.50 | 3.50 | 0.25 | **10.25** | 7.75 | 1.25 | 0.25 | **9.25** |
| December 2019 | 8.50 | 2.00 | 0.50 | **11.00** | 7.50 | 2.00 | 0.75 | **10.25** |
| January 2020 | 5.40 | 1.20 | 0.00 | **6.60** | 8.00 | 2.40 | 1.20 | **11.60** |
| February 2020 | 9.00 | 3.50 | 1.00 | **13.50** | 11.25 | 2.75 | 0.00 | **14.00** |
| March 2020 | 7.00 | 1.25 | 0.75 | **9.00** | 6.50 | 0.75 | 0.50 | **7.75** |



Average Weekly Admissions August 2019 through March 2020

