DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>GAVIN NEWSOM, et al.,<br><br>  Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF JOINT REPORT IN RESPONSE TO COURT'S APRIL 6, 2020 ORDER [ECF NO. 6580]**<br><br>Judge: Hon. Kimberly J. Mueller |

I, Michael W. Bien, declare:

1. I am an attorney duly admitted to practice before this Court. I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration in support of the parties' Joint Report in Response to Court's April 6, 2020 Order [ECF No. 6580].

2. On April 8, 2020, I participated in a telephonic meet and confer with counsel for CDCR in which we discussed Defendants' response to the Court's April 6, 2020 Order as set forth in Defendants' April 7, 2020 letter, which is located in the record as Exhibit 20 to ECF No. 6587-1. During the April 8, 2020 meet and confer, Defendants stated that their current plan did not specifically prioritize moving *Coleman* patients with risk factors for COVID-19 out of densely populated areas. Defendants also stated they were still in the process of gathering information to allow calculation of the physical distancing currently possible for each set of class members at each institution and level of care. While they were able to provide the total square footage of *buildings* that contained dorms within CDCR's facilities, that information included all communal areas, control booths, guard towers, solid walls, etc. Defendants did not provide square footage information specific to the bed space of each dorm, and did not have any further update regarding when they would have that information. In response to questions posed by Plaintiffs' counsel during the meet and confer, Defendants stated that they did not have a specific methodology for calculating the number of people each dorm could house to achieve the requisite physical distancing. Defendants were not able to provide a date by which they will achieve appropriate physical distancing for the *Coleman* class.

3. Also during the April 8, 2020 meet and confer, Defendants stated that while they were still developing a plan to transfer some inmates from the dorms at San Quentin State Prison (SQ) to vacant cells at California State Prison, Corcoran (COR), they did not have an estimate for when those possible transfers would take place, or how many inmates would be involved. In addition to the transfers referenced and described in Defendants'

April 7, 2020 letter, Defendants explained that they were in the process of developing a plan to move some inmates from California Correctional Center (CCC) and Sierra Conservation Center (SCC) to fire camps. Although Defendants stated that the transfers would likely impact several hundred inmates, they could not provide an estimate of when the transfers would take place. In addition, Defendants stated they were considering grouping the dorm populations into small cohorts of eight inmates each and physically distancing the groups from one another while still housing them in the same dorm together. Defendants did not have any further concrete information regarding this plan, or whether and when it would be implemented.

4. Also during the April 8, 2020 meet and confer, Defendants stated that other than moving 46 female inmates from Folsom Women's Facility (FWF) to McFarland Female Community Reentry Facility, and an unspecified number of male inmates to a second outside facility with which CDCR already has a contract, Defendants did not currently have a concrete plan to temporarily house additional inmates in facilities outside of its 35 institutions. Defendants stated they did not currently have a sense of the total number of inmates that they would need to move from occupied to unoccupied spaces within the 35 prisons in order to feel comfortable with the level of physical distancing in all the various housing settings.

5. I have personally encouraged Defendants to identify and secure facilities outside of the prison system to safely house class members and to reduce the density of the overcrowded prisons. Attached hereto as **Exhibit 1** is a true and correct copy of an email dated March 20, 2020 that I sent to Kelli Evans, Chief Deputy Legal Affairs Secretary in the Office of the Governor, and a memorandum I attached to that email published by the Community Oriented Correctional Health Services entitled "Addressing the Needs of Justice-Involved People During the COVID-19 Pandemic: An 1135 Waiver Approach." I sent this memorandum to Ms. Evans in order to provide her with information on how States can request that the Health and Human Services Secretary, pursuant to Section 1135 of the Social Security Act, waive certain Medicare, Medicaid and CHIP requirements to

ensure availability of health care services for Medicaid beneficiaries.  By requesting 1135 waivers, the State could allow for emergency medical and mental health facilities to be created to specifically serve individuals from correctional institutions.

