XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 510-3585
 Fax: (415) 703-5843
 E-mail: Kyle.Lewis@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                     Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                     Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**JOINT REPORT REGARDING DEFENDANTS' PLAN TO ACHIEVE GREATER PHYSICAL DISTANCING FOR MEMBERS OF THE PLAINTIFF CLASS**<br><br><br>Judge:      The Honorable<br>                 Kimberly J. Mueller |

As required by the Court's order (ECF No. 6580 at 3), on April 7, 2020, Defendants produced information to the Special Master and Plaintiffs concerning *Coleman* class members and their plan to achieve a defined level of physical distancing for those inmates at CDCR facilities. Defendants later supplemented that information, and on April 8, 2020, the parties met and conferred regarding the information produced and discussed Defendants' plan to achieve physical distancing. (*Id.*) The parties now file a joint report concerning Defendants' plan to achieve greater physical distancing for members of the Plaintiff class. (*Id.*)

1

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

**DEFENDANTS' POSITION**

The global pandemic caused by the spread of coronavirus (COVID-19) and its associated health risks has posed challenges for health care systems, public entities, and the public. The State has taken extraordinary measures in the face of this public health crisis that touches every aspect of society, including enacting the Emergency Services Act, to prepare public services to address this pandemic. Beyond action by government officials, greater attention to living space cleanliness, personal hygiene, and physical distancing is the new norm, and society, as a whole, must adapt practices to prevent the further spread and transmission of COVID-19.

California's prisons are not immune from COVID-19's risks. The proximity of inmates and staff within the prisons and constant necessary interactions create situations where the virus can easily be transmitted and spread throughout the prison communities. Defendants recognize this risk and have proactively and aggressively taken numerous actions to reduce the chance for COVID-19 to enter the State's prisons and move among the inmate and staff populations. Defendants also recognize that certain members of the prison population, including certain *Coleman* class members, have a higher risk of COVID-19 infection, and take these concerns seriously.

Defendants have instituted a multi-faceted plan to prevent the introduction and spread of COVID-19 at CDCR's facilities encompassing physical distancing, population density reduction measures, modified programs, inmate education, increased hygiene, and staff screening, among other things. Defendants' plan is constantly evolving in light of the pandemic's ever-changing nature, public health guidance, and conditions at the prisons, mindful that physical distancing is just one aspect of their holistic strategy to combat COVID-19. Operating under tremendous time constraints and concern for the health and safety of inmates and staff, Defendants have made extraordinary efforts to achieve a level of physical distancing at CDCR facilities.

Defendants are entitled to sufficient deference when exercising authority to prevent the introduction and spread of COVID-19 in California's prisons. While Defendants' actions impact inmates' programming and movement, they are not intended to infringe upon inmates' constitutional rights, but rather, to protect inmates, staff, and the public from the unprecedented

2

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

danger posed by COVID-19. Defendants are permitted to take informed, real-time actions that they deem necessary to respond to this pandemic.

Indeed, as the Fifth Circuit noted just days ago, state authorities are entitled to great deference concerning responses to a public health crisis. *In re: Abbott*, Case No. 20-50264, Document No. 00515374865 (5th Cir., Apr. 7, 2020). "[W]hen faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *Id.* at 13 (citing *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31 (1905)). "Courts may ask whether the state's emergency measures lack basic exceptions for 'extreme cases,' and whether the measures are pretextual—that is, arbitrary or oppressive. (citing *Jacobson* at 38.) At the same time, however, courts may not second-guess the wisdom or efficacy of the measures. (citing *Jacobson* at 28, 30.) Further, "[i]t is no part of the function of a court" to decide which measures are "likely to be the most effective for the protection of the public against disease." *Id.* (citing *Jacobson*, 197 U.S. at 30). A court's "fail[ure] to apply (or even acknowledge) the framework governing emergency exercises of state authority during a public health crisis, established over 100 years ago in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905)" is "extraordinary error." *Id.* at 10; *see also id.* at 13 ("*Jacobson* remains good law"). Here, Defendants are exercising appropriate authority to enact measures that affect all inmates, including *Coleman* class members, to protect the health and safety of society, and must be permitted to continue taking actions that they deem necessary.

