1              IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF CALIFORNIA
2            BEFORE THE HONORABLE KIMBERLY J. MUELLER

3

4

5    RALPH COLEMAN, et al.,

6                    Plaintiffs,
     vs.                              Sacramento, California
7                                     No. 2:90-CV-00520
     GAVIN NEWSOM, et al.,            Friday, April 10, 2020
8                                     10:03 a.m.
                     Defendants.
9    _____/

10

11

12                        --oOo--

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

14             TELEPHONIC STATUS CONFERENCE

15                        --oOo--

16

17

18

19

20

21   Official Reporter:      KACY PARKER BARAJAS
                             CSR No. 10915, RMR, CRR, CRC
22                           UNITED STATES DISTRICT COURT
                             501 I Street, Suite 4-200
23                           Sacramento, CA  95814
                             kbarajas.csr@gmail.com
24
     *Proceedings recorded by mechanical stenography.  Transcript*
25   *produced by computer-aided transcription.*

```
1    APPEARANCES:  (All parties appearing by telephone.)

2    For the Plaintiffs:      ROSEN BIEN GALVAN & GRUNFELD LLP
                              BY:  MICHAEL BIEN
3                                  Attorney at Law
                                  LISA ELLS
4                                  Attorney at Law
                                  CARA TRAPANI
5                                  Attorney at Law
                                  JESSICA WINTER
6                                  Attorney at Law
                              101 Mission Street, 6th Floor
7                             San Francisco, CA  94105

8                             PRISON LAW OFFICE
                              BY:  DAVID SPECTER
9                                  Attorney at Law
                                  STEVEN J. FAMA
10                                 Attorney at Law
                              1917 Fifth Street
11                            Berkeley, CA  94710

12   For the Defendants:      DEPARTMENT OF JUSTICE
                              OFFICE OF THE ATTORNEY GENERAL
13                            BY:  TYLER V. HEATH
                                  Attorney at Law
14                                 LUCAS L. HENNES
                                  Attorney at Law
15                                 ELISE THORN
                                  Attorney at Law
16                                 MONICA ANDERSON
                                  Attorney at Law
17                                 SARAH M. BRATTIN
                                  Attorney at Law
18                            1300 I Street
                              Sacramento, CA  95814
19
                              DEPARTMENT OF JUSTICE
20                            OFFICE OF THE ATTORNEY GENERAL
                              BY:  KYLE LEWIS
21                                 Attorney at Law
                                  ADRIANO HRVATIN
22                                 Attorney at Law
                              455 Golden Gate Ave., Suite 11000
23                            San Francisco, CA  94102

24

25
```

```
1    APPEARANCES (Continued):

2    For the Defendants:      ROBINS KAPLAN LLP
                              BY:  ROMAN M. SILBERFELD
3                                  Attorney at Law
                              2049 Century Park East, Suite 3400
4                             Los Angeles, CA  90067-3208

5    Also Present:            Matthew Lopes, Special Master
                              Jeff Metzner, Special Master Team
6                             Henry Dlugacz, Special Master Team
                              Kerry Walsh, Special Master Team
7                             Kristina Hector, Special Master Team
                              Mohamedu Jones, Special Master Team
8
                              Diana Toche, Undersecretary of Health
9                             for State of California
                              Joseph Bick, M.D.
10
                              Stephanie Clendenin
11                            Director, Dept. of State Hospitals

12                            Christine Ciccotti
                              Christopher Kent
13                            Antonina Raddatz
                              Attorneys at Law
14                            Department of State Hospitals

15                            James Spurling
                              Attorney at Law
16                            Office of the Inspector General

17                            Melissa Bentz
                              Jennifer Neill
18                            Nick Weber
                              Attorneys at Law
19                            California Department of Corrections

20                            Haven Gracey, Law Clerk

21                                  --oOo--

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, FRIDAY, APRIL 10, 2020, 10:03 AM

2                              --oOo--

3          THE CLERK:  Court is now in session.  Calling civil

4   case 90-520, Coleman, et al. versus Newsom, et al.  This is on

5   for a telephonic status conference.

6          THE COURT:  All right.  Thank you, Ms. Schultz.

7          Is the court reporter on the line and able to hear

8   everything so far?

9          (Court reporter confers with the Court.)

10          THE COURT:  All right.  Good morning, Mr. Barajas.

11   Thank you.

12          I am going to call roll, as I have in the past.

13          Ms. Schultz posted the ground rules for the hearing on

14   the calendar.  I just want to remind everyone who is on the

15   line that when you are not speaking, you should mute your

16   phone.  The only persons allowed to speak are those the Court

17   calls on, according to rules I will review.  If any member of

18   the public is listening, it is essential to keep the line on

19   mute the entire time.  And so with that, let me call roll for

20   the plaintiffs.

21          Michael Bien.

22          MR. BIEN:  Present, your Honor.

23          THE COURT:  Lisa Ells.

24          MS. ELLS:  Good morning, your Honor.

25          THE COURT:  Cara Trapani.

```
1              MS. TRAPANI:  Good morning, your Honor.

2              THE COURT:  Jessica Winter.

3              MS. WINTER:  Yes, your Honor.  Good morning.

4              THE COURT:  And Donald Specter.

5              MR. SPECTER:  Present.

6              THE COURT:  Steven Fama.

7              MR. FAMA:  Present, your Honor.

8              THE COURT:  All right.  Is there any other counsel

9     appearing for plaintiffs, Mr. Bien?

