IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.,

        Plaintiffs,

          vs.

GAVIN NEWSOM, et al.,

        Defendants.
_____ /

Case No. 2:90-cv-00520

Sacramento, California
April 3, 2020
10:00 a.m.


TELEPHONIC STATUS CONFERENCE

BEFORE THE HONORABLE KIMBERLY J. MUELLER
UNITED STATES DISTRICT CHIEF JUDGE


APPEARANCES:

For the Plaintiffs:
(All parties appearing by telephone.)

For the Plaintiffs:       ROSEN BIEN GALVAN & GRUNFELD LLP
                          BY:  MICHAEL BIEN
                               LISA ELLS
                               MARC SHINN-KRANTZ
                               Attorneys at Law
                               101 Mission Street, 6th Floor
                               San Francisco,California94105

                          PRISON LAW OFFICE
                          BY:  DAVID SPECTER
                               STEVEN J. FAMA
                               Attorneys at Law
                               1917 Fifth Street
                               Berkeley, California 94710

Court Reporter:           DIANE J. SHEPARD, CSR 6331, RPR
                          Official Court Reporter
                          501 I Street, Rm 4-200
                          Sacramento, California 95814
                          (916) 554-7460

Proceedings reported by mechanical stenography, transcript produced by computer-aided transcription.

```
1
        APPEARANCES (continued):
2

3    For the Defendants:      DEPARTMENT OF JUSTICE
                              OFFICE OF THE ATTORNEY GENERAL
4                             BY:  TYLER V. HEATH
                                   LUCAS L. HENNES
5                                  ELISE THORN
                                   MONICA ANDERSON
6                                  1300 I Street
                                   Sacramento, CA 95814
7
                              DEPARTMENT OF JUSTICE
8                             OFFICE OF THE ATTORNEY GENERAL
                              BY:  KYLE LEWIS
9                                  ADRIANO HRVATIN
                                   455 Golden Gate Ave., Suite 11000
10                                 San Francisco, CA 94102

11                            ROBINS KAPLAN LLP
                              BY:  ROMAN M. SILBERFELD
12                                 Attorney at Law
                              2049 Century Park East, Suite 3400
13                            Los Angeles, CA 90067-3208

14   Also Present:            Matthew Lopes, Special Master.
                              Kerry Hughes, M.D., Special Master Team
15                            Jeff Metzner, M.D., Special Master Team
                              Henry Dlugacz, Special Master Team
16                            Kerry Walsh, Special Master Team
                              Mohamedu Jones, Special Master Team
17
                              Diana Toche, Undersecretary of Health
18                            for the State of California

19                            Joseph Bick, M.D.
                              Director of Health Care Services, CDCR
20
                              Stephanie Clendenin
21                            Director, Department of State Hospitals

22                            Christine Ciccotti
                              Kristopher Kent
23                            Antonina Raddatz
                              Attorneys at Law
24                            Department of State Hospitals

25
```

