1  XAVIER BECERRA
   Attorney General of California
2  MONICA N. ANDERSON
   Senior Assistant Attorney General
3  ADRIANO HRVATIN
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   TYLER V. HEATH, State Bar No. 271478
5  KYLE A. LEWIS, State Bar No. 201041
   LUCAS HENNES, State Bar No. 278361
6  Deputy Attorneys General
    1300 I Street, Suite 125
7   P.O. Box 944255
    Sacramento, CA 94244-2550
8  Telephone:  (916) 210-7323
   Fax:  (916) 324-5205
9  E-mail:  Lucas.Hennes@doj.ca.gov
   Attorneys for Defendants

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone:  (310) 552-0130
 Fax:  (310) 229-5800
 E-mail:  RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

10

11                IN THE UNITED STATES DISTRICT COURT

12              FOR THE EASTERN DISTRICT OF CALIFORNIA

13                      SACRAMENTO DIVISION

14

15  **RALPH COLEMAN, et al.,**               2:90-cv-00520 KJM-DB (PC)

16                            Plaintiffs,   **DEFENDANTS' STRATEGIC COVID-19
17                                          MANAGEMENT PLAN**

18       **v.**

19  **GAVIN NEWSOM, et al.,**

20                            Defendants.

21

22       Pursuant to the Court's April 10, 2020 order (ECF No. 6600), Defendants submit their

23  strategic plan for preventing the spread of coronavirus disease (COVID-19) and managing it once

24  the virus infects an institution.  Defendants' plan addresses guidelines and recommendations

25  provided by the United States Centers for Disease Control and Prevention (CDC) Interim

26  Guidance on Management of Coronavirus Disease (2019) (COVID-19) in Correctional and

27  Detention Facilities.  (Id. at 2.)  Defendants continue to manage this unprecedented and

28  worldwide crisis with extensive, proactive, and thoughtful actions.

                                     1

**I.    DEFENDANTS' COVID-19 STRATEGIC PLAN, DEVELOPED IN COLLABORATION WITH CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES, INCLUDES ACTIONS TAKEN, OBJECTIVES, AND TIMELINES REFLECTING ROBUST EFFORTS TO RESPOND TO THE GLOBAL PANDEMIC.**

Defendants' strategic plan was developed by the California Department of Corrections and Rehabilitation (CDCR) in conjunction with California Correctional Health Care Services (CCHCS) and describes steps taken to address the COVID-19 global pandemic within California's prison system.  The primary goals of CDCR and CCHCS are to ensure the safety and security of inmates, staff, and the public, minimize the spread of COVID-19, treat all patient healthcare needs, and communicate with inmates, staff, and the public about COVID-19 and steps taken by CDCR to minimize its spread.  Part of CDCR and CCHCS's COVID-19 plan is to comply, to the extent possible in a correctional setting, with the CDC interim guidelines.  As ordered, Defendants' plan includes a detailed comparison of CDCR and CCHCS's efforts with the CDC's guidelines and a timeline of CDCR and CCHCS's efforts to address COVID-19.

In addition to efforts taken to mitigate the spread of COVID-19, CDCR is taking a long list of actions to address the needs of patients with mental illnesses.  Consistent with the overall goals of CDCR and CCHCS, CDCR's Statewide Mental Health Program is focused on preserving life, stabilizing acute mental health deterioration, and providing coping skills to the mental health population.  CDCR mental health program leadership and the Division of Adult Institutions (DAI) developed guidance, in consultation with several of the Special Master's experts, regarding the provision of appropriate and adequate mental health care to patients during the present state of emergency, including continuity of care and attendant programming needs, taking into account potential staffing pressures and movement restrictions.  This guidance was issued to CDCR's institutions after further consultation with the Special Master and Plaintiffs' counsel during the COVID task force meetings.  Relevant memoranda and guidance demonstrating these actions and mental health care services plans are also attached to Defendants' strategic plan.  Moreover, CDCR's COVID-19 strategic plan describes various steps taken to communicate with inmates and the public concerning pandemic response and management, preventive practices, population management, movement reduction, additional space utilization and physical distancing, staff

2

1   screening, and other preventive measures that Defendants are taking to respond to the pandemic.

2   Memoranda issued to CDCR facilities addressing these actions are attached to Defendants'

3   strategic plan.

4   **II.    DEFENDANTS ARE ENTITLED TO DEFERENCE IN FORMULATING A PLAN
         ADDRESSING THE GLOBAL PANDEMIC POSING AN UNPRECEDENTED RISK TO**

5   **PUBLIC HEALTH.**

6           Exercising appropriate authority, California leaders and public health officials have taken

7   numerous steps over the past month in response to the COVID-19 pandemic.  As the United

8   States Court of Appeal for the Fifth Circuit recently noted, state authorities are entitled to great

9   deference concerning responses to a public health crisis.  *In re: Abbott*, Case No. 20-50264,

10  Document No. 00515374865 (5th Cir., Apr. 7, 2020).  "[W]hen faced with a society-threatening

11  epidemic, a state may implement emergency measures that curtail constitutional rights so long as

12  the measures have at least some 'real or substantial relation' to the public health crisis and are not

13  'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'"  *Id.*

14  at 13 (citing *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 31 (1905)).  "Courts

15  may ask whether the state's emergency measures lack basic exceptions for 'extreme cases,' and

16  whether the measures are pretextual—that is, arbitrary or oppressive.  *Id.* (citing *Jacobson* at 38).

17  At the same time, however, courts may not second-guess the wisdom or efficacy of the measures.

18  *Id.* (citing *Jacobson,* 197 U.S. at 28, 30).  Further, "[i]t is no part of the function of a court" to

19  decide which measures are "likely to be the most effective for the protection of the public against

20  disease."  *Id.* (citing *Jacobson*, 197 U.S. at 30).  A court's "fail[ure] to apply (or even

21  acknowledge) the framework governing emergency exercises of state authority during a public

22  health crisis, established over 100 years ago in *Jacobson v. Commonwealth of Massachusetts*,

23  197 U.S. 11 (1905)" is "extraordinary error."  *Id.* at 10; *see also id.* at 13 ("*Jacobson* remains

24  good law").

