DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>            Plaintiffs,<br><br>     v.<br><br>GAVIN NEWSOM, et al.,<br><br>            Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' STRATEGIC COVID-19 MANAGEMENT PLAN**<br><br>Judge:   Hon. Kimberly J. Mueller |

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

I. Defendants May Finally Have Decided On A Social Distancing Plan, Including Adopting the Receiver's Cohorting Proposal. ........................................ 2

II. CDCR Has Not Taken Any Measures to Target Prevention Efforts to Protect the Medically Vulnerable in Its Care, or to Any Other Specific Population, and It Has No Intention of Doing So. ......................................................................... 5

III. The Piecemeal Measures Defendants Have Enacted Have Been Adopted Far Too Slowly, Demonstrating the Lack of Urgency in Their Response to the Pandemic and Therefore to Address the Danger of the Pandemic Fully. .................. 7

IV. The Recent Outbreaks At CIM and LAC Are Case Studies in the Vast Expansion of COVID-19 Cases that May Soon Hit CDCR's Other Institutions, Particularly Those Housing Large Numbers of Individuals in Dorms, the Medically Vulnerable, and *Coleman* Class Members. ............................ 9

V. Defendants' Failure to Meet Specific Elements of the CDCR Guidance Relating to Staffing, Supplies, and PPE Only Reinforce the Obvious Need for Population Reduction Measures. ...................................................................... 10

CONCLUSION ..................................................................................................................... 12

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Brown v. Plata*, (2011)
    563 U.S. 493, 520 .................................................................................................. 9

*Plata v. Brown*, (2013)
    --- F. Supp. 3d ---, 2013 WL12436093 ....................................................................... 9

*Plata v. Newsom*, (2020)
    N.D. Cal. No. 01-cv-01351-JST, ECF No. 3266.................................................. 4, 5, 6

**OTHER AUTHORITIES**

Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in
    Correctional and Detention Facilities, CDC Guidance
    https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-
    correctional-detention.pdf.......................................................................... 2, 4, 5, 10

# INTRODUCTION

The Court's April 10, 2020 Order directed Defendants to develop a plan that:

> include[s] objectives and timelines for defendants' plans for housing of *Coleman* class members who are not being granted early release from the California Department of Corrections and Rehabilitation (CDCR), including those most at risk for COVID-19. It should provide for continuity of mental health care, including access to clinically indicated levels of mental health care and attendant programming as outlined in the Program Guide.

Order, ECF No. 6600 at 2 (Apr. 10, 2020).[1] This Court made clear that a unified, comprehensive approach with clear objectives and timeframes "is essential to protection and preservation of the vital interests at stake in this case." *Id.* at 2. But as explained in this Court's order from April 17, 2020, Defendants' Strategic COVID-19 Management Plan, ECF Nos. 6616, 6616-1 (Apr. 16, 2020) ("Strategic Plan"), does not meet those basic requirements. *See* Order, ECF No. 6622 at 2 (Apr. 17, 2020). Specifically, Defendants have failed to identify: (1) their objectives for housing *Coleman* class members who are not being granted early release from CDCR; (2) timelines for those objectives; and (3) a specific plan for housing medically vulnerable members of the *Coleman* class. *Id.*

The Strategic Plan itself is fundamentally deficient because it fails to address adequately the linchpin of the Federal Centers for Disease Control and Prevention ("CDC") guidance for correctional systems—physical distancing between individuals to prevent transmission of the disease, frequent hand washing and other hygiene measures, and sanitation. And even where Defendants discuss a low-on-the-CDC-list option (proposed by the *Plata* Receiver) of cohorting groups of eight individuals in dorm settings, they have failed to clearly endorse that plan, let alone develop steps or a timeline for implementing it. Notwithstanding this Court's rejection of a non-unified and piecemeal approach, *see* ECF No. 6600 at 1-2, Defendants still have not articulated what they hope to achieve to ensure class members are safe, and without that benchmark, they cannot know whether or when they will get to safe—for class members, non-class members, and CDCR

---

[1] Pagination references are to the ECF pagination.

clinical and custody staff.

