DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California 94703-2578
Telephone: (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,

    v.

GAVIN NEWSOM, et al.,

        Defendants.

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' STRATEGIC COVID-19 MANAGEMENT PLAN**

Judge: Hon. Kimberly J. Mueller

1    I, Michael W. Bien, declare:

2    1.    I am an attorney duly admitted to practice before this Court.  I am a partner

3  in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I

4  have personal knowledge of the facts set forth herein, and if called as a witness, I could

5  competently so testify.  I make this declaration in support of Plaintiffs' Response to

6  Defendants' Strategic COVID-19 Management Plan.

7    2.    Attached hereto as **Exhibit A** is a true and correct copy of an all-facilities

8  guidance letter dated January 23, 2020 from the California Department of Public Health

9  ("CDPH") entitled "AFL 20-09:  Health Update and Interim Guidance – 2019 Novel

10  Coronavirus (nCoV)" available at

11  https://www.cdph.ca.gov/Programs/CHCQ/LCP/CDPH%20Document%20Library/AFL-

12  20-09.pdf.

13    3.    Attached hereto as **Exhibit B** is a true and correct copy of guidance from

14  March 20, 2020 from CDPH entitled "COVID-19 Health Care System Mitigation

15  Playbook", available at

16  https://www.cdph.ca.gov/Programs/CHCQ/LCP/CDPH%20Document%20Library/AFL-

17  20-23-Mitigation-Playbook.pdf.

18    4.    Attached hereto as **Exhibit C** is a true and correct copy of a CDCR press

19  release dated April 24, 2019, last accessed on April 20, 2020, entitled "CDCR Starts

20  Chlorine Water Treatment Process at Stockton Correctional Facilities:  Hyperchlorination

21  part of a larger plan to address *Legionella*" available at

22  https://www.cdcr.ca.gov/news/2019/04/24/cdcr-starts-chlorine-water-treatment-process-at-

23  stockton-correctional-facilities/.

24    5.    Attached hereto as **Exhibit D** is a true and correct copy of a California

25  Correctional Health Care Services (CCHCS) memorandum to all CDCR staff dated

26  April 6, 2020 entitled "Staff Use of Personal Protective Equipment (PPE)."

27

28

1

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO
DEFENDANTS' STRATEGIC COVID-19 MANAGEMENT PLAN

6.      Attached hereto as **Exhibit E** is a true and correct copy of a CCHCS memorandum to all CDCR staff dated April 6, 2020 entitled "COVID-19 Personal Protective Equipment (PPE) Guidance and Information."

7.      Attached hereto as **Exhibit F** is a true and correct copy of a CCHCS memorandum to all CDCR Wardens and Chief Executive Officers dated April 15, 2020 entitled CALPIA Cloth Face Barrier/Mask.

8.      Attached hereto as **Exhibit G** is a true and correct copy of an all-facilities guidance letter dated January 27, 2020 from the CDPH entitled "AFL 20-10:  Healthcare Facility Resources for the 2019 Novel Coronavirus (2019-nCoV)" available at , available at https://www.cdph.ca.gov/Programs/CHCQ/LCP/CDPH%20Document%20Library/AFL-20-10.pdf.

9.      Attached hereto as **Exhibit H** is a true and correct copy of an all-facilities guidance letter dated January 31, 2020 from the CDPH entitled "AFL 20-11:  Updated 2019 Novel Coronavirus Information (2019-nCoV), Including Patient Under Investigation (PUI) Guidance from the Centers for Disease Control and Prevention (CDC)" available at https://www.cdph.ca.gov/Programs/CHCQ/LCP/CDPH%20Document%20Library/AFL-20-11.pdf.

10.      Attached hereto as **Exhibit I** is a true and correct copy of an all-facilities guidance letter dated February 10, 2020 from the CDPH entitled "AFL 20-13:  2019 Novel Coronavirus Interim Guidance for Risk Assessment and Health Management of Healthcare Personnel with Potential Exposure" available at https://www.cdph.ca.gov/Programs/CHCQ/LCP/CDPH%20Document%20Library/AFL-20-13.pdf.

11.      Attached hereto as **Exhibit J** is a true and correct copy of an all-facilities guidance letter dated February 19, 2020 from the CDPH entitled "AFL 20-14: Environmental Infection Control for the Coronavirus Disease 2019 (COVID-19)" available at https://www.cdph.ca.gov/Programs/CHCQ/LCP/CDPH%20Document%20Library/AFL-20-14.pdf.

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' STRATEGIC COVID-19 MANAGEMENT PLAN

12.     Attached hereto as **Exhibit K** is a true and correct copy of an all-facilities guidance letter dated March 3, 2020 from the CDPH entitled "AFL 20-17:  Guidance for Healthcare Facilities on Preparing for Coronavirus Disease 2019 (COVID-19)" available at https://www.cdph.ca.gov/Programs/CHCQ/LCP/CDPH%20Document%20Library/AFL-20-17.pdf.

13.     Attached hereto as **Exhibit L** is a true and correct copy of an all-facilities guidance letter to all hospitals dated March 8, 2020 from the CDPH entitled "AFL 20-18: Hospital Surge Survey to Assess Capacity Regarding Coronavirus Disease 2019 (COVID-19) and Reminder to Contact Medical Health Operational Area Coordination Office (MHOAC)" available at https://www.cdph.ca.gov/Programs/CHCQ/LCP/CDPH%20Document%20Library/AFL-20-18.pdf.

14.     Attached hereto as **Exhibit M** is a true and correct copy of a news article dated January 14, 2008 from the Hanford Sentinel, by Eiji Yamashita, entitled "Virus outbreak halts visits to 2 area prisons" available at https://hanfordsentinel.com/news/virus-outbreak-halts-visits-to-2-area-prisons/article_d594bf2d-0b78-5dd5-8d12-42271cb621b2.html.

15.     Attached hereto as **Exhibit N** is a true and correct copy of an email dated April 20, 2020 from Plaintiffs' counsel in *Armstrong v. Newsom*, Case No. C-94-2307-CW currently pending in the Northern District of California, to CDCR counsel and the *Coleman* Special Master entitled RE: Plaintiffs' Questions re: COVID-19 and Armstrong Impacts.

16.     Attached hereto as **Exhibit O** is a true and correct copy of a press release issued by CDCR on May 3, 2009 entitled "Prison System Diagnoses First Probable Case of Swine Flu (H1N1) Virus," available at: https://www.cdcr.ca.gov/news/2009/05/03/prison-system-diagnoses-first-probable-case-of-swine-flu-h1n1-virus/.

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO
DEFENDANTS' STRATEGIC COVID-19 MANAGEMENT PLAN

[3531107.4]

17.     Attached hereto as **Exhibit P** is a true and correct copy of California Department of Public Health ("CDPH") guidance dated March 16, 2020, entitled "Self-Isolation for Older Adults and Those Who Have Elevated Risk," and available at: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf.  The CDPH guidance directs individuals over 65 years old, individuals with serious chronic medical conditions like heart disease, diabetes, and lung disease, and individuals with compromised immune systems to reduce the risk from COVID-19 by practicing social distancing, both in and outside of the home.

18.     Attached hereto as **Exhibit Q** is a true and correct copy of Executive Order N-27-20 issued by Governor Newsom on March 15, 2020, available at: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.15.2020-COVID-19-Facilities.pdf. Executive Order N-27-20 directs the state to focus on protecting the health and safety of vulnerable populations in assisted living facilities, who include older adults and those at higher risk for serious illness.

19.     Attached hereto as **Exhibit R** is a true and correct copy of a document entitled "COVID Monitoring Patient Registry" that was provided to me by co-counsel at the PLO.  This registry shows 120 of the 121 patients who have tested positive for COVID-19.  I am informed that the final patient, who is now deceased, was housed at CIM when he tested positive and was a *Coleman* class member at the time of his death.  Of the 120 patients on this registry, 87 (73%) are *Coleman* class members participating in the MHSDS including 30 class members at CIM, 55 class members at LAC, one class member at California Mens Colony (CMC) and one class member at California Institution for Women (CIW).

20.     On March 26, 2020, I attended a COVID-19 Task Force meeting in which representatives for Defendants stated that CDCR was not testing any of its staff members for COVID-19 and instead relied solely on staff members to self-report any illness.

[3531107.4]

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO
DEFENDANTS' STRATEGIC COVID-19 MANAGEMENT PLAN

21.     On April 3, 2020, I attended a COVID-19 Task Force meeting in which representatives for Defendants acknowledged that CDCR does not yet have access to rapid COVID-19 testing to be used for incarcerated people.

22.     On April 17, 2020, I appeared as counsel of record at a telephonic status conference before this Court, during which representatives for Defendants stated that they are "examining" the Receiver's cohorting proposal.

23.     Attached hereto as **Exhibit S** is a true and correct excerpted section of a copy of a news article dated April 20, 2020 from The New York Times entitled "Coronavirus Live Updates: Southern States Move to Reopen as Outbreak Continues to Spread in Parts of U.S.:  *Cases surge in an Ohio prison, making it the top known U.S. hot spot*" last accessed, April 20, 2020, available at

https://www.nytimes.com/2020/04/20/us/coronavirus-live-news.html#link-58dfe2ae.

24.     I have received and reviewed numerous emails and letters from persons incarcerated in CDCR and their family members concerning conditions in the prisons during the past few weeks.  In addition, attorneys from my office have conducted telephone interviews with class members as part of their monitoring efforts in *Coleman* and *Armstrong*.  We have received numerous complaints about lack of access to soap, sanitizer, masks, cleaning materials for showers, toilets, and other common surfaces and as to the crowded conditions that preclude social distancing.  I have also reviewed various news reports and Facebook posts with information from persons purporting to be CDCR staff concerning their lack of access to masks and gloves.  I am aware of various efforts on Facebook to locate and donate masks to CDCR prisons for use by staff and prisoners due to shortages in CDCR supplies.

25.     Attached hereto as **Exhibit T** is a true and correct copy of a Joint Case Management Conference Statement filed today in *Plata v. Newsom*, Case No. 01-1351 JST, currently pending in the Northern District of California at, Dkt. No. 3294 (April 20, 2020).  Today, April 20, 2020, during a *Plata* case management conference, counsel for Defendants also promised to provide documents describing the details of their plan and a

1  timeline for completion of the dorm moves to Plaintiffs' counsel.  As of the time of this

2  filing, Plaintiffs' counsel has not received the documents.

3         26.     I declare under penalty of perjury under the laws of the United States of

4  America that the foregoing is true and correct, and that this declaration is executed at San

5  Francisco, California this 20th day of April, 2020.

6

7                                    */s/ Michael W. Bien*
                                     Michael W. Bien
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO
DEFENDANTS' STRATEGIC COVID-19 MANAGEMENT PLAN

[3531107.4]

# EXHIBIT A

# California Department of Public Health

**SONIA Y. ANGELL, MD, MPH**
*State Public Health Officer & Director*

**GAVIN NEWSOM**
*Governor*

January 23, 2020

AFL 20-09

**TO:**        All Facilities

**SUBJECT:**  Health Update and Interim Guidance – 2019 Novel Coronavirus (nCoV)

---

### All Facilities Letter (AFL) Summary

- This AFL provides information on the 2019 Novel Coronavirus (2019-nCoV)
- This AFL contains the latest Centers for Disease Control and Prevention (CDC) information on 2019-nCoV including infection control guidance, criteria for evaluation of Patients Under Investigation (PUIs), and recommendations for reporting, specimen collection, and testing. It is likely that CDC will update its guidance in the coming weeks, so please check for updates on CDC's 2019-nCoV webpage.
- At this time there are no confirmed 2019-nCoV cases in California.

---

**Background**

An outbreak of pneumonia of unknown etiology in Wuhan, China was reported to the World Health Organization (WHO) on December 31, 2019, and a novel coronavirus was soon identified as the cause. On January 21, 2020, CDC announced the first U.S. case in a traveler who had returned from Wuhan.

*What is known:*

- Limited person-to-person spread is occurring.
- Some healthcare workers in China have reportedly been infected.
- Although severe and fatal illness has been reported in some patients, many have had milder illness and do not require hospitalization.
- On January 21, 2020, CDC updated its interim travel health notice for people traveling to Wuhan, China from "Level 1, Practice Usual Precautions" to "Level 2, Practice Enhanced Precautions".
- CDC has implemented symptom screening of travelers arriving from Wuhan, China at three United States airports (San Francisco International Airport, Los Angeles International Airport, and John F. Kennedy International Airport in New York); screening will soon expand to Atlanta Hartsfield-Jackson International Airport and Chicago O'Hare International Airport.

---



- Disembarking travelers with symptoms potentially consistent with 2019-nCoV infection are being referred for further evaluation at health care facilities.
- Asymptomatic travelers are given written instructions regarding steps to take if they become ill in the 14 days after arrival from Wuhan, including calling ahead to a health care facility and explaining that they have traveled from Wuhan.
- There is no vaccine or specific treatment for 2019-nCoV infection.
- An investigational new drug known as remdesivir may be requested via CDC for compassionate use in severely ill patients. Please contact the CDC Emergency Operation Center at 770-770-488-7100 to request remdesivir.

*What is not yet known:*
- Attack rate of the virus, or how easily and sustainably this virus spreads person-to-person.
- Incubation period of 2019-nCoV infections; current recommendations are based on the known incubation period of 2-14 days for other coronaviruses.
- Whether infected persons are infectious before they show clinical signs and symptoms.
- Spectrum of clinical illness associated with 2019-nCoV.

**Recommendations for Healthcare Facilities**

Although airports are screening travelers from Wuhan at entry, it is possible travelers who become ill in the days following their arrival may present for care at health care facilities in the community. The California Department of Public Health (CDPH) is encouraging all healthcare facilities to:

- Obtain a travel history for **all** patients presenting with fever and acute respiratory illness.
- Place signage, implement travel history screening at triage, and review procedures for immediately placing symptomatic patients with a positive travel history in a surgical mask and private room, ideally an airborne infection isolation room (AIIR), wherever possible.
- Immediately contact your local health department and your facility's infection preventionist if a patient may meet CDC's criteria for PUI.
- Review infection control guidance for potential 2019-nCoV patients. Ensure facility infection control policies are consistent with the CDC's Interim Infection Control Precautions for Patients Under Investigation for 2019-nCoV.
- Review procedures for collection of laboratory specimens for 2019-nCoV testing and laboratory biosafety guidelines; your local health department will work closely with the CDPH Viral and Rickettsial Disease Laboratory (VRDL) and the CDC to coordinate testing.

**Criteria for a Person Under Investigation (PUI) for 2019-nCoV**
Patients in the United States who meet the following criteria should be evaluated as a PUI in association with the outbreak of 2019-nCoV in Wuhan City, China.

| Clinical Features | & | Epidemiologic Risk |
|---|---|---|
| Fever[1] ($\geq$38°C/100.4°F) **and** symptoms of lower respiratory illness (e.g., cough, difficulty breathing) | and | In the last 14 days before symptom onset, a history of travel from Wuhan City, China. — or — In the last 14 days before symptom onset, close contact[2] with a person who is under investigation for 2019-nCoV while that person was ill. |
| Fever[1] (>38°C/100.4°F) **or** symptoms of lower respiratory illness (e.g., cough, difficulty breathing) | and | In the last 14 days, close contact[2] with an ill laboratory-confirmed 2019-nCoV patient. |

[1]Fever may not be present in some patients, such as those who are very young, elderly, immunosuppressed, or taking certain fever-lowering medications. Clinical judgment should be used to guide testing of patients in such situations.

[2]Close contact is defined as—
a) being within approximately 6 feet (2 meters), or within the room or care area, of a novel coronavirus case for a prolonged period of time while not wearing recommended personal protective equipment or PPE (e.g., gowns, gloves, NIOSH-certified disposable N95 respirator, eye protection); close contact can include caring for, living with, visiting, or sharing a health care waiting area or room with a novel coronavirus case.— or –
b) having direct contact with infectious secretions of a novel coronavirus case (e.g., being coughed on) while not wearing recommended personal protective equipment.

Please contact your local health department **immediately** if a PUI is identified, or if patient's status as a PUI is uncertain.

The above criteria are intended to serve as guidance for evaluation and testing. Patients should be evaluated and discussed with the local public health department on a case-by-case basis if their clinical presentation or exposure history is equivocal (e.g., uncertain travel or exposure).  Patients who meet PUI criteria should also be evaluated for common causes of respiratory infections and community-acquired pneumonia.

Testing for viral respiratory pathogens should be performed by molecular methods, e.g., multiplex viral respiratory testing via real reverse transcription polymerase chain reaction (RT-PCR); viral cultures should not be performed. Do not use rapid influenza diagnostic tests that are not RT-PCR based. At this time, positive results for another respiratory pathogen do not preclude testing for 2019-nCoV.

Case 2:90-cv-00520-KJM-DB   Document 6627   Filed 04/20/20   Page 12 of 150

**Infection Control Guidance for 2019-nCoV Infection**

Although the transmission dynamics have yet to be determined, CDPH currently recommends a cautious approach to patients under investigation for 2019-nCoV. Such patients should be given a surgical mask to wear as soon as they are identified and should optimally be evaluated in an airborne infection isolation room (AIIR). If an AIIR is not available, and it is not possible to transfer the patient to a facility with an AIIR, the patient should be evaluated in a private room with the door closed, and healthcare personnel entering the room should use Standard, Contact, and Airborne precautions, plus eye protection; this means that healthcare personnel should don gloves, gown, goggles or a face shield, and a fit tested N95 or higher level respirator upon room entry.

Healthcare facilities should additionally implement procedures to minimize the number of healthcare personnel that interact with a PUI and ensure that potentially exposed healthcare personnel and patients can be identified if the PUI is confirmed to be infected with 2019-nCoV.

As healthcare employers, facilities are required to follow recommendations under the California Occupational Safety Health Administration's (Cal/OSHA) Aerosol Transmissible Diseases (ATD) Standard, Title 8 of the California Code of Regulations (CCR) Section 5199. Because 2019-nCoV meets the criteria for a novel aerosol transmissible pathogen (ATP) under the ATD Standard, employers must provide a powered air purifying respirator (PAPR) with a High Efficiency Particulate Air (HEPA) filter(s), or a respirator providing equivalent or greater protection, to employees who perform high hazard procedures on 2019-nCoV PUIs or confirmed cases.

**Laboratory Biosafety for 2019-nCoV Infection**

Laboratory workers should wear appropriate personal protective equipment (PPE), which includes disposable gloves, laboratory coat/gown, and eye protection when handling potentially infectious specimens.

Any procedure with the potential to generate fine-particulate aerosols (e.g., vortexing or sonication of specimens in an open tube) should be performed in a Class II Biological Safety Cabinet (BSC). Appropriate physical containment devices (e.g., centrifuge safety buckets; sealed rotors) should be used for centrifugation. Ideally, rotors and buckets should be loaded and unloaded in a BSC. Perform any procedures outside a BSC in a manner that minimizes the risk of exposure to an inadvertent sample release.

After specimens are processed, decontaminate work surfaces and equipment with appropriate disinfectants. Use any EPA-registered hospital disinfectant. Follow manufacturer's recommendations for use-dilution (i.e., concentration), contact time, and care in handling. All disposable waste should be autoclaved.

Virus isolation in cell culture and initial characterization of viral agents recovered in cultures of 2019-nCoV specimens are NOT recommended at this time.

Laboratories are also required to follow recommendations under the laboratory section of Cal/OSHA ATD Standard, Title 8 CCR Section 5199, found under subsection (f).

**2019-nCoV Update Teleconference**
CDPH is holding a teleconference with providers to discuss 2019-nCoV to discuss the status of this outbreak. Healthcare facilities and providers are encouraged to attend. The teleconference will be held:
- Date: Thursday, January 23, 2020
- Time: 12:00 P.M.
- Dial-in: 1-844-867-6167
- Access Code: 2633697

**CDC Resources**
Please refer to the following guidance for further information:
- Criteria to Guide Evaluation of Patients Under Investigation (PUI) for 2019-nCoV
- Interim Healthcare Infection Prevention and Control Recommendations for Patients Under Investigation for 2019 Novel Coronavirus
- Interim Laboratory Biosafety Guidelines for Handling and Processing Specimens Associated with 2019 Novel Coronavirus (2019-nCoV)

If you have any questions regarding the infection prevention and control of 2019-nCoV, please contact the CDPH Healthcare-Associated Infections (HAI) Program at novelvirus@cdph.ca.gov.


Sincerely,

**Original signed by Sonia Y. Angell**

Sonia Y. Angell MD MPH
State Public Health Officer and Director
California Department of Public Health

# EXHIBIT B



# COVID-19

## HEALTH CARE SYSTEM

## MITIGATION PLAYBOOK

**California Department of Public Health**



March 2020

# Table of Contents

## I. PURPOSE AND BACKGROUND
Novel Coronavirus (COVID-19)
Pandemic Response Phases
Containment to Mitigation Continuum
Health Care System Mitigation: Key Considerations

## II. Health Care Delivery System
Facility Capacity Management
Emergency Medical Services (EMS)
Health Care Workforce
COVID-19 Patients and the Health Care Worker
Supply Chain
Infection Control

## III. Communications
Public and Patient Outreach

## IV. Laboratory Testing

## V. Medical Counter Measures (MCM)

## VI. GLOSSARY



March 2020

# I. PURPOSE AND BACKGROUND

The purpose of this mitigation playbook is to provide a summary for a mitigation strategy in the State of California and the health care system. Each of the items listed in this playbook should have detailed operational plans to support them.

## Novel Coronavirus (COVID-19)

The family of coronaviruses has been around for some time. Coronavirus Disease 2019, or COVID-19, the cause of the current outbreak that originated in China is a new member of this coronavirus family.  CDC has assigned a scientific name to the virus, SARS-CoV-2.

The most common symptoms of COVID-19 include fever, cough, and respiratory symptoms.  It is believed that most people – more than 80% – have moderate to no symptoms, while others experience a more complicated disease course, including pneumonia.  COVID-19 appears to be more severe in older individuals and those with underlying chronic illnesses.  Children seem to be less affected.   Much is still to be determined about the virus, but based on multiple early reports, here are key characteristics of COVID-19 infection:

- **Incubation Period:** Estimated to be 2-14 days.
- **Mode of Transmission:** Evidence is building.  Systems should ensure appropriate PPE is available for most critical patients where procedures occur frequently.  Reports from around the world indicate most infections have occurred when a contagious individual has close contact with family, colleagues, or healthcare workers due to droplets which can spread up to 6 feet. Some evidence of spread has occurred through contact with surfaces contaminated with droplets, but this does not appear to be the primary mode of spread. Because the virus has been isolated in stool, there is concern for spread through the fecal-oral route, including use of shared toilets in congregate settings, but more data is needed on this. Similarly, there are some concerns about airborne transmission, but more data is needed on this.
- **Transmissibility:** The $R_0$ is estimated to be between 2-4, depending on the cohort studied. This means that one infected person will *on average* spread the virus to 2-4 individuals.
- **Severity:** 80% of individuals with documented COVID-19 disease have a milder spectrum of asymptomatic to moderate illness.  Different reports estimate the mortality rate to be between 2-3%. The mortality rate may be lower since asymptomatic individuals are less likely to seek care and get tested.
- **Convalescence:** The period after which an individual is clinically recovered and no longer capable of transmitting the virus is still to be determined.  CDC has stated that viral shedding may occur for 15-30 days after onset of infection.



