XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 210-7323
 Fax:  (916) 324-5205
 E-mail:  Lucas.Hennes@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone:  (310) 552-0130
 Fax:  (310) 229-5800
 E-mail:  RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

|  |  |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                    Plaintiffs,<br><br>          **v.**<br><br>**GAVIN NEWSOM, et al.,**<br><br>                                    Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' STRATEGIC COVID-19 MANAGEMENT PLAN** |

**TABLE OF CONTENTS**

Page

Introduction ................................................................................................................... 1

Discussion ...................................................................................................................... 2

I.    Plaintiffs' Objections to Defendants' COVID-19 Plan Are Squarely in the
Province of the Plata Court. ........................................................................ 2

    A.    Plaintiffs Cannot Forum-Shop and Re-Litigate Issues They Raised
and Lost in Plata. ............................................................................. 2

    B.    Plaintiffs' Objections Tread on the Plata Court's Order and Violate
Judicial Comity. ............................................................................... 4

    C.    The Secretary of CDCR Does Not Have Unilateral Authority to
Transfer Inmates, Specifically in Connection with CDCR's
COVID-19 Response. ....................................................................... 5

II.    Plaintiffs' Objections to Defendants' COVID-19 Plan Are Unfounded ................. 6

    A.    As Guidance, Public Health Guidance Does Not Create a Static List
of Requirements Defendants Must Meet to Comply with the
Constitution. .................................................................................... 6

    B.    CDCR's Plan Aligns with the Vast Majority of the CDC's General
Guidance. ......................................................................................... 8

    C.    Defendants Did Not Fail to Foresee and Plan for the Global
Pandemic. ....................................................................................... 10

    D.    The Strategic Plan Targets All Inmates in All Housing Units,
Including the Medically Vulnerable and Patients Housed in
Dormitories. ................................................................................... 12

    E.    CDCR's COVID-19 Strategy Plan Is Comprehensive, as the Plata
Court Found, and Is Consistent with or Exceeds Actions Taken by
Other Correctional Systems Across the Country. ........................... 13

III.    Plaintiffs' Objections to COVID-19 Plan Are Procedurally Improper
Because They Request Additional Relief Rather than Addressing the
Court's Order. ........................................................................................... 16

IV.    CDCR's COVID-19 Plan is Dynamic, As Demonstrated By Recent
Actions Approved by the Plata Receiver to Achieve Greater Physical
Distancing Among Small Groups of Inmates Through Transfers. ................. 16

Conclusion .................................................................................................................. 18

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*
  402 U.S. 313 (1971) ................................................................................................3

*Church of Scientology of Cal. v. U.S. Dep't of Army*
  611 F.2d 738 (9th Cir. 1979) ...................................................................................4

*Coleman v. Wilson*
  912 F.Supp. 1282 (1995) ................................................................................. *passim*

*Farmer v. Brennan*
  511 U.S. 825 (1994) ................................................................................................7

*Feller v. Brock*
  802 F.2d 722 (4th Cir. 1986) ...................................................................................4

*Hoptowit v. Ray*
  682 F.2d 1237 (9th Cir. 1982) .................................................................................7

*In re Palmer*
  207 F.3d 566 (9th Cir. 2000) ...................................................................................3

*Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*
  342 U.S. 180 (1952) ................................................................................................4

*Mays v. Dart*
  No. 20 C 2134, 2020 WL 1812381 (N.D. Ill. Apr. 9, 2020) ....................................8

*Nellson v. Barnhart*
  No. 20-cv-00756, 2020 WL 1890670 (D. Colo. Apr. 16, 2020) ..........................8, 15

*Ord v. United States*
  8 Fed. Appx. 852 (9th Cir. 2001) ............................................................................4

*Plata v. Newsom*
  N.D. Cal. No. 4:01-cv-01351-JST (April 17, 2020) ....................................... *passim*

*Rhodes v. Chapman*
  452 U.S. 337 (1981) ................................................................................................7

*United States v. Weems*
  49 F.3d 528 (9th Cir. 1995) .....................................................................................3

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

*West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*
    751 F.2d 721 (5th Cir. 1985).....................................................................................4

4

CONSTITUTIONAL PROVISIONS

5

United States Constitution
    Eighth Amendment ...............................................................................................2, 7

6

7

COURT RULES

8

Federal Rules of Civil Procedure
    Rule 7 ....................................................................................................................16

9

10

OTHER AUTHORITIES

11

*CDC's Interim Guidance on Management of COVID-19 in Correctional and
    Detention Facilities*, available at https://www.cdc.gov/coronavirus/2019-
    ncov/downloads/guidance-correctional-detention.pdf (last accessed Apr. 21,
    2020) .......................................................................................................................7

12

13

14

Corrections, *FDC COVID-19 Action Items*, available at
    http://www.dc.state.fl.us/comm/covid-19.html#action (last visited Apr. 21,
    2020) .....................................................................................................................15

15

16

*DOCCS COVID-19 Report, Preparedness and What DOCCS is Doing*, available at
    https://doccs.ny.gov/doccs-covid-19-report...........................................................15

17

18

ECF No. 3266 *with Coleman* ..........................................................................................2

19

Federal Bureau of Prisons, *Bureau of Prisons COVID-19 Action Plan:  Phase Six*,
    available at
    https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_pla
    n_6.pdf (last accessed Apr. 21, 2020) ...................................................................13

20

21

22

Federal Bureau of Prisons, *COVID-19 Action Plan:  Phase Five*, available at
    https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp
    (last accessed Apr. 21, 2020) ................................................................................14

23

24

Guidance for Correctional & Detention Facilities, available at
    https://www.cdc.gov/coronavirus/2019-ncov/community/correction-
    detention/guidance-correctional-detention.html (last accessed Apr. 22, 2020)........11

25

26

*People Who Are at Higher Risk for Severe Illness*, available at:
    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-
    higher-risk.html (last accessed Apr. 22, 2020.) ....................................................12

