| | |
|---|---|
| XAVIER BECERRA<br>Attorney General of California<br>MONICA N. ANDERSON<br>Senior Assistant Attorney General<br>ADRIANO HRVATIN<br>Supervising Deputy Attorney General<br>ELISE OWENS THORN, State Bar No. 145931<br>TYLER V. HEATH, State Bar No. 271478<br>KYLE A. LEWIS, State Bar No. 201041<br>LUCAS HENNES, State Bar No. 278361<br>Deputy Attorneys General<br>  1300 I Street, Suite 125<br>  P.O. Box 944255<br>  Sacramento, CA 94244-2550<br>  Telephone: (916) 210-7325<br>  Fax: (916) 324-5205<br>  E-mail: Tyler.Heath@doj.ca.gov<br>*Attorneys for Defendants* | ROMAN M. SILBERFELD, State Bar No. 62783<br>GLENN A. DANAS, State Bar No. 270317<br>ROBINS KAPLAN LLP<br>  2049 Century Park East, Suite 3400<br>  Los Angeles, CA 90067-3208<br>  Telephone: (310) 552-0130<br>  Fax: (310) 229-5800<br>  E-mail: RSilberfeld@RobinsKaplan.com<br>*Special Counsel for Defendants* |

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                         Plaintiffs,<br><br>     v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                         Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF CONNIE GIPSON IN SUPPORT OF DEFENDANTS' REPLY REGARDING CDCR'S COVID-19 PLAN** |

I, Connie Gipson, declare:

1. I am employed by the California Department of Corrections and Rehabilitation (CDCR) and am the Director of CDCR's Division of Adult Institutions. I have worked for CDCR since 1988. I started my CDCR career as a medical technical assistant at the California Institution for Women, where I worked from 1988 to 1997. From 1997 to 2008, I held several positions at Wasco State Prison, including captain, business manager, and health program coordinator. From 2008 to 2010, I was the Associate Warden at North Kern State Prison. From

1

1  2010 to 2013, I served in multiple positions at California State Prison, Corcoran, including as

2  Warden, Acting Warden, and Chief Deputy Warden.  From 2013 to 2016, I served as the

3  Associate Director of general population male offenders at CDCR's Division of Adult

4  Institutions.  From 2016 to 2019, I served as deputy director of facility operations at the Division

5  of Adult Institutions.  In 2019, I was promoted to the Acting Director of the Division of Adult

6  Institutions, and was appointed to my current position as the Director in April 2019.  I am

7  competent to testify to the matters set forth in this declaration and, if called upon by this Court,

8  would do so.  I submit this declaration in support of Defendants' reply addressing Plaintiffs'

9  objections to CDCR's COVID-19 strategic plan.

10  2.  The Division of Adult Institutions is comprised of four mission-based disciplines

11  which include Reception Centers, High Security (males), General Population (males), and Female

12  Offenders.  Among other tasks, the Division of Adult Institution works with communities and the

13  government on programs to improve inmate programming, directs, advises and mentors Wardens,

14  on matters related to institution operations, and represents the mission based program area, the

15  Division, and CDCR in hearings and meetings with the Administration, the Legislature, and

16  government agencies.  As Director, my responsibilities include, but are not limited to, ensuring

17  that the needs of all inmates are met.  For example, my responsibilities include ensuring that all

18  inmates have safe and secure housing and appropriate access to healthcare, self-help, education,

19  and rehabilitation programs.  In addition, I also need to ensure that all institutions have a qualified

20  workforce available.

21  3.  In January 2020, CDCR was notified by California public health officials about

22  potential global impacts from the growing spread of the novel coronavirus and its associated

23  disease, COVID-19.  At that time, like the rest of the world, CDCR began monitoring the

24  progress of the virus and public health guidance regarding its risks to persons.  As world leaders

25  declared a global pandemic, CDCR began convening work groups to assess the potential impact

26  of COVID-19 on its inmate and staff populations and prison operations.  In February 2020, as

27  public health officials began providing further information concerning risks to the United States

28  from the virus, CDCR began planning for COVID impacts and working with officials from

2

Decl. C. Gipson Supp. Defs' Reply COVID-19 Plan  (2:90-cv-00520 KJM-DB (PC))

California Correctional Health Care Services (CCHCS) on strategies to address the pandemic throughout California's prison facilities.

