1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
2

3    Ralph Coleman, et al.,
            Plaintiffs,
4

    vs.                          Sacramento, California
5                                No. 2:90-cv-00520
    Gavin Newsom, et al.,        Fri., Apr. 17, 2020
6          Defendants.           11:07 a.m.
    _____/
7
              TRANSCRIPT OF TELEPHONIC HEARING
8      BEFORE THE HONORABLE KIMBERLY J. MUELLER, DISTRICT JUDGE
                    ---oOo---
9

10  APPEARANCES:
    (All parties appearing by telephone)
11
      For the Plaintiffs:          Rosen, Bien, Galvan and
12                                 Grunfeld, LLP
                                   50 Fremont Street, 19th Floor
13                                 San Francisco, CA  94105
                                   By:  Michael Bien
14                                 Lisa Adrienne Ells
                                   Attorneys at Law
15

16    For the Defendants:          Office of the Attorney
                                   General
17                                 455 Golden Gate Ave.
                                   Suite 11000
18                                 San Francisco, CA  94102
                                   By: Kyle Anthony Lewis
19                                 Adriano Hrvatin
                                   Damon Grant McClain
20                                 Attorneys at Law

21  (Appearances continued on following page)

22    Official Court Reporter:     Kimberly M. Bennett,
                                   CSR, RPR, RMR, CRR
23                                 501 I Street
                                   Sacramento, CA 95814
24

25    Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription

```
 1                        APPEARANCES CONTINUED
 2
      For the Plaintiffs:              Rosen, Bien, Galvan &
 3                                     Grunfeld, LLP
                                       101 Mission Street
 4                                     Sixth Floor
                                       San Francisco, CA  94105
 5                                     By:  Jessica L. Winter
                                       Marc J. Shinn-Krantz
 6                                     Attorneys at Law

 7
      For the Plaintiffs:              Prison Law Office
 8                                     1917 Fifth Street,
                                       Berkeley, CA  94710
 9                                     By: Donald Specter
                                       Steven Fama
10                                     Attorneys at Law

11    For the Defendants:              Robins Kaplan, LLP
                                       2049 Century Park East, Suite
12                                     3400
                                       Los Angeles, CA  90067
13                                     By: Roman M. Silberfeld
                                       Attorney at Law
14

15    For the Defendants:              Office of the Attorney
                                       General
16                                     1300 I Street, Suite 125
                                       Sacramento, CA  94244
17                                     By: Elise Owens Thorn
                                       Tyler Vance Heath
18                                     Lucas L. Hennes
                                       Monica Anderson
19                                     Attorney at Law

20

21

22

23

24

25
```

1                          APPEARANCES CONTINUED

2    Also Present:
     Diana Toche, Undersecretary of Health, CDCR
3    Jennifer Neill, Assistant Secretary/Chief Counsel, CDCR
     Joseph Bick, M.D., Director, Health Services, CDCR
4    Melissa Bentz, Legal Affairs, CDCR
     Nick Weber, Legal Affairs, CDCR
5    Stephanie Clendenin, Director, DSH
     Christine Ciccotti, General Counsel, DSH
6    Christopher Kent, General Counsel, DSH
     Antonina Raddatz, General Counsel, DSH
7    James Spurling, General Chief Counsel, OIG
     Gregg Adam, Counsel for CCPOA
8    Matthew Lopes, Special Master
     Mohamedu Jones, Special Master Team
9    Kerry Walsh, Special Master Team
     Kristina Hector, Special Master Team
10   Jeff Metzner, M.D., Special Master Team
     Kerry Hughes, M.D., Special Master Team
11   Henry Dlugacz, Special Master Team
     Haven Gracy, Law Clerk for Chief Judge Mueller

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to order of the court, 11:07 a.m.)

 2              THE CLERK:  Court is now in session.  Chief Judge

 3    Kimberly J. Mueller now presiding.

 4        Calling civil case 90-520; Coleman, et al. versus Newsom,

 5    et al.  This is on for a telephonic status conference and

 6    motion hearing.

 7              THE COURT:  All right.  Thank you, Ms. Schultz.

 8        We have a court reporter covering the proceeding

 9    telephonically.  Could the court reporter please identify

10    herself and confirm that she is hearing everything.

11              THE COURT REPORTER:  Yes.  Good morning, Judge.  This

12    is Kimberly Bennett, and I can hear.

13              THE COURT:  All right.  Very good.  Thank you.  And

14    the court reporter knows to let us know if she is unable to

15    catch anything as we proceed.

16        It is essential that whoever is not speaking have their

17    phone on mute to avoid feedback and any other noise that gets

18    in the way of preparing a good record.  So far we have had good

19    success with these calls, but Ms. Schultz has posted the ground

20    rules.

21        I'm hearing some static and so I need to ask that anyone

22    who is on the phone, including parties appearing, mute your

23    phones.  I will call on anyone before they speak.

24        So let me do roll call.

25        For the plaintiffs, Michael Bien.
```

```
 1                    MR. BIEN:  Present, Your Honor.

