1

<pre>
1              IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF CALIFORNIA
2            BEFORE THE HONORABLE KIMBERLY J. MUELLER

3

4

5    RALPH COLEMAN, et al.,

6                   Plaintiffs,
     vs.                          Sacramento, California
7                                 No. 2:90-CV-00520
     GAVIN NEWSOM, et al.,        Friday, March 20, 2020
8                                 10:02 a.m.
                   Defendants.
9    _____/

10

11

12                      --oOo--

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14      FIRST QUARTERLY TELEPHONIC STATUS CONFERENCE

15                      --oOo--

16

17

18

19

20

21   Official Reporter:       Tiphanne G. Crowe,
                              CSR No. 10958
22                            501 I Street
                              Sacramento, CA  95814
23                            Tcrowe.csr@gmail.com

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
</pre>

```
1   APPEARANCES:

2   For the Plaintiffs:      ROSEN BIEN GALVAN & GRUNFELD LLP
                             Attorneys at Law
3                            BY: MICHAEL BIEN
                                 CARA E. TRAPANI
4                                LISA A. ELLS
                                 JESSICA L. WINTER
5                                JENNY S. YELIN
                             101 Mission Street, 6th Floor
6                            San Francisco, CA  94105

7                            PRISON LAW OFFICE
                             Attorneys at Law
8                            BY: DONALD SPECTER
                                 STEVEN FAMA
9                            1917 Fifth Street
                             Berkeley, CA  94710
10

11
    For the Defendants:      DEPARTMENT OF JUSTICE
12                           OFFICE OF THE ATTORNEY GENERAL
                             Attorneys at Law
13                           BY:  LUCAS L. HENNES
                                  ELISE THORN
14                                MONICA ANDERSON
                             1300 I Street
15                           Sacramento, CA  95814

16                           DEPARTMENT OF JUSTICE
                             OFFICE OF THE ATTORNEY GENERAL
17                           Attorneys at Law
                             BY:  KYLE LEWIS
18                                ADRIANO HRVATIN
                             455 Golden Gate Ave., Suite 11000
19                           San Francisco, CA  94102

20                           ROBINS KAPLAN, LLP
                             Attorneys at Law
21                           BY:  ROMAN M. SILBERFELD
                             2049 Century Park East, Suite 3400
22                           Los Angeles, CA  90067-3208

23

24                               --oOo--

25
```

```
1                        APPEARANCES (Continued)

2    ALSO PRESENT:             Matthew Lopes, Special Master
                               Kerry Walsh, Special Master Team
3
                               Diana Toche, Undersecretary of Health
4                              for the State of California

5                              Christine Cicotti
                               Kristopher Kent
6                              Antonina Raddatz
                               Attorneys at Law
7                              Department of State Hospitals

8                              Melissa Bentz
                               Jennifer Neill
9                              Nick Weber
                               Attorneys at Law
10                             California Department of Corrections

11                             Haven Gracey, Law Clerk
                               Sam Stanton, Sacramento Bee
12

13                                  --oOo--

14   ///

15

16

17

18

19

20

21

22

23

24

25
```

4

1          SACRAMENTO, CA, FRIDAY, MARCH, 20, 2020, 10:02 A.M.

2                              --o0o--

3          THE CLERK:  Calling case 90-520, *Coleman versus*

4     *Newsom*, et al.  This is on for a quarterly status conference.

5          THE COURT:  All right.  Counsel, before we even call

6     roll, let me just review the ground rules.  We have tested this

7     approach to holding a hearing yesterday, and so we're confident

8     that we can create a decent record, but I just want to

9     reinforce the rules that Ms. Schultz has shared with you muting

10    their phone, not using a speakerphone, and one person at a

11    time, and so waiting for me to call on you, and I've received

12    information on who's covering what topics, so that is very

13    helpful.  Thank you for that.

14         So let me call roll.  First for the Plaintiffs,

15    Michael Bien.  Is Mr. Bien on the line?  All right, I'm not

16    hearing Mr. Bien.

17         Let me just -- is Mr. Specter present?

18         MR. BIEN:  I'm here, your Honor.  This is Michael

19    Bien.  Can you hear me?

20         THE COURT:  Oh, now I can hear you.  All right, so

21    Michael Bien is present.  Mr. Specter?

22         MR. SPECTER:  Yes, I'm present as well.  Thank you.

23         THE COURT:  All right.  Steve Fama?

24         MR. FAMA:  Present, your Honor.

25         THE COURT:  Lisa Ells?

1          MS. ELLS:  Yes, your Honor.

2          THE COURT:  Cara Trapani?

3          MS. TRAPANI:  Yes, your Honor.

4          THE COURT:  Jessica Winter?

5          MS. WINTER:  I'm here.

6          THE COURT:  Jenny Yelin?

7          MS. YELIN:  Yes, your Honor.

8          THE COURT:  All right.  And for the Defense, Kyle

9    Lewis.

10         MR. LEWIS:  Good morning, your Honor.

11         THE COURT:  Elise Thorn?

12         MS. THORN:  Yes, your Honor.

13         THE COURT:  Roman Silberfeld?

14         MR. SILBERFELD:  Good morning, your Honor.

15         THE COURT:  Tyler Heath?  Is Mr. Heath on the line?

16         MR. LEWIS:  Your Honor, this is Kyle Lewis.

17   Mr. Hennes, you can take this.

18         MR. HENNES:  Your Honor, this is Lucas Hennes.  Mr.

19   Heath will not be appearing today.

20         THE COURT:  All right.  So it's Lucas -- can you spell

21   your last name?

