# Exhibit A

No. 09-1233

IN THE
Supreme Court of the United States
———————

GOVERNOR ARNOLD SCHWARZENEGGER, *et al.*,
*Appellants,*

v.

MARCIANO PLATA and RALPH COLEMAN, *et al.*,
*Appellees.*

———————

On Appeal from the United States District Courts For
the Northern and Eastern Districts of California

———————

**BRIEF FOR APPELLEE INTERVENOR
CALIFORNIA CORRECTIONAL PEACE
OFFICERS' ASSOCIATION**

———————

Daniel M. Lindsay
David A. Sanders
CALIFORNIA
  CORRECTIONAL PEACE
  OFFICERS' ASSOCIATION
755 Riverpoint Drive
Suite 200
West Sacramento, CA
95605

Laurie J. Hepler
  *Counsel of Record*
Gregg McLean Adam
Gonzalo C. Martinez
CARROLL, BURDICK &
  MCDONOUGH LLP
44 Montgomery Street
Suite 400
San Francisco, CA 94104
(415) 989-5900
LHepler@cbmlaw.com

Jeffrey L. Fisher
Pamela S. Karlan
STANFORD LAW SCHOOL
  SUPREME COURT
  LITIGATION CLINIC
559 Nathan Abbott Way
Stanford, CA 94305

KMT 367

i

## RULE 29.6 DISCLOSURE

California Correctional Peace Officers' Association is a non-profit corporation organized under the laws of the State of California. As such, it has no parent, and there is no publicly-held company owning 10% or more of its stock.

ii

## TABLE OF CONTENTS

RULE 29.6 DISCLOSURE ...........................................i

TABLE OF AUTHORITIES .......................................iv

STATEMENT OF THE CASE....................................1

    A.  Overcrowding And Medical Care Within
        California's Correctional Facilities ................2

    B.  The Special Three-Judge Court Provisions
        Of The Prison Litigation Reform Act ...........11

    C.  The Procedural History Of These Cases......13

SUMMARY OF ARGUMENT ...................................16

ARGUMENT...........................................................20

I.  In Light Of The Failure Of Their Prior Orders
    To Remedy The Constitutional Violations In
    These Cases, The *Plata* And *Coleman*
    Single-Judge District Courts Properly
    Convened A Three-Judge Court ........................20

    A.  The PLRA Does Not Require Delay In
        Convening A Three-Judge Court
        To Allow Compliance With Orders That
        Will Not Fully Remedy The Constitutional
        Violation .......................................................22

    B.  The More Recent Orders Of The Single-Judge
        District Courts Appointing The Receiver
        In *Plata* And The Special Master In *Coleman*
        Did Not Require Delay In Convening A
        Three-Judge Court........................................27

    C.  Attacks On The Composition Of The Three-
        Judge Court Are Untimely And Meritless...34

iii

II. The Three-Judge Court Correctly Found That Overcrowding Is The Primary Cause Of The State's Ongoing Constitutional Violations And That No Other Relief Would Remedy Those Violations .................................................. 36

    A. The Three-Judge Court Properly Understood That The "Biggest Inhibiting Factor" To Fixing A Constitutional Violation Is "The Primary Cause" of That Violation ............... 37

    B. Clear And Convincing Evidence Showed That Overcrowding Is The "Primary Cause" Of The Eighth Amendment Violations In These Cases and That "No Other Relief" Will Remedy These Violations ..................... 44

III. The Three-Judge Court Properly Imposed The 137.5% Capacity Limitation ................................ 53

    A. In Setting The 137.5% Capacity Limit, The Three-Judge Court Gave The Appropriate Weight To Public Safety Concerns ............... 56

    B. Federal Law Provides Sufficient Avenues For Obtaining Modifications Of The 137.5% Capacity Cap If Changed Circumstances So Require ...................................................... 59

CONCLUSION ......................................................... 60

iv

## TABLE OF AUTHORITIES

### Cases

*Abrams v. Hunter*, 910 F. Supp. 620 (M.D. Fla. 1995) *aff'd*, 100 F.3d 971 (11th Cir. 1996)............. 42

*Amadeo v. Zant*, 486 U.S. 214 (1988)........................ 30

*Asgrow Seed Co. v. Winterboer*, 513 U.S. 179 (1995) ................................................................... 37

*Borras v. Sea-Land Serv., Inc.*, 586 F.2d 881 (1st Cir. 1978).................................................... 40

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949).................................................. 33

*Coleman v. Schwarzenegger*, 2007 WL 2669591 (9th Cir. Sept. 11, 2007)......................................... 33

*Coleman v. Wilson*, 933 F. Supp. 954 (E.D. Cal. 1996) ...................................................... 27

*Correspondent Serv. Corp. v. First Equities Corp. of Fla.*, 338 F.3d 119 (2d Cir. 2003)............. 30

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995) ............................... 38

*Easley v. Cromartie*, 532 U.S. 234 (2001)................. 45

*Eastern States Petroleum Corp. v. Rogers*, 265 F.2d 593 (D.C. Cir. 1959)...................................... 53

*Estelle v. Gamble*, 429 U.S. 97 (1976) ........................ 1

*Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480 (1985)................................................. 35

*Fla. Lime & Avocado Growers, Inc. v. Jacobsen*, 362 U.S. 73 (1960).................................................. 52

*Hagans v. Lavine*, 415 U.S. 528 (1974).................... 52

*Hamilton* v. *Lanning*, 130 S. Ct. 2464 (2010) ........... 37

*Hawkins* v. *Dir., Office of Workers' Comp.
    Programs, Dep't of Labor*, 907 F.2d 697 (7th
    Cir. 1990) ................................................................ 40

*Hicks* v. *Miranda*, 422 U.S. 332 (1975) ..................... 35

*Jacobs* v. *Tawes*, 250 F.2d 611 (4th Cir. 1957) ......... 34

*Kanter* v. *Comm'r of Internal Revenue*, 590 F.3d
    410 (7th Cir. 2009) ................................................. 30

*Mahan* v. *Howell*, 410 U.S. 315 (1973) ..................... 35

*Marsh* v. *Barry*, 824 F.2d 1139 (D.C. Cir. 1987) ...... 41

*Metro. Pittsburgh Crusade for Voters* v. *City of
    Pittsburgh*, 964 F.2d 244 (3d Cir. 1992) ................ 40

*Rocco* v. *Lehigh Valley R.R.*, 288 U.S. 275 (1933) .... 38

*Swift & Co.* v. *Wickham*, 382 U.S. 111 (1965) .......... 52

*The G.R. Booth*, 171 U.S. 450 (1898) ........................ 38

*United States* v. *United States Gypsum Co.*, 333
    U.S. 364 (1948) ...................................................... 45

*Wyatt* v. *Stickney*, 344 F. Supp. 373 (M.D. Ala.
    1972), *aff'd in relevant part sub nom. Wyatt* v.
    *Alderholt*, 503 F.2d 1305 (5th Cir. 1974) .............. 25

### Constitutional Provisions

U.S. Const. amend. VIII .................................... *passim*

### Statutes

18 U.S.C. § 3626(a)(1) ................................................. 26

18 U.S.C. § 3626(a)(2) ................................................. 26

18 U.S.C. § 3626(a)(3) .................................... 11, 12, 41

18 U.S.C. § 3626(a)(3)(A) .................................... *passim*

18 U.S.C. § 3626(a)(3)(A)(i) ............................... *passim*

18 U.S.C. § 3626(a)(3)(A)(ii) .............................. *passim*

18 U.S.C. § 3626(a)(3)(B) ............................... 12, 26, 3:

18 U.S.C. § 3626(a)(3)(C) ............................... 12, 14, 3:

18 U.S.C. § 3626(a)(3)(D) .................................... 12, 3:

18 U.S.C. § 3626(a)(3)(E) ................................... *passin*

18 U.S.C. § 3626(a)(3)(E)(i) ................................ 13, 3'

18 U.S.C. § 3626(a)(3)(E)(ii) ............................... 13, 3:

18 U.S.C. § 3626(b)(1) ................................................. 5:

18 U.S.C. § 3626(b)(4) ................................................. 5:

18 U.S.C. § 3626(g)(4) ............................................ 11, 1:

28 U.S.C. § 1253 .......................................................... 3:

28 U.S.C. § 2284 .................................................... 34, 3:

28 U.S.C. § 2284(b)(3) ................................................. 5:

Department of Veterans Affairs and Housing
    and Urban Development, and Independent
    Agencies Appropriations Act of 1997, Pub. L.
    No. 104-204, § 422, 110 Stat 2874 (1996) ............. 4(

Housing and Community Development Act of
    1987, Pub. L. No. 100-242, § 147, 101 Stat.
    1815 (1988) ............................................................. 4(

Prison Litigation Reform Act (PLRA), Pub. L.
    No. 104-134, tit. VIII, 110 Stat. 1321, 1321-66
    (1996) ................................................................ *passin*

Pub. L. No. 110-180, § 2(5)(a)-(b), 121 Stat. 2559
    (2008) ...................................................................... 39

Pub. L. No. 111-22, § 1002(a)(1), 123 Stat. 1663
    (2009) ...................................................................... 39

Violent Crime Control and Law Enforcement
    Act of 1994, Pub. L. No. 103-322, § 20409, 108
    Stat. 1796, 1827 (formerly codified at 18
    U.S.C. § 3626(b)) .................................................... 12

## Other Authorities

Fed. R. Civ. P. 60(b)(5)................................................ 59

H.R. Rep. No. 104-21 (1995)...................................... 44

S. Rep. No. 102-263 (1992) ........................................ 39

S. Rep. No. 105-149 (1997) ........................................ 39

*Taking Back Our Streets Act of 1995: Hearing
Before the Subcommittee on Crime of the
Senate Committee on the Judiciary*, S. Hrg.
104-99, 104th Cong. (Jan. 19, 1995)...................... 41

141 Cong. Rec. S14316 (daily ed. Sept. 26, 1995)
(statement of Sen. Spencer Abraham) .................. 41

Office of the Governor, Prison Overcrowding
State of Emergency Proclamation (Oct. 4,
2006), *available at*
http://gov.ca.gov/index.php?/print-
version/proclamation/4278/............................ 8, 9, 56

Restatement (Third) of Torts: Phys. & Emot.
Harm § 27 (2010).................................................... 42

Oxford English Dictionary (2d ed. 1989)................... 37

Random House Webster's Unabridged
Dictionary (2d ed. 1998)........................................ 37

Comment, *Coleman v. Schwarzenegger*, 123
Harv. L. Rev. 752 (2010)........................................ 52

Note, *Reviewing the Grant of a Three-Judge
Court*, 69 Colum. L. Rev. 146 (1969) ..................... 34

## STATEMENT OF THE CASE

The only question before this Court is whether the three-judge district court properly ordered that California limit its prison population to 137.5% of the system's design capacity in order to remedy conceded and ongoing Eighth Amendment violations. For more than thirty years, this Court has recognized that states violate the Eighth Amendment's prohibition on cruel and unusual punishment when they fail to provide incarcerated persons with basic health care sufficient to prevent the unnecessary and wanton infliction of pain or death. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). During the course of this litigation, the State of California has not disputed that its correctional facilities have long failed to provide these minimal levels of mental health and medical care to the 160,000 inmates being held within them. Nor does the State dispute that overcrowding contributes significantly to these failures.

