```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF CALIFORNIA
 2                          --oOo--

 3   RALPH COLEMAN, ET AL,        ) Docket No. 90-CV-520
                                  ) Sacramento, California
 4                  Plaintiffs,   ) May 1, 2020
                                  ) 9:09 a.m.
 5             v.                 )
                                  )
 6   GAVIN NEWSOM, ET AL.,        ) Re: Telephonic status conference
                                  )
 7                  Defendants.   )

 8                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE KIMBERLY J. MUELLER
 9                  UNITED STATES DISTRICT JUDGE

10   APPEARANCES (telephonic):

11   For the Plaintiffs:     ROSEN BIEN GALVAN & GRUNFELD, LLP by
                             MR. MICHAEL BIEN
12                           MS. ADRIENNE ELLS
                             50 Fremont Street, 19th Floor
13                           San Francisco, CA 94105

14                           MS. JESSICA WINTER
                             MR. MARC J. SHINN-KRANTZ
15                           MS. CARA E. TRAPANI
                             100 Mission Street, Sixth Floor
16                           San Francisco, CA 94105

17                           PRISON LAW OFFICE by
                             MR. DONALD SPECTER
18                           MR. STEVE FAMA
                             1917 Fifth Street
19                           Berkeley, CA 94710

20        (Appearances continued next page.)

21                  JENNIFER COULTHARD, RMR, CRR
                       Official Court Reporter
22                     501 I Street, Suite 4-200
                        Sacramento, CA 95814
23                     jenrmrcrr2@gmail.com
                          (530)537-9312

24

25          Mechanical Steno - Computer-Aided Transcription
```

```
 1    APPEARANCES (Cont'd)

 2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL by
                                MR. KYLE ANTHONY LEWIS
 3                              MR. ADRIANO HRVATIN
                                MS. ELISE THORN
 4                              455 Golden Gate Avenue, Suite 11000
                                San Francisco, CA 94102
 5
                                OFFICE OF THE ATTORNEY GENERAL by
 6                              MR. TYLER HEATH
                                MR. LUCAS L. HENNES
 7                              1300 I Street, Suite 125
                                Sacramento, CA 94244
 8
                                ROBINS KAPLAN, LLP
 9                              MR. ROMAN SILBERFELD
                                2049 Century Park East, Suite 3400
10                              Los Angeles, CA 90067

11    Also Present:            DIANA TOCHE,
                                Undersecretary of Health, CDCR
12                              ALISON HARDY
                                Plaintiff's class counsel in Plata
13                              JENNIFER NEILL
                                Assistant Secretary/Chief Counsel, CDCR
14                              JOSEPH BICK, M.D.,
                                Director, Health Services, CDCR
15                              MELISSA BENTZ
                                Legal Affairs, CDCR
16                              NICK WEBER,
                                Legal Affairs, CDCR
17                              STEPHANIE CLENDENIN,
                                Director, DSH
18                              CHRISTINE CICCOTTI,
                                General Counsel, DSH
19                              CHRISTOPHER KENT
                                General Counsel, DSH
20                              ANTONINA RADDATZ
                                General Counsel, DSH
21                              JAMES SPURLING
                                General Chief Counsel, OIG
22                              GREGG ADAM
                                Counsel for CCPOA
23                              DAVID SANDERS
                                Counsel for CCPOA
24                              MATTHEW LOPES
                                Special Master
25                              MOHAMEDU JONES
                                Special Master Team
```

```
1    APPEARANCES (Cont'd)

2    Also Present:            KERRY WALSH
                              Special Master Team
3                             KRISTINA HECTOR
                              Special Master Team
4                             JEFF METZNER, M.D.
                              Special Master Team
5                             KERRY HUGHES, M.D.
                              Special Master Team
6                             HENRY DLUGACZ
                              Special Master Team
7                             HAVEN GRACY
                              Law Clerk for Chief Judge Mueller
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, FRIDAY, MAY 1, 2020

2                              --oOo--

3      (In open court.)

4          THE COURT:  Good morning.  This is Judge Mueller.  Is

5 everyone hearing me?

6          THE CLERK:  Yes, Your Honor.

7          THE COURT:  All right.  And the court reporter is

8 present and able to hear?

9          COURT REPORTER:  Yes, Your Honor.

10         THE COURT:  All right.  Ms. Schultz, could you please

11 call the matter.

12         THE CLERK:  Yes, Your Honor.  The United States

13 District Court for the Eastern District of California is now in

14 session.  Chief Judge Kimberly J. Mueller now presiding.

15         Calling civil case 90-520, Coleman, et al. v. Newsom,

16 et al.  This is on for a further telephonic status conference.

17         THE COURT:  All right.  The Court will call role, as

18 it has in the past.  First, for plaintiffs, Michael Bien?

19         MR. BIEN:  Good morning, Your Honor.

20         THE COURT:  Lisa Ells?

21         MS. ELLS:  Good morning, Your Honor.

22         THE COURT:  Jessica Winter?

23         MS. WINTER:  Yes, Your Honor.  Good morning.

24         THE COURT:  Marc Shinn-Krantz.

25         MR. SHINN-KRANTZ:  Present, Your Honor.  Good morning.

1          THE COURT:  Cara Trapani?

2          MS. TRAPANI:  Good morning, Your Honor.

3          THE COURT:  Donald Specter?

4          MR. SPECTER:  Present, Your Honor.

5          THE COURT:  Steven Fama.

6          MR. FAMA:  Good morning, Your Honor.

7          THE COURT:  All right.  Is there anyone else appearing

8   as counsel for plaintiffs, Mr. Bien?

9          MR. BIEN:  No, Your Honor.  Well, Alison Hardy may

10  appear.  Sorry.

11          Oh, okay.  I'm sorry Alison Hardy.

12          THE COURT:  Okay.  Is Alison Hardy appearing as class

13  counsel in Plata?

14          MS. HARDY:  Yes, Your Honor.  This is Alison Hardy

15  appearing as class counsel in Plata.

16          THE COURT:  All right.  Your presence is noted.  For

17  the defendants, Kyle Lewis?

18          MR. LEWIS:  Good morning, Your Honor.

19          THE COURT:  Roman Silberfeld.

20          MR. SILBERFELD:  Good morning, Your Honor.

21          THE COURT:  Andriano Hrvatin.

22          MR. HRVATIN:  Present, Your Honor.

23          THE COURT:  Elise Thorn.

24          MS. THORN:  Present.

25          THE COURT:  Tyler Heath?

1          MR. HEATH:  Good morning, Your Honor.

2          THE COURT:  And Lucas Hennes?

3          MR. HENNIS:  Present, Your Honor.  Good morning.

4          THE COURT:  All right.  Is anyone else appearing as

5     counsel for defendants, Mr. Lewis?

6          MR. LEWIS:  No, Your Honor.

7          THE COURT:  All right.  Also present as a party or

8     otherwise affiliated with a party or intervenor, Diana Toche,

9     undersecretary of health services for CDCR?

10          MS. TOCHE:  Good morning, Your Honor.

11          THE COURT:  Jennifer Neill, chief counsel CDCR?

12          MS. NEILL:  Yes.  Good morning, Your Honor.

13          THE COURT:  Dr. Joseph Bick, health services director

14     CDCR?

15          MR. BICK:  Present, Your Honor.

16          THE COURT:  Melissa Bentz legal affairs CDCR.

17          MS. BENTZ:  Present, Your Honor.

18          THE COURT:  Nick Weber, legal affairs CDCR?

19          MR. WEBER:  Good morning Your Honor.

20          THE COURT:  Stephanie Clendenin, director of

21     Department of State Hospitals.

22          MS. CLENDENIN:  Good morning, Your Honor.

23          THE COURT:  Christine Ciccotti, general counsel

24     Department of State Hospitals.

25          MS. CICCOTTI:  Good morning, Your Honor.

1          THE COURT:  Christopher Kent, also general counsel.

2          MR. KENT:  Yes.  Good morning, Your Honor.

3          THE COURT:  And Antonina Raddatz, general counsel DSH.

4          MS. RADDATZ:  Good morning, Your Honor.

5          THE COURT:  I also believe that James Spurling,

6   general chief counsel for the Office of Inspector General is --

7          MR. SPURLING:  Good morning --

8          THE COURT:  -- present.

9          MR. SPURLING:  Good morning, Your Honor.

10         THE COURT:  All right.  Good morning to you.

11         And for CCPOA, also an intervenor, Gregg Adam,

12  counsel.

13         MR. ADAMS:  Yes.  Good morning, Your Honor.

14         THE COURT:  And David Sanders.

15         MR. SANDERS:  Yes.  Good morning, Your Honor.

16         THE COURT:  All right.  The Special Master, Matthew

17  Lopes is appearing.

18         MR. LOPES:  I'm here, Your Honor.

19         THE COURT:  Could you please identify the numbers of

20  your team who are on the line?

21         MR. LOPES:  Yes, Your Honor.  Mohamedu Jones, Kerry

22  Walsh, Kristina Hector, Jeffrey Metzner, Kerry Hughes, and

23  Henry Dlugacz are on the phone as well.

24         THE COURT:  All right.  Good morning to all of you.

25  Thank you.

1          And the Court's law clerk is on the phone line, Haven

2     Gracy.  Is there anyone else appearing or present as a party or

3     intervenor?  If so, please identify yourselves now.

4          All right.  The ground rules remain in effect.  Mute

5     if you're not speaking.

6          I'm going to first ask the special master to provide a

7     report.  While the Court is inclined to move on and talk about

8     Coleman generally, separate and apart from COVID-19, the first

9     item of business remains an update on the impact of COVID-19 on

10    the Coleman class.

11         I know the special master, with the parties, have

12    engaged in many task force meetings continuing up until

13    yesterday, so I'd like him to provide a report at this point

14    focused on that aspect of this case and then we'll -- we will

15    move on to the other agenda items.  So Special Master Lopes.

16         MR. LOPES:  Thank you, Your Honor.  Two formal task

17    force meetings were held between April 17th and April 30th.

18    The task force meetings included plaintiff, defendant, members

19    from my team, the Armstrong expert and representatives from the

20    receiver's office.  In order to address issues that did not

21    require the full complement of attendees, more focused task

22    force meetings have also been scheduled, as they have in the

23    past.

24         During the same time frame three separate workgroup

25    meetings were held, two with the Coleman expert and the CDCR

1   clinicians and one with members from my team, CDCR

2   representatives and plaintiff's counsel.

3       The workgroups were designed to address specific and

4   limited issues, which can then be brought to the entire task

5   force, if necessary.

6       So the task force meetings were held on 4/23 and 4/30.

7   The CDCR workgroups met on 4/24, 4/27 and 4/30/2020.

8       Approximately 460 inmates have been moved into dorms

9   and out of other dorms to reduce the population -- the dorm

10  population, excuse me, and allow for increased physical

11  distancing.  Some of these moves involved moving inmates to

12  different institutions.  Other inmates remained in the same

13  institution but were moved to other locations, such as

14  gymnasium.

15      CDCR created cohorts.  Another term would have been

16  "households," usually consisting of 8 inmates in gymnasiums and

17  dorms to promote physical distancing.  At night each cohort is

18  separated by 6 feet from other cohorts, but during the day

19  social distancing is the responsibility of the inmates.

20      I've learned indirectly that the California

21  Institution for Men had erected tents for inmates to increase

22  physical distancing.  I have asked the defendant to update me

23  at a time about any mission changes or bed changes that may

24  occur.  We have regularly scheduled mission change calls, but

25  because of the epidemic crisis that is before us, those mission

1    change calls have been postponed.

2         The task force going forward will convene weekly on

3    Tuesdays and the mental health workgroup will continue to meet

4    every Friday, or more often, as new issues arise.

5         We will also start workgroup meetings with the DSH

6    defendants to analyze transfers, projections and other issues

7    involving DSH.

8         The task force is working on a stipulation which will

9    identify provisions within Defendant's COVID-19 plan, which

10   represents specific departures from the program guide

11   provisions for the treatment of mentally ill inmates.

12        The parties were not able to finalize the stipulation

13   prior to the status conference and they will -- they have

14   sought permission to file that stipulation on or before May

15   15th if the Court approves the extension requested -- the

16   extension request.  Excuse me.

17        The parties are formulating a process to analyze data

18   regarding Coleman class members with COVID-19 risk factors and

19   to analyze the location of their housing and social/physical

20   distancing.

21        It was reported that by the end of the day yesterday,

22   six patients should have transferred to DSH.  And each week in

23   advance of task force meetings, DSH defendants, accompanied by

24   CDCR, will provide specific data regarding referrals,

25   transfers, rejections and discharges of Coleman patients.  And

1  the Coleman experts will now be included in the review process

2  of patients referred to DSH.

