XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone:  (916) 210-7323
 Fax: (916) 324-5205
 E-mail:  Lucas.Hennes@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone:  (310) 552-0130
 Fax:  (310) 229-5800
 E-mail:  RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>　　　　　　　　　　Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' NOTICE OF SUBMISSION OF *PLATA* CASE MANAGEMENT CONFERENCE STATEMENT** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendants submit as Exhibit A a true copy of the Joint Case Management Conference Statement filed on May 6, 2020 (ECF No. 3316) in *Plata, et al. v. Newsom, et al.,* Case No. 01-1351 JST (N.D. Cal.). The *Coleman* Defendants concur with the position taken by the defendants in this filing concerning coordination of issues related to COVID-19 regarding California Department of Corrections and Rehabilitation inmates, and with the position taken as to the appropriate venue to address such issues.

Dated: May 6, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

*/s/ Lucas L. Hennes*

LUCAS L. HENNES
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003

# EXHIBIT A

XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | CASE NO. 01-1351 JST<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date:     May 6, 2020<br>Time:    2:00 p.m.<br>Crtrm.:  6, 2nd Floor<br>Judge:  Hon. Jon S. Tigar |

The parties submit the following joint statement in advance of the May 6, 2020 Case Management Conference. The parties exchanged their respective sections at approximately 8:05 this morning.

## I. PLAINTIFFS' STATEMENT

As of just before 8:00 a.m. this morning, 378 patients statewide had been confirmed to have COVID-19 via testing: 252 (an increase of approximately 150 from a week ago) at the California Institution for Men (CIM), 109 at California State Prison – Los Angeles County (LAC), 11 at California Men's Colony, two each at Centinela State Prison, and the California Institution for Women (CIW), and one each at North Kern State Prison and the Substance Abuse Treatment Facility and State Prison. At CIM, most confirmed patients have been in Facility D; more recently some confirmed cases have occurred in Facility C, located approximately a mile away, and this past week more than 60 confirmed COVID-19 cases have been reported in Facility A, the first cases there. Facility A is comprised of eight dorms; 85% – 90% of the population is designated medical high risk, with many who are elderly. At LAC, where previously all cases were in various housing units in Facility D, three COVID-19 cases were confirmed this past week in Facility A.

There has been one death (on April 19th) statewide. Currently, 21 patients statewide, including 17 from CIM and four from LAC, are at outside hospitals; another 13 (eight at CIM, four at LAC, one at CIW) are housed in inpatient medical beds within the prisons. Per the CCHCS COVID-19 population tracking website, three patients' COVID-19 condition is considered resolved. In addition, while not yet listed as resolved on the website, dozens of patients at CIM and LAC have been removed from medical isolation status, which is reserved for those who require daily monitoring and must be separated from others who do not have COVID-19. These patients' condition apparently are resolved as well.

Also, on April 24, 2020, CCHCS changed its COVID-19 testing criteria to permit, for the first time, the testing of asymptomatic patients if directed by its public health staff.

It appears that partly as a result of this change, the total number of people tested for COVID-19 in the last 12 days, including those pending results, substantially exceeds the number tested in the 30 days before the change. CCHCS has also said it plans to conduct testing of asymptomatic patients at all prisons (apparently the numbers will be relatively small at first).

### A. Defendants' implementation of the Receiver's directive to facilitate distancing in CDCR dorms and other congregate living settings.

Plaintiffs do not yet have complete information regarding Defendants' implementation of the Receiver's directive to facilitate distancing in CDCR dorms and other congregate living units, as explained below. What appears clear, however, is that, even if Defendants have fully completed all related transfers and finalized all auxiliary housing units (including gyms and tents), their program to facilitate distancing in the living units remains inadequate to stem the spread of the virus inside the prisons.

First, we do not know whether Defendants believe they have completed the implementation of their plan to facilitate distancing in the CDCR dorms and congregate living units.

Second, Plaintiffs do not have sufficient information to determine what Defendants have done to execute their plan to "cohort" people living in dorms. Specifically, we have not been provided requested information to demonstrate whether Defendants have moved beds in all dormitories and congregate living areas so that they are either six feet from other beds, or they are arranged in cohorts of eight beds, surrounded by at least six feet of space in all directions. Given restrictions on prison visiting, Plaintiffs are unable to conduct site visits to assess Defendants' progress towards completing this mission. Accordingly, Plaintiffs requested that Defendants "provide photos or video-recorded site visits of each of the newly configured dormitories, in which staff measure the distances between cohorts, and document access to programs, bathrooms and showers, medical/mental health services, and meals." ECF No. 3294 at 3.

