UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB P |
| Plaintiffs, | |
| v. | ORDER |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

The court held a further telephonic status conference on May 1, 2020, for further updates on defendants' response to the novel coronavirus (COVID-19) pandemic and its impact on *Coleman* class members as well as to address agenda items deferred from the first regular quarterly status conference of this year held March 20, 2020. At hearing, the court made several rulings, which are confirmed in this written order. The court also clarifies certain matters and makes additional orders to provide further direction going forward.

/////

/////

/////

/////

/////

1

I. IMPACTS OF COVID-19 ON CLASS MEMBERS AND MENTAL HEALTH PROGRAMMING

A. Background

The remedy in this action, developed over twenty-five years, includes a comprehensive Mental Health Services Delivery System Program Guide (Program Guide), which governs the delivery of mental health care to incarcerated class members; a Compendium of Custody Related Measures, which governs remediation of identified Eighth Amendment violations in certain custody practices with respect to class members; a mental health staffing plan; and regular mental health bed projections and concomitant planning for building of necessary mental health beds and clinical treatment space. *See* July 9, 2019 Order, ECF No. 6214 at 2.[1] This court, assisted by its Special Master, has both the authority and the responsibility to oversee development and implementation of, as well as defendants' compliance with, all aspects of that remedy. In carrying out its role, the court must ensure the plaintiff class receives constitutionally adequate mental health care and is not subjected to the unconstitutional custodial practices identified at trial and during the remedial phase of this action. In this case, the court's actions at all times are consistent with that authority and obligation.

Of necessity, in light of COVID-19's infiltration of the state prisons, most of the discussion at regular status conferences conducted by this court since March 20, 2020, has focused on the impact of COVID-19 on members of the *Coleman* class and on *Coleman* compliance. *See, e.g.*, Reporter's Transcript of Proceedings (3/20 RT), ECF No. 6636, at 15, 22 (discussing formation of task force to "address *Coleman* compliance during this critical phase of managing the coronavirus outbreak," as coordinated effort with *Plata*[2] Receiver "both to contain or mitigate spread of COVID-19, but also to ensure that there aren't collateral consequences for the *Coleman* class, which is already under stress."); *see also* Reporter's Transcript of Proceedings

---

[1] References to page numbers in documents filed in the Court's Electronic Case Filing (ECF) system are to the page number assigned by the ECF system and located in the upper right hand corner of the page.

[2] *Plata v. Newsom*, Case No. 01-1351 JST (N.D. Cal.).

(3/27 RT), ECF No. 6557, *passim* (conference included update on initial coronavirus task force meetings, availability of testing, limitations on class members transfers to Department of State Hospitals (DSH inpatient care and to higher levels of care from at least certain prisons; access to group therapy for Enhanced Outpatient Program (EOP) inmates); Reporter's Transcript of Proceedings (4/3 RT), ECF No. 6603, *passim* (conference focused on transfer of *Coleman* class members to inpatient care at Department of State Hospitals (DSH)); Reporter's Transcript of Proceedings (4/17 RT), ECF No. 6634, passim (covering task force update, monitoring of *Coleman* class member transfers to DSH inpatient programs, filing of responses to defendants' April 16, 2020 Strategic Management Plan, and detailed review by task force of housing of *Coleman* class members, starting with those at high risk for COVID-19).

At the first March 20 status conference focused on COVID-19 issues, as noted above, the court ordered the formation of a coronavirus task force to allow expedited, pragmatic discussions and decisionmaking and preclude, to the extent possible, the need for litigation. *See* 3/20 RT, ECF No. 6636, at 26. Defendants represented they had a "draft plan" which they could share at the initial task force meeting, and the court directed them to do so. *Id.* at 24, 26. At the second status conference on COVID-19 issues, held on March 27, 2020, the Special Master reported that on March 25, 2020, defendants had provided what was described at the time as a "final mental health plan," though the Special Master reported the parties had also agreed to share "any updates" to that plan. 3/27 RT, ECF No. 6557, at 12. The court ordered defendants to file the plan right after the March 27, 2020 hearing, which they did. ECF No. 6535 (hereafter March 25 Mental Health Plan). The March 25 Mental Health Plan, styled "COVID-19 – Mental Health Delivery of Care Guidance, was issued by Dr. Eureka Daye, Deputy Director for CDCR's Statewide Mental Health Services, on the letterhead of the California Correctional Health Care Services (CCHCS), the organization established and overseen by the *Plata* Receiver.

