1   DONALD SPECTER – 083925             MICHAEL W. BIEN – 096891
    STEVEN FAMA – 099641                JEFFREY L. BORNSTEIN – 099358
2   MARGOT MENDELSON – 268583           ERNEST GALVAN – 196065
    PRISON LAW OFFICE                   THOMAS NOLAN – 169692
3   1917 Fifth Street                   LISA ELLS – 243657
    Berkeley, California  94710-1916    JENNY S. YELIN – 273601
4   Telephone:   (510) 280-2621         MICHAEL S. NUNEZ – 280535
                                        JESSICA WINTER – 294237
5   CLAUDIA CENTER – 158255             MARC J. SHINN-KRANTZ – 312968
    DISABILITY RIGHTS EDUCATION         CARA E. TRAPANI – 313411
6   AND DEFENSE FUND, INC.              ALEXANDER GOURSE – 321631
    Ed Roberts Campus                   ROSEN BIEN
7   3075 Adeline Street, Suite 210      GALVAN & GRUNFELD LLP
    Berkeley, California  94703-2578    101 Mission Street, Sixth Floor
8   Telephone:   (510) 644-2555         San Francisco, California  94105-1738
                                        Telephone:   (415) 433-6830
9
    Attorneys for Plaintiffs
10

11                  UNITED STATES DISTRICT COURT

12                 EASTERN DISTRICT OF CALIFORNIA

13

14   RALPH COLEMAN, et al.,          Case No. 2:90-CV-00520-KJM-DB

15           Plaintiffs,             **STIPULATION AND [PROPOSED]
                                     ORDER IN RESPONSE TO APRIL 17,**
16      v.                           **2020 ORDER**

17   GAVIN NEWSOM, et al.,           Judge:  Hon. Kimberly J. Mueller

18           Defendants.

19

20

21

22

23

24

25

26

27

28

[3536986.23]

On April 17, 2020, the Court ordered the parties to file a stipulation identifying the "temporary departures from certain Program Guide requirements" for the provision of mental health care that Defendants had implemented in response to the COVID-19 pandemic.  Order, ECF No. 6622 at 2-3 (Apr. 17, 2020).  The parties engaged in an initial meet and confer in response to the Court's April 17 Order, and determined more time would be necessary to come to agreement on the content of the stipulation.  *See* Stip. Requesting & Order Granting Ext'n of Time to File Resp. to April 17 Order, ECF No. 6652 at 2 (May 1, 2020).  Accordingly, the parties requested and the Court granted the parties an extension until May 15, 2020 to file the stipulation.  *See id.* at 2, 3.  On May 15, 2020, the parties requested a second short extension until May 20, 2020 to file the stipulation, which the Court granted on May 18, 2020.  *See* Stip. & Order To Extend Time to File Stip. Identifying Program Guide Departures, ECF No. 6677 at 2 (May 8, 2020).

Since the initial meet and confer, the parties have continued to negotiate, under the supervision of the Special Master, the content of the Court-ordered stipulation identifying COVID-19-based departures from Program Guide requirements for mental health treatment and programming.  Pursuant to those negotiations, the parties now stipulate and agree to the following:

1.      The chart attached hereto as **Appendix A** identifies the temporary policies and procedures implemented due to the COVID-19 pandemic that permit or effectuate departures from Program Guide requirements for mental health care. The chart also identifies several memoranda ("Compendium Policies") listed in the "Compendium of Custody Related Measures," *see* ECF No. 6661 at 2, jointly filed by the parties on December 19, 2019 (ECF No. 6431), that are impacted by COVID-19.[1]

---

[1] As stated in their response to the Special Master's Amended Report On the Proposed Processes for Updating the 2018 Program Guide Revision, ECF No. 6466,  Defendants dispute that the documents jointly filed at ECF No. 6431 are part of the Program Guide. *See* ECF No. 6506.  Plaintiffs disagree.  The issue is currently pending before the Court. *See* Apr. 30, 2020 Order, ECF No. 6647 at 3; May 1, 2020 Hr'g Tr., ECF No. 6657 at 78:4-6.

2.      Certain policies in Appendix A do not necessarily require, but merely permit, departures from the Program Guide and/or Compendium Policies, depending, for example, on the availability of clinical and custodial staffing, medical quarantines and/or isolations in place for particular housing units, and other COVID-19-related considerations that may vary as frequently as daily.  As to those policies—each of which is marked in Appendix A with an asterisk—the parties have agreed that Defendants shall report to the Special Master and Plaintiffs the status of actual departures from the relevant requirements by institution and mental health program.  The parties have agreed to develop, with the Special Master, specific reports for this function, which will have transparent, clearly stated business rules and shall include, at a minimum, the following features:

(a)      a weekly list of all mental health programs, by institution, that had been at Tier 3 or Tier 4 under Defendants' March 25, 2020 policy entitled "COVID-19 Mental Health Delivery of Care Guidance" for at least one day in the preceding work week (Monday through Friday).  Defendants have represented that this report will be available by May 25, 2020;

(b)      a weekly list of all class members housed in each institution's general population or Max Custody Temporary Mental Health Units ("TMHU"), or "treated in place" under Defendants' April 10, 2020 policy entitled "COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow" and Defendants' April 17, 2020 policy entitled "COVID Emergency Mental Health Treatment Guidance for MAX Custody Patients and COVID Enhanced Outpatient Program Transfer Guidelines and Workflow" ("COVID Temporary MAX Custody and EOP Transfer Policy").  The list will include the class members' name, CDCR number, level of care, housing location, date of arrival, and date of release.  Defendants have represented that this report will be available by May 25, 2020;

(c)      a monthly list of class members reviewed by institution pursuant to the COVID Temporary MAX Custody and EOP Transfer Policy's expedited Warden and ICC review provisions, the time to completion of that process from referral, and the results

1   of that review.  Defendants have represented that this report will be available by June 10,

2   2020;

3           (d)     a monthly report on each mental health segregation unit showing

4   compliance for required yard time and access to showers.[2]  Defendants have represented

5   that this report will be available by June 10, 2020;

6           (e)     A report utilizing the TMHU 114-A Tracking log under development.

7   The log provides demographic information on each inmate in a general population or Max

8   Custody TMHU, including data on yard and dayroom time, as well as property and

9   privileges for each inmate in a TMHU, including appliances (radio/TV/tablet) and supplies

10   (writing implements/books/paper).

11          (f)     In addition to the reports to be provided in subsections (a)-(e), real

12   time information on the performance of CDCR's mental health programs can be accessed

13   by the Plaintiffs or Special Master on CDCR's On Demand Performance Report, Heat Grid

14   Report, ASU EOP Performance Report, and PSU Performance Report, among other

15   sources of real time information.[3]  CDCR is committed to ensuring Plaintiffs and the

16   Special Master have access to these reporting systems.[4]  CDCR is also in the process of

17   _____

18   [2] As of the time of this filing, the parties were still negotiating what data Defendants can
     provide regarding the average number of hours of out of cell treatment, and yard and
19   recreational time, being provided per week, as well as the status of availability of
     entertainment devices and other in cell activities for all class members in mental health
20   segregation units.  The parties will continue to meet and confer on this issue and provide
     an update to the Court in the next monthly filing contemplated in section 4, below.
21

22   [3] Given Plaintiffs' ongoing concerns regarding Defendants' data integration, integrity, and
     management, *see, e.g.*, ECF No. 6661 at 18, Plaintiffs maintain that the data expert
23   recently appointed to the Special Master's staff will need to review Defendants' data and
     confirm the accuracy and appropriateness of new and existing reports and measures, with
24   participation by the Plaintiffs.

25   [4] Plaintiffs' Counsel are currently experiencing technical difficulties accessing Defendants'
26   real time reports in the Mental Health On Demand reports suite, but Defendants are
     providing support to resolve these issues as soon as possible.  Once Plaintiffs have access,
27   Defendants will provide training to Plaintiffs' Counsel on how to review and understand
     the various reporting systems.
28

STIPULATION AND [PROPOSED] ORDER IN RESPONSE TO APRIL 17, 2020 ORDER

[3536986.23]

1  developing the following automated reports, which will be accessible to the Plaintiffs and

2  Special Master on the On Demand suite:

3          (i)     On Demand Patient Registry.  This registry will provide

4  demographic information for each inmate referred to a crisis bed or inpatient program, but

5  still in outpatient housing.  Demographic data will include patient location, level of care,

6  length of stay, dates and times of individual appointments, whether the appointments are

7  confidential, group attendance, and rounding checks.  CDCR expects a beta, non-validated

8  version of the dashboard to be published within the next one to two weeks.

9          (ii)    COVID 19 Mental Health Dashboard.  This dashboard will

10 provide real time information, by institution, on the status of the mental health program's

11 operation under COVID policies.  The dashboard will focus on access to higher levels of

12 care, suicide prevention, and the TMHUs.  CDCR expects a beta, non-validated version of

13 the dashboard to be published within the next one to two weeks.

14        3.       Plaintiffs agree that failures to meet inpatient and MHCB transfer timelines

15 due to COVID-19 fall within the scope of the "unusual circumstances" exception to the

16 Program Guide transfer timeframes.[5]  Plaintiffs reserve the right to contest whether any

17 failure to meet an inpatient and MCHB transfer timeline was due to COVID-19.

18 Defendants will present a plan to the COVID-19 Taskforce for the admission to inpatient

19 programs of patients affected by this exception within two weeks of the filing of this

20 stipulation.  Until the parties reach agreement on that plan, Defendants will act in

21 accordance with the agreed-upon temporary policy governing referrals to higher levels of

22 care.  Defendants will continue to file monthly reports on transfers to inpatient

23 hospitalization and MHCBs, and those timelines and claimed exceptions, and document

24 COVID-19-related delays.

25        4.       Because the circumstances surrounding COVID-19 will continue to change

26 _____

27 [5] *See* Addendum to 12.11.2101(A) PIP Policy and Procedure Referral and Admission (ECF
   No. 5744); Addendum to 12.05.2000 MHCB Referral, Referral Rescission, and Discharge

28 Policy (ECF No. 6261-1).

1   for the foreseeable future, the parties shall meet and confer in the COVID-19 Taskforce,

2   under the supervision of the Special Master, on a monthly basis, and provide an update to

3   the Court, regarding any changes to Appendix A or this stipulation.  The parties' updates

4   will be submitted to the Court on the 15th of every month, until the Court determines that

5   such updates are no longer necessary.  The parties intend these updates to provide the

6   Court a current and accurate understanding of the status of COVID-19-based departures

7   from the court-ordered remedy in this case.

8          5.     The policy modifications outlined in Appendix A will be valid for ninety

9   days from the date of this order.  Prior to the expiration of this order, the parties agree to

10  meet and confer to determine if an extension of these modifications is required.

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

STIPULATION AND [PROPOSED] ORDER IN RESPONSE TO APRIL 17, 2020 ORDER

6.    Each month, Defendants will file with the Court the reports outlined in sections 2(a)-(e) above and a point-in-time snapshot of the On Demand Patient Registry and the COVID 19 Mental Health Dashboard outlined in sections 2(f)(i)-(ii).  Defendants' first set of reports will be filed on June 15, 2020.  In the event the temporary policies are no longer necessary, all reporting requirements outlined in this stipulation shall end.

