<pre>
 1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
 2                        --oOo--

 3   RALPH COLEMAN, ET AL,       ) Docket No. 90-CV-520
                                 ) Sacramento, California
 4                 Plaintiffs,   ) May 15, 2020
                                 ) 1:04 p.m.
 5           v.                  )
                                 )
 6   GAVIN NEWSOM, ET AL.,       ) Re: Telephonic status conference
                                 )
 7                 Defendants.   )

 8               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE KIMBERLY J. MUELLER
 9             UNITED STATES DISTRICT JUDGE

10   APPEARANCES (telephonic):

11   For the Plaintiffs:     ROSEN BIEN GALVAN & GRUNFELD, LLP by
                             MR. MICHAEL BIEN
12                           MS. ADRIENNE ELLS
                             50 Fremont Street, 19th Floor
13                           San Francisco, CA 94105

14                           MS. JESSICA WINTER
                             100 Mission Street, Sixth Floor
15                           San Francisco, CA 94105

16                           PRISON LAW OFFICE by
                             MR. DONALD SPECTER
17                           MR. STEVE FAMA
                             1917 Fifth Street
18                           Berkeley, CA 94710

19       (Appearances continued next page.)

20              JENNIFER COULTHARD, RMR, CRR
                   Official Court Reporter
21              501 I Street, Suite 4-200
                  Sacramento, CA 95814
22                jenrmrcrr2@gmail.com
                     (530)537-9312
23

24       Mechanical Steno - Computer-Aided Transcription

25
</pre>

```
 1   APPEARANCES (Cont'd)

 2   For the Defendant:      OFFICE OF THE ATTORNEY GENERAL by
                             MR. KYLE ANTHONY LEWIS
 3                           MR. ADRIANO HRVATIN
                             MS. ELISE THORN
 4                           455 Golden Gate Avenue, Suite 11000
                             San Francisco, CA 94102
 5
                             OFFICE OF THE ATTORNEY GENERAL by
 6                           MR. TYLER HEATH
                             MR. LUCAS L. HENNES
 7                           1300 I Street, Suite 125
                             Sacramento, CA 94244
 8
                             ROBINS KAPLAN, LLP
 9                           MR. ROMAN SILBERFELD
                             2049 Century Park East, Suite 3400
10                           Los Angeles, CA 90067

11   Also Present:           DIANA TOCHE,
                             Undersecretary of Health, CDCR
12                           ALISON HARDY
                             Plaintiff's class counsel in Plata
13                           JENNIFER NEILL
                             Assistant Secretary/Chief Counsel, CDCR
14                           JOSEPH BICK, M.D.,
                             Director, Health Services, CDCR
15                           MELISSA BENTZ
                             Legal Affairs, CDCR
16                           NICK WEBER,
                             Legal Affairs, CDCR
17                           STEPHANIE CLENDENIN,
                             Director, DSH
18                           CHRISTINE CICCOTTI,
                             General Counsel, DSH
19                           CHRISTOPHER KENT
                             General Counsel, DSH
20                           ANTONINA RADDATZ
                             General Counsel, DSH
21                           JAMES SPURLING
                             General Chief Counsel, OIG
22                           GREGG ADAM
                             Counsel for CCPOA
23                           DAVID SANDERS
                             Counsel for CCPOA
24                           MATTHEW LOPES
                             Special Master
25                           MOHAMEDU JONES
                             Special Master Team
```

```
1    APPEARANCES (Cont'd)

2    Also Present:            KERRY WALSH
                             Special Master Team
3                            KRISTINA HECTOR
                             Special Master Team
4                            JEFF METZNER, M.D.
                             Special Master Team
5                            KERRY HUGHES, M.D.
                             Special Master Team
6                            HENRY DLUGACZ
                             Special Master Team
7                            HAVEN GRACEY
                             Law Clerk for Chief Judge Mueller
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, FRIDAY, MAY 15, 2020

2                          --oOo--

3      (In open court.)

4          THE COURT:  Good afternoon.  This is Judge Mueller.

5          Ms. Schultz, you're hearing me?

6          THE CLERK:  Yes, Your Honor.

7          THE COURT:  All right.  And the court reporter is on

8  the line and is also hearing well?

9          COURT REPORTER:  Yes, Your Honor.

10         THE COURT:  All right.  Ms. Schultz, can you please

11 call the matter.

12         THE CLERK:  Calling Civil Case 90-520, Coleman, et al.

13 v. Newsom, et al.  This is on for a telephonic status

14 conference.

15         THE COURT:  All right.  I will, once again, call role

16 for the plaintiffs.  Michael Bien.

17         MR. BIEN:  Present, Your Honor.

18         THE COURT:  Ms. Ells.

19         MS. ELLS:  Good afternoon, Your Honor.

20         THE COURT:  Ms. Winter?  Is Jessica Winter on the

21 line?  All right.  I'm not hearing Ms. Winter.

22         Mr. Specter.

23         MR. SPECTER:  Present.

24         THE COURT:  And Mr. Fama.

25         MR. FAMA:  Good afternoon.  Present.

 1    THE COURT:  All right.  Is anyone else appearing for

 2  plaintiffs, Mr. Bien?

 3    MR. BIEN:  I think Ms. Winter will be appearing.

 4    MS. WINTER:  I'm trying to speak now.  Can you hear

 5  me?

 6    THE COURT:  All right.  Is that Ms. Winter?

 7    MS. WINTER:  That's me.  Can you hear me?

 8    THE COURT:  Yes.  We can hear you now.

 9    MS. WINTER:  Okay.  Thank you so much.

10    THE COURT:  All right.

11    All right.  For the defense, Mr. Lewis.

12    MR. LEWIS:  Good afternoon, Your Honor.

13    THE COURT:  Mr. Silberfeld.

14    MR. SILBERFELD:  Good afternoon, Your Honor.

15    THE COURT:  Mr. Hrvatin.

16    MR. HRVATIN:  Here, Your Honor.

17    THE COURT:  Ms. Thorn.

18    Present, Your Honor.

19    THE COURT:  Mr. Heath.

20    MR. HEATH:  Good afternoon, Your Honor.

21    THE COURT:  Mr. Hennes.

22    MR. HENNES:  Present, Your Honor.  Good afternoon.

23    THE COURT:  Ms. Anderson.

24    MR. ANDERSON:  Yes.  Good afternoon, Your Honor.

25    THE COURT:  And then I understand also present

```
 1    monitoring the hearing Diana Toche, undersecretary health
 2    services for CDCR.
 3              MS. TOCHE:  Yes.  Good afternoon.
 4              THE COURT:  Jennifer Neill, assistant secretary chief
 5    counsel.
 6              MS. NEILL:  Yes.  Good afternoon, your Honor.
 7              THE COURT:  Dr. Bick, director health services.
 8              DR. BICK:  Good afternoon, Your Honor.
 9              THE COURT:  Ms. Bentz, legal affairs.
10              MS. BENTZ:  Present.  Good afternoon, Your Honor.
11              THE COURT:  Mr. Weber, legal affairs.
12              MR. WEBER:  Yes, Your Honor.
13              THE COURT:  Stephanie Clendenin, director of DSH.
14              MS. CLENENDIN:  Good afternoon, Your Honor.
15              THE COURT:  Christine Ciccotti, general counsel DSH.
16              MS. CICCOTTI:  Good afternoon, Your Honor.
17              THE COURT:  Christopher Kent, general counsel DSH.
18              MR. KENT:  Good afternoon, Your Honor.
19              THE COURT:  And Antonina Raddatz, general counsel DSH.
20              MS. RADDATZ:  Good afternoon, Your Honor.
21              THE COURT:  And then also monitoring, James Spurling,
22    general chief counsel OIG.
