**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

RALPH COLEMAN, et al.
    Plaintiffs,

    vs.                              No. 2:90-cv-0520 KJM DB

GAVIN NEWSOM, et al.,
    Defendants.

**SPECIAL MASTER'S REPORT ON HIS EXPERT'S ANALYSIS OF PSYCHIATRIST EMPLOYMENT CONDITIONS AND COMPENSATION AT THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION AND THE DEPARTMENT OF STATE HOSPITALS**

I.      **INTRODUCTION**

      This submission by the *Coleman* Special Master accompanies the report of his expert Dwight Steward, Ph.D. and the research firm of EmployStats, "An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals." The Special Master requested the limited appointments of Dr. Steward, an economist and statistician, and the EmployStats research firm[1] to conduct the analysis in furtherance of his efforts to assist defendants in their quest to attract, hire, and retain psychiatrists. ECF No. 5903 at 3.[2]

---

[1] The Special Master's request for the appointment of the EmployStats research firm included but was not limited to, Jeffrey Peterson, Ph.D.; Valentyna Katsalap, Ph.D.; Matt Rigling; and Susan Wirtanen. ECF No. 5903. Hereinafter, Dr. Steward, Dr. Peterson, Dr. Katsalap, Mr. Rigling, and Ms. Wirtanen are collectively referred to as the "EmployStats research firm" or "EmployStats."

[2] References to page numbers for documents filed in the court's Electronic Case Filing (ECF) System are to page numbers assigned by the ECF system.

## II.    <u>BACKGROUND</u>

The Special Master's need to hire a labor economist was preceded by the California

Department of Corrections and Rehabilitation (CDCR) defendants' years of significant

challenges in the hiring and retention of psychiatrists.  Since 2002, CDCR has been under a court

order to limit psychiatry vacancy rates to ten percent—including contracted services.  ECF No.

1383 at 4.[3]  In an order issued on June 18, 2009, the CDCR defendants were ordered to "continue

to take all steps necessary to resolve all outstanding staffing allocation issues" and, as part of that

effort, to—under the guidance of the Special Master—"complete a staffing plan by the end of

August 2009."  ECF No. 3613 at 2.  CDCR filed their staffing plan ("2009 Staffing Plan") on

September 30, 2009.[4]  ECF No. 3693.  The 2009 Staffing Plan provided proposed staffing ratios

(i.e., number of patients per each mental health clinician) for each of the Mental Health Services

Delivery System programs.  *Id*. at 12-30.  Currently, necessary staffing ratios continue to be

determined by those contained in the 2009 Staffing Plan.

On June 19, 2014, after their consistent failure to maintain clinical staffing vacancies at

or below ten percent, CDCR was ordered to conduct a review of the 2009 Staffing Plan, revising

it as appropriate, to achieve compliance with the court's June 13, 2002 order.  ECF No. 5171 at

4.  The court noted in its order "that defendants continue[d] to struggle with the task of hiring

sufficient mental health staff, particularly psychiatrists."  *Id*. at 2.  The CDCR defendants were

directed to report the results of their review of the 2009 Staffing Plan to the court on or before

---

[3] The order also required vacancy rates be limited to ten percent for psychologists and social workers, including contract employees.  *Id.*
[4] On August 28, 2009, defendants requested a 30-day extension of time to file their staffing plan.  ECF No. 3651. The court issued an order on September 4, 2009 directing defendants to submit their staffing plan on or before September 30, 2009.  ECF No. 3665.

September 12, 2014. *Id*. at 4. In their "Report on Review of Mental Health Staffing" filed February 2, 2015,[5] the CDCR defendants conceded that the vacancy rate among psychiatry positions, including the use of contract staff, was nearly 20 percent. ECF No. 5269 at 6. As part of their remedial efforts, defendants proposed offering differential pay for civil service psychiatrists and increasing contract rates for contract psychiatrists to work in hard to recruit locations. *Id*. at 9. In an order issued on May 18, 2015, the court directed CDCR to move forward with the proposals in their "Report on Review of Mental Health Staffing." ECF No. 5307 at 6. The same order directed the Special Master to, within 180 days from the date of the order, "report to the court on the status of defendants' implementation of" those proposals and "include in that report such recommendations as may be necessary to address any ongoing mental health staffing deficiencies." *Id*.

On May 6, 2016, the Special Master filed his Twenty-Sixth Round Monitoring Report, wherein he reported on the status of CDCR's implementation of their staffing proposals. ECF No. 5439. The Special Master found that defendants "[had] demonstrated no sense of the required urgency for a meaningful implementation of the plan. As a result, there [had] been little to no change in mental health staffing throughout CDCR." *Id*. at 31. In response, the Special Master included in his report several recommendations designed to facilitate the CDCR defendants' implementation of their staffing proposals. *Id*. at 141.

On August 9, 2016, the court issued an order adopting the Special Master's Twenty-Sixth Round Monitoring Report recommendations. ECF No. 5477. Related to staffing, the court ordered, in part, that the CDCR defendants provide the Special Master with "monthly updates on

---

[5] Defendants received an extension of time to submit the results of their review in an order dated August 28, 2014. ECF No. 5210.

their implementation of their staffing plan." *Id*. at 8.  The court directed the Special Master to track and monitor the implementation of CDCR's staffing plan and within 120 days from the date of the order, "issue a stand-alone report on the status of mental health staffing and implementation of defendants' staffing plan." *Id*. at 8-9.

On February 6, 2017, the Special Master filed his "Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan,"[6] wherein he reported that the CDCR defendants had submitted an updated staffing plan on January 10, 2017 ("January 2017 Updated Staffing Plan").  ECF No. 5564 at 8.  In addition to the proposals from their preceding staffing plan, the CDCR's updated staffing plan contained several new proposals, including two related to psychiatry salaries and compensation:  increased pay rates for contract psychiatrists, and salary increases for psychiatrists. *Id*.  However, as the Special Master reported, during the court-ordered meet and confer process to discuss the implementation of CDCR's staffing proposals, defendants asserted that the issue of salary increases was being addressed through the collective bargaining process and would provide no further information on the subject. *Id*. at 24. With regard to increased pay rates for contractors, although CDCR reported in their updated staffing plan that during the preceding year and a half, they had increased rates for contract psychiatrists at 15 institutions, they did not provide details on the timing or amount of the rate increases. *See id*. at 12-13.

The CDCR defendants' position on these issues resulted in three specific recommendations from the Special Master: (1) "that defendants be required to provide detailed

---

[6] On November 23, 2016, the Special Master requested a 60-day extension of time to file his report on staffing.  ECF No. 5523.  On December 9, 2016, the court granted the Special Master's request, ordering that his report on staffing be filed on or before February 6, 2017. ECF No. 5530.

information about the timing and the amount of the increase in contractor rates," *id.* at 13, (2) "that defendants be required to monitor the effect of salary rate increases on the usage of registry hours in order to determine whether further rate increases [were] necessary to assist in the recruitment and retention of psychiatry registry staff and report to the Special Master on a quarterly basis" regarding their findings, *id.*, and (3) that the court enter an order requiring defendants to develop a supplemental plan to address (among other items) salary increases for psychiatrists. *Id.* at 28.

In an order issued on March 7, 2017, the court ordered the Department of State Hospitals (DSH) defendants to "continue to work on their staffing plan for their inpatient programs that treat *Coleman* class members." ECF No. 5573 at 3. DSH's plan was to be "developed in coordination with CDCR's development of its own mental health staffing plan, and within the context of the same meet and confer process with the *Coleman* parties, under the guidance of the Special Master." *Id.* The DSH defendants were further directed to "provide the Special Master with monthly updates on their implementation of their staffing plan." *Id.*

On October 10, 2017, the court issued an order adopting the findings in the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan in full. ECF No. 5711 at 29. The Special Master's recommendations were adopted with modifications. *Id.* In relevant part, the court ordered defendants to report to the Special Master at regular intervals, as set by him, on the implementation of their staffing plan proposals. *Id.* Defendants and the Special Master were ordered to meet and confer no less than every 90 days over the next year to discuss the status of defendants' compliance with the court's order, including plaintiffs where appropriate. *Id.* CDCR was given one year to achieve compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate

5

required by the court's June 13, 2002 order (ECF No. 1383). ECF No. 5711 at 30. The order also amended "paragraph two of the court's March 8, 2017 order, ECF No. 5573, to require complete implementation of the DSH defendants' staffing plan within one year from the date of the order." *Id.*

Additionally, the order set two status conferences: an April 12, 2018, interim status conference to assess defendants' progress, and a further status conference on October 11, 2018, to address issues pertaining to the enforcement of the October 10, 2017 order and the durability of the staffing remedy. *Id.* at 30-31.[7]

On January 26, 2018, in response to defendants conducting prison tours with staffing consultants they had purportedly retained to evaluate CDCR's current mental health staffing plan, plaintiffs filed a motion for case management orders and sanctions. ECF No. 5764. As a result, the court advanced the interim status conference scheduled for April 12, 2018 to February 14, 2018. ECF No. 5774 at 2, 3.

In an order filed on February 15, 2018, the court directed the Special Master to "take all steps necessary to create a complete factual record for consideration and resolution of the issues" related to psychiatry staffing. ECF No. 5786 at 3. The factual record would be made available to the All-Parties Workgroup and would form the basis for the Court's consideration of those issues. *Id.* The issues to be addressed by the factual record were as follows:

> 1. Can defendants hire a sufficient number of psychiatrists, through salary adjustments, forensic psychiatric fellowships, exhaustion of clustering, and other recruiting and retention efforts, to meet the staffing levels for psychiatrists required by the 2009 court-ordered staffing ratios, ECF No.

---

[7] The court later continued the October 11, 2018 status conference to October 15, 2018, and expanded it to include an evidentiary hearing on the use of telepsychiatry to give defendants an opportunity to "prove that the changes they have effected, moving from limited use of telepsychiatry as a supplement to on-site psychiatry in the face of short-term staffing shortages, to the further expansion they appear to be implementing is consistent with the requirements of the Eighth Amendment." ECF No. 5928 at 12; *see also* ECF No. 5933.

> 3693, with a maximum ten percent vacancy rate as required by the court's
> June 13, 2002 order, ECF No. 1383[?]

> 2. What role does and can telepsychiatry play, consistent with the Eighth
> Amendment, to aid in solving the psychiatrist staffing shortage?

> 3. Keeping in mind that the staffing levels that preceded the current ratios were
> constitutionally inadequate, are there any adjustments to the psychiatrist
> staffing ratios that could be made to alleviate the psychiatrist staffing
> shortages without compromising the constitutionally required access to
> adequate mental health care?

ECF No. 5786 at 3, 4.

The parties were directed to file a joint status report by June 21, 2018, informing the

court of their progress in resolving the questions. *Id.* at 5. The court set a further status

conference for June 28, 2018 to address that progress. *Id.*

As directed by the court, the parties filed their joint status report on June 21, 2018. ECF

No. 5841. On July 3, 2018, the court issued an order providing further guidance on the factual

record, having considered both the progress and the disputes as reported in the parties' joint

status report, as well as additional information provided by the Special Master. ECF No. 5850.

The court directed the parties to file a joint status report by September 7, 2018. *Id.* at 4. The

court extended the parties' deadline to file the joint status report to September 14, 2018, by

minute order issued on August 28, 2018. ECF No. 5890. The parties filed their joint status

report on September 14, 2018. ECF No. 5922. The status report included joint statements

related to defendants' psychiatry staffing proposal, the status of the implementation of the

proposed telepsychiatry policy, and defendants' compliance with staffing ratios. *Id.* at 3, 4. The

parties' positions diverged on the durability of the staffing remedy. *See id.* at 4-9. On

September 21, 2018, the Special Master filed his certification of the outstanding disputes. ECF

No. 5929.

As noted by the court, in the year following the court's October 2017 order, the parties, under the guidance and supervision of the Special Master, engaged in extensive negotiations over issues related to staffing compliance. ECF No. 6427 at 3. Indeed, the workgroup met approximately 20 times in 2018 leading up to the October hearing. As a result of the discussions in those meetings, plaintiffs were on the verge of accepting the CDCR defendants' proposal to cut the allocation for staff psychiatry by approximately 20 percent systemwide. *See id.* To be sure, the CDCR defendants had sent a stipulation regarding their staffing plan to plaintiffs on September 19, 2018.[8] On October 3, 2018, while plaintiffs were reviewing the stipulation and before they had finalized their agreement to it, Dr. Michael Golding, CDCR's Chief Psychiatrist, sent a whistleblower report ("Golding Report") to the *Plata* Receiver. *Id.* at 3, 4.

As a result of the Golding Report, on October 5, 2018, ten days before the scheduled hearing, the court received requests from both parties: plaintiffs requested a status conference, ECF No. 5936, and defendants requested a stay of proceedings, ECF No. 5938. On the same day, plaintiffs informed the defendants that they were no longer willing to enter into a stipulation regarding the defendants' staffing plan.[9] Following a special status conference on October 10, 2018, the court vacated the original status conference set to consider enforcement of the October 10, 2017 order, ECF No. 5849 at 5, and the evidentiary hearing on the use of telepsychiatry. ECF No. 5980. After hearing from the parties, the court appointed its own neutral investigator to investigate the allegations contained in the Golding Report. ECF No. 6033.[10]

---

[8] *See* email from Elise Thorn to Special Master Lopes and plaintiffs' counsel (September 19, 2018), attached as Exhibit A.
[9] *See* email from Lisa Ells to Elise Thorn (October 5, 2018), attached as Exhibit B.
[10] This order was amended on January 8, 2019. ECF No. 6064.

The neutral expert conducted a four-month investigation, and on April 22, 2019, submitted a report to the court. *See* ECF No. 6135 at 1. Thereafter, the court scheduled an evidentiary hearing limited to certain issues identified in the neutral expert's report to commence on October 15, 2019. *See* ECF No. 6345. The evidentiary hearing lasted four days and concluded on October 23, 2019. *See id.*; *see also* ECF Nos. 6350, 6364, and 6365. Following a status conference held on December 13, 2019, the court issued an order on January 7, 2020. ECF No. 6441. Within the order, the court set for hearing on April 23, 2020 "the deferred questions of defendants' compliance with the October 2018 deadline set in the court's October 10, 2017 order." *Id.* at 5. A minute order was issued on January 9, 2020, setting the date of the first quarterly status conference for March 20, 2020.[11] ECF No. 6442.

Prior to the March 20, 2020 quarterly status conference, the COVID-19 pandemic and the defendants' response to it became the top priority for the parties, court, and Special Master. *See* ECF No. 6509. As a result, several status conferences were held in March and April 2020. *See, e.g.,* ECF Nos. 6513, 6531, 6546, and 6600.

Following the April 10, 2020 status conference, the court issued an order vacating the April 23, 2020 hearing on the defendants' compliance with the court's October 17, 2017 staffing order. ECF No. 6600 at 4. As of the date of this writing, a new date has yet to be scheduled.

## III.    THE SPECIAL MASTER'S RETENTION OF A LABOR ECONOMY EXPERT

The Special Master's need to retain an independent labor economist came as a direct result of defendants' refusal to provide the Special Master and plaintiffs with requested information regarding defendants' efforts to use salary increases to recruit and retain

---

[11] The January 7, 2020 order contained a typographical error that noted the date of the first quarterly status as March 23, 2020. ECF No. 6441 at 10.

psychiatrists during the meet and confer process.  ECF No. 5564 at 24.  Instead, defendants repeatedly cited the confidential nature of the collective bargaining process, leaving the Special Master unable to determine if the reported salary increases were sufficient to reduce longstanding vacancy rates.  *Id*.  The implication was, as previously reported, "that the mere act of engaging in the collective bargaining process satisfied [defendants'] Court-ordered directive to consider salary increases as a measure to recruit and retain psychiatry staff."  *Id*.

In advance of making a request of the court, the Special Master informed the parties of his intention to hire an independent labor economist.  ECF No. 5850 at 3.  Neither party objected to the concept.  Moreover, defendants had already retained a labor economics group in anticipation of a possible modification of their 2009 Staffing Plan.[12]  The Special Master subsequently confirmed his intention to request the appointment of an independent labor economist to the court.  ECF No. 5850 at 3.  On September 4, 2018, the Special Master filed a request for the appointment of additional staff, in which he outlined his need for expert assistance to conduct labor market and salary analyses designed to aid him in his evaluation of the efficacy of defendants' recently negotiated salary and compensation increases.  ECF Nos. 5903; 5903-1.

Upon receipt of the Special Master's request, the court invited responses from the parties.  ECF No. 5904.  Defendants filed a response on September 6, 2018, wherein they requested that the court limit any expert appointments to a six-month term and require the preparation of a stand-alone report that met the requirements of Federal Rule of Civil Procedure 26(2)(B)(i)-(v)

---

[12] Defendants reported on their retention of a labor economics group in the parties' June 21, 2018 status report. ECF No. 5841 at 6 n.2.  On September 20, 2018, defendants provided the Special Master and plaintiffs' counsel with a copy of the report prepared by their labor economist group, Economists Incorporated, dated September 19, 2018, entitled "Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists."

to be distributed to the parties for review and comment.[13]  ECF No. 5908 at 1-2.  Plaintiffs did

not file a response.

On September 11, 2018, the court issued an order approving the Special Master's request

to hire economist and statistician Dwight Steward, Ph.D., and the EmployStats research firm.

ECF No. 5919.  The court noted that it had reviewed the experts' *curriculum vitae*, which had

been filed on the court's docket.  *Id*. at 1.  In answer to the requests put forth in defendants'

response, the order directed that the expert appointments would be limited to the completion of

the discrete task for which the appointments were being made, but there would be no specific

timeframe imposed for completion of that task.  *Id*. at 2.  The order further stated that "Rule 26

governs disclosure by parties of expert testimony by witnesses who may be called at a trial,"[14]

that "[t]he Special Master is not a party to this action," and therefore, Rule 26 does not apply to

the work of his experts."  *Id*. at 2, 3.

## IV.    PREPARATION OF REPORT – PROCESS

Consistent with the court orders discussed above, ECF No. 5573 and ECF No. 5711, and

as he was aware that both the CDCR and the DSH defendants shared the same labor market, and

were known to compete for psychiatrists, the Special Master directed EmployStats to include

DSH in its market and salary analyses.  EmployStats performed separate analyses of the

employment conditions and compensation of both CDCR and DSH psychiatrists.  For the

analysis of psychiatrists' employment conditions, EmployStats developed and conducted a

survey of CDCR and DSH psychiatrists' perceptions of their working conditions and

---

[13] Defendants' response also included a footnote noting that the *curricula vitae* of the proposed experts had not been included with the Special Master's request and reserving their right to object to the experts' qualifications at a later time.  ECF No. 5908 at 2 n.1.

[14] *See* Fed. R. Civ P. 26(A).

compensation.[15]  The analysis of psychiatrists' compensation consisted of a comparison of the

salary and total compensation of CDCR and DSH psychiatrists to psychiatrists employed by

other public and private California employers.[16]

The data collection process required a coordinated effort between EmployStats, the

parties, and the Special Master.  A substantial amount of data in various forms was collected

from both CDCR and DSH over a period of several months.  There were also a series of

meetings related to the development and administration of the surveys and other data collection

efforts.  A brief description of those processes is outlined below.

**A.  The Development and Administration of a Compensation and Working Conditions Survey for CDCR and DSH Psychiatrists**

Immediately after their appointment by the court, EmployStats began work to develop a

salary and working conditions survey (survey) that would be distributed to current CDCR and

DSH psychiatrists, both supervisory and staff.  The survey would be designed for online

completion and would serve, in part, as the basis for EmployStats' analysis.  An initial draft of

the survey was provided to the Special Master on October 8, 2018.  On November 6, 2018, the

Special Master provided the draft survey to the parties for review and comment.

On November 14, 2018, plaintiffs emailed a letter to defendants and the Special Master in

which they proposed a series of additional questions for inclusion in the survey, asked some

clarifying questions, requested certain clarifications be made in the survey draft, suggested

enlarging the categories of psychiatrists surveyed, and identified some minor errors for

---

[15] *See* "An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals" (hereinafter "EmployStats Report") pp. 3-4
[16] *See id*.

correction.[17]  On November 14, 2018, the CDCR defendants sent an email to Deputy Special

Master Walsh requesting additional time to respond to the draft survey.  The CDCR defendants

sent a follow-up email on November 15, 2018 indicating they would respond to the draft survey

by November 21, 2018.

On February 7, 2019, the Special Master convened a meeting with the parties and EmployStats to discuss the

draft survey on November 19, 2018.  On November 21, 2018, the CDCR defendants sent the

Special Master and plaintiffs an email in which they outlined six areas of concern related to the

draft survey for CDCR psychiatrists.[18]  Plaintiffs responded in a November 26, 2018 email,

addressing the items outlined in defendants' November 21, 2018 correspondence.[19]  On

November 29, 2018, defendants responded to plaintiffs' November 26, 2018 correspondence.[20]

On February 7, 2019, the Special Master provided the draft survey for DSH psychiatrists

to the parties for review and comment.[21]  Plaintiffs responded to the draft survey on February 13,

2019.[22]  In their response, plaintiffs proposed additional questions regarding working conditions,

offered suggestions on the survey format, proposed revisions to certain questions, suggested

additional revisions and corrections for clarification, and suggested enlarging the categories of

psychiatrists surveyed.  The DSH defendants provided their response to the survey on February

13, 2019, wherein they included some comments and suggestions regarding the structure of

[17] *See* letter from Michael Nunez to Special Master Lopes and defendants' counsel (November 13, 2018), attached as Exhibit C.
[18] *See* email from Dillon Hockerson to Special Master Lopes and plaintiffs' counsel (November 21, 2018), attached as Exhibit D.
[19] *See* email from Michael Nunez to Special Master Lopes and defendants' counsel (November 26, 2018), attached as Exhibit E.
[20] *See* email from Melissa Bentz to Special Master Lopes and plaintiffs' counsel (November 29, 2018), attached as Exhibit F
[21] Email from Deputy Special Master Walsh to the *Coleman* parties (February 7, 2019).
[22] *See* letter from Michael Nunez to Special Master Lopes and defendants' counsel (February 13, 2019), attached as Exhibit G.

13

certain questions, posed additional questions to consider, offered suggestions on the survey format, provided clarifying information to help shape the survey questions, and requested the exclusion of one question.[23]

After carefully considering the objections and concerns raised by the parties, as well as incorporating certain of the items defendants had requested into the survey,[24] EmployStats finalized the surveys that would be distributed to the CDCR and DSH psychiatrists. One survey was developed for the CDCR psychiatrists, with a separate survey developed for the DSH psychiatrists.

EmployStats began the process of conducting the surveys by starting with two pilots, utilizing a random sample of ten psychiatrists for each one. The pilot survey for CDCR psychiatrists was administered on January 25, 2019 and the pilot survey for DSH psychiatrists was administered on March 28, 2019.[25]

Including the pilot, the online surveys for CDCR psychiatrists were conducted over the course of approximately three months, between January and April 2019.[26] The survey was sent to 344 CDCR psychiatrists, whose names were taken from a list of current CDCR psychiatrists provided by CDCR. The response rate for the CDCR psychiatrists was 62.2 percent. The online surveys were conducted for DSH psychiatrists over the course of approximately two and a half months between March and June 2019. The survey was sent to 138 DSH psychiatrists, whose

---

[23] *See* email from Joanna Mupanduki to Deputy Special Master Walsh and plaintiffs' counsel (February 13, 2019), attached as Exhibit H.
[24] A detailed list of EmployStats' responses to defendants' concerns about the draft survey for CDCR psychiatrists is included in Appendix D to the EmployStats report.
[25] The Special Master received the list of current psychiatrist contacts from DSH on March 19, 2020. Email from Tyler Heath to Deputy Special Master Walsh (March 19, 2020).
[26] The data gathered from the pilot surveys for both CDCR and DSH psychiatrists was included in EmployStats' final analysis.

names were taken from a list of current DSH psychiatrists provided by DSH.  The response rate for DSH psychiatrists was 50.7 percent.

### B.  The Data Collection Process

Beginning in September 2018, and continuing until June 2019, CDCR and DSH received and responded to several data requests from EmployStats.  On October 4, 2018, members of the Special Master's staff, EmployStats, and the *Coleman* parties met to discuss the EmployStats data requests.  A list of the data collected from CDCR and DSH that was used in EmployStats' analysis is located in Appendices B and C to the EmployStats report.

## V.  THE COMPLETION AND DISTRIBUTION OF THE EMPLOYSTATS DRAFT REPORT AND THE PARTIES' RESPONSES

EmployStats kept the Special Master updated on the work that was being performed throughout each stage of their report preparation process.  On April 29, 2019, EmployStats submitted a draft table of contents, which provided an outline of the topics that would be addressed in the EmployStats draft report to the Special Master.  As the report continued to take shape, status updates, in the form of working drafts of the report, were provided until completion of the final draft, which was submitted to the Special Master on August 14, 2019.

### A.  Responses to the Draft Report

On August 15, 2019, the EmployStats draft report was distributed to the *Coleman* parties for comments and/or objections to be submitted to the Special Master no later than 30 days thereafter.[27]  Defendants subsequently requested an additional 60 days to respond to the draft report, citing the need to allow defendants additional time to give their labor economist group, Economists Incorporated, the opportunity to review and comment on the draft report.  The

---

[27] Email from Deputy Special Master Walsh to the *Coleman* parties (August 15, 2019).

Special Master granted defendants' request in part, allowing them an additional 30 days to respond.

On October 14, 2019, defendants submitted their comments and objections to the EmployStats draft report.[28]  Included with defendants' submission was a response to the EmployStats draft report prepared by Economists Incorporated.[29]

Plaintiffs' counsel did not submit a response to the EmployStats draft report.

### 1.  Defendants' Response to the Draft Report

Defendants objected to EmployStats' draft report's findings and recommendations.[30] Defendants' response detailed each of their objections and included a request that the Special Master decline to ask the court to adopt the report's findings and recommendations.  Defendants' objections were generally divided into two categories: methodology and recommendations.  Both categories are discussed in brief below.

### a.  Objections Related to Report and Survey Methodology

According to defendants, one objection was based on the court's order approving the Special Master's request to appoint EmployStats to his staff.  *See* Exhibit F at 4.  In response to defendants' request that EmployStats be required to prepare a stand-alone report meeting the requirements of Federal Rule of Civil Procedure 26(2)(B)(i)-(v), the court held that Rule 26 did

---

[28] *See* letter from Tyler Heath to Special Master Lopes (October 14, 2019), attached as Exhibit I.

[29] *See* Exhibit B to Letter from Tyler Heath to Special Master Lopes, (October 14, 2019)

[30] During November 2019, it came to the Special Master's attention that during defendants' most recent round of collective bargaining with the union representing physicians, some of the labor negotiations that had taken place that year appeared to correlate with the EmployStats report's recommendations related to salary increases.  Upon receiving this information, the Special Master asked defendants if they intended to withdraw any of their objections to the report based on the efforts that appeared to have already taken place.  Defendants responded to the Special Master several months later, informing him that they would not be withdrawing any of their previous objections to the report.

not apply to EmployStats as part of the Special Master's team. ECF No. 5919 at 3. The court further held that EmployStats' work was for use as directed by the Special Master and not as an independent source of evidence. *Id*.

Notwithstanding the court's order indicating that the EmployStats report was not for use as an independent source of evidence, defendants argued that under Rule 702 of the Federal Rules of Evidence, expert testimony "must be based on sufficient facts or data, must be the product of reliable principles and methods, and the expert must have 'reliably applied the principles and methods to the facts of the case.'" *See* Exhibit F at 4, citing Fed. R. Evid. 702(b)-(d). Applying this rule to the EmployStats' draft report, defendants argued that the psychiatrist salary and compensation comparison relied upon to prepare the report's findings and recommendations was objectionable because the methodology used to conduct the comparison, and the reliability and acceptance of it, was unclear. Defendants asserted that the draft report failed to state "whether its chosen methodology is generally recognized in the field or supported by objective verifiable evidence." *Id*. Further, the defendants stated the draft report failed to state "whether the methodology and information relied on for those recommendations are generally recognized or supported or based on scientifically valid principles or objective verifiable evidence." *Id*.

Defendants based their objection to the survey methodology on a Ninth Circuit opinion, which they indicated represented that "surveys may be admitted if they are conducted according to accepted principles and are relevant." *Id*. Citing a different Ninth Circuit opinion, defendants asserted that EmployStats had the burden of showing that their surveys were "conducted under generally accepted principles and the results were used in a statistically correct manner," and they had not done so. *Id*. at 4-5. Defendants also stated that the draft report did not justify the

way it relied on the data gathered from the survey. *Id.* A list of five critiques of the survey was included in defendants' response. *Id.* at 5-9.

### b. Objections Related to Report Recommendations

Defendants' objected to the report's recommendations as "too vague and ambiguous to adopt." *Id.* at 16. Generally, defendants argued that certain recommendations lacked support and justification and that EmployStats failed to analyze all available evidence in reaching others. *Id.* at 16-17. Defendants asserted that the recommendations for DSH were too broad, and thus outside the scope of the *Coleman* litigation. *Id.* at 17-18.

### B. EmployStats' Response to Defendants' Objections to the Draft Report

On October 18, 2019, the Special Master provided defendants' response to EmployStats for review. EmployStats reviewed defendants' objections and critiques and prepared a response to each one. EmployStats' responses which refute defendants' objections to the report recommendations, are attached as Appendix D to the EmployStats' report.

## VI.    EMPLOYSTATS' REPORT FINDINGS AND RECOMMENDATIONS

### A. Report Findings

Based on the analyses performed using the data gathering processes described in Section IV above, EmployStats reported the following general findings related to CDCR and DSH psychiatrists' compensation and working conditions:

- CDCR and DSH psychiatrist salaries were initially competitive with other employers, however salary increases diminish through a psychiatrist's employment tenure.

- CDCR and DSH psychiatrists' perception of the adequacy of their salary diminishes over time; psychiatrists that have been employed at either CDCR or DSH for 10 or more years report higher dissatisfaction with their current salary.

18

- A reduction in CDCR vacancy rates and an increase in CDCR retention rates occurred in recent years in which psychiatrists received salary increases.

- CDCR and DSH psychiatrists earn higher salaries than psychiatrists at other private and public California employers, however CDCR and DSH psychiatrists report overall job dissatisfaction related to a variety of factors including office space, professional standing, limited promotional opportunities and limited institutional support from the medical assistant program.

- On-site, registry, and telepsychiatry CDCR and DSH psychiatrists all report job dissatisfaction, but job dissatisfaction was most pronounced among on-site psychiatrists.

- Vacancy rates are twice as high at CDCR institutions in the Central Valley compared to those outside the Central Valley; CDCR psychiatrists in the Central Valley consistently report higher dissatisfaction with their employment conditions than CDCR psychiatrists at institutions outside of the Central Valley.

EmployStats Report, pp. 4-5.

Additionally, and regarding psychiatry vacancy rates, EmployStats reported that "CDCR psychiatry vacancy rates were more than three times the mandated levels for CDCR staff psychiatrists and more than twice the mandated levels for all types of CDCR psychiatrists." *Id.* at 13.

### B.  Report Recommendations

Based on their findings, EmployStats developed a list of five detailed recommendations designed to help CDCR and DSH with some of their hiring and retention challenges and assist in decreasing psychiatry vacancy rates.  Those recommendations are reproduced in part below:

- Provide a system of consistent and larger salary increase opportunities for psychiatrists throughout their employment tenure at CDCR and DSH;

- Provide a system of compensation differentials to incentivize psychiatrists to fill [CDCR] Central Valley positions, and to retain incumbents in those positions;

19

- Increase and improve the office space and facilities provided to [CDCR and DSH] psychiatrists to perform their job functions at its facilities;

- Improve the working environment for CDCR and DSH psychiatrists;

- In conjunction with improving CDCR and DSH psychiatrists' overall working conditions, better inform psychiatrists of the value of their compensation and their compensation relative to their peers.

EmploysStats Report, pp. 5-6.

## VII.    **CONCLUSION AND RECOMMENDATION**

The Special Master supports the processes used by EmploysStats to conduct the labor market and salary analyses upon which the report's findings and recommendations are based. In order to conduct a thorough comparison of the salary and total compensation of CDCR and DSH psychiatrists to that of psychiatrists employed by other public and private California employers, EmploysStats used data provided by CDCR and DSH, public salary data from the U.S. Bureau of Labor Statistics, and publicly available salary data for California state employees. To analyze psychiatrists' working conditions and their perceptions of their current employment, EmploysStats went directly to the source, developing and conducting a survey of current CDCR and DSH psychiatrists, and including both supervisory and staff psychiatrists in their analysis.

As reported in Section IV above, the parties participated in the data collection process and were provided with the opportunity to review and comment on the psychiatrist survey as it was being developed. Additionally, the CDCR and DSH defendants were instrumental in responding to EmploysStats' various data requests and providing the data upon which EmploysStats—in part—ultimately based their findings and recommendations.

Attached hereto as Appendix A, is EmployStats' report, "An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals."

The Special Master recommends that the court adopt the attached report and the findings and recommendations contained therein.

Respectfully submitted,

/s/*Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master

May 29, 2020

# Exhibit A

**Lopes Matthew**

| | |
|---|---|
| **From:** | Elise Thorn <Elise.Thorn@doj.ca.gov> |
| **Sent:** | Wednesday, September 19, 2018 5:52 PM |
| **To:** | Michael Bien (mbien@rbgg.com); Lisa Ells (LElls@rbgg.com); 'TNolan@rbgg.com'; Cara Trapani; 'sfama@prisonlaw.com'; Lopes Matthew; Walsh Kerry F. |
| **Cc:** | Katherine Tebrock (katherine.tebrock@cdcr.ca.gov); Ponciano, Angela@CDCR (Angela.Ponciano@cdcr.ca.gov); Bentz, Melissa@CDCR; Weber, Nicholas@CDCR; Dillon Hockerson; Jerome Hessick; Adriano Hrvatin; Andrew Gibson; Damon McClain; Elise Thorn; Ian Ellis; Jay Russell; Tobias Snyder; Tyler Heath |
| **Subject:** | Coleman - Draft Stipulation and [Proposed] Order Re Defendant CDCR's Adjustments to the 2009 Staffing Plan |
| **Attachments:** | Stip re Staffing Proposals.doc; Ex A Revised CDCR Psychiarty Staffing Proposal.pdf |

Dear Special Master and Counsel:

Attached for your consideration is a draft of the Stipulation and [Proposed] Order Re Defendant CDCR's Adjustments to the 2009 Staffing Plan.  We look forward to receipt of any requested revisions or comments you may have.

Sincerely,

Elise Thorn

Elise Owens Thorn
Deputy Attorney General
Department of Justice
Office of the Attorney General
1300 I Street, Rm. 1040-16
Sacramento, CA 95814
(916) 210-7318
Elise.Thorn@doj.ca.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

1  XAVIER BECERRA
   Attorney General of California
2  MONICA N. ANDERSON
   Senior Assistant Attorney General
3  JAY C. RUSSELL
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   ANDREW M. GIBSON, State Bar No. 244330
5  TYLER V. HEATH, State Bar No. 271478
   IAN MICHAEL ELLIS, State Bar No. 280254
6  TOBIAS G. SNYDER, State Bar No. 289095
   Deputy Attorneys General
7      1300 I Street, Suite 125
       P.O. Box 944255
8      Sacramento, CA 94244-2550
       Telephone:  (916) 210-7318
9      Fax:  (916) 324-5205
       E-mail:  Andrew.Gibson@doj.ca.gov
10 Attorneys for Defendants

11                    IN THE UNITED STATES DISTRICT COURT

12                   FOR THE EASTERN DISTRICT OF CALIFORNIA

13                            SACRAMENTO DIVISION

14

15

16  **RALPH COLEMAN, et al.,**                2:90-cv-00520 KJM-DB (PC)

17                              Plaintiffs,   **STIPULATION AND [PROPOSED]**
                                              **ORDER RE DEFENDANT CDCR'S**
18        **v.**                              **ADJUSTMENTS TO THE 2009**
                                              **STAFFING PLAN**
19
    **EDMUND G. BROWN JR., et al.,**
20
                                Defendants.
21

22
         The parties, through their counsel of record, stipulate, subject to Court approval, to adjust

23
    the California Department of Corrections and Rehabilitation's (CDCR) 2009 Staffing Plan (ECF

24
    No. 3693), as follows:

25
         1.  On October 10, 2017, the Court ordered the California Department of Corrections and

26
    Rehabilitation (CDCR) to "take all steps necessary to come into compliance with the staffing

27

28
                                              1

1    ratios in [the] 2009 Staffing Plan and the maximum ten percent vacancy rate required by the

2    court's June 13, 2002 order."  (October 10, 2017 Staffing Order, ECF No. 5711 at 30.)

3        2.    On February 15, 2018, the Court asked the parties to consider whether there are "any

4    adjustments to the psychiatry staffing ratios that could be made to alleviate the psychiatrists

5    staffing shortages without compromising the constitutionally required access to adequate mental

6    health care." (February 15, 2018 Order, ECF No. 5786 at 4.)

7        3.    To comply with the October 10, 2017 Staffing Order, CDCR proposed adjustments to

8    its 2009 Staffing Plan (ECF No. 3693) that reduce unnecessary psychiatry staffing allocations

9    required under the 2009 Staffing Plan.  The parties, through the workgroup process and under

10   direction of the Special Master, have agreed to changes in staffing as fully set forth in the

11   *Adjustments to the 2009 Staffing Plan*, attached as Exhibit A and specified below.

12                     ADJUSTMENTS TO THE 2009 STAFFING PLAN

13   **A.    Reduce the Psychiatrist Allocation for Desert Institutions in Line with the
           Limited Workload for the Small Population Temporarily Housed There.**
14

15        The 2009 Staffing Plan allocates 0.5 psychiatrists to each of the desert
     institutions.[1] (2009 Staffing Plan, ECF No. 3693 at 20.)  In order to bring the
16   allocation in line with the actual workload, CDCR will reduce the psychiatry
     allocation for all desert institutions to 0.5, and utilize telepsychiatry to provide
17   services to all five desert institutions. The telepsychiatrists providing services to the
     desert institutions will visit an institution biannually in accordance with the frequency
18   of site visits agreed upon for the Correctional Clinical Case Management System
     (CCCMS) level of care in the telepsychiatry policy.

19   **B.    Apply the Psychiatrist Staffing Ratio for the CCCMS General Population
           Only to the Population Who Are Prescribed Psychotropic Medication or
20         Require Psychiatric Care.**

21        The Program Guide requires that "[e]ach CCCMS inmate-patient on psychiatric
     medication" "be reevaluated by a psychiatrist a minimum of every 90 days."
22   (Program Guide at 12-3-11.) The 2009 Staffing Plan establishes a psychiatry staffing
     ratio for every CCCMS patient in the General Population (GP) who receives
23   psychotropic medication.  (2009 Staffing Plan, ECF No. 3693 at 8.)  This adjustment
     does not alter the staffing ratio laid out in the 2009 Staffing Plan; rather, it correctly
24   applies the staffing ratio to the CCCMS population that is in need of routine
     psychiatry services, while also ensuring adequate staff to provide services to patients
25   who may soon be placed on psychotropic medication.

26

27        [1] The five desert institutions are California Conservation Center, Calipatria State Prison,
     Centinela State Prison, Chuckawalla Valley State Prison, and Ironwood State Prison

28

                                        2

To avoid the over allocation of staff, CDCR will only provide psychiatry staffing for the following CCCMS inmates:

1. CCCMS inmates currently on psychotropic medication;

2. CCCMS inmates who have been at the CCCMS level of care for less than three months;

3. CCCMS inmates who had previously been prescribed psychotropic medication, but have been off of the medication for less than six months; and

4. CCCMS inmates who, in the opinion of their treating psychiatrist, could benefit from medication but have refused medication.

To identify the precise number of inmates who fall into the fourth category, CDCR will review the number of patients who refuse psychiatry contacts, refuse currently prescribed medication, and conduct a prospective study to determine how many inmates refuse an initial medication prescription. The offset percentage will be determined by adding the percentage of patients who refuse psychiatry contacts, refuse prescribed medication, and those who fall into the prospective study to the number of inmates who fall into the first three categories listed above. The prospective study is expected to have on-site psychiatrists and telepsychiatrists document any CCCMS patient who fits into the last category. The study will be conducted at a minimum of six institutions over a three-month period and will be concluded prior to the staffing allocation adjustments in January 2019.

**C.    Remove Psychiatry Positions Allocated for Crisis Intervention on Weekends and Holidays and Retain Eight Positions for On-Call Coverage.**

The 2009 Staffing Plan allocated 0.52 psychiatry positions at every institution to provide crisis intervention on weekends and holidays. (2009 Staffing Plan, ECF No. 3693 at 50, Exhibit 23.)  CDCR will eliminate these positions as this allocation was never implemented as intended in the 2009 Staffing Plan. Weekend and holiday crisis intervention is covered by psychiatrist on-call.  Since these positions do not carry a caseload, this change removes an unnecessary psychiatry allocation, but does not adjust the staffing ratios.

CDCR will redirect eight positions to nighttime on-call psychiatry coverage via telepsychiatry.  CDCR will expand the pilot program it began in November 2017, which currently provides nighttime telepsychiatry coverage for six institutions, three days per week. Thus far, the program has been very successful. A local psychiatrist or medical doctor is still required to be on-call, in case an in-person examination of a patient is required overnight, which rarely occurs. CDCR will endeavor to maintain consistent assignments for telepsychiatrists who are assigned to nighttime on-call coverage. Under CDCR's plan, on-call coverage via telepsychiatry will cover a large portion of the workload for the local on-call psychiatrist, which will likely increase retention.

**D.    Modify the Psychiatry Allocation at Reception Centers (RC) for Intake and Screening Based on Intake Population and Adjust Biannually/**

The 2009 Staffing Plan includes positions to conduct the mental health screenings required for every new commitment and parole violator.  (2009 Staffing Plan, ECF No. 3693 at 9, Exhibit 12.)  A percentage of those screenings result in a need for a medication consultation by psychiatry. The staffing plan ratio applied to

3

this population established 13.5 positions for psychiatry intake and screening (*Id*.), which has not been adjusted since 2009. CDCR will adjust the currently fixed psychiatrist allocation for reception center intake and screening to reflect the current incoming population. This adjustment does not change the underlying staffing ratio in any way and does not require a modification of the 2009 Staffing Plan.

**E.    Adjust the CCCMS General Population Staffing Ratio to Allow for 1.25 Routine Contacts Every 90 Days.**

The 2009 Staffing Plan workload assumption for routine CCCMS psychiatry contacts overstated the Program Guide requirement that a patient on medication be seen every 90 days, (Program Guide at 12-3-11) by assuming that each patient will be seen by a psychiatrist for routine contacts an average of 1.5 times every 90 days. (2009 Staffing Plan, ECF No. 3693 at Exhibit 10.) CDCR will revise the ratio of routine contact frequency from 1.5 to 1.25 contacts every 90 days. This reduction will not interfere with CDCR's commitment to providing more than the minimum treatment required by the Program Guide to CCCMS inmates who require more individualized treatment.

**F.    Adjust the EOP General Population Staffing Ratio to Allow for 1.25 Routine Contacts Every 30 Days.**

The 2009 Staffing Plan workload assumption for routine EOP contacts overstated the Program Guide requirement that an EOP inmate be seen once every 30 days, (Program Guide at 12-4-9) by assuming that each patient will be seen an average of 1.5 times every 30 days for routine contacts. CDCR will revise the EOP general population staffing ratio to allow for routine psychiatry contacts 1.25 times every 30 days. The reduction of psychiatrist positions will not affect CDCR's ability to provide additional individualized group treatment, recreational therapy, or individual therapy, as these services are provided by classifications other than psychiatrists.

Good cause presented to the Court and appearing, the parties stipulate that the Court should approve CDCR's *Adjustments to the 2009 Staffing Plan*.

**IT IS STIPULATED AS FOLLOWS:**

1.    CDCR's *Adjustments to the 2009 Staffing Plan*, as set forth above, shall be effective immediately upon the date of Court approval;

2.    Plaintiffs reserve their objections to CDCR's psychiatry staffing proposal subject to monitoring by the Special Master.

3.    The Special Master shall monitor CDCR's *Adjustments to the 2009 Staffing Plan* and report as needed.

4

1  Dated:  September 21, 2018                        XAVIER BECERRA
                                                    Attorney General of California
2                                                   JAY RUSSELL
                                                    Supervising Deputy Attorney General
3

4                                                   /s/ ANDREW M. GIBSON
                                                    ANDREW M. GIBSON
5                                                   Deputy Attorney General
                                                    *Attorneys for Defendants*
6
   Dated:  September 21, 2018                        /s/ MICHAEL W. BIEN
7                                                   MICHAEL W. BIEN
                                                    *Attorneys for Plaintiffs*
8

9          **IT IS SO ORDERED.**

10  Dated: _____
                                                    _____
11                                                  KIMBERLY J. MUELLER
                                                    UNITED STATES DISTRICT COURT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# Exhibit A

**ADJUSTMENTS TO THE 2009 STAFFING PLAN**

On October 10, 2017, the Court ordered the California Department of Corrections and Rehabilitation (CDCR) to "take all steps necessary to come into compliance with the staffing ratios in [the] 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." 10/10/2017 Staffing Order, ECF No. 5711 at 30. On February 15, 2018, the Court asked the parties to consider whether there are "any adjustments to the psychiatry staffing ratios that could be made to alleviate the psychiatrists staffing shortages without compromising the constitutionally required access to adequate mental health care." 2/15/2018 Order, ECF No. 5786 at 4.

On May 17, 2018, Defendants provided the Special Master and Plaintiffs with a plan to modify the 2009 Staffing Plan based on how psychiatry care is provided and correcting some of the underlying assumptions. Since that time, the parties have met and conferred and have reached an agreement with respect to the modifications.[1] Those changes are outlined in more detail below.

> A. Reduce the Psychiatrist Allocation for Desert Institutions in Line with the Limited Workload for the Small Population Temporarily Housed There

The 2009 Staffing Plan allocates 0.5 psychiatrists to each of the desert institutions.[2] 2009 Staffing Plan at 20. However, the workload, which takes into account the average contacts and contact duration for all five desert institutions, could easily be accomplished by half of a psychiatrist allocation.

In order to bring the allocation in line with the actual workload, CDCR will reduce the psychiatry allocation for all desert institutions to 0.5, and utilize telepsychiatry to provide services to all five desert institutions. The telepsychiatrist providing services to the dessert institutions will visit an institution biannually in accordance with the frequency of site visits agreed upon for the CCCMS level of care in the telepsychiatry policy.

> B. Apply the Psychiatrist Staffing Ratio for the CCCMS General Population Only to the Population Who are Prescribed Psychotropic Medication or Require Psychiatric Care

The Program Guide requires that "[e]ach CCCMS inmate-patient on psychiatric medication" "be reevaluated by a psychiatrist a minimum of every 90 days." Program Guide at 12-3-11. The 2009 Staffing Plan establishes a psychiatry staffing ratio for every CCCMS patient in the General Population (GP) who receives psychotropic medication. Despite the Program Guide requirement that only CCCMS inmates on medication should be seen for routine contacts, CDCR's practice has been to apply the ratio to the entire CCCMS population, including thousands of CCCMS patients who are not prescribed any psychiatric medication and who are not seeing a psychiatrist.

In order to avoid the over allocation of staff, CDCR will alter its prior practice and only provide psychiatry staffing for the following CCCMS inmates:

---

[1] Plaintiffs reserve their objections to CDCR's psychiatry staffing proposal subject to monitoring by the Special Master.

[2] California Conservation Center, Calipatria State Prison, Centinela State Prison, Chuckawalla Valley State Prison, and Ironwood State Prison.

1. CCCMS inmates currently on psychotropic medication;
2. CCCMS inmates who have been at the CCCMS level of care for less than three months;
3. CCCMS inmates who had previously been prescribed psychotropic medication, but have been off of the medication for less than six months; and
4. CCCMS inmates who, in the opinion of their treating psychiatrist, could benefit from medication but have refused medication.

The number of inmates in the first three categories can be identified using existing data.  In order to identify the precise number of inmates who fall into the last category, CDCR has agreed to review the number of patients who refuse psychiatry contacts, refuse currently prescribed medication, and conduct a prospective study to determine how many inmates refuse an initial medication prescription.  The offset percentage will be determined by adding the percentage of patients who refuse psychiatry contacts, refuse prescribed medication, and those who fall into the prospective study to the number of inmates who fall into the first three categories listed above.   The prospective study is expected to have on-site psychiatrists and telepsychiatrists document any CCCMS patient who fits into the last category.  The study will be conducted at a minimum of six institutions over a three month period and will be concluded prior to the staffing allocation adjustments in January 2019.  This adjustment does not alter the staffing ratio laid out in the 2009 Staffing Plan; rather, it correctly applies the staffing ratio to the CCCMS population that is in need of routine psychiatry services, while also ensuring adequate staff to provide services to patients who may soon be placed on psychotropic medication.

      C.    Remove Psychiatry Positions Allocated for Crisis Intervention on Weekends and Holidays And Retain Eight Positions for On-Call Coverage

The 2009 Staffing Plan allocated 0.52 psychiatry positions at every institution to provide crisis intervention on weekends and holidays.  CDCR will eliminate these positions as this allocation was never implemented as intended in the 2009 Staffing Plan.  Weekend and holiday crisis intervention is covered by psychiatrist on-call.  Since these positions do not carry a caseload, this is not an adjustment to the staffing ratios, but, rather, a removal of an unnecessary psychiatry allocation.[3]

Rather than completely eliminate all of the crisis intervention positions, CDCR will redirect eight positions to nighttime on-call psychiatry coverage via telepsychiatry.[4]  CDCR will expand the pilot program it began in November 2017, which currently provides nighttime telepsychiatry coverage for six institutions, three days per week.  Thus far, the program has been very successful.  A local psychiatrist or medical doctor is still required to be on-call, in case an in-person examination of a patient is required overnight, which rarely occurs.  CDCR will endeavor to maintain consistent assignments for telepsychiatrist who are assigned to nighttime on-call coverage. Under CDCR's plan, on-call coverage via

---

[3] CDCR has agreed to discuss implementation of the Crisis Intervention Teams at the upcoming policy meeting, currently scheduled for November 9, 2018.

[4] Once the eight on-call telepsychiatry positions have been filled, CDCR will reassess whether more on-call telepsychiatry coverage is necessary based on the volume of afterhours calls and what institutions take advantage of on-call telepsychiatry coverage.

telepsychiatry will cover a large portion of the workload for the local on-call psychiatrist, which will likely increase retention.

    D.   Modify the Psychiatry Allocation at Reception Centers (RC) for Intake and Screening Based on Intake Population And Adjust Biannually

The 2009 Staffing Plan includes positions to conduct the mental health screenings required for every new commitment and parole violator.  A percentage of those screenings result in a need for a medication consultation by psychiatry.  The staffing plan ratio applied to this population established 13.5 positions for psychiatry intake and screening, which has not been adjusted since 2009.  These positions were based on reception center intake data from 2009, but the psychiatry allocations have not been adjusted to reflect the significant reduction in reception center intake since that time.

In response, CDCR will adjust the currently fixed psychiatrist allocation for reception center intake and screening to reflect the current incoming population.  To be clear, the adjustment does not change the underlying staffing ratio in any way and thus does not require a modification of the 2009 Staffing Plan.  Rather, it ensures that the allocation is adjusted biannually based on current reception center intake population.  Adjusting staffing allocation in response to population changes is consistent with the approach of the 2009 Staffing Plan and with CDCR's current practice in adjusting other population driven staffing allocations.[5]

    E.   Adjust the CCCMS Staffing Ratio to Allow for 1.25 Routine Contacts Every 90 Days

The 2009 Staffing Plan workload assumption for routine psychiatry contacts overstated the Program Guide requirement.  The Program Guide requires that a patient on medication be seen every 90 days.  Program Guide at 12-3-11.  In contrast, the 2009 Staffing Plan assumes that each patient will be seen by a psychiatrist for routine contacts an average of 1.5 times every 90 days.  2009 Staffing Plan, Exhibit 10.  The 2009 Staffing Plan separately accounts for urgent or emergent psychiatry referrals in between routine contacts as part of the ratio.

CDCR will revise the ratio of routine contact frequency from 1.5 to 1.25 contacts every 90 days.  This reduction would not interfere with CDCR's commitment to providing more than the minimum treatment required by the Program Guide to CCCMS inmates who require more individualized treatment.  This changed assumption would result in a ratio of 1:336, without accounting for relief.

    F.   Adjust the EOP Staffing Ratio to Allow for 1.25 Routine Contacts Every 30 Days

The 2009 Staffing Plan workload assumption applied to CCCMS routine contacts, as described above, was also applied to EOP routine contacts.  2009 Staffing Plan, Exhibit 10.  Thus, while the Program Guide

---

[5] The 2009 Staffing Plan assumed that out of every 100 new inmate arrivals at RCs, 15 to 16 inmates would need to be evaluated by psychiatrists. ECF No. 3693 at 13.  At Plaintiffs' request, CDCR provided updated data regarding the number of psychiatry referrals per 100 newly arrived inmates. This data showed that from January 2018 through June 2018, 11.41 inmates were referred for psychiatry evaluations of every 100 new inmates who arrived at the RC.

requires an EOP participant to be seen once every 30 days, the 2009 Staffing Plan assumes that each patient will be seen an average of 1.5 times every 30 days for routine contacts.  The 2009 Staffing Plan separately accounts for urgent or emergent psychiatry referrals in between routine contacts as part of the ratio.  *Id.*  CDCR will revise the ratio to allow for routine psychiatry contacts 1.25 times every 30 days.  The reduction of psychiatrist positions would not affect CDCR's ability to provide additional individualized group treatment, recreational therapy, or individual therapy, as these services are provided by classifications other than psychiatrists.  This changed assumption would result in a ratio of 1:144 for EOP, without accounting for relief.

# Exhibit B

**Lopes Matthew**

| | |
|---|---|
| **From:** | Lisa Ells <LElls@rbgg.com> |
| **Sent:** | Friday, October 05, 2018 2:22 PM |
| **To:** | Elise Thorn; Cara Trapani |
| **Cc:** | Katherine Tebrock (katherine.tebrock@cdcr.ca.gov); Ponciano, Angela@CDCR (Angela.Ponciano@cdcr.ca.gov); Bentz, Melissa@CDCR; Nick Weber; Dillon Hockerson; Jerome Hessick; Adriano Hrvatin; Andrew Gibson; Damon McClain; Ian Ellis; Jay Russell; Tobias Snyder; Tyler Heath; Michael W. Bien; Thomas Nolan; Steve Fama; Lopes Matthew; Walsh Kerry F.; Coleman Team - RBG Only |
| **Subject:** | RE: Coleman - Draft Stipulation and [Proposed] Order Re Defendant CDCR's Adjustments to the 2009 Staffing Plan [IWOV-DMS.FID6429] |

Elise,

We are no longer willing to enter into this stipulation.  In light of the information provided to us yesterday by Andy Gibson and Gabe Sanchez, we are no longer confident that the factual representations underlying Defendants' proposal, which we relied on in formulating our position, were accurate or presented the full picture.

Lisa

---

**From:** Elise Thorn <Elise.Thorn@doj.ca.gov>
**Sent:** Monday, October 1, 2018 4:07 PM
**To:** Cara Trapani <CTrapani@rbgg.com>
**Cc:** Katherine Tebrock (katherine.tebrock@cdcr.ca.gov) <katherine.tebrock@cdcr.ca.gov>; Ponciano, Angela@CDCR (Angela.Ponciano@cdcr.ca.gov) <Angela.Ponciano@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Dillon Hockerson <Dillon.Hockerson@cdcr.ca.gov>; Jerome Hessick <Jerome.Hessick@cdcr.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Andrew Gibson <Andrew.Gibson@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Ian Ellis <Ian.Ellis@doj.ca.gov>; Jay Russell <jay.russell@doj.ca.gov>; Tobias Snyder <Tobias.Snyder@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Thomas Nolan <TNolan@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Matt Lopes <mlopes@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>
**Subject:** RE: Coleman - Draft Stipulation and [Proposed] Order Re Defendant CDCR's Adjustments to the 2009 Staffing Plan [IWOV-DMS.FID6429]

Cara,

Attached for your consideration is a red-lined draft with a few additional revisions.  Deputy Special Master Walsh requested that I add the language inserted at the end of the stipulation that the Special Master has reviewed the stipulation and has no objections.  Let us know if you agree with the revisions and that we may file the stipulation.  Please let us know if you would like to discuss the revisions.

Thank you,

Elise

Elise Owens Thorn
Deputy Attorney General
Department of Justice

Office of the Attorney General
1300 I Street, Rm. 1040-16
Sacramento, CA 95814
(916) 210-7318

---

**From:** Cara Trapani <CTrapani@rbgg.com>
**Sent:** Tuesday, September 25, 2018 5:19 PM
**To:** Elise Thorn <Elise.Thorn@doj.ca.gov>
**Cc:** Katherine Tebrock (katherine.tebrock@cdcr.ca.gov) <katherine.tebrock@cdcr.ca.gov>; Ponciano, Angela@CDCR (Angela.Ponciano@cdcr.ca.gov) <Angela.Ponciano@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Dillon Hockerson <Dillon.Hockerson@cdcr.ca.gov>; Jerome Hessick <Jerome.Hessick@cdcr.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Andrew Gibson <Andrew.Gibson@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Ian Ellis <Ian.Ellis@doj.ca.gov>; Jay Russell <Jay.Russell@doj.ca.gov>; Tobias Snyder <Tobias.Snyder@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Thomas Nolan <TNolan@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Matt Lopes <mlopes@pldlaw.com>; Kerry F. Walsh <kwalsh@pldlaw.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>
**Subject:** RE: Coleman - Draft Stipulation and [Proposed] Order Re Defendant CDCR's Adjustments to the 2009 Staffing Plan [IWOV-DMS.FID6429]

Dear Elise,

Thank you for drafting the Stipulation and [Proposed] Order Re Defendant CDCR's Adjustments to the 2009 Staffing Plan.  Attached is Plaintiffs' redline of the draft stipulation, in which we propose some clarifying language and additional details.  Please let me know if you would like to discuss any of Plaintiffs' proposed revisions.

Sincerely,
Cara Trapani

 ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
ctrapani@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.
IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

---

**From:** Elise Thorn <Elise.Thorn@doj.ca.gov>
**Sent:** Wednesday, September 19, 2018 2:52 PM
**To:** Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Thomas Nolan <TNolan@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Matt Lopes <mlopes@pldlaw.com>; Kerry F. Walsh <kwalsh@pldlaw.com>

**Cc:** Katherine Tebrock (katherine.tebrock@cdcr.ca.gov) <katherine.tebrock@cdcr.ca.gov>; Ponciano, Angela@CDCR (Angela.Ponciano@cdcr.ca.gov) <Angela.Ponciano@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Dillon Hockerson <Dillon.Hockerson@cdcr.ca.gov>; Jerome Hessick <Jerome.Hessick@cdcr.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Andrew Gibson <Andrew.Gibson@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Ian Ellis <Ian.Ellis@doj.ca.gov>; Jay Russell <jay.russell@doj.ca.gov>; Tobias Snyder <Tobias.Snyder@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>

**Subject:** Coleman - Draft Stipulation and [Proposed] Order Re Defendant CDCR's Adjustments to the 2009 Staffing Plan

Dear Special Master and Counsel:

Attached for your consideration is a draft of the Stipulation and [Proposed] Order Re Defendant CDCR's Adjustments to the 2009 Staffing Plan.  We look forward to receipt of any requested revisions or comments you may have.

Sincerely,

Elise Thorn

Elise Owens Thorn
Deputy Attorney General
Department of Justice
Office of the Attorney General
1300 I Street, Rm. 1040-16
Sacramento, CA 95814
(916) 210-7318
Elise.Thorn@doj.ca.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit C



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email: mnunez@rbgg.com

November 13, 2018

VIA ELECTRONIC MAIL

Matthew A. Lopes
*Coleman* Special Master
Pannone Lopes Deveraux & O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI  02919-4946
MLopes@pldolaw.com

Christine Ciccotti
Sean Rashkis
Elaine Ekpo
Joanna Mupanduki
DSH Legal Team
Christine.Ciccotti@dsh.ca.gov
Sean.Rashkis@dsh.ca.gov
Elaine.Ekpo@dsh.ca.gov
Joanna.Mupanduki@dsh.ca.gov

Nicholas Weber
Melissa Bentz
Jerome Hessick
Dillon Hockerson
CDCR Office of Legal Affairs
P.O. Box 94283
Sacramento, CA  94283-0001
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Jerome.Hessick@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

Re:    *Coleman v. Brown*:  Plaintiffs' Comments on the Psychiatrist Survey
       Proposed by the Special Master's Labor Economists
       Our File No. 489-3

Dear Special Master Lopes:

Thank you for circulating your labor economists' proposed survey of CDCR and DSH psychiatrists on November 6, 2018 ("Psychiatrist Survey" or "Survey").  We write to provide our comments on the proposed Survey.  We appreciated the detailed questions regarding psychiatrist salaries and compensation in the Survey. We request that the

Matthew A. Lopes et al.
November 13, 2018
Page 2

Survey be revised so that it is clear that it is directed at both CDCR and DSH psychiatrists. In addition, we propose below several additional questions concerning CDCR and DSH psychiatrists' working conditions, given that both Defendants' Staffing Expert Report and Dr. Golding's report made clear that at least some psychiatrists have significant complaints in this area that may affect recruiting and retention. We have also proposed a few additional questions aimed at obtaining additional data regarding CDCR and DSH's ability to recruit and retain psychiatrists, and we have proposed revisions to clarify or correct errors in certain questions. Finally, we request that, in addition to surveying current employees, the Special Master's labor economist survey former CDCR and DSH psychiatrists and psychiatrists who were offered but declined to accept a position as a CDCR or DSH psychiatrist.

## I.     Directing the Survey to both CDCR and DSH Psychiatrists

In his November 6, 2018 email circulating the proposed Survey, Kerry Walsh stated that the Survey would be distributed to both CDCR and DSH psychiatrists. Will there be a second version of the Survey tailored for DSH psychiatrists? If not, we request that the introduction and questions throughout the survey be revised to reference both CDCR and DSH so that DSH psychiatrists responding to the survey are not confused by the fact that the Survey currently only references CDCR.

## II.     Additional Questions Regarding Psychiatrists' Working Conditions

We request that additional questions regarding working conditions for CDCR and DSH psychiatrists be added to the Survey. The parties have long discussed that CDCR institutions present a particularly challenging working environment for psychiatrists. In addition, the recent report of Dr. Michael Golding, CDCR's Chief Psychiatrist, describes pervasive problems that he claims profoundly and negatively impact the working conditions that CDCR psychiatrists face, including, among other things, the marginalization of psychiatry within the Department and its leadership, the lack of dedicated confidential treatment and office space for psychiatrists, and core deficiencies in the electronic medical records and scheduling systems. CDCR Mental Health System Report (Oct. 31, 2018), ECF No. 5988-1. We have received information from multiple sources that lead us to believe that many of the concerns about work conditions expressed by Dr. Golding are not unique to him. Furthermore, Defendants' Staffing Expert report and the associated appendix summarizing the results of anonymous interviews with clinicians, reported additional psychiatrist complaints and concerns that related to the working conditions, rather than salary and compensation. We have similarly discussed the fact that DSH psychiatrists work with a very challenging patient population. We are concerned that without additional questions seeking psychiatrists' input on various

Matthew A. Lopes et al.
November 13, 2018
Page 3

potentially troubling aspects of their conditions of employment that the survey will fail to capture major impediments to Defendants' ability to recruit and retain psychiatrists.

In particular, including additional questions regarding psychiatrists' working conditions will enable the Special Master's labor economists to gather data regarding how psychiatrists' perceptions of their working conditions relate to (1) CDCR and DSH's ability to retain psychiatrists, and (2) psychiatrists' views regarding the competitiveness of CDCR and DSH psychiatrist compensation.

We propose adding questions regarding working conditions to the Survey after the three questions listed on page 14 of the Survey and that these additional questions use a similar seven point response scale employed by those three questions. We propose that questions similar to the following be added to the Survey, or that the Survey be revised to capture similar topics. If the Special Master's labor economists use the same survey for both CDCR and DSH psychiatrists, then we ask that the Survey clearly indicate when a question is only applicable to psychiatrists at one of the two agencies.

1. On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how would you rate your overall job satisfaction?

2. On a scale of one to seven, where seven is "excellent" and one is "terrible," how would you describe the overall quality of your working conditions?

3. On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with staff training and new employee orientation at CDCR/DSH?

4. On a scale of one to seven, where seven is "always" and one is "never," how often are you able to meet with patients at their scheduled appointment times?

5. On a scale of one to seven, where seven is "always" and one is "never," how often are you able to meet with patients in a confidential setting?

6. On a scale of one to seven, where seven is "always" and one is "never," how often are you able to meet with patients for an adequate length of time?

7. On a scale of one to seven, where seven is "always" and one is "never," how often are you able to access patients' medical records when needed?

8. On a scale of one to seven, where seven is "always" and one is "never," how often are you able to use CDCR's Electronic Health Record System to accurately and efficiently document contacts with patients?

Matthew A. Lopes et al.
November 13, 2018
Page 4

9.     On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with your autonomy to determine the course of treatment for your patients, including at IDTTs and Huddles?

10.    On a scale of one to seven, where seven is "strongly agree" and one is "strongly disagree," do you agree with the following statement: "non-medical staff at CDCR do not perform duties that only psychiatrists or other medical professionals are professionally qualified to perform"?

11.    On a scale of one to seven, where seven is "always" and one is "never," how often are you clinically supervised by individuals other than psychiatrists?

12.    On a scale of one to seven, where seven is "always" and one is "never," how often would you say that custody staff actively support your efforts to meet with and treat patients?

13.    On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with the way that the on-call system operates?

14.    On a scale of one to seven, where seven is "strongly agree" and one is "strongly disagree," do you agree with the following statement: "Overall, I have enough time to adequately treat patients"?

15.    On a scale of one to seven, where seven is "strongly agree" and one is "strongly disagree," do you agree with the following statement: "Overall, I feel safe when performing my professional duties"?

16.    On a scale of one to seven, where seven is "strongly agree" and one is "strongly disagree," do you agree with the following statement: "There is sufficient trust between my manager and me"?

17.    On a scale from one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with opportunities for promotion?

18.    On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with the number of psychiatrists in leadership roles, both on an institution level and an agency-wide level?

19.    On a scale from one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with the medical assistant program?

Matthew A. Lopes et al.
November 13, 2018
Page 5

We also request that the Survey include a text box after each of these nineteena questions to permit respondents to explain their answers to each of these questions.  We also suggest the addition of an open-ended question asking for additional comments or concerns about working conditions generally.

### III.   Providing Survey Respondents with the Opportunity to Answer Questions with Additional Information

We also request that additional text boxes be added to the survey to allow respondents to explain their answers, especially where the answer is "other" or "none of the above."  Specifically, we propose adding text boxes to the questions identified below. For the first three questions, we also suggest changing the radio buttons to check-boxes that allow respondents to select more than one answer.

1.    On page 8, revise the question "[h]ow did you first learn of the job posting for your current position?" by adding a text box to the answer choice "[o]ther method."

2.    On page 13, revise the question "[w]hich of the following best describes why you work less than full time?"  by changing "[n]one of the above" to "other" and adding a text box.

3.    On page 15, revise the question "[w]hich of the following best describes why you chose telepsychiatry over a facility psychiatrist position?" by changing "[n]one of the above" to "other" and add a text box.

4.    Revise the questions on pages 14-15 by adding optional text boxes to each of the sliding scale questions to permit respondents to elaborate.

5.    At the end of the survey, add a text box and an open-ended question permitting respondents to elaborate on their survey responses.

### IV.   Clarifying Questions and Additional Questions

We request that the Survey ask each psychiatrist how long he or she has worked as a psychiatrist at the employing agency, either CDCR or DSH.  We propose adding this question immediately after the question asking the respondent for his or her job title on page 3 of the Survey.  This question would assist with determining how long on average CDCR and DSH are currently retaining psychiatrists and whether psychiatrists' views regarding the competitiveness of CDCR and DSH compensation are correlated with longevity (or lack thereof) of their employment at these agencies.

Matthew A. Lopes et al.
November 13, 2018
Page 6

We also propose several revisions related to telepsychiatry.  We request that the Survey be updated to permit telepsychiatrist respondents to indicate the facilities where they physically work and where they provide services.  We propose combining the question on page 7 "[t]elepsychiatrist (Y/N)" with the question on page 2 "[e]mployment [i]nformation" and adding a field for telepsychiatrists to indicate the facility from which they provide services:  Elk Grove, San Quentin, Rancho Cucamonga, Diamond Bar, and once active, Santa Ana.  On what is currently page 2, we propose deleting the "Telepsychiatrist" checkbox and  modifying the sentence, "If you work as a Telepsychiatrist, select 'Telepsychiatrist' below" to read "If you work as a Telepsychiatrist, select the facility or facilities to which you provide services."  Page 2 should also have a checkbox for California City Correctional Facility (CAC).  We also suggest asking on-site psychiatrists how satisfied they are with their ability to timely communicate with telepsychiatrists and asking telepsychiatrists how satisfied they are with their ability to timely communicate with staff who are on site.  Finally, we recommend asking telepsychiatrists how often technology problems interfere with their ability to treat patients.

Moreover, we request that the Survey include a follow up question regarding relocation costs.  After the question asking where the respondent lived when the respondent joined CDCR, Psychiatrist Survey at 8, we request that a question be added that asks whether the respondent moved to a new home to work as a CDCR or DSH psychiatrist when the respondent first joined CDCR or DSH.  Asking this question will allow for collection of more precise data regarding what percentage of psychiatrists incurred relocation costs in order to become a CDCR or DSH psychiatrist, a factor that would in effect reduce the net value of compensation offered.

In addition, we propose revisions to questions regarding salary and benefits.  We request that the question on page 8 asking "[w]hich of the following best describes the salary that CDCR offered you when you were initially hired at CDCR?" be slightly revised to add the answer option "I felt that the salary that CDCR offered me was greater than that of other employers."  We also ask that the question regarding "hiring above minimum" ("HAM") be revised slightly to clarify the question.  Psychiatrist Survey at 8.  We propose revising the question to ask "at the time that you were hired, were you hired at a salary above the minimum salary offered for the psychiatrist position (Hired Above Minimum or HAM)."  Finally, we ask that a question be added that asks respondents about how satisfied they are with their total benefits package.

We also recommend that the Survey be revised to permit respondents to provide additional information regarding their employment status.  First, we propose adding an answer option to the question on page 6 of the Survey asking for Hours Worked that would allow psychiatrists to indicate whether they work more than 40 hours per week

Case 2:90-cv-00520-KJM-SCR     Document 6695     Filed 05/29/20     Page 45 of 317

Matthew A. Lopes et al.
November 13, 2018
Page 7

because, for instance, they hold a dual appointment.  Second, we request that the option "the work environment is challenging" be added as an answer choice to the question that asks respondents why they choose to work part time.  Psychiatrist Survey at 13.  This option will allow for collection of some data regarding whether the work environment in particular, which all parties have acknowledged can be very challenging, affects the willingness of currently employed psychiatrists to work additional hours up to full-time (or greater than full-time) employment.

## V.     Surveying Psychiatrists Previously Employed by CDCR or DSH

We request that the Special Master's labor economists also survey psychiatrists who were previously employed as psychiatrists at CDCR or DSH but who chose to leave their employing agency, either CDCR or DSH, within the past five years.  First, we ask that the Survey ask these psychiatrists questions similar to those listed in Section II above regarding the working conditions they experienced while working as CDCR or DSH psychiatrists.  Second, we request that the survey specifically ask these former CDCR and DSH psychiatrists the following:

1.     How long each respondent worked as a psychiatrist at the agency, either CDCR or DSH.

2.     The reason or reasons that each respondent decided to leave his or her position as a psychiatrist at the agency, either CDCR or DSH.  If answer choices are provided, the answer choices should include options concerning salary, overall compensation, and difficult working conditions.

3.     For those psychiatrists who left CDCR or DSH to practice psychiatry elsewhere whether, in their new psychiatrist positions:

   a.     They earned higher or lower salaries and compensation than they had previously earned as CDCR or DSH psychiatrists, and if so how much higher or lower;

   b.     They earned higher or lower salaries and compensation than they had anticipated earning as CDCR or DSH psychiatrists if they had remained at CDCR or DSH, and if so how much higher or lower;

   c.     The working conditions are better or worse than the working conditions that they had as CDCR or DSH psychiatrists.

Surveying former CDCR and DSH psychiatrists will allow the Special Master's labor economists to independently gather data concerning what factors, salary or otherwise,

Matthew A. Lopes et al.
November 13, 2018
Page 8

actually caused CDCR and DSH to lose psychiatrists in recent years. It is our understanding that, as licensed professionals, the current contact information for former CDCR and DSH psychiatrists can be obtained through the State's regulatory board, the Medical Board of California, and that other states are similarly required to identify the address of record for all licensed psychiatrists.

## VI.    Surveying Psychiatrists Who Declined Job Offers for Positions as CDCR or DSH Psychiatrists

We also request that the Special Master's labor economists survey psychiatrists who declined job offers for positions as CDCR or DSH psychiatrists within the past five years. In particular, we request that the Survey ask these respondents the following:

1.    The position that they accepted or remained in instead of becoming a psychiatrist at CDCR or DSH.

2.    The reason or reasons that they declined the CDCR or DSH psychiatrist position offered. If answer choices are provided for this question, we request that the answer choices include options for concerns regarding the compensation offered, the salary offered, and working conditions for the position.

3.    Whether, since declining the psychiatrist position that CDCR or DSH offered, they earned more salary and compensation than CDCR or DSH had offered.

Surveying psychiatrists who declined CDCR or DSH job offers will allow the Special Master's labor economist to independently gather data concerning what factors have recently prevented CDCR and DSH from successfully recruiting psychiatrists. Again, it is our understanding that the relevant regulatory boards for California and other states maintain information regarding every licensee's address of record.

## VII.    Correcting Errors in Survey

Finally, we identify minor errors in the Survey for correction. First, one of the answer choices for the question asking whether the respondent is full time or part time appears to contain an error. Psychiatrist Survey at 6. The choice labeled as "8/9 time" should be labeled as "9/10 time" because it refers to individuals who work 36 out of 40 hours per week, which is a ratio of 9 to 10. *Id.* The Survey also contains a handful of misspelled or conflated words that we assume will be corrected when the Survey is finalized.

Matthew A. Lopes et al.
November 13, 2018
Page 9

## VIII.  Conclusion

We appreciate the efforts of Dr. Dwight Steward and the Special Master's team to prepare the proposed Psychiatrist Survey.  At the November 9, 2018 policy meeting, Kerry Walsh stated that the Special Master's team would organize a call to discuss the parties' comments on the proposed Survey.  We look forward to discussing the Survey with the Special Master's labor economists, the rest of the Special Master team, and Defendants.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael S. Nunez*

By:   Michael S. Nunez

MSN:cg

[3321663.1]

# Exhibit D

**Lopes Matthew**

| | |
|---|---|
| **From:** | Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov> |
| **Sent:** | Wednesday, November 21, 2018 4:51 PM |
| **To:** | Tebrock, Katherine@CDCR; Bentz, Melissa@CDCR; Elise Thorn (Elise.Thorn@doj.ca.gov); Weber, Nicholas@CDCR; Tyler Heath; Christine Ciccotti; Lopes Matthew; Walsh Kerry F.; Jessica Winter; Michael W. Bien (MBien@rbgg.com); Lisa Ells; Ponciano, Angela@CDCR; Michael Nunez; Dylan Verner-Crist; Cara Trapani; Mupanduki, Joanna@DSH-S; Maynard, George@DSH-S; Hammer, Sean@DSH-S |
| **Subject:** | Coleman: CDCR's Comments re Proposed Salary Survey |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Good afternoon,

Per the request of the Special Master's retained Labor Economist, below are the factual concerns regarding the salary survey that were raised during the call on November 19, 2018.

1.      Page one, second paragraph, first sentence: "As you know, the CDCR often has difficulty hiring psychiatrist and maintaining psychiatrist staffing levels."
•       Comment: This sentence is factually incorrect as there are institutions that do not have consistent difficulties hiring and retaining psychiatry staff.

2.      Page three, question: "what is your current job title?"
•       Comment: From this question it is unclear whether the survey is intended to be sent only to line psychiatrists or if recipients will include Supervising and Chief Psychiatrist. Only the staff psychiatry classification is included in the psychiatry staffing fill rates provided monthly to the Court. Neither Supervising nor Chief Psychiatrists are included in the overall fill rate required by the 2002 Court order. Therefore, the answers "Supervising Psychiatrist" and "Chief Psychiatrist" should be removed.  Further, CDCR does not have difficulty hiring for the Supervising and Chief Psychiatry classifications.

3.      Page four, third paragraph: "When thinking about your salary, only consider the actual amount of money that you earn each week, i.e. take home pay."
•       Comment 1: This statement contradicts the fourth paragraph which requests that the psychiatrist "only consider the actual amount of pre-tax money that you earn…." It should be determined whether the question should be regarding net salary or gross salary and the language referenced above should be adjusted accordingly.
•       Comment 2: The word "week" should be changed to "month" as psychiatrists are paid on a monthly basis, not weekly.

4.      Page six, and the six responses available.
•       Comment 1: The question asked "[w]hat is your current employment status?" Whether an employee is full time or part time is generally referred to in CDCR as the employee's "time base." Thus, we recommend that the question be rephrased to state "[w]hat is your current employment time base?"
•       Comment 2: CDCR recommends that the number of hours per week, and number of hours a year should be struck from each response.  CDCR civil service psychiatrists are exempt employees and are expected to work an average of 40 hours per week. This means that one week a psychiatrist may only work 36 hours, but the next

week may work over 40 hours. Thus, including several choices based on hours per week may cause confusion and submission of incorrect answers.

• Comment 3: CDCR recommends that the responses be limited to "Full-time" and "Part time". The other response options should be removed. As explained above, civil service psychiatrists are an exempt classification and are required to work an average of 40 hours per week, but their hours per week may vary. Registry psychiatrists are not exempt employees and are paid on an hourly basis. However, the number of hours worked varies significantly between registry psychiatrists. Further, CDCR has already provided the hours worked per year for each registry psychiatrists from January 1, 2010 to October 3, 2018.

5. Page eight, fourth question on the page: "At the time you were hired, were you hired above minimum ('HAM')?"

• Comment: CDCR recommends that this question be removed from the survey. There are concerns that asking this information could cause confusion and disrupt the field because HAMs are not generally advertised and are not offered to all new hires. Further, this question is duplicative as CDCR has already provided this information to the Labor Economist.

6. Pages nine through twelve, questions requiring psychiatrist to compare their salary and total compensation to their peers who work for other employers outside of CDCR.

• Comment: CDCR recommends an open text box be provided following each of these questions asking the psychiatrist how they determining their peer's salaries.

While this email only includes detailed responses to factual concerns with the psychiatry salary survey, CDCR reiterates its concerns with the expansive questions regarding "Psychiatrists' Working Conditions" raised in Plaintiffs' November 13th letter. This scope of questioning falls outside what would be expected in a salary survey and touches on issues raised in Dr. Golding's allegations. CDCR disagrees that these questions should be included and believes the current questions on pages 14 and 15 of the proposed salary survey are sufficient to understand the impact working in an institutional setting may have on the hiring or retention of psychiatrists within CDCR.

Respectfully,

**Dillon Hockerson**
Attorney
California Department of Corrections and Rehabilitation
Email: Dillon.Hockerson@cdcr.ca.gov
Phone: (916)-445-2779



**THIS DOCUMENT IS CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT PERMISSION OF THE SENDER. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY THE SENDER IMMEDIATELY.**

# Exhibit E

**Lopes Matthew**

| | |
|---|---|
| **From:** | Michael Nunez <MNunez@rbgg.com> |
| **Sent:** | Monday, November 26, 2018 11:01 PM |
| **To:** | Hockerson, Dillon@CDCR; Bentz, Melissa@CDCR; Nick Weber; jerome.hessick@cdcr.ca.gov; Coleman Special Master Team |
| **Cc:** | Coleman Team - RBG Only; Steve Fama; Christine Ciccotti; Mupanduki, Joanna@DSH-S; Elaine.Ekpo@dsh.ca.gov; Sean.Rashkis@dsh.ca.gov |
| **Subject:** | RE: Coleman: CDCR's Comments re Proposed Salary Survey |

Dear Special Master Lopes and CDCR OLA team,

I write to respond to CDCR's assertion made on the parties' November 19, 2018 call regarding Dr. Steward's proposed psychiatrist survey and again in Defendants' written comments below regarding the applicability of the court-ordered staffing fill rate to supervising psychiatrist and chief psychiatrist positions. The court-ordered fill rate applies to all CDCR psychiatrists. Order at 4 (Jun. 13, 2002), ECF No. 1383 ("Defendants shall maintain the vacancy rate among psychiatrists . . . at a maximum of ten percent, including contracted services"). Chief psychiatrists and supervising psychiatrists are not exempt from this order. *Id.* The 2009 staffing plan provides for required numbers of chief psychiatrists and supervising psychiatrists. ECF No. 3693 at 22-23, 31-32. The Court's more recent staffing orders did not exempt chief psychiatrists and supervising psychiatrists from the court-ordered fill rate. *See, e.g.*, Order at 30 (Oct. 10, 2017), ECF No. 5711 ("Within one year from the date of this order,. . . defendants shall take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order.").

In addition, surveying CDCR chief psychiatrists and supervising psychiatrists is appropriate because, contrary to Defendants' assertion, CDCR's data shows it does have difficulty recruiting and retaining psychiatrists in those positions. As of September 2018, CDCR was not in compliance with the ordered 90% fill rate for either chief psychiatrists or supervising psychiatrists either on a systemwide level or at several institutions. *See* Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies at Enclosure 1b Mental Health Institution Vacancies Summary by Classification (clinical positions only) as of September - 2018 (Nov. 14, 2018) ("Coleman Monthly Staffing Vacancy Report"). CDCR reported that only 15 of its 18 chief psychiatrist positions were filled, resulting in a position fill rate of 80% and meaning that CDCR had chief psychiatrists at fewer than half of its institutions as required by the 2009 Staffing Plan. *Id.*; ECF No. 3693 at 31. CDCR reported that only 17 of 19.5 of its supervising psychiatrist positions were filled, yielding a fill rate of 87.2. *See* Coleman Monthly Staffing Vacancy Report Enclosure 1b. CDCR has not achieved a 90% fill rate for either chief psychiatrists or supervising psychiatrists for at least well over a year. SAC, RJD, and PBSP all lacked a chief psychiatrist as recently as September 2018. *Id.* Enclosure 1c Mental Institution Vacancy Summary by Classification. CHCF and CRC also had a 100% vacancy rate for supervising psychiatrists at that time. *Id.*

Additionally, it does not make sense to send the survey to only certain categories of psychiatrists, as line and supervisory positions are inherently interrelated. Many supervisors formerly served as line staff, which allows them to provide additional information and insight that is of value to understanding the extent of the overall hiring and retention challenges. Surveying chief psychiatrists and supervising psychiatrists will allow the Special Master and his labor economists to gather data needed to fully and properly evaluate the barriers to recruitment and retention not only for supervisory positions, but for all psychiatry positions.

Thank you,

Michael

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Wednesday, November 21, 2018 1:51 PM
**To:** Tebrock, Katherine@CDCR <Katherine.Tebrock@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>;
Elise Thorn <Elise.Thorn@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Tyler Heath
<Tyler.Heath@doj.ca.gov>; Christine Ciccotti <christine.ciccotti@dsh.ca.gov>; Matt Lopes <mlopes@pldolaw.com>;
Kerry F. Walsh <kwalsh@pldolaw.com>; Jessica Winter <JWinter@rbgg.com>; Michael W. Bien <MBien@rbgg.com>; Lisa
Ells <LElls@rbgg.com>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Michael Nunez
<MNunez@rbgg.com>; Dylan Verner-Crist <DVerner-Crist@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>;
Mupanduki, Joanna@DSH-S <Joanna.Mupanduki@dsh.ca.gov>; Maynard, George@DSH-S
<george.maynard@dsh.ca.gov>; Hammer, Sean@DSH-S <Sean.Hammer@dsh.ca.gov>
**Subject:** Coleman: CDCR's Comments re Proposed Salary Survey

Good afternoon,

Per the request of the Special Master's retained Labor Economist, below are the factual concerns regarding the salary survey that were raised during the call on November 19, 2018.

1.     Page one, second paragraph, first sentence: "As you know, the CDCR often has difficulty hiring psychiatrist and maintaining psychiatrist staffing levels."
•      Comment: This sentence is factually incorrect as there are institutions that do not have consistent difficulties hiring and retaining psychiatry staff.

2.     Page three, question: "what is your current job title?"
•      Comment: From this question it is unclear whether the survey is intended to be sent only to line psychiatrists or if recipients will include Supervising and Chief Psychiatrist. Only the staff psychiatry classification is included in the psychiatry staffing fill rates provided monthly to the Court. Neither Supervising nor Chief Psychiatrists are included in the overall fill rate required by the 2002 Court order. Therefore, the answers "Supervising Psychiatrist" and "Chief Psychiatrist" should be removed.  Further, CDCR does not have difficulty hiring for the Supervising and Chief Psychiatry classifications.

3.     Page four, third paragraph: "When thinking about your salary, only consider the actual amount of money that you earn each week, i.e. take home pay."
•      Comment 1: This statement contradicts the fourth paragraph which requests that the psychiatrist "only consider the actual amount of pre-tax money that you earn…." It should be determined whether the question should be regarding net salary or gross salary and the language referenced above should be adjusted accordingly.
•      Comment 2: The word "week" should be changed to "month" as psychiatrists are paid on a monthly basis, not weekly.

4.     Page six, and the six responses available.
•      Comment 1: The question asked "[w]hat is your current employment status?" Whether an employee is full time or part time is generally referred to in CDCR as the employee's "time base." Thus, we recommend that the question be rephrased to state "[w]hat is your current employment time base?"
•      Comment 2: CDCR recommends that the number of hours per week, and number of hours a year should be struck from each response.  CDCR civil service psychiatrists are exempt employees and are expected to work an average of 40 hours per week. This means that one week a psychiatrist may only work 36 hours, but the next week may work over 40 hours. Thus, including several choices based on hours per week may cause confusion and submission of incorrect answers.

•        Comment 3: CDCR recommends that the responses be limited to "Full-time" and "Part time". The other response options should be removed.  As explained above, civil service psychiatrists are an exempt classification and are required to work an average of 40 hours per week, but their hours per week may vary. Registry psychiatrists are not exempt employees and are paid on an hourly basis. However, the number of hours worked varies significantly between registry psychiatrists. Further, CDCR has already provided the hours worked per year for each registry psychiatrists from January 1, 2010 to October 3, 2018.

5.        Page eight, fourth question on the page: "At the time you were hired, were you hired above minimum ('HAM')?"
•        Comment: CDCR recommends that this question be removed from the survey.  There are concerns that asking this information could cause confusion and disrupt the field because HAMs are not generally advertised and are not offered to all new hires. Further, this question is duplicative as CDCR has already provided this information to the Labor Economist.

6.        Pages nine through twelve, questions requiring psychiatrist to compare their salary and total compensation to their peers who work for other employers outside of CDCR.
•        Comment: CDCR recommends an open text box be provided following each of these questions asking the psychiatrist how they determining their peer's salaries.

While this email only includes detailed responses to factual concerns with the psychiatry salary survey, CDCR reiterates its concerns with the expansive questions regarding "Psychiatrists' Working Conditions" raised in Plaintiffs' November 13th letter. This scope of questioning falls outside what would be expected in a salary survey and touches on issues raised in Dr. Golding's allegations. CDCR disagrees that these questions should be included and believes the current questions on pages 14 and 15 of the proposed salary survey are sufficient to understand the impact working in an institutional setting may have on the hiring or retention of psychiatrists within CDCR.

Respectfully,
**Dillon Hockerson**
Attorney
California Department of Corrections and Rehabilitation
Email: Dillon.Hockerson@cdcr.ca.gov
Phone: (916)-445-2779



**THIS DOCUMENT IS CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT PERMISSION OF THE SENDER. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY THE SENDER IMMEDIATELY.**

# Exhibit F

**Lopes Matthew**

| | |
|---|---|
| **From:** | Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov> |
| **Sent:** | Thursday, November 29, 2018 7:37 PM |
| **To:** | Michael Nunez; Hockerson, Dillon@CDCR; Weber, Nicholas@CDCR; Hessick, Jerome@CDCR; Coleman Special Master Team |
| **Cc:** | Coleman Team - RBG Only; Steve Fama; Christine Ciccotti; Mupanduki, Joanna@DSH-S; Ekpo, Elaine@DSH-S; Rashkis, Sean@DSH-S |
| **Subject:** | RE: Coleman: CDCR's Comments re Proposed Salary Survey |

Dear Special Master Lopes and Plaintiffs' Counsel,

I write in response to the email from Michael Nunez dated November 26, 2018 regarding the staffing fill rates.

Over a decade after the 2002 order and following years of litigation and monitoring on this issue, Plaintiffs have now raised a new interpretation of the application of the staffing vacancy rate requirement. Plaintiffs quote the Court's June 13, 2002 order which states that "Defendants shall maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services." However, in Plaintiffs' email, the reference to "case managers" was left out. This reference is very important as it shows that the application of the ten percent vacancy rate is limited to line staff, not supervisors.

The Program Guide defines a case manager as "mental health clinician, typically a psychologist or Psychiatric Social Worker, who provides functions such as assessment, intervention, treatment planning, treatment, and case review." (Program Guide, Appendix A at A-1; *see* ECF No. 5564 at 3 fn. 2 "'Case managers' refers collectively to psychologists and social workers, which are now referred to as 'primary clinicians.'") This term does not apply to supervisors or managers. Thus, the application of the maximum ten percent vacancy rate is only to line psychologists and social workers. Given this context, the 2002 Court order only applies the vacancy rate to line staff, including psychiatrists. Plaintiffs' assertion that "[c]hief psychiatrists and supervising psychiatrists are not exempt" from the 2002 order is incorrect.

Plaintiffs state that CDCR's data shows that it has difficulty recruiting and retaining chief and supervising psychiatrists and states that CDCR is in violation of the 2009 Staffing Plan as it has filled chief psychiatry positions at less than half of the institutions. As detailed above, CDCR does not agree that the maximum ten percent vacancy rates apply to supervisory and management positions, thus the fact that CDCR currently has less than a ninety percent fill rate for these positions holds no meaning. In addition, the statement in the 2009 Staffing Plan that "[a]t least half of all prison will have a Chief Psychiatrist[,]" is not a ratio and should not be strictly applied. CDCR allocates chief psychiatrists as necessary based on the programs and missions at the institutions, not based on a ratio or numerical requirement in the 2009 Staffing Plan. Despite this, over half of the institutions with a Mental Health Services Delivery System program are in fact allocated a chief psychiatrist. Even if Plaintiffs maintain that there is a strict numerical standard set in the 2009 Staffing Plan, the fact that all of those positions are not currently filled does not render CDCR out of compliance.

The focus of the prior discussions and litigation on the issue of staffing has been focused on line staff, primarily staff psychiatrists. This is evident by the staffing plans provided by CDCR since at least 2015. Further, the Court has indicated that staff psychiatrists are the positions at issue. In the February 14, 2018 transcript, the Court ordered monthly filling of a report that included information on the vacancy rates for staff psychiatrists. (Feb. 14, 2018 Tr. 19:7-20; *see id.* at 19:15-16, "And I'm looking specifically at the line for staff psychiatrists.") This focus should not stray to other classifications.

CDCR once again reiterates its request that supervising and chief psychiatrists be removed from the survey and the focus of the survey remain on staff psychiatrists, as required by the 2002 Court order and the court's recent statements.

Respectfully,

*Melissa C. Bentz*

Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email:   Melissa.Bentz@cdcr.ca.gov
Office Phone: (916) 324-7177
Cell Phone: (916) 628-5385
Fax: (916) 327-5306

ATTORNEY CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT – DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF THE AUTHOR.

**From:** Michael Nunez [mailto:MNunez@rbgg.com]
**Sent:** Monday, November 26, 2018 8:01 PM
**To:** Hockerson, Dillon@CDCR; Bentz, Melissa@CDCR; Weber, Nicholas@CDCR; Hessick, Jerome@CDCR; Coleman Special Master Team
**Cc:** Coleman Team - RBG Only; Steve Fama; Christine Ciccotti; Mupanduki, Joanna@DSH-S; Ekpo, Elaine@DSH-S; Rashkis, Sean@DSH-S
**Subject:** RE: Coleman: CDCR's Comments re Proposed Salary Survey

Dear Special Master Lopes and CDCR OLA team,

I write to respond to CDCR's assertion made on the parties' November 19, 2018 call regarding Dr. Steward's proposed psychiatrist survey and again in Defendants' written comments below regarding the applicability of the court-ordered staffing fill rate to supervising psychiatrist and chief psychiatrist positions. The court-ordered fill rate applies to all CDCR psychiatrists. Order at 4 (Jun. 13, 2002), ECF No. 1383 ("Defendants shall maintain the vacancy rate among psychiatrists . . . at a maximum of ten percent, including contracted services"). Chief psychiatrists and supervising psychiatrists are not exempt from this order. *Id.* The 2009 staffing plan provides for required numbers of chief psychiatrists and supervising psychiatrists. ECF No. 3693 at 22-23, 31-32. The Court's more recent staffing orders did not exempt psychiatrists and supervising psychiatrists from the court-ordered fill rate. *See, e.g.*, Order at 30 (Oct. 10, 2017), ECF No. 5711 ("Within one year from the date of this order,. . . defendants shall take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order.").

In addition, surveying CDCR chief psychiatrists and supervising psychiatrists is appropriate because, contrary to Defendants' assertion, CDCR's data shows it does have difficulty recruiting and retaining psychiatrists in those positions. As of September 2018, CDCR was not in compliance with the ordered 90% fill rate for either chief psychiatrists or supervising psychiatrists either on a systemwide level or at several institutions. *See* Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies at Enclosure 1b Mental Health Institution Vacancies Summary by Classification (clinical positions only) as of September - 2018 (Nov. 14, 2018) ("Coleman Monthly Staffing Vacancy Report"). CDCR reported that only 15 of its 18 chief psychiatrist positions were filled, resulting in a position fill rate of 80% and meaning that CDCR had chief psychiatrists at fewer than half of its institutions as required by the 2009 Staffing Plan. *Id.*; ECF No. 3693 at 31. CDCR reported that only 17 of 19.5 of its supervising psychiatrist positions were filled, yielding a fill rate of 87.2. *See* Coleman Monthly Staffing Vacancy Report Enclosure 1b. CDCR has not achieved a 90% fill rate for either chief psychiatrists or supervising psychiatrists for at least well over a year. SAC, RJD, and PBSP all lacked a chief psychiatrist as recently as September 2018. *Id.* Enclosure 1c Mental Institution Vacancy Summary by Classification. CHCF and CRC also had a 100% vacancy rate for supervising psychiatrists at that time. *Id.*

Additionally, it does not make sense to send the survey to only certain categories of psychiatrists, as line and supervisory positions are inherently interrelated. Many supervisors formerly served as line staff, which allows them to provide additional information and insight that is of value to understanding the extent of the overall hiring and retention

challenges.  Surveying chief psychiatrists and supervising psychiatrists will allow the Special Master and his labor economists to gather data needed to fully and properly evaluate the barriers to recruitment and retention not only for supervisory positions, but for all psychiatry positions.

Thank you,

Michael

---

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Wednesday, November 21, 2018 1:51 PM
**To:** Tebrock, Katherine@CDCR <Katherine.Tebrock@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Christine Ciccotti <christine.ciccotti@dsh.ca.gov>; Matt Lopes <mlopes@pldolaw.com>; Kerry F. Walsh <kwalsh@pldolaw.com>; Jessica Winter <JWinter@rbgg.com>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Michael Nunez <MNunez@rbgg.com>; Dylan Verner-Crist <DVerner-Crist@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Mupanduki, Joanna@DSH-S <Joanna.Mupanduki@dsh.ca.gov>; Maynard, George@DSH-S <george.maynard@dsh.ca.gov>; Hammer, Sean@DSH-S <Sean.Hammer@dsh.ca.gov>
**Subject:** Coleman: CDCR's Comments re Proposed Salary Survey

Good afternoon,

Per the request of the Special Master's retained Labor Economist, below are the factual concerns regarding the salary survey that were raised during the call on November 19, 2018.

1.      Page one, second paragraph, first sentence: "As you know, the CDCR often has difficulty hiring psychiatrist and maintaining psychiatrist staffing levels."
•       Comment: This sentence is factually incorrect as there are institutions that do not have consistent difficulties hiring and retaining psychiatry staff.

2.      Page three, question: "what is your current job title?"
•       Comment: From this question it is unclear whether the survey is intended to be sent only to line psychiatrists or if recipients will include Supervising and Chief Psychiatrist. Only the staff psychiatry classification is included in the psychiatry staffing fill rates provided monthly to the Court. Neither Supervising nor Chief Psychiatrists are included in the overall fill rate required by the 2002 Court order. Therefore, the answers "Supervising Psychiatrist" and "Chief Psychiatrist" should be removed.  Further, CDCR does not have difficulty hiring for the Supervising and Chief Psychiatry classifications.

3.      Page four, third paragraph: "When thinking about your salary, only consider the actual amount of money that you earn each week, i.e. take home pay."
•       Comment 1: This statement contradicts the fourth paragraph which requests that the psychiatrist "only consider the actual amount of pre-tax money that you earn…." It should be determined whether the question should be regarding net salary or gross salary and the language referenced above should be adjusted accordingly.
•       Comment 2: The word "week" should be changed to "month" as psychiatrists are paid on a monthly basis, not weekly.

4.      Page six, and the six responses available.

•     Comment 1: The question asked "[w]hat is your current employment status?" Whether an employee is full time or part time is generally referred to in CDCR as the employee's "time base." Thus, we recommend that the question be rephrased to state "[w]hat is your current employment time base?"

•     Comment 2: CDCR recommends that the number of hours per week, and number of hours a year should be struck from each response. CDCR civil service psychiatrists are exempt employees and are expected to work an average of 40 hours per week. This means that one week a psychiatrist may only work 36 hours, but the next week may work over 40 hours. Thus, including several choices based on hours per week may cause confusion and submission of incorrect answers.

•     Comment 3: CDCR recommends that the responses be limited to "Full-time" and "Part time". The other response options should be removed. As explained above, civil service psychiatrists are an exempt classification and are required to work an average of 40 hours per week, but their hours per week may vary. Registry psychiatrists are not exempt employees and are paid on an hourly basis. However, the number of hours worked varies significantly between registry psychiatrists. Further, CDCR has already provided the hours worked per year for each registry psychiatrists from January 1, 2010 to October 3, 2018.

5.     Page eight, fourth question on the page: "At the time you were hired, were you hired above minimum ('HAM')?"

•     Comment: CDCR recommends that this question be removed from the survey. There are concerns that asking this information could cause confusion and disrupt the field because HAMs are not generally advertised and are not offered to all new hires. Further, this question is duplicative as CDCR has already provided this information to the Labor Economist.

6.     Pages nine through twelve, questions requiring psychiatrist to compare their salary and total compensation to their peers who work for other employers outside of CDCR.

•     Comment: CDCR recommends an open text box be provided following each of these questions asking the psychiatrist how they determining their peer's salaries.

While this email only includes detailed responses to factual concerns with the psychiatry salary survey, CDCR reiterates its concerns with the expansive questions regarding "Psychiatrists' Working Conditions" raised in Plaintiffs' November 13th letter. This scope of questioning falls outside what would be expected in a salary survey and touches on issues raised in Dr. Golding's allegations. CDCR disagrees that these questions should be included and believes the current questions on pages 14 and 15 of the proposed salary survey are sufficient to understand the impact working in an institutional setting may have on the hiring or retention of psychiatrists within CDCR.

Respectfully,
**Dillon Hockerson**
Attorney
California Department of Corrections and Rehabilitation
Email: Dillon.Hockerson@cdcr.ca.gov
Phone: (916)-445-2779



**THIS DOCUMENT IS CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT PERMISSION OF THE SENDER. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY THE SENDER IMMEDIATELY.**

Exhibit G



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email:  mnunez@rbgg.com

February 13, 2019

VIA ELECTRONIC MAIL

Matthew A. Lopes                        Christine Ciccotti
*Coleman* Special Master                Sean Rashkis
Pannone Lopes Deveraux & O'Gara LLC     Elaine Ekpo
Northwoods Office Park, Suite 215N      Joanna Mupanduki
1301 Atwood Avenue                      DSH Legal Team
Johnston, RI  02919-4946               Christine.Ciccotti@dsh.ca.gov
MLopes@pldolaw.com                      Sean.Rashkis@dsh.ca.gov
                                        Elaine.Ekpo@dsh.ca.gov
                                        Joanna.Mupanduki@dsh.ca.gov

Nicholas Weber
Melissa Bentz
Jerome Hessick
Dillon Hockerson
CDCR Office of Legal Affairs
P.O. Box 94283
Sacramento, CA  94283-0001
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Jerome.Hessick@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

        Re:    *Coleman v. Newsom*:  Plaintiffs' Comments on the DSH Psychiatrist
               Survey Proposed by the Special Master's Labor Economists
               Our File No. 489-3

Dear Special Master Lopes:

        Thank you for circulating your labor economists' proposed survey of DSH
psychiatrists on February 7, 2019 ("DSH Psychiatrist Survey" or "Survey").  We write to
provide our comments on the proposed Survey.  We appreciated the detailed questions
regarding psychiatrist salaries and compensation in the Survey.

[3350977.2]

Matthew A. Lopes et al.
February 13, 2019
Page 2

We propose below adding questions targeted at gathering additional information regarding how working conditions impact DSH's ability to recruit and retain psychiatrists. We also propose below revisions to several of the questions to conform the Survey to the circumstances of DSH employment. Furthermore, we propose a few additional questions aimed at obtaining other data regarding DSH's ability to recruit and retain psychiatrists, and we have proposed revisions to clarify certain questions. Finally, we request that, in addition to surveying current employees, the Special Master's labor economist survey former DSH psychiatrists and psychiatrists who were offered but declined to accept a position as a DSH psychiatrist.

## I.    Revisions to Questions Regarding Respondents' Backgrounds

We propose revising the answer choices to the question "what is your current job title?" Survey at 2. The answer choices currently include "staff psychiatrist," "supervising psychiatrist," "chief psychiatrist," and "telepsychiatrist." We are concerned that these choices may confuse respondents because the term "staff psychiatrist" usually denotes a civil service psychiatrist, but telepsychiatrists may also be civil service employees. To clarify the choices, we propose revising the choice "staff psychiatrist" to read as "on-site staff psychiatrist." However, we request that the Special Master's labor economists inform us if we are misunderstanding the nature of the distinction that is being presented with the currently proposed answer choices.

After the question that asks respondents whether they have been employed as a psychiatrist before working as a psychiatrist at DSH, we propose adding a question that asks how long the respondent worked as a psychiatrist prior to joining DSH. Survey at 2. Adding this question will enable the Special Master's labor economists to determine whether differences in respondents' views about working at DSH are correlated with level of experience.

We also request that the Survey ask each psychiatrist how long he or she has worked as a psychiatrist at DSH. This question would assist with determining whether psychiatrists' views regarding the competitiveness of DSH compensation is correlated with longevity (or lack thereof) of their employment DSH.

Furthermore, we propose adding a question asking respondents to estimate how many hours per week they work after the question asking respondents for their current time base. Survey at 5. Including this question will allow the Special Master's labor economists to determine whether the views of DSH's psychiatrists are correlated with hours worked and to assess how much DSH psychiatrists work, a factor that may impact job satisfaction and retention.

Matthew A. Lopes et al.
February 13, 2019
Page 3

## II.      Additional Questions Regarding Psychiatrists' Working Conditions

We request that additional questions regarding working conditions for DSH psychiatrists be added to the Survey.  We have discussed the fact that DSH psychiatrists work with a very challenging patient population.  We are concerned that without additional questions seeking psychiatrists' input on various potentially troubling aspects of their conditions of employment that the survey will fail to capture major impediments to Defendants' ability to recruit and retain psychiatrists.

In particular, including additional questions regarding psychiatrists' working conditions will enable the Special Master's labor economists to gather data regarding how psychiatrists' perceptions of their working conditions relate to (1) DSH's ability to retain psychiatrists, and (2) psychiatrists' views regarding the competitiveness of DSH psychiatrist compensation.

We propose adding additional questions regarding working conditions to the Survey after the questions listed on page 13 to 15 of the Survey and that these additional questions use a similar seven point response scale employed by those questions.  We propose that questions similar to the following be added to the Survey, or that the Survey be revised to capture similar topics.

1.      On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with staff training and new employee orientation at DSH?

2.      On a scale of one to seven, where seven is "always" and one is "never," how often are you able to meet with patients at their scheduled appointment times?

3.      On a scale of one to seven, where seven is "always" and one is "never," how often do you interact with patients on an informal basis, rather than during scheduled appointment times?

4.      On a scale of one to seven, where seven is "always" and one is "never," how often are you able to meet with patients in a confidential setting?

5.      On a scale of one to seven, where seven is "always" and one is "never," how often are you able to meet with patients for an adequate length of time?

6.      On a scale of one to seven, where seven is "always" and one is "never," how often are you able to access patients' medical records when needed?

Matthew A. Lopes et al.
February 13, 2019
Page 4

7.    On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with your autonomy to determine the course of treatment for your patients?

8.    On a scale of one to seven, where seven is "always" and one is "never," how often are you clinically supervised by individuals other than psychiatrists?

9.    On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with the extent to which you are required or expected to provide coverage for other psychiatrists who are absent on a short- or long-term basis, in addition to your assigned duties?

10.   On a scale of one to seven, where seven is "strongly agree" and one is "strongly disagree," do you agree with the following statement:  "Overall, I have enough time to adequately treat patients"?

11.   On a scale of one to seven, where seven is "strongly agree" and one is "strongly disagree," do you agree with the following statement:  "Overall, I feel safe when performing my professional duties"?

12.   On a scale of one to seven, where seven is "strongly agree" and one is "strongly disagree," do you agree with the following statement:  "There is sufficient trust between my manager and me"?

13.   On a scale of one to seven, where seven is "very satisfied" and one is "very unsatisfied," how satisfied are you with the number of psychiatrists in leadership roles, both on a hospital level and an agency-wide level?

We also request that the Survey include a text box after each of these 13 questions to permit respondents to explain their answers to each of these questions.  We also suggest the addition of an open-ended question asking for additional comments or concerns about working conditions generally.

Finally, we propose revising the answer choices to the question "which of the following describes why you work less than full time?"  Survey at 12.  First, we propose replacing the answer choice "the work environment is too demanding," with two different choices, "the workload is too heavy" and "the work environment is poor."  Making this revision will allow respondents an opportunity to clearly communicate whether concerns about workflow or concerns about quality of working environment have dissuaded them from working more for DSH.  We also propose changing the answer choice "none of the above" to "other" and adding a text box after that answer choice and asking respondents who select "other" to use the text box to explain their answers.

[3350977.2]

Matthew A. Lopes et al.
February 13, 2019
Page 5

### III. Providing Survey Respondents with the Opportunity to Answer Questions with Additional Information

We also request that additional text boxes be added to the following questions to allow respondents to explain their answers.

1.    Revise the questions on pages 13-15 by adding optional text boxes to each of the sliding scale questions to permit respondents to elaborate.

2.    At the end of the survey, add a text box and an open-ended question permitting respondents to elaborate on their survey responses.

### IV. Revising Questions Targeted at Telepsychiatrists

We propose revising the question "which of the following describes why you chose telepsychiatry over a staff psychiatrist position?" Survey at 15. First, we propose revising the question to read "Which of the following describes why you chose telepsychiatry over an on-site staff psychiatrist position?" to clarify that "staff psychiatrist" refers to on-site staff psychiatrists and to remain consistent with our first proposed revision in Section I of this letter. Second, we recommend deleting the answer choice "able to work with different levels of care." DSH offers only two levels of care, acute and intermediate, and we understand that both telepsychiatrists and on-site psychiatrists work with patients in both of these levels of care. Third, we propose revising the answer choice "none of the above" to "other" and adding a text box after that choice and inviting respondents who choose this answer option to use the box to explain their answer.

We also propose adding additional questions to the list of questions directed at telepsychiatrists. Survey at 15. We propose adding a question that asks, on a scale of one to seven, where one is "very unsatisfied" and seven is "very satisfied," how satisfied telepsychiatrists are with their ability to visit DSH facilities when necessary. We also suggest asking on-site psychiatrists how satisfied they are with their ability to timely communicate with telepsychiatrists and asking telepsychiatrists how satisfied they are with their ability to timely communicate with staff who are on site. Finally, we recommend asking telepsychiatrists how often technology problems interfere with their ability to treat patients. Including these questions will permit the Special Master's labor economists to collect information regarding a valuable aspect of telepsychiatrists' working conditions.

Matthew A. Lopes et al.
February 13, 2019
Page 6

## V.  Additional Clarifying Revisions and Corrections

We propose revising the answers to the question "how did you first learn of the job posting for your current position"?  Survey at 7.  First, we propose adding a text box after the answer choice "other method" to permit respondents who select this option to explain their answer.  Second, we propose adding the answer choice "I learned of the position through a residency program at Napa or Patton."  DSH's Staffing Plan states that DSH has residency programs at both Napa and Patton State Hospitals.  DSH Staffing Plan at 12.  Adding this answer choice will enable the Special Master's labor economists to collect data regarding the efficacy of DSH's residency programs at recruiting and retaining new DSH psychiatrists.

We also propose revising the answer choices to the question "which factors describe why you perform psychiatric work outside of DSH."  Survey at 17.  First, we propose revising the answer choice "more opportunity" to make it more clear and specific.  We assume that the question is getting at opportunity for advancement and leadership, and if so, we recommend revising this answer choice to explicitly state that.  Second, we propose adding a text box after the answer choice "other" and add text inviting respondents who select "other" to explain their answers.

Finally, we propose a few additions and corrections.  First, we ask that a question be added that asks respondents about how satisfied they are with their total benefits package.  Second, we recommend that the questions regarding Medical Assistants be deleted.  Survey at 14, 16.  It is our understanding that the Medical Assistant program is specific to CDCR and does not exist at DSH.  Third, the question "before today, do you remember hearing or reading anything about any lawsuit involving DSH?" appears both on pages 17 and 18 of the Survey.  The second instance of that question should be deleted.

## VI.  Adding Questions Targeted at DSH Psychiatrists Who Previously Worked as CDCR Psychiatrists

We also urge the Special Master's labor economists to add a question targeted at DSH psychiatrists who previously worked for CDCR.  The Survey should ask these psychiatrists why they left CDCR to join DSH.  If the Survey includes a set of answer choices to this question, those choices should include options concerning differences in working conditions between the two agencies.  Asking these questions will allow the Special Master's labor economists to gather additional data regarding how DSH and CDCR impact each other regarding recruitment and retention of psychiatrists.

Matthew A. Lopes et al.
February 13, 2019
Page 7

## VII.    Surveying Psychiatrists Previously Employed by DSH

We request that the Special Master's labor economists also survey psychiatrists who were previously employed as psychiatrists at DSH but who chose to leave DSH within the past five years.  First, we ask that the Survey ask these psychiatrists questions similar to those listed in Section II above regarding the working conditions they experienced while working as DSH psychiatrists.  Second, we request that the Survey specifically ask these former DSH psychiatrists the following:

1.    How long each respondent worked as a psychiatrist at DSH.

2.    The reason or reasons that each respondent decided to leave his or her position at DSH.  If answer choices are provided, the answer choices should include options concerning salary, overall compensation, and difficult working conditions.

3.    For those psychiatrists who left DSH to practice psychiatry elsewhere whether, in their new psychiatrist positions:

    a.    They earned higher or lower salaries and compensation than they had previously earned as DSH psychiatrists, and if so how much higher or lower;

    b.    They earned higher or lower salaries and compensation than they had anticipated earning as DSH psychiatrists if they had remained at DSH, and if so how much higher or lower;

    c.    The working conditions are better or worse than the working conditions that they had as DSH psychiatrists.

Surveying former DSH psychiatrists will allow the Special Master's labor economists to independently gather data concerning what factors, salary or otherwise, actually caused DSH to lose psychiatrists in recent years.  It is our understanding that, as licensed professionals, the current contact information for former DSH psychiatrists can be obtained through the State's regulatory board, the Medical Board of California, and that other states are similarly required to identify the address of record for all licensed psychiatrists.

Matthew A. Lopes et al.
February 13, 2019
Page 8

## VIII.   Surveying Psychiatrists Who Declined Job Offers for Positions as DSH Psychiatrists

We also request that the Special Master's labor economists survey psychiatrists who declined job offers for positions as DSH psychiatrists within the past five years.  In particular, we request that the Survey ask these respondents the following:

1.  The position that they accepted or remained in instead of becoming a psychiatrist at DSH.

2.  The reason or reasons that they declined the DSH psychiatrist position offered.  If answer choices are provided for this question, we request that the answer choices include options for concerns regarding the compensation offered, the salary offered, and working conditions for the position.

3.  Whether, since declining the psychiatrist position that DSH offered, they earned more salary and compensation than DSH had offered.

Surveying psychiatrists who declined DSH job offers will allow the Special Master's labor economist to independently gather data concerning what factors have prevented DSH from recruiting desirable psychiatrist job candidates.  Again, it is our understanding that the relevant regulatory boards for California and other states maintain information regarding every licensee's address of record.

## IX.   Conclusion

We appreciate the efforts of Dr. Dwight Steward and the Special Master's team to prepare the proposed DSH Psychiatrist Survey.  We would be happy to discuss the Survey and our comments in this letter with the Special Master's labor economists, the rest of the Special Master team, and Defendants.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael S. Nunez*

By:   Michael S. Nunez

MSN:fgl

[3350977.2]

# Exhibit H

**From:** Mupanduki, Joanna@DSH-S <Joanna.Mupanduki@dsh.ca.gov>
**Sent:** Wednesday, February 13, 2019 5:40 PM
**To:** Walsh Kerry F. <kwalsh@pldolaw.com>; Jones Mohamedu <mjones@pldolaw.com>; Gribbin Rachel <rgribbin@pldolaw.com>; Dunbar, Roxie <rdunbar@pldolaw.com>; sfama@prisonlaw.com; lells@rbgg.com
**Cc:** Ciccotti, Christine@DSH-S <Christine.Ciccotti@dsh.ca.gov>; Clendenin, Stephanie@DSH-S <Stephanie.Clendenin@dsh.ca.gov>; Price, Stirling@@DSH-S <Stirling.Price@dsh.ca.gov>; Tyler.Heath <Tyler.Heath@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Elise.Thorn@doj.ca.gov; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Subject:** Psychiatrist Survey

Good afternoon Kerry,

DSH writes in response to the proposed Psychiatrist survey provided by the Special Master's Labor Economist.  Please consider the following comments:

1.  We would like to know if DSH will be provided the results of the anonymous survey?
2.  DSH is concerned with the overall tone of the survey, which is most often phrased in the negative.  By using negative wording, it can create a bias in the survey that may drive the respondent to provide negative responses.  We have several suggestions to improve the tone:
    a.  On the introduction page, the second paragraph states "As you know, the DSH often has difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain institutions."  We believe that this sentence should be struck from the paragraph.  The first paragraph already states the purpose of the survey, and the statement only serves to cement an assumption in the mind of the reader.
    b.  On page 12, the available answers are generally written in the negative (e.g. "The work environment is too demanding").  We recommend half of the available responses be positive to make the question more balanced.  It also appears to leave out two common reasons, which are family or medical.  We would suggest the addition of these response, or a box titled "Other" and a blank for the psychiatrist to fill in their reason.
3.  Under the heading "Employment Information" on page 2, the survey asks: "At what facility or facilities do you currently work?"
    a.  The responses include all of DSH's hospitals, including those that do not house any *Coleman* class members.  DSH provides care for a wide variety of commitments in many different settings and *Coleman* class members represent a very small percentage of the overall population and programs.  By seeking information from psychiatrists at hospitals that do not treat *Coleman* class members, the survey and this question go beyond the scope of the *Coleman* litigation.  This is also beyond the scope of EmployStats' October 2018 document requests, which were limited to hospitals with *Coleman* programs.  DSH is also concerned that surveying hospitals and psychiatrists that do not treat *Coleman* patients will pollute the results of the survey with information from programs and hospitals that are not relevant to the *Coleman* litigation.

    b. It is DSH's belief that this should only be sent to the psychiatrists and telepsychiatrists who treat patients on our Coleman units. However, we understand that we recruit for each facility as a whole and do recruit separately for the Coleman units. Therefore, it would seem an appropriate middle ground to include psychiatrists and telepsychiatrists who serve those facilities that have *Coleman* programs. This would also comport with EmployStats' document request, which they confirmed during the October 4, 2019 meeting were only for hospitals treating *Coleman* class members.

4. We are also concerned with the series of questions on pages 3-4 as well as pages 8-11 that ask the psychiatrist to compare salary and total compensation to non-DSH peer psychiatrists. These questions ask whether DSH salary and total compensation are higher, lower, or about equal to those of non-DSH psychiatrists. Unfortunately, the questions do not contain any follow-up questions or spaces for more detail to gather important context for the response.

    a. For example, the responding psychiatrists are not prompted to provide the salary or employer to which DSH's salary is being compared. Nor are there follow-up questions asking the size of the other employer, whether the work performed is equivalent, if the other employer is private or public, or if the responding psychiatrist considers the other employer to be desirable employment at the salary offered.

    b. These concerns also apply to the question on page 7 asking "which of these best describes the salary that DSH offered you when you were initially hired" and the questions on pages 8 to 11 asking the psychiatrists to quantify how much more or less their DSH salary and total compensation is to that of other non-DSH psychiatrists.

    c. In order to produce more accurate answers, DSH believes that this question should exclude CDCR as an "other employer" since the *Coleman* court ordered in ECF No. 2301 at 2 the adoption of pay scales for DSH clinicians that were 5% lower than CDCR salaries. Thus, inclusion of CDCR as a comparative employer would not provide accurate results given the difference in pay between the two departments.

5. On page 7, the second question asks about relocation costs, but not about reimbursement, which would be a natural and logical follow-up as DSH does reimburse some relocation costs if the move is over a certain mileage.

6. On page 13, the third question asks about the sufficiency of the office space, but conflates office space with treatment space. Generally, a psychiatrist provides most of their treatment in the treatment spaces on the unit and not exclusively in his or her office. This question would provide more accurate answers if separated in two questions: the first asking about their office space where they complete paperwork and hold meetings, while the second concerns the treatment space available for seeing patients, leading treatment groups, etc.

7. The second question on page 14 asks about the "medical assistant program." This is a program that CDCR runs in their institutions. DSH does not have this program and the

duties of a medical assistant are handled by different classifications at DSH, therefore, asking questions about it would cause a lot of confusion.

8.  The questions on pages 18 and 19 are extremely broad and may elicit irrelevant and improper information from the respondents.

    a.  DSH has numerous other civil cases that range from employment issues to individual lawsuits.  Since the *Coleman* population is less than one-half of one percent of the patients at DSH, this question is not likely to elicit responses about the *Coleman* case.  Many of DSH's psychiatrists do not treat *Coleman* class members and may not know the *Coleman* case exists.  Given the large variety of unrelated cases that psychiatrists may be familiar with, the individual psychiatrists are more likely to believe that this question is referring to a case that they are personally involved in and may divulge inappropriate information related to other litigation.  This is of particular concern because it may cause a psychiatrist to divulge attorney-client privileged information or confidential patient information related to another case.  If this question is necessary, we suggest asking if the respondent is aware of *Coleman v. Newsom* and what they know about the case without divulging confidential patient or attorney-client information.

    b.  DSH believes that the question on page 19 should not be included as it does not appear have any bearing on the issue at hand, which is psychiatrist compensation and job satisfaction.

    c.  Also, on page 18, the page title states that this question is about "Outside work- no," is this a typo?

9.  A few more minor points that we noticed:

    a.  In the introduction you refer to our hospitals as "institutions," which is a CDCR phrase.  We refer to our hospitals as facilities, which you appear to do in the rest of the survey.

    b.  On page 3, there should be a space between "your" and "**salary**."

    c.  On page 4, there should be a space between "your" and "**total compensation**."

Thank you for your consideration,
Joanna

*Joanna D. Mupanduki*
Attorney III
Legal Division
Department of State Hospitals
1600 9th Street
Sacramento, CA 95814
Phone: (916)651-9733
Fax: (916)651-5661
Email: Joanna.Mupanduki@DSH.ca.gov

# Exhibit I

**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 210-7325
Facsimile: (916) 324-5205
E-Mail: Tyler.Heath@doj.ca.gov

October 14, 2019

*By Email*

Special Master Matthew Lopes
Pannone Lopes Devereaux & O'Gara, LLC
1301 Atwood Avenue, Suite 125 N
Johnston, RI 02919

RE:     *Coleman, et al. v. Newsom, et al.,*
        U.S. District Court, Eastern District of California, Case No. 2:90-cv-00520 KJM-DB

Dear Special Master Lopes:

Defendants write to respond to EmployStats draft report, "An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospital" (the Draft Report), which you provided to the parties on August 14, 2019.[1] EmployStats was appointed by the Court on September 11, 2018 to conduct a labor market and salary analysis for the Special Master. The appointment was part of the Court's direction to the parties and the Special Master to consider the efficacy of certain measures, including salary increases, for hiring and retaining psychiatrists. (ECF No. 5786 at 3-4.)[2]

---

[1] The Special Master initially gave the parties 30 days to respond to the Draft Report. Given that the Draft Report took almost a year to be produced and provided to the parties, and contained responses to Defendants' labor economist report, Defendants requested that Plaintiffs stipulate to a 60-day extension of the response deadline. When Plaintiffs rejected Defendants' proposal, Defendants requested the extension from the Special Master, who granted a 30-day extension of time. Defendants requested 60 additional days to fully analyze and respond to the Draft Report and to provide their experts time to review and respond to the Draft Report's findings and recommendations and criticisms of Defendants' report. Accordingly, Defendants reserve the right to further respond to additional versions of the Draft Report or to the Draft Report in its final form.

[2] In 2018, the California Department of Corrections and Rehabilitation retained expert economists from Economists Incorporated to analyze whether salary adjustments and other benefits would allow CDCR "to achieve a tangible and permanent increase in the size of its employed psychiatrist workforce." (Economists Incorporated, Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists, 3 (Sept.

October 14, 2019
Page 2

 The Draft Report contains a number of findings and recommendations for Defendants, the California Department of Corrections and Rehabilitation (CDCR) and the Department of State Hospitals (DSH). Those recommendations include: (1) providing a system of consistent and larger salary increase opportunities for psychiatrists throughout their employment tenure at CDCR and DSH; (2) providing a system of compensation differentials to incentivize psychiatrists to fill positions at CDCR's Central Valley facilities; (3) increasing office and treatment space and the quality of medical practice support; (4) improving the working environment; (5) and better informing psychiatrists of the value of their compensation. According to the Draft Report, EmployStats's findings and recommendations rely heavily on a survey designed by EmployStats and administered solely to psychiatrists employed by CDCR and DSH.

 Defendants appreciate the time and effort devoted to the Draft Report. And Defendants intend to use the information in the Draft Report to help inform their efforts to address staffing challenges and ongoing efforts to continue to provide competitive salaries and positive working conditions. Defendants also agree with some of the Draft Report's findings and recommendations. For example, Defendants agree with the Draft Report's finding that CDCR and DSH offer greater salaries to psychiatrists than other public and private employers in California. This is consistent with Defendants' labor economist experts' conclusions. Defendants also agree, generally, that they want to improve the satisfaction of their employees with their jobs, work space, and standing in the work place. Despite these areas of agreement, Defendants object to the Draft Report's findings and recommendations and do not believe they should be ordered by the Court.

 First, the Draft Report has serious methodological issues underlying its recommendations. The Draft Report fails to provide the methodology it relied on in making its recommendations. In recommending greater yearly salary increases and differential pay for Central Valley psychiatrists, it does not provide any analysis, independent evidence, or study showing that these recommendations have in the past or are predicted to increase retention and recruitment. It also ignores its conclusion that Defendants already provide greater salaries than

---

19, 2018) (Exh. A).) Defendants provided Economists Incorporated's report (the Economic Report) to the parties and Special Master for discussion in September 2018. Relying on documents and data from CDCR, information from publicly available sources, academic research and findings, policy studies analyzing psychiatry workforce optimization, and independent statistical analysis, the Economic Report concluded that the evidence does not support a finding that monetary compensation will allow "CDCR to permanently and significantly increase the size of the pool of psychiatrists that it employs." (*Id*.) It also concluded that existing salary premiums and other forms of compensation have been ineffective in boosting CDCR's psychiatry numbers and a number of additional barriers exist to CDCR filling its psychiatry vacancies. (*Id*.) The only response to date is a section in the Draft Report. As best as they can, this submission presents Defendants' response to the Draft Report's criticisms, including through the attached response to the Draft Report provided by Economists Incorporated (Response) attached as Exhibit B.

October 14, 2019
Page 3

other California employers and fails to compare Defendants' total compensation (including benefits such as the state pension and health benefits) to other employers. In determining that Defendants should offer greater yearly salary increases, it fails to analyze the nature of the salary increases provided by the other employers it references and justify them as comparators.

The survey that EmployStats prepared and relied on for its findings and recommendations raises issues with its methodology, reliability, and scope. It did not include any psychiatrists outside of Defendants and failed to provide any comparison to how psychiatrists would answer those questions at other employers. Also, due to its limited scope, the survey itself is biased because it questioned respondents who may potentially benefit from its findings. And, the Draft Report's analysis of the survey failed to provide all of the results from all of the questions and biased the results toward negative responses by defining more responses on a one to seven scale as negative than positive.

The recommendations themselves also present issues. The recommendations have no evidentiary support to show that they have been or can be effective at recruiting or retaining psychiatrists. They are also too vague for Defendants to fully analyze and determine to what extent any particular recommendation can be adopted and implemented. None of the recommendations include details about the changes the Draft Report advocates that Defendants should make to increase retention and recruiting. This is a problem—Defendants don't have a full opportunity to analyze the recommendations and their efficacy, including those that they may be inclined to adopt.[3] Accordingly, Defendants object to the Draft Report's recommendations in their current form and ask that the Special Master report that the Court not adopt them at this time.

### A.    The Draft Report's Methodology and the Reliability and Acceptance of the Methodology Is Unclear and Objectionable.

Notwithstanding Defendants' objections, the Court's order appointing EmployStats stated that Federal Rule of Civil Procedure 26(a)(2)(B) does not apply to EmployStats as part of the

---

[3] On February 15, 2018, the Court ordered the parties, with the Special Master's guidance, to address whether Defendants "can hire a sufficient number of psychiatrists, through salary adjustments . . ." (ECF No. 5786 at 3-4.) Seven months after this order, the Special Master requested the Court authorize the appointment of a labor economist team to review "salary and labor market trends," (ECF No. 5903-1 at 1-2), which the Court granted. (ECF No. 5919 at 2-3.) But the Draft Report arguably goes beyond the scope of the Court's appointment by analyzing CDCR and DSH staff satisfaction, the adequacy of CDCR and DSH's office and treatment space, CDCR psychiatry staff's perception of the medical assistant program, and how CDCR and DSH psychiatrists perceived their standing with other staff and in their institutions. (Draft Report at 5-7.) These topics are arguably surplus to the Court's appointment 'to determine the potential of . . . collective bargaining salary and compensation increases' as part of an overall effort to bring defendants into compliance with required mental health staffing levels." (ECF No. 5919 at 2.)

Special Master's team.  (ECF No. 5919 at 2-3.)  The Court also held that EmployStats work will be directed by the Special Master and not an independent source of evidence.  (*Id.* at 3.)  Based on the Court's order, Defendants object to the Draft Report's methodology and recommendations.

Expert testimony is generally admitted under Rule 702 of the Federal Rules of Evidence, which provides that a witness may provide opinion testimony when he or she is qualified as an expert by knowledge, skill, experience, training, or education.  When determining whether expert testimony should be considered, courts ask whether the expert is "proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).  The expert testimony must be based on sufficient facts or data, must be the product of reliable principles and methods, and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d).  Rule 702 requires that the Court serve as a gatekeeper to ensure that all expert testimony "is not only relevant, but reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589).

Here, the Draft Report states that it relied on a salary and total compensation comparison to psychiatrists employed by other public and private California employers, and a survey of CDCR and DSH psychiatrists' perceptions of working conditions.  (Draft Report at 11-12, 65-66.)  But because the Special Master's expert did not perform an independent analysis and instead did its work specifically for the *Coleman* litigation, the Draft Report's methodology and findings must be supported by "objective verifiable evidence that the testimony is based on 'scientifically valid principles,'" through peer review, or by pointing to some other source stating that the methodology is generally recognized in the field.  *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317-19 (9th Cir. 1995).  The Draft Report fails to state whether its chosen methodology is generally recognized in the field or supported by objective verifiable evidence. Moreover, while the Draft Report lays out some of the information relied on to make its recommendations, it does not state whether the methodology and information relied on for those recommendations are generally recognized or supported or based on scientifically valid principles or objective verifiable evidence.

In addition to its general failure to justify its methodology, the Draft Report has other specific methodological issues, which Defendants raise below.

**B.  The Draft Report's Survey Has Methodological Issues and the Draft Report's Reliance on the Data from the Survey is Objectionable.**

A substantial amount of the Draft Report's findings and recommendations rely on the results of the survey drafted by EmployStats.  However, the survey and the way it was conducted is objectionable.  The Ninth Circuit holds that surveys may be admitted if they are conducted according to accepted principles and are relevant.  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010).  The proponent of the survey carries the burden to show that it was conducted under generally accepted principles and the

results were used in a statistically correct manner. *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988). Generally, technical inadequacies regarding question format or the manner of the survey "bear on the weight of the evidence, not its admissibility." *Id.* (quoting *Keith*, 858 F.2d at 814.)

EmployStats did not provide any information showing that the survey was designed or conducted based on general accepted principles. Nor does the Draft Report justify the way it relies on the data gathered from the survey. According to Defendants' expert's response, the American Association for Public Opinion Research – a leading professional organization for public opinion and survey research – provides best practices for survey research and in its current form the Draft Report's survey reporting falls short of those best practices. (Response at 17.) The Draft Report does justify its scope, the particular questions asked in the survey, and the responses that it decided to use in making its findings and recommendation. (*Id.* at 17-19.) The reliability of the survey and whether it is methodologically sound remains in doubt until EmployStats justifies the survey's methodology.[4]

### 1.    The Survey's Scope is Overly Restrictive Because It is Limited to Defendants' Employees.

The survey only reports information based on responses from CDCR and DSH psychiatrists. It did not include any non-CDCR and DSH employed psychiatrists. This is important—without that information, it is impossible to tell whether the concerns raised in the survey are specific to CDCR and DSH or if they are characteristic of the psychiatry labor market in general. Without this comparison, the survey is not able to appropriately compare the responses with their peers' responses. (Response at 19-20.)

In one instance, the Draft Report compares its survey results to job satisfaction ratings from Glassdoor. However, the reliability of this comparison is not apparent. According to the Draft Report, the Glassdoor survey used a different survey scale and included a middle satisfaction rating – unlike the Draft Report. (Draft Report at 35.)[5] The Draft Report also does

---

[4] CDCR and DSH received copies of the surveys before they were provided to the psychiatrists. Both agencies submitted objections, which are attached to this response as Exhibits C and D. CDCR and DSH did not receive specific responses to those objections from EmployStats and the final versions of the surveys largely mirrored the draft versions with some changes. Defendants re-raise and reincorporate those objections.

[5] The Draft Report relied on two articles to support its use of Glassdoor's satisfaction rating: 1) M. Karabarbounis and S. Pinto, "What Can We Learn from Online Wage Postings? Evidence from Glassdoor," *Economic Quarterly* 104(4), Q4 2018; and 2) Stamolampros, et al., "Job Satisfaction and Employee Turnover Determinants in High Contact Services: Insights from Employees' Online Reviews" (2019). However, these articles do not directly support the use of the Glassdoor data. The article by Karabarbounis and Pinto notes that user entries on Glassdoor were underrepresented, especially in the healthcare industry, and the paper by Stamolampros focused on satisfaction surveys in the tourist industry. Karabarbounis, "What Can We Learn from Online Wage Postings? Evidence from Glassdoor, at 174; Stamolampros, Job Satisfaction

October 14, 2019
Page 6

not state how many ratings it collected from Glassdoor, how many individuals were in the sample, or any information about the employers rated. (*Id.*; Response at 20.) And the Glassdoor is not the result of a survey submitted to all psychiatrists in California. As a voluntary survey, employees who view their employers more favorably may have responded to the survey. (Response at 20.) Without this information it is unclear whether the comparison is appropriate or if the comparison is biased against CDCR and DSH. (*Id.*)

> **2.     The Survey Suffers from Self-Interest Bias Because It is Limited to Respondents Who May Benefit from Its Results.**

The limited scope of the survey also contains a potential self-interest bias. Survey results that are to be used in litigation are of questionable reliability if they contain a self-interest bias due to the fact that the respondents have a vested interest in the results of the survey and the litigation. *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 589 (N.D. Cal. 2016), on reconsideration in part, No. 14-CV-00608, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017), *aff'd in part, rev'd in part and remanded*, 934 F.3d 918 (9th Cir. 2019) (the court expressed serious questions regarding bias of participants where they would benefit from the outcome of the survey and the litigation). Courts express a particular concern where the survey respondents are aware of the ongoing litigation. *Id.* Here, it is undeniable that the survey respondents stand to benefit from the outcome of the survey. The Court has been considering salary increases and the Special Master's labor economists were appointed and their report commissioned as part of the Court's direction to analyze whether or not salary increases would result in Defendants hiring sufficient psychiatrists to meet its Court-ordered obligations. (ECF No. 5786 at 3.) The respondents are only CDCR and DSH psychiatrists whose wages are being reviewed in the *Coleman* litigation. Based on the outcome of that review, they may stand to receive increased pay if the Special Master recommends pay increases to the Court.

The survey itself strongly implies to the respondents that it is being used to analyze the adequacy of their pay. It specifically asks the psychiatrists to compare their salaries to the salary of their peers and state whether it is higher or lower. (Draft Report at 91-93, 100-102.) Moreover, the first page confirms its purpose is to explore the possible improvements for the jobs of the people taking the survey. On survey's first page states that it will ask about "compensation, working conditions, and job satisfaction." (*Id.* at 98.) It goes on to inform the respondents that "As you know, the [DSH/CDCR] often has difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain institution" and tells them that their "answer to this survey provide vital information to assist policy makers in assessing and implementing policies that address that issue." (*Id.*) The survey is effectively telling the respondents that there is a problem and their responses to questions – many about salary – will help formulate the solution. Defendants' expert labor economists object to this approach—these formulations and making respondents aware of this information could lead to biased responses, and it is not always possible to know the extent or predict the size of the bias. (Response at 22-23.)

---

and Employee Turnover Determinants in High Contact Services: Insights from Employees' Online Reviews, at 3.

October 14, 2019
Page 7

In addition, the responding psychiatrists are aware of the *Coleman* litigation.  The survey specifically asks the respondents whether they are aware of any litigation involving the agencies and to describe what they know about the litigation.  (Draft Report at 97, 106.)    Accordingly, the survey has a potential for self-interest bias and is unreliable.

### 3.     The Way the Draft Report Interpreted the Data Biased the Results Towards Negative Responses.

The survey is also biased towards negative responses for many of its questions.  For example, the survey asks "On a scale from 1 to 7, where 1 is 'very dissatisfied' and 7 is 'very satisfied, how would you rate your overall job satisfaction at CDCR?"  (Draft Report at 93.)  It also asked, "On a scale from 1 to 7, where 1 is generally disregarded and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a psychiatrist?"  (*Id*.)  The survey asked approximately seven of this type of question of both CDCR and DSH's on-site and telepsychiatrists.  (*Id*. at 93-97, 102-104.)  However, the Draft Report did not classify an equal number of positive and negative correlated responses with one neutral response.  Instead, the Draft Report and survey classified anything from 1 to 4 as dissatisfied and generally disregarded, leaving only three responses as positive selections.  (*Id*. at 12.)  This is particularly problematic because the survey explained to the respondents that a four would be treated as a negative rather than a positive or neutral response.  (*Id*. at 93, 101.)  And the negative bent appears to have had a real effect on the reported data.  For example, if four were treated by the analysis as a midpoint or neutral, then nearly two-thirds of CDCR's respondents reported an overall job rating of neutral (4 out of 7) to very satisfied (7 out of 7).  Nearly 60 percent of DSH's responding on-site psychiatrists rated their job satisfaction between neutral and very satisfied.  (Response at 21-22; Draft Report at 32.)  Also, overall 63 percent of all CDCR respondents would report that their office space was neutral to completely adequate (4 to 7 out of 7).  (*Id*.)  Similar changes would apply to the other responses that used this scale.  (*Id*.)  Accordingly, the way the survey responses were interpreted and the way they were reported appear to be skewed to the negative.

### 4.     The Survey Failed to Include Questions that Would Allow it to Verify the Accuracy of the Responses or Independently Verify the Responses.

The survey failed to explore the basis for or accuracy of some of the opinions expressed by psychiatrists in response to the survey.  Survey information may be admissible if the trustworthiness and objectivity of the survey is sufficiently supported.  *Keith v. Volpe*, 858 F.2d 467, 481 (court found that party offering survey evidence provided sufficient evidence regarding objectivity and trustworthiness).  The survey created by EmployStats does not have any follow-up questions to verify the participants' responses.  For example, the survey asks the psychiatrists if their salaries are more than or less than those of their peers.  However, it does not ask any questions to explore what the psychiatrist considers a peer or the salary and total compensation against which the psychiatrist is making the comparison.  (Draft Report at 91-93, 99-102.)  The

Draft Report does not appear to have taken other steps to independently verify the responses by looking at independent sources of information in a similar way that it did for salary.

The Draft Report's findings and recommendations call into question the reliability of the survey. According to the Draft Report, the survey found that CDCR and DSH psychiatrists believed that their salaries and total compensation were less than that of their peers. However, the Draft Report's comparison of CDCR and DSH's salaries to those offered by other public and private employers in California revealed that since at least 2012, CDCR and DSH's salaries have been significantly higher than its competitors. In fact, the survey responses were so inconsistent with the Draft Report's own salary comparisons that the Draft Report recommended CDCR and DSH develop ways to inform their psychiatrists that the salaries they receive are higher than those of other public and private employers. (*Id.* at 7.) This disconnect strongly suggests that the survey and its results are not reliable.

### 5.    The Survey Failed to Ask Many Important Questions.

The survey also failed to fully explore a number of issues relevant to its report. Two of the topics explored were related to employee job satisfaction and their standing with other staff. However, the questions asked on those topics were overly restrictive. The survey asks them about office space, opportunities for promotion, and, in the case of CDCR, the medical assistant program. However, it does not clarify if all of these factors are part of the respondents' dissatisfaction and if any of the factors rank higher than the others. (Draft Report at 94-95, 100-103.) It failed to analyze any other potential factors that may influence their dissatisfaction or justify its reason for only asking about these particular factors. (*Id.*) Similarly, the survey does not ask for any information regarding why the psychiatrists feel their opinion is not valued by others or if there is a particular group that does not value their opinion. (*Id.*) Accordingly, the survey assumes that those are the only factors leading to dissatisfaction and does not assign weight to the factors or explore the underlying causes and does not explore whether the psychiatrists perceive any benefits from their employment.

The Draft Report is also selective in the data that it reports from the survey and leaves out a significant amount of information that was gathered. This is not considered best practices for survey analysis and statistical reporting. (Response at 18.) First, the Draft Report only includes some of the data gathered. For example, for the questions that asked how satisfied or dissatisfied the psychiatrists were, the Report only discusses the dissatisfied responses. (Draft Report at 32-34.) Also, the Draft Report does not include information from many of the questions asked. The survey asked CDCR and DSH's psychiatrists to quantify how much more or less they believed their salaries to be in comparison other employers, but did not provide that information in the Draft Report. (*See* Draft Report at 55-61, 85-87.) The Draft Report does not justify its selective use of the data gathered or the data used and that which is left out is part of some generally accepted methodology. Ultimately, a significant amount of data and information was left out the Draft Report. By not being fully transparent and forthcoming with all of the results, it is difficult to fully analyze the Draft Report's findings and recommendations. This includes an inability to properly weight the responses based on the number of respondents and the characteristics of

those respondents to determine whether certain conclusions may have been affected by sample size.  (Response at 23.)

EmployStats has not provided the necessary information to verify that its survey is methodologically acceptable and the survey has a number of issues that call into question its reliability.  Defendants request all of the data and responses gathered by the survey be provided to Defendants so that they may analyze the results.  This information would be helpful in considering the Draft Report's recommendations and as part of Defendants own efforts to address any current or future staffing challenges.

### C.   The Draft Report's Recommendation that CDCR and DSH Adopt a System of Greater Yearly Salary Increases Lacks Support.

Defendants object to the Draft Report's recommendation that CDCR and DSH provide a system of larger yearly salary increases.

#### 1.   EmployStats Agrees Defendants Already Offer Higher Salaries that Other Public and Private Employers.

The recommendation ignores the already existing higher salaries offered by CDCR and DSH.  The Draft Report does not dispute the finding of Defendants' expert report that CDCR's base salaries have remained consistently over statewide and national benchmarks between approximately 2010 and 2018.  (Economic Report at 20.)  According to Defendants' expert report, CDCR's compensation remained consistently above increases in statewide and nationwide psychiatrist compensation.  (*Id.*)  And, CDCR's average psychiatrist salaries have remained competitive and, in many cases, higher than the average salaries of psychiatrists in each of California's regions.  (*Id.* at 21 & Figure E.)

The Draft Report agrees that CDCR and DSH both provide higher average salaries than other public and private employers of psychiatrists.  According to the Draft Report, in 2011 CDCR's average salary was $260,952 compared to $182,000 average for the West Region, $188,991 median for non-CDCR and DSH California Public employers, and $192,290 average for Private and Public Employers.  (Draft Report at 28.)  Over the next six to seven years other California employers did not fully close the salary to offer salaries that were competitive with CDCR and DSH.  Specifically, in 2017, CDCR's $299,496 median salary was far greater than the $245,491 median salary for other non-CDCR and DSH California public employers and $259,570 average for California public and private employers; while CDCR's 2018 median salary of $309,184 was significantly higher than the average salary of $255,790 for California public and private employers.  (*Id.*)  Similarly, according to the Draft Report, DSH's salaries were also significantly over the median and average salaries for public and private employers in California.  (*Id.* at 28, 72.)[6]

---

[6] The Draft Report notes that DSH's median salary has been 2 percent lower than CDCR's median salary in 2011, 2013, 2014, 1015, and 2017, as well as 2.9 percent lower in

October 14, 2019
Page 10

The Draft Report attempts to justify this salary premium by stating that psychiatry is an emotionally and cognitively taxing position. Defendants do not disagree that their psychiatrists perform difficult and demanding jobs, but EmployStats fails to provide any analysis or study showing that CDCR and DSH employment is more demanding or taxing and justify the salary differences. (*See* Response at 7, 11.) This is particularly true given that at least some of the comparators included in the salary analysis are likely jails and may have similar working conditions. Moreover, as labor economists, EmployStats are not qualified to offer opinions on the relative demands of psychiatric treatment between systems.

The Draft Report's finding is consistent with Defendants' experts' conclusion. CDCR and DSH are already offering higher salaries than other public and private employers.

### 2.     The Draft Report Fails Consider and Compare Total Compensation Between Defendants and Other California Employers.

Despite finding that CDCR and DSH consistently provided greater compensation since at least 2011, the Draft Report does not fully capture the possible disparity because it does not include an analysis of total compensation other than its survey questions to the psychiatrists. The Draft Report does not define what it means by total compensation, but it states that it did not review the value of benefits, including pension benefits for CDCR or DSH employees. (Draft Report at 28.) This is potentially significant because it does not compare the total compensation that CDCR and DSH employees may receive compared to their private counterparts. Specifically, it does not recognize the significant benefits that one might receive from a pension retirement plan over those from other retirement plans potentially offered by private employees. According to a 2014 Total Compensation Report prepared by CalHR, approximately one-third of total compensation is not reflected only by looking at the median salary. California Dep't of Human Resources, 2014 California State Employee Total Compensation Report at 71 (Jan. 12, 2016) available at https://www.calhr.ca.gov/Documents/2014-California-State-Employee-Total-Comp-Report.pdf. According to that analysis, psychiatrists employed by the state were at or above the market average for both average wages and total compensation. *Id.* Specifically, total compensation for psychiatrists employed by the state exceeds total compensation for psychiatrists employed by local governments by 27.8 percent. *Id.*[7] The Draft Report's comparison of Defendants' compensation to the compensation offered to others remains incomplete until it analyzes total compensation.

---

2018 and 4.8 percent lower in 2019. However, the Draft Report fails to acknowledge that the Court ordered a pay scale for DSH "staff working at non-CDCR institutions in classifications that provide services to *Coleman* class members that is 95% of parity with the pay scale ordered for clinicians serving inmates in CDCR institutions." (ECF No. 2301 at 2.)

[7] The California Department of Human Resources is in the process of updating its analysis, but the report is not complete.

October 14, 2019
Page 11

### 3. The Draft Report's Methodology Does Not Support Offering Greater Yearly Salary Increases.

The Draft Report appears to ignore the above facts in arriving at its conclusion that CDCR and DSH need to offer a system of greater salary increases. Instead, it relies on data that it claims shows CDCR and DSH psychiatrists receive lower average annual salary increases than psychiatrists at other employers. It also relies on survey responses from psychiatrists who were employed for more than ten years and reported they received lower compensation than their peers employed outside CDCR and DSH. Not only does it ignore the greater salaries the Draft Report admits are already offered, but the methodology employed to arrive at this conclusion is unclear.

The Draft Report fails to point to any accepted economic literature, study or objective evidence to support the efficacy of this recommendation. The Draft Report needs to justify why yearly salary increases are more important to recruitment and retention than overall higher salaries. It currently does not offer any study, economic literature, or objective independent evidence to show that psychiatrists would choose higher yearly salary increases over an overall higher salary. Without this evidence, Defendants should not be forced to adopt this recommendation and strategy.

The Draft Report compares Defendants' yearly salary increases to the salary increases of other employers, but it does not provide any evidence showing that the employers with higher salary increases are able to hire and retain psychiatrists or if their higher average salary increases resulted in hiring additional psychiatrists to meet those employers' needs. Also, the California Correctional Health Care Services Exit Survey and Exit Interview Analysis, First Quarter Report actually found the opposite to be true for physicians, including psychiatrists. According to the exit interview results, the majority of respondents leaving CDCR employment indicated that salary had no impact on their decision to leave and 60.6 percent of mental health classifications agreed their salary was appropriate. California Correctional Health Care Services Exit Survey and Exit Interview Analysis, First Quarter Report 2019, 18.

The Draft Report failed to show that the salaries of the other employers and the salary increases were sufficiently similar to CDCR and DSH's salaries and increases to be reliable comparators. While the Draft Report provides the average yearly salary increases for ten different public employers, it does not state the actual yearly salaries offered by those employers. (Draft Report at 23-24.) This is problematic because it is possible that the other employers' salaries were not competitive with the much higher salaries already offered by CDCR and DSH. Accordingly, the other employers may have needed to offer higher yearly salary increases in order to offer salaries that were more competitive with CDCR and DSH. (Response at 6.)

In addition, the Draft Report also fails to state the nature of the yearly salary increases offered by the other employers and justify the comparison. The Draft Report does not state whether the ten non-CDCR employers to which CDCR is compared offered their salary increases as part of one-time contract, if they were part of a yearly salary structure, or they were part of

October 14, 2019
Page 12

yearly salary increases set to expired after a certain amount of time. This is important because it shows that the Draft Report failed to understand the state's overall pay structure that includes salary ranges, maximum salaries, and increases and changes to salary through the collective bargaining process. For example, the Draft Report completely ignores the 5 percent yearly merit pay increase that all psychiatrists are already eligible to receive until they reach the top of their respective salary range. Gov. Code § 19832; *see* Bargaining Unit 16 Physicians, Dentists and Podiatrists Agreement, <available at https://www.calhr.ca.gov/labor-relations/Documents/mou-20160701-20200701-bu16.pdf>. And it fails to set out the yearly salary increases provided in the current collective bargaining agreement. (*Id.*) Based on the information in the Draft Report, it is impossible to tell if it is comparing similar salary structures and so it is not possible to know if CDCR and DSH are offering competitive yearly salary increases and working with the same restrictions as the other employers.

The recommendation does not contain sufficient analysis or support and there are significant questions surrounding the Draft Report's comparisons. Moreover, given the fact that CDCR and DSH continue to have significantly higher overall salaries, the Draft Report has not justified the recommendation that they also adopt a system of greater yearly salary increases. Defendants object to this recommendation and request that the Special Master recommend that the Court reject it.

### D. The Draft Report Fails to Justify Its Recommendation that CDCR Adopt a System of Pay Differentials for the Central Valley.

Similar to the Draft Report's recommendation that CDCR and DSH develop a system of consistent and larger salary increase opportunities, this recommendation fails to provide any independent evidence, study, or economic literature to support its conclusion that differentials "could help vacancies" and "retain incumbents." The entire support for this recommendation is the psychiatrist vacancy rate in the Central Valley and the survey responses. The Report's reliance on this evidence is problematic for at least two reasons.

The Draft Report does not provide any study or evidence to show that pay differentials have been successful in attracting psychiatrists to the Central Valley and to other employers in the Central Valley. This is an important part of the analysis because the Central Valley suffers from a lack of psychiatry resources. According to UC San Francisco's Healthforce Center, the Inland Empire and San Joaquin Valley have low per capita mental health professional ratios compared to California's other regions. J. Coffman, et al., California's Current and Future Behavioral Health Workforce, Healthforce Center at UCSF, 54 (Feb. 12, 2018) <available at https://healthforce.ucsf.edu/sites/healthforce.ucsf.edu/files/publication-pdf/California%E2%80%99s%20Current%20and%20Future%20Behavioral%20Health%20Workforce.pdf>. Also, the U.S. Department of Health and Human Services has designated 66 geographic areas in California as Health Professional Shortage Areas, many of them in the Central Valley. Health Professional Shortage Areas – Mental Health, Health Resources & Services Administration, U.S. Dep't of Health and Human Services, (Oct. 3, 2019) <available at https://data.hrsa.gov/ExportedMaps/HPSAs/HGDWMapGallery_BHPR_HPSAs_MH.pdf>.

Second, the Draft Report's reliance on the dissatisfaction reported by existing psychiatrists in the Central Valley is insufficient to justify the recommendation. As previously stated, the Draft Report is limited to CDCR and DSH psychiatrists. It does not contain any analysis of job satisfaction by non-CDCR psychiatrists in the Central Valley. And, while the survey results reported that 58.1 percent of the psychiatrists in the Central Valley perceived their salaries and total compensation to be lower than their peers, that result is undermined by the Draft Report's conclusion that CDCR's salaries are much greater than other employers in California (Draft Report at 48, 57), and Defendants' experts report analysis showing that salaries in the Central Valley are much higher. (Economic Report at 21.)

The available evidence appears to suggest that a strict Central Valley pay differential may not be as successful as suggested. As explained by Defendants' experts, it may be difficult to attract physicians to move to the Central Valley. Academic literature has suggested that physicians were generally attracted to urban areas and areas offering amenities. (Economic Report at 31.) And psychiatrists are more likely to practice in areas where they have ties. (*Id.*) As discussed by Defendants' expert's response, the possibility for a bidding war for psychiatry in the Central Valley is particularly acute. (Response at 29-30.) In the absence of support and analysis showing the efficacy of differential pay, it is unclear whether it would be an effective path for hiring new psychiatrists and retaining existing psychiatrists. The Draft Report does not offer any evidence or analysis supported by economic literature or findings to contradict any of those findings.

Defendants object to the Special Master or Court adopting this recommendation.

E.    **The Draft Report's Recommendation to Increase and Improve Office Space Fails to Analyze All Available Information in Reaching Its Recommendation and Ignores the Benefits of Telepsychiatry.**

Defendants are always interested in exploring reasonable ways to increase the amount and quality of office and treatment space and staff support resources, and welcome the opportunity to review their existing office and treatment space and support programs. However, the recommendation fails to recognize that CDCR and DSH may already have a solution to this challenge in telepsychiatry. Defendants' Economic Report demonstrated that telepsychiatry did lower the prevailing overall psychiatry vacancy rate. (Economic Report at 25 (in April 2018 the prevailing vacancy rate would have been 34.7 percent without telepsychiatry.) Telepsychiatry may offer better office space over other modalities of employment. Employ Stats' survey found that 88.2 percent of telepsyhciatrists reported that they were satisfied to very satisfied with their office space. (Draft Report at 41 (this is based on EmployStats interpretation of the data interpreting a 4 response as negative rather than neutral.).) Telepsychiatry may have any even great impact if it is able to alleviate some of the greater emotional and cognitive demands the Draft Report states are on prison psychiatrists. (Response at 15.) But the Draft Report did not provide that analysis. (*Id.*)

The Draft Report also did not analyze all available information in making its recommendation. The recommendation is entirely based on the survey responses and does not contain any objective analysis of DSH or CDCR's existing office and treatment space at its institutions. Significantly, EmployStats did not even visit any of DSH or CDCR's facilities or analyze available office or treatment space compared to the needs of the staff and mental health populations in DSH and CDCR's facilities.

The recommendation also leaves out potentially valuable information gathered by the survey. The survey asked each psychiatrist to identify the facility at which he or she is employed. However, the Draft Report does not analyze the data based on the respondents' facility – a question asked by the survey – and identify those facilities where psychiatrists report better or worse office space. Without that information, the Draft Report and Defendants cannot cross check the responses against the institutions' available space and confirm the reliability of the response, or determine if there are specific institutions that require solutions for office space challenges.

## F. The Draft Report Failed to Analyze All Necessary Information for Its Recommendations that Defendants Adopt New Human Resource Programs Focused On Improving Employee Standing.

CDCR and DSH are always open to the possibility of improving working conditions and employee satisfaction, as well as the standing of their employees with other staff. However, the Draft Report's recommendation that they adopt human resource programs "to better inform facility employees about the role and function of psychiatrists and improve their working environment," and increase the amount and quality of medical practice support provided to psychiatrists in its current form lack the necessary analysis and clarity for the Court or Special Master to adopt them. (Draft Report at 7.) The Draft Report fails to state whether they asked existing administrative staff about any efforts they have made in the past to improve or address these particular issues or analyzed any existing programs. Due to the Draft Report's failure to analyze any existing programs, it does not explore through its survey or otherwise, any improvements that could be made to those existing programs. That information would be valuable to Defendants ongoing review of its efforts to address staffing challenges.

## G. The Draft Report Fails to Analyze Whether Any of its Recommendations Would Actually Result in Greater Retention and Hiring.

In addition to being overly vague, the Draft Report fails to analyze whether or not any of its recommendations would actually improve CDCR and DSH's ability to hire and retain psychiatrists to treat *Coleman* class members. As the Court's order of appointment stated, the purpose of retaining the labor economist was to determine the efficacy of current salary rates and the efficacy of additional compensation on Defendants' ability to hire and recruit staff. (ECF No. 5919 at 2.) This was part of the Court's direction to the parties and Special Master to determine whether Defendants could hire sufficient psychiatrists to meet Court-ordered obligations through salary adjustments. (ECF No. 5786 at 3-4.) The Draft Report does neither.

October 14, 2019
Page 15

It only claims that the recommendations "could" help with hiring and retention. (Draft Report at 6-7.)  It fails to provide any objective evidence, study, or economic literature showing that the recommendations can be effective in helping CDCR and DSH actual recruit and retain psychiatrists.  As pointed out above, the Draft Report only relies on a survey of current CDCR and DSH psychiatrists and comparisons of compensation information to make its recommendations.

The Draft Report's failure to provide more analysis of the efficacy of its recommendations is notable given the undisputed fact discussed above that CDCR and DSH offer greater higher salaries than other California employers.  As Defendants experts' demonstrated in their review and statistical analysis led them to conclude that salary adjustments and other forms of monetary compensation would not allow CDCR to permanently and significantly improve hiring and retention. (Economic Report at 41.)

In addition, the Draft Report also failed to address the undisputed fact that there is a shortage of psychiatrists in California and the entire country.  Defendants pointed out the well-documented shortage of psychiatrists in their March 30, 2017 response to the Special Master's report on CDCR's staffing plan.  (ECF No. 5591 at 12-13.)  At the time of that filing, CDCR and DSH employed more psychiatrists than existed in entire states and at higher mean annual wages compared to 2014 data from the 2014 U.S. Bureau of Labor Statistics.  (ECF No. 5591 at 13, Table 1.)  The critical shortage is only worsening.  Defendants shared with the Special Master and Plaintiffs a February 2018 study from researchers at the University of California, San Francisco's Healthforce Center, which showed that in 2016 California's supply of psychiatrist's was 23.6 percent fewer than the actual demand of those who needed care.  Coffman, California's Current and Future Behavioral Health Workforce, at 50.  And, the shortage is projected to increase to 50 percent fewer psychiatrists than needed by 2028.  *Id.*  Defendants' expert report was consistent and relied on these findings.  (Economic Report at 11-13.)

The Draft Report does not dispute the severe shortage of psychiatrists in California, nor does it show how any of its recommendations will be effective in this environment.  Instead, the Draft Report criticizes Defendants' expert's determination that CDCR alone employed approximate 285 of the state's 5,800 psychiatrists, but the population it served accounted for only 0.3 percent of the state's overall population.  (Economic Report at 14.)  The Draft Report criticizes this finding, stating that Defendants' expert report does not account for the fact that prison inmates have greater mental health needs.  (Draft Report at 63.)  While Defendants do not necessarily contest the general proposition that the prison population has a significant need for mental health services, they object to this conclusion in the report.

First, the EmployStats does not appear to be qualified to opine on the needs of CDCR and DSH's inmate population versus California's general population; nor, is the team qualified to opine that the disparity is so great that it requires CDCR to provide sixteen times the psychiatric services as are available to the general population.  Nothing in their qualifications or experience listed in the Draft Report is related to the provision of health care to inmates or the general

population.  (Draft Report at 9-10.)  And the draft report fails to point to any study or underlying information upon which their conclusion is based.[8]  (*Id.* at 62.)

The Draft Report also misses a threshold concept—namely, that the demand for psychiatry services continues to grow throughout the population, while the supply of psychiatrists is decreasing at a critical rate.  In this severely compressed environment, CDCR already utilizes a large percentage of the dwindling market of psychiatrists.  This percentage only increases when you consider the additional psychiatrists employed by DSH at its hospitals.  Even assuming the Draft Report's recommendations and findings were well founded, the reality is that there already may not be a sufficient number of additional psychiatrists in the market to hire without taking them from another part of the population that also needs mental health care.  As pointed out by the Healthforce study, more and more psychiatrists are retiring and fewer are entering the market.  (Coffman, California's current and Future Behavioral Health Workforce, at 53.)  It also fails to acknowledge a point made in the Defendants' expert report and response, that the environment already exists for a bidding war for scarce psychiatry resources through salary increases.  (Economic Report at 37-38; Response at 12.)

The Draft Report does not provide sufficient evidence or to show the efficacy of its findings and recommendations in the current psychiatry shortage crisis.

>    **H.    The Draft Report's Recommendations Are Too Vague and Ambiguous To Adopt.**

The Draft Report's recommendations are too vague and ambiguous to analyze, let alone adopt.  The Prison Litigation Reform Act requires that before a court may grant an injunction, it must ensure that the relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1).  Any relief granted "must be consistent with the policy of minimum intrusion into the affairs of state prison administration. *Toussaint v. McCarthy*, 801 F.2d 1080, 1086 (9th Cir. 1986), *abrogated in part on other grounds in Sandin v. Conner*, 515 U.S. 472 (1995)).  The Court abuses its discretion by granting relief that is overlybroad or vague in its requirements.  *See McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (district court abuses discretion by issuing overbroad injunctions that are not tailored to remedy the specific harm); *Cont'l Baking Co. v. Katz*, 68 Cal. 2d 512, 534 (1968) ("An injunction must not be uncertain or ambiguous and defendant must be able to determine from the order what he may and may not do.").  None of the recommendations contain anything

---

[8] This conclusion also fails to recognize the severity of mental illness and the demand for mental health treatment in California's population.  According to the California Health Care Foundation, nearly 1 in 6 California adults experience mental illness and 1 in 24 have a serious mental illness that makes it difficult to carry out major life activities.  California Health Care Almanac, Mental Health in California:  For Too Many, Care Not There, California Health Care Foundation (March 2018) available at <https://www.chcf.org/wp-content/uploads/2018/12/MentalHealthCA2018.pdf>.

more than vague suggestions on what CDCR and DSH should generally do. They do not contain any detail to inform Defendants or the Court on what should be expected under each recommendation.

The recommendation to better inform psychiatrists of their value and improve the working environment does not provide any details on how specifically DSH and CDCR can accomplish improving the working environment. The Draft Report is bereft of any specific examples of effective strategies for improving these two areas. (Draft Report at 7.) Without this vital information, it is unclear what EmployStats is suggesting CDCR and DSH do to put its recommendation into place.

The Draft Report's recommendations that CDCR and DSH adopt a system of consistent and larger salary increases for psychiatrists and for CDCR to adopt compensation differentials to incentivize psychiatrists to fill Central Valley positions are similarly vague and ambiguous. (*Id.* At 6.) Neither recommendation contains any specifics. It is not clear whether the report is recommending that CDCR and DSH offer larger salary increases to all of its psychiatrists or if larger salary increases should be offered to the psychiatrists with longer tenures. Moreover, The Draft Report does not suggest what size yearly salary increase should be adopted or what size salary would be effective and it fails to state what differential pay the Central Valley institutions should adopt.

This lack of detail leaves CDCR and DSH without important information to evaluate when considering the Draft Report's recommendations and leaves the recommendation too vague to provide a full response or analysis. It also leaves the recommendations too vague for the Special Master to recommend or for the Court to adopt.

**I.** **The Draft Report's Recommendations for DSH Are Too Broad Given the Scope of the *Coleman* Litigation.**

The Draft Report's recommendations for DSH go far beyond the bounds of the *Coleman* litigation and DSH's involvement in that litigation. The Draft Report's recommendations for DSH are for the entirety of DSH. But DSH's involvement in this litigation is much more limited and such broad requirements would go beyond the Court and Special Master's jurisdiction. After the inpatient programs DSH managed in CDCR prisons shifted back to CDCR control on July 1, 2017, DSH's involvement in this case decreased substantially. Specifically, it transferred three inpatient from DSH to CDCR management, including the staff allocated to those programs. (ECF No. 5894 at 14-15.) Now, DSH currently only provides care for a maximum of 336 inmates in three programs at three of their hospitals – DSH-Atascadero, DSH-Coalinga, and DSH- Patton. (ECF No. 6286 at 5.) The number of beds used for *Coleman* class members represents only a small fraction of the patient care provided by those three hospitals and DSH overall. DSH only has a total of 12 psychiatrists allocated to the programs that treat *Coleman* class members and it has consistently filled most of those 12 psychiatry positions. Moreover, the psychiatry staffing at DSH's hospitals has never been found to be unconstitutional. However, the Draft report fails to take any of this information into account. Accordingly, the global

October 14, 2019
Page 18

recommendations of the Draft Report exceed DSH's limited involvement in *Coleman* and its staffing psychiatry needs.  And they would not comport Prison Litigation Reform Act's requirement that any relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1).

## CONCLUSION

The Special Master should not adopt EmployStats recommendations because the Draft Report and the information it relies on have methodological concerns.  The recommendations are too vague, and the Draft Report does not provide any independent evidence, objective study, or other reliable information showing that its recommendations represent effective methods of recruiting and retaining psychiatrists.  Significantly, the Draft Report failed to give appropriate attention and consideration to the substantial findings made by Defendants' economic experts that CDCR is already offering larger salaries to its psychiatrists than those offered by other California employees and additional increases is unlikely to have a sustained impact on recruitment and retention.  The Special Master should reject its experts' recommendations in their current form.

Sincerely,

*/s/ Tyler V. Heath*

TYLER V. HEATH
Deputy Attorney General

For   XAVIER BECERRA
Attorney General

TVH:

CF1997CS0003
Defs' Response to EmployStats Draft Report

EXHIBIT A

# Economic Report:

# Impact of Labor Market Conditions and CDCR's

# Initiatives on the Employment of Psychiatrists

*This report was prepared by Dr. Erica Greulich and Dr. Lona Fowdur, who are economists with the consulting firm, Economists Incorporated.*

*Dr. Greulich is a labor economist who specializes in empirical microeconomics and quantitative analysis. She consults on a range of employment-related matters including wage and hour class action lawsuits, racial and gender discrimination matters, wrongful termination, personal injury and wrongful death matters. Dr. Greulich completed her doctoral training at the University of California, Berkeley, where her research focused on the nexus among wage and employment outcomes, housing markets and regulation.*

*Dr. Fowdur is a healthcare economist with antitrust expertise. In the course of her consulting work, Dr. Fowdur investigates market conditions pertaining to the provision of healthcare services, the sale of health insurance, and the commercialization of pharmaceutical products. Recently, she was retained as an expert witness in the Anthem-Cigna merger trial and in a case involving competition between a brand pharmaceutical manufacturer and generic companies. Dr. Fowdur also has experience with economic modeling and impact studies. She completed her doctoral training at Cornell University.*

# Table of Contents

I.    Executive Summary .................................................................................................... 3

II.   Market Conditions Indicate that Psychiatrist Shortages and Other Factors Will Continue to Impair CDCR Hiring............................................................................................................. 4

    A.    Nationwide Shortages of Psychiatrists Create Universal Hiring Challenges.................. 4

        1.    Demand for Psychiatrists ................................................................................. 5

        2.    Supply of Psychiatrists ..................................................................................... 6

        3.    Extent of Nationwide Shortages ....................................................................... 7

    B.    Shortages Are Prevalent in the State of California ....................................................... 11

    C.    CDCR Psychiatrist Shortages ...................................................................................... 14

    D.    CDCR Hiring Initiatives............................................................................................... 18

        1.    Competitive Salary and Benefits ................................................................... 18

        2.    Telepsychiatry ................................................................................................ 25

        3.    Other Benefits Offered by CDCR ................................................................. 26

        4.    Strategies to Optimize Psychiatrist Workloads ............................................. 27

        5.    Hiring Initiatives ............................................................................................ 28

    E.    Factors that Compound CDCR's Hiring Challenges .................................................... 29

        1.    General Barriers to Labor Mobility................................................................ 29

        2.    Physician-Specific Barriers to Labor Mobility.............................................. 30

III.  Potential of Increased Pay and/or Benefits to Alleviate Psychiatrist Shortages................ 32

    A.    Salary Premiums and Staff Psychiatrist Fill Rates...................................................... 32

        1.    Correlation Analysis....................................................................................... 32

        2.    Regression Analysis ....................................................................................... 33

    B.    Salary Premiums and Hiring Gains and Losses ........................................................... 34

        1.    Correlation Analysis....................................................................................... 35

        2.    Regression Analysis ....................................................................................... 36

    C.    Sensitivity of Registry Hires to Rates ......................................................................... 36

    D.    Competition and the Possibility of a Bidding War Due to Additional CDCR Pay Increases............................................................................................................................... 37

IV.   Survey of Policy Solutions Proposed to Alleviate Psychiatrist Shortages ........................ 39

    A.    Telepsychiatry .............................................................................................................. 39

    B.    Increasing the Supply of Psychiatrists ........................................................................ 40

    C.    Expanding Utilization of Other Types of Mental Health Professionals........................ 40

## I.    Executive Summary

The purpose of this report is to evaluate whether salary adjustments and the provision of other benefits can allow the California Department of Corrections and Rehabilitation ("CDCR") to achieve a tangible and permanent increase in the size of its employed psychiatrist workforce. The report is based on a comprehensive review of documents and data from CDCR, information from publicly available sources, academic research and findings, policy studies addressing initiatives to optimize the psychiatrist workforce, and independent statistical analyses of CDCR compensation data and hiring outcomes. Based on the materials that we have considered and our own independent statistical analyses, we have concluded that the evidence does not comport with a finding that salary adjustments or other forms of monetary compensation will enable CDCR to permanently and significantly increase the size of the pool of psychiatrists that it employs. Further, most of the other monetary initiatives that CDCR has implemented to attempt to improve hiring and retention appear to have had limited efficacy and there is no evidence that these ancillary initiatives will have a different outcome in the future.

CDCR already employs about one in every 20 psychiatrists in the state, but CDCR inmates only comprise one of every 335 members of the state's population. Notwithstanding the large number of psychiatrists retained by CDCR, there are several underlying causes of CDCR's inability to hire additional psychiatrists despite its provision of competitive compensation and benefits relative to other employers in California. Chief among these causes is the generalized shortage of psychiatrists both at the national and statewide levels. A multitude of academic articles, policy studies, and news sources have documented these shortages and the extent to which they have worsened over time. Because of the shortages, psychiatrist employers around the country have been unable to hire their desired number of psychiatrists, and patient wait times to receive psychiatric services have lengthened. National and regional compensation trends also evidence worsening psychiatrist shortages relative to other physician specialties. Despite large increases in compensation over time, however, an insufficient number of physicians have joined the ranks of practicing and employed psychiatrists.

Some of the additional factors that have impaired CDCR's ability to hire include general and physician-specific barriers to labor mobility and less desirable geographic locations of prisons relative to the amenity-filled urban areas of California. Further, generalized shortages create intense competition between psychiatrist employers and allow psychiatrists to pick their first choice of employment, which for many individuals does not appear to be CDCR.

A comprehensive analysis of CDCR's hiring outcomes, as the relative salaries that CDCR offered fluctuated over time, indicates that even large salary premiums over statewide and national averages for employed psychiatrists have been ineffective at boosting CDCR's pool of employed psychiatrists. Similarly, improvements in contract pay through a registry program have been ineffectual at delivering sustained increases in psychiatrist full-time equivalents ("FTEs"). Other programs that CDCR has implemented to increase compensation, including dual-appointment opportunities, cash-for-call, reimbursement for relocation expenses, and retention and merit-based salary increases, potentially boost CDCR psychiatrist compensation levels significantly above statewide and national averages. However, these programs have individually and collectively been ineffective at permanently boosting employment.

Telepsychiatry has had measurable success towards expanding CDCR's pool of employed psychiatrists. CDCR is currently in the process of expanding the capacity of its telepsychiatry program from 73 to 105 FTEs. However, as psychiatrist shortages worsen and competition for the pool of psychiatrists seeking employment intensifies, it is unclear whether CDCR will be able to permanently fill its expanded capacity for telepsychiatry.

This report is organized as follows. In Section II, we review the extent of the nationwide and statewide psychiatrist shortages. We evaluate the extent to which CDCR has been able to fill its psychiatrist requirements based on the compensation and other benefits it has offered over time, and we assess additional factors that have compounded CDCR's inability to hire a full complement of psychiatrists. In Section III, we perform a statistical analysis of CDCR's compensation and hiring data and find that there is no statistical basis to conclude that higher CDCR pay relative to statewide or nationwide averages is associated with greater employment of civil service psychiatrists. This conclusion holds whether we undertake a simple correlational analysis or employ a regression technique and perform several tests checking the robustness of this finding. In Section IV, we briefly survey the main policy recommendations of national and statewide studies that have investigated how best to meet patients' needs for mental health services as shortages of psychiatrists and other qualified professionals worsen. We find that CDCR has already implemented several of the recommended initiatives and the remainder are outside of its control. Thus, there do not appear to be additional policy measures that CDCR could readily implement to generate a significant and permanent increase in the size of its psychiatrist workforce.

In sum, we conclude that salary adjustments or other forms of additional monetary compensation will not enable CDCR to permanently and significantly increase the size of the pool of psychiatrists that it employs.

## II.  Market Conditions Indicate that Psychiatrist Shortages and Other Factors Will Continue to Impair CDCR Hiring

### A.  Nationwide Shortages of Psychiatrists Create Universal Hiring Challenges

There are currently about 45,000 psychiatrists in the U.S., but an additional 2,800 psychiatrists (6% of the workforce) are needed to alleviate acknowledged shortages.[1] Studies that document

---

[1] *See* National Council Medical Director Institute (2017), "The Psychiatric Shortage: Causes and Solutions," National Council for Behavioral Health, March 28, p. 15 (*hereinafter*, "NCBH Report"). Available from https://www.thenationalcouncil.org/wp-content/uploads/2017/03/Psychiatric-Shortage_National-Council-.pdf. The size of the nationwide pool of psychiatrists in this report comports with the number of psychiatrists under 75 years old who have completed graduate studies. *See* HRSA Health Workforce (2016), "National Projections of Supply and Demand for Selected Behavioral Health Practitioners: 2013-2025," U.S. Department of Health and Human Services, p. 7 (*hereinafter,* "HRSA Report"). Available from https://bhw.hrsa.gov/sites/default/files/bhw/health-workforce-analysis/research/projections/behavioral-health2013-2025.pdf. Other sources report significantly fewer psychiatrists. For example, the Occupational Outlook Handbook of the Bureau of Labor Statistics ("BLS") estimates that there were 27,500 active psychiatrists in 2016, including the self-employed. *See* Elaine Heisler (2018), "The Mental Health Workforce: A Primer," *Congressional Research Service*, R43255, pp. 10-11. Available from https://fas.org/sgp/crs/misc/R43255.pdf. The American Medical Association ("AMA") reports that there were

the shortages also predict that they will worsen and reach a deficit of 25% of the workforce by 2025.[2]  The shortages are ubiquitous.  Of all U.S. counties, 60% do not have any psychiatrists and an additional 17% have critically low numbers of psychiatrists.[3]  In rural areas, where 80% of counties do not have any psychiatrists, the shortages are especially acute.[4]

Nationwide, the median ratio of psychiatrists per 100,000 residents has declined by 10% between 2003 and 2013.[5]  The decline is stark when compared to other specialties where national shortages also exist.  For example, the pool of neurologists increased by 15% and the pool of primary care physicians increased by 1.3% per 100,000 residents between 2003 and 2013.[6]  The factors that drive a worsening psychiatrist shortage include both an increase in demand for mental health services and a diminishing supply of psychiatrists nationwide.

### 1.  Demand for Psychiatrists

The growing demand for psychiatrist services nationwide has several causes, including a high incidence of mental illness and substance abuse, patients' increased awareness of mental health conditions, and improvements in insurance coverage for mental health treatment related to the Affordable Care Act ("ACA").[7]  One in every five adults in the United States suffers from some form of mental illness and a quarter of adults with some form of mental illness suffer from severe illnesses.[8]  Greater awareness of their conditions has led to more patients seeking care and to increased healthcare spending on their mental health conditions over time.[9]  For the first time, in 2013, spending on mental health conditions exceeded $200 billion and topped the list of the costliest conditions, surpassing heart disease, cancer, and respiratory illness.[10]

---

37,938 self-designated psychiatrists in 2013.  *Id.*  These lower workforce totals imply that the current shortage could be as high as 10% of the workforce.

[2] NCBH Report, p. 15.

[3] *See* New American Economy (2017), "The Silent Shortage" October, p. 5 (*hereinafter*, "NAE Report").  Available from https://www.newamericaneconomy.com/press-release/new-study-shows-60-percent-of-u-s-counties-without-a-single-psychiatrist/.  *See also* NCBH Report, p. 15.

[4] NAE Report, p. 6.

[5] NCBH Report, p. 5. *See* Tara Bishop, Joanna Seirup, Harold Pincus, and Joseph Ross (2016), "Population of U.S. Practicing Psychiatrists Declined, 2003-2013, Which May Help Explain Poor Access to Mental Health Care." *Health Affairs*, 35(7): 1271-1277 (*hereinafter*, "Bishop Study").  Available from https://doi.org/10.1377/hlthaff.2015.1643

[6] Bishop Study, Exhibit 1.

[7] NCBH Report, p 27.

[8] *See* Merritt Hawkins (2018), "The Silent Shortage, A White Paper Examining Supply, Demand and Recruitment Trends in Psychiatry." Merritt Hawkins White Paper Series, p. 4, citing National Alliance on Mental Illness (NAMI) (*hereinafter*, "MH Study").  Available from https://www.merritthawkins.com/news-and-insights/thought-leadership/white-paper/examining-supply-demand-and-recruitment-trends-in-psychiatry/. *See also* NAMI, "Mental Health by the Numbers," available from https://www.nami.org/Learn-More/Mental-Health-By-the-Numbers.

[9] *See* Stacy Weiner (2018), "Addressing the Escalating Psychiatrist Shortage," *AAMC News, Association of American Medical Colleges.* Available from https://news.aamc.org/patient-care/article/addressing-escalating-psychiatrist-shortage.

[10] *See* Charles Roehrig (2016), "Mental Disorders Top the List of The Most Costly Conditions In The United States: $201 Billion," *Health Affairs*, 35(6): 1659.  Available from https://doi.org/10.1377/hlthaff.2015.1659.

Demand for mental health services generally, and psychiatric services in particular, have also increased in the past few years due to implementation of health reform through the ACA, which has broadened coverage to previously uninsured patients and provided parity coverage for mental health services.[11]  The requirement for parity coverage prevents health plans from providing less favorable benefits for mental health disorders relative to other medical conditions.[12]

A recent study by the National Council for Behavioral Health confirms that policy initiatives related to the ACA, parity coverage, and the opioid crisis, coupled with community requirements placed on a broad range of stakeholders such as community health centers, primary care practices, hospital emergency departments, courts and schools, have expanded demand for psychiatric services.[13]  The study also notes that demand for on-site presence, timely intervention and team-based collaboration have further contributed to increased demand for services.[14]

## 2.  Supply of Psychiatrists

The supply of psychiatrists, while already limited, is likely to become more constrained over the next few years because almost 60% of practicing psychiatrists are over 55 years old and more than a quarter are over 65.[15]  Many of these psychiatrists will retire or reduce their hours within a few years.[16]  The aging supply of physicians is worse for psychiatrists than the overall physician population where about 40% of active physicians are over 55 and 14% are over 65.[17]

A preference by younger medical professionals to work fewer hours than their older counterparts has also reduced the supply of psychiatrists in FTE terms.  A recent study that analyzes data from the American Community Survey to assess physicians' weekly hours worked finds that physicians aged 30 to 34 worked about 5% fewer hours in 2015 and 2016 relative to 2000 through 2002.  Older physicians also worked fewer hours, albeit to a lesser extent: male physicians aged 50 to 54 worked about 4% fewer hours per week, and female physicians worked 1% fewer hours over the same comparison timeframe.[18]

---

[11] NCBH Report, p. 27; *See also* Janet Coffman, Timothy Bates, Igor Geyn, and Joanne Spetz (2018), "California's Current and Future Behavioral Health Workforce," HealthForce Center at UCSF, p. 10. (*hereinafter, "*Coffman Study").  Available from https://healthforce.ucsf.edu/publications/california-s-current-and-future-behavioral-health-workforce.

[12] For a description of the ACA's Mental Health Parity and Addiction Equity Act, s*ee* https://www.cms.gov/cciio/programs-and-initiatives/other-insurance-protections/mhpaea_factsheet.html.

[13] NCBH Report, p. 27.

[14] *Id.*

[15] Merritt Hawkins (2017), "2017 Review of Physician and Advanced Practitioner Recruiting Incentives," 24th Edition, p. 21 (*hereinafter, "*MH 2017 Review").  Available from https://www.merritthawkins.com/uploadedFiles/MerrittHawkins/Pdf/2017_Physician_Incentive_Review_Merritt_Hawkins.pdf.

[16] *See* IHS Markit (2018), "The Complexities of Physician Supply and Demand: Projections from 2016 to 2030, 2018 Update," Final Report for Association of American Medical Colleges, pp. 14-15.  Available from https://aamc-black.global.ssl.fastly.net/production/media/filer_public/85/d7/85d7b689-f417-4ef0-97fb-ecc129836829/aamc_2018_workforce_projections_update_april_11_2018.pdf.

[17] *Id.*, p. 36.

[18] *Id.,* pp. 14-15.

Further, younger psychiatrists are not completing residency programs and joining the workforce at a sufficient pace to replace the older generation, let alone to meet the increasing demand. According to the American Psychiatric Association Resident Census for 2013-2014, a total of about 6,000 residents were expected to finish graduate programs between 2014 and 2017, a graduation rate that is potentially insufficient to replace the large volume of imminent retirements.[19]  Other studies note that psychiatry has not been a popular specialty among medical residents.  Between 1995 and 2013, the total number of physicians has experienced 45% growth, while the U.S. population has grown by 21%, but the number of psychiatrists has only increased by 12%.[20]

### 3.  Extent of Nationwide Shortages

#### a.  HPSA Designations

In recognition of the shortages of mental health professionals, the federal government has created a mental health category within Health Professional Shortage Area ("HPSA") designations to track areas with inadequate access to mental health services.[21]  The National Center for Workforce Analysis, an agency within the U.S. Department of Health and Human Services, collects these statistics to generate projections of demand and supply of health workers.[22]  The agency designates HPSAs to identify geographic areas and population groups within the United States where population-to-provider ratios are below the threshold that establishes adequate access to care.[23]  The underlying model accounts for aging and growth of the patient population, the overall economy, expanded health-insurance coverage, and changes in reimbursement rates, all of which impact demand for mental health services.[24]  On the supply side, the model accounts for psychiatrists entering and leaving the workforce, as well as availability of residency programs and the geographic distribution of the workforce.[25]  One recent HPSA model forecasts shortages for mental health services using two scenarios, one of which relies on a baseline shortage of 2,800 psychiatrists in 2013.[26]  In the alternative scenario, the model considers unmet needs or the requirements of the proportion of the population who needed treatment for a mental health illness

---

[19] MH Study, pp. 14-15.

[20] *See* Jonathan Block (2015), "Shortage of Psychiatrists only Getting Worse," *Psychiatry Advisor*, September 8. Available from https://www.psychiatryadvisor.com/practice-management/psychiatrist-psychiatry-shortage-few-stigma/article/437233/ .  Population data is from Official Census for 1990 and 2000 with annual updates, available from http://www.census.gov.

[21] *See* Bureau of Health Workforce, Health Resources and Services Administration (2018), "Designated Health Professional Shortage Areas Statistics, Quarterly Summary As of December 31, 2017," U.S. Department of Health & Human Services, Table 5 and notes (*hereinafter,* "HRSA Q4 2017 Report").  Available from https://ersrs.hrsa.gov/ReportServer?/HGDW_Reports/BCD_HPSA/BCD_HPSA_SCR50_Qtr_Smry_HTML&rc:Toolbar=false.

[22] https://bhw.hrsa.gov/health-workforce-analysis/about.

[23] *See* Henry J Kaiser Family Foundation (2018), "State Health Facts, Mental Health Care Health Professional Shortage Areas (HPSAs)," December 31.  Available from https://www.kff.org/other/state-indicator/mental-health-care-health-professional-shortage-areas-hpsas/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[24] HRSA Report, pp. 7-8.

[25] HRSA Report, pp. 7-8.

[26] HRSA Report, p. 7. The 2,800 number also informed the NCBH Report.  *See* NCBH Report, p. 15.

in 2013, but did not seek or receive treatment.[27]  The model's results indicate an estimated shortage of almost 6,100 psychiatrist FTEs in 2025 under the first scenario and 15,400 FTEs under the alternative scenario.[28]  In its most recent update, the HRSA found that as of June 30, 2018, the number of psychiatrists needed to alleviate all mental health professional shortage areas in the country had already reached almost 6,000 FTEs.[29]  This is more than twice the baseline shortage identified in 2013.

### b. Salary Trends

The progression of psychiatrist salaries relative to other physician specialties and all employment categories also provides evidence of psychiatrist shortages.  The Office of Employment Statistics ("OES") is a program that operates under the umbrella of the Bureau of Labor Statistics and provides annual estimates of employment and wages for over 800 occupations, including some physician specialties.[30]  For each occupation, OES provides average wages for the United States as a whole as well as for individual states, metropolitan areas, and nonmetropolitan areas.  The averages are based on employee salaries and other forms of compensation such as incentive pay and production bonuses excluding overtime.[31]  Self-employed individuals are excluded.  A comparison of nationwide average salaries between 2010 and 2017 indicates that psychiatrist salaries have grown by 29% in the past seven years, more than twice the salary increase of 14% for all occupations in the same period.[32]  In comparison, average salaries for surgeons have grown 12% and average salaries for family and general practice physicians have grown 20% over the same period.[33]  Several studies have documented generalized physician shortages across primary care and specialty physician categories.[34]  A significantly higher increase in psychiatrist salaries relative to other physician specialties comports with worse shortages for psychiatrists relative to surgeons and primary care physicians.

The OES-reported psychiatrist salary trends align with those reported by physician search and placement firms Merritt Hawkins and Medicus.  Merritt Hawkins, a national medical-professional search and consulting firm, ranked psychiatrists second on their list of most requested recruiting assignments in both 2016 and 2017 due to "a severe shortage of mental health professionals nationwide."[35]  For their most recent reporting year (2016/2017), Merritt Hawkins reported that it conducted 256 searches for psychiatrists, up more than 50% from 168 in

---

[27] HRSA Report, p. 6.
[28] HRSA Report, Exhibit 1.
[29] *See* HRSA (June 30, 2018), "Designated Health Professional Shortage Areas Statistics, Third Quarter of Fiscal Year 2018, Designated HPSA Quarterly Summary as of June 30, 2018,"  Available from https://ersrs.hrsa.gov/ReportServer?/HGDW_Reports/BCD_HPSA/BCD_HPSA_SCR50_Qtr_Smry_HTML&rc:Toolbar=false.
[30] A description of the program is at https://www.bls.gov/oes/.
[31] Inclusions and exclusions from OES wage data are described at: https://www.bls.gov/oes/oes_ques.htm#overview.
[32] EI analysis of annual OES data, 2010-2017 (Salaries and Growth Rates by Occupation_CKD.xlsx).
[33] *Id.*
[34] *See for example,* AAMC Press Release (2018), "New Research Shows Increasing Physician Shortages in Both Primary and Specialty Care," AAMCNews, April 11. Available from https://news.aamc.org/press-releases/article/workforce_report_shortage_04112018.
[35] MH 2017 Review, pp. 3, 26.

2012/2013.[36]  Average base salaries for the psychiatrist positions that Merritt Hawkins brokered increased by 21%, from $218,000 to $263,000 over the same four years.[37]  Another physician recruiting firm, Medicus, reported that demand for psychiatrists continues to increase nationwide and that compensation trends point to a growing shortage.[38]  Medicus reports that the average compensation package accepted by psychiatrists grew by about 10% in 2017 relative to the prior year, while compensation among other top-ten physician specialties for which it recruited increased by only 2%.[39]  The average total compensation inclusive of bonuses for psychiatrists that Medicus placed in 2017 was $319,333, up from $291,000 in 2016.

These salaries also align with the company Medscape's online physician compensation survey of almost 20,000 physicians including 1,350 psychiatrists.  The survey reports that psychiatrist compensation ranged between $223,000 and $252,000 in 2017, depending on the region.[40]  Psychiatrists in the Western U.S. region earned the highest average compensation, followed by psychiatrists in the Central U.S. and Great Lakes regions; those in the Southeast earned at the bottom of the range.

### c. Long Wait Times Comport with Shortages

Long wait times for psychiatrists also provide evidence of hiring challenges and the extent of national shortages.  A recent survey of psychiatrists in three metropolitan areas, Boston, Chicago and Houston, found that patients experience long wait times regardless of ability to pay for services.[41]  Despite patients' insurance coverage or expressed willingness to pay out of pocket, only about one-quarter of the psychiatrists provided appointments, and the average waiting time was 25 days for a first visit.  Further, about one in five psychiatrists were not accepting any new patients at all.  In parts of Arkansas, wait times are as long as three to six months for new patients.[42]  Long wait times are also common in Central New York.[43]  Surveys of colleges and universities across the country have also documented shortages of psychiatrists and other mental health professionals that have generated long wait times for services provided to their students.[44]

---

[36] *Id.*, p. 7.  In over 90% of cases, the searches pertained to employed physicians, rather than the private practice model, and more than half of the searches were for recruitment within communities of 100,000 or more, rather than for rural communities. *See* MH 2017 Review, p. 4.

[37] MH 2017 Review, p. 9.

[38] *See* Medicus Press Release (2018), "Physician Placement & Compensation Trends Point to Psychiatry Shortage," March 1. Available from https://www.themedicusfirm.com/news/physician-placement--compensation-trends-point-to-psychiatry-shortage.

[39] *Id.*

[40] *See* Statista Infographic citing Medscape Psychiatrist Compensation Report 2017.  Available from https://www.statista.com/statistics/723889/average-psychiatrist-compensation-by-us-region.

[41] *See* Monica Malowney, Sarah Keltz, Daniel Fischer, Wesley Boyd (2016), "Availability of Outpatient Care From Psychiatrists: A Simulated-Patient Study in Three U.S. Cities," *Psychiatric Services*, 66(1): 94-96.  Available from https://doi.org/10.1176/appi.ps.201400051

[42] *See* Erica Hall (2016), "Psychiatric Health Care Shortage in Northwest Arkansas," NWA, August 30.  Available from http://www.nwahomepage.com/news/psychiatric-health-care-shortage-in-northwest-arkansas/541727577.

[43] *See* Nextstar Broadcasting Inc. (2018), "National psychiatrist shortage impacting patients in Central New York," LocalSYR.com.  Available from http://www.localsyr.com/news/national-psychiatrist-shortage-impacting-patients-in-central-new-york/237681061.

[44] *See* Megan Thielking (2018), "Surging Demand for Mental Health Care Jams College Services," *Scientific American*, February 8.  Available from https://www.scientificamerican.com/article/surging-demand-for-mental-health-care-jams-college-services.

### d. Evidence of Pervasive Hiring Challenges Due to Shortages

Regions and specific organizations across the country have experienced persistent hiring challenges.  For example, the Chicago Department of Public Health has been unable to hire a full complement of psychiatrists despite a more than 20% salary increase in 2015 and designation as a shortage site where physicians can qualify for student-loan forgiveness.[45]  Chicago's St. Bernard Hospital, a facility with a high proportion of patients with Medicaid coverage, also faced recruitment challenges and was unable to afford a $30,000 per psychiatrist finder's fee to fill its vacancies.[46]  In Texas, where shortages are severe, lawmakers have enacted student-loan forgiveness to entice psychiatrists to underserved areas.[47]  Wisconsin has also experienced shortages, especially in rural areas.[48]  Since physicians tend to settle close to where they complete their residency, service providers in Wisconsin have sought to attract physicians by launching a psychiatric residency program at the Medical College of Wisconsin.[49]  Unable to fill their psychiatrist positions, hospitals in Florida are following the same approach and adding their own residency programs.[50]  California recently approved $15 million to fund psychiatric residency slots and telepsychiatry services at the University of California in Riverside, which lies within a medically underserved area.[51]

As patients have sought treatment and encountered a lack of behavioral health professionals in their communities, they have increasingly turned to hospital emergency rooms for care.[52]  These facilities have experienced a 42% increase in demand for psychiatric services in three years, but most emergency rooms have been unable to hire psychiatrists due to shortages.[53]

Institutional employment of additional psychiatrists also appears to be impaired by the high proportion of psychiatrists (40%) who practice in cash-only private offices rather than being employed.[54]  As a consequence of psychiatrists choosing to practice in cash-only practices, the

---

[45] *See* Alexia Elejalde-Ruiz (2018), "More People Are Seeking Out Mental Health Care, But Psychiatrists Are in Short Supply: 'It's Getting Worse,'" *Chicago Tribune*, March 24 (*hereinafter,* "Elejalde-Ruiz Article").  Available from http://www.chicagotribune.com/business/ct-biz-illinois-psychiatrist-shortage-20180320-story.html.

[46] *Id.* The CEO of this facility reported that new hires preferred to join more affluent teaching hospitals where they could undertake medical research as part of their responsibilities.

[47] *See* Associated Press (2015), "Across the Country, a Serious Shortage of Psychiatrists," September 7.  Available from https://www.cbsnews.com/news/across-the-country-serious-shortage-of-psychiatrists/.

[48] *See* Nathan Phelps, (2016), "Mental Health Help on the Horizon," *USA TODAY*, June 10. Available from https://www.greenbaypressgazette.com/story/news/2016/06/10/mental-health-help-horizon/85480414/.

[49] *Id.*

[50] *See* Naseem Miller (2018), "UCF to Bring First Psychiatry Residency Program to Area," *Orlando Sentinel*, April 25.  Available from http://www.orlandosentinel.com/get-healthy-orlando/os-ucf-psychiatry-transitional-year-20180424-story.html.

[51] *See* Hannah Holzer, (2018), "California Needs More Mental Health Professionals – and the Shortage Will Get Worse, Experts Say," *Sacramento Bee*, July 11.  Available from https://www.sacbee.com/news/local/health-and-medicine/article214019489.html.

[52] *See* Christopher Cheney (2017), "Psychiatric Services Crisis Spurs Call for Reform," *HealthLeaders Magazine*, March 30.  Available from https://www.healthleadersmedia.com/strategy/psychiatric-services-crisis-spurs-call-reform?page=0%2C1.

[53] *Id*.

[54] NCBH Report, p. 15. *See also* Bishop Study, p. 1271.  In other specialties, almost 85% of office-based physicians accepted new commercially insured patients in 2013.  *See* Esther Hing, Sandra Decker, and Eric Jamoom (2015),

hiring pool for organizations seeking to employ more psychiatrists is inevitably smaller. The high proportion of psychiatrists who can maintain financially viable cash-only practices comports with generalized psychiatrist shortages.[55] In particular, because the supply of psychiatrists is constrained, demand for services from patients who can pay out-of-pocket is sufficient to utilize up to 40% of psychiatrists within cash-only practices.

### B. Shortages Are Prevalent in the State of California

California's 4,500 psychiatrists comprise 15% of the nation's workforce of general psychiatrists and the largest statewide pool of psychiatrists in the United States.[56] With 11.5 psychiatrists per 100,000 individuals, California also has more psychiatrists per capita than the nationwide average of 9.4 and the ninth highest ratio among all U.S. states and Washington D.C.[57] Nevertheless, psychiatrist shortages in California are pervasive. For example, the HPSA survey for the quarter ending June 2018 indicates that 474 facilities in California qualify for the Mental Health Professional Shortage Area designation, up from 378 just six months earlier in December 2017.[58] For residents of these HPSAs, only about a third of mental health needs were met.[59] A total of 260 additional practitioners were needed to remove all mental health HPSA designations in the state in December 2017, and within six months, this number increased by 5% to 274 in June 2018.[60]

Data from the Substance Abuse and Mental Health Services Administration ("SAMHSA") indicates that demand for mental health services continues to increase and that a significant proportion of mental health needs are unmet in California. This agency's findings show that only 37% of adults with mental illnesses in California sought and received treatment between 2011 and 2015, and that the incidence of conditions leading to greater demand for services, such as episodes of depression, suicidal thoughts, and substance abuse has remained unabated over the

---

"Acceptance of New Patients with Public and Private Insurance by Office-based Physicians: United States, 2013," NCHS Data Brief No. 195. Available from https://www.cdc.gov/nchs/data/databriefs/db195.pdf.

[55] Typically, physicians and medical facilities accept insurance contracts because they receive more patients when they are included in health plan networks. The increase in patient volume occurs because health plans provide financial incentives such as lower copays and deductibles to steer their enrollees towards in-network providers. Some studies have documented, however, that inadequate reimbursement rates from health plans, including Medicare and Medicaid, have contributed to psychiatrists turning to cash-only practices. *See* NCBH Report, p. 19. A Milliman study also confirms that from 2013 to 2015, commercial insurers paid PCPs rates that were 21%-22% higher for office visits than behavioral health physicians. *See* Charlotte Huff (2018), "Shrinking the Psychiatrist Shortage," *Managed Care Magazine*, January 1 (*hereinafter* "Huff Article"). Available from https://www.managedcaremag.com/archives/2018/1/shrinking-psychiatrist-shortage.

[56] MH Study, p. 7. The 4,500 figure excludes psychiatrists in specialized practices such as child and adolescent psychiatry.

[57] *Id.*, pp. 7-10.

[58] Bureau of Health Workforce, Health Resources and Services Administration (2018), "Designated Health Professional Shortage Areas Statistics, Quarterly Summary As of June 30, 2018", U.S. Department of Health & Human Services Report, Table 5. Available from https://ersrs.hrsa.gov/ReportServer?/HGDW_Reports/BCD_HPSA/BCD_HPSA_SCR50_Qtr_Smry_HTML&rc:Toolbar=false; HRSA Q2 2018 Report, Table 5.

[59] *Id.*

[60] *Id.* The percentage of need met is based on the ratio of existing psychiatrists to the total number of psychiatrists needed such that at least one psychiatrist is available for every 30,000 residents. *See* note [6] for more detail.

same period.[61]  The Public Policy Institute of California projects that the state's population will reach 50 million in 2050, up from about 39 million in 2016.[62]  As California's population continues to grow, demand for mental health and psychiatrist services will increase further.  A recent study indicates that implementation of the ACA in California has expanded health insurance coverage from 83% of the population in 2013 to 93% in 2016 and that the expansion in coverage, coupled with mental health coverage parity laws, will contribute to greater demand for mental health services generally in the future.[63]

In 2004, the State of California passed Proposition 63 (also known as the Mental Health Services Act or MHSA) to foster adequate levels of mental health care at individual county levels through increased funding, personnel and other resources.  Proposition 63 requires individual counties to implement and meet threshold levels of access for mental health services and pursue prevention and treatment goals for mental health patients.[64]  One outcome of Proposition 63 is augmented demand for psychiatrists by individual counties, which has generated greater competition for an already constrained pool of psychiatrists.

As in the rest of the country, the supply of psychiatrists in California has neither kept pace with demand, nor has it been sufficient to replace a diminishing workforce.  A recent academic study by researchers at the University of California, San Francisco found that 45% of psychiatrists in California are over age 60 and likely to retire or reduce their hours in the near future.[65]  As a consequence of these retirements, the study projects that the overall number of psychiatrists will decline by 34% between 2016 and 2028.[66]  The same study calculated that current utilization rates in California indicated a shortage of 336 psychiatrists in 2016, but adjusted for unmet need, the shortage was closer to 1,400.[67]  The study considered changes in the supply of psychiatrists based on a stock-and-flow model.[68]  The modelling exercise began with the number of licensed professionals practicing in the state and considered inflows of new graduates and out-of-state or foreign psychiatrists.  Next it considered outflows due to retirements, deaths, etc.  On the demand side, the study relied in part on the HRSA analysis to assess existing shortages and considered both current utilization and unmet need in its projections.[69]  The results of the study indicated that California's psychiatrist shortage will get significantly worse, expanding to almost 2,700 by 2028 under current utilization rates and to almost 3,900 to relieve unmet need.[70]

The study also pointed to significant regional differences in the psychiatrist shortages across California.  For instance, while the ratios of psychiatrists to every 100,000 in population are highest in the San Francisco, Los Angeles and San Diego regions, and are above average in the

---

[61] *See* SAMHSA (2016) "Behavioral Health Barometer California, Volume 4."  Center for Behavioral Health Statistics and Quality, HHS Publication No. SMA–17–Baro–16–States–CA, pp. 7-9.  Available from https://www.samhsa.gov/data/sites/default/files/California_BHBarometer_Volume_4.pdf.
[62] *See* www.ppic.org/publication/californias-population.
[63] Coffman Study, p. 10.
[64] *See* California Department of Healthcare Services website, available from http://www.dhcs.ca.gov/services/mh/Pages/MH_Prop63.aspx.
[65] Coffman Study, Table 3.9.
[66] *Id.*, p. 1.
[67] *Id.*, p. 51.
[68] *Id.*, p. 44.
[69] *Id.*, p. 49.
[70] *Id.*, Figure 5.2.

Central Coast region, they fall to about half the statewide average in the San Joaquin Valley and Inland Empire regions, and are lower than average in the Northern and Sierra, Sacramento and Orange County regions.[71] Regional differences are not simply based on rural and urban distinctions, however, and some news articles have reported inner-city shortages, especially in low-income areas.[72]

For public sector employers such as county departments of health, state hospitals and prison systems, hiring challenges are compounded because many employed psychiatrists have a preference for larger private systems such as Kaiser Permanente and Sutter.[73] As a result, public institutions face hiring challenges even when they are located outside of rural areas. For example, Yolo County, a suburban area west of Sacramento, has been unable to recruit a psychiatrist to its health department for four years despite implementing four salary increases.[74]

Hiring challenges are not limited to public-sector employers. Even institutions such as Kaiser Permanente have been unable to recruit a full complement of psychiatrists and other mental health professionals. In 2017, for the second time since 2013, California regulators cited the Kaiser Permanente Health Plan for deficiencies in enrollees' access to behavioral health services.[75] These deficiencies were ongoing despite the health plan's aggressive hiring and the addition of more than 800 FTEs (including 160 psychiatrist FTEs) to its complement of behavioral health professionals between 2011 and 2016.[76] In its responses to regulator surveys, the Kaiser Permanente Health Plan highlighted a daunting behavioral health shortage, an aging psychiatrist workforce, low proportions of medical school residents specializing in psychiatry and other factors that contributed to its hiring challenges.[77]

Thus, the same factors that have increased demand and constrained the supply of psychiatrists nationwide have also created hiring challenges for all employers of psychiatrists within California. Competition for employed psychiatrists in California mirrors the vigorous competition for psychiatrists nationwide.

---

[71] *Id.*, Figure 3.3, Table 3.4.
[72] *See for example,* Robert Waters (2018), "In Telehealth: A Window to Our Future Workforce," *California Health Care Foundation Blog*, March 26. Available from https://www.chcf.org/blog/telehealth-window-to-our-future-workforce.
[73] *Id.* Employed psychiatrists refer specifically to those hired by institutions such as hospitals and the government. It excludes self-employed psychiatrists in private or small group practice.
[74] *Id.*
[75] *See* Jesse Migault (2017), "Kaiser Permanente Health Plan Falls Short on Behavioral Health," *Health Payer Intelligence*, July 6. Available from https://healthpayerintelligence.com/news/kaiser-permanente-health-plan-falls-short-on-behavioral-health. The Kaiser HMO has faced lawsuits and fines compelling it to increase its complement of psychiatrists and other mental health professionals. *See* Jenny Gold (2017), "Kaiser Permanente Cited — Again — for Mental Health Access Problems," Kaiser Health News, July 7. Available from https://www.scpr.org/news/2017/07/07/73596/kaiser-permanente-cited-again-for-mental-health-ac.
[76] *See* Office of Plan Monitoring, Division of Plan Surveys (2017), "Routine Survey of Kaiser Foundation Health Plan, Inc.," Department of Managed Health Care, pp. 14-15. Available from https://www.dmhc.ca.gov/desktopmodules/dmhc/medsurveys/surveys/055_r_full%20service-behavioral%20health_061217.pdf.
[77] *Id.*

### C. CDCR Psychiatrist Shortages

In the face of acute national and state-wide psychiatrist shortages, CDCR has been unable to hire a full complement of psychiatrists sufficient to meet the requirements of its 2009 Staffing Plan. Recent population and employment statistics indicate, however, that CDCR already employs a disproportionately large proportion of psychiatrists in the state relative to the share of the state's population corresponding to CDCR inmates.

In recent months, CDCR employed approximately 285 of the state's roughly 5,800 psychiatrists, or about one in every 20 psychiatrists.[78]  CDCR's inmate population of about 118,000 adults at in-state and non-contracted facilities comprise just 0.3% of the state's population and 0.4% of the state's adults, however.  Thus, CDCR inmates have more than 16 times as much access to psychiatrists than members of the public.[79]

Between February 2010 and March 2018, the discrepancy between CDCR's required, or authorized positions, and the number of psychiatrist positions it has filled through civil service and hours contracted through a registry program, has resulted in an average vacancy rate of 23.3%.  Figure [A] shows the monthly fluctuations in CDCR's statewide psychiatrist vacancy rate.  The vacancy rate trended upwards for most of the period between 2010 and 2012, fluctuated for the next two years, exhibited some decline in 2014 and trended back upwards to peak in October 2016.  Since then, the vacancy rate has generally declined, reaching 20.7% in March 2018.

---

[78] CDCR Monthly Hiring Report, March 2018; Coffman Study, Table 3.2.  Based on data compiled by Merritt Hawkins, 4,500 of these psychiatrists are generalists outside of specialized practices such as child and adolescent psychiatry. MH Study, p. 7.  Thus, CDCR already employs about one in every 16 these psychiatrists.
[79] The CDCR employed psychiatrist to inmate ratio is 1:413, and the general psychiatrist to adult population ratio in the state is 1:6,774.

**Figure [A]: CDCR Statewide Psychiatrist Vacancy Rate**



Source: CDCR Monthly Staffing Reports.
Data is not available for April 2010, May 2010 and July 2016

Changes in both CDCR's demand for psychiatrists and the number of hires over time help explain the changes in vacancy rates. The top line of Figure [B] below shows the monthly progression of CDCR's demand for psychiatrists over time. CDCR's demand reflects the number of authorized positions which have increased by about 20% over the past eight years, from approximately 300 positions between February 2010 and June 2013 to around 360 positions after July 2015. Figure B also shows the monthly counts of positions that CDCR has filled, both through permanent (civil service) positions and contracted (registry) positions. The latter counts are based on a conversion of registry hours into FTEs. The solid green line shows total filled positions. The balance between authorized positions and total filled positions provides a vacancy count as shown by the red line in Figure [B]. The number of vacancies has fluctuated, but has trended lower since October 2016, in part due to an increase in registry hires since May 2017.

**Figure [B]: CDCR Statewide Psychiatrist Positions and Vacancy Counts**



Source: CDCR Monthly Staffing Reports.

Figure [C] shows a map of CDCR's facilities and a recent snapshot of the psychiatrist vacancy rate at each facility.  Figure [C] indicates that nine CDCR facilities had a psychiatrist fill rate of more than 85%, or a vacancy rate lower than 15%, based on filled civil service positions alone. An additional eight facilities achieved 15% or lower vacancy rates after the inclusion of registry and temporary positions.  Most of the remaining facilities with more than 15% vacancy rates appear to be located outside of the major population centers of San Francisco, Los Angeles and San Diego and within the California regions where psychiatrist shortages are more acute.[80]  The San Joaquin Valley, Inland Empire, Northern & Sierra and Orange County regions have markedly fewer psychiatrists per capita than the state average.

---

[80] *See* Coffman Study, Figure 3.3, Table 3.4.

**Figure [C]: CDCR Facilities and Staff Psychiatrist Shortages**



Source: CDCR Mental Health Hiring Report (MH Exec Summary - 12-8-17.pdf).
Note: Compliance figures include telepsychiatry.

### D.  CDCR Hiring Initiatives

As competition for an increasingly limited pool of psychiatrists has intensified, CDCR has implemented numerous initiatives to boost hiring and remain competitive as an employer. CDCR's initiatives pertain to compensation and other employee benefits, strategies to boost hiring and retention, as well as utilization management and clustering processes to streamline service provision while maintaining an adequate case balance for employed psychiatrists.  The discussion below addresses each of these incentive categories as well as their past and likely future impact on hiring.

#### 1.      Competitive Salary and Benefits

##### a.  Salary

Figure [D] below provides a comparison of CDCR salaries with average salaries paid to psychiatrists in the state and nationwide.

The purple line tracks average CDCR staff psychiatrist salaries by month.  These salaries are understated because they exclude compensation for overtime, call coverage, and certain other forms of pay such as fringe benefits, award payments, and other miscellaneous reimbursements. Further, they rely on the assumption that psychiatrists who do not receive the maximum base pay offered to board-certified psychiatrists instead receive the minimum base pay awarded to psychiatrists who are not board-certified.  This assumption is conservative because at least some CDCR psychiatrists who do not receive the maximum do earn salaries that are higher than the minimum.  On average, the data indicate that CDCR staff psychiatrists earned about $261,000 in base pay in 2010 and 14% more or about $297,000 in 2017.  Recent pay increases include a 2% adjustment in May 2017 followed by an additional 3% increase in June 2017.[81]  These increases will be followed by two contractually planned increases of 2% in July 2018 and 2019, respectively.[82]  Psychiatrists who are not hired at the maximum salary scale are also eligible to receive annual salary raises of 5% until they reach their respective caps, based on merit.[83]  For 2017, the most recent year for which a comparison is possible, CDCR provided base salaries that were 13% higher than the average base salary of $263,000 offered in placements brokered by

---

[81] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan; *see also* Agreement Between State of California and Union of American Physicians and Dentists Covering Bargaining Unit 16, Physicians, Dentists, and Podiatrists, Effective July 1, 2016 through July 1, 2020, p. 60. Available from http://calhr.ca.gov/labor-relations/Documents/mou-20160701-20200701-bu16.pdf (*hereinafter*, "MOU Unit 16 Agreement").
[82] *Id*.
[83] MOU Unit 16 Agreement, p. 54.

recruiting firm Merritt Hawkins, and 18% higher than the Western Region average total compensation of $252,000 collated by the MedScape surveys.[84]

**Figure [D]: CDCR Average Psychiatrist Salary Comparison with Statewide and National Averages**



Source: CDCR Pay Ranges, CDCR Proportion of Psychiatrists at Max Salary; OES data.

Figure [D] also shows average statewide and national salaries for psychiatrists, based on annual data available from OES. These salaries are for employed psychiatrists only (i.e., they exclude self-employed individuals) and tend to include other forms of compensation such as incentive pay and some production bonuses. Thus, OES salaries likely overestimate base salaries for

---

[84] MH 2017 Review. p. 9, for the average salaries that Merritt Hawkins offered; Statista Infographic citing Medscape Psychiatrist Compensation Report 2017. Available from https://www.statista.com/statistics/723889/average-psychiatrist-compensation-by-us-region.

employed psychiatrists.[85]  The OES average compensation for psychiatrists has increased by 29% nationwide, from about $168,000 in 2010 to $216,000 in 2018.

In California, the increase was significantly higher, jumping by 45% from about $179,000 in 2010 to $258,000 in 2018.  Most of this increase occurred between 2014 and 2015 when the average compensation in California increased from $199,000 to $247,040.  There are at least two possible reasons for the jump in statewide psychiatrist compensation at that time, but precise data confirming these hypotheses are not available.  First, Kaiser Permanente Health Plan had been saddled with litigation-related obligations and conducted an aggressive hiring campaign around that period resulting in the addition of 160 psychiatrist FTEs.[86]  This likely put pressure on the already constrained hiring pool and generated upward pressure on wages.  Second, implementation of the ACA in California in 2014 led to increased coverage for mental health services and potentially to higher demand for services.  These factors could have placed greater pressure on employers to pay higher salaries to hire and retain psychiatrists.  OES data provides some support for the proposition that implementation of the ACA could be associated with high wage growth for psychiatrists from 2014 to 2015.  Of the 12 states (including California) that experienced double-digit percentage wage increases for psychiatrists in 2015 relative to 2014, nine (including California) had implemented the ACA and expanded Medicaid coverage in 2014.[87]

Figure [D] shows that CDCR base salaries have remained consistently above both the statewide and national benchmarks over the past eight years despite higher increases in the statewide and national salaries that narrowed the pay gap with CDCR.  CDCR staff psychiatrists have on average received base salaries that were at least 9% and up to 47% higher than compensation averages statewide.  Since national averages have consistently been below the California statewide average, CDCR salaries have consistently exceeded the nationwide averages by an even larger percentage than the statewide averages.

A direct comparison of CDCR base pay with OES averages does not provide an apples-to-apples comparison because CDCR statewide average base pay excludes certain forms of compensation included in the OES data, such as awards, incentives, and fringe benefits.[88]  To perform an apples-to-apples comparison, additional forms of compensation included in OES salaries can be added to CDCR base salaries.  A CDCR salary report for the past two years provides information to calculate the amounts paid to CDCR psychiatrists within each compensation category included in OES averages.  Adding these amounts to CDCR base salaries results in CDCR average compensation that was at a 17% premium over the OES statewide average during the past two

---

[85] OES wages do not include call coverage and overtime payments.  *See* https://www.bls.gov/current/oes_tec.htm.

[86] *See* Office of Plan Monitoring, Division of Plan Surveys (2017), "Routine Survey of Kaiser Foundation Health Plan, Inc.," Department of Managed Health Care, pp. 14-15.  Available from https://www.dmhc.ca.gov/desktopmodules/dmhc/medsurveys/surveys/055_r_full%20service-behavioral%20health_061217.pdf.

[87] EI analysis of OES data (Psychiatrist Salaries by State and Year) and implementation dates of ACA available from https://www.healthinsurance.org/medicaid.

[88] Overtime and other productivity bonuses are excluded from OES salaries as well as CDCR base pay.

years.[89]  Based on this comparison, CDCR currently offers a significant premium above statewide average compensation for employed psychiatrists.

CDCR average salaries are also competitive regionally within California.  As Figure [E] shows, within the 10 metropolitan and micropolitan statistical areas where CDCR has facilities and for which region-specific OES data are available, CDCR average base salaries have consistently been at least as high as the regional OES average salaries and often significantly higher.

**Figure [E]: CDCR Average Psychiatrist Salary Comparison with Regional Averages**



---

[89] The 17% figure is calculated by including all forms of compensation except for those related to overtime.  *See* Staff Psychiatrist Salary 6-18-18 v2.xlsx.







Source: CDCR Pay Ranges, CDCR Proportion of Psychiatrists at Max Salary; OES data.

Furthermore, CDCR average salaries are substantially higher than the those paid to Federal Bureau of Prisons ("BOP") psychiatrists working in California, which are publicly available via the Bureau of Prisons and Office of Personnel Management websites.[90] BOP psychiatrists are paid at Federal General Schedule grade 13 and 15 rates. Between 2010 and 2017, CDCR psychiatrists' statewide average base pay was 68% to 91% above the maximum salary earned by BOP psychiatrists in California, depending on the BOP psychiatrists' location. CDCR psychiatrists' statewide average base pay was 169% to 246% above the minimum salary earned by BOP psychiatrists in California.[91] Since federal employees' salaries are statutorily limited, the base pay of BOP psychiatrists at or near the top of the GS-15 pay grade does not change in response to changes in the supply of or demand for psychiatrists.[92]

>   b.  *Call Coverage, Overtime, Fringe Benefits and Other Monetary Compensation*

CDCR's compensation data for on-site psychiatrists indicate that over the last two years, psychiatrists earned an average of about 9% of their regular pay in the form of other

---

[90] https://www.bop.gov/jobs/positions/index.jsp?p=Psychiatrist; https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/.
[91] Comparison of CDCR statewide average salary to GS-13 step 1 and GS-15 step 10 salary data.
[92] Statutory limits apply in the four metropolitan areas in California where BOP psychiatrists earn higher locality pay. Rates are limited to the rate for level IV of the Executive Schedule (5 U.S.C. 5304 (g)(1)). See https://www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/.

compensation for call coverage, overtime, awards, travel, paid leave, and other benefits.[93]  These additional monetary incentives contribute to CDCR's competitiveness relative to other psychiatrist employers.  Nevertheless, these incentives have not been effective at bridging the deficit between CDCR's psychiatrist needs and its filled positions.

### c.  Annual Merit-Based Salary Adjustment

For CDCR psychiatrists who are not hired at the maximum salary scale, CDCR also offers annual salary raises of 5% based on merit.[94]  These increases are typically granted annually until the employee reaches the maximum of their salary range.[95]  Thus, psychiatrists who start at the minimum of their respective ranges in 2018 need no more than four years of service to reach the maximum of their pay ranges if they become eligible for a merit adjustment in each year.[96]  CDCR data shows that almost four of every five CDCR psychiatrists earn the maximum salary within their respective pay ranges.[97]

### d.  Pensions

CDCR psychiatrists are also eligible for pension benefits per the collective bargaining agreements that psychiatrists have with the state.  These pension are administered by CalPERS.[98]  Psychiatrist pensions are calculated using a defined benefit formula based on years of service, age at retirement, and final compensation or average salary for a defined period of employment.[99]  On January 1, 2013, a number of reforms under the Public Employees' Pension Reform Act ("PEPRA") came into effect, primarily impacting employees hired after that date.[100]

Under PEPRA pension benefits for employees hired after January 1, 2013 generally are not as generous as those for employees already employed by CDCR as of that date.  Nonetheless, hiring trends do not indicate that PEPRA compromised the competitiveness of CDCR pension benefits relative to other employers of psychiatrists in the state.  In particular, the data underlying Figure [B] indicate that the monthly average number of filled civil-service psychiatrist positions was

---

[93] EI analysis of CDCR data, Staff Psychiatrist Salary 6-18-18 v2.xlsx.

[94] MOU Unit 16 Agreement, p. 54.

[95] Interview of Angela Ponciano, Associate Director of CDCR Mental Health Program. Interview conducted on June 13, 2018.

[96] EI Analysis of Psychiatrist Salary.xlsx. In 2018, the salary range P for non-board certified psychiatrists is between $20,825 and $24,958 on a monthly basis, and the equivalent range Q for board certified psychiatrists is between $21,374 and $25,682.

[97] See Staff Psych – MAX.pdf.

[98] For a description of the plan, see https://www.calpers.ca.gov/page/employers/benefit-programs/retirement-benefits.

[99] Id.

[100] CDCR psychiatrists not subject to PEPRA accrue up to 2.5% of their final compensation in retirement benefits for each year of service up to a maximum of $275,000 in 2018 dollars, with adjustments for cost of living in future years.  In contrast, CDCR psychiatrists subject to PEPRA accumulate 2.0% of their final compensation per year of service up to a maximum of $145,666.  Since the effect of PEPRA is cumulative over an employee's number of years of service, PEPRA's effect on psychiatrists employed at CDCR for only a few years is limited because the pension caps would not be triggered with just a few years of employment.

higher in each of the five post-PEPRA years, 2013 through 2017, relative to the last pre-PEPRA year, 2012.[101]

### e. Enhanced Registry Contract Rates

CDCR issued a new bid for the contract with its registry-services provider in May 2017, resulting in higher hourly rates to contract psychiatrists at all its facilities. Prior to that date, the hourly rate was between $220 and $275 depending on the facility, but all facilities now have a registry rate of $265 per hour, except for CHCF and SVSP, where the rate is $285.[102] Subsequent to the increase, CDCR was able to hire an additional 26.8 monthly FTEs (13% of total positions filled) through the registry program in the six-months ended in March 2018 relative to the same six-month period in 2017. As we explain in Section III below, registry rate increases are not likely to facilitate additional hiring, even though a psychiatrist working full-time through the registry program could earn almost twice the maximum psychiatrist base salary in 2018.

### f. Differential Pay Rates

CDCR currently does not have a differential pay structure for psychiatrists at facilities where vacancy rates are especially high. Based on experiences with differential pay rates for other medical specialties such as primary care, CDCR has concluded that rate differentials at high-vacancy institutions are unlikely to alleviate the high vacancy rates. In particular, analyses undertaken by CDCR show that implementation of a 15% differential for primary care at 12 institutions largely resulted in employees transferring to receive the higher pay.[103] Further, five of the 12 facilities where the pay differential was implemented failed to attract additional hires, indicating that the strategy had limited efficacy.[104]

### g. Dual-Appointment Program

CDCR allows its employed psychiatrists to assume a second position up to a quarter-time basis (or 10 hours per week) at a second CDCR facility. CDCR compensates psychiatrists for this second appointment at an hourly rate that comports to a conversion of their existing salaries into an hourly equivalent.[105] Thus, CDCR psychiatrists could earn an increment equivalent to 25% of their average base salary of $297,000 in 2017 by participating in the dual-appointment program. CDCR has, however, only been able to realize an incremental three FTEs through this

---

[101] PEPRA would not have disadvantaged CDCR vis-à-vis any competing state employers of psychiatrists, such as the state hospitals, since PEPRA pertains to all state employers. A differential impact could arise relative to private employers of psychiatrists who are not bound by PEPRA and who are more likely to provide 401K plans instead of guaranteed benefit plans. However, the competitiveness of state pensions vis-à-vis 401K plans depends on the performance of the financial markets and employees' years of service, risk tolerance and the extent to which they discount future cash flows. Data sufficient to perform a comprehensive analysis of the competitiveness of CDCR pension benefits relative to private sector retirement benefits are not available.

[102] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.

[103] Case 3:01-cv-01351-JST, Document 3008.

[104] Id.

[105] Interview of Angela Ponciano, Associate Director of CDCR Mental Health Program. Interview conducted on June 26, 2018.

program.[106]  The lack of success of this program indicates that the existing pool of employed psychiatrists have a preference not to work additional hours for CDCR even though they have an opportunity to boost their salaries by up to 25%.  Relatedly, this program has the potential to boost CDCR base pay by 25% for psychiatrists considering competing employment offers from other employers.  But, even an opportunity to earn up to a 25% salary boost has not led to discernible improvements in CDCR's vacancy rates.

### h.  Cash-for-Call Program

Upon consultation with its psychiatrist employees, CDCR implemented a program to provide cash compensation for call coverage, instead of leave credits.[107]  This program enabled psychiatrists to collectively earn approximately $2 million in the past year, an increment of approximately 5% over their regular pay.[108]  Data to assess the effectiveness of this program are not available.

### i.  Relocation, Retention and Other Bonuses

CDCR also offers compensation to hired psychiatrists to cover relocation costs, subject to approval by the hiring department.[109]  Once hired, psychiatrists receive additional fringe benefits and other awards for retention and performance.[110]  These two compensation categories comprised 1.3% of total compensation in the past two years.[111]

## 2.  Telepsychiatry

As of April 2018, CDCR had allocated and filled telepsychiatry positions at 20 of its 29 facilities with outpatient services, and it plans to expand its usage of this modality of care throughout the system.[112]  CDCR's telepsychiatry offices are in Elk Grove, San Quentin, Rancho Cucamonga, and Diamond Bar.[113]  To help with the expansion of the telepsychiatry program, CDCR intends to add space in San Quentin, Diamond Bar and Santa Ana in late 2018.[114]  This expansion will increase the total number of telepsychiatry positions that CDCR can fill from 73 to 105.[115]

The telepsychiatry program has been instrumental in lowering vacancy rates.  In April 2018, CDCR employed 50.4 telepsychiatrists, without whom the prevailing vacancy rate of 20.7% in March 2018 would have been 34.7%.[116]

---

[106] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan; Interview of Angela Ponciano, Associate Director of CDCR Mental Health Program. Interview conducted on June 26, 2018.
[107] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.
[108] Interview of Angela Ponciano, Associate Director of CDCR Mental Health Program. Interview conducted on June 26, 2018.
[109] Id.
[110] Interview of Angela Ponciano, Associate Director of CDCR Mental Health Program. Interview conducted on June 13, 2018.
[111] See Staff Psychiatrist Salary 6-18-18 v2.xlsx.
[112] Allocated and Filled Telepsychiatry Positions, April 2018.
[113] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan, p. 2.
[114] Attachment C June 2018 Mission Change Letter.
[115] Id..
[116] CDCR Monthly Staffing Reports, 1.b.

Faced with competition from numerous other public and private sector entities that have a need for psychiatrist employees, CDCR's acceptance of telepsychiatry as a modality of care provides an important enticement to psychiatrists who could otherwise be reluctant to work with inmates or accept other demands of working in prison environments, such as adherence to security protocols, etc.

Further, a study that recognizes worsening psychiatrist shortages on a national level evaluated the cost effectiveness of telepsychiatry and locum tenens (which are comparable to CDCR's registry hours) and finds that telepsychiatry is less expensive.[117]  Based on the positive research findings and cost-effectiveness of telepsychiatry as well as its general acceptance by employed CDCR psychiatrists, it is economically justifiable for CDCR to continue to pursue a strategy of filling vacancies for psychiatrist positions using this modality of care.

CDCR data indicate that the telepsychiatry program has not grown at the expense of civil service positions since the two programs have expanded simultaneously in the past two years, although growth of the telepsychiatry program has been more rapid.[118]  Faster growth of the telepsychiatry program indicates that this program could be effective at overcoming non-monetary factors that impair civil-service hiring, such as a distaste for working in prison environments or relocation to undesirable employment locations.

### 3.    Other Benefits Offered by CDCR

#### a.  *Medical Assistant Program*

CDCR has implemented a medical assistant program to better utilize its existing pool of psychiatrists.  The goal of this program is to increase psychiatrist productivity and retention rates through improved work benefits and job satisfaction.  The assignment of a medical assistant to each psychiatrist allows psychiatrists to transfer their administrative burden and other routine duties to medical assistants, thereby freeing up time to see additional patients, while simultaneously delivering greater job satisfaction.[119]

As of January 2018, CDCR had hired a total of 112 medical assistants across 26 facilities, up from just 52 in 2016.[120]  CDCR initially hired medical assistants through the registry program

---

[117] *See* Jonathan Thiele, Charles Doarn and Jay Shore, (2015), "Locum Tenens and Telepsychiatry: Trends in Psychiatric Care," *Telemedicine and E-Health*, 21(6).  Available from https://doi.org/10.1089/tmj.2014.0159.

[118] Data tracking employment within telepsychiatry and civil service separately are only available since August 2016.

[119] CDCR November 2015 Update to Report on the June 19, 2014, Staffing Review Order; Case 2:90-cv-00520-KJM-DAD Document 5269, filed 02/02/2015, pp. 6-7.  As part of their duties, medical assistants manage patient appointments, send out lab or medication orders, make referrals to therapists and other physicians, collect patient data, take blood pressures and measure weights.  *Id.*

[120] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan; CDCR June 2016 Update to Report on the June 19, 2014, Staffing Review Order.

only. CDCR recommended the institution of a permanent job classification for medical assistants, which was implemented and resulted in the hiring of 11 civil service employees as of January 2018.[121] CDCR's collection and analysis of data evaluating the benefits of this new program are ongoing, but preliminary results based on a 2016 survey indicate that CDCR psychiatrists perceive the availability of medical assistants as a job benefit. The survey found that 82% of psychiatrists who were assigned medical assistants were more satisfied with their jobs as a result.[122]

This program could entice additional physicians considering employment with CDCR and promote retention of existing psychiatrists who view the program as a job benefit. Indeed, studies that have proposed policy solutions to alleviate psychiatrist shortages recognize the reduction of administrative burden as an important aspect of improving the efficiency of psychiatrists.[123]

### 4.        Strategies to Optimize Psychiatrist Workloads

#### a.  Utilization Management

CDCR is in the process of collecting data on its Enhanced Outpatient ("EOP") program to determine whether demand for psychiatric services could be reduced if patients who are sufficiently stabilized could be safely transitioned to a lower level of psychiatric-care.[124] This initiative can allow for a better allocation of limited resources and diminish CDCR's need for additional psychiatrists.

#### b.  Bed Clustering

CDCR has managed EOP beds to address the needs of the patient population and meet staffing needs at each clustered location. To the extent that staffing efficiencies due to clustering could be achieved, they have now been exhausted and CDCR does not plan to undertake further clustering.[125]

Further, clustering within urban locations that potentially have larger pools of psychiatrists from which CDCR could hire is unlikely to be beneficial because of the ubiquity of unfilled positions across most CDCR prison locations. In particular, all facilities where clustering could occur already have vacancies, except for one.[126] If CDCR has been unable to fill vacancies based on the current size of the patient population at each location, it is unlikely that CDCR will be able to attract more psychiatrists at those same locations when the workload increases as a result of more or sicker patients.

---

[121] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.
[122] CDCR June 2016 Update to Report on the June 19, 2014, Staffing Review Order.
[123] NCBH Study, p. 33.
[124] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.
[125] Interview of Angela Ponciano, Associate Director of CDCR Mental Health Program. Interview conducted on June 13, 2018.
[126] See CDCR Document, Attachment F – Psychiatrist EOP Vacancy History.pdf.

To the contrary, if existing psychiatrists become disgruntled with the increased volume of patients to their caseloads, they could become more inclined to leave state service and pursue other employment opportunities, thereby compromising CDCR's retention of psychiatrists. Further, existing CDCR psychiatrists have foregone opportunities to work additional hours through the dual appointment or registry programs, demonstrating a preference not to work more for CDCR and suggesting that they could become dissatisfied if required to work more. Since urban areas in general tend to have more available psychiatrist positions, psychiatrists leaving CDCR's employment likely could find alternative employment with ease in urban locations. As a result, increased clustering in urban locations could have an adverse impact on retention of CDCR's existing pool of psychiatrists.

### c.  Psychiatric Nurse Practitioner Program

In 2017, CDCR began recruiting psychiatric nurse practitioners who are qualified to prescribe psychotropic medication and can partially relieve psychiatrists' workloads.[127]  Shortages exist for this type of mental health professional as well, however.[128]  Due to the shortages, CDCR has only hired three nurse practitioners since the implementation of the program,[129] and it is unlikely that a sufficient number of such practitioners can be hired to have a meaningful impact on psychiatrist vacancy rates.

## 5.    Hiring Initiatives

### a.  Fellowship Program

CDCR currently has two part-time psychiatry fellows at the Richard J. Donovan Correctional Facility (RJD) in collaboration with the University of California, San Diego.[130]  In addition, two fellows are employed at the San Quentin facility through a collaboration with the University of California in San Francisco.  While several policy studies indicate that the implementation of fellowship programs can effectively attract psychiatrists upon completion of their residency, this program has yet to meaningfully impact CDCR's vacancy rates.

### b.  Professional Outreach Efforts

In 2015, CDCR also partnered with the *Plata* Receiver's office to conduct outreach to professional organizations at conferences and through advertising in magazines, websites, targeted mailers, and other publications to boost hiring.[131]  These efforts did not generate any meaningful reduction in vacancy rates.

---

[127] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.
[128] Coffman Study, p. 7, Figure 5.10.
[129] Case 2:90-cv-00520-KJM-DB Document 5813, Exhibit A.
[130] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.
[131] Case 2:90-cv-00520-KJM-DAD Document 5269, filed 02/02/15, p. 6; CDCR November 2015 Update to Report on the June 19, 2014, Staffing Review Order.

### E.  Factors that Compound CDCR's Hiring Challenges

The geographic scope of the psychiatrist labor pool from which CDCR can reasonably attract hires is not broader than the entire U.S.[132]  As previously discussed, California and the U.S. more broadly are experiencing a psychiatrist shortage that is projected to worsen.  Several factors compound the hiring challenges that CDCR faces.  Prominent among them are barriers to the mobility of labor, which exist among all professions.  Certain barriers to mobility become more pronounced with generalized labor shortages, as job candidates can more readily act on personal preferences for their desired locations and job environments.

### 1.        General Barriers to Labor Mobility

A spatial, or geographic, barrier to labor mobility is anything that impedes the movement of workers from one region to another.[133]  Geographic barriers to mobility likely impede CDCR's ability to hire additional psychiatrists.

Migration within the U.S., particularly interstate migration, has been declining in recent decades.[134]  While the reasons for this decline are not fully understood, academic literature acknowledges both economic and amenity-driven barriers to mobility.  CDCR has offered higher salaries and other incentives to help overcome some economic barriers, but these have been insufficient to overcome barriers to mobility such as individuals' preferences for amenities attached to certain locations.

The most commonly cited economic barriers to geographic mobility include moving costs, housing affordability, debt burden from educational expenses, the cost of living, expected wages and job opportunities in the destination area.[135]  Other barriers arise due to the existence of dual earner households and preferences for certain amenities.  Dual earner households face a colocation problem since both individuals seek a common location where each can pursue their careers.[136]  This colocation problem is more pronounced for working couples in which both partners have at least a college education.  The proportion of working couples has risen substantially in past decades, as has married women's labor force participation.  Thus, the

---

[132] CDCR has at times utilized the H1B program to fill psychiatrist positions and 13 currently employed psychiatrists were hired through the program, but these psychiatrists comprise less than 5% of the total fill rate.
[133] Geographic barriers to mobility differ from occupational barriers to labor mobility, which impede workers from changing jobs or gaining the skills necessary to enter a new job or occupation.  The substantial barriers to occupational mobility for psychiatrists – years of specialized training and a limited number of available residency positions – are unlikely to change in the near future, and rule out occupational mobility as a means of expanding the pool of potential CDCR psychiatrist hires.
[134] *See, e.g.,* Raven Molloy, Christopher L. Smith, and Abigail Wozniak (2011), "Internal Migration in the United States," *Journal of Economic Perspectives*, 25(3): 173-197 (*hereinafter*, "Molloy, et al.").  Available from https://doi.org/10.1257/jep.25.3.173; Mai Dao, Davide Furceri, and Prakash Loungani (2017), "Regional Labor Market Adjustment in the United States: Trend and Cycle," *The Review of Economics and Statistics*, 99(2): 243-257.  Available from https://doi.org/10.1162/REST_a_00642.
[135] See, e.g., Molloy, et al., pp. 181-182.
[136] The colocation problem pertains to both members of dual-earner households, particularly members of dual-career households who are likely to seek employment commensurate with their skills and training, and who need to find employment and housing within a reasonable commute.

proportion of the labor force more likely to face a colocation problem has increased as well.[137] Large metropolitan areas offer more employment opportunities and a greater diversity of potential jobs.  In such locations there is a higher likelihood that both working partners will find one or a succession of jobs that they would consider good matches.[138]  One economic study found that working couples are increasingly locating in large metropolitan areas, due largely to worsening colocation problems but also to the increased desirability of urban areas themselves.[139] The authors posited that as college-educated individuals increasingly form working couples, employers in smaller cities could find it more difficult to attract highly skilled individuals.[140]

Broad swaths of the U.S. population choose to live in large, and to a smaller extent medium-sized, metropolitan areas.[141]  Urban locations are attractive to many people, whether because of job opportunities or the cultural, healthcare, educational and other amenities that tend to accompany population density.  As a result, the scarcity of certain amenities in rural areas presents a barrier to mobility for many individuals.  However, studies have found that other amenity-based barriers to mobility – social factors such as proximity to a hometown, parents, or training location, or familiarity with a location because of prior residence or a spouse's connections there – outweigh economic factors in location choices.[142]

## 2.      Physician-Specific Barriers to Labor Mobility

Academic literature specific to the mobility of physicians suggests that barriers to labor mobility likely impair CDCR's ability to hire additional psychiatrists.  Researchers have found that physicians' migration is driven by amenities, and not just economic factors.  One study of migration of U.S. primary care physicians concluded that economic criteria appear to be less important than geographic features such as population size and hospital access.  Physicians more frequently left rural counties that lacked a hospital, had a smaller population, and had a lower physician supply relative to population.[143]

Researchers have hypothesized that some physicians select their initial post-residency employment based on availability rather than preference, until their preferred option becomes

---

[137] *See* Dora L. Costa and Matthew E. Kahn (2000), "Power Couples: Changes in the Locational Choice of the College Educated, 1940-1990," *The Quarterly Journal of Economics*, 115(4): 1290-1315.  Available from https://doi.org/10.1162/003355300555079.

[138] *Id.*, pp. 1294-1295.

[139] *Id.*, p. 1287.

[140] *Id.*, p. 1309.

[141] *See, e.g., id.*, Table III, p. 1293; Molloy et al., p. 185.  Although many CDCR facilities are located in metropolitan or micropolitan statistical areas, they are not necessarily in more densely populated urban areas. (*See, e.g.,* https://www2.census.gov/geo/pdfs/reference/ua/Defining_Rural.pdf.)  Barriers to rural migration are relevant for many CDCR facilities.

[142] *See* Ina Drejer, Jacob Rubæk Holm, and Karin Dam Petersen (2014), "The geographical mobility of recently graduated medical doctors," draft paper prepared for the workshop "Beyond spillovers? Channels and effects of knowledge transfer from universities," at the University of Kassel, p. 4 (*hereinafter,* "Drejer, et al.").  Available from http://vbn.aau.dk/en/publications/id(557b724a-fdf2-4838-b922-a4561ebe26af).html; Matthew McGrail, Peter Wingrove, Stephen Petterson, and Andrew Bazemore (2017), "Mobility of US Rural Primary Care Physicians During 2000-2014," *Annals of Family Medicine*, 15(4): 322-328 (*hereinafter,* "McGrail et al.").  Available from https://doi.org/10.1370/afm.2096.

[143] McGrail et al., p. 325.

available.[144]  Furthermore, constraints due to family circumstances, debt, or discrimination can reduce the likelihood that physicians' initial employment choice is a good match for them.[145]  Consequently, CDCR could find it difficult to retain psychiatrists who receive work opportunities that better fit their geographic or work-condition preferences.

Studies have noted that highly educated people such as medical professionals tended to be attracted to urban areas for professional, social, and cultural reasons.[146]  Conversely, physicians practicing in rural areas chose their location because of personal reasons or targeted financial incentives.[147]

A study of the migration of recent medical school graduates corroborates that personal reasons appear to drive decisions to practice in rural areas.  General practitioners who moved to less urban regions were primarily those for whom opportunity costs (i.e., foregone opportunities in other regions) were mitigated by the presence of family and friends.  Physicians also strongly tended to work in the type of region (urban or rural) that they grew up in.[148]

Among physicians, psychiatrists in particular tend to practice in geographic areas to which they have ties.  More than half (56%) of active psychiatrists in the U.S. practice in the state where they trained.[149]  Additionally, physicians practicing in the same state as where they attended medical school tended to change practices less often than those who practice elsewhere.[150]

California has a higher psychiatrist-to-population ratio than all but seven states and the District of Columbia.  The states with higher per capita ratios are in the New England or Mid-Atlantic regions, historically where most training programs were located.[151]  This potentially reflects California's ability to attract psychiatrists away from locations where they trained, overcoming that particular barrier to migration.  However, psychiatrists are not uniformly distributed within California.  They tend to locate in larger metropolitan and central coast areas.  The San Joaquin Valley, Inland Empire, Northern & Sierra and Orange County regions have markedly fewer psychiatrists per capita than the state average.[152]

---

[144] *Id.*, p. 327.

[145] Richard J Willke (1991), "Practice Mobility Among Young Physicians," *Medical Care,* 29(10): 977-988, 982 (*hereinafter*, "Willke").  Available from https://www.jstor.org/stable/3766085.

[146] *See, e.g.,* Drejer, et al., p. 3.

[147] McGrail, et al., p. 323. These include several reasons mentioned above, such as the physician's or a spouse's previous residence or training in the area, as well as personal preferences regarding work autonomy and lifestyle. Specific financial incentives include J-1 visa waivers that exempt international medical graduates from the requirement to return to their home country for at least two years before seeking a permanent visa to re-enter the U.S., loan forgiveness, small business incentives and National Health Service Corps programs which finance clinicians to work in underserved areas.

[148] Drejer, et al., p. 14.

[149] This is percentage exceeds that of any other specialty except child and adolescent psychiatry and family medicine / general practice.  Association of American Medical Colleges, 2016 Physician Specialty Data Report, Executive Summary, p. 2.

[150] Willke, p. 985.

[151] MH Study, pp. 8-10.

[152] Coffman Study, Table 3.4, p. 22. The regions with greater numbers of psychiatrists per capita are the Sacramento Area, Los Angeles, Central Coast, San Diego Area and Greater Bay Area.

### III.    Potential of Increased Pay and/or Benefits to Alleviate Psychiatrist Shortages

Figures [A] and [B] indicate that CDCR has faced challenges hiring psychiatrists since at least 2010. CDCR's demand has increased since 2010, as have the salaries it has paid to psychiatrists. Figure [D] demonstrates that on average, CDCR psychiatrists have consistently earned a base salary premium relative to average salaries of employed psychiatrists statewide and nationwide.[153] The CDCR salary premium decreased considerably relative to the statewide average, and trivially relative to the nationwide average, in 2015.[154] The decrease is due to a substantial jump in the statewide average salary from 2014 to 2015, which we discuss above, while average CDCR salaries increased at a slower pace over the same period. The diminution in CDCR's salary premium relative to the statewide average from an average of 41% prior to 2015 to 13% thereafter provides an opportunity to assess the extent to which large salary premiums relative to averages paid by all employers can effectively enable CDCR to meet its hiring obligations.

#### A.  Salary Premiums and Staff Psychiatrist Fill Rates

##### 1.    Correlation Analysis

A correlation coefficient measures how strongly two variables – such as CDCR relative salaries and the number of filled staff psychiatrist positions – are related. The coefficient can range in value from -1, indicating a perfectly negative relationship, to +1, indicating a perfectly positive relationship. Positively correlated variables move in the same direction while negatively correlated variables move in opposite directions. Two variables are uncorrelated – i.e., the movement of one is not associated with the movement of the other, in any direction – if their correlation coefficient is close to zero.

The correlation coefficient of CDCR salaries relative to the statewide average and filled CDCR civil service staff psychiatrist positions is negative (-0.45) throughout the February 2010 to December 2017 period.[155] Higher CDCR salaries appear to be associated with fewer filled positions. The inverse relationship between these two variables does not provide evidence corroborating CDCR's ability to attract more permanent hires by offering higher salary premiums. This conclusion holds with several refinements and extensions to a simple correlation-based analysis.

As noted above, there was a large increase in average statewide salaries, and a concomitant decrease in CDCR relative salaries, in 2015 relative to 2014. To assess whether this temporal

---

[153] The OES data on which statewide and nationwide average salaries are based do not include self-employed psychiatrists. Although self-employed psychiatrists could earn above-average incomes, CDCR seeks to fill its vacancies with employed psychiatrists. Hence, it is appropriate to compare CDCR salaries with those of other employed psychiatrists.

[154] The CDCR salary premium is the percentage by which the average CDCR staff psychiatrist base salary exceeds the average statewide or nationwide average at a given point in time.

[155] The discussion of salary and fill rates in this section is based on information limited to CDCR Staff Psychiatrists as opposed to Chief, Senior (Specialist) or Senior (Supervisor) Psychiatrists. A large majority of CDCR's psychiatrists are Staff Psychiatrists and we limit the analysis to this category to avoid bias due to small sample issues and confounding factors involved in hiring and retention at more senior levels.

dynamic drives the negative correlation, we estimate separate correlation coefficients for the 2010-2014 period (-0.38) and the 2015-2017 period (0.23).  However, as both correlation coefficients are weak and one is negative, neither provides strong evidence that higher CDCR salaries are associated with an increased ability to fill psychiatrist openings.[156]

The correlation coefficient of CDCR salaries relative to the nationwide average and CDCR fill levels for staff psychiatrists (-0.22) is qualitatively similar to those based on statewide average pay.[157]

While a correlation coefficient can explain the extent to which two variables are related, additional independent factors can bias results of simple correlational analyses.  A regression analysis is better suited to explain the relationship between relative salaries and fill rates as it controls for additional factors that potentially affect the relationship between relative salaries and filled positions.

## 2.    Regression Analysis

We use multivariate linear regression techniques to estimate the relationship between CDCR's filled psychiatrist positions and relative salaries.  A detailed description of regression specifications, results, and interpretation of those results are provided in the Appendix.  We summarize the methodology and results here.

The regressions estimate the relationship between CDCR's filled civil service psychiatrist positions and CDCR relative salaries, which reflect CDCR's salary premium relative to the statewide or national average salary for employed psychiatrists.  All regressions control for the number of authorized CDCR staff psychiatrist positions (a measure of CDCR's demand) and a time trend.  One regression includes a separate control variable for the 2015-2017 period to account for the drop in CDCR salaries relative to average California salaries at the start of 2015.

Regressions relating filled positions to CDCR salaries relative to California average salaries indicate a negative and statistically significant relationship between these two variables.  In other words, similar to the correlation analyses, the regressions do not provide statistical evidence that higher CDCR salaries (relative to the state average) are associated with an increase in filled civil service positions.[158]  This finding holds even though we control for increases in authorized staff psychiatrist positions over time.  In particular, it is not the case that the absence of a positive correlation between relative salaries and filled positions is driven by lower demand for psychiatrists at CDCR when its relative salaries were higher.  The finding also holds when we

---

[156] The correlations between "total fill" (i.e., positions filled through civil service and registry) and CDCR salary premiums relative to statewide averages exhibit a pattern similar to those observed for civil service alone: -0.39 for the entire 2010-2017 period, -0.36 for the 2010-2014 period and 0.21 for the 2015-2017 period. As expected, the total fill correlations are marginally weaker than those for civil service alone, since registry physician FTEs should be unaffected by civil service salary adjustments.

[157] Since there was no "jump" in the nationwide salaries at any given time, a calculation of correlations for separate periods is not necessary.

[158] We reject the null hypothesis that an increase in CDCR relative salaries is associated with an increase in filled positions using a one-tailed test of significance and a 5% significance level.  Details are in the Appendix.

control for the 2015-2017 period when statewide average salaries increased substantially. The statistical significance of these results implies that they are unlikely to be attributable to chance.

A regression relating filled positions to CDCR salaries relative to the U.S. average indicates a statistically insignificant relationship between the two variables. This result also does not provide evidence that higher CDCR salary premiums are associated with increased filled positions.[159]

These results could potentially be influenced by the omission of controls for unobserved or unquantifiable factors that are correlated with the CDCR salary premium. These factors could include benefits and non-monetary inducements offered by CDCR relative to other employers, and barriers to mobility potentially overcome by salary. However, to the extent that these other inducements are positively correlated with both salary and hiring, the direction of the bias is positive. In other words, the regression results have overestimated CDCR's effect of the salary premium on hiring, and the true relationship between CDCR's salary premium and filled positions is even weaker than we estimate.

In sum, data from a reasonably long period of eight years do not provide a statistical basis to conclude that higher CDCR pay relative to statewide or nationwide averages is associated with greater fill rates for civil service psychiatrists. This conclusion holds whether we undertake a simple correlational analysis or employ regression techniques and test several sensitivities.

### B. Salary Premiums and Hiring Gains and Losses

The above analyses of filled positions estimate the relationship between salary premiums and total employment of staff psychiatrists at CDCR. While total employment in each month reflects the cumulative effects of hires and separations over time, the number of staff psychiatrists hired or separating in a month is arguably more responsive to salary changes. We use weekly data on gains and losses of CDCR staff psychiatrists to determine whether there is a statistically significant relationship between CDCR salary premiums and new hires.[160]

Figure [F] below shows the monthly gains and losses among staff psychiatrists at CDCR. Both measures fluctuate throughout the period, albeit to a lesser extent after July 2015.

---

[159] Similar results were estimated from a model relying on CDCR salary levels rather than premiums over statewide or nationwide averages.

[160] CDCR hiring data from September 2012 to December 2017 are taken from the 12/08/2017 Mental Health Hire Tracking Executive Summary. The summary describes new hires (gains) as "Employment events."

**Figure [F]: CDCR Statewide Hiring Gains and Losses**



Source: CDCR Mental Health Hiring Report, December 8, 2017.

### 1.      Correlation Analysis

The correlation coefficients between staff psychiatrist hires and CDCR salaries relative to the statewide average (0.47) or nationwide average (0.38) are positive for the September 2012 – December 2017 period.  That is, on average there were more hires in months when CDCR salaries were relatively higher.  However, there also tended to be more separations (loses) in those same months when CDCR salaries were relatively higher: the correlation coefficient is 0.30 when CDCR salaries are measured relative to either the statewide or nationwide average.[161]

Because of the large decrease in CDCR salary premiums relative to the statewide average in 2015, we estimate separate correlation coefficients for the September 2012-2014 period and the 2015-2017 period.  All four correlation measures (one each for hires and separations in each period) are between -0.07 and 0.06.  Since these correlations are all close to zero, they provide neither strong nor consistent evidence of a relationship between salaries and hiring, separations or net gains in hiring.

---

[161] Separations/losses are stated as negative numbers. We converted them to positive numbers for the correlation analysis. Thus, a positive correlation indicates that there were more separations when relative salaries were higher.

Again, as correlation analysis is potentially biased due to omitted confounds, we turn to regression analysis to test whether the absence of a relationship between salaries and hires holds as we include more controls.  The details of this analysis are in the Appendix.  We summarize the methodology and results here.

## 2. Regression Analysis

The hiring regressions estimate the relationship between a measure of employment change – monthly gains or losses – and CDCR salary premiums relative to the state and the U.S.  We run three sets of regressions for each measure (gains or losses) of CDCR hiring.  Each regression controls for the number of authorized CDCR staff psychiatrist positions and a time trend.  One regression tests for the relationship between the hiring measures and statewide salary premiums.  The second also focuses on the statewide salary premium, but includes a separate control variable for the 2015-2017 period to account for the drop in CDCR salaries relative to average California salaries at the start of 2015.  The third regression tests for the relationship between the hiring measures and nationwide salary premiums.

Of the six regressions, only one – hiring regressed on salaries relative to the California average, without the post-2014 control – estimates a positive and statistically significant relationship between employment change and relative salaries.  This result is not robust to the inclusion of a control for the post-2014 period, however.  In other words, this regression does not provide sufficient statistical evidence to conclude that there is a positive relationship between wages and hiring.  Furthermore, the regression of hiring on CDCR salaries relative to the U.S. average does not provide statistical evidence of any relationship between wages and hiring.  None of the regressions of losses provide statistical evidence of a relationship between wages and hiring.[162]

In sum, data from the past five years do not provide a statistical basis to conclude that higher CDCR pay relative to statewide or nationwide averages is associated with increased hiring or decreased separations of staff psychiatrists.

## C. Sensitivity of Registry Hires to Rates

Prior to May 2017, the hourly registry rate was between $220 and $275 depending on the facility.  All facilities now have a registry rate of $265 per hour, except for CHCF and SVSP where the rate is $285.[163]  While CDCR was able to hire an additional 26.8 monthly FTEs through the registry program in the six-months ended in March 2018 relative to the same six-month period in 2017, it is too soon to evaluate whether the effect on hiring will be permanent.  The reason is that a previous contract-rate increase implemented in October 2014 generated a

---

[162] Similar results were estimated from models relying on CDCR salary levels rather than premiums over statewide or nationwide averages.  We also estimated statistically insignificant results from models relying on monthly averages rather than monthly aggregates of weekly hiring data.  We considered testing whether hiring measures appear to respond to prior rather than contemporaneous changes in relative salaries, and whether relationships between hiring measures and salaries were more precisely estimated when the regressions control for seasonal differences in hiring, as suggested by Figure [F].  Unfortunately, data limitations preclude reliable estimation.  Further details are provided in the Appendix.

[163] CDCR January 2018 Status Report on CDCR's January 2017 Staffing Plan.

similar spike in registry hours, but the increase was only temporary and disappeared after a few months: The average number of monthly FTEs due to registry hours was 38 in the first six months of 2014, prior to the implementation of the contract-rate adjustment; it increased to 54 FTEs in the first six months of 2015 but reverted to 41 FTEs in the first six months of 2016.

A comparison of registry rates with civil service pay also provides an opportunity to gauge the sensitivity of psychiatrists' employment decisions to compensation increases. Presently, the maximum annual base salary for civil service staff psychiatrists at CDCR is just over $308,000. As an alternative to civil service employment, psychiatrists could provide their services to CDCR through the registry program. With full-time employment through the registry program (i.e., 40 hours per week), a psychiatrist could earn $551,200, or 1.8 times more than the maximum annual base pay of $308,000.[164] Despite the potential to earn almost a salary enhancement of 80% more than civil service pay through the registry program, CDCR has been unable to hire additional registry psychiatrists sufficient to meet its hiring goals.

The evidence from CDCR's registry program further indicates that it is unlikely that significant civil service wage increases will be effective at lowering CDCR's vacancy rates.

### D. Competition and the Possibility of a Bidding War Due to Additional CDCR Pay Increases

Evidence relating CDCR compensation to measures of employment and hiring does not provide a basis to conclude that higher pay attracts additional psychiatrists to CDCR employment, whether as civil service or registry hires. A related concern if CDCR opts to increase psychiatrist pay in an effort to augment the premium it offers relative to competing employment alternatives is the potential that a bidding war for employed psychiatrist services could ensue.

Economic theory indicates that when a labor shortage exists, such as when the demand for psychiatrist services exceeds the supply, wages increase. If the shortage of individuals with desired skills is severe enough, a bidding war is likely to ensue. For example, a study of the supply of and demand for college graduates found that when a shortage of college graduates developed in the 1980s, the wage premium of the college-educated relative to those without a college education rose to an all-time high. Graduates in fields of study such as business and engineering, where shortages were particularly severe, earned much higher wages than graduates in other fields. Conversely, there was a surplus of college graduates in the 1970s accompanied by a decline in the college-wage premium.[165]

Instances of bidding wars developing from labor shortages in a wide range of industries abound. For instance, in recent years workforce shortages and bidding wars have been noted in health

---

[164] Psychiatrists at CHCF and SVSP can currently earn $592,800 or a 92% salary enhancement.
[165] John H. Bishop and Shani Carter (1991), "The Worsening Shortage of College-Graduate Workers," *Educational Evaluation and Policy Analysis*, 13(3): 221-246. Available from https://doi.org/10.3102/01623737013003221. The authors predicted that a further increase in demand for college graduates would lead to a bidding war for their services.

care,[166] technology startups,[167] public relations,[168] information technology,[169] and compliance,[170] among other industries. Bidding wars frequently involve non-salary payments such as signing bonuses or other financial assistance. However, when all employers in an area offer greater pay (such as larger signing bonuses), employees are more likely to engage in job-hopping and employers' labor costs simply increase.[171]

The evidence presented in this report suggests that conditions that could lead to a bidding war for psychiatrist services currently exist. There is a nationwide shortage of psychiatrists that is mirrored within California. Based on nationwide data from 2010 through 2017, in recent years psychiatrists' salaries have already risen substantially more than salaries in other medical specialties or than all occupations more broadly.[172]

Finally, there is precedence for a bidding war for psychiatrist services to develop in California. In 2007, pursuant to court order, the State of California increased the wages paid to psychiatrists working at CDCR facilities. The pay increase lured many psychiatrists employed at state hospitals to transfer to the prison system, leading to severe vacancy rates at state hospitals. According to the former head of California's mental health department, the pay increases caused staff costs for psychiatrists to rise elsewhere. Six months after California increased psychiatrist pay at CDCR facilities, it did the same for psychiatrists working at state hospitals, stemming the flow of employees from the mental health system to the prison system. Subsequently, the two systems have reportedly aimed to ensure that they do not compete for each other's professionals.[173]

The proximity of certain state hospitals and CDCR facilities, such as Coalinga State Hospital and Pleasant Valley State Prison, is perceived as contributing to the 2007 migration of psychiatrists from the state mental health system to the prison system.[174] Furthermore, our regression analyses show that during a period when CDCR salaries were 9% to 47% above statewide average pay the

---

[166] Fay Hansen (2006), "Rethinking Signing Bonuses," *Workforce Management*, March 27 (*hereinafter* "Hansen"). Available from http://www.workforce.com/2006/03/29/rethinking-signing-bonuses/.

[167] Elaine Pofeldt (2010), "New hiring game for tech startups," *Crain's New York Business*, June 7, p. 16. Available from http://www.crainsnewyork.com/article/20100606/SUB/306069998/new-hiring-game-for-tech-startups.

[168] Helen Gregory (2006), "The headhunters are back," *PR Week*, May 25. Available from https://www.prweek.com/article/560656/headhunters-back.

[169] Rachel Fielding (2010), "Finance sector rewards top IT talent," *Computing*, May 11. Available from https://www.computing.co.uk/ctg/analysis/1859406/finance-sector-rewards-it-talent; *Recruiter* (2012), "Candidate Shortage Creates City IT Bidding War," September 13. Available from https://www.recruiter.co.uk/news/2012/09/candidate-shortage-creates-city-it-bidding-war.

[170] Charles Paikert (2005), "Compliance pros hot commodity as SEC regs fuel boom," *Investment News*, February 7. Available from http://www.investmentnews.com/article/20050207/SUB/502070721/compliance-pros-hot-commodity-as-sec-regs-fuel-boom.

[171] Hansen.

[172] EI analysis of annual OES data, 2010-2017. Psychiatrists' salaries increased 29% between 2010 and 2017. During this same period, salaries of physicians in family and general practice rose 20% and surgeons' salaries rose 12%. Wages rose 14% across all occupations.

[173] Freeman Klopott, et al. (2012), "$822,000 Worker Shows California Leads U.S. Pay Giveaway: Bidding War for Prison Psychiatrists," *Bloomberg News*, December 12. Available from https://www.bloomberg.com/news/articles/2012-12-11/-822-000-worker-shows-california-leads-u-s-pay-giveaway (hereinafter "Klopott et al.").

[174] Klopott et al.

number of CDCR hires and positions filled (with psychiatrists from the private and public sector) did not respond to pay increases.  In short, we are unaware of any evidence suggesting that CDCR pay increases have enticed psychiatrists to leave the private sector for CDCR in 2007 or at any other time.

If CDCR implements a large salary increase, not only could it not be enough to attract sufficient additional psychiatrists to meet the court-ordered level, but it could also entice other state and local government employers, systems such as Kaiser or Sutter, hospitals and group practices to increase the wages they pay to psychiatrists in their employ.  Since Kaiser is already under court-mandated requirements to increase its provision of psychiatrist services, it will likely be compelled to engage in a bidding war.

## IV.     Survey of Policy Solutions Proposed to Alleviate Psychiatrist Shortages

Multiple policy studies have documented the increasing demand for mental health services due to demographic trends, expanded coverage related to the implementation of the ACA, greater awareness of mental health conditions and treatment options, and less stigma about seeking treatment, among other reasons.  These same studies also describe how an aging population of psychiatrists not replaced sufficiently quickly by new physicians entering the workforce has led to acute national and California-wide psychiatrist shortages.  To allay some of the employment challenges due to the widening gap between the demand and supply of psychiatrists, these studies have proposed several policy changes and other initiatives.  CDCR has already implemented several of the initiatives and those that remain tend to be outside of its control.

### A.  Telepsychiatry

Chief among the policy recommendations issued in numerous academic research papers and policy briefs is to expand the use of telepsychiatry.[175]  As we explained in Section D.2, empirical evidence of the efficacy and cost-effectiveness of telepsychiatry as a modality of care is well documented.  The American Psychiatric Association ("APA") lists telepsychiatry as a valid means to meet patients' needs for convenient, affordable and readily-accessible mental health services.[176]  In recognition of the merits of this modality of care, the APA recently issued a toolkit to help practitioners implement telepsychiatry within their practice groups.

As we discussed in Section D.2, CDCR has already implemented a telepsychiatry program which has contributed to a lowering of psychiatrist vacancy rates.  Expansion of the program's capacity is expected to result in additional hiring in the near future.  This program represents a promising avenue to boost CDCR psychiatrist hiring, but, due to the acute nationwide and statewide shortages, it is unclear whether a full complement of psychiatrists can be hired through this program alone.

---

[175] NCBH Report, p. 32, Huff Article, p. 7., Coffman Study, p. 56.
[176] *See* APA website: https://www.psychiatry.org/psychiatrists/practice/telepsychiatry.

### B.  Increasing the Supply of Psychiatrists

Some studies note that the single most important opportunity to expand the psychiatric workforce is to reduce the proportion of psychiatrists who practice solely in cash-only private practices.[177]  Other proposed avenues to increase the supply of psychiatrists include expansion of the number of residency positions for psychiatry and increasing resources in support of these programs.[178]  These measures pertain to policy proposals that are beyond the scope of initiatives within CDCR's control.

### C.  Expanding Utilization of Other Types of Mental Health Professionals

Some studies recognize the limited potential of policies aimed at increasing the supply of psychiatrists and recommend the complementary measure of expanding the utilization and reliance on nurse practitioners and physician assistants.

According to the American Psychiatric Nurse Association ("APNA") there are currently 13,815 mental health nurses specializing in psychiatry, and that number will increase to 17,900 by 2025.[179]  A recent study by the National Council of Behavioral Health ("NCBH") notes that these nurses can be especially valuable for patients with co-occurring medical conditions because they can liaise with primary care physicians and coordinate care.[180]  Nationwide, 21 states and the District of Columbia have passed laws providing "full practice authority" that allow nurse practitioners to diagnose, treat, order diagnostic tests and prescribe medications to patients without physician oversight.[181]  The same NCBH report also notes that physician assistants with psychiatric training represent a new development with potential for expansion; this would provide a cost-effective, albeit partial, solution to the shortage of psychiatrists nationwide.[182]  However, the Coffman Study separately evaluated the availability of mental health professionals other than psychiatrists in California and found that shortages of these other types of professionals are beginning to emerge.  Based on current utilization patterns, shortages of other mental health professionals will exceed 10% of the available workforce within the next decade.[183]  As a result, the Coffman study projects pervasive and worsening shortages in the overall mental health workforce and recommends the implementation of collaborative and team-based environments that include psychiatrists, nurse practitioners, physician assistants and primary-care physicians, to better address mental health needs in light of the shortages.[184]

The NCBH report notes that psychiatric pharmacists, through collaborative practice agreements with physicians, could be allowed to prescribe and manage medications to alleviate psychiatrists' workloads.[185]  The Coffman Study also finds that increasing the supply of professionals who can

---

[177] NCBH Report, p. 8.
[178] Coffman Study, p. 56.
[179] NCBH Report, p. 57.
[180] *Id.*
[181] *Id.,* p. 57.
[182] *Id.,* p. 31.
[183] Coffman Study, p. 6.
[184] Coffman Study, p. 56.
[185] NCBH Report, pp. 31-32.

prescribe psychiatric medications is especially critical.[186]  The Department of Veterans Affairs, Department of Defense, and states such as Oregon and Ohio have already implemented regulations allowing psychiatric pharmacists to perform these roles.[187]

Similar initiatives could provide avenues for CDCR to alleviate its psychiatrist shortages. However, due to shortages of mental health professionals more generally their efficacy appears to be limited in the foreseeable future.

To summarize, based on materials that we have considered and independent statistical analyses, we conclude that salary adjustments or other forms of monetary compensation will not enable CDCR to permanently and significantly increase the size of the pool of psychiatrists that it employs.  Most of the other monetary initiatives that CDCR has implemented to attempt to improve hiring and retention appear to have had limited efficacy. Hence, there is no evidence that these ancillary initiatives will have a different outcome in the future. Although telepsychiatry has had measurable success towards expanding CDCR's pool of employed psychiatrists, as psychiatrist shortages worsen and competition for the pool of psychiatrists seeking employment intensifies, it is unclear whether CDCR will be able to permanently fill its expanded capacity for telepsychiatry.

---

[186] Coffman Study, p. 56.
[187] NCBH Report, pp. 31-32.

I declare that the foregoing report is true and correct.

Executed on September 19, 2018.

Lona Fowdur, Ph. D.

Erica Greulich, Ph. D.

**Appendix: Regressions Relating CDCR Measures of Employment and Salary Premiums**

Economists use regression analysis to evaluate and model relationships among multiple variables. A multivariate linear regression analysis relates the values of a dependent variable (here, total filled positions or hiring changes) to the values of independent or explanatory variables that are believed to explain variation observed in the dependent variable.

We use multivariate linear regression techniques to estimate the relationship between CDCR's employment of staff psychiatrists and relative salaries, controlling for authorized psychiatrist positions and the passage of time:

$$employment = \beta_0 + \beta_1 * \frac{CDCR\ salary}{Market\ salary} + \beta_2 * authorized + \beta_3 * t + \epsilon.$$

"Employment" is alternately measured as filled civil service staff psychiatrist positions (capturing the "stock" of CDCR employed psychiatrists at a point in time) and the gains or losses associated with civil service hiring (each of which captures the "flow" of CDCR employed psychiatrists at a point in time). "Market salary" is either the California statewide or the nationwide average and $t$ is a linear time trend measuring the number of months since January 2010 (regressions of filled positions) or August 2012 (regressions of hiring measures). The time trend proxies for unobserved changes in the supply of or demand for psychiatrists over time. Each coefficient β measures the relationship between an independent variable and the dependent variable (filled positions or hiring measure). Regressions of filled positions utilize monthly data from February 2010 through December 2017.[188] Regressions of hiring changes utilize monthly data from September 2012 through December 2017.[189] The source of filled and authorized positions is CDCR's monthly vacancy reports. Data on hires and separations are attached to the 12/08/2017 Mental Health Hire Tracking Executive Summary. CDCR salaries are imputed from CDCR salary data.[190] California and U.S. average salaries for psychiatrists are published in 2010-2017 Occupational Employment Statistics data, downloaded from the Bureau of Labor Statistics.[191]

Filled positions, authorized positions and relative salaries are measured in logarithmic terms. Coefficients in regressions of filled positions are interpreted as the percentage changes associated with a one-percent increase in filled positions. Hires and separations are measured as monthly changes and cannot be measured in logarithmic terms. Coefficients in hiring regressions are thus interpreted as percentage changes associated with one additional hire (or separation, depending on the regression specification).

---

[188] Data exclude April 2010, May 2010 and July 2016 dues to missing information on filled and authorized positions.

[189] Data exclude July 2016 due to missing information on authorized positions. Hiring data are aggregated from weekly totals.

[190] Psychiatrist Salary.xlsx; STAFF PSYCH – MAX.pdf. The average imputed salary is calculated by weighting minimum and maximum salaries for staff psychiatrists by the statewide proportion of psychiatrists earning the maximum salary. The proportion of psychiatrists not earning the maximum salary are assumed to earn the minimum salary.

[191] https://www.bls.gov/oes/tables.htm. OES data exclude the self-employed. Wages include certain forms of incentive pay but exclude overtime.

If higher CDCR salaries are associated with greater employment of staff psychiatrists, we expect the estimate of $\beta_1$ to be positive. Similarly, we expect the relationship between employment and authorized positions ($\beta_2$) to be positive. Assuming, as documented in this report and elsewhere, that statewide and nationwide psychiatrist shortages are worsening over time, and that the increasing shortages outweigh other time-variant factors associated with the number of positions filled, we expect the estimate of $\beta_3$ to be negative. However, the time trend may capture other unobserved or unquantifiable factors.

## A. Regressions Relating CDCR Salary Premiums to Filled Positions

Model (1) in Appendix Table A1 shows the results of the regression relating filled positions to CDCR salaries measured relative to the statewide average.

| Appendix Table A1 | | | |
|---|---|---|---|
| **Filled Positions Regressions** | | | |
| | | | |
| Dependent variable: Filled civil service staff psychiatrist positions | | | |
| | | | |
| | | Coefficient | |
| | | [P-value] | |
| Independent variables | Model (1) | Model (2) | Model (3) |
| | | | |
| CDCR/CA salary | -0.174 | -0.445 | |
| | [0.953] | [0.971] | |
| CDCR/US salary | | | 0.248 |
| | | | [0.187] |
| Authorized positions | 1.073 | 1.049 | 1.107 |
| | [0.000] | [0.000] | [0.000] |
| Time trend | -0.003 | -0.003 | -0.002 |
| | [0.000] | [0.000] | [0.009] |
| Post-2014 | | -0.067 | |
| | | [0.198] | |
| Constant | -0.723 | -0.497 | -1.096 |
| | [0.492] | [0.639] | [0.288] |
| | | | |
| **Note:** P-values reported for CDCR/CA salary and CDCR/US salary are based on a one-tailed test of significance assuming a null hypothesis that the coefficient is less than zero. All other P-values are based on two-tailed tests of significance. | | | |

Each coefficient estimates the association between the percentage increase (or decrease) in filled positions when the independent variable changes by one percent (in the cases of CDCR relative salary and authorized positions) or one unit (time).

The bracketed P-values indicate the probability of seeing a result as extreme as the estimated statistic in a set of random data where there is no relationship between the independent variable and the dependent variable.[192]  A P-value of 5% or less is frequently used as a rule of thumb to reject the null hypothesis that there is no relationship between the independent variable and the dependent variable.[193]  This corresponds to a five percent (or smaller) chance that the observed result is due to chance.

With the exception of CDCR relative salaries, the P-values reported in Appendix Table A1 test the null hypothesis that there is no relationship between the independent variable and the dependent variable.  These are called "two-tailed tests" which assess the likelihood of a relationship between two variables being statistically equivalent to zero.  However, for CDCR relative salaries we are specifically interested in understanding whether an increase in the salary premium is associated with a greater number of filled positions – i.e., we expect that $\beta_1>0$, not $\beta_1\neq0$.  In this situation we test the null hypothesis that $\beta_1\leq0$ using a "one-tailed" test of significance.  If the statistical evidence rejects the null hypothesis that $\beta_1\leq0$ we would conclude that the number of filled positions increases with CDCR salaries.

As expected, in Model (1) the percentage change in filled positions is positively associated with the percentage change in authorized positions.  The P-value is less than 1%, indicating that the relationship between authorized and filled positions is highly statistically significant.

The relationship between the time trend and filled positions is negative and small, but highly statistically significant.  There were on average fewer filled positions as time passed.

Contrary to expectations, the relationship between the percentage change in CDCR relative salaries and filled positions, controlling for time and authorized positions, is negative.  A 1% increase in the CDCR salary premium is associated with 0.17% fewer filled positions, and this result is statistically insignificant based on a one-tailed test that $\beta_1\leq0$.  That is, we fail to reject the null hypothesis that $\beta_1\leq0$.  The test does not provide statistical evidence indicating that higher CDCR salary premiums lead to more filled positions.

There was a substantial increase in average salaries throughout California, and consequently a decrease in CDCR salary premiums, beginning in 2015.  To test whether this large one-time drop drives our finding of a lack of a relationship between filled positions and the CDCR salary premium, we estimate the regression adding a control equal to one for all months in 2015-2017 and zero in prior months.  Results are presented in Model (2) of Appendix Table A1.

The results are qualitatively similar.  The percentage change in filled positions increases with the percentage change in authorized positions.  The coefficient on the post-2014 control variable is

---

[192] P-values of 0.000 in Appendix Tables A1 and A2 denote probabilities of less than 0.0005, or less than 0.05%, of seeing a result as extreme as the estimated statistic in a set of random data where there is no relationship between the independent variable and the dependent variable.

[193] *See, e.g.,* Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," in National Research Council, *Reference Manual on Scientific Evidence: Third Edition*, Washington DC: The National Academies Press, 2011, p. 320.

not statistically significant. Controlling for the post-2014 change in the CDCR salary premium, there have been fewer filled positions filled over time. The relationship between the percentage change in the CDCR salary premium and filled positions is negative and insignificant based on a one-tailed test of the null hypothesis that salary premiums are negatively related to filled positions (i.e., we fail to reject this hypothesis). There is no statistical evidence of a *positive* association between CDCR salary premium and filled positions.[194]

Model (3) of Appendix Table A1 reports the results of a regression that relates filled positions to the premium of CDCR salaries over the nationwide average rather than the statewide average. It excludes the post-2014 control as there was not a substantial change in the CDCR-nationwide premium in 2015 (or at any other time in the 2010-2017 period). Similar to the regression presented in the top panel, it controls for authorized positions and the passage of time.

When we measure CDCR salaries relative to the U.S. average, we find a positive but statistically insignificant relationship between salary premiums and filled positions. The P-value for a one-tailed test of the null hypothesis that an increase in CDCR salary premiums is associated with a decrease in filled positions is 18.7%. This does not allow us to conclude, to a reasonable degree of statistical certainty, that the relationship is indeed positive.

To assess whether there is any measurement error in the OES salary data that biases our estimates, we ran a version of Model (1) using CDCR salary levels rather than CDCR salaries relative to the statewide average as an independent variable. The coefficient estimate on CDCR pay was insignificant while all other coefficient estimates were qualitatively similar and statistically significant.

Taken collectively, these regressions do not provide statistical evidence that higher CDCR salary premiums are associated with an increase in filled civil service positions.

### B. Regressions Relating CDCR Salary Premiums to Staff Psychiatrist Hires and Separations

Appendix Table A2 shows the results of regressions relating staff psychiatrist hiring gains and losses to CDCR salary premiums. Models (1), (2) and (3) are the same specifications as in Appendix Table A1.

Each coefficient estimates the association between the number of a measure of hiring (gains or losses) when the independent variable changes by one percent (in the cases of CDCR relative salary and authorized positions) or one unit (time). As in Appendix Table A1, the P-values on CDCR relative salary variables report significance levels based on one-tailed tests while the P-values on all other variables report significance levels based on two-tailed tests.

---

[194] The P-value is 97.1% based on a one-tailed test of significance that $\beta_1 \leq 0$.

| | Coefficient [P-value] | | | | | |
|---|---|---|---|---|---|---|
| Independent variables | Model (1) Gain | Model (2) Gain | Model (3) Gain | Model (1) Loss | Model (2) Loss | Model (3) Loss |
| CDCR/CA salary | 19.630 | 10.950 | | -1.430 | 8.850 | |
| | [0.0194] | [0.349] | | [0.574] | [0.352] | |
| CDCR/US salary | | | 15.800 | | | 4.811 |
| | | | [0.262] | | | [0.404] |
| Authorized positions | 0.856 | -0.441 | -8.698 | -9.440 | -7.904 | -9.997 |
| | [0.948] | [0.975] | [0.543] | [0.386] | [0.489] | [0.380] |
| Time trend | 0.008 | 0.010 | -0.030 | 0.084 | 0.081 | 0.103 |
| | [0.896] | [0.872] | [0.721] | [0.113] | [0.128] | [0.133] |
| Post-2014 | | -1.871 | | | 2.217 | |
| | | [0.745] | | | [0.639] | |
| Constant | -4.656 | 5.630 | 49.750 | 47.200 | 35.010 | 47.700 |
| | [0.950] | [0.945] | [0.518] | [0.445] | [0.603] | [0.436] |

**Appendix Table A2**
**Hiring Gains and Losses Regressions**

**Note:** P-values reported for CDCR/CA salary and CDCR/US salary are based on a one-tailed test of significance assuming a null hypothesis that the coefficient is less than zero. All other P-values are based on two-tailed tests of significance.

The results of these regressions are less clear than the filled positions regressions in Appendix Table A1. With the exception of Model (1) when losses are the dependent variable, we estimate positive relationships between gains or losses and CDCR salary premiums. However, only in one specifications – Model (1) when gains are regressed on CDCR's salary relative to the statewide average, without the post-2014 control – is the estimate statistically significantly greater than zero (the P-value is 1.9%). When the post-2014 control is included, this relationship is no longer statistically significant. That is, controlling for the large 2014-2015 drop in relative salaries, we do not find statistical evidence that hiring gains are positively related to changes in CDCR salary premiums.

None of the estimates of the relationship between hiring gains or losses and any other independent variables in Models (1), (2) and (3) are significantly different from zero. That is, we do not find a statistically significant relationship between either measure of hiring and authorized positions, time or the post-2014 period. Both measures of hiring exhibit substantial month-to-month variation and we cannot rule out the possibility that omitted explanatory variables cause the coefficients to be imprecisely estimated and potentially biased. As described below, we test for this to the extent possible in our data.

To assess whether there is any measurement error in the OES salary data that biases our estimates, we ran a version of Model (1) using CDCR salary levels rather than CDCR salaries relative to the statewide average as an independent variable. The coefficient estimates on CDCR salary levels were insignificant in both regressions (gains and losses), and all other coefficient estimates remained statistically insignificant.

There are several missing weeks (amounting to 6% of all weeks) of CDCR hiring data over the more than five year data period. It is unclear why these weeks are missing. If it is because there were no hires or separations in those weeks, then the estimates reported above are unaffected by our aggregation to monthly totals. However, if the weeks are missing because information for those weeks no longer exists, we underreport monthly hires and separations. To assess whether potential underreporting affects our estimates, we ran a version of Models (1), (2) and (3) that relied on average rather than aggregate weekly hiring data within each month. The coefficient estimates on CDCR salary premiums were insignificant in all specifications. Other coefficient estimates were generally statistically insignificant as well.

There is inevitably a lag between the time when potential (or current) CDCR employees observe a change in relative salaries, decide to apply for a position at CDCR (or leave their position at CDCR) and when the employment action ultimately occurs. That is, there is a lag between changes in CDCR relative salaries and when individuals would act in response to such changes. Unfortunately, due to the infrequent changes in the salary premium a model relying on lagged salary premiums is unlikely to generate meaningful results.

Additionally, the monthly changes in CDCR's statewide hiring gains and losses plotted in Figure [F] in the text suggest that there may be a seasonal pattern to hiring and separations. However, as shown in Figure [D], many of the changes in CDCR salary premiums also follow a seasonal pattern. Controlling for seasonal changes in addition to the salary premium would introduce collinearity into the regression model, making it difficult or impossible to draw inferences from the model.

Viewed collectively, the hiring regressions do not provide statistical evidence that higher CDCR salary premiums are associated with greater hiring gains or fewer losses.

EXHIBIT B

## Economists Incorporated Response to the EmployStats Draft Report

### I.    Executive Summary

Economists Incorporated has been asked by counsel for the California Department of Corrections and Rehabilitation ("CDCR") and Department of State Hospitals ("DSH") to respond to the draft report submitted by EmployStats ("Draft Report") to the *Coleman* Special Master.[1]  We respond to the Draft Report's recommendations, criticisms of the Economists Incorporated Report[2] and certain other findings and issues.[3]  While the Draft Report acknowledges that CDCR and DSH psychiatrist salaries are already far higher than the salaries of psychiatrists at other California employers, it nevertheless recommends additional salary increases.  However, the Draft Report's own findings do not support this recommendation. More generally, the Draft Report's recommendations are seriously weakened by methodological flaws and a failure to take into account pertinent sources of information including findings in the Draft Report itself, findings in the Economists Incorporated Report, relevant academic literature, psychiatrist labor market reports, and news articles.

Most importantly, the Draft Report and Economists Incorporated Report agree that CDCR psychiatrists have consistently been paid significantly higher salaries than psychiatrists employed elsewhere in California or broader geographic areas. The two reports even found a similar range of salary premiums paid to CDCR psychiatrists relative to psychiatrists employed

---

[1] Dwight D. Steward, Lead Researcher, "An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals," August 14, 2019.

[2] Lona Fowdur and Erica Greulich, "Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists," September 19, 2018.

[3] This critique is based on a review of the Draft Report, selected documents, data underlying the analyses in the Economists Incorporated Report, survey results in the Draft Report, and labor economics literature. We do not have access to the underlying data, particularly the survey information that the Draft Report relies upon, which precludes a more fulsome critique of the recommendations in the Draft Report.

elsewhere in California between 2011 and 2018. The Draft Report similarly found that DSH psychiatrists have consistently been paid substantially higher salaries than psychiatrists employed elsewhere in California or the Western Region. Both the Draft Report and the Economists Incorporated Report additionally found that substantial vacancy rates persisted at CDCR even in years when CDCR paid significant salary premiums relative to other employers in California.

Despite these areas of agreement, the Draft Report has numerous shortcomings which render its findings and recommendations unsupported. We address the Draft Report's shortcomings in four chief areas, namely its salary analysis, its conclusions regarding the use of telepsychiatry, its survey-based findings and recommendations, and additional methodological concerns and issues that it fails to address.

The Draft Report recommends a system of "consistent and larger" salary increases. To start, the Draft Report does not provide any evidence linking "consistent and larger" salary increases to improvements in employment outcomes. Its recommendation is therefore untethered to statistical or survey-based evidence.  The validity of this recommendation is further impaired by the Draft Report's failure to evaluate some of its own findings demonstrating that CDCR and DSH have consistently paid psychiatrists substantially higher salaries relative to other employers.

The Draft Report focuses on the size of salary *increases* rather than salary levels, finding that CDCR and DSH salary increases have tended to be lower than those at many other employers in recent years. However, this ignores that CDCR and DSH psychiatrists were already (and continue to be) paid higher salaries than psychiatrists employed elsewhere. Lower increases are arguably unsurprising with higher baseline salaries, and the Draft Report does not explain why "consistent and larger" increases will be effective when large baseline increments themselves have not generated sustained improvements in hiring and retention outcomes.

The recommendation also ignores findings that higher salary differentials and registry pay increases have not led to long-lasting improved hiring and retention outcomes at CDCR. The Draft Report's recommendation appears to be based in part on survey results indicating job dissatisfaction among CDCR and DSH psychiatrists and perceptions of lower salaries, but numerous deficiencies with EmployStats' survey instrument and analysis call its findings into question.

The Draft Report fails to assess the broader implications of its recommendation of "consistent and larger" salary increases. It fails to analyze prevailing vacancy rates at employers whose salary increases it compares to CDCR and DSH, and whether those employers' salary increases enabled them to hire a full complement of psychiatrists. It ignores the widely acknowledged shortage of psychiatrists in California and nationwide and fails to assess whether salary increases at CDCR would generate meaningful long-term increases in fill rates or merely invite a bidding war unlikely to improve long-term hiring and retention outcomes for any employer.

The Draft Report portrays a need for a "compensating wage differential" that considers differences in working conditions and fringe benefits at CDCR and DSH relative to other public and private employers. However, it fails to assess or quantify any differences in working conditions and fringe benefits, does not specify what it includes among fringe benefits, and presents no evidence that the existing salary differential insufficiently compensates psychiatrists for differences in working conditions and fringe benefits, to the extent they exist.

The Draft Report fails to consider the benefits of using telepsychiatry as a modality of hiring and retention in addition to other modalities employed by CDCR. It erroneously concludes that CDCR telepsychiatrists were "not significantly more satisfied" with all aspects of their positions than on-site and registry psychiatrists. Its survey findings indicate the opposite result, namely that CDCR telepsychiatrists were *more satisfied* than on-site or registry psychiatrists with their jobs, working conditions and professional standing. The Draft Report also fails to highlight telepsychiatrists' satisfaction with the adequacy of their office space, another apparent advantage of the telepsychiatry program and one that the Draft Report ignores as a potential avenue to address some of its findings and recommendations. The Draft Report also fails to assess whether its finding that relatively more telepsychiatrists perceived their salaries being lower than their peers was driven by factors such as less experience or shorter job tenure.

The Draft Report's conclusions and recommendations based on their survey results are deficient. EmployStats' survey instrument fails to adhere to best practices recommended by the American Association for Public Opinion Research, raising serious questions about EmployStats' methodology and conclusions. The Draft Report fails to assess the significance and reliability of its self-reported survey results in finding that CDCR and DSH's psychiatrists

perceive their salaries to be lower than their peers' salaries. The reported perceptions are on average incorrect, as demonstrated by salary analyses in both the Draft Report and the Economists Incorporated Report, and the disconnect calls into question the validity of the survey-based findings and recommendations in the Draft Report.

The Draft Report limits its overall survey findings to "negative" responses, namely those that it categorizes as "less than satisfied" or "unsatisfied". It also characterizes responses rated 4 on a scale of 1 to 7 as "less than satisfied", inviting a negative interpretation where none exists. To avoid biasing interpretation of the survey responses, and given EmployStats' wording on the survey instrument,[4] a score of 4 that falls in the middle of the scale should capture neutral perceptions, not negative ones.

EmployStats' survey instrument omitted relevant questions and failed to survey or analyze the perceptions of psychiatrists at competing employers. As a result the survey responses cannot be compared adequately to the perceptions of psychiatrists with other employers. Further, the Draft Report did not assess whether survey respondents are representative of the larger group of all CDCR psychiatrists.

The survey instrument explicitly made respondents aware of, or reminded them of, both CDCR's and DSH's claimed difficulties hiring and retaining psychiatrists and the existence of a lawsuit involving CDCR and DSH. Awareness of the issues with CDCR and DSH psychiatrist staffing levels and the lawsuit may have influenced individuals' survey responses and led them to respond in ways that could benefit them or their peers if CDCR's or DSH's policies or pay were to change.

There are additional shortcomings in the Draft Report, namely: it fails to show that "consistent and larger" salary increases throughout psychiatrists' tenure at CDCR and DSH will benefit retention; its statistical analyses are deficient; it fails to address the inherent difficulties of filling Central Valley psychiatrist positions; and it fails to address why access to 16 times more

---

[4] EmployStats asked survey respondents to rate overall satisfaction, working conditions and professional standing on a scale from 1 to 7, with no suggestion that 4 should be anything other than the midpoint. See, e.g., Draft Report p. 94.

psychiatrists relative to the general population, or approximately one in 20 psychiatrists in California, is insufficient to meet the mental health needs of CDCR prison inmates. Each of these shortcomings is discussed below.

Since EmployStats did not provide all of the information underlying the Draft Report and the time to respond to the Draft Report was limited to 60 days, we are unable to perform a fulsome critique of its findings and recommendations. Should additional materials that the Draft Report relied upon become available in the future and we are provided more time, we reserve the right to supplement our response.

## II.     The Draft Report's Recommendation that "Larger and Consistent" Salary Increases May Help with Increased Retention Is Tenuous

The Draft Report recommends "consistent and larger" salary increases for psychiatrists throughout their CDCR or DSH employment tenure, but fails to document the basis for this recommendation. In particular, the Draft Report fails to present any evidence linking "consistent and large" salary increases to better employment outcomes. Additionally, contradictory findings and the implications of those findings further compromise the reliability of the Draft Report's recommendation.

### A.  The Draft Report's "Consistent and Larger" Salary Increase Recommendation Erroneously Ignores CDCR's Higher Actual Salaries

To support its recommendation, the Draft Report cites to a cursory analysis that finds smaller salary increases at other employers.[5] This focus on increases ignores existing baseline differences. In particular, the Economists Incorporated Report documented that between 2010 and 2017, CDCR psychiatrists' base salaries alone exceeded the statewide average compensation (including call-coverage and overtime) by at least 9% and by up to 47%.[6] The salary analysis in

---

[5] *See for example*, Draft Report Tables 5-8, pp. 21-26.

[6] Economists Incorporated Report, Figure D, p. 19.

the Draft Report corroborates this result, finding that CDCR median salaries between 2011 and 2018 were 11% to 46% higher than median salaries at non-CDCR and non-DSH California public employers, average salaries at California public and private employers, and average salaries across the Western Region.[7] The Draft Report also found that DSH median salaries between 2011 and 2018 were between 95% and 103% of CDCR median salaries.[8] DSH psychiatrist median salaries between 2011 and 2018 were 9% to 50% higher than median salaries at non-CDCR and non-DSH California public employers, average salaries at California public and private employers, and average salaries across the Western Region.[9]

The Draft Report fails to present any analysis to support their recommendation in light of CDCR's and DSH's existing higher baseline salaries. Lower increases are unsurprising given higher initial baseline salaries. The Draft Report should provide an explanation for its recommendation in light of expectedly lower increases when initial baseline salaries are higher.

Further, as the Economists Incorporated Report found, during the period when CDCR offered the highest salary premium relative to other employers, CDCR did not experience better hiring and retention outcomes. There is little evidence that "consistent and larger" salary increases – which may conceivably widen the CDCR's and DSH's present salary premiums to what they have been historically – would generate increased hiring and retention.

Separately, the Draft Report's focus on a comparison of salaries could also be biased by a failure to consider total compensation differences. The Draft Report should explain why it chose to focus its comparison on salaries instead of total compensation.

---

[7] Draft Report Table 9, p. 28. Limiting the comparison to the state of California from 2011 to 2018, the years analyzed in both reports, the Draft Report found that CDCR median salaries were 14% to 46% higher than public and private employers in California, while the Economists Incorporated Report found that CDCR salaries were 9% to 47% higher than the statewide average.

[8] Draft Report Table 37, p. 72.

[9] Draft Report Table 9, p. 28, and Table 37, p. 72.

**B.  The Draft Report Ignores that Significant "Compensating Wage Differentials" Have Previously Failed to Generate Better Employment Outcomes**

Relatedly, the Draft Report points to a need for a "compensating wage differential" to address "amplified" cognitive and emotional demands placed on prison psychiatrists relative to psychiatrists who practice in other environments,[10] but it does not provide any evidence to support this point. The Draft Report does not provide a precise definition or quantification of "compensating wage differential" or "cognitive and emotional demands."  Nevertheless, this recommendation again appears to ignore the findings in both the Economists Incorporated Report and in the Draft Report that large salary premiums at CDCR relative to other employers have been in effect for several prior years.[11] This consistent salary premium is arguably no different than a "compensating wage differential" for prison psychiatrists that the Draft Report references. Notably, this salary premium or wage differential failed to generate desired employment outcomes for CDCR. Indeed, employment outcomes were not significantly different[12] when CDCR salaries were highest relative to other employers. The Draft Report fails to explain why "consistent and larger" increases would work now, when a salary premium or "compensating wage differential" of almost 50% for about five years between 2010 and 2014 (based on Economists Incorporated's analysis) did not.

The Draft Report does not recommend a specific differential. To the extent the Draft Report is arguing that the differential needs to be higher than 50%, it does not quantify how much higher, nor does it offer any evidence that a higher differential will lead to better employment outcomes. The Draft Report found CDCR vacancy rates ranging from 23% to 34%

---

[10] Draft Report, p. 64.

[11] Economists Incorporated Report, Figure D, p. 19; Draft Report Table 9, p. 28.  The Draft Report also report similar premiums for DSH psychiatrists.

[12] Regressions in the Economists Incorporated Report provide a statistical analysis of the relationship between salary premiums and hiring outcomes.

from 2013 to 2017 despite substantial CDCR salary premiums in those years.[13] Even the Draft Report's own evidence indicates that substantial "compensating wage differentials" at CDCR failed to generate desired employment outcomes in the years it analyzed.

## C. The Draft Report Fails to Consider Whether "Consistent and Larger" Salary Increases Will Have a Persistent Effect

Regressions in the Economists Incorporated Report[14] provided statistical evidence that increases in CDCR's salary premium or "compensating wage differential" did not generate sustained improvements in employment outcomes. The Draft Report does not engage with the substantive findings of the regression analysis in the Economists Incorporated Report, merely stating that the statistical evidence therein was inconsistent with "the increase in psychiatrist fill and retention rates that occurred after CDCR's most recent pay increases."[15] The Economists Incorporated Report explained, however, that based on historical data and statistical evidence: a) higher CDCR pay relative to statewide or nationwide averages is not associated with improved fill or hiring rates; b) improvements in fill and retention rates following pay increases tend to be short-lived; and c) offering a higher base salary potential via the registry program did not enable CDCR to fulfill its hiring goals.[16]

The Draft Report also did not clarify the source and time period for its conclusion regarding the "most recent pay increases."[17] The conclusion appears to be drawn from Table 1b in the Draft Report.[18] If so, the "most recent" salary increase was in 2017, when the vacancy rate

---

[13] Draft Report Table 1b, p. 17, and Table 9, p. 28. Table 9 indicates that between 2013 and 2017 the CDCR median salary was 11% to 45% higher than the median salary at other non-CDCR and non-DSH public employers, the average salary at California private and public employers, and the average salary in the Western Region. The Draft Report does not present vacancy rates for DSH psychiatrist positions.

[14] Economists Incorporated Report, pp. 32-36.

[15] Draft Report, p. 63.

[16] Economists Incorporated Report, pp. 33-37.

[17] Draft Report, p. 63.

[18] Draft Report, p. 17.

also declined. However, based on Figure 1 of the Draft Report, in 2018 the vacancy rate among staff psychiatrists reverted to its 2016 level of 33-34%,[19] despite a 3% general salary increase at CDCR in July 2017 followed by a 2% general salary increase in July 2018.[20] This fact pattern supports the findings in the Economists Incorporated Report regarding the transient effect of salary increases on employment outcomes.[21]

Further, the "most recent pay increase" to which the Draft Report refers pertains to a time when the "compensating wage differential" was at its lowest relative to earlier years since 2010. Indeed, the Economists Incorporated Report demonstrated that by 2017, the gap between CDCR psychiatrists' base salaries and statewide average compensation had narrowed to 9%.[22] In other words, when the differential was higher, employment outcomes were not consistently better. This fact pattern again contradicts the Draft Report's conjecture that higher differentials or "consistent and larger" increases would lead to better employment outcomes.

### D. The Draft Report Failed to Undertake an Economic Analysis of Differences in Working Conditions and Fringe Benefits

The Draft Report criticizes the Economists Incorporated's Report for ignoring potential differentials that may influence hiring and retention, such as limitations on the ability to work long hours at CDCR, fringe benefits, and other factors.[23] EmployStats' survey instrument suggests that retirement, health insurance, federal loan forgiveness and bonuses would be included among fringe benefits.[24] The Economists Incorporated Report did analyze some of these components of non-salary compensation, such as retention bonuses and other awards.[25] As

---

[19] Ibid. p. 14.

[20] See, e.g., "Salary Comparison - Staff Psychiatrists v Physician Surgeon.pdf".

[21] Economists Incorporated Report, p. 24.

[22] Economists Incorporated Report, pp. 19-20.

[23] Draft Report, pp. 63-64.

[24] Draft Report pp. 90-91, 99-100.

[25] Economists Incorporated Report, p. 25.

the Economists Incorporated Report found, these two categories alone comprised up to 1.3% of total compensation between 2016 and 2018.[26] The Economists Incorporated Report also found that CDCR on-site psychiatrists earned an average of 9% of their regular pay in the form of compensation for call coverage, overtime, awards, travel, paid leave, and other benefits.[27] The Draft Report includes no such analysis. Nor did it analyze the effects of fringe benefits on retention or hiring. Similarly, it did not analyze the effect of long hours or other factors, nor did it analyze whether there was any difference in the pertinent factors between CDCR and other employers. The Draft Report's inference that higher pay is likely to overcome their nebulous and unquantified representations of differences in fringe benefits, long hours and other factors is therefore untethered to any economic or statistical evidence.[28]  The Draft Report has no basis to suggest that fringe benefit packages available to CDCR psychiatrists are inferior relative to other employers.

The Draft Report also does not discuss the extent to which psychiatrists perform work outside of CDCR and why. To the extent that psychiatrists already receive fringe benefits through other employment, inclusion of benefits may not incentivize psychiatrists to avail themselves of these benefits at CDCR or DSH. The Draft Report did not address this point, although its survey asked and it presumably could analyze responses regarding the extent to which CDCR and DSH psychiatrists perform work outside of CDCR and DSH, respectively.[29]

The Draft Report posits, without any support, that CDCR psychiatrists may be "so emotionally exhausted" that compensating wage differentials are needed to entice them to work longer.[30]  But it separately notes that long hours may not be possible in the CDCR system. The

---

[26] Ibid.

[27] Economists Incorporated Report, pp. 22-23.

[28] The survey-based evidence pertaining to dissatisfaction is insufficient because the Draft Report lacks survey results of psychiatrists with other employers.  The required comparison of dissatisfaction, between CDCR and DSH psychiatrists on the one hand and other employers' psychiatrists on the other, is therefore not feasible.

[29] *See* EmployStats CDCR survey questions 13, 13a-1 and 13a-2, p. 96; EmployStats DSH survey questions 13, 13a-1 and 13a-2, p. 105.

[30] Draft Report, p. 64.

Draft Report should address this logical inconsistency. Further, the Draft Report does not present any evidence to support its hypothesis about emotional exhaustion. None of its survey questions addressed the emotional state of CDCR psychiatrists on their own, or in relation to their peers employed by others. The Draft Report does not cite to any supportive literature documenting this phenomenon nor does it provide any support for the relative difference between prison and non-prison settings.[31]

As to the Draft Report's reference to emotional exhaustion, even if CDCR and DSH psychiatrists are emotionally exhausted, the Draft Report does not point to any evidence of greater emotional exhaustion at CDCR or DSH *relative to* other employers. Presumably, it would be this relative differential that would warrant the "compensating wage differential" to which the Draft Report alludes.

In addition, the CDCR salary comparisons in both the Economists Incorporated Report and Draft Report are relative to reference groups that include other public employers of psychiatrists, which may include psychiatrists employed at county jails and federal prisons. The Draft Report does not indicate to what extent its reference groups include psychiatrists who face similar "amplified" cognitive and emotional demands. To the extent EmployStats can quantify a differential in cognitive and emotional demands between CDCR psychiatrists and these reference groups, it should also document why a salary differential of up to 50%, which had been offered before, did not sufficiently compensate for the differential.

Finally, the survey did not ask CDCR psychiatrists how many hours they worked, only whether they worked full time or not, and why (questions 7 and 7a).[32] As discussed in the Economists Incorporated Report, while CDCR's dual appointment program had not led to large numbers of psychiatrists working extended hours, several CDCR psychiatrists did take advantage of the opportunity to earn additional salary by working extra hours at a second CDCR facility.[33]

---

[31] To the extent differences do exist, telepsychiatry could provide a mechanism to overcome them, but the Draft Report ignores this factor.

[32] Draft Report, p. 93.

[33] Economists Incorporated Report, pp. 24-25.

The Draft Report apparently ignores, or at least does not directly respond to, this evidence that at least some psychiatrists in the CDCR system chose to work additional hours when presented with the opportunity to do so.

### E. The Draft Report Fails to Assess General Labor Market Conditions and Generalized Shortages of Psychiatrists that Could Lead to a Bidding War

The Economists Incorporated Report carefully documented worsening psychiatrist shortages, both at the state and nationwide levels, and the resulting implications for any employer seeking to boost its ranks of psychiatrists.[34] The Economists Incorporated Report also explained why the conditions in the psychiatrist labor market were such that a bidding war would be likely to arise in response to persistent salary increases without commensurate increases in the supply of psychiatrists.[35] The Draft Report ignored those findings, which bear upon any employer's ability to recruit and retain psychiatrists via salary increases. In particular, the Draft Report failed to provide any evidence that "consistent and larger" salary increases will be effective in reducing vacancies at CDCR as employers vie with one another and respond to each other's salary increases in an environment where the pool of psychiatrists is shrinking and national shortages are worsening. The Draft Report's recommendation of "consistent and larger" increases in light of the widely acknowledged shortage of psychiatrists in California and nationwide simply invites a bidding war, without any long-term increase in hiring and retention outcomes for any employer.

### F. The Draft Report Fails to Analyze Tenure-Based Salary Increases

The Draft Report specifically recommends that CDCR and DSH provide consistent and larger salary increase opportunities for psychiatrists throughout their employment tenure.[36] The recommendation is both imprecise and unfounded.

---

[34] Economists Incorporated Report, pp. 37-39.

[35] Ibid.

[36] Draft Report, p. 6.

To start, the Draft Report does not define what it means by "throughout their employment tenure." Elsewhere in the Draft Report, tenure distinctions appear to pertain to those with 10 or more years of employment on the one hand and those with less than 10 years on the other.[37] The Draft Report should clarify whether the reference to "throughout their tenure" in their recommendation pertains to the same 10-year cut-off, or whether a different meaning was intended.

Aside from survey results reporting salary perceptions of psychiatrists above or below the 10-year cut-off, the Draft Report did not undertake any analysis to predict what the effect their recommendation might be. The only information the Draft Report appears to have considered consists of tenure-based increases at CDCR and DSH and survey-based salary perceptions, also by tenure. There are numerous ways to evaluate differences by tenure, and the Draft Report's chosen method is arbitrary.

Considering each incremental year of tenure at CDCR or DSH (e.g., 1 year, 2 years, etc.) would provide the most detailed information about how salary increases and psychiatrists' perceptions change with tenure. Considering ranges between milestone years of tenure (e.g., 1 year, 2-3 years, 4-5 years, 6-9 years and 10 or more years) provides slightly less information but may be reasonable for analyzing survey responses if there are very few respondents who have worked a specific number of years at CDCR or DSH. Using a single cut-off year (e.g., less than 10 years versus 10 or more years) provides the least information and can mask differences among psychiatrists with fewer than 10 years of tenure, or mask a lack of differences among psychiatrists on either side of the cut-off (e.g., those with 8 to 12 years of tenure). The Draft Report does not explain why it chose to focus on an apparently arbitrary cutoff of 10 or more

---

[37] For example, Figures 3 and 4 in the Draft Report show that CDCR and DSH psychiatrists with less than 10 years of experience typically, though not always, received higher salary increases in the five years between 2013 and 2017. Draft Report Figure 3, p. 27; and Figure 4, p. 73. The Draft Report also presents several survey findings separately for psychiatrists with less than 10 years and those with 10 or more years at CDCR or DSH. Draft Report Table 12, p. 34; Table 16, p. 39; Table 19, p. 43; Table 22, p. 47; Table 27, p. 53; Table 28, p. 54; Table 31, p. 58; Table 39, p. 76; Table 42, p. 79; Table 46, p. 83; Table 47, p. 84; Table 49, p. 86.

years of experience ("more experienced") versus less than 10 years of experience ("less experienced") when it could have used more nuanced approaches.

The Draft Report does not analyze whether any of its salary analyses or survey results are sensitive to this definition of "more experienced" versus "less experienced." EmployStats had the data to check how sensitive its findings were to alternative definitions of experience, but it did not do so or at least did not report such checks in the Draft Report. Without such sensitivity checks, the Draft Report's tenure-based findings and recommendations could be biased by its definition of more or less experience.

Moreover, the salary increase analyses in the Draft Report do not compare tenure-based increases at CDCR or DSH to those at other employers.[38] Any tenure-based salary increase recommendations in the Draft Report are therefore weakened by the lack of information about how CDCR's and DSH's *tenure-based* salary increases compare to other employers. The Draft Report's survey-based findings provide some broad findings as to how psychiatrists with 10 or more years of tenure and those with less than 10 years of tenure perceive their salaries, but the mere fact that some psychiatrists perceive their salaries as being lower than their peers is statistically and economically insufficient to support a broad recommendation of "consistent and larger" salary increases during a psychiatrist's tenure.

## III.    The Draft Report Fails to Capture the True Value of the Telepsychiatry Program

### A.    The Draft Report Fails to Assess the Efficacy of the Telepsychiatry Program

The Draft Report fails to assess the extent to which CDCR needs to avail itself of multiple modalities of employment, including telepsychiatry, in order to attract psychiatrists who would otherwise prefer to work for other employers. As the Economists Incorporated Report documented, each modality of employment, namely telepsychiatry, on-site positions, and registry, has provided significant contributions to psychiatrist hiring and retention. The Draft Report fails to assess the efficacy of the telepsychiatry program in making its recommendations.

---

[38] See, e.g., Draft Report Findings 1 and 2, Tables 5-8, pp. 22-26; and Finding 12, Table 36, p. 71.

The Economists Incorporated Report documented that the telepsychiatry program resulted in a lowering of the otherwise prevailing vacancy rate of 34.7% in April 2018 to 20.7%.[39] Since on-site and registry positions were available at the same time that psychiatrists chose to join CDCR's telepsychiatry program, the telepsychiatrists' choices reveal their preference for the telepsychiatry program relative to other modalities of service and other types of employment positions.[40]

Further, the Draft Report ignores literature findings that call for greater reliance on telepsychiatry as well-documented psychiatrist shortages worsen.[41] EmployStats should explain what basis it has to conclude that telepsychiatry programs will not help alleviate CDCR and DSH's psychiatrist shortages.[42] Given the Draft Report's purported finding of "amplified cognitive and emotional" demands placed on prison psychiatrists, EmployStats should document support for its belief that the telepsychiatry program does not effectively alleviate those same amplified demands.

Finally, the Economists Incorporated Report documented that given acute nationwide shortages, even the telepsychiatry program may plateau and become less effective at generating better employment outcomes in the future. To the extent the program offers an avenue for additional psychiatrists to provide services to CDCR, however, the program should be upheld and supported as an additional modality of employment.

---

[39] Economists Incorporated Report, p. 25.

[40] The survey instrument as presented in Appendix A of the Draft Report did not ask facility psychiatrists why they chose that position over a telepsychiatry position. It asked telepsychiatrists why they chose that position over a facility position but did not make this information available.

[41] Economists Incorporated Report, pp. 26, 39.

[42] Draft Report, p. 64.

## B.   The Draft Report Makes Incorrect Inferences About the Telepsychiatry Program Based on Its Survey Results

Based on the survey evidence in the Draft Report, the statement that "[t]elepsychiatrists are not significantly more satisfied with all aspects of their positions with CDCR than on-site and registry psychiatrists,"[43] including initial and current salaries, is incorrect. In particular, Table 10 of the Draft Report documents that substantially *lower* percentages of telepsychiatrists had lower overall job satisfaction relative to their on-site and registry peers, and 61.8% of telepsychiatrists surveyed ranked their overall job satisfaction as 5, 6 or 7 on a scale of 1 (very unsatisfied) to 7 (very satisfied).[44] Further, Table 14 documents that CDCR telepsychiatrists as a group are *less* dissatisfied (i.e., are more satisfied) with overall working conditions relative to their on-site and registry peers.[45]

The following findings do not indicate that telepsychiatrists are more dissatisfied with their current or initial salary, just that they perceive it to be lower than those of other psychiatrists or opportunities:

- Table 29 documents that telepsychiatrists were relatively more likely than on-site or registry psychiatrists to perceive that their salaries were lower than psychiatrist peers.[46]

- Table 32 documents that telepsychiatrists were relatively more likely to perceive that they had lower starting salaries at CDCR relative to other employers.[47]

---

[43] Draft Report, p. 64.

[44] Ibid. p. 32.

[45] Ibid. p. 37. Tables 17, 20, 23 and 24 (respectively, pp. 41, 45, 49-50) similarly document that CDCR telepsychiatrists as a group are *less* dissatisfied than on-site or registry psychiatrists in terms of the adequacy of office space, medical assistant program and their perceived professional standing.

[46] Ibid. p. 56.

[47] Ibid. p. 60.

Although Table 29 of the Draft Report documents that CDCR psychiatrists (particularly telepsychiatrists) perceive that they earn less than psychiatrists employed elsewhere, EmployStats did not ask CDCR or DSH psychiatrists in its survey how they perceived the quantity of hours that they work or their effective hourly earnings relative to peers who work for other employers. CDCR and DSH psychiatrists may perceive that they work fewer hours, effectively forgoing additional salary in favor of greater free time, or that they earn more per hour than psychiatrists employed elsewhere.[48] The Draft Report does not offer any basis to draw the conclusion that CDCR and DSH psychiatrists' perceptions of lower salaries imply dissatisfaction because EmployStats' survey did not ask respondents whether they are dissatisfied with their salaries or total compensation.

The Draft Report similarly fails to highlight office-space adequacy of the telepsychiatry program. Fewer than one in eight CDCR telepsychiatrists responding to EmployStats' survey (11.8%) rated their office space as less than adequate, and fewer than six percent of CDCR telepsychiatrists responding to EmployStats' survey rated their office space as inadequate.[49] Again, the Draft Report ignores the apparent advantage of the telepsychiatry program as it pertains to adequacy of office space.

## IV.    The EmployStats Survey Instrument Is Deficient

### A.    The EmployStats Survey Falls Short of Best Practices

The American Association for Public Opinion Research ("AAPOR") is the leading professional organization of public opinion and survey research professionals in the United

---

[48] As discussed further below, CDCR psychiatrists appear to be incorrect on average that they earn less than psychiatrists employed elsewhere. Salary analyses in both the Draft Report (p. 28) and the Economists Incorporated Report (p. 19) both demonstrated that CDCR psychiatrists have consistently earned a premium relative to psychiatrists employed elsewhere in the state of California, the Western Region, and the U.S.

[49] Draft Report Table 17, p. 41. "Less than adequate" (1-4 on a scale of 1-7) and "inadequate" (1-3 on a scale of 1-7) are EmployStats' categorizations.

States.[50] The AAPOR website lists best practices for survey research, including the use of statistical analytic and reporting techniques appropriate to the data collected.[51] This includes:

- Competent and clear data analysis and interpretation, with findings or results presented fully, understandably, and fairly;

- Sampling errors included for all statistics presented, not just the statistics themselves;

- Honest and objective presentation of findings and interpretations, and full reporting of all relevant findings, including any that may seem contradictory or unfavorable.

The survey findings in the Draft Report fall short of these best practices. To avoid any appearance of selectively choosing the survey results it presents, the Draft Report should present findings for all survey questions. Complete findings would include all actual responses, or alternatively, complete counts of responses by type of respondent (as EmployStats categorizes them) for each question. Complete findings would clarify how many individuals chose each specific response option for each question, not just the percentages of respondents falling into the categories the Draft Report pre-selected.

## B. Survey Results that Reflect Incorrect Perceptions Call Into Question All Survey Findings in the Draft Report

The Draft Report fails to assess the significance and reliability of its self-reported survey results. The surveys found that CDCR and DSH psychiatrists perceive their salaries to be lower than those of their peers.[52] CDCR and DSH psychiatrists appear to be incorrect on average, as demonstrated by the CDCR and DSH salary analyses in the Draft Report and the CDCR salary analysis in the Economists Incorporated Report, which found that CDCR and DSH psychiatrists have consistently earned a salary premium relative to psychiatrists employed elsewhere in the

---

[50] https://www.aapor.org/About-Us.aspx.

[51] https://www.aapor.org/Standards-Ethics/Best-Practices.aspx#best10.

[52] Draft Report Tables 29-31, pp. 56-58; Tables 48-49, pp. 85-86.

state of California, the Western Region, and the U.S.[53] This disconnect between perceptions and fact calls into question the reliability of the survey-based findings in the Draft Report.

### C. The EmployStats Survey Suffers from Bias Due to Omitted Questions and Lack of Comparators

The Draft Report should clarify how it designed the CDCR and DSH survey instrument. In particular, it should explain why it omitted survey questions about hours worked per week, age, years of experience, years at CDCR or DSH, and other employee characteristics from its survey. Responses to such questions could be compared to actual information to determine the extent to which respondents are representative of the larger groups of CDCR and DSH psychiatrists based on age, experience, full-time status, etc. If the respondents to EmployStats' surveys are not representative of all CDCR and DSH psychiatrists, then there is no reason to assume that the Draft Report's survey-based findings and recommendations are generalizable to all CDCR and DSH psychiatrists.

The Draft Report should also explain how it selected the set of questions asked. For example, the survey did not ask facility psychiatrists why they chose that position over telepsychiatry, although it asked a parallel question of telepsychiatrists. This question is particularly important as the Draft Report hypothesizes that expanding the use of telepsychiatry may not help CDCR alleviate psychiatrist shortages.[54] It is relevant to understand why on-site and registry psychiatrists chose those positions instead of telepsychiatry, but the EmployStats survey did not ask those questions.

Additionally, the Draft Report should explain whether it conducted a survey of psychiatrists employed outside of CDCR and DSH, and if not, why not. The lack of survey information from psychiatrists outside CDCR and DSH means that Draft Report cannot appropriately compare CDCR and DSH psychiatrist responses with those of their peers employed by others. For example, psychiatrists working for other employers may exhibit similar

---

[53] Draft Report Table 9, p. 28 and Table 37, p. 72; Economists Incorporated Report Figure [D], p. 19.
[54] Draft Report, p. 64.

patterns of job dissatisfaction by geographic location. If so, compensation differentials at CDCR Central Valley locations may not entice psychiatrists working for other employers in the Central Valley to switch to CDCR. All psychiatrists may simply be dissatisfied with the Central Valley location and prefer to seek employment elsewhere.

Tables 13 and 40 of the Draft Report purports to compare overall job satisfaction ratings among CDCR and DSH psychiatrists versus psychiatrists at other California employers.[55] The Draft Report states that job satisfaction ratings at other employers were gathered from Glassdoor, a website where current and former employees can review employers. The Draft Report does not state how many ratings it collected from Glassdoor, how many individuals created those ratings, how many employers were rated or anything about the employers reflected in the Glassdoor ratings other than that they are in California. Most concerning is the fact that employer ratings on Glassdoor are <u>not</u> the result of a survey submitted to all psychiatrists at the reviewed employers, similar to the survey conducted by EmployStats. Glassdoor ratings are ostensibly submitted voluntarily by employees. Employees who view their employers more favorably may be more likely to rate them on Glassdoor. There is no indication that the Draft Report assessed whether the ratings it collected from Glassdoor are representative of all psychiatrists at all other California employers. As such, its comparison may be biased against CDCR and DSH by design.[56]

---

[55] Draft Report, pp. 35, 77.

[56] Footnotes to Tables 13 and 40 of the Draft Report (pp. 35, 77) cite two academic articles to support their use of Glassdoor's information. The fact that other publications have used Glassdoor data says nothing about its appropriateness for the purposes of the Draft Report. In fact, the Karabarbounis and Pinto article cited by EmployStats states that user entries on Glassdoor are underrepresented in certain industries, "especially" health care (Marios Karabarbounis and Santiago Pinto, "What Can We Learn from Online Wage Postings? Evidence from Glassdoor," *Economic Quarterly* 104(4), Q4 2018  ("Karabarbounis and Pinto"), p. 174). It also notes that the most important discrepancies between salary information on Glassdoor and salary information in the Quarterly Census for Employment and Wages, published by the U.S. Census Bureau, are observed in industries where workers receive high salaries (Karabarbounis and Pinto, p. 175). These findings respectively suggest that Glassdoor ratings for psychiatrists are more likely to be affected by outliers or bias and be less representative of all psychiatrist employers,

**D. The Draft Report Limits Survey Findings to Negative Responses and Mischaracterizes Responses**

Even among the limited survey results discussed in the Draft Report, only negative responses (characterized in the Draft Report as "less than satisfied" or "unsatisfied") are referenced in the overall findings and recommendations. Relatedly, the Draft Report characterizes survey responses rated 4 on a scale of 1 to 7 as "less than satisfied" rather than "neutral", as the midpoint of a response scale is typically characterized. The survey instrument did not inform respondents that a "4" would be categorized negatively rather than neutral. This mischaracterization of responses rated 4 on a scale of 1 to 7 appears to invite a negative interpretation where none exists. If respondents perceived a rating of 4 as neutral, the Draft Report would find that a majority or nearly two-thirds of respondents reported an overall job rating of neutral (4 of 7) to very satisfied (7 of 7).[57] Similarly, more than 80% of telepsychiatrists, more than 70% of registry psychiatrists, and nearly 60% of on-site psychiatrists responding to the CDCR survey rated their job satisfaction between neutral and very satisfied. Nearly 60% of respondents in the Central Valley and more than 70% of respondents outside the Central Valley rated their job satisfaction between neutral and very satisfied.[58] Of all respondents, 67% of those with less than 10 years at CDCR and 64% of those with 10 or more years at CDCR rated their job satisfaction between neutral and very satisfied.[59] Similarly, among DSH survey respondents nearly 65% reported an overall job rating of neutral to very satisfied. Of

------

and that Glassdoor salary information for psychiatrists is more likely to deviate from national or regional averages. The Stamolampros et al. study cited by EmployStats looked at Glassdoor employee review ratings in the tourism and hospitality industry and did not assess the veracity or reliability of the ratings on which it relied (Panagiotis Stamolampros, et al., "Job Satisfaction and Employee Turnover Determinants in High Contact Services: Insights from Employees' Online Reviews," *Tourism Management* (Forthcoming)). Neither the industry nor the methodology is relevant here.

[57] Draft Report Table 10, p. 32.

[58] Draft Report Table 11, p. 33.

[59] Draft Report Table 12, p. 34.

all respondents, 50% of telepsychiatrists, nearly 90% of registry psychiatrists, and nearly 60% of on-site psychiatrists responding to the DSH survey rated their job satisfaction between neutral and very satisfied.[60] Nearly 60% of respondents with less than 10 years at DSH and 60% of respondents with 10 or more years at DSH rated their job satisfaction between neutral and very satisfied.[61] Similar conclusions apply to the responses submitted to many other questions in the EmployStats CDCR and DSH surveys regarding working conditions and professional standing.

### E. Awareness of the CDCR's Staffing Difficulties and Lawsuit Had the Potential to Bias Survey Responses

The introduction to EmployStats survey instrument stated, "As you know, the [CDCR/DSH] often has difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain [institutions/facilities]. Your honest and thoughtful answers to this survey will provide vital information to assist policy makers in assessing and implementing policies that address that issue."[62] Questions 13a-3, 13b-1 and 14 ask respondents whether they have heard or read anything about a lawsuit involving CDCR, and to describe in as much detail as possible what they remember about the purpose of any such lawsuit.[63] The survey instrument thus explicitly made respondents aware of both CDCR and DSH's alleged staffing difficulties and the existence of a lawsuit involving CDCR and DSH. Such awareness could have influenced individuals' survey responses and led them to respond in ways that could benefit them, or their CDCR and DSH peers, if CDCR's or DSH's policies or pay were to change. For example, respondents may have reported that they perceived their salaries were typically lower than the salaries of psychiatrist peers at other employers whether or not they truly believed this, if they thought it might lead to policies increasing CDCR and DSH pay in the future.

---

[60] Draft Report Table 38, p. 75.

[61] Draft Report Table 39, p. 76.

[62] Draft Report, p. 89.

[63] Ibid. p. 97.

It is not always possible to predict the size or direction of any bias associated with awareness of the circumstances relating to a survey. Nevertheless, EmployStats failed to utilize best practices aimed at minimizing such effects.[64]

## F.  The EmployStats Survey Fails to Control for Differences Among Psychiatrists and Fails to Report Subgroup Sizes

The Draft Report generally failed to analyze any characteristics of its survey respondents, such as age, experience, average hours worked and actual salary level, which would potentially illuminate whether there is a particular factor driving the apparent discrepancy between survey responses and actual salaries. Absent such analysis, the disconnect calls into question the validity of *all* of the survey-based findings and recommendations in the Draft Report.

For example, CDCR telepsychiatrists may be younger and/or have less tenure on average than on-site or registry psychiatrists. They may correctly perceive that their salaries are lower than other psychiatrists if their reference group is older, more experienced psychiatrists who earn higher salaries. It is entirely normal for older, more experienced or longer-tenured employees to command higher salaries in the labor market.  Absent a breakdown of responses by age and tenure, however, the reason why more telepsychiatrists perceive that their salaries are lower than their peers' salaries cannot be inferred.

The Draft Report should provide breakdowns of the number of respondents by type for each question (e.g., within versus outside Central Valley; less than 10 versus 10 or more years of CDCR or DSH employment; and on-site versus registry versus telepsychiatrist). Such breakdowns would allow a statistician to discern whether any conclusions that EmployStats

--------

[64] See, e.g., Shari Seidman Diamond, "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence, Third Edition (2011), pp. 410-411: "To ensure objectivity in the administration of the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible: Both the interviewer and the respondent are blind to the sponsor of the survey and its purpose. Thus, the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses."

draws from a particular group are affected by its small sample size. For example, if there are few respondents with a particular group, conclusions based on the responses of that group could be distorted by just a few individual responses.

Concerns about small numbers of respondents by type are especially pertinent because the Draft Report calls for consistent and larger salary increases over psychiatrists' tenure at CDCR or DSH. If this recommendation is based on survey responses from disproportionately small groups of longer-tenured individuals, any generalizations to be made from those groups are unlikely to be reliable. The small group may be unrepresentative of all psychiatrists with 10 or more years of experience at CDCR or DSH.

## V.    Additional Shortcomings of the Draft Report

### A.    The Draft Report Failed to Show that "Consistent and Larger" Salary Increases Throughout Psychiatrists' CDCR Tenure Will Benefit Retention

The Draft Report finds that CDCR and DSH "psychiatrist salaries were initially competitive with other employers, however salary increases diminish through a psychiatrist's employment tenure," and recommends that CDCR and DSH provide "consistent and larger salary increase opportunities for psychiatrists throughout their employment tenure."[65] It perfunctorily notes that salary increases can help increase retention,[66] but offers no analysis to validate any specific linkage to tenure.

The Draft Report finds that salary increases diminish throughout psychiatrists' tenure at CDCR and DSH, but its analysis does not support this finding. Its conclusion appears to relate to the salary analyses in Figures 3 and 4, which compares average annual psychiatrist salary increases from 2013 to 2017 among psychiatrists with fewer than 10 years' experience at CDCR or DSH versus 10 or more years at CDCR or DSH.[67] Figures 3 and 4 ignore numerous factors

---

[65] Draft Report, pp. 5-6.

[66] Ibid. p. 6.

[67] Ibid. p. 27.

relevant to comparing salaries as tenure varies. For example, they ignore variability with tenure of other forms of compensation and benefits such as pension contributions, healthcare insurance and malpractice insurance. These benefits may be larger and/or more valuable to psychiatrists with more experience, who may be willing to forgo larger salary increases for non-salary benefits. Figures 3 and 4 also ignore hours worked. The tradeoffs between forgoing larger salary increases and scaling back hours worked at CDCR may vary based on psychiatrists' tenure. To be reliable, a tenure-based analysis should also assess differences in absolute salaries with tenure, an assessment that the Draft Report mistakenly omits.

Since Figures 3 and 4 only consider five years of salary increases, they ignore at least half (and potentially many more years) of the salary increases paid to psychiatrists with 10 or more years of experience at CDCR and DSH. Additionally, psychiatrists with 10 or more years of experience at CDCR had larger salary increases on average in 2017 than those employed fewer than 10 years at CDCR.[68] The Draft Report ignores this inconsistency in its overall findings and recommendations.

Further, the survey findings presented in the Draft Report do not support its finding that CDCR and DSH psychiatrist salary increases diminish with tenure. EmployStats did not ask psychiatrists about their salary increases while employed at CDCR or DSH (or elsewhere). The EmployStats survey asked CDCR and DSH psychiatrists for their perceptions about how their salary and compensation *levels* related to their peers. However, EmployStats' salary analysis focused on salary *increases* not salary levels. The Draft Report should explain why it chose to compare CDCR and DSH salary increases, but not salary levels to those prevailing at other employers, but why it chose to survey CDCR and DSH psychiatrists about perceptions of their salary levels, but not about salary increases.

Finally, EmployStats defined psychiatrists' experience as the number of years from the employee's initial date of hire at CDCR or DSH until their last pay period (CDCR) or last year (DSH) worked.[69] They apparently ignored any gaps in CDCR employment. If an employee left

---

[68] Draft Report Figure 3, p. 27; Figure 4, p. 73.

[69] Ibid.

CDCR or DSH employment and was rehired at a later date, or if the employee took an extended unpaid leave of absence, EmployStats overstates their tenure at CDCR or DSH. Since EmployStats did not present any data indicating the extent to which employees separated and were rehired, or took a leave of absence, it is unclear how often this occurs and the extent to which their measure of experience is overstated.

## B. The Draft Report's Statistical Analyses are Deficient

Based on the information presented in the Draft Report's Table 5, ten of the largest public employers in California outside of CDCR and DSH provided salary increases of 3.6% to the median psychiatrist from 2012 to 2017 while CDCR provided a median increase of 2.3%.[70] EmployStats should explain why it focused on a comparison of medians rather than averages.

The median salary increase is the salary increase such that half of the remaining salary increases were greater and half were less. The median masks any variation in salary increases that existed among the ten largest non-CDCR employers, or from year to year, during this period. In contrast, the average and standard deviation reflect the actual salary increases expressed as an average, and their variability around that average.[71] Based on statistical principles, a statistician cannot conclude, to a reasonable degree of statistical certainty, that the averages of two groups are different from one another based on a comparison of medians alone.  The Draft Report's reliance on medians does not support a conclusion that the average salary increase at the top ten non-CDCR and non-DSH employers actually differs from the average salary increase at CDCR.

---

[70] Draft Report Table 5, p. 23.

[71] For example, if Los Angeles County, Riverside County and Santa Clara County psychiatrist salaries increased 3%, 3.6% and 4.2% respectively, the median and average would both be 3.6%. However, if the increases were 0.2% in Los Angeles County, 3.6% in Riverside County and 3.7% in Santa Clara County, the average would be 2.5% but the median would still be 3.6%. The standard deviation is the measure of dispersion of individual values around the mean. A smaller standard deviation indicates that the individual values are collectively closer to the mean.

A large number of respondents in both groups indicates that a statistical comparison of averages would allow more precise comparisons than medians. EmployStats should provide average changes for both groups (as well as the corresponding standard deviations), and it should assess whether the difference between the two groups was statistically significant. To the extent statistical differences remain, EmployStats should then explain their economic significance in light of higher baseline salaries.

EmployStats should also address the significance of the discrepancy between perceived and actual salary differences in their results. Psychiatrists would be acting irrationally if they truly perceived other employers as offering more competitive compensation, were dissatisfied with their current positions and continued to work for CDCR or DSH in the face of well-documented nationwide and statewide psychiatrist shortages.

In addition, the Draft Report fails to document a number of relevant factors such as psychiatrists' hours worked and years of experience. As noted above in the discussion of EmployStats survey questions, these are important factors that need to be controlled for when comparing salaries (and salary increases) across various groups. Academic labor economics literature has consistently established relationships between earnings and experience, and earnings and age.[72] A "typical" wage profile shows earnings increasing with age until workers approach retirement age.[73]

Suppose hypothetically that all CDCR psychiatrists are 50 years old, with 20 years of experience at CDCR and already at the maximum contractually determined salary. Suppose also that all psychiatrists employed elsewhere are 31 years old and have 1 year of experience.. Given that the psychiatrists employed elsewhere in this hypothetical example are considerably younger and less experienced than CDCR psychiatrists, their earnings would on average be substantially

---

[72] See, e.g., Robert J. Willis, "Wage Determinants: A Survey and Reinterpretation of Human Capital Earnings Functions," Chapter 10 in the *Handbook of Labor Economics, Volume I*, O. Ashenfelter and R. Layard, eds., 1986, and Thomas E. MaCurdy, "An Empirical Model of Labor Supply in a Life-Cycle Setting," *The Journal of Political Economy*, 89:6 (December 1981) ("MaCurdy"), pp. 1059-1085.

[73] See, e.g., MaCurdy p. 1070.

less. For these same reasons, and the fact that the CDCR psychiatrists all earn the maximum possible salary, psychiatrists employed outside of CDCR should on average enjoy substantially greater salary increases over time than the CDCR psychiatrists. Without knowing who is being compared and how many hours their employer expects them to work, comparing CDCR's and other employers' salaries or salary increases is not an apples-to-apples comparison.

The Draft Report fails to test for statistically significant differences in both its salary increase analysis *and* in its survey analysis. Without an assessment of statistical significance it is unclear whether EmployStats' survey findings are generalizable to all CDCR and DSH psychiatrists.[74]

## C. The Draft Report Fails to Address Difficulties of Filling Positions in the Central Valley

The Draft Report recommends that CDCR provide "a system of compensation differentials to incentivize psychiatrists to fill Central Valley positions, and to retain incumbents in those positions."[75] These recommendations are based on its findings that the disparity in vacancy rates between the Central Valley and other locations has increased and that CDCR Central Valley psychiatrists were substantially more likely to report dissatisfaction with their jobs.[76] However, the Draft Report presents no evidence that such compensation differentials would be likely to reduce Central Valley vacancy rates or how large they would need to be to achieve sufficient reductions. EmployStats' survey did not ask CDCR psychiatrists employed

---

[74] The Draft Report presents numerous findings by location (Central Valley versus elsewhere), CDCR tenure (less than 10 years versus 10 years or more), and type (on-site, registry or telepsychiatrist). Not all CDCR psychiatrists responded to EmployStats' survey – the response rate was 62.2%, with higher rates of item nonresponse. An understanding of the statistical differences between each group is necessary to establish whether the differences were legitimate or simply due to chance.

[75] Ibid. p. 6.

[76] Ibid. Figure 2, p. 15 and Table 11, p. 33.

outside of the Central Valley whether they would consider working in these harder-to-recruit locations or how much additional compensation would be required to induce them to do so.

The Draft Report does not present survey responses regarding CDCR psychiatrists' satisfaction with salary or total compensation by location. Although a higher percentage of CDCR Central Valley psychiatrists perceived that their salary was lower than peers at other employers relative to non-Central Valley CDCR psychiatrists,[77] EmployStats did not ask who their reference peers were. They could have compared their salaries to peers outside of the Central Valley. Additionally, Central Valley psychiatrists were *less* likely to report that their initial salary at hire was less than other employers.[78]

Further, the Draft Report does not address whether the rurality of the Central Valley creates a natural barrier to additional employment, notwithstanding high salary levels, in light of the fact that 80% of rural counties in the U.S. do not have any psychiatrists at all.[79] Indeed, the San Joaquin Valley had only 7.1 active licensed psychiatrists per 100,000 population in 2016, the lowest ratio among the nine regions in California and less than half of the statewide average.[80]

The Economists Incorporated Report discussed labor market conditions that can lead to a bidding war and noted that several such conditions currently exist in the market for psychiatrist services.[81] Bidding wars are particularly likely to arise in rural area such as the Central Valley where psychiatrist shortages are more pronounced. Simple economic arguments can be used to explain why. Psychiatrists with jobs and families in urban areas have revealed a preference for those locations and are unlikely to want to move to the Central Valley even with significant salary premiums because of their pre-existing preferences and the costs of relocating their

---

[77] EmployStats Table 30, p. 57.

[78] EmployStats Table 33, p. 61.

[79] Economists Incorporated Report, p. 5.

[80] Janet Coffman, Timothy Bates, Igor Geyn and Joanne Spetz, "California's Current and Future Behavioral Health Workforce," February 12, 2018, Table 3.4, p. 22. Available from https://healthforce.ucsf.edu/publications/california-s-current-and-future-behavioral-health-workforce. This suggests that in order to fill vacancies at Central Valley facilities, CDCR must attract psychiatrists largely from other regions.

[81] Economists Incorporated Report, pp. 37-39.

families. At the same time, the few psychiatrists who are already in the Central Valley are more likely to switch between local employers even with small salary differentials because they do not experience high job-switching costs.[82] These factors lead to intense competition between Central Valley employers for a limited pool of psychiatrists, and they in turn magnify the possibility of bidding wars. The Draft Report does not address these labor market factors or the possibility that geographic compensation differentials could increase the risk of a bidding war in the Central Valley.

### D. The Draft Report Fails to Address Why 16 Times More Psychiatrist Access Relative to the General Population Is Insufficient

The Draft Report criticizes the Economists Incorporated Report as having failed to address "the variance in mental health issues that exist with those incarcerated."[83] It further makes a perfunctory observation that "prisoners have much higher rates of mental illness, and severe mental illness, compared to the general population" and "prison is not necessarily a setting where someone can recover quickly from mental illness…"[84] These observations fail to assess whether access to <u>16 times</u> more psychiatrists than the general population sufficiently meets the mental health needs of prison inmates. CDCR already employs approximately one in 20 psychiatrists in the state of California, a substantial portion while the state faces a shortage of psychiatrists.[85] The implicit conclusion in the Economists Incorporated Report is that 16 times greater access sufficiently addresses "the variance in mental health issues that exist with those

---

[82] The Economists Incorporated Report noted (p. 24) that 15% CDCR differential pay for primary care physicians failed to attract additional hires at five of 12 facilities with high vacancy rates, and largely resulted in employees transferring to receive the higher pay.

[83] Draft Report, p. 63.

[84] Ibid.

[85] Economists Incorporated Report, p. 14. EmployStats' analysis in Table 5 (p. 23) corroborates this finding. It shows that CDCR employed an average of 267.5 psychiatrists from 2012 to 2017, while the top 10 non-CDCR and non-DSH public employers in California employed an average of 641.7 psychiatrists. CDCR thus employed almost 30% of the psychiatrists collectively working at these 11 employers.

incarcerated."[86] To the extent the Draft Report finds that this multiple is too low, it fails to explain why.

Since CDCR and DSH already employ approximately one in twenty psychiatrists in California and pay a premium relative to other employers, it is conceivable that psychiatrists who are likely to offer their services to CDCR or DSH already do so, and that psychiatrists with other employers are sufficiently satisfied with their current employment conditions that they would not switch to CDCR or DSH even with significant salary increases. EmployStats did not survey psychiatrists at other employers to determine whether they would be inclined to switch to CDCR or DSH, and if so, at what salary level.  As a result, the Draft Report's conclusion that larger and consistent salary increases will help CDCR and DSH to hire additional psychiatrists is not well founded.

## VI.    Conclusion

For the reasons discussed above, the overall findings and recommendations in the Draft Report are unsupported. Its recommendations, particularly those relating to salary increases and compensation differentials, ignore some of the information presented in the Draft Report itself, as well as the findings in the Economists Incorporated Report. The Draft Report's recommendations are also unsupported because EmployStats failed to perform requisite analyses or ask survey questions that would inform how effective its recommendations are likely to be.

The salary analysis in the Draft Report is cursory and incomplete. It fails to address its own finding (corroborated by the Economists Incorporated Report) that CDCR and DSH psychiatrists have consistently received higher salaries than psychiatrists employed elsewhere. The Draft Report further fails to perform sensitivity checks or test whether any of its findings are statistically significant, thus calling into question the reliability of its findings.

Similarly, the survey-based findings in the Draft Report are of questionable reliability. In particular, psychiatrists' perceptions of their salary levels relative to other employers were

---

[86] Draft Report, p. 63.

clearly wrong.  This calls into question the accuracy of all of the survey-based findings in the Draft Report.

The Draft Report does not assess whether *any* of its survey findings are generalizable to CDCR and DSH psychiatrists who did not respond to its survey, nor did EmployStats' survey ask psychiatrists with other employers whether salary increases at CDCR or DSH would sufficiently motivate them to switch employers. Additionally, the survey failed to follow best practices, failed to report complete results and failed to ask questions or conduct analyses that would place the results in proper context. As a result, the Draft Report does not have a strong basis to conclude that the salary increases that it recommends will be effective at generating better employment outcomes at CDCR and DSH.

In sum, the analyses in the Draft Report do not provide strong analytical or survey-based evidence for the recommendations in the Draft Report.  The Draft Report ignores some of its own findings as well as findings in the Economists Incorporated Report.  These shortcomings call into question the efficacy of the Draft Report's recommendations.

I declare that the foregoing is true and correct.

Executed on October 14, 2019.

Lona Fowdur, Ph.D.

Erica Greulich, Ph.D.

EXHIBIT C

| From: | Bentz, Melissa@CDCR |
|---|---|
| To: | Michael Nunez; Hockerson, Dillon@CDCR; Weber, Nicholas@CDCR; Hessick, Jerome@CDCR; Coleman Special Master Team |
| Cc: | Coleman Team - RBG Only; Steve Fama; Christine Ciccotti; Mupanduki, Joanna@DSH-S; Ekpo, Elaine@DSH-S; Rashkis, Sean@DSH-S |
| Subject: | RE: Coleman: CDCR"s Comments re Proposed Salary Survey |

Dear Special Master Lopes and Plaintiffs' Counsel,

I write in response to the email from Michael Nunez dated November 26, 2018 regarding the staffing fill rates.

Over a decade after the 2002 order and following years of litigation and monitoring on this issue, Plaintiffs have now raised a new interpretation of the application of the staffing vacancy rate requirement. Plaintiffs quote the Court's June 13, 2002 order which states that "Defendants shall maintain the vacancy rate among psychiatrists and case managers at a maximum of ten percent, including contracted services." However, in Plaintiffs' email, the reference to "case managers" was left out. This reference is very important as it shows that the application of the ten percent vacancy rate is limited to line staff, not supervisors.

The Program Guide defines a case manager as "mental health clinician, typically a psychologist or Psychiatric Social Worker, who provides functions such as assessment, intervention, treatment planning, treatment, and case review." (Program Guide, Appendix A at A-1; *see* ECF No. 5564 at 3 fn. 2 "'Case managers' refers collectively to psychologists and social workers, which are now referred to as 'primary clinicians.'") This term does not apply to supervisors or managers. Thus, the application of the maximum ten percent vacancy rate is only to line psychologists and social workers. Given this context, the 2002 Court order only applies the vacancy rate to line staff, including psychiatrists. Plaintiffs' assertion that "[c]hief psychiatrists and supervising psychiatrists are not exempt" from the 2002 order is incorrect.

Plaintiffs state that CDCR's data shows that it has difficulty recruiting and retaining chief and supervising psychiatrists and states that CDCR is in violation of the 2009 Staffing Plan as it has filled chief psychiatry positions at less than half of the institutions. As detailed above, CDCR does not agree that the maximum ten percent vacancy rates apply to supervisory and management positions, thus the fact that CDCR currently has less than a ninety percent fill rate for these positions holds no meaning. In addition, the statement in the 2009 Staffing Plan that "[a]t least half of all prison will have a Chief Psychiatrist[,]" is not a ratio and should not be strictly applied. CDCR allocates chief psychiatrists as necessary based on the programs and missions at the institutions, not based on a ratio or numerical requirement in the 2009 Staffing Plan. Despite this, over half of the institutions with a Mental Health Services Delivery System program are in fact allocated a chief psychiatrist. Even if Plaintiffs maintain that there is a strict numerical standard set in the 2009 Staffing Plan, the fact that all of those positions are not currently filled does not render CDCR out of compliance.

The focus of the prior discussions and litigation on the issue of staffing has been focused on line staff, primarily staff psychiatrists. This is evident by the staffing plans provided by CDCR since at least 2015. Further, the Court has indicated that staff psychiatrists are the positions at issue. In the February 14, 2018 transcript, the Court ordered monthly filling of a report that included information on the vacancy rates for staff psychiatrists. (Feb. 14, 2018 Tr. 19:7-20; *see id.* at 19:15-16, "And I'm looking specifically at the line for staff psychiatrists.") This focus should not stray to other classifications.

CDCR once again reiterates its request that supervising and chief psychiatrists be removed from the survey and the focus of the survey remain on staff psychiatrists, as required by the 2002 Court order

and the court's recent statements.

Respectfully,

*Melissa C. Bentz*

Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Email:   Melissa.Bentz@cdcr.ca.gov
Office Phone: (916) 324-7177
Cell Phone: (916) 628-5385
Fax: (916) 327-5306

ATTORNEY CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT –
DO NOT FORWARD COMMUNICATION WITHOUT THE EXPRESS PERMISSION OF
THE AUTHOR.

---

**From:** Michael Nunez [mailto:MNunez@rbgg.com]
**Sent:** Monday, November 26, 2018 8:01 PM
**To:** Hockerson, Dillon@CDCR; Bentz, Melissa@CDCR; Weber, Nicholas@CDCR; Hessick, Jerome@CDCR; Coleman Special Master Team
**Cc:** Coleman Team - RBG Only; Steve Fama; Christine Ciccotti; Mupanduki, Joanna@DSH-S; Ekpo, Elaine@DSH-S; Rashkis, Sean@DSH-S
**Subject:** RE: Coleman: CDCR's Comments re Proposed Salary Survey

Dear Special Master Lopes and CDCR OLA team,

I write to respond to CDCR's assertion made on the parties' November 19, 2018 call regarding Dr. Steward's proposed psychiatrist survey and again in Defendants' written comments below regarding the applicability of the court-ordered staffing fill rate to supervising psychiatrist and chief psychiatrist positions.  The court-ordered fill rate applies to all CDCR psychiatrists.  Order at 4 (Jun. 13, 2002), ECF No. 1383 ("Defendants shall maintain the vacancy rate among psychiatrists . . . at a maximum of ten percent, including contracted services").  Chief psychiatrists and supervising psychiatrists are not exempt from this order.  *Id.*  The 2009 staffing plan provides for required numbers of chief psychiatrists and supervising psychiatrists.  ECF No. 3693 at 22-23, 31-32.  The Court's more recent staffing orders did not exempt chief psychiatrists and supervising psychiatrists from the court-ordered fill rate.  *See, e.g.*, Order at 30 (Oct. 10, 2017),  ECF No. 5711 ("Within one year from the date of this order,. . . defendants shall take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order.").

In addition, surveying CDCR chief psychiatrists and supervising psychiatrists is appropriate because, contrary to Defendants' assertion, CDCR's data shows it does have difficulty recruiting and retaining psychiatrists in those positions.  As of September 2018, CDCR was not in compliance with the ordered 90% fill rate for either chief psychiatrists or supervising psychiatrists either on a systemwide level or at several institutions.  *See* Coleman Monthly Report of Information Requested and Response to January 19, 1999 Court Order Regarding Staff Vacancies at Enclosure 1b Mental Health Institution Vacancies Summary by Classification (clinical positions only) as of September - 2018 (Nov.

14, 2018) ("Coleman Monthly Staffing Vacancy Report").  CDCR reported that only 15 of its 18 chief psychiatrist positions were filled, resulting in a position fill rate of 80% and meaning that CDCR had chief psychiatrists at fewer than half of its institutions as required by the 2009 Staffing Plan.  *Id.*; ECF No. 3693 at 31.  CDCR reported that only 17 of 19.5 of its supervising psychiatrist positions were filled, yielding a fill rate of 87.2.  *See* Coleman Monthly Staffing Vacancy Report Enclosure 1b.  CDCR has not achieved a 90% fill rate for either chief psychiatrists or supervising psychiatrists for at least well over a year.  SAC, RJD, and PBSP all lacked a chief psychiatrist as recently as September 2018.  *Id.* Enclosure 1c Mental Institution Vacancy Summary by Classification.  CHCF and CRC also had a 100% vacancy rate for supervising psychiatrists at that time.  *Id.*

Additionally, it does not make sense to send the survey to only certain categories of psychiatrists, as line and supervisory positions are inherently interrelated.  Many supervisors formerly served as line staff, which allows them to provide additional information and insight that is of value to understanding the extent of the overall hiring and retention challenges.  Surveying chief psychiatrists and supervising psychiatrists will allow the Special Master and his labor economists to gather data needed to fully and properly evaluate the barriers to recruitment and retention not only for supervisory positions, but for all psychiatry positions.

Thank you,

Michael

---

**From:** Hockerson, Dillon@CDCR <Dillon.Hockerson@cdcr.ca.gov>
**Sent:** Wednesday, November 21, 2018 1:51 PM
**To:** Tebrock, Katherine@CDCR <Katherine.Tebrock@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Nick Weber <Nicholas.Weber@cdcr.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Christine Ciccotti <christine.ciccotti@dsh.ca.gov>; Matt Lopes <mlopes@pldlaw.com>; Kerry F. Walsh <kwalsh@pldlaw.com>; Jessica Winter <JWinter@rbgg.com>; Michael W. Bien <MBien@rbgg.com>; Lisa Ells <LElls@rbgg.com>; Ponciano, Angela@CDCR <Angela.Ponciano@cdcr.ca.gov>; Michael Nunez <MNunez@rbgg.com>; Dylan Verner-Crist <DVerner-Crist@rbgg.com>; Cara Trapani <CTrapani@rbgg.com>; Mupanduki, Joanna@DSH-S <Joanna.Mupanduki@dsh.ca.gov>; Maynard, George@DSH-S <george.maynard@dsh.ca.gov>; Hammer, Sean@DSH-S <Sean.Hammer@dsh.ca.gov>
**Subject:** Coleman: CDCR's Comments re Proposed Salary Survey

Good afternoon,

Per the request of the Special Master's retained Labor Economist, below are the factual concerns regarding the salary survey that were raised during the call on November 19, 2018.

1.      Page one, second paragraph, first sentence: "As you know, the CDCR often has difficulty hiring psychiatrist and maintaining psychiatrist staffing levels."

•        Comment: This sentence is factually incorrect as there are institutions that do not have consistent difficulties hiring and retaining psychiatry staff.

2.        Page three, question: "what is your current job title?"
•        Comment: From this question it is unclear whether the survey is intended to be sent only to line psychiatrists or if recipients will include Supervising and Chief Psychiatrist. Only the staff psychiatry classification is included in the psychiatry staffing fill rates provided monthly to the Court. Neither Supervising nor Chief Psychiatrists are included in the overall fill rate required by the 2002 Court order. Therefore, the answers "Supervising Psychiatrist" and "Chief Psychiatrist" should be removed.  Further, CDCR does not have difficulty hiring for the Supervising and Chief Psychiatry classifications.

3.        Page four, third paragraph: "When thinking about your salary, only consider the actual amount of money that you earn each week, i.e. take home pay."
•        Comment 1: This statement contradicts the fourth paragraph which requests that the psychiatrist "only consider the actual amount of pre-tax money that you earn…." It should be determined whether the question should be regarding net salary or gross salary and the language referenced above should be adjusted accordingly.
•        Comment 2: The word "week" should be changed to "month" as psychiatrists are paid on a monthly basis, not weekly.

4.        Page six, and the six responses available.
•        Comment 1: The question asked "[w]hat is your current employment status?" Whether an employee is full time or part time is generally referred to in CDCR as the employee's "time base." Thus, we recommend that the question be rephrased to state "[w]hat is your current employment time base?"
•        Comment 2: CDCR recommends that the number of hours per week, and number of hours a year should be struck from each response.  CDCR civil service psychiatrists are exempt employees and are expected to work an average of 40 hours per week. This means that one week a psychiatrist may only work 36 hours, but the next week may work over 40 hours. Thus, including several choices based on hours per week may cause confusion and submission of incorrect answers.
•        Comment 3: CDCR recommends that the responses be limited to "Full-time" and "Part time". The other response options should be removed.  As explained above, civil service psychiatrists are an exempt classification and are required to work an average of 40 hours per week, but their hours per week may vary. Registry psychiatrists are not exempt employees and are paid on an hourly basis. However, the number of hours worked varies significantly between registry psychiatrists. Further, CDCR has already provided the hours worked per year for each registry psychiatrists from January 1, 2010 to October 3, 2018.

5.        Page eight, fourth question on the page: "At the time you were hired, were you hired above minimum ('HAM')?"
•        Comment: CDCR recommends that this question be removed from the survey.  There are concerns that asking this information could cause confusion and disrupt the field because HAMs are not generally advertised and are not offered to all new hires. Further, this question is duplicative as CDCR has already provided this information to the Labor Economist.

6.        Pages nine through twelve, questions requiring psychiatrist to compare their salary and total compensation to their peers who work for other employers outside of CDCR.
•        Comment: CDCR recommends an open text box be provided following each of these

questions asking the psychiatrist how they determining their peer's salaries.

While this email only includes detailed responses to factual concerns with the psychiatry salary survey, CDCR reiterates its concerns with the expansive questions regarding "Psychiatrists' Working Conditions" raised in Plaintiffs' November 13th letter. This scope of questioning falls outside what would be expected in a salary survey and touches on issues raised in Dr. Golding's allegations. CDCR disagrees that these questions should be included and believes the current questions on pages 14 and 15 of the proposed salary survey are sufficient to understand the impact working in an institutional setting may have on the hiring or retention of psychiatrists within CDCR.

Respectfully,
**Dillon Hockerson**
Attorney
California Department of Corrections and Rehabilitation
Email: Dillon.Hockerson@cdcr.ca.gov
Phone: (916)-445-2779



**THIS DOCUMENT IS CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. PLEASE DO NOT FORWARD THIS EMAIL WITHOUT PERMISSION OF THE SENDER. IF YOU RECEIVED THIS DOCUMENT IN ERROR PLEASE NOTIFY THE SENDER IMMEDIATELY.**

EXHIBIT D

| From: | Mupanduki, Joanna@DSH-S |
| To: | "kwalsh@pldolaw.com"; "mjones@pldolaw.com"; "rgribbin@pldolaw.com"; "rdunbar@pldolaw.com"; "sfama@prisonlaw.com"; "lells@rbgg.com" |
| Cc: | Ciccotti, Christine@DSH-S; Clendenin, Stephanie@DSH-S; Price, Stirling@@DSH-S; Tyler Heath; Adriano Hrvatin; Elise Thorn; Weber, Nicholas@CDCR; Bentz, Melissa@CDCR |
| Subject: | RE: Psychiatrist Survey |
| Date: | Wednesday, February 13, 2019 3:00:05 PM |

I spotted a typo, under 3(b), we do NOT recruit separately for Coleman units.

Thank you,
Joanna

*Joanna D. Mupanduki*
Attorney III
Legal Division
Department of State Hospitals
1600 9th Street
Sacramento, CA 95814
Phone: (916)651-9733
Fax: (916)651-5661
Email: Joanna.Mupanduki@DSH.ca.gov

**From:** Mupanduki, Joanna@DSH-S
**Sent:** Wednesday, February 13, 2019 2:40 PM
**To:** kwalsh@pldolaw.com; mjones@pldolaw.com; rgribbin@pldolaw.com; rdunbar@pldolaw.com; sfama@prisonlaw.com; lells@rbgg.com
**Cc:** Ciccotti, Christine@DSH-S <Christine.Ciccotti@dsh.ca.gov>; Clendenin, Stephanie@DSH-S <Stephanie.Clendenin@dsh.ca.gov>; Price, Stirling@@DSH-S <Stirling.Price@dsh.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; Bentz, Melissa@CDCR <Melissa.Bentz@cdcr.ca.gov>
**Subject:** Psychiatrist Survey

Good afternoon Kerry,

DSH writes in response to the proposed Psychiatrist survey provided by the Special Master's Labor Economist. Please consider the following comments:

1. We would like to know if DSH will be provided the results of the anonymous survey?
2. DSH is concerned with the overall tone of the survey, which is most often phrased in the negative. By using negative wording, it can create a bias in the survey that may drive the respondent to provide negative responses. We have several suggestions to improve the tone:
   a. On the introduction page, the second paragraph states "As you know, the DSH often has difficulty hiring Psychiatrists and maintaining psychiatrist staffing levels at certain institutions." We believe that this sentence should be struck from the paragraph. The first paragraph already states the purpose of the survey, and the statement only serves to cement an assumption in the mind of the reader.
   b. On page 12, the available answers are generally written in the negative (e.g. "The work environment is too demanding"). We recommend half of the available responses be positive to make the question more balanced. It also appears to

          leave out two common reasons, which are family or medical. We would suggest the addition of these response, or a box titled "Other" and a blank for the psychiatrist to fill in their reason.

3. Under the heading "Employment Information" on page 2, the survey asks: "At what facility or facilities do you currently work?"

   a. The responses include all of DSH's hospitals, including those that do not house any *Coleman* class members. DSH provides care for a wide variety of commitments in many different settings and *Coleman* class members represent a very small percentage of the overall population and programs. By seeking information from psychiatrists at hospitals that do not treat *Coleman* class members, the survey and this question go beyond the scope of the *Coleman* litigation. This is also beyond the scope of EmployStats' October 2018 document requests, which were limited to hospitals with *Coleman* programs. DSH is also concerned that surveying hospitals and psychiatrists that do not treat *Coleman* patients will pollute the results of the survey with information from programs and hospitals that are not relevant to the *Coleman* litigation.

   b. It is DSH's belief that this should only be sent to the psychiatrists and telepsychiatrists who treat patients on our Coleman units. However, we understand that we recruit for each facility as a whole and do recruit separately for the Coleman units. Therefore, it would seem an appropriate middle ground to include psychiatrists and telepsychiatrists who serve those facilities that have *Coleman* programs. This would also comport with EmployStats' document request, which they confirmed during the October 4, 2019 meeting were only for hospitals treating *Coleman* class members.

4. We are also concerned with the series of questions on pages 3-4 as well as pages 8-11 that ask the psychiatrist to compare salary and total compensation to non-DSH peer psychiatrists. These questions ask whether DSH salary and total compensation are higher, lower, or about equal to those of non-DSH psychiatrists. Unfortunately, the questions do not contain any follow-up questions or spaces for more detail to gather important context for the response.

   a. For example, the responding psychiatrists are not prompted to provide the salary or employer to which DSH's salary is being compared. Nor are there follow-up questions asking the size of the other employer, whether the work performed is equivalent, if the other employer is private or public, or if the responding psychiatrist considers the other employer to be desirable employment at the salary offered.

   b. These concerns also apply to the question on page 7 asking "which of these best describes the salary that DSH offered you when you were initially hired" and the questions on pages 8 to 11 asking the psychiatrists to quantify how much more or less their DSH salary and total compensation is to that of other non-DSH psychiatrists.

   c. In order to produce more accurate answers, DSH believes that this question should exclude CDCR as an "other employer" since the *Coleman* court ordered in ECF No. 2301 at 2 the adoption of pay scales for DSH clinicians that were 5% lower than CDCR salaries. Thus, inclusion of CDCR as a comparative employer would not provide accurate results given the difference in pay between the two departments.

5. On page 7, the second question asks about relocation costs, but not about reimbursement, which would be a natural and logical follow-up as DSH does reimburse some relocation costs if the move is over a certain mileage.

6. On page 13, the third question asks about the sufficiency of the office space, but conflates office space with treatment space. Generally, a psychiatrist provides most of their treatment in the treatment spaces on the unit and not exclusively in his or her office. This question would provide more accurate answers if separated in two questions: the first asking about their office space where they complete paperwork and hold meetings, while the second concerns the treatment space available for seeing

patients, leading treatment groups, etc.

7. The second question on page 14 asks about the "medical assistant program." This is a program that CDCR runs in their institutions. DSH does not have this program and the duties of a medical assistant are handled by different classifications at DSH, therefore, asking questions about it would cause a lot of confusion.

8. The questions on pages 18 and 19 are extremely broad and may elicit irrelevant and improper information from the respondents.

   a. DSH has numerous other civil cases that range from employment issues to individual lawsuits. Since the *Coleman* population is less than one-half of one percent of the patients at DSH, this question is not likely to elicit responses about the *Coleman* case. Many of DSH's psychiatrists do not treat *Coleman* class members and may not know the *Coleman* case exists. Given the large variety of unrelated cases that psychiatrists may be familiar with, the individual psychiatrists are more likely to believe that this question is referring to a case that they are personally involved in and may divulge inappropriate information related to other litigation. This is of particular concern because it may cause a psychiatrist to divulge attorney-client privileged information or confidential patient information related to another case. If this question is necessary, we suggest asking if the respondent is aware of *Coleman v. Newsom* and what they know about the case without divulging confidential patient or attorney-client information.

   b. DSH believes that the question on page 19 should not be included as it does not appear have any bearing on the issue at hand, which is psychiatrist compensation and job satisfaction.

   c. Also, on page 18, the page title states that this question is about "Outside work-no," is this a typo?

9. A few more minor points that we noticed:

   a. In the introduction you refer to our hospitals as "institutions," which is a CDCR phrase. We refer to our hospitals as facilities, which you appear to do in the rest of the survey.

   b. On page 3, there should be a space between "your" and "**salary**."

   c. On page 4, there should be a space between "your" and "**total compensation**."

Thank you for your consideration,
Joanna

*Joanna D. Mupanduki*
Attorney III
Legal Division
Department of State Hospitals

1600 9th Street
Sacramento, CA 95814
Phone: (916)651-9733
Fax: (916)651-5661
Email: Joanna.Mupanduki@DSH.ca.gov

# Appendix A

# An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals

**Ralph Coleman, et al., v. Gavin Newsom, et al**

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**May 20, 2020**

**Dwight D. Steward, Ph.D.**

Economist
Lead Researcher



www.employstats.com

# Table of Contents

**Executive Summary** **3**

    Overall Findings 4

    Recommendations 5

    COVID-19 Considerations 7

**Research Team** **8**

**CDCR Study Methodology and Data** **11**

**CDCR Psychiatrist Workforce Background** **13**

**CDCR Salary Analysis** **21**

    Finding 1: CDCR psychiatrists received lower annual salary increases than psychiatrists employed at other California public employers. 22

    Finding 2: CDCR psychiatrists received lower annual salary increases than private and public employers in California, and in the Western States Region. 26

    Finding 3: CDCR psychiatrists with 10 or more years of experience at CDCR experienced lower salary growth than CDCR psychiatrists with less than 10 years of experience at CDCR. 27

    Finding 4: CDCR psychiatrists' salary levels overall were competitive with psychiatrists at other California employers, but did not account for working conditions within its facilities. 28

**CDCR Employment Conditions Analysis** **30**

    Finding 5: Most CDCR psychiatrists reported an overall job satisfaction rating of less than satisfied. 31

    Finding 6: The majority of CDCR psychiatrists reported that they were less than satisfied with their overall working conditions. 36

    Finding 7: The majority of CDCR psychiatrists reported that their office space was not adequate. 40

    Finding 8: CDCR psychiatrists overall reported dissatisfaction with the CDCR medical assistant program. 44

    Finding 9: CDCR psychiatrists reported they were less than satisfied with their professional standing within their institutions and with opportunities for promotion. 48

    Finding 10: The majority of CDCR psychiatrists reported that they believed their current salary and compensation was lower than their peers who work at other employers. 55



Finding 11: The majority of CDCR psychiatrists reported that they believed their salary at the time of their hire was at least competitive with their peers.                               59

**Discussion of the CDCR Economic Expert's Report**                                              **62**

**DSH Study Methodology and Data**                                                                **65**

**DSH Psychiatrist Workforce Background**                                                          **67**

**DSH Salary Analysis**                                                                           **70**

Finding 12: DSH psychiatrists earned lower salaries than CDCR psychiatrists and lower annual salary increases than private and public employers in California, in the Western States Region, and in the United States as a whole.                                             71

Finding 13: DSH psychiatrists who have worked for DSH for 10 or more years experienced lower salary growth compared to psychiatrists at DSH with less than 10 years experience working at DSH.                                                                               73

**DSH Employment Conditions Analysis**                                                            **74**

Finding 14: DSH psychiatrists reported an overall job satisfaction rating of less than satisfied.                                                                                       75

Finding 15: Compared to other California employers, psychiatrists at DSH reported less overall job satisfaction than other psychiatrists.                                              77

Finding 16: The majority of DSH psychiatrists reported that they were less than satisfied with their overall working conditions.                                                           78

Finding 17: The majority of DSH psychiatrists reported that their office space was not adequate.                                                                                        80

Finding 18: DSH psychiatrists reported that they were less than satisfied with their professional standing within their institutions and opportunities for promotion.               81

Finding 19: The majority DSH psychiatrists reported that they believed their current salary and compensation was typically lower than that of their peers who work at other employers.                                                                                       85

Finding 20: The majority of DSH psychiatrists reported that they believed their salary at hire was at least competitive with their peers.                                                87

**Appendix A: Psychiatrist Surveys**                                                              **88**

**Appendix B: CDCR Data and Documents**                                                          **107**

**Appendix C: DSH Data and Documents**                                                           **110**

**Appendix D: Responses to Defendants' Criticisms**                                              **112**



# Executive Summary

Ralph Coleman, et al. v. Gavin Newsom, et al. requires that California correctional facilities maintain certain psychiatrist employment levels within its facilities. California Department of Corrections and Rehabilitation (CDCR) psychiatrist staffing reports[1] indicate that CDCR has had difficulty achieving and maintaining mandated psychiatrist employment levels within its facilities. California Department of State Hospitals (DSH) have reported similar difficulties with achieving and maintaining psychiatrist levels at its facilities. CDCR, and its economists, assert that overall labor market conditions and high employer demand for psychiatrists limit the impact that salary adjustments and additional monetary compensation will have on the employment level of CDCR psychiatrists.[2]

On September 11, 2018, EmployStats was appointed by the United States District Court for the Eastern District of California to conduct labor market and salary analyses in this case. The objective of the appointment was to assist the Court in its effort "to determine the potential efficacy of...collective bargaining salary and compensation increases" as part of an overall effort to bring Defendants into compliance with required mental health staffing levels. An analysis of the employment conditions and compensation of CDCR and DSH psychiatrists is provided in this report.

In addition, we received the October 14, 2019 Defendants' Response to the EmployStats Draft Report and the Defendant's economic experts' responses to our analysis.[3] Our responses to the Defendants' criticisms are addressed in Appendix D and in the footnotes of this report.

Two principal analyses of CDCR and DSH psychiatric employment and compensation were performed for the purpose of this report. First, a comparison of the salary and total compensation of CDCR and DSH psychiatrists to that of psychiatrists employed by other public and private California employers was performed. The salary comparison analysis utilized data

---

[1] Coleman Monthly Reports of Information Requested and Response to January 19, 1999, Court Order Regarding Staff Vacancies

[2] Economic Report: Impact of Labor Market Conditions and CDCR's Initiatives on the Employment of Psychiatrists

[3] Economists Incorporated Response to the EmployStats Draft Report, October 14, 2019.



provided by CDCR and DSH, public salary data from the U.S. Bureau of Labor Statistics (BLS), and publicly available salary data for California state employees.  Second, a survey of CDCR and DSH psychiatrists' perceptions of their working conditions and compensation was conducted.  In addition to these analyses, a discussion of the Defendants' economic expert report completed by Erica Greulich, Ph.D. and Lona Fowdur, Ph.D., is also provided in this report.

In brief, the analyses show that CDCR and DSH psychiatrists generally earned lower annual salary increases than psychiatrists at other California employers.  CDCR and DSH psychiatrists' salary levels overall were generally competitive with psychiatrists at other California employers, but do not account for working conditions within its facilities.  Further, the survey indicated that CDCR and DSH psychiatrists were dissatisfied with their salary and total compensation.  CDCR and DSH psychiatrists perceived that their pay was not competitive with their psychiatrist peers at other employers.  CDCR and DSH psychiatrists also reported dissatisfaction with their working conditions including their office space, administrative support, and perceived roles within their institutions.  The rates of dissatisfaction of CDCR and DSH psychiatrists was generally higher than that reported by psychiatrists employed by other California employers.

The analyses indicate that compensation adjustments can potentially assist CDCR and DSH in their effort to bring psychiatrist staffing up to mandated levels.

## Overall Findings

The overall findings and conclusions as drawn from the data and analyses described in this report are below:

- CDCR and DSH psychiatrist salaries were initially competitive with other employers, however salary increases diminish through a psychiatrist's employment tenure.

- CDCR and DSH psychiatrists' perception of the adequacy of their salary diminishes over time; psychiatrists that have been employed at either CDCR or DSH for 10 or more years report higher dissatisfaction with their current salary.



- A reduction in CDCR vacancy rates and an increase in CDCR retention rates occurred in recent years in which psychiatrists received salary increases.

- CDCR and DSH psychiatrists earn higher salaries than psychiatrists at other private and public California employers, however CDCR and DSH psychiatrists report overall job dissatisfaction related to a variety of factors including office space, professional standing, limited promotional opportunities and limited institutional support from the medical assistant program.

- On-site, registry, and telepsychiatry CDCR and DSH psychiatrists all report job dissatisfaction, but job dissatisfaction was most pronounced among on-site psychiatrists.

- Vacancy rates are twice as high at CDCR institutions in the Central Valley compared to those outside the Central Valley; CDCR psychiatrists in the Central Valley consistently report higher dissatisfaction with their employment conditions than CDCR psychiatrists at institutions outside of the Central Valley.

## Recommendations

The analysis suggests that the following changes to CDCR and DSH compensation structure and working conditions could help CDCR and DSH ameliorate some of the hiring and retention difficulties and decrease the vacancy rate of psychiatrists at their facilities and improve challenging working conditions within their facilities.

- Provide a system of consistent and larger salary increase opportunities for psychiatrists throughout their employment tenure at CDCR and DSH. The CDCR and DSH data shows psychiatrists that have been with their employer for 10 or more years received lower average annual salary increases than those psychiatrists employed for less than 10 years. CDCR psychiatrists employed for 10 or more years were also more likely than psychiatrists employed less than 10 years to report being unsatisfied with current salary and working conditions. Salary increases can also help increase retention;

- Provide a system of compensation differentials to incentivize psychiatrists to fill Central Valley positions, and to retain incumbents in those positions. The disparity in vacancy rates between CDCR institutions inside the Central Valley and those outside of the



Central Valley has increased.  Additionally, CDCR psychiatrists employed at institutions in the Central Valley were 50% more likely to report dissatisfaction with their job compared to psychiatrists employed at CDCR institutions outside of the Central Valley. Providing more compensation to psychiatrists in the difficult to fill areas, such as the Central Valley, could help reduce vacancies;

- Increase and improve the office space and facilities provided to psychiatrists to perform their job functions at its facilities.  Facility psychiatrists reported that their office space was inadequate.  Improving the office space for CDCR and DSH psychiatrists could help increase psychiatrist recruitment and retention.  The survey results suggest that CDCR psychiatrists working at facilities within the Central Valley region are approximately twice as dissatisfied with their office space as psychiatrists at facilities outside of the region. The study results also suggest that increasing the amount and quality of medical practice support provided to psychiatrists could also benefit recruitment and retention;

- Improve the working environment for CDCR and DSH psychiatrists.  CDCR and DSH psychiatrists reported that they were not satisfied with how other facilities employees valued their medical and professional opinions and their role within the facility.  Creating human resource programs to better inform facility employees about the role and functions of psychiatrists could help improve their working environment and ultimately help CDCR and DSH fill more difficult positions and retain current staff;

- In conjunction with improving CDCR and DSH psychiatrists' overall working conditions, better inform psychiatrists of the value of their compensation and their compensation relative to their peers.  In 2017, the median salary of CDCR and DSH psychiatrists was at least 19% higher than that of psychiatrists at other California public employers. However, the majority of CDCR and DSH psychiatrists reported that they perceive their salary to be lower than their psychiatrist peers who work for other employers.  Further, psychiatrists that reported that they were unsatisfied with their job were more likely to report that they perceived their salary to be lower than their psychiatrist peers who work for other employers.



## COVID-19 Considerations

In addition to the labor market analysis findings and recommendations as described above, the potential impact of the current global pandemic COVID-19 on the staffing recommendations discussed in this report is discussed.  The impacts of COVID-19 on employment and staffing in the medical field are not fully known at the current time and it is not clear what the full extent of the effects will be on recruitment, hiring, and retainment at CDCR.  However, in relation to CDCR and the federally mandated staffing levels, the COVID-19 pandemic may have several impacts as discussed below.

There may be a number of effects on the labor market for psychiatrists.  For instance, changing certain professional licensure requirements for health professionals, including psychiatrists, due to COVID-19 could result in an increase in supply.  On the contrary, due to the circumstances of COVID-19, psychiatrists, along with other healthcare workers, could be less likely to enter the workforce for the short term due to quarantine, sickness, or taking care of their family.  This could make meeting staffing requirements more difficult for CDCR.

In addition, the demand for psychiatrists at CDCR may be impacted.  For example, a reduction in the inmate population may aid in CDCR reaching its mandated staffing levels of psychiatrists.  If CDCR's inmate population were to decrease, then CDCR's staffing levels, which are based on the size of the mental health inmate population, would increase.  According to CDCR's COVID-19 preparedness, as of April 13, 2020 CDCR expedited the release of approximately 3,500 inmates.  If these types of inmate population reductions were to continue, it is possible that CDCR's mental health inmate population based psychiatrist staffing levels could increase.

In addition, it is possible that CDCR psychiatrists will place greater emphasis on their office space and facility working conditions.   As described in this report, CDCR psychiatrists reported that their office space was inadequate prior to the COVID-19 pandemic.  The psychiatrists' dissatisfaction in relation to office space is likely to increase during the pandemic as cleaning procedures and safety equipment will need to be implemented and concerns regarding employee health rise.



# Research Team

**Dwight D. Steward, Ph.D., Lead Researcher**

Dwight Steward, Ph.D. is a labor economist with over 20 years of experience teaching, researching, and performing labor market analyses.  Dr. Steward has worked with municipalities, civil rights organizations including the NAACP and League of United Latin American Citizens (LULAC), and police agencies such as the Police Executive Research Forum (PERF) on statistical analyses of criminal justice issues involving prison conditions, racial profiling, police use of force, drug sentencing, and racial bias in jury selection.  Dr. Steward's jail and prison research include statistical analyses of jail and prison guard staffing rates and inmate overcrowding.

Dr. Steward's 2004-2011 analyses of Texas police agencies' stops and searches were the first and largest analyses of police racial profiling in the nation. In this project, Dr. Steward worked with the NAACP, ACLU, and several national criminal justice organizations, to compile a database of hundreds of thousands of police contacts and created survey data for approximately 1,600 law enforcement agencies concerning police officers' critical knowledge, beliefs, attitudes and practices.  Further, Dr. Steward assisted stakeholders and members of the Texas State legislature with the development of a statewide repository for police agency racial profiling data and reports in Texas.   During the Texas State 77th Legislature, Dr. Steward provided testimony to the Texas State Senate in support of HB-1074 Bill: Racial Profiling in Texas.

In addition, Dr. Steward has also held teaching positions in the Department of Economics at The University of Texas at Austin, the Red McCombs School of Business at The University of Texas at Austin, and the College of Business Administration at Sam Houston State University.  He has taught dozens of courses in labor market economics and statistics to advanced undergraduate and graduate students at the University of Texas at Austin.  Dr. Steward has organized numerous labor economics research panels and presented peer-reviewed labor economic research on labor market economics topics and data at numerous major national economic conferences.  Dr. Steward has provided numerous expert reports and trial testimony on labor



market and employment issues in Federal Court and State Court in California, Texas, and across the U.S.

**Valentyna Katsalap, Ph.D., Researcher**

Valentyna Katsalap joined EmployStats in 2015 after graduating with her Ph.D. from the University of Houston.  She specializes in labor economics and applied microeconomics.  Dr. Katsalap has taught courses in Principles of Macroeconomics at the University of Houston as well as served as a teaching assistant for Economics of Globalization and Principles of Microeconomics.   In addition, Dr. Katsalap has performed complex analyses investigating claims of discrimination and disparate impacts in courts across the nation.  Dr. Katsalap has presented at economic conferences around the United States including the Missouri Economics Conference, STATA Texas Empirical Microeconomics Conference, and the Annual Western Social Science Conference.

**Jeff Peterson, Ph.D., Researcher**

Jeffrey S. Petersen is an affiliate of EmployStats and has been a partner at Allman & Petersen Economics, LLC since 2003.   He was previously employed at the U.S. Government Accountability Office as a senior economist from 1998 to 2003.  Dr. Petersen received his Ph.D. in economics from the University of Utah in 1994.  From 1995 to 1998, he was a postdoctoral fellow at the University of California, Berkeley.  Dr. Petersen's areas of expertise are labor and health economics.  He has published articles on topics such as returning to work following an injury, the intersection of health and employment at older ages, workers compensation, compensation in the construction industry, and pension and Social Security issues.  Dr. Petersen also teaches economics at St. Mary's College. He recently co-authored an article in the Journal of Legal Economics with Phillip Allman on conducting surveys in class-action wage and hour cases.

**Matt Rigling, M.A., Economic Consultant**

At EmployStats, Matt Rigling is an experienced Economic Consultant, providing consulting services on labor and employment class action cases.  Mr. Rigling has a Master of Arts degree in economics from the University of Texas at Austin.  He provides wage and hour consulting to Plaintiff and Defense attorneys across the United States.



**Susan Wirtanen, B.A., Research Associate**

Susan Wirtanen is an Economic Research Associate at EmployStats.  Ms. Wirtanen assists with calculations of economic damages in employment litigation cases and provides support to the firm's Economists.  She frequently conducts economic and statistical research related to the labor market.  Ms. Wirtanen performs analyses with large data sets and publicly available data in wage and hour, employment, personal injury, and business legal cases and consulting.



# CDCR Study Methodology and Data

Two principal analyses of CDCR psychiatrists' employment and compensation were performed in this report.  First, the salary and total compensation of CDCR psychiatrists was compared to psychiatrists employed by other public and private California employers.  Second, a survey of CDCR psychiatrists' perceptions of their working conditions and compensation was conducted.[4]

The salary comparison analysis utilizes personnel data provided by CDCR and publicly available benchmark compensation data for psychiatrists in California and the United States. The personnel data provided by CDCR includes information on the psychiatrists' education and credentials, dates of hire and separation, employment location, current compensation, and compensation history.  CDCR provided this information for personnel classified as Permanent Facility, Contract or Registry, and Telepsychiatry.  The CDCR personnel data was provided for the September 2012 to October 2018 time period.   A description of the CDCR documents used in the analysis is provided in Appendix B of this report.[5]

Psychiatrist compensation benchmark data was obtained from the U.S. BLS Occupational Employment Statistics (OES), Transparent California compensation database, Salary.com, and Medscape.com.   The BLS OES program produces widely used annual wage and employment data by occupation. Transparent California is an online compensation database that is assembled through open records information by the Nevada Policy Research Institute.

---

[4] The Report is based on generally accepted methodologies and scientifically valid principles.  The survey methodology is consistent with peer reviewed and generally accepted sources including text books such as Groves, R. M., Fowler, F.J., Couper, M.P., Leprowski, J.M, Singer, E., Tourangeau, R., "*Survey Methodology*", John Wiley & Sons, New Jersey, 2009 and *The Federal Judicial Center, Reference Manual on Scientific Evidence*.  The underlying survey data, comparison salary data, and references is clearly defined in the following sections of this report.

The survey methodology utilized in the Report has been accepted in Federal Court and State Court in California.  Dr. Steward has provided numerous reports and testified at trial on survey-based employment data in cases including Otsuka et al. v. Polo Ralph Lauren Corporation (United States District Court, Northern District of California) and Johnson, et al., v. York Claims Service, Inc. (Superior Court of the State of California, Sacramento County).   Dr. Peterson has also provided numerous reports and testimony on survey-based employment data in cases including Li et al. v. A Perfect Day Franchise Inc. (United States District Court, Northern District of California).

[5] Data regarding the values of the total compensation packages that Defendants paid to their psychiatrists was requested for analysis, but not provided by Defendants.



Transparent California's database obtains annual salary and pension records for public California state and local employees. Salary.com is a website that specializes in producing market pay data by occupation and location. The compensation data of Salary.com is based on employer-reported data, covering over 29 million employees, and more than 16,000 companies. Medscape is an online resource that provides information related to the medical industry, including annual compensation reports for psychiatrists. Data included in Medscape's annual compensation reports include the average salary of psychiatrists nationwide, as well as by region.

An online survey was conducted between January 25, 2019 and April 26, 2019 to obtain CDCR psychiatrists' perceptions of their working conditions and compensation. Current CDCR psychiatrists were surveyed and asked to provide their satisfaction ratings based on their overall working conditions, as well as individual components such as their office space, their professional standing at their CDCR institution, the medical assistant program, opportunities for promotion, and compensation. For survey questions regarding employment conditions, psychiatrists were asked to provide their satisfaction rating on a scale from 1 to 7 where a response of 1 indicates that the psychiatrist is very unsatisfied, and a response of 7 indicates that the psychiatrist is very satisfied. Ratings of 5 and higher were classified as satisfied, ratings of 4 and below were classified as less than satisfied, and ratings of 3 and below were classified as unsatisfied. The survey instrument is attached as Appendix A.

Prior to the administration of the survey, the parties provided input regarding the information to be obtained from the survey. The survey was administered through Survey Monkey, a widely used online survey development and cloud-based software service company. The survey was sent to the 344 psychiatrists on the current CDCR psychiatrist contact list.[6] Two hundred fourteen of the 344 psychiatrists on the contact list, or 62.2% of the psychiatrists, responded to the survey. Two hundred ten of the 214 psychiatrists who responded to the survey, or 98.1% of the psychiatrists, completed the survey.

---

[6] Only current CDCR psychiatrists were included in the analysis. CDCR provided address information for a list of 47 former psychiatrists. It was not possible to determine if the address was the correct current address for the individual. Two of the letters sent to these were returned and 11 of the individuals completed the survey. These responses were not included in the analysis described in this report. The sample size of these responses is too small.



# CDCR Psychiatrist Workforce Background

- CDCR psychiatrists' job vacancy rate levels were more than three times the mandated levels for CDCR staff psychiatrists and more than twice the mandated levels for all types of CDCR psychiatrists (Page 14, Figure 1).

- The disparity in vacancy rates between CDCR institutions inside the Central Valley and those outside of the Central Valley has increased.  The vacancy rate at CDCR institutions in the Central Valley has increased relative to CDCR institutions outside of the Central Valley since 2016 (Page 15, Figure 2).

- Retention rates for psychiatrists at CDCR facilities have declined over time (Page 16, Table 1).

- A number of CDCR facilities have relatively low psychiatrist job offer acceptance rates (Page 18, Table 2).

- The majority of CDCR new hires were psychiatrists with previous experience (Page 19, Table 3).

- CDCR psychiatrists primarily learned about CDCR job postings through 'word of mouth' networking (Page 20, Table 4).



## Figure 1. CDCR Psychiatrist Vacancy Rate, 2012 to 2018

**Methodology**

The vacancy rate for CDCR psychiatrists is the number of unfilled CDCR psychiatric positions divided by the number of total positions, both filled and unfilled. The overall vacancy rate is calculated as follows. First, all psychiatrist positions across CDCR institutions each month are added together to provide the overall number of authorized, filled, and registry psychiatrist positions.  The vacancy rate is then calculated across the months from January 2012 through July 2018.  The average vacancy rate across all months is displayed in Figure 1 above.  The monthly staffing reports provide information regarding the number of authorized, established, filled, vacant, and adjustments to vacancies.[7] The vacancy rate is calculated as follows: The adjusted filled amount is calculated as the number of filled positions plus the number of registry, hires, and 918 adjustments.  The 920 adjustments were then subtracted from the adjusted filled amount.  The adjusted vacant amount is calculated as the authorized amount less the adjusted filled amount.  The adjusted vacancy rate is then calculated as the adjusted vacant amount divided by the amount authorized.  Psychiatrist class codes included in this analysis were Staff Psychiatrist (9758), Senior Psychiatrist (Supervisor) (9761) and Chief Psychiatrist (9774).[8]

---

[7]  Adjustments to vacancies include; 918 adjustments, pending hires; 920 adjustments, long term sick positions; registry positions; and hires.

[8] July 2016 mental health vacancies by institution by classification was not provided.



## Figure 2. CDCR Psychiatrist Vacancy rates by Region

**— Central Valley    — Outside Central Valley**

*(Line chart: Y-axis "Vacancy rate" ranging from 0.00% to 40.00%; X-axis "Year" from 2012 to 2018.)*

**Methodology**

The Central Valley institutions are: California State Prison (CSP)/Corcoran, CSP/Sacramento (New Folsom), CSP/Solano, California Correctional Institution, California Health Care Facility, California Medical Facility, Central California Women's Facility, Deuel Vocational Institution, Folsom State Prison, Kern Valley State Prison, North Kern State Prison, Pleasant Valley State Prison, Substance Abuse Treatment Facility and State Prison, Valley State Prison, Wasco State Prison, Avenal State Prison, and the California City Correctional Facility.

The institutions outside of the Central Valley are: CSP/Los Angeles County, CSP/San Quentin, California Institution for Men, California Institution for Women, California Men's Colony, California Rehabilitation Center, Calipatria State Prison, Centinela State Prison, Chuckawalla Valley State Prison, High Desert State Prison, Ironwood State Prison, Mule Creek State Prison, Pelican Bay State Prison, Richard J. Donovan Correctional Facility, Salinas Valley State Prison, Sierra Conservation Center, the California Corrections Center, and the Correctional Training Facility.



**Table 1a. CDCR Psychiatrist Retention Rates**

|  |  | Percentage of Psychiatrists Still Employed at the End of the Year | | | | |
|---|---|---|---|---|---|---|
|  |  | 2014 | 2015 | 2016 | 2017 | 2018 |
| **Year of Hire** | **2013** | 96.2 | 71.7 | 64.2 | 54.7 | 49.1 |
|  | **2014** |  | 90.9 | 65.5 | 60.0 | 50.9 |
|  | **2015** |  |  | 71.4 | 67.9 | 46.4 |
|  | **2016** |  |  |  | 93.1 | 79.3 |
|  | **2017** |  |  |  |  | 81.3 |

**Methodology**

CDCR psychiatrists' retention rates were calculated for each hire cohort for the years 2013 to 2017. Using the psychiatrist's date of hire and salary history, the psychiatrists were grouped into cohorts by their year of hire. For each cohort, the number of psychiatrists still employed at the end of the year was calculated for each year. The annual retention rate for each cohort is shown in the table above.

For example, for psychiatrists hired in 2013 by CDCR, 96.2% of these psychiatrists were still employed one year later in 2014. For psychiatrists hired in 2013 by CDCR, 71.7% of these psychiatrists were still employed two years later in 2015.

It should be noted that CDCR institutions in the Central Valley have lower retention rates than those outside the Central Valley.

**Source: '2018_06_21 CDCR9758_Mark IV no SSN.xlsx'.**



**Table 1b. CDCR Psychiatrist Salary Increases and Vacancy Rates**

| Year | Salary Increase | Vacancy Rate |
|------|-----------------|--------------|
| 2013 | 4.8% | 25.5% |
| 2014 | 2% | 24.1% |
| 2015 | 2% | 22.5% |
| 2016 | 0% | 33.8% |
| 2017 | 5.1% | 26.8% |

**Source: '2018_06_21 CDCR9758_Mark IV no SSN.xlsx' and Coleman Monthly Reports of Information Requested and Response to January 19, 1999, Court Order Regarding Staff Vacancies.**



**Table 2. CDCR Psychiatrist Job Offer Acceptance Rates, 2013 to 2018**

|  | Job Offer Acceptance Rate |
|---|---|
| All CDCR Institutions | 73.5% |
| Central Valley CDCR Institutions | 71.5% |
| Outside Central Valley CDCR Institutions | 75.1% |

**Methodology**

The CDCR psychiatrist job offer acceptance rate is calculated by taking the number of psychiatrist job offers accepted at each institution divided by the number of job offers made at each institution, for each year.  The average acceptance rate for all years is then calculated for each institution.  Then the average of the average annual acceptance rates is calculated for all CDCR institutions, CDCR institutions inside the Central Valley, and CDCR institutions outside of the Central Valley.  **Source: 'Candidates - Hired' and 'Candidates - Not Hired' worksheets from the 'Psychiatrist Hiring and Applicant Data.xlsx' provided by CDCR.**



**Table 3. Median number of years out of residency at the time of hire by CDCR**

| Year of Hire | Median number of years out of residency at the time of hire |
|:---:|:---:|
| 2013 | 8.0 |
| 2014 | 8.9 |
| 2015 | 11.7 |
| 2016 | 11.0 |
| 2017 | 9.1 |
| 2018 | 6.6 |

**Methodology**

The median number of years out of residency at the time of hire is calculated for CDCR psychiatrists using information provided by CDCR.  For each psychiatrist, the number of years since the date that the psychiatrist completed residency until the psychiatrist's initial date of hire at CDCR is calculated.  Then using the psychiatrist's date of hire at CDCR, the median number of years out of residency is calculated for each year of hire cohort.  **Source: 'Credentialing_TBL' and 'Candidates - Hired' worksheets from the 'Psychiatrist Hiring and Applicant Data.xlsx' provided by CDCR.**



**Table 4. Source of CDCR Psychiatrist Hires**

| Method | Percentage of CDCR Psychiatrists |
|---|---|
| 'Word of Mouth' Networking | 46.2 |
| Active CDCR Job Advertising | 23.3 |
| Passive CDCR Job Advertising | 17.1 |
| Other | 13.3 |

**Methodology**

CDCR psychiatrists were asked "How did you first learn of the job posting for your current position?" Respondents who searched CDCR's official website, were contacted by a recruiter, applied at a psychiatric conference, received an ad at their residency, or applied at a career fair were classified as "Active CDCR Job Advertising." Respondents who applied on-site at a CDCR facility or through an online job posting site (Indeed, Monster, etc.) were classified as "Passive CDCR Job Advertising." Respondents who used other methods or could not recall were classified as "Other." **Source: CDCR Psychiatrist Salary and Working Conditions Survey.**



# CDCR Salary Analysis

CDCR psychiatrists received lower annual salary increases than psychiatrists at other employers.

- CDCR psychiatrists received lower annual salary increases than psychiatrists employed at other California public employers (Finding 1, Page 22).

- CDCR psychiatrists received lower annual salary increases than private and public employers in California, and in the Western States Region (Finding 2, Page 26).

- Experienced CDCR psychiatrists experienced lower salary growth than early career CDCR psychiatrists (Finding 3, Page 27).

- CDCR psychiatrists' salary levels overall were competitive with psychiatrists at other California employers (Finding 4, Page 28).



# Finding 1: CDCR psychiatrists received lower annual salary increases than psychiatrists employed at other California public employers.

- CDCR psychiatrists received annual salary increases that were approximately two-thirds (64%) that of psychiatrists at other large California public employers (Page 23, Table 5).

- Compared to the other ten largest public California employers[9] of psychiatrists, CDCR psychiatrists received the 4th lowest annual salary increase over the 2012 to 2017 time period (Page 24, Table 6).

- Compared to the other ten largest public California employers of psychiatrists, CDCR psychiatrists received the 6th highest annual salary increase in 2017 (Page 25, Table 7).

---

[9] The top ten largest public California psychiatrist employers includes Los Angeles County, Riverside County, State of California (not including CDCR and DSH employees), Santa Clara County, San Bernardino County, San Mateo County, San Diego County, Fresno County, Orange County, and San Joaquin County.



**Table 5. Average Median Salary Increase for CDCR Psychiatrists and Psychiatrists at Ten of the Largest Public California Psychiatrists Employers, 2012 to 2017**

|  | Average Median Salary Increase | Average Total Number of Psychiatrists Employed |
|---|---|---|
| Top 10 largest Non-CDCR/DSH California Public Employers | 3.6% | 641.7 |
| CDCR | 2.3% | 267.5 |

**Methodology**

The top ten largest public California psychiatrist employers were calculated by determining the average number of psychiatrist employees at each public California employer during the period of 2012 to 2017. The top ten largest public California psychiatrist employers includes Los Angeles County, Riverside County, State of California (not including CDCR and DSH employees), Santa Clara County, San Bernardino County, San Mateo County, San Diego County, Fresno County, Orange County, and San Joaquin County.   The average median salary increase is the median increase experienced across all years 2012 through 2017 and across all top ten largest public California psychiatrist employers as listed above.    **Source: Transparent California database and '2018_06_21 CDCR9758_Mark IV no SSN.xlsx'.**



**Table 6. Average Median Psychiatrist Salary Increase for the Largest Public California Psychiatrist Employers, 2012 to 2017**

| Rank | California Public Employer | Average Median Salary Increase | Average Number of Psychiatrists Employed |
|------|---------------------------|--------------------------------|------------------------------------------|
| 1 | Orange County | 14.7% | 18.6 |
| 2 | San Mateo County | 9.6% | 36.6 |
| 3 | San Joaquin County | 5.3% | 16.6 |
| 4 | Los Angeles County | 5.1% | 233.3 |
| 5 | Santa Clara County | 4.7% | 65.3 |
| 6 | State of California | 2.7% | 84.0 |
| 7 | Riverside County | 2.7% | 97.1 |
| **8** | **CDCR** | **2.3%** | **267.5** |
| 9 | Fresno County | 1.8% | 20.9 |
| 10 | San Bernardino County | 1.5% | 39.0 |
| 11 | San Diego County | 0.0% | 30.4 |

**Methodology**

The top ten largest public California psychiatrist employers were calculated by determining the average number of psychiatrist employees at each public California employer during the period of 2012 to 2017. The top ten largest public California psychiatrist employers includes Los Angeles County, Riverside County, State of California (not including CDCR and DSH employees), Santa Clara County, San Bernardino County, San Mateo County, San Diego County, Fresno County, Orange County, and San Joaquin County.  The average median salary increase is the median increase experienced across all years 2012 through 2017 for each of the top ten largest public California psychiatrist employers as listed above.  **Source: Transparent California database and '2018_06_21 CDCR9758_Mark IV no SSN.xlsx'.**



**Table 7. Median Psychiatrist Salary Increase for the Largest Public California Psychiatrist Employers, 2017**

| Rank | California Public Employer | Median Salary Increase | Number of Psychiatrists Employed |
|------|---------------------------|------------------------|----------------------------------|
| 1 | San Joaquin County | 27.6% | 17 |
| 2 | San Bernardino County | 14.1% | 46 |
| 3 | Santa Clara County | 11.7% | 75 |
| 4 | San Mateo County | 9.9% | 46 |
| 5 | Los Angeles County | 5.5% | 236 |
| **6** | **CDCR** | **5.1%** | **270** |
| 7 | State of California | 3.1% | 69 |
| 8 | Orange County | 2.5% | 44 |
| 9 | San Diego County | 2.3% | 18 |
| 10 | Fresno County | 1.4% | 10 |
| 11 | Riverside County | 0.0% | 75 |

**Methodology**

The top ten largest public California psychiatrist employers were calculated by determining the average number of psychiatrist employees at each public California employer during the period of 2012 to 2017. The top ten largest public California psychiatrist employers includes Los Angeles County, Riverside County, State of California (not including CDCR and DSH employees), Santa Clara County, San Bernardino County, San Mateo County, San Diego County, Fresno County, Orange County, and San Joaquin County.  The median salary increase is the median increase experienced in 2017 for each of the top ten largest public California psychiatrist employers as listed above.  **Source: Transparent California database and '2018_06_21 CDCR9758_Mark IV no SSN.xlsx'.**



Finding 2: CDCR psychiatrists received lower annual salary increases than private and public employers in California, and in the Western States Region.

**Table 8. Average Psychiatrist Salary Increases for CDCR, California, Western States, and the United States, 2012 to 2016**

|  | Average Annual Salary Increase |
|---|---|
| CDCR | 3.9% |
| Other California Private and Public Employers | 6.0% |
| Western States | 6.2% |
| U.S. Overall | 2.8% |

**Methodology**

The average annual salary increase was calculated as the average increase experienced by psychiatrists in each respective category in 2012, 2013, 2014, 2015, and 2016.  Western States were defined by Medscape Psychiatrist Compensation reports.[10]  The average annual salary increase for Other California Private and Public Employers and the U.S. Overall were calculated from the Bureau of Labor Statistics Occupational Employment Statistics survey.  Data for the Western States was not available for 2017 and annual salary increases for year 2017 were not included in this table.  **Source: Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment Statistics; Medscape; and '2018_06_21 CDCR9758_Mark IV no SSN.xlsx'.**

---

[10] The Medscape Psychiatrist Compensation Reports for 2013 to 2016 defined the Western States as California and Hawaii.  The Medscape Psychiatrist Compensation report for 2017 defined that Western States as California, Hawaii, and Alaska.  The annual Medscape Psychiatrist Compensation Reports present compensation for the previous year.


employstats
ECONOMICS • STATISTICS

Finding 3: CDCR psychiatrists with 10 or more years of experience at CDCR experienced lower salary growth than CDCR psychiatrists with less than 10 years of experience at CDCR.

**Figure 3. Average Annual Salary Increase for CDCR Psychiatrists by Experience at CDCR**

■ Less Than 10 Years Experience    ■ 10 or More Years Experience

*(bar chart: % Annual Salary Increase vs. Year, 2013–2017)*

**Methodology**

The average annual salary increase for CDCR psychiatrists, by years of experience, was calculated as follows.  For each psychiatrist, the annual salary increase experienced by the psychiatrist was calculated for each year, from 2013 to 2017.  The average annual salary increase was then calculated for each year, for psychiatrists with less than 10 years of experience at CDCR, and psychiatrists with 10 or more years of experience at CDCR.  Experience at CDCR was defined as the number of years from the employee's initial date of hire at CDCR until the employee's last pay period worked.  **Source: '2018_06_21 CDCR9758_Mark IV no SSN.xlsx', 'Hired Dates.xlsx', and 'Candidates - Hired' worksheet from 'Psychiatrist Hiring and Applicant Data.xlsx'.**



Finding 4: CDCR psychiatrists' salary levels overall were competitive with psychiatrists at other California employers, but did not account for working conditions within its facilities.

**Table 9. Annual Psychiatrist Salary Levels at CDCR, California Public Employers, California Private and Public Employers, and Employers in the Western Region.[11]**

| Year | CDCR Median Salary | Other non-CDCR and DSH California Public Employers Median Salary | California Private and Public Employers Average Salary | West Region Average Salary |
|------|------|------|------|------|
| 2011 | $260,952 | $188,991 | $192,290 | $182,000 |
| 2012 | $261,337 | $189,829 | $179,270 | $198,000 |
| 2013 | $273,996 | $192,107 | $191,460 | $218,000 |
| 2014 | $279,480 | $193,458 | $206,200 | $251,000 |
| 2015 | $285,072 | $214,309 | $250,090 | $243,000 |
| 2016 | $293,340 | $226,340 | $252,030 | $252,000 |
| 2017 | $299,496 | $245,491 | $259,570 | Unavailable |
| 2018 | $308,184 | Unavailable | $255,790 | Unavailable |

**Methodology**

The CDCR median salary was calculated as the median annual salary of CDCR psychiatrists for each year. Similar, the median salary was also calculated for the top 10 largest public California employers. These employers include Los Angeles County, Riverside County, State of California (not including CDCR and DSH employees), Santa Clara County, San Bernardino County, San Mateo County, San Diego County, Fresno County, Orange County, and San Joaquin County. The average salary of psychiatrists employed by California private and public employers was calculated as the average annual salary for each year using the United States BLS OES data. The average annual salary for the West Region was gathered from the Medscape Psychiatrist Compensation reports. Western States were defined by

---

[11] This table does not consider the value of compensation benefits for CDCR, other non-CDCR and DSH California public employers, California private and public employers, or West region. EmployStats understands that CDCR changed the total compensation benefits that psychiatrists received by reducing the safety retirement benefit.



Medscape Psychiatrist Compensation reports.[12]  Data for the Western States was unavailable at the time the data was retrieved past year 2016.  The annual salary for years 2017 and 2018 were listed as 'Unavailable' in this table.  Similarly, data for non-CDCR and DSH California public employers was unavailable at the time the data was retrieved for 2018 and the annual salary for 2018 was listed as 'Unavailable' in this table.  **Source: Transparent California; Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment Statistics; Medscape; and '2018_06_21 CDCR9758_Mark IV no SSN.xlsx'.**

---

[12] The Medscape Psychiatrist Compensation Reports for 2013 to 2016 defined the Western States as California and Hawaii.  The Medscape Psychiatrist Compensation report for 2017 defined that Western States as California, Hawaii, and Alaska.  The annual Medscape Psychiatrist Compensation Reports present compensation for the previous year.



# CDCR Employment Conditions Analysis

- CDCR psychiatrists reported an overall job satisfaction rating of less than satisfied (Finding 5, Page 31).

- The majority of CDCR psychiatrists reported that they were less than satisfied with their overall working conditions (Finding 6, Page 36).

- The majority of CDCR psychiatrists reported that their office space was not adequate (Finding 7, Page 40).

- CDCR psychiatrists overall reported dissatisfaction with the CDCR medical assistant program (Finding 8, Page 44).

- CDCR psychiatrists were not satisfied with their professional standing, which included how their professional opinion and professional role was regarded by other employees, and opportunities for promotion within their institutions (Finding 9, Page 48).

- The majority of CDCR psychiatrists reported that they believed their current salary and compensation was lower than that of their peers who worked at other employers (Finding 10, Page 55).

- The majority of CDCR psychiatrists reported that they believed their salary at the time of their hire was at least competitive with that received by their peers who worked at other employers (Finding 11, Page 59).



# Finding 5: Most CDCR psychiatrists reported an overall job satisfaction rating of less than satisfied.

- On-site and registry psychiatrists were less likely than telepsychiatrists to be satisfied with their job; however, telepsychiatrists were also less than satisfied (Page 32, Table 10).

- Psychiatrists who worked at CDCR institutions located outside of the Central Valley were more satisfied with their job than those working in the Central Valley (Page 33, Table 11).

- Both psychiatrists with 10 or more years of experience at CDCR and psychiatrists with less than 10 years of experience at CDCR reported that they were less than satisfied with their job (Page 34, Table 12).

- Compared to other California employers, psychiatrists at CDCR reported less overall job satisfaction than other psychiatrists (Page 35, Table 13).



**Table 10. Overall Job Satisfaction Ratings for CDCR Psychiatrists by Type**

|  | **All** | **On-Site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting overall job rating of less than satisfied (rating ≤ 4) | 53.4 | 63.0 | 53.7 | 38.2 |
| Percentage reporting overall job rating of unsatisfied (rating ≤ 3) | 34.1 | 42.0 | 29.3 | 17.7 |

## Methodology

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction?"  The range of job satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A job rating of 4 or less was classified as less than satisfied.  A job rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Two hundred eight of the 214 (97.2%) individuals who responded to the survey completed this question. The survey response rate for this question was 208 out of 344 (60.5%) of psychiatrists surveyed.



**Table 11. Overall CDCR Psychiatrist Job Satisfaction Ratings by Location[13]**

|  | Central Valley | Outside Central Valley |
|---|---|---|
| Percentage reporting overall job rating of less than satisfied (rating ≤ 4) | 61.2 | 45.8 |
| Percentage reporting overall job rating of unsatisfied (rating ≤ 3) | 42.7 | 27.7 |

## Methodology

Both groups of CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction?"  The Central Valley contains all CDCR institutions in the following 18 counties: Butte, Colusa, Glenn, Fresno, Kings, Kern, Madera, Merced, Placer, San Joaquin, Sacramento, Shasta, Solano, Stanislaus, Sutter, Tehama, Tulare, Yuba, and Yolo. Outside Central Valley contains all CDCR institutions in California's other 40 counties. The range of job satisfaction ratings is from 1 (very unsatisfied) to 7 (very satisfied).

A job rating of 4 or less was classified as less than satisfied.  A job rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

One hundred eighty six of the 214 (86.9%) individuals who responded to the survey completed this question.  The survey response rate for this question is 186 out of 344 (54.1%) psychiatrists surveyed.

---

[13] In this analysis, all CDCR psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



**Table 12. Overall CDCR Psychiatrist Job Satisfaction Ratings by CDCR Job Tenure[14]**

| | Less than 10 Years of CDCR Employment | 10 or More Years of CDCR Employment |
|---|---|---|
| Percentage reporting overall job rating of less than satisfied (rating ≤ 4) | 51.6 | 58.0 |
| Percentage reporting overall job rating of unsatisfied (rating ≤ 3) | 32.9 | 36.0 |

**Methodology**

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction?"  CDCR job tenure was the calculated number of years from the psychiatrist's date of hire at CDCR to the date they responded to the survey.  The range of job satisfaction ratings is from 1 (very unsatisfied) to 7 (very satisfied).

A job rating of 4 or less was classified as less than satisfied.  A job rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Two hundred five of the 214 (95.8%) individuals who responded to the survey completed this question.  The survey response rate for this question is 205 out of 344 (59.6%) of psychiatrists surveyed.

---

[14] In this analysis, all CDCR psychiatrist respondents were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists.  Of staff psychiatrists who have been employed at CDCR for 10 years or more, 65.7% report an overall job satisfaction rating of less than satisfied, and 40.0% of staff psychiatrists who have been employed at CDCR for 10 years or more report a job satisfaction rating of unsatisfied.



**Table 13. Overall CDCR Psychiatrist Job Satisfaction Ratings versus Psychiatrist Job Satisfaction at Other California Employers**

|  | CDCR Psychiatrists | Psychiatrists at other California Employers |
|---|---|---|
| Percentage reporting overall reporting job ratings higher than middle job satisfaction rating | 46.6 | 80.0 |

**Methodology**

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction?"  The range of job satisfaction ratings is from 1 (very unsatisfied) to 7 (very satisfied).  A rating of 4 is the middle job satisfaction rating for CDCR psychiatrists.  Job satisfaction ratings of non-CDCR psychiatrists working at California employers were gathered from external, publicly available site Glassdoor.  Glassdoor asks employees to rate their overall job satisfaction with their current or former employer on a 1 to 5 scale, with 1 being "Very Dissatisfied" and 5 being "Very Satisfied".  The middle job satisfaction rating is 3 in the Glassdoor job satisfaction rating system.[15]

---

[15] For additional academic sources using data from online review sites, see studies such as *What Can We Learn from Online Wage Postings? Evidence from Glassdoor* (Karabarbounis and Pinto 2018), and *Job Satisfaction and Employee Turnover Determinants in High Contact Services: Insights from Employees' Online Reviews* (Stamolampros et al. 2019).



## Finding 6: The majority of CDCR psychiatrists reported that they were less than satisfied with their overall working conditions.

- CDCR psychiatrists of all types reported less than satisfied and unsatisfied job ratings (Page 37, Table 14).

- Psychiatrists working at CDCR institutions inside the Central Valley region were typically more unsatisfied with the overall working conditions than those working outside of the Central Valley (Page 38, Table 15).

- Psychiatrists who have been employed at CDCR for 10 or more years reported higher levels of dissatisfaction with working conditions than psychiatrists with less than 10 years at CDCR (Page 39, Table 16).



**Table 14. Overall Working Conditions Satisfaction Ratings by Type**

|  | **All** | **On-Site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting overall working condition rating of less than satisfied (rating ≤ 4) | 64.9 | 73.0 | 58.5 | 47.1 |
| Percentage reporting overall working condition rating of unsatisfied (rating ≤ 3) | 47.6 | 57.0 | 43.4 | 17.7 |

**Methodology**

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at CDCR?"  The range of satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A working conditions rating of 4 or less was classified as less than satisfied.  A working conditions rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Two hundred eight of the 214 (97.2%) individuals who responded to the survey completed this question. The survey response rate for this question was 208 out of 344 (60.5%) of psychiatrists surveyed.



**Table 15. Overall CDCR Psychiatrist Working Conditions Satisfaction Ratings by Location[16]**

|  | Central Valley | Outside Central Valley |
|---|---|---|
| Percentage reporting overall working condition rating of less than satisfied (rating ≤ 4) | 72.8 | 56.6 |
| Percentage reporting overall working condition rating of unsatisfied (rating ≤ 3) | 55.3 | 45.8 |

**Methodology**

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at CDCR?" The Central Valley contains all CDCR institutions in the following 18 counties: Butte, Colusa, Glenn, Fresno, Kings, Kern, Madera, Merced, Placer, San Joaquin, Sacramento, Shasta, Solano, Stanislaus, Sutter, Tehama, Tulare, Yuba, and Yolo. Outside Central Valley contains all CDCR institutions in the other 40 counties of California. The range of satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A working conditions rating of 4 or less was classified as less than satisfied. A working conditions rating of 3 or less was classified as unsatisfied. The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

One hundred eighty six of the 214 (86.9%) individuals who responded to the survey completed this question. The survey response rate for this question was 186 out of 344 (54.1%) psychiatrists surveyed.

---

[16] In this analysis, all CDCR psychiatrist responses were analyzed. Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



**Table 16. Overall CDCR Psychiatrist Working Conditions Satisfaction Ratings by CDCR Employment Tenure[17]**

|  | Less than 10 Years of CDCR Employment | 10 or More Years of CDCR Employment |
|---|---|---|
| Percentage reporting overall working condition rating of less than satisfied (rating ≤ 4) | 60.7 | 76.0 |
| Percentage reporting overall working condition rating of unsatisfied (rating ≤ 3) | 43.2 | 60.0 |

**Methodology**

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at CDCR?"  CDCR job tenure is the calculated number of years from the psychiatrist's date of hire at CDCR to the date they responded to the survey.  The range of satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A working conditions rating of 4 or less was classified as less than satisfied.  A working conditions rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Two hundred five of the 214 (95.8%) individuals who responded to the survey completed this question.  The survey response rate for this question was 205 out of 344 (59.6%) psychiatrists surveyed.

---

[17] In this analysis, all CDCR psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



# Finding 7: The majority of CDCR psychiatrists reported that their office space was not adequate.

- The majority of on-site and registry psychiatrists reported that their office space was less than adequate (Page 41, Table 17).

- Registry psychiatrists reported higher dissatisfaction with their office space than both on-site and telepsychiatrists employed by CDCR (Page 41, Table 17).

- Psychiatrists working within the Central Valley region were approximately twice as likely to report that their office space was inadequate compared to psychiatrists working outside of the Central Valley region (Page 42, Table 18).

- Psychiatrists who have been employed at CDCR for 10 or more years were more likely to report dissatisfaction with their office space than psychiatrists who have been employed less than 10 years at CDCR (Page 43, Table 19).



**Table 17. CDCR Psychiatrist Office Space Adequacy Ratings by Type**

|  | All | On-Site | Registry | Tele- |
|---|---|---|---|---|
| Percentage reporting office space rating of less than adequate (rating ≤ 4) | 58.7 | 66.0 | 73.2 | 11.8 |
| Percentage reporting office space rating of inadequate (rating ≤ 3) | 37.0 | 41.0 | 51.2 | 5.9 |

**Methodology**

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'completely inadequate' and 7 is 'completely adequate', how would you rate your current office space for performing all of the job functions of a Psychiatrist, such as seeing patients, having meetings, and completing paperwork, etc?"

An office space rating of 4 or less was classified as less than adequate. An office space rating of 3 or less was classified as inadequate. The categories of less than adequate and inadequate do not add up to 100 and were not mutually exclusive

Two hundred eight of the 214 (97.2%) individuals who responded to the survey completed this question. The survey response rate for this question was 208 out of 344 (60.5%) psychiatrists surveyed.



**Table 18. CDCR Psychiatrist Office Space Adequacy Ratings by Location**[18]

|  | **Central Valley** | **Outside Central Valley** |
|---|---|---|
| Percentage reporting office space rating of less than adequate (rating ≤ 4) | 71.8 | 50.6 |
| Percentage reporting office space rating of inadequate (rating ≤ 3) | 49.5 | 27.7 |

**Methodology**

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'completely inadequate' and 7 is 'completely adequate', how would you rate your current office space for performing all of the job functions of a Psychiatrist, such as seeing patients, having meetings, and completing paperwork, etc?" The Central Valley contains all CDCR institutions in the following 18 counties: Butte, Colusa, Glenn, Fresno, Kings, Kern, Madera, Merced, Placer, San Joaquin, Sacramento, Shasta, Solano, Stanislaus, Sutter, Tehama, Tulare, Yuba, and Yolo. Outside Central Valley contains all CDCR institutions in the other 40 counties.

An office space rating of 4 or less was classified as less than adequate. An office space rating of 3 or less was classified as inadequate. The categories of less than adequate and inadequate do not add up to 100 and were not mutually exclusive

One hundred eighty six of the 214 (86.9%) individuals who responded to the survey completed this question. The survey response rate for this question was 186 out of 344 (54.1%) psychiatrists surveyed.

---

[18] In this analysis, all CDCR psychiatrist responses were analyzed. Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



**Table 19. CDCR Psychiatrist Office Space Adequacy Ratings by CDCR Job Tenure[19]**

|  | Less than 10 Years of CDCR Employment | 10 or More Years of CDCR Employment |
|---|---|---|
| Percentage reporting office space rating of less than adequate (rating ≤ 4) | 55.5 | 66.0 |
| Percentage reporting office space rating of inadequate (rating ≤ 3) | 34.2 | 44.0 |

**Methodology**

CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'completely inadequate' and 7 is 'completely adequate', how would you rate your current office space for performing all of the job functions of a Psychiatrist, such as seeing patients, having meetings, and completing paperwork, etc?"  The psychiatrists that have been with CDCR for less than 10 years were more satisfied with their office space than those that have been employed at CDCR for 10 or more years.

An office space rating of 4 or less was classified as less than adequate.  An office space rating of 3 or less was classified as inadequate.  The categories of less than adequate and inadequate do not add up to 100 and were not mutually exclusive

Two hundred five of the 214 (95.8%) individuals who responded to the survey completed this question.  The survey response rate for this question was 205 out of 344 (59.6%) psychiatrists surveyed.

---

[19] In this analysis, all CDCR psychiatrist respondents were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists.  Sixty percent of staff psychiatrists who have been employed at CDCR for 10 years or more report an office space adequacy rating of less than adequate, and 40.0% of staff psychiatrists who have been employed at CDCR for 10 years or more report an office space adequacy rating of inadequate.



# Finding 8: CDCR psychiatrists overall reported dissatisfaction with the CDCR medical assistant program.

- On-site psychiatrists were more dissatisfied with CDCR's medical assistant program than both Registry and Telepsychiatrists (Page 45, Table 20).

- Psychiatrists inside the Central Valley region were as likely to report being less than satisfied with the medical assistant program as those working outside of the region (Page 46, Table 21).

- Psychiatrists who have been employed by CDCR for 10 or more years were less likely to report being satisfied with CDCR's medical assistant program than psychiatrists who have been employed less than 10 years at CDCR (Page 47, Table 22).



**Table 20. CDCR Psychiatrist Medical Assistant Program Ratings by Type**

|  | **All** | **On-site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting medical assistant program rating of less than satisfied (rating ≤ 4) | 63.0 | 71.0 | 58.5 | 38.2 |
| Percentage reporting medical assistant program rating of unsatisfied (rating ≤ 3) | 36.5 | 43.0 | 26.8 | 17.7 |

## Methodology

CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with the medical assistant program?" The range of medical assistant program ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A medical assistant program satisfaction rating of 4 or less was classified as less than satisfied. A medical assistant program satisfaction rating of 3 or less was classified as unsatisfied. The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Two hundred eight of the 214 (97.2%) individuals who responded to the survey completed this question. The survey response rate for this question was 208 out of 344 (60.5%) of psychiatrists surveyed.



**Table 21. CDCR Psychiatrist Medical Assistant Program Ratings by Location**[20]

| | Central Valley | Outside Central Valley |
|---|---|---|
| Percentage reporting medical assistant program rating of less than satisfied (rating ≤ 4) | 64.1 | 63.9 |
| Percentage reporting medical assistant program rating of unsatisfied (rating ≤ 3) | 38.8 | 36.1 |

**Methodology**

CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with the medical assistant program?"  The Central Valley contains all CDCR institutions in the following 18 counties: Butte, Colusa, Glenn, Fresno, Kings, Kern, Madera, Merced, Placer, San Joaquin, Sacramento, Shasta, Solano, Stanislaus, Sutter, Tehama, Tulare, Yuba, and Yolo. The range of medical assistant program satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).  Outside Central Valley were all CDCR institutions in the remaining 40 counties of California.

A medical assistant program satisfaction rating of 4 or less was classified as less than satisfied.  A medical assistant program satisfaction rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

One hundred eighty six of the 214 (86.9%) individuals who responded to the survey completed this question.  The survey response rate for this question was 186 out of 344 (54.1%) psychiatrists surveyed.

---

[20] In this analysis, all CDCR psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



**Table 22. CDCR Psychiatrist Medical Assistant Program Ratings by CDCR Employment Tenure[21]**

|  | Less than 10 Years of CDCR Employment | 10 or More Years of CDCR Employment |
|---|---|---|
| Percentage reporting medical assistant program rating of less than satisfied (rating ≤ 4) | 60.0 | 74.0 |
| Percentage reporting medical assistant program rating of unsatisfied (rating ≤ 3) | 34.2 | 46.0 |

**Methodology**

CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with the medical assistant program?" CDCR job tenure was the calculated number of years from the psychiatrist's date of hire at CDCR to the date they responded to the survey. The range of medical assistant program satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A medical assistant program satisfaction rating of 4 or less was classified as less than satisfied. A medical assistant program satisfaction rating of 3 or less was classified as unsatisfied. The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Two hundred five of the 214 (95.8%) individuals who responded to the survey completed this question. The survey response rate for this question was 205 out of 344 (59.6%) psychiatrists surveyed.

---

[21] In this analysis, all CDCR psychiatrist responses were analyzed. Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



Finding 9: CDCR psychiatrists reported they were less than satisfied with their professional standing within their institutions and with opportunities for promotion.

- On-site and Registry psychiatrists were more likely to report that they were less than satisfied or unsatisfied with their professional standing within their institutions, however telepsychiatrists were also less than satisfied (Page 49-50, Table 23-24).

- Psychiatrists employed at institutions outside of the Central Valley region were more likely to report being satisfied with their professional standing than psychiatrists employed inside the region (Page 51-52, Table 25-26).

- Psychiatrists who have been employed by CDCR for 10 or more years report similar satisfaction with their professional standing at CDCR compared to psychiatrists with less than 10 years of experience working at CDCR (Page 53-54, Table 27-28).



**Table 23. CDCR Psychiatrists with Less than Satisfied Rating of Professional Standing by Type**

|  | **All** | **On-site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting less than satisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 4) | 51.0 | 52.0 | 56.1 | 41.2 |
| Percentage reporting less than satisfied rating with how **professional role** is viewed by other employees (rating ≤ 4) | 48.6 | 53.0 | 58.5 | 35.3 |
| Percentage reporting less than satisfied rating with regards to **opportunities for promotion** (rating ≤ 4) | 71.6 | 74.0 | 85.4 | 67.7 |

**Methodology**

CDCR psychiatrists were asked the following questions.  (1) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?" The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 4 or less was classified as defined as less than satisfied. Two hundred eight of the 214 (97.2%) individuals who responded to the survey completed these questions. The survey response rate for these questions was 208 out of 344 (60.5%) psychiatrists surveyed.



**Table 24. CDCR Psychiatrist with Unsatisfied Rating of Professional Standing by Type**

|  | All | On-site | Registry | Tele- |
|---|---|---|---|---|
| Percentage reporting unsatisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 3) | 30.3 | 29.0 | 34.2 | 20.6 |
| Percentage reporting unsatisfied rating with how **professional role** is viewed by other employees (rating ≤ 3) | 29.3 | 32.0 | 39.0 | 14.7 |
| Percentage reporting unsatisfied rating with regards to **opportunities for promotion** (rating ≤ 3) | 41.4 | 46.0 | 51.2 | 29.4 |

## Methodology

CDCR psychiatrists were asked the following questions.  (1) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?" The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 3 or less was classified as defined as unsatisfied. Two hundred eight of the 214 (97.2%) individuals who responded to the survey completed this question. The survey response rate for this question was 208 out of 344 (60.5%) psychiatrists surveyed.



**Table 25. CDCR Psychiatrists with Less than Satisfied Rating by Location[22]**

|  | Central Valley | Outside Central Valley |
|---|---|---|
| Percentage reporting less than satisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 4) | 57.3 | 47.0 |
| Percentage reporting less than satisfied rating with how **professional role** is viewed by other employees (rating ≤ 4) | 58.3 | 41.0 |
| Percentage reporting less than satisfied rating with regards to **opportunities for promotion** (rating ≤ 4) | 77.7 | 67.5 |

**Methodology**

CDCR psychiatrists were asked the following questions.  (1) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?" The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 4 or less was classified as defined as less than satisfied. One hundred eighty six of the 214 (86.9%) individuals who responded to the survey completed this question.  The survey response rate for this question was 186 out of 344 (54.1%) psychiatrists surveyed.

---

[22] In this analysis, all CDCR psychiatrist respondents were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists. Of staff psychiatrist respondents located outside of the Central Valley 45.6% indicated they were less than satisfied with how their professional role is viewed by other employees. Seventy five percent of staff psychiatrist respondents located outside of the Central Valley indicated they were less than satisfied with their opportunities for promotion at CDCR.



**Table 26. CDCR Psychiatrist with Unsatisfied Rating by Location**[23]

|  | Central Valley | Outside Central Valley |
|---|---|---|
| Percentage reporting unsatisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 3) | 37.9 | 24.1 |
| Percentage reporting unsatisfied rating with how **professional role** is viewed by other employees (rating ≤ 3) | 34.0 | 26.5 |
| Percentage reporting unsatisfied rating with regards to **opportunities for promotion** (rating ≤ 3) | 43.7 | 43.4 |

**Methodology**

CDCR psychiatrists were asked the following questions.  (1) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?" The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 3 or less was classified as defined as unsatisfied. One hundred eighty six of the 214 (86.9%) individuals who responded to the survey completed this question.  The survey response rate for this question was 186 out of 344 (54.1%) psychiatrists surveyed.

---

[23] In this analysis, all CDCR psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists. Of staff psychiatrist respondents located outside of the Central Valley 51.5% indicated they were unsatisfied with their opportunities for promotion at CDCR.



**Table 27. CDCR Psychiatrist with Less than Satisfied Rating by CDCR Employment Tenure[24]**

|  | Less than 10 Years of CDCR Employment | 10 or More Years of CDCR Employment |
|---|---|---|
| Percentage reporting less than satisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 4) | 51.6 | 48.0 |
| Percentage reporting less than satisfied rating with how **professional role** is viewed by other employees (rating ≤ 4) | 46.5 | 52.0 |
| Percentage reporting less than satisfied rating with regards to **opportunities for promotion** (rating ≤ 4) | 72.9 | 66.0 |

**Methodology**

CDCR psychiatrists were asked the following questions.  (1) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?" The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 4 or less was classified as defined as less than satisfied.  Two hundred five of the 214 (95.8%) individuals who responded to the survey completed this question. The survey response rate for this question was 205 out of 344 (59.6%) psychiatrists surveyed.

---

[24] In this analysis, all CDCR psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists.  Of staff psychiatrist respondents employed at CDCR for 10 or more years, 57.1% indicated they were less than satisfied with how their professional role is viewed by other employees.  Of staff psychiatrist respondents employed at CDCR for 10 or more years 77.1% indicated they were less than satisfied with their opportunities for promotion at CDCR.



**Table 28. CDCR Psychiatrist with Unsatisfied Rating by CDCR Employment Tenure[25]**

| | Less than 10 Years of CDCR Employment | 10 or More Years of CDCR Employment |
|---|---|---|
| Percentage reporting unsatisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 3) | 29.0 | 32.0 |
| Percentage reporting unsatisfied rating with how **professional role** is viewed by other employees (rating ≤ 3) | 28.4 | 30.0 |
| Percentage reporting unsatisfied rating with regards to **opportunities for promotion** (rating ≤ 3) | 40.0 | 44.0 |

## Methodology

CDCR psychiatrists were asked the following questions.  (1) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) CDCR psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?" The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 3 or less was classified as defined as unsatisfied.  Two hundred five of the 214 (95.8%) individuals who responded to the survey completed this question.  The survey response rate for this question was 205 out of 344 (59.6%) psychiatrists surveyed.

---

[25] In this analysis, all CDCR psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists.  Of staff psychiatrist respondents employed at CDCR for 10 or more years, 48.6% indicated they were unsatisfied with their opportunities for promotion at CDCR.



# Finding 10: The majority of CDCR psychiatrists reported that they believed their current salary and compensation was lower than their peers who work at other employers.

- The majority of psychiatrists reported that they perceived their salary and total compensation to be typically lower than the salary and total compensation of their psychiatrist peers at other employers (Page 56, Table 29).

- Psychiatrists at institutions inside the Central Valley region were more likely to report that they believed their salary and total compensation was typically lower than their psychiatrist peers at other employers, compared to psychiatrists at institutions outside of the Central Valley region (Page 57, Table 30).

- The majority of psychiatrists who have worked at CDCR for 10 or more years felt that their salary was typically lower than that of their psychiatrist peers at other employers, while a smaller percentage felt similarly about total compensation (Page 58, Table 31).



**Table 29. CDCR Psychiatrist Perception of Salary and Compensation by Type**

|  | **All** | **On-site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting that **salary** typically lower than the salaries of psychiatrist peers | 56.3 | 60.4 | 41.5 | 65.7 |
| Percentage reporting total **compensation** typically lower than the total compensation of psychiatrist peers | 53.1 | 56.4 | 56.1 | 42.9 |

**Methodology**

CDCR psychiatrists were asked the following questions. (1) CDCR psychiatrists were asked "Which of the following best describes your salary in relation to the salaries of your Psychiatrist peers who work for other employers?" Respondents could select if they felt their salary was typically "higher", "lower", or "equal" to the salaries of their psychiatrist peers who worked for other employers outside of CDCR. Respondents were instructed to only consider the salary of other psychiatrists they believed were their peers. Respondents were instructed to only consider the actual amount of pre-tax money they earned as a CDCR psychiatrist each month. Fringe benefits, such as retirement or health care, were asked to not be considered in this question. Two hundred thirteen of the 214 (99.5%) individuals who responded to the survey completed this question. The survey response rate for this question was 213 out of 344 (61.9%) psychiatrists surveyed.

(2) CDCR psychiatrists were asked "Which of the following best describes your total compensation in relation to the total compensation of your Psychiatrist peers who work for other employers?" Respondents could select if they felt their total compensation was typically "higher", "lower", or "about equal" to the total compensation of their psychiatrist peers who worked for other employers outside of CDCR. Respondents were instructed to consider the monetary value of all forms of compensation that they received such as salary, health benefits, retirement, federal loan forgiveness and bonuses. Two hundred thirteen of the 214 (99.5%) individuals who responded to the survey completed this question. The survey response rate for this question was 213 out of 344 (61.9%) psychiatrists surveyed.


employstats
ECONOMICS • STATISTICS

**Table 30. CDCR Psychiatrist Perception of Salary and Compensation by Location[26]**

|  | Central Valley | Outside Central Valley |
|---|---|---|
| Percentage reporting that **salary** typically lower than the salaries of psychiatrist peers | 58.1 | 53.6 |
| Percentage reporting total **compensation** typically lower than the total compensation of psychiatrist peers | 58.1 | 50.0 |

**Methodology**

CDCR psychiatrists were asked the following questions. (1) CDCR psychiatrists were asked "Which of the following best describes your salary in relation to the salaries of your Psychiatrist peers who work for other employers?" Respondents could select if they felt their salary was typically "higher", "lower", or "equal" to the salaries of their psychiatrist peers who worked for other employers outside of CDCR. Respondents were instructed to only consider the salary of other psychiatrists they believed were their peers. Respondents were instructed to only consider the actual amount of pre-tax money they earned as a CDCR psychiatrist each month. Fringe benefits, such as retirement or health care, were asked to not be considered in this question. One hundred eighty nine of the 214 (88.3%) individuals who responded to the survey completed this question. The survey response rate for this question was 189 out of 344 (54.9%) psychiatrists surveyed.

(2) CDCR psychiatrists were asked "Which of the following best describes your total compensation in relation to the total compensation of your Psychiatrist peers who work for other employers?" Respondents could select if they felt their total compensation was typically "higher", "lower", or "about equal" to the total compensation of their psychiatrist peers who worked for other employers outside of CDCR. Respondents were instructed to consider the monetary value of all forms of compensation that they received such as salary, health benefits, retirement, federal loan forgiveness and bonuses. One hundred eighty nine of the 214 (88.3%) individuals who responded to the survey completed this question. The survey response rate for this question was 189 out of 344 (54.9%) psychiatrists surveyed.

---

[26] In this analysis, all CDCR psychiatrist responses were analyzed. Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists. Of staff psychiatrist respondents located outside of the Central Valley, 55.1% indicated that they perceived their total compensation to be typically lower than the total compensation of their psychiatrist peers.



**Table 31. CDCR Psychiatrist Perception of Salary and Compensation by CDCR Employment Tenure[27]**

|  | Less than 10 Years of CDCR Employment | 10 Years or More of CDCR Employment |
|---|---|---|
| Percentage reporting that **salary** typically lower than the salaries of psychiatrist peers | 54.4 | 60.0 |
| Percentage reporting total **compensation** typically lower than the total compensation of psychiatrist peers | 55.0 | 46.0 |

**Methodology**

CDCR psychiatrists were asked the following questions. (1) CDCR psychiatrists were asked "Which of the following best describes your salary in relation to the salaries of your Psychiatrist peers who work for other employers?" Respondents could select if they felt their salary was typically "higher", "lower", or "equal" to the salaries of their psychiatrist peers who worked for other employers outside of CDCR. Respondents were instructed to only consider the salary of other psychiatrists they believed were their peers. Respondents were instructed to only consider the actual amount of pre-tax money they earned as a CDCR psychiatrist each month. Fringe benefits, such as retirement or health care, were asked to not be considered in this question. Two hundred ten of the 214 (98.1%) individuals who responded to the survey completed this question. The survey response rate for this question was 210 out of 344 (61.0%) psychiatrists surveyed.

(2) CDCR psychiatrists were asked "Which of the following best describes your total compensation in relation to the total compensation of your Psychiatrist peers who work for other employers?" Respondents could select if they felt their total compensation was typically "higher", "lower", or "about equal" to the total compensation of their psychiatrist peers who worked for other employers outside of CDCR. Respondents were instructed to consider the monetary value of all forms of compensation that they received such as salary, health benefits, retirement, federal loan forgiveness and bonuses. Two hundred ten of the 214 (98.1%) individuals who responded to the survey completed this question. The survey response rate for this question was 210 out of 344 (61.0%) psychiatrists surveyed.

---

[27] In this analysis, all CDCR psychiatrist responses were analyzed. Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists. Of staff psychiatrist respondents employed at CDCR for 10 or more years, 86.6% indicated that they perceived their salary to be typically lower than the total compensation of their psychiatrist peers. Of staff psychiatrist respondents employed at CDCR for 10 or more years 51.4% indicated that they perceived their total compensation to be typically lower than the total compensation of their psychiatrist peers.



# Finding 11: The majority of CDCR psychiatrists reported that they believed their salary at the time of their hire was at least competitive with their peers.

- The majority of psychiatrists reported that they perceived the initial salary they were offered to be at least competitive or greater than that of other employers (Page 60, Table 32).

- Psychiatrists at institutions inside the Central Valley region were similarly likely to have reported that they believed the initial salary they were offered to be at least competitive or greater than that of other employers, compared to psychiatrists at institutions outside of the Central Valley region (Page 61, Table 33).



**Table 32. CDCR Psychiatrist Perception of Salary at Hire by Type**

|  | **All** | **On-site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting initial salary at hire **less** than the starting salaries of other employers | 31.0 | 30.0 | 22.5 | 38.2 |

## Methodology

CDCR psychiatrists were asked "Which of the following best describes the salary that CDCR offered you when you were initially hired?" Respondents could select if they felt the salary CDCR offered them was "greater", "less than", or "competitive" to that of other employers.

Two hundred ten of the 214 (98.1%) individuals who responded to the survey completed this question. The survey response rate for this question was 210 out of 344 (61.0%) psychiatrists surveyed.



**Table 33. CDCR Psychiatrist Perception of Salary at Hire by Location**[28]

|  | **Central Valley** | **Outside Central Valley** |
|---|---|---|
| Percentage reporting initial salary at hire **less** than the starting salaries of other employers | 28.2 | 32.5 |

**Methodology**

CDCR psychiatrists were asked "Which of the following best describes the salary that CDCR offered you when you were initially hired?" Respondents could select if they felt the salary CDCR offered them was "greater", "less than", or "competitive" to that of other employers.

One hundred eighty six of the 214 (86.9%) individuals who responded to the survey completed this question. The survey response rate for this question was 186 out of 344 (54.1%) psychiatrists surveyed.

---

[28] In this analysis, all CDCR psychiatrist responses were analyzed. Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



# Discussion of the CDCR Economic Expert's Report

The Defendants' Economic Report prepared by Dr. Erica Greulich and Dr. Lona Fowdur explored the impact of labor market conditions and CDCR's initiatives on the employment of psychiatrists. The purpose of the report, as stated, was to evaluate whether salary adjustments and the provision of other benefits would allow CDCR to achieve a tangible and permanent increase in the size of its employed psychiatrist workforce.

The Defendants' expert report detailed many factors to explain the shortage of psychiatrists at CDCR. First, the expert report explained that there was a nationwide shortage, and a California shortage of psychiatrists. Second, there were general and physician-specific barriers to labor mobility and less desirable geographic locations of prisons. Third, the shortage of psychiatrists causes intense competition between psychiatrist employers and allows psychiatrists to pick their first choice of employment, which the Defendants' experts claimed does not appear to be CDCR.

As will be described in this section of the report, the Defendants' expert report raised important issues with regard to the overall environment of the psychiatrists' job market, yet failed to address potential compensating differentials and account for several key factors.

The Defendants' report examined the overall market conditions surrounding psychiatrists. The shortage of psychiatrists as described by the Defendants' experts was due to the demand for psychiatrists, the supply of psychiatrists, and the extent of the shortage with regards to pay, wait times for patients, and overall hiring challenges. Defendants' experts explored the shortages that were prevalent and the extent of those shortages in the state of California as well as the shortages within CDCR. The experts discussed CDCR's hiring initiatives in regard to salary and benefits, such as fringe benefits, merit based salary adjustments, pensions, contract rates, differential pay rates, dual-appointment, and bonuses. CDCR contends the introduction of their telepsychiatry program has increased staffing of psychiatrists.

The Defendants' report provided regression analyses to determine whether there was a relationship between filled positions and CDCR salaries relative to average California salaries. Additionally, the regressions control for the number of CDCR psychiatrist staff positions and a



time trend.  In these analyses, the economists found that higher psychiatrist salaries were not associated with an increase in filled civil service psychiatrist positions.  The Defendants' report purported that an increase in salary for CDCR psychiatrists would result in the possibility of a bidding war between employers of psychiatrists.

Finally, the Defendants' experts offered several potential policy solutions to alleviate the psychiatrist shortages.  First, Defendants' experts suggested expanding the use of telepsychiatry.  The experts opined that telepsychiatry was efficient, cost-effective, and was a valid means to meet patients' needs for mental health care.  Second, the Defendants' experts contended the way to increase the supply of psychiatrists was to reduce the proportion of psychiatrists practicing solely in cash-only private practices or expand the number of residency positions and programs.  Third, the Defendants' experts suggested expanding utilization of other types of mental health professionals, including mental health nurses and physician assistants with psychiatric training.

The Defendants' expert report, as detailed above, failed to account for many factors that influence the labor market for psychiatrists.  The Defendants' report claimed that California prisoners have 16 times more access to psychiatrists and mental health assistance than the general population in the state of California.  This conclusion was solely based on the number of psychiatrists in CDCR relative to the prison population versus the number of psychiatrists in California relative to the general population.

The Defendants' report and analysis failed to consider the variance in mental health issues that exist with those incarcerated.  There was no analysis of the need for psychiatric care for prisoners relative to the general population.  It is well documented that prisoners have much higher rates of mental illness, and severe mental illness, compared to the general population.  Further, prison is not necessarily a setting where someone can recover quickly from mental illness as for some it may be an environment that will likely exacerbate pre-existing problems and possibly create new mental health problems.

The Defendants' report provided regression analyses and concluded that increases in salary do not correlate or result in an increase in filled psychiatrist positions.  The Defendants' report findings were inconsistent with the increase in psychiatrist fill and retention rates that occurred after CDCR's most recent pay increases.  The report also failed to explore any other potential



differentials that may influence hiring and retention. It is well documented in compensating wage differential literature that psychiatrists have one of the most emotionally demanding jobs. Emotionally demanding jobs do not necessarily command a large compensation wage differential unless they are combined with high cognitive demands. Psychiatry is both cognitively and emotionally demanding, and this is amplified for prison psychiatrists. Any analysis of the elasticity of supply of psychiatrist labor in CDCR must be centered on a discussion of the compensating wage differential. The Defendants experts' analysis did not address this issue.

Further in contrast to the defendants' experts' opinions it is not clear that expanding the use of telepsychiatry will help CDCR alleviate psychiatrist shortages. Telepsychiatrists are not significantly more satisfied with all aspects of their positions with CDCR than on-site and registry psychiatrists. For instance, telepsychiatrists reported higher dissatisfaction with their initial and current salary than on-site and registry psychiatrists at CDCR.

Similar to the above point, the Defendants' analysis concluded that when psychiatrists were given the opportunity to work more hours or work in a registry position to earn a higher salary, psychiatrists did not take those opportunities. The Defendants' analysis also suggested that in some instances where psychiatrists had been granted the ability to work more hours at higher pay rates, these psychiatrists were not taking advantage of it. However, the Defendants' report did not offer any other benefits, besides salary increases, that may be motivating factors for hiring and retention of psychiatrists. For instance, one psychiatrist work program allows psychiatrists to earn 1.8 times their hourly wage but does not include fringe benefits. The conclusion that higher pay does not increase the supply of labor is inappropriate in this instance. Further, it may be the case that after working a normal shift, CDCR psychiatrists may be so emotionally exhausted that a higher compensating wage differential is needed to get them to work more hours. It also may be the case that long hours in the CDCR system are not possible due to the demands of the job.



# DSH Study Methodology and Data

Two principal analyses of DSH psychiatrists' employment and compensation were performed in this report.  First, the salary and total compensation of DSH psychiatrists was compared to that of psychiatrists employed by other public and private California employers.  Second, a survey of DSH psychiatrists' perceptions of their working conditions and compensation was conducted.

The salary comparison analysis utilized personnel data provided by DSH and publicly available benchmark compensation data for psychiatrists in California and in the United States.  The personnel data provided by DSH included information on the psychiatrists' education and credentials, dates of hire and separation, employment location, current compensation, and compensation history.  The DSH personnel data was provided for the 2009 to 2018 time period. A description of the DSH documents used in the analysis is provided in Appendix C of this report.

Psychiatrist compensation benchmark data was obtained from the BLS OES, Transparent California compensation database, Salary.com, and Medscape.com.[29]

An online survey was conducted between March 28, 2019 and June 12, 2019 to obtain DSH psychiatrists' perceptions of their working conditions and compensation.   Current DSH psychiatrists were surveyed and asked to provide their satisfaction ratings based on their overall working conditions, as well as individual components such as their office space, their professional standing at their DSH institution, opportunities for promotion, and compensation. For survey questions regarding employment conditions, psychiatrists were asked to provide their satisfaction rating on a scale from 1 to 7 where a response of 1 indicates that the psychiatrist is very unsatisfied, and a response of 7 indicates that the psychiatrist is very

---

[29] As described in the previous section, the BLS OES program produces widely used annual wage and employment data by occupation. Transparent California is an online compensation database that is assembled through open records information by the Nevada Policy Research Institute.  Transparent California's database obtains annual salary and pension records for public California state and local employees.  Salary.com is a website that specializes in producing market pay data by occupation and location.  The compensation data of Salary.com is based on employer-reported data, covering over 29 million employees and more than 16,000 companies.  Medscape is an online resource that provides information related to the medical industry, including annual compensation reports for psychiatrists.  Data included in Medscape's annual compensation reports include the average salary of psychiatrists nationwide, as well as by region.



satisfied. Ratings of 5 and higher were classified as satisfied, ratings of 4 and below were classified as less than satisfied, and ratings of 3 and below were classified as unsatisfied. The survey instrument is attached in Appendix A.

Prior to the administration of the survey, attorneys for the parties provided input regarding the information to be obtained from the survey. The survey was administered through Survey Monkey, a widely used online survey development and cloud-based software service company. The survey was sent to the 138 psychiatrists on the current DSH psychiatrist contact list. Seventy of the 138 psychiatrists on the contact list, or 50.7% of the psychiatrists, responded to the survey. Sixty-seven of the 70 psychiatrists who responded to the survey, or 95.7% of the psychiatrists, completed the survey.



# DSH Psychiatrist Workforce Background

- Retention rates for psychiatrists have declined at DSH facilities in some years (Page 68, Table 34).

- DSH psychiatrists primarily learned about DSH job postings through 'word of mouth' networking (Page 69, Table 35).



**Table 34. DSH Psychiatrist Retention Rates**

| | | **Percentage of Psychiatrists Still Employed at the End of the Year** | | | | |
|---|---|---|---|---|---|---|
| | | **2014** | **2015** | **2016** | **2017** | **2018** |
| **Year of Hire** | **2013** | 75.0 | 75.0 | 75.0 | 75.0 | 75.0 |
| | **2014** | | 100.0 | 63.6 | 54.5 | 54.5 |
| | **2015** | | | 66.7 | 33.3 | 33.3 |
| | **2016** | | | | 83.3 | 66.7 |
| | **2017** | | | | | 80.0 |

**Methodology**

DSH psychiatrists' retention rates were calculated for each hire cohort for the years 2013 to 2017. Using the psychiatrist's date of hire and salary history, the psychiatrists were grouped into cohorts by their year of hire. For each cohort, the number of psychiatrists still employed at the end of the year was calculated for each year. The annual retention rate for each cohort is shown in the table above.

For example, for psychiatrists hired in 2014 by DSH, 100.0% of these psychiatrists were still employed one year later in 2015. For psychiatrists hired in 2014 by DSH, 63.6% of these psychiatrists were still employed two years later in 2016.

**Source: 'DSH SCO MIRS Data Report_ DSH9758B_19740101-20181231_Final.xlsx'.**



**Table 35. Source of DSH Psychiatrist Hires**

| Method | Percentage of DSH Psychiatrists |
|---|---|
| 'Word of Mouth' Networking | 34.3 |
| Active DSH Job Advertising | 31.3 |
| Passive DSH Job Advertising | 7.5 |
| Other | 26.9 |

**Methodology**

DSH psychiatrists were asked "How did you first learn of the job posting for your current position?" Respondents who searched the DSH official website, were contacted by a recruiter, applied at a psychiatric conference, received an ad at their residency, participated in the Napa or Patton residency program, or applied at a career fair were classified as "Active DSH Job Advertising." Respondents who applied on-site at a DSH facility or through an online job posting site (Indeed, Monster, etc.) were classified as "Passive DSH Job Advertising." Respondents who used other methods or could not recall were classified as "Other." **Source: DSH Psychiatrist Salary and Working Conditions Survey.**



# DSH Salary Analysis

- DSH psychiatrists earned lower salaries than CDCR psychiatrists and lower annual salary increases than private and public employers in California, in the Western States Region, and in the U.S. as a whole (Finding 12, Page 71).

- DSH psychiatrists who have worked for DSH for 10 or more years experienced lower salary growth compared to psychiatrists at DSH with less than 10 years of experience working at DSH (Finding 13, Page 73).



Finding 12: DSH psychiatrists earned lower salaries than CDCR psychiatrists and lower annual salary increases than private and public employers in California, in the Western States Region, and in the United States as a whole.

**Table 36. Average Psychiatrist Salary Increases for DSH and CDCR**

|  | Average Annual Salary Increase, 2012 to 2016 | Average Annual Increase, 2017 |
|---|---|---|
| DSH | 2.4% | 4.6% |
| CDCR | 3.9% | 3.8% |
| Other California Private and Public Employers | 6.0% | 3.0% |
| Western States | 6.2% | Unavailable |
| U.S. Overall | 2.8% | 7.9% |

**Methodology**

The average annual salary increase was calculated as the average increase experienced by psychiatrists in each respective category in 2012, 2013, 2014, 2015, and 2016.  Western States are defined by Medscape Psychiatrist Compensation reports.[30]  The average annual salary increase for Other California Private and Public Employers and the U.S. Overall was calculated from the Bureau of Labor Statistics Occupational Employment Statistics survey.  Data for the Western States was unavailable for 2017 and the average annual salary increase for year 2017 was marked 'Unavailable' for the Western States in this table.

**Source: Bureau of Labor Statistics, U.S. Department of Labor, Occupational Employment Statistics; Medscape; 'DSH SCO MIRS Data Report_ DSH9758B_19740101-20181231_Final.xlsx'; and '2018_06_21 CDCR9758_Mark IV no SSN.xlsx'.**

---

[30] The Medscape Psychiatrist Compensation Reports for 2013 to 2016 defined the Western States as California and Hawaii.  The Medscape Psychiatrist Compensation report for 2017 defined that Western States as California, Hawaii, and Alaska.  The annual Medscape Psychiatrist Compensation Reports present compensation for the previous year.



**Table 37. Annual Psychiatrist Salary Levels at DSH and CDCR**

| Year | DSH Median Salary | CDCR Median Salary | Percentage DSH Median Salary compared to CDCR Median Salary |
|------|------|------|------|
| 2011 | $255,732 | $260,952 | 98.0 |
| 2012 | $268,524 | $261,337 | 102.7 |
| 2013 | $268,524 | $273,996 | 98.0 |
| 2014 | $273,900 | $279,480 | 98.0 |
| 2015 | $279,384 | $285,072 | 98.0 |
| 2016 | $279,384 | $293,340 | 95.2 |
| 2017 | $293,520 | $299,496 | 98.0 |
| 2018 | $299,388 | $308,184 | 97.1 |

**Methodology**

The DSH median salary was calculated as the median annual salary of DSH psychiatrists for each year. Similar, the DSH median salary was calculated as the median annual salary of DSH psychiatrists for each year.  The percentage DSH median salary compared to CDCR median salary was calculated as a proportion of the median DSH salary for each year divided by the CDCR salary.  **Source: 'DSH SCO MIRS Data Report_ DSH9758B_19740101-20181231_Final.xlsx'; and '2018_06_21 CDCR9758_Mark IV no SSN.xlsx'.**



Finding 13: DSH psychiatrists who have worked for DSH for 10 or more years experienced lower salary growth compared to psychiatrists at DSH with less than 10 years experience working at DSH.

### Figure 4. Average Annual Salary Increase for DSH Psychiatrists by Experience at DSH



**Methodology**

The average annual salary increase for DSH psychiatrists, by years of experience was calculated as follows.  For each psychiatrist, the annual salary increase experienced by the psychiatrist was calculated for each year, from 2013 to 2017.  The average annual salary increase was then calculated for each year, for psychiatrists with less than 10 years of experience at DSH, and psychiatrists with 10 or more years of experience at DSH.  Experience at DSH was defined as the approximate number of years from the employee's initial date of hire at DSH until the employee's last year worked. **Source: 'DSH SCO MIRS Data Report_ DSH9758B_19740101-20181231_Final.xlsx'.**



# DSH Employment Conditions Analysis

- DSH psychiatrists reported an overall job satisfaction rating of less than satisfied (Finding 14, Pages 75-76).

- Compared to other California employers, psychiatrists at DSH reported less overall job satisfaction than other psychiatrists (Finding 15, Page 77).

- The majority of DSH psychiatrists reported that they were less than satisfied with their overall working conditions (Finding 16, Pages 78-79).

- The majority of DSH psychiatrists reported that their office space was not adequate (Finding 17, Page 80).

- DSH psychiatrists reported that they were less than satisfied with their professional standing within their institutions and opportunities for promotion (Finding 18, Pages 81-84).

- The majority of DSH psychiatrists reported that they believe that their current salary and compensation was typically lower than that of their peers who worked at other employers (Finding 19, Pages 85-86).

- The majority of DSH psychiatrists reported that they believe that the salary they received when they were hired was competitive with that received by their peers who worked at other employers (Finding 20, Page 87).



# Finding 14: DSH psychiatrists reported an overall job satisfaction rating of less than satisfied.

**Table 38. Overall DSH Psychiatrist Job Satisfaction Ratings by Type**

|  | All | On-Site | Registry | Tele- |
|---|---|---|---|---|
| Percentage reporting overall job rating of less than satisfied (rating ≤ 4) | 58.2 | 67.4 | 31.3 | 50.0 |
| Percentage reporting overall job rating of unsatisfied (rating ≤ 3) | 35.8 | 43.5 | 12.5 | 50.0 |

**Methodology**

DSH psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction?"  The range of job satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A job satisfaction rating of 4 or less was classified as less than satisfied.  A job satisfaction rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question.  The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.



**Table 39. Overall DSH Psychiatrist Job Satisfaction Ratings by DSH Job Tenure[31]**

|  | Less than 10 Years of DSH Employment | 10 or More Years of DSH Employment |
|---|---|---|
| Percentage reporting overall job rating of less than satisfied (rating ≤ 4) | 61.5 | 60.0 |
| Percentage reporting overall job rating of unsatisfied (rating ≤ 3) | 42.3 | 40.0 |

## Methodology

DSH psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction?" The range of job satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A job satisfaction rating of 4 or less was classified as less than satisfied. A job satisfaction rating of 3 or less was classified as unsatisfied. The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question. The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.

---

[31] In this analysis, all DSH psychiatrist responses were analyzed. Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



# Finding 15: Compared to other California employers, psychiatrists at DSH reported less overall job satisfaction than other psychiatrists.

**Table 40. Overall DSH Psychiatrist Job Satisfaction Ratings versus CDCR and other Employer Psychiatrist Job Satisfaction Ratings**

|  | DSH Psychiatrists | CDCR Psychiatrists | Psychiatrists at other California Employers |
|---|---|---|---|
| Percentage reporting overall job ratings higher than middle job satisfaction rating | 41.8 | 46.6 | 80.0 |

**Methodology**

DSH and CDCR psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction?"  The range of job satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).  A rating of 4 was the middle job satisfaction rating for DSH and CDCR psychiatrists.  Job satisfaction ratings of non-DSH/CDCR psychiatrists working at California employers were gathered from external, publicly available site Glassdoor.  Glassdoor asks employees to rate their overall job satisfaction with their current or former employer on a 1 to 5 scale, with 1 being "Very Dissatisfied" and 5 being "Very Satisfied".  The middle job satisfaction rating was 3 in the Glassdoor job satisfaction rating system.[32]

---

[32]  For additional academic sources using data from online review sites, see *What Can We Learn from Online Wage Postings? Evidence from Glassdoor* (Karabarbounis and Pinto 2018), and *Job Satisfaction and Employee Turnover Determinants in High Contact Services: Insights from Employees' Online Reviews* (Stamolampros et al. 2019).



Finding 16: The majority of DSH psychiatrists reported that they were less than satisfied with their overall working conditions.

**Table 41. Overall DSH Working Conditions Satisfaction Ratings by Type**

|  | All | On-Site | Registry | Tele- |
|---|---|---|---|---|
| Percentage reporting overall working condition rating of less than satisfied (rating ≤ 4) | 82.1 | 84.8 | 81.3 | 50.0 |
| Percentage reporting overall working condition rating of unsatisfied (rating ≤ 3) | 49.3 | 54.4 | 31.3 | 50.0 |

**Methodology**

DSH psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at DSH?"  The range of satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A working conditions satisfaction rating of 4 or less was classified as less than satisfied.  A working conditions satisfaction rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question.  The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.



**Table 42. Overall DSH Psychiatrist Working Conditions Satisfaction Ratings by DSH Employment Tenure[33]**

|  | Less than 10 Years of DSH Employment | 10 or More Years of DSH Employment |
|---|---|---|
| Percentage reporting overall working condition rating of less than satisfied (rating ≤ 4) | 96.2 | 72.0 |
| Percentage reporting overall working condition rating of unsatisfied (rating ≤ 3) | 50.0 | 56.0 |

**Methodology**

DSH psychiatrists were asked "On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at DSH?"  The range of satisfaction ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A working conditions satisfaction rating of 4 or less was classified as less than satisfied.  A working conditions satisfaction rating of 3 or less was classified as unsatisfied.  The categories of less than satisfied and unsatisfied do not add up to 100 and were not mutually exclusive.

Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question.  The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.

---

[33] In this analysis, all DSH psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



# Finding 17: The majority of DSH psychiatrists reported that their office space was not adequate.

**Table 43. DSH Psychiatrist Office Space Adequacy Ratings by Type**

|  | All | On-site | Registry | Tele- |
|---|---|---|---|---|
| Percentage reporting office space rating of less than adequate (rating ≤ 4) | 68.7 | 76.1 | 50.0 | 50.0 |
| Percentage reporting office space rating of inadequate (rating ≤ 3) | 49.3 | 50.0 | 43.8 | 50.0 |

**Methodology**

DSH psychiatrists were asked "On a scale from 1 to 7, where 1 is 'completely inadequate' and 7 is 'completely adequate', how would you rate your current office space for performing all of the job functions of a Psychiatrist, such as seeing patients, having meetings, and completing paperwork, etc?"

An office space rating of 4 or less was classified as less than adequate. An office space rating of 3 or less was classified as inadequate. The categories of less than adequate and inadequate do not add up to 100 and were not mutually exclusive.

Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question. The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.



Finding 18: DSH psychiatrists reported that they were less than satisfied with their professional standing within their institutions and opportunities for promotion.

**Table 44. DSH Psychiatrist with Less than Satisfied Rating of Professional Standing by Type**

|  | **All** | **On-site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting less than satisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 4) | 46.3 | 56.5 | 12.5 | 100.0 |
| Percentage reporting less than satisfied rating with how **professional role** is viewed by other employees (rating ≤ 4) | 42.3 | 50.0 | 12.5 | 100.0 |
| Percentage reporting less than satisfied rating with regards to **opportunities for promotion** (rating ≤ 4) | 64.2 | 67.4 | 56.3 | 50.0 |

**Methodology**

DSH psychiatrists were asked the following questions.  (1) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?" The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 4 or less was classified as defined as less than satisfied.  Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question.  The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.



**Table 45. DSH Psychiatrists with Unsatisfied Rating of Professional Standing by Type**

| | All | On-site | Registry | Tele- |
|---|---|---|---|---|
| Percentage reporting unsatisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 3) | 31.3 | 37.0 | 6.3 | 100.0 |
| Percentage reporting unsatisfied rating with how **professional role** is viewed by other employees (rating ≤ 3) | 32.8 | 34.8 | 12.5 | 100.0 |
| Percentage reporting unsatisfied rating with regards to **opportunities for promotion** (rating ≤ 3) | 37.3 | 37.0 | 37.5 | 50.0 |

**Methodology**

DSH psychiatrists were asked the following questions.  (1) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?"  The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 3 or less was classified as defined as unsatisfied. Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question.  The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.



**Table 46. DSH Psychiatrist with Less than Satisfied Rating of Professional Standing by DSH Employment Tenure[34]**

| | Less than 10 Years of DSH Employment | 10 or More Years of DSH Employment |
|---|---|---|
| Percentage reporting less than satisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 4) | 53.9 | 48.0 |
| Percentage reporting less than satisfied rating with how **professional role** is viewed by other employees (rating ≤ 4) | 48.0 | 48.0 |
| Percentage reporting less than satisfied rating with regards to **opportunities for promotion** (rating ≤ 4) | 69.2 | 60.0 |

**Methodology**

DSH psychiatrists were asked the following questions.  (1) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?"  The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 4 or less was classified as defined as less than satisfied.  Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question.  The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.

---

[34] In this analysis, all DSH psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



**Table 47. DSH Psychiatrist Perception of Professional Standing by DSH Employment Tenure[35]**

|  | Less than 10 Years of DSH Employment | 10 or More Years of DSH Employment |
|---|---|---|
| Percentage reporting unsatisfied rating with how **professional opinion** is regarded by other employees (rating ≤ 3) | 34.6 | 40.0 |
| Percentage reporting unsatisfied rating with how **professional role** is viewed by other employees (rating ≤ 3) | 34.6 | 36.0 |
| Percentage reporting unsatisfied rating with regards to **opportunities for promotion** (rating ≤ 3) | 42.3 | 32.0 |

**Methodology**

DSH psychiatrists were asked the following questions.  (1) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?"  The range of ratings was from 1 (generally disregarded) to 7 (very highly regarded).

(2) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?"  The range of ratings was from 1 (of no value) to 7 (very highly valued).

(3) DSH psychiatrists were asked "On a scale of 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?"  The range of ratings was from 1 (very unsatisfied) to 7 (very satisfied).

A rating of 3 or less was classified as defined as unsatisfied.  Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question.  The survey response rate for this question was 67 out of 138 (48.6%) of psychiatrists surveyed.

---

[35] In this analysis, all DSH psychiatrist responses were analyzed.  Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



Finding 19: The majority DSH psychiatrists reported that they believed their current salary and compensation was typically lower than that of their peers who work at other employers.

**Table 48. DSH Psychiatrist Perception of Salary and Compensation by Type**

|  | **All** | **On-site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting that **salary** typically lower than the salaries of psychiatrist peers | 74.3 | 85.1 | 43.8 | 100.0 |
| Percentage reporting total **compensation** typically lower than the total compensation of psychiatrist peers | 59.4 | 61.7 | 50.0 | 100.0 |

**Methodology**

DSH psychiatrists were asked the following questions. (1) DSH psychiatrists were asked "Which of the following best describes your salary in relation to the salaries of your Psychiatrist peers who work for other employers?"  Respondents could select if they felt their salary was typically "higher", "lower", or "equal" to the salaries of their psychiatrist peers who worked for other employers outside of DSH. Respondents were instructed to only consider the salary of other psychiatrists they believed were their peers.  Respondents were instructed to only consider the actual amount of pre-tax money they earned as a DSH psychiatrist each month.  Fringe benefits, such as retirement or health care, were asked to not be considered in this question.  Seventy of the 70 (100%) individuals who responded to the survey completed this question.  The survey response rate for this question was 70 out of 138 (50.7%) of psychiatrists surveyed.

(2) DSH psychiatrists were asked "Which of the following best describes your total compensation in relation to the total compensation of your Psychiatrist peers who work for other employers?" Respondents could select if they felt their total compensation was typically "higher", "lower", or "about equal" to the total compensation of their psychiatrist peers who worked for other employers outside of DSH.  Respondents were instructed to consider the monetary value of all forms of compensation that they received such as salary, health benefits, retirement, federal loan forgiveness and bonuses.  Sixty-nine of the 70 (98.6%) individuals who responded to the survey completed this question.  The survey response rate for this question was 69 out of 138 (50%) of psychiatrists surveyed.



**Table 49. DSH Psychiatrist Perception of Salary and Compensation by DSH Employment Tenure[36]**

|  | **Less than 10 Years of DSH Employment** | **10 Years or More of DSH Employment** |
|---|---|---|
| Percentage reporting that **salary** typically lower than the salaries of psychiatrist peers | 75.0 | 84.0 |
| Percentage reporting total **compensation** typically lower than the total compensation of psychiatrist peers | 63.0 | 64.0 |

**Methodology**

DSH psychiatrists were asked the following questions. (1) DSH psychiatrists were asked "Which of the following best describes your salary in relation to the salaries of your Psychiatrist peers who work for other employers?" Respondents could select if they felt their salary was typically "higher", "lower", or "equal" to the salaries of their psychiatrist peers who worked for other employers outside of DSH. Respondents were instructed to only consider the salary of other psychiatrists they believed were their peers. Respondents were instructed to only consider the actual amount of pre-tax money they earned as a DSH psychiatrist each month. Fringe benefits, such as retirement or health care, were asked to not be considered in this question. Seventy of the 70 (100%) individuals who responded to the survey completed this question. The survey response rate for this question was 70 out of 138 (50.7%) of psychiatrists surveyed.

(2) DSH psychiatrists were asked "Which of the following best describes your total compensation in relation to the total compensation of your Psychiatrist peers who work for other employers?" Respondents could select whether their total compensation was typically "higher", "lower", or "about equal" to the total compensation of their psychiatrist peers who worked for other employers outside of DSH. Respondents were instructed to consider the monetary value of all forms of compensation that they received such as salary, health benefits, retirement, federal loan forgiveness and bonuses. Sixty-nine of the 70 (98.6%) individuals who responded to the survey completed this question. The survey response rate for this question was 69 out of 138 (50%) of psychiatrists surveyed.

---

[36] In this analysis, all DSH psychiatrist responses were analyzed. Responses were also analyzed separately for respondents that indicated they were employed as staff psychiatrists, and the responses were found to be quantitatively similar.



Finding 20: The majority of DSH psychiatrists reported that they believed their salary at hire was at least competitive with their peers.

**Table 50. DSH Psychiatrist Perception of Salary at Hire by Type**

|  | **All** | **On-site** | **Registry** | **Tele-** |
|---|---|---|---|---|
| Percentage reporting initial salary at hire **less** than the starting salaries of other employers | 38.8 | 37.0 | 37.5 | 100.0 |

**Methodology**

DSH psychiatrists were asked "Which of the following best describes the salary that DSH offered you when you were initially hired?"  Respondents could select whether they feel the salary DSH offered them was "greater", "less than", or "competitive" to that of other employers.  Sixty-seven of the 70 (95.7%) individuals who responded to the survey completed this question.  The survey response rate for this question is 67 out of 138 (48.6%) psychiatrists surveyed.



# Appendix A: Psychiatrist Surveys



## CDCR Psychiatrist Salary and Working Conditions Survey

**INTRODUCTION**

This survey is being conducted by EmployStats, an economic consulting firm. EmployStats is a neutral third-party entity and is conducting this survey in order to gather data to assess CDCR Psychiatrists' work satisfaction, compensation, and environment, and assess staffing levels for Psychiatrists. In this survey we will ask you a few short questions concerning your compensation, working conditions, and job satisfaction.

As you know, the CDCR often has difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain institutions. Your honest and thoughtful answers to this survey will provide vital information to assist policy makers in assessing and implementing policies that address that issue.

Your responses will not impact your employment. We will not individually identify your responses. Your name will not be presented with your survey response and survey responses will be aggregated.

This survey should take approximately 15 minutes to complete.

**EMPLOYMENT INFORMATION**

Instructions: Please answer the following questions as they are true to you today.

Q1. Which of the following best describes your current employment with CDCR?
- Registry or Contract Psychiatrist                   (CONTINUE TO Q2)
- Civil Service Psychiatrist                         (CONTINUE TO Q2)

Q2. At what facility or facilities do you currently work? If you are working as a Telepsychiatrist, select 'Telepsychiatrist below, as well as the facilities where you perform telepsychiatrist duties.

(CHECK BOXES ALLOWING MULTIPLE SELECTIONS FOR TELEPSYCHIATRISTS.)

- Telepsychiatrist                  (CONTINUE TO Q3)
- Avenal State Prison              (CONTINUE TO Q3)
- California City Correctional Facility (CAC)     (CONTINUE TO Q3)
- California Correctional Center        (CONTINUE TO Q3)
- California Correctional Institution      (CONTINUE TO Q3)
- California Health Care Facility        (CONTINUE TO Q3)
- California Institution for Men         (CONTINUE TO Q3)
- California Institution for Women      (CONTINUE TO Q3)
- California Medical Facility           (CONTINUE TO Q3)
- California Men's Colony            (CONTINUE TO Q3)
- California Rehabilitation Center      (CONTINUE TO Q3)
- Calipatria State Prison            (CONTINUE TO Q3)
- Centinela State Prison            (CONTINUE TO Q3)
- Central California Women's Facility    (CONTINUE TO Q3)
- Chuckawalla Valley State Prison      (CONTINUE TO Q3)
- Correctional Training Facility        (CONTINUE TO Q3)



| - | CSP Corcoran | (CONTINUE TO Q3) |
| - | CSP Los Angeles County | (CONTINUE TO Q3) |
| - | CSP Sacramento (New Folsom) | (CONTINUE TO Q3) |
| - | CSP San Quentin | (CONTINUE TO Q3) |
| - | CSP Solano | (CONTINUE TO Q3) |
| - | Deuel Vocational Institution | (CONTINUE TO Q3) |
| - | Folsom State Prison | (CONTINUE TO Q3) |
| - | High Desert State Prison | (CONTINUE TO Q3) |
| - | Ironwood State Prison | (CONTINUE TO Q3) |
| - | Kern Valley State Prison | (CONTINUE TO Q3) |
| - | Mule Creek State Prison | (CONTINUE TO Q3) |
| - | North Kern State Prison | (CONTINUE TO Q3) |
| - | Pelican Bay State Prison | (CONTINUE TO Q3) |
| - | Pleasant Valley State Prison | (CONTINUE TO Q3) |
| - | Richard J. Donovan Correctional Facility | (CONTINUE TO Q3) |
| - | Salinas Valley State Prison | (CONTINUE TO Q3) |
| - | Sierra Conservation Center | (CONTINUE TO Q3) |
| - | Substance Abuse Treatment Facility and State Prison | (CONTINUE TO Q3) |
| - | Valley State Prison | (CONTINUE TO Q3) |
| - | Wasco State Prison | (CONTINUE TO Q3) |

Q3. What is your current job title?

| - | Staff Psychiatrist | (CONTINUE TO Q4) |
| - | Supervising Psychiatrist | (CONTINUE TO Q4) |
| - | Chief Psychiatrist | (CONTINUE TO Q4) |
| - | Telepsychiatrist | (CONTINUE TO Q4) |

Q4. Prior to being employed as a Psychiatrist with CDCR, have you ever been employed as a Psychiatrist outside of CDCR or self-employed as a Psychiatrist? Please do not consider your residency training.

| - | Yes | (CONTINUE TO Q5) |
| - | No | (CONTINUE TO Q5) |

**CDCR PSYCHIATRIST SALARY VERSUS NON-CDCR PEER PSYCHIATRIST SALARY**

Instructions: We will now ask you about how you feel your salary as a CDCR Psychiatrist compares with the salary of your peers who work as Psychiatrists for other employers. When answering these questions, please consider the salary of other Psychiatrists that you feel are your peers.

Q5. **Your Salary**. When answering the question below concerning your salary, only consider the actual amount of pre-tax money that you earn as a CDCR Psychiatrist each month.

For this question, do not consider fringe benefits, such as retirement or health insurance. You will be asked a separate question concerning these benefits later in the survey.

Which of the following best describes your salary in relation to the salaries of your Psychiatrist peers who work for other employers?

- I feel that my salary is **typically higher** than the salaries of my Psychiatrist peers who work for other employers outside of CDCR.                          (CONTINUE TO Q5a)
- I feel that my salary is **typically lower** than the salaries of my Psychiatrist peers who work for other employers outside of CDCR.                          (SKIP TO Q5b)



-   I feel that my salary is **typically about equal** to the salaries of my Psychiatrist peers who work for other employers outside of CDCR.                                    (SKIP TO Q6)
-   I do not know                                                                                                   (SKIP TO Q6)

## CDCR SALARY - HIGHER THAN PSYCHIATRIST PEERS

Instructions: You responded that your salary is typically higher than the salaries of your Psychiatrist peers who work for other employers outside of CDCR. Please tell us how much higher you feel your salary is than these Psychiatrist peers.

Q5a. Which of the following best describes how much higher your salary is typically than the salaries of your Psychiatrist peers who work for employers outside of CDCR?

-   My salary is **more than 20% higher** than the salaries of my Psychiatrist peers (SKIP TO Q6)
-   My salary is **15% to 20% higher** than the salaries of my Psychiatrist peers   (SKIP TO Q6)
-   My salary is **10% to 14% higher** than the salaries of my Psychiatrist peers   (SKIP TO Q6)
-   My salary is **5% to 9% higher** than the salaries of my Psychiatrist peers     (SKIP TO Q6)
-   My salary is **1% to 4% higher** than the salaries of my Psychiatrist peers     (SKIP TO Q6)
-   My salary is **less than 1% higher** than the salaries of my Psychiatrist peers (SKIP TO Q6)
-   I do not know                                                                   (SKIP TO Q6)

## CDCR SALARY - LESS THAN PSYCHIATRIST PEERS

Instructions: You responded that your salary is typically lower than the salaries of your Psychiatrist peers who work for other employers outside of CDCR.  Please tell us how much lower you feel your salary is than these Psychiatrist peers.

Q5b. Which of the following best describes how much lower your salary is typically than the salaries of your Psychiatrist peers who work for employers outside of CDCR?

-   My salary is **more than 20% lower** than the salaries of my Psychiatrist peers (SKIP TO Q6)
-   My salary is **15% to 20% lower** than the salaries of my Psychiatrist peers    (SKIP TO Q6)
-   My salary is **10% to 14% lower** than the salaries of my Psychiatrist peers    (SKIP TO Q6)
-   My salary is **5% to 9% lower** than the salaries of my Psychiatrist peers      (SKIP TO Q6)
-   My salary is **1% to 4% lower** than the salaries of my Psychiatrist peers      (SKIP TO Q6)
-   My salary is **less than 1% lower** than the salaries of my Psychiatrist peers  (SKIP TO Q6)
-   I do not know                                                                   (SKIP TO Q6)

## CDCR PSYCHIATRIST TOTAL COMPENSATION VERSUS NON-CDCR PEER PSYCHIATRIST TOTAL COMPENSATION

Instructions: We will now ask you about how you feel your compensation as a CDCR Psychiatrist compares with the compensation of your peers who work as Psychiatrists for other employers.  When answering these questions, please consider the monetary value of the total compensation of other Psychiatrists that you feel are your peers.

Q6. **Your Total Compensation**. When answering the question below concerning your compensation, consider the monetary value of all forms of compensation that you receive such as salary, health benefits, retirement, federal loan forgiveness program and bonuses.



Which of the following best describes your <u>total compensation</u> in relation to the total compensation of your Psychiatrist peers who work for other employers?

- I feel that my total compensation is **typically higher** than the total compensation of my Psychiatrist peers who work for other employers outside of CDCR   (CONTINUE TO Q6a)
- I feel that my total compensation is **typically lower** than the total compensation of my Psychiatrist peers who work for other employers outside of CDCR        (SKIP TO Q6b)
- I feel that my total compensation is **typically about equal** to the total compensation of my Psychiatrist peers who work for other employers outside of CDCR        (SKIP TO Q7)
- I do not know                                                                (SKIP TO Q7)

## CDCR TOTAL COMPENSATION - MORE THAN PSYCHIATRIST PEERS

Instructions: You responded that your total compensation is typically higher than the total compensation of your Psychiatrist peers who work for other employers outside of CDCR.  Please tell us how much more you feel your total compensation is than these Psychiatrist peers.

Q6a. Which of the following best describes how much higher your total compensation is typically than the total compensation of your Psychiatrist peers who work for employers outside of CDCR?

- My total compensation is **more than 20% higher** than the total compensation of my Psychiatrist peers                                                                (SKIP TO Q7)
- My total compensation is **15% to 20% higher** than the total compensation of my Psychiatrist peers                                                                (SKIP TO Q7)
- My total compensation is **10% to 14% higher** than the total compensation of my Psychiatrist peers                                                                (SKIP TO Q7)
- My total compensation is **5% to 9% higher** than the total compensation of my Psychiatrist peers                                                                (SKIP TO Q7)
- My total compensation is **1% to 4% higher** than the total compensation of my Psychiatrist peers                                                                (SKIP TO Q7)
- My total compensation is **less than 1% higher** than the total compensation of my Psychiatrist peers                                                                (SKIP TO Q7)
- I do not know                                                                (SKIP TO Q7)

## CDCR TOTAL COMPENSATION - LESS THAN PSYCHIATRIST PEERS

Instructions: You responded that your total compensation is typically lower than the total compensation of your Psychiatrist peers who work for other employers outside of CDCR.  Please tell us how much lower you feel your total compensation is than these Psychiatrist peers.

Q6b. Which of the following best describes how much lower your total compensation is typically than the total compensation of your Psychiatrist peers who work for employers outside of CDCR?

- My total compensation is **more than 20% lower** than the total compensation of my Psychiatrist peers                                                                (CONTINUE TO Q7)
- My total compensation is **15% to 20% lower** than the total compensation of my Psychiatrist peers                                                                (CONTINUE TO Q7)
- My total compensation is **10% to 14% lower** than the total compensation of my Psychiatrist peers                                                                (CONTINUE TO Q7)



- My total compensation is **5% to 9% lower** than the total compensation of my Psychiatrist peers
(CONTINUE TO Q7)
- My total compensation is **1% to 4% lower** than the total compensation of my Psychiatrist peers
(CONTINUE TO Q7)
- My total compensation is **less than 1% lower** than the total compensation of my Psychiatrist peers (CONTINUE TO Q7)
- I do not know (CONTINUE TO Q7)


## HOURS WORKED

Instructions: We will now ask you about your hours worked and your current CDCR work schedule.

Q7. What is your current employment time base with CDCR?

- Full-time (SKIP TO Q8)
- Less than full-time (CONTINUE TO Q7a)
- I do not know (SKIP TO Q8)


## WHY LESS THAN FULL TIME

Q7a. Which of the following describes why you work less than full time?  Please select all that apply.

(CHECK BOXES ALLOWING MULTIPLE SELECTIONS)

- The compensation is too low (CONTINUE TO Q8)
- There are no opportunities to work additional hours at a facility near me (CONTINUE TO Q8)
- The work environment is too demanding (CONTINUE TO Q8)
- I have outside interests and pursuits (CONTINUE TO Q8)
- I have outside employment (CONTINUE TO Q8)
- None of the above (CONTINUE TO Q8)


## TELEPSYCHIATRIST (Y/N)

Q8. Are you currently employed as a Telepsychiatrist at CDCR?

- Yes (CONTINUE TO Q8a-1)
- No (SKIP TO Q8b-1)
- Other (please specify) (OPEN TEXTBOX) (SKIP TO Q9)


## TELEPSYCHIATRIST

Instructions: These questions are for CDCR Psychiatrists who are currently employed as a Telepsychiatrist.

Q8a-1. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction at CDCR?



(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8a-2)

Q8a-2. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at CDCR?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8a-3)

Q8a-3. On a scale from 1 to 7, where 1 is 'completely inadequate' and 7 is 'completely adequate', how would you rate your current office space for performing all of the job functions of a Telepsychiatrist, such as seeing patients remotely, having meetings, and completing paperwork, etc?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8a-4)


Q8a-4. Which of the following describes why you chose telepsychiatry over a facility Psychiatrist position? Please select all that apply.

(CHECK BOXES ALLOWING MULTIPLE SELECTIONS)

- There is no facility near where I live                    (CONTINUE TO Q8a-5)
- Better working conditions as a telepsychiatrist          (CONTINUE TO Q8a-5)
- Prefer not to work directly with inmates                 (CONTINUE TO Q8a-5)
- Able to work with different levels of care               (CONTINUE TO Q8a-5)
- More stable/predictable schedule                         (CONTINUE TO Q8a-5)
- None of the above                                        (CONTINUE TO Q8a-5)

Q8a-5. On a scale from 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Telepsychiatrist?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8a-6)

Q8a-6. On a scale from 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Telepsychiatrist in operation of the facility where you work?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8a-7)

Q8a-7. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8a-8)

Q8a-8. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with the medical assistant program?

(SLIDER SCALE FROM 1 TO 7)                                      (SKIP TO Q9)


**FACILITY PSYCHIATRIST**

Instructions: These questions are for CDCR Psychiatrists who see patients in a facility and are not currently employed as a telepsychiatrist.



Q8b-1. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction at CDCR?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8b-2)

Q8b-2. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at CDCR?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8b-3)

Q8b-3. On a scale from 1 to 7, where 1 is 'completely inadequate' and 7 is 'completely adequate', how would you rate your current office space for performing all of the job functions of a Psychiatrist, such as seeing patients, having meetings, and completing paperwork, etc?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8b-4)

Q8b-4. On a scale from 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8b-5)

Q8b-5. On a scale from 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8b-6)

Q8b-6. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q8b-7)

Q8b-7. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with the medical assistant program?

(SLIDER SCALE FROM 1 TO 7)                                      (CONTINUE TO Q9)


**<u>SUPPLEMENTAL INFORMATION</u>**

Instructions: Please answer these questions as they are true to you today unless otherwise specified.

Q9. What was the location of your personal residence when you first applied to a position with CDCR?

- In California                                        (CONTINUE TO Q10)
- Outside of California (within United States)         (CONTINUE TO Q10)
- Outside of United States                             (CONTINUE TO Q10)

Q10. Did you incur relocation costs in order to become a CDCR Psychiatrist?

- Yes                                                  (CONTINUE TO Q11)
- No                                                   (CONTINUE TO Q11)
- I do not know                                        (CONTINUE TO Q11)



Q11. How did you first learn of the job posting for your current position?

- Online job posting site (ex. Simply Hired, Indeed, etc.)     (CONTINUE TO Q12)
- CDCR official website                                        (CONTINUE TO Q12)
- CDCR on-site facility                                        (CONTINUE TO Q12)
- Psychiatric Conference                                       (CONTINUE TO Q12)
- Career fair                                                  (CONTINUE TO Q12)
- Ad at residency location                                     (CONTINUE TO Q12)
- CDCR recruiter contacted me                                  (CONTINUE TO Q12)
- Word of mouth                                                (CONTINUE TO Q12)
- Other method                                                (CONTINUE TO Q12)
- I do not know                                               (CONTINUE TO Q12)

Q12. Which of the following best describes the salary that CDCR offered you when you were initially hired?

- I felt that the salary that CDCR offered me was greater than that of other employers
  (CONTINUE TO Q13)
- I felt that the salary that CDCR offered me was competitive with other employers
  (CONTINUE TO Q13)
- I felt that the salary CDCR offered me was less than that of other employers
  (CONTINUE TO Q13)
- I do not know                                               (CONTINUE TO Q13)

Q13. Do you currently perform psychiatric work outside of CDCR?

- Yes                                                         (CONTINUE TO Q13a-1)
- No                                                          (SKIP TO Q13b-1)


**OUTSIDE WORK - YES**

Q13a-1. Approximately how many hours per week do you perform psychiatric work outside of CDCR? Please enter only one number.

(OPEN TEXT BOX, LIMIT TO NUMERIC VALUES)                      (CONTINUE TO Q13a-2)

Q13a-2. Which factors describe why you perform psychiatric work outside of CDCR?  Please select all that apply.

(CHECK BOXES ALLOWING MULTIPLE SELECTIONS)

- Maintain skills                                             (CONTINUE TO Q13a-3)
- Need additional income                                      (CONTINUE TO Q13a-3)
- Want additional income                                      (CONTINUE TO Q13a-3)
- More opportunity                                            (CONTINUE TO Q13a-3)
- Better working environment                                  (CONTINUE TO Q13a-3)
- Work with different patients                                (CONTINUE TO Q13a-3)
- Other                                                       (CONTINUE TO Q13a-3)



Q13a-3. Finally, before today, do you remember hearing or reading anything about any lawsuit involving CDCR?

- Remember hearing or reading something               (SKIP TO Q14)
- Do not remember hearing or reading anything        (END SURVEY)
- Do not know                                        (END SURVEY)
- Do not wish to answer                              (END SURVEY)

**OUTSIDE WORK - NO**

Q13b-1. Finally, before today, do you remember hearing or reading anything about any lawsuit involving CDCR?

- Remember hearing or reading something               (CONTINUE TO Q14)
- Do not remember hearing or reading anything        (END SURVEY)
- Do not know                                        (END SURVEY)
- Do not wish to answer                              (END SURVEY)

**REMEMBER LAWSUIT**

Q14. Please describe in as much detail as you can, everything you can remember about the purpose of any lawsuit involving CDCR.

(OPEN TEXT BOX)                                      (END SURVEY)



## DSH Psychiatrist Salary and Working Conditions Survey

**INTRODUCTION**

This survey is being conducted by EmployStats, an economic consulting firm. EmployStats is a neutral third-party entity and is conducting this survey in order to gather data to assess DSH Psychiatrists' work satisfaction, compensation, and environment, and assess staffing levels for Psychiatrists. In this survey we will ask you a few short questions concerning your compensation, working conditions, and job satisfaction.

As you know, the DSH often has difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain facilities. Your honest and thoughtful answers to this survey will provide vital information to assist policy makers in assessing and implementing policies that address that issue.

Your responses will not impact your employment. We will not individually identify your responses. Your name will not be presented with your survey response and survey responses will be aggregated.

This survey should take approximately 15 minutes to complete.


**EMPLOYMENT INFORMATION**

Instructions: Please answer the following questions as they are true to you today.

Q1. Which of the following best describes your current employment with DSH?

- Registry or Contract Psychiatrist          (CONTINUE TO Q2)
- Civil Service Psychiatrist          (CONTINUE TO Q2)

Q2. At what facility or facilities do you currently work? If you are working as a Telepsychiatrist, select 'Telepsychiatrist' below, as well as the facilities where you perform telepsychiatrist duties.

(CHECK BOXES ALLOWING MULTIPLE SELECTIONS FOR TELEPSYCHIATRISTS.)

- Telepsychiatrist          (CONTINUE TO Q3)
- Atascadero          (CONTINUE TO Q3)
- Coalinga          (CONTINUE TO Q3)
- Metropolitan          (CONTINUE TO Q3)
- Napa          (CONTINUE TO Q3)
- Patton          (CONTINUE TO Q3)

Q3. What is your current job title?

- Staff Psychiatrist          (CONTINUE TO Q4)
- Supervising Psychiatrist          (CONTINUE TO Q4)
- Chief Psychiatrist          (CONTINUE TO Q4)
- Telepsychiatrist          (CONTINUE TO Q4)

Q4. Prior to being employed as a Psychiatrist with DSH, have you ever been employed as a Psychiatrist outside of DSH or self-employed as a Psychiatrist? Please do not consider your residency training.

- Yes          (CONTINUE TO Q5)
- No          (CONTINUE TO Q5)



**DSH PSYCHIATRIST SALARY VERSUS NON-DSH PEER PSYCHIATRIST SALARY**

Instructions: We will now ask you about how you feel your salary as a DSH Psychiatrist compares with the salary of your peers who work as Psychiatrists for other employers.  When answering these questions, please consider the salary of other Psychiatrists that you feel are your peers.

Q5. **Your Salary.** When answering the question below concerning your salary, only consider the actual amount of pre-tax money that you earn as a DSH Psychiatrist each month.

For this question, do not consider fringe benefits, such as retirement or health insurance.  You will be asked a separate question concerning these benefits later in the survey.

Which of the following best describes your salary in relation to the salaries of your Psychiatrist peers who work for other employers?

- I feel that my salary is typically higher than the salaries of my Psychiatrist peers who work for other employers outside of DSH                                (CONTINUE TO Q5a)
- I feel that my salary is typically lower than the salaries of my Psychiatrist peers who work for other employers outside of DSH                                (SKIP TO Q5b)
- I feel that my salary is typically about equal to the salaries of my Psychiatrist peers who work for other employers outside of DSH                                (SKIP TO Q6)
- I do not know                                                                                (SKIP TO Q6)


**DSH SALARY - HIGHER THAN PSYCHIATRIST PEERS**

Instructions: You responded that your salary is typically higher than the salaries of your Psychiatrist peers who work for other employers outside of DSH.  Please tell us how much higher you feel your salary is than these Psychiatrist peers.

Q5a. Which of the following best describes how much higher your salary is typically than the salaries of your Psychiatrist peers who work for employers outside of DSH?

- My salary is **more than 20% higher** than the salaries of my Psychiatrist peers (SKIP TO Q6)
- My salary is **15% to 20% higher** than the salaries of my Psychiatrist peers  (SKIP TO Q6)
- My salary is **10% to 14% higher** than the salaries of my Psychiatrist peers  (SKIP TO Q6)
- My salary is **5% to 9% higher** than the salaries of my Psychiatrist peers     (SKIP TO Q6)
- My salary is **1% to 4% higher** than the salaries of my Psychiatrist peers      (SKIP TO Q6)
- My salary is **less than 1% higher** than the salaries of my Psychiatrist peers (SKIP TO Q6)
- I do not know                                                                                (SKIP TO Q6)



99

**DSH SALARY - LESS THAN PSYCHIATRIST PEERS**

Instructions: You responded that your salary is typically lower than the salaries of your Psychiatrist peers who work for other employers outside of DSH.  Please tell us how much lower you feel your salary is than these Psychiatrist peers.

Q5b. Which of the following best describes how much lower your salary is typically than the salaries of your Psychiatrist peers who work for employers outside of DSH?

- My salary is **more than 20% lower** than the salaries of my Psychiatrist peers
                                                                        (CONTINUE TO Q6)
- My salary is **15% to 20% lower** than the salaries of my Psychiatrist peers
                                                                        (CONTINUE TO Q6)
- My salary is **10% to 14% lower** than the salaries of my Psychiatrist peers
                                                                        (CONTINUE TO Q6)
- My salary is **5% to 9% lower** than the salaries of my Psychiatrist peers
                                                                        (CONTINUE TO Q6)
- My salary is **1% to 4% lower** than the salaries of my Psychiatrist peers
                                                                        (CONTINUE TO Q6)
- My salary is **less than 1% lower** than the salaries of my Psychiatrist peers
                                                                        (CONTINUE TO Q6)
- I do not know                                                         (CONTINUE TO Q6)


**DSH PSYCHIATRIST TOTAL COMPENSATION VERSUS NON-DSH PEER PSYCHIATRIST TOTAL COMPENSATION**

Instructions: We will now ask you about how you feel your compensation as a DSH Psychiatrist compares with the compensation of your peers who work as Psychiatrists for other employers.  When answering these questions, please consider the monetary value of the total compensation of other Psychiatrists that you feel are your peers.

Q6. **Your Total Compensation**. When answering the question below concerning your compensation, consider the monetary value of all forms of compensation that you receive such as salary, health benefits, retirement, federal loan forgiveness program and bonuses.

Which of the following best describes your total compensation in relation to the total compensation of your Psychiatrist peers who work for other employers?

- I feel that my total compensation is **typically higher** than the total compensation of my Psychiatrist peers who work for other employers outside of DSH      (CONTINUE TO Q6a)
- I feel that my total compensation is **typically lower** than the total compensation of my Psychiatrist peers who work for other employers outside of DSH          (SKIP TO Q6b)
- I feel that my total compensation is **typically about equal** to the total compensation of my Psychiatrist peers who work for other employers outside of DSH          (SKIP TO Q7)
- I do not know                                                         (SKIP TO Q7)



**DSH TOTAL COMPENSATION - MORE THAN PSYCHIATRIST PEERS**

Instructions: You responded that your total compensation is typically higher than the total compensation of your Psychiatrist peers who work for other employers outside of DSH.  Please tell us how much more you feel your total compensation is than these Psychiatrist peers.

Q6a. Which of the following best describes how much higher your total compensation is typically than the total compensation of your Psychiatrist peers who work for employers outside of DSH?

- My total compensation is **more than 20% higher** than the total compensation of my Psychiatrist peers                                                                                                                 (SKIP TO Q7)
- My total compensation is **15% to 20% higher** than the total compensation of my Psychiatrist peers                                                                                                                 (SKIP TO Q7)
- My total compensation is **10% to 14% higher** than the total compensation of my Psychiatrist peers                                                                                                                 (SKIP TO Q7)
- My total compensation is **5% to 9% higher** than the total compensation of my Psychiatrist peers                                                                                                                 (SKIP TO Q7)
- My total compensation is **1% to 4% higher** than the total compensation of my Psychiatrist peers                                                                                                                 (SKIP TO Q7)
- My total compensation is **less than 1% higher** than the total compensation of my Psychiatrist peers                                                                                                                 (SKIP TO Q7)
- I do not know                                                                                                 (SKIP TO Q7)


**DSH TOTAL COMPENSATION - LESS THAN PSYCHIATRIST PEERS**

Instructions: You responded that your total compensation is typically lower than the total compensation of your Psychiatrist peers who work for other employers outside of DSH.  Please tell us how much lower you feel your total compensation is than these Psychiatrist peers.

Q6b. Which of the following best describes how much lower your total compensation is typically than the total compensation of your Psychiatrist peers who work for employers outside of DSH?

- My total compensation is **more than 20% lower** than the total compensation of my Psychiatrist peers                                                                                                                 (CONTINUE TO Q7)
- My total compensation is **15% to 20% lower** than the total compensation of my Psychiatrist peers                                                                                                                 (CONTINUE TO Q7)
- My total compensation is **10% to 14% lower** than the total compensation of my Psychiatrist peers                                                                                                                 (CONTINUE TO Q7)
- My total compensation is **5% to 9% lower** than the total compensation of my Psychiatrist peers                                                                                                                 (CONTINUE TO Q7)
- My total compensation is **1% to 4% lower** than the total compensation of my Psychiatrist peers                                                                                                                 (CONTINUE TO Q7)
- My total compensation is **less than 1% lower** than the total compensation of my Psychiatrist peers                                                                                                                 (CONTINUE TO Q7)
- I do not know                                                                                                 (CONTINUE TO Q7)



## HOURS WORKED

Instructions: We will now ask you about your hours worked and your current DSH work schedule.

Q7. What is your current employment time base with DSH?

- Full-time                                         (CONTINUE TO Q8)
- Less than full-time                               (SKIP TO Q7a)
- I do not know                                     (SKIP TO Q8)


## WHY LESS THAN FULL TIME

Q7a. Which of the following describes why you work less than full time?  Please select all that apply.

(CHECK BOXES ALLOWING MULTIPLE SELECTIONS)

- The compensation is too low                                           (CONTINUE TO Q8)
- There are no opportunities to work additional hours at a facility near me (CONTINUE TO Q8)
- The work environment is too demanding                                 (CONTINUE TO Q8)
- I have outside interests and pursuits                                 (CONTINUE TO Q8)
- I have outside employment                                             (CONTINUE TO Q8)
- None of the above                                                     (CONTINUE TO Q8)


## TELEPSYCHIATRIST (Y/N)

Q8. Are you currently employed as a Telepsychiatrist at DSH?

- Yes                                               (CONTINUE TO Q8a-1)
- No                                                (SKIP TO Q8b-1)
- Other (please specify) (OPEN TEXT BOX)            (SKIP TO Q9)


## TELEPSYCHIATRIST

Instructions: These questions are for DSH Psychiatrists who are currently employed as a Telepsychiatrist.

Q8a-1. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction at DSH?

(SLIDER SCALE FROM 1 TO 7)                          (CONTINUE TO Q8a-2)

Q8a-2. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at DSH?

(SLIDER SCALE FROM 1 TO 7)                          (CONTINUE TO Q8a-3)



Q8a-3. On a scale from 1 to 7, where 1 is 'completely inadequate' and 7 is 'completely adequate', how would you rate your current office space for performing all of the job functions of a Telepsychiatrist, such as seeing patients remotely, having meetings, and completing paperwork, etc?

(SLIDER SCALE FROM 1 TO 7)                                    (CONTINUE TO Q8a-4)

Q8a-4. Which of the following describes why you chose telepsychiatry over a staff Psychiatrist position? Please select all that apply.

(CHECK BOXES ALLOWING MULTIPLE SELECTIONS)

- There is no facility near where I live                        (CONTINUE TO Q8a-5)
- Better working conditions as a Telepsychiatrist              (CONTINUE TO Q8a-5)
- Prefer to not work directly with individuals who committed or are accused of committing a crime
                                                               (CONTINUE TO Q8a-5)
- Able to work with different levels of care                   (CONTINUE TO Q8a-5)
- More stable/predictable schedule                            (CONTINUE TO Q8a-5)
- None of the above                                           (CONTINUE TO Q8a-5)

Q8a-5. On a scale from 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Telepsychiatrist?

(SLIDER SCALE FROM 1 TO 7)                                    (CONTINUE TO Q8a-6)

Q8a-6. On a scale from 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Telepsychiatrist in operation of the facility where you work?

(SLIDER SCALE FROM 1 TO 7)                                    (CONTINUE TO Q8a-7)

Q8a-7. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?

(SLIDER SCALE FROM 1 TO 7)                                    (CONTINUE TO Q9)


**FACILITY PSYCHIATRIST**

Instructions: These questions are for DSH Psychiatrists who see patients in a facility and are not currently employed as a Telepsychiatrist.

Q8b-1. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how would you rate your overall job satisfaction at DSH?

(SLIDER SCALE FROM 1 TO 7)                                    (CONTINUE TO Q8b-2)

Q8b-2. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with your overall working conditions at DSH?

(SLIDER SCALE FROM 1 TO 7)                                    (CONTINUE TO Q8b-3)



Q8b-3. On a scale from 1 to 7, where 1 is 'completely inadequate' and 7 is 'completely adequate', how would you rate your current office space for performing all of the job functions of a Psychiatrist, such as seeing patients, having meetings, and completing paperwork, etc?

(SLIDER SCALE FROM 1 TO 7)                          (CONTINUE TO Q8b-4)

Q8b-4. On a scale from 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded', how would you say that other facility employees regard your medical and professional opinions as a Psychiatrist?

(SLIDER SCALE FROM 1 TO 7)                          (CONTINUE TO Q8b-5)

Q8b-5. On a scale from 1 to 7, where 1 is 'of no value' and 7 is 'very highly valued', how would you say that other facility employees value your role as a Psychiatrist in operation of the facility where you work?

(SLIDER SCALE FROM 1 TO 7)                          (CONTINUE TO Q8b-6)

Q8b-6. On a scale from 1 to 7, where 1 is 'very unsatisfied' and 7 is 'very satisfied', how satisfied are you with opportunities for promotion?

(SLIDER SCALE FROM 1 TO 7)                          (CONTINUE TO Q9)


## SUPPLEMENTAL INFORMATION

Instructions: Please answer these questions as they are true to you today unless otherwise specified.

Q9. What was the location of your personal residence when you first applied to a position with DSH?

- In California                                   (CONTINUE TO Q10)
- Outside of California (within United States)     (CONTINUE TO Q10)
- Outside of United States                         (CONTINUE TO Q10)

Q10. If you incurred relocation costs to become a DSH Psychiatrist, were you fully reimbursed for those expenses?

- Yes                                            (CONTINUE TO Q11)
- No                                             (CONTINUE TO Q11)
- I did not incur relocation costs               (CONTINUE TO Q11)
- I do not know                                  (CONTINUE TO Q11)



Q11. How did you first learn of the job posting for your current position?

- Online job posting site (ex. Simply Hired, Indeed, etc.)    (CONTINUE TO Q12)
- DSH official website    (CONTINUE TO Q12)
- DSH on-site facility    (CONTINUE TO Q12)
- Napa or Patton residency program    (CONTINUE TO Q12)
- Psychiatric Conference    (CONTINUE TO Q12)
- Career fair    (CONTINUE TO Q12)
- Ad at residency location    (CONTINUE TO Q12)
- DSH recruiter contacted me    (CONTINUE TO Q12)
- Word of mouth    (CONTINUE TO Q12)
- Other method    (CONTINUE TO Q12)
- I do not know    (CONTINUE TO Q12)

Q12. Which of the following best describes the salary that DSH offered you when you were initially hired?

- I felt that the salary that DSH offered me was greater than that of other employers
    (CONTINUE TO Q13)
- I felt that the salary that DSH offered me was competitive with other employers
    (CONTINUE TO Q13)
- I felt that the salary DSH offered me was less than that of other employers
    (CONTINUE TO Q13)
- I do not know    (CONTINUE TO Q13)

Q13. Do you currently perform psychiatric work outside of DSH?

- Yes    (CONTINUE TO Q13a-1)
- No    (SKIP TO Q13b-1)


**<u>OUTSIDE WORK -YES</u>**

Q13a-1. Approximately how many hours per week do you perform psychiatric work outside of DSH? Please enter only one number.

(TEXT BOX, ALLOWING ONLY NUMERIC RESPONSE)    (CONTINUE TO Q13a-2)

Q13a-2. Which factors describe why you perform psychiatric work outside of DSH?  Please select all that apply.

(CHECK BOXES ALLOWING MULTIPLE SELECTIONS)

- Maintain skills    (CONTINUE TO Q13a-3)
- Need additional income    (CONTINUE TO Q13a-3)
- Want additional income    (CONTINUE TO Q13a-3)
- More opportunity    (CONTINUE TO Q13a-3)
- Better working environment    (CONTINUE TO Q13a-3)
- Work with different patients    (CONTINUE TO Q13a-3)
- Other    (CONTINUE TO Q13a-3)



105

Q13a-3. Finally, before today, do you remember hearing or reading anything about any lawsuit involving DSH?

- Remember hearing or reading something                    (SKIP TO Q14)
- Do not remember hearing or reading anything            (END SURVEY)
- Do not know                                                              (END SURVEY)
- Do not wish to answer                                            (END SURVEY)


## OUTSIDE WORK - NO

Q13b-1. Finally, before today, do you remember hearing or reading anything about any lawsuit involving DSH?

- Remember hearing or reading something                    (CONTINUE TO Q14)
- Do not remember hearing or reading anything            (END SURVEY)
- Do not know                                                              (END SURVEY)
- Do not wish to answer                                            (END SURVEY)


## REMEMBER LAWSUIT

Q14. Please describe in as much detail as you can, everything you can remember about the purpose of any lawsuit involving DSH.

(OPEN TEXTBOX)                                                        (END SURVEY)



# Appendix B: CDCR Data and Documents

Psychiatrist Hiring and Applicant Data.xlsx, Credentialing_TBL: provides psychiatrist education and credentialing information current as of October 2018.  This file contains the name, job position, degree, year of degree, medical school and completion date, residency location, state of licensure, and the eligibility and status of board certification for CDCR psychiatrists as of October 2018.

Psychiatrist Hiring and Applicant Data.xlsx, EEHIST_TBL: provides psychiatrist transactional salary and job position history current as of October 2018.  This file contains the name, institution, employee time base, alternate range, salary total, base pay, transaction date, and transaction name for CDCR psychiatrists as of October 2018.

Psychiatrist Hiring and Applicant Data.xlsx, Candidates - Hired: provides information on the hiring process for CDCR psychiatrist candidates that were hired, current as of October 2018. This file contains the name, application date, interview date, hire date, status of employment offer and acceptance, preferred work locations, and location offered for candidates that were hired as of October 2018.  The file also contains an indication of whether the candidate was previously employed at another California State Agency, and whether the hire was an internal or external hire.

Psychiatrist Hiring and Applicant Data.xlsx, Candidate - Not Hired: provides information on the hiring process for CDCR psychiatrists candidates that were not hired, current as of October 2018.  This file contains the name, status of CV and application, year of degree, date completed residency, state of residency, state of licensure, date applied, date interviewed, whether employment was offered, reason not offered employment, whether employment offer was accepted, reason applicant declined or withdrew, preferred work locations, and offered location for candidates that were not hired as of October 2018.  The file also contains an indication of whether the candidate was previously employed at another California State Agency, and whether the candidate was an internal or external candidate.

Psychiatrist Hiring and Applicant Data.xlsx, No Info on Candidates: provides partial information on the hiring process for CDCR psychiatrist candidates that were not hired, current as of



October 2018.  This file contains the name, application date, interview date, reason candidate declined or withdrew, and an indication of whether the candidate was an internal or external candidate for candidates that were not hired as of October 2018.

Registry Data Requested 1 of 2.xls: provides registry psychiatrist information current as of October 2018.  This file contains the name, year of degree, date completed residency, residency location, state of licensure, registry submission date, assignment start date, assignment end date, location of assignment, employee time base, and an indication of board eligibility and certification for each assignment of registry psychiatrists as of October 2018.

Registry Data Requested 2 of 2.xlsx: provides registry psychiatrist yearly compensation information current as of October 2018.  The file contains the name, year, institution, number of hours worked, number of overtime hours worked, number of on-call hours worked, total hours worked, amount paid, and average cost per hour for registry psychiatrists as of October 2018.

Psychiatry email list 1.17.2019.xlsx: provides email addresses for CDCR psychiatrists, current as of January 17, 2019.  This file contains the email addresses used to distribute the pay and job satisfaction survey.

Staff Psych Separations.xlsx: provides email addresses for CDCR psychiatrists who separated or transferred from July 2017 to December 2018.  This file contains the name, institution, class title, address, city, state, zip code, transaction name, and transaction date for each psychiatrist separation or transfer current as of December 2018.  The addresses were used to distribute the pay and job satisfaction survey.

2018_06_21 CDCR9758_Mark IV no SSN.xlsx: provides payment histories for CDCR psychiatrists for each pay period from January 2009 to May 2018.  This file contains the name, pay period, institution, payment type, days paid, hours paid, gross pay, and payment date for CDCR psychiatrists, current as of June 2018.

Credentialing Information May 2.xlsx: provides credentialing information for CDCR psychiatrists, current as of May 2019.  This file contains the name, classification, institution, certifying board, primary specialty, duration, expiration/reverification date, status of current board certification, and date completed residency for CDCR psychiatrists, current as of May 2019.



Hire Dates.xlsx: provides hire dates for CDCR psychiatrists.  This file contains the name and hire date for psychiatrists that were hired by CDCR.

Coleman Monthly Reports, Mental Health Institution Vacancies, By Institution, By Classification: provides monthly vacancy information by classification for CDCR institutions.  These files contain the month, year, institution, classification, class code, authorized per 7A, established, filled, vacant, 918 adjustments, 920 adjustments, registry, hires, adjusted vacancy, and percent vacant, as of July 2018.



# Appendix C: DSH Data and Documents

ATASCADERO Special Master Data Request_DSH-A 11-16-18 revised.xlsx, Hired Staff Psychiatrists: provides psychiatrist education, credentialing and DSH employment dates as of November 2018 for the Atascadero institution.  This file contains the name, job position, year of degree, approximate date completed residency, residency location, state of licensure, date applied to DSH, date of original hire at DSH, date of rehire at DSH, date of termination at DSH, work type, indication of whether the employee was hired from other California state agency, and the eligibility and status of board certification for each DSH psychiatrist as of November 2018.

ATASCADERO Special Master Data Request_DSH-A 11-16-18 revised.xlsx, Applicants, Candidates: provides information on the hiring process for DSH psychiatrist applicants and candidates at the Atascadero institution, current as of November 2018.  This file contains the name, job position, application date, interview date, hire date, status of employment offer and acceptance, reason applicant rejected offer, applicant's residence at application, preferred work locations, and location offered as of November 2018.  The file also contains an indication of whether the candidate was previously employed at another CA State Agency, and whether the application was an internal or external application.

COALINGA Special Master Data Request (as of 11-29-18).xlsx, Hired Staff Psychiatrists: provides psychiatrist education, credentialing and DSH employment dates as of November 2018 for the Coalinga institution.  This file contains the name, job position, year of degree, approximate date completed residency, residency location, state of licensure, date applied to DSH, date of original hire at DSH, date of rehire at DSH, date of termination at DSH, work type, indication of whether the employee was hired from other California state agency, and the eligibility and status of board certification for each DSH psychiatrist as of November 2018.

COALINGA Special Master Data Request (as of 11-29-18).xlsx, Applicants, Candidates: provides information on the hiring process for DSH psychiatrist applicants and candidates at the Coalinga institution, current as of November 2018.  This file contains the name, job position, application date, interview date, hire date, status of employment offer and acceptance, reason applicant rejected offer, applicant's residence at application, preferred work locations, and location offered as of November 2018.  The file also contains an indication of whether the



candidate was previously employed at another CA State Agency, and whether the application was an internal or external application.

PATTON Special Master Data Request-Master-Hiring FINAL (DSH-Patton 11-30….xlsx, Hired Staff Psychiatrists: provides psychiatrist education, credentialing and DSH employment dates as of November 2018 for the Patton institution.  This file contains the name, job position, year of degree, approximate date completed residency, residency location, state of licensure, date applied to DSH, date of original hire at DSH, date of rehire at DSH, date of termination at DSH, work type, indication of whether the employee was hired from other California state agency, and the eligibility and status of board certification for each DSH psychiatrist as of November 2018.

PATTON Special Master Data Request-Master-Hiring FINAL (DSH-Patton 11-30….xlsx, Applicants, Candidates: provides information on the hiring process for DSH psychiatrist applicants and candidates at the Patton institution, current as of November 2018.  This file contains the name, job position, application date, interview date, hire date, status of employment offer and acceptance, reason applicant rejected offer, applicant's residence at application, preferred work locations, and location offered as of November 2018.  The file also contains an indication of whether the candidate was previously employed at another CA State Agency, and whether the application was an internal or external application.

DSH SCO MIRS Data Report_ DSH9758B_19740101-20181231_Final.xlsx: provides psychiatrist transactional salary and job position history current as of December 2018.  This file contains the name, department name, facility name, transaction date, type of transaction, class code and title, time base, base pay, and salary total for each DSH psychiatrist as of December 2018.

Psychiatrist Emails at DSH-Atascadero, DSH-Coalinga, DSH-Patton.xlsx:  provides email addresses for DSH psychiatrists, current as of March 2019.  This file contains the email addresses used to distribute the pay and job satisfaction survey.



# Appendix D: Responses to Defendants' Criticisms

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response |
|---|---|---|
| Section A, Paragraph 3 | The Draft Report fails to state whether its chosen methodology is generally recognized in the field or supported by objective verifiable evidence. Moreover, while the Draft Report lays out some of the information relied on to make its recommendations, it does not state whether the methodology and information relied on for those recommendations are generally recognized or supported or based on scientifically valid principles or objective verifiable evidence. | The Draft Report is based on generally accepted methodologies and scientifically valid principles. The survey methodology is consistent with peer reviewed and generally accepted sources including text books such as Groves, R. M., Fowler, F.J., Couper, M.P., Leprowski, J.M, Singer, E., Tourangeau, R., "Survey Methodology", John Wiley & Sons, New Jersey, 2009 and The Federal Judicial Center, Reference Manual on Scientific Evidence. The underlying survey data, comparison salary data, and references is clearly defined in the report (See for example page 25 of Draft Report, page 28 of Draft Report, and page 37 of Draft Report). |
|  |  | The survey methodology utilized in the Draft Report has been accepted in Federal Court and State Court in California. Dr. Steward has provided numerous reports and testified at trial on survey-based employment data in cases including Otsuka et al. v. Polo Ralph Lauren Corporation (United States District Court, Northern District of California) and Johnson, et al., v. York Claims Service, Inc. (Superior Court of the State of California, Sacramento County). Dr. Peterson has also provided numerous reports and testimony on survey-based employment data in cases including Li et al. v. A Perfect Day Franchise Inc. (United States District Court, |



| | | |
|---|---|---|
| | | Northern District of California). |
| Section B, Paragraph 2 Footnote 4 | CDCR and DSH received copies of the surveys before they were provided to the psychiatrists. Both agencies submitted objections, which are attached to their response as Exhibits C and D. CDCR and DSH did not receive specific responses to those objections from EmployStats and the final versions of the surveys largely mirrored the draft versions with some changes. Defendants re-raise and re-incorporate those objections. | The Defendants' statements are incorrect. The Defendants' and Plaintiffs' comments and objections were incorporated in the EmployStats Draft Report. Multiple telephone calls and emails from both parties were exchanged in advance of the final formulation of the survey. Suggestions and objections from both sides were considered and incorporated. |
| | | The Defendants submitted an email on November 21, 2018 that described six areas of concern. The final version of the survey directly incorporated four of the six areas of concerns expressed by the Defendants. One of the areas of concern expressed by the Defendants that EmployStats did not address, involved what EmployStats viewed as a legal question as to which psychiatrists should be included in the survey. EmployStats included Staff, Supervising, and Chief Psychiatrists in the survey. The Defendants expressed that they felt the survey should be limited to Staff Psychiatrists only. The results in the report are analyzed for Staff, Supervising, and Chief Psychiatrists. Differences between responses of the different types of psychiatrists is noted and discussed in the Draft Report. |



| | | |
|---|---|---|
| | | In an additional area of concern, the Defendants stated that they wanted open ended and free text box entry responses to be added to a number of the survey questions. For instance, the Defendants wanted an open ended question that would allow survey respondents to provide qualitative comments and responses about how they felt about their salary and comparators. The Plaintiffs also requested similar open ended questions and text box responses be added to a number of survey questions. |
| | | Neither the Defendants nor Plaintiffs suggestions regarding open ended text response boxes were incorporated into the final survey. Open ended text response boxes, which may provide some qualitative information that is specific to the partied, do not allow for quantitative measurements of the salary and job satisfaction issues that are analyzed in this report. Accordingly, open ended text response boxes were not added for neither Defendants nor Plaintiffs. |
| Section B-1 | The Survey's scope is overly restrictive because it is limited to Defendants' Employees. | The Defendants are incorrect. While EmployStats only sent surveys to CDCR and DSH employees, survey responses from non-CDCR and non-DSH employed psychiatrists were incorporated in our analysis. Information related to the job satisfaction of non-CDCR and non-DSH employed psychiatrists was obtained from Glassdoor job and Medscape. The job satisfaction ratings of psychiatrists employed at non-Defendant facilities is used to compare overall job satisfaction with the job satisfaction ratings of the Defendant's employees. For example, see Table 13. Direct surveying of non-CDCR and non-DSH psychiatrists is outside of the scope of our assignment in this case. |



| Section B-1, Paragraph 2 | According to the Draft Report, the Glassdoor survey used a different scale and included a middle satisfaction rating - unlike the Draft Report. | The Defendant is incorrect. The EmployStats Draft Report does utilize a middle satisfaction rating. A rating scale of '1' to '7' is utilized and a rating of '4' is the middle satisfaction rating. The Glassdoor survey, like the EmployStats survey, also uses a middle satisfaction rating. In the Glassdoor survey a rating scale of '1' to '5' is used and a rating of '3' is the middle satisfaction rating. The rating scale, which is different between Glassdoor and EmployStats, is not relevant. In the analysis, the results are presented relevant to the middle satisfaction ratings. This allows the two ratings scales to be compared directly. |
| Section B-1, Paragraph 2 | In one instance, the Draft Report compares its survey results to job satisfaction ratings from Glassdoor. However, the reliability of this comparison is not apparent. | Glassdoor data is routinely used as survey data in peer reviewed articles. The referenced peer reviewed articles in the draft report show the reliability of data from Glassdoor, and other similar online job survey sources, and show the data from Glassdoor are generally accepted data sources for research. The removal of Glassdoor analysis would not change the Draft Report's findings. EmployStats also reviewed job satisfaction data from Medscape, which is focused on the healthcare industry. The salary satisfaction responses from Medscape was consistent with the salary satisfaction Glassdoor data. |
| | | For instance, the peer review article, What Can We Learn from Online Wage Postings? Evidence from Glassdoor, by Karabarbounis and Pinto (2018), directly asks whether publicly available data on Glassdoor can be used as a reliable source of aggregate economic statistics. The paper directly compares employee salary information on Glassdoor with two other publicly available and widely used |



| | | |
|---|---|---|
| | | government surveys: the Quarterly Census for Employment and Wages (QCEW), published by the US Census Bureau, and the Panel Study of Income Dynamics (PSID). The authors found that salaries on Glassdoor were very highly correlated with data collected in the QCEW and the PSID. The paper concludes that the distribution of wages (by industry and/or region) in Glassdoor well represents the respective distributions in other two datasets. |
| | | Another peer review article, Job Satisfaction and Employee Turnover Determinants in High Contact Services: Insights from Employees' Online Reviews by Stamolampros et al. (2019), asks whether publicly available reviews on Glassdoor can be used to determine job satisfaction and performance. The authors study a combination of numerical ratings for specific job elements, and open ended text responses from Glassdoor reviews to analyze turnover and customer satisfaction in a particular industry. Critically, the study expanded upon small surveys previously conducted in the industry by data mining several hundred thousand job reviews available on Glassdoor. In the course of studying a particular industry, the paper concluded that Glassdoor reviews were broadly representative of the industry's workforce, and that the Glassdoor reviews were not affected by self-selection bias. |
| Section B-2 | The Survey suffers from Self-Interest Bias because it is limited to Respondents who may benefit from its results. | The survey does not suffer from self-interest bias. The issue of potential self bias is addressed in the design of the survey and is specifically analyzed in the report. The survey was designed using neutral wording and is consistent with survey generally accepted practices. For instance, there is no mention in the survey |



|  |  | of any specific or potential impact that the psychiatrist's answers to the survey may or may not have on their specific employment conditions or salary. |
|  |  | Further, specific analyses were performed to address this potential issue of self-interest bias. The potential for self-interest bias is an issue that is not specific to the survey participants in this case and is routinely addressed by statistical and survey experts. The statistical results showed that there were no statistically significant differences in the responses that would be consistent with self-interest bias by the psychiatrists. |
|  |  | For example, in this case an analysis was performed to compare the responses of psychiatrists who had knowledge of the Coleman lawsuit to those who did not have knowledge of the Coleman lawsuit. This statistical analysis is consistent with generally accepted statistical practices when studying issues related to self interest bias. Survey experts routinely design survey questions to assess the survey participants' prior knowledge of the litigation underlying the survey. In these instances, survey and statistical experts investigate the correlation of survey responses with the individual's prior knowledge of the underlying litigation and make statistical adjustments to the findings as appropriate. |
|  |  | In this case, there was no statistically significant difference between the responses of the two groups of psychiatrists. The responses of individuals who had some knowledge of the Coleman case were not statistically different from that of those who had no knowledge of the Coleman case. This finding is not consistent with self biased survey |



117

| | | responses. |
|---|---|---|
| Section B-2, Paragraph 2 | The survey itself strongly implies to the respondents that it is being used to analyze the adequacy of their pay. It specifically asks the psychiatrists to compare their salaries to the salary of their peers and state whether it is higher or lower. Moreover, the first page confirms its purpose is to explore the possible improvements for the jobs of the people taking the survey. On the survey's first page states that it will ask about "compensation, working conditions, and job satisfactions". | The Defendants' statements in the paragraph misstate and misrepresent the form and structure of the survey that was actually administered. The wording choice is neutral and consistent with survey general practices. Defendants assert the first page is "effectively" telling respondents there is a problem with CDCR/DSH pay, and the respondents answers would lead to salary changes; the wording of the first page does not imply there is a salary issue. The survey only says "CDCR/DSH often has difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain institutions," and makes no mention of pay. Further, Defendants did not raise the issue of potential bias in the comments they provided prior to the implementation of the survey. |
| Section B-3, Paragraph 1 | The survey is also biased towards negative responses for many of its questions. ... Instead, the Draft Report and survey classified anything from 1 to 4 as dissatisfied and generally disregarded, leaving only three responses as positive selections. This is particularly problematic because the survey explained to the respondents that a four would be treated as a negative rather than a positive or neutral response. And the negative bent appears to have had a real effect on the reported data. For example, if four were treated by the analysis as a midpoint or neutral, then nearly two-thirds of CDCR's | The Defendants are misinterpreting the survey results. The EmployStats Draft Report does not classify ratings '1' to '4' as dissatisfied. As explained in the report, a rating of '1' to '4' is classified as 'less than satisfied' and is not classified as dissatisfied as stated by the Defendant. In a rating scale with a clearly defined middle point, ratings of '1' to '3' are classified as unsatisfied/dissatisfied and ratings of '5' to '7' are classified as satisfied. The analyses present results for both 'less than satisfied' ('1' to '4' ratings) and 'unsatisfied'/'dissatisfied' (ratings '1' to '3') categories. The qualitative findings and EmployStats recommendations are consistent regardless of which category is analyzed. |



| | respondents reported an overall job rating of neutral (4 out of 7) to very satisfied (7 out of 7). Nearly 60 percent of DSH's responding on-site psychiatrists rated their job satisfaction between neutral and very satisfied. | |
|---|---|---|
| Section B-3, Paragraph 1 | Also, overall 63 percent of all CDCR respondents would report that their office space was neutral to completely adequate (4 to 7 out of 7). Similar changes would apply to the other responses that used this scale. Accordingly, the way the survey responses were interpreted and the way they were reported appear to be skewed to the negative. | The results are not skewed toward the negative. The percentage of employees who answered that they were satisfied can be readily obtained from the tables provided. Presenting the 'flip side' of the results has no impact on the findings or EmployStats' recommendations. |
| Section B-4, Paragraph 1 | The Survey failed to include questions that would allow it to verify the accuracy of the responses to the salary and compensation questions, or independently verify the responses. The survey failed to explore the basis for or accuracy of some of the opinions expressed by psychiatrists in response to the survey. | Determining how the psychiatrists determined their salary benchmarks was not a goal of the survey. The survey captures CDCR and DSH psychiatrists' perceptions regarding their pay comparators and peers. How the psychiatrist determined their salary and compensation peer groups is not a goal of this study. It is expected that psychiatrists will arrive at their comparison group differently. In addition, salary verification questions were asked that allow for the statistical analysis of the salary responses. The survey logic and questions that allow for the checking of the accuracy of the survey responses are incorporated into the survey design. For example, questions that asked the psychiatrist if they were underpaid or overpaid relative to their peers were followed up with subsequent questions that asked the amount of |



|  |  | overpayment or underpayment. |
| --- | --- | --- |
| Section B-4, Paragraph 2 | The Draft Report's findings and recommendations call into question the reliability of the survey. According to the Draft Report, the survey found that CDCR and DSH psychiatrists believed that their salaries and total compensation were less than that of their peers. However, the Draft Report's comparison of CDCR and DSH salaries to those offered by other public and private employers in California revealed that since at least 2012, CDCR and DSH's salaries have been significantly higher than its competitors. In fact, the survey responses were so inconsistent with the Draft Report's own salary comparisons that the Draft Report recommended CDCR and DSH develop ways to inform their psychiatrists that the salaries they receive are higher than those of other public and private employers. This disconnect strongly suggests that the survey and its results are not reliable. | The Defendants are misinterpreting the overall finding of the study. The fact that CDCR and DSH psychiatrists are paid more than their competitors, but feel that they are paid less than their peers, is not suggestive of a disconnect, nor should it call into question the reliability of the survey. The relationship between the psychiatrists' perceptions of their salary and their actual salary indicates that their actual monetary compensation is only a component of the psychiatrists' employment conditions. Issues such as office availability, opportunities for promotion, medical practice support, and other employment conditions all impact their perception of their pay as it relates to other psychiatrists who may work in less demanding working environments. Also, it is possible, and this finding strongly indicates, that overall compensation may need to increase to account for the CDCR and DSH psychiatrist working conditions. As was also noted by the Defendants' economic experts, these compensation differentials, which are referred to as compensating wage differentials, may be required to meet mandated employment levels. |



| Section B-5 | The Survey failed to ask many important questions. | The proposed additional questions by Defendants do not change the findings of the report. For example, Defendants state that the survey did not ask for any information regarding why the psychiatrists feel their opinion is not valued by others. This question would not change the Draft Report's finding that the psychiatrists were less than satisfied with how their opinions are valued by others. The survey questions were discussed with both parties prior to implementation. As is consistent with generally accepted survey methodology, limiting the number of questions increases survey participation. Some of the questions that they raise can be done by a separate survey that Defendants perform at a later date if they so desire. They also did not raise any objections or suggest these questions when they submitted their responses to the survey instrument. |
|---|---|---|
| | | |
| Section C-1, Paragraph 1 | EmployStats agrees Defendants already offer higher salaries than other public and private employers -- The recommendation ignores the already existing higher salaries offered by CDCR and DSH. | Defendants' statements are incorrect. The higher salaries are not ignored. The focus of the analysis is on salary increases. EmployStats acknowledges the salary levels that CDCR and DSH currently have, and Defendants recognize that the Draft Report provides an analysis of the salary levels. The recommendation regarding salary increases does take the salary levels into account. In addition, as was also noted by the Defendants' economic experts, compensating wage differentials may be required to meet mandated employment levels. |
| Section C-2 | The Draft Report fails to consider and compare total compensation between Defendants and other California Employers. | Defendants did not provide information on the value of the individual psychiatrists' total compensation. EmployStats requested total compensation data, reflecting actual benefit amounts that Defendants pay the |



| | | |
|---|---|---|
| | | psychiatrists. Without this information that EmployStats requested, this analysis cannot be performed. |
| Section C-3, Paragraph 2 | The Draft Report fails to point to any accepted economic literature, study or objective evidence to support the efficacy of this recommendation. | The Draft Report shows that the CDCR and DSH psychiatrists receive lower salary increases than psychiatrists at other California employers, the economic literature outlined below shows that a system of salary increases have a positive impact on employee retention rates. It is generally accepted that salary increases are related to higher retention rates, as shown by these and numerous other studies. In addition, the Defendants' economic study showed that in years where there was an increase the retention rate also increased (as measured by the fill rate). The relationship between salary increases, job retention, and hiring is not controversial in the field of economics. |
| | | For example, in Voluntary turnover and job performance: Curvilinearity and the moderating influences of salary growth and promotions by Trevor, Gerhart, & Boudreau (1997), the paper analyzed the relationship between voluntary turnover and job performance, finding that high turnover among the highest and lowest performing employees. Importantly, the paper found that salary growth and turnover were very highly correlated, especially for the highest performing employees. The paper found that higher salary growth was a critical factor in predicting lower turnover, whereas low salary growth predicted higher turnover. |
| | | In another article, The effects of pay level on organization-based self-esteem and performance: A field study, by Gardner, Van Dyne, & Pierce (2010), concluded that an employee's pay was not only a motivating factor in productivity, but also was an |



| | | effective retention strategy. The paper collected field study data and assessed how an employee's given pay level affected the employee's subsequent self-esteem and performance. The paper found a statistically significant increase in an employee's tenure at a firm after an employee received higher pay. |
| --- | --- | --- |
| | | In another article, So Hard to Say Goodbye? Turnover Intention among U.S. Federal Employees by Pitts, Marvel, & Fernandez (2011), an employee's perceived relative pay and opportunity for pay increases was a motivating factor for public employees voluntarily leaving federal service. The paper collected survey data from the 2006 Federal Human Capital Survey, and on federal employees who voluntarily left federal service. The paper found that one of the reasons employees left federal government service was perceived pay disparities, and the authors recommended increases in pay as part of a strategy to boost retention in the Federal Civil Service. |
| Section C-3, Paragraph 3 | The Draft Report compares Defendants' yearly salary increases to the salary increases of other employers, but it does not provide any evidence showing that the employers with higher salary increases are able to hire and retain psychiatrists or if their higher average salary increases resulted in hiring additional psychiatrists to meet those employers' needs. | The research supports the finding that higher salary increases are linked with retention, as described above, in articles such as Voluntary Turnover and Job Performance, The Effects of Pay Level on Organization-based Self-esteem and Performance, So Hard to Say Goodbye? Turnover Intention among U.S. Federal Employees. The additional analysis that the Defendant proposes is outside the scope of this project and does not impact EmployStats' recommendations and findings. Such an analysis could be done at a later point if it is so desired. |



| Section C-3, Paragraph 3 | Also, the California Correctional Health Care Services Exit Survey and Exit Interview Analysis, First Quarter Report actually found the opposite to be true for physicians, including psychiatrists. | The Defendants' interpretation is incorrect. The Exit Survey that Defendants reference does not ask any question related to salary increases. The exit survey provided respondents the opportunity to select their top five reasons that most influenced the respondents' reason for leaving. The options included family reasons, looking for more career advancement opportunities, and worksite conditions. There is no option for psychiatrists to indicate a reason for leaving relating to salary increases. Additionally, the Exit Survey asks if the respondent felt their salary was appropriate. The Exit Survey does not ask the respondent about how they felt about their salary increases. |
| --- | --- | --- |
| Section C-3, Paragraph 4 | The Draft Report failed to show that the salaries of the other employers and the salary increases were sufficiently similar to CDCR and DSH's salaries and increases to be reliable comparators. While the Draft Report provides the average yearly salary increases for ten different public employers, it does not state the actual yearly salaries offered by those employers. This is problematic because it is possible that the other employers' salaries were not competitive with the much higher salaries already offered by CDCR and DSH. | This level of analysis is not necessary and has no impact on EmployStats recommendations and findings. This is especially evident in light of the salary increase data that shows that the vacancy rate falls when the average salary increase paid to psychiatrists increases. As shown in Table 1b of the Draft Report, in the years where the psychiatrists received a salary increase such as 2015 and 2017, CDCR experienced a lower vacancy rate than 2016 where they did not receive a salary increase. Further, in the years where the average salary increase percentage increased, the CDCR psychiatrist vacancy rate decreases. Defendants' comments do not change the findings of this report. |

employstats
ECONOMICS • STATISTICS

124

| Section C-3, Paragraph 5 | In addition, the Draft Report also fails to state the nature of the yearly salary increases offered by the other employers and justify the comparison. The Draft Report does not state whether the ten non-CDCR employers to which CDCR is compared offered their salary increases as part of a one-time contract, if they were part of a yearly salary structure, or they were part of yearly salary increases set to expire after a certain amount of time. This is important because it shows that the Draft Report failed to understand the state's overall pay structure that includes salary ranges, maximum salaries, and increases and changes to salary through the collective bargaining process. For example, the Draft Report completely ignores the 5 percent yearly merit pay increase that all psychiatrists are already eligible to receive until they reach the top of their respective salary range. | The Defendants misunderstand the Draft Report's analysis of CDCR and DSH salary increases. The State's overall pay structure is understood, and the increases such as the merit increase or those detailed in the CBAs are accounted for in the analysis. The analysis uses the actual salary increases that the CDCR, DSH, and non-CDCR and non-DSH psychiatrists received, and reflects both the state and comparator's pay structure appropriately and incorporates the underlying structures of the pay increases. |
| | | |
| Section D, Paragraph 2 | The Draft Report does not provide any study or evidence to show that pay differentials have been successful in attracting psychiatrists to the Central Valley and to other employers in the Central Valley. | The Draft Report provides clear evidence that CDCR employed psychiatrists located in the Central Valley are generally less satisfied than psychiatrists in other areas of California. The salary increase tables show that the vacancy rates are the highest when the salary increases are the lowest. Figure 2 in the Draft Report actually shows the vacancy rates in the Central Valley decreased by more than 5 percentage |



| | | |
|---|---|---|
| | | points from 2016 to 2017 when the average salary increase for CDCR went from 0% to 5.1% from 2016 to 2017 as shown in Table 1b of the Draft Report. The issue of compensating wage differential is not controversial in the field of economics and was also noted by the Defendants' economic experts in their report. |
| Section D, Paragraph 3 | The Draft Report's reliance on the dissatisfaction reported by existing psychiatrists in the Central Valley is insufficient to justify the recommendation. As previously stated, the Draft Report is limited to CDCR and DSH psychiatrists. | An analysis of non-CDCR and non-DSH psychiatrists as proposed by the Defendants is outside of the scope of this report and does not impact EmployStats recommendations or findings. The Draft Report's focus is on the psychiatrists employed by CDCR and DSH. |
| Section D, Paragraph 4 | The available evidence appears to suggest that a strict Central Valley pay differential may not be as successful as suggested...In the absence of support and analysis showing the efficacy of differential pay, it is unclear whether it would be an effective path for hiring new psychiatrists and retaining existing psychiatrists. The Draft Report does not offer any evidence or analysis supported by economic literature or findings to contradict any of those findings. | This is a fundamental disagreement. The data and economic literature cited in the Draft Report and in the responses above shows clearly that paying additional differentials is a way to increase fill rates. The Defendants' own economic analysis clearly illustrates the need of introducing a pay differential for places like the Central Valley. The Defendants' economists highlight the fact that CDCR and DSH psychiatrists favor working in areas that are not similar to the Central Valley. Furthermore, the Defendants' economists' analysis and report argue that increases to pay will cause a bidding war, because people prefer living in urban areas. The Defendants' own observations indicate clear support for a differential to lessen the impact of psychiatrists' living preferences. |
| | | |



| Section E, Paragraph 1 | Defendants are always interested in exploring reasonable ways to increase the amount and quality of office and treatment space and staff support resources, and welcome the opportunity to review their existing office and treatment space and support programs. However, the recommendation fails to recognize that CDCR and DSH may already have a solution to this challenge in telepsychiatry...Telepsychiatry may have any even great impact if it is able to alleviate some of the greater emotional and cognitive demands the Draft Report states are on prison psychiatrists. But the Draft Report did not provide that analysis. | Defendants' suggestion assumes that the psychiatrists working in telepsychiatry would not work in any other capacity, such as an on-site staff psychiatrist. It is possible that telepsychiatry could lead to a drain of on-site psychiatrists, and might not increase the overall staffing levels of psychiatrists. The Defendants' assumption overstates the potential impact of telepsychiatry on vacancy rates. |
|---|---|---|
| Section E, Paragraph 2 | The Draft Report also did not analyze all available information in making its recommendation. The recommendation is entirely based on the survey responses and does not contain any objective analysis of DSH or CDCR's existing office and treatment space at its institutions. Significantly, EmployStats did not even visit any of DSH or CDCR's facilities or analyze available office or treatment space compared to the needs of the staff and mental health populations in DSH and | The analyses suggested by Defendants are not necessary. EmployStats had numerous detailed discussions with members of the Special Master team who are very familiar with CDCR and DSH office space. Defendants' suggestions do not have an effect on the Draft Report's findings that CDCR and DSH employed psychiatrists are less than satisfied with their office space and work environment. It is outside the scope of a Labor Economist to determine the office space needs of psychiatrists. |



|  | CDCR's facilities. |  |
|---|---|---|
| Section E, Paragraph 3 | The recommendation also leaves out potentially valuable information gathered by the survey. The survey asked each psychiatrist to identify the facility at which he or she is employed. However, the Draft Report does not analyze the data based on the respondents' facility – a question asked by the survey – and identify those facilities where psychiatrists report better or worse office space. | The Defendants' criticism is not accurate. The Draft Report utilizes the respondent's facility in the analysis of both salary and working conditions, and presents these findings in the report. The Draft Report identifies the facilities in the Central Valley as facilities where the psychiatrists report lower satisfaction with office space conditions. |
|  |  |  |
| Section F, Paragraph 1 | The Draft Report fails to state whether they asked existing administrative staff about any efforts they have made in the past to improve or address these particular issues or analyzed any existing programs. Due to the Draft Report's failure to analyze any existing programs, it does not explore through its survey or otherwise, any improvements that could be made to those existing programs. | Defendants' critique does not have an effect on the findings of the Draft Report on the current level of dissatisfaction of CDCR and DSH employed psychiatrists. Defendants are able to use knowledge of past programs as they prepare and adopt the recommended programs. |
|  |  |  |
| Section G, Paragraph 1 | In addition to being overly vague, the Draft Report fails to analyze whether or not any of its recommendations would actually improve CDCR and DSH's ability to hire and retain psychiatrists to treat Coleman class members. | EmployStats disagrees with this contention. The analysis speaks directly to this point. |



| Section G, Paragraph 1 | It only claims that the recommendations "could" help with hiring and retention. (Draft Report at 6-7.) It fails to provide any objective evidence, study, or economic literature showing that the recommendations can be effective in helping CDCR and DSH actually recruit and retain psychiatrists. | Defendants' critique fails to account for widespread objective evidence and studies demonstrating that salary increases and pay differentials are linked to increased hiring and retention of employees. The articles cited above are just a small fraction of the economic literature on the subject. The Draft Report's recommendations provide the Special Master and the Court with areas that should be addressed in order to ameliorate the difficulties in hiring and retention of psychiatrists. |
|---|---|---|
| | | Defendants' response also does not account for the evidence presented in the Draft Report that shows the vacancy rate falls when the average salary increase paid to psychiatrists increases. As shown in Table 1b of the Draft Report, in the years where the psychiatrists received a salary increase such as 2015 and 2017, CDCR experienced a lower vacancy rate than 2016 where they did not receive a salary increase. Further, in the years where the average salary increase percentage increased, the CDCR psychiatrist vacancy rate decreases. |
| Section G, Paragraph 4 | The Draft Report does not dispute the severe shortage of psychiatrists in California, nor does it show how any of its recommendations will be effective in this environment. | EmployStats disagrees with this contention. The analysis speaks directly to this point. |
| Section G, Paragraph 6 | The Draft Report also misses a threshold concept—namely, that the demand for psychiatry services continues to grow throughout the population, while the supply of psychiatrists is decreasing at a critical rate. | This economic situation does not change EmployStats recommendations or findings. |



| | | |
|---|---|---|
| Section H | The Draft Report's recommendations are too vague and ambiguous to adopt. | The Draft Report's purpose is to conduct a labor market and salary analysis of CDCR and DSH. The Draft Report provided general recommendations as appropriate, and provided sufficient information for policy and decision makers with more advanced knowledge of details specific to CDCR and DSH to make implementation decisions. |
| | | |
| Section I | The Draft Report's recommendations for DSH go far beyond the bounds of the Coleman litigation and DSH's involvement in that litigation. The Draft Report's recommendations for DSH are for the entirety of DSH. But DSH's involvement in this litigation is much more limited and such broad requirements would go beyond the Court and Special Master's jurisdiction. | The Draft Report's purpose is to conduct a labor market and salary analysis of CDCR and DSH. The Draft Report provided general recommendations as appropriate, and provided sufficient information for policy and decision makers with more advanced knowledge of details specific to CDCR and DSH to make implementation decisions. |

