DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**NOTICE OF FILING MOTION IN COORDINATED CASE *ARMSTRONG V. NEWSOM* TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE WITH DISABILITIES**<br><br>Judge:   Hon. Kimberly J. Mueller |

NOTICE OF FILING MOTION IN COORDINATED CASE ARMSTRONG V. NEWSOM TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE WITH DISABILITIES

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on Wednesday, June 3, 2020, Plaintiffs' counsel in the coordinated case, *Armstrong v. Newsom*, N.D. Cal. Case No. C94 2307 CW, filed a Motion to Stop Defendants from Assaulting, Abusing and Retaliating Against People with Disabilities ("Motion"). The opening brief for that Motion is attached to this Notice as **Exhibit A.** Voluminous additional documents were filed in support of the Motion, including many documents under full or partial seal. Upon request, Plaintiffs would be happy to provide the Court with any additional documents, complying with the rules regarding sealed documents.

The Motion is relevant to *Coleman v. Newsom* because the victims of many of the allegations of abuse are *Coleman* class members, including numerous *Coleman*-only class members.

This Motion addresses staff abuse of class members systemwide, not just at Richard J. Donovan Correctional facility, along with systemwide failures in CDCR's disciplinary and investigative systems. The Motion raises important cross-case issues that should be addressed in the coordination process.

DATED: June 4, 2020                    Respectfully submitted,

                                        ROSEN BIEN GALVAN & GRUNFELD LLP

                                        By: */s/ Jessica Winter*
                                              Jessica Winter

                                        Attorneys for Plaintiffs

[3556574.2]

NOTICE OF FILING MOTION IN COORDINATED CASE ARMSTRONG V. NEWSOM TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE WITH DISABILITIES

# Exhibit A

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:  (510) 280-2621
Facsimile:  (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:  (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:  (510) 644-2555
Facsimile:  (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. C94 2307 CW<br><br>**NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge:  Hon. Claudia Wilken<br>Date:  July 21, 2020<br>Time:  2:30 p.m.<br>Crtrm.:  TBD |

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ............................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 2

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 3

I.      DEFENDANTS' ONGOING AND WIDESPREAD MISCONDUCT AND
        DELAYS IN PRODUCING REQUESTED DISCOVERY HAVE
        NECESSITATED THE FILING OF THIS ADDITIONAL MOTION .................. 3

II.     STAFF AT PRISONS THROUGHOUT CDCR ARE ASSAULTING AND
        OTHERWISE ABUSING PEOPLE WITH DISABILITIES ................................. 5

        A.      Horrific Abuses of People With Disabilities are Occurring at Multiple
                CDCR Prisons ................................................................................................. 5

        B.      Staff at RJD Continue to Assault and Retaliate Against People with
                Disabilities ................................................................................................... 10

        C.      Staff's Failure to Take Seriously an RJD Declarant's Safety Concerns
                Resulted in His Death in February 2020 ...................................................... 11

III.    CDCR'S SYSTEM FOR INVESTIGATING AND DISCIPLINING STAFF
        WHO ENGAGE IN MISCONDUCT IS BROKEN, LEAVING ABUSES
        UNDETERRED AND UNPUNISHED ............................................................... 12

IV.     CDCR NO LONGER PLANS TO INSTALL NEW SURVEILLANCE
        CAMERAS AT ANY PRISONS ........................................................................ 15

ARGUMENT ................................................................................................................ 17

I.      DEFENDANTS ARE VIOLATING THE ADA, RA, AND ORDERS OF
        THIS COURT BY ALLOWING SYSTEMIC ABUSE AIMED AT
        *ARMSTRONG* CLASS MEMBERS ................................................................... 17

II.     THE ENVIRONMENT AT MANY CDCR PRISONS—WHERE
        *ARMSTRONG* CLASS MEMBERS ARE TOO AFRAID OF STAFF TO
        REQUEST ACCOMMODATIONS FOR THEIR DISABILITIES—
        VIOLATES THE ADA, RA, AND PRIOR ORDERS OF THIS COURT ............ 18

III.    DEFENDANTS ARE IN VIOLATION OF THIS COURT'S ORDERS
        REGARDING ACCOUNTABILITY ................................................................... 20

IV.     THE SYSTEMIC ADA VIOLATIONS REQUIRE SIGNIFICANT
        CHANGES TO CDCR OPERATIONS ............................................................... 21

CONCLUSION ............................................................................................................. 25

[3549914.6]

# TABLE OF AUTHORITIES

**Page**

## CASES

*Arizona Dream Act Coalition v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) ................................................................. 22

*Armstrong v. Brown*,
    768 F.3d 975 (9th Cir. 2014) ................................................................. 25

*Armstrong v. Davis*,
    275 F.3d 849 (9th Cir. 2001) ................................................................. 22

*Armstrong v. Wilson*,
    942 F. Supp. 1252 (N.D. Cal. 1996) ..................................................... 17

*Ashker v. Newsom*,
    No. 09-CV-05796-CW (RMI), 2019 WL 330461 (N.D. Cal. Jan. 25, 2019) .......... 22

*Brown v. City of Tucson*,
    336 F.3d 1181 (9th Cir. 2003) ............................................................... 19

*Brown v. Plata*,
    563 U.S. 493 (2011) .............................................................................. 22

*Chess v. Dovey*,
    790 F.3d 961 (9th Cir. 2015) ................................................................. 22

*Duvall v. Cty. of Kitsap*,
    260 F.3d 1124 (9th Cir. 2001) ............................................................... 17

*EEOC v. Day & Zimmerman NPS, Inc.*,
    265 F. Supp. 3d 179 (D. Conn. 2017) ................................................... 19

*Farmer v. Brennan*,
    511 U.S. 825 (1994) .............................................................................. 22

*Hoptowit v. Spellman*,
    753 F.2d 779 (9th Cir. 1985) ................................................................. 22

*Hudson v. McMillian*,
    503 U.S. 1 (1992) ................................................................................. 22

*Kiman v. New Hampshire Dep't of Corr.*,
    451 F.3d 274 (1st Cir. 2006) ................................................................. 19

*Parsons v. Ryan*,
    949. F. 3d 443 (9th Cir. 2020) ............................................................... 22

*Purcell v. Pennsylvania Dep't of Corr.*,
    No. CIV. A. 95-6720, 1998 WL 10236 (E.D. Pa. Jan. 9, 1998) ............... 19

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

*Sheehan v. City and County of San Francisco*,
    743 F.3d 1211 (9th Cir. 2014), *rev'd in part on other grounds*, 575 U.S. 600
    (2015) ............................................................................................................. 18

*Updike v. Multnomah Cty.*,
    870 F.3d 939 (9th Cir. 2017) ....................................................................... 18

*Vos v. City of Newport Beach*,
    892 F.3d 1024 (9th Cir. 2018) ............................................................... 17, 18

*Wolff v. McDonnell*,
    418 U.S. 539 (1974) ..................................................................................... 22

**STATUTES**

18 U.S.C. § 3626 ..................................................................................................... 25

42 U.S.C. § 12132 ................................................................................................... 17

42 U.S.C. § 12203 ................................................................................... 17, 19, 20, 24

**RULES**

Fed. R. Civ. P. 65 .................................................................................................... 22

Fed. R. Evid. 706 .................................................................................................... 23

**REGULATIONS**

28 C.F.R. § 35.107 .............................................................................................. 19, 20

28 C.F.R. § 35.130 .............................................................................................. 19, 20

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on July 21, 2020, at 2:30 p.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Claudia Wilken, located at 1301 Clay Street, Plaintiffs John Armstrong, *et al.*, will and hereby do move the Court for an order to stop Defendants Gavin Newsom, *et al.*, from assaulting, abusing and retaliating against people with disabilities ("Motion").

This Motion is based on this Notice of Motion and Memorandum of Points and Authorities, the Proposed Order, and the Declarations of Gay Crosthwait Grunfeld, Michael Freedman, Thomas Nolan, and Jeffrey Schwartz, filed herewith, Plaintiffs' Motion to Stop Defendants from Assaulting, Abusing and Retaliating Against Incarcerated People with Disabilities at R.J. Donovan Correctional Facility and supporting pleadings, *see* Dkt. 2922 to 2922-8, all of which are incorporated herein by reference, the entire record in this action, and such other materials and argument as may be presented before or at the hearing.

DATED:  June 3, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Michael Freedman*
Michael Freedman

Attorneys for Plaintiffs

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1                                                                  Case No. C94 2307 CW

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

On February 28, 2020, Plaintiffs filed the Motion to Stop Defendants From Assaulting, Abusing and Retaliating Against People with Disabilities at R.J. Donovan Correctional Facility ("RJD Motion").  *See* Dkt. 2922.  Plaintiffs have filed the instant Motion—which incorporates by reference all pleadings filed in support of the RJD Motion, Dkts. 2922 to 2922-8, and relies on identical legal arguments—(1) to present further evidence that systemic misconduct that violates the rights of people with disabilities is occurring at many prisons within the California Department of Corrections and Rehabilitation ("CDCR"), not just at RJD, and (2) to seek state-wide relief commensurate with the scope of the violations.  Plaintiffs have filed this separate Motion because Defendants objected to Plaintiffs supplementing the record and submitting a broader proposed order for the RJD Motion, even though the majority of new evidence was not available to Plaintiffs when they filed the RJD Motion.

