1

1           IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF CALIFORNIA
2         BEFORE THE HONORABLE KIMBERLY J. MUELLER

3

4

5    RALPH COLEMAN, et al.,

6                   Plaintiffs,
     vs.                          Sacramento, California
7                                 No. 2:90-CV-00520
     GAVIN NEWSOM, et al.,        Friday, May 29, 2020
8                                 10:04 a.m.
                    Defendants.
9    _____/

10

11

12

13                        --oOo--

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            TELEPHONIC STATUS CONFERENCE

16                        --oOo--

17

18

19

20

21

22   Official Reporter:        Tiphanne G. Crowe
                               CSR No. 10958
23                             501 I Street
                               Sacramento, CA  95814
24                             Tcrowe.csr@gmail.com

25   *Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.*

1

APPEARANCES (Telephonic):

2

For the Plaintiffs:        **ROSEN BIEN GALVAN & GRUNFELD LLP**
3                          Attorneys at Law
                           BY: **MICHAEL BIEN**
4                              **CARA E. TRAPANI**
                               **LISA A. ELLS**
5                              **JESSICA L. WINTER**
                               **AMY XU**
6                          101 Mission Street, 6th Floor
                           San Francisco, CA  94105
7
                           **PRISON LAW OFFICE**
8                          Attorneys at Law
                           BY: **DONALD SPECTER**
9                              **STEVEN FAMA**
                           1917 Fifth Street
10                         Berkeley, CA  94710

11

For the Defendants:        **DEPARTMENT OF JUSTICE**
12                         **OFFICE OF THE ATTORNEY GENERAL**
                           Attorneys at Law
13                         BY:  **LUCAS L. HENNES**
                               **MONICA ANDERSON**
14                             **TYLER HEATH**
                           1300 I Street
15                         Sacramento, CA  95814

16                         **DEPARTMENT OF JUSTICE**
                           **OFFICE OF THE ATTORNEY GENERAL**
17                         Attorneys at Law
                           BY:  **KYLE LEWIS**
18                             **ELISE THORN**
                               **ADRIANO HRVATIN**
19                         455 Golden Gate Ave., Suite 11000
                           San Francisco, CA  94102
20
                           **ROBINS KAPLAN, LLP**
21                         Attorneys at Law
                           BY:  **ROMAN M. SILBERFELD**
22                         2049 Century Park East, Suite 3400
                           Los Angeles, CA  90067-3208
23

24                             --oOo--

25

1                          **APPEARANCES (Continued)**

2    ALSO PRESENT:             **Matthew Lopes,** Special Master
                               **Kerry Walsh,** Special Master Team
3                              **Mohamedu Jones,** Special Master Team
                               **Dr. Jeffrey Metzner,**
4                              Special Master Team
                               **Dr. Kerry Hughes,** Special Master Team
5                              **Henry Dlugacz,** Special Master Team

6                              **Diana Toche,** Undersecretary,
                               Health Services, CDCR
7
                               **Christine Cicotti**
8                              **Kristopher Kent**
                               **Antonina Raddatz**
9                              Attorneys at Law
                               Department of State Hospitals
10
                               **Dr. Joseph Bick,** Director,
11                             Health Services, CDCR
                               **Melissa Bentz**
12                             **Jennifer Neill,** Chief Counsel
                               **Nick Weber**
13                             Attorneys at Law
                               California Department of Corrections
14
                               **James Spurling,**
15                             General Chief Counsel OIG
                               **Gregg Adam,** Counsel for CCPOA
16                             **David Sanders,** Counsel for CCPOA

17                             **Haven Gracy,**
                               Law Clerk for Chief Judge Mueller
18

19                                  --oOo--

20   ///

21

22

23

24

25

4

1          SACRAMENTO, CALIFORNIA, FRIDAY, MAY 29, 2020, 10:04 A.M.

2                               --oOo--

3          THE CLERK:  The United States District Court for the

4    Eastern District of California is now in session.  Chief Judge

5    Kimberly J. Mueller now presiding.

6          Calling Civil Case 90-520, Coleman, et al., v. Newsom,

7    et al.  This is on for telephonic status conference.

8          THE COURT:  All right.  I'll call roll for the

9    Plaintiffs.  Mr. Bien.

10          MR. BIEN:  Present, your Honor.

11          THE COURT:  Miss Ells.

12          MS. ELLS:  Good morning, your Honor.

13          THE COURT:  Miss Winter.

14          MS. WINTER:  Yes, your Honor.  Good morning.

15          THE COURT:  Miss Trapani.

16          MS. TRAPANI:  Good morning, your Honor.

17          THE COURT:  We have a new association.  Assist me with

18    your last name.  Is it Miss -- is it Xu, (pronouncing)?

19          MS. XU:  It is Xu.  Good morning, your Honor.

20          THE COURT:  All right.  Good morning, Miss Xu.

21          Mr. Specter.

22          MR. SPECTER:  Present, thank you.

23          THE COURT:  Mr. Fama.

24          MR. FAMA:  Here, your Honor.

25          THE COURT:  All right.  For the Defendants,

1    Mr. Lewis.

2              MR. LEWIS:  Good morning, your Honor.

3              THE COURT:  Mr. Silberfeld.

4              MR. SILBERFELD:  Good morning, your Honor.

5              THE COURT:  Mr. Hrvatin.

6              MR. HRVATIN:  Present, your Honor.

7              THE COURT:  Miss Thorn.

8              MS. THORN:  Good morning, your Honor.

9              THE COURT:  Mr. Heath.

10             MR. HEATH:  Good morning, your Honor.

11             THE COURT:  Mr. Hennes.

12             MR. HENNES:  Present, your Honor.  Good morning.

13             THE COURT:  Miss Anderson.

14             MS. ANDERSON:  Good morning, your Honor.

15             THE COURT:  Good morning to all of you.  Also

16   monitoring the hearing, as I understand it, Undersecretary

17   Toche.

18             MS. TOCHE:  Good morning, your Honor.

19             THE COURT:  Assistant Secretary/Chief Counsel Miss

20   Neill.

21             MS. NEILL:  Yes, good morning.

22             THE COURT:  Dr. Bick.

23             MR. BICK:  Good morning.

24             THE COURT:  Miss Benz, Legal Affairs.

25             MS. BENTZ:  Good morning, your Honor.

1          THE COURT:  Mr. Weber, Legal Affairs.

2          MR. WEBER:  Good morning, your Honor.

3          THE COURT:  I understand Ms. Clendenin has been called

4     away.

