**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**


**RALPH COLEMAN, et al.**
        **Plaintiffs,**

        **vs.**                                                    **No. 2:90-cv-0520 KJM DB**

**GAVIN NEWSOM, et al.,**
        **Defendants.**


**SPECIAL MASTER'S INITIAL REPORT ON DATA ISSUES WITHIN THE**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**

I.      **INTRODUCTION**

On October 8, 2019, the court ordered that the Special Master submit a report within six months and opine on whether data system sharing with the *Plata*[1] Receiver was a sensical, worthwhile endeavor in using resources in an efficient way.  *See* ECF No. 6312 at 3.[2]  In light of the flurry of activity surrounding COVID-19, on April 6, 2020 the court issued a minute order extending the filing deadline 60 days.[3]  ECF No. 6575.

Since that time, and in response to the court's January 7, 2020 order signaling the Special Master's need for additional staffing resources, s*ee* ECF No. 6441 at 7, the Special Master filed his request for the appointment of a data expert for purposes of advising him on all mental health data-related issues.  *See* ECF No. 6604.  The court granted the request on April 29, 2020.  *See* ECF No. 6646.

---

[1] *Plata* v. *Newsom*, Case No. C01-1351 JST (N.D.Cal.).
[2] References to page numbers for documents filed in the court's Electronic Case Filing (ECF) System are to page numbers assigned by the ECF system.
[3] To date, there have been 20 COVID-19 Task Force meetings and numerous, additional small workgroup meetings to address specific COVID-19 issues before they are presented to the larger COVID-19 Task Force group.

On May 8, 2020, the court issued an order directing the Special Master to report on his data expert's progress in reviewing and analyzing the data reports underlying defendants' Enhanced Outpatient Program (EOP) Administrative Segregation Unit (ASU) Hub.[4]  *See* ECF No. 6661 at 20. This filing responds to the court's directives in both its October 8, 2019 and May 8, 2020 orders concerning data issues.

## II.   BACKGROUND

### a.   Filing of the Golding Report to the Completion of the Neutral Expert's Investigation

On October 4, 2018, the Special Master received a whistleblower report from the *Plata* Receiver (hereinafter, Golding Report) authored by Dr. Michael Golding, California Department of Corrections and Rehabilitation's (CDCR) Chief Psychiatrist, which set off a chain of events that led to the appointment of a neutral expert and a hearing to determine whether the defendants intentionally provided misleading information to the court and the Special Master.[5]  *See* ECF No. 6064 at 2.  The impact of the release of the Golding Report was immediate.  These events put a halt to an almost concluded year-long negotiation to address the defendants' October 10, 2018 deadline to come into compliance with the court's prior orders to fill at least 90 percent of clinical staffing vacancies.[6]  *See* ECF Nos. 5711 and 5928; *see also* ECF No. 6695 at 8.

On October 5, 2018, the plaintiffs filed a request for a status conference and a request to file a copy of the Golding Report under seal, and the defendants filed an *ex parte* request to stay the proceedings.  ECF Nos. 5936, 5937, and 5938.  The court, on October 9, 2018, granted the

---

[4] Throughout this report, ASU EOP Hub certification and EOP ASU Hub certification are used interchangeably.
[5] Throughout this report, the neutral expert is interchangeably referred to as the "neutral expert," "neutral investigator," and "independent investigator."
[6] The parties, under the guidance and supervision of the Special Master, engaged in extensive negotiations over issues related to staffing compliance.  ECF No. 6427 at 3.  Indeed, the workgroup met approximately 20 times in 2018 leading up to the October hearing.  As a result of the discussions in those meetings, plaintiffs were on the verge of accepting the CDCR defendants' proposal to cut the allocation for staff psychiatry by approximately 20 percent systemwide.  *See id.*

plaintiffs' request for a status conference and scheduled it for the next day, October 10, 2018.

ECF No. 5941.

During the October 10, 2018 status conference, the court ordered the parties to meet and

confer to complete a redacted version of the Golding Report.  ECF No. 5949 at 3.  On October

12, 2018, the court denied the defendants' request for a stay, *id.* at 6, and scheduled a hearing on

October 22, 2018 "to assess whether [Dr. Golding's] report justifies investigation and, if so, what

the scope of that investigation should be and what person or persons should conduct the

investigation."  *Id.* at 4.

