DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**PLAINTIFFS' NOTICE OF JUNE 8, 2020 JOINT CASE MANAGEMENT CONFERENCE STATEMENT AND JUNE 9, 2020 MINUTE ENTRY FILED IN *PLATA***<br><br>Judge:   Hon. Kimberly J. Mueller |

[3559942.2]

PLAINTIFFS' NOTICE OF JUNE 8, 2020 JOINT CASE MANAGEMENT CONFERENCE STATEMENT AND
JUNE 9, 2020 MINUTE ENTRY FILED IN *PLATA*

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that, in connection with the upcoming status conference

3   in this matter set for June 12, 2020 at 10:00 am, Plaintiffs hereby submit a copy of a Joint

4   Case Management Conference Statement and a Minute Entry filed in *Plata, et al. v.*

5   *Newsom, et al.*, Case No. 01-1351 JST, currently pending in the Northern District of

6   California.

7        A copy of the *Plata* Joint Case Management Conference Statement, filed on June 8,

8   2020 as *Plata* Docket No. 3345, is attached hereto as **Exhibit A**.  A copy of the *Plata*

9   Court's Minute Entry for the Case Management Conference, filed on June 9, 2020 as *Plata*

10  Docket No. 3347, is attached hereto as **Exhibit B**.

11

12  DATED:  June 10, 2020                    Respectfully submitted,

13                                           ROSEN BIEN GALVAN & GRUNFELD LLP

14                                           By:  */s/ Marc J. Shinn-Krantz*

15                                               Marc J. Shinn-Krantz

16                                           Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

[3559942.2]

PLAINTIFFS' NOTICE OF JUNE 8, 2020 JOINT CASE MANAGEMENT CONFERENCE STATEMENT AND
JUNE 9, 2020 MINUTE ENTRY FILED IN *PLATA*

# Exhibit A

XAVIER BECERRA
Attorney General of California
DAMON MCCLAIN (209508)
Supervising Deputy Attorney General
NASSTARAN RUHPARWAR (263293)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-3035
Damon.McClain@doj.ca.gov

HANSON BRIDGETT LLP
PAUL B. MELLO (179755)
SAMANTHA D. WOLFF (240280)
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366
pmello@hansonbridgett.com

*Attorneys for Defendants*

PRISON LAW OFFICE
DONALD SPECTER (83925)
STEVEN FAMA (99641)
ALISON HARDY (135966)
SARA NORMAN (189536)
RANA ANABTAWI (267073)
SOPHIE HART (321663)
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Fax: (510) 280-2704
dspecter@prisonlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| MARCIANO PLATA, et al., | CASE NO. 01-1351 JST |
| Plaintiffs, | **JOINT CASE MANAGEMENT CONFERENCE STATEMENT** |
| v. | |
| GAVIN NEWSOM, et al., | Date:    June 9, 2020 |
| Defendants. | Time:    10:00 a.m. |
| | Crtrm.:  6, 2nd Floor |
| | Judge:  Hon. Jon S. Tigar |

1    The parties submit the following joint statement in advance of the June 9, 2020

2  Case Management Conference (CMC).

3    Since the last CMC, the parties have met and conferred regarding certain aspects of

4  Defendants' response to the current health crisis.  On Monday, June 1, Plaintiffs sent

5  Defendants an email, with a copy to the Receiver, requesting "a meet and confer this week

6  on the following topics with the people identified below and anyone else whom you or [the

7  Receiver] believe would be helpful to our discussions."  1) Testing CDCR and CCHCS

8  staff for COVID-19; 2) Moving high risk patients from cells to dorms; and 3) "Steps

9  necessary to improve the safety of people living in cells and dorms, especially high risk

10  people living in congregate living areas."  The email did not contain any specific proposals

11  with respect to the topics listed therein.

12    On Wednesday, June 3, at 3:16 p.m., Plaintiffs emailed Defendants, again copying

13  the Receiver.  In that email Plaintiffs wrote that "[i]n order to make the Meet and Confer

14  scheduled for Friday as productive as possible in the attached document we have set forth

15  our proposals on the three subjects we outlined below [in the June 1, email]."  Plaintiffs

16  attached a two paged single-spaced document entitled "Plaintiffs Proposals For June 5,

17  2020 Meet and Confer."  That document set forth Plaintiffs positions and demands on

18  "testing staff" and "steps necessary to improve the safety of people living in cells and

19  dorms, and especially high risk people living in congregate living areas."

20    On Friday, June 5, the parties had a conference call that lasted more than one and a

21  half hours.  Approximately 20 people participated in the conference call, including the

22  Receiver and members of his staff, CDCR Division of Adult Institutions staff, CDCR

23  Employee Health and Wellness staff and lawyers from the Prison Law Office, the Attorney

24  General's office, Hanson Bridgett, and CDCR's Office of Legal Affairs to discuss the

25  proposals.  With the exception of what is described below, no agreements were reached.

