IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE KIMBERLY J. MUELLER

```
RALPH COLEMAN, et al.,

                Plaintiff,
vs.                                  Sacramento, California
                                     No. 2:90-CV-00520
GAVIN NEWSOM, et al.,                Friday, June 12, 2020
                                     10:14 a.m.
                Defendant.
_____/
```

--oOo--

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE

*(Proceedings held via Zoom video conference)*

--oOo--

```
Official Reporter:      KACY PARKER BARAJAS
                        CSR No. 10915, RMR, CRR, CRC
                        UNITED STATES DISTRICT COURT
                        501 I Street
                        Sacramento, CA  95814
                        kbarajas.csr@gmail.com
```

*Proceedings recorded by mechanical stenography.  Transcript produced by computer-aided transcription.*

```
 1   APPEARANCES:

 2   For the Plaintiffs:     ROSEN BIEN GALVAN & GRUNFELD LLP
                             BY:  MICHAEL BIEN
 3                                Attorney at Law
                                  LISA ELLS
 4                                Attorney at Law
                                  JESSICA WINTER
 5                                Attorney at Law
                                  MARC SHINN-KRANTZ
 6                                Attorney at Law
                                  AMY XU
 7                                Attorney at Law
                             101 Mission Street, 6th Floor
 8                           San Francisco, CA  94105

 9                           PRISON LAW OFFICE
                             BY:  DAVID SPECTER
10                                Attorney at Law
                                  STEVEN J. FAMA
11                                Attorney at Law
                             1917 Fifth Street
12                           Berkeley, CA  94710

13   For the Defendants:     DEPARTMENT OF JUSTICE
                             OFFICE OF THE ATTORNEY GENERAL
14                           BY:  TYLER V. HEATH
                                  Attorney at Law
15                                LUCAS L. HENNES
                                  Attorney at Law
16                                ELISE THORN
                                  Attorney at Law
17                                MONICA ANDERSON
                                  Attorney at Law
18                           1300 I Street
                             Sacramento, CA  95814
19
                             DEPARTMENT OF JUSTICE
20                           OFFICE OF THE ATTORNEY GENERAL
                             BY:  KYLE LEWIS
21                                Attorney at Law
                             455 Golden Gate Ave., Suite 11000
22                           San Francisco, CA  94102

23                           ROBINS KAPLAN LLP
                             BY:  ROMAN M. SILBERFELD
24                                Attorney at Law
                             2049 Century Park East, Suite 3400
25                           Los Angeles, CA  90067-3208
```

```
 1   APPEARANCES (Continued):

 2   Also Present:          Matthew Lopes, Special Master
                            Jeffrey Metzner, Special Master Team
 3                          Henry Dlugacz, Special Master Team
                            Kerry Walsh, Special Master Team
 4                          Kristina Hector, Special Master Team
                            Mohamedu Jones, Special Master Team
 5
                            Diane Toche, Undersecretary of Health
 6                          for State of California
                            Joseph Bick, M.D.
 7
                            James Spurling
 8                          General Chief Counsel, OIG

 9                          Gregg Adam, CCPOA
                            David Sanders, CCPOA
10                          Attorneys at Law

11                          Stirling Price, DSH

12                          Christopher Kent
                            Antonina Raddatz
13                          Christine Ciccotti
                            Attorneys at Law
14                          Department of State Hospitals

15                          Melissa Bentz
                            Jennifer Neill
16                          Nick Weber
                            Attorneys at Law
17                          California Department of Corrections

18                          Haven Gracey, Law Clerk

19                               --oOo--

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, FRIDAY, JUNE 12, 2020, 10:14 AM

2                              --oOo--

3          THE CLERK:  United States District Court for the

4    Eastern District of California is now in session.  Chief Judge

5    Kimberly J. Mueller now presiding.

6          Calling civil case 90-520, Coleman, et al. versus

7    Newsom, et al.  This is on for a video status conference.

8          THE COURT:  All right.  Good morning.  I will call

9    roll.  For the plaintiffs, Mr. Bien?

10         MR. BIEN:  Yes, your Honor.  I'm here.

11         THE COURT:  All right.  And you're appearing by audio

12   only, Mr. Bien?

13         MR. BIEN:  I don't know what happened to my video.  I

14   was on video a minute ago but --

15         THE COURT:  Well, this is one reason we're testing to

16   see how well this works.  It's important to be able to proceed

17   in this way if needed.  So not so important for today, but if

18   you can figure that out, Mr. Bien, that would be good.

19         Ms. Ells, you're now upright.

20         MS. ELLS:  Yes, your Honor.  I'm here.

21         THE COURT:  All right.  Ms. Winter.

22         MS. WINTER:  Yes.  I'm here, your Honor.  Good

23   morning.

24         THE COURT:  All right.  Mr. Shinn-Krantz.

25         MR. SHINN-KRANTZ:  Good morning, your Honor.  I seem

```
1    to have lost my video too.
2              THE COURT:  All right.  Thank you.
3              On the screen, Ms. Xu.
4         MS. XU:  Good morning.
5              THE COURT:  Good morning.
6              Mr. Specter, I see what looks like a ceiling for
7    Mr. Specter.  He's muted.  Is Mr. Specter actually there?
8    Well, again, good that we're testing this.
9              Mr. Fama.
10             MR. FAMA:  Good morning, your Honor.  Good to see you.
11             THE COURT:  All right.  And then for the defense,
12   Mr. Lewis.
13             MR. LEWIS:  Good morning, your Honor.
14             THE COURT:  Good morning.
15        Mr. Silberfeld.
16             MR. SILBERFELD:  Good morning, your Honor.
17             THE COURT:  Good morning.
18             Ms. Thorn.  All right.  So you're muted, Ms. Thorn.  I
19   can see your lips moving.
20             MS. THORN:  Excuse me.  Good morning, your Honor.
21             THE COURT:  All right.  Good morning, Ms. Thorn.
22        Mr. Heath.
23             MR. HEATH:  Good morning, your Honor.
24             THE COURT:  Good morning, Mr. Heath.
25        Mr. Hennes.
```

1          MR. HENNES:  Good morning, your Honor.

2          THE COURT:  Good morning.

3          Ms. Anderson.

4          MR. ANDERSON:  Good morning, your Honor.

5          THE COURT:  Good morning.

6          And Mr. McClain?

7          MR. LEWIS:  Your Honor, Mr. McClain may not have been

8    able to make it.

