1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:    (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

10 Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

15  RALPH COLEMAN, et al.,

16          Plaintiffs,

17      v.

18  GAVIN NEWSOM, et al.,

19          Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO JUNE 2, 2020 ORDER [ECF No. 6700]**

Judge:   Hon. Kimberly J. Mueller

[3563055.3]

1  On May 20, 2020, in response to the Court's April 17, 2020 Order, the parties filed a

2  stipulation identifying "temporary departures from certain Program Guide requirements"

3  implemented by Defendants in response to the COVID-19 pandemic.  Stip. re: Apr. 17, 2020

4  Order, ECF No. 6679 at 2.  The Court subsequently ordered briefing on three issues: (1) "the

5  extent to which, if at all, the court can or should approve any measure that falls below Eighth

6  Amendment requirements as those are memorialized in the Program Guide"; (2) "whether

7  there is any temporary period of time for such measures to remain in place that survives

8  scrutiny under applicable legal standards"; and (3) "how specifically 'hiring authority' is

9  defined as used in the attachments to the stipulation."  June 2, 2020 Order, ECF No. 6700 at 1-

10  2.  Plaintiffs' responses are below.

11  **I.     THE COURT HAS A DUTY TO ADVANCE REMEDIATION OF THE
       ONGOING EIGHTH AMENDMENT VIOLATIONS IN THIS CASE**

12

13  The Court cannot and should not "approve any measure that falls below Eighth

14  Amendment requirements."  June 2, 2020 Order, ECF No. 6700 at 1.  Nor is there a period of

15  time during which such unconstitutional measures may "remain in place" without an

16  acceptable plan to remedy such deficiencies.  *Id.* at 2.

17  "Courts … must not shrink from their obligation to enforce the constitutional rights of

18  all persons, including prisoners."  *Brown v. Plata*, 563 U.S. 493, 511 (2011) (internal

19  quotation marks omitted).  Where, as here, the "government fails to fulfill [its] obligation" to

20  provide adequate mental health care, "the courts have a responsibility to remedy the resulting

21  Eighth Amendment violation."  *Id*. at 511.  In fashioning that remedy, especially in intractable

22  cases like this, courts must take steps to bring defendants closer to, rather than farther from,

23  full remediation of the underlying violations.  *See id*. at 516.

24  It is "undisputed" that the original constitutional violation here—Defendants'

25  "systemic failure to deliver necessary care to mentally ill inmates" in California prisons—

26  persists.  *See* Apr. 4, 2020 Order, ECF No. 6574 at 15 (Mueller, J. concurring); *Coleman v.*

27  *Wilson*, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995); *see also, e.g.*, *Plata*, 563 U.S. at 545;

   *Coleman v. Brown*, 938 F. Supp. 2d 955, 990 (E.D. Cal. 2013).  Given the "ongoing,

28

[3563055.3]

1  intractable nature of this litigation," this Court has "considerable discretion" in determining

2  how best to achieve complete remediation.  *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir.

3  2014).  Those determinations "must and indeed can only be developed contextually."

4  *Coleman*, 938 F. Supp. 2d at 971 (internal quotation marks omitted).  But in no event can this

5  Court "authorize delayed access to necessary mental health care" consistent with its

6  constitutional duties.  Oct. 10, 2017 Order, ECF No. 5710 at 13.

7        The context within which this Court must advance remediation while simultaneously

8  prohibiting delays in necessary care has changed in the face of the coronavirus pandemic.  But

9  this is not the Court's first encounter with roadblocks to Defendants' full compliance with the

10  Eighth Amendment.  When similar dire circumstances impeding remediation arose in the long

11  evolution of this case, the Court acknowledged, but did not *approve*, care that fell below the

12  Eighth Amendment and instead required Defendants to take steps to adjust their remediation

13  efforts to account for the setbacks.  *See, e.g.*, July 3, 2019 Order, ECF No. 6212 at 10

14  (unlicensed MHCBs permissible only "as a stop-gap measure to limit harm to the plaintiff

15  class"); Mar. 24, 2017 Order, ECF No. 5583 at 14 (noting Defendants' "responsibility to

