XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3585
  Fax: (415) 703-5843
  E-mail: Kyle.Lewis@doj.ca.gov
Attorneys for Defendants

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**JOINT STATUS REPORT IN RESPONSE TO JUNE 12, 2020 ORDER REGARDING THE JUNE 25, 2020 HEARING, THE STATUS OF DEFENDANTS' UPDATES TO PLAINTIFFS' DISCOVERY REQUESTS, AND THE DEADLINE TO RESPOND TO THE SPECIAL MASTER'S MAY 29, 2020 REPORT**<br><br>Judge:        The Hon. Kimberly J. Mueller |

## INTRODUCTION

As the Court directed at the June 12, 2020 status conference, the parties submit this joint status report setting forth the parties' respective positions on three disputed issues: (1) the Court's jurisdiction to proceed with the June 25, 2020 evidentiary hearing described in the Court's May 7, 2020 order (ECF No. 6660) given Defendants' pending appeal (ECF No. 6684); (2) the timing of Defendants' supplemental discovery responses described in Plaintiffs' Status Update Regarding June 25, 2020 Evidentiary Hearing (ECF No. 6711); and (3) the deadline for responding to the Special Master's May 29, 2020 report (ECF No. 6695). Due to the exigencies

[3562159.2]                                   1

Jt. Report Resp. June 12, 2020 Order  (2:90-cv-00520 KJM-DB (PC))

1  of the deadline for filing, the parties were not able to exchange their portions of the joint report

2  prior to filing.[1]

3  **I.    JURISDICTION RE: THE JUNE 25, 2020 EVIDENTIARY HEARING.**

4      **A.    Plaintiffs' Position.**

5      For the third time in three years, Defendants are attempting to wield a faulty appeal as a

6  shield to block this Court from proceeding to enforce Plaintiffs' constitutional rights.  The Ninth

7  Circuit swiftly dismissed both of Defendants' two prior improper appeals for lack of jurisdiction.

8  *See Coleman v. Newsom*, 789 Fed. App'x 38 (9th Cir. 2019); *Coleman v. Brown*, 743 Fed. App'x

9  875 (9th Cir. 2018).  Defendants' pending appeal of the April 24 and May 7, 2020 orders (ECF

10  No. 6684) will unquestionably suffer the same fate because it too does not meet the requirements

11  of 28 U.S.C. §§ 1292(a)(1) or 1291 and thus cannot divest this Court of jurisdiction.  Moreover,

12  even if Defendants' appeal is proper, Defendants are still required to comply with the April 24

13  and May 7 Orders, as district courts always retain jurisdiction to enforce earlier injunctive orders

14  during the pendency of an appeal absent a stay, which Defendants have not sought much less

15  received.

16      First, as this Court knows, only appeals of properly appealable orders can divest this Court

17  of jurisdiction in the first instance.  *See Ruby v. Secretary of U.S. Navy*, 365 F.2d 385, 389 (9th

18  Cir. 1966).  Neither the April 24 nor May 7 Order is appealable.  Taking the latter first, the May 7

19  Order, ECF No. 6660, clearly pertains only to the "conduct or progress of litigation before th[e]

20  court" and is thus not appealable under the narrowly construed exception to the final judgment

21  rule laid out in Section 1292(a)(1).  *See Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485

22  U.S. 271, 279 (1988); *see also Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478, 480 (1978)

23  (Section 1292(a)(1) must be narrowly construed).  The May 7 Order contains no new substantive

24

25  [1] Defendants appreciate that this filing comes after the close of normal business hours.
Defendants took on filing the joint submission, and requested that Plaintiffs provide their sections

26  by 4:30 pm.  Plaintiffs provided their sections at 4:41 p.m.  Defendants worked to finalize the
joint statement but encountered challenges when combining and formatting the filing. Defendants

27  are responsible for the timing of this filing, which they volunteered to accomplish.  Defendants
take full responsibility for this after-hours filing and apologize to the Court, the Special Master,

28  and Plaintiffs for any inconvenience.

1   provisions that could qualify as an injunction; it merely clarifies, at Defendants' request, the

2   procedure that will be followed at the future evidentiary hearing.  *See Gon v. First State*

3   *Insurance Co.*, 871 F.2d 863, 866 (9th Cir. 1989) (mere clarifications of prior orders do not

4   confer appellate jurisdiction).  And it is not a final order within the terms of 28 U.S.C. § 1291 as

5   it expressly anticipates further proceedings, i.e., the evidentiary hearing and attendant deadlines.

6   *See Coleman*, 743 Fed App'x at 876; *see also Plata v. Schwarzenegger*, 560 F.3d 976, 980 (9th

7   Cir. 2009) (orders representing "interim step[s] toward further proceedings" not appealable).

8        Like the May 7 Order, the April 24 Order, ECF No. 6639, is not appealable, as it neither

9   granted nor modified an injunction within the meaning of Section 1292(a)(1).  As the Ninth

10  Circuit has now twice held in dismissing both of Defendants' recent appeals for lack of

11  jurisdiction, an order that merely reiterates existing, unappealed injunctive orders cannot be

12  appealed anew.  *Coleman*, 789 Fed. App'x at 39 (holding no jurisdiction lies where limitations in

13  appealed order "merely reiterate" limitations in a prior unappealed order); *Coleman*, 743 Fed.

14  App'x at 876 (where appealed order requires nothing more than compliance with prior order, "it

15  cannot be appealed").  The April 24 Order takes pains to outline numerous prior orders requiring

16  Defendants to provide timely access to adequate inpatient care, including through the provision

17  and full utilization of the beds reserved at DSH hospitals for class members, in addition to

18  Defendants' persistent non-compliance with those prior orders.  ECF No. 6639 at 2-6.  As the

19  Court notes, it unquestionably has the authority to enforce those prior orders to ensure

20  Defendants' compliance when, like here, Defendants take steps to evade them without securing

21  (or even seeking) leave of the Court.  *Id*. at 6-11.

22       Absent the provision allowing Defendants to screen for COVID-19 before class member

23  transfers, to which Defendants surely do not object, the April 24 Order neither imposes new

24  injunctive terms nor modifies the preexisting requirements laid out in the Court's prior orders.

25  Defendants were already obligated to comply with the Program Guide requirements for DSH

26  transfers and to permit Special Master monitoring prior to the April 24 Order.  *See* ECF No. 6639

27  at 11; *see also Coleman*, 789 Fed. App'x at 39-40 (holding order requiring Special Master to act

28  in accord with Order of Reference duties did not constitute a new injunction, and indeed was not

[3562159.2]                                                    3

Jt. Report Resp. June 12, 2020 Order  (2:90-cv-00520 KJM-DB (PC))

1  an injunction at all since it required no action by Defendants); *Coleman*, 743 Fed. App'x at 876

2  (holding order requiring compliance with Program Guide was not appealable injunction).  Under

3  clear Ninth Circuit law – including two rulings in this case alone – the April 24 Order is therefore

4  simply an unappealable enforcement order that does not divest this Court of jurisdiction to

5  continue enforcing the existing, long-standing orders seeking to force Defendants to comply with

6  their constitutional obligations.  *See Pub. Serv. Co. of Colo. v. Batt*, 67 F.3d 234, 236-38 (9th Cir.

7  1995) (dismissing appeal from order that enforced but did not modify injunction); *Plata*, 560 F.3d

8  at 982 (finding no jurisdiction where "nothing in the [order] modified the consent orders; indeed,

9  the [order] clearly seems to be founded in the earlier consent orders and the [order] that was

10  imposed to enforce them"); *Thompson v. Enomoto*, 815 F.2d 1323, 1327 (9th Cir. 1987) (order

11  not appealable when it is "pursuant to, and not a modification of" earlier injunction).  Similarly,

12  as the Ninth Circuit declared in disposing of another of Defendants' recent meritless appeals, the

13  legal holdings reiterated in the April 24 Order are law of the case, having been long established

14  and never appealed.  *See Coleman v. Brown*, 756 Fed. App'x 677, 678-79 (9th Cir. 2018).

