XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
KYLE A. LEWIS, State Bar No. 201041
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
LUCAS L. HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7325
 Fax: (916) 324-5205
 E-mail: Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                              Plaintiffs,<br><br>     **v.**<br><br>**GAVIN NEWSOM, et al.,**<br><br>                              Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE TO COURT'S JUNE 2, 2020 ORDER** |

**TABLE OF CONTENTS**

**Page**

Introduction ............................................................................................................................. 1

Analysis .................................................................................................................................. 3

    I.    The Court Should Approve the Parties' Stipulation Because Its Measures Do Not Fall Below Eighth Amendment Standards. ............................................... 3

    II.   Even If the Stipulation's Departures from the Program Guide Fall Below Eighth Amendment Standards, Such Departures Are Authorized During a Public Health Emergency Like the COVID-19 Pandemic. .................................. 6

    III.  Allowing Departure from the Program Guide Would Survive Scrutiny for at Least the Duration of the COVID-19 Pandemic. ............................................... 9

Conclusion ............................................................................................................................ 10

i

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Altman v. Cty. of Santa Clara*
No. 20-CV-02180-JST, 2020 WL 2850291 (N.D. Cal. June 2, 2020) .................................. 9

*Farmer v. Brennan*
511 U.S. 825 (1994)............................................................................................1, 4, 8

*Gregg v. Georgia*
428 U.S. 153 (1976) ........................................................................................................ 3

*Hudson v. McMillian*
503 U.S. 1 (1992)............................................................................................................ 3

*In re Abbott*
954 F.3d 772 (5th Cir. 2020) .......................................................................................... 7

*In re Rutledge*
956 F.3d 1018 (8th Cir. 2020) ..................................................................................... 7, 9

*Jacobson v. Commonwealth of Mass.*
197 U.S. 11 (1905).................................................................................................... 6–9

*Moore v. Texas*
137 S. Ct. 1039 (2017) ................................................................................................... 4

*S. Bay United Pentecostal Church v Newsom*
No. 19A1044, --- S. Ct. ---- (May 29, 2020) ................................................................. 9

*Spain v. Procunier*
600 F.2d 189 (9th Cir. 1979) .......................................................................................... 4

*Toguchi v. Chung*
391 F.3d 1051 (9th Cir. 2004) ........................................................................................ 8

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Second Amendment ..................................................................................................... 9
    Eighth Amendment ............................................................................................... *passim*
    Fourteenth Amendment ................................................................................................ 7

ii

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

**INTRODUCTION**

The world is in the midst of a pandemic. In roughly five months, the United States has gone from seeing its first reported case of the novel coronavirus disease (COVID-19) to having nearly two million reported cases. Over 100,000 people in this nation have died.[1] The disease is highly contagious, and an infected person can infect others even before they begin exhibiting symptoms. Government officials worldwide have issued various measures, consistent with studied public health research, to limit the disease's spread. One of the most effective and widely utilized ways to minimize COVID-19's spread is "social distancing"—*i.e.*, limiting in-person contacts and keeping safe (usually 6 feet) distance from other people when possible. This measure is better accomplished in certain settings than in others (*e.g.*, in jails and prisons, homeless communities, nursing homes, and overcrowded households). Since March 2020, state and local governments have issued various shelter-in-place orders, requiring people to remain in their homes whenever feasible and shuttering non-essential businesses, to help slow the rate of infection.[2] Scientists and academics generally agree that this approach has been successful and saved thousands of lives.[3]

Like the rest of the world, Defendants and the inmates in their care have been impacted. CDCR learned of the first case of COVID-19 within its institutions on March 22. Consistent with their ongoing duty to protect the prisoners, *see Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994), Defendants acted quickly to limit inmate movement and increase social distancing in their prisons. Notwithstanding those actions, Plaintiffs in this case, and in the *Plata* and *Three Judge*

---

[1] *See, e.g.*, Center for Systems Science & Eng'g Johns Hopkins Univ., *COVID-19 Dashboard*, https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6 (last visited June 8, 2020).

