Xavier Becerra, State Bar No. 118517
Attorney General of California
Adriano Hrvatin, State Bar No. 220909
Supervising Deputy Attorney General
Elise Owens Thorn, State Bar No. 145931
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7318
  Fax: (916) 324-5205
  E-mail: Elise.Thorn@doj.ca.gov
Attorneys for Defendants
California Department of Corrections and
Rehabilitation - General

Roman M. Silberfeld, State Bar No. 62783
Glenn A. Danas, State Bar No. 270317
Robins Kaplan LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail:
  RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' RESPONSE AND OBJECTIONS TO THE SPECIAL MASTER'S MAY 29, 2020 REPORT ON HIS EXPERT'S ANALYSIS OF PSYCHIATRIST EMPLOYMENT CONDITIONS AND COMPENSATION** |

# TABLE OF CONTENTS

**Page**

I.    Defendants Provided Expert Economic Analysis to Answer the Court's Questions, But This Analysis Was Ignored. ........................................................... 2

II.    Defendants' Objections to EmployStats' Analysis. ................................................ 5

    A.    EmployStats' Methodology is Unclear and Objectionable. ...................... 6

    B.    EmployStats' Survey Is Unsound and the Report's Reliance on the Survey's Data is Objectionable. ................................................................. 9

        1.    The Survey's Scope is Overly Restrictive Because It is Limited to Defendants' Employees. ............................................. 10

        2.    The Survey Suffers from Self-Interest Bias Because it is Limited to Respondents Who May Benefit from Its Results. ....... 11

        3.    EmployStats Interpreted the Survey Data to Bias the Results Towards Negative Responses. ................................................. 12

        4.    The Survey Omitted Questions That Would Allow EmployStats to Verify the Accuracy of the Responses or Independently Verify the Responses. ........................................... 15

        5.    The Survey Is Incomplete and Lacks Transparency. .................. 17

    C.    The Recommendation that CDCR and DSH Adopt Systems of Greater Yearly Salary Increases Lacks Support. ...................................... 19

        1.    EmployStats agrees Defendants already offer higher salaries than other public and private employers. ...................................... 19

        2.    EmployStats failed to consider and compare total compensation between Defendants and other California employers, distorting its analysis and generating misleading conclusions. ................................................................................. 20

        3.    EmployStats' methodology does not support offering greater yearly salary increases. ..................................................... 21

    D.    EmployStats Fails to Justify its Recommendation That CDCR Adopt a System of Pay Differentials for the Central Valley. ..................... 23

    E.    EmployStats Failed to Analyze Whether Any of Its Recommendations Would Actually Result in Greater Retention and Hiring. ........................................................................................... 25

    F.    The Special Master and His Expert Fail to Acknowledge the Nationwide Shortage of Psychiatrists. ....................................................... 27

    G.    Defendants Cannot Adopt the Report's Vague and Ambiguous Recommendations. .................................................................................. 29

    H.    EmployStats' Recommendations for DSH Are Too Broad Given the Scope of the Coleman Litigation. ......................................................... 30

III.    EMPLOYSTATS' DISCUSSION OF CORONAVIRUS IS SPECULATIVE AND FAILS TO ACCOUNT FOR BUDGET SHORTFALLS. .............................................................................................. 31

CONCLUSION ........................................................................................................... 34

i

**STATEMENT**

On May 29, 2020, the Special Master filed a report on his expert's analysis of employment conditions and compensation for psychiatrists employed by the State of California to treat *Coleman* class members.[1]  The report does little to assist the Court or Defendants to address the State's long-standing struggle to hire and retain enough psychiatrists to meet staffing levels from the outdated 2009 staffing plan.  Nor does the report address the flaws and limitations Defendants identified in their October 14, 2019 written objections to his expert's draft findings and recommendations.  Without analysis or explanation, the Special Master concludes that "EmployStats . . . prepared a response to each [objection] . . .  which refute defendants' objections to the report recommendations."  (ECF No. 6695 at 16-18.)  The record shows otherwise.

EmployStats either ignored Defendants' October 14 written objections or failed to substantively address them.  Defendants object to the EmployStats report, and the Special Master's endorsement of his expert's findings and recommendations, on the grounds that: (1) EmployStats' analysis is based on faulty methodology and objectively unverifiable evidence; (2) EmployStats designed and used a flawed survey to reach its conclusions; (3) EmployStats' findings and recommendations are inconsistent with its own reported data, and ignore relevant facts; (4) EmployStats failed to analyze whether any of its recommendations would actually result in greater retention and hiring; (5) the recommendations are too vague and broad to be useful and capable of implementation; and (6) the recommendations related to DSH improperly focus on the psychiatry needs for all of its 6,000-plus patients, instead of focusing on psychiatry needs for the 330 *Coleman* patients it treats and are subject to this Court's jurisdiction.

For these reasons, the Court should not accept the conclusions in the Special Master's report.  Rather, the Court should direct the Special Master and his expert to engage in focused workgroup sessions with Defendants to discuss practical and reasonable staffing solutions.

**BACKGROUND LEADING UP TO THE SPECIAL MASTER'S REPORT**

---

[1] (ECF No. 6695.)  The report attaches Defendants' October 14, 2019 objections and EmployStats' May 20, 2020 report.  All references to the Special Master's report, Defendants' October 14, 2019 objections, and EmployStats' report use the ECF number and pagination.

1

1    The Court appointed the Special Master's expert, EmployStats, on September 11, 2018 to

2    conduct a labor market and salary analysis.  The appointment was part of the Court's direction to

3    the parties and the Special Master to consider the efficacy of certain measures, including salary

4    increases, for hiring and retaining psychiatrists.  (ECF No. 5786 at 3-4.)

5    The expert's analysis began with months of developing and then conducting, with input

6    from the parties, a survey of CDCR and DSH psychiatrists.  EmployStats also reviewed salary

7    and other staffing data it requested from CDCR and DSH.  The Special Master sent the

8    EmployStats Draft Report to the parties on August 15, 2019.  (ECF No. 6695 at 15.)

9    EmployStats issued draft findings and recommendations based on an analysis of data and

10   information provided by CDCR and DSH, information available from a number of non-Defendant

11   resources, and the survey designed by EmployStats and conducted solely of psychiatrists

12   employed by CDCR and DSH.  (ECF No. 6695 at 18-20, 190-93.)

13   Defendants responded with objections to the Draft Report on October 14, 2019.  (ECF No.

14   6695.)  The Special Master included Defendants' October 14 submission as Exhibit I to his May

15   29 Report.  (*Id.* at 74-185.)  EmployStats responded to Defendants' expert's report and submitted

16   an eighteen-page appendix to its final report.  EmployStats rejected Defendants' factual and

17   scientific challenges to its survey methodology and ultimate conclusions and simply restated its

18   five initial recommendations in its Final Report, without qualification.  (*Id.* at 192-93, 249-51,

19   and 299-317.)  In turn, the Special Master did not address Defendants' criticisms and

20   recommended, without qualification (just like his expert), that the Court adopt the EmployStats'

21   report and its findings and recommendations.  (*Id.* at 20-21.)

22   Given all of these deficiencies, the Court should reject the Special Master's

23   recommendation that the Court adopt EmployStats' report and its findings and recommendations.

24   ### DEFENDANTS' RESPONSE AND OBJECTIONS

25   **I.    DEFENDANTS PROVIDED EXPERT ECONOMIC ANALYSIS TO ANSWER THE COURT'S QUESTIONS, BUT THIS ANALYSIS WAS IGNORED.**

26

27   The Court's February 15, 2018 order required the parties to address a number of questions,

28   including whether Defendants "can hire a sufficient number of psychiatrists, through salary

2

1  adjustments, forensic psychiatry fellowships, exhaustion of clustering, and other recruiting and

2  retention efforts, to meet the staffing levels for psychiatrists required by the 2009 court-ordered

3  staffing ratios, ECF No. 3693, with a maximum ten percent vacancy rate as required by the

4  court's June 13, 2002 order, ECF No. 1383." (ECF No. 5786 at 3-4.)  To address these issues,

5  CDCR retained expert economists from Economists Incorporated to analyze whether salary

6  adjustments and other benefits would allow CDCR "to achieve a tangible and permanent increase

7  in the size of its employed psychiatrist workforce."  The results of that analysis are provided in

8  Economists Incorporated's report: *Impact of Labor Market Conditions and CDCR's Initiatives on*

9  *the Employment of Psychiatrists* (Sept. 19, 2018) (Economic Report).  The Economic Report is

10  part of Exhibit I to the Special Master's May 29 Report.  (ECF No. 6695 at 93-141.)

11      Defendants provided the Economic Report to the parties and Special Master for discussion

12  in September 2018.  (ECF No. 6695 at 75.)  Relying on documents and data from CDCR,

13  information from publicly available sources, academic research and findings, policy studies

14  analyzing psychiatry workforce optimization, and independent statistical analysis, the Economic

15  Report made several findings.  Specifically, the analysis showed that there is no evidence to

16  support the conclusion that monetary compensation will allow "CDCR to permanently and

17  significantly increase the size of the pool of psychiatrists that it employs."  (*Id*.)  The analysis also

18  concluded that existing salary premiums and other forms of additional compensation have been

19  ineffective in boosting CDCR's psychiatry staff numbers and that additional barriers exist to

20  CDCR filling its psychiatry vacancies.  (*Id*.)  For reasons unknown, the Special Master dismissed

21  the Economic Report, failing to mention it even once in his report, notwithstanding evidence

22  showing that salary enhancements and compensation are not likely to have a positive sustainable

23  impact on the State's psychiatry staffing issues.[2]  The Special Master has never raised the

24

25          [2] EmployStats provided a short three-page response to the Economic Report in its Draft
    Report.  Defendants' October 19 objections to the EmployStats' report included a list of
    deficiencies identified by Economics Incorporated in a supplemental report responding to the
26  Draft Report.  (ECF No. 6695 at 14-75.)  EmployStats included a detailed response to the
    deficiencies Defendants identified in Appendix D to their report.  (*Id.* at 299-317.)  However,
27  EmployStats still failed to provide any support in the form of economic literature or studies to
    support its criticisms of the Economic Report.  Defendants' experts provide a detailed response to
28  Appendix D.  (*See* Exhibit 1, June 29, 2020 letter from Economist Incorporated.)

