# Exhibit 1

# Economists
## INCORPORATED

*In affiliation with*
The Allen Consulting Group, Australia

Washington DC • San Francisco • Tallahassee

101 Mission Street
Suite 1000
San Francisco, CA 94105
———
Main (415) 975-5510  Fax (415) 281-9151
www.ei.com

Erica E. Greulich
Direct Dial:  (415) 975-3227
greulich.e@ei.com

Lona Fowdur
Direct Dial:  (202) 833-5244
fowdur.l@ei.com

June 29, 2020

Elise Owens Thorn
Deputy Attorney General
Department of Justice
Office of the Attorney General
1300 I Street, Rm. 1040-16
Sacramento, CA 95814
(916) 210-7318
Elise.Thorn@doj.ca.gov

Re: *Coleman, et al. v. Newsom, et al.*,
    U.S. District Court, Eastern District of California, Case No. 2:90-cv-00520 KJM-DB

Dear Ms. Thorn,

      Economists Incorporated has been asked by counsel for Defendants to respond to Appendix D of EmployStats' May 20, 2020 report ("EmployStats Report")[1] attached as Appendix A to the May 29, 2020 report of the Special Master ("Special Master's Report").[2] We attach a detailed response as Exhibit A to this letter and briefly summarize our response below. In preparing this response we have reviewed the Special Master's Report and attachments, the EmployStats Report and Appendices, prior reports submitted by Economists Incorporated and EmployStats in this matter, materials provided by Defendants and publicly available articles and information.

      As explained in greater detail in Exhibit A:

· The EmployStats Report implicitly acknowledges that a shortage of psychiatrists exists in California but does not show how any of its recommendations will be effective in the

---

[1] *An Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals*, May 20, 2020.
[2] *Special Master's Report on His Expert's Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals*, May 29, 2020.

June 29, 2020
Page 2

presence of this shortage. It fails to respond to analyses in the Economists Incorporated Report that documented the shortage of psychiatrist services nationwide, in California and at CDCR.

· Absent evidence that a recommended course of action will effectuate specific outcomes, there is no reliable basis for the recommendations in the EmployStats Report. In particular, the EmployStats Report fails to present clear evidence in support of its recommendations. The Report also lacks concrete scientific evidence that its recommendations will lead to improvements in CDCR and DSH's ability to hire and retain psychiatrists to treat Coleman class members. As an example, the EmployStats Report fails to indicate how high the salary increases it recommends need to be to effectuate improved hiring and retention. Similarly, it fails to articulate what fill rate should be expected subsequent to its recommended increase.

· The EmployStats Report recommends larger salary increases for psychiatrists throughout their tenure at CDCR and DSH but fails to support this recommendation. Its salary increase analysis fails to compare psychiatrists employed by Defendants to similar psychiatrists – i.e., those earning similar salaries – elsewhere. Its further fails to compare tenure-based salary increases at CDCR and DSH to those at other employers.

· Appendix D to the EmployStats Report cites articles that EmployStats alleges support its contention that salary increases, irrespective of salary levels, are related to higher retention rates. EmployStats misinterprets this literature, which does not support its inferences. The articles cited in the EmployStats Report's Appendix D uniformly find that higher pay *levels*, which CDCR psychiatrists have consistently enjoyed relative to psychiatrists employed elsewhere, are likely to enhance retention.

· Appendix D to the EmployStats Report repeatedly asserts that compensation differentials may be required to meet Defendants' mandated employment levels. EmployStats fails to conduct any analysis directly relating working conditions to pay. Its assertions that Economists Incorporated noted a possible need for compensation differentials are blatantly incorrect, as both the Economists Incorporated Report and Economists Incorporated Response to the EmployStats Draft Report concluded that compensation differentials have not generated sustained improvements in CDCR's employment outcomes. Our analysis suggests that if CDCR and DSH were to offer a system of pay

June 29, 2020
Page 3

differentials for the Central Valley, the likely result would either be a bidding war or minimal employment gains, a point the EmployStats Report completely overlooks.

- Appendix D to the EmployStats Report asserts that the CDCR vacancy rate falls when the average *increase* in salary (not the average salary itself) paid to psychiatrists increases. This assertion is incorrect and ignores the evidence in the EmployStats Report as well as data presented in the Economists Incorporated Report.

- EmployStats misreads its own Figure 2 and erroneously concludes that vacancy rates in the Central Valley decreased when the average CDCR *increase* in salary (not the average salary itself) increased. None of the reports submitted by EmployStats or Economists Incorporated in this matter provide evidence showing that pay differentials have been successful in attracting psychiatrists to its Central Valley locations.

- The EmployStats Report repeatedly fails to follow the survey methodologies and principles laid out in reputable sources including those to which it cites.

- The EmployStats Report utilizes a survey instrument with an ambiguous response scale and fails to present complete survey results. To the extent the response scale can be trusted to provide reliable results, the survey responses document that the majority of CDCR psychiatrists are not on the whole unsatisfied, nor are the majority dissatisfied with their working conditions, office space, the medical assistant program, their professional standing or opportunities for promotion.

- EmployStats asserts that psychiatrists' job satisfaction ratings obtained from Glassdoor can be compared to job satisfaction ratings from its survey of Defendants' psychiatrists. This argument fails for numerous reasons: Glassdoor ratings are submitted voluntarily and are not the result of a survey; they are not based on a random or statistically representative sample of psychiatrists; academic literature demonstrates that online ratings, including those on Glassdoor, are inflated; and EmployStats did not assess whether the Glassdoor ratings it employed were representative or applicable to its analysis. The EmployStats Report fails to present reliable evidence comparing job satisfaction among psychiatrists employed by Defendants to psychiatrists employed elsewhere.

- Despite EmployStats' assertions to the contrary, its survey responses were potentially biased due to respondents' knowledge of the *Coleman* lawsuit, knowledge of CDCR's and DSH's staffing difficulties, and the survey instrument itself which explicitly

June 29, 2020
Page 4

referenced both of these issues. EmployStats claims to have performed a statistical analysis that is impossible given the wording of its survey instrument, and it fails to present information that would permit independent evaluation of such a statistical test or its reliability.

- EmployStats' unsupported assertion in Appendix D that telepsychiatry could lead to a drain of on-site CDCR psychiatrists and not increase overall staffing levels is contradicted by evidence presented in the Economists Incorporated Report and which EmployStats does not contest.

- Recent news articles document the sharply increased use of telemedicine to deliver healthcare during the COVID-19 pandemic, and healthcare professionals' expectations that the increased use of telemedicine will continue beyond the pandemic.[3] The EmployStats Report failed to consider the increased use of telemedicine in its section on COVID-19 considerations.

The EmployStats Report and Appendix D contain numerous erroneous or unsupported assertions. Appendix D notes several analyses that it asserts are outside the scope of the EmployStats report. However, those analyses are highly relevant to interpretation and application of the EmployStats Report's findings, particularly given the lack of support for certain of its recommendations. Exhibit A explains these errors, failures and omissions in greater detail.

Sincerely,

Erica Greulich, Ph.D.

Lona Fowdur, Ph.D.

---

[3] See, e.g., Galewitz, Phil, "Telehealth Surges, Fueled By Coronavirus Fears And Shift In Payment Rules," *Kaiser Health News*, March 27, 2020 (www.khn.org/news/telemedicine-surges-fueled-by-coronavirus-fears-and-shift-in-payment-rules/); "Telemedicine transforms response to COVID-19 pandemic in disease epicenter," *Science Daily*, April 30, 2020 (www.sciencedaily.com/releases/2020/04/200430150220.htm).

