1   SHAWNA BALLARD, State Bar No. 155188
    KATE FALKENSTIEN, State Bar No. 313753
2   Reichman Jorgensen LLP
     100 Marine Parkway, Suite 300
3    Redwood Shores, CA  94065
     Telephone:  (650) 623-1401
4    Fax:  (650) 623-1449
     E-mail:  sballard@reichmanjorgensen.com
5            kfalkenstien@reichmanjorgensen.com
    *Attorneys for Plaintiff-Intervenor Christopher Lipsey*
6
7   XAVIER BECERRA                          ROMAN M. SILBERFELD, State Bar No. 62783
    Attorney General of California          GLENN A. DANAS, State Bar No. 270317
8   MONICA N. ANDERSON                      ROBINS KAPLAN LLP
    Senior Assistant Attorney General        2049 Century Park East, Suite 3400
9   ADRIANO HRVATIN                          Los Angeles, CA 90067-3208
    Supervising Deputy Attorney General      Telephone:  (310) 552-0130
    ELISE OWENS THORN, State Bar No. 145931  Fax:  (310) 229-5800
10  TYLER V. HEATH, State Bar No. 271478     E-mail:  RSilberfeld@RobinsKaplan.com
    KYLE A. LEWIS, State Bar No. 201041     *Special Counsel for Defendants*
11  LUCAS HENNES, State Bar No. 278361
    Deputy Attorneys General
12   1300 I Street, Suite 125
     P.O. Box 944255
13   Sacramento, CA 94244-2550
     Telephone:  (916) 210-7323
14   Fax:  (916) 324-5205
     E-mail:  Lucas.Hennes@doj.ca.gov
15  *Attorneys for Defendants*

16              IN THE UNITED STATES DISTRICT COURT

17            FOR THE EASTERN DISTRICT OF CALIFORNIA

18                      SACRAMENTO DIVISION

19

20

21  **RALPH COLEMAN, et al.**              Case No. 2:90-cv-00520 KJM DB P

22                          Plaintiffs,   **JOINT      DISCOVERY      DISPUTE
                                          STATEMENT**
23       v.
                                          Judge:       Hon. Kimberly Mueller
24  **GAVIN NEWSOM, et al.,**              Action Filed: April 23, 1990

25                          Defendants.

26

27

28

1

## **FULL DISCOVERY REQUEST AT ISSUE**

2          The discovery request at issue in this statement is Plaintiff-intervenor Christopher Lipsey's

3    first Request for Production, requesting production of:

4          All complaints submitted by inmates in any CDCR institution to Defendants or other
           current or former CDCR employees or officers, regarding the Guard One system, the
5          welfare check program, night-time noise, or sleep deprivation.

6    Defendants responded as follows:

7

8          Defendants object to this request on the grounds that it is overbroad and exceeds
           the permissible scope of discovery under the Court's order. (*See* ECF No. 6487 at 3
9          ["Lipsey may intervene for the limited purpose of addressing his claim that Guard One
           causes sleep deprivation in violation of the Eighth Amendment to the United States
10         Constitution."]; *see also id.* at 4 ["the court hereby GRANTS Lipsey and his counsel the
           right to conduct limited discovery to obtain information from which to identify the
11         administrative complaints filed by both *Coleman* class members and non-class member
           inmates related to the use of Guard One at all CDCR institutions where it is currently in
12         use"].) Lipsey's request regarding "night-time noise" or "sleep deprivation" is outside the
           scope of the order, and his request seeking documents as far back as seven years ago is
13         irrelevant to the question of whether Guard One is *currently* causing sleep deprivation.
           This renders Lipsey's request disproportionate to the needs of Lipsey's limited claim and
14         is objectionable. Defendants further object to this request on the grounds that it is unduly
           burdensome, harassing, and oppressive. As stated on the record by defense counsel
15         during the February 26, 2020 status conference, and as supported by the attached
           declaration of S. Pulley, CDCR cannot specifically identify which appeals were related to
16         Guard One without manually pulling and reading each appeal individually from over
           100,000 inmates' records statewide. (*See* Pulley Decl. ¶¶ 2-3.) Depending on the volume
17         of appeals to be manually checked at each institution, as set forth in the attached
           declaration, such a search cannot reasonably be completed in the timeframe provided by
18         the Court. (*Id.* at ¶ 3.) Such an assignment would further distract Defendants' daily
           obligation to provide adequate mental health services to over 30,000 class members.
19         Defendants also object to this request to the extent it seeks personal or private identifying
           information about inmates who may or may not be class members in this case and from
20         whom Lipsey has failed to obtain a waiver to disclose such information.
21
22         Without waiving these objections, and subject to the limitations Lipsey agreed to
           during the parties' March 3, 2020 meet-and-confer telephone call, after a reasonable
23         search and diligent inquiry, Defendants were able to locate several appeals from
           California State Prison, Corcoran, specifically concerning Guard One from 2014-2020.
24         Those responsive appeals are attached as Exhibit A. If Defendants locate further
           responsive documents, they will supplement their response to this request.
25

26

27

28

## PLAINTIFF-INTERVENOR'S OPENING STATEMENT

Christopher Lipsey has repeatedly complained that noisy Guard One welfare checks deprive him of sleep. Understandably, the Court wants to know whether other inmates agree, so it authorized narrow, expedited discovery into other inmates' complaints about Guard One. Almost four months later, Defendants still have not complied. They initially failed to disclose <u>98%</u> of complaining inmates at Pelican Bay, turning over nearly a thousand pages of complaints only after their absence was proven by extrinsic evidence. Defendants' search methodology was clearly flawed, but they refuse to correct it or answer basic questions, including the number of documents reviewed and whether responsive documents were destroyed. The Court cannot evaluate complaints about Guard One when Defendants refuse to conduct an adequate search or even to explain what they have done. Lipsey moves to compel.

## FACTS

On February 14, 2020, Lipsey filed a Motion for Temporary Restraining Order, to address sleep deprivation caused by the noisy Guard One system used to record welfare checks. *See* Dkt. 6462. At a hearing on February 26, the Court asked Defendants for "compiled information on appeals," to understand any "systemwide concern" about Guard One. *See* Ex. A at 13:24-14:2.[1] Defendants did not have that information and claimed it "would be difficult to get [it] quickly." *Id.* at 16:1-18.

The next day, the Court ordered discovery regarding complaints "related to the use of Guard One at all CDCR institutions where it is currently in use." Dkt. 6487 at 4. Despite Defendants' claim that such discovery would be time-consuming, the Court ordered "an expedited schedule," with responses due in 14 days. *Id.* Lipsey served the discovery the next day, requesting all complaints regarding Guard One, welfare checks, night-time noise, and sleep deprivation and asking whether complaining inmates were members of the *Coleman* class.[2] *See* Ex. B; Ex. C.

