IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA


Ralph Coleman, et al.,
          Plaintiffs,

vs.                                    Sacramento, California
                                       No. 2:90-cv-00520
Gavin Newsom, et al.,                  Fri., June 26, 2020
          Defendants.                  1:18 p.m.
_____/


                    TRANSCRIPT OF HEARING
         (Proceedings held via Zoom video conference)
    BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
                       ---oOo---

APPEARANCES:

  For the Plaintiffs:              Rosen, Bien, Galvan and
                                   Grunfeld, LLP
                                   101 Mission Street, Sixth
                                   Floor, 19th Floor
                                   San Francisco, CA  94105
                                   By:  Michael Bien
                                   Lisa Adrienne Ells
                                   Jessica L. Winter
                                   Marc Shinn-Krantz
                                   Amy Xu
                                   Cara Elizabeth Trapani
                                   Attorneys at Law

  For the Defendants:             Office of the Attorney
                                   General
                                   455 Golden Gate Ave., Suite
                                   11000
                                   San Francisco, CA  94102
                                   By: Kyle Anthony Lewis
                                   Attorney at Law

(Appearances continued on following page)
  Official Court Reporter:         Kimberly M. Bennett,
                                   CSR, RPR, RMR, CRR
                                   501 I Street
                                   Sacramento, CA 95814

  Proceedings recorded by mechanical stenography, transcript
  produced by computer-aided transcription

```
 1                    APPEARANCES CONTINUED

 2    For the Plaintiffs:            Prison Law Office
                                     1917 Fifth Street,
 3                                   Berkeley, CA  94710
                                     By:  Steven Fama
 4                                   Attorney at Law

 5
      For the Defendants:            Office of the Attorney
 6                                   General
                                     1300 I Street, Suite 125
 7                                   Sacramento, CA  94244
                                     By:  Elise Owens Thorn
 8                                   Lucas L. Hennes
                                     Monica Anderson
 9                                   Attorneys at Law

10    For the Defendants:            Robins Kaplan, LLP
                                     2049 Century Park East
11                                   Suite 3400
                                     Los Angeles, CA  90067
12                                   By:  Roman M. Silberfeld
                                     Attorney at Law
13
      Also Present:
14    Diana Toche, Undersecretary of Health, CDCR
      Jennifer Neill, Assistant Secretary/Chief Counsel, CDCR
15    Joseph Bick, M.D., Director, Health Services, CDCR
      Melissa Bentz, Legal Affairs, CDCR
16    Nick Weber, Legal Affairs, CDCR
      Stephanie Clendenin, Director, DSH
17    Christine Ciccotti, General Counsel, DSH
      Christopher Kent, General Counsel, DSH
18    Antonina Raddatz, General Counsel, DSH
      James Spurling, General Chief Counsel, OIG
19    Gregg Adam, Counsel for CCPOA
      Matthew Lopes, Special Master
20    Mohamedu Jones, Special Master Team
      Kerry Walsh, Special Master Team
21    Kristina Hector, Special Master Team
      Jeffrey Metzner, M.D., Special Master Team
22    Kerry Hughes, M.D., Special Master Team
      Henry Dlugacz, Special Master Team
23    Haven Gracy, Law Clerk for Chief Judge Mueller

24

25
```

```
 1    (Call to order of the court, 1:18 p.m.)

 2              THE CLERK:  Calling civil case 90-520; Coleman, et

 3    al. versus Newsom, et al.  This is on for a video status

 4    conference.  And if you are not lead counsel, please block your

 5    video.

 6              THE COURT:  All right.  I'll call role just to create

 7    a record of who is appearing.

 8        Mr. Bien as lead counsel for plaintiffs, who is muted.

 9              MR. BIEN:  Yes.  Good morning -- good afternoon, Your

10    Honor.

11              THE COURT:  Good afternoon, Mr. Bien.

12        Ms. Ells.

13              MS. ELLS:  Yes, Your Honor.

14              THE COURT:  All right.  Ms. Winter.

15              MS. WINTER:  Yes, Your Honor.  I'm here.

16              THE COURT:  Mr. Shinn-Krantz.

17              MR. SHINN-KRANTZ:  Good afternoon, Your Honor.

18              THE COURT:  Good afternoon.

19        Ms. Xu.

20              MS. XU:  Present.

21              THE COURT:  Ms. Trapani.

22              MS. TRAPANI:  Good afternoon, Your Honor.

23              THE COURT:  And Mr. Fama.

24              MR. FAMA:  Yes.  Good afternoon.

25              THE COURT:  Good afternoon.
```

