XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS L. HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7325
 Fax: (916) 324-5205
 E-mail: Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**FIRST JOINT UPDATE ON THE WORK OF THE COVID-19 TASK FORCE** |

Over the past several months, the Court conducted regular status conferences focused on the COVID-19 pandemic. During those conferences, the Special Master and parties updated the Court on the state of COVID-19 in the California Department of Corrections and Rehabilitation (CDCR) and the California Department of State Hospitals (DSH), including the number of cases, deaths, and tests. They also informed the Court of issues addressed in the weekly Special Master supervised COVID-19 Task Force meetings, which include Plaintiffs, and regular small workgroup meetings with representatives from Defendants and the Special Master's team. Unless otherwise indicated, the small workgroup meetings include members of Defendants' leadership

and experts from the Special Master's team, and not Plaintiffs.  The Special Master holds meetings with Plaintiffs to update them on the status of the workgroups.  At the June 29, 2020 status conference, the Court suspended the regular COVID-19 focused status conference, and instead directed the parties to file a joint report with updates "on the work of the Task Force" by July 15, 2020 and file additional joint updates "every two weeks thereafter."  (ECF No. 6741.) This report provides the parties' first Task Force joint update following the Twenty-Fourth (June 30), Twenty-Fifth (July 7), and Twenty-Sixth (July 14) Task Force meetings.

I.   **UPDATE REGARDING COVID-19 CASES IN CDCR AND DSH.**

   A.   **CDCR's Report On COVID-19 Cases and Testing.**

The following table shows the total number of confirmed COVID-19 cases, both active and resolved to date, and the number and percentage of those cases involving *Coleman* class members and their level of care.

| COVID Result | Total Patients | MHSDS Patients Only | MSHDS patients as % of total |
|---|---|---|---|
| Active | 2,285 | 650 (577 CCCMS, 66 EOP, 4 MHCB, 1 ICF, 1 APP) | 28.45% |
| Resolved | 3,967 | 1,023 (872 CCCMS, 139 EOP, 4 MHCB, 6 ICF, 2 APP) | 25.79% |
| TOTAL active + Resolved | 6,252 | 1,673 (1,449 CCCMS, 205 EOP, 8 MHCB, 7 ICF, 3 APP) | 26.76% |

To date, 38 prisoners have died due to the novel coronavirus, of whom 14 were part of the Mental Health Statewide Delivery System (MHSDS) at the time of their deaths. CDCR reported that, as of July 7, a total of 95 prisoners statewide were at that time admitted to outside hospitals and thirty-seven of the hospitalized prisoners are *Coleman* class members.[1] CDCR reports these numbers exclude patients who were COVID-19 positive and admitted to outside hospitals for reasons other than COVID-19.

According to CDCR, as of July 15, it had tested 52,930 unique prisoners and former prisoners, 48,252 of whom are still in CDCR custody. Of the 48,252 in-custody prisoners tested, 13,217, or 27.39 percent, of those tested were part of the MHSDS.

**B.   Update Regarding Specific CDCR Institutions and Programs.**

CDCR also provided updates on the COVID-19 status at several of its prisons at the July 7 and 14 Task Force meetings. In advance of the outbreak at San Quentin, as CDCR previously reported in its May 15, 2020 in camera Maps submission to the Court, CDCR had reduced the occupancy of the H-Unit dorms to encourage social distancing. CDCR informed the parties and Special Master that, following the outbreak, it had identified excess medical space at San Quentin State Prison to provide care to prisoners on site, and had set up an alternate care site in the Prison Industry Authority Furniture Factory space. San Quentin is using gym space to house COVID-19 negative patients and tents to house COVID-19 confirmed patients. CDCR and San Quentin took a number of additional steps to respond to the COVID-19 outbreak, including placing the entire facility on modified programming, requiring all staff working behind the gates to wear N95 masks, issuing N95 masks to all incarcerated people, and quarantining individual housing units. CDCR reported that on this modified program, San Quentin is offering showers every 72 hours, continues to allow canteen and packages, and is providing two cold and one hot meal in-cell per day (provided by an outside vendor), but is unable to provide phone calls or yard to incarcerated

---

[1] CDCR reports it is currently unable to determine the number of people who have been hospitalized to date and the number of *Coleman* class members included in that group. CDCR has manually pulled and provided class member hospitalization data from May 8 to July 6, 2020, however Plaintiffs have raised concerns that this data missing some class members hospitalized during that timeframe. The parties will meet and confer about whether CDCR is able to calculate this information.

people.  Plaintiffs expressed their concerns particularly about the lack of phone calls and CDCR agreed to further review that issue.  CDCR reported at the July 14 Task Force receiving COVID-19 positive test results from San Quentin's H-Unit dormitories housing EOP class members.  CDCR also reported on July 7 that it would have its new academy graduates report to work at San Quentin to provide relief to custodial staff, however as of July 14 CDCR reported it was able to end the redirection of academy graduates due to relief staffing from other institutions.  It also brought in healthcare registry and contract staff to provide additional assistance.  CDCR is offering hotel rooms to staff who do not want to risk returning home after working shifts at San Quentin.  And CDCR created an Incident Command Post at San Quentin and all other institutions.  CDCR is offering people incarcerated in the Reception Center the opportunity to purchase entertainment appliances and is relying on a volunteer organization to purchase additional devices.  Plaintiffs noted support for this, but encouraged CDCR to directly purchase devices and provide them to the incarcerated population.

