1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   MARGOT MENDELSON – 268583
    PRISON LAW OFFICE
3   1917 Fifth Street
    Berkeley, California  94710-1916
4   Telephone:   (510) 280-2621

5   CLAUDIA CENTER – 158255
    DISABILITY RIGHTS EDUCATION
6   AND DEFENSE FUND, INC.
    Ed Roberts Campus
7   3075 Adeline Street, Suite 210
    Berkeley, California  94703-2578
8   Telephone:   (510) 644-2555

9

10  Attorneys for Plaintiffs

    MICHAEL W. BIEN – 096891
    JEFFREY L. BORNSTEIN – 099358
    ERNEST GALVAN – 196065
    THOMAS NOLAN – 169692
    LISA ELLS – 243657
    JENNY S. YELIN – 273601
    MICHAEL S. NUNEZ – 280535
    JESSICA WINTER – 294237
    MARC J. SHINN-KRANTZ – 312968
    CARA E. TRAPANI – 313411
    ALEXANDER GOURSE – 321631
    AMY XU – 330707
    ROSEN BIEN
    GALVAN & GRUNFELD LLP
    101 Mission Street, Sixth Floor
    San Francisco, California  94105-1738
    Telephone:   (415) 433-6830

11

12                UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14

15  RALPH COLEMAN, et al.,

16            Plaintiffs,

17        v.

18  GAVIN NEWSOM, et al.,

19            Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO ORDER OF JULY 2, 2020**

Judge:  Hon. Kimberly J. Mueller
Status Conference:  July 17, 2020
Time:  10:00

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.  CLUSTERING, ALTHOUGH WITHIN THE COURT'S POWER TO ORDER, IS FUTILE WITHOUT A SUBSTANTIAL TARGETED REDUCTION OF THE MENTAL HEALTH POPULATION. ............................... 1

II.  THE STATE'S ACCELERATED RELEASES AND OTHER POPULATION REDUCTION MEASURES ANNOUNCED TO DATE DO NOT TARGET THE *COLEMAN* CLASS. ................................................ 6

III.  A *SUA SPONTE* ORDER TO CONVENE A THREE-JUDGE PANEL WOULD BE WELL-SUPPORTED BY THE EVIDENCE THAT CDCR CONTINUES TO VIOLATE THE RIGHTS OF THE *COLEMAN* CLASS AND THE PRIOR ORDERS HAVE NOT REMEDIED THE FEDERAL VIOLATIONS. ................................................................................ 6

    A.  OVERCROWDING OF THE MENTAL HEALTH POPULATION CAUSES ONGOING, SERIOUS CONSTITUTIONAL VIOLATIONS ......................................................................... 9

        1.  The State's Population Reduction Measures Have Failed to Benefit the *Coleman* Class ............................................ 9

        2.  Persistent Overcrowding Severely Harms the Mental Health Population............................................................ 11

            (a)  Profound Psychiatry Shortages Impede the Provision of Mental Health Care ............................ 12

            (b)  The State Lacks Sufficient Resources to Provide Minimally Adequate Mental Health Care to its Most Acutely Ill Population ............................................. 18

            (c)  The Prison System Lacks Sufficient Space to Deliver Mental Health Care .............................. 23

            (d)  The State Is in the Midst of a Suicide Crisis ......................... 30

            (e)  Class Members Disproportionately Are Subjected to Harmful Conditions in Segregation Units............................... 36

                (i)  The State's Response to COVID-19 Has Resulted in Extended and Unnecessary Stays in Segregation With Limited Mental Health Treatment ...................................................... 39

                (ii)  The State is Once Again Imposing Widespread Segregation-Like Settings In General Population Settings Due to Limitations in Space and Staffing ...... 42

            (f)  CDCR Fails to Provide Safe and Humane Conditions for Class Members ............................................... 44

(g)   Mental Health Overcrowding Strains the Delivery of Adequate Medical Care ................................................ 46

(h)   Coleman Class Members are Disproportionately Affected by Overcrowding and Related Susceptibility to Coronavirus ................................................................... 47

B.   THIS COURT SHOULD REQUEST THE CONVENING OF A THREE-JUDGE COURT FOR CONSIDERATION OF TARGETED RELIEF TO ADDRESS RAMPANT CONSTITUTIONAL VIOLATIONS ARISING FROM ONGOING OVERCROWDING OF THE MENTAL HEALTH POPULATION ............................................. 48

1.   The State Failed To "Properly Account for" the Mental Health Population in Implementing its Population Reduction Measures ...... 48

2.   The PLRA's Requirements for Convening a Three-Judge Court are Met .................................................................................. 51

(a)   Less Intrusive Orders Have Failed to Remedy the Violation of Class Member's Right to Constitutionally Adequate Mental Health Care .................................................. 51

(b)   The State Has Had More than a Reasonable Amount of Time to Comply ...................................................................... 53

CONCLUSION ........................................................................................................ 54

[3574826.15]

1

# TABLE OF AUTHORITIES

2

**Page**

3

<u>CASES</u>

4

*Brown v. Plata*,
     563 U.S. 493 (2011) ........................................................................ passim

*Cameron v. Bouchard*,
     No. CV 20-10949, 2020 WL 2569868 (E.D. Mich. May 21, 2020), *vacated*
     *on other grounds at* No. 20-1469, 2020 WL 3867393 (6th Cir. July 9, 2020) .......... 5

*Coleman v. Brown*,
     28 F. Supp. 3d 1068 (E.D. Cal. 2014) ............................................... 38, 39

*Coleman v. Brown*,
     938 F. Supp. 2d 955 (E.D. Cal. 2013) ...................................................... 53

*Coleman v. Schwarzenegger*,
     922 F. Supp. 2d 882 (E.D. Cal. 2009) ............................................... passim

*Coleman v. Wilson*,
     912 F. Supp. 1282 (E.D. Cal. 1995) ........................................... 13, 44, 53

*Mays v. Dart*, No. 20 C 2134,
     2020 WL 1987007 (N.D. Ill. Apr. 27, 2020) ............................................ 5

*New York State Assn. for Retarded Children, Inc. v. Carey*,
     706 F.2d 956 (C.A.2 1983) ......................................................................... 49

*Plata v. Brown*,
     427 F.Supp.3d 1211 (N.D. Cal. 2013) ................................................... 1, 4

*Reaves v. Dep't of Corr.*,
     392 F. Supp. 3d 195 (D. Mass. 2019) ....................................................... 5

*Reaves v. Dep't of Corr.*,
     404 F. Supp. 3d 520 (D. Mass. 2019) .................................................... 4, 5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

<u>STATUTES</u>

23

18 U.S.C. § 3626 ....................................................................... 7, 9, 51, 54

Cal. Penal Code § 2064.1 ............................................................................. 34

24

25

26

27

28

[3574826.15]

1    Plaintiffs, through their counsel, hereby answer the three questions posed in this

2  Court's July 2, 2020 Order, ECF No. 6750.

3  **I.     CLUSTERING, ALTHOUGH WITHIN THE COURT'S POWER TO
        ORDER, IS FUTILE WITHOUT A SUBSTANTIAL TARGETED
4        REDUCTION OF THE MENTAL HEALTH POPULATION.**

5    The Court's July 2 Order posed the following question regarding clustering:

6           Whether increased clustering of members of the plaintiff class,
            particularly at the Enhanced Outpatient Program (EOP) and
7           higher levels of care, is a feasible option for achieving full and
            durable compliance with the Program Guide and other
8           remedial requirements of this action sooner rather than later,
            given that clustering could be expected to reduce the need for
9           transfers within the prison system to achieve compliance. The
            briefing on this issue should include discussion of available
10          clustering options and whether any of those options can be
            achieved during the COVID-19 pandemic through application
11          of best practices defined by reputable public health authorities.
            In considering this issue, in addition to any other matter the
12          parties may brief, they should address whether *Plata v. Brown*,
            427 F.Supp.3d 1211 (N.D. Cal. 2013), serves as authority for
13          the proposition that this court sitting as a single judge court
            may sua sponte enter an order directing defendants to submit a
14          clustering plan and to order implementation of that plan at such
            time as best public health practices indicate it is safe to do so.

15

16    Clustering alone is not a feasible path to full and durable compliance, given the

17  *Coleman* class still numbers over 33,000 individuals, over 8,000 of whom are at the EOP

18  level of care or higher.  Declaration of Michael Bien in Support of Plaintiffs' Response to

19  July 2, 2020 Order ("Bien Decl."), filed herewith, ¶ 8, Ex. I.  There are simply too many

20  patients to care for in a system that cannot hire enough clinicians to care for them, and

21  cannot work out the necessary programming and movement within institutions, much less

22  with transfers among institutions.  Restrictions on movement imposed to address the

23  pandemic certainly highlight the inadequacies of the current overcrowded mental health

24  delivery system, and clustering, which could lessen the need for transfers, should certainly

25  be part of a plan to achieve full and durable compliance.  But without a substantial and

26  targeted population reduction, clustering will fail.

27    The State informed the Court in 2018 that, in its opinion, further clustering will not

28  bring this action close to a durable remedy.  Joint Status Report Re: June 28, 2018 Status

1 Conference Re: Staffing, June 21, 2018, ECF No. 5841 at 5:23-24 ("Defendants do not

2 believe that further clustering presents a workable solution."); Joint Status Report Re

3 October 11, 2018 Status Conference, Sept. 14, 2018, ECF No. 5922 at 10:5-10 ("CDCR

4 has determined that further clustering of the EOP populations is not a viable solution to

5 resolve its staffing challenges due to the constraints placed on population management and

6 timely transfers, the limited effect further clustering would have on staffing recruitment,

7 the need for adequate office and treatment space at the institutions, and the adverse effects

8 on staff morale and retention caused by housing the sickest patients together."); *see* Joint

9 Status Report Re: June 28, 2018 Status Conference Re: Staffing, June 21, 2018, ECF No.

10 5841 at 5:18-23.  Although two years have passed, conditions for the *Coleman* class have

11 continued to deteriorate both before and during the pandemic, and the State's refusal to

12 take any meaningful steps to address the problem, including the consideration of additional

13 clustering, along with targeted population reduction, must be addressed.

14        Of course, clustering was once the remedy endorsed by the State both for the

15 *Coleman* and *Plata* cases.  The California Health Care Facility at Stockton (CHCF), was

16 intended, at least in part, to respond to Plaintiffs' 2007 *Plata-Coleman* three-judge court

17 motion for a population reduction order.  Certainly, this plan constituted construction and

18 "clustering."  The Receiver's "10,000 Bed Plan"[1] would have constructed and staffed

19 several dedicated medical facilities to provide appropriate housing, programming and

20 treatment to incarcerated persons requiring the highest and most intense levels of medical

21 and mental health care.  *See* Receiver Turnaround Plan at 38-39.[2]  These health care

22 facilities would have been located at sites where it was reasonable to expect success

---

[1] The "10,000 bed plan" was outlined by the *Plata* Receiver in a court filing on June 6, 2008, entitled "Notice of Filing of the Receiver's Turnaround Plan of Action," *Plata v. Newsom,* N.D. Cal. Case No. 01-1351 ("*Plata*"), June 6, 2008, ECF No. 1229 ("Receiver Turnaround Plan").  The 10,000-bed plan is listed as Objective 6.2, with the heading "Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs," starting at page 38.

[2] All citations to pages in filed documents refer to the ECF pagination unless otherwise stated.

1  recruiting and retaining clinical staff.  In addition, these facilities would have the delivery

2  of health care as their primary mission, and, though secure, would be designed to tip the

3  balance away from custodial control—so critical to successful mental health programs.

4  While initially embraced by the State as a central defense to Plaintiffs' three-judge court

5  motion, by the time of the overcrowding trial in 2008, the State had, for financial and

6  political reasons, largely gutted and abandoned the Receiver's 10,000 Bed Plan.  *Coleman*

7  *v. Schwarzenegger*, 922 F. Supp. 2d 882, 953-54 (E.D. Cal. 2009) (reciting history of

8  Receiver-CDCR negotiations to build "'health care-focused prison facilities,'" and noting

9  that "the state ultimately declined to sign the agreement").

10      The 3,000-bed CHCF was the only medical facility ultimately constructed and its

11  design and operation were significantly changed to be more like a prison than a medical

12  facility.  *See* Notice of Filing of Receiver's Twenty-Fifth Tri-Annual Report, Feb. 3, 2014,

13  ECF. No. 5036 at 37 ("Stated another way, the institution was being run as just another

14  prison—where custody issues are typically the highest priority and health care and other

15  programs are secondary—instead of being run as a health care facility for patient-

16  inmates.").  For *Coleman*, the altered design and construction of hundreds of necessary

17  beds for licensed inpatient psychiatric hospitalization resulted in a physical plant that

18  fundamentally precluded patients from accessing appropriate out-of-cell treatment and

19  activity.  *See* Special Master's Monitoring Report on the Mental Health Inpatient Care

20  Programs for Inmates of the California Department of Corrections and Rehabilitation,

21  Aug. 30, 2018, ECF No. 5894 at 211, 220, 233.  The State's refusal to allow CHCF to be a

22  true secure medical facility, rather than a prison with a medical mission, results in the

23  custodial interference with mental health care that remains an obstacle today.  Bien Decl.

24  ¶¶ 59-60.  CHCF is, of course, a positive for the system in many ways and does represent a

25  successful, yet limited, example of clustering.  Once a patient is at CHCF, there is no need

26  for transfers between institutions for higher levels of care.  Such transfers have always

27  been burdensome, time-consuming, and expensive and, now, during the pandemic, are

28  perilous for the system.

In concert with the implementation of a targeted population reduction order, designed to substantially reduce overcrowding in the *Coleman* class, clustering of EOP and higher programs at a limited number of facilities will be a necessary part of a durable and sustainable remedy.  By locating these programs where recruiting and retention of clinical staff is far more likely, and using telepsychiatry services for CCCMS programs at the other prisons, clustering can help address clinical staffing challenges.  But as the ongoing challenges at CHCF demonstrate, unless and until these mental health programs are allowed to operate with minimal custodial interference, quality mental health treatment with the prospect of stabilizing and controlling symptoms and restoring function will not be realized.

In *Plata v. Brown*, 427 F. Supp. 3d 1211 (N.D. Cal. 2013), the district court ordered CDCR to implement the Receiver's plan to restrict admission to certain prisons due to life-threatening risks from Valley Fever.  At least 36 incarcerated persons had died from Valley Fever between 2006 and 2011.  *Id.* at 1218.  The district court rejected CDCR's arguments that its order was tantamount to a "prisoner release order" under the PLRA and therefore required a three judge-court.  A transfer from one prison to another is not a release, a point CDCR had conceded by the time of oral argument, and in the face of overwhelming authority.  *Id.* at 1222 & n.11.  The court specifically identified a number of circumstances where a transfer order might be necessary to enforce constitutional rights, including "if specialized medical care were not available at a particular prison."  *Id.* at 1223.  Securing specialized care, in this case mental health care, would be the need met by a clustering order if one were entered here.

