DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO ORDER OF JULY 2, 2020** |
| v. | |
| EDMUND G BROWN, JR., et al., | |
| Defendants. | |

I, Michael W. Bien, declare:

1. I am an attorney duly admitted to practice before this Court. I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration in support of Plaintiffs' Response to the Order of July 2, 2020.

2. Attached hereto as **Exhibit A** is a true and correct copy of a press release the California Department of Corrections and Rehabilitation (CDCR) issued on July 10, 2020, "CDCR Announces Additional Actions to Reduce Population and Maximize Space Systemwide to Address COVID-19," which is available at https://www.cdcr.ca.gov/news/2020/07/10/cdcr-announces-additional-actions-to-reduce-population-and-maximize-space-systemwide-to-address-covid-19/.

3. Attached hereto as **Exhibit B** is a true and correct copy of a document from the California Secretary of State's website regarding the November 3, 2020 Statewide Ballot Measures, including Proposition 20, which is available at https://www.sos.ca.gov/elections/ballot-measures/qualified-ballot-measures/. Attached hereto as **Exhibit C** is a true and correct copy of a description of Proposition 20 for the November 2020 ballot from Ballotpedia, which is available at https://ballotpedia.org/California_Proposition_20,_Criminal_Sentencing,_Parole,_and_DNA_Collection_Initiative_(2020).

4. The total CDCR in-custody population was 165,630 people as of August 31, 2009. This figure is provided in CDCR's monthly population report for August 31, 2009. A true and correct copy of that report is attached hereto as **Exhibit D**, which my office received by contacting CDCR's Office of Research Data at the email address for historical reports listed at https://www.cdcr.ca.gov/research/population-reports-2/. The total CDCR in-custody population as of February 29, 2020 was 123,123 people, according to CDCR's monthly population report for that date. This report, a true and correct copy of which is attached hereto as **Exhibit E**, is available at https://www.cdcr.ca.gov/research/wp-

1   content/uploads/sites/174/2020/05/Tpop1d2002.pdf.  The total in custody population as of

2   July 8, 2020 was 112,507 people, according to CDCR's weekly population report for that

3   date.  This report, a true and correct copy of which is attached hereto as **Exhibit F**, can be

4   found at: https://www.cdcr.ca.gov/research/wp-

5   content/uploads/sites/174/2020/07/Tpop1d200708.pdf.

6         5.     The total in-custody population as of February 29, 2020 is 42,507 individuals

7   fewer, or 25.7%, than the total in-custody population as of August 31, 2009.  A paralegal

8   at my office, Emma Cook, working under my direction and supervision, calculated this

9   reduction by subtracting the total population in February 2020 from the total population in

10   August 2009 and then dividing the resulting figure by the total population in August 2009.

11   Using this same method, Ms. Cook calculated that the total in-custody population as of

12   July 8, 2020 was 10,616 individuals fewer, or 8.6%, than the total in-custody population as

13   of February 29, 2020.

14         6.     According to the February 29, 2020 Population Report (Exhibit E), several

15   prisons in CDCR were at over 137.5% of design capacity as of February 29, 2020.

16   California Rehabilitation Center, Correctional Training Facility, North Kern State Prison,

17   California Substance Abuse Treatment Facility, Valley State Prison, and Wasco State

18   Prison were over 150% full as of this date, and Chuckawalla Valley State Prison and CSP-

19   Solano were over 160% full.

20         7.     The Legislative Analyst's Office released a report on October 16, 2019

21   entitled "Planning for a Declining Inmate Population."  A true and correct copy of this

22   report, available at https://lao.ca.gov/handouts/crimjust/2019/Declining-Population-

23   101619.pdf, is attached hereto as **Exhibit G.**

24         8.     The total population of *Coleman* class members as of August 28, 2009 was

25   35,821 people, according to the August 2009 Health Care Placement Oversight Program

26   Information Report (HCPOP Report) produced to Plaintiffs' Counsel on September 30,

27   2009.  This report, a true and correct copy of which is attached hereto as **Exhibit H**, also

28   states that as of August 2009 the Enhanced Outpatient Program (EOP) population was

1  4,742 people and the CCCMS population was 30,074 people.  According to Defendants'

2  Mental Health Services Delivery System (MHSDS) Management Information Summary

3  Report ("MIS Report") for February 24, 2020, the total *Coleman* population as of that date

4  was 35,836 people.  A true and correct copy of this report, was provided to Plaintiffs'

5  Counsel on March 16, 2020 as part of Defendants' ongoing monthly data reporting for this

6  case, is attached hereto as **Exhibit I.**  This report also states that the total EOP population

7  as of February 24, 2020 was 6,748 people, and that the total CCCMS population as of the

8  same date was 27,207 people.  According to Defendants' MIS Report for July 8, 2020, the

9  total *Coleman* population as of that date was 33,400 people.  A true and correct copy of

10  this report, which was provided to Plaintiffs' Counsel on July 10, 2020 as part of

11  Defendants' ongoing monthly data reporting for this case, is attached hereto as **Exhibit J**.

12  This report also states that the total EOP population as of July 8, 2020 was 6,636 and the

13  CCCMS population as of the same date was 25,092.  Using these reports, Ms. Cook

14  subtracted the August 2009 EOP population from the February 2020 EOP population, and

15  then divided the resulting figure by the August 2009 EOP population to determine the

16  percentage increase of the EOP population since the Court's August 2009 Order.

