Exhibit I

**DIVISION OF HEALTH CARE SERVICES**
STATEWIDE MENTAL HEALTH PROGRAM
P.O. Box 588500
Elk Grove, California 95758

March 16, 2020

Matthew A. Lopes, Jr. Esquire
Office of the Special Master
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI 02919

via: Elise Owens Thorn, Esquire
Deputy Attorney General
Department of Justice
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550

## RE: *COLEMAN* MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES

Dear Mr. Lopes:

Enclosed is the *Coleman* Monthly Report reflective of January, 2020, data (or as otherwise noted). The following is the list of enclosures:

1. California Department of Corrections and Rehabilitation (CDCR) Staffing Report.
    a. Mental Health Executive Summary.
    b. Mental Health Institution Vacancy by Classification.
    c. Mental Health Institution Vacancies Summary by Classification.
    d. Mental Health Month to Month Registry Usage.
    e. Mental Health Six-Month Vacancy Summary.
    f. Mental Health Program Institution Vacancies - Summary by Classification.
    g. Statewide Mental Health Program Compliance Summary Report.
    h. Enhanced Outpatient Program Administrative Segregation Unit (EOP ASU) Case Manager Positions and Vacancies.
    i. Mental Health Hiring Progress Report.
    j. Mental Health Statewide Hire Tracking Summary - Clinical Positions Only.
    k. Mental Health Telepsych Allocated and Filled Positions Report.
    l. Psychiatric Inpatient Program (PIP) Staffing Data.
    m. Department of State Hospitals (DSH) Staffing Data.

2. Reception Center Monthly Reports.
    a. Reception Center Mental Health Screening Report.
    b. Reception Center Transfer Timelines Report.

3. Continuous Length of Stay Counts for Mental Health Services Delivery Systems (MHSDS) ASU, Secured Housing Unit (SHU), and Psychiatric Services Unit (PSU) report.

Matthew A. Lopes, Jr. Esquire
Page 2


4. EOP Inmates Waiting Transfers to PSU.

5. EOP ASU Hub Trends.

6. Population and Census Reports.
   a. Health Care Placement Oversight Program (HCPOP) Information Report,
      Summary of Mental Health Population by Institution and Level of Care (H-1).
   b. MHSDS Management Information Summary (MIS).
   c. Weekly EOP/Outpatient Psychiatric Program Report.

7. Mental Health Crisis Bed (MHCB) Reports.
   a. MHCB Referrals report.
   b. MHCB Stays report.
   c. MHCB Wait List.

8. DSH and Inpatient Program Referral Reports.
   a. Referrals for Transfer to Inpatient Programs Report.
   b. DSH Monthly Report of CDCR Patients in DSH Hospitals, Summary of PC 2684s
      Report.

9. Milestone Credits Report.

10. Work Assignments Report.

11. Out of Level Housing Report.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

EUREKA C. DAYE, Ph.D, MPH, MA, CCHP
Deputy Director (A), Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

cc:  Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
     Kerry F. Walsh, Esq., *Coleman* Deputy Special Master
     Jeffrey L. Metzner, M.D., *Coleman* Expert
     Kerry C. Hughes, M.D., *Coleman* Expert

Matthew A. Lopes, Jr. Esquire
Page 3

Mary Perrien, Ph.D., *Coleman* Expert
Henry A. Dlugacz, Esq., *Coleman* Expert
Patricia Williams, Esq., *Coleman* Monitor
Nicholas Weber, Esq, Office of Legal Affairs, CDCR
Melissa Bentz, Esq, Office of Legal Affairs, CDCR
Michael Bien, Esq., Rosen, Bien and Galvan
Donald Specter, Esq., Prison Law Office
Steve Fama, Esq., Prison Law Office
Angela Ponciano, Associate Director, Statewide Mental Health Program, DHCS
Laura Ceballos, Ph.D., Mental Health Administrator, Inpatient Facilities and Quality Improvement, Statewide Mental Health Program, DHCS
Steven Cartwright, Psy.D. Chief Psychologist, Quality Management, Statewide Mental Health Program, DHCS
Teresa Owens, Health Program Specialist I, Quality Management, Statewide Mental Health Program, DHCS

| Level of Care | Housing Program | MALES | | | FEMALES | | |
|---|---|---|---|---|---|---|---|
| | | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
| **Correctional Clinical Case Management System (CCCMS)** | | **27,000** | **25,119** | | **2,250** | **2,088** | |
| CCCMS | Reception Center (RC) | | 2,309 | | | 244 | |
| | General Population (GP) | | 20,933 | | | 1,719 | |
| | Enhanced Outpatient Program (EOP) | | 90 | | | 0 | |
| | Mental Health Crisis Bed (MHCB) | | 3 | | | 1 | |
| | Psychiatric Inpatient Program (PIP) | | 0 | | | 0 | |
| | Specialized Medical Beds Housing | | 539 | | | 20 | |
| | Administrative Segregation Unit (ASU) | | 239 | | | 63 | |
| | Condemned | | 130 | | | 16 | |
| | Long Term Restricted Housing Unit (LTRH) | 130 | 224 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 0 | | | 0 | |
| | Psychiatric Services Unit (PSU) | | 13 | | | 0 | |
| | Security Housing Unit (SHU) | | 0 | | | 25 | |
| | Short Term Restricted Housing Unit (STRH) | 1,125 | 639 | | | 0 | |
| **Enhanced Outpatient Program (EOP)** | | **7,075** | **6,559** | | **225** | **189** | |
| EOP | Reception Center (RC) | | 162 | | | 1 | |
| | General Population (GP) | | 60 | | | 48 | |
| | Enhanced Outpatient Program (EOP) | 6,318 | 5,524 | | 195 | 119 | |
| | Mental Health Crisis Bed (MHCB) | | 7 | | | 1 | |
| | Psychiatric Inpatient Program (PIP) | | 21 | | | 0 | |
| | Specialized Medical Beds Housing | | 178 | | | 3 | |
| | Administrative Segregation Unit (ASU) | 585 | 390 | 34 | 20 | 14 | 0 |
| | Condemned | | 59 | | | 0 | |
| | Long Term Restricted Housing Unit (LTRH) | | 0 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 0 | | | 0 | |
| | Psychiatric Services Unit (PSU) | 172 | 126 | 10 | 10 | 3 | 0 |
| | Security Housing Unit (SHU) | | 0 | | | 0 | |
| | Short Term Restricted Housing Unit (STRH) | | 32 | | | 0 | |

| Level of Care | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
|---|---|---|---|---|---|---|
| **Mental Health Crisis Bed (MHCB)** | **407** | **323** | **12** | **41** | **31** | **3** |
| **Psychiatric Inpatient Programs:** | | | | | | |
| **Intermediate Care Facility (ICF)** | **1,131** | **1,062** | **103** | | | |
| Low Custody | 390 | 360 | 32 | | | |
| *Atascadero State Hospital (ASH)* | 256 | 237 | 22 | | | |
| *Coalinga State Hospital (CSH)* | 50 | 48 | 2 | | | |
| *California Medical Facility (CMF)* | 84 | 75 | 8 | | | |
| High Custody | 741 | 702 | 71 | | | |
| *California Health Care Facility (CHCF)* | 331 | 322 | 21 | | | |
| *CMF Single Cells* | 94 | 90 | 22 | | | |
| *CMF Multi Cells* | 70 | 52 | 8 | | | |
| *SVPP Single Cells* | 202 | 195 | 17 | | | |
| *Salinas Valley Psychiatric Program (SVPP) Multi Cells* | 44 | 43 | 3 | | | |
| **Acute Psychiatric Program (APP)** | **421** | **388** | **36** | | | |
| ASH | 0 | 0 | 0 | | | |
| CHCF | 203 | 193 | 17 | | | |
| CMF | 218 | 195 | 19 | | | |
| **Psychiatric Inpatient Program (PIP)** | **40** | **29** | **1** | **75** | **48** | **5** |
| California Institution for Women (CIW) | | | | 45 | 35 | 3 |
| Patton State Hospital (PSH) | | | | 30 | 13 | 2 |
| SQ | 30 | 27 | 1 | | | |
| SQ (Non-condemned)[6] | 10 | 2 | 0 | | | |
| **Penal Code 2974s (Parolees)[5]** | | **2** | | | | |
| Metro State Hospital (MSH) | | 0 | | | | |
| Napa State Hospital (NSH) | | 2 | | | | |
| Patton State Hospital (PSH) | | 0 | | | | |
| **TOTALS (excluding Parolees)** | **36,074** | **33,480** | **196** | **2,591** | **2,356** | **8** |

| | Total Capacity | Total Census[1] | Total Awaiting Placement[2] | Total Over Timeframes[3] | CENSUS PERCENTAGES | |
|---|---|---|---|---|---|---|
| | | | | | % MHSDS | % CDCR[4] |
| CCCMS | 29,250 | 27,207 | | | 75.92% | 22.07% |
| EOP | 6,513 | 6,183 | | | 17.25% | 5.02% |
| EOP-ASU/NDS/STRH | 605 | 436 | 34 | 6 | 1.22% | 0.35% |
| EOP-PSU/LTRH/SHU | 182 | 129 | 10 | 0 | 0.36% | 0.10% |
| MHCB | 448 | 354 | 15 | 0 | 0.99% | 0.29% |
| PSYCHIATRIC INPATIENT | 1,667 | 1,527 | 145 | 3 | 4.26% | 1.24% |
| **GRAND TOTAL** | **38,665** | **35,836** | **204** | **9** | **100.00%** | **29.07%** |

[1] Census sources: HCODS for CCCMS, EOP; HEART for MHCB; RIPA reports for ICF, APP, and PIP programs.

[2] Awaiting Placement = The sum of inmates waiting to be placed in a bed at a specific level of care. Those awaiting placement to ICF, APP, and PIP include referrals that have been custodially reviewed by HCPOP and are awaiting bed availability, inpatient program acceptance, or transfer to the inpatient program as of the reporting date (based on the Referrals to Inpatient Programs Application (RIPA)).

[3] Total Over Timeframes = The number of referrals that are beyond Mental Health Program Guide transfer timeframes: EOP-ASU includes cases in non-hubs waiting > 30 days, PSU includes cases with an original CSR endorsement date > 60 days, MHCB includes referrals > 24 hours, Psychiatric Inpatient includes Intermediate referrals > 30 days and Acute referrals > 10 days.

[4] CDCR pop as of 2/19/20 (OISB). Based on Total In-State Institution Population and Out of State (COCF).

[5] Census numbers are tracked and updated by Department of State Hospital (DSH).

[6] SQ for non-condemned has two MHCB placements.

# Exhibit J

**MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS)**
**MANAGEMENT INFORMATION SUMMARY (MIS) REPORT**
7/6/2020

| Level of Care | Housing Program | MALES | | | FEMALES | | |
|---|---|---|---|---|---|---|---|
| | | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
| **Correctional Clinical Case Management System (CCCMS)** | | **27,000** | **23,189** | | **2,250** | **1,903** | |
| CCCMS | Reception Center (RC) | | 1,183 | | | 120 | |
| | General Population (GP) | | 20,056 | | | 1,655 | |
| | Enhanced Outpatient Program (EOP) | | 99 | | | 0 | |
| | Mental Health Crisis Bed (MHCB) | | 5 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 2 | | | 0 | |
| | Specialized Medical Beds Housing | | 562 | | | 29 | |
| | Administrative Segregation Unit (ASU) | | 419 | | | 70 | |
| | Condemned | | 142 | | | 14 | |
| | Long Term Restricted Housing Unit (LTRH)[6] | 270 | 157 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 1 | | | 0 | |
| | Psychiatric Services Unit (PSU) | | 5 | | | 0 | |
| | Security Housing Unit (SHU) | | 0 | | | 15 | |
| | Short Term Restricted Housing Unit (STRH)[6] | 1,125 | 558 | | | 0 | |
| **Enhanced Outpatient Program (EOP)** | | **7,075** | **6,472** | | **225** | **164** | |
| EOP | Reception Center (RC) | | 76 | | | 1 | |
| | General Population (GP) | | 149 | | | 36 | |
| | Enhanced Outpatient Program (EOP) | 6,318 | 5,316 | | 195 | 112 | |
| | Mental Health Crisis Bed (MHCB) | | 20 | | | 0 | |
| | Psychiatric Inpatient Program (PIP) | | 24 | | | 0 | |
| | Specialized Medical Beds Housing | | 192 | | | 1 | |
| | Administrative Segregation Unit (ASU) | 585 | 439 | 113 | 20 | 11 | 0 |
| | Condemned | | 62 | | | 0 | |
| | Long Term Restricted Housing Unit (LTRH) | | 0 | | | 0 | |
| | Non-Disciplinary Segregation (NDS) | | 0 | | | 0 | |
| | Psychiatric Services Unit (PSU) | 172 | 115 | 59 | 10 | 3 | 1 |
| | Security Housing Unit (SHU) | | 0 | | | 0 | |
| | Short Term Restricted Housing Unit (STRH) | | 79 | | | 0 | |

| Level of Care | Capacity | Census[1,7] | Awaiting Placement[2] | Capacity | Census[1,7] | Awaiting Placement[2] |
|---|---|---|---|---|---|---|
| **Mental Health Crisis Bed (MHCB)[7]** | **424** | **262** | **3** | **41** | **14** | **0** |
| **Psychiatric Inpatient Programs:** | | | | | | |
| **Intermediate Care Facility (ICF)** | **1,165** | **1,037** | **56** | | | |
| Low Custody | 390 | 335 | 9 | | | |
| *Atascadero State Hospital (ASH)* | 256 | 224 | 9 | | | |
| *Coalinga State Hospital (CSH)* | 50 | 46 | 0 | | | |
| *California Medical Facility (CMF)* | 84 | 65 | 0 | | | |
| High Custody | 775 | 702 | 47 | | | |
| *California Health Care Facility (CHCF)* | 356 | 350 | 15 | | | |
| *CMF Single Cells* | 105 | 103 | 6 | | | |
| *CMF Multi Cells* | 68 | 45 | 1 | | | |
| *SVPP Single Cells* | 202 | 168 | 20 | | | |
| *Salinas Valley Psychiatric Program (SVPP) Multi Cells* | 44 | 36 | 5 | | | |
| **Acute Psychiatric Program (APP)** | **368** | **290** | **22** | | | |
| ASH | 0 | 0 | 0 | | | |
| CHCF | 161 | 100 | 18 | | | |
| CMF | 207 | 190 | 4 | | | |
| **Psychiatric Inpatient Program (PIP)** | **40** | **30** | **0** | **75** | **39** | **0** |
| California Institution for Women (CIW) | | | | 45 | 29 | 0 |
| Patton State Hospital (PSH) | | | | 30 | 10 | 0 |
| SQ | 30 | 23 | 0 | | | |
| SQ (Non-condemned) | 10 | 7 | 0 | | | |
| **Penal Code 2974s (Parolees)[5]** | | **2** | | | | |
| Metro State Hospital (MSH) | | 0 | | | | |
| Napa State Hospital (NSH) | | 2 | | | | |
| Patton State Hospital (PSH) | | 0 | | | | |
| **TOTALS (excluding Parolees)** | **36,072** | **31,280** | **253** | **2,591** | **2,120** | **1** |

| | Total Capacity | Total Census[1] | Total Awaiting Placement[2] | Total Over Timeframes[3] | CENSUS PERCENTAGES | |
|---|---|---|---|---|---|---|
| | | | | | % MHSDS | % CDCR[4] |
| CCCMS | 29,250 | 25,092 | | | 75.13% | 22.15% |
| EOP | 6,513 | 5,989 | | | 17.93% | 5.29% |
| EOP-ASU/NDS/STRH | 605 | 529 | 113 | 72 | 1.58% | 0.47% |
| EOP-PSU/LTRH/SHU | 182 | 118 | 60 | 25 | 0.35% | 0.10% |
| MHCB | 465 | 276 | 3 | 1 | 0.83% | 0.24% |
| PSYCHIATRIC INPATIENT | 1,648 | 1,396 | 78 | 35 | 4.18% | 1.23% |
| **GRAND TOTAL** | **38,663** | **33,400** | **254** | **133** | **100.00%** | **29.48%** |

[1] Census sources: HCODS for CCCMS, EOP; HEART for MHCB; RIPA reports for ICF, APP, and PIP programs.
[2] Awaiting Placement = The sum of inmates waiting to be placed in a bed at a specific level of care. Those awaiting placement to ICF, APP, and PIP include referrals that have been custodially reviewed by HCPOP and are awaiting bed availability, inpatient program acceptance, or transfer to the inpatient program as of the reporting date (based on the Referrals to Inpatient Programs Application (RIPA)).
[3] Total Over Timeframes = The number of referrals that are beyond Mental Health Program Guide transfer timeframes: EOP-ASU includes cases in non-hubs waiting > 30 days, PSU includes cases with an original CSR endorsement date > 60 days, MHCB includes referrals > 24 hours, Psychiatric Inpatient includes Intermediate referrals > 30 days and Acute referrals > 10 days.
[4] CDCR pop as of 7/1/20 (OISB). Based on Total In-State Institution Population and Out of State (COCF).
[5] Census numbers are tracked and updated by Department of State Hospital (DSH).
[6] LTRH and STRH capacity numbers obtained from the PMU Weekly Population Summary Report dated March 6, 2020.
[7] In response to CDCR COVID-19 Guidelines some patients may be housed outside of their level of care and/or in a Temporary Mental Health Unit.

Exhibit K



Exhibit M

*California*
State Auditor

August 2017



# California Department of Corrections and Rehabilitation

It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides

Report 2016-131



COMMITMENT
INTEGRITY
LEADERSHIP

 **CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814

 **916.445.0255** | TTY **916.445.0033**

For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
 **1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* **auditor.ca.gov**

*For questions regarding the contents of this report, please contact* Margarita Fernández, Chief of Public Affairs, *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternate format reports available upon request | Permission is granted to reproduce reports



**Elaine M. Howle** State Auditor
**Doug Cordiner** Chief Deputy

August 17, 2017                                                                                                                                 2016-131

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As requested by the Joint Legislative Audit Committee, the California State Auditor presents this audit report concerning the California Department of Corrections and Rehabilitation's (Corrections) policies, procedures, and practices for suicide prevention and reduction, with a particular emphasis on the recently elevated suicide rate at the California Institution for Women. Although female inmates account for about 4 percent of Corrections' total inmate population, they accounted for 11 percent of inmate suicides from 2014 through 2016. This report concludes that Corrections should provide increased oversight and leadership to ensure that prisons follow its policies related to suicide prevention and response.

We identified significant weaknesses in prisons' suicide prevention and response practices at the four prisons we reviewed. Specifically, we found that the prisons failed to complete some required evaluations to assess inmates' risk for suicide and those that the prisons did complete were often inadequate. The inadequacies included leaving sections of the risk evaluations blank, failing to appropriately justify the determinations of risk, failing to develop adequate plans for treatment to reduce the inmates' risk, and relying on inconsistent information about inmates to determine risk. Also, the prisons we reviewed did not properly monitor inmates who were at risk of committing suicide. For example, we found that staff were not staggering behavior checks or conducting checks in the required 15-minute intervals. Finally, we found that some staff members at the prisons we visited had not completed required trainings related to suicide prevention and response. These conditions may have contributed to elevated suicide and attempted suicide rates at California prisons.

Corrections also lacks assurance that prisons are implementing its policies to address serious issues. For many years, a court-appointed special master, working with Corrections to address inmate mental health care, identified many of the same issues we discuss in this report. In 2013 Corrections began developing an audit process to review prisons' compliance with its policies and procedures, including those it issued in response to the special master's reports; however, that process is still in development. In addition, Corrections could provide additional leadership to prisons regarding the communication of best practices related to suicide prevention efforts. Finally, Corrections' policies require it to complete a thorough review of a prison's compliance with policies and procedures following an inmate's suicide, but Corrections does not complete such reviews for suicide attempts. This hinders Corrections' ability to identify problems with a prison's compliance with crucial policies and procedures until after an inmate dies.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
State Auditor

## Selected Abbreviations Used in This Report

| | |
|---|---|
| CCWF | Central California Women's Facility |
| CIW | California Institution for Women |
| Corrections | California Department of Corrections and Rehabilitation |
| health care division | Corrections' Division of Health Care Services |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison, Sacramento |
| VSPW | Valley State Prison for Women |

# Contents

Summary                                                                                          1

Introduction                                                                                     7

Chapter 1
Prisons Have Not Followed Corrections' Policies When
Responding to Inmates Who Have Attempted or Are at
Risk of Attempting Suicide                                                                      17

Recommendations                                                                                 37

Chapter 2
A Number of Factors Have Likely Contributed to High Rates
of Inmate Suicides and Suicide Attempts at CIW                                                  39

Recommendations                                                                                 49

Chapter 3
To Reduce Inmate Suicides and Attempts, Corrections Must
Strengthen Its Oversight and Demonstrate Greater Leadership                                     51

Recommendations                                                                                 63

Appendix A
Rates of Inmate Suicides and Suicide Attempts in State Prisons
From 2012 Through 2016                                                                          67

Appendix B
Scope and Methodology                                                                           71

Response to the Audit
California Department of Corrections and Rehabilitation                                         75

Blank page inserted for reproduction purposes only.

# Summary

## Results in Brief

Despite the fact that the rates of inmate suicide in California's prisons has been higher on average than those of all U.S. state prisons for several years, the California Department of Corrections and Rehabilitation (Corrections) has failed to provide the leadership and oversight necessary to ensure that its prisons follow its policies related to inmate suicide prevention and response. Corrections is responsible for providing mental health services to its inmates who are unable to function within the usual correctional environment because of mental illness. However, from 2005 through 2013, the average suicide rate in Corrections' prisons was 22 per 100,000 inmates—substantially higher than the average rate of 15.66 per 100,000 in U.S. state prisons during the same period. Further, in recent years, the rates of female inmates who committed suicide while in Corrections' prisons have soared: from 2014 through 2016, female inmates made up only about 4 percent of Corrections' total inmate population, yet they accounted for about 11 percent of its inmate suicides. These statistics, combined with the significant deficiencies we identified when we reviewed suicide prevention and response practices at four prisons, raise questions regarding Corrections' leadership on this critical issue.

When we reviewed the California Institution for Women (CIW); California State Prison, Sacramento (SAC); Central California Women's Facility (CCWF); and Richard J. Donovan Correctional Facility (RJD), one area in which we identified significant weaknesses was the four prisons' evaluations of inmates' suicide risk. Specifically, for various reasons, including when inmates attempt suicide, express suicidal thoughts, or engage in self-harm, Corrections' policy requires that prison mental health staff (mental health staff) complete suicide risk evaluations (risk evaluations) to assess an inmate's risk for suicide. These risk evaluations are critical to successful suicide prevention because they help mental health staff identify inmates who are likely to attempt suicide and the treatments needed to prevent them from doing so. Nonetheless, over the past several years, court-appointed mental health experts have repeatedly notified Corrections of problems related to its risk evaluations. Further, when we examined risk evaluations for the 36 of 40 inmates we reviewed who required them, we found that the prisons failed to complete at least one required risk evaluation for 10 of the inmates and completed inadequate risk evaluations for 26 of the inmates. The inadequacies we noted included leaving sections of the risk evaluations blank, failing to appropriately justify the determinations of risk, failing to develop adequate plans for treatment to reduce the inmates' risk, and relying on inconsistent or incomplete information about the inmates to determine risk.

*Audit Highlights . . .*

*Our audit of Corrections' policies and practices for inmate suicide prevention and response highlight the following:*

» *The average suicide rate in Corrections' prisons was substantially higher than the average of U.S. state prisons.*

» *The rates of female inmates who committed suicide while in Corrections' prisons have soared in recent years.*

» *We found significant weaknesses in compliance with suicide prevention and response policies when we reviewed 40 files on inmates who committed or attempted suicide at four prisons.*

  • *Prisons failed to complete or completed inadequate risk evaluations for many of those inmates who required them.*

  • *Prisons did not complete or created inadequate treatment plans for some inmates—plans did not always specify medication dosage and frequency, treatment methods, provider information, or follow-up upon discharge.*

  • *Prisons did not properly monitor inmates who were at risk of committing suicide.*

» *Although Corrections has known about many of the issues related to suicide prevention and response policies and practices that we found for a number of years, it has not fully implemented processes to address the issues that have been raised.*

» *Corrections could take a more proactive leadership role in identifying programs or best practices and reviewing a prison's practices following an inmate's suicide attempt.*

In 2013 Corrections established a risk evaluation training, as well as a mentoring program to assess, every two years, whether mental health staff adequately completed risk evaluations and to provide training as needed. Corrections enhanced the mentoring program in 2016 by requiring prisons to audit mental health staff's risk evaluations twice each year and to have these staff undergo mentoring if they failed the audit; however, the results of our review demonstrate that this program has not resolved the problems. The failure may be due in part to Corrections allowing mental health staff to improperly complete significant sections of the risk evaluations and still pass Corrections' audit. According to Corrections' clinical support chief, Corrections does not expect perfection from its mental health staff. She also stated that despite their training, some mental health staff still do not know how to complete risk evaluations, and that others may rush when completing them because of their heavy workloads. Although Corrections has taken some steps to address these issues, the fact that the problems with the risk evaluations have continued shows that Corrections must increase its oversight.

Similarly, the prisons we reviewed failed to complete required treatment plans for some inmates and created inadequate treatment plans for others. Treatment plans are crucial to suicide prevention: based on the inmates' needs, they set goals for the inmates' treatment and determine the specific treatment methods mental health staff will use. State regulations and Corrections' policy require that prisons complete a plan for initial treatment (initial treatment plan) within 24 hours of an inmate's admission to a mental health crisis bed (crisis bed) and a more comprehensive plan within 72 hours of admission (72-hour treatment plan). Initial treatment plans are important because they prescribe treatment for the first few days of an inmate's crisis-bed stay. Nonetheless, when we reviewed the files of 26 inmates who required them, we found that CIW, CCWF, and RJD did not complete initial treatment plans for some inmates. Further, 25 inmates also required 72-hour treatment plans, but one prison did not complete such plans for two inmates. Finally, all 23 of the remaining 72-hour treatment plans we reviewed failed to meet the requirements outlined in state regulations. The most common problems we identified were that the plans did not specify medication dosage and frequency, treatment methods, the providers responsible for the treatments, or the follow-up treatments for the inmates who were discharged.

