1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   ADRIANO HRVATIN, State Bar No. 220909
    Supervising Deputy Attorney General
3   ELISE OWENS THORN, State Bar No. 145931
    TYLER V. HEATH, State Bar No. 271478
4   KYLE A. LEWIS, State Bar No. 201041
    LUCAS L. HENNES, State Bar No. 278361
5   Deputy Attorneys General
      1300 I Street, Suite 125
6     P.O. Box 944255
      Sacramento, CA 94244-2550
7     Telephone: (916) 210-7318
      Fax: (916) 324-5205
8     E-mail: Elise.Thorn@doj.ca.gov
    Attorneys for Defendants

    ROMAN M. SILBERFELD, State Bar No. 62783
    GLENN A. DANAS, State Bar No. 270317
    ROBINS KAPLAN LLP
      2049 Century Park East, Suite 3400
      Los Angeles, CA 90067-3208
      Telephone: (310) 552-0130
      Fax: (310) 229-5800
      E-mail: RSilberfeld@RobinsKaplan.com
    Special Counsel for Defendants

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14   **RALPH COLEMAN, et al.,**                    2:90-cv-00520 KJM-DB (PC)

15                                 Plaintiffs,     **DEFENDANTS' RESPONSE TO JULY 2,**
                                                   **2020 ORDER**
16          v.

17
     **GAVIN NEWSOM, et al.,**
18
                                  Defendants.
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................................. 1

Analysis of the Court's Questions ........................................................................................ 3

I. Question No. 1:  Further Clustering of EOP Patients and Patients at Higher Levels of Care Will Not Limit Class Member Transfers Nor Improve Compliance with the Program Guide ............................................................. 3

    A. CDCR Already Clusters Class Members .................................................... 3

    B. CDCR Has Previously Analyzed and Reported Problems Inherent in Clustering the Highest Acuity Patients .................................................... 5

    C. More Clustering Will Not Limit Class Member Transfers ........................ 7

    D. More Clustering Will Require Construction of New Prison Facilities in Violation of the PLRA ............................................................. 8

    E. The 2013 Plata v. Brown Decision Does Not Support Further Clustering ...................................................................................................... 9

II. Question No. 2:  Defendants' Plans for Additional Voluntary Releases Are Intended to Protect Inmates from COVID-19, and Defendants Continue to Substantially Comply with Program Guide Requirements Where Feasible ........ 10

    A. This Court's Premise That Additional Population Reductions Are Necessary to Achieve "Full and Durable" Program Guide Compliance Is Flawed .................................................................................. 10

    B. Coleman Class Members Have and Will Continue to Benefit from CDCR's Plans to Voluntarily Release Inmates ........................................ 12

    C. During the COVID-19 Pandemic, Defendants' Planned Releases Cannot Achieve a Targeted Occupancy Goal to Facilitate Full and Durable Program Guide Compliance ........................................................ 14

III. Question No. 3:  the Court May Not Sua Sponte Request the Convening of a New Three-Judge Panel to Release Coleman Class Members .......................... 15

Conclusion ............................................................................................................................ 17

# TABLE OF AUTHORITIES

**Page**

CASES

*Brown v. Plata*
    563 U.S. 493 (2011) ...................................................................................................16

*Coleman v. Schwarzenegger/Plata v. Schwarzenegger*
    922 F. Supp. 2d 882 (E.D. Cal., N.D. Cal. Aug. 4, 2009) ............................... *passim*

*Jones v. Wittenberg*
    29 Ohio Misc. 35 (N.D. Ohio 1971) .........................................................................8

*Padgett v. Stein*
    406 F. Supp. 287 (M.D. Pa. 1975) ............................................................................8

*Parton v. White*
    203 F.3d 552 (8th Cir. 2000)...................................................................................16

*Plata v. Brown*
    427 F.Supp.3d 1211 (N.D. Cal. 2013) .......................................................1, 6, 9, 10

*Rufo v. Inmates of the Suffolk County Jail*
    502 U.S. 367 (1992) .................................................................................................16

STATUTES

18 U.S.C.
    § 3626(a)(1)(A) ..........................................................................................................9
    § 3626(a)(1)(C) ..........................................................................................................8
    § 3626(a)(2)..............................................................................................................16
    § 3626(a)(3)(E)..........................................................................................................16

California Penal Code 290 ....................................................................................12, 13

OTHER AUTHORITIES

available at https://www.cdcr.ca.gov/research/wp-
    content/uploads/sites/174/2020/03/Tpop1d200318.pdf.........................................17

https://www.cdcr.ca.gov/news/2020/07/10/cdcr-announces-additional-actions-to-
    reduce-population-and-maximize-space-systemwide-to-address-covid-19/...........12

https://www.cdcr.ca.gov/research/wp-
    content/uploads/sites/174/2020/07/Tpop1d200708.pdf (retrieved July 15,
    2020) ..........................................................................................................................3

ii

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

# TABLE OF AUTHORITIES
**(continued)**

**Page**

July 8, 2020, available at https://www.cdcr.ca.gov/research/wp-
content/uploads/sites/174/2020/07/Tpop1d200708.pdf ...........................................................17

*Plata/Three-Judge Panel* Order, Apr. 4, 2020, ECF No. 3261 .........................................................1

iii

16696978.1

1

**INTRODUCTION**

2      Over the past four months, the California Department of Corrections and Rehabilitation

3   (CDCR) and the Department of State Hospitals (DSH) have tirelessly worked to protect inmates

4   from the coronavirus (COVID-19) pandemic, in close collaboration with the federal *Plata*

