# Exhibit ZZ



*Roy W. Wesley*, *Inspector General*

*Bryan B. Beyer*, *Chief Deputy Inspector General*



# OIG | OFFICE *of the* INSPECTOR GENERAL

Independent Prison Oversight

January 2019

# Special Review of Salinas Valley State Prison's Processing of Inmate Allegations of Staff Misconduct

Fairness ▪ Integrity ▪ Respect ▪ Service ▪ Transparency

Electronic copies of reports published by the Office of the Inspector General
are available free in portable document format (PDF)
on our website at **www.oig.ca.gov**.

We also offer an online subscription service.
For information on how to subscribe,
visit **www.oig.ca.gov/pages/mail-list.php**.

For questions concerning the contents of this report,
please contact Shaun R. Spillane, Public Information Officer,
at 916-255-1131.



STATE of CALIFORNIA

OIG   **OFFICE** *of the*
      **INSPECTOR GENERAL**

*Roy W. Wesley, Inspector General*
*Bryan B. Beyer, Chief Deputy Inspector General*

Independent Prison Oversight

*Regional Offices*

*Sacramento*
*Bakersfield*
*Rancho Cucamonga*

January 24, 2019

Dear Governor and Legislative Leaders:

Enclosed is the Office of the Inspector General's report titled *Special Review of Salinas Valley State Prison's Processing of Inmate Allegations of Staff Misconduct*. In January 2018, the secretary of the California Department of Corrections and Rehabilitation (the department) and attorneys from the Prison Law Office requested that the Office of the Inspector General assess Salinas Valley State Prison's (Salinas Valley) process for handling inmate allegations of staff misconduct, commonly referred to as *staff complaints*. The prison conducts staff complaint inquiries—a precursor to a formal investigation—to address such allegations. A staff complaint inquiry includes the gathering of evidence, through interviews and document collection, and can evolve into a formal investigation if the prison suspects staff misconduct serious enough to warrant disciplinary action. This special review encompassed two periods: a retrospective review of 61 staff complaint inquiries that the prison completed between December 1, 2017, and February 28, 2018, and an onsite monitoring review of 127 staff complaint inquiries that the prison initiated between March 1, 2018, and May 31, 2018.

In this report, we concluded that Salinas Valley's process for handling staff complaints was inadequate and may have resulted in decisions it cannot defend. The hiring authority—the person with the authority to hire and discipline staff—determined that subject staff had not violated policy in 183 of the 188 staff complaint inquiries we reviewed (97 percent of the inquiries) and concluded that only one of them warranted a formal investigation. However, we found that more than half of the staff complaint inquiries were inadequately performed because the staff complaint reviewers—supervisors the prison assigned to conduct the staff complaint inquiries—did not follow sound practices with respect to interviewing, collecting evidence, and writing reports. Notably, we found at least one significant deficiency (or inadequate rating) in 173 of the staff complaint inquiries included in this review (92 percent). We did not conclude whether the hiring authority's decisions were correct or incorrect, or whether an accused staff member was responsible for committing the alleged misconduct; rather, we concluded that the hiring authority often made decisions based on flawed investigative work.

The deficiencies we found may have resulted, in part, from a lack of training for the staff complaint reviewers. For instance, among the 61 individual reviewers, only 14 of them had received any training prior to conducting their first staff complaint inquiry-related interview, and that training component consisted of only a two-hour class providing them with a general overview of the process and acquainting them with filling out proper forms. Forty-two individuals received this training class sometime after conducting their first interview, and five individuals never received this training.

*Gavin Newsom, Governor*

10111 Old Placerville Road, Suite 110
Sacramento, California 95827
Telephone: (916) 255-1102
www.oig.ca.gov



Governor and Legislative Leaders
January 24, 2019
Special Review: Salinas Valley State Prison
Page 2

Nevertheless, none of the reviewers received meaningful training in how to conduct interviews, collect evidence, or write reports. Overall, this lack of training was evident in the quality of their staff complaint inquiries.

In addition, we concluded that inadequate staff complaint inquiries resulted not only from poor investigative skills, but also from the staff complaint reviewers' lack of independence. These reviewers were frequently peers or coworkers who worked in the same location as the accused staff—the same individuals the reviewers must rely upon if their physical safety were threatened. The reviewers also displayed signs of bias in favor of their fellow staff when conducting their staff complaint inquiries; they sometimes ignored corroborating evidence offered by inmate witnesses and often compromised the confidentiality of the process. As a result, we question whether Salinas Valley can effectively police itself utilizing the staff complaint process. Furthermore, an inadequately functioning staff complaint process that lacks independence fosters distrust among inmates and, in the cases we reviewed, the compromised confidentiality could have exposed inmates to retaliation for complaining about staff.

Moreover, although we determined Salinas Valley completed most staff complaint inquiries within the required time frame of 30 working days, it did not always notify inmates or its associate director when some staff complaint inquiries took longer to complete than required.

Finally, we also assessed nine other inquiries conducted by reviewers regarding inmate complaints concerning alleged staff misconduct that the Prison Law Office brought to the department. We found that the reviewers' work with respect to these inquiries suffered from the same general types of failures as those we identified during the two periods covered in this special review. We found the quality of seven of the nine inquiries to be inadequate.

Respectfully submitted,

Roy W. Wesley
Inspector General

# Contents

**Summary**                                                                    1

Special Review Highlights                                                       3

**Introduction**                                                               11

Scope and Methodology                                                          27

**Special Review Results**                                                     31

Salinas Valley Inadequately Conducted Reviews of Allegations
of Staff Misconduct                                                            31

Salinas Valley's Staff Complaint Review Process
Lacked Independence                                                            53

Salinas Valley Completed Most Staff Complaint Inquiries Within
Required Time Frames, but Did Not Always Provide the Proper
Notifications When Inquiries Were Late                                          65

The Office of the Inspector General's Analysis of Nine Additional
Complaints at Salinas Valley Submitted to the Department
by the Prison Law Office                                                       69

Recommendations                                                                89

**Appendices**                                                                 91

A.   Engagement Letter Outlining the Scope of Work                             91

B.   Detail of Staff Complaint Cases and Outcomes,
     as Determined by the Department                                           93

C.   Detail of Staff Complaint Cases and Outcomes,
     as Determined by the OIG                                                 104

D.   The Appeal Package (CDCR Form 602 and
     Attachments A Through F)                                                 117

# Illustrations

## Figures

1. Number of Staff Complaints Accepted by the Department                  20

2. Number of Staff Complaints Accepted at Salinas Valley                  21

3. Number and Type of Allegations Included in the 188 Staff Complaint Inquiries
   We Reviewed                                                            23

4. Number of Staff Complaints for Which the Prison Completed a
   Staff Complaint Inquiry, by Appellant Housing Location at Time
   of Submission                                                          24

5. Salinas Valley State Prison: Site Plan                                 26

6. Number and Types of Interviews Conducted by the Prison                 30

7. Overall Quality Ratings for the 188 Staff Complaint Inquiries
   We Reviewed                                                            36

8. Overall Quality for the Staff Complaint Inquiries We Reviewed,
   by Reviewer Rank                                                       38

9. Number and Types of Relevant Documentation the OIG Found
   to Be Missing During the Staff Complaint Review Process                43

10. Quality of the Staff Complaint Inquiry Reports                        46

11. Configuration of Control Booth and Interview Office at Salinas Valley  62

12. Timeliness of Staff Complaints the OIG Reviewed                       66

13. Number of Adequate and Inadequate Ratings,
    by Assessment Question                                                105

## Tables

Definitions of Select Terms Used in This Report                           8

1. Comparison of Activities Associated With Inquiry and
   Investigation Processes                                                19

2. Summary of Corrective Actions for the Six Employees Who Were Found
   to Have Violated Policy                                                32

3. Summary of the OIG's Assessment Questions                              37

## Graphics

Staff Complaints ... *By the Numbers*                                     2

"Scales of Justice" (cover): Graphic image designed by the U.S. Department of Justice; sourced via the Internet.

# Summary

In January 2018, the secretary of the California Department of Corrections and Rehabilitation (the department) and attorneys from the Prison Law Office requested that the Office of the Inspector General (the OIG) assess Salinas Valley State Prison's (Salinas Valley) process of handling inmate allegations of staff misconduct, commonly referred to as *staff complaints*. The department allows prisons to conduct what are known as *staff complaint inquiries*, a preliminary collection of evidence pertaining to an allegation, and to use local prison supervisors to conduct them. A staff complaint inquiry can evolve into a formal investigation if the hiring authority—the person responsible for hiring and disciplining staff—determines, as part of an inquiry, that staff misconduct may have occurred which warrants disciplinary action.

This special review included a retrospective paper review of 61 staff complaint inquiries the prison completed between December 1, 2017, and February 28, 2018, and an onsite monitoring review of 127 staff complaint inquiries the prison initiated between March 1, 2018, and May 31, 2018. In total, our review included 188 staff complaint inquiries. This special review also included our assessment of nine additional complaints submitted to the department by the Prison Law Office.

Any inmate who alleges staff misconduct may file an appeal, and the prison may handle this appeal as a staff complaint by conducting a staff complaint inquiry. A supervisor—typically a sergeant or a lieutenant—is assigned the staff complaint inquiry as an extra task, in addition to all other regular duties. That supervisor, who is referred to as a *reviewer* for the purposes of this process, collects evidence and conducts interviews of the inmate appellant, of inmate witnesses and staff witnesses, and of the staff member who is the subject of the complaint.

The reviewer then composes a report summarizing the evidence and the interviews, offers a recommendation, collects all evidence into a package, and sends that package to the hiring authority for a determination. If, at any time during this process, the reviewer suspects that serious misconduct possibly warranting adverse personnel action might have occurred, the reviewer must stop the staff complaint inquiry immediately and refer the matter to the hiring authority for further disposition. If the reviewer completes the staff complaint inquiry, the hiring authority then determines whether staff violated policy, and if so, takes appropriate action. If the hiring authority determines that staff did not violate policy, then generally no action is taken. The inmate is informed in writing of the hiring authority's determination of whether staff violated policy.



## Staff Complaints … *By the Numbers*

| | |
|---|---|
| **3,218** | Staff complaint appeals the department accepted statewide during the six-month period of December 1, 2017, through May 31, 2018. |
| **298** | Staff complaint appeals Salinas Valley accepted during the six-month period of December 1, 2017, through May 31, 2018. This number was significantly higher than the number accepted at all other prisons during this time frame and represented about 9 percent of the total. |
| **188** | Staff complaint inquiries included in this review. This number reflects the inquiries the prison completed during the three-month period of December 1, 2017, through February 28, 2018, and those it began during the three-month period of March 1, 2018, through May 31, 2018. |
| **414** | Interviews of inmates and staff that inquiry reviewers conducted beyond our presence while we were onsite. This included 373 staff witnesses and subjects, and 41 inmate appellants and witnesses. The department did not permit OIG staff to attend interviews of peace officers employed by the department, nor were we properly notified of some interviews conducted with the inmate appellants and witnesses. |
| **218** | Interviews of inmates and staff we observed while we were onsite. These included 10 staff witnesses and subjects (none of whom were peace officers), and 208 inmate appellants and witnesses. |
| **183** | Staff complaint inquiries for which the hiring authority determined staff acted within policy. In percentage terms, this equated to 97 percent of the staff complaint inquiries. In five instances, the hiring authority determined staff violated policy. |
| **104** | Staff complaint inquiries in which we determined the overall quality of the inquiry was inadequate. In percentage terms, this equated to 55 percent. |

## Special Review Highlights

### The Process Salinas Valley Used to Review Allegations of Staff Misconduct Was Inadequate, and Staff Assigned to Conduct the Reviews Were Inadequately Trained

Of the 188 staff complaint inquiries we reviewed, the prison determined that its staff did not violate policy in 183 of them (97 percent). However, we found that the dependability of the staff complaint inquiries was significantly marred by inadequate investigative skills that reviewers demonstrated—notably, by their deficiencies in interviewing, collecting evidence, and writing reports. This resulted in final reports that were often incomplete or inaccurate, or both incomplete and inaccurate. Due to these overall procedural deficiencies, we determined that prison staff completed more than half of the staff complaint inquiries inadequately. This resulted in the hiring authority being deprived of adequate investigative results for making determinations. The hiring authority found that staff had violated policy in five cases and took corrective action in only four cases. The hiring authority determined corrective action was not possible in the fifth case. Furthermore, the hiring authority determined that one case warranted a formal investigation.

Our conclusions, however, are not meant to convey whether the hiring authority's decisions were correct or incorrect, or whether accused staff members were responsible for committing the alleged misconduct; rather, we point out that the hiring authority made decisions based on inadequate investigative work. Highlights of our findings in this section include the following:

✓ We found 104 of the 188 staff complaint inquiry reviews (55 percent) to be inadequate.

✓ We found at least one significant deficiency in 173 of the 188 staff complaint inquiries (92 percent).

✓ A reviewer's rank of service had little effect on the quality of the staff complaint inquiry; we found the work across all ranks to be lacking in quality.

*Poor interviewing techniques:*

✓ In 28 staff complaint inquiries (16 percent), a reviewer improperly interviewed a subject before interviewing the appellant, which was out of sequence.

✓ During the onsite review period, in 22 staff complaint inquiries (17 percent), reviewers failed to ask relevant questions or appropriate follow-up questions while interviewing the appellants and inmate witnesses.

✓ In the 158 staff complaint inquiries with a potential witness, reviewers failed to interview the witnesses or explain why they had not done so in 47 of those inquiries (30 percent).

✓ In 16 instances (9 percent), we found reviewers failed to interview all of the subjects whom they identified or reasonably should have identified.

*Poor evidence collection techniques:*

✓ Of the 150 staff complaint inquiries that could have had relevant evidence to collect, reviewers failed to do so in 90 instances (60 percent).

*Poor report writing skills:*

✓ Of the 188 staff complaint inquiry reports, 108 of them (57 percent) were incomplete or inaccurate, or both.

✓ We concluded that 101 of the 188 staff complaint inquiry reports were incomplete (54 percent).

✓ We concluded that 45 of the 188 staff complaint inquiry reports were inaccurate (24 percent).

In addition, we found that reviewers were inadequately trained in how to conduct staff complaint inquiries. The two-hour training component that reviewers received during our monitoring period focused on completing forms and observing legal requirements when dealing with peace officers. The training did not include instructions in best practices for framing interviews, planning questions or preparing follow-up questions, or deducing conclusions from evidence. We note the following deficiencies:

✓ Only 14 of the 61 reviewers (23 percent) had received any relevant training on the staff complaint inquiry process before conducting their first staff complaint inquiry-related interview.

✓ We found that 42 reviewers (69 percent) received training at some point after conducting their first interview. As of November 19, 2018, we found that five reviewers (8 percent) had no record of receiving any training in the staff complaint process.

✓ None of the 61 reviewers received meaningful training in techniques of interviewing, collecting evidence, or writing reports.

## Staff Complaint Reviewers Were Not Independent: They Sometimes Displayed Bias in Favor of Their Fellow Staff Members, Sometimes Ignored Inmate Witness Testimony, and Often Compromised Confidentiality

Reviewers conducting staff complaint inquiries were supervisors—typically, sergeants and lieutenants—performing inquiries in addition to their regular duties; they were also frequently peers or coworkers of the staff members they were investigating, and were sometimes involved directly or peripherally with the incident under investigation. In a prison setting, these reviewers must always rely on fellow staff for their physical safety, which raises concerns over their ability to remain impartial. Reviewers demonstrated bias against inmates and in favor of staff, recording opinions as evidence, and basing conclusions on

those opinions. Reviewers also ignored corroborating evidence given by inmates in some instances and discounted or mischaracterized corroborating evidence in other instances. Moreover, reviewers frequently compromised the confidentiality of the staff complaint inquiry process, which, in the cases we reviewed, could have exposed the inmates to retaliation for raising concerns against staff. Selected highlights of this finding include the following:

✓ In 113 of the 188 staff complaint inquiries (60 percent), the prison assigned a reviewer who worked on the same yard and shift as the subject employee.

✓ In 11 instances (6 percent), the reviewer held the same rank or a lower one than the subject employee.

✓ In five instances (3 percent), the reviewer was actually involved in the incident giving rise to the staff complaint.

✓ During 34 appellant interviews and during 31 witness interviews, reviewers improperly compromised the confidentiality of the process.

### Salinas Valley Completed Most of the Staff Complaint Inquiries Within Required Time Frames; However, the Prison Did Not Always Notify Inmates, as Required, When Inquiries Were Overdue

Although the prison completed most of the staff complaint reviews within a 30-working-day time frame, some staff complaint inquiries took longer without the reviewer seeking extensions or notifying the inmates involved that the staff complaint inquiry would be late. On average, the prison completed a staff complaint inquiry in 27 days. We include the following notable findings:

✓ Reviewers completed 133 of the 165 time-sensitive staff complaint inquiries (81 percent) within the 30-working-day requirement. Reviewers completed another 18 staff complaint inquiries after 30 working days had passed, but within their requested extension period.

✓ Reviewers did not complete 14 staff complaint inquiries (8 percent) on time, including those with a time extension granted.

✓ Reviewers failed to provide the inmates with the required notification in 24 of the 32 cases (75 percent) that took longer than 30 working days to complete, and failed to notify their associate director in 27 of the 32 cases (84 percent).

### Salinas Valley Staff Worked More Thoroughly When Reviewing Complaints Submitted by Attorneys Who Represented Inmates, but They Still Did Not Complete High-Quality Inquiries

The OIG also assessed the department's inquiries conducted in connection with nine complaint letters submitted to Salinas Valley by the Prison Law Office. Although the inquiry reports for these cases were generally longer and more detailed than the staff complaint inquiry reports prepared in connection with the 188 cases the OIG reviewed during the paper review and the onsite review periods, these inquiries also suffered from the reviewers' general failures to interview subjects and relevant witnesses, the reviewers' not addressing all allegations, and the reviewers interviewing the inmate complainant after interviewing the subjects or other witnesses. We found the quality of seven of the nine inquiries to be inadequate. In addition, the reviewers at times relied upon the investigative work and findings in prior staff complaint inquiries conducted by Salinas Valley regarding these same complaints rather than conducting independent inquiries.

| Definitions of Select Terms Used in This Report | |
|---|---|
| Adverse Action | A documented action, punitive in nature and intended to correct misconduct or poor performance or terminate employment. Examples of these actions include a letter of reprimand, pay reduction, suspension without pay, or termination. |
| Appeal | An inmate may appeal (or challenge) any policy, decision, action, condition, or omission by the department that has a material adverse effect upon his or her health, safety, or welfare. Toward that end, an inmate may use the form "CDCR Form 602" (commonly referred to as a "602") to file his or her appeal. |
| Appeals Coordinator | A prison employee who is responsible for processing appeals (receiving, logging, routing, and monitoring disposition), monitoring the system, preparing the quarterly appeals report, recommending corrective action where indicated, and working with the in-service training officer to ensure that training on the appeals process is carried out. |
| Appellant | The inmate who has submitted an appeal. |
| Confidential Supplement to Appeal or "Attachment C" | The template used by staff inquiry reviewers to document the results of their inquiries into the allegations in a staff complaint appeal. The template requires the name of accused staff, the allegation or allegations in question, statements of witnesses, findings, conclusion, and recommendation. |
| Corrective Action | A documented nonadverse action taken by a supervisor to assist an employee improve his or her work performance, behavior, or conduct. Examples of these actions include verbal counseling, in-service training, on-the-job training, written counseling, or a letter of instruction. |
| Hiring Authority | The individual who has the authority to hire and discipline staff under his or her signature authority. In this context, the hiring authority is the warden of Salinas Valley State Prison and also, in some delegated instances, the chief deputy warden. Throughout this report, we refer to the *hiring authority* with respect to various decisions. For the 188 inquiries we monitored, a total of six individuals were considered to be the hiring authority, two of whom were women and four, men. Thus, the pronouns we use throughout the report may alternate from time to time, depending upon the hiring authority's gender for the case under discussion. |
| Department Operations Manual | The department's operations manual. The full title is *California Department of Corrections and Rehabilitation Adult Institutions, Programs, and Parole Operations Manual.* It is commonly referred to as the DOM. |
| Investigative Services Unit | A unit staffed by prison employees who are trained to conduct administrative reviews and investigations. |
| Office of Internal Affairs | The office within the department authorized to investigate allegations of staff misconduct. This office works independently of the prison chain of command. |
| Reviewer | A supervising prison employee who is responsible for conducting the staff complaint inquiry. Typically, the reviewer is a sergeant or a lieutenant, but the reviewer must hold at least one rank above that of the accused staff member. This is not a dedicated position: reviewers must also complete their regular duties in addition to conducting staff complaint inquiries. |
| Staff Complaint | An inmate appeal alleging facts that would constitute prison employee misconduct. |
| Staff Misconduct | Staff behavior that violates a law, regulation, policy, procedure, or that violates an ethical or professional standard. |
| Subject | A prison employee who is alleged to have committed misconduct. |

| Definitions of Select Terms Used in This Report (continued) | |
|---|---|
| *Types of Inquiries/Investigations* | |
| Allegation Inquiry | The collection of preliminary information concerning an allegation of employee misconduct necessary to evaluate whether a matter shall be referred to the (Office of Internal Affairs) Central Intake Unit. Allegation inquiries shall be conducted at the direction of the hiring authority when there is an allegation of misconduct, which if true could lead to adverse action, and the subject(s), allegation(s), or both are not clearly defined or more information is necessary to determine if misconduct may have occurred. Prison employees assigned to the Investigative Services Unit or Office of Internal Affairs' special agents conduct allegation inquiries. |
| Appeal Inquiry | The department conducts a confidential staff complaint appeal inquiry upon receipt of an inmate complaint alleging staff misconduct when the nature of the allegation or the lack of evidence makes adverse action unlikely. The process involves gathering evidence, including documentary evidence and interviews with the appellant, any witnesses, and accused staff, that supports or refutes an allegation of misconduct. Employees at the prison conduct appeal inquiries in addition to carrying out their regular assigned duties. (For purposes of this OIG review, an appeal inquiry is synonymous with a staff complaint inquiry.) |
| Investigation | The collection of evidence that supports or refutes an allegation of misconduct, including criminal investigations, administrative investigations, retaliation investigations, or allegation inquiries. Office of Internal Affairs' special agents conduct investigations. |
| *Decisions Made During the Appeals Process* | |
| Accepted Appeal | A form 602 appeal that meets the proper criteria and is accepted for processing. |
| Canceled Appeal | An appeal the appeals coordinator or a manager at the department's headquarters has returned to the appellant without responding to the specific appeal issue and which is considered closed without the appellant having exhausted his or her administrative remedies. |
| Rejected Appeal | A form 602 appeal the appeals coordinator or a manager at the department's headquarters has returned to the appellant with instructions to correct a deficiency. In some cases, the hiring authority may order an administrative review even though the appeal was rejected. |
| Withdrawn Appeal | An appeal an inmate has withdrawn. An inmate may withdraw an appeal by requesting that the process be stopped at any point up to receiving a signed response. A withdrawn staff complaint (appeal) must be returned to the hiring authority to determine further administrative action. |
| *Monitoring Periods in This Review* | |
| Onsite Review Period | The three-month period of staff complaint inquiries the prison initiated between March 1, 2018, and May 31, 2018. During this period of the review process, we actively monitored the handling of complaints in real time, attending the interviews of inmates and nonpeace officer staff. |
| Paper Review Period | The three-month period of staff complaint inquiries the prison completed between December 1, 2017, and February 28, 2018. During this period of the review process, we performed a retrospective review of all written documents supporting the type of review the prison conducted. |

*(This page left blank for reproduction purposes.)*

# Introduction

## Background

In January 2018, the secretary of the department and attorneys from the Prison Law Office requested that the OIG assess the process Salinas Valley used when handling inmate allegations concerning staff misconduct.[1] The department refers to these allegations as *staff complaints.*

### An Overview of the Staff Complaint Inquiry Process

The department processes staff complaints in accordance with the regulatory requirements of Title 15, *California Code of Regulations,* and of its departmental operations manual.[2] The department established the staff complaint process as a result of previous negative attention received from the media, courts, and the legislature, who criticized the department for ignoring or condoning employee misconduct toward inmates.[3] To address these concerns, the department acknowledged that "its credibility depended upon its ability to demonstrate appropriate steps [would] be taken to identify and correct staff misconduct when it occur[red] or to refute allegations found to be false."[4]

The department also acknowledged that "the most effective approach would have been to investigate each and every complaint," but noted that "a process involving investigations for every complaint would have been cost[-]prohibitive and easily overwhelmed." The department instead created the confidential staff complaint inquiry process for staff accused of wrongdoing by inmates. The department provided some insight into its rationale on page 3 from its instructional handbook:

> Absent the court[']s approval of a confidential
> review process, plaintiff's counsel would have been
> able to litigate the legal sufficiency of each and
> every step of the process[,] however trivial the

---

[1] The Prison Law Office is a nonprofit public interest law firm that provides free legal services to adult and juvenile offenders to improve their conditions of confinement.

[2] Title 15, *California Code of Regulations,* Section 3084–3984.9. *California Department of Corrections and Rehabilitation Adult Institutions, Programs, and Parole Operations Manual* (State of California: Department of Corrections and Rehabilitation, 2018). Commonly known as the DOM. Sections 54100.25–54100.25.2.

[3] *Instructional Handbook for Preparers of Staff Complaint Appeal Templates* (California Department of Corrections and Rehabilitation, Division of Adult Institutions, Office of Appeals, February 1, 2016). Hereafter referred to as "departmental instructional handbook."

[4] Ibid, p. 3.

complaint. The *process*, instead of the complaint[,] would be on trial. This means that every allegation would require a long and costly investigation irrespective of its merit or importance in order to ensure every action was legally defensible. The courts understood this would inevitably result in large backlogs and defeat the main purpose of the staff complaint process which is to ensure timely resolution of complaints.

The department also noted that inmate allegations of staff misconduct may reflect inmates' attempts to manipulate or retaliate against staff, and that staff members' rights to due process must therefore be protected. The staff complaint inquiry review process also functions to "exonerate staff who have been falsely accused,"[5] with this departmental publication offering additional instruction on its opening page[6]:

Staff complaints raise important issues with respect to how we manage our core responsibilities. Information developed through staff complaint inquiries can provide the Department [with] critical information regarding its effectiveness at managing the inmate population. If the allegations can be proven, the importance of this process is [self-evident]. But even untrue allegations can provide insight into the status of an inmate population. Since institutions are environments where allegations of misconduct may reflect attempts by inmates to manipulate or retaliate against staff, the right of staff to due process is critical to preserve the integrity of the system.

### Initial Screening, Reviewing, and Processing of Staff Complaints

An inmate who alleges staff misconduct (i.e., staff behavior that violates law, regulation, policy, procedure, or that violates an ethical or professional standard) may fill out an appeal form (known as CDCR Form 602). On the appeal form, the appellant—the inmate who files an appeal—describes in detail what happened, including dates,

---

5 *Administrative Interview Process Training Module* (State of California: Department of Corrections and Rehabilitation), p. 1. Hereafter referred to as "departmental training module."

6 Ibid.

times, places, and names of all people involved in the incident and all witnesses, if possible (see Appendix D).

The appellant submits the appeal form to the prison's appeals office, where its staff briefly screen the form to determine whether the complaint would be considered either a routine complaint or a staff complaint. A routine complaint would appear to not involve staff misconduct; for example, an inmate's complaint that his books did not arrive from the library could be one type of a routine complaint. In contrast, an inmate's complaint that a staff member stole his books would be a staff complaint.

Staff at the appeals office send the appeal, now a possible staff complaint, to the appeals coordinator for a second opinion to confirm that it is a staff complaint. The appeals coordinator further screens the appeal to determine whether the alleged misconduct would violate any policy if the allegations were true. While this level of screening duplicates the initial screening, it also provides a trail of additional paper documentation: the appeals coordinator checks a box on a separate form—which serves as a memorandum to the hiring authority—designating his or her judgment in the matter (see Appendix D). If the appeals coordinator concurs that the appeal contains a staff complaint, he or she forwards the appeal form along with the memorandum to the hiring authority.[7] At that point, after reviewing both the appeal and the recommendation from the appeals coordinator, the hiring authority makes the official determination of the staff complaint; this is effected by checking a box on the memorandum form, which offers the following options[8]:

- Refer to the Office of Internal Affairs (OIA) via CDCR Form 989 for Investigation/notification of direct adverse action (reasonable belief misconduct occurred and adverse action likely). *(This option is reserved for instances when the hiring authority reasonably believes that misconduct has occurred and that adverse action is likely.)*

- Refer to Institutional Services Unit (ISU) for Allegation Inquiry (additional information needed to establish

---

[7] The individual who has the authority to hire and discipline staff under his or her signature authority. In this context, the hiring authority is the warden of Salinas Valley State Prison and also, in some delegated instances, the chief deputy warden. Throughout this report, we refer to the hiring authority with respect to various decisions. For the 188 inquiries we monitored, a total of six individuals were considered to be the hiring authority, two of whom were women and four, men. Thus, the pronouns we use throughout the report may alternate from time to time, depending upon the hiring authority's gender for the case under discussion.

