# Exhibit YY



# COMPSTAT DAI Statistical Report - 13 Month

**Data Analysis 13 Month as of 07-11-2019**
Location(s): CAC, CCI, COR, HDSP, KVSP, LAC, PBSP, SAC, SATF, SVSP



| | | 2018 | | | | | | | | 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **Apr** | **May** |
| **CAC** | **Custody Operations** | | | | | | | | | | | | | |
| | **Total Bed Capacity** | | | | | | | | | | | | | |
| | Blueprint Crowding Capacity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Maximum Capacity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Design Beds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Inmate Count | 2,262 | 2,239 | 2,166 | 2,259 | 2,397 | 2,475 | 2,463 | 2,512 | 2,492 | 2,418 | 2,434 | 2,432 | 2,466 |
| | **% Institution Filled to Blueprint Crowding Capacity** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** |
| | **Inmate Security Level** | | | | | | | | | | | | | |
| | Inmate Level I (Classification Score of 0-18) | 218 | 194 | 162 | 157 | 163 | 186 | 192 | 204 | 204 | 188 | 196 | 209 | 244 |
| | Out of Bed Level I Assignments | 78 | 74 | 58 | 63 | 59 | 63 | 60 | 68 | 66 | 61 | 69 | 71 | 74 |
| | **% of Out of Level I Assignments** | **36 %** | **38 %** | **36 %** | **40 %** | **36 %** | **34 %** | **31 %** | **33 %** | **32 %** | **32 %** | **35 %** | **34 %** | **30 %** |
| | Inmate Level II (Classification Score of 19-35) | 1,829 | 1,828 | 1,786 | 1,852 | 1,976 | 2,038 | 2,014 | 2,041 | 2,028 | 1,984 | 1,996 | 1,992 | 1,999 |
| | Out of Bed Level II Assignments | 3 | 2 | 7 | 7 | 8 | 11 | 7 | 6 | 6 | 8 | 8 | 8 | 5 |
| | **% of Out of Level II Assignments** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **1 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** | **0 %** |
| | Inmate Level III (Classification Score of 36-59) | 211 | 214 | 205 | 242 | 250 | 243 | 252 | 256 | 245 | 235 | 231 | 224 | 217 |
| | Out of Bed Level III Assignments | 15 | 21 | 20 | 17 | 26 | 25 | 24 | 28 | 25 | 21 | 25 | 21 | 19 |
| | **% of Out of Level III Assignments** | **7 %** | **10 %** | **10 %** | **7 %** | **10 %** | **10 %** | **10 %** | **11 %** | **10 %** | **9 %** | **11 %** | **9 %** | **9 %** |
| | Inmate Level IV (Classification Score of 60+) | 4 | 3 | 13 | 8 | 8 | 8 | 5 | 11 | 15 | 11 | 11 | 7 | 6 |
| | Out of Bed Level IV Assignments | 0 | 0 | 1 | 0 | 0 | 1 | 2 | 2 | 1 | 2 | 0 | 0 | 2 |
| | **% of Out of Level IV Assignments** | **0 %** | **0 %** | **8 %** | **0 %** | **0 %** | **13 %** | **40 %** | **18 %** | **7 %** | **18 %** | **0 %** | **0 %** | **33 %** |
| | **Camps** | | | | | | | | | | | | | |
| | *Camps (CMC, CRC only)* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* |
| | Camps | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | *Pipeline* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* | *0* |



# COMPSTAT DAI Statistical Report - 13 Month

**Data Analysis 13 Month as of 07-11-2019**
Location(s):  CAC, CCI, COR, HDSP, KVSP, LAC, PBSP, SAC, SATF, SVSP



| | | 2018 | | | | | | | | 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **Apr** | **May** |
| **HDSP** | Attempted Homicide - Inmate | 1 | 3 | 2 | 1 | 5 | 3 | 2 | 3 | 0 | 2 | 1 | 0 | 0 |
| | Homicide | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Expected Death | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Unexpected Death | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 0 |
| | **Total Inmate Deaths** | **1** | **0** | **1** | **0** | **0** | **0** | **0** | **2** | **3** | **0** | **0** | **0** | **0** |
| | Controlled Cell Phone Discoveries | 3 | 2 | 9 | 6 | 2 | 5 | 11 | 6 | 15 | 8 | 3 | 4 | 26 |
| | Uncontrolled Cell Phone Discoveries | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| | Cell Phone Seizures | 8 | 2 | 10 | 6 | 2 | 5 | 11 | 8 | 15 | 8 | 3 | 4 | 26 |
| | Fighting | 11 | 8 | 7 | 5 | 10 | 12 | 6 | 11 | 6 | 5 | 9 | 10 | 3 |
| | Miscellaneous | 10 | 5 | 5 | 7 | 6 | 13 | 11 | 12 | 7 | 4 | 10 | 7 | 12 |
| | **Incidents Involving Mental Health Inmates** | | | | | | | | | | | | | |
| | Number of Non UOF Incidents Involving Mental Health Inmates | 12 | 7 | 12 | 12 | 10 | 18 | 9 | 15 | 14 | 6 | 14 | 15 | 14 |
| | **% of Non UOF Incidents Involving Mental Health Inmates** | **34 %** | **33 %** | **41 %** | **29 %** | **45 %** | **46 %** | **24 %** | **39 %** | **42 %** | **25 %** | **48 %** | **58 %** | **39 %** |
| | Number of UOF Incidents Involving Mental Health Inmates | 22 | 21 | 22 | 18 | 21 | 19 | 18 | 27 | 20 | 12 | 14 | 28 | 20 |
| | **% of UOF Incidents Involving Mental Health Inmates** | **76 %** | **75 %** | **81 %** | **64 %** | **64 %** | **58 %** | **64 %** | **63 %** | **71 %** | **52 %** | **58 %** | **74 %** | **69 %** |
| | **Contraband Surveillance Watch (CSW)** | | | | | | | | | | | | | |
| | Inmate Placements on CSW | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Count of CSW Items Recovered | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | CSW Search Warrants Requested | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Inmate Placements Exceeding 3 Days On CSW | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Inmate Placements Exceeding 6 Days On CSW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **In Cell Violence/Incidents** | | | | | | | | | | | | | |



# COMPSTAT DAI Statistical Report - 13 Month

**Data Analysis 13 Month as of 07-11-2019**
Location(s):  CAC, CCI, COR, HDSP, KVSP, LAC, PBSP, SAC, SATF, SVSP



| | | 2018 | | | | | | | | 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **Apr** | **May** |
| **LAC** | Attempted Homicide - Inmate | 1 | 1 | 1 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 1 | 1 | 1 |
| | Homicide | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Expected Death | 3 | 0 | 1 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| | Unexpected Death | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 1 |
| | **Total Inmate Deaths** | **4** | **0** | **1** | **1** | **3** | **1** | **1** | **1** | **0** | **1** | **1** | **4** | **1** |
| | Controlled Cell Phone Discoveries | 24 | 38 | 60 | 86 | 26 | 66 | 32 | 31 | 35 | 53 | 46 | 60 | 57 |
| | Uncontrolled Cell Phone Discoveries | 10 | 12 | 10 | 12 | 2 | 1 | 0 | 14 | 11 | 10 | 1 | 4 | 1 |
| | Cell Phone Seizures | 34 | 50 | 70 | 98 | 28 | 67 | 32 | 45 | 46 | 63 | 47 | 64 | 58 |
| | Fighting | 19 | 11 | 19 | 17 | 18 | 18 | 23 | 16 | 25 | 17 | 18 | 16 | 31 |
| | Miscellaneous | 17 | 5 | 8 | 9 | 12 | 16 | 6 | 6 | 14 | 9 | 14 | 16 | 14 |
| | **Incidents Involving Mental Health Inmates** | | | | | | | | | | | | | |
| | Number of Non UOF Incidents Involving Mental Health Inmates | 37 | 25 | 31 | 42 | 41 | 41 | 37 | 20 | 32 | 27 | 33 | 37 | 42 |
| | **% of Non UOF Incidents Involving Mental Health Inmates** | **71 %** | **64 %** | **67 %** | **79 %** | **72 %** | **75 %** | **77 %** | **69 %** | **78 %** | **68 %** | **80 %** | **74 %** | **75 %** |
| | Number of UOF Incidents Involving Mental Health Inmates | 49 | 38 | 42 | 42 | 47 | 42 | 35 | 28 | 45 | 29 | 40 | 46 | 50 |
| | **% of UOF Incidents Involving Mental Health Inmates** | **88 %** | **93 %** | **82 %** | **78 %** | **84 %** | **89 %** | **73 %** | **90 %** | **88 %** | **88 %** | **87 %** | **85 %** | **81 %** |
| | **Contraband Surveillance Watch (CSW)** | | | | | | | | | | | | | |
| | Inmate Placements on CSW | 1 | 1 | 1 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | Count of CSW Items Recovered | 1 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | CSW Search Warrants Requested | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Inmate Placements Exceeding 3 Days On CSW | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Inmate Placements Exceeding 6 Days On CSW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **In Cell Violence/Incidents** | | | | | | | | | | | | | |





# COMPSTAT DAI Statistical Report - 13 Month

**Data Analysis 13 Month as of 07-11-2019**
Location(s):  CAC, CCI, COR, HDSP, KVSP, LAC, PBSP, SAC, SATF, SVSP



|  |  | 2018 |  |  |  |  |  |  |  | 2019 |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **Apr** | **May** |
| **SAC** | Attempted Homicide - Inmate | 2 | 1 | 4 | 1 | 0 | 3 | 1 | 2 | 2 | 1 | 0 | 3 | 1 |
|  | Homicide | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
|  | Expected Death | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | Unexpected Death | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 |
|  | **Total Inmate Deaths** | **0** | **0** | **2** | **2** | **1** | **0** | **1** | **1** | **3** | **0** | **1** | **0** | **1** |
|  | Controlled Cell Phone Discoveries | 88 | 67 | 69 | 7 | 67 | 43 | 62 | 54 | 49 | 83 | 0 | 44 | 29 |
|  | Uncontrolled Cell Phone Discoveries | 16 | 0 | 15 | 0 | 27 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
|  | Cell Phone Seizures | 104 | 67 | 84 | 7 | 94 | 50 | 62 | 54 | 49 | 83 | 0 | 44 | 31 |
|  | Fighting | 9 | 4 | 6 | 10 | 4 | 8 | 7 | 9 | 8 | 7 | 2 | 10 | 17 |
|  | Miscellaneous | 5 | 5 | 5 | 8 | 5 | 9 | 7 | 9 | 6 | 8 | 8 | 8 | 10 |
|  | **Incidents Involving Mental Health Inmates** |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | Number of Non UOF Incidents Involving Mental Health Inmates | 54 | 54 | 45 | 55 | 42 | 45 | 64 | 50 | 47 | 47 | 51 | 38 | 62 |
|  | **% of Non UOF Incidents Involving Mental Health Inmates** | **92 %** | **86 %** | **82 %** | **83 %** | **79 %** | **79 %** | **83 %** | **79 %** | **87 %** | **69 %** | **88 %** | **84 %** | **79 %** |
|  | Number of UOF Incidents Involving Mental Health Inmates | 55 | 40 | 18 | 47 | 40 | 45 | 44 | 39 | 49 | 32 | 45 | 55 | 45 |
|  | **% of UOF Incidents Involving Mental Health Inmates** | **90 %** | **83 %** | **82 %** | **90 %** | **93 %** | **87 %** | **94 %** | **98 %** | **89 %** | **84 %** | **98 %** | **93 %** | **88 %** |
|  | **Contraband Surveillance Watch (CSW)** |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | Inmate Placements on CSW | 1 | 0 | 1 | 0 | 2 | 0 | 3 | 3 | 2 | 1 | 1 | 1 | 0 |
|  | Count of CSW Items Recovered | 1 | 0 | 1 | 0 | 2 | 0 | 3 | 3 | 0 | 1 | 0 | 1 | 0 |
|  | CSW Search Warrants Requested | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | Inmate Placements Exceeding 3 Days On CSW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
|  | Inmate Placements Exceeding 6 Days On CSW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | **In Cell Violence/Incidents** |  |  |  |  |  |  |  |  |  |  |  |  |  |



# COMPSTAT DAI Statistical Report - 13 Month

**Data Analysis 13 Month as of 07-11-2019**
Location(s):   CAC,  CCI,  COR,  HDSP,  KVSP,  LAC,  PBSP,  SAC,  SATF,  SVSP



| | | 2018 | | | | | | | | 2019 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Jan** | **Feb** | **Mar** | **Apr** | **May** |
| **SVSP** | Attempted Homicide - Inmate | 0 | 2 | 1 | 0 | 1 | 1 | 0 | 3 | 2 | 0 | 1 | 1 | 0 |
| | Homicide | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Expected Death | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| | Unexpected Death | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| | **Total Inmate Deaths** | **0** | **1** | **1** | **2** | **1** | **2** | **0** | **1** | **0** | **0** | **0** | **1** | **1** |
| | Controlled Cell Phone Discoveries | 40 | 37 | 43 | 35 | 50 | 36 | 80 | 34 | 35 | 64 | 76 | 104 | 80 |
| | Uncontrolled Cell Phone Discoveries | 10 | 48 | 12 | 20 | 20 | 18 | 26 | 5 | 39 | 27 | 20 | 41 | 54 |
| | Cell Phone Seizures | 50 | 85 | 55 | 55 | 70 | 54 | 106 | 39 | 74 | 91 | 96 | 145 | 134 |
| | Fighting | 20 | 8 | 16 | 9 | 24 | 18 | 13 | 23 | 17 | 20 | 23 | 13 | 18 |
| | Miscellaneous | 6 | 8 | 8 | 5 | 8 | 10 | 7 | 6 | 8 | 12 | 12 | 16 | 14 |
| | **Incidents Involving Mental Health Inmates** | | | | | | | | | | | | | |
| | Number of Non UOF Incidents Involving Mental Health Inmates | 37 | 37 | 37 | 40 | 35 | 26 | 40 | 27 | 27 | 48 | 36 | 54 | 51 |
| | **% of Non UOF Incidents Involving Mental Health Inmates** | **70 %** | **77 %** | **70 %** | **71 %** | **59 %** | **50 %** | **65 %** | **68 %** | **59 %** | **71 %** | **65 %** | **62 %** | **66 %** |
| | Number of UOF Incidents Involving Mental Health Inmates | 38 | 28 | 33 | 37 | 51 | 49 | 38 | 44 | 43 | 41 | 37 | 40 | 41 |
| | **% of UOF Incidents Involving Mental Health Inmates** | **86 %** | **74 %** | **75 %** | **77 %** | **82 %** | **89 %** | **88 %** | **80 %** | **84 %** | **79 %** | **70 %** | **77 %** | **82 %** |
| | **Contraband Surveillance Watch (CSW)** | | | | | | | | | | | | | |
| | Inmate Placements on CSW | 2 | 3 | 3 | 1 | 4 | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 1 |
| | Count of CSW Items Recovered | 2 | 1 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 1 |
| | CSW Search Warrants Requested | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Inmate Placements Exceeding 3 Days On CSW | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Inmate Placements Exceeding 6 Days On CSW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **In Cell Violence/Incidents** | | | | | | | | | | | | | |

Exhibit \ \

**Robert A. Barton**
**Inspector General**

# Office of the Inspector General

# 2015
# Special Review:
# High Desert State Prison
# Susanville, CA



**December 2015**

**Fairness ◆ Integrity ◆ Respect ◆ Service ◆ Transparency**

# Office of the Inspector General
# 2015 Special Review:
# High Desert State Prison



Robert A. Barton
*Inspector General*

Roy W. Wesley
*Chief Deputy Inspector General*

10111 Old Placerville Road, Suite 110
Sacramento, CA 95827
Telephone: 916-255-1102
Facsimile: 916-255-1403

December 2015

# Table of Contents

FOREWORD ...................................................................................................... i

    Scope, Methodology, and Objective .......................................................... i

    Summary of Findings................................................................................ ii

BACKGROUND .............................................................................................. 1

    High Desert State Prison ........................................................................... 1

    Media Attention, Legislative Scrutiny, and Past OIG Reports ................... 3

ENTRENCHED CULTURE .............................................................................. 7

    Remote Location ...................................................................................... 7

    The Susanville "Car" Mentality and Code of Silence ............................... 9

    Peer Review ............................................................................................. 9

    Racism and Implicit Bias ........................................................................ 11

    The Need For Increased Inmate Programming and Staff Resiliency Training........ 13

    The California Correctional Peace Officers Association........................... 15

    Recommendations to CDCR.................................................................... 17

SEX OFFENDERS AND THE R SUFFIX ....................................................... 19

    R Suffix.................................................................................................. 19

    SOMS Access ........................................................................................ 20

    Recommendations to CDCR.................................................................... 21

SENSITIVE NEEDS YARDS ......................................................................... 22

    Recommendations to CDCR.................................................................... 26

INMATE APPEALS AND STAFF COMPLAINTS ......................................... 27

    Appeal Collection and Processing ........................................................... 27

    Volume of Appeals at HDSP ................................................................... 28

    Staff Complaints .................................................................................... 29

    Disincentives to Filing Staff Complaints................................................. 31

    Recommendations to CDCR.................................................................... 32

USE OF FORCE INCIDENTS......................................................................... 34

    HDSP Use of Force Frequency ............................................................... 34

    The Need For Cameras in All Inmate Areas............................................. 36

    The Need to Pilot a Program Using Body Cameras ................................. 37

    Allegations That Staff Are Slow to Respond to Incidents......................... 38

    Recommendations to CDCR.................................................................... 39

*ARMSTRONG* REMEDIAL PLAN–ADA INMATES.................................................... 40

    Disability Placement Program ............................................................ 40

    Callous Treatment of DPP Inmates..................................................... 41

    Internal Compliance Reviews and Plaintiff Tours.............................. 42

    Recommendations to CDCR................................................................ 47

INTERNAL AFFAIRS INVESTIGATIONS ........................................................ 48

    Hiring Authority Referrals and Internal Allegation Inquiries................ 48

    Allegations of Misconduct Involving HDSP Staff ................................ 49

    Office of Internal Affairs Resident Agents ......................................... 53

    Recommendations To CDCR ............................................................. 54

FINDINGS AND RECOMMENDATIONS........................................................... 55

CONCLUSION........................................................................................... 61

APPENDICES ........................................................................................... 63

    Appendix A–Senate Rules Committee Authorization Letter………………….…...64

    Appendix B–CDCR Memorandum: Enhanced Program Facility Institutions….....66

    Appendix C–CDCR Memorandum: Secure Appeal Collection Sites and Related

        Matters...............................................................................................69

    Appendix D–CDCR Zero Tolerance Regarding the Code of Silence…………..…71

    Appendix E–Peer Review–High Desert State Prison………………………..……72

    Appendix F–Police Racial Violence: Lessons From Social Psychology………....89

    Appendix G–Center for Mindfulness in Corrections…………………………..…105

    Appendix H–Average Number of Incidents per 100 Inmates, June 2014-June

        2015………………………………………………………….…………107

    Appendix I–Average Number of Inmate Disciplinary Actions per 100 Inmates June

        2014-June 2015 ………..…...........................................................…...108

    Appendix J–WCI Taser Body Camera Pilot…………………………….......…….109

# FOREWORD

On June 25, 2015, the Office of the Inspector General (OIG) received a request and authorization[1] from the Senate Committee on Rules, to review the practices at High Desert State Prison (HDSP) in Susanville, California, with respect to:

1. Excessive use of force against inmates,
2. Internal reviews of incidents involving excessive use of force against inmates,
3. Protection of inmates from assault and harm by others, and
4. *Armstrong* class inmates.[2]

In its request, the Senate Committee reported that a number of allegations surfaced that raised concerns about the safety of both inmates and staff. As part of this review, the OIG requested the California Department of Corrections and Rehabilitation's (CDCR or the department) Office of Internal Affairs (OIA) immediately open expedited investigations into each allegation; the OIG is monitoring these investigations. The incidents are discussed later in this report. In addition to these specific incidents, the Senate Committee noted that there have also been general allegations asserted that some members of custody staff at HDSP refer to inmates as "sodomites" or "sex offenders" in the presence of other inmates and disclose inmates' commitment offenses, placing inmates at risk of harm from other inmates.

Ultimately, this review is intended to determine whether there is a culture among the custody staff at HDSP that contradicts the CDCR's paramount objective of ensuring the safety of both inmates and staff in the prison system.

## SCOPE, METHODOLOGY, AND OBJECTIVE

The scope of this special review encompasses the areas of the Senate Committee on Rules' request described above, along with the statutory mandate of Penal Code (PC) Section 6126, which requires the OIG to identify areas of full and partial compliance, or noncompliance, with departmental policies and procedures, specify deficiencies in the completion and documentation of processes, and recommend corrective actions, including, but not limited to, additional training, additional policies, or changes in policy, as well as any other findings or recommendations deemed appropriate.

During the course of its review, the OIG examined applicable laws, policies, and procedures; revisited past reports and media accounts; interviewed staff and inmates formerly assigned to HDSP; reviewed complaints filed by former HDSP staff and deposition testimony from the *Jones v. Cate* litigation; reviewed inmate appeals, disciplinary actions, confidential inmate files, and complaints against staff; reviewed misconduct allegation inquiry reports, internal affairs investigation reports, and death review reports; and actively monitored 20 misconduct investigations involving HDSP staff.

---

[1] A copy of the authorization can be found in Appendix A.
[2] The *Armstrong* class action lawsuit is discussed in detail on page 40 of this report.

## SUMMARY OF FINDINGS

There is evidence that a perception of insularity and indifference to inmates exists at High Desert State Prison, exacerbated by the unique geographical isolation, the high stress environment, and a labor organization that opposes oversight to the point of actively discouraging members from coming forward with information that could in any way adversely affect another officer. These aspects coupled with the difficult missions at HDSP have helped create an entrenched culture of self-protection and loyalty to HDSP above everything else.

Accounts from both staff and inmates depict a culture of indifference perpetuated by at least some staff. Reports from inmates of appeals being read and destroyed and officers using profane and derogatory language directed at inmates were corroborated by at least some staff.

The conflicting missions at HDSP make it difficult for vulnerable inmates, whether by commitment offense or disability, to program safely. Hardline officers run some yards with little regard for vulnerable inmates. The most extreme example is the Level IV sensitive needs yard (SNY) facility, which is just as violent as the general population (GP) yards, with gang politics meting out abuse and punishment for drug and gambling debts and extorting vulnerable inmates for protection, all of which is exacerbated by the tacit acquiescence of custody staff.

The department's use of the R suffix to designate the restricted custody of certain inmates has served as a bull's-eye target at HDSP and other prisons, most notably on SNY yards. Based upon this review and observations in prior OIG reports, the continued use of sensitive needs yards merits a complete overhaul.

The inmate appeals system at HDSP is not functioning adequately and the staff complaint process is broken. Very few staff complaints were referred for investigation and those that were referred have not been adequately monitored and tracked for response. Also, HDSP does not have a process for addressing officers who are repeatedly accused of misconduct by different inmates. There are statistical trends, continued complaints, and recent misconduct allegations that cause alarm about the use of force at HDSP.

Finally, the OIG found that the use of resident agents by the Office of Internal Affairs is a poor practice, and should be discontinued, especially at HDSP in light of the issues that arose from the placement of a resident agent at that institution. Additionally, the processes in place for allegation inquiries at HDSP are inadequate, and could be improved statewide. The OIG is monitoring several misconduct investigations that, but for this review, may not have been opened or investigated to the broadest extent appropriate. Because the investigations have not been completed, only the general facts are discussed in this report, but results will be published in a future OIG Semi-Annual Report. The OIG made 7 broad findings and 45 specific recommendations during this review (see pages 55 to 60 for a detailed list).

--- ROBERT A. BARTON, INSPECTOR GENERAL

# BACKGROUND

## HIGH DESERT STATE PRISON

In 1995, the department activated High Desert State Prison adjacent to the grounds of the California Correctional Center (CCC), in Susanville, CA. Since its activation 20 years ago, HDSP has undergone continuing changes to its mission, and today each facility houses a population uniquely different from the adjacent yards. According to CDCR's website, the primary mission of HDSP is to provide for the housing[3] and programming of general population and sensitive needs high security (Level IV) and sensitive needs medium security (Level III) inmates. The inmate population consists of three Level IV yards, two of which are 180-degree design buildings (Facility C and Facility D), and one 270 design building (Facility B). Facility B was converted to a sensitive needs yard in October 2007, which houses Level IV SNY inmates.

| HDSP Facility | Housing Type | Custody Level | Number of Housing Unit Buildings |
|---|---|---|---|
| A | SNY | III | 4 |
| A | Reentry Hub | III | 1 |
| B | SNY | IV | 5 |
| C | EPF | IV | 8 |
| D | GP | IV | 7 |
| D | ASU | III/IV | 1 |
| E | MSF | I | 2 |
| Z | ASU | III/IV | 1 |

In mid-2015, Facility A was converted from a Level III general population yard to a Level III sensitive needs yard. The stated purpose of the conversion was to: 1) assist the department in reducing the number of Level III GP vacancies and reduce current Level III SNY overcrowding; 2) further allow increased Reception Centers (RC) inmate movement, and mitigate potential inmate backlogs in the RC, which impede CDCR's ability to accommodate weekly county intake; and 3) assist in efforts to meet the Level III SNY crowding standard, as outlined in *The Future of California Corrections Blueprint.* Facility A is also the home of the Reentry Hub Facility, which has the goal of providing relevant training and services to eligible and interested inmates in order to facilitate the successful transition back to their communities and reduce their likelihood of reoffending.

---

[3] An inmate's classification determines the type of housing in which he will be placed. Level I or II inmates may be housed in open dormitory settings. Level III and IV inmates are placed in 180-degree design or 270 celled housing units. The number of degrees refers to view from a central elevated control booth. The "180-degree" design is a configuration of the cellblocks (housing units). The cellblocks are partitioned into three separate, self-contained sections, forming a half circle (180 degrees). The partitioning of sections, blocks, and facilities ensures maximum control of movement and quick isolation of disruptive incidents, thereby ensuring effective overall management of inmates.

On January 1, 2014, Facility C became the location of one of CDCR's seven enhanced program facilities (EPF). According to CDCR's EPF activation memo,[4] EPFs are designed to "offer incentives for inmates who, based on their own behaviors and choices, are ready to take full advantage of programming opportunities." The EPFs are designed to provide programs and privileges not readily available on other yards, such as advanced college degree programs, increased canteen draw, and an expanded property allowance, with the goal to incentivize and reinforce positive behavior. While HDSP Facility C has been designated an EPF for nearly two years, it appears to be an EPF in name only, as staff estimate that 95 percent of the inmates in the EPF do not meet the criteria, and are only placed there because they meet the general Level IV housing criteria, with no enemy concerns, and not because they voiced a desire to participate in enhanced programming.

HDSP's Facility E is the minimum support facility (MSF), which houses non-camp eligible Level I inmates who perform job duties in various areas of the institution outside the secure perimeter.

The Administrative Segregation Unit (ASU) was originally located on Facility D, a 180-design housing unit, and consisted of two buildings, D7 and D8. Within the first three years of HDSP's activation, it became apparent that the building originally designed and designated as the ASU was not adequate to meet the demands of the inmate population who require segregated housing. Construction on a new stand-alone ASU began in October 2001. The new unit was named Facility Z and activated in September 2004, but buildings D7 and D8 continued to also serve as ASU beds, until just recently, when building D7 reverted back to GP housing.

Finally, while this area is addressed in depth later in this report, it should be noted that HDSP has been a designated Disability Placement Program (DPP) institution since at least 1997. This means that inmates with verified disabilities impacting their placement (such as wheelchair users or inmates with impairments to their mobility, vision, hearing, or speech) can be housed at HDSP, with the expectation that these inmates will be provided access to programs and services, with reasonable accommodation when required. The requirements of the DPP are laid out in the *Armstrong* court-ordered remedial plan. *Armstrong* is a class action lawsuit brought under the Americans with Disabilities Act (ADA) and the Rehabilitation Act in 1994, on behalf of inmates and parolees with disabilities.

No two yards at HDSP have the same mission. According to CDCR, the design capacity for housing inmates at HDSP is 2,324 with a staffed capacity of 3,461.[5] While the actual number of inmates housed at the prison changes daily, the total number of inmates housed at HDSP on November 30, 2015, was 3,482, or 149.8 percent of its design capacity.

---

[4] A copy of the EPF memo can be found in Appendix B.
[5] http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Monthly/TPOP1A/TPOP1Ad1511.pdf

In the last eight years, HDSP has had six different wardens or acting wardens. Suzanne Peery was the acting warden at HDSP from February 2, 2015, until December 1, 2015. Peery has spent her entire corrections career in Susanville, starting at CCC in 1988 before transferring to HDSP in 2006 as the employee relations officer, and ultimately working her way up to Chief Deputy Warden before being named acting warden.

Adjacent to HDSP is the California Correctional Center, which houses approximately 2,196 inmates with responsibility for an additional 1,726 inmates assigned to fire camps, giving it a total population of 3,922 inmates. It is also worth noting that located 37 miles south of Susanville is Federal Correctional Institution, Herlong, a medium security federal correctional institution with an adjacent minimum security satellite camp, which houses approximately 1,445 male offenders.

## MEDIA ATTENTION, LEGISLATIVE SCRUTINY, AND PAST OIG REPORTS

### 2007 PBS documentary: Prison Town, USA

Susanville was the subject of a 2007 PBS documentary titled Prison Town, USA. The program focused on the prison building boom and the common practice of siting prisons in rural towns, due to the "NIMBY" (Not In My Back Yard) policies of large metropolitan cities, coupled with the desire of city officials to generate jobs in rural communities that have suffered an economic downturn due to the closure of anchor employers such as sawmills. The program examined the impact of building HDSP in a town that already had a State prison and a federal prison. The program followed the lives of specific officers (some of whom still work at a Susanville prison) and their families over the course of two years. According to the PBS website:

> The resulting story is one of hard choices and unanticipated consequences. As Susanville's good-hearted country-boys-turned-prison-guards soon learn, life outside the walls is developing eerie parallels to life on the inside. At the correctional officer training academy, officers have to learn new skills and attitudes, often quite foreign to their upbringing. Besides the obvious dangers of the job, the constant tension spills into the [officers'] home lives, changing how they relate to their families and friends. In a sense they, too, are imprisoned — a reality that is hard to shake once they leave work.

According to the documentary's co-director, Katie Galloway, one reason for making the film was: "We hope this film will awaken people to the real consequences of prison expansion, particularly in rural areas that have been so important in forming the history and character of California and the country."

### July 2008 Evaluation of the Behavior Modification Unit Pilot Program at High Desert State Prison, Conducted by CDCR's Adult Research Branch

In July 2008, the department published an evaluation report of its Behavior Modification Unit (BMU) Pilot Program, which was implemented at HDSP on November 21, 2005. This program was developed and implemented to respond to disruptive inmate behavior

that was not serious enough to warrant ASU or Security Housing Unit (SHU) placement, but was disruptive to the general population. The report contained inmate interviews and stated that some of the accounts were rather typical inmate complaints, while others were serious allegations of mistreatment, such as inmates (some clad only in socks and boxer briefs) forced to stand outside in the snow for over two hours. Recurring themes included racism, retaliation for filing appeals, and officers provoking physical altercations.

**May 2010 Sacramento Bee articles, written by Charles Piller, titled: "_Guards accused of cruelty, racism_" and "_California prison behavior units aim to control troublesome inmates_"**

The headline for a two part series in the Sacramento Bee described the report as an "investigation into the behavior units at High Desert State Prison, including signed affidavits, conversations and correspondence with 18 inmates … [which] uncovered evidence of racism and cruelty at the Susanville facility."

**December 2010 California State Senate Review of the BMU at HDSP**

After the publication of the Sacramento Bee articles referenced above, staff working on behalf of the California State Senate reviewed hundreds of documents and conducted numerous interviews to better understand and assess the allegations referenced in the article. The Senate cited the need for improvement in the department's system of accountability to ensure that allegations of abuse and misconduct in correctional institutions are addressed swiftly, systematically, and fairly for all involved. The Senate's review of the circumstances that gave rise to the public scrutiny of conditions at the BMU at HDSP highlighted the importance of making sure that the department's methods for handling reports of inmate abuse or staff misconduct are performing well. The review stated, "Every means by which the department receives information about prison conditions - whether formal or informal, or from an inmate, employee or member of the public is a valuable opportunity for the department to ensure the integrity of its operations. Every observer ought to be regarded as an asset, and every supervisor ought to be empowered as a portal through which information about prison conditions will be shared, evaluated, investigated and addressed." The Senate's review of the BMU allegations suggested that the department would be well served by a recalibration of how it handles complaint allegations, from intake through investigation and resolution.

**September 2011 OIG Special Report: CDCR's Revised Inmate Appeal Process Leaves Key Problems Unaddressed[6]**

In January 2011, CDCR revised its inmate appeal process. One of the primary deficiencies CDCR identified in its appeals process was that appeals are not logged until they reach the Appeals Office and appeals do not have a receipt feature, leading to system-wide allegations that appeals were destroyed or lost, either intentionally or negligently.