6. Attached hereto as **Exhibit 2** is a true and correct copy of an email dated March 24, 2020 that I sent to Ms. Evans, identifying several available adult, skilled nursing and hospital facilities in California that Defendants could use to house class members.  The facilities identified in my email include: St Vincent's Hospital in Los Angeles (500 beds), Sonoma Developmental Center in Sonoma County, St. Louise Hospital near Gilroy (150 beds), Castle Air Force Base in Atwater, McClellan Air force Base in Sacramento, Alameda Naval Station, Fort Ord, and Camp Roberts near Paso Robles.  My email also provided publically available information about closed military bases in California.  *See* http://www.formerbases.com/california_northern.htm.

7. Attached hereto as **Exhibit 3** is a true and correct copy of a webpage dated April 8, 2020 published by the Legislative Analyst's Office entitled, "COVID-19 and the National Guard," *available at* https://lao.ca.gov/Publications/Report/4218?utm_source=laowww&utm_medium=email&utm_campaign=4218.  As described herein, on March 22, 2020, President Trump authorized the National Guard in California to serve under Title 32 of the U.S. Code in order the support the State's COVID-19 response efforts.

8. Attached hereto as **Exhibit 4** are true and correct copies of an email dated April 7, 2020 that Defendants sent to me and other members of Plaintiffs' counsel pursuant to the Court's April 6, 2020 Order, and a memorandum that was attached to that email entitled "Attachment B – Mental Health Patients by Institution and Bed Type as of 4/7/2020."  Based on the information provided in Exhibit 4 hereto, there are currently 11,163 *Coleman* class members who live in dorms.  Jessica Winter, an associate employed at my firm working under my direction and supervision, calculated this figure by reviewing the numbers in Exhibit 4 and adding together the total number of class

members, at each level of care, as identified in the fourth column in Exhibit 4, housed in the Bed Type "Dorm," from the third column in Exhibit 4.

9. Attached hereto as **Exhibit 5** are true and correct copies of an email dated April 8, 2020 that Defendants sent to me and other members of Plaintiffs' counsel pursuant to the Court's April 6, 2020 Order, and a memorandum that was attached to that email entitled "4-7-20 Institution Bed Audit – By Bed Program."

10. If CDCR reduced the populations in its large dorms that house *Coleman* class members to 100% and 90% of design capacity, that would result in the movement of 8,583 and 10,586 individuals, respectively. Ms. Winter, working under my direction and supervision, calculated these figures by using Exhibit 4 hereto (the memorandum entitled "Mental Health Patients by Institution and Bed Type as of 4/7/20") to identify what institutions have large open dorms (designated in Exhibit 4 as "Dorm") that house *Coleman* class members. Ms. Winter then compared that list of institutions to Exhibit 5 hereto (the memorandum entitled "April 7, 2020 Institution Bed Audit," hereafter referred to as "Bed Audit"). Using the Bed Audit, Ms. Winter identified the total number of individuals housed in each dorm, in each facility, in each institution identified from Exhibit 4 that have large open dorms housing *Coleman* class members. She excluded from all of her calculations any dorm with a design capacity of 10 or fewer individuals. Using the numbers from the Bed Audit, Ms. Winter calculated the total number of individuals housed in large open dorms with *Coleman* class members that would amount to 100% and 90% design capacity for each dorm. In certain circumstances—where, for example, entire facilities contained dorms crowded above 100% of design capacity—Ms. Winter performed these calculations for the entire facility, rather than by individual dorm. Ms. Winter then used the column in the Bed Audit titled "occupied count" to identify the actual census in the dorms. She then calculated the difference between the actual census in the dorms and the number of individuals that would amount to 100% and 90% design capacity. Ms. Winter then added all the resulting numbers for 100% and 90% design capacity, respectively, for each facility and institution, to arrive at the grand totals of 8,583

1  and 10,586.  In performing these calculations, Ms. Winter assumed that all large general
2  population dorms house at least some CCCMS class members.  She also omitted the
3  population numbers that could be reduced in certain dorms and facilities where those
4  reductions would have only a negligible impact on the total population numbers.  For
5  example, Ms. Winter did not include in her calculations the population numbers for the
6  dorms that comprise the Minimum Support Facility at North Kern State
7  Prison.  Elsewhere, where an entire facility comprised of multiple dorms contained mostly
8  dorms filled below 90% or 100% capacity, but one or two dorms filled above those
9  percentages, Ms. Winter lumped the calculations for the overall facility together because
10 the overall population impact of reducing numbers in the overcrowded individual dorms
11 would be negligible.  Whenever Ms. Winter omitted certain population numbers from her
12 calculations, or lumped individual dorm calculations into a facility-wide calculation, she
13 erred on the side of underestimating the total impact on the dorm population that could be
14 reduced.  A true and correct copy of Ms. Winter's calculations is attached hereto as
15 **Exhibit 6**.