**A. Physical Distancing is a Component of CDCR's COVID-19 Response Plan.**

The Centers for Disease Control and Prevention (CDC) recommends that physical distancing is one method to stop the spread of contagious diseases. But it is only one of many measures recommended to slow the spread of COVID-19. *See*, *e.g.*, CDC's Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities, available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf. Furthermore, in responding to the COVID-19 pandemic, CDCR is facing a number of constraints

3

outside of CDCR's control, including tight time constraints to respond to rapidly changing circumstances, safety concerns, space and staff availability, and the obligation to ensure that the inmates' other constitutional rights (such as the right to food, out-of-cell time, etc.) remain intact while implementing measures to address the COVID-19 pandemic. These constraints also impact Defendants' ability to facilitate physical distancing in CDCR's institutions.

**B. Programmatic Changes to Address Physical Distancing.**

CDCR has taken a number of steps to achieve physical distancing among the inmate population, which necessarily includes *Coleman* class members. The CDC defines social distancing as "keeping space between yourself and other people outside of your home." *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html. While it is not possible to create separations that mirror in correctional settings the separate households that exist in the free world, CDCR has taken various steps to separate inmates in housing units from inmates in other housing units, akin to a household or similar community environment. Those steps include rearranging scheduled movements to minimize mixing of people from different housing areas and adjusting dining schedules where possible to allow for physical distancing. Also, no rehabilitative programs, group events, or in-person educational classes are taking place until further notice. Institutions have also begun placing markings on the floor in facility communal areas to indicate six-feet between each space, including in housing units near kiosks and telephones, as well as on the yard for medication pass. These collective measures allow inmates to carry on activities and cohabitate in an environment that provides greater physical distancing necessarily constrained by correctional realities.

Effective April 8, 2020, CDCR's Division of Adult Institutions (DAI) implemented a mandatory 14-day statewide modified program at all CDCR prisons. The modified program directs how movement will occur within the institution to maximize physical distancing, preventing inmates in different housing units from mixing, reducing yard and dayroom capacity to facilitate further social distancing, and detailing what phone calls, canteen, education, and other programs will be provided to inmates and how. While these restrictive measures are mandatory, the incarcerated population will still have access to medication, mental and medical care services,

4

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

yard time, packages, and cell-front religious programming while allowing for physical distancing and proper cleaning/disinfecting of common areas and appliances. Implementation of this temporary modified program will reduce staff and inmate exposure to COVID-19.

### C. Defendants' Measures to Reduce Population Density.

In the past weeks, Defendants have also taken unprecedented measures to address overall population density concerns within CDCR's institutions that also directly impact the *Coleman* class. On March 24, 2020, Governor Newsom temporarily suspended all CDCR intake from California county jails for 30 days, which, absent any other measures, will result in a net population reduction of approximately 3,000 inmates. *See* https://www.gov.ca.gov/2020/03/24/governor-newsom-issues-executive-order-on-state-prisons-and-juvenile-facilities-in-response-to-the-covid-19-outbreak/. Furthermore, on March 31, 2020, CDCR Secretary Diaz ordered CDCR to expedite the transition to parole of approximately 3,500 non-violent male and female inmates who are within 60 days of their release date. *See* https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/. In total, CDCR anticipates releasing 3,496 inmates under this accelerated release plan. Of those who will be released through the accelerated release program, approximately 930 were in the Mental Health Services Delivery System as of April 2, 2020. On April 3, 2020, CDCR began releasing inmates under this plan. As of the end of day on April 8, 2020, a total of 2,019 inmates have been released from institutions across the system. CDCR anticipates that all releases will be completed by April 13, 2020. According to DAI, while not specifically intended to address mental health treatment needs of *Coleman* class members, these measures will reduce the number of MHSDS patients in CDCR and facilitate CDCR's ability to provide appropriate treatment for its other patients during the pandemic.

### D. Arrangement of Housing Units to Promote Physical Distancing.

As discussed above, Defendants have taken numerous steps to promote physical distancing within the institutions. In addition to those steps, Defendants are assessing whether there is additional space within the institutions that may be used to house inmates, such as gymnasiums.

5

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

However, those spaces must first be approved by the State Fire Marshal to be used as housing, a process which has started and will continue over the next week. CDCR is also purchasing additional cots and assessing staffing needs for each location so that staff can ensure that safety and security can be maintained and the inmates' essential needs, such as feeding, escorts, medication, and any mental health or medical needs, can be met. As of this week, nineteen potential sites have been identified and approximately 600 bunks are being procured, with additional cots available for purchase, if required. At this time, the State Fire Marshal has approved a number of CDCR gymnasiums for occupancy. CDCR is working expeditiously to determine if, when, and how these spaces can be used.