10             MR. BIEN:  No, your Honor.

11             THE COURT:  All right.  For the defendants,

12    Kyle Lewis.

13             MR. LEWIS:  Good morning, your Honor.

14             THE COURT:  Roman Silberfeld.

15             MR. SILBERFELD:  Good morning, your Honor.

16             THE COURT:  Adriano Hrvatin.

17             MR. HRVATIN:  Good morning, your Honor.

18             THE COURT:  Elise Thorn.

19             MS. THORN:  Present.

20             THE COURT:  Tyler Heath.

21             MR. HEATH:  Good morning, your Honor.

22             THE COURT:  Lucas Hennes.

23             MR. HENNES:  Present, your Honor.  Good morning.

24             THE COURT:  Monica Anderson.

25             MS. ANDERSON:  Yes.  Good morning, your Honor.
```

 1          THE COURT:  All right.  Good morning to you all.

 2          Mr. Lewis, is there any other counsel appearing for

 3   defendants?  I realize there are others monitoring the hearing

 4   who I will identify by roll call in just a moment.  But anyone

 5   else appearing, Mr. Lewis?

 6          MR. LEWIS:  No, your Honor.

 7          THE COURT:  All right.  Also present and monitoring

 8   the hearing available, as the Court understands it to answer

 9   questions, are Dr. Diana Toche.

10          DR. TOCHE:  Good morning, your Honor.

11          THE COURT:  Jennifer Neill.

12          MS. NEILL:  Yes, good morning.

13          THE COURT:  Dr. Joseph Bick.

14          DR. BICK:  Good morning.

15          THE COURT:  Melissa Bentz.

16          MS. BENTZ:  Yes, your Honor.  Good morning.

17          THE COURT:  Nick Weber.

18          MR. WEBER:  Good morning, your Honor.

19          THE COURT:  Stephanie Clendenin.

20          MS. CLENDENIN:  Good morning, your Honor.

21          THE COURT:  Christine Ciccotti.

22          MS. CICCOTTI:  Yes, your Honor.

23          THE COURT:  Christopher Kent.

24          MR. KENT:  Yes.  Good morning, your Honor.

25          THE COURT:  Antonina Raddatz.

1          MS. RADDATZ:  Present, your Honor.

2          THE COURT:  James Spurling.

3          MR. SPURLING:  Present, your Honor.  Good morning.

4          THE COURT:  The Court's Special Master, Matthew Lopes,

5    is on the phone.

6          Mr. Lopes, you're present?

7          SPECIAL MASTER LOPES:  I am here, your Honor.

8          THE COURT:  Could you please identify the members of

9    your team who are monitoring the hearing.

10          MR. LOPES:  Yes, your Honor.  Mohammedu Jones,

11   Kerry Walsh, Dr. Jeff Metzner, and Henry Dlugacz.

12          THE COURT:  All right.  And the Court's law clerk also

13   is monitoring the proceedings by telephone, Haven Gracey.

14          You're present on the phone, Ms. Gracey?

15          MS. GRACEY:  Yes, I am, your Honor.  Good morning.

16          THE COURT:  All right.  Is there anyone else

17   affiliated with plaintiffs or defendants monitoring the

18   hearing?  Let me ask first, Mr. Bien, for the plaintiffs?

19          MR. BIEN:  I think there are some people, your Honor.

20          THE COURT:  Are you able to identify those by name, or

21   is there a member of your team able to identify those persons

22   by name?

23          MR. BIEN:  I think Jessica Winter.

24          THE COURT:  I called her name earlier.

25          MR. BIEN:  Okay.  Lisa Ells is on.

1        MS. ELLS:  No one who hasn't appeared and I don't

2   believe there are -- anybody is except for the people that

3   already appeared.

4        MR. BIEN:  Thank you.

5        THE COURT:  All right.

6        All right.  For the defense, Mr. Lewis.

7        MR. LEWIS:  Your Honor, I believe that possibly we may

8   have one additional person, Sarah Brattin, B-r-a-t-t-i-n, I

9   understand is listening in.

10       THE COURT:  All right.  Ms. Brattin.

11       MS. BRATTIN:  Yes, your Honor, present.

12       THE COURT:  All right.

13       All right.  Thank you.  Let me just -- this is a

14   status.  We've been holding these statuses now for about a

15   month, and the task force that the Court convened has been

16   meeting very regularly since the first status.  The Court's

17   agenda for today is the following:

18       I'm first going to ask the Special Master to provide

19   an update.  I understand there was a task force meeting or at

20   least a subset of the task force met last evening, so I'm going

21   to ask the Special Master for a report both on Department of

22   State Hospitals matters and any other update he may have that

23   is not reflected on the Court's docket.

24       Secondly, I'd like to ask the parties several

25   questions about the responses to the order to show cause with

1    respect to Department of State Hospitals transfers.

2            Third, I have questions based on the parties' filings

3    regarding the Coleman class generally in light of the

4    Coronavirus pandemic, and then I will ask if anyone has

5    anything else they want to bring to my attention.

6            So Mr. Lopes, first, if you could provide your update

7    as the Court's Special Master.

8            SPECIAL MASTER LOPES:  Thank you, your Honor.  Before

9    I start, I would like to mention that Kristina Hector from my

10   team is also on the line.  I apologize for not listing her

11   earlier.

12           THE COURT:  All right.  Her appearance is noted.

13           SPECIAL MASTER LOPES:  Your Honor, the COVID-19 task

14   force has met three times since the last status conference

15   which was held last Friday, April 3rd.  We had a task force

16   meeting immediately following the status conference, another

17   one on the 7th of April, and one late last night on the 9th of

18   April.

19           Because of the urgent nature of some of the activities

20   that we wanted to undertake, we had -- we formed a subcommittee

21   with folks from -- or representatives from CDCR Mental Health,

22   Department of Adult Institutions, and on one of these

23   subcommittees we had DSH officials.

24           So the subcommittees, which I'll also refer to as work

25   groups, started meeting roughly at 10:00 eastern last Friday

1   night to discuss transfers that could occur throughout the

2   facilities for -- to provide inpatient care to the inmate

3   class.  Those subcommittees met nearly eight times or roughly

4   eight times.  They met throughout the weekend and every day

5   this week.  It was a collaborative, productive process

6   clinician to clinician, and where DAI had to come in, having

7   them was very helpful as well.  We tried to keep the numbers

8   small, and for many of the work group meetings, attorneys did

9   not participate at all which may have led to more collaboration

10  and more productivity.

11       So the experts assisted CDCR with revising their

12  proposed plan to minimize the transfer of inmates out of the

13  institutions than higher levels of care indicated.  The

14  original transfer proposal was distributed some 30 minutes

15  before last week's status conference, and there wasn't a chance

16  to really discuss it fully on the status conference call.  But

17  everyone rolled up their sleeves, and they started to work

18  carefully to craft the plan or modify the plan in a way that

19  was acceptable to all parties.

20       The experts, my experts, or should I say your experts,

21  your Honor, excuse me, helped CDCR formulate a plan of care for

22  inmates requiring inpatient treatment while retaining housing

23  units within the institutions.  The group designed treatments

24  for inmates in temporary housing units to match intermediate

25  care as closely as possible given the crisis guidelines for

1    care were developed for when inmates are unable to move to

2    temporary housing units.  And two proposed plans have been

3    agreed to by all of the parties for providing care.

4         There was one task force meeting where DSH

5    participated, with the help of the Special Master's experts,

6    your experts, in developing a similar plan or at least

7    discussing the development of a similar plan, excuse me.  And

8    that work group met just yesterday, but we don't have any

9    results to share.

10        Unresolved related treatment concerns are the

11   following:

12        Retaining inmates requiring EOP level care at non-EOP

13   institutions, that has been discussed, but we don't have a

14   resolution.

15        Retaining administrative segregation and max custody

16   inmates in restrictive housing when they require inpatient

17   levels of care, we are grappling with those issues and hope to

18   report next week on some progress there and the maximum time

19   inmates may be housed in temporary mental health units.

20        So again, your Honor, these work groups have really

21   rolled up their sleeves.  They've done a lot of good work, and

22   the treatment guidelines for inmates requiring inpatient care

23   while retained within the institutions including the

24   development of temporary housing units to ensure inmates

25   requiring inpatient care work closely together and provided

1   services as closely matched to intermediate care as possible,

2   and enhancement of care in terms of treatment hours, use of

3   telehealth and opening of cell doors for treatment, certain

4   treatment modalities, time frames for IDTPs, process of

5   discharge, and evaluation of suicide risk and safety planning

6   all were discussed and agreed upon including discussions along

7   appropriate staffing levels.

8           It was very clear, your Honor, that the work groups

9   were able to move more freely and collaboratively when we moved

10  to a subcommittee work group platform without all of us lawyers

11  doing what we do best, lawyering and displaying our prowess, if

12  you will.

13          So the clinicians were able to freely again work

14  together, develop creative ideas to the identified problems,

15  and then we would loop in the plaintiffs appropriately to make

16  sure that they understood what was taking place.  And then the

17  work groups would meet to formalize any agreements that were