1

2    APPEARANCES (continued):

3

    Also Present:          Melissa Bentz
4                          Jennifer Neill
                           Nick Weber
5                          Attorneys at Law
                           California Department of Corrections
6
                           Haven Gracey, Law Clerk
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE CLERK:  Calling civil case 90-520, Coleman, et
 2    al., versus Newsom, et al.  This is on for a further telephonic
 3    status conference.
 4              THE COURT:  All right.  And for the record, could the
 5    court reporter please confirm that she is on the line and
 6    hearing everything clearly.
 7              THE REPORTER:  Good morning, Your Honor.  This is
 8    Diane Shepard, and I am able to hear at this point.
 9              THE COURT:  Thank you, Ms. Shepard.  And you know, as
10    always, to let us know if you cannot get the record.
11              THE REPORTER:  Yes, Your Honor.
12              THE COURT:  So feel free to interrupt.
13        I'm going to call role for counsel following the procedure
14    that we've established now through these series of telephonic
15    statuses, and I'll also call role for those who are also
16    appearing on the telephone line even if they are not planning to
17    make statements.
18        So for the plaintiffs, Michael Bien.
19              MR. BIEN:  Present, Your Honor.
20              THE COURT:  Donald Specter.
21              MR. SPECTER:  Present, Your Honor.
22              THE COURT:  Steven Fama.
23              MR. FAMA:  Present.
24              THE COURT:  Lisa Ells?
25              MS. ELLS:  Yes, Your Honor.
```

1        THE COURT:  Jessica Winter?

2        MS. ELLS:  Ms. Winter will not be appearing today.

3        THE COURT:  All right.  Thank you for that

4   clarification.  Mr. Shinn-Krantz.

5        MR. SHINN-KRANTZ:  Present, Your Honor.

6        THE COURT:  All right.  And for the defendants,

7   Mr. Lewis, Kyle Lewis.

8        MR. LEWIS:  Good morning, Your Honor.

9        THE COURT:  Roman Silberfeld?

10       MR. SILBERFELD:  Good morning, Your Honor.

11       THE COURT:  Adriano Hrvatin.

12       MR. HRVATIN:  Good morning, Your Honor.

13       THE COURT:  Elise Thorn.

14       MS. THORN:  Good morning, Your Honor.

15       THE COURT:  Tyler Heath.

16       MR. HEATH:  Good morning, Your Honor.

17       THE COURT:  Lucas Hennes.

18       MR. HENNES:  Good morning, Your Honor.

19       THE COURT:  Monica Anderson.

20       MS. ANDERSON:  Yes, good morning, Your Honor.

21       THE COURT:  All right.  As in the past, I will call on

22   Mr. Bien for the plaintiffs, Mr. Lewis for the defendants, and

23   if they yield to someone else on their teams, they can advise

24   the Court of that and identify specifically who they are

25   yielding to.

1      Just so I'm clear, is anyone else appearing as counsel for

2   plaintiffs, Mr. Bien?

3           MR. BIEN:  No, Your Honor.

4           THE COURT:  For the defendants, Mr. Lewis?

5           MR. LEWIS:  No, Your Honor.

6           THE COURT:  All right.  I note, however, that also

7   present are Undersecretary of Health for the State of

8   California, Diana Toche.

9           MS. TOCHE:  Good morning.

10           THE COURT:  Dr. Joseph Bick, CDCR.

11           DR. BICK:  Good morning.

12           THE COURT:  Ms. Ciccotti, Christine Ciccotti, general

13   counsel for Department of State Hospitals.

14           MS. CICCOTTI:  Yes, Your Honor.

15           THE COURT:  Kristopher Kent, also counsel for the

16   Department of State Hospitals.

17           MR. KENT:  Yes.  Good morning, Your Honor.

18           THE COURT:  Is Antonina Raddatz on the line?  I had

19   understood she had not checked in.

20           MS. RADDATZ:  Yes, Your Honor.

21           THE COURT:  All right.  Antonina Raddatz, counsel for

22   State Hospitals is present.  Melissa Bentz, CDCR.

23           MS. BENTZ:  Good morning, Your Honor.

24           THE COURT:  Nick Weber, CDCR.

25           MR. WEBER:  Yes, Your Honor.

1              THE COURT:  Stephanie Clendenin, Director of DSH.

2              MS. CLENDENIN:  Good morning, Your Honor.

3              THE COURT:  Am I pronouncing your last name correctly?

4              MS. CLENDENIN:  Yes.  You've got it perfect.  Thank

5    you.

6              THE COURT:  All right.  Jennifer Neill, CDCR.

7              MS. NEILL:  Yes.  Good morning.

8              THE COURT:  And then the Special Master is monitoring

9    the proceedings, Matthew Lopes.  You are present.

10             SPECIAL MASTER LOPES:  I'm here, Your Honor.  And

11   would you like me to list my teammates who are on as well?

12             THE COURT:  Yes, please.

13             SPECIAL MASTER LOPES:  We have Mohamedu Jones, Kerry