25          Similarly, an Illinois district court emphasized the deference due state officials in the prison

26  context when responding to this pandemic.  *Money v. Pritzker,* --- F. Supp. 3d ---, 2020 WL

27  1820660, at *1 (N.D. Ill. Apr. 10, 2020).  Actions that require courts to get involved in prison

28  management raise "serious concerns under core principles of federalism and the separation of

3

Defs.' Strategic COVID-19 Management Plan (2:90-cv-00520 KJM-DB (PC))

1  powers." *Id*. at *15.  Federalism counsels against courts getting involved in state prison

2  management, while the separation of powers commits the task of running prisons to the

3  "executive and legislative branches." *Id*. at *16.  The concerns about "institutional competence

4  [are] especially great where, as here, there is an ongoing, fast-moving public health emergency."

5  *Id*.

6        As world leaders continue to be in crisis management mode addressing this unprecedented

7  pandemic as best they can, Defendants are entitled to deference as they work around the clock to

8  respond to the rapidly evolving emergency impacting their operations of California's prisons.

9  Like society in general, Defendants' goal is to prevent the spread of COVID-19.  The Court

10  should allow Defendants to meet that goal and continue implementing and operationalizing the

11  various facets of their attached strategic plan, which is focused on protecting the health and safety

12  of CDCR inmates, staff, and the public from COVID-19.

13  Dated:  April 16, 2020                           Respectfully submitted,

14                                                   XAVIER BECERRA
                                                     Attorney General of California
15                                                   ADRIANO HRVATIN
                                                     Supervising Deputy Attorney General
16

17                                                   */s/ Lucas L. Hennes*

18                                                   LUCAS L. HENNES
                                                     Deputy Attorney General
19                                                   *Attorneys for Defendants*

20  CF1997CS0003

21

22

23

24

25

26

27

28

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



April 16, 2020


Elise Thorn
Office of the Attorney General
1300 I Street
Sacramento, CA 95814


*VIA EMAIL ONLY*


Dear Elise:

Attached please find the California Department of Corrections and Rehabilitation's plan and supporting attachments to respond to the COVID-19 pandemic, as required by the Coleman Court's April 10, 2020 order.


Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation

CDCR COVID Plan

I.      Introduction

The California Department of Corrections and Rehabilitation (CDCR), along with California Correctional Health Care Services (CCHCS) have taken, and continue to take, appropriate steps to address the COVID-19 global pandemic within the California prison system. The myriad of efforts undertaken by CDCR and CCHCS are informed by outside agencies, public health professionals, and the Centers for Disease Control and Prevention (CDC). Public safety remains CDCR's top priority, along with the health of the staff and inmates who work and live within CDCR institutions.

CDCR's goals are keeping the inmate population and staff working within CDCR safe and secure, minimizing the spread of COVID-19 as much as possible, treating patients for all their healthcare needs during the pandemic, to the greatest extent possible, and regularly communicating with staff, inmates, and the public about COVID-19 and the steps taken by CDCR to minimize its spread. With those goals in mind, CDCR has taken the following steps:

- Activated the Department Operations Center (DOC), jointly chaired by CDCR's Director of Division of Adult Institutions and CCHCS's Director of Healthcare Operations, on March 15, 2020, enabling centralized oversight and immediate response to any departmental impacts of COVID-19;
- Stopped inmate visitation and all large events within institutions beginning on March 11, 2020 and stopped all tours and family visits by March 16, 2020;
- Suspended all intake from county jails for at least sixty days beginning on March 24, 2020, which will result in a reduction of approximately 5,000-6,000 inmates;
- Released over 3,400 inmates from CDCR early, who were within sixty days of release;
- Transferred 630 inmates from dormitory housing to empty housing units within CDCR, and plans to transfer an additional 640 inmates from dormitory housing by April 16, 2020;
- Implemented robust staff screening measures, including temperature screenings for anyone entering an institution;
- Increased cleaning within the institution and made hand sanitizer and masks available to inmates and staff;
- Issued guidance to healthcare and correctional staff on the treatment and prevention of COVID-19, including guidance on quarantine, isolation, personal protection, and hygiene; and
- Issued guidance, via posters, handouts, videos, and Inmate Advisory Council Meetings, to inmates on physical distancing, hygiene, prevention techniques, and symptoms of COVID-19.

II.      Compliance with the Centers for Disease Control and Prevention Guidelines

Part of CDCR and CCHCS's COVID-19 plan is to comply with CDC's guidelines, to the extent possible in a correctional setting. Indeed, CDCR and CCHCS's plans and policies have been made with guidance from public health experts and with reference to the guidelines on the prevention of COVID-19 in correctional settings issued by the CDC. CDCR implemented much of what CDC ultimately issued as guidelines before the CDC even issued its guidelines on March 23, 2020. CDCR and CCHCS have closely adhered to the guidelines and have complied with almost all of them. A detailed comparison of CDCR and CCHCS's efforts and the CDC's guidelines is laid out in Attachment A and a timeline of CDCR and CCHCS's efforts to address COVID-19 is in Attachment B.

While steps are being taken to mitigate the spread of COVID-19, CDCR is taking additional action to address the needs of patients with mental illness. In addition to the overall goals of CDCR and CCHCS,

CDCR's Statewide Mental Health Program is focused on preserving life, stabilizing acute mental health deterioration, and providing coping skills to the mental health population. To that end, Mental Health and its partners at CCHCS and the Division of Adult Institutions (DAI) have issued guidance to the field on providing mental health care during a state of emergency, taking into account potential staffing pressures and movement restrictions. CDCR has also issued policies on how and when to transfer patients to a higher level of care, and how to provide additional treatment and coping skills to patients who are awaiting a higher level of care. These policies have been developed in consultation with the *Coleman* Special Master and Plaintiffs, through numerous taskforce meetings convened since March 20, 2020.

Like the rest of the world, CDCR's plans to mitigate the spread of COVID-19 continue to evolve as additional scientific and medical information becomes available. The plans set forth below are those implemented by CDCR and CCHCS to date and are in line with guidance provided by public health agencies. CDCR and CCHCS are committed to reviewing and revising the plans as new information, treatments, and prevention techniques become available.

III.     CDCR and CCHCS Plan to Prevent the Spread of COVID-19 in the Institutions

First and foremost in CDCR and CCHCS's plan is to prevent the spread of COVID-19 among inmates and staff, which has been done through communication and coordination, prevention practices, safe practices for our health care providers, increased cleaning and disinfecting, and overall pandemic guidance throughout every institution.

CDCR and CCHCS are dedicated to the safety of everyone who lives in, works in, and visits our institutions. CDCR and CCHCS have longstanding outbreak management plans in place to address communicable disease outbreaks such as influenza, measles, mumps, norovirus, and varicella, as well as preparedness procedures to address a variety of medical emergencies and natural disasters. While COVID-19 is a pandemic unlike the world has seen, CDCR and CCHCS have used past practices combined with new guidance from CDC and public health professionals to combat the spread of the virus. Details of the steps that have been taken and those that are in the process of being implemented are provided below.