## I. Defendants May Finally Have Decided On A Social Distancing Plan, Including Adopting the Receiver's Cohorting Proposal.

Defendants' Strategic Plan skirts any meaningful response to the CDC's COVID-19 guidance for correctional systems, to achieve and maintain physical distancing between incarcerated people. *See* Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC Guidance (last visited Apr. 20, 2020) ("CDC Guidance").  For example,

- The CDC Guidance directs correctional systems to: "Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission density."  CDC Guidance at 6.

    Defendants' opaque response is:  "CDCR/CCHCS leadership have been considering, and continue to review and consider, all options to improve social distancing."  Strategic Plan, ECF No. 6616-1, Attachment A at 3 (Apr. 16, 2020).

- The CDC Guidance states that correctional systems should "[e]xplore strategies to prevent over-crowding."  CDC Guidance at 6.

    Defendants respond only that this is "[b]eing done on an ongoing basis." Strategic Plan, ECF No. 6616-1, Attachment A at 4 (Apr. 16, 2020).

- Correctional systems should "implement social distancing strategies to increase the physical distance between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms)." CDC Guidance at 11,

    Defendants mention a number of ad hoc measures, including "encourag[ing]" social distancing, and referencing the Receiver's eight-person cohort proposal, which Defendants have not yet even endorsed, nor implemented.  Strategic Plan, ECF No. 6616-1, Attachment A at 15 (Apr. 16, 2020).

- The CDC also recommends that correctional systems "[c]onsider additional options to intensify social distancing,"  CDC Guidance at 22,

    CDCR responds: "CDCR continues to move inmates out of dorm housing and educating [sic] the population about the importance of communal social distancing.  CDCR and CCHCS continue to assess the institutions and determine what more needs to be done."  Strategic Plan, ECF No. 6616-1, Attachment A at 40 (Apr. 16, 2020).

The main body of the Strategic Plan echoes this unwillingness to engage with the social distancing guidance, stating vaguely only that:

> The [Department Operation Center]'s goal is to implement measures and strategies to protect inmates and staff during the COVID-19 pandemic, to enhance social distancing in communal areas, and to review alternative housing options that may be used to increase physical distancing between inmate cohorts in dorms where possible.

Strategic Plan, ECF No. 6616 at 7-8 (Apr. 16, 2020).

These responses link directly back to Defendants' fallback excuse for not having affirmatively identified how to achieve a safe level of physical distancing: the "constantly evolving" nature of the pandemic. *See, e.g.*, Strategic Plan, ECF No. 6616 at 7 (Apr. 16, 2020). But one component of the effort that has not changed since the initial guidance is the need for physical distancing to minimize spread of the disease, as Defendants elsewhere acknowledge. Strategic Plan, ECF No. 6616 at 11 (Apr. 16, 2020) ("Social distancing is crucial in preventing the spread of COVID-19."). And in any event, as this Court has noted, the evolving circumstances and need for flexibility to craft responses against a changing backdrop are not reasons not to address this issue head-on. *See* Order, ECF No. 6600 at 2 (Apr. 10, 2020) ("The adoption of a strategic plan that sets out specific goals and objectives to be accomplished by a date certain is not inconsistent with the flexibility defendants require to meet the significant challenges presented by the coronavirus pandemic. Indeed, such a plan is essential to protection and preservation of the vital interests at stake in this case.").

Of course, the *Plata* Receiver has proposed that Defendants adopt a plan to create eight-person cohorts in the large dorms, with each cohort's sleeping space physically separated by six feet in all directions from the sleeping space of other cohorts. *See* ECF No. (Apr. 10, 2020). But in their Strategic Plan, Defendants could do no more than equivocate as to their intent to implement the Receiver's proposal. Strategic Plan, ECF No. 6616 at 11 (Apr. 16, 2020) ("Upon completion of all currently scheduled transfers related to physical distancing, CDCR, in conjunction with the *Plata* Receiver, will assess the population in the dorms and determine what additional steps need to be taken, if any."); *Id.*, ECF No. 6616-1, Attachment A at 14 ("CDCR and CCHCS have defined housing cohorts of 8 in dorm settings to increase social distancing in sleeping areas."); *Id.* at 15

("Receiver memo of April 10, 2020, specifies that cohorts of 8 within dorms are sufficient for social distancing.").