March 2020

## Pandemic Response Phases

In the early stages of a pandemic, key strategies include detecting cases using routine surveillance and epidemiologic investigations. As continued clusters of cases are identified and there is confirmation of human-to-human transmission in a given country, non-impacted countries attempt to contain the outbreak and limit any potential spread. This includes travel restrictions, screening, quarantine of any exposed individuals, and isolation of anyone who becomes ill. As continued implementation of case-based control measures becomes less effective, community interventions are used to limit the spread of disease in local geographic areas, including social distancing actions such as school closures or cancellation of events.

In a state as large as California, the transition from containment to mitigation phase is not homogenous. While many California communities are still working through containment-mitigation strategies, other communities are already in the mitigation phase due to widespread community transmission of COVID-19. Now that California has documented community spread and is progressing to the peak of the pandemic, disruption across social, economic, community and health care delivery environments will occur. California is now in a position where preparation of the healthcare system is essential and should not wait for the rapid surge in COVID-19 cases.

Cases are quickly increasing in multiple communities across the state, and there is a narrow window (7-10 days) in which to aggressively implement community interventions (closing schools, canceling large gatherings, and social distancing) in order to bend the epidemiologic curve or stretch it out. If aggressive community intervention actions are delayed, the interventions will have low or no impact. Studies[1,2] analyzing U.S. major city interventions and mortality rates from the Influenza Pandemic of 1918 clearly show that cities who delayed implementing early, aggressive community interventions suffered greatly, with substantially higher mortality. Even worse, those cities then suffered both the widespread illness *and* the burden of aggressive social distancing measures which were too late to be effective. Importantly, the lack of a vaccine or anti-viral treatments for COVID-19 has put the U.S. in a similar circumstance to 1918. This concept is vividly demonstrated by an analysis of response time of public health community interventions versus excess deaths from major U.S. cities in 1918:





**Figure 1.** Scatterplot of Public Health Response Time for 43 US Cities From September 8, 1918, Through February 22, 1919

The 4 cities represented by black circles are discussed further in the text. The 2 cities represented by blue circles are outliers chosen to demonstrate that the associations shown are not perfect. The Spearman rank correlation coefficient was used.





Given that laboratory testing has not been available for widespread testing, and the case definition for testing was initially very restrictive and did not allow for testing for community spread, the reality is that infection already exists in many California communities but has been undetected because the vast majority of cases have a mild spectrum of illness. Therefore, the window for maximum impact of community interventions may have already passed in some communities. The movement to mitigation also signals the need to further engage the healthcare delivery system to prepare for a rapidly rising number of cases.



March 2020

## Containment to Mitigation Continuum

The strategies differ in each phase of response to an outbreak. Initially during an outbreak of any viral or bacterial strain, the goal is to contain it as much as possible. Actions taken under the containment phase may seem extraordinary or excessive to normal medical protocols and procedures, but they seek to stop the spread. Once the virus has demonstrated the ability to spread through a community, the health care delivery system then must shift its response activities to both contain the virus and prepare for mitigation of large-scale healthcare system impacts. It is this preparation to preserve space capacity, supply chain, and the staffing workforce that determines the health care facility's ability to handle the incoming healthcare needs during mitigation. This continuum is best described by the graphic below, which shows the potential triggers (catalysts) for health care facilities to shift and move to the next form of response.

# HEALTH CARE SYSTEM CONTAINMENT TO MITIGATION CONTINUUM

- Treatment of single patient or person under investigation (PUI) as a special event. Hospitalization regardless of medical need.
- High level precautions and high usage volume of PPE
- Negative pressure room only and ample resources used

**CONTAINMENT/LOW LEVEL**
Triggers: multi-county involvement; increase of cases; noticeable health system impacts

**CONTAINMENT WITH MITIGATION / MODERATE LEVEL**
Triggers: Local public health declarations; 1 case of community spread; health care system capacity, staffing and resources maxed

- Supply chain concerns: begin sending resource requests to local and state
- Workforce issues: furloughs from exposure, staff absenteeism or fear
- Space conversion program flexes; tents, screening, isolation areas
- Screening staff, visitors, and limiting access

- Facilities invoke surge capacity plan
- Adjust to reduce burn rate of PPE, clean and re-use, or use less preferred methods to reserve some PPE for higher risk procedures
- State run alternative health care facility and/or isolation shelter sites
- Workforce staffing ratios waivers
- Cohorting similar diagnosed patients

**MITIGATION / HIGH LEVEL**
Triggers: Governor and/or Presidential State of Emergency; WHO or CDC pandemic declaration; multiple community spread cases; alternative health care sites and triage protocols needed



# Health Care System Mitigation: Key Considerations

- **SPACE:** Expand health care system surge capacity by using community sites (such as stadiums, gyms, churches, federal/state properties, community centers, etc.) as temporary government run health care facilities and/or isolation shelters.

- **STAFFING:** Recruit traveling, temporary staff and grant immediate California medical and licensure privileges; expand/alter scope of practice of RNs, LVNs, MAs and CNAs, as well as providers like NPs and PAs. Adjust staffing ratios in population based care settings and consolidate patients in cohorted spaces.

- **SUPPLIES:** Mitigate scarce resources through proper re-use, using expired or other mask models, and rationing supplies like personal protective equipment (PPE) to ensure the most high-risk situations for spread (i.e., aerosol-generating procedures) have the proper PPE to protect healthcare workers. Procure gurneys, IVs and other medical supplies for mass government run facilities now, so they are at the ready when it is time.

- **INFECTION CONTROL:** Provide "just in time" training for all levels of staff and adjust guidelines for specific facility types and supply chain situations.

- **COMMUNICATION:** Educate the public on patient triage systems in individual communities to guide infected individuals to the right level of care including: 1) self-isolation, 2) admission to local isolation shelter or state run health facility, and 3) hospitalization.

- **PARTNERSHIPS:** Develop partnerships between stakeholders, facilities, industries, and states to provide opportunities for mutual aid. Partner with local media to help educate the public on that community's triage system for symptomatic individuals.

- **LABORATORY TESTING:** Testing strategies during the shift from containment to mitigation initially focus on tracking the increasing number of infected individuals to determine when the health care system should rapidly increase their capacity. As the virus becomes widespread, testing becomes clinically focused and many patients will be presumed to be positive, similar to the peak of influenza season.

- **MEDICAL COUNTERMEASURES (MCM):** Work with health care delivery systems to procure, store, transport, and administer life-saving drugs, ventilators, other medical resources, and vaccines for COVID-19 as they become available.

- **MITIGATION STRATEGY BY PANDEMIC SEVERITY:** Each community or county may be in a different phase of the pandemic compared to a neighboring community, so it is imperative for each region to focus on mitigation steps specific to the phase they are experiencing.



March 2020

# II. Health Care Delivery System

## Facility Capacity Management

### General Considerations

Because it is unclear when California will reach the peak of the pandemic, the state needs to continue to identify and prepare for the number of hospital beds that may be needed as new infection rapidly increase over the coming weeks and months. Given that the health care system is already impacted by the current influenza season, this represents increased strain on the system. Reports from Italy's healthcare delivery system suggest that hospitals must prepare for rapid surge needs for ICU beds including making plans to convert operating rooms and other spaces to ICUs. Importantly, this surge will occur in the context of many hospitals already operating at or above capacity with overcrowded Emergency Departments (EDs) due in part to the demands of homelessness, behavioral health needs, and the opioid epidemic.

The increased demand for health care associated with a large novel coronavirus outbreak will require effective partnership across government and the entire continuum of health care, from hospitals to primary care, and must include cooperative strategies across our complex healthcare system. The likelihood that the impact will disproportionately burden certain regions of the state must also be anticipated, and plans made to shift patients and resources accordingly to ensure the entire state's healthcare delivery system remains strong.

### Expansion of Health Care Capacity

The increased demand for health care should be addressed through a multifaceted approach, including expansion of existing hospital capacity, and expansion of the continuum of health care, and through the establishment of government-run alternate care sites, which may include state-run hospital facilities. Over the past several years, hospitals have been planning for increased capacity in the event of a public health emergency, with the assumption of the need for 15-20% immediate bed availability; however, most urban hospitals in the state have far less surge capacity. **Health care facilities need to enact their surge plans now** to create overflow space for screening, triage, isolation, and transfer/discharge, including conversion of outpatient space for inpatient use and using non-patient areas for patient care. In addition, facilities need to immediately implement patient education, phone advice, and treatment and triage algorithms to minimize unnecessary emergency department visits and admissions. Facilities also need policies and procedures to route patients with symptoms who may need testing away from congested emergency rooms, urgent care centers and clinics to locations (labs, community testing centers, etc.) where testing can be done without putting vital health delivery system assets at risk for undue infection burden.



March 2020

Hospital surge plans are enacted in stages. The first step is to free up regular medical/ surgical beds and then to use program flexes to further expand the number of regular and ICU beds. As facilities across the state begin to report that they are at their bed capacity even with program flexes in place, and there is no ability to move patients to facilities within the region or the state, facilities will need waivers from both state and federal statutes to deliver additional patient care under modified conditions according to their surge plans. Because this situation will likely escalate quickly, potentially within hours or days, hospitals must solidify their plans now based on the most extreme potential numbers, not conservative estimates. This will ensure hospitals and local healthcare systems are prepared for a worst-case scenario. The State of California, and specifically the regulatory entities within Health and Human Services Agency, stand ready to assist and partner with healthcare facilities in this effort.

Health care facilities are well-versed in the ability to request program flexes to address health care needs in their facilities and routinely request such flexibilities during severe influenza seasons or during other local or state emergencies. CDPH has created a centralized structure through the Medical Health Coordination Center (MHCC) to quickly grant individual facility program flexes within 24 hours to allow triage of patients within tent structures on hospital property. As the impact worsens, CDPH will grant blanket program flexes to more quickly allow facilities to waive provisions of state regulations.

CDPH continues to monitor health care system capacity. Health care facilities should reach out to their Medical and Health Operational Area Coordinator to request resources from the county, region, state or federal government as needed. In addition, facilities should reach out to the Licensing and Certification District Office when they experience issues with their ability to deliver care or cannot meet the demand for care.

Large health care systems must develop plans now to expand care delivery for extreme surge capacity and work with the state with any identified barriers in staffing, capacity, or supplies and equipment. Additionally, sharing real-time creative solutions during this rapidly evolving pandemic will need to happen quickly among key leaders of large health care systems and public health.

The State of California recognizes that state and federal statutes will need to be waived when health care facility needs go beyond regulatory changes and require higher level modifications to existing laws governing care delivery such as scope of practice, movement between systems of care, transfer of patients, EMTALA, medical licensing of retired inactive or outside of California clinicians, use of supplies and equipment beyond manufacturer's recommended use, Medicaid or Medicare requirements, and liability and immunity protections, among others.



## Expansion of Complementary Non-Hospital-Based Care

In order to relieve demands on hospitals, care will need to be augmented with additional outpatient services.  Clinic hours may need to be extended to address patient needs.  Long term care facilities may need to expand their role and accept additional patients who are discharged from the hospital but not yet able to go home. It is imperative that all health care providers, in all facility types, collaborate regionally to address any barriers to providing care and establish additional designated areas for care. Similar to hospital preparations, outpatient clinics need to repurpose their space and operations in order to meet the extreme estimates of patients needing treatment, not conservative estimates.

## Establish Screening Areas

In order to reduce exposure at the health care facility while safely and quickly assessing patients to determine the level of care needed, implement the following:

- Establish separate screening areas, either on the health care facility property or in the community.
- Cohort patients in the screening area during assessment; screening areas for COVID-19 do not have to be a private room.
- Use the precaution level that is recommended by your institution.
- PPE must be changed between patients.
- Provide a 6 foot distance from other patients with reasonable privacy considerations.
- Record each patient screening with appropriate medical record documentation.
- Depending on the medical screening determination, transfer patient to 1) self-isolation at home, 2) centralized isolation shelter/urgent care facility; 3) hospital for admission.

## Facility Access

In order to minimize unnecessary exposures, establish Safety Checkpoints at all portals of entry with the following provisions:

- Access to the medical facility should be limited to main portals of entry.
- Staff should be stationed at main portals of entry to conduct screenings.
- Patients who have a cough or shortness of breath should be directed to put on a mask before they are directed to the appropriate screening area.
- Visitors should be limited to one person, whether accompanying a patient to an appointment, or visiting a patient who is hospitalized.
- Restrict individuals with symptoms of upper respiratory infection from visiting.
- Instruct visitors and caregivers to wear a mask when outside the patient room and to clean hands before entering and leaving the patient room.
- Discourage visitors and caregivers from public locations within the medical facility (e.g. waiting room, cafeteria).



March 2020

## Move to Population-Based Care

During this pandemic, the demand for medical care will quickly exceed available resources to deliver that care.  When staffing, supplies, and beds are scarce, the goal of health care becomes population-based care rather than individual care.  Population based care means that resources are used to do the greatest good for the greatest number rather than providing all resources needed to treat each individual.  Physicians will need to balance the obligation to save the greatest possible number of lives against the need to care for each individual.  CDPH will work with experts to provide guidance on how to deliver care to ensure that ethical principles guide decisions to withdraw or withhold care.

## Long Term Care Facilities Transfer/ Readmit/ Discharge Considerations

Patients with confirmed or suspected COVID-19 should not be sent to a long term care facility via hospital discharge, inter-facility transfer, or readmission after hospitalization without first consulting the local public health department. This will prevent the introduction of COVID-19 into a highly vulnerable population with underlying health conditions in a congregate setting.  As discussed above, as the pandemic rapidly progresses, it will be necessary to designate certain long term care facilities as receiver sites for those with confirmed or suspected COVID-19; this would constitute community cohorting of COVID-19 patients requiring long term care but not hospital-level care. Regional healthcare systems should begin planning for this community-level cohorting now, as part of their overall triage system to direct individuals to the right level of care.

## Emergency Medical Services (EMS)

Ambulance personnel should follow CDC guidelines for personal protective equipment (PPE). EMS personnel should have a designated area to doff their personal protective equipment and clean their ambulance between patients.

Medical facilities that have outside or specialized screening areas should direct EMS personnel to those locations for patient transport.  Medical facility staff should meet ambulance personnel at a designated location outside the medical facility.  The medical facility staff member should escort the patient and any accompanying family member to a designated COVID-19 evaluation and assessment area within the facility.  When direct admit is possible, the patient and accompanying family member should be escorted to the designated inpatient setting.

Contingency plans for delays in ambulance transfer to receiving facility should also be made.



March 2020

## Health Care Workforce

Perhaps the most challenging aspect of expanding health care capacity during a pandemic is staffing.  There will be shortages in the health care workforce as some workers become ill or are taken off duty because of exposure to individuals testing positive for COVID-19, while others may be fearful to come to work, need to care for sick parents or children, or have issues with childcare.

In addition, school closures can create a health care workforce shortage in a region, as it may result in health care staff needing to stay home to care for family members rather than being available to treat patients.  Health care facilities need to develop back up staffing plans and may need to work with the Department of Social Services (DSS) to create provisions for onsite child care that meets DSS safety standards.

Because this is a national and global outbreak, securing mutual aid may be a significant challenge.  Health care systems should use normal augmentations such as registries or increasing contract staff but as the need grows, this will likely be inadequate.

Health care facilities may need to rely on Medical Reserve Corps, volunteer staff, and even family members to assist with care.  Facilities will need to examine administrative procedures to bring on staff quickly and determine both licensing, credentialing and privileging.

Health care facilities will need to work with the state to explore expanding scope of practice for licensed practitioners based on skill and experience and under the supervision of higher-level clinicians. Acute health facilities may also consider expediting credentialing for additional clinicians in the community that do not have hospital/admission privileges.

For non-patient care administrative staff, health care facilities should implement general recommendations for workplace social distancing, including flexible work sites (e.g. telecommuting), flexible work schedules (e.g. staggered shifts), replacing in-person meetings with teleconferences and restricting non-essential travel.

## COVID-19 Patients and the Health Care Worker

If there is an exposure of an employee to a COVID-19 patient, the employee should self-monitor for symptoms of fever and a lower respiratory tract infection.  If the employee does not have symptoms of fever or respiratory tract infection, the employee may continue to work.  If the employee experiences any symptoms of fever and lower respiratory tract infection, they should be tested for influenza and COVID-19 and furloughed according to the same practices used for influenza during flu season.  If the employee tests positive for COVID-19, follow guidance on criteria to determine when the employee may return to work.



## Supply Chain

CDC and the World Health Organization are already reporting global shortages of critical supplies and equipment, in particular, of personal protective equipment (PPE) needed to ensure the safety of health care workers and in some cases the public.

To limit numbers of exposed health care workers and conserve PPE supplies, facilities should:

- Use dedicated or disposable patient-care equipment (e.g., blood pressure cuffs, stethoscopes).
- When facilities use reusable equipment, they must clean, disinfect, and sterilize (if needed) after use and according to manufacturer's instructions.
- Re-use masks and respirators by doffing, storing and cleaning correctly.
- Use expired surgical masks and N95 respirators and/or non-medical grade N95 respirators as a last resort if all other N95 supplies are exhausted.
- Minimize patient transfers to reduce opportunities for contamination both internally and externally.
- Triage areas for evaluation of persons presenting with fever and acute respiratory symptoms.
- Create entire units within the facility to care for hospitalized persons with suspected or confirmed COVID-19 infection.
- Have dedicated health care workers who practice extended use, reprocessing, and reuse of PPE, including respirators and eye protection.

Facilities should review CDC's PPE optimization strategies, available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html including options for extended use, reprocessing, and reuse of the various PPE components given current shortages of PPE. Extended use refers to the practice of wearing the same N95 respirator and eye protection for repeated close contact encounters with several different patients, without removing the respirator and eye protection between patient encounters. Health care workers should remove only gloves and gowns and perform hand hygiene between patients. This is typically done where multiple patients with the same infectious disease diagnosis are cohorted in the same area of the facility.

Facilities currently facing a shortage of N95 or other supplies, should contact their Medical Health Operational Area Coordinator (MHOAC); a MHOAC contact list is available at https://emsa.ca.gov/medical-health-operational-area-coordinator/ and the MHOAC Program Manual at https://www.cdph.ca.gov/Programs/CCLHO/CDPH%20Document%20Library/MedicalandHealthOperationalAreaCoordinationManual.pdf



March 2020

# Infection Control

## Source Control: Additional Patient Considerations

Patients with minimal symptoms should be advised to home isolate and work restrict until well (resolution of fever for 24 hours, resolution of cough).  These patients do not require testing. Evaluation by phone or video visit should be encouraged. Patients presenting to a medical facility with cough or shortness of breath should be immediately advised to wear a mask.

## Personal Protective Equipment (PPE) and Isolation and Environmental Cleaning: General Considerations

Recommended PPE should be donned and doffed appropriately for patients suspected or confirmed to have COVID-19. Negative pressure rooms are not required for all suspect and confirmed COVID-19 patients but staff should at minimum take droplet precautions for any patients with respiratory symptoms while being evaluated and treated.  During procedures or when providing treatment to critically ill COVID-19 patients, N95 respirators and other PPE should be used.

Those escorting patients with respiratory symptoms or suspected to have COVID-19 do not need to wear a mask, if the patient is masked. If the patient is unable to wear a mask, staff must put on a mask while escorting.  Staff must wear full PPE if in direct contact (touching or providing care) with patients during transport.

- PAPR/CAPR or N95 Use and Additional Equipment:
    - o Clean reusable components of PAPR/CAPR after each use.
    - o Dispose of N95 after each use as per current infection prevention protocols.
    - o Use disposable supplies if available; otherwise dedicate reusable supplies or equipment for patients suspected or confirmed to have COVID-19.
    - o Reusable equipment must be cleaned routinely with hospital-approved disinfectant.
    - o Rooms occupied by patients suspected or confirmed to have COVID-19 should be cleaned following protocols for routine daily and discharge cleaning.
    - o Environmental services (EVS) should follow at minimum droplet and contact precautions with eye protection while performing daily and discharge protocols for cleaning of rooms occupied by patients suspected or confirmed to have COVID-19.
    - o In general, rooms of discharged patients suspected or confirmed to have COVID-19 on droplet precautions need not be closed for 1 hour prior to cleaning.  The exception is negative pressure rooms used by patients suspected or confirmed to have COVID-19 on airborne precautions due to aerosol-generating procedures; these must be closed for at least 1 hour prior to cleaning.  However, the room may be cleaned without waiting for 1 hour if EVS staff wear a properly fitted N95 respirator.



- Initiate Airborne Precautions and wear PAPR/CAPR/N95 if performing or present in the room for high-risk procedures (intubation, bronchoscopy, sputum induction, suctioning, opening ventilator circuit, etc.) on patients suspected or confirmed to have COVID-19.
  - If available, perform high risk procedure in a negative pressure room; otherwise, a private room with closed door is adequate.
  - Conversion of rooms to negative pressure as possible
  - Limit high-risk procedures when impact to care is less obvious, i.e., nebulized medications without firm objective need, bronchoscopy when blind lavage will do, etc.

- Limit transport and movement of patients to medically necessary purposes.
  - Use alternative bedside procedures and imaging when possible.
  - Patient must be masked if ambulating outside the room or being transported for a procedure.
  - Staff need not wear mask or other PPE if patient is wearing mask during transport.

- Avoid unnecessary testing and routine periodic evaluation of patients in isolation
  - Decrease vital sign assessments to medically appropriate intervals to match clinical condition and improvement in condition.
  - Testing and imaging only when needed for clinical indications (e.g. diuresis, clinically evident bleeding, change in urine output, change in tidal volumes, oxygenation, etc.)
  - Utilize alternative diagnostic methods rather than resource- and staff-intense methods when appropriate (point of care ultrasound, etc.)

- Use remote interaction with patients in isolation as appropriate
  - 2-way intercom or phone
  - "Baby monitors" or other video monitors may suffice if patients unable to communicate
  - Remote telemonitoring equipment if available

## Cohorting of COVID-19 Patients
- Patients with the same known respiratory disease/condition other than COVID-19 may be cohorted with local IP/ID guidance.
- Patients confirmed with COVID-19 may be cohorted with local IP/ID guidance.

## Reusable Equipment and Environmental Cleaning
- Use disposable supplies if available; otherwise dedicate reusable supplies or equipment for patients suspected or confirmed to have COVID-19.
- Reusable equipment must be cleaned routinely with hospital-approved disinfectant following each use.



## Visitation Restriction

Social distancing measures that decrease the amount of interaction between people can reduce virus transmission by decreasing the frequency and duration of social contact among persons of all ages. Social distancing should include medically screening visitors, limiting visitors, and possibly restricting visitors. It may also include restricting access to common areas like a recreation room, the cafeteria, and canceling outings and classes.