27

28

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

Prisons, *About Our Facilities*, available at

4

https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited Apr. 21, 2020) ....................................................................................................................13

5

Prisons, *About Our Facilities, By the Numbers*, available at

6

https://www.bop.gov/about/facilities/ (last visited Apr. 21, 2020)...........................................13

7

Prisons, *BOP Implementing Modified Operations*, available at

8

https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed Apr. 21, 2020) ....................................................................................................................14

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Reply Pls.' Resp. Defs.' COVID-19 Plan (2:90-cv-00520 KJM-DB (PC))

## INTRODUCTION

Defendants, like the rest of the world's leaders and public officials, are working around the clock to keep people safe from an unprecedented and unpredictable pandemic that has no horizon. Defendants have worked closely with the federal Receiver appointed under the *Plata* Court — who oversees healthcare in the California Department of Corrections and Rehabilitation's (CDCR) 35 institutions—to prevent and slow the spread of COVID-19.  CDCR has quickly implemented extensive, thoughtful, and unprecedented measures in response to a rapidly-fluctuating and novel pandemic, including nearly all of the Centers for Disease Control and Prevention's (CDC) recommended measures for correctional facilities, many of which were implemented before the CDC's recommendations were even released.  On April 10, 2020, the Court ordered Defendants to submit their COVID-19 strategic plan.  (ECF No. 6600.) Defendants met that mandate, filing a plan with nearly three hundred pages of supporting materials demonstrating Defendants' comprehensive, proactive, and ongoing efforts addressing the emergency crisis.

After repeatedly attempting to impede and micromanage Defendants' crisis response in three separate federal courts, Plaintiffs now object to Defendants' efforts.  Plaintiffs devote significant attention to the concept of social distancing guidance, allege that Defendants were not diligent enough in preparing for COVID-19 within institutions, and take issue with a perceived shortage of personal protective equipment, largely based on unsourced "anecdotal reports."  (ECF No. 6626.)  What Plaintiffs' objections do *not* focus on, however, is telling—Plaintiffs make no allegation that Defendants' COVID-19 plan fails to address *Coleman* class members' members' interests or the provision of mental health care.  Instead, Plaintiffs' objections read more like a motion for reconsideration of the recent order in *Plata v. Newsom*, N.D. Cal. No. 4:01-cv-01351-JST (April 17, 2020), denying their emergency motion.  But this is not the *Plata* court, and Plaintiffs' criticisms of CDCR's strategic plan focus on broader health concerns impacting all CDCR inmates with no focus on issues with specific relevance to the *Coleman* class or the provision of mental health care.  Plaintiffs failed to obtain a prison release order before the Three-Judge Panel (ECF No. 6574) and failed to obtain an order requiring Defendants to develop a plan

1

1    to manage and prevent the further spread of COVID-19 in *Plata* (*Plata,* ECF No. 3291).

2    Plaintiffs are thus precluded from seeking the same relief in this forum to obtain a different and

3    conflicting result.

4          Plaintiffs' objections lack merit and the Court should reject them so that Defendants can

5    continue to act responsibly in real time to address the pandemic.  First, contrary to Plaintiffs'

6    objections, Defendants' plan has a clear objective—the preservation of health and safety—and,

7    with the newly added dormitory transfer plan set forth in *Plata* on Monday, has a timeline for

8    effecting greater physical distancing.  CDCR's response to the global pandemic has been thus far

9    reasonable and certainly does not violate the Eighth Amendment.

10          Second, while Plaintiffs appear to be laying the groundwork for yet another meritless

11    population reduction motion, Defendants have been diligently working with the federal Receiver

12    to ensure the safety of all inmates under their care, including *Coleman* class members, during this

13    unprecedented pandemic.  As Defendants have noted on several occasions, the plans provided to

14    this Court are subject to review and amendment based on daily changing circumstances and new

15    information.  Indeed, the plan submitted on Thursday has already been changed in several

16    important ways, as set forth below.  Finally, as the *Plata* court found last week, Defendants have

17    not been deliberately indifferent to the emergent health crisis they now face.  Plaintiffs cannot re-

18    litigate that claim here.

19                          **DISCUSSION**

20    I.    **PLAINTIFFS' OBJECTIONS TO DEFENDANTS' COVID-19 PLAN ARE SQUARELY IN
          THE PROVINCE OF THE *PLATA* COURT.**

21

22          A.    **Plaintiffs Cannot Forum-Shop and Re-Litigate Issues They Raised and
                Lost in *Plata*.**

23          Plaintiffs' objections to Defendants' COVID-19 Strategic Plan amount to a rehashing of

24    their emergency motion in *Plata*, rather than relating to any issue specific to the *Coleman* class.

25    (*See Plata*, ECF No. 3266.)  For example, Plaintiffs focus on the perceived inadequacy of

26    Defendants' social distancing measures, predict dire consequences for Defendants' plan of action,

27    and ask this Court to impose population reduction measures as the only "real" way to remedy the

28    alleged deficiencies with Defendants' plan.  (*Compare Plata*, ECF No. 3266 *with Coleman* ECF

                                    2

No. 6626.)  But the *Plata* court denied Plaintiffs' motion, describing in detail Defendants'

response to the COVID-19 crisis and finding specifically that the response was not

constitutionally deficient.  (*See Plata* order, ECF No. 3291 at 14.)  Because Plaintiffs have

already had a "full and fair opportunity" to litigate their claims regarding Defendants' response to

COVID-19, the doctrine of issue preclusion bars them from re-litigating those claims before this

Court.  *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313,

329 (1971).

     Issue preclusion requires that:  "(1) the issue sought to be litigated is sufficiently similar to

the issue present in an earlier proceeding and sufficiently material in both actions to justify

invoking the doctrine; (2) the issue was actually litigated in the first case; and (3) the issue was

necessarily decided in the first case."  *United States v. Weems*, 49 F.3d 528, 532 (9th Cir.