4. On March 11, 2020 CCHCS issued a memorandum titled "2019 NOVEL CORONAVIRUS (COVID-19)" to advise healthcare providers throughout CDCR of new guidance concerning the disease issued by the Centers for Disease Control and Prevention (CDC), California Department of Public Health (CDPH) and California Occupational Safety and Health Administration (CalOSHA). On March 15, 2020, CDCR activated the Department Operations Center (DOC), a centrally-located command center where CDCR and CCHCS experts monitor information, prepare for known and unknown events, and exchange information centrally in order to make decisions and provide guidance quickly. I co-chair the DOC with Dr. Steven Tharatt from CCHCS, and together we make decisions about CDCR's and CCHCS's measures in response to the COVID-19 pandemic.

5. Among other duties and responsibilities, we issue various guidance to the field regarding COVID-19 issues on a real-time basis based on information we receive from a number of stakeholders and experts. This specifically includes the Receiver, who controls inmate movement and housing during this crisis. On March 20, 2020, Dr. Tharrat and I issued joint guidance concerning field operations that, for example, directed institutions to implement social distancing as much as possible for all inmates and staff, with particular emphasis for the most vulnerable patients, including those most at risk per clinical judgment. The guidance also recommended against cohorting or housing vulnerable patients together because they are more susceptible to contracting and rapidly spreading the disease to other high-risk patients and are at high risk for developing serious complications or death related to the disease. A true and correct copy of this memorandum is attached as Exhibit A.

6. On April 10, 2020, the *Plata* Receiver wrote a memorandum to CDCR Secretary Ralph Diaz recommending the creation of 8-person pods within CDCR's dormitory housing to promote physical distancing among inmates. Physical distancing is one of the CDC's many recommended actions that correctional institutions can take to prevent the transmission and spread of COVID-19 among inmates. The memorandum states that CDCR should not authorize

3

Decl. C. Gipson Supp. Defs' Reply COVID-19 Plan  (2:90-cv-00520 KJM-DB (PC))

or undertake any inmate movements between institutions to achieve necessary social distancing without the approval of Health Care Placement Oversight Program in consultation with the CCHCS public health team. On April 12, the Receiver issued a supplemental memorandum clarifying that his earlier memo was not intended to affect any inter-institution transfers that are to address either medical, mental health, or dental treatment needs that are not available at the sending institution. A copy of the Receivers' April 10 and April 12 memoranda are attached as Exhibit B. I was working with the DOC and my team on efforts to achieve greater inmate distancing with healthcare staff, and when the Receiver issued his April 10 memorandum, I gathered more information to implement its concept. I worked with my staff and CDCR's Facilities Management Division to obtain a template for using prison gymnasiums to achieve the pods, and then began communicating with Associate Directors and Wardens to explain the concept and provide direction. As we gathered further information and prepared revised plans consistent with the Receiver's instruction, I directed the Associate Directors to have prisons begin establishing 8-person pods or implement similar measures to promote six feet of distance between inmates.

7.  Based on the need to move inmates to facilitate this process, Division of Adult Institutions headquarters staff also developed an inmate transfer schedule. I submitted a transfer plan, including identification of numbers of inmates to be moved from certain institutions and a proposed schedule, to the Receiver and the Secretary on April 17. This transfer plan is intended to create distancing for all inmates in the identified institutions, and does not differentiate based on inmate medical or mental health factors. The Receiver requested additional information concerning the plan which my staff provided over the next few days. On April 20, I submitted a revised transfer plan to the Receiver and Secretary for approval, which was approved on the same day. The transfer plan targets those dorms that have not already achieved physical distancing by either creating eight person pods or establishing six feet of distance between inmates. Inmates will begin moving to facilitate creation of the 8-person pods on April 22, and will be completed by April 29. As a result of this plan, approximately 1,300 inmates will be moved to new housing units in order promote physical distancing.

4

Decl. C. Gipson Supp. Defs' Reply COVID-19 Plan  (2:90-cv-00520 KJM-DB (PC))

1   I declare under penalty of perjury that to the best of my knowledge the above is true and
2   correct.  Executed on this 22nd day of April 2020, in Sacramento, California.

*/s/ Connie Gipson*
Connie Gipson

CF1997CS0003
34017706

5

Decl. C. Gipson Supp. Defs' Reply COVID-19 Plan  (2:90-cv-00520 KJM-DB (PC))

# Exhibit A



# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

# MEMORANDUM

**Date:** March 20, 2020

**To:** Wardens
Chief Executive Officers

**From:**

STEVEN THARRATT, MD, MPVM, FACP
Director, Health Care Operations
Statewide Chief Medical Executive

CONNIE GIPSON, Director
Division Adult Institutions

**Subject:** COVID 19 Pandemic – Guidance Regarding Field Operations

In response to the current coronavirus disease 2019 (COVID-19) pandemic, and out of an abundance of caution, California Department of Corrections (CDCR) and California Correctional Health Care Services (CCHCS) are taking necessary precautions in an effort to reduce exposure to both inmates and staff. This memorandum replaces the one sent on March 18, 2020, and provides guidance on inmate screening, isolation, quarantine, social distancing, and essential health care services.