 2                    THE COURT:  Lisa Ells.

 3                    MS. ELLS:  Yes, Your Honor.

 4                    THE COURT:  Jessica Winter.

 5                    MS. WINTER:  Yes, Your Honor.  Good morning.

 6                    THE COURT:  Mark Shinn-Krantz.

 7                    MR. SHINN-KRANTZ:  Good morning, Your Honor.

 8                    THE COURT:  Donald Specter.

 9                    MR. SPECTER:  Present.

10                    THE COURT:  Steven Fama.

11                    MR. FAMA:  Present, Your Honor.

12                    THE COURT:  All right.  Mr. Bien, is there anyone

13    else appearing for plaintiffs?

14        I'm not hearing Mr. Bien respond so I'm assuming no one

15    else is appearing.

16        For the defendants.  Mr.  Lewis, Kyle Lewis.

17                    MR. LEWIS:  Good morning, Your Honor.

18                    THE COURT:  Roman Silberfeld.

19                    MR. SILBERFELD:  Good morning, Your Honor.

20                    THE COURT:  Adriano Hrvatin.

21                    MR. HRVATIN:  Present, Your Honor.

22                    THE COURT:  Elise Thorn.

23                    MS. THORN:  Yes.  Present, Your Honor.

24                    THE COURT:  Tyler Heath.

25                    MR. HEATH:  Good morning, Your Honor.
```

```
 1                 THE COURT:  Lucas Hennes.

 2                 MR. HENNES:  Present, Your Honor.  Good morning.

 3                 THE COURT:  Monica Anderson.

 4                 MS. ANDERSON:  Yes, Your Honor.  Good morning.

 5                 THE COURT:  I understand Damon McClain is also on the

 6      phone.  Is that correct?

 7                 MR. MCCLAIN:  Yes, I'm here, Your Honor.  Thank you.

 8                 THE COURT:  All right.  And do I also understand that

 9      there is counsel appearing for an intervenor?

10                 MR. ADAM:  Your Honor, this is Gregg Adam for

11      California Correctional Peace Officers.  I'm just monitoring

12      rather than appearing, unless the Court needs anything from us.

13                 THE COURT:  All right.  How do you spell your last

14      name, sir?

15                 MR. ADAM:  Adam, A-D-A-M, like the guy in the Bible.

16                 THE COURT:  All right.  All right.  I just wanted to

17      acknowledge your presence, but understand that you are

18      monitoring at this point.

19           Let me also call roll for those I understand who are

20      present.

21           Dr. Diana Toche, Undersecretary of Health Services.

22                 DR. TOCHE:  Good morning, Your Honor.

23                 THE COURT:  Jennifer Neill.

24                 MS. NEILL:  Yes.  Good morning, Your Honor.

25                 THE COURT:  Dr. Joseph Bick.
```

```
 1              DR. BICK:  Good morning.

 2              THE COURT:  Melissa Bentz.

 3              MS. BENTZ:  Good morning, Your Honor.

 4              THE COURT:  Nick Weber.

 5              MR. WEBER:  Good morning, Your Honor.

 6              THE COURT:  Stephanie Clendenin.

 7              MS. CLENDENIN:  Good morning.

 8              THE COURT:  Christine Ciccotti.

 9              MS. CICCOTTI:  Good morning, Your Honor.

10              THE COURT:  Christopher Kent.

11              MR. KENT:  Yes.  Good morning, Your Honor.

12              THE COURT:  Antonina Raddatz.

13              MS. RADDATZ:  Present, Your Honor.

14              THE COURT:  James Spurling.

15              MR. SPURLING:  Present, Your Honor.  Good morning.

16              THE COURT:  All right.  Also monitoring,

17    Mr. Spurling, correct?

18              MR. SPURLING:  Yes, for the Office of the Inspector

19    General, that's correct, Your Honor.

20              THE COURT:  All right.  And then the Special Master,

21    Mr. Lopes, you are present?

22              MR. LOPES:  I am present, Your Honor.

23              THE COURT:  All right.  Mr. Lopes, could you please

24    identify who on your team is also present.