22         MR. HENNES:  Yes.  It's Hennes, H-e-n-n-e-s.

23         THE COURT:  All right.  Is there any other counsel on

24   line representing a party?  If so, please speak up now.

25         MS. CICCOTTI:  Yes, your Honor.  On behalf of the

1    Department of State Hospitals -- oh, I'm sorry.  Go ahead,

2    Monica.

3            MS. ANDERSON:  Sorry, Christine.  Monica Anderson from

4    the Attorney General's office also appearing on behalf of the

5    Defendant.

6            MR. HRVATIN:  Good morning, your Honor.  Adriano

7    Hrvatin also appearing for Defendants from the Attorney

8    General's office.

9            THE COURT:  All right.  And someone from the

10   Department of State Hospitals?

11           MS. CICCOTTI:  Yes, your Honor.  Christine Ciccotti

12   for the Department of State Hospitals, and I believe I have two

13   other members of my legal team on the phone.

14           THE COURT:  All right.  For the record, for the court

15   reporter's benefit, can you spell your last name.

16           MS. CICCOTTI:  Yes, your Honor.  C-i-c-c-o-t-t-i.

17           THE COURT:  All right.  Others from Department of

18   State Hospitals?

19           MR. KENT:  Yes, your Honor.  This is Kristopher

20   Kent.

21           THE COURT:  All right.  Also please spell your name --

22   your last name.

23           MR. KENT:  Kent, K-e-n-t.

24           THE COURT:  All right.  And there's one other person

25   from State Hospitals?

1      MS. RADDATZ:  Yes, your Honor.  Thank you.  Antonina

2 Raddatz, R-a-d-d-a-t-z.

3      THE COURT:  And it's Antonina?

4      MS RADDATZ:  Yes, your Honor.

5      THE COURT:  All right.  Is there anyone else

6 representing a party on the phone?

7      All right.  For court staff, you've already heard Miss

8 Schultz, Courtroom Deputy, covering the hearing.  Miss Schultz

9 is actually in the courtroom.  A court law clerk is covering

10 the hearing telephonically.

11      Haven Gracey, are you present?

12      MS. GRACEY:  Yes, I am, your Honor.  I'm still

13 struggling with these buttons on this phone, but I'm here.

14      THE COURT:  All right.  I just want to make certain

15 everyone knows who all is appearing one way or the other.  We

16 have a court reporter covering the hearing.

17      Miss Schultz, is that court reporter in the courtroom?

18      THE CLERK:  No, your Honor.  And it's, for the record,

19 it's Tiphanne Crowe.  And one other thing, Judge, I believe Dr.

20 Toche, the Undersecretary of Health for State of California, is

21 also on the line.

22      THE COURT:  All right.  Thank you, Miss Schultz.

23 First let me clarify, Dr. Toche, are you present?

24      MS. TOCHE:  Yes, I am, your Honor.

25      THE COURT:  All right.  So that's Diana Toche,

8

1    T-o-c-h-e, with CDCR.

2            And, Miss Crowe, just so we make certain that you are

3    hearing everything, are you present?

4            THE REPORTER:  Yes, I am, your Honor.

5            THE COURT:  And are you able to hear everything in

6    order to create an accurate record so far?

7            THE COURT REPORTER:  Yes, I am.

8            THE COURT:  All right.  Very good.  The Special Master

9    is appearing telephonically.  Mr. Lopes, are you present?

10           SPECIAL MASTER LOPES:  I am here, your Honor.

11           THE COURT:  Is there anyone on your staff monitoring

12   the hearing telephonically?

13           SPECIAL MASTER LOPES:  Kerry Walsh will be sitting in

14   later this morning, your Honor, or this afternoon, excuse me,

15   but I will be the only person speaking on behalf of my team.

16           THE COURT:  All right.  Thank you.  We have a member

17   of the media who is monitoring the hearing telephonically, and

18   I just wanted to clarify, the Court will be clarifying on its

19   webpage later today, while the courthouse is closed to the

20   public, it recognizes the rights of the media to cover

21   hearings, and so it is allowing for telephonic monitoring of

22   hearings by the media, and so let me just check to make certain

23   he is able to hear everything.

24           Mr. Stanton from the Sacramento Bee, I believe, has

25   arranged to call in.

1         Mr. Stanton, are you able to hear everything?  Maybe

2    he hasn't been able to call in at this point?

3         Miss Schultz, perhaps you can just send an e-mail to

4    make certain that Mr. Stanton is able to hear.