Appellee-Intervenor California Correctional Peace Officers' Association (CCPOA) represents the 35,000 correctional officers working within California's prison system. These correctional officers are, as the three-judge court found, "essential to providing health care to prisoners." JS1-App. 110a.[1] Among their many responsibilities,

_____

[1] Citations to "JS1-App." refer to the Appendix to the Jurisdictional Statement in No. 09-416. Citations to "JS2-App." refer to the Appendix to the Jurisdictional Statement in this appeal. Filings in *Plata*, No. C01-1351-TEH (N.D. Cal.), and *Coleman*, No. CIV-S-90-0520-LKK (E.D. Cal.), are cited by docket entry number (*i.e.*, "*Plata* D.E. __," "*Coleman* D.E. __").

2

correctional officers are the front-line officials who identify medical and mental health conditions among prisoners, escort prisoners to treatment, and oversee clinics to ensure the safety of inmates and staff. CCPOA's members play an integral role in nearly every facet of prison health services. For the reasons described below, and despite their best efforts, CCPOA's members cannot adequately perform these duties given the current state of overcrowding. Based on its members' experience with the day-to-day realities of overcrowding and the resulting medical deficiencies in California's prisons, CCPOA took the extraordinary step of intervening in the three-judge court remedial proceedings on the same side as the plaintiffs.

## A. Overcrowding And Medical Care Within California's Correctional Facilities

In 2009, when the three-judge court ordered the State to develop a plan to reduce the prison population, California's prisons were operating at approximately 190% of design capacity. JS1-App. 78a. The State does not dispute that overcrowding impedes the delivery of constitutionally adequate health care. *Id.* at 84a. Prison overcrowding prevents the delivery of adequate medical treatment because the number of inmates and lack of space overwhelm the system's capacity. Overcrowding also causes infectious diseases to spread among prisoners and to staff. These systemic difficulties are detailed in the briefs of appellees Coleman and Plata. We highlight here the experiences of correctional officers and their inability, under the circumstances, to facilitate the provision of constitutionally adequate care.

3

1. California's prisons lack adequate physical space to provide necessary medical care. As overcrowding increases the number of patients who need medical care, it simultaneously results in a cannibalization of space and resources needed to provide that care. As a result, the State's prisons now contain less than half the clinic space needed to treat current inmates. JS1-App. 93a (citing the *Plata* Receiver's 2007 Report).

The shortage of clinical space means that medical staff sometimes have no choice but to turn away inmates who need medical care and should be isolated from other prisoners. This leaves correctional officers to face medical problems they have no resources to handle. During a 2008 influenza outbreak at Chuckawalla Valley State Prison, for example, one correctional officer sent three inmates within his unit to the central infirmary for isolation. Due to a lack of bed space, they were almost immediately sent back. Influenza quickly spread to over half of the 340 inmates in the building, and the unit soon had no other choice than to order a lockdown. 4 Tr. 720-21 (testimony of Correctional Officer Ruben Leija).[2]

As a result of space shortage, medical staff administer health care in conditions that are unsafe and result in health care well below constitutional standards. At the state prison in Solano, the

---

[2] Citations to testimony offered during the remedial trial before the three-judge court that occurred in November and December 2008 will be cited to the transcript volume number and page. For example, Officer Leija's testimony regarding the influenza outbreak appears on pages 720-21 in the fourth volume of the trial transcript.

4

scheduling nurse is assigned to an active examination room, and she frequently must work in the dark so that other practitioners can conduct eye examinations. 4 Tr. at 664 (testimony of Correctional Officer Deborah Rowlett). At Old Folsom State Prison, the triage nurse works from a converted storage closet which previously secured the prison's supply of narcotic drugs and sharp instruments. 3 Tr. 606-07 (testimony of Correctional Officer Gary Benson). These instruments are now contained in separate padlocked boxes, which nurses must open within the reach of four to six inmates who are receiving treatment within the same space. The single correctional officer monitoring this clinic cannot simultaneously monitor all of the secure boxes and the inmates receiving treatment. Attempting to treat prisoners in this inadequate space thus compromises the safety of inmates and staff. *Id.* at 614-16.

The lack of space also defeats basic medical protocols regarding patient confidentiality and care, thus substantially undermining inmate and staff safety. Examinations are routinely performed with other patients in the same room or with only a thin curtain partition. JS1-App. 94a. Because of insufficient space for medicine distribution, medications are distributed *en masse* to prisoners in a manner that easily reveals their medical information to other inmates. 4 Tr. 663-64 (testimony of Correctional Officer Deborah Rowlett). To be sure, inmates have limited privacy rights within prison walls. But regardless of individual privacy concerns, the disclosure of stigmatizing illnesses, such as HIV, tuberculosis, and staph

5

infections, leads directly to increased violence against sick inmates, thereby making it more difficult for correctional officers to maintain prison security. Furthermore, when medical staff cannot administer proper physicals or expect honest answers from patients regarding their health, illnesses go undiagnosed and are left to spread to other inmates and staff.

In the mental health context, the number of inmates who need either a suicide-watch bed or a mental-health-crisis bed consistently exceeds the number of such beds available. Correctional officers therefore must place these at-risk inmates in telephone-booth-sized holding cages inside of converted supply closets. While internal prison policies recognize that such cages are not suitable for confining inmates for more than four consecutive hours, officers have no choice but to shuffle prisoners back and forth between these spaces as they wait for beds to become available. 3 Tr. 575-77 (testimony of Correctional Officer Brenda Gibbons).

Finally, California's overcrowded prisons do not have the necessary space to administer and store inmate medical records. Inadequate space also limits the system's organizational capacity, thus leading to medical records that are "unwieldy, rarely organized chronologically and, in general, poorly maintained." JS1-App. 119a (statement of Dr. Ronald Shansky). The danger of poor recordkeeping is even more acute when combined with insufficient medical staff to double check for errors. In her experience in the clinic at the Solano facility, Correctional Officer Deborah Rowlett observed *nearly every day* that inmates would correct nurses as the nurses were

about to administer the wrong insulin dosage. 4 Tr.
663. Even a small error in the amount or type of
insulin administered can lead to severe health
consequences, which is why standard practice
requires that two nurses be present for its
administration. *Id.* at 662. Without sufficient space
and staff to maintain medical records, life-
threatening errors are commonplace.

2. Overcrowding in California's prisons causes
failures in management, security, and oversight that
further undermine the provision of necessary medical
care. According to former California Department of
Corrections and Rehabilitation (CDCR) Secretary
Jeanne Woodford, "[o]vercrowding in the CDCR is
extreme, its effects are pervasive and it is preventing
the Department from providing adequate mental and
medical health care to prisoners." JS1-App. 84a.

Due to overcrowding, inmates are assigned to the
next available bed without regard for their specific
medical and mental health needs. As a result,
inmates who have seizures can be assigned to sleep
on elevated bunks of a stacked bed with no rails. 4
Tr. 679 (testimony of Correctional Officer Deborah
Rowlett). Correctional officers are often unaware
that an inmate is having a seizure until it is too late
to offer assistance, and inmates frequently display
injuries consistent with falling out of their elevated
bunks. *Id.* at 676-77.

In the context of mental health, the necessity of
assigning low-functioning and easily victimized
inmates to any available bed means that these
prisoners can often be assigned to cells with highly
predatory inmates.    3 Tr. 564 (testimony of

Correctional Officer Brenda Gibbons). The ensuing
violence undermines the safety of both prisoners and
staff, especially when repeated throughout an entire
psychiatric unit.

Even when specific medical needs are identified,
correctional officers' efforts to respond effectively are
undermined by the lack of available bed space.
System administrators know that Chuckawalla
Valley State Prison, on the Arizona border, should
not house prisoners on psychotropic medications that
make them susceptible to heat-induced health
problems.    Yet Correctional Officer Ruben Leija
watched as one such medicated inmate remained in
the facility for three months awaiting transfer,
regularly suffering heat induced seizures as a result
of 120-degree weather.   4 Tr. 709-10, 713.   Other
patients have languished for over a year in outpatient
mental health units despite needing urgent inpatient
psychiatric care. 3 Tr. 563 (testimony of Correctional
Officer Brenda Gibbons).

Sufficient correctional staff-to-inmate ratios are
essential to enable constitutionally adequate health
care. Due to overcrowding, California uses converted
gymnasiums to house hundreds of inmates on double-
and triple-stacked bunks.     In these prison
"dormitories" there are normally only one or two
correctional officers to supervise approximately 200
inmates. JS1-App. 111a. Under these conditions,
"[t]he California prison system lacks sufficient
custodial staff . . . to provide prisoners with timely
access to [medical] care and still perform other
essential [penological] functions." *Id.* at 110a. First,
correctional officers often cannot identify medical
emergencies. The Governor himself acknowledged in

8

his 2006 Prison Overcrowding State of Emergency Proclamation that overcrowding causes "line-of-sight" problems for correctional officers by inhibiting their ability to observe inmates, which creates a substantial security risk. *See id.* at 61a; *see also* Plaintiffs' Tr. Exh. 1.

Second, once officers become aware of medical emergencies, overcrowding interferes with their ability to respond effectively because they are hamstrung by the crowded and noisy environment, thus preventing communication with other officers while they facilitate medical assistance. 4 Tr. 677 (testimony of Correctional Officer Deborah Rowlett).

As Officer Rowlett testified, when an officer and her partner must deal with a medical emergency (such as an inmate under her supervision who suffered daily seizures), no correctional officer will be available to supervise the other almost two hundred inmates, creating a safety hazard for inmates and staff. 4 Tr. 678-79. It is unsafe to leave hundreds of prisoners supervised by only one officer so that his or her partner can escort a sick inmate to medical care. JS1-App. 110a-111a.

Finally, overcrowding in California's prisons substantially increases the use of lockdowns, which further delay the provision of medical care. JS1-App. at 116a. During lockdowns, correctional officers must individually escort prisoners to medical appointments. Often, correctional officers cannot perform this function in a timely fashion because of their other duties. Simply put, the staffing levels in California's prisoners are not set in anticipation of continual lockdowns. JS1-App. 117a. Lockdowns also result in the cancelation of group psychiatric

9

treatment and, as with medical services, inmates often miss individual psychiatric treatment because there are not enough correctional officers to escort them to appointments. For many inmates who are mentally ill, the stress of being locked down and the simultaneous lack of psychiatric care causes further deterioration and an increase in suicidal tendencies. *Id.* at 118a.

3. Overcrowding also exacerbates the spread of infectious diseases. Assigning prisoners to double- and triple-bunked beds in converted gymnasiums leads to unsanitary conditions that breed sickness among inmates and staff. JS1-App. at 100a-102a. In his Emergency Proclamation, Governor Schwarzenegger declared that the overcrowded conditions of California's prisons leads to an "increased, substantial risk for transmission of infectious illnesses." *Id.* at 61a; *see also* Plaintiffs' Tr. Exh. 1 at 1-2. This rampant spread of disease causes healthy inmates to become sick in a system that cannot respond to their medical needs.

Prison administrators have neither space nor organizational capacity to quarantine inmates with antibiotic-resistant staph infections. Instead, prisoners with this highly contagious condition share crowded communal areas such as showers and waiting areas with other inmates. 3 Tr. 604-05 (testimony of Correctional Officer Gary Benson). The same is true for spread of tuberculosis, including drug-resistant tuberculosis.