3            It has been reported to me, Your Honor, that CDCR may

4  accept admission from the counties again at the end of the

5  month.  If that is to occur, I would recommend that the Court

6  require me to participate in the planning process and that the

7  defendant report on the same in subsequent status conferences.

8            I have asked Dr. Jody Rich to advise me and the Court

9  on a pro rata basis regarding infectious disease and public

10  health issues.  Dr. Rich is a professor of medicine and

11  epidemiology at the Warren Alpert School at Brown University

12  here in Rhode Island.  He has been a practicing infectious

13  disease specialist since 1994 and is an expert in public health

14  as well.

15            Your Honor, one last thing.  I believe that the Court

16  ordered that status conferences should occur every three weeks.

17  And I, in fact, thought that that was the best way to proceed.

18  But given the sheer volume of activities that will occur in

19  upcoming task force meetings, I've had a change of heart, if

20  you will, and I respectfully request that the Court consider

21  having status conferences every two weeks so that the good work

22  that is being performed can be reported to the Court and we can

23  grapple with issues to identify the problems or corrective

24  measures to identify problems more quickly.  That's my report,

25  Your Honor.

1        THE COURT:  So taking questions before I ask each

2    party and I will also ask the intervenors if they have any

3    statement to make.  But first, is it your position, Special

4    Master Lopes, that the mission change calls should resume and,

5    if so, immediately, or what's your understanding of the plan in

6    that regard?

7        MR. LOPES:  The mission change calls are regularly

8    scheduled calls where we tackle all changes that are occurring

9    or about to occur, and it's usually a thoughtful conversation

10   that occurs on every one of those calls.

11       But just simply because of the nature of all the other

12   things that we've been working on, it just made sense to, I

13   think -- at least to me and the parties that we suspend some of

14   those or reschedule some of those meetings.  And we rescheduled

15   at least one meeting recently, and it may have been that on

16   that call the defendants would have shared with me a full

17   description of their plan to erect tents at CIM.  I'm just not

18   sure.  So it's through no one's fault that we've decided to

19   suspend some of those meetings just simply because we have so

20   many other task force activities that are taking place.

21       THE COURT:  On that issue, I would direct the special

22   master to work with the parties to either resume mission change

23   calls or integrate the agenda items of those calls into task

24   force meetings to ensure that nothing falls through the cracks.

25   Does that work for you, Mr. Lopes?

1          MR. LOPES:  It does, Your Honor.

2          THE COURT:  All right.  To the extent the special

3    master has informed me of the parties' request for additional

4    time to file a stipulation with respect to the temporary

5    modifications to the program guide with a stip available --

6    with a stip to be filed now by May 15th, the Court would

7    approve that stipulation subject to the parties submitting a

8    short proposed order.

9          The parties should not assume, nor the special master,

10   that the Court's a rubber stamp.  I will need to review

11   carefully what the parties are proposing.  But they may have

12   additional time up to May 15th to prepare a stipulation.

13         When I hear from the parties, please let me know if

14   you have any objection to the infectious diseases expert the

15   special master has identified, Dr. Rich, with the understanding

16   that at this point he is offering his services on a pro bono

17   basis.

18         The Court has not spoken to Dr. Rich, but with the

19   understanding that he said no objection he would become a

20   member of the team, I may, in fact, hear from him.

21         In terms of the county admissions, if the defendants

22   have an update on county admissions, please let me know in your

23   report.  If anyone has any objection to my ordering the special

24   master to participate in any discussions regarding how those

25   are affected, please let me know.

1          On the number of transfers completed, 460, Special

2     Master Lopes I understand that that is not the Coleman class

3     alone.   That's CDCR population as a whole; is that correct?

4          MR. LOPES:   That's my understanding, Your Honor.

5          THE COURT:   All right.   So the Court has that

6     understanding.   If I'm incorrect in that respect, please let me

7     know.

8          And finally, in their remarks to the Court if the

9     parties can let the Court know their positions regarding

10    whether or not we should adjust the schedule for these statuses

11    to every two weeks to the extent there are check-ins on the

12    ongoing effects of COVID-19 on the Coleman class.

13         So with those questions and comments, I would turn

14    first to the parties.   And in this case I note that Mr. Specter

15    filed a copy of a Plata joint status report on the Court's

16    docket, so I'm going to acknowledge both Mr. Bien and

17    Mr. Specter to make statements on behalf of the plaintiff class

18    here in any order they choose.

19         MR. BIEN:   Thank you, Your Honor.   Let me just start

20    off, it's Michael Bien.   First, Your Honor, we agree with the

21    special master's recommendations to add Dr. Rich to his team,

22    to increase the frequency of status conferences to every two

23    weeks and for him to participate in the planning for any

24    reopening of CDCR to new admissions.

25         I do think that the number of transfers that Special

1    Master Lopes reported is incorrect and that perhaps CDCR

2    counsel will correct that.  I think it's been closer to a total

3    of 2000 people who have been transferred from one place to

4    another in an effort to create social distancing in the dorms,

5    and that is not limited to Coleman class members, Your Honor.

6            THE COURT:  And just so I'm clear, does that number,

7    Mr. Bien, your understanding is subject to the defendant's

8    correction, so that's transfers, not released?

9            MR. BIEN:  No.  These are internal transfers within

10   prisons done over the last several weeks.  I think the number

11   that the special master reported was the last phase.  It was

12   just done in the last couple of days, not the total number of

13   transfers.

14           THE COURT:  All right.  Thank you.

15           MR. BIEN:  And I'm going to turn it over to

16   Mr. Specter to talk about some developments that occurred in

17   the Plata case, including the CMC filing and subsequent

18   measures that have occurred.

19           THE COURT:  All right.  Mr. Specter?

20           MR. SPECTER:  Thank you, Your Honor.

21           Before I get to that, I would just want to add our

22   support for Dr. Rich as an expert and assisting the special

23   master.  In additional to the qualifications that Special

24   Master Lopes mentioned, Mr. Rich has -- my understanding is

25   that Dr. Rich has been working in the Rhode Island prison

1    system for decades.  So with that, I will discuss the social

2    distancing transfers that Mr. Lopes and Mr. Bien have been

3    discussing.

4         So just some background, Your Honor, about our

5    understanding or my understanding of how this occurred.  The

6    receiver, Mr. Kelso, issued a memorandum I believe with the

7    signature or to the CDCR suggesting that there be -- people in

8    the dorms be separated into cohorts of 8 persons and that each

9    cohort be separated by 6 feet to create social distancing.

10   That guidance or direction was undertaken by the CDCR and, as

11   has been described, thousands of people have been moved from

12   one dormitory to another to accomplish that goal.

13        It's important to understand that the receiver's

14   direction was not accompanied by any criteria or guideline in

15   terms of once the transfers occurred and once the dorms were

16   set up to align with the cohorts how social distancing was

17   going to be maintained at all.  So between -- not necessarily

18   between the people in the cohort but between people who are in

19   the cohort and other cohorts or other staff members.

20        And also, there were no guidelines or there are still

21   no established policies, to my knowledge, on how the social

22   distancing is going to be maintained while the people who are

23   living in these dormitories are programmed, which means how

24   they are going to use the dayroom, how they're going to use the

25   showers, the bathrooms and other features of normal prison

1   life.

2          The second thing is that these cohorts -- the

3   transfers were made not based on medical necessity and, in

4   fact, as I understand it, the transfers were not based -- well,

5   as I understand it, if the receiver categorized people --

6   patients as medically high risk, they were not to be moved at

7   all.  So the people who are living in dormitories, the patients

8   who are living in dormitories who have been designated by the

9   receiver as high risk are still living in the same dormitories

10  and we are concerned about their safety, given that these

11  people, many of whom I believe are Coleman class members, are

12  at the greatest risk for transmission of the disease.

13          So one of the main problems with the way that this has

14  been implemented by the CDCR is that, to my knowledge, there's

15  not -- there's, to this day, still not a written policy about

16  how these cohorts are to manage their daily lives; secondly --

17  in terms of interacting with other people; secondly, it's my

18  understanding that the staff do not change -- the staffing

19  patterns have not been changed to be consistent with the

20  cohorts, meaning that different staff will interact with the

21  people in the cohorts.

22          And as I'm sure the Court is aware, the fact that

23  there are many people who -- many staff members who have tested

24  positive, not all staff are tested so that we don't know

25  whether a staff member who is contagious and asymptomatic is

1   mixing with people who are in these cohorts and especially

2   mixing with people who are medically high risk for this

3   infection.  Therefore, we are very concerned that the transfers

4   that took place have not really alleviated the goal of social

5   distancing because I believe the concept of the cohorts was to

6   create a structure similar to what the shelter-in-place

7   structure is in the free community, which is people's

8   households.  They're supposed to remain isolated from other

9   people's households.  But in this case, and as we understand

10  it, the cohorts are mainly isolated when people are in their

11  bunks, not when they are out and about in the prison system.

12       We do understand that the CDCR has been verbally

13  directing the wardens and their staff to maintain certain

14  hygiene features and to limit the number of people that go into

15  the dayroom.  However, from our conversations in the task force

16  meeting yesterday, I'm very concerned about even that not

17  happening because, essentially, there's no method of

18  accountability for determining whether even those practices are

19  occurring or really understanding exactly what the specific

20  policies are.

21       So we are concerned that the transfers that did occur

22  leave the medically high risk people still at virtually the

23  same risk that they were in before.  And we're also concerned

24  that the people that have been transferred and are in the

25  cohorts are not being protected from the infection, as intended

1   by the receiver.  So with that, I'll end, unless the Court has

2   any questions.

3           THE COURT:  I do have two questions.  One, this Court

4   has issued an order earlier this week clarifying that it's not

5   construing any party's filing to date as a motion but provided

6   a period for the filing of motions related to this initial

7   crisis management phase, for lack of a better term, with the

8   transfers the CDCR contemplate having now been completed.  Is

9   your suggestion that this Court should do more while waiting to

10  see if any motions are filed and, if so, what, besides

11  directing the task force to complete it?

12          MR. SPECTER:  Yes.  I believe there are some steps

13  that should be undertaken immediately, the first being that

14  there should be a development of instructions and guidelines on

15  how these cohorts are supposed to function, practically

16  speaking, in the dormitories with respect to the transmission

17  of the virus and consistent with community public health

18  standards.

19          In the filing that we -- in the CMC statement that we

20  filed yesterday, we set forth some of those standards, which we

21  believe are critical.  The second thing I think which is

22  necessary is that either the receiver or the CDCR should

23  undertake an analysis of the people who are living in dorms and

24  cells, for that matter, who are medically high risk and

25  establishing a process for putting them in living situations

1    which put them at the minimal risk practical under the

2    circumstances.

3            THE COURT:  And is it plaintiff's position that this

4    Court could, sua sponte, direct the preparation of the

5    instructions and guidelines and identification of who's at risk

6    with respect to the Coleman class?  Mr. Specter or Mr. Bien.

7            MR. BIEN:  Your Honor, we do feel that you have the

8    power to order such an analysis for the safety of the Coleman

9    class.  You've been supervising a process by which to assure

10   that the housing and treatment of the Coleman class is

11   appropriate in the midst of a pandemic and we are very

12   concerned that the plan that defendants have now implemented,

13   without consultation, the dorm transfer plan was not brought to

14   the special master or the task force until after it was

15   implemented.  It doesn't achieve anything, as Mr. Specter

16   noted, in terms of safety for Coleman class members in these

17   crowded dorms and, in fact, did nothing for medically high-risk

18   Coleman class members.

19           Certainly this Court has the power to require

20   defendants to address the areas that Mr. Specter outlined.

21   That would be our position.

22           THE COURT:  And would that be in the form of modifying

23   the orders currently in effect -- a refinement of the orders

24   currently in effect in Coleman, is that plaintiff's position,

25   the broad remedial orders in effect?

1        MR. BIEN:  Yes, Your Honor.  I think the broad

2   remedial orders in this case address both the treatment, mental

3   health treatment, and housing of class members.

4        And to the extent defendants have failed to achieve

5   safety in the face of this pandemic for Coleman class members,

6   we think it's appropriate for the Court to act.

7        We could also, you know, bring a motion for such

8   relief as another tool, but I think it has to be done -- I

9   agree with Mr. Specter -- it has to be done soon.