Defendants' response thus far has been limited and unsatisfactory. They have produced some photographs, drawings, and copies of blueprints that appear to depict some of the dormitories at ten of the 35 state prisons. Defendants produced no video recordings. Just one photo included a tape measure stretched between bunks, but that photo was not sufficiently detailed to allow one to read the length marked by the tape measure. Some of the drawings and blueprints reflect measurements of six feet, but are not clear regarding what is being measured, or whether the drawings are to scale, or whether the drawings reflect what is actually happening on the ground. On April 29, we asked Defendants' counsel when they intended to provide the photos and drawings of the remaining housing facilities in all of the state prisons. On May 4, Defendants' counsel stated that they did not know when they would complete the production, and that further photos and drawings would be produced "soon." Plaintiffs have received no further documents.

Finally, even if Defendants have reached their goal of rearranging beds in all of the congregate living units in the prisons, the creation of eight-person sleeping cohorts and the distancing of some dorm beds does not, without more, adequately address the risk of viral spread at the prisons. As we explained in last week's Joint Case Management Conference Statement, "the new housing design fails to protect *Plata* class members from a very significant risk of harm from COVID-19" because the design impacts only sleeping arrangements. ECF No. 3304 at 3. Because incarcerated people and staff continue to move freely in these housing units when not sleeping, sharing common areas including day rooms, showers, and toilets, those in the dorms remain at substantial risk of harm from contracting COVID-19.

At last week's hearing, after hearing from the parties, this Court ordered Defendants to respond to three questions regarding their cohorting plan:

1. What do we know about distancing among dorm residents while they are awake?

 2. What steps is CDCR taking to achieve physical distancing for inmates in dormitories?
 3. What steps is CDCR taking to limit the number of staff that interact with dorm residents on a daily basis?

Defendants' response conflated the first two questions. ECF No. 3314 at 2. Essentially, Defendants acknowledge that people living in the dorms "have greater freedom of movement" than those living in cells, and "this has not changed since the pandemic began." *Id.* at 3.

Connie Gipson, the Director of Adult Institutions, has claimed that the CDCR's "social distancing cohorts" would be analogous to family units in communities. ECF 3275 ¶ 9. In fact, they are clearly not analogous to family units that have, since March 19, been sheltering in place in their own homes pursuant to the Governor's order. In the dorms, the eight-person cohorts are not expected to remain distanced from other cohorts during the day in the way that households in the community remain distanced from each other. ECF No. 3314 at 3. Defendants claim that "[s]imilar to when people in the community leave their homes to recreate or shop for groceries, the onus is primarily on inmates themselves to maintain physical distancing when they leave their bunk areas…." *Id.* But the comparison to people in the community is simply not helpful here. Unlike *Plata* class members, people in the community do not have to share their bathrooms, dining rooms, showers, and living rooms with scores of other people, risking exposure to a potentially deadly virus. They are not locked inside with dozens of other families with no independent access to the outdoors. Defendants maintain that people in the dorms "seem to be highly motivated to practice physical distancing and to take other precautions," but these vague assurances are supported by no data, and are unverifiable. *Id.* Indeed, none of

the policies and practices that Defendants maintain exist in these dormitories is subject to any form of accountability.[1]

Regarding staffing in the dorms, Defendants tacitly acknowledge that staff are not assigned to particular cohorts of people within the dormitories.  *Id.* at 5.

Based on Defendants' response to the Court, it appears conditions in the dorm are substantially as Plaintiffs described them in the last Joint CMC Statement.  The prison dormitories and other congregate living spaces remain dangerous, exposing the dorm residents to an unreasonable risk of contracting COVID-19.

To address these dangerous conditions, Plaintiffs propose that Defendants, CCHCS, and Plaintiffs form a work group to develop guidelines for cohort housing in CDCR prisons and ensure that vulnerable patients are adequately housed.   Such guidelines should include standards for ensuring that common areas, including showers, day rooms, and prison yards, are made available to specific cohorts throughout the day, and all common areas, including bathrooms, are cleaned and disinfected between uses.  Further, they should govern how meals are provided and how people in different cohorts access canteen, medical care, and other services at the prison.  The work group should consider what measures may be taken to ensure the greatest consistency for staffing in the dorms.  Also, monitoring measures can be developed so that compliance can be assessed and tracked.  The work group could also address related issues that will arise as the population in CDCR increases when intake reopens, complicating efforts to maintain distancing in the dorms.