On April 2, 2020, the Three Judge Court convened in this action and in the *Plata* action held a hearing and on April 4, 2020 denied plaintiffs' emergency motion to modify that Court's population reduction order without prejudice to the rights of the plaintiff classes to seek relief in the individual cases. ECF No. 6574. On April 6, 2020, following conclusion of the

Three Judge Court proceedings, this court issued an order noting, *inter alia*, that as of that time seventeen inmates had tested positive for COVID-19, "more than double[ ]" the number of positive tests since the latter part of the prior week, that at least one of the infected individuals was a *Coleman* class member, that fifty-three correctional staff had self-reported as positive for COVID-19, and that at least one of those had conducted a group session for *Coleman* class members in March 2020.  ECF No. 6580 at 2.[3]  Given the growth in positive COVID-19 tests among CDCR inmates and staff and the attendant "exigent circumstances" that "appear[ed] to require immediate steps to safeguard the constitutional rights of the plaintiff class," and which the court had "no indication" defendants were taking, the court directed the parties to file, by April 8, 2020, simultaneous briefing addressing the following questions:

> 1. In light of the coronavirus pandemic, what are the constitutional minima required for physical safety for *Coleman* class members? Is six feet of physical distancing required by the Constitution? If not, why not and what is required?
>
> 2. Assuming some level of physical distancing is required by the Constitution, what additional steps, if any, must be taken to ensure that defendants continue to deliver to *Coleman* class members at a minimum the level of mental health care that has thus far been achieved in the ongoing remedial process in this case, focused on achieving the delivery of constitutionally adequate mental health care to the plaintiff class?

*Id*. at 2.  The court also ordered defendants to provide specific expedited discovery concerning the housing status of *Coleman* class members and identifying those with at least one COVID-19 risk factor, and "defendants' specific plan" to achieve in one week "a defined level of physical distancing for any *Coleman* class member" living in housing that did not permit six feet of physical distancing, "including but not limited to concrete information on any plans to

---

[3] Now, just over one month later, the number of inmates who have tested positive for COVID-19 has risen to 462 from a total of 2005 inmates tested.  Of those, 430 remain "active" in custody, 5 were released from custody while "active," 23 have "resolved," and 4 have died.  In this context, "active" means the total number of inmates who have had a positive COVID-19 test result and who have not met the California Correctional Health Care Services criteria for being "resolved," or did not meet those criteria before release from custody.  *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/.  As noted below, the 4 inmates who have died are all members of the *Coleman* class.  *See* note 4 *infra*.

4

temporarily relocate such class members to off-site secure facilities." *Id*. at 3. Except for a minor dispute over what information should be sealed, defendants provided the discovery ordered and filed the requested briefing without objection. ECF Nos. 6586, 6596.

The court set the specific deadlines in its April 6, 2020 order in anticipation of a third status conference on the impact of the COVID-19 pandemic on the plaintiff class, which it previously had scheduled for April 10, 2020. ECF No. 6580 at 1-2. Informed by the briefing responsive to the April 6, 2020 order, that status conference covered a wide range of issues, while still tethered to concerns for the vulnerable *Coleman* class in the face of the coronavirus pandemic.[4] Reporter's Transcript of Proceedings (4/10 RT), ECF No. 6601. In addition to several matters focused on *Coleman* compliance generally as well as the impact of COVID-19 on class members, the court discussed with the parties whether defendants had particular plans for testing *Coleman* class members and for housing *Coleman* class members to achieve physical distancing guidelines, and also covered impacts on transportation systems, as well as the anticipated horizon for the duration of defendants' emergency plans in light of COVID-19. Consistent with their briefing, at the status conference defense counsel informed the court that, with respect to matters such as physical distancing, testing and inmate releases and transfers, the focus was on "departmentwide mitigation" and that there were no particularized plans for *Coleman* class members or for high-risk inmates, *id.* at 31, 32, although *Coleman* class members would also be covered by such measures. *See* ECF No. 6596 at 2-7. Defense counsel also told the court there was "no horizon" to the "temporary circumstances" of the COVID-19 pandemic, and CDCR's Director of Health Services, Dr. Joseph Bick, confirmed it was "too early to identify a horizon." *Id*. at 38.

---

[4] These concerns continue to grow. At the May 1 hearing, Dr. Bick reported that 71 percent of inmates diagnosed with COVID-19 at that time were members of the *Coleman* class. Reporter's Transcript of Proceedings (5/1 RT), ECF No. 6657, at 51. As of May 7, 2020, four inmates have died of COVID-19. The Special Master has provided information to the court, which he received from defendants and which has been shared with plaintiffs, that all four of these individuals belonged to the *Coleman* class.

In the briefing and at the status conference, defendants also referred to their March 25 Mental Health Plan as one among several "plans afoot." 4/10 RT, ECF No. 6601, at 37; ECF No. 6586 at 6-8. Defendants reported they were "actively working with the Special Master and his experts to develop guidelines for temporary transfers of inmate-patients should they need a higher level of mental health care." ECF No. 6586 at 8. Finally, as part of its overall effort to understand the landscape confronting the plaintiff class and the implications for the established *Coleman* remedy, and defendants reference to multiple plans, the court directed defendants to file their overall strategic COVID-19 management plan "recognizing that" in light of defendants' overall description of their efforts, this plan would "answer this Court's questions about the *Coleman* class" and allow the court to "evaluate whether or not that plan does meet the needs of the *Coleman* class under the circumstances." 4/10 RT, ECF No. 6601, at 40.