The Special Master has reviewed and approves this stipulation.

IT IS SO STIPULATED.

DATED:  May 20, 2020                    Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:   */s/ Jessica Winter*
         Jessica Winter

Attorneys for Plaintiffs

DATED:  May 20, 2020                    XAVIER BECERRA
                                                       Attorney General of California

By:   */s/ Kyle Lewis*
         Kyle Lewis
         Deputy Attorney General

Attorneys for Defendants

1

**[PROPOSED] ORDER**

2        Having reviewed the foregoing stipulation of the parties, and good cause appearing,

3  the Court hereby accepts the parties' stipulation addressing Program Guide departures

4  resulting from the COVID-19 pandemic.  Further, the Court orders the parties to meet and

5  confer on a monthly basis to update this stipulation, and to submit any updates by the 15th

6  of every month, until the Court determines such updates are no longer necessary.  The

7  Court also orders Defendants to provide the weekly reporting of actual Program Guide

8  departures, as described in paragraph 2 of the foregoing stipulation, to the Special Master

9  and Plaintiffs.  The Court orders that the policy modifications outlined in Appendix A will

10  be valid for ninety days from the date of this order and any updates shall be reported to the

11  court through the monthly update process as outlined in paragraph 4 of the foregoing

12  stipulation.  The Court further orders that Defendants will file regular reports with the

13  Court as outlined in paragraph 6 of the foregoing stipulation.

14

15        IT IS SO ORDERED.

16

17  DATED: _____, 2020      _____

18                                  Honorable Kimberly J. Mueller
United States District Judge

19

20

21

22

23

24

25

26

27

28

**Appendix A**

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **\*COVID-19 Mental Health Delivery of Care Guidance & Tier Document (Mar. 25, 2020)** | Stipulation and Order Approving CDCR's Telepsychiatry Policy, ECF No. 6539 (Mar. 27, 2020)<br><br>Program Guide 12-1-12 & Attachment A (confidentiality) | • Permits telepsychiatry broadly, including in PIPs and MHCBs, without a finding of emergency<br><br>• Telepsychiatry not treated as a supplement, but rather a substitute, for in-person psychiatry at EOP and higher levels of care<br><br>• Permits use of tele-psychology<br><br>• Approval for use of telepsychiatry is made by the hiring authority, and may be preferred modality of providing psychiatry services<br><br>• Telepsychiatrists may provide telepsychiatry services from their homes during regular work hours, rather than from telepsychiatry hubs<br><br>• Each institution can decide which telepresenters can be used, including: MA or CNA, and any healthy staff unable to perform their assigned duties during the crisis (with training).<br><br>• Temporary telepsychiatry providers not required to conduct site-visits at any particular frequency<br><br>• Registry telepsychiatrists may be used without limitation |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | • Patients may not have an option to refuse telepsychiatry as a treatment modality<br><br>• On-site psychiatrists may not be available if a clinical emergency occurs during a telepsychiatry session<br><br>• Confidential space for telepsychiatry contacts may not be available<br><br>• Nurse practitioners may provide telepsychiatry services<br><br>• Requires telepresenters for telepsychiatry, but clinical and other telepsychiatry support-staff may not be available |
| | Mental Health Services Delivery System Program Guide, 2020 Revision ("Program Guide") at 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-6 to 8, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-1, 12-5-3 to 10, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to | Decisions on admission and discharge subject to day-to-day analysis of staffing, individual patient needs, space availability, social distancing, restrictions on movement, quarantine and isolation status, and the degrees of risk when making these decisions. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21; 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | Groups may not be offered, depending on space, staffing, and quarantine or isolation status. Groups that do continue may be reduced in size in order to adhere to social distancing requirements.<br><br>Larger classrooms or vocational space could be used to allow for smaller groups.<br><br>Patients in isolation and/or quarantine will not attend groups but shall be provided with activities and receive daily rounding. |
| | Program Guide 12-1-12 & Attachment A (confidentiality requirements) | Groups may not be confidential if placed in an alternative location (e.g. day room, class rooms) or due to social distancing purposes. |
| | Program Guide 12-1-12 & Attachment A (confidentiality requirements) | Contacts with IDTT may be cell front and non-confidential |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21; 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14  (availability | Patients may be limited to in-cell activities only<br><br>Patients housed in an MHCB awaiting transfer to a higher level of care and patients in alternative housing awaiting transfer to an MHCB will be provided enhanced out-of-cell time and therapeutic activities as well as daily rounds, as operations allow. |