23              MR. SPURLING:  Good afternoon, Your Honor.
24              THE COURT:  Gregg Adam CCPOA counsel.
25              MR. ADAM:  Good afternoon, Your Honor.
```

1              THE COURT:  David Sanders, CCPOA counsel.

2              MR. SANDERS:  Good afternoon, Your Honor.

3              THE COURT:  All right.  Does either party have any

4    other person present and monitoring the hearing available as a

5    possible resource, Mr. Bien?

6              MR. BIEN:  No, Your Honor.

7              THE COURT:  Mr. Lewis?

8              MR. LEWIS:  No, Your Honor.

9              THE COURT:  All right.  The special master is present.

10   Special Master Lopes.

11             MR. LOPES:  I am here, Your Honor.

12             THE COURT:  And could you please identify the members

13   of your team on the line.

14             MR. LOPES:  Yes.  Mohamedu Jones, Kerry Walsh,

15   Kristina Hector, Dr. Jeffrey Metzner, Dr. Kerry Hughes, and

16   Henry Dlugacz.

17             THE COURT:  All right.  Thank you.  And finally the

18   Court's law clerk is monitoring the hearing telephonically.

19             Thank you all for appearing once again.  I did provide

20   the agenda yesterday afternoon, and I'm in the process of

21   reviewing materials the parties have provided, including as

22   recently as this morning.  I acknowledge the parties' filing

23   and the significant work that continues to go on.  And I do

24   want to obtain a status so that I understand my role and you

25   understand what I'm thinking about my role as we go forward and

1    then let you get back to work following the status.  I

2    recognize there's significant effort being put into this matter

3    at this time in light of the Corona virus.

4         So in terms of a general update regarding COVID -- and

5    today's agenda primarily addresses issues related to COVID-19,

6    as relevant to the Coleman class.  So I'd first like to ask for

7    brief updates from the special master and then give each party

8    a chance to provide a brief update.  So Special Master Lopes,

9    your brief update at this time?

10        MR. LOPES:  Thank you, Your Honor.  I'll start with an

11   update on COVID-19 statistics.  As of May 15th, CDCR reported

12   that there were 3,474 inmates that had been tested for COVID-19

13   of which 1,461 or 42 percent were Coleman class members.  Of

14   the 606 inmates who tested positive, 333 or 55 percent were

15   Coleman class members.  And 4 of the 5 individuals who

16   unfortunately passed away due to the virus were members of the

17   Coleman class.  CDCR reported that an outbreak of COVID-19 has

18   occurred at CIW with 46 cases at present, of which 34 are

19   Coleman class members at the CCC level of care.

20        The task force and workgroups met regularly since the

21   last status conference.  Two task force meetings and seven

22   workgroup meetings were held since that time and the task force

23   met on May 5th and May 12th and the smaller workgroups met on

24   May 4th, 5th, 6th, 7th, 8th, May 11th and May 13th.

25        The task force meeting included plaintiffs, defendant,

1  members from my team and representatives from the receiver's

2  office as well as an Armstrong representative.  The workgroup

3  meetings were attended by small contingents from my team as

4  well as CDCR and DSH.  We have established regular meeting

5  dates for the task force and the smaller workgroups.  Task

6  force meetings are held every Tuesday and the DSH transfer

7  workgroup meets every Monday and mental health workgroup meets

8  every Wednesday.

9       I did want to let Your Honor know that my clinicians

10  are in contact with CDCR and DSH officials regarding transfers

11  almost daily with additional meetings scheduled as needed.

12       Five of the workgroup meetings were held specifically

13  to address transfers to DSH and the other two workgroup

14  meetings addressed more global issues related to the provision

15  of mental health treatment to the Coleman class during this

16  pandemic.

17       The DSH transfer workgroup meetings addressed issues

18  relative to temporary transfer guidelines and the impact on

19  existing MOU, technician criteria, COVID screening, the process

20  of transfer, including the use of cohorts, subsequent transfers

21  from temporary mental health units and various treatment

22  modalities provided at DSH and in the PIPs.

23       The three additional workgroup meetings were held with

24  members from my team and CDCR representatives to discuss a

25  range of issues, including ASU EOP hub certification, temporary

1  mental health units, tele-health, COVID-19 dashboards and

2  designated COVID positive psychiatric in-patient units as well

3  as the reopening of the reception centers.

4       Task force activities in progress included having the

5  parties continue to analyze data regarding the Coleman class

6  members with COVID-19 risk factors, the location of the housing

7  and the physical distancing that is occurring.

8       CDCR is working on a proposal to monitor the EOP ASU

9  hubs during this crisis because the Court-approved

10 certification process, which calls for on-site monitoring by

11 CDCR regional staff, is not feasible at this time.

12      CDCR's developing a memo that will direct institutions

13 to use tele-health for psychologists and social workers.  The

14 revised number was provided to my team last night and will be

15 shared with the plaintiffs as well.

16      The dashboard is being developed that will allow the

17 parties to see, in realtime, indicators that will show the

18 actual performance of mental health programs operating under

19 the temporary COVID-19 guidelines.

20      For the Department of State hospitals it was reported

21 that by the end of the day yesterday 14 patients had

22 transferred to DSH since admissions resumed, and 5 more are

23 scheduled for next week.  Each week, in advance of the task

24 force meetings, defendants provide specific data regarding

25 referrals, transfers, rejections and discharges of Coleman

1   patients from DSH.

2          Transfers from CDCR to DSH continue to occur through

3   the collaborative efforts of the CDCR -- CDCR officials along

4   with officials from DSH and the Coleman experts.

5          As for case activities, the parties have filed with

6   the Court stipulations seeking the Court's permission to

7   continue the evidentiary hearing regarding DSH transfers for an

8   additional 30 days to observe if the current process will

9   continually result in regular transfers of Coleman patients to

10  DSH facilities.

11         The parties are in the final phases of completing a

12  stipulation that identifies the temporary departures from

13  program guide requirements for the provision of mental health

14  care, which are based on the new COVID-19 policies.  It is

15  expected that the stipulation will be filed sometime today.

16         As Your Honor is aware, in accordance of your order of

17  May 8th, the parties have provided maps to the Court that

18  indicate where all Coleman class members are housed following

19  the transfers that were made to increase physical distancing

20  and reduce the spread of COVID-19.  A list has also been

21  created by a certain number of inmates at each level of care at

22  every institution so Your Honor can better understand -- have a

23  better understanding, excuse me, of the new COVID-19 landscape

24  regarding the Coleman class.

25         I wanted to note that the Hayes Suicide Prevention

1    Report was sent out to the parties in draft yesterday and I

2    anticipate filing with the Court next week the labor

3    economist's report.

4         Finally, Your Honor, I wanted to report that the

5    Court's data expert, Dr. Potter, has been meeting with

6    representatives from CDCR and CCHCS to begin the process of

7    validating data regarding the provision of mental health

8    treatment.  At present he's had at least five meetings with

9    representatives of CDCR and the receiver's office and he's

10   reviewing population data at a granular level regarding

11   COVID-19 issues.

12        I met this morning, Your Honor, with Secretary Diaz

13   and counsel and their executive team to discuss the reopening

14   of reception centers to admissions from the county.  That was a

15   productive meeting, and I anticipate having follow-up meetings

16   with members of Secretary Diaz's executive team to understand

17   more clearly what will be done, when it will be done and how it

18   will be done, in terms of transferring folks into the reception

19   centers, and I will report on the same at the next status

20   conference.