With this Motion, thirty-nine people with disabilities have submitted new declarations describing shocking abuses they experienced or witnessed at CSP – Los Angeles County ("LAC"), California Correctional Institution ("CCI"), Kern Valley State Prison ("KVSP"), CSP – Corcoran ("COR"); and Substance Abuse and Treatment Facility ("SATF").  Plaintiffs also collected nineteen additional declarations from incarcerated people at RJD about assaults and retaliation that occurred in just the last four months.  Notwithstanding the ongoing abuse of people with disabilities and Defendants' repeated admissions that video surveillance would reduce staff misconduct, on May 14, 2020, CDCR abandoned its previously-proposed plan to install video cameras at RJD and two other prisons.

After the filing of the RJD Motion, Defendants also finally produced staff investigation and disciplinary documents from RJD that Plaintiffs requested in November 2019.  Plaintiffs' expert on discipline and use of force, Jeffrey Schwartz, reviewed those materials and has concluded that problems with the staff misconduct complaint, investigation, and disciplinary processes result in gross failures to hold officers

2

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

1 accountable for their abuses of incarcerated people with disabilities.  He further found that

2 the profound shortcomings of the system allow staff to assault and retaliate against people

3 with disabilities with near-impunity, only facing discipline in the rare cases when video

4 evidence or staff reports make it impossible for CDCR to find that the misconduct did not

5 occur.  Mr. Schwartz concludes that CDCR's current system, even with the newly-

6 implemented Allegation Inquiry Management Section, is incapable of punishing

7 wrongdoers and keeping incarcerated people with disabilities safe.

8   The evidence filed in support of the instant Motion, combined with the evidence

9 submitted in support of the RJD Motion, demonstrates that abuse of people with

10 disabilities is a system-wide problem.  So long as *Armstrong* class members are being

11 assaulted because they have a disability and are too afraid to request needed disability

12 accommodations and so long as the officers who terrorize people with disabilities go

13 unpunished, Defendants will remain out of compliance with the Americans with

14 Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and prior orders of this Court.

15 Plaintiffs respectfully request that the Court enter their Proposed Order, filed herewith,

16 requiring Defendants to develop a plan to implement a number of remedies, including, but

17 not limited to, immediately installing surveillance cameras at the prisons with the most

18 pervasive misconduct and reforming and allowing for additional oversight of the staff

19 complaint, investigation, and discipline process.  The time has come to put an end to the

20 terrible abuses of and retaliation against class members.

21      **FACTUAL AND PROCEDURAL BACKGROUND**

22 **I.** **DEFENDANTS' ONGOING AND WIDESPREAD MISCONDUCT AND
   DELAYS IN PRODUCING REQUESTED DISCOVERY HAVE**
23   **NECESSITATED THE FILING OF THIS ADDITIONAL MOTION**

24   Plaintiffs filed the RJD Motion on February 28, 2018.  Dkt. 2922.  In support of the

25 Motion, Plaintiffs submitted, *inter alia*, declarations from fifty-four people with disabilities

26 regarding assaults, abuse and retaliation they witnessed or experienced at RJD and other

27 evidence of CDCR's failures to address the widespread misconduct, about which it has

28 been aware for years.  *See* RJD Mot. at 4-35.  Plaintiffs also submitted evidence of

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

1   misconduct against people with disabilities occurring at other CDCR prisons.  *See id.* at

2   35-37.  In response to serial requests from Defendants for more time to respond to the RJD

3   Motion, Plaintiffs ultimately agreed that Defendants' opposition would be due on June 9,

4   2020—an eighty-eight day extension—with a hearing on the motion scheduled for July 21,

5   2020.  Decl. of Gay Crosthwait Grunfeld in Supp. of Motion ("Grunfeld Decl."), filed

6   herewith, ¶¶ 3-5; *see also* Dkt. 2942.

7        As of the date Plaintiffs filed the RJD Motion, Defendants had produced almost

8   none of the staff investigation and disciplinary documents Plaintiffs requested on

9   November 21, 2019.  Decl. of Gay Crosthwait Grunfeld in Supp. of RJD Mot. ("Grunfeld

10  RJD Decl."), Dkt. 2922-1, ¶ 43 & Ex. L; Grunfeld Decl., ¶¶ 10-11.  By mid-April, after

11  extensive meet and confer efforts, Defendants had produced a sufficient number of

12  complete files to permit an expert to conduct a meaningful review of the documents.  *Id.*,

13  ¶ 13; Decl. of Michael Freedman in Supp. of Mot. ("Freedman Decl."), filed herewith

14  under seal, Exs. 65-74.  In addition, on May 15, 2020, nearly six months after Plaintiffs

15  served their Rule 30(b)(6) deposition notice, Defendants finally produced a person-most-

16  knowledgeable deponent on the topic of CDCR's new Allegation Inquiry Management

17  Section ("AIMS").  Grunfeld Decl., ¶¶ 23-24.  Plaintiffs have also continued to collect

18  declarations from people with disabilities at RJD and elsewhere, which Plaintiffs shared

19  with Defendants in April, May, and June 2020.  *Id.*, ¶ 8; Freedman Decl., ¶¶ 3-6.

20       On May 27, 2020, Plaintiffs emailed Defendants to inform them that Plaintiffs

21  intended to supplement the record for the RJD Motion with newly-obtained evidence of

22  misconduct at RJD and other prisons and with an expert report regarding deficiencies in

23  Defendants' staff complaint, investigation, and discipline process.  Grunfeld Decl., ¶ 6 &

24  Ex. B.  On June 1, 2020, Defendants indicated that they would move to strike any

25  supplemental evidence submitted in support of the RJD Motion.  *Id.*, Ex. C.  The parties

26  met and conferred that same day with the Court Expert and, even though Defendants have

27  not yet filed an opposition, Defendants continued to maintain their objection to Plaintiffs'

28  supplementing the evidence for the RJD Motion.  *Id.*, ¶ 7.

4                                                  Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

1   Plaintiffs have filed this Motion, which incorporates by reference all filings in and

2   repeats the legal argument from the RJD Motion, out of an abundance of caution to ensure

3   the Court can consider all evidence regarding staff misconduct that violates the rights of

4   *Armstrong* class members and issue appropriate relief not limited to RJD.  Given the

5   tremendous overlap between the two motions, Plaintiffs believe it would be most efficient

6   for briefing to be consolidated.

7   **II.   STAFF AT PRISONS THROUGHOUT CDCR ARE ASSAULTING AND
        OTHERWISE ABUSING PEOPLE WITH DISABILITIES**

8

9   Plaintiffs have already presented overwhelming evidence that officers at RJD have

10   engaged in a long-standing pattern of abusing people with disabilities.  *See* RJD Motion at

11   4-20.  With this Motion, Plaintiffs are submitting thirty-nine declarations from people with

12   disabilities[1] at LAC, CCI, COR, KVSP, and SATF, that reveal conduct of the same

13   horrible quantity and quality as at RJD.  Freedman Decl. Exs. 25-63.  Plaintiffs also

14   present nineteen additional declarations from people with disabilities at RJD that show that

15   abuses have continued there, unabated.  *Id.*, Exs. 3-5, 9-24.  Including the RJD Motion,

16   Plaintiffs have now submitted one hundred and twelve declarations from one hundred

17   declarants regarding misconduct at six institutions demonstrating the system-wide

18   violations of the rights of people with disabilities.  *Id.*, ¶ 7.

19   **A.   Horrific Abuses of People With Disabilities are Occurring at Multiple
          CDCR Prisons**

20

21   In the RJD Motion, Plaintiffs presented evidence of the state-wide scope of the staff

22   misconduct problem, including reports from the Office of the Inspector General ("OIG")

23   regarding abuses at High Desert State Prison (2015) and Salinas Valley State Prison

24

25   _____

[1] The declarants who have submitted declarations in support of this Motion are all
*Armstrong* class members, people with serious mental illness who are class members in
*Coleman v. Newsom*, 2:90-cv-0520 KJM DB (E.D. Cal.), and/or people with
developmental disabilities who are class members in *Clark v. California*, 3:96-cv-01486-
CRB (N.D. Cal.).  *Coleman* and *Clark* class members are people with disabilities.  *See* 42
U.S.C. § 12102(1).  Their experiences are highly relevant to whether Defendants are
violating the rights of *Armstrong* class members.

26

27

28

5                                      Case No. C94 2307 CW

[3549914.6]

1  ("SVSP) (2019), an admission by the Chief Ombudsman for CDCR of serious issues at

2  California Institution for Women ("CIW"), and reports from Plaintiffs' counsel regarding

3  problems at LAC, COR, SATF, CIW, and CSP – Sacramento.  *See* RJD Mot. at 35-37;

4  Grunfeld RJD Decl., ¶¶ 23, 65-73 & Ex. H, at DOJ00013200-01; *id.*, Exs. Y, EE-KK;

5  Decl. of Michael Freedman in Supp. of RJD Motion ("Freedman RJD Decl."), Dkt. 2922-2

6  to 2922-5, Exs. 77-82.