5          Christine Ciccotti, DSH.

6          MS. CICCOTTI:  Good morning, your Honor.

7          THE COURT:  Christopher Kent, DSH.

8          MR. KENT:  Good morning, your Honor.

9          THE COURT:  Miss Raddatz, DSH counsel.

10          MS. RADDATZ:  Good morning.

11          THE COURT:  Mr. Spurling, OIG.

12          MR. SPURLING:  Present, your Honor.  Good morning.

13          THE COURT:  Mr. Adam, CCPOA.

14          MR. ADAM:  Good morning, your Honor.

15          THE COURT:  And Mr. Sanders, CCPOA.

16          MR. SANDERS:  Good morning, your Honor.

17          THE COURT:  The Special Master is appearing.  Special

18     Master Lopes, you are on the line.

19          SPECIAL MASTER LOPES:  I'm here, your Honor.

20          THE COURT:  Could you identify the members of your

21     team on this call, please.

22          SPECIAL MASTER LOPES:  Yes, your Honor.  Joining us

23     will be Mohamedu Jones, Kerry Walsh, Dr. Jeffrey Metzner, Dr.

24     Kerry Hughes and Henry Dlugacz.

25          THE COURT:  All right.  The Court's law clerk is

1    monitoring this hearing.

2           Okay.  So I did not publish an agenda for today.  Let

3    me tell you what I'd like to cover in these updates.  Let me

4    just find my notes.  Just so you know, we're holding this

5    status by telephonic conference, but I am hoping by the next

6    status to move to a Zoom proceeding.

7           I think it might be good for us to see each other

8    again, and we have that ability.  And so Miss Schultz will let

9    you know prior to the next status what the connection is for

10   that link for the persons appearing, and we have ground rules,

11   even when there are quite a few people appearing that will

12   facilitate that.

13          So I am today, as always, going to ask for an update

14   from the Special Master, and then each party will have an

15   opportunity to provide an update on the relevant events that

16   have transpired in the last two weeks.

17          I would like to discuss some issues with regard to the

18   maps.  The Court continues to see those as very helpful tools,

19   and I believe the ground is shifting under our feet once again,

20   and so the maps become particularly helpful tools in

21   understanding what is going on and the implications for the

22   Coleman class.

23          I am still considering the program guide issues, both

24   the parties' stipulation, and the Special Master's

25   recommendations regarding a process for annual updates.  I have

8

1     some brief comments on that to bring the parties up to date.

2              And then I would provide time at the end for any other

3     matters the parties wish to bring to the Court's attention.

4              So with that, Special Master Lopes, you have a report?

5              SPECIAL MASTER LOPES:  I do, your Honor.  Thank you

6     very much.  I'll start with an update on COVID-19 statistics.

7     As of March 27th, 2020, CDCR reported that 11,829 inmates have

8     been tested for COVID-19, of which 4,366, or 37 percent, were

9     Coleman class members.

10             Of the 1,190 inmates who tested positive, 500, or 42

11    percent were Coleman class members.  Of the 268 inmates whose

12    cases were resolved, 169 or 63 percent were Coleman class

13    members.

14             Of the nine individuals who passed away due to the

15    virus, five were members of the Coleman class.  As for the task

16    force and workgroup meetings, we had two task force meetings,

17    and seven workgroup meetings since the last status conference

18    on May 15th.

19             Task force met on May 19th and May 26th, and the

20    smaller workgroups met on May 18th, May 20th, 21st, 22nd, 25th,

21    the 27th, and the 28th.  The task force meetings included

22    Plaintiffs, Defendants, Coleman experts, and a representative

23    from the receiver's office, as well as an Armstrong

24    representative.

25             The workgroup meetings were attended by smaller

1   contingents from my team as well as from CDCR and DSH.  We

2   continue to have regularly scheduled task force and smaller

3   workgroup meetings each week.  The task force meetings, again,

4   are held on Tuesdays.

5       As I previously state to your Honor, the Coleman

6   experts remain in contact with CDCR and DSH officials regarding

7   transfers on almost a daily basis with additional meetings

8   as-needed.

9       I've also scheduled meetings with the Plaintiffs to

10  provide them with updates, because they are not a part of the

11  small workgroup meetings.  Three of the small workgroup

12  meetings were held specifically to address transfers to DSH,

13  and the other four workgroup meetings address more global

14  issues related to the provision and monitoring of mental health

15  treatment for Coleman class members during the pandemic.

16      The DSH small workgroup meetings address issues

17  relative to transfers, reviews of individual patients scheduled

18  for admission.

19      A process for the resolution of disputes regarding

20  transfers.  A revision to the transfer process to allow more

21  admissions to DSH facilities and how to treat personality

22  disorders.

23      The four additional workgroup meetings were held with

24  members from my team and CDCR representatives to discuss a

25  range of issues, including the ASU EOP hub certifications,

1   temporary mental health units, COVID-19 mental health dashboard

2   with the creation of the dashboard.

3          Increase in the EOP ad-seg population and extended

4   lengths of stay.  Milestone credits for patients in the TMHU

5   units.  Treatment of inmates with personality disorders and

6   using crisis beds at CIM and CIW to house COVID-positive

7   medical patients.

8          Task force activities that are still in progress

9   include CDCR, as identified.  High-risk inmates at CIM who have

10  tested negative for coronavirus and plan to move these inmates

11  to institutions with less risk of COVID-19 exposure.

12         A small workgroup has been convened to focus on

13  treatment for patients with personality disorders who may not

14  be appropriate for DSH.  The proposal to modify the

15  court-approved certification process for the EOP ASU hubs, due

16  to the pandemic, was proposed by CDCR, but I still have

17  concerns about the underlying certification process itself.

18         Our data expert, Dr. Potter, will be examining this

19  issue in the weeks to come.  CDCR implemented a process that

20  directs the institutions to use telehealth for psychologists

21  and social workers, who because of COVID-19 risk factors, do

22  not work on site.

23         A COVID mental health dashboard is in the initial

24  phase of development by CDCR that will track the performance of

25  mental health programs operating -- operating under the

1  temporary COVID guidelines.

2        As for DSH, transfers from CDCR to DSH continue to

3  occur.  It was reported that as of May 27th, 23 patients had

4  transferred to DSH since admissions resumed, and six were

5  scheduled for transferring next week.