Prior to the October 22, 2018 hearing, the court scheduled a telephonic status conference

on October 17, 2018 and converted the October 22, 2018 hearing to a status conference.  *See*

Reporter's Transcript of Proceedings, October 17, 2018, ECF No. 5972 at 12:15-14:24.  During

the telephonic status conference, the court outlined its intent to move forward on three parallel

tracks, one to identify potential areas where fraud on the court might have been committed, one

to repair and improve future reporting to ensure accuracy and compliance, and one to evaluate

the need to amend prior orders or the Program Guide.  *Id.*

On October 19, 2018, the court confirmed the October 22, 2018 status conference and

removed the evidentiary hearing from the calendar.  ECF No. 5975.  During the October 22,

2018 status conference, the court outlined its initial plan to address potential fraud and heard

from the parties regarding their ability to work collaboratively, under the direction of the Special

Master, to repair or improve existing data.  *See* Reporter's Transcript of Proceedings, October

22, 2018, ECF No. 5984 at 26:12-33:3.  On October 31, 2018, the court set a status conference

for November 5, 2018.  ECF No. 5989.

During the November 5, 2018 status conference, the plaintiffs agreed with the court's assessment that there needed to be an independent investigation prior to any hearing on the Golding Report.  Reporter's Transcript of Proceedings, November 5, 2018, ECF No. 5998 at 9:2-10:1.  The defendants reserved the right to object to the appointment of an independent investigator.  *Id.* at 20:24-21:2.  Defendants argued that they wanted the opportunity to respond to the Golding Report.  *Id.* at 14:4-8.  The court denied the defendants' request and confirmed that the parties would have an opportunity to further respond to the court's plan to retain a neutral investigator.  *Id.* at 20:4-23; *see also* ECF No. 6018 at 1-2.

On November 13, 2018, the court issued an order to show cause why it should not issue an order to appoint a neutral investigator "to investigate the Golding Report's allegations that pertain to fraud or intent to mislead the court and/or the Special Master."  ECF No. 6002 at 8.  After consideration of the parties' responses to the show cause order, the court issued an order outlining its plan to appoint a neutral investigator.  *See* ECF No. 6018; *see also* ECF Nos. 6009 and 6011.[7]  On December 13, 2018, the court issued an order indicating its intention to appoint the neutral expert, subject to his confirmation, and requested his attendance at the December 14, 2018 status conference.  ECF No. 6032.

During the December 14, 2018 status conference, the court confirmed that Mr. Charles J. Stevens, Esq.[8] was willing and able to act as a neutral expert.  *See* Reporter's Transcript of Proceedings, December 14, 2018, ECF No. 6054 at 11:12-19.  Following the status conference,

---

[7] Defendants simultaneously filed an objection to the Golding Report which the court declined to consider as it was filed in contradiction of the court's prior ruling.  *See* ECF Nos. 6018 at 1-2, 6012, and Reporter's Transcript of Proceedings, November 5, 2018, ECF No. 5998 at 20:4-23.

[8] In an order dated November 29, 2018, the court provided Mr. Stevens' curriculum vitae.  ECF No. 6018 at Exhibit A.

4

the court issued an order appointing the neutral expert.  *See* ECF No. 6064 at 1 (amending ECF No. 6033).[9]  The court explained the purpose of the appointment as follows:

> The purpose of this appointment is to assist the court in investigating allegations raised in the verified report of Dr. Michael Golding, Chief Psychiatrist for the California Department of Corrections and Rehabilitation (CDCR) (Golding Report)…to determine whether defendants have committed any fraud on the court or the Special Master, or have intentionally provided false or misleading information to the court or the Special Master.

*Id.* at 2 (internal citations omitted).  The court also ordered the neutral expert to submit a report to the court, with supporting evidence, that indicated whether there was sufficient evidence to warrant a hearing on whether the defendants presented false or misleading information to the court.  *Id.* at 4.

On the day of the neutral expert's appointment, the court ordered the defendants to provide business rules for the electronic health records system (EHRS), health care dashboard reports, self-monitoring reports, and mental health performance reports for timeframes requested by the neutral expert.  *See* ECF No. 6038 at 2.

On April 22, 2019, the neutral investigator provided his report to the court.  *See* ECF No. 6147.[10]  The court held a status conference on April 26, 2019, and gave the parties and Dr. Golding 30 days to respond to the substance of the report, which would be discussed at a special status conference scheduled for June 10, 2019.  ECF No. 6135 at 1-2.  Thereafter, the court ordered that the neutral expert's report be filed on the public docket.  ECF No. 6146.