26  This was due in part to the short time frame that Defendants had to respond to the

27  document, the number of people on the call and because the Defendants are evaluating

28

16576559.1

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

many items that require thoughtful and coordinated action and approval and input from many stakeholders.  Plaintiffs also contend that additional agreements were not reached because neither the Receiver nor anyone representing Defendants was prepared to make any decisions regarding Plaintiffs' proposals.[1]

## I.  TESTING STAFF FOR COVID-19

The Receiver has identified prison staff as the main vector for spreading COVID-19 in the state prisons and has recommended that all staff at all institutions be tested for COVID-19. Plaintiffs proposed that Defendants implement a testing program that includes the following three elements:

- universal baseline testing of all staff as soon as possible;
- regular surveillance testing thereafter; and
- testing of relevant staff for contact tracing investigations, whenever there is a new confirmed COVID-19 case (incarcerated person or staff) at the prison.

Defendants agree that staff testing is critical, and are developing a staff-testing plan with assistance and guidance from the California Department of Public Health.  The details of that plan are still being worked out.  When it is complete, the staff-testing plan will need to be reviewed by stakeholders, including the California Department of Public Health, the California Department of Health and Human Services, and the Governor's Office. Defendants do not yet know when the staff-testing plan will be finalized.  Katherine Minnich, Deputy Director of Human Resources, the office that oversees CDCR's Office of

_____

[1] The parties did not meet and confer about further population reduction measures. This Court has now three times urged Defendants to resume releasing people who are within 60 days of released dates, noting that the Defendants' initial early release program was "a factor in the determination by the court that the state was not deliberately indifferent."  RT, 5/14/20 at 6-7.  The following week, the Court pointed out that "the state of the record right now is that early inmate release . . . which the state earlier determined was appropriate from a public safety standpoint, which we know is feasible because it happened, doesn't require us to take money from any other programs.  In fact, it saves money."  RT 5/21/20 at 36.  At the last CMC, this Court again urged the Secretary and the Governor to continue the early release program.  Defendants to date have not reconsidered their position.

16576559.1

Employee Health and Wellness, stated the draft protocol for testing sets different testing standards for:

- Prisons without a recent COVID-19 case;
- Prisons with recent COVID-19 cases; and
- Prisons that provide skilled nursing facility (SNF) level of care (California Health Care Facility, California Medical Facility and Central California Women's Facility).

Plaintiffs agree that the staff-testing plan should include a baseline test of all employees working in the SNF-type facilities (California Health Care Facility, Central California Women's Facility, and California Medical Facility), with serial retesting of employees who test negative. For the non-SNF prisons with no recent cases, Defendants do not intend to do baseline testing of all staff, but rather intend to do surveillance testing of ten percent of the staff, every fourteen days. For the non-SNF prisons with recent cases, Defendants also do not intend to do baseline testing of all staff, but will test every fourteen days all staff that worked in an area with close contact to the staff or incarcerated person who tested positive. Defendants stressed, however, that these intentions have not been finalized and are not yet being implemented.

With regard to the current outbreaks, CDCR has already tested about 1,164 staff at Avenal State Prison and about 1,100 staff at California Institution for Men. Additionally, in May, CDCR tested 438 staff at the California Men's Colony and 146 staff at the California Institution for Women. CDCR has recommended to staff at Corcoran who may have been exposed that they obtain testing in the community but CDCR has not yet conducted staff testing at Corcoran.

**Plaintiffs' Position:**

A comprehensive, strategic plan to test staff is critical to reduce the risk of the spread of the virus. Plaintiffs support Defendants' decision to develop a more comprehensive plan for testing employees. However, we have serious concerns with the

16576559.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   draft plan as presented at the June 5 meet and confer.  Defendants' current plan calls for

2   baseline testing of all staff (followed by periodic re-testing) only at CMF, CHCF, and

3   CCWF.  Consistent with the Receiver's recommendation, Plaintiffs believe Defendants

4   should conduct universal baseline testing of all staff at all prisons.

5          Plaintiffs also believe Defendants should conduct more robust surveillance testing

6   of staff once baseline testing is completed, similar to that recommended for nursing homes.

7   Defendants are currently considering testing just 10% of staff every 14 days.[2]  For skilled

8   nursing facilities <u>without</u> any positive COVID-19 cases, the California Department of

9   Public Health has recommended "testing of 25 percent of all [staff] every 7 days including

10  staff from multiple shifts and facility locations" such that "100 percent of facility staff are

11  tested each month."  *See* Memorandum from Deputy Director Heidi Steinecker to Skilled

12  Nursing Facilities (May 22, 2020), available at:

13  https://www.cdph.ca.gov/Programs/CHCQ/LCP/Pages/AFL-20-53.aspx.  This

14  recommendation was made in recognition of the medical vulnerability of the residents, and

15  the inherent risks of congregate living.  As Dr. Scott Allen, former State Medical Program

16  Director for the Rhode Island Department of Corrections and current subject matter expert

17  for the Department of Homeland Security, recently explained in his testimony to the

18  Senate Committee on the Judiciary, "there is no reason there should be a lesser standard

19  for correctional and detention facilities."  *Examining Best Practices for Incarceration and*

20  *Detention During COVID-19 before the United States Senate Committee on the Judiciary*,

21  116th Cong. (June 2, 2020) (Written Statement of Dr. Scott A. Allen, M.D.), available at:

22  https://www.judiciary.senate.gov/imo/media/doc/Scott%20Allen%20Testimony.pdf.