9          THE COURT:  All right.  Then also monitoring,

10   Undersecretary Toche.

11         MS. TOCHE:  Good morning, your Honor.

12         THE COURT:  Good morning.  Hanging out by the river, I

13   see.

14         Chief Counsel Secretary Ms. Neill.

15         MS. NEILL:  Good morning, your Honor.

16         THE COURT:  Good morning.

17         Dr. Bick.

18         DR. BICK:  Good morning, your Honor.

19         THE COURT:  Good morning, Dr. Bick.

20         Ms. Bentz.

21         MS. BENTZ:  Good morning, your Honor.

22         THE COURT:  Good morning.

23         Mr. Weber.

24         MR. WEBER:  Good morning, your Honor.

25         THE COURT:  Good morning to you.

1          Is Ms. Stafford present?  I have a Carrie Stafford on

2     my list.  I'm not seeing her.

3          I understand that Mr. Price is standing in for

4     Director Clendenin today.

5          MR. PRICE:  Yes, I am, your Honor.  Good morning.

6          THE COURT:  Good morning, Mr. Price.

7          Ms. Ciccotti.

8          MS. CICCOTTI:  Good morning, your Honor.

9          THE COURT:  Good morning.

10         Mr. Kent.

11         MR. KENT:  Yes.  Good morning, your Honor.

12         THE COURT:  Ms. Raddatz.

13         MS. RADDATZ:  Good morning, your Honor.

14         THE COURT:  General chief counsel of OIG,

15    Mr. Spurling.

16         MR. SPURLING:  Good morning, your Honor.

17         THE COURT:  Good morning.

18         Mr. Adam, CCPOA.

19         MR. ADAM:  Good morning, your Honor.

20         THE COURT:  Good morning.

21         Mr. Sanders, CCPOA.

22         MR. SANDERS:  Good morning, your Honor.

23         THE COURT:  Good morning.

24         And Special Master Lopes.

25         SPECIAL MASTER LOPES:  So nice to see you, your Honor.

1    Good morning.

2            THE COURT:  All right.  Good morning.

3            And there are members of your team.  Are they

4    monitoring by telephone alone or audio alone?

5            SPECIAL MASTER LOPES:  Yes, they are.

6            THE COURT:  All right.  Could you identify who is on

7    the line that way, Special Master Lopes.

8            SPECIAL MASTER LOPES:  Yes, your Honor.  We have

9    Mohamedu Jones, Kerry Walsh, Kristina Hector, Dr. Jeffrey

10    Metzner, Dr. Kerry Hughes, and Henry Dlugacz.

11            THE COURT:  All right.  Thank you.

12            All right.  And I have you on two separate screens, so

13    we may all have to do some toggling back and forth.  We do ask

14    that you stay muted when you're not speaking.  That helps with

15    the audio.  And this is somewhat of a test.  We've had good

16    luck with telephonic proceedings, but I think we do need to be

17    ready to proceed in this way.  Ms. Schultz will follow up with

18    you.

19            This proceeding by Zoom, as much as it allows us to

20    hold virtual court, and even colleagues have had good success

21    with evidentiary proceedings, the one thing we don't plan on

22    doing by Zoom is jury trials.  It does place a burden on court

23    staff, on Ms. Schultz, the courtroom deputy.  IT staff is at

24    the ready.  One way that you could help her is by making

25    certain your names are set up before you sign on.  She'll

1    follow up with you on that, and we would request that you help

2    her in that regard.

3              A couple of housekeeping matters before I ask for a

4    report from Special Master Lopes, it appears the Court is going

5    to have to resolve a dispute about time lines for responding to

6    the Special Master's report on the labor economist and also

7    production of materials in discovery as may be relevant to the

8    June 25th evidentiary hearing.  On those two matters, I am

9    going to direct the parties to file a joint report.  You don't

10   have time; I don't have time for full motion practice.  So the

11   streamlined joint report will work for the Court to understand

12   your separate positions on those matters, assuming you're still

13   unable to resolve them.  And I would ask for that by next

14   Tuesday at 4:00 p.m., and then I will resolve the disputes

15   promptly to allow things to move forward.

16             So that's all I have to say about those two matters.

17   Another housekeeping matter, I note that plaintiffs continue to

18   file documents from the Plata matter on the docket with a

19   simple notice.  I peeked at the most recent.  I see

20   Mr. Shinn-Krantz signed the notice.  Without any explanation, I

21   see them as, at this point, cluttering the docket.  So unless

22   they're filed in anticipation of motion practice and unless you

23   can tell me otherwise today, I would request that they not be

24   filed.  I'm not reading them unless they're accompanied with a

25   request to this Court.  I don't know if it's an effort to

1  create a record that makes it look as if there's some

2  coordination there.  I just -- I don't know what to make of

3  them.  So Mr. Shinn-Krantz, you signed the most recent notice.

4  Is there anything you want me to know about those?  Any reason

5  they need to be filed, unless they're anticipating motion

6  practice, in which case they can be filed at the time of any

7  motion?

8         MR. BIEN:  Your Honor, this is Michael Bien.  May I

9  address that?

10         THE COURT:  You may.

11         MR. BIEN:  Yes.  We were filing them because of -- to

12  keep the Court informed about what was going on with

13  coordination issues.  We will not file them in the future

14  unless they're directly relevant to something we want the Court

15  to be aware of.

16         THE COURT:  All right.  Thank you.  I'm not

17  uninterested, of course, but I can't do much with them unless

18  they're accompanied by a specific request.  So thank you.

19  Thank you for that.

20         So the two agenda items the Court has in mind today,

21  we'll hear from the Special Master with his update, allow the

22  parties to weigh in.  And then I have a general question about

23  the status of movements of inmates within the system and what

24  is the date by which stasis will be achieved based on current

25  plans.