16  maintain an adequate [bed] capacity" despite flooding of inpatient units); Oct. 10, 2017 Order,

17  ECF No. 5711 at 13, 19, 28 (requiring Defendants to "advance remediation of the Eighth

18  Amendment [staffing] violation" despite "nationwide shortages of psychiatrists," yet allowing

19  Defendants "one year" to "achiev[e] adequate mental health staffing levels"); Apr. 14, 2017

20  Stip. & Order, ECF No. 5605 at 4 (authorizing operation of unlicensed temporary inpatient

21  beds while clarifying "approval should not be construed to condone or approve any continua-

22  tion of wait lists for inpatient care that exceed Program Guide timelines"); *Coleman*, 938 F.

23  Supp. 2d at 983 (noting order requiring Defendants to plan for sufficient MHCB beds to allow

24  for elimination of "totally inappropriate" alternative housing, which remained in use); Mar.

25  31, 2009 Order, ECF No. 3556 at 5-6 (reinforcing prior orders establishing lack of sufficient

26  mental health beds while also allowing Defendants to proceed with long-term construction

27  projects); Feb. 17, 2009 Order, ECF No. 3516 at 1 ("The court finds that the urgent need by

28  class members for mental health crisis beds persists with such severity that state licensing

PLAINTIFFS' RESPONSE TO JUNE 2, 2020 ORDER [ECF No. 6700]

[3563055.3]

1   requirements must temporarily give way to remedy the Eighth Amendment violations that

2   remain …."). Even the Supreme Court in affirming the population reduction order in this case

3   acknowledged the reasonableness of a two-year, rather than immediate, deadline for Defend-

4   ants to achieve compliance. *See Plata*, 563 U.S. at 542. But neither it nor this Court ever

5   sanctioned the patently unconstitutional conditions that remained in the interim. Funda-

6   mentally, the guiding principle in times of crisis has always been to require "interim step[s]"

7   towards full remediation. *See Plata v. Schwarzenegger*, 560 F.3d 976, 980 (9th Cir 2009).

8       The instant proceedings must proceed against this backdrop. The Constitution requires

9   that incarcerated persons be protected from substantial and known risks of serious harm.

10  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). And there is no question that the virus presents

11  such a risk. *See* Apr. 4, 2020 Order, ECF No. 6574 at 9. Defendants were not providing

12  constitutionally adequate mental health care prior to the pandemic, and (as described more

13  fully in Section II, below), the pandemic has only exacerbated those deficiencies. Defendants

14  repeatedly have acknowledged that "there is no horizon for the impact of the COVID-19

15  pandemic on the California prison system." *See* May 8, 2020 Order, ECF No. 6661 at 11.

16  While Defendants' initial crisis management phase of planning for the impact of the virus may

17  have initially justified increased deference, California's prisons—like the State itself—are now

18  transitioning "into an interim … phase of implementation." *See* Apr. 24, 2020 Order, ECF

19  No. 6643 at 2. Defendants' obligations to provide constitutionally adequate mental health

20  care, and this Court's attendant duty to enforce the Eighth Amendment and continue

21  advancing this case towards complete remediation, do not diminish under this new normal.

22  *See Coleman*, 938 F. Supp. 2d at 972; *Plata*, 563 U.S. at 501, 516. Instead, as Defendants'

23  response to the virus enters a period of increased stasis, Defendants must take all steps

24  necessary to both safeguard inmates from disease *and* provide adequate mental health care.

25  Meanwhile, the Court must do what it has always done in the face of remedial setbacks:

26  account for the context of the pandemic while also "not allow[ing] constitutional violations to

27  continue." *Plata*, 563 U.S. at 511; *see also Coleman*, 938 F. Supp. 2d at 972. So long as the

28  Court continues to ensure Defendants take adequate steps *towards* full remediation in light of

[3563055.3]

1   the pandemic, it is acting within its "broad authority to manage [this] complex litigation."

2   *Plata v. Brown*, 754 F.3d 1070, 1077 (9th Cir. 2014); *see also Plata*, 563 U.S. at 516.