15  Because nothing about the April 24 Order "substantially changes the terms or force" of the

16  Court's prior orders, *see Gon*, 871 F.2d at 866, it does not confer appellate jurisdiction and thus

17  cannot as a matter of law divest this Court of jurisdiction.

18      Nor can Defendants present a colorable argument that the April 24 Order meets the test laid

19  out in *Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981), for orders that implicitly impose an

20  injunction.  As the Ninth Circuit recently counselled in this case, to establish jurisdiction under

21  *Carson*, Defendants must establish the April 24 Order (1) has the practical effect of granting an

22  injunction, (2) has serious and perhaps irreparable consequences for Defendants, and (3) cannot

23  be effectively challenged except by immediate appeal.  *Coleman*, 789 Fed. App'x at 39 (citing

24  *Thompson*, 815 F.2d at 1326-27).

25      Defendants cannot meet the first prong for the same reasons they cannot establish the April

26  24 Order is a new injunction:  The Order requires nothing more from Defendants than compliance

27  with existing Court orders and appropriate procedures governing modification of those orders.

28  Nor can Defendants establish any serious, much less irreparable, harm arising from the April 24

[3562159.2]                                                    4

1   Order under the second *Carson* prong.  The April 24 Order imposes no sanctions.  *See* ECF No.

2   6639 at 11.  It permits Defendants to screen for COVID-19 before transferring patients between

3   DSH and CDCR under their own selected protocols.  *See id.*  By all accounts, Defendants have

4   welcomed the Special Master's monitoring required by the Order.  *Cf. id.*  And Defendants had,

5   on their own accord, rescinded the prohibition on class members transfers from DSH hospitals

6   that gave rise to the April 24 Order before that order even issued.  *See id.* at 10.

7        The only potential harm to Defendants arising from the April 24 Order is its admonition

8   that Defendants cannot unilaterally decide to ignore this Court's orders sua sponte, even in cases

9   of emergencies.  But of course, that prohibition is axiomatic in the law and not unique to the April

10  24 Order.  *See Hutto v. Finney*, 437 U.S. 678, 690 (1978); *see also* ECF No. 6639 at 6-11.  And

11  that limitation presents no serious harm to Defendants for the same reason that Defendants cannot

12  establish the third prong of the *Carson* test:  because Defendants can ensure appellate review in

13  the future.  If this Court in the future orders sanctions for Defendants' non-compliance, that order

14  will be appealable.  *Cf. Coleman*, 743 Fed. App'x at 876 (citing *Plata,* 560 F.3d at 980).  If this

15  Court imposes new injunctive terms at the forthcoming evidentiary hearing based on the legal

16  holdings and standards laid out in the April 24 Order, that order too will be appealable under the

17  literal text of Section 1292(a)(1).  *See Coleman,* 789 Fed. App'x at 40 (third *Carson* prong not

18  met where Defendants have opportunity to prove case at upcoming trial, and to appeal resulting

19  order if unsuccessful).  And, as Defendants well know, they always have the opportunity to move

20  to modify the Court's orders under Federal Rule of Civil Procedure 60(b).  *See* ECF No. 6639 at

21  7-9 & n.5; *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004).  If their motion is

22  denied, Section 1292(a)(1) clearly confers appellate review there too.  Indeed, if Defendants had

23  followed proper procedure here, that is exactly what would likely have happened and there would

24  be no question of this Court's jurisdiction.  Defendants must establish all three prongs of the

25  *Carson* test for appellate jurisdiction to lie over the April 24 Order.  It cannot meet a single one.

26  This Court's jurisdiction to proceed with the June 25 evidentiary hearing and otherwise enforce

27  its existing orders is unquestionably proper.

28

1  Moreover, the April 24 Order is non-final under Section 1291 for the same reasons as the

2  May 7 Order:  It expressly anticipates further proceedings.  *See Coleman*, 743 Fed. App'x at 876;

3  *see also Plata*, 560 F.3d at 982.  The Court expressly declined to issue sanctions, invited

4  Defendants to move to modify the existing court orders – including on shortened time – if such a

5  motion were warranted, and set a future evidentiary hearing to permit Defendants to more fully

6  present their case.  ECF No. 6639 at 8-9, 11 & n.5.  None of those actions are consistent with the

7  notion that the April 24 Order is final, and indeed all point to the fact that potentially appropriate

8  opportunities for appellate review exist if and when necessary to secure Defendants' rights.

9  Finally, even if this Court concludes that Defendants' appeal is proper, it need not cancel

10  the June 25 evidentiary hearing nor cease enforcing Plaintiffs' rights.  Federal Rule of Civil

11  Procedure 62 creates an exception to the appellate divestiture rule that applies here.  Even where

12  an order is on appeal, a district court retains jurisdiction to "act[] to preserve the status quo and

13  protect plaintiffs' rights in direct response to defendants' repeated and willful non-compliance

14  with its earlier orders," particularly where, like here, the case "involves a series of enforcement

15  orders dating back over a decade and a continuous course of conduct marked by the development

16  of new facts."  *See Armstrong v. Brown*, 732 F.3d 955, 959 n.6 (9th Cir. 2013).   Like in the

17  *Armstrong* case, proceeding with the evidentiary hearing here will not disturb the question on

18  appeal from the April 24 and May 7 Orders:  whether Defendants may unilaterally exercise

19  discretionary state power to modify federal court orders during a pandemic.  *See id*.; *see also* ECF

20  No. 6639 at 7-10 (describing and resolving Defendants' legal challenges).  Unless and until

21  Defendants secure a stay, which they have not even sought, this Court retains jurisdiction to hold

22  the forthcoming evidentiary hearing and issue further enforcement orders consistent with the

23  April 24 and May 7 Orders, and its prior orders, to secure Plaintiffs' rights.

24  / / /

25  / / /

26  **B.   Defendants' Position.**

27  During a time of public health crisis, like the one presented by the worldwide COVID-19

28  pandemic, government officials are obligated to take affirmative and immediate action to

[3562159.2]                                                                6

Jt. Report Resp. June 12, 2020 Order  (2:90-cv-00520 KJM-DB (PC))

1    maintain safety and security.  Faced with the highly contagious coronavirus entering its facilities,

2    the Department of State Hospitals (DSH) acted as necessary here by implementing a plan to

3    temporarily halt *Coleman* patient admissions and transfers on an emergency basis.  DSH told the

4    Special Master, Plaintiffs' counsel, and its CDCR colleagues about this emergency plan of action.

5    (ECF No. 6565 at 3, Ex. E.)  That plan proved successful.  Indeed, thanks to DSH's foresight and

6    speedy and decisive action, no COVID-19 positive patient emerged in its facilities until many

7    weeks after COVID-19 struck similar types of facilities across the nation and within the state.

8    Although DSH's actions almost definitely saved patient and staff lives, Plaintiffs complain that

9    DSH acted in violation of the Program Guide, and thus is subject to sanction.  And even while

10   Defendants continue to battle the pandemic, the Court intends to hold a trial to examine whether

11   DSH is complying with Program Guide requirements, and if the agency is not complying, what

12   are the reasons for such deviations.  But Defendants have appealed the Court's April 24 and May

13   7, 2020 orders challenging Defendants' authority to make temporary life-saving decisions in

14   emergency circumstances.

15        Defendants' appeal of the April 24 and May 7 orders divests the Court of jurisdiction to

16   proceed to trial on June 25.  The appeal implicates the legal standard and factual basis of those

17   orders, including the standard that will be applied at trial.  The issues on appeal are inextricably

18   bound with the trial—the Court cannot address the issues at trial without encroaching upon the

19   threshold issues Defendants' challenge on appeal.  The Court should vacate the June 25 trial

20   pending resolution of Defendants' appeal.