[2] *See, e.g.*, *Coronavirus in the US: How all 50 states are responding – and why eight still refuse to issue stay-at-home orders*, USA Today (Mar. 30, 2020; updated Apr. 9, 2020), *available at* https://www.usatoday.com/story/news/nation/2020/03/30/coronavirus-stay-home-shelter-in-place-orders-by-state/5092413002/ (last visited June 10, 2020).

[3] *See UC Berkeley Study Says Covid-19 Prevention Measures Prevented 500M Infections*, SFGate.com (June 8, 2020), *available at* https://www.sfgate.com/news/bayarea/article/Uc-Berkeley-Study-Says-Covid-19-Prevention-15324979.php (last visited June 9, 2020); *California's early shelter-in-place order may have saved 1,600 lives in one month*, The Conversation (June 3, 2020), *available at* https://theconversation.com/californias-early-shelter-in-place-order-may-have-saved-1-600-lives-in-one-month-137978 (last visited June 9, 2020); *Shelter-in-Place Orders Saved Nearly 250,000 Lives*, Mother Jones (May 19, 2020), available at https://www.motherjones.com/coronavirus-updates/2020/05/shelter-in-place-orders-saved-nearly-250000-lives/ (last visited June 9, 2020).

1

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

*Panel* cases, insisted the response was insufficient, and filed motions alleging that Defendants were violating the Eighth Amendment by not taking sufficient action to prevent COVID-19's spread. (ECF No. 6584, 6–9; *Plata v. Newsom*, Case No. 4:01-cv-01351-JST, ECF No. 3266, 3–8; *Three Judge Court*, Case Nos. 2:90-CV-00520-KJM-DB & 4:01-cv-01351-JST, ECF No. 3219, 10–21.) Those motions were denied, but Defendants continued moving to minimize infection, including releasing 3,500 non-violent offenders on early parole to decrease the prison population, and halting admissions of new inmates for 60 days. Defendants are evaluating a further early release of inmates. But the virus has continued to spread, as it has in the rest of the world, with roughly 2,500 active cases among inmates, and 270 among staff, as of June 13.

On May 20, the parties submitted a stipulation that would allow Defendants to temporarily depart from certain Program Guide requirements so inmates and staff can maintain better social distancing and minimize the risk of COVID-19 spreading among inmates, between institutions, and between the prisons and the community. (ECF No. 6679.) The stipulation and attachments lay out how Defendants may depart from certain Program Guide requirements, such as by decreasing inmate transfers, and having fewer and smaller treatment groups. (*Id.*) They also lay out the extra steps Defendants would take—beyond what the Program Guide requires—to ensure that class members are above all else safe, while also continuing to receive appropriate mental-health treatment to the extent possible. (*Id.*) The stipulation and its attachments were developed with Plaintiffs, under the Special Master's guidance, and agreed to by both parties.

On June 2, the Court invited the parties to submit briefing on three questions relating to that stipulation: (1) "the extent to which, if at all, the court can or should approve any measure that falls below the Eighth Amendment requirements as those are memorialized in the Program Guide"; (2) "whether there is any temporary period of time for such measures to remain in place that survives scrutiny under applicable legal standards"; and (3) how the phrase "hiring authority" is defined in the stipulation's attachments. (ECF No. 6700.)

As to the third question, "hiring authority" is meant to be defined as it is in the Department Operations Manual, Chapter 3, Article 22:

2

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

> The Undersecretary or General Counsel or any Chief Deputy Secretary, Executive Officer, Chief Information Officer, Assistant Secretary, Director, Deputy Director, Associate Director, Warden, Superintendent, Health Care Manager, Regional Health Care Administrator, or Regional Parole Administrator authorized by the appointing power to hire, discipline, and dismiss staff under his/her signature authority. The Administrator at the Richard A. McGee Correctional Training Center shall serve as the Hiring Authority for Correctional Officer Cadets. The appointing power is a Hiring Authority, for purposes of this Article.

*Dep't Op. Manual*, Ch. 3, art. 22, § 33030.4 (Jan. 1, 2019). Defendants' response to the Court's other two inquiries follows.