1  Economic Report with the parties, let alone requested a meeting to discuss its analysis or findings

2  and how it might inform his position on the Court's questions.

3      Seven months after the Court's February 2018 order requesting information on whether

4  Defendants can hire a sufficient number of psychiatrists to meet the Court's 2009 staffing ratios,

5  the Special Master requested the Court authorize the appointment of a labor economist team to

6  review "salary and labor market trends."  (ECF No. 5903-1 at 1-2.)  The Court granted the

7  Special Master's request to appoint a labor economist "to perform the discreet [sic] duties set

8  forth" in his request, including to conduct a "the labor market and salary analyses required to

9  determine the potential efficacy of the collective bargaining salary and compensation increases

10  and thereby assist the Special Master in moving defendants towards compliance with court-

11  approved staffing levels and ratios."  (ECF No. 5919 at 3.)

12      Rather than focus on a salary analysis and an analysis of the labor market, EmployStats

13  analyzed and discussed CDCR and DSH staff satisfaction, the adequacy of CDCR and DSH's

14  office and treatment space, CDCR psychiatry staff's perception of the medical assistant program,

15  and how CDCR and DSH psychiatrists perceived their standing with other staff and in their

16  institutions.  (ECF No. 6695 at 198-99.)  These all fall outside of the "discrete" scope of the labor

17  economist's appointment to "conduct labor market and salary analysis in an effort 'to determine

18  the potential of . . . collective bargaining salary and compensation increases' as part of an overall

19  effort to bring defendants into compliance with required mental health staffing levels.  (ECF No.

20  5919 at 2.)  This is particularly true given that many of the areas of review and discussion are not

21  actually compared in the EmployStats Report to any analysis or study of the labor market outside

22  of CDCR and DSH.  Similarly, EmployStats' recommendations that CDCR and DSH develop

23  human resource programs to better inform staff about the role of psychiatry and improve their

24  working environment, increase the amount and quality of medical practice support for

25  psychiatrists, and increase and improve office and treatment space fall outside the of the Court's

26  order.  (ECF No. 6695 at 193.)

27      The Special Master should have taken steps to determine whether EmployStats' findings

28  and recommendations could be married with the analysis completed by Defendants' experts in a

4

1  way to benefit the *Coleman* class. But both the Special Master and his expert made no effort to

2  address that possibility. Instead, the Special Master accepted EmployStats' vague

3  recommendations, without offering any practical guidance on how to include the

4  recommendations as part of a staffing plan or policy. This approach undermines EmployStats'

5  analysis and fails to provide the Court with the guidance it requested.

6  **II.    DEFENDANTS' OBJECTIONS TO EMPLOYSTATS' ANALYSIS.**

7       Defendants' October 14, 2019 submission included objections to EmployStats' findings and

8  recommendations and its methodology. Those objections, summarized here, apply equally to the

9  May 2020 EmployStats Report:

10  - EmployStats' methodology, and the reliability and acceptance of the methodology is
11    unclear and objectionable;

12  - EmployStats' survey has methodological issues and reliance on the data from the
      survey is objectionable;

13

14  - The recommendation that CDCR and DSH adopt a system of greater yearly salary
      increases lacks support;

15

16  - EmployStats did not provide sufficient justification for its recommendation that
      CDCR adopt a system of pay differentials for the Central Valley;

17

18  - EmployStats failed to analyze whether any of its recommendations would actually
      result in greater retention and hiring;

19  - EmployStats' recommendations are too vague and ambiguous to adopt; and

20  - The recommendations for DSH are too broad given the scope of the *Coleman*
      litigation.

21

22       The objections identify critical flaws in EmployStats' methodology and point to the factual

23  support for its findings and recommendations. None of the recommendations move the ball

24  towards the goal line of ensuring that CDCR and DSH can hire and retain a sufficient number of

25  psychiatrists to provide adequate mental health care to the *Coleman* class. The Special Master

26  and his expert failed to meet the Court's ask, which was to conduct a labor market and salary

27  analysis, and to consider the efficacy of certain measures, including salary increases, for hiring

28  and retaining psychiatrists. (ECF No. 5786 at 3-4.) To make an appropriate record again

5

explaining why the Court should reject the Special Master's recommendations, Defendants elaborate on each objection below.

### A. EmployStats' Methodology is Unclear and Objectionable.

Defendants objected to Dr. Steward's appointment, requesting that Dr. Steward be required to submit a stand-alone report conforming to the Federal Rules of Civil Procedure, including Rule 26(2)(B)(i)-(v), which requires an expert to provide information supporting his or her opinions. (Defs.' Resp. Special Master's Req. Appt. Addt'l Staff, ECF No. 5908 at 2-3, Sept. 6, 2018.)  The Court's 2018 order appointing EmployStats stated that Rule 26(a)(2)(B) does not apply to EmployStats because the Special Master is not a party.  (ECF No. 5919 at 2-3.)  The Court also held that EmployStats' work will be directed by the Special Master and not an independent source of evidence.  (*Id.* at 3.)

The Court did not hold that the Special Master's expert was exempt from using established methodology in his analysis or that he could bypass the long-established requirements for expert opinions established by the Federal Rules of Evidence and associated case law.  While the Special Master's expert may not testify in support of a party, the Special Master relied exclusively on his expert's opinions and recommendations and filed those opinions with the Court, requesting that the Court issue potentially wide-ranging relief based on his expert's opinions.  Nothing in the text of the Prison Litigation Reform Act or Rule 53 exempts the Special Master's recommendations and evidence relied on for those recommendations from the Federal Rules of Evidence.  *See* 18 U.S.C. § 3626(f); *see also* Fed. R. Civ. P. 56 (all factual findings are reviewed de novo).  Indeed, a special master's findings must be supported by sufficient evidence.  *See In re Refco Sec. Litig.,* 280 F.R.D. 102, 105 (S.D.N.Y. 2011) (special master's reliance on conclusory statement was insufficient to support finding).  And permanent injunctive relief, as recommended here, must be supported by admissible evidence.  *See United States v. Zenon,* 711 F.2d 476, 478 (1st Cir. 1983) (court properly excluded inadmissible evidence when considering permanent injunction).  Defendants object to the Special Master's expert's report's methodology and recommendations.

Expert testimony is generally admitted under Rule 702 of the Federal Rules of Evidence, which provides that a witness may provide opinion testimony when he or she is qualified as an

6

1  expert by knowledge, skill, experience, training, or education.  When determining whether expert

2  testimony should be considered, courts ask whether the expert is "proposing to testify to (1)

3  scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in

4  issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).  The expert testimony

5  must be based on sufficient facts or data, must be the product of reliable principles and methods,

6  and the expert must have "reliably applied the principles and methods to the facts of the case."

7  Fed. R. Evid. 702(b)-(d).  Rule 702 requires that the court serve as a gatekeeper to ensure that all

8  expert testimony "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S.

9  137, 147 (1999) (citing *Daubert*, 509 U.S. at 589).

10       Here, EmployStats relied on a salary and total compensation comparison to psychiatrists

11  employed by other public and private California employers, and a survey of CDCR and DSH

12  psychiatrists' perceptions of working conditions.  (ECF No. 6695 at 198-99, 223-34.)  In *Daubert*

13  *v. Merrell Dow Pharmaceuticals, Inc*., the Ninth Circuit drew a distinction between expert

14  information that developed naturally out of an expert's research done independent of any

15  litigation, and those opinions developed specifically for litigation.  43 F.3d 1311, 1317-19 (9th

16  Cir. 1995).  For opinions that are not based on independent research, there must be "objective

17  verifiable evidence that the testimony is based on 'scientifically valid principles,'" through peer

18  review, or by pointing to some other source stating that the methodology is generally recognized

19  in the field.  *Id*.  EmployStats' Report was not the product of independent research; it was created

20  at the request of the Special Master for the purpose of the *Coleman* litigation.  Accordingly, the

21  methodology used by EmployStates' for its opinions must be based on valid principles, through

22  peer review, or generally accepted in the field.

23       The Special Master's report, which relies entirely on EmployStats' opinions and

24  recommendations, fails to include any information showing that the underlying survey is an

25  accepted methodology to determine whether system-wide changes to compensation and working

26  environments – as recommended here – are necessary.  (ECF No. 6695 at 77.)  EmployStats

27  argues that its report "is based on generally accepted methodologies and scientifically valid

28  principles" and that "[t[he survey methodology is consistent with peer reviewed and generally

7

1   accepted sources including text books such as Groves, R. M., Fowler, F.J., Couper, M.P.,

2   Leprowski, J.M, Singer, E., Tourangeau, R., "Survey Methodology", John Wiley & Sons, New

3   Jersey, 2009 and The Federal Judicial Center, Reference Manual on Scientific Evidence."

4   (Appendix D, ECF No. 6695 at 299.)  But EmployStats fails to explain how the sources they site

5   justify their particular survey for the particular questions they asked or how their survey applied

6   the principles discussed in those sources.  For example, the Federal Judicial Center's Reference

7   Manual on Scientific Evidence states that courts should consider the following questions when

8   considering survey based opinions, including, but not limited to: whether the survey was designed

9   to address the relevant question; whether the questions were framed to be clear, precise and

10  unbiased; and whether steps were taken to reduce the likelihood of bias.  Diamond, Shari

11  Seidman, Reference Guide on Survey Research, Reference Manual on Scientific Evidence, The

12  Federal Judicial Center, 373-408 (Third Edition).  Defendants raised these objections to

13  EmployStats' draft report—EmployStats did not respond, nor did the Special Master.

14      EmployStats contends that its survey methodology has been accepted in California federal

15  and state courts.  However, EmployStats fails to state how their work in those other cases qualify

16  their methodology to answer the Court's questions in *Coleman*.[3]  That EmployStats' work was

17  accepted in other litigation does not make it appropriate here or contribute to the weight the Court

18  should give it in this case.