# Exhibit A

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| | | | We incorporate refererences to the Economists Incorporated Response to the EmployStats Draft Report ("EI Response") below. EmployStats' May 20, 2020 final report ("EmployStats Report"), attached as Appendix A to the Special Master's May 29, 2020 Report, changed minimally from EmployStats' Draft Report ("Draft Report"). The discussions and critiques in the EI Response apply to the EmployStats Report as well.<br><br>The "COVID-19 Considerations" section of the EmployStats Report, which we do not discuss further below, is wholly speculative. We note that it fails to consider the sharply increased use of telemedicine during the COVID-19 pandemic, and healthcare professionals' expectations that the increased use of telemedicine will continue beyond the pandemic, as have been documented in recent news articles. See, e.g., Galewitz, Phil, "Telehealth Surges, Fueled By Coronavirus Fears And Shift In Payment Rules," Kaiser Health News, March 27, 2020 (www.khn.org/news/telemedicine-surges-fueled-by-coronavirus-fears-and-shift-in-payment-rules/); "Telemedicine transforms response to COVID-19 pandemic in disease epicenter," Science Daily, April 30, 2020 (www.sciencedaily.com/releases/2020/04/200430150220.htm). |
| Section A, Paragraph 3 | The Draft Report fails to state whether its chosen methodology is generally recognized in the field or supported by objective verifiable evidence. Moreover, while the Draft Report lays out some of the information relied on to make its recommendations, it does not state whether the methodology and information relied on for those recommendations are generally recognized or supported or based on scientifically valid principles or objective verifiable evidence. | The Draft Report is based on generally accepted methodologies and scientifically valid principles. The survey methodology is consistent with peer reviewed and generally accepted sources including text books such as Groves, R. M., Fowler, F.J., Couper, M.P., Leprowski, J.M, Singer, E., Tourangeau, R., "Survey Methodology", John Wiley & Sons, New Jersey, 2009 and The Federal Judicial Center, Reference Manual on Scientific Evidence. The underlying survey data, comparison salary data, and references is clearly defined in the report (See for example page 25 of Draft Report, page 28 of Draft Report, and page 37 of Draft Report). | The EmployStats Report and Draft Report repeatedly fail to follow the methodologies and principles laid out in these and other reputable sources. As stated in the EI Response (pp. 17-18), the Draft Report falls short of numerous best practices of the American Association for Public Opinion Research, including "competent and clear data analysis and interpretation, with findings or results presented fully, understandably, and fairly," "sampling errors included for all statistics presented, not just the statistics themselves," "honest and objective presentation of findings and interpretations, and full reporting of all relevant findings, including any that may seem contradictory or unfavorable."<br><br>The Draft Report and EmployStats Report also fail to follow procedures laid out in the generally accepted sources cited here. For example, both reports fail to include complete and detailed information on relevant survey characteristics, which includes "[s]tatistical tables clearly labeled and identified regarding the source of the data, including the number of raw cases forming the base for each table, row, or column" (Diamond (2011), Reference Manual on Scientific Evidence, "Reference Guide on Survey Research," pp. 415-416).<br><br>Additionally, as pointed out in the EI Response (pp. 22-23), the introduction and questions 13a-3, 13b-1 and 14 of the EmployStats survey instrument explicitly made respondents aware of both CDCR and DSH's alleged staffing difficulties and the existence of a lawsuit involving CDCR and DSH. This awareness could have unconsciously or consciously influenced individuals' responses and led to biased findings. As a result the survey instrument fails to meet best practices as laid out in the Reference Manual on Scientific Evidence (pp. 410-411.) |
| | | The survey methodology utilized in the Draft Report has been accepted in Federal Court and State Court in California. Dr. Steward has provided numerous reports and testified at trial on survey-based employment data in cases including Otsuka et al. v. Polo Ralph Lauren Corporation (United States District Court, Northern District of California) and Johnson, et al., v. York Claims Service, Inc. (Superior Court of the State of California, Sacramento County). Dr. Peterson has also provided numerous reports and testimony on survey-based employment data in cases including Li et al. v. A Perfect Day Franchise Inc. (United States District Court, Northern District of California). | |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section B, Paragraph 2 Footnote 4 | CDCR and DSH received copies of the surveys before they were provided to the psychiatrists. Both agencies submitted objections, which are attached to their response as Exhibits C and D. CDCR and DSH did not receive specific responses to those objections from EmployStats and the final versions of the surveys largely mirrored the draft versions with some changes. Defendants re-raise and re-incorporate those objections. | The Defendants' statements are incorrect. The Defendants' and Plaintiffs' comments and objections were incorporated in the EmployStats Draft Report. Multiple telephone calls and emails from both parties were exchanged in advance of the final formulation of the survey. Suggestions and objections from both sides were considered and incorporated. | |
| | | The Defendants submitted an email on November 21, 2018 that described six areas of concern. The final version of the survey directly incorporated four of the six areas of concerns expressed by the Defendants. One of the areas of concern expressed by the Defendants that EmployStats did not address, involved what EmployStats viewed as a legal question as to which psychiatrists should be included in the survey. EmployStats included Staff, Supervising, and Chief Psychiatrists in the survey. The Defendants expressed that they felt the survey should be limited to Staff Psychiatrists only. The results in the report are analyzed for Staff, Supervising, and Chief Psychiatrists. Differences between responses of the different types of psychiatrists is noted and discussed in the Draft Report. | The Draft Report and EmployStats Report (pp. 33-61, 76-86) include incomplete information on how responses differ by job title. Responses to some but not all questions are provided and grouped as "less than satisfied" or "unsatisfied" for staff psychiatrists but not other psychiatrists. In these instances responses are provided for some but not all psychiatrists, e.g. response rates are provided for those outside the Central Valley but not those within the Central Valley. |
| | | In an additional area of concern, the Defendants stated that they wanted open ended and free text box entry responses to be added to a number of the survey questions. For instance, the Defendants wanted an open ended question that would allow survey respondents to provide qualitative comments and responses about how they felt about their salary and comparators. The Plaintiffs also requested similar open ended questions and text box responses be added to a number of survey questions. | |
| | | Neither the Defendants nor Plaintiffs suggestions regarding open ended text response boxes were incorporated into the final survey. Open ended text response boxes, which may provide some qualitative information that is specific to the partied, do not allow for quantitative measurements of the salary and job satisfaction issues that are analyzed in this report. Accordingly, open ended text response boxes were not added for neither Defendants nor Plaintiffs. | Open ended responses can provide a check on whether quantitative questions were sufficiently comprehensive, or what limitations respondents may have faced in interpreting the quantitative questions. Failure to include open ended text response boxes may lead to inferences based on incomplete information. |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section B-1 | The Survey's scope is overly restrictive because it is limited to Defendants' Employees. | The Defendants are incorrect. While EmployStats only sent surveys to CDCR and DSH employees, survey responses from non-CDCR and non-DSH employed psychiatrists were incorporated in our analysis. Information related to the job satisfaction of non-CDCR and non-DSH employed psychiatrists was obtained from Glassdoor job and Medscape. The job satisfaction ratings of psychiatrists employed at non-Defendant facilities is used to compare overall job satisfaction with the job satisfaction ratings of the Defendant's employees. For example, see Table 13. Direct surveying of non-CDCR and non-DSH psychiatrists is outside of the scope of our assignment in this case. | The Draft Report and EmployStats Report fail to present reliable evidence comparing job satisfaction among CDCR and DSH psychiatrists to those employed elsewhere.<br><br>Information from Glassdoor and Medscape is not comparable to EmployStats' survey results. The Draft Report and EmployStats Report utilize job ratings, not survey responses, from Glassdoor. These ratings are neither the result of a survey nor are they based on a statistically representative sample (EmployStats Report, p. 35). The American Association for Public Opinion Research includes "[r]epresenting the results of a self-selected 'pool' as if they were the outcome of legitimate research" among its condemned survey practices. (www.aapor.org/Standards-Ethics/Survey-Practices-that-AAPOR-Condemns.aspx)<br><br>A recent National Bureau of Economic Research working paper finds that voluntary reviews on Glassdoor are distributed differently than incentivized reviews in which users submitted information in order to continue viewing online content. Voluntary reviews, such as the Draft Report and EmployStats Report presumably rely on, reflected a more positive perception of employers on average than did incentivized reviews. (Marinescu et al. (2018), "Incentives Can Reduce Bias in Online Reviews," www.nber.org/papers/w24372.)<br><br>Further reinforcing the non-representative nature of online ratings, Filippas et al. (2017) note the "implausibly rosy" distribution of online marketplace ratings, such as have occurred on EBay, Uber or Lyft. Their analysis of a large online market showed that an overwhelming majority received perfect feedback, the ratings had increased markedly over time, the public nature of feedback led to inflated reputations, and those who gave negative private feedback were less likely to rate the individual publicly. (Filippas et al. (2017), "Reputation in the Long-Run," CESifo Working Paper No. 6750.) |
| | | | As discussed in the EI Response (p. 20), since Glassdoor ratings are ostensibly submitted voluntarily by employees, those who view their employers more favorably may be more likely to rate them on Glassdoor, biasing the ratings' comparison to EmployStats' CDCR/DSH survey responses. The Draft Report and EmployStats Report do not assess whether the Glassdoor ratings utilized are representative of all psychiatrists employed in California. The Draft Report andn EmployStats Report do not state how many ratings were collected from Glassdoor, how many individuals created those ratings, how many employers were rated or anything about the employers reflected in the Glassdoor ratings other than that they are in California. Each of these omissions calls into question whether the ratings are representative of psychiatrists employed in California. |
| | | | The Draft Report and EmployStats Report do not report job satisfaction information from Medscape. The reports only discuss benchmark compensation data from Medscape. |
| Section B-1, Paragraph 2 | According to the Draft Report, the Glassdoor survey used a different scale and included a middle satisfaction rating -unlike the Draft Report. | The Defendant is incorrect. The EmployStats Draft Report does utilize a middle satisfaction rating. A rating scale of '1' to '7' is utilized and a rating of '4' is the middle satisfaction rating. The Glassdoor survey, like the EmployStats survey, also uses a middle satisfaction rating. In the Glassdoor survey a rating scale of '1' to '5' is used and a rating of '3' is the middle satisfaction rating. The rating scale, which is different between Glassdoor and EmployStats, is not relevant. In the analysis, the results are presented relevant to the middle satisfaction ratings. This allows the two ratings scales to be compared directly. | The Glassdoor ratings are neither the result of a survey nor are they based on a statistically representative sample (EmployStats Report, p. 35). For this and other reasons discussed above, it is questionable that they are representative of psychiatrists employed in California or that it is appropriate to compare them to the ratings in the EmployStats survey.<br><br>Further, the Glassdoor comparison in Table 13 is the EmployStats Report's only non-salary comparison of CDCR psychiatrists to psychiatrists at other employers. It is thus the only basis EmployStats has for its assertion that salary might have any effect on retention, and for the reasons listed here and above this is evidence is weak. |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section B-1, Paragraph 2 | In one instance, the Draft Report compares its survey results to job satisfaction ratings from Glassdoor. However, the reliability of this comparison is not apparent. | Glassdoor data is routinely used as survey data in peer reviewed articles. The referenced peer reviewed articles in the draft report show the reliability of data from Glassdoor, and other similar online job survey sources, and show the data from Glassdoor are generally accepted data sources for research. The removal of Glassdoor analysis would not change the Draft Report's findings. EmployStats also reviewed job satisfaction data from Medscape, which is focused on the healthcare industry. The salary satisfaction responses from Medscape was consistent with the salary satisfaction Glassdoor data. | Neither the Draft Report nor the EmployStats Report (other than Appendix D) mention job satisfaction information from Medscape. The Draft Report and EmployStats Report only discuss benchmark compensation data from Medscape. Neither report provides evidence that Medscape job satisfaction data even exist, whether they are survey-based or self-reported, who and how many individuals participated, where the participants are employed, whether they are psychiatrists, whether they are representative of any broader group of psychiatrists, or how the data compare to any other data or findings in the Draft Report or EmployStats Report. |
| | | For instance, the peer review article, What Can We Learn from Online Wage Postings? Evidence from Glassdoor, by Karabarbounis and Pinto (2018), directly asks whether publicly available data on Glassdoor can be used as a reliable source of aggregate economic statistics. The paper directly compares employee salary information on Glassdoor with two other publicly available and widely used government surveys: the Quarterly Census for Employment and Wages (QCEW), published by the US Census Bureau, and the Panel Study of Income Dynamics (PSID). The authors found that salaries on Glassdoor were very highly correlated with data collected in the QCEW and the PSID. The paper concludes that the distribution of wages (by industry and/or region) in Glassdoor well represents the respective distributions in other two datasets. | As discussed in the EI Response (p. 20), the Karabarbounis and Pinto (2018) article states that user entries on Glassdoor are underrepresented in certain industries, "especially" health care (p. 174). Karabarbounis and Pinto (2018) also note that the most important discrepancies between salary information on Glassdoor and salary information in the Quarterly Census for Employment and Wages, published by the U.S. Census Bureau, are observed in industries where workers receive high salaries (p. 175). These findings respectively suggest that Glassdoor ratings for psychiatrists are more likely to be affected by outliers or bias and less representative of all psychiatrist employers, and that Glassdoor salary information for psychiatrists is more likely to deviate from national or regional averages. |
| | | Another peer review article, Job Satisfaction and Employee Turnover Determinants in High Contact Services: Insights from Employees' Online Reviews by Stamolampros et al. (2019), asks whether publicly available reviews on Glassdoor can be used to determine job satisfaction and performance. The authors study a combination of numerical ratings for specific job elements, and open ended text responses from Glassdoor reviews to analyze turnover and customer satisfaction in a particular industry. Critically, the study expands upon small surveys previously conducted in the industry by data mining several hundred thousand job reviews available on Glassdoor. In the course of studying a particular industry, the paper concluded that Glassdoor reviews were broadly representative of the industry's workforce, and that the Glassdoor reviews were not affected by self-selection bias. | In contrast, Marinescu et al. (2018) find that voluntary reviews on Glassdoor are differently distributed than incentivized reviews in which users submitted information in order to continue viewing online content. Voluntary reviews on average reflected a more positive perception of employers than did incentivized reviews, reflecting selection bias. (Marinescu et al. (2018), "Incentives Can Reduce Bias in Online Reviews," www.nber.org/papers/w24372.)