---

[1] All Lipsey's exhibits are attached to the declaration of Kate Falkenstien, filed herewith.

[2] After much discussion, the parties resolved their dispute over the interrogatory regarding *Coleman* class membership. Defendants initially refused to identify the class membership of inmates who joined group appeals, claiming their "identity" was not "readily available." Ex. K at 1. Such inmates are listed directly on the group grievances, so Lipsey's counsel compiled those lists from Defendants' own production and sent them to Defendants. *Id.* Defendants did not respond, and Lipsey briefed the issue in the initially exchanged drafts of this statement. Then, on June 8 (after reading Lipsey's brief), Defendants produced updated information about the group complainants—that is, the complainants Defendants had claimed were unidentifiable before Lipsey filed and briefed his Motion to Compel.

On March 3, the parties conferred, and Defendants claimed they could not respond in the Court-ordered time. *See* Ex. D. Lipsey offered a one- to two-month extension. *Id.* at 3. Defendants declined. *Id.* at 2. They estimated reviewers would spend 8 hours per 100 grievances, and calculated that, across all prisons, Lipsey's request would require review of nearly 90,000 grievances. Ex. E, ¶ 3.

Defendants then sought a protective order, *see* Dkt. 6501, and the parties again conferred on March 18. Lipsey suggested the parties use keywords to search the grievances. Falkenstien Decl., ¶ 11. However, Defendants represented that the grievances were not stored electronically (and thus could not be keyword searched), and that it would be burdensome to scan all the documents for review. *Id.* Having ruled out an electronic search, Lipsey proposed a compromise limiting his request in three respects to make feasible a manual review. First, Defendants would search only the four prisons with Security Housing Units ("SHUs"), not those with only administrative segregation units. Ex. F at 4. Second, they would search only first-level complaints, not second- or third-level appeals (except as to staff complaints, which bypass the first level). *Id.* Third, they would search only complaints filed in four substantive categories. *Id.*; Ex. E, ¶ 2. In exchange, Defendants would complete the production in 30 days. Counsel confirmed this agreement on March 20, making Defendants' full production due on April 19. Due to COVID-19, Lipsey subsequently granted a further one-week extension.

In the meantime, on March 16, Defendants produced 253 pages of grievances from Corcoran. Falkenstien Decl., ¶ 5. On April 27, Defendants' counsel sent another production, representing that it contained "all documents responsive to your discovery requests" from the four agreed-upon prisons. Ex. G. The April production included 50 total grievances: 3 from CCI, 30 from Corcoran (including duplicates of the grievances produced in March), 9 from Pelican Bay, and 8 from Sacramento. *Id.*

After reviewing these documents, Lipsey's counsel realized that at least 80 grievances were missing from Pelican Bay alone. An internal CDCR email previously filed in this case stated that there were 87 appeals filed about Guard One by September 22, 2015. Ex. H. Yet, as of April 27, Defendants had produced only 9 *total* complaints from Pelican Bay, from 2014 to present. None was dated before September 22, 2015. Thus, all 87 complaints from pre-September 2015 were missing. Defendants had also listed inmates in their interrogatory response whose grievances had not been produced.

On May 12, Lipsey's counsel flagged these deficiencies in a letter, requesting the known

missing documents and also raising broader concerns about the adequacy of Defendants' search. *See* Ex. I. The letter noted that a search that "missed all 87 of these complaints that happen to have been mentioned in a publicly filed email" likely also "missed many other responsive complaints as well." *Id.* To address these broader concerns, counsel requested information about the search methodology: the number of reviewed documents, the number of employees who worked on the review, the hours they worked, and what they were instructed to flag as responsive. *Id.*

The parties again conferred on May 20. Defendants had discovered a "miscommunication" with the Pelican Bay reviewers: the production omitted *all* complaints from 2014-15, when Guard One was introduced there. Ex. J. Defendants had not yet investigated the methodology questions raised in the May 12 letter. *Id.* Lipsey agreed to wait until May 27 for any additional production or answers to the methodology questions. *Id.* Lipsey informed Defendants that he would move to compel if they did not answer the questions or any additional missing documents came to light. *Id.* Lipsey also asked if Defendants had discovered any other problems, but Defendants "had not discovered any other missing complaints at other prisons or outside the 2014-15 time period at Pelican Bay." *Id* (email memorializing the May 20 call, to which Defendants did not respond). With the addition of the 2014-15 Pelican Bay complaints, Defendants promised the agreed-upon search would be complete. *Id.*

On May 22, Defendants produced 898 pages of new grievances. Beyond the 9 Pelican Bay complaints produced in April, Defendants produced 86 new complaints signed by 325 more inmates. Falkenstien Decl., ¶ 6. Defendants refused to answer the questions about search methodology from the May 12 letter, except to say each institution's reviewers "filtered through thousands of documents" and did not track the time they spent. Ex. K at 2.

In reviewing Defendants' March, April, and May productions, Lipsey's counsel realized that more identifiable documents were still missing. Evidence from other cases reveals at least four concrete categories of missing grievances, spanning dozens of additional complaints. <u>First</u>, in the related *Murillo* case, the parties attached as exhibits 26 complaints signed by at least 100 inmates at CCI—and those reflect only a six-month period in 2014. *See Murillo v. Holland*, 2019 WL 1099836, at *5 (E.D. Cal. Mar. 8, 2019). Yet in this case, Defendants—represented by the same counsel as the *Murillo* defendants—produced only 3 complaints from CCI, signed by 6 total inmates, none of which

1    is from 2014. *See* Ex. N. In other words, Defendants failed to produce *every single* responsive

2    grievance from 2014 at CCI. <u>Second</u>, even after conferring about deficiencies in the Pelican Bay

3    production, Defendants *still* have not produced all the complaints referenced in the internal CDCR

4    email. As discussed *supra*, p. 3, that email indicates that 87 complaints were filed by September 22,

5    2015. *See* Ex. H. Yet Defendants have produced only 76 complaints before that date. *See* Ex. N. <u>Third</u>,

6    some grievances produced in the related *Suarez* case are missing here. For example, Appeal PBSP-C-

7    15-02204 was produced in *Suarez* but not here. Ex. O; Falkenstien Decl., ¶ 22. It is plainly responsive:

8    the inmate complains that the "banging of the wand on sensor" caused him to "los[e] a lot of sleep."