1          For the defense, lead counsel, Mr. Lewis.

2               MR. LEWIS:  Good afternoon, Your Honor.

3               THE COURT:  Good afternoon.

4          Mr. Silberfeld.

5               MR. SILBERFELD:  Good afternoon, Your Honor.

6               THE COURT:  Good afternoon to you.

7          Mr. Hrvatin.  Not present.

8          Ms. Thorn.

9               MS. THORN:  Good afternoon, Your Honor.

10              THE COURT:  Good afternoon.

11         Mr. Heath.

12              UNIDENTIFIED SPEAKER:  Mr. Heath is not present, Your

13    Honor.

14              THE COURT:  All right.  Mr. Hennes.

15              MR. HENNES:  Yes, Your Honor.  Good afternoon.

16              THE COURT:  Good afternoon.

17         Ms. Anderson.

18              MS. ANDERSON:  Yes, Your Honor.  Good afternoon.

19              THE COURT:  And then monitoring, Undersecretary

20    Toche.

21              MS. TOCHE:  Good afternoon, Your Honor.

22              THE COURT:  Chief Counsel Neill.

23              MS. NEILL:  Good afternoon.

24              THE COURT:  Dr. Bick.

25              DR. BICK:  Good afternoon, Your Honor.

```
 1              THE COURT:  Ms. Bentz.

 2              MS. BENTZ:  Good afternoon, Your Honor.

 3              THE COURT:  Mr. Weber.

 4              MR. WEBER:  Good afternoon.

 5              THE COURT:  Good afternoon to all of you.

 6         Director Clendenin with DHS.

 7              MS. CLENDENIN:  Good afternoon, Your Honor.

 8              THE COURT:  Good afternoon.

 9         Ms. Ciccotti.

10              MS. CICCOTTI:  Good afternoon.

11              THE COURT:  Mr. Kent.

12              MR. KENT:  Yes.  Good afternoon, Your Honor.

13              THE COURT:  Ms. Raddatz.

14              MS. RADDATZ:  Good afternoon, Your Honor.

15              THE COURT:  Also monitoring, Mr. Spurling, OIG.

16              MR. SPURLING:  Good afternoon, Your Honor.

17              THE COURT:  Good afternoon.

18         Counsel for CCPOA, Mr. Adam.

19              MR. ADAM:  Good afternoon, Your Honor.

20              THE COURT:  Good afternoon.

21         Mr. Sanders.

22              UNIDENTIFIED SPEAKER:  Mr. Sanders isn't with us

23    today.

24              THE COURT:  All right.

25         Special Master Lopes, you're appearing.
```

1          MR. LOPES:  I'm here, Your Honor.

2          THE COURT:  If you could identify the members of your

3    team monitoring, please.

4          MR. LOPES:  Yes, Your Honor.  Mohamedu Jones, Kerry

5    Walsh, Kristina Hector, Dr. Jeffrey Metzner, Dr. Kerry Hughes,

6    and Henry Dlugacz are joining us.

7          THE COURT:  All right.  Thank you, Special Master

8    Lopes.

9      I didn't publish a formal agenda.  I did -- I saw something

10   was filed even in the last hour.  I don't know if that relates

11   to today, I have not had a chance to review it.

12     I'd like to talk just very briefly about the maps, which I

13   continue to believe are an incredibly useful tool, and just

14   tell you what I am thinking with respect to those going

15   forward, which I will continue to receive.  I want to talk

16   about unmet bed need study, scheduling, looking towards our

17   next quarterly status conference, and maybe signal some agenda

18   items for that next quarterly status conference.

19     So first, though, I'd like to hear from the Special Master

20   and hear any update he has to provide.  The task force

21   continues to meet, and so anything you have to say for the

22   record now, Special Master Lopes, the Court would hear.