    CDCR also informed the Task Force that it had installed medical tents at the California Medical Facility and was working on its plan for the prisoners who would be cared for in the tents.  At the July 7, 2020 workgroup, CDCR reported it also planned to set up medical tents after a prisoner at Folsom State Prison tested COVID-19 positive.  CDCR reported that the tents at the California Institution for Men were closed and removed because they were no longer necessary for housing inmates as part of CDCR's ongoing COVID-19 response effort.

    At the June 30 Task Force meeting, CDCR reported that movement at Salinas Valley State Prison was temporarily stopped due to COVID-19 cases, including in the Psychiatric Inpatient Program (PIP), which was closed because a COVID-19 positive inmate worked in the PIP as a porter.  CDCR reported on July 7 that the PIP was still on quarantine and Plaintiffs questioned whether quarantines were expected to last 14-days or for some longer period of time.  On July 8, CDCR informed the parties that the quarantine of units C5 and C6 was lifted after all patients tested negative for a second time, however CDCR clarified at the July 14 Task Force meeting that the entire institution, including the PIP, remains closed to inter-institution transfers.

At the June 30 and July 7 Task Force meetings, CDCR updated the parties on the status of its Temporary Mental Health Units (TMHUs). According to CDCR, there were 39 *Coleman* class members in TMHUs as of June 30, which represented a decrease from 41 the week before. CDCR also informed the Task Force that class members in the mainline TMHUs were getting dayroom and those in the Max Custody TMHUs were being offered yard and confidential out-of-cell treatment. CDCR also reported that it is working on a way to track patient activity in the TMHUs as part of its COVID-19 dashboard, discussed below in greater detail.

And on July 9, CDCR notified the Special Master and Plaintiffs that the Correctional Health Care Facility (CHCF), including its PIP, was closed to all intake. As of that date, CHCF had one active COVID-19 positive patient and 25 active staff cases.

**C.  DSH Report Regarding COVID-19 Cases and Facilities.**

DSH reported that, as of July 10, it does not have any confirmed positive cases in its *Coleman* population. As of July 14, 19 of DSH-Patton's treatment units, including all of its admissions units, were on quarantine due to COVID-19 cases at that facility. The DSH-Patton unit that houses *Coleman* class members was previously quarantined, but that quarantine was lifted on July 6. No *Coleman* class members were symptomatic or tested positive; the quarantine was due to a staff member and a non-*Coleman* patient who tested positive. DSH-Patton was closed on June 18, 2020 to new admissions, except for non-*Coleman* patients designated as Offenders with Mental Health Disorders (OMDs), and remains closed. In response to Plaintiffs' questions, DSH confirmed that, in order to increase safety for staff and patients, it is conducting baseline testing of its patients in skilled nursing, geriatric, and medically fragile units to ensure the most at-risk patients are not positive. It is also conducting ongoing surveillance testing of its staff to reduce the risk of introducing COVID-19 into its units. DSH has established a public online COVID-19 tracker, available at https://www.dsh.ca.gov/COVID-19/Patient_and_Staff_COVID-19_Tracking.html. As of July 14, 2020, the online tracker showed there were positive patients and staff at all five DSH hospitals.

## II.  UPDATES ON DSH CENSUS, WAITLIST, AND ADMISSIONS.

At each of the Task Force meetings, DSH and CDCR provided their census, waitlist, and admission reports. As of the July 10 data discussed at the July 14 Task Force meeting, there were 220 *Coleman* class members at DSH-Atascadero (36 available beds), 46 at DSH Coalinga (4 available beds), and 10 at DSH-Patton (20 available beds). Since DSH lifted its temporary suspension of admissions effective April 16, 2020, DSH has admitted 67 *Coleman* class members. Since the June 26 status conference, DSH has admitted 14 class members. None of those patients waited longer than 30 days for admission.[2] Two referrals to DSH-ASH/CSH have been pending admission for more than 30 days. Both patients are on a COVID-19 hold because their institutions are closed, but they are currently in a CDCR PIP at the intermediate care facility (ICF) level of care and were referred to DSH based on their least restrictive housing. No other pending referrals to DSH have been waiting longer than 30 days for admission. The Task Force also discussed how information is reported in DSH's weekly update on referrals and transfers.