The *Plata* decision has also been cited favorably for the proposition that the three-judge court requirement of the PLRA does not apply where the constitutional harms at issue are caused by something other than overcrowding.  *Reaves v. Dep't of Corr.,* 404 F. Supp. 3d 520, 522-23 (D. Mass. 2019) (transfer of paraplegic prisoner to a facility outside the corrections department for treatment not available in corrections facility); *Cameron v. Bouchard*, No. CV 20-10949, 2020 WL 2569868, at *27 (E.D. Mich. May 21, 2020),

[3574826.15]

1   *vacated on other grounds at* No. 20-1469, 2020 WL 3867393 (6th Cir. July 9, 2020)

2   (decision to release prisoners due to COVID-19 risk not subject to PLRA three-judge court

3   requirement).  If, in this case, the Court were to find that CDCR's inability to hire

4   clinicians at particular prisons was a cause of constitutional harms independent of

5   crowding, then this Court could issue a prisoner release order, without the three-judge

6   court requirement.  Insufficient clinical staffing, however, is difficult to separate from

7   overcrowding, since staffing requirements are inherently tied to caseloads.  Similarly,

8   during the current pandemic, some courts have held that inability to socially distance is a

9   function of crowding, putting a single-judge prisoner release order out of bounds, even

10  under the rationale of the *Plata* Valley Fever decision.  *See, e.g.*, *Mays v. Dart*, No. 20 C

11  2134, 2020 WL 1987007, at *31 (N.D. Ill. Apr. 27, 2020).

12        Perhaps more important, the above-cited *Reaves* decision involved transfer outside

13  of a department of corrections—to a treatment facility equipped to handle the prisoner's

14  specific medical needs.  *Reaves*, 404 F. Supp. 3d at 525; *see also Reaves v. Dep't of Corr.*,

15  392 F. Supp. 3d 195, 210 (D. Mass. 2019).  Moving people to a place of confinement

16  outside of a prison, so long as they remain in custody of the corrections department, is not

17  a prisoner release order.  If it were, this Court's many orders regarding access to

18  Department of State Hospitals ("DSH") beds would also be prisoner release orders,

19  something the State has never contended.

20        In summary, Plaintiffs are aware of no evidence suggesting that the State can

21  achieve a durable remedy solely through clustering.  If something has changed recently to

22  make clustering more viable, the Court can order clustering via transfers among prisons

23  under the *Plata* Valley Fever decision.  The Court could also order transfers outside of

24  prison, for example to treatment facilities, under circumstances that fall short of release.

25  *Reaves*, 404 F. Supp. 3d at 522-23.  Such circumstances might include transfer to a

26  treatment facility in the community while CDCR retains formal custody of the individual,

27  or to additional beds in DSH hospitals beyond those already reserved for the *Coleman*

28  class.

## II. THE STATE'S ACCELERATED RELEASES AND OTHER POPULATION REDUCTION MEASURES ANNOUNCED TO DATE DO NOT TARGET THE *COLEMAN* CLASS.

The Court's second question, ECF No. 6750 at 2, is directed at the State:

> Whether defendants are or soon will be planning for additional voluntary releases or sentencing reforms that would reduce the size of the plaintiff class in sufficient numbers to achieve full and durable compliance with the Program Guide and other remedial requirements of this action sooner rather than later.  If defendants are so planning, do they have a targeted occupancy rate for which they are aiming that will facilitate compliance concurrently with implementation of best practices in management of COVID-19.

On July 10, 2020, the State announced modifications to a previously disclosed accelerated release plan as well as some new accelerated release initiatives to reduce the CDCR population.  Bien Decl. ¶ 2, Ex. A (CDCR Press Release, July 10, 2020).  None of these measures in any way target the *Coleman* class or are likely to reduce the size of the *Coleman* class relative to the total CDCR population.  In addition, whatever efforts the State may be planning in this direction could be severely undermined by the passage of an initiative on the November 2020 ballot that would undo parts of Propositions 47 and 57, which were the centerpieces of the prior administration's sentencing reforms.  *See id.* ¶ 3, Ex. B (California Secretary of State Summary of Proposition 20 noting that it would "[r]estrict[] parole for Non-Violent Offenders," "[a]uthorize[] felony Sentences for certain offenses currently treated only as misdemeanors," and "[c]hange[] standards and requirements governing parole decisions" among other things); *id.* ¶ 3, Ex. C (explaining that Proposition 20 would change AB 109 and Propositions 47 and 57).

## III. A *SUA SPONTE* ORDER TO CONVENE A THREE-JUDGE PANEL WOULD BE WELL-SUPPORTED BY THE EVIDENCE THAT CDCR CONTINUES TO VIOLATE THE RIGHTS OF THE *COLEMAN* CLASS AND THE PRIOR ORDERS HAVE NOT REMEDIED THE FEDERAL VIOLATIONS.

The Court's third question, ECF No. 6750 at 2-3, is:

> If the answer to the second question above is no, and if Program Guide compliance cannot be achieved without a greater number of population reductions than currently planned, whether this court should sua sponte request the convening of a three-judge court to consider entry of a prisoner

release order specifically directed to reduce the number of *Coleman* class members in the California Department of Corrections and Rehabilitation. *See* 18 U.S.C. § 3626(a)(3)(D) (" If the requirements under subparagraph (A) have been met, a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered."); *see also* 18 U.S.C. § 3626(a)(3)(A) (setting out requirements that "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and (ii) the defendant has had a reasonable time to comply with the previous court orders"). Here, "the previous order requirement of § 3626(a)(3)(A)(i) was satisfied … by appointment of a Special Master in 1995 … [which was] intended to remedy the constitutional violations … [and which has] been given ample time to succeed." *Brown v. Plata*, 563 U.S. at 514. The parties may, as appropriate, include their discussion of the requirements of 18 U.S.C. § 3626(a)(3)(A) in the briefing required by this order.

Over a decade after the three-judge court in this matter imposed a cap on the state prison population, serious and dangerous overcrowding persists in the delivery of mental health care.  Intractable staffing shortages plague the mental health care system.  At some prisons, more than half the psychiatry positions remain unfilled.  Clinicians routinely conduct mental health evaluations by hollering to their patients through the narrow slits in heavy, locked cell doors due to the severe dearth of treatment space.  Inpatient psychiatric hospitals lack sufficient staff and space to offer patients more than a few hours of treatment each week, instead leaving them locked in their cells.  The alarmingly high suicide rate has risen steadily over the last several years.  And all of this was true before the onset of the COVID-19 pandemic exacerbated each and every one of these constitutional deficiencies.

In the face of these serious shortcomings, this Court and the Special Master have issued dozens of orders and thousands of pages of reports and recommendations.  But as this Court has concluded time and again, the State nonetheless is failing to meet its basic constitutional obligations.  People with serious mental illness continue to suffer and die needlessly as a result of the State's ongoing failure to provide adequate mental health care

[3574826.15]

1   to its incarcerated population, and will only do so more as the ongoing pandemic further

2   contracts the delivery of what was already dangerously inadequate mental health care.

3   At the root of this failing system is persistent, unabated overcrowding among the

4   *Coleman* class.  Eleven years after the three-judge court's landmark order, the State's

5   overall prison population has dropped by almost a third.  By contrast, the sheer number of

6   people with serious mental illness in California prisons is almost unchanged, and

7   increasingly concentrated at the highest levels of care.  Although the State has reported

8   compliance with the 137.5% population cap for over five years, the benefits of the State's

9   population reduction efforts in response to the three-judge court's ruling have failed to

10  reach the most vulnerable population in the prison system—people with serious mental

11  illness.  And the State's recent and planned releases in response to the novel coronavirus

12  have compounded this effect, as they have once again failed to benefit the *Coleman* class

13  even though class members are uniquely susceptible to COVID-19.

14  As this Court observed as recently as December 2019, the sheer scale of the mental

15  health population—and the State's ongoing reliance on its prison system as a de facto

16  mental health hospital—drives many of the serious, dangerous, and persistent

17  constitutional violations in the case.  *See* Order, Dec. 17, 2019, ECF No. 6427 at 49.  The

18  State has failed for decades to provide sufficient resources to meet the ever-growing need

19  for mental health services in the prison population, and the deficiencies are only getting

20  worse as COVID-19 further strains the State's ability to deliver mental health care.

21  When the three-judge court entered its population reduction order in 2009, it

22  retained jurisdiction to consider subsequent modifications, and noted that it may be

23  necessary to "ask this court to impose a lower cap … [s]hould the state prove unable to

24  provide constitutionally adequate medical and mental health care after the prison

25  population is reduced to 137.5% design capacity."  *Coleman v. Schwarzenegger*, 922 F.

26  Supp. 2d 882, 970 (E.D. Cal./N.D. Cal. 2009).  That time has come.  The unrelenting

27  growth of the *Coleman* class warrants—indeed, necessitates—modifying the cap to target

28  the mental health population.

1    Plaintiffs therefore agree that this Court should "sua sponte request the convening

2  of a three-judge court to consider entry of a prisoner release order specifically directed to

3  reduce the number of *Coleman* class members in the California Department of Corrections

4  and Rehabilitation."  *See* Order, July 2, 2020, ECF No. 6750, at 2.  Such action is

5  consistent with this Court's authority to under 18 U.S.C. § 3626(a)(3)(D) as well as its

6  overarching "responsibility to remedy the resulting Eighth Amendment violation" in this

7  case.  *See Brown v. Plata*, 563 U.S. 493, 511 (2011).

8    **A.**    **OVERCROWDING OF THE MENTAL HEALTH POPULATION**
        **CAUSES ONGOING, SERIOUS CONSTITUTIONAL VIOLATIONS**
9
         **1.**    **The State's Population Reduction Measures Have Failed to**
10            **Benefit the *Coleman* Class**

11    In the eleven years since the three-judge court ordered the State to reduce its prison

12  population, the CDCR population fell by over 25%, from 165,630 in August 2009 to

13  123,123 in February 2020.  *See* Bien Decl. ¶¶ 4-5.  The State first reported compliance

14  with the 137.5% population cap in January 2015.  *See* Defs.' Feb. 2015 Status Report in

15  Response to Feb. 14, 2014 Order, Feb. 17, 2015, ECF No. 5278 at 2.  The reported

16  population has remained below the cap since and was projected to continue to decline even

17  before the coronavirus-related releases of recent months.  *See* Bien Decl. ¶ 7, Ex. G at 1.

18    But the number of incarcerated people with serious mental health needs not only did

19  not drop in a similar proportion to the overall population in that timeframe; it barely

20  dropped at all.  While the overall prison population decreased by over one-quarter, the

21  *Coleman* class remained virtually unchanged:  35,821 in August 2009, compared to 35,836

22  in February 2020.  *See* Bien Decl. ¶ 8.  During the same time period, the acuity of the

23  *Coleman* class also increased dramatically.  The number of patients who require Enhanced

24  Outpatient Program ("EOP") level of care grew by 42.3% since 2009, from 4,742 in

25  August 2009 to 6,748 in February 2020.  *Id.*

26  / / /

27  / / /

28  / / /







Figure 1: EOP Population                        Figure 2: CDCR Population

Indeed, had the EOP population dropped in response to the three-judge court's 2009 population reduction order at the same pace as the non-mental health population, there would have been fewer than half the number of EOP patients in the prison system by February 2020 as there were.[3]  *Id.* ¶ 10.  The corresponding strain on the system's scarce staffing and space resources would be substantially reduced.

In other words, the demand for mental health services in the State's prisons has only grown.  Not only is there a far higher percentage of incarcerated people who require mental health services in CDCR today, but there are more people who require the most intensive levels of mental health care.  While EOP patients constituted less than 3% of the CDCR population in 2009, they represented 5.5% of the prison population by February 2020.  *Id.* ¶ 11.  EOP patients also made up a higher percentage of the total mental health population in February 2020 than they did in August 2009.  *Id.*  The mental health population in CDCR before the onset of the current pandemic was thus both larger and

---

[3] The non-mental health population dropped by 33% between August 2009 and February 2020.  Had the number of EOP patients dropped by the same rate, there would have been 3,182 EOP patients in February 2020.  *See* Bien Decl. ¶ 7.

PLAINTIFFS' RESPONSE TO ORDER OF JULY 2, 2020

[3574826.15]

1  more acutely mentally ill than it was a decade ago.[4]

2         Although the State's recent releases of prisoners from CDCR in response to

3  COVID-19 are to be applauded, they, like the State's prior population reduction measures,

4  have not only failed to benefit the *Coleman* class, they have further concentrated the

5  percentage of people with serious mental illness incarcerated in CDCR.  While the non-

6  mental health population in CDCR dropped by almost ten percent in the last five months,

7  the percentage of class members increased.  *Compare* Bien Decl. ¶ 8, Ex. I (showing class

8  members made up 29.07% of total CDCR population in February 2020), *with id.* ¶ 8, Ex. J

9  (showing class members made up 29.48% of total CDCR population in July 2020); *see*

10  *also id.* ¶¶ 4-5, Exs. E, F (total CDCR population dropped from 123,123 in February 2020

11  to 112,507 in July 2020, or 8.6%).  As with the reductions made in response to the three-

12  judge court order, the State's population measures in response to COVID-19 have caused

13  the acuity of the class as a whole to increase.  EOP patients now make up a higher

14  percentage of the total mental health population than they did in February 2020,

15  comprising almost twenty-percent of the class.  *See* Bien Decl. ¶ 11.  Had the number of

16  EOP patients dropped by the same rate as the non-mental health population over the last

17  five months, there would be nearly 500 fewer EOP patients today.  *See id.* ¶ 12.

18         **2.      Persistent Overcrowding Severely Harms the Mental Health
                       Population**

19

20         Eleven years after the three-judge court's order requiring a population reduction, the

21  crowding-related problems that plagued the system then continue unabated, and in some

22

23  [4] As previously stated, Plaintiffs believe the true number of people needing EOP and
    higher levels of care were drastically undercounted even before the pandemic, and expect
24  the numbers of class members will increase dramatically after the forthcoming court-
    ordered unmet need study is concluded.  *See generally* Pls.' Response to Oct. 8, 2019
25  Order, Nov. 27, 2019, ECF No. 6410; Pls' Reply to Defs' Response to Oct. 8, 2019 Order,
    Dec. 9, 2019, ECF No. 6410 at 13-14; *see also* Transcript of June 29, 2020 Status
26  Conference, ECF No. 6753, at 21; Order, Oct. 8, 2019, ECF No. 6312 at 5-6 ("[T]he
    Special Master informed the court … [of] a likely need for a study . . . to determine
27  whether there is an unmet need for MHCB care and inpatient care in CDCR's inmate
    population.").

28

[3574826.15]

1  respects are now worse.  The three-judge court detailed chronic understaffing among

2  mental health professionals, particularly psychiatrists, *Coleman*, 922 F. Supp. 2d at 899,

3  906; endemic bed shortages for people who require higher levels of mental health care, *id.*

4  at 903; a troubling rate of suicide, *id.* at 941; and the persistence of "unmet mental health

5  needs" in the prison population, *id.* at 915.  It concluded that "[a]fter fourteen years of

6  remedial efforts under the supervision of a special master and well over seventy orders by

7  the *Coleman* court, the California prison system still cannot provide thousands of mentally

8  ill inmates with constitutionally adequate mental health care."  *Id.* at 898.  Nothing has

9  changed about this fundamental finding except for the passage of more time and dozens of

10  additional failed remedial orders.