17  According to her calculations, the EOP population grew by 42.3% from August 2009 to

18  February 2020.

19          9.      Attached hereto as **Exhibit K** is a true and correct copy of a chart prepared

20  by Ms. Cook, which is also set forth in the body of Plaintiffs' Response.  This chart shows

21  the increase in the EOP population from August 2009 to February 2020 alongside the

22  decrease in the total CDCR population in the same period.  Ms. Cook prepared this chart

23  using data from the reports provided as Exhibits H, I, and J hereto (described *supra*), along

24  with the "Chart Tools" function in Microsoft Excel.

25          10.     As set forth in paragraph 4 *supra*, the total CDCR in-custody population as

26  of August 31, 2009 was 165,630 people.  The corresponding MHSDS population in

27  August 2009 was 35,821 people, meaning that the Non-MHSDS population at the time

28  was 129,809 people.  By the end of February 2020, the Non-MHSDS CDCR population

1  was 87,287 people, which represents a decrease of 42,522, or 32.8%.  As stated *supra* in

2  paragraph 8, there were 4,742 EOP class members in August 2009 and 6,478 EOP class

3  members in February 2020.  If the EOP population had mirrored the overall population

4  drop rate of 32.8% between August 2009 and February 2020, the EOP population in

5  February 2020 would have been 3,187 people, or approximately 47.2% of the actual

6  February 2020 EOP population.  Similarly, if the CCCMS population had dropped by

7  32.8% between August 2009 and February 2020, the CCCMS population in February 2020

8  would have been 20,210, which is 6,997 fewer patients than it actually was.  Similarly, the

9  total CDCR in-custody population as of February 29, 2020 was 123,123 people.  The

10  corresponding MHSDS population in February 2020 was 35,836 people, meaning that the

11  Non-MHSDS population at the time was 87,287 people.  As of early July 2020, the Non-

12  MHSDS CDCR population was 79,107 people, which represents a decrease of 8,180, or

13  9.4%.  As stated *supra* in paragraph 8, there were 6,748 EOP class members in February

14  2020 and 6,636 EOP class members in July 2020.  If the EOP population had mirrored the

15  overall population drop rate of 9.4% between February 2020 and July 2020, the current

16  EOP population would be 6,114 people, or approximately 92.1% of the current EOP

17  population.  Similarly, if the CCCMS population had dropped by 9.4% between February

18  2020 and July 2020, the current CCCMS population would be 24,649, which is 443 fewer

19  patients than the current population.  Under my direction and supervision, Ms. Cook

20  calculated these figures using the reports in Exhibits D, E, F, H, I, and J.

21      11.    In August 2009, the EOP population also constituted 2.9% of the total CDCR

22  population, as there were only 4,742 EOP patients out of a total CDCR population of

23  165,630 people.  *See* Ex. D, Ex. H.  In February 2020, the EOP population had nearly

24  doubled to 5.5% of the total CDCR population, and as of July 2020, the EOP population

25  had grown to 5.9% of the total CDCR population  *See* Ex. E, Ex. F, Ex. I, Ex. J.  EOP

26  patients also constitute a larger share of the overall MHSDS population than they did at the

27  time of the Three-Judge Court's Order:  in August 2009, EOP patients constituted 13.2%

28  of the total MHSDS population, whereas by February 2020, they had grown to 18.8% of

the total MHSDS population, and by July 2020, they had grown to 19.9% of the total MHSDS population.  Working under my direction and supervision, Ms. Cook calculated these figures using the reports described in ¶¶ 4 and 8, *supra*.

12.     As set out in ¶ 4, *supra*, the total in-custody population as of February 29, 2020 is 42,507 individuals fewer, or 25.7%, than the total in-custody population as of August 31, 2009.  If the CCCMS population had dropped at the same rate between August 2009 and February 2020, the CCCMS population would have been 22,345 people in February 2020, 4,862 fewer people than were actually at the CCCMS level of care during that time.  In other words, the CCCMS population dropped only by 9.5% during the same period that the total CDCR population dropped 25.7%.  The total in custody population as of July 8, 2020 is 10.616 individuals fewer, or 8.6% lower, than the total in custody population of February 2020.  If the CCCMS population had dropped by 8.6% between February and July 2020, there would be 24,867 CCCMS patients as of July 8, 2020, 225 fewer than were actually at the CCCMS level of care at that time.  In other words, the CCCMS population only dropped by 7.8% during the same period the total in custody population dropped by 8.6%.  Similarly, the total in-custody population as of February 29, 2020 is 42,507 individuals fewer, or 25.7%, than the total in-custody population as of August 31, 2009.  If the EOP population had dropped at the same rate between August 2009 and February 2020, the EOP population would have been 3,524 people in February 2020, 3,224 fewer people than were actually at the EOP level of care during that time.  In other words, the EOP population increased by 42.3% during the same period that the total CDCR population dropped 25.9%.  The total in custody population as of July 8, 2020 is 10,616 individuals fewer, or 8.6%, than the total in custody population of February 2020.  If the EOP population had dropped by 8.6% between February and July 2020, there would be 6,168 EOP patients as of July 8, 2020, 468 fewer patients than were actually at the EOP level of care at that time.  In other words, the EOP population only dropped by 1.6% during the same period the total in custody population dropped by 8.6%.  Working under

[3490868.11]

1  my direction and supervision, Ms. Cook calculated these figures using the reports

2  described in ¶¶ 4 and 8, *supra*.

3      13.    The State Auditor's Office released a report in August 17, 2017 entitled

4  "California Department of Corrections and Rehabilitation:  It Must Increase Its Efforts to

5  Prevent and Respond to Inmate Suicides."  A true and correct copy of this report, available

6  at https://www.auditor.ca.gov/pdfs/reports/2016-131.pdf, is attached hereto as **Exhibit M**.