The four prisons also did not properly monitor inmates who were at risk of committing suicide. Corrections' policies require prisons to conduct staggered behavior checks at intervals not to exceed every 15 minutes of inmates who are at high risk of self-injury but not in immediate danger. However, when we reviewed records for 25 such inmates, we found that the prisons exceeded 15-minute

intervals for checks on 17 inmates, did not stagger checks for 19 inmates, and appeared to have prefilled or preprinted the forms documenting checks for eight inmates. Corrections said that a new electronic health record system that it is currently implementing systemwide will reduce some of these issues, as will a planned audit process that will include automated monitoring of these checks. Nevertheless, we still found problems with staff not staggering checks or conducting checks that exceeded intervals of 15 minutes at two prisons that implemented the new system, bringing into question whether it will fully resolve the problems we identified.

Taken as a whole, the types of compliance issues we identified at the four prisons we reviewed may have contributed to Corrections' continuing high suicide rates relative to those of prison systems in other states. In addition, a number of specific factors may have contributed to elevated suicide and suicide attempt rates among Corrections' female inmates. As we mention previously, the rate of suicide among female inmates has increased dramatically since 2014. This increase is especially pronounced at CIW, where six of the seven suicides by female inmates from 2014 through 2016 occurred. Officials at Corrections and CIW identified a number of reasons why the suicide rate at CIW may have increased during this period, including domestic violence in interpersonal relationships, drug involvement, and drug trafficking. Officials at CIW further cited a change in prison culture resulting from the conversion of Valley State Prison for Women to a men's institution and the subsequent transfer of high-security-level inmates to CIW.

In addition, we found that some staff members at CIW and the other prisons we visited had not completed required trainings related to suicide prevention and response. Corrections' policies require prison staff to participate in specific trainings on issues such as preventing suicide, assessing inmates' suicide risk, and developing treatment plans. However, when we reviewed records for 20 staff members at CIW, we found that the prison could not provide evidence that the staff members attended all required trainings. For example, the prison could not demonstrate that four of the 20 staff members attended annual required suicide prevention training in 2016. Further, Corrections' officials reported that not all staff members at the other three prisons received required trainings in 2016. Corrections' clinical support chief was unable to explain why these staff members had not participated in trainings as required. Instead, she stated that Corrections relies on the prisons' in-service training units to address clinical training noncompliance issues.

The ongoing nature of many of the problems we identified at the four prisons we reviewed is particularly troubling. A court-appointed special master has overseen many aspects of Corrections' provision

of mental health care since 1995. Since at least 1999, the special master has identified many of the same problems we found in our audit. In January 2015, the special master filed a report that was an audit of suicide prevention practices in each of the 35 prisons, which contained 32 recommendations. Corrections responded to the majority of these recommendations through the adoption of new policies, improvements to its facilities, changes to its trainings, and other actions. However, Corrections has not yet fully ensured prisons' compliance with changes resulting from the recommendations. According to Corrections, it began developing an audit process in 2013 to audit prisons' compliance with policies and procedures, but it has not yet completed that process nearly five years later, explaining that it continues to work on finalizing it with the special master. Absent such monitoring, Corrections lacks assurance that the prisons are addressing the serious problems the special master has identified.

Further, Corrections could take a more proactive leadership role in identifying programs and best practices that may help in preventing inmate suicide. For example, we identified best practices at one of the prisons we visited that we believe could benefit certain inmates at other prisons. Although Corrections recently conducted a suicide prevention summit with the chiefs of mental health and other prison leadership, at which it discussed best practices related to prisons' suicide prevention efforts, its documentation and dissemination of innovative programs and best practices related to suicide prevention has generally been limited. Similarly, Corrections has not conducted thorough reviews of the circumstances surrounding suicide attempts. Pursuant to its policies, the death of an inmate by suicide initiates an intensive review process in which Corrections identifies any problems with the prison's compliance with policies and procedures. It then issues a report containing recommendations to address those problems. However, Corrections requires no such review for suicide attempts. Corrections' clinical support chief explained that Corrections plans to implement a process for each prison to review a selection of its incidents of inmate self-harm; however, we question whether such reviews will be sufficiently impartial and critical. Without a thorough and unbiased review of the factors contributing to inmate suicide attempts, Corrections is hindered in its ability to identify potential problems with a prison's suicide prevention and response practices until after an inmate dies.

## Selected Recommendations

### *Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress toward meeting its goals related to the completion of suicide risk evaluations in a sufficient manner.

- Its progress toward meeting its goals related to the completion of 72-hour treatment plans in a sufficient manner.

- The status of its efforts to ensure that all staff receive training related to suicide prevention and response.

- Its progress in implementing the recommendations made by the special master regarding inmate suicides and attempts. Corrections should also include in its report to the Legislature the results of any audits it conducts as part of its planned audit process to measure the success of changes it implements as a result of these recommendations.

- Its progress in identifying and implementing mental health programs at the prisons that may ameliorate risk factors associated with suicide.

### *Corrections*

Corrections should immediately require mental health staff to score 100 percent on risk evaluation audits in order to pass. If a staff member does not pass, Corrections should require the prison to follow its current policies by reviewing additional risk evaluations to determine whether the staff member needs to undergo additional mentoring.

To ensure that prison staff conduct required checks of inmates on suicide precaution in a timely manner, Corrections should implement its automated process to monitor these checks in its electronic health record system by October 2017.

To address the unique circumstances that may increase its female inmates' rates of suicide and suicide attempts, Corrections should continue to explore programs that could address the suicide risk factors for female inmates.

To ensure that all prison staff receive required training related to suicide prevention and response, Corrections should immediately implement a process for identifying prisons where staff are not attending required trainings and for working with the prisons to solve the issues preventing attendance.

To ensure that prisons comply with its policies related to suicide prevention and response, Corrections should continue to develop its audit process and implement it at all prisons by February 2018. The process should include, but not be limited to, audits of the quality of prisons' risk evaluations and treatment plans.

To ensure that all its prisons provide inmates with effective mental health care, Corrections should continue to take a role in coordinating and disseminating best practices related to mental health treatment by conducting a best practices summit at least annually. The summits should focus on all aspects of suicide prevention and response, including programs that seek to improve inmate mental health and treatment of and response to suicide attempts. Corrections should document and disseminate this information among the prisons, assist prisons in implementing the best practices through training and communication when needed, and monitor and report publicly on the successes and challenges of adopted practices.

In an effort to prevent future inmate suicide attempts, Corrections should implement its plan to review attempts with the same level of scrutiny that it uses during its suicide reviews. Corrections should require each prison to identify for review at least one suicide attempt per year that occurred at that prison. To ensure that the reviews include critical and unbiased feedback, Corrections should either conduct these reviews itself or require the prisons to review each other. These reviews should start in September 2017 and follow the same timelines as the suicide reviews, with the timeline beginning once the team identifies a suicide attempt for review.

**Agency Comments**

Corrections stated it would address the specific recommendations in a corrective action plan within the timelines outlined in the report. We look forward to Corrections' 60-day response to our recommendations.

# Introduction

## Background

The California Department of Corrections and Rehabilitation (Corrections) is responsible for protecting the public by safely and securely supervising adult and juvenile offenders, providing effective rehabilitation and treatment, and integrating offenders successfully into the community. It operates two adult women's prisons and 33 adult men's prisons across the State.[1] According to a report Corrections issued in 2017, 123,540 male inmates and 5,876 female inmates were incarcerated within its facilities as of December 31, 2016. Figure 1 on the following page shows the locations of Corrections' prisons and highlights the four prisons we selected for review during the course of our audit work.

Corrections is responsible for the provision of mental health care to all of its inmates, including receiving, evaluating, housing, treating, and referring those inmates who are unable to appropriately function within the constraints of the usual correctional environment because of mental illnesses. Its Division of Health Care Services (health care division) provides mental health services through its Mental Health Services Delivery System (mental health system), the mission of which is "to provide inmates with an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both [the inmates and prisons]." Corrections employs numerous individuals, such as psychiatrists, psychologists, social workers, and nurses, to provide mental health services to inmates (mental health staff). Prison staff may refer inmates to the prison's mental health program, or inmates may submit requests for services to the prison's mental health staff for their approval.

Despite the mental health services that Corrections provides, the rate at which its inmates commit suicide has generally been higher than the rates in most other states. Table 1 on page 9 shows the number of attempted suicides and suicides from 2012 through 2016 at the four prisons we reviewed, and Appendix A presents these data for all the State's prisons. According to a 2016 report by a mental health expert appointed by a U.S. district court, the average suicide rate in Corrections was 22 per 100,000 inmates from 2005 through 2013, significantly higher than the average rate of 15.66 per 100,000 inmates in U.S. state prisons during the same period. Although Corrections' 2014 inmate suicide rate of 16.97 per 100,000 inmates was lower than the 2014 rate of 20 per 100,000 inmates for all U.S. state prisons, Corrections' inmate suicide rates have been higher on average than those of U.S. state prisons since 1999.

---

[1]   Corrections houses women within other facilities, including some medical facilities and a small facility at Folsom State Prison. In addition, Valley State Prison housed women before Corrections converted it to a men's facility in 2013.

Case 2:90-cv-00520-KJM-DB   Document 6768-1   Filed 07/15/20   Page 24 of 113

**Figure 1**
Map of Adult Correctional Institutions and the Four Prisons We Visited



Source: Corrections.

The suicide rate of Corrections' male inmates remained relatively static from 2012 through 2016; however, the suicide rate of its female inmates increased. In 2012 female inmates accounted for about 5 percent of Corrections' inmate population and for 4 percent of its suicides. However, although female inmates made up about 4 percent of Corrections' inmate population from 2014 through 2016, they accounted for about 11 percent of the suicides. Almost all of the suicides during this period occurred at the California Institution for Women (CIW). In fact, concern about CIW's high suicide rate was the impetus for this audit.

**Table 1**

**Suicides and Suicide Attempts at the Four Prisons We Visited, From 2012 Through 2016**

| | WOMEN'S PRISONS | | MEN'S PRISONS | |
| --- | --- | --- | --- | --- |
| | CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF) | CIW | RICHARD J. DONOVAN CORRECTIONAL FACILITY (RJD) | CALIFORNIA STATE PRISON, SACRAMENTO (SAC) |
| **2012** | | | | |
| Population* | 2,931 | 1,642 | 3,539 | 2,698 |
| Suicides | 0 | 1 | 0 | 1 |
| Attempts | 5 | 13 | 28 | 22 |
| **2013** | | | | |
| Population* | 3,531 | 2,082 | 3,364 | 2,246 |
| Suicides† | 0 | 1 | 3 | 1 |
| Attempts | 8 | 15 | 33 | 32 |
| **2014** | | | | |
| Population* | 3,648 | 2,005 | 3,070 | 2,218 |
| Suicides | 0 | 2 | 1 | 2 |
| Attempts | 6 | 15 | 22 | 11 |
| **2015** | | | | |
| Population* | 3,002 | 1,882 | 3,096 | 2,237 |
| Suicides† | 0 | 2 | 2 | 3 |
| Attempts | 11 | 34 | 51 | 12 |
| **2016** | | | | |
| Population* | 2,865 | 1,863 | 3,094 | 2,327 |
| Suicides† | 1 | 2 | 0 | 3 |
| Attempts | 25 | 24 | 59 | 8 |
| **Totals** | | | | |
| Population* | 3,195 | 1,895 | 3,233 | 2,345 |
| Suicides† | 1 | 8 | 6 | 10 |
| Attempts | 55 | 101 | 193 | 85 |

Sources:  California State Auditor's analysis of Corrections' COMPSTAT metrics from 2012 through 2016, and the average daily population for each prison as reported by Corrections.

\* *Population* is based on Corrections' average daily population. The total represents the average of the five years' populations.

† The numbers we present here reflect our amendments to Corrections' COMPSTAT data. As we discuss in Chapter 3, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. We have therefore adjusted the number of suicides in 2013, 2015, and 2016 to include three suicides that we identified at CIW, RJD, and SAC; however, we caution that these numbers may still not be accurate.

### Court-Ordered Oversight of Corrections' Mental Health Services

As Figure 2 shows, federal courts have monitored Corrections' delivery of mental health services to its inmates for over two decades, as a result of a decision on a lawsuit that began in 1990—*Coleman v. Brown* (*Coleman*).[2] This federal class action lawsuit alleged that Corrections failed to provide constitutionally adequate mental health care to mentally ill inmates. The court identified that Corrections had failed to provide timely access to necessary care, which exacerbated inmates' suffering and illnesses. In addition the court found that Corrections had an inadequate screening system for mental illnesses, deficient medical recordkeeping, improper administration of medication, and insufficient staffing. In December 1995, the court in *Coleman* appointed a special master to oversee and work with Corrections to address the constitutional violations, monitor implementation of court-ordered remedial plans, and submit reports on Corrections' progress in implementing improvements. Over the next decade, the special master submitted 15 reports to the court, which noted that although Corrections had made some progress, it still had not met its constitutional obligation to provide inmates with adequate mental health care during that time. Further, the special master's fifteenth report in January 2006 indicated a reversal in Corrections' progress. Specifically, this report noted systemwide increases in staffing vacancy rates and rates of inmate suicide.

In April 2001, another class action lawsuit, *Plata v. Brown* (*Plata*), alleged constitutional violations in Corrections' delivery of medical care to inmates that resulted in unnecessary pain, injury, and death.[3] These violations included delays in or failure to provide access to medical care, untimely responses to medical emergencies, and the interference of custodial staff with the provision of medical care. After the plaintiffs filed the lawsuit, they and Corrections agreed that Corrections would implement certain policies and procedures to improve its delivery of medical care, which the court entered as an order in 2002. However, in 2005 the federal court determined that Corrections had yet to ensure that its medical system met constitutional standards. As a result, the court appointed a receiver in February 2006 to provide leadership and executive management of Corrections' medical health care delivery system. This receivership is still in place.

---

[2] When this case was filed, it was called *Coleman v. Wilson*.

[3] When this case was filed, it was called *Plata v. Davis*.

**Figure 2**
**Timeline of Court-Ordered Oversight of Corrections**



**April 1990**
*Coleman*, a class action lawsuit, is filed, alleging constitutional violations due to lack of adequate mental health care.

1990

1995

**September 1995**
Court rules in favor of plaintiff, stating Corrections' delivery of mental health care violated the Constitution.

**December 1995**
Court ordered a special master to develop a plan to address constitutional violations and monitor Corrections' implementation of the plan.

2001

**April 2001**
*Plata*, a class action lawsuit, is filed, alleging constitutional violations in Corrections' delivery of medical care to its inmates.

**January 2006**
Special master files reports, noting a reversal in Corrections' progress of its remedial efforts.

2006

**February 2006**
Court appoints receiver to provide leadership and executive management of Corrections' medical health care delivery system.

**August 2009**
Court finds that Corrections' prison population reached a high of more than 170,000 inmates in October 2006. Court orders Corrections to reduce its prison population to 137.5 percent of capacity.

2009

2013

**November 2013**
Suicide expert begins his audit on Corrections' prisons.

**January 2015**
Suicide expert files his completed audit on suicide prevention practices at Corrections' prisons, which results in 32 recommendations.

2015

2016

**January 2016**
Suicide expert completes a follow-up audit on prisons' implementation of the recommendations.

**August 2016**
The Joint Legislative Audit Committee approves a request for the State Auditor to conduct an audit of Corrections' suicide prevention policies due to concerns related to the number of suicides at CIW.

SPECIAL MASTER OVERSEES CORRECTIONS' MENTAL HEALTH CARE DELIVERY (*Coleman*)

FEDERAL RECEIVERSHIP OVERSEES CORRECTIONS' MEDICAL CARE DELIVERY (*Plata*)

Sources:  Reports from the special master's suicide expert in 2015 and 2016, court documents, and minutes of the California State Legislature's Joint Legislative Audit Committee.

In 2007 the courts in *Coleman* and *Plata* recommended that both cases be assigned to a three-judge panel to address prison overcrowding. In August 2009, the three-judge panel noted that in 2006—the same year that the *Coleman* special master's report noted a reversal in Corrections' delivery of mental health services and the court in *Plata* appointed the receiver—California's prison population reached a historic high of more than 170,000 inmates. This historic high led to unprecedented overcrowding of California's prisons. The three-judge panel found overcrowding to be the primary cause of many of the issues relating to inadequate mental health and medical care in California's prisons. Therefore, the three-judge panel ordered Corrections to develop a plan to reduce its prison population, which at that time was at about 190 percent of capacity, to 137.5 percent of capacity. In 2011 the Legislature passed various laws that realigned the criminal justice system, which reduced overcrowding by allowing for inmates who were not convicted of serious or violent crimes, or felonies requiring registration as a sex offender, to serve their sentences in county jails instead of state prisons.

Although these efforts resulted in the reduction of Corrections' inmate population, a March 2013 *Coleman* special master's report identified continuing inadequacies in Corrections' delivery of mental health services. The special master had repeatedly identified many of these inadequacies in earlier reports, such as Corrections' failure to enforce its own policies regarding the delivery of mental health services and the prisons' failure to provide adequate emergency responses to suicides. In response to the report, the court in *Coleman* ordered Corrections to establish a suicide prevention and management workgroup consisting of members of Corrections' clinical, custody, and administrative staff; experts appointed by the special master; and others. The workgroup engaged a nationally recognized suicide prevention expert (suicide expert) to conduct a review of the suicide prevention practices at each of Corrections' prisons. In January 2015, the suicide expert filed his report, which contained 32 recommendations to Corrections. The suicide expert issued an update to this report in January 2016, in which he evaluated Corrections' progress in implementing the recommendations through a review of 18 prisons. We discuss the suicide expert's report and update in Chapter 3.

**Suicide Prevention and Response**

As we mention earlier, the goal of Corrections' mental health system is to provide appropriate levels of mental health treatment to seriously mentally ill inmates in the least restrictive environment. As presented in Figure 3, Corrections provides escalating levels of mental health care to inmates, up to and including referrals to Department of State Hospitals' facilities if Corrections cannot meet inmates' mental health needs.

**Figure 3**
**Levels of Care in Corrections' Mental Health System**

**Inpatient Care**
Provides care at Department of State Hospitals' facilities for inmates whose conditions cannot be successfully treated in the outpatient setting or in short-term mental health crisis-bed (crisis bed) stays. Corrections provides this level of care for female inmates in the Psychiatric Inpatient Program at CIW.

**4**

**Crisis Beds**
Provides care to inmates with marked impairment and dysfunction requiring 24-hour nursing care, inmates who present a danger to others as a consequence of serious mental disorders, and inmates who present a danger to themselves for any reason.

**3**

**Enhanced Outpatient Program**
Provides care to inmates with mental disorders who would benefit from the structure of a therapeutic environment that is less restrictive than an inpatient setting and who do not require continuous nursing care. The program is located in a designated living unit at each prison.

**2**

**Correctional Clinical Case Management System**
Provides care to inmates whose conditions are relatively stable and whose symptoms are controlled or are in partial remission as a result of treatment.

**1**

Sources: Corrections' 2009 *Mental Health Program Guide* (program guide) and *2014 Annual Accomplishments* report.
Note: Not all institutions contain all levels of care.

---

### Terms Related to Inmate Suicide

**Suicidal ideation:** Thoughts of suicide or death. Such thoughts may be either specific or vague and may include the desire to be dead.

**Suicidal intent:** The intention to deliberately end one's life.

**Self-harm without intent:** An act of purposeful self-harm without suicidal intent.

**Suicide attempt:** An act of purposeful self-harm with the intent to die.

**Suicide:** An act of purposeful self-harm that causes or leads to one's own death.

Sources: Corrections' 2009 program guide and suicide risk evaluation training documents.

---

A primary component of Corrections' mental health system is crisis intervention, which is treatment for rapid-onset or worsening symptoms of mental illness in inmates. Such symptoms may include thoughts of suicide. Corrections has identified factors that can lead inmates to experience mental health crises while in prison, including the loss of an existing support system outside of prison, the restrictions of incarceration, and fears of being unable to cope with the outside world upon release. Corrections' policy states that staff must refer inmates who are dangers to themselves to crisis beds, an inpatient treatment setting for inmates who have acute symptoms of serious mental disorders or are suffering from significant or life-threatening disabilities. If no crisis beds are available at a prison, staff must place an inmate in a temporary housing location in the prison—known as *alternative housing*—pending admission to a crisis bed. Under these circumstances, policy requires prisons to transfer an inmate to a crisis bed at another prison if the other prison can provide the same level of custody and security.

Corrections' policies outline specific steps prison staff must take when they become aware of inmates' suicidal ideation, suicidal intent, or self-harm, which the text box defines. If prison staff become aware of any of these conditions, Corrections' policy requires that they place inmates under observation until mental health staff can conduct a suicide risk evaluation (risk evaluation). As we discuss in Chapter 1, mental health staff use these evaluations to determine inmates' risk of suicide and to make specific recommendations regarding the level of care required.

Corrections also has a policy that prison staff must follow when staff discover inmates who are attempting suicide. When responding to a suicide attempt in progress, Corrections' policy requires prison staff to sound an alarm to summon additional personnel, respond appropriately when blood is present, neutralize any significant security threats to themselves or others, and initiate life-saving measures consistent with training. When medical personnel arrive, they take over responsibility for the medical treatment and life-saving measures.

Following the admission of inmates to crisis beds as a result of suicide attempts, ideation, or self-harm, prison staff must complete various steps in order to provide treatment. Figure 4 provides a summary of these steps. For example, while inmates are in crisis beds, prison staff must keep them under observation. Depending on whether inmates are in immediate danger, staff must either

maintain continuous visual contact with them or perform checks at staggered intervals not exceeding once every 15 minutes. Further, while inmates are in crisis beds, prison staff must complete treatment plans. According to Corrections' policies, crisis-bed stays are supposed to last for up to 10 days, although inmates may stay longer with the approval of a prison's chief of mental health.

**Figure 4**
**Corrections' Process for Inmates' Admission to and Discharge From Crisis Beds**



Sources:  Corrections' 2009 program guide and related policy memos.

Corrections has taken certain actions to ensure that the prisons comply with its policies and to identify additional ways to prevent inmate deaths due to suicide. For example, Corrections has established its own Suicide Prevention and Response Focused Improvement Team (suicide prevention team) and established suicide prevention teams at each prison. The purpose of these teams is to provide staff with training and guidance with regard to suicide prevention, response, reporting, and review. The suicide prevention teams at each prison are also responsible for monitoring and tracking all self-harm incidents, suicide attempts, and deaths, as well as reviewing the prison's policies to ensure consistency with Corrections' policies. According to Corrections' policies, these teams must be composed of certain prison staff representing multiple disciplines, such as the chief psychologist and chief psychiatrist, and must meet once per month.

In addition, following each suicide, Corrections completes a review of the prison's compliance with policies and procedures, including examining the history of the inmate's mental health care while incarcerated and the prison's emergency response to the suicide. It describes the results of its review in a report (suicide report) that it provides to the prison. When warranted, Corrections makes recommendations to the prison to improve the quality of care and ensure compliance with its policies and procedures.

# Chapter 1

## PRISONS HAVE NOT FOLLOWED CORRECTIONS' POLICIES WHEN RESPONDING TO INMATES WHO HAVE ATTEMPTED OR ARE AT RISK OF ATTEMPTING SUICIDE

The four prisons we reviewed failed to consistently follow Corrections' policies for responding to, treating, and observing inmates who had attempted or were at risk of attempting suicide. For example, we found many instances in which prisons either did not perform or did not adequately complete required risk evaluations, even though mental health staff use these critical documents to determine the treatment inmates should receive. In addition, we identified numerous instances in which prisons did not include necessary information in inmates' treatment plans, potentially affecting the nature and timeliness of the care the inmates received. In fact, Corrections' reviews of inmate suicides and its own audits of the quality of both risk evaluations and treatment plans have found that prisons did not complete these documents to its required standards. Further, the four prisons may have placed inmates at risk of death by insufficiently monitoring them following suicide attempts, and some prisons failed to respond to suicide attempts in accordance with Corrections' policies.

### The Prisons We Reviewed Did Not Properly Evaluate Some Inmates' Suicide Risk

Risk evaluations are critical to successful suicide prevention because they help prisons identify inmates who are likely to attempt suicide and determine the treatments needed to prevent them from doing so. The proper completion of a risk evaluation can therefore be the difference between life or death for an inmate. Corrections' policies require that mental health staff complete risk evaluations under a number of circumstances, including when inmates have initial face-to-face evaluations for suicidal thoughts, threats, attempts, or self-harm, as well as before their discharge from crisis beds. When completing risk evaluations, mental health staff are to examine inmates' mental status and determine the presence or absence of chronic and acute risk factors for suicide. The text box includes examples of such risk factors. They must also review any protective factors that may mitigate inmates' risk of suicide, such as religious beliefs, family support, and participation

**Examples of Inmate Suicide Risk Factors**

**Chronic risk factors**

- History of suicide attempts
- History of emotional, physical, or sexual abuse
- Chronic pain problem
- Long or life sentence
- History of depressive or psychotic disorders
- History of certain mental illnesses
- History of substance abuse

**Acute risk factors**

- Suicidal thoughts
- Recent trauma
- Recent bad news
- Agitation or anger
- Hopelessness or helplessness
- Increasing interpersonal isolation
- Single cell placement

Sources: Corrections' 2009 program guide and suicide risk evaluation form.

in group activities. Finally, mental health staff must document whether inmates are at high, moderate, or low risk for suicide and make specific recommendations regarding the appropriate level of care. Mental health staff must also address how the treatment plan will be implemented and any required follow-up procedures.