5   Receiver, while simultaneously ensuring that inmate-patients' mental health needs are met.

6   Among a number of proactive measures, Defendants implemented substantial reductions in the

7   size of the inmate population, which has both reduced the population of *Coleman* class members

8   and made more space and resources available for those in the Mental Health Services Delivery

9   System (MHSDS) who do not qualify for release.  Building on these reductions, Defendants have

10  now initiated a new set of measures to reduce the population even further.  Despite these efforts,

11  the Court suggests that still further releases are necessary, whether because of COVID-19 or

12  otherwise.[1]  But Court-ordered releases are not necessary, especially given the extensive

13  population reductions that have already occurred (approximately 10,000 inmates since March,

14  when the pandemic hit the State's institutions) and those that are imminently expected

15  (approximately 8,000 planned by the end of August, with additional rolling releases anticipated),

16  which have had and will continue to benefit the *Coleman* class.

17      There is no dispute that COVID-19 has affected Defendants' progress towards the many

18  Court-ordered tasks and Special Master-led projects that were under way before the pandemic.

19  Even though Defendants have been forced to shift their daily focus and resources to address

20  _____

21  [1] *See*, *e.g.*, *Plata/Three-Judge Panel* Order, Apr. 4, 2020, ECF No. 3261 at 14-15 (J. Mueller
    concurring and observing that "[e]ven though the prison population for some time has remained
22  below the cap this [Three-Judge Panel] previously set, Defendants have not achieved the
    durability of remedy required" and that "current circumstances appear to expose, in stark terms,
23  the potential need to revisit the current population cap" and stating that "[g]iven the availability of
    expedited proceedings before [the *Plata* and *Coleman*] district courts to immediately exhaust the
24  possibility of inmate transfers and relocations to secure facilities to achieve constitutionally
    acceptable conditions for the Plaintiff classes, those proceedings must be invoked first"); ECF
25  No. 6643 at at 1-2 (inviting any party or intervenor on April 27 to file "[a]ny motion concerning
    the initial crisis management phase of planning for the impact of the COVID-19 on defendants'
26  obligations to class members in this action . . . within the next thirty days"); May 15, 2020 Status
    Conf. Tr. at 24-25 (inviting "plaintiffs in particular" to "proceed by way of focused motion
27  practice, and it can be on an expedited basis," to raise *Coleman*-specific issues related to CDCR's
    COVID-19 response).  The Court has reminded the parties that it "is remaining open for
28  consideration of motions and respectively 24/7."  (ECF No. 6557 at 32.)

1

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

COVID-19, and take specific responsive action to protect the lives of inmates and staff, the Court has expressed a desire to get this case "back on track," with "plans to resume proceedings to oversee defendants' compliance with those aspects of the Program Guide in this case with which compliance has not yet been achieved." (ECF No. 6643 at 2.)  Defendants are doing the best they can to confront a deadly disease that is rapidly infecting communities across the nation, and this Court, the Special Master, and Plaintiffs have acknowledged that inmate safety is paramount and should take precedence over strict compliance with some Program Guide requirements.  (ECF No. 6679.)

In response to the Court's first question in its July 2 order, Defendants oppose further clustering of mental health patients.  Further clustering on top of the significant clustering that has already occurred is not a feasible option and will not improve Program Guide compliance by limiting class member transfers.  Rather, further clustering will increase transfers and compound pressures on clinical and custodial staff tasked with providing care to large numbers of high acuity patients, and burn staff out.  In addition, clustering will not remedy the current Program Guide modifications due to COVID-19, such as reduced group programming and unmet transfer timelines, as those modifications are a direct reflection of the new steps that must be taken to protect patients and staff alike during this pandemic.  Addressing the Court's second question in its July 2 order, while Defendants are in the midst of additional inmate releases that will include *Coleman* class members, these releases are targeted to protect inmates from contracting COVID-19, not to improve compliance with the Program Guide and other remedial measures.  Lastly, in response to the Court's third inquiry, the Court cannot sua sponte convene a new three-judge court because such a court has already been empaneled for the purpose of considering Plaintiffs' initial request for a prisoner release order.  Rather, if the PLRA's requirements are met, Plaintiffs could seek modification of the prior population reduction order to limit the size of the *Coleman* class specifically.

Defendants have shown that they are prepared to address the ever-changing demands presented by COVID-19 to save inmate lives and also provide mental health care.  Rather than

1  subject Defendants to even more orders, the Court should recognize the flexibility and authority

2  Defendants need under these extraordinary conditions.

3  **ANALYSIS OF THE COURT'S QUESTIONS**

4  **I.    QUESTION NO. 1:  FURTHER CLUSTERING OF EOP PATIENTS AND PATIENTS AT
         HIGHER LEVELS OF CARE WILL NOT LIMIT CLASS MEMBER TRANSFERS NOR**

5         **IMPROVE COMPLIANCE WITH THE PROGRAM GUIDE.**

6         CDCR has expended significant resources and time over the past several years to analyze

7  options for clustering EOP and high acuity mental health patients in fewer institutions.  Even

8  before the COVID-19 pandemic, Defendants made clear that they could not further cluster the

9  mental health population without interfering with Defendants' ability to meet patients' needs and

10  staffing requirements.  COVID-19 has not changed that position.  In short, further clustering is

11  not the panacea to achieve compliance with staffing and bed transfer requirements, and clustering

12  will not limit class member transfers.  Significant clinical, custodial, and public health concerns

13  outweigh any possible benefit of further clustering of the mental health population.