[8] Language in this listing is taken directly from departmental memoranda (see Appendix D, this report); language set in italics is our explanation of the options.

likelihood of adverse action per Department Operations Manual (DOM) Section 31140.14.[)] (*This option is reserved for instances when the hiring authority needs additional information to establish the likelihood of adverse action. The reference to ISU is to the prison's Investigative Services Unit.*)

- Refer to [    ] for an Appeal Inquiry to be conducted by appropriate supervisory staff (adverse action unlikely). The Original of the completed "Confidential Supplement to Appeal, Appeal Inquiry" (Attachment C) is to be forwarded to the Inmate Appeals Office for filing with the appeal. Inmates/ Parolees will not be provided a copy of this confidential report. (*This option is reserved for instances when the hiring authority does not believe that adverse action is likely. The square brackets should include a location or area of assignment.*)

- Process as a routine appeal. Appeal does not meet criteria for assignment as a staff complaint (no misconduct identified, even if facts as alleged are assumed to be true)—accept, reject or cancel in accordance with CCR Title 15, Section 3084.5. (*This option is for when the hiring authority believes the appeal does not meet the criteria for assignment as a staff complaint because even if the facts are assumed to be true, as alleged, it would not constitute misconduct.*)

- Cancel/Reject with no Investigation/Inquiry.

- Cancel. Assign for review outside Appeal Process via an Inquiry or Investigation (Offender will *not* be notified. Attachment E is not used). (*For these last two bullet points, the hiring authority could cancel or reject the appeal, but still assign the matter for an inquiry or investigation outside of the appeals process.*)

## Steps of a Staff Complaint Inquiry: Interviewing, Collecting Evidence, Writing Reports

When the hiring authority determines that an allegation warrants a staff complaint inquiry (which would be demonstrated by him or her checking off the third bullet point on the outline of the memorandum form listed above), the appeals coordinator forwards the staff complaint to a manager within a particular yard. That manager then assigns the staff complaint inquiry to a reviewer, a supervisor who holds a rank at least one level above that of the accused staff member. In general, the prison must complete the staff complaint inquiry within 30 working days of receiving it. The reviewer first assesses all information contained in the staff complaint and collects any other necessary documentation relevant to the allegations. Next, the reviewer conducts interviews

with the appellant, with all pertinent witnesses, and finally with the subject to obtain relevant testimonial evidence. When conducting a staff complaint inquiry, the reviewer is not compelled to interview all witnesses if he or she can demonstrate that the witness testimony would not be relevant or is not needed because the testimony would be cumulative. If the reviewer believes a witness is not credible, he or she must present facts that support such a conclusion. Reviewers cannot decline to interview witnesses "or reject their testimony 'because they are an inmate'" (departmental training module, p. 3).

If, at any point during the course of the staff complaint inquiry, the reviewer discovers information indicating that serious misconduct (conduct that would likely lead to adverse action) may have occurred, the reviewer must cease interviewing any staff or inmate regarding the matter. The reviewer must immediately bring this information to the hiring authority's attention for further review. The hiring authority must then determine whether to instruct the reviewer to continue the staff complaint inquiry, assign the matter to the prison's Investigative Services Unit, or refer the matter to the Office of Internal Affairs for consideration of an investigation.

## Outcomes Following a Staff Complaint Inquiry

When a hiring authority receives a completed staff complaint inquiry report package (the Confidential Supplement to Appeal or Attachment C and related supporting documents), he or she must weigh a number of options. The hiring authority may conclude no policy violation occurred and take no further action. Alternatively, the hiring authority may conclude a policy violation did occur and may impose corrective action, such as on-the-job training or counseling, for minor infractions.

Conversely, if the hiring authority reasonably believes that the policy violation would likely require adverse action, such as a reprimand, pay reduction, suspension, or dismissal, he or she must first refer the matter to the Office of Internal Affairs for consideration of an investigation or for permission to take adverse action without any additional investigation. If the Office of Internal Affairs conducts an investigation, that office would subsequently return its final investigative report to the hiring authority for final disposition. The Office of Internal Affairs' investigative reports do not contain any conclusions or recommendations concerning whether the misconduct occurred; the reports only contain factual evidence uncovered during the investigation. Ultimately, the hiring authority determines all disciplinary and corrective actions against his or her employees. Following the hiring authority's final determination, he or

she must inform the appellant in writing whether or not subject staff violated policy.

### Differences Between an Inquiry and an Investigation

Investigative entities often interchangeably use the words *inquiry* and *investigation* to mean an examination or the attempt to determine the facts of an event or situation. In fact, the definitions of *investigation* or *to investigate* incorporate the word *inquiry*, such as in the following example: "The activity of trying to find out the truth about something, such as a crime, accident, or historical issue; especially, either an authoritative inquiry into certain facts, as by a legislative committee, or a systematic examination of some intellectual problem or empirical question, as by mathematical treatment or use of the scientific method."[9] Furthermore, a thesaurus we reviewed identified the word *inquiry* as a synonym for an *investigation*.[10]

Despite these generally accepted meanings, the department does not use the words interchangeably and posits a distinction between inquiries and investigations. The department views an inquiry as either the first step of an investigation or part of the larger process of its investigations. Section 31140.14 of the department's operations manual sets forth that "allegation inquiries shall be conducted at the direction of the Hiring Authority when there is an allegation of misconduct, which if true could lead to adverse action, and the subject(s), allegation(s), or both are not clearly defined or more information is necessary to determine if misconduct may have occurred." If, during the course of an inquiry, the individual conducting the inquiry obtains sufficient information to warrant an internal investigation, then the hiring authority is directed to forward a request for investigation or for authorization to take direct action regarding the allegation(s) to the department's Office of Internal Affairs. Furthermore, in terms of its appeal inquiries, the department notes that "the current appeals review process is designed to complement the larger and more formal investigative process ... by providing **an initial review of less serious allegations**" (emphasis added; departmental instructional handbook, p. 3).

Although the department attempts to make a distinction between an inquiry and an investigation, in reality, both processes encompass several and, in some cases, identical core steps in the examination of an event or situation. In its inquiries and investigations, department staff

---

[9] *Black's Law Dictionary*, ed. B. Garner, 10th ed. (Thomson Reuters, 2014). Entry: "investigation."

[10] *Merriam-Webster's Thesaurus*, online: **https://www.merriam-webster.com/thesaurus/inquiry**.

(the reviewer at the prison or a special agent at the Office of Internal Affairs) conduct interviews with various individuals, including inmates and other prison staff; gather and examine relevant documentary evidence; and draft a report.

However, even though the department's core activities for inquiries and investigations mirror each other, the department uses the term *investigation* to refer to the work conducted by its statewide Office of Internal Affairs, reserving the term *inquiry* primarily for the work conducted by reviewers (or investigators) at the prisons. Ironically, even though the department characterizes the work conducted by special agents with the Office of Internal Affairs as investigations, the special agents advise the accused employees they investigate that the employees are the subjects of an *inquiry* being conducted by the Office of Internal Affairs. Also, the department's own definition of *investigation* includes "allegation inquiries."[11]

Furthermore, investigations conducted by the Office of Internal Affairs are generally more robust, and benefit from the background of those assigned to conduct them and the additional investigative tools and techniques at the disposal of those investigators. The prisons assign *reviewers* at the institutions to conduct inquiries. A reviewer is typically a sergeant or a lieutenant, most of whom have had very little or no investigative training or on-the-job experience conducting investigations. Even when trained in the investigative process, these reviewers tend to possess only rudimentary training in conducting interviews and collecting evidence. In contrast, the Office of Internal Affairs employs special agents to conduct its investigations. These special agents undergo many hours of advanced, specialized, and on-the-job training in conducting investigations.

In addition to the differing backgrounds between those whom the department assigns to conduct inquiries and those it assigns to perform investigations, different tools are generally available to those conducting inquiries versus those performing investigations. Reviewers at the prisons generally have at their disposal basic documentation regarding the misconduct allegation, such as the inmate's written complaint, staff reports, time sheets, and documentation regarding the inmate's housing assignment, disciplinary history, and complaint history. In contrast, special agents have more sophisticated investigative techniques and tools available to them, including the ability to obtain forensic examinations of email messages and other computer-related information; the option to perform surveillance; the ability to conduct

---

[11] From the DOM, Section 31140.3: "The collection of evidence that supports or refutes an allegation of misconduct, including criminal investigations, administrative investigations, retaliation investigations, or allegation inquiries."

undercover and sting operations; the ability to obtain wiretap evidence; the option to obtain and execute search warrants; and the ability to audio-record interviews. Such techniques are typically unavailable to reviewers at the prisons.

The ability of reviewers and special agents to audio-record interviews is markedly different and illustrates the limitations under which prison reviewers operate in contradistinction to the conditions under which special agents perform their investigations. Reviewers at the prison conducting appeal inquiries may audio-record interviews of employees accused of misconduct only in very limited circumstances. Pursuant to the department's operations manual, Section 54100.25.2, employees who are subjects of a staff complaint inquiry "may request to record the interview and will be allowed to retain their copy of the recording. However, under such circumstances, a concurrent separate recording shall be made by the Department and retained in the appeal office. **Only the subject** can initiate a request to record the interview" (emphasis added).

In contrast, Section 31140.33 of the department's operations manual states that during Office of Internal Affairs investigations, "all noticed employee interviews concerning matters that could lead to an adverse action shall be audiotape-recorded." Furthermore, an employee being interviewed as the subject or witness of an investigation may also request audio-recording of the interview.[12] Therefore, in performing investigations, a special agent must record subject and witness interviews. By being required to record such interviews, the special agent has the ability to later review those individuals' statements. This allows the special agent the ability to better familiarize him- or herself with the evidence in the case, and, thus, to conduct a more thorough investigation and prepare a more accurate written report. A special agent often uses information gleaned from reviews of recorded interviews to develop and pursue additional witnesses or evidence. The requirement to record and the ability to later review interviews is also particularly important to assist a special agent in conducting further interviews in an investigation and in being able to effectively confront a subject with information previously provided in interviews conducted at an earlier date. Conversely, due to the recording limitations imposed upon him or her, a reviewer at the prison is deprived of these investigative techniques.

Lastly, another key distinction between these two processes exists when a reviewer uncovers any indication that the matter is serious enough

---

[12] DOM Section 31140.33, and the *Agreement Between the State of California and California Correctional Peace Officers Association (CCPOA) Covering Bargaining Unit 6 Corrections* (Effective July 3, 2018, Through July 2, 2019, Section 9.09 (j.)).

to lead to adverse action. In such cases, the reviewer must immediately stop the inquiry process and return the matter to the hiring authority, who may in turn request that the Office of Internal Affairs conduct an investigation. This procedural stop-mechanism does not occur during an investigation conducted by the Office of Internal Affairs. As we describe in more detail in the body of this report, reviewers completed all but one of the staff complaint inquiries they undertook during our six-month review period, presumably because the one staff complaint inquiry met the department's conditions warranting an additional level of review and, thus, warranting an investigation. Table 1 below lists a comparison of activities associated with the two processes.

**Table 1. Comparison of Activities Associated With Inquiry and Investigation Processes**

| Action | Inquiry | Investigation |
|---|---|---|
| Conduct Interviews | ✓ | ✓ |
| Collect and Review Documentary Evidence | ✓ | ✓ |
| Prepare Report | ✓ | ✓ |
| Conducted by Individual With Extensive Training in Investigations | | ✓ |
| Conducted by Prison Staff With Minimal Training in Investigations | ✓ | |
| Forensic Examination of Evidence (optional) | | ✓ |
| Surveillance (optional) | | ✓ |
| Undercover / Sting Operations (optional) | | ✓ |
| Wiretap Evidence (optional) | | ✓ |
| Search Warrant (optional) | | ✓ |
| Audio-record Interviews | | ✓ |

Source: Analysis of the two processes by the Office of the Inspector General.

**Figure 1. Number of Staff Complaints Accepted by the Department, December 1, 2017, Through May 31, 2018**



* FOPS/SH is the department's abbreviation that stands for Female Offender Programs and Services/Special Housing.

Source: Data from the California Department of Corrections and Rehabilitation's *Inmate/Parolee Appeals Tracking System.*

## Volume and Nature of Staff Complaints

During the six-month period that began December 1, 2017, through May 31, 2018, the department accepted 3,218 staff complaint appeals statewide, ranging from nine to 298 staff complaints among the prisons (see Figure 1, above). This translated into an average acceptance rate of about 92 staff complaints per prison. The department's High Security Mission, which contains 10 institutions, accounted for the largest share of accepted staff complaints, with 1,473 (46 percent).[13] Among those

---

[13] The department groups the institutions into one of four mission-based disciplines: (1) high security, (2) general population, (3) reception centers and camps, and 4) female offender programs and services/special housing.

10 institutions, Salinas Valley stood out, having accepted 298 staff complaints, 110 more than the prison with the next-highest number of staff complaints and more than three times as many as the average rate per prison. We acknowledge that inmates' awareness of our review could have exerted some influence over these numbers if inmates filed staff complaints in anticipation of our visit during the last three months in this period.

Figure 2 below illustrates the volume of staff complaints accepted by Salinas Valley by month over the six-month review period ending May 2018. From December 2017 through February 2018, Salinas Valley accepted 121 staff complaints, and from March 2018 through May 2018, the prison accepted 177 staff complaints, an increase of 56 staff complaints (46 percent). Again, it is possible the increase is partly due to inmates' anticipation of our review.

**Figure 2. Number of Staff Complaints Accepted at Salinas Valley, December 1, 2017, Through May 31, 2018**



Source: Data from the California Department of Corrections and Rehabilitation's *Inmate/Parolee Appeals Tracking System.*

Our review focused on the 61 staff complaint inquiries the prison *completed* between December 1, 2017, and February 28, 2018, and the 127 staff complaint inquiries the prison *initiated* between March 1, 2018, and May 31, 2018. The total number of complaints we reviewed for which the prison completed a staff complaint inquiry during these two periods was 188 (the combination of 61 and 127).[14] We organized these 188 complaints into seven general categories:

- Discourteous Treatment

- Discrimination

- Dishonesty or Falsified Documentation

- Neglect of Duty

- Retaliation or Threats

- Sexual Misconduct

- Unreasonable Use of Force

Of the 188 staff complaint inquiries we reviewed, allegations included a variety of topics, and many staff complaint inquiries included more than one type of allegation (totaling 268 allegations). Figure 3 on the following page shows the most prevalent allegation type included some form of alleged discourteous treatment: in 79 instances (42 percent), inmates complained about their treatment by staff. The second most prevalent complaint involved staff's neglect of duty, for which we reviewed 62 instances (33 percent). The next most prevalent was the use of force: in 46 instances (24 percent), inmates alleged that officers used unnecessary or excessive force against them. Next followed 39 complaints (21 percent) alleging retaliation or threats. This type was followed by 26 complaints (14 percent) alleging some form of dishonesty, nine allegations (5 percent) concerning various types of sexual misconduct, and seven allegations (4 percent) of discrimination.

---

[14] Not all of the inmate complaints accepted by the prison resulted in a staff complaint inquiry; some were withdrawn, canceled, or referred to the Office of Internal Affairs before they could become inquiries. Our methodology for selecting inquiries for the paper review period included only those for which the prison *completed* an inquiry between December 1, 2017, and February 28, 2018. Therefore, this included some cases that the prison accepted before December 1, 2017, and excluded some cases the prison accepted, but did not complete an inquiry by February 28, 2018. During the onsite review period, we reviewed the inmate appeals reviewed and accepted as staff complaints between March 1, 2018, and May 31, 2018. Some of the onsite review period cases closed, but some did not during the time we completed our review. This accounts for the difference between the 298 staff complaints accepted by the prison during the six-month period and the 188 staff complaint inquiries we reviewed during the same time frame.

**Figure 3. Number and Type of Allegations Included in the 188 Staff Complaint Inquiries We Reviewed**



Source: Allegations categorized by the Office of the Inspector General.

To provide a frame of reference, we also organized the 188 complaints we reviewed by the inmate's location at the time the person submitted the complaint (see Figure 4, following page). During the first three months of this period, the highest number of complaints originated from inmates housed on yard "D," which was followed by those housed on yard "A" and in the administrative segregation unit. However, over the second three-month period of our review, the highest numbers of complaints originated from yard "A" and in the administrative segregation unit, followed by those on yards "B" and "D."

**Figure 4. Number of Staff Complaints for Which the Prison Completed a Staff Complaint Inquiry, by Appellant Housing Location at the Time of Submission, December 1, 2017, Through May 31, 2018**



\* Yard D includes housing units D2–D8.

† The Administrative Segregation Unit (ASU) includes D1 and Z9 housing units.

‡ Other includes Central Health, Minimum Support Facility, and other institutions.

Source: Data collected by the Office of the Inspector General.

## The Department Is Considering New Options for Handling Staff Complaints

In October 2017, the department set forth an issue paper addressing the findings and recommendations of a wardens' advisory group (wardens' group) that the department convened to consider reforming the appeals process[15] departmentwide. This wardens' group reviewed the department's current appeals processes and procedures, as well as those of other jurisdictions and states, and proposed a series of adjustments it believed would improve efficiency and cost effectiveness while reducing the likelihood of litigation against the department. Proposed changes included implementing an optional informal process that the warden's group surmised could promote inmates' or parolees' direct interaction with departmental staff and help to realize an efficient resolution of complaints, and consolidating levels of review to streamline the appeals process.

---

[15] In this section, our reference to the department's "appeals process" includes the department's handling of staff complaints.

The issue paper included analyses of the costs and benefits associated with each proposed change to the department's appeals process. Regarding one major area of proposed change, the prison level of review, the wardens' group proposed three distinct alternative plans, each consisting of a detailed process by which an appeal travels to and from various levels of review, including proposed staffing changes to accommodate the changed process. The department, however, did not choose a solution from among these alternatives.

In December 2018, the department provided us with a draft proposal, contemplating another option for restructuring the appeals process. In general terms, the draft proposal considers renaming appeals by calling them "grievances" and "appeals of grievances." Toward that end, grievances would be handled at the local level (prisons) and appeals of grievances would be handled at the headquarters level by the Division of Internal Oversight and Research (a division separate from the Division of Adult Institutions, which controls the prisons). If adopted, the department contends the new process would expedite grievances related to personal safety, institutional safety, or sexual misconduct. The draft proposal also modifies the number of reasons to five for canceling or rejecting appeals.

**Figure 5. Salinas Valley State Prison: Site Plan**





### Key

**A** and **B**: Complex 1

**C** and **D**: Complex 2

**MSF**: Minimum Support Facility

Source of map data: Google Earth © 2018.

URL: https://earth.google.com/web/@36.47787827,-121.37716242,86.03962306a,801.12769569d,35y,130.20425371h,0t,0r (accessed November 20, 2018).

## Scope and Methodology

In January 2018, the secretary of the department and attorneys from the Prison Law Office requested that the OIG assess the effectiveness of Salinas Valley's process of handling inmate complaints alleging staff misconduct (see Appendix A to review a copy of the engagement letter and the scope of our work).

This assessment comprised a *review*. We differentiate this term from the term *investigation* in two primary respects. First, a review focuses on the adequacy of a *process*, whereas an investigation focuses on the appropriateness of an individual's *behavior*. Second, a review's intended outcome is fundamentally different from that of an investigation: a review may result in recommendations regarding policies and procedures, whereas an investigation may result in disciplinary or criminal action against individuals due to their behavior, if warranted. Consequently, we present a number of recommendations that address process-related improvements. Our recommendations do not take into consideration the behavior of the individuals we observed throughout the monitoring period.

As a significant limitation to our scope, at the direction of the secretary, OIG monitors were not allowed to witness or attend the interviews of the prison's peace officers. Thus, the conclusions presented in this report reflect only the interviews we were able to witness and the documents we were able to review. At the direction of the federal receiver who oversees the prison health care system, we also limited our review to the staff complaint process under the control of the secretary of the department. Consequently, we did not review any staff complaints processed by California Correctional Health Care Services that were related to the delivery of medical care.

To accomplish our assessment, we reviewed the department's policies, procedures, and regulations regarding the handling of staff complaints. We reviewed both its 2016 instructional handbook and its training module. Both sources served—and continue to serve—as guides for employees involved with the staff complaint process. We also reviewed local operating procedures used specifically by Salinas Valley in connection with this process. Our assessment resulted in a qualitative conclusion of either *adequate* or *inadequate*, referring to the overall quality of the staff complaint inquiry. In this context, quality refers to our opinion of the reviewer's competence in performing various inquiry-related tasks, such as interviewing, collecting evidence, and writing reports. Collectively, we formed an opinion in connection with each staff complaint inquiry we reviewed. Since we were not permitted to observe key interviews of staff subjects and witnesses, our assessment is not

intended to convey validation or invalidation of the prison's conclusions regarding the alleged staff misconduct.

To gain an understanding of the staff complaint inquiry process from the employee's perspective, we spoke with several staff members who worked in the prison's appeals office as well as with various employees who were later assigned to conduct staff complaint inquiries. Several of the employees we spoke with told us they were interested in receiving more training and gaining more experience in performing the duties associated with this process.

To determine how the prison tracked and monitored staff complaints, we reviewed printed outputs generated by the inmate appeals tracking system. The department uses this system statewide to track and monitor staff complaints at all of its locations. However, for the purposes of this review, we did not audit the data or perform any data reliability tests to ensure the completeness and accuracy of the data stored in the system.

To determine whether staff had received training related to the staff complaint process, we reviewed training records for every employee who conducted staff complaint inquiries. We evaluated whether any of the training listed for those employees was sufficient for them to conduct effective staff complaint inquiries.

To determine whether the prison followed its policies when resolving staff complaints, we reviewed documentation for the 61 staff complaints the prison completed between December 1, 2017, and February 28, 2018. Throughout this report, we refer to this period as the *paper review period* since we were not present at the prison, and our review primarily consisted of a paper document review. In contrast, we monitored in person the 127 staff complaint inquiries initiated by the prison between March 1, 2018, and May 31, 2018. We refer to this period as the *onsite review period*. Throughout this report, we present several comparisons of the department's handling of staff complaints in each period. During our review period, the hiring authority referred four staff complaints originating from the appeals process to the Office of Internal Affairs, bypassing the prison's inquiry process. We did not monitor those cases as part of this review, and they are not counted among the 188 staff complaint inquiries. Following the investigation conducted by the Office of Internal Affairs, the hiring authority determined in two of the cases that staff had not violated policy; in the remaining two cases, the hiring authority disciplined staff, issuing a Letter of Reprimand to one employee and imposing a two-day suspension on another employee.

We observed a total of 218 interviews of inmates and noncustody staff, consisting of 118 appellant interviews, 90 inmate witness interviews, four witness interviews of noncustody staff, and six subject interviews

of noncustody staff. As previously noted, the secretary did not permit
OIG monitors to attend interviews of peace officer subjects or peace
officer witnesses who were named in the complaints. Significantly,
during the onsite review period, reviewers conducted a total of
414 interviews outside of the presence of our monitors, consisting
of seven appellant interviews, 34 inmate witness interviews, 191 staff
witness interviews, and 182 staff subject interviews. Our scope was again
limited when reviewers interviewed seven appellants and 34 inmate
witnesses without notifying the respective OIG monitor. During
the onsite review period, collectively, reviewers conducted 134 more
interviews of staff than of inmates. Much of the information reviewers
obtained during those interviews was unavailable to us due to the scope
limitation; consequently, we could rely only upon the written summary
of those interviews contained in the Confidential Supplement to Appeal
(staff complaint inquiry report). On the following page, Figure 6 presents
a summary of these data points.

To gain an understanding of the staff complaint inquiry process from
an inmate's perspective, we interviewed 20 inmates at random who
were previously involved with the process during each period. Many of
the inmates commented that the staff complaint process was broken.
Only three inmates stated that they believed the process was fair, and
many said they felt reluctant to use it because they were either directly
threatened or retaliated against for filing staff complaints. Comments
from interviews ranged from inmates expressing feelings of negativity
concerning how they were treated during the staff complaint process to
their more serious feelings of being threatened in retaliation for filing a
staff complaint.

For example, one inmate told us a reviewer was argumentative with him
while he was being interviewed for his staff complaint. According to the
inmate, the reviewer challenged the manner in which a subject officer
had disrespected him, and the reviewer made the inmate feel "stupid
and petty." The inmate told us that he believed the appeal process
was a "joke." He made further comments, suggesting the process was
"not fair," that "nothing happens with complaints," and "they get shot
down." He finally commented that "it is [the inmate's] word versus the
officer's word."

Another inmate more ominously described how he was approached by a
sergeant three weeks after the inmate participated in a staff complaint
inquiry interview. The inmate stated that the sergeant told him not to
pursue the staff complaint any further and not to file any additional
staff complaints or the inmate would end up in the administrative
segregation unit. The inmate added during our discussion with him,
"If you file a staff complaint in [the housing unit], they make your life
a living hell. The floor officers will go into your cell and destroy it and

**Figure 6. Number and Types of Interviews Conducted by the Prison, December 1, 2017, Through May 31, 2018**



* One appellant in each of the review periods refused to be interviewed, and one appellant in the onsite period waived his right to be interviewed.

† We did not observe interviews with seven appellants and 34 inmate witnesses as well as with one staff witness and two staff subjects because Salinas Valley neglected to notify us of the interviews.

Source: Data collected by the Office of the Inspector General.

they will use excessive force." The inmate told us that he decided not to elevate his staff complaint to the third level following the sergeant's comments.

Finally, to assess the prison's handling of and response to nine specific complaints submitted to the department by the Prison Law Office between December 21, 2017, and January 23, 2018, we obtained and reviewed the relevant documentation related to each complaint. We present the results in summary form, beginning on page 69.

# Special Review Results

## Salinas Valley Inadequately Conducted Reviews of Allegations of Staff Misconduct

Salinas Valley's process of reviewing inmate complaints cleared the overwhelming majority of staff who were accused of misconduct. However, we found numerous problems with its process as demonstrated by staff's inadequate skills in gathering evidence through interviews and document collection, and by staff's inadequate report writing skills that rendered final reports that were often incomplete or inaccurate. Staff members who were tasked with conducting staff complaint inquiries received inadequate training in interviewing, gathering evidence, or writing reports, and were instead oriented to filling out basic forms. Further, we found that Salinas Valley did not consistently follow through on corrective actions for the few staff who were found to have violated policy.

An inmate who alleges that a staff member's behavior violated law, policy, or ethical or professional standards is permitted to file an appeal with Salinas Valley's management. The department refers to these types of employee misconduct appeals as *staff complaints* and internally reviews them by conducting a staff complaint inquiry, which is a local, less-formal version of an investigation. In the prison setting, an assigned supervisor (a reviewer) performs a staff complaint inquiry by conducting interviews, collecting relevant documentary evidence, and writing a report. Following a completed staff complaint inquiry, the hiring authority (an individual with the authority to hire and discipline staff) determines whether staff violated policy. We retrospectively reviewed 61 staff complaint inquiries the prison completed from December 1, 2017, through February 28, 2018 (labeled the paper review period), and monitored in person 127 staff complaint inquiries the prison initiated from March 1, 2018, through May 31, 2018 (labeled the onsite review period). Between the two periods, we reviewed a total of 188 staff complaint inquiries (the sum of 61 and 127).

### Salinas Valley Rarely Found Misconduct From Its Staff Complaint Inquiries, and in the Few Cases Where It Determined That Staff Violated Policy, It Did Not Always Provide Corrective Action—Until We Asked About It

The hiring authority determined that subject staff did not violate policy in 183 of the 188 staff complaint inquiries we reviewed (97 percent). Although the hiring authority determined that at least six officers violated policy in the remaining five inquiries (3 percent), he or she

did not timely provide the corrective actions ordered for five of the six officers; the hiring authority concluded staff in the remaining staff complaint inquiry violated policy, but did not specifically identify any particular individuals (see Table 2, below). The prison provided a Letter of Instruction (a type of corrective action) to one officer shortly after the hiring authority identified the policy violation, but prison staff took an additional 240 days to provide training to three other officers and 411 days to provide training to two more officers. Unfortunately, too much time had elapsed between the dates the policy violations occurred and the officers' training, greatly diminishing the value of this training. Furthermore, the failure to train staff in a timely manner also suggests Salinas Valley did not take the violations seriously and failed to demonstrate the prison was committed to ensuring its staff make improvements in these areas of concern.

**Table 2. Summary of Corrective Actions for the Six Employees Who Were Found to Have Violated Policy**

| Case ID | Employee | Allegation Type | Policy Violation | Description of Corrective Action | Date Ordered | Date Received* | Number of Days Between Ordered and Received |
|---------|----------|-----------------|------------------|----------------------------------|--------------|----------------|---------------------------------------------|
| 14 | Officer 1 | Unreasonable Force | Yes | Training | 10/27/17 | 12/12/18 | 411 |
| | Officer 2 | Unreasonable Force | Yes | Training | 10/27/17 | 12/12/18 | 411 |
| 65 | Officer 3 | Neglect of Duty | Yes | Training | 4/3/18 | 11/29/18 | 240 |
| | Officer 4 | Neglect of Duty | Yes | Training | 4/3/18 | 11/29/18 | 240 |
| 80 | Officer 5 | Unreasonable Force | Yes | Training | 4/4/18 | 11/29/18 | 239 |
| 155 | Unidentified Employee(s) | Neglect of Duty† | Yes | None | – | – | – |
| 163 | Officer 6 | Discourteous Treatment | Yes | Letter of Instruction | 6/18/18 | 7/10/18 | 22 |

* On November 29, 2018, we asked Salinas Valley to provide us with a status report of the corrective actions it took on the above cases. Based on this request, the prison provided training to three officers as a result of our query (see above, Cases 65 and 80). In addition, on December 12, 2018, Salinas Valley provided training to two officers as a result of our query (see above, Case 14).