---

[6] OIG reports can be accessed at www.oig.ca.gov

CDCR's revised process redirects the inmate to the written "request for interview" process, which does require a copy be given to the inmate; however, this report found that if the inmate bypasses this process or elevates the issue to the formal appeal level, there is still no receipt feature.



As a consequence, CDCR's appeal process still does not address inmate allegations that appeals are routinely discarded or read by custody staff and then destroyed if they contain accusations of misconduct.

In response to this report, the department issued a December 30, 2011, directive[7] to all institutions, which, among other mandates, prohibited the reading or inspecting of appeals by anyone other than Appeals Office staff, and required the installation of secure appeals lock boxes in the housing units, retrieval from which shall only be done by Appeals Office staff and/or staff designated by the warden.

## October 2011 OIG Special Review

Between November 8, 2010, and June 16, 2011, the OIG conducted a review of allegations that HDSP staff violated the civil rights of inmates housed in Facility Z, often referred to as "Z Unit," the institution's stand-alone ASU. After reviewing a dozen different categories of alleged abuses, the OIG determined most of the allegations to be unfounded, but discovered concerns with inconsistent laundry exchange practices, a lack of policy direction regarding cold weather searches, inadequate law library access, and failure to provide the required ten hours of exercise yard time per week.

## May 2012 OIG Special Review: High Desert State Prison

As a result of repeated complaints regarding HDSP staff, the Senate Committee requested the OIG conduct a special review to determine whether staff intentionally or negligently allowed inmates to identify sex offender inmates, thereby subjecting inmates to potential

---

[7] A copy of the directive can be found in Appendix C.

harm. Although the review did not result in enough corroboration to pursue all inmate allegations, the volume and relative consistency among the inmate complaints gave credence to the existence of a problem within the Level IV SNY facility at HDSP. The pervasive complaints and incidents revealed should have at least alerted the department and caused some action to make sure such practices were not occurring. However, it appears that no action was taken. It was evident from the number of inmate victims and assailants making allegations of officer misconduct that there was a culture of hostility toward sex offender inmates at HDSP. In addition, some of the officers interviewed at the time indicated that they believed there were officers at HDSP who would provoke inmates into physical altercations to necessitate the use of force. This raised a concern regarding a culture of abuse and code of silence at HDSP, and some of the inmates interviewed believed that they would be retaliated against just for talking to the OIG or CDCR's Office of Internal Affairs.

**August 30, 2015 BuzzFeed News article written by Albert Samaha, titled: _The Job Made Me Do It. The Prison Guard Who Couldn't Escape Prison, Scott Jones loved being a correctional officer at California's High Desert State Prison. Then he saw his colleagues commit enough abuses that he saw no choice but to break the code of silence, turning himself into a pariah in a neighborhood called C/O Row._**

The BuzzFeed article chronicles the events leading up to an officer's suicide, after he "broke what one former prison guard called 'the green wall of silence' — the code of silence that has turned California's state prisons into insular and isolated facilities of unconstitutional conditions, where what happens on the Inside stays on the Inside. It is an unwritten rule meant to protect the men and women tasked with overseeing the state's 130,000 inmates, and Scott had to pay for violating it."

**August 31, 2015 Rolling Stone Magazine article written by Jessica Pishko, titled: _High Desert Suicide: Was a Prison Guard Hazed to Death? At one of the country's most dangerous prisons, correctional officers face off against murderers, rapists, gangsters and each other._**

The Rolling Stone article explores the events leading up to the 2011 suicide of a High Desert State Prison correctional officer (one of five staff suicides since 2008, according to the article).

None of these prior articles or reviews has had the desired impact of permanently improving HDSP. Instead, they were mere harbingers of continued problems that still exist.

# ENTRENCHED CULTURE

### REMOTE LOCATION

Susanville is located in Lassen County, a remote location in rural northeast California. Susanville is located 86 miles from Reno, Nevada; 112 miles from Redding, California; and 106 miles from Red Bluff, California. The 2014 census population estimate for Susanville was 15,543. HDSP and CCC employ 953 and 871 staff, respectively, making them the largest employers in all of Lassen County.



**California Population Density Map**
**Source: United States Census Bureau data compiled by censusviewer.com**

Due to the remote location and distance from other communities, HDSP and CCC mostly pull staff from the local community of Susanville. More so than any other prison locale, those that work at the prisons also interact outside the prison on a daily basis. According to former HDSP staff, many employees' family members work together, socialize together, grew up together, and went to school together. Interacting with members of the prison staff in the community is part of daily life in Susanville. One former employee who relocated to another part of the State reported that when visiting family in Susanville, she stopped visiting any of the major grocery stores or shopping centers because it was inevitable that she would run into former co-workers. Even in the far reaches of Crescent City and Blythe, where prisons are located, there is still a significant percentage of staff that commute from different outlying areas and towns.

Interviews with other former HDSP staff indicated the majority of long term staff at HDSP are from the local community. Many cadets originally from major metropolitan areas of the State who graduate from the academy and get assigned to HDSP will leave as soon as they can transfer to another institution. Former non-white staff reported that Susanville's lack of diversity made it an undesirable community in which to live and they would not choose to return.

Inmate visiting statistics from the last calendar year for a sampling of institutions demonstrate how isolated Susanville is from the rest of the State. Only Pelican Bay State Prison (PBSP) located in Crescent City has comparable visitation statistics, making PBSP, HDSP, and CCC the least visited institutions of those sampled by almost 6,000 visitors per year. On the other hand, California State Prison, Los Angeles County (LAC) in Lancaster received as many visitors as all three of those prisons combined. Not only has a lack of visitors been tied to increased recidivism rates, but it also cuts down on the number of outlets inmates have to report misconduct. Inmates' friends and family members are valuable confidants for inmates to report issues they are experiencing inside the prison.

All of these attributes frame the picture of a location that presents a unique set of challenges that CDCR should factor into consideration for providing guidance and accountability over the management of the prisons it has sited there and the needs of the inmates they have designated for housing in these locations.

**Visiting Statistics Calendar Year 2014[8]**

| Institution, Location | Number of Visitors |
|---|---|
| Los Angeles County (LAC), Lancaster | 31,070 |
| Pleasant Valley State Prison (PVSP), Coalinga | 28,157 |
| Kern Valley State Prison (KVSP), Delano | 23,764 |
| Mule Creek State Prison (MCSP), Ione | 22,555 |
| Folsom State Prison (FSP), Represa | 22,426 |
| Richard J Donovan (RJD), San Diego | 21,758 |
| Salinas Valley State Prison (SVSP), Soledad | 20,340 |
| California State Prison, Sacramento (SAC), Represa | 17,445 |
| High Desert State Prison (HDSP), Susanville | 11,488 |
| Pelican Bay State Prison (PBSP), Crescent City | 11,373 |
| California Correctional Center (CCC), Susanville[9] | 7,638 |

---

[8] The OIG sampled PBSP due to its remote location, SAC and FSP due to their centralized location near the California capitol, HDSP and CCC due to their location in Susanville, and the remaining institutions because they house SNY inmates in various locations throughout the State.

## THE SUSANVILLE "CAR" MENTALITY AND CODE OF SILENCE

Interviews of staff formerly assigned to HDSP indicated the existence of tight-knit social groups among employees, commonly referred to as "cars" within the correctional community. These groups of employees socialize frequently outside of work and are often comprised both of supervisors and correctional officers who work on the same housing units and during the same shifts. In addition, many of the staff are actually related. Spouses, siblings, and cousins are often employed at one or the other institution, literally creating "family" ties.

On one hand, some staff described these groups as mostly innocuous; they would eat lunch together, get each other things from the cafeteria, and barbecue and have drinks together on weekends. Even these former staff members who did not witness any misconduct indicated that supervisors who belonged to these groups would sometimes display favoritism towards the other members of their "car." One former staff member stated that supervisors would assign members of their "car" to favorable work assignments and working hours, such as administrative posts with weekends off, despite other staff being entitled to the positions by operation of the seniority provisions of the Bargaining Unit 6, Memorandum of Understanding[10] (MOU) (the correctional officers' union contract).

On the other hand, some former staff described the negative consequences that could occur if you were not a member of the "car" or if you spoke out or reported misconduct against a member of the "car." These consequences could include unfavorable job changes, being ostracized and labeled as a "rat," shunning in the community, retaliatory investigations, verbal badgering and abuse, the threat of not responding to an inmate assault on staff, and even physical assault by a custody supervisor.

The actual existence or even the perception of a management "car" can lead staff to participate in a code of silence, for fear that the consequences of reporting misconduct will outweigh the risk of remaining silent. Even though the department has a zero tolerance policy[11] for engaging in a code of silence, the OIG found several examples in the HDSP cases currently being monitored.

## PEER REVIEW

In response to ongoing reports of issues at High Desert State Prison, CDCR sent a four-person team to HDSP to conduct a peer review in April 2015. At one time, peer reviews were conducted on a regular basis, although there is no record of one ever being conducted at HDSP prior to this one. CDCR reports that a HDSP peer review was scheduled to occur in May 2010, but did not occur, due to budget cuts.

---

[9] This statistic only includes visitors to inmates housed at CCC in Susanville, not the 18 Northern California conservation camps associated with CCC.
[10] A copy of the MOU can be found at http://www.calhr.ca.gov/Documents/bu06-20130703-20150702-mou.pdf
[11] A copy of the zero tolerance policy can be found in Appendix D.

The peer review team interviewed selected members of HDSP staff and inmate advisory council (IAC) members representing the HDSP inmate populations; randomly interviewed staff and inmates on each facility; and reviewed a variety of documentation. The peer review team found 18 areas of non-compliance[12] at HDSP, some of which are as follows:

- Multiple infractions related to the requirements pertaining to disciplinary action logs, including failure of management to regularly review and approve.
- Lack of program opportunities on the Facility B sensitive needs yard.
- Inaccurate documentation on ASU isolation logs, reflecting inmates were receiving out-of-cell time, when they in fact were not.
- Multiple infractions related to the processing of inmate appeals, including appeals being screened out at a high rate; failure to follow the inmate appeal collection process outlined in policy; by routing appeals to the mailroom instead of the Appeals Office; several overdue inmate appeal modification orders; and failure of the appeals coordinator to meet with the IAC on a quarterly basis, as required.
- Underutilization of the custody sick leave monitoring process.
- Officers not appropriately completing cell search logs and issuing proper receipts, coupled with supervisors and managers not completing required weekly and monthly tours.
- Officers modifying inmate programs, without prior approval of the area manager or Administrative Officer-of-the-Day (AOD).
- Custody staff not carrying their required equipment.

While HDSP does have some new staff, the majority are tenured staff who should be well versed in CDCR's policies and procedures. The type of errors cited in the peer review are indicative of lax supervision, complacency, and management indifference. The institution completed a corrective action plan for all 18 areas of noncompliance and the overwhelming majority of recommendations made by the peer review team to remedy the infractions were for staff to be provided training, which was completed. However, one has to assume that this training was given previously, or should have been. Unfortunately, by requiring staff only receive one-time training, the department has failed to ensure the infractions will not continue to occur. There are no safeguards built into the peer review process, such as requiring HDSP leadership to provide proof that staff have not slipped back into old behaviors, or requiring the peer review team to conduct a follow-up review in a few months. Additionally, no one was held accountable for the policy violations or lack of training in the first place.

The department reports that it is currently in the process of developing a new peer review process. The OIG recommends that in doing so, in addition to requiring the institution to develop a corrective action plan addressing the deficiencies, the department must include a follow-up plan at the headquarters level, to ensure that the identified issues have been completely remedied and no longer exist. In addition, the tool should include an in-depth examination of areas such as inmate staff complaints, large volumes of appeals in

---

[12] A copy of the peer review report can be found in the Appendix E.

particular categories (such as, in the case of HDSP, property), and mandates such as a measurement of the institution's compliance with Department Operations Manual (DOM) Article 44, CDCR's Prison Rape Elimination Act (PREA) Policy.

## RACISM AND IMPLICIT BIAS

In interviews conducted of inmates formerly assigned to HDSP, a common allegation was the existence of overt racism at HDSP. Several former inmates stated that the racism they experienced at HDSP was far worse than they experienced at any other institution where they had been housed. The following excerpts are summarized from individual inmate interviews, conducted separately over the course of this review:

*.. officers called inmates the N-word or wetbacks. Black inmates wouldn't get enough time to eat; the officers would 'kick' the blacks out of the chow hall first and then the Hispanics. The white inmates didn't have to leave, they were running the kitchen.*

*.. officers were more racist than he experienced at his former prison and the white inmates were usually allowed to go to canteen first, and when it was the black inmates' turn, the yard would sometimes be recalled [not allowing time for canteen purchases].*

*.. never saw such a lack of respect toward black inmates than he experienced at HDSP. Officers called black inmates the N-word and threatened them. This disrespect occurred with free staff as well, including medical staff.*

*.. officers at HDSP were especially disrespectful to black inmates. Officers would search the cells of black inmates more often than those of other races, and often for no apparent reason. The disrespect and corrupt environment was far worse at HDSP than other prisons.*

*.. the staff at HDSP are absolutely racist. They are just a bunch of hateful people at that place. It was very different at HDSP compared to other prisons.*

*.. the white staff were very racist and bigoted, not just towards inmates but also towards officers that were of different a race. Staff would search the blacks more than others after chow. It wasn't the search so much; it was the way they did it. He got that KKK and green wall feeling from HDSP.*

*.. there were a lot of disrespectful staff at HDSP. The staff at HDSP were openly racist. The sergeants and lieutenants were worse than the officers. Blacks were treated very differently: they are on lockdowns a lot longer; they go to the hole for the smallest of reasons; and officers messed with their food.*

*.. officers were racist, called black inmates the N-word, and black inmates were locked down for longer periods of time than other races.*

*.. white inmates were assigned the better jobs.*

*.. officers were racist against black inmates because Susanville was a white community.*

*.. officers try hard to not to appear racist, but when you talk to them in private, they use the N-word when referring to black inmates and use derogatory terms directly to inmates.*

*.. the biggest issues are race-related. Once heard an officer call blacks "skid marks." Regardless of who was involved in an incident, the black population was always held responsible. Since HDSP was run by predominately white staff, the white inmates were favored. White inmates always got the better jobs. Clerical jobs were mainly given to white inmates. Black inmates have to wait at the end of the line during canteen. The canteen manager allows Hispanic and white inmates to run canteen, resulting in the black inmates often not getting a chance to have their canteen orders filled.*

The racial composition of HDSP's inmate population and HDSP's custody staff differ drastically. Although 76 percent of custody staff are white, only 18 percent of the total inmate population identifies as white. Hispanic and Black comprise 79 percent of the inmate population at HDSP, but only 21 percent of the custody staff, which includes officers, supervisors, and managers.

**SEPTEMBER 2015, HDSP RACE/ETHNICITY PERCENTAGES**

|  | HISPANIC | BLACK | WHITE | ASIAN | OTHER* |
|---|---|---|---|---|---|
| HDSP Inmates | 54% | 25% | 18% | 2% | 2% |
| HDSP Custody Officers | 20% | 3% | 74% | 3% | 1% |
| HDSP Custody Supervisors & Managers | 10% | 1% | 89% | 0% | 1% |

*Other includes American Indian, Pacific Islander

OIG interviews highlighted a culture of racism and lack of acceptance of ethnic differences. From the casual use of derogatory racial terms to de facto discrimination, it became apparent to the OIG that there is a serious issue at HDSP and that the institution's leadership appears oblivious to these problems.

In addition, the remote, rural location and lack of diversity in the Susanville population could give the perception that non-white residents are not welcome. One former HDSP staff person stated that he was warned at the academy to be careful in Susanville due to his race. He said that other non-white staff that had formerly worked in Susanville stated they would never go back to Susanville, due to its lack of diversity.

The culture at HDSP could benefit from programs that are becoming more and more prevalent in police departments, which educate officers about the influence of implicit biases. Implicit bias describes the automatic association people make between groups of people and stereotypes about those groups. Under certain conditions, those automatic associations can influence behavior—making people respond in biased ways even when they are not explicitly prejudiced.

Discussions of implicit bias in policing tend to focus on implicit racial biases; however, implicit bias can be expressed in relation to non-racial factors, including gender, age, religion, or sexual orientation. As with all types of bias, implicit bias can distort one's

perception and subsequent treatment either in favor of or against a given person or group. In policing, this has resulted in widespread practices that focus undeserved suspicion on some groups and presume other groups innocent.

Research has shown that it is possible to address and reduce implicit bias through training and policy interventions with law enforcement agencies. Research suggests that biased associations can be gradually unlearned and replaced with nonbiased ones.[13]

In 2015, the US Department of Justice (DOJ) announced six cities to host pilot sites for the National Initiative for Building Community Trust and Justice, which will seek to assess the police-community relationship in each of the six pilot sites, as well as develop a detailed site-specific plan that will enhance procedural justice, reduce bias, and support reconciliation in communities where trust has been eroded. One of the host pilot sites is Stockton, CA. The three-year grant has been awarded to a consortium of national law enforcement experts from John Jay College of Criminal Justice, Yale Law School, UCLA's Center for Policing Equity, and the Urban Institute.

In addition, law enforcement agencies can request training, peer mentoring, expert consultation, and other types of assistance on implicit bias, procedural justice, and racial reconciliation through DOJ's Office of Justice Program's Diagnostic Center. The initiative launched a new online clearinghouse that includes up-to-date information about what works to build trust between citizens and law enforcement.[14]

## THE NEED FOR INCREASED INMATE PROGRAMMING AND STAFF RESILIENCY TRAINING

As described earlier, HDSP houses high security (Level IV) general population and sensitive needs inmates and medium security (Level III) sensitive needs inmates. Three of the institution's four main yards are classified as Level IV housing. HDSP also maintains a stand-alone administrative segregation unit. As a high security institution, HDSP houses the most violent and dangerous male offenders.

Prison populations consisting predominantly of people serving long sentences can be difficult to manage because inmates can have a sense of hopelessness and a "what have I got to lose" attitude that can lead to continued criminality and violent behavior. Couple this with half of the HDSP inmate population[15] needing protection due to vulnerability based on commitment offense or disability, and correctional officers can be unprepared for dealing with these populations. One way to mitigate these behaviors is through meaningful programming opportunities and programs that offer incentives to those who participate, whether that means extra privileges or activities that give a sense of accomplishment. Unfortunately, HDSP's Level IV sensitive needs yard has very few programming opportunities, and the enhanced program facility on its Level IV general population yard, by staff's own account, consists mainly of inmates resistant to

---

[13] An article from the Fordham Law Review related to implicit bias can be found in Appendix F.

[14] The clearinghouse can be found at www.trustandjustice.org.

[15] Two of the four main facilities at HDSP house inmates designated as sensitive needs.

programming. Increasing programming on these yards and ensuring the right population is placed into the EPF could reduce the violence and continued criminality that exists at HDSP.

Working around such dangerous individuals on a daily basis can be a highly stressful experience. CDCR does not have a program that adequately trains its staff or gives them the tools to cope with working in such a stressful environment. Additionally, in the tightknit, rural community of Susanville, where many people work and socialize together, there are few outlets for staff to seek assistance when they feel their complaints of mistreatment are not being addressed by prison leadership. There have been staff suicides reported and some staff reported retaliation for bringing misconduct forward.

There is a staff resiliency training program being developed by the Center for Mindfulness in Corrections,[16] which CDCR is considering piloting at one of its Level IV institutions. The program is geared toward developing consistent and healthy self-care practices and a "safe environment to disengage from negative drama." This type of resiliency program is showing promising results in law enforcement agencies across the country. The department should consider piloting this or a similar program at HDSP, and then expanding statewide.

In addition, CDCR should ensure HDSP is following the requirements of DOM Sections 33010.30 – 33010.30.3, related to staff in high stress assignments. High stress assignments are defined as those in controlled housing units requiring direct and continuous contact with inmates confined therein because they present too great a management problem for housing in general population settings. Such housing unit assignments include, but are not limited to: SHUs, ASUs, psychiatric services units, and protective housing units. The policy requires:

- Employees be carefully evaluated before such assignment.
- Employees to have demonstrated a high degree of maturity, tolerance, and ability to cope with stressful situations.
- Assignments shall be limited to no longer than two years, with exceptions allowed by the warden when the employee indicates a desire to remain, or the employee's performance is completely satisfactory and does not reflect the effect of undue stress.
- Supervisors to evaluate the performance of employees on a continuous basis.
- Supervisors to act promptly to remedy stress-related problems that appear to adversely affect the employee's physical and mental health and effectiveness.
- Supervisors to take remedial action including placement in a less stressful assignment in or outside of the unit.

Increasing meaningful inmate programs and maximizing the EPF participation incentives, with the goal of decreasing inmate criminality and violence, while at the same time giving staff the tools to cope with working in a uniquely stressful environment, should result in improved staff morale and a healthier more resilient staff.

---

[16] An outline of the resiliency program can be found in Appendix G.

# THE CALIFORNIA CORRECTIONAL PEACE OFFICERS ASSOCIATION

The California Correctional Peace Officers Association (CCPOA) is the labor union representing correctional officers. CCPOA's mission is "to promote and enhance the correctional profession, protect the safety of those engaged in corrections and advocate for the laws, funding and policies needed to improve prison operations and protect public safety."[17] However, during the course of the OIG's Senate-authorized review, OIG staff faced significant opposition from the union, which attempted to impede the OIG's informational, non-disciplinary interviews aimed at uncovering the veracity of allegations that the integrity of the correctional profession and the advancement of public safety at HDSP have been compromised.

Despite PC Section 6126.5's provision that all CDCR employees shall comply with the OIG's requests to be interviewed, with the consequence that failure to comply would be considered a misdemeanor, on October 15, 2015, CCPOA circulated the following instruction to its members:

---

**ALL Unit 6 Employees.... ALL Unit 6 Employees**

ALERT.... ALERT.... ALERT.... ALERT.... ALERT.... ALERT.... ALERT....

Agents of the Office of the Inspector General are interviewing CO's who work or worked at High Desert State Prison. We do not know what the interviews are about. The Agents maintain the interviews are "voluntary" however, they are not providing Officers advanced notice, the topic of the interview, or the opportunity to obtain legal representation. In at least one case, an Officer was ordered to interview after refusing to give a voluntary statement.

If you are contacted at work, or home, by Agents of the OIG and asked to interview, CCPOA suggests:

1. Immediately request a representative;
2. Give no voluntary statement; and
3. Do not allow the Agent into your home or have a conversation with them.

If required by OIG or ordered by a CDCR supervisor to participate in the interview do not disobey a direct order BUT DO CONTINUALLY REQUEST THE INTERVIEW BE SUSPENDED UNTIL YOU CAN TALK TO A LEGAL REPRESENTATIVE.

For Northern Institutions Contact:
Janice Shaw – 916-662-4385
Daniel Lindsay – 916-425-8466

For Central Valley Institutions Contact:
Shelley Lytle – 559-250-2862

For Southern Institutions Contact:
Sonia Garcia-Djajich – 909-677-9409

---

In an effort to maximize its reach, CCPOA e-mailed this instruction as an "Urgent Alert" to all CCPOA members and some CCPOA chapters recirculated the message on their Facebook pages. CCPOA based its advisement on the premise that the OIG's interviews somehow violated its members' rights under the Public Safety Officer Procedural Bill of

---

[17] https://www.ccpoa.org/about-us/

Rights Act [POBR, located at Government Code (GC) Section 3300, et seq.] and the MOU between the State Employer (CDCR) and CCPOA. CCPOA's instruction to its members was not only an inaccurate statement of its members' legal rights, but it also encouraged its members to commit acts qualifying as misdemeanor offenses under the law.

Before beginning the interviews of CDCR employees, the OIG informed the interviewees that the OIG was not conducting an investigation, that the employee being interviewed was not the subject of an investigation, and that the OIG would not use any statements provided during the interviews to initiate an investigation into the interviewee. The OIG did not permit these employees a representative during the interviews in order to prevent compromising the integrity of its review. There is a valid concern that CCPOA representatives were there not to protect any rights of the persons being interviewed, (who were never at peril of adverse action), but rather to find out which staff were telling on others, and what they were saying. In fact, none of the people interviewed still work at HDSP.

Pursuant to GC Section 3303, POBR rights apply only when a peace officer is "under investigation and subjected to interrogation by his or her commanding officer, or any other member of the employing public safety department." Because the OIG employees who conducted the interviews were not CDCR employees, pursuant to PC Section 6126.5(d), POBR rights did not apply to the OIG interviews unless "it appears that the facts of the case could lead to punitive action" against the officer being interviewed. Because the OIG was not performing an investigation into their misconduct and expressly informed these officers of that fact prior to the interviews, POBR did not provide the employees being interviewed with any rights to representation during the interviews, any right to advance notice of the interview, or to be made aware of the subject matter of the interview. As also set out in PC Section 6126.5(d), the terms of the MOU between the State and CCPOA do not apply to OIG interviews. No actions were ever contemplated and none were initiated against any of the interviewed employees.

CCPOA's State President also attempted to interfere with the OIG's authorized review by calling a member of CDCR's senior management on multiple occasions to complain about the OIG's interviews and CDCR's acquiescence to the OIG's requests to interview its employees. This interference also flies in the face of PC Section 6126.5(d), which requires that "[a]ny employee requested to be interviewed shall comply and shall have time afforded by the appointing authority for the purpose of an interview with the Inspector General or his or her designee."

On November 4, 2015, CCPOA filed a grievance against CDCR claiming CDCR's "acquiescence to the Office of the Inspector General's directives result[ed] in the violation of several Correctional Officers' MOU and POBR rights." Despite every correctional officer being informed prior to the interviews that they were not the subjects of an investigation and that they would not become the subjects of an investigation as a result of information provided during the interviews, CCPOA demanded expedited arbitration of the grievance, claiming that the OIG's interviews were causing its members "irreparable injury … for which there is no adequate remedy at law." As explained above, POBR did not provide the interviewees with any rights during their interviews with the

OIG. Even if officers' POBR rights had been violated, GC Section 3309.5 provides a remedy by authorizing the superior courts with initial jurisdiction to adjudicate alleged POBR violations and issue various forms of injunctive relief, including injunctions and restraining orders to prevent POBR violations from occurring.

On November 23, 2015, CCPOA's State President sent a letter to the Governor and each member of the California State Legislature disparaging the OIG with various unfounded accusations of impropriety in all facets of its operations. The OIG finds the accusations baseless, devoid of any understanding of the OIG's role and function, and disruptive to the provision of independent oversight as initially ordered by the federal court in *Madrid* and later codified by the Legislature. Due to their frivolous nature, the OIG deems CCPOA's allegations unworthy of a substantive response. Rather, the letter is the latest strong-arm tactic CCPOA has elected to deploy in an effort to obstruct the OIG's Senate-authorized review and attempt to discredit the OIG in advance of the release of this report.

Finally, on November 24, 2015, CCPOA filed a lawsuit in Sacramento County Superior Court in which it claims its members' POBR rights were violated, seeking monetary damages and injunctive relief. These actions serve as an attempt to chill the transparent oversight of the correctional system that the department has worked hard to embrace in the wake of the *Madrid* federal lawsuit.

CCPOA's collective actions during the course of the OIG's review cast into doubt the genuineness of its stated organizational mission. The union's staunch opposition to the OIG's review of HDSP demonstrates a clear hostility towards transparency and independent oversight in the prison system. The culture fostered by CCPOA is one of regression to prior periods of the "green wall" and code of silence, when officers were actively encouraged to disrupt and sabotage legitimate inquiries into pressing issues of public policy. This especially exacerbates a situation in a prison with the problems and culture discovered at HDSP.

## RECOMMENDATIONS TO CDCR

- Infuse HDSP supervisory and management positions with culturally diverse staff who have experience working in other institutions and do not have lifelong ties to the community.

- Consider rotating HDSP management staff to other institutions, similar to the rotation required for CDCR headquarters peace officer staff.

- Increase the frequency at which peer reviews are conducted at HDSP.

- Revise the peer review tool to include follow-up measures and tests that better assess areas that could indicate deep-seated issues, such as by adding PREA and ADA compliance components.

- Increase inmate programming, especially on the SNY facilities.

- Ensure inmates housed in enhanced program facilities meet the EPF participation criteria.

- Ensure HDSP is following the DOM requirements related to staff in high stress assignments.

- Require HDSP seek approval from the CDCR Associate Director, prior to extending staff in high stress assignments beyond the initial two years.

- Seek out opportunities to partner with organizations, such as the US DOJ, to conduct research and provide training to custody staff, starting at HDSP, on how to recognize and address implicit bias.

- Implement a mindfulness and wellness program that gives staff resiliency tools to cope with working in a uniquely stressful environment.

# SEX OFFENDERS AND THE R SUFFIX

## R SUFFIX

As part of CDCR's inmate classification process, inmates with a history of sex offenses are designated with an R suffix, signifying restricted custody. According to California Code of Regulations (CCR), Title 15, Section 3377.1(b), the purpose of applying an R suffix is to ensure the safety of inmates, correctional personnel, and the general public by identifying inmates with a history of specific sex offenses. Inmates with an R suffix are automatically assessed a mandatory 19 classification points, which restricts them from being housed or assigned to jobs or programs outside the prison's security perimeter (to reduce the risk of escape).

The R suffix designation follows the inmate for every subsequent incarceration, even if he has served his term on the initial sex offense and is later recommitted for a different, non-sex related offense. Regardless of an inmate's current commitment offense, if that inmate is required to register as a sex offender, pursuant to PC Section 290, for any offense committed in his lifetime, an R suffix is applied (in California, PC 290 sex offender registration is a lifetime registration). In addition, CDCR's policies require every arrest, detention, or charge for an offense that would warrant the inmate to register pursuant to PC Section 290, be evaluated for assignment of an R suffix; the policy is applied liberally.

The mandatory application of 19 classification points is the ONLY requirement tied to the R suffix. However, over the years, the R suffix has come to be automatically associated with the inmate being a sex offender, triggering bias and preconceived beliefs inmates and officers might have related to sex offenders.

In interviews conducted of former HDSP inmates, allegations were raised related to staff disclosing the commitment offense of inmates to other inmates, placing their safety at risk. These former inmates alleged that staff told inmates that other inmates were sex offenders, or had shown them classification documents or let them view the electronic inmate records retained in the Strategic Offender Management System (SOMS), showing that an inmate had an R suffix. Having an R suffix carries a major stigma in prison and can jeopardize an inmate's safety by setting the inmate up for assault or extortion for protection from assault.

The OIG was also told by former HDSP inmates and staff that, more commonly, inmates are told by other inmates to show their paperwork, which includes the inmate's commitment offense. Inmates who are celled together regularly show each other their paperwork. This occurs on general population yards, as well as sensitive needs yards. The document being shared is usually a form provided to the inmate documenting the outcome of their classification committee hearing. Previously, the information was documented on a Classification Chrono, *CDCR Form 128-G*; however, it has been replaced by a printout of the SOMS screen titled Classification Committee Chrono (Chrono). The information provided in the Chrono not only summarizes the classification committee's decisions regarding the inmate's status, such as clearance for double-celling,

and education and work assignments, but it also documents the inmate's case factors including his commitment offense and prior arrest history. It also includes any applicable custody suffix, including an R suffix.

In addition to the Chrono, many CDCR forms include an inmate's commitment offense, arrest history, or custody suffix information, including the Legal Status Summary, the Classification Scoresheet, and Crime/Incident Reports. Although staff may be mindful not to route copies of documents containing sensitive information through inmate mail, and instead hand-deliver the documents to the inmate, once an inmate is in possession of these documents he can be pressured to provide them to other inmates. The OIG recognizes that there are multiple ways inmates can find out about each other's commitment offenses; however, limiting the information provided in hard copies given to all inmates would eliminate one way in which this information is discovered and reduce the pressures faced by inmates which then lead to victimization. The department cites no penological reason that information related to R suffix, commitment offense, or arrest history must appear on the Chrono given to the inmate.

With the implementation of SOMS and staff's ability to review inmate records in real-time, it is recommended that CDCR review any forms and documents that have required the commitment offenses and R suffix information, and determine if including this information is necessary and who has a need to know. CCR, Title 15, Section 3375(h), requires that an inmate be provided a copy of all non-confidential CDCR staff-generated documentation and reports placed in the inmate's central file, unless otherwise requested in writing by the inmate. Inmates who are pressured to provide a document to verify their commitment offense may be placed in a predicament if they request that their documentation not be provided since one can then assume that the inmate is hiding something.

The dangers associated with an inmate's paperwork and R suffix are all too real. In May 2013, on an SNY facility (not HDSP), an officer discovered an inmate lying unresponsive on the floor of his cell with a sheet pulled over him and a classification document resting on top of the sheet. There was a ligature around the inmate's neck, wound tight by a connected State-issued cup, and blood near his head. The classification document found on the deceased inmate noted that his commitment offense was for lewd and lascivious acts with a child under 14 years of age.

Additionally, as recently as December 2015 on an SNY facility (not HDSP), an inmate with a history of in-cell violence and gang affiliation informed an officer that his cellmate was dead. The victim was found face down on the floor and hogtied with multiple injuries and a pen and pencil stabbed in the victim's ear. Written on the victim's t-shirt were derogatory slurs specific to his criminal history. Although the victim's current offense was not a sex offense, he had sex offenses in his history.