16        11.     On April 8, 2020, the Special Master emailed me a copy of an Excel
17 spreadsheet entitled "PLO High Risk Population2" created by the *Plata* Receiver that
18 provides data for thousands of CDCR inmates based on the following identifying criteria:
19 Name; CDCR Number; Location (Prison, Building, and whether in a Dorm or Cell);
20 Gender; Age (or DOB); Race and Ethnicity; Classification Score; CSRA score; COMPAS
21 score; DPP Codes, if any; DDP Codes, if any; Current Mental Health Designation;
22 Admitted/been in MHDS in past year; Medical Risk Level (High Risk 1, High Risk 2, or
23 Pregnant); Underlying Health Conditions that lead to High Risk 1 or High Risk 2 score;
24 Security Level; Commitment offense category; Offense group; Sex registrant; Date of
25 commitment to CDCR; Sentence Length; Projected release date; MEPD (lifers only); and
26 Controlling county.  The data shows that thousands of *Coleman* class members who have
27 at least one COVID-19 risk factor live in dorms.  I have not attached this document here
28 because it is a voluminous roster of class members that would require redactions of the

relevant information due to the protective orders in this matter.  It is my understanding and belief that counsel for Defendants has ready access to this spreadsheet.

12. Attached hereto as **Exhibit 7** is a redacted true and correct copy of the California Correctional Health Care Services (CCHCS) COVID-19 Monitoring Patient Registry last accessed at approximately 9:30 AM on April 9, 2020 and provided to me by *Plata* counsel.  The log shows all of the incarcerated people at CDCR who have tested positive for COVID-19 to date.  As of 9:30 AM on April 9, 2020, 33 incarcerated people, including 22 *Coleman* class members, have tested positive.  Of the 33 positive cases, there are 12 EOP class members at CSP-Lancaster (LAC), 1 MHCB class member at California Institution for Women (CIW), 9 CCCMS class members and 9 non-MHSDS patients at California Institution for Men (CIM), one non-MHSDS patient at North Kern State Prison (NKSP), and one non-MHSDS patient at California Substance Abuse and Treatment Facility at Corcoran (SATF).

13. Attached hereto as **Exhibit 8** is a true and correct copy of CDCR's Population COVID-19 Tracking webpage, last accessed on April 9, 2020 at approximately 9:30 AM, available at https://www.cdcr.ca.gov/covid19/population-status-tracking/.  The tracker shows that as of April 9, 2020 at approximately 9:30 AM, CDCR had tested 459 incarcerated people within CDCR, with 145 tests pending, 281 negative, 33 positive, 0 inconclusive, 107 tested in the previous calendar day, 0 patients recovered, and 0 deaths.

14. Attached hereto as **Exhibit 9** is a true and correct copy of CDCR's Employee COVID-19 Status webpage, last accessed on April 9, 2020 at approximately 9:30 AM.  The tracker shows that as of the prior day, April 8, 2020, at 5:30 PM, 62 employees at 15 CDCR adult prisons and 4 other worksites, had self-reported positive COVID-19 test results.  It is my understanding based on publically available information located on CDCR's website that CDCR's policy and practice fails to encourage employees to stay home and not enter the prisons if they have been exposed to a person or persons with COVID-19 or are caring for a relative that is ill at home as such employees are forced to use up their sick leave.  *See* https://www.cdcr.ca.gov/covid19/frequently-asked-

questions-pertaining-to-cdcr-and-cchcs-employee-time-off-requests-related-to-covid-19/. Only employees who test positive for COVID-19 are given paid time off.  *Id.*  Because medical providers such as Kaiser do not make testing available for persons who do not have symptoms, CDCR employees, as is true of most Californians, have not had ready access to COVID-19 testing.