With respect to inmates residing in dormitory-style housing units, CDCR is evaluating the feasibility of assigning groups of approximately eight inmates to family-unit-type pods that are separated from other pods and mirror separate "households" of people who live together and have less or no exposure to inmates in other pods. This approach corresponds to physical distancing guidelines for families and co-habitating groups in the community recognized by the CDCR, and demonstrates Defendants' continual efforts to achieve conditions reducing the risk of COVID-19 transmission among the prisons.

For example, on April 1, 2020, DAI issued a directive to transfer over 800 inmates from several Level II dormitories to institutions with vacant buildings. CDCR anticipates transferring 300 inmates from Chuckawalla Valley State Prison (CVSP) to Ironwood State Prison (ISP), 57 inmate from CVSP to California State Prison, Corcoran (COR), 361 inmates from California Rehabilitation Center (CRC), and 100 inmates from the Substance Abuse Treatment Facility and State Prison, Corcoran to COR. These transfers are anticipated to be complete by April 15, 2020. In addition, DAI is developing plans to transfer inmates from other dormitories to vacant cells around the state. On April 8, 2020, CDCR commenced transferring 43 inmates from Folsom Women's Facility to the Female Community ReEntry Facility, and is developing a plan to transfer 226 inmates from California State Prison, Solano to Deuel Vocational Institution. CDCR is also developing plans to transfer inmates from the dorms at San Quentin State Prison to vacant cells at California State Prison, Corcoran and to transfer inmates from California Correctional

6

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

Center and Sierra Conservation Center to fire camps. These dormitory inmate transfer plans are constantly evolving as officials identify inmate cohorts for safe transfer, and facility spaces that can house inmates in light of appropriate physical distancing guidance.

### E. Other Measures Supplementing Defendants' Physical Distancing Measures.

CDCR is also taking other actions to promote physical distancing among inmates and staff and to capitalize on greater awareness of COVID-19 protective measures. Video message updates are provided to inmates via institution television network, and senior correctional staff have been instructed to meet with their respective Inmate Advisory Councils, either individually or in small groups where social distancing can be maintained, at each institution. These open lines of communication between inmates and institution leaders demonstrate Defendants' consistent approach to involving the whole of CDCR in the strategy to prevent COVID-19 from harming inmates or staff. Furthermore, CDCR has distributed fact sheets and posters in both English and Spanish to educate inmates concerning COVID-19 and precautions recommended by the CDC, along with streaming CDC educational videos on the inmate television network and the CCHCS inmate health care television network. CDCR has also instituted isolation and quarantine efforts, where warranted, to emplace additional physical distancing in response to COVID-19 exposure or infection concerns that may arise.

Additionally, CDCR institutions have been instructed to conduct additional deep-cleaning efforts in high-traffic, high-volume areas, including dining halls, showers, and health care facilities. Institutions have ordered and begun installing additional hand sanitizer dispenser stations in dining halls, work change areas, housing units, and where sinks/soap are not immediately available. These dispensers will contain the type of alcohol-based hand sanitizer recommended by the CDC to help eliminate coronavirus.

And in a further effort to help prevent the spread of COVID-19, the California Prison Industry Authority (CALPIA) has begun producing hand sanitizer for use by both staff and the incarcerated population, both alcohol and alcohol-free. CALPIA has also started producing reusable cloth barrier masks to meet some of the supply needs of staff and inmates. As of April 8, 2020, CALPIA has made approximately 17,000 barrier masks, and is producing 10,000 per day,

7

and has begun distributing the masks to the institutions for both staff and inmate use. *See* https://www.calpia.ca.gov/news/articles/media-release-calpia-begins-cloth-face-mask-production-for-cdcr-staff-and-offenders-in-response-to-covid-19-pandemic/.

**F.  Conclusion.**

Defendants are taking reasoned actions to operate California's prisons during a global pandemic by continually assessing steps needed to protect the health and safety of inmates, staff, and the public. Creating appropriate social distancing in CDCR institutions is one aspect of Defendants' plan to prevent the introduction or spread of COVID-19, and Defendants are entitled to substantial deference in the decisions made to protect all inmates, including *Coleman* class members, from this unprecedented public health risk. In their response to the Court's questions regarding some level of physical distancing among the inmate population, Plaintiffs seek to argue both sides of the issue. On one hand, Plaintiffs argue that CDCR's response is not strong enough because it is insufficient to create the physical distancing necessary to combat the spread of COVID-19. (*See* ECF No. 6584 at 6.) On the other hand, Plaintiffs argue that Defendants have been too aggressive in stopping movement, claiming in speculative fashion—and without evidence—that the response will "surely exacerbate Defendants' ongoing suicide crisis" due to their belief that mental health care will be less available to class members. (*Id*. at 7-8.) But Plaintiffs can't have it both ways—the claim that Defendants' plan is both too aggressive and too weak illustrates the complicated balance that Defendants—and all state agencies—must strike when combating this unprecedented public health emergency. As Defendants pointed out in their response, there is no one-size-fits-all answer to this pandemic. (ECF No. 6586 at 2.) Defendants' plan—limiting unnecessary physical contact between inmates in separate housing units, creating specialized mental health plans for class members according to their case factors, and decreasing the inmate population by nearly 4,000 inmates—is reasonable and represents a strong, decisive first step at managing COVID-19 while still striving to provide constitutionally mandated care.