18  entered into.

19          So we had a very, very, very productive workweek, and

20  again these groups met day and night starting with last Friday

21  night at 10 p.m. eastern.

22          That's my report, your Honor.

23          THE COURT:  All right.  Thank you, Special Master

24  Lopes.  That has many encouraging aspects to it.  And again,

25  you expect the treatment guidelines you're working on, which

1    are really geared towards ensuring that Coleman compliance is

2    satisfied to the maximum extent possible during this time, you

3    expect those to be finalized sometime next week?

4             SPECIAL MASTER LOPES:  They have -- portions of the

5    protocols have already been finalized or are being memorialized

6    right now, your Honor.  It's just with the limited exceptions

7    that I outlined around EOP level of care --

8             THE COURT:  Okay.

9             SPECIAL MASTER LOPES:  -- ad seg and the like, that we

10   don't have any agreements and we have to continue to meet.  But

11   what has been agreed to is going to be sent out to the field

12   relatively soon if it hasn't been already.

13            THE COURT:  All right.  Very good.  So with regard to

14   those exceptions, you anticipate the ability to conclude those

15   discussions and reach agreement by the end of next week?

16            SPECIAL MASTER LOPES:  I think that the discussions

17   will conclude next week, yes, your Honor.  The answer to that

18   is yes.  I am uncertain as to whether we will be able to bridge

19   the gap around providing care in ad seg and -- in the ad seg

20   units.  That's a more difficult conversation to have and one

21   where I'm not certain the work groups will have a meeting of

22   the minds.

23            THE COURT:  All right.  Thank you for that

24   clarification.  So I'll look for your report on that issue by

25   the end of next week.

1          Let me just ask the parties, any need to register a

2    position with respect to what you've just heard from Special

3    Master Lopes, Mr. Bien?

4          MR. BIEN:  Your Honor, I think the discussions have

5    been productive.  I agree with Special Master Lopes that we're

6    down to some very smaller but important issues.  I hope that we

7    can reach resolution, but perhaps they can be brought to you if

8    we can't because I think it's important that clear guidelines

9    be set as soon as possible.

10          So I think what I'm saying is that I think we should

11   try to complete the negotiations as far as we can so that they

12   can be -- if we have a dispute, it can be brought to the

13   Court's attention by -- perhaps in advance of next Friday so

14   that we can get a decision.  I think what's really important

15   for the clinicians and custody trying to manage this situation

16   is that they have, you know, a clear direction from the Court.

17          THE COURT:  All right.  Mr. Lewis.

18          MR. LEWIS:  Good morning, your Honor.  Yes, your

19   Honor, defendants do believe that the guidelines are

20   appropriate, and the clinicians, CDCR's clinicians, want to get

21   the guidelines.

22          The Special Master is correct.  There have been some

23   very fruitful conversations among the clinicians and the

24   experts, and that's exactly what defendants believe is the best

25   way to bridge this gap.  So I think that this is definitely

1   something we should leave the parties to work out.  Meaning,

2   when I say "the parties," the clinicians and the experts then

3   engaging and then bringing in the plaintiffs because we are

4   seeing the task force really doing a lot of positive work, and

5   I would encourage that the Court allow that process to work its

6   way through over the next week so that the parties can work

7   this out and find out what's best both for the patients and for

8   the plaintiffs' clients in this regard.

9           THE COURT:  All right.  Thank you each for that

10  feedback.  I think it's consistent with what I was clarifying

11  with the Special Master.  I'll ask the Special Master to

12  provide me with his report on the status of the remaining

13  discussions that are occurring with respect to treatment

14  guidelines by next Thursday.  And it's not on the calendar yet,

15  but it's clear that people are assuming we'll have a further

16  status next Friday, and the Court had concluded prior to the

17  start of this status conference that we will need a further

18  status next Friday.  So we'll talk about the timing of that

19  before we conclude this call.

20          In terms of the other issues, let's move on to the

21  other agenda items.  I just want to acknowledge before we do

22  that, this Court did call for the convening of the task force,

23  and it was specifically to open up a nonlitigation path because

24  of the press of time and to try to avoid the parties going to

25  their litigation corners because that can impede corrective

1    problem solving, to the extent the problems raised by the

2    Coronavirus pandemic can be resolved without a court's

3    deciding a dispute, so I am encouraged by the good work of the

4    task force.

5          At the same time, I would note that numbers are

6    rising.  Every time the Court checks the web page, the numbers

7    have risen again.  But the last I checked, my understanding is

8    33 inmates had tested positive within the California prison

9    system.  22 of those were Coleman class members.  I acknowledge

10   the larger number of staff members which is of great concern to

11   the Court that have tested positive.  At this point this Court

12   has no sense of how long those numbers will continue to rise

13   and when a plateau may be reached within the prison system.

14         I will have one question that maybe that Dr. Bick is

15   the right person to answer that question at this point.  Are

16   the parties seeing a horizon when a plateau may be reached, and

17   if so, what is their sense of when that might be because it

18   affects our thinking even at this still relatively early phase

19   regarding how long any temporary plan remains in effect.

20         The Court's observation is that the defendants are

21   still in crisis management mode.  They've taken many steps, and

22   I acknowledge those.  But I think it's fair to characterize

23   those as crisis management mode in the early stages, and

24   without having achieved at this point a sustainable level of

25   stability, to the extent some stability is possible, for as

1    long as the defendants need to be taking account of the

2    Coronavirus.

3            So with that said, here are my few questions at this

4    point about the responses to the order to show cause regarding

5    the Department of State Hospitals' suspension of transfers.  I

6    have many questions, but I don't think we have time or that I

7    have convened this status conference in a way that allows me to

8    get to the bottom of those questions.

9            First, is there an update on the status of the

10   screening protocol that Dr. Bick is working on?  When will that

11   be done?  When will it be implemented?  And specifically, will

12   it be immediately implemented to evaluate the Coleman class

13   members on a wait list for DSH beds.  I believe there are at

14   least 35 of those persons, if that number hasn't changed.

15           So Mr. Lewis, do you have anything to say in response

16   to those questions, or is Dr. Bick the person to respond?

17           MR. LEWIS:  Your Honor, I can say that those

18   conversations are ongoing between DSH, being Dr. Warburton and

19   Dr. Bick, as well as all other medical people that would be

20   involved in this.  As the various pleadings that have been in

21   front of the Court over the past few days have shown, this is a

22   continually changing and evolving situation.  And as the

23   Special Master alluded, the Special Master is also very

24   helpfully involved in this as well.  So there are various

25   things going on.

1              As to the actual status of the assessment tool, there

2    are various tools out there, but there is a heightened

3    screening tool which is being developed.  It may be even being

4    finalized and will be put out.

5              But in terms of the larger picture, the Special

6    Master's also involved in this.  So I would just like to say

7    that to the extent that the Special Master's involvement has

8    been important, that's one thing defendants would like to

9    continue doing, to use the Special Master to resolve this issue

10   short of litigation, short of getting the Court involved to see

11   if there's a way that we can determine if there is a small

12   cohort and they're appropriately medically screened and all

13   those things.

14             There is a protocol out there.  There is, like I said,

15   guidelines out there.  It's done and it is in use.  And it is

16   ready.  But there are just a -- simply by a case-by-case

17   situation where the two agencies will come together and assess

18   if there are particular individuals that would be transferred

19   between CDCR and DSH.  The memo was released, I believe -- your

20   Honor, I believe it was released last Sunday or Monday on this,

21   and it was pushed through.  So that enhanced screening is out

22   there.

23             THE COURT:  Is there an additional protocol though

24   that Dr. Bick is still working to develop?

25             MR. LEWIS:  Your Honor, I believe that there is not an

1    additional protocol.  I believe that the heightened protocols

2    that have been developed are being put into the field and are

3    being used.  They're continually evolving and continually

4    looking at it.  So in the sense of, yes, there will be an

5    enhanced protocol that will come up, but it has to be approved.

6    It has to go through -- there could even be action on it as

7    early as today.

8         THE COURT:  And can you tell me, are the Coleman class