14   Walsh, Dr. Jeffrey Metzner, Dr. Kerry Hughes, and Henry Dlugacz.

15             THE COURT:  All right.  Thank you, Special Master

16   Lopes.  And, finally, so that it's clear, the Court's law clerk,

17   Haven Gracey, is monitoring the proceedings by telephone.

18       I believe we can accomplish what we need to this morning in

19   half an hour.  I realize that there are heavy burdens placed on

20   everyone appearing on this phone call, but I do want to check in

21   on a few matters and talk about future statuses and hearings in

22   the Coleman case, recognizing the very challenging circumstances

23   under which everyone is operating.

24       And so I want to ask, first, if either side, counsel for

25   either side has specific comments based on the Special Master's

1    report filed with the Court yesterday making the bottom-line

2    observation that coordination between CDCR and Department of

3    State Hospitals has not achieved the ideal level that the

4    Special Master suggests is needed in times like these.

5         At this point, so the parties know the Court's tentative

6    reaction to that report, I do want to hear your thoughts.  I

7    acknowledge the state just this morning, shortly before the

8    hearing, of CDCR guidelines for COVID transfers, but I

9    understand that that applies to transfers across CDCR facilities

10   and does not apply to possible transfers into or out of DSH.

11        So I just want to make certain the parties know I have

12   received those guidelines, and I'll have questions about that

13   after I hear any comments on the Special Master's filing.

14        At this point, given that the Three-Judge Court proceedings

15   are underway, I do not plan to issue any orders until those

16   proceedings are resolved.  But I'm aware of my ability to do

17   that just so that is clear.

18        So we'll talk about the Special Master's report, the CDCR

19   guidelines, specifically the suggestion in an e-mail from

20   Mr. Weber to the Special Master, among others, suggesting

21   discussion at a next task force meeting, but also that those

22   guidelines be put in place immediately.

23        And so I just want to understand what those messages in

24   Mr. Weber's e-mail mean, and, specifically, should this Court

25   direct a task force meeting to talk about those guidelines and,

1   if so, on what timeline.

2      Then we'll talk about the next statuses in Coleman.  I'll

3   address the hearing that is still showing for April 23rd.  So

4   that's my agenda for today.  We can get through that and then

5   see if anyone has other comments.

6      So, first, on the Special Master's filing regarding the

7   transfer of Coleman class members into DSH beds and the current

8   status of that possibility, do the plaintiffs have anything to

9   say at this point that they want this Court to hear?  Mr. Bien?

10          MR. BIEN:  Yes, Your Honor.  Ms. Ells is going to

11   address that issue.

12          THE COURT:  All right.  Ms. Ells.  I'm not hearing

13   Ms. Ells.  Is she there?

14          MS. ELLS:  I apologize, Your Honor.  Can you hear me

15   now?

16          THE COURT:  Yes.

17          MS. ELLS:  Okay.  Your Honor, we think the situation

18   is urgent, that the Special Master has documented very clearly

19   what's happening here, and there is a crisis that is already in

20   the mix, and it's going to get worse.

21      We request that the Court order to show cause to defendants,

22   with a response by Monday, as to why DSH admissions should not

23   reopen with appropriate safety measures to ensure that required

24   in-patient care at beds that are available and critically needed

25   should not continue with, again, appropriate measures in place

1    to ensure that those transfers can occur appropriately and

2    safely; similar to what DSH is doing with mentally-disordered

3    offenders who are continuing to flow from CDCR into DSH at a

4    rate of -- you know, I believe it was 8 this week.  There are at

5    least 4 going next week.  CDCR -- DSH has already put in place a

6    process in order to handle those admissions, and there should be

7    a similar process immediately put in place here.

8        We already know and the Special Master has already

9    documented very clearly what the problem is.  There are simply

10   not enough beds.  There are 39 class members who are custodially

11   and clinically appropriate and eligible for the DSH beds, where

12   there are 22 beds sitting vacant right now.

13       And we also know that the PIPs are woefully deficient.  They

14   were before this crisis happened.  They are even worse now, and

15   it's going to get worse as staffing continues to drop in those

16   units.  There is a clear link between the deficient care in the