A.     Communication and Coordination

Part of CDCR and CCHCS's plan is to have ongoing, transparent, communication and coordination within CDCR and CCHCS and with the public. To that end, on March 11, 2020, CCHCS issued a memorandum regarding the 2019 Novel Coronavirus. (Attachment C). The memo discussed risk assessment and management of patients with respiratory illness, laboratory testing for COVID-19, surveillance and reporting requirements, and resources for up-to-date COVID-19 information. This was the first of many communications issued from CDCR to staff regarding COVID-19. Since that time, CDCR and CCHCS have taken numerous steps to keep staff, inmates, and the public informed of the steps taken to combat the spread of COVID-19.

i.     Department Operations Center

An important part of the communication within CDCR and CCHCS and with the Administration is the DOC. On March 15, 2020, CDCR and CCHCS activated the DOC, which is a centrally-located command center where CDCR and CCHCS experts monitor information, prepare for known and unknown events, and exchange information centrally in order to make decisions and provide guidance quickly. The DOC is chaired by the Director of DAI and CCHCS's Director of Healthcare Operations. The DOC's goal is to implement measures and strategies to protect inmates and staff during the COVID-19 pandemic, to enhance social distancing in communal areas, and to review alternative housing options

2

that may be used to increase physical distancing between inmate cohorts in dorms where possible. Under the guidance of the DOC, both CDCR's DAI and CCHCS have issued numerous memoranda providing guidance to staff regarding housing, transfers, programming, and other aspects of institutional operations in light of COVID-19.

ii.    CDCR COVID-19 Preparedness Webpage

One of the key goals of CDCR and CCHCS during this pandemic is transparency with staff, inmates, and the public. To facilitate information to the public, CDCR and CCHCS initiated a COVID-19 Preparedness website that provides almost daily updates regarding the steps CDCR and CCHCS have taken in response to the COVID-19 pandemic. (https://www.cdcr.ca.gov/covid19/). On March 26, 2020, as part of the COVID-19 Preparedness website, CDCR and CCHCS unveiled a COVID-19 tracking tool for inmate testing, cases, and results. (https://www.cdcr.ca.gov/covid19/population-status-tracking/). Data for the tracking tool is extracted directly from internal systems such as the Strategic Offender Management System (SOMS) and the Electronic Health Record System (EHRS), and provides near real time updates. CDCR and CCHCS have also provide a public tracking system for the number of employees that have self-reported positive COVID-19 cases at each institution. (https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/). CDCR and CCHCS will continue to update these websites on a regular basis to outline the steps taken to mitigate and appropriately react to the spread of COVID-19.

iii.    Communication with Inmate Population

Just as CDCR and CCHCS have made significant efforts to keep the public informed of the steps taken in light of COVID-19, CDCR and CCHCS have also taken numerous steps to ensure that the inmate population is informed of COVID-19, including the appropriate safety precautions that should be taken to minimize risk of contracting the virus, and the steps CDCR and CCHCS has taken to prevent the spread of COVID-19 in the institutions. This communication occurs in numerous ways, including by the hanging of posters throughout the institutions with information regarding symptoms, appropriate social distancing in communal areas, COVID-19 facts and frequently asked questions, and preventing the spread of illness. (Attachment D). In addition, both Secretary Diaz and the *Plata* Receiver, Clark Kelso, have recorded videos for the inmate population that have been added to the Division of Rehabilitative Programs institutional television wellness channel. The videos, which provide information regarding COVID-19 and the steps CDCR and CCHCS have taken in response, can be viewed on CDCR and CCHCS's COVID-19 Preparedness website. (https://www.cdcr.ca.gov/covid19/population-communications/). All printed material, as well as all videos, are available in both English and Spanish, including closed captioning.

In addition, Wardens, Captains, Public Information Officers, and other institution executives have been meeting regularly with their respective Inmate Advisory Councils (IAC), either individually or in small groups where social distancing can be maintained. These meetings allow institution executives to provide information to the IAC regarding COVID-19 and any steps CDCR and CCHCS are taking, as well as allowing the inmates to raise any questions or concern they may have. CDCR is also providing daily updates regarding COVID-19 to the Statewide Inmate Family Council and all institutional Inmate Family Councils.

Finally, CDCR and CCHCS have created a public email box at COVID19@cdcr.ca.gov where questions specific to COVID-19 can be answered for concerned family members or friends. The email address has been made available on CDCR's social media platforms, the CDCR website, and in daily updates to stakeholder groups.

B.  Prevention Practices

As with the general public, a goal of CDCR and of CCHCS is to prevent the spread of COVID-19.  This effort necessarily involves strategies targeted at inmates and staff, individually and collectively.

i.    Inmates

CDCR and CCHCS have collectively taken numerous steps to prevent the spread of COVID-19 amongst the inmate population. This includes population management measures, mandatory modified programming, eliminating non-essential transfers, and transferring inmates out of dormitory settings to enhance physical distancing, and taking steps to enhance social distancing in communal areas. All plans related to social and physical distancing between inmates are being jointly developed by CDCR and the *Plata* Receiver. There are currently no plans to target specific portions of the population, such as *Coleman* class members or high risk inmates, for special movement or housing, except as detailed below in section III regarding the provision of Mental Health care. The approach taken by both CDCR and the *Plata* Receiver is a holistic approach that aims to protect and mitigate the spread of COVID-19 amongst the entire CDCR population.

a.    Population Management

An important step in curbing the spread of COVID-19 is managing the prison population to allow for social distancing.  Since March 25, 2020, CDCR has reduced its state prison population by 6,758 inmates, allowing more space and flexibility in housing inmates statewide. The reduction was achieved through CDCR's expedited release plan and through the suspension of intake of inmates from county jails.

1.    Intake of New Inmates

One of the key guidelines from the CDC recommends restricting transfers of inmates to and from other jurisdictions and facilities unless necessary. (https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html). On March 24, 2020, Governor Newsom issued an executive order directing the Secretary of CDCR to use his emergency authority under California Penal Code section 2900, subdivision (b) to suspend intake of inmates into state facilities for 30 days. (Attachment E). The executive order also granted the Secretary the authority to issue one or more 30-day extensions of suspension of intake as needed to protect the health, safety, and welfare of inmates and staff at CDCR. On April 13, 2020, the Secretary indicated that he plans to use this authority to issue a 30-day extension on the suspension of intake into CDCR. *See Plata v.  Newsom*, Case No. 01-cv-01351, ECF No. 3274, page 3, paragraph 6. The need for a further extension will be continually assessed based on the circumstances in the community, county jails, and CDCR's institutions.