Defendants were given multiple opportunities at the April 17, 2020 hearing before this Court to confirm that they actually are implementing the eight-person cohort plan, as they represented to the *Plata* court at its April 16, 2020 hearing on Plaintiffs' COVID-based emergency motion for relief for the *Plata* class. *See Plata v. Newsom*, N.D. Cal. No. 01-cv-01351-JST, ECF No. 3266 at 11 (Apr. 17, 2020) ("Defendants responded with an unqualified commitment to implementing the Receiver's directive . . . ."). But before this Court, Defendants only went so far as to say they are "examining" the Receiver's cohorting proposal. Decl. of Michael W. Bien in Supp. of Pls' Response to Defs' Strategic COVID-19 Management Plan ("Bien Decl."), ¶ 29.

And even if CDCR adopted the eight-person cohort concept, Defendants have never addressed whether they intend or are even able to follow the CDC Guidance, and the Receiver's matching recommendation, that each cohort be separated physically from every other cohort by six feet in all directions. *See* CDC Guidance at 4, 11. Nor have they explained what steps they intend to prevent transmission of the virus when eight-person cohorts share bathrooms, *see* CDC Guidance at 19; Bien Decl., ¶ 3, Ex. B at 3 (March 2020 CDPH guidance warns that the virus may be "spread through the fecal-oral route, including use of shared toilets in congregate settings"), and intermix for the purpose of feeding, *see* CDC Guidance at 19, 21.

Defendants' failure to discuss or share the objectives and goals of their plans for addressing the overcrowded dorms is especially troubling given initial reports received by Plaintiffs' counsel over the past few days that CDCR is *increasing* rather than decreasing the level of crowding in at least some dorms housing medically vulnerable persons. Bien Decl., ¶ 15, Ex. N. Without any measurable goal on a large or small-scale to achieve true physical distancing in its institutions—and without the necessary resources otherwise to prevent and combat the disease—CDCR is still likely bound to experience severe, but otherwise preventable, outbreaks.

1  In a filing this morning in *Plata*, Defendants again reversed course and stated in their Case Management Conference Statement that they have decided to follow the Receiver's guidance and have a plan to "fully implement the eight-person cohorts contemplated in the Receiver's plan." Joint Case Management Conference Statement, *Plata v. Newsom*, N.D. Cal. No. 01-cv-1351-JST, ECF No. 3294 at 11 of 19 (Apr. 20, 2020). They also promised to provide documents describing the details of their plan and a timeline for completion of the dorm moves to plaintiffs' counsel. Bien Decl., ¶ 25. As of the time of this filing, Plaintiffs' counsel has not received the documents. *Id.*

## II. CDCR Has Not Taken Any Measures to Target Prevention Efforts to Protect the Medically Vulnerable in Its Care, or to Any Other Specific Population, and It Has No Intention of Doing So.

While Defendants have provided Plaintiffs a list of class members with at least one risk factor for COVID-19, Defendants' failure to create a plan for using that list to develop a safe housing plan for those "identified as medical vulnerable[] is of grave concern." Order, ECF No. 6622 at 3 (Apr. 17, 2020); *see also id.* & n.3 (directing the COVID-19 taskforce to give this issue "expedited consideration," i.e., give the task "the highest priority"). Defendants, however, have made clear that they do not intend to target COVID-related efforts to any particular population, including the medically vulnerable: "There are currently no plans to target specific portions of the population, such as *Coleman* class members or high risk inmates, for special movement or housing, except as detailed below in section III regarding the provision of Mental Health care." Strategic Plan, ECF No. 6616 at 9 (Apr. 16, 2020).