These measures can be common-sense approaches to limiting potential symptomatic and asymptomatic individual contact between people, which reduces person-to-person transmission; however, it can also quickly result in a decline of the patient's overall mental health. Isolation measures of this magnitude may save lives, but it is important to note that anxiety, depression and other mood disorders could ensue from this level of social isolation.

## Removal of Remains

Mortuary and funeral home workers should always follow good biosafety practices. When handling human remains with known or suspected COVID-19 infection, workers must be protected from exposure to infected blood and body fluids or to contaminated objects and surfaces. Employers are responsible for following applicable OSHA requirements. Workers should use standard precautions to ensure protection from body fluids splashing or contaminating eyes, mouth, nose, hands or clothing.

At a minimum, mortuary workers should:
- Wear latex or nitrile, nonsterile gloves when handling potentially infectious materials.
- Wear heavy-duty gloves over the latex/nitrile gloves if there is a risk of cuts, puncture wounds or other injuries that break the skin.
- Wear a clean, long-sleeved fluid-resistant or impermeable gown to protect the clothing.
- Use a plastic face shield or a surgical mask and goggles to protect the face, eyes, nose and mouth from potentially infectious body fluids if there is a risk of splashing. If there is a risk of aerosol generation while handling human remains, use respiratory protection as specified in the OSHA general guidance.

Prompt cremation of remains from COVID-19 cases can avoid worker exposure. Embalming is allowed but an open casket should be discouraged to prevent mourners from touching the body.

# III. Communications

There are over 11,169 health care facilities in over 30 different facility types in California that are licensed by CDPH, which underscores the challenges of consistent and timely communication. Note that this does not include the Veterans' Affairs health care system. In addition, there are thousands of other facilities like urgent cares, clinics and other ancillary health care facilities that are not licensed by CDPH.



March 2020

CDPH will continue weekly All Facility Calls (AFCs) and add ad hoc AFCs or increase regular frequency as needed.  CDPH will also continue weekly and ad hoc All Facility Letters (AFLs) with increased frequency as needed.  CDPH will continue updating the CDPH web site for important updates and develop a more robust social media and radio presence.  Most importantly, CDPH leadership will continue to keep the lines of communication open between health care facility leadership and stakeholders who represent the members of facility types, and be available and responsive to their evolving situational needs.

Similar to other pandemics, COVID-19 is not a singular event – it is a series of occurrences at different times, in different communities, over a sustained period of time. Messaging must be grounded in risk communication principles and based on the time and location of the events. The public must be informed about the potential threat, kept up to date in an environment of uncertainty, and provided relevant and usable information in a transparent manner. Additionally, health care providers and response personnel must be kept abreast of best practices, availability of resources and methods to ensure appropriate public care and safety. The effective use of crisis and emergency risk communication principles can help instill and maintain public confidence in the state and national public health system.

Recommended best practices include:
- Develop strategic public and stakeholder communications plan, adapting to the evolving situation.
- Identify credible spokesperson across multiple languages as needed.
- Develop and disseminate clear, plain-language COVID-19 communications, adapting messaging as the situation develops and evolves.
- Translate messaging to reach targeted and culturally appropriate populations.
- Utilize appropriate methods of communications, particularly social media and video messaging, to share information as it develops. Correct misinformation.

## Public and Patient Outreach

Public Service Announcements with generalized recommendations about COVID-19 can serve as a useful tool to provide direction to patients to community screening areas and isolation shelters.  It is important that the public has access to information about COVID-19 across all technological platforms.  Outreach to the public can educate them on what to expect at screening and how to safely access care.

Communications should be developed to inform patients with potential infection to call first, before presenting to a clinic setting, and to visit a screening area first.  All communication materials should be available in ADA compliant format in multiple languages as appropriate. Focus communications on the patient demographics who are at the highest risk and seek



March 2020

communication avenues that reach the target audiences who are the most vulnerable to COVID-19.

## Physician and Staff Education

Key groups to include in educational efforts include:

- Appointment and advice call center staff who field a variety of questions will require the development and training on FAQs.
- Front office and administrative staff need training on COVID-19 to reduce fears and enable them to properly handle suspected cases.
- Physicians should be familiar with triage workflows so they understand the new patient pathways through the health system and can refer patients appropriately.
- Physicians will need updates on reporting, epidemiology and outbreak information for their community and how to communicate with their local health department.
- Clinic directors will need timely information about business operations, staff and supply availability and what regulatory flexes are available.



March 2020

# IV. Laboratory Testing

There are 4 categories of lab testing: state public health lab diagnostic testing, local public health lab diagnostic testing, surveillance testing (by CDC or local public health lab), and commercial tests (multi-viral panels and point-of-care (POC) COVID-19 testing similar to POC flu tests).

As the pandemic progresses, public health labs will transition from testing all suspect cases to mostly testing for new COVID-19 strains; similar to influenza testing for virus mutations, testing will likely be conducted in outbreaks or high-risk or high-exposure settings, and specific instances (those re-infected with COVID-19, those in ICU, death).  Like influenza surveillance for virus mutations, public health labs should plan for some form of surveillance testing for variant COVID-19 strains.

## Criteria for Clinical Testing

Criteria for testing will continue to shift as the pandemic cycle follows its course. Hospitals and clinics should promulgate clinical guidelines for who should be tested regardless of federal guidelines. This may include:

- Patients who present with an influenza like syndrome (fever, cough, malaise)
- Patients who have a severe lower respiratory illness (pneumonia, ARDS) without another clear etiology
- Patients who have mild symptoms but are in close contact with individual(s) at high risk for complications of COVID-19

The need for testing diminishes once the community is saturated with cases.  At that point, the focus on resources should be treatment for the patient.  If a vaccine or other medical counter measure becomes available, then the need for testing will increase again.

## Methods of Testing

CDPH encourages health care facilities to provide quick testing methods that reduces the amount of exposure to the facility.  Designated "Drive By" testing locations on hospital or clinic property space is encouraged as to not bring in suspected or ill patients into the interior of the property.  Staff conducting testing in these outdoor or tent screening environments should still follow proper PPE and infection control guidelines.

## Mandatory Reporting

Commercial or POC testing results should be transmitted via Electronic Lab Report (ELR) to public health, which is normally used for other diseases including influenza. This automates the process of tracking new positive cases.  Laboratories that are not yet participating in ELR should report to



March 2020

their local health department.  Clinicians are currently also mandated to report to their local health department per Title 17, Section 2500.

## V. Medical Counter Measures (MCM)

In the context of the public health response to COVID-19, medical counter measures (MCMs) refer to FDA-regulated products used to prevent or treat the virus, including vaccines, antiviral medications for treatment or post-exposure prophylaxis (as used in influenza and HIV), and biologics (such as intravenous immunoglobulin used in measles and rabies). Additional supportive medical devices may also be needed such as ventilators or other respiratory or equipment support.

At this juncture, there are several groups actively working on developing a vaccine.  Researchers are also testing a new antiviral under development (remdesivir), which can be requested on a compassionate use basis, as well as the efficacy of existing antiviral and anti-inflammatory agents.  CDPH partners closely with the CDC to stay abreast of research on both vaccines and treatments, and will be developing a statewide plan to coordinate the distribution of any future vaccine via an algorithm that prioritizes high risk groups and critical responders.  CDPH will work with the health care delivery system to procure, store, deliver and administer vaccines and drugs as needed.



# VI. GLOSSARY

| | |
|---|---|
| **Containment** | Efforts made to prevent introduction of virus into a population including travel restrictions, quarantine of those with exposure, immediate isolation of new cases, aggressive contact tracing, etc. |
| **Coronaviruses** | A family of viruses known to cause a variety of diseases including the common cold, Severe Acute Respiratory Syndrome (SARS) and Middle East Respiratory Syndrome (MERS); when the virus mutates it can jump from animal to human hosts. |
| **COVID-19** | The name CDC adopted for the disease caused by SARS-CoV-2, the name of the novel coronavirus. |
| **Mitigation** | When it is recognized that widespread community transmission exists, and containment is ineffective, activities shift to lessening burden on healthcare system, protecting those most at risk, specific outbreak control, and slowing spread within populations. |
| **N95 respirator** | Respiratory protective device designed to achieve a very close facial fit and very efficient filtration of air borne particulars, the N95 designation means the respirator blocks at least 95 percent of very small particles (0.3 micron). |
| **SARS-CoV-2** | CDC adopted this as the scientific name of this novel coronavirus because it is closely genetically related to the corona virus that caused SARS. |
| **Personal protective equipment (PPE)** | Supplies such as masks, respirators, eye protections such as goggles and face shields, gowns and gloves, and other supplies that protect the healthcare workforce caring for infectious persons, first responders, and field staff. |
| **Point of Care Testing (POC)** | Medical diagnostic testing at or near the point of care. |
| **R-naught ($R_0$)** | Basic reproductive number; the average number of new infections caused by a typical infectious individual in a wholly susceptible population. |
| **Strategic National Stockpile** | The U.S. National repository of supplies including medical supplies such as antibiotics, vaccine, and personal protective equipment. |
| **Population-based care** | Resources are used to provide the greatest good for the greatest number rather than provided all resources needed to treat each individual; some may not receive care. |



# EXHIBIT C

# CDCR Starts Chlorine Water Treatment Process at Stockton Correctional Facilities

**APRIL 24, 2019**

*Hyperchlorination part of a larger plan to address Legionella*

STOCKTON – Since March, officials from the California Department of Corrections and Rehabilitation (CDCR), California Correctional Health Care Services, the California Department of Public Health San Joaquin County Public Health Services and the Centers for Disease Control have been working together to investigate the source of two confirmed cases of Legionnaires' disease at California Health Care Facility (CHCF) in Stockton.

Legionnaires' disease is a type of pneumonia caused by bacteria that grows in warm water. It is not contagious, but can be acquired when people breathe mists or vapors that contain the bacteria from contaminated water sources.

Environmental testing showed the presence of Legionella at CHCF and the neighboring N.A. Chaderjian and O.H. Close Youth Correctional Facilities. As a result, CHCF and the Northern California Youth Correctional Center (NCYCC) discontinued the use of potable water, installed self-filtering shower heads, stopped using yard misters and power washers, and shut off the drinking-water fountains and instant hot water dispensers. Bottled water is being provided to everyone who lives and works in the facilities and more self-filtering shower heads are on order.

As part of a comprehensive strategy to eliminate Legionella, a chlorine water treatment process called hyperchlorination began this morning, April 24, at CHCF and NCYCC, which includes the two juvenile facilities and a training center.

Hyperchlorination is the process used to disinfect water systems. It will take place between 7 a.m. and 5 p.m. seven days a week until all plumbed water supply lines and fixtures in the approximately 115 buildings at the Stockton facilities have been treated.

Follow-up environmental testing will be done to ascertain the effectiveness of the hyperchlorination.

CHCF has obtained five mobile shower trailers, some with eight shower units and some with 12. CHCF also has six ADA-compliant shower units that are wheelchair accessible with two showers for each unit. Bottled water will continue to be provided.

In addition to the inmate who passed away in March, one other inmate tested positive for Legionnaires' disease; he is in good condition after receiving treatment at the institution. There were 30 cases of pneumonia at CHCF tested for Legionnaires' disease with 27 of those being negative; one test result is pending. No cases of Legionnaires' disease have been reported at NCYCC.

CHCF provides medical and mental health care to inmates who have the most severe and long term needs. Opened in 2013, CHCF also provides inpatient and outpatient mental health treatment, has a diagnostic center, a dental clinic, a dialysis unit and provides services to inmate-patients needing or recovering from surgery. The facility also has a palliative care unit

and recently opened a memory care unit for inmate-patients with dementia. The Stockton
facility houses nearly 2,700 inmates and employs approximately 4,000 people.

NCYCC consists of two active facilities, the N.A. Chaderjian Youth Correctional Facility and the
O.H. Close Youth Correctional Facility, on a campus of several buildings in Stockton. The two
facilities currently house, educate and rehabilitate 410 youth, aged 15-25. There are 767 people
employed there.

---

**FOR IMMEDIATE RELEASE**

---

Wednesday, April 24, 2019

---

**CONTACT: (916) 445-4950**

---

###

# EXHIBIT D

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES



# MEMORANDUM

| | |
|---|---|
| **Date:** | April 6, 2020 |

| | |
|---|---|
| **To:** | California Department of Corrections and Rehabilitation (CDCR) All Staff |
| | California Correctional Health Care Services (CCHCS) All Staff |

| | |
|---|---|
| **From:** | *Original Signed By* |
| | Connie Gipson |
| | Director, Division of Adult Institutions |
| | California Department of Corrections and Rehabilitation |
| | |
| | *Original Signed By* |
| | R. Steven Tharratt, MD, MPVM, FACP |
| | Director of Health Care Operations and Statewide Chief Medical Executive |
| | California Correctional Health Care Services |

| | |
|---|---|
| **Subject:** | **STAFF USE OF PERSONAL PROTECTIVE EQUIPMENT (PPE)** |

We understand the importance and urgency surrounding the availability and use of personal protective equipment (PPE), particularly masks, for CDCR/CCHCS staff and the incarcerated population. Our top priority is doing everything we can to provide appropriate protection to slow the spread of COVID-19 within our institutions.

We must face the reality that during this global pandemic, CDCR and CCHCS are not immune from the unprecedented demand for more PPE to protect those on the frontlines. While we are not the only organization impacted by this shortage, we are working every day to increase our supplies, including reusable barrier cloth masks manufactured by the California Prison Industry Authority (CALPIA). While we work to expand our supply, we all need to do our part to make sure that PPE, especially masks, are utilized in the most appropriate and efficient way possible. We need a mutual understanding of PPE and develop innovative solutions to help increase our supply.

See COVID-19 Personal Protective Equipment (PPE) Guidance and Information from CDCR/CCHCS Public Health.

PPE including "medical grade" masks (N95 and surgical) should only be used by both CDCR and CCHCS staff as recommended in the memo above. The Centers for Disease Control and Prevention (CDC) and California Department of Public Health (CDPH) issued guidance recommending face cloth covering in the general public and in close quarters. We understand that additional facial protection can potentially limit "droplet" transmission while also offering some peace of mind to our staff,

# MEMORANDUM

their families, stakeholders and our population. To help address this moment of need, CALPIA has started manufacturing two-ply, cotton, reusable barrier masks that we will start distributing to our population in quarantine settings this week. Distribution of the masks will begin for inmates in quarantine and medically fragile inmates. As CALPIA continues to expand the production of these masks, we will also make them available to the general population and staff who do not have access to face coverings as a precautionary measure as supply allows.  CALPIA is making 800 masks per day between two locations and will continue to ramp up to full production to meet the expected needs.

CALPIA also began ramping up their brand new production of hand sanitizer, which has already started arriving at most institutions and locations. We are extremely grateful for CALPIA and our population workers providing these valuable services in such a short time frame.

**FACE COVERINGS (REUSABLE BARRIER CLOTH MASKS)**

While we continue internal production and procurement of PPE, CDCR and CCHCS will also follow the recently released guidance from The Joint Commission (TJC), a trusted health care accreditation organization, by allowing staff to bring in a personal supply of reusable barrier (cloth) masks and approved medical masks if supply is not readily available. Any personally provided mask must be appropriate for the workplace and cannot contain any inherently offensive logos, graphics or text. Designer face masks that have skulls, "gate keeper," "punisher," logos, etc. on them (motorcycle type) would not be appropriate and employees will not be permitted to wear while on duty. The Department assumes no responsibility for personally owned face coverings. Staff will be required to remove face coverings for identification purposes at entry points.

**Recommended PPE as described should be utilized first; if recommended PPE is not available use the most comparable coverage.**

**EXPANDING SUPPLY**

The CDCR and CCHCS procurement teams are rigorously searching for PPE supplies, especially masks, to purchase. If you have a lead, please send the information to COVID19@cdcr.ca.gov. We are looking into innovative solutions we may never have considered before, such as smaller supply vendors and more. Our top priority is the safety of all those who live and work in our facilities, and we are doing all we can to get you the protection you need.

Please continue to provide feedback to the local leadership at your facility, headquarters and the CDCR/CCHCS COVID-19 Department Operations Center.

We truly appreciate all of our staff working hard on the front lines as we are making unprecedented changes to our operations to keep everyone healthy and safe. There are sure to be changes over the next several weeks, and so we thank you for the flexibility, patience and support for that you all have provided to each other. We are all CDCR Strong.

# EXHIBIT E

# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | April 6, 2020 |

| | |
|---|---|
| **To:** | California Department of Corrections and Rehabilitation (CDCR) - All Staff |
| | California Correctional Health Care Services (CCHCS) - All Staff |
| **From:** | *Original signed by:* |
| | Heidi M. Bauer, MD MS MPH |
| | Public Health Epi/Surveillance Lead |
| | Public Health Branch |
| | |
| | *Original signed by:* |
| | Diane O'Laughlin, FNP-BC, DNP |
| | Headquarters Chief Nurse Executive |
| | Public Health and Infection Prevention |
| **Subject:** | **COVID-19 Personal Protective Equipment (PPE) Guidance and Information** |

The purpose of this memo is to provide information and resources related to COVID-19 and the continuously evolving status personal protective equipment (PPE) supply availability. The information below is intended to guide the use of PPE as we move forward in responding to this pandemic. In-depth guidance is provided in the COVID-19: Interim Guidance for Healthcare and Public Health Providers.

**TYPES OF MASKS**

**Filtering facepiece respirator N95**: An "N95" is a type of respirator which removes at least 95 percent of particles from the air that are breathed through it. An N95 currently has two recommended uses:

- Staff person accompanying individuals with respiratory symptoms in a transportation vehicle.
- A staff person present during "aerosol producing procedures" on suspect or confirmed COVID-19 cases such as COVID-19 testing, CPR, etc. or providing high-contact patient care such as bathing someone confirmed to have COVID-19.

**More information about N95 and surgical masks:**
- Understanding the difference between N95 and Surgical Masks
- Proper use and disposal of PPE
- Facial hair and PPE use

**Use of Privately Owned Masks and Respirators and Reusable barrier masks (cloth/washable)**: "The Joint Commission (TJC) issued a statement on March 31, 2020, supporting the use of standard face masks and/or respirators provided from home when health care organizations cannot provide access to protective equipment that is commensurate with the risk health care workers are exposed to amid the

# MEMORANDUM

COVID-19 pandemic.  The CDCR/CCHCS will follow the TJC recommendations for privately owned PPE, including N95 and surgical masks.  Please wash reusable cloth masks between each use using hot water with regular detergent and dry completely on hot setting.

**EXTENDING THE USE OF PPE (MEDICAL EQUIPMENT MASKS)**

The CDC has put out guidance on extending the use of medical equipment masks. There is not an exact determination on the number of safe reuses for these masks and those decisions must be made based on a number of variables per CDC guidelines such as impact respirator function and contamination over time.

**RESOURCES**

The **COVID-19 Quick Guide Poster** follows Center for Disease Control (CDC) guidelines for COVID-19 management.  This quick guide defines quarantine, who to isolate, COVID-19 case actions and how to perform appropriate surveillance during the COVID-19 pandemic. The COVID-19 Quick Guide Poster pairs with the Personal Protective Equipment (PPE) Guide Poster, number 2 below, to inform staff on what type of PPE they will need.

The **COVID-19 Protective Equipment (PPE) Guide Poster** adopts CDC guidelines as of March 29, 2020, which reflect the CDC's recommendations for optimizing PPE supplies (link below). The PPE guide poster reinforces 6 foot social distancing, and gives guidance for individuals who must be within 6 feet for a prolonged period of time of suspected/confirmed COVID-19 individuals.

A **COVID-19 Quick Reference Pocket Guide** is intended to keep on person as a resource for PPE, quarantine, isolation and surveillance.

The CDC's also provides recommendations for optimizing PPE supplies.

These resource tools, TJC statement on privately owned face masks, and current available supplies should all be considered when determining the type of PPE staff will use for the safety of staff and the population.  Please place the posters in high traffic staff areas to remind staff of these key concepts for COVID-19 management.  Please assure your staff is aware of these resource tools.

Thank you all for your cooperation, as we continue to work together to guard against the spread of COVID-19 and to keep our staff and patients protected.

# EXHIBIT F

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES



# MEMORANDUM

| | |
|---|---|
| **Date:** | April 15, 2020 |
| **To:** | Wardens<br>Chief Executive Officers |
| **From:** | *Original Signed By*<br>Connie Gipson<br>Director, Division of Adult Institutions<br>California Department of Corrections and Rehabilitation<br><br>*Original Signed By*<br>R. Steven Tharratt, MD, MPVM, FACP<br>Director of Health Care Operations and Statewide Chief Medical Executive<br>California Correctional Health Care Services |
| **Subject:** | **CALPIA CLOTH FACE BARRIER/MASK** |

As an on ongoing effort to prevent further exposure of COVID-19, the following information is intended to provide guidance on the use of cloth masks by staff and inmates/patients who are performing day-to-day activities within our institutions.  This guidance is not a substitute for health care and custody staff following current Centers for Disease Control and Prevention or county health department recommendations in dealing with suspected, quarantine or diagnosed patients.   Staff and inmates/patients are required to wear a face barrier once a supply of two (2) face barriers/masks per correctional staff and inmate/patient has been delivered to the institution.  Staff may bring in their own face coverings as previously communicated.

Staff working or performing duties on institutional grounds shall wear a cloth face covering at a minimum.  In addition, maintaining social distancing requirements when moving about the institution for routine tasks is still recommended.  These masks are not intended for direct patient care scenarios.

Inmates <u>shall</u> use a cloth face covering within the institution during the following activities:

- Any situation that requires movement outside of cell or while in a dorm setting
- During interactions with other inmates (ex: yard time, canteen, dayroom)
- Movement to and from for health care appointments
- Movement to and from medication administration areas

# MEMORANDUM

Wardens and Chief Executive Officers should work together in developing an informational directive to all staff and inmate/patients on this wear requirement.  Institutions, CIM, LAC, CHCF, have received their masks and therefore this expectation is effective immediately.

If you have any questions, please email DOCCOVID19@cdcr.ca.gov.

# EXHIBIT G

State of California—Health and Human Services Agency

# California Department of Public Health

**SONIA Y. ANGELL, MD, MPH**
*State Public Health Officer & Director*

**GAVIN NEWSOM**
*Governor*

January 27, 2020                                                    AFL 20-10

**TO:**        All Facilities

**SUBJECT:**    Healthcare Facility Resources for the 2019 Novel Coronavirus
               (2019-nCoV)

---

### All Facilities Letter (AFL) Summary

This AFL requests health facilities to voluntarily complete a state-wide infection control resource assessment for coordinated emergency response planning, and includes materials for facilities to prepare for the 2019 Novel Coronavirus (2019-nCoV).

---

**Background**

Since the Centers for Disease Control and Prevention (CDC) announced on January 21, 2020 that the 2019 Novel Respiratory Syndrome Coronavirus had its first confirmed case in the United States, the California Department of Public Health (CDPH) sent out AFL 20-09 Health Update and Interim Guidance – 2019 Novel Coronavirus (nCoV), on January 23, 2020, to provide personal protective equipment (PPE) and infection control guidance to facilities.