1995).  Moreover, the person against whom issue preclusion is being asserted must have been "a

party or in privity with a party in the previous action."  *In re Palmer*, 207 F.3d 566, 568 (9th Cir.

2000).  Each of these elements is certainly present here; in *Plata* and before this Court, Plaintiffs

objected to Defendants' plan to manage COVID-19 within CDCR institutions, and the *Plata* court

rejected those objections, stating explicitly that Defendants' response to the crisis has been

reasonable.  (*Plata*, ECF No. 3291.)

     From a more pragmatic standpoint, Plaintiffs' objections to the plan do not highlight any

perceived danger specific to the *Coleman* class or any concerns regarding the provision of mental

health care.  In fact, the phrase "mental health" only appears four times in the Plaintiffs' 16-page

brief, and three of those instances are quotes from the Court's order or Defendants' plan itself.

(ECF No. 6626 at 4, 8, 9.)  Plaintiffs bring no new issue before this Court, nor could they—as

Defendants' COVID-19 plan, which applies statewide to protect all inmates and staff, is already

being addressed in *Plata*.  Plaintiffs have failed to identify any unique or specific relief

permissible in this case.

**B.     Plaintiffs' Objections Tread on the *Plata* Court's Order and Violate Judicial Comity.**

The well-established doctrine of judicial comity permits one district to decline judgment on an issue that is properly before another district.  *See Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 184–86 (1952).  The purpose of the doctrine is to avoid rulings that may "trench upon the authority of sister courts."  *West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985).  The doctrine is also designed to avoid placing unnecessary burden on the federal judiciary, and to avoid the confusion and embarrassment of conflicting judgments. *Church of Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979) (*overruled on other grounds by Animal Legal Defense Fund v. U.S. Food & Drug Administration*, 836 F.3d 987 (9th Cir. 2016); *see Feller v. Brock*, 802 F.2d 722, 727 (4th Cir. 1986) (holding that whenever possible, coordinator courts should avoid duplicating litigation or issuing conflicting orders).

In *Ord v. United States,* the plaintiff asked the district court to declare another court's order void and to enjoin the Securities and Exchange Commission from enforcing it.  The Ninth Circuit found that the district court properly dismissed the plaintiff's action based on "considerations of comity and orderly administration of justice."  *Ord*, 8 Fed. Appx. 852, 854 (9th Cir. 2001) (citing *Lapin v. Shulton, Inc.*, 333 F.2d 169, 172 (9th Cir. 1964)).  The court found that "[w]hen a court entertains an independent action for relief from the final order of another court, it interferes with and usurps the power of the rendering court."  *Id*. (citing *Treadaway v. Acad. of Motion Picture Arts & Sci.*, 783 F.2d 1418, 1422 (9th Cir. 1986)).  Attempts to overturn another court's order should, in all but rare instances, yield to principles of judicial comity, fairness, and efficiency.  *Id*.

Here, Judge Tigar has already ruled on Defendants' actions to manage COVID-19 within CDCR's institutions, finding "without difficulty that Defendants' response has been reasonable." (*Plata*, ECF No. 3291 at 14.)  Plaintiffs all but invite this Court to overturn Judge Tigar's order finding Defendants' COVID-19 plan reasonable and constitutional.  Because this issue has already been addressed in *Plata*, it would be more appropriate and efficient to continue any

4

Defs.' Reply Pls.' Resp. Defs.' COVID-19 Plan (2:90-cv-00520 KJM-DB (PC))

1   further discussions of the general COVID-19 plan in the *Plata* court while addressing issues

2   specific to the provision of mental health in this case.

3       **C.    The Secretary of CDCR Does Not Have Unilateral Authority to Transfer
             Inmates, Specifically in Connection with CDCR's COVID-19 Response.**

4

5       Plaintiffs request that "Coleman class members or high risk inmates" be "target[ed] . . . for

6   special movement or housing."  (ECF No. 6626 at 8.)  This request is problematic for at least two

7   reasons.  First, CDCR may only order general transfers of inmates in response to the COVID-19

8   pandemic in coordination with, and with the approval of, the Plata Receiver.  (Plata, ECF No. 473

9   at 4.)  Under the Plata order, the Receiver shall "exercise all powers vested by law in the

10  Secretary of CDCR as they relate to the administration, control, management, operation, and

11  financing of the California prison medical health care system."  (Id.)  And although some

12  institutions' medical delivery has been delegated back to CDCR, the Receiver retains control of

13  the administrative functions of CDCR's medical services and sets statewide medical policy.  All

14  matters concerning COVID-19-related inmate transfers and health care decisions fall under the

15  full purview and authority of the Receiver in the Plata action.  Defendants are collaborating with

16  the Plata Receiver, Plaintiffs, and the Special Master to address issues related to all class

17  members, of which Coleman class members are a subset being addressed through Plata.  Any

18  request made by this Court with respect to inmate movement or care requires approval by the

19  Plata Receiver.  The jurisdiction lies in the Plata court addressing this global pandemic.  Thus,

20  CDCR cannot enter into agreements regarding the provision of medical care to "high risk"

21  patients or regarding physical-distancing measures for medical purposes without the approval of

22  the Receiver.  (Gipson Decl., ¶ 6.)

23      Plaintiffs request that "*Coleman* class members or high risk inmates" be "target[ed] . . . for

24  special movement or housing."  (ECF No. 6626 at 8.)  This request is problematic for at least two

25  reasons.  First, CDCR may only order general transfers of inmates in response to the COVID-19

26  pandemic in coordination with, and with the approval of, the *Plata* Receiver.  (*Plata*, ECF No.