**Screening on Entry into the Prison**

Immediately upon entry, all inmates must be screened for symptoms of influenza-like illness (ILI) including COVID-19. The inmate populations that must be screened include, but are not limited to, inmates entering via reception centers, receiving and release locations, fire camps, and returning from court, a higher level of care, or an offsite specialty appointment. The screening shall include:

1. Asking the following questions.
    a. Do you have a cough?
    b. Do you have a fever?
    c. Do you have difficulty breathing?
2. Measuring the patient's temperature.

# MEMORANDUM

Based on the outcome of the screening questions, temperature reading, and the nurse's clinical judgement, individuals shall be housed according to one of the three options noted below.

1) <u>Isolation</u>: Any inmate who answers "yes" to one or more of the screening questions and/or has a temperature above 100.4 must be isolated.
2) <u>Quarantine</u>: Reception center Inmates arriving from the jail who answer "no" to all of the screening questions must be quarantined for a period of 14 days.
3) <u>Other Housing</u>: *All other inmates* returning to CDCR or transferring between prisons who answer "no" to all of the screening questions may be housed as appropriate per custody and clinical protocol that does not require placing in quarantine.

**Screening within the Institution**

Patients with ILI symptoms including possible COVID-19 should be screened in a manner that minimizes exposures to others. Strategies to be considered include, but are not limited to, screening primarily in the housing unit clinics, separate "ILI-only" clinics, spaces made available by modified programming or, if needed, the triage and treatment area (TTA). Patients with ILI symptoms shall be isolated. Individuals exposed to patients with ILI symptoms should be quarantined.

**Social Distancing**

Social distancing strategies should be implemented as much as possible for all individuals; however, it is imperative that social distancing be enforced for the most vulnerable patients including, but not limited to, <u>high risk 1, high risk 2, pregnant, and any other patient at high risk per clinical judgement</u>.

Provide information to all individuals about why their movements may be restricted to a greater degree than others (e.g., older adults and those with serious health conditions), and consider the implications of potential stigma and social isolation. For prisons that do not have a large number of vulnerable patients, cohorting or housing these patients together should be avoided if possible. Cohorting vulnerable patients is not recommended as they are more susceptible to contracting and rapidly spreading the disease to other high-risk patients and are at high risk for developing serious complications or death related to the disease. For the most vulnerable patients delivery of meals and medications to the cell front should be considered *if feasible*.

General strategies for all individuals regardless of clinical risk will need to be tailored to the available space in the facility and the needs of the population and staff. Examples of strategies *where feasible* may include, but not be limited to:

- Maintaining a distance of six feet between individuals.

# MEMORANDUM

- Not congregating in groups of 10 or more individuals.
- Reassigning bunks to provide more space between individuals.
- Suspending group programs where participants are likely to be in close contact.
- Rearranging scheduled movements to minimize mixing of individuals from different housing areas.
- Minimizing housing assignment changes unless necessary for health care reasons and/or safety and security concerns.
- Providing meals inside the housing unit if feasible or extending meal times to reduce crowding and increase social distancing along with thoroughly disinfecting solid surfaces including but not limited to such as tables, chairs, railings, and door knobs.
- Restricting recreation yard usage to a single housing unit per yard, where feasible.

**Essential Health Care Services**

Hospital and Emergency Department Services

Hospital send outs should be limited to only those patients who require a higher level of care to prevent or reduce the risk of morbidity and mortality. If patients can safely receive clinically appropriate care at the prison they should not be sent out. Patients presenting with ILI symptoms that are manageable within our system capabilities should remain in our care. Symptomatic but stable patients should *not* be sent to emergency departments or community hospitals.

Specialty Services

Effective immediately, all elective procedures/surgeries shall be postponed, as well as onsite and non-essential offsite specialty medical appointments, until further notice. Use discretion in keeping only appointments that are absolutely necessary and consider telemedicine as an option as well. Examples of necessary specialty appointments include, but are not limited to, face-to-face oncology care for pre-chemotherapy planning, diagnostic colonoscopies for positive screening, and symptomatic patients that cannot wait several weeks for further evaluation and treatment. Patients who require frequent appointments outside the prison (such daily chemo or radiation therapy or transports to an offsite Narcotic Treatment Program) may require special housing accommodations, *if feasible*, and should wear a surgical mask if possible.