25              MR. LOPES:  Yes, Your Honor.  Mohamedu Jones, Kerry
```

1    Walsh, Kristina Hector, Dr. Jeffrey Metzner, Dr. Kerry Hughes,

2    and Henry Dlugacz present.

3              THE COURT:  All right.  Thank you.

4        And the Court's law clerk, Haven Gracy, is monitoring

5    telephonically.

6        For today's status here is what the Court plans to cover:

7        First I would like, as we have been at the status

8    conferences in the past, to hear from the Special Master a

9    brief report with any updates on the coronavirus task force

10   meetings, and anything that has come out of those.

11       And then I would like to talk a bit about the plan that has

12   now been filed by the defendants.  The Court acknowledges

13   receipt of that plan last evening and has had a chance to

14   conduct an initial review, including key attachments relevant

15   to mental health.

16       And then I do want to talk about the evidentiary hearing

17   currently calendared for next Tuesday, and hear, to the extent

18   necessary, the motion for reconsideration of the setting of

19   that hearing, or at least a request for further clarification.

20       And then we'll also talk about the next status.

21       So, first, Special Master Lopes, could you please provide a

22   brief update.

23              MR. LOPES:  Thank you, Your Honor.

24       The task force meetings were held between April 10th and

25   April 16th.  The task force meetings included plaintiffs,

1    defendants, members from my team, the Armstrong court expert,

2    and the receiver's chief medical officer.

3        During the same timeframe, five separate workgroup meetings

4    were held --

5            THE COURT REPORTER:  Excuse me.  Excuse me.  This is

6    the court reporter, Kimberly Bennett.  I am having a really

7    difficult time hearing you.  If you could speak --

8            MR. LOPES:  Go back to the beginning.  Try one more

9    time.

10    Two COVID-19 task force meetings were held between

11    April 10th and April 16th, 2020.  The task force meetings

12    included plaintiffs, defendants, members from my team, the

13    Armstrong court expert, and the receiver's chief medical

14    officer.

15        During the same timeframe, five separate workgroup meetings

16    were held with either the Coleman experts and CDCR clinicians,

17    or with the Coleman experts, CDCR clinicians, and Department of

18    State Hospitals clinicians.

19        The task force meetings met on -- the task force met on

20    April 15th and April 16th.  The workgroup meetings met on

21    April 13th, twice on April 14th, once on April 15th, and once

22    on April 16th.

23        After several revisions and approval from all of the

24    parties, the so-called COVID-19 Temporary Transfer Guidelines

25    and the COVID-19 Emergency Mental Health Treatment Guidance

1   documents were distributed to the institutions on the evening

2   of April 10, 2020.

3       Mental health headquarters provided an overview of the

4   emergency transfer and treatment guidelines via teleconference

5   with each of the four mental health administrative regions on

6   April 14th.  The four calls were monitored by the Coleman

7   monitoring team.

8       The task force reached an agreement regarding the transfer

9   and treatment of inmates requiring BOP levels of care.  And the

10  task force also reached an agreement regarding the transfer and

11  treatment of max custody inmates requiring a higher level of

12  mental health care.  This agreement included an understanding

13  that CDCR would issue a memo reinforcing the importance of the

14  warden and/or Institutional Classification Committee reviewing

15  and possibly revising the max custody status for inmates

16  requiring a higher level of mental health care.  That memo is

17  still pending.

18      Activities that are still in progress:

19      The task force is currently working with CDCR on a

20  temporary agreement for the housing of mental health crisis bed

21  patients in the California Institution for Men and inmates

22  referred for crisis bed placement in the future.  The task

23  force agreed that currently empty mental health crisis beds at

24  CIM would be used for housing medically-compromised inmates at

25  risk for death due to the COVID-19; specifically, transfer --

 1    excuse me, transplant patients.

 2        CDCR is discussing with the task force options for

 3    transferring current mental health crisis bed patients who are

 4    awaiting psychiatric inpatient program placement to available

 5    psychiatric inpatient program beds at other institutions, which

 6    would free up additional beds for medical patients at the

 7    California Institution for Men.  The task force is still

 8    working on a suitable overflow unit, or the development of a

 9    suitable overflow unit, for mental health crisis bed inmates at

10    CIM.

11        The workgroup met several times with clinicians from the

12    Department of State Hospitals to develop transfer plans and

13    inclusion criteria for eligible inmates but we were unable to

14    reach an agreement.

15        On April 15th, the Department of State Hospitals issued a

16    memo stating that the suspension of admission to its facilities

17    was lifted.  The California Department of Corrections and

18    Rehabilitation and DSH subsequently adopted an internal

19    agreement for transfers, which may have a chilling effect on

20    subsequent transfers.

21        The defendants consulted with me regarding their emergency

22    plan that is before the Court that I believe was filed

23    yesterday.

24        Finally, Your Honor, because the transfer guidelines and

25    the transfer -- the temporary transfer policies and the

1    temporary mental health units that are being created were not

2    contemplated by the Program Guide, the parties are going to

3    have to work together with me this week to stipulate -- to

4    craft a stipulation that would waive some of the Program Guide

5    requirements because what is being crafted right now is being

6    done on a temporary emergency basis that was not contemplated