5              THE CLERK:  Yes, your Honor.

6              THE COURT:  All right.  We'll assume that if he's not

7    present it's because he has been called away to other business.

8    Is there anyone else on the phone who has not identified him or

9    herself?

10             MS. NEILL:  Yes.  Good morning, Judge Mueller.  It's

11   Jennifer Neill, general counsel for the Department of

12   Corrections and Rehabilitation.

13             THE COURT:  All right.

14             MR. WEBER:  Good morning, your Honor.  Nick Weber for

15   CDCR.

16             THE COURT:  All right.  Good morning, Mr. Weber.

17             MS. BENTZ:  Good morning, your Honor.  Melissa Bentz

18   from CDCR.

19             THE COURT:  All right.  Good morning, Miss Bentz.  And

20   remind me, is your last name, B-e-n-t-z?

21             MS. BENTZ:  Correct, your Honor.

22             THE COURT:  All right.  Anyone else?

23             All right.  Let's work through the agenda -- frankly,

24   I think we would all agree that the first agenda item may have

25   overwhelmed and become the priority for us at this point.

1    And while I'm prepared to run through the remainder of

2    the agenda items, I really think we need to spend time on the

3    first agenda item to make certain that we have critical updates

4    and discuss whether or not a special approach is needed to deal

5    with the coronavirus update -- the coronavirus outbreak, I'm

6    sorry.

7        Miss Schultz is just confirming that Mr. Stanton can

8    hear us.  He has muted his phone.

9        So in terms of the update on the coronavirus outbreak,

10   I'd like to ask first Special Master Lopes to very briefly

11   summarize what he knows.  He has filed something on the Court's

12   docket this morning, I understand.

13       But to the extent someone may not have seen that,

14   Mr. Lopes, could you very briefly summarize the steps you've

15   taken to address the outbreak.

16       SPECIAL MASTER LOPES:  Thank you, your Honor.

17       For the reporter, this is Matthew Lopes.  This morning

18   we filed a report with the Court outlining some of the measures

19   that we've taken to ensure safety of inmates, inmate patients,

20   staff, and the team here in -- and throughout the United States

21   that monitors the prisons.

22       I have been in regular contact with Secretary Diaz,

23   Undersecretary Toche, officials from DSH, Plaintiffs' counsel

24   and Defendants' counsel as well on a regular basis over the

25   course of the last three weeks to monitor coronavirus -- the

1    spread of coronavirus throughout the United States.

2              But our contact actually started in a different way

3    closer to the beginning of the year, because there were flu

4    outbreaks in the Department of State Hospitals, specifically

5    Coalinga State Hospital had an outbreak of the flu.

6              And we were working closely with DSH to monitor

7    whether we should have in-person monitoring of Coalinga, and it

8    just became impossible to do so, and we settled on having paper

9    reviews of that facility.

10             A paper review process has been in place at different

11   times and different rounds throughout the history of this case,

12   so we are familiar with uploading information, and looking at

13   information remotely.

14             Then we had a tour of Atascadero State Hospital that

15   was set.  There hadn't been any outbreak of any type of flu,

16   and we had to suspend that visit, because there was a necessary

17   workforce sort of review of suicides that were committed in --

18   at Sac, and we had to pull our team out of Atascadero, so that

19   they could be at Sac to look at suicides and start planning for

20   different ways of mitigating or eliminating suicides in the

21   department.

22             So after that, ASH had its own flu outbreak -- not

23   coronavirus -- but its own outbreak, and we decided that we

24   would go to a paper monitoring process during that period so

25   that we wouldn't do an in-person review of Atascadero.  That

1  information was shared with the parties, and as well with DSH

2  officials and CDCR officials.

3       Over the last three weeks, again, I've been in

4  constant communication with Secretary Diaz, Diana Toche, and

5  other DSH officials, and CDCR officials, as well as receiver

6  counsel, so we could be in tune with what was happening on the

7  a daily basis.

8       My teams were involved in any sort of conference calls

9  or in-person meetings regarding the outbreak, including to

10  monitor when visitations were ultimately canceled, and when

11  others steps were taken by the department, to screen

12  individuals coming in and out of state prisons.

13       Based on all of that last Friday the 13th, I had a

14  call with Undersecretary Toche to let her know that we were

15  strongly considering suspending our in-person visits, which are

16  part of the twenty-eighth round of monitoring tour.

17       And I followed that up with a call to Lisa Ells,

18  attorney for the Plaintiffs, to let her know that unless there

19  was some objection, that that was the direction that we were

20  heading in, and I felt like it was appropriate to do so.  There

21  were no objections.

22       The next day, on Saturday, I called my team to let

23  them know that all in-person visits would be suspended, as well

24  as those essential monitoring tasks that we are conducting,

25  although we are available and have been meeting telephonically

13

1    with the receivers team, with the CDCR, and we have had calls

2    with DSH as well.

3           But we suspended in-person monitoring towards last

4    Saturday, and this week we had two tours that were scheduled to

5    be conducted of the California Men's Colony, CMC, and of a

6    unit -- the so-called L1 unit in CMF.