Communicable diseases also spread to correctional staff. For example, Officer Gary Benson had to undergo two invasive surgeries to address

10

antibiotic-resistant staph infections he contracted while working in the triage clinic at Old Folsom penitentiary. 3 Tr. 605; *Plata* D.E. 1669. The State attempts to prevent such inmate-to-staff spread of disease by directing correctional officers to don rubber gloves and to change them between each inmate interaction, a near impossibility for correctional officers monitoring several hundred inmates at once. Such stop-gap measures fail to prevent the spread of diseases and cause tension with inmates who find the procedure demeaning. 4 Tr. 697-98 (testimony of Correctional Officer Ruben Leija).

Moreover, in their unsuccessful struggle to avoid infection, prisoners engage in dangerous behavior which further promotes the spread of disease. For instance, inmates are so anxious to avoid intermingling their clothes with those of infected inmates that many try to launder their clothes in their cell toilets, thereby risking other health problems and failing to effectively sanitize their clothes. 3 Tr. 570 (testimony of Correctional Officer Brenda Gibbons).

Ironically, the danger of contracting infectious diseases rises when prisoners seek out medical care for conditions they already have. At Old Folsom, for example, inmates seeking treatment wait in a twelve-by-twenty foot holding cage built to hold twenty inmates. But normally twice that number are confined there for hours awaiting treatment. 3 Tr. at 597-99 (testimony of Correctional Officer Gary Benson). As they wait to receive treatment for drug-resistant tuberculosis, many inmates cough continually on their neighbors. Prisoners seeking

11

treatment for staph infections are routinely bleeding or oozing pus through their clothes as they wait. *Id.* at 601. Many inmates avoid seeking medical care altogether to avoid this prolonged exposure to other sicker inmates, thus further exacerbating the spread of unidentified and untreated illnesses.

In sum, CCOPA members' daily work experiences reveal an overcrowded, inadequately staffed system that cannot deliver adequate medical care in spite of the best efforts of prison employees. As Correctional Officer Gary Benson explained at trial, there are "way too many inmates in that small of a space to do the job." 3 Tr. at 601.

## B. The Special Three-Judge Court Provisions Of The Prison Litigation Reform Act

In 1996 Congress passed the Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, tit. VIII, 110 Stat. 1321, 1321-66 (1996), to establish detailed statutory standards governing prison conditions litigation. While the Act does restrict prisoners' ability to bring suit or obtain particular remedies, the PLRA also expressly recognizes that under appropriate circumstances federal courts can order a limitation on prison crowding to remedy a constitutional violation. 18 U.S.C. § 3626(a)(3).

The PLRA defines any such limitation as a "prisoner release order" ("PRO") without regard to whether that order actually requires releasing inmates. *See* 18 U.S.C. § 3626(g)(4) ("the term 'prisoner release order' includes any order" having "the purpose or effect of reducing or limiting the prison population," as well any order directing "the release from or nonadmission of prisoners to a

12

prison").[3] The order at issue in this appeal is a PRO because it "effect[ively] limit[s]" California's prison population to 137.5% of the system's design capacity. The State, however, may achieve that ratio through a combination of policies that either reduce the number of inmates within the system or increase the system's capacity. Therefore, we refer to the three-judge court's order as a "capacity limit order" to distinguish it from other types of orders that fall within Section 3626(g)(4).

Section 3626(a)(3) details the procedural and substantive requirements for issuing any Section 3626(g)(4) order. First, the Act authorizes only specially-convened three-judge district courts to enter PROs. 18 U.S.C. § 3626(a)(3)(B). The PLRA presupposes that, faced with prison conditions that violate the Eighth Amendment, single-judge district courts will issue remedial orders designed to cure the violations. If such orders for "less intrusive relief" have "failed to remedy" the constitutional violation, *id.* § 3626(a)(3)(A)(i), even after "the defendant has had a reasonable amount of time to comply," *id.* § 3626(a)(3)(A)(ii), only then may the single-judge court convene a three-judge panel. *Id.* § 3626(a)(3)(C) (providing that any "party" may move to convene three-judge court); *id.* § 3626(a)(3)(D) (providing that a single-judge district court may *sua sponte* convene a three-judge court). Proceedings to determine whether to enter a PRO take place before the three-

[3] Congress has also used the more precise term "inmate population ceiling" to refer to such orders. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 20409, 108 Stat. 1796, 1827 (formerly codified at 18 U.S.C. § 3626(b)) (amended 1996).

13

judge court; the single-judge district court retains jurisdiction over other aspects of the ongoing litigation.

Once a three-judge court is convened, the PLRA provides that the panel "shall enter" a PRO "only if the court finds by clear and convincing evidence" that two conditions are met. 18 U.S.C. § 3626(a)(3)(E). First, the court must find that overcrowding is "the primary cause" of the constitutional violation requiring remediation. *Id.* § 3626(a)(3)(E)(i). Second, the court must find that "no other relief will remedy the violation." *Id.* § 3626(a)(3)(E)(ii).

## C. The Procedural History Of These Cases

1. The consolidated case before this Court originated in two long-running lawsuits challenging the provision of health care in the California prison system. The *Coleman* class action, filed in 1990, involves delivery of constitutionally inadequate mental health care. JS1-App. 32a. *Coleman* entered its remedial phase in 1995 after a single-judge district court determined that California failed to provide constitutionally adequate care to inmates with serious mental disorders. *Id.* at 31a-36a. The *Plata* class action, filed in 2001, involves the State's failure to deliver constitutionally adequate medical care. *Id.* at 13a. *Plata* entered its remedial phase almost immediately after the case was filed because California stipulated that medical health care conditions within its prisons violated the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at 14a. The extensive remedial proceedings before the *Plata* and *Coleman* single-judge district courts are set out in the briefs filed by

the two appellees. Although the *Coleman* litigation has been in the remedial phase for over fifteen years, and the *Plata* litigation has been in the remedial phase for over eight, the California prison system has yet to provide constitutionally adequate mental and medical health care.

While the *Coleman* and *Plata* lawsuits were ongoing, the population of California's prisons exploded, reaching an all-time record of more than 160,000 inmates in 2006. JS1-App. 9a. This dramatic increase in the prison population was not accompanied by a commensurate expansion of space or other resources, including sufficient staff, essential to providing constitutionally adequate care. As a result, by 2006, the majority of California's prisons operated at 200% of design capacity. *Plata* D.E. 719 at 5.

In light of unprecedented overcrowding and the State's failure to cure its health care violations through compliance with previous remedial orders, in November 2006 the plaintiffs in each suit separately moved, pursuant to 18 U.S.C. § 3626(a)(3)(C), for appointment of a three-judge court to consider a PRO. JS1-App. 63a. CCPOA filed an *amicus curiae* brief in support of convening a three-judge court, arguing that the "day-to-day impact of overcrowding" was "getting worse," *Plata* D.E. 719 at 8, and that the State had proved unwilling or unable to "meaningfully address" the problem. *Id.* at 7. CCPOA emphasized that overcrowding had reached crisis levels, creating "increasingly unsafe conditions for inmates and employees in all of California's prisons." *Id.* at 3.

After several months of extensive briefing and argument, the *Coleman* and *Plata* single-judge district courts conducted a final combined hearing to consider plaintiffs' motions. JS1-App. 65a. In July 2007, each court separately issued an order finding that the PLRA's requirements for convening a three-judge panel had been met. *Id.* at 273a; *id.* at 288a. Both courts emphasized that overcrowding had prevented prior remedial orders from eliminating the unconstitutional defects in mental and medical health services. *Id.* at 281a-283a; *id.* at 296a.

Following the designation of the three-judge court, CCPOA moved to intervene in the proceedings. CCPOA argued that "[e]very person CCPOA represents has a direct and substantial adverse experience, every day and night that he or she is on the job, as a result of severely overcrowded prison conditions." *Plata* D.E. 828 at 5. In particular, CCPOA emphasized the mental toll on members as a result of their daily inability to prevent unconstitutional conditions. *Id.* at 8. It further noted that several correctional officers had themselves contracted infectious diseases as a result of overcrowding. *Id.* at 7. The three-judge district court, finding it was "apparent that the membership of the CCPOA is significantly affected by the conditions in California's prisons," granted CCPOA's motion. *Coleman* D.E. 2427 at 5.

3. Once convened, the three-judge court encouraged the parties to reach a settlement through mediation. JS1-App. 69a-70a. Only after those efforts failed did the three-judge court embark upon the ensuing proceedings and trial. At trial, CCPOA presented evidence, including testimony by six

correctional officers, that extreme overcrowding in the California prison system made it impossible for its members to facilitate the provision of constitutionally adequate health care to inmates under their control or otherwise to perform their duties effectively. 3 Tr. 503-614; 4 Tr. 657-722.

Following trial, the three-judge court issued a lengthy and detailed opinion that found overcrowding to be "the primary cause" of California's constitutional violations. JS1-App. 82a. It further found that "no other relief" could remedy the problem. *Id.* at 145a. The court therefore ordered that the State develop a plan to bring the prison population to no greater than 137.5% of design capacity within two years. *Id.* at 169a. After the three-judge court rejected the State's first plan for failure to comply with the order, *Plata* D.E. 2269, the State submitted a second plan which included six-month benchmarks for achieving the required capacity ratio. JS2-App. 3a-6a. The court then ordered the State to achieve the necessary reductions in accordance with these benchmarks, but it left the State free to comply through policies of its choosing. In sum, the capacity limit order does not require the actual release of any prisoner, and it provides California with substantial discretion regarding implementation methods, including the option of increasing prison capacity in order to comply with the Constitution.

## SUMMARY OF ARGUMENT

Under the circumstances of this case, the Prison Litigation Reform Act authorized the convening of a three-judge court and the issuance of a remedial

order capping the population in California's prisons at 137.5% of their design capacity.

I. Based on their years of experience with California's failure to remedy conceded Eighth Amendment violations, the district courts in *Plata* and *Coleman* properly convened a three-judge court to consider ordering a capacity limit on the State's prisons. The PLRA provides for three-judge courts when a district court's previous orders have failed to remedy the constitutional violations even after the State has been given reasonable time to comply with them. In this case, the State does not dispute as a matter of fact that the district courts in *Plata* and *Coleman* each had issued previous less intrusive orders to remedy the violations; that the State was given reasonable time to comply with those orders; and that those orders failed to remedy the violations. Instead, the State argues that a three-judge court should not have been convened, because the single-judge district courts issued additional relief orders in 2006 and 2007.

To the extent that the State's position would permit delaying the convening of a three-judge court in cases, such as this one, where the new orders cannot remedy the constitutional violation, its argument fails as a matter of statutory construction. The language of Section 3626(a)(3)(A) requires such a delay only with respect to orders that direct the "defendant" – as opposed to some other party – "to comply" and only with respect to orders that can "remedy the deprivation of the Federal right." Neither of those conditions is met by the 2006 and 2007 orders to which the State points. Some of those orders are not directed at the State, and thus fall

18

outside Section 3626(a)(3)(A)(ii).    Others, as the single-judge district courts found, could at most provide only partial alleviation of the unconstitutional conditions, and thus fall outside Section 3626(a)(3)(A)(i).

Not only is the State's argument unsupportable as a textual matter, but it would undermine the proper functioning of the PLRA. In cases where a federal district court correctly concludes that a three-judge court should be convened, the State's position would compel the court to choose between two unacceptable alternatives. Either the court would have to forgo addressing discrete elements of a systemic constitutional violation in order to avoid triggering a new period for compliance, or, if the court orders such relief, it would needlessly delay the convening of a three-judge court.