10       We understood that the process that the Court is now

11  supervising with the special master analyzing the dorm plan and

12  how it has affected the Coleman class and the process the

13  special master is undertaking to assure that the parties agree

14  factually on what has happened is a good precursor to the Court

15  acting, and so we have been awaiting the conclusion of that

16  process and we think that having that factual agreement would

17  be useful, but I think we're very close to that point right

18  now.

19       THE COURT:  All right.  But just so I'm clear, the

20  plaintiffs believe that I do have the ability, sua sponte,

21  without a motion, to address the issues that Mr. Specter has

22  raised?  Is that what plaintiffs are telling me?

23       MR. BIEN:  I think you do because it's been part of

24  the task force process that you've already ordered.  You've

25  ordered the special master to review these procedures.

1    Defendants have agreed to that process and it seems to be part

2    of the process that if the special master recommends

3    refinements of their plan and additional steps to their plan

4    that this court has the power to address those without a

5    motion.

6           THE COURT:  All right.  And finally, before I speak to

7    defendants, does that include the power to -- if the Court

8    concluded the record supported it -- the power to order

9    internal transfers of Coleman class members?

10          MR. BIEN:  We would -- we think that the Court should,

11   at this time, order defendants to develop a plan that would

12   include transfers, to the extent they're necessary, internal to

13   the prison system.

14          We believe that one of the big holes in defendant's

15   pandemic response has been the failure to address high-risk

16   people living in the system.  The plan just has left them where

17   they are, including in the crowded dorms that we included in

18   our initial motion to the three-judge court on those photos.

19          As far as we understand, those dorms have been

20   virtually untouched, so the same conditions could prevail

21   today.  And ordering defendants to develop a plan to address

22   the safety of the people living in those crowded dorms is

23   within your Court's power, and defendants have agreed to this

24   process, as we understand, that the special master has

25   undertaken.

1      So for example, when Mr. Specter pointed out about the

2  lack of direction to the institutions as to how people are

3  supposed to manage in these new cohorted dorms is just a

4  missing piece of their plan, and the special master recommends

5  that it be developed.  I think it's within your Court's power

6  to so order.

7      MR. SPECTER:  And if I may add -- sorry.

8      THE COURT:  All right.  Let me ask my follow-up

9  question and either or both of you can address this.  And if

10  you're not prepared to address it today and it needs to be the

11  subject of briefing, which I'm not sure is called for at this

12  time, but just to put this question on the table, has the

13  landscape changed since, for example, the former Plata judge

14  ordered transfers in the Valley Fever case, or is the

15  fundamental landscape the same with respect to the ability of a

16  single court to order transfers of members of a class before

17  that court?  Mr. Specter?

18      MR. SPECTER:  Yes.  I think the landscape has not

19  changed, Your Honor.  We have done some -- we haven't found any

20  cases which contradict Judge Henderson's orders in those cases

21  or his reasoning.

22      And I just wanted to add on your -- just expand on

23  Mr. Bien's answers to your other question, which is, the Court

24  has already ordered the defendants come up with a plan, and

25  that hasn't really happened.  The document they submitted was

1    not a plan, as they've suggested in the past.  And so it seems

2    to me that the kind of plan that Mr. Bien was talking about is

3    just another kind of an enforcement of your prior order.

4            THE COURT:  All right.  Understood.  Anything further

5    from plaintiff's counsel, Mr. Bien?

6            MR. BIEN:  No, Your Honor.

7            THE COURT:  All right.  Mr. Lewis, for the defendant?

8            MR. LEWIS:  Good morning, Your Honor.  At the outset,

9    Your Honor, I must address the comments made by Mr. Specter and

10   Mr. Bien, particularly with reference to the Plata case

11   management conference.  The defendants believe that this is

12   unfair and improper, and they object to Mr. Bien and

13   Mr. Specter's comments regarding matters that are happening in

14   Plata.

15           There are no Plata counsel on this phone line for the

16   defendant.  The receiver is not present.  And yet, much of

17   Mr. Bien's conversation with the Court specifically addressed

18   medically high-risk inmates and specifically mentioned actions

19   by the receiver.  This is something that is being handled by

20   the Plata courts.  This is something that is being handled

21   through coordination and it is improper for plaintiff to be

22   arguing to this Court about matters that are being handled in

23   the Plata litigation.

24           Today at 5:00 p.m. I understand that colleagues from

25   my office will be responding to many of the questions that

1    Judge Tigar asked at his status conference earlier this week.

2    That will be filed by, I believe, 5:00 p.m. today.  That will

3    likely address many of the points that Mr. Specter made today

4    and made within his own case management conference statement

5    that was the subject of the earlier hearing in Plata.  This is

6    something that needs to be handled by Plata.

7         My concern and defendant's concern would be that if

8    this court were to get involved in this matter regarding

9    transfers or anything like that, you have a great risk of

10   conflicting orders.

11        Frankly, this court does not have the power to engage

12   in this because, as Mr. Specter identified, these are medically

13   high-risk individuals.  That is specifically and exclusively

14   the purview of the Plata court, and we do not believe that this

15   court --

16             THE COURT:  All right.

17             MR. LEWIS:  I'm sorry, Your Honor.

18             THE COURT:  Mr. Lewis, just to -- your objection is

19   made of record and it may be that the issue gets briefed.

20        I make clear every time I address an issue that I am

21   thinking about the Coleman class, which includes high-risk

22   persons, not just medically but in terms of their mental

23   health.  And so I am thinking only about my case and what I can

24   do in this case and I am well familiar with the first question

25   a federal judge asks:  Do I have jurisdiction.

1    On coordination I previously, in response to the

2 defense suggestion that there should be coordination, I have

3 invited a clarification of what that means, and I don't believe

4 I've seen any clarification or request filed in this case.  But

5 just so it's clear, this Court is focused only on Coleman, as I

6 assume the Plata court is focused on Plata.

7    All right.  You may continue.

8    MR. LEWIS:  Yes, Your Honor.  Mr. Bien talks about how

9 he wants the Court to consider asking for an order to get

10 involved in transfers.  Well -- and he also mentions that the

11 dorm transfers were done without consultation.  That is

12 actually incorrect.  Dorm consultations and the dorm moves were

13 done with the approval of the receiver.  Once again, another

14 action taken by the receiver in other litigation that Mr. Bien

15 is now referencing to this Court.  That failure to address

16 high-risk patients, as he mentioned, is specifically within the

17 Plata litigation.

18    And I would also point out something.  Mr. Bien said

19 that the plan is not working.  As it currently stands, there

20 are only 7 of CDCR's institutions that have COVID positive

21 inmates at them.  94 percent of those infected inmates are at

22 two institutions.  It would bear out that CDCR's transfer plan,

23 or what they are doing, is having some kind of positive impact.

24    The Plata court has recognized part of this by finding

25 that aspects of CDCR's plan were reasonable and the court is

1   asking -- the Plata court is asking further questions about

2   this.

3        Those statistics alone indicate that something that

4   the defendants are doing in this sphere is being managed

5   appropriately or is being looked at by other people or other

6   litigation.

7        And so, once again, Your Honor, I don't mean to

8   belabor the point, but Mr. Bien and Mr. Specter are asking

9   about things that are either being dealt with and dealt with

10  appropriately and there is a plan out there of which this court

11  is aware, but this should not be discussed here, and this is

12  not appropriate at this time.

13        THE COURT:  The objection is recorded.  Let me -- are

14  your statistics based on comprehensive testing?

15        MR. LEWIS:  Your Honor, I understand that testing has

16  increased.

17        I believe the reason why we're seeing more positive

18  results right now is because testing has started happening.

19  Now, of course, there's 120,000 inmates.  It has not been

20  possible to test them all.  But as greater testing capabilities

21  come online, CDCR will be better able to identify who has it

22  and who doesn't.

23        Mind you, I understand that many of the positive tests

24  right now were asymptomatic inmates.  And I'll make some other

25  points and if the Court wants me to do further updates, we also

1    have Dr. Bick on the line who could be prepared to discuss the

2    Court's questions a little bit more in depth, but the

3    institution specifically has updates --

4         THE COURT:  I would at the right time -- I would at

5    the right time like to hear from Dr. Bick.

6         Just so you know what I'm thinking about the way we're

7    proceeding today, my thought is that we conclude the Corona

8    virus discussions, take a break for the court reporter's sake,

9    and then come back -- ten minute break, come back and complete

10   the rest of the agenda.

11        So Mr. -- I want to make certain I understand what you

12   are saying.  Is there a suggestion -- are you saying you don't

13   believe this Court does have the authority to order transfer of

14   Coleman class members?

15        MR. LEWIS:  No, Your Honor.  For the purpose of -- if

16   it's related to their COVID-related factors and medical risk or

17   those kind of things, no, Your Honor.

18        If the Court is looking at this --

19        THE COURT:  If it's related to their mental health as

20   a piece of an overall set of circumstances, does this court

21   have that authority?

22        MR. LEWIS:  Not if the underlying reason is because

23   they're being looked at for COVID factors, Your Honor, no.

24        THE COURT:  So if this Court had great concern, is the

25   suggestion that it needs to supplicate to the receiver?

1    MR. LEWIS:  Your Honor, are you talking about if the

2    Court had great concern that the inmate's mental health needs

3    weren't being met?

4    THE COURT:  That transfer was needed to take account

5    of an inmate's mental health.

6    MR. LEWIS:  Your Honor, I still believe that if there

7    is a reason for the transfer, it's because it's related to

8    COVID or the Court is concerned of COVID at a certain

9    institution or things like that.  No, Your Honor, because that

10   is something in the COVID response, and the medical issue falls

11   under the receiver's purview.

12   THE COURT:  So what's the procedure for this Court to

13   make a motion to the receiver, if I accept what you're saying?

14   MR. LEWIS:  Your Honor, I believe this could be

15   something that would be handled through coordination efforts

16   and things like that.

17   The CDCR and the CCHCS, from what I understand, are

18   not looking at subclasses or subsets of the inmate population.

19   They're trying to treat everyone to provide -- care for all

20   inmates.

21   So in terms of mental healthcare, there's also great

22   steps been made to adjust mental health programming during this

23   pandemic, as evidenced by our plan, the plan that was submitted

24   to the Court.  But in terms of ordering the receiver to do

25   something or things like that, I am not prepared to discuss

1    that, though I believe those are things that can be handled

2    through the coordination process, if necessary.

3        THE COURT:  I'm not saying I would ever order the

4    receiver to do something.  Can I order CDCR to transfer Coleman

5    class members if ultimately the record leads this Court to

6    conclude, which I have not, I'm just -- I'm probing the

7    parameters of your position that ultimately this issue wouldn't

8    be with me.

9        MR. LEWIS:  No, Your Honor, I do not --

10        THE COURT:  Do you agree with Mr. Specter that the

11    landscape that was in place at the time of the Valley Fever

12    cases is the same with respect to who effects transfers and who

13    this Court could order to effect transfers?

14        MR. LEWIS:  No, Your Honor, I don't believe that is

15    true.  I believe that this Court, under the current environment

16    with the pandemic and the actions that are being taken with

17    respect to COVID, that the Court does not have the power to

18    order the transfer of inmates that may have COVID-related

19    factors and measures involved.

20        THE COURT:  All right.  Well, there's not a complete

21    joining of the issue.  It may well be that this issue needs to

22    be briefed sooner rather than later, but I will let the parties

23    know on that question.

24        So Mr. Lewis, you had additional comments to make --

25        MR. LEWIS:  Yes, Your Honor, and I'll --

1          THE COURT:  -- in response to my questions at the

2    beginning of the hearing?

3          MR. LEWIS:  Yes, Your Honor.  I apologize for

4    interrupting and I'll try to be brief, being mindful of your

5    comments about giving the reporter a break.

6          First of all, the receiver -- I'm sorry.  The special

7    master raised the issue of the new infectious disease expert.

8    Once again, I think defendants would be concerned here because

9    infectious disease control and those kinds of issues are

10   specifically the purview of CCHCS and the receiver and we'd be

11   concerned that someone would be coming in and basically giving

12   contrary advice or trying -- or may become embroiled within

13   CDCR operations that could conflict with some of these things

14   that are going on from the duly appointed people that have

15   charge over this in the receiver's office in CCHCS.  So from

16   that perspective, defendants would be troubled by the

17   introduction of a new infectious disease specialist.

18         As to the county admissions, the defendants don't

19   believe that the receiver should be involved in the planning

20   for the turn on of intakes.  There's nothing out there that

21   says the receiver has a role in this, which is specifically

22   reserved to the secretary and the governor.  This is the very

23   beginning of the criminal justice process as it pertains to

24   CDCR, and there's no indication that the receiver should be

25   involved in that.  These are duties and responsibilities that

1     fall to the secretary and I'm pressed to --

2              THE COURT:  You mean the special master.

3              MR. LEWIS:  I'm sorry?

4              THE COURT:  You're saying "receiver," but you mean

5     special master?