Plaintiffs understand that, as soon as May 24, CDCR may re-open intake into the Reception Centers, re-start transfers out of the Reception Centers to other prisons, and

---

[1] Near the close of business yesterday, the Receiver's counsel sent an email to the parties stating that the certain activities in the dormitories would be "documented" but not "audited" by other custodial staff, who presumably report not to the Receiver, but the Secretary.  These vague descriptions are not sufficient to provide confidence that the sufficient safeguards are in place to minimize the risk of infection.

perhaps re-start transfers between prisons as well. This raises questions about Defendants' and CCHCS's plans to prevent or limit the introduction and spread of the virus. The decision to resume intake also raises questions about CDCR's plans for cohorting in the dorms. In response to COVID-19, CDCR halted Reception Center intake, and accelerated the release of a group of people who were within 60 days of their parole dates. The population reduction achieved by those measures will be lost once intake is resumed and those currently held in county jails are transferred to CDCR. Plaintiffs are concerned about CDCR's ability to maintain the integrity of the cohort system in the dorms when the population increases.

**B.     Medical care and other matters related to COVID-19.**

As part of Plaintiffs' monitoring, the Receiver's office has arranged for weekly phone conferences with CCHCS's Chief Medical Executive and, when Plaintiffs' questions involve custody staff, CDCR executives. This week's call is scheduled for tomorrow, May 7. Plaintiffs have requested that CDCR executives again attend the call.

Among the key questions and concerns Plaintiffs hope to discuss are:

1. <u>Intake</u>: <u>Testing</u>: As explained above, CCHCS recently changed the criteria for who may be tested for COVID-19. Plaintiffs have asked to discuss whether/how this change impacts CCHCS's testing strategies and the availability of test supplies.

<u>Specialty Care and Elective Procedures</u>: In light of the Governor's decision to loosen restrictions on elective surgeries statewide, Plaintiffs have asked to discuss whether CCHCS will resume referrals to specialty care and elective procedures.

**II.    DEFENDANTS' STATEMENT**

Defendants' statement describes the additional measures CDCR has taken since the last case management conference on April 29, 2020. In addition, Defendants' statement provides a summary of additional information and documents they have produced to Plaintiffs since the last conference.

### A. *Plata/Coleman* Coordination

As Defendants indicated in prior joint statements to this Court, Defendants remain concerned regarding the risk of conflicting orders being issued by the *Plata* and *Coleman* Courts with respect to Defendants' response to the COVID-19 pandemic. That concern has only increased, particularly following the recent May 1, 2020 *Coleman* telephonic status conference, during which Plaintiffs' counsel, Mr. Specter, stated that the *Coleman* Court should immediately require CDCR to develop "instructions and guidelines on how these cohorts are supposed to function … in the dormitories with respect to the transmission of the virus and consistent with community public health standards." *Coleman* ECF 6657 (May 1, 2020 Transcript) at 19:14-18. Mr. Specter also requested that the Court require "either the [R]eceiver or the CDCR [to] undertake an analysis of the people who are living in dorms and cells, for that matter, who are medically high risk and establish[] a process for putting them in living situations which put them at the minimal risk practical under the circumstances." *Id.* at 19:20-20:2. These requests, which were not ruled upon by the *Coleman* Court, lie squarely within this Court's purview and only serve to complicate any coordination efforts between the Courts.

On May 4, 2020, Plaintiffs' counsel in *Plata* and *Coleman* – Mr. Specter and Mr. Bien – reached out to Defendants' counsel to request that the parties stipulate to coordinate the following three COVID-19-related topics to "minimize the potential for conflicting orders": (1) the use of cohorts in dormitories, (2) testing, and (3) housing of high risk individuals. Mr. Mello responded on May 5, 2020, and stated that Defendants believe that issues related to the provision of medical care for inmates who contract COVID-19, and efforts to prevent and slow the spread of the virus, are strictly medical in nature and require a focused response from the Receiver with oversight through the *Plata* Court. Defendants advised that they would support a stipulation indicating that CDCR's efforts to treat infected inmates and to prevent and slow the spread of the virus, which would encompass the three topics identified by Mr. Specter, should be handled by the Receiver,

as they currently are, and that questions or concerns about those subjects should be raised with the *Plata* Court, as they currently are.[2]  As of the time of this filing, Defendants have not yet received a response from Plaintiffs' counsel.  Defendants suggest that this be a topic for discussion during today's case management conference.

### B. CDCR Has Taken Additional Steps to Improve Physical Distancing in Its Institutions.

As set forth below, Defendants have continued implementing measures, including inmate transfers, to achieve physical distancing and establish eight-person cohorts in CDCR's dorms.

#### 1. All dorm transfers have been completed.

On April 29, 2020, 50 inmates from the Substance Abuse Treatment Facility were transferred to CSP-Corcoran.  Shortly thereafter, the remaining inmates from the Facility A-dorms at the California Institution for Men (CIM) were transferred out to other areas within CIM.  All scheduled transfers have now been completed.