In its written order after the April 10 hearing, the court confirmed the direction to defendants to file their strategic plan, which they had described as aimed at achieving, "to the maximum extent defendants currently maintain is possible," compliance with the U.S. Centers for Disease Control and Prevention (CDC) Interim Guidance on Management of Coronavirus Disease (2019) (COVID-19) in Correctional and Detention Facilities (CDC Guidance). ECF No. 6600 at 2. The court's order specifically provides:

> The plan should include objectives and timelines for defendants' plans for housing of *Coleman* class members who are not being granted early release from the California Department of Corrections and Rehabilitation (CDCR), including those most at risk for COVID-19. It should also provide for continuity of mental health care, including access to clinically indicated levels of mental health care and attendant programming as outlined in the Program Guide.

*Id*. On April 16, 2020, defendants filed a plan accompanied by twenty-eight attachments (hereafter April 16 Strategic Plan). ECF Nos. 6616, 6616-1.

Sections I through III of the April 16 Strategic Plan are represented to be a joint plan of CDCR and CCHCS. These sections cover communication and coordination between and among the two agencies and with the public; practices to prevent the spread of COVID-19, with population management steps including temporary restrictions on transfers of new inmates from county jails, an expedited release plan for certain inmates, a modified program to significantly

6

restrict inmate movement for a 14-day period; limitations on inmate transfers; housing transfers to increase physical distancing; changes to institutional staffing patterns; verbal screening and temperature protocols for all persons entering prisons; suspension of visitation; use of personal protective equipment (PPE); cleaning protocols; and tiered operational guidelines. ECF No. 6616-1 at 6-16.  Section IV is "CDCR's Plan to Provide Mental Health Care to Patients During COVID-19 Global Pandemic" and incorporates as attachments the March 25, 2020 Mental Health Plan, and other documents covering transfer and screening of patients referred to a higher level of care (Attachment V); provision of treatment to patients awaiting transfers to higher level of care (Attachment X); establishment of temporary mental health units for patients in restricted housing units referred to MHCBs or PIPs (Attachment Y); access to EOP and "enhanced treatment for patients who cannot transfer" (Attachment Z); enhancements to certain property restrictions and programming (Attachments AA and AB); and expanded phone privileges (Attachment L).[5] Attachment V is issued on CCHCS letterhead by Dr. Bick, CDCR's Director of the Division of Health Care Services.  Attachment W is issued on CCHCS letterhead by three persons, namely, Dr. Daye, CDCR's Deputy Director of the Statewide Mental Health Program, Connie Gipson, the Director of CDCR's Division of Adult Institutions, and Barbara Barney-Knox, Deputy Director of Nursing for CCHCS.  Attachments X through Z are not issued on any letterhead.  Attachments L, AA and AB are issued on CDCR Memorandum letterhead.  On April 17, 2020, the court allowed briefing responsive to the April 16 Strategic Plan, ECF No. 6622, and on April 20, 2020, approved three hour extensions of time for plaintiffs' response and defendants' reply in light of new information the parties said had been presented at a case management conference held that day in the separate *Plata* case.  Plaintiffs timely responded on April 20, 2020, ECF Nos. 6626-6628, and defendants' reply was timely filed April 22, 2020, ECF Nos. 6633, 6633-1.

In their reply, defendants assert that plaintiffs' objections to the April 16 Strategic Plan raise issues beyond the scope of this court's jurisdiction and focus principally on matters

---

[5] An additional relevant attachment, Attachment F, issued on CDCR Memorandum letterhead, applied during the modified 14-day lockdown, which apparently has ended.

1  "squarely in the province of the *Plata* court" and its Receiver.  ECF No. 6633 at 2.  At the  May

2  1, 2020 hearing, defendants raised a similar objection to the presentation by plaintiffs' counsel to

3  this court.  *See* ECF No. 6657, at 24-25.  Defendants argued there would be "a great risk of

4  conflicting orders" were this court "to get involved in this matter regarding transfers or anything

5  like that" and specifically took the position that this court has no authority to order the transfer of

6  *Coleman* class members "if it's related to their COVID-related factors and medical risk or those

7  kind of things."  *Id*. at 25, 28.  These arguments, against the backdrop of six weeks of status

8  conferences and associated filings by the parties, for the first time appear to question the scope of

9  this court's authority to act in this matter.[6]

10                   B.        Relationship to *Plata; Coleman* Jurisdiction

11         To the extent there is any effort to blur lines, it must be emphasized this court's

12 jurisdiction does not extend to the delivery of medical care to, or medical management of,