A-3

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | of treatment modalities) | |
| | Program Guide at 12-5-7 to 8, 12-5-10, 12-5-31, 12-10-7 to 12 | Patients may not receive SRASHEs if suicidal, but may instead be screened using the Columbia screening tool |
| | Program Guide at 12-1-6, 12-1-16, 12-3-1 to 2, 12-5-4<br><br>Order, ECF No. 5710 (Oct. 10, 2017)<br><br>CCHCS Policy 12.05.301: Housing of Patients Pending Mental Health Crisis Bed Transfers | Depending on the institution's Tier level, patients may be placed in alternative housing for longer than 24 hours.  Within 24 hours of placement or if patient remains longer than 24 hours, a full SRASHE must be completed |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 13, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14  (availability of treatment modalities)<br><br>Program Guide Chapters 5, 6 | As patients wait for inpatient referrals to process, they may not receive treatment commensurate with their level of care. |
| | Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to | Symptomatic patients shall be isolated from other patients in the general population and will not transfer absent showing of legal or medical necessity |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 21, 12-5-2, 12-5-3 to 10, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12, 12-8-1, 5 to 7, 9, 11 to 12, 12-9-2 to 3, 4 to 5, 6, 12 to 14, 12-10-12 to 13, 19 to 21 (access to higher levels of care) | |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 10, 12-8-4, 10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | |
| | Program Guide at 12-1-4, 12-3-3 to 4, 12-4-10 to 11, 12-4-13 Memo: Release Planning for Inmates Participating in the Institution's Mental Health Services Delivery System (Mar. 11, 2010), Program Guide, Appendix C, *see* ECF No. 5864-1 at 276-82. | Pre-release planning activities may be limited to varying degrees. All required activities to occur when social distancing can be followed. |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5- | 1:1 contacts with psychiatrists may not occur within timeframes. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15,12-4-19, 20, 12-5-14, 12-5-33,12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | 1:1 contacts with psychologists or social workers may not occur within timeframes. |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12- | 1:1 suicide watch may not occur where clinically indicated |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 4-1 to 2, 12-10-15 to 19 (availability of treatment modalities) | |
| | Program Guide 12-3-2 (psychiatrists as primary clinicians)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | Any physician, nurse practitioner, or physician assistant can serve as psychiatrist |
| | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | Psychiatrist duties may be triaged only to serve urgent or emergent needs |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **COVID-19 Pandemic – Guidance Regarding Field Operations (Mar. 18, 2019, revised Mar. 20, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-15, 12-5-33 to 34, 12-7-7, 10, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>February 14, 2017 memorandum titled Mental Health Crisis Bed Privileges Revision, Program Guide, Appendix C, *see* ECF No. 5864-1 at 349. | Not congregating in groups of 10 or more individuals and suspending group programs where participants are likely to be in close contact |
| **Restricted housing, Reception Centers, PIP Phone Calls (Apr. 8, 2020)** | September 22, 2016, memorandum regarding Reception Center Privileges for EOPs, *see* ECF No. 6431 at 4. | Extends phone call privileges for those in segregated housing, reception centers, and PIPs beyond what is permitted by privilege group. |
| **\*COVID-19 Programming Opportunities for Inmates Participating in the MHSDS in Restricted Housing (Apr. 1, 2020)** | Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, | Implementation of third watch programming opportunities within restricted housing.  If mental health groups and 1:1 clinical contacts cannot occur in the restricted housing units, wardens will ensure PM yard is offered to those in the MHSDS. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) | |
| **COVID-19 Electronic Appliance Loaner Program (Apr. 1, 2020)** | January 22, 2014 Memo – Multi-Powered Radio Loaner Program in Administrative Segregation Units; and March 12, 2007 Memo – Televisions in Segregation Units, *see* ECF No. 6431 at 4. | Increase patient access to loaner electronic appliances |
| **COVID-19 Screening Prior to Mental Health Transfers (Apr. 5, 2020)** | Program Guide 12-1-16 (timelines for level of care transfers) Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | Adds screening step to within 12 hours of any mental health transfer from one facility to another, which includes documentation of the justification for the referral and the outcome of the screen |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **\*COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow (Apr. 10, 2020)** | Program Guide 12-1-8 to 9, 12-5-1, 12-5-32 to 34 (MHCB care provided in licensed settings)<br><br>Program Guide 12-1-12 & Attachment A (confidentiality)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-9-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21,12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | Creation of TMHUs<br><br>• Replaces in many circumstances transfers to hospitals and MHCBs to provide inpatient mental health care<br><br>• Group Therapy may be reduced to 3-4 people and may be eliminated.  If no groups can be run, then yard time in the evening should be considered.<br><br>• Decisions on admission and discharge subject to day-to-day analysis by Clinical Leadership regarding the available workforce, space availability, social distancing, restrictions on movement, individual patient needs, facility-system flows, and quarantine and isolation status<br><br>• IDTTs may occur by teleconference<br><br>• IDTT staffing level varies based on availability of staff<br><br>• Content and delivery of treatment will be based on a daily evaluation of the proportion of staff available for patient care and direct activities<br><br>• Huddles may be telephonic, but only if in-person huddles cannot be conducted safely<br><br>• Daily out-of-cell individual treatment offerings with |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide 12-3-9, 12-4-6, 12-5-11 to 12, 12-7-12 to 13, 12-8-8, 12-9-5 (required IDTT staffing)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts)<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | psychiatrist or primary clinician will occur whenever possible<br><br>• When possible, all PC and Psychiatrist contacts shall be conducted in a confidential space.  Where necessary due to staffing, available treatment team members may engage in collaborative cell front tele-heath treatment sessions using portable equipment.  It is preferable for cell doors to be open when conducting this cell side treatment modality.<br><br>• Permits cell-front tele-mental health<br><br>• Each institution can decide which telepresenters can be used, including: MA or CNA, and any healthy staff unable to perform their assigned duties during the crisis (with training).<br><br>• Upon discharge from TMHU and the IDTT determines the patient no longer requires inpatient mental health treatment, then referral to higher level of care shall be rescinded<br><br>• If an inpatient bed opens, only the patient that the institution triaged as the most acutely mentally ill will be assigned to the bed |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide 12-1-12 & Attachment A (confidentiality)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15,12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7- | Enhanced Treatment-in-Place<br><br>• When a patient is referred to an inpatient level of care and is unable to transfer to an inpatient bed, a TMHU, or is not already in an inpatient setting, treatment will be provided in the patient's housing unit until transfer can occur ("treatment-in-place")<br><br>• Decisions on admission and discharge subject to day-to-day analysis by Clinical Leadership regarding the available workforce, space availability, social distancing, restrictions on movement, individual patient needs, facility-system flows, and quarantine and isolation status<br><br>• When possible, all treatment, including groups and clinical contacts, shall be provided in confidential setting, however that may not always be possible<br><br>• Primary clinical contacts may not occur on a daily basis<br><br>• Group Therapy may be reduced to 3-4 people and may be eliminated. If no groups can be run, then yard time in the evening should be considered.<br><br>• If in-person Huddles cannot be conducted safely, then huddles should but are not required to occur telephonically |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | 7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts) Orders, ECF Nos. 6095, 6314 (Feb. 20, 2019, Oct. 8, 2019) (requirement implementation of Custody and Mental Health Partnership Plan, including inter-disciplinary huddles) CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | |
| | Program Guide 12-1-16 (timelines for level of care transfers) Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-5-2,12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | Transfer Guidelines and Workflow <br><br> • In an attempt to limit the transmission of COVID-19, transfers to external inpatient hospitalization, including PIPs and MHCBs, will occur only where necessitated by an imminent, life-threatening emergency, or serious mental health decompensation, and the life-threatening condition or serious decompensation cannot be treated at the same institution <br><br> • External transfers to an MHCB or inpatient hospital require an additional layer of review by regional and headquarters |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | inpatient referral unit (IRU) staff<br><br>• Medical risk for COVID-19 will factor into an evaluation as to whether an external transfer will occur<br><br>• Plaintiffs will not seek contempt sanctions for failures to transfer patients in a timely manner when the failure resulted from COVID-19<br><br>• Patients will be discharged to the same facility unless irreconcilable custodial considerations prevent doing so, in which case an additional screening step will occur |
| **Department of State Hospitals Directive on Suspension of Admissions from CDCR to DSH (Apr. 15, 2020)** | Program Guide 12-1-9<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | Coleman admissions to DSH resumed after a 30-day suspension with additional guidelines and protocols required to effectuate transfers from CDCR to DSH.  *See* COVID-19 Temporary Guidelines for Transfer to DSH Inpatient Care (filed Apr. 15, 2020). |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | |
| **\*COVID Emergency Mental Health Treatment Guidance for MAX Custody Patients and COVID EOP Temporary Transfer Guidelines and Workflow (Apr. 17, 2020)** | Program Guide 12-1-12 & Attachment A (confidentiality)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-4-20 to 21, 12-5-2, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-5-14, 12-5-33 to 34, 12-7-7, 12-7-10, 12-8-4, 12-8-10, 12-9-7 to 9, 12-10-14 (availability of treatment modalities) | • When referred to an inpatient bed, MAX custody patients shall be placed in an inpatient bed, if one is available within the institution, by Health Care Placement Oversight Program (HCPOP).  If no inpatient bed is available within the institution, then the patient is placed under observation as clinically appropriate until a MAX custody review is completed within the next 24 hours of referral.<br><br>• Patients referred to an inpatient bed for whom MAX custody status is lifted will proceed through the standard COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow (Apr. 10, 2020)<br><br>• Patients referred to an inpatient bed who remain on MAX custody status following review can be sent to a MAX TMHU for a maximum of 10 days<br><br>• Permits the creation of TMHUs specific to MAX patients. MAX Custody TMHUs will be located in a segregation setting, |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide at 12-3-14 to 15, 12-4-9, 12-4-14 to 15, 12-4-19, 20, 12-5-14, 12-5-33, 12-7-4, 12-7-6, 12-7-7, 12-7-10, 12-7-13, 12-8-4, 12-8-9 to 11, 12-9-6 to 8 (primary clinician contacts)<br><br>Memo: Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing (Jan. 15, 2015), Program Guide, Appendix C, *see* ECF No. 5864-1 at 420-24.<br><br>CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | according to the following priority: EOP ASU Hub/PSU; STRH/LTRH; ASU.<br><br>• Patients offered 5 hours weekly of structured treatment and 15 hours weekly of unstructured out of cell time<br><br>• Group therapy occurs only where done safely<br><br>• IDTT held within 72 hours of placement in MAX TMHU and again at 7 days from date of placement<br><br>• At 7-day IDTT, if the patient is not stabilizing or improving, they are referred to MHCB and transferred to an inpatient setting, potentially at another institution, within 10 days from date of placement following procedures described in the COVID-19 Temporary Emergency Transfer Guidelines.<br><br>• Decisions on admission and discharge subject to day-to-day analysis by Clinical Leadership regarding the available workforce, space availability, social distancing, restrictions on movement, individual patient needs, facility-system flows, and quarantine and isolation status<br><br>• Content and delivery of treatment will be based on a |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | daily evaluation of the proportion of staff available for patient care and direct activities |
| | | • If the inpatient referral is based on acute suicidality, the patient will be placed on 1:1 watch until the Treatment Team determines what level of observation is clinically necessary |
| | | • If in-person huddles cannot be accomplished safely then huddles shall occur telephonically |
| | | • Individual out-of-cell treatment by psychiatrist or primary clinician shall occur daily whenever possible |
| | | • Group Therapy may be reduced to 3-4 people and should only be performed where it can safely be done.  It may be eliminated entirely, in which case only in-cell treatment would be provided.  If no groups can be run, then yard time in the evening should be considered. |
| | | • Psychiatrist and primary clinician contacts may not be confidential |
| | | • Permits tele-mental health treatment |
| | | • Permits the following staff members to act as tele-presenter: Medical Assistant; |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | | any staff unable to perform their assigned duties during the crisis, provided the staff member has been provided adequate training; any mental health provider; an LVN, RN, CAN, Psych Tech; or any medical provider<br><br>• Upon discharge from a MAX TMHU, and the IDTT determines the patient no longer requires inpatient mental health treatment, then the referral to higher level of care shall be rescinded |
| | Program Guide 12-1-8, 12-4-1, 12-4-4 (EOP patients housed in designated units only)<br><br>Program Guide 12-1-16 (timelines for level of care transfers)<br><br>Program Guide at 12-3-2 to 4, 12-3-11, 12-4-1 to 2, 12-4-8 to 12, 12-4-18 to 21, 12-9-7 to 9 (availability of treatment modalities)<br><br>Program Guide at 12-3-14 to 15, 12-4-14 to 15, 12-4-19, 12-4-20, 12-9-6 to 8 (primary clinician contacts) | COVID EOP Temporary Transfer Guidelines and Workflow<br><br>• In an attempt to limit the transmission of COVID-19 all non-emergency transfers shall be immediately curtailed. All movement within a facility can continue while taking into consideration COVID status<br><br>• Inter-facility transfers subject to review and approval by regional or headquarters staff<br><br>• Outpatient external transfers or releases from segregated housing to mainline mental health programs at other institutions, to include transfers from desert institutions, transfers from stand-alone ASUs to STRH, CCCMS to EOP, and EOP to CCCMS, will |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | Program Guide at 12-4-4 to 5 (access to EOP level of care) | only occur if the treatment team determines, and the Regional Clinical Leadership agrees, that the transfer is necessitated by an imminent, life-threatening emergency or serious mental health decompensation, and the life-threatening condition or serious decompensation cannot be reasonably treated at current institution <br><br> • EOP-level treatment provided when full staffing is available; otherwise subject to tier status <br><br> • Patients discharged from EOP ASU who cannot transfer internally to an EOP may be placed on a local CCCMS yard |
| **COVID-19 Temporary Guidelines for Transfer to DSH Inpatient Care (filed Apr. 15, 2020, and as addressed in the Court's April 24, 2020 Order (ECF No. 6639) and subject to ongoing Special Master monitoring as required by the Court's April 17, 2020 Order (ECF No. 6622))** | Program Guide 12-1-16 (timelines for level of care transfers) <br><br> Program Guide at 12-3-1 to 2, 12-3-12 to 14, 12-4-1, 12-4-13, 12-4-16, 12-5-15, 12-5-26 to 29, 12-5-32, Chapter 6, 12-7-2 to 8, 12-7-11, 12-7-12, 12-8-1, 12-8-5 to 7, 12-8-9, 12-8-11 to 12, 12-9-2 to 3, 12-9-4 to 5, 12-9-6, 12-9-12 to 14, 12-10-12 to 13, 12-10-19 to 21 (access to higher levels of care) | • Transfers from CDCR to DSH for inpatient hospitalization will occur only where an imminent, life-threatening emergency and/or serious mental health decompensation necessitates transfer, and where the patient cannot be treated at their current institution or elsewhere within CDCR <br><br> • If referral meets standard and foregoing criteria, then CDCR and DSH officials will consult regarding the transfer, including discussing COVID-19 risk. If there is disagreement, the patient will not transfer to DSH |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| | CDCR-DSH MOU and PIP Policy 12.11.2101(A) – Referrals and Admissions | • In the absence of COVID-19 testing, quarantine shall occur for 14 days pre- or post-transfer<br><br>• Discharges from DSH will follow existing criteria, although a consult between DSH and CDCR officials, and quarantine, will occur as necessary<br><br>• The Special Master continues to closely monitor all referrals, rejections and completed transfers to and from the DSH inpatient programs. *See* ECF No. 6622 at 3.  DSH and CDCR have collaborated to refine the risk analysis of balancing the patients' psychiatric medical needs with the COVID-19 risk factors with the advent of new testing capabilities, under the supervision of the Special Master and within the limits outlined in the Court's April 24, 2020 Order (ECF No. 6639). DSH is working with the Special Master's experts and CDCR to update and revise these transfer protocols to capture accurately the COVID-19 risk analysis that is occurring in practice. |

| Policy, Memorandum, or Guidelines | Program Guide or Related Policy Provision | Summary of Departure |
|---|---|---|
| **COVID-19 Temporary Transfer Restriction Psychiatric Inpatient Programs FLEX Guidance** | [Pending] | |
| **Tele-Mental Health Memorandum** | [Pending] | |
| **Procedure for Resumption of Inpatient Transfers** | [Pending] | |



# CALIFORNIA CORRECTIONAL
# **HEALTH CARE SERVICES**



# MEMORANDUM

| | |
|---|---|
| **Date:** | March 25, 2020 |
| **To:** | Chief Executive Officers |
| | Chief Psychiatrists |
| | Chief of Mental Health |
| | Senior Psychiatrist, Supervisors |
| **From:** | |

EUREKA C. DAYE, Ph.D., MPH, MA, CCHP
Deputy Director (A)
Statewide Mental Health Services

**Subject:** **COVID-19 – MENTAL HEALTH DELIVERY OF CARE GUIDANCE**

In response to the current coronavirus disease 2019 (COVID-19) pandemic and out of an abundance of caution the California Department Corrections and Rehabilitation (CDCR) Statewide Mental Health Program (SMHP) is taking necessary precautions to reduce exposure to Coleman patients and mental health staff by addressing exceptional allowances provided. This memorandum provides guidance for the delivery of mental health care with the understanding that new challenges and impacts of COVID-19 may permit more restrictions at some institutions than others as we move through this difficult time and may likewise lead to interim changes in practice and/or policy exceptions not otherwise allowed by the *Mental Health Services Delivery System Program Guide 2009 Revision.*

Clinical leadership (to include Chief Executive Officers, Chiefs of Mental Health, Chief Nurse Executives, Chief Medical Executives, and the Chief Psychiatrist) shall assess program capacity and make determinations on admission and discharge practices based on factors to include available workforce, known COVID-19 exposure, etc.. Leadership must consider individual patient needs, facility-system flows, and the degrees of risk when making these decisions.