21        That's my report, Your Honor.

22        THE COURT:  All right.  Thank you, Special Master

23   Lopes.  Just to touch on one issue the special master

24   referenced to eliminate any suspense on the hearing currently

25   set for next Tuesday, I will be vacating that hearing in light

1    of the parties' stipulation.  I have yet to review the language

2    carefully, given the other things that have been on my plate,

3    but I anticipate signing something with respect to that

4    stipulation if not by the end of the day on Monday, but the

5    hearing will be vacated and we'll discuss that in more detail

6    as we proceed here today.

7            So for the plaintiffs is there a brief report from the

8    plaintiffs?  And perhaps as part of that report the plaintiffs

9    can clarify their filing of a Plata joint statement I believe

10   last evening and if there are certain portions of that

11   statement that are calling out for this Court's attention.

12           Mr. Bien, are you taking the lead or are you yielding?

13           MR. BIEN:  I'll take the lead on this, Your Honor.

14   Mr. Specter also will speak, especially concerning the

15   reopening of admissions, the third item on your agenda.

16           The reason we filed the Plata CMC statement was to

17   emphasize several issues that plaintiff's counsel in both

18   Coleman and Plata are extremely concerned about.  One is the

19   plan to reopen CDCR to new admissions and the fact that the

20   accelerated releases are now completed so that the

21   population -- if CDCR moves forward with this plan, the

22   population will go back to increasing and we are very concerned

23   about the overcrowding, especially in the dormitories.  Also

24   related -- and as put forth in the Plata CMC statement, we have

25   serious concerns about the public health rationale of the dorm

1    plan and cohorting in dorms and whether or not having people

2    sleep apart in these cohorts has any real effect limiting the

3    spread of COVID-19 when, for the rest of the day, they are

4    mingling and using toileting facilities, sinks, showers and

5    toilets, day rooms, chow halls, medication lines, are mixed.

6          We also want to emphasize today, and it's a Plata

7    statement, that there is still no evidence of any plan for

8    high-risk prisoners, either Coleman high-risk prisoners or any

9    other high-risk prisoners.  By "high risk" I mean prisoners

10   that have, by virtue of their age or their preexisting medical

11   conditions, are likely to have adverse outcomes from COVID

12   infection.

13         I will just point out that the five prisoners who have

14   died so far all have been at CIM, all have been ages -- all

15   have high-risk medical factors and all were living indoor.

16   This is exactly what we feared.  And there remains tremendous

17   numbers of high-risk prisoners in what we consider dangerous

18   housing today, including, of course, numerous Coleman class

19   members.

20         THE COURT:  All right.  Mr. Specter, did you want to

21   say more at this time?

22         MR. SPECTER:  Yes.  Thank you, Your Honor.  To add to

23   what Mr. Bien said about the high-risk population in CDCR, just

24   to complete the story, Judge Tigar ordered the defendants in

25   Plata to respond by 5:00 today to our request that there be a

1    plan to deal with what we call the "vulnerable people" who are

2    incarcerated, especially in the dormitories.  So we are waiting

3    to see that response.  And as the CMC statement made clear, we

4    have been trying to get a response on this particularly

5    vulnerable population and action plans since early April, and

6    so we're grateful for Judge Tigar ordering the defendants to

7    finally provide us with their response.  So we will probably

8    have more information to provide you with at the next status

9    conference.

10          As far as the intake procedures are concerned, we are

11    concerned about new admissions coming into the prison system.

12    One of the things it seems to us that has worked well is the

13    fact that there hasn't been much movement around the system and

14    the admission of new people into the reception center will

15    necessarily cause people who are there at the moment to be

16    moved out and we're concerned about the effects of that and the

17    effects of introduction of those people into the existing

18    cohorts.  And we're also concerned about the testing abilities

19    of the department to have the appropriate number of tests and

20    provide -- and actually provide those tests appropriately to

21    both the people who are coming in when they come in after

22    they've been quarantined for a certain amount of time and prior

23    to transfer and the like.

24          We were also concerned about the criteria for movement

25    from the reception center into other prisons and we hope to

1    have more information about that on the call at 3:30 this

2    afternoon with the defendants.  They have asked us to provide

3    our questions in writing, which we did, and we're hoping to get

4    more information about some of these issues later this

5    afternoon.

6            THE COURT:  All right.  Thank you for that update.

7            Is there any reason -- and perhaps this is a question

8    for the defendants that the plan being provided -- recognizing

9    it's at the request of the Plata court but it appears it will

10   cover certain members of the Coleman class, any reason not to

11   provide a courtesy copy to this Court, including on the docket?

12           MR. SPECTER:  Your Honor -- I'm sorry.  There's no

13   assurance at this point whether they're actually going to

14   provide a plan.  The only thing Judge Tigar ordered them to do

15   is to respond to our requests for a plan.

16           THE COURT:  Ah.  All right.  Understood.

17           MR. SPECTER:  But if they do provide a plan or

18   whatever their response is, I think it's appropriate to provide

19   a courtesy copy to the Court.

20           THE COURT:  All right.  Also, I note there is a

21   reference in the Plata joint statement.  And again, I have not

22   had time to review the statements carefully, but there is a

23   reference to a May 11th document styled as "COVID-19 Guidance

24   for Daily Program Regarding Social Distancing For Cell or

25   Alternative Dorm-style Housing of 8-person Cohorts."  Is that a

1  document that -- is that before this Court at this point for

2  review, Mr. Specter, do you know?

3        MR. SPECTER:  I don't think it's been provided to you

4  for review, but I think maybe that Mr. Lewis might be able to

5  answer that more definitively.  I haven't seen it, what has

6  been provided to you.

7        THE COURT:  All right.  Well, Mr. Lewis --

8        Is there anything else from the plaintiffs, Mr. Bien?

9        MR. BIEN:  No, Your Honor.

10       THE COURT:  All right.  Mr. Lewis for the defense?  If

11  you could, in what were you're saying or anyone on your team is

12  saying, if and when there is a plan, as directed by the Plata

13  court, any reason not to provide this Court with a courtesy

14  copy and any reason not to provide this Court and its special

15  master now with the guidance I just mentioned?

16       MR. LEWIS:  Yes, Your Honor.  Good afternoon.  Thank

17  you first, Your Honor, for the comment that you've made about

18  the parties' efforts of the recent weeks and we all address

19  issues arising from the COVID pandemic.

20       Here today defendants will try to provide as much

21  information as possible in response to your agenda that was

22  issued just less than 24 hours ago.  We recognize -- defendants

23  recognize that these are complicated questions and issues and

24  that the Court is entitled to answers and we also realize how

25  busy Your Honor is by some of the comments you've made.  The

1   parties need to gather the information, conduct multiple levels

2   of conversation, synthesize the information for the Court,

3   gather things like the May 11th document and provide them to

4   you, if necessary.

5          And so, in fairness to the process, we would need more

6   time to respond.  So in the future we would ask if there is

7   agendas that are issued, perhaps there's an opportunity for us

8   to respond in writing ahead of the status conference.  And if

9   you have to do that so that we can get the Court information

10  like the May 11th document that you referenced, it may help

11  with this process and we'd just ask that that consideration be

12  given that possibly time to put something in writing is

13  provided so that we can get as much information as possible for

14  the Court for the purposes of these status conferences.

15         THE COURT:  I'll do what I can.  It's also the case

16  that when -- you know, writing can take time, and so sometimes

17  this more informal format can be more efficient.

18         MR. LEWIS:  Yes, Your Honor.

19         THE COURT:  But I'll bear that in mind.

20         MR. LEWIS:  Yeah.  And we'll all try to get as much

21  information as we can to Your Honor.