7          The thirty-nine declarations from people with disabilities regarding misconduct at

8  LAC, CCI, KVSP, SATF, and COR leave little doubt that Defendants are abusing people

9  with disabilities at prisons throughout the state.  Just like at RJD, staff at these other

10  institutions routinely use unnecessary and excessive force against people with disabilities,[2]

11  often resulting in broken bones, loss of consciousness, stitches, or injuries that require

12  medical attention at outside hospitals.[3]  In a number of instances, staff assaulted or

13  discriminated against incarcerated people because of their disabilities or because they had

14  requested disability accommodations.[4]  When staff use force against people with

15

16  [2] Freedman Decl., Ex. 26, ¶¶ 11-18; Ex. 27, ¶¶ 10-12,14-15, 25-30; Ex. 28, ¶¶ 19-23; Ex.
   30, ¶¶ 9-11; Ex. 31, ¶¶ 11-14; Ex. 38, ¶¶ 12, 21-22; Ex. 44, ¶¶ 8-12; Ex. 46, ¶¶ 19-23, 33;

17  Ex. 48, ¶¶ 14-15, 19; Ex. 50, ¶¶ 13-18; Ex. 51, ¶¶ 9-12; Ex. 54, ¶¶ 7-11; Ex. 56, ¶¶ 8-10;
   Ex. 57, ¶¶ 8-11; Ex. 58, ¶¶ 15-19; Ex. 59, ¶¶ 9-15; Ex. 60, ¶ 8; Ex. 63, ¶¶ 7-9.

18  [3] Freedman Decl., Ex. 29, ¶ 21; Ex. 30, ¶ 10; Ex. 32, ¶ 16; Ex. 34, ¶¶ 27, 32; Ex. 37, ¶¶ 11,
   15; Ex. 38, ¶¶ 12, 14; Ex. 39, ¶¶ 9, 12-13; Ex. 41, ¶¶ 18, 24-25; Ex. 43, ¶ 11; Ex. 44, ¶¶ 24-

19  25; Ex. 46, ¶ 23; Ex. 47, ¶ 23; Ex. 48, ¶¶ 18, 21; Ex. 49, ¶ 17; Ex. 54, ¶ 9; Ex. 56, ¶ 17; Ex.
   57, ¶ 18; Ex. 58, ¶ 22; Ex. 59, ¶ 18; Ex. 61, ¶ 21.

20  [4] Freedman Decl., Ex. 27, ¶¶ 25-30 (officer at LAC threw an individual out of his

21  wheelchair for requesting help cleaning up cell after his catheter bag broke and leaked
   urine and blood); Ex. 50, ¶¶ 4-17 (officers at LAC assaulted *Armstrong* class member for

22  refusing upper bunk assignment that violated his lower bunk accommodation); Ex. 35, ¶¶
   9-11 (officer at LAC refused to open cell door for ADA Worker to assist class member in

23  wheelchair  with help cleaning); Ex. 45, ¶¶ 7-10 (officer at LAC instructed *Coleman* class
   member to assault person with mental illness and developmental disabilities and called

24  person "retarded"); Ex. 48, ¶¶ 28-30 (officers at LAC used waist chains to drag a person
   out of his wheelchair and across his cell because he could not stand due to his disability);

25  Ex. 55, ¶ 29 (officers at CCI accused a person with disabilities of "faking it" or "milking
   the system."); Ex. 35, ¶¶ 15-16 (officers at refused to let a person in a wheelchair use the

26  accessible pathway to go to dining hall and issued an RVR for Battery on a Peace Office to
   class member when he attempted to do so and accidentally ran over an officer's foot); Ex.

27  61, ¶¶ 9-10, 19-20 (officers at KVSP assaulted *Armstrong* class member two times when
   they ordered him to prone out, even though he wears a mobility vest and told them he

28  could not); Ex. 63, ¶¶ 7-9 (officers slammed hard of hearing class member with broken
   hearing aids to ground for being unable to hear order to come out of his cell).

[3549914.6]

1  disabilities it often results in people being unnecessarily thrown out of wheelchairs or

2  dragged on the ground.[5]  Similar harm is occurring to people with mental illness, who staff

3  frequently assault when reporting suicidality or when making other requests for mental

4  health care.[6]  Officers frequently resort to violence with people with mental illness without

5  making any or sufficient attempts at de-escalation.[7]  And when people complain about

6  mistreatment, they face substantial threats and retaliation.[8]

7        Most troublingly, just like at RJD, incarcerated people with disabilities at these

8  other CDCR facilities are terrified of staff.  As a result, they refrain from asking for

9  accommodations and other help that they require for their disabilities and avoid interacting

10  with staff.[9]  The hostile environment leads people with mental illness to not report

11  suicidality or need for treatment.[10]  And because they have seen what happens to people

12

13  [5] Freedman Decl., Ex. 27, ¶¶ 25-30 (officer at LAC flipped person out of wheelchair);
   Ex. 48, ¶¶ 28-30 (officers at LAC dragged person out of his wheelchair); Ex 53, ¶¶ 14-21
14  (officer at LAC tackled person out of wheelchair then assaulted him further); Ex. 61, ¶ 10
   (officers at KVSP assaulted person then forced him to walk without his cane, resulting in
15  him falling, then dragged him to holding cage).

16  [6] Freedman Decl., Ex. 25, ¶¶ 16-21, 34-36; Ex. 32, ¶¶ 8-14; Ex. 33, ¶ 19; Ex. 37, ¶ 8-11;
   Ex. 38, ¶¶ 3-4, 31; Ex. 41, ¶¶ 11-19,  ; Ex. 45 ¶¶ 33-34; Ex. 47, ¶¶ 14-19, 47; Ex. 49, ¶¶
17  11-14, 23; Ex. 55, ¶ 29; Ex. 56, ¶¶ 8-9, 12, 19.

   [7] Freedman Decl., Ex. 29, ¶¶ 10, 14-20; Ex. 46, ¶¶ 3-4, 10-20.
18
   [8] Freedman Decl., Ex. 26, ¶ 9 & Ex. 62 (staff at LAC and KVSP called same person a
19  "Coleman Snitch"); Ex. 27, ¶¶ 44-45; Ex. 38, ¶¶ 21-23, 29; Ex. 51, ¶¶ 28-30; Ex. 59, ¶¶ 7-
   10 (Coleman class member at COR was beaten by officers while trying to submit 602 and
20  officer snatched 602 form out of his hand); Ex. 60, ¶¶ 11, 21, 27; Ex. 62, ¶ 7-18 (officer at
   KVSP threatened to deploy pepper spray, destroy property, plant a weapon, falsely report a
21  rules violation, and kill an individual who reported misconduct to Plaintiffs' counsel in
   Coleman and Armstrong ).

22  [9] Freedman Decl., Ex. 26, ¶ 9; Ex. 27, ¶ 41; Ex. 31, ¶ 25; Ex. 35, ¶¶ 9-13, 20 (class
   member at LAC who uses wheelchair no longer showers outside cell and does not ask for
23  incontinence supplies, instead rips up bedsheets to clean himself); Ex 36, ¶ 35; Ex 37,
   ¶¶ 37-38; Ex. 38, ¶ 33; Ex. 41, ¶ 43; Ex. 44, ¶¶ 29-30, 33 (person at LAC with
24  incontinence does not ask for showers after accidents); Ex 46, ¶35; Ex. 50, ¶ 26 (person at
   LAC assaulted for requesting lower bunk now avoids requesting anything from officers);
25  Ex. 51, ¶ 34; Ex. 53, ¶ 38 ("The staff misconduct I experienced [at LAC] on August 27,
   2019 has forever changed how I interact with custody staff …. I felt like if I asked for
26  anything from staff, they might attack me.  I no longer asked officers for … any other
   disability accommodations or medical accommodations.") Ex. 52, ¶ 28; Ex. 57, ¶¶ 22, 24;
27  Ex. 61, ¶¶ 29-35.

   [10] Freedman Decl. Ex. 25, ¶ 41; Ex. 26, ¶ 9; Ex. 33, ¶ 21; Ex. 45, ¶ 32-33; Ex. 46, ¶ 36;
28  Ex. 47, ¶ 47 ("[O]ften times, I am depressed, and sometimes suicidal, and instead of asking
   to speak with mental health, I choose to hurt myself. Sometimes I bite myself, or slam my

[3549914.6]

1   who complain, they refrain from filing grievances when they do not receive the

2   accommodations or help that they need or staff otherwise mistreat them.[11]

3       Among the worst incidents at these institutions:

4   •     Officers at LAC threw an *Armstrong* and *Coleman* class member out of his
       wheelchair for requesting a cell move, then took him to the gym to assault
5       him further. Freedman Decl., Ex. 53, ¶¶ 15-24.

6   •     Staff at LAC body slammed an *Armstrong* class member who had just had
       back surgery, worsening his disability such that he is now reliant on a
7       wheelchair, and then issued him a false Rules Violation Report ("RVR") to
       cover up the misconduct. *Id.*, Ex. 44, ¶¶ 23-26.