6        Data provided by DSH at the task force meeting

7  indicated that as of May 22nd there were 27 vacant beds at ASH,

8  five vacant beds at Coalinga, and 18 vacant beds at Patton.

9        The Defendants continue to provide specific data

10  regarding referrals, transfers, rejections, and discharges of

11  Coleman patients from DSH in advance of each task force

12  meeting.

13        As for case activity, I wanted to report, your Honor,

14  that later today I will file the Labor Economist report.  Other

15  updates would include that Dr. Potter, again, the Court's data

16  expert, is continuing to meet with representatives from CDCR

17  and the receiver's office to begin the process of validating

18  data regarding the provision of mental health treatment.

19        I -- since the last meeting I attended a second

20  meeting with Secretary Diaz and Mr. Kelso on May 20th to

21  discuss the reopening of reception centers to admissions from

22  the counties.  Secretary Diaz, at that time, announced that the

23  first two reception centers to reopen to county admissions

24  would be Wasco State Prison, and North Kern State Prison --

25  Prison, excuse me.  Each reception center was scheduled to

1  receive 100 inmates per month initially.

2         We have held a second meeting with the DSH defendants

3  to further discuss their staffing plan, which will be presented

4  to the Plaintiffs in the upcoming weeks.

5         Finally, your Honor, two Coleman experts, and one

6  monitored, attended on-site tours of California State Prison at

7  Sacramento, California Medical Facility, and the California

8  Health Care Facility on Wednesday and Thursday of this week to

9  observe how facilities were complying with physical distancing

10  and hygiene protocols, and to observe the general movement of

11  the inmates.

12         I will share a full report with the parties at the

13  next task force meeting, at which time I will also show them

14  photographs taken during the visits.

15         That is my report, your Honor.

16         THE COURT:   All right.  Thank you, Special Master

17  Lopes.  Just to follow up on two matters.  The statistics that

18  you shared at the beginning, the Court's understanding is that

19  at this point you are being provided with real-time information

20  on the Coleman class statistics; is that correct?

21         SPECIAL MASTER LOPES:  Yes, it is.

22         THE COURT:  All right.  So that -- the Court is glad

23  to hear that.  In the past, the Court has had to ask, and the

24  Special Master as well, what the breakdown is by Coleman class.

25         So it is important for us to understand

1    Coleman-class-only data in real time.  In terms of the tours

2    you just mentioned, the Court is aware of those tours that

3    members of your team conducted earlier this week looking at

4    Coleman class housing.

5            Those are not part of any formal monitoring round.

6    They will not be subject to formal reporting, but the Court

7    approves your sharing of the observations your team made in

8    each instance, and I thank those teams for conducting those

9    visits.

10           I know that other visits are also occurring that the

11   Court particularly appreciates.  The Special Master's team is

12   following through on the Court's observation that this is a

13   time to be aware of what's actually happening in the prison

14   facilities.

15           With that, let me ask, do the Plaintiffs have any

16   brief report since our last status conference?  Mr. Bien.

17           MR. BIEN:  Yes, your Honor.  I'd just like to correct,

18   or give more information about some issues that Special Master

19   Lopes reported on.

20           We have looked more deeply at the people who have died

21   at CIM, their records, and there's a sixth person, who, though

22   he was not a Coleman class member at the time of his death, was

23   a Coleman class member within a year or so of his death.

24           And I also wanted to mention that with the opening of

25   reception, CDCR has begun movements of prisoners who had been

1    in reception when movements were frozen -- beginning of the

2    crisis -- out to regular prisons.

3            With movements restored, we have been pressuring CDCR

4    to also move Coleman class members who are in segregation and

5    ready to get out, and who need higher levels of care within

6    CDCR going to MATBs, EOP programs, and PIP programs to move.

7            We've been assured that they will be moved, but we

8    have not seen them as a high priority move.  They seem to be

9    towards the back of the line, rather than the front of the

10   line, and we wanted to report that to the Court.

11           The -- there's also been a tour, virtual tour, that

12   happened last Friday with members of PLO, and my office as a

13   test of the CIM facility to look at the housing dorms.

14           It did not work so well in terms of the technology.

15   There were areas where there was no WiFi coverage, but it was

16   important that through that tour, it was evident that the dorms

17   did not meet the standards that the receivers are six feet in

18   all directions of the beds, and as a result of CDCR's and the

19   receiver's office are taking additional measures, we

20   understand, to at least try to achieve that spacing in the

21   dorms.

22           There's also increased monitoring by the receiver's

23   office that's going to be happening and about compliance with

24   social distancing, masks, cleaning, other -- other issues, and

25   those reports will be forthcoming.

1          Those are the issues I wanted to bring to the Court's

2     attention at this time.

3          THE COURT:  All right.  Thank you.  Mr. Lewis, and

4     perhaps you can respond to Mr. Bien's implicit question about

5     the status of the moves of those that have been identified as

6     vulnerable and qualifying for moves.

7          MR. LEWIS:  Yes.  Good morning, your Honor, Kyle

8     Lewis.  Your Honor, at the outset I would note that the Special

9     Master's report demonstrates just how much and how often CDCR

10    is meeting with the various stakeholders and providing

11    information, and thank you, your Honor, for recognizing the

12    statistics that have been provided.

13         CDCR is striving to provide all of the information it

14    can to both Plaintiffs and the Special Master to demonstrate

15    how serious it takes its need of the mental health

16    population -- or the need of the mental health population and

17    to provide care to them.

18         Transfers have commenced.  They are moving.  There are

19    groups that are scheduled that are moving right now, and there

20    are moves scheduled for next week.

21         Dr. Bick is on the line and when I -- with your

22    Honor's permission, I will provide him, or ask him to provide

23    more detailed numbers.  As your Honor noted, statistics are

24    important, and there are very real numbers within those

25    statistics that demonstrate just how seriously we take the

1    needs to move mental health population.

2          Mental health is not at the back of the line.  The

3    system is restarting movements.  We're at large across the

4    entire system.  Mental health is a serious and large part of

5    that, and those movements are happening.

6          As you have seen with the DSH transfers, there's

7    already 23 admitted, and six more coming next week.  No one has

8    taken longer than 30 days to transfer to DSH, even with the

9    screening.