### b.    Data Issues Identified by the Neutral Expert's Report through the Evidentiary Hearing

In accordance with the court's April 29, 2019 order, the parties and Dr. Golding submitted their responses to the substance of the neutral expert's report.  *See* ECF Nos. 6163,

---

[9] Defendants appealed the amended December 14, 2018 order.  *See* ECF No. 6058 and 6078.
[10] The court granted the neutral expert a one-week extension to file his report.  ECF No. 6124.

6169, and 6170.  On June 10, 2019, the court held a special status conference to discuss the neutral expert's report and next steps.  *See* ECF No. 6135.  The court announced that it anticipated a focused evidentiary hearing in September 2019 and directed the parties to meet and confer to determine whether they could stipulate to any underlying facts that were reported by the neutral expert.  *See* Reporter's Transcript of Proceedings, June 10, 2019, ECF No. 6185 at 24:20-25:2.

On June 14, 2019, the court issued an order accepting the neutral expert's report, while specifically noting it "did not, and does not, delegate any fact finding to the neutral expert."  ECF No. 6187 at 2.  The court set an evidentiary hearing for September 13, 2019 and outlined areas that could establish that misleading data had been provided to the court.  *Id.*  The parties were ordered to meet and confer and to evaluate plaintiffs' proposal to require that the defendants self-certify data within 30 days of the order.  *Id*.

On July 23, 2019, the parties filed their joint report, which addressed what the parties would, and would not, stipulate to concerning the neutral expert's report, and requested a prehearing conference.  *See* ECF No. 6226.[11]  In preparation for the evidentiary hearing, the court held a telephonic prehearing conference on August 8, 2019.  *See* ECF No. 6242 at 1. Following the prehearing conference, the court issued an order on August 14, 2019.  *Id.*  The order reviewed the areas to be discussed at the hearing, *see id.* at 4-13, and identified the issues from the neutral expert's report that were being referred to the Special Master for negotiation through the All-Parties workgroup.  *Id*. at 11.  The order specifically discussed defendants' performance reports that were affected by their business rule change which lengthened the

---

[11] In accordance with the court's July 12, 2019 order, the parties were granted a one-week extension to file their stipulation and joint statement.  ECF No. 6219.

amount of time for EOP psychiatry appointments from 30 to 45 days, and questioned the data accuracy issues with defendants' hub certifications.  *Id*. at 5-6.

Regarding the increase in the length of time between EOP psychiatry appointments, the court made reference to the neutral expert's report and his finding that, "CDCR's decision to redefine 'monthly' from 30 to 45 days to lengthen the intervals between EOP appointments 'would have likely resulted in the reporting of misleading data, and that data was reported to the court in two filings.'"  *See id*. at 5 (*citing* ECF No. 6185).  The court observed that in their joint status report, the parties agreed that the decision to redefine "monthly" in CDCR's business rules resulted in the reporting of misleading data to the court, which was reported in two filings.  *See id*. (*citing* ECF No. 6226 at 3-4).  Accordingly, defendants represented that they would re-run the reports affected by the business rule change and file amended documents.  *Id*.

Related to the ASU EOP Hub certifications, the court noted that even though defendants admitted that five certification letters were sent to the Special Master and the plaintiffs based on data using an incorrect business rule, defendants nonetheless took the position in July 2019 that they "should not have to re-run the[] reports because the time for certification of the hubs ha[d] passed, and the timely psychiatry contact indicator was not one of the five mandatory compliance indicators."  *Id*. at 5-6.  The court was unpersuaded by defendants' argument and stated that defendants were not relieved "of the obligation to correct the record, which must satisfy the highest levels of integrity," and that defendants would be "required to correct the[] five monthly certification letters…."  *Id*. at 6.  Lastly, the August 14, 2019 order directed the Special Master "to share information concerning his plans for, and progress on obtaining, independent data auditing with the parties…."  *Id*. at 13.