23         Each prison's plan for surveillance testing should also be regularly adjusted based

24  on conditions in the community.  The plan should call for prisons to conduct more frequent

25  staff testing if there is a significant outbreak in the community.  *See* CDC, *Testing*

26

27  _____

28  [2] When Plaintiffs asked at the meet and confer how 10% was selected for surveillance,
    counsel for Defendants would not allow any response.

16576559.1   JOINT CASE MANAGEMENT CONFERENCE STATEMENT

*Guidance for Nursing Homes*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/nursing-homes-testing.html (updated May 19, 2020) ("State and local officials may adjust the requirement for weekly testing of HCP based on the prevalence of the virus in their community . . . .").

Plaintiffs made a number of these recommendations to Defendants during the June 5th call, emphasizing the need for universal baseline testing, as well as more robust staff surveillance testing.  Plaintiffs recognize Defendants' plan is not yet finalized, and have requested that they share a draft of their plan before it is finalized to avoid further delay and consequent harm.  Defendants did not respond to that request.

**Defendants' Position:**

From Defendants' perspective, there is significant agreement between the parties regarding staff testing in that CDCR fully agrees that it is critically important to develop and implement a comprehensive staff-testing plan that involves testing staff at all of CDCR's institutions.  In fact, CDCR began working closely with the California Department of Public Health in May to develop such a plan.  In the meantime, CDCR has cooperated with local health departments on staff-testing-related issues and requests, and as discussed above, a substantial amount of staff testing has already been completed.  CDCR has also been consulting with, and seeking the cooperation of, the California Correctional Peace Officers Association concerning efforts to ramp up staff testing.  And as CDCR continues to develop its staff testing plan, it is also working toward securing testing resources and making arrangements with labs for a smooth transition to the new plan.

During the meeting to discuss staff testing, Plaintiffs' counsel had several comments and proposals in light of the information Defendants shared about CDCR's draft plan, and CDCR's representative advised that those ideas and concerns would be considered as the plan is further developed.  The completion and final approval of CDCR's staff-testing plan is forthcoming, and CDCR will produce the staff-testing plan to

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

16576559.1

Plaintiffs' counsel when it is finished.  CDCR will consider any additional concerns or proposals from Plaintiffs' counsel after the completed plan is circulated.  As with all of the measures CDCR has taken in response to the pandemic, if changes to the plan are warranted, adjustments will be made.

Regarding Plaintiffs' reference to the statement of Dr. Scott Allen, Defendants do not believe the final staff-testing plan will be inconsistent with his position that all staff should be tested in locations with COVID-19.  *Examining Best Practices for Incarceration and Detention During COVID-19 before the United States Senate Committee on the Judiciary*, 116th Cong. (June 2, 2020) (Written Statement of Dr. Scott A. Allen, M.D., at p. 6), available at: https://www.judiciary.senate.gov/imo/media/doc/Scott%20Allen%20Testimony.pdf.  This, of course, can be further assessed and discussed with Plaintiffs' counsel when the completed staff-testing plan is circulated.

## II.    SAFELY HOUSING MEDICALLY VULNERABLE PEOPLE

Plaintiffs proposed Defendants work with the Receiver to identify the vulnerable people who are most at risk of harm from contracting COVID-19.  For each person, Plaintiffs recommended Defendants and the Receiver determine whether they are safely housed. Plaintiffs asked that those who have tested negative, are at highest risk (due to age and/or multiple risk factors or poorly controlled chronic conditions that constitute risk factors) and are currently living in dormitories, gyms or day rooms, be transferred to single cells or cells with other people who have tested negative. Finally, Plaintiffs asked that those people who have medical risk factors that are less serious should be considered for cell housing or housing in smaller dorms where they are able to distance and may be monitored.

Regarding medically vulnerable patients, the Receiver indicated that he and his staff have made this issue a top priority and were expending significant resources to determine how best to safely house them.  No decision had yet been reached on Plaintiffs' proposals,

1    nor could the Receiver say when a decision would be reached.

2         **Plaintiffs' Position:**

3         It is the opinion of Dr. Arthur Reingold that cells are safer for the medically

4    vulnerable patients than dormitories, and that those medically vulnerable people who have

5    tested negative should be moved out of prisons where there are outbreaks.