1          And then secondly, I realize they may be aspirational,

2     but the Court of course reads the news and I've seen recent

3     suggestions that the administration is contemplating closure of

4     facilities.  I would like to understand if anything is being

5     signaled with respect to mental health there.  I'll have a few

6     more comments before I ask the defendants to tell me whatever

7     they may know and how that may affect the Court's thinking

8     about the Coleman case.

9          So those are really the two or three agenda items the

10    Court has.  As always, I would give the parties a chance to

11    weigh in at the end before we sign off.

12         I should say also, I don't think we need to discuss

13    this unless either party wishes to, but I understand the

14    Special Master's data expert is continuing his work and that

15    the defendants are respecting that he's entitled to all records

16    that he may require for that work; and at this point in time it

17    inevitably includes information regarding COVID-19 data as it

18    relates to class members.

19         So I'm confirming that that is the Court's

20    understanding.  If the defendants disagree with me, please let

21    me know when it's your chance to speak.

22         So with that, Special Master Lopes, your report.

23         SPECIAL MASTER LOPES:  Thank you, your Honor.

24         As of June 11th, 2020, CDCR reported that 22,158

25    inmates have tested positive for COVID-19 of which 7,184 or 33

1    percent were Coleman class members.  Of the 3,055 inmates who

2    have tested positive, 775, over 25 percent were Coleman class

3    members.  Of the 640 inmates whose cases were resolved, 319 or

4    50 percent were class members.  Of the 15 individuals who have

5    sadly passed away due to the virus, six were members of the

6    Coleman class.

7            Your Honor, the task force continues to meet

8    regularly, and we're doing a lot of important work.  Two task

9    force meetings and numerous work group meetings were held since

10   the last status conference on May 29th.  The task force met on

11   June 2nd and June 9th.  The CDCR small work group met on

12   June 3rd and June 10th.  The DSH small work group met on

13   June 1st, June 8th, and June 11th.  And the newly formed

14   behavior treatment work group had its first meeting on June 5th

15   and also met on June 10th.

16           There was also discussion with all the parties to

17   address modifications to the court-ordered maps.  In fact,

18   we've had two meetings already.  The task force meetings

19   include plaintiffs, defendants, Coleman experts, and a

20   representative from the Receiver's Office as well as an

21   Armstrong representative.

22           The work group meetings were attended by small

23   contingents from my team as well as CDCR and DSH officials.  We

24   continue to have regularly scheduled meetings for the task

25   force and small work groups each week.  The Coleman experts

1    continue to meet with the defendants as needed outside of the

2    work groups.

3        Over the last two Mondays I have briefed the

4    plaintiffs on what has been happening in the small work group

5    process because they are not members of that small work group.

6        The DSH small work group meetings were held to address

7    transfers to DSH.  The CDCR small work group meetings addressed

8    the issues relating to CDCR including DSH transfers, the

9    resumption of transfers to the PIPs at MHCBs and the COVID-19

10   mental health dashboard and treatment in the so-called team

11   rooms.

12       The behavior treatment work group addressed issues

13   including former attempts by CDCR to address the needs of

14   patients with personality disorders.  A small work group will

15   be meeting to discuss EOP ASU hub certifications, and that will

16   include our data expert, Dr. Potter.

17       Guidelines addressing the resumption of transfers to

18   ICF and acute levels of care in CDCR's psychiatric inpatient

19   programs were distributed, and plaintiffs have provided their

20   comments.  However, all the parties have agreed that transfers

21   would resume, but the policy hasn't been formally adopted.

22       As of June 5th, 11 patients had transferred to

23   intermediate care, and 11 patients have transferred to acute

24   care.  14 more were in process.

25       CDCR provided plaintiffs with the COVID mental health

1    dashboard indicators that have been the subject of small work

2    group meetings with my experts.

3            In terms of the transfers from CDCR to DSH, they

4    continue to occur, and it was reported that since the last

5    status conference, 19 patients have transferred to DSH and ten

6    were scheduled for transfer next week.  Data provided by DSH at

7    the task force meeting indicated that as of June 5th there were

8    29 vacant beds at ASH, 5 vacant beds at Coalinga, and 19 vacant

9    beds at Patton.  We will continue to review the data regarding

10   transfers, referrals, rejections, and discharges in future task

11   force meetings.

12           Revised guidelines for transfers to DSH were still in

13   the process of being developed by DSH and CDCR.  I believe that

14   I saw an email, your Honor, just moments ago where -- that a

15   draft may have been distributed to the parties, but I will let

16   the defendants speak to that point.

17           In terms of case activity, the parties have filed a

18   stipulation that identifies the temporary departures from the

19   program guide requirements for the provision of mental health

20   care which are based on the new COVID-19 policies.  A meeting

21   was held yesterday to discuss exactly what would be reported to

22   the Court in its first monthly filing which is due on Monday,

23   and we will be having another call later today, probably this

24   status -- further status conference.

25           The parties continue to meet and confer regarding data

1   that will be reported in conjunction with the court-ordered

2   maps.  We had a meeting just yesterday to go over some

3   modifications that occur in that -- that process continues to

4   be collaborative, and both parties are giving meaningful input.

5          Since March 14th, your Honor, I just wanted to report

6   that I have filed five status reports, and I filed the Lindsay

7   Hayes draft suicide prevention report and distributed that to

8   the parties.  That is not before the Court yet, but there have

9   been five reports filed.  The most recent of which was the data

10  report that was filed on Monday, June 8th.  I may have

11  misspoken.  There have been -- yes, five that have been filed

12  and the sixth is Lindsay which has been distributed in draft.

13         Dr. Potter, the data expert, is continuing to have

14  regularly scheduled meetings with officials from CDCR and the

15  Receiver's Office, and he will be involved in the discussions

16  around remodeling, reconstructing the EOP ASU hub certification

17  process.