3       The parties' May 20, 2020 stipulation—which identifies Defendants' temporary

4   COVID-19 policies that allow for departures from the Program Guide (which in turn

5   "provides the framework for remediation of the Eighth Amendment violations," *see* Apr. 7,

6   2017 Order, ECF No. 5595 at 13) and other court-ordered requirements—is consistent with

7   this approach.  In agreeing to allow Defendants' policy modifications to remain in place for

8   ninety days, Plaintiffs acknowledge that the steps Defendants have taken since the Court

9   began its heightened oversight of Defendants' COVID-19 response on March 20, 2020 were

10  reasonable, interim measures necessary to bring Defendants closer to, rather than farther from,

11  the level of constitutional compliance that existed prior to the pandemic.  *See* Stip. re: Apr. 17,

12  2020 Order, ECF No. 6679 at 6.  But Plaintiffs never agreed that these policies would

13  remediate the underlying constitutional violations.  There is no question they will not.  The

14  Eighth Amendment violations identified in 1995 persisted prior to the pandemic, and the

15  mental health treatment now tolerated under Defendants' temporary policies falls far short of

16  even the deplorable conditions that existed in February 2020.  *See* Section II.A., *infra*.

17      Despite this, the Court can and should issue an order on the parties' May 20, 2020

18  stipulation.  Specifically, the Court should acknowledge that the policies identified in

19  Appendix A of the stipulation, ECF No. 6679 at 9-29, constitute "stop-gap measure[s]"

20  developed by Defendants "to limit harm to the plaintiff class" on a temporary basis in light of

21  the initial crisis management phase of their COVID-19 response.  *See* July 3, 2019 Order, ECF

22  No. 6212 at 10.  However, now that three months have passed and Defendants are beginning

23  to transition into a secondary response phase, the Court should also make clear that these

24  policies are woefully insufficient to ensure that Defendants meet their constitutional obligation

25  to deliver adequate mental health care.  To that end, the Court's order on the parties'

26  stipulation should also affirmatively hold that Defendants' temporary COVID-19 policy

27  modifications violate the Program Guide, and thereby the Eighth Amendment.

28

A.    **Recent Rulings Approving Emergency Restrictions of Federal Rights Do Not Authorize This Court to Approve Constitutionally Deficient Care**

A few federal courts have recently issued rulings suggesting that temporary restrictions on civil liberties may be necessary in light of the pandemic. *See, e.g.*, *South Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 946 (9th Cir. 2020), *cert. denied* Case No. 19-A1044, 2020 WL 2813056 (S.Ct. May 29, 2020); *In re Abbott*, 954 F.3d 772, 778 (5th Cir. 2020) (citing *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 30 (1905)). Defendants have cited such cases to argue that they may implement emergency measures that curtail constitutional rights. *See* Defs.' Reconsideration Mot., ECF No. 6612 at 5 (Apr. 15, 2020). While these cases do acknowledge that the executive enjoys broad power to address emergencies, they also emphasize the judiciary's duty to limit infringement on constitutional rights to the greatest extent possible.

The Court's April 24, 2020 Order recognized that allowing a government to minimally restrict certain civil liberties on a temporary, emergency basis is distinct from easing Defendants' affirmative obligations in this case to remedy entrenched, longstanding Eighth Amendment violations. *See* Apr. 24, 2020 Order, ECF No. 6639 at 8 (finding neither *Abbott* nor *Jacobson* "arose in the context of state action undertaken by state actors subject to prior remedial orders of a federal court"). In the 100-plus-year-old *Jacobson* case, on which *Abbott* and *South Bay United* rely, the Supreme Court affirmed Cambridge Massachusetts's imposition of a five-dollar fine on a resident who refused to comply with the city's mandatory vaccination regime enacted in response to a smallpox outbreak. *See Jacobson*, 197 U.S. at 12. Notwithstanding that permitting a single small fine for refusing to vaccinate is a far cry from denying 35,000 people sufficient mental health care to avoid "[n]eedless suffering and death," *see Plata* 563 U.S. at 501, *Jacobson* is distinguishable due to the narrowness of its framework for assessing emergency exercises of state authority during a public health crisis. Specifically, *Jacobson* held that if a government imposes a restriction that "is, beyond all question, a plain palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." 197 U.S. at 31. Such is the case here.