21               **1.    Defendants filed a timely Notice of Appeal concerning the April 24**
                          **and May 7 orders.**
22

23        Defendants timely filed a notice of appeal of the Court's April 24 and May 7 orders

24   regarding requirements for transfer to DSH facilities.  The April 24 order found that "Director

25   Clendenin acted unilaterally to suspend admission of *Coleman* class members to DSH beds in

26   violation of multiple court orders requiring Defendants to keep a full complement of 256 beds

27   available to Coleman class members at ASH," and "violated the court's March 8, 2017 order

28   requiring consultation with the Special Master before closing DSH inpatient beds."  (ECF No.

1    6639 at 8.)  The Court rejected Defendants' reliance on well-established precedent permitting

2    states to implement emergency measures in response to public health emergencies, finding that

3    Defendants must first seek this Court's permission to deviate in any way from a Court order.  (*Id*.)

4    The Court found that, putting aside COVID-19 screening, "the Program Guide requirements for

5    transfer to DSH inpatient hospital beds remain in full force and effect unless and until modified

6    by order of this court."  (*Id*. at 11.)

7         The May 7 order confirmed and further clarified that the Court would hold an evidentiary

8    hearing to assess the following factual issues: "(1) as required by the April 24, 2020 order, have

9    DSH and  CDCR been complying with the Program Guide requirements, as modified by the

10   temporary addition of COVID-19 screening, for transfer class members to inpatient beds; (2) if

11   they are not complying with those requirements, in what way or ways are they deviating from

12   those requirements; and (3) what is the rationale for any deviation."  (ECF No. 6660 at 2.)  The

13   order further directs that "[i]f defendants are not following the requirements of the court's order,

14   for the reasons explained in the April 24 order, they have the burden of proving that modification

15   of that order and the underlying Program Guide provisions are required.  The standards applicable

16   to a motion based on Federal Rule of Civil Procedure 60 will apply."  (*Id*.)

17        Defendants' appeal of the Court's orders deprived the Court of taking any further action

18   over matters implicated by the April 24 and May 7 orders, particularly any evidentiary

19   proceeding.  The Ninth Circuit has jurisdiction under 28 U.S.C. § 1291 because the orders

20   constrain Defendants' ability to take temporary and immediate action to protect the inmate-

21   patient population and the public.  This Court's order is final under the standard applied to

22   appeals of post-judgment orders.  A final decision "is one which ends the litigation on the merits

23   and leaves nothing for the court to do but execute the judgment[.]"  *Armstrong v.*

24   *Schwarzenegger*, 622 F.3d 1058, 1064 (9th Cir. 2010) (post-judgment orders are given a practical

25   construction of finality).  Here, however, the litigation on the merits concluded in 1995, and

26   everything since then has been in execution of the judgment.  *Coleman v. Wilson*, 912 F. Supp.

27   1282 (E.D. Cal. 1995).  Where there has already been a final judgment, the primary jurisdictional

28   concern is "allowing some opportunity for review, because unless … post-judgment orders are

[3562159.2]

8

found final, there is often little prospect that further proceedings will occur to make them final." *Armstrong*, 622 F.3d at 1064 (internal quotation marks and brackets omitted).

Here, the Court finally determined that DSH violated prior Court orders and inmate-patients' Eighth Amendment rights when it temporarily halted patient admissions and transfers to curb the spread of COVID-19 in its facilities. The Court's orders stand as final decisions inhibiting Defendants' ability to take proactive measures to protect patients and staff in the face of a worldwide crisis. And although the Court intends to hold further proceedings, in the interim, the Court's April 24 and May 7 orders tied Defendants' hands, which is why they appealed them. The Court cannot hold a trial without encroaching upon the jurisdiction that now sits with the Ninth Circuit.

> **2.   The Court is divested of jurisdiction to hold the June 25 hearing because Defendants' appeal challenges the legal determinations underpinning the issues to be resolved through the hearing.**

The filing of a notice of appeal divests the district court of jurisdiction over the matters being appealed. *Griggs v. Provident Consumer Discount Co*., 459 U.S. 56, 58 (1982) (per curiam). The divestiture doctrine is a judicially-created doctrine "designed to avoid the confusion and waste of time that might flow from putting the same issues before two courts at the same time." *Kern Oil & Ref. Co. v. Tenneco Oil Co.*, 840 F.2d 730, 734 (9th Cir. 1988). The divestiture rule applies to appeals from injunctions, *McClatchy Newspapers v. Central Valley Typographical Union No*. 46, 686 F.2d 731, 734 (9th Cir. 1982), and non-frivolous interlocutory orders, *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001). A district court is divested of jurisdiction over matters appealed, however, it retains jurisdiction during the pendency of an appeal to act to preserve the status quo. *Natural Resources Defense Council, Inc. v. Southwest Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001); Fed. R. Civ. P. 62. This limited exception to the divestiture rule allows the district court to take new action in response to new facts. *Hoffman ex rel. NLRB v. Beer Drivers & Salesmen's Local Union No*. 888, 536 F.2d 1268, 1276 (9th Cir. 1976). But that rule does not restore jurisdiction to "adjudicate substantial rights directly involved in the appeal." *McClatchy Newspapers*, 686 F.2d at 735. Thus, a district court may not take further action that "materially alters the status of the

[3562159.2]                                                                9

Jt. Report Resp. June 12, 2020 Order  (2:90-cv-00520 KJM-DB (PC))

1    case on appeal." *Natural Resources Defense Council*, 242 F.3d at 1166.  Any questions regarding

2    appealability of the April 24 and May 7 orders should be resolved in favor of awaiting disposition

3    of the appeal.  *See Ruby v. Sec'y of U.S. Navy*, 365 F.2d 385, 389 (9th Cir. 1966) (en banc) ("If

4    the district court is in doubt as to whether the notice of appeal is inoperative by reason of some

5    such defect, it may decline to act further until the purported appellee obtains dismissal of the

6    appeal in the court of appeals."); *United States v. Hitchmon*, 602 F.2d 689, 694 (5th Cir. 1979)

7    (en banc) (district court's jurisdiction was not divested where order was "clearly unappealable"

8    and thus notice of appeal was "manifestly ineffective.").

9        Defendants' appeal divests the Court of jurisdiction over the issues decided by the April 24

10   and May 7 orders, including its determination that DSH officials violated existing Court orders or

11   the Eighth Amendment.  According to this Court, notwithstanding the emergency circumstances

12   faced by Defendants (and other government actors worldwide), Defendants must follow Program

13   Guide requirements regarding patient transfers in every instance, with the addition of certain

14   COVID-19 screening criteria, unless modified by subsequent orders.  That erroneous conclusion

15   is the subject of Defendants appeal and any decision by this Court during or following the trial on

16   these issues will impact Defendants' substantial rights.  Indeed, some of the factual issues that are

17   the potentially subject of the hearing—namely, the rationale for Defendants' deviation from the

18   Program Guide requirements, if such deviations are occurring—are directly impacted by the

19   Court's findings in the April 24 order and confirmed by the May 7 order.  Any further findings or

20   orders concerning compliance with Program Guide requirements for DSH transfers, particularly

21   any orders limiting what actions DSH can take to protect its patients and facilities from harm

22   during a global pandemic, substantially affects rights that Defendants intend to vindicate on

23   appeal.  The Court is therefore divested of jurisdiction, and it should vacate the presently-

24   scheduled June 25 trial.

25              **3.    Alternatively, if the Court retains jurisdiction, it should defer the
                         hearing until the appeal is resolved.**
26

27        Alternatively, if the Court decides it retains jurisdiction, Defendants request that the Court

28   defer the hearing until the Ninth Circuit resolves the appeal of the April 24 and May 7 orders.