## ANALYSIS

The Court can and should approve the stipulation. The stipulation does not allow conduct that would violate the Eighth Amendment. It permits limited departures from certain Program Guide requirements, but only temporarily, and provides countervailing benefits to ameliorate any impact from those departures. But even if the Court finds that mental health services delivered under the stipulation would not satisfy the Eighth Amendment, the ongoing public health emergency authorizes such departures when necessary to protect the public health and welfare. Here, the parties seek leave to allow Defendants to increase social distancing and minimize person-to-person interaction as a means of minimizing the spread of COVID-19 among not only class members, prison staff, and care providers, but also the entire prison population and society-at-large. And this threat is real, as evinced by the recent spread of COVID-19 to San Quentin State Prison by *Plata* class members transferred there. The Court should approve the stipulation for the agreed-to 90 days, or until the immediate public health emergency has subsided.

I. **THE COURT SHOULD APPROVE THE PARTIES' STIPULATION BECAUSE ITS MEASURES DO NOT FALL BELOW EIGHTH AMENDMENT STANDARDS.**

The stipulation does not depart from the Eighth Amendment. Rather, it has both give and take. It describes ways in which CDCR will temporarily depart from Program Guide requirements to slow the spread of COVID-19, but also describes alternative treatment and benefits that will counterbalance those departures. The Eighth Amendment is flexible enough that the Court should approve the stipulation without concern that it is sanctioning an Eighth Amendment violation.

3

The Eighth Amendment is "contextual and responsive to contemporary standards of decency," *Hudson v. McMillian*, 503 U.S. 1, 8 (1992), and "has been interpreted in a flexible and dynamic manner," *Gregg v. Georgia*, 428 U.S. 153, 171 (1976). The present context is a global pandemic of a highly contagious and deadly disease, which implicates Defendants' ever-present Eighth Amendment duty to protect prisoners in their custody—including the *Coleman* class members—from reasonably foreseeable harm. *See Farmer*, 511 U.S. at 832–33. The parties' stipulation contains temporary departures from the Program Guide and alternative arrangements that reasonably respond to the threat that the pandemic poses to inmates and the public. Eighth Amendment remedies are similarly flexible, permitting exceptions if unexpected circumstances make the remedy infeasible. *See Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (affirming order requiring inmates to receive a specific quantity of outdoor exercise "unless inclement weather, unusual circumstances, or disciplinary needs made that impossible"). And there is no Eighth Amendment liability if prison officials responded reasonably to a risk, even if they do not successfully avert the harm. *Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

This Court has recognized the need for similar flexibility and exceptions to the Program Guide. Though the Court has stated that the Program Guide embodies the Eighth Amendment's requirements, and that certain departures from it would violate the Eighth Amendment,[4] the Court has also acknowledged that there must be exceptions. (*See, e.g.*, ECF No. 5610 (ordering the parties to develop rules for when periods may be excluded when gauging compliance with transfer timelines); *see also* ECF No. 5744 & ECF No. 5750 at 4 (adopting the parties' Program Guide Addendum).) Some exceptions are explicit in the Program Guide, such as the addenda for exceptions to the inpatient transfer timelines, and to the transfer timeline for referrals to the

---

[4] Defendants maintain their long-standing objection that the Program Guide—a multi-hundred-page manual with thousands of rules of varying significance—does not establish an Eighth Amendment floor. *Cf. Moore v. Texas*, 137 S. Ct. 1039, 1042 (2017) (assuring States that, in the death-penalty context, "being informed by the medical community does not demand adherence to everything stated in the latest medical guide"). The Court should clarify its prior orders to state that not every Program Guide departure violates the Eighth Amendment.

4

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

Mental Health Crisis Bed (MHCB) level of care. (ECF No. 5631 & ECF No. 6295.) And the Court instructed the Special Master to develop a process for updating the Program Guide that may yield additional exceptions. (ECF No. 6211 at 15–16, 19, *amended by* ECF No. 6214 at 3.) These Court-ordered exceptions will not render the Program Guide inadequate to satisfy the Eighth Amendment. Given this flexibility in both the Eighth Amendment and the Program Guide, the well-justified departures from certain aspects of the Program Guide during a public health emergency captured by the parties' stipulation do not violate the Eighth Amendment.