19      EmployStats' failure to follow well-established survey methodologies and principles is

20  evident from its report.  (ECF No. 6695 at 159-60 (referencing Defendants' objections that the

21  report falls short of numerous best practices of the American Association for Public Opinion

22  Research, including "competent and clear data analysis and interpretation, with findings or results

23  presented fully, understandably, and fairly," "sampling errors included for all statistics presented,

24  not just the statistics themselves," "honest and objective presentation of findings and

25  interpretations, and full reporting of all relevant findings, including any that may seem

26  contradictory or unfavorable").)  EmployStats also failed to include complete and detailed

27

28  [3] In typical litigation, Defendants would be able to conduct discovery, including expert depositions, but they have not been granted that opportunity in this case.

8

1    information on relevant survey characteristics, which includes "[s]tatistical tables clearly labeled

2    and identified regarding the source of the data, including the number of raw cases forming the

3    base for each table, row, or column (Diamond, "Reference Guide on Survey Research," at 415-

4    16)." And, as pointed out by Defendants' experts, the survey introduction and several questions

5    explicitly made the respondents aware of Defendants' staffing difficulties, potentially biasing the

6    respondents and findings and falling short of best practices laid out in the Reference Manual on

7    Scientific Evidence. (*Id*. at 410.)

8        The Special Master's report and his expert failed to justify the methodology used in the

9    expert's report and it should be given little weight by the Court.

10       **B.    EmployStats' Survey Is Unsound and the Report's Reliance on the
            Survey's Data is Objectionable.**

11

12       EmployStats' findings and recommendations rely in large part on the results of the survey it

13   crafted. However, the survey and the way it was conducted have serious flaws. The Ninth

14   Circuit holds that technical inadequacies regarding question format or the manner of the survey

15   "bear on the weight of the evidence, not its admissibility." *Fortune Dynamic, Inc. v. Victoria's

16   Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). EmployStats failed to

17   meet any of these standards. As the court in *Fortune Dynamics* noted, the way to attack such

18   shaky but admissible evidence is through a *Daubert* challenge. *Id.* at 1038. For this reason, the

19   flaws and concerns Defendants raise are vitally important to the Court's action on the Special

20   Master's report. It is in no one's best interest to waste time and resources on recommendations

21   that, even if they sound like good suggestions, are not likely to produce results because they fail

22   to recognize the heart of the staffing challenges—*i.e.*, the lack of a labor pool.

23       EmployStats did not provide any information showing that the survey was designed or

24   conducted based on general accepted principles. Nor does the EmployStats Report justify the

25   way it relies on the data gathered from the survey. According to Defendants' expert's response,

26   the American Association for Public Opinion Research – a leading professional organization for

27   public opinion and survey research – provides best practices for survey research and in its current

28   form the EmployStats Report's survey reporting falls short of those best practices. (Response at

                                        9

1  17, ECF No. 6695 at 159-60.)  EmployStats does not justify its scope, the particular questions

2  asked in the survey, or the responses that it decided to use in making its findings and

3  recommendation.  (*Id.* at 159-61.)  EmployStats has never justified its survey's methodology—as

4  a result, it's unreliable, as are any opinions stemming from the survey.  The Court should reject

5  any recommendations based on the survey.  Defendants now elaborate on the survey's flaws and

6  why they make the survey unreliable.

### 1.    The Survey's Scope is Overly Restrictive Because It is Limited to Defendants' Employees.

9  The survey only reports information based on responses from CDCR and DSH

10  psychiatrists.  It did not include any non-CDCR and DSH employed psychiatrists.  This is

11  important—without that information, it is impossible to tell whether the concerns raised in the

12  survey are specific to CDCR and DSH or if they are characteristic of the psychiatry labor market

13  in general.  Without this comparison, the survey does not appropriately compare CDCR and DSH

14  psychiatrists' responses with their peers' responses.  (ECF No. 6695 at 161-62.)

15  In one instance, EmployStats compares its survey results to job satisfaction ratings from

16  Glassdoor, which is a job search and recruiting website that relies on self-reporting by job

17  searchers.  However, EmployStats fails to explain the relevance or reliability of this comparison.

18  According to EmployStats, the Glassdoor survey used a different survey scale and included a

19  middle satisfaction rating – unlike EmployStats' survey.[4]  The EmployStat Report also does not

20  state how many ratings it collected from Glassdoor, how many individuals were in the sample, or

21  any information about the employers rated.  (ECF No. 6695 at 162.)  And the Glassdoor data was

_____

[4] EmployStats relies on two articles to support its use of Glassdoor's satisfaction rating: 1) M. Karabarbounis and S. Pinto, "What Can We Learn from Online Wage Postings? Evidence from Glassdoor," *Economic Quarterly* 104(4), Q4 2018; and 2) Stamolampros, et al., "Job Satisfaction and Employee Turnover Determinants in High Contact Services: Insights from Employees' Online Reviews" (2019).  However, these articles do not support Glassdoor data.  The article by Karabarbounis and Pinto notes that user entries on Glassdoor were underrepresented, especially in the healthcare industry, and the paper by Stamolampros focused on satisfaction surveys in the tourist industry.  Karabarbounis, "What Can We Learn from Online Wage Postings? Evidence from Glassdoor, at 174; Stamolampros, Job Satisfaction and Employee Turnover Determinants in High Contract Services: Insights from Employees Online Reviews, at 3.

1   voluntary and not the result of a survey submitted to all psychiatrists in California because of an

2   ongoing class action.  As a voluntary survey, employees who view their employers more

3   favorably may have responded to the survey.  (*Id.*)  Without this information it is unclear whether

4   the comparison is appropriate or if the comparison is biased against CDCR and DSH.  (*Id.*)

5           **2.     The Survey Suffers from Self-Interest Bias Because it is Limited to
                     Respondents Who May Benefit from Its Results.**
6

7           The limited scope of the survey also contains a potential self-interest bias.  Survey results

8   that are to be used in litigation are of questionable reliability if they contain a self-interest bias

9   due to the fact that the respondents have a vested interest in the results of the survey and the

10  litigation.  *Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 589 (N.D. Cal. 2016), *on*

11  *reconsideration in part*, No. 14-CV-00608, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017), *aff'd in*

12  *part, rev'd in part and remanded*, 934 F.3d 918 (9th Cir. 2019) (the court expressed serious

13  questions regarding bias of participants where they would benefit from the outcome of the survey

14  and the litigation).  Courts express a particular concern where the survey respondents are aware of

15  the ongoing litigation.  *Id.*  Here, it is undeniable that the survey respondents stand to benefit from

16  the outcome of the survey.  But the Special Master and EmployStats failed to take this into

17  consideration in making their recommendations, even though the ultimate goal of the survey was

18  allegedly to analyze whether or not salary increases would result in Defendants hiring sufficient

19  psychiatrists to meet its Court-ordered obligations.  (ECF No. 5786 at 3.)

20          EmployStats claims that self-bias is addressed in its survey instrument and that the results

21  showed no statistically significant differences in the responses that would be consistent with self-

22  interest bias by psychiatrists.  (Appendix D, ECF No. 6695 at 303-04.)  The introduction to

23  EmployStats' survey instrument states that the survey is being conducted in order to assess

24  psychiatrists' "work satisfaction, compensation, and environment," that CDCR and DSH "often

25  ha[ve] difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain

26  institutions [facilities]" and that survey responses will "provide vital information to assist policy

27  makers in assessing and implementing policies that address that issue."  (ECF No. 6695 at 276,

28  285.)  This knowledge alone could have led individuals to respond in ways that could benefit

                                                    11

1   them or their CDCR and DSH peers, if CDCR's or DSH's policies or pay were to change.

2   EmployStats claims that Defendants' objections misstate and misrepresent the survey instrument.

3   (Appendix D, ECF No. 6695 at 305.)  But Defendants' objections are based on a direct quote

4   from the survey, which clearly mentions compensation and suggest that survey responses,

5   including to questions regarding compensation, may be used to assess and implement policies

6   addressing hiring and staffing difficulties.  (ECF No. 6695 at 276, 285.)

7       The survey itself strongly implies to the respondents that it is being used to analyze the

8   salaries of their peers and state whether it is higher or lower.  (ECF No. 6695 at 279-80, 288-89.)

9   Moreover, the first page confirms its purpose is to explore the possible improvements for the jobs

10  of the people taking the survey by stating that it will ask about "compensation, working

11  conditions, and job satisfaction."  (*Id.* at 285.)  The survey goes on to inform the respondents that

12  "[a]s you know, the [DSH/CDCR] often has difficulty hiring Psychiatrists and maintaining

13  Psychiatrist staffing levels at certain institution" and tells them that their "answer to this survey

14  provide vital information to assist policy makers in assessing and implementing policies that

15  address that issue."  (*Id.*)  The survey is effectively telling the respondents that there is a problem

16  and their responses to questions – many about salary – will help formulate the solution.  This

17  approach is objectionable because making respondents aware of the problem as part of the

18  question could lead to biased responses, and it is not always possible to know the extent or predict

19  the size of the bias.  (ECF No. 6695 at 164-65.)