Additionally, Filippas et al. (2017) note the "implausibly rosy" distribution of online marketplace ratings, such as have occurred on EBay, Uber or Lyft. Their analysis of a large online market showed that an overwhelming majority received perfect feedback, the ratings had increased markedly over time, the public nature of feedback led to inflated reputations, and those who gave negative private feedback were less likely to rate the individual publicly. (Filippas et al. (2017), "Reputation in the Long-Run," CESifo Working Paper No. 6750.) |
| Section B-2 | The Survey suffers from Self-Interest Bias because it is limited to Respondents who may benefit from its results. | The survey does not suffer from self-interest bias. The issue of potential self bias is addressed in the design of the survey and is specifically analyzed in the report. The survey was designed using neutral wording and is consistent with survey generally accepted practices. For instance, there is no mention in the survey of any specific or potential impact that the psychiatrist's answers to the survey may or may not have on their specific employment conditions or salary. | EmployStats' survey instruments need not directly tie potential impact to a respondent's specific employment conditions or salary for responses to be affected. The introduction to EmployStats' survey instrument states that the survey is being conducted in order to assess psychiatrists' "work satisfaction, compensation, and environment," that CDCR and DSH "often ha[ve] difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain institutions [facilities]" and that survey responses will "provide vital information to assist policy makers in assessing and implementing policies that address that issue." (EmployStats Report pp. 89, 98.) This knowledge alone could have led individuals to respond in ways that could benefit them or their CDCR and DSH peers, if CDCR's or DSH's policies or pay were to change. |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| | | Further, specific analyses were performed to address this potential issue of self-interest bias. The potential for self-interest bias is an issue that is not specific to the survey participants in this case and is routinely addressed by statistical and survey experts. The statistical results showed that there were no statistically significant differences in the responses that would be consistent with self-interest bias by the psychiatrists. | Neither the Draft Report nor the EmployStats Report present the results of any tests of statistical significance. The statistical test that is described in general terms below is impossible given the wording of EmployStats' survey instrument, which never specifically mentions the Coleman lawsuit. See response immediately below for additional explanation. |
| | | For example, in this case an analysis was performed to compare the responses of psychiatrists who had knowledge of the Coleman lawsuit to those who did not have knowledge of the Coleman lawsuit. This statistical analysis is consistent with generally accepted statistical practices when studying issues related to self interest bias. Survey experts routinely design survey questions to assess the survey participants' prior knowledge of the litigation underlying the survey. In these instances, survey and statistical experts investigate the correlation of survey responses with the individual's prior knowledge of the underlying litigation and make statistical adjustments to the findings as appropriate. | CDCR and DSH psychiatrists need not have knowledge of the Coleman lawsuit to be affected by self-interest bias. The introduction to EmployStats' survey instrument states that the survey is being conducted in order to assess psychiatrists' "work satisfaction, compensation, and environment," that CDCR and DSH "often ha[ve] difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain institutions [facilities]" and that survey responses will "provide vital information to assist policy makers in assessing and implementing policies that address that issue." (EmployStats Report pp. 89, 98.) This knowledge alone could have led individuals to respond in ways that could benefit them or their CDCR and DSH peers, if CDCR's or DSH's policies or pay were to change.

Neither the Draft Report nor the EmployStats Report present a statistical analysis or survey responses sufficient to permit independent assessment of any statistical test that may have been conducted. Neither report provides responses to any open ended questions or other data or evidence considered, that would permit indepenent evaluation of whether such a test would be statistically reliable.

EmployStats' CDCR and DSH survey questions 13a-3, 13b-1 and 14 ask respondents whether they remember hearing or reading about any lawsuit involving CDCR [DSH], and to describe what they remember about the purpose of any such lawsuit. None of the survey questions specifically mention the Coleman lawsuit. |
| | | In this case, there was no statistically significant difference between the responses of the two groups of psychiatrists. The responses of individuals who had some knowledge of the Coleman case were not statistically different from that of those who had no knowledge of the Coleman case. This finding is not consistent with self biased survey responses. | Neither the Draft Report nor the EmployStats Report present a statistical analysis or survey responses sufficient to permit independent assessment of any statistical test that may have been conducted. Neither report provides responses to any open ended questions or other data or evidence considered, that would permit indepenent evaluation of whether such a test would be statistically reliable.