9    *Id.* <u>Fourth</u>, Defendants did not produce all grievances submitted by named plaintiffs in the related

10   cases: they did not produce anything from Joaquin Murillo or Ivan Lee Matthews at CCI. *See* Ex. N.

11       Other aspects of the production are also suspicious. For example, every grievance produced

12   from 2014-15 at Pelican Bay (i.e., the May corrected production) was appealed to the second level.

13   This is suspicious because many inmates do not appeal, such that no second-level response is ever

14   created. It seems unlikely that *every* responsive grievance in 2014-15 at Pelican Bay was appealed.[3]

15   More likely, Defendants did not search unappealed complaints. As another example, all but one of the

16   grievances produced from 2016-present at Pelican Bay (i.e., the April production) bypassed the first

17   level of review. Only grievances in one of the four categories to be searched—staff complaints—

18   bypass the first level of review. Ex. D. It is unlikely that nearly every responsive complaint was a staff

19   complaint. More likely, Defendants did not search the other three categories in 2014-15.

20       Given the missing documents and anomalies in the production, and Defendants' refusal to

21   correct their search or answer Lipsey's questions, Lipsey filed his Motion to Compel on May 29. Dkt.

22   6691. The parties set a schedule to exchange sections of this brief. Lipsey sent his section on June 5.

23       In the interim, having read an initial draft of this brief, Defendants suddenly changed their

24   minds and purported to answer the methodology questions from the May 12 letter—questions

25

26

27   [3] Defendants' interrogatory responses included a declaration listing the number of first- and second-
     level grievances at each prison. *See* Ex. E. That chart shows 1821 initial grievances in the four relevant
     categories from 2012-2020, and only 1522 at the second level. In 2015 specifically, there were 210
28   initial grievances and only 151 at the second level. Thus, about 20-30% of all grievances are not
     appealed. It would be anomalous to find no unappealed grievances about Guard One.

1   Defendants had claimed it would be "impossible" to answer "with any further specificity" before

2   Lipsey filed his Motion. *Compare* Ex. K, *with* Ex. P. In their June 11 response, Defendants still refused

3   to estimate the number of documents reviewed. *See* Ex. P. However, they provided other new

4   information raising yet more red flags about their search. First, Defendants estimated the time spent

5   on the review at each prison. *Id.* They spent much less time than they had estimated pre-review.

6   *Compare* Ex. P, *with* Ex. E, ¶ 3 (estimating 8 hours per 100 grievances); *see also* Ex. Q at 3 (calculating

7   the actual rate of review at each prison). Second, Defendants revealed for the first time that responsive

8   grievances at CCI had been destroyed. *Id.* Defendants had not mentioned any five-year document

9   destruction policy when they earlier agreed to a search period stretching back, at a minimum, to the

10  first implementation of Guard One at each prison—which was more than five years ago. *See* Ex. Q at

11  2. Third, Defendants claimed (again, for the first time) that grievances more than three years old were

12  stored electronically. Ex. P. This new information contradicted Defendants' representations pre-

13  review that grievances were not stored electronically and thus could not be keyword searched.

14          On June 16, Lipsey wrote to Defendants, raising these concerns and asking follow-up questions

15  in light of the new information. For example, Lipsey asked when Defendants' counsel first learned

16  about the document destruction at CCI, whether all responsive grievances at CCI were subject to the

17  destruction policy, whether documents had been destroyed at other prisons, whether any otherwise-

18  destroyed documents were retained under a litigation hold (and if so, whether they had been searched),

19  which grievances were stored electronically, and whether they could be keyword searched. Two hours

20  after receiving the letter, Defendants responded, flatly refusing to "perform[] any additional searches."

21                                        **ARGUMENT**

22  **I.      Defendants Must Correct Their Search And Produce Any Missing Grievances.**

23          After three months—and many attempts to confer and narrow Lipsey's requests—Defendants

24  still have not produced the core documents the Court ordered. Although Lipsey has repeatedly raised

25  concerns about missing documents and flawed search methodology, Defendants still refuse to correct

26  these problems. Instead, they have flatly represented that they will not "perform[] any additional

27  searches." Ex. P. That blanket refusal is not acceptable when the existing search was flawed.

28          Defendants' failure to produce plainly responsive documents proves their search was

inadequate. Their belated Pelican Bay production, after Lipsey's complaints, added grievances from more than *forty times* as many inmates as included in their initial production. Had Lipsey's counsel not, by sheer luck, had access to the internal Pelican Bay email, Lipsey would have had no basis to challenge Defendants' initial search. They could have relied upon their woefully underinclusive production—reflecting at most 2% of the complaining inmates at Pelican Bay—to argue that few inmates are bothered by Guard One. And even now, after extensive discussions, Defendants have not produced all known Pelican Bay grievances. *See supra*, p. 5 (calculating that at least 11 known grievances are still missing). Defendants have also omitted dozens of grievances from other prisons whose existence is confirmed by extrinsic information. As just one example, ten times as many complaints were filed *in a six-month period in 2014* at CCI as Defendants have produced *for the entire six-year search period* there. *See supra*, p. 5. These identifiable missing documents are likely only the tip of the iceberg. When the search missed the vast majority of responsive complaints cited in publicly filed documents, it likely also missed responsive complaints *not* mentioned in related filings.

It is hardly surprising Defendants missed so many responsive documents when the limited information they have disclosed about their methodology reveals widespread problems. Defendants do not know what documents their reviewers reviewed—not even an estimate of the number of boxes or filing cabinets, or the length of any electronic compilation of grievances reviewed. Exs. K, P. As they disclosed for the first time in mid-June, they suspect some responsive documents were destroyed in at least one prison (CCI), but they have not yet "confirmed" whether those documents were under litigation holds and have not answered any follow-up questions on that matter. *See* Exs. P, Q. Nor will they explain whether responsive documents were destroyed at *other* prisons, nor whether they searched documents subject to litigation holds in the related cases. *Id.* In short, Defendants cannot confirm that their reviewers even looked at the full set of potentially responsive documents. Defendants must ensure they have searched the relevant universe of documents—including any subject to litigation holds that were destroyed in their original storage location.

Moreover, reviewed documents were apparently not adequately screened for responsiveness. The searched documents were processed in a fraction of the time Defendants estimated pre-review. A CDCR official testified in a sworn declaration that reviewers could process 12.5 grievances per hour.