23     You're muted.  You need to unmute.  This is the most common

24   error in the Zoom environment.

25          MR. LOPES:  Sorry, Your Honor it was unmuted and

1  now -- I don't know, technological problems.  Pardon me.

2      We worked as a team this week to try to come up with

3  numbers for the Court that we could all agree upon so that

4  there weren't discrepancies being pointed out at the end of my

5  presentation.  So as I have done in the past, the numbers that

6  I am about to report were provided to me by CDCR.

7      On June 23, 2020, CDCR reported that 29,688 inmates

8  currently in the custody of CDCR had been tested for COVID-19,

9  of which 8,984, or 30 percent, were Coleman class members.

10  CDCR also reported that of the 3,619 inmates who tested

11  positive, 953, or 26 percent, were Coleman class members.  Of

12  the 1,799 inmates whose cases were resolved, 553, or 31

13  percent, were class members.  And sadly, of the 20 individuals

14  who passed away due to the virus, 8, or 40 percent, were

15  members of the Coleman class.

16      The task force has continued to meet weekly, and since the

17  last status conference we've had two task force meetings and

18  numerous meetings of the workgroups were held as well.  The

19  task force met on June 16th and June 23rd.  The CDCR small

20  workgroup met on June 3rd and June 10th.  The DSH small

21  workgroup met on June 15th, June 16th and June 22nd.  The

22  newly-formed behavior treatment workgroup met on June 17th and

23  June 24th.

24      As in the past, the task force meetings included

25  plaintiffs, defendants, Coleman experts, and a representative

1   from the receiver's office, as well as the Armstrong

2   representative.

3       The CDCR, DSH, and behavioral treatment workgroup meetings

4   were attended by smaller contingents from my team, as well as

5   CDCR and DSH.

6       I've continued to brief the plaintiffs every Monday on the

7   progress being made in the small workgroup meetings in

8   preparation for the weekly task force meeting.  The DSH small

9   workgroup meetings were held to address transfers to DSH and

10  the recently updated transfer policy.

11      The CDCR small workgroup meetings addressed issues relating

12  to CDCR including transfers to DSH, updates on testing,

13  creation of the COVID-19 mental health dashboard, treatment

14  being provided during the pandemic, designated quarantine space

15  at the PIPs, TMHUs, and the resumption of ICF and acute

16  transfers that are taking place.

17      The behavioral workgroup -- excuse me, the behavioral

18  treatment workgroup discussed the development of a program to

19  treat patients with personality disorders and self-injurious

20  behaviors and future steps that needed to occur.

21      A small workgroup also met to discuss the EOP ASU hub

22  certification process and to clarify the plaintiffs' written

23  concerns with the process.

24      We had a small workgroup meeting this week on the same, and

25  the plaintiffs were present for that meeting.

1    I continue to have weekly check-in meetings with

2    Undersecretary Toche to discuss broad issues, in addition to

3    COVID-19 related matters.

4    CDCR provided a presentation of the COVID-19 mental health

5    dashboard yesterday to my team and plaintiffs, and it is

6    anticipated that another presentation will occur next week.

7    One issue that should be brought to the Court's attention

8    is a memo was issued last Friday -- excuse me -- was issued on

9    June 19th, which caused some confusion regarding continued

10    transfers to DSH.  The memo addressed cancellation of all

11    nonessential movement of inmates, and there is language in that

12    memo that is not contained in the temporary DSH transfer

13    guidelines that were approved by the parties.  A revised memo

14    was sent out today by CDCR meant to clarify any discrepancies,

15    but I believe that further discussions need to take place in

16    order to reconcile the two documents and to resolve any mis --

17    misrepresentations or misinterpretations that may have

18    occurred.

19    The Department of State Hospitals' report I have there is

20    that transfers from CDCR to DSH continue to occur.  It was

21    reported that only one patient transferred to ASH last week,

22    which was due to a delay in obtaining COVID-19 test results

23    prior to transferring more patients.  One patient was admitted

24    on Tuesday, it was reported that three patients were admitted

25    today, and five patients are scheduled for admission no later

1   than tomorrow.