DSH also reported that there are currently four pending ICF referrals to DSH-Patton. None of those referrals have been pending for more than 30 days and the patients are all currently being treated at the ICF level of care at the California Institution for Women psychiatric inpatient facility. Plaintiffs expressed concerns that the patients were waiting for admission while DSH-Patton remained closed to admissions other than a small number of patients designated as OMDs. DSH confirmed that it would work to admit those patients to DSH-Patton as soon as it is safe to do so; however, as of July 15, 2020, DSH-Patton has had 75 positive COVID-19 cases for staff and 95 for patients. As of July 14, 2020, DSH-Patton had 19 units still under quarantine and three units in isolation. At the July 14 Task Force, Plaintiffs expressed their concern that DSH has not identified specific conditions under which it will restart admissions to DSH-Patton. DSH stated that it plans to restart admissions once there is not significant COVID-19 transmission there and the admissions units have come off quarantine.

---

[2] The temporary transfer guidelines in place before the current June 19 guidelines provided for a pre-referral COVID-19 screening. Under the prior guidelines, DSH tracked and reported transfer timelines to the Task Force based on time of referral post initial COVID-19 screening, as well as from the time DSH received the pre-referral package for COVID-19 screening. Under either timeline, no patient waited longer than 30 days to transfer.

### III. UPDATES ON THE CDCR AND DSH SMALL WORKGROUP ACTIVITIES.

Since the June 26 status conference, the Special Master and the parties held Task Force meetings on June 30, July 7, and July 14. In addition to these Task Force meetings, the Special Master's experts have held small workgroups with CDCR and DSH leadership, and without Plaintiffs, focused on specific topics. The CDCR small workgroup has met three times since the June 26 status conference and reported its work to the Task Force. The workgroup has been working on a revised movement matrix and a memorandum clarifying the meaning of "clinically essential" movement as it is used by the Division of Adult Institutions' (DAI) order to halt movement. CDCR also clarified that mental health staff continue to refer patients to different levels of care while movement is halted, including patients who are currently housed at institutions that are closed due to the number of COVID-19 cases.

The DSH small workgroup has also met three times and reported its activities to the Task Force. Public health officials from the California Department of Public Health joined the workgroups to discuss the admission process created for patients transferred to DSH facilities during the pandemic and whether DSH can safely admit COVID-19 positive patients. The small workgroup discussed how it would handle admissions from CDCR's prisons that are closed to transfers due to COVID-19 cases and confirmed that it was working on a protocol for reviewing referrals from closed prisons, which it expected to share in draft form at the July 21 Task Force meeting, however the small workgroup previewed that such transfers likely would be rare under the draft protocol. The small workgroup also reported that it continued to discuss referrals to DSH from CDCR. During the July 7 Task Force meeting, DSH confirmed that it is tracking transfer timeframes based on the date of referral as stated in the current temporary transfer guidelines issued on June 12 and finalized on June 19.

At the June 30 Task Force meeting, the Special Master and parties discussed the purpose and use of minutes being kept by the small workgroups. The parties agreed that the purpose of those minutes would be for the small workgroups to track their discussions and progress—the minutes are not meant to be used in the *Coleman* litigation. Based on that understanding, the parties agreed the minutes do not need to be produced to the parties.

Members of CDCR and DSH leadership have also been meeting with the Special Master's experts as part of a Behavioral Treatment small workgroup discussing options to address class members with behavioral issues in addition to their serious mental illness. This group has not met since the June 26 status conference and is next scheduled to meet on August 5.

## IV. MISCELLANEOUS COVID-19 RELATED UPDATES.

### A. In-Cell Materials for *Coleman* Class Members.

On June 30, Plaintiffs emailed Defendants regarding materials they understood to be developed by CDCR mental health for "in-cell" use. Plaintiffs attached pages from the materials they received from an individual outside of CDCR and asked whether those and other materials have been provided to class members and requested copies of the materials. Plaintiffs raised this issue in the July 7 Task Force meeting, and Defendants stated they would respond to Plaintiffs' inquiry.

### B. Update Regarding CDCR's COVID-19 Dashboard.

On June 25, CDCR held the first part of its COVID-19 Dashboard Presentation for Plaintiffs and the Special Master's team and data expert. The Special Master's expert offered suggestions to improve visualizations and normalize the data by census and Plaintiffs made a number of requests. CDCR provided the second part of its presentation on July 1, during which CDCR reviewed Plaintiffs' prior requests for the dashboard and responded to new questions. CDCR resolved certain questions and stated that it would take others back for additional discussion and consideration. At the July 7 Task Force meeting, CDCR reported that it would soon begin rolling-out its COVID-19 dashboard to the field as part of the validation process.