11       As the three-judge court observed, crowding is a function not only of the square

12  footage of a prison system, but also of "the system's resources and its ability to provide

13  inmates with essential services."  922 F. Supp. 2d at 921.  At oral argument before the

14  Supreme Court, Justice Anthony Kennedy cast this point in sharp relief: "Overcrowding is,

15  of course, always the cause.  If … I'm looking at a highway system, … what's the number

16  of cars?  If the problem is bad service in a hotel, well, it's the number of employees … per

17  guest.  I mean, that's fairly simple."  Transcript of Oral Argument at 21:20-25, *Plata*, 563

18  U.S. 493.

19       Moreover, as the three-judge court has found, prison "crowding worsens many of

20  the risk factors for suicide among California inmates and increases the prevalence and

21  acuity of mental illness throughout the prison system."  922 F. Supp. 2d at 950.  In the

22  absence of population reduction for the mental health population, this trend has continued

23  unabated.  Suicide rates are spiraling upward, the level of mental health acuity is growing,

24  and grave constitutional violations persist.  CDCR's mental health system remains

25  overburdened and unable to meet the needs of this vulnerable population.

26         **(a)**      **Profound Psychiatry Shortages Impede the Provision of Mental Health Care**

27

28       In 2009, the three-judge court identified chronic understaffing as a key indicator

1  that the size of the prison population had outpaced the State's capacity.  The three-judge

2  court noted that, at the time of the trial, vacancy rates for psychiatrists ranged from 30.6 to

3  54.1 percent, *id.* at 934, and concluded that "[c]rowding … renders the state incapable of

4  maintaining an adequate staff," *id*. at 921.

5       In the years since the three-judge court's order, psychiatry staffing rates have

6  remained consistently abysmal.  Both just before the onset of the coronavirus pandemic

7  and currently, the State reported that a full one-third of the statewide psychiatry positions

8  remained unfilled even with the use of telepsychiatry and contractors.  *See* Defs.' Monthly

9  Psychiatry Vacancy Report for February 2020 ("February 2020 Psychiatry Report"),

10 April 1, 2020, ECF No. 6563 at 4 (reporting 66% fill rate for psychiatrists systemwide,

11 excluding psychiatric nurse practitioners); Defs.' Monthly Psychiatry Vacancy Report for

12 May 2020 ("May 2020 Psychiatry Report"), June 30, 2020, ECF No. 6745 at 5 (reporting

13 67% fill rate for psychiatrists systemwide, not including psychiatric nurse practitioners).

14      The State's failure to retain sufficient clinical staff to deliver care to patients with

15 serious mental illness has been a core concern of this Court for no less than 25 years, since

16 it first found that severe understaffing led to unacceptably long delays in access to care,

17 deficient suicide prevention practices, and inadequate monitoring of patients in 1995.

18 *Coleman v. Wilson*, 912 F. Supp. 1282, 1308-09, 1315 (E.D. Cal. 1995); *see also id.* at

19 1307 (deeming system "significantly and chronically understaffed in the area of mental

20 health care services").

21      The State has been ordered for almost two decades to keep its mental health staff

22 vacancy rate below ten percent of the number it concedes represents the constitutional

23 floor.  *See* Order, Oct. 10, 2017, ECF. No. 5711 at 15-16 (noting Defendants represented

24 the staffing levels established by their 2009 Staffing Plan were necessary to meet

25 constitutional standards); *see also* Order, June 13, 2002, ECF No. 1383 at 2, 4 (imposing

26 maximum 10% vacancy rate and noting the "central role that adequate staffing has in

27 meeting defendants' constitutional obligations to class members").  But the "stark reality"

28 is that "[f]or most of that fifteen year period, and for several classifications of mental

[3574826.15]

1  health staff, defendants have been in violation of that order." Order, Oct. 10, 2017, ECF.

2  No. 5711 at 28. Indeed, as the Special Master reported in 2016, "[v]acancies in the key

3  mental health clinical disciplines of psychiatry and psychology remained problematic and

4  were nearly unchanged from rates in *1998*." Twenty-Sixth Monitoring Round Report of

5  the Special Master, May 6, 2016, ECF No. 5439 at 16 (emphasis added).

6  Almost three years ago, this Court set a hard one-year deadline for "defendants to

7  complete the task of hiring sufficient mental health staff to come into compliance with the

8  Eighth Amendment and orders of this court." Order, Oct. 10, 2017, ECF No. 5711 at 11;

9  *see also id.* at 2. In doing so, it expressly queried "whether defendants will ever be able to

10  hire sufficient staff to meet their constitutional obligations to members of the plaintiff

11  class, as long as the size of the seriously mentally ill inmate population in California's

12  prison system remains at current levels or continues to grow." *Id.* at 28.

13  The answer to the Court's question is abundantly clear at this point. The State blew

14  past the one-year deadline for compliance almost two years ago, but is nonetheless no

15  closer to providing sufficient numbers of clinical staff to adequately care for the *Coleman*

16  class at its present size. Twenty-three licensed hospital beds—including ten crisis beds at

17  SVSP and thirteen PIP beds at CMF—have remained closed for well over a year because

18  the State lacks enough clinical staff to operate them. Bien Decl. ¶ 23, Ex. X at 2-3.[5] At a

19  number of institutions with significant EOP programs, the psychiatry vacancy rate before

20  the start of the pandemic exceeded 40%. *See* February 2020 Psychiatry Report at 4

21  (reporting 56% vacancy at California Health Care Facility (CHCF), 42% vacancy at

---

22  [5] Notably, although thirteen CMF PIP beds have been offline since April 2019, Bien Decl.
23  ¶ 23, Ex. X at 2-3, the State failed to report that fact to the Court in its monthly Inpatient
    Census and Waitlist Report until over a year later. *See* Defs.' Inpatient Census and
24  Waitlist Report, May 15, 2020, ECF No. 6670, at 4; *see generally* Defs.' Inpatient Census
    and Waitlist Report, April 15, 2020, ECF No. 6611 (failing to note offline beds at CMF
25  PIP). Even now, the State's court-ordered reports themselves do not show the true number
    of operative inpatient beds. *See* ECF No. 6670, at 4 (noting offline CMF-PIP beds not
26  reflected in CDCR's census and waitlist report and PIP census reports). Although
    Plaintiffs have repeatedly requested that the State correct the prior years' worth of
27  inaccurate pleadings that failed to mention the thirteen-bed reduction at CMF PIP, the
    State has not done so.

28

[3574826.15]

1   California Men's Colony (CMC), 56% vacancy at California Substance Abuse Facility

2   (SATF), 58% vacancy at Central California Women's Facility (CCWF) and 46% vacancy

3   at Mule Creek State Prison (MCSP)).  Ironically, among the most severely understaffed of

4   the facilities are the programs where psychiatrists are the most needed:  in the State's

5   licensed psychiatric inpatient programs, the PIPs, which are reserved for the most acutely

6   ill patients in the class.  *Id.*  The PIP programs at California Medical Facility (CMF),

7   Salinas Valley State Prison (SVSP), and CHCF account for over 90% of CDCR's inpatient

8   psychiatric beds.  As of February 2020, each had a psychiatry vacancy rate of well over

9   30% (51% vacancy at CMF PIP, 44% vacancy at CHCF PIP, and 32% vacancy at SVSP

10   PIP).  *Id.*  Notably, the pandemic has, to date, had essentially no appreciable effect on the

11   fill rate of CDCR's psychiatrist positions although some positions have shifted around in

12   the system.  *See generally* May 2020 Psychiatry Report at 5 (continuing to report one-third

13   of psychiatrist positions unfilled statewide).

14         For patients, these staffing shortages have grave effects.  As the Special Master

15   recently found, the State's lack of adequate numbers of psychiatrists presents "a major

16   obstacle in providing class members with adequate mental health care."  Twenty-Seventh

17   Round Monitoring Report of the Special Master, Feb. 13, 2018, ECF No. 5779 ("27th

18   Round Report") at 41.  A recent report by the California State Auditor linked understaffing

19   in CDCR to its chronically high suicide rates and cited a statement by the coordinator of

20   suicide prevention at CSP-Sacramento that "a shortage of psychiatrists has a trickle-down

21   effect because if inmates do not receive proper medication, they may act out more and

22   require additional attention or therapy, exacerbating mental health staff's already heavy

23   workloads."  *See* Bien Decl. ¶ 13, Ex. M at 47.  These deficiencies pose serious risks of

24   harm and death to *Coleman* class members.  In 2013, in denying the State's motion to

25   terminate, the *Coleman* court observed that "[c]hronic understaffing continues to hamper

26   the delivery of constitutionally adequate medical care and is a central part of the ongoing

27   constitutional violation in this action."  Order, Apr. 5, 2013, ECF No. 4539 at 62.  In 2017,

28   the court again observed that staffing shortages "plague the delivery of constitutionally

15

1  adequate mental health care to class members." Order, Oct. 10, 2017, ECF No. 5710 at 13.

2  "Until defendants have sufficient mental health beds and sufficient mental health staff to

3  meet th[e] demand [of the population], they will not be in compliance with the Eighth

4  Amendment." *Id*. at 17; *see also* Order, Oct. 10, 2017, ECF No. 5711 at 12 ("It should not

5  have to be said again:  It is defendants' responsibility to meet their constitutional

6  obligations.").

7          These chronic staffing shortages plainly are tied to continuing population pressures,

8  as this Court has repeatedly noted. *See, e.g.*, Order, Aug. 9, 2016, ECF No. 5477 at 6

9  ("The ongoing rise in the numbers of mentally ill inmates in California's prisons

10  compounds defendants' difficulties, as staffing levels are based on inmate/staff ratios."

11  (citations omitted)); Order, Oct. 10, 2017, ECF No. 5711 at 28.  As the Special Master

12  reported, "[t]he data shows that the mental health population has yet to experience a

13  population decrease in relation and/or in comparison to the decrease of the total

14  population, which drives many of the issues [in the case]. … Population size also clearly

15  correlates with caseload ratios, thus driving staffing needs." 27th Round Report at 41.

16          The State has tried and failed to staff up to the requirements of the current mental

17  health population.  Even with its best efforts, the State admits it cannot hire its way out of

18  the crisis. *See* Joint Status Report re Feb. 14, 2018 Status Conference, Feb. 12, 2018, ECF

19  No. 5777 at 5; *see also* Defs.' Objections to Special Master's May 29, 2020 Labor

20  Economist Report, June 29, 2020, ECF No. 6744 at 30 (noting "shortage of psychiatrists in

21  California and nationwide," and asserting "the reality [is] that it may be impossible in

22  some cases [for Defendants] to hire additional psychiatrists"); Defs.' Reply to Pls.'

23  Opening Brief Regarding Obstacles to Timely Access to MHCBs, Sept. 19, 2017, ECF No.

24  5688 at 11 ("[I]t is a well-known fact that there is a nationwide shortage of mental health

25  clinicians.  This severely affects Defendants' ability to hire staff to work during normal

26  business hours, let alone at night."); Defs.' Response to the Special Master's Report re

27  Mental Health Staffing and the Implementation of Defs.' Staffing Plan, March 30, 2017,

28  ECF No. 5591 at 4 (acknowledging that Defendants have a "persistent challenge [to] face

[3574826.15]

1    in reaching the court-ordered statewide staffing requirement," and noting that "[t]he

2    difficulty in hiring psychiatrists is not new and reflects in large part the acute nationwide

3    shortage of psychiatrists that exists today"); *id.* at 13 (noting Defendants' "serious doubts

4    whether the ninety-percent court-ordered staffing requirement for psychiatrists can ever be

5    realistically satisfied").

6           The State has not or cannot increase the supply of clinicians who will work in its

7    prisons.  But it can decrease the demand, and concomitant need for mental health staff, by

8    controlling the population, particularly at the resource-intensive higher levels of care.  Had

9    the mental health population dropped at the same rate as the non-mental health population

10   between August 2009 and February 2020, there would be less than half the number of EOP

11   patients in the prison population today.  *See supra* Section II.A; *see also* Bien Decl. ¶ 10.

12   There also would have been about 7,000 fewer patients at the Clinical Case Management

13   (CCCMS) level of care.  *See id.*  Based on the State's own staffing ratios, there would then

14   have been enough on-site psychiatrists employed by CDCR to serve the *Coleman*

15   population, even without any use of telepsychiatry.  *Id.* ¶¶ 14-16, Exs. N and O; *see*

16   *generally* Defendants' Staffing Plan, Sept. 30, 2009, ECF No. 3693.

17          The COVID-19 pandemic has only further stressed clinical resources as more staff

18   fall ill and call out of work, and the State's response to the virus causes increased acuity

19   and need for mental health services.  In addition, significant numbers of clinical staff who

20   are aged and/or medically vulnerable for adverse COVID-19 outcomes if infected are

21   working only from home.  As of July 14, 2020, CDCR announced 755 active cases of

22   COVID-19 among staff members, three deaths, and 536 returned to work.  *Id.* ¶ 17, Ex. P.

23   Mental health programs at sixteen institutions are operating without a large percentage of

24   their staff.  *Id.* ¶¶ 19-20, Exs. R and S; *see also id.* ¶ 18, Ex. Q at 1-2, 7-14 (noting that

25   programs at the higher tiers are operating with fewer resources and thus are providing less

26   care, culminating at Tier 4, for programs operating with "dramatically decreased

27   resources").  This includes three crisis bed units, one of the State's three male inpatient

28   programs, and every single mental health program at CSP-SAC, which houses one of the

[3574826.15]

1   largest populations of class members in the system, including the only male PSU, and

2   where a record-breaking nine class members committed suicide in 2019 alone. *Id.* ¶¶ 19-

3   20, 38, Exs. R and S.  Mental health programs operating with such limited staffing are

4   substantially constrained in what services they can provide and therefore, per CDCR

5   policy, prioritize rounding in the hopes that each patient can at least be briefly seen by a

6   staff member once a day. *Id.* ¶ 18, Ex. Q at 3, 13.  Instead of providing treatment,

7   recreational therapists are limited to playing music on the tiers and distributing in-cell

8   activity packets. *Id.* at 14.  Staff attention and mental health treatment is allocated using a

9   triage model, meaning that patients are essentially denied treatment unless they present an

10  emergency. *Id.*  But momentary check ins and reactive responses for *Coleman* class

11  members are not sufficient to provide mental health treatment that meets the requirements

12  of the Constitution, especially with the added fear, anxiety, and stress caused by the

13  pandemic.

14          The State has had over a decade since the three-judge court order to show that it can

15  solve its staffing problem without reducing the mental health population in its prisons.  Its

16  chronic and dangerous failure to do so indicates that the State must address the underlying

17  population pressures that drive demand for mental health services.  The various population

18  reduction strategies the State has used to date to achieve compliance with the 137.5% cap

19  have simply left the *Coleman* class behind.  Thus, the constitutional violations persist.

20                  **(b)    The State Lacks Sufficient Resources to Provide Minimally
                            Adequate Mental Health Care to its Most Acutely Ill**
21                          **Population**

22          The effects of CDCR's resource shortages are particularly devastating for the

23  population with the most acute mental health needs.  In 2009, the three-judge court

24  observed the tremendous degree of unmet mental health need in the prison population,

25  including at the highest levels of mental health care. *See* 922 F. Supp. 2d at 906-08.  In the

26  last eleven years, the State has opened more than 800 inpatient psychiatric beds to address

27  rising mental health acuity in the population, but it has proven unable to provide adequate

28  staff, space, or resources to ensure that its programs can deliver adequate care. *Compare*

1  Bien Decl. ¶ 21, Ex. T at 7 (showing on June 30, 2009, the State had 820 inpatient beds),

2  *with id.* ¶ 8, Ex. I (showing 1,667 inpatient beds as of February 2020).  As a result, even

3  before the novel coronavirus emerged, the system continued to be overwhelmed by unmet

4  mental health need among its most seriously ill patients, who require inpatient psychiatric

5  hospitalization with round-the-clock nursing and intensive mental health treatment to

6  prevent further deterioration and self-harm.  And class members' unmet mental health

7  needs are rising with the pandemic, as staffing, mental health treatment, and movement

8  within CDCR have been constrained, and the State's response to COVID-19 causes

9  increased mental health acuity and need for related services.