7      14.    Current psychiatrist staffing ratios are determined by Defendants' Court-

8  Ordered Staffing Plan, which prescribes required ratios of clinical staff to incarcerated

9  patients.  *See* Defendants' Staffing Plan, ECF No. 3693 (Staffing Plan).  For instance, the

10  Staffing Plan requires one staff psychiatrist for every 280 incarcerated patients at the

11  CCCMS level of care and one staff psychiatrist for every 120 incarcerated patients at the

12  EOP level of care.  *See id*. at 12, 17.  The Staffing Plan also sets forth unit and bed-based

13  staffing for Mental Health Crisis Beds (MHCB), Outpatient Housing Units (OHU), Crisis

14  Intervention, and Desert Institutions.  *See id*. at 21-25.  Using the prescribed ratios in the

15  Staffing Plan, Ms. Cook calculated the approximate number of psychiatrists required

16  statewide if the MHSDS population had decreased at an equivalent rate to the Non-

17  MHSDS population for the time period from August 2009 to February 2020.  To do this,

18  Ms. Cook first calculated the percentage drop in that period if the CCCMS and EOP

19  populations had both decreased by 32.8% from August 2009 to February 2020.  According

20  to her calculations, if the EOP and CCCMS populations had decreased at the same rate that

21  the non-MHSDS population did, the EOP population would have been 47.2% of the EOP

22  population in February 2020, while the CCCMS population would have been 74.3% of the

23  CCCMS population in February 2020.

24      15.    Ms. Cook then applied these percentage reductions to the four subgroupings

25  of the EOP and CCCMS populations that have different ratio allocations in the Staffing

26  Plan: General Population, Reception Center, ASU/Condemned, and SHU.  *See* Staffing

27  Plan at 8-17.  A table displaying these adjusted populations is attached hereto as

28  **Exhibit N**.  Ms. Cook used these figures and the Staffing Plan's allocation process to

1  calculate the number of required psychiatrists if the MHSDS population had been reduced

2  by an equivalent amount as the Non-MHSDS population in the period from August 2009

3  through February 2020.  She then calculated the reduced unit-based staffing by reducing

4  the Staffing Plan's MHCB, OHU, Crisis Intervention, and Desert Institution Based

5  Staffing by 32.8%.  A table showing the prescribed ratios and resulting allocations is

6  attached hereto as **Exhibit O.**  From the calculations, CDCR would be required to have

7  184.46 staff psychiatrists if the MHSDS population had decreased by the same margin as

8  the Non-MHSDS population.

9         16.    Defendants' Psychiatry Vacancy Report for February 2020 (Psychiatry

10  Vacancy Report), ECF No. 6563, shows that, in February 2020, CDCR employed 171.45

11  non-PIP, on-site staff psychiatrists – well within the 90% staffing rate required by the

12  June 13, 2002 Order.  This Psychiatry Vacancy Report also shows that if telepsychiatry is

13  included, Defendants employed 216.14 psychiatrists in February 2020, which would have

14  been well in excess of the Staffing Plan's requirements if the MHSDS population had

15  decreased by the same margin as the Non-MHSDS population in the time period from

16  August 2009 through February 2020.

17         17.    According to the CDCR/CCHCS COVID-19 Employee Status Tracker, there

18  were 755 active COVID-19 cases, three deaths, and 536 returned to work among CDCR

19  staff members as of July 14, 2020.  A true and correct copy of that report, which is

20  generally available at https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/, that

21  was downloaded by a paralegal in my office on July 14, 2020 is attached hereto as

22  **Exhibit P.**

23         18.    Attached hereto as **Exhibit Q** is a true and correct copy of a document from

24  Eureka Daye, Deputy Director for Statewide Mental Health Services, dated March 25,

25  2020 and entitled COVID-19 – Mental Health Delivery of Care Guidance, which was

26  provided to Plaintiffs' counsel by counsel for Defendants.

27         19.    Attached hereto as **Exhibit R** is a true and correct copy of an email dated

28  July 6, 2020 from counsel for Defendants to Plaintiffs' counsel attaching Defendants' Tier

1  Report for the week of June 22-26, 2020.  This report shows that, during the week of

2  June 22 through June 26, forty mental health programs at sixteen institutions operated at a

3  Tier 3 or 4, indicating that a significant number of staff members are unavailable, and there

4  are substantial limitations to the mental health treatment being provided.

5       20.      Attached hereto as **Exhibit S** is a true and correct copy of an email dated

6  July 14, 2020 from counsel for Defendants to Plaintiffs' counsel attaching Defendants'

7  Tier Report for the week of June 29–July 3, 2020.  This report shows that, during the week

8  of June 29 through July 3, forty-one mental health programs at the same sixteen

9  institutions operated at a Tier 3 or 4, indicating that a significant number of staff members

10  are unavailable, and there are substantial limitations to the mental health treatment being

11  provided.

12       21.      Attached hereto as **Exhibit T** is a true and correct copy of CDCR's January

13  2010 Mental Health Bed Study Report, which was provided to Plaintiffs' counsel by

14  Defendants' counsel in 2010.

15       22.      Attached hereto as **Exhibit U** is a true and correct copy of the Psychiatric

16  Inpatient Program Staffing Report for February 2020, which was provided to Plaintiffs'

17  Counsel on April 15, 2020 as part of Defendants' ongoing monthly data reporting for this

18  case (Enclosure 1L).