*Despite the critical role risk evaluations serve, all four prisons we reviewed failed to complete at least one required risk evaluation.*

Despite the critical role risk evaluations serve, all four prisons we reviewed failed to complete at least one required risk evaluation. Specifically, for a selection of 40 inmates who attempted or committed suicide from 2014 through 2016, we reviewed the risk evaluations the prisons conducted just before or immediately following the suicide attempt or suicide, and the suicide reports Corrections completed following the suicides. We identified that the prisons should have completed risk evaluations for 36 of these 40 inmates. However, as Table 2 shows, 10 of the 36 inmates were missing at least one required risk evaluation. Although the four prisons offered a number of reasons for the missing risk evaluations, they generally agreed that they had failed to comply with Corrections' policies. For example, the chief of mental health of CCWF stated that risk evaluations are not always necessary for inmates discharged to a higher level of care because the receiving institutions will complete them on admission. However, she acknowledged that Corrections' policies require prisons to complete risk evaluations under these circumstances, and Corrections' clinical support chief affirmed that conducting risk evaluations on discharge to a higher level of care is helpful for continuity of care.

In addition to failing to complete certain risk evaluations, the four prisons completed inadequate risk evaluations for 26 of the 36 inmates we reviewed. Each of these 26 inmates received at least one inadequate risk evaluation, and 13 received more than one. The types of problems we identified varied. For example, mental health staff left blank sections of the risk evaluations for 10 inmates, including sections detailing their consideration of some risk factors and identifying whether the inmates had a desire or plan to die. These blank spaces suggest that the mental health staff may not have considered all relevant information when determining the likelihood of the inmates attempting suicide, which could have caused them to underestimate the inmates' suicide risk level.

Further, for 18 of the 36 inmates, mental health staff did not adequately justify their determinations of the inmates' suicide risk levels. Specifically, either they did not incorporate risk factors when justifying their determinations or they simply listed inmates' risk factors without considering their behaviors or symptoms. In some cases, mental health staff noted the presence of several risk factors and warning signs of imminent suicide risk, yet they still concluded that inmates were at low acute risk, which refers to short-term

fluctuations in inmates' risk of attempting suicide, without adequately documenting the rationale for their determinations. For example, one mental health staff member at SAC indicated that an inmate was at low acute risk for suicide, despite noting that he demonstrated five of the 10 warning signs of imminent suicide risk. The mental health staff member did not include any of these warning signs in the justification of risk, but rather noted that the inmate denied a desire to commit suicide. However, the mental health staff member also indicated that the inmate stated that talking about his suicidal ideation was difficult because he had no intention of ever going to a crisis bed. The inadequate justification for this inmate's risk determination suggests that the mental health staff member may not have considered all risk factors and therefore may have incorrectly estimated the inmate's risk of suicide—a problem that we found repeatedly in the risk evaluations we reviewed.

**Table 2**

**The Four Prisons We Reviewed Completed Inadequate Risk Evaluations**

| PRISON | NUMBER OF INMATES REVIEWED WHO REQUIRED ONE OR MORE RISK EVALUATIONS | NUMBER OF INMATES MISSING AT LEAST ONE REQUIRED RISK EVALUATION | NUMBER OF INMATES WITH ONE OR MORE INADEQUATE RISK EVALUATIONS |
|---|---|---|---|
| CCWF | 9 | 7 | 7 |
| CIW | 8 | 1 | 4 |
| RJD | 9 | 1 | 6 |
| SAC | 10 | 1 | 9 |
| Totals | 36 | 10 | 26 |

| PRISON | SPECIFIC PROBLEMS WITH THE RISK EVALUATIONS* (BY NUMBER OF INMATES) | | | |
|---|---|---|---|---|
| | SECTIONS IN RISK EVALUATION WERE BLANK | JUSTIFICATION OF RISK DETERMINATION WAS INCOMPLETE† | TREATMENT PLAN TO REDUCE RISK WAS MISSING OR INCOMPLETE† | STAFF USED INCONSISTENT OR INCOMPLETE INFORMATION ABOUT THE INMATE TO DETERMINE SUICIDE RISK |
| CCWF | 5 | 5 | 3 | 2 |
| CIW | 2 | 2 | 2 | 1 |
| RJD | 0 | 4 | 5 | 3 |
| SAC | 3 | 7 | 8 | 4 |
| Totals | 10 | 18 | 18 | 10 |

Sources: California State Auditor's review and analysis of health records for 10 inmates at each of the four prisons, Corrections' 2009 program guide, and other Corrections' policies.

\* We present the number of inmates who had risk evaluations with the problem listed. Some inmates had multiple inadequate risk evaluations, and some had risk evaluations that had more than one of the problems listed.

† We determined whether the justifications and risk reduction plans in the risk evaluations were complete based on whether they contained all required elements named in Corrections' suicide risk evaluation audits and mentoring documents.

The four prisons also failed to develop adequate plans for treatment within the risk evaluations for half of the inmates we reviewed. When completing risk evaluations, mental health staff must document treatments targeting modifiable risk factors, such as feelings of agitation, anger, or hopelessness. These treatments should be as specific as possible, leaving little room for misinterpretation or confusion. However, mental health staff failed to document such specific treatments in the risk evaluations for 18 of the 36 inmates we reviewed. For example, CIW's risk evaluation for an inmate that had just attempted suicide indicated that she demonstrated seven acute risk factors, including depression and agitation or anger. However, the mental health staff member did not prescribe treatment, noting only that the inmate should be observed and should continue her current medication. Prisons are not likely to be able to prevent inmates from attempting suicide without addressing the factors that increase their risk of doing so.

*Prisons are not likely to be able to prevent inmates from attempting suicide without addressing the factors that increase their risk of doing so.*

Further, for 10 of the inmates we reviewed, mental health staff completed risk evaluations based on inconsistent or incomplete information. For example, according to the suicide report Corrections completed following one inmate's suicide at SAC, mental health staff had completed for the inmate three different risk evaluations, which stated that he had certain protective factors in place to reduce his risk of suicide, including family support and good coping skills. However, a review of other documents in the inmate's file showed that he did not have these protective factors. Corrections stated in the suicide report that similarities among the three risk evaluations suggest that mental health staff copied the risk and protective factors from previous evaluations, resulting in an inaccurate picture of the inmate's mental health. Similarly, another one of Corrections' suicide reports stated that the final risk evaluation CIW completed before an inmate's suicide failed to note that she had a history of suicide attempts—a critical determinant of future suicide risk. According to the suicide report, the mental health staff member appeared to accept the inmate's denial of any prior suicide attempts and did not review the suicide attempt history documented in a previous risk evaluation.

Corrections offered some reasons for the prisons' failure to complete adequate risk evaluations. Specifically, its clinical support chief explained that mental health staff have heavy caseloads, which the four prisons we reviewed generally also indicated is a contributing factor. The clinical support chief stated that if prison management has not set clear expectations that suicide risk evaluations should be prioritized, mental health staff may rush to complete risk evaluations. She said prison management should help mental health staff by redirecting their workloads to allow

them to devote the necessary attention to complete adequate risk evaluations. She also stated that, despite existing training, mental health staff are still unsure of how to complete risk evaluations.

Despite its ability to point to reasons for deficiencies in risk evaluations, our review demonstrates that Corrections has not adequately addressed those factors, jeopardizing its ability to prevent inmate suicide attempts. In fact, for years mental health experts on suicide have called on Corrections to address many of the same problems we identified in our review. For example, a 2013 special master's report stated that for half of the suicide cases in 2011, prisons either did not complete risk evaluations or concluded that inmates had a low or "no appreciable" risk of suicide without adequate consideration of risk factors, past history, or medical records. Clinical experts that the special master engaged noted similar problems with risk evaluations each year through 2014, when they concluded that the prisons had either failed to conduct or had inadequately completed risk evaluations in almost 70 percent of the suicide cases that occurred that year. Further, beginning in November 2013 and continuing through July 2014, the suicide expert reviewed each prison's suicide prevention practices and found that mental health staff often did not complete required risk evaluations and that the quality of risk evaluations was frequently problematic. Specifically, the suicide expert's review of hundreds of risk evaluations found that many contained risk factors and protective factors that did not align with the mental health staff's assessments of the inmates' risk levels.

> *For years mental health experts on suicide have called on Corrections to address many of the same problems we identified in our review.*

Although Corrections has taken actions in response to these findings, those actions have not resulted in significant change. For example, in 2013 Corrections issued policies requiring mental health staff to attend a seven-hour training and, every two years, undergo a mentoring program that focuses on administering risk evaluations. The mentoring program involves trained mentors observing mental health staff conducting one or more risk evaluations, assessing their skills, and when needed, providing training on the proper techniques for completing risk evaluations. However, as the reports cited demonstrate, neither the training nor the mentoring program ensured that mental health staff adequately completed risk evaluations. The suicide expert noted that mental health staff were required to complete only two risk evaluations under the supervision of a mentor and that they received no additional critiques until they had to undergo the mentoring program two years later. Based on his recommendations, Corrections modified its policy in early 2016 to, among other things, require that prisons audit risk evaluations for each mental health staff member twice each year, and to require that those who failed the audit repeat the mentoring program.

Although we agree that this change was necessary to improve oversight of risk evaluations, room for further improvement in both the policy and its implementation remains. Specifically, Corrections' risk evaluation audits permit a degree of failure. Figure 5 shows the process prisons use when completing the audits to determine whether mental health staff members need additional mentoring. During the audit, program supervisors review seven items—which Table 3 lists—that must be in a risk evaluation. Corrections' policy requires that mental health staff correctly complete six of the seven items to pass the audit.

**Figure 5**

**Corrections' Process for Determining Whether Mental Health Staff Require Additional Mentoring on Completing Risk Evaluations**



Twice each year the prison audits one randomly selected suicide risk evaluation for every staff member who completes risk evaluations.

The audit reviews seven items, and the staff member must adequately complete at least six to pass.

✓ PASS          FAIL ✗

The prison audits a second suicide risk evaluation.

✓ PASS          FAIL ✗

The prison audits a third suicide risk evaluation.

✓ PASS          FAIL ✗

No further action is taken until the next audit cycle.          The prison refers the staff member to repeat the mentoring program.

Sources: Corrections' health care division's March 15, 2016, memorandum revising its risk evaluation mentoring program and Corrections' instructions for completing the risk evaluation audit.

However, as a result, a mental health staff member could fail to complete an important section in a risk evaluation, such as detailing the inmate's history of suicide attempts or describing the risk reduction plan, and still pass. Corrections' clinical support chief said that Corrections does not require that mental health staff obtain 100 percent because it does not expect perfection and because if too many failed the audit, it would not have enough mentors to complete the necessary mentoring. She also identified all but one item in the audit—the identification of sources of information— as critical. Nevertheless, listing the sources of information is important to ensure that mental health staff are considering all critical sources of information when evaluating an inmate's risk factors. In response to our concerns, Corrections' clinical support chief explained that Corrections could make passing certain items within the audit mandatory. However, because of the importance of each section of the risk evaluation, we believe requiring mental health staff to adequately complete all sections is essential for reducing the risk of inmate suicide.

**Table 3**

**Items of a Risk Evaluation and Corrections' Corresponding Audit Criteria**

| RISK EVALUATION ITEM | RISK EVALUATION AUDIT CRITERIA | |
|---|---|---|
| | AUDIT ITEM | DESCRIPTION |
| Check boxes indicating the presence or absence of chronic and acute suicide risk factors. | 1 | Are all risk factor boxes checked? |
| Check boxes indicating the presence or absence of protective factors that mitigate suicide risk. | 2 | Are all protective factor boxes checked? |
| Check box indicating whether inmate has a history of suicide attempts. | 3 | Is the item complete? |
| Include details of previous suicide attempts. | 4 | If the inmate has a history of suicide attempts, did the staff member detail those attempts? |
| Include the sources of information used to complete the risk evaluation, such as inmate interview, staff interview, or mental health file review. | 5 | Did the staff member document the sources of information used? |
| Describe the justification of risk determination. | 6 | Are both chronic and acute risk levels checked and justified in the narrative, citing the presence or absence of identified risk factors, protective factors, and warning signs? |
| Describe the safety/risk reduction plan. | 7 | Did the staff member incorporate the identified modifiable risk factors, protective factors, and warning signs into a risk reduction plan? |

Sources:  Corrections' risk evaluation form and its risk evaluation audit criteria.

*Although prisons reported that 71 percent of risk evaluations systemwide met the audit criteria from December 1, 2016, through May 31, 2017, it is still far below Corrections' established goal of 90 percent.*

Corrections has similarly set the bar too low for the percentage of prisons' risk evaluations that must pass the risk evaluation audit—90 percent—yet it has still struggled to meet its own standards. According to Corrections' mental health administrator for quality management and inpatient facilities (quality administrator), the prisons report to Corrections the percentage of mental health staff members who passed the risk evaluation audit each month. A June 2017 Corrections report shows that from December 1, 2016, through May 31, 2017, prisons reported that 71 percent of risk evaluations systemwide met the audit criteria. Although this is a marked improvement from the prisons' performance each 2014 and 2015—Corrections' reports show that only 38 percent of the risk evaluations audited passed during that two-year period—it is still far below Corrections' established goal of 90 percent. However, even if Corrections achieved its goal, mental health staff would still have adequately completed only nine out of 10 risk evaluations. We believe that this is an unacceptable level of failure, given the potential consequences of deficient risk evaluations.

Corrections also sets its completion standards too low for the percentage of risk evaluations that each prison should complete on time. According to the quality administrator, Corrections uses an automated process to track the percentage of risk evaluations that each prison completes on time and requires prisons that score lower than 85 percent to develop an action plan for improvement. According to Corrections' reports, from December 1, 2016, through May 31, 2017, the prisons collectively achieved a score of 92 percent for being on time. The quality administrator said that it set the goal at 85 percent because that is a standard goal for health care processes. However, given that the timely completion of risk evaluations is critical to ensuring that inmates receive prompt and necessary treatment to reduce their risk of suicide, we believe Corrections should find it unacceptable for more than one in 10 inmates to not receive a risk evaluation on time.

Corrections could improve the quality of its risk evaluations by updating its electronic risk evaluation form. In our review of risk evaluations at RJD, we found that the prison had included prompts to aid the mental health staff member in completing the form. For example, in the section for documenting the treatment to reduce the inmate's risk, the prison included text instructing mental health staff to document treatment interventions for those risk factors that can be treated, which are referred to as *modifiable risk factors*. We found that this risk evaluation met all of the requirements of the risk evaluation audit. Although this was the only risk evaluation that we reviewed at RJD that contained these prompts, according to RJD's chief psychologist, the prison began including these prompts in early 2016 and she believed that they had contributed to an improvement in risk evaluations. Consistent with the chief's

statement, Corrections' risk evaluation audit reports showed that the percentage of RJD's risk evaluations that passed the audit increased from 77 percent in January 2016 to 100 percent in March 2017. Corrections' clinical support chief agreed that such prompts would be beneficial, and that Corrections could incorporate them into the risk evaluation forms in its electronic health record system.

### Prison Staff Failed to Establish Treatment Plans for Some Inmates, and the Plans They Established for Others Were Inadequate

According to the suicide expert, treatment planning is a critical element of any correctional system's suicide prevention program. A treatment plan is based on a comprehensive assessment of an inmate's physical, mental, emotional, and social needs and must include the goals of treatment and identify the treatment methods prison staff will use. State regulations and Corrections' policies require that the admitting staff develop a provisional diagnosis and a plan for initial treatment (initial treatment plan) within 24 hours of an inmate's admission to a crisis bed. In addition, state regulations and Corrections' policies require that an inmate's treatment team—which must include, at a minimum, a crisis-bed psychiatrist, a crisis-bed clinician, nursing staff, a correctional counselor, and the inmate if appropriate—complete a treatment plan within 72 hours of the inmate's admission to a crisis bed (72-hour treatment plan). The text box describes selected information state regulations require in a 72-hour treatment plan.

> **Selected Requirements for a 72-Hour Treatment Plan**
>
> - All mental health diagnoses.
>
> - Prescribed medication, dosage, and frequency of administration.
>
> - Treatment goals with interventions, actions toward improvement, and measurable objectives.
>
> - Treatment methods to be used, including the frequency of the methods and the persons or disciplines responsible for each method.
>
> - Goals for aftercare and a plan for post-discharge follow-up.
>
> Source: California Code of Regulations, Title 22, Section 79747.

Despite the importance of treatment plans, three of the four prisons we reviewed did not always comply with state regulations and Corrections' policy that require prison staff admitting inmates to crisis beds to develop an initial treatment plan within 24 hours. Corrections' policies state that this initial treatment plan should contain a provisional diagnosis and an initial plan for treatment. Although this is Corrections' only written requirement regarding initial treatment plans, its clinical support chief explained that she would expect an initial treatment plan to contain an admitting diagnosis, reason for admission, a description of symptoms, and immediate interventions to address those symptoms and target the reason for admission. However, mental health staff did not complete such plans for four of the 26 inmates who should have had them at the four prisons we reviewed. Because Corrections' policies state that inmates must be discharged from crisis beds within 10 days, unless otherwise approved for a longer stay, inmates

without initial treatment plans may not have a treatment plan for up to 30 percent of their stays in crisis beds—until the 72-hour treatment plan is complete.

In addition, one of the prisons we reviewed failed to comply with state regulations and Corrections' policies for completing 72-hour treatment plans. As Table 4 shows, we reviewed 25 files for inmates who attempted or committed suicide from 2014 through 2016 who should have had 72-hour treatment plans following their admission to crisis beds at the four prisons. We found that mental health staff completed 23 of these 72-hour treatment plans. However, CCWF's mental health staff did not complete a 72-hour treatment plan for two inmates, but rather completed a separate supplemental section, which does not serve as the 72-hour treatment plan. CCWF's chief of mental health acknowledged that when she assumed her position in mid-2015, mental health staff were not completing all sections of the 72-hour treatment plans. She could not provide an explanation for this deficiency because she was not familiar with the guidance mental health staff had received at that time; however, she stated that after she noticed the practice, she reminded mental health staff that they needed to complete all sections of the 72-hour treatment plans.

**Table 4**

**Problems With 72-Hour Treatment Plans at the Four Prisons We Reviewed**

|  | PRISON | | | | |
| --- | --- | --- | --- | --- | --- |
|  | CCWF | CIW* | RJD | SAC | TOTAL |
| **Number of inmates who...** | | | | | |
| ...should have had a 72-hour treatment plan | 9 | 7 | 5 | 4 | 25 |
| ...did not receive a 72-hour treatment plan | 2 | 0 | 0 | 0 | 2 |
| ...received a 72-hour treatment plan | 7 | 7 | 5 | 4 | 23 |
| **Missing or incomplete items on the treatment plans reviewed** | | | | | |
| Mental health diagnoses | 0 | 0 | 0 | 0 | 0 |
| Medication dosage and frequency | 1 | 4 | 4 | 3 | 12 |
| Treatment goals with interventions and measurable objectives | 1 | 0 | 0 | 2 | 3 |
| Treatment methods, including frequency and persons responsible for each method | 7 | 4 | 5 | 4 | 20 |
| Post-discharge follow-up plan | 5 | 5 | 3 | 4 | 17 |

Sources: California State Auditor's analysis of mental health records for selected inmates at each of the four prisons reviewed, Corrections' 2009 program guide, and California Code of Regulations Title 22, Section 79747.

* Staff at CIW completed one treatment plan more than 72 hours after the inmate was admitted to a crisis bed.

Moreover, none of the 23 completed 72-hour treatment plans we reviewed were adequate based on the elements state regulations require. For example, many of the 72-hour treatment plans were missing either the treatment methods, the frequency at which the treatment methods should be completed, or who was responsible for administering the methods. Without this information, inmates may not receive necessary treatment from the correct providers at appropriate intervals. In addition, many of the 72-hour treatment plans we reviewed had missing or incomplete discharge follow-up plans. It is vital that the treatment teams begin planning for inmates' care following discharge from crisis beds as soon as possible because Corrections' policies state that crisis-bed stays should be 10 days or fewer, although crisis-bed stays may surpass 10 days with the approval of the prison's chief of mental health or a designee.

Further, some 72-hour treatment plans we reviewed had multiple deficiencies. For example, one 72-hour treatment plan at SAC—for an inmate admitted to a crisis bed after a suicide attempt in 2016—lacked specific treatment interventions, the frequency of treatment, and a discharge plan. Additionally, the prison's mental health staff left several other sections of this plan blank, such as a statement of the inmate's mental condition and descriptions of the long-term goals of the inmate and of the inmate's participation in the treatment planning process. When we inquired, prison officials at SAC stated that this treatment plan was not acceptable and that management would address the deficiencies with the mental health staff member.

Corrections has been aware for years that its 72-hour treatment plans were inadequate, because multiple experts have reached this conclusion. For instance, a 1999 special master's monitoring report found that several treatment team meetings failed to develop realistic and meaningful 72-hour treatment plans at one prison. The same report noted that another prison did not hold any treatment team meetings in the crisis-bed unit. Further, a special master's review of inmate suicides that occurred in the second half of 2012 determined that the prisons had provided inadequate 72-hour treatment plans for about 33 percent of the inmates who committed suicide, while a similar special master's review of inmate suicides that occurred in 2014 found that this number had risen to over 65 percent. Finally, the suicide expert found continued problems with the adequacy of treatment planning for patients identified as suicidal at all 18 prisons that he reviewed in his 2016 report on suicide prevention practices.

*Corrections has been aware for years that its 72-hour treatment plans were inadequate, because multiple experts have reached this conclusion.*

To address concerns related to treatment planning, Corrections stated that it implemented an internal audit of the quality of the 72-hour treatment plans beginning in September 2013. Every quarter, each prison must audit a random sample of 15 of its 72-hour treatment plans per institutional program, which includes

crisis beds. In these audits, the reviewers are instructed to examine 15 crucial aspects of the 72-hour treatment plans, including whether the interventions are measurable and specify frequency and duration, as well as whether the goals for the inmates are correlated to problems and interventions. According to Corrections' quality administrator, a plan must meet 13 of the 15 criteria in order for a treatment plan to pass the internal audit. She also stated that if the audits identify a systemic problem in a program or prison, the prison must work with Corrections' staff to create a corrective action plan that the prison must then submit to Corrections.

These audits found varying levels of treatment plan quality from 2014 through 2016 at the four prisons we reviewed. According to Corrections' reports, its overall monthly rate of 72-hour treatment plans that met the audit criteria from 2014 through 2015 fluctuated between 0 percent and 67 percent, with no treatment plans meeting the audit criteria for 14 of these 24 months. According to the quality administrator, none of the audited plans met the criteria during these months because the audits were new and the standards were fairly high. In the second half of 2016, the overall monthly rate of treatment plans that met audit criteria fluctuated from 55 percent to 68 percent. However, in at least one month, all four prisons we reviewed had lower percentages of treatment plans that met the audit criteria than Corrections' overall rate. In fact, in July 2016, only 33 percent of SAC's audited treatment plans met the audit criteria. The quality administrator stated that the prisons have continued to struggle to pass the audits because Corrections had examined only the timeliness of 72-hour treatment plans before 2014. She explained that mental health staff should now be more aware of the standards as the result of several trainings. However, Corrections has had regulations in effect since 1996 that specify what a 72-hour treatment plan should include. Therefore, Corrections' mental health staff should have already been aware of these requirements.

As part of this audit, we were also requested to determine whether CIW allows inmates identified as suicidal to have access to inmate program activities or movements, such as yard time. The chief of mental health at CIW explained that it had always been CIW's policy to allow inmates in crisis beds access to yard time; however, prior to this audit, privileges for inmates would only be documented in treatment plans if access to these privileges was restricted in any way. He further described that any records of yard privileges for inmates in crisis beds would have been maintained by a recreation therapist separate from the treatment plan; however, CIW was unable to provide these records for the six inmates we reviewed. Thus, we were unable to determine whether these inmates had access to privileges like yard time. As a result of our audit, CIW stated that it has verbally instructed staff to improve their

*It had always been CIW's policy to allow inmates in crisis beds access to yard time; however, prior to this audit, privileges for inmates would only be documented in treatment plans if access to these privileges was restricted in any way.*

documentation regarding inmate privileges such as yard time by indicating in treatment plans whether inmates have access to such privileges or by justifying why the inmates do not. Furthermore, in response to the suicide expert's recommendation, Corrections updated its policies in June 2016 to allow inmates in crisis beds to have access to phone and visitation privileges equal to the privileges the inmates would have when not in a crisis bed—privileges which inmates in crisis beds at CIW were previously not allowed to have.

In conducting our audit work, we observed that some inmates faced delays in being placed in a crisis bed. Specifically, in certain cases, inmates must await assignment to crisis beds because only a limited number of these beds are available. Corrections' policies require that inmates awaiting crisis beds be assigned to alternative housing, which is meant to be short-term and can include large holding cells or other housing where complete and constant visibility can be maintained. Inmates must be transferred out of alternative housing within 24 hours and, according to CCWF's chief of mental health, alternative housing should provide a crisis-bed level of care. Thus, we expected that inmates who remain in alternative housing for more than 24 hours would receive the same documentation of care as inmates in crisis beds, including initial and—if necessary—72-hour treatment plans. However, Corrections' clinical support chief for mental health stated that mental health staff complete treatment plans when inmates enter a new level of care and that alternative housing is a temporary placement rather than a level of care. She explained that completing treatment plans for inmates in alternative housing is not practical for various reasons, including that most alternative housing settings lack space to conduct confidential treatment plan meetings and not all members of the treatment team are required to see inmates in alternative housing. She also stated that inmates receive their standard medications while in alternative housing and that psychiatrists can order additional medication as necessary. Although these explanations appear to be reasonable, we remain concerned that Corrections has not always transferred inmates out of alternative housing within 24 hours.

*In conducting our audit work, we observed that some inmates faced delays in being placed in a crisis bed.*

For example, in a 2016 monitoring report, the special master found that 47 percent of CIW's alternative housing stays and 36 percent of RJD's alternative housing stays during the review period exceeded 24 hours. Our findings are similar to those of the special master. Specifically, 10 of 40 inmates we reviewed remained in alternative housing for more than 24 hours. For instance, one inmate was in alternative housing for approximately six days following a suicide attempt before being admitted to a crisis bed. Because she was discharged from the crisis bed about seven days after her admission, nearly half of her time at a crisis-bed level of care was spent in alternative housing. Of even greater concern,

*Two inmates assigned to alternative housing ultimately committed suicide after not being admitted to crisis beds based on the mental health staff's assessments of their mental health.*

two inmates assigned to alternative housing ultimately committed suicide after not being admitted to crisis beds based on the mental health staff's assessments of their mental health. Both of these inmates committed suicide within two weeks of discharge from alternative housing.