14         **A.    CDCR Already Clusters Class Members.**

15         CDCR already clusters higher acuity MHSDS patients, limiting options for further

16  clustering.  Currently, CDCR houses 6,572 EOP inmates at just fifteen of its thirty-five

17  institutions.  Two institutions house only female EOP inmates.  (Powell Decl., Ex. A (Summary

18  of Mental Health Population by Institution and Level of Care (H1) as of July 15, 2020).)[2]  At the

19  institutions housing male EOP inmates, the percent of the inmate population in the MHSDS

20  already ranges from 31 percent to as high as almost 63 percent.[3]  (*Id.*)  And at almost half of these

21  institutions, the EOP population alone accounts for approximately 16 percent or more of the total

22

23  [2] CDCR houses EOP inmates at the following institutions: Central California Women's Facility
   (CCWF), California Health Care Facility (CHCF), California Institution for Women (CIW),
24  California Men's Colony (CMC), California Medical Facility (CMF), California State Prison-
   Corcoran (COR), Kern Valley State Prison (KVSP), California State Prison- Los Angeles County
25  (LAC), Mule Creek State Prison (MCSP), Richard J. Donovan Correctional Facility (RJD),
   California State Prison- Sacramento (SAC), California Substance Abuse Treatment Facility
26  (SATF), San Quentin State Prison (SQ), Salinas Valley State Prison (SVSP), and Valley State
   Prison (VSP).  (*Id.*)

27         [3] Comparing the EOP population with the total CDCR population. *See*
   https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/07/Tpop1d200708.pdf
28  (retrieved July 15, 2020)

3

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1    population.  (*Id.*)  In addition, CDCR clusters the MHSDS population at five Psychiatric Inpatient

2    Programs (PIPs) at five institutions (CHCF, SVSP, CMF, SQ, and CIW), and at three DSH

3    facilities (DSH Atascadero, DSH-Coalinga, and DSH-Patton).  (*Id.*)  Patients needing MHCB

4    level of care may be transferred to one of twenty-one MHCB units across the state (nineteen for

5    males and two for females).  (*Id.*)  In addition to clustering based on patients' assigned levels of

6    care, Defendants also cluster patients by excluding the MHSDS population from being housed

7    and treated at certain institutions.  Under the agreement approved by the Court, CDCR does not

8    provide mental health programming at six desert institutions.[4]  And with very limited exceptions,

9    CDCR does not house any MHSDS patients in the desert institutions.  (ECF No. 6279.)  Options

10   for further clustering are also limited by inmates' case factors—such as restrictions due to Valley

11   Fever, other medical needs, physical disabilities, enemy concerns, staff separations, and custody

12   level.  (ECF No. 5591-5 at 2 and ECF No. 5922 at 32-36.)

13        Further clustering inmates in the MHSDS will have an ancillary impact on other class

14   actions, such as *Clark* and *Armstrong*, as many inmates are cross-class members.  (*Id.*)  For

15   example, a *Coleman* class member who is also an *Armstrong* class member may only be housed

16   at institutions that are able to accommodate the patient's disability, further limiting the options for

17   that class member's housing.  Consequently, CDCR may not be able to house any given EOP

18   inmate in one of the 15 institutions with EOP housing and programming.  Defendants have

19   previously explained how patients' custody factors limit the number of institutions where they

20   may be housed:

21            For example, a male EOP inmate with Level II custody points who is high
             risk medical can only be housed at CHCF, CMF, MCSP, or SATF. See
22           Attachment H- Case Factors at Institutions. A male EOP inmate with Level III
             custody points and a disability that impacts placement can only be housed at three
23           institutions:  MCSP, RJD, or SVSP.  *Id.*  A male EOP inmate with Level IV
             custody points who is on Clozapine can only be housed at COR, MCSP, or SAC.
24           *Id.*  Adding one additional case factor to the examples above, such as a Cocci
             restriction, enemy concerns, or a lower bunk/lower tier requirement would further
25           limit the alternative institutions in which the inmate could be appropriately housed.
26           There are a sizeable number of *Coleman* class members who are in situations

27   _____
     [4]  The desert institutions are Calipatria State Prison, California City Correctional Facility, the
28   California Correctional Center, Centinela State Prison, Chuckawalla Valley State Prison, and
     Ironwood State Prison.                              4

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

> similar to those described above.  Of the 7,551 EOP inmates, 2,496 are high risk
> medical, which means that one-third of the EOP population can be housed within
> 11 of the 15 EOP institutions, two of which house only female inmates.  *See*
> Attachment G- MHSDS Pop by Case Factor.  Restricting EOP placement at even
> one of these institutions would further limit the options for inmate placement,
> causing delays in regular transfers between institutions, transfers out of
> segregation, and transfers out of reception centers.

(*Id*. at 19-20.)

CDCR has already concentrated its EOP and PIP patients to a limited number of institutions.  Further narrowing the options for safe patient housing for mental health treatment will place unnecessary burdens on staff and resources without evidence that additional clustering will reduce patient transfers or improve the provision of mental health care to the *Coleman* class.