† The original allegation in this case was related to discourteous treatment. The reviewer and hiring authority concluded, however, that unidentified staff violated policy when they failed to sign a search receipt. We categorized this as a neglect of duty.

Source: Analysis by the Office of the Inspector General.

The hiring authority determined in one of the staff complaint inquiries that an officer improperly confiscated an inmate's signal amplifier (used for his television) and timely issued the officer a Letter of Instruction, a form of corrective action, 22 days after it was ordered (Case 163). In a second staff complaint inquiry, the hiring authority found that an officer failed to document a use of force and ordered training. However, it took the prison 239 days to train the officer, and only because we asked to see documentation (since the date of the training was the same as the date we contacted the prison) (Case 80). In the third staff complaint inquiry, the hiring authority concluded that two officers had inappropriately refused to sign a form and recommended the officers receive training. As with the last example, the prison provided training to the two officers on the same day we asked for evidence that the training occurred, 240 days after the training was initially ordered (Case 65).

An inmate alleged in the fourth staff complaint that he was subjected to unreasonable force when officers slammed him to the ground. The hiring authority determined that two officers' actions violated policy with respect to their use of force. Based on a handwritten notation on the staff complaint inquiry report (dated December 2017), the hiring authority claimed that corrective action had been taken; however, when we asked in November 2018 to see documentation of the training it provided, the prison responded that it had yet to provide the training and that the action was still pending. On December 12, 2018, Salinas Valley provided us with copies of the training it had just given to the two employees, which took place 411 days after it was initially ordered (Case 14).

In the fifth, and perhaps most problematic, of these five staff complaint inquiries, the hiring authority did not find staff violated policy in any of the inmate's allegations; instead, the hiring authority found that a different policy had been violated when staff did not properly sign a form. Despite finding a violation of policy, the hiring authority did not identify the particular staff members who violated that policy. In this instance, the inmate alleged discourteous treatment and neglect of duty when he complained that upon returning to his bunk, he found that staff had discarded his dental prosthetics during a search of his living area in the dormitory. The inmate alleged that when he spoke to the sergeant about his dental prosthetics, the sergeant responded, "Tough shit[.] 602 it."

We were onsite for the reviewer's interview with this appellant, who commented to the reviewer that his dental prosthetics had been accidentally discarded and that he did not want his appeal to be a staff complaint; he was merely unhappy with the sergeant's response because the inmate wanted to get his missing prosthetics replaced as soon as

possible.[16] The inmate said he was "not looking to get anyone in trouble" and that too many officers had been present for him to be able to identify any one individual.

The reviewer did not obtain the sign-in sheet for staff or the logbook to identify potential staff witnesses, nor did the reviewer interview any witnesses. The reviewer did obtain the search receipt provided to the inmate, but it included only the inmate's name, number, and assigned bunk, and no staff member had signed the receipt. The reviewer also obtained the order requisition confirming the inmate had been issued dental prosthetics.

We were not permitted to observe the reviewer's interview of the named sergeant, but the completed staff complaint inquiry report packet noted that the reviewer asked the sergeant whether he recalled making the statement, "Tough shit[.] 602 it," and that the sergeant replied, "I spoke to several inmates that night and informed them that I was not involved with the searches, [and] that they would have to 602 the Supervisor who oversaw the searches and those conducting the searches."

The reviewer concluded that because the subject sergeant was not the sergeant in charge of the searches, the inmate had "misidentified the sergeant." In fact, the reviewer noted the name of the sergeant who was actually in charge of the searches—the one who should have been included as a subject—but did not interview him. The reviewer provided no explanation for not having done so. Furthermore, the reviewer dropped the allegation of discourteous treatment and focused instead on the neglect of duty for the unsigned search receipt. That unsigned receipt, the reviewer observed, was improper documentation, concluding:

> Staff violated policy when they failed to properly account for a search of the assigned area of the appellant thus causing the unnecessary loss of his upper and lower partial dental prosthetics. Therefore, the appellant's claims do not hold merit against [the interviewed sergeant], but his claims against staff due [*sic*] hold merit as they failed in their responsibilities to properly document a Cell/Bunk/Locker Search within Dorm 1.

---

[16] Based on our analysis of the six-month period of complaints we reviewed (December 1, 2017, through May 31, 2018), it took Salinas Valley, on average, 27 days to process a staff complaint, which was not soon enough.

The reviewer concluded staff violated policy for the unsigned search receipt, yet failed to connect the violation with any staff names. The reviewer also failed to address the alleged discourteous statement made by a sergeant to the appellant. We are puzzled that the hiring authority agreed with the reviewer's conclusions and signed off on the staff complaint inquiry. She also did not identify any staff names or request further attempts to identify them and also did not address the appellant's discourteous treatment allegation.

When we asked the prison about this staff complaint inquiry in November 2018, a lieutenant responded that he did not believe any further action was possible, unless prison staff were to complete a blanket-style training "on search form completion and/or removal of medical appliances." The hiring authority agreed with the lieutenant and indicated that she did not believe that another training was "warranted at this time." Consequently, no one was held accountable for potentially making a discourteous statement nor for improperly filling out a search form (Case 155).

Moreover, the prison referred six of the 188 staff complaints to the prison's Investigative Services Unit for an additional level of review. This additional review led to the hiring authority determining that staff had not violated policy. The prison also referred one of the 188 staff complaints to the department's Office of Internal Affairs. In this case, the appellant alleged that an officer improperly conducted an unclothed search. The Office of Internal Affairs conducted an interview with the subject and returned the case to the hiring authority for consideration of adverse action. Upon conclusion, the hiring authority did not sustain that allegation.

### The Quality of More Than Half of the Staff Complaint Inquiries We Reviewed Was Inadequate

Our assessment revealed numerous weaknesses in reviewers' technical proficiencies in their capacities to perform these reviews: their skills in interviewing people, collecting evidence, and writing reports were broadly inadequate. We found, for example, that reviewers frequently interviewed individuals out of sequence and, in some cases, failed to ask relevant questions during interviews. We also found that reviewers sometimes failed to interview pertinent witnesses and subjects altogether and did not explain why they had not done so, as instructed. We also found that reviewers often failed to collect all relevant documentary evidence necessary for a complete staff complaint inquiry. Finally, we found a multitude of deficiencies in the reviewers' report writing skills, reflected regularly in reports that

were inaccurate or incomplete, or both inaccurate and incomplete. We found at least one significant deficiency (or inadequate rating) in 173 of the 188 staff complaint inquiries (92 percent). Overall, these deficiencies led us to conclude that the quality of 104 of the 188 staff complaint inquiries (55 percent) were inadequate (see Figure 7, bottom of this page). Consequently, we question whether the prison could ultimately defend its conclusions while basing them on inadequate staff complaint inquiries.

For the purpose of this review, we assessed *quality* subjectively, using our own professional experience with monitoring investigations and other departmental processes. We assessed the appropriateness of the reviewer's assignment; interviews conducted with the appellant, the witnesses, and the subject; the evidence collected; and the thoroughness of the staff complaint inquiry report. Our qualitative assessments, however, were not intended to reflect either validation or invalidation of the department's policy determinations. An adequate rating reflected our opinion that, overall, the staff complaint inquiry was performed using sound investigative practices. Our assessment was based on six questions, as depicted in Table 3 on the following page.

**Figure 7. Overall Quality Ratings for the 188 Staff Complaint Inquiries We Reviewed**



Source: Analysis by the Office of the Inspector General.

**Table 3. Summary of the OIG's Assessment Questions**

| Assessment Question* | Relevant Period | |
|---|---|---|
| | Paper | Onsite |
| **Question 1**<br>Was the staff complaint inquiry assigned to an appropriate reviewer? | ✓ | ✓ |
| **Question 2**[†]<br>Did the reviewer properly conduct an interview of the appellant? | (partial)<br>✓ | ✓ |
| **Question 3**<br>Did the reviewer properly conduct an interview of the witnesses? | ✗ | ✓ |
| **Question 4**<br>Did the reviewer properly conduct an interview of the subjects? | ✗ | ✓ |
| **Question 5**<br>Did the reviewer collect all relevant documentary evidence? | ✓ | ✓ |
| **Question 6**<br>Did the reviewer prepare an adequate inquiry report? | ✓ | ✓ |

\* For a complete description of the criteria we used to assess these questions, please refer to Appendix C.

[†] During the paper review period, we only checked whether the appellant was interviewed in the proper order; we did not assess the quality of the interview.

Source: The Office of the Inspector General.

For cases we found inadequate, we did not conclude that staff members alleged to have committed misconduct actually violated policy or were found responsible for the alleged misconduct. Rather, we found that the prison's handling of these cases was inadequate because it did not rely on an adequate process to fully support its conclusions.

We summarized each reviewer by rank or classification to discern whether any notable performance differences were evident; for example, whether more senior employees performed more effectively than less senior employees. On the following page, Figure 8 depicts the groupings by rank, including managers, lieutenants, sergeants, and all others. In addition, we separately grouped those staff complaint inquiries conducted by staff in the Investigative Services Unit. By frequency, out of the 188 staff complaint inquiries, lieutenants performed the majority of them at 112 (60 percent); followed by sergeants with 40 (21 percent). The remaining groups combined performed 36 staff complaint inquiries (19 percent).

The best performers, by rank, were included in the category "others," composed of correctional counselors and other nonsworn supervisors and managers. We found their work to be adequate in 50 percent of their staff complaint inquiries. Next were lieutenants, whom we found conducted adequate staff complaint inquiries in 48 percent of their cases. We found the performance of managers, consisting of associate wardens and captains, to be surprisingly subpar with only 46 percent of their staff complaint inquiries rated adequate. Finally, we found the performance of sergeants to be particularly weak, having rated the quality of their reviews adequate in only 30 percent of their staff complaint inquiries.

**Figure 8. Overall Quality for the Staff Complaint Inquiries We Reviewed, by Reviewer Rank**



\* Managers include the classifications of Associate Warden and Captain.

† The Investigative Services Unit group consisted of inquiries performed by two Lieutenants and two Sergeants.

‡ Other includes the classifications of Correctional Food Manager I, Assistant Correctional Food Manager, Building Trades Supervisor, Prison Industry Manager, and other noncustody, supervisory positions. Also included in this category is the Correctional Counselor II classification, which is a custody position.

Source: Data collected by the Office of the Inspector General.

Similarly, we studied the performance of the staff working in the prison's Investigative Services Unit, who generally bring more experience to bear when conducting various types of investigative activities. We found their performance, however, to be only slightly better than that of those in the other groupings. Two sergeants and two lieutenants from this unit conducted 11 staff complaint inquiries; in six of those, we found the quality of their staff complaint inquiries to be adequate (55 percent).

## We Observed Many Instances of Deficient Interviewing Skills

A key problem we found in our review was deficient interviewing skills. Examples of these deficiencies included interviewing subjects prior to interviewing appellants, failing to ask relevant questions during the interviews, neglecting to inquire about other witnesses, or failing to interview all of the pertinent witnesses and subjects. These deficiencies heavily contributed to our overall assessment.

An important aspect of interviewing is the sequence in which interviews are carried out. Both standard investigative practices and the departmental training module dictate that the reviewer interview the appellant first, followed next by interviewing all witnesses, leaving the subject interview for last. Interviewing the appellant first affords the reviewer a better opportunity to fully understand the nature of the complaint and gather information beyond any narrative the appellant is able to communicate in writing. This is especially crucial in the prison setting where inmates often have little formal education and may be less adept with handwriting or expressing their thoughts on paper. This interview sequence also allows the reviewer to develop a comprehensive understanding of the situation before finally questioning the subjects. The reviewer must also establish effective communication with the people he or she interviews, prepare and organize questions in advance of the interview, and recognize opportunities to identify additional potential witnesses as interviews are taking place. A strong proficiency also includes the ability to deviate from a script of interview questions as information is discovered during an interview.

We found that out of the 172 staff complaint inquiries in which reviewers interviewed the appellant and at least one subject, reviewers improperly interviewed at least one subject before they interviewed the appellant in 28 of the cases (16 percent). When this occurred, the reviewers lost the opportunity to question the subject about key issues that arose from speaking with the appellant first. In one case, during the interview of the appellant, the reviewer disclosed to the appellant that he had already spoken to the subject and witnesses and that they had all denied the allegations of misconduct. The appellant then informed the reviewer that he had two separate conversations with the subject: he stated

there were witnesses to the first conversation, but not to the second conversation. The appellant stated that it was the second interaction he was referring to in his complaint. The reviewer would have learned that fact had he interviewed the appellant first, but since he did not, he did not have a complete account of the allegations when he initially interviewed the subject. Of concern, the reviewer did not conduct a follow-up interview with the subject to address the issue of the second conversation (Case 132).

During the onsite review period, we observed numerous instances of reviewers asking ineffective questions or failing to ask appellants obvious follow-up questions when the situation warranted doing so. For example, in one case we monitored a telephone interview of an appellant who, for reasons unrelated to the complaint, had been transferred to another prison. According to the appellant, staff at Salinas Valley had subjected him to cruel and unusual punishment as part of a use-of-force incident. The inmate's appeal stated in its entirety:

> I would like to do a video interview for staff misconduct and for cruel and unusual punishment on 3-18-18. I thank you for your time.

After contacting the appellant by telephone and advising him that the call concerned his staff complaint at Salinas Valley, the reviewer asked the appellant only one question: "Do you have anything else?" The appellant responded by giving a lengthy statement about the incident, including the comment, "All the officers knew." Instead of inquiring about this statement, the reviewer simply repeated, "Do you have anything else?" The appellant made a few additional comments, after which the reviewer concluded the interview. The appellant had not identified any of the officers by name, and the reviewer failed to ask him obvious questions, such as whether the appellant could identify any of the officers by name. The reviewer also failed to ask follow-up questions, such as whether the inmate could clarify his statement or provide a general description of the officers involved in the incident. By asking only one general question and by failing to ask other more pertinent questions, the reviewer appeared disinterested and missed an opportunity to obtain evidence that could have aided in assessing the appellant's credibility or in supporting or refuting his allegations (Case 100).

In another example, an appellant claimed during his interview that a female officer harassed him, calling him a "bitch" and a "coward"; falsely accused him of misbehavior; and issued him an undeserved counseling memorandum. And yet, the male reviewer stated: "She is always professional with me." The appellant replied, in effect, that the

subject officer would naturally be professional with the reviewer because the reviewer held a higher rank and was a supervisor. The reviewer then responded: "Are you calling me a liar?" This reviewer's interviewing technique resulted in the inmate disengaging from the interview. Not only did we find this question to be ineffective, we also found it to be inappropriate and argumentative. Since this conversation took place in the presence of our monitor, it suggested that the reviewer did not care that his comments could be construed as being inappropriate or argumentative. In addition, the reviewer's remarks ignored the department's specific instruction from page 3 of its training module concerning secondhand evidence, as cited below (Case 77):

> When interviewing staff and inmates ask them to state the facts as they observed them. Unfounded, [secondhand] and conclusory statements such as, "he was professional" that do not speak to the allegations are not acceptable responses.

In yet another example, an appellant alleged that a supervising custodian, the subject of the staff complaint, threatened to have the appellant fired from his job if the appellant did not withdraw a prior appeal. The appellant claimed the supervising custodian stated to him "And you wonder why I won't allow you to get a raise to a higher pay slot … just so you know, if you keep this up, you might find yourself without a job." The appellant alleged that when he asked, "Keep what up?", the supervising custodian responded, "Writtin [*sic*] complaints on … staff."

We were present during the reviewer's interview with the appellant and observed a number of problems. The reviewer's first question was "What are you looking for?" The appellant responded, "Fairness." The reviewer then asked about the appellant's level of pay and stated that he would look at the appellant's current hourly wage and make any adjustments if he was not being paid according to policy. The reviewer then asked the appellant if he would consider withdrawing the appeal. The appellant agreed to withdraw his appeal on the condition that the reviewer "would look at … hiring practices." One concern we have with the reviewer's interview is that he neglected to ask any questions about the alleged misconduct, which was the threatening comments made by staff. The reviewer instead offered to address the appellant's pay rate. Although it was good for the reviewer to check the status of the appellant's pay rate, it was not the focus of the staff complaint inquiry. We also found it problematic that the reviewer asked the appellant to withdraw his appeal. The appellant's withdrawal of his appeal did not absolve the supervising custodian if he had made threatening comments (Case 93).

Furthermore, we found that reviewers did not always ask appellants if they could identify witnesses who could provide additional corroborating information. In 21 of the staff complaint inquiries we observed during the onsite review period, reviewers failed to ask whether the appellant had additional witnesses. In these cases, the reviewers missed an opportunity to gather evidence to better support or refute the allegations.

We also found that reviewers did not interview all pertinent witnesses who were identified. In 158 of the 188 staff complaint inquiries, at least one witness was, or reasonably should have been, identified, but reviewers did not interview one or more of them in 47 inquiries (30 percent). The reviewers also failed to provide an explanation, as they are supposed to do, per the departmental training module: "Interview requested witnesses unless it can be demonstrated that their testimony would not be relevant or is not needed as it would only restate information already available" (p. 3).

Moreover, we also found that in at least 16 staff complaint inquiries, reviewers failed to interview all the subjects whom they identified or reasonably should have identified. Again, as with the witnesses, the reviewers did not provide a rationale for not interviewing the subjects. In one case, we noted that an appellant named another subject he believed engaged in misconduct, but the reviewer did not interview the additional named subject or other staff. Without having comprehensive investigative results available, the hiring authority did not have enough information to make an informed decision (Case 151).

### Staff Complaint Inquiry Reports We Reviewed Often Lacked Complete Documentary Evidence

Our review also revealed that reviewers did not collect or attach to the completed staff complaint inquiry report all necessary documentary evidence required to support or refute allegations of staff misconduct. In the absence of such documentation, reviewers also failed to document their attempts to validate the existence of the documents. Of the 150 staff complaint inquiries that we believe required the reviewer to collect or to attempt to collect some type of documentary evidence, reviewers failed to do so in 90 instances (60 percent). In these instances, we found that reviewers did not collect or try to validate the existence, or contents, of available reports related to other incidents, other interviews, medical visits, prior complaints or appeals, committee decisions regarding uses of force, or records documenting personnel

assignments and attendance, to name a few examples. Figure 9 below shows the number of documents that reviewers neglected to collect, validate, or attach to the completed staff complaint inquiry report. As the figure illustrates, this happened during both the paper review and onsite review periods with some regularity.

**Figure 9. Number and Types of Relevant Documentation the OIG Found to Be Missing During the Staff Complaint Review Process**



* During our review periods, Salinas Valley conducted 46 use-of-force-related staff complaint inquiries. Out of those 46 inquiries, in 17 cases, the use-of-force review committee made findings, which were available to the reviewer. In four of those cases, the reviewer obtained information regarding the findings, but did not attach findings documentation to the staff complaint inquiry report; and in 13 cases, the reviewer did not obtain information regarding the findings. In all 17 of these cases, the reviewer did not attach available findings documentation to the report. In one remaining case, there was no indication that the reviewer contacted the use-of-force review committee to learn whether there were any findings, and if so, obtain them.

† Other includes various types of documentation such as logs, classification records, prior appeals information, counseling records, and work assignment and pay records.

Source: Data collected by the Office of the Inspector General.

We noted that while some of the staff complaint inquiry reports contained a list of evidence the reviewer had examined, such as incident reports, medical assessments, time sheets, and sign-in logs, other reports did not. Staff complaint inquiry reports lacking these references led us to question whether the reviewer even considered this type of supporting evidence. For example, if an appellant stated that he was seen by medical staff after being subjected to a use of force, we would expect the reviewer to collect the related medical records. Similarly, we would expect a reviewer to collect documentary evidence to identify the names of employees when the appellant was unable to provide their names during the interview. For example, the reviewer could examine employee sign-in sheets or other employee rosters to identify staff members who worked on the date, time, and place in connection with the allegation.

A common omission in evidence collection was the prison's Institutional Executive Review Committee's (use-of-force review committee) findings regarding uses of force. The prison separately reviews use-of-force incidents to evaluate those actions in light of policy and training. Findings produced by this committee were sometimes available for the reviewer to include in the staff complaint inquiry report package and also to consider when recommending action to the hiring authority. In fact, the department's guidance on handling staff complaint inquiries even directs the reviewer to defer to the use-of-force review committee findings (departmental instructional handbook, p. 10). Despite the importance of this evidence, in 13 of the 17 cases in which use-of-force review committee findings were available, the reviewer did not obtain information regarding the findings or note in the staff complaint inquiry report that the committee findings were reviewed or considered.

In one of the cases monitored during the paper review period, an appellant alleged that two officers used unreasonable force on him by slamming him to the ground. The reviewer failed to collect a number of documents central to the allegation, namely, the use-of-force reports prepared by the staff involved in the incident, a previous interview with the appellant concerning this issue, and the findings of the prison's official use-of-force review committee (which had already determined that the use of force violated policy). The reviewer, however, independently determined that the force used was appropriate and indicated that no policy violation had occurred. The hiring authority caught the discrepancy when reviewing the staff complaint inquiry and made a notation on the final staff complaint inquiry report indicating that staff had, in fact, violated policy (Case 14).

Another common type of documentary omission was related to the collection of relevant medical documentation. In one case, for example, an appellant alleged that an officer shut a food port on one of the appellant's hands while the appellant was attempting to retrieve a medication cup he dropped during medication pass. The appellant alleged that his hand remained stuck in the food port for 15 to 30 minutes, which caused one of his left fingers to be injured. Because we reviewed this case as part of the paper review period, we were not present for the interviews. Nevertheless, our review of the staff complaint inquiry report revealed the reviewer did not document any attempts to locate a medical assessment form that a psychiatric technician generated after evaluating the appellant. Notably, the staff complaint inquiry report included a summary by the psychiatric technician who stated he had not seen anything wrong with the appellant's finger. However, we independently gathered and reviewed a medical assessment form completed by the same psychiatric technician three days later, which documented a "split" to the appellant's left index finger. The reviewer's failure to collect the relevant documentary evidence precluded her from addressing this discrepancy (Case 51).

By not including the requisite documents or documenting any attempts to collect them, the reviewers in these instances neglected to provide the evidence needed to better support or refute staff misconduct allegations. The reviewers also undermined the hiring authority's final review, forcing him or her to rely only on the reviewer's written report without the inclusion of additional supporting evidence.

### Staff Complaint Inquiry Reports We Reviewed Were Often Incomplete or Inaccurate; Some Were Both Incomplete and Inaccurate

We found many staff complaint inquiry reports seriously deficient because they were either incomplete or inaccurate, or both incomplete and inaccurate. This deficiency remained consistent throughout both the paper review and the onsite review periods. Since OIG monitors were present for many interviews conducted during the onsite review period, we were in a position to discover numerous discrepancies between what appellants or witnesses said during those interviews and what the reviewer ultimately reported in the summary. In other instances, we found discrepancies by reviewing the completed staff complaint inquiry reports. Figure 10 on the following page shows the distribution of deficiencies.

**Figure 10. Quality of the Staff Complaint Inquiry Reports**



Source: Data and analysis by the Office of the Inspector General.

The department requires reviewers to complete their staff complaint inquiry report using a specific template form, referred to as the "Confidential Supplement to Appeal" or "Attachment C" (see Appendix D, which offers a blank sample of this form). The template allows reviewers to enter a synopsis of the allegation, their findings, and their conclusion in a consistent format; it also allows the reviewer to include specific information concerning witnesses, including all witnesses he or she interviewed, as well as the identities of witnesses not interviewed and the reasons for not interviewing them. The findings section of this report must include "detailed statements from the inmate/parolee making the allegation, all pertinent witnesses, accused staff (if needed) and a detailed description of any other evidence reviewed" (departmental training module, p. 7). The training module directs the reviewer to "analyze the facts and any logical inference that can be drawn from those facts" and then to indicate on the form "whether any or all of the allegations were supported by the facts, whether the facts were insufficient to support any conclusion or whether the facts were sufficient to exonerate staff of the allegations" (departmental training module, p. 7).

We concluded that 101 of the 188 staff complaint inquiry reports were incomplete. In one particularly egregious instance, a reviewer who interviewed two inmate witnesses failed to include the witness statements in his completed report and thus failed to mention that the witnesses' statements actually corroborated an allegation of potential misconduct. In this case, the appellant alleged that an officer repeatedly called him a "coward" and a "bitch." The appellant also alleged that the officer wrote the word "bitch" on a piece of paper and placed it on his cell-front window, and that the officer had falsified a counseling memorandum issued for talking to other inmates through the cell doors. The appellant provided the reviewer with detailed information concerning his complaint, including names of both inmate and staff witnesses.

The OIG monitor was present during the interviews of the inmate witnesses. One inmate witness stated that he heard the officer scream at the appellant and heard her call the appellant a "coward." The second inmate witness stated that he heard a "heated exchange" between the appellant and the officer, and heard the officer call the appellant a "bitch." On the face of it, these statements directly support the appellant's allegations. Curiously, the reviewer failed to include these inmate witness statements in the staff complaint inquiry report, but he did summarize statements made by three officers whom he interviewed as witnesses outside of our presence. According to these statements, the three officers had not observed any conflicts between the subject officer and the appellant nor observed the subject officer behave in an unprofessional manner toward the appellant. Because he neither presented the information received from inmate witnesses in his report nor offered a credibility assessment of the inmates' statements, the reviewer did not provide the hiring authority with a complete staff complaint inquiry report. Based on the evidence provided, the hiring authority determined staff did not violate policy (Case 77).

In another case demonstrating an incomplete report, the appellant alleged that staff inappropriately housed him with a cellmate, which later resulted in a fight between the two inmates. The appellant did not know who made the decision to house him with another person, so the reviewer chose to name as the subject an officer who escorted the appellant to the administrative segregation unit after the fight. Based on the comments in the staff complaint inquiry report, the subject officer denied having had any part of the decision to house the appellant, resulting in the reviewer concluding that no policy violation occurred. However, if the reviewer had instead conducted even a perfunctory review of the appellant's housing chronology records in the department's computer system, he could have determined which staff member made the housing decision and then talked to that

person about his or her rationale.[17] By not doing so, the reviewer's report was incomplete (Case 5).

Not only did we find omissions that rendered a staff complaint inquiry report incomplete, we also found errors that rendered the staff complaint inquiry reports inaccurate. Of the reports we reviewed during the paper review period, 25 percent (15 of 61) contained errors affecting accuracy; this percentage was nearly the same, 24 percent (30 of 127), during the onsite review period. Errors ranged from incorrect interview dates to more serious inaccuracies.

For example, in one case, the reviewer's characterization of the evidence was inaccurate, and his conclusion was self-contradictory. In this case, the appellant alleged, among other things, that in 2017, three officers falsified monthly pay sheets indicating that he had worked as a porter for more days than he actually had worked. In his conclusion, the reviewer stated that there was no evidence to support allegations of staff misconduct and that witness testimony refuted the allegations. Our monitors, however, observed that an inmate witness did corroborate the appellant's allegations. The inmate witness stated that most officers in the building did not like the appellant and did not allow him out to work very often, and when he was let out to work, he was only allowed to work a couple of hours. Despite the reviewer's previous statement that there was no evidence to support the allegations, he continued, "I conclude that there might have been a violation of policy, and therefore this reviewer recommends administrative action." However, the hiring authority determined—based on an inaccurate staff complaint inquiry report—that no policy violation had occurred and took no further action (Case 82).

An appellant alleged in another case that an officer put the appellant's life in jeopardy when the officer inappropriately disclosed to other inmates the nature of the appellant's convictions. During his interview, we heard the appellant state that he feared for his safety if he were released to a particular yard, but not if he were housed in the administrative segregation unit. Yet the reviewer noted in his conclusion, in error, that the appellant stated he did *not* fear for his safety. Again, this significant error rendered the staff complaint inquiry report inaccurate (Case 160).

---

[17] We checked the department's computer system and, in a matter of minutes, were able to identify the staff member who made the housing decision.

## Staff Were Not Adequately Trained to Conduct Staff Complaint Inquiries

During our interactions with reviewers during the onsite monitoring period, we found that staff assigned to conduct staff complaint inquiries were clearly and admittedly unaware of even the most basic investigative techniques, and were not well-versed in best practices in the investigative field. Training serves an essential role in ensuring that staff members have a full grasp of how to conduct a staff complaint inquiry, the standard steps required, and the department's expectations. Proper training also results in greater uniformity and comparability of the resultant work product.

Nevertheless, the reviewers assigned to complete staff complaint inquiries received only rudimentary training. In fact, among the 61 individual staff members who conducted staff complaint inquiries during our review, only 14 had undergone any training prior to conducting their first staff complaint inquiry-related interview, and that training had consisted of a two-hour course that provided only a general overview of the process and the official forms used when conducting staff complaint inquiries. Forty-two staff members received training at some point after conducting their first interview and, as of November 19, 2018, five had not received training at all. In some instances, reviewers received only a one-hour class because the primary instructor was unavailable, and a substitute instructor stepped in to teach the class. None of the reviewers, however, received substantive training in conducting interviews, collecting evidence, or preparing staff complaint inquiry reports.