## SOMS ACCESS

In the last few years, CDCR has converted from a paper inmate file, to an electronic inmate record. While this has made major improvements, it has come with the unintended consequence of giving staff unfettered access to an inmate's history. In the past, staff

wanting to know if an inmate was a sex offender would have to visit the prison records office, request the inmate's hard copy file, sign in on a log sheet, and sit in the records office to review the file. Now, from just about every housing unit in a prison, with a few key strokes and no admonishment or reminder that the information contained therein is sensitive and confidential, anyone accessing SOMS can instantly know if an inmate has an R suffix. In fact, the very first screen that appears after entering the inmate's CDCR number contains the R suffix information in the header.

In addition, although these SOMS computers are considered to be out of bounds for inmates, their placement throughout the housing units can sometimes be in areas where inmates can see the information on the screen. While the OIG recognizes that there are legitimate penological reasons that custody staff may need to access some information from an inmate's electronic record, for instance, to verify an inmate has no enemy concerns before rehousing him on another yard, custody staff must be mindful of the sensitive information being displayed on the computer monitors. Additionally, most custody officers do not have a need to know most information regarding inmates' commitment offenses.

## RECOMMENDATIONS TO CDCR

- Develop a policy authorizing staff to access an inmate's electronic record on a "need to know" basis only. The policy should add admonishment language to the SOMS login screen, advising against misuse, and the consequence thereof.

- Develop a method of tracking and recording staff access to records in SOMS and other inmate records, and periodically audit access history to identify potential misuse.

- Remove the R suffix information from the SOMS header, as any staff specifically needing this information can find it on another screen.

- Conduct an in-depth review of every form and document that currently requires commitment offense information and R suffix notations, and remove this requirement from all forms and documents where it no longer serves a legitimate purpose.

- Consider providing inmates with only hard copies of certain portions of non-confidential documentation from SOMS or other inmate records, to exclude commitment offenses, R suffix notations, and any other information that may put an inmate at risk.

# SENSITIVE NEEDS YARDS

When sensitive needs yards were first conceptualized in the late nineties, they were developed with the expectation that inmates would volunteer to be housed on a yard where they would pledge to program, in return for a "violence free" environment. There are no policies or procedures related to SNY housing, only a loose set of placement consideration guidelines outlined in a single memo from 2002. Essentially, the department did not want to establish rigid criteria for SNY placement, but rather a case-by-case review of each inmate would be conducted by the classification committee. SNYs do not have additional programming or anything different than general population facilities, as they were perceived to be truly a GP placement for inmates who simply wish to live in a nonviolent environment. The memo grouped inmates appropriate for SNY housing as falling into one of the following general categories:

- <u>Prison Gang Dropout</u> – these inmates had to be validated by CDCR's Office of Correctional Safety as a gang dropout.

- <u>Victim of Assault</u> – these inmates may have been assaulted because of a commitment offense or failure to commit an ordered assault on another inmate.

- <u>Significant Enemy Concerns</u> – these inmates may have provided testimony in open court, or their status as snitches or informants may have become known to the general inmate population.

- <u>Other Safety Concerns</u> – these inmates may be high notoriety, public interest cases, or sex offenders. These inmates might also include those that refuse to recognize inmate-imposed racial or cultural lines and other safety concerns not specifically listed.

The memo instructed staff to take a liberal approach to placing an inmate in an SNY and a conservative approach on any considered action to remove an inmate from an SNY. Additionally, the department foresaw that as the number of inmates receiving and requesting SNY housing grew, so would the need for SNY beds. These facilities "simply become housing for _programming_ inmates who are willing not to prey upon other inmates in exchange for a feeling that they are less likely to be preyed upon" [emphasis added].

Because CDCR considers SNY facilities to be no different than GP facilities, SNY staff have never received any training in supervising vulnerable populations. However, unlike GP facilities, CDCR does not require SNY facilities to have an ethnic balance for inmate program and job assignments, leading many SNY inmates to complain that other races are receiving the best job assignments.

The demand for sensitive needs housing has grown to over 37,000 inmates being designated SNY. CDCR staff no longer wait for inmates to volunteer or request SNY housing. It is common now for classification staff to recommend SNY housing to inmates who have committed a sex offense or other crimes that make them targets for violence. Many vulnerable inmates who accept SNY housing do so expecting a protective environment and it is not always explained to them by classification staff that sensitive

needs yards are still violent, have programming no different from GP yards, and once they are assigned to an SNY, it is very difficult to ever return to a general population yard.

The growing numbers of gang dropouts being placed in SNYs has resulted in numerous new gangs forming and warring with rivals on the SNYs. Gang violence has grown so bad that some SNY inmates have asked to return to mainline yards rather than continue to face the gangs on the SNYs. However, once an inmate has been housed on an SNY facility, he then becomes a target or is labeled as soft, making it very difficult to ever transfer out. In fact, CDCR's SNY guidelines acknowledge that SNY housing in itself adds a label or stigma to the inmate and under no circumstances will an SNY inmate be returned to a GP if it is believed that the inmate's safety would be threatened by such housing, not even inmates who repeatedly assault other SNY inmates.

As one former HDSP staff member stated*, inmates take a very dim view of other inmates who have committed various crimes, mostly sex offenses. And they tend to target them for assaults, for extortion, for a whole variety of negative actions. Many of the assaults that happen, you could probably break down into a couple of categories, inmate-on-inmate assaults that are debts, generated from drugs or protection or bribery or blackmail. Then there's the gang-related assaults that happen when somebody is not toeing the line where they are supposed to, and they need to be removed from the picture from the inmate point of view. And so it's really hard to say the frequency of assaults– it happens all the time.*

To further gauge the amount of violence occurring on sensitive needs yards compared to general population yards, the OIG analyzed CDCR's COMPSTAT[18] reports for the 13-month period from June 2014 through June 2015. The OIG compared the data reported for the *Average Number of Incidents per 100 Inmates* and found that, of the ten facilities with the highest number of incidents per 100 inmates, 80 percent of the institutions housed SNY inmates. The OIG then compared the data reported for the *Average Number of Inmate Disciplinary Actions, per 100 Inmates* and found that of the twenty facilities with the highest number of inmate disciplinary actions per 100 inmates, 70 percent of the institutions housed SNY inmates.[19]

Finally, the OIG compiled the COMPSTAT data for the number of inmate disciplinary actions for specific violent offenses[20] issued at each institution.[21] Unfortunately, CDCR's COMPSTAT data is not broken down by individual facility within a prison, so the OIG is unable to compare individual SNYs within a prison to GP or other yards. However, as indicated in the following table, institutions housing SNY inmates (highlighted in green) have violence prevalence similar to institutions housing GP inmates.

---

[18] COMPSTAT data can be found at www.cdcr.ca.gov
[19] See Appendices H and I for number of incidents and disciplinary actions.
[20] The violent offenses included: assault on staff, battery on staff, assault on inmate, battery on inmate, attempted murder, and murder.
[21] Data was unavailable for the California Health Care Facility and the California City Correctional Facility. Additionally, there are no SNYs at female institutions.

**Inmate Disciplinary Actions (115's) for Specific Violent Acts, June 2014 through June 2015**

| Institution | Total 115s for Violent Acts | Monthly average | June 2015 Inmate Count | June 2015 SNY Pop | All Levels | SNY Levels | Mission |
|---|---|---|---|---|---|---|---|
| WSP | 672 | 51.69 | 4881 | N/A | I, III, RC | N/A | RC |
| NKSP | 612 | 47.08 | 4365 | N/A | I, III, RC | N/A | RC |
| SAC | 572 | 44.00 | 2319 | N/A | I, IV, PSU, SHU | N/A | HS |
| LAC | 562 | 43.23 | 3494 | 896 | I, III, IV | IV | HS |
| SOL | 430 | 33.08 | 3866 | N/A | II, III | N/A | GP |
| CAL | 420 | 32.31 | 3774 | 922 | I, IV | IV | GP |
| CCI | 326 | 25.08 | 3931 | 3186 | I, II, III, IV, SHU | I, II, III, IV | HS |
| HDSP | 324 | 24.92 | 3300 | 1009 | I, III, IV | III, IV | HS |
| SVSP | 323 | 24.85 | 3678 | 1468 | I, III, IV | III, IV | HS |
| SATF | 318 | 24.46 | 5581 | 3156 | II, III, IV | II, III, IV | HS |
| COR | 287 | 22.08 | 4405 | 1850 | I, III, IV, SHU, PHU | III, IV | HS |
| KVSP | 286 | 22 | 3638 | 1578 | I, IV, THU | IV | HS |
| DVI | 235 | 18.08 | 2117 | N/A | I, II, RC | N/A | RC |
| SCC | 222 | 17.08 | 4345 | 788 | I, II, III | III | RC |
| CCC | 212 | 16.31 | 4089 | N/A | I, II, III | N/A | RC |
| PVSP | 209 | 16.08 | 2271 | 1274 | I, III | III | GP |
| CMF | 184 | 14.5 | 2269 | N/A | I, II, III | N/A | FOPS |
| PBSP | 177 | 13.62 | 2742 | N/A | I, IV, PSU, SHU | N/A | HS |
| CEN | 173 | 13.31 | 3489 | 871 | I, III, IV | III | GP |
| CIM | 173 | 13.31 | 3802 | 1810 | I, II, RC | II | RC |
| MCSP | 165 | 12.69 | 2941 | 2778 | I, III, IV | I, III, IV | GP |
| CMC | 154 | 11.85 | 3809 | N/A | I, II, III | N/A | RC |
| ISP | 154 | 11.85 | 3401 | 1561 | I, III | I, III | GP |
| RJD | 142 | 10.92 | 3148 | 2118 | I, III, IV | III, IV | RC |
| SQ | 121 | 9.31 | 3687 | N/A | II, RC | N/A | RC |
| FSP | 114 | 8.7 | 2876 | N/A | I, II, FWF | N/A | FOPS |
| ASP | 112 | 8.62 | 2766 | 2324 | II | II | GP |
| CRC | 89 | 6.85 | 2434 | 784 | II | II | RC |
| VSP | 79 | 6.08 | 3379 | 3326 | II | II | GP |
| CTF | 72 | 5.54 | 5167 | 2668 | I, II | II | GP |
| CVSP | 50 | 3.85 | 2264 | 1178 | I, II | I, II | GP |

Also indicative of the increased violence in SNYs is the proportion of inmate homicides that occur involving victims assigned to SNY housing. In the OIG's October 2014 Semi-Annual Report, Volume II, it reported on the homicides that took place on sensitive needs yards. Of the 11 inmate-on-inmate homicides reported, 10 occurred on Level IV sensitive

needs yards, 8 of which were in-cell homicides. In addition to the 11 homicides, another case reported was an in-cell great bodily injury case that also occurred on an SNY facility, but did not result in death.

In addition to the cases noted above, a 2012 SNY homicide at HDSP involved an inmate strangling his cellmate to death in their cell. The aggressor was convicted for murder and the victim for multiple violent sex offenses. The aggressor had been placed on the sensitive needs facility because he had been attacked during intake, upon his arrival at HDSP. The question later arose as to why a violent murderer had been celled together with a sex offender. Subsequent investigation determined that CDCR has no policies requiring an analysis of housing compatibility on sensitive needs yards.

Also at HDSP, a 2013 SNY homicide involved an inmate with a history of in-cell violence strangling his cellmate to death in their cell. The aggressor was convicted for murder and rape in 1994 and the victim for sex offenses against minors in 2011. They had only been celled together for 16 days.

In the OIG's assessments of these events, it became clear that there are steps that the department can take to lessen such risks. The assumption that placement in SNY housing includes an implied agreement by SNY inmates to co-exist peacefully is no longer a viable premise, especially in light of the fact that CDCR staff no longer wait for an inmate to volunteer before designating him for SNY housing. CDCR does not complete a double-cell housing compatibility review form for SNY inmates. This form is intended to ensure that inmates are properly placed with compatible cellmates and that potential cellmates are given the opportunity to document their agreement to house together or expose reasons why they should not be housed together. Similar forms are not used on GP yards either, but the inherent volatility created by mixing a sex offender and violent gang member (albeit a dropout) does not typically exist on a GP yard.

The OIG further determined that the department's policy for changing an inmate from single-cell to double-cell status is insufficient. The policy states in part*: A classification committee may consider whether an inmate with single-cell designation has since proven capable of being double-celled.* The policy does not provide specific guidelines or examples of how an inmate that previously assaulted cellmates can prove capable of transitioning back to double-cell status. As a result of these findings, in the OIG's October 2014 Semi-Annual Report, Volume II, the OIG issued CDCR the following recommendations:

- Institute compatibility guidelines requiring the completion of *CDCR Form 1882-A, General Population Double Cell Review* and completion of the *CDCR Form 1882-B, Administrative Segregation Unit/Security Housing Unit Double-Cell Review* to help ensure that inmates are properly housed with compatible cellmates.

- Require potential cellmates to document their agreement to house together.

- Provide clear guidelines for transitioning single-cell designated inmates to double-cell status on SNY facilities.

- Require that SNY inmates' central files be reviewed for propensity for violence and prior assaultive behavior before double-celling, or at least prior to placement with a vulnerable cellmate (part of the *CDCR Form 1882-A* process).

The department initially declined to implement any of these recommendations, but later agreed to develop a classification system to identify inmates that are at risk of being assaulted and to identify inmates that are likely to assault other inmates. With this new system, CDCR hopes to ensure inmates from these two groups are not celled together. The new classification system is expected to be implemented in early 2016.

Finally, as heard repeatedly in interviews with former HDSP staff, the lack of quality programs at HDSP is a factor leading to inmates having nothing to do and causing tensions to rise. As stated earlier in this report, one way to mitigate criminality and violence is to increase program opportunities for the inmate population.

## RECOMMENDATIONS TO CDCR

- Address the growing violence on sensitive needs yards by:

    o developing formal policies and procedures related to SNY housing;

    o considering the development of separate SNY housing criteria for vulnerable inmates at risk of assault;

    o transferring aggressors to some other type of housing;

    o re-examining the double cell policy for sensitive needs yards pursuant to previous OIG recommendations;

    o requiring completion of a compatibility review, similar to the *CDCR Form 1882-B*, *Administrative Segregation Unit/Security Housing Unit Double Cell Review*; and

    o reviewing the process for transitioning inmates from single-cell designation to double-cell status, pursuant to prior OIG recommendations.

- Add more meaningful programs to sensitive needs yards, especially Level IV SNYs such as HDSP's Facility B, where programs have been historically lacking.

- Ensure that classification staff designating inmates as requiring SNY placement, inform inmates that SNYs are still violent, have programming no different from GP yards, and once assigned to an SNY, it is very difficult to ever return to a general population yard.

- Require training for SNY staff in supervising vulnerable populations.

- Require racial balance criteria for inmate program assignments in SNY housing, at least at HDSP (similar to general population facilities), to overcome the perception of racial bias.

# INMATE APPEALS AND STAFF COMPLAINTS

## APPEAL COLLECTION AND PROCESSING

The OIG reviewed dozens of complaints, filed by both inmates and staff, related to the processing of inmate appeals. Some of the allegations included:

- Appeals were being destroyed or discarded, never being delivered to the Appeals Office.

- Appeals were being read by officers, and if the appeal contained a complaint against staff, the inmate was subjected to retaliation or the appeal was destroyed.

- Staff complaints were never addressed.

- Appeals were being shredded by Appeals Office staff.

As referenced earlier, the OIG published a review in September 2011 of CDCR's inmate appeals process, finding the process does not provide enough accountability to address inmate allegations that appeals are subject to intentional destruction or negligence. In response to OIG recommendations, the department issued a December 30, 2011, directive to all institutions, which, among other mandates, included the following:

- A secure appeals lock box is required on every yard and in each building, retrieval from which shall only be done by Appeals Office staff and/or staff designated by the warden.

- Reading or inspecting the contents of appeals by anyone outside of Appeals Office staff is prohibited.

At HDSP, neither of these directives were implemented. The OIG's review found that the first watch program sergeant is delegated the responsibility for collecting appeals from the lock boxes and delivering them to the Appeals Office. The key to each lock box is on each program sergeant's key ring, which is passed from the first watch sergeant to the second watch sergeant to the third watch sergeant. This of course means that throughout the course of any given day, many different people have access to read, tamper with, or destroy inmate appeals.

Appeals may also be submitted through the mail. All inmate mail not marked as legal mail, including inmate appeals, is opened, read, and examined for contraband by HDSP officers. As an aside, department managers were unable to explain why a letter addressed to the Appeals Office within the prison needed to be opened and examined for contraband. Once read and examined, instead of routing the appeals directly to the Appeals Office, officers were placing the mail into a mailbag for delivery to the mailroom, where it would once again be subject to review by mailroom staff, before finally arriving at the Appeals Office.

Additionally, inmates housed in the administrative segregation unit or on modified program during a lockdown, cannot personally deposit their appeals in a lock box in any institution. In these situations, the same staff who provide day-to-day supervision of the inmates in their assigned housing units personally collect the appeals from the inmates' cells and are then supposed to deposit them into the lock box on the inmates' behalf. HDSP's appeals collection process allows inmate appeals to pass directly through the hands of those who might have an interest in the complaint, whether that be the officer being accused of misconduct, that officer's friend (or quite possibly neighbor), or a supervisor who may be friends with the accused officer. This process decreases individual accountability and thwarts HDSP's ability to determine who is responsible if the appeals lock box has been tampered with or if an inmate's appeal goes missing.

As reported above, in 2011, the OIG found that the appeal process lacks an accountable means of verifying that appeals are made and lacks an accountable means of delivering appeals. The report recommended CDCR add a receipt feature to its appeal form so that appeals could be tracked; allow inmates to make copies of their appeals; and implement accountability measures, such as requiring Appeals Office staff to directly collect inmate appeals instead of custody staff.

The OIG reiterates its recommendations from its 2011 report, and in addition, the department must address the issue of inmates in ASU or on a modified program during lockdown who are unable to personally place their appeal into a lock box. This can be remedied by mandating Appeals Office staff personally retrieve the appeal from the inmates' cells or instituting some form of secure mobile collection process.

## VOLUME OF APPEALS AT HDSP

During the 18-month period of January 1, 2014 through June 30, 2015, the HDSP Appeals Office logged 5,711 appeals. The following table indicates property complaints are overwhelmingly the most appealed issue, at more than double the amount of the next highest appeal category. Although the topic of lost or destroyed inmate property is not the focus of this review, the sheer volume of property appeals should signal to HDSP management that there are systemic issues related to its handling of inmate property that need to be addressed.

During interviews of inmates and parolees formerly assigned to HDSP, a few stated that staff would take an inmate's property and give it to another inmate in exchange for a favor. One inmate mentioned a particular staff member who was known for giving confiscated inmate property to other inmates as a reward for assaulting inmates. Another inmate said that he had seen staff take property from inmates involved in assaults, place the property on a table, and later allow other inmates to take it.

The OIG found during the course of its review that staff do not always have a clear understanding of the policies and procedures related to the processing and handling of property. In addition, the OIG is currently monitoring an internal affairs investigation related to allegations of officers tampering with inmate property as a ruse to confiscate the property. The OIG will report on the outcome of the case at the conclusion of the investigation.

**HDSP Appeals January 2014 – June 2015**

| Facility | Appeals |
|----------|---------|
| HDSP-A | 1246 |
| HDSP-ASU | 396 |
| HDSP-B | 1136 |
| HDSP-C | 1127 |
| HDSP-D | 1229 |
| HDSP-E (MSF) | 42 |
| HDSP-H (CTC) | 80 |
| HDSP-Other | 455 |
| Grand Total | 5711 |

| Appeal Issue | Appeals |
|--------------|---------|
| PROPERTY | 1539 |
| CUSTODY/CLASS. | 580 |
| DISCIPLINARY | 510 |
| ADA | 412 |
| LEGAL | 410 |
| STAFF COMPLAINTS | 384 |
| LIVING CONDITIONS | 318 |
| FUNDS | 305 |
| WORK INCENTIVE | 256 |
| MAIL | 253 |
| CASE RECORDS | 228 |
| PROGRAM | 220 |
| TRANSFER | 148 |
| VISITING | 58 |
| MEDICAL | 43 |
| SEGREGATION | 39 |
| RE-ENTRY/PAROLE | 8 |
| Grand Total | 5711 |

In addition to the appeals above, during this same timeframe, over 2,000 health care related appeals were responded to by HDSP's health care services department. The most appealed health care issues were related to medication, disagreements regarding treatment decisions, issues related to reasonable accommodations for ADA inmates, access to care, referrals, and issues related to reasonable accommodation medical devices. Unlike regular appeals, which are stored in an inmate's electronic file, health-care-related appeals, due to HIPAA laws, are kept in the Health Care Appeals Tracking System. If a health care appeal is received in the Inmate Appeals Office by mistake, it is re-routed to the Health Care Appeals Office for response.

## STAFF COMPLAINTS

When an inmate wants to file a complaint against a staff person, it is handled by Appeals Office staff in a manner similar to a regular appeal, with a few exceptions. The policy for processing a staff complaint can be found in CCR, Title 15, Section 3084.9(i), titled *Exceptions to the Regular Appeal Process*. Basically, the policy requires the inmate alleging staff misconduct by a departmental employee to forward the appeal to the appeals coordinator who in turn must forward it to the hiring authority (at a level not below chief deputy warden) with a recommendation on whether to process as a regular appeal or handle as a staff complaint.

If the hiring authority determines it should not be handled as a routine appeal, the hiring authority has the following options:

(1) If the hiring authority determines the alleged conduct would likely lead to adverse personnel action, the case will be referred for an internal affairs investigation by CDCR's Office of Internal Affairs.

(2) If the hiring authority determines the alleged conduct does not warrant a request for an internal affairs investigation, a confidential inquiry shall be completed by whomever at the prison the hiring authority designates.

The staff complaint process can be very frustrating for the appellant inmate, as the confidential nature of the proceedings give little feedback to the inmate. The inmate is only informed whether or not the complaint is being referred for an investigation or confidential inquiry and then the final outcome of the investigation or inquiry. The inmate does not receive a copy of the confidential report; however, the accused staff may review the confidential report in the Appeals Office upon approval of the prison's litigation coordinator.

The OIG reviewed the HDSP logs for staff complaints filed at HDSP from January 1, 2014, through June 30, 2015. The OIG found that of the 807 staff complaints filed, only 282 were referred for investigation. This is not uncommon in CDCR, as individual staff complaint determinations tend to come down to the inmate's word versus the word of staff, and allegations of misconduct can be difficult to prove.

| HDSP Staff Complaints - January 1, 2014 - August 18, 2015 | |
|---|---|
| 807 | Total number of staff complaints processed by the HDSP Appeals Office. |
| 34 | Cancelled. Usually due to the issues being identified as duplicative of another appeal. |
| 491 | Processed as a routine appeal after being deemed not to meet the criteria for assignment as a staff complaint. |
| 267 | Processed as a staff complaint. Referred to an Associate Warden for inquiry, due to adverse action being unlikely. |
| 5 | Referred to HDSP's Investigative Services Unit for an allegation review to gather additional information. |
| 10 | Referred to CDCR's Office of Internal Affairs for investigation, based on a reasonable belief that misconduct occurred. |

As illustrated in the table above, in all but ten of the HDSP staff complaints, the hiring authority decided to handle the complaints internally. Only about one percent of all the staff complaints filed were ever reviewed by anyone outside of HDSP. Additionally, in one of the ten cases where HDSP reported it had been referred for an outside investigation, there is no evidence that the complaint ever actually left the institution.

The OIG noted that there were several staff who had multiple staff complaints filed against them from several different inmates. The alarming number of complaints should have triggered HDSP management staff to look more closely at the totality of the

circumstances surrounding the complaints, such as deficiencies in supervision; however, management never correlated multiple complaints against officers.

HDSP is not consistently logging its allegations of misconduct, which is required by DOM Section 31140.13; therefore, it cannot accurately track the status of complaints referred for inquiry or investigation, nor can it easily recognize potential areas of concern related to allegations being lodged repeatedly against the same staff or in the same work area.

## DISINCENTIVES TO FILING STAFF COMPLAINTS

The appeal collection process places inmate appeals directly in the hands of the officers being accused of misconduct. This creates a significant disincentive for inmates to file appeals; knowing that the officers they are accusing of misconduct will be handling or reading the appeals will likely dissuade an inmate from filing a complaint. When an inmate does file a complaint against staff, the inmate is often placed in administrative segregation for their own "protection," which is yet another disincentive.

However, even if the appeals collection process is changed in a manner that precludes custody staff from reading or handling inmate appeals, the CCPOA MOU contains a provision that mandates that officers who are accused of misconduct by inmates be immediately notified of the contents of all inmate complaints filed against them. Section 9.09 of the Bargaining Unit 6 MOU states:

> (D) Whenever a ward/inmate/parolee/patient files or submits a grievance, a 602 (Inmate Appeal), any written complaint, or verbal complaint which is later reduced to writing by either the inmate or the State, which, if found true, could result in adverse action against the employee or contain a threat against the employee, the Department agrees to immediately notice the employee of said filing. The State agrees to provide the affected employee a copy of said document if the employee so requests. This is not intended to preclude the informal level response procedure in the current CDCR Operations Manual. Upon the employee's request, a copy of the outcome of the ward/inmate/parolee/patient's complaint shall be provided, if the complaint has progressed beyond the informal stage. The Employer and CCPOA agree that all video tapes, audio tapes or any other kind of memorialization of an inmate/ward/parolee/patient statement or complaint shall be treated as a writing within the meaning of this subsection. The tapes or writings shall be turned over, regardless of whether the complaint/statement is deemed inmate/ward/ parolee/patient initiated or not.

The department's appeal process fails to protect the identity of the inmate accusing an officer of misconduct and unjustifiably exposes the inmate to retaliation for filing a complaint. The appeal process is the inmate's main avenue for resolving issues and the OIG was repeatedly informed that inmates choose to no longer file appeals for fear of

reprisal. CDCR's own peer review found additional deficiencies in HDSP's appeal processing.

CDCR's headquarters Appeals Office has responsibility for ensuring institutions have the necessary training and assistance needed relative to the appeal system; conducting audits of appeals units; and meeting with CDCR administrators to review policy and procedure needs as revealed by inmate appeals. It does not appear that the headquarters Appeals Office has done any of these related to High Desert State Prison, which could greatly benefit from oversight, training, and assistance.

## RECOMMENDATIONS TO CDCR

- Create a formal policy that reflects the contents of the December 30, 2011, memo titled: *Secure Appeal Collection Sites and Related Matters*, but require appeals in lock boxes be retrieved by Appeals Office staff only.

- Add a receipt feature to the *CDCR Form 602, Inmate/Parolee Appeal*, or assign a log number to all appeals at the point of collection.

- Immediately reiterate that initial appeal content is to be read by Appeals Office staff only, until assigned out for response.

- Provide HDSP staff with training relating to the processing and handling of inmate property and hold officers accountable for failing to abide by the relevant policies and procedures.

- Require institutions to conduct a management review into an employee's performance and worksite when multiple staff complaints are filed by multiple inmates against an individual employee.

- Revisit DOM Section 31140.14, and develop a procedure to ensure staff completing allegation inquiries have received approved internal affairs investigation training, prior to being designated and/or approved by CDCR's OIA or OIA investigators.

- Require staff performing allegation inquiries into staff complaints receive formal internal affairs investigations training prior to conducting allegation inquiries.

- Ensure hiring authorities and managers reviewing allegation inquiry reports are trained to recognize complete, thorough, and adequate allegation inquiry reports.

- Develop an accountability process for ensuring hiring authorities are keeping accurate and complete *CDCR Form 2140, Internal Affairs Allegation Logs*, in accordance with DOM Section 31140.13, which requires each allegation of employee misconduct be logged, regardless of whether the allegation is referred for investigation.

- Renegotiate Section 9.09 of the Bargaining Unit 6 MOU to treat inmate appeals in the same manner as any other allegation of staff misconduct.

- Remedy the inability of inmates in ASU or on a modified program to personally place their appeal into a lock box, by mandating Appeals Office staff personally retrieve the appeal from the inmates' cells or instituting some form of secure mobile collection process.

- Dispatch staff from the Appeals Office to conduct an in-depth audit of HDSP's appeal process, provide any remedial training necessary, and report back to CDCR administrators any policy or procedure deficiencies revealed by a review of HDSP inmate appeals, such as property issues and the handling of staff complaints.

# USE OF FORCE INCIDENTS

## HDSP USE OF FORCE FREQUENCY

As part of this review of High Desert State Prison, the Senate Committee specifically requested the OIG review practices related to excessive use of force against inmates, internal reviews of incidents involving excessive use of force against inmates, and protection of inmates from assault and harm by others.

The OIG analyzed and compared a variety of use of force documents and data points, spanning, unless otherwise noted, the 18-month period of January 1, 2014, through June 30, 2015. This included several dozen use-of-force incident packages, staff complaints alleging excessive or unnecessary use of force, disciplinary logs and rules violation reports, confidential inmate files related to force allegations, complaints filed directly with outside stakeholders, and internal affairs investigations. In addition, the OIG interviewed several inmates formerly housed at HDSP.

From the data gathered by the OIG, it developed the following tables to get a snapshot of how HDSP compares to other similar facilities, and how the facilities within HDSP compared to each other.

The table below compares the total number of incidents to the total number of incidents involving use of force, and the percentage of incidents involving use of force, that occurred on Level IV SNY facilities.

### Incident Data, Level IV SNY Facilities[22]

| Facility | Total # of Incidents | Total # of Incidents Involving Use of Force | Percent of Incidents Involving Use of Force |
|---|---|---|---|
| HDSP-B | 227 | 173 | 76% |
| CAL-D | 91 | 49 | 54% |
| COR-03B | 343 | 176 | 51% |
| KVSP-C | 226 | 118 | 52% |
| KVSP-D | 204 | 141 | 69% |
| LAC-C | 217 | 134 | 62% |
| MCSP-A | 334 | 214 | 64% |
| RJD-C | 209 | 98 | 47% |
| SATF-D | 128 | 80 | 63% |

---

[22] SVSP and CCI also have a Level IV SNY; however, they went through their conversions during this timeframe, so comparable data was not available.

This data demonstrates that HDSP's Level IV SNY Facility B had the highest percentage of incidents involving the use of force, compared to other Level IV SNY facilities.

The next table compares the number of inmate disciplinary actions for a variety of serious or violent offenses to the total number of all inmate disciplinary actions, for each yard at HDSP.

**HDSP Inmate Disciplinary Actions**

| Inmate Disciplinary Actions January 1, 2014-July 31, 2015 | HDSP-A | HDSP-B (SNY) | HDSP-C | HDSP-D |
|---|---|---|---|---|
| Inmate Disciplinary Actions for Serious or Violent Offenses | 337 | 805 | 354 | 387 |
| All Inmate Disciplinary Actions | 643 | 1076 | 486 | 548 |
| Percent of Disciplinary Actions for Serious or Violent Offenses | 52% | 75% | 73% | 71% |

This data demonstrates that a significantly higher number of disciplinary actions occurred on Facility B, with a higher percentage involving serious or violent offenses, compared to the other HDSP facilities.

In addition to reviewing incident data, the OIG has been reviewing every use of force incident package and attending every Institutional Executive Review Committee[23] (IERC) meeting since March 2015,[24] where the warden and executive staff review every use of force incident package. Reviews conducted by the OIG find that the majority of the incident packages and staff reports are thorough and the IERC conducts a fair review. It should be noted that IERC reviews are only as thorough as the reports available for review. If fights are instigated or staff are not fully reporting the force used, this will not be apparent in the reports. Additionally, unlike institutions with yard cameras, staff reports are the only source of information related to HDSP use-of-force incidents for the IERC to review.

In the OIG's 2012 report related to sex offender abuses at High Desert State Prison, some of the officers interviewed indicated that they believed there were officers at HDSP who would provoke inmates into physical altercations to necessitate the use-of-force. The inmate interviews conducted by the OIG are consistent with the picture the data paints of High Desert State Prison as an institution with a high level of violence. The interviews are also consistent with inmate complaints the OIG read in appeals and also in letters written to the OIG and received from outside stakeholders.

---

[23] IERC requirements can be found in CCR, Title 15, Section 3268, Use of Force.
[24] Prior to March 2015, the OIG would attend at least one IERC meeting at HDSP per month.

The following excerpts are summarized from individual inmate interviews, conducted separately over the course of this review:

*.. officers are slow to respond to incidents.*

*.. always concerned that an incident could erupt at any time.*

*.. had safety concerns due to his commitment offense.*

*.. officers at times were slow to respond during riots.*

*.. felt less safe than other prisons.*

*.. an officer sent an inmate to attack him, and then the officer and his buddies sat and watched.*

*.. constantly afraid at HDSP, and had never been afraid at any other prison. It was the officers he was afraid of, and not the inmates.*

Additionally, the OIG was told that staff who had previously worked at HDSP and then transferred to CCC were heavy-handed and quicker to "jump" to using force.

The OIG is also currently monitoring a number of internal affairs investigations related to excessive or unnecessary force which are detailed in the ***Internal Affairs Investigations*** portion of this report. The OIG will report on the outcome of these cases at the conclusion of the investigations. All of these incidents currently being monitored allegedly occurred between October 2014 and September 2015.