15. Attached hereto as **Exhibit 10**, is a true and correct copy of CDCR's COVID-19 Preparedness webpage, last updated on April 9, 2020 and available at https://www.cdcr.ca.gov/covid19/.  According to this web posting, CDCR has suspended transfers of inmates into the Male Community Reentry Program (MCRP), the Custody to Community Transitional Reentry Program (CCTRP), the Alternative Custody Program (ACP), and to the Conservation Camp program until further notice.  It is my understanding that *Coleman* class members at the EOP and CCCMS levels of care are eligible to participate in the MCRP.

16. Defendants should investigate other options for housing inmates outside its 35 institutions.  For example, it is my understanding that Defendants currently have contracts with the following Modified Community Correctional Facilities: Golden State Modified Community Golden State Modified Community Correctional Facility (700 beds); Desert View Modified Community Correctional Facility (700 beds); Shafter Modified Community Correctional Facility (640 beds); Taft Modified Community Correctional Facility (600 beds); Delano Modified Community Correctional Facility (578 beds); and McFarland Female Community Reentry Facility (300 beds).  Alex Gourse, an associate employed at my firm working under my direction and supervision, obtained this publically available information via the following webpages: https://www.cdcr.ca.gov/adult-operations/reentry-services/ (last accessed Apr. 9, 2020); https://www.cdcr.ca.gov/facility-locator/community-correctional-facilities/ (last accessed Apr. 9, 2020).  I also understand that Defendants previously had contracts with the following private facilities: Central Valley Modified Community Correctional Facility in La Palma, Arizona; North Lake Correctional Facility in Michigan; North Fork Correctional Center in Oklahoma; Florence

Correctional Facility in Arizona; and Tallahatchie Correctional Facility in Mississippi. Mr. Gourse provided me with this information, which is publically available. *See* https://www.cdcr.ca.gov/news/2019/09/27/california-department-of-corrections-and-rehabilitation-ends-contract-with-private-prison/ (last accessed Apr. 9, 2020); https://www.bakersfield.com/news/cdcr-to-stop-using--bed-private-prison-in-mcfarland/article_37bffdf4-a4f4-11e9-b8c2-cf04c887b93c.html; https://www.cdcr.ca.gov/news/2019/09/27/california-department-of-corrections-and-rehabilitation-ends-contract-with-private-prison/ (last accessed Apr. 9, 2020); https://www.privateprisonnews.org/media/publications/cdcr_termination_letter_and_contract_geo_group_sept_2011.pdf (last accessed Apr. 9, 2020).

17.     The Governor, in Executive Order N-25-20, issued on March 12, 2020, invoked emergency powers to "commandeer property-hotels and other places of temporary residence, medical facilities as necessary for quarantining, isolating or treating individuals who test positive for COVID-19 or who have had a high-risk exposure and are thought to be in the incubation period." *Id.* ¶ 8. A true and correct copy of the Executive Order is attached hereto as **Exhibit 11** and available at https://www.gov.ca.gov/wp-content/uploads/2020/03/3.12.20-EO-N-25-20-COVID-19.pdf (last accessed Apr. 9, 2020). As shown on the California Department of General Services' webpage identifying and describing all types of state-owned property, there are numerous available properties in California that the State may be able to use to temporarily house class members. *See* https://spigis.apps.dgs.ca.gov/ (last accessed Apr. 9, 2020).

18.     In February 2020, Defendants engaged in a search for available vacant spaces appropriate to house vulnerable persons who may have been exposed to or contracted COVID-19 on cruise ships and were then repatriated by the federal government and housed at Travis Air Force Base. According to a declaration filed in federal court by Dr. Mark Ghaly, the Secretary of the California's Health and Human Services Agency (CHHS), on February 23, 2020, his agency considered several facilities around the state including "Sonoma Developmental Center, Army National Guard Camp Roberts and