**PLAINTIFFS' POSITION**

Over a month after the Governor's March 4, 2020 declaration of a State of Emergency, this Court observed, that "the growing numbers of infected CDCR inmates and staff members, the

8

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class  (2:90-cv-00520 KJM-DB (PC))

exigent circumstances of which this court is aware appear to require immediate steps to safeguard the constitutional rights of the plaintiff class." ECF No. 6580 at 2 (April 6, 2020 Order); Decl. of Michael W. Bien In Supp. of Pls.' Three-Judge Court Emergency Mot., ECF No. 6529 ¶ 52 & Ex. 38 (attaching state of emergency declaration). Even after nine COVID-19 Taskforce meetings as of that time, and extensive briefing in the proceedings before the Three-Judge Court convened in this case, this Court noted, "[a]t this point, this court has no indication that defendants are taking the immediate steps called for at this time. So that the court may by the time of the upcoming status conference make a reasoned assessment of the current circumstances," ECF No. 6580 at 2 (April 6, 2020 Order), the Court ordered Defendants to provide expedited discovery to the Special Master and Defendants, including critically relevant data about the *Coleman* class and a "specific plan to achieve by the end of this week a defined level of physical distancing for any *Coleman* class member currently residing in housing space that does not allow six feet of physical distancing between inmates, including but not limited to concrete information on any plans to temporarily relocate such class members to off-site secure facilities." *Id.* at 3. In the time since the Court's order the number of people incarcerated in CDCR who have tested positive has ballooned from 17 to 33 people spread across five prisons, including 22 *Coleman* class members, and the number of staff who have self-reported positive tests has increased from 53 to 62 employees at 15 prisons and four other worksites. *Compare id.* at 2, *with* Decl. of Michael W. Bien filed concurrently with this Joint Statement ("Bien Decl.") ¶¶ 12, 13, 14 & Exhs. 7, 8, 9.

**A.     Defendants Have No Plan That Complies With This Court's Order.**

Defendants do not have a plan that even attempts to comply with this Court's Order. *See* Decl. of Michael W. Bien in Supp. of Pls.' Resp. to April 6, 2020 Order, ECF No. 6587 ¶ 22 & Exh 20 (attaching counsel for Defendants' April 7, 2020 letter describing the plan, hereafter referred to as "Defs.' April 7 Plan"). Defendants have no methodology, goal, or standard that they are using as an appropriate defined level of physical distancing for the *Coleman* class. *Id.* Nor is there evidence that they are giving serious consideration to the temporary relocation of class members to off-site secure facilities. *See* Bien Decl. ¶ 4.

9

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

1  Defendants will move around a few hundred of the 46,000 people, including more than
2  11,000 class members, currently living in CDCR's dorms, and their actions will be limited to just
3  a few of those dorms. *See See* Defs.' April 7 Plan; Bien Decl. ¶ 8 & Exh. 4. This amounts to
4  shuffling deck chairs on the Titanic. Thousands of *Coleman* class members who have at least one
5  COVID risk factor live in dorms. *See* Bien Decl. ¶ 11. Defendants have all along had the means
6  to know who is at risk in order to prioritize them. But even after finally identifying those
7  individuals in response to this Court's order, Defendants still are not prioritizing them for release
8  or transfer to safety.