9    members wait listed for DSH beds, are they being screened using

10   whatever the current protocol is?

11        MR. LEWIS:  Your Honor, no, I cannot speak to that.  I

12   do not have that information.

13        THE COURT:  Is it all right with you if Dr. Bick --

14        MR. LEWIS:  Yes, your Honor, I have no problem.

15   Dr. Bick, I believe you're available.  Is that correct?

16        DR. BICK:  Yes, good morning.

17        THE COURT:  Dr. Bick, so the specific questions for

18   now, just to give the Court a sense of where things are, is

19   there an enhanced screening protocol that will be available?

20   If so, when?  And how will it be implemented with respect to

21   Coleman class members on the wait list for DSH beds?

22        DR. BICK:  So yes, your Honor, there is a COVID-19

23   screening tool that we worked closely with DSH and also with

24   the office of the Special Master and ultimately was shared with

25   the plaintiffs.  This is a series of 11 questions that are to

1   be asked of patients.  Last Sunday, after approval with

2   conversations with the office of Special Master, we issued that

3   through the department's operations center to the field, and it

4   was to apply to all movement for mental health in and out of

5   higher level of care throughout CDCR.

6         We followed that up with a conversation with the chief

7   executive officers and their executive teams at each CDCR

8   facility this week, and that is being utilized now for all

9   movement throughout CDCR.  That document also is part of the

10  conversation with our DSH colleagues, and as of yesterday, I

11  believe the day before, we've incorporated that screening into

12  all OMDs or prior called MDOs that are moving from CDCR to the

13  Department of State Hospitals.  So that screening tool is now

14  in use and has been applied to those populations.

15        THE COURT:  Based on what you know, is there a plan to

16  apply it to Coleman class members on the wait list for DSH

17  beds?

18        DR. BICK:  When patients are ready to be transferred

19  either from DSH to CDCR or from CDCR to DSH, our expectation is

20  that they will be screened using the same COVID-19 screening

21  tool.

22        THE COURT:  All right.  Let me just ask one other

23  question for the defendants at this point.  The plaintiffs

24  provided information which has been presented to this Court

25  before in other settings.  With respect to other hospitals,

1  state hospitals in the system, and empty wings in state

2  hospitals, Mr. Lewis, in the first instance, at this point is

3  there any expectation that DSH would open up any of those empty

4  wings under the current circumstances, for example, to obtain

5  distancing?

6       MR. LEWIS:  Your Honor, I understand that DSH is --

7  has used some of its space to create what would be essentially,

8  I won't call them quarantine areas but I'll call them areas

9  that when an inmate comes in, they can be -- I'm sorry -- a

10  patient comes in.  They can be set aside and kind of screened

11  there.  But aside from using space to create those types of

12  preadmission screening places, I am not aware of any

13  indications or any plans by DSH to open up open space or to

14  open space to more patients.

15       THE COURT:  All right.  As I said, I have many

16  questions based on the parties' filings in response to the

17  order to show cause.  I'm prepared certainly to allow the

18  Special Master to continue working with the parties to see if

19  some agreements can be reached regarding a transfer of Coleman

20  class members into DSH beds, but I'm not prepared to have this

21  remain an open-ended process.

22       The Court's current thought is that, while recognizing

23  the imperfect setup we have currently, I believe the Court

24  needs to hold a focused evidentiary hearing, and I'm prepared

25  to do that early or middle of next week after the parties with

1    the Special Master have a bit more time to see if they can work

2    out their differences.  But for me to truly understand the

3    record, I believe I would need to hear, in a very focused way,

4    I believe it could be done in half a day from Dr. Warburton,

5    Dr. Bick, and there may be one doctor the plaintiffs would

6    identify.

7              So that is my current plan.  Any response to that

8    plan, Mr. Bien?

9              MR. BIEN:  I'm sorry.  I was on mute.  I think that

10   it's important to -- that there is a decision.  As far as I

11   know, the negotiations have broken down, and there's a hard no

12   on this from DSH.  There's no evidence that patients are being

13   screened, the 2684s are being screened.  Dr. Bick did not say

14   they're being screened, and the wait list remains approximately

15   the same magnitude as the Court mentioned.  And a close reading

16   of the declarations filed by the defendants on this issue shows

17   that there is a hard door closed.

18             And, you know, I think as to the second question the

19   Court asked about does DSH have additional space available that

20   might be made available to the Coleman class, I would like

21   there to be some -- that question needs to be answered under

22   oath by DSH in advance of a hearing.  We get all sorts of mixed

23   messages about the difference between how many beds they

24   actually have, in other words, physically have, how many are

25   staffed and licensed, which can be a smaller number based on

1    the budget.  And I think we need some accurate information

2    about the actual size of the DSH hospitals, what could be made

3    available if they were funded, and what's staffed and empty

4    now.  And it's very hard to get a straight answer about those

5    questions, and I don't think just a straight evidentiary

6    hearing without some written response.

7         We'd like an expedited -- either an expedited chance

8    to ask some of those questions of DHS and get a response before

9    the hearing, or they can actually give us the information in

10   advance in writing about -- I think we've actually asked of

11   them recently, but we can do it again.  But I think without

12   that information in writing and under oath, it's a hearing that

13   won't be beneficial.

14        THE COURT:  All right.  So expedited discovery in the

15   form of written discovery, responses to interrogatories,

16   perhaps a very limited deposition, is that what you're

17   suggesting, just so I'm clear?

18        MR. BIEN:  Hopefully -- and maybe we can do a limited

19   deposition or perhaps just some, you know, interrogatories

20   focused on the actual capacities of these state hospitals.

21   Perhaps we can start with the interrogatories and only do a

22   deposition if necessary.

23        THE COURT:  All right.  Mr. Lewis.

24        MR. LEWIS:  Yes, your Honor, a few points.  First of

25   all, your Honor, I would bring us all back to your Honor's

1    earlier comments about how litigation sometimes isn't

2    necessary.  This is not necessary for a few reasons.  One is,

3    as the Court was informed by the Special Master, there are a

4    lot of conversations going on about this.  To inject a

5    deposition and a hearing in this at this time I don't think

6    would be very productive and would take the same people who are

7    working to get this resolved away from getting it resolved.

8    And that's just a formal issue.  There is a process that has

9    been working, and I would ask that it be continued.

10        Another reason that was brought out in our papers is

11   that there's reason why these transfers by DSH were stopped

12   across the board, and that is, there are very serious public

13   health concerns with this.  To open up additional wings or

14   anything that the plaintiffs may intimate invites further

15   COVID-related issues that the defendants have briefed very

16   thoroughly in their papers.

17        Moreover, there are protocols that are being worked

18   out to talk about this very thing that is going on.  Discovery

19   is not needed and once again I believe would get in the way of

20   the people that are trying to do this.  An evidentiary hearing

21   would take away the resources from trying to solve this problem

22   without getting the courts involved or litigation started up.

23        I have been informed that there are no additional

24   spaces or anything.  But for these particular issues, I think

25   we can actually answer a lot of the Court's questions right now

1   and today without taking much time.  We have a good

2   representation from Department of State Hospitals to include

3   their director, Christine Ciccotti, the chief counsel is on the

4   line.  I think that many of these questions could be answered,

5   and I would invite the Court to ask Ms. Ciccotti particularly

6   about maybe the space questions or some of the other planning

7   that's going on to address these so that we don't need to go

8   down the road of discovery or a hearing that will once again

9   take everyone's resources and I fear take everyone's eye off of

10  the ball on this one so that we go down a path we don't need to

11  go down.

12          So your Honor, if possible, I would invite

13  Ms. Ciccotti to talk to the Court or maybe answer some of your

14  questions or maybe respond to some of the points that Mr. Bien

15  has raised if your Honor will permit it.

16          THE COURT:  At this point I would want to put people

17  under oath, and I don't know that you've been on notice that

18  that's what the Court would need to get to the bottom of some

19  of its questions.  And so I am acutely aware of the many balls

20  in the air, and I have no desire to pull people off of the

21  highest priority tasks.  And again, I've opened up this task in

22  an attempt to avoid that.

23          We have been talking about these issues in one form or

24  another for going on a month.  It's been several months since

25  the state was aware of the Coronavirus being an issue elsewhere

1   in the world and well more than a month since the worldwide