17   PIPs and suicides, and it's going to get worse.

18       So we urge this Court to take action and request a response

19   to an order to show cause about why those admissions should not

20   reopen immediately.

21            THE COURT:  All right.  Do plaintiffs take the

22   position that the Court could issue -- this Court could issue

23   that order notwithstanding what is currently pending before the

24   Three-Judge Court?

25            MS. ELLS:  We do.  Yes.  We do think this Court can

1    take action.  We don't think there is anything in that motion

2    that precludes action here.

3              THE COURT:  All right.  Understood.  Mr. Lewis?

4              MR. LEWIS:  Good morning, Your Honor.  Regarding the

5    Special Master's report, defendants would first like to thank

6    Special Master for his time and also thank Special Master for

7    recognizing the positive work that went on during the task force

8    meetings that led to the report.

9        It does demonstrate that defendants are taking a variety of

10   actions to respond to this ever-evolving pandemic situation

11   that's facing the entire state, the entire nation, the entire

12   world.

13       I read this morning that three billion people are in some

14   kind of stay-in-place order; 87 percent of this country is in

15   some kind of stay-in-place order; and what we're seeing with DSH

16   and CDCR operations tracks on that exactly.

17       The clinicians feel -- this is the medical clinicians and

18   the mental health clinicians feel strongly that limiting

19   movement is the most important thing that can be done, and we

20   appreciate the Special Master's report shows that.

21       One of the things that has been going on that the Special

22   Master's report may not fully reflect is that there have been

23   levels of coordination or there have been meetings, etcetera,

24   between DSH and CDCR staff regarding transfer issues.  But there

25   is a line of thinking that movement of patients is perhaps one

1    of the most dangerous things that can be done right now.

2        The plan that was released by Mr. Weber earlier today has

3    been developed exclusively by CDCR's mental health leadership,

4    Drs. Daye, Bick, Golding, Mehta, DAI was involved in this, HCPOP

5    was involved in this, and it reflects a large thinking about how

6    CDCR will manage its population within its institutions.

7        It is correct that DSH does have open beds right now, but

8    DSH also has no COVID among its more than 6,000 patients that it

9    has.  So the movement restrictions not only protect the

10   non-Coleman class members, but they also protect the 303 Coleman

11   class members that are there.

12       As for the MDOs, that is a complete separate issue because

13   those are those individual's constitutional rights.  They have

14   to be admitted and discharged because they have reached term

15   limits, or they cannot be held longer; whereas with the COVID

16   restrictions that we're seeing on movements, we're seeing that

17   for a medical reason to prevent introduction of COVID into the

18   DSH facilities.

19       CDCR and DSH have worked together on the plan that you saw

20   or that was produced earlier this morning.  And defendants

21   absolutely invite a -- we would have a meeting today with the

22   task force about this issue because we've actually prefaced that

23   this was coming.  We talked about it.  I believe our last task

24   force meeting was on Tuesday, and on Wednesday guidelines were

25   released, and then now we're on Friday morning, this plan is

1    being used.

2        It's a constant, evolving plan.  The situation is evolving.

3    And to have the defendants be ordered to show cause why DSH

4    should be opening when such a large portion of the community is

5    in a stay-in-place order, and that there are demonstrations by

6    CDCR that it's going to take active steps to ensure that its

7    care is being provided at the local institutions, mindful of

8    both COVID restrictions and staffing concerns, that the CDCR has

9    a plan to do this and is thinking actively about this, and wants

10   to engage the parties on this demonstrates that an OSC is

11   probably inappropriate at this time, and, in fact, is premature

12   and will take the very people that have to worry and have to

13   think about how to do this -- as Your Honor pointed out -- the

14   heavy burden on everyone -- will take them away from the ability

15   to devise further plans as to how to provide the treatment

16   that's necessary.

17       And once again, I would say that this plan has been

18   developed by all of the mental health staff, the leadership from

19   Dr. Mehta on the telepsychiatry side, Dr. Golding on the