2.    Expedited Release Plan

The advance release of inmates to parole or community supervision was also an important component of the goal to reduce the spread of COVID-19.  On March 31, 2020, CDCR announced an expedited release plan to improve the institutions' capacities to respond to the threat posed by COVID-19 by accelerating the release of eligible inmates who have 60 days or less to serve on their sentences, and who are not currently serving time for a violent crime as defined by law, required to register under Penal Code section 290, or serving a commitment for domestic violence. In total, CDCR has released over 3,400 inmates under this expedited release plan. Of those who were released through the accelerated release program, approximately 930 were in the Mental Health Services Delivery System as of April 2, 2020. On April 3, 2020, CDCR began releasing inmates under this plan. All inmates who were eligible under the expedited release criteria have been released.

4

b.      Mandatory 14-Day Modified Program

An integral part of the prevention of the spread of COVID-19 is to minimize movement. Thus, on April 7, 2020, DAI issued a memorandum implementing a mandatory 14-day statewide modified program. (Attachment F). The memorandum provides direction regarding how movement will occur within the institution to maximize social distancing and prevent inmates from different housing units from coming into contact with one another. While these restrictive measures are mandatory, the inmate population will still have access to medication, health care services, yard time, canteen, packages, and cell-front religious programming, while allowing for physical distancing and proper cleaning and disinfecting. Showers and telephones will be disinfected between each use. Meals will be served in cells or housing units. Recreation and yard time will be available, but the schedules will be staggered by housing unit. If canteen cannot be accommodated during yard time, staff will facilitate delivery of canteen items to housing units. Only inmates classified as critical workers will be permitted to report to work. Implementation of these restrictions over the two-week period will further reduce potential staff and inmate exposure to COVID-19. On April 7, 2020, DAI and the Department of Rehabilitative Programs issued a memoranda to provide clarification to the institution schools regarding the modified program. (*Id.*)

c.      Transfers

Just as with the limitation of movement imposed throughout the public by "stay-at-home" or "shelter-in-place" orders, CDCR has imposed limitations on movement to minimize the spread of COVID-19.

1.      Elimination of Non-Essential Transfers

CDCR has taken many steps as the COVID-19 pandemic has spread to limit transfer in and out of state institutions, as each movement carries a potential for exposure not only to the inmate who is transferring, but also to those at the location to where the inmate transfers. As an initial action, on March 17, 2020, CDCR suspended all transfers of out-of-state parolees or inmates. On March 19, 2020, CDCR restricted non-essential transfer of inmates between CDCR facilities, only allowing transfer in the following scenarios: removal from restricted housing units; transfer from reception centers; transfers to and from mental health crisis beds, conservation camps, Male Community Reentry Programs (MCRP), Custody to Community Transitional Reentry Programs (CCTRP), Alternative Custody Programs (ACP); and transfers from Modified Community Correction Facilities due to deactivation efforts. Transfers required due to Health Care Placement Oversight Program (HCPOP) placement, court appearances, and medical emergencies was also allowed.

On March 23, the California Judicial Council issued a statewide order suspending all jury trials for 60 days, which significantly reduced the need to transfer inmates from CDCR to outside county jails or courts. On March 24, 2020, CDCR suspended transfers of inmates to the conservation camps, MCRP, CCTRP, and ACP. On the same day, Governor Newsom issued an executive order requiring the Secretary use his authority to suspend intake of inmates into CDCR for 30 days. (Attachment E). On April 7, 2020, CDCR took the additional step of suspending all transfers of inmates from Reception Centers through April 22, 2020. On April 10, 2020, CDCR's Statewide Mental Health Program issued transfer guidelines regarding inmates who need a higher level of care, the details of which are outlined in section III. On April 15, 2020, CDCR communicated with county sheriffs about changes to the transfer of state prison inmates to county jails for mandated court hearings. Inmates leaving CDCR custody to be housed in county jails for purposes of attending a court hearing will not be accepted back until intake is resumed. Inmates transferred for same-day court appearances will be allowed to return to CDCR, but will be provided a mask and will be screened by health care staff upon return to the institution.

5

## 2.   Transfers Out of Dormitory Settings

Targeted moves of inmates out of dormitory settings is another tool CDCR has utilized to meet the goal of limiting the spread of COVID-19.  On April 1, 2020, DAI issued a directive to transfer just over 800 inmates from several Level II dormitories to locations with vacant buildings within the system, including transferring 300 inmates from Chuckawalla Valley State Prison (CVSP) to Ironwood State Prison (ISP), 57 inmates from CVSP to California State Prison, Corcoran (COR), 361 inmates from California Rehabilitation Center (CRC), and 100 inmates from the Substance Abuse Treatment Facility and State Prison, Corcoran to COR. CDCR also transferred 43 inmates from Folsom Women's Facility to the Female Community Reentry Facility. In addition, CDCR transferred 228 inmates from California State Prison, Solano to Deuel Vocational Institution. All noted transfers were completed by April 16, 2020. Finally, CDCR has identified 426 inmates in Level I or Level II dorms at California Correctional Center and Sierra Conservation Center who will be transferred to fire camps. The transfer of these inmates is being coordinated at a local level with CAL FIRE based on need at each fire camp. As of April 13, 2020, 53 inmate have been transferred from California Correctional Center to fire camps. As of April 15, 2020, 159 inmates have been transferred from Sierra Conservation Center to fire camps.

On April 10, 2020, the *Plata* Receiver issued a memorandum to Secretary Diaz regarding CCHCS's Guidelines for Achieving and Maintaining Social Distancing in California Prisons. (Attachment G).[1] The memorandum explained that social distancing was already being achieved in single- and double-celled units, as cellmates constitute an appropriate "social distancing cohort" for correctional purposes and "are analogous to a family unit in the free world." With respect to dorm housing, the Receiver determined that "necessary social distancing can be achieved by creating 8-person housing cohorts" with at least six feet of distance in all direction between each cohort. In addition, the memorandum instructed that all movement of inmates out of dorms to achieve social distancing must be done in coordination and concurrence with the Health Care Placement Oversight Program to ensure that such movement does not contribute to the spread of COVID-19. Before the release of this memorandum, CDCR was developing plans to transfer inmates from San Quentin State Prison to COR. However, these plans have been temporarily paused. Upon completion of all currently scheduled transfers related to physical distancing, CDCR, in conjunction with the *Plata* Receiver, will assess the population in the dorms and determine what additional steps need to be taken, if any.