Defendants' refusal to target any population is puzzling and dangerous. Virtually all of the available guidance makes clear that systems should prioritize their efforts on the elderly and medically vulnerable, since they are disproportionately likely to experience severe COVID-19 based symptoms and/or death as a result of the disease. The CDC Guidance states that prisons must implement extra social distancing measures for quarantined patients at high-risk for medical complications. CDC Guidance at 20 ("If cohorting [of high-medical-risk quarantined individuals with low-medical-risk individuals]

is unavoidable, make all possible accommodations to reduce exposure risk for the higher-risk individuals. (For example, intensify social distancing strategies for higher-risk individuals.)."). CCHCS, the California Department of Public Health, and the Governor also recommend special measures for medically vulnerable patients. *See* COVID-19: Interim Guidance for Health Care and Public Health Providers, *Plata v. Newsom*, N.D. Cal. No. 01-cv-1351-JST, ECF No. 3274-6 at 19 (Apr. 3, 2020) (CCHCS guidance recommending that institutions place vulnerable patients in a "protective shelter in place"); Bien Decl., ¶ 17, Ex. P at 1-2 (California Department of Public Health guidance directing individuals over 65 years-old, individuals with serious chronic medical conditions like heart disease, diabetes, and lung disease, and individuals with compromised immune systems to reduce the risk from COVID-19 by practicing social distancing, both in and outside of the home); *id.*, ¶ 18, Ex. Q (California Executive Order N-27-20 issued on March 15, 2020, directing the state to focus on protecting the health and safety of vulnerable populations in assisted living facilities, who include older adults and those at higher risk for serious illness).

The information that CDCR provided for the *Coleman* class, when used in conjunction with the much more comprehensive information the Receiver has provided, contains individualized housing unit identifications, as well as specific COVID-19 vulnerabilities such as age, medical conditions, mental health level of care, and others. *See* Decl. of Ernest Galvan in Supp. of Pls' Response to Defs' Strategic COVID-19 Management Plan ("Galvan Decl ISO Pls' Response"), ¶¶ 2, 10. These databases can be analyzed to show the specific housing units where large numbers of particularly vulnerable people live. *Id.* at ¶¶ 7 (Table 1, EOP dorms); 8 (Table 2, EOP Celled Units); 9 (Table 3, CCCMS in dorms); 11 (Table 4, EOP over age 65); 12 (Table 5, CCCMS over age 65); 17 (Table 9, units housing high medical risk); 18 (Table 10, units housing *Coleman* high medical risk). For example, the Receiver's data shows the specific dormitories where *Coleman* class members aged 65 and older live. *Id.* ¶ 11 (Table 4, EOP aged 65 and older); ¶ 12 (CCCMS aged 65 and older). This information can be used to focus efforts on

housing units where vulnerable people reside.  In addition, this data can be married with CDCR's reports on design capacity and housing unit occupancy to focus efforts as appropriate on units where vulnerable persons are crowded together, sharing small spaces and facilities such as sinks, toilets, and showers.  *Id.*, ¶¶ 4-5.  That Defendants have not already undertaken targeted efforts for vulnerable class members is alarming, and their refusal to prioritize this population is inexplicable.

### III. The Piecemeal Measures Defendants Have Enacted Have Been Adopted Far Too Slowly, Demonstrating the Lack of Urgency in Their Response to the Pandemic and Therefore to Address the Danger of the Pandemic Fully.

Defendants have been on notice since January of the impending pandemic, yet continue to implement, and apparently consider, only piecemeal and ad hoc preventative and containment measures.  The California Department of Public Health ("CDPH") began issuing COVID-19-specific guidance to all licensed healthcare facilities in the state beginning in January 2020.  Bien Decl., ¶ 2 & Ex. A at 4 (January 23, 2020 guidance document sent to all licensed California healthcare facilities, directing facilities to give suspected COVID-19 patients surgical masks "as soon as they are identified," to place them in an airborne infection isolation room, and healthcare personnel to "don gloves, gown, goggles or a face shield, and a fit tested N95 or higher level respirator upon room entry."); *id.* at ¶ 8 & Ex. G at 1 (January 27, 2020 guidance directing all healthcare facilities to take steps to help evaluate "the capacity for California to respond to potential expansion of [COVID-19]"); *id.* at ¶ 9 & Ex. H (January 31, 2020 guidance providing updated information regarding COVID-19); *id.* at ¶ 10 & Ex. I (February 10, 2020 guidance notifying facilities of interim CDC guidance regarding COVID-19); *id.* at ¶ 11 & Ex. J (February 19, 2020 guidance directing healthcare facilities to "have environmental infection control procedures in place to prevent infections from spreading during healthcare delivery"); *id.* at ¶ 12 & Ex. K (March 3, 2020 guidance notifying healthcare facilities of updated CDC guidance regarding COVID-19 and recommending increasingly intensive infection control measures and comprehensive planning for spread of the disease); *id.* at ¶ 13 & Ex. L (March 8, 2020 guidance directing hospitals to provide a