As of January 24, 2020, there are confirmed cases in California. CDPH is requesting health facilities to assist in evaluating the capacity for California to respond to potential expansion of 2019-nCoV in California. CDPH requests that facility leadership complete the Facility Capacity to Respond to Potential 2019 Novel Coronavirus (2019-nCoV) survey by the end of day, Wednesday, January 29, 2020.

The questions are listed below so you can see the information we are requesting before you respond on behalf of your facility.  Please note that designation of an individual as a facility's contact is voluntary. To every extent possible, personally identifiable information submitted will be kept confidential subject to the provisions of state and federal laws including, but not limited to, the California Information Practices Act of 1977, and only used for the purposes stated herein.

Health facility responses to these questions will greatly assist CDPH in understanding the capacity throughout the geographic regions of the state. This is only a gathering of

---



information so that CDPH can better plan, communicate, and coordinate responses if needed.

List of questions on the survey:
1. Type of health facility
2. Name of health facility
3. In the event that you should have a Patient Under Investigation (PUI) tested or a confirmed case, please write in the cell/direct number and contact information of the administrator at your facility whom we can work with to coordinate a response. (Optional)
4. How many isolation rooms or private enclosed spaces do you have to isolate a patient?
5. How many airborne infection isolation (negative pressure) rooms do you have for symptomatic patients?
6. How many rooms do you have which could be converted to temporary negative pressure isolation rooms using portable high efficiency particulate air (HEPA) machines?
7. Do you have adequate staffing to handle a PUI, a confirmed case, or potential multiple cases?
8. Do you currently have adequate supplies (preferably up to 30 days of operational use) of personal protective equipment (PPE) for potential multiple cases?
   a. gloves
   b. gowns
   c. eye protection
   d. N95 respirators
   e. powered air purifying respirators (PAPRs) for PUI or confirmed case
9. Are there other spaces in your facility, such as a floor or nursing unit, that could be designated for the care of 2019-nCoV patients only, rather than placing them in airborne isolation rooms throughout the hospital, if the capacity for individual airborne isolation rooms is exceeded?
10. Does your hospital's onsite clinical laboratory have the capacity to perform multiplex polymerase chain reactions (PCR) for viral pathogens, e.g., Biofire?
11. Are there other factors or comments about your facility that are important for CDPH to know?

In addition to the above survey, we have also attached resources for your facility to prepare: Healthcare Facility Preparedness Checklist (PDF) and Air Changes Per Hour (ACH) Table (PDF).

Please contact your local health department **immediately** if a PUI for 2019-nCoV is identified, or if a patient's status as a PUI is uncertain.  In addition, please report this as an unusual occurrence to your local CDPH Licensing & Certification District Office so they can communicate with the CDPH Medical and Health Coordination Center.

If you have any questions regarding the infection prevention and control of 2019-nCoV, please contact the CDPH Healthcare-Associated Infections (HAI) Program at novelvirus@cdph.ca.gov.

Sincerely,

**Original signed by Heidi W. Steinecker**

Heidi W. Steinecker
Deputy Director

Attachment:
Healthcare Facility Preparedness Checklist (PDF)
Air Changes Per Hour (ACH) Table (PDF)

# EXHIBIT H



# California Department of Public Health

SONIA Y. ANGELL, MD, MPH
*State Public Health Officer & Director*

GAVIN NEWSOM
*Governor*

January 31, 2020 AFL 20-11

**TO:** All Facilities

**SUBJECT:** Updated 2019 Novel Coronavirus Information (2019-nCoV), Including Patient Under Investigation (PUI) Guidance from the Centers for Disease Control and Prevention (CDC).

---

### All Facilities Letter (AFL) Summary

This AFL provides updated information on 2019-nCoV including updated CDC guidance for PUI.

---

The World Health Organization (WHO) has declared 2019-nCoV a Public Health Emergency of International Concern. China has reported a 26 percent increase of 2019-nCOV cases since January 30, 2020. Over 7,000 new cases worldwide have been reported within the past week. The CDC is taking progressive action to protect the public and decrease impact on the United States (US). The risk to the American public is still considered to be low.

**Updated 2019-nCoV Information**
- 2019-nCoV can be spread through person-to-person transmission
- Recent report from Germany confirms that the disease can be transmitted from an asymptomatic individual
- Screening with current laboratory tests is not effective in recognizing those who are incubating 2019-nCoV asymptomatically
- A negative result does not mean someone will not start to show symptoms or contract 2019-nCoV
- CDC does not recommend the use of face masks for the general public

For additional information, see the CDC 2019 Novel Coronavirus webpage.

**Updated CDC PUI Guidance**
The CDC Interim Infection Prevention and Control Recommendations for Patients with Known or Patients Under Investigation for 2019 Novel Coronavirus (2019-nCoV) in a Healthcare Setting webpage

---

Center for Health Care Quality, MS 0512
P.O. Box 997377 ● Sacramento, CA 95899-7377
(916) 324-6630 ● (916) 324-4820 FAX
Department Website (www.cdph.ca.gov)



Case 2:90-cv-00520-KJM-DB   Document 6627   Filed 04/20/20   Page 55 of 150

**US Temporary Measures**

A White House Briefing on January 31, 2020, announced that beginning at 5:00 p.m. Eastern Time on Sunday February 2, 2020, the US will implement the following temporary measures:

- Any US citizen returning to US from Hubei province in the previous 14 days will be subject to up to 14 days mandatory quarantine to ensure they receive proper health screening and medical care
- Any US citizen returning to the US from the rest of mainland China within the previous 14 days will undergo proactive entry health screening at a select number of ports of entry and up to 14 days of monitored self-quarantine to ensure they have not contracted the virus and do not pose a public health risk
- President Trump has signed a Presidential Proclamation temporarily suspending entry into the US of foreign nationals that pose a risk of transmitting 2019-nCoV
- Foreign nationals other than immediate family of US citizens and permanent residents who have traveled in China within the last 14 days will be denied entry into the US at this time

**Reporting**

If a PUI for 2019-nCoV is identified, or if a patient's status as a PUI is uncertain, health facilities must report this event, as required in Title 22 California Code of Regulations, to the local public health officer **immediately** and to your local CDPH Licensing & Certification District Office (DO), so the DO can communicate with the CDPH Medical and Health Coordination Center. See AFL 19-18 for additional information on the requirements of reporting outbreaks and unusual infectious disease occurrences.

If you have any questions regarding the infection prevention and control of 2019-nCoV, please contact the CDPH Healthcare-Associated Infections (HAI) Program at novelvirus@cdph.ca.gov.

Sincerely,

**Original signed by Heidi W. Steinecker**

Heidi W. Steinecker
Deputy Director

**Resources**
CDC PUI Guidance
CDPH 2019-nCoV webpage
Coronavirus Alert Poster– English (PDF)
Coronavirus Alert Poster – Spanish (PDF)
Coronavirus Alert Poster– Mandarin (PDF)

# EXHIBIT I

State of California—Health and Human Services Agency

# California Department of Public Health

SONIA Y. ANGELL, MD, MPH
State Public Health Officer & Director

GAVIN NEWSOM
Governor

February 10, 2020                                                                    AFL 20-13

**TO:**          All Facilities

**SUBJECT:**     2019 Novel Coronavirus Interim Guidance for Risk Assessment and
                 Health Management of Healthcare Personnel with Potential Exposure

---

### All Facilities Letter (AFL) Summary

This AFL notifies health facilities that the Centers for Disease Control and Prevention
(CDC) has released interim guidance on risk assessment and management of
potential exposure of healthcare personnel (HCP) to the 2019-nCoV.

---

On February 8, 2020, the CDC released interim guidance to assist health facilities with
assessment of risk, monitoring, and work restriction decisions for HCP with potential
exposure to 2019-nCoV. Healthcare facilities should review the CDC's Interim U.S.
Guidance for Risk Assessment and Public Health Management of Healthcare Personnel
with Potential Exposure in a Healthcare Setting to Patients with 2019 Novel Coronavirus
(2019-nCoV).

**Risk Assessment**
The CDC Interim Guidance includes risk assessment categories for health facilities to
use when assessing the level of risk after a HCP has experienced potential exposure.
Additionally, the interim guidance provides monitoring recommendations based on each
risk assessment category. The HCP exposure risk factors described in the CDC interim
guidance include, but are not limited to, the following:

- The duration of exposure (e.g., longer exposure time likely increases exposure
  risk)
- Clinical symptoms of the patient (e.g., coughing likely increases exposure risk)
- Whether the patient was wearing a facemask (which can efficiently block
  respiratory secretions from contaminating others and the environment)
- Whether an aerosol generating procedure was performed
- The types of personal protective equipment (PPE) used by HCP

Information on the 2019-nCoV remains limited; therefore, the CDC recommends that
heath facilities use clinical judgment as well as the principles outlined in the CDC
Interim Guidance when evaluating risk of exposure and management of potential
exposure of HCP. Health facilities should use this guidance in coordination with their

---



local public health department to assess risk, determine the need for work restrictions, and guide monitoring decisions.

**Travel or Community Exposure**
HCP with potential travel or community exposures to 2019-nCoV should have their exposure risk assessed according to the CDC Interim Guidance for travel or community-associated exposures. HCP who fall into the *high-* or *medium- risk* category described there should undergo monitoring as defined by their local public health authority and be excluded from work in a healthcare setting until 14 days after their exposure. Healthcare facilities should additionally consider work exclusion for HCP that returned from China before the CDC guidance became effective on February 3, 2020 and are still within the 14-day incubation period.

**Communication**
Since response and prevention planning for the 2019-nCoV is constantly changing as we learn more about this emerging disease, CDPH will host weekly All Facility Calls every Tuesday morning at 7:45 a.m. Depending on what new information develops, we will adjust these calls each week to be for all facilities, or only for specific facility types. Tomorrow's call will be geared toward hospitals only, but future calls will include all facilities. You will receive information for the call-in number via the California Health Alert Network (CAHAN) and meeting invitations from our Medical and Health Coordination Center (MHCC).

Again, if you have any questions regarding the infection prevention and control of 2019-nCoV, please contact the CDPH Healthcare-Associated Infections (HAI) Program at novelvirus@cdph.ca.gov.

Sincerely,

**Original signed by Heidi W. Steinecker**

Heidi W. Steinecker
Deputy Director

**Resources**
- Interim U.S. Guidance for Risk Assessment and Public Health Management of Healthcare Personnel with Potential Exposure in a Healthcare Setting to Patients with 2019 Novel Coronavirus (2019-nCoV).

- Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential 2019 Novel Coronavirus (2019-nCoV) Exposure in Travel-associated or Community Settings

# EXHIBIT J

State of California—Health and Human Services Agency

# California Department of Public Health

**SONIA Y. ANGELL, MD, MPH**
*State Public Health Officer & Director*

**GAVIN NEWSOM**
*Governor*

February 19, 2020                                                                 AFL 20-14

**TO:**            All Facilities

**SUBJECT:**    Environmental Infection Control for the Coronavirus Disease 2019 (COVID-19)

---

### All Facilities Letter (AFL) Summary

This AFL notifies healthcare facilities of the Centers for Disease Control and Prevention (CDC) guidance regarding environmental infection control for Coronavirus Disease 2019 (COVID-19), formerly referred to as Novel Coronavirus (2019-nCoV).

---

Healthcare facilities should have environmental infection control procedures in place to prevent infections from spreading during healthcare delivery. Environmental infection control procedures, such as waste management, laundry, food service, and environmental cleaning, should align with the CDC's Interim Infection Prevention and Control Recommendations for Patients with Confirmed 2019 Novel Coronavirus (2019-nCoV) or Persons Under Investigation for 2019-nCoV in Health Care Settings.

For persons under investigation and patients managed with transmission-based isolation precautions for COVID-19, the CDC recommends the following environmental infection control measures:

- Dedicated medical equipment should be used for patient care.
- All non-dedicated, non-disposable medical equipment used for patient care should be cleaned and disinfected according to manufacturer's instructions and facility policies.
- Ensure that environmental cleaning and disinfection procedures are followed consistently and correctly.
- Routine cleaning and disinfection procedures (e.g., using cleaners and water to pre-clean surfaces prior to applying an EPA-registered, hospital-grade disinfectant to frequently touched surfaces or objects for appropriate contact times as indicated on the product's label) are appropriate for COVID-19 in healthcare settings, including those patient-care areas in which aerosol-generating procedures are performed.
  - Products with EPA-approved emerging viral pathogens claims are recommended for use against COVID-19.

---

Center for Health Care Quality, MS 0512
P.O. Box 997377  ●  Sacramento, CA 95899-7377
(916) 324-6630  ●  (916) 324-4820 FAX
Department Website (www.cdph.ca.gov)



AFL 20-14
Page 2
February 19, 2020

- o If there are no available EPA-registered products that have an approved emerging viral pathogen claim for COVID-19 (at the facility), products with label claims against human coronaviruses should be used according to label instructions.
- **Management of laundry, food service utensils, and medical waste should also be performed in accordance with routine procedures.**

Refer to the CDC's Guidelines for Environmental Infection Control in Heatlh-Care Facilities and Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings for detailed information on environmental infection control. For the most recent COVID-19 information and guidance, please visit the CDC's Coronavirus Disease 2019 (COVID-19) webpage.

If you have any questions regarding the infection prevention and control of COVID-19, please contact the CDPH Healthcare-Associated Infections (HAI) Program at novelvirus@cdph.ca.gov.

Sincerely,

**Original signed by Heidi W. Steinecker**

Heidi W. Steinecker
Deputy Director

**CDC Resources:**

- Interim Infection Prevention and Control Recommendations for Patients with Confirmed 2019 Novel Coronavirus (2019-nCoV) or Persons Under Investigation for 2019-nCoV in Health Care Settings
- Guidelines for Environmental Infection Control in Health-Care Facilities
- Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings
- Coronavirus Disease 2019 (COVID-19)

# EXHIBIT K

State of California—Health and Human Services Agency

# California Department of Public Health



**SONIA Y. ANGELL, MD, MPH**
*State Public Health Officer & Director*

**GAVIN NEWSOM**
*Governor*

March 3, 2020                                                                        AFL 20-17

**TO:**          All Facilities

**SUBJECT:**     Guidance for Healthcare Facilities on Preparing for Coronavirus
                 Disease 2019 (COVID-19)

---

### All Facilities Letter (AFL) Summary

This AFL provides healthcare facilities new and updated COVID-19 guidance from the
Centers for Disease Control and Prevention (CDC), which include:
- Interim guidance healthcare facilities should follow to prepare for community
  transmission of COVID-19
- Strategies to prevent spread in long-term care (LTC) facilities
- Use of N95 filtering facepiece respirators (N95s) that have exceeded their
  manufacturer-designated shelf life

---

**CDC Guidance for Healthcare Facilities**
Community transmission has been confirmed in California, although the extent of
transmission remains unknown. California healthcare facilities should follow the CDC's
Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of
COVID-19 in the United States to:
- Work with your local public health department to understand the impact and
  spread of the outbreak in your area.
- Designate staff who will be responsible for caring for suspected or known
  COVID-19 patients. Ensure they are trained on the infection prevention and
  control recommendations for COVID-19 and proper use of personal protective
  equipment.
- Monitor healthcare workers and ensure maintenance of essential healthcare
  facility staff and operations:
- Ensure staff are aware of sick leave policies and are instructed to stay home if
  they are ill with respiratory symptoms.
- Be aware of recommended work restrictions and monitoring guidance for staff
  exposed to COVID-19 patients.
- Instruct employees to check for any signs of illness before reporting to work each
  day and notify their supervisor if they become ill; In settings of widespread
  transmission, consider screening staff for fever or respiratory symptoms before
  entering the facility.

---

Center for Health Care Quality, MS 0512
P.O. Box 997377  ●  Sacramento, CA 95899-7377
(916) 324-6630  ●   (916) 324-4820 FAX
Department Website (www.cdph.ca.gov)



- Make contingency plans for increased absenteeism caused by employee illness or illness in employees' family members that would require them to stay home, including extending hours, cross-training current employees, or hiring temporary employees.
- When possible, manage mildly ill COVID-19 patients at home.

In addition to the general recommendations in the setting of community transmission, CDC provides guidance for specific health care settings including outpatient facilities, acute care inpatient facilities, and long term care facilities (LTC).

Additionally, for LTC facilities, the CDC released Strategies to Prevent the Spread of COVID-19 in Long-Term Care Facilities to provide general information to prevent spread of respiratory infections and  to prepare to care for residents with COVID-19. California LTC facilities should continue to adhere to the CDC Interim Infection Prevention and Control Recommendations for Patients with Confirmed Coronavirus Disease 2019 (COVID-19) or Persons Under Investigation for COVID-19 in Healthcare Settings which recommends standard, contact, and airborne precautions, and use of eye protection.

**Use of Expired N95 Respirators**
The CDC also provided guidance for the "Release of Stockpiled N95 Filtering Facepiece Respirators Beyond the Manufacturer-Designated Shelf Life: Considerations for the COVID-19 Response." The CDC advised that certain N95 models past manufacturer-designated shelf life can be considered when responding to COVID-19; however, these N95 models should be used only as outlined in the CDC Strategies for Optimizing the Supply of N95 Respirators, and in compliance with State laws and regulations.

The California Division of Occupational Safety and Health (Cal/OSHA) developed and published interim guidance for the efficient use of respirator supplies. Facilities should refer to the Cal/OSHA Interim Guidance on Novel Coronavirus (COVID-19) for Health Care Facilities: Efficient Use of Respirator Supplies to ensure compliance with the aerosol transmissible disease (ATD) standard. For more information on stockpiled N95s, please refer to the joint CDPH-CAL/OSHA Frequently Asked Questions About Use of Stockpiled N95 Filtering Facepiece Respirators for Protection from COVID-19 Beyond the Manufacturer-Designated Shelf Life.

**Program Flexibility for Alternative Spaces**
CDPH encourages facilities to submit program flexibility requests to create alternative spaces on their property for screening patients. General acute care hospitals may refer to AFL 18-09 for more information on requesting temporary program flexibility for increased patient accommodations during a disease outbreak. Other healthcare facilities and providers may refer to this AFL guidance in requesting program flexibility for regulations applicable to their facility type.

AFL 20-17
Page 3
March 3, 2020

**Long Term Care Patient Transfer/Discharge/Readmits**
CDPH asks that any hospital who receives a long term care resident transfer who becomes a PUI or confirmed case for COVID-19, first reach out to their local public health department for coordination before the patient is discharged, if the patient no longer requires hospitalization.

If you have any questions regarding the infection prevention and control of COVID-19, please contact the CDPH Healthcare-Associated Infections (HAI) Program at novelvirus@cdph.ca.gov.

Sincerely,

**Original signed by Heidi W. Steinecker**

Heidi W. Steinecker
Deputy Director

**Resources**
- CDC Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States
- CDC Strategies to Prevent the Spread of COVID-19 in Long-Term Care Facilities
- CDC Interim Infection Prevention and Control Recommendations for Patients with Confirmed Coronavirus Disease 2019 (COVID-19) or Persons Under Investigation for COVID-19 in Healthcare Settings
- CDC Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19), February 2020
- CDC Release of Stockpiled N95 Filtering Facepiece Respirators Beyond the Manufacturer-Designated Shelf Life: Considerations for the COVID-19 Response
- CDC Strategies for Optimizing the Supply of N95 Respirators
- Cal/OSHA Interim Guidance on Novel Coronavirus (COVID-19) for Health Care Facilities: Efficient Use of Respirator Supplies
- Frequently Asked Questions About Use of Stockpiled N95 Filtering Facepiece Respirators for Protection from COVID-19 Beyond the Manufacturer-Designated Shelf Life
- CDPH Novel Coronavirus (COVID-19) webpage
- CDC Coronavirus Disease 2019 (COVID-19) webpage
- AFL 18-09: Requesting Increased Patient Accommodations Including Medical Surge Tent Use

# EXHIBIT L

State of California—Health and Human Services Agency

# California Department of Public Health



**SONIA Y. ANGELL, MD, MPH**
*State Public Health Officer & Director*

**GAVIN NEWSOM**
*Governor*

March 8, 2020                                                                 AFL 20-18

**TO:**            Hospitals

**SUBJECT:**    Hospital Surge Survey to Assess Capacity Regarding
Coronavirus Disease 2019 (COVID-19) and Reminder to Contact
Medical Health Operational Area Coordination Office (MHOAC)

---

**All Facilities Letter (AFL) Summary**

This AFL requests that all hospitals voluntarily complete a state-wide resources survey on surge capacity. The California Department of Public Health (CDPH) is requesting that all hospitals complete the survey immediately.

This AFL reminds hospitals to contact their MHOAC with resource requests related to COVID-19.

---

**Hospital Surge Survey**
In anticipation of California potentially experiencing a surge of COVID-19 patients, CDPH is requesting that all hospitals complete an online survey on surge capacity. Hospital responses to these questions will greatly assist CDPH in assessing the California health care system's surge capacity. Additionally, this survey will assist CDPH in understanding hospitals current space, supply, and staffing situations, as well as future needs. This is only a gathering of information so that CDPH can better plan, communicate, and coordinate responses if needed.

CDPH requests that hospital leadership immediately complete the Hospital Surge Survey (https://www.surveymonkey.com/r/CDPHSurge).

If you have any questions regarding the Hospital Surge Survey, please contact CDPH by email at CDPH_FacilityContactSurvey@CDPH.CA.gov.

For information on program flexibility, including the submission process for requesting a temporary program flexibility, see AFL-18-09 Requesting Increased Patient Accommodations Including Medical Surge Tent Use.

---



**Medical Health Operational Area Coordination Office**

In order to ensure adequate resources are available to meet the needs of your county/jurisdiction's operational area (OA) medical and health response system, the MHOAC coordinates all medical and health resources within, into, and out of your county/jurisdiction OA consistent with the California Public Health and Medical Emergency Operations Manual (EOM). The MHOAC uses the EOM as a guide to coordinate response among multiple jurisdictions and to access disaster medical and health service response at all levels of government and the private sector.

The MHOAC is responsible for managing disaster medical resources, including personnel, equipment, and supplies. Resource management includes assessing disaster medical response needs, tracking available resources, and requesting or providing mutual aid. The status of local available resources within the OA is assessed before requesting outside resources or submitting a resource request to the Region Disaster Medical Health Coordination/Specialist Program (RDMHC/S). Following an assessment of local resources, the MHOAC may request or provide mutual aid as conditions warrant. The MHOAC acts as the single-point ordering authority for OA medical health mutual aid requirements. If necessary, the MHOAC may also request the public health and medical Department Operations Center (DOC) or OA Emergency Operations Center (EOC) to be activated to support the public health or medical event.

If the MHOAC cannot fulfill a request using local sources, they may request public health and medical resources from outside of the OA via your RDMHC/S. If regional resources are inadequate or delayed, the RDMHC Program will forward the request to the State. If in-State resources are unable to fill the request in a timely manner, the State will request Federal assistance through the California Office of Emergency Services (Cal OES). Acting through Cal OES, the Governor will request Strategic National Stockpile (SNS) via the Department of Homeland Security. Please be aware that while every effort will be made to obtain resources as quickly as possible, requesting entities should anticipate that time from acceptance of a request to actual receipt of the resource may be 48-96 hours or longer, depending on the type and scope of the incident.