27  473 at 4.)  Under the *Plata* order, the Receiver shall "exercise all powers vested by law in the

28  Secretary of CDCR as they relate to the administration, control, management, operation, and

5

1    financing of the California prison medical health care system." (*Id.*) And although some

2    institutions' medical delivery has been delegated back to CDCR, the Receiver retains control of

3    the administrative functions of CDCR's medical services and sets statewide medical policy.

4    Thus, CDCR cannot enter into agreements regarding the provision of medical care to "high risk"

5    patients or regarding physical-distancing measures for medical purposes without the approval of

6    the Receiver. (Gipson Decl., ¶ 6.)

7         Second, the Receiver has explicitly stated that inmates with higher risk factors for COVID-

8    19 should *not* be housed together, as a single point of entry for the virus could result in an

9    outbreak among all of them, with dire consequences. (Gipson Decl., Ex. A at 2.) Transferring

10   elderly patients or those with medical risk factors to be housed together would essentially create a

11   series of nursing home-like facilities within CDCR—the very scenario that Plaintiffs claim to be

12   concerned about in their objections. Defendants acknowledge the greater risk of mortality and

13   morbidity from inmates with additional risk factors, but the best way to protect them from

14   COVID-19 is to adopt strategies that protect *all* inmates within CDCR, not to group them

15   together in such a manner that a single infection could spread to all of them. The Court should

16   reject Plaintiffs' efforts to usurp the *Plata* Receiver's well-established authority, particularly in

17   this time of crisis.

18   II.   **PLAINTIFFS' OBJECTIONS TO DEFENDANTS' COVID-19 PLAN ARE UNFOUNDED.**

19         **A.    As Guidance, Public Health Guidance Does Not Create a Static List of
                   Requirements Defendants Must Meet to Comply with the Constitution.**
20

21         Plaintiffs' objections to CDCR's comprehensive plan for responding to COVID-19 rely

22   heavily on a few cherry-picked citations to Centers for Disease Control and Prevention (CDC)

23   and California Department of Public Health's (CDPH) guidance. But broad generic guidelines

24   from public agencies meant to set best practices for a wide range of other organizations with

25   varying characteristics are not the criteria that establish whether a plan is constitutionally

26   adequate.

27         As Defendants previously pointed out in their prior response to the Court's April 6, 2020

28   order, there is "no one-approach-fits-all answer" in determining the constitutional minima in

6

1    responding to an emergency – let alone a global pandemic.  The Eighth Amendment requires

2    Defendants take reasonable steps under the circumstances in responding to a serious risk of harm.

3    *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).  In this case, the Court has recognized that

4    Defendants' actions must be considered in context in determining whether they meet the

5    constitutional minima, and requires balancing "common sense, and the clinical nature of the

6    problem," with deference to prison administrators.  *See Coleman v. Wilson,* 912 F.Supp. 1282,

7    1301 (1995).  Expert-based standards are "helpful and relevant" to the Eighth Amendment

8    analysis, but they do not set fixed constitutional benchmarks.  *See Rhodes v. Chapman*, 452 U.S.

9    337, 348 n.13 (1981); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1253-54 (9th Cir. 1982)

10    (reversing injunction adopting American Medical Association standard because the district judge

11    "failed to take into account the approach taken by the State").

12         The CDC itself recognizes that not all parts of its guidance will be possible or applicable to

13    all prisons across the country and are to be considered "guiding principles."  (*See*, *e.g.*, *CDC's*

14    *Interim Guidance on Management of COVID-19 in Correctional and Detention Facilities*,

15    available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-

16    detention.pdf (last accessed Apr. 21, 2020).)  Moreover, "[t]he guidance will not necessarily

17    address every possible custodial setting" and recommendations are not differentiated based on

18    "different facility types [] and sizes."  *Id*.  Accordingly, prison officials are encouraged to tailor

19    their response based on "facilities' physical space, staffing, population, operations, and other

20    resources and conditions."  *Id*.  And, the CDC envisions its guidance will change and be updated

21    over time "as additional information becomes available."  *Id*.

22         Similarly, the courts have followed the CDC's guidance and recognized that complete

23    compliance may not be possible, and deviations from certain parts of CDC's guidance does not

24    render a prison's response to the pandemic constitutionally deficient.  As pointed out, the court in

25    *Plata* considered the constitutionality of Defendants actions under the same plan now before this

26    Court.  There, plaintiffs acknowledged that Defendants' plan was largely consistent with the CDC

27    and CDPH's guidance, but, similar to here, claimed Defendants lacked a plan to facilitate

28    physical distancing.  (*Plata*, ECF No. 3291 at 8.) The court disagreed, finding Defendants

7

1    implemented "several measures to promote increased physical distancing," and while "the Court

2    might adopt additional distancing measures if it were solely responsible for prison health care," it

3    could not "conclude Defendants' actions are constitutionally deficient." (*Id*.)  In reaching its

4    conclusion, the court recognized that CDC's guidance acknowledge that social distancing may

5    not be possible in all situations.  (*Id*. at 9.)  And other courts have also been hesitant to find prison

6    responses inadequate because they failed to meet the letter of CDC's requirements in one way or

7    another.  *See Mays v. Dart*, No. 20 C 2134, 2020 WL 1812381, at *10 (N.D. Ill. Apr. 9, 2020)

8    (Sheriff's ongoing efforts to modify arrangement to create greater separation between inmates

9    was not unreasonable even though it did not strictly adhere to CDCR guidance that recognized

10    social distancing may not be possible); *Nellson v. Barnhart*, No. 20-cv-00756, 2020 WL

11    1890670, at *6 (D. Colo. Apr. 16, 2020) (lack of social distancing in the law library and

12    communal restrooms did not establish deliberate indifference).

13    By focusing on whether CDCR's plan aligns perfectly with every part of the CDC's

14    guidance, the Plaintiffs risk losing the forest through the trees.  The inquiry is whether CDCR's

15    comprehensive plan is a reasonable response to COVID-19, not whether it perfectly aligns with a

16    few select generic guidelines.