Primary Care Services

Health Care 7362 requests that require a face-to face encounter should be conducted in ways that minimize patient movement and exposure to others within the facility. If possible, during

# MEMORANDUM

regular business hours, primary care teams should consider triaging patients complaining of ILI symptoms at cell front using appropriate Personal Protective Equipment (PPE). After regular business hours, 7362 screening for patients with ILI or COVID-19 symptoms shall be done at cell front by a nurse. Transport to TTA shall be reserved for patients needing urgent or emergent care. Whenever patients with ILI symptoms must be transported outside their cell, the patient shall wear a surgical mask.

Non-essential primary care appointments with providers such as preventive health screenings, routine health care 7362 referrals, some chronic care visits, and other appointments that do not pose a risk of harm if delayed several weeks should be postponed.

### Medications

Medications need to be converted to "Keep on Person" (KOP) where possible. If medications must be prescribed Nurse Administered or Direct Observation Therapy (NA/DOT), the regiment should be prescribed once or twice daily if possible. In addition to administering medications cell front or bedside for the most vulnerable patients, institutions should consider other situations where cell front medications can be given depending on staffing in order to reduce movement and the congregation of more than ten persons that does not allow social distancing.

The health and safety of all individuals within the institutions is a top priority. We believe taking these steps now is in the best interest of all. Please work together at the institution to operationalize the guidance provided above.

cc: Joseph Bick, MD
    Renee Kanan, MD, MPH
    Barbara Barney-Knox
    Regional Health Care Executives
    Regional Chief Nurse Executives
    Regional Deputy Medical Executives
    CCHCS Deputy Directors
    Kimberly Seibel
    Jennifer Barretto
    Associate Directors, DAI

# Exhibit B



# MEMORANDUM

| | |
|---|---|
| **Date:** | April 10, 2020 |
| **To:** | Secretary Ralph DIaz |
| **From:** | J. Clark Kelso, Receiver |
| **Subject:** | CCHCS Guidelines for Achieving and Maintaining Social Distancing in California Prisons |

In the face of the ongoing COVID-19 pandemic, California Correctional Health Care Services (CCHCS) will continue to be guided by the developing scientific and medical consensus regarding social distancing in correctional settings, as well as by the Receiver's authority under the Order Appointing Receiver and the applicable regulatory provisions of Title 15 of the California Code of Regulations.  Accordingly, the Receiver has determined that CCHCS and California Department of Corrections and Rehabilitation (CDCR) should implement the following steps in their ongoing efforts to mitigate the risks associated with transmission of the COVID-19 coronavirus.

1. CDCR should not authorize or undertake any further movements of inmates between institutions to achieve necessary social distancing without the approval of Health Care Placement Oversight Program (HCPOP) in consultation with the CCHCS public health team. Inter-institution moves risk carrying the virus from one institution to another.

2. The Center for Disease Control's "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," dated March 23, 2020 (https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html), recommends maintaining social distance of 6 feet between inmates while acknowledging that "Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities."  Necessary social distancing is already being achieved in both single- and double-celled units.  In double cells, cell mates constitute one another's "social distancing cohort" for correctional purposes and are analogous to a family unit in the free world.  With respect to housing in dorm settings, the Receiver has determined that necessary social distancing can be achieved by creating 8-person housing cohorts.  Each cohort is to be separated from the others by a distance of at least six feet in all directions.

3. Any movement of inmates out of the dorms to achieve necessary cohort social distancing must be coordinated with, and may not occur without the concurrence of,

**MEMORANDUM**

HCPOP to ensure to the extent feasible that such movement does not cause, contribute to or exacerbate the potential spread of the disease.

4. CCHCS will continue to monitor developments closely and will modify these guidelines as necessary and appropriate.

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

P.O. Box 588500
Elk Grove, CA 95758

**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**

# MEMORANDUM

| | |
|---|---|
| **Date:** | April 12, 2020 |
| **To:** | Secretary Ralph Diaz |
| **From:** | J. Clark Kelso, Receiver |
| **Subject:** | CCHCS Guidelines for Achieving and Maintaining Social Distancing in California Prisons |

This memorandum supplements my memorandum dated April 10, 2020 and clarifies my intention regarding the steps set forth in that memorandum.

I had not intended for my April 10, 2020 memorandum to affect any inter-institution transfers that are to address either medical, mental health, or dental treatment needs that are not available at the sending institution, such as to provide a higher level of care or to reduce or prevent morbidity or mortality, or a safety or security issue that cannot be managed by the sending institution.

If you have any questions, please do not hesitate to contact me.

CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

P.O. Box 588500
Elk Grove, CA 95758