7    by the Program Guide or orders related to the Program Guide.

8         That is my report.

9              THE COURT:  All right.  Thank you, Special Master

10   Lopes.

11        The Program Guide, of course, is the Bible embodying the

12   remedy in this long-running case, and so the Court does

13   understand that there will need to be some formal

14   acknowledgment of temporary modifications under the current

15   circumstances.  So I will look for the stipulation the Special

16   Master referenced at some point in the relatively near future,

17   I would assume in the next week to ten days.

18        Let me just ask briefly if either party has anything to

19   cover with respect to task force meetings that it believes was

20   not covered by the Special Master.

21        Mr. Bien?

22              MR. BIEN:  No, Your Honor.

23        I think the task force process has been valuable.  I do

24   think that, as the Special Master indicated, obviously,

25   normal -- nothing is normal, and we think it's very important,

1   now that we have an agreement on everything but -- but the DSH

2   access, that there will be close monitoring of the kind of care

3   that patients that ordinarily would have been referred to

4   higher levels of care are now receiving in this new world.  I

5   think it's going to be a challenge.  I think it's necessary

6   under -- under this emergency, but it's -- I think there is

7   certainly some risk being taken as to these patients and we are

8   confident that adequate monitoring both by defendants'

9   headquarters but also by the Special Master team is an

10   important element.

11           THE COURT:  All right.  So the close monitoring would

12   be in the form of the Special Master's monitoring, currently

13   primarily on a paper basis, not by visiting institutions, but,

14   Mr. Bien, when you say "close monitoring," that is by the

15   Special Master and his team to the extent they can; is that

16   correct?

17           MR. BIEN:  Yes.  I think because they could check

18   medical records and make phone calls with institutions just to

19   check on how things are going, I think it's an important aspect

20   of this crisis.

21           THE COURT:  All right.  Understood.

22       Mr. Lewis?

23           MR. LEWIS:  Good morning, Your Honor.

24       Defendants just wish to acknowledge and thank, once again,

25   the Special Master and his team for their time.  As he's

 1    pointed out, there were seven meetings in the past week, and

 2    enumerable additional phone calls and contacts among various

 3    persons.  We do appreciate his time, as well as plaintiffs'

 4    time, as we move forward.

 5        And this demonstrates all parties coming together to

 6    collaboratively address these issues raised by the pandemic.

 7    It also showed the fluid nature of everything that's going on,

 8    and we believe that the continued collaboration among the

 9    parties, with the Special Master's help, is bearing a positive

10    result, and we look forward to continuing those conversations

11    as needed to do the best things that we can for CDCR's

12    population and staff to keep everyone safe in this pandemic.

13        Thank you, Your Honor.

14            THE COURT:  All right.  Thank you, counsel.

15        The Court is encouraged by the ongoing reports out of the

16    task force.  I do think that task force has served as a forum

17    for hashing out a lot of very important issues on a short

18    timeframe.  So the Court thanks the Special Master and everyone

19    who has been involved in those task force meetings.  I

20    understand from the Special Master that CDCR has been very

21    responsive to his requests and a full participant in those

22    meetings.  And I note the reference to the task force in the

23    plan that has now been submitted.

24        Let me turn to the plan.

25        I believe the plaintiffs had not seen the plan before its

1    filing, at least not the entire document.  The Court's thought

2    would be to allow some time for any substantive response by the

3    plaintiffs.  The Court has, again, reviewed the plan once, can

4    spend some more time doing that.

5        My question to the plaintiffs initially is, are you

6    requesting a chance to provide some written response to the

7    plan so the Court can know whether or not there is more for it

8    to consider with respect to what is before it, Mr. Bien?

9            MR. BIEN:  Your Honor, we have had a chance to

10   quickly review the plan.  And I think there are some things I

11   would like to address today, but I would like an opportunity to

12   give the Court a thorough analysis, which would -- perhaps we

13   could do by early next week.

14       My comment that is most important is that the plan does

15   not, in our minds, fulfill the directive of this Court.  It

16   does not set forth specific goals and objectives to be achieved

17   by a date certain.  It does not set forth defendants' -- there

18   is no compliance with the Court's directive to have a

19   particular plan for those most at risk for COVID-19, the

20   medically vulnerable are not addressed in the plan.  It does

21   not have objectives and timetables for housing.

22       And I think most important is that while yesterday at the

23   Plata hearing defendants' counsel represented to Judge Tigar

24   that a decision had been made to -- to go along with the

25   receiver's direct -- directive to use the eight-person cohorts

1   within the dormitories, and then to separate those eight-person

2   cohorts from each other by six feet, in the plan that was

3   submitted last night, defendants continued to waffle about that

4   point.  There is no clear acknowledgment that they will or will

5   not comply with the receiver's directive; it says it's under

6   consideration.  And there is certainly no date or plan or

7   objective for when such a plan will be implemented.  So that

8   still remains a grave concern to plaintiffs' counsel.

9       There are other things we'd like to point out about the

10  plan.  And, again, we have not had a chance to go through it in

11  great detail, we were just checking on those, kind of, key