7           Those -- we were provided with documents from both

8    facilities, and my teams conducted entrance calls to clarify

9    any questions that they might have had or asked for additional

10   documents and other calls were made to those facilities

11   throughout the week.

12          There are a number of other tours that will take place

13   this week and the following week.  The suspension will last

14   until roughly April 6th when I will huddle again with the

15   necessary stakeholders to determine whether we should continue

16   paper monitoring going forward.

17          We believe that the paper monitoring process is

18   important while we're not -- while we're mindful of the fact

19   that we all need to practice social distancing, and in the

20   prisons we probably shouldn't be there at all, so as not to

21   bring anything in -- into that environment at the very least,

22   and certainly most of my colleagues would have to fly, and

23   that's -- that's probably a dangerous situation for everyone in

24   the prisons.

25          We do feel that it's necessary to keep the paper tours

14

1    going so that we can get current information about what is

2    happening with the inmates and inmate patients in the system.

3         We are also -- this was not in the report that I filed

4    this morning, your Honor, we're also going to have our suicide

5    experts spend a substantial amount of time working with CDCR

6    officials, and others, to work on suicide prevention efforts,

7    and to make sure that we're aware of all of the activities that

8    are occurring, so as to not lose sight of the fact that while

9    people are being locked in more, and more, and more, that they

10   may become, sadly, less able to get treatment and potentially

11   become more desperate.

12        So that is -- that is what we are doing at this point,

13   your Honor.  We are conducting paper tours again.  We conducted

14   paper tours in the past.  We're in a different world now, the

15   electronic record, so many of the documents we need have been

16   uploaded and can be reviewed.  We have access to the health

17   records that we need as well.

18        In the past, when we conducted paper tours, we would

19   literally receive boxes of documents to review and we would

20   opine on those and put those into our reports.

21        THE COURT:  All right.  Thank you, Special Master.

22   The Special Master has mentioned the possible impact on suicide

23   prevention efforts.

24        The Court would next like to hear from Mr. Lewis and

25   Mr. Bien.  Perhaps starting with Mr. Lewis, to understand how

1    the Defendants are viewing *Coleman* compliance in light of the

2    lockdowns in the prisons, and DHS' temporary suspension into

3    hospital beds.  The Court understands there are some beds still

4    available at state hospitals, but the director has exercised

5    her discretionary power to temporarily suspend transfer into

6    those beds.

7              And ultimately we need to decide do we need a focused

8    task-force effort to address *Coleman* compliance during this

9    critical phase of managing the coronavirus outbreak.

10             But with that in mind, Mr. Lewis, if you could share

11   your thoughts.  Mr. Bien, then your thoughts, and then I may

12   ask the Special Master to weigh in with his thoughts.

13             Mr. Lewis.

14             MR. LEWIS:  Yes, your Honor, executives and staff at

15   CDCR and California Correctional Healthcare Services are

16   working closely with infectious disease experts to prepare for

17   a situation where COVID may significantly impact prison

18   operation.

19             They've taken numerous precautionary measures

20   positioning themselves to respond to any outbreak that could

21   happen.  As I'm sure you've heard, this is a public healthcare

22   crisis.  It's affecting everything from schools, to courts, to

23   daily life, and CDCR is not immune from that, and nor is the

24   patient population, and neither is the DSH.

25             The CDCR fully intends to meet its compliance,

1   requirements and, frankly, its requirements to its inmates for

2   healthcare, mental healthcare, and all of those important

3   things that it has to do, but it has to be viewed to the

4   reality that COVID is affecting and will affect operation.

5           CDCR fully intends to meet its mental health

6   obligations to its inmates, and will continue programming as

7   much as it can, but in light of -- as the Court has noted --

8   social distancing, and other things that have been mandated by

9   federal and state public health officials, the department has

10  had to reconfigure and restructure how it does group training,

11  or group programming, and things like that.

12          It cannot operate as normal.  It fully intends to, but

13  it is the reality that it is going to have to -- to -- to do

14  its mental health programs in a different way, and they are

15  planning for that.

16          This is a rapidly evolving situation.  As everyone has

17  seen, things have changed from Monday to Friday of this week,

18  particularly in the state with the Governor's recent order last

19  night locking everyone down, or ordering a stay-in-place for

20  everyone.

21          That has not affected CDCR's operation fully yet,

22  because it is an exempt organization, because of its mission,

23  but it is something that the department has been planning for,

24  and is looking ahead.

25          Those plans are continually evolving, and they fully

1    intend to meet all their obligations regarding mental health

2    for its inmates.  DSH has instituted a plan for suspension of

3    *Coleman* patient admissions along with other groups that it

4    relieves for the next 30 days so the quarantine and other

5    measures can be assessed.  This is a measured response to

6    reduce the risk.

7         As I said before, this is evolving, just as to the

8    guidance the public has received, and just as other agencies

9    and organizations are doing.

10        Once again, this is just a temporary suspension for

11   only certain categories of commitment patients of which *Coleman*

12   is one of them.  It's important to understand that DSH has the

13   largest inpatient psychiatric hospitals in the nation.