In any event, the proper question before this Court is whether the capacity limit order issued by the three-judge court should be affirmed, and not whether the three-judge court should have been convened in the first place. The structure of the PLRA shows that only the three-judge court's orders, and not its constitution, are subject to review on appeal. Moreover, any challenges to the composition of the court were waived and are meritless.

II. The three-judge court correctly held that overcrowding is "the primary cause" of the ongoing constitutional violations in this case. The court properly interpreted the phrase according to its ordinary meaning – that is, as referring to the most fundamental obstacle to providing a complete remedy. The court then found, based on

19

overwhelming evidence, that overcrowding is the most important factor contributing to California's inability to provide constitutionally adequate care. Because the prison population so exceeds design capacity, disease is rampant; inmates are housed without regard for their medical conditions; correctional staff cannot effectively monitor inmates' health problems or deliver them for timely treatment; and clinic facilities are overwhelmed, leading to treatment that falls far below constitutionally adequate standards.

Unable to dispute the factual underpinnings of the three-judge court's decision, the State instead offers a strained reading of the term "primary cause." It argues that the PLRA uses that phrase as a term of art purportedly to impose an elevated level of causation requiring proof that reducing crowding is not only necessary but will also be sufficient by itself to remedy the constitutional violations. The State's argument finds no support within the Act itself, which refers to "primary" rather than "sole" cause. Nor is there any indication in the legislative history that Congress intended to impose such an unusual definition.    To the contrary, the State's definition would create serious constitutional problems by foreclosing remedies to address overcrowding, even when constitutional violations cannot otherwise be remedied.    It would thus undermine the overall structure of the PLRA, which recognizes that although PROs may be a last resort, they remain available when necessary.

III. Once it was clear that no relief other than an order directed at overcrowding could remedy the constitutional violations in California's prison

20

system, the three-judge court issued an order that complied with the specific requirements for all relief orders under the PLRA. First, as the Act requires, the order was narrowly tailored. By setting a capacity limit, rather than directing the release or transfer of particular inmates, the order left the State with broad discretion over how to achieve the required ratio. The specific ratio the three-judge court set – 137.5% of the system's design capacity – rested on careful consideration of the evidence presented. The State did not identify a more narrowly tailored alternative that could cure the violation.

Second, as the Act requires, the three-judge court gave substantial weight to public safety in crafting its remedy. Particularly given the State's proposals to reduce inmate population to a similar degree for budgetary reasons, the State has provided no grounds for rejecting the three-judge court's finding that a capacity limit is consistent with the PLRA.

## ARGUMENT

I.  **In Light Of The Failure Of Their Prior Orders To Remedy The Constitutional Violations In These Cases, The *Plata* And *Coleman* Single-Judge District Courts Properly Convened A Three-Judge Court.**

The PLRA allows plaintiffs to move for the convening of a three-judge panel if (i) prior remedial orders have failed to remedy the constitutional violation, and (ii) "the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A). Appellants do not dispute that in 1995 and 2002, the

21

single-judge district courts in *Plata* and *Coleman* had each "previously entered an order for less intrusive relief that ha[d] failed to remedy the deprivation" of inmates' Eighth Amendment rights. 18 U.S.C. § 3626(a)(3)(A)(i). Nor do appellants dispute the findings of the single-judge courts in *Plata,* JS1-App. 279a, and *Coleman, id.* at 296a-297a, that the State had been given reasonable time to comply with these orders. *See* State Br. 16.

Nevertheless, appellants argue that the three-judge court was prematurely convened because the State was not given "a reasonable amount of time to comply" with more recent orders issued by the single-judge district courts in 2006 and 2007. In other words, they assert that these new relief orders triggered a compliance period during which the three-judge court could not be convened.

Appellants' argument contravenes the text and structure of the PLRA, and it would require federal courts to act in ways that Congress could not have intended. Once a single-judge district court concludes that the State has been given reasonable time to comply with its previous orders to remedy the violation and that the constitutional violation cannot be cured without limiting a prison system's capacity, additional orders for partial relief do not require new time for compliance before a three-judge can be convened.[4]

---

[4] The *Plata* appellees offer a complementary interpretation of Section 3626(a)(3)(A)(ii). They argue that whether the State has been given "a reasonable amount of time to comply with the previous court orders" depends on evaluating state compliance throughout the litigation. A recent order by a single-judge

22

## A. The PLRA Does Not Require Delay In Convening A Three-Judge Court To Allow Compliance With Orders That Will Not Fully Remedy The Constitutional Violation.

The *Plata* and *Coleman* district courts properly applied the statutory prerequisites for convening a three-judge court. Under the PLRA, a three-judge court should not be convened until "the defendant has had a reasonable amount of time to comply with the previous court orders." 18 U.S.C. § 3626(a)(3)(A)(ii). The reasonable time provision expressly refers only to "orders" with which the "defendant" must "comply." Moreover, read in context, the phrase "the previous court orders" refers only to those orders described in the preceding sentence – specifically, orders that may remedy the violation. In other words, orders that improve conditions somewhat but cannot be expected to fix the constitutional violation do not trigger the "reasonable time" provision. Therefore, under the PLRA, a single-judge district court may convene a three-judge panel even while continuing to attempt improvements through ameliorative orders, so long as those orders cannot by themselves fix the constitutional violation.

court, therefore, does not mandate additional time for compliance because the State has been given reasonable time overall to remedy the constitutional violation. *Plata* App. Br. 29-35.

Under either of these interpretations, the three-judge court was properly convened. Moreover, both approaches avoid the absurd consequences that would follow from appellants' interpretation.

23

1. Before convening a three-judge court, Section 3626(a)(3)(A)(i) requires a district court to have "previously entered an order for less intrusive relief that has failed to remedy the deprivation of [a] Federal right." The statute uses the word "remedy," rather than "reduce," or "lessen," or "ameliorate." Thus, as appellants implicitly acknowledge, only a judicial decree that "may cure" a constitutional violation, State Br. 16, satisfies the condition in Section 3626(a)(3)(A)(i) for convening a three-judge court. By contrast, a merely palliative order – such as an order to hire additional nurses in a system where several factors beyond staffing shortages make it impossible to provide adequate care – would not meet that condition.

2. Section 3626(a)(3)(A)(ii) imposes a waiting period to give defendants reasonable time to comply with "the previous court orders." The structure of the statute demonstrates that "the previous court orders" are those orders described in Section 3626(a)(3)(A)(i) – that is, orders that may "remedy" the violation.[5]

By contrast, appellants take the position that *all* previous court orders directed at a constitutional violation trigger the period provided in Section

[5] Orders under the PLRA need only be narrowly tailored to the violation and do not have to be, by themselves, sufficient to "remedy" the violation. There may be instances where a court realizes early on that prison overcrowding prevents any "less intrusive" order from remedying the constitutional violation. In such instances, Section 3626(a)(3)(A)(i) still requires a single-judge district court to issue a less intrusive order before convening a three-judge court. Thus, a state will always have reasonable time to remedy the violation before a three-judge panel is convened.

24

3626(a)(3)(A)(ii). State Br. 11. Under this view, every time a single-judge district court issues any relief order in a prison conditions case, it restarts the clock on when a three-judge court can be convened.[6] This restart occurs even if the district court's new order cannot possibly result in fully remedying the Eighth Amendment violations. In such situations, appellants' interpretation would lead to perverse results that Congress could not have intended. District courts would be forced to choose between two unacceptable options. They must either forgo entering *any* ameliorative orders, or, by entering such orders, they must needlessly wait before they can pursue the only avenue capable of fully curing the violation.

For example, suppose overcrowding is the primary cause of unconstitutional health conditions in multiple prisons within a state system and that the state has been given reasonable time to comply with previous orders to remedy the violation. In such a situation, the statutory preconditions for convening a three-judge court have been met. But suppose further that on the eve of requesting the designation of a three-judge court, the district court learns that one facility within the system has antiquated

---

[6] Of course, convening a three-judge court does not relieve the State of its duty to comply with existing relief orders or its right to have reasonable time to do so. The structure of the PLRA, which delegates the question whether to grant a PRO to a three-judge court, while leaving all other issues before the single-judge court, means that there will often be parallel proceedings. The fact that a three-judge court is underway does not change a state's obligations with respect to orders issued by the single-judge court.

25

equipment for sanitizing dishes and prisoner laundry. *Cf. e.g., Wyatt v. Stickney*, 344 F. Supp. 373, 382 (M.D. Ala. 1972) (responding to constitutionally inadequate conditions in a state mental hospital connected to the failure to provide sufficiently hot water for patient use, dishwashers and laundry facilities), *aff'd in relevant part sub nom. Wyatt v. Alderholt*, 503 F.2d 1305, 1307 (5th Cir. 1974). An order to update the water system at the single prison might be necessary to protect the health and safety of inmates in that particular facility, yet that order could not fix the systemwide constitutional violation. Under appellants' interpretation of the PLRA, however, the court would either have to withhold ordering any relief relating to the water system in order to convene the three-judge panel, or it would have to wait a reasonable amount of time for the state to replace the single facility's water system before a three-judge court could be convened. That result makes no sense and could not possibly be within Congress's intent in passing the PLRA.

Appellants' reading also leads to absurd results even after a three-judge court properly convenes. It is unclear whether, under Section 3626(a)(3)(A), reasonable time must be given to comply with a single-judge district court's orders after the three-judge panel convenes but before entry of a PRO. The unreasonableness of appellants' argument is apparent regardless of how one answers that question.[7]

---

[7] *See infra* at 32-34 (showing that that these conditions are merely procedural and should not be reviewed after the three-judge panel convenes).

a. If the "reasonable time" provision applies after the three-judge panel convenes, then appellants' proposed rule would temporarily suspend the three-judge panel's authority to enter a PRO each time the single-judge district court enters a relief order. This result would obtain even if the new order *could not*, by itself, remedy the constitutional violation. For instance, referring to the hypothetical already described, if the single-judge district court ordered that the single prison's water system be updated after the three-judge panel convened, that order would delay the three-judge panel's authority to issue a PRO. This result makes no sense. Moreover, it is inconsistent with the structure of the PLRA, which gives authority over PROs to three-judge courts, 18 U.S.C. § 3626(a)(3)(B), while leaving the resolution of the many other remedial issues that inevitably arise in prison litigation in the hands of single-judge district courts, 18 U.S.C. § 3626(a)(1), (2). In fact, the single-judge district courts in *Plata* and *Coleman* have each issued dozens of orders since the three-judge court was convened.

b. By contrast, if the "reasonable time" provision does not apply after the three-judge panel convenes, the State's position is untenable for a different reason. Under the State's interpretation, whether the three-judge panel has jurisdiction to enter a PRO would depend on the technicality of whether the single-judge court's recent orders came before or after the three-judge court was convened. For example, if a single-judge district court entered a relief order a week *before* convening the three-judge panel, that panel would supposedly lack jurisdiction. But if the single-judge district court issued precisely the same

relief a week *after* convening a three-judge panel, then the panel would have jurisdiction. There is no reason to think that Congress intended such nonsensical distinctions.

**B. The More Recent Orders Of The Single-Judge District Courts Appointing The Receiver In *Plata* And The Special Master In *Coleman* Did Not Require Delay In Convening A Three-Judge Court.**

Of the recent orders from 2006 and 2007 that the State contends precluded convening a three-judge court, none was capable of curing the constitutional violations.