6              MR. LEWIS:  I am, Your Honor, my apologies because

7     these are things that are reserved to the secretary of CDCR and

8     it's unclear as to what role the special master would have in

9     intakes of people coming into CDCR, so defendants would

10    question whether or not that is necessary.

11             As for the status conferences every two weeks, as your

12    Court's -- as this Court's aware, an incredible amount of

13    activity has been going on in this case recently and defendants

14    would just be troubled by the fact that the continual,

15    continual, continual status conferences, while important in

16    informing the Court, do sometimes syphon people away from the

17    responsibilities they have, particularly in this pandemic.

18             If the Court maybe would welcome maybe more regular

19    written updates or possibly updates through the special

20    master's task force, that could be a way that we think we could

21    use existing structures to inform the Court.

22             The three-week structure that the Court has is

23    obviously an accelerated pace from its previous, and defendants

24    think that that does hit a good mark where every three weeks on

25    a cycle we can start reporting back to the Court as the

1    pandemic continues and what is going forward and how it moves

2    forward and what the department is doing to respond to it.

3         And one last thing, Your Honor.  Mr. Specter, I

4    believe it was, or Mr. Bien, I forgot, mentioned the tents at

5    CIM, and the special master mentioned them as well.  There was

6    no mission change associated with this.  These were -- there's

7    only sixty individuals in these tents.  They are -- I believe

8    there's only six of them.  They are attached or they're outside

9    of one facility at the CIM.  And like I said, there's only

10   sixty inmates in enclosed air conditioned structures, tents

11   with floors and sides, with shower facilities and bathroom

12   facilities right nearby that are cleaned daily.  And I just

13   wanted to make that clear for the Court's information that this

14   is also not a mission change.  It was something that defendant

15   would have had to inform the special master of through a

16   regular reporting process.

17        And that's all I have, Your Honor.

18        THE COURT:  All right.  Just a couple of follow-up

19   questions.  In terms of the county admissions, are you saying

20   the special master should not be at the table to at least hear

21   what is being discussed?

22        MR. LEWIS:  Well, Your Honor, I believe he had said

23   that he wanted to be involved in planning, so I would say not

24   in the planning.

25        If the special master is present, possibly yes, that

1    would be acceptable, but the planning should be reserved

2    exclusively to CDCR officials and those empowered by the

3    secretary.  The special master should not a role in the

4    planning of intakes.

5          THE COURT:  It is the case that a certain percentage,

6    probably a healthy percentage of those intakes become Coleman

7    class members, correct?

8          MR. LEWIS:  Yes, Your Honor.  I mean, obviously people

9    that come into prison do have some mental illness or some

10   mental conditions that do require them or do ultimately end up

11   in the MHSDS, but there's no indication that what CDCR is doing

12   presently or before the COVID impacts were realized is harming

13   them or would require the special master to become involved in

14   the intake process.

15         THE COURT:  All right.  Just a few questions to

16   clarify.  Is it fair for the Court to assume that the

17   transfers, the 2000 transfers, including some Coleman class

18   members, that CDCR has concluded the transfers that it plans to

19   make in light of COVID; is that correct?

20         MR. LEWIS:  Your Honor, I would say no, they have not.

21   I cannot speak to whether or not they have concluded all of the

22   transfers.  In fact, I think there may be a few more that have

23   still yet to happen.  That total dorm number or the total

24   number of dorm moves to create social distancing is actually

25   2,378, Your Honor.

1        THE COURT:  All right.  At this point when would CDCR

2   be concluding its transfers?

3        MR. LEWIS:  My understanding, Your Honor, is that this

4   is the current -- this is cycle 2 or cycle 3.  I don't know

5   when the additional, maybe, last few pieces may be going in, I

6   can't speak to that yet.  But CDCR, if necessary, could always

7   look at this again.  But I believe that, for the most part,

8   they are complete.  There may be one last small cohort that's

9   going out, but I believe this is relatively stable, the number

10  I just provided to Your Honor.

11       THE COURT:  And for how long does CDCR contemplate

12  that those transfers will remain in effect?  For how long will

13  people be in their new locations?

14       MR. LEWIS:  Your Honor, I don't think that there has

15  been a determination on that, given that the pandemic --

16  there's no end in sight of the pandemic.

17       Also, it's kind of creating a new norm, so social

18  distancing and these kind of activities will have to continue

19  going forward.  So it is not like these inmates will go back to

20  their regular dorm settings.  This idea of social distancing

21  is, I believe, a more long-term plan in terms of it's the

22  reality that both the public and CDCR have to recognize going

23  forward.

24       THE COURT:  So what does that mean for the tents at

25  CIM?  Does that mean those are now considered long-term housing

1    for 60 inmates, 10 per tent, I would note?

2           MR. LEWIS:  I don't believe that those are envisioned

3    as a long-term plan.  I believe that was a specific quarantine

4    situation, but I don't have the specific information on that.

5    I think this is something that obviously there will be more

6    information provided to the special master during next week's

7    meetings about.

8           And I also understand that this is something that the

9    Plata court is also being informed about, so the information

10    will be coming out about this.

11           THE COURT:  Does CDCR currently assume there will be

12    waves of the pandemic?  There are widely reported, educated

13    assumptions that the Corona virus will recur in waves.  Is CDCR

14    making that assumption?

15           MR. LEWIS:  I think that CDCR is aware that there is

16    definitely thinking about that.  Maybe when you speak to

17    Dr. Bick later on, if you intend to, he could answer this

18    question.  But I believe that, yes, CDCR is looking at all

19    information out there.  And yes, we have seen information that

20    there are concerns about waves, which is why things like social

21    distancing, the cleaning, the masks and the various things that

22    CDCR has done in its plan will continue going forward if you

23    kind of set this new situation within the institutions

24    respecting the needs of the inmates and the staff to keep safe

25    but still maintain operations.

1          THE COURT:  Two more questions.  And I would like to

2     hear briefly from Dr. Bick specifically with respect to what is

3     going on currently with testing.  I'm remembering his comments

4     from several weeks ago, but, again, public reports suggest

5     there's more testing, there's prioritization given to testing

6     of CDCR staff, so I'd like to understand that.  But before I

7     hear from Dr. Bick, by the next time the Court meets, and I'll

8     determine when that is, on this issue, I would request a map.

9     Assuming that the transfers are concluded, I would like to have

10    a visual showing me where Coleman class members are.  I realize

11    CCCMS distributed within the general population may not be

12    easily identified, but the other groups within the Coleman

13    class, I'd like to see a map.  And so that's a direction I'll

14    direct the special master to work with the parties to prepare

15    that.

16          For you, Mr. Lewis, this Court has received offers in

17    the past to go on field trips, essentially, and I have resisted

18    those because I know a judge's presence can have a distorting

19    effect on the environment, particularly if announced and

20    preplanned.  But if there's ever a time when this Court feels

21    the need for a visual inspection, and this was a need

22    identified before seeing any filing of plaintiffs, it is now

23    because I am trying to understand, as I have from the

24    beginning, what the landscape is for the Coleman class and to

25    understand what that means for the delivery of the remedies

1    that class awards under the constitution.  So the does the

2    defense have suggestions on how I might accomplish a visual

3    inspection?  I've asked the special master the same question,

4    so you know.  Are there any members of his team, this 28th

5    round, are there any members of his team that would make

6    unannounced inspections of the locations where Coleman class

7    members currently are?  I can have him meet with the parties.

8    Do the defendants have views on how I get a mutual visual

9    inspection of Coleman class locations, not including CCCMS?

10            MR. LEWIS:  So Your Honor, I fully respect the Court's

11    interest in seeing and getting a visual.  We all know how

12    important it is to get on the ground.  This, I fear, is not the

13    time because of the pandemic.

14            As the Court's very aware, essentially all visitation

15    has stopped, everyone, to include my office.  I am not allowed

16    to go within the prison because of the restrictions on movement

17    for public health reasons being put forth by the public health

18    experts.  So I am very hesitant and I think -- I have not had a

19    chance to speak to my clients about this, but I would be

20    hesitant because when Your Honor would show up or when maybe

21    the special master would go, you are introducing people from

22    the outside.  There will be potentially other persons; it will

23    be a group.  It is introducing something new within the prison

24    and I would be concerned about the public health posed to not

25    only the inmates but also to anyone visiting because of the

1   dangers associated with COVID at some of the institutions.

2          So I would have to speak to my clients about this in

3   more depth, Your Honor, and we would be prepared to respond in

4   writing, if you would like, but I think this is something that

5   really, operationally, I need to discuss; fully understanding,

6   though, Your Honor's point and Your Honor's concerns.

7          THE COURT:  Does any CDCR staff, correctional

8   officers, mental health clinicians, do any of them currently

9   wear body cameras at any time?

10          MR. LEWIS:  I do not believe that we have body cameras

11   within the institutions, Your Honor.

12          THE COURT:  All right.  I have no other questions.

13   Mr. Lewis has indicated he's concluded.  Let me just ask if the

14   intervenors have any comments they would like to make for the

15   Court at this time.  Is there lead counsel for CCPOA still on

16   the line?

17          MR. ADAM:  Yeah, still on, Your Honor.

18          THE COURT:  All right.  Mr. Adam, anything you would

19   like to say?

20          MR. ADAM:  No.  We will get some information about the

21   cameras question.  I know our people do not have body-worn

22   cameras, but we'll get whatever information we can on what

23   other video cameras may be in the premises.

24          THE COURT:  All right.  Would you be willing to file

25   something within the week?

1    MR. ADAM:  Yes.  We'll get something filed by Tuesday,

2    if that works.

3    THE COURT:  All right.  Very good.  Thank you.

4    Mr. Spurling, if you're still on the line is there

5    anything you would like to say at this time?

6    MR. SPURLING:  Thank you, Your Honor.  Yes, I'm still

7    on the line but the OIG has nothing to add at this point.

8    Thank you.

9    THE COURT:  All right.  I believe that concludes what

10    the Court needs to hear at this point about COVID.

11    Let me just -- I just want to say with regard to

12    coordination, I rely on the special master to tell me if he

13    believes he's getting the coordination he needs with the Plata

14    receiver.  He has not said anything on the record here this

15    morning.  I have invited the parties to let me know if they

16    have specific proposals regarding forms of the coordination

17    that are appropriate at this point in time.  This courtroom is

18    open to hearing any proposals.

19    I realize that the parties may feel that there's a bit

20    of a game of ping pong going on.  I have no desire for anyone

21    to feel like a ping pong ball.  If I serve, which I might have,

22    I can't help but think of the -- some of you are too young to

23    have ever watched Captain Kangaroo, but there were scenes in

24    that Saturday morning children's show when, you know, hundreds

25    of ping pong balls fell from the ceiling, and so -- and I can't

1     help but think of that at this point.  It feels as if quite a

2     few ping pong balls have been released.  It is not this Court's

3     desire to be part of any ping pong game, but it's still this

4     Court's solemn obligation to remain focused on the needs of the

5     Coleman class, and so that is what it is doing here.  It will

6     continue to do that.  I will bear in mind everything the

7     parties have said.

8             I will let you know following this hearing whether or

9     not I'm inviting minimal briefing on any of the issues raised.

10    There were some profound issues raised.  I will provide you

11    guidance on whether or not I need formal briefing.

12            I'll look for the CCPOA's filing, and I'll let you

13    know if we are convening again on COVID within three weeks or

14    two weeks.

15            So with that, let's take a 10-minute break.  My clock

16    says it's 11:10 and let's sign back on at 11:20.

17            Let me just ask at this point so that Ms. Schultz

18    doesn't have to check everyone in, is it safe to assume,

19    Mr. Bien, that all of the attorneys who appeared originally for

20    plaintiffs will sign back in at 11:20?

21            MR. BIEN:  Yes, Your Honor.

22            THE COURT:  And for Mr. Lewis, all the attorneys for

23    the defense?

24            MR. LEWIS:  Yes, Your Honor.

25            THE COURT:  All right.  I realize I haven't heard from

1    Mr. Bick yet.  What we'll do is take the break, then I'll hear

2    from Dr. Bick and then we'll move on to the rest of our agenda.

3            All right.  So let's sign back on at 11:20, please.

4    Thank you.

5        (Recess at 11:12 a.m. to 11:24 a.m.)