#### 2. The activation of gyms in CDCR's institutions has been completed.

On or around April 11, 2020, CDCR started activating gyms at various institutions to provide for additional housing space.  Twelve gyms have been activated and they are ready to house inmates.  These twelve activated gyms have capacity to house up to 578 inmates, as follows:  California State Prison, Los Angeles County (34 beds); California State Prison, Solano – Facility C (64 beds); California State Prison, Solano – Facility C (64 beds); CIM (50 beds); Correctional Training Facility (54 beds); Mule Creek State Prison – Facility A (34 beds); Mule Creek State Prison – Facility B (34 beds); Mule Creek State Prison – Facility C (34 beds); Pleasant Valley State Prison – Facility A (34 beds); Pleasant Valley State Prison – Facility B (34 beds); Pleasant Valley State Prison – Facility D (34

---

[2] Defendants can provide a copy of this email chain upon request, but understand exhibits are not permitted in case management statements.

beds); and San Quentin State Prison (108 beds). All of these gyms have been approved by the State Fire Marshal and provide for proper access to showers and bathrooms. The daily cleaning schedule for the gyms is the same as the COVID-19 related cleaning schedule for other housing units or living areas, *i.e.,* a minimum of two rounds of cleanings per shift during second and third watch.

Inmates are already residing in the following gyms: California State Prison, Solano – Facility C gym (approximately 64 inmates); Correctional Training Facility gym (approximately 53 inmates); and San Quentin State Prison gym (approximately 101 inmates). As of May 5, 2020, the gym at CIM was housing approximately 44 inmates. These numbers fluctuate on a daily basis. The remaining gyms have capacity to house an additional 302 inmates if needed in the future.

      **3.    CDCR is working toward providing updated guidance to all institutions regarding measures to mitigate inmate and staff exposure to COVID-19.**

Following Defendants' May 1, 2020 filing responding to the Court's questions about dorms, CDCR began working on additional written guidance that will reiterate the measures that each institution must consider when developing their daily operational programs to mitigate the exposure of inmates and staff to COVID-19. The guidance will include measures the institutions must consider to facilitate and encourage social distancing among inmates during yard time, in the dayrooms, in the dining halls, during showers, and in the restrooms. However, the guidance will not sanction the use of discipline or force on inmates who exercise their free will and choose not to socially distance themselves during yard time, in the dayrooms, etc. Instead, staff will work to facilitate social distancing during the daily program and educate and encourage inmates to engage in social distancing practices including the mandatory use of face barrier masks.

### C. Miscellaneous Other Updates

As mentioned in the last CMC statement, in collaboration with the Governor's Office of Emergency Services, CDCR commenced work on Project Hope, which provides hotel

rooms to inmates who are released on parole while under isolation or quarantine. The program ensures that these parolees will have an appropriate and safe place to complete their quarantine or isolation. The project is now fully operational. As of May 4, 2020, three parolees, all of whom were release from CIM, have been placed in hotels.

Further, CCHCS has started to perform surveillance testing of asymptomatic inmates for COVID-19 with the goal of further expanding the tests based on each institution's needs and consistent with the Rockefeller Foundation's National COVID-19 Testing Action Plan. Just as when surveillance testing is done in the community, the results of these surveillance tests may lead to an increase in the number of COVID-19-positive inmates at CDCR's institutions.

### D. Information and Documents CDCR has produced to Plaintiffs since April 29, 2020

On April 30, 2020, CDCR produced an updated document to Plaintiffs' counsel that reflected the status of the dorm transfers. Further, on May 4, 2020, CDCR provided answers to several questions about food services at CIM and the tents that were set up to house inmates at CIM's Facility D. The same day, CDCR also produced photos and a diagram pertaining to the tents as well as a roster with the names of all inmates who were housed in the tents.

Following CDCR's April 24, 2020 production of photos and diagrams that depict the set-up of the eight-person cohorts in dorms at ten facilities, Plaintiffs' counsel has asked for more photos and diagrams from the dorms at the remaining institutions. Defendants are coordinating this request with the respective institutions, and will soon begin providing the requested documents on a rolling basis.

/ / /
/ / /
/ / /
/ / /

| | |
|---|---|
| DATED:  May 6, 2020 | PRISON LAW OFFICE |
| | By: _____*/s/ Steven Fama*_____<br>STEVEN FAMA<br>Attorney for Plaintiffs |
| DATED:  May 6, 2020 | XAVIER BECERRA<br>Attorney General of California |
| | By: _____*/s/ Damon McClain*_____<br>DAMON MCCLAIN<br>Supervising Deputy Attorney General<br>NASSTARAN RUHPARWAR<br>Deputy Attorney General<br>Attorneys for Defendants |
| DATED:  May 6, 2020 | HANSON BRIDGETT LLP |
| | By: _____*/s/ Paul Mello*_____<br>PAUL B. MELLO<br>SAMANTHA D. WOLFF<br>Attorneys for Defendants |