13 members of the plaintiff class here.  That authority, and responsibility, are with the *Plata* court

14 and the *Plata* Receiver.  As this court has recognized, "[w]hile there are areas of overlap"

15 between this action and *Plata*, "the two cases are distinct," Order filed December 17, 2019, ECF

16 No. 6427, at 43, and "each court ha[s] 'individual obligations' under their respective decrees."

17 Order filed November 19, 2019, ECF No. 6396, at 2 (quoting Reporter's Transcript, June 8, 2006,

18 ECF No. 1848, at 2:21-25).

19         Given the areas of overlap between the *Coleman* and *Plata* cases, the two courts

20 established a coordination process more than fifteen years ago, intending "to avoid any surprises

21 in the remedial proceedings in either case."  Order filed November 19, 2019, ECF No. 6396, at 2

22 (citing Reporter's Transcript, June 8, 2006, ECF No. 1848 (6/8/06 RT) at 4:2-7.  The COVID-19

---

[6] Defendants' April 22, 2020 reply to plaintiffs' response to defendants' April 16 Strategic Plan, which is not in the form of a motion, focuses principally on arguments that plaintiffs have overstepped by asking this court for relief that is under the jurisdiction of the *Plata* court and its Receiver.  *See* ECF No. 6633 at, *e.g.*, 6-7.  The court does not reach those arguments in this order.  While the court does address the scope of its jurisdiction, as part of clarifying its answer to the first question a federal court asks, the court assumes the parties will from now on tailor and focus any formal requests for relief from this court by noticed motion.

1    pandemic is just the latest in a series of issues that calls for meaningful coordination. On the one
2    hand, COVID-19 is an illness requiring specialized medical management and treatment and
3    protocols for medical management of California's prison population are the responsibility of the
4    *Plata* court and CDCR. At the same time, to the extent those protocols govern inmate housing
5    placement decisions and restrict inmate transfers, they may have a direct impact on *Coleman* class
6    members' access to necessary mental health care as ordered by this court. And as defendants
7    themselves have recognized, *Coleman* class members "are at increased risk for escalation in
8    depression, anxiety, panic attacks, psychomotor agitation, psychotic symptoms, delirium, and
9    suicidality during this COVID-19 pandemic", ECF No. 6535 at 5, with a pressing need for access
10   to the full menu of remedies ordered in this case. To the extent court orders are required to
11   ensure class members are provided that essential access, it is for this court to issue the required
12   orders.
13              While defendants may be correct that a potential conflict exists between decisions
14   this court may be called upon to make and actions of the *Plata* Receiver, defendants' suggestion
15   at hearing that this court lacks authority to order any transfer of *Coleman* class members at this
16   time, *see* 5/1 RT, ECF No. 6657, at 28-29, is without merit. And counsel's suggestion that all
17   such transfers would inevitably be related to COVID-19 and therefore in the purview of the *Plata*
18   Receiver is unsupported. *Id*. To be sure, the issues raised by COVID-19 are complex, and must
19   be explored carefully and with a level of precision that may not have been possible during the
20   early crisis management phases of the pandemic. But the complexity does not mean the Eighth
21   Amendment rights of *Coleman* class members to adequate mental health care are, by reason of
22   the COVID-19 pandemic, simply subsumed within the jurisdiction of the *Plata* court and its
23   Receiver. While taking account of the complex circumstances and the enhanced needs of the
24   *Coleman* class, this court will continue to exercise its authority and accept its responsibility to
25   ensure the *Coleman* remedy is preserved and implemented.
26              In asserting its authority, the court remains fully committed to the coordination
27   principles embodied in its predecessor's joining in the *Plata* and *Coleman* courts' coordination
28   process established in 2006 and discussed in this court's November 19, 2019 order, ECF No.

6396. As a practical matter at this point, as this court understands it, coordination relevant to COVID-19 planning and management as initiated by this court is taking place primarily at the level of the coronavirus task force this court directed the Special Master to convene. The task force continues to meet weekly, with additional focused meetings comprised of subsets of the task force membership, which also are occurring regularly. 5/1 RT, ECF No. 6657, at 8, 10. The court is informed the Special Master has invited the *Plata* Receiver to attend or send a representative to all task force meetings and it is the court's understanding at least one representative of the Receiver's office has been present at most of the meetings. The court assumes without deciding at this point that the Special Master's good faith efforts to ensure full coordination are being reciprocated by the Receiver.