To ensure patients continue to receive the most appropriate and effective interventions necessary to meet their needs, each clinical provider shall assess the patient's needs and continue to deliver services as appropriate in person, or via tele-health technology such as WebEx, Citrix, and other solutions.

The attached chart serves as a guide and provides a tiered approach on the delivery of care dependent upon each institution's staffing and operational circumstances. The CEOs, in consultation with the Wardens, will determine which tier shall be applied each day. Tier One

represents operating close to Program Guide requirements, while Tier Four represents dramatically decreased resources. The following factors shall be taken into consideration when determining the tier an institution will operate within:

- Clinical and custodial staffing levels
- Space availability
- Social distancing requirements
- Local and statewide restrictions on movement
- Quarantines and Isolations

**Mental Health Patients**
Mental health patients are at increased risk for escalation in depression, anxiety, panic attacks, psychomotor agitation, psychotic symptoms, delirium, and suicidality during this COVID-19 pandemic. Sources of stress include social isolation, decreased sensory stimulation, lack of access to standard clinical programing, diminished coping strategies, and limited outdoors or out-of-cell exercise and activities. We are focused on three critical areas during this COVID-19 pandemic: 1) Preserving life; 2) Stabilizing of acute mental health deterioration; 3) Helping the mental health population cope.

**Provisions of Treatment**
To the extent possible, institutions shall follow current Program Guide policies and procedures including, but not limited to: clinical contacts, group and treatment requirements, emergent and urgent referral processes, crisis intervention, suicide prevention, and inpatient referrals. However, to ensure patients receive the essential care and support services during this time of fewer onsite staff and various restrictions on patient movement the below and attached guidelines provide direction on ways to provide services and minimize the risk to both patients and staff:

- Individual clinical contacts shall continue while maintaining social distancing. As institutions move toward less patient movement measures and staffing levels decrease, individual contacts should be triaged by emergent referrals, patient acuity and levels of care.
- Interdisciplinary Treatment Teams (IDTT) shall continue while maintaining social distancing. In lieu of the tradition setting, the use of technology should be optimized to ensure attendance by all IDTT members. The best solution is to turn team meetings into teleconference meetings, with staff calling in from their individual offices.
- Groups shall continue but may be reduced in size in order to adhere to social distancing requirements. In addition, alternative locations should be explored. Larger classrooms or vocational space, temporarily closed during this time, could be used to allow for social distancing for groups. Develop in-cell Recreational Therapy and other group activities that can be conducted and distributed.
- Patients in isolation and/or quarantine will not attend groups but shall be provided with therapeutic treatment packets, workbooks, and other in cell activities and shall receive daily rounding by a primary clinician and a psychiatrist.

- Psychiatry and primary care clinicians should be consulted urgently on patients expressing suicidal ideation or intent, psychosis, medication side effects, incomplete symptom control, or acute agitation.
- Psychiatry should also be consulted for other non-urgent significant psychiatric symptoms as usual.
- In the event of severe staffing shortages, frequent mental health wellness and surveillance rounding is required with liaison between psychiatrists, psychologists, suicide prevention coordinators and recreational therapists to identify significant concern for a patient's mental health sequelae. These rounds are to identify any urgent/emergent clinical issues including but not limited to acute suicidality.
- Issues identified through these rounds are to be promptly brought to the attention of the assigned psychiatrist.
- Staff performing rounds shall use appropriate personal protective equipment (PPE) as determined by public health.
- Psychiatry encounters may be via tele-psychiatry during the COVID-19 pandemic as approved by the hiring authority (See section on tele-psychiatry below for details).

## Suicide Prevention

As much as possible, all Suicide Risk Assessments shall continue per policy and patients identified as a suicide risk will receive an in-person mental health evaluation.  As operational abilities are impacted due to staff reductions, the clinician assessing the patient for suicidality will conduct the Columbia screener and a full mental health status exam and do the following:

1. If the patient screens positive, he/she shall be placed in alternative housing and be referred to a Mental Health Crisis Bed (MHCB).  Within 24 hours of placement in the MHCB or if the patient remains in alternative housing longer than 24 hours, a full Suicide-Risk and Self-Harm Evaluation shall be completed.
2. If the patient screens negative, the clinician shall establish a safety plan with the patient and he/she can be returned to housing with a consult order for the primary clinician to see the patient with an urgent or routine referral.
   - All (5) five-day follow-ups will be completed in person, per policy, while maintaining social distancing.
   - As the operational abilities begin to limit clinical contacts and services, Administrative Segregated Unit workbooks shall be distributed to Enhanced Out-Patient housing units and the Correctional Clinical Case Management System population for in-cell activities.
   - Suicide Prevention and Response Focus Improvement Team Coordinators shall distribute the high risk list to all primary clinicians and psychiatrists.  Cell visit check-ins with these patients shall be conducted by a mental health provider, in addition to the required scheduled appointments.

**Inpatient Referrals and Services**

As of March 17, 2020, the Department of State Hospitals (DSH) has temporarily suspended patient transfers to and from CDCR.  As a result, patients referred to a higher level of care of at least a restrictive housing of a DSH facility will remain at CDCR.  The below information and reminders are critical to ensure all patients currently housed or awaiting placement to an inpatient bed receive the appropriate care and oversight during this time.

- All referrals to higher levels of care shall continue as clinically indicated and determined by the IDTT.
- Patients housed out of their least-restrictive housing due to the inability to transfer to DSH, shall be placed in the least restrictive housing available within CDCR.
- As wait times increase, every effort shall be made to provide these patients with the services commensurate with their level of care.  This includes providing enhanced out-of-cell time and therapeutic activities as well as daily rounds, as operations allow, while awaiting transfer.
- Patients housed in an MHCB awaiting transfer to a higher level of care and patients in alternative housing awaiting transfer to an MHCB will be provided enhanced out-of-cell time and therapeutic activities as well as daily rounds, as operations allow, while awaiting transfer.
- Inpatient licensed beds shall not be closed to admissions by the institutions without going through the proper authorization and notification process.

**Patient Education**

Clinical focus shall be on supporting patients by encouraging questions and helping them understand the current pandemic situation.  Clarify misinformation and misunderstandings about how the virus is spread and that not every respiratory disease is COVID-19.  Provide comfort and extra patience. Check back with patients on a regular basis or when the situation changes. Recognize that feelings such as loneliness, boredom, fear of contracting disease, anxiety, stress, and panic are normal reactions to a stressful situation such as a disease outbreak.

Key communication messages to mental health patients:

- The importance of reporting fever and/or cough or shortness of breath along with reporting if another patient is coughing in order to protect themselves.  Indicate how these reports should be made.
- Reminders about good-health habits to protect themselves, emphasizing hand hygiene.
- Plans to support communication with family members if visits are curtailed.
- Plans to keep patients safe, including social distancing.

**Patient Isolation (Symptomatic Patients)**

A critical infection control measure for COVID-19 is to promptly separate patients who are sick with fever or respiratory symptoms away from other patients in the general population. Precautionary signs shall be placed outside the isolation cell and PPE appropriate protocols shall be followed.

**Quarantine (Asymptomatic Exposed Patients)**
The purpose of quarantine is to assure that patients who are known to have been exposed to the virus are kept separated from other patients with restriction of movement to assess whether they develop viral infection symptoms.

- Exposure is defined as having been in a setting where there was a high likelihood of contact with respiratory droplets and/or body fluids of a person with suspected or confirmed COVID19.
- Examples of close contact include sharing eating or drinking utensils, riding in close proximity in the same transport vehicle, or any other contact between persons likely to result in exposure to respiratory droplets.
- The door to the Quarantine Unit should remain closed. A sign should be placed on the door of the room indicating that it is a Quarantine Unit which lists recommended personal protective equipment (PPE).
- Medical Holds are employed for both isolation and quarantine. A temporary prohibition of the transfer of patients with the exception of legal or medical necessity is now in place.

**Social Distancing**
To stop the spread of COVID-19, social distancing must be employed. CDC officials recommend avoiding large gatherings of more than 10 people and maintaining a distance of 6 feet from other people. This reduces the chance of contact with those knowingly or unknowingly carrying the infection.

**Patient-to-Patient; Patient-to-Staff Social Distancing**
If group spaces are too small to accommodate the 6-feet rule, consider smaller group sizes in the interim. Groups can be smaller with higher frequency or this may mean needing to decrease the number of treatment offerings. Say to the patients that because of the COVID19, "We have a policy of keeping at least 6 feet of distance between patients and staff and patients and each other, which is why I'm sitting here and you're sitting there." If you don't say it, many patients may misinterpret social distancing (i.e. "my clinician is scared of me"). Maximize disinfection of all areas used for group and 1:1 treatment.

**Tele-Psychiatry and Social Distancing**
With the latest expansion of tele-psychiatry waivers, exceptions issued by the Center for Medicare and Medicaid Services (CMS), tele-psychiatry may be used to minimize any COVID-19 impacts that could disrupt the daily psychiatric services to patients. Psychiatrists who are unable to come into the institution because of personal risk factors (age > 65, chronic medical condition, etc.) or are under a personal quarantine who are otherwise fit to work can be authorized to use WebEx to conduct patient visits from a home computer that has a camera, speaker, and microphone. A state laptop with a VPN or any home computer with Citrix can access the EHRS.

- Each clinician who is providing tele-services will require a tele-presenter within the institution.
- Tele-presenters can include Medical Assistant, Certified Nursing Assistant, Licensed Vocational Nurse, Registered Nurse, or any other healthy employee who is available to assist. This could include support staff who are on Administrative Time Off.
- Presenters shall be provided PPE as needed based upon public health recommendations. Successful use of tele-psychiatry will require clinic space, tele-health equipment, IT assistance, scheduling organization, escort support, frequently updated telephone and email contact lists, and local executive leadership support.

cc: Diana Troche, DDS, Undersecretary
Joseph Bick, MD, CCHP, Director
Connie Gipson, Director
Regional Health Care Executives
Deputy Directors

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES

## MEMORANDUM

**Date:**   March 20, 2020

**To:**   Wardens
Chief Executive Officers

**From:**

STEVEN THARRATT, MD, MPVM, FACP
Director, Health Care Operations
Statewide Chief Medical Executive

CONNIE GIPSON, Director
Division Adult Institutions

**Subject:**   **COVID 19 Pandemic – Guidance Regarding Field Operations**

In response to the current coronavirus disease 2019 (COVID-19) pandemic, and out of an abundance of caution, California Department of Corrections (CDCR) and California Correctional Health Care Services (CCHCS) are taking necessary precautions in an effort to reduce exposure to both inmates and staff. This memorandum replaces the one sent on March 18, 2020, and provides guidance on inmate screening, isolation, quarantine, social distancing, and essential health care services.