22         Regarding the May 11th document, I do believe that

23  that is going to be referenced in a subsequent time that we

24  have.  We do not have a problem -- I do not believe there would

25  be any problem providing anything that -- from the Plata court

1    to you, recognizing the Plata court has taken a lot of

2    ownership of these issues and in the most recent status

3    conference has even had more stuff going on and has directed

4    further action be taken with the development and consideration

5    of CDCR's plan and its movements on testing, intake and these

6    kinds of things.  These are things that are clearly within the

7    Plata court's ambit, and its clearly putting its arms around it

8    and asking defendant to do a lot of litigation, to do a lot of

9    things that had been referenced to you by Mr. Specter and

10   Mr. Bien.  We'll provide as much information as possible that

11   we receive on those things.

12        One of the updates I'd like to provide, Your Honor, is

13   that there are no new facilities with COVID since we last

14   appeared before Your Honor on May 1st.  It is still only 8

15   facilities.  The percentage of Coleman class members among the

16   entire number of positive COVID inmate cases has decreased from

17   our previous report and testing under the auspices of the Plata

18   receiver in CCHCS has been increasing as more kits have become

19   available and CDC guidance has evolved.  And as the special

20   master has reported, there are multiple conversations going on

21   about things like intake and other matters that we'll discuss

22   later on at this conference that the special master has been

23   present on and that other stakeholders are involved in.

24        At this point I would invite Dr. Bick to provide a

25   further update on the status of Corona virus issues at the

1    institutions, if Your Honor would like that.

2        THE COURT:  All right.  That's fine.  Dr. Bick.

3        DR. BICK:  Good afternoon, Your Honor.  I won't repeat

4    the information that Mr. Lopes and others have already

5    presented in terms of cases.  I would say still the

6    overwhelming majority of our cases among our patients have been

7    at the initial two facilities, CIM and LAC, which account for

8    90 percent of our cases.

9        This past week we are most concerned about the new

10   cases at the women's facility, CIW, where we now have 47 cases,

11   so that is a concern.  I am heartened by, as Mr. Lewis said,

12   that we don't have cases beyond those 8 thus far.  I think this

13   is a reflection that early on we all recognized, and I think it

14   was Mr. Specter who mentioned that the primary risk to our

15   patients is from cases coming into the community, whether

16   they're carried by employees or new intake of inmates into our

17   system.  I think all the actions taken thus far were efforts to

18   mitigate those risks, starting with restricting volunteers

19   coming in and contractors and visitors and then the screening

20   of employees for symptoms followed by the cancellation of

21   nonessential movement both driven by custody reasons and then

22   also by clinical.  I think all of those efforts have

23   contributed mightily to our ability to keep down the number of

24   active cases among our patients.

25       That was followed, as you know, by the temporary pause

1    in admissions to DSH and our emergency plan for providing

2    mental health treatment within CDCR that curtailed nonessential

3    movement.  All of this, as we've said all along, was pending

4    the availability of sufficient testing capability so that we

5    could more safely move our patients throughout the

6    institutions.

7           Now we've learned this week that we do, in fact, have

8    access to sufficient testing that we think will enable us to

9    adequately screen those patients who are moving both from

10   facility to facility but also any patients that will be coming

11   from reception.

12          And I can touch upon the reception process now or

13   later as you see fit, but I think that the bottom line is that

14   all -- everything we've been doing is Plata designed movement,

15   has been waiting for a process where we feel that we can more

16   safely move patients to their appropriate locations without

17   encouraging transmission of Corona virus.

18          THE COURT:  If you could elaborate very briefly on the

19   opening of reception centers and specifically let me ask you

20   this:  In the past, you have discussed the lack not just of

21   testing but of reliable testing.  And so if you could comment

22   on the nature of the testing available, is it antibody testing

23   or testing for the presence of active disease?  What is the

24   reliability of the testing and specifically the plan to reopen

25   reception centers and the wait to reopen those, specifically

1    based on the availability of testing and a plan for

2    administering of tests, Dr. Bick?

3              DR. BICK:  Yes, Your Honor.  The testing that we have

4    been using and will continue to use for the foreseeable future

5    is testing for the virus itself, so it's identifying people who

6    are currently infected and, therefore, potentially contagious.

7              We have, as many other organizations have, been

8    working aggressively to find alternate methods of testing that

9    are more rapid with shorter turnaround time for results.  Thus

10   far, that has not panned out.  Some of the companies providing

11   those tests were doing so under emergency authorization from

12   the FDA and now subsequently we've found that those tests have

13   an unacceptable level of missing active cases.  So they're more

14   reliable when a patient tests positive, but if someone tests

15   negative, it is not reliable enough to exclude an active COVID

16   infection.  So we're still using the tests that detect virus.

17   We're doing that through our contracted laboratory.  Turnaround

18   times have varied between one and four days or so, depending

19   upon the location.  Those are the tests that we're going to be

20   continuing to use.  And when I mentioned the increased

21   availability of those tests, those were the ones that I was

22   referring to.

23             Sorry, Your Honor.  So at the reception center there

24   are numerous pressures, obviously, from a variety of

25   stakeholders to resume that.  Everything that I have heard from

1    CDCR and from the receiver is that all of that is contingent on

2    available testing and that patients will not be moved in from

3    reception until we have a plan in place where we feel that we

4    can safely do so.

5         And so the plan that was developed prior to us

6    identifying the adequate tests, which we now have, was that

7    when patients come in from jails, they'll be put on to

8    quarantine, they'll be screened for symptoms of COVID and

9    they'll also be tested for the presence of COVID infection.  If

10   they test negative, they'll be released to the reception center

11   where they will remain until they are to go to the receiving

12   institution.  The plan is for that to happen in an expedited

13   manner, within 30 days.  And prior to them leaving to go to

14   their ultimate destination, they'll be tested again for the

15   presence of virus.  They'll be screened and they'll be tested.

16   Only if they test negative that second time will they then be

17   transported to their receiving facility.  And upon arrival at

18   the receiving facility, they'll be placed on an observation

19   status for two weeks to screen them more carefully for the

20   possibility of symptoms.  So we think that this is going to be

21   an efficient way to identify patients who are infected and

22   potentially contagious.

23        THE COURT:  So the second testing and the 14-day

24   period upon arrival at a facility, that offsets the lack of

25   reliability in negative test results; do I understand that

1    correctly?

2              DR. BICK:  So, Your Honor, I think I wasn't clear in

3    my prior speaking about the tests.  The ones that we have

4    chosen not to use are the ones that are unreliable in

5    determining who is infected.  That's why we chose not use those

6    new methods.  The ones that we are using are extremely

7    sensitive, meaning that they can identify active cases and

8    they're extremely specific, meaning if they say that a patient

9    is not infected that they're truly not infected, so they're

10   very reliable.

11             THE COURT:  All right.  Understood.  Thank you for

12   that.  Anything further, Mr. Lewis, from an introductory

13   standpoint?

14             MR. LEWIS:  Not from an introductory.  Maybe some of

15   the other agenda items, Your Honor.