8

9   •     Staff at KVSP slammed an *Armstrong* class member's face into a table after
       they ordered him to get down on the ground, in violation of his "no-get-
10      down" accommodation. *Id.*, Ex. 61, ¶¶ 9-14.

11  •     Officers at SATF threw a hard-of-hearing class member with broken hearing
       aids to ground for being unable to hear an order to come out of his cell.
12      Ex. 63, ¶¶ 6-9.

13  •     Officers at LAC assaulted an *Armstrong* class member with a lower bunk
       accommodation after he refused to sleep on the upper bunk to which officers
14      had assigned him. *Id.*, Ex. 50, ¶¶ 9-17.

15  •     Staff at LAC punched an *Armstrong* and *Coleman* class member in the face
       multiple times, knocking him unconscious. *Id.*, Ex. 30, ¶¶ 9-17.

16  •     Staff at CCI inappropriately grabbed a *Coleman* class member's genitals,
       then pepper sprayed and assaulted him, all because he requested a grievance
17      form to complain that staff had refused to provide him with a razor blade.
       *Id.*, Ex. 57, ¶¶ 8-11.

18

19  •     Officers at COR beat a *Coleman* class member, knocking him unconscious
       multiple times and breaking his jaw, resulting in his jaw being wired shut for

20  _____

21  head against the wall. I understand that this is not a good coping mechanism, but at least I
    am in control and do not have to risk a staff assault."); Ex. 49, ¶ 32; Ex. 51, ¶¶ 30-32;
22  Ex. 52, ¶ 28 ("I am afraid to show the officers my cuts when I need help because they do
    not help and do not take my mental health issues seriously. I have never told officers when
23  I am suicidal, because I have seen other people be assaulted for reporting that they are
    suicidal. Also, the officers use people being suicidal as a reason to enter their cells and
    assault them."); Ex. 56, ¶ 19; Ex. 57, ¶ 22; Ex. 58, ¶ 34, 41.

24  [11] Freedman Decl., Ex. 25, ¶ 41; Ex. 27, ¶ 41; Ex. 33, ¶ 22; Ex. 38, ¶ 33; Ex 39, ¶ 25;
    Ex. 41, ¶ 46 ; Ex. 43, ¶ 14 (from a *Coleman* class member assaulted at LAC, resulting in
25  four broken bones: "I have not filed a 602 about this incident because I am afraid. I also
    refused my use of force videotape that was offered to me the day after I was assaulted. I
26  was afraid to speak with staff about what had happened to me and afraid they would
    retaliate against me if I reported what happened."), Ex. 45, ¶ 18; Ex. 47, ¶ 48 ("Each time I
27  report something at LAC, I am afraid for my life.... I am afraid to report anything.");
    Ex. 54, ¶ 16; Ex. 55, ¶¶ 15-16; Ex. 57, ¶ 24 ("I would simply agree to everything custody
28  said [at CCI]. I was living in fear."); Ex. 58, ¶ 40.

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

three months, because he attempted to file a grievance form to complain about an aggressive search.  *Id.*, Ex. 59, ¶¶ 10-18.

- Officers at LAC beat a transgender *Coleman* class member, restrained her, and then dragged her a long distance on her stomach, causing permanent scarring. *Id.*, Ex. 29, ¶¶ 15-25.

- Staff at LAC pushed a *Coleman* class member head first into the floor after the individual refused to be housed in a cell with a person suspected of having COVID-19.  *Id.*, Ex. 46, ¶¶ 10-20, 25-26.

The assaults and retaliation at LAC, documented in twenty-nine of the declarations, are particularly disturbing, as Plaintiffs' counsel has been communicating reports of serious misconduct at the prison to Defendants for years.  Since 2017, Plaintiffs' counsel has, in tour reports and letters in *Armstrong* and *Coleman*, notified CDCR of more than one hundred and forty allegations of misconduct at LAC perpetrated against *Armstrong* class members and other people with disabilities.  Declaration of Thomas Nolan in Supp. of Mot. ("Nolan Decl."), filed herewith under seal, ¶ 7.  Defendants have not responded at all to many of the allegations and have frequently failed to include them on the *Armstrong* Accountability Logs.  *Id.*, ¶¶ 8, 32, 38-39 & Ex. O.  In each and every case for which Defendants have provided a substantive response, Defendants have not confirmed the allegations.  *Id.*, ¶¶ 7, 9-50.  As far as Plaintiffs' counsel is aware, Defendants have not imposed discipline against a single officer or made a single change in policy or practice at LAC in response to the reports of misconduct raised by Plaintiffs' counsel.  *Id.*, ¶ 7.[12]

---

[12] The physical abuse of people with disabilities is but one manifestation of CDCR's discriminatory and intolerant culture.  As the RJD strike force found, "[m]entally disordered offenders, developmentally disabled offenders, sex offenders, and homosexual/ transgender offenders [are] being targeted for assault and/or abuse by staff."  Freedman RJD Decl., Ex. 2, at 1.  Many of the incidents involve officers' use of degrading, offensive, and inappropriate language against people with disabilities.  Consistent with these attitudes, CDCR officers have made posts on social media that show their hatred and disdain for people with disabilities and other vulnerable people.  Grunfeld Decl., ¶¶ 42-43 & Exs. W, X.  Officers have also harassed non-custody staff who show any kindness and compassion toward incarcerated people, as demonstrated in a declaration from a former RJD social worker who quit because of the intolerable working conditions created by officers.  Freedman Decl., Ex. 64; *see also* RJD Mot. at 17-18 (retaliation against psychologist who reported staff misconduct).

9                                                     Case No. C94 2307 CW

[3549914.6]

### B.    Staff at RJD Continue to Assault and Retaliate Against People with Disabilities

Since the filing of Plaintiffs' Motion, staff at RJD have continued to terrorize incarcerated people with disabilities.  Officers are still using unnecessary or excessive force against people with disabilities;[13] still throwing people in walkers to the ground without any justification;[14] still breaking people's bones or otherwise seriously injuring them;[15] still retaliating against or threatening people who complain (including by the filing of false Rules Violation Reports);[16] still using incarcerated people to threaten and assault people with disabilities;[17] and still trapping people who use wheelchairs and walkers in cell doors.[18]  People with disabilities remain so afraid of staff that they frequently refrain from asking for disability accommodations and other help they require.[19]  These appalling abuses have occurred even **after** the filing of the RJD Motion and even though, on March 20, 2020, CDCR posted anti-retaliation notices to which the parties agreed at locations throughout RJD.  *See* Dkt. 2931.  In fact, some of the perpetrators are the same officers identified as wrongdoers in the declarations filed with the RJD Motion.[20]

Despite the widespread and ongoing abuses documented in the RJD Motion and the instant Motion, interrogatory responses from Defendants served after the filing of the RJD

---

[13] Freedman Decl., Ex. 9, ¶ 9; Ex. 10, ¶ 10; Ex. 11, ¶ 8; Ex. 13, ¶¶ 9-10; Ex. 14, ¶ 6; Ex. 16, ¶¶ 4-5; Ex. 18, ¶ 6; Ex. 19, ¶¶ 6-7; Ex. 20, ¶ 9; Ex. 23, ¶¶ 9-10.

[14] Freedman Decl., Ex. 10, ¶ 7.

[15] Freedman Decl., Ex. 13, ¶¶ 8-9; Ex. 20, ¶¶ 9, 17; Ex. 23, ¶ 12.

[16] Freedman Decl., Ex. 9, ¶¶6,  9, 11, 14-15, 17, 23-25; Ex. 10, ¶¶ 9-10; Ex. 12, ¶¶ 5-12, 14, 16-17; Ex. 15, ¶ 9; Ex. 17, ¶ 9; Ex. 18, ¶ 7; Ex. 19,  ¶ 10; Ex. 22, ¶¶ 6-10; Ex. 23, ¶ 13.

[17] Freedman Decl., Ex. 9, ¶¶ 23-24; Ex. 11, ¶ 9; Ex. 12, ¶¶ 4-5, 9-12; Ex. 16, ¶¶ 5-6; Ex. 18,  ¶¶ 9-10; Ex. 22, ¶ 6-10.

[18] Freedman Decl., Ex. 13, ¶¶ 13-14; Ex. 24, ¶¶ 4-5.

[19] Freedman Decl., Ex. 3, ¶ 16; Ex. 9, ¶ 26; Ex. 12, ¶¶ 19; Ex. 13, ¶¶ 15-16; Ex. 15, ¶ 11; Ex. 17, ¶ 12; Ex. 20, ¶ 23.

[20] *Compare* Freedman Decl., Ex. 13, ¶¶ 13-15 *with* Freedman RJD Decl., ¶¶ 33, 55, 81, 84, 238, 253; *compare* Freedman Decl., Ex. 18, ¶ 9 *with* Freedman RJD Decl., ¶ 247; *compare* Freedman Decl., Ex. 22, ¶¶ 6-10 *with* Freedman RJD Decl., ¶ 194; *compare* Freedman Decl., Ex. 3, ¶ 13-14, Ex. 4, ¶¶ 10-11, Ex. 5, ¶¶ 6-7 *with* Freedman RJD Decl., ¶¶ 76, 253.