10          DSH and CDCR are demonstrating full transparency

11    regarding these moves in terms of when they are received, and

12    how they move through the referral process.  They issue

13    progress reports and weekly reports on these issues, and the

14    Special Master has been very involved, and we value his input

15    with clinicians where they have reached agreement amongst -- at

16    least the clinicians from DSH, Special Master's team and CDCR

17    regarding who should be moved and under what guideline.

18          In fact, those guidelines regarding DSH transfers are

19    still being revised and a new set will be coming out likely

20    shortly.

21          Groups are restarting within the institution, and

22    holistically, the mental health program is looking at the best

23    way they can provide services to its population within the

24    COVID environment, and if -- with your permission -- I would

25    like to invite Dr. Bick to provide some further information,

1    statistics about the numbers of people that have been

2    identified to move, and of those, how many are Coleman class

3    members and the like with your Honor's permission.

4            THE COURT:  That's fine.  And ultimately whether it's

5    Dr. Bick or you, Mr. Lewis, some nutshell summary of how the

6    moves take account of Coleman programming to which those being

7    moved are entitled.  Some --

8            MR. LEWIS:  Yes, your Honor.

9            THE COURT:  -- just to give me a sense of the

10   strategic vision for taking account of that.  But Dr. Bick you

11   may proceed at this time.

12           DR. BICK:  Good morning, your Honor.  So -- excuse

13   me -- last week working with the receiver staff and with

14   D.A.I.,  we completed a COVID screening and testing matrix to

15   guide patient movement both within CDCR, and back and forth

16   from outside facilities including community hospitals and the

17   Department of State Hospital.

18           We identified 22 different types of movement, and for

19   each one there's a specific COVID testing strategy and

20   guidelines for housing, and also guidelines for what to do if

21   the patient declines the COVID testing.

22           So as I said, this was distributed to the field last

23   Friday, and movement has been initiated, according to that

24   guideline document, the matrix for movement.

25           In terms of how we were prioritizing patients from a

1   Coleman perspective, we made it clear that we wanted to move

2   those patients who were in restricted housing, and so they are

3   at the top of the list to the extent that we can move them.

4          Mr. Lewis said that there's movement this week and

5   next, patients out of restricted housing.  This week a total of

6   477 patients around the state are moving, and of those 107 are

7   CCCMS, and 20 are EOP.

8          For this coming week, 334 patients are scheduled to be

9   transferred out of restricted housing, and that includes 108

10  CCC patients, and 61 EOP.

11         The other criteria that's at the top of our priority

12  is getting patients out of the temporary mental health units,

13  and we've given clear direction to folks in headquarters and

14  mental health, and also to HCPOP, that our intent is to have

15  all patients out of TMHU's by June 15th.

16         And if there are any patients who were not able to

17  move by that time, then we have a clear plan for when they will

18  be out of there.  Our goal is to get all patients into an

19  appropriate treatment space within the next couple of weeks.

20         So I would say that we are prioritizing the movement

21  of the Coleman class members.

22         THE COURT:  All right.  Does that mean that the TMHU's

23  will be closed as of June 15th if the current schedule holds?

24         THE WITNESS:  That's my target date.  That's the clear

25  message I've provided to staff and mental health, and if we do

1    not achieve that, it won't be for lack of trying.

2            There are some factors that are involved in terms of

3    which facilities are closed to movement in and out, and that is

4    in flux currently.  There are six facilities that are closed

5    that can change at any given time, but that is our goal.

6            THE COURT:  All right, thank you.  On the matrix, I

7    did review the matrix.  I appreciate receiving a copy of that.

8    Two follow-up questions for Dr. Bick, and then back to

9    Mr. Lewis on the strategic vision questions.

10           I gather -- I mean, I've heard you say -- and I've

11   seen it in writing -- inmates have the right to decline

12   testing.  So is it ultimately up to an inmate in every instance

13   whether or not that inmate is tested, Dr. Bick?

14           DR. BICK:  For -- it depends on the -- on the

15   condition that we're talking about.  But in general, we do not

16   force testing for most conditions.  We come up with an

17   alternate strategy to protect the safety of that patient and

18   others who may be exposed.

19           So if we're talking specifically about COVID, there

20   are no situations in which we would force test them.

21   Appropriate movement would continue, and we would just utilize

22   the necessary personal protective equipment, and then either

23   isolation or quarantine as appropriate.

24           THE COURT:  All right.  So taking that answer, in

25   combination with the other information that's been provided to

1    the Court, in the past we've talked about best practices with

2    respect to management of COVID in congregate living facilities.

3            And I recall your saying you do consider the prisons

4    congregate living facilities.  I'm not seeing anything that --

5    that looks like a strategic focus on a testing plan for a

6    congregate living facility in terms of getting some baseline

7    information before effecting the moves, including of Coleman

8    class members.  Do I have that right?

9            DR. BICK:  What I would say to that is the receiver

10   staff working closely with -- with us at CDCR have developed a

11   plan that involves increased testing across all institutions.

12           There are numerous criteria -- or numerous types of

13   testing being done.  Obviously testing in those who are

14   symptomatic with COVID-like symptoms.  Those who have been in

15   contact with them.

16           In outbreak facilities more widespread testing to

17   include, in some cases, the entire institution as was done at

18   CIM, and then on top of that, random surveillance testing that

19   is being done at every facility across the state, which is

20   providing with a good deal of certainty a -- an estimation of

21   the likelihood of undiagnosed cases at each facility.

22           Adding on to that, every patient who is transferring

23   now, or the overwhelming majority of them, except those that

24   decline, are also being tested.  So on a weekly basis we'll be

25   doing an additional 1,500, or so, tests of patients who are

1    moving in and out of these 22 categories of movement.

2              Those will all provide additional information as to

3    the prevalence of COVID within our institutions.

4              THE COURT:  All right.  Thank you.  That clarifies

5    what I've reviewed.  So the proactive measures are -- the

6    proactive approach is the sampling, the random sampling, right?

7              DR. BICK:  That's correct.  The surveillance

8    sampling.

9              THE COURT:  All right.  Mr. Lewis, do you have

10   anything to tell the Court on the vision, the goals for

11   ensuring -- not to use it in the way that the Defendants have

12   always used the term -- but continuity of care for Coleman

13   class members following transfer?