On August 28, 2019, the plaintiffs submitted their response to the August 14, 2019 order and indicated that the defendants had asserted for the first time that the data in the ASU EOP Hub certification letters were not generated using the erroneous business rule; thus, they did not need to be modified.  ECF No. 6255 at 8.  Plaintiffs also contended that the defendants did not provide any information to substantiate this claim.  *Id.*  Defendants' response to the August 14, 2019 order confirmed that the defendants did not believe that they needed to modify the ASU EOP Hub certifications as they were not impacted by changes to the business rules.  ECF No. 6257 at 27.

On September 17, 2019, and following the filing of the parties' individual responses to the court's August 14, 2019 order, the court issued an order requiring defendants "to file and serve evidence in support of the assertion in their response to the court's August 14, 2019 order that they 'did not modify the business rule [for] timely psychiatry contacts conducted for patients in the ASU EOP Hub program' and their corresponding assertion that they 'no longer need[ ] to resubmit the five ASU EOP Hub certification letters' they previously represented contained misleading data."  *See* ECF No. 6288 at 4 (*citing* ECF No. 6257 at 27).  The same order gave plaintiffs 14 days to file a response to defendants' proposal for correcting the misleading information contained in defendants' timely psychiatry performance reports.  *Id.*

On October 10, 2019, defendants submitted their response to the court's September 17, 2019 order.[12]  ECF No. 6330 at 1.  Within their response, defendants admitted that, **"**[c]ontrary to its representation that the business rule had not been modified for ASU EOP Hubs, CDCR learned that the business rule for ASU EOP Hubs was changed from every 30 days to 'once every calendar month, never to exceed 45 days between appointments.'"  *Id.* at 2.  Defendants

---

[12]The defendants asked for, and were granted, an extension to file their response.  ECF No. 6309.

went on to state that, "CDCR erred when it reported that it 'did not modify the business rule [for] timely psychiatry contacts conducted for patients in the ASU EOP Hub program' and that it 'no longer needed to resubmit the five ASU EOP Hub certification letters.'"  *Id*.  Defendants apologized for their error and stated that they were "taking remedial steps" and "welcome[ed] the opportunity to further clarify the record regarding this issue through declaration or through testimony at the upcoming evidentiary hearing."  *Id*.  Defendants asserted that they had corrected the timely psychiatry contact data submitted to the Special Master for the ASU EOP Hub certifications for the five months in question and attached a copy of CDCR's letter to the Special Master confirming the corrections as an exhibit.  *Id*. at 3-9.  Additionally, defendants stated that they would file a declaration from Dr. David Leidner, Senior Psychologist Specialist for CDCR at the California Men's Colony (CMC), regarding CDCR's modification to the business rule for the ASU EOP timely psychiatry contacts indicator.  *Id.* [13]

Plaintiffs filed their response to the court's September 17, 2019 order on October 21, 2019.  ECF No. 6360.  Plaintiffs argued that the defendants failed to correct the timely psychiatry data for every ASU EOP Hub institution for all five months at issue, and further failed to acknowledge both the seriousness of their "erroneous business rule change" and the "limitations of their methodology for providing the corrected data."  *Id*. at 2.  Consequently, plaintiffs objected to the defendants' corrected filing, stating that it was "insufficient to fully and transparently correct the record consistent with this Court's dictates."  *Id*.

---

[13] Defendants filed a declaration from Dr. Leidner on October 11, 2019, which stated he "mistakenly extended the rule change to patients in the ASU EOP Hubs", but "worked with staff at headquarters to help them recreate the ASU EOP Hub data requested by the Court."  ECF No. 6332 at 2.  Dr. Leidner took responsibility for the error.  *Id.*

c.        **Data Issues Arising During the Evidentiary Hearing on the Golding Report**

The evidentiary hearing began on October 15, 2019 and lasted four days, concluding on

October 23, 2019.  *See* ECF No. 6345; *see also* ECF Nos. 6350, 6364, and 6365.  During the

hearing, the extent of the data issues became clearer.  *See generally* ECF No. 6427 at 13-19

(discussing testimony provided at the evidentiary hearing).  To be sure, on the final day of the

hearing the court offered its thoughts from the bench and noted that the defendants had

acknowledged that misleading data had been offered to the court in at least two court filings.  *See*

Reporter's Transcript of Proceedings, October 23, 2019, ECF No. 6380 at 7:7-12.  Additionally,

the court discussed the defendants' admission that ASU EOP Hub certification letters provided

to the court were based on data generated from faulty business rules.  *Id.* at 7:12-15.