6         This issue has been pending for three months, yet despite Dr. Reingold's

7    uncontradicted expert opinion, thousands of high-risk patients remain in dormitories

8    throughout the state.  During the meet and confer session, the Receiver announced that this

9    issue was a top priority and he was now considering the appropriateness of moves from

10   dorms to cells.  Plaintiffs urge the Receiver and Defendants to take action to safely rehouse

11   these people as soon as possible.[3]

12        In addition to Dr. Reingold's opinion, dorms are plainly the locus of the largest,

13   most widespread, and serious outbreaks.  In one Avenal dorm, more than 90% of patients

14   tested positive.  At Chuckawalla Valley, which houses nearly 3,000 people, all in dorms,

15   hundreds had been tested and CCHCS last week said the positive rate was approximately

16   75%.  By contrast, the outbreaks in celled housing at Lancaster and CMC, while

17   concerning, were stopped before they extended nearly as widely and appear to be

18   contained.  Lancaster has had 128 cases, but only one is currently active; CMC has had 11

19   cases, but only one is currently active.  With regard to morbidity and mortality, almost all

20   of the approximately 50 people currently hospitalized statewide due to COVID-19 were

21   infected while living in dorms, and the same is true of the dozen patients who have died

22   thus far.  Dorms present an unacceptable risk of infection and harm under current

23   conditions.

24   _____

25   [3] In order to more precisely ascertain the extent of the risk, Plaintiffs have asked for and
     the Receiver's office stated that it will provide a list of all people incarcerated in CDCR
26   who have one or more risk factors for complications from COVID-19, along with the
     number of such factors for each person, and whether the person is housed in a cell or a
27   dorm.

28

1   CCHCS had a plan to move almost 700 medically high risk patients who had tested

2  negative for the virus from California Institution for Men (CIM) to other prisons.  Those

3  transfers began on or around May 29th.  The patients who were transferred had tested

4  negative, but in many cases the tests were done *two to three weeks before the transfer.*  Not

5  surprisingly, some of those people tested positive shortly after their arrival at the new

6  prisons.  As a result, the process was suspended after the first 125 transfers[4].  CCHCS is

7  now reconsidering its testing strategy for transfers, including of the medically vulnerable.[5]

8  Plaintiffs have requested to review the proposed revised testing protocols before they are

9  finalized.

10   At the meet and confer, the Receiver raised concerns that some people who are high

11  risk may prefer not to transfer from a dorm to a cell, and asked Plaintiffs what such

12  patients should be told, and what should be done.  Plaintiffs now propose the following

13  approach: a high risk patient living in a congregate area who has recently tested negative

14  may refuse a transfer to a celled housing unit, unless the Receiver or his medical staff

15  determines that the patient's continued presence in that congregate living area would be a

16  public health threat.  Before the patient is asked to make a decision, the patient must

17  receive meaningful education from a Primary Care Provider on the medical risks of staying

18  in his/her present congregate living space and potential medical benefits of being

19  transferred to another location, and an opportunity to have any questions answered.

20

21  _____

22  [4] On May 22, a week before the first transfer, Plaintiffs asked the Receiver's office to
23  consider whether certain practices regarding the housing of CIM patients who had tested
    positive with those who tested negative created a risk of infection for the latter group and
24  for others if any members of that group became infected and were then transferred.

25  [5] On June 2nd, after the date of many of 125 transfers from CIM, CCHCS published clinical
    guidelines stating that those who transfer "may be tested within a week prior to transfer or
26  upon arrival."  *COVID-19: Interim Guidance for Health Care and Public Health*
    *Providers,* at https://cchcs.ca.gov/covid-19-interim-guidance/.   Plaintiffs do not know why
27  this standard was not applied to the CIM patients discussed above, although we note that as
28  posted it is discretionary not mandatory.

16576559.1     JOINT CASE MANAGEMENT CONFERENCE STATEMENT

**Defendants' Position:**

As reported last week, on May 26, the Receiver notified CDCR that 691 high-risk inmates at Correctional Institution for Men (CIM) tested negative for COVID-19 and should be transferred out of CIM.  CDCR immediately began the process of evaluating this group of inmates to determine whether they should be excluded from transfers based on factors such as display of COVID-19 related symptoms, their overall medical or mental health condition, pending appointments, or upcoming release within the next ten days. Between May 28 and May 30, 194 inmates on the Receiver's list were moved out of CIM to Corcoran and San Quentin.  All inmates tested negative for COVID-19 before their transfers out of CIM.  Transfers of approximately 125 more inmates out of CIM were planned for June 4 and 5.  But the Receiver ordered the suspension of all transfers from CIM on June 4 after it was discovered that some of the inmates who transferred out of CIM tested positive when they arrived at their destinations.    To date, sixteen of the transferred inmates have tested positive.  Unfortunately, San Quentin, which was previously a COVID-free prison, now has COVID-positive inmates.  San Quentin is taking a number of measures to prevent spread of COVID-19 from these inmates, including placing all inmates transferred from CIM in quarantine or isolation, and strictly limiting their movement and exposure to other inmates and staff.