18         I have had a meeting since the last status conference

19  with Secretary Diaz to discuss transfers into CDCR and

20  additional efforts by CDCR to reduce the spread of COVID-19.

21         That's my report, your Honor.

22         THE COURT:  All right.  Thank you, Special Master

23  Lopes.

24         Any party can respond to what they've heard if they

25  wish.  So let me ask first, it may make sense for the

1   defendants to go first on this question of what's the status of

2   transfers, when will stasis be achieved yet again, and perhaps,

3   Mr. Lewis, you could also help the Court understand are the

4   transfers without respect to whether or not someone is in the

5   Coleman class, that is, are they being affected looking only at

6   numbers of inmates being moved, not their status under Coleman?

7           Mr. Lewis.

8           MR. LEWIS:  Good morning, your Honor.  And very

9   quickly, if I could make two clarifications to the Special

10  Master's report.  I believe the Special Master said that there

11  were 22,000 positive test results.  There's 22,000 tests.  And

12  I can understand how with some of these statistics that may

13  have come out confused, but there's been 22,000 tests

14  conducted.

15          THE COURT:  Right.

16          MR. LEWIS:  Further, there have been -- since the last

17  status conference, there have been a total of 19 admissions to

18  the DSH for a total of 42 now since admissions were resumed.

19  The Special Master had said 11.  I think there's 11 in the past

20  week.  So a total of 19 over the past two weeks, 42 all

21  together.

22          To address your question, your Honor, about the

23  movements.  Movements did start up.  They did identify some

24  inmates at CIM that were medically vulnerable inmates that were

25  going to be moved out, but unfortunately there were some

1   difficulties encountered with moving COVID with those inmates.

2   There was an outbreak that has now started -- I wouldn't call

3   it an outbreak, but they have now had some positive tests at

4   CSP -- or at San Quentin, I'm sorry, as a result of that

5   movement.  So they moved -- I believe the number -- I would

6   look to my screen, but I believe the number was over a hundred

7   inmates were moved of which about 40 were CCCMS inmates to

8   other institutions.  When they started getting positive test

9   results, they halted the movements.

10          So right now in the Plata court I understand they have

11   asked the Receiver and CCHCS to kind of reassess their movement

12   criteria as well as their testing criteria so that when

13   movements resume, they have this additional safety layer within

14   it to include the tests on both sides and things like that.

15          So as of right now, movements are stopped or very

16   restricted because they're trying to refine the movement

17   criteria as to testing and things like that.

18          Now as to your question about whether or not there are

19   specific targeted moves being addressed to Coleman class

20   members, my understanding is, aside from the inmates that were

21   at CIM that were being moved due to medical vulnerabilities,

22   there are no specific targeted moves directed at Coleman class

23   members other than, as Dr. Bick has stated -- and I apologize.

24   I believe Dr. Bick may have lost connection, so I'll try to

25   speak as best I can to some of these issues.  There was

1    Dr. Bick's statement about he wanted --

2              (Court reporter interruption.)

3              THE COURT:  All right.  So Mr. Lewis, you may pick up

4    but going more slowly and more clearly.

5              MR. LEWIS:  Yes, your Honor.  And also I believe there

6    could be some microphone issues, so I apologize for that.

7              So movements have been stopped, as I was saying,

8    because of some of the issues being encountered with CIM, with

9    testing issues and the problems.  They removed people with

10   COVID to some of the other institutions.  But in terms of

11   identifying specific things as to the Coleman class, aside from

12   some of the statements that Dr. Bick has made earlier about his

13   interest in maybe shutting down the TMHUs or trying to

14   depopulate the TMHUs as much as possible and do that and then

15   get some of the inmates -- they've identified about 150 inmates

16   per week in restricted housing that they're trying to move out

17   to the extent that they may involve some Coleman class members.

18   That is happening.  But there are no specific targeting

19   movements addressed at the Coleman class members that I'm

20   aware.

21             And I believe Dr. Bick did join now.  Dr. Bick, are

22   you able to hear me?

23             THE COURT:  Dr. Bick, I do see you on the screen.

24   You're back on.

25             MR. LEWIS:  Maybe unmute, Dr. Bick.

1        THE COURT:  Did you want to yield to Dr. Bick to add a

2   few comments?

3        MR. LEWIS:  Your Honor, maybe if Dr. Bick can talk

4   about whether or not there are any specific targeted movements

5   for the Coleman class members, maybe that's something that

6   Dr. Bick could provide some more information.

7        THE COURT:  All right.  I would be happy to hear from

8   Dr. Bick, if he could also update the Court -- I mean,

9   previously towards the beginning of our statuses on the

10  coronavirus, I had asked whether or not there was CDC guidance

11  for mentally ill incarcerated persons.  At that point I

12  understood Dr. Bick to say there was not.  I'm wondering if

13  there's any update on such guidance.  Has the CDC developed

14  such guidance?  Has California Department of Public Health or

15  any other public health entity done so?

16       So Dr. Bick.  Whoops, we're not hearing you.  We can

17  see you.  It does not appear that you're muted.  Ms. Schultz is

18  saying you don't have an audio connection.

19       All right.  Dr. Bick does not have an audio

20  connection.  Again, it's good that we're testing this medium.

21       So Mr. Lewis, are you able to fill in, recognizing

22  that Dr. Bick has more to say, and I am interested in hearing

23  from him, but can you tell me at least about the guidance

24  question?  Is there any guidance that has been developed since

25  the start of the coronavirus pandemic with respect to mentally

1    ill incarcerated persons?

2        MR. LEWIS:  Your Honor -- okay, your Honor, I'm on.  I

3    am not aware of any specific guidance.  I have not seen it, and

4    of course if there was, I believe that probably would have been

5    talked about in some of the task force meetings and brought up

6    by some of the many clinicians involved in the case.  So I will

7    look into that, but I am presently not aware, and in fact, I'll

8    look it up right now just to confirm.