[3563055.3]

1    The Eighth Amendment's proscription on "unnecessary and wanton infliction of pain"

2 is plainly part of the fundamental law to which *Jacobson* refers.  *See, e.g.*, *Plata*, 563 U.S. at

3 510; *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).  As this Court stressed, "the

4 seriously mentally ill individuals housed behind bars in this state [] have the absolute,

5 undeniable right to constitutionally adequate treatment and care."  Dec. 17, 2019 Order, ECF

6 No. 6427 at 45.  Especially in light of Defendants' decades-long failure to provide such care, it

7 is "beyond all question" that this ongoing violation constitutes "a plain, palpable invasion of

8 rights secured" by the *Coleman* class.  *See Jacobson*, 197 U.S. at 31.

9    The Sixth Circuit's recent decision in *Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913

10 (6th Cir. 2020), addressing Tennessee's COVID-19 restrictions on abortion, supports this

11 conclusion.  There, the Court rejected the state's attempt to postpone abortions during the

12 pandemic, reasoning that while the "context [of the pandemic] matters," courts must not

13 "countenance … the notion that COVID-19 has somehow demoted [fundamental rights] to

14 second-class rights, enforceable against only the most extreme and outlandish violations."  *Id.*

15 at 927.  Citing *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), for the point that "[t]he

16 Constitution … covers with the shield of its protection all classes of men, at all times, and

17 under all circumstances," the Sixth Circuit went on to explain that "[s]uch a notion is

18 incompatible not only with *Jacobson*, but also with American constitutional law writ large."

19 *Id.*; *see also U.S. v. Bollman*, 24 F. Cas. 1189, 1192 (C.C.D.D.C. 1807) ("The constitution was

20 made for times of commotion. … In cases of emergency … this court is bound by the law and

21 the constitution in all events.").

22    Neither *Jacobson* nor its progeny forbid this Court from supervising Defendants'

23 attempts to address the COVID-19 crisis here.  Indeed, by initiating the task force and

24 deploying its Special Master, the Court has taken reasonable steps to ensure Defendants'

25 deviations from the longstanding remedy are as narrow and short-lived as possible.  And

26 Defendants have welcomed these enhanced oversight measures.  That said, the Court cannot

27 defer remediation indefinitely.  *See* Section I, *supra*.  Given that Defendants' crisis

28 management phase has ended, *see* Apr. 24, 2020 Order, ECF No. 6643 at 2, the constitutional

leeway tolerated in *Abbott* and *South Bay United* is not applicable.  Defendants must plan for how to simultaneously respond to the pandemic *and* ensure that class members receive adequate mental health care.  Especially given Defendants' inadequate efforts to date, detailed next, the Court is well within its discretion to proceed with full enforcement of the Program Guide and its other numerous remedial orders.

## II.   THE COURT CAN AND SHOULD CONTINUE TO ENSURE THAT DEFENDANTS MOVE CLOSER TO, RATHER THAN FARTHER FROM, FULL REMEDIATION

Although the Court may not approve any measure below Eighth Amendment standards, it need not sit idly by as Defendants respond to the pandemic (it has not).  Now that three months have passed since Defendants' initial emergency response and there is "no horizon" for this new reality, the time is now to address how Defendants will come into full compliance with the Program Guide and this Court's remedial orders as rapidly as possible.  To facilitate this goal, and for the reasons set forth above, the Court should issue an order on the parties' stipulation finding that Defendants' temporary COVID-19 policies fall far below Program Guide requirements, and therefore perpetuate the ongoing Eighth Amendment violations.