[3562159.2]                                          10

1   Defendants remain committed to transferring clinically and custodially appropriate patients from

2   CDCR to DSH as expeditiously as possible in the midst of a pandemic that has plagued prison

3   and state hospital systems around this country, and are daily reporting on their transfer activities

4   to the Special Master's COVID-19 Task Force.  Moreover, Defendants are working closely with

5   the Special Master's psychiatric experts in the small workgroup setting, where each *Coleman*

6   patient referral is discussed with the experts and the referral process is monitored by those experts

7   and reported back to the larger Task Force.  Defendants are committed to maintaining these

8   workgroup functions, openly discussing their processes, and demonstrating an effective patient

9   transfer procedure between CDCR and DSH.

10          The validity of the April 24 and May 7 orders is a necessary prerequisite to the Court's

11   ability to issue additional orders or make findings concerning the issues for the June 25

12   evidentiary hearing.  The Court has discretion to defer this hearing to avoid the waste of resources

13   that would result if the order is overturned on appeal.  *See S. Cal. Edison Co. v. Lynch*, 307 F.3d

14   794, 807 (9th Cir. 2002) (district courts have inherent power to control their dockets.)  The Court

15   previously exercised this discretion during the pendency of Defendants' appeals of the Court's

16   orders concerning transfers to intermediate and acute care and Mental Health Crisis Beds.  (*See*

17   ECF No. 5726 at 7; ECF No. 5750 at 4.)  It is particularly important that the Court exercise

18   similar discretion in this instance because the issues on appeal are so central to the evidentiary

19   hearing topics.  Moreover, the potential witnesses for the Court's hearing are key individuals

20   involved in responding to and managing care for *Coleman* class members and, in the case of

21   DSH, nearly 6,000 non-*Coleman* patients, during this pandemic.  The hearing will require

22   significant time to prepare for their appearance in Court, pulling them away from their usual

23   duties at a time when they are needed most.  The Court should exercise its discretion and defer

24   the hearing, should it find it retains jurisdiction notwithstanding Defendants' appeal.

25   **II.     SUPPLEMENTAL DISCOVERY FROM DSH.**

26          **A.     Plaintiffs' Position.**

27          On April 10, 2020, after holding an ongoing series of status conferences addressing the

28   impact of the coronavirus pandemic on the *Coleman* class and Program Guide compliance and

1    issuing an order to show cause to Defendants, this Court set an evidentiary hearing for April 21,

2    2020 to address the issue of *Coleman* class member access to Department of State Hospitals

3    ("DSH") inpatient psychiatric hospital care.  ECF No. 6600 at 4.  In that order, the Court also

4    authorized Plaintiffs "to conduct limited and focused written discovery as discussed at [the]

5    hearing concerning the availability of extra space in the state hospitals, given the circumstances

6    posed by the coronavirus pandemic, to provide the care that is necessary to *Coleman* class

7    members." *Id.* at 3–4.

8         On April 13, 2020, Plaintiffs issued one set of interrogatories and one set of document

9    requests to Defendant Stephanie Clendenin, Director of the Department of State Hospitals.

10   Defendants agreed to provide responsive discovery as to Atascadero, Coalinga, and Patton State

11   Hospitals, but refused to provide responses as to Metropolitan and Napa State Hospitals as

12   Plaintiffs had requested.  After the parties met and conferred on several occasions, and then

13   presented the issue to the Court during an informal discovery conference on April 22, *see* Minute

14   Order, ECF No. 6629 (Apr. 21, 2020), Defendants ultimately agreed to produce documents

15   responsive to Plaintiffs' requests for all DSH hospitals.  Defendants produced responsive

16   documents on April 17, April 30, and May 1.

17        After the parties agreed on the scope of the relevant discovery, the Court continued the

18   evidentiary hearing to May 19, 2020, in light of the parties' stipulation to continue the hearing

19   subject to close monitoring in the interim by the Special Master of all referrals, rejections and

20   completed transfers to and from the DSH inpatient programs.  *See* ECF No. 6622 at 3.  Again on

21   May 18, 2020, the Court granted the parties' May 13, 2020 stipulation to continue the hearing to

22   June 25, 2020.  ECF No. 6676 at 4-5.

23        Plaintiffs requested on June 2, 2020 that, consistent with Federal Rule of Civil Procedure

24   26(e)(1), Defendants supplement their responses to Plaintiffs' discovery requests authorized by

25   this Court's April 10, 2020 Order, given that the previous production was completed nearly six

26   weeks prior and the most up to date information was current only through mid-April.  *See* ECF

27   No. 6600 at 3-4.  After meeting and conferring on June 9 and June 15, Defendants informed

28   Plaintiffs that they would not be able complete their supplementation to provide updated

[3562159.2]                                          12

Jt. Report Resp. June 12, 2020 Order  (2:90-cv-00520 KJM-DB (PC))

1   information current through May 31, 2020 until June 22, 2020—less than three days before the

2   June 25 evidentiary hearing.  Though Defendants provided a partial supplementation to the

3   discovery on June 11, nearly all of the relevant data going to the issue at the heart of the June 25

4   evidentiary hearing—whether DSH is making use of all of its available space to provide *Coleman*

5   class members court-ordered access to its psychiatric hospitals—will not be provided with

6   sufficient time for Plaintiffs to prepare for the evidentiary hearing, let alone comply with this

7   Court's procedures to exchange trial exhibits four days before the hearing.

8           Plaintiffs have proposed various potential solutions that would permit Defendants to

9   provide a portion of the supplemental responses earlier than June 22, all of which Defendants

10  have promptly rejected.  *See* Declaration of Amy Xu ISO Plaintiffs' Submission to the Joint

11  Status Report.  During a meet and confer call on June 9, the parties seemed to acknowledge that

12  the Net Bed Capacity Report with data as of May 31 is the report that provides the most relevant

13  information for the evidentiary hearing, because this report identifies where there are vacancies

14  across all units in all DSH hospitals.  In an email on June 12, Plaintiffs proposed that Defendants

15  provide a partial supplement to the discovery with data only up until May 24 (instead of May 31),

16  which Defendants stated was infeasible.  Additionally, during a meet and confer call on June 15,

17  Plaintiffs proposed that Defendants provide by the week of June 19 – one business day before

18  their self-imposed deadline – various smaller subsets of the information within the Net Bed

19  Capacity Report, such as information for just Atascadero and Coalinga State Hospitals, or just the

20  total number of vacant beds at each of the five DSH hospitals, rather than a unit-by-unit count at

21  each hospital.  In that call, Plaintiffs also pointed out that Defendants provide a subset of this

22  information weekly for the COVID taskforce meetings, but Defendants stated none of the

23  information sourced from the Net Bed Capacity report would be available before June 22.

24  Defendants stated that they need approximately three weeks to compile and validate this

25  information (notwithstanding their independent obligation under the Federal Rules to supplement

26  their responses, which Defendants clearly were not anticipating doing of their own accord).

27  Defendants not only rejected all of Plaintiffs' suggestions, but also failed to offer any solution to

28  provide Plaintiffs with relevant information about vacancies across the DSH hospitals with

1    adequate time to prepare for the currently scheduled June 25 evidentiary hearing, and to exchange

2    trial documents in the court-ordered timeframe.