Moreover, the stipulation does more than merely forgive non-compliance with the Program Guide—it provides class members with alternative treatment options and benefits, responsive to the present emergency, that the Program Guide does not require. The Court has never held that the Program Guide is the only way an inmate can receive mental health care consistent with the Eighth Amendment. Rather, the Court has suggested that the Program Guide reflects Defendants' determination of what is an appropriate remedy. The stark change in circumstances justifies permitting Defendants to craft an alternative, at least temporarily. And strictly limiting the remedy to the Program Guide would be illogical, and inconsistent with other correctional systems' practices. Other states do not follow the Program Guide, nor does the Bureau of Prisons, so a correctional facility can provide constitutional mental health care services by ways other than adherence to the innumerable Program Guide requirements that California must follow.

The parties' stipulation is such an alternative, tailored to this public health emergency. Its goal is to maximize care while minimizing transmission of COVID-19 among patients, other inmates, staff, care-providers, and the public. It loosens certain requirements that involve close personal contact, but provides additional privileges and programming during that time to ensure class members remain safe and receive suitable treatment during the pandemic. For example, CDCR will limit transfers to outside hospitals and MHCBs for inpatient care (ECF No. 6679 at A-13 to A-14), but has created Temporary Mental Health Units (TMHUs) within its institutions, where inmates will receive services and treatment similar to what they would receive at an

5

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

outside hospital or MHCB.[5] (*Id.* at A-10 to A-11, A-15 to A-17.) Mental health providers will also conduct daily rounds to meet with any inmates awaiting transfer to a higher level of care. (*Id.* at A-3.) And CDCR has agreed to provide Enhanced Treatment-in-Place, *i.e.*, in the patient's own cell, if no other inpatient setting is available. (*Id.* at A-12.) Maximum-custody patients will be offered 5 hours of weekly structured treatment and 15 hours of unstructured out-of-cell time, among other benefits. (*Id.* at A-16.) And, while group treatment will be less frequent and in smaller groups, class members will get opportunities for positive interaction through additional telephone privileges (*id.* at A-8), additional programming and/or yard time when in restricted housing (*id.*), and increased access to recreational electronic devices (*id.* at A-9).

The parties, under the Special Master's supervision, spent over three weeks developing and negotiating the Program Guide departures embodied in the stipulation. (ECF No. 6679 at 2.) In light of the flexibility of the Eighth Amendment, and the ongoing public health emergency, the Court should not conclude the stipulation—which departs from the Program Guide, but also provides other benefits—violates the Eighth Amendment.

II. **EVEN IF THE STIPULATION'S DEPARTURES FROM THE PROGRAM GUIDE FALL BELOW EIGHTH AMENDMENT STANDARDS, SUCH DEPARTURES ARE AUTHORIZED DURING A PUBLIC HEALTH EMERGENCY LIKE THE COVID-19 PANDEMIC.**

If, however, the Court concludes that the measures set forth in the stipulation fall below the Eighth Amendment minimum, even for the limited time it will be in effect, the Court should still approve the stipulation based on the ongoing public health emergency. For over 100 years, the Supreme Court has recognized that unique public health emergencies, such as the outbreak of a deadly disease, temporarily shift the balance of constitutional interests and give the State greater leeway to take actions that infringe on individual liberty. *See Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 29 (1905). The COVID-19 pandemic is such an emergency.

One of a government's core purposes is to protect the health and welfare of its citizens. In ordinary circumstances, that goal yields to the individual rights outlined in the constitution—and rightly so. *Cf. id.* In the face of a public health emergency, however, the government has more

---

[5] Defendants intend to decrease use of TMHUs as COVID-19 testing becomes more accessible and efficient, such that inmates can safely be transferred more quickly.

6

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

flexibility to take action in pursuit of the public's health and welfare, even when it encroaches on individual rights. *Id.* As the United States Supreme Court explained: "in every well-ordered society charged with the duty of conserving the safety of its members[,] the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Id.* (upholding a mandatory vaccination law with criminal penalties for noncompliance over a Fourteenth Amendment challenge during a smallpox outbreak).