20          **3.   EmployStats Interpreted the Survey Data to Bias the Results**
                  **Towards Negative Responses.**

21

22      The survey is also biased because several questions beg a negative response.  For example,

23  the survey asks, "On a scale from 1 to 7, where 1 is 'very dissatisfied' and 7 is 'very satisfied,

24  how would you rate your overall job satisfaction at CDCR?"  (ECF No. 6695 at 281.)  It also

25  asked, "On a scale from 1 to 7, where 1 is 'generally disregarded' and 7 is 'very highly regarded',

26  how would you say that other facility employees regard your medical and professional opinions

27  as a psychiatrist?"  (*Id.*)  The survey asked approximately seven questions of this type of both

28  CDCR and DSH's on-site and telepsychiatrists.  (*Id.* at 93-97, 102-04.)  However, the

12

Defs.' Response to the Special Master's May 29, 2020 Report  (2:90-cv-00520 KJM-DB (PC))

1    EmployStats Report did not classify an equal number of positive and negative correlated

2    responses with one neutral response.  Instead, the EmployStats Report and survey classified

3    anything from 1 to 4 as dissatisfied and generally disregarded, leaving only three responses as

4    positive selections.  (*Id.* at 199.)

5         This is particularly problematic because the survey did not explain to the respondents that a

6    four would be treated as a negative, rather than ~~appositive or neutral~~ positive or neutral response.

7    (*Id*. at 93, 101, 280, and 289.)  However, in their conclusions, they included "4" as a negative

8    response.  (*Id.* t 270.)  So there were more negative options to choose from, a fact that was never

9    disclosed to survey participants.  And the negative bent appears to have had a real effect on the

10   reported data.  For example, if four were treated by the analysis as a midpoint or neutral, then

11   nearly two-thirds of CDCR's respondents reported an overall job rating of neutral (4 out of 7) to

12   very satisfied (7 out of 7).  Nearly 60 percent of DSH's responding on-site psychiatrists rated

13   their job satisfaction between neutral and very satisfied.  (ECF No. 6695 at 163-64, 219.)  Also,

14   overall 63 percent of all CDCR respondents would report that their office space was neutral to

15   completely adequate (4 to 7 out of 7).  (*Id*.)  Similar changes would apply to the other responses

16   that used this scale.  (*Id*.)  Accordingly, the way the survey responses were interpreted and the

17   way they were reported appear to be skewed to the negative.  Accordingly, if respondents had

18   known "1" to "4" would be interpreted as negative, they might not have chosen a "4."

19        EmployStats attempts to explain away this flaw in its survey instrument by claiming that

20   Defendants have misinterpreted the survey or that the issue does not change the results of the

21   survey.  Not quite.  The EmployStats survey instrument utilized an ambiguous response scale.  It

22   did not state how respondents should interpret "4" on a scale of "1" to "7," but it is reasonable to

23   assume respondents would think of "4" as "neutral."  It is disingenuous to characterize "4" as

24   "less than satisfied" particularly as the survey instrument did not clarify that "5" to "7" would be

25   considered "satisfied" and "1" to "3" would be considered "unsatisfied."  However, respondents

26   could have interpreted each number's meaning differently, undermining the conclusions that

27   EmployStats draws from the survey.

28

1    Also, EmployStats confuses this terminology.  For example, Finding 8 (ECF No. 6695 at

2    231-32) states that CDCR psychiatrists overall reported dissatisfaction with the CDCR medical

3    assistant program although only 36.5% of respondents rated the medical assistant program

4    between "1" and "3."  An additional 26.5% of respondents gave the medical assistant program a

5    neutral "4" rating.  (*Id.*)  Thus, CDCR psychiatrists overall did not report dissatisfaction with the

6    CDCR medical assistant program.

7    More generally, EmployStats presented responses within selected groups of ratings but

8    failed to include full survey results by individual rating (e.g., how many respondents selected "1,"

9    how many selected "2," etc.), causing much of the information inherent in complete ratings to be

10    obscured.  For example, the grouped ratings reported in the EmployStats Report treat "1" ("very

11    unsatisfied") responses identically to "3" (presumably unsatisfied) responses and "7" ("very

12    satisfied") responses identically to "5" (presumably satisfied) responses.

13    Defendants' experts describe how EmployStats' survey instrument skewed the results to the

14    negative by flipping the results.  EmployStats found that: (1) most CDCR psychiatrists reported

15    an overall job satisfaction rating of not unsatisfied (Finding 5, pp. 31-32); (2) the majority of

16    CDCR psychiatrists reported that they were not unsatisfied with their overall working conditions

17    (ECF No. 6695 at 223-24); (3) the majority of CDCR psychiatrists reported that their office space

18    was not inadequate (*id.* at 227-28); (4) the majority of CDCR psychiatrists were not dissatisfied

19    with the CDCR medical assistant program (*id.* at 231-32); and (5) most CDCR psychiatrists were

20    not unsatisfied with their professional standing within their institutions and with opportunities for

21    promotion (*id.* at 235-36).

22    At bottom, EmployStats' own data, when reviewed objectively, shows that the survey

23    instrument was crafted so that its results, even if positive, could be presented as negative.  It's

24    clear that most of the psychiatrists have positive job ratings.  Accordingly, the survey should not

25    be given much weight, if any, in making generalized findings about psychiatrists' job satisfaction.

26    / / /

27    / / /

28

14

4.    **The Survey Omitted Questions That Would Allow EmployStats to Verify the Accuracy of the Responses or Independently Verify the Responses.**

The survey failed to explore the basis for or accuracy of some of the opinions expressed by psychiatrists in response to the survey. Survey information may be admissible if the trustworthiness and objectivity of the survey is sufficiently supported. *Keith v. Volpe*, 858 F.2d 467, 481 (court found that party offering survey evidence provided sufficient evidence regarding objectivity and trustworthiness). The survey created by EmployStats lacks any follow-up questions to verify the participants' responses. For example, the survey asks the psychiatrists if their salaries are more than or less than those of their peers. However, it does not ask any questions to explore what the psychiatrist considers a peer or the salary and total compensation against which the psychiatrist is making the comparison. (ECF No. 6695 at 278-90, 286-99.) EmployStats did not take any other steps to independently verify the responses by looking at independent sources of information in a similar way that it did for salary.

EmployStats responded to this criticism by asserting that "[d]etermining how the psychiatrists determined their salary benchmarks" and "[h]ow the psychiatrist [sic] determined their salary and compensation peer groups" were not a goal of their analysis. Yet the way CDCR psychiatrists determined salary benchmarks and peer groups informs the interpretation and application of EmployStats' survey findings. EmployStats' concession that "[i]t is expected that psychiatrists will arrive at their comparison group differently" indicates the impossibility of identifying comparator groups, since the EmployStats survey did not pose that question.

Although follow-up questions asking the amount of overpayment or underpayment may confirm (or contradict) CDCR psychiatrists' perception that they were over- or underpaid, such follow-ups are uninformative about the actual pay CDCR psychiatrists received relative to non-CDCR and non-DSH psychiatrists. According to a Harvard Business Review article, two-thirds of people paid the market rate and one-third of people paid above the market rate perceive that they are underpaid (hbr.org/2015/10/most-people-have-no-idea-whether-theyre-paid-fairly).

The EmployStats Report's findings and recommendations call into question the reliability of the survey. The survey found that CDCR and DSH psychiatrists believed that their salaries

15

1    and total compensation were less than that of their peers.  (ECF No. 6695 at 217, 246, 261.)

2    However, the EmployStats Report revealed that since at least 2012, CDCR and DSH's salaries

3    have been significantly higher than its competitors.  (*Id*. at 215, 259.)  In fact, the survey

4    responses were so inconsistent with the salary comparisons in the EmployStats Report that

5    EmployStats recommended CDCR and DSH develop ways to inform their psychiatrists that the

6    salaries they receive are higher than those of other public and private employers.  (ECF No. 6695

7    at 193.)  This disconnect strongly suggests that the survey and its results are not reliable.

8         EmployStats claim that Defendants misinterpret the overall finding of the study.  (Appendix

9    D, ECF No. 6695 at 307.)  EmployStats claims that the relationship between the psychiatrists'

10   perceptions of their salary and their actual salary indicates that their actual monetary

11   compensation is only a component of the psychiatrists' employment conditions, and that this

12   finding strongly indicates, that overall compensation may need to increase to account for the

13   CDCR and DSH psychiatrist working conditions.  (*Id.*)  But the actual survey instrument shows

14   that EmployStats' rationale for the disconnect identified by Defendants' experts falls flat.

15        The relevant questions in EmployStats' CDCR survey are Q5 and Q6.  (EmployStats

16   Report at 90-92.)  Q5 asks respondents to compare their salary to that of psychiatrist peers who

17   work for other employers, only considering the amount of pre-tax money earned as a CDCR

18   psychiatrist each month.  Q6 asks respondents to compare the monetary value of their total

19   compensation "such as salary, health benefits, retirement, federal loan forgiveness program and

20   bonuses" to that of psychiatrist peers who work for other employers.  Neither question makes any

21   reference to employment conditions and there is no reason to believe that any respondent adjusted

22   his or her response for employment conditions, the economy, past experience or anything else

23   when instructed to only consider salary or compensation.  Further, it is disingenuous to suggest

24   that "[i]ssues such as office availability, opportunities for promotion, medical practice support,

25   and other employment conditions all impact their perception of their pay as it relates to other

26   psychiatrists who may work in less demanding working environments" when the EmployStats

27   Report failed to conduct any analysis that directly relates any or all of these factors to pay.

28

16

Defs.' Response to the Special Master's May 29, 2020 Report  (2:90-cv-00520 KJM-DB (PC))

1    And the EmployStats Report (Appendix D, ECF No. 6695 at 306) concedes that it expects

2    respondents to determine their salary and compensation peer groups differently.  There is no

3    evidence or basis to conclude that survey respondents on average compared their compensation to

4    other psychiatrists working in less demanding working environments.  Defendants' economic

5    experts did not find that compensation differentials may be required to meet mandated

6    employment levels.  Their statistical analysis shows that increases in CDCR's salary premium or

7    "compensating wage differential" did not generate sustained improvements in employment

8    outcomes.  (ECF No. 6695 at 125-29.)  Defendants' experts also point out that EmployStats' own

9    evidence indicates that substantial "compensating wage differentials" at CDCR failed to generate

10    desired employment outcomes in the years it analyzed.  (*Id.* at 149-50.)  All of the foregoing

11    dictates against imposing any requirement for wage differentials based on EmployStats' findings

12    and recommendations.