EmployStats' CDCR and DSH survey questions 13a-3, 13b-1 and 14 ask respondents whether they remember hearing or reading about any lawsuit involving CDCR [DSH], and to describe what they remember about the purpose of any such lawsuit. None of the survey questions specifically mention the Coleman lawsuit. |
| Section B-2, Paragraph 2 | The survey itself strongly implies to the respondents that it is being used to analyze the adequacy of their pay. It specifically asks the psychiatrists to compare their salaries to the salary of their peers and state whether it is higher or lower. Moreover, the first page confirms its purpose is to explore the possible improvements for the jobs of the people taking the survey. On the survey's first page states that it will ask about "compensation, working conditions, and job satisfactions". | The Defendants' statements in the paragraph misstate and misrepresent the form and structure of the survey that was actually administered. The wording choice is neutral and consistent with survey general practices. Defendants assert the first page is "effectively" telling respondents there is a problem with CDCR/DSH pay, and the respondents answers would lead to salary changes; the wording of the first page does not imply there is a salary issue. The survey only says "CDCR/DSH often has difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain institutions," and makes no mention of pay. Further, Defendants did not raise the issue of potential bias in the comments they provided prior to the implementation of the survey. | The introduction to EmployStats' CDCR survey instruments states:
"EmployStats is a neutral third-party entity and is conducting this survey in order to gather data to assess CDCR Psychiatrists' work satisfaction, compensation, and environment, and assess staffing levels for Psychiatrists. In this survey we will ask you a few short questions concerning your compensation, working conditions, and job satisfaction.
As you know, the CDCR often has difficulty hiring Psychiatrists and maintaining Psychiatrist staffing levels at certain institutions. Your honest and thoughtful answers to this survey will provide vital information to assist policy makers in assessing and implementing policies that address that issue."
(EmployStats Report p. 89.)

The DSH survey instrument contains analogous language. Both clearly mention compensation and suggest that survey responses, including to questions regarding compensation, may be used to assess and implement policies addressing hiring and staffing difficulties. |

Exhibit A

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section B-3, Paragraph 1 | The survey is also biased towards negative responses for many of its questions. ... Instead, the Draft Report and survey classified anything from 1 to 4 as dissatisfied and generally disregarded, leaving only three responses as positive selections. This is particularly problematic because the survey explained to the respondents that a four would be treated as a negative rather than a positive or neutral response. And the negative bent appears to have had a real effect on the reported data. For example, if four were treated by the analysis as a midpoint or neutral, then nearly two-thirds of CDCR's respondents reported an overall job rating of neutral (4 out of 7) to very satisfied (7 out of 7). Nearly 60 percent of DSH's responding on-site psychiatrists rated their job satisfaction between neutral and very satisfied. | The Defendants are misinterpreting the survey results. The EmployStats Draft Report does not classify ratings '1' to '4' as dissatisfied. As explained in the report, a rating of '1' to '4' is classified as 'less than satisfied' and is not classified as dissatisfied as stated by the Defendant. In a rating scale with a clearly defined middle point, ratings of '1' to '3' are classified as unsatisfied/dissatisfied and ratings of '5' to '7' are classified as satisfied. The analyses present results for both 'less than satisfied' ('1' to '4' ratings) and 'unsatisfied'/'dissatisfied' (ratings '1' to '3') categories. The qualitative findings and EmployStats recommendations are consistent regardless of which category is analyzed. | The EmployStats survey instrument utilized an ambiguous response scale. It did not state how respondents should interpret "4" on a scale of "1" to "7" but it is reasonable to assume respondents would think of  "4" as "neutral." It is disingenuous to characterize "4" as "less than satisfied" particularly as the survey instrument did not clarify that "5" to "7" would be considered "satisfied" and "1" to "3" would be considered "unsatisfied." However, respondents could have interpreted each number's meaning differently, undermining the conclusions that the Draft Report and EmployStats Report draw from the survey.<br><br>The Draft Report and EmployStats Report themselves confuse this terminology. For example, Finding 8 (p. 44) states that CDCR  psychiatrists overall reported dissatisfaction with the CDCR medical assistant program although only 36.5% of respondents rated the medical assistant program between "1" and "3" (p. 45). An additional 26.5% of respondents gave the medical assistant program a neutral "4" rating. Thus CDCR psychiatrists overall did not report dissatisfaction with the CDCR medical assistant program.<br><br>More generally, the Draft Report and EmployStats Report present responses within selected groups of ratings but fail to include full survey results by individual rating (e.g., how many respondents selected "1," how many selected "2," etc.), causing much of the information inherent in complete ratings to be obscured. For example, the grouped ratings reported in the Draft Report and EmployStats Report treat "1" ("very unsatisfied") responses identically to "3" (presumably unsatisfied) responses and "7" ("very satisfied") responses identically to "5" (presumably satisfied) responses. The Draft Report's and EmployStats Report's findings that 34.1% of CDCR psychiatrists reported an overall job rating of unsatisfied (p. 32) could mean that 34.1% of respondents rated their job satisfaction as a "3" and none as a "1". |
| Section B-3, Paragraph 1 | Also, overall 63 percent of all CDCR respondents would report that their office space was neutral to completely adequate (4 to 7 out of 7). Similar changes would apply to the other responses that used this scale. Accordingly, the way the survey responses were interpreted and the way they were reported appear to be skewed to the negative. | The results are not skewed toward the negative. The percentage of employees who answered that they were satisfied can be readily obtained from the tables provided. Presenting the 'flip side' of the results has no impact on the findings or EmployStats' recommendations. | "Flipping" the results, the EmployStats survey notably found that:<br>1. Most CDCR psychiatrists reported  an  overall  job satisfaction rating of not unsatisfied (Finding 5, pp. 31-32).<br>2. The majority of CDCR psychiatrists reported that they were not unsatisfied with their overall working conditions (Finding 6, pp. 36-37).<br>3. The majority of CDCR psychiatrists reported that their office space was not inadequate (Finding 7, pp. 40-41).<br>4. The majority of CDCR psychiatrists were not dissatisfied with the CDCR medical assistant program (Finding 8, pp. 44-45).<br>5. Most CDCR psychiatrists were not unsatisfied with their professional standing within their institutions and with opportunities for promotion (Finding 9, pp. 48, 50). |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section B-4, Paragraph 1 | The Survey failed to include questions that would allow it to verify the accuracy of the responses to the salary and compensation questions, or independently verify the responses. The survey failed to explore the basis for or accuracy of some of the opinions expressed by psychiatrists in response to the survey. | Determining how the psychiatrists determined their salary benchmarks was not a goal of the survey. The survey captures CDCR and DSH psychiatrists' perceptions regarding their pay comparators and peers. How the psychiatrist determined their salary and compensation peer groups is not a goal of this study. It is expected that psychiatrists will arrive at their comparison group differently. In addition, salary verification questions were asked that allow for the statistical analysis of the salary responses. The survey logic and questions that allow for the checking of the accuracy of the survey responses are incorporated into the survey design. For example, questions that asked the psychiatrist if they were underpaid or overpaid relative to their peers were followed up with subsequent questions that asked the amount of overpayment or underpayment. | EmployStats responds that "[d]etermining how the psychiatrists determined their salary benchmarks" and "[h]ow the psychiatrist [sic] determined their salary and compensation peer groups" were not a goal of their analysis. Yet the way CDCR psychiatrists determined salary benchmarks and peer groups is highly relevant to interpretation and application of EmployStats' survey findings. EmployStats' concession that "[i]t is expected that psychiatrists will arrive at their comparison group differently" indicates the impossibility of identifying comparator groups, since the EmployStats survey did not pose that question.

Although follow-up questions asking the amount of overpayment or underpayment may confirm (or contradict) CDCR psychiatrists' perception that they were over- or underpaid, such follow-ups are uninformative about the actual pay CDCR psychiatrists received relative to non-CDCR and non-DSH psychiatrists.

According to a Harvard Business Review article, two-thirds of people paid the market rate and one-third of people paid above the market rate perceive that they are underpaid (hbr.org/2015/10/most-people-have-no-idea-whether-theyre-paid-fairly). |
| Section B-4, Paragraph 2 | The Draft Report's findings and recommendations call into question the reliability of the survey. According to the Draft Report, the survey found that CDCR and DSH psychiatrists believed that their salaries and total compensation were less than that of their peers. However, the Draft Report's comparison of CDCR and DSH salaries to those offered by other public and private employers in California revealed that since at least 2012, CDCR and DSH's salaries have been significantly higher than its competitors. In fact, the survey responses were so inconsistent with the Draft Report's own salary comparisons that the Draft Report recommended CDCR and DSH develop ways to inform their psychiatrists that the salaries they receive are higher than those of other public and private employers. This disconnect strongly suggests that the survey and its results are not reliable. | The Defendants are misinterpreting the overall finding of the study. The fact that CDCR and DSH psychiatrists are paid more than their competitors, but feel that they are paid less than their peers, is not suggestive of a disconnect, nor should it call into question the reliability of the survey. The relationship between the psychiatrists' perceptions of their salary and their actual salary indicates that their actual monetary compensation is only a component of the psychiatrists' employment conditions. Issues such as office availability, opportunities for promotion, medical practice support, and other employment conditions all impact their perception of their pay as it relates to other psychiatrists who may work in less demanding working environments. Also, it is possible, and this finding strongly indicates, that overall compensation may need to increase to account for the CDCR and DSH psychiatrist working conditions. As was also noted by the Defendants' economic experts, these compensation differentials, which are referred to as compensating wage differentials, may be required to meet mandated employment levels. | The relevant questons in EmployStats' CDCR survey are Q5 and Q6. (EmployStats Report pp. 90-92.) Q5 asks respondents to compare their salary to that of psychiatrist peers who work for other employers, only considering the amount of pre-tax money earned as a CDCR psychiatrist each month. Q6 asks respondents to compare the monetary value of their total compensation "such as salary, health benefits, retirement, federal loan forgiveness program and bonuses" to that of psychiatrist peers who work for other employers. Neither question makes any reference to employment conditions and there is no reason to believe that any respondent adjusted his or her response for employment conditions, the economy, past experience or anything else when instructed to only consider salary or compensation.