Ex. E, ¶ 3. Yet Defendants now claim to have reviewed as many as *180 grievances per hour*. Exs. P, Q. That pace would require reading each page in about three seconds. Ex. Q. Accuracy is not possible at that speed. *See, e.g.*, *First Tech. Capital, Inc. v. JPMorgan Chase Bank, N.A.*, 2013 WL 7800409, at *4 (E.D. Ky. Dec. 10, 2013) (finding attorneys could not accurately review for privilege in ten seconds per page); *Nordstrom v. Ryan*, 128 F. Supp. 3d 1201, 1216 (D. Ariz. 2016), rev'd, 856 F.3d 1265 (9th Cir. 2017) (citing correctional officers' testimony that it takes fifteen seconds to scan, without reading, a handwritten page); *Scott Hutchison Enters., Inc. v. Cranberry Pipeline Corp.*, 318 F.R.D. 44, 57 (S.D.W. Va. 2016) (finding that 32 seconds per page was "objectively reasonable" for review). If Defendants insist on a full manual review, they must redo it at an appropriate speed.

Alternatively, Defendants could keyword-search electronically stored grievances, as Lipsey originally proposed in March. Defendants had represented that grievances were not stored electronically and could not easily be scanned, so Lipsey agreed to a more limited manual review. Falkenstien Decl., ¶ 11. Now, after Lipsey filed his Motion to Compel, Defendants have for the first time revealed that grievances more than three years old are "compiled by scanning archived paper files." Ex. P. That scanned archive could be electronically searched for any responsive documents the reviewers missed in their haste, but Defendants refuse to discuss any such plan.

## II. Defendants Must Answer Outstanding Questions About Their Search Efforts So Far.

Even after Defendants provided new information about their methodology during the drafting of this brief, serious questions remain. Defendants *still* have not disclosed the number of documents reviewed, the scope of the destroyed documents, and whether copies of any destroyed documents were retained under litigation holds (and if so, whether any such documents were searched).

Defendants' refusal to answer these questions itself violates their discovery obligations. When evidence "indicate[s] that there are more documents than have been produced" and a party refuses to explain the "search methodology," it has not "established that [it] conducted a reasonable and appropriate search." *Rawcar Grp., LLC v. Grace Med., Inc.*, 2013 WL 12076572, at *3 (S.D. Cal. Dec. 16, 2013). The producing party must then answer questions about "the location, search, and collection of potentially responsive documents." *Armas v. USAA Cas. Ins. Co.*, 2019 WL 1501578, at *1 (N.D. Cal. Apr. 5, 2019); *see also Res. Converting, LLC v. Dunne*, 2018 WL 3208656, at *6 (S.D. Iowa Mar.

15, 2018) (ordering "a detailed description of what was done to search for responsive documents," including descriptions of locations searched); *Care One Mgmt., LLC v. Connecticut*, 2017 WL 2662190, at *5 (D. Conn. June 20, 2017) (ordering "an affidavit of compliance describing in detail all efforts that were made to search for and identify responsive documents"); *Bd. of Regents of Univ. of Neb. v. BASF Corp.*, 2007 WL 3342423, at *6 (D. Neb. Nov. 5, 2007) (same).[4]

Defendants claim they *cannot* answer some remaining questions, because they do not know how many documents were searched. Exs. K, P. This professed ignorance is suspect when the CDCR knew the exact number of grievances by category and prison pre-review. *See* Ex. E. But if counsel truly does not know, that ignorance only underscores the problem. Counsel must be "proactive in ensuring that [their] clients are conducting thorough and appropriate document searches, especially in light of obvious gaps and underproduction." *Logtale, Ltd. v. IKOR, Inc.*, 2013 WL 3967750, at *2 (N.D. Cal. July 31, 2013). "[I]t is not enough for counsel to simply give instructions to his clients and count on them to fulfill their discovery obligations." *Id.* (citing Fed. R. Civ. P. 26(g)). Rather, when "counsel notices obvious 'gaps in the production,'" counsel must "make a reasonable inquiry as to the thoroughness of that search." *Id.* (awarding sanctions); *see also Qualcomm Inc. v. Broadcom Corp.*, 2008 WL 66932, at *13 (S.D. Cal. Jan. 7, 2008), *vacated in part on other grounds*, 2008 WL 638108 (S.D. Cal. Mar. 5, 2008) (sanctioning lawyers who "accept[ed] the unsubstantiated assurances of an important client that its search was sufficient" and "ignore[d] the warning signs that the document search and production were inadequate"). Counsel cannot know Defendants conducted an adequate search without knowing what they did. If counsel cannot answer the questions, that *itself* is a problem.

### III.   Defendants Should Be Sanctioned.

In addition to completing their production and answering outstanding methodology questions, Defendants should also pay sanctions. Defendants missed a staggering proportion of responsive documents—for example, initially failing to disclose *98%* of the inmates now known to have

---

[4] Courts may also order a forensic accounting, through which a third party examines the producing party's files. *See, e.g.*, *Klipsch Grp., Inc. v. Big Box Store Ltd.*, 2014 WL 904595, at *7 (S.D.N.Y. Mar. 4, 2014), *aff'd sub nom. Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620 (2d Cir. 2018); *Beef Prod., Inc. v. Hesse*, 2019 WL 6841362, at *9 (D.S.D. Dec. 16, 2019); *Ameriwood Indus., Inc. v. Liberman*, 2006 WL 3825291, at *3 (E.D. Mo. Dec. 27, 2006), *as amended on clarification*, 2007 WL 685623 (E.D. Mo. Feb. 23, 2007).

1  complained at Pelican Bay. "[S]evere sanctions" are warranted given "specific evidence" of missing
2  documents that are "purposefully withh[eld]." *Dupree v. Cty. of L.A.*, 2010 WL 11597454, at *3 (C.D.
3  Cal. Feb. 3, 2010). It is sanctionable misconduct to falsely "assert[] to the court and [the moving party]
4  that [the producing party] had made a thorough search and all the responsive documents in its
5  possession had been produced." *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 2016 WL 6609208,
6  at *14 (C.D. Cal. July 12, 2016), *report and rec. adopted*, 2016 WL 6901696 (C.D. Cal. Sept. 2, 2016);
7  *United States v. Metro. Disposal Corp.*, 622 F. Supp. 1262, 1266 (D. Or. 1985), *aff'd*, 798 F.2d 1273
8  (9th Cir. 1986) (awarding sanctions where party "fail[ed] to place a knowledgeable employee or
9  officer in charge of the search" and missed approximately 80% of responsive documents later
10 uncovered). Defendants' failures are especially egregious because the Court already ordered them to
11 respond to the discovery at issue. Dkt. 6487 at 4. "A 'disobedient party,' after failing to comply with
12 a court order, must 'pay the reasonable expenses, including attorney's fees, caused by [its] failure.'"
13 *Ramos v. Swatzell*, 2017 WL 2857523, at *15 (C.D. Cal. June 5, 2017), *report and rec. adopted*, 2017
14 WL 2841695 (C.D. Cal. June 30, 2017) (quotation omitted) (ordering sanctions when the CDCR had
15 "no justification for [its] failure to produce the file when ordered, or for its misrepresentations to the
16 court and plaintiffs that it had produced all such documents"); *see also* Fed. R. Civ. P. 37(b)(2)(C).