2       Data provided by DSH at the task force meeting indicated

3   that there were 32 beds vacant at ASH, 5 vacant beds at

4   Coalinga, and 19 vacant beds at Patton.

5       At the task force meeting it was also reported that

6   admissions to Patton were suspended due to COVID-19 concerns,

7   with 13 units on quarantine status and 2 units on isolation

8   status.

9       Again, the revised guidelines for transfers to DSH were

10   developed by DSH and CDCR and were approved by the parties;

11   however, the issue of not transferring patients to DSH from

12   institutions with positive COVID-19 cases was not clearly

13   addressed in the guidelines and has raised concerns for the

14   parties and will now be addressed in future workgroup meetings.

15       In terms of case activity, the first filing for the maps

16   and charts was entered on the docket on June 15th in accordance

17   with Your Honor's order -- previously-issued order.  Excuse me.

18       We also received copies of the maps that were filed under

19   seal with the Court.  We continue to meet with the parties to

20   further refine the information provided in those filings.  And

21   as I've stated in the past, this has been a truly collaborative

22   effort.

23       The Coleman data expert, Dr. Potter, is having regular

24   meetings with representatives from CDCR and the receiver's

25   office as previously stated, and he is now involved in the

 1    discussions regarding the EOP ASU hub certification process.

 2        This last status conference I've had two meetings with

 3    Kathy Allison, Acting Undersecretary of Operations at CDCR,

 4    together with other representatives from CDCR and the

 5    receiver's office to discuss how to safely transfer inmates

 6    from the various counties to CDCR institutions.

 7        Lastly, I've received written notice that no movement to

 8    and from the Salinas Valley State Prison PIP has been stopped

 9    due to 3 positive cases of COVID-19 being reported.  I was

10    provided advanced notice of that action and I discussed the

11    same with plaintiffs' counsel.

12        That's my report, Your Honor.

13            THE COURT:  All right.  Thank you, Special Master

14    Lopes.

15        I'll hear now from the parties, starting with the

16    plaintiffs.  Mr. Bien, if you have a report, and if you would

17    let the Court know if there is any outstanding issue with DSH

18    at this point or if things are moving in the right direction,

19    given what Special Master Lopes reported.

20            MR. BIEN:  I was happy to hear from defendants over

21    the last day or two that they issued a new memo as we requested

22    clarifying the restrictions on movement and that it did not

23    apply to the DSH transfers, the transfer guidelines negotiated

24    remained in effect.

25        More important, I think, they gave me information showing

1    that CDCR did refer a substantial number of cases this week,

2    and a substantial number of Coleman class members transferred

3    to DSH this week.  That was reassuring to us that in fact,

4    despite the potential for miscommunication in the memo issued

5    last week, that the officials -- CDCR officials and DSH

6    officials had, you know, gotten the word out and continued with

7    the process.  That's very important.

8         We are quite concerned, Your Honor, with the -- as I'm sure

9    you may have read about, with the outbreak at San Quentin.  San

10   Quentin has, you know, a unique population and also unique

11   architecture that is making control of the outbreak very, very

12   difficult.  The last time I checked there were well over 500

13   positive cases of incarcerated people at San Quentin, and more

14   than 70 staff members, and the situation is quite dire.

15        There are -- as you may recall it, Your Honor, we

16   established an EOP level 2 program in the dorms at San Quentin,

17   which has several hundred EOPs.  So far, last I checked, the

18   virus had not been found in the dorms, but it will be very

19   difficult, you know, to protect any part of the prison.  And

20   there is a recommendation from outside epidemiological experts,

21   including Dr. Brie Williams who works with Judge Tigar and the

22   receiver, to take, you know, pretty drastic steps to protect

23   San Quentin.  We're hoping that the state will agree to do a

24   lot more.  Among the recommendations were to rapidly reduce the

25   population by half to give enough room to achieve social

1    distancing.

2        There are quite a few EOPs and triple Cs that have tested

3    positive already at San Quentin, many of those are from death

4    row, which has a large Coleman class, as you may know.  And

5    there are also Coleman class members that have been

6    hospitalized from San Quentin.

7        Last week, Your Honor, I also -- you also raised the issue

8    of whether the parties were aware of studies or guidances about

9    people with serious mental illness being particularly

10   vulnerable to COVID-19.  I didn't respond.