### C. Updates to CDCR's COVID-19 Tracking Maps and Charts.

Defendants will file an update to the maps and charts on July 15. Since the June 26 status conference, the Special Master and parties met on July 2 to discuss updates to CDCR's COVID-19 tracking maps. The Special Master's data expert also held a meeting directly with CDCR mental health staff. During the meeting, the data expert and mental health staff discussed the inclusion of trend data. CDCR expressed concerns about its ability to include trend data by July 15, given already-constrained resources. CDCR agreed that it would work to determine the best

way to provide trend data and a timeframe for including that data in the maps.  CDCR also agreed to include explanatory cover sheets for the maps providing each institution's security levels and reception centers.

### D. Updated Stipulation and Order Identifying Program Guide Departures.

As ordered by the Court, the parties met and conferred to update the stipulation and proposed order and attached appendix identifying Program Guide departures.  The stipulation and appendix were updated to show changes since the parties' June 15 filing and will be filed by July 15.

### E. Information Regarding the Relationship Between Serious Mental Illness and COVID-19 And Plan for Enhanced Pandemic Treatment Strategies.

On June 19, Plaintiffs sent Defendants and the Special Master a letter and attached exhibits. In the letter, Plaintiffs described their position that a link exists between serious mental illness and COVID-19 risk, and the need to develop a strategy to provide mental health care to class members and other prisoners during the long-term pandemic.  During the June 26 status conference, the Court requested that the parties file any data showing a connection between the *Coleman* class and potential vulnerability to COVID-19.  In response to the Court's request, Plaintiffs on July 2 filed a brief describing a connection between serious mental illness and risk of complications for COVID-19, as well as several exhibits.

Defendants are currently working on a response to Plaintiffs' July 2 filing and intend to provide it to the Special Master and Plaintiffs for discussion at the July 21 Task Force meeting. As appropriate, Defendants then will provide information from their response and the Task Force discussions to the Court.

### F. CDCR's Mission Change Update.

CDCR provided its monthly mission change letter on July 3 and discussed the letter with the Special Master and Plaintiffs at the July 7 Task Force meeting.  CDCR announced that it intends to close the Reception Centers at San Quentin, the California Institution for Men, and Duel Vocational Institution on October 5.  Those closures will also result in the closure of the Reception Center mental health programs and Short Term Restricted Housing units at each of

those institutions. CDCR also shared its May 7 memorandum announcing expedited timelines for processing and transferring prisoners from Reception Centers including its goal to shorten the transfer timeframes for everyone to approximately 30 days.

### G.     Update Regarding the ASU EOP Hub Certification Process.

Since the June 26 status conference, there have been two small workgroup meetings between CDCR leadership and the Special Master's team on the ASU EOP Hub certification process. At the June 30 Task Force meeting, CDCR mental health reported that the small workgroup discussed CDCR's original proposal to modify the certification process during COVID-19, and the workgroup scheduled a follow-up meeting to address the Special Master's experts' questions on the proposed modification. Also at the June 30 Task Force meeting, Plaintiffs recommended that DAI data be recorded and taken into account as part of the certification process.

### H.     Leadership Changes at CDCR.

On July 6, CDCR announced that Dr. Joseph Bick, M.D., would be leaving his position as the Director of Health Care Services for the mental health and dental programs to become the Director of Health Care Services (formerly titled Health Care Operations) for the California Correctional Health Care Services and CDCR. In that capacity, Dr. Bick will oversee all health care services within CDCR, including medical, nursing, quality management, mental health, and dental, and continue to take a leading role in organizing CDCR's response to COVID-19. He will also continue to take a leading role in directing CDCR's *Coleman* activities and he will directly supervise CDCR's Deputy Director of Mental Health Services. He will report to both the *Plata* Receiver and Dr. Diana Toche, CDCR's Undersecretary for Health Care Services.

Also, Dr. Eureka Daye is no longer the acting Deputy Director of Mental Health Services. Dr. Amar Mehta, M.D., is the acting Deputy Director of Mental Health Services. Dr. Mehta previously served as CDCR's Chief of Telepsychiatry.

| | | |
|---|---|---|
| Dated:  July 15, 2020 | | Respectfully submitted, |
| | | XAVIER BECERRA<br>Attorney General of California<br>ADRIANO HRVATIN<br>Supervising Deputy Attorney General |
| | | /s/ Tyler V. Heath<br>TYLER V. HEATH<br>Deputy Attorney General<br>*Attorneys for Defendants* |
| Dated:  July 15, 2020 | | ROSEN BIEN GALVAN & GRUNFELD LLP |
| | | /S/ MARC J. SHINN-KRANTZ<br>MARC J. SHINN-KRANTZ<br>*Attorneys for Plaintiffs* |

CF1997CS0003
34239580.DOCX