10        As of February 2020, the PIP units at CHCF, SVSP, and CMF not only had

11  psychiatry vacancy rates exceeding 30%, as discussed above, but also had substantial

12  vacancy rates in other key clinical disciplines.  The CMF PIP program had a 42% vacancy

13  rate for clinical psychologists and a 28% vacancy rate for clinical social workers.  *See* Bien

14  Decl. ¶ 22, Ex. U at 8.  Between 13 and 23 beds in the CMF PIP have been offline since

15  April 2019 due to serious staffing shortages.  Bien Decl. ¶ 23, Ex. X at 3 (13 beds offline

16  due to staffing); *see also id.*. Ex. V at 3 (23 beds offline due to staffing).  At the CHCF

17  PIP, the overall mental health staffing functional vacancy rate was 34.78%.  *Id.* ¶ 22, Ex. U

18  at 7.  SVSP's PIP had high vacancy rates for clinical social workers (30%), psychiatrists

19  (54%), and medical technical assistants (81%).  *Id.* at 9.  The institution also has been

20  unable to reopen its mental health crisis bed unit for over a year and a half due to

21  psychiatry and primary clinician shortages.  *Id.* ¶ 23, Ex. X at 2-3 of letter.

22        By definition, patients who are referred to PIP units are acutely ill, requiring full-

23  time psychiatric hospitalization and intensive treatment because they cannot function in an

24  outpatient setting.  In practice, due to profound understaffing and custodial interference,

25  most of the PIP programs delivered only minimal treatment even before the coronavirus

26  pandemic further exacerbated existing deficiencies.

27        The State's inpatient psychiatric units are understaffed, under-resourced, and

28  unprepared to meet the needs of the thousands of severely mentally ill people in their

1  charge.  Just three months ago, the Special Master reported that "CDCR's PIPs are not

2  providing adequate mental health care to patients, and the care that is being provided has

3  been further constricted by the COVID-19 pandemic."  Special Master Amended Report re

4  Status of Class Member Access to Inpatient Care ("2020 Inpatient Access Report"),

5  April 6, 2020, ECF No. 6579 at 29.  "In the period preceding the onset of the COVID-19

6  pandemic, staffing vacancies and the lack of appropriate treatment at CHCF-PIP, CMF-

7  PIP, and SVSP-PIP were known to CDCR, the Special Master and plaintiffs' counsel to

8  have seriously limited what mental health care was available to patients in these

9  programs."  *Id.* at 19.  Describing the dismal conditions in the PIPs as "institutional

10  program failures," the Special Master reported that, even before the pandemic, the State's

11  top psychiatric programs for class members suffered from "significant functional

12  vacancies" in all clinical categories, offered patients "minimal" clinical structured

13  therapeutic activities, poor access to individual treatment, and "problematic" treatment

14  planning.  *Id.* at 19-21.  Patients on maximum custody status barely got out of their cells at

15  all.  *Id.* at 20.  Even the State's emergency corrective action plan to address the severe

16  deficiencies in the CMF-PIP would still provide hospitalized class members with less care

17  than in an EOP program—even though those patients' clinicians had already determined,

18  by definition, they needed more intensive treatment than an EOP program could provide.

19  *See id.* at 21.

20      Again, these problems are not new, as "Defendants' long-standing, pervasive

21  struggles to provide adequate inpatient care in the PIPs were highlighted in the Special

22  Master's 2016 and 2018 reports on inpatient treatment."  *Id.* at 34; *see also generally*

23  Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for

24  Inmates of CDCR, Aug. 30, 2018, ECF No. 5894.  Unfortunately, the already inadequate

25  conditions in the PIPs, which have now stretched on for years without remediation, have

26  only gotten worse with the onslaught of the COVID-19 pandemic.  Available staffing and

27  programming in inpatient programs are severely restricted by the pandemic, causing class

28  members in need of the most acute levels of care to receive even less than the paltry

[3574826.15]

1    amount of treatment provided a few months ago. *See* 2020 Inpatient Access Report at 29

2    (finding already deficient care in the PIPs "has been further constricted by the COVID-19

3    pandemic"). "Already inadequate staffing levels and insufficient access to structured out-

4    of-cell activities have only worsened since the onset of the COVID-19 pandemic." *Id.* at

5    34. As of March 30, the vast majority of clinical positions in the PIPs were either vacant

6    or "filled" with clinicians who were not actually working due to the pandemic. *Id.* at 22.

7    For example, at CMF-PIP, only 19% of allocated psychiatrist positions, 25% of allocated

8    psychologists, 29% of allocated social workers, and 22% of rehabilitation therapists were

9    available, as many positions remain unfilled, and yet more staff members called out due to

10    illness. *Id.* Predictably, such severe staffing shortages, coupled with the increased space

11    needed for social distancing, further limited the type of mental health treatment—

12    particularly out of cell programming—available to class members at the two PIPs that

13    provided the Special Master with any information whatsoever on their current

14    programming. *See id.* at 23-28. There is no question that "mental health care in these

15    inpatient programs ha[s] been further compressed by the COVID-19 pandemic and the

16    treatment available for *Coleman* class members has further declined" from the already

17    inadequate pre-pandemic levels. *Id.* at 28-29.

18       This level of treatment is woefully insufficient to address the needs of the most

19    acutely ill patients in the system. Even worse, hundreds of patients needing psychiatric

20    hospitalization cannot even access the State's inpatient programs at this point and merely

21    linger indefinitely on the waitlist, which now shows roughly one-hundred more patients

22    waiting than available beds. *See* Defs.' Inpatient Census and Waitlist Report, June 15,

23    2020, ECF No. 6719 at 9, 11 (reporting 234 patients waiting for inpatient hospitalization

24    and 152 available beds, but not accounting for the 15 additional unavailable beds at CMF

25    PIP). Indeed, many are trapped in makeshift temporary prison units dangerously

26    inappropriate to house and treat high-acuity patients.

27       As an alternative to continuing inter-facility transfers that may serve as a vector for

28    disease, CDCR's response to COVID-19 included establishing temporary mental health

[3574826.15]

units ("TMHUs") in lieu of housing and treatment in a licensed inpatient mental health bed.  As of June 26, more than 70 different patients in need of crisis bed or inpatient treatment received such care in TMHUs.  Bien Decl. ¶ 24, Ex. Y.  However, these temporary solutions are plagued with problematic limitations on resources and staffing, and are anything but a substitute for care in a licensed inpatient psychiatric unit.  Patients in dire need of hospitalization are seen only briefly and in cell-front and non-confidential settings not conducive to effective treatment.  The TMHU cells have not been modified to reduce suicide risk and confidential treatment space, and nursing stations and other necessary elements of an inpatient hospital are absent.  TMHUs are no different than other "alternative housing" that the State has used to warehouse patients who require inpatient psychiatric hospitalization whose transfers are delayed for a variety of reasons.  *See Coleman*, 922 F. Supp. 2d at 929 (finding class members awaiting inpatient care held in temporary "alternative placements [that] lack suitable staffing and/or the physical configuration needed for the continuous monitoring or intensive treatment provided in a MHCB unit," including unsafe segregation cells and other outpatient and infirmary settings (internal quotation marks omitted)); *see also Plata*, 563 U.S. at 503–04.

Furthermore, *Coleman* class members in need of inpatient psychiatric hospitalization have been restricted from transferring to the inpatient psychiatric resources provided by DSH.  On March 16, 2020, DSH announced a unilateral policy to suspend admissions of patients from CDCR for at least thirty days, its latest salvo in a long history of intransigent refusals to provide class members with full access to these court-ordered psychiatric hospital beds.  *See* Order, Apr. 24, 2020, ECF No. 6639 at 5.  Even though this Court intervened to order the suspension lifted, *see id.* at 10, lingering damage was done, as progress in referring and transferring patients to inpatient care remains painstakingly slow, despite close monitoring by the Special Master.  Meanwhile, the number of empty beds at DSH allocated for *Coleman* class members continues to grow each week, while patients who could transfer to less restrictive environments remain congested within the PIPs or sitting in makeshift TMHU prison units.  *Compare* Apr. 24, 2020 Order, ECF 6639

[3574826.15]

1    at 6 (reporting 20 open ASH beds and two open CSH beds after DSH closed admissions to

2    class members in March 2020), *with* Bien Decl. ¶ 27, Ex. BB (reporting 36 open ASH beds

3    and four open CSH beds as of July 10, 2020).

4            The State's response to the pandemic has led to greater unmet need for acute mental

5    health treatment, though the true extent of the impact will not be known until more data is

6    available.  But a number of early data points give reason to be alarmed.  The raw numbers

7    of class members actually receiving crisis and inpatient care have plummeted since

8    February 2020.  Bien Decl. ¶ 8, Ex. I (showing 354 patients in MHCBs and 1,527 patients

9    in inpatient hospitals in February 2020), *with* Bien Decl. ¶ 8, Ex. J (showing 276 patients

10   in MHCBs and 1,396 patients in inpatient programs in July 2020).  Compared to a year

11   ago, crisis bed referrals have decreased by 34%, signaling that staff are not referring all

12   patients to crisis bed care who need it.  *See* Bien Decl. ¶ 28, Exs. CC, DD (showing 761

13   MHCB referrals between June 7 and July 7, 2020, compared to 1,156 MHCB referrals

14   between June 7 and July 7, 2019).  Further, even patients who are actually referred to

15   emergent treatment may not receive it, as 44% of crisis bed referrals in June 2020 were

16   rescinded.  *Id.* ¶ 28, Ex. DD.  Indeed, the State's data shows that, of the 27 patients held in

17   TMHUs awaiting crisis care during the week ending June 26, 2020, only nine eventually

18   transferred to a crisis bed; the rest returned to a lower level of care without ever being

19   admitted to an MHCB, meaning 67% of these patients had their referrals rescinded.  *Id.*

20   ¶ 24, Ex. Y.  It is simply undeniable that fewer patients who need it are receiving crisis bed

21   treatment at a time when *Coleman* class members are experiencing increased stress and

22   anxiety associated with the pandemic.

23                      **(c)      The Prison System Lacks Sufficient Space to Deliver
                                  Mental Health Care**

24

25           A decade ago, the three-judge court concluded that "[t]he severe shortage of

26   treatment space" impeded the provision of mental health care throughout the state prison

27   system.  *Coleman*, 922 F. Supp. 2d at 927.  That court observed that due to population

28   pressures, the available clinical space was "less than half of what is necessary for daily

[health care] operations." *Id.* (internal quotation marks omitted); *see also Plata*, 563 U.S. at 507 (observing that the "existing programming space …. [was] inadequate to keep pace" with the demand for care).  Consequently, clinicians failed entirely to deliver mental health care to patients who needed it or to observe "fundamental medical confidentiality rights" in the treatment they did provide.  *Coleman*, 922 F. Supp. 2d at 927 (internal quotation marks omitted).

The three-judge court further concluded that "[s]taffing and space issues are inextricably intertwined." *Id.* at 933.  It observed that "the space that does exist to provide health care services is often 'woefully inadequate.'" *Id.* (internal citations omitted). Consequently, the "serious deficiencies in office and treatment spaces … are themselves an obstacle to ever achieving appropriate clinical staffing." *Id.* at 933 (internal quotation marks omitted).

As a result of unabated crowding among the mental health population, serious shortages of treatment and office space persist today, with devastating effects. The Special Master recently found, after a comprehensive survey of CDCR and DSH clinicians conducted by his labor economist experts, that insufficient and inadequate office space and facilities directly affect the State's ability to hire and retain sufficient numbers of psychiatrists to treat the *Coleman* class.  Special Master Labor Economist Report, May 29, 2020, ECF No. 6695 at 19-20, 191-93, 217, 227-30.  That problem is likely to become even more pronounced due to the ongoing pandemic. *Id.* at 194.

The October 2018 whistleblower report by CDCR Statewide Chief Psychiatrist Michael Golding illustrates the gravity of these concerns and their effect on mental health treatment.  Without proper offices, psychiatrists have been forced to treat patients through cracks in cell doors, or in makeshift spaces and without access to patient records.  *See* CDCR Mental Health System Report, ECF No 5988-1 at 11, 67-69, 77.  In such settings, cellmates, officers, and other patients can hear everything, which discourages patients from communicating critical information about their mental health needs. *Id.* at 65.  As Dr. Golding noted, "[i]t might not be surprising to find high rates of hospitalization and

[3574826.15]

1    suicide in such a … system." *Id.* at 11.

2        Dr. Golding's report indicated that this problem is widespread in CDCR prisons.  In

3    the crisis bed units at CHCF, for example, "100% of the [psychiatry] follow up visits occur

4    by communicating non confidentially through a slit in a closed cell door." *Id.* at 68; *see*

5    *also id.* at 69.  Similarly, at SVSP, "psychiatrists are essentially never able to have

6    confidential one to one (1:1) appointments" because "psychiatrists have been allocated

7    confidential office space for only three hours *per week* in which to see all of their patients

8    combined, for months at a time.  Three hours in total, out of a 40 hour work week." *Id.* at

9    75.  Nor is inadequate office space limited to psychiatrists.  For years, the Special Master

10   also has reported on severe deficiencies in the available office space for primary clinicians.

11   The Special Master documented in his last monitoring report that at several prisons,

12   clinicians have to share office space, rendering them unable to conduct confidential

13   clinical contacts in their office.  *See* 27th Round Report at 129-30.  At SCC and DVI, for

14   example, some clinicians have no permanent office space at all.  *Id.*  Clinicians at DVI

15   reported to the Special Master that the space in which they work is so degraded that they

16   experience "problems with pests, mold, water leaks and sewage." *Id.* at 129.[6]

17       Treatment space, too, remains woefully deficient.  In his most recent monitoring

18   report, the Special Master concluded that "the availability of appropriate mental health

19   treatment space remain[s] [a] formidable challenge[] for defendants," and that "CDCR

20

21   [6] Chronic delays in the implementation of the Health Care Facility Improvement Project
     (HCFIP) have undermined the State's efforts to improve the conditions in which health
22   care is delivered.  The Receiver has reported that most construction projects are seriously
     delayed, and that clinical space at some prisons constitute "a 'barrier to care." *Achieving a*
23   *Constitutional Level of Medical Care in California's Prisons*, Forty-Third Tri-Annual
     Report of the Federal Receiver, Feb. 3, 2020, ECF No. 6454 at 11-12.  The COVID-19
24   pandemic has only worsened the already chronically delayed clinical space construction.
     In his most recent Tri-Annual Report, the Receiver noted that as of March 20, 2020 "all
25   construction related to the [HCFIP] was halted," and that even when construction can
     resume, "completion schedules will likely be delayed longer than the shutdown period by
26   at least a few months and potentially longer for some sites," which "will extend
     completion of the HCFIP construction well into 2022, if not further." *Achieving a*
27   *Constitutional Level of Medical Care in California's Prisons*, Forty-Fourth Tri-Annual
     Report of the Federal Receiver, June 1, 2020, ECF No. 6698 at 11; *see also id.* at 12.

28

[3574826.15]

1  institutions continue to struggle from the lack of sufficient adequate treatment space."