19       23.      Attached hereto as **Exhibit V** is a true and correct copy of an October 3,

20  2019 email from counsel for Defendants to Plaintiffs' counsel attaching a letter dated

21  October 3, 2019 letter from Defendants to the Special Master concerning Defendants'

22  planned mission changes.  Attached hereto as **Exhibit W** is a true and correct copy of an

23  November 1, 2019 email from counsel for Defendants to Plaintiffs' counsel attaching a

24  letter from Defendants to the Special Master dated November 1, 2019 concerning

25  Defendants' planned mission changes.  Attached hereto as **Exhibit X** is a true and correct

26  copy of a July 3, 2020 email from counsel for Defendants to Plaintiffs' counsel attaching a

27  letter from Defendants to the Special Master dated July 3, 2020 concerning Defendants'

28  planned mission changes.

24. Attached hereto as **Exhibit Y** is a true and correct copy of an email dated July 6, 2020 from counsel for Defendants to Plaintiffs' counsel attaching Defendants' TMHU Patient List Report, which lists the patients referred for inpatient care who had been in temporary mental health units ("TMHUs") or were being "treated in place" during the week of June 22-26, 2020. This document has been redacted by a paralegal in my office at my direction to remove patient names and identifying information.

25. Department of State Hospitals ("DSH"), released a memo on March 16, 2020 that was a directive on the "Suspension of Patient Admissions from the California Department of Corrections (CDCR)". A true and correct copy of this memo, available at https://www.dsh.ca.gov/Treatment/docs/DSH_DIrector_Letter_re_Suspension_of_Coleman_Admissions.pdf, is attached hereto as **Exhibit Z.**

26. Attached hereto as **Exhibit AA** is a true and correct copy of a document entitled DSH CDCR Patient Census and Waitlist Report: Data as: of 5/8/20, which was provided to Plaintiffs' Counsel by Defendants' counsel on May 11, 2020.

27. Attached hereto as **Exhibit BB** is a true and correct copy of a document entitled DSH CDCR Patient Census and Waitlist Report: Data as: of 7/10/20, which was provided to Plaintiffs' Counsel by Defendants' counsel on July 13, 2020.

28. Attached hereto as **Exhibit CC** is a true and correct copy of an excerpt of a document entitled MHCB Referrals Report, which was generated from CDCR's Mental Health Dashboard by an attorney in my office, Lisa Ells, on July 8, 2020. This report shows a summary of all MHCB referrals for the period of June 7 through July 7, 2019. The additional pages of this report include individual patient-level data, and thus were not included in this exhibit. Attached hereto as **Exhibit DD** is a true and correct copy of an excerpt of a document entitled MHCB Referrals Report, which was generated from CDCR's Mental Health Dashboard by an attorney in my office, Lisa Ells, on July 8, 2020. This report shows a summary of all MHCB referrals for the period of June 7 through July 7, 2020. The additional pages of this report include individual patient-level data, and thus were not included in this exhibit.

29.     The suicide rate in CDCR prisons in 2019 was 30.3 deaths per 100,000 people.  Catherine Johnson, a paralegal working under my supervision, calculated the 2019 rate by using the methodology employed by the Special Master's experts in their 2014 Suicide Report.  Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2014 – December 31, 2014 ("2014 Suicide Report"), March 29, 2016, ECF No. 5428, at 1-6.  In the report, the Special Master's experts give the CDCR suicide rates for the years 1999 through 2014, calculated by multiplying the number of suicides for the given year by 100,000 and then dividing this number by the total in-custody population as of June 30 of that same year. *See id.* at 2.  Following this methodology, Ms. Johnson used the total in-custody population for June 30, 2019 that is reported in CDCR's Monthly Total Population Report.  Attached hereto as **Exhibit EE** is a true and correct copy of the CDCR population report used for this calculation, available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/07/Tpop1d1906.pdf, which shows that the total in-custody population as of June 30, 2019 was 125,472 incarcerated people.

30.     To calculate the number of suicides per year, Ms. Johnson used CDCR's Suicide Death Notifications, which Defendants regularly provide to Plaintiffs' Counsel in the *Coleman* case.  After obtaining the number of suicides in 2019 (38 suicides), Ms. Johnson multiplied this figure by 100,000 and divided the resulting figure by the total in-custody population as of June 30, 2019.  She used the same methodology to calculate the suicides rates in 2015, 2016, 2017, and 2018.  After computing these rates, Ms. Johnson and Ms. Cook used the "Chart Tools" Excel function to format the chart in Plaintiffs' Response that displays the CDCR suicide rates by year.  A true and correct copy of this chart is attached hereto as **Exhibit FF.**  Ms. Johnson divided 365, the number of days in 2019, by 38, the total number of suicides in CDCR in 2019, which equals 9.6.  That means that on average, a suicide occurred in CDCR custody less than every ten days in 2019.

[3490868.11]

31.     Attached hereto as **Exhibit GG** is a true and correct copy of a CDCR report dated October 1, 2019 and entitled "Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation", available at https://cchcs.ca.gov/wp-content/uploads/sites/60/MH/CDCR-2018-SB-960.pdf.

32.     Attached hereto as **Exhibit HH** is a true and correct copy of a San Francisco Chronicle article dated October 8, 2019 by J. Fagone & M. Cassidy and entitled "California Prisons Head Acknowledges 'Inmate Suicide Crisis' After Report", available at https://www.sfchronicle.com/crime/article/California-prisons-head-acknowledges-inmate-14502131.php.

33.     Attached hereto as **Exhibit II** is a true and correct copy of the Mortality in State and Federal Prisons, 2001-2016 – Statistical Tables, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, February 2020, NCJ 251920 ("BJS Report"), available at https://www.bjs.gov/content/pub/pdf/msfp0116st.pdf.