In order to address the fact that some inmates spend more than 24 hours in alternative housing while waiting to transfer to a crisis bed, Corrections submitted a budget change proposal for the 2017–18 fiscal year, requesting the construction of 100 new crisis beds. It is Corrections' belief that adding additional crisis beds will help alleviate the issue of inmates spending more than 24 hours in alternative housing, because many of the inmates that spend more than 24 hours in alternative housing do so because no crisis beds are available. The Legislature approved Corrections' request for 100 new crisis beds in its 2017–18 budget. According to the deputy director of the statewide mental health program, the 100 crisis beds should be sufficient; however, sufficiency assumes that the needs of Corrections' inmate population will not change in ways that will require additional crisis beds. Also, Corrections has the ability to monitor alternative housing stays that exceed 24 hours as a part of its audit process, which we discuss in Chapter 3.

### Prison Staff Did Not Sufficiently Monitor At-Risk Inmates or Respond to Suicide Attempts as Corrections' Policies Require

At all four prisons we reviewed, we observed deficiencies in the prisons' efforts to monitor inmates who were at risk of committing suicide. Staff at each of the four prisons failed to appropriately observe inmates within the required time interval, giving inmates greater opportunities to injure themselves with potentially lethal results. Further, we found instances where prison staff prefilled observation logs and did not stagger the timing of checks. In addition, Corrections has determined that prison staff did not always respond appropriately upon discovering that inmates had attempted to commit suicide. Specifically, Corrections' reviews of inmate suicides found that prison staff sometimes failed to bring required life-saving equipment to the scene, did not appropriately relieve pressure on three hanged inmates' airways, and did not always promptly summon medical responders. Although Corrections agreed that these issues are problematic, it has only recently taken steps to address them.

*Prison Staff Did Not Always Monitor Inmates at High Risk of Suicide as Corrections' Policies Require*

Our review found that the four prisons have not always performed timely and appropriate checks of inmates placed on suicide precaution. As the text box shows, Corrections has established specific policies for monitoring inmates at risk of suicide, depending on whether they are in immediate danger of self-harm. Because suicide watch entails continuous, direct visual observation of inmates, we could not confirm through a review of watch logs whether this type of observation occurred. Instead, we focused our review on suicide precaution logs, which indicate when prison staff conducted their staggered behavior checks of inmates. Corrections' policy requires prison staff to stagger their behavior checks of inmates on suicide precaution in intervals not to exceed 15 minutes. According to the chief nursing executive at CCWF, the purpose of staggering behavior checks is to ensure that inmates are not able to anticipate when checks will occur and hurt themselves between checks. Nonetheless, the records for 19 out of 25 inmates we reviewed who were placed on suicide precaution indicated they did not always receive staggered behavior checks. Table 5 on the following page presents the problems we identified with suicide precaution checks at the four prisons we reviewed. When prison staff do not stagger the timing of their behavior checks of inmates on suicide precaution, they increase the risk that inmates will be able to injure themselves, perhaps fatally.

> **Suicide Watch and Suicide Precaution**
>
> When inmates are in crisis beds because of suicide risk and are in immediate danger of self-harm, they are placed on suicide watch, which entails the following:
>
> - They are allowed only a no-tear smock or gown, a safety mattress, and a no-tear blanket. All furniture is removed.
>
> - Staff must provide continuous, direct visual observation as well as nursing checks every 15 minutes.
>
> When inmates are in crisis beds because of a high risk of attempting self-harm but are not in immediate danger, they are placed on suicide precaution, which entails the following:
>
> - If they are at higher risk, they are allowed only a no-tear smock or gown, a safety mattress, and a no-tear blanket. If they are at lower risk, they are allowed certain clothing, reading and writing materials, and toiletries. Mental health staff must use their clinical judgment when allowing inmates access to these items.
>
> - Staff must conduct staggered behavior checks of the inmate in intervals not to exceed 15 minutes.
>
> Source: Corrections' 2009 program guide.

Table 5 on the following page shows that the prisons we reviewed did not always conduct suicide precaution behavior checks in a timely manner and that, for several inmates, prison staff prefilled or preprinted the observation logs. All four prisons exceeded the maximum requirement of 15-minute intervals between checks for some inmates, with several intervals at SAC and CCWF exceeding 20 minutes. In one particularly egregious example, prison staff at CCWF checked on an inmate on suicide precaution 90 times, but exceeded 15 minutes between checks more than 35 times, with one gap lasting longer than one hour. Further, we found that staff appeared to prefill times for checks on observation logs for eight of the 19 inmates on suicide precaution that we reviewed in prisons that used paper logs, rather than electronic logs. For example, we found several instances of logs with preprinted observation times for three inmates on suicide precaution who required staggered

Case 2:90-cv-00520-KJM-DB   Document 6768-1   Filed 07/15/20   Page 48 of 113

checks. We also identified logs that listed observation times after inmates had been discharged, suggesting the logs were prefilled. This strongly suggests that staff may not have actually conducted visual observation at the times the logs indicate, and may not have conducted the observations at all.

**Table 5**

**Problems With Monitoring of Inmates on Suicide Precaution at the Four Prisons We Reviewed**

| PRISON | NUMBER OF INMATES OUT OF 10 ON SUICIDE PRECAUTION | INMATES ON SUICIDE PRECAUTION WHO DID NOT RECEIVE STAGGERED CHECKS | | INMATES ON SUICIDE PRECAUTION WHO RECEIVED CHECKS WITH INTERVALS GREATER THAN 15 MINUTES | | NUMBER OF INMATES WITH LOGS NOT COMPLETED APPROPRIATELY (I.E. PREFILLED OR PREPRINTED) | TOTAL NUMBER OF SUICIDE PRECAUTION RECORDS REVIEWED THAT HAD AT LEAST ONE OF THE ISSUES IDENTIFIED IN THIS TABLE |
|---|---|---|---|---|---|---|---|
| | | NUMBER | PERCENTAGE | NUMBER | PERCENTAGE | | |
| CCWF* | 7 | 6 | 86% | 6 | 86% | 2* | 7 |
| CIW* | 7 | 6 | 86 | 2 | 29 | 1* | 6 |
| RJD | 5 | 4 | 80 | 4 | 80 | 2 | 5 |
| SAC | 6 | 3 | 50 | 5 | 83 | 3 | 6 |
| **Totals** | 25 | 19 | 76% | 17 | 68% | 8 | 24 |

Sources: California State Auditor's review and analysis of health records for 10 inmates at each of the four prisons, Corrections' 2009 program guide, and Corrections' other policies.

* CCWF and CIW transitioned to an electronic health record system in October 2015, and suicide precaution checks are now recorded electronically in this system. Therefore, we could only test for prefilling/preprinting for four of the seven inmates on suicide precaution at CCWF and six of the seven inmates on suicide precaution at CIW.

Officials at the four prisons agreed that suicide precaution observations have been problematic. The chief of mental health at CCWF stated that checks might have been late or not appropriately staggered in the past because staff did not understand how to implement staggered checks. She also explained that staff shift changes can cause intervals between checks that exceed 15 minutes and that staff are sometimes unable to conduct checks at the required times because they are engaged with other inmates. Prison staff at SAC indicated that the prison used preprinted forms in the past to help nurses stagger their checks but stopped this practice after the suicide expert's 2015 report stated that they were inappropriate. Further, they explained that SAC now conducts spot checks of its suicide precaution logs.

Although prison officials indicated the implementation of Corrections' new electronic health record system should reduce some of the issues we found, we still identified problems in the prisons that have implemented the system. According to Corrections' January 2016 report titled *An Update to the Future of California Corrections*, the electronic health record system allows providers to more efficiently prescribe treatment, maintain or

strengthen continuity of care, work cohesively with other treatment team members, and monitor inmate progress. Both CCWF and CIW implemented the system in October 2015, whereas Corrections' remaining prisons are in various stages of transitioning to the new system, with Corrections estimating that all prisons will have implemented it by October 2017. Prison officials at CCWF and CIW indicated that the shift to the new system has improved compliance with their monitoring of suicidal inmates because providers can order the behavior checks and set when they are due. However, we still found instances in which staff did not stagger behavior checks after CIW and CCWF implemented the system, and the checks continued to occur at predictable intervals. Corrections' chief psychologist of quality management and informatics asserted that he believed it is difficult in practice for mental health staff to mentally track every patient they are monitoring and plan to stagger the behavior checks. The continued problems we observed with staggering behavior checks suggest that Corrections needs to increase training for mental health staff on how to properly stagger such checks.

Additionally, out of the four prisons we reviewed, SAC and RJD did not regularly check on the welfare of inmates in certain housing units as required by Corrections' policies. The policies require that prison staff regularly observe all inmates placed in certain housing units.[4] These checks, known as security welfare checks, should occur at staggered intervals twice an hour, with the intervals not exceeding 35 minutes. However, the security welfare check data show that SAC and RJD did not conduct these checks as required. For example, four of the 10 inmates we reviewed at SAC were in segregated housing units, yet none appeared to have received timely security welfare checks on the days they either committed or attempted to commit suicide. For one of these inmates, SAC could not provide any evidence demonstrating the welfare checks occurred at all. For another inmate, the security welfare check log shows some intervals between checks were longer than an hour on the day the inmate committed suicide. According to a Corrections' suicide report, when staff discovered the inmate's body, more than 50 minutes had elapsed since the last check. As these examples clearly show, when they do not check on inmates as required, prison staff may miss opportunities to prevent inmates from injuring themselves or attempting to commit suicide.

Although Corrections has recently taken steps to ensure that prisons comply with the suicide precaution and security welfare check policies, it is too soon to determine the effectiveness of

*Out of the four prisons we reviewed, SAC and RJD did not regularly check on the welfare of inmates in certain housing units as required by Corrections' policies.*

---

[4] Inmates may be removed from a prison's general population and placed in segregated housing for various reasons, including that they pose an immediate threat to the safety of others.

these actions. In particular, the suicide expert recommended in his January 2015 report that Corrections enforce its policies regarding behavior checks at staggered intervals not to exceed 15 minutes between checks for inmates on suicide precaution. In response to this recommendation, Corrections issued a memorandum in March 2016 reiterating policies for inmates placed in crisis beds, including the requirements for observing inmates on suicide precaution. Additionally, Corrections' quality administrator explained that it is developing an audit process that it plans to implement statewide for reviewing prisons' compliance with its policies and procedures. Corrections' regional teams will conduct this process, and it will include a review of suicide precaution logs and security welfare check logs. We describe this audit process in more detail in Chapter 3. Further, she indicated that as part of this audit process, Corrections is developing automated monitoring of suicide precaution checks in its electronic health record system to ensure compliance with Corrections' policies. However, since Corrections has not yet finalized its development of the audit process, including the automated monitoring, it is too early to determine its effectiveness.

*We found that mental health staff at CCWF, RJD, and CIW did not always make required daily progress notes for inmates in crisis beds.*

Finally, we found that mental health staff at CCWF, RJD, and CIW did not always make required daily progress notes for inmates in crisis beds. Corrections' policies require mental health staff to assess and monitor on a daily basis the condition of inmates who are in crisis beds. According to the policies, mental health staff must document these daily contacts within 24 hours. However, four inmates we reviewed at CCWF, two inmates at RJD, and two inmates at CIW did not receive daily progress notes for at least one day while in crisis beds. Without these notes, prison staff are hindered in their ability to assess inmates' progress and determine whether they should be either discharged or referred to a higher level of care. For example, an inmate at CCWF spent over 20 days in a crisis bed before she was discharged—more than twice as long as Corrections' policies specify—yet she did not receive progress notes for several of the additional days. Had staff completed the daily progress notes, this inmate might have received the treatment she needed in a timelier manner. The chief of mental health at CCWF could not explain why staff did not make these progress notes. The quality administrator stated that Corrections does not currently monitor prisons' compliance with requirements for daily progress notes for inmates in crisis beds but is open to incorporating such monitoring into its audit process once all prisons have transitioned to the electronic health record system in October 2017.

*Corrections' Suicide Reports Are Not Always Timely and Have Identified Various Concerns Regarding Prisons' Compliance With Emergency Response Requirements*

One of the experts engaged by the special master noted that the suicide review process and the issuance of suicide reports on each inmate suicide is one of the strengths of Corrections' suicide prevention program. However, of the 16 suicide reports that we reviewed, Corrections completed nine later than the 60 days following a suicide that its policy requires. In two instances, Corrections took 137 days to complete a report—more than double the timeline established in its policies. Corrections' clinical support chief attributed two of the late reports to a shortage of resources caused by a large number of suicides that occurred over a short time frame, while she explained that several others were late due to the complexities of the necessary reviews. However, she stated that delays in completing a suicide report would not delay Corrections from informing a prison of an urgent problem that needed immediate attention; in such cases, while reviewers are still on-site, they would inform the prison of the issue. Nevertheless, we believe that it is critical that Corrections complete these reports as expeditiously as possible because they are a crucial tool for identifying problems with the prisons' clinical care and compliance with policies and procedures, including their emergency responses to suicides.

In fact, several suicide reports we reviewed identified that prison staff have not always complied with Corrections' requirements and state regulations for how to respond to suicide attempts. For instance, state regulations and Corrections' policy require that a cut-down kit be immediately accessible in each housing unit of a prison and that staff use the kit in cases of attempted hangings. The text box lists the cut-down kit's required contents—several of which can be used to provide life-support care or clear an obstruction to an airway—which Corrections has identified as being critical to saving the life of inmates who attempt suicide by hanging. However, of the 15 suicides by hanging that we reviewed, Corrections' suicide reports noted three instances in which responders did not indicate having or using all or part of a cut-down kit. For example, one suicide report found that prison staff immediately responding to the hanging did not use a resuscitator at the scene of the emergency. Rather, the report found that prison staff indicated the resuscitator was used after the inmate had been transported away from the scene of the emergency.

> **Contents of a Cut-Down Kit**
>
> A cut-down kit must be kept in a lockable metal box maintained within each housing unit and must contain the following:
>
> - An inventory list affixed to the inside of the box door.
> - One emergency cut-down tool.
> - One single patient use resuscitator.
> - One CPR mask.
> - A minimum of 10 latex gloves.
> - A disposable oral airway.
>
> Source: Corrections' 2009 program guide.

Corrections offered several possible explanations for why prison staff may not have carried or used the entire kit when responding to suicide attempts. According to an associate warden for the Division of Adult Institutions' mental health compliance team (compliance team associate warden), staff who did not bring an entire cut-down kit may have had any missing items elsewhere on their persons or used their required training to perform the necessary life-saving measures. She also noted that the kits' storage locations in some units may have restricted staff's access to them. For example, she explained that some housing units store kits in secured control booths, even though the booth windows may not be large enough for the required metal boxes to pass through. According to the compliance team associate warden, this limitation has resulted in prisons using various bags, buckets, or other storage devices to store cut-down kits—all of which deviate from Corrections' policy that prisons store kits in lockable metal boxes.

Corrections is aware of the problems related to the storage of the cut-down kits and is in the process of taking steps to address them. Specifically, the clinical support chief for mental health indicated that Corrections had formed a workgroup to address keeping the kits in bags rather than boxes so that they could be more easily stored in secured areas. The compliance team associate warden also explained that her team is in the process of developing a memo to update Corrections' policies on when to use cut-down kits and how prison staff should maintain them. According to the compliance team associate warden, the memo will make some significant changes to Corrections' current policies, including requiring that prisons keep all cut-down kit items together in a durable bag and that prison staff bring the kits to suicide attempts by asphyxiation in addition to hangings. It will also emphasize that staff must transport the entire kit to the scene of an emergency. The compliance team associate warden expects that Corrections will finish and implement the memo by August or September 2017. Without such changes to its policies, Corrections risks additional instances of prison staff not having the entire kit at a moment when it could potentially save an inmate's life.

*Without changes to its policies, Corrections risks additional instances of prison staff not having the entire kit at a moment when it could potentially save an inmate's life.*

Corrections' suicide reports also note other issues with prisons' emergency response, and the suicide review process can result in changes to emergency response preparedness. For example, two suicide reports identified issues with the timing of summoning medical responders. Corrections addresses these types of issues by including recommendations in its suicide reports, which the prisons are responsible for implementing. Furthermore, Corrections' policy requires specific staff to follow up with prisons to ensure that they implement the recommendations. To address several issues related to their emergency responses, the prisons involved submitted to Corrections evidence that they had provided additional training

to their staff, which we believe is appropriate. In another example, three suicide reports identified concerns with staff not relieving pressure on an inmate's airway when the inmate was discovered hanging. However, CIW identified that prison staff involved in one of these incidents had most recently received suicide prevention training roughly six months before the suicide, but that the training did not provide specific instruction on relieving tension on the inmate's body by using a stable object for support. We find it concerning that Corrections omitted this critical information from this training, as its mental health policies have specified since 2009 that responding prison staff must relieve pressure on the inmate's airway. In 2016 Corrections updated its suicide prevention training to include instruction to support the inmate's airway. Corrections' clinical support chief stated that the information should have been included in previous versions of the training and that its omission was an oversight. She explained that the information was likely missing from previous versions of the training because when her team revised the training they focused on adding new issues rather than reviewing the training to ensure that all of the necessary information was included. She further explained that she was surprised to find that the information was missing, because the same team that assembled the 2009 program guide with Corrections' policies put together the training.

## Recommendations

### Legislature

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress toward meeting its goals related to the completion of risk evaluations in a sufficient manner.

- Its progress toward meeting its goals related to the completion of 72-hour treatment plans in a sufficient manner.

### Corrections

Corrections should immediately require mental health staff to score 100 percent on risk evaluation audits in order to pass. If a staff member does not pass, Corrections should require the prison to follow its current policies by reviewing additional risk evaluations to determine whether the staff member needs to undergo additional mentoring.

To ensure that it identifies inmates who are at risk of attempting suicide and determines the treatments needed to prevent them from doing so, Corrections should immediately reevaluate and revise its goals for the percentage of risk evaluations that mental health staff must complete on time and for the percentage of risk evaluations that must pass its risk evaluation audits. It should set revised goals that better take into consideration the importance of mental health staff completing adequate risk evaluations in a timely matter. Corrections should require prisons that perform below its revised goals to develop improvement plans.

To improve the quality of its risk evaluations, by December 2017 Corrections should develop and incorporate into its electronic risk evaluation form prompts to aid mental health staff in completing adequate risk evaluations that meet all audit criteria.

To minimize the number of inmates who spend more than 24 hours in alternative housing, Corrections should use the audit process it is developing to monitor the amount of time inmates spend in alternative housing and annually reassess its need for additional crisis beds.

To ensure that prisons document the privileges, such as yard time, that inmates receive while in a crisis bed, Corrections should immediately require prisons to develop and formalize policies to record on their treatment plans the privileges inmates are allowed and receive while in a crisis bed.

To ensure that prison staff conduct required checks of inmates placed on suicide precaution in a timely manner, Corrections should implement its automated process to monitor suicide precaution checks in its electronic health record system by the time it is implemented systemwide in October 2017. Further, Corrections should train staff on how to plan for and conduct staggered suicide precaution checks.

To monitor prisons' compliance with its requirement that inmates in crisis beds receive daily progress notes, Corrections should implement monitoring of these notes electronically into its audit process by the time the electronic health record system is in use systemwide in October 2017. Corrections should require prisons that are out of compliance to develop and implement quality improvement plans, and it should follow up on the prisons' implementation of those plans.

To ensure that prison staff appropriately respond to attempted suicides, Corrections should implement its proposed changes to its emergency response policies regarding cut-down kits by December 2017 and should include in its policies a method for monitoring prisons' compliance.

# Chapter 2

## A NUMBER OF FACTORS HAVE LIKELY CONTRIBUTED TO HIGH RATES OF INMATE SUICIDES AND SUICIDE ATTEMPTS AT CIW

From 2014 through 2016, the rates of inmate suicides and suicide attempts at CIW were significantly higher than the rates at either CCWF or Corrections' men's prisons. Staff at Corrections and CIW provided several reasons for CIW's elevated rates, including inmate drug involvement, domestic violence in interpersonal relationships between female inmates, and the transfer of additional inmates to CIW and CCWF following the conversion of a women's prison to a men's prison. Because suicide is the result of multiple factors, we believe many of these causes could have contributed to CIW's high rates of suicides and suicide attempts. In addition, we identified several factors that many of Corrections' prisons share in common that may influence rates of inmate suicides and suicide attempts. Specifically, Corrections has not established a means of ensuring that all staff receive required trainings related to suicide prevention and response, and as a result, some staff may not have the knowledge necessary to address inmates' mental health needs. Further, Corrections has struggled to fill certain mental health staff vacancies, particularly for psychiatrist positions. Finally, Corrections has not recently updated its staffing model to ensure that the prisons have adequate staff to meet their inmates' mental health needs.

### Corrections Has Identified Possible Causes for the High Suicide Rate at CIW

As the Introduction discusses, the rates of suicides and suicide attempts at women's prisons in California have increased over the last several years. After declining from 2012 through 2013, the rates of both suicides and attempted suicides at women's prisons rose dramatically, from 3.7 attempts and 0.35 suicides per 1,000 inmates in 2014 to 10.3 attempts and 0.63 suicides in 2016.

Further, as Table 6 on the following page shows, the rates of suicides and attempted suicides at women's prisons were significantly higher and less stable than the rates at other prisons in California during this same time period. Although the increase in female inmate suicides is dramatic, Corrections' clinical support chief noted that even one suicide can significantly affect the rate because of the small population of female inmates. However, she acknowledged that there have been more suicides among female inmates than she would have expected and she believes that California's rates are high in comparison to large prison systems in other states.

**Table 6**
Suicides and Attempted Suicides in Adult Prisons From 2012 Through 2016

| | | INMATE POPULATION* TOTALS | ATTEMPTED SUICIDES | | SUICIDES | |
|---|---|---|---|---|---|---|
| | | | TOTALS | PER 1,000 INMATES | TOTALS[†] | PER 1,000 INMATES |
| **2012** | Women's prisons | 6,643 | 30 | 4.5 | 1 | 0.15 |
| | All other prisons[‡] | 119,633 | 322 | 2.7 | 24 | 0.20 |
| | All prisons | 126,276 | 352 | 2.8 | 25 | 0.20 |
| **2013** | Women's prisons | 5,627 | 23 | 4.1 | 1 | 0.18 |
| | All other prisons[‡] | 117,611 | 351 | 3.0 | 25 | 0.21 |
| | All prisons | 123,238 | 374 | 3.0 | 26 | 0.21 |
| **2014** | Women's prisons | 5,646 | 21 | 3.7 | 2 | 0.35 |
| | All other prisons[‡] | 117,006 | 344 | 2.9 | 18 | 0.15 |
| | All prisons | 122,652 | 365 | 3.0 | 20 | 0.16 |
| **2015** | Women's prisons | 4,887 | 45 | 9.2 | 2 | 0.41 |
| | All other prisons[‡] | 109,243 | 346 | 3.2 | 17 | 0.16 |
| | All prisons | 114,130 | 391 | 3.4 | 19 | 0.17 |
| **2016** | Women's prisons | 4,743 | 49 | 10.3 | 3 | 0.63 |
| | All other prisons[‡] | 114,938 | 370 | 3.2 | 23 | 0.20 |
| | All prisons | 119,681 | 419 | 3.5 | 26 | 0.22 |
| **5-YEAR TOTALS** | **Women's prisons** | | **168** | | **9** | |
| | **All other prisons[‡]** | | **1,733** | | **107** | |
| | **All prisons** | | **1,901** | | **116** | |

Sources: California State Auditor's analysis of Corrections' COMPSTAT metrics and additional information on suicides provided by various prisons.

\* *Inmate population* is the average of the 12 months in each year.

† The numbers we present here reflect our amendments to Corrections' COMPSTAT data. As we discuss in Chapter 3, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. We have therefore adjusted the number of suicides in 2013, 2015, and 2016 to include three suicides that we identified at CIW, RJD, and SAC that were not included in the COMPSTAT data; however, we caution that these numbers may still not be accurate.

‡ According to a COMPSTAT research program specialist, Corrections expresses its numbers in COMPSTAT by institution and not by gender. Thus, *Women's prisons* includes CCWF and CIW, as well as the former Valley State Prison for Women (VSPW) in 2012, and CCWF and CIW from 2013 through 2016. *All other prisons* comprises nearly all male inmates; however, it does include inmates in other facilities, including some that house both men and women, such as certain medical facilities, and Folsom State Prison, which has a small women's facility.

The clinical support chief offered three primary reasons for why the suicide rate at women's prisons has been high in recent years. First, she explained that unlike male inmates, female inmates tend to build family units within prisons, and Corrections has found that domestic violence can occur within these units. She believes that this domestic violence has contributed to the higher suicide rates at women's prisons. She stated that in order to address this issue, Corrections is planning to develop a curriculum regarding same-sex domestic violence for female inmates who receive mental health services.

The second reason the clinical support chief pointed to was drug involvement. Specifically, she explained that substance abuse affects female inmates differently than male inmates because incarcerated women have high levels of past trauma. That trauma, combined with substance abuse, likely increases the risk of suicide. According to the clinical support chief, drugs or drug trafficking were involved in four of the six most recent suicides in women's prisons. She stated that in order to address this issue, Corrections is hoping to finalize a contract in the near future to establish a co-occurring disorders program at CIW and at other prisons. She explained that this program would be modeled on best practices that combine mental health issues with treatment for substance abuse.

*Substance abuse affects female inmates differently than male inmates because incarcerated women have high levels of past trauma that, when combined with substance abuse, likely increases the risk of suicide.*

Finally, the third reason she cited was that the realignment of prisons changed the composition of the inmate population in state prisons. In 2011 the Legislature passed various laws that realigned the criminal justice system by allowing inmates who were not convicted of serious or violent felonies, or felonies requiring registration as a sex offender, to serve their sentences in county jails rather than state prisons. She explained that as a consequence of realignment and lower-level offenders being sentenced to county jails, inmates who remain in state prisons generally have more severe behavioral issues and are more likely to have committed violent crimes. She also said that inmates who have committed violent crimes are potentially more likely to commit suicide because they have a history of using violence as a response to various situations, including self-directed violence. As a result, female inmates in the State's prisons may be more likely to make lethal suicide attempts.