> **B.     CDCR Has Previously Analyzed and Reported Problems Inherent in
>     Clustering the Highest Acuity Patients.**

The Special Master in his Twenty-Sixth Round Monitoring Report originally recommended clustering to meet CDCR's 2009 staffing plan and address staffing at hard-to-recruit institutions. (ECF No. 5439 at 131.)  In response, the Court adopted the Special Master's clustering recommendation and ordered Defendants and the Special Master to meet and confer monthly to discuss and consider strategies and initiatives, including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained.  (ECF No. 5477 at 5.)  On October 10, 2017, after reviewing the parties' positions on clustering and rejecting Defendants' objections, the Court adopted the Special Master's further recommendation and "advised" Defendants to work with the Special Master to develop a more robust clustering plan.  (ECF No. 5711 at 26.)  The work that followed the Court's order confirmed CDCR's position that further clustering of the *Coleman* class is not a viable solution to CDCR's staffing challenges and would raise myriad clinical and custody concerns.  Defendants' position has not changed, and Defendants are not aware of any factual basis to support the conclusion that further clustering EOP patients at even fewer institutions will result in a durable increase in staff or compliance with the Program Guide or other remedial orders.

5

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1    On December 18, 2018, this Court ordered the parties to participate in a settlement

2  conference focused "on whether mentally ill inmates can be located in fewer total institutions to

3  address persistent impediments to Program Guide compliance in the areas of staffing, bed

4  transfers and cultural compliance training." (ECF No. 6050.) The settlement judge then ordered

5  the parties to present options for clustering that included a discussion of how clustering could

6  help eliminate "the persistent obstacles to full achievement of a constitutional remedy in this

7  case," including the ways in which compliance with staffing and bed transfers could be achieved.

8  (ECF No. 6075 at 2.) CDCR again analyzed the options for further clustering and presented them

9  to the Court and Plaintiffs in the context of settlement discussions and in reporting options for

10  compliance with staffing proposals. (ECF No. 5922 at 17-36.) Part of the analysis included

11  identification of the reasons why further clustering of class members is not clinically or

12  custodially sound. The analysis concluded that further clustering of the EOP population will not

13  improve compliance with programming and staffing requirements. (ECF No. 5922 at 18.) EOP

14  patients require more time and attention from all staff, including mental health, custody, nursing,

15  and medical. (*Id.*) EOP patients are more challenging to communicate with and often have

16  difficulty following staff direction. (*Id.*) There is a limit to how many high acuity patients one

17  facility can reasonably handle—if one facility has too many high acuity patients, "care processes

18  begin to break down and staff experience burnout and become dissatisfied." (*Id.* at 19.)

19    CDCR's current approach to clustering the CCCMS and EOP population, while beneficial,

20  affects staff morale and satisfaction. (*Id.* at 18-19.) Similarly, the *Plata* court experts opined

21  following an April 13, 2017 inspection at Salinas Valley State Prison that "[a] higher acuity

22  mental health population is more a difficult population to manage clinically and is likely to make

23  recruitment of staff even more challenging." (Thorn Decl., Exh. E (*Plata* Court Experts' Salinas

24  Valley State Prison Report, dated Apr. 13, 2017, at 6).) In other words, grouping high acuity

25  inmates in geographically desirable locations does not mean that CDCR will be able to hire

26  sufficient staff to provide care to such a large, higher acuity population. (*Id.*) To the contrary,

27  populating an institution with mostly EOP patients will increase incidences of burnout and job

28  dissatisfaction, and, in turn, lead to a higher rate of staff turn-over, making it more difficult to

6

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1    comply with the 90 percent fill rate required by the Court's 2002 order.  (ECF No. 5591, at 16-17,

2    ECF No. 5591-2 at 5, and ECF No. 5591-5 at 2.)  Clustering the EOP population also adversely

3    impacts population management, including CDCR's ability to transfer inmates in a timely

4    manner, as *Coleman* class members have additional case factors which make them difficult to

5    place.  (ECF No. 5591-5 at 2.)  Clustering limits the flexibility CDCR needs to address these case

6    factors when making housing decisions, particularly if safety concerns arise at any given

7    institution.  (*Id.*)  In that regard, more clustering undercuts CDCR's ability to make safe and

8    appropriate housing decisions for individual Coleman class members.  (*Id.*)

9            **C.    More Clustering Will Not Limit Class Member Transfers.**

10           The high volume and frequency of the EOP population's transfers between different levels

11    of care make further clustering of that population unsound and, in light of the current pandemic,

12    unsafe.  CDCR's mental health population, including its EOP population, frequently change

13    levels of care.  Clustering the EOP population is not a ready or permanent fix to address the

14    dynamic nature of this population.  Even if the Court were to order further clustering of all EOP

15    patients to a handful of institutions, CDCR would still be required to transfer *Coleman* class

16    members to higher or lower levels of care.

17           In 2018, 5,635 EOP patients transferred to a MHCB, and in 2019, 4,768 EOP patients

18    transferred to a MHCB.  (*See* Powell Decl., ¶ 5; Exh. C.)  In 2018, 449 EOP patients transferred

19    to PIP beds, and in 2019, 507 EOP patients transferred to PIP beds.  (*Id.*)  These numbers do not

20    include the additional transfers that may have been necessary upon the patient's discharge from

21    the MHCB or PIP programs.  And every year thousands more patients change level of care

22    between EOP and CCCMS, necessitating transfers in many cases.