During the onsite review period, Salinas Valley's appeals coordinator conducted multiple two-hour training courses that covered the staff complaint process. The course consisted of an overview covering two of the department's publications: its 2016 instructional handbook and its training module. The 17-page instructional handbook focuses primarily on introducing the official forms used to document staff complaint inquiries into allegations of staff misconduct and on the minutiae of completing those forms, rather than on the actual process of conducting a staff complaint inquiry, such as interviewing techniques, collecting evidence, and writing reports. The 15-page training module also focuses on instructions for completing the forms and includes a sequence of steps involved with investigating individuals. In addition, the training module urges reviewers to stop a staff complaint inquiry if they become aware of misconduct that could lead to adverse action against staff; and also includes detailed instructions for complying with notification rules and recording rules to protect staff member rights when staff are called as subjects or witnesses.

Upon querying the training instructor, we learned that the two-hour training course the department offered to reviewers was never intended to help reviewers understand best practices when interviewing appellants, witnesses, or subjects. Our review of the course materials led us to conclude that the training was inadequate for preparing reviewers to conduct a staff complaint inquiry review using best practices.

## Some Reviewers' Performances Were Very Good

Despite our overall conclusion that the quality of more than half of the staff complaint inquiries was inadequate, some of the reviewers' performances were very good. The following are examples of interviews that reviewers conducted properly:

- In one case, the appellant, who was part of the enhanced outpatient program and who had a low reading-comprehension level, was interviewed by the reviewer about his allegations. The reviewer asked simple initial questions, posed appropriate follow-up questions, and allowed the appellant to thoroughly explain his complaint (Case 63).

- In another case, the reviewer asked several open-ended questions and follow-up questions. The reviewer also attempted to address the appellant's concerns that were based on a letter he had received from the legal processing unit. Also, when the appellant offered to withdraw his complaint if the reviewer would just get him some assistance, the reviewer advised him the process did not work in that manner, and that he would help the appellant and still process the complaint appropriately (Case 113).

- In another case, even though the reviewer interviewed the subject before interviewing the appellant, the reviewer studied relevant operating procedures before conducting his interview of the appellant, asked relevant follow-up questions, and appropriately confirmed the appellant had received medical assistance after his alleged fall (Case 162).

- In one instance, a reviewer told an OIG monitor an inmate had approached the captain and stated he wanted to withdraw one of his appeals. The OIG monitor observed the reviewer speak privately with the appellant to confirm whether the appellant really wanted to withdraw the appeal or not, that he was doing so of his own accord, and that he had not been threatened or promised anything to coerce the withdrawal (Case 115).

- In another case, even though the reviewer interviewed the subject before interviewing the appellant, the reviewer conducted a very thorough telephonic interview of the appellant. He went through the list of the appellant's allegations and then talked with the appellant about each of them. He asked appropriate follow-up questions, requested inmate and staff witness names (or descriptions if the appellant did not know their names), and took extensive notes. The reviewer also asked the appellant to pause while speaking, so the reviewer could write down as much detail as possible (Case 104).

- In another case, at the conclusion of an interview with the appellant, the reviewer actually read his notes back to the appellant and asked if he had documented the appellant's statement and concerns correctly. The inmate replied, "Yes" (Case 156).

We also noted some reviewers utilized good investigative techniques, including the example below:

- An appellant alleged that he was constantly provided meals with flies on them or that the food was cold. In addition to interviewing staff and other inmates in the housing area, the reviewer interviewed the central kitchen sergeant regarding the types of trays the meals were served on and how food was kept hot before it was distributed to the inmates. The reviewer also observed the process of meal pass on two separate shifts, during which time he observed staff prepare the meal trays, witnessed the use of the "hot cart," which keeps food warm during preparation, and even tested the temperature of the food with a thermometer just before it was passed out to the inmates. The reviewer also provided on-the-job training to officers regarding the inspection of food trays after he observed a fly on one (Case 135).

In addition, many of the reviewers appeared eager for guidance and training to learn the process correctly and to improve their interviewing techniques and abilities. The following include some of our interactions with staff reviewers:

- One lieutenant informed us that he took a week of leave to attend an "Interviews and Interrogations" course on his own time.

- One sergeant asked a lieutenant if he could sit in and observe the lieutenant's interview as a training opportunity; the lieutenant agreed. When the OIG later monitored this sergeant conducting interviews, we observed that he seemed well-prepared.

- One sergeant told a lieutenant, before an interview took place, that this was the sergeant's first time reviewing a staff complaint and said to the lieutenant, "I don't know what I am doing." The lieutenant quickly outlined the process for the sergeant and gave him some advice about conducting the interview. The lieutenant also offered to provide further assistance if the sergeant had any questions about writing his report.

## Salinas Valley's Staff Complaint Review Process Lacked Independence

Our assessment revealed that Salinas Valley's process for reviewing staff complaints lacked independence: that is, the staff complaint inquiries were conducted by individuals who typically worked closely with those accused of misconduct. For instance, staff reviewers who conducted staff complaint inquiries typically worked with the accused staff on the same yard or were sometimes involved with the incident related to the complaint. We also observed instances wherein staff reviewers demonstrated their bias in favor of their coworkers and against inmates by including their own opinions as evidence in their reviews. Staff reviewers also discounted or ignored inmates' corroborating statements. In addition, staff complaint reviewers frequently compromised the confidentiality of the review process, potentially exposing the appellants to retaliation for filing a complaint. Collectively, these concerns undermine the integrity of the process and the trust of inmates who file complaints alleging staff misconduct.

### Staff Members Assigned to Conduct Staff Complaint Inquiries Did Not Function Independently: They Were Often Assigned to the Same Work Location or Were Peers of the Subjects, and They Were Sometimes Involved in the Incident Related to the Complaint

In our opinion, staff complaint inquiries must be conducted by individuals who are independent. The reviewer assigned to conduct a staff complaint inquiry must have no personal involvement with the subject matter of the staff complaint inquiry nor with any person involved in the matter, whether that person is a witness, a subject, or an appellant. In a workplace setting, independence requires that the reviewer not investigate coworkers with whom the reviewer has close working relationships and personal alliances or who may at some future date investigate the reviewer. Moreover, independence requires that the reviewer, whose report may influence the career of the subject staff, not share the same career ladder as subject staff. When the workplace setting is a prison environment, independence requires that the reviewer not investigate staff upon whom the reviewer must rely for protection and support in the event of grave physical danger.

Salinas Valley's process for reviewing inmate allegations of staff misconduct was not independent. Reviewers worked each day in their capacities as custody staff while adding to their duties the task of investigating their fellow officers. Staff complaint inquiries are required to be assigned to a supervisor who occupies a position at least one rank

higher than that of the person accused of misconduct. In addition, the supervisor must not have participated in the event or decision being appealed.[18] At Salinas Valley, we found these conditions of independence frequently unmet. Specifically, in 113 instances, the reviewers generally worked in close proximity with the subject; in 11 instances, the reviewer held either the same rank or a rank lower than the subject's; and in five instances, the reviewer was involved in the incident related to the allegation. In all, we found the appropriateness of the assignment of the reviewer inadequate in 120 of the 188 staff complaint inquiries (64 percent).

The department's policy, in part, requires reviewers to be at least one rank above the subject, but it stops well short of requiring independence, such as prohibiting the reviewers from investigating staff who work on the same yard. However, we believe that staff complaint inquiries conducted by staff who work closely with one another—such as those who work on the same yard and on the same shift—cannot be independent. Work environments naturally include friendships and alliances. This is true of all workplace environments, not just prison work environments. The potential for a conflict of interest arising from conflicting loyalties is one of the primary reasons that impartiality and independence are generally best served by requiring that staff complaint inquiries or investigations be conducted by people who work outside of the workplace.

The prison work environment, however, calls for an additional need for independence because staff may need to investigate one another in a prison workplace, yet must also rely on one another during those occasions when great physical danger can ensue. In prisons, physical attacks by inmates against staff occur, and prison staff are trained to protect one another. At the same time, these same individuals must also, if involved in the department's staff complaint inquiry process, investigate one another when someone is accused of wrongdoing. Siding with fellow officers against an inmate may be one result of this lack of independence. An inherent bias against exposing a fellow officer to disciplinary action when a reviewer knows he or she will need to rely on

---

[18] Title 15, *California Code of Regulations*, Section 3084.7. *Levels of Appeal Review and Disposition* (d) Level of staff member conducting review. (1) Appeal responses shall not be reviewed and approved by a staff person who: (A) Participated in the event or decision being appealed. This does not preclude the involvement of staff who may have participated in the event or decision being appealed, so long as their involvement with the appeal response is necessary in order to determine the facts or to provide administrative remedy, and the staff person is not the reviewing authority and/or their involvement in the process will not compromise the integrity or outcome of the process. (B) Is of a lower administrative rank than any participating staff. This does not preclude the use of staff, at a lower level than the staff whose actions or decisions are being appealed, to research the appeal issue. (C) Participated in the review of a lower level appeal refiled at a higher level.

that individual in the future to defend him or her during an attack may be another result.

### In Some Instances, Staff Reviewers Demonstrated an Appearance of Bias

We also found examples of reviewer bias in favor of the accused officer and against the appellant. In such cases, we noted that reviewers included their biases in the staff complaint inquiry report by supporting their conclusions with their own personal opinions. For example, an appellant in one case alleged that a sergeant had behaved unprofessionally during the course of an interview by yelling at and patronizing him, and by taking his personal property without cause. The reviewer in that case concluded:

> Upon review of this claim, the reviewing officer has found that there has not been any intentional inconvenience to the appellant and that [the sergeant] acted professionally with the appellant. It appears the appellant['s] mental health condition played a factor in his perception.

Rather than focus the report's narrative on the facts, the reviewer based his conclusion on his opinions of the subject and about the appellant's mental health condition (Case 59).

In another case, the reviewer commented on the subject's professionalism, demeanor, and pride while concluding that no policy violation occurred. The reviewer wrote:

> Through my observations [the subject] is very professional with staff and inmates. She has a no[-]nonsense demeanor about herself and takes a lot of pride in her job. Staff did not violate any policy.

Again, the reviewer's personal opinion in favor of his fellow coworker appeared to have been the primary basis for the conclusion. While the allegations against the subject employee may not have been true, the reviewer undermined the objectivity of his findings by interjecting his personal opinion, leading us to consider his conclusion to be a result of his bias (Case 103). Of additional concern, we found nearly the same verbiage in another staff complaint inquiry report a month later wherein the subject became the reviewer. This separate staff complaint inquiry report stated:

> Through my observations [the subject] is very
> professional with staff and inmates. She has a
> no[-]nonsense demeanor and takes a lot of pride
> in her job. The allegations that [the subject] was
> unprofessional are not true. Staff did not violate
> any policy.

Not only is it problematic for both reviewers to have included their personal opinions of the subject in the staff complaint inquiry report, but it concerns us that one reviewer copied the conclusions from another report nearly verbatim (Case 123).

In another case, an inmate alleged that two officers did not properly document the appellant's hunger strike nor would medical staff acknowledge his hunger strike unless custody staff notified them. We identified numerous problems with the reviewer's staff complaint inquiry work on this case. Of significance, we found the reviewer failed to interview medical staff whom the appellant spoke to during the hunger strike and a sergeant who authored the appellant's hunger strike chronological report. Perhaps most problematic was a statement in the report itself, which stated:

> Correctional staff are familiar with the Operational
> Procedure number 16 Inmate Hunger Strike and
> would have acted upon [the appellant] notifying
> staff that he was on a hunger strike and would
> have generated all the supporting documentation
> required.

The reviewer's comment that staff *would have* acted appropriately is speculative at best and clearly represents his personal opinion. The reviewer then concluded that there was no evidence to support the allegation of staff misconduct. The hiring authority agreed (Case 184).

In another case, an inmate complained about an unreasonable use of force, alleging that three officers had entered his cell, put him forcefully on the ground, twisted his arm, placed their boots on his back, leg, and neck, and dragged him out of his cell by his legs. The reviewer even documented in his report that two inmate witnesses stated in their interviews that they saw an inmate being dragged out of his cell by his legs. Nevertheless, despite the testimony of two inmate witnesses who corroborated the appellant's claim, the reviewer concluded there was no evidence to substantiate the claim, adding:

> It appears [the appellant is] providing an allegation of staff misconduct in an attempt to discredit custody staff and have [his rules violation report] dismissed.

The reviewer gave more credence to his personal opinion by speculating as to the intent of the appellant as opposed to addressing the evidence he collected, which weakened this investigation's objectivity (Case 24).

### Staff Reviewers Ignored Corroborating Information Provided by Inmates

Our review found that staff reviewers frequently ignored corroborating evidence, both testimonial and documentary. In at least 19 cases, staff did not reference in their conclusions evidence that supported the inmate's allegations. Staff sometimes collected corroborating evidence and simply ignored it, concluding in their final report that no evidence existed to support an inmate's allegations. Other times, reviewers heard corroborating testimony from appellants and witnesses, but inaccurately reported that testimony in their reports. As part of their training, reviewers were taught the following: "If you [the reviewer] believe a witness is not credible, you must present facts that support such a conclusion. You cannot decline to interview a witness or reject their testimony 'because they are an inmate.'"[19] Despite this, reviewers neglected to assess the credibility of statements from staff and inmates. Such an assessment would provide hiring authorities with context and would facilitate their decision-making calculus.

Reviewers sometimes ignored corroborating evidence after first gathering it in the form of inmate witness interviews, falsely asserting in the report that no evidence corroborated the appellant's allegation. In one instance, an inmate alleged an officer used unreasonable force when he sprayed the inmate's face with pepper spray. The appellant said he immediately lay down on the ground in a prone position, but that the officer put his knee on the appellant's lower back and again sprayed the appellant's face. Upon review of the staff complaint inquiry report, we found that an inmate who witnessed the incident corroborated the appellant's account, affirming that the officer continued spraying the appellant after the inmate had assumed the prone position. Although the reviewer documented the corroborating witness statement, he nevertheless concluded that no testimony corroborated the appellant's allegations (Case 19).

---

[19] Departmental training module, p. 3, "Interview staff witnesses."

In another instance, an inmate alleged that a female officer told him to strip naked, or she would not permit him to leave his cell to attend morning activities in the yard. The reviewer interviewed the subject officer first, before interviewing the appellant or any witnesses; one inmate witness corroborated the appellant's account when he told the reviewer that he overheard a female officer telling the appellant "to strip naked or no yard." The subject staff had already been interviewed and therefore could not have been asked to respond to the inmate witness account. The reviewer incorrectly concluded that "no facts, evidence, or information were gathered which would support the [appellant's] contentions" (Case 48).

In yet another instance, staff ignored both testimonial and documentary evidence. In this case, the appellant requested to be moved from his cell because his cellmate was threatening him; however, an officer told him to wait until the following week. Two days later, the appellant's cellmate battered the appellant as the appellant lay on his bunk. In his complaint, the appellant alleged that not only did the officer fail to separate him from his cellmate, but also that a sergeant tried to cover up the officer's neglect of duty by issuing the appellant a rules violation report for fighting. The appellant also alleged that the sergeant forced the appellant to sign a compatibility agreement declaring that he and his cellmate were compatible and could live together safely. The appellant alleged that the sergeant threatened to place him in the administrative segregation unit—that is, in isolation—if he did not sign the compatibility agreement.

The reviewer of this staff complaint collected the incident report, the rules violation report, and a document dismissing the rules violation report. A handwritten note by the hiring authority at the end of the staff complaint inquiry report stated, "[correctional counselor name] claims that she interviewed building staff and they indicated they were [illegible text] prior to the battery, as claimed by [appellant]." It appeared the illegible portion of the note may have supported the appellant's allegation since the counselor who conducted the interviews was also the person who conducted an inquiry into the rules violation report and recommended its dismissal. The reviewer should have interviewed the same building staff that the counselor interviewed since they may have had relevant information regarding the incident. Instead, the reviewer relied only on the statements provided by the appellant, the officer, and the sergeant, and concluded: "Staff did not act unprofessionally. I find the appellant's allegations of staff misconduct to be vague at best with no witnesses or evidence presented" (Case 6).

We found yet another way of discounting corroborating inmate evidence when a reviewer, gathering evidence, dismissed an inmate's testimony because no staff member had verified it. For example, in one case we

reviewed, an inmate alleged that an officer saw him on two occasions making a noose, and that on the second occasion, the officer said to the appellant:

> If [you are] going to kill yourself, go ahead and f***ing do it.

Again, we were not permitted to observe the interviews of the subject officer nor of two other officers and one sergeant. However, we were present when the reviewer interviewed the appellant and one inmate witness who corroborated the appellant's allegation. The reviewer acknowledged in his report that the inmate witness corroborated the appellant's allegation, but noted that staff did not verify the witness's testimony. He then concluded that he could not determine whether the subject officer committed misconduct and recommended further action by the hiring authority. However, the reviewer then ignored his own recommendation and submitted a proposed appeal response to the hiring authority containing a finding that staff did not violate policy.

The hiring authority signed the proposed appeal response without ordering further action as recommended in the staff complaint inquiry report. Although the reviewer's conclusion appeared to place some significance on the inmates' statements, both the reviewer's and the hiring authority's actions of issuing an appeal response with a finding that staff did not violate policy demonstrated that the inmates' statements held no value as evidence, compared with statements made by staff. This directly contradicts the reviewer's training that we described earlier, which specifically instructs staff regarding the interviewing, or testimony, of inmate witnesses (departmental training module, p. 3; Case 139).

In a similar but perhaps more troubling discounting of evidence provided by an inmate, an inmate alleged that an officer made several derogatory remarks about the inmate's sexual identity. The reviewer did not collect the employee sign-in sheet to determine whether any staff witnesses were present. The reviewer interviewed an inmate witness who corroborated the appellant's allegation, but the reviewer concluded there was no additional evidence beyond the statements of these two inmates to support the allegation. The hiring authority assigned the case to the prison's Investigative Services Unit, but specified that the appellant's witness undergo a computerized voice stress analysis test (i.e., a lie detector). The witness, however, declined to participate once he learned of the lie detector test. With this approach to collecting evidence, an inmate's statements held no value as evidence unless it was validated by a machine (Case 1).

In another case, an appellant alleged that two officers and a nurse were inappropriately sharing his confidential case factors with other inmates. We were present for the interview with the appellant and an inmate witness, but not for the interview with a subject officer and a nurse. The reviewer did not interview one of the subject officers. According to the staff complaint inquiry report, the reviewer summarized the subject officer's statement in one sentence: "[Subject] stated that the appellant's claims are completely false and unfounded." The reviewer wrote in the staff complaint inquiry report that the inmate witness stated, "I don't know anything of the allegations…. He would not do that[;] he is one of the best officer's [*sic*] we have." The reviewer concluded: "The appellant's witness that he named did not corroborate the appellant's claims."

However, since we were present for the interview with the witness, we found this statement to be false and misleading. The OIG monitor noted that the witness did corroborate the appellant's claim, stating he had not observed one of the subjects share any confidential information, but had knowledge of other officers having done so. The reviewer never asked the witness to identify the names of the *other officers* nor did he include any of this information in his staff complaint inquiry report. The hiring authority found that staff did not violate policy, but obviously did not have sufficient information to render a fair decision (Case 151).

As we discussed earlier in the report, we also found that staff did not consistently collect relevant evidence. In many instances, staff neglected to gather evidence that could corroborate an inmate's claims: for example, we found that reviewers frequently neglected to interview witnesses who might have provided evidence against a fellow officer. We also observed staff ignoring potential leads to corroborating evidence, such as during interviews with inmates, when reviewers often neglected to ask obvious follow-up questions that could have led to evidence implicating a fellow officer. Most commonly, we observed that staff avoided collecting evidence by violating standard interview practices by interviewing the subject first. In this way, none of the inmate or witness statements or any documentary evidence would be available to generate questions for the subject to answer, aptly demonstrating why the interviewing sequence is so critical to this entire process.

Reviewers invalidate the staff complaint inquiry process when they ignore or discount corroborating evidence, whether by failing to collect it, failing to acknowledge it, mischaracterizing it, or discounting it because it came from an inmate. Doing so erodes any confidence inmates may have in the staff complaint inquiry process and the public's trust in the department's handling of inmate complaints.

## Staff Frequently Compromised the Confidentiality of the Staff Complaint Inquiry Process

The staff complaint inquiry process culminates in a document that the department titles "Confidential Supplement to Appeal" (see Appendix D). Maintaining confidentiality while interviewing appellants, witnesses, and subjects is necessary to establish trust in the process as well as protect appellants from retaliation by staff or other inmates. Without confidentiality, witnesses can be intimidated or retaliated against. Moreover, appellants may not be completely candid or may even refuse to participate altogether.

During our review, we found numerous examples of staff who compromised the confidentiality of the process. For example, we frequently found instances when an appellant's identity or staff complaint was disclosed to nearby staff and inmates. Attorneys from the Prison Law Office who represent inmates told us their clients felt intimidated by the manner in which they were contacted to set up their interviews. Appellants claimed to have been summoned over the public-address system or when they were within listening range of other inmates and staff members.

Indeed, we observed one instance in which staff used the public-address system to call an appellant out of his cell for a staff complaint inquiry interview. The reviewer notified the control booth officer that he needed to speak with the appellant about his appeal. The control booth officer then announced over the public-address system, "[Appellant's name], 602 appeal. Come to the office." The phrase "602 appeal" refers to the department's appeal form number, and although this phrase could have referred to any type of appeal, the phrase used in this context raised unnecessary awareness of an issue and called attention to the appellant. When the appellant arrived at the office, he refused to be interviewed because he believed the reviewer had a conflict of interest related to the complaint. The prison later reassigned the appeal to another supervisor. When the new reviewer requested to interview the appellant, the control booth officer announced over the public-address system, "[Appellant's name], come on out." The announcement for this second interview attempt was more discreet (Case 117).

We noted compromised confidentiality during a total of 34 appellant interviews and 31 witness interviews. In one particularly egregious example, a reviewer told our monitor that the subject of the appellant's complaint was actually working in the control booth in the inmate's housing unit. Nevertheless, the reviewer conducted the interview in an office located immediately beneath the control booth, with the gun port

**Figure 11. Configuration of Control Booth and Interview Office at Salinas Valley**



Two levels: From the upper level (control booth), prison staff can observe activities taking place in the office on the level below (interview room).

Source: Photographs taken by the Office of the Inspector General.

window open (the window in the ceiling), and within visual and hearing range of the subject officer (see Figure 11, facing page, for photographs depicting the configuration of the control booth and the interview room). In fact, our monitor believed that the subject officer in the control booth was actively listening to the conversation.

The reviewer apparently thought he appropriately addressed the matter when he told the appellant that the subject officer was working in the control booth immediately over their room and would be able to overhear the interview. The reviewer then asked the appellant if the subject officer's listening to the interview bothered him; the appellant replied, "No." Notwithstanding the appellant's response, the interview should have taken place in a private setting, the subject officer should not have known the conversation was about the appeal, and the appellant should not have been asked to make that decision (Case 185).

The following are examples of other incidents we encountered that demonstrated this lack of concern with maintaining confidentiality:

- A reviewer, along with one sergeant and one officer, approached an appellant's cell and asked the appellant if he wanted to be interviewed about his staff complaint. Of significance, the officer accompanying the reviewer was a subject of the appellant's complaint. The reviewer would have known this since the officer's name was listed on the complaint form. Moreover, other inmates were within hearing distance in the showers adjacent to the appellant's cell (Case 92).

- A reviewer was conducting a telephone interview of an appellant in a small office. Also present in the room were an OIG monitor and a captain, a lieutenant, and a sergeant who were having a conversation without regard to the reviewer's interview and could easily hear the conversation taking place over the phone (Case 105).

- A reviewer approached an appellant in a holding cell and told the appellant that the reviewer was there because the appellant had submitted a staff complaint. This occurred within hearing range of officers and other health care clinicians working in the area (Case 180).

- A reviewer made a phone call to the appellant's housing unit and asked an officer to send the appellant to the program office. The officer called back a short time later, indicating the appellant refused to go to the program office. The reviewer then told the officer, "Tell him [reviewer's name] is calling him." The officer called back a second time and reported that the appellant still refused. The reviewer then told the officer, "Tell him it's about his 602; tell him it's about his staff complaint." The appellant again refused to report to the program office (Case 67).

- A reviewer did not close the office door while conducting an interview with an inmate witness about a complaint regarding meals being served to inmates in the administrative segregation unit. During the interview, other staff were nearby, and an officer uninvolved in the investigation stood in the doorway and interjected personal observations concerning the quality and the preparation of the inmate meals served in the unit (Case 135).

## Salinas Valley Completed Most Staff Complaint Inquiries Within Required Time Frames, but Did Not Always Provide the Proper Notifications When Inquiries Were Late

The *California Code of Regulations* requires prisons to complete staff complaint inquiries within 30 working days, allowing exceptions only for certain limited circumstances.[20] The department takes this time frame seriously, as demonstrated by a January 2016 memorandum from an associate director to all wardens at prisons within the High Security Mission, which includes Salinas Valley. In this memorandum, the associate director stated, in part:

> The timely completion of inmate appeals, including Disability Placement Program (DPP) appeals, and modifications orders are critical to the success of each institution's mission, and to ensure due process for inmate complainants. […] **Wardens must have a zero tolerance policy for overdue appeals** [emphasis added].

On average, the prison took about 27 working days to complete 165 time-sensitive staff complaint inquiries during our paper and onsite review periods.[21] Completion time for reviewing these staff complaint inquiries ranged from five working days to 58 working days, with reviewers completing 133 of the 165 staff complaint inquiries (81 percent) within the 30-working-day requirement. Reviewers timely completed 18 other staff complaint inquiries after 30 working days, but within their allotted extensions of time. However, reviewers did not complete the remaining staff complaint inquiries in a timely manner, with 14 of them noted as having taken place between one and seven working days after their respective deadlines had passed (see Figure 12, following page).

---

[20] Title 15, Section 3084.8(d) allows exceptions to the time limits only in the event of (1) unavailability of the inmate or parolee, or staff, or witnesses; (2) the complexity of the decision, action, or policy requiring additional research; (3) necessary involvement of other agencies or jurisdictions; and (4) state of emergency pursuant to subsection 3383(c) requiring the postponement of nonessential administrative decisions and actions, including normal time requirements for such decisions and actions.

[21] This figure does not include 23 appeals for which the prison completed inquiries, but that were rejected for not meeting the criteria for staff complaints, or that the inmate withdrew after filing the appeal. The time frame for these cases was not applicable.

**Figure 12. Timeliness of Staff Complaints the OIG Reviewed, December 1, 2017, Through May 31, 2018**



* This figure does not include 23 staff complaint inquiries the prison completed even though the appeals were either rejected or withdrawn. Consequently, the regulatory time frame of 30 working days was not applicable.

† We considered an inquiry to be timely if it was completed within 30 working days or within the additional time afforded by an extension.

Source: Data and analysis by the Office of the Inspector General.

When reviewers request extensions for additional time to review complaints, they must also inform the appellant of the delay; yet in most of the staff complaint inquiries triggering this notification, staff did not inform the appellants. The *California Code of Regulations* requires the prison to provide an explanation to an appellant when it cannot meet the required 30-day time limit and to include the reasons for the delay as well as an estimated completion date. However, of the 32 staff complaint inquiries that took longer than 30 working days to complete, Salinas Valley failed to notify the appellants in 24 instances (75 percent).

Moreover, the associate director of the High Security Mission issued a directive as part of a memorandum in January 2016 that required prisons within the mission to notify the associate director in writing of all appeals prison staff could not complete within the 30-day time limit. This memorandum stated in part:

> From this point forward, late appeals will require proper follow-up. This includes a monthly memorandum from each institution listing any late appeals and/or modification orders. The memorandum shall include the appeal log number, inmate name and number, reason for [the] delay, and corrective action taken to address the failure in timely completion.

We found that the prison did not notify the associate director in 27 of the 32 staff complaint inquiries (84 percent) it completed beyond 30 working days. Had the associate director been aware of these late staff complaint inquiries, he or she would have had an opportunity to address them.

Staff complaint inquiry review promptness is important not only to comply with policy, but also as a means to maintain discipline since disciplinary action must be taken within a statute of limitations. The hiring authority must take any disciplinary action against an employee within an applicable statute of limitations; for peace officers, this disciplinary window is generally one year. After completing a staff complaint inquiry, if the hiring authority has a reasonable belief that misconduct occurred that might result in adverse action, then he or she must refer the matter to the department's Office of Internal Affairs to request an investigation or authorization to take direct action regarding the alleged misconduct. Any delay erodes the Office of Internal Affairs' available time to complete a full investigation and shortens the hiring authority's time after the investigation is concluded to consider the matter and take disciplinary action, if warranted.

*(This page left blank for reproduction purposes.)*

## The Office of the Inspector General's Analysis of Nine Additional Complaints at Salinas Valley Submitted to the Department by the Prison Law Office

In addition to the 188 staff complaint inquiries the OIG reviewed during the paper review and the onsite review periods, the OIG also reviewed an additional nine complaints at Salinas Valley submitted to the department by the Prison Law Office.[22] These cases originated from written complaints the Prison Law Office submitted to the department regarding various allegations of staff misconduct made by inmates housed at Salinas Valley. The prison processed these complaints separately from the staff complaint inquiry process. Salinas Valley assigned one staff member from its Investigative Services Unit to conduct the inquiries related to eight of the nine complaints. A lieutenant from another institution completed the remaining inquiry as a result of a conflict of interest. For each of the nine cases, the assigned reviewer conducted an allegation inquiry and submitted a confidential inquiry report to the hiring authority.