With an appeals process that is fatally flawed and a staff complaint process that results in only about one percent of complaints getting referred for an outside investigation, coupled with staff's unwillingness to report misconduct for fear of reprisal, it is very difficult to prove excessive or unnecessary use of force. However, inmates continue to utilize all available avenues to report alleged abuses, including writing letters to the CDCR Ombudsman, the OIG, the Prison Law Office, the Legislature, and the Governor. Until the department takes steps to address these issues, outside stakeholders will continue to place a heightened level of scrutiny on HDSP.

## THE NEED FOR CAMERAS IN ALL INMATE AREAS

In the OIG's September 2015 Semi-Annual Report, it was noted that one area where the department agrees but has yet been unable to address, is the placement of cameras on all yards and in all housing units. Such surveillance is invaluable in capturing misconduct, documenting inmate activity, and exonerating employees who have been wrongly accused of misconduct. The OIG monitors all incidents involving the use of deadly force, as well as incidents involving lesser force that may not have complied with departmental policy. Often times there are conflicting accounts of what transpired, making it difficult

to assess whether the force used complied with policy. High quality visual recordings of incidents can serve to resolve these conflicting accounts. In addition, there are many rule violations and crimes inmates commit that visual recordings could memorialize for just resolution. However, most institutions still lack cameras, including HDSP.

Installing cameras at High Desert State Prison should be the department's number one fiscal priority. Allegations of excessive and unnecessary use of force, inmate abuse, and staff misconduct have been relentlessly lodged at HDSP for years, and with evidence of lax supervision and sustained cases of officers failing to report use of force that they observed, cameras are the absolute best tool for CDCR to curtail misconduct and exonerate staff falsely accused of using unnecessary or excessive force.

When deciding on a camera system to install, the OIG recommends that the department look to the system installed at the California Health Care Facility or the California City Correctional Facility, and ensure the cameras are installed in all inmate areas.

## THE NEED TO PILOT A PROGRAM USING BODY CAMERAS

In addition to installing cameras in all inmate areas, CDCR should pilot a program similar to the program piloted by the Wisconsin Department of Corrections (WDOC). According to the WDOC, it partnered with a company known as Taser International to conduct a pilot program using body cameras in its Waupun Correctional Institution (WCI). The pilot was designed to enhance staff professionalism, reduce sexual assault allegations, staff assaults, inmate complaints regarding staff, and use of force incidents. At the conclusion of the pilot, WCI found that there was a reduction in the number of use of force incidents; however, PREA allegations and inmate complaints remained consistent.

WCI found the body cameras to be very effective for interactions at cell doors and when speaking to inmates. They were not effective while escorting inmates; however, the audio provided perspective as to what was taking place.

In the beginning of the pilot, WDOC reported that staff were apprehensive about wearing the cameras, while the inmate population appeared to be playing to the camera, attempting to provoke an unprofessional response from staff. Training regarding professional communication skills was conducted with all staff involved in the pilot and after a couple of weeks, staff were comfortable wearing the cameras and the inmates had adjusted as well. The pilot showed that the cameras enhanced the professionalism of staff and how they communicated with inmates.

Although the number of complaints and PREA allegations did not decrease during the pilot, the camera footage made it easier to review the allegations and determine if an incident occurred. The use of body cameras by police departments has also had a positive

impact of enhanced officer safety and reduced liability, and as the WDOC pilot shows, it appears that similar benefits can also be achieved within correctional settings.[25]

In piloting the use of body cameras, the OIG recommends that CDCR choose at least one building on HDSP Level IV SNY facility. This will enable the department to compare incident and disciplinary data, among other things, to other buildings housing similar inmates. The OIG further recommends that the body cameras be equipped with GPS (global positioning satellite) geotagging technology, which is a common feature in body cameras. This feature could be important to determine the location of staff during incidents at any particular point in time, improving officer safety and possibly disproving staff misconduct allegations.

## ALLEGATIONS THAT STAFF ARE SLOW TO RESPOND TO INCIDENTS

Although the earlier table shows that HDSP has a high percentage of incidents involving the use of force, several inmates previously housed at HDSP said that staff would pick and choose which incidents to respond to with force. Inmates stated officers were sometimes deliberately slow to respond to incidents and intervene when inmates assaulted one another. Two recent incidents occurred at HDSP, where staff reports suggest a delayed response and failure to use force when it appears force was necessary to stop serious injuries to the victims from multiple attackers. The details of these incidents are as follows:

> Staff observed three inmates attacking another inmate on the yard by punching the victim with their fists. One officer reported that it took ten minutes before the inmates finally complied with staffs' orders to get down into a prone position. As staff finally approached the incident, the combatants ceased their attack. Staff reports state that the victim lost consciousness during the incident and was transported to an outside hospital for serious bodily injuries, including a broken nose, broken orbital socket, and stitches to his left eye. Force was not used to stop the attack.

> Staff observed four inmates attacking another inmate on the yard by punching the victim with their fists, while one of them stabbed the victim multiple times with an inmate manufactured weapon. Staff reports state that staff gave multiple orders for the inmates to get down, but the combatants continued their assault. As staff finally approached, the combatants ceased their attack. Staff reports state that the victim was transported to an outside hospital for serious bodily injuries, including more than 30 lacerations and puncture wounds to his face, neck, stomach, head, and back areas. Force was not used to stop the attack.

Allegations that officers are slow to respond to incidents are exceedingly difficult to adjudicate. There is no system currently in use that documents where officers are within

---

[25] A copy of WDOC's pilot report at WCI can be found in the Appendix J.

the prison. One solution would be to use GPS or RFID (radio frequency identification) type tags to document where officers are in the prison. Not only would these types of allegations be easy to resolve, but the use of this type of technology would be a significant enhancement to the safety and security of the individual officers. No officer could ever be isolated without someone knowing their location.

## RECOMMENDATIONS TO CDCR

- Immediately install cameras in all inmate areas, including, but not limited to, the exercise yards, rotundas, building dayrooms, patios, and program offices of HDSP.

- Implement a pilot program in at least one building on HDSP's Level IV SNY facility, requiring custody staff to wear body cameras, similar to the pilot conducted at Wisconsin's Waupun Correctional Institution. Ensure the body cameras are equipped with GPS geotagging technology. Collect, compare, and report the resulting incident, disciplinary, and other relevant data for the buildings with body cameras and the similar buildings without body cameras, for possible statewide pilot program expansion.

- Ensure that HDSP custody supervisors are scrutinizing all incidents where inmates receive serious injuries, and hold accountable officers who fail to timely respond to incidents and fail to use force when appropriate to stop potential deadly attacks.

- Consider using GPS or RFID type technology to document where within an institution an officer is located.

# *ARMSTRONG* REMEDIAL PLAN – ADA INMATES

## DISABILITY PLACEMENT PROGRAM

In 1994, a class action lawsuit (known as *Armstrong*) was brought against the department under the Americans with Disabilities Act and the Rehabilitation Act on behalf of inmates and parolees with disabilities. The resulting court-ordered *Armstrong* Remedial Plan[26] is the department's framework for ensuring inmates are not excluded from programs, services, or activities, and are not discriminated against, due to a disability.

The Disability Placement Program (DPP) is the department's set of plans, policies, and procedures related to *Armstrong*. Inmates with permanent mobility, hearing, vision, and speech impairments, or other disability or compound conditions severe enough to require special housing and programming, are to be placed in a designated DPP facility. HDSP has been a designated DPP facility since at least 1997. Inmates with a permanent impairment of lesser severity may be assigned to any of the department's institutions consistent with their existing classification factors.

The number of DPP inmates at any institution varies from day to day. In October 2015, of the more than 3,000 inmates housed at HDSP, approximately five percent (165) were DPP inmates, who were housed on various yards throughout the institution based on their classification factors.

| HDSP DPP Inmates | |
|---|---|
| Mobility Impaired (not impacting placement) | 58 |
| Full Time Wheelchair User | 30 |
| Hearing Impaired (not impacting placement) | 28 |
| Mobility Impaired | 19 |
| Intermittent Wheelchair User | 17 |
| Vision Impaired | 10 |
| Hearing Impaired | 3 |
| Total DPP Inmates[27] | 165 |

At the designated facilities, the department is required to provide reasonable accommodations or modifications for known physical or mental disabilities of qualified inmates. Examples of reasonable accommodations include: special equipment (such as

---

[26] A copy of the Plan can be found on CDCR's website, at: www.cdcr.ca.gov
[27] In addition, 19 of the 165 DPP inmates also had a secondary disability.

readers, sound amplification devices, or Braille materials), inmate or staff assistance, bilingual or qualified sign language interpreters, modified work or program schedules, or grab bars installed for mobility impaired inmates who require such.

Ultimately, when an inmate requests a durable medical device or an accommodation, custody staff must initially provide the device or accommodation to the inmate and then refer the inmate to a physician to determine whether the accommodation or device is needed for the disability. Custody staff does not have the authority to deny an accommodation or medical device unless there is a demonstrated security concern.

## CALLOUS TREATMENT OF DPP INMATES

During the OIG's review, allegations surfaced that staff callously disregarded an inmate's claimed disability and that a general culture of indifference to the plight of severely disabled inmates exists at HDSP. The OIG is currently monitoring three investigations that illustrate this culture of indifference. HDSP referred one of these investigations on its own; the other two cases would not have been referred for investigation, but for this review.

### Case Number 1

In this case, an inmate who had mobility impairment was virtually ignored by staff for hours. The *Armstrong* issues arose after a use-of-force incident. The inmate, who wore a leg brace to prevent foot drop due to an injury that occurred prior to his commitment to State prison, was confronted about alleged contraband shoes that he was wearing. When he refused to voluntarily relinquish the shoes, the shoes were forcibly removed. When the shoes were removed, custody staff also confiscated his leg brace. During that incident, the inmate received a head injury and a leg injury which required him to be taken to an outside hospital for a higher level of care.

When he returned from the hospital, he was in a wheelchair and was dressed in an orange jumpsuit (the type of jumpsuit inmates wear when outside the prison). He was directed to remove the jumpsuit and to return to his housing unit to pick up his issued blue prison clothing. His wheelchair was also taken from him. He protested that, because of his injuries, he could not walk and needed the wheelchair. By this time, he was only dressed in boxer briefs. He was told by custody staff that he did not have an authorization for a wheelchair and that he needed to walk back to his housing unit to get dressed. It should be noted that prior to the altercation he did walk with a cane and with a leg brace. The inmate protested that he could not walk and needed the wheelchair and was told by custody staff "when you get tired of sitting here you will get up and walk back to your housing unit." He remained outside the housing unit for an extended period of time while custody staff simply ignored him sitting there in his boxer briefs. At some point, a lieutenant noticed him sitting there and asked him why he was simply sitting there. The inmate explained that he could not walk back to the housing unit and, at this point, the lieutenant retrieved a wheelchair and had the inmate delivered to a medical clinic.

The inmate remained in the medical clinic for several more hours, sitting in a holding cell in his boxer briefs. Again, there is no evidence that staff inquired as to what his condition was and why he was sitting there. Finally, the same lieutenant who had delivered him to the medical clinic observed him sitting there and again inquired as to why he was just sitting in the medical clinic. The inmate again informed the lieutenant that he needed help getting back to his housing unit and at that point the lieutenant made arrangements for the inmate's cellmate to take the inmate back to his housing unit in a wheelchair. After finally arriving at his cell, the inmate remained for several days without a wheelchair and was unable to participate in programming. There is no evidence that custody checked on the inmate until he was transferred to another institution several days later.

There appears to have been a complete disregard for this inmate during the hours that he was simply sitting trying to get back to his housing unit and further disregard after he was in his cell.

**Case Number 2**

In this case, a wheelchair-bound inmate resisted being placed in a cell, claiming that he had safety concerns with the other occupant of the cell. The officers disregarded his safety concerns and physically picked him up out of the wheelchair and threw him into the cell. The door to the cell was then closed and the wheelchair was thrown against the door, damaging the wheelchair. Neither the use of force nor the damage to the wheelchair was reported. In addition, an inmate who could not ambulate was left in the cell without his wheelchair.

**Case Number 3**

In this case, a hearing impaired inmate who was wearing a vest noting that he was hearing impaired was slightly injured during a use-of-force incident. The inmate was receiving a package through Receiving and Release and for reasons still not clearly understood; the inmate became upset regarding his package. There was no sign language interpreter and it does not appear that the officer ever tried to establish effective communication.

The account of what happened becomes somewhat confused at this point with officer witnesses claiming that the inmate took a bladed stance and raised his fists while inmate witnesses consistently claim that this inmate turned around to leave and was tackled from behind. What is clear is that no reasonable attempt was made to establish effective communication with an inmate who has been deaf and speechless since birth.

## INTERNAL COMPLIANCE REVIEWS AND PLAINTIFF TOURS

As part of this authorized review, the OIG reviewed CDCR internal *Armstrong* compliance reviews and the reviews done by plaintiffs' counsel. The department has not done an internal compliance review since 2013, while plaintiffs' counsel has done a review within the past few months.

CDCR's 2013 internal *Armstrong* compliance review showed a decrease in compliance from the prior review done in 2011. After the 2013 compliance review, a final corrective action plan was required; however, the corrective action plan was not submitted until March 24, 2015.

In contrast, the most recent plaintiffs' counsel tour and document review at HDSP was conducted from August 18 – 21, 2015. Plaintiffs' counsel conducts yearly tours of each CDCR institution. The most recent Plaintiff *Armstrong* monitoring tour found HDSP significantly out of compliance in several areas. Many of the serious violations identified in this report have been previously identified by Plaintiffs, but never effectively addressed or remedied by the institution. The areas of noncompliance found by Plaintiffs are broadly documented in the following areas:

## I. MANAGEMENT FAILURES PREVENT THE INSTITUTION FROM RECOGNIZING AND REMEDYING VIOLATIONS

Plaintiffs believe that management has not embraced the reforms mandated by the *Armstrong* remedial orders. Plaintiffs allege that prison management fails to identify or stop violations from occurring. Plaintiffs report that inmates who were interviewed have claimed that staff retaliate against prisoners who request disability accommodations. These reports have remained consistent from year to year. What is most troubling is that the department has not investigated these complaints, seemingly dismissing them because they come from inmates.

For several years, a consistent complaint has been that appeals "disappear" or "go missing." Interviews of inmates by Plaintiffs' counsel have been consistent with complaints received by the OIG about appeals that have gone missing or are not acted on. The OIG's review of the appeals system at HDSP noted that the institution is not collecting appeals as directed by a memo authored by a former Director of Adult Institutions, which directed institutions to collect appeals with personnel other than officers who may be subjects of staff complaints. HDSP tasks housing officers on first watch to collect the appeals. This practice sets the department up for allegations that officers who may be the subject of a complaint are interfering with the complaint process.

## II. THE YARDS ARE INACCESSIBLE AND PRISON STAFF DO NOT BELIEVE THERE IS ANY DURABLE REMEDY

Plaintiffs allege that the paths of travel throughout the yards at HDSP are inaccessible to people with mobility and vision impairments. Cracks that appear two or three inches wide and one-half to two inches deep run throughout each of the prison yards, making the yards unsafe for prisoners with significant mobility and vision impairments. Path of travel problems throughout the yards are longstanding, and are the subject of numerous reports and appeals as documented in the Plaintiffs' March 2014 HDSP report.

There appears to be no immediate ongoing remedial plan to improve accessibility of all paved areas at the prison and at all times of year. Although CDCR expects to complete "master plan" repairs to HDSP, those repairs are not expected to begin until mid-2016.

Again, it appears that there is no management emphasis on making the yards accessible in the near term.

## III. VIOLATION OF STATE MOBILITY IMPAIRED VEST POLICY

Prison staff confirmed that the policy at HDSP is to require everyone to sit down on the ground when there is an alarm – including those wearing mobility vests. This is contrary to the statewide policy stated in a February, 25, 2014, Memorandum from the Director of Adult Institutions and the Director of Health Care Operations at the California Correctional Health Care Services (CCHCS) to all wardens, which states that "inmates wearing a MI [Mobility Impaired] Vest are not required to attain a seated position" during alarms. This violation of policy is particularly concerning because the *identical* violation was identified in the Plaintiffs' March 2014 HDSP report.

## IV. LACK OF EFFECTIVE INMATE DISABILITY ASSISTANT PROGRAM

The Inmate Disability Assistant Program (IDAP) is not functioning adequately at HDSP, as IDAP workers are not allowed out of their cells during their work hours unless they are specifically called by a correctional officer to provide help; IDAP workers are not trained; and IDAP workers were instructed to perform inappropriate tasks including carrying canteen items for prisoners and, more troubling, one IDAP worker was instructed to place his cellmate in waist-chain restraints.

## V. FAILURE TO ACCOMMODATE PRISONERS WITH HEARING IMPAIRMENTS

Class members reported that staff failed to allow the use of telecommunication devices for the deaf (TDD) phones, failed to provide sign language interpretation, and failed to communicate alarms and announcements.

## VI. OTHER CUSTODY STAFF FAILURES ALLEGED BY PLAINTIFFS' COUNSEL

### *Failure to maintain ADA cells in working order*
There was water leaking from the ceiling in numerous wheelchair-accessible cells on facility B and the ADA staff had been unaware of these leaks until Plaintiffs raised them. If prison staff had been conducting the safety checks and ADA features checks required by the local operating procedures, staff would have identified and remedied these leaks earlier.

### *Failure to provide orientation materials*
Numerous class members who had recently arrived to the prison reported that they had not received orientation, including information regarding the purpose of the DPP; availability of the CCRs, ARP, and similar printed materials in accessible formats; reasonable accommodations or modifications available to qualified inmates; access to readers or scribes and availability of specialized library equipment.

### *Lack of access to day room showers*
Numerous inmates with disability placement wheelchair (DPW) status throughout B yard reported that they have difficulty accessing the ADA showers because so many non-disabled

prisoners use that shower, and because prisoners with disabilities who have mobility devices, prostheses, or incontinent supplies, often require additional time to complete their showers. This issue has been raised in numerous appeals, and in numerous prior reports.

### Laundry

Incontinent prisoners throughout the institution reported to Plaintiffs' counsel that when they have accidents, they are unable to get clean clothing or laundry. That complaint has been relayed to management with no evidence of management action.

### Lack of knowledge of the new durable medical equipment (DME) policy

Interviews with class members suggest that custody staff still demand Chronos for hygiene supplies, such as toilet paper. Numerous prisoners throughout the institution who are incontinent as a result of their disability also reported that they are denied access to a shower when they have an accident. The same issues were reported last year.

### Failure to provide restroom accommodations in the library

Library staff confirmed that prisoners are not allowed to access restrooms while in C or D facility libraries. This poses a problem for class members who, because of their disability, are incontinent and may need immediate access to a bathroom.

### Mismanagement of prisoner property

Plaintiffs received a number of complaints from class members claiming that prison staff allow other prisoners go through their personal property and, as a result, items are stolen. The OIG has also received the same type of complaints.

## VII. HEALTH CARE STAFF FAILURES ALLEGED BY PLAINTIFFS' COUNSEL

### Delayed provision of durable medical equipment

A number of prisoners complained of improper delays in receipt of ordered durable medical equipment. A review of the DME logs and receipts indicate additional delays.

### Wheelchair repair problems

Although the local operating procedures require HDSP staff to evaluate each wheelchair each day to determine if it is in safe working order, it is apparent that this is not occurring. Nor are staff taking appropriate steps to ensure that broken wheelchairs are repaired. This same problem was reported last year.

### Erroneous charges for durable medical equipment supplies

Plaintiffs identified numerous instances where class members were inappropriately charged for wheelchair gloves and hearing aid batteries.

### Failure to provide needed toileting supplies

Monitors received reports that disabled inmates had not received needed toileting supplies, such as colostomy supplies, gloves, chux, tape, or bio bags.

*Confusing or incomplete documentation of disabilities and failure to ensure effective communication*
Plaintiffs received reports that medical staff failed to ensure effective communication with hearing impaired prisoners.

## VIII. APPEALS STAFF RESPONSIBILITIES

HDSP recently implemented the Reasonable Accommodation Panel (RAP) process for addressing requests for disability accommodations and/or allegations of disability discrimination.

*Inappropriately identifying requests as "non-ADA"*
RAP responses continue to include language inappropriately identifying ADA accommodation requests as "non-ADA". For example; an inmate reported that R&R staff made him choose whether to transfer with his wheelchair or with his property. The RAP response inappropriately states that this issue is "non-ADA related" even though failing to transfer prisoners with their ADA assistive devices is a violation of the ADA and Remedial Plan.

*Failure to identify accountability issues raised in appeals*
Multiple appeals alleged *Armstrong* violations on the part of staff members were not flagged for *Armstrong* accountability investigations.

*Improperly construing access issues*
Plaintiffs' counsel identified a tendency on the part of the RAP to narrowly construe the definition of equal access to programs, services, and activities. For example, one inmate stated that he was in special education previously and is now "unable to focus on things or take knowledge in." He requests transfer to a prison that will help him learn properly. The RAP response form inappropriately states that "no issues were identified with access to program, services, or activities." Access should not be construed as physical access only; it also includes barriers resulting from communication and learning difficulties.

## IX. ACCOUNTABILITY

This report and prior tour reports allege violations of the ADA, the *Armstrong* Remedial Plan, and *Armstrong* Court orders. Pursuant to the August 22, 2012, order, CDCR must "track any allegation that any employee of the Department of Corrections and Rehabilitation was responsible for any member of the Plaintiff class not receiving access to services, programs, activities, accommodations or assistive devices required by" the ADA, the Court's Orders, or the Remedial Plan. "All such allegations shall be tracked, even if the non-compliance was unintentional, unavoidable, done without malice, done by an unidentified actor or subsequently remedied." The order contains detailed requirements regarding the timing and content of investigations and investigation reports. Plaintiffs' counsel reviewed the CDCR and CCHCS "Employee Non-Compliance Logs" for the months of January – May 2015. Defendants recorded a total of 423 incidents during those months. Of those, investigations are still ongoing in 76 cases. Of the cases where investigations were completed, employee non-compliance was confirmed in 325 (or 77 percent of) cases. In

addition, Plaintiffs' counsel found seven allegations of non-compliance in appeals that did not appear in the logs, but should have.

**DEPARTMENT RESPONSE**

After the Plaintiff tour and report, the department provided a response that, for the most part, acknowledges the deficiencies found by Plaintiffs. The almost universal response by the institution management to these deficiencies is that "staff will be trained."

This response does not address the underlying concerns about why staff has not already been trained, and who is accountable for the lack of training. For example, one deficiency found in the August 2015 tour was that mobility-impaired inmates were being required by HDSP custody staff to prone out on the yard when an alarm was sounded. The directive excusing mobility impaired inmates from this requirement was published by the Director of Adult Institutions in February 2014. The underlying concern is why staff is not already trained in this area and who should be held accountable for the lack of training. Prison managers have not been held accountable for these lapses.

The above information documents a profound lack of management and custody staff emphasis on ADA issues in a facility designated to house disabled inmates. Staff is not sensitive to the needs of disabled inmates nor does staff appear to consider ADA accommodation to be an important aspect of custody duties.

The OIG's review found evidence that insensitivity to these issues still exists.

## RECOMMENDATIONS TO CDCR

- Move the DPP inmates to another *Armstrong*-designated institution, if paths of travel and accessibility cannot be immediately fixed at HDSP.

- Revise the ADA tab in the SOMS computer system to:

  - Better capture details of an ADA inmate's accommodation needs. For instance, instead of only stating that an inmate has an accommodation for "shoes," insert a detailed description, or even a picture of the shoes.

  - Include a place to record the doctor's name.

  - When applicable, describe the specific restraint accommodation needed, such as "waist restraint."

- Train staff on *Armstrong* Remedial Plan and ADA requirements, document the training, and when new violations occur, hold both the offending officers and their supervisors accountable for failure to follow or enforce the training.

# INTERNAL AFFAIRS INVESTIGATIONS

Over the past few years there have been a significant number of misconduct complaints levied against staff at High Desert State Prison. However, especially over the last 12 months, there have been numerous instances in which the hiring authority has failed to refer cases of serious misconduct to CDCR's Office of Internal Affairs for investigation. Additionally, a concern has arisen regarding CDCR's assignment of "resident special agents," particularly at High Desert State Prison. Resident agents are OIA special agents, but they do not work out of the Office of Internal Affairs; instead their office is located within the prison they are assigned to investigate. Thus, they are enmeshed into the culture of the prison and not in an independent office at a centralized location away from the prison, like the majority of the other OIA special agents.

## HIRING AUTHORITY REFERRALS AND INTERNAL ALLEGATION INQUIRIES

DOM Chapter 3, Article 14 sets forth the department's policies regarding internal investigations. Section 31140.14 gives the hiring authority the discretion to direct "locally designated investigators approved by the OIA or OIA investigators [special agents]" to conduct an allegation inquiry when there is an allegation of misconduct, which if true could lead to adverse action, and the subject(s), allegation(s), or both are not clearly defined or more information is necessary to determine if misconduct may have occurred.

The locally designated investigator is often times a sergeant or higher ranking member of the institution's Investigative Services Unit (ISU).

The hiring authority is required to maintain a log on a *CDCR Form 2140*, of all allegations of staff misconduct, regardless of whether the allegation is referred for investigation. The log must also state whether or not an allegation inquiry is being conducted and the resulting action from the allegation inquiry (e.g., referred to OIA for investigation, processed as a *CDCR Form 602, Inmate/Parolee Appeal Form*, or found to not have merit).[28]

If sufficient evidence is known or obtained through an allegation inquiry to warrant an internal investigation, the hiring authority is to refer a *CDCR Form 989, Confidential Request for Internal Affairs Investigation*.[29] Upon receipt of a referral, the Office of Internal Affairs decides whether to open an investigation, refer the case to another entity for an investigation, return the case to the hiring authority without an investigation for direct disciplinary or corrective action, return the case for further inquiry, or determines that no action is necessary. Pursuant to PC Section 6133, the OIG is responsible for the

---

[28] DOM, Chapter 3, Article 14, Section 31140.13.
[29] DOM, Chapter 3, Article 14, Sections 31140.4.10 and 31140.4.14, and 31140.4.15.

contemporaneous public oversight of the investigations conducted by the Office of Internal Affairs and for advising the public regarding the adequacy of each investigation and whether discipline of the subject of the investigation is warranted.

During the review of HDSP, several areas of concern arose related to allegation inquiries. First, HDSP is not keeping a consistent *CDCR Form 2140, Internal Affairs Allegation Log*. This makes it very difficult for HDSP to identify staff who have repeated allegations of misconduct made against them and this lack of transparency makes it difficult to determine what action, if any, High Desert State Prison management has taken regarding specific allegations of misconduct made against HDSP staff.

Second, when allegation inquiries are conducted, one route that can be taken is to close the case, without referring the case to OIA for an investigation, if the person conducting the allegation inquiry finds that the allegation has no merit and the hiring authority agrees. Unfortunately, there actually is no process for OIA to appoint "a locally designated investigator," so the persons conducting allegation inquiries are appointed by the hiring authority with no "designation" from the Office of Internal Affairs. Additionally, there is no required training for persons conducting allegation inquiries, and there is no training for hiring authorities to recognize what is an adequate enough allegation inquiry to deem it unnecessary to refer to OIA for an investigation. Therefore, the quality of allegation inquiries varies widely, and without a consistent Allegation Log, it is difficult to determine what the hiring authority has decided to do when allegations of misconduct become known. One thing we do know for sure is that there were many allegations of staff misconduct that HDSP management chose not to refer for investigation (please refer to the following).

## ALLEGATIONS OF MISCONDUCT INVOLVING HDSP STAFF

The OIG learned of several allegations of misconduct involving HDSP staff and urged both HDSP and CDCR's Office of Internal Affairs to take action. The cases described below are examples of staff misconduct allegations the HDSP hiring authority did not refer for investigation, and would not have been investigated, but for this review.

- An officer allegedly directed expletives at inmates including derogatory language and racial slurs. The officer's misconduct placed inmates and staff in a dangerous situation, and as inmates became agitated, two additional officers heard the statements and failed to report the officer's misconduct. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- An officer allegedly threatened an inmate that he would be assaulted if the inmate refused to sign a form declaring that the inmate did not have enemy concerns on the yard. The officer allegedly had the inmate assaulted by other inmates. The Office of Internal Affairs investigation is still in progress.

- An officer allegedly called an inmate a "baby killer" and disclosed the inmate's criminal history to other inmates, creating a serious security risk for the inmate. The same officer allegedly pulled an inmate's pants and underwear up to the middle of his back during a routine search. The officer also attempted to humiliate the inmate in front of others, and threatened him. In retaliation for the inmate's complaint regarding this incident, that officer and another officer allegedly conducted a search of the inmate's cell and wrote false rules violations reports against the inmate and his cellmate for possession of inmate manufactured alcohol. The second officer also allegedly falsely attested that a sergeant confirmed that alcohol was found in the cell. The sergeant allegedly neglected his duty when he signed the rules violation report before completing a review of the document. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- Officers allegedly provided confidential criminal history about an inmate to other inmates, after which the inmate was assaulted. The Office of Internal Affairs concluded its investigation and forwarded its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- An officer allegedly yelled abusive comments toward an inmate and then directed the control booth officer to turn the power off on the lower tier. The control booth officer allegedly turned the power off on the lower tier, and placed the inmate in jeopardy when he announced to the other inmates that the power outage was due to the inmate. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- Two officers allegedly falsely claimed that an inmate's property had another inmate's name on it and confiscated it as contraband. An officer allegedly removed security screws from an inmate's television as a ruse to confiscate the property as contraband. The Office of Internal Affairs investigation is still in progress.

- An officer allegedly used physical force to take a hearing-impaired inmate to the ground and repeatedly slammed his head onto a concrete floor. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- A nurse issued non-standard shoes to an inmate as a medical accommodation. The shoes had a red stripe. A captain, without resolving the medical accommodation needs of the inmate, allegedly determined the shoes were contraband and ordered officers to seize the shoes from the inmate. The officers also seized a leg brace from the inmate. When the officers attempted to seize the shoes, the inmate resisted and officers used physical force and allegedly injured the inmate during

the incident. The inmate suffered an injury to his pre-existing disabled leg and a cut to his forehead necessitating medical attention at an outside hospital. When the inmate was returned to the institution the same day, officers initially refused to assist him to his cell with a wheelchair. The inmate was left to remain on a patio and then in a medical holding cell for several hours without proper attire considering the weather conditions. The Office of Internal Affairs concluded its investigation and is in the process of forwarding its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- Prison officials allegedly failed to respond to safety concerns expressed by an inmate. Subsequently, the inmate was assaulted. The Office of Internal Affairs concluded its investigation and forwarded its report and investigative materials to the hiring authority for a decision on whether or not to sustain the charges.

- Two officers and a sergeant allegedly solicited an inmate to commit assaults on another inmate who had masturbated in front of a female sergeant. The Office of Internal Affairs investigation is still in progress.

- Several officers allegedly disclosed an inmate's confidential criminal history to other inmates. Subsequently, the officers allegedly approached the inmate's cell, cursed at him, discussed his case, and said that he "deserves to die." An officer then allegedly arranged for the inmate to be assaulted. The Office of Internal Affairs investigation is still in progress.

In the following instances, the hiring authority identified possible misconduct and referred the cases to the Office of Internal Affairs:

- An officer allegedly told an employee, she should join the green team, inmates are not human, and that the institution is a zoo. The officer also allegedly slammed his baton onto the counter and stated, "I have my own version of progressive discipline." The Office of Internal Affairs determined that an investigation was not necessary, as there was sufficient evidence of misconduct, and returned the case to the hiring authority to take direct action. The hiring authority imposed a salary reduction.

- An officer allegedly taunted an inmate in a mental health crisis bed, banged the door to the inmate's cell with his baton, and then covered the inmate's window with paper. The Office of Internal Affairs investigation is still in progress.

- Six officers allegedly responded to an inmate's safety concerns by physically picking him up out of his wheelchair, throwing him into a cell, and then damaging the wheelchair by throwing it against the closed cell door. The six officers also allegedly failed to report their use of force. A seventh officer who was working in the control booth in the building failed to report the force that he observed. The Office of Internal Affairs investigation is still in progress.

- An officer allegedly failed to report a second officer's use of force. During the incident, the control booth officer allegedly failed to maintain observation of the officers and inmates. The Office of Internal Affairs investigation is still in progress.

- An OIA resident agent released confidential information regarding multiple internal investigations, including information regarding a pending criminal investigation. The hiring authority demoted the special agent, who returned to his former lieutenant position at High Desert State Prison. Shortly after his return, the HDSP acting warden at the time placed him in an acting captain position.

- An employee relations officer allegedly failed to report that an OIA special agent had improperly divulged confidential information. The special agent allegedly falsely advised the employee relations officer that he had reported his misconduct to a senior special agent. The employee relations officer allegedly withheld information during an interview with the Office of Internal Affairs. The OIA concluded its investigation and the hiring authority imposed a salary reduction against the employee relations officer, who resigned before the penalty was served.