closed youth correctional facilities." Ghaly Decl. ¶ 12. A true and correct copy of Mr. Ghaly's declaration and the associated pleadings in the matter *City of Costa Mesa v. United* States, Case No. 8:20-cv-00368-JLS (JDE) (S.D. Cal.), is attached hereto as **Exhibit 12**. Mr. Ghaly declared that "[a]ny facility selected needed to meet the very strict CDC sheltering criteria, which includes individual rooms and bathrooms for each patient." Ghaly Decl. ¶ 12. The safe and appropriate location identified was the Fairview Developmental Center in Orange County that was very recently closed by the State, "with the last patient moving out on February 24, 2020." Ghaly Decl. ¶ 14. Based on my review of publically available information, it is my understanding that Fairview Developmental Center has housed more than 900 patients and was licensed as a hospital and skilled nursing facility. *See* https://www.dds.ca.gov/services/state-facilities/fairview-dc/ (last accessed Apr. 9, 2020). Other Developmental Centers, which provide inpatient care and treatment to people with intellectual disabilities, could be used to temporarily house class members. It is my understanding that the State has closed four large Developmental Centers and one state-operated community facility, but continues to operate one Developmental Center, one community facility, and two acute crisis homes. *See* https://www.dds.ca.gov/services/state-facilities/ (last accessed Apr. 9, 2020).

19. Based on my review of publically available information, it is my understanding that Porterville Developmental Center (PDC), located at 26501 Avenue 140, Porterville, CA 93257, is on about 670 acres in the Sierra Nevada foothills of Tulare County, outside the town of Porterville. PDC housed more than 2,600 people at its peak in 1958. It has two components, the General Treatment Area ("GTA") and the Secure Treatment Program ("STP"). I understand that it had 203 people between the two programs as of February 26, 2020, but historical data from September 1999 showed 849 people living there. *See* https://www.dds.ca.gov/Porterville/PortervillePop.cfm (last accessed Apr. 9, 2020). The GTA provides 24-hour residential services for individuals 18 years or older who have serious medical and/or behavioral problems for which appropriate services are not currently available through community resources. PDC has medical

facilities licensed by the CDPH to provide general acute medical services, skilled nursing services, and intermediate care services. *See* https://www.dds.ca.gov/services/state-facilities/porterville-dc/.

20. Another Developmental Center that could be used to temporarily house incarcerated people is Canyon Springs Community Facility. Based on my review of publically available information, it is my understanding that this facility is located at 69-696 Ramon Road, Cathedral City, CA 92234, in Riverside County. Canyon Springs opened in 2000, and is a 57,000 square foot community facility that is privately owned and leased by the California Department of Developmental Services (CDDS) to provide residential services, treatment, and training for up to 55 adults. I understand that the facility originally operated as a private inpatient mental health treatment center. *See* https://www.dds.ca.gov/services/state-facilities/canyon-springs/ (last accessed Apr. 9, 2020).

21. Another available Developmental Center is the Sonoma Developmental Center. Based on my review of publically available information, it is my understanding that this facility closed in December 2018. It is located at 15000 Arnold Drive, Eldridge, CA 95431, between the City of Sonoma and Santa Rosa, on more than 800 acres of land. It has a multitude of cottages on both sides of Arnold Drive that housed people with developmental disabilities. I understand that its highest reported population in the past 25 years was 1,164, in December 1994. *See* https://www3.dds.ca.gov/Porterville/PortervillePop.cfm (last accessed Apr. 9, 2020).

22. Based on my review of publically available information, it is my understanding that in addition to temporarily transferring inmates to the aforementioned Developmental Centers, Defendants could house class members in Division of Juvenile Justice (DJJ) facilities, which I understand are currently at less than 40% capacity. *See* https://lao.ca.gov/Publications/Report/3998 (last accessed Apr. 9, 2020).

23. Attached hereto as **Exhibit 13** is a declaration from Megan Lynch, an investigator at the Prison Law Office, counsel of record in *Plata v. Newsom*, Case N. C-01-

1351 JST in the Northern District of California. This declaration was filed on April 8, 2020 in *Plata v. Newsom* in support of Plaintiffs' Emergency Motion Regarding Prevention and Management of COVID-19, ECF No. 3266-2.

24. Attached hereto as **Exhibit 14** is a declaration from Patrick Booth, counsel of record in *Plata v. Newsom*, Case N. C-01-1351 JST in the Northern District of California. This declaration was filed on April 8, 2020 in *Plata v. Newsom* in support of Plaintiffs' Emergency Motion Regarding Prevention and Management of COVID-19, ECF No. 3266-3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 9th day of April, 2020.

*/s/ Michael W. Bien*
Michael W. Bien

11
DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF JOINT REPORT IN RESPONSE TO COURT'S APRIL 6, 2020 ORDER [ECF NO. 6580]

[3524775.4]