**1.  Defendants Have Made No Attempt To Assure The Safety Of The Class Members Most Medically Vulnerable For Adverse Outcomes From COVID-19.**

Defendants now have produced a list of medically high risk class members. *See* Bien Decl. ¶ 11. But their plan makes no use of this information in any way. There is no prioritization of this high risk population for release or transfer to safety. *See* Defs.' April 7 Plan; Bien Decl. ¶ 4. There is no effort to assure that these high risk persons are not housed in crowded dorms. *Id.*; *see also* Bien Decl. ¶ 2. The plan does not in any way target the medically vulnerable. Defs.' April 7 Plan; Bien Decl. ¶ 2, 4. This failing will have a drastic and disproportionately negative effect on the *Coleman* class. According to data provided by the Receiver on March 30, 2020, about one half of *Coleman* class members have at least one risk factor for COVID-19. About one third of non-class members do. *See* Pls.' Resp. to April 6, 2020 Order, ECF 6584 at 4 & n.2; Decl. of Don Specter In Supp. Of Pls.' Emergency Mot., ECF No. 6559, Exh. B.

**2.  There Is Still No Methodology For Achieving The Physical Distancing Required To Fight The Pandemic.**

Defendants have not calculated how many people they will need to move out of the dorms to achieve physical distancing. *See* Defs.' April 7 Plan; Bien Decl ¶ 2, 4. Nor do they have a methodology, goal, or standard that they have shared for physical distancing for incarcerated persons. Bien Decl. ¶ 2. As a result, they also have no date by which they will achieve appropriate physical distancing for the *Coleman* class. *Id.* The only information Defendants could provide relevant to physical distancing is the total square footage of buildings with dorms

10

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

in them. *Id.* At the Court-ordered meet and confer on April 8, 2020, Defendants stated they are still working on a plan, but could not estimate when they would have more answers. *Id.* ¶¶ 2-4.

Defendants did make reference to a distancing concept that would treat housing units like a household in order to then try to maintain distancing between households, but without more detail. *Id.* ¶ 3. Even if Defendants are able to cluster smaller groups such as eight incarcerated people within set areas of each dorm, it is not clear how Defendants could keep those people together as a cohort. As of the April 8, 2020 meet and confer, this plan was still in development, and Defendants did not have further details on how it would happen. *Id.* But even clustering groups of eight people within areas of a dorm will not be enough to keep them safe because doing so does not begin to address the problem of sharing touched surfaces and spaces, like toilets, showers, phones, chow halls, and recreation areas. *See* Decl. of Marc Stern In Supp. of Pls.' Resp. to April 6, 2020 Order, ECF No. 6585 at ¶¶ 2, 9. And cohorts of eight people are not really a true quarantined cohort if staff move from cohort to cohort and to their own households in the free world without adequate personal protective equipment. Defendants have no plan to provide adequate personal protective equipment to incarcerated people and staff in the prisons. *See* Defs.' April 7 Plan.

### 3. Defendants' Plan is Too Little, and Too Late and Not Broad Enough in Terms of Reducing the Population Density.

Defendants' only concrete plans for transferring people to places outside of prison is moving 46 women to McFarland Female Community Reentry Facility and another unspecified number of male inmates to another outside facility with which CDCR already has a contract. Bien Decl ¶ 3. As explained in Plaintiffs' Reply Brief to the Three-Judge Court convened in this case, the other measures Defendants have already taken—stopping jail intakes, releasing fewer than 3,500 people with 60 days left on their sentences, and moving some people from dorms to unoccupied spaces—is a step in the right direction, but on the whole woefully inadequate. *See* Pls.' Reply Brief In Supp. of Emergency Motion to Three-Judge Court, ECF No. 6558 at 6. Failures to do more amount to deliberate indifference. *Id.* at 7. Other measures need to be taken to transfer people out. That is the only way to achieve necessary and appropriate physical

11

distancing given the level of overcrowding in the system.  As discussed below, there are numerous options available to Defendants regarding where to temporarily transfer people in order to keep them safe during the COVID emergency.

### 4.   Defendants have the power right now to do this.

Defendants have the power under California law to temporarily transfer medically vulnerable class members to safe locations where the risk of contracting COVID-19 is substantially reduced.  Indeed, in support of the limited releases already ordered, CDCR invoked its authority under California Government Code section 8658, which provides as follows:

> In any case in which an emergency endangering the lives of inmates of a state, county, or city penal or correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution.  He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them.  Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section.

These transfers can be made without the delay of all of the pre-release planning steps previously mentioned by Defendants in opposition to Plaintiffs' Emergency Motion.  In addition, these temporary transfers to safety for medical purposes are not a release from CDCR custody and do not involve the same public safety decision-making required for a release from custody to parole.  *See* Pls.' Resp. to April 6, 2020 Order, ECF No. 6584 at 10.