2   pandemic was declared.  So I've heard what both of you have

3   said.  Let me think about that, and I'll let you know following

4   this hearing how I'm going to resolve my need to get some

5   additional questions answered.

6          Let's move on to the Coleman class generally.  Looking

7   at the parties' filings, I note the joint statement, including

8   a reference to 930 MHSDS inmates being released I believe by

9   Monday, so perhaps I can ask Mr. Lewis, in the first instance,

10  are all of those persons Coleman class members?

11         MR. LEWIS:  Yes, your Honor.  Well, your Honor, there

12  are a portion of the release that are Coleman class members.

13  As of the statistics I had a few days ago, it was going to be

14  in the range of 930, but as you imagine, this is a rolling

15  release.  I know in our papers we reported yesterday that there

16  were 2,019.  I've got numbers that -- I'm now seeing numbers

17  that go up to 3,000 in terms of numbers of release.  So it's a

18  continually moving number, but my understanding is, yes, there

19  were, as of earlier this week, there were going to be 930

20  Coleman class members in the release that would have been or I

21  guess the accelerated parole.  I'll call it that, your Honor.

22         THE COURT:  So those are persons, Coleman class

23  members who are within 60 days of release, in any event?

24         MR. LEWIS:  Correct, your Honor.  That is my

25  understanding.  I can't give you an absolute specific number,

1   but that is the number I saw.

2          THE COURT:  All right.  Have the plaintiffs been

3   provided information on where those persons are being released

4   from, what institution, what exact location within an

5   institution?

6          MR. LEWIS:  No, your Honor.  They have not.

7          THE COURT:  Can that information be easily provided to

8   help the plaintiffs understand -- subject to protective

9   order -- to help the plaintiffs understand how those releases

10  affect distancing, for example?

11         MR. LEWIS:  Pardon me, your Honor.  I will talk with

12  my clients and try to get that information to the plaintiffs as

13  soon as possible.  I do not have it right now.

14         THE COURT:  All right.  Let me just again --

15         MR. BIEN:  Your Honor.

16         THE COURT:  Yeah.  I'll give you a chance, Mr. Bien.

17  Just hold on.  In terms of relocations, Mr. Lewis, just looking

18  at the record that's before the Court currently, am I reading

19  the numbers correctly, that relocation within institution of

20  Coleman class members will result in about a thousand being

21  relocated to achieve some level of distancing?

22         MR. LEWIS:  Yes, your Honor.  But once again, the

23  numbers are -- it's difficult to precisely quantify this

24  because there are so many different movements going on in terms

25  of to create the physical distancing with the family units, the

1    family pod ideas, and the different identifications of space.

2    The Coleman class members will be necessarily involved in any

3    kind of relocation that goes on to create physical distancing.

4           But I cannot provide an accurate number at this time.

5    But yes, your Honor, there will be a large portion of them.

6    Because of the representative nature of the Coleman class

7    within the population, there will be a number of Coleman class

8    members that will be essentially subject to the physical

9    distancing measures that are going on as well as all of the

10   other measures that the department is taking because it's doing

11   this as a holistic approach to the entire population of which

12   obviously the Coleman class members are an important subset.

13          THE COURT:  I understand that approach, but the

14   relocations currently planned, will they be completed by

15   April 15th?

16          MR. LEWIS:  I don't have that information, your Honor.

17   I know it's a moving target and consistently rolling forward.

18   In fact, there may be even more locations that go on that are

19   decided maybe tomorrow or in the coming days that would push

20   that window out because there's more planning that has to go

21   on.  It's a continually moving plan as they look for more

22   space, identify more space, get the fire marshal involved, get

23   space cleared for bunking and housing and things like that.

24          So yes, your Honor, a certain portion of them will be

25   done by the middle of April, April 15th, but they will always

1   be continually rolling as they look for more space and try to,

2   you know, respond to what you have acknowledged is kind of an

3   evolving epidemic.

4        THE COURT:  All right.  Mr. Bien.

5        MR. BIEN:  Yes, your Honor.  From our discussion with

6   defendants and our review of their plan, there is no -- they

7   have not been targeting the Coleman class in any of the moves

8   they have made so far.  In other words, they've been -- the

9   releases, accelerated releases from prison had to do with

10  people who had a particular -- you know, had a release date

11  accelerated and met the filter of not -- of not seeing being

12  sex offenders, violent, various other filters, but there's

13  nothing particularly about that group that had anything to do

14  with the Coleman class.  Of course some Coleman class members

15  were included.

16       Same with the moves, as we understand so far, you

17  know, they've moved various populations from dorms to other

18  locations, but they're not particularly targeting a Coleman

19  class.  And again, we have not -- we don't understand that

20  there's anything targeting either Coleman class or medically

21  vulnerable people in general, as far as we know from the plan,

22  nor is there any, you know, time frame as we understand from

23  the plan as to how much will be achieved when.

24       THE COURT:  All right.  I understand that.  I

25  understand that position.

1          So my understanding is at this point the plaintiffs'

2     counsel know who in the Coleman class is high risk, but the

3     plaintiffs' counsel does not know where those people are

4     located specifically in terms of their conditions.  Is that

5     correct?

6          MR. BIEN:  I'm sorry, your Honor.  This is Mike Bien

7     again.  We now have received a complete list of all class

8     members, actually all prisoners in the system including their

9     location, their risk for COVID-19, their age, and other

10    characteristics including their CSRA score, their sentence

11    release dates.  We now have a complete set on an active Excel

12    spreadsheet.  We've just had that for a very short time, and

13    we're learning how to manipulate it.  It would be possible, I

14    think, from that spreadsheet to determine how many Coleman

15    class members are, for example, in the dorms that were included

16    in the photos that plaintiffs' counsel put in the original

17    motion to the three-judge court.

18          I may have misspoke.  The spreadsheet we have may only

19    be high-risk people.  I'm getting a clarification from Don on

20    that.

21          THE COURT:  All right.  Well, here's the bottom line

22    question for the defendants, responding to what Mr. Bien just

23    said, Mr. Lewis, I don't see in the record before me, is it the

24    case that a plan has not crystallized for Coleman class and

25    specifically the most vulnerable, as identified by the CDC, for

1   relocation to obtain the maximum level of distancing or an

2   alternative placement that allows substantial compliance with

3   the CDC guidance?  Is it the case that there's no plan that has

4   been finalized, a clearly stated goal, Mr. Lewis?

5          MR. LEWIS:  Yes, your Honor.  So everything that's

6   being done within the department is departmentwide mitigation.

7   It is not focused on specifically Coleman class members.  The

8   list that Mr. Bien is referring to was provided by the -- I'm

9   sorry -- by the Receiver's office that identified all of CDCR's

10  high-risk inmates.  And so the department is focused on

11  treating everyone, and the reason for that is because they have

12  a responsibility to everyone including Coleman class members.

13         The departmentwide mitigation necessarily will impact,

14  hopefully positively, the Coleman class members as well because

15  it is focused on mitigating the risk for everyone.  So no,

16  there is a never -- and there is no final plan, I apologize,

17  your Honor, because it's just -- this is such an evolving

18  situation that CDCR needs to be nimble enough to determine

19  where it needs to go next in terms of this move, this idea,

20  this thing.

21         Because as the CDC points out, it's not just physical

22  distancing.  It's one of many factors that can help mitigate or

23  stop the spread of the disease.  The department is looking at

24  this all across and is not focused on one particular aspect

25  such as physical distancing or one particular class such as

1    Coleman.  They're looking at it for everyone.  Because there

2    was 55,000 inmates that were identified with the high-risk

3    factors or the risk factors.  So they need to look at it for

4    everyone and not just the Coleman subclass because they will be

5    involved in it because they're part of that group.

6            THE COURT:  So is there a plan departmentwide that

7    calls out how the most vulnerable, regardless of whether or not

8    they're in the Coleman class or any other class will be

9    handled?

10           MR. LEWIS:  No, your Honor.  There is not a

11   particularized plan that I'm aware of in terms of just the

12   high-risk inmate.  It is to everyone because anyone can be

13   affected by COVID.  Obviously there are higher-risk inmates.

14   But no, your Honor, I am not aware of a specific plan as regard

15   to high-risk inmates.  It may be present in the Receiver's

16   office or, I'm sorry, in CCHCS, but I am not aware of it from

17   my work on Coleman.