20   psychiatry side, Drs. Daye and Bick from a leadership

21   perspective, really working together across all of their

22   agencies and all of their departments within CDCR, their

23   divisions within CDCR, to provide guidance in the field.  And

24   this is what they would like to continue using the task force

25   for.  And that's what I have to say, Your Honor.

1          THE COURT:  All right.  So I've heard those

2    statements.  Ms. Ells, very brief rebuttal.

3          MS. ELLS:  Yes.  Very brief.  Thank you.

4      Your Honor, two points.  The first is that all of the

5    shelter-in-place orders and CDC guidelines and current CCHCS

6    guidelines within CDCR allow for medically necessary transports

7    for outside hospitalization where necessary, for transfers to

8    higher level of care.  So to say that the shelter-in-place

9    orders are what is happening here is not accurate.

10      Furthermore, it's interesting to hear Mr. Lewis talk about

11    the constitutional rights of mentally-disordered offenders while

12    ignoring the constitutional rights of our class members.  They

13    have a constitutional right to adequate care.  We know the PIPs

14    cannot provide that care.  We also know that without these beds

15    at DSH, that transfers will not occur in a constitutionally

16    timely manner, and we urge this Court to take immediate action.

17      We have so far heard nothing, and the Special Master, so far

18    as I'm aware, has heard nothing to indicate that any of the

19    steps CDCR and DSH are taking will actually lead to transfers of

20    patients into DSH beds.  And without that type of flow, this

21    system will continue to break down.  There will be suffering and

22    likely death.  And those admissions need to continue.  And this

23    Court should take urgent action to ensure that they do.  Again,

24    with appropriate safety measures, which DSH and CDCR know how to

25    take because they already have them in place for

1    mentally-disordered offenders and for other internal transfers.

2    Thank you.

3            THE COURT:  All right.  Again, this is a status.  If

4    we're going to litigate this question, it will be in response to

5    a Court order.  Mr. Lewis, we can go back and forth here for a

6    while, but what more do you need the Court to know?

7            MR. LEWIS:  I would just point out one thing, Your

8    Honor.  There are various other state hospital systems that are

9    doing the exact same thing that California is doing.  Florida,

10   Pennsylvania, Washington and Oregon have all suspended their

11   admissions.  California is not unique in its approach to this

12   pandemic.  Furthermore, there are serious healthcare or public

13   health practices that they have to look at here about how you

14   test people going into these facilities, etcetera, that are not

15   refined because we're hearing about false negatives and

16   everything.

17       So this is the reaction by defendant to a pandemic that is

18   constantly evolving; yet other systems are doing the exact same

19   thing.  Thank you for your time, Your Honor.

20           THE COURT:  All right.  Well, these are new, the

21   current circumstances raise new questions.  As I've said

22   previously, the Constitution is not suspended by virtue of the

23   Coronavirus pandemic, but the Court does need to think carefully

24   about what the circumstances mean for the Coleman class's

25   constitutional rights addressed in prior Court orders.

1       I will take account of what you each said, and you'll know

2   by whatever appears on the docket whether or not I am ordering

3   any further response.

4       Let me ask the plaintiffs, you heard Mr. Lewis say that

5   defendants do request an immediate task force meeting to discuss

6   the COVID transfer guidelines that are now proposed.  Again, the

7   Court understands those are guidelines that would apply to

8   transfers across CDCR facilities.

9       Do the plaintiffs agree that an immediate task force meeting

10  to review those guidelines is appropriate?  Mr. Bien?

11          MR. BIEN:  Yes, Your Honor.  We're available.  We want

12  to assist DSH and CDCR to address this, you know, as rapidly as

13  possible.  We accept the urgency, and we will staff it no matter

14  what.

15          THE COURT:  All right.  Well, I will then direct the

16  Special Master to convene, as soon as possible following this

17  status, a task force discussion of those COVID transfer

18  guidelines that the Court has received.

19      I want to make clear my thinking about the task force at

20  this point.  I realize that significant time and effort has gone

21  into task force sessions, and I thank the Special Master for