## 3.   Utilization of Additional Vacant Space for Housing

CDCR and CCHCS are currently assessing whether there is additional space within the institutions that may be used to house inmates, such as gymnasiums. However, the State Fire Marshal must approve those spaces to be used for housing. Further, CDCR must ensure there are enough cots and assess the staffing needs for each location so that DAI can ensure that safety and security can be maintained and the inmates' essential needs, such as feeding, escorts, medication, and any mental health or medical needs, can be met. At this time, nineteen potential sites have been identified for use to house inmates. To date, the State Fire Marshal has approved occupancy for twelve gymnasiums and two visiting rooms located at Mule Creek State Prison, Central California Women's Facility, Pleasant Valley State Prison, Salinas Valley State Prison, San Quentin State Prison, California State Prison, Solano, and California State Prison, Los Angeles County. CDCR has procured 600 cots and can obtain more if needed. CDCR is working closely with the State Fire Marshal to get approval for additional space as soon as possible. CDCR, along with CCHCS, will work together to determine how these spaces might best be used to improve physical distancing.

---

[1] On April 12, 2020, the *Plata* Receiver issued a supplemental memorandum clarifying that the April 10, 2020 memorandum was not intended to affect any inter-institution transfers to address either medical, mental health, or dental needs that were not available at the sending institution. (Attachment G).

> d.     Social Distancing in Communal Areas

Social distancing is crucial in preventing the spread of COVID-19. One of CDCR's first directives to the institutions was to implement social distancing. The CDC defines social distancing as "keeping space between yourself and other people outside of your home." (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html). Thus, CDCR's initial focus has been on ensuring appropriate distancing of inmates who do not live in the same cell or housing unit. Institutions implemented this directive by placing markings on the floor in communal areas marking six feet between each space. These markings were placed in the housing units near kiosks and telephones, and on the yard for medication pass. The markings serve as prompts and reminders for inmates to maintain physical distance from others as they wait for services in these areas. Pictures of these markings at various institutions are provided in Attachment H.

> ii.     Staff

An essential step in limiting the spread of COVID-19 is decreasing exposure points by limiting interaction between people who are not in the same family group. In the state of California, this step was implemented by Governor Newsom's shelter-in-place order. In CDCR, part of limiting exposure points was to limit unnecessary personnel from entering the institutions and appropriately screening those essential workers who entered the institutions.

> a.     Limitation of Staff Entering Institutions

On March 12, 2020, all tours of CDCR institutions statewide were cancelled. On March 15, 2020, in-person observers were no longer permitted at parole suitability hearings. On March 17, 2020, DAI provided a letter notifying rehabilitative program providers and volunteers that all inmate activity groups and programs were suspended until further notice. (Attachment I).

> b.     Telework and Administrative Time Off

To further the goal of preventing the spread of COVID-19, on March 19, 2020, Governor Newsom issued an executive order requiring Californians to stay at home or in their place of residence except as needed to maintain continuity of operations of critical infrastructure sectors. (Attachment J). In response, CDCR issued direction that all hiring authorities should maximize telework to the extent possible. (https://www.cdcr.ca.gov/covid19/360-2/). There are currently more than 8,500 CDCR staff successfully teleworking.

In addition, staff members whose job duties are not immediately critical to the continuity of operations and are not viable for telework, and who cannot be redirected to work that is critical or can be accomplished via telework, are provided Administrative Time Off. This allows employees to continue to earn wages without being required to work.

> c.     Verbal Screening and Temperature Protocols

Preventing the introduction of COVID-19 into CDCR facilities is also important to reducing the spread of the virus.  On March 14, 2020, CDCR implemented mandatory verbal screening for all persons entering state prisons. Those attempting to enter a state prison or office building at any time are required to verbally respond if they currently have any new or worsening symptoms of a respiratory illness or fever. If the individual responds affirmatively, that person is restricted from entering the site that day. On March 27, 2020, touchless temperature screening was implemented as an additional precaution for all persons entering institutions and community correctional facilities. (Attachment K).

iii.    Visitors

Another significant potential for the introduction of COVID-19 to institutions is through visitors who may have contracted the virus before entering an institution.  Therefore, on March 11, 2020, CDCR suspended normal visiting. All overnight family visits were suspended effective March 16, 2020. CDCR, however, understands the need to ensure that all inmates have the ability to stay connected with friends and family during this trying time. Thus, CDCR has worked with partners Global Tel Link (GTL) and JPay to ensure that access continues.

On March 17, 2020, GTL announced that it would offer free phone calls to the inmate population on March 19th and March 26th. On the same day, JPay offered two free stamps per week for registered electronic message users through available kiosk or tablets.[2] On March 30, 2020, Secretary Diaz announced that GTL and JPay had agreed to provide three days of free phone calls per week on Tuesdays, Wednesdays, and Thursdays through the end of April 2020. In addition, JPay agreed to offer reduced-priced emails to registered electronic message users at the pilot institutions, and to provide free emails for those unable to pay.

On April 8, 2020, DAI provided a memorandum to the field increasing phone call privileges for all inmates housed in restricted housing, Reception Centers, and Psychiatric Inpatient Programs. (Attachment L). The memorandum increased phone call privileges as follows: (1) All non-disciplinary segregation inmates are allowed one phone call per week; (2) All other inmates in restricted housing are allowed a phone call every two weeks; (3) All C status inmates are allowed one call every two weeks; (4) All Reception Center inmates are provided one phone call a week; and (5) All Psychiatric Inpatient Program inmates are provided one phone call a week, unless restricted by the Interdisciplinary Treatment Team (IDTT). The memorandum was revised and re-released on April 13, 2020, to clarify that inmates in the above housing units will be provided at least the number of phone calls specified in the memorandum. (*Id.*)

Most recently, on April 8, 2020, CDCR partnered with JPay to provide inbound email print services to all institutions at a reduced rate by April 10, 2020. This service enables inmates' family and friends to use JPay to send e-correspondences, which mailroom staff then print and deliver with regular mail. While this will not eliminate physical mail, this process will reduce COVID-19 transmission risk from outside of the institution. This service is also a cost-effective way for inmates to maintain contact with family and friends, which is especially important while visiting is closed.