survey identifying their surge capacity "[i]n anticipation of California potentially experiencing a surge of COVID-19 patients").

Because Defendants operate a multitude of licensed facilities within CDCR, they cannot claim they were unaware of this guidance when it was issued.  In addition, CDPH guidance from March 20, 2020—nearly a month before Defendants provided this Court their incomplete Strategic Plan, and days after various California counties had issued shelter-in-place orders—specifically instructed Defendants to achieve surge capacity in their facilities immediately, and to rely on the most extreme estimates of their need for beds and resources to combat the disease.[2]  Bien Decl., ¶ 3, Ex. B at 9 ("**Health care facilities need to enact their surge plans now** to create overflow space for screening, triage, isolation, and transfer/discharge.") (bold in original); *id.* at 10 ("Large health care systems must develop plans now to expand care delivery for extreme surge capacity and work with the state with any identified barriers in staffing, capacity, or supplies and equipment."); *id.* at 11 ("Similar to hospital preparations, outpatient clinics need to repurpose their space and operations in order to meet the extreme estimates of patients needing treatment, not conservative estimates.").  As the guidance made clear, any healthcare system needed to be prepared yesterday to meet the anticipated need for physical space; given that Defendants still have not taken these measures, they are far too late.

And Defendants should have understood the gravity of the guidance they began to receive in January.  CDCR has dealt with numerous outbreaks of infectious disease before:

---

[2] Although the guidance is directed at healthcare facilities rather than correctional systems, CDCR has a vast healthcare system in place that must be ready to treat all the patients in the system.  In addition, the impact of COVID-19 on the CDCR system is directly analogous to a healthcare system: CDCR, like a hospital, is a mostly-contained system with a limited amount of space and number of beds to house and care for those in its custody.  The analogy is particularly apt at a time when physical space is at a premium and is the key component to preventing transmission of disease.  In any event, the guidance promulgated by a California agency and directed specifically to CDCR's healthcare system put CDCR on notice months ago regarding what was and is to come.

Legionnaires' disease most recently at the California Health Care Facility in Stockton ("CHCF"), Bien Decl., ¶ 4, Ex. C; norovirus, *id.*, ¶ 14 & Ex. M; swine flu, *id.*, ¶ 16, Ex. O; Valley Fever, *see Plata v. Brown*, --- F. Supp. 3d ---, 2013 WL12436093 (June 24, 2013), influenza and antibiotic-resistant staph infections, *Brown v. Plata*, 563 U.S. 493, 520 n.7 (2011), to name a few. *See also* Strategic Plan, ECF No. 6616 at 7 (Apr. 16, 2020) ("CDCR and CCHCS have longstanding outbreak management plans in place to address communicable disease outbreaks such as influenza, measles, mumps, norovirus, and varicella . . . ."). CDCR should understand not only that infectious-disease outbreaks are serious, *see, e.g.*, *Brown v. Plata*, 563 U.S. at 520 n.7 (describing how inmates with influenza sent back to their housing unit due to a lack of beds in the infirmary quickly infected more than half of the 340 individuals in their unit), but also that this novel disease has characteristics that can allow it to devastate in ways Defendants have not seen before. And CDCR certainly did not need to wait for the Receiver to develop a plan for physical distancing. It cannot delay now in implementing his proposal.

### IV. The Recent Outbreaks At CIM and LAC Are Case Studies in the Vast Expansion of COVID-19 Cases that May Soon Hit CDCR's Other Institutions, Particularly Those Housing Large Numbers of Individuals in Dorms, the Medically Vulnerable, and *Coleman* Class Members.