Please see the Medical Health Operational Area Coordination (MHOAC) Manual for more information. (https://www.cdph.ca.gov/Programs/CCLHO/CDPH%20Document%20Library/MedicalandHealthOperationalAreaCoordinationManual.pdf#search=RDMHS)

For questions about infection control, please contact the CDPH Healthcare-Associated Infections Program at HAIProgram@cdph.ca.gov.

If you have any questions regarding the infection prevention and control of COVID-19, please contact the CDPH HAI Program at novelvirus@cdph.ca.gov.

Please remember to report to your district office if you have confirmed COVID-19 patients at your facility.

Sincerely,

**Original signed by Heidi W. Steinecker**

Heidi W. Steinecker
Deputy Director

**Resources**

- Hospital Surge Survey (https://www.surveymonkey.com/r/CDPHSurge)

- AFL-18-09 Requesting Increased Patient Accommodations Including Medical Surge Tent Use

- CDPH 5000 (PDF) - Program Flexibility

- CDPH 5000 A (PDF) - Temporary Permission for Program Flexibility for Increased Patient Accommodations

- Medical Health Operational Area Coordination (MHOAC) Manual (https://www.cdph.ca.gov/Programs/CCLHO/CDPH%20Document%20Library/MedicalandHealthOperationalAreaCoordinationManual.pdf#search=RDMHS)

- CDPH Coronavirus Disease 2019 (COVID-19) webpage

# EXHIBIT M

**Virus outbreak halts visits to 2 area prisons** SHARE THIS          💬 0  comments

https://hanfordsentinel.com/news/virus-outbreak-halts-visits-to-2-area-prisons/article_d594bf2d-0b78-5dd5-8d12-42271cb621b2.html

# Virus outbreak halts visits to 2 area prisons

By Eiji Yamashita
Jan 14, 2008

SALE! Subscribe for $1/mo.

Four California prison facilities — including Avenal and Coalinga — remain closed to visitors after outbreaks of a stomach flu virus were confirmed over the past month, state prison medical officials said Monday.

Avenal State Prison had by far the largest number of inmates who came down with the contagious virus, according to the Department of Corrections and Rehabilitation.

CDCR spokesman Lt. Brian Parriott said 125 to 140 inmates were diagnosed with norovirus gastroenteritis infections in Avenal.

The outbreak at the Avenal prison was reported on Jan. 2, and the number of inmates showing symptoms has since gone down to 50, said Rachel Kagan, spokeswoman for California's prison medical receiver.

Outbreaks in other prisons appear contained, but the facilities remain closed to visitors while medical staff continue to try keeping the virus from spreading.

"Norovirus is nothing new to prisons or any sort of institutional living," Kagan said Monday.

The so-called cruise ship virus causes flu symptoms of fever, diarrhea and vomiting.

**Virus outbreak halts visits to 2 area prisons**

0 comments

Meanwhile, staff are restricting the movements of prisoners in the affected areas as they engage in "aggressive cleaning" to disinfect bunks and common areas at the state's four prisons, Kagan said.

The other prisons with confirmed outbreaks are:

* Pleasant Valley State Prison in Coalinga.

* Sierra Conservation Center in Jamestown.

* Deuel Vocational Institution in Tracy.

Pleasant Valley Prison is on lockdown status again this week after another outbreak of a stomach flu virus was suspected on Friday, Kagan said.

The report comes on the heels of the first outbreak involving 21 inmates reported in late December. On Friday, 20 other inmates experienced symptoms of stomach flu, prompting the officials to shut down the facility again while lab work is being done to confirm the outbreak.

"It was a conservative and early response," Kagan said. "The facility is closed until we can determine if it's norovirus and the extent of (the outbreak)."

**Virus outbreak halts visits to 2 area prisons** PRINT THIS

💬 0 comments

The Sierra Conservation Center has been reopened after 55 inmates affected by the virus were treated and the facility disinfected.

An outbreak at Deuel Vocational Institution peaked at 35 cases, and inmates who aren't affected are again being allowed to move about, Kagan said. Inmates there began falling ill last week, causing a lockdown.

The lockdown has been partially lifted this week, Kagan said. But public health officials in San Joaquin County remain on alert because increased norovirus infections have been reported among civilians in the community, she said.

Four inmates at California Medical Facility in Vacaville also came down with diarrhea on Dec. 24, but norovirus has been ruled out, Kagan said. The facility was not closed, she added.


**Virus outbreak halts visits to 2 area prisons**    💬 **0 comments**

(Jan. 15, 2008)

💬 **0 comments**

## Be the first to know

Get local news delivered to your inbox!

| Email Address | Sign up! |
|---|---|

* I understand and agree that registration on or use of this site constitutes agreement to its user agreement and privacy policy.

## Most Popular

### 5 new resident cases of COVID-19 confirmed
Updated Apr 16, 2020

### Tachi Palace Casino Resort to remain closed
Apr 15, 2020

### Hanford man arrested for DUI, other charges
Apr 13, 2020

### KCSO SWAT team called after suspect refuses to exit home
Updated Apr 17, 2020

Virus outbreak halts visits to 2 area prisons THIS   💬 0 comments

📷 +2

---

## Inmates released on newly-adopted bail schedule

Updated Apr 17, 2020

📷 +2

---

## Emergency Food and Shelter funds available

Apr 18, 2020

---

## New managing editor, general manager named at Sentinel

Updated Apr 16, 2020

---

## KCSO K-9 officer helps apprehend fleeing suspect after high-speed chase

Updated Apr 17, 2020

📷 +3

---

## Man arrested for unlawful possession of firearm, other charges

Apr 14, 2020

📷 +2

---

## Man, teen arrested in connection to gang activity

Updated Apr 13, 2020

Case 2:90-cv-00520-KJM-DB   Document 6627   Filed 04/20/20   Page 76 of 150

**Virus outbreak halts visits to 2 area prisons**

0 comments

+2

# EXHIBIT N

**Greg Gonzalez**

| | |
|---|---|
| **From:** | Thomas Nolan |
| **Sent:** | Monday, April 20, 2020 7:48 AM |
| **To:** | Davis, Tamiya@CDCR; Penny Godbold; Vincent Cullen; Russa Boyd; Beland, Bruce@CDCR; Powell, Alexander@CDCR; Meyer, Nicholas@CDCR; Ed Swanson; Ed Swanson ████████████ |
| **Cc:** | ████████████; Sean Lodholz; Armstrong Team - RBG only; Armstrong Team; ████████████; Miranda, Teauna@CDCR; Fouch, Adam@CDCR; Bravo, Landon@CDCR; Annakarina De La Torre-Fennell; Michael Nunez; CDCR OLA Armstrong CAT Mailbox; Coleman Team - RBG Only; Coleman Special Master Team; Steve Fama |
| **Subject:** | RE: Plaintiffs' Questions re: COVID-19 and Armstrong Impacts [IWOV-DMS.FID3579] |

Hi Tamiya –

Our office has been contacted over the weekend by three different family members of class members or ADA workers at CMC-West about plans to add bunk beds and addition incarcerated individuals into the two ADA dormitories these.  CMC West housing is entirely dormitory housing in old military barracks.  On G-Yard at CMC West, Dorms 22 and 23 have long been designated ADA dorms because they have a level entrance and are located adjacent to the dining hall for the yard.  Many of the individuals residing in these two dormitories are older and medically vulnerable.  They would appear to be the individuals at CMC-West most vulnerable to Coronavirus, and it is hard to understand the logic of adding additional individuals and bunk beds into these dorms.   These e-mails also raise serious and troubling concerns about the lack of cleaning supplies, and the institution's (or perhaps CDCR's) unwillingness to allow incarcerated individuals to use hand sanitizer, which we understand is now being made by PIA in large quantities, and about the fact that staff are not wearing protective masks that are now mandatory in many parts of the state.

We received the following report from the wife of an ADA worker at CMC West:

> [My husband] asked me to contact you about what is going on at the prison that will effect ADA inmates. According to him, there is a plan to extend the population of the dorm to house 15 additional men. My husband believes that this places ADA inmates in a more vulnerable position as far as potentially contracting the COVID-19 virus. He is under the thinking that the inmates there should be in as less contact as possible right now, and not being placed into bunk beds with other inmates. We both understand that their ability to recover from this virus wouldn't come with the best odds. My husband has stated that CMC had supplied building porters with extra cleaning supplies during the first day (after making a pledge to the media and public), but have not given anything extra since. **They have not given any extra soap or hand sanitizer out individually yet; haven't even made it available for purchase through the canteen. They made hand sanitizer available for two meals and then rescinded it, saying that it was for the staff and that it contained alcohol so it could not be utilized for inmates. It's important to note that the sanitizer was never given to inmates, but that a pump style bottle was set up and inmates could get some from there on their way to eat. The point is that CMC-WEST is picking the wrong time to make a decision to expand the amount of people in the dorms. If the virus were to get in there, they are giving it more host and ability to be spread to men who already have underlining conditions.**

We also received the following e-mail from a family member of someone in one of the ADA dorms at CMC-West:

> Contrary to your efforts to protect and preserve the lives of the elderly and those with chronic diseases, CDCR appears to have a completely different agenda. I am 74 years old and have been housed in building 22 at CMC-West for the past 7½ years. Buildings 22 and 23 are the 2 buildings that are used to house inmates with mobility impairments and chronic conditions. However, yesterday we were informed that, in the middle of a pandemic, the prison has decided to raise the population of the 2 buildings,

tomorrow. CMC-West has decided to raise the population of the buildings that house inmates who are at the greatest risk, from 45 to 60 by installing and utilizing bunk beds to facilitate this transition. They will take the military barracks stole dorm and create "makeshift" 4-6 man pods, though no barriers will be installed at all. So down the right side of the wall, it will be 2 to 3 (4 to 6 people) bunk beds in a row, approximately 4½ feet of space, 2 to 3 bunk beds in a row, space, and so on. This will be repeated for the left side of the wall as well. Inmates in the building raised the question of how this played any part in social distancing and were informed that CDCR only needed to practice social distancing outside of the buildings, not inside. Medical has also begun reducing and/or eliminating nebulizer treatments for inmates in their quest to protect staff and others. It is clear that CDCR has no idea what to do and continue to work out the kinks at the potential cost of the inmates. **The staff are not even wearing mask while people in society are continuously being directed to do so. I find this particularly troubling since the greatest chance we have of contracting this virus is through these very staff. While I applaud your efforts to send us home out the front door to our loved ones, it appears that CDCR's plan could potentially send us out of the back door.**

Several e-mails we received also pointed out that the dormitories at CMC West that house the dog training program are being allowed to maintain a reduced population size of 32 to 45 individuals in the dorm, even as the population in the ADA dorms is increased to 60.  One relative concluded by saying "I guess the dogs and mentors out value the elderly."

We ask that CDCR look into and reconsider these plans, ensure that incarcerated individuals are given access to cleaning supplies and hand sanitizer (easily done safely in locations like entrances to dining rooms where the process can be observed), and ensure that staff wear protective masks.

Sincerely,

Tom Nolan

Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105
███████████  (cell)
(415) 433-6830 (office telephone)
(415) 433-7104 (fax)
tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Sent:** Friday, April 10, 2020 2:42 PM
**To:** Penny Godbold <PGodbold@rbgg.com>; Vincent Cullen ███████████████████; Russa Boyd ████████████; Beland, Bruce@CDCR ███████████ Powell, Alexander@CDCR ███████████; Meyer, Nicholas@CDCR ███████
**Cc:** ████████ Sean Lodholz ████████████; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Armstrong Team <arm-plo@prisonlaw.com>; ████████; Miranda, Teauna@CDCR ████████████; Fouch, Adam@CDCR ████████; Bravo, Landon@CDCR ████████; Annakarina De La Torre-Fennell ████████████; Michael Nunez <MNunez@rbgg.com>; CDCR OLA Armstrong CAT Mailbox ████████
**Subject:** RE: Plaintiffs' Questions re: COVID-19 and Armstrong Impacts [IWOV-DMS.FID3579]

Hello all:

Thank you for the productive call this morning. Attached please find a copy of email that went to people with tablets explaining accessibility features and the DRP memo regarding plan for broadcasting ADA compliant content on institutional television systems.

Take care and have a wonderful weekend.

*Tamiya Davis*

Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Phone: ███████████
Cell: ████████████

**From:** Penny Godbold <PGodbold@rbgg.com>
**Sent:** Thursday, April 9, 2020 4:55 PM
**To:** Davis, Tamiya@CDCR <████████████>; Cullen, Vincent@CDCR ████████████; Boyd, Russa@CDCR ████████████; Beland, Bruce@CDCR <████████████>; Powell, Alexander@CDCR ████████████; Meyer, Nicholas@CDCR ████████
**Cc:** ████████; Sean Lodholz <████████v>; Armstrong Team - RBG only ████████████; Armstrong Team <████████ Miranda, Teauna@CDCR ████████>; Fouch, Adam@CDCR <████████>; Bravo, Landon@CDCR ████████; Annakarina De La Torre-Fennell ████████████; Michael Nunez ████████>; CDCR OLA Armstrong CAT Mailbox ████████>
**Subject:** RE: Plaintiffs' Questions re: COVID-19 and Armstrong Impacts [IWOV-DMS.FID3579]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Tamiya,
Thank you for providing the written responses to the questions we were unable to cover during the Tuesday call.  We have some clarifying questions based on your answers and those are highlighted in ==yellow== in the attached document.

In addition, we would like clarification on your comment regarding the last two questions: "Defendants request this to be meet and Confer item." Are you proposing these issues be discussed during the May meeting? We are hoping to have answers before that time.

Lastly, we would like to follow up on the outstanding requests for information that we discussed on Tuesday which include:

1. Clarity on the cell-feeing direction - It was unclear if this applied to dorms and what procedures for feeding were being used in dorm settings.
2. Isolation beds for DPW class members – DAI and CCHCS were going to talk after the Tuesday call to discuss whether there are enough DPW designated isolation beds at designated institutions, and particularly dorms with DPW class members, and develop a plan for if/when there is a need to isolate DPW class members and they cannot be housed appropriately.
3. Class members moved to nontraditional housing locations – at the end of the call, we asked for clarity on whether any Armstrong class members have been moved from dorms to gyms or other housing locations that are being used during the pandemic. We requested a list of class members who have been moved.
4. 128s for class members housed out of DPP placement
5. Field memo re DPP after sent on Friday
6. COVID-19 education/information provided to ADA workers
7. Copy of email that went to people with tablets explaining accessibility features
8. We request a copy memo to TV specialists regarding captioning

I think it's a good idea to move forward with the call tomorrow and we look forward to talking to you then.
Thanks,
-Penny

---

**From:** Davis, Tamiya@CDCR ████████████████████
**Sent:** Wednesday, April 08, 2020 3:09 PM
**To:** Penny Godbold <PGodbold@rbgg.com>; Vincent Cullen ████████████████; Russa Boyd ████████████; Beland, Bruce@CDCR ████████████████; Powell, Alexander@CDCR ████████████>; Meyer, Nicholas@CDCR ████████████>
**Cc:** ████████████ Sean Lodholz ████████████████>; Armstrong Team - RBG only ████████████; Armstrong Team ████████████; Miranda, Teauna@CDCR ████████████; Fouch, Adam@CDCR ████████████; Bravo, Landon@CDCR ████████████; Annakarina De La Torre-Fennell ████████████; Michael Nunez <MNunez@rbgg.com>; CDCR OLA Armstrong CAT Mailbox ████████████████████
**Subject:** RE: Plaintiffs' Questions re: COVID-19 and Armstrong Impacts [IWOV-DMS.FID3579]

Hello all:

Attached please find written responses to your questions that were not addressed on yesterday's call.

Take care,

*Tamiya Davis*

Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Phone: ████████████
Cell: ████████████

**From:** Penny Godbold <PGodbold@rbgg.com>
**Sent:** Thursday, April 2, 2020 2:04 PM
**To:** Davis, Tamiya@CDCR <████████████████; Cullen, Vincent@CDCR <████████████████>; Boyd, Russa@CDCR ████████████████; Beland, Bruce@CDCR <████████████████>; Powell, Alexander@CDCR <████████████████ Meyer, Nicholas@CDCR ████████████████
**Cc:** ████████████ Sean Lodholz ████████████████>; Armstrong Team - RBG only ████████████>; Armstrong Team <████████████████; Miranda, Teauna@CDCR ████████████████ Fouch, Adam@CDCR <████████████████>; Bravo, Landon@CDCR ████████████████>; Annakarina De La Torre-Fennell ████████████████>; Michael Nunez <MNunez@rbgg.com>
**Subject:** RE: Plaintiffs' Questions re: COVID-19 and Armstrong Impacts [IWOV-DMS.FID3579]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Tamiya,

Thanks for your response. We are available for a call next Tuesday at 2 pm and we do understand that the situation is changing daily. The fact that the situation is changing daily is precisely why we hope to get answers to some of these questions sooner than Tuesday. It is also why we are concerned that any information that is approved by the Director tomorrow might be out of date by the time you share it on Tuesday. Thus, any information that you are able to share with us this week, especially with regard to our general questions, is much appreciated and will be received with the understanding that the situation is changing daily.

Thanks,
-Penny

**From:** Davis, Tamiya@CDCR ████████████████>
**Sent:** Thursday, April 02, 2020 1:39 PM
**To:** Penny Godbold <PGodbold@rbgg.com>; Vincent Cullen ████████████████; Russa Boyd ████████████████>; Beland, Bruce@CDCR ████████████████>; Powell, Alexander@CDCR <████████████████>; Meyer, Nicholas@CDCR <████████████████
**Cc:** ████████████; Sean Lodholz ████████████████>; Armstrong Team - RBG only ████████████>; Armstrong Team <████████████████>; Miranda, Teauna@CDCR ████████████████>; Fouch, Adam@CDCR <████████████████>; Bravo, Landon@CDCR ████████████████>; Annakarina De La Torre-Fennell ████████████████>; Michael Nunez <MNunez@rbgg.com>
**Subject:** RE: Plaintiffs' Questions re: COVID-19 and Armstrong Impacts [IWOV-DMS.FID3579]

Hi Penny,

We are diligently working on getting the information and answers to your questions below. I know I sound like a broken record when I say that the COVID-19 situation is fluid and has varying impacts to CDCR's operations that are literally changing on a daily basis. As you are aware, we have three institutions that have inmates that have tested positive to COVID-19. CDCR's focus is on containment and life-saving measures.

We want to ensure that the information we provide is accurate and current to the best of our ability. To do so, we need to make sure the Director has any opportunity to review and provide any up-to-date information. Additionally, some of these questions require input from multiple stakeholders including CHCHCS and OCE. We plan on providing the Director

the information tomorrow, and would like to propose to meet next Tuesday at 2 pm to provide you a thorough update and provide answers to your questions. Please let us know if that day and time works for Plaintiffs.

Thank you,

*Tamiya Davis*

Attorney III, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Phone: ███████
Cell: ████████

---

**From:** Penny Godbold <PGodbold@rbgg.com>
**Sent:** Wednesday, April 1, 2020 6:54 AM
**To:** Cullen, Vincent@CDCR <███████████>; Davis, Tamiya@CDCR <████████████>; Boyd, Russa@CDCR <█████████>; Beland, Bruce@CDCR <████████████>; Powell, Alexander@CDCR <████████████>; Meyer, Nicholas@CDCR <████████>
**Cc:** █████████; Sean Lodholz <████████████>; Armstrong Team - RBG only <███████████>; Armstrong Team <████████; █████; Miranda, Teauna@CDCR <████████████>; Fouch, Adam@CDCR <█████████████; Bravo, Landon@CDCR <████████████>; Annakarina De La Torre-Fennell <██████████████>; Michael Nunez <MNunez@rbgg.com>
**Subject:** RE: Plaintiffs' Questions re: COVID-19 and Armstrong Impacts [IWOV-DMS.FID3579]

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Vince and Tamiya,

I am just following up on this to see if Friday at 2 pm would work for a phone call to discuss.

Thanks,
-Penny

---

**From:** Penny Godbold
**Sent:** Tuesday, March 31, 2020 7:24 AM
**To:** Vincent Cullen <████████████>; Davis, Tamiya@CDCR <████████████>; Russa Boyd <██████████>; Beland, Bruce@CDCR <████████████>; Powell, Alexander@CDCR <████████████>; Meyer, Nicholas@CDCR <████████>
**Cc:** █████████; Sean Lodholz <████████████>; Armstrong Team - RBG only <███████████>; Armstrong Team <████████; █████; Miranda, Teauna@CDCR <████████████>; Fouch, Adam@CDCR <█████████████; Bravo, Landon@CDCR <████████████>; Annakarina De La Torre-Fennell <██████████████>; Michael Nunez <MNunez@rbgg.com>
**Subject:** Plaintiffs' Questions re: COVID-19 and Armstrong Impacts [IWOV-DMS.FID3579]

Vince,

Thank you for the phone call updates regarding the developing situation with COVID-19 and the impact on *Armstrong* class members in CDCR.  As of our call on Friday afternoon, our understanding is:

6

All Non-Essential Transfers of incarcerated people have been limited.  This includes transfers of *Armstrong* class member with codes impacting placements.

> Non-Essential Transfers at this time include transfers out of the RC and transfers due to 1845 code changes

> Essential Transfers include, among other emergent concerns, those who are kicked out of Ad Seg as well as LOC changes.  To the extent possible those class members will be housed at the prison where released from Ad Seg or the LOC.  However, if they need to be transferred to a different prison, they will be.

Defendants have stated that for class members with a new or changed 1845 showing a DPP code that impacts placement, ADA Coordinators have been directed to interview those class members to determine what accommodations are needed and to document that interview and needed accommodations on a 128.  You confirmed that you will notify us of who these class members are.