17    **B.    CDCR's Plan Aligns with the Vast Majority of the CDC's General**
      **Guidance.**

18

19    Plaintiffs argue that the Strategic Plan fails to "identify: (1) their objectives for housing

20    *Coleman* class members who are not being granted early release from CDCR; (2) timelines for

21    those objectives; and (3) a specific plan for housing medically vulnerable members of the

22    Coleman class."  (ECF No. 6626 at 4.)  But Plaintiffs mischaracterize the contents of the Strategic

23    Plan and the CDC Guidelines.  CDCR's plan, nearly 300 pages in length, provides both the

24    concrete steps and the dates those steps began, including the steps required to provide a safe

25    living environment (housing) for all inmates, including *Coleman* class members. (ECF No. 6616,

26    and 6616-1.)  Specifically, the plan outlines a myriad of preventative measures to ensure safe

27    housing for all inmates including "population management measures, mandatory modified

28    programming, eliminating non-essential transfers,…transferring inmates out of dormitory

8

settings…and taking steps to enhance social distancing in communal areas." (ECF Nos. 6616 at pp. 9-12.)  Additionally, the plan addresses steps to ensure staff do not bring COVID-19 into the institutions (ECF No. 6616 at 12), testing protocols to ensure prompt identification and quarantine of sick or exposed inmates (ECF No. 6616 at 13-14), and the use of proper protective equipment and hygiene protocols to prevent the spread of COVID-19 through inmate housing.  (ECF No. 6616 at 14-15.)  The plan also references the release of thousands of inmates, the suspension to intake of another several thousand inmates, and the steps taken to manage yard and groups to reduce the spread of COVID-19.  (ECF No. 6616-1 at 9-10.)

CDCR's plan is not equivocal. Prior to the submission of the plan, CDCR had initiated transfers from dorms to increase physical distancing and reducing the population by releasing inmates under the accelerated release plan. (*Id.*  at 6, 9.)   As a result of these efforts, the vast majority of dorms in CDCR were able to accomplish appropriate physical distancing as recommended by the Receiver as of April 19, 2020.  (*Plata*, ECF No. 3294 at 10-12.)  Completion of these tasks were necessary to allow CDCR to assess what additional population moves were needed to comply with the Receiver's April 10, 2020 memorandum.  Development of CDCR's April 20, 2020 dorm movement out of dorms began immediately following the completion of the initial dorm movements discussed in Defendants' plan (ECF No. 6616 at 11) and following the completion of the early releases.  (ECF No. 6616 at 9.)  As a result of the implementation of that plan, CDCR anticipates that all transfers necessary to accommodate physical distancing as recommended by the federal Receiver will be complete by April 29, 2020. (*See* COVID Compliance Transfer Schedule filed under seal at ECF No. 6631.)

Contrary to Plaintiffs' argument, CDCR's comprehensive plan contains policies, procedures, and guidelines that are responsive to most of the CDC's guidance.  As CDCR's plan notes, "CDCR and CCHCS's plans and policies have been made with guidance from public health experts and with reference to the guidelines on the prevention of COVID-19 in correctional settings issued by the CDC." (ECF No. 6616 at 6.)  And, it implemented plans that accounted for what ultimately became CDC's guidance before it issued the guidance on March 23, 2020.  (*Id.*)

9

A fair reading of CDCR's plan and 28 attachments, including its table comparing its plan to the general principles in the CDC's guidance, shows that its plan is responsive to almost all of CDC's guidance.  Plaintiffs' critiques are primarily aimed at two parts of the guidance: social distancing and the provision of PPE supplies.  Those critiques miss the point.  They ignore the overwhelming number of efforts CDCR undertakes in its plan to combat the spread of COVID-19, including the ongoing measures taken to provide sufficient PPE and social distancing.  CDCR instituted additional cleaning procedures, made soap and hand sanitizer available, providing PPE for those who require it, provided education on the use of PPE, and is providing cloth masks to all inmates and staff.  (ECF No. 6616 at 6,14-15; ECF No. 6616-1 at 43-44.)  And, the *Plata* court already determined that the steps CDCR has taken and will take to provide for social distancing are constitutionally sufficient.  (*Plata*, ECF No. 3291 at 8, 12)

It is important to note that, similar to CDCR's plan to protect all medically vulnerable inmates, including those who have a mental illness, the CDC's guidance does not single out inmates with mental illness as requiring special protection.  The CDCR's guidance does not include mental illness as one of the medically vulnerable categories.  And its guidance does not include specific recommendations on how mental health care should be provided to patients in prison during the COVID-19 outbreak beyond stating that it should continue to the extent possible.  CDCR's comprehensive plan contains policies and strategies that are targeted to treating mental illness in the inmate population throughout the COVID-19 pandemic, including plans for providing care based on available resources, plans for providing care for different levels of acuity, and plans for how and when inmates are transferred.  Plaintiffs raised no objections with those temporary policies.

**C.    Defendants Did Not Fail to Foresee and Plan for the Global Pandemic.**

Plaintiffs claim that Defendants should have been aware of the risks posed by COVID-19 and started planning for its possible effects in CDCR's prisons in January 2020.  The contention fails.  They seek to impute a duty on Defendants to foresee and respond to a global pandemic before most other people in the United States did, including Plaintiffs' counsel.  Indeed, the CDC, which the Court and Plaintiffs have relied on to great extent did not issue its guidance until March

10

23, 2020.  (United States Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Guidance for Correctional & Detention Facilities, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed Apr. 22, 2020).)  Defendants were in constant contact with Plaintiffs and the Special Master throughout January and February, and Defendants are not aware of an attempt by either to find out whether CDCR was beginning to plan for the possibility that COVID-19 might reach California and spread.  Plaintiffs certainly do not point to any such attempt.  And Plaintiffs' counsel, who are counsel in Plata, Clark, and Armstrong, continued to tour CDCR institutions in January, February and through much of March 2020, evidencing a lack of concern over the potential spread of COVID-19.  Nonetheless, despite the relatively unknown nature of VOID-19's threat to CDCR in January 2020, CDCR did begin early assessments of the potential impact of the virus and soon started discussions with healthcare officials about it.  (Gipson Decl. at ¶ 3.)