12  facts, and we would appreciate an opportunity to respond to the

13  plan more thoroughly early next week.

14          THE COURT:  All right.  By when do you believe you

15  could file something?  By Wednesday at the latest?

16          MR. BIEN:  Definitely, Your Honor.

17          THE COURT:  All right.  I'll look for your comments

18  on the plan by next Wednesday.

19      In the meantime, Mr. Lewis, any response?

20      The Court did note I didn't see clearly articulated goals

21  and objections.  I think that is a fair observation from the

22  plaintiffs.  And the Court noted that there is no horizon

23  identified.

24      So anything else you'd like to say at this point in

25  response to Mr. Bien's initial comments?

1                    MR. LEWIS:  Good morning, Your Honor.

2        I would simply say that the plan is a compilation of many

3   different efforts.  As Your Honor notes, there is a lot of

4   stuff out there, there are 30 -- almost 30 attachments to it.

5   That shows that the department has taken a rather massive step

6   forward in terms of pulling together the information the Court

7   requested.

8        Most importantly, as we've repeatedly said, the fluid

9   nature of this pandemic is causing CDCR to continually update

10  its plan.  And some of the things that Mr. Bien notes have been

11  addressed within it.

12       In terms of objections or timetables for housing, CDCR has

13  committed to examining the idea of moving patients to the

14  appropriate spacing, and those kinds of issues, but this is a

15  continually evolving plan as they continue to identify space,

16  meet with fire marshals, etc.

17       We look forward to the plaintiffs' comments and will take

18  them into consideration, considering this is something that

19  will be continually evolving as the response to the pandemic is

20  evolving.

21       And as for Your Honor's question about the horizon, it's

22  just simply not known yet.  As the governor has briefed in his

23  daily press conferences or in daily releases, this is the

24  evolving nature of this public health risk.  So right now there

25  is no current horizon, but the department is moving forward,

1    focused on a very simple goal of maintaining safety for all of

2    its population and all of its staff in the face of this

3    pandemic.  So all of their efforts are specifically targeted at

4    preserving the safety and the health of the people within its

5    charge, both staff and inmates.

6        And as to the mental health population, as the plan shows,

7    and the numerous attachments to it, there are various steps

8    that the department has taken specific to mental health care,

9    with the help of the Special Master and the plaintiffs' review,

10   to make sure that they provide adequate care to the inmate

11   population that requires mental health care.

12             THE COURT:  All right.  Thank you, counsel.

13       Let me ask one question.  Previously, the defendants have

14   shared, subject to protective order, with the plaintiffs

15   detailed information on members of the Coleman class, their

16   locations, and I believe information that can help identify the

17   most at risk among that population.

18       Do I have that right, Mr. Bien?

19             MR. BIEN:  Yes, Your Honor.

20             THE COURT:  So have the parties, in the task force or

21   otherwise, had a granular discussion?  Have they conducted

22   together a granular review of those that the plaintiffs would

23   identify as the most at risk, and looked at where they are

24   located, and what CDCR's plans are for those members of the

25   class?

1            Mr. Bien first.

2                 MR. BIEN:  No, Your Honor.

3            And I guess I would -- in commenting on the task force, one

4       thing I should have said is that I note that Your Honor ordered

5       that defendants consult with the Special Master in coming up

6       with this plan.  I don't know whether that happened, but they

7       did not consult with us.  We've had no discussions with the

8       defendants about housing of, you know, Coleman class members

9       other than as to CIM.  And that discussion was brought to Your

10      Honor's attention.  We have not had that opportunity, you know,

11      to discuss those details.

12           And again, you know, I do think that, having consulted a

13      little bit with my team by the way, we are prepared to file a

14      response to the plan by Monday.  And we do think there is some

15      urgency to the Court addressing the merits of the plan as soon

16      as possible.

17                THE COURT:  All right.  So I'll look for a response

18      by Monday.

19           Let me ask the Special Master, I know there are many balls

20      in the air, of course, but is there any reason the task force

21      could not be a forum for review of the -- of detailed

22      information on members of the Coleman class that the

23      plaintiffs, in the first instance, would identify as being at

24      high risk in light of coronavirus, with the Special Master

25      facilitating a discussion about CDCR's specific plans for those

1    persons?

2        Special Master Lopes?

3            MR. LOPES:  Thank you, Your Honor.

4        I believe that the task force could take that on.  To date,

5    we have been moving so quickly and working day and night around

6    transfer issues that we simply haven't gotten there yet.  But

7    many of the transfer issues have been resolved, and many of the

8    planning aspects -- the emergency planning aspects are being

9    implemented, so there is no reason why we can't pivot and now

10   look at the population data that are going to be affected by

11   COVID.  Agreed, we can do that.

12           THE COURT:  Any objection, Mr. Bien, to referring

13   that specific assignment to the task force as a priority

14   matter?

15           MR. BIEN:  I think it would be useful to start

16   addressing it as soon as possible.

17       In addition to referring these broader issues to the

18   judge's -- to your attention, Your Honor, I think there are

19   some things that are -- that -- the big issues about -- that