14        800 to 1,500 beds with units of up to 50 beds in one

15   area.  Unlike other psychiatric hospitals.  And most of its

16   rooms are dorms with multiple patients per dorm.

17        So as a result, its housing units present the greatest

18   concern, because they are basically one large hospital where

19   everything is shared.  An outbreak in those facilities would be

20   incredibly difficult to contain, as they experienced in January

21   and February referenced by the Special Master with the flu

22   outbreak in Coalinga.

23        And that was a time when nearly every unit at the

24   hospital became infected with the flu.  So they are likely to

25   have significant illness risks if it gets into the hospital,

1    this COVID gets into the hospital.

2           As a result, the department, DSH, took the step to

3    temporarily halt *Coleman* patient admission, among other groups,

4    for the next 30 days.

5           Right now they actually have 303 *Coleman* patients.

6    They want to protect those *Coleman* patients as well as all of

7    their other patients and staff from any risk of an infection,

8    and that's why this temporary measured response has been taken.

9           More importantly, DSH also has counties refusing

10   discharges.  As of yesterday, Los Angeles County, San

11   Bernardino County, and Alameda County have said they weren't

12   going to take patients back from DSH.

13          Those are some of their largest commitment counties,

14   and if they can't discharge, that means they can't even take

15   in.  So they are creating a bed shortage issue because of

16   external factors that neither DHS, nor CDCR can control.

17          So once again this is a temporary measure to allow the

18   department, DSH, to reduce the risk of entry into its

19   facilities of this very dangerous disease.

20          This only concerns a very small number of beds, and

21   more importantly, it's to protect not just the staff and

22   population, but the *Coleman* patients that they already have in

23   the system.

24          It's a rapidly evolving situation in society.  It's

25   not unique to DSH.  They are examining other possibilities, but

1    for now this is the measured response that they think is

2    appropriate, and, frankly, is appropriate in light of the

3    change in guidance that we are receiving -- that we are seeing

4    all across society, and as well as what the Governor issued

5    yesterday.

6              THE COURT:  Thank you, Mr. Lewis.

7              Mr. Bien.

8              MR. BIEN:  Yes, your Honor.  We understand that the

9    public officials in the state, both CDCR, DSH and the

10   Governor's office are addressing a crisis, and -- but we want

11   to make sure that when decisions are, they are made in a way

12   that does -- does not discriminate unnecessarily against the

13   class of persons who are themselves in a vulnerable position.

14             As demonstrated by the medical healthcare guidance

15   that was also provided in our filing last night to the Court,

16   CDCR will be transferring a patient who requires

17   hospitalization for a medical reason to an outside hospital

18   despite the risk of COVID transmission, because the person is

19   in a medical crisis.

20             For that same reason, we want to make sure that this

21   decision to restrict psychiatric hospitalization has

22   appropriately balanced the interests of patients in need of

23   those beds in CDCR with the risk to the DSH facilities.

24             There is no greater risk provided to a DSH hospital by

25   a CDCR patient coming in than there is from a staff member

1    coming in.  It's the same risk.  One could screen those people

2    just like they are screening their staff.

3           At the same time, there is a serious shortage of

4    inpatient psychiatric beds available to the *Coleman* class.

5    That information was finally provided by the state earlier this

6    morning.  I won't go into the details, but losing access to

7    these beds will put additional pressure on an already squeezed

8    system.

9           And I'm afraid will ultimately result in a loss of

10   life through increased suicide.  CDCR has already made

11   decisions which Mr. Lewis referred to, which I understand, to

12   limit group activities and to quarantine various units in CDCR

13   prisons, that has already resulted in a restriction to the

14   number of hours of treatment available to our class members.

15   We can document that already.

16          And our greatest concern is that we have not been

17   consulted about any plan.  We haven't seen any plan in writing

18   for how services are going to be provided.  How given the

19   inability to provide as much group care or any group care, what

20   is the alternative, especially for our clients in segregation

21   units.

22          And, in general, is there a process by which mental

23   healthcare actually can be delivered to this population in this

24   very crowded and understaffed system.

25          Ultimately there are tremendous challenges to the

1    people responsible for the safety and security of the people

2    living and working in the prison system right now.  It's a very

3    crowded system.  It's a very understaffed system.

4           Various counties have already responded in their plans

5    to the situation by identifying low-risk populations to be

6    early released.

7           We have been in communication with the state about

8    identifying population, but to date, we are not aware of any

9    plan to reduce the density of the prison population, which is

10   still highly overcrowded, and especially for the *Coleman*

11   population, very dangerous.  Even before the COVID outbreak.

12          So we are looking for a plan.  We're looking for -- to

13   make sure that this Court, Special Master, and Plaintiffs'

14   counsel are properly informed of what is going on.

15          Obviously the state has to have tremendous discretion

16   to address this crisis, but these decisions, such as the DSH

17   closure decision, was -- we were informed of it, we were not

18   consulted about it.