1. The text of the PLRA provides no basis for delay here. Some of the district court's actions that appellants claim should have restarted the waiting period did not fit within Section 3626(a)(3)(A)(ii) because they did not require the defendant to "comply" with an order. First, appellants suggest that "the remedy of Receivership" restarted the clock. State Br. 15. But establishing a Receivership does not, by itself, create any obligation with which the defendant must "comply." *Cf. Coleman v. Wilson*, 933 F. Supp. 954, 957 (E.D. Cal. 1996) (distinguishing between "the remedies required to cure the constitutional deficiencies" and "the appointment of a special master").[8]  Next, appellants argue that the Receiver's submission of a preliminary plan in May 2007 should also have restarted the clock. *See* State

_____
[8] To be sure, other aspects of the order that appointed the Receiver did place obligations on the State. *See infra* at 28-31 (addressing those aspects). But the appointment of a Receiver by itself is not an order with which the State has to comply.

Br. 14-15. But they face an even greater difficulty here because the Receiver's preliminary plan is not a "court orde[r]." *See* 18 U.S.C. § 3626(a)(3)(A)(ii). Nor did it require that the State "comply" with anything.[9] *Id.*

Similarly, appellants fault the *Coleman* district court for failing to provide reasonable time for the State to comply with various 2006 orders directed at improving coordination of the Special Master's plans in *Coleman* with the Receiver's plans in *Plata.* Appellants characterize these orders as a "new remedial program." State Br. 21. Even if these rulings involved a remedial "program," they did not involve orders with which "the defendant" had to "comply," 18 U.S.C. § 3626(a)(3)(A)(ii), because they related only to coordination between court-appointed agents. *See, e.g., Plata* D.E. 691. Thus, under the terms of the PLRA, these orders could not delay the decision to convene a three-judge court.

2. While a number of post-2005 orders from the single-judge district courts did require the State to "comply" with some directive, the PLRA did not require postponing the convening of a three-judge court because these orders were not the kind of

───────────

[9] The *Plata* Receiver did not file a final Plan of Action until November 15, 2007, *Plata* D.E. 929, 930, *after* the three-judge court had properly been convened to address the issue of a capacity limit. Thus, that order does not qualify as a "previous" court order, as the PLRA requires. Appellants provide no support for concluding that "previous" means "subsequent." Furthermore, by the time the *Plata* single-judge court accepted the Plan, it had determined that the Plan by itself would be inadequate to remedy the violation fully. *See* JS1-App. 155a (reiterating that conclusion).

orders to which Sections § 3626(a)(3)(A)(i)-(ii) refer, given that the orders could not by themselves "remedy" the deprivation of constitutional rights. This is shown both by a facial examination of the orders and by district court factual findings that the orders could not remedy the violation.[10]

In contrast to the 2002 order in *Plata* and the 1995 order in *Coleman* – both of which ordered full compliance with constitutional standards and thus required giving the State "reasonable time" for compliance – the 2006 and 2007 orders binding on the State addressed only discrete aspects of the ongoing constitutional violation. For instance, as part of the order creating the Receivership – which, as previously explained, was not itself an order with which the State had to comply – the *Plata* court further ordered that "[p]ending development of a Plan of Action, the Receiver shall undertake immediate and/or short term measures designed *to improve* medical care and *begin the process of* restructuring and development of a constitutionally adequate medical health care delivery system." *Plata* D.E. 473 at 3:3-6 (emphasis added). To be sure, the

───────────

[10] The evaluation of whether a previous order may "remedy" the violation is one the single-judge court must make when it considers convening a three-judge court. First, the PLRA does not contemplate any distinction between partial relief and remedies outside the context of convening a three-judge panel. Therefore, most orders do not specify whether the court anticipates the order will "remedy" the violation, although it certainly may have so intended. Moreover, factual conditions often change, thus revealing past assessments regarding the effectiveness of remedial orders as inaccurate. Indeed, as appellants argue elsewhere, courts should tailor remedies to current conditions.

court was required to determine whether the Receiver could remedy the violations before it convened a three-judge court or issued a crowding reduction remedy, and it did so, finding that the Receiver would be unable to cure the violations while the prisons remain overcrowded. Other orders issued by the single-judge district courts similarly could not have remedied the violation, even cumulatively, without a capacity limit order. *See, e.g., Coleman* D.E. 2200 at 1:25-26 (approving the Special Master's long-range bed plan).

Accordingly, in their orders to convene a three-judge court, both district courts found that their recent orders could not remedy the underlying violations without an overcrowding reduction order. Those findings must be accepted unless "clearly erroneous." *Amadeo v. Zant,* 486 U.S. 214, 223 (1988).[11] In *Plata,* the district court found the record "clear that the Receiver will be unable to eliminate the constitutional deficiencies at issue in this case in a reasonable amount of time unless something is done to address the crowded conditions in California's prisons." JS1-App. 286a. Similarly, the district court in *Coleman* found "that the overcrowding crisis in the CDCR is preventing the delivery of constitutionally adequate mental health care to the plaintiff class."

---

[11] The clear error standard would apply even if this Court were to treat the conditions of Section 3626(a)(3)(A) as jurisdictional. *See Correspondent Serv. Corp. v. First Equities Corp. of Fla.,* 338 F.3d 119, 123 (2d Cir. 2003) (Sotomayor, J.) (appellate courts considering jurisdictional questions "review a district court's factual findings for clear error and its legal conclusions *de novo*"); *see also Kanter v. Comm'r of Internal Revenue,* 590 F.3d 410, 424 (7th Cir. 2009) (same).

*Id.* at 304a. The three-judge court reiterated these findings two years later:

> While improvements have been and continue to be made, and the *Plata* and *Coleman* courts have continued their efforts during this three-judge court proceeding, it is clear that the Receiver and the Special Master cannot remedy the constitutional violations in the absence of a prisoner release order.

JS1-App. 155a. Thus, the single-judge courts each properly found that their more recent orders could provide only partial relief and would not themselves remedy the constitutional violations. Therefore, these orders did not trigger the PLRA's mandate that the State have additional time for compliance before a three-judge court could be properly convened.

Appellants' lengthy argument to the contrary misses the mark. Improvements in prison conditions preceding and following the convening of the three-judge court do not undermine the single-judge courts' findings that their more recent orders were incapable of bringing the state into constitutional compliance.[12]

---

[12] Moreover, appellants misleadingly cite data regarding staffing levels in California's prisons. State Br. 38. Starting in 2009 and continuing to date, CDCR has been attempting to furlough all custodial staff for three days per month, thereby reducing staffing levels without those reductions being evident in the State's statistics. Additionally, CDCR has been running many "non-critical" positions vacant through a cost-saving "redirection" program, which further hides the actual level of staffing when citing only vacancy rates. Finally, California recently slashed its funding for prison operations and health care by hundreds of millions of dollars. These are, to say the least, *not* promising signs of improvement.

32

3. In any event, the PLRA does not contemplate that the procedural decision to convene a three-judge court – as opposed to the substantive decision of a three-judge court with respect to a PRO – should be subject to appellate review. Appellants argue that Section 3626(a)(3)(A) establishes jurisdictional conditions without which a three-judge court would be improperly convened and therefore lack jurisdiction to enter a PRO.[13] State Br. 24-25. This interpretation finds no support in the PLRA and would produce only protracted collateral appeals while adding little to the PLRA's substantive limitation on the scope of the courts' remedial powers.

The structure of the PLRA indicates that Congress protected state interests through the requirements of Section 3626(a)(3)(E)(ii). Before issuing any sort of PRO, a three-judge panel must find by clear and convincing evidence that "no other relief will remedy the violation of the Federal right." 18 U.S.C. § 3626(a)(3)(E)(ii). Thus, a three-judge court may not issue a PRO if any other form of relief could remedy the violation. In effect, this inquiry incorporates the requirements of Section 3626(a)(3)(A) and prevents a three-judge panel from acting prematurely because it forces the court to refrain from issuing a PRO when other avenues of relief may fix the violation. Here, the three-judge panel found, by clear and convincing evidence, that "no other relief" will remedy the violation of the Federal right. JS1-App. 168a; *id.* at 145a-168a.

_____
[13] The conditions in Section 3626(a)(3)(A) apply to the convening of a three-judge court because they are cross-referenced in Sections 3626(a)(3)(C) and (D), which specify when a three-judge court should be convened.

33

Appellants characterize Section 3626(a)(3)(A)'s requirements as jurisdictional. However, the fact that Congress used Section 3626(a)(3)(E)(ii) to prevent premature release orders suggests that Congress used Section 3626(a)(3)(A)'s requirements merely to avoid wasting limited district court resources by unnecessarily convening a three-judge court. This interpretation is consistent with Section 3626(a)(3)(B), which provides for prison release orders "if the requirements of *subparagraph (E)* have been met." 18 U.S.C. § 3626(a)(3)(B) (emphasis added). The PLRA does not contemplate any independent review of the single-judge court's determination to convene a three-judge court by either the three-judge court or an appellate court.

Moreover, appellants' interpretation would generate simultaneous and potentially conflicting appeals before this Court and the court of appeals. If a defendant were entitled to appeal the decision to convene a three-judge court, it would file such an appeal in the court of appeals and it could do so only after the three-judge panel has entered a final judgment. *See Coleman v. Schwarzenegger*, Nos. 07-16361, 07-16383, 2007 WL 2669591 (9th Cir. Sept. 11, 2007) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545-47 (1949)). By contrast, any appeal from the judgment of the three-judge court would come to this Court. 28 U.S.C. § 1253. Therefore, appellants' interpretation creates the real possibility of conflicting decisions. For instance, this Court could affirm the three-judge court's final order only to have the Ninth Circuit reject the convening of and underlying basis for the panel's "jurisdiction." There is no reason to interpret the PLRA to create

simultaneous appeals and thus a potential for conflict. After a three-judge panel is convened, Section 3626(a)(3)(E) effectively subsumes the conditions in Section 3626(a)(3)(A).

Finally, the conditions in Section 3626(a)(3)(A) would not implicate the three-judge court's jurisdiction in any event. *See Jacobs v. Tawes*, 250 F.2d 611, 614 (4th Cir. 1957) (Parker, C.J.) ("The court of three judges is not a different court from the District Court, but is the District Court composed of two additional judges sitting with the single District Judge before whom the application for injunction has been made."); Note, *Reviewing the Grant of a Three-Judge Court*, 69 Colum. L. Rev. 146, 154 (1969) (describing this Court's treatment of conditions for convening a three-judge court as nonjurisdictional).

## C. Attacks On The Composition Of The Three-Judge Court Are Untimely And Meritless.

Neither appellants nor appellant-intervenors raised any objections below to the composition of the three-judge court in this case. Nevertheless, before this Court, they and their *amici* intimate that there is something irregular about the assignment of Judges Karlton and Henderson to the three-judge court. Thus, appellants argue that if this Court were to decide that a three-judge court should have been convened in only one of the two consolidated cases, then its remand order should direct that a new three-judge court be convened and that the Chief Judge of the Ninth Circuit should "'designate two other judges' as [28 U.S.C.] § 2284 commands." State Br. 25-26 n.8. The import of their argument is that such a newly convened three-judge court start from scratch

in considering whether to address the continued overcrowding and ongoing constitutional violations in the California system.

To begin with, appellants have waived any objection to the membership of the three-judge court and offer no excuse for their waiver. *Hicks v. Miranda*, 422 U.S. 332, 338 n.5 (1975) (objections to membership of three-judge courts cannot be initiated on appeal). In any event, Chief Judge Schroeder fully complied with the requirements of Section 2284. She in fact did "designate two other judges" in each of the cases before her. For *Coleman*, where Judge Karlton was the initiating judge, she designated Judges Henderson and Reinhardt. For *Plata*, where Judge Henderson was the initiating judge, she designated Judges Karlton and Reinhardt. Nothing in the statute prevents such cross-designation.