6            THE COURT:  This is Judge Mueller finding out again,

7    Ms. Schultz, are you present?

8            THE CLERK:  Yes, Your Honor.

9            THE COURT:  And our court reporter is back,

10   Ms. Coulthard?

11           COURT REPORTER:  Yes, Your Honor.

12           THE COURT:  All right.  Mr. Bien, you're present?

13           MR. BIEN:  Yes, Your Honor.

14           THE COURT:  Mr. Specter?

15           MR. SPECTER:  Yes, Your Honor.

16           THE COURT:  And Mr. Lewis?

17           MR. LEWIS:  Yes, Your Honor.

18           THE COURT:  All right.  I'm not going to call role

19   again.  When I signed off, there were 34 people on the call,

20   the majority of the number that was on the call previously, so

21   I'm going to assume that whoever needs to appear is appearing,

22   either monitoring or monitoring any member of the public with

23   an interest is able to hear the proceedings.

24           Just a couple of follow-up questions before a brief

25   summary of the status of testing from Dr. Bick.  The special

1    master actually communicated with me during the break and

2    suggested I clarify that this total number of transfers 2,378,

3    what number of those were between institutions, Mr. Lewis, do

4    you know?

5              MR. LEWIS:  Your Honor, I do not have that information

6    available.  We can file that by the end of today, if you'd

7    like.

8              THE COURT:  Is it possible that the number 460 was the

9    between-institution number with other transfers made within

10   institutions?

11             MR. LEWIS:  You know, Your Honor, if you give me a few

12   minutes, maybe we can continue on, I will try to look for that

13   information.  I do have a report and that may be a column in

14   the report, so we can address that maybe over the course of the

15   hearing, Your Honor.

16             THE COURT:  All right.  And then just to clarify, I

17   did listen carefully when you talked about the opening of

18   reception centers to releasees from the county facilities, and

19   I believe that the secretary or a person that he delegates

20   to -- is it fair to assume that either of those individuals

21   were at those planning meetings?

22             MR. LEWIS:  And Your Honor, if I could maybe clarify a

23   question.  So are you asking if the receiver is at the table

24   for standard intake meetings?

25             THE COURT:  Well, the intake -- let's just say we're

1    talking about the reopening of the building, of reception

2    centers to those coming from county authorities, so the next

3    round of planning.  Is it fair to assume the receiver will be

4    involved in the decision to open up those reception centers?

5        MR. LEWIS:  I don't have that information, Your Honor,

6    I apologize.  I can find out and can report back.

7        THE COURT:  All right.  All right.  So Dr. Bick,

8    briefly, if you could provide a focused update on the status of

9    testing and a summary of the strategic approach, if there is a

10   strategic approach, that CDCR is currently using with respect

11   to testing Coleman class members and staff members with whom

12   those members come in contact.  Dr. Bick, are you there?

13       DR. BICK:  Good morning, Your Honor.  This is Joseph

14   Bick with the CDCR.  So I have found the developments this last

15   week to be encouraging in terms of increased availability for

16   testing both through our standard process using our contracted

17   Quest Laboratory and also with external resources, including

18   the UCSF bio hub and a new novel process through the public

19   health department called "Operation Baseline," which is testing

20   available in the community essentially to anyone who wants it

21   who's affiliated with healthcare organizations.  So there have

22   been some preliminary conversations with our internal public

23   health department and external departments are taking advantage

24   of that.

25       So as I think I mentioned before, we now have 218

1  patients who have tested COVID positive.  This is up from 133

2  last week, a significant increase.

3       It should be noted that we tested an additional 800

4  people this week, so more than doubling the number of tests

5  that had been done to that point.  And the overwhelming

6  majority of those new cases among patients were asymptomatic

7  contacts at the two centers -- epidemic centers that we have,

8  both CIM and LAC.

9       205 of the cases that have been diagnosed among

10  patients thus far are at those two facilities, as Mr. Lewis

11  said.  94 percent of our cases are at those two facilities.

12       The number of cases among employees has continued to

13  increase.  We're up to 158 -- 150 employees at 28 facilities.

14  I think it's encouraging, to me anyway, that there are no new

15  facilities that have inmate patient cases over the last three

16  weeks.  We're still at seven facilities even while we see the

17  increases among employees.

18       So what that suggests to me is that some of the

19  mitigation efforts that are underway have been successful thus

20  far.

21       Getting to strategies in testing, the change --

22  significant change over the last week is the broader use of

23  testing in areas where we know we have endemic spread of the

24  virus, so specifically CIM and LAC.  So in those settings,

25  following guidance from Centers for Disease Control and

1   California Department of Public Health, testing is being done

2   more broadly.

3         It's also being done in the context of patients that

4   were moving from CDCR to DSH and may be used in patients who

5   are moving back from DSH to CDCR.  And we're hopeful that those

6   patients will be coming back next week.

7         We're not moving to wide-scale testing of all patients

8   in the department at this point, but what is starting this

9   week, under the direction of the receiver's public health unit,

10  is testing at every facility, sampling at every facility among

11  asymptomatic people with the goal of having testing being

12  performed at every facility across the state to identify

13  asymptomatic cases.  This will be a sample of patients, it's

14  not going to be the entire patient population, but I think it's

15  a good start to try to identify whether we have unrecognized

16  cases among our patients.

17        The only other thing I would add to that is I think a

18  change that we've seen because of the availability of testing

19  is when we have identified new cases that happened just last

20  weekend at California medical facilities in the PIP there,

21  where there was an employee who was identified and then an

22  employee contact of that initial employee who was also found to

23  be COVID positive, the decision was rapidly made to test all 30

24  patients on the housing unit where those employees were.  And

25  within a matter of days they were able to determine that all of

1    those patients tested COVID negative.  So I think that that was

2    an excellent use of this broader testing methodology.

3         I think the only other thing I'd add, Your Honor, is

4    that every credible scenario that I've seen from infectious

5    disease and public health excerpts includes ongoing

6    transmission of COVID over the next 12 to 24 months until

7    there's significant herd immunity and hopefully a vaccine.  And

8    this, in my opinion, is going to significantly change how we

9    interact in group settings and congregate living environments

10   for the foreseeable future, both in the free world, at

11   restaurants and hotels and conferences and theaters and

12   sporting events and then of course within our settings and how

13   we feed, how we house, how we program, group therapy, yards,

14   showers and the like.  That's all I have, Your Honor.

15        MR. SPECTER:  Your Honor, may -- Don Specter -- may I

16   ask a question?

17        THE COURT:  This is Mr. Specter?

18        MR. SPECTER:  Yes.

19        THE COURT:  Wait until I call on you.

20        Dr. Bick, in terms of the testing, it's one-time

21   testing without repeat testing on any schedule?

22        DR. BICK:  At this point if someone is identified as a

23   contact there's one-time testing of that individual, they're

24   placed under quarantine.

25        Let me back up, Your Honor.  The contacts are first

1    screened for symptoms and if they're found to be symptomatic,

2    then they are isolated and tested.  If they're found to be

3    asymptomatic, then they are quarantined and also tested.

4            There isn't currently a plan to test them a second

5    time.  And for the random testing that's happening in all of

6    the facilities around the state, that is a one-time test.

7            THE COURT:  And clarify that at times you used the

8    word "patients."  Is there any separate focus on staff,

9    correctional officers or clinicians?

10           DR. BICK:  So any time that I had used "patients" in

11   my comments, that would apply to our inmate population.  The

12   staff is a separate initiative through the Office of Employee

13   Wellness.  We are moving to try to integrate a little bit

14   more -- when I say "we," the department, including CCHCS -- the

15   approach to both staff and inmate patients so that we are

16   following similar methodologies.  We are not -- we, as a

17   department, are not currently doing testing within institutions

18   for staff.  They're being directed to their own providers and

19   now new resources, such as this operation baseline, which is

20   basically a drive-through testing location for anyone who has

21   had possible exposure.

22           THE COURT:  Final question.  The Court is following

23   COVID closely, and I can remind you all when I need to, but as

24   Chief judge of the Court I receive information on a regular

25   basis and I seek information as it relates to resumption of

1    open court proceedings.  I believe I could at some point take

2    notice of best practices that have been developed for use in

3    congregate living facilities or a record could be developed

4    along those lines.

5         Is it your view that CDCR is able to follow best

6    practices for congregate living facilities tailored to the

7    prisons?

8         DR. BICK:  And Your Honor, is that a question for me?

9         THE COURT:  For Dr. Bick.

10        DR. BICK:  Yes.  This is Joseph Bick.

11        So in my opinion, jails and prisons are congregate

12   living environments and that many, if not most of the

13   recommendations that are generated for congregate living

14   environments apply, in some manner, to jails and prisons.

15        When the question is put directly to the California

16   Department of Public Health and sometimes to the Centers for

17   Disease Control about whether those guidelines apply directly

18   to jails and prisons, the answer I most commonly receive is

19   that there are separate jail and prison guidance documents that

20   are either in circulation or being developed, but my

21   professional opinion is that there's significant overlap.

22        THE COURT:  All right.  Thank you for that.

23        Mr. Specter, you wanted to pose a question.  I'll

24   determine whether or not anyone's going to answer the question

25   after hearing whether there's any objection.  Mr. Specter?

1          MR. SPECTER:  Thank you, Your Honor.  This is Don

2   Specter.  My question -- you asked half of the question about

3   staff.  My question to Dr. Bick is whether the number of

4   reported staff positive cases is based solely on the report of

5   the affected staff members.

6          MR. LEWIS:  And Your Honor, this is Kyle --

7          THE COURT:  Mr. Lewis, any objection?

8          MR. LEWIS:  Yes, Your Honor.  I object to these

9   questions because, first of all, Plata or Mr. Specter appears

10  to be appearing in the capacity of Plata counsel, and so I

11  would say that that is our number one objection right there;

12  and second, this is not a cross-examination.  Your Honor had

13  questions for Dr. Bick.  I don't believe counsel should be able

14  to be asking questions.

15         THE COURT:  All right.  I'll sustain the objection at

16  this time.  I see no reason why there couldn't be a discussion

17  of these issues in the task force.  But if I need to more

18  formally address the issue, I can.

19         I guess final question.  I don't think I asked this:

20  Dr. Bick, you have a breakdown of Coleman class members.  At

21  one point it was by far the most number of positive tests that

22  were linked to Coleman class members.  And one inmate, the

23  first inmate to die, was a Coleman class member.  Do you have a

24  breakdown by Coleman class member of positive tests?

25         DR. BICK:  I do, Your Honor, and by virtue of the fact

1   that the institutions that were hit the hardest did have a

2   large number of Coleman class members, 71 percent of the cases

3   diagnosed as of this morning are Coleman class members.  And

4   that's further broken down by 64 who are CCCMS, 87 BOP, 2 ICF

5   and 1 in a mental health crisis bed.

6           THE COURT:  All right.  Thank you for that.  All

7   right.  I'm prepared now to move on to the rest of the agenda.

8           Let me just ask, any one or two-minute wrap up from

9   either side on COVID?  Mr. Bien?

10          MR. BIEN:  Mr. Specter has an additional point to

11  make.

12          THE COURT:  All right.  Mr. Specter?

13          MR. SPECTER:  I'm sorry, Your Honor.  I think we got

14  our wires crossed.  I didn't have anything to say.

15          MR. BIEN:  Okay.

16          THE COURT:  All right.  Mr. Bien, anything?

17          MR. BIEN:  We were just going to point out I think

18  that there are new cases in this period at CMC that came from

19  someone coming from county jail.  So I think at least --

20  correct me, Dr. Bick, that within this time period another

21  prison has a small outbreak.  Hopefully it will not turn into a

22  large outbreak.

23          THE COURT:  All right.

24          MR. SPECTER:  And Your Honor, I do have one point to

25  make if we're in the two-minute zone.

1          THE COURT:  This is Mr. Specter.

2          MR. SPECTER:  Yes.  I'm sorry.  Don Specter.  And that

3     is given the fluidity of the circumstances, I guess I would

4     request that the Court consider holding -- still holding these

5     conferences on a kind of weekly basis, essentially since things

6     are moving so rapidly and there's such an urgent need for the

7     Court's direction, but I also understand that that's within the

8     Court's discretion and your busy schedule.  Thank you.

9          THE COURT:  All right.  So that was once per week is

10    your request, correct?

11         MR. SPECTER:  Yes, ma'am.

12         THE COURT:  All right.  All right.  Just in terms of

13    making certain of what I know -- again, as chief of this

14    district, there are clusters of positive cases at Kern County's

15    Lerdo detention facility and in the Fresno County Jail.  That's

16    what I know from within the Eastern District.  This is purely

17    for your information and the interest of transparency.