        C.        <u>Management of Mental Health Care Delivery In Light of COVID-19</u>

In the March 25 Mental Health Plan, also included as Attachment U to the April 16 Strategic Plan, defendants recognized the heightened concerns for Coleman class members posed by COVID-19. As noted above, defendants put it this way in the March 25 Mental Health Plan:

> [m]ental health patients are at increased risk for escalation in depression, anxiety, panic attacks, psychomotor agitation, psychotic symptoms, delirium, and suicidality during this COVID-19 pandemic. Sources of stress include social isolation, decreased sensory stimulation, lack of access to standard clinical programing, diminished coping strategies, and limited outdoors or out-of-cell exercise and activities.

ECF No. 6535 at 5.

The March 25 Mental Health Plan is the component of defendants' COVID-19 planning that, as updated by attachments that accompany its inclusion in the April 16 Strategic Plan, addresses directly the impact of COVID-19 on the delivery of mental health care required by the Program Guide, a key component of the remedy in this case. The March 25 Mental Health Plan is based on a "tiered approach" to the delivery of mental health care, where "Tier One represents operating close to Program Guide requirements, while Tier Four represents dramatically decreased resources." *Id*. at 4-5. It recognizes, and is predicated on, the impact of "fewer onsite staff and various restrictions on patient movement" and generally focuses on

10

1  increasingly limited access to the mental health care required by the Program Guide and a shift
2  toward principally emergency mental health needs. *See*, *e.g.*, *id*. at 5-6. As discussed in Section
3  I(A) above, the April 16 Strategic Plan expands on the March 25 Mental Health Plan with the
4  addition of the attachments outlined above.

5  While noting DSH's temporary suspension of inpatient mental health beds for
6  Coleman class members,[7] the March 25 Mental Health Plan provides that all referrals to higher
7  levels of inpatient mental health care "shall continue as clinically indicated." Attachments V
8  through Z to the April 16 Strategic Plan govern interim inpatient mental health care protocols and
9  follow from the restriction in Attachment V limiting referrals to inpatient mental health care to
10 circumstances where "a patient requires such placement to prevent serious harm to self or others
11 or to address serious mental health decompensation." ECF No. 6616-1 at 237. The court has
12 directed the parties to file a stipulation identifying provisions in these documents that represent
13 specific, temporary departures from Program Guide provisions. *See* 4/17 RT, ECF No. 6634, at
14 12 That stipulation is now due May 15, 2020. *See* 5/1 RT, ECF No. at 10. Without having seen
15 the stipulation, the court cannot currently forecast whether it will approve the parties' agreements,
16 in full or in part.

17 In considering any stipulation, the court will necessarily evaluate for how long any
18 purportedly temporary arrangements will remain in effect. Defendants now have repeatedly told
19 this court there is "no horizon" for the impact of the COVID-19 pandemic on the California
20 prison system. At the May 1, 2020 status conference, Dr. Bick shared with the court his view
21 that

> every credible scenario that I've seen from infectious disease and public health excerpts [sic] includes ongoing transmission of COVID over the next 12 to 24 months until there's significant herd immunity and hopefully a vaccine. And this, in my opinion, is going to significantly change how we interact in group settings and congregate living environments for the foreseeable future . . . within our settings and how we feed, how we house, how we program, group therapy, yards, showers and the like.

---

[7] An evidentiary hearing focused on *Coleman* class access to DSH inpatient hospital beds is currently set for May 19, 2020. ECF No. 6660.

11

ECF No. 6557, at 47. On its face, the potential for changes in programming in the prisons that continue "for the foreseeable future," calls into question whether the foundations of the remedy embodied in the Program Guide are put at risk. It is well-established that the requirements of the Program Guide are co-extensive with the requirements of the Eighth Amendment in this action. Thus, a departure from delivery of mental health care in accordance with Program Guide requirements runs afoul of the constitutional rights of class members.

As reviewed with the parties at the most recent status conference on May 1, the court requires additional information in order to consider proposed temporary modifications to the Program under the circumstances posed by COVID-19. Specifically, the court is requiring the parties to work under the supervision of the Special Master to develop a tool that allows the court to determine whether *Coleman* class members are able to access the mental health care they require at the institutions where they currently are housed. The court further clarifies that it is directing the parties to work under the Special Master's direction, using the census data defendants have provided of *Coleman* class members, including their locations, to create a map showing where *Coleman* class members are housed following the defendants' recent completion of expedited releases "to reduce the spread of COVID-19" and transfers out of prison dormitories undertaken "to enhance physical distancing."[8] ECF No. 6616-1 at 9. Defendants have

---

[8] The April 16 Strategic Plan explains the expedited release program:

> The advance release of inmates to parole or community supervision was also an important component of the goal to reduce the spread of COVID-19. On March 31, 2020, CDCR announced an expedited release plan to improve the institutions' capacities to respond to the threat posed by COVID-19 by accelerating the release of eligible inmates who have 60 days or less to serve on their sentences, and who are not currently serving time for a violent crime as defined by law, required to register under Penal Code section 290, or serving a commitment for domestic violence. In total, CDCR has released over 3,400 inmates under this expedited release plan. Of those who were released through the accelerated release program, approximately 930 were in the Mental Health Services Delivery System as of April 2, 2020. On April 3, 2020, CDCR began releasing inmates under this plan. All inmates who were eligible under the expedited release criteria have been released.