**Screening on Entry into the Prison**

Immediately upon entry, all inmates must be screened for symptoms of influenza-like illness (ILI) including COVID-19. The inmate populations that must be screened include, but are not limited to, inmates entering via reception centers, receiving and release locations, fire camps, and returning from court, a higher level of care, or an offsite specialty appointment. The screening shall include:

1. Asking the following questions.
   a. Do you have a cough?
   b. Do you have a fever?
   c. Do you have difficulty breathing?
2. Measuring the patient's temperature.

# MEMORANDUM

Based on the outcome of the screening questions, temperature reading, and the nurse's clinical judgement, individuals shall be housed according to one of the three options noted below.

1) <u>Isolation</u>:  Any inmate who answers "yes" to one or more of the screening questions and/or has a temperature above 100.4 must be isolated.

2) <u>Quarantine</u>: Reception center Inmates arriving from the jail who answer "no" to all of the screening questions must be quarantined for a period of 14 days.

3) <u>Other Housing</u>: *All other inmates* returning to CDCR or transferring between prisons who answer "no" to all of the screening questions may be housed as appropriate per custody and clinical protocol that does not require placing in quarantine.

**Screening within the Institution**

Patients with ILI symptoms including possible COVID-19 should be screened in a manner that minimizes exposures to others.  Strategies to be considered include, but are not limited to, screening primarily in the housing unit clinics, separate "ILI-only" clinics, spaces made available by modified programming or, if needed, the triage and treatment area (TTA).  Patients with ILI symptoms shall be isolated. Individuals exposed to patients with ILI symptoms should be quarantined.

**Social Distancing**

Social distancing strategies should be implemented as much as possible for all individuals; however, it is imperative that social distancing be enforced for the most vulnerable patients including, but not limited to, <u>high risk 1, high risk 2, pregnant, and any other patient at high risk per clinical judgement</u>.

Provide information to all individuals about why their movements may be restricted to a greater degree than others (e.g., older adults and those with serious health conditions), and consider the implications of potential stigma and social isolation.  For prisons that do not have a large number of vulnerable patients, cohorting or housing these patients together should be avoided if possible.  Cohorting vulnerable patients is not recommended as they are more susceptible to contracting and rapidly spreading the disease to other high-risk patients and are at high risk for developing serious complications or death related to the disease.  For the most vulnerable patients delivery of meals and medications to the cell front should be considered *if feasible*.

General strategies for all individuals regardless of clinical risk will need to be tailored to the available space in the facility and the needs of the population and staff.  Examples of strategies *where feasible* may include, but not be limited to:

- Maintaining a distance of six feet between individuals.

# MEMORANDUM

- Not congregating in groups of 10 or more individuals.

- Reassigning bunks to provide more space between individuals.

- Suspending group programs where participants are likely to be in close contact.

- Rearranging scheduled movements to minimize mixing of individuals from different housing areas.

- Minimizing housing assignment changes unless necessary for health care reasons and/or safety and security concerns.

- Providing meals inside the housing unit if feasible or extending meal times to reduce crowding and increase social distancing along with thoroughly disinfecting solid surfaces including but not limited to such as tables, chairs, railings, and door knobs.

- Restricting recreation yard usage to a single housing unit per yard, where feasible.

**Essential Health Care Services**

Hospital and Emergency Department Services

Hospital send outs should be limited to only those patients who require a higher level of care to prevent or reduce the risk of morbidity and mortality.  If patients can safely receive clinically appropriate care at the prison they should not be sent out.  Patients presenting with ILI symptoms that are manageable within our system capabilities should remain in our care.  Symptomatic but stable patients should *not* be sent to emergency departments or community hospitals.

Specialty Services

Effective immediately, all elective procedures/surgeries shall be postponed, as well as onsite and non-essential offsite specialty medical appointments, until further notice. Use discretion in keeping only appointments that are absolutely necessary and consider telemedicine as an option as well. Examples of necessary specialty appointments include, but are not limited to, face-to-face oncology care for pre-chemotherapy planning, diagnostic colonoscopies for positive screening, and symptomatic patients that cannot wait several weeks for further evaluation and treatment.  Patients who require frequent appointments outside the prison (such daily chemo or radiation therapy or transports to an offsite Narcotic Treatment Program) may require special housing accommodations, *if feasible*, and should wear a surgical mask if possible.

Primary Care Services

Health Care 7362 requests that require a face-to face encounter should be conducted in ways that minimize patient movement and exposure to others within the facility.  If possible, during

# MEMORANDUM

regular business hours, primary care teams should consider triaging patients complaining of ILI symptoms at cell front using appropriate Personal Protective Equipment (PPE). After regular business hours, 7362 screening for patients with ILI or COVID-19 symptoms shall be done at cell front by a nurse. Transport to TTA shall be reserved for patients needing urgent or emergent care. Whenever patients with ILI symptoms must be transported outside their cell, the patient shall wear a surgical mask.

Non-essential primary care appointments with providers such as preventive health screenings, routine health care 7362 referrals, some chronic care visits, and other appointments that do not pose a risk of harm if delayed several weeks should be postponed.

Medications

Medications need to be converted to "Keep on Person" (KOP) where possible. If medications must be prescribed Nurse Administered or Direct Observation Therapy (NA/DOT), the regiment should be prescribed once or twice daily if possible. In addition to administering medications cell front or bedside for the most vulnerable patients, institutions should consider other situations where cell front medications can be given depending on staffing in order to reduce movement and the congregation of more than ten persons that does not allow social distancing.

The health and safety of all individuals within the institutions is a top priority. We believe taking these steps now is in the best interest of all. Please work together at the institution to operationalize the guidance provided above.

cc:  Joseph Bick, MD
     Renee Kanan, MD, MPH
     Barbara Barney-Knox
     Regional Health Care Executives
     Regional Chief Nurse Executives
     Regional Deputy Medical Executives
     CCHCS Deputy Directors
     Kimberly Seibel
     Jennifer Barretto
     Associate Directors, DAI

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA 95758

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date:       April 1, 2020

To:         Associate Directors, Division of Adult Institutions
            Wardens
            Chief Executive Officers
            Chiefs of Mental Health
            Chief Psychiatrists
            Senior Psychiatrists, Supervisors

Subject:    **RESTRICTED HOUSING, RECEPTION CENTERS, PSYCHIATRIC INPATIENT PROGRAM PHONE
            CALLS**

This memorandum is in response to the Coronavirus (COVID-19) and current allowable
phone call privileges for inmates housed in restricted housing, Reception Centers (RCs), and
Psychiatric In-Patient Programs (PIPs). The Division of Adult Institutions (DAI) recognizes the
need for inmates to be able to maintain communication with family and friends and is taking
proactive measures in an effort to assist inmates with increased communication.

This memorandum is to provide direction in regards to providing inmates housed in
restricted housing, RCs, and PIPs the ability to make phone calls above their current privilege
group. Wardens are directed to implement these additional phone call privileges.
Institutions will utilize the current inmate phone equipment that already exists. Precautions
are to be taken for both staff and inmate safety to include procedures to limit risk of
exposure and transmittal of illness from inmate to inmate as phone calls are provided.

General strategies for providing all restricted housing, RC and PIP inmates' phone calls will
need to be tailored by each respective institution based on physical plant design along with
taking the following recommendations into consideration:

- All Non-Disciplinary Segregation (NDS) inmates will be allowed to make a phone call
  once a week (currently NDS A inmates are permitted one phone call a week, and NDS
  B inmates are permitted one phone call a month)
- All other inmates in restricted housing units will be allowed to make a phone call
  once every two weeks (currently no phone calls are permitted)
- C status inmate will remain on phone restrictions until C status has been completed or
  removed
- RC inmates will be provided one phone call a week (currently one phone call within
  first seven days of arrival and one phone call per month afterwards)
- PIP inmates will be allowed to make one phone call a week unless restricted by the
  Interdisciplinary Treatment Team with clinical justification documented in the health
  record

Associate Directors, Division of Adult Institutions
Wardens, Chief Executive Officers, Executive Directors
Chiefs of Mental health
Page 2


As a result of COVID-19, the Office of Correctional Education, the Division of Rehabilitative Programs (DRP) classes, and Visiting have been temporarily closed. Correctional staff assigned to the Office of Correctional Education, DRP, or visiting positions as an example may be redirected to help facilitate the phone calls in the RCs, restricted housing units, and PIPs.

This policy memorandum will remain in effect until this COVID-19 crisis is no longer in effect or rescinded.

This situation remains fluid and ever changing, thank you for your patience and cooperation. If you have any questions, please contact Justin Penney, Special Assistant to Deputy Director, Facility Operations, DAI, at (916) 323-1029 or Justin.penney@cdcr.ca.gov.


CONNIE GIPSON
Director
Division of Adult Institutions

EUREKA C. DAYE, Ph.D., MPH/MA, CCHP
Deputy Director (A)
Statewide Mental Health Program

cc:  Kimberly Seibel
     Patrice Davis
     Justin Penney
     Angela Ponciano
     Michael Golding
     Travis Williams
     Laura Ceballos
     Mental Health Regional Administrators
     Regional Health Care Executives

State of California                                                        Department of Corrections and Rehabilitation

# Memorandum

Date:   April 1, 2020

To:     Associate Directors, Division of Adult Institutions
        Wardens
        Chief Executive Officers
        Chiefs of Mental Health
        Chief Psychiatrists
        Senior Psychiatrists, Supervisors

Subject:   **COVID-19 PROGRAMMING OPPORTUNITIES FOR INMATES PARTICIPATING IN THE MENTAL HEALTH SERVICES DELIVERY SYSTEM IN RESTRICTED HOUSING**

The purpose of this memorandum is to announce the implementation of third watch programming opportunities within restricted housing in response to the current Coronavirus (COVID-19) disease. This program implementation shall remain intact during the duration of the pandemic. At the resolution, all programming will reconvene to their original format.

In the event mental health groups and clinical one-to-ones are unable to occur in the restricted housing units, wardens will ensure evening (PM) yard is provided to inmates in the mental health services delivery system. For those units designated to quarantine status, all movement will be in accordance with current departmental expectation. This direction has been developed in order to maximize out-of-cell time and enhance the Department's suicide prevention efforts during this pandemic. The attached listing identifies those institutions and their respective restricted housing units already staffed to provide PM yard. Due to the direction to increase evening programming opportunity within every mental health restricted housing program, the wardens without staffing for PM yard will have the authority to approve overtime on an as needed basis. All overtime detail code for this program will be coded as "MHYD" to accurately capture expenditures and a weekly report of incurred overtime will be reported to the respective Associate Director.

Wardens are encouraged to collaborate with Mental Health managers and provide innovative methods to assist in combating boredom and encouraging mental stimulation within their restricted housing settings. Wardens shall also ensure precautions are taken for both staff and inmate safety to include procedures to limit risk of exposure and transmittal of illness (social distancing) from inmate to inmate.