16             THE COURT:  All right.  Given that we've spent some

17   time on the reception center, let's just touch on that agenda

18   item, moving it up to the next item.  And then let me also say,

19   to further clarify, what the Court attempted to clarify in its

20   most recent order.  At this point I believe it makes more

21   sense.  On the one hand, there are these multiple workgroup

22   meetings.  There are good lines of communication, as I

23   understand it, opened up on all fronts and the parties are

24   taking full advantage of the sessions to share information to

25   narrow disputes, to try to work things out.  To the extent

1   there are Coleman class issues -- and there may well be, as

2   I've attempted to clarify in my most recent order -- those are

3   not subsumed within Plata just because of the Corona virus

4   pandemic.  But the only way I can be clear on whether or not

5   any party, plaintiffs in particular, believe there's a Coleman

6   class issue calling for this Court's attention and decision, I

7   believe it's to proceed by way of focused motion practice, and

8   it can be on an expedited basis.  So any motion on an expedited

9   schedule could be set from one of these statuses.

10          And in particular, if there's a suggestion from the

11  plaintiffs that Coleman class members need to be transferred --

12  and that is within this Court's purview -- I'm prepared to

13  entertain that suggestion, but I believe focused motion

14  practice can be -- doesn't need to be 20 pages of briefing, it

15  can be on an expedited schedule, but that would be the most

16  useful.  Any disagreement with that or anything you want me to

17  know in response to that observation, Mr. Bien and Mr. Specter?

18          MR. SPECTER:  No, Your Honor.  We understand.

19          THE COURT:  All right.  All right.

20          MR. LEWIS:  Your Honor?

21          THE COURT:  Mr. Lewis?

22          MR. LEWIS:  Yes, Your Honor.  A few things.  First of

23  all, if I understand correctly, I definitely understand the

24  Court's concern about Coleman class members, but to the extent,

25  once again, that anything would touch upon whether or not a

1    Coleman class member has a COVID factor related to what they're

2    doing, I think that is exactly what the Plata court is trying

3    to make sure that it has cognizance over because, as we pointed

4    out before, the receiver and CCHCS are the ones who have been

5    empowered by the Court to deal with medical issues as they

6    arise within the population.

7         Moreover, the idea that we're engaging in motion

8    practice on an expedited basis, it also implies that there

9    should be something that comes before a motion on an expedited

10   basis.  If the plaintiffs have a concern, if they can identify

11   something, a specific concern rather than just say Coleman

12   class members writ large, we would ask that they inform

13   defendants that if they think inmates at a certain institution

14   or something like that are necessary to address, we would ask

15   for that meet-and-confer process before any motions were --

16        We'd also point out that the plaintiffs have said

17   they're having a meeting this afternoon at 3:30 with defendants

18   about their request for identification about medically

19   vulnerable.  This issue, this particular issue, as it may

20   relate to Coleman class members and many that have COVID

21   vulnerability may arise as COVID is actively being litigated

22   within the Plata class.

23        So to the extent that, once again, anything would

24   touch on that, we're very concerned that we are going to run

25   the risk of conflicting orders if the plaintiffs bring

1    something to this Court that would involve something related to

2    COVID or something that's being addressed in the other

3    litigation.

4         I am also informed that if there was to be a move or

5    anything like that that would impact a Coleman class member

6    that there would be consultation from the receiver's office or

7    from CDCR, I'm sorry, to the Office of the Special Master to

8    make sure the special master is aware of anything that impacts

9    the Coleman class.

10        So there are many processes that the Court has set up

11   that act like a meet and confer that could head off any

12   litigation to take off this Court's already busy time,

13   particularly in light of some of the recent orders where we

14   have seen where all jury trials are off and things like that

15   within the Eastern District.  There's processes that the Court

16   has put in place that can be resolved short of litigation or at

17   least that the parties can entertain short of litigation that

18   we would ask that they consider and that this Court ask them to

19   consider before launching into an ex parte or a shortened time

20   motion on transfers of inmates when the situation is so fluid

21   and it's being addressed so rapidly with the changing

22   circumstances.

23        THE COURT:  All right.  Counsel, what I just said was

24   a reference to the many fora in which ongoing meet and confer

25   is happening.  And so just to clarify, I meant to say I assume

1    meet and confer is being exhausted daily if not hourly and I'm

2    not inviting motion practice, but because of the line drawing

3    that is necessary here -- and this is why I issued my most

4    recent order, because this Court does retain jurisdiction,

5    which defendants could challenge in a motion if they wish, but

6    this Court does retain jurisdiction with respect to the Coleman

7    class in many respects.  I'm not monitoring what the Plata

8    court is doing.  I'm assuming the Plata court is not making

9    "Coleman claw Coleman" decisions to the extent that this Court

10   is the court to make decisions because Coleman class members'

11   rights under the remedies in place are affected.  I'm just

12   clarifying the process for resolution.  That's all I'm doing.

13   And I am assuming ongoing meet and confer.  And I am satisfied

14   as I hear that that is happening, that there's no sandbagging

15   going on.

16        All right.  So on the reception center, I don't want

17   to spend much more time on this, but I just want to note what

18   the special master said.  He was on a call this morning with

19   the secretary and the receiver.  This Court assumes that

20   confirms its understanding that the special master will be

21   included in discussions, meetings, so that he has information

22   in realtime to be able to fulfill his Coleman monitoring

23   obligations.

24        I get -- everything I'm hearing leads me to conclude

25   that that is the way discussions with respect to reopening are

1    proceeding.  This Court previously has stated for the record

2    the assumption that approximately 25 percent of the incoming

3    population are Coleman class, and so there is a need for the

4    special master to be closely involved to receive realtime

5    information.

6          I note the plaintiff's concerns, but the process I've

7    just described is the way to exhaust any effort to resolve

8    those concerns without motion practice.  But if it's being

9    determined by a particular motion, I shall determine the

10   process for that.  So at this point I'm not feeling the need to

11   talk more about the reopening of admissions from the counties.

12         I'm aware of that as a hot button issue.  Is there

13   anything more I need to know today on that front, Mr. Bien?

14         MR. BIEN:  No, Your Honor.

15         THE COURT:  Mr. Lewis?

16         MR. LEWIS:  Your Honor, the only thing I would add,

17   and I'm not sure if Dr. Bick expressly stated this, that I was

18   informed that as of this morning the receiver and CCHCS had a

19   sufficient assurance that necessary testing supplies are

20   available to CDCR for intake to reopen.  So that would be in

21   the range of 18,000 tests I understand based on the receiver's

22   position.  And so I think that this is something that will be

23   updated both to the receiver -- obviously the Plata litigation

24   to the receiver but we'll make sure to provide this information

25   to the special master.  And I believe that he and his team will

1   hear this in the course of intake meetings or other things that

2   they attend.

3           THE COURT:  All right.  I was attempting to probe

4   that, perhaps inartfully.  Dr. Bick, is there more you want to

5   say based on what Mr. Lewis just said?

6           DR. BICK:  No.  The only thing I would clarify is that

7   my understanding is that the amount of available tests are

8   18,000 per month ongoing.

9           MR. LEWIS:  Yes, that's correct, Dr. Bick.  My

10  apologies.

11          Your Honor, he is correct.  That is 18,000 per month.

12  And that there's a priority given to mental health and medical

13  transfers for the receiving of tests.  So this is something

14  that the department is continuing to evolve as it's finding its

15  got its availability of tests.  It's integrating this into its

16  plan to care for its patients and its population.

17          THE COURT:  All right.  Any comment on that, Mr. Bien,

18  at this point?

19          MR. BIEN:  No, but we will discuss with defendant the

20  issue of -- a pure Coleman issue -- is there room within the

21  system to provide appropriate housing and treatment for

22  additional, you know, Coleman class members.  And that remains

23  a concern.

24          THE COURT:  Understood.  And I understood the -- I

25  understand the Coleman issue there, so I will stay tuned.