Case No. C94 2307 CW

[3549914.6]

1   Motion confirm that very few officers have been disciplined for harming incarcerated

2   people.  Since January 1, 2017, only nine RJD officers have been terminated for five

3   incidents of misconduct against incarcerated people.  Grunfeld Decl., Ex. G, at 2-3.[21]

4   Tellingly, the victims in all five incidents were people with disabilities (four were

5   *Armstrong* class members and one was a *Coleman* class member), suggesting that the most

6   serious misconduct is aimed at people with disabilities.  *Id.*  And all four incidents where

7   staff victimized an *Armstrong* class member involved either video evidence of the

8   misconduct or staff willing to report their co-workers for abusing an incarcerated person.

9   *See* Decl. of Jeffrey Schwartz in Supp. of Mot., filed herewith under seal, ¶¶ 53, 126, 127,

10   172, 210, 219; Freedman Decl., ¶¶ 91-94 & Exs. 77-80.[22]

11       **C.**   **Staff's Failure to Take Seriously an RJD Declarant's Safety Concerns
12          Resulted in His Death in February 2020**

13         Plaintiffs also submit additional evidence that officers at RJD are culpable in the

14   death of an *Armstrong* and *Coleman* class member and declarant for the RJD Motion, who

15   was killed by his cell mate in February 2020.  *See* Freedman Decl., Exs. 3-5; RJD Mot. at

16   13, 33; Freedman RJD Decl., ¶¶ 72-74 & Exs. 22a, 22b.  According to multiple witnesses,

17   before the fatal altercation, the declarant and his cell mate repeatedly requested that the

18   officers move them to separate cells because of safety concerns.  Freedman Decl., Ex. 3,

19   ¶ 5; Ex. 4, ¶10; Ex. 5, ¶¶ 6-8.  In response to those requests, officers repeatedly told the

20   declarant and his cell mate to "fuck or fight," i.e., get along or fight to prove they were

21   incompatible.  *See id.*, Ex. 3, ¶¶ 5-; Ex. 4, ¶¶ 10-11; Ex. 5, ¶¶ 6-7.  When the declarant and

22   his cell mate did finally fight in their cell, officers failed to respond for 15-30 minutes.  *Id.*,

23

---

24   [21] Defendants' tracking of incidents, investigations, and discipline is so poor that
   Defendants had to amend their interrogatory responses two times to represent the accurate
25   number of officers who have been terminated for misconduct that victimized an
   incarcerated person.  Grunfeld Decl., ¶¶ 16-19 & Exs. E-G; *see also* RJD Mot. at 31-32.

26   [22] The Chair of the Assembly Subcommittee on Public Safety, when read a portion of the
   RJD Motion at a hearing on March 2, 2020, said "I find it very alarming that these things
27   are still taking place in our prisons, and I read a lot of the stories and they're absolutely
   horrible, absolutely horrible, that they are committed by our staff …. I find it totally
28   unacceptable …." Grunfeld Decl., Ex. N, at 6.

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

Ex. 3, ¶¶ 8-11; Ex. 5, ¶¶ 9-11.  The declarant died from his serious injuries fifteen days later.  *Id.*, Ex. 4, ¶¶ 14-15; *id.*, Ex. 6; Freedman RJD Decl., Exs. 22a, 22b.  Officers' refusal to take the reported safety concerns seriously and encouragement for incarcerated people to fight led to the violent death of a witness and class member in this case.

Tragically, in 2016, CDCR let one of the implicated officers keep his job after finding that he used and failed to report unreasonable force that resulted in the death of another incarcerated person.  *See* Freedman Decl., Ex. 7, at EX7_07, EX7_09.  Pursuant to CDCR's Department Operation Manual ("DOM"), the base penalty for his failure to report his own unreasonable use of force was dismissal, the highest possible penalty (Level 9).  *See id.* at EX7_09; Grunfeld RJD Decl., Ex. LL, at 246, 252 (DOM §§ 33030.16, 33030.19).  However, the RJD warden only imposed a Level 6 penalty of 10% salary reduction for eighteen months.  Freedman Decl., Ex. 7, at EX7_09.  The officer lost approximately $12,500 in salary, remained employed by CDCR at RJD, and continued to work in a position where he was able to harm other incarcerated people, including the now-deceased declarant.  *See* Freedman Decl., ¶ 17 & Ex. 8.

Making matters even worse, one of the witnesses who provided information regarding the declarant's death faced significant retaliation from staff for speaking with Plaintiffs' counsel about the incident.  *See* Freedman Decl., Ex. 9.

### III. CDCR'S SYSTEM FOR INVESTIGATING AND DISCIPLINING STAFF WHO ENGAGE IN MISCONDUCT IS BROKEN, LEAVING ABUSES UNDETERRED AND UNPUNISHED

At the time Plaintiffs filed the RJD Motion, Plaintiffs suspected that shortcomings in CDCR's complex system for investigating and disciplining staff were to blame for relentless and unchecked staff misconduct against people with disabilities at RJD and other CDCR prisons.[23]  As discussed above, though Plaintiffs requested investigation files in

---

[23] A complaint about staff misconduct generally goes through a number of stages: First, staff at the prison or investigators at the newly-created AIMS conduct a local inquiry. Second, the warden decides, based on the information gathered in the inquiry, whether to refer the case to the Office of Internal Affairs ("OIA").  Third, the Central Intake Unit ("CIU") of OIA decides whether to accept the referral for an investigation, to grant the warden authority to issue direct adverse action (where the information gathered in the

1   November 2019, Defendants produced almost no files prior to the filing of the RJD Motion

2   and did not produce a meaningful number of mostly-complete files until mid-April 2020.

3   *See* Grunfeld RJD Decl., ¶ 43 & Ex. L; Grunfeld Decl., ¶¶ 11-13.

4       Once Plaintiffs finally obtained the documents, Jeffrey Schwartz, Plaintiffs' expert

5   on discipline and use of force, conducted a comprehensive review.  Mr. Schwartz

6   confirmed Plaintiffs' fears.  From his review, he found that that CDCR's system for

7   investigating misconduct and disciplining staff is wholly ineffective and fails to hold

8   officers accountable for harming incarcerated people.  *See generally* Schwartz Decl.

9       As a starting point, Mr. Schwartz concluded that until CDCR installs fixed

10  surveillance cameras with full coverage of its facilities and requires the use of body-worn

11  cameras, CDCR will never be able to adequately investigate misconduct because CDCR

12  will, in most cases, have deliberately avoided collecting the type of evidence most useful

13  in determining whether misconduct occurred.  Schwartz Decl., ¶¶ 32, 87, 94-98; *see also*

14  Decl. of Eldon Vail in Supp. of RJD Mot. ("Vail Decl."), Dkt. 2922-6, ¶¶ 83, 94-101.

15      Cameras will not solve all of the systems' problems, however.  As described by

16  Mr. Schwartz, the current investigation system is not resulting in the discipline, including

17  terminations and criminal prosecutions, necessary to hold officers accountable and protect

18  incarcerated people.  Mr. Schwartz found the local inquiries conducted by staff at RJD

19  were incomplete, unprofessional, and profoundly biased against incarcerated complainants

20  and witnesses.  Schwartz Decl., ¶¶ 40-47, 84, 181, 187, 273, 276, 327.  Mr. Schwartz's

21  findings in this respect are consistent with CDCR's own admissions and conclusions of the

22  OIG, including in a June 2, 2020 Report.  *See* Grunfeld RJD Decl., Ex. GG, at 3-6, 89;

23

24  ─────────────────────
    inquiry supports discipline), or to reject the referral.  The CIU rejects referrals if the

25  evidence submitted by the warden does not support a reasonable belief misconduct
    occurred that would likely result in adverse action.  If the CIU rejects a case, the warden

26  cannot impose any adverse action.  Fourth, if the CIU accepts a referral, OIA conducts an
    investigation and produces an investigation report, which it sends to the warden.  Fifth, the

27  warden, based on the investigation report, decides whether to find the employee violated
    policy, and, if yes, what discipline to impose based on the Employee Discipline Matrix in

28  DOM.  *See* Schwartz Decl., ¶¶ 16-19, 75, 77; *see also* Grunfeld Decl., Exs. P-Q; *id.*, Ex. J,
    33, 36-42.

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

1   Grunfeld Decl., Ex. V, at 2, 36-52, 75-81; *see also* Vail Decl., ¶¶ 62-63.  Furthermore,

2   Defendants' creation of AIMS—a new unit within OIA that will conduct some local

3   inquiries into staff complaints instead of local prison staff—will not solve these problems.

4   AIMS (a) will not conduct inquiries into many staff complaints (including some claims of

5   excessive and unnecessary force), and (b) will only conduct inquiries following a written

6   complaint by the victim of misconduct (excluding oral reports of misconduct and reports

7   from third parties).  Schwartz Decl., ¶¶ 90-91; *see also* Grunfeld Decl., ¶¶ 31-33 & Exs. J,

8   at 70-72, 80-99; *id.* at Exs. O-R.