14             MR. LEWIS:  Your Honor, the only thing I would add is

15   that -- as you are hearing from Dr. Bick -- there's a genuine

16   desire to make sure that the care is continuing, and Dr. Bick,

17   as he's told you, has a plan or has an idea about how he wants

18   to stop TMHU's, get inmates into their appropriate physical

19   treatment space, and continue to care there.

20             So I have nothing to add other than I think you are

21   hearing from the people and the clinicians and the Special

22   Master's hearing from the clinicians within the task force,

23   that there is a strong desire from the actual operators to make

24   sure that they meet the needs of the patient class.

25             THE COURT:  All right.  Mr. Lewis, can I have your

1    commitment that the Special Master will receive ongoing

2    real-time information on transfers?  The information shared

3    here today was very helpful.  Can I be assured the Special

4    Master is getting that real time in between these statuses?

5              MR. LEWIS:  Yes, your Honor.  I think we've actually

6    talked about this.  To make sure that at the beginning of every

7    weekly task force that we provide the most up-to-date data, and

8    will continue to do so.

9              THE COURT:  All right.  And the Court would appreciate

10   being updated at each status to the extent transfers remain an

11   issue once again.

12             All right.  Let's talk a bit more about transfers,

13   particularly as it affects the maps.  I'm going to approve, of

14   course, filing the maps themselves under seal, just a

15   housekeeping matter.

16             There's a general mental health services delivery map,

17   and a two-page letter from Miss Bentz, and am I correct that

18   those documents can be filed on the public record?  It's the

19   detailed maps themselves that would go under seal.

20             Mr. Lewis.

21             MR. LEWIS:  Yes, your Honor.  I believe it is the

22   detailed facility maps that are the most -- is the issue that

23   should be protected.  The cover letter, I believe, is

24   acceptable, as is the statewide map, and if I get any different

25   guidance, I will make sure to let the Court know as soon as

1    possible.  But right now, I believe, it is just the facility

2    sub-maps -- we'll call them -- are the ones that are subject to

3    in-camera protection.

4              THE COURT:  All right.  Very good.  So I'll resolve

5    that probably later today.  In terms of additional information,

6    at this point I'm gathering that there's general agreement that

7    those maps can be updated at least monthly.  I realize there's

8    going to be a lot of movement in the next month.

9              As a general rule, as long as the Special Master is

10   getting real-time information, at this point monthly updates

11   could be sufficient.  Is there any reason not to identify that

12   the temporary mental health units --

13             MR. LEWIS:  Your Honor --

14             THE COURT:  -- as taken offline, or on the maps --

15   someone is typing.  Whoever is typing can be certain they are

16   muted.  At least I think that's what I heard.

17             So Mr. Lewis, any reason not to identify on the maps

18   the team locations that have been taken offline by the time of

19   the next map update?

20             MR. LEWIS:  Your Honor, actually you raise a very good

21   point.  Some of the TMHUs and the need to report them, may not

22   exist, because they may not exist at that time, when we do the

23   updates to the maps in a few weeks.

24             So this is one of the issues that I think we're trying

25   to work through with the Special Master, because the teams will

1       hopefully be disappearing, and they wouldn't be on the maps at

2       all.  So that's --

3                   THE COURT:  So what -- what -- do the Defendants

4       plan a redesignation of those spaces, or would they just show

5       as unused space?

6                   MR. LEWIS:  They may be -- they may turn back into

7       what they were in the past, whether it be -- as your Honor

8       pointed out -- unused space, or other housing spaces for other

9       types of treatment areas or stuff like that, but they would not

10      be noted as TMHUs on the maps going forward.

11                  THE COURT:  Speaking of unused space, I'm aware that

12      there's talk about the possibility of identifying unused space

13      within institutions to allow transfers within institutions.

14                  I don't see on the maps that unused space is

15      identified.  Can I ask that the next map update identify

16      clearly, quote, unquote, unused space.  Mr. Lewis.

17                  MR. LEWIS:  Your Honor, my one concern with that would

18      be that's a very, very broad term, because unused space could

19      mean a gymnasium, you know, large storage area.  Things like

20      that.

21                  So I would be hesitant to be laying out that -- that

22      also could be quite -- to do that for every single facility

23      where there are mental health service delivery patients, that

24      could be quite an onerous task to take that on.

25                  And also, that would be subject to very -- at what

1    point in time is the unused space there.  It could switch

2    literally after the map is produced.  So I would be a little

3    hesitant -- perhaps we could talk that out with the Special

4    Master, and try and figure out where -- what the way to do that

5    would be.  It would be a very difficult task, across all of the

6    facilities, to mark unused space, particularly given the --

7    the -- the fuzziness of that definition.

8              THE COURT:  Is there a subset of unused space that

9    Defendants have identified as amenable to transfers within an

10   institution, and could that subset be identified?

11             MR. LEWIS:  Your Honor, I'm not -- I'm not readily

12   aware of whether or not that identification process has gone on

13   yet.  I can speak with my clients about it and report back to

14   the Court, and maybe through the Special Master, with our

15   process that we have, to talk about the maps.  We can work on

16   that.  But at this time, I'm sorry, I don't have this

17   information.

18             THE COURT:  All right.  Well, those are -- the Court's

19   questions are:  Can the maps be updated to include

20   identification of TMHU space that has been taken offline with

21   some indication of how it's being redesignated, and can unused

22   space deemed available by CDCR for transfer of inmates

23   internally also be identified as such?

24             Let me just ask Mr. Bien or whoever is the person on

25   his team to address the question regarding the TMHUs, because I

1    know this is an issue we touched on at the last status.  The

2    Court had received a letter from the Plaintiffs.  Is there an

3    update on the Plaintiffs' position in light of what you've

4    heard today or otherwise know?

5              Mr. Bien, or Miss Ells.

6              MR. BIEN:  I think -- is it -- Jessica Winter is going

7    to address this.

8              THE COURT:  Miss Winter.

9              THE WITNESS:  Yes, your Honor.  So we have talked with

10   Defendants a lot about the maps and charts, and we have seen

11   the version that you have seen, which Defendants provided on

12   May 15th.  We have not seen a version that identifies the TMHUs

13   on the maps as of yet.

14             So we don't really know what it would like then to

15   designate what has been taken offline.  There's no real

16   comparison at this point.  Although Defendants have agreed that

17   they are willing to identify the TMHUs on the map, we just

18   haven't seen that yet.  Although, we anticipate we were told

19   that we would see that information.