Furthermore, during the court's summation, it addressed the neutral investigator's report

and stated that, "while it is possible to find some parts of the neutral expert's report that could be

read as exonerating defendants, I think it has to be said [that] the neutral expert himself did not

let defendants off the hook."  *Id.* at 8:14-17.  The court went on to say that to the contrary, the

neutral investigator "pointed to serious examples of misleading information being presented [to

the court]… ."  *Id.* at 8:18-19.

While opining on its initial thoughts and observations, the court made reference to the

need for a "new plan for improved data collection, analysis, and reporting," and noted its request

to the Special Master "to work on that issue."  *Id.* at 35:8-10.  Additionally, the court discussed

its concerns with the *Plata* Receiver acting as the data warehouse for *Coleman* class members.

*See id*. at 35:1-6.  It cautioned that if that were to occur, the Receiver would act as a service

provider and "it ha[d] to be understood [that] this Court and its Special Master are the client[s],

and the client is going to negotiate and make certain that the *Coleman* class and its interests are served." *Id*. at 35:17-20.

The court concluded its summation by addressing how critical it was for defendants to correct their data.  It stated that, "the data must be fixed with the key stakeholders at the table." *Id*. at 40:14-15.  Furthermore, the court directed that:

> The data must be pulled together, gathered and collected in a form that allows the defendants ultimately, when they truly can, accurately to demonstrate to the Court that the Constitution is finally satisfied.

*Id*. at 40:16-20.

### d.      Orders Concerning Data After the Conclusion of the Evidentiary Hearing

The court memorialized its October 23, 2019 summation in an order that issued on December 17, 2019.  ECF No. 6427.  The court found that "it [wa]s clear defendants ha[d] presented misleading information to the court."  *Id*. at 20.  Moreover, the court determined that:

> the weight of the evidence and the reasonable inferences to be drawn from the totality of the record before the court fully supports the finding that as to [two of the three] issues covered at hearing, defendants have engaged in knowing presentation of misleading information to the court and to the Special Master.

*Id*. at 22.[14]  The court added that, "[t]aken together with defendants' admissions prior to hearing, defendants have knowingly presented misleading information to the court in numerous areas critical to the remedy in this case and measuring compliance with that remedy."  *Id*. at 41.

In addition to defendants' knowing presentation to the court of misleading data, the court pointed out its concerns with the lack of boundaries between *Plata* and *Coleman*.  *See id.* at 43-44.  While the court readily acknowledged that certain areas of both cases would overlap, it stated that "the two cases [we]re distinct and it [wa]s clear defendants were not policing the

---

[14] The two issues where the court found the defendants had presented misleading information were the "change in the EOP timeline business rule and the failure to properly quantify and identify the extent to which supervising psychiatrists perform the duties of line staff psychiatrists."  ECF No. 6427 at 40.

boundaries between the two to protect and advance the remedies required in [*Coleman*]."  *Id*. at

43.  Consequently, the court noted that it would "closely manage renewed coordination effort

involving the Special Master in this case and the *Plata* Receiver, with the presiding judges at the

table as appropriate."  *Id*. at 44.

On December 23, 2019, the court issued an order regarding remedies.  ECF No. 6435.

The court discussed how the defendants had proposed relocating the management of defendants'

mental health care data from CDCR Mental Health Headquarters to the California Correctional

Health Care System (CCHCS) Quality Management Section, which is overseen by the *Plata*

Receiver.  *Id*. at 2.  The court noted that the plaintiffs were in agreement and referred back to its

past statements noting concern, and identifying its expectations, with this proposed remedy.  *Id*.

The court reiterated that if such a proposal were to move forward, CCHCS would be acting as a

service provider and the court and Special Master as its client.  *Id*.  Accordingly, the court made

known its intention "to take all steps necessary to ensure that the needs of the plaintiff class and

complete remediation in this action would be served by such an arrangement, prior to any

approval."  *Id*.  The court informed the parties that there would be "certain preliminary steps"

that they must take in order to allow the court to adequately assess the proposal.  *Id*.  The first

step was the court's authorization, with the parties' agreement, to allow the Special Master to

hire his own data expert, and concurrently, defendants' arrangement for the Special Master to

have access to all of the business rules used to analyze mental health data.  *Id*.  Next, defendants

were directed to arrange for the Special Master to be included in all discussions concerning

CCHCS's management of CDCR's mental health data.  *Id*. at 3.  Lastly, the court ordered that

the Special Master and the plaintiffs "must forthwith have access to all mental health care data

that affects the care and treatment of members of the plaintiff class."  *Id*.