CDCR is prepared to work with the Receiver once he has determined an approach for housing medically high-risk patients.

**III.   ESTABLISHING AND ENFORCING WORKABLE DISTANCING PROTOCOLS AT CDCR'S INSTITUTIONS**

Plaintiffs' proposal to improve the safety of people living in cells and dorms included two elements: (1) establish and enforce workable distancing protocols for all incarcerated people; and (2) create livable dorms and gyms.

Specifically, Plaintiffs recommended people be assigned to cohorts for yard, chow hall, showers, and dayroom, and staff be assigned to working with a particular cohort to

16576559.1

minimize interactions between incarcerated people and different staff members.  Plaintiffs
further recommended that incarcerated people be assigned to work as porters in the
housing unit where they live.  Plaintiffs recommended the following strategies to strike a
balance between ensuring physical distancing and protecting people's ability to engage,
interact, and avert the physical and mental distress that accompanies social deprivation: (1)
reduce population density to create significantly more distance between cohorts and
significant fewer cohorts in each congregate living space, to maximize the amount of time
people can be assigned to use common spaces; (2) create an incentive system to encourage
remaining in cohorts; (3) test dorm residents more frequently; and (4) install clear shields
strategically in the dorms.

The parties discussed Plaintiffs' proposals.  Defendants said that they would
consider the second and fourth proposals (creating and incentive system and installing
shields), but no agreement was reached.

Plaintiffs also requested that the Division of Adult Institutions consider whether the
ventilation systems at each of the prisons is using the filters required by current COVID
community standards.  Ms. Gipson stated that she would refer that question the Plant
Operations.

**Plaintiffs' Position:**

The primary barrier to establishing, encouraging, or enforcing workable protocols
for distancing in the dorms is that most CDCR dorms are too crowded to permit people to
stay six feet from people in other cohorts.  The reduction of population density in the
dormitories so that there are fewer cohorts sharing congregate living space is a critical
strategy for mitigating the spread of the COVID-19 virus.  The Receiver has affirmed that
CDCR'S decision to release approximately 3,500 people early had a measureable positive
impact on the State's ability to avoid illness and death related to COVID-19. RT 5/21/20 at
34.  Plaintiffs strongly agree that reducing the prison population will aid in slowing the
spread of the virus, including by reducing the demand on dormitory beds.  Population

16576559.1

1   density can be reduced by, as discussed below, re-closing the CDCR to intake, so that the

2   population is reduced by attrition.  Additionally, as this Court has stated repeatedly,

3   Defendants have demonstrated that people can be safely released ahead of schedule,

4   reducing the prison population by thousands.  Plaintiffs strongly urge the Defendants to

5   close intake and to renew their successful early release program.

6          Defendants describe below corrective actions recently taken, and newly instituted

7   self-monitoring weekly checklists that a captain or manager is required to complete at each

8   prison regarding COVID-19 risk reduction measures.  Those correction actions are not yet

9   complete, and we have not yet verified what is said to have been done.  Also, while self-

10  monitoring is necessary and welcome, it is too soon to know whether it works to identify

11  all substantial problems or result in long term improvements.

12          **Defendants' Position:**

13          Defendants disagree with Plaintiffs' assertion that dorms across the prison system

14  are too crowded to allow for six-foot distancing between cohorts.  In the two prisons where

15  it has been discovered that there was insufficient space between certain cohorts in

16  particular dorms, CDCR has either already corrected, or is in the process of correcting,

17  those identified issues by, for example, rearranging the cohorts or extending the height of

18  barrier walls between cohorts.

19          Defendants were pleased that Plaintiffs' counsel acknowledged that there must be a

20  balance between maintaining an appropriate level of physical distancing while still

21  allowing inmates to engage and interact with other inmates and move around the facilities

22  to the extent their security levels permit them to.  Many inmates have worked hard to

23  lower their classification scores so that they can enjoy the benefits of living in less

24  restrictive dorm environments.  Unfortunately, many of those benefits have been curtailed

25  in response to the pandemic.  Despite that fact, many dorm inmates currently have a

26  cooperative and helpful attitude toward the implementation of measures to prevent the

27  spread of COVID-19.  Defendants are concerned, however, that overly strict enforcement

28

1  of those measures, in particular through discipline or threats of discipline, could disrupt the

2  delicate balance that has been achieved, and cause a backlash.

3       CDCR has implemented new measures to ensure accountability and compliance

4  with physical distancing rules and enhanced cleaning measures:

### 1.    May 27 memorandum from the Division of Adult Institutions

6       On May 27, CDCR issued a memorandum titled COVID-19 Operational Guidelines

7  Monitoring and Accountability to the institutions.  This new memorandum requires that

8  captains and area managers complete checklists on a weekly basis confirming that the

9  areas they manage are compliant with previous directives concerning cloth face masks,

10  social distancing, cleaning schedules, display of COVID-19 posters, and availability of

11  hand sanitizer and disinfectants.  The completed checklists are to be submitted to CDCR

12  headquarters on a weekly basis.  The new memorandum also requires that the cleaning of

13  bathrooms and showers be recorded on cleaning logs, and that inmate porters wear gloves

14  and masks when they clean.