9        THE COURT:  All right.  Ms. Schultz believes that

10   Dr. Bick now has audio.  So if you can unmute, Dr. Bick, and

11   let's see if we can hear you now.

12       DR. BICK:  Good morning.

13       THE COURT:  All right.  Good morning.  We can hear you

14   now.  So brief comments based on the exchange you've just heard

15   including whether or not there is guidance now for mentally ill

16   incarcerated persons.

17       DR. BICK:  I apologize for the delays this morning,

18   your Honor.  You know, we continue to scour the literature for

19   specific guidance regarding mentally ill patients, in addition,

20   evidence for adverse outcomes specifically related to the

21   mental health of clients.  There isn't -- there has not been

22   any guidance that I have been able to find from either

23   California Department of Public Health Centers for Disease

24   Control or other authorities and nothing specifically in other

25   literature talking about different guidance for the mentally

 1    ill.

 2                THE COURT:  Given your expertise and your position,

 3    are you in a position to develop such guidance for CDCR?

 4                DR. BICK:  Based on what I understand about this

 5    virus, I don't believe that there are specific strategies that

 6    need to be developed regarding our mentally ill patients in

 7    terms of different housing, different locations, and the like.

 8                I do obviously understand that for many of our

 9    patients, including the mentally ill, the developmentally

10    disabled, the people that have had significant head trauma,

11    those who have dementia, there are particular challenges to

12    them maintaining hygiene and following the guidance that we're

13    providing but nothing that I've seen that is specific to the

14    mental health patients.

15                THE COURT:  All right.  Thank you.

16                Mr. Lewis, just finally before I ask Mr. Bien if he

17    has things to say in response to what he's heard on this point,

18    are you effectively saying that transfers of inmates may stop

19    and start depending on infection rates and locations and

20    continue over the next many months?

21                MR. LEWIS:  Yes, your Honor.  There was a matrix, a

22    movement matrix that was produced by CDCR which was provided to

23    plaintiffs and Special Master, and it does envision things like

24    your Honor is talking about where certain institutions could

25    have a spike in COVID cases so they would be closed to intake.

1   So that would affect movement.

2          To your larger question, I believe that CDCR is

3   definitely interested and wants to resume movement as soon as

4   possible once a safe -- I guess a better plan or a new plan is

5   worked out with CCHCS and the Receiver.  So I guess my answer

6   your Honor, is yes, it can happen.  CDCR does not want to

7   happen -- they want movement to happen to get inmates moving

8   throughout the system as they have to, but in light of COVID

9   happening and popping up at certain institutions, according to

10  the matrix that's been released, there would be restrictions on

11  where inmates would go, and it would have impacts on movements

12  in general.

13         But having said that, CDCR does want to begin movement

14  as soon as possible making sure that it's safe for all inmates

15  regardless of what class or conditions they have.

16         THE COURT:  So just so I'm clear, there's been a lot

17  of talk about strategic planning here, and I'm not clear on

18  where defendants are with that, but is there a plan to effect a

19  certain number of movements, and if so, if infection rates and

20  locations did not impede that plan, let's just assume for sake

21  of argument CDCR could start now and continue all those

22  movements, when would they be done?

23         MR. LEWIS:  Your Honor, I can't speak to that question

24  about when they would be done, but I can say that there are

25  definitely plans, strategic plans, et cetera, to start moving.

1    In fact, there was a plan as -- last week there was, but then

2    this -- these positive tests at some of the institutions caused

3    the system to stop.  This is something that's being worked

4    through not only at CDCR but DAI, the Division of Adult

5    Institutions, but also with the Receiver's Office given some of

6    the medical concerns that would be out there about moving

7    inmates.

8         So yes, there is definitely a plan to resume movement.

9    It was put on hold because of what happened with the CIM

10   movements.  I cannot speak to when all movements will happen.

11   There may be even a number as to what that movement would look

12   like.  I know for instance, like I said earlier, they're

13   identifying about 150 inmates per week that are in restricted

14   housing that they would like to move.  So there are continual

15   moving plans to identify large groups of inmates that could be

16   moved responsibly in cohorts and given some of the

17   transportation restrictions that are just -- that are

18   identified in the matrix that's been circulated and the plans

19   that have been circulated about movement so far.

20        THE COURT:  But again, the moves are to try to address

21   COVID and achieve best practices with respect to COVID.

22   There's no strategic element of the plan that is attempting to

23   move mental health patients to their ideal location.  For

24   example, to achieve clustering, I know there's been talk about

25   clustering in the past, nothing is thinking about that as a

1    factor when it comes to movement?

2            MR. LEWIS:  Your Honor, I am aware, such as Dr. Bick

3    mentioned earlier, that said that the TMHUs, that there is

4    definitely a movement afoot to depopulate the TMHUs and to get

5    those individuals into their appropriate physical space or

6    appropriate treatment space and that there's moves to restart

7    MHCB transfers to get them to the appropriate beds.  So if I

8    misspoke, I apologize.  There definitely are plans, and things

9    are happening to start movements to get people moved including

10   patients at various levels of care to get them to the right

11   locations and things like that.  You've already seen it with

12   DSH transfers resuming and stuff like that.

13           So I think that there definitely are plans.  I mean,

14   there definitely is a strategic guideline or guidance to get --

15   and I think Dr. Bick could speak to this as well -- to get the

16   person to the right bed and make sure that treatment is

17   happening.  That's foremost in all planning that's going on and

18   is definitely a concern of the department particularly as to

19   the Coleman class.

20           THE COURT:  Final question, just to make sure I'm

21   comprehending.  I keep using this word "stasis."  Does that

22   notion just not fit what's going on?  That is, is it

23   unrealistic to think that at some point following moves, once

24   they can occur, given the need for quarantine and delays to

25   manage COVID, will CDCR reach at some point a relative place of

1    stability with regard to the location of all inmates including

2    Coleman class?

3         MR. LEWIS:  Yes, your Honor.  I think CDCR wants to

4    reach a level of stasis.  It's good for their operations.  It

5    makes it easier to do when you can get to a normal practice,

6    even though normal under COVID is going to be different.  I

7    just can't -- I don't think anyone could responsibly give a

8    deadline as to when that's going to be, but there definitely is

9    an interest in getting there.  But as we've seen with just

10   this -- the resumption of the CIM-related transfers, there are

11   hiccups and issues along the way.  We're trying to figure out

12   the best practices to do that to both safeguard staff and

13   inmates from the disease.