### A.   Defendants Provided Inadequate Mental Health Care Before the COVID-19 Pandemic And Care Is Even More Deficient Now

Defendants' mental health care system was already in crisis prior to the pandemic. Clinical resources, particularly psychiatry, were severely limited.  *See, e.g.*, Psychiatry Vacancy Report, ECF No. 6491 at 4 (reporting 72% of positions filled in February 2020); Oct. 10, 2017 Order, ECF No. 5711 at 13.  The suicide rate was astronomical.  *See* Special Master Amended Report re: Access to Inpatient Care in DSH ("DSH Access Report"), ECF No. 6579 at 29 (Apr. 6, 2020).  Treatment in the PIPs fell far below minimum standards.  *Id*. And shortages of available treatment space remained rampant, especially at the highest levels of care.  *See, e.g.*, Sept. 24, 2018 Order re: Unlicensed Walker Unit, ECF No. 5931 at 2; Nov. 14, 2017 Order re: Unlicensed L-1 Unit, ECF No. 5605 at 2 .

The COVID-19 pandemic has seriously exacerbated these preexisting constitutional violations.  *See, e.g.*, DSH Access Report at 22-30, 34 (finding pandemic aggravated clinical

staffing shortages). Likewise, Defendants' temporary COVID-19 policies violate Program Guide requirements and put class members at heightened risk of pain, suffering, and even death. For example, despite knowing that segregation endangers class members, *see Coleman v. Brown*, 28 F. Supp. 3d 1068, 1095 (E.D. Cal. 2014), Defendants' policies allow for increased use of solitary confinement-like conditions while decreasing treatment and access to yard, visiting, and other activities. *See, e.g.*, Defs.' COVID Plan, ECF No. 6535 at 5-8 (Mar. 27, 2020). Most group therapy has ceased, and most, if not all, clinical contacts now occur cell-front in high security units, if they occur at all. *See, e.g.*, *id.* at 4-6, 8-9, 11. Even on non-quarantined units, Defendants' policies allow out of cell activities to cease depending on staffing shortages. *Id.* at 15-17. Defendants have severely restricted patient movement. *See, e.g.*, June 12, 2020 Hr'g Tr., ECF No. 6722 at 17:15-17 ("[M]ovements are stopped or very restricted …."); DSH Access Report at 51. And literally hundreds of patients await inpatient care. *See* Defs.' Inpatient Waitlist Report, ECF No. 6719 at 11 (June 15, 2020).

### B. The Court Cannot Tolerate Delays in Care and Must Continue to Require Compliance with Program Guide Requirements

While the Court can, and should, acknowledge Defendants' COVID-19 policies as establishing the floor beyond which Defendants must not fall, the pandemic can no longer excuse ongoing delays in the provision of minimally adequate mental health care. *See* Oct. 10, 2017 Order, ECF No. 5710 at 13. As this Court has found time and again, delayed access to necessary care causes substantial harm and violates the Constitution. *See, e.g.*, Apr. 24, 2020 Order, ECF No. 6639 at 2-4 & n.2; Apr. 19, 2017 Order, ECF No. 5610 at 6, 11; Aug. 15, 2011 Order, ECF No. 4069 at 5; *see also Coleman*, 938 F. Supp. 2d at 982 (finding "delays in access to inpatient care and the sequelae therefrom … unconscionable"). Now that Defendants are no longer in their initial crisis management phase, class members' right to adequate mental health care must be enforced to the maximum possible extent.

### C. If Defendants Cannot Provide Constitutional Care Under Current Circumstances, They Should Reduce the Population Or Transfer Class Members to Locations Where Necessary Mental Health Care is Possible

Given the realities of the COVID-19 pandemic, Defendants are unlikely to be able to

1  provide minimally adequate mental health care without drastically reducing the *Coleman*

2  population.  This Court has long recognized that Defendants' ongoing failure to remedy the

3  Eighth Amendment violations in this case is inextricably linked to the growing mental health

4  population.  *See, e.g.*, Oct. 10, 2017 Order, ECF No. 5710 at 17 ("In the past twenty-five

5  years, California's population of seriously mentally ill inmates has swelled to greater than

6  38,000, with nearly 10,000 inmate-patients in need of [EOP], MHCB or inpatient mental

7  health care.  Until defendants have sufficient mental health beds and sufficient mental health

8  staff to meet this demand, they will not be in compliance with the Eighth Amendment."