3          Receiving the vast majority of the updated production only three days before the

4    evidentiary hearing severely prejudices Plaintiffs' ability to prepare for trial, including

5    preparation of their expert witness as appropriate.  At an evidentiary hearing, Plaintiffs will likely

6    question Defendants' witnesses about how the current admissions process affects Defendants'

7    ability to admit *Coleman* patients.  To do so, Plaintiffs may solicit testimony about the manner

8    that admissions units, *Coleman* units, and permanent housing units are currently being used at

9    DSH hospitals, and whether those practices negatively affect Defendants' ability to admit

10   *Coleman* class members so that to the extent possible all *Coleman* beds are available to *Coleman*

11   patients.  Without access to an updated Net Bed Capacity Report, Plaintiffs cannot evaluate the

12   status of bed vacancies in the DSH hospitals and how DSH would be able to accept and house

13   waiting *Coleman* patients.  Indeed, assuming the Court follows the procedure outlined in its May

14   7, 2020 order that requires exchange of trial exhibits four days before the evidentiary hearing, *see*

15   ECF No. 6660 at 3, Defendants' production of documents and information responsive to

16   discovery requests on June 22 would preclude Plaintiffs' use of those documents at the June 25

17   trial.

18         In order to provide Plaintiffs sufficient time to prepare for the June 25 evidentiary hearing,

19   the Court should order Defendants to produce all supplemental discovery by June 19 at noon.  In

20   the alternative, Plaintiffs request that the Court issue a short continuance for the hearing until the

21   week of June 29, which would permit Plaintiffs sufficient time to prepare after receiving the final

22   supplemental discovery from Defendants on June 22.  In addition, in the event the upcoming

23   evidentiary hearing is continued one or more additional times, this Court should issue an

24   affirmative order requiring Defendants to supplement their discovery responses on a date certain

25   each month, no less than five business days before the date of the hearing, to prevent this issue

26   from recurring.

27         **B.    Defendants' Position.**[2]

28   _____
     [2] Defendants' position is supported by the two declarations filed concurrently herewith.

[3562159.2]                                    14

                                      Jt. Report Resp. June 12, 2020 Order  (2:90-cv-00520 KJM-DB (PC))

1    This dispute concerns DSH's ability to produce data for May 2020 on its census and bed

2    capacity in its five hospitals.  DSH has committed to producing the May data, but cannot do so

3    until June 22, 2020, because DSH needs at least three weeks to generate the reports through

4    which DSH compiles, validates, and produces the data at issue.  This is a manual process wherein

5    DSH compiles 30 data points for each of its 156 units comprised over over 6,000 beds.  Despite

6    the incredible amount of manual work associated with the collection and compilation of DSH

7    data, DSH has cooperated with Plaintiffs' discovery requests to date, and continues to provide

8    weekly data on *Coleman* patients for the task force meetings, DSH simply cannot further expedite

9    the reports Plaintiffs allege (without any specificity or support) they need before the June 25

10   hearing, which concerns three narrow issues.  Neither can the data be produced on a rolling basis.

11   The parties' discovery negotiations reflect DSH's willingness to address Plaintiffs' requests with

12   readily-available information as quickly as possible.  The Court should reject Plaintiffs' efforts to

13   overreach and subject DSH to overbroad and irrelevant discovery demands that continue to

14   distract DSH officials and staff from their prime obligation to manage the ongoing pandemic.

15   The discovery at issue arose in relation to Plaintiffs' request at the April 10, 2020 status

16   conference, that DSH assure under oath that it had sufficient space to safely admit *Coleman* class

17   members to its hospitals during the pandemic.  (4/10/20 Tr. At 20:22 – 23:22.)  The Court issued

18   an order providing Plaintiffs the opportunity to conduct "limited and focused written discovery as

19   discussed at the hearing concerning the availability of extra space in the state hospitals, given the

20   circumstances posed by the coronavirus pandemic, to provide the care that is necessary to

21   *Coleman* class members."  (ECF No. 6600 at 3-4.)  The Court further ordered the discovery to be

22   conducted so that it would be completed by April 17, presumably so Plaintiffs would receive it

23   before the then-scheduled April 21 evidentiary hearing.  (ECF No. 6600 at 4.)

24   On April 13, at 4:11 p.m., Plaintiffs served Defendants with a request for production of

25   documents and a request for answers to interrogatories, requesting Defendants provide Plaintiffs

26   with written objections no later than noon on April 15, less than 48 hours later, and that the

27   discovery responses be served no later than noon on April 16.  (Thorn Decl. ¶ 2, Exhibit 1.)  On

28   the morning of April 15, Defendants' counsel notified Plaintiffs' counsel that Defendants' written

[3562159.2]                                        15

1    objections would be provided on April 15, but not by Plaintiffs' noon deadline, and offered to

2    meet and confer with Plaintiffs on April 16 to discuss the objections.  (Thorn Decl. ¶ 3, Exhibit 2,

3    April 15, 2020 e-mail from E. Thorn to J. Winter.)  On April 15, Defendants also sent Plaintiffs

4    their written objections to the discovery, and confirmed that, subject to articulated objections,

5    Defendants would be producing documents and interrogatory responses on April 17.  (*See* Thorn

6    Decl. ¶ 4, Exhibit 3, Apr. 15, 2020 letter from E. Thorn to J. Winter.)

7        The parties met and conferred concerning the discovery requests and objections on April

8    16.  (Thorn Decl. ¶ 5.)  Defendants explained various constraints preventing them from gathering

9    the data and information available to respond fully to Plaintiffs' requests.  (*Id*.)  Specifically, and

10   as stated in their April 15 written objections, DSH's normal operating procedures require its

11   individual hospitals to track and produce information concerning patient census and bed usage

12   and report that information to headquarters.  This information is compiled and reported monthly

13   in the DSH Net Bed Capacity Reports and the Census by Unit Reports.  Defendants informed

14   Plaintiffs that the Net Bed Capacity Report containing April data would not be available until

15   May but that they would work with Plaintiffs to try and produce other data, if available and

16   responsive to Plaintiffs' requests.  (*Id*.)

17       On April 17, Defendants produced written discovery responses and documents but limited

18   the Net Bed Capacity Reports and the Census by Unit Reports to the hospitals that treat *Coleman*

19   class members, DSH-Atascadero, DSH-Coalinga, and DSH-Patton.  (Thorn Decl. ¶ 6.)  Following

20   further negotiations, DSH on April 30 supplemented its discovery responses to include data and

21   information for DSH-Metropolitan and DSH-Napa, even though those facilities do not treat

22   *Coleman* class members.  (Thorn Decl. ¶ 7.)  On May 1, DSH further supplemented its discovery

23   responses to produce its hospitals' pandemic plans.  (*Id*.)

24       On June 2, Plaintiffs requested that Defendants supplement their discovery responses,

25   specifically the Bed Net Capacity report for April and May data and the Census by Unit reports

26   for data through May 31.  (Thorn Decl. ¶ 8, Exhibit 4.)  On June 4, Defendants confirmed (as they

27   had previously stated) that DSH could not produce the data requested by Plaintiffs' deadline.

28   (Thorn Decl. ¶ 9, Exhibit 5.)  On June 9, the parties met and conferred and DSH described the

[3562159.2]                                      16

1    limits on the availability of certain data—specifically, that the Net Bed Capacity reports for the

2    hospitals for April data could not be produced before June 22.  (Thorn Decl. ¶ 10.)

3         On June 11, Defendants supplemented their document production and produced data

4    covering April 2020 in the Net Bed Capacity Report as of May 1, the Census by Unit reports as of

5    May 1, the Pending Weekly Placement Report as of June 1, and updates to DSH's coronavirus

6    management plans.  (Thorn Decl. ¶ 11.)  Accordingly, DSH is not interfering with or obstructing

7    Plaintiffs' discovery efforts—but it can only produce what it has ready access to, and Plaintiffs

8    continue to push for data that cannot be complied and verified on Plaintiffs' timeline.

9         DSH is not able to produce reports that do not yet exist and cannot provide accurate data

10   without taking steps necessary to ensure its reports are comprehensive and validated.  Defendants

11   have committed to producing additional documents and supplementing discovery responses to

12   cover data for May 2020 by June 22.  To do so, DSH is already expediting the procedures

13   required to collect and validate the data Plaintiffs seek on the use and availability of over 6,000

14   hospital beds and 150 units.  This is a substantial undertaking.