This does not mean that the pandemic "suspend[s] the Constitution." (May 29, 2020 Hrg. Tr. at 31:23–24.) Rather, it shifts the relevant legal standard. The emergency magnifies the State's inherent police power, granting it more flexibility to take actions in pursuit of public health and safety. *See Jacobson*, 197 U.S. at 24–31. That shift can result in the law permitting the State to take some actions that, absent the emergency, might violate the constitution; but it is not a blank check. In place of the usual Eighth Amendment standard, a court should engage in a two-step analysis to determine whether state action during a pandemic violates the constitution.

First, the court asks whether the relevant action has a "real or substantial relation" to the public health emergency. If not, the court applies the usual constitutional standard. Otherwise, the court should find the action unconstitutional only if it is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31; *see also In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) ("The bottom line is this: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" (quoting *Jacobson*)); *In re Rutledge*, 956 F.3d 1018, 1027 (8th Cir. 2020) ("[I]n the context of a public health crisis, a state action is susceptible to constitutional challenge only if it, 'purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" (quoting *Jacobson*)). Under this test, Defendants' temporary COVID-19 measures are legally permissible.

7

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

     No one disputes that the departures from the Program Guide embodied in the stipulation have a real and substantial relation to the public health emergency. The proposed departures, to which Plaintiffs and the Special Master agreed, are an effort to minimize the spread of infection within and between CDCR's institutions, and among and between CDCR's inmates and staff, by maintaining social distance and minimizing nonessential activities that require close personal contact. (*See* ECF No. 6679, App'x A, pp. A-1 to A-21.) Examples include greater reliance on telepsychiatry in lieu of in-person visits, fewer and smaller treatment groups to permit greater distance between participants, and using cell fronts and alternative spaces in lieu of smaller meeting rooms. (*Id.* at A-1 to A-3.) Even if one disagrees that such measures are the best ones to achieve the parties' goals, their relationship to the current emergency is reasonable and justifiable.

     And the stipulation is not "beyond all question, a plain, palpable invasion" of inmates' Eighth Amendment rights. *Jacobson*, 197 U.S. at 31. An official is only deliberately indifferent under the Eighth Amendment if there is a substantial risk of objectively serious harm, the official is subjectively aware of that risk, and nevertheless acts in conscious disregard of it. *See Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). As explained above, the stipulation's departures from the Program Guide are temporary, and accompanied by countervailing benefits to the class members. Temporary restrictions on transfers to outside hospitals and MHCBs are balanced with comparable treatment in TMHUs and Enhanced Treatment-in-Place. (ECF No. 6679 at A-10 to A-17.) Fewer group sessions and smaller groups are balanced with increases in one-on-one treatment opportunities, out-of-cell time, telephone privileges, and access to recreational electronic devices. (*Id.* at A-8, A-9, A-16.) Regardless of how the Court might weigh the objective risk of harm in the absence of the COVID-19 pandemic, were it to fully analyze how these trade-offs comport with the Eighth Amendment, they do not, "beyond all question," reflect "a plain, palpable invasion" of inmates' Eighth Amendment rights. *Jacobson*, 197 U.S. at 31.

     The same is true of the subjective component. Even if the Court were to hold that, under normal circumstances, deviating from the Program Guide meets the Eighth Amendment's subjective component, these are not normal circumstances—we are in an unprecedented global pandemic requiring the State to take swift action to limit loss of life. Defendants have an Eighth

8

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

Amendment duty to keep all inmates safe from reasonably foreseeable harm, *Farmer*, 511 U.S. at 832–33, and the temporary COVID-19 measures are in furtherance of that duty. And, again, the Program Guide departures are not one-sided—inmates are receiving alternative benefits, which at least casts doubt on whether Defendants would be subjectively aware that the stipulation creates a substantial risk of harm. Overall, the stipulation is not, "beyond all question, a plain, palpable invasion" of the Eighth Amendment. Therefore, under *Jacobson*, it is permissible. *See S. Bay United Pentecostal Church v Newsom*, No. 19A1044, --- S. Ct. ----, 2020 WL 2813056 (May 29, 2020) (noting that the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect," and that "[w]hen those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad'") (quoting *Jacobson*).