13        **5.    The Survey Is Incomplete and Lacks Transparency.**

14    The survey failed to fully explore a number of issues relevant to EmployStats' analysis.

15    Two of the topics explored by EmployStats were related to employee job satisfaction and their

16    standing with other staff.  However, the questions asked on those topics were overly restrictive.

17    The survey asked about office space, opportunities for promotion, and, in the case of CDCR, the

18    medical assistant program.  However, nothing confirms that all of these factors are part of the

19    respondents' dissatisfaction and if any of the factors rank higher than the others.  (ECF No. 6695

20    at 281-82 and 290-91.)  It failed to analyze any other potential factors that may influence their

21    dissatisfaction or justify its reason for only asking about these particular factors.  (*Id.*)  Similarly,

22    the survey does not ask for any information regarding why the psychiatrists feel their opinion is

23    not valued by others or if there is a particular group that does not value their opinion.  (*Id.*)

24    Accordingly, the survey assumes that those are the only factors leading to dissatisfaction and does

25    not assign weight to the factors or explore the underlying causes and does not explore whether the

26    psychiatrists perceive any benefits from their employment.

27    EmployStats was also selective in the data that it reported from its survey, leaving out a

28    significant amount of information that was gathered.  The Special Master's expert's approach

1    contravenes best practices for survey analysis and statistical reporting.  (ECF No. 6695 at 160.)

2    First, EmployStats only included some of the data gathered.  For example, for the questions that

3    asked how satisfied or dissatisfied the psychiatrists were, the Report only discusses the

4    dissatisfied responses.  (*Id* at 219-21.)  Also, EmployStats does not include information from

5    many of the questions asked.  The survey asked CDCR and DSH's psychiatrists to quantify how

6    much more or less they believed their salaries to be in comparison other employers, but did not

7    provide the salary information in the report.  (*Id.* at 243-45, 272-74.)  And EmployStats does not

8    justify its selective use of the data gathered or the data used, or explain that leaving out certain

9    data is part of some generally accepted methodology on reporting survey results.  Ultimately, a

10    significant amount of data and information was left out of EmployStats' report and, even though

11    Defendants raised this issue with the Special Master, he failed to mention this missing data.  As a

12    result, Defendants cannot fully analyze EmployStats's findings and recommendations.  This

13    includes an inability to properly weight the survey responses based on the number of respondents

14    and the characteristics of those respondents to determine whether certain conclusions may have

15    been affected by sample size.  (*Id.* at 165.)

16        EmployStats again purports to excuse the omission by arguing that the responses to the

17    additional questions Defendants claims should have been asked do not change the findings of the

18    report, limiting the number of questions increases survey participation, and Defendants can ask

19    missing questions in a separate survey at a later date.  (Appendix D, ECF No. 6695 at 308.)  But

20    EmployStats has no basis to claim that questions that it did not ask and responses that it therefore

21    does not have would "not change the findings of the report."

22        EmployStats has not provided enough information to verify its survey's methodology, and

23    the survey has a number of issues that question its reliability.  Defendants request all of the data

24    and responses gathered by the survey be provided to Defendants so that they may separately

25    analyze the results.  This information will help evaluate the Special Master' recommendations as

26    Defendants continue to address any current or future staffing challenges.

27

28

**C.    The Recommendation that CDCR and DSH Adopt Systems of Greater Yearly Salary Increases Lacks Support.**

    **1.    EmploysStats agrees Defendants already offer higher salaries than other public and private employers.**

The recommendation ignores the already existing higher salaries offered by CDCR and DSH.  EmploysStats does not dispute that CDCR's base salaries have remained consistently over statewide and national benchmarks between approximately 2010 and 2018.  (ECF No. 6695 at 113.)  According to Defendants' experts, CDCR's compensation remained consistently above increases in statewide and nationwide psychiatrist compensation.  (*Id.*)  And, CDCR's average psychiatrist salaries have remained competitive and, in many cases, higher than the average salaries of psychiatrists in each of California's regions.  (*Id.* at 21 & Figure E.)

EmploysStats agrees that CDCR and DSH both provide higher average salaries than other public and private employers of psychiatrists.  According to the EmploysStats Report, in 2011 CDCR's psychiatrists' average salary was $260,952 compared to $182,000 average for the West Region, $188,991 median for non-CDCR and DSH California Public employers, and $192,290 average for Private and Public Employers.  (ECF No. 6695 at 215.)  Over the next six to seven years, other California employers did not close the salary gap to offer salaries competitive with CDCR and DSH.  Specifically, in 2017, CDCR's $299,496 median salary was far greater than the $245,491 median salary for other non-CDCR and DSH California public employers and the $259,570 average for California public and private employers, while CDCR's 2018 median salary of $309,184 was significantly higher than the average salary of $255,790 for California public and private employers.  (*Id.*)  Similarly, according to EmploysStats, DSH's salaries were also significantly over the median and average salaries for public and private employers in California.  (ECF No. 6695 at 215, 279.)[5]

---

[5] EmploysStats notes that DSH's median salary has been 2 percent lower than CDCR's median salary in 2011, 2013, 2014, 1015, and 2017, as well as 2.9 percent lower in 2018 and 4.8 percent lower in 2019.  However, they fail to acknowledge that the Court ordered a pay scale for DSH "staff working at non-CDCR institutions in classifications that provide services to Coleman class members that is 95% of parity with the pay scale ordered for clinicians serving inmates in CDCR institutions."  (ECF No. 2301 at 2.)

19

1    EmployStats attempts to justify the salary premium paid by CDCR and DSH based on the

2    need for a "compensating wage differential" to address the cognitive and emotional demands

3    placed on prison psychiatrists.  Defendants agree that their psychiatrists perform difficult and

4    demanding jobs, but EmployStats fails to provide any analysis or study showing that CDCR and

5    DSH employment is more demanding or taxing to justify the salary differences.  (ECF No. 6695

6    149, 153.)  This is particularly true given that at least some of the comparators included in the

7    salary analysis are likely jails and may have similar working conditions.  Moreover, as labor

8    economists, EmployStats are not qualified to offer opinions on the relative demands of

9    psychiatric treatment between systems.

10       At bottom, EmployStats' finding is consistent with Defendants' experts' conclusion.

11   CDCR and DSH are already offering higher salaries than other public and private employers.

12       **2.    EmployStats failed to consider and compare total compensation
             between Defendants and other California employers, distorting its
13           analysis and generating misleading conclusions.**

14       While finding that CDCR and DSH consistently provided greater compensation since at

15   least 2011 than other employers, the EmployStats Report does not even capture the full disparity

16   because it does not include an analysis of total compensation.  Significantly, EmployStats

17   acknowledges it did not review the value of compensation that has been deferred for payment at

18   retirement, such as substantial pension benefits that CDCR and DSH employees receive, and

19   other benefits promoting longevity.  (ECF No 6695 at 215.)  Consequently, EmployStats did not

20   compare the total compensation that CDCR and DSH employees receive compared to their

21   private counterparts.  According to a 2014 Total Compensation Report prepared by CalHR,

22   looking at median salary only excludes approximately one-third of total compensation received.

23   California Dep't of Human Resources, 2014 California State Employee Total Compensation

24   Report at 71 (Jan. 12, 2016) available at https://www.calhr.ca.gov/Documents/2014-California-

25   State-Employee-Total- Comp-Report.pdf.  According to that analysis, psychiatrists employed by

26   the state were at or above the market average for both average wages and total compensation.

27   (*Id.*)  Specifically, total compensation for psychiatrists employed by the state exceeds total

28   compensation for psychiatrists employed by local governments by 27.8 percent.  (*Id.* at 7.)

20

1    Without analyzing the total compensation for psychiatrists, EmployStats' comparison of

2    Defendants' compensation to the compensation offered to others is deficient, and EmployStats'

3    findings are misleading.

          **3.    EmployStats' methodology does not support offering greater yearly**
                  **salary increases.**

6    The EmployStats Report ignores CDCR and DSH's higher salary history and the lack of

7    correlation between larger salary in concluding that they need to offer a system of greater salary

8    increases.  Instead, EmployStats relied on data that CDCR and DSH psychiatrists receive lower

9    average annual salary increases than psychiatrists at other employers and on survey responses

10   from psychiatrists who were employed for more than ten years and reported they received lower

11   compensation than their peers employed outside CDCR and DSH.  How EmployStats arrived at

12   the conclusion that greater salary increases will result in a sustainable level of psychiatry staffing

13   is unclear.

14   EmployStats failed to point to any accepted economic literature, study or objective

15   evidence to demonstrate that the recommendation would be effective in hiring and retaining

16   psychiatrists.  EmployStats does not explain why yearly salary increases are more important to

17   recruitment and retention than overall higher salaries.  Its recommendation is not supported by

18   any study, economic literature, or objective independent evidence that shows that psychiatrists

19   would choose higher yearly salary increases over an overall higher salary from the beginning.