Further, it is disingenuous to suggest that "[i]ssues such as office availability, opportunities for promotion, medical practice support, and other employment conditions all impact their perception of their pay as it relates to other psychiatrists who may work in less demanding working environments" when the EmployStats Report failed to conduct any analysis that directly relates any or all of these factors to pay.

The EmployStats Report (Appendix D, p. 119) concedes that it expects respondents to determine their salary and compensation peer groups differently. There is no evidence or basis to conclude that survey respondents on average compared their compensation to other psychiatrists working in less demanding working environments.

Contrary to EmployStats' misleading assertion, Defendants' economic experts did not find that compensation differentials may be required to meet mandated employment levels. Both the EI Report and the EI Response reached the opposite conclusion. The EI Report's statistical analysis provided evidence that increases in CDCR's salary premium or "compensating wage differential" did not generate sustained improvements in employment outcomes. (EI Report pp. 32-36.) The EI Response noted that the Draft Report's own evidence indicated that substantial "compensating wage differentials" at CDCR failed to generate desired employment outcomes in the years it analyzed. (EI Response pp. 7-8.) |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section B-5 | The Survey failed to ask many important questions. | The proposed additional questions by Defendants do not change the findings of the report. For example, Defendants state that the survey did not ask for any information regarding why the psychiatrists feel their opinion is not valued by others. This question would not change the Draft Report's finding that the psychiatrists were less than satisfied with how their opinions are valued by others. The survey questions were discussed with both parties prior to implementation. As is consistent with generally accepted survey methodology, limiting the number of questions increases survey participation. Some of the questions that they raise can be done by a separate survey that Defendants perform at a later date if they so desire. They also did not raise any objections or suggest these questions when they submitted their responses to the survey instrument. | EmployStats has no basis to claim that questions that it did not ask and responses that it therefore does not have would "not change the findings of the report." This may be particularly true of open ended questions such as both Plaintiffs and Defendants requested. |
| Section C-1, Paragraph 1 | EmployStats agrees Defendants already offer higher salaries than other public and private employers -The recommendation ignores the already existing higher salaries offered by CDCR and DSH. | Defendants' statements are incorrect. The higher salaries are not ignored. The focus of the analysis is on salary increases. EmployStats acknowledges the salary levels that CDCR and DSH currently have, and Defendants recognize that the Draft Report provides an analysis of the salary levels. The recommendation regarding salary increases does take the salary levels into account. In addition, as was also noted by the Defendants' economic experts, compensating wage differentials may be required to meet mandated employment levels. | The Draft Report and EmployStats Report fail to show how the recommendation regarding salary increases accounts for salary levels. The Draft Report's and EmployStats Report's salary increase analysis comparing CDCR and DSH to other employers does not account for CDCR's and DSH's higher initial baseline salaries. It fails to compare salary increases at CDCR and DSH to salary increases of psychiatrists earning similar salaries and employed elsewhere.

The Draft Report's and EmployStats Report's specific recommendation is to "[p]rovide a system of consistent and larger salary increase opportunities for psychiatrists throughout their employment tenure at CDCR and DSH." (EmployStats Report, p. 5.) As discussed in the EI Response (pp. 12-14), the Draft Report and EmployStats Report do not clarify what is meant by "throughout their employment tenure." The only relevant analysis reports salary perceptions of surveyed psychiatrists with more veruss less than 10 years of tenure. The Draft Report and EmployStats Report fail to provide a more detailed, informative analysis by years of tenure even though EmployStats' survey collected the information to do so. Both reports also fail to compare tenure-based salary increases at CDCR and DSH to those at other employers.

The EI Report, Draft Report and EmployStats Report all find that improved CDCR psychiatrist employment outcomes following salary increases are short-lived. (EI Response pp. 8-9.)

Contrary to EmployStats' misleading assertion, Defendants' economic experts did not find that compensation differentials may be required to meet mandated employment levels. Both the EI Report and the EI Response reached the opposite conclusion. The EI Report's statistical analysis provided evidence that increases in CDCR's salary premium or "compensating wage differential" did not generate sustained improvements in employment outcomes. (EI Report pp. 32-36.) The EI Response noted that the Draft Report's own evidence indicated that substantial "compensating wage differentials" at CDCR failed to generate desired employment outcomes in the years it analyzed. (EI Response pp. 7-8.) |
| Section C-2 | The Draft Report fails to consider and compare total compensation between Defendants and other California Employers. | Defendants did not provide information on the value of the individual psychiatrists' total compensation. EmployStats requested total compensation data, reflecting actual benefit amounts that Defendants pay the psychiatrists. Without this information that EmployStats requested, this analysis cannot be performed. | The EI Report (pp. 20-21) utilized CDCR data on salary and certain benefits (Staff Psychiatrist Salary 6-18-18 v2.xlsx) from mid-2016 through mid-2018. If this data was provided to EmployStats, they should have utilized it to the extent possible even if it does not include every single item included in total compensation. |

Exhibit A

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section C-3, Paragraph 2 | The Draft Report fails to point to any accepted economic literature, study or objective evidence to support the efficacy of this recommendation. | The Draft Report shows that the CDCR and DSH psychiatrists receive lower salary increases than psychiatrists at other California employers, the economic literature outlined below shows that a system of salary increases have a positive impact on employee retention rates. It is generally accepted that salary increases are related to higher retention rates, as shown by these and numerous other studies. In addition, the Defendants' economic study showed that in years where there was an increase the retention rate also increased (as measured by the fill rate). The relationship between salary increases, job retention, and hiring is not controversial in the field of economics. | The three articles that the EmployStats Report's Appendix D cites below do not support its contention that salary increases - irrespective of relative salary *levels* - are related to higher retention rates. In fact, the articles uniformly find that higher pay *levels*, such as CDCR psychiatrists have consistently enjoyed relative to psychiatrists employed elsewhere, are likely to enhance retention. The relationship between salary levels, job retention and hiring is not controversial in the field of economics. None of these articles examine the relationship between competing employers' comparative rates of salary increases and hiring or retention.

The EmployStats Report mischaracterizes the EI Report, which did <u>not</u> find that salary increases and retention (filled positions) increases occurred in the same years. The EI Report analyzed CDCR salary premiums relative statewide and nationwide averages for employed psychiatrists, and found that higher CDCR salary premiums were not associated with greater fill rates, nor were they associated with increased hiring gains or fewer losses. (EI Report, pp. 32-36.) |
| | | For example, in Voluntary turnover and job performance: Curvilinearity and the moderating influences of salary growth and promotions by Trevor, Gerhart, & Boudreau (1997), the paper analyzed the relationship between voluntary turnover and job performance, finding that high turnover among the highest and lowest performing employees. Importantly, the paper found that salary growth and turnover were very highly correlated, especially for the highest performing employees. The paper found that higher salary growth was a critical factor in predicting lower turnover, whereas low salary growth predicted higher turnover. | Trevor et al. (1997) analyze the relationship between salary growth turnover at a single employer, <u>controlling for salary level</u>. That is, they compare the relationship of salary growth and turnover among employees earning the same salary. The EmployStats Report does not control for psychiatrists' salary level, which is higher at CDCR than at other employers, when it compares salary increases. Its finding that CDCR psychiatrists received lower salary increases than psychiatrists employed elsewhere is uninformative about psychiatrists employed elsewherewho earn salaries comparable to those at CDCR. Such individuals may experience similar or lower salary increases than CDCR psychiatrists.

Trevor et al. (1997) find the strongest relationship between salary growth and turnover among top performers. The associaton is much less pronounced for average and poor performers, who constitute the large majority of employees in their analysis.