### CONCLUSION

17
18     Lipsey respectfully requests that the Court order Defendants to correct their search to find and
19 produce any remaining responsive grievances; answer the remaining questions about methodology
20 (including the documents searched, destruction policies, and litigation holds); and pay attorney's fees
21 for counsel's review of Defendants' inadequate productions and preparation of this brief.

22
23
24
25
26
27
28

1

**DEFENDANTS' RESPONSE**

2

**INTRODUCTION**

3

In February 2020, this Court allowed Plaintiff-Intervenor Lipsey "the right to conduct *limited*

4

discovery to obtain information from which to identify the administrative complaints filed by both

5

*Coleman* class members and non-class member inmates related to the use of Guard One at all CDCR

6

institutions where it is currently in use." (ECF No. 6487 at 4 [emphasis added].) Defendants have

7

produced more than enough discovery on this limited issue, providing over a thousand pages of

8

grievances and information regarding the class status of each involved inmate. Despite this

9

production, complicated as it was by the ongoing global pandemic and consequent state shutdown,

10

Lipsey now moves this Court for unnecessary relief, speculating that additional responsive

11

documents exist and grossly mischaracterizing the parties' ongoing meet-and-confer discussions.

12

Defendants have pledged to provide all responsive documents they can reasonably locate based on

13

an ongoing search under less-than-ideal circumstances—state officials and employees are focused

14

daily on addressing the ongoing COVID-19 pandemic. There is no need for this motion, and Lipsey

15

has failed to show why he needs additional discovery to resolve his pending motion for injunctive

16

relief. Defendants accordingly request that this Court deny Lipsey's motion in its entirety.

17

**RELEVANT FACTUAL SUMMARY**

18

On November 14, 2019, Lipsey moved to intervene in this case. (ECF No. 6389.) On

19

February 14, 2020, while his motion to intervene was pending, Lipsey filed a motion for injunctive

20

relief, asking this Court to "bar[] Defendants from conducting twice-hourly Guard One checks in his

21

unit at Corcoran State Prison[5] and requiring Defendants to adopt an alternative system to replace

22

Guard One."[6] (ECF No. 6462.) At a status conference on February 26, 2020, this Court asked

23

Defendants if there was a "systemwide concern" regarding sleep deprivation caused by Guard One.

24

(Falkenstein Decl., Ex. A at 13:24-14:2.) Defendants indicated that they could investigate the

25

number of grievances filed by inmates throughout the system, but that those grievances would be

26

27

28

---

[5] Lipsey is no longer housed at Corcoran State Prison. (*See* Falkenstein Decl., Ex. J at 3.)
[6] Lipsey's motion was entitled "Motion for Temporary Restraining Order," but rather than seeking to preserve the status quo, it seeks permanent injunctive relief regarding the manner in which Defendants conduct welfare checks. (*See* ECF No. 6462.)

maintained in the ordinary course of business as part of a much larger subset of grievances and would be difficult to find quickly.  (*Id.* at 15:1-18.)

On February 27, 2020, the Court granted permissive intervention for Lipsey, concurrently granting him "the right to conduct limited discovery to obtain information from which to identify the administrative complaints filed by both *Coleman* class members and non-class member inmates related to the use of Guard One at all CDCR institutions where it is currently in use."  (ECF No. 6487 at 4.)  Lipsey served the discovery requests at issue in this motion the next day.  (Falkenstein Decl., ¶ 4.)

On March 3, 2020, the parties conferred regarding Lipsey's discovery requests.  (*See id.* at Ex. D.)  Defendants reiterated that the breadth of Lipsey's requests made it impossible to respond within the time ordered by the Court.  (*Id.*)  Lipsey offered to extend the time to respond, but was unwilling to narrow the scope of the requested discovery responses.  (*Id.*)  Because Defendants would not be able to respond timely even under Lipsey's proposed modest extension, they instead proposed a rolling production of documents, which Lipsey's counsel rejected, stating "I believe we are at an impasse."  (*Id.*)

On March 13, 2020, Defendants filed a motion for protective order on the grounds that Lipsey's discovery requests were overly broad, sought information beyond the scope of the order, and were highly burdensome.  (ECF No. 6501.)  As required by this Court's local rules, on March 18, 2020, the parties met and conferred regarding the motion, and the parties were able to reach a compromise: Defendants would produce all relevant grievances from 2012 through 2020 from four specific prisons, searching four distinct categories of grievances for any that were related to noise caused by Guard One welfare checks.  (Falkenstein Decl., Ex. F.)  Defendants estimated that this production could be completed within thirty days, but that the estimate could change "due to COVID-19 or other unforeseen circumstances."  (*Id.*)

On March 16, 2020, Defendants timely produced the results of their initial search under the terms of the Court's order.  (*Id.* at ¶ 5.)  On April 27, 2020, Defendants supplemented this production based on their earlier agreement with Lipsey.  (*Id.* at Ex. G.)  On May 12, 2020, Lipsey informed Defendants that there were missing grievances in their production, including 87 appeals

filed at Pelican Bay State Prison before September 2015.[7]  (*Id*. at Ex. I.)  Now allegedly suspicious of Defendants' production as a whole, Lipsey demanded that Defendants provide details regarding the searches themselves and threatened to file a motion to compel within a week if that information was not provided.  (*Id*. at Ex. J.)  Defendants supplemented their production on May 22, 2020 by providing the inadvertently-omitted documents, supplementing their previous interrogatory response, and describing how they conducted their search, while cautioning that it would be impossible to answer some of Lipsey's questions more specifically without completely redoing the search.  (Hennes Decl., Ex. B.)

On May 26, 2020, in response to Defendants' supplemental interrogatory response, Lipsey requested additional information regarding the *Coleman* class membership of inmates who had joined group appeals, rather than those who had submitted the appeal.  (Hennes Decl., Ex. C.)  Defendants responded that the identities of those inmates were not readily available, but that if Lipsey were able to provide a list, they would provide that information.  (*Id.*)  Defendants provided Lipsey with this information on June 8, 2020.  (*Id.*)

On May 28, 2020, Lipsey's counsel contacted defense counsel, stating that "I believe there are still significant numbers of responsive grievances that your search missed," and indicated that she would be filing a motion to compel the next day.  (Hennes Decl., Ex. D.)  At this time, Lipsey had not notified Defendants of any specific missing grievances beyond the 87 inadvertently-omitted Pelican Bay grievances discussed in Lipsey's May 12, 2020 letter.  (Hennes Decl., ¶ 12.)