11       Since then, plaintiffs have provided to defendants and the

12   Special Master Team resources that we have located that are

13   guidances about COVID-19 being -- having particular

14   vulnerabilities for people with serious mental illness for two

15   reasons:  One, the inability to understand and comply with the

16   directions for social distancing, and cleaning, and

17   understanding all the measures about how to keep away from

18   infection.  But in addition to that, the known comorbidities

19   with, you know, high medical vulnerabilities of people with

20   serious mental illness both because of their illness, because

21   of the medications.

22       Most recently, CDCR issued -- I'm sorry, the Centers For

23   Disease Control issued a study -- massive study showing -- that

24   included serious mental illness as an underlying medical

25   condition that results in high risk, and it said -- it

1  recommended far more focussed on high risk patients, including

2  those with serious mental illness, as a strategy.  It found

3  that hospitalizations were 6 times higher among patients with

4  high risk, and deaths were 12 times more likely among patients

5  with high risk.

6      So we, again, in both this case and in Plata, are urging

7  the state to take more measures to identify and move to safety

8  people with high risk, including Coleman class members.

9          THE COURT:  All right.  Have any of those materials

10  been filed on the Court's docket?

11          MR. BIEN:  They have not, Your Honor, and we'd be

12  happy to do so if the Court would like --

13          THE COURT:  I would be interested in receiving copies

14  of anything either party believes is reporting on what may well

15  be a developing area to help the Court and the parties

16  understand the impacts of COVID on the Coleman class.  So, yes,

17  I would request that you file everything you've referenced here

18  with the Court.

19          MR. BIEN:  I will, Your Honor.

20          THE COURT:  All right.  Mr. Lewis.

21          MR. LEWIS:  Good afternoon, Your Honor.

22      If I might, I think Mr. Bien's initial comments about how

23  he was reassured both between the memo that was released by

24  CDCR this morning and that the DSH transfers are up are showing

25  some of the processes that Your Honor has put in place are

1   being utilized by the parties and are resulting in some good

2   results for everything.  So we appreciate plaintiffs' comments.

3   We were glad we were able to provide them with information to

4   reassure them about what the transfer process is right now to

5   DSH, and that it is not being changed, and that the thing that

6   we talked about within the group setting is what is happening

7   in the field.

8        We understand the plaintiffs' comments about San Quentin

9   and the outbreak there.  I understand that that is obviously a

10  very, very central point in the Plata matter and that there is

11  a lot of attention being paid to that.  So I will -- I would

12  defer to anything that would happen in Plata with Judge Tigar

13  or my colleagues in the Plata case or the receiver's office as

14  to what is going on there, but definitely we are aware in the

15  Coleman matter about the importance of that given that there

16  are a large number of Coleman class members that are there.

17       One other thing that I did want to mention, Your Honor, is

18  the correspondence that Mr. Bien is referencing about the link

19  between COVID-19 and mental health factors, we have received

20  that, we are looking at it, we got it at the end of last week.

21  We are discussing this, and we do look forward to discussing

22  this and some of the issues that are raised in it with

23  plaintiffs and the Special Master.

24       There is a lot of data within that, there is a lot of

25  clinical information in there that we are having our own

1  clinicians look at, as well as trying to assess it with public

2  health officials and things like that.  So that's a

3  conversation definitely we will be having going forward.

4      There is a lot of different things about the mental health

5  population that we're starting to understand now, and the

6  impacts of COVID both on the mental health population and CDCR

7  population at large because we're starting to get more data.

8  You're hearing it from the Special Master about how tests are

9  being performed, and things like that.

10      If Your Honor has specific questions, we do have Dr. Bick

11  available, and he is prepared to dive into the statistics a

12  little more, which I know Your Honor sometimes appreciates.

13          THE COURT:  Thank you, Mr. Lewis.

14      I'm not feeling the need for that today.  I did ask

15  Dr. Bick, you know, his professional opinion at our last

16  session.  What I would do is extend the offer to the defense

17  team, including Dr. Bick, to the extent you're identifying

18  additional materials or other materials.  I realize reasonable

19  professionals may disagree, but the Court would welcome the

20  opportunity to keep itself abreast of whatever is emerging in

21  this field with respect to best practices with respect to

22  mental health populations, particularly the incarcerated

23  mentally ill.  That's my broad interest at this point.