2  27th Round Report at 126, 128.  For example, some prisons simply do not offer required

3  group mental health treatment because they have no space in which to deliver it.  *Id.* at

4  128-29.  At other prisons, mental health treatment takes place in noisy, distracting, and

5  non-confidential locations.  At California Correctional Institution (CCI), for instance, the

6  mental health treatment space is "located in the hallway of the dining area, which also

7  doubled as the law library."  *Id.*  At Folsom Women's Facility (FWF), group treatment

8  takes place in a "non-confidential multipurpose room that lacked privacy."  *Id.* at 213.  At

9  Deuel Vocational Institution (DVI), "[d]ue to poor ventilation, windows and doors in

10  treatment areas remained opened …, allowing non-treating staff and inmates outside a

11  room to hear group discussions."  *Id.* at 129.  In addition to undermining confidentiality,

12  "noise from outside the room created an ongoing distraction for the group, severely

13  compromising the therapeutic milieu."  *Id.*  The Special Master's 27th Round Report

14  specifically identified lack of appropriate treatment space as an impediment to the delivery

15  of mental health care at *seventeen* prisons.  *See* 27th Round Report at 129, 130, 213, 250,

16  309, 339, 343, 394, 445, 501, 529.

17          Little has changed in the more than two years since that report.  The most recent

18  prison monitoring tours conducted in 2019 and 2020, which included prisons with large

19  EOP programs, continued to reveal deficiencies of space.  The Special Master's Suicide

20  Prevention Expert, Lindsay Hayes, concluded in his most recent report that space

21  constraints resulted in failures to provide confidential nursing intake screenings to patients

22  at several prisons, a problem that had become more pronounced since his prior report.  *See*

23  The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the

24  California Department of Corrections and Rehabilitation ("Third Re-Audit"), Nov. 5,

25  2018, ECF No. 5993-1 at 4-5.  Mr. Hayes also refused to accept a proposal by the State to

26  convert an administrative segregation unit at R.J. Donovan Prison ("RJD") to yet another

27  temporary unlicensed MHCB unit to address chronic shortages of crisis bed space in the

28  Southern Region, reporting the plan would create "deplorable conditions – unacceptable

[3574826.15]

1   for class members needing an MHCB level of care." *Id.* at 35; *see also id.* at 32-35.  This

2   Court agreed, noting that the State's failure to expedite construction of permanent crisis

3   beds in the Southern Region had resulted in the—very predictable—shortage of licensed

4   MHCB space there.  Order, July 3, 2019, ECF No. 6212, at 10-11.  The Court has required

5   the State to provide regular updates regarding its promised construction of additional

6   licensed crisis beds for more than a year, *id.* at 12, and in that time, the State has

7   abandoned one of the 50-bed projects, and is still more than two years away from

8   completing construction of the other one.  *See* Order, Oct. 8, 2019, ECF No. 6312 at 4;

9   Declaration of Dean L. Borg Supporting Defs.' Brief in Response to Oct. 8, 2019 Order,

10  Nov. 27, 2019, ECF No. 6402-3 at ¶ 5; Defs.' Fourteenth Status Report on Funding for the

11  Construction of 100 MHCBs, June 26, 2020, ECF No. 6739 at 2 (project is still in the

12  design phase).

13        As a result, the State continues to rely on 73 "temporary" unlicensed mental health

14  crisis beds.[7]  Most of these beds were authorized for use on a temporary basis over a

15  decade ago, but due to population pressures, rising mental health acuity, and poor

16  leadership, they remain in use today.  *See, e.g.*, Order, Feb. 17, 2009, ECF No. 3516 at 1-2

17  ("The court finds that the urgent need by class members for mental health crisis beds

18  persists with such severity that state licensing requirements must temporarily give way ….

19  Accordingly, the court ORDERS that defendants operate, on an emergency basis, the

20  mental health crisis beds at CIM-GACH [General Acute Care Hospital] . . . ."); Order,

21  Dec. 11, 2009, ECF No. 3748 at 2 (authorizing "20 temporary unlicensed Mental Health

22  Crisis Beds" at SAC).

23        For example, the unlicensed MHCB unit at SAC, which this Court authorized as a

24  "temporary" measure in December 2009, has been denounced for a decade.  The unit

25

26  _____

    [7] The State operates 20 unlicensed crisis beds at CSP-Sacramento, 34 unlicensed crisis
27  beds at California Institution for Men, and 19 unlicensed crisis beds at California Institu-
    tion for Women, including four "flexible use" beds.  *See* Supp. to Defs.' 3d Status Report
    on Funding for the Construction of 100 MHCBs, Aug. 2, 2019, ECF No. 6235 at 3.

28

[3574826.15]

1  continues to hold actively suicidal patients despite the fact that it "has been problematic for

2  many years" and "[t]here appears to be universal agreement" that it should be closed.

3  Third Re-Audit at 35.  The cells are "dirty and dark" with "limited visibility."  *Id*. at 40.

4  Due to the lack of clinical offices in the unit, assessments are "regularly conducted at cell-

5  front" or in cages, where, due to "large industrial floor fans," "clinicians and [patients] had

6  a great deal of difficulty hearing each other, negatively impacting the assessment process."

7  *Id*.  The unit is not equipped to provide programming, so patients are simply "locked down

8  in their cells 24 hours a day (with the exception of occasional shower time)."  *Id*.

9  "Although telephone privileges were often recommended by clinicians, telephone usage

10  was non-existent because the only telephone in the [unit's] dayroom had been deactivated

11  since the unit opened in 2009."  *Id*.

12       The State has represented for years that it intends to decommission the unlicensed

13  MHCB units and replace them with licensed crisis beds.  *See, e.g.*, Stip. & Order Waiving

14  State Law Re: the Use of Unlicensed MHCBs at CIW, Sept. 24, 2018, ECF No. 5931 at 1

15  ("Defendants plan to build an additional 100 flexible use inpatient and crisis beds for

16  mentally ill inmate-patients in southern California.").  But with the permanent, licensed

17  crisis bed construction project scaled back, and the planned 50-bed unit still more than two

18  years from activation, as discussed above, decommissioning the unlicensed beds is

19  nowhere on the horizon even as other crisis bed units are in such a state of disrepair that

20  they remain offline for months and years.  *See* Bien Decl. ¶ 23, Ex. X at 3 of letter (noting

21  PVSP crisis bed unit has been offline for repairs since Feb. 2019).  As a consequence, the

22  State continues to house patients experiencing acute crisis in unlicensed, unsuitable, and

23  inhumane spaces.

24       The State also operates several hundred "temporary" inpatient psychiatric hospital

25  beds at Salinas Valley State Prison and California Medical Facility.  These beds, like the

26  unlicensed crisis beds, were licensed only by Court order and authorized by this Court for

27  use on a temporary basis only.  *See, e.g.*, Defs.' 2012 Mental Health Bed Plan, ECF No.

28  4196-2 at 62 (pledging that "[t]he remaining temporary programs at… SVSP (242 ICF-H)

1  and CMF (20 MHCBs, 68 Acute, 140 ICF-H) will be decommissioned [when] there is

2  adequate capacity to accommodate future need in that level of care"); Stip. & Order

3  Waiving State Law, Apr. 6, 2017, ECF No. 5592 at 3 (ordering "state licensing

4  requirements shall be waived with respect to the 70 *temporary* Intermediate Care Facility

5  beds and two observation and restraint rooms in the L Wing, L-1, at California Medical

6  Facility" (emphasis added)).  Nonetheless, the State has no plan to decommission these

7  temporary inpatient hospital beds, which are, after all, simply regular prison units, or to

8  replace them with real ones.

9  The coronavirus pandemic creates even greater pressure as CDCR has had to use

10  every available space for makeshift quarantine and isolation units, and to allow some

11  degree of distancing among incarcerated persons.  Once again, due to overcrowding, the

12  State is creating "ugly beds," using spaces designed for other purposes to house people.

13  *Cf. Plata*, 563 U.S. at 502 ("Prisoners are crammed into spaces neither designed nor

14  intended to house inmates.").  Thousands of incarcerated persons have now been moved

15  back to gyms for housing at prisons throughout the State.  *Cf. id.* at 519-20 (crediting

16  expert testimony describing then-present "living quarters in converted gymnasiums or

17  dayrooms, where large numbers of prisoners may share just a few toilets and showers, as

18  'breeding grounds for disease,'" and noting such makeshift housing "promote[s] unrest and

19  violence" and can both exacerbate prisoners' mental illness and impede delivery of care).

20  Similarly, unlicensed TMHUs have been established in regular prison housing units for

21  patients who are unable to access the licensed inpatient psychiatric hospitalization that

22  CDCR clinicians indicate they need.  ECF No. 6616-1 at 239-40 (April 10, 2020 CCHCS

23  memo describing creation of TMHUs), 246 (TMHUs are "a consolidation of high acuity

24  patients in adjacent cells where treatment can be provided to a group of individuals who

25  require inpatient treatment"); *cf. Coleman*, 922 F. Supp. 2d at 929-30 (describing routine

26  use of regular prison cells in lieu of transfers to higher levels of care and concomitant

27  harm).  And non-confidential cell-front mental health treatment is all that can be delivered

28  at times in the pandemic.  *See* Bien Decl. ¶ 50-53, Ex. WW (review of patient data

[3574826.15]

1   showing essentially all treatment in maximum custody TMHUs conducted cell-front).

2       In short, the State still lacks sufficient space to adequately care for class members,

3   and the situation is getting worse, not better, despite the passage of more than a decade

4   because of the size of the *Coleman* class.

5                  **(d)      The State Is in the Midst of a Suicide Crisis**

6       Suicide is the ultimate failure of a mental health system.  The rate of suicide in

7   CDCR has been steadily increasing and achieved a record level of ignominy in 2019, to the

8   highest rate CDCR has recorded since it started tracking in 1990.  *See* Bien Decl. ¶ 31,

9   Ex. GG ("2018 Suicide Report to Legislature") at 6-7.  As the State's mental health

10  infrastructure falters under the weight of the mental health population, the suicide rate

11  among CDCR prisoners continues to spiral upward, to the point where CDCR Secretary

12  Diaz has now deemed it a crisis.  Bien Decl. ¶ 32, Ex. HH.  The three-judge court observed

13  in 2009 that the suicide rate in California prisons far exceeded the national average, and

14  found that "crowding is a major cause" of many of the contributing factors, such as

15  inadequate clinical assessments, inappropriate interventions, unsupported diagnoses,

16  failure to review records, assignments to inappropriate levels of mental health care, and the

17  provision of inadequate or untimely resuscitation efforts.  922 F. Supp. 2d at 941.  In 2011,

18  the Supreme Court observed that "the suicide rate in California's prisons was nearly 80%

19  higher than the national average for prison populations."  *Plata*, 563 U.S. at 504.

20      Tragically, in subsequent years the suicide rate in CDCR has increased

21  significantly, despite an overall reduction in CDCR's population.  In 2009, when the total

22  CDCR population was nearly 165,000 prisoners, CDCR's suicide rate was 15 per 100,000.

23  Bien Decl. ¶¶ 4, 31, Ex. GG, at 6-7; *see also* Figure 3, *infra*.  Ten years later, despite the

24  overall prisoner population dropping to approximately 125,000, 38 people in the custody

25  of CDCR committed suicide in a single year, and the rate had more than doubled to an

26  astonishing 30.3 per 100,000.  *See* Bien Decl. ¶¶ 29-30.  This was no aberration—in 2018,

27  the suicide rate was 26.3 per 100,000, which at the time was close to the highest rate on

28  record in CDCR since the State started tracking the data in 1990, and the rate had

[3574826.15]

increased steadily year-over-year since 2014.  *See* 2018 Suicide Report to Legislature at 6-7.



**Figure 3: CDCR Suicide Rate**

CDCR's suicide rate has also continued to far outpace the rates and raw numbers in other prison systems nationwide.  The 2019 CDCR suicide rate is 44% higher than the last available national average for state prisons (the 2016 rate of 21 per 100,000), and 89% higher than the annual average rate of suicides for state prisons from 2001 to 2016 (16 deaths per 100,000).  *See* Bien Decl. ¶ 33, Ex. II at 5 (Table 1), 6 (Table 4).  Although the federal prison system is much larger than California's, approximately half as many people killed themselves in federal prisons between 2001 and 2016:  California counted 496 suicides in this period, while the federal system counted only 260.  *See id.* at 5 (Table 1), 13 (Table 13).

In 2019, a suicide occurred in CDCR custody less than every ten days on average. Bien Decl. ¶ 30.  Nine of the 38 suicides in 2019 followed a recent (*i.e.,* within 30 days) discharge from a higher level of care – including three from the chronically understaffed and overstressed PIP units.  *See id.* ¶ 34.  Six more occurred within months to a year of a CDCR clinician's decision to drop that patient's level of mental health care.  *Id.*  And

[3574826.15]

1   indeed many of the patients who committed suicide in 2019 never made it into the higher

2   levels of care they required before they killed themselves.  Sixteen of the prisoners who

3   committed suicide in 2019 either had referrals to a Mental Health Crisis Bed rescinded

4   before they were admitted, or were never referred for a higher level of care despite clear

5   signs such care was warranted, according to CDCR's own suicide reviewers.[8]  Bien Decl.

6   ¶ 35.  In contrast, in 2015 there were only two suicides out of a total of 24, or 8%, in which

7   the patients had been discharged from a higher level of care within the prior 30 days.

8   Yelin Decl. Re: Opening Brief Re: MHCB Construction and Unmet Bed Needs Study,

9   Nov. 27, 2019, ECF 6401-1 ¶ 6.  By 2018, that percentage had more than doubled to 21%,

10   and in 2019, it was nearly 24%.  *Id.* ¶ 4; Bien Decl. ¶ 34.

11          Plaintiffs have already presented significant evidence that the State's ramped up

12   efforts in 2018 and 2019 to restrict usage of the highest levels of care in order to achieve

13   compliance benchmarks and avoid enforcement have likely contributed to the skyrocketing

14   suicide rate.  *See, e.g.*, *id.*; Yelin Decl. re Pls' Reply to Defs' Response to Oct. 8, 2019

15   Order, Dec. 9, 2019, ECF No. 6410-1 ¶¶ 6-15; Under Seal Supp. Yelin Decl. Re: Pls'

16   Reply to Defs' Response to Oct. 8, 2019 Order, lodged with the Court on Dec. 12, 2019.

17   The Special Master has also documented the detrimental effect of CDCR's recent failures

18   to refer patients to higher levels of care and practice of discharging patients prematurely on

19   the rapidly increasing suicide rate.  *See* 2020 Inpatient Access Report at 29-30 (noting that

20   the forthcoming Fourth Re-Audit Report from the Special Master's Suicide Prevention

21   expert will discuss the connection between failures to refer and inappropriate discharges

22   from higher levels of care, and recognizing that failure to provide adequate access to

23   inpatient care results in inadequate suicide prevention program).  And the Court, after

24   reviewing the parties' briefing regarding failures to refer to and discharges from higher

25   levels of care and their relationship to the suicide epidemic in CDCR prisons, has ruled

26

27   _____

    [8] Some of those sixteen patients overlap with those whose level of care was dropped prior
    to their suicide.

28

1   that an Unmet Bed Need Study is necessary to identify gaps in the provision of higher

2   levels of care to the *Coleman* class.  *See* Transcr. of June 26, 2020 Status Conf., ECF No.

3   6753, at 21.