34.     Of the thirty-eight suicides in CDCR institutions in 2019, nine (or 24%) occurred within thirty days after the decedent was discharged from a higher level of mental health care.  In three of these cases, the decedent had been discharged from a PIP unit to a lower level of care.  Six more of the 2019 suicides occurred within months to a year of a CDCR clinician's decision to drop that patient's level of mental health care. Members of my team computed these figures, under my supervision, by reviewing the Electronic Health Records System ("EHRS") records and the Final Suicide Reports for each decedent.  Following each suicide notification sent by Defendants to Plaintiffs' Counsel announcing a prisoner had committed suicide in 2019, members of my team carefully reviewed health care records in the EHRS to determine whether the decedent's level of care had been lowered within the 30 days prior to the prisoner's suicide by reviewing all "Mental Health Master Treatment Plan" entries in each record, which document all level of care change decisions for a given patient.  Our team also reviewed the Final Suicide Reports for individuals who committed suicide in 2019 to confirm their level of care changes prior to their suicides.

[3490868.11]

35.     According to my team's review of the Final Suicide Reports and EHRS records for the individuals who committed suicide in 2019, sixteen of the thirty-eight individuals either had referrals to a Mental Health Crisis Bed rescinded before they were admitted, or they were never referred to a higher level of care despite clear signs such care was warranted, according to CDCR's Headquarters suicide case reviewers. Our review of the Final Suicide Reports also showed that in 23 of the 38 2019 suicides, or 60.5%, the CDCR suicide case reviewers concluded that there were failures related to utilization management issues that were significant enough to warrant Quality Improvement Plans (QIPs) for the relevant institutions' mental health staff. There has not been such a high percentage of Final Suicide Reports with utilization management-related QIPs in prior years.

36.     Of the thirty-eight suicides in CDCR institutions in 2019, eleven came from patients at the CCCMS level of care and sixteen came from EOP patients. Together, these suicides represent 71% of all CDCR suicides in 2019. The levels of care for each suicide were compiled and tabulated by Ms. Johnson, who recorded the level of care noted on Defendants' Suicide Death Notifications.

37.     The CCCMS and EOP suicide rates for 2019 were 39.5 and 247.6 per 100,000, respectively. The EOP rate was over twenty times higher than the rate for non-class members, who committed suicide at a rate of 12.3 per 100,000 in 2019. These rates were calculated by Ms. Johnson using the methodology described in ¶ 29 *supra*. The population figures used in these calculations were taken from Defendants' HCPOP Information Report, Summary of Mental Health Population by Institution and Level of Care (H-1) for June 2019, which provides data as of June 24, 2019. A true and correct copy of this report, which was provided to Plaintiffs' Counsel on August 14, 2019 as part of Defendants' ongoing monthly data reporting for this case, is attached hereto as **Exhibit JJ.** To obtain the Non-MHSDS population for the calculation of the 2019 Non-MHSDS suicide rate, Ms. Johnson subtracted the total MHSDS population given in the

DECL. OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO ORDER OF JULY 2, 2020

1  report (35,944 patients) from the June 30, 2019 CDCR Population Report, provided as

2  Exhibit DD.

3      38.   Nine of the suicides in 2019 occurred at CSP-Sacramento.

4      39.   So far in 2020, thirteen individuals have committed suicide while in CDCR

5  custody.  Seven of them, or 54%, were *Coleman* class members.  From my team's review

6  of the EHRS records for the thirteen individuals after we received notice of their suicides,

7  we have concluded that five of the individuals, or 38%, had been discharged from a higher

8  level of care within the 90 days preceding their deaths.

9      40.   Members of my team have previously analyzed the 2016 suicides in CDCR.

10  Twenty-seven of the reported suicides in 2016, twenty-two (82%) were deemed to be

11  either foreseeable, preventable, or both, by CDCR case reviewers.  In 2017, we were

12  informed by counsel for Defendants that early in that year, CDCR had unilaterally elected

13  to stop including determinations about whether suicides were foreseeable or preventable.

14      41.   After years of negotiations with the Special Master and Plaintiffs regarding

15  CDCR's draft aggregate report regarding 2015 suicides, CDCR on July 10, 2020

16  unilaterally published the report on its website despite Plaintiffs and the Special Master

17  lingering concerns. A true and correct copy of CDCR's report, entitled Annual Report on

18  Suicides in the California Department Of Corrections and Rehabilitation, January 1, 2015

19  – December 31, 2015, available at https://cchcs.ca.gov/wp-

20  content/uploads/sites/60/SR/2015-Annual-Suicide-Report.pdf, is attached hereto as

21  **Exhibit KK**.  To Plaintiffs' counsel knowledge, CDCR has not completed initial drafts of

22  the annual aggregate reports regarding suicides in 2016, 2017, 2018 or 2019.

23      42.   The Special Master provided the parties with a draft of Lindsay Hayes's

24  Fourth Re-Audit Report on May 14, 2020, and the parties have provided written comments

25  on the draft report, but the final report has not yet been filed with the Court.