These reasons, however, apply to all female inmates and do not necessarily explain the difference in the rates of suicides and attempts between CIW and CCWF, which are both women's prisons. As Table 1 in the Introduction shows, all but one of the suicides occurring from 2014 through 2016 at the two women's prisons we reviewed occurred at CIW. During this same period, there were also more suicide attempts at CIW than at CCWF, despite CIW's smaller inmate population. For example, there were 11 attempted suicides at CCWF in 2015, but 34 attempted suicides at CIW. We asked the clinical support chief why she thought the suicide and suicide attempt rates at CIW were higher than those at CCWF from 2014 through 2016 and she stated that she did not have any easy hypotheses for why the rates were higher at CIW. She additionally described that based on her understanding, the characteristics of the inmates at CIW and CCWF do not seem to differ significantly. Moreover, the Centers for Disease Control and Prevention has identified that suicidal behavior results from a combination of many factors—including genetic, developmental, environmental, psychological, social, and cultural factors—operating through diverse and complex pathways. It is therefore likely that there are many components to the cause for the difference in suicide and suicide attempt rates between CIW and CCWF.

Prison officials at CIW, however, did identify one other explanation for why the suicide rate at CIW was elevated from 2014 through 2016: they attributed the increased suicide rate at CIW to the conversion of VSPW to a men's prison and the subsequent transfer of higher-security-level inmates to CIW than the prison was designed to house. Corrections converted VSPW to a men's prison due to the decline in the number of female inmates in state prisons following realignment. According to Corrections' acting associate warden of female offender programs and services, Corrections transferred about 970 inmates to CCWF and 400 inmates to CIW from VSPW from September 2012 through January 2013. Two chief psychologists and a senior psychologist at CIW stated that the transfer of inmates resulted in a number of negative effects, including increases in gang influences, more drugs, higher-security-level inmates, and increased conflict in the housing units. The chief executive officer at CIW explained that CIW was not designed to house high-security-level offenders, and he agreed that the change in prison culture following the conversion of VSPW may have contributed to the increase in suicides and attempted suicides. We attempted to verify whether high-security-level inmates were transferred to CIW; however, Corrections' acting associate warden of female offender programs and services explained that Corrections does not have a historical breakdown of that information.

*Two chief psychologists and a senior psychologist at CIW stated that the transfer of inmates resulted in a number of negative effects, including increases in gang influences, more drugs, higher-security-level inmates, and increased conflict in the housing units.*

Although Corrections acknowledged at the time that the conversion of VSPW to a men's prison might significantly affect CIW and CCWF, it did little to prepare those prisons. According to documentation Corrections provided, beginning in 2011, Corrections developed action plans for the conversion of VSPW and held meetings with certain stakeholders to discuss these plans. However, Corrections was unable to provide evidence of such a meeting occurring at CIW. Further, CIW officials were unable to recall the occurrence of such a meeting. Corrections distributed a memorandum in late August 2012 announcing the conversion of VSPW and the resulting transfer of its female inmates to CIW, CCWF, and certain other special programs beginning the next month. However, the memorandum lacked any details regarding the steps the prisons should take to prepare for the new inmates; instead, it simply stated that the support of the wardens in ensuring their prisons' assistance was appreciated. According to Corrections' acting associate warden of female offender programs and services, the wardens at each prison were responsible for preparing their staff for the conversion and the subsequent increases in their inmate populations. Both an associate warden at CIW and its chief executive officer confirmed that, beyond the standard preparations made for inmate transfers, they could not remember any special preparations or training that CIW provided for its staff.

The inmates who transferred from VSPW were not the majority of those attempting suicide at either CIW or CCWF. This supports CIW officials' perspective that there was a cultural change at the prison subsequent to the transfers. According to CIW, inmates who transferred from VSPW committed 8 percent of the suicides and suicide attempts at CIW from 2014 through 2016. Similarly, CCWF's data show inmates who transferred from VSPW committed 12 percent of the suicide attempts at CCWF during this period. CIW's chief executive officer stated that before the transfer of inmates from VSPW, he would have described CIW as a prison that had relatively few issues with inmates. He explained that he could no longer describe the prison in this way after the transfer because the inmates from VSPW brought with them a culture of substance abuse, illegal drug trading, and violence related to drug trafficking.

### CIW and Other Prisons Have Not Ensured That Their Staff Have Received Required Training on Suicide Prevention and Response

As we describe in the previous section, Corrections and CIW were able to identify certain factors that are unique to CIW and CCWF and that may have contributed to CIW's high rates of suicides and suicide attempts. However, we identified additional factors that may increase the risk of inmate suicides and attempts at both men's and women's prisons throughout the State. One of these factors is Corrections' failure to ensure that prison staff receive required training related to suicide prevention and response. We believe this lack of training may have contributed to some of the problems we identify in Chapter 1.

Because effective suicide prevention and response at prisons requires a collective effort, staff that routinely interact with inmates should receive training on how to identify and help inmates at risk of suicide as well as on how to respond to suicide attempts. When staff fail to fulfill their duties as Corrections' policies require, it may result in the serious injury or death of inmates whose lives depend on both the quality and promptness of the interventions that staff provide. The Joint Legislative Audit Committee (Audit Committee) asked us to evaluate the adequacy of the mental health and suicide prevention training specifically for CIW staff, and we found that the prison did not ensure that its staff received the required trainings. We also identified similar attendance concerns at the three other prisons we reviewed, and we found that some trainings need improvement in terms of their content and delivery.

Officials at CIW could not demonstrate that some staff had attended required training courses related to inmate suicide. State regulations and Corrections' policies require each prison to ensure that all staff

*Officials at CIW could not demonstrate that some staff had attended required training courses related to inmate suicide.*

---

**Selected Training That Corrections Requires Related to Suicide Prevention and Response**

**Annual Suicide Prevention:** Provides staff with a basic understanding of suicide prevention and their roles when working in a prison. This training includes elements related to responding to suicide attempts.

**Risk Evaluation Mentoring Program:** Provides one-on-one training and mentoring on the administration of risk evaluations. Mentoring includes feedback on suicide assessment, risk formulation, and crisis intervention skills.

**Risk Evaluation for Mental Health Staff:** Focuses on practical methods to improve the accuracy and reliability of risk assessments across staff and settings. This training is designed to complement the risk evaluation mentoring program.

**Safety/Treatment Planning Within Suicide Risk Assessment and Management:** Helps mental health staff know when and how to create adequate treatment/safety plans that contain specific actions mental health staff and inmates will undertake to reduce risk of suicide.

Sources: State regulations, Corrections' policies, 2016 lesson plans, and presentation slides for the listed trainings.

---

whose assignments routinely involve inmate contact complete various trainings related to suicide prevention and response. The text box lists some of these trainings. In addition, we reviewed a training on working with female offenders, which provides information and skills that support managing female inmates safely and effectively. However, when we reviewed training records for a selection of staff at CIW, we found that prison officials could not demonstrate whether some staff had attended certain trainings. Specifically, the in-service training manager at CIW could not demonstrate that four of the 20 staff members attended a required annual suicide prevention training during 2016. Further, of the 15 mental health staff we reviewed who were required to take the same course at CIW in 2015, the prison's documentation shows that only nine attended.

Moreover, some mental health staff at CIW did not attend a required training on conducting risk evaluations or receive mentoring. Corrections requires staff who will be evaluating whether inmates are at risk of suicide to attend a training on how to complete risk evaluations. We reviewed 10 psychologists, psychiatrists, or social workers who were required to attend this training within 180 days of hire; however, the documents the prison provided demonstrate that only six did so. Further, we found that CIW did not adequately audit risk evaluations for five of the 10 mental health staff we reviewed, and did not provide mentoring for two mental health staff that failed the audit. As Chapter 1 explains, the correct completion of risk evaluations is critical because they help mental health staff identify inmates who are likely to attempt suicide as well as the treatments needed to prevent them from doing so.

CIW provided several reasons for why it was unable to demonstrate that certain staff attended the required trainings. In particular, the in-service training manager explained that some of the staff simply did not attend the training. However, he also stated that before May 2015, CIW did not effectively track its training. Further, he explained that staff in the training units at CIW and other prisons do not always record attendance—which is demonstrated by a sign-in sheet—in Corrections' tracking system. He indicated that as a result, when staff transfer to CIW, CIW must directly contact the prisons at which they previously worked to determine if those prisons can provide the sign-in sheets for trainings. This situation could lead to staff missing required trainings. For example, CIW's in-service training manager stated that one staff member we

reviewed had received the required suicide prevention training at a different prison in 2016, but he could not provide documentation that the staff member had actually received this training.

Some of the problems we found are not unique to CIW: Corrections reported that not all staff at the prisons we reviewed received required trainings in 2016. For example, at SAC, about half of the required staff received training on the principles of safety planning for suicidal inmates. Attendance compliance at RJD, CIW, and CCWF was 72 percent, 83 percent, and 89 percent, respectively, with this training requirement, according to Corrections' reports. Staff attendance rates for the annual suicide prevention training ranged from 68 percent at CIW to 95 percent at CCWF. Staff attendance was similar for the suicide risk evaluation mentoring, with reported attendance rates ranging from 71 percent at SAC to 95 percent at CCWF. Corrections' clinical support chief stated that Corrections has not followed up with the prisons regarding the reasons for the low attendance rates. She explained that although the prisons provide Corrections with some staff attendance rates at trainings, Corrections does not request that they explain or justify those rates. Rather, she stated that Corrections relies on the prisons' in-service training units and chiefs of mental health to address training noncompliance issues. Lastly, although not a training on suicide prevention, a program regarding working with female offenders was offered in 2015 and 2016. CIW and CCWF reported average staff attendance rates of 74 percent and 91 percent, respectively, for this training.

This is not a new problem, nor is it isolated. In his 2016 report regarding selected prisons' suicide prevention practices, the suicide expert also identified concerns with staff attendance at required trainings in 2014. Specifically, he found that attendance for the annual suicide prevention training across 18 prisons varied from 0 percent to 100 percent during the period he reviewed. He reported that 94 percent of custody staff, 69 percent of medical staff, and 63 percent of mental health staff received the annual suicide prevention training in the 18 prisons during 2014. He concluded that the compliance rates for training both medical and mental health staff remained problematic.

*The suicide expert found that attendance for the annual suicide prevention training across 18 prisons varied from 0 percent to 100 percent during 2014.*

In addition, our review found that CIW's trainers themselves have missed required classes. Corrections requires that instructors teaching suicide prevention and risk evaluation trainings participate in specific train-the-trainer courses. Although both of CIW's instructors for the suicide prevention training and the instructor for the risk evaluation training attended the required courses, only one of five of its mentors had received the necessary training. Further, the two suicide prevention trainers taught several trainings before they were qualified to do so per Corrections' requirements. CIW's suicide prevention

team coordinator stated that she received training from Corrections and that she subsequently provided training to all mentors. She explained that she believed the training she provided was sufficient to fulfill the training requirements for mentors. However, the clinical support chief stated that all mental health staff are required to receive Corrections' training before mentoring other staff. She further explained that, at one point, Corrections allowed prisons to train their own mentors, but it discontinued this practice around 2013 after realizing the content was not always adequately communicated.

Unless Corrections ensures that its trainers have the knowledge and tools necessary to provide instruction in an engaging and effective manner, it reduces the effectiveness of its training about suicide prevention practices. In the suicide expert's January 2015 report, he stated that he attended the required one-hour suicide prevention trainings at seven prisons and that many were problematic. For example, the suicide expert noted that at one of the trainings, the instructor simply read the nearly 40 PowerPoint slides at a fairly quick pace, ending the presentation after about 25 minutes. The suicide expert pointed out that another training lasted roughly 40 minutes and that the only interaction between the instructor and the participants occurred when one participant asked about the length of the class. He also observed that one prison had only offered the suicide prevention training via DVD. If Corrections does not ensure that all trainers receive instruction on delivery, it risks its trainers poorly presenting information and failing to create meaningful discussions regarding the training topic, which significantly diminishes the value to those attending the training.

*We found that some of Corrections' suicide prevention trainings were missing required content.*

Additionally, we found that some of Corrections' suicide prevention trainings were missing required content. For example, Corrections' policies require that the annual suicide prevention and response training explain how to handle situations in which inmates with mental health concerns commit violations of prison rules. However, we did not find such content in the suicide prevention training from 2014 through 2016. Corrections offers a training that focuses on situations involving violations of prison rules, but that training is not offered to everyone whom Corrections requires to take the annual suicide prevention training. Corrections must also follow a 2015 court order requiring it to incorporate into its trainings certain topics that the suicide expert's January 2015 report outlines. The suicide expert recommended that Corrections expand the length and content of certain suicide prevention trainings by including various topics, such as dealing effectively with inmates perceived to be manipulative. Although the annual suicide prevention training, risk evaluation training, and a training aimed at helping staff improve the accuracy of their diagnoses contained discussion of such perceptions, a webinar on treatment planning in risk evaluations did not. Without required content, Corrections' trainings will lack effectiveness in

preventing suicides and improving responses to attempted suicides. For example, if Corrections' staff assume inmates are expressing suicidal thoughts in order to obtain some benefit—in other words, are being manipulative—the staff may miss important warning signs of impending suicide attempts.

### Staff Vacancies Continue to Challenge Corrections' Ability to Provide Sufficient Mental Health Services to Inmates

For more than 20 years, Corrections has continued to struggle to fill key mental health position vacancies, creating the risk that it may not be able to adequately serve inmates in need of mental health services. In a May 2016 report, the special master recounts that the court in *Coleman* ruled in 1995 that Corrections was significantly and chronically understaffed in the area of mental health care services and did not have sufficient staff to treat the large numbers of mentally ill inmates in its custody. The special master reported that during the intervening 20 years, the proportion of Corrections' inmates requiring mental health care soared from less than 15 percent to 29 percent of the total inmate population, for a total of nearly 37,000 inmates requiring mental health care. In 2002 the court ordered Corrections to maintain a vacancy rate among psychiatrists, psychologists, and social workers of not more than 10 percent.

When we reviewed Corrections' data on three key positions the court identified—psychiatrists, psychologists, and social workers—we found that vacancy rates were highest among psychiatrists. According to our analysis of Corrections' data, its prisons overall had a 31 percent vacancy rate for psychiatrists, 9 percent for psychologists, and 2 percent for social workers as of December 2016. Each of the four prisons we reviewed had vacancy rates below 10 percent for social workers and at or below 10 percent for psychologists. However, CCWF, RJD, and SAC have continued to struggle to fill psychiatrist positions, with vacancy rates of about 32 percent, 31 percent, and 44 percent, respectively. According to a March 2017 report from the National Council for Behavioral Health, there is a national shortage of psychiatrists. Only CIW had vacancy rates below 10 percent for all three classifications. When prisons do not maintain adequate mental health staff, their ability to provide quality mental health care to inmates can suffer. For example, according to the coordinator of SAC's suicide prevention team, a shortage of psychiatrists has a trickle-down effect because if inmates do not receive the proper medication, they may act out more and require additional attention or therapy, exacerbating mental health staff's already heavy workloads.

*When we reviewed Corrections' data on three key positions the court identified—psychiatrists, psychologists, and social workers—we found that vacancy rates were highest among psychiatrists at 31 percent as of December 2016.*

Furthermore, the prisons' total authorized mental health positions may not be enough to fulfill inmates' needs. For example, CIW's chief of mental health stated that even when CIW's mental health positions are almost fully staffed, mental health staff still feel overwhelmed and do not have time to meet with inmates as often as they believe is needed. Similarly, the chief of mental health at CCWF stated that although workloads seem manageable based on Corrections' minimum requirements for mental health care, inmates sometimes require significantly more visits than the minimum required, effectively increasing staff workload. She explained that given the increased workload for suicide prevention, mental health staff may neglect routine but important tasks, such as completing follow-up suicide risk evaluations, to focus on urgent matters, such as responding to imminent suicide threats.

The staffing problems that these prisons noted are likely in part due to the fact that Corrections has not updated its staffing model since 2009. Specifically, the chiefs of mental health at both CIW and CCWF expressed the need for Corrections to revisit the staffing model it uses to determine the number of mental health staff needed per prison. For example, CCWF's chief of mental health indicated that the staffing ratios for women's prisons is 20 percent higher than staffing ratios for men's prisons in the model; however, this adjustment is not enough to compensate for the increased number of mental health crises and referrals that arise with the female inmate population. Corrections' associate director of policy and clinical support (associate director) acknowledged that Corrections has not revised the model since 2009, eight years ago. She explained that when calculating the number of staff needed per prison, the model does not take into account the following factors: gender; facility layout; security level; and number of inmates in each security level, excluding restricted housing. The associate director explained that she believes Corrections needs to revisit the 2009 staffing model to take into account some of these factors as well as Corrections' revised policies, recent court orders, the prisons' implementation of the new electronic health record system, and the prisons' adherence to requirements based on its current filled positions.

## Recommendations

### *Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- The status of its efforts to ensure that all mental health staff receive required training and mentoring related to suicide prevention and response.

- The status of its efforts to fill vacancies in its mental health treatment programs, especially its efforts to hire and retain psychiatrists.

### *Corrections*

To address the unique circumstances that may increase its female inmates' rates of suicide and suicide attempts, Corrections should take the following actions:

- Implement its planned same-sex domestic violence curriculum by December 2017.

- Continue to explore additional programs that could address the suicide risk factors for female inmates.

To ensure that all prison staff receive required training related to suicide prevention and response, Corrections should immediately implement a process for identifying prisons where staff are not attending required trainings and for working with the prisons to solve the issues preventing attendance.

To ensure that trainers and risk evaluation mentors at all prisons are able to train staff effectively, Corrections should immediately begin requiring prisons to report the percentage of their trainers and mentors who have received training on how to conduct training and mentoring. It should work with prisons to ensure that all trainers and mentors receive adequate training.

To maximize the value of its trainings related to suicide prevention and response, Corrections should ensure that starting in January 2018, its trainings include all content that the special master and its own policies require.

To ensure that it has enough staff to provide mental health services to all inmates who require care, Corrections should review and revise its mental health staffing model by August 2018.

# Chapter 3

## TO REDUCE INMATE SUICIDES AND ATTEMPTS, CORRECTIONS MUST STRENGTHEN ITS OVERSIGHT AND DEMONSTRATE GREATER LEADERSHIP

Corrections has struggled for decades to adequately provide mental health services to inmates. As a result, most of its efforts to reduce its inmate suicide rates in recent years have been in response to court-ordered oversight. For example, in response to the suicide expert's 2015 recommendations, it adopted a number of policies, implemented facility improvements, and improved its training. However, its policies are unlikely to have significant impact if it does not ensure that the prisons fully implement and adhere to them—which it has yet to do. Although Corrections stated it is developing an audit process to ensure that prisons comply with policies and procedures, it has known about their noncompliance for years, and it is uncertain as to when it will fully implement this process across all prisons. Similarly, Corrections created teams at each of the prisons to specifically focus on suicide prevention and response; however, it has not ensured that these teams consistently provide leadership on critical issues. In addition, Corrections has not always proactively sought opportunities to demonstrate leadership in regards to documenting and disseminating programs or best practices for preventing inmate suicide.

### Although Corrections Has Developed Policies and Training to Address Past Recommendations, It Has Not Ensured That Prisons Fully Implement These Changes

From November 2013 through July 2014, the suicide expert conducted a comprehensive audit of suicide prevention practices in each of Corrections' prisons. This audit resulted in a January 2015 report containing 32 recommendations. The court in *Coleman* subsequently ordered Corrections to work with the special master to develop strategies to implement these recommendations, and it also ordered the suicide expert to provide an updated report on Corrections' progress. The suicide expert completed this updated report in January 2016, in which he stated that Corrections had begun to implement corrective actions in response to his recommendations. Through the adoption of new policies, improvements to its facilities, changes to its trainings, and other actions, Corrections has now addressed the majority of the recommendations from the suicide expert's January 2015 report. Table 7 on the following page lists selected recommendations from the suicide expert's 2015 report to Corrections and Corrections' responses to those recommendations.

**Table 7**
**Selected Recommendations From the Suicide Expert's 2015 Report**

| RECOMMENDATION | CORRECTIONS' ACTION IN RESPONSE TO RECOMMENDATION | DATE ACTION TAKEN | IS CORRECTIONS ENFORCING/MONITORING COMPLIANCE WITH THIS POLICY? |
|---|---|---|---|
| Corrections should revise its risk evaluation mentoring program to require ongoing mentoring throughout the year and audit mental health staff's risk evaluations on a regularly scheduled basis. | Issued memorandum to all prisons implementing a revised mentoring program and describing regular audits of risk evaluations. | March 2016 | No. Corrections tracks aggregate information the prisons report to monitor compliance, but does not follow up with the prisons. |
| Corrections should enforce its policy authorizing only two levels of observation for suicidal inmates: *suicide precaution* and *suicide watch.* | Issued memorandum to all prisons reiterating existing policy that the only two levels of observation are suicide precaution and suicide watch. | March 2016 | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should take action to correct inaccurate documentation on inmate suicide precaution observation forms. | Issued memorandum to all prisons reiterating existing policy regarding documentation on suicide precaution observation forms. | March 2015 | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should enforce its policy of housing only newly admitted inmates in administrative segregation units in retrofitted suicide-resistant cells for their first 72 hours of admission to the prison. | Included reiteration of this policy in its annual suicide prevention training. | July 2015 | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should ensure all crisis beds are suicide resistant. | Developed a schedule to begin retrofitting cells at identified prisons. | November 2015 | Corrections indicated one prison required extensive retrofitting and is still in progress. |
| Corrections should revise its policy so that all inmates discharged from a crisis bed or alternative housing, where they had been housed due to suicidal behavior, are observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred. | Issued revised policy regarding checks of inmates discharged from crisis beds, and is working to finalize a policy regarding alternative housing. | January 2016 | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should take corrective action to address inconsistencies between privileges allowed for patients in crisis beds. | Issued memo reiterating and clarifying policy regarding privileges for inmates in crisis beds. | June 2016 (revised February 2017) | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |

Sources:  The suicide expert's 2015 report, Corrections' memoranda, and interviews with Corrections' officials.

Several of the recommendations from the suicide expert's 2015 report directed Corrections to revise, examine, or enforce existing policies. Corrections addressed several of these recommendations by issuing memos to the prisons that either reiterate or revise policies. For example, Corrections' 2009 program guide states that custody staff must conduct hourly checks for the first 24 hours after discharge of inmates at risk of suicide who had been admitted to a crisis bed or alternative housing. However, the suicide expert recommended in his 2015 report that these checks occur at 30-minute intervals. In response to this recommendation, Corrections issued a memorandum in January 2016 requiring checks every 30 minutes for the first 24 hours that inmates are discharged from crisis beds.

Corrections is working to finalize a similar policy for inmates released from alternative housing. Further, Corrections made changes to its suicide prevention training and risk evaluation mentoring program.

However, Corrections has yet to fully ensure prisons' compliance with the new and revised policies resulting from the suicide expert's recommendations. For example, despite these policies, many of the problems we identify in Chapter 1 relate to the completion and quality of both risk evaluations and treatment plans. Further, these same issues have persisted for years: court-ordered reports by the special master dating back to 2002 identified similar concerns. In addition, Corrections has yet to ensure attendance at suicide prevention team meetings, as we describe later in this chapter. Further, as we show in Chapter 1, the monitoring it currently provides does not result in significant positive change at the prisons. Although revising policies and holding trainings are important parts of improving prisons' ability to prevent and respond to suicides, Corrections cannot ensure that prisons actually comply with its policies unless it provides adequate monitoring.

Corrections is still developing an audit process to, among other things, track implementation of several of the suicide expert's recommendations. According to Corrections' quality administrator, Corrections is integrating certain recommendations from the suicide expert's report into an audit process for conducting audits of prisons' compliance with policies and procedures. The portion of the audit process conducted on site at the prisons rates 12 broad areas—including treatment planning processes, suicide prevention and response to suicide, leadership, staffing, and quality management—on a scale ranging from *proficient* to *urgent concerns*. The resulting reports include specific recommendations.

We reviewed the report of a pilot audit that Corrections conducted of a certain prison and found that the audit was thorough and critical in its analysis of identified deficiencies. According to the report, the audit combined performance data, document reviews, patient and staff interviews, health care record reviews, and the regional teams' on-site observations of the prison's day-to-day operations. Our review suggests that the audit process may prove helpful as Corrections begins improving areas in which it has consistently struggled, particularly because it requires monitoring of several of the suicide expert's recommendations. For example, in response to one of the suicide prevention expert's recommendations, Corrections issued a memo to prisons in March 2016 that explicitly states that they can use only suicide watch or precaution levels of observation for suicidal inmates in crisis beds. According to the health care administrator in charge

*Corrections has yet to fully ensure prisons' compliance with the new and revised policies resulting from the suicide expert's recommendations.*

of quality control, Corrections added instructions on reviewing prisons' use of suicide watch and precaution to the audit process in response to the suicide expert's recommendations.

Nevertheless, the audit process has been in development for some time. According to Corrections' chief psychologist of the health care division, the court in *Coleman* indicated several times that Corrections needs to demonstrate that it has a full quality improvement system in place that includes processes for continually monitoring, enforcing, and improving its policies and procedures. She explained that, to comply with this requirement with the eventual goal of replacing the court's monitoring, Corrections began developing the audit process and expanded the role of its regional teams, who will be following it. Corrections' quality administrator stated that Corrections first began development of the audit process in 2013, that the regional teams have conducted several initial audits of selected prisons, and that they plan to continue developing the process for use systemwide in the future. However, the quality administrator indicated that Corrections has not established a concrete date for implementation of the audit process systemwide. Corrections' quality administrator stated that it is continuing to work collaboratively with the special master to finalize the audit process. Until Corrections fully implements the audit process systemwide, it lacks assurance as to whether its prisons are adhering to the policies it put in place to address several of the suicide expert's recommendations.