23           An order requiring that CDCR house patients at a specific level of care at a handful of

24    institutions will necessarily increase the need for inter-institution transfers, when those patients

25    are referred to a level of care not available at their home institution.  Increases in transfers bring

26    added pressures to custodial, medical, and mental health staff, notwithstanding additional serious

27    concerns due to the spread of COVID-19 from transfers.  For example, transfers to crisis beds

28    require mental health staff to complete referral packages and perform appropriate discharge

7

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1    reviews and documentation before a patient may transfer.  (ECF No. 5680, at 6-7; ECF No. 5680-

2    7, at 1-21; and ECF No. 5680-10, at 3-5.)  Transfers also require CDCR classification and parole

3    representatives at the referring institution to perform multiple tasks, including planning for

4    transportation of the inmate; clearing issues that could halt patient movement; contacting the

5    receiving institution to confirm the patient is medically cleared for transport; contacting the

6    sending and receiving institutions to provide the details of the transportation arrangements,

7    including the coordination of all records, pharmacy needs and other items as necessary for each

8    individual patient; completing the non-committee endorsement upon receipt of the transfer chrono

9    (order) from mental health; contacting the receiving institution to ensure they were notified and

10   can physically accept the inmate; and determining whether the receiving institution has any

11   inmates who should be returned to the receiving institution.  (*Id.*)

12        The EOP population's needs are best addressed when CDCR has the flexibility to transfer

13   these patients to facilities with appropriate treatment space and programming opportunities.

14   Clustering those patients at fewer institutions takes away that flexibility and will result in reduced

15   programming, educational, and vocational opportunities available to *Coleman* class members.

16        **D.    More Clustering Will Require Construction of New Prison Facilities in
              Violation of the PLRA.**

17

18        Federal courts cannot order a government entity that represents the public to spend money

19   to build new prisons facilities.  *See Padgett v. Stein*, 406 F. Supp. 287, 303 (M.D. Pa. 1975);

20   *Jones v. Wittenberg*, 29 Ohio Misc. 35 (N.D. Ohio 1971), *aff'd sub nom. Jones v. Metzger*, 456

21   F.2d 854 (6th Cir. 1972).  The PLRA provides, "[n]othing in this section shall be construed to

22   authorize the courts, in exercising their remedial powers, to order the construction of prisons or

23   the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial

24   powers of the courts."  18 U.S.C. § 3626(a)(1)(C).  Thus, even for those institutions with

25   sufficient space to add EOP beds, the Court does not have the authority to order additional

26   clustering of the population if such clustering would require construction of office and treatment

27   space to accommodate the patient population.

28

**E.    The 2013 *Plata v. Brown* Decision Does Not Support Further Clustering.**

The Court's proposed clustering order fails to meet the PLRA's requirement that the order be narrowly drawn, extend no further than necessary to correct the federal violation, and be the least intrusive means to achieve full and durable compliance.  18 U.S.C. § 3626(a)(1)(A).

In its July 2 order, the Court asks whether the *Plata* court's decision at *Plata v. Brown,* 427 F.Supp.3d 1211 (N.D. Cal. 2013) gives it authority to order Defendants to submit a clustering plan and to order implementation of that plan.  (ECF No. 6750 at 2.)  It does not.  The Court's proposed clustering order lacks the foundation that supported the exclusion order in *Plata*.  The exclusion order in *Plata* was issued in response to the plaintiffs' motion to compel CDCR to implement the *Plata* Receiver's exclusion policy to reduce risks associated with infectious disease (Coccidioidomycosis (Cocci)) at two prisons that reported high rates of Cocci cases.  The *Plata* Receiver and the California Department of Public Health performed investigations and issued recommendations that patients with certain factors should be excluded from those two institutions.  *Id.* at 1215-20.  Defendants argued that Plaintiffs' motion seeking an exclusion order was, in effect, an improper request for a prisoner release order under the PLRA.  Both the *Plata* court and the Ninth Circuit held that the court could order inmates excluded from two prisons without running afoul of the PLRA because it would merely require the intra-system transfer, and not release, of inmates.

The *Plata v. Brown* decision is inapposite here.  Whereas in *Plata*, both the Receiver and the California Department of Public Health recommended the exclusion of certain inmates from two institutions, no comparable recommendations exist here.  No prior reports or expert evidence suggest that clustering would reduce the frequency of inter-institutional transfers and thus reduce the risk of some harm to *Coleman* class members.  To the contrary, the record suggests that less intrusive means of ensuring compliance exist.  The EOP population and class members requiring treatment at higher levels of care make up only a small percentage of the *Coleman* class, but that segment of the mental health population require the most resources.  (*See* CDCR's 2009 Staffing Plan, ECF No. 3693; MHSDS Program Guide, 2018 Revision, ECF No. 5864-1 at 53-56, 57-65, and 65-66.)  Housing and treating the most challenging group of class members together in fewer

9

1    institutions will not reduce their need for inpatient and crisis bed transfers and group treatment.

2    And clustering will not avoid the public health concerns Defendants face daily in efforts to

3    provide the requisite level of mental health treatment to the *Coleman* class.

4         Defendants have shown that clustering will further delay Program Guide compliance and

5    present an even greater challenge to CDCR's ability to operate its mental health program,

6    negatively impacting on staffing (both medical and mental health) and exacerbating the lack of

7    programming and other resources available at institutions that may not be appropriate locations to

8    cluster high acuity patients.  In *Plata*, the defendants were given the discretion as to where

9    affected inmates could transfer and thus retained flexibility in the administration of their system.

10   But a clustering order here would have the opposite effect by further limiting the already-limited

11   number of institutions where certain patients could be housed.  And as explained above, those

12   limited number of institutions do not have the infrastructure and staff to support the influx of

13   mentally acute patients.  Nor does the State—facing deep deficits due to the pandemic—have the

14   budget to implement changes to those institutions to accommodate this influx of high acuity

15   patients, and the PLRA prohibits this Court from ordering the State to construct such facilities.