We assessed these nine allegation inquiries in a manner similar to that which we used to review the 188 staff complaint inquiries in the paper review and onsite review periods. Most of the allegation inquiries occurred during a period outside of the OIG's onsite review period. However, in a few of the cases, the OIG was able to monitor interviews conducted by the reviewers. The OIG monitored five interviews in cases emanating from the written complaints submitted by the Prison Law Office. Unlike most of the staff complaint inquiry reports assessed during the paper and onsite review periods, the allegation inquiry reports for these cases were generally longer and more detailed. The reviewers analyzed and summarized documentary evidence and were generally more descriptive regarding the documentary evidence they reviewed in connection with their inquiries. In two cases, the reviewers also included photographic evidence they obtained during the inquiry. Furthermore, as to the five interviews monitored by the OIG, they were thorough and the reviewers demonstrated a general understanding of the complaints.

---

[22] The engagement letter outlining the scope of work (see Appendix A) reflected that the OIG would assess the department's handling and response to ten specific complaints submitted by the Prison Law Office; however, the department consolidated two of the complaints into one inquiry, therefore resulting in the nine allegation inquiries to which we refer in this report.

However, we noted similar inadequacies in the allegation inquiries conducted relative to the nine complaints as we noted in the 188 staff complaint inquiries we reviewed. The most common shortcomings we identified were the failure to interview the subjects of the allegation inquiries; the failure to interview all relevant witnesses; not addressing all the allegations reflected in the written complaints; and the reviewers interviewing the complainant after interviewing witnesses and, in some cases, after subjects were interviewed. Also, other than the two allegation inquiry reports that contained photographic evidence, the reviewers did not attach documentary evidence to the inquiry reports they submitted to the hiring authority. In November 2018, we contacted one of the reviewers who advised us that the reviewers collected, analyzed, and retained the documentary evidence as part of their case files, but did not present the documentary evidence to the hiring authority; he also recognized the benefit of doing so and stated he would discuss implementing that change with his supervisor.

Therefore, as to the majority of the documentary evidence collected by the reviewers, the hiring authority, who was charged with making a final determination as to the resolution of each case, did not review the actual source documents, but relied only on summaries of the documents compiled by the reviewers.

Salinas Valley had previously reviewed the vast majority of the allegations contained in the nine complaints submitted by the Prison Law Office, largely in the form of staff complaint inquiries in connection with prior complaints submitted by the inmates. In fact, instead of conducting an independent review or investigation of the allegations, the two reviewers often relied on prior investigative work completed by the reviewers who were assigned to conduct those prior staff complaint inquiries. In one case, the reviewer interviewed the complaining inmate, reviewed the prior staff complaint inquiry report, and indicated that he agreed with the findings made during the prior inquiry, without completing any other independent investigative work. Given that staff at the prison had previously reviewed the vast majority of the allegations and conducted staff complaint inquiries, it would have been prudent for the hiring authority to have forwarded these particular complaints from the Prison Law Office to an independent investigative body within the department, such as its Office of Internal Affairs, for an independent inquiry or investigation.

In sum, based on the above, we assessed seven of the nine allegation inquiry reports as inadequate and only two as adequate.

## Prison Law Office Case 1: Allegations of an unprofessional cell search, threats, unsafe housing conditions, excessive use of force, false rules violations, and unfair disciplinary hearings

*Allegation background and summary: On January 8, 2018, the Prison Law Office requested the department investigate allegations of staff misconduct on behalf of an inmate who is an* Armstrong[23] *class member.*

The Prison Law Office reported the complainant alleged that on April 7, 2017, an officer searched his cell and confiscated property that was not identified on a confiscated items receipt. The complainant stated that he confronted the officer about the missing property, and the officer threatened him. The complainant reported that on June 9, 2017, he was falsely accused of sexual disorderly conduct by the same officer. The complainant reported that the officer was in the control booth at the time and that the complainant was in his cell cleaning himself with the lights out, suggesting it would have been impossible for the officer to see him. The Prison Law Office further alleged that the complainant is physiologically unable to perform the acts he was alleged to have committed and that the complainant did not receive a fair disciplinary hearing because the hearing officer failed to ask relevant questions of staff and because the hearing was untimely.

The Prison Law Office alleged that on two occasions, June 9, 2017, and June 11, 2017, the complainant reported seeing a known enemy on the yard. On June 9, 2017, the complainant reported no action was taken. On June 11, 2017, the complainant told his clinician about his concerns, who contacted a sergeant. The sergeant spoke with the complainant and informed him that he would be returned to his same housing unit; the complainant refused to return to his assigned housing unit due to safety concerns. The sergeant then ordered four officers to take the complainant to a holding cell in the gym. The complainant reported that he feared going to the empty gym because he had heard rumors that officers "brutalize inmates" there. When taken to the gym, the complainant alleged that officers forced him out of his wheelchair, and they placed him in a standing holding cell that could not accommodate a full-time wheelchair user. The officers allegedly grabbed him around the neck, slammed him to the ground, and began kicking and punching him until they heard other staff approaching the gym. The complainant stated that he was issued a false rules violation report for battery on a peace officer arising out of this incident and was later found guilty. The Prison Law Office also alleged that the complainant did not receive a fair

---

[23] *Armstrong* v. *Wilson* is a class-action lawsuit brought about under the Americans with Disabilities Act and the Rehabilitation Act on behalf of inmates with vision, hearing, mobility, kidney, speech, and learning disabilities. (942 F.Supp. 1252 (N.D. Cal. 1996)).

disciplinary hearing because the hearing officer failed to ask relevant questions of staff and because the hearing was untimely.

On March 12, 2018, the department assigned a staff member from the Investigative Services Unit to conduct a review of the allegations. The review was ongoing during the OIG assessment period, allowing the OIG to engage in real-time monitoring of the complainant's interview.

***OIG analysis and conclusion of the prison's handling of the allegations:***
The OIG monitored the interview of the complainant and noted that it was conducted in a confidential setting. The reviewer asked him detailed questions about five allegations, including whether he had any additional witnesses to support the allegations.

The OIG was provided a copy of the inquiry report for this complaint, which summarized the allegations in the Prison Law Office letter and identified five allegations to be reviewed during the inquiry. Although the reviewer addressed each of these five allegations, because he failed to identify several additional allegations in the Prison Law Office letter, these additional issues went unaddressed during the inquiry. Specifically, the inquiry report did not address allegations that an officer threatened the complainant after he asked the officer why his property had been confiscated, that the hearing officer failed to ask relevant questions of the witnesses at two rules violation hearings, and that the rules violation hearings were untimely.

A review of the inquiry report identified additional deficiencies with the thoroughness of the inquiry. First, although an OIG monitor attended the interview of the complainant and noted that the reviewer thoroughly inquired about the five allegations he identified, the summary of the interview contained in the inquiry report did not adequately summarize the complainant's statements about the allegations. This lack of detail in the report gives the reader the false impression that the reviewer did not sufficiently address the allegations during the interview even though the reviewer thoroughly inquired about these allegations. Second, the reviewer interviewed two subjects and one witness before interviewing the complainant. However, the reviewer partially resolved this mistake by re-interviewing one of the subjects following the complainant's interview. Third, the reviewer did not interview the two subjects who were alleged to have used excessive force, and relied entirely on the officers' written reports provided after the incident. Finally, although the reviewer independently identified a policy violation not included among the allegations in the Prison Law Office letter (that the complainant was placed in handcuffs locked in front of his body while seated in his wheelchair), he failed to take adequate steps to determine which staff member committed the policy violation, concluding: "Although this is a violation, there is no clear

identification as to which staff placed him in the restraints on the facility. Due to this, focused action is not possible on a specific staff member." Before arriving at this conclusion, the reviewer should have interviewed the two officers who escorted the complainant to ask whether they could recall if one of them had applied the handcuffs to the complainant while he was in his wheelchair.

With the exception of the above concerns, the report summarized every document reviewed and every interview conducted for each allegation separately and in a well-organized manner, providing a specific conclusion for each allegation. The report included recommendations for training in two areas. First, the reviewer noted that the temporary holding cell used on June 11, 2017, was not an approved temporary holding cell for inmates with disabilities and recommended that all custody staff receive training in *Armstrong* Custody Staff Responsibilities regarding reasonable accommodations. He further recommended that all custody captains ensure that their respective areas have disability accommodating temporary holding cells and should immediately request such cells if necessary. Second, the reviewer noted that custody staff members restrained the complainant in front of his body in violation of policy and recommended training on the usage of mechanical restraints be added to the annual block training all officers receive. The reviewer also took independent steps to address the complainant's enemy concern, even reaching out to an outside agency to gain additional information about the identity of the enemy who allegedly attacked the complainant before he was incarcerated; the enemy had a very common name that caused the complainant to mistakenly identify other inmates as enemies because they had similar names.

Overall, the quality of the inquiry was inadequate.

### Prison Law Office Case 2: Allegations of improper commitment offense disclosure, unaddressed safety concerns, coercion, and retaliation

*Allegation background and summary: On December 21, 2017, the Prison Law Office requested the department investigate allegations of staff misconduct on behalf of an inmate who is an* Armstrong *class member.*

On March 16, 2017, the Prison Law Office met with the complainant. The complainant reported that the following day, the television he was loaned was confiscated. The complainant alleged that an officer took away his television and disclosed to other inmates in his housing unit the nature of his commitment offense in retaliation for speaking with the Prison Law Office. The complainant reported to the Prison Law

Office that he was told by other inmates that the information "came from up top." The Prison Law Office also alleged that staff members disclosed information regarding the nature of the complainant's commitment offense and, as a result, the complainant was assaulted twice and received a false rules violation report for engaging in mutual combat. The Prison Law Office further alleged that staff were not taking the complainant's safety concerns seriously; that he was forced to sign documents stating he was compatible with certain inmates; that an inmate housed in another housing unit was allowed to come to his unit and assault him; and that mental health staff told the complainant he would have to eat and spread his own feces in his cell to attain single cell status.

On December 26, 2017, the department assigned a staff member from the Investigative Services Unit to conduct a review of the allegations. Because the review was completed prior to the OIG assessment period, the OIG did not monitor any of the interviews performed as part of the inquiry.

***OIG analysis and conclusion of the prison's handling of the allegations:***
The OIG was provided a copy of the inquiry report, which summarized the allegations of the Prison Law Office letter and identified seven allegations to be reviewed during the inquiry. The reviewer summarized an interview he conducted with the complainant and one inmate witness. One other inmate witness refused to be interviewed. The reviewer also summarized documents reviewed during the inquiry.

A review of the inquiry report identified several deficiencies with the thoroughness of the inquiry. First, the reviewer did not interview any of the subjects implicated in the allegations of misconduct: the officer who allegedly confiscated the complainant's television and was allegedly overheard discussing complainant's commitment offense; one other officer who was allegedly overheard discussing complainant's commitment offense; the officer who allegedly issued the false rules violation report; the sergeant who allegedly did not address complainant's enemy concerns and coerced the complainant into signing a housing form; and the psychologist who allegedly told the complainant he had to eat and spread his feces on the wall to attain single-cell status. Second, the reviewer failed to interview the inmate who allegedly overheard two officers discussing his commitment offense. Third, the reviewer determined the allegation that staff disclosed complainant's commitment offense to other inmates lacked merit because of a slight variance in the statements contained in the Prison Law Office letter and the statements the complainant made during his interview; because the complainant acknowledged that other inmates had spread information about his commitment offense; and because the complainant reported that although staff had disclosed that

he was convicted of a sex offense, staff had not discussed "any specifics of his case."

However, even if some inmates were already aware of the complainant's commitment offense, staff are still not permitted to discuss an inmate's commitment offense in front of other inmates; the reviewer should not have dismissed this allegation on these bases. Fourth, the reviewer did not take adequate steps to resolve the allegations that the officer's statement in the rules violation report that the complainant engaged in mutual combat was false and that the complainant only protected himself from the assailant's attacks. The reviewer determined the statements the officer included in the rules violation report were true because, in his opinion, the statements were "clearly articulate[d]." Despite interviewing the alleged assailant, who stated he targeted the complainant due to his commitment offense and pressure from other inmates in the housing unit, the reviewer did not ask the assailant whether the complainant fought back. Finally, the reviewer interviewed the complainant after the only witness interviewed in connection with the inquiry.

The reviewer also recommended corrective action be provided to the psychologist who suggested the complainant eat and spread his own feces in order to attain single-cell status, but never interviewed the psychologist about this allegation.

Overall, the quality of the inquiry was inadequate.

### Prison Law Office Case 3: Allegations of discrimination, falsifying a rules violation report, and discouraging inmates from filing appeals

*Allegation background and summary: On January 9, 2018, the Prison Law Office requested the department investigate allegations of staff misconduct on behalf of two inmates who are* Armstrong *class members.*

The Prison Law Office reported that on June 14, 2017, the complainant alleged that a control booth officer had been discriminating against him on the basis of his hearing disability by repeatedly releasing him last for pill call. Because the complainant had difficulty explaining things in writing, he asked another inmate to help him write a reasonable accommodation request (request) to address the issue, which the complainant then signed and submitted. The prison treated the request as an appeal and assigned a sergeant to perform the staff complaint inquiry.

On June 16, 2017, the sergeant allegedly called the complainant for an interview, during which he questioned the request's authenticity,

demanded the complainant provide a writing sample, asked detailed questions about information contained in the request, accused the complainant of playing games with the appeal process, threatened the complainant with rules violation reports and a bed move, and ultimately had the complainant sign a withdrawal of his appeal. After the complainant allegedly confirmed he authorized the second inmate to complete the request form for him and approved everything written in the request, the sergeant concluded in his appeal response that the complainant did not write or submit the request, and a second inmate submitted the request without the complainant's knowledge. Based on this allegedly false conclusion, the sergeant issued the second inmate a rules violation for falsifying a document, stating, "[Complainant] stated that he did not fill out the form and didn't even know what it stated[.]... [The second inmate] transcribed the [request] with the content unbeknownst to [complainant]." The complainant alleged that during his interview, the sergeant asked him to state that he did not know what was written on the request form, which the complainant refused to do, expressly reaffirming that he knew what was written on the request form. The second inmate was later found not guilty of the rules violation.

On March 9, 2018, the department assigned a staff member from the Investigative Services Unit to conduct a review of the allegations. The review was ongoing during the during the OIG assessment period, allowing the OIG to engage in real-time monitoring of the complainant's interview.

***OIG analysis and conclusion of the prison's handling of the allegations:***
The OIG monitored the interview of one of the complainants and noted that it was conducted in a confidential setting. During the interview, the reviewer summarized the allegations contained in the letter received from the Prison Law Office and asked the complainant detailed questions about the allegations, including whether the complainant had any additional witnesses in support of the allegations, which he did not. He was only able to provide a description of a neighboring inmate. In the OIG's opinion, the interview was thorough and complete.

The OIG was provided with a copy of the inquiry report for this complaint, which identified two allegations to be reviewed during the inquiry. Although the reviewer addressed both of these allegations, because he failed to identify additional allegations contained in the Prison Law Office letter, these additional issues went unaddressed during the inquiry. The Prison Law Office letter raised specific concerns with the sergeant's actions, noting the office received many complaints from inmates at the prison alleging that staff had discouraged inmates from filing appeals. Despite these concerns, the inquiry report did not address the allegation that a sergeant issued the second inmate a rules

violation report for falsifying a document, which included allegations the sergeant knew to be untrue. The inquiry report also did not address the allegations that the sergeant accused the complainant of playing games with the appeal process and threatened him with rules violation reports and a bed move.

With regard to the allegations that were addressed during the inquiry, the report was very detailed and demonstrated the reviewer performed a thorough and complete review of these particular allegations. The report indicated the reviewer interviewed the two complainants, two staff witnesses, three inmate witnesses, and a subject officer to determine whether the control booth officer discriminated against disabled inmates and whether they noticed issues with inmates not being released for pill call.

With the exception of the reviewer also interviewing four witnesses before interviewing the complainant, the report appeared to contain thorough summaries of the interviews. The interviews revealed that the physical structure of the housing unit might have restricted the control booth officer's view of certain cells in one corner of the housing unit, which made it difficult for the control booth officer to see when inmates were flashing their lights and asking to be released for pill call. To confirm these reports, the reviewer visited the housing unit and took multiple photographs of the cells in question and of the view of these cells from the control booth, demonstrating that the physical layout of the housing unit did, in fact, obstruct the view of the complainant's cell.

The reviewer also determined that the control booth officer and the complainant discussed the issues the complainant raised regarding being released last for pill call and that these issues were resolved to the complainant's satisfaction. The complainant indicated that after speaking with the control booth officer about the issues, from that point forward, he was always released for pill call when he requested to be released and had no further complaints with the process.

The reviewer also adequately addressed the allegation that the sergeant questioned the authenticity of the complainant's appeal. The reviewer interviewed the complainant, the sergeant, and the only staff witness to the incident and thoroughly summarized their statements regarding that allegation in the inquiry report.

Although the reviewer thoroughly addressed the issues he identified in his inquiry report, he disregarded critical allegations also contained in the Prison Law Office letter.

The overall quality of the inquiry was inadequate.

### Prison Law Office Case 4: Allegations of neglect of duty, improper placement in administrative segregation, coercion, and threats

*Allegation background and summary: On January 9, 2018, the Prison Law Office requested the department investigate allegations of staff misconduct on behalf of an inmate who is an* Armstrong *and a* Clark[24] *class member.*

The Prison Law Office reported that on May 16, 2017, the complainant was attacked by another inmate in a dining hall and that no officers were present at the time, which allowed the attack to occur. The complainant suffered head trauma as a result of the attack. The Prison Law Office further stated that the complainant was threatened with a rules violation report and placement in the administrative segregation unit if he did not sign a document indicating he was compatible with the inmate who attacked him. The Prison Law Office noted that the complainant was deemed an immediate threat to institutional safety and placed in administrative segregation on May 16, 2017, despite being the victim of an assault. The complainant's case was not reviewed until September 1, 2017, at which time the department noted that the inmate who attacked him had transferred to another institution and ordered the complainant released from administrative segregation. However, the Prison Law Office alleged the complainant was not released until six days after the order was issued. On September 11, 2017, after refusing on several prior occasions, the complainant signed a document indicating he was compatible with the inmate who attacked him and was told his rules violation report would be dismissed.

On January 16, 2018, the department assigned a staff member from the Investigative Services Unit to conduct a review of the allegations. The review was completed during the OIG's assessment period; however, the reviewer was not advised of the OIG's request to engage in real-time monitoring of this case. As a result, the OIG did not monitor any of the interviews performed as part of the inquiry.

***OIG analysis and conclusion of the prison's handling of the allegations:***
The OIG was provided a copy of the inquiry report, which thoroughly summarized all of the allegations in the Prison Law Office letter. The report indicates the reviewer interviewed the officer assigned to the dining hall and the officer assigned to the observation post above the dining hall to determine what they witnessed. The report summarized their statements with sufficient detail. The report also indicates the reviewer reviewed and summarized two documents that discussed the

---

[24] *Clark* v. *California* is a class-action lawsuit brought about under the Americans with Disabilities Act and the Rehabilitation Act on behalf of inmates with developmental disabilities. (123 F.3d 1267 (9th Cir. 1997)).

incident in which the complainant was attacked by another inmate and determined the complainant was found not guilty of the rules violation. The report thoroughly summarized the reviewer's interview with the complainant regarding the attack.

The report also indicates the reviewer adequately addressed the allegations regarding the complainant's placement in administrative segregation and the length of his placement. The reviewer thoroughly summarized an interview he conducted with the correctional counselor who performed the institutional classification committee hearing and spoke with the complainant multiple times to explain the purpose of the compatibility form and the consequences of not signing the form. The reviewer also reviewed and summarized three documents that identified the date on which the rules violation report was dismissed, the date the complainant was ordered released from administrative segregation, the date the complainant was actually released from administrative segregation, and the date the complainant signed the compatibility form. The report thoroughly summarized the reviewer's interview with the complainant regarding his placement in administrative segregation, the attempts to convince him to sign the compatibility form, and his reason for signing the form.

The reviewer then used the evidence collected during the inquiry to arrive at conclusions regarding each allegation in the Prison Law Office letter. Although the complainant was interviewed after all three witnesses, the overall quality of the inquiry was adequate.

### Prison Law Office Case 5: Allegations of unprofessionalism and failure to respond to a medical emergency

*Allegation background and summary: On January 10, 2018, the Prison Law Office requested the department investigate allegations of staff misconduct on behalf of an inmate who is an* Armstrong *class member.*

The Prison Law Office reported the complainant alleged that staff failed to respond to a medical emergency and conducted an unprofessional cell search. In particular, the complainant alleged that on June 19, 2017, the complainant fell out of his wheelchair while on the yard, and four officers failed to initiate an alarm or assist the inmate. Further, the complainant alleged that on July 13, 2017, two officers searched his cell and left his property in disarray. On January 16, 2018, the department assigned a staff member from the Investigative Services Unit to conduct a review of the allegations. The majority of the review was completed prior to the OIG assessment period.

***OIG analysis and conclusion of the prison's handling of the allegations:***
The OIG was provided a copy of the inquiry report, which summarized
the allegations of the Prison Law Office letter and identified two
allegations to be reviewed during the inquiry. As to the first allegation
regarding the wheelchair incident, the reviewer analyzed and
summarized a prior appeal inquiry report regarding the incident and
interviewed inmates who were present and some officers to determine
whether they witnessed the incident. However, the reviewer did not
interview the complainant, nor did he interview any of the four subject
officers. The reviewer noted that some of the subject officers were on
their routine days off from work or were assigned to another yard on
the day in question. However, the reviewer did not identify in his report
which particular officer or officers were off work or purportedly working
on another yard. While the reviewer confirmed that one of the subject
officers was working on the yard on the day in question, the reviewer
did not interview that officer either. The reviewer did not give a reason
for not interviewing the one officer whom he identified as having
worked in the unit on the day in question and who was identified by the
complainant as a subject.

As to the second allegation, the reviewer did not interview the
complainant and did not interview the two subject officers. The reviewer
did not identify a reason for not interviewing the complainant or the
subject officers. The reviewer analyzed records to determine which other
officers were working in the unit the day of the incident and interviewed
those officers. The reviewer interviewed one officer identified by the
complainant as having observed the cell in disarray after the search.

The reviewer concluded there was no evidence to substantiate the
allegations and that no further investigation was warranted. However,
the reviewer did not interview the complainant regarding either
allegation, nor did he interview any of the subjects identified by the
complainant as having committed the misconduct set forth in the
allegations.

Overall, the quality of the inquiry was inadequate.

## Prison Law Office Case 6: Allegations of inappropriate housing assignment, civil rights violations, and unprofessionalism

*Allegation background and summary: On January 10, 2018, the Prison Law
Office requested the department investigate allegations of staff misconduct
on behalf of an inmate who is an* Armstrong *class member.*

The Prison Law Office reported the complainant alleged he was issued
a false rules violation report for fighting, denied single-cell status, not

permitted to shower, forced to stay in a cell with a broken toilet for multiple days and had to damage his cell before officers would respond, and that he was left in a temporary holding cell for over four hours. The complainant also alleged that staff wrote and utilized inappropriate nicknames on the inmates' picture cards posted in the housing unit.

On January 16, 2018, the department assigned a staff member from the Investigative Services Unit to conduct a review of the allegations. The review was completed prior to the OIG assessment period.

***OIG analysis and conclusion of the prison's handling of the allegations:***
The OIG was provided a copy of the inquiry report, which summarized the allegations of the Prison Law Office letter and identified five allegations to be reviewed during the inquiry. The reviewer interviewed the complainant and another inmate who provided information regarding the incident in which the complainant purportedly engaged in a fight. The reviewer also conducted an informational interview with a sergeant regarding the shower issue; interviewed an inmate, a psychologist, and two nurses regarding the complainant's retention in a temporary holding cell; interviewed multiple inmates regarding the complainant's clogged toilet; and interviewed a staff member and an inmate regarding the complainant's allegation regarding the use of inappropriate nicknames. The reviewer also analyzed the rules violation report, documentation reflecting the complainant's prior statements to staff regarding the fight, medical reports of injury, documentation regarding the complainant's housing classification, a memorandum from a sergeant, shower logs, a work order regarding the toilet issue, and various logbooks.

The reviewer also noted that with regard to the allegation that staff did not permit the complainant to shower, the reviewer spoke to several inmates "in passing" regarding their ability to shower, and none reported any concern. However, the reviewer did not note which inmates he spoke to in passing to obtain this information, nor did he indicate whether he interviewed those inmates in a confidential setting. Furthermore, the reviewer did not interview the officer identified by the complainant as having refused to let the complainant shower; nor did he interview the two officers the complainant identified as having refused to move the complainant to another cell when the toilet in his cell was not working or the officer who allegedly secured the complainant in a temporary holding cell for over four hours.

The reviewer concluded the complainant's allegations were not substantiated and that no further investigation was necessary. Although the reviewer interviewed the complainant and several witnesses, and gathered and reviewed several pieces of documentary evidence, he

did not interview any of the staff members whom the complainant identified as committing misconduct. He also conducted several informal interviews with inmates "in passing" without identifying the identities of those inmates or whether he conducted those interviews in confidential settings.

Overall, the quality of the inquiry was inadequate.

### Prison Law Office Case 7: Allegations of harassment and intimidation

*Allegation background and summary: On January 12, 2018, the Prison Law Office requested the department investigate allegations of staff misconduct on behalf of an inmate who is an* Armstrong *class member.*

The Prison Law Office reported a complainant alleged that staff had been harassing and intimidating him since reporting an incident of excessive force. The complainant reported that on February 28, 2017, staff unnecessarily placed him in a temporary holding cell after requesting that staff replace a medical brace which had been taken during a cell search. Upon release from the holding cell, the inmate, who suffered from a medical condition and could fall frequently, became dizzy and fell to the floor. The complainant reported that staff ordered the complainant to get up from the floor and, when he could not, several officers assaulted him. The department then issued the complainant a rules violation report for battery on a peace officer. The complainant stated that staff, including two officers, two sergeants, and a lieutenant, harassed him since the incident, including various incidents of verbal degradation and mocking, banging the complainant's face on a holding cell door, and threatening further rules violation reports.

On January 16, 2018, the department assigned a staff member from the Investigative Services Unit to conduct a review of the allegations. The review was ongoing during the OIG assessment period, allowing the OIG to engage in real-time monitoring of the complainant's interview.

***OIG analysis and conclusion of the prison's handling of the allegations:***
The OIG was provided a copy of the inquiry report, which summarized the allegations of the Prison Law Office letter and identified five allegations to be reviewed during the inquiry. The reviewer conducted a thorough interview of the complainant in a confidential setting, asking him questions about each allegation. The reviewer conducted the interview prior to interviewing other witnesses. The inquiry report included a thorough summary of the complainant's statements regarding each allegation.

The reviewer also interviewed relevant staff witnesses and three of the five subjects (two officers and a sergeant) regarding the allegations, reviewed relevant documents, and visited the scene of the incident, which occurred in the temporary holding cell, and took photographs of the temporary holding cell. The reviewer included photographs in his inquiry report.

The reviewer concluded that the allegations against the staff members, except a lieutenant, were not substantiated. The reviewer recommended that the lieutenant receive formalized training regarding ethics and professionalism concerning the statement he made during a conversation with the inmate.

As to the quality of the inquiry, the reviewer did not interview two of the five subjects: a sergeant and a lieutenant. The reviewer did not explain why he did not interview the sergeant, but the sergeant had previously provided a statement during a prior inquiry conducted regarding the allegation against him. The reviewer did not note why he did not interview the lieutenant, and there is no indication that the lieutenant previously submitted to an interview. Nevertheless, the other interviews conducted by the reviewer were thorough, he obtained and reviewed relevant documentary evidence, and visited and took photographs of the scene of one of the incidents.

Overall, the quality of the inquiry was adequate.

### Prison Law Office Case 8: Allegations of harassment, retaliation, and unprofessionalism

*Allegation background and summary: On January 18, 2018, the Prison Law Office requested the department investigate allegations of staff misconduct on behalf of two inmates who are* Armstrong *class members.*

The Prison Law Office reported that the complainants, who were housed in the same cell at Salinas Valley, alleged that various staff members harassed, intimated, and retaliated against them, conducted unprofessional searches, planted evidence, confiscated legal mail and other items without cause, and denied them access to inmate appeals or complaint forms.

On April 11, 2018, the department assigned a lieutenant from another institution to conduct a review of the allegations. The review was ongoing during the OIG assessment period, allowing the OIG to engage in real-time monitoring of one inmate's interview.