- Two non-custody staff allegedly released confidential information pertaining to the internal investigations of several employees. One of the employees was allegedly dishonest during an interview with the Office of Internal Affairs and allegedly discussed the interview with another employee after being ordered not to do so. The hiring authority sustained the allegations, dismissed the dishonest employee, and imposed a salary reduction against the other.

- An officer allegedly subjected another officer to threats and intimidation for failing to use lethal force on inmates during a prior incident when the inmates assaulted custody staff. The Office of Internal Affairs investigation is still in progress.

Several of these investigations involve allegations meriting dismissal if sustained. It should be noted that there are some officers involved in multiple cases.

# OFFICE OF INTERNAL AFFAIRS RESIDENT AGENTS

CDCR's Office of Internal Affairs has started assigning "resident agents" to institutions located in hard-to-reach areas. In addition to the recent retirement of the resident agent assigned to the California Men's Colony (CMC) in San Luis Obispo, resident agents were assigned to the following institutions:

- Chuckawalla Valley State Prison – Blythe, CA
- California State Prison, Centinela – Imperial, CA
- High Desert State Prison – Susanville, CA
- California Correctional Center – Susanville, CA
- Pelican Bay State Prison – Crescent City, CA
- Salinas Valley State Prison – Soledad, CA
- San Quentin State Prison – San Quentin, CA

As part of the regular monitoring of the discipline process, the OIG has previously criticized this practice, and the OIA responded by ending the San Quentin assignment, and does not plan to assign a resident agent to CMC in San Luis Obispo. However, the others have remained in place.

Routinely, resident agents have an office physically located within the prison they are tasked with investigating. In all of the current assignments, the resident agent worked at least part of their career, if not their entire career, at one of the institutions they now "reside" at for work. While the OIG understands the department is attempting to remedy a recruiting issue, the assignment of resident agents can lead to bias or the perception of bias. In addition, the assignment of resident agents runs counter to the recently codified[30] *Madrid* mandate, which to facilitate contemporaneous oversight and transparency, requires OIG staff be physically co-located with OIA staff.

Recent events at High Desert State Prison highlight the problems that assigning a resident agent can cause, not only for the resident agent, but also for the friends and coworkers the agent encounters. As described in a previous section, a special agent assigned to HDSP was demoted after he released confidential information regarding multiple internal investigations, including information regarding a pending criminal investigation. His demotion caused him to be placed back at HDSP. Shortly thereafter, he was promoted. This leaves the perception that he was being rewarded by HDSP management for his actions as an OIA special agent, and his loyalty to HDSP.

Additionally, an officer from CCC was disciplined for receiving confidential information from the resident agent pertaining to another employee's internal investigation and then failing to report that he had received the information. Staff from HDSP released confidential information pertaining to the internal investigations of several other employees.

---

[30] PC Section 6133.

On a separate but similar note, the OIA routinely assigns investigations to non-resident agents at institutions where they recently worked. While special agents are required to sign a conflict of interest form, disclosing any conflict in the cases they are assigned to investigate, the Office of Internal Affairs assigns an overly narrow interpretation to the concept of a "conflict of interest." While OIA contends it can be valuable for a special agent to be familiar with a prison (in particular, its processes, layout, etc.) when conducting investigations, it is important that all possible conflicts be duly considered, as an effective investigation and employee discipline process must be free from bias or the perception of bias. OIA's conflict form requires only a self-assessment by the assigned agent with little or no additional scrutiny by a supervisor unless the agent indicates a potential conflict.

## RECOMMENDATIONS TO CDCR

- Revisit DOM Section 31140.14, and develop a procedure to ensure staff completing allegation inquiries have received approved internal affairs investigation training, prior to being designated and/or approved by CDCR's OIA or OIA investigators.

- Require allegation inquiries be conducted only by staff who have received formal internal affairs investigation training.

- Ensure hiring authorities and managers reviewing allegation inquiry reports are trained to recognize a complete, thorough, and adequate allegation inquiry report.

- Develop an accountability process for ensuring hiring authorities are keeping accurate and complete *CDCR Form 2140, Internal Affairs Allegation Logs*, in accordance with DOM Section 31140.13.

- Cease the practice of assigning resident agents.

- Carefully review and consider conflict of interest forms completed by special agents prior to assigning investigations, especially when contemplating assigning investigations to special agents who formerly worked at the institution where the misconduct allegations arose.

# FINDINGS AND RECOMMENDATIONS

## FINDING 1 – ENTRENCHED CULTURE

There is evidence that a perception of insularity and indifference to inmates exists at High Desert State Prison, exacerbated by the unique geographical isolation, the high stress environment, and a labor organization that opposes oversight.

## RECOMMENDATIONS TO CDCR

1.1 Infuse HDSP supervisory and management positions with culturally diverse staff who have experience working in other institutions and do not have lifelong ties to the community.

1.2 Consider rotating HDSP management staff to other institutions, similar to the rotation required for CDCR headquarters peace officer staff.

1.3 Increase the frequency at which peer reviews are conducted at HDSP.

1.4 Revise the peer review tool to include follow-up measures and tests that better assess areas that could indicate deep-seated issues, such as by adding PREA and ADA compliance components.

1.5 Increase inmate programming, especially on the SNY facilities.

1.6 Ensure inmates housed in enhanced program facilities meet the EPF participation criteria.

1.7 Ensure HDSP is following the DOM requirements related to staff in high stress assignments.

1.8 Require HDSP seek approval from the CDCR Associate Director, prior to extending staff in high stress assignments beyond the initial two years.

1.9 Seek out opportunities to partner with organizations, such as the US DOJ, to conduct research and provide training to custody staff, starting at HDSP, on how to recognize and address implicit bias.

1.10 Implement a mindfulness and wellness program that gives staff resiliency tools to cope with working in a uniquely stressful environment.

## FINDING 2 – SEX OFFENDERS AND THE R SUFFIX

The R suffix has served as a bull's-eye target on some inmates at HDSP and other prisons, some of whom have never been convicted of a sex offense.

## RECOMMENDATIONS TO CDCR

2.1 Develop a policy authorizing staff to access an inmate's electronic record on a need-to-know basis only. The policy should add admonishment language to the SOMS login screen, advising against misuse, and the consequence thereof.

2.2 Develop a method of tracking and recording staff access to records in SOMS and other inmate records, and periodically audit access history to identify potential misuse.

2.3 Remove the R suffix information from the SOMS header, as any staff specifically needing this information can find it on another screen.

2.4 Conduct an in-depth review of every form and document that currently requires commitment offense information and R suffix notations, and remove this requirement from all forms and documents where it no longer serves a legitimate purpose.

2.5 Consider providing inmates with only hard copies of certain portions of non-confidential documentation from SOMS or other inmate records, to exclude commitment offenses, R suffix notations, and any other information that may put an inmate at risk.

## FINDING 3 – SENSITIVE NEEDS YARDS

Based upon this review and observations in prior OIG reports, the use of sensitive needs yards merits a complete overhaul.

## RECOMMENDATIONS TO CDCR

3.1 Address the growing violence on sensitive needs yards by:

a) developing formal policies and procedures related to SNY housing;

b) considering the development of separate SNY housing criteria for vulnerable inmates at risk of assault;

c) transferring aggressors to some other type of housing;

d) re-examining the double cell policy for sensitive needs yards pursuant to previous OIG recommendations,

e) requiring completion of a compatibility review, similar to the *CDCR Form 1882-B*, *Administrative Segregation Unit/Security Housing Unit Double Cell Review*; and

f) reviewing the process for transitioning inmates from single-cell designation to double-cell status, pursuant to prior OIG recommendations.

3.2 Add more meaningful programs to sensitive needs yards, especially Level IV SNYs such as HDSP's Facility B, where programs have been historically lacking.

3.3 Ensure that classification staff designating inmates as requiring SNY placement, inform them that SNY yards are still violent, have programming no different from GP yards, and once assigned to an SNY, it is very difficult to ever return to a general population yard.

3.4 Require training for SNY staff in supervising vulnerable populations.

3.5 Require racial balance criteria for inmate program assignments in SNY housing, at least at HDSP, similar to general population facilities, to overcome the perception of racial bias.

## FINDING 4 – INMATE APPEALS AND STAFF COMPLAINTS

The inmate appeals system at HDSP is not functioning adequately and the staff complaint process is broken.

## RECOMMENDATIONS TO CDCR

4.1 Create a formal policy that reflects the contents of the December 30, 2011, memo titled: **Secure Appeal Collection Sites and Related Matters**, but require appeals in lock boxes be retrieved by Appeals Office staff only.

4.2 Add a receipt feature to the *CDCR Form 602, Inmate/Parolee Appeal*, or assign a log number to all appeals at the point of collection.

4.3 Immediately reiterate that initial appeal content is to be read by Appeals Office staff only, until assigned out for response.

4.4 Provide HDSP staff with training relating to the processing and handling of inmate property and hold officers accountable for failing to abide by the relevant policies and procedures.

4.5 Require institutions to conduct a management review into an employee's performance and worksite when multiple staff complaints are filed by multiple inmates against an individual employee.

4.6 Revisit DOM Section 31140.14, and develop a procedure to ensure staff completing allegation inquiries have received approved internal affairs

investigation training, prior to being designated and/or approved by CDCR's OIA or OIA investigators.

4.7 Require staff performing allegation inquiries into staff complaints receive formal internal affairs investigation training prior to conducting allegation inquiries.

4.8 Ensure hiring authorities and managers reviewing allegation inquiry reports are trained to recognize complete, thorough, and adequate allegation inquiry reports.

4.9 Develop an accountability process for ensuring hiring authorities are keeping accurate and complete *CDCR Form 2140, Internal Affairs Allegation Logs*, in accordance with DOM Section 31140.13, which requires each allegation of employee misconduct be logged, regardless of whether the allegation is referred for investigation.

4.10 Renegotiate Section 9.09 of the Bargaining Unit 6 MOU to treat inmate appeals in the same manner as any other allegation of staff misconduct.

4.11 Remedy the inability of inmates in ASU or on a modified program to personally place their appeal into a lock box by mandating Appeals Office staff personally retrieve the appeal from the inmates' cells or instituting some form of secure mobile collection process.

4.12 Dispatch staff from the Appeals Office to conduct an in-depth audit of HDSP's appeal process, provide any remedial training necessary, and report back to CDCR administrators any policy or procedure deficiencies revealed by a review of HDSP inmate appeals, such as property issues and the handling of staff complaints.

## FINDING 5 – USE OF FORCE INCIDENTS

There are statistical trends, continued complaints, and recent misconduct allegations that cause alarm about the use of force at HDSP.

## RECOMMENDATIONS TO CDCR

5.1 Immediately install cameras in all inmate areas, including, but not limited to, the exercise yards, rotundas, building dayrooms, patios, and program offices of HDSP.

5.2 Implement a pilot program in at least one building on HDSP's Level IV SNY facility, requiring custody staff to wear body cameras, similar to the pilot conducted at Wisconsin's Waupun Correctional Institution. Ensure the body cameras are equipped with GPS geotagging technology. Collect, compare, and report the resulting incident, disciplinary, and other relevant data for the

buildings with body cameras and the similar buildings without body cameras, for possible statewide pilot program expansion.

5.3   Ensure that HDSP custody supervisors are scrutinizing all incidents where inmates receive serious injuries, and hold accountable officers who fail to timely respond to incidents and fail to use force when appropriate to stop potential deadly attacks.

5.4   Consider using GPS or RFID type technology to document where within an institution an officer is located.

# FINDING 6 – *ARMSTRONG* REMEDIAL PLAN – ADA INMATES

In light of the *Armstrong* federal court's ongoing monitoring, the OIG expressly refrains from making findings in this area, and has reserved comment to those areas where OIG's review has supported the Plaintiffs' last review and the department's inadequate responses. We make the following recommendations in light of these comments.

## RECOMMENDATIONS TO CDCR

6.1   Move the DPP inmates to another *Armstrong*-designated institution, if paths of travel and accessibility cannot be immediately fixed at HDSP.

6.2   Revise the ADA tab in the SOMS computer system to:

a) Better capture details of an ADA inmate's accommodation needs. For instance, instead of only stating that an inmate has an accommodation for "Shoes," insert a detailed description, or even a picture of the shoes.

b) Include a place to record the doctor's name.

c) When applicable, describe the specific restraint accommodation needed, such as "waist restraint."

6.3   Train staff on *Armstrong* Remedial Plan and ADA requirements, document the training, and when new violations occur, hold both the offending officers and their supervisors accountable for failure to follow or enforce the training.

# FINDING 7 – INTERNAL AFFAIRS INVESTIGATIONS

The use of resident agents is a poor practice and should be discontinued, especially at HDSP in light of the issues that arose from the placement of a resident agent at that institution. Additionally, the processes in place for allegation inquiries at HDSP are inadequate, and could be improved statewide. The OIG is monitoring several misconduct investigations that, but for this review may not have been opened or investigated to the broadest extent appropriate.

# RECOMMENDATIONS TO CDCR

7.1 Revisit DOM Section 31140.14, and develop a procedure to ensure staff completing allegation inquiries have received approved internal affairs investigation training, prior to being designated and/or approved by CDCR's OIA or OIA investigators.

7.2 Require allegation inquiries be conducted only by staff who have received formal internal affairs investigation training.

7.3 Ensure hiring authorities and managers reviewing allegation inquiry reports are trained to recognize a complete, thorough, and adequate allegation inquiry report.

7.4 Develop an accountability process for ensuring hiring authorities are keeping accurate and complete *CDCR Form 2140*, *Internal Affairs Allegation Logs*, in accordance with DOM Section 31140.13.

7.5 Cease the practice of assigning resident agents.

7.6 Carefully review and consider conflict of interest forms completed by special agents prior to assigning investigations, especially when contemplating assigning investigations to special agents who formerly worked at the institution where the misconduct allegations arose.

# CONCLUSION

First, we want to note that there are dedicated, hardworking, and conscientious staff that make up the vast majority of the workforce at HDSP. They come to work every day and do the best they can in a very difficult job. However, as a famous quote states:

"*All that is necessary for the triumph of evil is that good men do nothing.*"
                                                                    -Edmund Burke

Many of the specific instances of misconduct and even some of the pervasive indifferent treatment of inmates can be narrowed down to a small percentage of active participants, many of whom are currently under investigation. But how is it that they have been able to continue this conduct without interference by others or management? How is it that the sister institution CCC does not have the same problems and complaints? The answers may lie in the very design and mission of HDSP and the environment in which it has been placed.

HDSP has a myriad of missions and houses the highest security level of inmates. The same is not true at CCC. Officers at HDSP are constantly on high alert, and enter the prison with an "us versus them" mindset. This translates into a culture where "if you aren't for us, you're against us." Add to that a labor organization that values the brotherhood of silence over the professionalism of its members, and you add another level of legitimacy to a negative culture. The irony is that this very culture endangers the staff working at HDSP as much as anything else. When you deprive inmates of procedural justice, and there is no recourse for mistreatment because the appeals process is broken and there is a perception that staff misconduct is not addressed, there should be no surprise that violence erupts.

Unlike any other locale, HDSP staff live in a true "prison town" where they cannot disassociate from the job. The pressure to conform to the prevailing norm is tremendous. One of the differences in a lower security prison such as CCC is that staff see the inmates trying to make a difference, and "deserving" of a chance to do so. There is less violence, more programs, less stress, and therefore not the same negative mentality.

The department could change the population of HDSP, and concede that the other forces at work prevent it from ever curing its dysfunction in the current mode. That would be the most drastic of solutions.

However, with the support of the CDCR Administration, and the right leadership from management and in the ranks, HDSP can change these perceptions, if they choose to do so. The department can implement recommendations from this review, weed out the problem individuals, and provide hope for the future.

The department is now being presented with yet another opportunity to fix the problems at HDSP that have plagued the institution for over a decade. Otherwise, this review will

have been for naught and another review will almost assuredly follow in the very near future.

To their credit, CDCR leadership had staff conduct a peer review, which was a start. The department has now instituted additional *Armstrong* training at HDSP, as well as a comprehensive management review and training plan, to be led in December and January by the newly placed acting warden. The OIG has met with CDCR's OIA to discuss the use of resident agents, and while CDCR has not agreed to discontinue their use, OIG's concerns were heard, and the department agreed in theory that hiring agents from the prisons they are assigned to is not a best practice. The OIA is considering steps to mitigate bias, such as moving agents to offices outside the institution. But even that measure will not cure the problems with using a resident agent at HDSP.

Nonetheless, these recent efforts signal that a desire for change exists within CDCR leadership. The OIG has a sincere hope that they will be successful.

# APPENDICES

Appendix A– Senate Rules Committee Authorization Letter……………………..…….64

Appendix B– CDCR Memorandum: Enhanced Program Facility Institutions……..…….66

Appendix C– CDCR Memorandum: Secure Appeal Collection Sites and Related
Matters.........................................................................................................69

Appendix D– California Department of Corrections and Rehabilitation Zero Tolerance
Regarding the Code of Silence……………..………………………………..71

Appendix E– Peer Review High Desert State Prison…………………………………72

Appendix F– Police Racial Violence: Lessons From Social Psychology………….…….89

Appendix G– Center for Mindfulness in Corrections…………………………..…..105

Appendix H– Average Number of Incidents per 100 Inmates, June 2014-June 2015....107

Appendix I– Average Number of Inmate Disciplinary Actions per 100 Inmates June
2014-June 2015…………..…..……………………………………………...108

Appendix J– WCI Taser Body Camera Pilot……………….……………..…………109

VICE-CHAIR
JEAN FULLER

MEMBERS
ANTHONY CANNELLA
CONNIE M. LEYVA
HOLLY J. MITCHELL

**CALIFORNIA LEGISLATURE**

SECRETARY OF THE SENATE
DANIEL ALVAREZ

DEPUTY SECRETARIES
SHERON VIOLINI
BOB RUFFNER
GAIL LANG

COMMITTEE ASSISTANT
JANE LEONARD BROWN



# SENATE RULES COMMITTEE

## KEVIN DE LEÓN
CHAIR

June 25, 2015

Robert A. Barton
Inspector General
Office of the Inspector General
10111 Old Placerville Road, Suite 110
Sacramento, CA 95827

Dear Inspector General Barton:

The Senate Rules Committee authorizes the Office of the Inspector General to review the practices at High Desert State Prison (HDSP) in Susanville with respect to (1) excessive use of force against inmates, (2) internal reviews of incidents involving the excessive use of force against inmates, and (3) protection of inmates from assault and harm by others. We also request that you consult with, and recommend appropriate actions to, the Office of Internal Affairs within the Department of Corrections and Rehabilitation regarding your review and that you provide this Committee with a written report detailing the results of your review.

A number of allegations have surfaced that raise concern about whether some members of HDSP staff are engaged in a pattern or practice of using inappropriate and excessive force against inmates and whether there is adequate protection of inmates from harm at the prison. The following allegations have prompted this authorization for a review:

- A March 2015 incident involving a mobility-impaired inmate who was reportedly assaulted by staff, and consequently required outside medical treatment, for refusing to remove and relinquish footwear worn to assist with his medical condition.

- A March 2015 incident involving a hearing- and speech-impaired inmate who was reportedly wrestled to the ground and severely assaulted after noncompliance with oral instructions from custodial staff even though the inmate was wearing a brightly-colored vest identifying his impairments.

- A March 2015 incident involving an inmate who was attacked by his cellmate after custodial officers allegedly told other inmates that he was a sex offender. Prior to the incident, the

2015 Special Review: High Desert State Prison                                    Page 64

Robert A. Barton, Inspector General
June 25, 2015
Page 2

inmate who was attacked allegedly reported to staff that he was being extorted by other
inmates and feared harm from his cellmate.

- The assault of an inmate in late 2014 and early 2015 after he was denied a request to be
  placed in protective administration segregation because of rumors that he was a sex offender.

In addition to the specific incidents noted above, there have been general allegations asserted that
some members of custodial staff refer to inmates as "sodomites" or sex offenders in the presence
of other inmates and disclosed inmates' commitment offenses to others; actions which would
place inmates at risk of harm from other inmates.

Ensuring the safety of both inmates and staff in our state prison system is amongst the paramount
objectives of the Department of Corrections and Rehabilitation. It is vital that the Senate
determine, through a review by the Office of the Inspector General, whether there is a pattern or
practice among members of the custodial staff at HDSP that contradicts that objective.

The Senate Rules Committee looks forward to working with you on this matter.

Sincerely,

**KEVIN DE LEÓN**
**President Pro Tempore**
**Twenty-Fourth Senate District**

State of California                                          Department of Corrections and Rehabilitation

# Memorandum

Date    :   December 31, 2013

To      :   Associate Directors, Division of Adult Institutions
            Wardens

Subject:   **ENHANCED PROGRAM FACILITY INSTITUTIONS/FACILITIES**

As part of the California Department of Corrections and Rehabilitation (CDCR) Blueprint, we are designating certain General Population (GP) and Sensitive Needs Yard (SNY) institutions/facilities as Enhanced Program Facility (EPF).  EPF will offer incentives for inmates who, based on their own behaviors and choices, are ready to take full advantage of programming opportunities.

Effective January 1, 2014, the following institutions/facilities will be designated as an EPF:

- Kern Valley State Prison, Level IV GP 180, Facility B
- High Desert State Prison, Level IV GP 180, Facility C
- Salinas Valley State Prison, Level IV GP 270, Facility B
- Pleasant Valley State Prison, Level III GP 270, Facility C
- California State Prison, Corcoran, Level IV SNY 270, Facility B
- Substance Abuse Training Facility, Level III  SNY 270, Facility E
- Valley State Prison, Level II SNY

**Program Options**

Program enhancements will be primarily volunteer based and self help options intended to incentivize and reinforce positive life choices.  These options may include, but are not limited to:

- Access to college degree programs
- Additional Self Help Groups
- Hobby craft programs

Recreational and enhanced privilege options may include, but are not limited to:

- Technology based privileges, as they are approved
- Microwave in the dayroom
- Increased canteen draw
- Increased canteen list
- Expansion of property matrix (see attached matrix)
- Yard photo programs

Associate Directors, Division of Adult Institutions
Wardens
Page 2

- Food sales (more frequent basis)
- Sports and game tournaments
- Self-Help/volunteer sponsored events (concerts, guest speakers etc.)

Placing Inmates into the Program

*Initial Activation:*  The EPF implementation process will not require mass screening or transfer of inmates from a designated facility.  Inmates currently residing on a designated EPF institution/facility will remain, provided they are willing to meet the program's expectations.

*Ongoing:*  EPF placement will be based on their behavior and willingness to meet programming expectations.  Inmates who have been identified as possible EPF participants shall be evaluated via the facility's classification process at the inmate's annual or program review.  Inmates identified for transfer to an EPF shall be reflected in the Institution Classification Committee/Unit Classification Committee CDCR Form 128G and Classification Staff Representative endorsement CDCR Form 128G.

Exclusionary factors are as follows:

- Security Housing Unit (SHU) Term within the past 12 months. (Imposed SHU term)
- Rules Violation Reports (RVR) for Security Threat Group related behavior within the past 12 months.
- RVR for controlled substance and alcohol related behavior within the past 12 months.  This shall include:

  1. Possession of any controlled substance, alcohol or paraphernalia.
  2. Use/under the influence of any controlled substance or alcohol.
  3. Production of alcohol.
  4. Refusal to provide a urine sample for the purpose of testing for the presence of controlled substance or alcohol.

- C/C status within the past 12 months.

Removing Inmates from the Program

To ensure program viability, participants are required to strictly adhere to the following behavioral and programming expectations in order to remain on an EPF.  EPF participants must:

- Program with all inmate groups.
- House according to their current integrated housing code.
- Participate in random drug testing.
- Participate in assigned work, education, training, and self help programs.
- Continually work to resolve enemy concerns or conflicts.
- Comply with rules and regulations.

Case 2:90-cv-00520-KJM-SCR   Document 6770-2   Filed 07/15/20   Page 81 of 127

Associate Directors, Division of Adult Institutions
Wardens
Page 3

- Participate in the Correctional Offender Management Profiling for Alternative Sanctions risk and needs assessment.

*Initial Activation:* Inmates who do not wish to participate in the EPF shall be transferred using existing transfer protocols to a non EPF institution/facility. This may or may not require endorsement or transfer to an alternate institution.

*Ongoing:* Removing an EPF participant shall be the responsibility of the facility's Captain. Inmates who fail to meet the behavioral criteria shall be removed from the EPF program. Removal from the EPF program shall not mandate Administrative Segregation placement. A classification committee shall evaluate the inmate's programming needs and transfer him to an alternate non EPF institution/facility accordingly. Housing pending transfer shall be determined based on the inmate's individual case factors.

If you have any questions, please contact Ron Davis, Warden, Valley State Prison, at (559) 665-6169 or via email at ron.davis@cdcr.ca.gov.

M. D. STAINER
Director
Division of Adult Institutions

Attachment

cc:  Kelly Harrington
     Terri Gonzalez
     Ron Davis

State of California          Department of Corrections and Rehabilitation

# Memorandum

Date     December 30, 2011

To:      Associate Directors, Division of Adult Institutions
          Wardens

Subject:  **SECURE APPEAL COLLECTION SITES AND RELATED MATTERS**

The Office of Inspector General (OIG) conducted a review of the revised inmate appeal process which became effective January 28, 2011. The OIG identified the concerns that led the Department to changes its inmate appeal process and assessed whether the revised inmate appeal process addressed those concerns. Pursuant to Inspector General recommendations, no later than April 30, 2012 each housing unit and every program office will ensure that a secure appeal collection site (lock box) is provided on every yard and in each building for use by inmates for submission of appeals directly to the Appeals Office.

- Retrievals from these collection sites will be performed by Appeals Office staff and/or staff designated by the Warden.

- By April 30, 2012 each institution/facility shall formulate an Operational Procedure identifying the collection sites, staff responsibilities in collection and the manner in which deposited appeals will be transmitted to the Appeals office.

In addition, inmates who desire a receipt for a submitted appeal are permitted the option of placing the appeal in an unsealed envelope addressed to the Appeals Office accompanied by a CDCR Form 22.

- Staff accepting the appeal will first confirm the presence of an appeal in the envelope and then on the CDCR Form 22, note the date and time they were given the appeal and provide the inmate with his/her receipt (Goldenrod copy) noting that the appeal is being forwarded to the Appeals Office.

- Reading or inspecting the contents of the appeal will be conducted only by the Appeals Office; therefore other staff shall not attempt to do this at the time of receipt. They will, however, date, initial and seal the envelope and deposit it at a secure collection site.

- No further response to the inmate shall be required on the CDCR Form 22 as their Inmate Appeals Tracking System (IATS) printout will serve to verify the acceptance of the appeal by the Appeals Office. If the appeal is rejected appellants receive a CDC Form 695 from the Appeals Office along with their returned appeal detailing each and every reason why it was rejected and what action(s) need to be taken for it to be accepted.

Appeals Coordinators shall, effective January 2012, meet at least quarterly with their local Inmate Advisory Councils (IAC) either independently or in conjunction with scheduled Warden Meetings in order to receive input on appeal and written request processing matters. Information developed during such meetings shall be shared with the Chief, Office of Appeals.

Associate Directors, Division of Adult Institutions
Wardens
Page 2

Each institution is hereby directed to conduct a self-certification audit to ensure revised appeal regulations are available in the prison law library with proof a practice being forwarded to their respective Associate Director as well as the Office of Appeals by January 23, 2012.

If you have any question regarding this matter, please contact Dean Foston, Office of Appeals at (916) 255-0182 or Captain Tom Emigh at (916) 255-4950.

GEORGE J. GIURBINO
Director (A)
Division of Adult Institutions

Attachment

cc: Dean Foston
    Tom Emigh

APPENDIX D –CDCR ZERO TOLERANCE REGARDING THE CODE OF SILENCE

## California Department of Corrections and Rehabilitation
### *Zero Tolerance Regarding the "CODE OF SILENCE"*

The California Department of Corrections and Rehabilitation (CDCR) is only as strong as the values held by each of its employees, sworn and non-sworn. How we conduct ourselves inside our institutions and in the Central Office is a reflection of those values.

The "Code of Silence" operates to conceal wrongdoing. One employee, operating alone, can foster a Code of Silence. The Code of Silence also arises because of a conspiracy among staff to fail to report violations of policy, or to retaliate against those employees who report wrongdoing. Fostering the Code of Silence includes the failure to act when there is an ethical and professional obligation to do so.

Every time a correctional employee decides not to report wrongdoing, he or she harms our Department and each one of us by violating the public's trust. As members of law enforcement, all Correctional Officers must remain beyond reproach. The public's trust in this Department is also violated by retaliating against, ostracizing, or in any way undermining those employees who report wrongdoing and/or cooperate during investigations. There is no excuse for fostering a Code of Silence.

Your hard fought efforts to protect the public deserve recognition and the public's trust must be maintained while we take steps to ensure the Department exemplifies integrity and instills pride. Part of this effort is the immediate implementation of a zero tolerance policy concerning the Code of Silence. We will not tolerate any form of silence as it pertains to misconduct, unethical, or illegal behavior. We also will not tolerate any form of reprisal against employees who report misconduct or unethical behavior, including their stigmatization or isolation.

Each employee is responsible for reporting conduct that violates Department policy. Each supervisor and manager is responsible for creating an environment conducive to these goals. Supervisors are responsible for acquiring information and immediately conveying it to managers. Managers are responsible for taking all appropriate steps upon receipt of such information, including initiating investigations and promptly disciplining all employees who violate Department policy.

Any employee, regardless of rank, sworn or non-sworn, who fails to report violations of policy or who acts in a manner that fosters the Code of Silence, shall be subject to discipline up to and including termination.

State of California                                                                Department of Corrections and Rehabilitation

# Memorandum

Date:    May 8, 2015

To:      Sandra Alfaro
         Associate Director (A)
         High Security Mission
         Division of Adult Institutions

Subject:    **PEER REVIEW – HIGH DESERT STATE PRISON**

The primary mission of High Desert State Prison (HDSP) is to provide for the Housing and Programming of general population and sensitive needs high security (Level IV) and medium security (Level III) inmates. HDSP inmate population consists of three (3) Level IV yards, two of which are 180 design buildings (Facility C and Facility D), and one 270 design building (Facility B). The 270 design yard, Facility B, was converted to a Sensitive Needs Yard (SNY) in October 2007, which houses Level IV SNY inmates. Facility A is a 270 design medium security facility which houses Level III inmates. Facility A is also the home of our Reentry Hub Facility, which provides relevant training and services to eligible and interested inmates in order to facilitate the successful transition back to their communities and reduce their likelihood of reoffending. HDSP's Reentry programs are comprised of Academics, the California Identification Card Program, Pre-Employment Transition, and Cognitive Behavioral Treatment, which includes Substance Abuse Treatment, Anger Management, Family Relationships and Criminal Thinking. The Minimum Support Facility (MSF) houses non camp eligible Level I inmates who perform job duties in various areas of the institution outside the secure perimeter, such as the warehouse, garage, outside grounds, staff snack bar, etc. HDSP Administrative Segregation Unit (ASU) is located on Facility D, 180 design housing and consists of two buildings, D7 and D8. HDSP also has a standalone ASU named Facility Z which was activated in September 2004. HDSP houses inmates with the lowest level custody, Minimum B, all the way up to Maximum custody (ASU inmates).

This Peer Review of HDSP was conducted from April 27-30, 2015. Representatives from various areas of the Division of Adult Institutions (DAI) and the Office of the Ombudsman were assigned to review the overall operations at HDSP and to interview staff and inmates in order to determine the overall health of the institution. This review team utilized the California Penal Code (PC), California Code of Regulations (CCR), Title 15, the California Department of Corrections and Rehabilitation's (CDCR) Department Operations Manual (DOM), and their combined training and experience as the primary sources of operational standards.

Random sampling techniques were employed as an intrinsic part of the review process. In addition, facilities were toured, union representatives, line staff from all disciplines, and inmate advisory council Members (IAC) were interviewed and documentation related to the areas toured were reviewed. Throughout the tour, on-duty staff at all levels as well as inmates were interviewed to gather an overall

Peer Review – High Desert State Prison
Page 2

perception of the institution.  The review team members were briefed prior to conducting this review regarding the nature and mission of the assignment.

**Review team members assigned:**

Jared Lozano, Correctional Administrator, DAI, High Security Mission
Michael Romero, Captain, DAI, High Security Mission
Theodore Verras, Captain, Folsom State Prison
U Chang, Correctional Counselor II Specialist, DAI, General Population Mission
Brian Unden, Ombudsman, Office of the Ombudsman

Overall, findings presented in the attached report represent the consensus of the entire review team.

**General Operations**

The Inmate Family Council (IFC) is active at HDSP.  The review team received the minutes from the meeting with the IFC dating back to October of 2014.  The Warden and/or the CDW have been active participants in these meetings.

The HDSP Daily Activity Report (DAR) was provided to the team during this review. The review team noted HDSP has only one DAR for the entire prison, the report is basic and mainly addresses operation division issues.  The DAR fails to address facility security operations and daily inmate programs.  This is an important tool for the management team to monitor and manage the inmate program on each facility (e.g., ensuring facility security checks are being completed, yard and dayroom programs are meeting their expectations).