In addition, the Governor in his March 12, 2020 Executive Order N-25-20, invoked emergency powers to "commandeer property-hotels and other places of temporary residence, medical facilities as necessary for quarantining, isolating or treating individuals who test positive for COVID-19 or who have had a high-risk exposure and are thought to be in the incubation period."  Bien Decl. ¶ 17 & Exh. 11.

The Governor also has new broad powers to use the National Guard to support efforts to house persons in the pandemic.  As reported by the Legislative Analyst's Office ("LAO"), The U.S. President on March 22, 2020, authorized the National Guard in California to serve under Title 32 of the U.S. Code to support California's response efforts to COVID-19, with the federal government covering the full costs of eligible activities.  Bien Decl. ¶ 7 & Exh. 3.  By issuing this authorization under Title 32 rather than Title 10, the President gave California far greater control

12

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

over how the guardsmembers are employed. *Id.* The LAO also highlighted that there was significant room for expansion in both the number of guardsmembers currently being used and the scope of their responsibilities to respond to COVID-19. *Id.*

The Governor also has the power to grant a reprieve from sentence under Article V, Section 8(a) of the California Constitution. Using these powers, the medically vulnerable should be rapidly transferred to available facilities—some already owned by the State —where they can be housed at a safe distance from one another and substantially lessen the risk of contracting COVID-19. Appropriate facilities are available right now and Defendants can and should be mobilizing to staff these facilities and make these transfers immediately. *See* Bien Decl. ¶¶ 5-6, 15-22.

### 5.    Right Now There Are Available Spaces Outside The 35 Prisons.

In February, the State engaged in a search for available vacant spaces appropriate to house vulnerable persons who may have been exposed to or contracted COVID-19 on cruise ships. According to a declaration filed in federal court by Dr. Mark Ghaly, the Secretary of California's Health and Human Services Agency (CHHS), on February 23, 2020, his agency considered several facilities around the state including "Sonoma Developmental Center, Army National Guard Camp Roberts and closed youth correctional facilities." *See* Bien Decl. ¶ 18 & Exh. 12. "Any facility selected needed to meet the very strict CDC sheltering criteria, which includes individual rooms and bathrooms for each patient." *Id.* at Exh. 12. The safe and appropriate location identified was the Fairview Development Center in Orange County that was very recently closed by the State, "with the last patient moving out on February 24, 2020." *Id.* Fairview Developmental Center has housed more than 900 patients and was licensed as a hospital and skilled nursing facility. Bien Decl. ¶ 18 (citing https://www.dds.ca.gov/services/state-facilities/fairview-dc/). There are many other available properties in California including other former Developmental Centers, closed Department of Juvenile Justice facilities, hospitals and closed military bases. *Id.* ¶¶ 5-6, 15-22. Defendants have disclosed no similar search for the *Coleman* class members or any other people incarcerated within CDCR.

///

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))

### B. Plaintiffs' Recommendations.

Defendants have so far not been able to measure how many people can be safely housed in each dormitory and actually move people out. As the next best proxy for this work, Plaintiffs' counsel have rapidly calculated how many persons would need to be moved out of dorms housing *Coleman* class members to achieve 100% or 90% of their design capacity. Lower density levels may ultimately prove necessary, but certainly, far better physical distancing would be achieved at 90% of design capacity. Doing so will require moving approximately ten thousand people out of the dorms. *See* Bien Decl. ¶ 10 & Exh. 6.

Defendants must act to release or transfer thousands more incarcerated people as soon as possible in order to mitigate a COVID-19 catastrophe that threatens to decimate not only CDCR's prisons but the surrounding communities. On April 8, 2020, Plaintiffs' counsel in *Plata v. Newsom*, Case N. C-01-1351 JST (N. D. Cal), filed an emergency motion regarding the inadequacy of Defendants' efforts to date and the need for immediate action. *See Plata* Doc. No. 3266. That motion, and the supporting declarations, *see* Bien Decl. ¶¶ 23, 24 & Exhs. 13, 14, provide additional support for the urgency with which Defendants must act.

Dated: April 9, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

*/s/ Kyle A. Lewis*
KYLE A. LEWIS
Deputy Attorney General
*Attorneys for Defendants*

Dated: April 9, 2020

ROSEN BIEN GALVAN & GRUNFELD LLP

*/s/ Michael W. Bien*
Michael W. Bien
*Attorneys for Plaintiffs*

CF1997CS0003
Coleman Joint Report Regarding Defendants' Plan.docx

14

Joint Report Re: Defs.' Plan to Achieve Greater Physical Distancing for Pl. Class   (2:90-cv-00520 KJM-DB (PC))