18           THE COURT:  All right.  Let me ask -- this may be a

19   question for Dr. Bick.  I've seen a reference to creating the

20   equivalent of families within the prison, the eight-person

21   pods, are your medical folks saying that that would comply with

22   CDCR's cohort guidance as an alternative to distancing?

23   Mr. Lewis, in the first assistance, if you wish to yield to

24   Dr. Bick, that's fine.

25           MR. LEWIS:  No, your Honor.  I believe Dr. Bick can

1  speak about this.  We have discussed it.  Within CDCR it is an

2  idea that definitely got some traction, and they're looking at

3  CDC for this.  So Dr. Bick.

4          DR. BICK:  Certainly.  This is Joseph Bick.  I can't

5  speak to what CCHCS believes that this will accomplish, but I

6  think it's an excellent idea, similar to what's being done in

7  the free community in terms of not having every person stay in

8  a separate room but identifying a smaller cohort, a family or a

9  close group of friends and limiting contact to those.

10         So I think this is an excellent idea, and I know

11  there's been active conversation between CCHCS and DAI on how

12  that can happen.  Some aspects of it are already being

13  implemented in terms of marks on the ground and housing units

14  to try to make it clear to people what's an appropriate

15  distance, but I think it's worthy of further pursuit.

16         THE COURT:  All right.  Let me ask a different

17  question at this point for you, Mr. Lewis, is there any CDCR

18  institution where no one has tested positive, inmate or staff,

19  or no one has displayed symptoms?

20         MR. LEWIS:  I will look at the CDCR website actually

21  as of today, and if I'm looking at the count, I don't see -- I

22  must say I believe that there probably are institutions where

23  no one has tested positive.  Simply because, according to the

24  website that I'm looking at right now, there's 34 confirmed

25  cases, but there's not 35 institutions listed.  So actually

1    right there, if there's 34 inmates, so there could not be --

2    there are -- yes, there are institutions where there are not

3    people who have tested positive yet in terms of the inmates.

4             THE COURT:  Inmates.  And staff?

5             MR. LEWIS:  Your Honor, if you would give me a minute,

6    I will look at the status one.  I apologize, your Honor.  I'm

7    just going to take a little time here to do this.  We have 71

8    total right now, and no, I can tell you that the list I'm

9    looking at, your Honor, updated as of last night at 5:45 there

10   are not 35 institutions listed on this list.  So yes, there are

11   institutions where people have not tested positive yet, staff

12   members have not tested positive.

13            THE COURT:  Is there a list of institutions that

14   allows you to answer whether or not there are institutions

15   where no one has displayed symptoms?

16            MR. LEWIS:  I don't have that information, your Honor,

17   but I do know that CDCR is continually updating that there may

18   actually be people in quarantine because they're being looked

19   at, but I don't have that information readily available, your

20   Honor.  Perhaps Dr. Bick or -- Dr. Bick, could you answer that

21   question?  Do we know about the -- where people are being

22   monitored or to answer the judge's question?

23            THE COURT:  Dr. Bick, that's fine.  And you could also

24   answer is there any meaningful update regarding the

25   availability of tests that meet the standards you referenced

1    last week, that is, quality tests that have the level of

2    specificity needed.

3            DR. BICK:  Thank you, your Honor.  This is Joseph

4    Bick.  So although, as Mr. Lewis said,  currently we have

5    documented cases at -- I'm just looking again at my numbers --

6    21 facilities for staff and four for patients.  Every facility

7    has patients who are on confinement to quarters for medical

8    reasons while they're being evaluated for influenza-type

9    symptoms or ILI.  The majority of those have not proven to be

10   positive for COVID, but every facility is going through that

11   routine as they do every year during this time.

12           To answer your second question, currently facilities

13   do have enough standard tests available to test symptomatic

14   people.  They don't have enough to do widespread testing.  The

15   tests that they are using are send-out tests to our statewide

16   contractor, Quest, and turnaround times are currently ranging,

17   from what I'm told, between three and five days.  The rapid

18   test is not yet available inside our system, but every effort,

19   from what I understand, is being made to make that possible.

20           THE COURT:  All right.  Thank you.

21           Just two other questions, one, just look at the

22   horizon, and I think a related question is the reduction in

23   workforce, Mr. Lewis, in a nutshell, can you tell me what the

24   current information is or how the defendants are assessing any

25   reduction in workforce given the lack of transports, so the

1   limitations on transportation?  My understanding is that there

2   are correctional officers who might be reassigned.  What is the

3   status?  What is the thinking about how to deal with reductions

4   in workforce either at the correctional officer level or

5   psychiatrists and psychologists?

6        MR. LEWIS:  Yes, your Honor.  This is Kyle Lewis.

7   Your Honor, right now there's a statewide total.  I believe

8   it's 71 or 72 of persons at various institutions that have been

9   infected.  So the department is actually quite large, as I'm

10   sure you know.  71 is a very serious number.  But on the whole,

11   CDCR is looking at this and has contingency plans to adjust for

12   staffing in case staffing goes down.

13        Now that has been a subject that is being brought up

14   at the department operations center.  It's being continually

15   tracked and monitored.  There's also conversations going on

16   about how to plan, and it's actually involved in some of the

17   tiered mental health response plans about what to do if a

18   certain facility starts losing staff members due to illness or

19   call-outs or anything like that because you may have persons

20   that are, you know, on quarantine at home.  But then there's

21   also plans to use things like telepsychiatry and other remote

22   means to account or to basically allow those staff members who

23   may not be present at the institutions to still perform their

24   work and assist the inmates with mental health services.

25        So while there's not a definite plan in terms of

1    numbers, there are plans afoot both on the operational custody

2    side to deal with custody staff, as well as a mental health

3    plan to address the tiered system and other plans how to

4    continue providing services in the event that more clinicians

5    or providers are lost due to illness or any of the factors

6    related to COVID.

7            THE COURT:  And finally, on the horizon, do the

8    defendants currently have an opinion about how long these

9    temporary circumstances will last?  Is it six months, 12

10   months, 18 months?  Mr. Lewis.

11           MR. LEWIS:  Your Honor, no, your Honor.  There is no

12   horizon out there.  I think, as we're all seeing, and as the

13   Governor's briefs always tell, we don't want to take our eye

14   off the ball.  This is going to continue in terms of the

15   operations that we're doing, and CDCR wants to of course end

16   some of these procedures, but we do have a 14-day modified

17   program.  We know that's going to be in effect for at least two

18   weeks.

19           So no, your Honor, there is no horizon.  Right now

20   CDCR is simply trying to keep the -- and basically keep what

21   it's doing now to prevent the spread of COVID.  That's the most

22   important thing is to prevent the spread of COVID around the

23   institutions among the staff, among the inmates, to keep

24   everyone safe there but still maintaining necessary

25   programming, mental/medical health, other things as allowed

1    under that modified program that we informed the Court about

2    earlier in our filings earlier this week.

3              THE COURT:  Does Dr. Bick have an opinion about how

4    long the temporary relocations, any modified program may need

5    to remain in effect based on what he currently knows?

6              MR. LEWIS:  Dr. Bick, would you like to address that

7    question?

8              DR. BICK:  Yes, your Honor.  This is Joseph Bick.  I

9    would agree that I think it's too early to identify a horizon.

10   Our biggest concern is the increasing number of employees who

11   obviously every day go back out to the community and come back

12   into our institution.  I think we're being extremely vigilant

13   and rigorous in trying to limit transmission from anyone who

14   may come into our facility ill, but that risk is going to

15   continue.  And California has not yet peaked in the number of

16   cases in the community.  So I think it's premature to know how

17   long we're going to need to have these restrictions.

18             MR. BIEN:  Your Honor, may I address --

19             THE COURT:  Mr. Bien, briefly, and then I have a final

20   question on this general area for both parties.  Mr. Bien.

21             MR. BIEN:  I think that we just refer your Honor to

22   the most recent declaration of Dr. Stern.  And again, the

23   measures that he has recommended, the four measures have not

24   taken place here.  You know, I guess we started out with the

25   first one, identify the case and the people who are highest

1    risk for severe complications.  We now have that.  But no steps

2    to move those people to safety either by releasing them or

3    assuring they're safely housed out of the crowded dorms.

4         There's no more steps to downsize the population, and

5    there are -- I am very concerned and Dr. Stern is very

6    concerned about the reduction in workforce, both clinical and