22  convening those as directed and for all the participants.

23      I also want to recognize the need to avoid unnecessary

24  meetings.  And so my thought is to request that the task force

25  remain on-call and available for referrals, such as the referral

1    I just made, without the expectation that it needs to keep

2    meeting daily or every other day.

3        So I will look for opportunities for special referrals to

4    the task force in addition to the one I just made.  The parties

5    may seek from the Court a special referral, but I want to

6    provide some flexibility so that the task force is only focusing

7    on issues where it is the best forum for resolving these

8    emergency questions that are arising under the evolving

9    circumstances.  So that is how I'm going to treat the task force

10   going forward.

11       Let me just ask with respect to the COVID transfer

12   guidelines a general question the Court has based on all of the

13   filings that I've seen.  The CDC has guidance for prison

14   facilities, but I have not seen anything that is tailored to

15   mental health populations in CDC guidance.

16       Am I correct that there is nothing I can take notice of or

17   consult that comes from the Centers for Disease Control?

18       I just ask each side to respond briefly.  Perhaps it's

19   Dr. Bick who knows best.  Mr. Bien?

20           MR. BIEN:  Your Honor, I have checked the guidance I

21   saw for correctional facilities.  I had the same feeling that

22   you did that it did not specifically call out mental health

23   facilities or programs in prisons or jails.

24           THE COURT:  Mr. Lewis.

25           MR. LEWIS:  Your Honor, I believe that's correct.  I

1    will defer to Dr. Bick to discuss this issue further.  Dr. Bick,

2    are you available?

3              DR. BICK:  I am.  Good morning.  Good morning, I am.

4    This is Joseph Bick.  I'm the Director of Health Care Services

5    for CDCR, and my background and training is in infectious

6    diseases.

7         As you probably all saw, as of yesterday we surpassed a

8    million cases world wide; 260,000 in the United States, and in

9    California over 11,000.  So far in the California Department of

10   Corrections we've only had 8 patients who have become infected,

11   and I think that's, at least to a large extent, as a result of a

12   lot of the steps that already have been taken in terms of

13   physical distancing, limitation of groups, increasing hand

14   sanitizer, limiting people coming into the institution.

15        All employees who come in have to be screened for symptoms

16   and for temperatures.  Volunteers are not coming anymore.  As

17   much as possible we've limited movement.  And that really formed

18   the basis of the CDCR COVID transfer guidelines, the e-mail you

19   have in your hands.

20        After this call started, at 10:07 this morning I got in my

21   e-mail box from the Centers for Disease Control their most

22   recent morbidity and mortality weekly report, and it had a

23   summary in there that I thought was particularly relevant to

24   what we're trying to do here.

25        And it's a report having to do with an assisted-living

1    facility in Seattle which has been an epicenter of transmission.

2    Our facilities share a lot in common with assisted-living

3    facilities, long-term care facilities being congregate living

4    environment, and many of the CDC guidelines that apply to

5    long-term care facilities apply to prisons.

6         And I'll just briefly, if I could, read about two sentences

7    of their conclusions.  What they did, after they identified two

8    COVID cases in a long-term care facility, they implemented

9    stringent preventive measures, and then they tested all

10   residents and staff.  They screened them all for symptoms and

11   they also tested them.  They identified four patients who were

12   positive.  Three of the four were asymptomatic.  So screening,

13   however rigorous you are, fails to identify the majority of

14   people who are infected.

15        And perhaps even more worrisome, 40 percent of the

16   population had symptoms in the last two weeks that were

17   consistent with COVID, but they did not test positive.  So the

18   reason this really impressed me this morning is I think it

19   really reinforces what we are trying to do in limiting movement

20   around our institution both within the CDCR and to outside

21   agencies as much as possible to avoid the very real possibility

22   that we're transmitting asymptomatic infected patients to

23   another facility where they can introduce the disease and lead

24   to significant morbidity and death.  Thank you.

25              THE COURT:  All right.  Dr. Bick, just to clarify a