C.  CCHCS Interim Guidance for Health Care and Public Health Providers

Providing up-to-date, best practices advice to heath care providers is an essential part of CDCR and CCHCS's plan.  On March 20, 2020, CCHCS issued COVID-19 Interim Guidance for Health Care and Public Health Providers. The document addresses COVID-19 testing, treatment, transmission, reporting requirements, personal protective equipment use, precautions, and management of suspected and confirmed cases of COVID-19. On April 3, 2020, CCHCS issued revised interim guidance. (Attachment M).

---

[2] The following institutions are part of the JPay pilot which provide inmates with access to kiosks and tablets: High Desert State Prison, Kern Valley State Prison, California Institution for Women, Central California Women's Facility, and the Substance Abuse Treatment Facility and Prison, Corcoran. At some of these institutions, only certain yards have access to this technology.

i.    Testing

The CDC has issued guidelines for COVID-19 testing, which divides the priority for testing into the four following tiers:[3]

| |
|---|
| **PRIORITY 1**<br>**Ensure optimal care options for all hospitalized patients, lessen the risk of nosocomial infections, and maintain the integrity of the healthcare system**<br>• Hospitalized patients<br>• Symptomatic healthcare workers |
| **PRIORITY 2**<br>**Ensure that those who are at highest risk of complication of infection are rapidly identified and appropriately triaged**<br>• Patients in long-term care facilities with symptoms<br>• Patients 65 years of age and older with symptoms<br>• Patients with underlying conditions with symptoms<br>• First responders with symptoms |
| **PRIORITY 3**<br>**As resources allow, test individuals in the surrounding community of rapidly increasing hospital cases to decrease community spread, and ensure health of essential workers**<br>• Critical infrastructure workers with symptoms<br>• Individuals who do not meet any of the above categories with symptoms<br>• Health care workers and first responders<br>• Individuals with mild symptoms in communities experiencing high COVID-19 hospitalizations |
| **NON-PRIORITY**<br>• Individuals without symptoms |

The CCHCS Interim Guidance for Health Care and Public Health Providers draws from the CDC recommendations regarding testing of patients and prioritizes testing for patients who are "close contacts of confirmed cases (should be in quarantine) who develop any symptoms of the illness, even if mild or not classic for COVID-19." (Attachment M, page 9). Any patient who is exhibiting symptoms of COVID-19 is also eligible for testing. Consistent with CDC guidelines, asymptomatic patients are not recommended for testing at this time. (*Id.*)

Recently, rapid testing has been developed. However, those tests are not currently available to CDCR. As those tests become available in large quantities, the recommendations regarding priorities for testing may be altered.

ii.    Personal Protective Equipment

In early March, CDCR conducted an initial assessment of all necessary personal protective equipment (PPE) at each institution. Per this assessment, most institutions had an adequate supply to immediately address any potential COVID-19 exposures. When needed, institutions submitted orders of masks, gloves, and gowns. The DOC is continuously monitoring supply and demand of PPE to ensure the institutions have the resources needed to protect staff and inmates. CDCR is also working with the Governor's Office of Emergency Services to ensure adequate supplies of PPE are available at each institution.

---

[3] https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last updated March 24, 2020)

9

In addition to using resources outside of CDCR to increase the available supply of PPE, CDCR has partnered with the California Prison Industry Authority (CALPIA) to produce PPE. CALPIA has begun producing reusable cloth barrier masks to meet some of the supply needs of staff and inmates. The masks are being produced at CALPIA's Fabric enterprises at the California Institution for Women, Mule Creek State Prison, California Men's Colony, Sierra Conservation Center, Correctional Training Facility, California Correctional Institution, and Centinela State Prison. As of April 10, 2020, CALPIA is producing about 22,000 barrier masks per day, and has begun distributing the masks to the institutions for both staff and inmate use. All institutions will increase laundry services in order to accommodate proper washing and drying of barrier masks. (See Attachment N).

CALPIA is also producing hand sanitizer for sanitizer dispenser stations in housing units, dining halls, work change areas, and other areas where sinks and soap are not immediately available. The hand sanitizer is available to all CDCR and CCHCS facilities and locations. If CALPIA's inventory exceeds the needs of those two departments, CALPIA will make the product available to other state agencies.

The interim guidance issued by CCHCS provides guidance to staff on the use of PPE. (Attachment M, page 20-23). On April 6, CCHCS issued a memo with additional guidance on staff use of PPE to make clear what types of PPE are appropriate for each situation and guidance on the extended use of PPE. (Attachment O). Finally, a quick reference guide was provided to staff. (Attachment P).

On April 15, 2020, CDCR issued a memorandum which requires the use of cloth face coverings for both staff and inmates. (Attachment Q). While staff are allowed to bring in their own masks to wear while performing any duties on institutional grounds, all staff and inmates are being provided at least two CALPIA reusable cloth barrier masks. Inmates will be required to wear the CALPIA masks during any situation that requires movement outside of cell or while in a dorm setting, during interactions with other inmates, such as yard time or canteen, and during movement to or from health care appoints or medication administration areas.

#### D. Cleaning and Disinfecting Practices

Cleaning and disinfecting is another critical component to minimizing the spread of COVID-19. To address this, CDCR directed increased cleaning and disinfection procedures to all institutions and mandated cleaning a minimum of every three hours. (Attachment R). All CDCR institutions have been instructed to conduct additional deep-cleaning efforts in high-traffic, high-volume areas, including health care facilities. Communal areas such as dayrooms, showers, restrooms, and officers are cleaned a minimum of twice per shift during second and third watch, and more if needed. Inmates who assist with cleaning high-traffic areas of the institutions have received direct instruction on proper cleaning and disinfecting procedures in order to eliminate COVID-19. All critical inmate workers are screened and cleaning practices allow for physical distancing of staff and porters when possible. (Attachment S).

#### E. DAI Pandemic Operational Guidelines

As a public institution responsible for the safety and well-being of those in its care, CDCR has plans in place to address a variety of circumstances. DAI has developed a 5-tiered system that explains operational programming in five different "operational conditions," *i.e.*, (i) Normal, (ii) Alpha, (iii) Bravo, (iv) Charlie, and (v) Delta. (Attachment T). Each condition reflects what kind of restrictions will be put in place depending on necessary movement restrictions and staffing levels at any given time. The plan explains how core functions (such as feeding, medications, health care, and showers), programs, privileges, and transportation will be modified in each of the five conditions.