The lack of an appropriate plan to achieve social distancing and to protect the most medically vulnerable, especially those housed in crowded dorms, is evident in the outbreaks at the California Institute for Men ("CIM") and California State Prison Lancaster ("LAC"). The steep rate of infection in these two prisons makes them hot spots—like nursing homes—threatening the overall public health effort to "flatten the curve." CDCR COVID-19 patients from both CIM and LAC have required hospitalization at community hospitals, and the first death of a CDCR prisoner from COVID-19 was reported yesterday—a medically vulnerable elderly *Coleman* class member from CIM who had been housed in a crowded dorm. *See* Bien Decl., ¶ 25, Ex. T at 17 (Defendants' statement in April 20, 2020 *Plata* Joint Case Management statement).

The vast majority of the COVID-19 patients—and the first CDCR victim of the

disease—are *Coleman* class members. As of today, 87 of the 121, or 72%, of CDCR's COVID-19 patients are class members: 30 at CIM, 55 at LAC, 1 at CMC and 1 at CIW. Bien Decl., ¶ 26 & Ex. Y.

Prisons and jails nationwide continue to be major sources of virus infections. According to the New York Times, the Marion Correctional Institution in Ohio is now the largest source of infections in the country with 1,828 cases, almost three-quarters of the prison population. Four of the ten largest sources of infection in the United States are correctional facilities. Bien Decl., ¶ 23, Ex. S.

## V. Defendants' Failure to Meet Specific Elements of the CDCR Guidance Relating to Staffing, Supplies, and PPE Only Reinforce the Obvious Need for Population Reduction Measures.

Defendants' Strategic Plan makes clear they are suffering from a severe lack of resources, including physical space, hygiene supplies, PPE, and staff, that can be remedied in the necessary timeframe only by reducing the population density in their system.

For example, as to space shortages:

- CDCR is already cohorting quarantined individuals, According to the CDCR guidance, however, "cohorting [of quarantined individuals] should *only be practiced if there are no other available options*." CDC Guidance at 15; Strategic Plan, ECF No. 6616-1, Attachment A at 24, 33 (Apr. 16, 2020) (emphasis added); *see also* CDC Guidance at 15 ("Facilities should make *every possible effort* to quarantine close contacts of COVID-19 cases individually." (emphasis added)).

- CDCR acknowledges that it mixes quarantined cohorts, including for feeding and sharing of bathrooms, contrary to CDC guidance. CDC Guidance at 19, 21. Strategic Plan, ECF No. 6616-1, Attachment A at 33, 37 (Apr. 16, 2020). at 33, 37.

As to staff shortages:

- The CDC guidance, and CDCR's response to the same, acknowledge that there are, and will be, ongoing staff shortages as a result of the COVID-19 pandemic, *see, e.g.*, CDC Guidance at 6-7; Strategic Plan, ECF No. 6616-1, Attachment A at 5-6 (Apr. 16, 2020), and those will occur on top of existing staffing shortages.

- Defendants already do not have sufficient custody staff to monitor individuals in medical isolation, nor are custody staff able to wear necessary PPE and limit their movement between different parts of their facilities. See CDC Guidance at 16 ("Custody staff should be designated to monitor [those in medical isolation] exclusively where possible. These staff should wear recommended PPE as appropriate for their level of contact with the

individual under medical isolation , , , and should limit their own movement between different parts of the facility to the extent possible."); Strategic Plan, ECF No. 6616-1, Attachment A at 26 (Apr. 16, 2020).

And as to shortages of PPE and sanitation and hygiene supplies:

- The CCHCS Receiver has issued two memoranda regarding the use of PPE in CDCR to combat COVID-19, and both acknowledge the current, and anticipated ongoing, lack of available PPE in the system.  Bien decl., Exs. D, E.  Due to the shortage, the memos advise that N95 and surgical masks should be used only in certain situations deemed highest priority.  *Id.*

- Despite the ubiquity of recommendations by the CDC regarding the need for PPE to combat COVID-19, *see, e.g.*, CDC Guidance at 5, 7-8, 23-25, CDCR is already limiting the provision of PPE to a very small subset of the many people who work and live in CDCR. Strategic Plan, ECF No. 6616-1, Attachment A at 36 (Apr. 16, 2020) ("PPE is reserved for isolated individuals based on our current supply.  Face coverings are available for staff and quarantined patients.").  Their triaging of PPE in this manner underscores their already limited supply of critical PPE.