Thank you for providing this information.  **For any class member who is housed inconsistent with their DPP code, we request that you please identify those class members and provide the 128 forms confirming that they were interviewed and what accommodations they will be provided, weekly.  Please also identify any class members who are being held in more restrictive placements – RC, Ad Seg, etc. – due to a lack of available bed space and inability to transfer.**

In addition to the information about transfers, and the plan for provision of basic accommodations, we have many additional questions regarding the provision of accommodations during this time.  I am also including CDCR, as many of the questions we have relate to custody functions.  We would like to have a call this week to discuss these issues.  I propose keeping the **Friday at 2 pm call**, but scheduling it for two-hours.  Also, to the extent that some of these issues may be handled differently at different prisons, we may need to have additional calls with ADA staff from the institutions to determine what is happening on the ground:

**General**

- **General Movement:** Has the movement of incarcerated people within the prison been limited statewide?  What about at individual prisons?  For example, are people still attending chow, yard, etc.?
- **Bed distance:**  What efforts have been made to allow social distancing for people in dormitories?  We are especially concerned, given the high number of people with lower-lower restrictions, that it will be difficult to sufficiently spread out.  (CDCR website says:  "The incarcerated population has received information about social distancing, and staff and inmates are practicing social distancing strategies where possible, including . . . assigning bunks to provide more space between individuals.")
- **Dining procedures**:  Are people still eating in the chow hall?  If so, are ADA workers carrying trays for certain class members?  If so, what safety precautions (e.g., PPE, increased sanitization) have been adopted to prevent the spread of the virus?
- **Shower program**:  Has access to showers been limited for incarcerated people, including after toileting accidents?
- **Isolation beds**:  Which beds in which prisons have been identified for use for isolation purposes?  Which of those are able to house DPW class members?  Which have accessible features, including grab bars?  Are there accessible showers and toilets?
- **1824 process**:  Is the 1824 process running as normal?  Is the RAP meeting weekly?  Where appropriate, are people being interviewed to gather more information regarding their 1824?  How are those interviews being conducted?
- **ADA workers**:  Have there been any changes to the ADA worker program?  What steps are taken to ensure social distancing during the provision of accommodations, including scribing assistance, wheelchair pushing, cleaning bed areas, and sighted guide work?  Have the workers received any PPE or extra soap or sanitizer?  If ADA workers are not providing services, how are the accommodations being provided to class members now?

- **Housing officers**:  Has custody staffing been reduced?  If so, has that affected officers' ability to provide accommodations, including assistance with reading and writing?
- **ADA staff**:  Are ADA Coordinators onsite?  Are staff still performing all usual functions?
- **DME**:  Any changes to the issuance, repair, and replacement of DME?
- **Fitness**:  Have people with disabilities been instructed on safe exercise activities they can complete in their bed areas?

**Blind and Low Vision Class Members**

- **Written COVID-19 information:**  What effective communication of COVID-19 information, including written information, posters, and information about free GTL and J-Pay services, was provided?  (See March 23, 2020 letter from Plaintiffs regarding CMF)  Was any material provided in braille, audio, or large print?  (From CDCR website:  "To keep members of our population informed, we have created and distributed fact sheets and posters in both English and Spanish that provide education on COVID-19 and precautions recommended by CDC, which expand upon those advised during cold and flu season.")
- **Audio description:**  Is audio description being provided for any videos updating incarcerated people about the situation?
- **Sighted guide:**  Have sighted guide procedures changed in light of COVID-19?   If so, how?
- **COMS training**:  Is COMS training being provided?  If not, will existing contracts be extended?  (We understand SATF's contract is through June 2020.)
- **Talking books**:  Are talking books still being mailed into the institution?  It appears they might not be, at least for SATF (http://www.fresnolibrary.org/tblb/ ("All Branches Closed.  Thank you for your understanding.")).  If that is the case, what are Defendants doing to ensure that blind people have access to audio materials?
- **Law library and auxiliary aids:**  Do class members still have regular access to the law library, where auxiliary aids, including the Merlin, DaVinci, JAWS, and Braille typewriter, as well as the MaxiAids catalog, are located?  If not, how are they able to access those devices?  How are those devices being cleaned and sanitized?  (From CDCR website:  "Recreation and Law Library Services will continue to be available to the incarcerated population even if physical access is restricted due to safety and security measures.")
- **J-Pay accessibility features:**  Has any training on the new text-to-speech or magnification features on the J-Pay tablets been provided to blind or low vision class members?  (From CDCR website:  "CDCR's electronic messaging provider for the incarcerated population, JPay, is providing reduced-priced emails to those incarcerated at the pilot institutions and free emails for those inmates who cannot afford it.")
- **In-cell OCE assignments:**  What in-cell assignments are provided by OCE, and are they accessible to blind and low vision class members?  (From CDCR website:  "The Office of Correctional Education is working with institution principals, library staff, and teachers to provide in-cell assignments where possible in order for students to continue their studies, legal library access and educational credit-earning opportunities. For those in our incarcerated population who need supplementary academic support, CDCR has encouraged Disability Placement Program, Developmental Disability Program, and Every Student Succeeds Act staff to coordinate with the institution instructor to provide additional assistance to enrolled students where possible.")

**Deaf, Hard of Hearing, and Low TABE Class Members**

- **Sign language interpretation**:  Have there been any changes to staff or contract interpreter availability?  Are they on the same schedules?  Are they still providing in-person services?  What about the use of contractor interpreters?
- **Videophones and TDD**:  How are these high-touch items being cleaned and sanitized?  Have TDDs been tested to ensure they are functioning properly?
- **Captioned phones**:  Have Defendants installed captioned telephones?  (See November 27, 2019 and March 27, 2020 letters from Plaintiffs) (From CDCR website:  "Institutions have been instructed to find opportunities to allow increased phone access for the incarcerated population so they may keep in touch with their support system")
- **Staff communication**:  How is verbal information from wardens, associate wardens, captains, supervisors, and counselors being communicated to deaf people (whose primary form of communication is sign language or written notes)?  Do Defendants now provide real-time captioning?  (Secretary Diaz said in an address to the

incarcerated population on March 25, 2020: "I've given direction to the wardens of your particular institution to be over communicating with you either from the warden themselves associate wardens captains, supervisors, counselors to be communicating with you.")

- **Biweekly captain/ADA meetings**:  Have these meetings continued for D/deaf class members whose primary form of communication is sign language?  At which institutions?  Is social distancing being maintained?
- **Written materials**:  What efforts are being made to effectively communicate written information to D/deaf people who use sign language or people with low TABEs?  A Deaf person at San Quentin told us that he could not fully understand a written handout he had been given regarding COVID-19:  "Some words I've never heard of or seen before."
- **J-Pay tablets**:  Do educational videos, including Khan Academy distance learning videos, have captions?  (We did not see captions during our February 2020 visit at SATF.)
- **Religious services**:  How will chaplains be able to conduct individual religious counseling with D/deaf class members (both who rely on written notes and sign language)?  Will televised religious services be provided in ASL and captions?  (From CDCR website:  "Chaplains will conduct individual religious counseling as appropriate while maintaining social distancing, and CDCR is working to provide televised religious services to the population.")
- **In-cell OCE assignments:**  What in-cell assignments are provided by OCE, and are they accessible to D/deaf and low-TABE class members?  (From CDCR website:  "The Office of Correctional Education is working with institution principals, library staff, and teachers to provide in-cell assignments where possible in order for students to continue their studies, legal library access and educational credit-earning opportunities. For those in our incarcerated population who need supplementary academic support, CDCR has encouraged Disability Placement Program, Developmental Disability Program, and Every Student Succeeds Act staff to coordinate with the institution instructor to provide additional assistance to enrolled students where possible.")
- **Secretary video messages**:  Will Secretary Diaz's video messages to the incarcerated population be provided in ASL?  In simpler language?  (From CDCR website:  "CDCR Secretary Ralph Diaz will be releasing regular video message updates directly to the incarcerated population.")
- **Educational videos**:  Will educational videos be provided in ASL?  In simpler language?  (From CDCR website:  "We have also begun streaming CDC educational videos on the CDCR Division of Rehabilitative Programs inmate television network and the CCHCS inmate health care television network.")
- **Televisions in common areas**:  Have Defendants installed larger televisions in common areas, so captions are clearly visible?  (In SATF's dorms, for example, individual televisions do not receive the state-run television channels with important educational information.)
- **Daily Moth news**:  Have Defendants considered making Daily Moth news clips available to D/deaf people in prison?  (https://www.dailymoth.com/)
- **Headphones**:  We understand that the Allowable Personal Property Schedule does not yet allow for headphones in some places, including the PSU.  Have hard of hearing class members been informed that they can request headphones on an individual basis?

We look forward to speaking with you this week.

(Please forward to anyone I may have missed.)

Thanks,
-Penny


Penny Godbold

**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
pgodbold@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.
IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

# EXHIBIT O

# Prison System Diagnoses First Probable Case of Swine Flu (H1N1) Virus

**MAY 3, 2009**

*Medical Receiver Calls for Halt to Visiting and Non-Essential Activities*

SACRAMENTO – An inmate at Centinela State Prison in Imperial County has been diagnosed with a probable case of the H1N1 virus, commonly referred to as Swine Flu. This is the first probable case within the California Department of Corrections and Rehabilitation (CDCR). In response, CDCR and the court appointed Receiver over inmate medical care are taking all appropriate precautions to protect public health.

"The single probable case of H1N1 Influenza is mild and the infected inmate and his cell mate are confined to an appropriate setting and receiving appropriate care within Centinela State Prison," said Dr. Steven Ritter, California Prison Health Care Services Acting Chief Physician Executive. "We are closing visitation and non-essential activities at all of our institutions statewide as a precautionary measure according to our established protocol to protect the public, the staff, and the inmates. The continued well-being of the staff and inmates is essential in order to contain any further potential outbreaks and avoid additional exposure to the public at-large."

Effective today, CDCR has stopped all visiting and other non-essential activities including volunteer activities, special events, and other non-staff related inmate and youth programs at prisons, youth facilities, and community correctional facilities. Critical and legally mandated activities, such as attorney visits, medical and psychological evaluations, contract services such as Substance Abuse Programs, and court ordered social worker and other visits, will continue with added precautions.

"The Department takes the threat of a Swine Flu influenza outbreak very seriously, and is taking all precautions to limit possibilities of exposure and prevent any spread of the virus. The health and safety of the inmates in our care and the staff members who provide for their custody is our primary concern," said Scott Kernan, CDCR Undersecretary of Operations. "We have comprehensive plans in place to respond to natural disasters, pandemics, or any other issues that may arise. In anticipation of a confirmed case of Swine Flu, CDCR activated its Department Operations Center at Headquarters last week to ensure that all institutions are on stand by and prepared to respond."

CDCR has approximately 68,000 employees and oversees nearly 170,000 adult inmates and youth offenders. The Department has taken numerous steps to protect public health by posting and distributing information to educate inmates and staff on proven practices to stop the spread of this communicable viral infection. CDCR is working closely with state Department of Public Health, and local health departments, to curtail the spread of this virus.

# EXHIBIT P



**COVID-19 PUBLIC HEALTH GUIDANCE**

**Self-Isolation for Older Adults and Those Who Have Elevated Risk**

**March 16, 2020**

This guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19). The California Department of Public Health (CDPH) will update this guidance as needed and as additional information becomes available.

This document is intended to be statewide guidance to help older adults and individuals who are at high risk for serious illness, this includes:

- Individuals over 65 years of age
- Individuals who have serious chronic medical conditions like:
    - Heart disease
    - Diabetes
    - Lung disease
- Individuals who have compromised immune systems

This guidance does not apply to people who work in essential services, such as hospital and health care workers, pharmacists, peace officers, firefighters, staff at skilled nursing facilities and residential care facilities for the elderly, and other essential workers.

**Background**

COVID-19 is a respiratory illness caused by a novel virus that has been spreading worldwide. Community-acquired cases have now been confirmed in California. We are gaining more understanding of COVID-19's epidemiology, clinical course, immunogenicity, and other factors as time progresses, and the situation is changing daily. CDPH is in the process of monitoring COVID-19, conducting testing with local and federal partners, and providing guidance and resources to prevent, detect and respond to the occurrence of COVID-19 cases in California.

At this time, community transmission of COVID-19 has occurred in California. All individuals should prepare for possible impacts of COVID-19 and take precautions to prevent the spread of COVID-19 as well as other infectious diseases, including influenza and gastroenteritis.

**Illness Severity**

The complete clinical picture with regard to COVID-19 is not fully understood. Reported illnesses have ranged from mild to severe, including illness resulting in death. Older people, those with compromised immune systems, and people with certain underlying health conditions like heart disease, lung disease and diabetes, for example, seem to be at greater risk of serious illness.

**Measures for Older Adults and Those Who Have Elevated Risk**

Individuals at elevated risk can take steps now to slow reduce the risk from infectious diseases, including COVID-19. CDPH recommends implementing the following steps:

- Remain at home until further guidance is issued.
  - Cancel any non-essential travel, appointments, etc.
  - For routine medical care, contact your health care provider to discuss rescheduling, if not urgent. Otherwise, discuss alternative provision of services, such as telehealth or in-home care.
  - If you are in need of medical care, and in consultation with your health care provider, make an appointment and visit your provider to get the necessary care. If you have an emergency and need immediate medical care, call 9-1-1.

- Continue with outdoor activities.
  - As long as you practice social distancing, we encourage you to continue your outdoor activities such as walks, runs and yardwork, to the extent your health allows it.

- Practice social distancing, both in and outside the home.
  - Maintain distance, at least six feet, between yourself and anyone who is coughing or sneezing.
  - Avoid handshaking, hugging or other intimate types of greetings—greet others with a wave, nod or bow instead.

- Stay in touch with others by phone, email, or other on-line tools (like Skype and Facebook).
  - Ask friends, family, neighbors, and other networks to do any essential grocery shopping, picking up medications, etc.  Consider on-line ordering for food and other supplies.
  - Ask for help from friends, family, neighbors, community health workers, etc. if you become sick.
  - Identify friends, family, neighbors, and other networks who can provide you with care if your caregiver gets sick or otherwise adjusts their scheduled services.

- Identify Family, Friends, Neighbors, and Caregivers who can provide Support
  - Family, friends, neighbors, and caregivers who come to homes to provide support should be asymptomatic, meaning having no fever, cough, or other respiratory symptoms.
  - Family, friends, neighbors, and caregivers can support by knowing what medications your loved one or client is taking and seeing if you can help them have extra on hand; monitoring food and medical supplies (oxygen, incontinence, dialysis, and wound care) needed and creating a back-up plan; and stocking up on non-perishable food items to have on hand in your home.

- Have supplies on hand
  - Contact your healthcare provider to ask about obtaining extra necessary medications to have on hand.

- If you cannot get extra medications, consider using mail-order for medications.
- Be sure you have over-the-counter medicines and medical supplies (tissues, etc.) to treat fever and other symptoms.

- Have a plan for if you get sick
  - Consult with your health care provider for more information about monitoring your health for symptoms suggestive of COVID-19.
  - Stay in touch with others by phone or email. You may need to ask for help from friends, family, neighbors, community health workers, etc. if you become sick.
  - Watch for symptoms and emergency warning signs
    - Pay attention to potential COVID-19 symptoms including fever, cough and shortness of breath. If you develop symptoms, call your doctor or local public health department.
    - If you develop emergency warning signs for COVID-19, get medical attention immediately. In adults, emergency warning signs* include:
      - Difficulty breathing or shortness of breath
      - Persistent pain or pressure in the chest
      - New confusion or inability to arouse
      - Bluish lips or face
      - *This list is not all inclusive. Please consult your medical provider for any other symptom that is severe or concerning.

- Practice Hand washing
  - Wash hands frequently for at least 20 seconds.
  - Encourage hand washing by family and friends, particularly children.
  - Provide alcohol based hand sanitizers to supplement hand washing.
  - Avoid touching eyes, nose, or mouth with unwashed hands.
  - Clean frequently used devices, such as mobile phones.

- Use "respiratory etiquette"
  - Cover cough with a tissue or sleeve. See CDC's Cover Your Cough page for multilingual posters and flyers, posted at the bottom of webpage.
  - Provide adequate supplies within easy reach, including tissues and no touch trash cans.

- Clean and disinfect your home to remove germs: practice routine cleaning of frequently touched surfaces (for example: tables, doorknobs, light switches, handles, desks, toilets, faucets, sinks & cell phones) with common cleaning supplies

- See the Center for Disease Control and Prevention's guidance regarding the prevention of disease in homes and residential communities.

# EXHIBIT Q

## EXECUTIVE DEPARTMENT
## STATE OF CALIFORNIA

**EXECUTIVE ORDER N-27-20**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** the impacts of COVID-19 are far-reaching in sectors throughout California; and

**WHEREAS** the most critical health and safety standards must be our state's highest priority at this time given the emergency associated with COVID-19; and

**WHEREAS** healthcare and other residential and non-residential facilities licensed by the state, and particularly those serving senior citizens and other vulnerable populations, will face significant challenges with respect to staffing and capacity as a result of COVID-19; and

**WHEREAS** it is imperative that monitoring and enforcement efforts among our state agencies, especially in these facilities and particularly those serving senior citizens and other vulnerable populations, are focused specifically on the safety of these populations and on compliance with the most critical protections for health and safety of all in these facilities; and

**WHEREAS** additional action and capacity are necessary to protect the health and safety of Californians receiving care in these critical facilities and in-home isolation; and

**WHEREAS** certain existing California state employees have skills, which can be immediately utilized in and to the benefit of these facilities, and in particular in those facilities providing services to senior citizens and other vulnerable populations; and

**WHEREAS** I find it necessary to redirect these staff pursuant to Government Code section 3100, which allows me to reassign state workers as necessary to protect the public during an emergency; and

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code section 8567, do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1. The Department of Social Services, the Division of Occupational Safety and Health, and the Department of Public Health, shall focus on those individuals who are most vulnerable and on the most serious health and safety issues at licensed facilities.  Consistent with this directive:



i)     licensing and enforcement staff shall focus on providing technical assistance and supporting compliance with core health and safety requirements for caregivers and the cared for;

ii)    these Departments and Division, in consultation with the Health and Human Services Agency, shall immediately identify health and community care facilities, and other sites housing populations that are particularly vulnerable to COVID-19, including but not limited to senior citizens and individuals who require assisted-living services due to chronic health conditions;

iii)   these Departments and Division shall redirect resources to facilities identified pursuant to (ii) of this section;

iv)    staff from these Departments and Division shall have primary focus on providing technical assistance and support to have maximum effect to address the risk of COVID-19;

v)     consistent with these requirements, staff shall focus enforcement activities where there are allegations of the most serious violations impacting health and safety.

2. The Health and Human Services Agency shall develop alternatives, in consultation with counties and representatives of labor organizations and consumers, to leverage the in home supportive services programs, the adult protective services programs, the area agencies on aging and regional centers, and other programs to support the home isolation of vulnerable Californians, including seniors and those with serious chronic underlying health conditions.

3. To address increased demand for healthcare workers and first responders, Emergency Medical Services Authority, Department of Social Services, and the Department of Public Health shall authorize first responders, health and human services care providers and workers who are asymptomatic to continue working during the period of this emergency, subject to those responders, providers, and workers taking precautions to prevent transmission.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person. The State shall be immune from any liability resulting from implementation of this Order.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 15th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

ALEX PADILLA
Secretary of State

# EXHIBIT R



# COVID MONITORING

*Patient Registry*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Current Institution | First Testing Institution | CDCR# | Last Name | Age | Care Team | Housing Facility | Cell Bed | MH LOC |
| CIM | CIM | ▉ | ▉ | 39 | ▉ | | | |
| CIM | CIM | ▉ | ▉ | 46 | ▉ | ▉ | ▉ | |
| CEN | CEN | ▉ | ▉ | 60 | ▉ | ▉ | ▉ | |
| NKSP | NKSP | ▉ | ▉ | 43 | ▉ | ▉ | ▉ | |
| CIM | CIM | ▉ | ▉ | 32 | ▉ | ▉ | ▉ | |
| CIM | CIM | ▉ | ▉ | 34 | ▉ | ▉ | ▉ | |
| CIM | CIM | ▉ | ▉ | 54 | ▉ | | | |
| CIM | CIM | ▉ | ▉ | 42 | ▉ | ▉ | ▉ | |
| CIM | CIM | ▉ | ▉ | 61 | ▉ | ▉ | ▉ | |

Institution(s):     Multiple
Care Team(s):      All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING
*Patient Registry*

Institution(s):     Multiple
Care Team(s):      All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING

*Patient Registry*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Identification & Housing** | | | | | | | | |
| **Current Institution** | **First Testing Institution** | **CDCR#** | **Last Name** | **Age** | **Care Team** | **Housing Facility** | **Cell Bed** | **MH LOC** |
| CIM | CIM | ▓ | ▓ | 46 | ▓ | ▓ | ▓ | |
| CIM | CIM | ▓ | ▓ | 53 | ▓ | ▓ | ▓ | |
| CIM | CIM | ▓ | ▓ | 37 | ▓ | ▓ | ▓ | |
| CIM | CIM | ▓ | ▓ | 29 | ▓ | ▓ | ▓ | |
| CIM | CIM | ▓ | ▓ | 68 | ▓ | ▓ | ▓ | |
| CIM | CIM | ▓ | ▓ | 61 | ▓ | ▓ | ▓ | |
| CIM | CIM | ▓ | ▓ | 37 | ▓ | ▓ | ▓ | |
| CEN | CEN | ▓ | ▓ | 36 | ▓ | ▓ | ▓ | |
| CIM | CIM | ▓ | ▓ | 47 | ▓ | ▓ | ▓ | |

Institution(s):      Multiple
Care Team(s):        All
Housing/Facility:    All

Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING
*Patient Registry*

Institution(s):     Multiple
Care Team(s):       All
Housing/Facility:   All

  Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING

*Patient Registry*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Current Institution** | **First Testing Institution** | **CDCR#** | **Last Name** | **Age** | **Care Team** | **Housing Facility** | **Cell Bed** | **MH LOC** |
| CIM | CIM | ▮ | ▮ | 51 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 39 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 33 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 44 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 60 | ▮ | ▮ | ▮ | |
| SATF | SATF | ▮ | ▮ | 37 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 63 | ▮ | | | |
| CIM | CIM | ▮ | ▮ | 58 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 48 | ▮ | ▮ | ▮ | |

Institution(s):      Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



Institution(s):     Multiple
Care Team(s):       All
Housing/Facility:   All

  Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*



# C O V I D   M O N I T O R I N G

*P a t i e n t   R e g i s t r y*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Current Institution | First Testing Institution | CDCR# | Last Name | Age | Care Team | Housing Facility | Cell Bed | MH LOC |
| CIM | CIM | ▮ | ▮ | 31 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 40 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 60 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 37 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 57 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 45 | ▮ | ▮ | ▮ | |
| CIM | CIM | ▮ | ▮ | 52 | ▮ | | | CCCMS |
| LAC | LAC | ▮ | ▮ | 63 | ▮ | ▮ | ▮ | CCCMS |
| LAC | LAC | ▮ | ▮ | 51 | ▮ | ▮ | ▮ | CCCMS |

Institution(s):      Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*                    Page 7



# COVID MONITORING
*Patient Registry*

Institution(s):     Multiple
Care Team(s):     All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*                    Page 8



# COVID MONITORING

*Patient Registry*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Current Institution** | **First Testing Institution** | **CDCR#** | **Last Name** | **Age** | **Care Team** | **Housing Facility** | **Cell Bed** | **MH LOC** |
| CIM | CIM | ███ | ███ | 35 | ███ | ███ | ███ | CCCMS |
| CIM | CIM | ███ | ███ | 54 | ███ | ███ | ███ | CCCMS |
| CIM | CIM | ███ | ███ | 26 | ███ | ███ | ███ | CCCMS |
| CIM | CIM | ███ | ███ | 57 | ███ | ███ | ███ | CCCMS |
| CIM | CIM | ███ | ███ | 54 | ███ | ███ | ███ | CCCMS |
| CIM | CIM | ███ | ███ | 48 | ███ | ███ | ███ | CCCMS |
| CIM | CIM | ███ | ███ | 33 | ███ | ███ | ███ | CCCMS |
| CIM | CIM | ███ | ███ | 43 | ███ | ███ | ███ | CCCMS |
| CIM | CIM | ███ | ███ | 58 | ███ | ███ | ███ | CCCMS |