Plaintiffs' argument is a distraction from the purpose of the Court's order.  Defendants' filed their comprehensive plan on April 16, 2020.  At a status conference the following day, the Court granted Plaintiffs' request to file a response to the plan.  (ECF No. 6622 at 2.)  Accordingly, the focus should be on the sufficiency of Defendants' fifteen-page long comprehensive plan and twenty-eight attachments.  (*See generally*, ECF No. 6616.)  The Court should not be distracted by Plaintiffs attempt to litigate when Defendants might have guessed an infected person might reach our shores and pose a threat to incarcerated people in California.

In addition, Plaintiffs' argument that Defendants' did not file a comprehensive plan until a month after CDPH issued guidance for health systems is disingenuous.  Plaintiffs are fully aware that Defendants were actively and aggressively implementing plans to respond to the COVID-19 pandemic during this time period.  They were involved in numerous task force meetings with Defendants and the Special Master and negotiated the minute details of Defendants policies.  (*See* ECF No. 6616 at 7.)  As Defendants have consistently represented to the Court, the fact that their COVID-19 plans were not in one specific document does not mean that CDCR was not taking a comprehensive approach in responding to COVID-19.  Defendants were addressing each part of

11

1  this crisis long before they filed their comprehensive plan and anticipate that, much like the rest

2  of the world, their "plans to mitigate the spread of COVID-19 [will] continue to evolve as

3  additional scientific and medical information becomes available." (*Id.*)[1]

4  **D.     The Strategic Plan Targets All Inmates in All Housing Units, Including the Medically Vulnerable and Patients Housed in Dormitories.**

5

6          Plaintiffs' conclusion that the outbreaks of COVID-19 at the California Institution for Men

7  (CIM) and CSP-Los Angeles County (LAC) are the result of poor planning is not based in reality

8  and not supported by the statistics cited.  First, there is no evidence of a causal connection

9  between mental illness and COVID-19.  Mental illness is not one of the risk factors identified by

10  the CDC.  (United States Centers For Disease Control and Prevention, Coronavirus Disease 2019

11  (COVID-19), *People Who Are at Higher Risk for Severe Illness*, available at:

12  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

13  (last accessed Apr. 22, 2020.)   Second, the statistics show that there were outbreaks limited to

14  discreet housing units that just happened to be limited, under mental health policies, to *Coleman*

15  class members.  This is not indicative that CDCR did not have a plan to address social distancing

16  in those housing units.  The COVID-19 outbreak at LAC is in an Enhanced Outpatient Program

17  (EOP) *celled*-housing unit housing *Coleman* class members.[2] (Facility D is a Level IV EOP

18  program, ECF No. 5779 at 31.)  Over half of the *Coleman* class members who have tested

19  positive for COVID-19 are housed in EOP housing units at LAC.  This is not an indication of an

20  overcrowded dorm or that CDCR has not done enough for *Coleman* class members.  And, as the

21  *Plata* court noted, "that a large percentage of confirmed cases are in a single housing unit is

22          [1] Plaintiffs attempt to analogize the entirety of CDCR to an acute care hospital in order to argue that CDCR should have acted on guidance provided for hospitals.  It is accurate that CDCR does provide medical care at some of its facilities, but to claim that CDCR is tantamount to a hospital is not credible.  Indeed, the CDC clearly saw the need to issue distinct guidance to for prisons and detention facilities rather than instructing them to follow existing guidance for health care facilities.  Moreover, contrary to Plaintiffs' analogy, acute community hospitals could expect to see a surge in patients coming from all over the surrounding communities, including potentially from jails and prisons if the patients were too ill to be isolated and treated in-house.  Prisons and jails would not be expected to become general care facilities for a surge of disease in the community.

          [2] Enhanced Outpatient Programs are "characterized by a separate housing unit," meaning that EOP patients may only be housed with other EOP patients.  (MHSDS Program Guide at 12-4-1.)

12

1   actually some evidence that Defendants' containment policies are having their intended effect."

2   (*Plata* Order, ECF No. 3291 at 7-8.)

3       E.   **CDCR's COVID-19 Strategy Plan Is Comprehensive, as the Plata Court Found, and Is Consistent with or Exceeds Actions Taken by Other Correctional Systems Across the Country.**

4

5       As the Court requested, CDCR showed how its strategic plan comports with the CDC's

6   guidance, noting the instances in which CDCR's plan may deviate from that guidance.  (Cite.)

7   CDCR and California have been leaders in their response to COVID-19, and Defendants'

8   comprehensive plan – provided to this Court and found to be constitutionally sufficient by the

9   *Plata* court – reflects that leadership in this ongoing time of crisis.  No one currently sees a

10  "horizon" to this pandemic.  Yet, this Court can credit the State's leadership as it manages the

11  pandemic in real time consistent with or in ways that exceed steps taken by other correctional

12  departments, in addition to steps not taken elsewhere.