20   still need to be addressed are if defendants are complying with

21   the receiver's directive.  And Mr. Lewis' statement today was

22   equivocal compared to Mr. Mello's statement at yesterday's

23   hearing in front of Judge Tigar.  If they are, then let's see a

24   plan for how they're going to do that, and what they're going

25   to do with the extra prisoners who don't fit in the doors.

1    That part of the plan has not been discussed, and there needs

2    to be -- that needs to be rapidly addressed, in our opinion.

3            THE COURT:  Mr. Lewis, any objection to referring

4    this issue to the task force?

5            MR. LEWIS:  No, Your Honor.  But I would just point

6    out that the -- the identification of class members that may be

7    considered medically high risk, I believe -- and I don't want

8    to misspeak this, but I believe the number was something like

9    11,000 inmates.  So the concept of getting to granular detail

10   on that may be stretched.  But we'll see what we can do.

11      We welcome anything referred to the task force to once

12   again foster that collaborative conversation that we've been

13   having.

14      As to Mr. Bien's comment about distancing, or things like

15   that, the steps that the plaintiff -- that the defendants are

16   taking as part of their plan, it's a holistic plan, distancing

17   is just one aspect.

18      As the CDC guidelines point out, and as our plans discuss

19   it, defendants have taken physical distancing as one of the

20   many measures, and they have taken very reasonable steps to

21   deal with and abate the COVID-19 risks, of which distancing is

22   only one of them.  They will continue to look at all potential

23   avenues and look at the evolving CDC guidance, look at the

24   evolving public health guidance, and all of these things as

25   part of the holistic plan to continue to address the COVID

 1   pandemic.

 2        Defendants would also ask, if it's okay with the Court,

 3   that we have an opportunity to respond to any objections that

 4   the plaintiffs may write, or any comments that they may submit

 5   to the Court next week about the plan, with Your Honor's

 6   permission.

 7             THE COURT:  All right.  I will provide for that.

 8   I'll give you a timeline once I see what the plaintiffs are

 9   saying.  And perhaps some of those issues can be folded into

10   the task force as well.  I'm not prejudging the question.

11        In terms of the granularity, I realize it's a large number,

12   but perhaps they can be sorted by location and some subgroups

13   created to try to get a sense of what's going on.  But

14   ultimately it really needs to take account of the individual

15   members of the class.

16        The Court has asked previously about the cohort concept,

17   which I believe was already on the table by last week's status

18   in this court.  So one thing the defense can make clear to the

19   plaintiffs is what are the plans for cohorting, if those are

20   ways of -- of creating families, as it were, within the prison

21   system, and how does that affect high risk members of the

22   Coleman class.

23        So with that said, the issue of reviewing, with some

24   specificity, what's happening with members of the Coleman class

25   will be referred to the task force.

1      On the evidentiary hearing currently set for next week to

2  probe the question of transfers of Coleman class members to

3  Department of State Hospitals facilities, I understand

4  circumstances have changed, at least in some respects.

5      Let me understand the parties' current positions.

6      I also understand there is a discovery dispute.  I'm going

7  to ask the parties to provide Ms. Schultz, by e-mail, the

8  discovery requests that are the subject of the dispute, clearly

9  identified, and the objections registered in response.  If they

10 can provide those today then I can provide a time where I'll

11 have a telephonic status to resolve that dispute.

12      But just so I'm clear on the plaintiffs' current position,

13 what is the plaintiffs' current position regarding the

14 appropriate timing of the evidentiary hearing, Mr. Bien?

15          MR. BIEN:  Yes, Your Honor.

16      Plaintiffs' position is that given the change in DSH's

17 position as to access, they are now representing that there

18 will be access to Coleman class members to inpatient

19 psychiatric care at their facilities, we continue to disagree

20 with their -- the language in their -- in the transfer

21 guideline that they have submitted to the workgroup, but I do

22 think that the proof is in what they actually do.  And rather

23 than fighting about what words mean without anything more for

24 the Court to consider, I think it would be appropriate to

25 carefully monitor the process and delay the hearing for not

1  more than 30 days and see what happens in terms of actual

2  patients.

3      There still are more than 30 patients that -- we don't have

4  the latest update, but at least 30 patients that we understand

5  are ASH eligible, are waiting for transfer.  The CDCR PIPs are

6  full and there is some urgency to this.  And I would like to

7  see CDCR and DSH actually begin reviewing patients and sending

8  them.  If they don't, then we will know that this is a

9  subterfuge and the door is really not open.  If they do, then

10  the situation is resolved and we don't need to waste your

11  Court's valuable time with the hearing.  So our recommendation

12  is to wait and carefully monitor the process.

13          THE COURT:  All right.

14      Mr. Lewis, I assume the defendants would not object to a

15  30-day continuance of the evidentiary hearing.  Is that fair?

16      And anything else to say in response to what Mr. Bien has

17  said?

18          MR. LEWIS:  Your Honor, I will defer to Roman

19  Silberfeld, my co-counsel, on this particular issue.

20          THE COURT:  All right.  Mr. Silberfeld.

21          MR. SILBERFELD:  Yes, Your Honor.  Good morning.

22      Mr. Bien and I had a series of conversations actually

23  earlier this morning, within the hour just before the hearing,