19          And the decisions about how, you know, treatment is

20   going to be provided in segregation, no one has talked to us

21   about that whatsoever.

22          I think that it would be appropriate to have a task

23   force, as the Court has suggested, or some sort of method.  We

24   don't want to slow things down, but we don't want to get in the

25   way of the officials in a crisis.

1    But we do feel a responsibility to our clients, who

2    are, frankly, very frightened, and in the circumstance of the

3    outbreak, and the new restrictions, there have been the

4    tremendous restrictions already in the prisons on visiting and

5    on yard and on treatment.

6    What is their plan?  How is this operating?  I think

7    we collectively, the Special Master of the court, and the

8    Plaintiffs' counsel have a role in this.  At least knowing

9    what's going on.  Being properly informed, and having some

10   input.

11   We don't want to, you know, file motions and try to

12   litigate what's going on.  I think that's just not the way to

13   proceed, unless it's absolutely necessary, and I hope we can

14   come up with a better way of proceeding when these decisions

15   are made.

16   THE COURT:  All right.  Thank you, Mr. Bien.  And for

17   each of you, I appreciate the last observation.

18   My question really is:  Is there any reason not to ask

19   the parties, with the Special Master, to form a task force or a

20   strike force, whatever you want to call it, time is of the

21   essence for all sorts of reasons, both to contain or mitigate

22   spread of COVID-19, but also to ensure that there aren't

23   collateral consequences for the *Coleman* class, which is already

24   under stress.

25   Let me just ask the Special Master, do you have

1    thoughts, if I were to task you with forming a strike force, to

2    meet beginning immediately following this hearing, does that

3    make sense to you, and could we convene another call, if

4    needed, within a week to review any further recommendations

5    that task force might come up with, Mr. Lopes?

6          SPECIAL MASTER LOPES:  Yes, your Honor.  I think

7    that's absolutely necessary.  As Kyle Lewis, Attorney Lewis,

8    pointed out, this is an ever-evolving situation, and we are all

9    learning things day-by-day, and there are adjustments that are

10   being made hourly, sometimes.

11         I -- this morning -- earlier this morning I had a team

12   call where I notified my -- the members of my team that I

13   thought it was absolutely vital for us to find a way and

14   discuss a way to develop planning with CDCR -- obviously with

15   the Plaintiffs involved -- to provide the resources that we

16   have available to us.

17         I mean, we -- we have some of the nation's best

18   experts that are available to give input on a regular basis.

19   So I think a collaborative effort, a strike force, a task

20   force -- whatever it should be called -- is absolutely -- it's

21   absolutely necessary.

22         I share Michael Bien's, Attorney Bien's, concerns

23   about planning and understanding what the plans will be and how

24   they will evolve and the role of the Plaintiffs that

25   participate, and certainly our role.

24

1    While -- to Mr. Bien's point, there are decisions that

2    are being made that are absolutely necessary, and they are

3    timely often, but that doesn't -- in our current structure, it

4    doesn't always lend itself to having all of us in a room, or on

5    the phone talking about the decision before it's made.

6    And sometimes because of any number of emergencies, or

7    other competing factors, the Plaintiffs -- and certainly I can

8    speak for myself -- I find things out, and I'm given a

9    briefing, but it's not on the planning stage, but it's to alert

10   me to the fact that something has occurred.

11   So to your point, that's a long-winded way of saying

12   "yes."  We can absolutely convene a task force, and we can

13   absolutely bring all resources to bear, and I think the time

14   for that is -- the timing for this is appropriate.

15   THE COURT:  And would that also include the receiver

16   for the purposes of full coordination?

17   SPECIAL MASTER LOPES:  Yes.  To the extent -- yes, the

18   receiver should be there.  I wholeheartedly agree.

19   THE COURT:  All right.  Mr. Lewis, do you agree?

20   MR. LEWIS:  Yes, your Honor.  Defendants would agree

21   the task force is appropriate, and to bringing Special Master.

22   Defendants actually have a draft plan that they would be

23   willing to circulate to the parties.

24   I have to point out once again, your Honor, this is

25   five days old.  This happened on Monday when all of the parties

1    were notified of this.  This went into effect on Tuesday with

2    DSH.

3          And it has been, as everyone has noticed, a rapidly

4    evolving situation.  Mr. Bien is correct.  They have tremendous

5    discretion to do these types of actions in response to

6    emergencies, and this is what was taken.

7          We have no problem being part of a task force to show

8    what it is that is going on, and the steps the departments are

9    taking to address this very serious issue.

10          We do ask the scope of it would be focused

11    appropriately when everyone is in the room, about what needs to

12    be done to help with this coronavirus issue that will affect

13    both agencies, all departments, and the public who are at

14    large.

15          THE COURT:  All right.

16          Mr. Bien, anything further to say?  Does the approach

17    being suggested by the Special Master, Mr. Lewis, comments

18    that's in line with what you are thinking is appropriate?

19          MR. BIEN:  Yes.  And I think that all parties need to

20    be present, which would include DSH.  In other words, I think

21    one of our points is just that DSH is not separate from the

22    other defendants.  It's part of this case, and part of the

23    healthcare system, necessary delivered care, to CDCR.