Indeed, the regular practice of federal courts in analogous circumstances supports such consolidation in the interests of consistency and judicial economy. For example, in *Mahan v. Howell*, 410 U.S. 315 (1973), the Supreme Court reviewed a decision of a four-judge district court which had ruled on three consolidated cases. The Court never so much as hinted that there was any problem with the district court's composition. *Id.* at 318; *see also Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 483 (1985) (referencing the consolidation of cases to the same three-judge district court where the FEC brought "separate action[s] against the same defendants seeking identical declaratory relief").

II. **The Three-Judge Court Correctly Found That Overcrowding Is The Primary Cause Of The State's Ongoing Constitutional Violations And That No Other Relief Would Remedy Those Violations.**

The PLRA authorized the three-judge court to issue a capacity limit order if it found by "clear and convincing" evidence that crowding was the "primary cause" of California's failure to provide constitutionally adequate health care and that "no other relief" would remedy the State's Eighth Amendment violations. *See* 18 U.S.C. § 3626(a)(3)(E). Appellants offer two arguments as to why the district court erred in finding that overcrowding was "the primary cause" of the constitutional violation. First, they contend the word "primary" requires plaintiffs to show "an elevated level of 'but for' causation." State Br. 31. Second, they suggest overcrowding is not the primary cause of the State's constitutional violation, because while remedying overcrowding might be necessary to eliminate the violation, it is not sufficient to do so. State Br. 33. These arguments find no support in the text or purposes of the PLRA, and defy the commonsense understanding of causation. Because overcrowding is the principal obstacle to achieving constitutionally adequate health care in the California prison system, it is "the primary cause" of the Eighth Amendment violation. Since "no other relief" could produce constitutional compliance as long as overcrowding persists, the three-judge court correctly ordered a PRO.

A. **The Three-Judge Court Properly Understood That The "Biggest Inhibiting Factor" To Fixing A Constitutional Violation Is "The Primary Cause" Of That Violation.**

1. Courts apply "ordinary meaning" when, as is true for the words "primary cause" in the PLRA, a statute provides no definition for a particular term. *See Hamilton v. Lanning*, 130 S. Ct. 2464, 2471 (2010) (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)). Accordingly, the three-judge court properly interpreted the term "primary cause" by looking to its ordinary usage.

The three-judge court employed a standard dictionary definition of the meaning of "primary." *See* JS1-App. 78a (defining "primary" as "first or highest in rank or importance; chief; principal") (citing *Random House Webster's Unabridged Dictionary* 1537 (2d ed. 1998)). *See also* 7 *Oxford English Dictionary* 472 (2d ed. 1989) (defining "primary" as "[o]f the highest rank or importance; that claims the first consideration; principal, chief"). In light of that definition, the three-judge court correctly understood that the question before it was whether, at this point in time, the most important impediment to fixing the unconstitutional conditions in the California prison system was overcrowding. *See* 18 U.S.C. § 3626(a)(3)(E)(i) (describing the three-judge-court's adjudication in the present tense; whether "crowding *is* the primary cause of the violation") (emphasis added). Certainly, the PLRA does not require a three-judge court to decide that question in the abstract or for all time. Instead, it directs the court to adjudicate that question based on

38

the evidence before it, and in a context where "no other relief" can provide a remedy.   18 U.S.C § 3626(a)(3)(E).   In short, as the three-judge court understood here, if overcrowding is the "biggest inhibiting factor" to providing constitutionally adequate health care within California's prisons under current conditions, then it is the "primary cause." JS1-App. 82a.

There is no indication that Congress intended to depart from this ordinary meaning when it used "primary cause" in the PLRA.   The term "primary cause" is not a statutory or legal term of art.   As the State itself admits, Congress has used "primary cause" rarely, State Br. 30, and certainly not with the requisite frequency to establish a special statutory meaning.   Cf. Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co., 514 U.S. 122, 126 (1995) (noting that the repeated and "long use" of a phrase in multiple statutes can create a "term of art").   Nor do appellants provide any reason to believe that Congress purposefully chose that term in order to adopt idiosyncratic legal meanings plucked from a more than one-hundred-year-old admiralty case, or a railroad injury decision not cited by any federal court in the last half-century.   See State Br. 31 (citing The G.R. Booth, 171 U.S. 450 (1898); Rocco v. Lehigh Valley R.R., 288 U.S. 275 (1933)).

To the contrary, what evidence there is suggests that when Congress uses the term "primary cause" it does so in contexts other than statutory requirements, such as legislative findings or committee reports, and it uses those words in their ordinary sense to refer simply to a particularly

39

fundamental factor (or factors) explaining an observed condition.   See, e.g., Pub. L. No. 110-180, § 2(5)(a)-(b), 121 Stat. 2559, 2560 (2008) (finding that both a lack of updated criminal records and a lack of firearm restriction records were the "primary cause," in the singular, of delay in background checks); Pub. L. No. 111-22, § 1002(a)(1), 123 Stat. 1663, 1664 (2009) (finding that both "a lack of affordable housing and limited scale of housing assistance programs are the primary causes of homelessness").   Moreover, around the time Congress enacted the PLRA, it also found in other contexts that a factor can be a "primary cause" even if eliminating that factor would not by itself cure the problem.   See, e.g., S. Rep. No. 105-149 (1997) (finding that even though habitat degradation also "played a role," overfishing "was the primary cause of the decrease in striped bass"); S. Rep. No. 102-263 (1992) (finding that although "heart disease is the primary cause of total and permanent disability," "lung diseases are the fastest growing cause of total and permanent disability").   Thus, when the three-judge court construed the term "primary cause" in its ordinary sense, it interpreted the term consistent with typical congressional usage.

2. Neither of the two alternative definitions for "primary cause" that the State proposes withstand scrutiny.

a. Had Congress intended "primary cause" to mean an "elevated level of but for causation," or "proximate cause," as appellants urge, State Br. 31, it would have used language to that effect.   When Congress wants to require "proximate cause," it knows how to do so.   Several statutes enacted contemporaneously with the PLRA used precisely

that term. *See, e.g.*, Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1997, Pub. L. No. 104-204, § 422, 110 Stat 2874, 2926 (1996) (formerly codified at 38 U.S.C. § 1151(a)(1)); Housing and Community Development Act of 1987, Pub. L. No. 100-242, § 147, 101 Stat. 1815 (1988) (codified at 42 U.S.C. § 1437f(t)(1)(A)). But Congress did not require "proximate cause" in the PLRA, and this Court should not rewrite the statute to do so.[14]

---

[14] Nor is there reason to believe that Congress drew from a few scattered court of appeals decisions from widely varied areas of law that contain the words "primary cause" but do not construe the term as a statutory phrase. *See* State Br. 31 (citing *Metro. Pittsburgh Crusade for Voters* v. *City of Pittsburgh*, 964 F.2d 244, 251 (3d Cir. 1992); *Hawkins* v. *Dir., Office of Workers Comp. Programs, Dep't of Labor*, 907 F.2d 697, 705 n.12 (7th Cir. 1990); *Borras* v. *Sea-Land Serv., Inc.*, 586 F.2d 881, 885-86 (1st Cir. 1978)).

In any event, the decisions cited by appellants do nothing to undermine the approach taken by the three-judge court here. The three-judge court never conflated "primary cause" with "simple contributing cause," *Hawkins*, 907 F.2d at 705; "contributing factor," *Borras*, 586 F.2d at 885-86, or "material contributing factor," *Pittsburgh Crusade*, 964 F.2d at 251. It always understood that the PLRA required it to ask whether crowding was a principal or fundamental or highly important explanation for the constitutional violation.

Moreover, none of appellants' citations provide support for their assertion that a primary cause "must encompass" the concept of "proximate cause." State Br. 31. In *Pittsburgh Crusade*, the Third Circuit was addressing the question of what counts as a "material contributing factor" for purposes of applying a fees statute. In the course of explaining whether a "material contributing factor" is less than "but for" or "proximate" cause, the court pointed to a decision in another case that had explained that a "material contributing factor"

Appellants' contention that Congress intended to heighten a "pre-existing" judicial causation requirement is also misplaced. *See* State Br. 32. Rather, Congress crafted Section 3626(a)(3) as a disapproving response to judicial decrees where courts had ordered the release of prison inmates without first finding that overcrowding had caused any constitutional violation at all. *See, e.g.,* 141 Cong. Rec. S14316 (daily ed. Sept. 26, 1995) (statement of Sen. Spencer Abraham) (criticizing a district court order on these grounds); *Taking Back Our Streets Act of 1995: Hearing Before the Subcommittee on Crime of the Senate Committee on the Judiciary*, S. Hrg. 104-99, 104th Cong. (Jan. 19, 1995) (statement of Philadelphia District Attorney Lynn Abraham) (same). Given this preoccupation with federal courts not making *any* causation findings, it is implausible that Congress legislated against the background of some unstated but preexisting causation requirement.

Even if it had been aware of the few cases appellants cite for this proposition, Congress could not have gleaned from them a settled causation test for issuing PROs. Indeed, two of these cases do not even involve PROs, but instead address a wholly

---

test was also less exacting than a requirement that the plaintiff show that the litigation was "the sole or even the primary cause." But the Third Circuit offered no comparison between "but for" and "proximate" cause on the one hand, and the "sole" or even "primary" cause on the other. 964 F.2d at 251. In *Hawkins*, a black lung disability benefits case, the Seventh Circuit introduced the term "primary cause" as a non-technical contrast to "'simple' contributory cause," and used the term interchangeably with "substantial contributing cause." 907 F.2d at 705.

42

different legal question: prison officials' liability for inmate-on-inmate harms. *See* State Br. 32 (citing *Abrams v. Hunter*, 910 F. Supp. 620, 621 (M.D. Fla. 1995) *aff'd*, 100 F.3d 971 (11th Cir. 1996); *Marsh v. Barry*, 824 F.2d 1139, 1140 (D.C. Cir. 1987)).

b. This Court should also reject appellants' assertion that a factor cannot be "the primary cause" within the meaning of the PLRA unless addressing it is not only necessary, but also sufficient, to cure the constitutional violation. State Br. 30. Appellants suggest that "[i]f overcrowding is the primary cause, then eliminating overcrowding should undo all or virtually all of the constitutional harm." *Id.* Appellants would thereby effectively rewrite the PLRA to require proof that overcrowding is the "sole," rather than simply the "primary," cause of the violation. This Court should reject such a construction, which does not track reality and creates potential constitutional difficulties.

In reality, most complex problems – and certainly unconstitutional prison health care systems – stem from multiple causes that must be addressed before the problem can be fully solved.[15] But even complex problems have a primary cause that must be tackled first. In other words, as long as that "primary cause" persists, not only will solutions to other causes fail to remedy the problem completely, but those solutions will themselves be undermined.

---

[15] Indeed, even proximate causation recognizes multiple sufficient causes such that even if one catalyst were prevented, the same outcome would nevertheless occur. Restatement (Third) of Torts: Phys. & Emot. Harm § 27 (2010).