18         Mr. Lewis, any brief wrap-up?

19         MR. LEWIS:  Yes, Your Honor.  I'll be very brief.

20    Defendants, for some of the reasons that we expressed earlier,

21    don't believe that accelerating the status conference schedule

22    even further than the special master had proposed to once a

23    week is going to be worthwhile.

24         As Mr. Specter points out, things are moving very

25    rapidly, but it is the reason that CDCR is having its plan

1    moving forward that they need to be able to rapidly evolve as

2    well.  They need to be able to do their plan implementation and

3    work through things.

4            If the Court was to start issuing orders all the time,

5    it may create issues where they are not able to put in place

6    their plan.  We need to see these things come to fruition.

7            As Dr. Bick noted, they could be having some positive

8    impacts, so that would militate towards letting the schedule go

9    forward that Your Honor has proposed of every three weeks so

10   that CDCR can enact its plans, work with the various agencies

11   that it's working with to get things moving and get things

12   done.

13           And then as for the dorm numbers, Your Honor, I do

14   have a better clarification, so I can provide those to you now,

15   if you'd like.

16           THE COURT:  All right.  Yes, please.

17           MR. LEWIS:  So the external moves, of that number I

18   provided, I believe it was 2,378, 1,928 was the total number of

19   the scheduled moves transferred out of the dorms to alternate

20   institutions to create physical distancing.  There were a total

21   of 450 internal moves, which is likely what the special master

22   was referring to.

23           THE COURT:  All right.  Well, the special master has

24   heard those numbers.  You're on the line, Mr. Lopes?

25           MR. LOPES:  I am, Your Honor.

1          THE COURT:  All right.  You've heard those numbers and
2     can take them into account.
3          MR. LOPES:  Thank you, Your Honor.
4          THE COURT:  All right.  Let's move to the rest of the
5     agenda, the development of an adequate process for updating
6     mental health records in EHRS.  Just checking in on this.  The
7     Court issued a January 7th order requiring implementation of a
8     process for necessary updates as an urgent priority.  At that
9     time the Court had initially directed a report by March 20th.
10    That report has been deferred.  What is the brief update on
11    this?  Has implementation of a process for necessary updates
12    been concluded?  We'll start with Mr. Lewis.
13         MR. LEWIS:  Yes, Your Honor.  CDCR has made various
14    steps over the past few months to make sure that EHRS
15    accurately captures information and records.
16         A special master had been involved in the development
17    of certain policies regarding data recording and patient file
18    management.
19         Since the Golding hearing at the end of last year,
20    various things had been done within EHRS to address some of the
21    issues that were involved or that were brought up.  I'll list a
22    few of them, perhaps.  Initial psychiatry contacts policy, the
23    EHRS fix was in place.  There's a dual signature IDTT memo
24    within EHRS fixed.  Medication not adhering to clarifying memos
25    with EHRS fixed.  So there are things out there that have been

1    done in conjunction with the knowledge of the special master

2    and with his assistance to address this issue, Your Honor.

3            THE COURT:  Anything to say on this, Mr. Bien?

4            MR. BIEN:  I'm going to defer to Ms. Ells.

5            THE COURT:  All right.  Ms. Ells?

6            MS. ELLS:  Good morning, Your Honor.  Lisa Ells.

7            From our perspective, there has not been significant

8    progress on this.  The testimony at the Golding hearing in

9    addition to the neutral expert report and the Golding report

10   itself indicate, particularly through the testimony of

11   Dr. Kuich, that there are significant systemic problems with

12   the way that EHRS -- I'm sorry -- the EHRS system was designed,

13   which both impede the ability of psychiatrists in particular

14   and possibly other clinicians to use the system but also impede

15   the ability to capture accurate data on the back end from that

16   system.  And both of those are crucial to the successful

17   conclusion of this case and required by other court order.

18           While there have been some initiatives here and there

19   to address some aspects of this, there hasn't been anything

20   systemic to actually evaluate whether this is a functional

21   system or whether it needs additional changes.  We know that it

22   was not designed out of the box for use in mental health

23   systems, it was sort of cobbled together.  And we know that

24   there were major problems during that implementation from the

25   trial.

1        So we had asked previously that the special master

2   look in depth at how EHRS has been designed and whether or not

3   it functions as it needs to in addition to monitoring how it's

4   used in the field.  And to our knowledge, there hasn't been any

5   systemic evaluation of that process at this point by the

6   special master or defendant -- or the defendants.

7        THE COURT:  Under the current circumstances, which

8   have changed since January 7th, are plaintiffs taking a

9   position on how to keep this issue on track?  Would it be

10  calendared for a more complete discussion at our next regular

11  quarterly status, which the Court would plan to hold at the

12  regular time?

13       MS. ELLS:  That seems appropriate, Your Honor, along

14  with sort of -- assuming that the workgroups on the

15  non-COVID-related topics pick up between now and then to add

16  that to the workgroup process.

17       THE COURT:  So the special master -- is it fair to

18  assume that the workgroups can pick up again and that this

19  issue could be on the agenda for a workgroup?

20       MR. LOPES:  Absolutely, Your Honor.  But I must state

21  that there -- I think both sides have legitimate points.  There

22  are currently institutionalized policies and processes that

23  regulate requests, approvals and we've worked out a completion

24  of change and update requests in the EHRS, but at the same

25  time, the adequacy of that has to be reviewed by the data

1  expert that the Court just appointed.  So both things are true,

2  that there has been activity, but you can't really gauge how

3  well it has all occurred without the data expert having a

4  review.  So by the next status conference, I would imagine that

5  an assessment could be made.

6      THE COURT:  All right.  That item will be placed on

7  the agenda for the next status conference then.  It is the case

8  that the Court just appointed the data expert.  The parties

9  agree, the special master should be able to consult with a

10 member of his team.

11     On the next agenda item, the sustainable process

12 improvement and the unmet bed needs study.  The Court has

13 signaled its conclusion.  The main question I have at this

14 point is time frame for conducting such a study, taking into

15 account the current circumstances.  So, one, what are the

16 parties' positions on time frame?  I'll start with the

17 defendants.  And will the parties stipulate to defendants

18 conducting that study under the guidance of the special master

19 without further order from the Court?  Mr. Lewis?

20     MR. LEWIS:  Yes, Your Honor.  This is Kyle Lewis.  I

21 will cede the floor my cocounsel, Mr. Silberfeld, on this

22 issue.

23     THE COURT:  All right.  Mr. Silberfeld.

24     MR. SILBERFELD:  Yes.  Good morning, Your Honor.

25 Since we received the Court's order yesterday, I just had an

1    opportunity to exchange emails with Mr. Bien about this timing

2    question, and I believe we're agreed that this work can wait

3    approximately 60 days to begin because of the COVID

4    circumstances in which we find ourselves.

5            THE COURT:  All right.  Mr. Bien; is that correct, you

6    would stipulate to 60 days?

7            MR. BIEN:  Just to be clear, as long as defendants are

8    stipulating that they will do the bed needs study, then we

9    agree that a 60-day delay beginning it would be appropriate,

10   given so much going on with COVID-19 at the moment.

11           THE COURT:  Mr. Silberfeld, would that be the

12   stipulation?

13           MR. SILBERFELD:  It is not yet the stipulation, Your

14   Honor.  We have not had a chance to, in the time between the

15   receipt of the order yesterday and today, to fully assess

16   whether our view is that the steps already taken are enough or

17   whether an unmet bed needs study should be conducted, whether

18   by us or otherwise.

19           To the extent that any of this touches on transfers,

20   our view is that COVID has to take precedence over this at this

21   time, and that's where the 60-day notion came from.

22           THE COURT:  Would 7 days be sufficient for you to

23   exhaust efforts to reach a stipulation with the plaintiffs?

24           MR. SILBERFELD:  Sure.  Absolutely.

25           THE COURT:  Does that work for you, Mr. Bien?

1      MR. BIEN:  I'm going to have Ms. Ells address this,

2   please.

3      THE COURT:  All right.  Ms. Ells.

4      MS. ELLS:  Your Honor, I think fundamentally that

5   7-day period, if it doesn't come with an agreement to actually

6   conduct a bed needs study is of no purpose.  This has been on

7   the Court's agenda since November, I believe, possibly earlier.

8   We spoke with you about this issue in December.  The Court

9   signaled that it was at that point thinking of having this bed

10  needs study.  It again signaled that in March.  This is not --

11  there's nothing new here.  There's no news.  The Court should

12  simply order this process to occur.  We are fine with having it

13  occur within, you know, not sooner than 60 days to account for

14  COVID, but we also believe that in those interim 60 days, we

15  should develop what the process will look like so it can

16  actually start within 60 days.

17      This is an issue that has been a major problem for

18  years.  The last three special master reports have noted that

19  it's broken.  There is no reason to wait anymore.  And all of

20  the initiatives that defendants put in their filing on March

21  2nd about the initiatives they've taken are all tinkering

22  around the edges.  It's, you know -- so looking at the form,

23  the problem is not the form.  The problem is the

24  implementation.  There are systemic problems and pressures to

25  not refer, and that is resulting in suicides.  The special

1    master's report on April 2nd documented that very plainly.

2          So we need to move ahead with this process.  We

3    understand that in the short-term, for approximately 60 days,

4    it may make sense to not begin that process, but we don't think

5    there's any purpose in waiting any longer to issue an order,

6    and we would not stipulate to not have a bed needs study.  So

7    if that is what defendants are hoping to achieve in the next 7

8    days, there's no purpose of that.

9          THE COURT:  My direction would be if there's a

10   stipulation where defendants agree to a bed needs study and

11   with that understanding plaintiffs formally agree to a 60-day

12   delay of any start or, you know, start by the 60th day, that's

13   when I would allow the parties time to file with the Court;

14   otherwise, the Court would make a decision.  Any objection to

15   that approach, Ms. Ells?

16         MS. ELLS:  Pardon me?  Yes.  This is Lisa Ells.

17         No, there's no concern about that.  We're happy to do

18   that.

19         THE COURT:  All right.  So that's what the Court would

20   look for with the 70 days -- 7 days.  This is not Speedy Trial

21   Act.  7 days.  And the stipulation, if there is one, should

22   address whether or not the defendant would agree to conducting

23   a study under the guidance and supervision of the special

24   master without further order of the Court.

25         MR. SILBERFELD:  Understood.

1        THE COURT:  That's what I'll look for within 7 days.

2        Next, in terms of deficient treatment and conditions

3   in the tents.  And there's some suggestion from the plaintiffs

4   that it may be necessary to reverse lift and shifts, and

5   plaintiffs are looking for a comprehensive report from

6   defendants on how they plan to improve the tents, arguably an

7   issue that has taken on new urgency, given temporary protocols

8   being put in place for in-patient care.  Would defendants

9   respond to the plaintiff's suggestion, Mr. Lewis?

10       MR. LEWIS:  Yes, Your Honor.  Defendants do not

11  believe that, I guess, a rollback of the Court's order for lift

12  and shift is appropriate at this time.

13       The special master has completed his monitoring of the

14  tents, but obviously, due to COVID issues, the report, his 28th

15  round report that would address those has not been issued yet.

16  So defendants would be looking for that as further information

17  about the PIPs that could inform any plan that they could be

18  having or that they may create.

19       Defendants also have to point out that right now under

20  COVID has changed operations everywhere.  When it goes back to

21  pre -- not pre-COVID but to post-COVID, the operations are

22  going to look different.  As Dr. Bick indicated, social

23  distancing may be a factor.  It's going to change parts of

24  prison life and, frankly, parts of programming.  So I think

25  defendants need to get a better picture on that before they can

1   implement any changes or do a program both with the special

2   master -- both the special master monitoring and with other

3   information they would have about what the world's going to

4   look like inside the institutions after the COVID pandemic.

5          So at this time we do not believe that rolling back

6   the lift and shift order is appropriate or should be

7   entertained by the Court.

8          THE COURT:  Let me just ask the special master before

9   I ask plaintiffs to respond:  On the current schedule with the

10  current method of conducting the 28th round, Special Master

11  Lopes, can you remind the Court when you expect that report to

12  be submitted?

13         MR. LOPES:  Your Honor, the reports that we've

14  submitted to the Court reflect that the last 10 facilities that

15  we will look at -- we've looked at both CDCR facilities and the

16  in-patient facilities -- the last 10 facilities are to be

17  reviewed virtually, if you will, and we're going to be looking

18  at records and a slither of the issues that we would typically

19  evaluate, and that process is not yet underway.