ECF No. 6616-1 at 9. It also explains the transfers:

> Targeted moves of inmates out of dormitory settings is another tool CDCR has utilized to meet the goal of limiting the spread of COVID-19. On April 1, 2020, DAI issued a directive to transfer just over 800 inmates from several Level II dormitories to locations with vacant buildings within the system, including transferring 300 inmates from Chuckawalla Valley State Prison (CVSP) to Ironwood State Prison (ISP), 57 inmates from CVSP to California State Prison, Corcoran (COR), 361 inmates from California Rehabilitation Center (CRC), and 100 inmates from the Substance Abuse Treatment Facility and State Prison, Corcoran to COR. CDCR also transferred 43 inmates from Folsom Women's Facility to the Female Community Reentry Facility. In addition, CDCR transferred 228 inmates from California State Prison, Solano to Deuel Vocational Institution. All noted transfers were completed by April 16, 2020. Finally, CDCR has identified 426 inmates in Level I or Level II dorms at California Correctional Center and Sierra Conservation Center who will be transferred to fire camps. The transfer of these inmates is being coordinated at a local level with CAL FIRE based on need at each fire camp. As of April 13, 2020, 53 inmates have been transferred from California Correctional Center to fire camps. As of April 15, 2020, 159 inmates have been transferred from Sierra Conservation Center to fire camps.
>
> On April 10, 2020, the *Plata* Receiver issued a memorandum to Secretary Diaz regarding CCHCS's Guidelines for Achieving and Maintaining Social Distancing in California Prisons. (Attachment G).FN1 The memorandum explained that social distancing was already being achieved in single- and double-celled units, as cellmates constitute an appropriate "social distancing cohort" for correctional purposes and "are analogous to a family unit in the free world." With respect to dorm housing, the Receiver determined that "necessary social distancing can be achieved by creating 8-person housing cohorts" with at least six feet of distance in all direction between each cohort. In addition, the memorandum instructed that all movement of inmates out of dorms to achieve social distancing must be done in coordination and concurrence with the Health Care Placement Oversight Program to ensure that such movement does not contribute to the spread of COVID-19. Before the release of this memorandum, CDCR was developing plans to transfer inmates from San Quentin State Prison to COR. However, these plans have been temporarily paused. Upon completion of all currently scheduled transfers related to physical distancing, CDCR, in conjunction with the Plata Receiver, will assess the population in the dorms and determine what additional steps need to be taken, if any.
>
> FN1 On April 12, 2020, the Plata Receiver issued a supplemental memorandum clarifying that the April 10, 2020 memorandum was not intended to affect any inter-institution transfers to address either medical, mental health, or dental needs that were not available at the sending institution. (Attachment G).

*Id*. at 10-11.

13

represented to the court these transfers would be complete by on or about April 29, 2020, *see* ECF No. 6633 at 14, and at hearing on May 1 counsel for defendants represented that "for the most part, they are complete." 5/1 RT, ECF No. 6657, at 35. The map should be accompanied by a list that identifies by level of care the total number of *Coleman* class members at each prison facility included on the map. Defendants shall also provide a map identifying the location of every mental health program above the Correctional Clinical Case Management System (CCCMS) level of care,[9] accompanied by, for each program, the total number of beds, the number of beds currently occupied, and the number of available beds. These documents shall be provided to the court in camera by 9:00 a.m. on Friday, May 15, 2020, before the next status conference set below.

The court also has raised its need to obtain a visual inspection of locations where *Coleman* class members at higher levels of care, not including the CCCMS level, are currently housed and of the mental health programming currently available at these levels of care.[10]

---

[9] The Mental Health Services Delivery System provides four levels of mental health care to inmates with serious mental disorders. The CCCMS is an outpatient level of care for inmates who can function in prison general population, administrative segregation or security housing units, do not meet criteria for higher levels of mental health care, and either show symptom control or are "in partial remission as a result of treatment." ECF No. 5864-1 at 9. The Enhanced Outpatient Program (EOP) is for inmates who show "acute onset or significant decompensation of a serious mental disorder" and/or are unable to function in the prison general population. *Id*. at 9-10. Mental Health Crisis Beds (MHCBs) is an inpatient level of care for inmates with marked decompensation or dangerousness to self or others; these units are for short-term stabilization of acute symptoms. *Id*. at 10-11. Both acute and intermediate inpatient mental health care programs are required to be "available for inmate-patients whose conditions cannot be successfully treated in the outpatient setting or in short-term MHCB placements." *Id*. at 11.