If you have any questions, contact Lourdes White, Captain, Mental Health Compliance Team, via email at Lourdes.White@cdcr.ca.gov or via phone at (916) 835-5679.

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
COVID-19 Programming Opportunities for Inmates Participating in the Mental Health Services
Delivery System in Restricted Housing
Page 2


CONNIE GIPSON
Director
Division of Adult Institutions

EUREKA C. DAYE, Ph.D., MPH, MA, CCHP
Deputy Director (A)
Statewide Mental Health Program

Attachment


Cc:  Kimberly Seibel
     Jennifer Barretto
     Joseph Bick, MD
     Angela Poniciano
     Adam Fouch
     Joe Moss
     Michael Golding
     Travis Williams
     Laura Ceballos
     Lourdes White
     Mental Health Regional Administrators
     Regional Healthcare Executives

Mental Health Restricted Housing
Third Watch Yard

| INST | Housing Designation |
|------|---------------------|
| COR | ASU-STRH |
| HDSP | ASU-STRH |
| KVSP | ASU-STRH |
| PBSP | ASU-STRH |
| LAC | ASU-STRH |
| CMC | EOP ASU |
| PVSP | STRH |
| SATF | STRH |
| SVSP | STRH |
| SAC | STRH |

Program Support Unit v.3.30.2020

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date:   April 1, 2020

To:   Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officer
Chiefs of Mental Health
Chiefs of Psychiatry

Subject:   **COVID- 19 ELECTRONIC APPLIANCE PROGRAM FOR RESTRICTED HOUSING INMATES**

The purpose of this memorandum is to announce the implementation of the Electronic Appliance Loaner Program in all restricted housing areas. Restricted housing shall encompass those inmates confined to quarters who are not permitted normal release, therefore require a greater degree of supervision than normal. This program has been developed in order to enhance the Department's in-cell activities in response to the COVID-19 pandemic. This program implementation shall remain in effect during the duration of the pandemic. Upon resolution, the memorandum dated January 22, 2014, titled, *Multi-Powered Radio Loaner Program in Administrative Segregation Units,* and memorandum dated August 4, 2017, titled *Electronic Tablet Loaner Program in Administrative Segregation and Short-term Restricted Housing,* shall reconvene.

The electronic appliance loaner program shall be implemented within all restricted housing units. Upon placement into restricted housing, all offenders shall be offered an electronic appliance as described below. Staff shall also ensure all appliances have been disinfected prior to any issuance or redistribution from one inmate to another. The process will be as follows:

- Initial Intake
  - During the initial 72-hour intake period, a loaner crank radio shall be issued if available.
- After Intake, the following may be provided:
  - Television
    - If the assigned cell has power capabilities and a television service provider, a television may be issued.
      - If the offender has a television in their personal property, it shall be retrieved and provided to the inmate.
      - If the inmate does not have an electronic appliance in their personal property, a loaner television shall be issued first.
      - In the event the cell does not have power capabilities, or there are not sufficient loaner televisions, staff shall issue the inmate a crank radio as outlined below.

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Electronic Appliance Program for Restricted Housing Inmates
Page 2

- o Radios
  - If the assigned cell has power capabilities and the offender has a corded radio in their personal property, it shall be retrieved and provided to the inmate.
  - If the assigned cell does not have power capabilities, a loaner crank radio shall be issued.
  - Should radios not be available, a wait list by date of placement shall be established and issued by arrival date order.

Expectations

- o Inmates will be allowed to keep the appliance until they are released from restricted housing, or issued an entertainment appliance from their personal property.
- o All property restrictions relative to entertainment appliances within restricted housing shall be suspended during this program.
- o Each institution shall ensure each loaner electronic appliance is issued a state property tag for accountability.
- o The restricted housing supervisor shall be responsible to ensure the assigned property officer and inmate complete a CDCR 128-B, Electronic Appliance Loaner Program Agreement form upon issuance.
- o The assigned property officer will track issuance of the appliance on a distribution log, and will ensure the appliance is in proper working order. Upon release from restricted housing, the inmate shall relinquish the loaner electronic appliance.
- o If the electronic appliance has been altered or destroyed, the restricted housing supervisor shall determine if it was intentional or unintentional. In the event it has been determined to be intentional, staff shall utilize progressive discipline per California Code of Regulations Section 3312. In addition, the inmate will be charged the full replacement cost.
- o Those institutions authorized to use the Electronic Tablet Loaner Program in their restricted housing units shall continue to offer tablets as a viable electronic appliance.

Wardens are directed to implement these procedures immediately. Provide proof of practice to your respective Mission Associate Director within 1 week of the date of this memoradum. In addition to this directive, Wardens are encouraged to collaborate with Mental Health managers and provide innovative methods to assist in combating boredom and encouraging mental stimulation within their restricted housing settings.

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Electronic Appliance Program for Restricted Housing Inmates
Page 3

If you have any questions, contact Lourdes White, Captain, Mental Health Compliance Team, at (916) 835-5679 or Lourdes.White@cdcr.ca.gov.

Original Signed by:

CONNIE GIPSON
Director
Division of Adult Institutions

JOSEPH BICK, M.D.
Director
Health Care Services

Attachments

cc: Kimberly Seibel
    Jennifer Barretto
    Eureka C. Daye, Ph.D., MPH, MA, CCHP
    Mental Health Regional Administrators
    Regional Healthcare Executives
    Michael Golding
    Angela Ponciano
    Adam Fouch
    Joe Moss
    Travis Williams
    Dawn Lorey
    Lourdes White



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



# MEMORANDUM

| | |
|---|---|
| **Date:** | April 5, 2020 |
| **To:** | Chief Executive Officers<br>Chief Psychiatrists<br>Chiefs of Mental Health<br>Senior Psychiatrist, Supervisors |
| **From:** | Joseph Bick, MD (signature on file)<br>Director (A), Division of Health Care Services |
| **Subject:** | **COVID-19 SCREENING PRIOR TO MENTAL HEALTH TRANSFERS** |

Referrals to Mental Health Inpatient care shall continue when a patient requires such placement to prevent serious harm to self or others or to address serious mental health decompensation. Transfers must take place in a manner that minimizes the risk for transmission of COVID-19. Therefore, all Mental Health patients shall be screened for COVID-19 within 12 hours of transfer from one facility to another.

Screening shall be performed by a medical or psychiatric physician in consultation with the institution public health or infection control nurse prior to the patient leaving a facility. The clearance shall be clearly documented in a transfer note in the chart. Prior to patient transfer, the content of the note shall also be verbally communicated from the sending psychiatrist or other medical physician to the Chief or Senior psychiatrist at the receiving institution.

The following information shall be included in the transfer note:

1. Title Note: Medical screening transfer note
2. Referring Institution
3. Receiving Institution
4. Does the patient have a new or worsening cough?  [Y/N]
5. Does the patient have a fever (>100 F)?  [Y/N]
6. Is the patient experiencing new or worsening shortness of breath?  [Y/N]
7. Is the patient currently on isolation?  [Y/N]
8. Is the patient currently on quarantine?  [Y/N]
9. Is the patient known to be a contact of a confirmed COVID -19 case?  [Y/N]
10. Include the patient's vitals for the last 14 days as available
11. Rationale for recommending transfer.

cc:  Diana Toche, DDS, Undersecretary of Healthcare
     Steve Tharratt, MD, Director Healthcare Operations
     Connie Gibson, Director, Division of Adult Institutions
     Eureka C. Daye, Deputy Director (A), Statewide Mental Health
     Renee Kanan, MD, MPH, Chief Quality Officer, Deputy Director of Medical Services
     Barbara Barney-Knox, Deputy Director of Nursing (A), Statewide Chief Nurse Executive
     Jay Powell, Associate Warden, HCPOP
     Regional Health Care Executives
     Regional Chief Nurse Executives
     Regional Deputy Medical Executives
     Deputy Directors





# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



# MEMORANDUM

| | |
|---|---|
| **Date:** | April 10, 2020 |
| **To:** | Associate Directors, Division of Adult Institutions |
| | Wardens |
| | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief/Senior Psychiatrists |
| | Chief Medical Executives |
| | Chief Nurse Executives |
| | Psychiatric Inpatient Program Executive Directors |
| **From:** | |

EUREKA C. DAYE, Ph.D., MPH, MA, CCHP
**Deputy Director (A)**
**Statewide Mental Health Program**

CONNIE GIPSON
**Director**
**Division of Adult Institutions**

BARBARA BARNEY-KNOX
**Deputy Director (A), Nursing**
**California Correctional Health Care Services**

| | |
|---|---|
| **Subject:** | **COVID EMERGENCY MENTAL HEALTH TREATMENT GUIDANCE AND COVID TEMPORARY TRANSFER GUIDELINES AND WORKFLOW** |

This memorandum announces the release of the COVID Emergency Mental Health Treatment Guidance and COVID Temporary Transfer Guidelines and Workflow (attached). These documents provide guidance to the field regarding temporary treatment-in-place and the activation of temporary housing for patients referred to an inpatient level of care but may not be able to transfer to another institution due to restrictions on transportation related to COVID-19.

When a patient requires emergency inpatient care to prevent serious harm to self or others or to address serious mental health decompensation, referrals to mental health inpatient level of care shall continue per the COVID Temporary Transfer Guidelines and Workflow, and following procedures detailed in the previously released COVID-19 Screening Prior to Mental Health Transfers.

A Temporary Mental Health Unit (TMHU) is a consolidation of high acuity patients in adjacent cells where treatment can be provided to a group of individuals who require similar inpatient

# MEMORANDUM

treatment. Institutions shall identify clusters of cells for a TMHU per the COVID Emergency Mental Health Treatment Guidance. Local custody and healthcare leadership shall work together to identify the TMHU locations.

The determination for the TMHU location shall be based upon space availability and the following considerations:

1. Suicide Resistant
2. Line of sight from the officers' station
3. Contiguous grouping of cells
4. Proximity to treatment space
5. Available space in the unit for out-of-cell activities
6. Functional loud-speaker system
7. Reasonable access to an exercise yard

To ensure staff awareness of this guidance, Wardens and Chief Executive Officers (CEOs) shall ensure training on this memorandum is completed and submit a proof of practice memorandum identifying the housing location of each TMHU. Wardens shall ensure all chief deputy wardens, associate wardens, captains, and lieutenants receive On-the-Job training and submit a proof of practice memorandum to their respective mission's Associate Director. CEOs shall ensure applicable healthcare staff receive On-the-Job training and submit a proof of practice memorandum to the respective Regional Mental Health Administrators. Proof of practice memorandums shall be submitted within 30 days from the date of this memorandum.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email:  CDCR MHPolicyUnit@cdcr.