1          All right.  Let's talk just very briefly about the

2    maps, which I have yet to fully digest, but I acknowledge the

3    filing of them.  They appear to be a very useful tool and very

4    responsive to the Court's request.  Just so I understand, they

5    reflect the current landscape, and that is all transfers to

6    achieve distancing completed, correct, Mr. Lewis?

7          MR. LEWIS:  Yes, Your Honor, they do.

8          THE COURT:  All right.  I have just a few questions.

9    The maps themselves would need to be filed under seal.  What

10   about the census information?  Do the defendants think that the

11   census information would need to be filed under seal as well,

12   Mr. Lewis?

13         MR. LEWIS:  By census information, Your Honor, are you

14   referring to the charts that accompany each individual facility

15   breakdown?

16         THE COURT:  Correct.

17         MR. LEWIS:  Your Honor, I have not had an opportunity

18   to confer with my client on that particular issue.  Perhaps

19   give me a few minutes and we can look through that and I can

20   circle back on that issue again.

21         THE COURT:  All right.  Well, why don't you -- maybe

22   you'll meet and confer with plaintiffs, you check with your

23   client and then let me know by Monday.

24         MR. LEWIS:  Will do, Your Honor.

25         THE COURT:  All right.  In terms of the questions I

1    have at this point in time, again, without further digesting

2    the maps, which I will be doing, it seems that several of the

3    units, the empty bed count plus the census doesn't always add

4    up to capacity.  Is there a general explanation for why that is

5    or a need to odd (phon.) the numbers, Mr. Lewis?

6         MR. LEWIS:  Your Honor, I do not have that information

7    readily available, but I'm -- my understanding is that this is

8    a point-in-time report, so there could be some variances based

9    on the fact that beds are moving, beds are transitioning and

10    those kinds of things.  This is also prepared on relatively

11    short time.  So maybe there's a way that we can go back and

12    re-examine some of the information to confirm it for data, but

13    it was put together, you know, relatively quickly.  But we can

14    go back and check those numbers again, Your Honor.

15         THE COURT:  All right.  And here are the things that

16    perhaps I suggest a refinement:  Information that identifies

17    how many inmates are at each institution out of their

18    designated location and what their actual location is.  For

19    example, there was one incident at facility E at CHCF.  There's

20    an EOP unit with a capacity of 50 beds, a census of 44 patients

21    with 1 empty bed.  Can the Court assume that all 44 are EOP?

22         MR. LEWIS:  So, Your Honor, the concern with that kind

23    of a breakdown would be -- that would be an incredibly arduous

24    and time-consuming task, in terms of identifying where every

25    single patient presently is, their location and going back and

1    determining all that data.

2         As Your Honor is very aware, it's a very large

3    population.  My concern is that that kind of report would take

4    a while to generate and basically go hand count and confirm.

5    It could be done, but it will take time.  I don't have a time

6    estimate.  I think it could possibly be by the next status

7    conference, maybe the one after that.  But this could also be

8    something that as we go through the meet-and-confer process and

9    the process with the special master that we could update him

10   and provide information to him and see if we could kind of find

11   a middle ground rather than having to go to a five-institution

12   verification of every single inmate.

13        There's also movement that goes on, I'm sure you

14   understand, Your Honor, so that it could be that someone is

15   transitioning so at the time that count was made that count

16   would automatically be off one week later because you've got

17   transitions between levels of care at institutions because, as

18   we've noted, movement may be restarting, so you may see these

19   numbers starting to shift.

20        THE COURT:  You're anticipating one of my questions.

21   So just a couple of other issues, which I'm happy to refer to

22   meet and confers, including the special master.  Can a report

23   be entered on the census of TMH Units?

24        MR. LEWIS:  I think possibly, Your Honor, yes, TMH

25   units.

 1          THE COURT:  All right.  And just thinking ahead, we

 2     don't need to go there just yet, but it occurs to the Court

 3     that adding a staffing chart by institution would be helpful as

 4     we start to look more closely at staffing.  So I'll refer those

 5     issues to workgroups and the special master.

 6          And then another question is can the reports be

 7     provided with updates, say -- what's the reasonable interval,

 8     is it every couple weeks?  So, again, with thanks for the

 9     effort that's gone into pulling this tool together, I think

10     with refinement and updates it will be very useful going

11     forward.

12          Does the plaintiff have anything to add on this point,

13     at this point recognizing that I'm referring the maps for

14     refinement to working groups?

15          MR. BIEN:  I'm going to delegate to Lisa Ells, please.

16          THE COURT:  All right.  Ms. Ells.

17          MS. ELLS:  Hello, Your Honor.  We appreciate the

18     opportunity to continue to refine these maps.  We identified

19     one concern that we have that you partially addressed with your

20     comments.  We believe that the TMHU units, which we've been

21     referring to as "TMHUs," be identified fairly in terms of --

22     both in terms of where they exist on the map but also within

23     the chart.  And in particular we believe it's necessary to

24     distinguish between the MAC custody TMHUs and the non-MAC

25     custody TMHUs.  There are additional protections and policies

1    governing the MAC custody TMHUs because they exist within

2    segregation units and are housing class members in need of

3    in-patient services in those segregation units.  So we would

4    appreciate the opportunity to address that in the workgroup.

5              And the other comment, relatedly, is that we also

6    think it would be appropriate for Your Honor to ask for

7    additional information on the CCCMS segregation units only, not

8    the general population CCCMS areas but the LTRH and FTRH units

9    because, again, those are dangerous units for class members and

10   we think it's appropriate to be carefully monitoring those

11   during this time frame, especially because, according to our

12   calculations, both the numbers of class members in segregation

13   overall and the lengths of stay of those class members have

14   increased significantly within the last month prior to earlier

15   trends.  So those are units that we're especially concerned

16   about and the class members within them, in terms of their

17   ability to receive services during this pandemic and the

18   increasingly dangerous environment that those class members are

19   in.

20             THE COURT:  All right.  I'm prepared to request that

21   those items be added to the list of refinements for the parties

22   to discuss.  I'd request those refinements be made unless the

23   defendants can provide an explanation as to why they cannot.

24   Pass that out and then if there are issues I need to resolve,

25   you can bring those back to me at the next status.

1              Does that work for you, Mr. Lewis?

2              MR. LEWIS:  Yes, Your Honor.  The only caution I would

3    give is that if these charts were -- they were quite onerous to

4    prepare, so I don't know if we'll be able to do weekly or

5    biweekly updates, but we will clearly work with the parties in

6    the special master process and through the special master to

7    address some of these questions that are being raised if we

8    have sufficient time, of course, to do it.  It's a very hard

9    thing, but we'll work on this, Your Honor.

10             THE COURT:  All right.  At the next status we'll talk

11   about what the right interval is after you've had a chance to

12   talk that through.

13             Anything else on the maps to cover today, Ms. Ells?

14             MS. ELLS:  No, Your Honor.

15             THE COURT:  Mr. Lewis?

16             MR. LEWIS:  No, Your Honor.

17             THE COURT:  All right.  Another question I forgot to

18   ask on reopening.  Does that mean generally -- does the

19   information the Court has heard today mean generally that

20   defendants are easing limitations on the class member

21   transfers?  And is it easing or removing them?  Is there a plan

22   in this respect, Mr. Lewis?

23             MR. LEWIS:  Your Honor, that is still actually being

24   developed as we speak, as we learn more about how the intake is

25   going to occur.  And more importantly, really the testing is

1    probably the most important thing that will allow for the

2    movement of class members to begin to different physical

3    locations.