9         The OIA Central Intake Unit ("CIU")—which functions as the gatekeeper for all

10   discipline of CDCR employees—blocked many potentially meritorious complaints against

11   RJD staff from even being investigated by OIA, an issue Plaintiffs have been bringing to

12   CDCR's attention for years.  Schwartz Decl., ¶¶ 54-57, 266; Grunfeld. Decl., Ex. U.

13   Mr. Schwartz found (1) that the CIU misapplied the "reasonable belief" standard in a

14   number of cases and (2) that the standard is inappropriate to use as an exclusionary criteria

15   before a formal investigation has even been conducted.  Schwartz Decl., ¶¶ 54-57, 266.

16         Mr. Schwartz observed that wardens at RJD—who, like all wardens in CDCR, have

17   the authority to decide whether to find an officer has violated policy and to impose

18   discipline—exercised their discretion poorly and inconsistently.  *Id.*, ¶¶ 77-78.  In some

19   cases, the wardens elected not to sustain allegations fully supported by the facts.  *Id.*  In

20   others, wardens made inconsistent decisions in finding misconduct and imposing penalties

21   where allegations of misconduct were substantially similar.  *Id.*, ¶¶ 172, 176-181.

22   Mr. Schwartz also found that the Employee Disciplinary Matrix—which sets forth

23   presumptive penalties for different types of misconduct—is seriously flawed and leads to

24   penalties that are too low for serious misconduct that harms incarcerated people.  *Id.*,

25   ¶¶ 75-76, 138; Grunfeld RJD Decl., Ex. LL.  Mr. Schwartz found staff members accused

26   of serious misconduct were nearly always permitted to remain in positions with control

27   over incarcerated people, sometimes including their victims, and receive their salaries

28   during the pendency of investigations.  Schwartz Decl., ¶¶ 51, 220.  Mr. Schwartz found

1    that, where evidence indicated that officers had engaged in criminal conduct, CDCR rarely

2    referred the cases to local prosecutors.  *Id.*, ¶ 52, 211, 248.  Lastly, Mr. Schwartz

3    concluded that CDCR only disciplines officers when there is video evidence or staff

4    reports of misconduct.  *Id.*, ¶¶ 53, 126, 127, 172, 208, 210, 219.  In sum, Mr. Schwartz

5    concluded that the current system is not capable of fulfilling its basic purposes—to

6    determine if staff violated policy and/or the law and to discipline them appropriately.

7         Though Mr. Schwartz only reviewed staff investigation files from RJD, his

8    conclusions regarding the problems with the staff complaint, investigation, and discipline

9    system apply to CDCR as whole.  The primary failings he identified—lack of video

10   surveillance, biased and poor-quality inquiries, inappropriate rejections of referrals by the

11   CIU, inadequate investigations by OIA, and improper exercise by wardens of their

12   authority to discipline—are endemic to the system created by CDCR.  Schwartz Decl.,

13   ¶¶ 84-87; *see also* RJD Mot. at 23-26; Grunfeld Decl., Ex. V.

14        The only other system within CDCR for holding officers accountable is this Court's

15   Accountability Orders.  *See* Grunfeld RJD Decl., ¶¶ 3-9 & Exs. B-D.  As discussed in the

16   RJD Motion, Defendants failed to place the majority of RJD allegations on the *Armstrong*

17   Accountability Logs, much less investigate them through the process outlined in the

18   Court's Modified Injunction.  RJD Motion at 34.  The Accountability Logs for January and

19   February 2020, which Defendants produced after the filing of the RJD Motion, also do not

20   include any of the staff misconduct allegations raised in the declarations attached to the

21   RJD Motion, all of which Plaintiffs' counsel provided to Defendants in January and

22   February 2020.  *See* Grunfeld Decl., ¶ 39; Freedman Decl., Ex. 75; Freedman RJD Decl.,

23   ¶ 9.  Similarly, Defendants have failed to log many instances of staff misconduct at LAC

24   that Plaintiffs have included in recent tour reports and have not confirmed any of the

25   allegations.  *See* Nolan Decl., ¶ 8; Freedman Decl., Ex. 76.

26   **IV.   CDCR NO LONGER PLANS TO INSTALL NEW SURVEILLANCE
           CAMERAS AT ANY PRISONS**

27

28        One area of agreement between the parties in this dispute is that video surveillance

1  would help reduce misconduct against people with disabilities.  As Plaintiffs wrote in the

2  RJD Motion, "[t]he December 2018 strike team, CDCR's Chief Ombudsman, both of

3  CDCR's persons most knowledgeable, and the OIG all agree that cameras are critical for

4  deterring misconduct and holding accountable officers who engage in misconduct."  RJD

5  Mot. at 26-27.  Both of Plaintiffs' experts agree that CDCR cannot begin to eradicate the

6  staff misconduct scourge until it installs fixed surveillance cameras and mandates the use

7  of body-worn cameras.  *See* Schwartz Decl., ¶¶ 87, 94-98; Vail Decl., ¶¶ 83, 94-101.

8        As of the filing of the RJD Motion, the Governor had included a $21.6 million

9  budget change proposal ("BCP") in the fiscal year 2020-2021 budget to install fixed

10 surveillance cameras at RJD, SVSP, and CIW.  *See* RJD Mot. at 27-28; Grunfeld RJD

11 Decl., Ex. Y.  Though the BCP would have had no impact on LAC, CCI, COR, KVSP, and

12 SATF, it was a necessary, albeit insufficient, step toward stopping the abuse of people with

13 disabilities at RJD.

14       On May 14, 2020, however, the Governor withdrew the BCP.  Grunfeld Decl.,

15 Ex. L, at 87.  Defendants now appear to have no current plan or funding for installing

16 surveillance cameras at RJD or any other prison in CDCR.  Grunfeld Decl., ¶ 29.

17       In his report, finalized on June 1, 2020, Mr. Schwartz wrote:

18    [O]ur country is in the midst of a national crisis brought on by the death of
      George Floyd at the hands of police officers.  I am struck by the similarities

19    between that awful case and what is unfolding in CDCR; multiple allegations
      of staff misconduct against the responsible officer and an utter failure to hold

20    staff accountable before it is too late.  There is one stark difference in the
      George Floyd case—the nation is outraged by the conduct because a video of

21    the misconduct exists.  Unfortunately, we do not have video of alleged
      misconduct at RJD, or throughout CDCR, and that is a travesty.

22

23 Schwartz Decl., ¶ 22.  Defendants' recent decision not to install additional cameras at any

24 of its prisons ensures the travesty identified by Mr. Schwartz will continue.  And while the

25 COVID-19 pandemic has placed burdens on California's budget, so too have the wanton

26 and unjustified attacks on incarcerated people with disabilities.  In many of the

27 declarations filed with this Motion and the RJD Motion, a person with a disability had to

28 be transported to a hospital for expensive treatment.  By serving as a deterrent to

[3549914.6]

1    misconduct, cameras will reduce these costs and untold human suffering.[24]

2                                   **ARGUMENT**

3    **I.    DEFENDANTS ARE VIOLATING THE ADA, RA, AND ORDERS OF THIS
       COURT BY ALLOWING SYSTEMIC ABUSE AIMED AT *ARMSTRONG***
4    **CLASS MEMBERS**

5         Officers at many CDCR prisons are assaulting, abusing, retaliating against, and

6    otherwise terrorizing people with disabilities because they have disabilities.  This conduct

7    violates the ADA, the RA, and prior orders of this Court.

8         Title II of the ADA provides that "no qualified individual with a disability shall, by

9    reason of such disability, be excluded from participation in or be denied the benefits of the

10   services, programs, or activities of a public entity, or be subjected to discrimination by any

11   such entity."  42 U.S.C. § 12132; *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir.

12   2001).[25]  In 2007, the Court ordered Defendants to comply with this provision.  *See*

13   Grunfeld RJD Decl., Ex. B ("2007 Injunction"), at 9; Grunfeld RJD Decl., Ex. A (ARP),

14   § I (copying language from 42 U.S.C. § 12132).  The ADA also prohibits any individuals,

15   including public entities, from retaliating against people who exercise their rights under

16   Title II.  *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual

17   because such individual has opposed any act or practice made unlawful by this chapter or

18   because such individual made a charge, testified, assisted, or participated in any manner in

19   an investigation, proceeding, or hearing under this chapter.").

20        The evidence is overwhelming that CDCR is allowing officers to attack and

21   retaliate against people with disabilities by reason of their disabilities or for exercising

22   their rights under the ADA.  *See* Factual and Procedural Background, § II, *supra*; RJD

23

---

24   [24] In the 2019-2020 budget, the OIG was provided with new authority to conduct its own
       investigations, audits, and reviews of CDCR policies and procedures.  *See* Grunfeld Decl.,
25   Ex. T, at 10.  In the May Revise for the 2020-2021 budget, however, the Governor
       removed all funding for that purpose, making it "unlikely that the OIG will be able to
26   make use of its new authority" and eliminating one much-needed means of oversight of
       CDCR.  *Id.*
27   [25] "The [ADA and Rehabilitation Act] provide identical remedies, procedures and rights."
       *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018) (internal quotation
28   marks omitted); *Armstrong v. Wilson*, 942 F. Supp. 1252, 1258 (N.D. Cal. 1996).