20             And I think -- although you didn't specifically ask

21   for this, all of Plaintiffs' requests about what we think

22   should be added to maps and charts, including, for example,

23   maps versus non-maps TMHUs, Defendants have agreed to put in

24   their reporting in the charts and maps in one form or another,

25   except that we have not seen -- or Defendants have not been

1  able to confirm that they can provide information as to the

2  numbers of class members who are being treated outside their

3  level of care, and their location.

4       And that would include not only people being treated

5  in TMHUs, but also people being treated in place.  Also EOPs,

6  for example, who cannot transfer -- due to the transfer

7  restrictions cannot be moved to the appropriate setting or --

8       THE COURT:  All right.  Understood.  Do you agree with

9  Mr. Lewis that there is more work that can be done on refining

10  the maps to address the TMHU, including the TMHU maps

11  identification, as well as the Court's interest in seeing the

12  unused space identified?

13       Do you agree that that can -- that that could still be

14  worked out given the discussions that have already occurred,

15  Miss Winters?

16       THE WITNESS:  Yes, I do think so.  We just haven't

17  seen sort of the next round of updates, so we don't know

18  what -- as you noted earlier, the ground is shifting under our

19  feet, so we haven't seen sort of the most updated version from

20  our last discussion with Defendants, and we just don't know

21  what it will look like to have yet the next iteration, but

22  we're happy to continue discussing, and we do think that

23  there's room for more discussion.

24       THE COURT:  All right.  Mr. Bien.

25       MR. BIEN:  Excuse me, I just wanted to add that I

1   think that -- my understanding is that the institutions were

2   asked to identify space for TMHUs, and where it would be, and

3   how it would be set up.

4        Even if -- and we hope that Defendants will rapidly

5   empty the TMHUs at this point.  As your Honor has noted, the

6   pandemic has a long horizon.  We expect that if and when

7   outbreaks occur at certain prisons, transfers will again be

8   restricted.

9        For example, at this point, certain prisons are not

10  receiving new -- any transfers because there are outbreaks at

11  the prisons.  So we think that the -- it makes sense just to --

12  assuming the space is identified at a particular prison as a

13  TMHU, will continue to be the space that they are identifying

14  if and when they need to use it, and it should be -- it doesn't

15  seem to make any sense to drop it off until we're finished with

16  this pandemic.

17       THE COURT:  All right.  Fair enough.  The Court is

18  assuming -- we're past initial crisis mode.  There are -- but

19  the -- as the parties appear to agree -- there's a delayed

20  effect in the prisons, because it's the community that's been

21  bringing the virus to the prisons.

22       And so we don't yet know what the curve is going to

23  look like in the prisons, and the Court does assume we're --

24  we're looking at least the next 12 to 18 months, if not longer,

25  in terms of having to deal with the pandemic.

1          So I -- with that backdrop, and clarifying that, I'm

2     going to assume the parties will work together to continue to

3     refine the maps to make them be the useful tool that they will

4     continue to be for some time.

5          And at some point the Court may want to get granular,

6     having studied the maps more closely, that there will be a

7     question as to -- by which date the Defendants expect to

8     achieve relative stasis again.

9          So Mr. Lewis, can you clarify for me at what point

10    would there be -- based on the Defendants' current plans -- an

11    end to the transfers now beginning?

12         MR. LEWIS:  Your Honor, I cannot provide that

13    information.  As you are seeing, movements are just restarting.

14    The system is essentially coming back online.  And as we start

15    up the transfers and intakes, it is going to take a little bit

16    of time for that stasis that you mentioned to become the

17    equilibrium to be established.

18         So I would say there's no horizon as to when that's

19    going to be right now.  I think the most important thing is

20    that we are restarting it.  That we are seeing -- you are

21    seeing a measured restart in terms of assessment, giving

22    testing like Dr. Bick talked about.

23         The most important thing is that this is done

24    responsibly among the institutions, and within the

25    institutions.  I think CDCR's goal is to make sure it gets done

1    right at the start, and then as it grows, and as it proceeds,

2    then possibly assess about how long it will take to get to

3    stasis where a more normalized operation can be assessed.

4            But the most important thing is to do it safely and

5    responsibly now, and then we can assess going forward.

6            THE COURT:  All right.  I understand that position.

7    With the reassurance that the Special Master will be receiving

8    real-time information on transfers, and can notify the Court if

9    there's any Coleman issue that needs urgent attention, I

10   believe that's what we need to cover for now.

11           I note the Plaintiffs' past observation, that the --

12   to the extent there's anything that looks like a strategic

13   plan, there may be gaps in that plan, but I'm not here to

14   address that at this point in time.

15           In terms of the horizon issue, let me move to the

16   program guide matters pending before the Court.  Both the

17   process for amendment and the parties stipulation.  First, let

18   me ask, there's some dates referenced in that stipulation, I

19   believe, including a May 25th date, an upcoming June date.

20           At this point, are the dates referenced in that

21   program guide, a 90-day stipulation, being met?

22           Your position on that, Mr. Bien.

23           MR. BIEN:  I'm going to refer that to Miss Ells,

24   please.

25           THE COURT:  All right, Miss Ells.

1          MS. ELLS:  Good morning, your Honor.  Yes.  The two

2     reports that were slated to be provided to us by the 25th were

3     provided this week.  We're continuing to review them and refine

4     them with Defendants, but we did receive draft reports.

5          The other time frames are, I think, approximately a

6     few days away still, but we are continuing to make progress on

7     those reports.

8          THE COURT:  All right.  Mr. Lewis, anything to say on

9     that point?

10          MR. LEWIS:  Nothing further, your Honor.

11          THE COURT:  All right.  Here's the Court's overarching

12     question, and at this point, I'm just letting you know that I

13     anticipate asking for some focused briefing if the parties want

14     to take the opportunity to respond to a question the Court has

15     regarding the stipulation in particular.

16          I am noting that the 90 days is underway, and the

17     question really comes down to:  Can the Court give its

18     imprimatur to the stipulation if measures agreed to by the

19     parties fall below the Eighth Amendment requirements that the

20     program guide embodies, and what -- what guides the Court's

21     thinking about that, if the parties want to draw my attention

22     to any authority?