Following a status conference held on December 13, 2019, the court issued an order on January 7, 2020.  ECF No. 6441.  The order covered a myriad of issues, including those related to *Coleman* and *Plata* coordination, and other data issues.  *Id*.  Regarding coordination with the *Plata* Receiver, the court noted that coordination between the two courts was not new and that formal coordination dated back to 2006.  *Id*. at 2.  Even so, the court avowed that "[a]s proceedings before this court have revealed, it also appears that the coordination process has strayed from its founding principles."  *Id*.  The court made it known that the fault was with the *Coleman* defendants and not the Receiver.  *Id*.  In so doing, the court stated that the defendants "failed to observe the proper boundaries between their remedial responsibilities to this court and its Special Master while they also work with the *Plata* Receiver on other matters."  *Id*.

Consequently, the court announced new "ground rules" for matters within its jurisdiction.  *See id*.  at 2-3.  The first rule was full transparency.  *Id*. at 2.  The court professed that, "[i]f any stakeholder has a question about whether information should be shared, it should be shared," and that "[e]veryone involved should err on the side of transparency."  *Id*.  The next ground rule pertained to claims of privilege.  *Id*. at 2-3.  The court expressed its bewilderment at recent claims of privilege raised by the defendants, stating that it could not "comprehend why new assertions of possible claims of privilege have arisen in discussions of the coordination process between this court's Special Master and the *Plata* Receiver, each of whom is an arm of his respective court."  *Id*.  The court asked all stakeholders "to think deeply and carefully before asserting claims of privilege in the context of the coordination process or otherwise as related to [the] case, given the public interests at stake."  *Id*. at 3.  Finally, the court cautioned that "[g]oing forward, [it would] not hesitate to reach the merits and resolve any asserted claim of privilege that affects the *Coleman* class in any way."  *Id*.

13

The January 7, 2020 order next discussed the following issue:

> Whether, and to what extent, defendants have been unilaterally coordinating remedial efforts with the Plata Receiver, advising the court and Special Master only after significant effort has been expended; whether, and to what extent, any such efforts have been properly and timely disclosed to the Special Master and/or the plaintiffs; and whether plaintiffs should be granted a period of discovery designed to identify answers to these questions.

*Id*. at 3.  The court noted how the parties had agreed to a 60-day period of time to exchange information on these issues and that the parties were discussing entering into a stipulation concerning information-sharing.  *Id*.  The court ordered the parties to file the stipulation and protective order within 30 days and informed the parties that this matter would be on the agenda for the first quarterly status conference set for March 20, 2020.[15]  *Id*.; *see also id*. at 10.

The order then addressed the issue of whether the Special Master should be able to hire his own data expert.  *Id*. at 4.  The court remarked that:

> [A]ll parties agreed the Special Master should be authorized to hire his own data expert as part of the ongoing remedial process that follows the court's proceedings on the Golding Report and the proposed coordination with the *Plata* Receiver. The court agrees, and will authorize the Special Master to submit a request to approve this hiring when he has identified an appropriate expert.

*Id*.

The next issue considered was the "[r]eview of reporting channels and committee/subcommittee structures relevant to mental health data collection and reporting."  *Id*. The court observed that the defendants had filed a list identifying all of their various committees and subcommittees, as well as reporting structures, "relevant to mental health data collection and reporting, whether currently in place or put on hold during the Golding proceedings."  *Id*.  (citing ECF No. 6398).  The court stated that the issue of committees and reporting structures would be

---

[15] The January 7, 2020 order contained a typographical error which noted the date of the first quarterly status as March 23, 2020.  ECF No. 6441 at 10.

on the agenda for the first quarterly status conference and directed defendants to be prepared with an updated organizational chart of committees at that time.  *Id*.

In discussing the review of *Coleman* and *Plata* coordination efforts in general, the court stated that "the details of coordinated efforts are evolving," and that this topic would "remain on the agenda for future status conferences."  *Id*. at 5.