15       The initial batch of checklists that were submitted have been produced to Plaintiffs'

16  counsel, but not all prisons have yet submitted their checklists.  The submitted checklists

17  were effective at identifying issues at the prisons that need to be addressed.  For example,

18  at California Correctional Center, the checklists revealed that some areas are out of hand

19  sanitizer; at California Correctional Institution, the checklists revealed that in some areas

20  staff and inmates need additional education and instruction about wearing cloth face

21  masks; at Deuel Vocational Institution, the checklists revealed that cleaning logs are

22  needed in certain areas; and at other prisons, the checklists helped identify areas where

23  inmates need more instruction and education on social distancing.  The checklists indicate

24  that immediate actions were taken to correct a number of these identified issues, and other

25  issues can be addressed by the institutions now that they have been identified.

### 2.    Improvements were made at CIM after the May 22 virtual tour.

27       As Defendants reported last week, CDCR facilitated a virtual tour for Plaintiffs at

16576559.1

JOINT CASE MANAGEMENT CONFERENCE STATEMENT

1   CIM's Facility A and Facility D dorms on May 22.  Plaintiffs identified several areas of

2   concern with respect to the set-up of cohorts at CIM's dorms, including concerns that there

3   were less than six feet separation between some cohorts in Facility D.

4       Since the tour, CIM began implementing changes to the Facility A dorms to

5   establish six feet of separation between cohorts or to extend barrier walls to separate

6   cohorts.    For example, for the Facility A dorms, CIM ordered Lexan (solid clear plastic)

7   barriers to extend the height of the pony walls between cohorts.  As of June 4, two of the

8   eight barriers were delivered to CIM, and one of the barriers was installed.  It took two

9   days to complete.  As of June 8, the second barrier has been installed.  The remaining six

10  barriers are expected to be delivered by June 22.  In the meantime, CIM is extending the

11  walls in the remaining Facility A Dorms with plastic sheeting.  As of June 8, the plastic

12  sheeting has been installed to extend the walls in four of the Facility A Dorms and CIM is

13  working on installing the plastic sheeting in the remaining two Facility A Dorms.

14      In addition, the transfer of inmates out of Facility A is helping to facilitate the

15  reassignment of bunks in a way that establishes six feet of separation in all directions.

16  Although Defendants believe that six feet of separation already existed in the Facility D

17  Dorms, CIM reconfigured some of the bunks or bunk assignments to create a different

18  layout of cohorts.  In addition, tape either has been or will be placed on the ground in

19  Facility A and D to identify the perimeter of each cohort.  Further, inmates received

20  additional instructions to sleep in alternating head-to-toe arrangements to maximize the

21  distance between inmates' heads.  Lastly, CIM is in the process of placing six-foot markers

22  on benches and chairs in the day rooms, and inmates were informed that they can only sit

23  on the marked spaces.  As of last week, CIM was waiting for the supply of additional tape

24  to complete these changes.

25      CDCR will facilitate a re-inspection of CIM's Facility A and D dorms for Plaintiffs

26  once the majority of the changes have been completed, which is currently anticipated this

27  week.

28

### 3.     Improvements were made at the California Medical Facility after the May 29 tour.

On May 29, CDCR permitted Plaintiffs' counsel to tour the California Medical Facility (CMF) in person.  The tour revealed several issues at CMF that required corrective action.

In two large dorms at CMF, some inmate cohorts were only separated by a short wall.  While the wall would seem to offer some protection to inmates while they are sleeping with their heads below the top of the wall, the heads of inmates sitting up on their bunks on either side of the wall could be well within six feet of each other with no barrier in between them.  This is the same issue that was identified in some dorms at CIM.  CDCR is investigating whether this situation exists in dorms at other institutions.

CMF immediately began to work on remedying this situation and has now erected a Visqueen (plastic sheeting) barrier that extends the height of the wall to just over six feet. CMF is now working to acquire sheets of Lexan that it plans to install in place of the Visqueen barrier.

CMF has previously taken a number of steps to inform inmates about keeping appropriate physical distance, including posting notices, broadcasting videos announcements concerning COVID-19 and the importance of social distancing, and educating staff and inmates about measures to prevent the spread of COVID-19.  But, during the tour, a number of inmates advised that they did not understand certain aspects of the cohort plan.  For example, some inmates said they did not understand that they should attempt to engage in some program activities, such as dayroom and recreation yard, with members of their cohort.  Accordingly, since the CMF tour, CMF officials have continued to make efforts to educate inmates about measures to prevent the spread of COVID-19 and the importance of keeping appropriate physical distance.  Specifically, the CMF management team conducted tours of each of their respective areas of the institution, further educating inmates regarding the expectations of social distancing, and further explaining the importance of the eight-person cohorts.  They also explained that inmates

16576559.1

should program within their cohorts when possible, and otherwise keep at least six feet away from other inmates.  And they reiterated the importance of wearing masks and of frequent cleaning and disinfecting.