14        THE COURT:  All right.  Mr. Bien, your thoughts on

15   this issue, and I need you to unmute.  You're still muted.

16        MR. BIEN:  Sorry, your Honor.

17        THE COURT:  All right.

18        MR. BIEN:  First of all, we understand that nine to

19   ten institutions are presently closed to transfers due to COVID

20   restrictions.  And as I'm sure your Honor knows from various

21   reports in the news, you know, COVID has been identified and

22   spreading into more prisons, not less.  Some of the places that

23   have had outbreaks before have come into control, such as LAC,

24   but others seem to be relatively, you know, out of control in

25   outbreak, such as Avenal or Chuckwalla where there was just a

1   death reported today at Chuckwalla.

2          So I think that we understood that as of yesterday

3   when we had a task force that despite the restrictions on

4   movement there still were movements going on from the TMHUs to

5   higher levels of care.  Again, Special Master Lopes reported on

6   that.  It was a small number, 22, I guess, but we didn't

7   understand from yesterday's report that there was a closure as

8   to those movements.  It's quite concerning to us the number of

9   people that we understand are -- need to be at higher levels of

10  care, MHCB or higher exceeds 300 as we understand.  So we're in

11  a very difficult position where movements are restricted due to

12  the inability of the department to control the spread of COVID,

13  and at the same time, Coleman patients are being held in

14  locations where they cannot receive appropriate levels of

15  mental health care, especially at the highest levels of care

16  where it's the most dangerous.  So it is quite concerning, and

17  we don't know when the department will be able to get to some

18  stasis.  At this point, you know, we're still on the upswing,

19  unfortunately, within the Department of Corrections.

20          THE COURT:  All right.  Understood.

21          MR. LEWIS:  And your Honor, if I may be heard, your

22  Honor.

23          THE COURT:  You could.  The Court is tracking.  This

24  Court's district, of course, has many of the institutions that

25  are affected, and so it's --

1          MR. LEWIS:  Yes, your Honor.

2          THE COURT:  -- seeing that in other ways as well.

3          Mr. Lewis.

4          MR. LEWIS:  My apology, your Honor.  Movements are

5     occurring, and it's just the volume may be decreasing in terms

6     of because of outbreaks at institutions.  But as Mr. Bien

7     mentioned, there are movements in and out of ICS and out of --

8     into higher levels of care as needed.  Those are happening.

9     They may not be in terms of like we're moving Coleman patients

10    only.  But if patients need to move for medical or mental

11    health reasons, they definitely are being moved.  So I

12    apologize if I didn't make that clear enough.

13          You definitely have MHCB movements occurring, and we

14    will get to a new stasis.  It's just going to be a new stasis

15    because of the layering on the COVID restrictions.  There's a

16    backlog out there.  They have to get through that, and then

17    we'll move forward into the new realm essentially.  But there

18    definitely is movement occurring.  My apologies if I didn't

19    make that clear, particularly as to some of the higher levels

20    of care movements out of the TMHUs, out of restricted housing

21    and things like that.  There just aren't a large scale moving

22    that's going on.  Particularly if that was to reoccur or when

23    that occurs, there's going to have be adequate testing, and the

24    policy behind that is going to have to be revised.  Thank you.

25          THE COURT:  All right.  I'm asking these questions to

1   try to update myself and think broadly about how this case

2   moves forward, recognizing that it may be many months before

3   COVID is permanently suppressed or an effective vaccine is

4   available.  And even if a point of stasis is reached at one

5   point, then that might be revisited based on new information.

6   It doesn't suspend this Court's need to pay attention to the

7   requirements of this case.

8            MR. FAMA:  Your Honor.

9            THE COURT:  Yes, Mr. Fama.

10           MR. FAMA:  Thank you.  If I may, and I don't know if

11  the Court is puzzled, as I am, but I'm not understanding

12  whether class members who need a crisis bed or intermediate

13  inpatient care can be moved from the nine or ten prisons that

14  are closed to all movement.  Do they act as an exception?

15  Because, as you know, I'm Plata counsel, and we were informed

16  yesterday of the nine or ten prisons closed to movement.  It

17  perhaps may be that the mental health patients can be moved out

18  to a crisis bed or inpatient as an exception.  But if the Court

19  is puzzled or curious, as I am, I would appreciate if Dr. Bick

20  or someone could address that particular point.

21           THE COURT:  I'm happy to ask Mr. Lewis in the first

22  instance, and then if he wants to yield to Dr. Bick.  The

23  details are not clear to this Court at all.  The question is

24  can they be addressed in the work groups currently, or is some

25  other type of focus required by this Court.  The maps, my

1   thought was the maps, as updated, would allow me to track what

2   is going on, but your response to Mr. Fama's question,

3   Mr. Lewis?

4        MR. LEWIS:  Yes, your Honor.  Very simply, yes,

5   essential movement is taking place if it's required, medically

6   required, mentally required, et cetera.  So if an inmate is in

7   crisis and needs to go to a mental health crisis bed, that

8   inmate will move.  There are going to always be implications

9   about whether or not an institution is quote, unquote, open or

10  closed, but if a person needs to move, they are going to be

11  moved, tested, observed, and those things under rules,

12  certain -- under circumstances of trying to keep situations

13  from COVID spreading and things like that.

14        THE COURT:  So there is an exception, but is it

15  subject to the potential for quarantine, some prescreening?