9  (citations omitted)); Dec. 9, 2016 Order, ECF No. 5529 at 4 (finding increase in EOP popula-

10  tion "red flag" and warning that "demand for these services appears to be exceeding capacity

11  to provide them").  The pandemic has only increased patients' stress, fear, and isolation,

12  exacerbating mental illness, thereby threatening further crowding of the *Coleman* class.  *See,*

13  *e.g.*, Defs.' COVID Plan, ECF No. 6535 at 5 (Mar. 27, 2020) (recognizing "[m]ental health

14  patients are at increased risk for escalation in depression, anxiety, panic attacks, psychomotor

15  agitation, psychotic symptoms, delirium, and suicidality during this COVID-19 pandemic").

16  Reductions in non-mental health programming, like visiting, yard, education, and work, may

17  well increase the need for non-class members to access mental health treatment to cope.  As

18  demands for mental health services from class members and people outside the class alike

19  increase, staffing levels will inexorably decline due to staff illness and other factors.  Under

20  these conditions, Defendants should be taking every possible step to provide more, not less,

21  mental health treatment than was available prior to the pandemic.

22       Unfortunately, however, there is still no evidence that Defendants are giving serious

23  consideration to reducing the *Coleman* class or temporarily relocating class members to secure

24  off-site facilities.  None of the population reduction measures implemented or announced to

25  date have targeted *Coleman* class members.  *See, e.g.*, June 12, 2020 Hr'g Tr., ECF No. 6722

26  at 38:23-39:17.  These efforts, while laudable to the extent they reduce population density and

27  assist in achieving social distancing, will therefore do nothing to aid Defendants in remedia-

28  ting the ongoing constitutional violations in this case.  Defendants have thus far ignored

1    numerous options available to them, including initiating targeted releases of high-risk
2    *Coleman* class members or temporarily transferring mentally ill patients to outside facilities.
3    *See, e.g.*, Joint Report re: Defs' Social Distancing Plan, ECF No. 6596 at 12-13; Pls.' Resp. to
4    Apr. 6, 2020 Order, ECF No. 6584 at 10 n.7.  Such steps would start to free up Defendants'
5    already limited staffing, bed, and clinical space resources and allow them a fighting chance at
6    providing the mental health treatment required under the Program Guide even in light of the
7    pandemic.  Until such resources shortages are addressed, it cannot be said that Defendants
8    have a viable plan to meet their obligations under the Eighth Amendment.

9    **III.    DEFINITION OF "HIRING AUTHORITY" AS USED IN THE PARTIES'
            STIPULATION**

10          Finally, CDCR's Department Operations Manual[1] defines "hiring authority" at Section
11   31040.4.3.10 as "any person authorized by the Secretary, CDCR, or the Receiver of the
12   [CCHCS], to hire, discipline and dismiss employees under his or her authority."  Plaintiffs
13   understand that for institutional medical and mental health staff such as psychiatrists, the
14   hiring authority is generally the institution's Chief Executive Officer.  *See, e.g.*, Brizendine
15   Decl., ECF No. 5879-1 ¶ 4 (Aug. 13, 2018) ("As Salinas Valley's CEO, I served as the hiring
16   authority over all healthcare which includes medical … [and] mental health.").

                                **CONCLUSION**

17          The Court did not countenance Defendants' failure to provide necessary mental health
18   care prior to the COVID-19 pandemic; nor should it permit Defendants to fail to do so now.
19   Accordingly, the Court should issue an order on the parties' May 20, 2020 stipulation, ECF
20   No. 6679, acknowledging that while the policies identified therein establish a temporary floor
21   for the provision of mental health care beyond which Defendants must not fall during the
22   pandemic, those policies nonetheless clearly violate Program Guide requirements, and thereby
23   the Eighth Amendment, and thus cannot be sanctioned by this Court.

---

[1] *Available at* https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2020/03/2020-DOM-02.27.20.pdf (last visited June 16, 2020).

[3563055.3]

1 | DATED: June 16, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Cara E. Trapani*
       Cara E. Trapani

Attorneys for Plaintiffs