15        The DSH Net Bed Capacity Report (NBCR) is a monthly report of all DSH licensed

16   housing units.  (Hendon Decl. ¶ 8.)  This report contains an accounting of all units by hospital

17   with descriptions of the unit's purpose, primary commitment types, and bed capacity details such

18   as licensed beds, additional capacity through emergency flex licensing, over-bedding approval, or

19   beds held or closed for specific purposes.  (*Id.*)  This monthly report is a manual compilation

20   process completed in collaboration with facility staff at each of the five hospitals to document all

21   adjustments to unit designations and capacity.  (*Id.*)

22        Each month, DSH follows an approximately three-week process to complete the Net Bed

23   Capacity Report.  (Hendon Decl. ¶ 9.)   On the last business day of each month, the Research,

24   Evaluation, and Data team within the Hospital Strategic Planning and Implementation Division

25   sends the finalized Net Bed Capacity Report from the prior month to all five hospitals. (*Id.*)

26   Hospital staff work from the finalized prior month report to document all adjustments for the next

27   report timeframe.  (*Id.*)  Hospital staff coordinate with multiple areas of the hospitals to obtain

28   information and to respond to questions.  (*Id.*)  This may include their local standards compliance

[3562159.2]                                              17

Jt. Report Resp. June 12, 2020 Order  (2:90-cv-00520 KJM-DB (PC))

1    offices, forensic offices, clinical administrators and hospital administrators.  (*Id.*)  Each hospital

2    has until the second Friday of the following month to compare and compile unit level capacity

3    changes effective through the first of the current month, June 1 for the report for May.  (*Id.*)  DSH

4    Sacramento then has until the third Friday of the current month to review and approve the five

5    hospital submissions, in this case June 19.  (*Id.*)  That review process starts with a review of all

6    capacity data per unit which compares census to the available bed capacity, and Sacramento

7    coordinates with the hospitals to obtain additional unit information if necessary. (*Id.*)  The

8    preliminary report is then sent to DSH management to ensure all unit activations, unit capacity

9    changes, or changes to the NBCR are captured accurately and within reporting timelines.  (*Id.*)

10        Completing the Net Bed Capacity Report requires updated information and calculations for

11   approximately thirty data fields covering 156 housing units.  The available bed count varies each

12   month—for example, here's the bed count for the past three months, with approximately 6,300

13   for March, 6,261 for April, and 6,244 for May. (*Id.*)  Completing this reporting for a subset of

14   May 2020 would require DSH to complete this process twice.  (*Id.*)  The report is needed

15   operationally and adding an additional report to this manual workload would delay the regular

16   report. (*Id.*)

17        The COVID-19 pandemic has significantly impacted DHS's ability to fast-track its

18   reporting processes.  (Hendon Decl. ¶ 10.)  For example, DSH developed and COVID-19

19   isolation units, identified capacity for patients under investigation (PUI), and created Admission

20   Quarantine Units.  DSH activated these units quickly over the past few many months as DSH's

21   COVID-19 response continued to evolve.  (*Id*.)  DSH's COVID-19 response requires constant

22   attention—as a result, DSH's reporting processes have been impacted and DSH has to spend time

23   in addition to what is "normally" required to ensure the reporting of all adjustments are captured

24   accurately, and within the correct reporting timeframes.  (*Id*.)  Moreover, DSH has had to allocate

25   significant resources to the *Coleman* task-force meetings this Court established.  DSH has

26   attended every task-force meeting since April, at which it has provided to some 50-plus

27   stakeholders (including *Plata* counsel) *Coleman* patient data, including referrals, admissions, and

28

1   discharges.   But providing numbers for bed vacancies is based on different data and subject to

2   different validation procedures.

3        The reporting and validation of bed capacity data is complex and made more complex by

4   current public health concerns.  For example, DSH changes in its capacity in various units has

5   involved adjusting standard reports to include notations for COVID-19 specific capacity,

6   inclusion of emergency flex housing, and calculating the impacts of COVID-19 capacity as it

7   relates to DSH Available Bed Capacity.  (Hendon Decl. ¶ 11.)  Those data points are reflected in

8   the Net Bed Capacity Reports as of April 1 and May 1, which Defendants produced to Plaintiffs

9   and will be provided in the May data on June 22.  (*Id.*)  Also, providing available Bed Capacity, is

10  calculated as "total licensed beds" less "beds held" less "closed beds."  (*Id.* ¶ 12.) Licensed beds,

11  within this calculation incorporates licensed beds, beds available in excess of licensed capacity,

12  and emergency flex housing.  (*Id.*) Capacity specific to COVID-19 Medical Isolation units and

13  PUI capacity are notated as "held capacity," as this capacity can only be used for the specified

14  COVID purpose.  (*Id.*)  Reporting on bed capacity also requires reviewing adjustments to

15  capacity based on movement across multiple units.  ((*Id.* ¶ 13.)  For example, movement may

16  occur to empty a unit for COVID, resulting in adjustments to other units accepting the moved

17  patients.  (*Id.*)  Updates to the Net Bed Capacity Report must reflect all changes which

18  subsequently occur to non COVID focused units.  (*Id.*)

19       While Defendants and DSH in particular have agreed to produce the documents and data in

20  question, they cannot produce documents that do not yet exist, and dispute whether the discovery

21  remains necessary to address Defendants' deviations, if any, from Program Guide requirements as

22  a result of the pandemic, and the rationale for any deviation.  DSH's temporary suspension of

23  admission to its hospitals expired on April 15.  And DSH has repeatedly confirmed that all of the

24  beds dedicated to the *Coleman* class are open and available for referrals from CDCR.

25  Accordingly, Plaintiffs are unlikely to suffer any prejudice as a result of the timing of production

26  of the May data.  If Plaintiffs must have additional time with the May data before proceeding with

27  the evidentiary hearing, Defendants propose that the solution is a short delay of the hearing, not

28  an order requiring discovery of reports that do not yet exists.

[3562159.2]

19

1    **III.    DEADLINE FOR RESPONSES TO THE SPECIAL MASTER'S MAY 29, 2020 REPORT.**

2          **A.      Plaintiffs' Position.**

3          The Special Master filed his "Report on His Expert's Analysis of Psychiatrist Employment

4    Conditions and Compensation at the California Department of Corrections and Rehabilitation and

5    the Department of State Hospital" ("Report") with this Court on May 29, 2020.  ECF No. 6695.

6    Under the clear terms of the Order of Reference, Defendants' objections to that compliance

7    Report, which had previously been circulated to the parties in draft form on August 15, 2019,

8    were due within ten days, i.e., on June 8, 2020.  *See* Dec. 11, 1995 Order of Reference, Dkt. 640

9    at 4, 8; *see also* Report at 15.  Defendants failed to file any objections within that period.  Nor did

10   they request from Plaintiffs or from this Court an extension of time for doing so, or file a request

11   for clarification to the extent they had a good faith basis for believing the Report was not

12   governed by the Order of Reference's 10-day timeframe for objections.  *Cf.* July 3, 2019 Order,

13   ECF No. 6211, at 3 n.6.  Accordingly, under the terms of the Order of Reference, this Court must

14   adopt the Report as its findings of fact and conclusions of law.  Order of Reference at 8.

15         After the close of business on the deadline for filing objections, Defendants emailed

16   Plaintiffs asserting that the Report did not qualify as a compliance report and was not circulated

17   to the parties in advance of filing for comment.  Accordingly, Defendants asserted that that the

18   Report is governed by the July 29, 2019 stipulation narrowly amending the Order of Reference

19   (ECF No. 6230, hereinafter "July 29 Stipulation") rather than the Order of Reference itself, and

20   thus was subject to a 30-day objection period rather than the 10-day deadline.[3]  Defendants'

21   arguments that the July 29 Stipulation applies are unpersuasive, and, if adopted, would set a

22   dangerous precedent for future reports that this Court must take pains to avoid.