### III. ALLOWING DEPARTURE FROM THE PROGRAM GUIDE WOULD SURVIVE SCRUTINY FOR AT LEAST THE DURATION OF THE COVID-19 PANDEMIC.

Given the flexibility of the Eighth Amendment, and the Court's recognition that the Program Guide should accommodate reasonable exceptions, the Court can and should approve reasonable departures from the Program Guide for the duration of the public health emergency. Because neither public health officials nor experts can accurately estimate when the pandemic will end or when a vaccination will be available, Defendants ask that the Court approve the stipulation and the parties' suggestion that its continued application be reviewed at reasonable intervals. For the time being, the Court should approve the parties' stipulation for the full 90-day period to which the parties agreed. *See In re Rutledge*, 956 F.3d at 1029–31 (rejecting challenge to Arkansas Department of Health directive postponing all non-medically necessary surgeries, including surgical abortions, in part because it would automatically terminate in 60 days absent further extension); *Altman v. Cty. of Santa Clara*, No. 20-CV-02180-JST, 2020 WL 2850291, at *12 (N.D. Cal. June 2, 2020) (rejecting Second Amendment challenge to shelter-in-place orders by gun retailers in part because of the order's limited duration). It is unlikely the COVID-19 pandemic will end before that 90-day period expires. But the stipulation also provides that the parties will meet and confer on a monthly basis to assess the ongoing health emergency and

9

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

1  determine whether changes to the stipulation are appropriate, and will report the results of these

2  meetings to the Court. (ECF No. 6679 at 4–5.) That will allow the Court to monitor the

3  stipulation, and could result in the stipulation winding up before the end of 90 days, if the parties

4  conclude that CDCR can safely return to normal operation under the Program Guide.

5        Otherwise, at the end of the 90-day term, the parties and Court can reassess. If scientists

6  discover a vaccination, cure, or effective treatment, such that suffering or death from COVID-19

7  is a less pressing concern, the parties might conclude that CDCR should discontinue the

8  temporary COVID-19 measures and resume mental health treatment under the Program Guide. If

9  there are lesser scientific developments, such as improvements in tracking the infection or

10 controlling its spread, the parties may seek to continue departing from Program Guide

11 requirements, but to a lesser degree. In fact, the stipulation contemplates that the departures from

12 the Program Guide might change or narrow during the 90-day period as the parties meet and

13 confer about the state of the pandemic and whether the departures remain necessary. And if the

14 situation remains as fraught and unpredictable as it is now, the parties might seek to extend the

15 present stipulation for one or more additional months. But the Court need not resolve such

16 hypothetical situations at this time to resolve the specific questions presented by its June 2 order.

## CONCLUSION

18       The Court can and should approve the stipulation to which the parties and Special Master

19 have agreed, and which authorizes Defendants to depart, temporarily, from certain Program

20 Guide requirements. Given their content and limited duration, those departures do not offend the

21 Eighth Amendment. But, even if they did, the nature of the ongoing COVID-19 pandemic makes

22 them permissible for at least the duration of the public health emergency.

23 / / /

24 / / /

25 / / /

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))

**CERTIFICATION**

Defendants' counsel certifies that he reviewed the following orders relevant to this filing: ECF Nos. 4361, 4539, 5131, 6214, 6639, 6622, 6660, and 6700.

Dated: June 16, 2020                           Respectfully submitted,

                                                                  XAVIER BECERRA
                                                               Attorney General of California

                                                               /s/ Adriano Hrvatin

                                                               ADRIANO HRVATIN
                                                               Supervising Deputy Attorney General
                                                               *Attorneys for Defendants*

CF1997CS0003 / 34162649.docxs

11

Defs.' Resp. Court's June 2, 2020 Order (2:90-cv-00520 KJM-DB (PC))