20   Without such support, the recommendation should not be adopted.

21   EmployStats compared Defendants' yearly salary increases to the salary increases of other

22   employers, but failed to provide any evidence showing that the employers with higher salary

23   increases are able to hire and retain psychiatrists or that higher average salary increases resulted

24   in hiring additional psychiatrists to meet those employers' needs.

25   EmployStats does not show that the salaries and salary increases offered by other

26   employers were sufficiently similar to CDCR and DSH's salaries and increases to be reliable

27   comparators.  While EmployStats provides the average yearly salary increases for ten different

28   public employers, no actual yearly salaries offered by those employers are reported.  (ECF No.

21

1  6695, 210-11.)  The failure to compare actual salaries is problematic because it is possible that the

2  other employers' salaries were not competitive with the much higher salaries already offered by

3  CDCR and DSH.  Accordingly, the other employers may have needed to offer higher yearly

4  salary increases to offer salaries that were more competitive with CDCR and DSH.  (Resp. 6.)

5       In addition, the EmployStats Report also fails to provide the nature of the yearly salary

6  increases offered by the other employers and justify the comparison.  The EmployStats Report

7  does not state whether the ten non-CDCR employers to which CDCR is compared offered their

8  salary increases as part of a one-time contract, if they were part of a yearly salary structure, or if

9  they were part of yearly salary increases set to expire after a certain amount of time.  These

10  omissions show that EmployStats failed to understand the state's overall pay structure that

11  includes salary ranges, maximum salaries, and increases and changes to salary through the

12  collective bargaining process.  For example, EmployStats ignores the 5 percent yearly merit pay

13  increase that all psychiatrists are already eligible to receive until they reach the top of their

14  respective salary range.  Cal. Gov. Code § 19832; *see* Bargaining Unit 16 Physicians, Dentists

15  and Podiatrists Agreement, <available at https://www.calhr.ca.gov/labor-

16  relations/Documents/mou- 20160701-20200701-bu16.pdf>.  And EmployStats failed to include

17  the yearly salary increases provided in the current collective bargaining agreement.  (*Id*.)  It is

18  impossible to tell whether EmployStats is comparing similar salary structures and not possible to

19  know if CDCR and DSH are offering competitive yearly salary increases and working with the

20  same restrictions as the other employers.

21       The recommendation to offer greater yearly salary increases is not supported by sufficient

22  analysis or evidence and there are significant questions with the comparisons made in the Report.

23  Moreover, given the fact that CDCR and DSH continue to have significantly higher overall

24  salaries, EmployStats has not justified the recommendation that they adopt a system of greater

25  yearly salary increases.  Defendants object to this recommendation and request that the Court

26  reject it.

27  / / /

28  / / /

1  **D.    EmployStats Fails to Justify its Recommendation That CDCR Adopt a
          System of Pay Differentials for the Central Valley.**

2

3        EmployStats made this recommendation without any independent evidence, study, or

4  economic literature to justify the conclusion that differentials "could help vacancies" and "retain

5  incumbents."  The only support for this recommendation is the psychiatrist vacancy rate in the

6  Central Valley and the survey responses.  But that evidence does not support the expert's

7  conclusion, and the Court should reject the expert's recommendation.

8        First, the Report does not provide any study or evidence to show that pay differentials have

9  been successful in attracting psychiatrists to the Central Valley and to other employers in the

10  Central Valley.  This is important because the Central Valley suffers from a lack of psychiatry

11  resources.  According to UC San Francisco's Healthforce Center, the Inland Empire and San

12  Joaquin Valley have low per capita mental health professional ratios compared to California's

13  other regions. J. Coffman, et al., California's Current and Future Behavioral Health Workforce,

14  Healthforce Center at UCSF, 54 (Feb. 12, 2018) <available at

15  https://healthforce.ucsf.edu/sites/healthforce.ucsf.edu/files/publicationpdf/California%E2%80%9

16  9s%20Current%20and%20Future%20Behavioral%20Health%20Workforce.pdf>.  Also, the U.S.

17  Department of Health and Human Services has designated 66 geographic areas in California as

18  Health Professional Shortage Areas, many of them in the Central Valley. Health Professional

19  Shortage Areas – Mental Health, Health Resources & Services Administration, U.S. Dep't of

20  Health and Human Services, (Oct. 3, 2019) <available at

21  https://data.hrsa.gov/ExportedMaps/HPSAs/HGDWMapGallery_BHPR_HPSAs_MH.pdf>.

22        Second, the dissatisfaction reported by existing psychiatrists in the Central Valley does not

23  justify the recommendation.  EmployStats' Report is limited to CDCR and DSH psychiatrists.  It

24  does not contain any analysis of job satisfaction by non-CDCR psychiatrists in the Central Valley.

25  And, while the survey results reported that 58.1 percent of the psychiatrists in the Central Valley

26  perceived their salaries and total compensation to be lower than their peers, that result is

27  undermined by the Report's conclusion that CDCR's salaries are much greater than other

28

1    employers in California (ECF No. 6695 at 215), and by Defendants' experts' analysis showing

2    that salaries in the Central Valley are much higher.  (ECF No. 6695 at 114.)

3         The available evidence shows that a strict Central Valley pay differential may not be as

4    successful as suggested.  Defendants' experts believe that it may be difficult to attract physicians

5    to move to the Central Valley.  Academic literature suggests that physicians are generally

6    attracted to urban areas and areas offering amenities.  (ECF No. 6695 at 124.)  And psychiatrists

7    are more likely to practice in areas where they have ties.  (*Id.*)  The possibility for a bidding war

8    for psychiatry in the Central Valley is particularly acute.  (ECF No. 6695 at 171.)  Without

9    showing the efficacy of a differential pay, it is unclear whether it would be an effective path for

10   hiring new psychiatrists and retaining existing psychiatrists.

11        EmployStats rejected Defendants' objection, pointing to its survey results as "clear

12   evidence that CDCR employed psychiatrists located in the Central Valley are generally less

13   satisfied than psychiatrists in other areas of California."  (Appendix D, ECF No. 6695 at 312-

14   313.)  It also argues that the salary increase tables show that the vacancy rates are the highest

15   when the salary increases are the lowest.  Figure 2 in the Report actually shows the vacancy rates

16   in the Central Valley decreased by more than 5 percentage points from 2016 to 2017 when the

17   average salary increase for CDCR went from 0% to 5.1% from 2016 to 2017 as shown in Table

18   1b of the Report.  The issue of compensating wage differential is not controversial in the field of

19   economics and was also noted by the Defendants' economic experts in their report.

20        But EmployStats' own data undercuts any assertion about the alleged relationship between

21   salary increases and the vacancy rate.  (ECF No. 6695 at 150-151; *see also* Exhibit 1, June 26

22   letter from Economists, at 3, Exhibit A at 12.)  The evidence shows that CDCR psychiatrists

23   received a salary increase in four out of five recent years and in the two years when the increase

24   was larger the vacancy rate was higher than the two years when the increase was lower.  (ECF

25   No. 6695 at 150-151.)  EmployStats' data also shows that in 2018, the vacancy rate among CDCR

26   staff psychiatrists reverted to its 2016 level of 33-34%, despite a 3% general salary increase at

27   CDCR in July 2017 followed by a 2% general salary increase in July 2018.  (*Id.* at 201-02, 214.)

28

24

Defs.' Response to the Special Master's May 29, 2020 Report  (2:90-cv-00520 KJM-DB (PC))

1    Also, EmployStats misreads its own Figure 2.  (ECF No. 6695 at 202.)  Vacancy rates in

2    the Central Valley increased from 2016 to 2017 when the average salary increase for CDCR went

3    from 0% to 5.1%.  (*Id.* at 204.)  Figure 2 and Table 1b also indicate that Central Valley vacancy

4    rates were flat from 2013 to 2014, when CDCR's average salary increase went from 4.8% to 2%,

5    and Central Valley vacancy rates decreased from 2014 to 2015, when CDCR's average salary

6    increase was unchanged.  (*Id.*)  These additional facts support Defendants' assertion that

7    EmployStats failed to provide evidence showing that pay differentials have been successful in

8    attracting psychiatrists to the Central Valley.

9    The Special Master recommends that the Court adopt the EmployStats' "finding" that

10   vacancy rates are twice as high at CDCR institutions in the Central Valley compared to those

11   outside the Central Valley.  But this is only true in 2018 and not in any of the other six years

12   (2012-2017) reported in Figure 2.  (ECF No. 6695 at 202.).  In fact, according to Figure 2, CDCR

13   Central Valley vacancy rates were lower than CDCR vacancy rates outside the Central Valley in

14   2012 and 2013 and equal in 2016.  EmployStats' finding is wrong.

15   EmployStats attempts to deflect from its own misreading of the data by making a

16   misleading assertion regarding Defendants' discussion of compensation differentials.  But

17   Defendants' experts make clear that the compensation differentials have not generated sustained

18   improvements in employment outcomes.  EmployStats' evidence confirms this fact.  (ECF No.

19   6695 at 125-29, 149-50.)

20   Based on the lack of evidence that a system of pay differentials will result in lower vacancy

21   rates for the Central Valley, the Court should reject this recommendation.

22   **E.    EmployStats Failed to Analyze Whether Any of Its Recommendations**
     **Would Actually Result in Greater Retention and Hiring.**
23

24   EmployStats failed to analyze whether any of its recommendations would actually improve

25   CDCR and DSH's ability to hire and retain psychiatrists to treat *Coleman* class members.  The

26   order appointed EmployStats for one clear reason—to determine the efficacy of current salary

27   rates and the efficacy of additional compensation on Defendants' ability to hire and recruit staff.