Additionally, Trevor et al. (1997) is based on data from 1983 through January 1, 1990, more than 30 years ago, and there is no evidence its findings apply in the present context. |
| | | In another article, The effects of pay level on organization-based self-esteem and performance: A field study, by Gardner, Van Dyne, & Pierce (2010), concluded that an employee's pay was not only a motivating factor in productivity, but also an effective retention strategy. The paper collected field study data and assessed how an employee's given pay level affected the employee's subsequent self-esteem and performance. The paper found a statistically significant increase in an employee's tenure at a firm after an employee received higher pay. | [We cite to this paper as Gardner et al. (2004) because it was published in 2004 not 2010. 2010 is the date the publication was put online.]

The EmployStats Report's statements that a) Gardner et al. (2004) conclude that an employee's pay was an effective retention strategy and b) this paper found a statistically significant increase in an employee's tenure at a firm after receiving higher pay are incorrect. This paper does not analyze the effect of pay on either employee retention or tenure.

Gardner et al. (2004) seek to analyze factors that link high pay *levels*, and not salary increases, to high performance. The article posits that pay level communicates more to employees about their value to the firm than the information conveyed by a single change in pay (such as a pay increase), as a single change in pay may be influenced by numerous external factors including the overall health of the economy, union negotiations, inflation and other non-value-based factors. |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| | | In another article, So Hard to Say Goodbye? Turnover Intention among U.S. Federal Employees by Pitts, Marvel, & Fernandez (2011), an employee's perceived relative pay and opportunity for pay increases was a motivating factor for public employees voluntarily leaving federal service. The paper collected survey data from the 2006 Federal Human Capital Survey, and on federal employees who voluntarily left federal service. The paper found that one of the reasons employees left federal government service was perceived pay disparities, and the authors recommended increases in pay as part of a strategy to boost retention in the Federal Civil Service. | Pitts et al. (2011) cite extensive literature finding that higher pay *levels* , not comparative rates of salary increases, reduce quit rates. As both the EmployStats Report and the EI Report find, CDCR psychiatrists have consistently been paid significantly higher salaries than psychiatrists employed elsewhere in California or broader geographic areas.<br><br>The EmployStats Report additionally micharacterizes Pitts et al. (2011). The article analyzes data relating to intention to leave, not whether employees actually left, and finds that satisfaction with pay level is negatively related to intention to leave the job. Its recommendations are silent regarding pay increases to boost retention, possibly because it found a substantively small impact of pay satisfaction on intention to leave. |
| Section C-3, Paragraph 3 | The Draft Report compares Defendants' yearly salary increases to the salary increases of other employers, but it does not provide any evidence showing that the employers with higher salary increases are able to hire and retain psychiatrists or if their higher average salary increases resulted in hiring additional psychiatrists to meet those employers' needs. | The research supports the finding that higher salary increases are linked with retention, as described above, in articles such as Voluntary Turnover and Job Performance, The Effects of Pay Level on Organization-based Self-esteem and Performance, So Hard to Say Goodbye? Turnover Intention among U.S. Federal Employees. The additional analysis that the Defendant proposes is outside the scope of this project and does not impact EmployStats' recommendations and findings. Such an analysis could be done at a later point if it is so desired. | The three articles to which the EmployStats Report cites in Appendix D (pp. 122-123) do not support its contention that salary increases - completely ignoring relative salary levels - are related to higher retention rates. In fact, the articles uniformly find that higher pay levels, such as CDCR psychiatrists have enjoyed and continue to enjoy relative to psychiatrists employed elsewhere, are likely to enhance retention.<br><br>The additional analysis that the EmployStats Report asserts is outside the scope of this project is highly relevant to interpretation of its findings. The EmployStats Report lacks evidence suggesting a causal relationship between salary increases and retention. If employers with salary increases larger than CDCR's in recent years have not experienced enhanced retention as a result of the increases, there is no reason to expect that the opposite would occur at CDCR.<br><br>We find the EmployStats Report's misinterpretations of the literature to be severely damaging to its findings and recommendations. |
| Section C-3, Paragraph 3 | Also, the California Correctional Health Care Services Exit Survey and Exit Interview Analysis, First Quarter Report actually found the opposite to be true for physicians, including psychiatrists. | The Defendants' interpretation is incorrect. The Exit Survey that Defendants reference does not ask any question related to salary increases. The exit survey provided respondents the opportunity to select their top five reasons that most influenced the respondents' reason for leaving. The options included family reasons, looking for more career advancement opportunities, and worksite conditions. There is no option for psychiatrists to indicate a reason for leaving relating to salary increases. Additionally, the Exit Survey asks if the respondent felt their salary was appropriate. The Exit Survey does not ask the respondent about how they felt about their salary increases. | The Exit Survey (Table 2, p. 14) provided respondents the opportunity to select up to five reasons that most influenced their decision to leave and included "Looking for a higher salary" among the options. It accounted for only 5.2% of the responses.<br><br>While the EmployStats Report is correct that the Exit Survey asks whether individuals sought a higher salary, as opposed to whether they were leaving because of insufficient salary increases, it has still not provided evidence that salary increases, *irrespective of salary levels* , drive retention. As the Draft Report, EmployStats Report and EI Report all conclude, CDCR psychiatrists have consistently been paid substantially higher salaries than psychiatrists employed elsewhere. |
| Section C-3, Paragraph 4 | The Draft Report failed to show that the salaries of the other employers and the salary increases were sufficiently similar to CDCR and DSH's salaries and increases to be reliable comparators. While the Draft Report provides the average yearly salary increases for ten different public employers, it does not state the actual yearly salaries offered by those employers. This is problematic because it is possible that the other employers' salaries were not competitive with the much higher salaries already offered by CDCR and DSH. | This level of analysis is not necessary and has no impact on EmployStats recommendations and findings. This is especially evident in light of the salary increase data that shows that the vacancy rate falls when the average salary increase paid to psychiatrists increases. As shown in Table 1 b of the Draft Report, in the years where the psychiatrists received a salary increase such as 2015 and 2017, CDCR experienced a lower vacancy rate than 2016 where they did not receive a salary increase. Further, in the years where the average salary increase percentage increased, the CDCR psychiatrist vacancy rate decreases. Defendants' comments do not change the findings of this report. | Figure 1 and Table 1b of the Draft Report and EmployStats Report (pp. 14, 17) contain evidence to the contrary. Table 1b shows that CDCR psychiatrists received a salary increase in four out of five recent years. In the two years when the increase was larger (4.8% in 2013, 5.1% in 2017) the vacancy rate was *higher* than the two years when the increase was lower (2% in 2014 and 2015). Figure 1 shows that in 2018 the vacancy rate among CDCR staff psychiatrists reverted to its 2016 level of 33-34%, despite a 3% general salary increase at CDCR in July 2017 followed by a 2% general salary increase in July 2018, undercutting the Draft Report's and EmployStats Report's assertions about the alleged relationship between salary increases and the vacancy rate. (EI Response, p. 9.)<br><br>The Draft Report and EmployStats Report provide no analysis of the vacancy rate controlling for concurrent factors other than salary. Such factors include the supply of psychiatrists available to fill open positions, CDCR/DSH salary levels, other employers' salary levels, working conditions and general economic conditions, among others. |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| | | | The Draft Report's and EmployStats Report's use of annual averages in Table 1b masks large within-year changes in vacancy rates and ignores the timing of CDCR's pay increases. As shown in the EI Report, CDCR's 2014, 2015 and 2017 pay increases all occurred midyear (EI Report pp. 18-19). If CDCR employees and prospective employees were unaware of the pay increases prior to their occurrence, vacancy rates in the months prior to the increases should not be included in a comparison of vacancy rates to salary increases. |
| | | | The data shown in EI Report Figure [A] (p. 15) indicate that the average vacancy rate from January through June 2015 was 17.2% and the average vacancy rate from July through December 2015 was 28.0%. (The EI Report's average for all of 2015 is 22.6%, similar to the 22.5% presented in the Draft Report and EmployStats Report Table 1b.) The vacancy rate was 63% higher in the six months following the 2015 pay increase, again undercutting the Draft Report's and EmployStats Report's assertions about the alleged relationship between salary increases and the vacancy rate. |
| | | | It is reasonable to expect that individuals' employment decisions occur with a lag following pay changes. If so, the salary change in a given year is plausibly more closely related to vacancy rates in the year following the change. Under this assumption, CDCR salary increases in 2013 and 2014 were followed by modest decreases in the vacancy rate in subsequent years, the 2015 salary increase was followed by a large increase in the vacancy rate, and the unchanged salary in 2016 was followed by a large decrease in the vacancy rate in 2017. (Draft Report and EmployStats Report Table 1b, p. 17.) This data pattern undercuts the Draft Report's and EmployStats Report's assertions about the alleged relationship between salary increases and the vacancy rate. |
| Section C-3, Paragraph 5 | In addition, the Draft Report also fails to state the nature of the yearly salary increases offered by the other employers and justify the comparison. The Draft Report does not state whether the ten non-CDCR employers to which CDCR is compared offered their salary increases as part of a one-time contract, if they were part of a yearly salary structure, or they were part of yearly salary increases set to expire after a certain amount of time. This is important because it shows that the Draft Report failed to understand the state's overall pay structure that includes salary ranges, maximum salaries, and increases and changes to salary through the collective bargaining process. For example, the Draft Report completely ignores the 5 percent yearly merit pay increase that all psychiatrists are already eligible to receive until they reach the top of their respective salary range. | The Defendants misunderstand the Draft Report's analysis of CDCR and DSH salary increases. The State's overall pay structure is understood, and the increases such as the merit increase or those detailed in the CBAs are accounted for in the analysis. The analysis uses the actual salary increases that the CDCR, DSH, and non-CDCR and non-DSH psychiatrists received, and reflects both the state and comparator's pay structure appropriately and incorporates the underlying structures of the pay increases. | |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section D, Paragraph 2 | The Draft Report does not provide any study or evidence to show that pay differentials have been successful in attracting psychiatrists to the Central Valley and to other employers in the Central Valley. | The Draft Report provides clear evidence that CDCR employed psychiatrists located in the Central Valley are generally less satisfied than psychiatrists in other areas of California. The salary increase tables show that the vacancy rates are the highest when the salary increases are the lowest. Figure 2 in the Draft Report actually shows the vacancy rates in the Central Valley decreased by more than 5 percentage points from 2016 to 2017 when the average salary increase for CDCR went from 0% to 5.1% from 2016 to 2017 as shown in Table 1b of the Draft Report. The issue of compensating wage differential is not controversial in the field of economics and was also noted by the Defendants' economic experts in their report. | Figure 1 and Table 1b of the Draft Report and EmployStats Report (pp. 14, 17) contain evidence to the contrary. Table 1b shows that CDCR psychiatrists received a salary increase in four out of five recent years. In the two years when the increase was larger (4.8% in 2013, 5.1% in 2017) the vacancy rate was higher than the two years when the increase was lower (2% in 2014 and 2015). Figure 1 shows that in 2018 the vacancy rate among CDCR staff psychiatrists reverted to its 2016 level of 33-34%, despite a 3% general salary increase at CDCR in July 2017 followed by a 2% general salary increase in July 2018, undercutting the Draft Report's and EmployStats Report's assertions about the alleged relationship between salary increases and the vacancy rate. (EI Response, p. 9.)