On June 5, 2020, as previously agreed, Lipsey's counsel sent a draft of this joint brief to defense counsel, which—for the first time—set forth *additional* grievances that Defendants allegedly had not provided, but were in Lipsey's possession, as well as Lipsey's accusation that Defendants were deliberately withholding responsive documents.  (Hennes Decl., ¶ 13.)  As a result of these new allegations, defense counsel wrote to Lipsey's counsel indicating that further meet-and-confer efforts were necessary to discuss these new allegations and pledging to remedy any deficiencies Lipsey

---

[7] As Defendants informed Lipsey during a further meet-and-confer session on May 20, 2020, the omission of these Pelican Bay grievances was due to a miscommunication between CDCR and defense counsel; these grievances were located during the initial search.  (*See* Falkenstein Decl., Ex. P.)

1   identified.  (*Id.*)  The parties agreed to meet and confer a final time on June 10, 2020, during which

2   Defendants reiterated their desire to resolve Lipsey's concerns without court intervention.  (Hennes

3   Decl., ¶ 14.)  As part of this effort, Defendants agreed to provide additional information about the

4   methodology of their search, cautioning that they would have to provide estimates to respond to

5   some of Lipsey's questions.  (Hennes Decl., Ex. F.)

6         On June 11, 2020, after conferring with each of the four responding CDCR institutions,

7   Defendants provided Lipsey with additional information regarding the methodology of their search.

8   (Falkenstein Decl., Ex. P.)  Rather than agreeing to delay the motion to compel to allow for further

9   collaborative efforts, Lipsey responded by accusing defense counsel of misconduct and refused to

10   withdraw his motion.  (Falkenstein Decl., Ex. Q.)  Based on this response, and based on Lipsey's

11   unwillingness to compromise, Defendants indicated that they would not provide further discovery

12   responses unless Lipsey agreed to continue the motion to compel.  (Falkenstein Decl., Ex. P.)

13   Lipsey's counsel refused to meet and confer any further.  (Hennes Decl., Ex. G.)

14

15                              **ARGUMENT**

16   **I. LIPSEY'S REQUESTS ARE OVERLY BROAD AND UNNECESSARY FOR THE LIMITED**
               **PURPOSE ORDERED BY THE COURT.**

17         When the responding party responds to discovery requests, the party moving to compel further

18   responses bears the burden of demonstrating why the responding party's objections are not justified.

19   *Puckett v. Zamora*, No. 1:12-cv-00948 DLB, 2015 WL 758289, at *1 (E. D. Cal. 2015), citing

20   *Grabek v. Dickinson*, No. CIV S-10-2892 GGH, 2012 WL 113799, at *1 (E.D. Cal. 2012).  To meet

21   that burden, he must "inform the Court which discovery requests are the subject of the motion to

22   compel, and for each disputed response, why the information sought is relevant and why the

23   responding party's objections are not meritorious."  *Id*.

24         On February 27, 2020, this Court permitted Lipsey to conduct *limited* discovery related to the

25   current use of Guard One.  (ECF No. 6487 at 4.)  The purpose of this discovery was to permit the

26   Court to determine the scope of current complaints about sleep deprivation caused by the Guard One

27   system.  (*See id.*; *see also* ECF No. 6488 at 14-15 [noting the lack of information in the record

28   regarding complaints by other inmates].)  Despite the limited scope of discovery permitted by the

1   Court's order, Lipsey propounded a request that Defendants produce "All complaints submitted by

2   inmates in any CDCR institution to Defendants or other current or former CDCR employees or

3   officers, regarding the Guard One system, the welfare check program, night-time noise, or sleep

4   deprivation." (Falkenstein Decl., Ex. B.)  After meeting and conferring with Defendants, Lipsey

5   agreed to limit the production to grievances related to the Guard One system from the four CDCR

6   institutions with Security Housing Units, but he refused to reduce the timeframe of this discovery

7   request, insisting that Defendants produce all such grievances dating back as far as 2014.  (Hennes

8   Decl., ¶ 4.)

9       The scope of Lipsey's requested discovery far exceeds the Court's order.  This Court permitted

10  Lipsey to intervene on a permissive basis to address his claim that Guard One causes sleep

11  deprivation in violation of the Eighth Amendment.  (ECF No. 6487 at 3.)  As an intervenor in this

12  case, Lipsey seeks injunctive relief related to the current use of the Guard One system—a claim

13  which is not dependent on knowing exactly how many complaints were filed by other inmates six

14  years ago, let alone the details of each of those grievances.  Defendants have no objection to a

15  stipulation that there were hundreds of such complaints filed when Guard One was first

16  implemented, but they maintain—and the data they have located supports—that the volume of such

17  complaints has decreased dramatically in the years since Guard One was originally implemented.

18  Lipsey's demand for documents dating back to 2014 is unnecessary and far exceeds their benefit to

19  this Court in resolving the issue at hand.

20
21  **II.    DEFENDANTS HAVE CONDUCTED A REASONABLE SEARCH UNDER THE
        CIRCUMSTANCES.**

22      Notwithstanding their objections to the timeframe of Lipsey's discovery requests, Defendants

23  request that this Court deny Lipsey's motion because they have conducted a reasonable search under

24  difficult circumstances.  The order permitting Lipsey to conduct limited discovery was issued on

25  February 27, 2020, and as this Court is well aware, the world has since changed dramatically due to

26  the ongoing COVID-19 pandemic.  The disease, and the consequent response by the State, has

27  caused significant shifts in CDCR's operations and staffing.  (Hennes Decl., ¶ 6.)  As part of this

28  shift, many non-custody staff are working remotely, only entering the institution two days a week, at

1   most.  (*Id.*)  And non-essential movement in and out of the prisons has been curtailed almost

2   entirely, including any visitation by defense counsel.  (*Id.*)

3       Despite the logistical challenges posed by this new reality, Defendants conducted a thorough

4   search of their available records, as follows:

- At CCI, three members of the appeals office searched all archives and the electronic
  appeals system for approximately 24 hours for grievances involving noise made by
  Guard One checks or welfare checks;

- At COR, four members of the appeals office and the litigation coordinator searched all
  scanned and paper grievances for each lockup unit dating back to April 2014 for
  approximately 24 hours for any grievance involving welfare checks;

- At PBSP, two members of the appeals office searched the appeals tracking system and
  physical archives going back to 2014 for approximately 24 hours for any grievance that
  involved noise made by Guard One checks or welfare checks; and

- At SAC, the appeals coordinator reviewed the scanned appeal archive and appeals
  tracking system for any grievance involving the terms "pipe," "Guard One," or
  "check." This review took approximately eight hours.