24      If you think there is something material and important that

25  would inform the Court's understanding and you want Dr. Bick to

1    share that with me today, I'm happy to listen to a report.

2        MR. LEWIS:  Yes, Your Honor.  Dr. -- Dr. Bick does

3    have a brief statistical analysis that may interest the Court.

4        And on another subject, as Your Honor is aware, we will be

5    filing something.  We do appreciate the opportunity to do that.

6    We're just kind of making sure we're getting everybody aligned

7    and spreading the plaintiffs' correspondence around.  So we

8    will be filing something with the Court on that eventually, and

9    we appreciate your time.

10       Perhaps I could turn it over to Dr. Bick now for some of

11   the statistics that you might find interesting, Your Honor.

12       THE COURT:  That's fine.

13       Dr. Bick, in a few minutes, can you summarize what you have

14   to share with the Court?

15       DR. BICK:  Certainly, Your Honor.  And I apologize,

16   I'm going to keep my video link off just because of instability

17   of the connection.

18       THE COURT:  All right.  I did see you earlier on the

19   video screen, so I know you're there.

20       DR. BICK:  Thank you.

21       I'm not going to repeat what Mr. Lopes said other than to

22   say testing continues at a very rapid clip, including 13,000

23   additional tests over the last two weeks.  We've now tested

24   over a third of our patient population.  And the mental health

25   delivery system patients are represented in their -- in a

1    similar proportion to everyone else, so they are all being

2    tested as well.

3        Of those who have tested positive, 30 percent have been in

4    the mental health delivery system, so they're represented at

5    similar numbers to their overall population.  So all -- about

6    30 percent of the tests have been among the Coleman class

7    patients.  26 percent of the positives were among Coleman class

8    patients.  26 percent of the hospitalizations were among

9    Coleman class patients.

10        And so, again, we're early, some of this depends upon where

11    the initial outbreaks are, but so far we're fortunate to be

12    able to say that it does not appear that our Coleman class

13    members are either getting infected at a greater rate or being

14    hospitalized at a greater rate.

15        One of the other things that calculated up this last week

16    that I was pleased to see is that the case mortality rate

17    nationwide is 1.4 percent of patients who get COVID are dieing

18    from it, in the department here it's .47 percent.

19        The only other thing I would say is I encourage and

20    appreciate all of the information that the plaintiffs are

21    providing, as was referenced earlier.  This is a rapidly

22    developing field.  We're looking forward to discussing that

23    with them.  We had a brief conversation in the task force.  And

24    to the extent that we can do anything to enhance our response

25    for the patients, we're willing to do that.

1            THE COURT:  All right.  And I trust you're on top of

2    emerging science in this field, and so to the extent you have

3    resources you want the Court to review, please ensure that

4    Mr. Lewis has them to provide to the Court.

5            DR. BICK:  Will do, Your Honor.

6            THE COURT:  All right.  Because there is statistics

7    and then there is -- there are nonstatistical concerns as well,

8    of course.

9            DR. BICK:  I thought you were about to give a Mark

10   Twain quote.

11           THE COURT:  Well, I could have gone in that

12   direction.  You can fill in the blanks.

13      Let me talk briefly about the maps.  They are very helpful

14   tools.  I'll be getting updates of those maps.  Two things,

15   I -- in a tutorial with Special Master Lopes -- these are nits,

16   relatively speaking, but he may have already addressed with

17   some of you -- reception centers are identified in different

18   ways.  I can see the list of reception centers on the CDCR

19   website, some of the maps have "Reception Center" at the top in

20   bold print, sometimes you have to look down into the legend.  I

21   think I'm clear on what are reception centers, but if you want

22   to make the maps as user friendly and consistent, you might

23   look at the labels.  That's a nit.  I think I understand now,

24   with Special Master Lopes' assistance, which are the reception

25   centers.

1        I've also started to wonder about trends.  The maps will be

2    useful in identifying trends, as well as seeing movements

3    throughout the system.