4          CDCR's broken mental health care system is ill-equipped to manage and serve the

5   increasingly more acutely mentally ill population.  This has had a clear and direct impact

6   on the steadily increasing suicide rate, through efforts to withhold scarce inpatient

7   resources from those who require it in order to improve compliance with court-ordered

8   transfer timelines.  CDCR's own suicide case reviewers concluded that in 23 of the 38

9   suicides in 2019, or 60.5%, there were failures related to utilization management that were

10  significant enough to warrant Quality Improvement Plans for the relevant institutions'

11  mental health staff, a dramatic increase from prior years.  Bien Decl. ¶ 35.

12         *Coleman* class members continue to be disproportionately affected by the spiraling

13  suicide rate.  In 2019, twenty-seven suicides, or 71% of the suicides, involved *Coleman*

14  class members, including sixteen suicides by EOP class members alone.  2020 Inpatient

15  Access Report at 29.  The suicide rates per 100,000 prisoners at the CCCMS and EOP

16  levels of care were 39.5 and an astronomical 247.6, respectively.  Bien Decl. ¶ 37.  EOP

17  class members were more than twenty times as likely to commit suicide as non-class

18  members.  *Id.*  The suicide crisis has continued in 2020 as, thirteen more individuals have

19  committed suicide while in CDCR custody, seven of whom, or 54%, were *Coleman* class

20  members.  *Id.* ¶ 39.  The relationship between the State's "utilization management" efforts

21  and suicides has persisted as well.  In 2020, five of the individuals who committed suicide,

22  or 38%, had been discharged from a higher level of care within the 90 days preceding their

23  deaths.  *Id.*

24         Both the three-judge court and the Supreme Court cited the high number of

25  preventable and foreseeable deaths among CDCR's suicides in their consideration of the

26  State's ability to safely and humanely manage its population.  As the Supreme Court

27  observed, 72.1% of the suicides that took place in CDCR in 2006 were found to be

28  foreseeable and/or preventable.  *See Plata*, 563 U.S. at 504.  CDCR's suicide prevention

[3574826.15]

1  failures not only did not improve in the ensuing decade, they got worse.  In 2016, CDCR's

2  internal Suicide Case Review Committee deemed an astounding 82% of the suicides to be

3  either foreseeable, preventable, or both.  *See* Bien Decl. ¶ 40; *see also* Bien Decl. ¶ 41,

4  Ex. KK at 39-40 (deeming 71% of suicides within CDCR in 2015 to be preventable and

5  54% to be foreseeable).[9]  Indeed, perhaps because of these unrelenting failures, CDCR

6  unilaterally elected in early 2017 to stop including determinations about whether suicides

7  were foreseeable or preventable in its individual suicide reports.  *See* Bien Decl. ¶ 40.

8  Consequently, rather than acknowledge and grapple with this problem, CDCR now simply

9  refuses to analyze some of the most important information about the factors underlying its

10  tragic and growing suicide rates.

11         California's Legislature has grown so concerned about CDCR's self-proclaimed

12  suicide crisis that it now requires CDCR to report annually on its suicide prevention

13  program.  *See* Cal. Penal Code § 2064.1 (enacted by Senate Bill 960 (Leyva) (Chapter 782,

14  Statues of 2018)).  CDCR produced its first report on October 1, 2019 in which it notably

15  refused to analyze the foreseeability or preventability of its 2018 suicides.  *See generally*

16  2018 Suicide Report to Legislature.  Instead, the report deflects responsibility for CDCR's

17  continually rising suicide rate by implying the rate is simply a result of "[s]uicide []

18  reaching epidemic levels in many parts of the country," *id.* at 1, even while acknowledging

19

20  [9] CDCR has long pressed the Special Master to allow it to assume responsibility for the court-ordered annual aggregate suicide reporting starting with 2015's deaths.  The State

21  failed to produce its draft 2015 suicide report for years, and then, in the face of the Special Master and Plaintiffs' serious ongoing concerns regarding the report's methodology and

22  contents, unilaterally published it anyways after rejecting the Special Master's recommendations.  *See* Bien Decl. ¶ 41.  Although the report spends nine of its sixty-four

23  pages detailing suicide-prevention measures undertaken after 2015, it fails to acknowledge that the suicide rate has gotten worse every one of the five years since then

24  notwithstanding these efforts, *see* id., Ex. KK at 50-59, and in general falsely presents suicides in CDCR as on the decline and/or typical of other national trends, *see id.* at 7, 24,

25  33-35.  Moreover, while the State has insisted it can be trusted to take over these reporting duties from the Special Master in a transparent and timely manner, it has not even

26  completed initial drafts of the annual reports analyzing suicides in CDCR's custody in 2016, 2017, 2018, or 2019 and has signaled its intent to whitewash out the foreseeability/

27  preventability analysis from future reports altogether by ceasing its clinicians' portion of that review in 2017.

28

1  what amount to major flaws in the Department's suicide prevention program, including

2  poor quality suicide risk evaluations system-wide.  *Id.* at 1-2.

3       The State's failures to implement key components of an adequate suicide

4  prevention program are longstanding and uncontested.  *See* Order, July 3, 2019, ECF No.

5  6212 at 14 (noting that "a substantial amount of work remains" for CDCR to implement a

6  successful suicide prevention program "and implementation is dragging out and taking too

7  long," and ordering that if Mr. Hayes is "unable to report full compliance with his

8  recommendations at the end of the fourth re-audit, the court anticipates reviewing with

9  defendants at a future status conference the specific steps necessary to enable Mr. Hayes to

10  report no later than after his fifth re-audit that all recommendations have by then been

11  implemented").  Mr. Hayes has conducted five audits of CDCR's suicide prevention

12  practices since 2013, and has produced four final reports.[10]  Each has noted significant

13  failures by CDCR.  The Special Master has indicated that the Fourth Re-Audit will again

14  report serious failures in CDCR's suicide prevention program, including "inadequate

15  assessments and/or treatment" contributing to a rash of suicides in 2019 taking place after

16  the patients expressed suicidality yet were not placed in appropriate levels of care.  2020

17  Inpatient Access Report at 29.

18       In 2017, an independent investigation by the California State Auditor similarly

19  concluded that "[d]espite the fact that the rates of inmate suicide in California's prisons has

20  been higher on average than those of all U.S. state prisons for several years, the California

21  Department of Corrections and Rehabilitation (Corrections) has failed to provide the

22  leadership and oversight necessary to ensure that its prisons follow its policies related to

23  inmate suicide prevention and response."  Bien Decl. ¶ 13, Ex. M at 1.  The California

24  State Auditor drew attention to many of the same persistent shortcomings that the Special

25  Master and his suicide prevention expert have identified for years.  Each of the Auditor's

26

27  [10] The fifth report, regarding Mr. Hayes' Fourth Re-Audit, has been provided to the parties in draft form, but has not yet been filed with the Court.  Bien Decl. ¶ 42.

28

1   primary critiques relate to the failure of CDCR staff to perform critical suicide prevention

2   functions—conducting suicide risk evaluations, safety and treatment planning, and

3   observation of suicidal patients, for example. *Id.* at 17-32. Indeed, the State Auditor was

4   "particularly troubl[ed]" by the "ongoing nature of many of the problems we identified,"

5   noting that "[s]ince at least 1999, the special master has identified many of the same

6   problems we found in our audit." *Id.* at 3-4.

7        The serious shortcomings in the State's suicide prevention program clearly arise

8   from inadequate clinical staffing and excessive caseloads for mental health staff. For

9   example, the Auditor reported that, according to a CDCR clinical support chief, heavy

10  caseloads are a "contributing factor" to the failure to complete adequate risk evaluations.

11  State Auditor Report at 20. The chief of mental health at CCWF reported to the Auditor

12  that "staff are sometimes unable to conduct checks at the required times because they are

13  engaged with other inmates." *Id.* at 32. Similarly, Mr. Hayes's Third Re-Audit Report

14  ascribed certain troubling practices in the mental health crisis beds to the limited

15  availability of recreational therapists, *see* Third Re-Audit at 14, and the Special Master's

16  April 2020 Inpatient Access Report concludes that "[i]t is clear that with staffing shortages

17  appropriate care cannot be provided in the PIPs," which in turn leads to class members'

18  suicides, *see* 2020 Inpatient Access Report at 30.

19       The State Auditor concluded that CDCR's chronic mental health vacancies frustrate

20  critical suicide prevention efforts and that, even if the current mental health positions were

21  fully staffed, existing mental health staffing allocations are too low to support an adequate

22  suicide prevention program. State Auditor Report at 48.

23       The persistence of CDCR's unacceptably high suicide rate reflects its inability to

24  safely and humanely incarcerate tens of thousands of patients with serious mental illness.

25              **(e)    Class Members Disproportionately Are Subjected to**
                         **Harmful Conditions in Segregation Units**
26

27       Six years ago, this Court refused to terminate relief in this case in part due to

28  ongoing concerns about the "elevated proportion of inmates in administrative segregation

[3574826.15]

1    who are mentally ill" and the need to address "reduction of risks of decompensation and/or

2    suicide [in segregation units] …, access to treatment/mitigation of harshness of conditions

3    in the administrative segregation units, suicide prevention, and reduction of lengths of stay

4    in administrative segregation."  Order, Apr. 5, 2013, ECF No. 4539 at 45-46.  The State's

5    failure to do so, and its ongoing disproportionate reliance on segregation to manage its

6    most severely mentally ill population, further demonstrate that it cannot humanely and

7    appropriately manage the demands of its population.  Without the resources to provide

8    meaningful mental health treatment, the State resorts to locking down many of the most

9    severely mentally ill patients in dangerous segregation units.  People with serious mental

10   health needs disproportionately wind up in segregation units, where they suffer still further

11   from the isolation and harsh conditions.

12       *Coleman* class members continue to represent an outsized share of CDCR's

13   segregation population.  As of late February/early March 2020, 8.4% of the EOP

14   population was in segregated housing, in contrast to 3.42% of the non-mental health

15   population.  *See* Bien Decl. ¶¶ 43-44, Ex. LL.  Combined, EOPs and CCCMS patients

16   represented 40% of the total number of people in CDCR's segregation units, but only 28%

17   of the total CDCR population.  *Id.* ¶ 45.  While EOP patients constituted only 5.5% of the

18   total CDCR population, they made up 12.7% of the total population in segregation.  *Id.*

19       All of those dangerous trends have continued in the months since the pandemic

20   started.  While the percentage of non-class members in segregation held steady, the

21   percentage of EOPs who are in segregation increased to 9.7% as of July 2020, compared to

22   3.36% of the non-mental health population.  *See* Bien Decl. ¶¶ 43-44, Ex. MM.  EOPs and

23   CCCMS class members now make up more than 43% of all people in segregation.  *Id.*

24   ¶ 45.  And EOP patients now constitute 15% of all people in segregation although they

25   constitute 5.9% of the overall prison population.  *Id.*

26       Patients in segregation at higher levels of care have reduced access to the

27   therapeutic services and interpersonal interactions that patients use to cope with their

28   mental illness.  The State maintains a blanket policy of requiring all patients in segregation

[3574826.15]

units to be restrained while receiving mental health treatment, irrespective of their individual security factors or the nature of their mental health needs—including patients on maximum custody status being treated in the State's licensed inpatient psychiatric hospitals.  As this Court concluded after trial in 2014, "placement of seriously mentally ill inmates in California's segregated housing units can and does cause serious psychological harm, including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide."  *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1095 (E.D. Cal. 2014); *see also Plata*, 563 U.S. at 504 (observing that *Coleman* class members in administrative segregation "endure harsh and isolated conditions and receive only limited mental health services"); *id.* at 519 (observing that prisoners are held in "tiny, phone-booth-sized cages" while awaiting treatment).

Suicide rates in CDCR's segregation units are astronomical by any measure—and significantly higher than in the general population.  And indeed, they are moving in the wrong direction.  In 2015, when CDCR entered into a settlement limiting the use of solitary confinement in *Ashker v. Governor of the State of California*, N.D. Cal. Case No. C 09-5796 CW, and was implementing the *Coleman* segregation remedial plan following this Court's April 2014 Order, *see* Order, Aug. 29, 2014, ECF No. 5212, the annual suicide rate in segregation units was 111.0 per 100,000 inmates.  *See* Bien Decl. ¶ 49.  That rate was extraordinarily high in comparison to the same year's suicide rate for people in non-segregated units—12.4 per 100,000 people.  *Id.*  By 2019, the suicide rate in CDCR's segregation units was 211.2 suicides per 100,000, compared to 23.2 in the CDCR non-segregation population.  *Id.*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



**Figure 4: Comparative CDCR Suicide Rates**

In addition to posing a serious risk of harm to *Coleman* class members, the harsh conditions in CDCR's segregation units also trigger a self-reinforcing mechanism that tends to keep people with serious mental illness in segregated housing. *Coleman* class members get caught in an inexorable cycle of segregation, their symptoms exacerbated by the isolation and harsh conditions, leading to decompensation, behavioral problems, and additional Rules Violation Reports ("RVRs"), all of which cause CDCR to extend their segregation terms and their prison terms. The conclusions the three-judge court reached in 2009 remain true: "[A] destructive feedback loop … is now endemic to the CDCR's mental health care delivery system. Inmates denied necessary mental health placements are decompensating and are ending up in mental health conditions far more acute than necessary[,] creating a cycle of sicker people being admitted, with greater resources necessary to treat them, which then creates even further backlog in an already overwhelmed system." 922 F. Supp. 2d at 930 (citation and alterations omitted); *see also Coleman*, 28 F. Supp. 3d 1068, 1099 (E.D. Cal. 2014).

**(i)**     **The State's Response to COVID-19 Has Resulted in Extended and Unnecessary Stays in Segregation With Limited Mental Health Treatment**

The conditions in CDCR's segregation units for class members—including the level

[3574826.15]

of mental health care and the custodial practices that interfere with that care, such as the routine treatment of class members in cages—were already dangerous and unconstitutional to start with.  In responding to the pandemic, CDCR has further limited its ability to provide mental health treatment to the point where the general population treatment—other than medication—for class members in these units has stopped.  "[N]eedless suffering and loss of life" will result from these practices.  Decl. of Craig Haney in Supp. of Pls.' Emergency Mot. ("Haney Decl."), Mar. 25, 2020, ECF No. 6526 ¶ 16.

Class members are now spending more time in segregation, thus exacerbating the dangerous impact of these harsh settings that are increasingly failing to provide even minimal mental health treatment.  With the onset of the pandemic, the number of EOP patients housed in segregation have gone up and their lengths of stay are increasing.  The number of *Coleman* patients at the EOP level of care or higher housed in an administrative segregation unit has increased by 22% since February 2020.  Bien Decl. ¶ 46, Exs. NN and OO.  And the average and median lengths of stay for EOP patients in segregation dramatically increased from February to July 2020.  *Id.* at ¶ 46, Exs. NN and OO (showing both the average and median length of stay of EOP, MHCB, and ICF patients in both the ASU and ASU Hub increased from February to July 2020 in every patient category except one).  While the State has attributed this dangerous trend to their COVID-19 policies limiting non-essential transfers, those policies only foreclose inter-facility movement and thus do not explain why the State cannot move vulnerable EOP class members to non-segregated units in their existing facilities given the extreme danger of continuing to house them in solitary confinement.