26      43.   As of February 24, 2020, 8.4% of the EOP population and 4.4% of the

27  CCCMS population were in segregation.  These figures were calculated by Ms. Cook

28  using the February 2020 MIS Report provided as Exhibit I.  The MIS Report provides that

1  436 EOP patients were in an administrative segregation unit (ASU), non-disciplinary

2  segregation (NDS), or short-term restricted housing (STRH), and that a further 129 EOP

3  patients were in a psychiatric services unit (PSU), long-term restricted housing (LTRH), or

4  security housing unit (SHU), for a total EOP segregation population of 565 incarcerated

5  people, or 8.4% of the total EOP population in February 2020 (6,748 people).  Similarly,

6  Ms. Cook calculated that, according to the February 2020 MIS Report, as of February 24,

7  2020, there were a total of 1,203 CCCMS patients, or 4.4% of the total CCCMS population

8  in February 2020 (27,207 people), in a segregation unit.  As of July 6, 2020, 9.7% of the

9  EOP population and 4.9% of the CCCMS population were in segregation.  These figures

10  were calculated as the July 2020 MIS Report, provided as Exhibit J**.**  The MIS report

11  provides that 529 EOP patients were in an ASU, NDS, or STRH, and that a further 118

12  EOP patients were in a PSU, LTRH, or SHU, for a total EOP segregation population of

13  647 incarcerated people, or 9.7% of the total EOP population.  Similarly, Ms. Cook

14  calculated that, according to the July 2020 MIS report, there was a total of 1,225 CCCMS

15  patients in segregation as of July 8, 2020, or 4.9% of the CCCMS population.

16         44.     Attached hereto **Exhibit LL** is a true and correct copy of a letter dated

17  March 3, 2020 that was provided by counsel for Defendants to counsel for Plaintiffs on

18  March 3, 2020, stating that as of March 2, 2020, 3.42%, or 2,693 of the 78,790 Non-

19  MHSDS incarcerated people in CDCR institutions were housed in segregation.  Attached

20  hereto as **Exhibit MM** is a true and correct copy of a letter dated July 6, 2020 that was

21  provided by counsel for Defendants to counsel for Plaintiffs on July 9, 2020, stating that as

22  of July 2, 2020, 3.36%, or 2,435 of the 72,485 Non-MHSDS incarcerated people in CDCR

23  institutions were housed in segregation.

24         45.     As of the end of February and beginning of March 2020, 40% of the total

25  CDCR segregation population were EOP and CCCMS patients.  Similarly, while EOP

26  patients constituted 5.5% of the total CDCR population (*see* paragraph 11, *supra*), they

27  made up 12.7% of the total segregation population.  Ms. Cook, under my direction and

28  supervision, calculated these percentages.  Ms. Cook added the population of non-MHSDS

[3490868.11]

1   individuals in segregation as of March 2, 2020 (from Exhibit LL), 2,693 individuals, to the

2   total number of EOP and CCCMS individuals in segregation as of February 24, 2020

3   (from Exhibit I), 1,768, which results in 4,461 individuals.  She then divided the number of

4   EOP patients in segregation as of February 24, 2020 (565) by 4,461, to determine that EOP

5   patients constituted 12.7% of the total segregation population.  She then divided the

6   number of CCCMS and EOP patients in segregation (1,768) by 4,461 to determine that

7   40% of the total segregation population was made up of EOP and CCCMS patients at the

8   end of February 2020.  Using the same method described above, Ms. Cook calculated that

9   EOP and CCCMS patients together represented 43.5% of the total segregation population

10  in July 2020.  In contrast, EOP and CCCMS patients only constituted, 28% of the total

11  CDCR population. Ms. Cook calculated that percentage by dividing the number of

12  CCCMS and EOP patients in July 2020, 31,728 (*see* Exhibit J) by the total in custody

13  population, 112,507 (*see* Exhibit F).  Using the same methodology, she calculated that in

14  July 2020, while EOP patients constituted 5.9% of the total CDCR population, they made

15  up 15% of the total segregation population.

16          46.     As of early March 2020, there were 410 patients at the EOP level of care or

17  higher housed in an ASU or ASU Hub unit.  These figures were calculated by Ms. Cook

18  using the Segregation Length of Stay Averages spreadsheet produced by Defendants on

19  March 3, 2020 as part of their ongoing monthly data reporting for this case.  True and

20  correct copies of excerpts from that report are attached hereto as **Exhibit NN.**  Using this

21  report, Ms. Cook added the number of patients at the EOP, ICF, and MHCB level of care

22  in the ASU and ASU Hub (listed in the "Patient" row in the table) to get a total of 410.

23  Using this same method, Ms. Cook calculated that as of July 1, 2020, there were 500

24  patients at the EOP level of care or higher housed in an ASU or ASU Hub unit, as shown

25  in Defendants' July 1, 2020, Segregation Length of Stay Averages Spreadsheet, produced

26  by Defendants on July 9, 2020 as part of their ongoing monthly data reporting for this case.

27  True and correct copies of excerpts from that report are attached hereto as **Exhibit OO.**

28  As such, the number of people at the EOP level of care or higher housed in ASU and ASU

1   Hub units increased by 22%.  Ms. Cook calculated the percentage change from February to

2   July by subtracting the July population of EOP, MHCB, and ICF patients in ASU and ASU

3   Hubs from the February population of EOP, MHCB, and ICF patients in ASU and ASU

4   Hubs, and dividing by the February population.

5          47.     As of June 2012, 7.4% of the CDCR segregation population was part of the

6   EOP level of care.  This percentage was calculated by Ms. Cook, who utilized Defendants'

7   Mental Health Population by Institution report for June 2012 to obtain the number of EOP

8   patients who were in segregation in June 2012.  A true and correct copy of this report

9   showing data as of June 8, 2012, which was provided to Plaintiffs' counsel by Defendants'

10  counsel as part of Defendants' ongoing monthly data reporting for this case, is attached

11  hereto as **Exhibit PP**.  Exhibit PP states at pages 4, 7, and 9 respectively that there were

12  375 EOP patients in the PSU,  483 EOPs in the ASU, and nine in the SHU, for a total EOP

13  segregation population of 867 incarcerated people.  This figure was then divided by the

14  total CDCR segregation population in June 2012, 11,663, which is the figure reported at