*Despite issuing and revising numerous policies, Corrections has not updated its program guide to reflect these changes since 2009.*

Additionally, despite issuing and revising numerous policies, Corrections has not updated its program guide to reflect these changes since 2009, creating the potential for confusion for the prisons that must implement those policies. Corrections' clinical support chief stated that it would have to coordinate any formal revision to the entire program guide with the special master. However, she explained that prisons can access all of Corrections' policy changes at a central location on its intranet. Further, in March 2017 the court in *Coleman* encouraged Corrections to update its program guide through the publication of addenda called "pocket parts." However, the fact that prison and mental health staff must refer both to the program guide and to any relevant update memos and addenda when determining how to implement policies, is inefficient and adds needless confusion to an already complex process.

Updating the program guide would also help Corrections to identify and correct inconsistencies within it. For example, the program guide states that inmates must not stay in crisis beds for more than 10 days without the approval of a high-ranking official. However, one part of the program guide states that approval must come from the chief of mental health or the appropriate designee,

whereas another part states that approval must come from the chief psychiatrist or the appropriate designee. These are different positions at the four prisons we reviewed. Although we did not identify specific concerns related to this discrepancy, it is further indicative of the need for Corrections to review and revise its program guide. When Corrections does not ensure that prisons are implementing policy changes appropriately or does not document its policies in a clear, organized, consistent, and consolidated fashion, it risks creating confusion and inconsistency in the treatment that prisons provide to inmates. According to Corrections' deputy director of the statewide mental health program, Corrections intends to incorporate appropriate portions of the program guide into state regulations, which will help strengthen Corrections' mental health system. She explained that Corrections has been working on memorializing the policies in regulations, but has yet to begin the formal process for promulgating the regulations and does not have a time frame for when it intends to begin this process.

## Corrections Has Not Ensured That Prisons' Suicide Prevention Teams Adequately Fulfill the Purposes for Which They Were Created

Although Corrections established a statewide suicide prevention team as well as suicide prevention teams at each of the prisons, it has not ensured that these teams exercise sufficient leadership to help prevent suicides. To reduce the risk of inmate suicides, Corrections' policies require the suicide prevention teams to provide staff with training and guidance with regard to suicide prevention, response, reporting, and review. Corrections' policies state that the statewide suicide prevention team and teams at each prison must meet at least monthly, and require that individuals in certain positions, as the text box shows, attend each meeting. However, only one of the four prisons we reviewed met Corrections' attendance requirements. Further, the suicide prevention teams often failed to discuss key issues that might enable the prisons to better prevent suicides.

Suicide prevention and response in California's prisons requires attention from multiple clinical disciplines. If required members are absent, they and the staff they supervise risk missing important information, and the suicide prevention team lacks the insight of the missing members. Nonetheless, only CCWF met attendance

---

**Required Membership of Suicide Prevention Teams**

**Prisons:**

- Suicide prevention team coordinator (chairperson)
- Chief psychiatrist*
- Chief psychologist*
- Supervising registered nurse
- Senior licensed psychiatric technician or licensed psychiatric technician
- Correctional health services administrator
- Department of State Hospitals' coordinator

**Statewide:**

- Suicide prevention team coordinator (chairperson)
- Chief psychiatrist
- Chief psychologist
- Nurse consultant
- Designated facility captain

Source: Corrections' 2009 program guide.

\* A senior psychiatrist or senior psychologist attendance meets the quorum requirement in prisons without a chief psychiatrist or chief psychologist position.

requirements for its team in 2016. Although each of the four prisons we visited held monthly suicide prevention team meetings during 2016, the minutes of these team meetings at CIW, SAC, and RJD indicate that they did not meet attendance requirements for 11, 10, and eight monthly meetings, respectively, in 2016. We also found instances in which required suicide prevention team members missed several meetings. For example, at CIW the chief psychiatrist or a designee failed to attend eight of 12 meetings, and at SAC the supervising registered nurse missed six of 12 meetings.

These attendance issues have been brought to Corrections' attention before, and it has pointed to obstacles that make achieving a quorum challenging. For instance, the suicide expert stated in his 2016 report that he found that attendance by some required suicide prevention team members, particularly chief psychiatrists or their designees, was inconsistent at many prisons. Specifically, he explained that eight of the 18 suicide prevention teams he reviewed still fell short of attaining a quorum at their monthly meetings. Corrections' clinical support chief stated that prison staff have many competing demands, making it difficult for teams to coordinate schedules and added that Corrections overlooked the difficulties in assembling key participants in these meetings at the time leadership drafted the program guide. She further explained that some elements regarding suicide prevention team attendance are not clear, such as whether one individual may fill multiple roles and who may send designees. Nevertheless, we found that CCWF was able to meet the attendance requirements every month during 2016. CCWF's chief of mental health explained that its team plans several weeks in advance of a meeting to ensure that all required members can attend, reminds team members about the meeting during the week it is scheduled, and waits until all members are present before starting the meeting.

Further, the suicide expert raised concerns regarding whether the prisons' suicide prevention teams had fully met their responsibilities, some of which are listed in the text box. For instance, one of these responsibilities is ensuring each prison's implementation of and compliance with all of Corrections' policies and procedures relating to suicide prevention and response. However, in his 2016 report, the suicide expert found that the suicide prevention teams had not adequately monitored and evaluated the risk evaluations completed at their respective prisons. Specifically, the suicide expert stated that the prisons' suicide prevention teams were collecting only

---

**Selected Responsibilities of Prisons' Suicide Prevention Teams**

- Ensure implementation of and compliance with all Corrections' policies and procedures relating to suicide prevention and response.

- Implement training related to suicide prevention and response.

- Update local operating procedures to ensure consistency with Corrections' policies regarding suicide prevention and response.

- Review all suicides and suicide attempts in response to which staff performed CPR or other medical procedures, as well as prison staff cell entry and cut-down procedures.

- Monitor and track all suicide gestures, suicide attempts, self-mutilations, and deaths.

Source: Corrections' 2009 program guide.

quantitative but not qualitative monthly data on the completion of risk evaluations. Moreover, in his 2015 report, the suicide expert explained that he found that the prisons engaged in little discussion of overall suicide prevention strategies during their meetings. He commented that most meeting minutes reflected recitations of certain monthly statistics, but included few meaningful discussions about challenging cases or struggles with risk evaluations and treatment planning. In his January 2016 report, he stated that he found few positive changes in suicide prevention team practices at the 18 prisons he reviewed.

We identified similar concerns when we reviewed the minutes for the past three years of suicide prevention teams' meetings at the four prisons we visited. Specifically, the teams often did not discuss key issues, including self-harm incidents and the completion of risk evaluations. CCWF's minutes indicate that the suicide prevention team's reviews of attempted suicides were mostly narrations of events or recitation of statistics rather than analytical discussions focused on lessons learned and prevention. For example, its May 2016 minutes describe that two inmates attempted suicide by swallowing foreign objects, but the minutes do not indicate any actions required or lessons learned as a result of these incidents. In the same minutes, the team reported that the prison's mental health staff had a 29 percent passing rate for risk evaluation audits, but the minutes do not indicate that the team discussed what caused the low passing rate and how they planned to improve staff performance. Similarly, at RJD, discussions about mentoring and training prison staff regarding the completion of risk evaluations largely focused on quantitative data, such as attendance and completion rates. Further, RJD's suicide prevention team minutes do not indicate that discussions extended to the quality of the training or mentoring. Without such discussions, the work of the suicide prevention teams becomes more focused on reporting data rather than ensuring compliance with Corrections' policies and procedures related to suicide prevention and response.

## Corrections Has Not Ensured That It Reports Reliable Data on Inmate Suicide and Suicide Attempts

Corrections collects and reports data related to its operations using an organizational management tool called COMPSTAT. Each month Corrections publishes a statistical report detailing more than 500 data points on its prisons' operations. According to the COMPSTAT operations manager, Corrections' staff conduct a quality control process that entails reviewing the data they receive from prisons each month. She explained that staff look for outliers, unexpected patterns, and system issues. In addition, she stated that Corrections' staff meet with each prison's staff annually to discuss

the data in detail, which includes a joint annual review with the prison's leadership to discuss each line item in the annual report to ensure that the COMPSTAT numbers match the prison's numbers.

*We found discrepancies in the data related to COMPSTAT—Corrections' organizational management tool—that bring into question the data's accuracy.*

Nevertheless, we found discrepancies related to COMPSTAT's data that bring into question the data's accuracy. For example, for each of the four prisons we reviewed, we selected four months of COMPSTAT data from 2014 through 2016 and compared those months to the prisons' incident logs. We found that COMPSTAT reported a greater number of attempted suicides at CIW and suicides at CCWF than were recorded in their incident logs, and that it reported fewer attempts at SAC and RJD than were recorded in their respective logs. Further, when we reviewed suicide prevention team meeting minutes, incident reports, and other records, we found that COMPSTAT did not include suicides that occurred from 2013 through 2016 at three of the prisons we reviewed. Moreover, we were surprised to find that the special master's reports identify significantly more suicides from 2012 through 2015 than are recorded in COMPSTAT. For instance, COMPSTAT shows 18 suicides in 2015, while the suicide expert reported 24—a 33 percent difference.

Corrections' clinical support chief offered a number of explanations for the discrepancies we identified. She stated that the special master's reports used data from Corrections' mental health program on suicides in prisons, which she believes are accurate because it is this program that determines whether a death is a suicide. She explained that the numbers in COMPSTAT may be understated because they are based on prison staff's initial incident reports. She told us that the classification of incidents may not be accurate because an inmate may die from an attempted suicide days or weeks after the attempt occurs. Further, she noted that mental health staff have the opportunity to more thoroughly review the circumstances of incidents, which may cause them to reach different conclusions than the prison staff's initial incident reports reflect. In these instances, the clinical support chief indicated that the mental health program's data will reflect its staff assessment of the incident, but COMPSTAT may not. Specifically, she explained that prison staff are supposed to update this information in COMPSTAT by providing updated incident reports; however, she believes this step may not have always occurred given the understated suicide numbers in COMPSTAT.

The clinical support chief stated that she has previously raised these concerns with the COMPSTAT team, and the team was not resistant to adjusting its processes in order to present more accurate data. Because COMPSTAT represents Corrections' comprehensive source of data it makes readily available to the public on suicides and attempted suicides for each of its prisons, it must take steps

to ensure that the data are accurate. Otherwise, the public may draw incorrect conclusions about the rate of suicides and suicide attempts at a given prison or in the system as a whole.

### Corrections Can Increase Its Documentation and Dissemination to Prisons of Best Practices Related to Suicide Prevention

Although innovative programs and best practices related to inmate suicide prevention exist, Corrections could increase its efforts to document and disseminate this information to the prisons, and to monitor the success of programs or practices that could prove beneficial. For example, during our visit to RJD, we noted that it had implemented a program known as Striving to Achieve Rewards (STAR) that might benefit certain inmates at other prisons as well. RJD implemented STAR in August 2016 for inmates in its enhanced outpatient program, which provides care for mentally disordered inmates in a structured therapeutic environment that is less restrictive than inpatient care. According to a STAR pamphlet, the program's purpose is to improve inmate quality of life by creating a therapeutic community where inmates have many opportunities for positive experiences. STAR provides rewards to inmates for engaging in positive behavior, such as attending mental health groups and treating mental health staff and peers in a respectful manner. Over time, the inmates accumulate points that they can use for different levels of rewards, including participating in drama and book clubs and purchasing items, such as hygiene products, from the STAR store. RJD's chief psychologist stated that preliminary data, while not conclusive, have indicated that incidents of self-harm and rules violations have decreased since STAR began, even though RJD's inmate population has increased.

*RJD implemented a program that rewards positive behavior, such as attending mental health groups and treating staff and peers in a respectful manner. RJD stated that incidents of self-harm and rules violations have decreased since the program began.*

We also noted another program that RJD is in the process of developing that could prove useful for staff working in other prisons. Specifically, according to the program-related materials, workplace stress and job burnout are high among staff working in correctional settings. To better support its staff in managing its high-risk inmate population, RJD began developing a program named Helping Everyone Reach Objectives. The program's documentation indicates that RJD is designing a framework to provide additional resources and support to its multidisciplinary treatment teams who directly deal with inmate-patients. The program aims to ensure that RJD continues to provide high-quality care to its inmate population by providing staff with consultation and coaching, as well as fostering closer collaboration between all prison staff. According to RJD's chief psychologist, the prison had implemented aspects of the program with certain staff as of May 2017. It anticipates an increased rollout by the summer of 2017.

Case 2:90-cv-00520-KJM-DB   Document 6768-1   Filed 07/15/20   Page 76 of 113

Corrections' clinical support chief agreed that RJD's programs are innovative and explained that implementing them on a systemwide basis might be useful at some prisons, depending on those prisons' missions, infrastructures, and security levels. Nevertheless, Corrections' documentation related to discussion and dissemination of innovative programs and best practices related to suicide prevention is limited. For example, the deputy director of Corrections' statewide mental health program stated that in February 2016, Corrections' mental health program held a summit regarding suicide prevention at its headquarters in Northern California. She explained that prison leadership, including prisons' suicide prevention team coordinators, chiefs of mental health, and selected wardens, attended the summit to discuss challenges with suicide prevention, share best practices, and identify additional initiatives that might help improve the suicide prevention efforts already in place. She noted that Corrections has a number of plans for implementing ideas such as increasing outreach to inmates both inside and outside of mental health care. However, she could not provide documentation of the best practices discussed or of the outcomes of the summit's discussions—she could only provide the agenda and a spreadsheet listing Corrections' suicide prevention team's July 2017 tasks and priorities, which indicated the suicide summit occurred and another one would be scheduled in the near future. She stated that Corrections is tentatively planning to hold another summit in October 2017, and acknowledged that holding these summits at least annually is a good idea. We believe such meetings should occur on an ongoing basis, not only to discuss and document best practices, but also to monitor their effectiveness. This approach would provide Corrections an opportunity to formally disseminate information regarding programs like those at RJD.

Additionally, Corrections' clinical support chief stated that it holds quarterly meetings at headquarters between the prisons' chiefs of mental health where informal discussion on best practices may occur. She further explained that the regional teams hold monthly calls for all prisons within their respective regions, which also allows for the sharing of ideas and best practices. However, because these discussions are not documented, the clinical support chief could not provide evidence of any best practices discussed. Because it has not documented the discussion of best practices during these meetings and calls, Corrections has likely missed opportunities to formally identify and disseminate innovative program ideas systemwide, as well as to evaluate the effectiveness of these practices.

**Corrections Could Do More to Assess Ways to Reduce Suicide Attempts**

Corrections' policies require that it review each suicide to determine whether staff complied with its policies and procedures, such as the prison's emergency response to the suicide, completion of suicide risk evaluations, and follow‑up treatment after the inmate's discharge from a crisis bed prior to the suicide. The text box lists the specific information Corrections reviews. Corrections' policies require it to submit a report to the prison within 60 days of the inmate's death that includes recommended actions to address any problems it identified during its review and due dates for the prison to complete those actions. Prisons then have 90 days to submit documentation proving they have implemented the recommendations. According to Corrections' clinical support chief, Corrections established these timelines to ensure that it promptly identifies problems and that prisons take quick action to correct them.

> **Information Included in Corrections' Investigation of an Inmate Suicide**
>
> - Emergency response to the incident.
> - Medical autopsy and toxicology findings.
> - Inmate's background.
> - Inmate's ability to function in an institutional setting.
> - Inmate's mental health history.
> - Inmate's suicide attempt history.
> - Mental health care the inmate received while incarcerated.
> - Inmate's medical history.
> - Significant events preceding the suicide.
>
> Source: California State Auditor's analysis of Corrections' suicide report template.

The resulting reports are comprehensive enough to provide Corrections and its prisons with information critical to improving suicide prevention and response. Nonetheless, Corrections does not conduct similarly detailed reviews of the circumstances surrounding suicide attempts. As a result, it may not identify problems with clinical care or prisons' compliance with policies until those problems have contributed to an inmate's death. Although Corrections' policies require prisons to monitor and track suicide attempts, we do not believe Corrections requires sufficient detail in these reviews. Specifically, as of March 2017, its policies require that prisons' suicide prevention teams review the appropriateness of treatment plans for these inmates and the daily follow‑up checks that mental health staff must complete for five days following the inmates' discharges from crisis beds. However, Corrections does not require prisons to review other important circumstances surrounding suicide attempts, such as the actions of staff responding to the incidents and the adequacy of the risk evaluations that mental health staff completed before the attempts.

One of the four prisons we reviewed has implemented policies requiring in‑depth documented reviews of selected self‑harm incidents, including suicide attempts, at its facility. Specifically, SAC implemented a policy requiring its suicide prevention coordinator and supervisors involved with crisis triage and inpatient care to identify self‑harm incidents that might require detailed review, such as incidents where the inmates suffered serious bodily injury.

SAC prison officials explained that the suicide prevention team assigns mental health staff to conduct a review of the identified incident. According to a prison official at SAC, since 2008 the prison has completed roughly 450 of these self-harm reviews, but has performed a decreasing number because of increasing workloads and time constraints. We reviewed three of these reviews that the prison completed in 2016 and found that they generally included a thorough review of the inmates' mental health history, mental health status, and suicide risk. However, the reviews did not contain an examination of the adequacy of the inmates' previous risk evaluations or treatment plans, and were not as detailed or pointed in their criticism as Corrections' suicide review process.

Corrections plans to require prisons to complete more detailed reviews of suicide attempts. According to Corrections' clinical support chief, Corrections will require prisons to conduct detailed reviews of a selection of self-harm incidents where the inmate intended to die and there was serious bodily injury beginning in July 2017. She said that the prisons will need to review all of the same items that are included in the suicide reviews, except those that are not applicable, such as autopsy and toxicology reports, or those that would be inappropriate due to the need to protect inmate privacy, such as cellmate or peer interviews. However, even if Corrections requires prisons to be more detailed in their examination of self-harm incidents, prison staff are less likely to be as critical of their own processes as an external reviewer from Corrections might be. Corrections' clinical support chief stated that requiring Corrections to conduct such reviews at each prison could be resource intensive, but that pairing each prison with another, similar prison and having them review each other could help to ensure that the reviews are impartial. Absent an unbiased, thorough review of the factors contributing to inmate suicide attempts, Corrections may not identify potential problems with prisons' suicide prevention and response practices until after inmates have already died.

## Recommendations

### Legislature

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress in implementing the recommendations made by the special master's experts, the court-appointed suicide expert, and its own reviewers regarding inmate suicides and attempts. Corrections should include in its report to the Legislature the results of any audits it conducts as part of its planned audit process to measure the success of changes it implements as a result of these recommendations.

- Its progress in identifying and implementing mental health programs that may ameliorate risk factors associated with suicides at the prisons.

### Corrections

To ensure that prisons comply with its policies related to suicide prevention and response, Corrections should continue to develop its audit process and implement it at all prisons by February 2018. The process should include, but not be limited to, audits of the quality of prisons' risk evaluations and treatment plans.

To ensure that prisons can easily access Corrections' current policies related to mental health, Corrections should ensure that its program guide is current and complete as it works to incorporate the program guide into regulations. Corrections should immediately begin working with federal court monitors to draft regulations.

To ensure that suicide prevention teams meet quorum requirements, Corrections should, starting January 2018, work with prisons that consistently fail to achieve a quorum to resolve issues that may be preventing the teams from having all required members present at meetings.

To eliminate confusion regarding suicide prevention team meeting attendance, Corrections should immediately update its program guide to clarify who is required to attend suicide prevention team meetings, which attendees may send designees, and the extent to which staff may fill multiple roles when meeting quorum requirements.

To ensure that suicide prevention teams exercise leadership at prisons, Corrections should immediately require them to use available information about critical factors—such as the number and nature of inmate self-harm incidents and the quality and compliance with the policy of risk evaluations and treatment plans—to identify systemic issues related to suicide prevention. Corrections should require the suicide prevention teams to assess lessons they can learn, create plans to resolve current issues, and prevent foreseeable problems in the future.

To provide the public and relevant stakeholders with accurate information on suicides and suicide attempts in its prisons, Corrections should immediately require prison staff to work with mental health staff to reconcile any discrepancies on suicides and suicide attempts before submitting numbers to the COMPSTAT unit.

To ensure that all its prisons provide inmates with effective mental health care, Corrections should continue to take a role in coordinating and disseminating best practices related to mental health treatment by conducting a best practices summit at least annually. The summits should focus on all aspects of suicide prevention and response, including programs that seek to improve inmate mental health and treatment of and response to suicide attempts. Corrections should document and disseminate this information among the prisons, assist prisons in implementing the best practices through training and communication when needed, and monitor and report publicly on the successes and challenges of adopted practices.

In an effort to prevent future inmate suicide attempts, Corrections should implement its plan to review attempts with the same level of scrutiny that it uses during its suicide reviews. Corrections should require each prison's suicide prevention team to identify for review at least one suicide attempt per year that occurred at its prison. To ensure that the reviews include critical and unbiased feedback, Corrections should either conduct these reviews itself or require the prisons to review each other. These reviews should start in September 2017 and follow the same timelines as the suicide reviews, with the timeline beginning once the team identifies a suicide attempt for review.

We conducted this audit under the authority vested in the California State Auditor by Section 8543 et seq. of the California Government Code and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives specified in the Scope and Methodology section of the report. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
State Auditor

Date:            August 17, 2017

Staff:           Laura G. Kearney, Audit Principal
                 John Lewis, MPA
                 Fahad Ali, CFE
                 Amanda Millen, MBA
                 Alejandro Raygoza, MPA
                 Kelly Reed, MSCJ

Legal Counsel:   Heather Kendrick, Sr. Staff Counsel

For questions regarding the contents of this report, please contact
Margarita Fernández, Chief of Public Affairs, at 916.445.0255.

Case 2:90-cv-00520-KJM-DB    Document 6768-1    Filed 07/15/20    Page 82 of 113

Blank page inserted for reproduction purposes only.

# Appendix A

## RATES OF INMATE SUICIDES AND SUICIDE ATTEMPTS IN STATE PRISONS FROM 2012 THROUGH 2016

The Joint Legislative Audit Committee (Audit Committee) requested that we compare the rates of suicides and attempted suicides for male and female inmates in all state prisons from 2014 through 2016. In order to calculate these rates, we used data from Corrections' COMPSTAT system because it is the most comprehensive source of publicly reported data for the entire correctional system. Based on our analysis of COMPSTAT data, Table A beginning on the following page presents the rates and number of inmate suicides and suicide attempts at each state prison from 2012 through 2016. As we discuss in Chapter 3, the data from COMPSTAT on inmate suicides and attempted suicides are unreliable; however, they are also the most comprehensive, as well as being the data Corrections makes available to the public. Therefore, we present the data here but recommend in Chapter 3 that Corrections take steps to ensure its accuracy in the future.

## Table A
## Suicides and Suicide Attempts in Each California Prison From 2012 Through 2016

| | 2012 | | | | | 2013 | | | | |
| | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | |
| PRISON | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 |
|---|---|---|---|---|---|---|---|---|---|---|
| Avenal State Prison | 5,020 | 5 | 1.00 | 1 | 0.20 | 4,497 | 3 | 0.67 | 0 | 0.00 |
| California City Correctional Facility | — | — | — | — | — | — | — | — | — | — |
| California Correctional Center | 4,657 | 2 | 0.43 | 0 | 0.00 | 4,903 | 2 | 0.41 | 0 | 0.00 |
| California Correctional Institution | 4,643 | 5 | 1.08 | 1 | 0.22 | 4,572 | 5 | 1.09 | 1 | 0.22 |
| California Health Care Facility | — | — | — | — | — | — | — | — | — | — |
| California Institution for Men | 5,002 | 10 | 2.00 | 0 | 0.00 | 4,747 | 7 | 1.47 | 0 | 0.00 |
| *California Institution for Women* | *1,636* | *13* | *7.95* | *1* | *0.61* | *2,095* | *15* | *7.16* | *0* | *0.00* |
| California Medical Facility | 2,363 | 17 | 7.19 | 1 | 0.42 | 2,250 | 28 | 12.45 | 2 | 0.89 |
| California Men's Colony | 5,368 | 21 | 3.91 | 0 | 0.00 | 4,983 | 29 | 5.82 | 0 | 0.00 |
| California Rehabilitation Center | 3,694 | 1 | 0.27 | 0 | 0.00 | 3,434 | 1 | 0.29 | 0 | 0.00 |
| California State Prison, Corcoran | 4,626 | 20 | 4.32 | 1 | 0.22 | 4,410 | 16 | 3.63 | 1 | 0.23 |
| California State Prison, Los Angeles County | 3,848 | 13 | 3.38 | 0 | 0.00 | 3,723 | 7 | 1.88 | 1 | 0.27 |
| *California State Prison, Sacramento* | *2,693* | *22* | *8.17* | *1* | *0.37* | *2,233* | *32* | *14.33* | *1* | *0.45* |
| California State Prison, Solano | 4,313 | 4 | 0.93 | 1 | 0.23 | 4,007 | 2 | 0.50 | 0 | 0.00 |
| California Substance Abuse Treatment Facility and State Prison | 5,683 | 15 | 2.64 | 0 | 0.00 | 5,603 | 11 | 1.96 | 0 | 0.00 |
| California Training Facility, Soledad | 5,759 | 4 | 0.69 | 0 | 0.00 | 5,279 | 3 | 0.57 | 2 | 0.38 |
| Calipatria State Prison | 3,814 | 0 | 0.00 | 0 | 0.00 | 3,621 | 12 | 3.31 | 0 | 0.00 |
| Centinela State Prison | 3,659 | 2 | 0.55 | 1 | 0.27 | 3,025 | 1 | 0.33 | 0 | 0.00 |
| *Central California Women's Facility* | *2,934* | *5* | *1.70* | *0* | *0.00* | *3,532* | *8* | *2.27* | *0* | *0.00* |
| Chuckawalla Valley State Prison | 2,712 | 0 | 0.00 | 0 | 0.00 | 2,594 | 0 | 0.00 | 0 | 0.00 |
| Deuel Vocational Institution | 2,504 | 12 | 4.79 | 2 | 0.80 | 2,515 | 6 | 2.39 | 0 | 0.00 |
| Folsom State Prison | 2,840 | 2 | 0.70 | 3 | 1.06 | 3,017 | 4 | 1.33 | 3 | 0.99 |
| High Desert State Prison | 3,695 | 8 | 2.17 | 0 | 0.00 | 3,359 | 2 | 0.60 | 1 | 0.30 |
| Ironwood State Prison | 3,503 | 3 | 0.86 | 0 | 0.00 | 3,273 | 3 | 0.92 | 0 | 0.00 |
| Kern Valley State Prison | 4,108 | 10 | 2.43 | 0 | 0.00 | 3,728 | 20 | 5.36 | 1 | 0.27 |
| Mule Creek State Prison | 3,027 | 15 | 4.96 | 1 | 0.33 | 2,822 | 13 | 4.61 | 1 | 0.35 |
| North Kern State Prison | 4,680 | 8 | 1.71 | 0 | 0.00 | 4,761 | 14 | 2.94 | 1 | 0.21 |
| Pelican Bay State Prison | 3,091 | 11 | 3.56 | 0 | 0.00 | 2,785 | 17 | 6.10 | 0 | 0.00 |
| Pleasant Valley State Prison | 3,737 | 8 | 2.14 | 2 | 0.54 | 3,412 | 5 | 1.47 | 1 | 0.29 |
| *Richard J. Donovan Correctional Facility* | *3,537* | *28* | *7.92* | *0* | *0.00* | *3,355* | *33* | *9.84* | *3* | *0.89* |
| Sierra Conservation Center | 4,555 | 1 | 0.22 | 1 | 0.22 | 4,856 | 4 | 0.82 | 0 | 0.00 |
| San Quentin State Prison | 3,853 | 13 | 3.37 | 3 | 0.78 | 4,206 | 14 | 3.33 | 3 | 0.71 |
| Salinas Valley State Prison | 3,607 | 37 | 10.26 | 4 | 1.11 | 3,503 | 27 | 7.71 | 2 | 0.57 |
| Valley State Prison | 2,074 | 12 | 5.79 | 0 | 0.00 | 3,004 | 3 | 1.00 | 0 | 0.00 |
| Wasco State Prison | 5,043 | 25 | 4.96 | 1 | 0.20 | 5,134 | 27 | 5.26 | 1 | 0.19 |
| **Totals*** | **126,276** | **352** | **2.79** | **25** | **0.20** | **123,238** | **374** | **3.03** | **25** | **0.20** |

Source: California State Auditor's analysis of Corrections' COMPSTAT metrics.