16   **II.    QUESTION NO. 2:  DEFENDANTS' PLANS FOR ADDITIONAL VOLUNTARY RELEASES**
17   **ARE INTENDED TO PROTECT INMATES FROM COVID-19, AND DEFENDANTS CONTINUE TO SUBSTANTIALLY COMPLY WITH PROGRAM GUIDE REQUIREMENTS**
18   **WHERE FEASIBLE.**

19        **A.    This Court's Premise That Additional Population Reductions Are Necessary to Achieve "Full and Durable" Program Guide Compliance Is**
20            **Flawed.**

21        The Three-Judge Court already determined that to achieve the constitutional delivery of

22   adequate mental health care, the population must be capped at 137.5 percent of design bed

23   capacity.  No court has issued any subsequent order holding that additional population reductions

24   are necessary "to reduce the size of the plaintiff class in sufficient numbers to achieve full and

25   durable compliance with the Program Guide and other remedial requirements of this action."

26   (ECF No. 6675 at 2.)  It is unclear if targeted release of *Coleman* class members would affect

27   Defendants' ability to address the COVID-19 pandemic.  It is also unclear whether it would

28   meaningfully affect their ability to meet "full and durable" compliance with the Program Guide

10

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1    and this Court's orders regarding the provision of mental health care.  Significantly, twenty-five

2    years into the remedial phase of this litigation, neither the Court nor the Special Master have

3    established benchmarks for "full and durable" constitutional compliance at any population level.

4         Beyond the immediate COVID-19 crisis, reductions in CDCR's overall inmate population

5    will not necessarily translate into improved Program Guide compliance, due to the continuing

6    need to transfer the MHSDS population.  Even at this point in time, CDCR currently has

7    sufficient available bed space at each level of care to provide the requisite mental health treatment

8    to the *Coleman* class. (Powell Decl., Exh. A (Summary of Mental Health Population by

9    Institution and Level of Care (H1) as of July 15, 2020).)  As current capacity and population data

10   indicate, as of July 15, 2020, CDCR had 4,507 empty CCCMS general population beds at twenty-

11   four institutions; 728 empty EOP beds at eleven institutions; 320 empty crisis beds at twenty

12   institutions; 14 empty acute inpatient beds at four psychiatric inpatient programs; and 13 empty

13   Intermediate Care Facility beds at four PIPs and three DSH hospitals.  (*Id.*)  There is no evidence

14   to suggest that the number of available beds is somehow insufficient, or that *Coleman*-specific

15   patient reductions are necessary.[5]

16        Defendants do not dispute that efforts to protect inmates from COVID-19 exposure present

17   challenges to Program Guide compliance.  Indeed, the COVID-19 pandemic has made nearly

18   every aspect of incarceration more challenging.  CDCR has had to change the manner in which it

19   offers treatment, and its ability to freely transfer patients between facilities is hampered by the

20   need for pre-transfer COVID-19 testing.  As discussed above, clustering would only exacerbate

21   those issues.

22

23

24

25

26

27   [5] Staffing continues to be an urgent priority.  Defendants have a set of proposals related to staffing that they would like to discuss with the Special Master and Plaintiffs. Discussion of these proposals has been delayed in part because of the current COVID-19 pandemic.

28
                                          11

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

**B.**   *Coleman* **Class Members Have and Will Continue to Benefit from CDCR's Plans to Voluntarily Release Inmates.**

Since mid-March, CDCR has reduced its inmate population by at least 10,000 inmates "as part of its previous pandemic emergency decompression efforts to reduce the risk of COVID-19 transmission within its facilities," along with regularly scheduled releases.[6]

In addition, CDCR is in the process of implementing a new set of release and credit-earning actions designed to mitigate the impact of COVID-19 in its institutions and to safeguard inmates, including *Coleman* class members.  Those plans are described in detail on its website at https://www.cdcr.ca.gov/news/2020/07/10/cdcr-announces-additional-actions-to-reduce-population-and-maximize-space-systemwide-to-address-covid-19/, a print-out of which is attached as Exhibit A, and has four primary elements.

First, CDCR will initially release approximately 4,800 inmates who have 180 days or less to serve on their sentences.  Those inmates are currently being screened and CDCR estimates they will be released by the end of this month.  On a rolling basis going forward, CDCR will also review all eligible inmates with 180 days or less to serve.  Inmates serving time for domestic violence or a violent crime, or with a current or prior sentence that requires registration as a sex offender under Penal Code 290, and an assessment score that indicates a high risk for violence, are not eligible for early release.

Second, CDCR will screen for release a second cohort of incarcerated persons with one year or less to serve on their sentence, and who reside at the following institutions, which were selected based on several factors, including, but not limited to, the size of the populations of high-risk patients and the physical plant layout:  San Quentin State Prison, Central California Women's Facility, California Health Care Facility, California Institution for Men, California Institution for Women, California Medical Facility, Folsom State Prison, and Richard J. Donovan Correctional Facility.  Criteria which excludes inmates from early release under this One-Year plan include serving time for domestic violence or a violent crime, current or prior sentences that require

---

[6] https://www.cdcr.ca.gov/news/2020/07/10/cdcr-announces-additional-actions-to-reduce-population-and-maximize-space-systemwide-to-address-covid-19/.

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1   registration as a sex offender under California Penal Code 290, and an assessment score that

2   indicates a high risk for violence.  Individuals who are thirty years-old and over and who meet the

3   eligibility criteria are immediately eligible for release.  Those who are age 29 or under and who

4   meet eligibility criteria will be reviewed on a case-by-case basis for release.  CDCR will consider

5   medical risk, case factors, and time served, among other factors, in determining whether to

6   expedite release for those identified in this cohort.  Like the 180-Day cohort, the One-Year cohort

7   will be screened on a rolling basis until CDCR determines such releases are no longer necessary.