*OIG analysis and conclusion of the prison's handling of the allegations:*

The OIG was provided a copy of the inquiry report, which summarized the allegations of the Prison Law Office letter and identified five allegations to be reviewed during the inquiry. The Prison Law Office reported that on June 9, and 10, 2017, staff interviewed one of the complainants in a nonconfidential setting about allegations against staff and, thereafter, several other inmates questioned the complainants about being called to speak to investigators, questioned them about speaking to the Prison Law Office, and informed the complainants that a particular officer would be planting a weapon in their cell. The reviewer interviewed both complainants about the allegations. However, the reviewer did not interview the lieutenant who allegedly conducted the interviews in the nonconfidential setting, did not interview an officer who allegedly was told about the plan to plant a weapon in the complainants' cell, and did not interview the officer who allegedly planned to plant the weapon. The complainants provided the names of three inmates who approached them after the nonconfidential interviews and questioned them and made statements about them reporting misconduct. The reviewer only interviewed one of the three inmates. The reviewer did not provide a reason for not interviewing the other two inmates. The reviewer concluded that the interviews were conducted in a manner which was not conducive to concealing the identity of the inmates involved and recommended that staff conduct interviews in a confidential setting. The reviewer also found that there was a previous inquiry regarding the allegations and agreed with the prior finding that staff did not violate policy.

The complainants also reported that on September 12, 2017, officers searched their cell in an unprofessional manner, leaving their cell in complete disarray, and also confiscated their legal mail. One officer also allegedly stated, "It's payback time." The reviewer obtained and analyzed documentation regarding a prior appeal submitted by one of the complainants regarding the search, and he also interviewed both complainants regarding the allegations. However, the reviewer did not interview any of the officers or other staff members involved in the cell search, including the officer who allegedly made the retaliatory comment. The reviewer also did not interview a captain to whom the complainants previously reported the allegation shortly after the incident. The reviewer did not attach to his inquiry report any of the documentation from the prior review, nor did he note or summarize any prior staff interviews. Therefore, it is not clear whether any of the staff members were ever interviewed about the allegations. The reviewer found that there was a previous inquiry regarding the allegations and agreed with the prior finding that staff did not violate policy.

In addition, the complainants reported that from September 15, 2017, through October 24, 2017, various staff made numerous verbal threats, incited other inmates to assault them, and conducted a cell search during which staff planted a weapon that resulted in a false weapons charge. The reviewer obtained and analyzed documentation regarding a previous appeal regarding some of these allegations and interviewed one of the two complainants, and two staff witnesses: a captain and a sergeant. The complainant provided the reviewer with the names of two other inmates who possessed information regarding the allegations. The reviewer did not independently interview them, but instead relied upon information they provided as set forth in the documentation regarding the prior appeal. The reviewer did not interview an officer who allegedly made verbal threats against the inmates and incited other inmates to assault them and another officer who also allegedly threatened them. The reviewer did not interview a sergeant who allegedly made intimidating statements to the inmates. The reviewer did not interview any of the six officers or two sergeants who allegedly participated in the search of the complainants' cell and all potential subjects regarding the allegation that staff planted a weapon in their cell. The reviewer concluded that he was unable to substantiate any of the complainants' allegations.

Lastly, the complainants reported that during various periods, including in October 2017, staff failed to provide vision-related accommodations to one of the complainants and denied both complainants access to the appeals process, including access to the complainant's appeal or complaint forms. The reviewer obtained and reviewed documentation from a prior inmate appeal regarding these issues. He also interviewed both complainants. The reviewer did not interview any staff members regarding these allegations, including one staff member whom one of the complainants specifically identified as having committed the alleged misconduct. The reviewer noted that he was unable to substantiate the allegations made by the complainants.

Although the reviewer interviewed both complainants as to the allegations and reviewed documentation from prior inquiries regarding some of the allegations, he failed to interview various relevant inmates and staff witnesses. In particular, the reviewer did not interview any of the staff members who allegedly committed misconduct.

Overall, the quality of the inquiry was inadequate.

### Prison Law Office Case 9: Allegations of unnecessary force, retaliation for filing a staff complaint, and disclosure of confidential medical information

*Allegation background and summary: On January 23, 2018, the Prison Law Office requested the department investigate allegations of staff misconduct on behalf of an inmate who is an* Armstrong *class member.*

The Prison Law Office alleged that on May 8, 2017, the complainant was subjected to unnecessary force and suffered injuries and ongoing medical difficulties as a result of the use of force. The complainant was on the yard when a fight broke out, at which point he took a seated position away from the fight. An officer responding to the fight turned away from the fight and threw a pepper spray grenade in the complainant's direction. The grenade landed in the complainant's lap, where it detonated, causing severe pain, burning, and other ongoing medical problems. The complainant alleged that after the fight was resolved, he approached a sergeant on the yard, who denied his request to be decontaminated from the pepper spray and threatened to issue him a rules violation report. Twelve days after the incident, the complainant sought medical attention for the ongoing medical problems he was experiencing as a result of the incident. The complainant filed an appeal alleging unnecessary force and describing the medical problems he was suffering from as a result of the incident. The complainant alleged the officer who used the unnecessary force then retaliated against him for filing the appeal by disclosing his personal medical information to other inmates, causing him embarrassment. The complainant also alleged another officer disclosed his personal medical information and refused his request to be housed in the same cell as his brother, who was also housed at the prison, in retaliation for filing the appeal.

On January 24, 2018, the department assigned a staff member from the Investigative Services Unit to conduct a review of the allegations. The review was completed prior to the OIG assessment period.

**OIG analysis and conclusion of the prison's handling of the allegations:**
The OIG was provided a copy of the inquiry report, which briefly summarized the allegations of the Prison Law Office letter and identified two allegations to be reviewed during the inquiry. Although the reviewer addressed both of these allegations, because he failed to identify two additional allegations in the Prison Law Office letter, these issues went unaddressed during the inquiry. Specifically, the inquiry did not address the allegation that a sergeant refused the complainant's request to decontaminate after being exposed to pepper spray and that staff disclosed his

embarrassing personal medical information in retaliation for filing his appeal.

A review of the inquiry report identified additional deficiencies with the thoroughness of the inquiry. First, the reviewer only interviewed the appellant and two staff witnesses during the inquiry. He did not interview, or provide a justification for not interviewing, the officer who allegedly threw the pepper spray grenade in his direction and later disclosed his confidential medication information; the sergeant who allegedly refused to allow him to decontaminate and threatened him with a rules violation; or the two officers who allegedly refused to house him with his brother and disclosed his confidential medication information. Second, although the reviewer reviewed the documents generated during the institution's review of the use-of-force incident, he did not interview any of the involved officers or witnesses to that incident to inquire as to whether they observed an officer throw a pepper spray grenade in complainant's direction. The reviewer relied entirely on the reports the officers wrote after the incident. Third, although the reviewer thoroughly summarized the complainant's interactions with health care and mental health staff after the incident, the reviewer failed to interview a mental health clinician whose report stated the ongoing medical problems the complainant was suffering could have been caused by medication he was taking. The reviewer relied on this information to support one of his conclusions, but did not interview the clinician to determine whether his medical problems were more likely caused by the use of force or the medication.

With the exception of the above concerns, the report summarized every document reviewed and every interview conducted during the inquiry. The reviewer also gathered extensive documentation during the inquiry that was relevant to the issues presented and thoroughly analyzed the evidence gathered during the inquiry. However, because the reviewer did not address all the allegations from the Prison Law Office letter and did not interview or provide justifications for not interviewing the subjects of the complaint, the overall quality of the inquiry was inadequate.

*(This page left blank for reproduction purposes.)*

## Recommendations

The problems we encountered require substantial changes at Salinas Valley. Although this special review focused only on Salinas Valley, the process we reviewed is in place at prisons statewide. Therefore, the conditions we found may also exist to some degree at other institutions. Toward that end, we offer the following recommendations for consideration at the departmental level:

To address the independence and quality issues we identified, the department should consider a complete overhaul of the staff complaint inquiry process. Specifically, we urge the department to reassign the responsibility of conducting staff complaint inquiries to employees who work outside of the prison's command structure, which is the Division of Adult Institutions.

To the extent the department utilizes staff from outside the prison's command structure, the department should consider adopting a regionalized model for staffing purposes. For instance, the reviewers should not work or be co-located in the facilities where they are assigned to conduct staff complaint inquiries. The department currently uses a regionalized model for special agents who work in the Office of Internal Affairs.

To ensure that all prison employees who conduct staff complaint inquiries possess the requisite knowledge and skills to perform staff complaint inquiry activities effectively and efficiently, the department should:

- Provide comprehensive and ongoing training to all staff members who may be assigned to conduct staff complaint inquiries. This training should provide, at a minimum, an understanding of the staff complaint inquiry process; best practices to apply when interviewing appellants, witnesses, and subjects; best practices to apply for maintaining impartiality and confidentiality; instructions in effective techniques in collecting and preserving evidence; and instructions in effective report writing techniques.

- Consider requiring reviewers receive a certificate from the California Commission on Peace Officer Standards and Training with respect to conducting investigations.

- Assign staff complaint inquiries to only those employees who have received training and are certified on how to properly conduct them.

To ensure that the hiring authority has the most complete information at his or her disposal when making decisions regarding staff complaint inquiry determinations, the department should consider requiring audio-recorded interviews of staff subjects and witnesses. If this is not permitted under existing labor Memoranda of Understanding, then this recommendation may require negotiating with the respective labor organizations to effectuate such a change. Furthermore, the department should require reviewers to video-record (or at least, audio-record) all appellant and inmate witness interviews.

To better align the processes of a staff complaint inquiry and an investigation, the department should:

- Consider redefining an inquiry so that it is not perceived as a less-laborious process or as an inferior process when compared with an investigation. As we describe in the body of this report, inquiries consist of the same basic activities as investigations and, for results to be meaningful, they must include thorough interviews of the appellant, all pertinent witnesses, and all subjects. The staff complaint inquiry must also include all relevant supporting documentation and a complete and accurate written report. A reviewer cannot cut corners on these steps without compromising quality.

- Require reviewers to report all evidence they have uncovered in the staff complaint inquiry reports, and prohibit them from including their personal opinions or from making conclusions and recommendations in the staff complaint inquiry report.

To improve communication with appellants, the department should evaluate its notification procedures to ensure it promptly notifies appellants when reviewers need additional time to process staff complaint inquiries, beyond the regulatory time frame.

To ensure better follow-through on identified policy deviations, the department should routinely audit whether employees who were found to be out of compliance as part of a staff complaint inquiry actually received the corrective or adverse actions ordered by the hiring authority and then report the findings publicly.

# Appendices

## Appendix A. Engagement Letter Outlining the Scope of Work



*Roy W. Wesley, Inspector General*                                              *Office of the Inspector General*

**The Office of the Inspector General will assess the effectiveness of Salinas Valley State Prison's process of handling inmate complaints alleging staff misconduct (referred to as "staff complaints"). This will include staff complaints originating from the inmate appeals process (Form 602), use of force reviews, the Prison Rape Elimination Act, or from any other official complaint-reporting method covered in policy. The scope of our review will include the following:**

1. Review and evaluate the department's policies, procedures, and regulations significant to the handling of staff complaints. This will also include a review of the prison's relevant supplemental local operating procedures.

2. Obtain and review the prison's tracking logs and related documentation for staff complaints.

3. Interview key staff who work in the prison's appeals office and other staff as necessary to gain a better understanding of the staff complaint-handling process.

4. Assess the training provided to staff involving staff complaints. Determine whether relevant prison staff received periodic training on how to conduct inquiries or investigations into staff complaints, including whether the training focused on interviewing techniques of inmates and staff.

5. Assess the department's handling and response to ten specific complaints submitted by the Prison Law Office between November 14, 2017, and January 23, 2018.

6. Review and evaluate the documentation of all staff complaints resolved at the prison between December 1, 2017, and February 28, 2018. For these complaints, determine whether the prison followed its policies when resolving such complaints. We will focus on timeliness, completeness, and due process-related issues.

7. Monitor in real-time all staff complaints submitted at the prison for a period of 90 days, beginning with those received on March 1, 2018, through May 31, 2018. During this period, we will monitor the prison's process for screening complaint-related documentation, collecting evidence, conducting interviews of the complainant, conducting interviews of staff who are identified as subjects and/or witnesses, and reaching the final disposition of the complaint. We will also assess the timeliness, completeness, and due process-related issues of the staff complaints in this period. As requested by the department, we <u>will not</u> attend in person any of the interviews of departmental, non-medical staff. However, as requested by the federal Receiver, we will attend in person all interviews of medical staff. For transparency, we will note in our public report as a scope limitation that we were unable to attend interviews of non-medical staff.

8. Compare how the department handled complaints in steps six and seven, above. Determine whether our real-time monitoring had an effect on the department's handling of staff complaints. Toward that end, interview a sample of inmates and staff to obtain their perspective of the process before and during our involvement.

9. Identify strengths and weaknesses of the department's policies and procedures related to its handling of staff complaints. To the extent applicable, determine whether the department's proposed changes to its appeals process will address any of the weaknesses identified during this review.

*Edmund G. Brown, Jr., Governor*

10111 OLD PLACERVILLE ROAD, SUITE 110, SACRAMENTO, CALIFORNIA 95827     PHONE (916) 255-1102     FAX (916) 255-1401

Note: The OIG letter sent to the department on February 28, 2018.

Case 2:90-cv-00520-KJM-SCR    Document 6770-1    Filed 07/15/20    Page 99 of 138

*(This page left blank for reproduction purposes.)*

## Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department

In this appendix, we present various conclusions made by the hiring authority in the 188 staff complaints included in this special review. Those numbered one through 61 cover the paper review period (those the prison completed between December 1, 2017, and February 28, 2018) and those numbered 62 through 188 cover the onsite review period (those the prison initiated between March 1, 2018, and May 31, 2018).

The following table summarizes "yes" or "no" answers that we applied to each case, corresponding to whether the hiring authority determined any of the following:

- policy violation

- a referral to the prison's Investigative Services Unit for an Allegation Inquiry

- a referral to the department's Office of Internal Affairs for investigation

- corrective action

- adverse action

The table also summarizes the type of allegation for each case, the location of the appellant at the time of filing the appeal, and whether the appellant was a member of the *Armstrong* or *Coleman* litigation classes (*Armstrong* v. *Wilson,* 942 F.Supp. 1252 (N.D. Cal. 1996); *Coleman* v. *Wilson*, 912 F.Supp. 1282 (E.D. 1995)).

Finally, the table also includes the number of subjects in each case and their corresponding rank.

**Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department**

| Case | Allegation Types | Appellant Housing Location | Armstrong or Coleman Litigation Status* | Number of Subjects | Rank of Subjects | Determinations Made by the Hiring Authority | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
| **Paper Review Period** | | | | | | | | | | |
| 1 | Discourteous Treatment | A Yard | Coleman | 1 | CO | No | Yes | No | No | No |
| 2 | Discrimination Retaliation/Threats | A Yard | Coleman | 1 | Custodian | No | No | No | No | No |
| 3 | Discourteous Treatment | D Yard | Coleman | 1 | Supervising Cook | No | No | No | No | No |
| 4 | Discourteous Treatment Neglect of Duty | C Yard | None | 1 | CO | No | No | No | No | No |
| 5 | Neglect of Duty | D Yard | Coleman | Unknown | CO | No | No | No | No | No |
| 6 | Neglect of Duty Retaliation/Threats | A Yard | Armstrong, Coleman | 2 | SGT, CO | No | Yes | No | No | No |
| 7 | Discourteous Treatment | ASU (D1) | None | 1 | CO | No | No | No | No | No |
| 8 | Discourteous Treatment Retaliation/Threats | CTC | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 9 | Discourteous Treatment Neglect of Duty | A Yard | Armstrong | 2 | CO | No | No | No | No | No |
| 10 | Discourteous Treatment | ASU (Z9) | Coleman | 4 | CO (x3), RT | No | No | No | No | No |
| 11 | Neglect of Duty Retaliation/Threats | M | None | 1 | SGT | No | No | No | No | No |
| 12 | Unreasonable Use of Force Discourteous Treatment | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 13 | Retaliation/Threats Dishonesty/Falsified Documentation Neglect of Duty | ASU (Z9) | Coleman | 2 | CO | No | Yes | No | No | No |
| 14 | Unreasonable Use of Force Dishonesty/Falsified Documentation | A Yard | Coleman | 2 | CO | Yes | No | No | Yes | No |
| 15 | Retaliation/Threats Dishonesty/Falsified Documentation Neglect of Duty | A Yard | Armstrong, Coleman | 1 | CO | No | Yes | No | No | No |
| 16 | Retaliation/Threats | ASU (D1) | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 17 | Unreasonable Use of Force | D Yard | Armstrong, Coleman | 1 | SGT | No | No | No | No | No |

\* *Armstrong v. Wilson*, 942 F.Supp. 1252 (N.D. Cal. 1996); *Coleman v. Wilson*, 912 F.Supp. 1282 (E.D. 1995).

*Continued on next page.*

**Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (continued)**

| Case | Allegation Types | Appellant Housing Location | *Armstrong* or *Coleman* Litigation Status* | Number of Subjects | Rank of Subjects | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Determinations Made by the Hiring Authority | | | | |
| 18 | Dishonesty/Falsified Documentation | D Yard | None | 1 | CPT | No | No | No | No | No |
| 19 | Unreasonable Use of Force | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 20 | Discourteous Treatment | A Yard | Armstrong, Coleman | 1 | Plumber | No | No | No | No | No |
| 21 | Unreasonable Use of Force Neglect of Duty | ASU (D1) | Armstrong | 1 | LT | No | No | No | No | No |
| 22 | Unreasonable Use of Force | C Yard | Coleman | 3 | SGT, CO, MTA | No | No | No | No | No |
| 23 | Unreasonable Use of Force Retaliation/Threats | D Yard | Armstrong | 1 | CO | No | No | No | No | No |
| 24 | Unreasonable Use of Force | ASU (D1) | None | 3 | CO | No | No | No | No | No |
| 25 | Unreasonable Use of Force | ASU (D1) | None | 3 | CO | No | No | No | No | No |
| 26 | Dishonesty/Falsified Documentation | ASU (D1) | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 27 | Discourteous Treatment Retaliation/Threats | D Yard | Coleman | 3 | SGT, CO(x2) | No | No | No | No | No |
| 28 | Discourteous Treatment Neglect of Duty | A Yard | Coleman | 1 | CO | No | No | No | No | No |
| 29 | Discourteous Treatment Retaliation/Threats | D Yard | Armstrong | 1 | CO | No | No | No | No | No |
| 30 | Unreasonable Use of Force | ASU (D1) | None | 2 | CO | No | No | No | No | No |
| 31 | Discourteous Treatment | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 32 | Discrimination Discourteous Treatment | D Yard | None | 1 | CO | No | No | No | No | No |
| 33 | Retaliation/Threats Neglect of Duty Discourteous Treatment | ASU (Z9) | None | 4 | CO | No | No | No | No | No |
| 34 | Retaliation/Threats | TC 2 | Coleman | 1 | CO | No | No | No | No | No |
| 35 | Discourteous Treatment | A Yard | Coleman | 1 | CO | No | No | No | No | No |
| 36 | Discrimination Discourteous Treatment | B Yard | None | 1 | CO | No | No | No | No | No |
| 37 | Neglect of Duty | ASU (Z9) | None | 1 | CO | No | No | No | No | No |

*Continued on next page.*

**Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (cont.)**

| Case | Allegation Types | Appellant Housing Location | Armstrong or Coleman Litigation Status* | Number of Subjects | Rank of Subjects | Determinations Made by the Hiring Authority | | | | |
| | | | | | | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 38 | Discourteous Treatment | D Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 39 | Unreasonable Use of Force | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 40 | Neglect of Duty | A Yard | Armstrong, Coleman | 5 | SGT(x1), CO(x4) | No | No | No | No | No |
| 41 | Unreasonable Use of Force | ASU (D1) | Coleman | Unknown | Unknown | No | No | No | No | No |
| 42 | Discourteous Treatment Dishonesty/Falsified Documentation | A Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 43 | Neglect of Duty | D Yard | Armstrong, Coleman | 2 | CPT, CCII | No | No | No | No | No |
| 44 | Unreasonable Use of Force Dishonesty/Falsified Documentation | A Yard | Coleman | Unknown | Unknown | No | No | No | No | No |
| 45 | Unreasonable Use of Force | B Yard | Coleman | 2 | MTA, CO | No | Yes | No | No | No |
| 46 | Discourteous Treatment | ASU (D1) | None | 1 | CO | No | No | No | No | No |
| 47 | Discourteous Treatment | B Yard | Coleman | 2 | CO | No | No | No | No | No |
| 48 | Sexual Misconduct | C Yard | Coleman | 1 | CO | No | No | No | No | No |
| 49 | Unreasonable Use of Force | ASU (D1) | None | 1 | CO | No | No | No | No | No |
| 50 | Unreasonable Use of Force | CTC | Coleman | 3 | CO | No | No | No | No | No |
| 51 | Unreasonable Use of Force Discourteous Treatment | ASU (Z9) | Coleman | 1 | CO | No | No | No | No | No |
| 52 | Unreasonable Use of Force | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 53 | Unreasonable Use of Force | ASU (Z9) | Coleman | 2 | CO | No | No | No | No | No |
| 54 | Neglect of Duty Discourteous Treatment | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 55 | Sexual Misconduct Discourteous Treatment Neglect of Duty Retaliation/Threats | A Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 56 | Unreasonable Use of Force | A Yard | None | 2 | CO | No | No | No | No | No |
| 57 | Discourteous Treatment | B Yard | None | 1 | CO | No | No | No | No | No |

*Continued on next page.*

**Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (cont.)**

| Case | Allegation Types | Appellant Housing Location | *Armstrong or Coleman* Litigation Status* | Number of Subjects | Rank of Subjects | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
|------|------------------|------|------|------|------|------|------|------|------|------|
| 58 | Discourteous Treatment | D Yard | Coleman | 1 | CCI | No | No | No | No | No |
| 59 | Retaliation/Threats Neglect of Duty | A Yard | Coleman | 1 | SGT | No | No | No | No | No |
| 60 | Retaliation/Threats | D Yard | None | 1 | CO | No | No | No | No | No |
| 61 | Sexual Misconduct Retaliation/Threats | A Yard | Armstrong, Coleman | 2 | CO | No | No | No | No | No |

### Onsite Review Period

| Case | Allegation Types | Appellant Housing Location | *Armstrong or Coleman* Litigation Status* | Number of Subjects | Rank of Subjects | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
|------|------------------|------|------|------|------|------|------|------|------|------|
| 62 | Sexual Misconduct Neglect of Duty | C Yard | Coleman | 2 | PT, MTA | No | No | No | No | No |
| 63 | Retaliation/Threats | ASU (Z9) | Armstrong, Coleman | Unknown | Unknown | No | No | No | No | No |
| 64 | Unreasonable Use of Force Discourteous Treatment | ASU (Z9) | Coleman | 3 | CO | No | No | No | No | No |
| 65 | Neglect of Duty | D Yard | Coleman | 2 | CO | Yes | No | No | Yes | No |
| 66 | Discourteous Treatment | ASU (Z9) | Armstrong, Coleman | 3 | CO | No | No | No | No | No |
| 67 | Neglect of Duty Discourteous Treatment | B Yard | None | 2 | CO | No | No | No | No | No |
| 68 | Neglect of Duty | B Yard | Armstrong | 1 | CO | No | No | No | No | No |
| 69 | Unreasonable Use of Force Neglect of Duty | D Yard | Coleman | Unknown | Unknown | No | No | No | No | No |
| 70 | Sexual Misconduct | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 71 | Discourteous Treatment | D Yard | Coleman | 1 | LT | No | No | No | No | No |
| 72 | Neglect of Duty Discourteous Treatment | B Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 73 | Unreasonable Use of Force | A Yard | Coleman | 2 | CO | No | No | No | No | No |
| 74 | Neglect of Duty | B Yard | Coleman | 1 | CO | No | No | No | No | No |
| 75 | Retaliation/Threats Dishonesty/Falsified Documentation Discourteous Treatment | C Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 76 | Neglect of Duty | ASU (Z9) | Coleman | 1 | CPT | No | No | No | No | No |

*Continued on next page.*

Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (cont.)

| Case | Allegation Types | Appellant Housing Location | Armstrong or Coleman Litigation Status* | Number of Subjects | Rank of Subjects | Determinations Made by the Hiring Authority | | | | |
|------|------------------|---------------------------|------------------------------------------|--------------------|--------------------|-------------------|----------------|----------------|-------------------|------------------|
| | | | | | | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
| 77 | Discourteous Treatment Dishonesty/Falsified Documentation | B Yard | None | 1 | CO | No | No | No | No | No |
| 78 | Neglect of Duty | A Yard | Coleman | 2 | CCII | No | No | No | No | No |
| 79 | Retaliation/Threats Dishonesty/Falsified documentation Neglect of Duty | D Yard | Armstrong, Coleman | 1 | LT | No | No | No | No | No |
| 80 | Unreasonable Use of Force | CMC | Coleman | 2 | CO | Yes | No | No | Yes | No |
| 81 | Neglect of Duty | A Yard | Coleman | Unknown | Unknown | No | No | No | No | No |
| 82 | Dishonesty/Falsified Documentation | A Yard | Armstrong, Coleman | 3 | CO | No | No | No | No | No |
| 83 | Unreasonable Use of Force Discourteous Treatment | ASU (D1) | None | 1 | CO | No | No | No | No | No |
| 84 | Discourteous Treatment | D Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 85 | Dishonesty/Falsified Documentation Discourteous Treatment | B Yard | Coleman | 2 | CPT, LT | No | No | No | No | No |
| 86 | Unreasonable Use of Force Discourteous Treatment Retaliation/Threats | A Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 87 | Unreasonable Use of Force | ASU (Z9) | Coleman | 2 | CO | No | No | No | No | No |
| 88 | Unreasonable Use of Force | ASU (Z9) | None | 1 | CO | No | No | No | No | No |
| 89 | Discourteous Treatment | ASU (Z9) | Coleman | 1 | CCI | No | No | No | No | No |
| 90 | Discourteous Treatment | D Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 91 | Discourteous Treatment | ASU (Z9) | Coleman | 1 | LT | No | No | No | No | No |
| 92 | Neglect of Duty Discourteous treatment | ASU (Z9) | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 93 | Discourteous Treatment Retaliation/Threats | A Yard | Coleman | 1 | Custodian | No | No | No | No | No |
| 94 | Unreasonable Use of Force | A Yard | Coleman | 1 | CO | No | No | No | No | No |
| 95 | Neglect of Duty | D Yard | None | 1 | LT | No | No | No | No | No |
| 96 | Unreasonable Use of Force | D Yard | Coleman | 1 | CO | No | No | No | No | No |

*Continued on next page.*

**Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (cont.)**

| Case | Allegation Types | Appellant Housing Location | Armstrong or Coleman Litigation Status* | Number of Subjects | Rank of Subjects | Determinations Made by the Hiring Authority | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
| 97 | Discourteous Treatment | D Yard | Armstrong | 3 | CO | No | No | No | No | No |
| 98 | Unreasonable Use of Force | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 99 | Unreasonable Use of Force | A Yard | Coleman | 1 | CO | No | No | No | No | No |
| 100 | Discourteous Treatment | TC 2 | Coleman | 2 | SMTA, MTA | No | No | No | No | No |
| 101 | Unreasonable Use of Force | ASU (D1) | Coleman | 2 | CO | No | No | No | No | No |
| 102 | Neglect of Duty | C Yard | Armstrong, Coleman | 2 | CO | No | No | No | No | No |
| 103 | Discourteous Treatment | A Yard | Coleman | 1 | Non-Sworn Manager | No | No | No | No | No |
| 104 | Unreasonable Use of Force | ASU (Z9) | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 105 | Discourteous Treatment | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 106 | Unreasonable Use of Force Dishonesty/Falsified Documentation Neglect of Duty | ASU (Z9) | Armstrong, Coleman | 4 | CO(x3), Senior Psychologist | No | No | No | No | No |
| 107 | Sexual Misconduct | B Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 108 | Unreasonable Use of Force | D Yard | Armstrong, Coleman | 4 | CO | No | No | No | No | No |
| 109 | Discourteous Treatment Retaliation/Threats | ASU (Z9) | Coleman | 1 | CO | No | No | No | No | No |
| 110 | Unreasonable Use of Force | C Yard | None | 2 | CO | No | No | No | No | No |
| 111 | Discourteous Treatment | B Yard | None | 1 | CO | No | No | No | No | No |
| 112 | Discrimination | B Yard | Coleman | Unknown | Unknown | No | No | No | No | No |
| 113 | Discourteous Treatment Neglect of Duty | D Yard | Coleman | 1 | CCI | No | No | No | No | No |
| 114 | Unreasonable Use of Force | CMF | Coleman | 4 | CO | No | No | No | No | No |
| 115 | Neglect of Duty | B Yard | None | 2 | CO | No | No | No | No | No |
| 116 | Neglect of Duty Dishonesty/Falsified Documentation | C Yard | Armstrong, Coleman | 2 | CO | No | No | No | No | No |