**Staff Interviews**

**Interview of Labor Relations Analyst (LRA):**

On April 27, 2015, an interview was conducted with the LRA.  During the interview, the review team asked general questions concerning the overall relationship between staff and administration, between the inmate population and administration, between staff and the inmate population, and overall staff morale.  Currently, the LRA is a correctional sergeant, as the permanent LRA at HDSP has been temporarily reassigned.  The LRA stated he thought the relationship between the inmate population and the administration is very positive.  The LRA characterization of the various relationships within the administration is positive, and did not reveal any specific issues or major concerns.  In fact, he believed that acting Warden Peery has brought positive change to the institution as the staff morale from the past warden had caused morale to go down.  The LRA expressed the staff's appreciation and belief that acting Warden Peery's efforts in this area enabled the line supervisors to better perform their job duties.  The LRA stated he has worked at HDSP for many years, and worked well with the current administration as he worked for them during previous assignments.

**Interview of Employee Relations Officer (ERO):**

On April 27, 2015, an interview was conducted with the ERO. During the interview, the review team asked general questions concerning the overall relationship between staff and administration, between the inmate population and administration, between staff and the inmate population, and overall staff morale. The ERO has been assigned in this office for many years, including working as an analyst while acting Warden Peery was the ERO. The ERO stated she thought the relationship was positive between the inmate population and the administration, even though she is not really exposed to it in her position. The ERO characterization of the various relationships with administration was positive and did not reveal any specific issues or major concerns. The ERO stated the previous warden was hard to work for and it was hard to repair relationships with staff whom he had disciplined. The ERO further stated the staff referred to the previous warden as "Five for Freddie," insinuating he was always trying to take money from staff during the disciplinary process. The ERO believes that acting Warden Peery has brought positive change to the institution as the staff morale from the past warden had caused morale to go down.

**Interview of Managers**

Between April 27-29, 2015, interviews/discussions were conducted with multiple managers. During the interviews, the review team asked general questions concerning the overall relationship between staff and administration, between the inmate population and administration, between staff and the inmate population, and overall staff morale. The managers all stated they thought the relationship was very positive between the inmate population and the administration. The managers all characterized the various relationships with administration as positive and did not reveal any specific issues or major concerns. In fact, they believed that acting Warden Peery has brought positive change to the institution as the staff morale from the past warden had caused low morale with line staff and supervisors. Some managers expressed thoughts that differed from the rest of the group. One suggestion was that the acting Chief Deputy Warden (CDW) assignment should be rotated through multiple associate wardens so more than one person could gain experience, albeit the team recognizes that the acting CDW assignment has only been in place for a couple of months, and a rotation normally would not occur until around 90 days.

**Interview of California Correctional Supervisor's Organization (CCSO) Union Representative**

On April 28, 2015, an interview was conducted with CCSO representatives. During the interview, the review team asked general questions concerning the overall relationship between staff and administration, between the inmate population and administration, between staff and the inmate population, and overall staff morale. The representatives' characterization of the various relationships with administration was positive and did not reveal any specific issues or major concerns. They believe that acting Warden Peery has brought positive change to the institution, she has it headed in the right direction, and she is not "micro-managing" everyone in the institution. The

CCSO representatives expressed the staff's appreciation and belief that acting Warden Peery's efforts enable the line supervisors to better perform their job duties. CCSO is attending the monthly meetings.

## Interview of Service Employees International Union (SEIU) Union Representative

On April 28, 2015, an interview was conducted with SEIU Representatives. During the interview, the review team asked general questions concerning the overall relationship between staff and administration, between the inmate population and administration, between staff and the inmate population, and overall staff morale. The representatives' characterization of the various relationships with administration was positive and did not reveal any specific issues or major concerns. Specifically, the representatives stated the relationship between acting Warden Peery and all staff at HDSP is very positive. The representatives did express concerns with the changes in standardized staffing and the expectation of Division of Rehabilitative Programs that an inmate be able to test 10.0 on the test of adult basic education before they are able to take the GED test. In addition, they stated the relationship between custody, medical, and education staff and at HDSP is very good and they have no issues. SEIU is attending the monthly meetings.

## Interview of California Correctional Peace Officer Association (CCPOA) Union Representatives

On April 28, 2015, an interview was conducted with the CCPOA Chapter Vice President, and two attorneys from CCPOA, as the vice president stated he did not know what we wanted to discuss, and he has a pending potential disciplinary action. The review team explained the interview had nothing to do with his personal issue; we would ask questions about the CCPOA chapter as a whole. During the interview, the review team asked general questions concerning the overall relationship between staff and administration, between the inmate population and administration, between staff and the inmate population, and overall staff morale. The vice president characterization of the various relationships with administration was positive and did not reveal any specific issues or major concerns. The vice president did feel that recently the completed and pending personnel actions against him and the president of CCPOA has brought morale down. He stated morale as a whole is improving since the change in wardens. He also stated the previous warden was severe in punishments against staff. He further stated "the jury's still out" on acting Warden Peery but he is confident she will do the right thing and not always go out of her way to look for ways to discipline staff members. The CCPOA vice president feels morale is improving. He stated that HDSP has a high staff suicide rate and this may be an issue in which HDSP would benefit from more training and resources.

## Interview of Inmate Advisory Council (IAC) Representatives (All Facilities)

On April 29, 2015,an interview was conducted with IAC representatives from all facilities at HDSP. During the interview, the review team asked various open ended questions, leaving the IAC open to reveal what they believed to be the most pressing issues at HDSP. The IAC on facilities A, C, and D volunteered their most pressing

issues were related to visiting vending machines, leaking roofs, television reception, more quality meat options (not just bologna) and syrups (not just sugar free) served in the culinary, and the D-7 conversion from ASU to GP delay. The issues related to visiting vending machines were universal among the facilities (it is noted according to the management team, HDSP is receiving new vending machines for their visiting rooms as the machines they have need replacing).

Facility B IAC was much more detailed and were concerned with more issues regarding operations. Specifically, the Facility B IAC stated some staff relate well with the inmate population, and others do not (specifics were provided to the warden and chief deputy warden). The Facility B IAC stated the acting captain on the yard has created a better working relationship with the IAC and staff. They also stated the inmate population packs other inmate property instead of the officers when the inmates go out to the hospital or are placed in administrative segregation. The Facility B IAC went on to state that cell searches are completed only in mass search operations and as retaliation measures by staff. Additionally, they stated that officers in the buildings are closing the dayroom program on their own if an inmate is "passing" items from cell to cell. Staff will recall the dayroom and identify the inmate that caused the action. The Facility B IAC stated the supervisors are not part of the issue as they do not believe the supervisors are even consulted about the closure.

The review team members then asked the IAC why they believed so many incidents of violence were occurring on Facility B. The universal response identified the actions of a few staff members as well as an inmate in building 2 who has been "the enforcer."

The Facility B IAC also expressed their belief that more programs, job assignments, and inmate receiving disciplinary reports via the CDCR 115 and ASU/SHU time may help the prison population deal with these conditions by incentivizing good behavior.

The previous warden was not regularly participating in the quarterly IAC council meetings; however, acting Warden Peery has started meeting with the IACs.

The review team noted acting Warden Peery did meet with Facility E IAC for the first quarter on March 18. The minutes supplied to the review team show that few issues were resolved, and many issues are "still being looked into." The review team noted, some questions that were not answered at the IAC meeting were basic facility operations questions that should have been easy to answer and resolve the issue (e.g. Agenda Item #1; Is the inmate population on Facility E required to go to the dining room for breakfast and dinner? The response was "Will look into the matter."). The review team notes this may be so because this was the first IAC meeting the new acting warden had facilitated. The second quarter meetings are scheduled with every facility. Agendas have been received from all facility IACs so more issues may be resolved at the meetings, thus avoiding as many items being left open at their conclusion. Minutes for the IAC meetings with the facility management are not being kept; however, based on our conversations with all IACs and staff, it is apparent that these meetings are occurring on a regular basis (some occur weekly). The facility managers were instructed by the warden to ensure minutes are kept as proof of

practice that these meetings have occurred.  It is also noted HDSP is not following their DOM supplement as to how the IAC meeting minutes are documented.

The review team notes that acting Warden Peery has begun a process to address these meeting deficiencies.  As stated above, a process has already been put in place to meet with the IACs every quarter and to ensure the meetings with the facility managers are memorialized via meeting minutes.

## Housing Units (General Conditions and Observations)

In this report, the review team has highlighted the overall facility/housing units needing attention.  The facility/housing attachment has been provided for the detail of the cases used to arrive at  these conclusions.  The review team met with all Facility Captains, Lieutenants and Sergeants.  Custodial staff was advised that the review team was there to inspect several areas of security and custodial operations.  They were also informed that based on the information obtained, each facility would subsequently be evaluated for efficiency.  The tour also consisted of dialogs with random officers and inmates on all facilities to determine the level of staff morale and the level of communication between staff and inmates.  A meeting was scheduled with the IAC on Facilities A, C, and D.  All the IACs were advised that the team was there to conduct a review, and that this was an opportunity for them to bring up any major concerns with inmate programs, Daily Activities Schedules, inmate staff relations, and anything else that was of major importance and concern to them.

## Facility A:

The Facility A Captain, Lieutenant, and Sergeant were very polite and expressed a joyful demeanor.  They were asked how they felt about their superiors and it was immediately obvious based on their positive responses, that they all support the management team at HDSP.

The IAC was assembled in the Facility Chapel without the presence of facility staff. The IAC's major concerns were the current laundry exchange program.

The IAC simply stated that they liked the one for one exchange and did not like the current method used (the review team notes the new process is temporary due to the HCFIP construction project currently occurring on Facility A).  They also stated that quarterly packages were not delivered in a timely manner.  The question was posed to the IAC, "Do you get released for yard and dayroom on time?"  The IAC stated that they do get released on time for the most part for both, and are only occasionally released late.  The IAC was asked how they are treated by staff and they all stated that they are mostly treated with dignity and respect but do occasionally run into the rude officer.  They also stated that it was never serious enough to make an issue of it. The IAC could not identify or name a specific staff member.

The Facility A Yard staff were very helpful and assisted the review team by gathering requested documents and answering questions.  Some of the newer officers who are not from the area expressed their desire to stay at HDSP, stating that they are

extremely happy with how they are treated and with the willingness of local staff to help them with whatever they need. The yard staff conducted clothed body searches of all inmates before allowing them into their respective work areas.

A review of the disciplinary log for the month of January and February revealed CDCR 115 disciplinary logs are reviewed and signed by management; however, it does not appear the logs are reviewed in accordance with DOM. The logs supplied to the review team for January and February were signed by the management staff on April 22, yet they should have been signed before then. Also, the managers signed pages that were incomplete. In addition, the log is not signed by the registrar stating he/she has received a copy of the CDCR 115. The disciplinary register did not include void memorandums for the voided Rules Violations Reports (RVRs). In review of the disciplinary logs, there are voided RVRs but the disciplinary log fails to identifiy who authorized the voiding of the RVRs. It appears no void memorandums are being generated by the CDO.     There was a total of 16 RVRs for February and a total 64 RVRs for January, 36 of which related to a riot.

A medical emergency was observed by the review team. During the emergency, staff were responding to A5 for an inmate down call in cell 103. Medical and Custody staff responded without delay and immediately transported the inmate to the Facility Satellite Clinic. It was very refreshing to see all staff understood the importance of medical emergencies within their facility.

## Facility B:

The Facility B Captain, Lieutenant and Sergeant were very polite and expressed a joyful demeanor. They were asked how they felt about their superiors and it was immediately obvious based on their positive responses that they all support the management team at HDSP.

The Facility B Yard staff were very helpful and assisted the review team by gathering requested documents and answering questions. Some of the newer officers who are not from the area expressed their desire to stay at HDSP, stating that they are extremely happy with how they are treated. The yard staff conducted clothed body searches of all inmates before allowing them into their respective work areas. The acting captain assigned to this facility was very engaged with the inmate population and staff. The acting captain was extremely responsive to the review teams' needs during this evaluation.

A review of the disciplinary log for the month of January and February revealed the CDCR 115 disciplinary logs are reviewed and signed by management; however, it does not appear the logs are reviewed in accordance with DOM. The logs supplied to the review team for January and February were signed by the management staff on April 28, yet they should have been signed before then. Also, the managers signed pages that were incomplete. The disciplinary register did not include void memorandums for the RVRs that were voided. In review of the disciplinary logs, there are voided RVRs but the disciplinary log fails to identifiy who authorized the voiding of the RVRs. It appears no void memorandums are being generated by the CDO.     In

addition, the log is not signed by the registrar stating he/she has received a copy of the CDCR 115.

Facility B Housing Unit staff indicated that the inmate mail is rerouted daily, if necessary utilizing SOMS to locate the inmate and ensure the mail is routed appropriately by having it taken to the program office for proper distribution.

The review team observed the evening (third watch) and the morning (second watch) meal release. The inmates were released on time and in a safe manner. Officers were strategically placed in positions to provide safety during both meals.

It should be noted the inmates on Facility B complained of not having jobs or inmate programs. Some inmates stated they have been on a work waiting list for over a year. The Facility B Captain expressed similar concerns and stated it is very difficult to obtain inmate programs at HDSP. The Facility B Captain conveyed concerns relative to the lack of program availability on Facility B.

**Facility C:**

Facility C appeared to be extremely clean. The program areas were very clean and it was apparent the floors had been polished to a shine. The Facility C Captain, Lieutenant and Sergeant were confident about what happens in the housing units due to consistent inspections and tours of those areas. They were asked how they felt about their superiors and it was immediately obvious based on their positive responses they all support the management team at HDSP. The captain appeared to be very organized and involved with the daily operations of his assigned facility. The control booths all had the same equipment boards and they were very neat and organized.

The IAC was assembled in the program office committee room without the presence of facility staff. The IAC had no major concerns and expressed that they were happy with the leadership on the yard. The IAC also stated they have a great relationship with custody staff on the facility.

The Facility C yard staff were very helpful and assisted the review team by gathering requested documents and answering questions. The captain had a yard officer escort us around and answer questions we had about custodial programs. The yard staff conducted clothed body searches of all inmates before allowing them into their respective work areas.

A review of the disciplinary log for the month of January and February revealed the CDCR 115 disciplinary logs are not reviewed and signed by management in accordance with DOM. The logs supplied to the review team for January and February were not signed by the management staff. The disciplinary register did not include void memorandums for the RVRs that were voided. In review of the disciplinary logs, there are voided RVRs but the disciplinary log fails to identifiy who authorized the voiding of the RVRs. It appears no void memorandums are being

generated by the CDO.     In addition, the log is not signed by the registrar stating he/she has received a copy of the CDCR 115.

Facility C Housing Unit staff indicated the inmate mail is re-routed daily if necessary utilizing SOMS to locate the inmate and ensure the mail is routed appropriately by having it taken to the program office for proper distribution.

**Facility D:**

The Facility D Captain was unavailable at the beginning of the audit due to ICC.  The lieutenant and sergeant were very polite and expressed a joyful demeanor.  They were asked how they felt about their superiors and it was immediately obvious based on their positive responses they all support the management team at HDSP.  The lieutenant escorted the review team and was instrumental in explaining current programs, as well as a brief history of HDSP since he has been at the institution.

The IAC was assembled in the program office without the presence of facility staff.  The IAC's major concern is Facility A becoming a SNY facility and having their food contaminated with feces and other things in central kitchen.  The review team noted the administration has a plan in place to mitigate these concerns from the inmate population at HDSP.

The IAC stated there were several inmates have been disciplinary free for years and there was no time frame given to them for transfer to a Level IV 270 design facility.  The IAC also complained the roofs leak water in the second tier cells during the winter.

The Facility D yard staff were very helpful and assisted the audit team by gathering requested documents and answering questions.  The yard staff conducted clothed body searches of all inmates before allowing them into their respective work areas.

A review of the disciplinary log for the month of January and February revealed the CDCR 115 disciplinary logs are not reviewed and signed by management in accordance with DOM.  The logs supplied to the review team for January and February were not signed by the management staff.  The disciplinary register did not include void memorandums for the RVRs that were voided.  In review of the disciplinary logs, there are voided RVRs but the disciplinary log fails to identifiy who authorized the voiding of the RVRs. It appears no void memorandums are being generated by the CDO.  In addition, the log is not signed by the registrar stating he/she has received a copy of the CDCR 115.  As the review team looked through the log, it appeared some CDCR 115s should have been completed, yet the log does not reflect whether or not they have been completed.

**ASU (Standalone Unit/Z Unit):**

The ASU Lieutenant was very knowledgeable about ASU procedures and assisted the audit team in gathering necessary documentation to complete our review of the standalone ASU.  The sergeant was very polite and expressed a joyful demeanor.  The staff were asked how they felt about their superiors and it was immediately obvious based on their positive responses that they all support the management team at HDSP.

The Z ASU staff were very helpful and assisted the audit team by gathering other requested documents and answering questions.

A review of the disciplinary log for the month of January and February revealed the log was completed.  Signatures indicating the logs are being reviewed by staff were present.  However, the signatures belonged to the sergeant and not the manager, as required.  The disciplinary register did not include void memorandums for the RVRs that were voided.  In review of the disciplinary logs, there are voided RVRs but the disciplinary log fails to identifiy who authorized the voiding of the RVR.  It appears no void memorandums are being generated by the CDO.  It appears no void memorandums are being generated by the CDO authorizing the voiding of RVRs.

The control booth officer requested identification before entering the unit.  All floor officers were wearing their respective personal alarm device (PAD) and required equipment.  Housing unit common areas were very clean.  CDCR 602, 602-A, 602-G, Forms 22 and 7362 inmate request for medical sevices forms are available for inmates upon request or on supply days.  Cell Search logs were inspected and were well maintained.  Cell Search Receipts were properly documented by officers.

A review of random cells indicated staff allows the inmates to clean their respective cells consistently.  A thorough review of the control booth officer's inventory revealed an accurate accounting of equipment and appropriate use of the chit method.

The floor officers conducted inmate showers and documented them in the CDCR 114-A Segregation File as the inmates completed showering.  A review of the ethnic balance report indicated the inmates in Z ASU are ethnically balanced.  No maintenance issues were observed nor reported.

Cold weather clothing was available for inmates.  The sergeant and the officers were familiar with the collection of appeals and sick call slips.

**Review of Classification**

The review team randomly chose inmates by pulling reports from the "SOMS>Reports>Population Tracking Report>Unlock Report" for each building.  The review team reviewed the inmate's Initial Classification, last Annual Classification review at HDSP, their Double Cell status, and C/C status inmates.

The review team inspected the Initial Classification Chronos (CDCR 128-G) and checked to see if the inmates were being seen by the Unit Classification Committee within 14 days after arriving at HDSP. The review team also checked to see if the inmates were given a copy of the Notice of Classification Hearing (CDCR 128-B1) ensuring the inmates were given at least a 72 hour notice prior to committee, and the notices were placed in the inmates' Electronic Records Management (ERMS) file. On the CDC 128-B1, the review team checked to see if the Correctional Counselors were documenting the type of committee the inmates were seeing. While reviewing the Initial Classification Chronos, the review team also checked to ensure the committee discussed the inmate's cell status (single cell or double cell) and whether the committee thoroughly documented how they made the decision of single cell or double cell.

For the Annual Review, the review team checked to ensure inmates were seen by committee within 30 days (prior or after) of their Annual Review and were not more than 30 days overdue.

Upon review of Work Group C/Privilege Group C (C/C) inmates, the review team asked the classification staff who tracks the RVRs, and whether or not an inmate's electronic appliances are removed when placing an inmate on C/C status. The review team randomly went to C/C inmate cells and performed a cursory search inside the cells. The review team spoke with floor staff and asked what privileges C/C inmates received.

In this report, the review team has highlighted the overall classification processes needing attention. The classification attachment has been provided for the detail of the cases used to come to these conclusions.

A review was conducted of HDSP's overdue Committee Actions. A list prior to April 30 was generated from SOMS. Within all the facilities, HDSP has a total of 46 overdue initial Unit Classification Committees (UCC), 25 overdue Annual Reviews (A/R) and one overdue Institutional Classification Committee (ICC). Filtering the overdue committees down to facilities:   Facility A has 10 overdue initial UCC and two overdue A/R; Facility B has five overdue initial UCC and five overdue A/R; Facility C has 20 overdue initial UCC and six overdue A/R; Facility D has 10 overdue initial UCC, 11 overdue A/R and one overdue ICC; Z Unit has one overdue ICC; and MSF has one overdue UCC.

**Facility A:**

Facility A has seven inmates on C/C status. The inmates are not clustered in one area. When the review team spoke with staff, their understanding of C/C status inmates was: electronic appliances are removed from the inmate's cell; allowed one hour of morning yard, a shower and emergency telephone calls only. During the audit of five out of the seven inmates on C/C status, two inmates were found to have portable CD players in their cells, with another or no inmate's name on the CD player. After the discovery, staff removed the electronic appliances per policy and procedure.

Facility A inmate intake is closed for level three general population due to the conversion schedule; however, it is open for MSF inmates. The MSF orientation inmates are coming to their initial UCC within 14 days after arriving to HDSP.

In speaking with counseling staff, most A/Rs are being seen within the 30 days; however, some are out to March, e.g., in May, they will be out 60 days.

During this review, the team randomly selected two to three inmates from each building for a total of 14 inmates on Facility A, and reviewed their cases. Upon review, it was noted counseling staff are not consistently issuing the Notice of Classification Hearing (CDCR 128B-1) and ensuring it is scanned into the inmate's ERMS file. Counselors are not consistently documenting the reason for clearing/approving an inmate for D/C status. When an inmate is more than 14 days from his initial UCC, counseling staff should document the reason for the late committee.

**Facility B:**

Facility B has 12 C/C status inmates and they are not clustered. Most inmates on C/C status are inmates who have been established by Facility B committees. The CC-Is are given a copy of the RVRs to track and determine when an inmate is to be placed on C/C. The CC-II has expectations; the inmates are being held accountable for their actions. A search of seven C/C status inmates was conducted. Of the seven, two inmates had electronic appliances in their cells. After the discovery, the floor staff removed the property per policy and procedure.

All orientation inmates are being seen for their initial UCC within 14 days after arriving. CC-I's Annual Reviews are backlogged to March. As of May, they will be out 60 days.

During this review, the team randomly selected two inmates from each building for a total of ten inmates on Facility B, and reviewed their cases. Upon review, it was noted that staff needs to be more consistent with their reason for clearing an inmate for D/C status and ensuring the CDCR 128B-1 is scanned into the inmate's ERMS file.

**Facility C:**

Facility C has two inmates on C/C status. The inmates are not clustered in one area. When I talked to Captain Lewis, he indicated all C/C inmates are moved to Facility D due to Facility C being an enhanced programming facility. The two inmates on Facility C were made aware of this and that they were going to being moved to Facility D. Captain Lewis also indicated when an inmate is placed on C/C, he does not go into his cell until the staff inventories the inmate's property to be transferred, and removes electronic appliances which are sent to Receiving and Release.

During this review, the team randomly selected two inmates from six buildings for a total of 12 inmates on Facility C, and reviewed their cases. Upon review it was noted that the Counseling staff are not consistently ensuring the CDCR 128B-1 is being scanned into the inmate's ERMS file. The recorder is not documenting the reason for placing an inmate on D/C status. In addition, counseling staff are not consistently

issuing the CDCR 128B-1s and ensuring they are scanned in the inmate's ERMS file. All initial UCCs are completed within the 14 days.

**Facility D:**

Facility D has seven C/C status inmates and they are not clustered. When the review team spoke with staff, their understanding was was:  electronic appliances are removed from the inmate's cell; allowed one hour of morning yard, a shower and emergency telephone calls only.  Most inmates on C/C status are inmates that are transferred from other institutions or facilities.  The CC-II indicated he gives a copy of the RVR to the CC-Is and they track the RVRs to determine if the inmate needs to be reviewed by UCC for placement on C/C status or not.

The CC-II indicated the orientation inmates are seen by UCC within 14 days after arriving at HDSP.  Some CC-I's Annual Reviews are out to March; e.g., in May, they will be out 60 days.

During this review, the team randomly selected two inmates from each general population building for a total of 12 inmates on Facility D, and reviewed their cases. Upon review it was noted that the counseling staff are not consistently ensuring the CDCR 128B-1s are in inmates' ERMS files.  So far, the initial Classification Committees are getting completed on time.  They should ensure when placing an inmate on D/C or S/C status to clearly document the reason.  When issuing the CDCR 128B-1s, counseling staff must ensure they mark the box of the appropriate committee type.

**ASU (Facility D and Z Unit):**

The team reviewed six inmates' "flimsy" files.  The inmates' CDC 114As were fully completed, indicating the staff offered ten hours of yard, three showers, cell searches, supplies and meals given, and trash removed.  The "CDCR 114 Audit Worksheets" are not being completed on a regular basis for upper and lower tiers and sections, for all the audit periods.  For example, for the Audit Worksheet period from 3/29/2015 to 4/4/2015, A section upper tier, B section lower tier and all of C section upper and lower tiers were missing.

During this review, the team randomly selected six inmates from ASU including both the stand alone "Z" unit and Facility D, Building 8 , and reviewed their cases.  Upon review it was noted that the CDCR 128B-1s are not consistently being scanned into the inmate's ERMS file.  Inmates are being seen within ten days after being placed in ASU.  Only one inmate was seen by ICC passed the 10 day requirement for his Initial ICC.

The team reviewed up to three inmates' "flimsy" files, per pod/section for the period 4/12/2015 to 4/18/2015.  The inmates' CDCR 114As were fully completed, showing the staff offered yard, showers, cell searches, supplies and meals given, and trash removed.

However, during this review, under the column for "Yard Total Hrs F/WK," the auditors entered "Y" for yes. This was not consistent with Facility D, Building 8's ASU audit and was not truly indicative of how many hours the inmates had or refused yard. In contrast, the Building 8 auditors entered the total hours the inmate had yard, and also indicated if there was a refusal. For example, on inmate Williams (K29648), the auditor documented "Y" making it appear inmate Williams had received yard; however, inmate Williams had a loss of privileges (LOP) so he did not get yard that audit period. Also discovered were two entries under the column "Cell Search." The auditor documented inmates Williams' (K29648) and Parrack's (AC1038) cells were searched in that period; however, the CDCR 114A does not indicate a cell search was conducted.

**Review of Appeals Office**

The review team interviewed appeals office staff and viewed supporting documents, finding that the Appeals office is operating at a marginal level. There were 38 overdue modification orders and no overdue first or second level appeal responses. According to staff, the largest inmate appeal issue is property. This appears to stem from inmates being placed into ASU with a subsequent release to a different facility or transfer, and finding his television is no longer operational. HDSP is screening a lot of appeals out (54%-70% per the last COMPSTAT report). Upon review, the appeals staff is resolving issues (e.g., Lost ID), and then the appeals office is screening the appeals out as they had no "adverse effect" since the issue had been resolved. However, the appeals office should be granting these appeals in part if the inmate does not wish to withdraw his appeal. Further, HDSP is not following the collection process for appeals articulated in the DOM Supplement (the facility staff are sending the appeals to the mailroom instead of directly to the appeals office). According to appeals staff, the greatest number of screen outs of inmate appeals is due to lack of supporting documentation. This issue should be resolved in a meeting between appeals staff and facility IACs which provides training for appeals staff to assist the inmate population on the facility. The appeals coordinators are not meeting with the IAC on a quarterly basis as required. It is very important that the review team identify the staff complaint attachment C forms (appeal inquiries) are thorough and are approved by the CDW or Warden. This is vital to protect HDSP and department staff against future litigation.

**Review of Mailroom**

The review team found the acting Mailroom Supervisor to be outstanding. The mailroom is up to date and operating extremely efficiently. The mailroom is processing mail within the department's expectations. Mailroom staff are very upbeat and have great working relationships with their supervisors and managers. The acting mailroom supervisor stated that if they are close to being outside the timeframes set forth by the department, she asks for assistance from other areas, and she gets it. It is apparent to the review team the acting mailroom supervisor has good knowledge of the Title 15 and DOM. The mailroom at HDSP is very clean and well organized.

Peer Review – High Desert State Prison
Page 15

## Review of In Service Training (IST)

The IST department at HDSP appears to be an extremely well run operation. The IST Lieutenant at HDSP is new to the unit as the previous IST manager took a position with the Office of Internal Affairs. The Office staff appeared friendly, helpful, and knowledgeable of their duties.

AOD training is being accomplished in a condensed manner over two days. HDSP has implemented a wonderful program of videotaping the training so new AODs may watch the videos to get them up to speed. This is done just until the next AOD training, as this training requires a lot of resources from many different areas to complete. Block training was scheduled and HDSP has a good process to ensure staff are completing this training. Custody staff may only "swap" their training with someone attending the training during the same month. Non custody block continues on, and according to the list supplied to the review team, staff are getting access to the training. RBART training is scheduled and occurs as required. The pride staff takes in explaining the thorough and in depth level of their training was outstanding. Staff at HDSP take training very seriously, and it starts with the expectation from the warden and the IST Manager.

Supervisors were also receiving training and being sent to both Basic and Advanced supervision, as well as Sergeant and Lieutenant Academies, when allowed by departmental scheduling, and travel exemption approval. It is noted the supervisor training at HDSP is delinquent -- like many of the institutions -- due to fiscal constraints and lack of available room in classes. However, training is important to HDSP, and they are constantly advocating for their staff to attend these trainings. HDSP has many staff scheduled for these classes in the near future, including one they are hosting at HDSP for CCC and HDSP later this month. It is also noted according to the IST manager, that HDSP is approximately 70% completed with the new UOF training that is required to be completed by June 12. The biggest issue found in the HDSP is they have not completed an escape drill in the past two to three years. It is noted the CDW and warden said they are working on facilitating the drill shortly.

## Review of Use of Force (UOF) Incident Reports

Team members reviewed ten incident reports involving staff's use of force on inmates. The team found no issues with the UOF in these cases. These incident reports met the department's overall standard for clarity, completeness and accuracy. The overall product met departmental standards. During the review, the team asked general questions concerning the overall relationship between staff and administration, between the inmate population and administration, between staff and overall staff morale. The UOF staff characterization of the various relationships with administration was positive and did not reveal any specific issues or major concerns with staff members. The UOF staff also noted they have no knowledge of inmate and administrative relationships, and limited knowledge of the staff members' relationships outside their processes. HDSP meets the time requirements as expected by the department; their incident packages are initially reviewed by IERC within 30 days of

the incidents.  It is noted at the time of the review, the IERC had about five incidents still open while clarification questions were sent back to the divisions from the IERC. The process and expectations of staff regarding reportable incidents is as follows: the division has three weeks to submit the completed incident to the UOF analyst; the UOF analyst has to review the incident package and present it in IERC.  If the analyst finds required clarification questions, she will present in IERC, and if agreed upon by the IERC, the case will remain open and the questions will be returned to the division for clarification.   It was noted that 49% of the UOF incidents this calendar year occurred on Facility B.  This is the only level 4 SNY 270 design facility at HDSP.  To determine whether or not these numbers are high, the review team reached out to other institutions with level 4 SNY 270 design facilities (see attachment A for number comparisons).

**Officer Sick Leave Review**

The Officer Sick Leave monitoring Program is being underutilized.  The AW BS is the person coordinating and "chairing" this task.  HDSP monitors every officer each 60-180 days, which is not consistent with expectations.  The process seems unorganized and the CDW and/or the Warden need to be a part of this process as it involves employee discipline.

**Inmate Assignments**

According to the last COMPSTAT report, HDSP has over 400+ inmate job assignment vacancies with more than 1200 inmates on the job assignment waiting lists.   In speaking with the inmate assignments lieutenant, 49 vacancies are on their level one and are not filled due to the reduction in level 1 population.  The lieutenant stated they are not assigning inmates to the Facility A vocations vacancies.  In addition, HDSP is not assigning inmates to Facility A support services positions due to the conversion. The lieutenant stated HDSP also has four teacher positions vacant.  This is also causing a high number of vacant positions with the inmate population.  It appears HDSP needs to review their need for some of these assignments.

**Summary/Conclusion**

The review team's overall consensus of HDSP appearance is very positive.  We found the prison to be clean and orderly.  HDSP's staff expressed a hopeful attitude toward the future of HDSP.  The High Security (HS) Mission staff will continue to work with HDSP on their deficiencies as identified in this report.  In addition, HS mission will also provide some recommended proactive processes to the executive management team to assist them in managing HDSP.

Peer Review – High Desert State Prison
Page 17

If you have any questions regarding the information contained in this report, please contact me via email or by telephone at (916) 327-2725.

J. LOZANO
Correctional Administrator
High Security Mission
Division of Adult Institutions

# POLICE RACIAL VIOLENCE:
# LESSONS FROM SOCIAL PSYCHOLOGY

## *L. Song Richardson\**

### INTRODUCTION

The recent rash of police killing unarmed black men has brought national attention to the persistent problem of policing and racial violence. These cases include the well-known and highly controversial death of Michael Brown in Ferguson, Missouri,[1] as well as the deaths of twelve-year-old Tamir Rice in Cleveland, Ohio;[2] Eric Garner in Staten Island, New York;[3] John Crawford III in Beavercreek, Ohio;[4] Ezell Ford in Los Angeles, California;[5] Dante Parker in San Bernardino County, California;[6] and Vonderrit D. Myers Jr. in St. Louis, Missouri.[7] Data reported to the FBI indicate that white police officers killed black citizens almost twice a week

---

\* Professor, The University of California, Irvine School of Law. J.D., Yale Law School; A.B., Harvard College. I wish to thank Professors Kimani Paul-Emile and Robin Lenhardt for the opportunity to participate in this symposium entitled *Critical Race Theory and Empirical Methods Conference* held at Fordham University School of Law. I am also appreciative of the excellent research assistance provided by Sierra Nelson and Ariela Rutkin-Becker. For an overview of the symposium, see Kimani Paul-Emile, *Foreword: Critical Race Theory and Empirical Methods Conference*, 83 FORDHAM L. REV. 2953 (2015).