7    custody staff.  We need to -- this is happening already.  I

8    think we're already at one of the higher tiers, as we

9    understand, where programming is restricted because of

10   shortness of staff and also an effort to stop the spread of the

11   disease, of course.  But both those things are happening, and I

12   think that without a significant reduction in the population,

13   we're going to have more outbreaks and a very dangerous

14   situation where there simply are not enough custody and health

15   care staff to take care of the prisoners who are inside the

16   prisons ill or not ill, just needing feeding and care.

17        So again, I do think that while the defendants have

18   been doing a lot of things, they have not done the things that

19   are most necessary to address this crisis.

20        THE COURT:  All right.  Well, my ultimate question is,

21   why would I not ask the defendants to provide to the Court a

22   plan that articulates some goals, and I'm not saying what those

23   goals should be, but that makes transparent, what are the goals

24   in terms of compliance with the CDC guidance, full correctional

25   institutions, assuming that is the gold standard.  So what is

1    the plan to accomplish any relocations that can be accomplished

2    or the creation of eight-person pods as cohorts, and how does

3    that address the most vulnerable within CDCR's population

4    recognizing that that will answer this Court's questions about

5    the Coleman class.

6           So why should I not ask for that plan to be presented

7    to the Court by the end of the day next Thursday so that the

8    Court can evaluate whether or not that plan does meet the needs

9    of the Coleman class under these circumstances?  Mr. Lewis.

10          MR. LEWIS:  Yes, your Honor.  The CDCR has a plan.  I

11   mean, we have laid it out in the various filings this week.

12   But the problem is and it is a -- it's a problem but it's a

13   good problem is that it is constantly evolving as the

14   department is moving forward to identify additional space for

15   physical distancing, getting additional resources online.  Cal

16   CIA is getting involved in making things that can -- protective

17   gear, cleaning gear, all the manner of that.

18          So this is such a moving and evolving crisis, as the

19   Court noted at the beginning of the hearing.  CDCR is

20   constantly reacting proactively and reactively but more

21   proactively to get ahead of it among things like creating the

22   pod units and things like that.  We could update you, your

23   Honor, but it's going to constantly be involving because the

24   situation is constantly evolving, whether it be approval of

25   space, finalizing protocols to assess where patients are going

1    to be moving, how they are going to be transferred, et cetera.

2         Even Dr. Bick noted testing is now coming online more

3    so.  As you can see, the situation is constantly evolving, so

4    that any plan that we give you, as this Court has seen through

5    the task force, it will be constantly refined and constantly

6    changed.  And so I would be concerned that we would be giving

7    you something, but by the time it was filed it would be

8    different.

9         THE COURT:  But there's a difference between tactics

10   and goals, objectives.  It would seem to me CDCR should have --

11   by now it should be able to articulate here is the goal we're

12   working towards.  So we're not just working inside our box,

13   recognizing the longstanding infrastructural deficiencies in

14   that box, here are the goals that we have to achieve to guide

15   what all those steps are, and maybe it is compliance with the

16   CDC guidance.  So it's really those what are the performance

17   standards that CDCR is using to evaluate its many actions to

18   keep some proper focus during this, as I said, still crisis

19   management mode that then gets it to a point of some

20   sustainable stability for as long as these temporary

21   circumstances remain in effect.

22        So I think it's a plan, maybe it's a cover sheet to

23   the CDC guidance, but why should I not ask to see the CDC

24   guidance turned into a chart so the guidance is on the

25   left-hand side of the page and the right-hand side is an

1    explanation of how CDCR is following that guidance, applying it

2    in the particularized circumstances of the California state

3    prison system?  And that guidance does, it makes some reference

4    to clinical treatment.  So why is that not a fair request,

5    Mr. Lewis?

6              MR. LEWIS:  Your Honor, I understand that there is

7    constantly evolving plans on this that also involve, because of

8    the medical component of COVID, involve the Receiver's office,

9    and so CDCR is working closely with CCHCS and the Receiver's

10   Office on this particular issue in terms of plans and how to

11   safely manage COVID among the entire population.  Of course a

12   subset of that is Coleman members.  So I would say that there

13   are plans afoot, your Honor, and I think we have referenced

14   them and we've referenced how we're moving and things like that

15   in terms of moving the population around.  But in terms of a

16   set plan that's going to happen and is set for now, this is

17   literally moving forward in terms of there are Receiver memos

18   being issued daily on this.

19              So this is something that CDCR is clearly doing, but

20   each day it's moving forward.  And in terms of a specific plan

21   going forward or a specific goal, I think the goal is quite

22   clear.  Yes, there are CDC guidelines out there that don't just

23   involve physical distancing.  They involve things like stopping

24   visiting, which CDCR did.  They involved limiting movement,

25   which CDCR has done.  There is the program memo that just went

1    out two days ago about this.

2          So there's various facets of the plan which we've

3    described in our pleadings that talk about how it's a

4    multidimensional response to this.  But if the Court is asking

5    about specific plans as to physical distancing and how to

6    create that, because that is constantly happening and

7    constantly moving, it's just something that can't be put to

8    paper because it is constantly, constantly changing.

9          THE COURT:  My observation is what level of

10   distancing, with all the other strategies recommended by the

11   CDC guidance, can you get to meaningful compliance with the CDC

12   guidance within your -- within the box that is the prison

13   system?  So I won't repeat that.  That's the overarching

14   question.

15         My only other comment and then I would hear from each

16   side, if there's anything more you want me to know at this

17   point, I'll think about whether or not I order the defendants

18   to provide something that crystallizes objectives in a way that

19   drives the day-to-day.  This with such a coordination, I just

20   want to observe that my understanding is the Special Master and

21   the Receiver have excellent coordination and information

22   sharing and regular communication, and this Court's view is

23   that that's the most important coordination right now that is

24   needed.

25         And so I acknowledged in my minute order docketed

1   yesterday the defendants' request for some other type of

2   coordination.  I gather that I'm just not clear on what that

3   would be.  And so I'm just reinforcing the defendants or the

4   parties jointly have the ability to let me know what they may

5   be thinking, but my understanding is the Receiver and the

6   Special Master are coordinating very, very well.

7           So with that, let me just ask Mr. Bien is there more

8   you need the Court to know at this point?

9           MR. BIEN:  Your Honor, we do think that requesting the

10  defendants to come up with a plan is necessary and appropriate.

11  Again, we urge that the Court, in its request of the plan,

12  refer specifically to the guidance of Dr. Stern which includes,

13  you know, what is the plan, what's their objectives, what are

14  they doing for the medically high risk, have they evaluated

15  other locations inside and outside the prisons to safely move

16  people at risk to, what are they doing to reduce the density.

17          By the way, you know, the coordination with the

18  Receiver and CDCR is apparently less than perfect.  As of about

19  two minutes ago, the Receiver just issued a directive to

20  Secretary Diaz telling him to not move people from dorm to dorm

21  without consulting with the Receiver.  So anyway, I think that

22  there is some need for a plan, and I think that the plan should

23  be done in consultation with the Receiver.  And apparently,

24  defendants' current planning is not being done perfectly with

25  the Receiver, and I think that's -- that is important here.

1            But I think the most important thing is, if the people

2    making these plans do not have the ability to recommend to the

3    Governor's office a reduction in population as part of their

4    planning or finding locations outside of the prison system for

5    people to temporarily be moved to, then their plans -- planning

6    is limited, and they can't really do what needs to be done to

7    comply with the federal guidelines for this pandemic.

8            So, you know, I think you should order that they come

9    up with a plan.  I think it's important to see a plan and

10   really understand it.  And at that point we can understand

11   whether or not it's a real plan or it's just a lot of scurrying

12   around within the limitations that the department has.

13           It's an overcrowded department, and without any relief

14   from population, I don't think that they can realistically be

15   expected to achieve any kind of safety from this pandemic, both

16   for the people living in the prisons, our clients, but also the

17   people working here in the surrounding communities.