1   couple of points.  I don't have time for a full tutorial here

2   today, but I construe your answer as saying the CDC does not

3   have any guidance tailored to the mentally ill in prison

4   systems, and so CDCR, with your expert input, is working to

5   tailor guidance to the California prison system and particularly

6   the Coleman class within that prison system.  Is that fair?

7            DR. BICK:  Yes.

8            THE COURT:  And in terms of testing, I don't know if I

9   can clearly infer from what you just said about the

10  assisted-living population, is it your position that there

11  should be targeted testing, and would that be prioritized for

12  Coleman class members, and how much testing is available to

13  assess the status of the Coleman class population within the

14  prisons?

15           DR. BICK:  Currently, there is very limited testing

16  available for our patients, and it is the standard testing which

17  involves collection of the specimen within the facility and

18  sending it out to an outside reference lab.  Turnaround times

19  have been delayed up to 10 days.  We've worked very closely with

20  our contracted labs, and we can get results now in 3 to 4 days.

21  So it's not sufficient to use in terms of moving people.

22      There are a number of rapid point-of-care tests becoming

23  available.  These are tests that can be done in a doctor's

24  office and get results within 15 minutes to 2 hours.  They're

25  just now becoming commercially available.  As you can imagine,

1    there is a huge demand for them, and we, as a department, have

2    reached out to try to put ourselves near the top of that queue.

3    We don't have availability of those machines yet.

4        I believe that if and when we do and we can start widespread

5    testing of all of our patients, it will facilitate some of these

6    types of movement.

7            THE COURT:  Is it your position that testing is

8    critical as well as monitoring symptoms?  Is it your belief that

9    it's possible for someone to have symptoms of COVID and actually

10   have COVID without testing positive?

11           DR. BICK:  I think your question was:  Can someone be

12   symptomatic and actually have COVID, and test, and the test not

13   be positive?

14           THE COURT:  Correct.

15           DR. BICK:  Yes.  It all depends upon the testing

16   method and how sensitive it is in identifying real positive

17   cases, and how specific it is in not calling someone positive

18   when they're not really positive.  Ideal tests would have both

19   high sensitivity and specificity.  The newly developed tests, I

20   don't have data on how sensitive and specific they are.

21           THE COURT:  Thank you very much.

22       And, finally, the population you have not mentioned, which

23   is the population that is essential to management of the

24   prisons, is the staff that is regularly coming in and out of the

25   prisons.

1          And the Court has reviewed information about the evaluations

2     of staff members.  Are they prioritized for testing?

3          DR. BICK:  To the best of my knowledge, there has not

4     been a plan developed that would involve testing staff.  I think

5     that potentially could be very useful.

6          What we're doing the best we can is to follow CDC

7     guidelines.  But to get to your earlier question, I'm not aware

8     of specific guidance from the CDC about testing and moving

9     mentally ill patients in correctional facilities.

10          THE COURT:  All right.  Thank you very much for that.

11          The obvious question placed -- or raised by shelter-in-place

12     as applied to the mentally ill population is the impact on

13     programming and interfacing with professional treatment, and so

14     I will think about what I just heard in that context.

15          Let me just talk about going forward in terms of the next

16     status.  Here is my current thinking.  That I would keep next

17     week's status on the calendar in case needed for any COVID only

18     update.  But I would otherwise continue until May 1st any

19     further status on Coleman.

20          We have a long list of issues to check in on.  We need to

21     stabilize our approach -- and I will do this working with the

22     Special Master -- to monitoring, taking account of the emergency

23     circumstances.  But we will return to that on May 1st.

24          So that quarterly status in all respects, except for the

25     COVID situation, is continued to May 1st.  Next week is held as

1    a placeholder.  Just as we did for this week, I will let you

2    know by the day before if we're keeping it.

3        We have currently scheduled an April 23rd hearing on