The first operational condition titled "Normal" reflects the normal daily scenario in which the institution is able to sustain normal operations and perform all functions. The second operational condition, "Alpha," mandates some modifications to program activities to minimize exposure or to address staff limitations impacting daily operations. The third operational condition, "Bravo," mandates increased modifications to program activities and transportation to minimize exposure, address quarantines, or to address increased staff limitations, including custodial staffing, which impact daily operations. The fourth operational condition, "Charlie," mandates significant modifications to program activities, transportation, and core functions due to increased isolations and quarantines, and to address increased staff limitations, including custodial staffing, which impact daily operations. The fifth and last operational condition, "Delta," is the last resort scenario with the most extensive modifications. The purpose of the different operational levels is to allow CDCR the ability to incrementally increase the levels and severity of counter measures at each institution while still conducting mission-essential operations.

Which one of the five conditions applies to each institution is, in large part, guided by the number of custodial staff available on any given day. For instance, the fifth and last operational condition, "Delta," will only be triggered if the number of available custodial staff decreases to the skeleton staffing level of 50 to 59 percent of current second watch staffing. Currently, CDCR only expects institutions in remote locations to ever reach condition "Delta." Institutions located in more central areas can usually obtain resources from nearby institutions or CDCR's headquarters when coverage is needed. CDCR has also taken the proactive step of reaching out to recently-retired correctional peace officers who would be willing to return to service to address staffing shortages during this emergency, if needed.

Most CDCR institutions are currently operating in the third tier, "Bravo," except for mail and phone services. As detailed above, CDCR has expanded mail and phone privileges for inmates in segregated housing.

IV.    CDCR's Plan to Provide Mental Health Care to Patients During COVID-19 Global Pandemic

Aside from the protections and services outlined above applicable to all CDCR institutions, inmates, and staff, over the past month, CDCR has worked to continue to provide adequate mental health care to its patients while balancing the need for treatment against the necessary restrictions in place to mitigate the spread of COVID-19. CDCR's Statewide Mental Health Program's goals are to preserve life, stabilize acute mental health deterioration, and provide coping skills to the mental health population. In furtherance of those goals, CDCR has issued policies on the delivery of mental health care during COVID-19, screening patients before referring to higher levels of care, and providing treatment to patients in need of a higher level of care while awaiting transfer.

A.    Mental Health Program Pandemic Operational Guidelines

In response to COVID-19, Mental Health has modified its programs, with input from the Special Master and his team, to meet the needs of its patients. On March 25, 2020, CDCR issued a memorandum titled COVID 19 – Mental Health Delivery of Care Guidelines. (Attachment U). The memorandum directs clinical leadership at each institution to regularly assess their mental health program capacity to make determinations based on available staff, known exposures to COVID-19, individual patient needs, and facility and system patient flow. The policy makes clear the expectation that institutions should follow current Program Guide policies as much as possible, including access to groups, one-on-one treatment, emergent and urgent referral processes, crisis intervention, suicide prevention, and inpatient referrals.

The policy creates four tiers of care based on the available resources at each institution, as determined by its clinical leadership. The guidelines help ensure patients receive care while minimizing the risk of COVID-19 to staff and patients. The document provides institutional leadership with guidance on

determining which tier an institution may be in based on several factors including the availability of staff, the ease of patient movement between and within institutions, the availability of inpatient beds, and the availability of beds to provide suicide watch. For each of the four tiers, the plan discusses how to handle inpatient referrals, required suicide prevention practices, what level and types of treatment should be provided, including individual and group treatment, rounding practices, and how to handle evaluations for patients who are potentially paroling as Offenders with Mental Health Disorders.

The March 25, 2020, policy also includes guidance for providing education on COVID-19 to patients, isolation and quarantine practices, and ensuring physical distancing between staff and patients in treatment settings. To that end, the policy also encourages institutions to increase the use of telepsychiatry to help with physical distancing between clinician and patient.

      B.   Transfers and Screening of Patients Referred to a Higher Level of Care

Notwithstanding COVID-19, CDCR continues to refer patients to higher levels of mental health care, including Mental Health Crisis Beds (MHCBs) or Psychiatric Inpatient Units (PIPs), when clinically indicated. Restrictions have been put in place, however, to ensure COVID-19 is not spread between institutions. On April 5, 2020, CDCR issued a memorandum titled COVID-19 – Screening Prior to Mental Health Transfers. (Attachment V). The memorandum makes clear that while referrals must continue, transfers must take place in a way that minimizes the risk to patients and staff.

The policy requires a medical physician or psychiatrist to conduct the screening in consultation with a public health or infection control nurse. The screening must be documented before the patient leaves the institution and must include a minimum of 11 data points concerning the patient's physical health.

On April 10, 2020, after meeting and conferring with the *Coleman* Special Master and Plaintiffs' counsel, CDCR issued further guidance to the field in a memorandum titled COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow. (Attachment W). The temporary Transfer Guidelines and Workflow immediately restricted all non-emergent movement between institutions. The policy sets forth instruction on referrals of patients to different institutions, including guidelines on which referrals require transfer to other institutions, how to obtain clearance for those transfers, the duties of the receiving institution, and the final transfer procedure. The policy also directs institutions to retain discharged patients at the same institution whenever possible. This is in accordance with department-wide direction on cessation of non-essential transfer first issued on March 24, 2020.

      C.   Provision of Treatment to Patients while Awaiting Transfer to a Higher Level of Care

Throughout the COVID-19 pandemic, CDCR has maintained its obligation to provide the appropriate level of metal heath care to each patient.

           i.   Access to MHCBs and PIPs, Temporary Mental Health Units, and Enhanced Level of Care Treatment

An important goal of CDCR throughout the COVID-19 pandemic is to communicate with mental health providers regarding the ongoing expected level of care for patients. Thus, on April 10, 2020, CDCR provided direction to the field on providing care to patients awaiting transfer to a higher level of care. (Attachment X). The memorandum provides the institutions direction on when a patient referred to a higher level of care should be transferred to a local MHCB or PIP bed, held in a Temporary Mental Health Unit (TMHU), or sent offsite to another institution's MHCB or PIP. When patients cannot be transferred to a local or external MHCB or PIP, TMHU placement must be considered. In some cases,

where a TMHU is not immediately available, the patient will receive Enhanced Level of Care Treatment in their cell.