- Defendants state that they have an adequate supply of N95 masks only; their lack of reference to other types of PPE makes clear they do not have enough gloves, non-N95 masks, goggles, eye shields, and gowns or coveralls.  *Id.* at 45-46.  And even as to N95 masks, as noted above, Defendants are already limiting to whom they will provide the limited supplies they have.

- CDCR states that "alcohol-based disinfectants are not currently in use" for cleaning electronic products, strongly suggesting that CDCR does not have enough alcohol-based disinfectant to perform all necessary disinfection. CDC Guidance at 18; Strategic Plan, ECF No. 6616-1, Attachment A at 30 (Apr. 16, 2020).

- CDCR does not have no-touch trash receptacles available to those in medical isolation.  CDC Guidance at 10. 17; Strategic Plan, ECF No. 6616-1, Attachment A at 13, 27 (Apr. 16, 2020).

- CDCR has not trained incarcerated people in use of PPE, in direct contravention of the CDC guidance, CDC Guidance at 8, 23-24, and despite relying on them for tasks that require use of PPE, such as laundry, cleaning, and sanitizing.  Strategic Plan, ECF No. 6616-1, Attachment A at 43-44 (Apr. 16, 2020); *see also, e.g.*, *id.* at 11 (describing incarcerated peoples' roles in "cleaning high-traffic areas"); *id.* at 17 (describing ongoing PIA tasks as including "food production, . . . cleaning of healthcare spaces, and laundry.").  CDCR also relies only on standard annual training for staff's use of PPE, providing no COVID-19-specific training, notwithstanding the unique characteristics of the disease.  *Id.* at 8-9.

- CDCR will not have an adequate supply of cloth face coverings until April 30, more than six weeks after the World Health Organization declared the pandemic.  Bien Decl., ¶ 7, Ex. F; *but see id.*, ¶ 25, Ex. T at 17 (Joint Case Management Statement, *Plata v. Newsom*, N.D. Cal. No. 01-cv-1351-JST, ECF No. 3294 at 8 (Apr. 20, 2020) ("[I]t is not known when each prison will receive [two cloth faces masks for each incarcerated person and custodial staff member].")).  And even when they do arrive, cloth face coverings are

an untested second-best alternative to PPE, including face masks. *See* Bien Decl., ¶¶ 5-6, Exs. D, E.

Even putting aside the inadequacies Defendants have acknowledged in their response to the CDC guidance, none of their responses address the many anecdotal reports Plaintiffs have received regarding the lack of supplies and PPE on yards and in facilities at various institutions, and the lack of replenishment of the same. Bien Decl., ¶ 24. The on-the-ground reality for more than one hundred thousand incarcerated people and the tens of thousands of CDCR clinical and custodial staff is critically different than what Defendants' broad assertions reveal. And putting different aspects of Defendants' plan together points to the large and dangerous gaps in their response. PPE *or* physical distance, if not both, along with adequate hygiene practices, is necessary to create physical barriers to transmission, given that there are no preventative or curative medical treatments available for COVID-19. But Defendants have not been able to provide or create adequate PPE or physical distance, and they have acknowledged they lack critical hygiene supplies and staff to try to even mitigate the gaps.

## CONCLUSION

For the foregoing reasons, we ask the Court to require Defendants to identify concrete, measurable benchmarks, with dates certain for completion, to ensure they are prepared to address adequately the next institution-level and system-wide COVID-19 outbreaks that will occur in their system.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

# CERTIFICATION

In preparing this filing, Plaintiffs' counsel reviewed the following orders of this Court: Order, ECF No. 6600 (Apr. 10, 2020); Minute Order, ECF No. 6602 (Apr. 13, 2020); Order, ECF No. 6622 (Apr. 17, 2020).

DATED: April 20, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Jessica Winter*
    Jessica Winter

Attorneys for Plaintiffs