Institution(s):     Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*



Institution(s):      Multiple
Care Team(s):        All
Housing/Facility:    All

Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING

*Patient Registry*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Current Institution | First Testing Institution | CDCR# | Last Name | Age | Care Team | Housing Facility | Cell Bed | MH LOC |
| CIM | CIM | ▮ | ▮ | 32 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 39 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 51 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 50 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 37 | ▮ | ▮ | ▮ | CCCMS |
| CMC | CMC | ▮ | ▮ | 74 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 40 | ▮ | | | CCCMS |
| CIM | CIM | ▮ | ▮ | 35 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 41 | ▮ | ▮ | ▮ | CCCMS |

Institution(s):     Multiple
Care Team(s):     All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



Institution(s):     Multiple
Care Team(s):      All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



# C O V I D   M O N I T O R I N G

*Patient Registry*

| | | | | Identification & Housing | | | | |
|---|---|---|---|---|---|---|---|---|
| Current Institution | First Testing Institution | CDCR# | Last Name | Age | Care Team | Housing Facility | Cell Bed | MH LOC |
| CIM | CIM | ▮ | ▮ | 58 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 22 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 69 | ▮ | | | CCCMS |
| CIM | CIM | ▮ | ▮ | 27 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 57 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 73 | ▮ | | | CCCMS |
| CIM | CIM | ▮ | ▮ | 64 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 27 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 32 | ▮ | ▮ | ▮ | CCCMS |

Institution(s):     Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING
*Patient Registry*

Institution(s):     Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



# C O V I D   M O N I T O R I N G

*Patient Registry*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Current Institution** | **First Testing Institution** | **CDCR#** | **Last Name** | **Age** | **Care Team** | **Housing Facility** | **Cell Bed** | **MH LOC** |
| CIM | CIM | ▮ | ▮ | 37 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 53 | ▮ | ▮ | ▮ | CCCMS |
| CIM | CIM | ▮ | ▮ | 39 | ▮ | ▮ | ▮ | CCCMS |
| LAC | LAC | ▮ | ▮ | 36 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 41 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 38 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 38 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 50 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 52 | ▮ | ▮ | ▮ | EOP |

Institution(s):     Multiple
Care Team(s):     All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*                    Page 15



Institution(s):     Multiple
Care Team(s):       All
Housing/Facility:   All

   Report run: 4/20/2020 11:29:56 AM



# C O V I D   M O N I T O R I N G

*P a t i e n t   R e g i s t r y*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Current Institution** | **First Testing Institution** | **CDCR#** | **Last Name** | **Age** | **Care Team** | **Housing Facility** | **Cell Bed** | **MH LOC** |
| LAC | LAC | ▇ | ▇ | 46 | ▇ | ▇ | ▇ | EOP |
| LAC | LAC | ▇ | ▇ | 45 | ▇ | ▇ | ▇ | EOP |
| LAC | LAC | ▇ | ▇ | 59 | ▇ | ▇ | ▇ | EOP |
| LAC | LAC | ▇ | ▇ | 50 | ▇ | ▇ | ▇ | EOP |
| LAC | LAC | ▇ | ▇ | 58 | ▇ | ▇ | ▇ | EOP |
| LAC | LAC | ▇ | ▇ | 38 | ▇ | ▇ | ▇ | EOP |
| LAC | LAC | ▇ | ▇ | 32 | ▇ | ▇ | ▇ | EOP |
| LAC | LAC | ▇ | ▇ | 31 | ▇ | ▇ | ▇ | EOP |
| LAC | LAC | ▇ | ▇ | 33 | ▇ | ▇ | ▇ | EOP |

Institution(s):      Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*                                   Page 17



Institution(s):      Multiple
Care Team(s):      All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING

*Patient Registry*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Identification & Housing** | | | | | | | | |
| **Current Institution** | **First Testing Institution** | **CDCR#** | **Last Name** | **Age** | **Care Team** | **Housing Facility** | **Cell Bed** | **MH LOC** |
| LAC | LAC | ▆ | ▆ | 35 | ▆ | ▆ | ▆ | EOP |
| LAC | LAC | ▆ | ▆ | 50 | ▆ | ▆ | ▆ | EOP |
| LAC | LAC | ▆ | ▆ | 55 | ▆ | ▆ | ▆ | EOP |
| LAC | LAC | ▆ | ▆ | 50 | ▆ | ▆ | ▆ | EOP |
| LAC | LAC | ▆ | ▆ | 63 | ▆ | ▆ | ▆ | EOP |
| LAC | LAC | ▆ | ▆ | 63 | ▆ | ▆ | ▆ | EOP |
| LAC | LAC | ▆ | ▆ | 53 | ▆ | ▆ | ▆ | EOP |
| LAC | LAC | ▆ | ▆ | 65 | ▆ | ▆ | ▆ | EOP |
| LAC | LAC | ▆ | ▆ | 55 | ▆ | ▆ | ▆ | EOP |

Institution(s):      Multiple
Care Team(s):      All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING
*Patient Registry*

Institution(s):      Multiple
Care Team(s):       All
Housing/Facility:   All

  Report run: 4/20/2020 11:29:56 AM



# C O V I D   M O N I T O R I N G

*P a t i e n t   R e g i s t r y*

| | | | Identification & Housing | | | | | |
|---|---|---|---|---|---|---|---|---|
| Current Institution | First Testing Institution | CDCR# | Last Name | Age | Care Team | Housing Facility | Cell Bed | MH LOC |
| LAC | LAC | ▮ | ▮ | 62 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 62 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 58 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 59 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 68 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 19 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 22 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 26 | ▮ | ▮ | ▮ | EOP |
| LAC | LAC | ▮ | ▮ | 30 | ▮ | ▮ | ▮ | EOP |

Institution(s):      Multiple
Care Team(s):      All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



Institution(s):      Multiple
Care Team(s):       All
Housing/Facility:    All

  Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*                              Page 22



# C O V I D   M O N I T O R I N G

*Patient Registry*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Current Institution | First Testing Institution | CDCR# | Last Name | Age | Care Team | Housing Facility | Cell Bed | MH LOC |
| LAC | LAC | ██ | ██ | 36 | ██ | ██ | ██ | EOP |
| LAC | LAC | ██ | ██ | 42 | ██ | ██ | ██ | EOP |
| LAC | LAC | ██ | ██ | 45 | ██ | ██ | ██ | EOP |
| LAC | LAC | ██ | ██ | 27 | ██ | ██ | ██ | EOP |
| LAC | LAC | ██ | ██ | 29 | ██ | ██ | ██ | EOP |
| LAC | LAC | ██ | ██ | 25 | ██ | ██ | ██ | EOP |
| LAC | LAC | ██ | ██ | 24 | ██ | ██ | ██ | EOP |
| LAC | LAC | ██ | ██ | 28 | ██ | ██ | ██ | EOP |
| LAC | LAC | ██ | ██ | 30 | ██ | ██ | ██ | EOP |

Institution(s):     Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



Institution(s):      Multiple
Care Team(s):        All
Housing/Facility:    All

   Report run: 4/20/2020 11:29:56 AM



# COVID MONITORING

*Patient Registry*

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Identification & Housing** | | | | | | | | | |
| Current Institution | First Testing Institution | CDCR# | Last Name | Age | Care Team | Housing Facility | Cell Bed | MH LOC |
| LAC | LAC | ▓ | ▓ | 66 | ▓ | ▓ | ▓ | EOP |
| LAC | LAC | ▓ | ▓ | 35 | ▓ | ▓ | ▓ | EOP |
| LAC | LAC | ▓ | ▓ | 40 | ▓ | ▓ | ▓ | EOPMod |
| LAC | LAC | ▓ | ▓ | 64 | ▓ | ▓ | ▓ | EOPMod |
| LAC | LAC | ▓ | ▓ | 49 | ▓ | ▓ | ▓ | EOPMod |
| LAC | LAC | ▓ | ▓ | 58 | ▓ | ▓ | ▓ | EOPMod |
| LAC | LAC | ▓ | ▓ | 74 | ▓ | | | EOPMod |
| LAC | LAC | ▓ | ▓ | 60 | ▓ | ▓ | ▓ | EOPMod |
| LAC | LAC | ▓ | ▓ | 35 | ▓ | ▓ | ▓ | EOPMod |

Institution(s):     Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*                    Page 25



# COVID MONITORING
*Patient Registry*

Institution(s):      Multiple
Care Team(s):      All
Housing/Facility:   All

  Report run: 4/20/2020 11:29:56 AM

*California Correctional Health Care Services*                              Page 26



# C O V I D   M O N I T O R I N G

*Patient Registry*

| Identification & Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Current Institution** | **First Testing Institution** | **CDCR#** | **Last Name** | **Age** | **Care Team** | **Housing Facility** | **Cell Bed** | **MH LOC** |
| LAC | LAC | ███ | ███ | 49 | ███ | ███ | ███ | ICF |
| LAC | LAC | ███ | ███ | 37 | ███ | ███ | ███ | ICF |
| CIW | CIW | ███ | ███ | 30 | ███ | ███ | ███ | MHCB |

Institution(s):      Multiple
Care Team(s):       All
Housing/Facility:   All

Report run: 4/20/2020 11:29:56 AM



Institution(s):      Multiple
Care Team(s):      All
Housing/Facility:   All

  Report run: 4/20/2020 11:29:56 AM

# EXHIBIT S

**LIVE UPDATES**    Updated 4 minutes ago

# Coronavirus Live Updates: Southern States Move to Reopen as Outbreak Continues to Spread in Parts of U.S.

As the virus overwhelms the health care system, people with other illnesses are struggling to find treatment. A $450 billion deal to aid taxpayers and businesses stalls in Congress amid a dispute over testing.

**RIGHT NOW**  South Carolina allowed retail shops to open on Monday with social distancing guidelines, and the governors of Georgia and Tennessee announced plans to ease restrictions on businesses in their states in the coming days.

---

**Here's what you need to know:**

- Several states in the South are moving to reopen businesses.

- Cases surge in an Ohio prison, making it the top known U.S. hot spot.

- The outbreak is continuing to worsen in some parts of the U.S.

- The outbreak's collateral damage includes people whose other illnesses go untreated.

- Oil plummets as storage capacity runs low, and a quirk in pricing wipes out one benchmark.

- A W.H.O. director warns that manufacturing and distributing a vaccine could be difficult.

- Cuomo says 478 more people died in New York, the lowest single-day toll in two weeks.

---

More live coverage:

**World**    **U.S.**    **New York**    **Business**

---

"While I am Case 2:90-cv-00520-KJM-DB Document 6627 Filed 04/20/20 Page 129 of 150 major metropolitan areas to ensure they are in a position to reopen as soon and safely as possible," he said in a statement. "Social distancing works, and as we open up our economy it will be more important than ever that we keep social distancing as lives and livelihoods depend on it."

## Cases surge in an Ohio prison, making it the top known U.S. hot spot.



More than 600 cases involving inmates and staff members at the Cook County Jail in Chicago have been tied to the coronavirus.   Shannon Stapleton/Reuters

A state prison in Ohio is now the largest reported source of virus infections in the United States, according to a New York Times database, continuing a trend of fast-moving outbreaks behind bars.

Ohio officials said Sunday that at least 1,828 inmates — almost three-quarters of the prison population — had tested positive at the Marion Correctional Institution, a minimum- and medium-security prison about an hour's drive north of Columbus. That's more than the number of known cases at a meatpacking plant in South Dakota and an aircraft carrier docked in Guam.

About one out of five confirmed virus cases in Ohio is now connected with the state's prison system, according to statewide figures. The Department of Rehabilitation and Correction said that as of Sunday, at least 2,400 inmates in the system had tested positive, and seven had died of either confirmed or suspected Covid-19 infections.

No deaths have been reported among the prisoners in Marion, but one staff member at the facility has died, and 103 employees have tested positive. The prison announced its first positive case, of an employee, on March 29.

Despite warnings from health officials and attempts to release some inmates to avoid outbreaks, jails, prisons and detention centers have emerged as major coronavirus spreaders. As of Monday, four of the 10 largest-known sources of infection in the United States were correctional facilities, according to Times tracking data.

And even those numbers are most likely a vast undercount, because some state and local agencies have not released information about cases behind bars, and others, including the federal Bureau of Prisons, are not testing everyone who falls ill. In contrast, the Ohio corrections department said it was testing aggressively inside prisons where the virus has been confirmed, extending tests even to prisoners who were not showing symptoms.

At the Cook County Jail in Chicago, more than 600 cases involving inmates and staff members have been tied to the virus, and four inmates have died. At one point last week, that jail was the top-known source of U.S. infections, but other sources have since surpassed it.

And an outbreak at a North Carolina prison is quickly worsening: More than half of the inmates at the Neuse Correctional Institution — 458 — have tested positive for the virus, county officials said. There have now been 575 cases in the county and six deaths.

## The outbreak is continuing to worsen in some parts of the U.S.



A medical worker took a sample at a coronavirus testing center in Chelsea, Mass., on Monday.  Steven Senne/Associated Press

Although there have been encouraging signs that the outbreak is beginning to level off in some places, the threat of the virus is continuing to grow in some states and regions.

Even in areas where the number of new cases is beginning to flatten, it is doing so at a very high level: New York, which reported its fewest new cases in a month and its lowest one-day death toll in more than two weeks, still reported 4,726 new cases and 478 new deaths on Monday. And the country has added more than 25,000 new cases a day for the past week.

But in some regions, there are signs that things are getting worse, not better.

Massachusetts has been particularly hard-hit in recent days. It reported 1,705 new cases on Sunday, bringing its total to 38,077, and 146 new deaths, which brought the death toll to 1,706. "We're right in the middle of the surge now," Gov. Charlie Baker, a Republican, said Sunday on "Face the Nation" on CBS.

Los Angeles County reported 81 deaths on Saturday, its highest one-day death toll.

"In this last week, we have doubled the number of deaths that occurred among L.A. County residents," Barbara Ferrer, the county's director of public health, said in a statement on Saturday. Fewer deaths were reported Sunday — 24 — but county officials noted that nearly 1,000 new cases had been identified in the previous 48 hours.

There have been significant workplace-based clusters in Iowa, Kansas, Minnesota, North Dakota, South Dakota, Tennessee and other states, suggesting that the pandemic is just beginning to sink into some communities.

Nursing homes and prisons also continue to be hot spots.

## The outbreak's collateral damage includes people whose other illnesses go untreated.

# EXHIBIT T

XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN - SBN 209508
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR - 263293
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO - 179755
SAMANTHA D. WOLFF -  240280
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

MARCIANO PLATA, et al.,

      Plaintiffs,

   v.

GAVIN NEWSOM, et al.,

      Defendants.

CASE NO. 01-1351 JST

**JOINT CASE MANAGEMENT
CONFERENCE STATEMENT**

Date:    April 20, 2020
Time:    2:00 p.m.
Crtrm.: 6, 2nd Floor
Judge:  Hon. Jon S. Tigar

The parties submit the following joint statement in advance of the April 20, 2019 Case Management Conference.

## I.   PLAINTIFFS' STATEMENT

As of 8:00 a.m. this morning, 121 patients statewide have tested positive for COVID-19: 60 at the California Institution for Men (CIM) (all from Facility D, we believe), 55 at California State Prison – Los Angeles County (LAC) (all from Facility D, almost or perhaps all from a single housing unit in that Facility, we believe), two at Centinela State Prison, and one each at the California Institution for Women, California Men's Colony, North Kern State Prison, and the Substance Abuse Treatment Facility and State Prison.  There has been one patient death from COVID-19, on April 19, 2020.

**A.    Defendants' plan to implement the Receiver's directive to facilitate distancing.**

Plaintiffs seek further information regarding Defendants' intent to implement the Receiver's April 10, 2020 Directive (Receiver's Directive) (ECF 3273-2) to create in the prison dormitories eight-person housing cohorts, each separated by a distance of at least six feet in all directions.  Defendants before this Court last week unequivocally indicated that they would implement this Directive, "and explained that they have already moved some individuals from dormitory housing into gymnasiums to increase physical distancing in the dorms."  Order, ECF 3291 at 11.  They further stated that the aspiration was to complete the process in the following week.

That same day, in response to Judge Mueller's Order requiring Defendants to submit a strategic plan for achieving compliance with the U.S. Centers for Disease Control and Prevention (CDC) *Interim Guidance on Management of Coronavirus Disease (2019) (COVID-19) in Correctional and Detention Facilities* ("CDC Guidance"), the CDCR filed a COVID-19 Plan that is inconclusive as to whether they will implement the Receiver's Directive.  That Plan states "CDCR, in conjunction with the Plata Receiver, will assess the population in the dorms and determine *what additional steps need to be taken, if any*" after completing already-scheduled transfers.  CDCR COVID Plan at 6, *Coleman v. Newsom*, Case No. 2:90-CV-00520-KJM-DB, ECF No. 6616 at 11 ("Strategic Plan") (emphasis added).

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

In light of these inconsistent positions, Plaintiffs seek the following information from Defendants:

First, do Defendants intend to comply with the Receiver's Directive to create housing cohorts?

Second, if Defendants intend to comply with the Receiver's Directive, Plaintiffs request that Defendants provide the "activation schedule" that Defendants' counsel referenced during the April 16, 2020 motion hearing.  That schedule should include an explanation of the methodology Defendants intend to use to house people at high risk due to COVID-19.  Plaintiffs request that this schedule include all of the dormitories, including any existing or established in re-purposed space (e.g., gyms) in each of the 35 facilities and indicate whether each dormitory has been or will be reorganized to incorporate the eight-person cohort plan, with six-foot separation, and the final date by which Defendants intend to complete this transition for each dormitory.

Third, Defendants must provide photos or video-recorded site visits of each of the newly configured dormitories, in which staff measure the distances between cohorts, and document access to programs, bathrooms and showers, medical/mental health services, and meals.

Finally, if Defendants do not intend to fully implement the Receiver's Directive, Plaintiffs request that Defendants provide details on their alternative plan to effect physical distancing in the prison dormitories.

**B.      People at higher risk for severe illness or death from COVID-19.**

In their Strategic Plan, Defendants stated that they do not intend to target COVID-related efforts to any particular population, including the medically vulnerable:  "There are currently no plans to target specific portions of the population, such as *Coleman* class members or high risk inmates, for special movement or housing, except as detailed [elsewhere in the Plan] regarding the provision of Mental Health care."  Strategic Plan at 4 (*Coleman* ECF 6616 at 9).  Defendants' filings in this Court likewise do not indicate any plan to specially-house the medically vulnerable.

Plaintiffs remain concerned by Defendants' decision to not target any COVID-19 efforts to the medically vulnerable people in their custody.  The Receiver's office has recognized the

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

importance of taking steps to protect these patients.  In its April 3 *COVID-19: Interim Guidance for Health Care and Public Health Providers*, CCHCS instructed that prisons may consider placing these vulnerable patients on a "protective shelter in place":

> During the COVID-19 pandemic, CCHCS institutions may implement additional measures to protect vulnerable patients who are at increased risk for severe COVID-19 disease (e.g., single-cell or protected housing area, limited movement, separate dining and yard time, and telemedicine services).  Patients in protective shelter in place should be educated regarding their risk and how to protect themselves, early symptom recognition and request for medical attention, and the availability of testing for COVID-19.

*See* April 3 Guidance at 18 (ECF 3274-6 at 19).

Defendants apparently have not adopted this recommendation.  On April 8, CCHCS and Defendants provided Plaintiffs a spreadsheet of patients considered more vulnerable to COVID-19 complications.  The spreadsheet showed that many of these individuals remained housed in crowded dorms.  For example, CIM's Alder Hall housed 71 people who were classified as "high risk" medical, over the age of 50, and/or had conditions that made them vulnerable to severe illness from COVID-19.  Alder Hall is the locus of a COVID-19 outbreak: at least 22 people were housed there prior to testing positive for COVID-19.  ECF 3284-2 ¶ 5.  Tragically, one CIM patient has recently died from COVID-19 complications, *see* Cal. Dep't of Corr. & Rehab., *California Institution for Men Inmate Dies from Complications Related to COVID-19* (April 19, 2020), https://www.cdcr.ca.gov/news/2020/04/19/california-institution-for-men-inmate-dies-from-complications-related-to-covid-19/, and medical records indicate he had been housed in Alder Hall.  In addition, those records indicate the patient had risk factors, including age and underlying medical conditions, which made him especially vulnerable to COVID-19.

According to the April 7, 2020 Bed Audit, Alder Hall was at 112% capacity (ECF 3284-2 at 27), with 112 people in a space designed for 100 beds.  Thus, sixty-three percent (63%) of the 112 people in this dorm were considered vulnerable to COVID-19 complications.  As of April 8, there were also 71 medically vulnerable people (70% of that dorm's population) in Cedar Hall,

1    where at least 5 people were housed prior to testing positive for COVID-19 (ECF 3284-2 ¶ 7).[1]

2    And, there were 83 medically vulnerable people (74% of that dorm's population) in Spruce Hall,

3    where at least 6 people have tested positive for COVID-19 (ECF 3284-2 ¶ 6).

4        CIM is not the only prison in the state housing medically vulnerable people in crowded

5    dormitories.  For example, data provided by the Receiver indicates that California Medical Facility

6    has five dorms that house 92, 84, 70, 70, and 61 people designated "high risk medical" in dorms

7    that are, respectively, 129%, 134%, 142%, 116%, and 114% of design capacity.  And, at

8    California State Prison Solano, a dorm houses 57 such people in a dorm at 162% of design

9    capacity.  Valley State Prison houses 63 and 71 people in dorms who have at least one COVID-19

10   risk factor; these housing units are up to 133% of design capacity.  Similarly, at the Substance

11   Abuse and Treatment Facility there are 47 and 46 people housed in dorms who have at least one

12   COVID-19 risk factor; those units are up to 141% of design capacity.

13       These figures demonstrate that Defendants have knowingly housed medically vulnerable

14   people in a situation that puts them at a serious risk of harm and in one recent case, death.  As

15   stated above, Defendants have no plan to specially protect these individuals through physical

16   distancing in their housing units.  In monitoring Defendants' response to COVID-19 the Court

17   should direct that those at medically high risk be housed in a manner that protects them from

18   infection to the fullest extent possible.

19       **C.    Medical care related to COVID-19.**

20       The changes to medical services, and Plaintiffs' monitoring, caused by the COVID-19

21   pandemic, described in the April 13, 2020 Case Management Conference Statement, continue.

22   On April 14th, the Receiver's Chief Medical Executive and Chief of Corrections Services held an

23   hour-long phone conference to answer questions Plaintiffs' regarding COVID-19.  Defendants

24   counsel participated in the conference.  Plaintiffs have asked for a similar session this week to

25   address questions and concerns that remain unresolved.  The Receiver has not yet replied whether

26

27   _____

28   [1]    Plaintiffs understand that the Cedar Hall dorm has since been converted to a kind of
     infection control unit for patients who have tested positive for COVID-19.