13      Notwithstanding Plaintiffs' repeated attacks, CDCR is not on an island in its management

14  of this unexpected, unprecedented, and unpredictable disease.  For example, the Federal Bureau

15  of Prison (BOP) – which has approximately 122 prisons and 143,803 inmates in the facilities it

16  operates – issued a plan to combat coronavirus.  (United States Federal Bureau of Prisons, *About

17  Our Facilities*, available at https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited

18  Apr. 21, 2020); United States Federal Bureau of Prisons, *About Our Facilities, By the Numbers*,

19  available at https://www.bop.gov/about/facilities/ (last visited Apr. 21, 2020).)  Like CDCR's

20  plan, the BOP has taken a phased approach, initiating and adjusting the particular pieces of its

21  plans as needed.  Presently, the BOP's plan is in phase six.  (U.S. Dept. of Justice, Federal Bureau

22  of Prisons, *Bureau of Prisons COVID-19 Action Plan:  Phase Six*, available at

23  https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last

24  accessed Apr. 21, 2020) (hereinafter Phase Six).)  BOP's modified operations and protective

25  measures include:

26      • suspended social visits, with a corresponding increase in inmate telephone system

27          minutes;

28

- a general suspension on inmate movement except in certain limited circumstance subject to COVID-19 screening criteria, including, but not limited to medical or mental health transfers, and, if necessary, to manage bedspace;
- suspension of legal visitation, with possible case-by-case exceptions;
- suspension of official staff travel except for relocation;
- suspension of staff training;
- mandatory health screening for all contractors performing essential maintenance on essential systems, with all other contractor work suspended;
- suspension of volunteer visits, with some exceptions;
- enhanced health screening for staff;
- enhanced health screening and quarantine protocols for new inmates;
- tour suspensions, with limited exceptions; and
- modified operations to maximize social distancing "as much as practicable," including "consideration of staggered meal times and staggered recreation times."

(U.S. Dept. of Justice, Federal Bureau of Prisons, *BOP Implementing Modified Operations*, available at https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed Apr. 21, 2020).)

In addition, BOP also implemented a plan to coordinate with the United States Marshals Service to decrease incoming movement, and significantly decrease internal inmate movement starting April 1, 2020.  Specifically, BOP ordered inmates secured in their assigned cells or quarters for fourteen days, during which time the inmates would be provided access to programs and services such as mental health and education "to the extent practicable."  (U.S. Dept. of Justice, Federal Bureau of Prisons, *COVID-19 Action Plan:  Phase Five*, available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last accessed Apr. 21, 2020) (hereinafter Phase Five).)  Phase Six extended all existing protective measures to May 18, 2020.  (*See* Phase Six.)

The plan CDCR has been developing and implementing for months with Plaintiffs, the Special Master, and the *Plata* Receiver contains a version of all these actions, including specific policies, procedures, and plans to address the mental health needs of class members.

14

1    Significantly, the BOP recognizes, as does CDCR, that it must "revise and update its action plan

2    in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance

3    from experts" including the World Health Organization and CDC.  (*See* Phase Five.)  And, just as

4    the *Plata* court determined CDCR's response was constitutional, the district court in *Nellson v.*

5    *Barnhart* determined it would not alter BOP's plan as it was implemented at one of its prisons.

6    *See Nellson v. Barnhart et. al.*, No. 20-CV-00756, 2020 WL 1890670, at *6 (D. Colo. Apr. 16,

7    2020) (denying motion for preliminary injunction because Plaintiff failed to exhaust, defendants

8    provided the relief requested, and BOP and United States Prison Florence were not deliberately

9    indifferent because they took numerous steps to reduce the risk of transmission).

10          Correctional departments around the country are taking approaches that are similar to

11    Defendants – if not always identical or as comprehensive as Defendants.  (*See* Florida

12    Department of Corrections, *FDC COVID-19 Action Items*, available at

13    http://www.dc.state.fl.us/comm/covid-19.html#action (last visited Apr. 21, 2020) (Florida

14    suspended visitation, implemented screening for all entrants, adjusted programming to comply

15    with social distancing, staggered meals, and suspended non-critical transfers, but unlike

16    California is still accepting new commitments); *see also* New York Department of Corrections

17    and Community Supervision, *DOCCS COVID-19 Report, Preparedness and What DOCCS is*

18    *Doing*, available at https://doccs.ny.gov/doccs-covid-19-report (last visited Apr. 21, 2020)  (New

19    York created a COVID-19 task force, mandated staff masking, allowed inmates to use

20    handkerchiefs and masking isolated inmates, suspended intake from the counties, suspended

21    external transfers unless exigent, suspended visitation, displayed COVID-19 information on

22    posters, issued enhanced cleaning and disinfecting procedures, among other steps.)  CDCR has

23    demonstrated its leadership in attacking the deadly COVID-19 virus, and it will continue to do so.

24    CDCR's plan mirrors or exceeds actions taken by other correctional systems, which shows the

25    constitutional adequacy of the plan.

26

27

28

**III.    PLAINTIFFS' OBJECTIONS TO COVID-19 PLAN ARE PROCEDURALLY IMPROPER BECAUSE THEY REQUEST ADDITIONAL RELIEF RATHER THAN ADDRESSING THE COURT'S ORDER.**

Plaintiffs criticize CDCR's COVID-19 Plan and request an order requiring "Defendants to identify concrete, measurable benchmarks, with dates certain for completion, to ensure they are prepared to address adequately the next institution-level and system-wide COVID-19 outbreaks that will occur in their system." (ECF No. 6626 at 15.)   In addition to denying Plaintiffs' request on the merits, this Court should disregard Plaintiffs' request because it is an improperly noticed motion.  Rule 7 of the Federal Rules of Civil Procedure provides that a request for a court order must be made by written motion unless made during a hearing or a trial.  Rule 7 also requires that the motion state with particularity the grounds for seeking the order.  Plaintiffs' objections do not meet the notice or substantive requirements of the Federal Rules of Civil Procedure and their requested relief should be denied.