24  and agreed that we would stipulate, subject to the Court's

25  acceptance of it, that the evidentiary hearing would be moved

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC

1    30 days, from April 21 to, you know, the first available date

2    around May 20th or so that's available to the Court.

3        We were not able, given the shortness of time, to let you

4    know about that before the hearing actually commenced, but that

5    is our agreement.

6            THE COURT:  All right.  All right.  I'm prepared to

7    accept that stipulation given the apparent changed

8    circumstances and the parties' agreement.

9        So we would move the evidentiary hearing to May 19th.  That

10   date is available, correct, Ms. Schultz?

11           THE CLERK:  Yes, Your Honor.

12           THE COURT:  All right.  So the evidentiary hearing is

13   moved until May 19th.

14       I'll go ahead and resolve the discovery dispute.  At this

15   point I would plan to do that sometime next week if the dispute

16   remains live.

17       Do you consider that dispute still live, Mr. Bien?

18           MR. BIEN:  Yes, Your Honor.  The nature of the

19   dispute -- the fundamental element still in dispute is whether

20   or not DSH will give us information about all five of their

21   hospitals, not just the three that are currently accepting

22   Coleman patients.  We think that's important for the larger

23   issue that we are dealing with, whether or not there is

24   sufficient place to achieve social distancing, and whether or

25   not we need to make use of DSH empty beds in addition to CDCR

 1   resources.

 2           THE COURT:  All right.  So with that I will -- I'll

 3   set a time, Ms. Schultz will let you know of a time when we'll

 4   address the discovery dispute next week by telephone.

 5      And with the change in the date, I anticipate providing

 6   some more information.  I acknowledge the defendants' filing

 7   raising due process concerns.  I'm not necessarily agreeing

 8   that there is the level of due process concern that the defense

 9   has raised, but I will use the time that we now have to clarify

10   procedure if the hearing goes forward.

11      The Court's position on burden.  I would note that there is

12   a history here, the director of state hospitals is a defendant

13   in the case, there have been prior orders, and this Court's

14   position is those orders are not suspended by the current

15   circumstances occasioned by coronavirus.  Even if there are

16   emergencies that need to be addressed and responded to, it does

17   not mean this Court's orders are not in effect.  Just as in a

18   time of war, not all civil liberties are suspended or should be

19   suspended.  Now, particularly with no clear horizon, the

20   Coleman class' constitutional rights are not suspended.

21      But I'll put something in writing to provide some guidance

22   so you understand what I'm thinking about what a hearing would

23   need to address if it does proceed.

24      And I do think if transfers aren't resumed subject to

25   screening that this Court would need to hear about that

 1    before -- well before any hearing.

 2        All right.  Let me ask if there is anything else with

 3    respect to the evidentiary hearing, the state hospital transfer

 4    question, Mr. Bien?

 5            MR. BIEN:  No, Your Honor.

 6        I guess the point you just made I was going to make myself.

 7    I think if, in fact, there is no movement to the state

 8    hospitals we would want to -- may want to come back earlier.

 9    But we're taking defendants at good faith that they will, in

10    fact, begin to transfer patients to the state hospitals.

11            THE COURT:  All right.  Mr. Lewis -- I'm a dog lover,

12    I hear a dog in the background, meaning someone hasn't muted

13    their phone.

14        Mr. Lewis.

15            MR. LEWIS:  No, Your Honor.

16        Anything regarding DSH issues we, of course, if necessary,

17    would address at the task force.  So we take your comments to

18    heart.  Thank you for your further guidance.  We have nothing

19    further to add.

20            MR. BIEN:  Your Honor, may I just add one other

21    point?  I apologize, that's my dog.

22        We would ask that -- that the Special Master report to the

23    Court on the transfers in advance of the hearing so there is a

24    shared factual basis about what happened between the time that

25    DSH changed their policy and the time of the hearing.

1          THE COURT:  All right.  And I'm sorry, I was

2  distracted.  Could you repeat that.

3          MR. BIEN:  Yes.  I guess we would ask that the Court

4  request of the Special Master a report on what happens in terms

5  of identification of patients appropriate for transfer to DSH

6  and actual transfers between the time that DSH changed its

7  policy and some date before the hearing -- the May 19th

8  hearing.

9          THE COURT:  All right.  I will request a report.  The

10  Special Master does a good job of keeping me up-to-date as he

11  has news to report, but I'll ask for something formal as well.

12      All right.  I've covered what I need to cover today.

13      Currently our next status is showing for May 1st, with a

14  hearing date also of May 22.  We don't need to think about

15  May 22nd yet, that will stay on calendar.

16      In terms of the May 1st date, we will hold that.  The

17  agenda may change depending on where we are at that time, but I

18  still am hoping, sooner rather than later, to resume relative

19  normalcy with respect to having statuses and checking on all

20  aspects of Coleman.

21      May 1st would be two weeks from now.  My current thought

22  would be to wait to see what the comments are on the plan from

23  the plaintiffs, and any reply from the defendants that the

24  Court allows, and I anticipate allowing some opportunity, and

25  then I would let you know if we would convene again before

1    May 1st.  We may need to, depending on those comments for the

2    plan.  But I already have a civil law and motion set for next

3    Friday, and so I'm not prepared to confirm a further status

4    next Friday morning.