24          THE COURT:  Understood, and agreed.

25          So my plan is to direct the Special Master to take the

1   lead on behalf of the Court, and convene a task force to begin

2   a meeting after this hearing, as promptly as possible.

3        Mr. Lewis, you can share that plan, and I would set a

4   further hearing next Friday at 10:00 for the Court to hear an

5   update, and the Court would remain available in the meantime.

6        The Court, too, has been wrestling with how do we keep

7   the Court as an essential branch open.  The courts are open,

8   and we will continue to function, and so the Court remains

9   available to provide supervision through its Special Master.

10        If need be, litigation, but hopefully litigation can

11   be avoided, because of the time that that takes, but the due

12   process rights are not out the window, and so if there is

13   motion practice needed, the Court will entertain that,

14   including on a shortened time frame.

15        But I'm hopeful, given the sentiment conveyed in all

16   of the parties' comments, that working together you can propose

17   to the Court anything it may need to approve.

18        So the task force would include CDCR's counsel and

19   anyone else counsel identifies that needs to be at the table.

20   Department of State Hospitals, Plaintiffs, and the Special

21   Master is tasked with coordinating with the receiver to the

22   extent needed, and we had good progress and coordination

23   recently, so that lays a foundation for those efforts, I

24   believe.

25        Anything more on the coronavirus outbreak that anyone

1    believes I need to hear?  Mr. Lopes?

2              SPECIAL MASTER LOPES:  No, your Honor.

3              THE COURT:  Mr. Lewis?

4              MR. LEWIS:  Nothing further, your Honor.

5              THE COURT:  Mr. Bien?

6              MR. BIEN:  No, your Honor.

7              THE COURT:  All right.

8              MR. FAMA:  Your Honor.

9              THE COURT:  Who is this?

10             MR. FAMA:  Steven Fama.  May I address the Court?

11             THE COURT:  You may.

12             MR. FAMA:  Your Honor, would you consider asking

13   Mr. Lewis when he will provide all with the draft plan,

14   including in particular, if it can be provided immediately

15   after the end of this morning's hearing?

16             THE COURT:  Mr. Lewis, I thought I heard you say you

17   are prepared to provide that.  Is it fair to say you can

18   provide it immediately following this hearing?

19             MR. LEWIS:  Your Honor, I have to confer with my

20   clients, and the department about that.  I know that it's out

21   there.  I cannot commit to a date at this certain time, but I

22   will say that we will make all efforts -- I will make all

23   efforts to ensure that this gets out as soon as possible,

24   understanding the importance, and, frankly, the Friday

25   deadline.

28

1            UNIDENTIFIED COUNSEL:  Your Honor --

2            THE COURT:  I would point out -- hold on one minute.

3    Let me ask if anyone else has something to say.

4            Mr. Lewis, you, yourself has said this is fast

5    evolving, even on an hourly basis.  Any reason I can't direct

6    you to provide something no later than 4:00 p.m. this

7    afternoon?

8            MR. LEWIS:  Your Honor, I would say that we will get

9    it out today.  Yes, we can do that.

10           THE COURT:  All right.  So that's the direction.  No

11   later -- as promptly as possible.  No later than 4:00 p.m.

12   today.

13           UNIDENTIFIED COUNSEL:  Your Honor, can I--

14           (Whereupon, the reporter asked for speaker

15   clarification.)

16           THE COURT:  Wait, wait.  You have to wait for me to

17   call on you.  I will give everyone a chance.  It's essential

18   for the creation of the record and so we can understand each

19   other.

20           So Mr. Lewis, I'm going to stick with 4:00 p.m.  You

21   just also said it's evolving so quickly.  Recognizing it's a

22   draft, and it's not the subject of, at this point, any

23   contemplated motion practice.

24           I think I hear all parties saying in good faith they

25   are prepared to meet and confer in a task-force format and

1    figure this out.  So someone else wants to say something?

2           MS. NEILL:  Your Honor, it's Jennifer Neill.  General

3    counsel for CDCR.  I was just going to commit to having it out

4    today before you had made that ruling.

5           THE COURT:  All right.  Thank you, Miss Neill.  That's

6    consistent with my impression of the parties' good-faith

7    efforts at this point.  Anyone else want to say anything about

8    coronavirus?

9           But perhaps relatedly, I just wanted to thump down the

10   agenda to deficient treatment and conditions in psychiatric

11   inpatient programs, to ask if Mr. Lewis and Miss Ells have

12   anything further to say that may inform the coronavirus task

13   force effort?

14          Mr. Lewis, anything in particular on that agenda item?

15          MR. LEWIS:  Your Honor, nothing that would directly

16   impact the coronavirus issue other than, obviously the

17   department acknowledges there are issues there.  They are

18   committed to it.  This is part of a larger review of the PIPs

19   issue that they are looking at.

20          But in terms of a specific impact on coronavirus

21   issues, I believe that's exactly what could be addressed by the

22   task force.