43

Appellants' suggestion to the contrary threatens absurd results unintended by Congress. Suppose a jurisdiction were to deny some citizens the right to vote because a budget crisis prevented it from operating sufficient polling places and because its antiquated polling machines were subject to mechanical failures. No one would doubt that the budget crisis was the primary cause of the constitutional violation. But under appellants' definition, the budget crisis could not be the "primary cause" because even once the board of elections obtains funds to reopen its polling locations, it will still continue to deny some voters their rights until it also updates its voting equipment. Appellants' reading would lead to similarly absurd results in the context of the PLRA, barring courts from addressing problems that unquestionably pose the biggest obstacles to constitutional relief.

Appellants' interpretation would also raise serious constitutional problems by creating insoluble circularity. Their interpretation presupposes that a court faced with a situation where crowding and some other factor each contribute to the unconstitutional situation can separately address the other factor first, at which point crowding will be the sole remaining cause and thus amenable to a PRO. But it is possible that there will be situations where the other factor *cannot* be addressed absent a response to the crowding. Suppose that a state were to stipulate that (1) as long as its facilities remain overcrowded, conditions within the system would continue to violate the Eighth Amendment, but were to claim (2) that if it were to reduce its population relative to capacity, it could provide constitutionally adequate

44

care by converting five former dormitories into clinics and staffing them. Even then, under appellants' definition, overcrowding would not be "the primary cause" because one additional step is necessary to remedy the violation. Thus, in a case where all agreed that constitutional compliance could not be achieved without a reduction, the State's construction of the PLRA would mean that federal courts would be precluded from ordering relief.

In other words, under appellants' strained interpretation, the PLRA would sometimes bar constitutionally necessary PRO orders altogether, rather than merely make them a "remedy of last resort," as Congress intended. H.R. Rep. No. 104-21, at 25 (1995). To avoid such constitutional insolubility, the Act must be construed to permit courts to order a PRO in situations where, as here, such an order is truly necessary to prevent unabated constitutional violations.

B. **Clear and Convincing Evidence Showed That Overcrowding Is The "Primary Cause" Of The Eighth Amendment Violations In These Cases And That "No Other Relief" Will Remedy These Violations.**

The three-judge court's order setting a 137.5% capacity limitation on California's prison system rests on detailed factfinding following two years of extensive discovery, the submission of several hundred exhibits into evidence, and a fourteen-day trial. The court heard or received testimony from more than fifty witnesses, including four current or former state-level prison administrators, numerous medical and mental health care experts, and frontline

45

providers within the California system. JS1-App. 70a, 81a. This evidence showed to a clear and convincing – indeed, an "overwhelming," *id.* at 140a – degree that overcrowding was the primary cause of ongoing unconstitutional conditions in California prisons, and that no other relief would remedy these violations. *Id.* at 82a, 145a.

This Court should affirm the three-judge court's factual findings unless it is "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948). Notwithstanding appellants' attempt to draw the Court into *de novo* review by quibbling over what the word "primary" means, the question of whether overcrowding is the "primary" (as opposed to a merely "contributory," App. Brief. 32) cause of California's violations is essentially factual. *See, e.g., Easley v. Cromartie,* 532 U.S. 234, 242 (2001) (applying clear error review to a three-judge court's evidentiary determination that race was the predominant motivation for redistricting). So too is the question whether "no other relief" would remedy the constitutional violations, in that answering that question involves a prediction about a factual state of the world. Thus, this Court should defer to the district court's findings on both questions unless those findings are clearly erroneous.

Here, there can be no real reason – let alone a definite and firm conviction – to believe that the three-judge court erroneously found (1) that overcrowding is the "primary cause" of California's unconstitutional prison conditions, and (2) that "no other relief" than a §3626(a)(3) order could rectify its violations.

46

1. Appellants make no attempt to dispute the extensive predicate factual findings that the three-judge court made to support its ultimate finding that overcrowding is at the crux of multiple deficiencies "central to the ongoing violation of California inmates' constitutional right to adequate medical and mental health care." JS1-App. 85a. The court found – and the State does not contest – that California's maintenance of a prison population almost double the design capacity causes the following: (a) unconstitutionally limited access to care; (b) extreme departures in the standard of care; (c) serious delays in the provision of care; and (d) the unnecessary infliction of infectious diseases. *Id.* 85a-118a. At trial, these findings were supported by "clear and convincing" evidence, and defendants presented no credible evidence to the contrary. *Id.* at 141a.

a. *Inadequate access to care.* Because the prison population so exceeds design capacity, California prisons simply lack the space to deliver constitutionally minimal medical and mental health care. The court heard extensive evidence showing a severe shortage of clinical space throughout the system, *id.* at 92a-95a, and found particularly persuasive the *Plata* Receiver's report that "investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily operations." *Id.* at 93a.

The three-judge court also found that space constraints from overcrowding caused a severe shortage of designated beds for inmates in need of mental health services. *Id.* at 97a. As the court

47

noted, "[i]t is not simply the beds themselves that the state does not possess, but the *space in which to place them*." *Id.* (emphasis added). It further found that "new mental health beds cannot be added quickly enough" because "overcrowding has led to a significant, unaddressed demand for mental health services that only becomes more acute over time." *Id.* at 99a. As several expert reports showed, when "inmates are denied necessary mental health placements" because of bed shortages, they "'end[] up in mental health conditions more acute than necessary. *Id.* This creates "a cycle of sicker people being admitted, with greater resources necessary to treat them, which then creates even further backlog in an already overwhelmed system." *Id.* (citing the report of a mental health expert).

The three-judge court also found that overcrowding is the principal barrier to health care access at reception centers for inmates who have yet to be assigned to a CDCR prison. Again, overcrowding erects obstacles to care through a destructive feedback loop: capacity overload at the main prisons results in inmates being held for unusually long periods at the reception centers. *Id.* at 86a. As a result, some reception centers are operating at nearly 300% of design capacity, and must rely on clinical facilities not equipped to handle long-term treatment of chronic conditions even at 100% of capacity. "This severe crowding . . . makes it impossible to provide medical and mental health services to inmates" who are housed without adequate care for extended periods of time. *Id.*

At the same time, the shortage of clinical space "makes it impossible" for California prisons to

48

accommodate additional staff. *Id.* at 106a-107a. The three-judge court cited evidence from a number of chief medical officers that the prisons "would not have sufficient space for clinical staff if all of the clinical positions currently budgeted were filled, let alone if new positions were created and filled." *Id.* (internal citations omitted). Without sufficient staff, California prisons cannot provide sufficient health care, and "[e]very day" must "make the difficult decision" to flout a federal judicial order in one of the many prison conditions cases that have been adjudicated against the California system. *Id.* at 104a-105a (citing the *Plata* Receiver's 2007 Report).

In addition to finding deficient medical staffing, the three-judge panel found that correctional staff cannot fully perform their duties to facilitate health care because of overcrowded conditions. Not only are there insufficient custodial staff, but overcrowding prevents existing staff from identifying medical needs and responding in a timely fashion. *Id.* at 111a-112a.

b. *Extreme departures from the standard of care.* Even when inmates are able to access care, the court found that overcrowding frequently results in grossly inadequate care. Extreme departures from the standard of care begin at intake facilities, where space shortages prevent prisons from properly screening newly admitted inmates. *Id.* at 88a (citing expert testimony describing intake rooms so small that it is "very difficult if not impossible to perform an actual physical examination"). As a result, inmates' health conditions may be misdiagnosed, or missed entirely. *Id.* at 89a. Experts also testified that overcrowding "makes it impossible" for California's prisons to manage medical records, which

49

further compromises care. *Id.* at 121a; *see also id.* at 119a-121a.

In addition, the court found that overcrowding leads to inadequate medication delivery. *Id.* at 112a. Numerous witnesses testified that because of overcrowding, "there are more patients requiring medications than the prison has the resources or staffing to address." *Id.* As a result, correctional officers have witnessed prisoners receiving their medication late, not at all, or may even receive the wrong medication. *Id.* (citing 4 Tr. 670-73 (testimony of Correctional Officer Deborah Rowlett) (describing the improper administration of medicine caused by overcrowding)). Though more staffing would obviously reduce the chance of errors and alleviate burdens on existing staff, the court expressly rejected the idea that more clinical staff could fit into the existing space. JS1-App. 107a.

c. *Serious delays in the provision of care.* On top of these problems, the three-judge court also found that overcrowding "engenders a state of perpetual crisis" that seriously delays the provision of care and contributes to an "unacceptably high" number of preventable deaths. JS1-App. 116a, 123a. In particular, overcrowding in California's prisons substantially increases the use of lockdowns to control prison populations, thus delaying the provision of medical care. *Id.* at 116a. When a prison is in lockdown, correctional officers must escort prisoners individually to and from clinic areas. *Id.* at 117a. Thus, delays in access to care are particularly "acute" during lockdowns because prisons are not sufficiently staffed to safely deliver care in this manner. *Id.* at 116a-117a.

d. *Infectious diseases.* Finally, the three-judge court credited the testimony of multiple experts regarding the relationship between crowding and disease, such as staph infections and tuberculosis. For example, Scott Kernan, then the Chief Deputy Secretary of the Division of Adult Institutions for the CDCR, testified that overcrowded housing conditions led directly to the increased spread of infectious diseases, JS1-App. 102a, that further overloaded the already constitutionally inadequate health care system. The three-judge court thus found that, "[u]ntil CDCR reduces its population, it will remain highly vulnerable to outbreaks of communicable diseases." *Id.*

2. After concluding that overcrowding is the primary cause of the ongoing health care violation in California's prisons, the three-judge panel correctly found that no relief other than a capacity limitation would remedy that violation. The court relied on multiple experts' conclusions that "the only avenue for building a constitutional health care delivery system is to reduce the demand on the system by lowering the number of patients it serves" within the existing facilities. JS1-App. 164a (citing Dr. Ronald Shansky); *see also, e.g., id.* (citing defendant-intervenors' expert Dr. David Bennett agreeing that "the necessary constitutional medical and mental health care services can't be provided with today's overcrowding").

Because overcrowding is clearly the first-order cause of the problems described above, every other feature of a comprehensive remedy for the unconstitutional conditions "depend[s] upon a reduction in prison overcrowding for [its] success."

JS1-App. 168a. After thoroughly canvassing the evidence, the three-judge court found that limiting capacity is "the only way to create an environment in which other reform efforts, including strengthening medical management, hiring additional medical and custody staffing, and improving medical records and tracking systems, can take root in the foreseeable future." *Id.* Because the clear and convincing evidence supported this conclusion, the three-judge court properly found that "no other relief" would suffice to solve the Constitutional violation. *Id.* at 145a.

3. Appellants suggest that the three-judge court's findings are tainted by reliance on stale evidence. That criticism is incorrect. The three-judge court based its findings on evidence of the State's ongoing failure to remedy admitted Eighth Amendment violations.

That those violations persisted up through the time the three-judge court was convened cannot be seriously disputed. In their separate orders granting appellee's motions to convene the three-judge panel, the *Plata* and *Coleman* single-judge courts both found – *without objection from appellants* – that the constitutional violations were ongoing. JS1-App. 77a.

The three-judge court fully understood the current conditions in California's prisons because both sides presented up-to-date evidence throughout the three-judge court proceedings.[16]   Appellants'

---

[16] Appellants and their *amici* contend at various points that the three-judge court should have re-adjudicated whether the underlying Eighth Amendment violations were continuing. *See,*

contention to the contrary misstates the record. As the *Plata* appellees' brief describes in detail, *Plata* App. Br. 37, the State's own experts testified at length about current conditions, having toured the prisons only a few weeks before trial. The State also introduced current data on prison health and staffing levels, as well as detailed reports on current conditions from the *Coleman* Special Master and *Plata* Receiver. JS1-App. 77a. Thus, although the three-judge court properly adhered to its remedial role in refusing to re-adjudicate the predicate constitutional violations already found by the single-judge district courts, it clearly considered the current state of the violations in deciding that overcrowding

---

*e.g.*, State Br. 27; CJLR Br. 6 (arguing that "the three-judge District Court had jurisdiction over the whole case").