20         In addition, we had to suspend the tours of Ash and

21  Coalinga because they had flu outbreaks; not COVID-19 but flu

22  outbreaks.  So the 28th round has been interrupted any number

23  of times and it would probably take us another six -- four to

24  six weeks to just get through the 10 remaining institutions,

25  and from there we'd probably have another four to six weeks to

1    produce a report.  So our report for the 28th round, including

2    in-patient facilities, is well off.  It's months and months

3    away.

4         We did report on some PIP issues, though, in the

5    in-patient care report that we filed just weeks ago and

6    reported on the conditions that we knew about, that there were

7    struggles that were occurring in terms of staffing vacancies at

8    CHCF, at CMF, at Salinas Valley and the like.  And those

9    staffing vacancies were making it so that appropriate care

10   couldn't always be provided, and that was pre-COVID.  So we had

11   our concerns about the care that was provided.

12        I'm not opining on reversing the lift and shift,

13   though, Your Honor, because we got the lift and shift because

14   there were so many difficult periods of time in the

15   relationship between CDCR and DSH.  In fact, my predecessor

16   looked at it and in one of his reports he called it a divorce,

17   that the relationships were very very complicated.  So

18   reversing -- I'm not opining on reversing the lift issue.  It's

19   took 10 plus years to get to a point where it was actually

20   effected.  CDCR asked for a lift and shift, if you will, I want

21   to say as early as 2006 and it took until 2017 to finally get

22   the transfer made.  So to reverse it is a complicated topic and

23   discussion with a long, long history.

24        THE COURT:  All right.  Thank you, Special Master

25   Lopes.

1    For the plaintiffs, having heard from the defendant

2  and what the special master's schedule clarified in those

3  comments, your response to the timing of any action the Court

4  might order here?

5    MS. ELLS:  Yes, Your Honor.  Lisa Ells again.

6    We think there's sufficient record statements from the

7  special master I'm finding in his April 2nd report regarding

8  the status of the PIP.

9    There were also detailed findings from the special

10 master, preliminary of course, but detailed findings and

11 discussions at the exits and during the tours themselves.

12    We don't think there's any reason to wait for the

13 formal report.  There is everything that is needed right now

14 for the defendants to begin working on a plan to fix the PIPs.

15    And, in fact, we are concerned about further delay, in

16 part because even though the CHCS PIP was toured on an

17 emergency basis last September and the special master and

18 plaintiffs were promised long-term, short-term and intermediate

19 plans for remediation in September, eight months ago, neither

20 me nor the special master have ever received any such remedial

21 plan.  There's been some workgroups for the CHCS PIP that the

22 special master wasn't even informed were happening, even though

23 he was engaged in headquarters monitoring.

24    This is not an issue that has been given sufficient

25 attention, and we think that the defendants need to be ordered

1    to develop a remediation plan within a short time, may be

2    within 90 days.  And there's no reason to delay that for the

3    further formal findings of the special master.  They have

4    enough to work with, they know what the problems are and,

5    frankly, the problems are every aspect of the PIP.  So, you

6    know, there's no groups, there's no individual treatments,

7    deeply inadequate IDTTs, suicides following discharges and a

8    suicide in the PIP last year, which is just unheard of, chronic

9    staffing shortages that are not getting any better and,

10   frankly, are getting worse even pre-COVID, and those are all

11   documented in the 4T report from the special master.  So

12   there's nothing more that's needed.  Defendants know what needs

13   to happen, they just aren't doing it and, from our perspective,

14   they should be ordered to do it.

15         THE COURT:  All right.  I understand those positions

16   and I will provide direction following this status.  In terms

17   of the staff misconduct against Coleman class members, the

18   Court believes that at this point it's addressed any issue

19   before this Court and any motion practice will be before the

20   Armstrong court for the plaintiff.  Do I have that right?

21         Is this Ms. Trapani?

22         MR. BIEN:  It's Mr. Bien.  There has been -- I think

23   we can do that.  There has not been -- there's still an

24   informal document production that's been done in Coleman.

25   Defendants began that production.  It's not completed yet.

1   It's represented to us that it will be -- there will be more

2   documents produced next week.

3        We have -- since we have -- I am not sure that we can

4   actually bring a motion to compel in Armstrong since we never

5   served the request in Armstrong, as we were told to seek the

6   documents in Coleman.  So we still may need intervention by

7   this Court, but right now I think we -- defendants are

8   voluntarily completing that production.

9        THE COURT:  All right.  Let me just ask, is there --

10  does the plaintiff believe a motion to compel is needed that

11  could be brought before the magistrate judge in the Coleman

12  case?

13       MR. BIEN:  Okay.  That's a good --

14       THE COURT:  Mr. Bien?  Any reason not -- I think in

15  this case that's -- the local rules refer discovery disputes to

16  the magistrate judge.  I would think that's a case where that

17  judge could hear the motions and rule as promptly -- more

18  promptly, than this Court could.

19       MR. BIEN:  Thank you, Your Honor.

20       THE COURT:  All right.  Anything to say in response to

21  those comments to the Court's observations, Mr. Lewis, or

22  whoever is the point person on this issue?

23       MR. LEWIS:  Your Honor, this is Mr. Lewis.  I would

24  just say I don't believe -- defendants do not believe that

25  Armstrong issues or issues that relate to the Armstrong motion,

1    even if they touch on Coleman class members, are appropriately

2    raised within this court for discovery purposes, understanding

3    what the Court just said, but that is defendant's position,

4    that it's not appropriate.

5            Mr. Bien is correct that there are attempts to resolve

6    all discovery issues right now, and we're hoping that a motion

7    would not be necessary in front of any court, this or Your

8    Honor's court.

9            THE COURT:  All right.  Understood.

10           MR. LEWIS:  And Your Honor, if I may.  Your Honor, I

11   apologize.  I did not want to interrupt, Your Honor.  If I may

12   be heard one final point on the PIP issue that you closed out a

13   few minutes ago, if I might?

14           THE COURT:  You may.

15           MR. LEWIS:  Very briefly, Your Honor, I would just

16   point out Ms. Ells said that there's enough to go on now that

17   defendants should be ordered to do something, but that actually

18   runs the risk of defense getting caught between two issues.

19   The special master is going to issue a report that may make

20   recommendations or findings.  Any plan that the defendants may

21   make could be contrary to those and would result in

22   inefficiencies, many of which aren't needed right now, in light

23   of the situation with COVID and other issues within the PIPs.

24   The defendant's party should wait until the special master

25   finishes his report and then the parties can move forward to

 1   improve the care, if necessary, according to his

 2   recommendation.  That's all I have on that, Your Honor.  Thank

 3   you.

 4          THE COURT:  All right.  I understand that position.

 5   I'll take account of that.  If I need more from either side on

 6   this issue, I'll let you know before I make a decision.

 7          On the deferred items, there are issues that have been

 8   slowed in light of the pandemic.  I'm just interested in

 9   hearing very briefly from each side when they think full

10   attention can resume.  So first, coordination following

11   conclusion of the Golding report.  Thoughts, Mr. Bien or a

12   member of your team?

13          MR. BIEN:  I'll address this.  We had a scheduled

14   meeting with receiver and his staff, I think it was actually

15   scheduled for yesterday, that we all agreed should be put off

16   in light of the COVID crisis, and we're going to have a -- I

17   think it's going to take place in about 30 days.

18          I think that we should be able to come to some -- we

19   are learning a lot more about the relationships between the

20   receiver and mental health through this COVID process, but I

21   think it will take another couple of months for us to be able

22   to complete our understanding of it and be in a position to

23   make recommendations to Your Honor or through the special

24   master.

25          THE COURT:  All right.  So that could -- this item

1    could go on the next quarterly status.

2           Mr. Lewis, does that sound right to you or whoever on

3    your team is covering this?

4           MR. LEWIS:  Yes, Your Honor, I'll address this.

5           Your Honor, I had mentioned earlier some of the

6    improvements that were made in EHRS.  I only mentioned three of

7    a very long list of EHRS improvements as well as other

8    improvements that had been made by defendants in light of some

9    of the Golding allegations, specifically to this agenda item.

10   There's a long list of them.  It involves both coordination,

11   involves giving access to certain things to the plaintiff and

12   special master, holding classes, educating them.

13          Dr. Leidner has met numerous times with various people

14   about this and tried to educate everyone as much as possible.

15   Defendants have tried to educate everyone as much as possible

16   on this and look forward to doing it.  So, Your Honor, yes, we

17   do believe this can be rolled over to the next conference, and

18   we do look forward to continuing these coordination efforts and

19   moving forward on this to demonstrate transparency.

20          THE COURT:  All right.  So that item will appear on

21   the next quarterly status.

22          With respect to the second item establishing

23   benchmarks and procedures for determining when constitutional

24   compliance has been durably achieved, any thoughts at this

25   time, Mr. Bien?

1          MR. BIEN:  Ms. Ells is going to address this.

2          THE COURT:  Ms. Ells?

3          MS. ELLS:  Yes, Your Honor.  So the party -- the

4    status on this essentially is that the parties began discussing

5    this topic last fall during the settlement conference

6    negotiations before Judge Drozd.  We made some progress, but

7    it's very clear that the parties are very far apart on where

8    they see both the end points and how to measure those end

9    points.  We'd be happy to file those and share those with the

10   Court so the Court could see where the parties were, but it's

11   very clear that this will be a complicated process with many

12   issues yet to resolve.

13          There's no data or method of measurement at this point

14   also, which complicates things because there has not been any

15   significant progress on fixing the data.  So any process like

16   this has got to -- we have to be aware that it's going to be

17   quite a process and it's going to be time consuming.  And our

18   concern on this one is that it's just not takeaway from the

19   actual issues affecting patient care.

20          So we think this is something that the parties have

21   already begun work on and expect to continue working on it, but

22   it isn't a priority, given the COVID crisis and all of the

23   major issues affecting mental health care right now.  So

24   dealing with it right now, from our perspective, is not the

25   most significant priority before the Court.

1      And I guess the other point I'd make is the Court's

2   original plan was to have the special master discuss this in

3   his report, which we have now heard nothing on when that is

4   expected, so it may well make sense to get the special master's

5   views on that, as the Court originally intended as well.

6      THE COURT:  All right.  Mr. Lewis?

7      MR. LEWIS:  Yes, Your Honor.  Defendants believe that

8   there's are -- there's a correlation between data and the

9   benchmarks.  So understanding the business rules and the data

10  can help build the benchmarks.  And defendants want to get to

11  the fidelity of the data, they want to work with the special

12  master and plaintiffs to develop a plan for validating the data

13  and that this can lead to the creation of the benchmarks.

14      So once we know the benchmarks, we can then refine the

15  tools for monitoring it.  So it is kind of a circle.  So

16  defendants do want to work with the special master and the

17  parties around this, they want to resolve any uncertainty

18  surrounding their data.  They may have stalled the development

19  of these benchmarks and we'll be looking forward to working

20  with the special master and his staff to work out any data

21  issues, explain these issues, some of the things that the Court

22  has already heard about now that has been stalled a little bit

23  with COVID, but this is something that the defendants want to

24  pick back up and would look forward to engaging the special

25  master and the plaintiffs on this going forward.

1        THE COURT:  All right.  Having heard from the parties,

2    the Court would just put this on the next quarterly status

3    agenda just to check in on process going forward without

4    expecting any detailed updates from the parties by the next

5    quarterly status.  But at that point, with better clarity on

6    the timing of the next monitoring round report, it may be that

7    we can look at returning to this issue as a quarterly status

8    thereafter.

9        All right.  On data integration -- I'm sorry, EOP

10   administration, segregation unit hub certification.  Thoughts

11   on that from plaintiffs?

12       MR. BIEN:  Ms. Ells will address.

13       MS. ELLS:  Yes, Your Honor.

14       THE COURT:  Ms. Ells.

15       MS. ELLS:  My apologies.  We don't see any reason to

16   delay action on this item.  All that plaintiffs are

17   requesting -- and this is what we reflected in our posttrial

18   briefing back in October -- is that the parties and special

19   master revisit this process.  Is it a failed remedy.  We know

20   that because it was established at the Golding trial that those

21   reports are totally reliant on defendant's self-reporting,

22   including some of their performance data that we all know

23   cannot be trusted fully.  So a self-reporting remedy for a

24   problem of this urgency, which, again, was designed to remedy

25   findings in the 2013 trial that segregation is dangerous and

1   harms class members' mental health, that's what this remedy is

2   for.  It's an absolutely critical remedy.  It is broken.