[10] At hearing, counsel for the California Correctional Peace Officers' Association (CCPOA) offered to make some inquiries about the availability of video equipment at the prisons. He filed a statement on May 5, 2020. ECF No. 6656. The court thanks counsel for his informal assistance, recognizing that at this point CCPOA has not formally intervened in this action at this time. At a prior status conference, CCPOA indicated it would put together a short statement of its history in the case and the extent to which it anticipates being involved going forward. 4/17 RT, ECF No. 6634, at 32. In its May 5, 2020 submission, CCPOA states that the *Plata* court has permitted it to continue informal involvement in those proceedings and that it "believes this arrangement suits its interests and benefits the Court and the parties." ECF No. 6656 at 5. Without objection, CCPOA will be permitted to continue its informal involvement in these proceedings while at the same time preserving its right to seek intervention by formal motion.

1    Following the May 1 status conference, the Special Master has informed the court there are
2    several members of his team who represent they are healthy and not at high risk for COVID-19
3    who are willing and able to conduct site visits while respecting public health measures applicable
4    to persons entering California prisons at this time. This information from the Special Master
5    suggests two possibilities: the availability of impromptu site inspections, and/or the possibility
6    that some selective site visits may resume as part of the 28th Monitoring Round, which is
7    currently underway on paper reviews. The court will discuss these options with the Special
8    Master and the parties at the next status conference.

9    In addition, as discussed at hearing the Special Master has asked Dr. Josiah Rich,
10   an expert in infectious disease and public health issues, to advise the Special Master and his team,
11   and be available to the court generally. Dr. Rich has agreed to serve on a pro bono basis. A copy
12   of Dr. Rich's CV is attached to this order. Good cause appearing, the court overrules the
13   defendants' objection to Dr. Rich's involvement in even a limited way and approves Dr. Rich's
14   service as a consultant to this court and to the Special Master. Dr. Rich will not be added to the
15   Special Master's team; his role will be to consult with the Special Master and this court at a
16   generalized level only as needed.

17   Finally, the Special Master recommends this court hold status conferences every
18   two weeks, rather than every three weeks as the court signaled in its last order. The court accepts
19   this recommendation, declining plaintiff's request for weekly sessions, and therefore sets the next
20   status conference for Friday, May 15, 2020 at 1:00 p.m.

21           D.        <u>Resumption of Admissions to CDCR from Counties</u>

22   At hearing, the Special Master reported he had been advised that CDCR may begin
23   accepting admissions to the state prison system from the counties again by the end of this month.
24   He recommends he be required to participate in the planning process for that next step and that
25   defendants be required to report to the court on the status of these admissions in subsequent status
26   conferences. Although defendants question the role the Special Master might play in these
27   discussions, it cannot reasonably be disputed that resumption of admissions will affect the
28   delivery of mental health care to class members. The Special Master estimates approximately

1    twenty-five percent of inmates admitted to CDCR from the counties have serious mental illness
2    and therefore become members of the *Coleman* class upon admission; the demand for mental
3    health care is therefore likely to increase if and when CDCR reopens admissions. Monitoring of
4    how that new demand will be managed, while also meeting the ongoing demands of *Coleman*
5    class members in the prisons currently -- class members under increased stress in light of
6    COVID-19 --, is squarely within the Special Master's purview and therefore he must be provided
7    a seat at the table where decisions are being made affecting the interests of *Coleman* class
8    members. Defendants will be directed to include the Special Master in all discussions related to
9    this planning process as this process is relevant to the delivery of mental health care to incoming
10   inmates as well as those already in state prisons; the Special Master must have access to real-time
11   information allowing him to perform his duties on behalf of this court.

12       II.    OTHER AGENDA ITEMS

13       As the court signaled in its April 27, 2020 order, it is now moving toward
14   oversight of this action on two fronts: monitoring of coronavirus issues as they are relevant to the
15   *Coleman* class, and resumption of overall compliance monitoring and oversight. *See* ECF No.
16   6643 at 2. To that end, the coronavirus task force will continue its work. As discussed at the
17   May 1, 2020 status conference, the Special Master shall work with the parties to either resume the
18   regularly scheduled mission change calls that had been suspended due to the COVID-19
19   pandemic, or to integrate the agenda items for those calls into task force meetings.

20       At hearing, the Special Master also agreed the regular workgroup process could
21   start to resume in the near future. For that reason, as discussed below, the court anticipates the
22   resumption of forward progress on many of the other agenda items discussed at the May 1, 2020
23   hearing.

24       A.    <u>Updates to Electronic Health Records System</u>

25       The parties disagree on the extent to which progress has been on the development
26   of an adequate process for updating mental health records in the Electronic Health Records
27   System (EHRS). At hearing, the Special Master reported there had been progress on
28

16

development of the required processes, but that their adequacy had to be reviewed by the data expert he recently appointed to his staff.