Attachment

cc: Angela Ponciano
    Laura Ceballos, Ph.D.
    Michael Golding, M.D.
    Amar Mehta, M.D.
    Shama Chaiken, Ph.D.
    Travis Williams, Psy.D.
    Amber Carda, Psy.D.
    Steven Cartwright, Psy.D.
    Steven Tharratt, M.D.
    Jennifer Johnson
    Adam Fouch
    Kimberly Seibel
    Jay Powell
    Regional Mental Health Administrators
    Regional Health Care Executives

State of California – Department of State Hospitals                                    Gavin Newsom, Governor



# Memorandum

**Date:**          April 15, 2020

**Subject:**      DEPARTMENT DIRECTIVE ON SUSPENSION OF PATIENT
ADMISSIONS FROM THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION (CDCR)


Pursuant to Governor Gavin Newsom's Proclamation of a State of
Emergency dated March 4, 2020, the Director of the Department of State
Hospitals issued a Directive suspending the admission of patients placed
at DSH facilities pursuant to Penal Code section 2684 (*Coleman* patients).
This Directive is set to expire on April 15, 2020.  On March 21, 2020, the
Governor further provided the Director of the Department of State
Hospitals authority to suspend any portion of the Penal Code as
necessary to mitigate the effects of the COVID-19 pandemic pursuant to
Executive Order N-35-20.

During the last 30 days, the Department worked closely with CDCR to
develop a plan to safely resume the transfer of individuals referred to DSH
from CDCR pursuant to Penal Code section 2684.

In light of the COVID-19 pandemic and current clinical guidance that
facilities must maximize their efforts to prevent the introduction or slow the
transmission of COVID-19 into DSH hospitals, as of April 16, 2020,
*Coleman* patient admissions to DSH hospitals will resume but effectuated
pursuant to temporary guidelines and protocols created by DSH and
CDCR.


STEPHANIE CLENDENIN
Director


Attachment: COVID-19 Guidelines for Transfer to DSH Inpatient Care


*"Caring Today for a Safe and Healthy Tomorrow"*

 CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES


# MEMORANDUM

| | |
|---|---|
| **Date:** | April 17, 2020 |
| **To:** | Associate Directors, Division of Adult Institutions |
| | Wardens |
| | Chief Executive Officers |
| | Chiefs of Mental Health |
| | Chief/Senior Psychiatrists |
| | Chief Medical Executives |
| | Chief Nurse Executives |
| | Psychiatric Inpatient Program Executive Directors |
| **From:** | |

EUREKA C. DAYE, Ph.D., MPH, MA, CCHP
Deputy Director (A)
Statewide Mental Health Program

CONNIE GIPSON
Director
Division of Adult Institutions

BARBARA BARNEY-KNOX
Deputy Director (A), Nursing
California Correctional Health Care Services

| | |
|---|---|
| **Subject:** | **COVID EMERGENCY MENTAL HEALTH TREATMENT GUIDANCE FOR MAX CUSTODY PATIENTS AND COVID ENHANCED OUTPATIENT PROGRAM TEMPORARY TRANSFER GUIDELINES AND WORKFLOW** |

This memorandum announces the release of the COVID Emergency Mental Health Treatment Guidance for MAX Custody Patients and COVID Enhanced Outpatient Program (EOP) Temporary Transfer Guidelines & Workflow (attached). It also provides additional information and clarification on the requirements for identifying and tracking of Temporary Mental Health Unit (TMHU) cells. These documents provide guidance to the field regarding temporary treatment-in-place for MAX Custody patients referred to an inpatient level of care and transfer for patients with outpatient referrals.

Every effort shall be made to suspend MAX custody designation in order to house and treat the patient in the least restrictive housing setting available within the institution. Within 24 hours of referral, the Warden or designee shall review the patient's case factors and if the patient no longer poses a threat to safety or security, a specialized Institutional Classification Committee (ICC) shall occur with participation of a mental health clinician.

Due to the requirement of the specialized ICC occurring within 24 hours of referral, Wardens shall ensure the appropriate ICC members are available on weekends or holidays to facilitate the

**HEALTH CARE SERVICES**

P.O. Box 588500
Elk Grove, CA 95758

# MEMORANDUM

ICC. Chief Executive Officers (CEO) shall ensure the on-call mental health clinicians are also available as needed on weekends and holidays. The patient shall be given the opportunity to waive the 72 hour notice and effective communication shall be documented. In the event the patient does not waive, the specialized ICC shall commence for the safety of the patients and as supported by California Code of Regulations (CCR) Title 15, Section 3375 (f)(4)(A). The ICC shall solely address the need to remove MAX custody for the purpose of treatment. The specialized ICC shall not address any issues that could be considered adverse in nature.

Wardens and CEOs shall work together to identify where their TMHUs (both MAX and Mainline) are located using the provided guidelines. The locations of the TMHUs must be reported by providing the facility, housing unit, cell number, etc., as required on the Temporary MHU Beds tracking sheet (attached). Wardens and CEOs shall submit the tracking sheet to the respective Associate Directors and to the Mental Health Policy Unit by email: CDCR MHPolicyUnit@CDCR and DAI-MHCompliance@cdcr.ca.gov within five days from the date of this memo.

Wardens shall ensure all Administrative Officers of the Day, Chief Deputy Wardens and classification staff are trained on this direction within five days. CEOs shall ensure all necessary clinical staff are trained on this direction within five days. The BET code OJT – 11061159 shall be utilized and a certification memorandum shall be submitted to the respective Associate Directors and the Mental Health Policy Unit by email: CDCR MHPolicyUnit@CDCR and DAI-MHCompliance@cdcr.ca.gov.

Attachments

cc: Angela Ponciano
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Amar Mehta, M.D.
Shama Chaiken, Ph.D.
Travis Williams, Psy.D.
Amber Carda, Psy.D.
Steven Cartwright, Psy.D.
Steven Tharratt, M.D.
Jennifer Johnson
Adam Fouch
Kimberly Seibel
Jay Powell
Regional Mental Health Administrators
Regional Health Care Executives

COVID Emergency Mental Health Treatment Guidance For MAX Custody Patients

When a MAX custody patient is referred to an inpatient bed, the patient shall be placed in an available inpatient bed within the institution by HCPOP whenever possible. If no inpatient bed is available, the patient shall be placed under observation as clinically appropriate until  the following occurs within 24 hours:

1. The Warden or designee will review the case and determine if a specialized ICC is necessary to consider suspension of MAX custody status.
2. If a specialized ICC is warranted, it will be held with mental health participation as usual to assess the patient's reason for MAX custody designation and to determine if the MAX custody can be suspended to allow housing and mental health treatment as per the COVID-19 Temporary Emergency Transfer Guidelines document..
3. If the specialized ICC suspends the MAX custody designation, then treatment and transfer will follow the COVID-19 Temporary Emergency Transfer Guidelines document.
4. If the committee determines MAX custody cannot be suspended, the MAX custody patient shall be housed in a TMHU for a maximum of 10 days, that can be located in the following locations in the following priority:
   a. EOP ASU Hub/PSU
   b. STRH/LTRH
   c. ASU


MAX Custody TMHU Location

Institutions shall identify a location where there are preferably 5-15 available clustered cells in a segregation setting as specified above. This is not alternative housing. All TMHU cells will be visually marked within the unit so staff are aware of their location. These units shall:

1. Allow for potential 1:1 and 2:1 suicide watch
2. Enable ease of tracking patients for mental health clinicians, custodial personnel, and nurses.
3. Whenever possible, make it easier to perform milieu-based therapeutic alternatives such as groups (including educational groups specific to COVID-19), based upon CDCR COVID-19 guidelines.
4. Enable staff to coordinate activities for patients.
5. Take the following into consideration:
   a. Line of sight from the officers' station.
   b. Proximity to treatment space.
   c. Available space in the unit for out-of-cell activities.
   d. Functional loud-speaker system.
   e. Reasonable access to an exercise yard.
   f. Suicide Resistant housing units (ligature points, friable items for ingestion, etc.). Retrofitted Intake Cells shall be used as first priority for the newly admitted segregation inmates as per policy.  In the event the institution has enough retrofitted Intake Cells for their new admits, the institution may consider using a few Intake Cells for their TMHU.


MAX Custody TMHU Treatment and Services

1. The patient will be offered at least 5 hours of structured, out-of-cell treatment during the week (this can include participation in existing ASU groups, or TMHU-patient-specific groups with RTs, nursing staff, or clinicians).
2. The patient will be offered at least 15 hours of unstructured out-of-cell time during the week (including yard in which social distancing is observed).
3. All group therapy should be considered in the context of the potential spread of infection, and should only be performed where it can be done safely.
4. The Sergeant and psychiatrist and/or primary clinician shall have a daily discussion regarding patients' participation in out-of-cell treatment, yard, meals, phone calls, showers and other information related to the patients programming.
5. Interdisciplinary treatment teams (IDTTs) will be held at 72 hours, and again at 7 days from the date of placement.
6. Treatment team members will track whether patients are availing themselves of the opportunity to program out of cell for at least the 5 hours of structured treatment and 15 hours of unstructured out of cell time. If the patient is not participating due to mental health reasons, the subsequent IDTT shall include a discussion of alternate treatment strategies to be considered.
7. If the patient is demonstrating signs of clinical decompensation, they would be moved from the segregation unit in a timely manner.
8. At seven days from the date of placement, an IDTT will be held. If it is determined that the patient is not improving or stabilizing sufficiently to decrease their level of care to the level prior to referral, the patient will be referred to an MHCB and must be transferred to an inpatient unit potentially at another facility within 10 days from the date of placement, following procedures described in the COVID-19 Temporary Emergency Transfer Guidelines.
9. <u>Staffing</u>: Clinical Leadership (to include Chief Executive Officers, Chiefs of Mental Health, Chief Nurse Executives, Chief Medical Executives, and the Chief Psychiatrist) shall assess program capacity and make determinations on admission and discharge practices based on factors to include available workforce, known COVID-19 exposure, etc. Leadership must consider individual patient needs, facility-system flows, and the degrees of risk when making these decisions.
10. All of the following services as per the COVID-19 Emergency Mental Health Treatment Guidance document:
    a. <u>Issuance of Property and Privileges</u>: Property and privileges should be provided in the Mental Health Patient Issue order for each patient. Additionally, these should be reviewed during the initial IDTT. The provision of property and privileges must be considered and communicated to all members of the treatment team. Considerations shall be for:
        - Clothing
        - Writing implements
        - Paper
        - Books
        - Phone calls
        - Yard time
        - Mental Health Observation
        - Access to the library cart
        - In-cell activities, games, puzzles, tablets, physical and other activities with the recreational therapist.

      o  Group therapy

b. Clinical teams shall refer to the memo titled, "Mental Health Crisis Bed Privileges Revision" dated February 14, 2017 when determining issuance of privileges for patients in the TMHU. All orders for level of observation, issuance and privileges shall be standing orders and updated as clinically indicated.

c. The delivery of care to patients in the TMHU will be evaluated daily, and adjusted based on the total percentage of staff available for patient care and direct activities.