4          The testing observations and other things that

5    Dr. Bick has spoken about are going to be crucial to allowing

6    the movement of class members, so I think that it's coming but

7    it's not there yet because that plan is still being developed

8    in conjunction with the intake plan and the impacts as the

9    department realizes the new reality going forward with COVID

10    testing and its operational impact.

11          THE COURT:  Anything to say on this, Mr. Bien?

12          MR. BIEN:  We look forward to talking with defendants

13    about this plan.  We think that to the extent movement for

14    reception is now going to be made available, we think that a

15    higher priority is movement of people to the appropriate level

16    of care.  I know that they are doing that for DSH.  They also

17    need to do it for access to PIPs and MACDs and EOP programs.  A

18    lot of people, as you see from the map, are at the wrong level

19    of care right now, and that is dangerous from a mental health

20    standpoint, especially given the increased stressors of the

21    pandemic.

22          THE COURT:  All right.  Understood.  And that has been

23    front of mind for this Court, just so it's clear.

24          MR. LEWIS:  Your Honor, if I may respond briefly.

25          THE COURT:  Mr. Lewis, you may.

1           MR. LEWIS:  You know, on this particular issue I think

2    this is where Mr. Specter's earlier comment about how he

3    thought it had been good that the department had been limiting

4    movement of people, the exact reverse has to happen now, the

5    department is going to start moving people but responsibly and

6    this is a process that has to be done at an appropriate pace

7    because the same concerns that informed the stop movement will

8    inform the resumption of movement.  This is one of those things

9    where we want to open up as much -- particularly as we did

10   closing down in the sense of for the right reasons, that there

11   were institutions, stopped movement.  We're not going to start

12   the movement and there will be a definite consideration given

13   to the mental health patients and other patients with the

14   resumed or with the increased ability of testing as we resume

15   movement.

16          If Your Honor has further questions on this, Dr. Bick

17   is available to discuss this.  I believe we've gotten many of

18   the information points that the Court was looking for.  We've

19   discussed this and if you find more stuff, we do have Dr. Bick

20   available to discuss it.

21          THE COURT:  I don't need more information today, but

22   it's obvious, I think, that if admissions are being reopened

23   and folks are being moved into facilities with no movement out

24   or no transfers to the level of care required, this is not the

25   time to be creating a sardine effect.  But I don't need more

1    information today.  I'm just -- I'm alert to the issues and I'm

2    going to let the parties continue to work on this.  And again,

3    I will remain available to hear either at status conferences or

4    if there is a motion -- again, I'm not inviting a motion, but

5    if a motion is the only way to tee this up, I remain available

6    to hear such motion practice.

7         I do want to also make clear, we haven't talked about

8    it on the record, but I have consulted with the special master

9    in terms of just very broadbrush understandings of what

10   supplemental services are being provided for Coleman class

11   members, given the deaths that have occurred and the number of

12   infections.  I do understand that there's grief counseling that

13   has been made available.  I haven't worked to develop more of a

14   record there, but I understand that some supplemental services

15   are being provided under the current circumstances.

16        In terms of the DSH evidentiary hearing, I've already

17   indicated I'm going to vacate next Tuesday's hearing.  Just so

18   I'm clear before I finalize review of the stipulation, do the

19   parties have an expectation around for how long the practice

20   described in the stipulation will continue and when the written

21   guidelines will match actual practice?  Anything on this point

22   at this time, Mr. Bien?

23        MR. BIEN:  I understand that DSH and CDCR and the

24   special master team are still working on developing a writing

25   that reflects the current practices that has not been provided

 1   to us and we need to review that to even understand completely

 2   the contact practices.  They were described to us in a manner

 3   sufficient for us to recommend to you that we continue the

 4   hearing for 30 days, and of course also we saw the proof by the

 5   movement of patients into DSH.  I don't know how long the

 6   COVID-19 procedures will need to stay in place and I'm not sure

 7   that -- Dr. Bick, maybe could comment on that, but I think it's

 8   unknown at this time.

 9        THE COURT:  So would that mean open-ended at this

10   point until further notice?

11        MR. BIEN:  I think that the -- I think I understand

12   that the parties in the -- are going -- in the joint

13   stipulation we're working on for the program guide says that

14   everything will expire within 90 days unless renewed.  That was

15   our best guess.

16        THE COURT:  All right.  All right.  I'll wait for that

17   stipulation.

18        But Dr. Bick, anything to say on this point?

19        DR. BICK:  Well, Your Honor, I would agree with both

20   Mr. Specter and Mr. Bien.  Initially the biggest concern was

21   the potential for movement contributing to transmission, and

22   that's why we took the aggressive initial steps, including

23   pretty early on canceling group therapy and other opportunities

24   for patients to mingle in a manner that could transmit the

25   virus.  So a lot of those steps were quite aggressive and were

1    taken with some concern.  We weren't entirely sure how our

2    patients were going to do if we stopped movement, but we felt

3    that the risk from COVID was greater.

4         I think as you and others have pointed out, now that

5    movement is being anticipated from the reception center and

6    we're gaining some practice with that -- by that I mean with

7    DSH -- we've now sent 14 patients to DSH using our modified

8    protocols; they've returned 10 patients to us.  We're sending

9    approximately 10 offenders with mental health disorders to DSH

10   every week using these modified policies or practices and we're

11   getting more experience with that and I think that we can do it

12   in a safe manner.  So I put it as a top priority to resume

13   movement and more and more to not have to depend upon any of

14   these temporary mental health units.  I think that's one of my

15   first goals and I think the CDCR's going to cooperate with

16   that.

17        The only other thing I would say in reference to

18   Mr. Bien's question, as far as how long this will go on, I

19   think there will be permanent changes to how we move patients

20   about and how patients congregate.  And although, you know,

21   over the next hopefully 12 to 18 months things will be

22   significantly safer and mitigated, I think we will be

23   continuing to use some type of screening like this for the

24   foreseeable future.

25        THE COURT:  All right.  Understood.

1          Anything on this point, Mr. Lewis?

2          MR. LEWIS:  Yes, Your Honor.  As Dr. Bick has noted,

3     there's no real clear end to the screening and review process

4     that's been put in place.  DSH's activities over the past few

5     months have really positioned it to benefit from the position

6     it's in now where it can now start taking patients.

7          Other state hospital systems, such as New York --

8     New York has 43 deaths in its state hospital system.

9     California is much larger than New York and other systems such

10    as Massachusetts or Michigan or New Jersey, Washington have

11    serious COVID outbreaks, but DSH's actions taken have given it

12    a position now where it can resume intakes with the addition of

13    testing and with the protocols and the guidelines that would

14    have been created with the special master's input and provided

15    to the plaintiff.

16          To answer the questions you had asked about when the

17    written guidelines will match the actual practice, this morning

18    those guidelines were provided to the task force to include the

19    plaintiff and the special master so that that discussion can

20    begin at the next task force meeting.  So we are starting to

21    move very closely to the position that the plaintiffs have

22    asked for, which is when the positions will match up.

23          So the draft document is out, it was produced this

24    morning and it just, once again, shows how DSH and CDCR are

25    trying to move forward with transfers and also keep everyone

1   informed about exactly what those guidelines are to safely

2   prevent the introduction of COVID into its facilities, into the

3   DSH facility, and will then protect patient populations on both

4   sides.

5           THE COURT:  All right.  I'll take these comments into

6   account when I finish reviewing the stipulation.

7           Just two more things.  One is I understand there's a

8   stipulation coming later today.  I will review that closely.