[3549914.6]

1   Mot. at 4-18.  It is difficult to conceive of conduct that more squarely violates the statute

2   than assaulting a person for requesting a disability accommodation, for complaining about

3   an officer's failure to provide an accommodation, or for being unable, because of

4   disability, to hear an officer's order.

5          Furthermore, the unnecessary and excessive force used by officers against people

6   with disabilities violates the ADA.  Law enforcement officers violate the ADA if, in the

7   course of an arrest, they "caus[e] the person [with a disability] to suffer greater injury or

8   indignity in that process than other arrestees."  *See Sheehan v. City and County of San*

9   *Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) (holding police officers who shot a person

10  in mental health crisis who was threatening to harm herself and others violated the ADA

11  by failing to use de-escalation techniques to avoid use of force), *rev'd in part on other*

12  *grounds*, 575 U.S. 600 (2015); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036-38 (9th

13  Cir. 2018) (same).  The same principle applies here.  When officers have used force to

14  unnecessarily throw people out of wheelchairs and walkers or have intentionally closed

15  cell doors on people with disabilities who move slowly, the people with disabilities suffer

16  "greater injury or indignity" than people without disabilities.

17  **II.    THE ENVIRONMENT AT MANY CDCR PRISONS—WHERE**
       ***ARMSTRONG* CLASS MEMBERS ARE TOO AFRAID OF STAFF TO**
18     **REQUEST ACCOMMODATIONS FOR THEIR DISABILITIES—**
       **VIOLATES THE ADA, RA, AND PRIOR ORDERS OF THIS COURT**
19

20         The pervasive violence at many CDCR prisons has made *Armstrong* class members

21  too afraid to exercise their right to request and receive reasonable accommodations needed

22  to participate in CDCR programs, services, and activities.  "Title II and § 504 include an

23  affirmative obligation for public entities to make benefits, services, and programs

24  accessible to people with disabilities." *Updike v. Multnomah Cty.*, 870 F.3d 939, 949 (9th

25  Cir. 2017).  The ADA's implementing regulations require that "[a] public entity shall make

26  reasonable modifications in policies, practices, or procedures when the modifications are

27  necessary to avoid discrimination on the basis of disability, unless the public entity can

28  demonstrate that making the modifications would fundamentally alter the nature of the

[3549914.6]

1  service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i). The Court has ordered CDCR

2  to abide by this requirement. *See* Grunfeld RJD Decl., Ex. B, at 9; *id.* Ex. A, § II.F ("The

3  Department shall provide reasonable accommodations or modifications for known physical

4  or mental disabilities of qualified inmates/parolees.").

5      Title II's accommodation mandate is generally triggered once a person with a

6  disability requests an accommodation. *See Kiman v. New Hampshire Dep't of Corr.*, 451

7  F.3d 274, 283 (1st Cir. 2006). As such, the ADA's implementing regulations recognize

8  the importance of a process for requesting accommodations, mandating that all public

9  entities "adopt and publish a grievance procedure providing for prompt and equitable

10  resolution" of requests for accommodation. 28 C.F.R. § 35.107(b). The Court has ordered

11  CDCR to provide a special grievance process for incarcerated people to request

12  accommodations. *See* Grunfeld RJD Decl., Ex. B, at 9; *id.* Ex. A, § IV.I.23 (setting forth

13  procedures for people with disabilities to "request an accommodation").

14      The ADA also includes a broad anti-interference provision, which makes it

15      unlawful to coerce, intimidate, threaten, or interfere with any individual in
       the exercise or enjoyment of, or on account of his or her having exercised or
16      enjoyed, or on account of his or her having aided or encouraged any other
       individual in the exercise or enjoyment of, any right granted or protected by
17      [Chapter 126, which includes Title II].

18  42 U.S.C. § 12203(b). This provision prohibits not only retaliation against people who

19  expressly exercise their rights under the ADA, but also conduct that has a chilling effect on

20  others' exercise of their ADA rights. *See Brown v. City of Tucson*, 336 F.3d 1181, 1190-

21  92 (9th Cir. 2003) (noting broad sweep of ADA's anti-interference provision); *EEOC v.*

22  *Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 206 (D. Conn. 2017) (disclosing name

23  of employee who filed an ADA complaint to other employees would violate anti-

24  interference provision because such disclosure "could have the effect of interfering with or

25  intimidating the [other employees] with respect to communicating with the EEOC about

26  possible disability discrimination"); *Purcell v. Pennsylvania Dep't of Corr.*, No. CIV. A.

27  95-6720, 1998 WL 10236, at *4, 9-10 (E.D. Pa. Jan. 9, 1998) (plaintiff-prisoner

28  established triable issue of fact for purposes of ADA interference claim premised, in part,

19                                                    Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

1    on evidence that prison superintendent sent "derogatory letters" relating to his disabilities).

2         As reflected in declaration after declaration, people with disabilities are so terrified

3    of becoming the next victim of staff misconduct that they refrain from requesting

4    accommodations they require to participate in CDCR programs, services, and activities or

5    from complaining when staff fail to provide accommodations.  *See* Factual and Procedural

6    Background, § II, *supra*; RJD Mot. at 18-20.  Defendants, by tolerating such an

7    environment, violate 42 U.S.C. § 12203(b), 28 C.F.R. § 35.130(b)(7)(i), 28 C.F.R.

8    § 35.107(b), and the Court's 2007 Injunction.  Put simply, Defendants cannot satisfy their

9    obligations to people with disabilities, including the court-ordered requirement for a

10   disability-specific grievance procedure, so long as a climate of fear prevents people from

11   asking for accommodations in the first place.

12   **III.    DEFENDANTS ARE IN VIOLATION OF THIS COURT'S ORDERS
         REGARDING ACCOUNTABILITY**

13

14        To help Defendants create a durable remedy in this case, the Court has required

15   Defendants to log and investigate allegations of non-compliance with the ADA, RA, ARP,

16   and orders of the Court.  *See* Grunfeld RJD Decl., ¶¶ 3-9 & Exs. B-D ("Accountability

17   Orders").  Pursuant to the 2007 Injunction, Defendants must "track the record of each

18   institution and the conduct of individual staff members" who were non-compliant and

19   "refer individuals with repeated instances of noncompliance to the [OIA] for investigation

20   and discipline, if appropriate."  *Id.*, Ex. B, at 7.  An important purpose of the accountability

21   process was to ensure that CDCR develop "effective internal oversight and accountability

22   procedures to ensure that Defendants learned what was taking place in their facilities, in

23   order to find violations, rectify them and prevent them from recurring in the future, without

24   involvement by Plaintiffs' counsel or the Court."  *Id.*, Ex. C, at 10.  In 2012, the Court

25   found that Defendants were not complying with the accountability process and modified it

26   to mandate that Defendants timely investigate allegations of non-compliance and provide

27   Plaintiffs with the documents underlying the investigation.  *Id.* at 10-12, 18.  The Court

28   ordered Defendants to log and initiate investigations within ten days of receipt of all

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

1    allegations of non-compliance.  *Id.*, Ex. D, at 1-2.

2         Defendants have failed to log and investigate many allegations of ADA non-

3    compliance related to staff misconduct at RJD and LAC.  *See* Freedman RJD Decl., ¶ 280;

4    Grunfeld Decl., ¶ 39; Nolan Decl., ¶ 8; Freedman Decl., Ex. 75-76.  Defendants have also

5    failed to log all allegations within ten business days of receipt.  Freedman RJD Decl.,

6    ¶ 281.  Accordingly, Defendants are violating the careful accountability protections put in

7    place by this Court.  Grunfeld RJD Decl., Ex. D, at 1-2.

8         Defendants' compliance with their accountability obligations would not, standing

9    alone, have solved the problems at RJD, LAC, or other prisons.  Nevertheless, had

10   Defendants complied, they would have possessed a complete record of searchable

11   allegations by officer and allegation type.  Grunfeld RJD Decl., Ex. C, at 20-21.  A

12   complete accountability log would also have made it possible for CDCR to impose

13   progressive discipline and to engage the OIA more thoroughly in the officer misconduct at

14   issue here, including through criminal referrals.

15        Furthermore, CDCR's inability to keep people with disabilities safe at many of its

16   prisons has rendered the Court's Accountability Orders futile and feckless.  For the

17   accountability remedies to work, Defendants must have mechanisms for self-monitoring

18   non-compliance.  If, however, *Armstrong* class members are too afraid to complain when

19   staff violate their rights, and if Defendants hide or ignore findings by their own staff, *see*

20   RJD Mot. at 23-24; Freedman RJD Decl., ¶ 282, CDCR has lost a central means for

21   discovering, logging, investigating, and remedying non-compliance, including through

22   imposing discipline on officers.