23          Because I -- this Court has taken the position that

24     the pandemic does not suspend the Constitution.  The Court

25     recognizes pragmatic challenges, to say the least, raised by

1    the pandemic, but is an alternative to accept the stipulation,

2    as the parties proposed order indicates, so I accept the

3    stipulation without approving it, or acknowledge it without

4    approving it, and it's a signal that the parties aren't going

5    to litigate certain questions that may be raised by any

6    temporary exceptions to the program guide.

7            So if you want to respond to that overarching question

8    the Court has, I'm happy to listen briefly today, but I'm

9    really just letting you know I anticipate issuing a very short

10   order allowing you to provide me five to ten pages providing

11   your response to that question.

12           So with that understanding, Mr. Bien, anything to say

13   at this point?

14           MR. BIEN:  No, your Honor.  The question you raised is

15   obviously a very serious question that we are also constantly

16   considering how long and -- and the denial of minimally

17   adequate psychiatric care for Coleman class members when there

18   might be other choices that the state is not considering at

19   this time to provide that care.

20           The limits the state has imposed on itself, which is

21   to remain within the prisons and not to release or transfer

22   people beyond the 33 prisons.

23           So I think that we would welcome the opportunity to

24   brief that question, and certainly we -- we reacted -- anyway,

25   that's about all I have to say at the moment.

1      THE COURT:  All right.  Mr. Lewis.

2      MR. LEWIS:  Your Honor, thank you for the opportunity

3  to address this issue.  We would welcome also the opportunity

4  to brief this.  But what must be said is that the state is --

5  by no means would the state be intending any of its actions to

6  be violating its patients' constitutional rights in any way.  I

7  appreciate the opportunity to brief this further, and I will

8  confer with my client on this issue.

9      THE COURT:  All right.  All right.  You'll see

10  something from me soon on that, probably by early next week.

11      Let me just ask if the parties have any further

12  comments?  I have no further questions or comments at this

13  time.  I would allow each party to make additional statements,

14  and then also the Special Master if he has any statements based

15  on anything he's heard during this hearing.

16      I do note that the Plaintiffs have again filed a joint

17  conference statement with declarations that were filed in the

18  Plata Court, so I note that filing.

19      I don't know if Mr. Specter wanted to say anything to

20  the Court at this time based on that.

21      But first Mr. Bien, Mr. Specter, and then Mr. Lewis.

22      MR. BIEN:  Your Honor, I would defer to Don Specter to

23  report on some issues from -- going on in the Plata case.

24      THE COURT:  All right.  Mr. Specter.

25      MR. SPECTER:  Thank you, your Honor.  Three issues

1    that I wanted to raise.  One, as you probably saw, if you had a

2    chance to review the status conference statement, is that, as a

3    result of the COVID outbreak, approximately 700 people who've

4    tested negative for the virus are being transferred to other

5    prisons, and that is something that we agree with and support.

6            We also have been talking to defendants in the Plata

7    Court about expanding that to other prisons where particularly

8    vulnerable people, including Coleman class members, are at risk

9    because of their living situation.

10           The second point I'd like to mention is that there has

11   come -- the -- the issue of testing of CDCR employees has risen

12   to the forefront of our discussions in Plata, and it's pretty

13   clear, I think, and, um, I think it's undisputed that the

14   vector for introducing the virus into the prisons to date has

15   been in CDCR employees since intake has been closed for the

16   last couple of months.

17           Fortunately, in my view, the state has not taken it

18   upon itself to do testing for the virus of employees who are

19   entering the prison.  So they have done some staff screening by

20   asking them about their symptoms if -- temperature checking,

21   and asking, I think, if they have been in contact with anyone

22   who has been exposed or been infected.

23           But I think everybody recognizes at this point that

24   testing is actually a better measure of determining infection

25   as the screening procedures.

1        So we attribute, at this point, the rise of infections

2   to the fact that the staff is bringing in the virus to these

3   prisons, and my expectation, at least, is that the number of

4   infections and possibly outbreaks in the prison system will

5   continue to grow.

6        So we had a conference call yesterday afternoon with

7   the receiver's office and state Defendants' counsel in order to

8   talk about staff testing, and it became clear to me for the

9   first time, I -- I didn't understand this, that the receiver's

10  office had basically deferred, if that's the appropriate word,

11  to the state Department of Corrections to determine when

12  testing -- when and whether to test staff.

13       And I think our view is that this testing has not been

14  adequate at this point, and we are going to continue to discuss

15  the issues at issue with whoever is responsible, hopefully next

16  week, in order to find out what the plan is, and also to see

17  what more testing can be done of staff to reduce the

18  transmission of the virus.

19       The third thing I just wanted to mention relates to

20  something Mr. Bien just spoke about, which is population

21  issues.  At the beginning of the status conference Judge Tigar

22  made some remarks about that.  I will paraphrase his remarks,

23  because I don't have a transcript, but essentially he relied on

24  the receiver's answer to the question of whether the prior

25  population reduction had assisted the receiver in reducing the

1    risk of disease and transmission of -- receiver said yes, and

2    the last hearing yesterday, Judge Tigar indicated that he

3    believed that the lack of population reduction was -- well,

4    first of all that he was, quote, profoundly disappointed in the

5    state officials for not continuing the population reduction

6    efforts, and that the failure to reduce population was leading

7    to unnecessary illness and possibly death.

8         And we certainly agree with those sentiments, your

9    Honor, and hope to take steps to enhance that objective.

10        Thank you.

11        THE COURT:  All right.  Before Mr. Lewis responds, and

12   also adds whatever he has to say at this point, just responding

13   to two of Mr. Specter's comments, as the Court has recently

14   clarified, as a reactive court, it waits for focused motions to

15   make particular decisions.

16        It has opened up a non-litigation track, but

17   litigation remains available.  Either this court or the Plata

18   Court could reach the point where it certifies that it has done

19   all it can, and requests the convening of a three-judge court,

20   and so that path remains available, and this Court certainly is

21   aware of that.

22        I cannot -- there is a lurking question, and I'm just

23   going to say this, I'm not inviting a motion, but it has

24   occurred to this court in thinking about the Coleman class

25   issues, and it's behind this Court's requesting the maps and

1    wanting to understand the unused space issue, but inevitably

2    there is a question about the population cap currently in

3    effect, which the three-judge court previously left -- left

4    open a question about.

5            And so I just want to acknowledge that I'm aware of

6    the broader picture here.  I am -- it's up to the parties to

7    focus any motion it thinks this court needs to resolve, as I

8    have recently tried to clarify.