Regarding outstanding matters related to data, the court first addressed the ASU EOP Hub certifications.  *See id*. at 9.  The court stated that "[t]he reliability of the EOP ASU Hub certification letters ha[d] been called into question by the Golding proceedings."  *Id*. Additionally, the court noted that "at hearing it became clear there are a number of disputes between the parties over whether the certification process is moving defendants toward constitutional compliance for adequate mental health care for EOP inmates in administrative segregation units."  *Id*.  The court stated that this matter would be discussed at the first quarterly status conference of 2020.  *Id.*

The last data-related issue discussed in the January 7, 2020 order concerned the EHRS. *Id*. at 10.  The court said all parties were in agreement that the Golding proceedings had "highlighted problems for mental health and *Coleman* compliance with the [EHRS] rolled out by the *Plata* Receiver."  *Id*.  Accordingly, the court stated that, "[a] process for implementation of necessary updates to the EHRS to meet the needs of psychiatry and mental health must be an urgent priority both for defendants and in the coordination process."  *Id*.  The court indicated that this matter would also be included on the agenda for the first quarterly status conference.  *Id*.

The court issued a formal agenda for the March 20, 2020 first quarterly status conference on March 17, 2020.  ECF No. 6509.  For purposes of this filing, the relevant agenda items to be discussed included updates on (1) the *Coleman* and *Plata* coordination process, (2) EOP ASU

15

Hub certifications, (3) data integration, management, and integrity, and (4) the status of an adequate process for updating mental health records in the EHRS.  *See id.* at 2-3.  Regarding the hub certifications, the court directed the parties to be prepared to present their positions on "whether the certification process [was] moving defendants toward the provision of constitutionally adequate mental health care to EOP inmates in administrative segregation units" and to offer "their respective positions with respect to any alleged ongoing constitutional violations" in administrative segregation units.  *Id.* at 2.

Due to the COVID-19 pandemic, the March 20, 2020 status conference was held telephonically.  ECF No. 6508.  Additionally, as the focus of the status conference ultimately concerned the pandemic and the defendants' response to it, all other agenda items previously scheduled to be discussed were deferred to March 27, 2020.  ECF No. 6513.  On March 26, 2020, a minute order issued notifying the parties and the Special Master that the agenda for the telephonic status conference on March 27, 2020 would be limited to two items -- a COVID-19 update and staff misconduct against *Coleman* class members.  *See* ECF No. 6531.  The remaining agenda items were to be discussed at the next telephonic status conference set for April 10, 2020.  *Id.*  The next day, on March 27, 2020, a minute order issued setting a telephonic status conference for April 3, 2020.  ECF No. 6538.  The court noted that it was calendaring the date in case an update to the court on matters related to COVID-19 was necessary.  *Id.*  On April 2, 2020, the court confirmed the telephonic status conference for April 3, 2020.  ECF No. 6567. Following the April 3, 2020 telephonic status conference, the court made it known that the April 10, 2020 telephonic status conference would have one agenda item, an update on defendants' COVID-19 response, and that all other agenda items would be continued for discussion at the next telephonic status conference scheduled for May 1, 2020.  ECF No. 6571.

16

Following the telephonic status conference held on May 1, 2020, the court issued an order on May 8, 2020.  ECF No. 6661.  Several items related to data issues were discussed in the order, including (1) updates to EHRS, (2) coordination between *Coleman* and *Plata* in light of the Golding Report and the evidentiary hearing, (3) EOP ASU Hub certifications,[16] and (4) data integration, management, and integrity.  *Id*. at 16-18.  The court ordered that the first, second, and fourth items be on the agenda for discussion at the July 17, 2020 second quarterly status conference.  *Id*.  Specific to EHRS, the court noted that the parties did not agree on the progress made in the development of an acceptable process for updating mental health records.  *Id*. at 16. The court stated that during the May 1, 2020 telephonic status conference, the Special Master reported that progress had been made as far as developing a process for updating the records, but that, regarding adequacy, his data expert had not yet had a chance to review that issue.  *Id*. at 16-17.

Regarding the hub certifications, the court acknowledged the Special Master's oral report at the May 1, 2020 status conference that his data expert would "be reviewing the data reports underlying the[] certifications and making recommendations on what must happen to make them fully transparent and completely usable."  *Id*. at 18 (internal quotations and citation omitted). The court ordered the Special Master to provide an update on the data expert's progress within thirty days.  *Id*.

---

[16] In response to COVID-19, the defendants have proposed modifying the hub certifications.  Defendants' proposal is still under consideration by the plaintiffs and the Special Master and no final action has been taken.