## IV.  INTAKE

While the subject was not identified in either Plaintiffs' June 1 or June 3 emails concerning the parties' meet and confer, during the meet-and-confer, Plaintiffs added an additional element to the proposal: that Defendants close all intake from county jails, including all movement of people from Reception Centers to accommodate that intake.

As reported the last two weeks, in May, CDCR decided to maintain the closure of intake for an additional 30 days to June 22, with the exception of the intake of approximately 200 county jail inmates from four counties (Los Angeles, San Bernardino, Fresno, and San Diego).  Approximately 50 inmates have been transferred from these county jails to CDCR prisons since May 20. They are currently housed at North Kern State Prison and Wasco State Prison.  Due to the high number of positive COVID-19 cases in Los Angeles County jails, CDCR suspended the intake of inmates from Los Angeles County jails on June 5 until further notice.  CDCR will continue monitoring the number of positive COVID-19 cases in the San Bernardino County, Fresno County, and San Diego jails.  Intake from all county jails is currently scheduled to resume on June 22; however, CDCR is continuing to evaluate when and how to resume intake.

Plaintiffs proposed that intake be closed until two conditions are met: first, Defendants identify the most medically vulnerable people housed in congregate living units who can be safely transferred, offer them celled housing, and safely transfer those who choose to move.  Second, Defendants reassess movement protocols in light of the problems already identified, such as patients at CIM who had tested negative being transferred to San Quentin several weeks later and testing positive on arrival.

Defendants did not have an immediate response.  Director Connie Gipson stated that CDCR plans to open intake on June 22.  She indicated that there will be limits on the

number of people accepted but those limits have not yet been determined.  She also stated that people would not be accepted from Los Angeles County, because at least five people from that county tested positive upon arrival at CDCR in the last week.  She indicated that CDCR was considering limiting intake from other counties with significant outbreaks in their jails, but that the procedures for re-opening to intake are not yet established.  Plaintiffs agree that counties with a current outbreak should not be eligible to send people to CDCR.

**Plaintiffs' Position:**

Plaintiffs believe that intake should be suspended because we agree with the Receiver that movement entails a significant risk for spreading the virus, and given the current state of multiple uncontrolled outbreaks, movement should cease unless it is done in a carefully thought-out way for the purpose of increasing patient safety.  Movement of medically vulnerable people to safer housing would be appropriate, if done pursuant to meticulously considered written protocols to minimize the risk to patients, staff, and others.  Bringing new people into the system, however, would serve only to increase the risk of greater infection and faster spread in more crowded facilities.

**Defendants' Position:**

CDCR is in the process of evaluating whether the current intake restrictions should be extended and other restrictions on intake should be put in place after June 22.  CDCR will continue reporting to this Court and Plaintiffs about its intake plans.

## V.   INSTITUTION INSPECTIONS

### A.   **Plaintiffs' Touring**

As mentioned above, on May 28, CDCR facilitated an in-person tour of CMF for Plaintiffs and will facilitate a virtual tour California Health Care Facility on Wednesday, June 10.  Further, CDCR is in the process of coordinating a re-inspection of CIM for Plaintiffs. On June 4, Plaintiffs requested that CDCR schedule additional virtual tours at California Men's Colony, Substance Abuse Treatment Facility, and California State Prison

– Solano, and an in-person re-inspection of CMF.

### B.   Additional Touring by CDCR and CCHCS
**Defendants' Position:**

As reported last week, CDCR's Associate Director of Reception Centers traveled to CIM on Tuesday, May 26, to inspect the reconfigurations and work with CIM to come up with options to extend the barrier between inmates on either side of pony walls.  CDCR will continue these types of visits in the future and will keep the Court and Plaintiffs apprised of the efforts.  In addition, the parties were informed that California Correctional Health Care Services commenced its tours of Pleasant Valley State Prison, R.J. Donovan, and San Quentin on June 1, and that it will tour all of CDCR's other institutions in the coming weeks.

## VI.   INFORMATION THAT CDCR HAS PRODUCED TO PLAINTIFFS SINCE MAY 28, 2020

As mentioned above, CDCR facilitated tours of CMF on May 29 and a California Health Care Facility virtual tour was offered on June 10.  Further, on June 5, CDCR produced checklists from the captain's tours from eleven facilities.  Further checklists will be produced on June 8.  In addition, on June 1 and 2, CDCR responded to Plaintiffs' questions about the status of the installation of Lexan barrier walls at CIM.  On June 3, CDCR answered various follow-up questions regarding Plaintiffs' tour at CMF.  On June 4, CDCR responded to various COVID-19 related questions pertaining to cohorting, mask wearing, and cleaning protocols at California Health Care Facility, and produced documents in response thereto and a separate request for documents and information related to legionella at California Health Care Facility.  On June 5, CDCR shared information about staff testing and other topics with Plaintiffs' counsel during the meet-and-confer session.  Lastly, on June 6, CDCR answered various COVID-19 related questions pertaining inmate housing and meals at Chuckawalla Valley State Prison.  CDCR also scheduled confidential calls for Plaintiffs to speak with their clients at

California Institution for Women and California Health Care Facility.