16        MR. LEWIS:  Absolutely, your Honor.

17        THE COURT:  All right.

18        MR. LEWIS:  Actually, that's definitely part of the

19  movement criteria and in the matrix and everything that has

20  been released.  Definitely there is, now with the breadth of

21  testing that's going on, you've got testing in the front and in

22  the back, quarantine and observation periods as well.

23        THE COURT:  All right.  As always, I'll give the

24  Special Master a chance to weigh in at the end of this hearing,

25  and so if he has anything further to say about this issue, he

1    may.

2         Let me ask Mr. Lewis just briefly, and then I would

3    take more complete reports from the parties and close with the

4    Special Master.

5         Can you provide me with any insights, Mr. Lewis, or

6    yield to someone on the defense team?  I realize there often

7    are aspirational suggestions that prisons are going to be

8    closed.  It's not the first time that there's been some

9    discussion about that possibility, but it seems to be front and

10   center with the current administration.  As I signaled at the

11   beginning, I don't see any recognition in the broad public

12   statements of a mental health population being a significant

13   factor and how any aspirational goals interface with population

14   caps and whether or not there is a goal to get to an even lower

15   population than the department is currently subject to.

16        But help me understand really the answer to the

17   question, to the extent the administration is talking about

18   closing prisons and identifying specific prisons, how is it

19   thinking about mental health in the context of those big plans?

20        MR. LEWIS:  Your Honor, you are correct.  There was

21   the budget release that did mention and also statements in the

22   press as well by the Governor about his desire to close

23   institutions eventually.  But as your Honor is aware, this is a

24   long process.  You can't simply just turn the lights off and

25   close a prison.  There has to be -- this has to be thought out

1    and gone through.  Prisons have to be identified most of all,

2    and there's obviously going to be labor issues and everything

3    like that that are involved in it as well.  I'm not aware of

4    any specific plans as to how they're going to go about or how

5    the administration may go about closing prisons or identifying

6    that.  Also I think in light some of the COVID concerns that

7    are going on right now and frankly the public health emergency,

8    closing the prisons right now, there's other things that are

9    happening that are taking a lot of attention away from that

10   particular issue.

11        When it comes to mental health population, I think any

12   reduction in the prison population would necessarily include

13   the impact on the Coleman class.  As your Honor is well aware,

14   the Coleman class members make up a significant portion of the

15   prison population.  So any reduction in the prison population

16   would necessarily affect the Coleman class and reduce the

17   number.  But I'm aware of nothing in particular as to regards

18   to closing prisons or numbers or anything like that, but I do

19   know that it would be plainly obvious that any closure of a

20   prison or reduction of population would impact the Coleman

21   class positively by reducing the numbers of the Coleman class

22   members within the system.

23        THE COURT:  I don't know if it's obvious that it would

24   be positive for the Coleman class unless it's strategically

25   managed.  For example, if release of prisoners got the prisons

1   down to a hundred percent design capacity and allowed

2   state-of-the-art mental health facilities for the mentally ill

3   incarcerated, you might be right.

4        Mr. Bien, anything to say on that point?  I realize

5   you may have nothing at this point.

6        MR. BIEN:  Your Honor, we know of no plans that are

7   taking into account the needs of the Coleman class

8   specifically.  And, you know, I personally am concerned that if

9   the administration closed a prison without sufficient

10  population reduction, then crowding levels would increase by

11  mathematics.  So I think that's our concern.  I mean, it's a

12  laudable goal to close a prison.  One can save money by closing

13  a prison.  But if overcrowding levels are not reduced, then the

14  Coleman class will continue to experience the shortages of

15  space and clinicians.  And again, we have -- we're not aware of

16  targeted population reduction measures for the Coleman class or

17  that the Coleman class is being considered in this planning

18  process, at least we have not been consulted.

19       THE COURT:  All right.  I would hear now from the

20  parties, and at this point, Mr. Bien, you could go first,

21  yielding to anyone on your team you wish.  I'll give

22  Mr. Specter and Mr. Fama a chance to weigh in if they'd like,

23  then defendants, then the Special Master.

24       Mr. Bien.

25       MR. BIEN:  Your Honor, the only -- I think that we

1   want to bring to the Court's attention the fact that in -- at

2   the Plata CMC, counsel for the defendants announced that there

3   would be a major significant population reduction announced

4   sometime this week.  We thought today.  We don't know what it

5   is or how it will be done or the impact.  We think that it's a

6   necessary, important move, and we're hoping it's significant

7   enough to both help manage COVID-19 by providing more space and

8   also by providing some relief for the Coleman class too.  But

9   again, we don't know anything about what's being planned or the

10  impact.

11          We also think it's important that the department is

12  beginning and there was actually an order by Judge Tigar to

13  accelerate some mandatory staff testing.  It's been a big

14  missing link in the management of COVID-19, and next week I

15  think the department is obligated to come forward with a plan

16  for staff testing for the -- all the institutions.

17          But the broader Coleman issues that we're most

18  concerned about are just the number of Coleman patients that

19  are not at the right level of care and the inability of the

20  department to deliver appropriate care, you know, given the

21  staff shortages, the restrictions on groups, the restrictions

22  on other activities.

23          We're quite concerned.  We're trying to be in

24  communication with our class members through mail and some

25  telephone calls, but we think conditions are very, very

1    difficult for Coleman class members.  There's very little

2    happening, and in those kind of conditions of high stress, low

3    activity, and very minimal access to normal clinicians'

4    contacts, that mental health care is certainly getting worse

5    and that our clients are less and less likely manage the

6    situation.  So we are quite concerned, and we are certainly

7    pressuring the state to come up with a plan to resume as much

8    care as they can as quickly as they can while balancing the

9    dangers of COVID-19.

10           THE COURT:  Mr. Specter or Mr. Fama?  Did Mr. Specter

11   get on?  Anything by Mr. Fama?

12           MR. FAMA:  I have nothing further, your Honor.  Thank

13   you very much.