23         The Report is clearly a compliance report within the meaning of paragraph A(5) of the

24   Order of Reference.  *See* ECF No. 640 at 4.  This Court's order granting the Special Master's

25   request to add the labor economist experts to his team makes this explicit:  This Court and the

26   _____

27         [3] Defendants did not and have not asserted that Federal Rule of Civil Procedure 53 or its
     attendant deadlines or procedures applied, and should be foreclosed from asserting any such
28   argument here to the extent they do given the parties' agreement not to exchange their positions
     in advance.

1    Special Master tasked the labor economist experts with "evaluat[ing] current salary rates and the

2    efficacy, if any, of compensation increases on defendants' ability to recruit and retain necessary

3    mental health staff to comply with the October 10, 2017 order and the prior court orders described

4    therein." Sept. 11, 2018 Order, ECF No. 5919, at 2; *see also id.* ("The Special Master seeks the

5    appointment of this team of labor economists to conduct labor market and salary analyses in an

6    effort 'to determine the potential efficacy of . . . collective bargaining salary and compensation

7    increases' as part of an overall effort to bring defendants into compliance with required mental

8    health staffing levels." (quoting ECF No. 5903)); Report at 1 (noting labor economists tasked

9    with conducting analysis "in furtherance of [the Special Master's] efforts to assist defendants in

10   their quest to attract, hire, and retain psychiatrists"). The Report itself exhaustively details the

11   long history of Defendants' noncompliance with the Court's many orders requiring provision of

12   minimally adequate levels of psychiatric staffing to treat the *Coleman* class that precipitated the

13   need for the labor economists' analysis. *See* Report at 2-11. There can be no real debate that the

14   Report is not a compliance report within the meaning of the Order of Reference.

15        Nor is there any question the Report was circulated in draft form to the parties for review

16   and comment prior to filing on August 15, 2019. *See* Report at 15. As the Special Master notes,

17   not only were Defendants given numerous extensive opportunities to comment on the

18   development of the labor economists' analysis and methodology, they requested and were given a

19   full two months to prepare and submit their response to the draft report – which they did on

20   October 14, 2020, by submitting over 100 pages of comments and objections, including a lengthy

21   critique of the labor economists' draft report prepared by their own labor economist experts. *See*

22   Report at 11-18 (describing parties' participation in development of labor economists' data

23   collection and survey process and Defendants' comments on the draft labor economist report); *see*

24   *also id.* at 73-175 (containing Defendants' and their experts' comments on draft labor economist

25   report).

26        Nonetheless, Defendants claim that the July 29 Stipulation's 30-day comment period

27   applies to extend their period for filing objections beyond the 10-days permitted by the Order of

28   Reference. But both this Court's order giving rise to the stipulation and its express terms

1    preclude that argument.  The genesis for the July 29 Stipulation was this Court's order requiring

2    the parties to resolve a specific, narrow ambiguity that had existed in the case for some years

3    concerning the timeline applicable for filing objections to "reports from the Special Master that

4    are not circulated to the parties for review and comment prior to filing."  July 3, 2019 Order, ECF

5    No. 6211, at 19.  Notably, in their objections precipitating the Court's July 3 Order, Defendants –

6    like now – claimed confusion over the governing deadlines but failed to file for clarification

7    within the shorter of the two potential timeframes.  While noting that "defendants should have,

8    within ten days, either filed their objections or moved for application of the" longer objection

9    period, the Court generously considered Defendants' objections in light of its previous

10   acknowledgment of the ambiguity because the Special Master report at issue "was not circulated

11   to the parties for review or comment prior to its filing."  *Id.* at 3 n.6.  At the same time, "[t]o

12   avoid further confusion," the Court required to the parties to prepare a "proposed stipulation and

13   order for modification of the ten-day objection period in the Order of Reference to add a

14   provision governing the objection period for reports the Special Master does not circulate to the

15   parties for review and comment prior to filing."  *Id.*

16       The ensuing July 29 Stipulation is specifically and narrowly tailored to address only this

17   issue identified in the July 3 Order and nothing more.  The limitation of the 30-day time period to

18   only those reports not circulated to the parties in draft form before filing is repeated no less than

19   four times in the text of the stipulation.  July 29, 2019 Order, ECF No. 6230, at 1, 2.  The

20   stipulation specifically states that "[n]o other aspect of the Order of Reference is herein

21   modified."  *Id.* at 2.  Because the Special Master provided the parties ample opportunity to

22   comment on the labor economists' report prior to filing – and because Defendants did in fact

23   submit extensive comments -- the July 29 Stipulation's 30-day objection period patently does not

24   apply.

25       Nor does the fact that the Report was not circulated to the parties in final form before filing

26   bring it outside the ambit of the Order of Reference's provisions.  Indeed, the Order of Reference

27   specifically provides that, after the parties are given a reasonable time in which to submit

28   "specific, written objections" to a draft report, the special master "shall serve and file his

compliance report with the court" after consideration of the parties' views.[4]  *See* Order of

Reference, ECF No. 640, at 4-5.  The Special Master is not required to re-circulate the report to

the parties prior to filing after making any modifications to the draft report he deems warranted in

light of the parties' objections.   Along the same lines, the Order of Reference limits a parties'

formal objections filed with the Court to only those previously submitted for the Special Master's

consideration while a given report was in draft form.  *See id.* at 8.  This provision ensures the

Special Master can address the parties' concerns prior to finalizing and filing his report so that the

Court can have a full and complete record for consideration in resolving the objections.

Indeed, this is the precise process – including the 10-day objection deadline -- that the

parties and Special Master routinely follow in this case for Special Master reports circulated in

draft form prior to filing.  Just recently, in objections resolved by the Court on the exact same day

as the July 3 Order giving rise to the limited July 29 Stipulation, Defendants timely filed, within

10 days, their formal objections to the Special Master's Report on Expert Lindsay Hayes's Third

Re-Audit.  *See* July 3, 2019 Order, ECF No. 6212, at 1-3.  As with the Report at issue here, that

report both contained a companion report by the Special Master accompanying his expert's

report, which opined on Defendants' objections and was not previously circulated to the parties

before filing, and noted that Mr. Hayes's expert report itself had been modified prior to filing to

account for Defendants' objections to the draft version.  *See* Special Master Report re Hayes

Third Re-Audit, Nov. 5, 2018, ECF No. 5993, at 5-8.  Defendants raised no objection that either

the Special Master's companion report or Mr. Hayes's finalized version of his Third Re-Audit

report were not governed by the Order of Reference's procedures or were otherwise required to

be circulated to the parties prior to filing.  *See* July 3, 2019 Order, ECF No. 6212, at 2-3

(summarizing Defendants' objections).  Nor did they appeal this Court's ruling that one of their

objections to the final report was waived under the Order of Reference because they had failed to

make it in their objections to the draft report.  *See id.* at 3.

---

[4] Defendants did not avail themselves of the opportunity provided in the Order of Reference to request a hearing before the Special Master regarding their objections to the Report. *See* Order of Reference, ECF No. 640, at 4-5.