28   (ECF No. 5919 at 2.)  The Court also directed the parties and Special Master to determine

25

1    whether Defendants could hire sufficient psychiatrists to meet Court-ordered obligations through

2    salary adjustments. (ECF No. 5786 at 3-4.)  EmployStats did not perform that analysis.

3    EmployStats did not analyze the Court's causation question and the Special Master's May 29

4    report likewise failed to address the question.  (ECF No. 6695 at 18-21.)

5        Even though Defendants pointed out this defect in both the EmployStats and Special

6    Master's reports, the final EmployStats Report makes no attempt at an analysis.  Instead,

7    EmployStats merely cites back to a broad reference to "widespread objective evidence and studies

8    demonstrating that salary increases and pay differentials are linked to increased hiring and

9    retention of employees." (Appendix D, ECF No. 6695 at 316.)  EmployStats notes that "[t]he

10   Draft Report's recommendations provide the Special Master and the Court with areas that should

11   be addressed in order to ameliorate the difficulties in hiring and retention of psychiatrists." (*Id.*)

12   Aside from the vague statement that the recommendations "could" help with hiring and retention,

13   EmployStats failed to provide any objective evidence, study, or economic literature showing that

14   the recommendations can be effective in helping CDCR and DSH actual recruit and retain

15   psychiatrists.  While Defendants' experts agree that pay differentials are linked to increased

16   hiring and retention, CDCR has consistently offered psychiatrists substantially greater pay and

17   overall compensation than other employers.  EmployStats does not provide any clear metrics

18   about the level of salary increases needed or what fill rate they expect as a result of such

19   increases.  Again, EmployStats and the Special Master propose a recommendation that lacks

20   foundation, guidance, or practical application to CDCR and DSH's operations.

21       The Special Master and his expert cannot dispute that CDCR and DSH offer higher salaries

22   for psychiatrists than other California employers.  And as Defendants' experts demonstrated in

23   their review and statistical analysis, salary adjustments and other forms of monetary

24   compensation would not allow CDCR to permanently and significantly improve hiring and

25   retention.  (ECF No. 6695 at 134.)  EmployStats claims that its data shows the vacancy rate falls

26   when salaries increase.  The facts do not support EmployStats' reading of its own data.  (*Id.* at

27   202 and 204.)  In sum, Figure 1 and Table 1b of the EmployStats Report show that when CDCR

28   psychiatrists received a salary increase in four out of five recent years the vacancy rate was higher

1    than when the salary increase was lower.  (*Id.* at 151;Exhibit 1 at 3, Exhibit A at 12.)

2    EmployStats has no evidence or data to support a different conclusion.

3        The EmployStats' Report makes no mention of an analysis of the vacancy rate controlling

4    for concurrent factors other than salary.  Such factors include the supply of psychiatrists available

5    to fill open positions, CDCR/DSH salary levels, other employers' salary levels, working

6    conditions and general economic conditions, among others.  Also, EmployStats' use of annual

7    averages in Table 1b masks large within-year changes in vacancy rates and ignores the timing of

8    CDCR's pay increases.  CDCR's 2014, 2015 and 2017 pay increases all occurred mid-year.  (ECF

9    No. 6695 at 111-12.)

10       **F.    The Special Master and His Expert Fail to Acknowledge the Nationwide
               Shortage of Psychiatrists.**

11

12       Another glaring omission is EmployStats' lack of attention or mention of the shortage of

13   psychiatrists in California and nationwide.  The EmployStats Report does not address this

14   threshold concept—namely, that the demand for psychiatry services continues to grow throughout

15   the population, while the supply of psychiatrists is decreasing at a critical rate.  In this severely

16   compressed environment, CDCR already utilizes a large percentage of the dwindling market of

17   psychiatrists.  This percentage only increases when considering the additional psychiatrists

18   employed by DSH at its hospitals.  Even assuming that EmployStats' recommendations and

19   findings were well founded, the recommendations must be assessed against the reality that it may

20   be impossible in some cases to hire additional psychiatrists in the market while also ensuring that

21   certain communities outside prison walls have minimally adequate mental health care that can

22   compare with the mental health care being provided within CDCR.  A recent study shows that

23   more and more psychiatrists are retiring and fewer are entering the market.  (Coffman,

24   California's current and Future Behavioral Health Workforce, at 53.)[6]  EmployStats also failed to

25   address that the environment already exists for a bidding war for scarce psychiatry resources

26   through salary increases.  (ECF No. 6695 at 130-31, 154.)

27        [6]

28   https://healthforce.ucsf.edu/sites/healthforce.ucsf.edu/files/publicationpdf/California%E2%80%9
     9s Current and Future Behavioral Health Workforce.pdf.

1    Defendants pointed out the well-documented shortage of psychiatrists in their March 30,

2    2017 response to the Special Master's report on CDCR's staffing plan.  (ECF No. 5591 at 12-13.)

3    At the time of that filing, CDCR and DSH employed more psychiatrists than existed in entire

4    states and at higher mean annual wages compared to 2014 data from the U.S. Bureau of Labor

5    Statistics.  (ECF No. 5591 at 13, Table 1.)  The critical shortage is only getting worse. Defendants

6    shared with the Special Master and Plaintiffs a February 2018 study from researchers at the

7    University of California, San Francisco's Healthforce Center, which showed that in 2016

8    California's supply of psychiatrists was 23.6 percent fewer than the actual demand of those who

9    needed care.  Coffman, California's Current and Future Behavioral Health Workforce, at 50.  And

10   the shortage is projected to increase to 50 percent fewer psychiatrists than needed by 2028.  *Id*.

11   Defendants' expert report was consistent and relied on these findings.  (ECF No. 6695 at 104-06.)

12   In response to Defendants' objection, EmployStats now claims that its analysis "speaks

13   directly to this point."  (Appendix D; *id*. at 316.)  But with the exception of the brief discussion

14   criticizing the Economic Report, the word "shortage" or its equivalent does not appear once in the

15   EmployStats Report or the May 29 Report.  In fact, the EmployStats Report implicitly

16   acknowledges that a shortage exists with the assertion that it is not clear that expanding the use of

17   telepsychiatry will help CDCR alleviate psychiatrist shortages.  (ECF No. 6695 at 251.)

18   EmployStats made no effort to show how Defendants can implement any of its recommendations

19   given the nationwide shortage of psychiatrists.

20   Instead, EmployStats criticizes Defendants' expert's finding that CDCR alone employed

21   approximate 285 of the state's 5,800 psychiatrists, but the population it served accounted for only

22   0.3 percent of the state's overall population.  (ECF No. 6695 at 107.)  EmployStats responded,

23   stating that Defendants' expert report does not account for the fact that prison inmates have

24   greater mental health needs.  (*Id*. at 250.)  While Defendants do not contest the general

25   proposition that the prison population has a significant need for mental health services,

26   EmployStats is not qualified to opine on the mental health needs of CDCR and DSH's inmate

27   population versus California's general population, and no one on the EmployStats team appears

28   qualified to opine that the disparity in need is so great that it requires CDCR to provide sixteen

28

1    times the psychiatric services as are available to the general population.  Nothing in their

2    qualifications or experience listed in their Report is related to the provision of health care to

3    inmates or the general population.  (*Id.* at 195-97.)  And the Report fails to point to any study or

4    underlying information upon which their conclusion is based.  (*Id*. at 250.)

5          **G.    Defendants Cannot Adopt the Report's Vague and Ambiguous**
               **Recommendations.**
6

7          The EmployStat Report's recommendations are too vague and ambiguous to analyze, let

8    alone adopt.  The Prison Litigation Reform Act requires that before a court may grant an

9    injunction, it must ensure that the relief "is narrowly drawn, extends no further than necessary to

10   correct the violation of the Federal right, and is the least intrusive means necessary to correct the

11   violation of the Federal right."  18 U.S.C. § 3626(a)(1).  Any relief granted "must be consistent

12   with the policy of minimum intrusion into the affairs of state prison administration."  *Toussaint v.*

13   *McCarthy*, 801 F.2d 1080, 1086 (9th Cir. 1986), abrogated in part on other grounds in *Sandin v.*

14   *Conner*, 515 U.S. 472 (1995)).  The court abuses its discretion by granting relief that is overbroad

15   or vague in its requirements.  *See McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012)

16   (district court abuses discretion by issuing overbroad injunctions that are not tailored to remedy

17   the specific harm); *Cont'l Baking Co. v. Katz*, 68 Cal. 2d 512, 534 (1968) ("An injunction must

18   not be uncertain or ambiguous and defendant must be able to determine from the order what he

19   may and may not do.")

20         All of the recommendations are vague suggestions on what CDCR and DSH should

21   generally do.  They do not contain any detail to inform Defendants or the Court on what should

22   and can be accomplished under each recommendation to effect real change.  In fact, in response

23   to Defendants' criticism, EmployStats confirmed that its purpose was to conduct a labor market

24   and salary analysis of CDCR and DSH, to provide general recommendations as appropriate, and

25   "provided sufficient information for policy and decision makers with more advanced knowledge

26   of details specific to CDCR and DSH to make implementation decisions."  (ECF No. 6695 at

27   317.)

28

1    The recommendation to better inform psychiatrists of their value and improve the working

2    environment does not provide any details on how specifically DSH and CDCR can accomplish

3    improving the working environment.  But the EmployStats Report and the May 29 Report are

4    bereft of any specific examples of effective strategies for improving these two areas.  (ECF No.

5    6695 at 193.)  Without this vital information, it is unclear what EmployStats is suggesting CDCR

6    and DSH do to implement its recommendation.