EmployStats misreads its own Figure 2 (Draft Report and EmployStats Report, p. 15). Vacancy rates in the Central Valley *increased* from 2016 to 2017 when the average salary increase for CDCR went from 0% to 5.1%. (Draft Report and EmployStats Report Table 1b, p. 17.) Figure 2 and Table 1b also indicate that Central Valley vacancy rates were flat from 2013 to 2014, when CDCR's average salary increase went from 4.8% to 2%, and Central Valley vacancy rates decreased from 2014 to 2015, when CDCR's average salary increase was unchanged. These additional facts support Defendant's assertion that the Draft Report and EmployStats Report do not provide evidence showing that pay differentials have been successful in attracting psychiatrists to the Central Valley. Furthermore, both EmployStats reports and the Special Master's report all note the "finding" that vacancy rates are twice as high at CDCR institutions in the Central Valley compared to those outside the Central Valley. But this is only true in 2018 and not in any of the other six years (2012-2017) reported in Figure 2 of the EmployStats Report. In fact, according to Figure 2 CDCR Central Valley vacancy rates were lower than CDCR vacancy rates outside the Central Valley in 2012 and 2013 and equal in 2016. The "finding" is belied by EmployStats' own evidence. |
|  |  |  | EmployStats again makes a misleading assertion regarding Defendants' economic expert's report and compensation differentials. Both the EI Report and the EI Response "noted" them only to conclude that compensation differentials have not generated sustained improvements in employment outcomes, as is confirmed by the Draft Report's and EmployStats Report's own evidence. (EI Report pp. 32-36, EI Response pp. 7-8.) |
| Section D, Paragraph 3 | The Draft Report's reliance on the dissatisfaction reported by existing psychiatrists in the Central Valley is insufficient to justify the recommendation. As previously stated, the Draft Report is limited to CDCR and DSH psychiatrists. | An analysis of non-CDCR and non-DSH psychiatrists as proposed by the Defendants is outside of the scope of this report and does not impact EmployStats recommendations or findings. The Draft Report's focus is on the psychiatrists employed by CDCR and DSH. | The EI Report shows that CDCR facilities located in the Central Valley have consistently paid more than other employers in their respective metropolitan areas (Figure [E], pp. 21-22.) EI's analysis further suggests that if CDCR and DSH follow the recommendation in the Draft Report EmployStats Report and offer a system of pay differentials for the Central Valley, the likely result would either be a bidding war or minimal employment gains, depending on how satisfied non-CDCR and non-DSH psychiatrists are in their current positions. |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section D, Paragraph 4 | The available evidence appears to suggest that a strict Central Valley pay differential may not be as successful as suggested...In the absence of support and analysis showing the efficacy of differential pay, it is unclear whether it would be an effective path for hiring new psychiatrists and retaining existing psychiatrists. The Draft Report does not offer any evidence or analysis supported by economic literature or findings to contradict any of those findings. | This is a fundamental disagreement. The data and economic literature cited in the Draft Report and in the responses above shows clearly that paying additional differentials is a way to increase fill rates. The Defendants' own economic analysis clearly illustrates the need of introducing a pay differential for places like the Central Valley. The Defendants' economists highlight the fact that CDCR and DSH psychiatrists favor working in areas that are not similar to the Central Valley. Furthermore, the Defendants' economists' analysis and report argue that increases to pay will cause a bidding war, because people prefer living in urban areas. The Defendants' own observations indicate clear support for a differential to lessen the impact of psychiatrists' living preferences. | EI agrees that this is a fundamental disagreement. The Draft Report and EmployStats Report provide neither data nor literature supporting that paying additional differentials is likely to increase fill rates. Other than Table 9 (CDCR, p. 28) and Table 37 (DSH, p. 72) which show that both CDCR and DSH psychiatrists earn substantially more than psychiatrists employed elsewhere in the state or region, neither the Draft Report nor the EmployStats Report analyze pay differentials.

The EmployStats Report's assertion that Defendants' economic analysis clearly illustrates the need of introducing a pay differential for places like the Central Valley is again erroneous and misleading. Both the EI Report and the EI Response "noted" compensation differentials only to conclude that they have not generated sustained improvements in employment outcomes, as is confirmed by the Draft Report's and EmployStats Report's own evidence. (EI Report pp. 32-36, EI Response pp. 7-8.)

The EI Response specifically notes that bidding wars are particularly likely to arise in rural areas such as the Central Valley where psychiatrist shortages are more pronounced, and that psychiatrists with jobs and families in urban areas are unlikely to want to move to the Central Valley *even with significant salary premiums* because of their pre-existing preferences. Concurrently, psychiatrists already employed in the Central Valley are more likely to switch between local employers even with small salary differentials because they do not experience high job-switching costs. (EI Response, p. 29, emphasis added.) This is not an argument for a differential. The only end a reasonable differential is likely to accomplish is job switching among psychiatrists in the Central Valley, with minimal additions to their ranks, especially if employers in urban locations are able to match the salary increases offered in Central Valley locations.