17      The details of this search have been provided to Lipsey as part of their meet-and-confer efforts

18  to resolve this motion.  (Falkenstein Decl., Ex. P.)  Defendants' efforts are reasonable and show their

19  desire to resolve Lipsey's concerns without court intervention.  To the extent that any additional

20  responsive documents exist, Defendants have repeatedly expressed their willingness to meet and

21  confer with Lipsey to address his concerns, and they have pledged to supplement their responses as

22  additional documents are found.  But rather than continue to work with Defendants in good faith,

23  Lipsey has now filed this motion, suggesting that he expects perfection and he expects it *now*.  This

24  is simply not reasonable, given the scope of the search demanded and particularly given the

25  incontrovertible impact of COVID-19 on all of CDCR's operations.

26      As further evidence of the "gotcha" nature of Lipsey's motion, Defendants were unaware of

27  *any* concerns regarding CCI's production of documents until after the motion was filed—the parties

28  did not meet and confer regarding those documents, giving Defendants no chance to evaluate

Lipsey's concerns before being forced to litigate the issue. (Hennes Decl., ¶¶ 12-13.) Defendants further note that each of the grievances Lipsey complains were omitted from Defendants' production are grievances that he *already has in his possession.* And to date, all of Lipsey's expressed concerns are focused on grievances from 2014 or 2015, which have significantly less probative value for his claim for injunctive relief.

In short, Defendants do not require a Court order to produce responsive documents to Lipsey's discovery requests. Indeed, they have already done so after a reasonable search, and they have pledged to continue to supplement this discovery as additional documents are found. Lipsey's motion is therefore unnecessary and unfounded.

### III.    LIPSEY IS NOT ENTITLED TO SANCTIONS.

In addition to his request for an unnecessary order, Lipsey also seeks sanctions against Defendants, claiming that "severe sanctions are warranted" due to Defendants' behavior. (Lipsey Jt. Stmt. section, page 8.) Lipsey appears to cite to Federal Rule of Civil Procedure 37(b) to justify his demand of sanctions. This reliance is misplaced. As detailed above, Defendants have not failed to comply with any Court order. Instead, Defendants have—at every turn—attempted to provide Lipsey with the information that he seeks so that his motion for injunctive relief may be resolved expediently.

To the extent that Lipsey is relying on Rule 37(a)(5) to justify any sanctions, his request is still unsupported. First, Lipsey has not attempted in good faith to obtain the discovery without Court action. Fed. R. Civ. P. 37(a)(5)(i). Defendants have repeatedly sought to provide Lipsey with the information he has requested while cautioning him that obtaining the information would take time. Each time Lipsey expressed concerns regarding Defendants' response to his discovery, Defendants responded to his concerns in good faith. Despite this willingness to work with Lipsey to address any perceived deficiencies, Lipsey insisted on bringing this dispute before the Court, first setting an arbitrary and unnecessary deadline of May 27 for Defendants to complete their supplemental response and then filing this motion with several new concerns never raised in the meet-and-confer process. (Hennes Decl., ¶¶10, 12.) This discovery behavior does not represent a good-faith attempt to avoid Court action. *See Bd. of Trustees of Leland Stanford Junior Univ. v. Tyco Int'l Ltd.,* 253

1    F.R.D. 521, 523 (C.D. Cal. 2008) (defendant who did not attempt in good faith to obtain disclosures

2    without Court action was not entitled to attorney's fees despite prevailing on motion to compel).

3           Second, Lipsey should not be awarded sanctions because such an award would be unjust.  As

4    noted above, Defendants have sought to work with Lipsey to provide him with the information he

5    requires.  However, because of COVID-19, searches and production are taking more time than they

6    would under normal circumstances.  Despite these challenges, at each instance where Lipsey has

7    identified gaps in Defendants' production, Defendants have worked to resolve those gaps.

8    Defendants acknowledge that this could not continue *ad infinitum* without some potential prejudice

9    to Lipsey, but that is not the situation the Court faces in this motion.  Lipsey's discovery requests

10   were only propounded three months before he filed this motion.  (Hennes Decl., ¶ 3.)  Two weeks

11   later, the entire state was shut down due to COVID-19.  (*Id.* at ¶ 6.)  Under these circumstances, it

12   would be unjust to reward Lipsey for short-circuiting the meet-and-confer process simply because he

13   believes Defendants should have been able to find the documents in question more quickly, or

14   because he speculates that additional documents are being withheld.

15                                        **CONCLUSION**

16          For the foregoing reasons, Defendants respectfully ask that this Court deny Lipsey's motion in

17   its entirety.

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF-INTERVENOR'S REPLY**

Defendants do not contest their initial failure to disclose *98%* of the now-revealed complaining inmates at two of the four prisons searched,[8] but they claim there are no other problems at those two prisons, no problems at the other two prisons searched, and no reason to question what went wrong. Defendants do not discuss their reviewers' suspect reading speed, the destruction of responsive documents, the inclusion of documents under litigation holds in related cases, the number of documents reviewed, or the viability of keyword searches. Refusing to engage with any methodological questions, Defendants simply declare they are finished with the search and demand to be believed without question—just as they did in April, and in May, only to later admit they were not finished after all. Each time, Defendants demand to be trusted unquestioningly that *this time* their production is complete. This pattern warrants investigating the underlying reasons why responsive documents have been repeatedly missed, and the use of keywords to ensure an adequate search.

Rather than defend their search, Defendants demand to confer further. The parties have conferred and are at an impasse. Indeed, Defendants have not identified anything else they would do, or any outstanding questions they would answer, if given more time. If Defendants wanted to fix their search, four months was plenty of time—especially when the Court ordered responses in two weeks on this urgent matter. Defendants estimated on March 19 that they could complete the search in 30 days. Lipsey granted the one subsequent extension Defendants requested due to COVID-19. *See* Ex. F. They did not ask for any further extension (due to COVID-19 or for any other reason).

Instead, they made their production and claimed—falsely—that it contained "all documents responsive" to the request. *See* Ex. G. After Lipsey identified missing documents, they refused to answer his methodological questions or conduct any further searches. *See* Ex. K (claiming that counsel would not "divert CDCR's staff further to obtain those answers" to Lipsey's outstanding questions). This refusal left nothing further to discuss. Knowing Lipsey intended to move to compel on May 29, Defendants agreed to a schedule for the briefing and hearing. *See* Ex. D to Hennes Decl.