4        I was inclined to try to develop my own calculations.

5    Special Master Lopes, you will thank him for this I think,

6    suggested that perhaps the defendants, with the plaintiffs'

7    input, might like to provide me with numbers demonstrating any

8    trends.  And so to the extent you want to include analyses to

9    help develop the picture longitudinally, please feel free to do

10   that.  And I think Special Master Lopes can talk with you about

11   what I'm looking for there.

12       In terms of updates, Special Master Lopes can also talk

13   this through with you, I had initially envisioned every time

14   you file a set of maps with the sealed counterpart, the entire

15   set.  If it reduces the workload on you to file only those maps

16   and charts where there is a change, that is fine.  So you

17   just -- you can work that out.  I need to see the changes, and

18   the way I -- just assume that I am putting this in a binder,

19   organized by institution and longitudinally, and I'm going to

20   be monitoring myself.  And so if there is no update, I may not

21   need to compare two maps that are identical.  So just thinking

22   about it from the user friendly, you know, lowest common

23   denominator reader, think about how to present that information

24   to me going forward.  But it's a very useful tool.  I think it

25   will be useful for all sorts of reasons as we proceed.

1       In terms of unmet bed needs, I'm going to put that on the

2    agenda for the next quarterly status.  And I believe we have

3    July 17th calendared, I'm confirming that date.  My

4    understanding is the Special Master could have resources

5    available to conduct that study in the fall.

6       Do I have that right, Special Master Lopes?

7              MR. LOPES:  Yes, Your Honor.

8              THE COURT:  So the question is, is it feasible.  Or

9    perhaps the question is, under the current circumstances, how

10   does the Special Master conduct that study.  I'm not inclined

11   to delay it further.  And so between now and the quarterly

12   status, in the task force, the parties, with Special Master

13   Lopes, can discuss how to allow that study to proceed in the

14   fall given the resources the Special Master has available.

15      Finally, here is my thinking, unless you tell me otherwise.

16   We have a lot to do to prepare for a meaningful quarterly

17   status in mid-July.  I believe we can suspend these statuses

18   with the Court until then.  However, I would direct the task

19   force to continue meeting and the parties to file, every two

20   weeks, a status report covering, in the briefest form possible,

21   what it believes -- what they believe the Court needs to know.

22   So you would be unburdened of these statuses.

23      You would still have the task force to work through issues,

24   including issues such as the most recent potential

25   misunderstanding about DSH transfers, and other issues as well,

1    and your updates would keep me up-to-date as needed.

2        And then I would publish a more complete agenda for

3    July 17th.  I've already signaled I plan to get back on track

4    with Coleman, but it needs to be with the recognition of the

5    current context.  And so this is where the maps are helpful to

6    me, the information you'll be providing me about the impact of

7    coronavirus on the mentally ill incarcerated, and any other

8    information you provide between now and then.  I may have

9    broader questions I want you to address in a joint status

10   before that status on July 17th.

11       So any objection to suspending these statuses and just

12   looking to the next status, assuming it's a full and

13   potentially lengthy status on July 17th, Mr. Bien?

14            MR. BIEN:  No, Your Honor.

15            THE COURT:  Mr. Lewis?

16            MR. LEWIS:  No objection, Your Honor.

17            THE COURT:  All right.  I will still look for the

18   reports, though, every two weeks.  Special Master Lopes knows

19   how to get ahold of me.

20       Is there anything else we should cover today, Special

21   Master Lopes?

22            MR. LOPES:  No, Your Honor.

23            THE COURT:  Mr. Bien?

24            MR. BIEN:  No.  Thank you, Your Honor.

25            THE COURT:  Mr. Lewis?

 1              MR. LEWIS:  Nothing, Your Honor.

 2              THE COURT:  All right.  Very good.  I'll look for

 3    your filings, do what work I need to before July, and I'll see

 4    you in July.  Thank you very much.

 5              THE CLERK:  Court is in recess.

 6                   (Proceedings adjourned, 1:52 p.m.)

 7                          ---oOo---

 8    I certify that the foregoing is a correct transcript from the

 9    record of proceedings in the above-entitled matter.

10

11                        /s/ Kimberly M. Bennett
                          KIMBERLY M. BENNETT
12                        CSR No. 8953, RPR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25