*Coleman* class members in need of crisis and inpatient care are also spending extended time in maximum-security TMHUs, where they only receive minimal mental health treatment.  *See* Defs' Strategic COVID-19 Mgmt. Plan, Apr. 16, 2020, ECF No. 6616 at 18–19 (establishing MAX TMHUs); *cf. Plata*, 563 U.S. at 504 (noting "inmates awaiting [higher levels of] care may be held for months in administrative segregation, where they endure harsh and isolated conditions and receive only limited mental health

services").  Even the best case scenario for these units only provides class members five hours of structured groups each week—well below the Program Guide's minimal requirements even for patients *not* in need of transfer to crisis beds and inpatient psychiatric hospitalization.  *See* Defs' Strategic COVID-19 Mgmt. Plan, Apr. 16, 2020, ECF No. 6616 at 18.  The limited data available indicates that patients in maximum custody TMHUs are receiving much less mental health treatment than expected.  Data from July 6-13, 2020 for fifteen patients in maximum custody TMHUs awaiting placement in crisis beds or inpatient treatment shows that, on average, these patient in need of inpatient hospitalization were offered approximately 0.27 hours or 16.2 minutes of mental health treatment daily.  Bien Decl. ¶ 50-53, Ex. WW.  No group treatment is being offered, and all but one patient received this minimal amount of mental health treatment cell-side and in non-confidential settings.  *Id.* ¶¶ 52-53.  These practices are taking place across the state, including at Folsom State Prison ("FSP"), Mule Creek State Prison ("MCSP"), California State Prison, Sacramento ("SAC"), and Salinas Valley State Prison ("SVSP"). *Id.* ¶ 51, Ex. WW.

While the State's policy requires class members in need of higher levels of care to be transferred out of dangerous maximum-custody TMHUs within a maximum of ten days, the State's own data shows that many patients in need of inpatient care continue to linger in these makeshift units receiving unquestionably unconstitutional care far longer.  Bien Decl. ¶ 24, Ex. Y (showing six patients held in maximum custody TMHUs longer than ten days as of June 26, 2020).  And other class members awaiting crisis care routinely spend multiple days in these solitary confinement units before their referrals are ultimately rescinded without ever reaching a crisis bed at all.  *Id.* (showing that during 5-day period ending June 26, 2020 only five out of 26 patients in maximum custody TMHUs referred for crisis care transferred to an MHCB, seven of 26 were discharged to a lower level of care after their MHCB referral was rescinded, and the other 14 patients remained in the maximum custody TMHU with stays of between two to fourteen days).

[3574826.15]

**(ii)** **The State is Once Again Imposing Widespread Segregation-Like Settings In General Population Settings Due to Limitations in Space and Staffing**

Like in 2009, class members (and non-class members alike) who are not in segregation units are once again increasingly being subjected to segregation-like conditions due to additional resource limitations resulting from the State's response to COVID-19, including lack of space to adequately quell the spread of the virus and staffing shortages. *See Plata*, 563 U.S. at 509 ("Overcrowding had increased the incidence of infectious disease … and had led to rising prison violence and greater reliance by custodial staff on lockdowns," which "inhibit the delivery of medical care and increase the staffing necessary for such care …." (internal citations and quotation marks omitted)); *Coleman*, 922 F. Supp. 2d at 949 (finding "crowding has created conditions of confinement that contribute to the spread of disease, and it requires the increased use of lockdowns as a method of prison control, further impeding the prison authorities' ability to provide needed medical and mental health care"); *see also id.* at 932 (quoting Special Master finding that crowding forces increasingly locked down conditions in which "'[a]ll inmates must spend larger chunks of their days in their cells.… None of this is conducive to the health and well-being of any inmate, much less a seriously mentally disordered inmate/patient'"); *id.* at 937-38 (documenting detrimental effect on class members of CDCR's pervasive reliance on lockdowns to manage system).

As class members are routinely locked down in their housing units to prevent the spread of COVID-19, the mental health treatment they receive becomes nearly nonexistent, with barebones rounding for all patients resulting from increasingly limited staffing resources. *See* Defs' Strategic COVID-19 Mgmt. Plan, Apr. 16, 2020, ECF No. 6616 at 16–20; Bien Decl. ¶ 18, Ex. Q (COVID-19 Mental Health Delivery of Care Guidance & Tier document). The State has drastically reduced class members' opportunities for in-person contacts with clinicians and treatment teams in lieu of increased reliance on telehealth technology. *See* Defs.' Strategic COVID-19 Mgmt. Plan, Apr. 16, 2020, ECF No. 6616 at 17 (institutions encouraged to increase use of telepsychiatry); Bien

[3574826.15]

1   Decl. ¶ 18, Ex. Q at 2–8 (telehealth expanded at tiers 2-4).  Even on non-quarantined units,

2   out of cell activities may cease entirely depending on staffing shortages.  *See* Defs.'

3   Strategic COVID-19 Mgmt. Plan, Apr. 16, 2020, ECF No. 6616 at 19 (enhanced in-cell

4   activities in segregated housing).  On April 7 and again on June 22, 2020, the State

5   imposed mandatory 14-day modified programming across all institutions.  *See* Bien Decl.

6   ¶ 61, Ex. CCC; *see also See* Defs.' Strategic COVID-19 Mgmt. Plan, Apr. 16, 2020, ECF

7   No. 6616 at 10 (describing April 7, 2020 modified programming memo).  The result is that

8   *Coleman* class members increasingly eat their meals in their cells, have limited access to

9   showers, and have fewer opportunities to engage in recreation in either the yard or in a

10  dayroom.  *See* Bien Decl. ¶ 61, Ex. CCC at 1–2 (describing modifications to shower,

11  dayroom, and yard schedules during the 14-day modified program).  Family visiting has

12  been stopped since March 16, 2020 and CDCR has yet to come forward with any sort of

13  plan to replace the loss through video visitation or other methods.  *See* ECF No. 6616-1 at

14  49 (reporting that CDCR "[s]uspended the family visiting program statewide" on March

15  16, 2020).

16        The State attempts to compensate somewhat for these serious deprivations by

17  encouraging increased provision of in cell activities, such as "therapeutic treatment

18  packets," and "workbooks."  Bien Decl. ¶ 18, Ex. Q at 2.  But these efforts have only a

19  negligible effect when incarcerated people who already suffer from mental illness are

20  forced to spend essentially all of their time in their cells in the midst of a tremendously

21  stressful, fast-spreading pandemic.  Further, the State's response to COVID-19 does not

22  guarantee *Coleman* class members in non-segregation units access to telephones or in-cell

23  entertainment devices, such as televisions, radios, tablets, or cell phones, even though

24  those objects are critical for helping class members cope in locked-down settings.  *See,*

25  *e.g.*, Haney Decl. ¶ 9.  As a result, patients who are not actually in segregation are

26  increasingly exposed to harsh and isolated conditions, with limited mental health services,

27  at a time when their mental health needs can be expected to significantly rise.

28        The true extent of these practices is not yet known.  The State's responses to the

[3574826.15]

1  pandemic are frequently evolving, and as a result, the type of mental health treatment and

2  programming available to *Coleman* class members is not stagnant nor, at this point, fully

3  evident from the data available.  However, it is undeniable that many patients are not

4  receiving even the most minimal level of mental health care, let alone what they are

5  entitled to under the Constitution.

6              **(f)     CDCR Fails to Provide Safe and Humane Conditions for**
                         **Class Members**
7

8              As the three-judge court has noted, extreme custodial control, and the violence that

9  ensues, are hallmarks of overcrowding.  *See Coleman*, 922 F. Supp. 2d at 888, 921, 932.

10  *Coleman* class members continue to experience serious abuse and intimidation by custody

11  officers at many prisons.  In 1995, this Court first raised concerns about the "punitive

12  measures by the custody staff" against people with serious mental illness.  *Coleman*, 912

13  F. Supp. at 1320.  More recently, this Court reminded the parties that "[c]onstitutionally

14  adequate mental health care requires not only sufficient staff," but also "a collaborative

15  culture between custody and mental health staff in each prison institution that houses

16  mentally ill inmates."  Order, Aug. 9, 2016, ECF No. 5477 at 6.  Just last year, the Court

17  emphasized the centrality of this issue to the resolution of the ongoing constitutional

18  violations.  *See* Order, Feb. 20, 2019, ECF No. 6095 at 4.

19              Yet custodial interference with mental health care has proven a widespread and

20  intractable problem, particularly at prisons with large numbers of acutely ill prisoners and

21  staff who are ill equipped and poorly trained to manage them.  *See, e.g.*, 27th Round

22  Report at 98, 100, 168, 182; Special Master's 26th Round Monitoring Report ("26th Round

23  Report"), May 6, 2016, ECF No. 5439 at 50, 65-66; *see also* Bien Decl. ¶ 54, Ex. XX

24  (OIG report documenting 188 complaints of staff misconduct at SVSP, a disproportionate

25  majority of which came from class members); Bien Decl. ¶ 56, Ex. ZZ at 14 (OIG report

26  concerning HDSP stating "CDCR does not have a program that adequately trains its staff

27  or gives them the tools to cope with working in such a stressful environment.").  So too has

28  custody staff's disproportionate use of force against class members, which this Court has

1   previously identified as a key problem, persisted.  Order, April 10, 2014, ECF No. 5131 at

2   17-18.  The State's own data shows that *Coleman* class members continue to be

3   disproportionately subjected to custody officers' uses of force.  *See* Bien Decl. ¶ 55,

4   Ex. YY (noting disproportionate uses of force against class members at prisons with high

5   numbers of EOPs, including CSP-SAC, HDSP, SVSP, and LAC).

6           These problems have not been ameliorated by the State's recent Custody Mental

7   Health Partnership Plan, and are not limited to a few institutions.  In fact, there is

8   voluminous evidence that the State still allows egregious staff misconduct to fester

9   uncontrolled in its system.  *See* Pls.' Notice of Filing Motion in *Armstrong v. Newsom* re

10  Systemwide Staff Misconduct and Abuse, June 4, 2020, ECF No. 6701; Pls.' Notice of

11  Filing Motion in *Armstrong v. Newsom* re Staff Misconduct and Abuse at RJD, March 2,

12  2020, ECF No. 6492.  The rampant staff misconduct that the Special Master has repeatedly

13  described remains pervasive, despite this Court's many orders seeking to remediate it.  *Cf.*

14  26th Round Report at 63 ("Despite all of the previous work committed to addressing the

15  issue of custody/mental health relations, and by extension custody interference in the

16  delivery of mental health care, this problem has remained pervasive across several

17  institutions statewide.").

18          Indeed, the increasingly locked down conditions in CDCR today intended to

19  prevent the spread of COVID-19, cannot help but increase stress in an already extremely

20  stressed system, as they have in the past.  *See supra* Section III.A.2.e.ii.; *see also Plata*,

21  563 U.S. at 509 ("Overcrowding had increased the incidence of infectious disease … and

22  had led to rising prison violence and greater reliance by custodial staff on lockdowns,"

23  which "inhibit the delivery of medical care and increase the staffing necessary for such

24  care …." (internal citations and quotation marks omitted)); *Coleman*, 922 F. Supp. 2d at

25  949 (finding "crowding has created conditions of confinement that contribute to the spread

26  of disease, and it requires the increased use of lockdowns as a method of prison control,

27  further impeding the prison authorities' ability to provide needed medical and mental

28  health care"); *see also id.* at 932 (quoting Special Master finding that crowding forces

[3574826.15]

1   increasingly locked down conditions in which "'all inmates must spend larger chunks of

2   their days in their cells …. None of this is conducive to the health and well-being of any

3   inmate, much less a seriously mentally disordered one'"); *id*. at 937 (documenting

4   detrimental effect on class members of CDCR's pervasive reliance on lockdowns to

5   manage system).

6        The three-judge court has observed that the population capacity of a prison system

7   must account for the system's ability to provide "humane conditions" to the people it

8   incarcerates.  922 F. Supp. 2d at 921.  The State's failure to ensure the humane and decent

9   treatment of people with serious mental illness reflects a system incapable of managing its

10  population.

11            **(g)**      **Mental Health Overcrowding Strains the Delivery of**
                    **Adequate Medical Care**

12

13       The presence of a large and acute mental health population strains many aspects of

14  CDCR's operations beyond the delivery of mental health care.  For example, providing

15  medical care to patients at the EOP or higher levels of acuity is complex and resource-

16  intensive.  Prisons that house large numbers of high-acuity mental health patients have

17  faced serious challenges providing adequate medical care.  Of the nine prisons that each

18  house more than 500 EOP or PIP patients, eight remain non-delegated, meaning that the

19  medical care is functioning too poorly to allow CDCR to resume some measure of control

20  from the Receiver.[11]  Only one has been found by the Receiver to provide medical care

21  such that management has been returned to the State.

22       High-acuity mental health patients can be unstable and may have difficulty com-

23  _____

24  [11] California Health Care Facility, California Medical Facility, California State Prison –
Los Angeles County, Mule Creek State Prison, R.J.  Donovan State Prison, California

25  State Prison – Sacramento, Substance Abuse Treatment Facility Prison, Salinas Valley
State Prison, and California Men's Colony each has more than 500 high-acuity mental

26  health patients, according to July 2020 population data.  *See* Bien Decl. ¶ 57, Ex. AAA.
Only California Men's Colony has been delegated. *See Achieving a Constitutional Level of*

27  *Medical Care in California's Prisons*, Forty-Fourth Tri-Annual Report of the Federal
Receiver, June 1, 2020, ECF No. 6698 at 18.

28

[3574826.15]

1    municating their symptoms and comprehending treatment plans and patient education,

2    which presents challenges for both diagnosis and treatment.  Providing adequate medical

3    care to these patients requires careful coordination and collaboration between medical and

4    mental health clinical staff.  This population requires additional medical staffing, including

5    for medication administration, but the recruitment and retention of medical staff to serve

6    acute mental health patients can be difficult due to the particular challenges they pose.

7    Programs that house high populations of acute mental health patients also require enhanced

8    custody staffing to facilitate programs and care delivery.

9           **(h)     Coleman Class Members are Disproportionately Affected
                        by Overcrowding and Related Susceptibility to**
10                     **Coronavirus**

11          Patients with serious mental illness ("SMI"), i.e., *Coleman* class members, are at an

12   increased risk for COVID-19 infection and adverse outcomes, yet another reason why they

13   are more likely to be affected by overcrowding in the California prison system.  *See* Pls'

14   Brief re: Serious Mental Illness as Risk Factor for COVID-19 ("Pls' Brief re: SMI"), July

15   2, 2020, ECF No. 6751.  As the Special Master recently warned, "[i]nmates who are

16   participants in the MHSDS are particularly vulnerable to the COVID-19 pandemic due to

17   both co-existing medical illnesses and impaired behaviors."  2020 Inpatient Access Report

18   at 29.

19          The Special Master's finding is borne out by recent research, which concludes that

20   patients with SMI typically engage in behaviors or have functional limitations that make it

21   harder to engage in infection control practices like social distancing, and are therefore

22   more likely to contract COVID-19.  *See* Pls' Brief re: SMI at 5–8.  Additionally, people

23   with serious mental illnesses have significantly higher rates of comorbid medical

24   conditions, such as hypertension, diabetes, and cardiovascular disease, that place them at

25   higher risk for infection and poor outcomes if exposed to COVID-19.  *Id.* at 10-14; *see*

26   *also* Ex. 3 to 2020 Inpatient Access Report, ECF 6579 at 43 (Mar. 17, 2020 email from

27   DSH Chief Counsel C. Ciccotti stating "Individuals with serious mental illness typically

28   have a 20% higher risk of morbidity and mortality than the general population").

[3574826.15]

1    CDCR's experience with hospitalizations and deaths among class members is

2    consistent with the available scientific information regarding these types of poor outcomes.