15  pages 8-9 of the Special Master's Expert's Report on Suicides Completed in the Second

16  Half of 2012, ECF No. 5325.

17         48.     Attached hereto as **Exhibit QQ** is a chart prepared by Ms. Cook showing the

18  segregation and non-segregation suicide rates, which is also set forth in the body of

19  Plaintiffs' Response.  Working under my direction and supervision, Ms. Cook made this

20  chart using the "Chart Tools" function in Excel.  She calculated the segregation and non-

21  segregation suicide rates using the methodology described in paragraph 29 *supra*.  The

22  housing location of each suicide from 2012 to 2019 was taken from CDCR's Suicide

23  Death Notifications, which provide the bed type in which a decedent was housed at the

24  time of their death.  Segregation and non-segregation population figures were derived from

25  a number of sources.  The segregation and non-segregation population figures for years

26  2012, 2013, and 2014 were taken respectively from: pages 8-9 of the Special Master's

27  Expert's Report on Suicides Completed in the Second Half of 2012, ECF No. 5325; page

28  10 of the Special Master's Expert's Report on Suicides Completed in 2013, ECF No. 5399;

DECL. OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO ORDER OF JULY 2, 2020

[3490868.11]

1    and page 11 of the Special Master's Expert's Report on Suicides Completed in 2014, ECF

2    No. 5428.  The segregation and non-segregation population figures for years 2015, 2016,

3    2017, and 2018 were taken from CDCR's "Offender Data Points" Reports for June 2017

4    and June 2018, *available at* https://www.cdcr.ca.gov/research/offender-outcomes-

5    characteristics/offender-data-points/.  Attached hereto as **Exhibit RR** are true and correct

6    excerpts from CDCR's June 2017 Offender Data Points report, which show the total in-

7    custody and segregation populations for June 2015, June 2016, and June 2017.  Attached

8    hereto as **Exhibit SS** are true and correct excerpts from CDCR's June 2018 report, which

9    show the total in-custody and segregation populations for June 2018.  Using these figures,

10   Ms. Cook derived the CDCR non-segregation populations for each year by subtracting the

11   total segregation population from the total in-custody population.  For 2019, Ms. Cook

12   utilized the following two data points from Defendants' routine monthly data productions,

13   true and correct copies of which are attached hereto at **Exhibits TT** and **UU**.  Exhibit TT is

14   a true and correct copy of the MIS Report showing data as of June 17, 2019, which

15   Defendants provided to Plaintiffs' counsel on July 9, 2019 as part of their ongoing monthly

16   data reporting for this case.  Exhibit UU is a true and correct copy of a letter sent by

17   Defendants' counsel to Plaintiffs' counsel dated June 7, 2019 letter regarding the number

18   of Non-MHSDS incarcerated people in segregation.  Together, these two reports provide a

19   June 2019 segregation population of 4,735 incarcerated people.  Ms. Cook calculated the

20   non-segregation population used in the above non-segregation suicide rate analysis by

21   subtracting this figure from the total CDCR population.

22        49.      From these calculations, the segregation suicide rate in 2019 was 211.2

23   suicides per 100,000, compared to 23.2 in the non-segregated CDCR population.  In 2015,

24   the segregation suicide rate was 111.0 per 100,000 incarcerated people, compared to 12.4

25   per 100,000 in the non-segregated CDCR population.

26        50.      Attached hereto as **Exhibit VV** is a true and correct copy of a July 13, 2020

27   email from counsel for Defendants to Plaintiffs' counsel attaching a report entitled

28

DECL. OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO ORDER OF JULY 2, 2020

1   TMHU/TIP Roster (7/6-7/10/20), which contains a list of all *Coleman* class members

2   housed in TMHUs from July 6-10, 2020.

3        51.     On July 14, 2020, Amy Xu, an attorney under my direction, conducted the an

4   analysis of total daily treatment hours offered for patients in maximum custody TMHUs

5   from July 6-13, 2020.  First, Ms. Xu identified all of the patients located in maximum

6   custody TMHUs by referring to Exhibit VV, which is a list of all patients in TMHUs from

7   July 6-10, 2020.  Next, Ms. Xu used Defendants' TMHU Registry (Beta) on the CCHCS

8   On Demand Suite to export data in a spreadsheet format for these patients from July 6-13,

9   2020 including daily treatment hours offered. There were fifteen patients listed as being in

10  maximum custody TMHUs with information on the TMHU Registry (Beta).  Ms. Xu then

11  renamed each unique patient with a number, i.e., Patient 1-16, and removed columns with

12  the patients' name, CDCR number, and cell location for confidentiality purposes.  Ms. Xu

13  then created a separate line for each day a patient was housed in a maximum custody

14  TMHU from July 6-13 and averaged the daily total treatment hours offered to each patient

15  located in a maximum custody TMHU.  From this, Ms. Xu concluded that Defendants

16  offered an average of 0.27 hours or 16.2 minutes of daily total treatment hours to each

17  patient located in a maximum custody TMHU from July 6-13.  A true and correct copy of

18  the described spreadsheet is attached hereto as **Exhibit WW**.  A complete copy of the

19  described spreadsheet, which includes columns with the patients' names and CDCR

20  numbers, will be provided to the Special Master and counsel for Defendants.