Notes: As we note in Chapter 3 on page 58, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. The numbers in this table are not adjusted; we present them as they appear in COMPSTAT. Italicized rows represent the four prisons reviewed in this audit.

* Because we calculated populations based on a 12-month average, annual population amounts may differ from the total prison populations due to rounding.

| | 2014 | | | | | 2015 | | | | | 2016 | | | |
| | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | |
| POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,028 | 4 | 0.99 | 0 | 0.00 | 3,369 | 3 | 0.89 | 0 | 0.00 | 3,274 | 2 | 0.61 | 0 | 0.00 |
| 1,825 | 0 | 0.00 | 0 | 0.00 | — | — | — | — | — | 1,933 | 0 | 0.00 | 0 | 0.00 |
| 4,909 | 0 | 0.00 | 1 | 0.20 | 4,138 | 1 | 0.24 | 0 | 0.00 | 3,991 | 0 | 0.00 | 1 | 0.25 |
| 4,404 | 3 | 0.68 | 2 | 0.45 | 3,949 | 11 | 2.79 | 1 | 0.25 | 3,435 | 17 | 4.95 | 2 | 0.58 |
| 1,626 | 17 | 10.45 | 0 | 0.00 | — | — | — | — | — | 2,342 | 26 | 11.10 | 1 | 0.43 |
| 4,636 | 13 | 2.80 | 1 | 0.22 | 3,859 | 7 | 1.81 | 1 | 0.26 | 3,669 | 6 | 1.64 | 0 | 0.00 |
| 1,994 | 15 | 7.52 | 2 | 1.00 | 1,887 | 34 | 18.02 | 2 | 1.06 | 1,882 | 24 | 12.75 | 2 | 1.06 |
| 2,082 | 16 | 7.69 | 1 | 0.48 | 2,342 | 15 | 6.41 | 1 | 0.43 | 2,563 | 8 | 3.12 | 0 | 0.00 |
| 4,368 | 18 | 4.12 | 0 | 0.00 | 3,910 | 15 | 3.84 | 2 | 0.51 | 4,101 | 12 | 2.93 | 3 | 0.73 |
| 2,826 | 0 | 0.00 | 0 | 0.00 | 4,946 | 7 | 1.42 | 0 | 0.00 | 3,006 | 2 | 0.67 | 0 | 0.00 |
| 4,335 | 17 | 3.92 | 0 | 0.00 | 4,280 | 20 | 4.67 | 1 | 0.23 | 3,640 | 33 | 9.07 | 0 | 0.00 |
| 3,587 | 22 | 6.13 | 0 | 0.00 | 3,520 | 11 | 3.13 | 0 | 0.00 | 3,479 | 19 | 5.46 | 2 | 0.57 |
| 2,212 | 11 | 4.97 | 2 | 0.90 | 2,240 | 12 | 5.36 | 3 | 1.34 | 2,339 | 8 | 3.42 | 2 | 0.86 |
| 4,005 | 8 | 2.00 | 1 | 0.25 | 3,858 | 5 | 1.30 | 0 | 0.00 | 3,983 | 2 | 0.50 | 0 | 0.00 |
| 5,435 | 16 | 2.94 | 1 | 0.18 | 5,489 | 19 | 3.46 | 0 | 0.00 | 5,296 | 32 | 6.04 | 0 | 0.00 |
| 4,963 | 5 | 1.01 | 0 | 0.00 | 2,539 | 1 | 0.39 | 0 | 0.00 | 5,184 | 5 | 0.96 | 0 | 0.00 |
| 3,863 | 5 | 1.29 | 0 | 0.00 | 3,792 | 2 | 0.53 | 0 | 0.00 | 3,819 | 0 | 0.00 | 0 | 0.00 |
| 2,862 | 0 | 0.00 | 0 | 0.00 | 3,287 | 4 | 1.22 | 0 | 0.00 | 3,614 | 4 | 1.11 | 0 | 0.00 |
| 3,652 | 6 | 1.64 | 0 | 0.00 | 3,000 | 11 | 3.67 | 0 | 0.00 | 2,861 | 25 | 8.74 | 1 | 0.35 |
| 2,315 | 1 | 0.43 | 0 | 0.00 | 2,150 | 0 | 0.00 | 0 | 0.00 | 2,425 | 0 | 0.00 | 0 | 0.00 |
| 2,561 | 14 | 5.47 | 0 | 0.00 | 2,361 | 10 | 4.24 | 3 | 1.27 | 2,340 | 14 | 5.98 | 0 | 0.00 |
| 3,100 | 2 | 0.65 | 0 | 0.00 | 2,913 | 0 | 0.00 | 1 | 0.34 | 2,979 | 1 | 0.34 | 1 | 0.34 |
| 3,421 | 9 | 2.63 | 1 | 0.29 | 3,416 | 1 | 0.29 | 0 | 0.00 | 3,702 | 2 | 0.54 | 0 | 0.00 |
| 3,018 | 5 | 1.66 | 0 | 0.00 | 3,392 | 1 | 0.29 | 0 | 0.00 | 3,265 | 1 | 0.31 | 0 | 0.00 |
| 3,804 | 30 | 7.89 | 1 | 0.26 | 3,759 | 26 | 6.92 | 0 | 0.00 | 3,910 | 16 | 4.09 | 3 | 0.77 |
| 2,908 | 17 | 5.85 | 2 | 0.69 | 2,869 | 22 | 7.67 | 0 | 0.00 | 3,266 | 18 | 5.51 | 0 | 0.00 |
| 4,591 | 18 | 3.92 | 0 | 0.00 | 4,243 | 11 | 2.59 | 0 | 0.00 | 4,381 | 5 | 1.14 | 1 | 0.23 |
| 2,777 | 4 | 1.44 | 1 | 0.36 | 2,647 | 11 | 4.16 | 0 | 0.00 | 2,247 | 15 | 6.67 | 1 | 0.44 |
| 3,113 | 7 | 2.25 | 0 | 0.00 | 2,868 | 2 | 0.70 | 0 | 0.00 | 3,206 | 1 | 0.31 | 1 | 0.31 |
| 3,076 | 22 | 7.15 | 1 | 0.33 | 3,114 | 51 | 16.38 | 1 | 0.32 | 3,112 | 59 | 18.96 | 0 | 0.00 |
| 4,628 | 2 | 0.43 | 0 | 0.00 | 4,377 | 3 | 0.69 | 0 | 0.00 | 4,329 | 3 | 0.69 | 0 | 0.00 |
| 3,920 | 12 | 3.06 | 2 | 0.51 | 3,720 | 14 | 3.76 | 2 | 0.54 | 3,953 | 10 | 2.53 | 0 | 0.00 |
| 3,415 | 19 | 5.56 | 1 | 0.29 | 3,663 | 23 | 6.28 | 0 | 0.00 | 3,718 | 17 | 4.57 | 4 | 1.08 |
| 3,243 | 7 | 2.16 | 0 | 0.00 | 3,339 | 11 | 3.29 | 0 | 0.00 | 3,455 | 6 | 1.74 | 0 | 0.00 |
| 5,154 | 20 | 3.88 | 0 | 0.00 | 4,897 | 27 | 5.51 | 0 | 0.00 | 4,983 | 26 | 5.22 | 0 | 0.00 |
| **122,652** | **365** | **2.98** | **20** | **0.16** | **114,130** | **391** | **3.43** | **18** | **0.16** | **119,681** | **419** | **3.50** | **25** | **0.21** |

Blank page inserted for reproduction purposes only.

# Appendix B

## SCOPE AND METHODOLOGY

The Audit Committee directed the California State Auditor to perform an audit of Corrections' policies, procedures, and practices related to suicide prevention and reduction. We were directed to review the suicide and attempted suicide rates for male and female inmates in all state prisons; Corrections' policies and procedures for inmate suicide prevention and response, as well as their implementation; and CIW's implementation of Corrections' policies. We were also asked to determine areas in which Corrections could improve its mental health services, causes for CIW's high suicide rates, and the adequacy of mental health and suicide prevention training for CIW staff. Table B lists the objectives that the Audit Committee approved and summarizes the methods we used to address those objectives.

**Table B**

**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | We reviewed relevant state laws and regulations. |
| 2 | Evaluate Corrections' policies and procedures for inmate suicide prevention and response, including those related to instances when an inmate exhibits suicidal behavior. Determine whether such policies and procedures are implemented consistently throughout California's state prisons. | • We judgmentally selected three prisons to review in addition to CIW based on an analysis of the number of suicides and suicide attempts from 2014 through 2016 and of the prisons' missions: CCWF, RJD, and SAC. <br><br>• We obtained Corrections' policies and procedures for inmate suicide prevention and response. Further, we reviewed local operating procedures at each of the four prisons. <br><br>• We reviewed the *Coleman* special master monitoring reports, Corrections' suicide reports, and the suicide expert's audits to identify recommendations made to CIW, Corrections, and the other three prisons. We determined if the appropriate policies and procedures reflected those recommendations. We also interviewed relevant Corrections' staff for perspective on the implementation of these recommendations. <br><br>• We judgmentally selected 10 inmate suicides and suicide attempts from 2014 through 2016 from each of the four prisons. We reviewed the records for the 40 inmates' suicides and suicide attempts to determine if the prisons adhered to their local operating procedures and Corrections' policies and procedures on suicide prevention and response. We interviewed relevant staff at Corrections and at the prisons to obtain perspective on issues we found pertaining to these records. |
| 3 | For the most recent three-year period, compare the suicide and attempted suicide rates for male and female inmates in all state prisons. | • To better identify trends, we reviewed the five-year period from 2012 through 2016. <br><br>• We gathered Corrections' statistics on inmate suicides and suicide attempts from 2012 through 2016 for all California state prisons from Corrections' organizational management tool called COMPSTAT. <br><br>• We analyzed the COMPSTAT data to present the inmate suicide and suicide attempt rates by prison in Appendix A. <br><br>• We obtained perspective from Corrections' officials on any trends or inaccuracies that we observed and the methods Corrections used to gather and track these data. <br><br>• For Table 1 on page 9 and Table 6 on page 40, we adjusted the COMPSTAT data we present on suicides for the four prisons we reviewed based on documentation of suicides not recorded in COMPSTAT. In Table 1, we also adjusted the prison populations for the four prisons we reviewed based on average daily populations Corrections provided. In Appendix A, we did not adjust the COMPSTAT data as they are the data Corrections makes available to the public. |

*continued on next page . . .*

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 4 | Identify areas where Corrections can improve its mental health services, particularly with respect to the safety and care for inmates needing mental health treatment. | • Using the results of the testing of policies and recommendations in Objective 2, we determined areas in which Corrections could improve its practices. We gathered perspective on these areas of improvement from relevant Corrections' staff.<br>• We reviewed the monthly meeting minutes for the statewide suicide prevention team and the suicide prevention teams at each of the four prisons for 2016 to determine the meeting attendees and the topics staff addressed.<br>• We interviewed Corrections' officials and reviewed available documentation to identify the methods used to discuss, document, and disseminate best practices to the prisons related to suicide prevention and response.<br>• We obtained Corrections' reports on position vacancy rates as of December 2016 for social workers, psychiatrists, and psychologists at the four prisons we reviewed and for Corrections as a whole.<br>• We interviewed key staff at the four prisons and Corrections' headquarters to gather perspective on staff vacancies. |
| 5 | In reviewing the CIW do the following:<br><br>a. Evaluate whether CIW appropriately implemented Corrections' suicide prevention policies. | The procedures we performed in Objective 2 also addressed this objective. |
| | b. Identify and analyze CIW's policies and procedures in the event of a suicide, including any ensuing investigation and communication with the deceased inmate's family during and after such investigation. | • The procedures we performed in Objective 2 also addressed this objective.<br>• We reviewed Corrections' procedures for communicating with a deceased inmate's family following a death.<br>• We reviewed records for six inmates who committed suicide from 2014 through 2016 and determined that CIW complied with Corrections' policies for communicating with a deceased inmate's family following a suicide. |
| | c. To the extent possible, identify the causes or factors contributing to the higher rates of suicide and suicide attempts at CIW, including any systemic problems or failures. | • We interviewed key Corrections' headquarters staff and CIW staff to gather their perspectives on the causes for the higher rates of suicide and suicide attempts at CIW from 2014 through 2016.<br>• We evaluated data from CIW and CCWF regarding the suicide attempts by inmates who transferred from VSPW.<br>• We reviewed Corrections' available documentation of the plan to convert VSPW to a men's prison.<br>• We interviewed officials at CIW and Corrections to determine if the conversion process accounted for the effect the transfer of inmates from VSPW would have on CIW. |
| | d. Identify and analyze CIW's policies and practices in the event that an inmate displays suicidal behavior. Evaluate CIW's ability to appropriately house and treat inmates identified as suicidal and determine whether CIW allows access to inmate program activities or movements such as yard time. | • The procedures we performed in Objective 2 for the 40 inmates' suicides and suicide attempts also addressed this objective.<br>• We reviewed CIW's policies and documentation for six inmates regarding access to yard time. |
| | e. Evaluate the adequacy of the mental health and suicide prevention training for CIW staff. | • From a list containing all employees at CIW, we randomly selected 20 CIW staff members and determined the percentage who received annual suicide prevention training in 2014, 2015, and 2016.<br>• From a list containing all mental health staff at CIW, we randomly selected 10 psychiatrists, psychologists, and social workers and determined how many received training on how to complete suicide risk evaluations and other trainings required for mental health staff.<br>• We reviewed several suicide prevention trainings that Corrections' staff received to determine if the trainings contained the content Corrections' policies require and any additional content the suicide expert had recommended.<br>• We obtained self-reported data on selected required trainings from CCWF, CIW, RJD, and SAC and identified instances of low compliance. |
| 6 | Review and assess any other issues that are significant to the audit. | • We interviewed selected advocacy groups to identify their key concerns related to our audit scope.<br>• We addressed concerns related to delays in emergency response and monitoring inmates in Objective 2.<br>• We also addressed concerns related to identifying and disseminating best practices in Objective 4. |

Sources:  California State Auditor's analysis of the Audit Committee's audit request number 2016-131, planning documents, and analysis of information and documentation identified in the table column titled *Method*.

**Assessment of Data Reliability**

In performing this audit, we obtained data from Corrections' COMPSTAT organizational management tool. The U.S. Government Accountability Office, whose standards we are statutorily required to follow, requires us to assess the sufficiency and appropriateness of computer-processed information that we use to support findings, conclusions, or recommendations. Corrections' COMPSTAT tool provides monthly data to stakeholders and the public on a variety of measures at each of Corrections' prisons and other institutions. We used COMPSTAT data to report on the number of suicides and attempted suicides throughout California's adult prisons. We performed data-set verification procedures and found no errors. Further, as reported in Chapter 3, we assessed the accuracy and completeness of COMPSTAT data by comparing the data on suicides and attempted suicides for selected months to incident logs from the four prisons we visited and identified several errors. We also compared the number of suicides reported in COMPSTAT to those in reports from the special master's suicide experts and found they did not agree. Finally, during the course of our audit work, we identified one suicide each at three of the four prisons we visited that was not included in COMPSTAT. As a result, we determined that COMPSTAT data are not sufficiently reliable for the purposes of this audit. Nevertheless, we present these data in the report because COMPSTAT is Corrections' comprehensive source of data available on suicides and attempted suicides for each of its prisons, and it contains data Corrections makes publicly available. We discuss our findings in more detail in Chapter 3 and make a recommendation for improving the data on page 64.

We also obtained summary data from Corrections on the rates at which its employees attend various trainings. We tested selected employees at CIW and determined they did not all attend required trainings. We requested self-reported summary data from Corrections for each of the four prisons we visited to determine whether there was evidence at each prison to corroborate our findings at CIW. Because the data corroborated our findings, we determined it would be too resource-intensive to further test the accuracy and completeness of the prisons' self-reported data. Instead, we clearly attribute the data in the report to Corrections.

Blank page inserted for reproduction purposes only.

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF THE SECRETARY**
P.O. Box 942883
Sacramento, CA 94283-0001

July 31, 2017

Ms. Elaine M. Howle, State Auditor
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

Dear Ms. Howle:

The California Department of Corrections and Rehabilitation (CDCR) submits this letter in response to the California State Auditor's (CSA) audit titled "California Department of Corrections and Rehabilitation: It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides."

CDCR takes its responsibility to prevent inmate deaths by suicide very seriously and reviews each case carefully to allow it to continue to refine the suicide prevention program. Delivery of mental health services to CDCR inmates has improved overall, and CDCR continues to create a culture of focused improvement, oversight, and accountability in the area of suicide prevention both with staff and inmates. CDCR is committed to continuously evaluating and improving the performance and quality of the entire Mental Health Services Delivery System, including suicide prevention and response practices.

CDCR has made a great deal of progress implementing policies, training, and support for suicide prevention practices statewide, and acknowledges there is further progress to make. CDCR has completed or has in progress 58 initiatives, only 29 of which were recommendations from external suicide experts. For example, CDCR is nearing completion of a contract to provide substance abuse treatment specifically designed for individuals with mental health issues at the California Institution for Women (CIW) and other institutions; is developing a contract to address domestic violence for inmates in the mental health system in CDCR's women's institutions; has implemented the use of new suicide assessment tools and treatment protocols that reflect best practices in the field of suicidology; and provides increased mental health outreach to all inmates at CIW (including those who are not in the mental health system) by offering access to brief, solution-focused counseling.

CSA's report on CDCR's suicide prevention policies highlights areas where CDCR has already improved its practices, and where improvements continue to be made. CDCR will consider the recommendations made by the auditors to continue to improve upon its ongoing suicide prevention mission.

CDCR would like to thank CSA for their work on this report and will address the specific recommendations in a corrective action plan within the timelines outlined in the report. If you have further questions, please contact me at (916) 323-6001.

Sincerely,

SCOTT KERNAN
Secretary

Exhibit N

| Male Patients | CCCMS Population if Population was 74.3% of February 2020 Population | EOP Population if Population was 47.2% of February 2020 Population |
|---|---:|---:|
| General Population | 16023 | 2733 |
| Reception Center | 1716 | 76 |
| ASU/STRH/NDS/Condemned | 749 | 227 |
| SHU/LTRH/PSU | 176 | 59 |
| Total Population | 18663 | 6559 |

| Female Patients | CCCMS Population if Population was 74.3% of February 2020 Population | EOP Population if Population was 47.2% of February 2020 Population |
|---|---:|---:|
| General Population | 1293 | 81 |
| Reception Center | 181 | 0 |
| ASU/STRH/NDS/Condemned | 59 | 7 |
| SHU/LTRH/PSU | 19 | 1 |
| Total Population | 1551 | 89 |

---

1 General Population figures include all patients at other levels of care but awaiting transfer to designated level of care, and all patients in specialized medical beds.

[3577894.1]

Exhibit O

| PATIENT BASED STAFFING | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Staff Psychiatrist (9272) | Relief Factor | Patients Per Clinician | Ratio as Decimal | Male Population With Reductions | Female Population With Reductions | FTEs[1] needed for Males | FTEs Needed for Females | TOTAL FTE Based on 2018 Numbers |
| CCCMS GP | 0.243 | 280 | 0.003571429 | 16023 | 1293 | 71.13 | 6.89 | 78.07 |
| CCCMS Reception Center (RC) | 0.243 | 200 | 0.005 | 1716 | 181 | 10.66 | 1.35 | 12.01 |
| CCCMS ASU/STRH/Condemned/NDS | 0.243 | 125 | 0.008 | 749 | 59 | 7.45 | 0.7 | 8.15 |
| CCCMS SHU/LTRH/PSU | 0.243 | 200 | 0.005 | 176 | 19 | 1.09 | 0.14 | 1.24 |
| EOP GP | 0.243 | 120 | 0.008333333 | 2733 | 81 | 28.31 | 1.01 | 29.32 |
| EOP RC | 0.243 | 120 | 0.008333333 | 76 | 0 | 0.79 | 0.00 | 0.79 |
| EOP ASU/STRH/Condemned/NDS | 0.243 | 64 | 0.015625 | 227 | 7 | 4.41 | 0.16 | 4.57 |
| EOP PSU/SHU/LTRH | 0.243 | 64 | 0.015625 | 126 | 3 | 2.45 | 0.07 | 2.52 |
| POPULATION BASED TOTAL | | | | 21826 | 1643 | 126.29 | 10.32 | 136.61 |

| UNIT OR BED BASED STAFFING | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Staff Psychiatrist (9272) | Relief Factor | Base Staffing Per MHCB Unit | Staff per | Bed | Ratio As Decimal | Units | Beds | Beds less 5 beds per MHCB Unit | TOTAL FTE |
| MHCB | 0.74 | | 2.35 | 25 | 0.094 | 13 | 227 | 162 | 26.50 |
| Staff Psychiatrist (9272) on call for MHCB | | 0.3 | 0.3 | 50 | 0.006 | 13 | 227 | 162 | 4.87 |
| MOHU | 0.74 | | 1 | 9 | 0.111111111 | | 18 | | 3.48 |
| Desert Institutions | 0.243 | 0.5 | | | | 5 | | | 2.5 |
| Crisis Intervention | 0.74 | 0.3 | | | | 35 | | | 10.5 |
| UNIT OR BED BASED TOTAL | | | | | | | | | 47.85 |
| GRAND TOTAL | | | | | | | | | 184.46 |

---

[1] Full-Time Employees

Exhibit P

# CDCR/CCHCS COVID-19 Employee Status

## Current number of active staff cases: 755

Updated July 14, 2020

| Locations | Cumulative Confirmed | Staff Returned to Work |
|---|---|---|
| Avenal State Prison (ASP) | 81 | 41 |
| California City Correctional Facility (CAC) | 8 | 3 |
| Calipatria State Prison (CAL) | 51 | 22 |
| California Correctional Center (CCC) | 8 | 0 |
| California Correctional Institution (CCI) | 92 | 10 |
| Central California Women's Facility (CCWF) | 9 | 2 |
| Centinela State Prison (CEN) | 69 | 22 |
| California Health Care Facility (CHCF) | 36 | 9 |
| California Institution for Men (CIM) | 105 | 67 |
| California Institution for Women (CIW) | 23 | 20 |
| California Men's Colony (CMC) | 6 | 2 |
| California Medical Facility (CMF) | 9 | 3 |
| California State Prison, Corcoran (COR) | 40 | 12 |
| California Rehabilitation Center (CRC) | 50 | 28 |
| Richard A. McGee Correctional Training Center, Galt (CTC) | 5 | 5 |
| Correctional Training Facility (CTF) | 2 | 2 |
| Chuckawalla Valley State Prison (CVSP) | 64 | 49 |
| Deuel Vocational Institution (DVI) | 5 | 2 |
| Folsom State Prison (FSP) | 4 | 4 |
| High Desert State Prison (HDSP) | 13 | 3 |
| Ironwood State Prison (ISP) | 95 | 58 |
| Kern Valley State Prison (KVSP) | 24 | 4 |
| California State Prison, Los Angeles County (LAC) | 61 | 46 |
| Mule Creek State Prison (MCSP) | 2 | 2 |
| North Kern State Prison (NKSP) | 78 | 11 |
| Pelican Bay State Prison (PBSP) | 2 | 2 |
| Pleasant Valley State Prison (PVSP) | 8 | 3 |
| Richard J. Donovan Correctional Facility (RJD) | 20 | 6 |
| California State Prison, Sacramento (SAC) | 9 | 8 |
| Substance Abuse Treatment Facility (SATF) | 13 | 8 |

Case 2:90-cv-00520-KJM-DB    Document 6768-1    Filed 07/15/20    Page 98 of 113

| Sierra Conservation Center (SCC) | | |
|---|---|---|
| California State Prison, Solano (SOL) | 12 | 0 |
| San Quentin State Prison (SQ) | 209 | 53 |
| Salinas Valley State Prison (SVSP) | 6 | 1 |
| Valley State Prison (VSP) | 7 | 1 |
| Wasco State Prison (WSP) | 23 | 8 |
| Northern California Youth Correctional Center (NCYCC) | 4 | 2 |
| OH Close Youth Correctional Facility (OH Close) | 4 | 1 |
| NA Chaderjian Youth Correctional Facility (NAC) | 2 | 1 |
| Ventura | 1 | 1 |
| CDCR/CCHCS Worksite Location —Los Angeles County | 7 | 4 |
| CDCR/CCHCS Worksite Location—Kern County | 1 | 0 |
| CDCR/CCHCS Worksite Location—Sacramento County | 14 | 3 |
| CDCR/CCHCS Worksite Location—San Bernardino County | 5 | 3 |
| CDCR/CCHCS Worksite Location —San Diego County | 1 | 1 |
| CDCR/CCHCS Worksite Location — San Joaquin County | 2 | 2 |
| STATEWIDE TOTAL | 1,291 | 536 |

**There have been three COVID-related staff deaths:**
May 30– (https://www.cdcr.ca.gov/news/2020/05/31/cdcr-correctional-officer-dies-after-testing-positive-for-covid-19/)staff member from California Rehabilitation Center
June 3– staff member from Ironwood State Prison
July 13– staff member from North Kern State Prison

Exhibit Q

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES


# MEMORANDUM

| | |
|---|---|
| **Date:** | March 25, 2020 |
| **To:** | Chief Executive Officers |
| | Chief Psychiatrists |
| | Chief of Mental Health |
| | Senior Psychiatrist, Supervisors |
| **From:** | |

EUREKA C. DAYE, Ph.D., MPH, MA, CCHP
Deputy Director (A)
Statewide Mental Health Services

**Subject:**   **COVID-19 – MENTAL HEALTH DELIVERY OF CARE GUIDANCE**

In response to the current coronavirus disease 2019 (COVID-19) pandemic and out of an abundance of caution the California Department Corrections and Rehabilitation (CDCR) Statewide Mental Health Program (SMHP) is taking necessary precautions to reduce exposure to Coleman patients and mental health staff by addressing exceptional allowances provided. This memorandum provides guidance for the delivery of mental health care with the understanding that new challenges and impacts of COVID-19 may permit more restrictions at some institutions than others as we move through this difficult time and may likewise lead to interim changes in practice and/or policy exceptions not otherwise allowed by the *Mental Health Services Delivery System Program Guide 2009 Revision.*

Clinical leadership (to include Chief Executive Officers, Chiefs of Mental Health, Chief Nurse Executives, Chief Medical Executives, and the Chief Psychiatrist) shall assess program capacity and make determinations on admission and discharge practices based on factors to include available workforce, known COVID-19 exposure, etc.. Leadership must consider individual patient needs, facility-system flows, and the degrees of risk when making these decisions.