8          Third, CDCR will provide positive participation credits "to recognize the impact on access

9   to programs and credit earning during the COVID-19 pandemic."  Eligible inmates will be

10  awarded a one-time Positive Programming Credit (PPC) of 12 weeks "to help offset not only

11  credits not earned due to program suspensions, but also to recognize the immense burden

12  incarcerated people have shouldered through these unprecedented times."  Inmates must meet the

13  following criteria to be eligible for the credits:  (1) currently incarcerated at any of the 35 adult

14  institutions, community correctional facilities, fire camps, Male Community Reentry Program,

15  Community Prisoner Mother Program, Custody to Community Transitional Program, Alternative

16  Custody Program, and those serving a state prison sentence in a state hospital; (2) not

17  condemned to death or serving life without the possibility of parole; and (3) no serious rules

18  violations between March 1 and July 5, 2020.  CDCR estimates that nearly 108,000 people will

19  be eligible for PPC.  Further, CDCR estimates the population will reduce by approximately 2,100

20  by the end of August 2020 as a result of the application of this credit.

21         Finally, CDCR will assess for release individuals deemed "high risk medical," including

22  inmates who are 65 or over who have chronic conditions, or who have respiratory illnesses such

23  as asthma or chronic obstructive pulmonary disease.  Criteria for eligibility are (1) being deemed

24  high risk for COVID-19 complications by CCHCS; (2) not serving life without parole or being

25  condemned; (3) having an assessment indicating a low risk for violence; and (4) not being a high-

26  risk sex offender.  Because this cohort's eligibility requires an individual review of each

27  incarcerated person's risk factors, an estimate of the number of releases is not yet available.

28

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

These plans show Defendants' commitment to ensuring the well-being of all inmates, including that of the *Coleman* class, and to addressing the constantly evolving nature of the COVID-19 pandemic.

### C.   During the COVID-19 Pandemic, Defendants' Planned Releases Cannot Achieve a Targeted Occupancy Goal to Facilitate Full and Durable Program Guide Compliance.

The State's previous and ongoing population reduction measures have and will directly benefit the *Coleman* class.  But those measures are designed to respond to the current public health crisis, and may not improve Program Guide compliance.  Of course, Defendants are working tirelessly to mitigate any impacts on Program Guide compliance while simultaneously addressing COVID-19's impact on inmate and staff health and safety.  Defendants will track and report on the population reductions, including reductions to the *Coleman* class, in addition to their normal course of tracking and reporting on compliance measures.  But further voluntary releases are either sufficient or necessary to achieve full and durable compliance with the Program Guide and other remedial requirements.

First, the Court's July 12, 2018 order required the Special Master during his latest monitoring round to develop and articulate clear benchmarks for compliance.  (ECF No. 5852 at 3.)  That never happened.  Defendants attempted to engage in multiple rounds of settlement discussions in late 2019 into 2020 to identify what they believe to be the targets for compliance under the Program Guide and the innumerable orders concerning mental health programming.  Those efforts, too, did not in a clear set of benchmarks to fully and durably comply with the Program Guide and other remedial orders.  Defendants' response to the Court's second question must be considered within this limbo, particularly as it appears to require defined benchmarks that, "when met, signal constitutional compliance."[7]

Second, as noted above, a population reduction does not bear on Defendants' ability to safely transfer patients between levels of care during the current pandemic, which is largely dependent on accurate and timely testing for infection among the inmate population as a whole.

---

[7] Defendants do not concede that future benchmarks and "other remedial requirements" establish constitutional minima.

14

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1   As a result, Defendants do not have a targeted occupancy goal and certainly not one that is tied to

2   specific compliance with the Program Guide and other remediation measures.  There is no

3   specific percentage of design capacity that the State is trying to reach—in the normal course,

4   CDCR's prisons are open to intake from counties and the inmate population is fluid, which

5   further affects its ability to tie occupancy to  remedial compliance.  Rather, the State is attempting

6   to reduce the population as much as reasonably possible across all institutions to further reduce

7   the risk of infection from COVID-19.

8   **III.    QUESTION NO. 3:  THE COURT MAY NOT SUA SPONTE REQUEST THE CONVENING**
        **OF A NEW THREE-JUDGE PANEL TO RELEASE *COLEMAN* CLASS MEMBERS.**
9

10          Finally, the Court asked "if Program Guide compliance cannot be achieved without a

11  greater number of population reductions than currently planned, whether this court should sua

12  sponte request the convening of a three-judge court to consider entry of a prisoner release order

13  specifically directed to reduce the number of *Coleman* class members in the California

14  Department of Corrections and Rehabilitation."  (ECF No. 6750 at 2:20-25.)  The Court may not

15  sua sponte request to convene a new three-judge court where one already exists to consider the

16  same issues presented by the Court's July 2 order.  Instead, the appropriate procedural mechanism

17  would be for Plaintiffs to request modification to the existing prisoner release order.

18          On July 23, 2007, this Court granted Plaintiffs' motion to convene a three-judge court to

19  adjudicate whether the PLRA's standards were met and, specifically, whether Plaintiffs could

20  show that crowding was the primary cause of the ongoing unconstitutional delivery of mental

21  health care.  (ECF No. 2320.)  The Ninth Circuit empaneled the current *Coleman/Plata* three-

22  judge court on July 26, 2007 to consider these issues.  (ECF No. 2328.)  On August 4, 2009, the

23  three-judge court ordered the State to cap its system-wide prison population at 137.5% of the

24  institutions' total "design capacity" within two years.  *Coleman v. Schwarzenegger/Plata v.*

25  *Schwarzenegger*, 922 F. Supp. 2d 882, 962, 970 (E.D. Cal., N.D. Cal. Aug. 4, 2009).  To meet

26  this order, CDCR needed to reduce its population by 46,000 inmates.  *Id.* at 994.