*Continued on next page.*

**Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (cont.)**

| Case | Allegation Types | Appellant Housing Location | Armstrong or Coleman Litigation Status* | Number of Subjects | Rank of Subjects | Determinations Made by the Hiring Authority | | | | |
|------|------------------|----------------------------|------------------------------------------|---------------------|-------------------|---------------|----------------|----------------|-------------------|------------------|
| | | | | | | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
| 117 | Unreasonable Use of Force Dishonesty/Falsified Documentation | B Yard | None | 1 | SGT | No | No | No | No | No |
| 118 | Discourteous Treatment | A Yard | Coleman | 1 | SGT | No | No | No | No | No |
| 119 | Neglect of Duty | A Yard | Armstrong, Coleman | Unknown | Unknown | No | No | No | No | No |
| 120 | Retaliation Threats Dishonesty/Falsified Documentation | ASU (Z9) | Armstrong, Coleman | 1 | LT | No | No | No | No | No |
| 121 | Dishonesty/Falsified Documentation Retaliation/Threats | D Yard | None | 1 | CO | No | No | No | No | No |
| 122 | Discourteous Treatment | C Yard | None | 2 | SGT, CO | No | No | No | No | No |
| 123 | Discourteous Treatment | ASU (Z9) | Coleman | 1 | Supervising Cook | No | No | No | No | No |
| 124 | Discourteous Treatment | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 125 | Unreasonable Use of Force | ASU (Z9) | Coleman | 4 | CO | No | No | No | No | No |
| 126 | Retaliation/Threats Neglect of Duty Discourteous Treatment | A Yard | Coleman | 4 | CO | No | No | No | No | No |
| 127 | Sexual Misconduct | M | None | 1 | CO | No | Yes | Yes | No | No |
| 128 | Retaliation/Threats Dishonesty/Falsified Documentation | B Yard | Coleman | 1 | SGT | No | No | No | No | No |
| 129 | Discourteous Treatment Retaliation/Threats | C Yard | None | 5 | LT, CO(x4) | No | No | No | No | No |
| 130 | Discourteous Treatment | B Yard | None | 1 | CO | No | No | No | No | No |
| 131 | Discourteous Treatment | A Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 132 | Dishonesty/Falsified Documentation Discourteous Treatment | B Yard | Armstrong | 1 | CCI | No | No | No | No | No |
| 133 | Dishonesty/Falsified Documentation | ASU (Z9) | Coleman | 2 | CO | No | No | No | No | No |
| 134 | Neglect of Duty | C Yard | None | 1 | Non-Sworn Staff Member | No | No | No | No | No |
| 135 | Discourteous Treatment | ASU (Z9) | Coleman | Unknown | Unknown | No | No | No | No | No |
| 136 | Retaliation/Threats Neglect of Duty Discourteous Treatment | D Yard | Armstrong | 1 | CO | No | No | No | No | No |

*Continued on next page.*

**Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (cont.)**

| Case | Allegation Types | Appellant Housing Location | *Armstrong* or *Coleman* Litigation Status' | Number of Subjects | Rank of Subjects | Determinations Made by the Hiring Authority | | | | |
|------|------------------|----------------------------|---------------------------------------------|--------------------|------------------|---------------------------------------------|--|--|--|--|
| | | | | | | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
| 137 | Unreasonable Use of Force | C Yard | Coleman | 1 | CO | No | No | No | No | No |
| 138 | Neglect of Duty | C Yard | None | 2 | CO | No | No | No | No | No |
| 139 | Discourteous Treatment | ASU (Z9) | Coleman | 1 | CO | No | No | No | No | No |
| 140 | Unreasonable Use of Force | CMC | Coleman | 1 | CO | No | No | No | No | No |
| 141 | Neglect of Duty | B Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 142 | Dishonesty/Falsified Documentation | C Yard | Coleman | 1 | CO | No | No | No | No | No |
| 143 | Neglect of Duty | SATF | Coleman | 4 | CO | No | No | No | No | No |
| 144 | Discourteous Treatment | ASU (Z9) | Coleman | 1 | CCII | No | No | No | No | No |
| 145 | Discourteous Treatment Neglect of Duty Dishonesty/Falsified Documentation | ASU (Z9) | None | 3 | CO | No | No | No | No | No |
| 146 | Neglect of Duty | C Yard | Armstrong | 1 | OA | No | No | No | No | No |
| 147 | Unreasonable Use of Force | LAC | Coleman | 8 | MD, RN, MTA(x3), CO, CCII, RT | No | No | No | No | No |
| 148 | Sexual Misconduct | M | None | 1 | CO | No | No | No | No | No |
| 149 | Retaliation/Threats | A Yard | Armstrong | 3 | CO | No | No | No | No | No |
| 150 | Discourteous Treatment Retaliation/Threats Dishonesty/Falsified Documentation | A Yard | Armstrong, Coleman | 2 | CO | No | No | No | No | No |
| 151 | Neglect of Duty | A Yard | Coleman | 3 | CO(x2), LVN | No | No | No | No | No |
| 152 | Neglect of Duty | D Yard | Armstrong, Coleman | 5 | SGT, CO(x4) | No | No | No | No | No |
| 153 | Neglect of Duty | ASU (D1) | Armstrong | 1 | Supervising Cook | No | No | No | No | No |
| 154 | Unreasonable Use of Force | A Yard | Armstrong, Coleman | 1 | LT | No | No | No | No | No |
| 155 | Discourteous Treatment Neglect of Duty | M | None | 1 | SGT | Yes | No | No | No | No |
| 156 | Unreasonable Use of Force | A Yard | Coleman | 2 | CO | No | No | No | No | No |

*Continued on next page.*

**Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (cont.)**

| Case | Allegation Types | Appellant Housing Location | *Armstrong* or *Coleman* Litigation Status* | Number of Subjects | Rank of Subjects | Determinations Made by the Hiring Authority | | | | |
|------|------------------|------------|------------|------------|------------|------------|------------|------------|------------|------------|
| | | | | | | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
| 157 | Discourteous Treatment | D Yard | Armstrong | 1 | LT | No | No | No | No | No |
| 158 | Neglect of Duty | A Yard | None | 3 | CO | No | No | No | No | No |
| 159 | Retaliation/Threats | ASU (Z9) | Coleman | 1 | CO | No | No | No | No | No |
| 160 | Retaliation/Threats | ASU (Z9) | Coleman | 1 | CO | No | No | No | No | No |
| 161 | Discrimination Retaliation/Threat | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 162 | Discourteous Treatment Neglect of Duty | A Yard | Armstrong | 2 | CO | No | No | No | No | No |
| 163 | Discourteous Treatment | B Yard | None | 1 | CO | Yes | No | No | Yes | No |
| 164 | Discourteous Treatment | ASU (Z9) | Coleman | 2 | CO | No | No | No | No | No |
| 165 | Neglect of Duty | A Yard | Armstrong | 1 | CO | No | No | No | No | No |
| 166 | Neglect of Duty | ASU (D1) | Coleman | 2 | SMTA, Psychiatrist | No | No | No | No | No |
| 167 | Neglect of Duty | A Yard | Armstrong | 1 | CO | No | No | No | No | No |
| 168 | Retaliation/Threats Neglect of Duty | ASU (D1) | None | 1 | CO | No | No | No | No | No |
| 169 | Neglect of Duty | B Yard | Coleman | 1 | Supervising Cook | No | No | No | No | No |
| 170 | Discourteous Treatment | A Yard | Coleman | 2 | CO | No | No | No | No | No |
| 171 | Retaliation/Threats Discourteous Treatment | B Yard | Armstrong, Coleman | 3 | CO | No | No | No | No | No |
| 172 | Neglect of Duty | A Yard | Coleman | 1 | CCII | No | No | No | No | No |
| 173 | Retaliation/Threats Neglect of Duty Sexual Misconduct | A Yard | Coleman | 3 | LT, SGT, CO | No | No | No | No | No |
| 174 | Dishonesty/Falsified Documentation | A Yard | Coleman | 2 | SGT | No | No | No | No | No |
| 175 | Neglect of Duty Discourteous Treatment Retaliation/Threats | A Yard | Armstrong | 2 | CO | No | No | No | No | No |
| 176 | Discourteous Treatment | B Yard | Coleman | 1 | CO | No | No | No | No | No |

*Continued on next page.*

Appendix B. Detail of Staff Complaint Cases and Outcomes, as Determined by the Department (cont.)

| Case | Allegation Types | Appellant Housing Location | *Armstrong* or *Coleman* Litigation Status° | Number of Subjects | Rank of Subjects | Determinations Made by the Hiring Authority | | | | |
|------|------------------|---------------------------|--------------------------------------------|--------------------|------------------|------|------|------|------|------|
| | | | | | | Policy Violation | Referral to ISU | Referral to OIA | Corrective Action | Adverse Action |
| 177 | Unreasonable Use of Force | CHCF | Armstrong, Coleman | 3 | CO(x2), Physician | No | No | No | No | No |
| 178 | Retaliation/Threats Discourteous Treatment | A Yard | Armstrong | 2 | CO | No | No | No | No | No |
| 179 | Neglect of Duty | B Yard | None | 1 | CO | No | No | No | No | No |
| 180 | Discrimination | D Yard | Coleman | 2 | CO | No | No | No | No | No |
| 181 | Dishonesty/Falsified Documentation Neglect of Duty | ASU (D1) | None | 1 | LT | No | No | No | No | No |
| 182 | Retaliation/Threats Dishonesty/Falsified Documentation | B Yard | None | 1 | CO | No | No | No | No | No |
| 183 | Discourteous Treatment Discrimination | D Yard | Coleman | 1 | CO | No | No | No | No | No |
| 184 | Neglect of Duty Discourteous Treatment | D Yard | Armstrong, Coleman | 2 | CO | No | No | No | No | No |
| 185 | Neglect of Duty Discourteous Treatment | B Yard | None | 1 | CO | No | No | No | No | No |
| 186 | Neglect of Duty | B Yard | None | 8 | SGT(x2), CO(x6) | No | No | No | No | No |
| 187 | Discourteous Treatment | A Yard | Armstrong, Coleman | 1 | CO | No | No | No | No | No |
| 188 | Discourteous Treatment | B Yard | None | 2 | Non-Sworn Manager, Teacher | No | No | No | No | No |
| | | | | | Total Yes: | 5 | 6 | 1 | 4 | 0 |

# Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG

In this appendix, we present our determinations of quality for each of the 188 staff complaint inquiries included in this special review. We assessed "quality" subjectively, using our own professional experience in monitoring investigations and other departmental processes. We assessed the appropriateness of the reviewer's assignment; the interviews conducted with appellants, witnesses, and subjects; evidence collected; and thoroughness of the inquiry report. Our qualitative assessments, however, were not intended to reflect the validation or invalidation of the department's policy determinations. An adequate rating reflected our opinion that, overall, the inquiry was performed using sound investigative practices. Below, we present the six primary assessment questions and the general methodology we applied to assess each.

**1. Was the staff complaint inquiry assigned to an appropriate reviewer?**
To assess the appropriateness of the assignment, we looked to see if the reviewer held a rank at least one level higher than the subject, worked on a different yard than the subject, or was uninvolved with the incident giving rise to the appeal. We evaluated this question for both review periods.

**2. Did the reviewer properly conduct an interview of the appellant?**
We evaluated whether the reviewer interviewed the appellant in the proper order (i.e., before interviewing witnesses or the subject); maintained confidentiality during the interview, including when the appellant was asked to be interviewed; maintained professionalism and impartiality during the interview; seemed prepared for the interview; and asked relevant questions and follow-up questions during the interview, including whether the appellant knew of any witnesses. We evaluated this question only for the onsite review period.

**3. Did the reviewer properly conduct an interview of the witness(es)?**
We applied the same standards described in question 2. We evaluated this question only for the onsite review period. However, we were not able to observe interviews of peace officers employed by the department.

**4. Did the reviewer properly conduct an interview with the subject(s)?**
We applied the same standards described in question 2. We evaluated this question only for the onsite review period. However, we were not able to observe interviews of peace officers employed by the department.

**5. Did the reviewer collect all relevant documentary evidence?**

We evaluated this question for both review periods and determined whether the reviewer collected and attached relevant documents that could support or refute allegations of staff misconduct. In the absence of collecting documents that may not have actually existed, we looked to see if the reviewer documented his or her attempt to validate their existence.

**6. Did the reviewer prepare an adequate inquiry report?**

We performed this evaluation for both review periods and evaluated the overall thoroughness of the report, including whether the reports were complete and accurate. An inquiry report is referred to as the Confidential Supplement to Appeal (or Attachment C).

**Figure 13. Number of Adequate and Inadequate Ratings, by Assessment Question**



* Our assessment questions were not always applicable. For instance, since we did not witness in person any of the interviews during the paper review period, we could only assess whether interviews were conducted in the proper order for question 2, but we could not assess questions 3 and 4 in their entirety. Additionally, we were not notified of some interviews during the onsite review period and, therefore, we could not make assessments for those instances, either. Finally, there were 38 inquiries for which we believed that, given the nature of the allegation, documentary evidence was not necessary to collect.

Source: Data and analysis by the Office of the Inspector General.

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|---|---|---|---|---|---|---|---|---|
| **Paper Review Period** | | | | | | | | |
| 1 | Discourteous Treatment | Red | Red | Gray | Gray | Red | Red | Red |
| 2 | Discrimination / Retaliation/Threats | Red | Red | Gray | Gray | Red | Red | Red |
| 3 | Discourteous Treatment | Red | Gray | Gray | Gray | Gray | Green | Green |
| 4 | Discourteous Treatment / Neglect of Duty | Green | Red | Gray | Gray | Red | Red | Red |
| 5 | Neglect of Duty | Green | Gray | Gray | Gray | Green | Gray | Red |
| 6 | Neglect of Duty / Retaliation/Threats | Red | Gray | Gray | Gray | Red | Red | Red |
| 7 | Discourteous Treatment | Green | Gray | Gray | Gray | Green | Green | Green |
| 8 | Discourteous Treatment / Retaliation/Threats | Green | Gray | Gray | Gray | Green | Green | Green |
| 9 | Discourteous Treatment / Neglect of Duty | Red | Gray | Gray | Gray | Green | Green | Green |
| 10 | Discourteous Treatment | Red | Gray | Gray | Gray | Green | Red | Red |
| 11 | Neglect of Duty / Retaliation/Threats | Red | Red | Gray | Gray | Red | Red | Red |
| 12 | Unreasonable Use of Force / Discourteous Treatment | Red | Gray | Gray | Gray | Red | Green | Green |
| 13 | Retaliation/Threats / Dishonesty/Falsified Documentation / Neglect of Duty | Red | Red | Gray | Gray | Green | Red | Red |
| 14 | Unreasonable Use of Force / Dishonesty/Falsified Documentation | Red | Gray | Gray | Gray | Red | Red | Red |
| 15 | Retaliation/Threats / Dishonesty/Falsified Documentation / Neglect of Duty | Red | Red | Gray | Gray | Green | Red | Red |
| 16 | Retaliation/Threats | Green | Gray | Gray | Gray | Green | Green | Green |
| 17 | Unreasonable Use of Force | Green | Red | Gray | Gray | Red | Red | Red |
| 18 | Dishonesty/Falsified Documentation | Red | Gray | Gray | Gray | Green | Green | Green |
| 19 | Unreasonable Use of Force | Red | Gray | Gray | Gray | Red | Red | Red |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (continued)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|---|---|---|---|---|---|---|---|---|
| 20 | Discourteous Treatment | red | red | gray | gray | green | red | red |
| 21 | Unreasonable Use of Force / Neglect of Duty | red | red | gray | gray | red | green | green |
| 22 | Unreasonable Use of Force | green | gray | gray | gray | red | red | red |
| 23 | Unreasonable Use of Force / Retaliation/Threats | green | gray | gray | gray | red | red | red |
| 24 | Unreasonable Use of Force | green | gray | gray | gray | red | red | red |
| 25 | Unreasonable Use of Force | gray | gray | gray | gray | gray | red | red |
| 26 | Dishonesty/Falsified Documentation | green | gray | gray | gray | red | green | green |
| 27 | Discourteous Treatment / Retaliation/Threats | red | gray | gray | gray | green | red | red |
| 28 | Discourteous Treatment / Neglect of Duty | green | gray | gray | gray | green | green | green |
| 29 | Discourteous Treatment / Retaliation/Threats | red | gray | gray | gray | green | green | green |
| 30 | Unreasonable Use of Force | green | gray | gray | gray | red | red | red |
| 31 | Discourteous Treatment | red | gray | gray | gray | green | green | green |
| 32 | Discrimination / Discourteous Treatment | red | gray | gray | gray | gray | green | green |
| 33 | Retaliation/Threats / Neglect of Duty / Discourteous Treatment | green | gray | gray | gray | green | green | green |
| 34 | Retaliation/Threats | red | red | gray | gray | gray | red | red |
| 35 | Discourteous Treatment | red | gray | gray | gray | green | green | green |
| 36 | Discrimination / Discourteous Treatment | red | gray | gray | gray | red | red | red |
| 37 | Neglect of Duty | green | gray | gray | gray | green | green | green |
| 38 | Discourteous Treatment | red | gray | gray | gray | green | red | green |
| 39 | Unreasonable Use of Force | red | gray | gray | gray | red | green | green |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|------|------------------|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| 40 | Neglect of Duty | 🔴 | ⚪ | ⚪ | ⚪ | 🔴 | 🔴 | 🔴 |
| 41 | Unreasonable Use of Force | 🟢 | ⚪ | ⚪ | ⚪ | 🔴 | 🟢 | 🟢 |
| 42 | Discourteous Treatment<br>Dishonesty/Falsified Documentation | 🔴 | ⚪ | ⚪ | ⚪ | 🟢 | 🔴 | 🔴 |
| 43 | Neglect of Duty | 🔴 | ⚪ | ⚪ | ⚪ | ⚪ | 🟢 | 🟢 |
| 44 | Unreasonable Use of Force<br>Dishonesty/Falsified Documentation | 🟢 | ⚪ | ⚪ | ⚪ | 🔴 | 🟢 | 🟢 |
| 45 | Unreasonable Use of Force | 🔴 | ⚪ | ⚪ | ⚪ | 🔴 | 🔴 | 🔴 |
| 46 | Discourteous Treatment | 🟢 | ⚪ | ⚪ | ⚪ | 🟢 | 🔴 | 🔴 |
| 47 | Discourteous Treatment | 🔴 | ⚪ | ⚪ | ⚪ | 🟢 | 🔴 | 🔴 |
| 48 | Sexual Misconduct | 🔴 | 🔴 | ⚪ | ⚪ | 🟢 | 🔴 | 🔴 |
| 49 | Unreasonable Use of Force | 🟢 | ⚪ | ⚪ | ⚪ | 🔴 | 🟢 | 🟢 |
| 50 | Unreasonable Use of Force | 🔴 | ⚪ | ⚪ | ⚪ | 🔴 | 🔴 | 🔴 |
| 51 | Unreasonable Use of Force<br>Discourteous Treatment | 🔴 | ⚪ | ⚪ | ⚪ | 🔴 | 🔴 | 🔴 |
| 52 | Unreasonable Use of Force | 🟢 | ⚪ | ⚪ | ⚪ | 🔴 | 🔴 | 🔴 |
| 53 | Unreasonable Use of Force | 🔴 | ⚪ | ⚪ | ⚪ | 🔴 | 🔴 | 🔴 |
| 54 | Neglect of Duty<br>Discourteous Treatment | 🟢 | ⚪ | ⚪ | ⚪ | 🟢 | 🟢 | 🟢 |
| 55 | Sexual Misconduct<br>Discourteous Treatment<br>Neglect of Duty<br>Retaliation/Threats | 🟢 | ⚪ | ⚪ | ⚪ | ⚪ | 🟢 | 🟢 |
| 56 | Unreasonable Use of Force | 🔴 | ⚪ | ⚪ | ⚪ | 🔴 | 🔴 | 🔴 |
| 57 | Discourteous Treatment | ⚪ | ⚪ | ⚪ | ⚪ | 🔴 | 🔴 | 🔴 |
| 58 | Discourteous Treatment | 🔴 | ⚪ | ⚪ | ⚪ | 🔴 | 🟢 | 🟢 |
| 59 | Retaliation/Threats<br>Neglect of Duty | 🔴 | ⚪ | ⚪ | ⚪ | 🔴 | 🟢 | 🟢 |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|---|---|---|---|---|---|---|---|---|
| 60 | Retaliation/Threats | Green | Gray | Gray | Gray | Gray | Green | Green |
| 61 | Sexual Misconduct Retaliation/Threats | Green | Gray | Gray | Gray | Red | Red | Red |

### Onsite Review Period

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|---|---|---|---|---|---|---|---|---|
| 62 | Sexual Misconduct Neglect of Duty | Green | Green | Gray | Gray | Red | Green | Green |
| 63 | Retaliation/Threats | Green | Green | Gray | Gray | Gray | Green | Green |
| 64 | Unreasonable Use of Force Discourteous Treatment | Green | Red | Gray | Gray | Red | Red | Red |
| 65 | Neglect of Duty | Green | Green | Red | Gray | Green | Green | Green |
| 66 | Discourteous Treatment | Red | Red | Green | Gray | Gray | Green | Green |
| 67 | Neglect of Duty Discourteous Treatment | Red | Red | Gray | Gray | Red | Red | Red |
| 68 | Neglect of Duty | Red | Red | Gray | Gray | Red | Red | Red |
| 69 | Unreasonable Use of Force Neglect of Duty | Green | Red | Red | Gray | Red | Red | Red |
| 70 | Sexual Misconduct | Red | Red | Gray | Gray | Gray | Gray | Red |
| 71 | Discourteous Treatment | Red | Green | Gray | Gray | Red | Green | Green |
| 72 | Neglect of Duty Discourteous Treatment | Red | Red | Red | Gray | Green | Red | Red |
| 73 | Unreasonable Use of Force | Green | Red | Red | Gray | Red | Red | Red |
| 74 | Neglect of Duty | Red | Red | Red | Gray | Gray | Red | Red |
| 75 | Retaliation/Threats Dishonesty/Falsified Documentation Discourteous Treatment | Green | Green | Green | Gray | Green | Green | Green |
| 76 | Neglect of Duty | Red | Green | Gray | Gray | Green | Gray | Green |
| 77 | Discourteous Treatment Dishonesty/Falsified Documentation | Red | Red | Red | Gray | Red | Red | Red |
| 78 | Neglect of Duty | Red | Red | Gray | Gray | Red | Red | Red |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|---|---|---|---|---|---|---|---|---|
| 79 | Retaliation/Threats; Dishonesty/Falsified documentation; Neglect of Duty | Green | Gray | Gray | Red | Red | Red | Red |
| 80 | Unreasonable Use of Force | Red | Green | Gray | Gray | Red | Green | Green |
| 81 | Neglect of Duty | Green | Green | Gray | Gray | Green | Green | Green |
| 82 | Dishonesty/Falsified Documentation | Red | Red | Red | Green | Red | Red | Red |
| 83 | Unreasonable Use of Force; Discourteous Treatment | Green | Green | Green | Gray | Red | Green | Green |
| 84 | Discourteous Treatment | Green | Green | Green | Gray | Green | Green | Green |
| 85 | Dishonesty/Falsified Documentation; Discourteous Treatment | Red | Gray | Gray | Gray | Green | Green | Green |
| 86 | Unreasonable Use of Force; Discourteous Treatment; Retaliation/Threats | Green | Red | Red | Gray | Red | Green | Green |
| 87 | Unreasonable Use of Force | Green | Red | Red | Gray | Green | Red | Red |
| 88 | Unreasonable Use of Force | Green | Green | Gray | Gray | Red | Green | Green |
| 89 | Discourteous Treatment | Green | Green | Gray | Gray | Green | Green | Green |
| 90 | Discourteous Treatment | Red | Green | Green | Gray | Green | Green | Green |
| 91 | Discourteous Treatment | Red | Red | Red | Gray | Red | Green | Green |
| 92 | Neglect of Duty; Discourteous treatment | Green | Red | Gray | Gray | Green | Green | Green |
| 93 | Discourteous Treatment; Retaliation/Threats | Red | Red | Gray | Red | Red | Red | Red |
| 94 | Unreasonable Use of Force | Red | Red | Gray | Gray | Red | Red | Red |
| 95 | Neglect of Duty | Red | Red | Red | Gray | Green | Green | Green |
| 96 | Unreasonable Use of Force | Green | Green | Green | Gray | Red | Green | Green |
| 97 | Discourteous Treatment | Red | Green | Gray | Gray | Gray | Green | Green |
| 98 | Unreasonable Use of Force | Red | Green | Gray | Gray | Green | Green | Green |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|------|------------------|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| 99 | Unreasonable Use of Force | green | red | gray | gray | green | green | green |
| 100 | Discourteous Treatment | green | red | gray | gray | red | red | red |
| 101 | Unreasonable Use of Force | green | green | gray | gray | red | red | red |
| 102 | Neglect of Duty | red | green | gray | gray | green | green | green |
| 103 | Discourteous Treatment | red | green | gray | dark green | red | green | green |
| 104 | Unreasonable Use of Force | green | red | gray | gray | green | green | green |
| 105 | Discourteous Treatment | red | green | gray | gray | green | green | green |
| 106 | Unreasonable Use of Force / Dishonesty/Falsified Documentation / Neglect of Duty | green | green | red | gray | red | green | green |
| 107 | Sexual Misconduct | green | red | gray | gray | green | green | green |
| 108 | Unreasonable Use of Force | red | green | gray | gray | red | red | red |
| 109 | Discourteous Treatment / Retaliation/Threats | red | green | red | gray | gray | red | red |
| 110 | Unreasonable Use of Force | green | red | gray | gray | green | green | red |
| 111 | Discourteous Treatment | red | green | green | gray | gray | red | red |
| 112 | Discrimination | red | red | red | gray | red | red | red |
| 113 | Discourteous Treatment / Neglect of Duty | red | green | gray | gray | green | green | green |
| 114 | Unreasonable Use of Force | red | gray | red | gray | red | red | red |
| 115 | Neglect of Duty | red | green | gray | gray | red | red | red |
| 116 | Neglect of Duty / Dishonesty/Falsified Documentation | red | green | gray | gray | green | red | red |
| 117 | Unreasonable Use of Force / Dishonesty/Falsified Documentation | green | red | gray | gray | red | red | red |
| 118 | Discourteous Treatment | red | green | red | gray | red | red | red |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|---|---|---|---|---|---|---|---|---|
| 119 | Neglect of Duty | Green | Green | Gray | Gray | Green | Green | Green |
| 120 | Retaliation/Threats; Dishonesty/Falsified Documentation | Red | Gray | Gray | Gray | Green | Red | Red |
| 121 | Dishonesty/Falsified Documentation; Retaliation/Threats | Green | Green | Green | Gray | Red | Red | Red |
| 122 | Discourteous Treatment | Red | Red | Gray | Gray | Green | Green | Green |
| 123 | Discourteous Treatment | Red | Red | Gray | Green | Red | Red | Red |
| 124 | Discourteous Treatment | Red | Red | Gray | Gray | Red | Red | Red |
| 125 | Unreasonable Use of Force | Green | Green | Gray | Gray | Red | Red | Red |
| 126 | Retaliation/Threats; Neglect of Duty; Discourteous Treatment | Red | Green | Red | Gray | Gray | Red | Red |
| 127 | Sexual Misconduct | Red | Red | Red | Gray | Red | Red | Red |
| 128 | Retaliation/Threats; Dishonesty/Falsified Documentation | Red | Red | Red | Gray | Red | Red | Red |
| 129 | Discourteous Treatment; Retaliation/Threats | Red | Green | Green | Gray | Green | Red | Red |
| 130 | Discourteous Treatment | Green | Red | Green | Gray | Green | Green | Green |
| 131 | Discourteous Treatment | Red | Green | Gray | Gray | Gray | Green | Green |
| 132 | Dishonesty/Falsified Documentation; Discourteous Treatment | Red | Red | Gray | Gray | Gray | Red | Red |
| 133 | Dishonesty/Falsified Documentation | Green | Red | Gray | Gray | Green | Red | Green |
| 134 | Neglect of Duty | Green | Red | Gray | Gray | Green | Green | Green |
| 135 | Discourteous Treatment | Red | Green | Red | Gray | Gray | Red | Red |
| 136 | Retaliation/Threats; Neglect of Duty; Discourteous Treatment | Red | Red | Gray | Gray | Gray | Red | Red |
| 137 | Unreasonable Use of Force | Red | Green | Gray | Gray | Red | Red | Red |
| 138 | Neglect of Duty | Red | Red | Gray | Gray | Gray | Green | Green |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|------|------------------|:--:|:--:|:--:|:--:|:--:|:--:|:--:|
| 139 | Discourteous Treatment | Green | Red | Red | Gray | Red | Red | Red |
| 140 | Unreasonable Use of Force | Red | Red | Green | Gray | Red | Red | Red |
| 141 | Neglect of Duty | Green | Red | Red | Gray | Gray | Red | Red |
| 142 | Dishonesty/Falsified Documentation | Red | Gray | Gray | Gray | Green | Green | Green |
| 143 | Neglect of Duty | Red | Red | Gray | Gray | Green | Red | Red |
| 144 | Discourteous Treatment | Red | Green | Gray | Gray | Green | Green | Green |
| 145 | Discourteous Treatment / Neglect of Duty / Dishonesty/Falsified Documentation | Red | Red | Gray | Gray | Green | Red | Red |
| 146 | Neglect of Duty | Green | Gray | Gray | Gray | Green | Red | Red |
| 147 | Unreasonable Use of Force | Green | Green | Green | Gray | Red | Green | Green |
| 148 | Sexual Misconduct | Green | Green | Gray | Gray | Gray | Red | Green |
| 149 | Retaliation/Threats | Red | Green | Green | Gray | Gray | Green | Green |
| 150 | Discourteous Treatment / Retaliation/Threats / Dishonesty/Falsified Documentation | Red | Red | Red | Red | Green | Red | Red |
| 151 | Neglect of Duty | Red | Green | Red | Gray | Gray | Red | Red |
| 152 | Neglect of Duty | Red | Red | Gray | Gray | Red | Red | Red |
| 153 | Neglect of Duty | Red | Red | Red | Red | Gray | Red | Red |
| 154 | Unreasonable Use of Force | Red | Green | Green | Gray | Red | Green | Green |
| 155 | Discourteous Treatment / Neglect of Duty | Red | Green | Gray | Gray | Red | Red | Red |
| 156 | Unreasonable Use of Force | Green | Green | Red | Gray | Red | Red | Red |
| 157 | Discourteous Treatment | Red | Green | Gray | Gray | Red | Green | Green |
| 158 | Neglect of Duty | Red | Green | Gray | Gray | Green | Green | Green |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|---|---|---|---|---|---|---|---|---|
| 159 | Retaliation/Threats | red | red | green | gray | red | green | green |
| 160 | Retaliation/Threats | green | green | green | gray | red | red | red |
| 161 | Discrimination / Retaliation/Threat | red | green | gray | gray | green | green | green |
| 162 | Discourteous Treatment / Neglect of Duty | red | red | gray | gray | red | red | red |
| 163 | Discourteous Treatment | green | red | gray | gray | green | green | green |
| 164 | Discourteous Treatment | red | green | red | gray | green | green | green |
| 165 | Neglect of Duty | red | red | red | gray | red | red | red |
| 166 | Neglect of Duty | green | red | gray | gray | red | green | green |
| 167 | Neglect of Duty | red | red | gray | gray | red | red | red |
| 168 | Retaliation/Threats / Neglect of Duty | red | red | red | gray | green | green | green |
| 169 | Neglect of Duty | green | red | gray | gray | green | green | green |
| 170 | Discourteous Treatment | red | green | green | gray | red | green | green |
| 171 | Retaliation/Threats / Discourteous Treatment | green | red | gray | gray | green | red | red |
| 172 | Neglect of Duty | red | green | red | gray | green | red | red |
| 173 | Retaliation/Threats / Neglect of Duty / Sexual Misconduct | red | red | gray | gray | gray | red | red |
| 174 | Dishonesty/Falsified Documentation | red | red | gray | gray | gray | green | green |
| 175 | Neglect of Duty / Discourteous Treatment / Retaliation/Threats | red | green | gray | gray | red | red | red |
| 176 | Discourteous Treatment | red | red | gray | gray | gray | red | red |
| 177 | Unreasonable Use of Force | red | red | gray | gray | red | red | red |
| 178 | Retaliation/Threats / Discourteous Treatment | red | green | gray | gray | green | red | red |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| Case | Allegation Types | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interviews | Q4 Subject Interviews | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|------|------------------|:---:|:---:|:---:|:---:|:---:|:---:|:---:|
| 179 | Neglect of Duty | Red | Green | Red | Gray | Gray | Red | Red |
| 180 | Discrimination | Green | Red | Gray | Gray | Gray | Red | Red |
| 181 | Dishonesty/Falsified Documentation Neglect of Duty | Red | Green | Gray | Gray | Green | Red | Red |
| 182 | Retaliation/Threats Dishonesty/Falsified Documentation | Red | Green | Gray | Gray | Red | Red | Red |
| 183 | Discourteous Treatment Discrimination | Red | Red | Gray | Gray | Gray | Red | Red |
| 184 | Neglect of Duty Discourteous Treatment | Red | Red | Gray | Gray | Red | Red | Red |
| 185 | Neglect of Duty Discourteous Treatment | Red | Red | Gray | Gray | Red | Red | Red |
| 186 | Neglect of Duty | Red | Red | Gray | Gray | Green | Green | Green |
| 187 | Discourteous Treatment | Red | Green | Green | Gray | Red | Red | Red |
| 188 | Discourteous Treatment | Red | Green | Green | Green | Red | Green | Green |