1. *See, e.g.*, Jonathan Cohn, *Darren Wilson Walks: No Indictment for Michael Brown's Killer*, NEW REPUBLIC (Nov. 24, 2014), http://www.newrepublic.com/article/120395/ferguson-grand-jury-makes-issues-no-charges-officer-wilson.
2. *See, e.g.*, Emma G. Fitzsimmons, *Video Shows Cleveland Officer Shot Boy in 2 Seconds*, N.Y. TIMES, Nov. 27, 2014, at A25, *available at* http://www.nytimes.com/2014/11/27/us/video-shows-cleveland-officer-shot-tamir-rice-2-seconds-after-pulling-up-next-to-him.html.
3. *See, e.g.*, J. David Goodman & Al Baker, *Wave of Protests After Grand Jury Doesn't Indict Officer in Eric Garner Chokehold Case*, N.Y. TIMES (Dec. 3, 2014), http://www.nytimes.com/2014/12/04/nyregion/grand-jury-said-to-bring-no-charges-in-staten-island-chokehold-death-of-eric-garner.html.
4. Catherine E. Shoichet & Nick Valencia, *Cops Killed Man at Walmart, Then Interrogated Girlfriend*, CNN (Dec. 16, 2014, 10:28 PM), http://www.cnn.com/2014/12/16/justice/walmart-shooting-john-crawford/.
5. Jennifer Medina, *Man Is Shot and Killed by the Police in California*, N.Y. TIMES, Aug. 14, 2014, at A16.
6. Philip Caulfield, *Father of 5 Dies After Getting Tased by Police During Attempted Burglary Arrest*, N.Y. DAILY NEWS (Aug. 15, 2014), http://www.nydailynews.com/news/national/father-5-dies-tased-police-arrest-article-1.1904577.
7. Alan Blinder, *New Outcry Unfolds After St. Louis Officer Kills Black Teenager*, N.Y. TIMES, Oct. 10, 2014, at A18.

2961

---

between 2005 and 2012.[8]  This number is underinclusive because the FBI database is based on self-reports by departments that choose to participate and only includes deaths that the police conclude are justifiable.[9]

Many accounts attempt to explain these instances of racial violence at the hands of the police, ranging from arguments that the police acted justifiably to arguments likening these killings to Jim Crow lynchings.[10]  Certainly, it is tempting to blame racial violence on either the racial animus of officers or the purportedly threatening behaviors of victims because it simplifies the problem; either the individual officer or citizen is at fault.

However, reducing the problem of racial violence to the individual police-citizen interaction at issue obscures how current policing practices and culture entrench racial subordination and, thus, racial violence.  This is because as a result of our nation's sordid racial history, white supremacy and racial subordination have become embedded not only within social systems and institutions but also within our minds.  As a result, unless corrective structural and institutional interventions are made, racial violence is inevitable regardless of whether officers have malicious racial motives or citizens engage in objectively threatening behaviors.

This Essay proceeds in three parts.  Part I discusses how unconscious racial biases and implicit white favoritism can result in racial disparities in police violence.  Part II moves beyond unconscious biases and focuses instead on how the personal insecurities of police officers in the form of stereotype threat and masculinity threat also can lead to racial violence.  Finally, Part III argues that when considered in combination, these psychological processes powerfully demonstrate why racial violence is inevitable and overdetermined given current policing practices and culture, even when conscious racial animus is absent.  Part III concludes by discussing the need to implement institutional and structural changes to reduce instances of racial violence.

## I.  IMPLICIT RACIAL BIAS AND IMPLICIT WHITE FAVORITISM

Both implicit racial bias and implicit white favoritism are consequential when it comes to racial violence, but in opposite ways.  Implicit racial biases typically refer to unconscious anti-black bias in the form of negative stereotypes (beliefs) and attitudes (feelings) that are widely held, can conflict with conscious attitudes, and can predict a subset of real world behaviors.  For instance, implicit racial biases can influence whether black

---

8.  Kevin Johnson et al., *Local Police Involved in 400 Killings Per Year*, USA TODAY (Aug. 15, 2014), http://www.usatoday.com/story/news/nation/2014/08/14/police-killings-data/14060357/.

9.  Only 750 of the approximately 17,000 law enforcement agencies in the United States participate. *Id.* Unfortunately, this is the only national database that collects data on police use of deadly force. *Id.* (quoting Geoff Alpert, a criminologist from the University of South Carolina who studies police use of deadly force).

10.  Isabel Wilkerson, *Mike Brown's Shooting and Jim Crow Lynchings Have Too Much in Common.  It's Time for America to Own Up*, GUARDIAN (Aug. 25, 2014), http://www.theguardian.com/commentisfree/2014/aug/25/mike-brown-shooting-jim-crow-lynchings-in-common.

individuals receive callback interviews[11] and life-saving medical procedures,[12] as well as whether individuals exhibit nonverbal discomfort when interacting with non-whites.[13] Decades of research demonstrate that most Americans are unconsciously biased against black individuals.[14]

Two specific types of implicit racial biases are consequential when it comes to racial violence. First is the implicit association between blacks and criminality.[15] This unconscious association has led officers to misidentify blacks with more stereotypically black features such as dark skin, full lips, and wide noses as criminal suspects,[16] to engage in unconscious racial profiling,[17] and to shoot more stereotypical-looking black suspects more quickly than others in computer simulations.[18]

More recently, a second type of unconscious anti-black bias has proven consequential to racial violence. Implicit dehumanization refers to the tendency of individuals to unconsciously associate blacks with apes. Recent studies demonstrate that implicit dehumanization predicts police violence against black juveniles.[19] In one of these studies, subjects who had been subliminally primed with images of apes were more likely to find a vicious beating of a black suspect to be justified.[20] Similar effects did not occur when the victim was white or when individuals were not primed.

---

11. *See* Dan-Olof Rooth, *Implicit Discrimination in Hiring: Real World Evidence* 1, 4–5 (Inst. for the Study of Labor, Discussion Paper No. 2764, 2007), *available at* http://d-nb.info/98812002X/34 (discussing the difference in receiving callback job interviews between applicants with Arab or Muslim names and applicants with Swedish names); *see also* Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable Than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, 94 AM. ECON. REV. 991, 998 (2004) (demonstrating that job applicants with white-sounding names such as Emily or Greg were 50 percent more likely to receive callback job interviews in Boston and 49 percent more likely in Chicago than applicants with black-sounding names like Jamal); Devah Pager et al., *Discrimination in a Low-Wage Labor Market: A Field Experiment*, 74 AM. SOC. REV 777, 788 (2009).

12. *See* Alexander R. Green et al., *Implicit Bias Among Physicians and Its Prediction of Thrombolysis Decisions for Black and White Patients*, 22 J. GEN. INTERNAL MED. 1231 (2007).

13. *See generally* John E. Dovodio et al., *Why Can't We Just Get Along? Interpersonal Biases and Interracial Distrust*, 8 CULTURAL DIVERSITY & ETHNIC MINORITY PSYCHOL. 88 (2002).

14. *See generally* Kristin Lane et al., *Implicit Social Cognition and Law*, 3 ANN. REV. L. & SOC. SCI. 427 (2007).

15. For an in-depth discussion of how this stereotype can influence judgments of criminality, see L. Song Richardson & Phillip Atiba Goff, *Self-Defense and the Suspicion Heuristic*, 98 IOWA L. REV. 293 (2012).

16. Jennifer L. Eberhardt et al., *Seeing Black: Race, Crime, and Visual Processing*, 87 J. PERSONALITY & SOC. PSYCHOL. 876, 876 (2004).

17. *See* Sophie Trawalter et al., *Attending to Threat: Race-Based Patterns of Selective Attention*, 44 J. EXPERIMENTAL SOC. PSYCHOL. 1322, 1322 (2008); Eberhardt et al., *supra* note 16, at 890.

18. *See* Kimberly Barsamian Kahn & Paul G. Davies, *Differentially Dangerous? Phenotypic Racial Stereotypicality Increases Implicit Bias Among Ingroup and Outgroup Members*, 14 GROUP PROCESSES & INTERGROUP REL. 569, 573 (2011).

19. *See generally* Phillip Atiba Goff et al., *Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences*, 94 J. PERSONALITY & SOC. PSYCHOL. 292 (2008).

20. *See id.* at 292–97.

2964                    *FORDHAM LAW REVIEW*                    [Vol. 83

Additionally, this study found that implicit dehumanization influences real world behaviors. The researchers discovered that the more closely police officers unconsciously associated black youths with apes, the more likely they were to have used force against black children throughout the course of their careers.[21]

The recognition that implicit racial biases can cause racially disparate effects, even in the absence of conscious bias, is becoming increasingly commonplace in mainstream discussions of police violence.[22] This science demonstrates that even when people are acting in identical ways, implicit racial bias places black citizens more at risk of mistaken judgments of danger and criminality. As a result, they are more likely to be shot, more likely to be dehumanized, and more likely to be seen as deserving of an officer's use of force.[23]

While significant attention has been paid to implicit anti-black racial bias, a sister concept, implicit white favoritism, has received almost no attention in the legal literature. I am only aware of one law review article on the subject.[24] In that article, Professors Robert Smith, Justin Levinson, and Zoë Robinson explain that implicit white favoritism is "the automatic association of positive stereotypes and attitudes with members of a favored group, leading to preferential treatment for persons of that group. In the context of the American criminal justice system, implicit favoritism is white favoritism."[25] While the concept of implicit white favoritism is new, critical race scholars have long identified white supremacy as a central building block of racial subordination.[26] Now, social psychological evidence provides empirical support for the theory.

Considering implicit white favoritism in tandem with implicit racial bias is important because it illuminates that racial disparities would remain in the context of racial violence even if all implicit anti-black biases were eliminated.[27] As Professor Smith and his colleagues explain, "Removing out-group derogation is not the same as being race-neutral."[28] For instance, one study found that when subjects were primed with white faces, they were slower to identify weapons than when they had not been primed with

---

21. *See* Phillip Atiba Goff et al., *The Essence of Innocence: Consequences of Dehumanizing Black Children*, 106 J. PERSONALITY & SOC. PSYCHOL. 526, 528–29 (2014).

22. *See* Chris Mooney, *The Science of Why Cops Shoot Young Black Men*, MOTHER JONES (Dec. 1, 2014), http://www.motherjones.com/politics/2014/11/science-of-racism-prejudice.

23. For a discussion of a recent study demonstrating this, see L. Song Richardson & Phillip Atiba Goff, *Interrogating Racial Violence*, 12 OHIO ST. J. CRIM. L. 115, 138–43 (2014).

24. Robert J. Smith et al., *Bias in the Shadows of Criminal Law: The Problem of Implicit White Favoritism*, 66 ALA. L. REV. (forthcoming 2015) (on file with author).

25. *Id.* (manuscript at 4).

26. Critical race scholars have long discussed white supremacy. *See, e.g.*, Derrick Bell, *Racial Realism*, 24 CONN. L. REV. 363, 363–379 (1998); DERRICK BELL, RACE, RACISM AND AMERICAN LAW (6th ed. 2008); DERRICK BELL, AND WE ARE NOT SAVED: THE ELUSIVE QUEST FOR RACIAL JUSTICE (1989).

27. *See* Smith et al., *supra* note 24 (manuscript at 4) (noting that "[e]ven if we could eliminate [implicit anti-black bias], . . . racial disparities would persist.").

28. *Id.* (manuscript at 28).

2015]                    *POLICE RACIAL VIOLENCE*                    2965

any faces at all.[29]  Thus, while black men are associated with violence and criminality, facilitating racial violence against them, white men "are automatically and cognitively *disassociated* with violence."[30]  In other words, being white protects people against racial violence.  It is simply cognitively more taxing to associate whites with criminality.

Both implicit racial bias and implicit white favoritism together highlight why attempting to determine whether officers are bigots or reasonably felt threatened by the actions of victims does little to explain or address the problem of racial violence.  These two processes together demonstrate that black men are at greater risk of racial violence at the hands of the police even when the officer confronting them is consciously egalitarian, and even if black men are acting identically to white men in the same situation.

Once implicit biases are activated—and simply thinking about crime is sufficient to activate them[31]—officers' attention will be drawn to black men more readily than white men, even if they are acting identically and even if officers are not engaged in conscious racial profiling.  Once black men are under close police scrutiny, unconscious racial criminality can influence the way an officer interprets their ambiguous behaviors, causing the officer to be more likely to interpret their actions as being consistent with criminality even as identical behaviors engaged in by young white men would not arouse suspicion.[32]  In fact, the unconscious association between blacks and criminality can explain why officers are primed to see a weapon or assume that one exists when black men reach into their pockets or the glove compartment of a car.  On the other hand, implicit white favoritism illuminates why unarmed white men are significantly less likely to be shot in similar circumstances.

Implicit white favoritism explains why being white helps inoculate white men from this series of events.  It is more difficult to view them as criminal.  Unlike with black men, thinking about crime draws attention away from whites.[33]  As Professor Smith and his colleagues write, "[S]eeing white automatically means seeing positive, law abiding behavior."[34]  In fact, in one study, Professor Levinson found that subjects reading about an aggressive white defendant recalled fewer aggressive facts when relating the story than when the defendant was black.[35]  Seeing white also makes it more difficult to identify weapons.[36]  Thus, asking whether officers feared for their safety when confronting an individual does not address the fact that white men acting in identical ways would not trigger the same violent reaction.  This is why focusing solely on the individual interaction between

---

29.  *Id.* (manuscript at 32) (citation omitted).
30.  *Id.* (emphasis added).
31.  *See* Eberhardt et al., *supra* note 16, at 883.
32.  For an extended discussion, see L. Song Richardson, *Arrest Efficiency and the Fourth Amendment*, 95 MINN. L. REV. 2035, 2045–48, 2052–53 (2011).
33.  *See* Smith et al., *supra* note 24 (manuscript at 47).
34.  *Id.*
35.  *Id.* (manuscript at 21–22) (citing Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 DUKE L.J. 345 (2007)).
36.  *Id.* (manuscript at 36, 48).

2966                    *FORDHAM LAW REVIEW*                    [Vol. 83

officers and victims merely entrenches racial disparities in police use of force. Rather, the inquiry must be structural and institutional.

## II. SELF-THREATS

Thus far, this Essay has focused on how police officers' unconscious perceptions can facilitate or inhibit racial violence. This part examines a different question, namely, how do officers' perceptions of themselves influence their use of force? Recent psychological evidence suggests that the self-directed insecurities of officers also can enable racial violence. This part analyzes two self-threats in particular, stereotype threat and masculinity threat.

### A. Stereotype Threat

Stereotype threat refers to the anxiety that occurs when a person is concerned about confirming a negative stereotype about his or her social group.[37] I have discussed stereotype threat in depth elsewhere but provide a brief summary here.[38] Stereotype threat affects performance because concerns about being negatively stereotyped redirect cognitive resources away from the task at hand, leading to deficient performances.[39] Importantly, people do not need to believe or endorse the stereotype in order to be influenced by stereotype threat. Rather, it occurs whenever individuals care about their performance on a given task, are aware of the negative stereotype, and are concerned that failure or a deficient performance will confirm the negative stereotype.[40]

---

37. *See* Claude M. Steele, *A Threat in the Air: How Stereotypes Shape Intellectual Identity and Performance*, 52 AM. PSYCHOL. 613 (1997); Claude M. Steele & Joshua Aronson, *Stereotype Threat and the Intellectual Test Performance of African Americans*, 69 J. PERSONALITY & SOC. PSYCHOL. 797 (1995).

38. *See* Richardson & Goff, *supra* note 23, at 124–28.

39. *See generally* Jennifer K. Bosson et al., *When Saying and Doing Diverge: The Effects of Stereotype Threat on Self-Reported Versus Non-Verbal Anxiety*, 40 J. EXPERIMENTAL SOC. PSYCHOL. 247 (2004); Laurie T. O'Brien & Christian S. Crandall, *Stereotype Threat and Arousal: Effects on Women's Math Performance*, 29 PERSONALITY & SOC. PSYCHOL. BULL. 782 (2003); Sian L. Beilock et al., *On the Causal Mechanisms of Stereotype Threat: Can Skills That Don't Rely Heavily on Working Memory Still Be Threatened?*, 32 PERSONALITY SOC. PSYCHOL. BULL. 1059 (2006); Jim Blascovich et al., *African Americans and High Blood Pressure: The Role of Stereotype Threat*, 12 PSYCHOL. SCI. 225 (2001); Phillip Atiba Goff et al., *The Space Between Us: Stereotype Threat and Distance in Interracial Contexts*, 94 J. PERSONALITY & SOC. PSYCHOL. 91 (2008); Brenda Major & Laurie T. O'Brien, *The Social Psychology of Stigma*, 56 ANN. REV. PSYCHOL. 393 (2005); Wendy Berry Mendes et al., *Challenge and Threat During Social Interactions with White and Black Men*, 28 PERSONALITY & SOC. PSYCHOL. BULL. 939 (2002); Wendy Berry Mendes et al., *How Attributional Ambiguity Shapes Physiological and Emotional Responses to Social Rejection and Acceptance*, 94 J. PERSONALITY & SOC. PSYCHOL. 278 (2008); Toni Schmader & Michael Johns, *Converging Evidence That Stereotype Threat Reduces Working Memory Capacity*, 85 J. PERSONALITY & SOC. PSYCHOL. 440 (2003).

40. *See generally* Steele & Aronson, *supra* note 37.

2015]                    *POLICE RACIAL VIOLENCE*                    2967

In one study demonstrating the influence of stereotype threat, white men who had high SAT math scores were asked to take a difficult math test.[41] In the stereotype threat condition, they were told that the test would evaluate mathematical proficiency.[42] They also were given information suggesting that Asians typically outperformed other students.[43] In the control condition, they were only told that the test evaluated mathematical ability without any mention of Asian student performance.[44] The subjects in the threat condition performed significantly worse than the subjects in the control group.[45] In another experiment, researchers found that when white men believed that an athletic skills task required athletic intelligence rather than natural sports ability, they performed better than when the opposite was true.[46]

Across a number of studies, researchers have discovered that dominant group members' concerns with being negatively stereotyped as racist can work to the detriment of subordinated groups. In one study, researchers had white teachers read and give written feedback on an essay purportedly written by students.[47] The researchers found that when white teachers experienced stereotype threat, their fear of being judged as racist caused them to give falsely positive feedback when they believed the essay was written by black students but not when they believed the essay was written by white students. In a similar study, researchers found that when white subjects feared they would appear racially biased, they were less likely to warn black students that their workload might be unmanageable while not feeling similarly constrained with white students.[48]

Recent work by social psychologist Phillip Atiba Goff and his colleagues suggests that the fear of being evaluated as racist can also result in racial violence. In one study, ninety-nine members of the San Jose Police Department completed measures of their explicit and implicit racial attitudes as well as a measure of how concerned they were with appearing racist.[49] The researchers then obtained a copy of each officer's use of force history from the previous two years to determine whether there was any relationship between the use of force and the officer's psychological

---

41. *See* Joshua Aronson et al., *When White Men Can't Do Math: Necessary and Sufficient Factors in Stereotype Threat*, 35 J. EXPERIMENTAL SOC. PSYCHOL. 29 (1999).

42. *Id.* at 36–37.

43. *Id.*

44. *Id.* at 37.

45. *Id.* at 37–38.

46. *See* Jeff Stone et al., *Stereotype Threat Effects on Black and White Athletic Performance*, 77 J. PERSONALITY & SOC. PSYCHOL. 1213 (1999).

47. *See* Kent D. Harber et al., *The Positive Feedback Bias As a Response to Self-Image Threat*, 49 BRIT. J. SOC. PSYCHOL. 207, 209 (2010).

48. *See* Jennifer Randall Crosby & Benoît Monin, *Failure to Warn: How Student Race Affects Warnings of Potential Academic Difficulty*, 43 J. EXPERIMENTAL SOC. PSYCHOL. 663, 665–66 (2007).

49. *See* PHILLIP ATIBA GOFF ET AL., PROTECTING EQUITY: THE CONSORTIUM FOR POLICE LEADERSHIP IN EQUITY ON THE SAN JOSE POLICE DEPARTMENT 3–4 (2012) [hereinafter SAN JOSE REPORT].

2968                    *FORDHAM LAW REVIEW*                    [Vol. 83

profile.[50]   Surprisingly, the researchers did not find any relationship between explicit and implicit racial bias and the use of force.[51]   However, they did find an association between stereotype threat and the use of force. Higher levels of stereotype threat were associated with the greater use of force against black suspects relative to other racial groups, both in the lab and in the real world.[52]   Goff also did not find significant differences between black and white officers in the level of stereotype threat they experienced.[53]

It is tempting to explain this counterintuitive result by suggesting that officers who have high levels of stereotype threat are also aversive racists. Aversive racists are individuals who are consciously egalitarian but unconsciously biased.[54]   However, if this were the case, then we would expect to see a relationship between unconscious bias and stereotype threat. Yet, this relationship did not exist.

It is more likely that this response is tied to legitimacy and how officers are trained to respond to safety concerns.   In his important work, Tom Tyler has demonstrated that subordinates are more willing to voluntarily defer to authorities and to follow their rules when those authorities are perceived to be trustworthy and legitimate.[55]   Thus, legitimacy reduces the need to rely upon coercive force to obtain compliance.[56]   While this focus on how subordinate groups judge the legitimacy of authorities is important, new evidence demonstrates that it is equally critical to attend to how dominant groups understand their own legitimacy.

In a recent study, Goff and his team examined whether officers' concerns about legitimacy would influence their sense of safety and anxiety.[57]   One hundred fourteen officers from two police departments participated in the study.[58]   Officers' legitimacy judgments were assessed along two dimensions:   whether they viewed their actions as legitimate and their understanding of how others perceived their legitimacy.[59]

---

50. *Id.* at 4.

51. *Id.* at 11.

52. *Id.*

53. *Id.* at 5.  As Goff notes, this could be attributed to either the small sample size of non-white officers. *Id.*  Fifty-three percent of the officers were white, 28 percent were Hispanic, 6 percent were black and 6 percent were Asian, respectively. *Id.* at 4.  It also could be related to concerns white officers may have had with admitting to a fear of being judged to be racist. *Id.* at 5.  However, he also observed that non-white officers frequently mentioned occasions when citizens of the same race accused them of racism. *Id.*

54. Leanne S. Son Hing et al., *Exploring the Discrepancy Between Implicit and Explicit Prejudice:  A Test of Aversive Racism Theory*, *in* SOCIAL MOTIVATION:  CONSCIOUS AND UNCONSCIOUS PROCESSES 274–75 (Joseph P. Forgas et al. eds., 2005).

55. Tom R. Tyler, *Trust and Law Abidingness:  A Proactive Model of Social Regulation*, 81 B.U. L. REV. 361, 386 (2001)*; see also* TOM R. TYLER & YUEN J. HUO, TRUST IN THE LAW:  ENCOURAGING PUBLIC COOPERATION WITH THE POLICE AND COURTS 49–96 (2002).

56. *See* Tyler, *supra* note 55, at 386; *see also* TOM R. TYLER, WHY PEOPLE OBEY THE LAW 4, 8 (2006).

57. *See* Phillip Atiba Goff et al., *Illegitimacy Is Dangerous:  How Authorities Experience and React to Illegitimacy*, 4 PSYCHOL. 340, 341 (2013).

58. *Id.* at 342.

59. *Id.* at 340.

*POLICE RACIAL VIOLENCE*

To examine both of these aspects of legitimacy, the researchers asked officers about a controversial policy that required them to enforce federal immigration laws by sometimes stopping individuals suspected of being undocumented and requesting proof of lawful immigration status.[60] Officers were asked about their own perceptions of the policy.[61] Additionally, because much of the debate surrounding this policy centered on the question of whether officers would disproportionately stop Latino residents, they were asked whether they believed the Latino community would respect them while they enforced the policy.[62]  The authors used respect as a proxy for legitimacy.[63]  The researchers also examined whether these legitimacy judgments would influence how anxious and how safe officers would feel when approaching either white or Latino suspects on the street to enforce the policy.[64]  The results demonstrated that when officers perceived that enforcing the policy would cause Latino individuals to lose respect for them, they not only experienced anxiety but also expressed concern for their safety when imagining future encounters with Latinos.[65]

This study illuminates one reason why stereotype threat can cause officers to more readily use force against black suspects.  Officers who believe black citizens will evaluate them as racist also likely suspect that those same citizens do not respect them and do not view them as legitimate.  As the Goff study revealed, these anxieties can translate into concerns for their safety when confronting black citizens.[66]

When confronted with potentially threatening situations, Professor Frank Rudy Cooper has observed that officers are trained to perform "command presence" which involves "tak[ing] charge of a situation [and] projecting an aura of confidence and decisiveness.  It is justified by the need to control dangerous suspects."[67]  Officers who anticipate a dangerous situation based on their experience of stereotype threat may enact command presence when it is unnecessary.  They may interpret the ambiguous behaviors of black suspects as dangerous and threatening given not only implicit racial biases but also their expectations that the situation is potentially dangerous.  However, this command and control approach may backfire.  As Professor Tom Tyler observes:

> [B]y approaching people from a dominance perspective, police officers encourage resistance and defiance, create hostility, and increase the likelihood that confrontations will escalate into struggles over dominance

---

60.  *Id.* at 342.
61.  *Id.*
62.  *Id.*
63.  *Id.*
64.  *Id.*
65.  *Id.* at 343.
66.  *Id.* at 341–42.
67.  Frank Rudy Cooper, *"Who's the Man?":  Masculinities Studies,* Terry *Stops, and Police Training*, 18 COLUM. J. GENDER & L. 671, 674 (2009); *see also* Geoffrey P. Alpert, Roger G. Dunham & John M. MacDonald, *Interactive Police-Citizen Encounters That Result in Force*, 7 POLICE Q. 475, 476 (2004) (explaining the difference between "dominating force" and "accommodating force").

that are based on force.  The police may begin a spiral of conflict that increases the risks of harm for both the police and for the public.[68]

Thus, this series of events can explain why officers are more likely to use force against black citizens as a result of stereotype threat.

Note, however, that the same concerns do not arise in dealings with white citizens.  First, there is no worry about stereotype threat, here defined as the fear of being evaluated as racist.  Second, because of implicit favoritism, more evidence of danger will be required before their ambiguous actions generate safety concerns.  Hence, officers are unlikely to enact command presence too early, thus not triggering the cascade of conflict that leads to the use of force.

### B.  Masculinity Threat

Another self-threat that can lead to racial violence is masculinity threat.  Masculinity threat refers to the fear of being perceived as insufficiently masculine.  I have discussed masculinity threat in depth elsewhere.[69]  In summary, what it means to be masculine is socially constructed and thus, how people perform their masculine identity depends upon the social context.   For men, maintaining their masculine identity often feels precarious because it is not perceived "as a developmental guarantee, but as a status that must be earned."[70]   Thus, masculinity threat is pervasive among men.  Men often respond with action to prove their masculinity when they feel that it is under threat.  Sometimes, this gender performance takes the form of violence, especially in hypermasculine environments where exaggerated displays of physical strength and aggression are glorified and rewarded as a means of demonstrating and maintaining one's masculine identity.[71]

A recent study demonstrated that police officers' level of masculinity threat predicts their use of force against black men.[72]  The researchers found that masculinity threat predicted whether officers had used force against black men, relative to men of other races, in the real world.[73]  The use of force against black suspects was not correlated with either explicit or implicit racial bias.[74]

---

68.  Tyler, *supra* note 55, at 369 (citations omitted).

69.  *See* Richardson & Goff, *supra* note 23, at 128–31.

70.  Johnathan R. Weaver et al., *The Proof Is in the Punch:  Gender Differences in Perceptions of Action and Aggression As Components of Manhood*, 62 SEX ROLES 241, 242 (2010) (citation omitted); *see also* Joseph A. Vandello et al., *Precarious Manhood*, 95 J. PERSONALITY & SOC. PSYCHOL. 1325, 1335 (2008) (finding that "manhood is seen as more of a social accomplishment that can be lost and therefore must be defended with active demonstrations of manliness").

71.  Angela P. Harris, *Gender, Violence, Race, and Criminal Justice*, 52 STAN. L. REV. 777, 785 (2000); Vandello et al., *supra* note 70, at 1327; *see* Jennifer K. Bosson & Joseph A. Vandello, *Precarious Manhood and Its Links to Action and Aggression*, 20 CURRENT DIRECTIONS IN PSYCHOL. SCI. 82, 83 (2011).

72.  *See generally* SAN JOSE REPORT, *supra* note 49.

73.  *Id.* at 11; *see also* Phillip Atiba Goff et al., *Voices of Dominance* (unpublished manuscript) (on file with author).

74.  SAN JOSE REPORT, *supra* note 49, at 11; Goff et al., *supra* note 73.

What might explain these results?  First, despite the fact that police departments have become more gender diverse since the 1950s,[75] hypermasculinity amongst the rank and file is still the norm.[76]  This orientation persists because departments remain male-dominated and continue to highlight the importance of physical strength in recruitment materials, reinforce the hypermasculine ideal during academy training, and police it through the harassment of women and gay men.[77]  The militarization of the police also strengthens the association between policing and violent masculinity.[78]  In hypermasculine environments, it is foreseeable that officers would respond to masculinity threats with aggression and even violence in order to prove their masculine identity.  Second, black men likely pose the greatest threat to an officer's masculinity, especially if they are disrespectful or noncompliant, because they are stereotyped, both consciously and unconsciously, as more masculine than other men.[79]  Thus, both race and masculinity intersect to facilitate racial violence.

Consider the grand jury testimony of Officer Wilson alleging that Michael Brown called him "too much of . . . a pussy to shoot."[80]  No doubt this statement, coupled with Michael Brown's race and physical size, challenged Wilson's masculinity and might explain why the confrontation between Brown and Wilson ended in violence.  Even if Officer Wilson is not consciously racist, unconscious biases may have influenced his perceptions of the threat posed by Brown.  In fact, his grand jury testimony referring to Brown as "super human" and "a demon" suggests the officer also dehumanized him.[81]  Additionally, masculinity threat can explain why Officer Wilson confronted Brown in the first place instead of calling for

---

75.  David Alan Sklansky, *Not Your Father's Police Department:  Making Sense of the New Demographics of Law Enforcement*, 96 J. CRIM. L. & CRIMINOLOGY 1209, 1210 (2006).

76.  JAMES W. MESSERSCHMIDT, MASCULINITIES AND CRIME:  CRITIQUE AND RECONCEPTUALIZATION OF THEORY 178 (1993) (citing Jennifer Hunt, *The Development of Rapport Through the Negotiation of Gender in Field Work Among Police*, 43 HUM. ORG. 283 (1984)); Susan Ehrlich Martin & Nancy C. Jurik, DOING JUSTICE, DOING GENDER: WOMEN IN LAW AND CRIMINAL JUSTICE OCCUPATIONS 43 (2d ed. 2006).

77.  Richardson & Goff, *supra* note 23, at 131–32.

78.  *See* Peter B. Kraska & Victor E. Kappeler, *Militarizing American Police:  The Rise and Normalization of Paramilitary Units*, 44 SOC. PROBS. 1, 2–3 (1997); U.S. Dep't of Justice, *Technology Transfer from Defense:  Concealed Weapon Detection*, 229 NAT'L INST. OF JUST. J. 1, 35 (1995) (the 1981 Military Cooperation with Law Enforcement Act and the 1984 National Defense Authorization Act gave military weapons and technology to departments to aid in the drug war); *see also* National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201, 110 Stat. 2422, 2639 (1996), *available at* www.nps.gov/legal/laws/104th/104-201.pdf; RADLEY BALKO, OVERKILL:  THE RISE OF PARAMILITARY POLICE RAIDS IN AMERICA 27 (2006).

79.  For an in-depth discussion, see Richardson & Goff, *supra* note 23, at 120–28.

80.  Conor Friedersdorf, *Witnesses Saw Michael Brown Attacking—and Others Saw Him Giving Up*, ATLANTIC (Nov. 25, 2014), http://www.theatlantic.com/national/archive/2014/11/major-contradictions-in-eyewitness-accounts-of-michael-browns-death/383157/.