18           THE COURT:  All right.  Well, if the Receiver did just

19   issue a directive to the secretary regarding housing without

20   any input from the Special Master, then I stand corrected.

21           Mr. Lewis.

22           MR. LEWIS:  Yes, your Honor, very briefly.  I would

23   take issue with the point that there hasn't been coordination

24   with the Receiver's office on this issue.  This is a health

25   care emergency.  Clearly the department would have been and has

1    been coordinating with the Receiver and with CCHCS on this very

2    important response to a public health pandemic.  There has been

3    consultation, and there is ongoing consultation.

4         The memo that Mr. Bien is referring to does talk about

5    the six- and eight-person dorm cohorts.  So the Receiver's

6    office is recognizing that that is a workable product.  But

7    this just demonstrates how much is going on to create a plan or

8    to go forward.

9         This is not CDCR in terms of operational side acting

10   by itself.  They are obviously working in conjunction with

11   CCHCS, as demonstrated by the fact that the department

12   operations center is dual chaired by a custody operational side

13   as well as by a CCHCS medical side.  It is dual chaired by two

14   people which demonstrates how important this is on the

15   coordination side with the medical staff in terms of how we

16   would respond to COVID best.  The CDC guidelines are out there.

17   The department is intent on meeting what it needs to meet, in

18   terms of those regulations or those -- I'm sorry -- written

19   requests and recommendation definitely out there.

20        But as the memo that was issued today shows,

21   coordination is clearly going on.  Defendants are going to move

22   forward on this and will continue to try to identify ways to

23   protect the population.  Moving them to certain housing

24   locations with the consultation of the Receiver is just one

25   portion of how this is going to be done.

1          So in terms of population, I would note that the

2     numbers that I gave the Court just a day or two ago have

3     already risen.  There's now over 3,000 inmates that have been

4     released since March 24th, since the Governor's -- or since the

5     decision to stop or to early parole certain people by the

6     secretary was named.  So that shows you that the population is

7     continuing to change, and it's going to continue to go down.

8     So the idea that there needs to be another population reduction

9     at this time while the previous one is still working through

10    and the Governor's decision to stop intakes is still working

11    through, that's going to result in the very palpable numbers

12    that we've already talked about.

13          When that is combined with the continuing coordination

14    that's going on with the Receiver's office to safely move

15    people, to put them in the right place, to identify cohorts

16    that can be put together without a COVID risk, say they don't

17    have a person positive within that small cohort, that's part of

18    the multifaceted plan that I've mentioned, and it's just

19    difficult for CDCR to come down right now and say this is

20    exactly what we're going to do to get to X because the

21    population is changing.  The guidance is evolving.  And the

22    decisions that are being made by two very important

23    organizations, CDCR correctional side and CCHCS receiver

24    medical side, are coming together and trying to treat all of

25    the inmates, Coleman members included.

1           THE COURT:  All right.  This Court, of course, is not

2     considering releases.  The question is, once any releases the

3     defendant have effected are completed, and maybe that's a

4     rolling number, and once relocations and any cohorting is

5     completed, what does that picture look like, and does that

6     achieve what is required by the constitution and the current

7     circumstances.

8           Mr. Bien, you had something else?

9           MR. BIEN:  Your Honor, if I may turn it over to

10    Mr. Specter for a moment.

11          THE COURT:  All right.  Mr. Specter.

12          MR. SPECTER:  Yes, your Honor.  I can't emphasize

13    enough how important it is for the defendants to come up with a

14    plan.  I think your idea of having them come up with a plan is

15    excellent.  I think the plan should respond to the CDC

16    guidelines and also to the mitigation measures that Dr. Stern

17    has represented or has testified to in his declaration.

18          The plan, what has been lacking in all the things that

19    the CDCR is doing is a plan to deal with the most vulnerable

20    people at the highest priority.  There's not even a plan to

21    take the people who are most vulnerable, and what are they

22    going to do with them?  A plan on that score would help

23    planning, and it would focus efforts.

24          And in response to Mr. Lewis's point, a plan can and

25    should be modified according to the current circumstances, but

1   that's not a reason not to have a plan in the first place.  It

2   also will help everybody to be able to measure, as the Court

3   has implied, the progress that the CDCR and the state and the

4   Receiver's office is making in response to the articulated

5   goals.

6           I think it should have been one of the first steps

7   that CDCR has taken, and it's even more important now that the

8   numbers are rising.

9           Thank you.

10          THE COURT:  All right.  Understood.

11          I would note I think the first point in the CDC

12  guidance is planning, preferably before the fact.  But --

13          MR. LEWIS:  Your Honor, may I be heard briefly.  I'm

14  sorry, this is Kyle Lewis.

15          THE COURT:  Very briefly.  And then I'm prepared to

16  conclude this status.  We will have another status next Friday,

17  and I will -- I will let you know in docket entries later today

18  what I'm expecting to happen between now and then.

19          Mr. Lewis.

20          MR. LEWIS:  Yes, your Honor.  Very briefly, your

21  Honor.  CDCR has a plan, your Honor, and maybe it's not because

22  it's labeled as such, but as our filings from this week clearly

23  show, there are movements afoot.  There are discussions

24  happening.  There are things happening.  These things don't

25  happen without a plan.  The plan is to --

1        THE COURT:  To hear a plan, Mr. Lewis, is there a plan

2   that you can file with the Court by noon today?

3        MR. LEWIS:  No, your Honor.  Not in terms of here's

4   the holistic plan.  There is moving pieces of everything.  And

5   I think that's what our filing was intended to show was this is

6   what we're doing to achieve not only social distancing but all

7   the other aspects of what we are doing.  But there's not a --

8   you know, a document that says this is the plan to deal with

9   this.  It is multifaceted.  As I said, it also involves the

10  Receiver's office.

11        Which to the point that Mr. Specter made, medically

12  high-risk individuals are necessarily people that would be

13  responded to or issue that demands the Receiver's input.  So

14  CDCR cannot act unilaterally as to medically high risk.  And as

15  perhaps the memo that's being issued today by the Receiver's

16  office shows, it shouldn't.  It needs to have the involvement

17  of the Receiver's office in it.  It needs to have the

18  coordination which indicates, as your Honor has pointed out in

19  the minute order, that there's coordination that possibly needs

20  to happen with the Plata court as to these medically high-risk

21  individuals.

22        So I would be hesitant to get in front of or to get

23  into Plata issues that I am not aware of that maybe my Plata

24  co-counsel are that I haven't been able to talk with them or,

25  as we can see with this memo coming out, things are happening

1   real time.

2           So I would just ask when the Court does -- if the

3   Court does issue any rulings or minute orders, be cognizant of

4   the fact that there are things going on that are happening in

5   such real time that we're all trying to do the best for the

6   inmates and the patients, but that there is so much

7   coordination and planning going on behind the scenes that may

8   not be in a written, stamped format, but clearly there's things

9   going on to address this multifaceted problem but with very

10  different -- with very different types of things to do, whether

11  it be social distancing, stopping movement, modified programs,

12  things to keep the inmates informed, things to keep the inmates

13  knowledgeable about what they can do personally to prevent the

14  spread of COVID and just everything that the department is

15  doing, it's just not in a sit down, this is exactly what's

16  going on.  And it's not something that I can readily point to,

17  but it's something that obviously we've addressed in all of the

18  pleadings.

19          Thank you, your Honor.

20          THE COURT:  All right.  I have read those.  I've read

21  the declarations.  I've read what the Department of State

22  Hospitals has issued this week.  So I'm aware, I believe, of

23  what's going on, and I am under no illusion that this is a

24  simple problem to solve.  But it is a problem, and it needs a

25  solution.

1          All right.  I'm going to take account of everything

2    all of you have said.  Thank you very much.  And I will let you

3    know when we'll meet next week and again what I expect between

4    now and then.

5          Thank you very much.

6          (The proceedings adjourned at 11:24 a.m.)

7                              --oOo--

8    I certify that the foregoing is a correct transcript from the

9    record of proceedings in the above-entitled matter.

10                         /s/ Kacy Parker Barajas

11    _____
      KACY PARKER BARAJAS
12    CSR No. 10915, RMR, CRR, CRC

13

14

15

16

17

18

19

20

21

22

23

24

25