4    staffing.  Under the circumstances, I'm continuing that by one

5    month.  And so what date would that be, Ms. Schultz?  Do you

6    have your calendar handy?

7            THE CLERK:  Yes, Your Honor.  We could specially set

8    for May 22nd.

9            THE COURT:  All right.

10           THE CLERK:  Or do you want it on a regular law and

11   motion?

12           THE COURT:  May 22nd would be fine.

13       So at this point, we will assume that that staffing hearing

14   is moved to May 22nd.  Ms. Schultz will reflect that on the

15   docket.

16       Finally, I acknowledge receipt of a proposed order that I

17   believe resolves the Armstrong question that has been raised

18   before this Court.  I have not had a chance to review the

19   substance, but I'll do that today.

20       Am I correct in assuming that if I sign that order, that the

21   Armstrong related issue is resolved?  Mr. Bien?

22           MR. BIEN:  Your Honor, this is Michael Bien.  The good

23   news is we have the protective order resolved.  The bad news is

24   that the State raised additional issues that need to be resolved

25   before they can produce the documents.

1       I won't go into them now.  We're hoping that that, too, can

2  be resolved, and maybe it can just be, I don't know, on-call for

3  the next one.  But I don't think -- I think that we should be

4  able to work this through, and Mr. Heath can address that.

5            THE COURT:  All right.  Mr. Lewis, it would be

6  Mr. Heath?

7            MR. LEWIS:  Yes, Your Honor.  But I'll just add to

8  this issue and, like Mr. Bien, express we can work through

9  anything that comes up.  It took a long time to get to this

10  protective order.  We'll continue working forward.  But I think

11  if you -- the order you have in front of you is enough for the

12  time.

13            THE COURT:  Mr. Heath, anything you would like to add?

14            MR. HEATH:  No.  Nothing, Your Honor.

15            THE COURT:  All right.

16            MR. BIEN:  Your Honor, I'm sorry.  This is Michael

17  Bien.  I have been informed by the counsel that negotiated it

18  that the defendants will not produce the documents based on the

19  order that you have in front of you, but they need another

20  order.  I think we should get that clear.  I'm willing to

21  negotiate it.  But unless the defendants have changed their

22  position that they told Ms. Grunfeld, my partner, we do have

23  another order necessary.

24            THE COURT:  All right.  We'll put that on assuming we

25  go forward next week and if that remains a live issue.

1       To the extent there are any objections and there is

2   discovery motion practice, that issue, I think, could be taken

3   to the magistrate judge.

4       All right.  I believe we've covered what I feel the need to

5   today.  Is there anything else you want to bring to the Court's

6   attention?  Mr. Bien?

7           MR. BIEN:  Your Honor, we intended to -- I just want

8   to refer you to -- you asked questions about the Coleman class

9   in reference to COVID-19 and its risks.  I just want to refer

10  you to Exhibit B to the Specter reply declaration which includes

11  detailed information about the Coleman class and its risk

12  factors.

13      And it's somewhat responsive to the Court's earlier

14  question, I think at the last status, and it shows that almost

15  40 percent of the Coleman class has at least one of the risk

16  factors, age or medical -- I'm sorry -- it's 40 percent of the

17  people who have at least one risk factor in CDCR are the Coleman

18  class.

19      Anyway, you can see that in Exhibit B to Mr. Specter's

20  declaration.  It wasn't brought up in the argument yesterday,

21  but I did want to bring it to your attention because you did ask

22  that specific question.  Thank you.

23          THE COURT:  That's the record before the Three-Judge

24  Court.

25          MR. BIEN:  Yes.

1                THE COURT:  Understood.  All right.  Anything further,

2   Mr. Lewis?

3                MR. LEWIS:  Nothing, Your Honor.

4                THE COURT:  All right.  Then we're in recess.  You'll

5   hear from the Special Master shortly on the next task force

6   meeting which will occur as soon as you can possibly convene it.

7   Thank you very much.

8        (Proceedings concluded at 10:42 a.m.)

9

10                            CERTIFICATION

11

12       I, Diane J. Shepard, certify that the foregoing is a correct

13   transcript from the record of proceedings in the above-entitled

14   matter.

15                            /s/ DIANE J. SHEPARD
                             DIANE J. SHEPARD, CSR #6331, RPR
16                            Official Court Reporter
                             United States District Court
17

18

19

20

21

22

23

24

25