TMHUs consist of a cluster of clearly-marked adjacent-celled housing where treatment can be provided to a group individuals who require similar inpatient treatment. The TMHUs will provide treatment team meetings within seventy-two hours of admission, and weekly thereafter.  Suicide watch will be provided on the unit for patients with suicidality. Staff shall participate in daily interdisciplinary huddles. And out of cell time must be provided in accordance with the unit on which the TMHU is located. At a minimum, out of cell treatment must be offered daily, and confidentially, to each patient to be conducted by the psychiatrist or primary clinician. Group therapy may be provided in small groups where physical distancing is possible.  Dayroom and evening yard shall also be considered, when appropriate, to enhance out of cell time.  Rounding must also occur at least daily and patients will have equal access to yard, showers, and phone calls. Patients will be offered recreational therapy, individual treatment, access to entertainment devices, and in cell treatment. Patients are transferred or discharged from the TMHU when an appropriate MHCB or PIP bed becomes available based on the patient's acuity or the patient no longer meets clinical criteria for their referral.

In case a patient is unable to transfer to an MHCB, PIP, or TMHU, the patient will be retained in his housing unit and provided Enhanced Level of Care Treatment. The goal is to provide the maximum out of cell time available to the patient. When clinically indicated, the patient will be placed on suicide watch. Out of cell time should be provided daily, including daily clinical contact with a psychiatrist or primary clinician.  Rounding shall also occur at least daily and, like TMHUs, patients shall have equal access to yard, showers, and phone calls, as compared with other inmates in the housing unit. Patients will also be offered recreational therapy, individual treatment, access to entertainment devices, group therapy, where feasible, and in cell treatment.

The TMHU and the Enhanced Level of Care Treatment will be monitored by Regional Mental Health Administrators.

        ii.     Temporary Mental Health Units for Patients in Restricted Housing Referred to MHCBs or PIPs

It is important to CDCR that patients on MAX custody status are appropriately accommodated during the COVID-19 pandemic. Therefore, during the week of April 13, 2020, CDCR developed a policy for providing care to patients on MAX custody who are referred to an MHCB or PIP. (Attachment Y). When transfer to a local or external MHCB or PIP is not possible, the policy requires the MAX custody patient be referred to a TMHU. First, the policy mandates that institutions work to resolve the reason the patient is on MAX custody in order to transfer the patient to a general population TMHU, as discussed above. If MAX custody cannot be suspended, the patient will be placed in a TMHU located within a restricted housing unit.

The policy sets forth the requirements for restricted housing in TMHUs, including mandates for minimum out of cell time and programming requirements. This treatment includes a minimum of five hours of structured groups each week, 15 hours yard each week, and daily out-of-cell individual treatment. Length of stay will be capped at 10 days. If a patient still requires inpatient care after seven days, an Interdisciplinary Treatment Team will order a transfer to an appropriate bed. Rounding must also occur at least daily and patients will have equal access to yard, showers, and phone calls. Patients will be offered recreational therapy, individual treatment, access to entertainment devices, and in cell treatment.

13

This policy was discussed in a COVID-19 task force meeting on April 15, 2020 with the Special Master and Plaintiffs' counsel. The final policy was sent to the Special Master and Plaintiffs' counsel on April 16, 2020 and will be issued to the field no later than Monday, April 20, 2020.

       iii.    Access to Enhanced Outpatient Program and Enhanced Treatment for Patients Who Cannot Transfer

To assist in meeting the goal of preventing the spread of COVID-19, during the week of April 13, 2020, CDCR developed a policy restricting the transfer of patients to Enhanced Outpatient Programs (EOP) except under the following circumstances: (1) where an imminent, life-threatening emergency necessitates transfer; or (2) a serious mental health decompensation necessitates transfer; and (3) the life threatening condition or serious decompensation cannot be reasonably treated at the institution. (Attachment Z).

In cases where the patient cannot transfer, the institution is directed to provide alternate strategies for managing the patient including, when staffing allows, updated individualized treatment plans to address the patient's current clinical needs and weekly clinical contacts. The tiered operations plan should be utilized to determine programming availability based on staffing resources.

This policy was discussed in a COVID-19 task force meeting on April 15, 2020 with the Special Master and Plaintiffs' counsel. The final policy was sent to the Special Master and Plaintiffs' counsel on April 16, 2020 and will be issued to the field no later than Monday, April 20, 2020.

    D.    Other COVID-19 Policies Ensure Patients with Mental Illness Receive Property, Privileges, and Access to Care

CDCR has issued several other policies since the start of the COVID-19 pandemic that touch on provisions of mental health care. On April 1, 2020, CDCR issued a memorandum titled COVID-19 – Electronic Appliance Program for Restricted Housing Inmates. (Attachment AA). The policy enhances in-cell activities for inmates, including *Coleman* class members, in segregated housing. The memorandum temporarily supersedes the January 22, 2014 memorandum titled Multi-Powered Radio Loaner Program in Administrative Segregation Units and the August 4, 2017 memorandum titled Electronic Tablet Loaner Program in Administrative Segregation and Short-Term Restricted Housing. The new policy guarantees access to a crank radio upon entry into restricted housing. Thereafter, the inmate may have access to a television, if available and if the cell has power. Otherwise, they will be issued a crank radio.

Also on April 1, 2020, CDCR issued a memorandum titled COVID-19 Programming Opportunities for Inmates Participating in the Mental Health Services Delivery System in Restricted Housing. (Attachment AB). The memo implements third watch programming for the duration of the COVID-19 pandemic. In order to maximize out of cell time and prevent suicides, the policy requires additional yard time when mental health groups or individual contacts are unable to occur in mental health restricted housing units.

On April 7, 2020, CDCR issued a memorandum titled Revised COVID-19 Mandatory 14-Day Modified Program, discussed in more detail above. (Attachment F). The memorandum makes clear that during the period of modified program and restricted movement, mental health groups and individual contacts remain classified as priority ducats. The policy also makes clear that canteen, packages, and phone calls remain available during the modified program.

On April 8, 2020, CDCR issued a memorandum titled Revised Restricted Housing, Reception Centers, and Psychiatric Inpatient Program Phone Calls, as discussed above. (Attachment L). The policy outlines expanded phone privileges for inmates including those with mental illness housed in Non-Disciplinary

Segregation (NDS), restricted housing, Reception Centers, C-Status housing, and Psychiatric Inpatient Units. NDS Privilege Groups A and B inmates will receive one phone call each week. Inmates in restricted housing will be given a phone call once every two weeks. C-Status inmates will be offered a phone call once every two weeks. Reception Center inmates will receive a weekly phone call. And PIP patients will receive one phone call per week unless restricted and documented by their treatment team. The memorandum was revised and re-released on April 13, 2020, to clarify that inmates in the above housing units will be provided at least the number of phone calls specified in the memorandum. (*Id.*)