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

a conference will be scheduled.  Among the questions and concerns Plaintiffs hope to discuss with Receiver are:

    a.  Medical Isolation

        i.  Criteria for release from medical isolation:  CCHCS said its "priority" last week was reconsideration of the criteria for when COVID-19 patients would be considered recovered and thus can be released from medical isolation.  Currently, no CDCR COVID-19 patient has been determined to be recovered and released from isolation; one patient has been on isolation for 30 days and others have been on that status for approximately three weeks.

        ii.  Outdoor time for those on medical isolation: None of the dozen patients on medical isolation at LAC and CIM were offered outdoor time, CCHCS said last week, even though it also said there was no medical or public health reason they could not be, so long as they did not mix with those not on medical isolation.  CCHCS guidance to the prisons is currently silent regarding outdoor time for those on medical isolation, even though it has specifically said those on quarantine can be provided outdoor exercise so long as they do not mix with others.  CCHCS said it would pass along Plaintiffs' request that the prisons be told that medical isolation patients can be offered outdoor time to those currently revising the directives and guidance given to the prisons.

        iii.  Question about cell-housing of medical isolation patient at LAC: A class member reported that although he did not have COVID-19 he was double-celled with a person who was positive for the virus.  Plaintiffs have asked CCHCS for information to determine if the class member's report is correct.

    b.  Testing

        i.  Availability of tests and timely test results: CCHCS said last week its

1    supply of test kits was fairly stable.  It reported 1400 COVID-19 test kits

2    statewide, roughly distributed equally among the prisons except for re-

3    allocations made to CIM and LAC given the outbreaks at those prisons.

4    CCHCS said it had not heard of any problems in obtaining tests in the near

5    future.  CCHCS said the test results turn-around time was 48-72 hours,

6    except at Pelican Bay State Prison (PBSP), where it was taking six days

7    (currently, seven PBSP patients have been tested).

8       ii.  Rapid tests: CCHCS said it expected to hear last week whether it would

9            obtain rapid COVID-19 testing developed and being sold by Abbott Labs.

10      iii.  Surveillance testing of non-symptomatic persons:  CCHCS sometime in the

11           last two weeks, apparently in partnership with an outside entity, offered

12           COVID-19 testing to non-symptomatic people housed in LAC's D-2, the

13           locus of a large outbreak.  As a result, more than 20 persons have been

14           diagnosed with COVID-19.  CCHCS has said it will attempt similar

15           surveillance testing at CIM, given the large outbreak at that prison's Facility

16           D.

17    c.   Personal Protective Equipment for staff

18       i.  CCHCS said last week that its supplies of masks for healthcare and other

19           staff was stabilizing.  It stated it had received approximately 10,000 N95 or

20           Nk95 masks, and some of those had been distributed to CIM and LAC.

21           CCHCS said it did have issues with gowns, but did not provide further

22           information.

23    d.   Cloth face barriers for incarcerated persons and staff

24       i.  On April 16, 2020, CDCR and CCHCS executives issued a memo stating

25           that incarcerated persons and staff are required to wear a cloth face barrier

26           "once a supply of two (2) face barriers/masks per correctional staff and

27           inmate/patient has been delivered to the institution."  CDCR last week

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

stated that it is manufacturing 20,000 cloth face coverings per day for use by incarcerated persons and staff.  However, it is not known when each prison will receive the supply necessary to trigger the requirement that cloth face barriers be worn.

e.  Availability of community hospital beds for COVID-19 patients in need of inpatient or other advanced care including ICU placement

    i.  CCHCS last week said it has not had and does not anticipate problems with hospital admissions in the Los Angeles area.  There may be concerns if patients need hospitalization in areas referred to as "medical deserts."  For example, the hospital in Crescent City, California, which is the nearest one to PBSP, has only eight ICU beds.

## II.  DEFENDANTS' STATEMENT

Defendants' statement describes the additional measures CDCR has taken since the filing of Defendants' opposition to Plaintiffs' emergency motion on April 13, 2020 (ECF No. 3272 et seq.).  In particular, this statement discusses the steps CDCR has taken in response to the Receiver's directives from April 10 and April 12, 2020, to mitigate the risks of COVID-19 in CDCR's institutions, including the creation of eight-person cohorts for inmates housed in dorm settings.

First, however, Defendants must raise a concern about the potential for orders related to CDCR's response to the COVID-19 pandemic issued in *Coleman v. Newsom*, No. 2:90-cv-0520 KJM DB (E.D. Cal.) to conflict with orders issued about that subject in *Plata*.  While the *Coleman* case focuses on a particular subset of correctional health care— mental health care—the potential for conflicting orders related to correctional health care more generally is emerging.  For example, in its recent ruling denying Plaintiffs' emergency motion, this Court concluded that it could not order the injunctive relief requested by Plaintiffs—which included a request for an order requiring CDCR to develop and implement a plan to minimize the spread of the COVID-19 virus to the incarcerated

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   population in California's state prisons—because Defendants have not been deliberately

2   indifferent.  (ECF No. 3291.)  By contrast, on April 10, the *Coleman* Court, after

3   acknowledging the same robust response to the COVID-19 crisis that this Court

4   considered, concluded that CDCR's efforts were insufficient,[2] and ordered the following:

> Good cause appearing, defendants will be directed to file, not later than
> 5 p.m. on Thursday, April 16, 2020, a strategic plan for achieving
> compliance with the U.S. Centers for Disease Control and Prevention
> (CDC) Interim Guidance on Management of Coronavirus Disease (2019)
> (COVID-19) in Correctional and Detention Facilities (CDC Guidance),
> to the maximum extent defendants currently maintain is possible.

9   (*Coleman,* ECF No. 6600 at 1-2; *see also* ECF No. 6622 at 1-2.)  It is difficult to reconcile

10  these two orders.  And the situation becomes more ambiguous upon considering the fact

11  that many of the CDC recommendations concern subjects that fall directly under the

12  Receiver's responsibility.

13          As this Court is aware, on February 14, 2006, it issued an order appointing the

14  Receiver, which divested the Secretary of CDCR from control of the medical delivery

15  system and placed the day-to-day management of it in the control of the Receiver.  (ECF

16  No. 473 at 4.)  Under that order, the Receiver shall "exercise all powers vested by law in

17  the Secretary of CDCR as they relate to the administration, control, management,

18  operation, and financing of the California prison medical health care system."  (*Id.*)  And

19  although some institutions' medical delivery has been delegated back to CDCR, the

20  Receiver retains control of the administrative functions of CDCR's medical services.

21  Thus, CDCR cannot enter into agreements about how to provide medical care to "high

22  risk" patients or on how to provide physical-distancing measures for medical purposes

23  without the approval of the Receiver.

24          On April 16, Defendants complied with the *Coleman* Court's order, which required

25  them to file a plan with the Court.  The strategic plan filed in *Coleman* sets forth a

26  _____

27  [2] The *Coleman* Court did not, however, explicitly find that CDCR's response to the pandemic
    constituted deliberate indifference under the Eighth Amendment or otherwise violated the

28  Constitution.

1   comprehensive summary of the measures that have already been presented to this Court,

2   plus additional actions CDCR has taken regarding the provision of mental health care to

3   address the needs of patients with mental illnesses.  (*Coleman,* ECF No. 6616.)  However,

4   upon "initial review," the *Coleman* Court found the plan (not limited to the mental health

5   components)—which was developed in close cooperation with the Receiver—to be

6   problematic.  (*Coleman,* ECF No. 6622 at 2 (noting that the Court's review "suggest[ed]

7   an absence of specific goals and objectives and no identification of the expected duration

8   of the plan or aspects thereof").)

9          The *Coleman* Court has allowed for additional briefing regarding the plan before it

10  takes the plan under formal review.  (*Id.* at 2.)  It is unclear what additional orders the

11  *Coleman* Court will make concerning CDCR's response to the pandemic.  To support

12  CDCR's preference for a holistic approach to addressing inmates' health needs and to

13  mitigate the potential for conflicting orders, Defendants request that this Court and the

14  *Coleman* Court address this issue through the Court's normal coordination mechanism.

15         While there is no doubt that the *Coleman* Court's jurisdiction fully encompasses

16  CDCR's continuing provision of adequate mental health care in its institutions, Defendants

17  believe that the determination of the adequacy of CDCR's measures to mitigate the

18  medical risks of COVID-19 in its institutions falls squarely in the purview of this Court.

19  In its April 10 order, the *Coleman* Court acknowledged that coordination between the two

20  cases is desirable, and going forward, Defendants are optimistic that coordination can

21  prevent the issuance of any conflicting orders.

22

23         **A.    CDCR Has Taken Significant Additional Steps to Improve Physical
                    Distancing in its Institutions.**

24          Defendants have rapidly begun to implement the Receiver's April 10 plan to

25  improve physical distancing in the dorms by transferring numerous inmates out of dorms

26  and into other locations, including celled housing and gyms.  Although additional transfers

27  are still needed, CDCR anticipates that by activating gymnasiums for occupation, and by

28

fully utilizing vacant cells in various locations, it will be able to fully implement the eight-person cohorts contemplated in the Receiver's plan.

### 1.   Dorm transfers have commenced.

Officials at all prisons with dorms have been directed to determine the reductions in their dorm populations that will be required to create the eight-person cohorts described in the Receiver's plan, and CDCR has moved quickly to conduct the required transfers.  In their opposition to Plaintiffs' emergency motion, Defendants described an initial phase of inmate transfers from dorms to improve physical distancing, which included the following transfers:

- 361 inmates from California Rehabilitation Center to CSP Corcoran; and
- 300 inmates from Chuckawalla Valley State Prison to Ironwood State Prison;
- 226 inmates from CSP Solano to Deuel Vocational Institution;
- 143 inmates from Sierra Conservation Center to camps;
- 100 inmates from Substance Abuse Treatment Facility to CSP Corcoran;
- 57 inmates from Chuckawalla Valley State Prison to CSP Corcoran;
- 52 inmates from California Correctional Center to camps;
- 43 inmates from Folsom State Prison B Facility to Female Community Reentry Facility.

The last of these transfers were completed last week, and the total number of inmates transferred in this first phase was about 1,282.

To create the space in the dorms required to implement the Receiver's plan for eight-person cohorts, however, additional transfers from some of the dorms are required.  On April 17, 2020, CDCR presented to the Receiver an initial proposal to comply with the Receiver's plan.  The Receiver sought additional information and CDCR therefore submitted a modified proposal to the Receiver for approval this morning—April 20, 2020. That modified proposal includes following additional dorm transfers:

- 175 inmates from Substance Abuse Treatment Facility to CSP Corcoran;

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

- 76 inmates from Substance Abuse Treatment Facility to California City Correctional Facility;
- 133 inmates from Correctional Training Facility to CSP Corcoran;
- 180 inmates from Chuckawalla Valley State Prison to Ironwood State Prison;
- 95 inmates from San Quentin to CSP Corcoran;
- 76 inmates from California Rehabilitation Center to CSP Corcoran;
- 57 inmates from CSP Solano to California City Correctional Facility;
- 19 inmates from CSP Solano to Deuel Vocational Institute;
- 50 inmates from Central California Women's Facility to Female Community Reentry Facility; and
- 38 inmates from Correctional Institution for Women to Female Community Reentry Facility.

If the Receiver approves these transfers on April 20, then CDCR should be able to complete them within about two weeks. CDCR anticipates that once these transfers are completed, nearly all dorms should have sufficient space to implement eight-person cohorts in accordance with the Receiver's plan. But it is possible that as CDCR works through this process it will identify a few remaining transfers that might be needed to fully implement eight-person cohorts in every dorm, in which case CDCR will promptly seek the Receiver's approval and conduct any such transfers as soon as possible.

### 2. CDCR has begun to activate gyms for housing as needed.

At this time, nineteen potential gymnasium sites have been identified. The State Fire Marshal, whose inspections are still underway, has approved occupancy at twelve gyms. The activation of gyms also requires that cots and lockers be moved into those locations for the inmates who will be housed there. CDCR has already acquired 600 cots and has ordered an additional 500 cots. And CDCR is in the process of surveying its need for additional lockers.

CDCR has already activated some approved gyms. To date, 108 inmates have been

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   moved into gyms at San Quentin, and 21 inmates have been moved into a gym at

2   California Institution for Men (that number will likely be increased to 50 inmates this

3   week).  CDCR anticipates that two gyms at CSP Solano will be activated this week and

4   that 128 inmates will be housed in them.  CDCR has the ability and resources to activate

5   more gyms, and will continue to do so as the need arises.

6            **3.      Appropriate physical distancing is being achieved in the dorms.**

7            All institutions with dorms have been directed to determine how their dorms can be

8   arranged to comply with the Receiver's eight-person-cohort plan, and to the extent their

9   dorm populations allow it, those prisons have been directed to begin implementing the

10  cohort plan.  A number of dorm locations have already completed implementing eight-

11  person cohorts.  And rather than use the cohort model, a number of dorm locations were

12  able to separate all inmates by at least six feet.

13           CDCR is in the process of surveying these efforts and has compiled some rough

14  numbers concerning dorm areas that have achieved appropriate physical distancing.

15  CDCR offers the following rough numbers to demonstrate that the process of ensuring

16  appropriate physical distancing in the dorms is well underway.  When considering these

17  numbers, it is important to note that the dorm locations vary greatly from institution to

18  institution.  Some dorm areas house as few as ten inmates and others house well over 200

19  inmates.  To date, it appears that about 135 dorm areas have implemented eight-person

20  cohorts and about 67 dorm areas have been able to separate all inmates by at least six feet.

21  Additionally, CDCR anticipates that over the next week an additional 88 dorm areas will

22  be able to implement eight-person cohorts, and eight additional dorm areas will be able to

23  separate all inmates by at least six feet.  CDCR anticipates that within about the next three

24  weeks, the remaining dorm areas (approximately 55) will achieve either eight-person

25  cohorts or six-foot distancing for all inmates.

26

27

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

**B.    Steps Taken at California Institution for Men and CSP Los Angeles County to contain the spread of COVID-19**

      **1.    Status of positive COVID-19 cases and hospitalizations among the inmate population**

As of April 18, 2020, at 5:30 p.m., a total of 115 inmates at CDCR's 35 institutions have tested positive for COVID-19.  Out of those 110 inmates, 59 are housed at California Institution for Men (CIM) and 50 are housed at CSP Los Angeles County (LAC).[3]  At CIM, the majority of the inmates who tested positive were previously housed in Dorm D10.  The other inmates who tested positive were also housed in Facility D dorms. Similarly, all inmates who tested positive at LAC were housed in Facility D at that institution before testing positive.

As of April 19, 2020, seven inmates from CIM and one inmate from LAC were hospitalized for COVID-19-related symptoms.

      **2.    CIM's and LAC's continuing efforts to contain the spread of COVID-19**

As described in prior briefings relating to Plaintiffs' emergency motions filed in the Three-Judge Panel and this case, to contain the spread of COVID-19, CDCR has been isolating inmates with COVID-19-related symptoms and quarantining inmates who have had contact with a COVID-19-positive individual.

          **a.    Measures taken by CIM to contain the spread of COVID-19**

In addition to the previously described measures, CIM has had a thorough and detailed plan in place to contain the spread of COVID-19 since the early stages of the COVID-19 pandemic.  For example, during the second week in March, CIM's healthcare and custody leadership started mapping out a plan to ensure that CIM would have sufficient supplies and buildings available to house quarantined or isolated inmates.  In addition, as soon as the first staff members and inmates tested positive, CIM immediately began its contact tracing investigations and placed inmates who had contact with COVID-

---

[3] In addition, as of April 18, 2020, two inmates at CEN, one inmate at CIW, one inmate at CMC, one inmate at NKSP, and one inmate at SATF have tested positive.

1  19 cases into quarantine.  Further, after receiving the first positive test from an inmate,

2  CIM set up an outdoor tent clinic where patients with COVID-19-related symptoms could

3  be evaluated without risking exposure to inmates receiving treatment for other issues.

4          In addition, CIM set up an Incident Command Post, which was staffed seven days a

5  week, to monitor patient information, supplies, and staff resources to consistently manage

6  the effects of the ongoing pandemic.  As part of the Incident Command Post, CIM

7  conducts a daily call (except for weekends and holidays) with various healthcare and

8  custody staff, including the Warden, the Associate Warden for health care, the Chief

9  Executive Officer, the Chief Medical Executive, the Chief Nurse Executive, and various

10  captains to discuss COVID-19-related topics.

11          All CIM inmates who display COVID-19-related symptoms are tested for COVID-

12  19 and housed individually in cells while awaiting their test results.  If the tests return

13  positive, the inmates are sent to a dorm where they will be housed with other inmates who

14  tested positive.  If the test results are negative, the inmates do not go straight back into

15  their old housing units.  Instead, as a matter of precaution, they are housed in a separate

16  unit together with other inmates who tested negative and are monitored for COVID-19-

17  related symptoms for 14 days before they return to their housing units.

18          Inmates who have had contact with a person infected with COVID-19 are

19  quarantined and monitored together in dorms.  As of April 18, 2020, approximately 1,200

20  inmates at CIM are quarantined.  Nurses and physicians perform surveillance screenings of

21  all inmates in isolation or on quarantine for COVID-19-related symptoms at least twice per

22  day.

23          With respect to face coverings, all CIM inmates who are isolated or quarantined

24  have received at least three cloth masks.  Inmates who tested positive are required to wear

25  cloth masks at all times.  Healthcare staff who evaluate inmates are required to wear a cap,

26  a face shield, and a N95 mask.  Inmates are required to wear their cloth masks during those

27  evaluations.  Custody staff who walk around the institution are also required to wear

28

Case No. 01-1351 JST

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  surgical or cloth masks.  (For further details about face coverings, Defendants refer to

2  heading D., *infra*.)

3                 **b.**       **Measures taken at LAC to contain the spread of COVID-19**

4       Similar to CIM, LAC reacted quickly after the first inmate in Facility D tested

5  positive for COVID-19.  Custody and health care immediately isolated the inmate and

6  began working together to establish protocols and methods to keep all inmates and staff

7  safe.  Further, LAC has set up an incident command center and reduced the staff footprint

8  by increasing telework options with alternating onsite and telework schedules for primary

9  care providers.

10       Staff members at LAC conduct additional rounds to ensure the safety and well-

11  being of inmates who are placed on modified program.  Inmates with complaints of cough,

12  fever or shortness of breath are tested for COVID-19.  In addition, inmates with respiratory

13  symptoms or complaints such as sore throat, runny nose, sneezing, loss of smell, feeling

14  feverish, or chest congestion are considered for COVID-19 testing as well.  Staff members

15  conduct additional rounds to ensure the safety and well-being of inmates on modified

16  program.  Further, cloth masks have been provided to all inmates at LAC and LAC is in

17  the process of providing cloth masks to all staff members.

18       Also, to determine the prevalence and the manner of the spread of COVID-19 at

19  LAC's housing unit D2 (where the majority of the inmates who tested positive were

20  located previously), the prison commenced surveillance testing of all quarantined inmates

21  who were asymptomatic last week.  According to California Correctional Health Care

22  Services, as of April 18, out of 51 inmates who were tested, 21 were positive, 18 were

23  negative, and 12 results were pending.  An additional 47 inmates still need to be tested.

24             **3.**     **Passing of released CIM inmate at a congregate living facility in**
                    **Los Angeles County**

25       On April 11, 2020, a 63-year old inmate who was released on parole (not an early

26  release) from CIM on April 3, 2020, to a congregate living center in Los Angeles County,

27  was found dead at the living center.  Prior to his release, the inmate was quarantined

28

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1  because he had been in contact with a COVID-19 positive person.  According to the

2  California Correctional Health Care Services, the inmate did not have any symptoms upon

3  release, and the Los Angeles County Public Health Department was notified of the

4  inmate's release and of his quarantine status.  He died at the living center of apparent

5  respiratory failure and his post-mortem testing was positive for COVID-19.  Los Angeles

6  County is performing a contact investigation at the living center.  The inmate had other

7  serious medical conditions at the time of his death.

8          **4.      Passing of a current CIM inmate**

9          On April 19, 2020, a 60-year old inmate from CIM passed away from what appear to

10  be complications related to COVID-19.  The exact cause of death has not yet been

11  determined.  The inmate was at an outside community hospital at the time of his death.  He

12  was sent to the hospital on April 16, 2020, from CIM's quarantined D10 dorm after he

13  became hypoxemic with a fever.

14

15  **C.    Updates on CALPIA's production and supply of hand sanitizer and
            masks, and new face covering policies**

16          The California Prison Industry Authority (CALPIA) plans to ship 11,880 bottles of

17  hand sanitizer next week.  Starting in May, CALPIA plans to produce 50,000 32-ounce

18  bottles of hand sanitizer per month, which will be shipped on a weekly basis.

19          In addition, CALPIA continues to produce 22,000 washable cloth barrier masks per

20  day.  The cloth masks are being distributed to all institutions for inmate and staff use.  On

21  April 10, 2020, CDCR issued a memorandum to notify all institutions that the cloth masks

22  will be issued to all inmates, starting with three cloth masks per inmate for immediate

23  distribution, with a later distribution of two additional cloth masks per inmate.  The

24  memorandum also noted that each facility needed to prepare for an increased demand for

25  laundry services in light of the need to wash the masks regularly.

26          On April 15, 2020, California Correctional Health Care Services issued a

27  memorandum that provided guidance on the use of the cloth masks.  The memorandum

28

1   clarified that the cloth masks are not intended for direct patient-care scenarios.  The

2   memorandum advised that staff members who are working or performing duties on

3   institutional grounds shall (at a minimum) wear a cloth face covering.  It also stated that

4   inmates shall use a cloth face covering within the institution during the following

5   activities: any situation that requires movement outside of cell or while in a dorm setting;

6   during interactions with other inmates (ex: yard time, canteen, dayroom); movement to and

7   from health care appointments; and movement to and from medication administration

8   areas.  These requirements are effective as soon as each institution receives a supply of two

9   face barriers/masks for each correctional staff member and each inmate.

10  DATED:  April 20, 2020                    XAVIER BECERRA

11                                          Attorney General of California

12

13                                    By:      /s/ Damon McClain

14                                          DAMON MCCLAIN
                                            Supervising Deputy Attorney General
15                                          NASSTARAN RUHPARWAR
                                            Deputy Attorney General
16                                          Attorneys for Defendants

17

18  DATED:  April 20, 2020                    HANSON BRIDGETT LLP

19

20

21                                    By:      /s/ Paul Mello

22                                          PAUL B. MELLO
                                            SAMANTHA D. WOLFF
23                                          Attorneys for Defendants

24

25

26

27

28

1   DATED:  April 20, 2020                        PRISON LAW OFFICE

2

3                                        By:        /s/ Steven Fama

4                                               STEVEN FAMA
                                                Attorneys for Plaintiffs
5
    CA2001CS0001
6   42157844.docx

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                      -19-                    Case No. 01-1351 JST