**IV.    CDCR'S COVID-19 PLAN IS DYNAMIC, AS DEMONSTRATED BY RECENT ACTIONS APPROVED BY THE *PLATA* RECEIVER TO ACHIEVE GREATER PHYSICAL DISTANCING AMONG SMALL GROUPS OF INMATES THROUGH TRANSFERS.**

Defendants have repeatedly stated that CDCR's COVID-19 strategic plan is not static and will evolve in response to the global pandemic.  CDCR's position is consistent with the daily (if not hourly) decisions government officials are making worldwide in response to the pandemic.  During an April 20 status conference in *Plata*, the State informed that court that the Receiver had approved CDCR's plan to transfer various groups of inmates out of dormitory settings into other prison facilities' spaces to achieve physical distancing among 8-person groups of inmates.  The plan creating physically separate groups of inmates comports with CDC guidance concerning physical distancing among persons in analogous congregate group settings, and demonstrates the rapid responsive actions that Defendants are taking to prevent the spread of COVID-19 throughout its facilities.

Working under the guidance of the Receiver and CCHCS, CDCR has consistently promoted physical distancing among the inmate population.  On March 20, 2020, CCHCS's Director of Health Care Operations, Dr. Steven Tharratt, and CDCR's Director of the Division of Adult Institutions, Connie Gipson, issued joint guidance to institutions among, other things,

16

Defs.' Reply Pls.' Resp. Defs.' COVID-19 Plan (2:90-cv-00520 KJM-DB (PC))

1   directed implementation of social distancing as much as possible for all inmates and staff, with

2   particular emphasis for the most vulnerable patients, including those most at risk per clinical

3   judgment.  (Gipson Decl. Supp. Defs.' Reply, ¶ 5.)  The guidance also recommended against

4   cohorting or housing vulnerable patients together because they are more susceptible to

5   contracting and rapidly spreading the disease to other high-risk patients and are at high risk for

6   developing serious complications or death related to the disease.  (*Id*.)  Indeed, any suggestion

7   that medically high-risk *Coleman* inmates should be housed together to protect them from

8   COVID-19 is incorrect and medically dangerous.

9           Furthermore, on April 10, 2020, the Receiver wrote a memorandum to CDCR Secretary

10   Ralph Diaz recommending the creation of 8-person pods within CDCR's dormitory housing to

11   promote physical distancing among inmates.  (Gipson Decl. ¶ 6.)  The memorandum reiterated

12   that CDCR was not able to initiate any inmate movements between institutions to achieve

13   necessary social distancing without the approval of CCHCS officials.  (*Id*.)  This memorandum

14   and its supplement coincided with efforts by CDCR staff to assess efforts to achieve greater

15   inmate distancing with healthcare staff.  (*Id*.)  As CDCR staff gathered further information and

16   prepared plans consistent with the Receiver's instruction, prisons were directed to begin

17   establishing 8-person pods or implement measures to promote six feet of distance between

18   inmates.  (*Id*.)

19           Based on the need to move inmates in order to facilitate this process, CDCR staff also

20   developed an inmate transfer schedule.  (Gipson Decl. ¶ 7.)  Director Gipson submitted a transfer

21   plan, including identification of numbers of inmates to be moved from certain institutions and a

22   proposed movement schedule, to the Receiver and the Secretary on April 17.  (*Id*.)  This plan is

23   intended to create distancing for all inmates in the identified institutions, and does not

24   differentiate based on inmate medical or mental health factors.  (*Id*.)  The Receiver requested

25   additional information concerning the plan, and on April 20, Director Gipson submitted a revised

26   transfer plan to the Receiver and Secretary for approval, which was approved on the same day.

27   (*Id*.)

28

1    Defendants informed the *Plata* Court and *Plata* Plaintiffs of the plan in conjunction with

2    the status conference that day.  Defendants' counsel in *Coleman* electronically delivered an

3    unredacted version the plan to *Coleman* Plaintiffs' counsel later on April 20.[3]  (*See* Decl. J. Yellin

4    Supp. Pls. Request to File Under Seal, ECF No. 6631-1 at 2, 5.)  Given the sensitive information

5    in plan, Defendants' counsel provided it under the case's protective orders.  (*Id*.)  Under the

6    approved plan, inmates will begin moving to facilitate physical distancing of 8-person pods on

7    April 22, and will be completed by April 29.  (Gipson Decl. ¶ 7.)  As a result, approximately

8    1,300 inmates will be moved into 8-person pods to promote physical distancing.  (*Id*.)  This quick

9    action by CDCR, working in conjunction with the Receiver and CCHCS to protect the health and

10   safety of inmates from COVID-19, demonstrates that Defendants' multi-faceted plan is and

11   continues to be a reasoned and active response to the global pandemic.  As Judge Tigar held,

12   CDCR's plan to prevent and manage the spread of COVID-19 in its institutions statewide, cannot

13   violation the constitution.  (*Plata* ECF No. 3291 at 13-14.)

14                                              **CONCLUSION**

15   As determined by the *Plata* court, CDCR's response to COVID-19 has already been found

16   constitutionally adequate.  Plaintiffs' objections raise no new issues or concerns related to this

17   case which justify disturbing any prior ruling regarding CDCR's plan.  CDCR's plan reflects a

18   thoughtful, informed, response—in real time—to a rapidly evolving worldwide pandemic.

19   Defendants will continue to make any appropriate changes as circumstances change while

20   working towards their ultimate goal: to keep all inmates and staff safe throughout this pandemic.

21

22

23

24

25

26

27   _____

[3] This is contrary to Plaintiffs' assertions in their response to CDCR's COVID-19 plan
that Defendants had not provided them with the plan before the response was filed.  (ECF No.
28   6626 at 8; ECF No. 6627 at 6-7.)

18

1  Dated:  April 22, 2020                                Respectfully Submitted,

2                                                        XAVIER BECERRA
                                                         Attorney General of California
3                                                        ADRIANO HRVATIN
                                                         Supervising Deputy Attorney General
4

5                                                        */s/ Lucas L. Hennes*

6                                                        LUCAS L. HENNES
                                                         Deputy Attorney General
7                                                        *Attorneys for Defendants*

   CF1997CS0003
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Reply Pls.' Resp. Defs.' COVID-19 Plan (2:90-cv-00520 KJM-DB (PC))