5        Is that approach acceptable to you, Mr. Bien?

6              MR. BIEN:  Yes, Your Honor.

7              THE COURT:  Mr. Lewis?

8              MR. LEWIS:  Yes, Your Honor.

9              THE COURT:  All right.  Is there anything else I need

10   to know from the plaintiffs today, Mr. Bien?

11             MR. BIEN:  Your Honor, one thing we wanted to provide

12   to you that is not available from the CDCR website is that as

13   of the last time we checked, 50 of the 75 COVID positive

14   prisoners are Coleman class members.  And, again, the vast

15   majority are at CIM and then at LAC.  I just thought that

16   should be brought to your attention, Your Honor.

17             THE COURT:  All right.  Do you agree with those

18   numbers, Mr. Lewis?

19             MR. LEWIS:  Your Honor, that does track with some of

20   the information that I am seeing.  But one of the things I

21   think I would like to point out, Your Honor, is that those are

22   at very specific institutions, whereas CDCR only has positive

23   COVID results at a limited number of its institutions.  So

24   while Mr. Bien is correct about that, these are focused to

25   certain institutions for those particular higher numbers.  It

1    happens to be in just a certain housing unit that happened to

2    be in a mental health area.

3            THE COURT:  All right.  And of course those reflect

4    testing, and as the Court has covered in past statuses,

5    including with Dr. Bick, there simply is not sufficient testing

6    available to be testing broad swabs of the population, and

7    particularly the Coleman class.

8        Correct, Mr. Lewis?

9            MR LEWIS:  Yes, Your Honor, that is correct.

10    Nationally, as well as statewide, there is not enough testing

11    to test the public general or specific portions of the inmate

12    population, but it is a nationwide concern that is going on.

13            THE COURT:  And are there any reports on symptomatic

14    patients?

15        Recognizing that the disease can be fully asymptomatic, is

16    there a separate list of patients who are symptomatic, even if

17    not tested, Mr. Lewis?

18            MR. LEWIS:  Not that I am aware of, Your Honor.  If

19    the person does have symptoms, or is symptomatic, for anything

20    that involves influenza-like illness, I-L-I, they are subject

21    to standard protocols that CDCR has for anything related to

22    influenza-like condition.

23        Some of the COVID conditions will initially appear to be

24    that, so anyone that has anything like that is set into a

25    separate, kind of, monitoring phase, COVID being one of them,

1    but there is no way to initially tell.

2        So, Your Honor, I do not have that information, but I do

3    know that CDCR looks at this in that perspective as an

4    influenza-like symptom.

5             THE COURT:  All right.  Well, the task force also can

6    explore to what extent are there symptomatic members of the

7    Coleman class who are not tested, or is testing a decent proxy

8    for who has symptoms.  We don't need to get to the bottom of

9    that today.

10       Anything further, Mr. Lewis?

11            MR. LEWIS:  Your Honor, the only thing I would add is

12   that no symptomatic people are not being tested, but that this

13   is an evolving thing as testing is wide, but there is also

14   testing for influenza, testing for COVID.  These are all issues

15   that we will be discussing with the Special Master as

16   necessary.

17            THE COURT:  All right.  Let me just finally ask, I

18   know intervenors have been monitoring, is there anything,

19   Mr. Adam, if you're still on the line, that you would like to

20   say?

21            MR. ADAM:  No, Your Honor.

22       We repeat comments I made in the Plata hearing about a week

23   ago, and that is the association initially got into the case

24   back in 2007 when we supported the convening of a three-judge

25   panel in both the Plata and the Coleman cases.  And we were

 1    involved supporting the remedy that was sought by the

 2    plaintiffs all the way through the Supreme Court; that is

 3    through 'til the Plata decision of 2011.

 4        Since then we've kind of taken a back seat.  Our

 5    responsibility, really, is to our members, and that was what

 6    drove us to get involved in the case in the first place.

 7        This is really, I think, the first time that there has been

 8    such a clear alignment between the interests of the inmates and

 9    the staff.  I think everybody has recognized that.  We

10    appreciate the Court's concern for it.  Also, the plaintiffs'

11    counsel and certainly the defense counsel has made it very

12    clear that the safety of staff is high in their minds as well.

13        I think one issue that came up last week was what exactly

14    our intervenor status is since we intervened in three-judge but

15    not necessarily in the individual cases.  And my thought as I

16    was listening today was at some opportune time perhaps the

17    association will put together a short statement of, you know,

18    our history in the case, and the extent to which we anticipate

19    being involved going forward, if that's helpful to the Court.

20            THE COURT:  All right.  Absolutely.  So I would say

21    to the extent you believe this Court needs to be clear on your

22    position, please let me know.

23            MR. ADAM:  Thank you.

24            THE COURT:  All right.  Mr. Spurling, is there

25    anything you wanted to say?

1          MR. SPURLING:  No.  Thank you, Your Honor.

2          THE COURT:  All right.  Then this session is

3  concluded.  I'll look for filings next week, and I will let you

4  know if I need to convene a further status before May 1st.

5     Thank you very much.

6              (Proceedings adjourned, 11:56 a.m.)

7                      ---oOo---

8  I certify that the foregoing is a correct transcript from the

9  record of proceedings in the above-entitled matter.

10

11                    /s/ Kimberly M. Bennett
                      KIMBERLY M. BENNETT
12                    CSR No. 8953, RPR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25