23          THE COURT:  Miss Ells.

24          MS. ELLS:  Your Honor, our primary concern remains

25   that the PIPs are providing woefully substandard care so it

1   feeds into our concern about DSH cutting off admissions.  There

2   already are too many people in need of inpatient care for the

3   PIPs to serve, and we know those PIPs are not operating in a

4   constitutional manner.

5        So it underscores our concern that the channel to DSH

6   must remain open, with appropriate measures taken to screen

7   people who are in need of that care.

8        THE COURT:  All right.  Understood.  So those issues

9   can be folded into the task force effort, and I'm going to ask

10  Mr. -- Special Master Lopes, can Special Master Lopes rely on

11  you, Mr. Bien, as the point person for task force coordination?

12       MR. BIEN:  Yes, your Honor.

13       SPECIAL MASTER LOPES:  Yes, your Honor.

14       THE COURT:  All right.  Let me ask this:  Given that

15  time is of the essence, my inclination -- again, the Court is

16  open.  The Court is not putting everything else on the back

17  burner, but my thought would be while I will give everyone a

18  chance to weigh in, my thought would be to defer all of the

19  other items we've had calendared for this morning, and bring

20  them up again next Friday, and see if at that point we're ready

21  to spend more time on these other issues.

22       They remain very important, but I think the

23  coronavirus task force effort supercedes all else at this

24  point.

25       Do you disagree with me, Mr. Bien?

1          MR. BIEN:  I think that the coronavirus issues are

2     primary.  We're in -- still negotiating this protective order

3     relating to the RJD staff misconduct discovery, which is also

4     an urgent matter.

5          And we have not yet reached an agreement, but I'm

6     willing to continue to negotiate and bring it to the Court's

7     attention next week if necessary.

8          THE COURT:  All right.  But otherwise the other items

9     can be deferred for any discussion until next week?

10         MR. BIEN:  Yes, your Honor.

11         THE COURT:  All right.  Mr. Lewis, do you agree with

12    that?  I do note the staff misconduct issue, having heard from

13    Mr. Bien, we can make that our priority next week right after

14    our coronavirus update.

15         MR. LEWIS:  Yes, your Honor, Kyle Lewis.  Mr. Bien's

16    information was correct.  We are continuing to work with that

17    issue.  Defendants have no problem, in fact, welcome deferring

18    to next week so that they can focus on coronavirus issues.

19         THE COURT:  All right.  Let me make certain, does

20    Department of State Hospitals, do you want to say anything

21    separate and apart from what Mr. Lewis has said this morning?

22         MS. CICCOTTI:  This is Christine Ciccotti from the

23    Department of State Hospitals.  No, your Honor.  I think

24    Mr. Lewis covered it.

25         THE COURT:  All right.  And, again, just so I'm clear,

Case 2:90-cv-00520-KJM-SCR    Document 6636    Filed 04/23/20    Page 32 of 33

32

1    Mr. Bien will be our point person.

2              Mr. Specter is there anything you want to say in light

3    of the PLATA case?

4              MR. SPECTER:  Thank you, your Honor.  It's Don

5    Specter.  I would just want to echo Mr. Bien's comments about

6    the necessity to reduce the density of the population, given

7    the likelihood that the coronavirus is going to be spread in

8    the institutions, and to me that's the overriding issue,

9    because -- because it doesn't matter -- mental health

10   programming doesn't matter if you aren't alive to receive it.

11             And to date, we really haven't had a response from the

12   state about methods that they are proposing or going to use in

13   order to deal with the density issue, which I think is probably

14   the only effective -- well, one of the -- one of the -- one of

15   the effective means of dealing with the virus, and I would -- I

16   would like that to be a discussion point in this task force if

17   the Court believes it's necessary.

18             THE COURT:  All right.  I believe Mr. Bien has

19   signaled that as an issue, and that can -- from the Court's

20   point of view, absolutely that issue can be on the table for

21   discussion, and as we've discussed, Mr. Lopes will be

22   coordinating with the receiver as needed.

23             MR. SPECTER:  Thank you, your Honor.

24             THE COURT:  Finally, Mr. Lopes, anything else you

25   would like to say?

TIPHANNE G. CROWE
OFFICIAL COURT REPORTER, USDC - (916) 743-0122

33

1        SPECIAL MASTER LOPES:  No thank you, your Honor.

2        THE COURT:  All right.  Then Mr. Lopes is directed

3   immediately following this status conference to initiate a

4   meeting of the coronavirus task force and report to the Court

5   as often as needed between now and next Friday, and we'll

6   convene again this way next Friday at 10:00 a.m., and good luck

7   to you all.  Thank you very much.

8        THE CLERK:  Court is in recess.

9        (The proceedings adjourned at 10:50 a.m.)

10                          --oOo--

11   I certify that the foregoing is a correct transcript from the

12   record of proceedings in the above-entitled matter.

13                      /s/ Tiphanne G. Crowe

14   _____
                     TIPHANNE G. CROWE
                     CSR No. 10958
15

16

17

18

19

20

21

22

23

24

25