These arguments are misplaced. Unlike other statutory provisions for convening three-judge panels, the PLRA grants the three-judge court authority only to enter a prisoner release order. *See* Comment, *Coleman v. Schwarzenegger*, 123 Harv. L. Rev. 752, 757 (2010) ("Although the statute does not explicitly require that three-judge courts limit themselves to the consideration of prisoner release orders, the statute's separation of prisoner release orders from other remedial stages implies such a limitation.").

This Court also has articulated strong reasons why a limited role for three-judge courts promotes judicial economy. *See Swift & Co. v. Wickham*, 382 U.S. 111, 124 (1965) (placing additional issues before a three-judge court "'not only expands this Court's obligatory jurisdiction but contradicts the dominant principle of having this Court review decisions only after they have gone through two judicial sieves.'" (quoting *Fla. Lime & Avocado Growers, Inc. v. Jacobsen*, 362 U.S. 73, 92-93 (1960) (Frankfurter, J., dissenting))).

---

was the "primary cause" and that "no other relief" would suffice to remedy them.[17]

## III. The Three-Judge Court Properly Imposed The 137.5% Capacity Limitation.

Once the three-judge court found that overcrowding in California's prisons was "the primary cause" of ongoing constitutional violations that could not be remedied by other forms of relief, it was required to respond to the overcrowding. *See* 18 U.S.C. § 3626(a)(3)(E) (listing the circumstances under which prisoner release orders can be entered). The court responded by entering an order determining the level of design capacity that could be maintained consistent with the State's constitutional obligations. Correctional experts offered the court an array of possibilities, ranging from 90% to 145% of design capacity. JS1-App. 178a-181a. The former

---

[17] Even if this Court were to determine that it was within the power of the three-judge court to reconsider decisions of the single-judge district courts, the three-judge court would not be compelled to do so and could instead, "pass [any] claim back to the single judge." *Hagans v. Lavine*, 415 U.S. 528, 544 (1974). *Amicus curiae* CJLF's citation of a sentencing decision is inapposite. *See* CJLF Br. 10. A judge's failure to recognize discretion in sentencing affects a defendant's substantive rights. In this case, any decision by the three-judge panel declining to exercise such discretion deprives the State of nothing since the single-judge courts retained their jurisdiction over all other matters except the issuance of a PRO.

Finally, CJLF plainly misinterprets § 2284(b)(3), which states only that a member of a three-judge court may review actions of single-judge courts in his or her capacity as a member of the panel. *See Eastern States Petroleum Corp. v. Rogers*, 265 F.2d 593, 597 (D.C. Cir. 1959) ("the expression 'single judge' [in § 2284] refers to a single judge of a three-judge court").

54

Secretary of the CDCR, Jeanne Woodford, concluded, based on her own experience managing California's prison system, that a 5% vacancy rate is necessary to providing adequate care. *Id.* at 178a. Joseph Lehman, the former head of corrections in Pennsylvania, Washington, and Maine, explained that since the health care facilities at California's prisons were not designed to provide care for more than the number of inmates at 100% design capacity, they would not be able to provide required health care services much beyond that level. *Id.* at 177a. The *Coleman* and *Plata* appellees presented evidence that constitutional compliance required a population of no more than 130% of capacity. *Id.* at 179a-180a. Finally, the State's Corrections Independent Review Panel (CIRP) concluded that 145% was the operable limit for California's prisons. *Id.* at 181a.

By contrast, appellants declined to provide any number at all (or any constitutionally adequate alternative to setting a number). *Id.* at 175a. Nor did they offer any guidance as to how the three-judge court might independently derive a capacity limit.

The three-judge court weighed the evidence before it and adopted a capacity limitation number near the top of the range offered to it, selecting a percentage equidistant from the figure proposed by the CIRP and the figure proposed by the plaintiffs. *Id.* at 184a. The three-judge court carefully considered the bases for the various proposals. For example, the CIRP's 145% figure rested on the overall functioning of the prison system without regard to the attainment of constitutionally adequate medical and mental-health services. *Id.* at 182a. Thus, the three-judge court concluded that a downward

55

adjustment would be appropriate given that the onl question pending before it was what level of capacit would be necessary to remedy the constitutiona violations with respect to health care. *Id.* (citing D Pablo Stewart for the proposition that 145° represented the maximum functional capacit without regard to ensuring constitutionally adequat care).

To be sure, the three-judge court had to exercis some judgment in selecting the precise capacity limi But it was clearly appropriate for it to impose *som* numerical restriction. The number it set wa narrowly tailored to the constitutional violation give the expert testimony upon which it relied, an therefore satisfies the PLRA's nexus requirement.

This capacity cap was narrowly tailored to cur the constitutional violations because any alternativ mechanism for achieving constitutional complianc would actually be far more intrusive on the State' control over its prison system. Specifically, th 137.5% capacity order avoided the need for federa judges to make more intrusive decisions, such a orders transferring individual prisoners to particula facilities, determining the custody conditions fo individual inmates, or ordering the actual release c specific prisoners.

The 137.5% capacity order, by contrast, leave control over the day-to-day management of the priso system to the State. The State retains discretion t determine whether to achieve compliance by reducin sentences, diverting technical parole violators t noncustodial settings, increasing good time credit building more prisons to increase the overall capacit

as to which the 137.5% figure applies, or adopting other mechanisms that will have similar effects.[18]

## A. In Setting The 137.5% Capacity Limit, The Three-Judge Court Gave The Appropriate Weight To Public Safety Concerns.

As Peace Officers of the State of California, the members of CCPOA are first and foremost concerned with law enforcement and public safety. Correctional officers confront daily the sobering realities of California's overcrowded prisons and the dangers they pose. CCPOA would not have taken the extraordinary step of intervening in this litigation if it did not recognize the real threat to the public and correctional officers caused by overcrowding.

Even the Governor has acknowledged that reductions in the prison population are necessary to address "substantial risk to the health and safety of CDCR staff [and] inmates." Plaintiffs' Tr. Exh. 1 at 2. It is at best hypocritical for the State to argue before this Court that the three-judge court inadequately considered public safety interests while asserting elsewhere that similar reductions of tens of

---

[18] Even within this 137.5% capacity limit, the State may be required to initiate other policy changes to achieve constitutional compliance. (That is, the capacity cap is only one component of providing constitutionally adequate care.) In particular, current (and in some cases, enhanced) levels of correctional staffing will be required to ensure that even a less-overcrowded system can provide sufficient security and medical assistance to inmates. While the three-judge court found additional staffing alone could not resolve the constitutional deficiencies, it found that adequate staff are required to provide sufficient monitoring and "deliver[y]" of "inmates for necessary care." JS1-App. 112a.

thousands of inmates are necessary to protecting public safety. *Id.*; *see also Plata* D.E. 2258.

In the course of crafting its capacity order the three-judge court heard nearly ten days of witness testimony and reviewed hundreds of exhibits specifically on the issue of public safety. JS1-App. 185a. In assessing this evidence, the court looked to evidence generated completely independent of this litigation, such as state reports examining different means for population reduction. *Id.* After considering all of this evidence, the court found that its capacity limit order would have "no adverse effect" on public safety. *Id.* at 234a. It further found that even if it were in error about there being no adverse effect, any such effect "would be small." *Id.* This conclusion was supported by the evidence, and the State has provided no credible evidence to undermine it.

First, while the State continues to claim that a reduction of the size required by the capacity limit order cannot be accomplished without adversely impacting public safety, this assertion is undermined by the fact that the State itself has separately offered numerous proposals to achieve similar reductions even without a court order. *Id.* at 197a (discussing the Governor's proposed expansion of good time credits); *id.* at 209a (discussing the proposal of the Governor's Rehabilitation Strike Team to divert technical parole violators); *id.* at 219a (discussing the Governor's proposal to adjust the threshold value at which property crimes constitute felonies). The three-judge court properly discounted the State's assertions in light of this contradiction and credited evidence that a variety of these reforms could be

58

achieved without an adverse impact on public safety. *Id.* at 185a-254a.

More fundamentally, as discussed above, the prison capacity limit imposes no absolute cap on the number of inmates that California may incarcerate. The State always retains the option of increasing the denominator (capacity) in order to avoid decreasing the numerator (prisoners).

The three-judge court recognized that criminal justice and public safety are central concerns of the State, and it therefore deferred to the State's expertise as much as possible. In crafting an order that left the implementation decisions to the State, the three-judge court avoided the need to parse through each of the State's proposed reduction methods to assess the public safety effects. Instead, it left to the State the task of reaching the population limit in the way most consistent with protecting public safety and with California's priorities.

To support its claim that a capacity limit will adversely impact public safety, the State cites its own assertion in the version of its plan ultimately accepted by the court that it could not accomplish the goals of that plan without compromising public safety. State Br. 54. But such an unsupported assertion cannot be sufficient to preclude a PRO. If it were, then it is difficult to conceive of any instance where one could be authorized over a state's objection. Given that Congress explicitly provides for PROs within the PLRA, this Court should not embrace an interpretation of the Act which gives states veto power over congressionally-authorized remedies.

59

**B. Federal Law Provides Sufficient Avenue For Obtaining Modifications Of The 137.5% Capacity Cap If Changed Circumstance S Require.**

Appellants and their *amici* have argued that thi Court should determine whether the capacity limi remains appropriate today in light of purporte developments occurring since it was entered. CCPO has already explained why, under the PLRA, neithe the three-judge court nor this Court should revisit th existence of an ongoing constitutional violation. Bu even if recent developments warranted revisiting th details of the order in this case, federal law provide an adequate path for appellants to seek such relief.

As an initial matter, Fed. R. Civ. P. 60(b)(5) set out the general mechanism for seeking relief from ai injunction such as a PRO. The PLRA expressl contemplates the availability of Rule 60(b)(5) relief *See* 18 U.S.C. § 3626(b)(4). Moreover, the PLR/ additionally provides separate and more expansiv authorization for periodic review of existin injunctions. *See id.* § 3626(b)(1). Those mechanism – rather than plenary review by this Court, includin evaluation of new evidence in the first instance – ar what Congress intended as the appropriate avenue to seek revisions to a PRO, if such revisions wer required by changed circumstances. Moreover, onc the State has remedied the Eighth Amendmen violations at the core of this case, it may then mov for complete termination of injunctive relief unde either of these avenues.

60

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

Daniel M. Lindsay
David A. Sanders
CALIFORNIA
  CORRECTIONAL PEACE
  OFFICERS' ASSOCIATION
755 Riverpoint Drive
Suite 200
West Sacramento, CA
95605

Laurie J. Hepler
  *Counsel of Record*
Gregg McLean Adam
Gonzalo C. Martinez
CARROLL, BURDICK &
  MCDONOUGH LLP
44 Montgomery Street
Suite 400
San Francisco, CA 94104
(415) 989-5900
LHepler@cbmlaw.com

Jeffrey L. Fisher
Pamela S. Karlan
STANFORD LAW SCHOOL
  SUPREME COURT
  LITIGATION CLINIC
559 Nathan Abbott Way
Stanford, CA 94305

October 25, 2010