3           I would also point out that the reports are so delayed

4   from defendants that it's almost a joke.  We received, just

5   yesterday, the last six months of reports.  We hadn't received

6   anything since December.  The December report covered data from

7   July 2019.  So, you know, we received yesterday reports about

8   conditions in August, September of last year.  It's just a

9   process and it's completely broken and we don't have any

10  confidence that it can work even when it functions properly

11  just because of the inherent nature of the self-reporting.

12          So, you know, our request is that this immediately be

13  taken up to revisit this process.  It is broken and it can

14  be -- it cannot be fixed at a fundamental level.

15          THE COURT:  And does that mean a fully-briefed agenda

16  item at the next quarterly status or before then?

17          MS. ELLS:  We would like to revisit this before then.

18          THE COURT:  All right.  Mr. Lewis?

19          MR. LEWIS:  Your Honor, Ms. Thorn of my office will

20  address this issue.

21          THE COURT:  All right.  I'm sorry.  I didn't hear who

22  you were yielding to?

23          MR. LEWIS:  Ms. Thorn, Elise Thorn of my office.

24          THE COURT:  Ah, all right.  Ms. Thorn.

25          MS. THORN:  Thank you, Your Honor.  Ms. Thorn here.

1          Defendants disagree with plaintiff's characterization

2   of the certification process.  That process initiated in 2014.

3   Defendants have submitted over 50 certification reports.  The

4   special master in 2016 indicated that in the 26th round report

5   he had not had the opportunity to monitor the process but that

6   he would do so in future monitoring reports, and we are still

7   waiting to engage in that discussion and look forward to the

8   special master's reporting of the process.

9          That said, defendants agree that the parties should

10  visit the process and work through the process either in the

11  workgroups or in some other forum.  There's no indication at

12  this point that the Court should disregard the entire process

13  as broken.  So with respect to any delay in the reports, there

14  was some problem following the Golding proceedings with some of

15  the healthcare executives having an issue with signing off on

16  the reports because they did not have or felt that they could

17  not sign off on them with some limitations on the data in the

18  report.  So defendants -- CDCR mental health worked with CCHCS

19  and was able to complete the reports and get those filed.

20  Although the submission of the reports themselves were delayed,

21  the process of the certification continued for the reporting

22  period August through this past February, so it's a very

23  focused review by mental health.  They go into all of the hubs

24  and do an on-site review as well as a chart review, and those

25  continued for the reporting period.

1       THE COURT:  All right.  Let me ask the special master

2   here, is this an issue that a workgroup could address promptly,

3   given everything else that is going on, to exhaust any effort

4   to work this out without briefing, or is this an issue the

5   Court just needs to decide, which it would be prepared to do,

6   of course.

7       MR. LOPES:  Your Honor, thank you for asking that

8   question.  This is one of the areas where the data expert is

9   absolutely necessary.  We have not reported on this area

10  because it was wrapped up in the Golding proceedings where data

11  was called into question and the reports, while at times they

12  have lagged, mostly it's that the information provided couldn't

13  be verified.  It wasn't necessarily verifiable.  So the reports

14  haven't served the usefulness that was contemplated when the

15  order was issued.

16      And if I can take a step back as well, what Mr. Lewis

17  said about DRHS and Dr. Leidner is really more appropriate for

18  the data discussion that we're going to have next, which is

19  that Dr. Leidner hasn't been helping us as much on EHRS as he

20  is in trying to give us a really comprehensive look at how data

21  is processed and the things that we need to be concerned about

22  from a lay standpoint, which has led to the appointment of the

23  data expert that we will be working with.

24      Dr. Leidner has been extraordinary in terms of giving

25  us an overview, but it just highlighted how much we needed --

1    how much more we needed to know and we hope that by having this

2    data expert there, we can get behind some of these things.

3         So going back again, Your Honor, the reporting is so

4    data driven and it has never been a completely transparent sort

5    of report.  I am not suggesting that anyone has done anything

6    untoward, it's just been complicated in terms of getting the

7    data that you actually need.  And then that was all complicated

8    with the Golding report.

9         So it's, I think, everyone's hope that the data expert

10   will be able to evaluate these reports and make recommendations

11   on what needs to be done to make them fully transparent and

12   completely usable.

13        THE COURT:  So taking into account what that means for

14   the certification reports, would it be possible for you,

15   special master, to provide a status report to me within 30 days

16   on that issue?

17        MR. LOPES:  I will -- I will do my best.  It really is

18   reliant upon the schedule of the data expert, but I can update

19   you on what he's able to accomplish in that period of time.

20   That I can definitely report on.

21        THE COURT:  All right.  That's my request.  I'm

22   directing the special master to provide an update on this issue

23   within 30 days.

24        All right.  On the data integration management

25   integrity, I don't know, is there more to say at this point

 1    about resumption of the correction of data problems and

 2    development of adequate mental health management systems?

 3          I would put this on the agenda for the next quarterly

 4    status for a more complete update.  Is there more the plaintiff

 5    would have to say on this front, Mr. Bien?

 6          MR. BIEN:  No, Your Honor.  I think that it's tied

 7    into the issues we've already discussed.

 8          THE COURT:  All right.  Mr. Lewis?

 9          MR. LEWIS:  Nothing further to add, Your Honor, other

10    than to say that defendants are committed to maintaining data

11    integrity and showing some experience in this issue.  Thank

12    you.

13          THE COURT:  All right.  Then just to check in on the

14    items referred to the special master, the Court, since trying

15    to bring proper focus to this issue, has been confronted with

16    the pandemic, as has everyone on this phone call representing a

17    party.  I just wanted to confirm, in the interest of

18    transparency and keeping track of those issues and not having

19    them fall through the cracks, the Court has provided a courtesy

20    copy of the list.  My assumption is that Items 1, 2, 3 and 7

21    are delayed.  I assume the special master agrees with that.

22    Agreed, Special Master Lopes?

23          MR. LOPES:  Yes.

24          THE COURT:  Anything to say about those items for the

25    plaintiff, Mr. Bien?

1           MR. BIEN:  No, Your Honor.

2           THE COURT:  All right.  Mr. Lewis?

3           MR. LEWIS:  Nothing, Your Honor.

4           THE COURT:  All right.  Item 5, I believe the ball

5    here is in the Court's court and I'm working on it; process for

6    annual updates to the program guide.  I understand from the

7    special master that his expert's report on suicide prevention

8    is in process on schedule, and Item 8 has been completed as

9    scheduled.

10          I also understand that coordination is ongoing between

11   the special master and the receiver and (inaudible).

12          I've heard what plaintiff's counsel has said regarding

13   potential gaps in coordination.  I don't have any specific

14   questions at this point in time.  I will follow up with the

15   special master on that issue.

16          Anything else on items referred to the special master

17   for the plaintiffs, Mr. Bien?

18          MR. BIEN:  No, Your Honor.

19          THE COURT:  For the defendants, Mr. Lewis?

20          MR. LEWIS:  No, Your Honor.

21          THE COURT:  All right.  Is there anything else that we

22   should discuss today before adjourning for the plaintiffs,

23   Mr. Bien?

24          MR. BIEN:  No, Your Honor.

25          THE COURT:  For the defendants, Mr. Lewis?

1          MR. LEWIS:  Yes, Your Honor.  I will defer to

2     Mr. Silberfeld for an issue.

3          THE COURT:  All right.  Mr. Silberfeld?

4          MR. SILBERFELD:  Thank you, Your Honor.  We have two

5     hearings now scheduled.  One's 18 days from today, that's the

6     OSC regarding the DSH suspension of transfers.  And then on the

7     22nd, 21 days from today, we have the hearing set on the

8     staffing issue.

9          I'm mindful of the fact that the Court said that the

10     Court would be issuing some further guidance to us about

11     process, what are the questions to be answered, what are the

12     issues, what's the scope, witnesses, burden of proof and such,

13     but I am -- since this falls in my area, I am concerned about

14     the ability to adequately prepare in time for at least that

15     first hearing, the OSC Re:  DSH.  And I'm just concerned about

16     what that process is going to look like, what the scope of that

17     hearing is; will we be able to call witnesses, will

18     declarations in lieu of live testimony be acceptable and so

19     forth.  I just wanted to raise it with the Court.

20          THE COURT:  All right.  So just in a nutshell, and I

21     can provide further clarification by next week, the Court would

22     plan to hold that hearing using what has now become an

23     essential tool for virtual court proceedings, Zoom.gov, which

24     is password protected, but it would be a video conference

25     hearing using that tool.

1          The courtroom deputy would serve as a moderator in

2    terms of allowing folks into the room.  Persons who are not

3    participating in the hearing would have telephonic access, not

4    video conference access, and witnesses could be called.  The

5    Court would identify witnesses.  As is quite typical in these

6    proceedings, I would accept declarations as direct testimony,

7    but I would assume that cross and redirect would occur through

8    video conference.

9          And at this point those dates remain on.  I didn't

10   hear you say, Mr. Silberfeld, that you sought a stipulation to

11   continue them.

12         MR. SILBERFELD:  Not at the moment.  It depends on,

13   frankly, the scope and the length of time and our ability to

14   marshal the evidence that we need to address the Court's

15   questions when we learn what they are, specifically detailed

16   enough to allow us to make an assessment.

17         THE COURT:  All right.

18         MR. WATNICK:  I at least want to reserve the right to

19   come back to the Court -- and I would obviously talk to

20   Mr. Bien in advance of that, but I would want to reserve the

21   right to come back to the Court and say, candidly, we can't be

22   ready by the 19th, or words to that effect.

23         THE COURT:  Understood.  I'll provide further detail,

24   beyond what I've provided today, next week.

25         MR. SILBERFELD:  Very well.

1          THE COURT:  All right.  Anything further from the

2    defense?

3          MR. LEWIS:  Nothing, Your Honor.  Kyle Lewis.

4          THE COURT:  Let me just ask -- all right, Mr. Lewis.

5          Once again, anything from CCPOA, Mr. Adam, if you're

6    still on the line?

7          MR. ADAM:  No thanks, Your Honor.  Thank you.

8          THE COURT:  All right.  Mr. Spurling?

9          MR. SPURLING:  No.  Nothing, Your Honor, thank you.

10          THE COURT:  All right.  Special Master Lopes, anything

11   you would like to say before we sign off?

12          MR. LOPES:  Yes.  Thank you, Your Honor.  I just

13   wanted to clarify a couple of things.  One, in terms of the

14   PIPs, the discussion around the PIPs, we did file, again, our

15   report on April 6th of this year, ECF 6611, which identifies

16   problems that have been discovered at the PIP, so there is

17   current information contained in a special master's report.

18          I will say, however, though, I was not intending,

19   whenever the report came out, to recommend to Your Honor that

20   the lift and shift be reversed.  And the reason for that is

21   because, again, it took so long to effect that change that

22   while there are significant problems, we should -- I believe

23   that the defendants should have a chance to remediate and

24   correct the problems that exist, but there are problems.  They

25   are in the record.  I just wanted to say that.

1          The other thing is Ms. Ells reported accurately that

2     on one report regarding data that she had informed --

3     plaintiffs hadn't heard from the special master, and that's

4     because I filed an extension on the data report, which was due

5     April 6th, then Your Honor granted another 60 days to produce

6     the report.  So yes, it is true that the plaintiffs have not

7     heard from me on that about data but it's only true because I

8     haven't filed the report because it has been -- a request was

9     put in for an extension of time and that request was granted.

10          THE COURT:  All right.  All right.  Understood.  I'll

11     take that into account and any follow-up to the status.

12          I believe we've covered what we need to.  I am very

13     pleased that we've been able to move on to looking forward,

14     once again, regarding what else remains to be done in Coleman.

15     So we will continue to do that even as we keep our finger on

16     the pulse of the Corona virus pandemic and its impact on the

17     Coleman class.

18          I will issue orders, I promise, on -- I don't know if

19     you'll see any other orders this week yet, but you'll see

20     clarification on future hearings and some kind of order next

21     week providing some guidance about how we proceed as well.

22          Thank you very much.  We're in recess.

23          (Concluded at 12:32 p.m.)

24

25

1                  C E R T I F I C A T E

2

3        I certify that the foregoing is a true and correct

4    transcript of the record of proceedings in the above-entitled

5    matter.

6
     /s/ JENNIFER L. COULTHARD              May 4, 2020
7                                                  DATE

8

9    JENNIFER L. COULTHARD, RMR, CRR
     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25