Good cause appearing, this issue is deferred to the second regular quarterly status conference for this year, set by this order for July 17, 2020 at 10:00 a.m.

### B. Sustainable Process Improvement/Unmet Bed Needs Study

As discussed at hearing, the parties were granted until May 8, 2020 in which to exhaust efforts to arrive at a stipulation that includes defendants' agreement to conduct an unmet bed needs study under the supervision of the Special Master and plaintiffs' agreement to postpone the start of that study for a period of sixty days.  Absent the filing of such stipulation, the question of whether an unmet bed needs study will be conducted and when it will begin will be submitted on the briefing already filed.

### C. Deficient Treatment and Conditions in Psychiatric Inpatient Programs

The issues raised by plaintiffs concerning inadequate care in the PIPs and their request that defendants be required to develop within ninety days a remediation plan based on deficiencies identified in the Special Master's April 2, 2020 report, ECF No. 6565, is submitted.

### D. Staff Misconduct Against *Coleman* Class Members

Plaintiffs report that discovery is ongoing in connection with the substantive motion filed in *Armstrong* and that it is not clear whether discovery motion practice will be necessary.  If related discovery motions are filed in this court, they shall be brought before the assigned magistrate judge.

### E. Remaining Agenda Items

#### 1. Update on Coordination Between *Coleman and Plata* Following Conclusion of Proceedings on Golding Report

This item is continued to the July 17, 2020 second regular quarterly status conference for this year.

2.       Establishing Benchmarks

This item is continued to the July 17, 2020 second regular quarterly status conference for this year for a brief report on process going forward.

3.       EOP/ASU Hub Certification

As noted, the court recently approved the Special Master's request to appoint a data expert. At hearing, the Special Master reported the data expert will be reviewing the data reports underlying these certifications and making recommendations on what must happen to make them "fully transparent and completely usable." 5/1 RT, ECF No. 6657, at 76. Within thirty days, the Special Master shall provide an update to the court on the data expert's progress in this area.

4.       Data Integration, Management, and Integrity

This item is continued to the July 17, 2020 second regular quarterly status conference for this year.

III.     CONCLUSION

As the court discussed in its April 27, 2020 order, this action is now proceeding on two fronts. ECF No. 6643 at 2. The primary front is resumption of court oversight of defendants' compliance with aspects of the remedial planning in this action where compliance has not yet been achieved. To that end, as noted the court will, by this order, sets the second quarterly status conference for this year for July 17, 2020 at 10:00 a.m. The second front requires assessment of the impact of defendants' COVID-19 planning and implementation of those plans on their Eighth Amendment obligation to provide constitutionally adequate mental health care to the plaintiff class in this case; assuming as the record suggests that such planning and implementation results in the provision of mental health care below the Eighth Amendment requirements established in this action, the question then becomes for how long, if at all, class members may be subjected to these conditions. As noted above the schedule for regular telephonic status conferences to review defendants' response to the coronavirus pandemic and the effects on the *Coleman* class set in the April 27, 2020 order, ECF No. 6643, is modified. Those status conferences will be held every two weeks, with the next status conference set for Friday, May 15, 2020 at 1:00 p.m.

In accordance with the foregoing, IT IS HEREBY ORDERED that:

1. The parties are granted an extension of time, to and including May 15, 2020, to file a stipulation identifying with specificity the ways in which defendants' COVID-19 mental health planning departs from Program Guide requirements.
2. On or before May 15, 2020 at 9:00 a.m., defendants shall submit in camera to this court the maps and lists prepared in accordance with the requirements of this order.
3. The court approves the service of Dr. Josiah Rich as a consultant to the court and to the Special Master on a pro bono basis.
4. The provision of this court's April 27, 2020 order, ECF No. 6643, setting regular telephonic status conferences to review defendants' response to the coronavirus pandemic and the effects on the *Coleman* class for every three weeks is VACATED. Such telephonic status conferences will be conducted every two weeks, with the next conference set for May 15, 2020 at 1:00 p.m.
5. Defendants shall include the Special Master in all discussions related to any planning process for resumption of admission of inmates from counties to state prisons, given that those admissions implicate the delivery of mental health care to a significant percentage of incoming inmates as well as those already in state prisons.
6. The second regular quarterly status conference of 2020 is set for July 17, 2020 at 10:00 a.m.
7. The date of May 8, 2020 is confirmed as the date the court provided the parties by which they shall have exhausted efforts to arrive at a stipulation that includes defendants' agreement to conduct an unmet bed needs study under the supervision of the Special Master and plaintiffs' agreement to postpone the start of that study for a period of sixty days.

8. Within thirty days, the Special Master shall provide an update to the court on his data expert's progress in reviewing and recommendations on the data reports underlying the EOP/ASU Hub Certification letters.

DATED: May 8, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE

20