d. All patients placed in the TMHU due to acute suicidality will be on 1:1 suicide watch until the treatment team can assess and determine the appropriate level of observation based upon clinical need and the patient's presentation. If the patient was admitted to the temporary mental health treatment unit for suicidality, the individual sessions should include safety planning development and enhancements to assist the patient in identifying and utilizing modifiable behaviors for ongoing safety from self-harm (see memorandum, "Updated Mental Health Crisis Bed – Referral, Referral Rescission, and Discharge Policy and Procedures" dated October 18, 2018).

      o  For patients on 1:1 suicide watch, the psychiatrist will make contact with a designated nursing staff, preferably before and after the clinical contact with the patient, to review pertinent information noted during the suicide watch.

      o  Suicide precautions (15-minute checks) are not authorized unless the cell has previously been found to be suicide-resistant.

e. Interdisciplinary huddles shall be utilized to disseminate clinical information about patients housed in the TMHU.

f. If in-person huddles cannot be accomplished safely, while adhering to social distancing, huddles shall occur telephonically.

g. Individual treatment out-of-cell shall occur daily and will be conducted by either the primary clinician or the psychiatrist, whenever possible. Supplemental treatment options provided in-cell should be reviewed during individual sessions and the clinician should provide feedback on the work the patient has completed with the in-cell activities.

h. Rounding shall occur twice per day, when possible, but no less frequently than at least once per day by a clinical social worker, psychologist, or psychiatrist. At least once per day, results from the rounding must be communicated to the psychiatrist covering the temporary mental health treatment unit if the psychiatrist did not perform the rounding.

i. All patients in the TMHU shall have at least equal access to existing resources, out-of-cell time and privileges that other inmates and patients have in the housing unit where the TMHU is located:

      o  Yard

      o  Showers

      o  Phone Calls

j. The patient shall be afforded other resources, unless clinically contraindicated by the IDTT, such as:

- o JPAY tablets
- o Radios
- o Electronic Appliance Loaner Program
- o Reading materials
- o See section entitled "Supplemental Treatment Options" below

k. Recreational Therapy

- o Increased Recreational Therapy, developed through collaboration with all members of the treatment team to determine the most effective activities for the patient, given his or her unique treatment teams.
- o If the patient cannot receive recreational therapy outside of his or her cell, due to COVID exposure risk, recreational therapy shall be focused on activities that the patient can engage in while in his or her cell. Examples are mindfulness activities, yoga, guided imagery, meditation, music therapy, community milieu activities, and physical activities to improve both physical and mental health wellbeing.

l. Individual treatment

- o Confidential individual treatment by a member of the treatment team shall occur each day, where safe to do so.
- o Primary clinicians shall focus their efforts during individual treatment not just on the primary mental health treatment goals for the patient, but also how to adjust to being in close quarters for extended periods of time due to the COVID crisis.
- o Supplemental treatment options provided in-cell should be reviewed during individual sessions and the clinician should provide feedback on the work the patient has completed with the in-cell activities.

m. Supplemental Treatment Options in the TMHU: In addition to the required elements of TMHU treatment, other optional treatment modalities can be considered. If/when necessary consider utilizing Collaborative Team Treatment, as described below:

- o Where necessary due to staffing, a tele-presenter with portable equipment such as a laptop with a camera, microphone, and speakers could connect to the same WebEx meeting with any available members of the treatment team attending by video conference. The team members would be able to participate on their own personal computers. The tele-presenter would then carry the laptop to the patient who should be secured within a TTM in a confidential location, where the entire treatment team would be able to engage in a collaborative session.
- o This is a strategy to minimize the amount of ingress and egress required within the entire institution, particularly for quarantined areas. This achieves the of goal minimizing the amount of potential staff and patient exposure, while maintaining an ability for the entire team to gather accurate information about the status of the patient, discuss patient care together, and develop & coordinate plans together.

- o If PPE or tele-presenters are not available in sufficient quantities, the tele-presenter could then be the only member of the treatment team required to don and doff scarce protective equipment.
- o Tele-presenter selection. The current working emergency COVID plan notes "staff that could be used as tele-presenters is decided by each institution to include:
    - i. Medical Assistant
    - ii. Any staff unable to perform their assigned duties during the crisis (with training), e.g.
        1. Dental
        2. Staff on administrative time off
        3. Support staff
        4. Any healthy state personnel
    - iii. Any Mental Health provider (Group leader, RT, SW, LCSW, PhD/PsyD)
    - iv. LVN, RN, CNA, Psych Techs
    - v. Any medical provider (PA, NP, MD)"

    During the COVID crisis, any of the above staff may serve as tele-presenters in a priority to be determined by the CEO in consultation with the Chief Psychiatrist, Director of Mental Health, Supervising Dentist, Chief Nurse Executive, and other leadership as necessary, based on local availability and necessary duties. Volunteers could be selected first, and if re-direction to tele-presenter duty continues to be necessary, they could be assigned based on inverse seniority. To reinforce, these decisions are at the discretion of the CEO, in consultation with the Chief Psychiatrist and other leadership.
- o Group therapy and structured out-of-cell time
    - i. All group therapy should be considered in the context of the potential spread of infection, and should only be performed where it can be done safely.
    - ii. When safely possible, it is preferable to have group therapy occur in small groups (3-4 people) where space allows them to remain at least 6 feet apart and the area can be sanitized between each group member.
    - iii. When safely possible, group Therapy shall occur in an existing mental health treatment area with TTMs. For individuals on suicide watch, consider having the staff member monitor patient while in group, when feasible and safe.
    - iv. If no groups can be run, then PM yard should be considered.
    - v. All out of cell activity offered within the TMHU will be documented on the 114-A

n. <u>Discharge Criteria</u>: If a patient no longer requires inpatient mental health treatment, the discharge IDTT shall rescind the referral to the higher level of care. Upon discharge, the primary clinician shall complete a full discharge SRASHE with Safety Planning Intervention.  Additionally, orders for five-day follow ups and custody discharge checks shall be made.

## CDCR COVID EOP Temporary Transfer Guidelines & Workflow

In an attempt to limit the transmission of COVID-19, all non-emergency movement shall be immediately curtailed, as per constantly evolving circumstances which require flexibility and adaptation as events and requirements change due to COVID-19. All movement within a facility can continue, taking into consideration COVID status. All transfer requests to other facilities will be reviewed as described below, and HCPOP will not act on the place-in order without approval from the Regional Mental Health Administrator or the IRU.

**Outpatient Referrals to a Different Facility:**

All outpatient external transfers or releases from segregated housing to mainline mental health programs at other institutions, to include transfers from desert institutions, transfers from stand-alone ASUs to STRH, CCCMS to EOP, and EOP to CCCMS will not occur unless the following exists:

I.   <u>Institution Review</u>: Transfer out of the patient's current facility shall not proceed unless meeting the criteria below, as assessed by the treatment team:
   1. an imminent, life-threatening emergency necessitates transfer, or
   2. serious mental health decompensation necessitates transfer, and
   3. the life-threatening condition or serious decompensation cannot be reasonably treated at the institution.

II.   <u>If transfer is pursued, Regional Review is required</u>: If the referral meets the criteria above, the Chief of Mental Health or Chief Psychiatrist shall email and call the Regional Mental Health Administrator or designee. They shall include an explanation of why the criteria above have been met. The Regional Mental Health Administrator must then consult with the Regional Deputy Medical Executive. The Division of Adult Institutions and/or HCPOP will not transfer patients to a new facility without receiving approval from the Mental Health Administrator.

When a transfer is not clinically necessary, alternate strategies for managing the patient within the institution must be implemented. When full staffing is available, EOP programming should be offered at the standard Program Guide mandated frequency and quality of care (Page 12-3-13: Inmate-patients awaiting EOP transfer shall have updated individualized treatment plans to address patient's current clinical needs [CDCR 7388, *Mental Health Treatment Plan*]. While awaiting EOP transfer, inmate-patients shall be seen on an at least weekly basis by the PC, as clinically indicated, with ongoing assessment of emergency transfer criteria). In institutions that do not have levels of staffing sufficient to provide standard EOP programming, they should be treated in accordance with the Tier Chart.  This includes patients released via ICC from an EOP ASU Hub program, but unable to be placed on any EOP yard at the same institution (e.g. due to widespread safety concerns); these patients may be placed on a local CCCMS yard while applying the same criteria for consideration of transfer.

**COVID-19 Temporary Guidelines for Transfer to DSH Inpatient Care**

In cases where psychiatric inpatient care is required, the process for determining transfer to DSH shall be conducted as follows:

I. Institution Review:
1. Transfer out of the patient's current facility shall not proceed unless meeting the criteria below, as assessed by the treatment team:
   a. an imminent, life-threatening emergency necessitates transfer, or
   b. serious mental health decompensation necessitates transfer, and
   c. the life-threatening condition or serious decompensation cannot be reasonably treated at the current institution or elsewhere within CDCR.

II. Acceptance Procedure:
1. Prior to a referral of a patient to a DSH inpatient program, CDCR Statewide Chief Psychiatrist or designee will consult with the DSH Medical Director or designee on the required transfer and the risk factors noted above.  If both are in agreement, then the referral will proceed and the receiving DSH institution will also review and determine acceptance as per normal procedure and protocol. If there is agreement on the transfer of the patient to the DSH inpatient program, the receiving DSH hospital will post the acceptance.
2. If there is a disagreement between the DSH Medical Director and CDCR Statewide Chief Psychiatrist regarding the transfer of a patient to a DSH inpatient program, a second level review will be conducted by the Director of DSH with the Director of CCHCS Health Care Services.

III. Communication and Documentation Requirements:
1. The clearance shall be clearly documented by the primary care physician or psychiatrist in a transfer note, to be included in the chart, addressing the factors included below.
2. The content of the note should also be orally communicated from the sending psychiatrist or other medical physician to the Medical Director at the receiving DSH institution so appropriate measures can be taken prior to patient arrival.
3.The above oral communication must be documented.

IV. Quarantine:
1. As with all current DSH admissions, transfers for DSH-Coalinga, DSH-Atascadero, and DSH-Patton must take place in a manner that minimizes the risk for transmission of COVID-19. Therefore, in the absence of testing, all interagency Mental Health transfer patients shall be quarantined for 14 days either pre or post transfer.

V.  DSH Discharges:

1. *Coleman* class members will be discharged when clinically appropriate.
2. *Coleman* class member discharges will be discussed between the DSH Medical Director or designee and the CDCR Director of Health Care Services or designee.
3. If quarantine is needed this will happen in the reverse for DSH to CDCR returns according to CDCR/CCHCS Policy.

VI. <u>Transfer Note Documentation</u>: The following information shall be included in the transfer note:

1. Title Note: Medical screening transfer note
2. Referring Institution
3. Receiving Institution
4. Does the patient have a new or worsening cough?  [Y/N]
5. Does the patient have a fever (>100 F)?  [Y/N]
6. Is the patient experiencing new or worsening shortness of breath?  [Y/N]
7. Is the patient currently on isolation?  [Y/N]
8. Is the patient currently on quarantine?  [Y/N]
9. Is the patient known to be a contact of a confirmed COVID -19 case?  [Y/N]
10. Include the patient's vitals for the last 14 days as available
11. Rationale for recommending transfer.