9   If I need more, I'll let you know.

10          Is there anything either side wants me to know at this

11  point, apart from what Mr. Bien referenced earlier?  Mr. Bien?

12          MR. BIEN:  I'll defer to Ms. Ells.

13          THE COURT:  Ms. Ells?

14          MS. ELLS:  No.  The stipulation should be forthcoming.

15  We are in the final stages of negotiating with the defendants

16  on it and I do expect that we will file it today.

17          THE COURT:  All right.  Anything further, Mr. Lewis?

18          MR. LEWIS:  Nothing, Your Honor.

19          THE COURT:  Finally, on resumption of monitoring or

20  site visits, let me just ask, I gather the plaintiffs are

21  contemplating some kind of inspections as early as next week.

22  Do I have that correct?  And if so, can the plaintiffs provide

23  more information, Mr. Bien?

24          MR. BIEN:  I will defer to Don Specter, please, Your

25  Honor.

1          THE COURT:  All right.  Mr. Specter?

2          MR. SPECTER:  Yes.  Thank you, Your Honor.  I just

3    tried to -- I wasn't on the -- let me start from the beginning.

4          Some people from my office were supposed to have a

5    phone call with people from CDCR about conducting what we're

6    calling virtual tours.  The CDCR has accepted, in concept, the

7    idea of having a virtual tour where we wouldn't be present but

8    there would be some sort of device which would allow us to see

9    the layout of the prisons and also hopefully be able to

10   converse, at least in a limited way, with staff and the people

11   who live in these environments.  And there was a phone --

12   supposed to be a phone call today, I believe, to discuss

13   whether that was technologically feasible and to iron out some

14   of the details and about 5 or 10 minutes ago I emailed my folks

15   to find out if the phone call had occurred and, if so, what was

16   the result, but I haven't gotten a report back.

17          THE COURT:  All right.

18          MR. FAMA:  Your Honor, Steven Fama.

19          THE COURT:  Yes, Mr. Fama.

20          MR. FAMA:  I'm sorry.  I was listening to court and

21   didn't catch Mr. Specter's email to me.  I was on the call.  I

22   can report that the attorneys for the Department of

23   Corrections, as Mr. Specter said, agree in concept.  They have

24   not yet run a technical rehearsal, to use a theatrical term,

25   and are going to do so on Monday at CIM and then report to us

1    as to whether or to what degree it appears feasible to possibly

2    do a virtual visit later next week at the prison.

3            THE COURT:  All right.  Thank you for that.

4            Anything to say on this point, Mr. Lewis?

5            MR. LEWIS:  Your Honor, we have discussed actually

6    resuming monitoring, on-site monitoring tours with the special

7    master and various stakeholders subject, of course, to notices

8    and screening and protective measures that we all need to do.

9    So if the special master gives notice of an in-person tour

10   subject to those measures, we're able to support, standing by

11   to support and plaintiffs are welcome to attend those tours in

12   person.  So, yes, resumption of on-site monitoring tours can

13   occur.

14           THE COURT:  All right.  Let me just ask the special

15   master if he has any update on his plans and (inaudible)

16   previously communicated the special master's willingness.

17   Members of his team have said they are able and willing to

18   resume monitoring or make impromptu visits.

19           So Special Master Lopes, could you provide any update

20   on this front?  And also, if there's anything else you'd like

21   to say in light of what you've heard, the Court would hear from

22   you now.

23           MR. LOPES:  Thank you, Your Honor.  In terms of

24   resuming of transfers, I am working with the receiver's office

25   about doing that in a manner that is safe and productive.  So

1   that -- conversations have occurred between my office and the

2   receiver's office, and we hope to be able to tour sometime

3   within the next two weeks.  Some of it is dependent on flights.

4   There are people that are going to come from the east coast and

5   other parts of the United States, and I will update you more at

6   the next task force meeting, but those conversations are

7   occurring and we hope to tour within the next two weeks.

8           In terms of additional reports, I am excited to hear

9   and was excited to hear this morning in a very -- it was a very

10  productive conversation with the secretary and the receiver

11  that there would be 18,000 tests conducted in or available each

12  month.  I am eager to learn more and excited about working with

13  the receiver's office and the secretary on the opening of the

14  reception centers.  And while 18,000 isn't a staggeringly high

15  number, I know places in the United States that can't get 1 or

16  2 tests.  Given the number of admissions in the -- from the

17  counties, which could be in the thousands, that number, you

18  know, could be -- per day or per week could be a very low

19  number and it's going to be something that we'll all have to

20  look at to see if it can really be achieved.

21          If you have 3,000 admissions, for instance, and there

22  are 18,000 tests and that goes on for about 600 a day, I don't

23  think it's impossible and I think it's an exciting development,

24  but it's certainly something that we're all going to have to be

25  mindful of.

1          Earlier in this conversation there was reference to a

2    memo from May 11th and it was regarding guidance in terms of

3    social distancing for cell or alternative dorm-style housing of

4    8-person cohorts.  That memo, Your Honor, is and was attached

5    to a daily operation center briefing report that has been

6    shared with me.  It was not shared with the plaintiffs.  It may

7    be on the defendant's website, but it is not in the record, to

8    my knowledge.  It may have been filed with something else, I

9    don't know about that.  I receive daily operation center

10   reports from counsel for CDCR, and that memo that was referred

11   to earlier was attached to one of those memos.  I think it

12   was -- the date of the memo was May 11th and I may have

13   received it on May 11th.  Whether it's in the docket or not,

14   Your Honor, is a question and with that we yield.

15          THE COURT:  All right.  All right.  That helps us out

16   about the May 11th document that sooner or later we will all be

17   able to review that.  I have no doubt.

18          All right.  That covers the Court's business for this

19   afternoon.  Is there anything else from the plaintiffs,

20   Mr. Bien?

21          MR. BIEN:  No, Your Honor.  Thank you.

22          THE COURT:  All right.  Mr. Lewis?

23          MS. ELLS:  Your Honor, this is Ms. Ells.  Could I ask

24   one business question?

25          THE COURT:  You may.

1          MS. ELLS:  Does the Court intend to hold these

2    biweekly status conferences at 1:00 always going forward, or

3    will we revert back to the 10:00 time?

4          THE COURT:  Well, from the Court's perspective it

5    depends on whether or not I have civil law and motion in the

6    morning.  Currently I'm holding civil law and motion every two

7    weeks.  My law clerk is prepared to provide a schedule with

8    times following this hearing to clarify dates and times.  If

9    the parties would request 1:00 as a standing time, I'm prepared

10   to entertain that.  It's just that some Fridays I'm not able to

11   offer a morning time.  Is there a request from the plaintiffs?

12         MS. ELLS:  No.  I don't think we have a preference for

13   1:00.  We would just appreciate clarity on what the time would

14   be.  So it sounds like your clerk is already preparing to

15   provide that, and we appreciate it.  Thank you.

16         THE COURT:  Yes.

17         All right.  Mr. Lewis, anything further?

18         MR. LEWIS:  Nothing further, Your Honor.

19         THE COURT:  All right.  Very good.  Thank you all very

20   much.  I'll let you get back to finalizing that stipulation.

21   We are in recess.  Have a good weekend.

22         (Concluded at 2:20 p.m.)

23

24

25

1                        C E R T I F I C A T E

2

3          I certify that the foregoing is a true and correct

4     transcript of the record of proceedings in the above-entitled

5     matter.

6
      _/s/ JENNIFER L. COULTHARD_              May 16, 2020
7                                                 DATE

8

9     JENNIFER L. COULTHARD, RMR, CRR
      Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25