23   **IV.   THE SYSTEMIC ADA VIOLATIONS REQUIRE SIGNIFICANT CHANGES
           TO CDCR OPERATIONS**

24

25        To remedy Defendants' violations of the 2007 Injunction, Accountability Orders,

26   ADA, and RA, the Court should require Defendants to develop, within forty-five days, a

27   plan to end assaults, abuse, and retaliation against class members.  This Court has the

28   inherent power to issue further remedial orders to effectuate its prior injunctions.  *See, e.g.*,

[3549914.6]

1  *Parsons v. Ryan*, 949. F. 3d 443, 454 (9th Cir. 2020) (recognizing court's inherent power

2  to effectuate prior order); *see also Brown v. Plata*, 563 U.S. 493, 542-43 (2011) (holding

3  that a court exercising equitable powers has the "duty and responsibility to assess the

4  efficacy and consequences" of prior orders and "to make further amendments … as

5  warranted by the exercise of its sound discretion").  This Court also has the power to issue

6  additional injunctive relief under Federal Rule of Civil Procedure 65.  *See Arizona Dream*

7  *Act Coalition v. Brewer*, 855 F.3d 957, 977 (9th Cir. 2017).

8       A strong remedial order is especially warranted and well within the Court's power,

9  because CDCR's actions not only violate the ADA and prior Court orders, but also the

10  Eighth and Fourteenth Amendments to the United States Constitution.  Officers'

11  harassment, retaliation, and use of violence against incarcerated people, along with prison

12  officials' willful lack of responsiveness in the face of systemic abuse of class members,

13  demonstrate CDCR staff members' malicious and sadistic, let alone deliberately

14  indifferent, attitude toward incarcerated people.  *See Farmer v. Brennan*, 511 U.S. 825,

15  833 (1994); *Hudson v. McMillian*, 503 U.S. 1, 5-6 (1992); *Chess v. Dovey*, 790 F.3d 961,

16  972-73 (9th Cir. 2015); *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985).[26]

17  CDCR's actions and inactions also have directly impeded class members' basic Fourteenth

18  Amendment Due Process rights, including, for example, their abilities to have fair hearings

19  regarding their RVRs.  *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)

20  (requiring adequate notice of and opportunity to present a meaningful defense in

21  disciplinary proceedings); *Armstrong v. Davis*, 275 F.3d 849, 865 (9th Cir. 2001); *Ashker*

22  *v. Newsom*, No. 09-CV-05796-CW (RMI), 2019 WL 330461, *13 (N.D. Cal. Jan. 25,

23  2019) (knowing reliance on fabricated evidence in prison disciplinary hearing violates due

24  process).  RVRs that are false or that incarcerated people are too afraid to challenge will

25  lengthen prison sentences and undermine class members' ability to obtain their release

26

27  [26] Regardless of the standard the Court applies to evaluate Defendants' subjective state of mind—deliberate indifference, *see Farmer*, 511 U.S. at 834, or malicious and sadistic, *see*

28  *Hudson*, 503 U.S. at 5-6—the evidence amply supports finding an Eighth Amendment violation.

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

1   through the Board of Parole Hearings.

2        Given the scope of the horrific violations of class members' rights, Defendants'

3   plan must be comprehensive.  As described in greater detail in Plaintiffs' Proposed Order,

4   Defendants' plan should include, at a minimum, the following elements:

5        **Cameras** – Within 90 days, CDCR should install and make operational fixed

6   surveillance cameras with coverage of all areas to which incarcerated people have access

7   at RJD, LAC, CCI, CIW, KVSP, COR, SVSP, and SATF ("the prisons").  Within 180

8   days, CDCR should purchase and begin using body-worn cameras for all correctional

9   officers at the prisons.  CDCR should adopt appropriate policies and procedures and then

10  conduct training regarding the use of camera footage.  *See* Schwartz Decl., ¶¶ 94-98; Vail

11  Decl., ¶¶ 83, 94-101.

12       **Reforms to Staff Complaint, Investigation, and Discipline Process** – CDCR

13  should develop a plan to reform its staff complaint, investigation, and discipline process to

14  ensure unbiased, comprehensive investigations into allegations made by *Armstrong* class

15  members, appropriate and consistent discipline, and, where warranted, criminal

16  investigations and referrals for prosecution ("Investigation and Discipline Plan").  CDCR's

17  plan must also ensure that officers accused of serious misconduct are reassigned so they

18  cannot further harm their victims.  *See* Schwartz Decl., ¶ 99-103, 106; Vail Decl., ¶ 49.

19       **Third-Party Expert Monitoring of Defendants Staff Investigation and**

20  **Discipline Plan** – The Court should appoint an expert pursuant to Federal Rule of

21  Evidence 706 to monitor Defendants' implementation of their Investigation and Discipline

22  Plan.  *See* Schwartz Decl., ¶ 103.

23       **Information Sharing** – CDCR should produce to Plaintiffs' counsel on a quarterly

24  basis all documents related to staff complaints in which the alleged victim is an *Armstrong*

25  class member.  CDCR should also provide Plaintiffs' counsel with monthly, written

26  updates regarding progress in implementing its plan to stop staff misconduct, including

27  data regarding staff complaints and use of force.  *See* Schwartz Decl., ¶ 103.

28       **Data Collection and Early Warning System** – CDCR should immediately

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]

1  develop an effective, electronic system to track all incidents so that it can identify non-

2  compliance and proactively address staff misconduct and other problems.  *See* Schwartz

3  Decl., ¶ 104; Vail Decl., ¶¶ 114-118.

4       **Staffing** – CDCR should significantly increase supervisory staff on all watches on

5  all yards at the prisons and create non-uniformed supervisory positions in housing units to

6  improve relationships between officers and incarcerated people.  *See* Vail Decl., ¶ 103.

7       **Training** – CDCR should develop and implement Human Rights, de-escalation,

8  and cultural training for all custody, mental health staff, and medical staff to include

9  discussion of reporting requirements, whistleblowing, non-retaliation, and treatment of

10  incarcerated people as patients.  *See* Vail Decl., ¶¶ 111-113.

11       **Oversight** – CDCR headquarters should exercise additional oversight over all staff

12  complaints, use of force reviews, staff disciplinary proceedings, and RVRs at the prisons

13  and should conduct quarterly interviews of randomly-selected incarcerated people to

14  determine if the changes are working.  *See* Vail Decl., ¶ 89.

15       **Anti-Retaliation** – CDCR should put an end to retaliation against class members

16  and staff.  42 U.S.C. § 12203(a).

17       **Other Remedies** – CDCR should adopt a policy requiring that all pepper spray

18  canisters be weighed before and after use; review all RVRs issued in the last three years to

19  individuals who filed declarations in support of this Motion and the RJD Motion; monitor

20  the conduct and treatment of incarcerated people who file staff complaints to ensure staff

21  are not engaging in retaliation; issue a policy of requiring that staff collect the names of all

22  staff and incarcerated people witnesses to all uses of force; and issue a policy requiring

23  medical and mental health staff to document and  report suspicious injuries to incarcerated

24  people.  *See* Schwartz Decl., ¶ 105; Vail Decl., ¶¶ 68-72, 102, 117.

25       **Other Prisons** – CDCR must also explain why it should not install cameras and

26  undertake the remedies listed here at institutions other than the prisons.

27       **Suspension of State Law** – If any provisions of state law interfere with CDCR's

28  ability to enact remedies necessary to remedy the violations of the ADA, RA, ARP, and

Case No. C94 2307 CW

[3549914.6]

1   orders of this Court, CDCR should request a court order suspending those provisions.

2          If Defendants fail to develop an appropriate plan or to timely implement their plan,

3   *Armstrong* class members should have the option to request and receive transfer from the

4   prisons and CDCR should stop transferring *Armstrong* class member to the prisons.

5          These remedies are all consistent with the Prison Litigation Reform Act's

6   requirement that the Court's orders be narrowly drawn, extend no further than necessary to

7   correct the violation of a federal right, and be the least intrusive means necessary to correct

8   the violation.  *See* 18 U.S.C. § 3626(a)(1)(A).  Anything short of these remedies will not

9   put an end to Defendants' ongoing and pervasive violation of *Armstrong* class members'

10  rights.  Given CDCR's failure to adequately address the staff misconduct crisis, the

11  specificity of the remedies is appropriate.  *See Armstrong v. Brown*, 768 F.3d 975, 985-86

12  (9th Cir. 2014) ("[A] court may … provide specific instructions to the State without

13  running afoul of the PLRA," and has "considerable discretion in fashioning relief" where,

14  as here, the Court has supervised the litigation for a long time).

15                                    **CONCLUSION**

16          For the aforementioned reasons, Plaintiffs respectfully request that the Court grant

17  this Motion and issue the Proposed Order.

18

19  DATED:  June 3, 2020                    Respectfully submitted,

20                                          ROSEN BIEN GALVAN & GRUNFELD LLP

21                                          By:  */s/ Michael Freedman*
                                                 Michael Freedman
22

23                                          Attorneys for Plaintiffs

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND
RETALIATING AGAINST PEOPLE WITH DISABILITIES; MEM. OF P. & A.

[3549914.6]