9            In terms of the testing strategy and staff, my

10   questions to Dr. Bick were trying to confirm my reading of the

11   information I have on testing generally, and I do note the

12   number for staff, which are very concerning for the sake of the

13   CDCR staff alone, and because they are the vector.

14           And as I said, I'm not seeing a fully strategic plan.

15   I don't think I'm in a position to direct that at this point,

16   but in the course of trying to understand its job generally,

17   this Court has spent significant time reviewing public health

18   information.

19           The unanswered question I would have, if this issue is

20   ever brought to my attention, and I don't think I'm the person

21   to bring it to, but let me just say to the extent that this is

22   an informal status, if we are moving into a long period of

23   managing COVID, the Court has come to understand that the way

24   to move forward, start to resume operations, is to have a very

25   well-developed plan for immediate testing when needed and

1    contact tracing.

2         And I don't -- I don't see that anywhere in the -- in

3    the materials.  I heard what Dr. Bick said about random

4    sampling, and I understand that might be an alternative

5    strategy, but as the Court looks at resuming its own

6    operations, and having -- loading more people into its

7    buildings, consistent with the public health advice it's

8    reviewing, the ability for an emergency response plan that

9    includes immediate testing of all concerned and contact tracing

10   seems critical.

11        I'm not asking you to respond to that.  I'm just

12   putting that out there so you know how the Court responds to

13   some of the information it's receiving here today.  So with

14   that, Mr. Lewis, you are free to respond to anything you've

15   heard from the Plaintiffs, and also provide the Court with your

16   own updates.

17        MR. LEWIS:  Yes, your Honor.  It's difficult for me to

18   speak to Mr. Specter's comments regarding Plata, or things that

19   happened in that case, or the receiver's actions, as I'm not

20   counsel on that case.

21        Regardless, I think it can be easily recognized that

22   there are many issues being addressed and discussed within the

23   Plata litigation to include staff testing, movement, transfers

24   of certain patients, et cetera, that are being handled there in

25   that case.

1          I note specifically as to the CIM transfers that

2     Mr. Specter referenced, I think something like 185 of those

3     inmates that have been identified for movement are Coleman

4     class members.

5          So once again it demonstrates that particular to this

6     case, and to your Honor's concerns, there are movements being

7     made that affect positively the Coleman class members.  We take

8     very seriously your Honor's comments about providing

9     appropriate services to the class.

10         And you are hearing that that is happening as there's

11    collaboration across both cases to make sure that medically

12    things are being done, but then more importantly in this case,

13    that the mental health treatment is being provided to the

14    inmates.

15         So we will continue to work on this issue as to an

16    emergency response plan, and your comments regarding testing

17    and contact tracing, I believe that would be something that

18    would be handled in the Plata litigation with the receiver's

19    office, but I report that to my client, and make sure that they

20    are aware of your Honor's thinking on this subject.

21         That's all I have, your Honor.

22         THE COURT:  All right.  Special Master Lopes, anything

23    you would like to add at this point given what you've heard?

24         SPECIAL MASTER LOPES:  Thank you, your Honor.  I hope

25    that you can hear me?  I have a few things to report.  One, I

1  believe that I misspoke at the beginning of my presentation.

2  The numbers that I cited were as of May 27th, not March 27th.

3       Sorry -- sorry.  The second thing is, and I don't want

4  to quibble about this, when reporting on deaths, it's very

5  clear that one death, because of this hideous disease, is one

6  death too many.  But my report was that based on the numbers

7  given to me from CDCR, of the nine individuals who passed away,

8  five were Coleman class members, and I believe that Plaintiffs'

9  counsel felt that that number was wrong, yet at the same time

10 said that the number was six, but one of the six had been in

11 the Coleman class a year ago.

12      So I stand with my report that there were five, to my

13 knowledge, who were Coleman class members, and it is possible

14 for someone to be a Coleman class member, and then not be on

15 the caseload any longer.

16      Nonetheless, one death is too many, and there's

17 certainly over 55 percent of the deaths are in the Coleman

18 class, and that's just simply tragic.  Miss Winter reported

19 that we have not seen updated maps from the Defendants, and

20 that is accurate.

21      I just wanted to report that this process, the

22 development of the maps, has been completely collaborative, and

23 at times surprisingly so.  In a case like this, there can often

24 be moments of tension, which can bubble to the surface, but in

25 the terms of the development of the maps, I think the

1    Defendants have done everything that they've said that they

2    would do, and I have no reason to believe that the updated maps

3    won't be -- I believe that the updated maps will be a positive

4    development for the Court, and it will allow the Court to track

5    movement.

6              I want to say one last thing.  I did mention that the

7    intake from the county would proceed, but on a limited basis,

8    and I view that as a positive development.  At the last status

9    conference I believe that I reported that there was some 18,000

10   tests that would have been available monthly, but the

11   admissions of 2- to 3,000 folks in the counties could deplete

12   that number pretty quickly.

13             So I think that CDCR is taking a positive step in

14   slowing the admissions from the counties in testing how to

15   transfer individuals in a safe way, or the safest way that they

16   know of at this time.

17             But I did express a reservation at the last status

18   conference, and I believe that I should state that I think this

19   is a positive development, a slow admissions process, and that

20   is all that I have, your Honor.  Thank you.

21             THE COURT:  All right.  Let me just clarify, I'm

22   assuming that Special Master Lopes is also receiving real-time

23   information on the number of persons who become members of the

24   Coleman class upon transfer in to the reception centers, and

25   then further into CDCR.

1        So I'll say that for the record, and if we need to

2    talk further about that at the next status we can.

3        Thank you very much for all the work you are doing

4    recognizing the issues that may still need to be resolved.  We

5    are now going to conclude this status.

6        We'll talk again hopefully by Zoom in two weeks, and

7    I'll let you know the agenda, if it's more than a

8    general agenda, in advance.  Thank you very much.  Have a good

9    rest of the day.  This Court is in recess.

10        (The proceedings adjourned at 11:11 a.m.)

11                            --oOo--

12    I certify that the foregoing is a correct transcript from the

13    record of proceedings in the above-entitled matter.

14                            /s/ Tiphanne G. Crowe

15                            _____
                              TIPHANNE G. CROWE
16                            CSR No. 10958

17

18

19

20

21

22

23

24

25