### III.    DISCUSSION OF THE DATA EXPERT'S ACTIVITIES AND REPORT

As mentioned previously, the appointment of the Special Master's data expert, Dr. Daniel Potter, was approved by the court on April 29, 2020.  *See discussion supra* at 1; *see also* ECF No. 6646.

Since that time, Dr. Potter has been provided a laptop by the *Plata* Receiver's staff to enable him to access the system's data, as well as maintenance, development, and bug reporting practices.  He has met telephonically multiple times with the *Plata* Receiver's quality management and information technology staff regarding CDCR's information technology systems and infrastructure.  Dr. Potter has commenced initial reviews of mental health business intelligence, mental health on demand reports, and update/change policies around mental health quality management and fixed benchmarks.  He has also undertaken efforts to understand data and policies regarding the *Coleman* class members and CDCR's population generally and with respect to COVID-19, including analysis of its risk factors.  Further regarding COVID-19, he is reviewing how data regarding its impact on the *Coleman* class and the general population is generated and measured.

The specifics of Dr. Potter's other activities include, but are not limited to:

- Attending meetings with CDCR's leadership regarding the role of the data expert;

- Meeting and discussing the activities of the COVID-19 small workgroup and the need to understand data and policies with respect to *Coleman* class members and the general population;

- Meeting to discuss the design and implementation of the business rules and how to best come up to speed on the data warehouse;

- Reviewing Citrix, the software used by CDCR to access securely its system remotely, to determine whether it was adequate to review mental health business intelligence;

- Identifying resources within CDCR to aid review;

- Reviewing CDCR pre-recorded presentations on understanding mental health business intelligence, key points about mental health on demand reports, fixed benchmarks, and rehabilitating mental health business intelligence;

- Providing suggestions to CDCR regarding granular review of COVID-19 data;

- Requesting information regarding how the data for measuring COVID-19's impact on the general population and the *Coleman* class is being generated; and whether there is a way to pull current and historical data;

- Reviewing initial COVID-19 risk factor analysis;

- Working with CDCR stakeholders to obtain access to quality management reports and the live data warehouse;

- Discussing variables related to COVID-19 Risk Monitoring registries;

- Discussing best practices, metrics, benchmark maintenance, and descriptive error;

- Requesting access to shared/network drive;

- Requesting access to COVID-19 data and policies;

- Attending weekly meetings to discuss COVID-19 data;

- Observing demonstration of MHSDS COVID-19 Impact Dashboard.

Dr. Potter is continuing to work with CDCR to deliver appropriate access to the Mental Health Services Business Intelligence (MHS BI) and data warehouse systems, development environments, and change management systems.  He anticipates he will have a better understanding of how the system computes and delivers several benchmark metrics by the end of June.

With regard to COVID-19, Dr. Potter believes that he has been granted sufficient access to the data that CCHCS's Public Health officials have been using to form their policies.  He has been asked by the Special Master to look at this data as it relates to the *Coleman* class, as he hopes to be able to form some conclusions in the coming weeks.

While the amount of work done by the Special Master's data expert to date is significant, the Dr. Potter continues to review and analyze data, in an effort to get a better understanding of the defendants' quality management and data systems.  Given that the Special Master and Dr. Potter are still evaluating and understanding the defendants' data systems, to offer an opinion at this early stage would be premature and unwise.  That said, at this time, the Special Master defers providing a formal opinion on "whether the general concept of data system sharing is indeed feasible, case compliant and will result in greater efficiency and transparency than could be achieved otherwise."  *See* ECF No. 6312 at 3.  The same holds true for "making recommendations on what must happen to make [the hub certifications] fully transparent and completely usable," and providing an update on the development of an acceptable process for updating mental health recordings in EHRS.  *See* ECF No. 6661 at 18 (internal quotations and citation omitted); *see also* ECF No. 6661 at 16.  Accordingly, the Special Master requests that the court order him to file an updated report wherein he will be prepared to offer his opinion on these data issues.

## IV.    CONCLUSION AND RECOMMENDATION

For the reasons stated herein, the Special Master recommends that the court order the

filing of a subsequent report within 90 days.  By that time, the Special Master's data expert will

have had the opportunity to conduct a more thorough analysis of the defendants' data systems.

Date:  June 8, 2020

Respectfully submitted,

/s/ *Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master