## VII.  OTHER UPDATES

**Defendants' Position:**

During Nurses Week in mid-May, CDCR and CCHCS honored and celebrated their hard working nurses by providing food and giving out COVID-19 prizes (such as toilet paper, disinfectant and paper towels) as well as gift cards while complying with social distancing practices.  Photos and more details can be found at https://www.cdcr.ca.gov/insidecdcr/2020/06/02/across-california-cdcr-cchcs-honor-nurses/.

On June 5, Wardens and Chief Executives Officers from across the State participated in a discussion titled "Lessons Learned the First 90 days" where leadership who have experienced COVID outbreaks at California Institution for Women, California Men's Colony, and California Institution for Men candidly shared advice and strategies that greatly assisted their staff during these recent outbreaks.

DATED:  June 8, 2020                    PRISON LAW OFFICE


By:      */s/ Alison Hardy*
      ALISON HARDY
      Attorney for Plaintiffs

16576559.1
JOINT CASE MANAGEMENT CONFERENCE STATEMENT

DATED:  June 8, 2020                          XAVIER BECERRA
                                              Attorney General of California


                                      By:    /s/ Damon McClain
                                              DAMON MCCLAIN
                                              Supervising Deputy Attorney General
                                              NASSTARAN RUHPARWAR
                                              Deputy Attorney General
                                              Attorneys for Defendants


DATED:  June 8, 2020                          HANSON BRIDGETT LLP


                                      By:    /s/ Samantha Wolff
                                              PAUL B. MELLO
                                              SAMANTHA D. WOLFF
                                              Attorneys for Defendants

# CERTIFICATE OF SERVICE

Case Name:   **_Plata, et al. v. Newsom, et al._**   No.   **01-cv-01351-JST**

I hereby certify that on <u>June 8, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## JOINT CASE MANAGEMENT CONFERENCE STATEMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>June 8, 2020</u>, at San Francisco, California.

| N. Codling | _/s/ N. Codling_ |
|:---:|:---:|
| Declarant | Signature |

CA2001CS0001
42218964.docx

# Exhibit B

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### Civil Minutes

Date: June 9, 2020                                              Judge:  Jon S. Tigar

Time:  1 hour 25 minutes

Case No.        **4:01-cv-01351-JST**
Case Name       **Marciano Plata et al v. Gavin Newsom et al**

Attorneys for Plaintiffs:        Donald Specter
                                 Steven Fama
                                 Alison Hardy
                                 Sophie Hart

Attorneys for Defendants:        Paul Mello
                                 Samantha Wolff
                                 Damon McClain

Counsel for Intervenors:         David Sanders
                                 Gregg Adam

Receiver:                        Clark Kelso

Outside Counsel for Receiver:    Martin Dodd


Deputy Clerk: Mauriona Lee                        Court Reporter: Raynee Mercado

### PROCEEDINGS

Further Case Management Conference – held.


### RESULT OF HEARING

1.  Hearing held via Zoom videoconference.

2.  Court discussed early releases.  Counsel for Defendants stated that a plan will be shared
    by the end of the week.

3.  After discussion with the parties, the Court entered an order for testing of staff members
    at San Quentin and Corcoran, and for staff who interacted with recently transferred

1

inmates.  Defendants are directed to share with Plaintiffs by June 16, 2020, a plan for testing of all staff systemwide.  That plan will be discussed at the next case management conference.

4.  By June 18, 2020, at 2:00 p.m., Defendants shall submit copies of all educational material regarding COVID-19 that has been sent to or posted for staff or inmates within the last two weeks.  The purpose of this request is to allow the Court to review messaging that is being provided to staff and inmates by headquarters and institution leadership.

5.  Parties to discuss, in consultation with the Receiver, the following issues: transfer protocols; whether high-risk inmates should be transferred from dorms to cells; if so, procedures for educating inmates who are offered transfers to cells; resumption of intake; development of workable protocols for physical distancing by inmates; and staff compliance with mask requirements.  The next case management conference statement shall include an updated discussion on these items.

6.  Defendants shall report in the next case management conference statement on the consequences for staff, including contracted staff, of not wearing a mask.  If there are no consequences, Defendants shall explain why that decision was made.

7.  Further case management conference set for June 19, 2020, at 3:00 p.m.  Case management statement due June 18, 2020, by 2:00 p.m.