14           THE COURT:  All right.

15           All right.  Mr. Lewis.

16           MR. LEWIS:  Yes, your Honor.  Defendants appreciate

17   the continuing efforts of the Special Master and the task force

18   groups.  I mean, I think this task force has now met 21 or 22

19   times as well as numerous subgroups.  We think that there's a

20   lot of positive work that's coming out of that.  We're able to

21   talk about things, move forward, talk about plans and things

22   like that.  Some of the issues that Mr. Bien has raised are

23   definitely Plata issues, but to the extent they impact the

24   Coleman class, they're being discussed in the work groups, and

25   I think that's going well.  I think that's a good forum for

1   that.  So that's really all I have to say about that.  There's

2   definitely an interest in doing the right thing for the

3   patients and the class members.

4           One thing that -- if your Honor would like, there is

5   one additional item that the defense would like to bring up at

6   the hearing, if possible, and I guess I would do it now if this

7   is quote, unquote, the new business time.

8           THE COURT:  It is.

9           MR. LEWIS:  And it regards our hearing that is

10  scheduled for June 25th on the DSH/CDCR transfer issue.  Our

11  view is that the June 25th hearing should be taken off the

12  calendar in light of the appeal that was filed recently by

13  defendants as to the April 4th -- or I'm sorry -- April 24th

14  and May 7th orders.  That appeal directly implicates the legal

15  standard and the factual basis of the order appealed from as

16  well as an issue that may come up at the hearing that's

17  currently set.  So the legal standard to be applied at the

18  upcoming hearing is bound within and subsumed within the

19  appeal, and it's for this reason that defendants believe that

20  that hearing should not proceed.

21          The parties are still working forward on various

22  issues in the small work groups and in the larger work groups.

23  So this is an issue that may get continued just by operation,

24  but at this point we don't believe the hearing should proceed

25  also because of the appeal that has been taken.

1  THE COURT:  Well, on that issue, the parties could add

2  to their joint status report due now Tuesday at 4:00 p.m.,

3  their respective positions on that question --

4  MR. LEWIS:  Yes, your Honor.

5  THE COURT:  -- about the hearing should be vacated.  I

6  have consciously kept it on to date.  So I'll look for your

7  respective positions, and I'll let you know if I need further

8  briefing on that question or a further status.  And I'll do

9  that promptly after receiving the joint status report.  I can't

10  remember if I gave you page limits, but I would hope five pages

11  per party per issue would be sufficient to alert me to your

12  respective positions.

13  MR. LEWIS:  Yes, your Honor.

14  THE COURT:  All right.

15  All right.  Having heard from Mr. Lewis and not heard

16  otherwise from the plaintiffs, this Court is not one that

17  believes in meetings for meetings' sake, but I do accept that

18  the task force is helping.  The working groups that the Special

19  Master is convening are making a difference, and to the extent

20  they are assisting in negotiated efforts to advance the

21  principles for which the Coleman case stands, I bless those

22  efforts.  It's this Court's hope that we are not left to learn

23  everything there is to know about the coronavirus's impact on

24  the mentally ill incarcerated who are class members through

25  post-talk epidemiology and post mortems.  And so I accept that

1  the working group is the best way to be proactive for the most

2  part, and the parties know that they can bring motions if they

3  feel the need to.  Again, I'm not inviting motions.  So I bless

4  the continuing efforts of the Special Master to work with the

5  parties to be as proactive as possible.

6       Special Master Lopes, any final words based on what

7  you've heard?

8       SPECIAL MASTER LOPES:  Yes, your Honor.  Thank you.

9  Your Honor, I'm not sure if I misspoke at the beginning of my

10  presentation or if my microphone just wasn't working properly,

11  but I thought that I reported that there were 22,158 inmates

12  who had been tested for COVID.  I just wanted to say that I

13  agree with what Mr. Lewis said.  That was the number of --

14  total number of those tested.

15       I will disagree with Mr. Lewis in terms of the numbers

16  reported by -- relative to DSH transfers.  Those numbers were

17  provided to us by the defendants, and I believe that the number

18  that the -- that Mr. Lewis cited was the total number of

19  transfers that have occurred since the reopening or resumption

20  of transfers.  My report was just since the last status

21  conference, and but again, those numbers were reported to us by

22  the defendants.

23       Finally, your Honor, I think that I agree with you

24  completely that when discussions occur regarding releases, they

25  are not strategically targeted towards the mentally ill

1    population, and I don't think after the three-judge court

2    process of 2009-2010 and the affirmation of the Supreme Court

3    which led to the process that the defendants put into place,

4    realignment, so-called realignment process, that we can just

5    assume that reducing the total number of people transferred --

6    of inmates transferred will result in a corresponding reduction

7    in the mentally ill caseload.

8            I believe that today, notwithstanding realignment and

9    the number of people that were moved throughout the system,

10   that the number of mentally ill is as high, if not higher, than

11   it was at the time of the three-judge court process.  So if

12   there are releases just because number "X" is put on the board,

13   that does not always mean that there will be a corresponding

14   reduction in the number of mentally ill patients.  And I

15   haven't been involved in any discussions that I can recall

16   where targeted releases for the mentally ill have been

17   discussed.

18           THE COURT:  All right.  Thank you, Special Master

19   Lopes.  At this point that's been a helpful update.  The Court

20   will reflect on what it's heard today.  It may have further

21   thoughts in advance of the next status, but in the meantime,

22   I'll look for your joint status report and resolve the disputes

23   that you have with respect to the discovery including as

24   relevant to the hearing currently set for the 25th and also

25   with respect to the labor economist report responses.

1          Thank you very much.  Have a good weekend.

2          THE CLERK:  Court is in recess.

3          (The proceedings adjourned at 11:11 a.m.)

4                          --oOo--

5    I certify that the foregoing is a correct transcript from the

6    record of proceedings in the above-entitled matter.

7                         /s/ Kacy Parker Barajas
                        _____
8                         KACY PARKER BARAJAS
                        OFFICIAL U.S. DISTRICT COURT REPORTER
9                         CSR No. 10915, RMR, CRR, CRC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25