1          As a practical matter, this Court should not indulge Defendants' repeated attempts to evade

2     or claim confusion about the Order of Reference and its terms, which have provided the parties

3     and Special Master with the clear ground rules governing this case for twenty-five years.  As this

4     Court previously informed Defendants, if they were confused about what deadline governed their

5     objections, they should have at a minimum filed a request for clarification within the 10-day

6     objection period.  July 3, 2019 Order, ECF No. 6211, at 3 n.6.  Permitting Defendants to

7     repeatedly flout the appropriate procedures by claiming innocent confusion – especially after

8     being warned once and given a pass-- only invites wasteful litigation and upends the need for

9     clear expectations and procedure.  Indeed, this Court only permitted Defendants' objections in its

10    July 3 Order because Defendants had, in fact, not been permitted to comment on the draft report

11    at issue there, meaning it was reasonable to believe a longer comment period would be

12    appropriate.  That is in direct contrast to the situation here, where Defendants had two months to

13    comment and indeed submitted over one-hundred pages of objections to the draft report.

14         Moreover, the procedure Defendants urge this Court to authorize here sets a dangerous

15    precedent for future reports.  Under Defendants' read of the July 29 Stipulation, their objections

16    will never be due within 10 days under the Order of Reference unless they are permitted to

17    comment on the final version of a Special Master report, after already commenting on the draft

18    report, prior to filing.  In other words, they want the last word, including potentially the

19    opportunity to provide additional comments and objections penned by their own experts that the

20    Special Master and his experts would not then have any opportunity to address prior to

21    submission of their report to this Court.  That is simply untenable, and renders the Order of

22    Reference's careful procedures essentially void.

23         Accordingly, this Court should reject Defendants' informal suggestion that their objections

24    to the Report be governed by the wholly inapplicable 30-day deadlines from the July 29

25    Stipulation pertaining solely to reports never circulated to the parties in draft form.  Not only is

26    the Report clearly governed by the Order of Reference (and not the July 29 Stipulation),

27    entertaining Defendants' baseless (unfiled) "motion" sets a dangerous precedent for the future of

28    this case that threatens to undermine and distract from what must be the true focus – remediating

1    Defendants' provision of patently unconstitutional mental health care for the over 35,000

2    members of the *Coleman* class.

3         **B.    Defendants' Position.**

4         For reasons unknown to Defendants, Plaintiffs during a worldwide pandemic contest

5    Defendants' deadline to make an appropriate informed record and file a formal response to the

6    Special Master's May 29, 2020 report on his expert's analysis of psychiatrists' employment

7    conditions and compensation.  (ECF No. 6695.)  The Special Master's report is not merely a

8    cover report.  The twenty-one-page report includes an extensive overview of staffing issues, and

9    findings and recommendations, along with correspondence from the parties related to staffing

10   issues, and Defendants' October 14, 2019 letter setting forth objections to the expert's August

11   2019 draft report.  Given the nature of the Special Master's filing, the deadline for the response to

12   the May 29 report is the thirty-day rule under the July 29, 2019 Stipulation and Order Modifying

13   the December 11, 1995 Order of Reference.  (ECF No. 6230.)  Defendants' response and

14   objections are due on June 29.

15        The stipulation and order provide that "for any report filed by the Special Master that has

16   not been circulated to the parties for review and comment prior to filing, the parties will have

17   thirty days from the date of service to file objections to, or move to modify, reject, or adopt, such

18   a report."  (ECF No. 6230.)  The thirty-day rule applies to the May 29 report because it was not

19   circulated to the parties for review and comment prior to filing.  While the Special Master

20   provided his expert's draft report to the parties on August]14, 2019, the May 20 final version of

21   the report has supplemental material not included in the August draft.  For example, the final

22   report adds an eighteen-page appendix with EmployStat's response to Defendants' October 2019

23   response to the draft report.  The May 20 report also commented on the impact of COVID-19 on

24   staffing and the labor market.  (ECF No. 6695 at 194.)

25        Because the May 29 report includes the draft EmployStat report previously circulated to the

26   parties for review and comment, Defendants, out of an abundance of caution, notified Plaintiffs

27   and the Special Master that they would respond to the May 29 report under the thirty-day rule.

28   Plaintiffs disagree and argue that the ten-day rule should apply because the Special Master

1    circulated his expert's report to the parties on August 15, 2019, and that Defendants had an

2    opportunity to comment on the draft report.  But this report is not a compliance report authored

3    by the Special Master or his team that is subject to the ten-day rule.  Indeed, those reports are

4    routinely provided in draft and are in fact identified as compliance reports.

5         It is undisputed that the Special Master's May 29 report was not circulated to the parties

6    prior to filing.  The report is also not a compliance report.  It addresses a survey on salary and

7    employment conditions and the Special Master's expert's findings and recommendations

8    following that survey.  It is also undisputed that EmployStats added findings and

9    recommendations to its final report that were not included in the report provided to the parties for

10   review and comment in August 2019.  Defendants' application of the thirty-day rule to the May

11   29 report is a reasonable interpretation of the rule in this instance.  Defendants had no opportunity

12   to submit written objections to either the May 29 report, including its findings and

13   recommendations, or to the new material in EmployStats' updated final report.  As Defendants

14   could not have submitted written objections to a report and material that was not yet written,

15   applying the ten-day rule to the May 29 report would unfairly limit Defendants' response to the

16   August 2019 draft of the EmployStats' report based on the Order of Reference's requirement that

17   only previously raised "identical objection[s]" will be entertained by the court.  (ECF No. 640 at

18   8.)  Defendants did not intend that the July 29, 2019 stipulation and order would be applied to

19   deprive any party of the ability to respond to a Special Master's report and it should not be

20   applied here to deprive Defendants of the time needed to respond fully to the Special Master's

21   report and the supplemental positions added to the EmployStats report.

22        The parties stipulated to the thirty-day rule following the Court's July 9, 2019 order on the

23   Special Master's June 29, 2018 report on updates to the Program Guide.  (ECF No. 6214.)  The

24   Court noted the conflict in the interpretation of the requirement under the Order of Reference, that

25   responses to compliance reports must be filed within ten days after service of the reports.  (ECF

26   No. 6214 at 3, n.7.)  In that case, Defendants applied the twenty-one-day rule under the Federal

27   Rules of Civil Procedure and not the ten-day rule under the Order of Reference because the report

28   was not a compliance report.  The Court agreed that where "the Special Master's report was not

1    circulated to the parties for review or comment prior to its filing, the court should err on the side

2    of considering all of the parties' views." (*Id.*)  To avoid future confusion with respect to these

3    rules, the Court ordered the parties to present a stipulation "for modification of the ten-day

4    objection period in the Order of Reference to add a provision governing the objection period for

5    reports the Special Master does not circulate to the parties for review and comment prior to

6    filing." (*Id.*)  The Court did not address whether the ten-day or new thirty-day rule only applies

7    to compliance reports and what qualifies as a compliance report under the Order of Reference.

8          The Court should end this dispute by confirming that the thirty-day rule applies to Special

9    Master's May 29 report, and further clarify that the July 29 stipulation and order should not be

10    used to preclude full consideration of the parties' right to comment on and object to the Special

11    Master's reports in this matter.  If the Court takes the position that the thirty-day rule does not

12    apply because the draft EmployStats report was provided to Defendants in August 2019, absent

13    some showing of prejudice to Plaintiffs, or some need for the Court to take action on the May 29

14    report before the end of June, the Court should permit Defendants to file a response to the May 29

15    report under the thirty-day deadline given current circumstances and constraints.

16    Dated:  June 16, 2020                    Respectfully submitted,

17                                          XAVIER BECERRA
                                          Attorney General of California

18                                          ADRIANO HRVATIN
                                          Supervising Deputy Attorney General

19

20                                          */s/ Kyle A. Lewis*
                                          KYLE A. LEWIS

21                                          Deputy Attorney General
                                          *Attorneys for Defendants*

22

23    Dated:  June 16, 2020                    ROSEN BIEN GALVAN & GRUNFELD LLP

24

25                                          */s/ Lisa Ells*

26                                          Lisa Ells
                                          *Attorneys for Plaintiffs*

27

28    CF1997CS0003