7    EmployStats' recommendations that CDCR and DSH adopt a system of consistent and

8    larger salary increases for psychiatrists and for CDCR to adopt compensation differentials to

9    incentivize psychiatrists to fill Central Valley positions are similarly vague and ambiguous.  (*Id.*

10    at 6.)  Neither recommendation contains any specifics.  EmployStats does not suggest what size

11    of yearly salary increases should be adopted or what size salary would be effective, and fails to

12    identify what differential pay the Central Valley institutions should adopt.

13    This lack of detail leaves CDCR and DSH without important information to evaluate when

14    considering the recommendations, places unreasonable burdens on Defendants, encourages

15    litigation, and creates unnecessary barriers for implementation.  Absent a recommended course of

16    action, there is no reliable basis for the recommendations.

17    **H.    EmployStats' Recommendations for DSH Are Too Broad Given the Scope**
18    **of the *Coleman* Litigation.**

19    The recommendations directed at DSH go far beyond the bounds of the *Coleman* litigation

20    and DSH's involvement in the litigation.  The recommendations extend to the entirety of DSH,

21    not only to the hospitals that treat *Coleman* class members.  The broad requirements EmployStats

22    recommend extend beyond the Court and Special Master's jurisdiction.

23    After the inpatient programs DSH managed in CDCR prisons shifted back to CDCR control

24    on July 1, 2017, DSH's involvement in this case decreased substantially.  Specifically, it

25    transferred three inpatient programs from DSH to CDCR management, including the staff

26    allocated to those programs.  (ECF No. 5894 at 14-15.)  Now, DSH currently only provides care

27    for a maximum of 336 inmates in three programs at three of their hospitals – DSH-Atascadero,

28    DSH-Coalinga, and DSH- Patton.  (ECF No. 6286 at 5.)  The number of beds used for *Coleman*

30

1   class members represents only a small fraction of the patient care provided by those three

2   hospitals and DSH overall.  DSH only has a total of 12 psychiatrists allocated to the programs

3   that treat *Coleman* class members and it has consistently filled most of those 12 psychiatry

4   positions.  Moreover, the psychiatry staffing at DSH's hospitals has never been found to be

5   unconstitutional.  EmployStats failed to take any of this information into account in rendering its

6   findings and recommendations.  Nor did the Special Master.  Accordingly, the global

7   recommendations exceed DSH's limited involvement in *Coleman* and its staffing psychiatry

8   needs.  And they would not comport with the Prison Litigation Reform Act's requirement that

9   any relief "is narrowly drawn, extends no further than necessary to correct the violation of the

10   Federal right, and is the least intrusive means necessary to correct the violation of the Federal

11   right." 18 U.S.C. § 3626(a)(1).

12        EmployStats responded to Defendants' objection by restating that the purpose of the Report

13   was "to conduct a labor market and salary analysis of CDCR and DSH," and that their draft report

14   provided general recommendations as appropriate, and provided sufficient information for policy

15   and decision makers with more advanced knowledge of details specific to CDCR and DSH to

16   make implementation decisions."  (ECF No. 6695 at 317.)  According to EmployStats'

17   justification, they have not provided specific information that would entitled the Court to take

18   action on their recommendations.  Absent evidence that a recommended course of action will

19   effectuate specific outcomes, there is no reliable basis for the recommendations.

20   **III.    EMPLOYSTATS' DISCUSSION OF CORONAVIRUS IS SPECULATIVE AND**
21           **FAILS TO ACCOUNT FOR BUDGET SHORTFALLS.**

22        In the eight months between the time Defendants submitted their objections to

23   EmployStats' draft report and when the Special Master issued his report on EmployStats' revised

24   draft, Defendants, like other government officials, have had to focus all of their resources on

25   addressing the novel coronavirus—an unexpected and unprecedented pandemic that has taken

26   lives and compelled officials to take extreme steps to limit COVID-19's spread.

27        The virus's impact, financially and otherwise, is undisputed—it has caused a severe

28   disruption of economic activity and shrunk government revenues.  California's government

1   operations, its residents, and businesses have suffered—this has naturally affected the state's

2   prisons.  The proposed May Revision to California's 2020-21 budget projects severe job losses

3   and business closures in addition to a projected 2020 unemployment rate of 18 percent and a nine

4   percent decrease in personal income.  *See* 2020-21 May Revision, Revised Budget Summary at 2-

5   3, http://www.ebudget.ca.gov/2020-21/pdf/Revised/BudgetSummary/FullBudgetSummary.pdf

6   (May 14, 2020).  As a result, revenues have decreased sharply from the Governor's Budget in

7   January 2020, resulting in a projected $54 billion dollar budget deficit through the 2020-2021

8   fiscal year.  (*Id.* at 3.)  One way that California is attempting to bridge this gap – like other public

9   and private employers throughout the country – is with cuts to spending, which may ultimately

10   include state employee pay.  *See* California State Budget 2020-21, 103-104,

11   http://www.ebudget.ca.gov/FullBudgetSummary.pdf (June 29, 2020).

12       Private health care companies are experiencing similar budgetary constraints.  According to

13   an article in the Los Angeles Times, thousands of nurses, doctors and other medical staff at major

14   health care facilities and small rural hospitals had been laid off, furloughed, or had their pay cut.

15   Karlamangla, Soumya and Melanie Mason, "Thousands of healthcare workers are laid off or

16   furloughed as coronavirus spread," Los Angeles Times, <

17   https://www.latimes.com/california/story/2020-05-02/coronavirus-california-healthcare-workers-

18   layoffs-furloughs> (May 2, 2020). The impact of coronavirus on jobs in the healthcare industry is

19   second only to its impact on restaurant workers.  (*Id.*)

20       Despite these severe economic effects, the Special Master recommends the Court adopt

21   EmployStats' recommendations that Defendants provide "larger salary increase opportunities for

22   psychiatrists," "provide a system of compensation differentials to incentivize psychiatrists to fill

23   Central Valley positions," and "[i]crease and improve the office space and facilities provided to

24   psychiatrists to perform their job functions."  (ECF No. 6695 at 18-20, 192-93.)  By failing to

25   account for California's budgetary strains and needs during the pandemic, these recommendations

26   are incomplete and potentially fiscally irresponsible—they would require an increase in spending

27   at a time when Defendants are facing a challenging and uncertain fiscal outlook now and for

28   several years going forward.  The Special Master fails to address the coronavirus's economic

32

1    impact and the impact that his recommendations would have on the state's budget.  Similarly, he

2    does not consider whether the recommendations would have a meaningful impact on Defendants'

3    ability to hire and retain psychiatrists.

4          EmployStats' recommendations are broad and vague and do not contain any

5    recommendation for how much salaries should be raised or how much prison infrastructure needs

6    to be added or changed.  Without these details, it is impossible for Defendants, the Special

7    Master, or the Court to assess their effectiveness or feasibility.  Rather, EmployStats claims,

8    without reference to any supporting evidence, that unspecified changes in licensure could increase

9    the supply of psychiatrists, psychiatrists could be less likely to enter the job market, CDCR's

10    demand for psychiatrists' may be impacted if the inmate mental health population decreases, and

11    psychiatrists may place a greater demand on their office space and conditions.  (ECF No. 6695 at

12    194.)  All of these claims are speculative, and the Court should reject them.

13          California's budget shortfall is not an excuse here, but an unfortunate reality that all

14    stakeholders must consider, particularly the Special Master's expert specifically retained to

15    provide helpful advice to Defendants and the Court.  Defendants remain committed to working to

16    hire and retain sufficient psychiatric staff to provide constitutionally adequate mental health care

17    to its incarcerated patients and will continue to pursue many of the creative solutions it has

18    discussed with the Court, Special Master, and Plaintiffs, as Defendants navigate this new

19    economic reality.  However, the Special Master and Court must also recognize the historic budget

20    deficits and uncertain fiscal future that the state faces and the Special Master's failure to justify

21    his expert's recommendations and their fiscal impact in light of those deficits.  Defendants (like

22    the rest of the nation) have struggled historically to hire psychiatrists—there just aren't enough.

23    The Special Master's expert speculates that the novel coronavirus will not make it more attractive

24    for psychiatrists to work in prisons, but the Special Master and his experts have offered no

25    targeted solution or justified their recommendations in light of COVID-19's impact.

26          The Court should reject the Special Master's report and refer this ongoing staffing issue to

27    the parties' workgroup process.

28

1

**CONCLUSION**

2          EmployStats' findings lack foundation, especially to the extent they are based on a flawed

3    survey that raises more questions than it answers.  The Special Master's assignment was to

4    conduct a labor market and salary analysis with the ultimate goal of assessing the efficacy of

5    measures designed to improve staffing levels.  After nearly two years, Defendants are left with a

6    set of recommendations that do not provide sufficiently detailed measures to resolve staffing

7    challenges—the Special Master's expert's analysis fails to address the heart of Defendants'

8    ongoing staffing challenges, a lack of an adequate labor pool.  As presented, the Court should

9    reject EmployStats' recommendations.  Defendants look forward to continuing discussions on

10   staffing through the workgroup process.

11   Dated:  June 29, 2020                              Respectfully Submitted,

12                                                      XAVIER BECERRA
                                                        Attorney General of California
13                                                      ADRIANO HRVATIN
                                                        Supervising Deputy Attorney General
14

15                                                      /s/ *Elise Owens Thorn*
                                                        ELISE OWENS THORN
16                                                      Deputy Attorney General
                                                        *Attorneys for Defendants*
17                                                      *California Department of Corrections and*
                                                        *Rehabilitation - General*
18   CF1997CS0003

19

20

21

22

23

24

25

26

27

28

Defs.' Response to the Special Master's May 29, 2020 Report  (2:90-cv-00520 KJM-DB (PC))