The Draft Report and EmployStats Report provide no analysis nor does either report cite to any literature on the existence or likelihood/unlikelihood of bidding wars. |
| Section E, Paragraph 1 | Defendants are always interested in exploring reasonable ways to increase the amount and quality of office and treatment space and staff support resources, and welcome the opportunity to review their existing office and treatment space and support programs. However, the recommendation fails to recognize that CDCR and DSH may already have a solution to this challenge in telepsychiatry...Telepsychiatry may have any even great impact if it is able to alleviate some of the greater emotional and cognitive demands the Draft Report states are on prison psychiatrists. But the Draft Report did not provide that analysis. | Defendants' suggestion assumes that the psychiatrists working in telepsychiatry would not work in any other capacity, such as an on-site staff psychiatrist. It is possible that telepsychiatry could lead to a drain of on-site psychiatrists, and might not increase the overall staffing levels of psychiatrists. The Defendants' assumption overstates the potential impact of telepsychiatry on vacancy rates. | As discussed in the EI Report (p. 26), CDCR data indicate that the telepsychiatry program has not grown at the expense of civil service positions. The two programs expanded simultaneously during the period analyzed (mid-2016 through early 2018) although growth of CDCR's telepsychiatry program was more rapid. The faster growth of the telepsychiatry program indicates that it could be effective at overcoming non-monetary factors that impair civil-service hiring, such as a distaste for working in prison environments or relocation to undesirable employment locations. |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section E, Paragraph 2 | The Draft Report also did not analyze all available information in making its recommendation. The recommendation is entirely based on the survey responses and does not contain any objective analysis of DSH or CDCR's existing office and treatment space at its institutions. Significantly, EmployStats did not even visit any of DSH or CDCR's facilities or analyze available office or treatment space compared to the needs of the staff and mental health populations in DSH and CDCR's facilities. | The analyses suggested by Defendants are not necessary. EmployStats had numerous detailed discussions with members of the Special Master team who are very familiar with CDCR and DSH office space. Defendants' suggestions do not have an effect on the Draft Report's findings that CDCR and DSH employed psychiatrists are less than satisfied with their office space and work environment. It is outside the scope of a Labor Economist to determine the office space needs of psychiatrists. | |
| Section E, Paragraph 3 | The recommendation also leaves out potentially valuable information gathered by the survey. The survey asked each psychiatrist to identify the facility at which he or she is employed. However, the Draft Report does not analyze the data based on the respondents' facility - a question asked by the survey - and identify those facilities where psychiatrists report better or worse office space. | The Defendants' criticism is not accurate. The Draft Report utilizes the respondent's facility in the analysis of both salary and working conditions, and presents these findings in the report. The Draft Report identifies the facilities in the Central Valley as facilities where the psychiatrists report lower satisfaction with office space conditions. | |
| Section F, Paragraph 1 | The Draft Report fails to state whether they asked existing administrative staff about any efforts they have made in the past to improve or address these particular issues or analyzed any existing programs. Due to the Draft Report's failure to analyze any existing programs, it does not explore through its survey or otherwise, any improvements that could be made to those existing programs. | Defendants' critique does not have an effect on the findings of the Draft Report on the current level of dissatisfaction of CDCR and DSH employed psychiatrists. Defendants are able to use knowledge of past programs as they prepare and adopt the recommended programs. | |
| Section G, Paragraph 1 | In addition to being overly vague, the Draft Report fails to analyze whether or not any of its recommendations would actually improve CDCR and DSH's ability to hire and retain psychiatrists to treat Coleman class members. | EmployStats disagrees with this contention. The analysis speaks directly to this point. | Neither the Draft Report nor the EmployStats Report articulate any clear metrics about how high a salary increase is needed or what fill rate they expect subsequent to such an increase. |
| Section G, Paragraph 1 | It only claims that the recommendations "could" help with hiring and retention. (Draft Report at 6-7.) It fails to provide any objective evidence, study, or economic literature showing that the recommendations can be effective in helping CDCR and DSH actually recruit and retain psychiatrists. | Defendants' critique fails to account for widespread objective evidence and studies demonstrating that salary increases and pay differentials are linked to increased hiring and retention of employees. The articles cited above are just a small fraction of the economic literature on the subject. The Draft Report's recommendations provide the Special Master and the Court with areas that should be addressed in order to ameliorate the difficulties in hiring and retention of psychiatrists. | EI agrees that pay differentials are linked to increased hiring and retention. CDCR has consistently offered psychiatrists substantially greater pay and overall compensation than other employers. EI respectfully disagrees with EmployStats' other contentions for numerous reasons stated above. Additionally, neither the Draft Report nor the EmployStats Report articulate any clear metrics about how high a salary increase is needed or what fill rate they expect subsequent to such an increase. |

Exhibit A

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| | | Defendants' response also does not account for the evidence presented in the Draft Report that shows the vacancy rate falls when the average salary increase paid to psychiatrists increases. As shown in Table 1b of the Draft Report, in the years where the psychiatrists received a salary increase such as 2015 and 2017, CDCR experienced a lower vacancy rate than 2016 where they did not receive a salary increase. Further, in the years where the average salary increase percentage increased, the CDCR psychiatrist vacancy rate decreases. | Figure 1 and Table 1b of the Draft Report and EmployStats Report (pp. 14, 17) contain evidence to the contrary. Table 1b shows that CDCR psychiatrists received a salary increase in four out of five recent years. In the two years when the increase was larger (4.8% in 2013, 5.1% in 2017) the vacancy rate was *higher* than the two years when the increase was lower (2% in 2014 and 2015). Figure 1 shows that in 2018 the vacancy rate among CDCR staff psychiatrists reverted to its 2016 level of 33-34%, despite a 3% general salary increase at CDCR in July 2017 followed by a 2% general salary increase in July 2018, undercutting the Draft Report's and EmployStats Report's assertions about the alleged relationship between salary increases and the vacancy rate. (EI Response, p. 9.)

The Draft Report and EmployStats Report provide no analysis of the vacancy rate controlling for concurrent factors other than salary. Such factors include the supply of psychiatrists available to fill open positions, CDCR/DSH salary levels, other employers' salary levels, working conditions and general economic conditions, among others. |
| | | | The Draft Report's and EmployStats Report's use of annual averages in Table 1b masks large within-year changes in vacancy rates and ignores the timing of CDCR's pay increases. As shown in the EI Report, CDCR's 2014, 2015 and 2017 pay increases all occurred midyear (EI Report pp. 18-19). If CDCR employees and prospective employees were unaware of the pay increases prior to their occurrence, vacancy rates in the months prior to the increases should not be included in a comparison of vacancy rates to salary increases. |
| | | | The data shown in EI Report Figure [A] (p. 15) indicate that the average vacancy rate from January through June 2015 was 17.2% and the average vacancy rate from July through December 2015 was 28.0%. (The EI Report's average for all of 2015 is 22.6%, similar to the 22.5% presented in the Draft Report and EmployStats Report Table 1b.) The vacancy rate was 63% higher in the six months following the 2015 pay increase, again undercutting the Draft Report's and EmployStats Report's assertions about the alleged relationship between salary increases and the vacancy rate. |
| | | | It is reasonable to expect that individuals' employment decisions occur with a lag following pay changes. If so, the salary change in a given year is plausibly more closely related to vacancy rates in the year following the change. Under this assumption, CDCR salary increases in 2013 and 2014 were followed by modest decreases in the vacancy rate in subsequent years, the 2015 salary increase was followed by a large increase in the vacancy rate, and the unchanged salary in 2016 was followed by a large decrease in the vacancy rate in 2017. (Draft Report and EmployStats Report Table 1b, p. 17.) This data pattern undercuts the Draft Report's and EmployStats Report's assertions about the alleged relationship between salary increases and the vacancy rate. |
| Section G, Paragraph 4 | The Draft Report does not dispute the severe shortage of psychiatrists in California, nor does it show how any of its recommendations will be effective in this environment. | EmployStats disagrees with this contention. The analysis speaks directly to this point. | With the exception of the brief discussion of the EI report, the word "shortage" appears exactly zero times in either the Draft Report or the EmployStats Report. The Draft Report and EmployStats Report implicitly acknowledge that a shortage exists with their assertion that it is not clear that expanding the use of telepsychiatry will help CDCR alleviate psychiatrist shortages. (EmployStats Report p. 64.) |
| Section G, Paragraph 6 | The Draft Report also misses a threshold concept—namely, that the demand for psychiatry services continues to grow throughout the population, while the supply of psychiatrists is decreasing at a critical rate. | This economic situation does not change EmployStats recommendations or findings. | Despite the fact that the purpose of the Draft Report and the EmployStats Report is to conduct a labor market and salary analysis of CDCR and DSH, this reponse appears to suggest that demand and supply in the market for psychiatrist services are irrelevant to the Reports' recommendations and findings. An economic analysis of the labor market and compensation cannot be divorced from supply of and demand for the services being analyzed.

Sections II(A) through II(C) of the EI Report document increased demand for, and a shortage in the supply of, psychiatrist services nationwide, within California and at CDCR. |

| Defendants' Response to EmployStats Draft Report | Defendant's Criticism | EmployStats Response | EI Response to EmployStats |
|---|---|---|---|
| Section H | The Draft Report's recommendations are too vague and ambiguous to adopt. | The Draft Report's purpose is to conduct a labor market and salary analysis of CDCR and DSH. The Draft Report provided general recommendations as appropriate, and provided sufficient information for policy and decision makers with more advanced knowledge of details specific to CDCR and DSH to make implementation decisions. | Absent evidence that a recommended course of action will effectuate specific outcomes, there is no reliable basis for the recommendations. |
| Section I | The Draft Report's recommendations for DSH go far beyond the bounds of the Coleman litigation and DSH's involvement in that litigation. The Draft Report's recommendations for DSH are for the entirety of DSH. But DSH's involvement in this litigation is much more limited and such broad requirements would go beyond the Court and Special Master's jurisdiction. | The Draft Report's purpose is to conduct a labor market and salary analysis of CDCR and DSH. The Draft Report provided general recommendations as appropriate, and provided sufficient information for policy and decision makers with more advanced knowledge of details specific to CDCR and DSH to make implementation decisions. | Absent evidence that a recommended course of action will effectuate specific outcomes, there is no reliable basis for the recommendations. |