---

[8] In addition to the problems at Pelican Bay, after writing their opposition, Defendants produced complaints from 289 additional inmates at CCI that were allegedly stored in the associate warden's office and not searched. *See* Ex. S. This new production increases the number of reported complaining inmates at CCI by almost 50-fold—from 6 to 289 inmates. Falkenstien Decl., ¶ 7.

1   They did not ask to confer further before filing, nor did they suggest any change to their prior

2   position: they would not conduct more searches or answer Lipsey's methodological questions.[9] *Id.*

3          *After* Lipsey filed his motion (and after Defendants read Lipsey's opening brief), Defendants

4   suggested a delay to give them yet another chance to address Lipsey's concerns. The parties

5   immediately conferred again, on June 10. Lipsey raised the same questions from his May 12 letter,

6   and Defendants for the first time suggested they *might* answer those questions. *See* Ex. R. Lipsey

7   offered to confer again after Defendants answered the questions, but Lipsey could not withdraw the

8   motion to compel preemptively because the answers would inform whether the dispute was resolved.

9   Defendants provided some answers the next day, *see* Ex. P, but they did not answer all the

10  outstanding questions and their answers only underscored Lipsey's concerns about the adequacy of

11  the search, *see* Ex. Q. At that point, Defendants conditioned any further discussions on Lipsey's

12  withdrawal of the motion to compel. Ex. P. And Defendants identified no additional steps they

13  would be willing to take if Lipsey *did* withdraw the motion to compel. Thus, the issues in the motion

14  remain unresolved, and the parties remain at an impasse.

15         Defendants suggest that Lipsey should have delayed his motion to confer about the missing

16  CCI documents, which Lipsey first raised on June 5 in exchanging the opening portion of this brief.

17  But the missing CCI documents did not raise new issues requiring new discussions. Rather, they

18  serve as further evidence of the methodological concerns Lipsey raised in his May 12 letter, which

19  the parties discussed on May 20 and which Defendants refused to address in their May 22 email. As

20  Defendants note, Lipsey already has copies of the missing CCI documents, because they were

21  publicly filed in the related *Murillo* case; he is not asking Defendants to produce those specific

22  documents now. Rather, the point of the missing CCI documents is that they should have been found

23  in Defendants' search and were not, underscoring that the methodology was flawed and there are

24  likely *other* missing documents Lipsey has not found through public filings. Lipsey seeks the same

25  remedy the parties extensively discussed in May: answers to questions about the search methodology

26

27  ───────────────

28  [9] Defendants suggest Lipsey filed his motion only a week after raising concerns about the search. *Supra*, p. 13. To the contrary, Lipsey sent a letter on May 12 raising his concerns. When the parties conferred on May 20, Defendants had not yet considered Lipsey's questions. Lipsey waited until May 29 to file his motion, a week after Defendants confirmed they would not answer the questions. Ex. K.

1    that might help identify and thus rectify the methodological flaws, and a corrected, adequate search.

2              In short, Defendants' insistence that the parties can work things out rings hollow when they

3    have consistently refused to answer Lipsey's questions and have repeatedly failed to produce

4    hundreds of responsive documents until Lipsey noticed their errors. Only when Lipsey sought Court

5    intervention did Defendants show any inclination to compromise. Only when Lipsey wrote a brief in

6    support of this motion did Defendants first consider answering questions Lipsey had asked a month

7    before. Only when those limited answers did not resolve the dispute did Defendants first investigate

8    to discover another 50 times more complaining inmates at CCI than they had previously disclosed.

9    The parties will meet and confer yet again after this complete statement is assembled, before it is

10   filed. If Defendants want to resolve the issues in this motion, they can address Lipsey's concerns in

11   some concrete way. But empty promises to engage in further discussions, after four months of

12   negotiation have left the parties at an impasse, do not warrant delaying resolution by the Court.

13             Defendants' desire to delay this motion must be taken in light of the urgency of the TRO,

14   which seeks emergency relief to address irreparable harm from sleep deprivation Lipsey is enduring

15   right now. As Defendants know, Lipsey's present SHU term may end after his upcoming trial in

16   July. *See* Dkt. 6690.1 at 5. By the time Defendants are satisfied the parties have finished conferring,

17   they will likely argue that Lipsey's claims are moot. *See* Ex. A at 17:7-12 (arguing that Lipsey's

18   claims would be mooted by release from restricted housing). Defendants' demands to confer for

19   *more than four months* before Court oversight would further imperil judicial review of an important

20   issue that is already likely to evade review because of the relatively short duration of SHU terms.

21             Aside from demanding further time to confer, Defendants offer almost no defense of their

22   production. Defendants argue that Lipsey cannot "expect[] perfection." *Supra*, p. 16.  But a search

23   that initially missed 98% of complaining inmates at both Pelican Bay and CCI did not approach

24   perfection. Lipsey asks only that Defendants correct their search to make it *adequate*: it must cover

25   appropriate sources of documents, include documents preserved under litigation holds or otherwise

26   archived, and give reviewers enough time to assess responsiveness (or use keyword searches).

27             Defendants' only other response is to claim that seeking grievances since 2014 is overbroad.

28   *Supra*, p. 14-15. These older grievances are relevant because many inmates complained when Guard

1    One was introduced. Under the rules for grievances, those inmates cannot complain about the same

2    issue again. Thus, older data is the only record of many inmates' concerns about Guard One—even

3    if those concerns remain pressing today. Moreover, Defendants already agreed to search back to

4    2014 as part of the parties' compromise limiting the search in other important ways (for example,

5    narrowing it to only four prisons), and they claim that they have in fact conducted that search.

6    Defendants cannot simultaneously claim both that they *have* adequately conducted the search the

7    parties negotiated and that they *cannot* conduct that search because it is so burdensome.

1  Dated: July 1, 2020                    Respectfully submitted,

2   /s/ *Kate M. Falkenstien*            /s/ *Lucas L. Hennes* (as authorized on 7/1/20)

3
    REICHMAN JORGENSEN LLP               XAVIER BECERRA
4   Shawna L. Ballard (SBN 155188)       Attorney General of California
    Kate Falkenstien (SBN 313753)        ADRIANO HRVATIN
5   100 Marine Parkway, Suite 300        Supervising Deputy Attorney General
    Redwood Shores, California 94065
6   Telephone: (650) 623-1401            LUCAS L. HENNES
    Fax: (650) 623-1449                  Deputy Attorney General
7   sballard@reichmanjorgensen.com
    kfalkenstien@reichmanjorgensen.com   *Attorneys for Defendants*
8
    *Attorneys   for   Plaintiff-Intervenor*
9   *Christopher Lipsey*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28