3    As of July 14, 2020, 15 out of the 34 deaths of incarcerated people within CDCR statewide

4    have been members of the *Coleman* class.  Bien Decl. ¶ 58.  Of the 73 people listed as

5    currently hospitalized by CDCR on July 14, 2020, 26 people (35%) are *Coleman* class

6    members.  *Id.*  Despite this clear relationship, CDCR's current policies and practices do

7    not consider the vulnerabilities of *Coleman* class members.  Plaintiffs have urged the State

8    to reallocate resources and attention to save more lives by focusing on those—like

9    *Coleman* class members—who have dramatically increased risk of contracting COVID-19

10   and of experiencing adverse outcomes, including hospitalization and death due to

11   COVID-19, but have not seen significant efforts in this respect to date.  The State has

12   made no indication that it will develop a plan to address and treat the increased stress and

13   anxiety associated with the pandemic, at the same time that it attempts to restore mental

14   health care to meet constitutional minimums.  In sum, the State's failure to reduce the

15   mental health population has ripple effects that challenge the broader operations of the

16   prison system, which are reverberating even more urgently during the ongoing pandemic.

17   **B.    THIS COURT SHOULD REQUEST THE CONVENING OF A**
     **THREE-JUDGE COURT FOR CONSIDERATION OF TARGETED**
18   **RELIEF TO ADDRESS RAMPANT CONSTITUTIONAL**
     **VIOLATIONS ARISING FROM ONGOING OVERCROWDING OF**
19   **THE MENTAL HEALTH POPULATION**

20        **1.    The State Failed To "Properly Account for" the Mental Health**
               **Population in Implementing its Population Reduction Measures**
21

22        The three-judge court, anticipating that the remedies ordered in 2009 might require

23   adjustment over time, "retain[ed] jurisdiction over this matter … to consider any

24   subsequent modifications made necessary by changed circumstances."  922 F.Supp.2d at

25   1004.  Specifically, that court recognized that the overall limit of 137.5% of capacity might

26   prove inadequate: "Should the state prove unable to provide constitutionally adequate

27   medical and mental health care after the prison population is reduced to 137.5% design

28   capacity, plaintiffs may ask this court to impose a lower cap." *Id.* at 970 (footnote

[3574826.15]

1   omitted).

2          The three-judge court's population reduction order was premised on the State's

3   ability to "properly account for" the needs of particularly vulnerable populations, by

4   maintaining them at lower populations as needed.  *Id*. at 970 n.64.  That court recognized

5   that some areas of the prison population might require stronger relief:

6              We recognize that certain institutions and programs in the
               system require a population far below 137.5% design capacity.
7              We trust that any population reduction plan developed by the
               state in response to our opinion and order will properly account
8              for the particular limitations and needs of individual
               institutions and programs.
9

10  *Id*.  The three-judge court also noted that the cap might need to be more targeted, and the

11  "single systemwide cap" might prove to offer "inadequate relief," necessitating further

12  action.  *Id*. at 964.

13         The Supreme Court too contemplated the possibility that modification of the cap

14  would be warranted and more targeted relief necessary.  The Court explained:

15             The three-judge court … retains the authority, and the
               responsibility, to make further amendments to the existing
16             order or any modified decree it may enter as warranted by the
               exercise of its sound discretion.  "The power of a court of
17             equity to modify a decree of injunctive relief is long-
               established, broad, and flexible."  *New York State Assn. for*
18             *Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (C.A.2
               1983) (Friendly, J.).  A court that invokes equity's power to
19             remedy a constitutional violation by an injunction mandating
               systemic changes to an institution has the continuing duty and
20             responsibility to assess the efficacy and consequences of its
               order.  *Id.* at 969-971.  Experience may teach the necessity for
21             modification or amendment of an earlier decree.  To that end,
               the three-judge court must remain open to a showing or
22             demonstration by either party that the injunction should be
               altered to ensure that the rights and interests of the parties are
23             given all due and necessary protection.

24                              *   *   *

25             These [foregoing] observations reflect the fact that the three-
               judge court's order, like all continuing equitable decrees, must
26             remain open to appropriate modification.

27  *Plata*, 563 U.S. at 542-43, 545.  The Supreme Court noted that if, as the State suggested at

28  the time, "a release order limited to … mentally ill inmates would be preferable to the

[3574826.15]

1  order entered by the three-judge court, the State can move the three-judge court for

2  modification of the order on that basis."  *Id.* at 532.

3          Indeed, in 2013, the three-judge court counseled Plaintiffs to evaluate the necessity

4  of further relief *after* the State had complied with the population cap.  At that time, that

5  court denied Plaintiffs' motion for additional relief in the form of institution-specific

6  population caps on the following grounds:  "Because defendants have not yet met the

7  systemwide cap of 137.5, it is difficult to determine whether that cap provides inadequate

8  relief. … Accordingly, it is best to wait and reassess the need for [additional relief] when

9  defendants reduce the systemwide prison population to 137.5% design capacity …."

10  Order, April 11, 2013, ECF 4541 at 61-62.

11          Now, over five years after the State came into compliance with the overall

12  population cap, and even as it has continued to release more prisoners in response to

13  COVID-19, it is indisputable that the *Coleman* class has been left behind to suffer the

14  consequences of the State's ongoing and persistent failures to allocate sufficient resources

15  to comply with the Eighth Amendment.  It is therefore necessary once again to convene a

16  three-judge court to consider the imposition of population caps specific to the mental

17  health population.

18          Nor would an order convening a three-judge court to address the size of the

19  *Coleman* class in any way be inconsistent with the three-judge court's April 4, 2020 ruling

20  declining to revise the August 2009 order to address the threat posed by COVOID-19

21  specifically.  In that order, the three-judge court concluded that the "impetus for the release

22  order Plaintiffs seek is different from the overarching structural violations underlying the

23  2009 population reduction order."  Apr. 4, 2020 Order, ECF No. 6574 at 8.  There is no

24  such distinction to be drawn now.  Here, the three-judge court would be convened to

25  consider a targeted prisoner release order for the *Coleman* class to alleviate overcrowding

26  and enable the State to provide constitutionally adequate mental health treatment—which

27  is the same violation that was underlying the 2009 population cap order.  That order, which

28  was explicitly intended to eliminate the primary barrier to the State's ongoing inability to

[3574826.15]

1  comply with the Constitution, was thwarted by the massive and disproportionate growth of

2  the *Coleman* class despite the State's overall population reduction measures.  Without

3  further targeted relief, Plaintiffs still suffer from the same "longstanding systemic

4  constitutional deficiencies in California's prison [mental] health care delivery system" the

5  three-judge court originally described and found warranted a prisoner relief order.  *Id.* at 9.

6         **2.      The PLRA's Requirements for Convening a Three-Judge Court are Met**

7

8         As the July 2, 2020 Order recognizes, this Court may request the convening of a

9  three-judge court for consideration of a prisoner release order where  (1) it "has previously

10  entered an order for less intrusive relief that has failed to remedy the deprivation of the

11  Federal right," and (2) "the defendant has had a reasonable amount of time to comply with

12  the previous court orders."  18 U.S.C. § 3626(a)(3)(A)(i), (ii).  The history of this case and

13  CDCR's own data unambiguously confirm that the prerequisites for convening a three-

14  judge court are easily met.  The problems of excessive staffing vacancies, overuse and

15  abuse of segregation, and high suicide rates for mentally ill patients persist or have

16  returned, and some of these problems have become worse with time.  And the ongoing

17  pandemic threatens to bring years of even more dangerous departures from the minimum

18  standards that the State could not even meet before its onset.  Given the circumstances, this

19  Court "is obligated to act."  *Coleman*, 922 F. Supp. 2d at 889.

20         **(a)     Less Intrusive Orders Have Failed to Remedy the Violation of Class Member's Right to Constitutionally Adequate Mental Health Care**

21

22         The history of this case demonstrates that the constitutional inadequacies in mental

23  health care have proven intractable, particularly for those with the greatest mental health

24  needs.  This Court entered 77 orders directed at ongoing constitutional violations from the

25  time of the first trial, through briefing of the Supreme Court overcrowding appeal.  Since

26  2011, it has issued dozens more substantive orders, including invoking contempt

27  proceedings against the State.  Those orders have been directed, inter alia, at staffing, bed

28  shortages (particularly at the highest levels of care), suicide prevention, and the use of

[3574826.15]

1   segregation.[12]

2       Despite these orders, the State has exhibited a pattern of noncompliance, reversal,

3   and, in some cases, exacerbation of the violations even before COVID-19 complicated

4   matters further.  The problems the State experienced in 2009, when the three-judge court

5   entered its general prisoner release order, and in 2011, when the Supreme Court affirmed

6   that order, continued to plague the State before the novel coronavirus' introduction, as did

7   many of the problems more specific orders were intended to address.  And it is only

8   getting worse.

9   / / /

10  / / /

11

12  [12] *See, e.g.*, ECF No. 6639 (April 24, 2020 order requiring class member access to DSH);
    ECF No. 6606 (April 15, 2020 regarding the use of unlicensed inpatient beds at CMF PIP);

13  ECF No. 6427 (Dec. 17, 2019 order making findings that CDCR had presented misleading
    data to the Court and Special Master); ECF No. 6314 (Oct. 8, 2019 order regarding

14  implementation of custody-mental health partnership plan initiative), ECF No. 6212
    (July 3, 2019 order directing Defendants to adopt suicide prevention recommendations);

15  ECF No. 6095 (Feb. 20, 2019 order regarding custody-mental health partnership plan
    initiative); ECF 5950 (Oct. 15, 2018 order regarding waiving licensing requirement to

16  permit temporary use of unlicensed intermediate-level inpatient beds); ECF No. 5931
    (Sept. 24, 2018 order regarding the use of unlicensed mental health crisis beds at CIW);

17  ECF No. 5850 (July 3, 2018 order regarding telepsychiatry and staffing levels); ECF No.
    5782 (Feb. 14, 2018 order regarding inadequate ventilation grates in the mental health

18  crisis beds at CSP-Corcoran); ECF No. 5762 (Jan. 25, 2018 order directing Defendants to
    adopt suicide prevention recommendations); ECF No. 5711 (Oct. 10, 2017 order regarding

19  psychiatry vacancies and inpatient bed planning); ECF No. 5710 (Oct. 10, 2017 order
    regarding mental health crisis bed transfer timelines); ECF No. 5610 (April 16, 2017 order

20  invoking contempt proceedings regarding the State's failure to comply with inpatient
    transfer timelines); ECF No. 5583 (March 24, 2017 order regarding inpatient bed planning,

21  utilization of Atascadero State Hospital); ECF No. 5573 (March 8, 2017 order adopting
    Special Master's recommendations regarding the State's inpatient psychiatric programs);

22  ECF No. 5477 (August 9, 2016 order regarding staffing); ECF No. 5392 (Dec. 28, 2015
    order regarding access to inpatient care); ECF No. 5343 (Aug. 21, 2015 order regarding

23  use of inpatient beds at Atascadero State Hospital); ECF No. 5307 (May 18, 2015 order
    regarding implementation of Special Master's staffing proposals); ECF No. 5271 (Feb. 3,

24  2015 order directing Defendants to adopt suicide prevention recommendations); ECF No.
    5212 (Aug. 29, 2014 order addressing Defendants' policies for use of segregation on class

25  members); ECF No. 5171 (June 19, 2014 order addressing mental health staffing
    vacancies); ECF No. 5131 (April 10, 2014 order re use of segregated housing on class

26  members); ECF No. 4951 (Dec. 10, 2013 order addressing access to inpatient care); ECF
    No. 4693 (July 12, 2013 order for Defendants to establish a suicide prevention and

27  management workgroup); ECF No. 4688 (July 11, 2013 order addressing staffing levels at
    SVSP).

28

PLAINTIFFS' RESPONSE TO ORDER OF JULY 2, 2020

[3574826.15]

1

2

**(b)      The State Has Had More than a Reasonable Amount of
Time to Comply**

3       The State has had more than reasonable opportunity to devise and implement

4  population reduction measures to eliminate the constitutional violations in its prisons.

5  Reasonableness, for these purposes, "must be assessed in light of the entire history of the

6  court's remedial efforts."  *Plata*, 563 U.S. at 516.

7       Since the 2009 three-judge court order, the State has had a decade to prove that its

8  efforts have yielded constitutionally adequate care—that is, a decade *in addition to* the 14

9  years between entry of the original judgment after trial and the 2009 order.  But in that

10 time, conditions for the *Coleman* class have largely stagnated or even become worse.

11 Eleven additional years is undoubtedly ample time to effect the required change.  *Cf.*

12 *Plata*, 563 U.S. at 514 (stating that Defendants "were given ample time to succeed" with

13 regard to earlier orders, where Defendants had 5 years and 12 years to implement changes

14 in the medical and mental health cases, respectively); *Coleman*, 922 F. Supp. 2d at 918

15 (stating, in 2009, that the State had been given a reasonable amount of time to comply with

16 the district court's orders).

17       This Court should not heed the State's inevitable arguments that they have not been

18 given sufficient time to respond to the COVID-19 pandemic.  As this Court well knows,

19 the constitutionally inadequate mental health treatment that Plaintiffs describe have been in

20 place since before the pandemic, and cannot be remedied by the State alone in the face of

21 the pandemic without a population reduction.  Though the coronavirus pandemic has

22 further exacerbated the inadequate treatment being provided, it is "undisputed" that the

23 original constitutional violation here—the State's "systemic failure to deliver necessary

24 care to mentally ill inmates" in California prisons—persists.  *See* Order, Apr. 4, 2020, ECF

25 No. 6574 at 15 (Mueller, J. concurring); *Coleman v. Wilson*, 912 F. Supp. 1282, 1316

26 (E.D. Cal. 1995); *see also, e.g.*, *Plata*, 563 U.S. at 545; *Coleman v. Brown*, 938 F. Supp.

27 2d 955, 990 (E.D. Cal. 2013).  In light of the pandemic, Plaintiffs have of necessity

28 tolerated modifications to the Program Guide's minimum standards that constitute "stop-

1 gap measure[s]" developed by the State "to limit harm to the plaintiff class" on a

2 temporary basis in light of the initial crisis management phase of the State's COVID-19

3 response. *See* Order, July 3, 2019, ECF No. 6212 at 10. These policies are woefully

4 insufficient on their face and *ipso facto* do not meet the State's constitutional obligation to

5 deliver adequate mental health care. *See* Pls' Response to June 2, 2020 Order, June 16,

6 2020, ECF No. 6724 at 5.

7      As the State transitions into a secondary response phase, the best case scenario is

8 that it will endeavor to return to the deplorable conditions that existed in February 2020.

9 This Court cannot and should not accept such a painstakingly slow process that is

10 ultimately doomed to failure: A targeted prisoner release order of *Coleman* class members

11 is needed, now more than ever before.

12 <center>**CONCLUSION**</center>

13      For the foregoing reasons, Plaintiffs urge this Court to act pursuant to the authority

14 granted to it under 18 U.S.C. § 3626(a)(3)(D) to convene a three-judge court for

15 consideration of entering an order modifying the 2009 population cap and requiring the

16 State to reduce the mental health population commensurate with the reduction of the

17 overall prison population.

18

19 DATED: July 15, 2020                  Respectfully submitted,

20                                  ROSEN BIEN GALVAN & GRUNFELD LLP

21                                  By: */s/ Lisa Ells*

22                                      Lisa Ells

23                                 Attorneys for Plaintiffs

24

25

26

27

28

[3574826.15]