21       52.     The vast majority of all mental health treatment provided in the maximum

22  custody TMHUs is in a non-confidential setting.  Data from column X (labeled

23  "ConfHour") in Exhibit WW, which was exported from the TMHU Registry (Beta) as

24  described in paragraph 51, shows that confidential mental health treatment was only

25  provided to one of the fifteen patients in a maximum custody TMHU from July 6-13.  Data

26  from columns Y (labeled "Non ConfHour") and Z (labeled "Cell Front") in Exhibit WW,

27  which was also exported from the TMHU Registry (Beta) as described in paragraph 51,

28

[3490868.11]

1 | shows that all other mental health treatment provided in the maximum custody TMHUs

2 | from July 6-13, 2020 occurred in non-confidential settings and cell-front.

3 |       53.      No group treatment was offered in the maximum custody TMHUs from

4 | July 6–13.  This can be seen from data in columns T, U, and V in Exhibit WW, all of

5 | which was exported from the TMHU Registry (Beta) as described in paragraph 51.  That

6 | data shows there were no groups attended, refused, or offered by any of the fifteen class

7 | members in maximum custody TMHUs during this period.

8 |       54.      Attached hereto as **Exhibit XX** is a true and correct copy of a January 2019

9 | Office of the Inspector General report entitled "Special Review of Salinas Valley State

10 | Prison's Processing of Inmate Allegations of Staff Misconduct," available at

11 | https://www.oig.ca.gov/wp-content/uploads/2019/05/2019_Special_Review_-

12 | _Salinas_Valley_State_Prison_Staff_Complaint_Process.pdf.

13 |       55.      Attached hereto as **Exhibit YY** is a true and correct copy of an excerpt of

14 | CDCR's COMPSTAT report for "High Security" institutions for May 2018 – May 2018,

15 | available at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/10/DAI-

16 | High-

17 | Security.pdf?label=High%20Security&from=https://www.cdcr.ca.gov/research/compstat/,

18 | showing the percentage of use of force incidents that involved MHSDS participants at

19 | SAC (88%), SVSP (82%), HDSP (69%), and LAC (81%).

20 |       56.      Attached hereto as **Exhibit ZZ** is a true and correct copy of a December

21 | 2015 Office of the Inspector General report entitled "2015 Special Review: High Desert

22 | State Prison, Susanville, CA," available at https://www.oig.ca.gov/wp-

23 | content/uploads/2019/05/2015_Special_Review_-_High_Desert_State_Prison.pdf.

24 |       57.      Attached hereto as **Exhibit AAA** is a true and correct copy of Defendants'

25 | HCPOP Information Report, Summary of Mental Health Population by Institution and

26 | Level of Care (H-1), showing data as of July 10, 2020.  This document was emailed to

27 | Plaintiffs' counsel by counsel for Defendants on July 10, 2020.

28 |

[3490868.11]

58.     With the help of my colleagues, including my co-counsel, Steven Fama of the Prison Law Office, I have collected information from records supplied by CDCR, including the EHRS and the COVID-19 Patient Registry, regarding each incarcerated person in CDCR who has died of COVID-19 or its complications.  As of the evening of July 13, 2020, I had received from CDCR identifying information about 34 of these individuals.  Fifteen (15 or 44%) of them were identified as *Coleman* class members at the time of their deaths.  I frequently review the CDCR's COVID-19 Patient Registry, a non-public resource to which my colleagues and I have received access as class counsel in this matter.  As of approximately 3 pm on July 14, 2020, the Registry listed 74 people as currently hospitalized, 26 of whom, or 35%, are identified as *Coleman* class members.

59.     On January 27, 28, and 29, 2015, Jane Kahn and I participated as Plaintiffs' counsel in a three-day tour of the California Health Care Facility (CHCF) in Stockton, in the company of counsel for CDCR and several CDCR officials, as well as experts and monitors from the *Coleman* Special Master team.  I observed that the mental health program was heavily reliant on physical restraint, including handcuffing of many patients when they were out of their cells.  I observed than CHCF custody staff placed many patients on "max" custody status, and that custody practices at CHCF required extensive use of restraints, and very limited time out of cell.  Walking through the units, I observed that patients were rarely in the yards or group rooms, and that the yards were small concrete enclosures with little or no recreational equipment.  There was no "day room." I observed practices that were similar to segregation units in regular prisons rather than to inpatient psychiatric facilities.  I observed that custody staff, rather than clinical staff, generally had control of whether a patient could move from "max" status to lower status with fewer use of restraints.

60.     In January 2019, I learned that CDCR intended to increase the level of restraint in the clinical programs at CHCF's PIP by introducing the use of cages (which the CDCR officials call "Therapeutic Treatment Modules" or TTMs).  The ostensible purpose of these cages is to allow CHCF PIP staff to offer group therapy to patients on "max"

[3490868.11]

status. As Plaintiffs' counsel in *Coleman,* I have advocated against the use of cages in all mental health programs, especially in what is supposed to be a licensed psychiatric hospital. For example, on July 15, 2019, I directed my associate Marc Shinn-Krantz to send a letter to CDCR detailing our objections to caged therapy, and outlining the many other ways of dealing with patients believed to be assaultive in other settings, such as the mental health units of the Veterans Administration, which to my knowledge do not use cages. A true and correct copy of the letter of July 15, 2019, with voluminous exhibits omitted, is attached hereto as **Exhibit BBB**.

61.     Attached hereto as **Exhibit CCC** is a true and correct copy of the June 19, 2020 Memorandum Re: COVID-19 Mandatory 14-Day Modified Program sent to Associate Wardens, Division of Adult Institutions, and Wardens, which counsel for Defendants sent to Plaintiffs' counsel on June 22, 2020 by email.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 15th day of July, 2020.

/s/ Michael W. Bien
Michael W. Bien

Case No. 2:90-CV-00520-KJM-DB

DECL. OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' RESPONSE TO ORDER OF JULY 2, 2020

[3490868.11]