To ensure patients continue to receive the most appropriate and effective interventions necessary to meet their needs, each clinical provider shall assess the patient's needs and continue to deliver services as appropriate in person, or via tele-health technology such as WebEx, Citrix, and other solutions.

The attached chart serves as a guide and provides a tiered approach on the delivery of care dependent upon each institution's staffing and operational circumstances. The CEOs, in consultation with the Wardens, will determine which tier shall be applied each day. Tier One

represents operating close to Program Guide requirements, while Tier Four represents dramatically decreased resources. The following factors shall be taken into consideration when determining the tier an institution will operate within:

- Clinical and custodial staffing levels
- Space availability
- Social distancing requirements
- Local and statewide restrictions on movement
- Quarantines and Isolations

**Mental Health Patients**

Mental health patients are at increased risk for escalation in depression, anxiety, panic attacks, psychomotor agitation, psychotic symptoms, delirium, and suicidality during this COVID-19 pandemic. Sources of stress include social isolation, decreased sensory stimulation, lack of access to standard clinical programing, diminished coping strategies, and limited outdoors or out-of-cell exercise and activities. We are focused on three critical areas during this COVID-19 pandemic: 1) Preserving life; 2) Stabilizing of acute mental health deterioration; 3) Helping the mental health population cope.

**Provisions of Treatment**

To the extent possible, institutions shall follow current Program Guide policies and procedures including, but not limited to: clinical contacts, group and treatment requirements, emergent and urgent referral processes, crisis intervention, suicide prevention, and inpatient referrals. However, to ensure patients receive the essential care and support services during this time of fewer onsite staff and various restrictions on patient movement the below and attached guidelines provide direction on ways to provide services and minimize the risk to both patients and staff:

- Individual clinical contacts shall continue while maintaining social distancing. As institutions move toward less patient movement measures and staffing levels decrease, individual contacts should be triaged by emergent referrals, patient acuity and levels of care.
- Interdisciplinary Treatment Teams (IDTT) shall continue while maintaining social distancing. In lieu of the tradition setting, the use of technology should be optimized to ensure attendance by all IDTT members. The best solution is to turn team meetings into teleconference meetings, with staff calling in from their individual offices.
- Groups shall continue but may be reduced in size in order to adhere to social distancing requirements. In addition, alternative locations should be explored. Larger classrooms or vocational space, temporarily closed during this time, could be used to allow for social distancing for groups. Develop in-cell Recreational Therapy and other group activities that can be conducted and distributed.
- Patients in isolation and/or quarantine will not attend groups but shall be provided with therapeutic treatment packets, workbooks, and other in cell activities and shall receive

daily rounding by at least one of the following designated staff to include: CNA, Psychologist, LVN, Recreational Therapists, PTs, RNs, or Social Workers.

- Psychiatry and primary care clinicians should be consulted urgently on patients expressing suicidal ideation or intent, psychosis, medication side effects, incomplete symptom control, or acute agitation.
- Psychiatry should also be consulted for other non-urgent significant psychiatric symptoms as usual.
- In the event of severe staffing shortages, frequent mental health wellness and surveillance rounding is required with liaison between psychiatrists, psychologists, suicide prevention coordinators and recreational therapists to identify significant concern for a patient's mental health sequelae. These rounds are to identify any urgent/emergent clinical issues including but not limited to acute suicidality.
- Issues identified through these rounds are to be promptly brought to the attention of the assigned psychiatrist.
- Staff performing rounds shall use appropriate personal protective equipment (PPE) as determined by public health.
- Psychiatry encounters may be via tele-psychiatry during the COVID-19 pandemic as approved by the hiring authority (See section on tele-psychiatry below for details).

**Suicide Prevention**

As much as possible, all Suicide Risk Assessments shall continue per policy and patients identified as a suicide risk will receive an in-person mental health evaluation. As operational abilities are impacted due to staff reductions, the clinician assessing the patient for suicidality will conduct the Columbia screener and a full mental health status exam and do the following:

1. If the patient screens positive, he/she shall be placed in alternative housing and be referred to a Mental Health Crisis Bed (MHCB). Within 24 hours of placement in the MHCB or if the patient remains in alternative housing longer than 24 hours, a full Suicide-Risk and Self-Harm Evaluation shall be completed.
2. If the patient screens negative, the clinician shall establish a safety plan with the patient and he/she can be returned to housing with a consult order for the primary clinician to see the patient with an urgent or routine referral.
   - All (5) five-day follow-ups will be completed in person, per policy, while maintaining social distancing.
   - As the operational abilities begin to limit clinical contacts and services, Administrative Segregated Unit workbooks shall be distributed to Enhanced Out-Patient housing units and the Correctional Clinical Case Management System population for in-cell activities.
   - Suicide Prevention and Response Focus Improvement Team Coordinators shall distribute the high risk list to all primary clinicians and psychiatrists. Cell visit check-ins with these patients shall be conducted by a mental health provider, in addition to the required scheduled appointments.

**Inpatient Referrals and Services**

As of March 17, 2020, the Department of State Hospitals (DSH) has temporarily suspended patient transfers to and from CDCR. As a result, patients referred to a higher level of care of at least a restrictive housing of a DSH facility will remain at CDCR. The below information and reminders are critical to ensure all patients currently housed or awaiting placement to an inpatient bed receive the appropriate care and oversight during this time.

- All referrals to higher levels of care shall continue as clinically indicated and determined by the IDTT.
- Patients housed out of their least-restrictive housing due to the inability to transfer to DSH, shall be placed in the least restrictive housing available within CDCR.
- As wait times increase, every effort shall be made to provide these patients with the services commensurate with their level of care. This includes providing enhanced out-of-cell time and therapeutic activities as well as daily rounds, as operations allow, while awaiting transfer.
- Patients housed in an MHCB awaiting transfer to a higher level of care and patients in alternative housing awaiting transfer to an MHCB will be provided enhanced out-of-cell time and therapeutic activities as well as daily rounds, as operations allow, while awaiting transfer.
- Inpatient licensed beds shall not be closed to admissions by the institutions without going through the proper authorization and notification process.

**Patient Education**

Clinical focus shall be on supporting patients by encouraging questions and helping them understand the current pandemic situation. Clarify misinformation and misunderstandings about how the virus is spread and that not every respiratory disease is COVID-19. Provide comfort and extra patience. Check back with patients on a regular basis or when the situation changes. Recognize that feelings such as loneliness, boredom, fear of contracting disease, anxiety, stress, and panic are normal reactions to a stressful situation such as a disease outbreak.

Key communication messages to mental health patients:

- The importance of reporting fever and/or cough or shortness of breath along with reporting if another patient is coughing in order to protect themselves. Indicate how these reports should be made.
- Reminders about good-health habits to protect themselves, emphasizing hand hygiene.
- Plans to support communication with family members if visits are curtailed.
- Plans to keep patients safe, including social distancing.

**Patient Isolation (Symptomatic Patients)**

A critical infection control measure for COVID-19 is to promptly separate patients who are sick with fever or respiratory symptoms away from other patients in the general population. Precautionary signs shall be placed outside the isolation cell and PPE appropriate protocols shall be followed.

**Quarantine (Asymptomatic Exposed Patients)**
The purpose of quarantine is to assure that patients who are known to have been exposed to the virus are kept separated from other patients with restriction of movement to assess whether they develop viral infection symptoms.

- Exposure is defined as having been in a setting where there was a high likelihood of contact with respiratory droplets and/or body fluids of a person with suspected or confirmed COVID19.
- Examples of close contact include sharing eating or drinking utensils, riding in close proximity in the same transport vehicle, or any other contact between persons likely to result in exposure to respiratory droplets.
- The door to the Quarantine Unit should remain closed. A sign should be placed on the door of the room indicating that it is a Quarantine Unit which lists recommended personal protective equipment (PPE).
- Medical Holds are employed for both isolation and quarantine. A temporary prohibition of the transfer of patients with the exception of legal or medical necessity is now in place.

**Social Distancing**
To stop the spread of COVID-19, social distancing must be employed. CDC officials recommend avoiding large gatherings of more than 10 people and maintaining a distance of 6 feet from other people. This reduces the chance of contact with those knowingly or unknowingly carrying the infection.

**Patient-to-Patient; Patient-to-Staff Social Distancing**
If group spaces are too small to accommodate the 6-feet rule, consider smaller group sizes in the interim. Groups can be smaller with higher frequency or this may mean needing to decrease the number of treatment offerings. Say to the patients that because of the COVID19, "We have a policy of keeping at least 6 feet of distance between patients and staff and patients and each other, which is why I'm sitting here and you're sitting there." If you don't say it, many patients may misinterpret social distancing (i.e. "my clinician is scared of me"). Maximize disinfection of all areas used for group and 1:1 treatment.

**Tele-Psychiatry and Social Distancing**
With the latest expansion of tele-psychiatry waivers, exceptions issued by the Center for Medicare and Medicaid Services (CMS), tele-psychiatry may be used to minimize any COVID-19 impacts that could disrupt the daily psychiatric services to patients. Psychiatrists who are unable to come into the institution because of personal risk factors (age > 65, chronic medical condition, etc.) or are under a personal quarantine who are otherwise fit to work can be authorized to use WebEx to conduct patient visits from a home computer that has a camera, speaker, and microphone. A state laptop with a VPN or any home computer with Citrix can access the EHRS.

- Each clinician who is providing tele-services will require a tele-presenter within the institution.
- Tele-presenters can include Medical Assistant, Certified Nursing Assistant, Licensed Vocational Nurse, Registered Nurse, or any other healthy employee who is available to assist. This could include support staff who are on Administrative Time Off.
- Presenters shall be provided PPE as needed based upon public health recommendations. Successful use of tele-psychiatry will require clinic space, tele-health equipment, IT assistance, scheduling organization, escort support, frequently updated telephone and email contact lists, and local executive leadership support.

cc: Diana Toche, DDS, Undersecretary
    Joseph Bick, MD, CCHP, Director
    Connie Gipson, Director
    Regional Health Care Executives
    Deputy Directors

| Tier | Inpatient Referrals | Suicide Prevention | Provision of Treatment | Evaluations (Pre-Release, MDO) |
|------|---------------------|---------------------|------------------------|--------------------------------|
| **Tier One:**<br>Delivery of care continues with minor modifications up to and including:<br>• Patient movement permitted between and within CDCR facilities.<br>• Minor movement restrictions within specific housing units or yards.<br>• Temporary suspension of transfers to DSH.<br>• Adequate clinical staff are on site and available to provide services<br>• Sufficient beds and staff are available for 1:1 watch and alternative housing.<br>• Social Distancing Required | Referrals continue per policy.<br><br>Patients out of LRH, due to bed unavailability (DSH unlocked dorm) will be placed in the least restrictive housing available within CDCR. | **Suicide Risk Assessments:** Continue to complete per policy.<br><br>**Five day follow ups:** Complete in person per policy, while maintaining social distancing.<br><br>**Referrals:** Continue to respond to referrals in accordance with MHPG timelines. | **IDTT:** Continue with social distancing. Optimize use of technology including VTC, SKYPE, conference calls, or other electronic alternatives.<br><br>**Groups:** Continue but may be reduced in size or in alternative non confidential locations (e.g. day room, class rooms) for social distancing.<br><br>**Individual contacts:** Continue, with social distancing.<br><br>**Patients on isolation:** Provide with treatment packets/therapeutic activities to complete in cell. Treatment team members visit cell daily.<br><br>**Personal Protective Equipment:** Those rounding in quarantined and isolated areas must be provided appropriate personal protective equipment (PPE) based upon the most recent public health recommendations. All staff shall receive training in the appropriate use of PPE. | **Pre-Release Planning:** All required activities to occur when social distancing can be followed.<br><br>**MDO Evaluations:** MDO evaluations will continue and patients meeting MDO criteria will be admitted to DSH.<br><br>If MDO evaluator cannot enter a facility review will occur remotely and the evaluator will work with the MDO Coordinator (CCI) at the facility to arrange for a telephonic interview. |

| Tier | Inpatient Referrals | Suicide Prevention | Provision of Treatment | Evaluations (Pre-Release, MDO) |
|------|---------------------|--------------------|------------------------|-------------------------------|
| **Tier Two:**<br>Minor movement restrictions and staff limitations impacting daily operations.<br><br>• Patient movement permitted between and within CDCR facilities<br>• Minor movement restrictions within specific housing units and/or yards<br>• Temporary suspension of transfers to DSH.<br>• Minor clinical staffing shortages requires triage for services<br>• Sufficient beds and staff are available for 1:1 watch and alternative housing.<br>• Social distancing required | Referrals continue per policy.<br><br>As wait times increase, patients shall be provided enhanced care, which may include, but not limited to, daily rounds, out of cell time, and therapeutic activities as operations allow, while awaiting transfer.<br><br>Patients awaiting MHCB will be placed in alternative housing on 1:1 status per current policy. Treatment frequency should be that of MHCB patients, when operations allow, while awaiting transfer. | **Suicide Risk Assessments:** Columbia Screener may be used with a mental status examination for suicide screening when staffing shortages prevent use of SRASHE.<br><br>Patients identified as suicide risk will receive in person evaluation.<br><br>**Five day follow ups:** Complete in person per policy, while maintaining social distancing.<br><br>**Referrals:** Triage referrals responding to emergent and urgent first, and triage routine referrals for urgency.<br><br>**Prevention:**<br>Distribute ASU Workbooks to outpatient housing units (EOP) for in-cell activities.<br><br>SPRFIT Coordinators distribute the high risk list to all primary clinicians. PCs to conduct cell visits for check-ins with individuals on this list. These visits should be in addition to required scheduled appointments.<br><br>If decompensation is noted, patients should be brought out for assessment. | **Treatment may be triaged as follows as staffing shortages and space access are decreased:**<br><br>**Triage Guidelines:** Individual contacts as follows:<br><br>- Emergent referrals<br>- Patients on high risk list<br>- Patients in inpatient facilities<br>- Patients awaiting transfer to inpatient LOC<br>- Patients in segregated housing<br>- Patients in EOP level of care<br>- Patients in CCCMS level of care<br><br>**IDTT:** Continue with social distancing. Optimize use of technology including VTC, SKYPE, conference calls, or other electronic alternatives.<br><br>**Groups:** Continue but may be reduced in size or in alternative non confidential locations (e.g. day room, class rooms) for social distancing. May be triaged.<br><br>- CCCMS groups may be reduced or cancelled to redirect resources to EOP and inpatient programs.<br><br>-Consider altering work schedules to stagger groups and offer into late evenings and weekends. | **Pre-Release Planning:**<br><br>Prioritize the ROIs to those releasing only to L.A. county and San Diego county<br><br>Prioritize completion of the PRPA for those releasing to L.A. and San Diego counties first.<br><br>The assigned psychiatrist will continue to be notified of the release date.<br><br>Provide groups in accordance with group guidelines in treatment activities section of this document<br><br>Complete 5150 requests per standard process<br><br>Complete transportation Chrono's per standard process<br><br>Conduct pre-release CCAT when possible (dependent upon outside clinician availability)<br><br>**MDO Evaluations:** MDO evaluations will continue and patients meeting MDO criteria will be admitted to DSH.<br><br>Evaluators will bundle evaluations for a single visit to reduce the number of trips to a facility.<br><br>If MDO evaluator cannot enter a facility review will occur remotely and the evaluator will work with the MDO Coordinator (CCI) at the |

| Tier | Inpatient Referrals | Suicide Prevention | Provision of Treatment | Evaluations (Pre-Release, MDO) |
|------|---------------------|--------------------|------------------------|--------------------------------|
| | | | -Develop in cell RT and other group activities and distribute when group offerings decrease.<br><br>**Patients on isolation:** Provide with treatment packets to complete in cell. Treatment team members visit cell daily.<br><br>**Psychiatry:** Psychiatrists check in & check out daily with Chief Psychiatrist to track availability and coverage. Updated contact lists and workflows will be determined and provided by each institution up to and including contact list for:<br><br>- Nursing<br>- MHCB/TTA/CTC<br>- Institutional leadership<br>  (Chief Psychiatrist, CMH, CEO)<br>- Medical providers<br>- Pharmacists<br>- Custody command chain<br>- Telepsychiatry Seniors<br>- Medication lines<br><br>Begin to Triage as follows:<br>Admissions and discharges and related inpatient processes<br>Suicide watch assessments and orders<br>- Suicide precaution assessments and orders<br>- Emergency Medication orders during patient crisis, PC 2602s<br>- Seclusion and Restraints "Face to Face" assessments or renewals<br>- Stat Labs for patients with suspected toxicity e.g. Lithium) | facility to arrange for a telephonic interview. |

| Tier | Inpatient Referrals | Suicide Prevention | Provision of Treatment | Evaluations (Pre-Release, MDO) |
|------|---------------------|--------------------|-----------------------|-------------------------------|
|      |                     |                    | - Renewing expiring psychiatric medications<br>- Medication changes as necessary<br>- Confirming lack of psychiatric medication-related medical issues<br>- IDTT participation<br>- Routine psychiatric follow up<br><br>**Telepsychiatry:** Psychiatrists who are assigned to work on-site who are no longer able to come into the institution (for example >65 years old, high risk medical condition, quarantine but still able to work) can use WebEx to conduct patient visits from any home computer with a camera/ speaker/ microphone. A state laptop with a VPN (or any home computer with Citrix) can access EHRS.<br>- Staff that could be used as telepresenters is decided by each institution to include:<br>  • MA or CNA<br>  • Any staff unable to perform their assigned duties during the crisis (with training), e.g.<br>   - Dental<br>   - ATO<br>   - support staff<br>   - any healthy state personnel<br>   - Any Mental Health provider (Group leader, RT, SW, LCSW, PhD/ PsyD)<br>   - LVN, RN |   |

| Tier | Inpatient Referrals | Suicide Prevention | Provision of Treatment | Evaluations (Pre-Release, MDO) |
|---|---|---|---|---|
| | | | - Any medical provider (PA, NP, MD)<br><br>All telepresenters require personal protective equipment as in Tier 1<br><br>This will also require: office space, tele-health equipment, IT assistance, OT organization, Custody escort support, contact lists as in tier 2, and local leadership support | |

| Tier | Inpatient Referrals | Suicide Prevention | Provision of Treatment | Evaluations (Pre-Release, MDO) |
|---|---|---|---|---|
| **Tier Three**<br>Movement restrictions within facilities and staffing shortages requires substantial change in standard practice<br><br>• Patient movement permitted between most CDCR facilities.<br>• Movement restrictions are in effect within the institutions.<br>• Temporary suspension of transfers to DSH.<br>• Substantial clinical staffing shortages requires increased triage for services<br>• There may be insufficient beds and/or staff for alternative housing and 1:1 watch. | Referrals continue per policy.<br><br>**If staffing and space become unavailable:**<br><br>**Alt Housing Location:** Patients who can be safely watched in their existing cell will be placed on 1:1 watch (must be single cell status, items removed per watch policy). These patients will be treated as MHCB patients for all clinical contacts as operations allow.<br><br>**1:1 Watch:** When there are not enough staff for 1:1 watch, patients in alternative housing may be placed on 2:1 watch if the location allows for good line of sight and patients are next door to one another, allowing continuous watch of each. CEO to determine when this can be applied and will provide the direction above with oversight for safety. | **Suicide Risk Assessments:** *See Tier two*<br><br>**Five day follow ups:** *See Tier Two*<br><br>**Referrals:** *See Tier Two*<br><br>**Prevention:** *See Tier Two and Provision of Treatment Column* | **Rounding:** Every day, every patient in the Mental Health Services Delivery System (CCCMS, EOP, MHCB, ICF, ACUTE) shall be rounded on by at least one of the following designated staff to include: CNA, Psychologist, LVN, Recreational Therapists, PTs, RNs, or Social Workers, by building and yard. The review includes questions of immediate, acute suicidality and/or medical concerns. Patients who answer in the affirmative must be brought to the attention of the assigned psychiatrist at least once a day (preferably twice) at fixed times for treatment.<br><br>When patients respond in the affirmative:<br><br>- A consult order shall be placed per current policy.<br>- MH clinicians will address emergent issues per current policy.<br>- Patients will be placed on a list for discussion with the psychiatrist.<br><br>Rounds shall be documented in the healthcare record as follows:<br><br>Nursing: Iview psych tech daily rounds.<br><br>MH Clinicians: MH PC Progress note.<br><br>Personal protective equipment required as in tier 1. | **Pre-Release Planning:**<br><br>ROIs to those releasing only to L.A. county and San Diego county ONLY.<br><br>Complete the PRPA for those releasing to L.A. and San Diego counties. For releases to other counties, the IMHPC or PC or other clinician who knows the patient, will determine if exigent circumstances related to release exist, and if so, will attempt to communicate those needs to the respective community stakeholders via email. Document efforts in a pre-release planning progress note.<br><br>The assigned psychiatrist will continue to be notified of the release date.<br><br>Provide groups in accordance with group guidelines in treatment activities section of this document.<br><br>Complete 5150 requests per standard process<br><br>Complete transportation Chrono's per standard process<br><br>Conduct pre-release CCAT when possible (dependent upon outside clinician availability)<br><br>**MDO Evaluations:** *See Tier Two* |

| Tier | Inpatient Referrals | Suicide Prevention | Provision of Treatment | Evaluations (Pre-Release, MDO) |
|---|---|---|---|---|
| | | | As ability to provide out of cell groups decreases:<br>- RTs play music and conduct other activities on the unit<br>- Continue to replenish supply of in cell treatment materials.<br><br>Direct Staff and Care as follows:<br>  - Emergent referrals<br>  - Five Day Follow Ups<br>  - Patients on high risk list<br>  - Patients in inpatient facilities<br>  - Patients awaiting transfer to inpatient facility<br>  - Patients in segregated housing<br>  - Patients in EOP level of care<br>  - Patients in CCCMS level of care<br><br>**Telepsychiatry: As per tier 2 above** | |

| Tier | Inpatient Referrals | Suicide Prevention | Provision of Treatment | Evaluations (Pre-Release, MDO) |
|---|---|---|---|---|
| **Tier Four**<br>Patient movement restrictions between and within facilities is suspended and significant staffing shortages require substantial change in standard practice<br>• Patient movement is not permitted between most CDCR facilities.<br>• Patient movement restrictions in most units and/or yards within facilities<br>• Temporary suspension of transfers to DSH.<br>• Substantial clinical staffing shortages requires further triage for services<br>• Insufficient beds and/or staff available for 1:1 watch and alternative housing. | *See Tier Three* | *See Tier Three* | *See Tier Three*<br><br>**Psychiatry Services** Any physician, NP, or PA serves as psychiatrists for the plans in Tier 2 and 3 above.<br><br>Laptops with VPN (or home computers with Citrix) provide for chart access from home, for the equivalent of basic on-call coverage. Local triage (by Chief Psychiatrist and CMH) to establish referral priority for tele-health. | **Pre-Release Planning:**<br>- ROIs will not be completed<br>- The PRPA will not be completed For releases, the IMHPC or PC or other clinician who knows the patient, will determine if exigent circumstances related to release exist, and if so, will attempt to communicate those needs to the respective community via email. The assigned psychiatrist will continue to be notified of the release date.<br>- Complete 5150 requests per standard process<br>- Complete transportation Chrono's per standard process<br>- Conduct pre-release CCAT when possible (dependent upon outside clinician availability)<br><br>**MDO Evaluations:** *See Tier Two* |