27          The Supreme Court affirmed the three-judge court's prisoner release order and emphasized

28  that the three-judge court "retains the authority, and the responsibility, to make further

15

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1    amendments to the existing order." *Brown v. Plata*, 563 U.S. 493, 542 (2011).  It explained that

2    "[e]xperience may teach the necessity for modification or amendment" and "the three-judge court

3    must remain open to a showing or demonstration ... that the injunction should be altered to ensure

4    that the rights and interests of the parties are given all due and necessary protection."  *Id*. at 542-

5    543 ("the three-judge court must give due deference to informed opinions as to what public safety

6    requires").

7        Relevant to Defendants' response to the Court's July 2 order, the Supreme Court held that if

8    "a release order limited to . . . mentally ill inmates would be preferable to the order entered by the

9    three-judge court, [then] [a party] can move the three-judge court for modification of the order on

10   that basis."  *Brown v. Plata*, 563 U.S. at 532 and 543 ("the three-judge court must remain open to

11   a showing or demonstration by either party that the injunction should be altered to ensure that the

12   rights and interests of the parties are given all due and necessary protection").  Accordingly,

13   referral to a new three-judge court would be procedurally improper based on the Supreme Court's

14   instruction that modification by the existing panel is the appropriate means to change the nature

15   of the release order.  To the extent Plaintiffs believe such a modification is warranted, they need

16   to demonstrate that "a significant change in facts or law warrants revision of the [population cap]

17   and that the proposed modification is suitably tailored to the changed circumstance.  *Rufo v.*

18   *Inmates of the Suffolk County Jail*, 502 U.S. 367 (1992); *see also Parton v. White*, 203 F.3d 552

19   (8th Cir. 2000) (modifying consent decree to increase population cap).  Plaintiffs must similarly

20   comply with the PLRA's mandatory requirements in imposing prospective relief, including

21   ensuring that no other relief will remedy the violation at issue, that the relief extends not further

22   than necessary, is narrowly drawn, and is the least intrusive means to correct the violation.  18

23   U.S.C. §§ 3626(a)(3)(E), (a)(2).  The three-judge court would also be required to give substantial

24   weight to any adverse impact on public safety or the operation of a criminal justice system caused

25   by the relief.  *Id*. at § 3626(a)(2).

26        It bears noting, however, that as of July 8, 2020, the last day that CDCR publicly reported

27   its population on its website, 104,725 inmates were housed in the State's 35 adult institutions,

28

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1  equating to approximately 123.1% of design capacity.[8]  And in less than four months, CDCR has

2  reduced its adult institution population by nearly 10,000 inmates in response to the COVID-19

3  pandemic.[9]  Whereas the *Coleman* class totaled 35,834 inmates as of March 18, 2020, it now

4  totals 33,081 inmates. (Powell Decl., Exhs. A and B.)  Further, as detailed above, the prison

5  population is anticipated to decline by at least 8,000 inmates by the end of August.  The initial

6  180-day and One-Year (30 and older) cohorts include approximately 2,000 *Coleman* class

7  members who will be released.  In the One-Year (29 and under) and high risk medical cohorts

8  there are approximately 2,200 *Coleman* class members who will be reviewed for possible

9  releases.  In addition, Defendants anticipate that a large number of *Coleman* class members will

10  be eligible and receive the positive programming credit, which will expedite their release.  The

11  accelerated transition to parole or post-release community supervision of CDCR inmates will

12  continue on a rolling basis.  Meanwhile, CDCR remains closed to county intake, and CDCR's

13  adult institution population—including the *Coleman* class—will continue to decline dramatically

14  with these measures in place.

15                                            **CONCLUSION**

16          The State is making difficult decisions under extraordinary circumstances to protect

17  *Coleman* class members from COVID-19, while still providing mental health services.  Further

18  clustering EOP class members at fewer institutions will not avoid patient transfers or bring

19  Defendants closer to meeting the Program Guide's broad and outdated requirements and other

20  remedial orders.  And this Court may not sua sponte seek to impanel a new three-judge court to

21  consider the release of *Coleman* class members, nor is modification by the current three-judge

22  court appropriate here where thousands of inmates have been released in response to this

23  pandemic and thousands more will be released imminently.

24

25          [8] *See* CDCR Weekly Population Report as of midnight on July 8, 2020, available at
   https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/07/Tpop1d200708.pdf

26

27          [9] *Compare* CDCR's adult institution population as of midnight on July 8, 2020 (104,725
   inmates) *with* CDCR's adult institution population as of midnight on March 18, 2020 (114,328),
   available at https://www.cdcr.ca.gov/research/wp-

28  content/uploads/sites/174/2020/03/Tpop1d200318.pdf

                                                    17

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1

1

Dated:  July 15, 2020                                        Respectfully Submitted,

2
                                                             XAVIER BECERRA
3                                                            Attorney General of California
                                                             ADRIANO HRVATIN
4                                                            Supervising Deputy Attorney General

5                                                            /s/ Elise Owens Thorn

6                                                            ELISE OWENS THORN
                                                             Deputy Attorney General
7                                                            Attorneys for Defendants

8       CF1997CS0003

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18

Defs.' Resp. July 2 Order (2:90-cv-00520 KJM-DB (PC))

16696978.1