*Continued on next page.*

**Appendix C. Detail of Staff Complaint Cases and Outcomes, as Determined by the OIG (cont.)**

| | | Q1 Appropriate Reviewer | Q2 Appellant Interview | Q3 Witness Interview(s) | Q4 Subject Interview(s) | Q5 Relevant Evidence | Q6 Adequate Report | Overall |
|---|---|---|---|---|---|---|---|---|
| **Paper Review Period** | | | | | | | | |
| | Total 🟢 | 25 | 0 | 0 | 0 | 20 | 26 | 27 |
| | Total 🔴 | 36 | 11 | 0 | 0 | 32 | 35 | 34 |
| | Total ⚪ | 0 | 50 | 61 | 61 | 9 | 0 | 0 |
| **Onsite Review Period** | | | | | | | | |
| | Total 🟢 | 43 | 58 | 18 | 3 | 40 | 54 | 57 |
| | Total 🔴 | 84 | 63 | 32 | 3 | 58 | 73 | 70 |
| | Total ⚪ | 0 | 6 | 77 | 121 | 29 | 0 | 0 |
| **Combined Review Periods** | | | | | | | | |
| | Total 🟢 | 68 | 58 | 18 | 3 | 60 | 80 | 84 |
| | Total 🔴 | 120 | 74 | 32 | 3 | 90 | 108 | 104 |
| | Total ⚪ | 0 | 56 | 138 | 182 | 38 | 0 | 0 |

## Appendix D. The Appeal Package: CDCR Form 602 and Attachments A Through F

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | | | |

*FOR STAFF USE ONLY*

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, _only_ one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**        **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| | | | |

**State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):**

A.  Explain your issue (If you need more space, use Section A of the CDCR 602-A): _____
_____
_____
_____

B.  Action requested (If you need more space, use Section B of the CDCR 602-A): _____
_____
_____
_____

**Supporting Documents: Refer to CCR 3084.3.**
☐ Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):
_____      _____
_____      _____

☐ No, I have not attached any supporting documents. Reason : _____
_____
_____
_____

Inmate/Parolee Signature: _____     Date Submitted: _____

☐ **By placing my initials in this box, I waive my right to receive an interview.**

**C.  First Level - Staff Use Only**                          Staff – Check One: Is CDCR 602-A Attached?  ☐ Yes  ☐ No
This appeal has been:
☐ Bypassed at the First Level of Review. Go to Section E.
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____     Interview Location: _____

Your appeal issue is: ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____
See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ Title: _____ Signature: _____ Date completed: _____
                   (Print Name)
Reviewer: _____ Title: _____ Signature: _____
                   (Print Name)
Date received by AC: _____

| AC Use Only |
|---|
| Date mailed/delivered to appellant ____ / ____ / ____ |

*(S T A F F   U S E   O N L Y — printed vertically)*

## Appendix D. The Appeal Package (continued)

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 2

D. **If you are dissatisfied with the First Level response**, explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response.  If you need more space, use Section D of the CDCR 602-A.

_____

Inmate/Parolee Signature: _____    Date Submitted : _____

E. **Second Level - Staff Use Only**    Staff – Check One:  Is CDCR 602-A Attached?  ☐ Yes   ☐ No

This appeal has been:
☐ By-passed at Second Level of Review.  Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____  Date: _____  Date: _____  Date: _____
☐ Cancelled (See attached letter)
☐ Accepted at the Second Level of Review

Assigned to: _____    Title: _____    Date Assigned: _____    Date Due: _____

Second Level Responder:  Complete a Second Level response.  If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: _____    Interview Location: _____

Your appeal issue is:  ☐ Granted    ☐ Granted in Part    ☐ Denied    ☐ Other: _____
See attached letter.  If dissatisfied with Second Level response, complete Section F below.

Interviewer: _____    Title: _____    Signature: _____    Date completed : _____
(Print Name)

Reviewer: _____    Title: _____    Signature: _____
(Print Name)

Date received by AC: _____

**AC Use Only**
Date mailed/delivered to appellant ____ / ____ / ____

F. **If you are dissatisfied with the Second Level response**, explain reason below; attach supporting documents and submit by mail for Third Level Review.  It must be received within 30 calendar days of receipt of prior response.  Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation,  P.O. Box 942883, Sacramento, CA 94283-0001.  If you need more space, use Section F of the CDCR 602-A.

_____

Inmate/Parolee Signature: _____    Date Submitted: _____

G. **Third Level - Staff Use Only**
This appeal has been:
☐ Rejected (See attached letter for instruction) Date: _____  Date: _____  Date: _____  Date: _____  Date: _____
☐ Cancelled (See attached letter)   Date: _____
☐ Accepted at the Third Level of Review.  Your appeal issue is ☐ Granted   ☐ Granted in Part  ☐ Denied   ☐ Other: _____
See attached Third Level response.

**Third Level Use Only**
Date mailed/delivered to appellant ____ / ____ / ____

H. **Request to Withdraw Appeal:**  I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____

_____ Inmate/Parolee Signature: _____    Date: _____
Print Staff Name: _____    Title: _____    Signature: _____    Date: _____

**Appendix D. The Appeal Package (cont.)**

---

Template Date: April 4, 2012
State of California

Attachment A
Department of Corrections and Rehabilitation

# Memorandum

Date    :

To    :

Subject:    DETERMINATION OF STAFF COMPLAINT

The attached appeal from Inmate,            dated        alleges staff misconduct.
Pursuant to Department policy, please review the attached appeal and determine the
following:

Brackets ( ) are for Appeal Coordinator (AC) recommendation, boxes ☐ are for Hiring Authority (HA) determination.

(   )  ☐  Refer to the Office of Internal Affairs (OIA) via CDCR Form 989 for investigation/notification of
direct adverse action (reasonable belief misconduct occurred and adverse action likely).

(   )  ☐  Refer to Institutional Services Unit (ISU) for Allegation Inquiry (additional information needed to
establish likelihood of adverse action per Department Operations Manual (DOM) Section
31140.14.

(   )  ☐  Refer to [                ] for an Appeal Inquiry to be conducted by appropriate supervisory
staff (adverse action unlikely). The Original of the completed "Confidential Supplement to Appeal,
Appeal Inquiry" (Attachment C) is to be forwarded to the Inmate Appeals Office for filing with the
appeal. Inmates/Parolees will not be provided a copy of this confidential report.

(   )  ☐  Process as a routine appeal. Appeal does not meet criteria for assignment as a staff complaint
(no misconduct identified, even if facts as alleged are assumed to be true) — accept, reject or
cancel in accordance with CCR Title 15, Section 3084.5.

**APPEAL SUBJECT TO CANCELLATION IN ACCORDANCE WITH CCR, TITLE 15,
SECTION 3084.6(c):  REASON:**

(   )  ☐  Cancel/Reject with no investigation/inquiry.

(   )  ☐  Cancel.  Assign for review outside Appeal Process via an Inquiry or Investigation
(Offender will *not* be notified, Attachment E not used).

Print name and sign below:

Name:_____ Sign_____    _____
Appeals Coordinator                                Date

Name:_____Sign_____    _____
_ Hiring Authority                                    Date

Appeal Log Number:_____

---

**Appendix D. The Appeal Package (cont.)**

---

Template Date: 4/4/2012                                                                      Attachment B

Date Received in Appeals Office: _____

# APPEAL INQUIRY CHRONOLOGICAL TRACKING WORKSHEET

**Inmate Name:** _____        **CDCR #:** _____

**Appeal Log Number:** _____        **Appeal Category/Issue:** Staff Complaint

To ISU:_____ by:_____ Duplicate:  YES  /  NO

if duplicate : Log #_____ Category:_____
Comments:_____

To ERO:_____ by:_____ Duplicate:  YES  /  NO

if duplicate : Log #_____ Category:_____
Comments:_____

To CDW:_____ by:_____ Date Rec'd:_____

CDW:_____

Returned to Appeals Office/Assigned or Rejected:_____

**Due Date:** _____        **Date Received Complete:** _____

**Comments:**

**ALLEGATIONS INVOLVING THE USE OF EXCESSIVE OR UNNECESSARY FORCE**

Injuries claimed (if any).

Date, time, and place of occurrence:

- Incident Report No: (if available)
- Notification of video interview/medical documentation (if necessary);

1st or 2nd line manager: Associate Warden _____ and Captain _____

Date notified: _____

Appeal Log Number:_____

---

## Appendix D. The Appeal Package (cont.)

Template Date: 4/4/2012                                             Attachment C

**CONFIDENTIAL SUPPLEMENT TO APPEAL**
**"APPEAL/ALLEGATION INQUIRY"**
DO NOT COPY OR DISTRIBUTE EXCEPT PURSUANT TO CCR Title 15, Section 3084.9(i)(3)(B)1.

**Date:**_____

**Appeal Log Number:**_____

**Inmate/Parolee Name:**_____

**CDC Number:**_____

**Assigned Staff: Name and Title** _____

**Date and place of interview:**_____

_____


**Accused Staff Member(s):**
*(Delete all italicized language from final copy) Identify accused staff by first initial, last name, civil service classification and area of assignment.*

**Synopsis of Allegation:**
*Summarize the allegation. Be brief while providing sufficient information to present a complete picture of the allegation(s).*

**Witnesses:** *(Identify witnesses interviewed. Identify requested witnesses not interviewed and note reason (lack of relevance, etc.) If the testimony of any staff witness conflicts with that of other staff witnesses, be sure to include the statements of all staff witnesses. *(See definitions of pertinent witnesses below).*

**Findings:**
*This section will include any additional statements from the person making the allegation, statements from all pertinent witnesses, and accused staff if necessary, along with a detailed description of any other evidence reviewed. Ensure that staff witnesses are identified by first initial, last name, and current assignment and inmates/parolees are identified by name, CDCR number, and current housing.*

*If, during the course of the review, serious misconduct (conduct which would likely lead to Adverse Personnel Action) is discovered or suspected regarding staff, then immediately terminate the review. The reviewer will then notify the hiring authority or designee of the information revealed.*

**Conclusion:**
*Summarize the Appeal Inquiry and include a finding and detailed conclusion relative to the allegations of misconduct. The finding will establish whether the alleged policy was or was not violated with regard to the conduct and whether further administrative actions is necessary. In the case where policy was violated with regard to one or more of the allegations but not all, the response should note that fact. If the inquiry reveals a violation of policy not alleged, it is subject to administrative action, but should not be identified in the finding as a violation of policy with respect to the staff complaint.*

**Note:** If it is determined that the complaint is based upon information the inmate/parolee knew was false and the inmate/parolee made the false allegations with the intent to do harm to the accused or defraud the state for monetary advantage, the interviewer will recommend disciplinary action.

Print and sign below:

Name _____Sign_____      _____
                Interviewer                                                            Date
Name _____Sign_____      _____
                Hiring Authority                                                        Date

*Definition of **pertinent witnesses** is the number of witnesses necessary to reasonably conclude whether:*
  • *Adverse action is likely and the matter is being referred for an investigation*
  • *Evidence or testimony is sufficient to reasonably establish misconduct did not occur or cannot be demonstrated.*

Appeal Log Number:_____

**Appendix D. The Appeal Package (cont.)**

---

Template Date 4/4/2012                                                                                          Attachment D
State of California                                                               Department of Corrections and Rehabilitation

# **M**emorandum

Date
:

To     :     [Insert name of employee]

Subject:     **NOTICE OF INTERVIEW RE: COMPLAINT AGAINST STAFF (CDCR FORM 602) LOG #**

You are instructed to report for an Appeal Inquiry. This interview will be conducted by *(insert name)*. You are the subject of a CDCR Form 602 staff complaint by inmate/parolee*(insert name and number)*, and this interview is being conducted regarding allegations of *(insert allegations)*.

The interview is scheduled as follows

| Date: | Time: |
|---|---|
| Location: | |

You may bring a representative, if you so desire. The representative cannot be a person involved in this matter. You may record any portion of this interview.  If you wish to bring a recording device, check ☐ box and initial here _____.  You will be notified in advance if any further proceedings are contemplated and prior to any subsequent interview.

You are being provided at least 24-hours notice prior to the interview being conducted. If you wish to waive the 24-hour notice requirement, check ☐ box and initial here _____.  If you have any questions or you are unable to appear for this interview, please contact the undersigned staff interviewer at *(insert phone number)*.

This is an ongoing appeal inquiry. Therefore, you are admonished not to discuss this inquiry with anyone other than the assigned interviewer and your representative should you choose to have one.

Please print and sign below:

_____ / _____     _____
Staff Interviewer                                                                                          Date

_____ / _____     _____
Employee                                                                                                     Date

_____ / _____     _____
Server                                                                                                        Date

cc: Employee
Appeal Log Number:_____

**Appendix D. The Appeal Package (cont.)**

Template Date 4/4/2012 — Attachment E-1
State of California — Department of Corrections and Rehabilitation

**Memorandum**

Date
:

To
:   Insert inmate name, # Insert inmate number
Insert inmate housing and institution

Subject    **STAFF COMPLAINT RESPONSE - APPEAL #** ____ *FIRST/SECOND* **LEVEL RESPONSE**
:

APPEAL ISSUE: *Provide a complete account of the issue(s) raised by the inmate. Then include the following:* All issues unrelated to the allegation of staff misconduct must be appealed separately and will not be addressed in this response. You do not exhaust administrative remedies on any unrelated issue not covered in this response or concerning any staff member not identified by you in this complaint. If you are unable to name all involved staff you may request assistance in establishing their identity.

DETERMINATION OF ISSUE: A review of the allegations of staff misconduct presented in the written complaint has been completed. Based upon this review your appeal is *(Select one and delete other two)*:
➢ Being processed as an Appeal Inquiry.
➢ Pending review by ISU as an Allegation Inquiry.
➢ Being referred to Office of Internal Affairs.

**You were interviewed on (date of interview) by (insert staff member's name).** A review of the Test of Adult Basic Education (TABE) list reveals the appellant has a TABE reading score of XXXX. The appellant's Disability Placement Program code is XXXX. The appellant is a participant in the Mental Health Services Delivery System (MHSDS) at the XXXX level of care. During the interview, the interviewer utilized simple English spoken slowly to ensure effective communication. During the interview, the appellant was afforded the opportunity to further explain his appeal issue and to provide any supporting evidence or documents. The appellant reiterated the statements contained in the appeal, demonstrating that effective communication was achieved. (Inmates' statement summarized).

*OR* You will be interviewed during the process of your inquiry/investigation
**Your appeal is PARTIALLY GRANTED in that: *(Select one of three options below and delete the other two)***

*Option One*

*Select one, delete the other)*
➢ An **Appeal Inquiry** will be conducted *(or)*

**Appendix D. The Appeal Package (cont.)**

---

Template Date 4/4/2012                                                    Attachment E-1

### Page 2

➢ The **Appeal inquiry** is complete/ has been reviewed and all issues were adequately addressed.

The following witness(es) will be / were questioned: [insert name(s)]. **[Delete following if not applicable]** *The following witnesses will not be / were not interviewed– give reason: i.e. not relevant etc.* The following information will be / was reviewed as a result of your allegations of staff misconduct: (indicate documents, etc. that will be / or were reviewed).

Staff: ***did*** ☐ ***did not*** ☐ violate CDCR policy with respect to one or more of the issues appealed.

---

*Option Two*
➢ **Allegation Inquiry**
Your appeal has been referred by the hiring authority to a trained investigator to determine whether the evidence warrants an investigation or an inquiry. After the determination has been made your complaint will be processed accordingly and you will be notified of the outcome.

---

*Option Three*
➢ **Investigation**
This matter has been referred to the Office of Internal Affairs for follow-up and a possible investigation. If investigated, upon completion of that investigation, you will be notified as to whether the allegations were SUSTAINED, NOT SUSTAINED, UNFOUNDED, EXONERATED or there was NO FINDING. In the event that the matter is not investigated, but returned by OIA to the institution or region to conduct an Appeal Inquiry, you will be notified upon the completion of that inquiry whether it was determined that staff did, or did not, violate policy.

---

On _____, the Institutional Executive Review Committee (IERC) conducted a review of the allegations. The IERC reviewed and determined [staff member] and [staff member] were in compliance with departmental policy regarding the Use of Force allegations. However, thorough review of all allegations revealed staff did violate California Department of Corrections and Rehabilitation policy with respect to one or more of the issues appealed.

ALL STAFF PERSONNEL MATTERS ARE CONFIDENTIAL IN NATURE.
• As such, the details of any inquiry will not be shared with staff, members of the public, or offender appellants.
• Although you have the right to submit a staff complaint, a request for administrative action regarding staff or the placement of documentation in a staff member's personnel file is beyond the scope of the staff complaint process. A variety of personnel actions may be initiated by the Department based upon the content of your complaint and the outcome of any investigation or inquiry conducted as a result of your complaint.
• Allegations of staff misconduct do not limit or restrict the availability of further relief via the inmate appeals process.

Appeal Log No:_____

**Appendix D. The Appeal Package (cont.)**

Template Date 4/4/2012                                        Attachment E-1

Page 3

If you wish to appeal the decision and/or exhaust administrative remedies, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Secretary's/Third Level of Review. Once a decision has been rendered at the Third Level, administrative remedies will be considered exhausted.

*[Print Name, Sign and Date]:*

Print:_____ Sign: _____ Date: _____
Interviewer

Print:_____ Sign: _____ Date: _____
Reviewing Authority

Appeal Log No:_____

**Appendix D. The Appeal Package (cont.)**

---

Template Date 4/4/2012
State of California

Attachment E-2
Department of Corrections and Rehabilitation

**Memorandum**

Date
:

To
:     Insert inmate name, # Insert inmate number
Insert inmate housing and institution

Subject
:     STAFF COMPLAINT RESPONSE - APPEAL #          *FIRST/SECOND* LEVEL RESPONSE

APPEAL ISSUE:  *Provide a complete account of the issue(s) raised by the inmate. Then include the following:*  All issues unrelated to the allegation of staff misconduct must be appealed separately and will not be addressed in this response.   You do not exhaust administrative remedies on any unrelated issue not covered in this response or concerning any staff member not identified by you in this complaint.  If you are unable to name all involved staff you may request assistance in establishing their identity.

DETERMINATION OF ISSUE: A review of the allegations of staff misconduct presented in the written complaint has been completed. Based upon this review your appeal is *(Select one and delete other two)*:
➢ Being processed as an Appeal Inquiry.
➢ Pending review by ISU as an Allegation Inquiry.
➢ Being referred to Office of Internal Affairs.

You were interviewed on (date of interview) by (insert staff member's name).  A review of the Test of Adult Basic Education (TABE) list reveals the appellant has a TABE reading score of XXXX. The appellant's Disability Placement Program code is XXXX. The appellant is a participant in the Mental Health Services Delivery System (MHSDS) at the XXXX level of care. During the interview, the interviewer utilized simple English spoken slowly to ensure effective communication. During the interview, the appellant was afforded the opportunity to further explain his appeal issue and to provide any supporting evidence or documents. The appellant reiterated the statements contained in the appeal, demonstrating that effective communication was achieved.   (Inmates' statement summarized).

*OR* You will be interviewed during the process of your inquiry/investigation
Your appeal is PARTIALLY GRANTED in that: *(Select one of three options below and delete the other two)*

Option One

Select one, delete the other)
➢ An **Appeal Inquiry** will be conducted *(or)*

**Appendix D. The Appeal Package (cont.)**

Template Date 4/4/2012                                          Attachment E-2

Page 2

> The **Appeal inquiry** is complete/ has been reviewed and all issues were adequately addressed.

The following witness(es) will be / were questioned: [insert name(s)]. **[Delete following if not applicable]** *The following witnesses will not be / were not interviewed– give reason: i.e. not relevant etc.* The following information will be / was reviewed as a result of your allegations of staff misconduct: (indicate documents, etc. that will be / or were reviewed).

Staff: *did* ☐  *did not* ☐ violate CDCR policy with respect to one or more of the issues appealed.

---

Option Two
> **Allegation Inquiry**

Your appeal has been referred by the hiring authority to a trained investigator to determine whether the evidence warrants an investigation or an inquiry.  After the determination has been made your complaint will be processed accordingly and you will be notified of the outcome.

---

Option Three
> **Investigation**

This matter has been referred to the Office of Internal Affairs for follow-up and a possible investigation.  If investigated, upon completion of that investigation, you will be notified as to whether the allegations were SUSTAINED, NOT SUSTAINED, UNFOUNDED, EXONERATED or there was NO FINDING.  In the event that the matter is not investigated, but returned by OIA to the institution or region to conduct an Appeal Inquiry, you will be notified upon the completion of that inquiry whether it was determined that staff did, or did not, violate policy.

---

On _____, the Institutional Executive Review Committee (IERC) conducted a review of the allegations.  The IERC reviewed and determined _____ and _____ were / were not in compliance with departmental policy regarding the Use of Force allegations.  However, thorough review of all allegations revealed staff did  or did not violate California Department of Corrections and Rehabilitation policy with respect to one or more of the issues appealed.

ALL STAFF PERSONNEL MATTERS ARE CONFIDENTIAL IN NATURE.
- As such, the details of any inquiry will not be shared with staff, members of the public, or offender appellants.
- Although you have the right to submit a staff complaint, a request for administrative action regarding staff or the placement of documentation in a staff member's personnel file is beyond the scope of the staff complaint process.  A variety of personnel actions may be initiated by the Department based upon the content of your complaint and the outcome of any investigation or inquiry conducted as a result of your complaint.
- Allegations of staff misconduct do not limit or restrict the availability of further relief via the inmate appeals process.

Appeal Log No:_____

**Appendix D. The Appeal Package (cont.)**

Template Date 4/4/2012                                    Attachment E-2

Page 3

If you wish to appeal the decision and/or exhaust administrative remedies, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Secretary's/Third Level of Review. Once a decision has been rendered at the Third Level, administrative remedies will be considered exhausted.

*[Print Name, Sign and Date]:*

Print:_____ Sign: _____ Date: _____
Interviewer

Print:_____ Sign: _____ Date: _____
Reviewing Authority

Appeal Log No:_____

**Appendix D. The Appeal Package (cont.)**

---

Template date 4/4/2012                                              Attachment F
State of California                          Department of Corrections and Rehabilitation

# **M**emorandum

Date
:

To        :

Subject:    **ADVISEMENT OF RIGHTS – APPEAL INQUIRY (CDCR FORM 602 - COMPLAINT
AGAINST STAFF Log #*(insert log number)***

The date is *(insert date)*. The time is approximately *(insert time)*.

You are a subject of a staff complaint by an inmate/parolee *(insert name and number)*

This is an official Appeal Inquiry concerning the California Department of Corrections
and Rehabilitation, involving an allegation(s) of staff misconduct *(briefly describe the
nature of the inquiry)*. The inquiry is being conducted at *(insert location)*. The
individual conducting this interview is *(insert name)*. Also present and their interests
in this matter is/are *(insert name and specify interest)*.

This is a CDCR Form 602 Appeal Inquiry and, as such, you do not have the right to
refuse to answer. The truth is expected, as is your entire knowledge relative to items
discussed. Refusal to respond or answer questions relating to the performance of
your duties can be grounds for adverse personnel action, which could result in your
dismissal from the Department. If you do answer, none of your statements nor any
information or evidence which is gained by reason of such statements can be used
against you in any criminal proceedings.

No promise or reward will be made as an inducement for the answer to any question.

The Department cannot initiate a recording without your permission but if you choose
to record the interview the Department must conduct a separate recording. You may
record any portion of this interview. You will be notified in advance if any further
proceedings are contemplated and prior to any subsequent interview or
interrogation.

You have the right to be represented by an individual of your choice who may be
present at all times during your interview, providing the person chosen is not a
witness or subject of this inquiry. Your representative may ask to have questions
clarified, may suggest that you give a more complete answer, may object to
questions outside the announced scope of the appeal inquiry, and may object to
what he or she believes is harassment of you. However, your representative cannot
impede the progress of the interview nor can he or she direct you not to answer any
of the questions asked of you. Your understanding and acceptance of the conditions
specified are denoted here: (initials) _____

If it is requested that this interview be recorded, each person present is required to
identify himself/herself and his/her voice on the tape/recording by stating his/her
name, title, and/or classification, and place of employment when applicable (be sure

Appeal Log #

**Appendix D. The Appeal Package (cont.)**

Template date 4/4/2012                                                          Attachment F

Page 2

to record each individual).   Your recording belongs to you but the Department's recording will be kept with the CDCR Form 602.

Understood & accepted? Initial(s) here _____.

If interview is being taped and a copy provided: initial here _____.

| RECORDING(S) LEAVE BLANK IF NO RECORDING MADE | | | |
|---|---|---|---|
| WHOSE EQUIPMENT WAS USED? ☐ DEPARTMENTS ☐ OTHER | WERE OTHER RECORDINGS MADE? ☐ NO ☐ YES, BY: | HOW MANY STORAGE DEVICES WERE REQUIRED TO RECORD PROCEEDINGS? Specify Here:▶ | No. |
| RECORDING DEVICE | | | |
| ☐ COMPACT DISC ☐ CASSETTE TAPE ☐ DIGITAL VOICE RECORDER ☐ OTHER _____ | | | |
| ☐ RECORDING I.D. NUMBER | STARTING MARK | ENDING MARK | TOPIC |
| | | | |

Print and sign below:

_____/_____                    _____
Staff Interviewer                                        Date

Appeal Log #

# Special Review of Salinas Valley State Prison's Processing of Inmate Allegations of Staff Misconduct

OFFICE *of the* INSPECTOR GENERAL

*Roy W. Wesley*
Inspector General

*Bryan B. Beyer*
Chief Deputy Inspector General

STATE *of* CALIFORNIA
January 2019

OIG