81.  Frederica Boswell, *In Darren Wilson's Testimony, Familiar Themes About Black Men*, NPR (Nov. 26, 2014), http://www.npr.org/blogs/codeswitch/2014/11/26/366788918/in-darren-wilsons-testimony-familiar-themes-about-black-men.

backup before engaging with him.   As one police veteran relates, "[O]fficers who 'call for help' are seen as weak, as vulnerable, and as feminine . . . .   The subculture dictates that 'real men' will never need to call for help; those who do are often subjected to ridicule and scorn after having done so."[82]

## III.  IMPLICATIONS

The influence of implicit racial biases, stereotype threat, and masculinity threat on police behavior explains why racial violence is inevitable and overdetermined even in the absence of conscious racial animus.   Thus, while punishing bad racial actors is important,[83] racial violence will continue unabated even if we could discover and remove all consciously racist officers from the department.   That is because the major problem is not dispositional, but rather, situational.

The key to reducing racial violence is to transform current policing strategies and cultures that create an "us-versus-them" mentality between officers and the non-white communities they police.   This is because positive intergroup contact is a proven method for reducing the influence of implicit racial biases[84] and getting to know people makes it more difficult to dehumanize them.[85]   Furthermore, when officers are able to build relationships with non-white citizens, they are less likely to worry about being stereotyped as racist.

However, officers are rarely in situations where they interact in positive ways with non-white citizens.   Rather than creating incentives for officers to work together with the community to identify and address the underlying causes of disorder, current policing practices discourage the social work aspects of policing in favor of proactive, aggressive policing strategies that prize arrests over problem-solving.   Such practices make it difficult for officers and community members to have positive contacts and to build relationships that are not defined by distrust and suspicion.   As a result, officers experience stereotype threat because they know the community believes they are racist.   Furthermore, because of their awareness that

---

82.  Thomas Nolan, *Behind the Blue Wall of Silence*, 12 MEN & MASCULINITIES 250, 255 (2009).

83.  Strategies for holding officers liable for their misconduct is woefully inadequate. *See* Erwin Chemerinsky, Op-Ed., *How the Supreme Court Protects Bad Cops*, N.Y. TIMES, Aug. 27, 2014, at A23 (discussing how U.S. Supreme Court decisions protect officers from liability); *see also* Kevin M. Keenan & Samuel Walker, *An Impediment to Police Accountability?  An Analysis of Statutory Law Enforcement Officers' Bills of Rights*, 14 B.U. PUB. INT. L.J. 185 (2005) (discussing the impact of police officer bill of rights on police accountability); Barbara E. Armacost, *Organizational Culture and Police Misconduct*, 72 GEO. WASH. L. REV. 453, 463 (2004); Rachel A. Harmon, *The Problem of Policing*, 110 MICH. L. REV. 761 (2012).

84.  Calvin K. Lai et al., *Reducing Implicit Racial Preferences:  A Comparative Investigation of 17 Interventions*, 143 J. EXPERIMENTAL PSYCHOL. 1765, 1772 (2014); Calvin K. Lai et al., *Reducing Implicit Prejudice*, 7 SOC. & PERSONALITY PSYCHOL. COMPASS 315, 317 (2013).

85.  Richardson & Goff, *supra* note 23, at 123.

members of the community view them as illegitimate, they enact command presence, which escalates rather than defuses already tense situations.

Thus, building relationships between officers and the community can reduce racial violence. Of course, doing this is easier said than done. Although community policing is a popular philosophy, most officers remain disengaged from the communities they police and continue to denigrate aspects of the job they associate with "social work."[86] These attitudes are understandable since success continues to be measured largely by the number of arrests made and how quickly officers respond to calls for service.[87] Why would an officer expend energy on more time-consuming problem-solving activities when these are unlikely to be rewarded?

Police departments are not solely to blame for this reward structure. Some federal grants create incentives for departments to engage in aggressive, proactive policing by tying funds to the number of arrests made.[88] It is no surprise, then, that departments encourage their officers to engage in policing practices such as stops and frisks that result in arrests but which end up alienating communities. Thus, creating incentives for officers to focus more on relationship building and problem-solving rather than on arrests will require interventions at both the institutional and national level. Rewarding the problem-solving and social work aspects of policing will naturally lead to changes in the hypermasculine police culture because those individuals not interested in engaging in this type of policing will no longer be attracted to the field. Furthermore, as these problem-solving and relational skills become more important, departments will have to begin recruiting individuals who excel in these areas, again helping to slowly change the culture.

While this intervention is large-scale and long-term, a more concrete intervention is for departments to begin collecting data to determine whether any of their practices result in racially disparate impacts. Some departments are already doing this. For instance, in 2008, the police chief in Kalamazoo, Michigan, did just that. Responding to community concerns over racial profiling, he put systems in place to gather data and hired a consulting group to conduct a study within his department.[89] When the study revealed racial disparities in the policing of black citizens, he shared the report with the community and implemented changes in policy that required officers to have reasonable suspicion before asking for consent to search.[90]

---

86. For an in-depth discussion, see *id.* at 143–47.

87. George L. Kelling & Mark H. Moore, *The Evolving Strategy of Policing*, *in* COMMUNITY POLICING: CLASSICAL READINGS 105–06 (Willard M. Oliver ed., 2000); George L. Kelling & William J. Bratton, *Implementing Community Policing: The Administrative Problem*, *in* COMMUNITY POLICING, *supra*, at 261.

88. MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS 75–82 (2010).

89. *See* Lorie Fridell, *Psychological Research Has Changed How We Approach the Issue of Biased Policing*, SUBJECT TO DEBATE, May–June 2014.

90. *Id.*

2974                    *FORDHAM LAW REVIEW*                    [Vol. 83

Another fruitful example is exemplified by the work of the Center for Policing Equity (CPE) based at UCLA.[91]  CPE has been successful in working closely with police departments to identify some of the causes of racially biased policing and to implement solutions.[92]  For instance, when working with the Las Vegas Police Department, the group found that many uses of force by police officers against racial minorities occurred after foot chases in non-white neighborhoods.  Acknowledging that it would be difficult for officers engaged in a foot chase to stop and think about whether implicit racial biases were influencing their behaviors, CPE instead helped the department develop new rules to address the problem.  Under the new policy, the officer engaged in a pursuit would no longer be allowed to lay hands on the suspect.  Rather, another officer would be required to step in if force was necessary.  This change resulted in a significant decline in the use of force against people of color.[93]

One challenge is that departments may be reluctant to gather racial data because of concerns that exposing their practices to outside review will subject them to liability.  CPE has developed a way to overcome liability concerns.  CPE researchers and departments sign a memorandum of understanding that provides legal protection against disclosure of confidential data, guarantees departments that they will be the first to learn of the results, allows departments to elect to remain anonymous when the results are published, and gives them a reasonable time to implement solutions, inform the press, or do nothing.[94]

Admittedly, it can be difficult to speak to police departments about gathering racial data because of the inevitable defensiveness that often accompanies discussions of race.  This problem is exacerbated by the fact that many people employ colorblindness as a strategy to reduce racial anxiety.[95]  CPE has been successful in overcoming this defensiveness and developing close, working relationships with numerous police departments.  Goff relates he has achieved this in part by approaching departments guided by two assumptions.  The first is "that everyone involved wants to do the right thing—that is, that the research partners are not bigots."[96]  The second is that "ridding a department of racism is both a worthy goal and a difficult one."[97]  These assumptions help overcome understandable defensiveness

---

91. CPE is "a research and action think tank that works with police departments to conduct original research in the interest of improving equity in police organizations and the delivery of police services." Phillip Atiba Goff et al., *(The Need for) A Model of Translational Mind Science Justice Research*, 1 J. Soc. & Pol. Psychol. 385, 391 (2013). Goff is CPE's cofounder and president.

92. *Id.* at 394.

93. Mooney, *supra* note 22.

94. Goff et al., *supra* note 91, at 392.

95. Evan P. Apfelbaum et al., *Seeing Race and Seeming Racist?  Evaluating Strategic Colorblindness in Social Interaction*, 95 J. Personality & Soc. Psychol. 918, 919 (2008); Phillip Atiba Goff et al., *Anything but Race:  Avoiding Racial Discourse to Avoid Hurting You or Me*, 4 Psychol. 335 (2013).

96. Goff et al., *supra* note 91, at 393.

97. *Id.*

that arises when issues of race are discussed as well as when racial disparities, sometimes stark, are discovered.[98]

Moving beyond a focus on conscious racial bias is another way to overcome defensiveness. The Fair and Impartial Policing (FIP) program has been successful in educating departments about the influence of implicit biases. FIP is a comprehensive program that relies on the science of implicit racial bias to help departments move toward unbiased policing practices.[99] It "addresses the ill-intentioned police who produce biased policing and the overwhelming number of well-intentioned police in this country who aspire to fair and impartial policing, but who are human like the rest of us."[100] The program involves trainings as well as issues related to recruitment and hiring, internal policies and procedures, outreach to the community, and creating accountability mechanisms and measurement tools to track data.[101] This program has been adopted by a number of police departments[102] and several states are considering statewide adoption of the program.[103] The program is being taken seriously by police leadership[104] and is gaining traction.[105] Many officers who have taken part in the program have praised it, making comments like: "It changed my perception,"[106] "I will better recognize bias and be able to address it with officers,"[107] and "could see doing this training in my retirement, would feel proud and honored to be involved in a program like this."[108]

Not only can this program help departments understand the importance of being race conscious when it comes to policing, but also, if departments begin to implement trainings such as those provided by the FIP program, they also can begin to tie promotions and other job perks to demonstrable

---

98. *Id.*

99. For information on this program, see Lorie Fridell, *FIP Client*, FAIR & IMPARTIAL POLICING, http://www.fairimpartialpolicing.com (last visited Apr. 23, 2015).

100. *Id.*

101. *Id.*

102. Lorie Fridell, *Press*, FAIR & IMPARTIAL POLICING, http://www.fairimpartialpolicing.com/press/ (last visited Apr. 23, 2015).

103. *See* Fridell, *supra* note 99.

104. *See, e.g.*, Tracey G. Cove, *Implicit Bias and Law Enforcement*, POLICE CHIEF, Oct. 2011, at 44, *available at* http://static.squarespace.com/static/54722818e4b0b3ef26cdc085/t/54790aece4b03c29747eb163/1417218796679/press-thepolicechief.pdf.

105. *See* Fridell, *supra* note 99.

106. UNIV. OF CAL. BERKELEY POLICE DEP'T, OFFICERS: RACIAL PROFILING, FAIR AND IMPARTIAL POLICING B, *available at* http://static.squarespace.com/static/54722818e4b0b3ef26cdc085/t/5472b238e4b0367870bd3335/1416802947888/rberkb.pdf (compiling course evaluations).

107. LORIE A. FRIDELL, FAIR AND IMPARTIAL POLICING 5, *available at* http://static.squarespace.com/static/54722818e4b0b3ef26cdc085/t/5478bbd4e4b045935f33df73/1417198548003/overview-program.pdf.

108. UNIV. OF CAL. BERKELEY POLICE DEP'T, OFFICERS: RACIAL PROFILING, FAIR AND IMPARTIAL POLICING A, *available at* http://static1.squarespace.com/static/54722818e4b0b3ef26cdc085/t/5472b245e4b081a2addcb9a9/1416802885101/rberka.pdf (compiling course evaluations); *see also* Lorie A. Fridell, *Racially Biased Policing: The Law Enforcement Response to the Implicit Black-Crime Association*, *in* RACIAL DIVIDE: RACIAL AND ETHNIC BIAS IN THE CRIMINAL JUSTICE SYSTEM (Michael J. Lynch, E. Britt Patterson & Kristina K. Childs eds., 2008).

2976                 *FORDHAM LAW REVIEW*                 [Vol. 83

changes in an officer's behaviors in response to what he or she learned. This is not only a way of changing incentives, but it also will help to change department culture as officers who are not motivated and committed to making the necessary adjustments will slowly be weeded out of the department.

## CONCLUSION

It will not be easy to transform current policing practices and culture in order to address racial violence. Doing so will not only require changes within police departments but also in legal doctrine and legislation. This is a tall order given that the problem of policing and race is a perennial one. However, now is a particularly auspicious time to push for meaningful, groundbreaking changes to police practices and culture. The high-profile cases of police violence, intransigence, and arrogance,[109] coupled with signs of optimism[110] have brought issues of policing to the public consciousness in ways not seen in recent history. Furthermore, the public protests that have sprung up across the country in response to the failure to indict police officers for killing unarmed black men have and will continue to play a critical role in facilitating the debate over the meaning of policing and how it should be reformed. As Professors Lani Guinier and Gerald Torres explained in a recent article, social movements can play a role in facilitating "the cultural shifts that make durable legal change possible."[111] Perhaps through their activism bringing attention to and contesting current policing practices, these movements can spark changes in how our society views the police in ways that will make changes to policing seem inevitable and appropriate. Until this occurs, we can expect that racial violence against unarmed black men will continue unabated.

---

109. Matt Taibbi, *The NYPD's "Work Stoppage" Is Surreal*, ROLLING STONE (Dec. 31, 2014), http://www.rollingstone.com/politics/news/the-nypds-work-stoppage-is-surreal-20141231.

110. For instance, the police chief of Richmond, California, recently took part in a protest against police brutality, holding a sign that read "Black Lives Matter." Robert Rogers, *Richmond Police Chief a Prominent Participant in Protest Against Police Violence*, CONTRA COSTA TIMES (Dec. 9, 2014), http://www.contracostatimes.com/west-county-times/ci_27102218/richmond-police-chief-prominent-participant-local-protest-against. Additionally, in December 2014, the Obama Administration created the Task Force on 21st Century Policing. *See* David Hudson, *President Obama Creates the Task Force on 21st Century Policing*, WHITE HOUSE BLOG (Dec. 18, 2014), http://www.whitehouse.gov/blog/2014/12/18/president-creates-task-force-21st-century-policing. The task force "will examine, among other issues, how to strengthen public trust and foster strong relationships between local law enforcement and the communities that they protect, while also promoting effective crime reduction." Press Release, Office of the Press Sec'y, White House, Fact Sheet: Task Force on 21st Century Policing (Dec. 18, 2014), http://www.whitehouse.gov/the-press-office/2014/12/18/fact-sheet-task-force-21st-century-policing.

111. Lani Guinier & Gerald Torres, *Changing the Wind: Notes Toward a Demosprudence of Law and Social Movements*, 123 YALE L.J. 2740, 2743 (2014).

**Center for Council and Center for Mindfulness in Corrections**
**Draft Proposal for a Wellness & Resiliency Skills Training Pilot**
**California Department of Corrections & Rehabilitation**

**Vision:** Establish an ongoing Wellness & Resiliency Skills Training program for CDCR staff designed to protect staff health and safety, enhance staff morale and provide staff with the skills they need to effectively manage job stress and build a healthy, positive and resilient CDCR staff culture in support of positive correctional outcomes.

**Providers:** Center for Council (C4C) and Center for Mindfulness in Corrections (CMC). C4C is a nonprofit agency providing training in council practice to organizations, business and institutions, including correctional facilities. CMC is a nonprofit agency providing evidence-based professional development training in the areas of wellness, communication, management and leadership to corrections, law enforcement, treatment agencies and personnel. This unique program combines the pioneering curriculum development that has been the hallmark of Center for Mindfulness in Corrections with the groundbreaking work Center for Council has accomplished in working with a variety of CDCR divisions and stakeholders, including rehabilitative programming and reentry support, community outreach and organizational policy development with staff leadership; C4C is currently providing services at 14 CDCR facilities.

**Program:** An initial 10-week pilot Wellness & Resiliency Skills Training program based on the CMC mindfulness-based wellness & resiliency (MBWR)™curriculum and designed to deliver to participants a broad range of simple and practical stress management, health maintenance, communication and resiliency building skills with which to improve performance and quality of life both on and off the job while significantly reducing the serious health risks faced by corrections professionals. Coaching to develop ongoing, council-based community of practice groups to sustain and extend the mindfulness-based wellness & resiliency (MBWR) skills learned and to provide ongoing peer-based support.

The pilot 10-week Wellness & Resiliency Skills Training would train up to sixty (60) CDCR personnel and include the following core components:

- **full-day introductory mindfulness-based Wellness & Resiliency Skills Training,** delivered by CMC Training Director Fleet Maull and C4C Director Jared Seide.

- **eight two-hour Council group sessions (ten officers in each group),** focused on the following areas (facilitated by C4C staff):

    > **Self Care Skills** for effective stress management and resilience building
    1) *Physical Resilience* – healthy nutrition, exercise, hydration, breathing, moderation
    2) *Mental Resilience* – mindfulness exercises, positive attitude, brain training & education
    3) *Emotional Resilience* – empathy, emotional literacy, emotion regulation, peer support
    4) *Spiritual Resilience* – faith & spirituality; gratitude & forgiveness, community service; nature

    > **Shift Readiness Skills** for effective stress management & optimal performance
    5) *Self-Awareness* – mindful attention, presence, reframing, positive outlook
    6) *Self-Management* – manage triggers, state shift with breathing, defuse drama
    7) *Social Awareness* – body language, empathic listening, aware of others' needs
    8) *Relationship Management* – effective communication & conflict management

- **final full-day Training, Debrief and Graduation** led by CMC Training Director Fleet Maull and C4C Director Jared Seide.

1

**Deliverables:**
- A strong foundation for a CDCR personnel/facility culture shift from stress, burnout, denial, untreated trauma exposure and the resulting emotional problems, health risks and health costs to a staff culture of healthy self-management & self-care, emotionally & socially intelligent communication, effective stress & conflict management, and overall staff wellness and safety.
- A measureable reduction in staff burnout (corrections fatigue).
- Improved staff morale and improved correctional outcomes achieved by healthier, more resilient, and more emotionally and socially intelligent and skillful corrections staff.
- Prevention of and/or measurable reduction in suicide, PTSD-related incidents, and trauma/stress-caused family discord, domestic violence, substance abuse, etc.
- Reduction in DOC costs for chronic stress or burnout related staff absences, lost-time injuries, staff turnover and related healthcare costs.
- Overall long-term health care savings through improved wellness and preventive health care programs.

**Training Content:**
- Mindfulness-Based Wellness & Resiliency (MBWR) skills training similar to that now being provided in many areas of U.S. society, including Fortune 500 corporations, law enforcement, K-12 education, health care, etc.
- Mindfulness-Based Emotional Intelligence (MBEI) training designed to increase capacity for self-awareness, self-management (including emotion regulation), social awareness (reading behavioral cues and empathy training), and communication and interpersonal relations management.
- Council training – basic training in the practice of council, a modern practice derived from many ancient forms of communicating in a circle. Sometimes referred to as "Listening Circles," council utilizes a center, a circle, and a talking piece to create an intentional space in which to share our stories.
- Support for sustaining these "communities of practice" beyond the completion date of this training program.
- Resiliency and stress management training
- Burnout and PTSD recovery training
- Accountability and self-empowerment training
- Psychological/emotional trauma first aid information
- Family applications: mitigating family impact of on-the-job stress and trauma, developing healthy family communication and conflict management
- Developing healthy support systems and resources

**Specific skills taught include:**
- Attention, focusing and mindfulness skills
- Physiology management and balancing skills
- Breath regulation and other stress management skills and practices
- Self-care and wellness practices
- Cognitive reframing skills and positive attitudinal skills
- Emotion regulation & self-management skills
- Listening – engaged, empathic and reflective listening skills
- Effective communication skills
- Difficult conversation skills
- Conflict de-escalation and conflict management skills

2

## APPENDIX H– AVERAGE NUMBER OF INCIDENTS PER 100 INMATES, JUNE 2014-JUNE 2015.

| Prison | Average # Incidents per 100 Inmates | June 2015 Inmate Count | June 2015 SNY Pop | All Levels | SNY Levels | Mission |
|--------|------|------|------|------|------|------|
| SAC | 5.13 | 2319 | N/A | I, IV, PSU, SHU | N/A | HS |
| LAC | 1.96 | 3494 | 896 | I, III, IV | IV | HS |
| SVSP | 1.95 | 3678 | 1468 | I, III, IV | III, IV | HS |
| CMF | 1.69 | 2269 | N/A | I, II, III | N/A | FOPS |
| COR | 1.50 | 4405 | 1850 | I, III, IV, SHU, PHU | III, IV | HS |
| KVSP | 1.30 | 3638 | 1578 | I, IV, THU | IV | HS |
| CAL | 1.30 | 3774 | 922 | I, IV | IV | GP |
| MCSP | 1.18 | 2941 | 2778 | I, III, IV | I, III, IV | GP |
| RJD | 1.10 | 3148 | 2118 | I, III, IV | III, IV | RC |
| HDSP | 1.07 | 3300 | 1009 | I, III, IV | III, IV | HS |
| PBSP | 0.97 | 2742 | N/A | I, IV, PSU, SHU | N/A | HS |
| NKSP | 0.89 | 4365 | N/A | I, III, RC | N/A | RC |
| WSP | 0.85 | 4881 | N/A | I, III, RC | N/A | RC |
| DVI | 0.81 | 2117 | N/A | I, II, RC | N/A | RC |
| CRC | 0.77 | 2434 | 784 | II | II | RC |
| SATF | 0.75 | 5581 | 3156 | II, III, IV | II, III, IV | HS |
| CMC | 0.72 | 3809 | N/A | I, II, III | N/A | RC |
| CCC | 0.71 | 4089 | N/A | I, II, III | N/A | RC |
| CEN | 0.67 | 3489 | 871 | I, III, IV | III | GP |
| SQ | 0.65 | 3687 | N/A | II, RC | N/A | RC |
| CIM | 0.62 | 3802 | 1810 | I, II, RC | II | RC |
| SOL | 0.59 | 3866 | N/A | II, III | N/A | GP |
| PVSP | 0.55 | 2271 | 1274 | I, III | III | GP |
| FSP | 0.53 | 2876 | N/A | I, II, FWF | N/A | FOPS |
| ISP | 0.50 | 3401 | 1561 | I, III | I, III | GP |
| CCI | 0.50 | 3931 | 3186 | I, II, III, IV, SHU | I, II, III, IV | HS |
| SCC | 0.44 | 4345 | 788 | I, II, III | III | RC |
| VSP | 0.35 | 3379 | 3326 | II | II | GP |
| ASP | 0.35 | 2766 | 2324 | II | II | GP |
| CVSP | 0.25 | 2264 | 1178 | I, II | I, II | GP |
| CTF | 0.21 | 5167 | 2668 | I, II | II | GP |

■ The institutions highlighted in green house the SNY inmates described in the columns.

# APPENDIX I– AVERAGE NUMBER OF INMATE DISCIPLINARY ACTIONS PER 100 INMATES JUNE 2014-JUNE 2105.

| Prison | Average # Inmate Disciplinary Actions, per 100 Inmates | June 2015 Inmate Count | June 2015 SNY Pop | All Levels at this Prison | SNY Levels at this Prison | Mission |
|--------|-----|------|------|------|------|------|
| LAC | 16.03 | 3494 | 896 | I, III, IV | IV | HS |
| SAC | 15.05 | 2319 | N/A | I, IV, PSU, SHU | N/A | HS |
| CCC | 10.82 | 4089 | N/A | I, II, III | N/A | RC |
| MCSP | 9.89 | 2941 | 2778 | I, III, IV | I, III, IV | GP |
| SCC | 9.75 | 4345 | 788 | I, II, III | III | RC |
| CAL | 8.82 | 3774 | 922 | I, IV | IV | GP |
| CEN | 8.22 | 3489 | 871 | I, III, IV | III | GP |
| CRC | 7.77 | 2434 | 784 | II | II | RC |
| KVSP | 7.75 | 3638 | 1578 | I, IV, THU | IV | HS |
| SVSP | 7.64 | 3678 | 1468 | I, III, IV | III, IV | HS |
| SATF | 7.09 | 5581 | 3156 | II, III, IV | II, III, IV | HS |
| RJD | 7.00 | 3148 | 2118 | I, III, IV | III, IV | RC |
| SOL | 6.58 | 3866 | N/A | II, III | N/A | GP |
| WSP | 6.41 | 4881 | N/A | I, III, RC | N/A | RC |
| COR | 6.28 | 4405 | 1850 | I, III, IV, SHU, PHU | III, IV | HS |
| PVSP | 6.20 | 2271 | 1274 | I, III | III | GP |
| CMF | 5.65 | 2269 | N/A | I, II, III | N/A | FOPS |
| ISP | 5.60 | 3401 | 1561 | I, III | I, III | GP |
| DVI | 5.29 | 2117 | N/A | I, II, RC | N/A | RC |
| CIM | 5.22 | 3802 | 1810 | I, II, RC | II | RC |
| CMC | 5.00 | 3809 | N/A | I, II, III | N/A | RC |
| NKSP | 4.73 | 4365 | N/A | I, III, RC | N/A | RC |
| ASP | 4.02 | 2766 | 2324 | II | II | GP |
| PBSP | 4.01 | 2742 | N/A | I, IV, PSU, SHU | N/A | HS |
| HDSP | 3.97 | 3300 | 1009 | I, III, IV | III, IV | HS |
| VSP | 3.56 | 3379 | 3326 | II | II | GP |
| FSP | 3.12 | 2876 | N/A | I, II, FWF | N/A | FOPS |
| CCI | 2.97 | 3931 | 3186 | I, II, III, IV, SHU | I, II, III, IV | HS |
| CVSP | 2.96 | 2264 | 1178 | I, II | I, II | GP |
| SQ | 2.86 | 3687 | N/A | II, RC | N/A | RC |
| CTF | 2.34 | 5167 | 2668 | I, II | II | GP |

▇ The institutions highlighted in green house the SNY inmates described in the columns.

## APPENDIX J—WCI TASER BODY CAMERA PILOT

### TASER BODY CAMERA PILOT

WCI began a pilot in conjunction with TASER International with the Institution receiving 10 units (6 AXON Flex and 4 AXON Body) the pilot also included a docking station as well as 40 staff members with accounts to Evidence.com for video review, archiving and storage purposes. During the 6 month pilot WCI staff created over 15,000 video downloads ranging from a couple of minutes to 45 minutes in duration.  During this time the following areas were compared PREA allegations against staff in Segregation, Reactive use of force incidents and inmate complaints.

### PREA Complaints Segregation by Month

| | |
|---|---|
| July 2013 – 2 | July 2014 – 2 |
| August 2013 – 3 | August 2014 – 1 |
| September 2013 – 4 | September 2014 – 6 |
| October 2013 – 1 | October 2014 – 2 |
| November 2013 – 4 | November 2014 – 1 |
| December 2013 – 2 | December 2014 – 9 |
| Total – 16 | Total – 21 |

Between January 2014 and June 2014 – 18

NCH Program PREA investigations initiated between July 2013 – July 2014 – 0 Total

NCH Program PREA investigations initiated since July 2014 – 4 Total

### Staff Assaults Segregation by Month

| | |
|---|---|
| July 2013 – 1 | July 2014 – 1 |
| August 2013 – 3 | August 2014 – 3 |
| September 2013 – 4 | September 2014 – 1 |
| October 2013 – 3 | October 2014 – 1 |
| November 2013 – 1 | November 2014 – 2 |
| December 2013 – 7 | December 2014 – 1 |
| Total – 19 | Total – 9 |

*Between January and June 2014 – 12

# APPENDIX J—WCI TASER BODY CAMERA PILOT

### Staff Assaults Segregation

Between July and December 2013 – WCI had 19 staff assaults in Segregation

Between July and December 2014 – WCI had 9 staff assaults in Segregation

### Inmate Complaints Segregation

From January 1, 2014 – June 30, 2014 – 549 total inmate complaints approximately 91 per month

From July 1, 2014 – October 9, 2014 – 307 total inmate complaints approximately 100 per month

From January 1, 2014 – June 30, 2014 – 57 inmate complaints regarding staff issues

From July 1, 2014 – October 9, 2014 – 34 inmate complaints regarding staff issues


From January 1, 2014 to June 30, 2014 there were 2 staff misconduct complaints from SEG

From July 1, 2014 to Present there were 4 staff misconduct complaints from SEG

From January 1, 2014 to June 30, 2014 there were 7 staff sexual misconduct complaints from SEG

From July 1 to Present, there were also 7 such complaints from SEG

At the conclusion of the pilot program WCI found that there was a difference in the amount of reactive use of force incidents however PREA allegation and inmate complaints remained consistent. WCI anticipated that the number of allegations would not change dramatically. Unlike Law Enforcement who utilize Body Cameras the pilot program was conducted strictly in a Maximum Security Segregation Building which contained approximately 180 inmates with lengthy history of assaultive and self-harm behaviors.

WCI did find the body cameras to be very effective. The AXON flex camera is the more expensive model available and can be mounted in a variety of different ways however we found that the small cord connecting the camera to the controller could be damaged/broken pretty easily. The AXON body camera is cheaper and more durable. Both cameras provided roughly the same view of an incident. They were both excellent for interactions at the cell door/trap and when speaking to inmates. They were not very effective while escorting inmates however the audio did give a perspective of what was taking place.

# APPENDIX J—WCI TASER BODY CAMERA PILOT

In the beginning of the pilot staff were very apprehensive about wearing the camera while the inmate population appeared to be "playing" to the camera attempting to provoke an unprofessional response from staff. Training regarding Professional Communication Skills was conducted with all staff involved in the pilot and after a couple of weeks staff were comfortable wearing the cameras and the inmates had adjusted as well. I believe the cameras definitely enhanced the professionalism of staff and how they communicated with inmates. I could see a pretty dramatic change in the communication level of staff throughout the pilot and I was able to see which staff communicated well with inmates.

Although the amount of complaints or PREA allegations did not change it was much easier to review the allegations and determine if an incident occurred.

I believe the AXON body camera would be beneficial to a Security staff member however the degree they could be utilized would be determined by cost. The camera is very inexpensive the cost will be incurred with licensing for Evidence.com and storing data in the accounts as well as Evidence.com cold storage for long term archiving of videos.

The following is the draft policy utilized by WCI staff involved in the Taser Body Camera Pilot

**PURPOSE:** To insure that unexpected use of force, staff assisted strip searches and medical emergencies can be recorded and preserved in a Segregation setting.

**POLICY:** An inmate may be recorded by a body camera worn by Segregation staff while in Segregation. This may occur both during planned and reactive use of force incidents and will include any staff assisted strip searches as well as incident that occur at the cell door trap. The Waupun Correctional Institution requires that whenever the body camera is utilized, the subsequent outlined procedures will be adhered to.

**GENERAL:** Designated Segregation staff will be provided with either an Axon Flex body camera (worn either on the staff member's eyewear, hat, collar or epaulette). Or the Axon body camera (worn on the uniform shirt or jacket). Staff will utilize the body camera assigned to them and will be registered camera users with evidence.com for data collection and storage.

**PROCEDURE:**

Designated staff will be assigned a body camera and be entered into evidence.com for data tracking and evidence preservation purposes. The following are instances when staff will activate their body camera.

1.     When responding to any type of Institution emergency.

2.     Whenever interacting with a Segregation inmate at the cell door trap.

3.     During any staff assisted strip search. During this type of search the staff member wearing the camera will conduct the search.

## APPENDIX J—WCI TASER BODY CAMERA PILOT

4.     Anytime a staff member has physical contact with the inmate (escorting, responding to medical emergencies, restraining a disruptive inmate and dealing with a verbally disruptive inmate, etc.)

5.     Staff will activate the camera by pressing the button to activate the camera as they respond to an emergency, when going onto a Segregation range where they anticipate having trap side contact or encounter a disruptive inmate.

6.     Only at the completion of the incident or scene will the staff member shut off the body camera.  Once a video camera has arrived on scene the body camera will continue to collect data and will not be turned off until the scene is cleared by the Shift Supervisor.

7.     Staff responsible for utilizing a body camera will register with evidence.com  and they will ensure they are logged into a camera at the beginning of their shift.  This will occur at the start of each day.  They will ensure the camera they utilize is placed in the appropriate docking station at the end of their shift.

MONITORING

1.     The staff member will be responsible for monitoring their own recorded video footage/evidence.  They will not be permitted access to other staff members downloads.  Staff can only access or review their downloaded footage while in pay status while at the WCI.

2.     Audio and video footage may be reviewed by the staff member assigned to the camera however only a system administrator will have access to delete any footage.

3.     Whenever possible staff will ensure that the inmate is aware that their actions are being recorded with both audio and video footage, however there is no requirement to inform the inmate they are being monitored or recorded.

4.     The body camera will be utilized for monitoring or recording inmates and their actions it is not intended to be used to record staff for disciplinary actions.

5.     The Warden will determine which staff will have access to review multiple camera users.

RECORDKEEPING

1.     Whenever a staff member is involved in an incident they will be required to complete all necessary documentation to include any incident reports (DOC-2466), Adult Conduct Reports (DOC-9 & 9A), Observation of Offender (DOC-112), Review of Placement of Offender in Restraints (DOC-111).

## APPENDIX J—WCI TASER BODY CAMERA PILOT

2.   An electronic record will be kept within evidence.com of anytime a video account is accessed and will include the date, time and who accessed the video account.  Only the

3.   System Administrator will have the ability to delete a video and that will be included on the evidence.com electronic record.

4.   The Security Director will assign a staff member to transpose or capture date on a recordable disk for possible disciplinary action or from Law Enforcement.



# 2015 Special Review:
# High Desert State Prison
# Susanville, CA

# OFFICE OF THE INSPECTOR GENERAL

Robert A. Barton
INSPECTOR GENERAL

Roy W. Wesley
CHIEF DEPUTY INSPECTOR GENERAL

# STATE OF CALIFORNIA
December 2015