Exhibit AAA

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE (H1)

CONFIDENTIAL

Data Refreshed: 7/10/20 6:07 AM

Mental Health Summary by Level of Care

| Institution | CCCMS Operational Capacity | CCCMS Population | CCCMS % Occupied | CCCMS Vacant Beds | EOP General Population EOP | EOP Administrative Segregation EOP | EOP Psychiatric Services Unit (PSU) | EOP Design Capacity | EOP Population | EOP % Occupied | EOP Vacant Beds | MHCB Design Capacity | MHCB Population | MHCB % Occupied | MHCB Vacant Beds | ICF Design Capacity | ICF Population | ICF % Occupied | ICF Vacant Beds | APP Design Capacity | APP Population | APP % Occupied | APP Vacant Beds | Total Mental Health Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 1,100 | 958 | 87% | 142 | | | | | 5 | | -5 | 3 | 3 | | -3 | | | | | | | | | 966 |
| CAL | | 16 | | -16 | | | | | | | | | | | | | | | | | | | | 9 |
| CCC | | 2 | | -2 | | | | | | | | | | | | | | | | | | | | 2 |
| CCI | 1,850 | 1,351 | 73% | 499 | | | | | 12 | | -12 | | | | | | | | | | | | | 1,364 |
| CEN | | 19 | | -19 | | | | | | | | | | | | | | | | | | | | 19 |
| CHCF | 550 | 644 | 117% | -94 | 375 | | | 50 | 579 | 136% | -154 | 95 | 9 | 9% | 86 | 398 | 385 | 102% | | 16 | 16 | 52% | | 969 |
| CIM | 1,050 | 906 | 86% | 144 | | | | | 37 | 89% | -37 | 34 | | 3% | 31 | | 18 | | -18 | | 7 | | -7 | 960 |
| CMC | 750 | 677 | 90% | 73 | 552 | | | 100 | 581 | 111% | -73 | 50 | 15 | 30% | 35 | 35 | 16 | | 16 | | 10 | | -10 | |
| CMF | 600 | 456 | 76% | 144 | 391 | | | 58 | 500 | | -55 | 50 | 10 | 20% | 40 | 257 | 235 | 91% | 22 | 207 | 173 | 84% | 34 | 1,058 |
| COR | 1,000 | 1,095 | 110% | -95 | 366 | | | 100 | 263 | 56% | | 24 | 6 | 25% | 18 | 203 | | | | 4 | | | -4 | 1,184 |
| CRC | 1,150 | 1,073 | 93% | 77 | | | | | 8 | | -8 | | | | | | | | | | | | | 1,075 |
| CTF | 1,500 | 1,302 | 87% | 198 | | | | | | | | | 4 | | -4 | | | | | | | | | 1,131 |
| CVSP | | 2 | | -2 | | | | | | | | | | | | | | | | | | | | 2 |
| DVI | 500 | 331 | 66% | 169 | | | | | 6 | | -6 | 10 | 3 | 30% | 7 | | 5 | | -5 | | 3 | | -3 | 331 |
| FOL | 500 | 512 | 102% | -12 | | | | | 11 | | -11 | | | | | | | | | | | | | 519 |
| HDSP | 1,050 | 1,042 | 99% | 8 | | | | | | | | | | | | | | | | | | | | 1,057 |
| ISP | | 22 | | -22 | | | | | | | | | | | | | | | | | | | | 22 |
| KVSP | 900 | 1,008 | 112% | -108 | 96 | | | | 124 | 129% | -28 | 12 | 3 | 25% | 8 | | 5 | | | | 3 | | | 1,144 |
| LAC | 1,000 | 761 | 76% | 239 | 600 | | 100 | | 545 | 78% | -155 | 12 | 4 | 33% | 28 | 31 | 28 | 90% | | 45 | 9 | 33% | -28 | 1,340 |
| MCSP | 1,350 | 1,481 | 110% | -131 | 774 | | 50 | | 668 | 81% | -156 | 10 | 8 | 75% | 9 | 246 | 201 | 82% | | | 7 | | | 2,159 |
| NKSP | 1,000 | 413 | 41% | 587 | | | | | 3 | | -3 | 10 | 1 | 10% | 9 | | | | | | | | | 272 |
| PBSP | 300 | 268 | 89% | 32 | | | | | 3 | | -3 | 6 | 1 | 10% | 5 | | | | | | | | | 50 |
| PVSP | 700 | 500 | 71% | 200 | | | | | | | | 14 | 10 | 71% | 4 | | 9 | 85% | | 38 | 4 | | | |
| RJD | 1,500 | 1,324 | 88% | 176 | 894 | 63 | | | 841 | 88% | -116 | 16 | 10 | 43% | 4 | 218 | 218 | | | 50 | 31 | | -22 | 2,218 |
| SAC | 500 | 472 | 94% | 28 | 642 | 64 | 172 | | 732 | 83% | -146 | 44 | 19 | 43% | 25 | | 22 | 90% | -22 | | 9 | | | 1,275 |
| SATF | 2,000 | 1,782 | 89% | 218 | 660 | | | | 524 | 79% | 136 | 26 | 4 | 15% | 22 | | 10 | | -10 | | | | | 2,323 |
| SCC | 400 | 520 | 130% | -120 | | | | | | | | | | | | | | | | | | | | 52 |
| SOL | 1,000 | 665 | 65% | 355 | | | | | 8 | | -8 | 9 | 2 | 22% | 7 | | | | | | | | | 665 |
| SQ | 1,250 | 868 | 69% | 382 | 200 | | | | 259 | 130% | -55 | 9 | | | | 28 | 28 | | | | | 33% | | 1,162 |
| SVSP | 850 | 836 | 97% | 24 | 396 | | | | 371 | 94% | -25 | 10 | 2 | 20% | 8 | | | | | | | | | 1,409 |
| VSP | 1,350 | 1,050 | 78% | 300 | 372 | | | | 331 | 89% | 41 | 6 | | | 6 | | | | | | 4 | | | 1,388 |
| WSP | 1,300 | 782 | 60% | 518 | | | | | 22 | | -22 | | 4 | 17% | | | | 85% | | | | | | 812 |
| DSH-ASH | | -1 | | 1 | | | | | 3 | | -3 | | | | | 256 | 218 | 85% | 38 | | | | | 226 |
| DSH-CSH | | | | | | | | | | | | | | | | 50 | 45 | 90% | | | | | | |
| **Male Subtotal** | **27,000** | **23,109** | **86%** | **3,891** | **6,318** | **585** | **172** | | **6,440** | **91%** | **615** | **424** | **116** | **27%** | **308** | **1,196** | **1,216** | **102%** | **-20** | **377** | **366** | **97%** | **11** | **31,267** |
| CCWF | 1,350 | 1,156 | 86% | 194 | 120 | 10 | 10 | | 105 | 81% | 25 | 12 | 4 | 33% | 8 | | 12 | | | 377 | 2 | | -20 | 1,366 |
| CIW | 750 | 636 | 85% | 114 | 75 | 10 | | | 49 | 52% | 46 | 29 | 3 | 10% | 26 | 40 | 29 | 64% | 16 | | | 64% | | 711 |
| FWF | 150 | 109 | 73% | 41 | | | | | 2 | | -2 | | | | | | | | | | | | | 10 |
| DSH-PSH | | -1 | | 1 | | | | | 1 | | -1 | | | | | 30 | 10 | 33% | 20 | | | | | 13 |
| **Female Subtotal** | **2,250** | **1,902** | **85%** | **348** | **195** | **20** | **10** | | **157** | **70%** | **68** | **41** | **7** | **17%** | **34** | **75** | **40** | **53%** | **35** | **0** | **3** | | **-3** | **2,109** |
| **Grand Total** | **29,250** | **25,011** | **86%** | **4,239** | **6,513** | **605** | **182** | | **6,617** | **91%** | **683** | **465** | **123** | **26%** | **342** | **1,271** | **1,256** | **99%** | **15** | **377** | **369** | **98%** | **8** | **33,376** |

## NOTES:

1. This report provides operational capacities, population, and vacant beds detail by mental health level of care and institution. Level of care is based on Current Mental Health level of care code in SOMS. For each level of care, a summary of patients by SOMS housing program and institution is provided. Data Source is HCDSS, as of the "Data Refreshed" time stamp.

2. Definitions:
- Operational Capacity = indicates the number of beds available in the program based on factors such as treatment space and staffing, as determined by CCHCS headquarters.
- Design Capacity = indicates the total number of beds available in the program Determined by Facility Planning, Construction, & Management.
- Population = total census per SOMS as of the "Data Refreshed" time stamp shown on the report.
- % Occupied = (Population) / (Operational Capacity) x 100.
- Vacant Beds = the number of beds available after subtracting the Population from the Operational Capacity.
- The "PHP" column in the "Psychiatry Inpatient Program (PIP) Housing" refers to programs that have the ability to provide multiple levels of care.

3. PIP Capacities:
- *SQ PIP is for male condemned patients only, and has a total capacity of 40 beds reflected under ICF capacity. It is noted that these are flex beds that can accommodate ICF, APP, and MHCB level of care.
- CIW PIP has a total capacity of 45 beds reflected under ICF capacity. It is noted that these are flex beds that can accommodate ICF and APP level of care.
- DSH-PSH has a total capacity of 30 beds reflected under ICF capacity. It is noted that these are flex beds that can accommodate ICF and APP level of care.

4. Housing Groups:
- *GP Housing Group census includes patients in the following housing programs: Camp Program Beds, Debrief Processing Unit, Family Visiting, Fire House, General Population, Institution Hearing Program, Minimum Security Facility, Non-Designated Program Facility, Protective Housing Unit, Restricted Custody General Population, Sensitive Needs Yard, Short Term Restricted Housing Unit, Unknown, Varied Use and Work Crew.
- MSF: Transitional Housing Unit, Unknown, Varied Use and Work Crew. House, SNY

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/10/20 6:07 AM

## Correctional Clinical Case Management System (CCMS) Level of Care Population by Housing Program

| Institution | RC | GP* | EOP | MHCB | Psychiatric Inpatient Program (PIP) Housing | | | Specialized Medical Beds Housing | | | | Condemned | Segregated Housing | | | | | Total CCMS Population |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Reception Center | General Population | Enhanced Outpatient Program | Mental Health Crisis Bed | Acute | Intermediate | PIP | CTC/SNF Correctional Treatment Center/Skilled Nursing Facility | Hospice | OHU Outpatient Housing Unit | ASU Administrative Segregation Unit | | LTRH Long Term Restricted Housing Unit | NDS Non-Disciplinary Segregation | PSU Psychiatric Services Unit | SHU Security Housing Unit | STRH Short Term Restricted Housing Unit | |
| ASP | | 955 | | | | | | | | 3 | | | | | | | | 958 |
| CAL | | 9 | | | | | | | | | 7 | | | | | | | 16 |
| CCC | | | | | | | | | | 2 | | | | | | | | 2 |
| CCI | | 1,303 | | | | | | | | | 48 | | | | | | | 1,351 |
| CEN | | 14 | | | | | | | | | 5 | | | | | | | 19 |
| CHCF | | 212 | 14 | 1 | 1 | | | 152 | | 257 | 7 | | | | | | | 644 |
| CIM | 89 | 744 | | | | | | | | 15 | 58 | | | | | | | 906 |
| CMC | | 656 | | | | | | 4 | | | 17 | | | | | | | 677 |
| CMF | | 415 | 1 | | | | | 14 | 5 | 12 | 9 | | | | | | | 456 |
| COR | | 877 | 5 | | | | | 11 | | 6 | 1 | | 116 | | | | 79 | 1,095 |
| CRC | | 1,071 | | | | | | | | 2 | | | | | | | | 1,073 |
| CTF | | 1,282 | | | | | | | | 8 | 12 | | | | | | | 1,302 |
| CVSP | | 1 | | | | | | | | | 1 | | | | | | | 2 |
| DVI | 104 | 192 | | | | | | | | 11 | 24 | | | | | | | 331 |
| FOL | | 495 | | | | | | | | | 17 | | | | | | | 512 |
| HDSP | | 992 | | | | | | 6 | | | | | | | | | 44 | 1,042 |
| ISP | | 22 | | | | | | | | | | | | | | | | 22 |
| KVSP | | 910 | | | | | | 4 | | | 1 | | | | | | 93 | 1,008 |
| LAC | | 636 | 19 | | | | | | | | 1 | | | | | | 105 | 761 |
| MCSP | | 1,428 | 27 | | | | | | | | 26 | | | | | | | 1,481 |
| NKSP | 220 | 173 | | | | | | 5 | | | 15 | | | | | | | 413 |
| PBSP | | 222 | | | | | | | | | | | | | | | 46 | 268 |
| PVSP | | 489 | | | | | | | | | | | | | | | 11 | 500 |
| RJD | | 1,273 | 5 | | | | | 1 | | | 45 | | | | | | | 1,324 |
| SAC | | 335 | 29 | | | | | 1 | | | 1 | | 32 | | 8 | | 66 | 472 |
| SATF | | 1,729 | 1 | | | | | 6 | | | | | | | | | 46 | 1,782 |
| SCC | | 506 | | 1 | | | | | | | 13 | | | | | | | 520 |
| SOL | | 615 | | | | | | 2 | | 1 | 27 | | | | | | | 645 |
| SQ | 141 | 533 | | | | | | 5 | | | 49 | 140 | | | | | | 868 |
| SVSP | | 736 | 5 | | | | | 5 | | | 5 | | | | | | 75 | 826 |
| VSP | | 1,026 | | | | | | 3 | | 4 | 17 | | | | | | | 1,050 |
| WSP | 620 | 142 | | | | | | | | | 20 | | | | | | | 782 |
| DSH-ASH | | 1 | | | | | | | | | | | | | | | | 1 |
| DSH-CSH | | | | | | | | | | | | | | | | | | |
| DSH-PSH | | | | | | | | | | | | | | | | | | |
| **Male Subtotal** | **1,174** | **19,994** | **107** | **2** | **1** | **0** | **0** | **219** | **5** | **328** | **418** | **140** | **148** | **0** | **8** | **0** | **565** | **23,109** |
| CCWF | 116 | 946 | | | | | | 18 | | | 62 | 14 | | | | | | 1,156 |
| CIW | | 600 | | | | | | 4 | | 7 | 10 | | | | | 15 | | 636 |
| FWF | | 109 | | | | | | | | | | | | | | | | 109 |
| DSH-PSH | | 1 | | | | | | | | | | | | | | | | 1 |
| **Female Subtotal** | **116** | **1,656** | **0** | **0** | **0** | **0** | **0** | **22** | **0** | **7** | **72** | **14** | **0** | **0** | **0** | **15** | **0** | **1,902** |
| **Grand Total** | **1,290** | **21,650** | **107** | **2** | **1** | **0** | **0** | **241** | **5** | **335** | **490** | **154** | **148** | **0** | **8** | **15** | **565** | **25,011** |

CCHCS, Health Care Placement Oversight Program

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/10/20 6:07 AM

Enhanced Outpatient Program (EOP) Level of Care Population by Housing Program

| Institution | RC (Reception Center) | GP* (General Population) | EOP (Enhanced Outpatient Program) | MHCB (Mental Health Crisis Bed) | Acute | Intermediate | PIP | CTC/SNF (Correctional Treatment Center/General Skilled Nursing Facility) | Hospice | OHU (Outpatient Housing Unit) | ASU (Administrative Segregation Unit) | Condemned | LTRH (Long Term Restricted Housing Unit) | NDS (Non-Disciplinary Segregation) | PSU (Psychiatric Services Unit) | SHU (Security Housing Unit) | STRH (Short Term Restricted Housing Unit) | Total EOP Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Psychiatric Inpatient Program (PIP) Housing | | Specialized Medical Beds Housing | | | | | Segregated Housing | | | | |
| ASP | | 4 | | | | | | | | | 1 | | | | | | | 5 |
| CAL | | 1 | | | | | | | | | | | | | | | | 1 |
| CCC | | | | | | | | | | | | | | | | | | |
| CCI | | 11 | 1 | | | | | | | | | | | | | | | 12 |
| CEN | | | | | | | | | | | | | | | | | | |
| CHCF | | | 403 | 4 | 1 | 19 | | 41 | | 89 | 22 | | | | | | | 579 |
| CIM | 32 | 1 | | | | | | | | | 4 | | | | | | | 37 |
| CMC | | 3 | 523 | 1 | | | | 2 | | | 52 | | | | | | | 581 |
| CMF | | 1 | 428 | 9 | 2 | 4 | | 11 | 2 | 7 | 36 | | | | | | | 500 |
| COR | | 1 | 193 | | | | | 18 | | 3 | 48 | | | | | | | 263 |
| CRC | | 2 | | | | | | | | | | | | | | | | 2 |
| CTF | | 8 | | | | | | | | | | | | | | | | 8 |
| CVSP | | | | | | | | | | | | | | | | | | |
| DVI | | | | | | | | | | | | | | | | | | |
| FOL | | | | | | | | | | | | | | | | | | |
| HDSP | | 5 | | | | | | | | | 1 | | | | | | | 6 |
| ISP | | 4 | | | | | | | | | | | | | | | 7 | 11 |
| KVSP | | 2 | 96 | | | | | 2 | | | | | | | | | 24 | 124 |
| LAC | | | 478 | | | | | 1 | | | 66 | | | | | | | 545 |
| MCSP | | 3 | 610 | | | | | 1 | | | 54 | | | | | | | 668 |
| NKSP | 10 | | | | | | | | | | 5 | | | | | | | 15 |
| PBSP | | 3 | | | | | | | | | | | | | | | | 3 |
| PVSP | | 7 | | | | | | | | | | | | | | | | 7 |
| RJD | | | 777 | | | | | 7 | | | 57 | | | | | | | 841 |
| SAC | | | 545 | 1 | | | | | | | 67 | | | | 119 | | | 732 |
| SATF | | 13 | 491 | | | | | 7 | | | | | | | | | 13 | 524 |
| SCC | | 1 | | | | | | | | | | | | | | | | 1 |
| SOL | | 1 | | 4 | | | | | | | 3 | | | | | | | 8 |
| SQ | 14 | 41 | 122 | | | | | 1 | | | 19 | 62 | | | | | | 259 |
| SVSP | | 27 | 306 | | | 5 | | 1 | | | | | | | | | 32 | 371 |
| VSP | | 9 | 319 | | | | | | | | 3 | | | | | | | 331 |
| WSP | 19 | | | | | 2 | | 1 | | | | | | | | | | 22 |
| DSH-ASH | | | | | | | | | | | | | | | | | | 3 |
| DSH-CSH | | | | | | | | | | | | | | | | | | |
| **Male Subtotal** | **75** | **149** | **5,292** | **19** | **3** | **30** | **0** | **93** | **2** | **100** | **440** | **62** | **0** | **0** | **119** | **0** | **76** | **6,460** |
| CIW | 2 | 33 | 63 | | | | | 1 | | | 6 | | | | 2 | | | 105 |
| CCWF | | 3 | 44 | | | | | | | | 3 | | | | | | | 49 |
| FWF | | 1 | | | | | | | | | | | | | | | | 1 |
| DSH-PSH | | | | | | | | | | | | | | | | | | 2 |
| **Female Subtotal** | **2** | **36** | **107** | **0** | **0** | **0** | **0** | **1** | **0** | **0** | **9** | **0** | **0** | **0** | **2** | **0** | **0** | **157** |
| **Grand Total** | **77** | **185** | **5,399** | **19** | **3** | **30** | **0** | **94** | **2** | **100** | **449** | **62** | **0** | **0** | **121** | **0** | **76** | **6,617** |

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/10/20 6:07 AM

## Mental Health Crisis Bed (MHCB) Level of Care Population by Housing Program

Column groups: Psychiatric Inpatient Program (PIP) Housing = Acute, Intermediate, PIP · Specialized Medical Beds Housing = CTC/SNF, Hospice, OHU · Segregated Housing = LTRH, NDS, PSU, SHU, STRH

Abbreviations: RC = Reception Center · GP* = General Population · EOP = Enhanced Outpatient Program · MHCB = Mental Health Crisis Bed · CTC/SNF = Correctional Treatment Center/Skilled Nursing Facility · OHU = Outpatient Housing Unit · ASU = Administrative Segregation Unit · LTRH = Long Term Restricted Housing Unit · NDS = Non-Disciplinary Segregation · PSU = Psychiatric Services Unit · SHU = Security Housing Unit · STRH = Short Term Restricted Housing Unit

| Institution | RC | GP* | EOP | MHCB | Acute | Intermediate | PIP | CTC/SNF | Hospice | OHU | ASU | Condemned | LTRH | NDS | PSU | SHU | STRH | Total MHCB Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | | | | | | | | | | 3 | | | | | | | | 3 |
| CAL | | | | | | | | | | 2 | | | | | | | | 2 |
| CCC | | | | | | | | | | | | | | | | | | 1 |
| CCI | | 1 | | | | | | | | | | | | | | | | 1 |
| CEN | | | | | | | | | | | | | | | | | | |
| CHCF | | | | 8 | 1 | | | | | | | | | | | | | 9 |
| CIM | | | | 1 | | | | | | | | | | | | | | 1 |
| CMC | | | | 15 | | | | | | | | | | | | | | 15 |
| CMF | | | | 10 | | | | | | | | | | | | | | 10 |
| COR | | 1 | | 5 | | | | | | | | | | | | | | 6 |
| CRC | | | | | | | | | | | | | | | | | | |
| CTF | | 4 | | | | | | | | | | | | | | | | 4 |
| CVSP | | | | | | | | | | | | | | | | | | |
| DVI | | | | | | | | | | | | | | | | | | |
| FOL | | | | | | | | | | | 1 | | | | | | | 1 |
| HDSP | | | | 3 | | | | | | | | | | | | | | 3 |
| ISP | | | | | | | | | | | | | | | | | | |
| KVSP | | | | 3 | | | | | | | | | | | | | | 3 |
| LAC | | 2 | | 1 | | | | | | | 1 | | | | | | | 4 |
| MCSP | | 2 | 2 | 2 | | | | | | | | | | | | | | 6 |
| NKSP | | | | 1 | | | | | | | | | | | | | | 1 |
| PBSP | | | | 1 | | | | | | | | | | | | | | 1 |
| PVSP | | | | 1 | | | | | | | | | | | | | | 1 |
| RJD | | | 2 | 5 | | | | 1 | | | 2 | | | | | | | 10 |
| SAC | | | | 15 | | | | | | | | | | 4 | | | | 19 |
| SATF | | | | 3 | | | | | | | | | | | | | | 3 |
| SCC | | | | | | | | | | | | | | | | | | |
| SOL | | | | | | | 2 | | | | | | | | | | | 2 |
| SQ | | | | 2 | 2 | | | | | | | | | | | | | 4 |
| SVSP | | 2 | | | | | | | | | | | | | | | | 2 |
| VSP | | 4 | | | | | | | | | | | | | | | | 4 |
| WSP | | | | 1 | | | | | | | | | | | | | | 1 |
| DSH-ASH | | | | | | | | | | | | | | | | | | |
| DSH-CSH | | | | | | | | | | | | | | | | | | |
| *Male Subtotal* | 0 | 16 | 4 | 77 | 3 | 0 | 2 | 1 | 0 | 5 | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 116 |
| CCWF | | | | 4 | | | | | | | | | | | | | | 4 |
| CIW | | | | 3 | | | | | | | | | | | | | | 3 |
| FWF | | | | | | | | | | | | | | | | | | |
| DSH-PSH | | | | | | | | | | | | | | | | | | |
| *Female Subtotal* | 0 | 0 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| **Grand Total** | 0 | 16 | 4 | 84 | 3 | 0 | 2 | 1 | 0 | 5 | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 123 |

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

Data Refreshed: 7/10/20 6:07 AM

| Institution | RC (Reception Center) | GP* (General Population) | EOP (Enhanced Outpatient Program) | MHCB (Mental Health Crisis Bed) | Intermediate Care Facility (ICF) / Psychiatric Inpatient Program (PIP) Housing | | | Specialized Medical Beds Housing | | | ASU (Administrative Segregation Unit) | Condemned | Segregated Housing | | | | | Total Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Acute | Intermediate | PIP | CTC/SNF (Correctional Treatment Center/Skilled Nursing Facility) | Hospice | OHU (Outpatient Housing Unit) | | | LTRH (Long Term Restricted Housing Unit) | NDS (Non-Disciplinary Segregation) | PSU (Psychiatric Services Unit) | SHU (Security Housing Unit) | STRH (Short Term Restricted Housing Unit) | |
| ASP | | | | | | | | | | | | | | | | | | |
| CAL | | | | | | | | | | | | | | | | | | |
| CCC | | | | | | | | | | | | | | | | | | |
| CCI | | | | | | | | | | | | | | | | | | |
| CEN | | | | | | | | | | | | | | | | | | |
| CHCF | | | | | 34 | 328 | | 1 | | | | | | | | | | 363 |
| CIM | | | | 18 | | | | | | | | | | | | | | 18 |
| CMC | | | 7 | 4 | | | | | | | 5 | | | | | | | 16 |
| CMF | | | 1 | 8 | 21 | 205 | | | | | 1 | | | | | | | 236 |
| COR | | | 5 | | | | | | | | 1 | | | | | | | 6 |
| CRC | | | | | | | | | | | | | | | | | | |
| CTF | | | | | | | | | | | | | | | | | | |
| CVSP | | | | | | | | | | | | | | | | | | |
| DVI | | | | | | | | | | | | | | | | | | |
| FOL | | | | | | | | | | | | | | | | | | |
| HDSP | | | | 1 | | | | | | | | | | | | | | 1 |
| ISP | | | | | | | | | | | | | | | | | | |
| KVSP | | | 5 | | | | | | | | | | | | | | | 5 |
| LAC | | | 15 | 1 | | | | 1 | | | 11 | | | | | | | 28 |
| MCSP | | | 5 | | | | | | | | 2 | | | | | | | 7 |
| NKSP | 1 | | | | | | | | | | | | | | | | | 1 |
| PBSP | | | | | | | | | | | | | | | | | | |
| PVSP | | | | | | | | | | | | | | | | | | |
| RJD | | | 4 | 5 | | | | | | | | | | | | | | 9 |
| SAC | | | 7 | 4 | | | | | | | 1 | | | 1 | 9 | | | 22 |
| SATF | | | 6 | 2 | | | | | | | | | | | | | 2 | 10 |
| SCC | | | | | | | | | | | | | | | | | | |
| SOL | | | | | | | | | | | | | | | | | | |
| SQ | | | | | 5 | | 23 | | | | | | | | | | | 28 |
| SVSP | | 3 | | | | 198 | | | | | | | | | | | | 201 |
| VSP | | | | | | | | 1 | | | | | | | | | | 1 |
| WSP | 1 | | | | | | | 2 | | | 1 | | | | | | | 4 |
| DSH-ASH | | 2 | 49 | 28 | 80 | 56 | | | | 1 | | | | | | | | 216 |
| DSH-CSH | | 1 | 15 | 7 | 18 | 4 | | | | | | | | | | | | 45 |
| *Male Subtotal* | 2 | 6 | 119 | 78 | 158 | 791 | 23 | 5 | 0 | 1 | 21 | 0 | 0 | 1 | 9 | 0 | 2 | 1,216 |
| CCWF | | | 2 | 1 | | | | | | | 1 | | | | | | | |
| CIW | | | | | | | 29 | | | | | | | | | | | |
| FWF | | | | | | | 3 | | | | | | | | | | | |
| DSH-PSH | | 4 | | | | | | | | | | | | | | | | |
| *Female Subtotal* | 0 | 4 | 2 | 1 | 0 | 0 | 32 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 36 |
| **Grand Total** | 2 | 10 | 121 | 79 | 158 | 791 | 55 | 5 | 0 | 1 | 22 | 0 | 0 | 1 | 9 | 0 | 2 | 1,252 |

CCHCS, Health Care Placement Oversight Program

# SUMMARY OF MENTAL HEALTH POPULATION BY INSTITUTION AND LEVEL OF CARE

**Data Refreshed:** 7/10/20 6:07 AM

Column groups: **Acute Psychiatric Program (APP) Level of Care Population by Housing Program** — Psychiatric Inpatient Program (PIP) Housing: Acute, Intermediate, PIP · Specialized Medical Beds Housing: CTC/SNF, Hospice, OHU · Segregated Housing: ASU, Condemned, LTRH, NDS, PSU, SHU, STRH

| Institution | RC (Reception Center) | GP* (General Population) | EOP (Enhanced Outpatient Program) | MHCB (Mental Health Crisis Bed) | Acute | Intermediate | PIP | CTC/SNF (Correctional Treatment Center/Skilled Nursing Facility) | Hospice | OHU (Outpatient Housing Unit) | ASU (Administrative Segregation Unit) | Condemned | LTRH (Long Term Restricted Housing Unit) | NDS (Non-Disciplinary Segregation) | PSU (Psychiatric Services Unit) | SHU (Security Housing Unit) | STRH (Short Term Restricted Housing Unit) | Total MHP Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | | | | | | | | | | | | | | | | | | |
| CAL | | | | | | | | | | | | | | | | | | |
| CCC | | | | | | | | | | | | | | | | | | |
| CCI | | | | | | | | | | | | | | | | | | |
| CEN | | | | | | | | | | | | | | | | | | |
| CHCF | | | | 3 | 75 | 3 | | 3 | | | | | | | | | | 84 |
| CIM | | | | 7 | | | | | | | | | | | | | | 7 |
| CMC | | | | 10 | | | | | | | | | | | | | | 10 |
| CMF | | | | 6 | 165 | 1 | | 1 | | | | | | | | | | 173 |
| COR | | | | 14 | | | | | | | | | | | | | | 14 |
| CRC | | | | | | | | | | | | | | | | | | |
| CTF | | | | | | | | | | | | | | | | | | |
| CVSP | | | | | | | | | | | | | | | | | | |
| DVI | | | | | | | | | | | | | | | | | | |
| FOL | | | | | | | | | | | | | | | | | | |
| HDSP | | | | | | | | | | | | | | | | | | |
| ISP | | | | | | | | | | | | | | | | | | |
| KVSP | | | | 3 | | | | | | | | | | | | | | 3 |
| LAC | | | | 10 | | | | | | | 1 | | | | | | | 11 |
| MCSP | | | 1 | 6 | | | | | | | | | | | | | | 7 |
| NKSP | | | | 1 | | | | | | | | | | | | | | 1 |
| PBSP | | | | | | | | | | | | | | | | | | |
| PVSP | | | | | | | | | | | | | | | | | | |
| RJD | | | | 4 | | | | | | | | | | | | | | 4 |
| SAC | | | | 23 | | | | 1 | | | 7 | | | | | | | 31 |
| SATF | | | | 9 | | | | | | | | | | | | | | 9 |
| SCC | | | | | | | | | | | | | | | | | | |
| SOL | | | | | | | | | | | | | | | | | | |
| SQ | | | | | 1 | 1 | 1 | | | | | | | | | | | 3 |
| SVSP | | | | | | | | | | | | | | | | | | |
| VSP | | | | | | | | | | | 1 | | | | | | | 1 |
| WSP | | | | 4 | | | | | | | | | | | | | | 4 |
| DSH-ASH | | | | | 2 | 1 | | | | | | | | | | | | 3 |
| DSH-CSH | | | | | 1 | | | | | | | | | | | | | 1 |
| *Male Subtotal* | 0 | 0 | 1 | 100 | 244 | 6 | 1 | 5 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 366 |
| CCWF | | | | 2 | | | | | | | | | | | | | | 2 |
| CIW | | | | 1 | | | | | | | | | | | | | | 1 |
| FWF | | | | | | | | | | | | | | | | | | |
| DSH-PSH | | | | | | | | | | | | | | | | | | |
| *Female Subtotal* | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| **Grand Total** | 0 | 0 | 1 | 103 | 244 | 6 | 1 | 5 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 369 |

# Exhibit BBB



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Marc J. Shinn-Krantz
Email: MShinn-Krantz@rbgg.com

July 15, 2019

<u>VIA ELECTRONIC MAIL ONLY</u>

CDCR Office of Legal Affairs
Nick Weber
Melissa Bentz
Jerome Hessick
Dillon Hockerson
Kristen Moose

Re:    *Coleman v. Newsom*:  Plaintiffs' Questions and Comments Re: Defendants'
       Proposal to Install Cages in the Inpatient Hospital at CHCF
       <u>Our File No. 0489-3</u>

Dear All:

　　We write in response to two documents initially circulated by Melissa Bentz on January 25, 2019, Defendants' proposal for a six-month trial of installing cages, which Defendants refer to as therapeutic treatment modules or TTMs, at the California Health Care Facility (CHCF) Psychiatric Inpatient Program (PIP) (the Pilot), and a related draft cage policy (the Policy).  We will respond soon in a separate letter to Defendants' draft Discretionary Programming Status (DPS) pilot policy.

　　Our comments and questions below come within the context of Plaintiffs' longstanding objections to Defendants' practice of providing mental health treatment to patients in cages, which evidence in this case has shown is inhumane and counter-therapeutic.  As we have repeatedly stated, Defendants' concerns about managing potential violence can and should be addressed using the same methods employed every day by mental health professionals treating similar patient populations—by ensuring their mental health units have sufficient numbers of appropriately trained staff.

　　Nonetheless, Plaintiffs agreed to consider the relevant proposals in good faith and intend to do so.  Our comments and questions below are offered in that vein, with the expectation that Defendants will provide additional responsive information in advance of workgroup discussions on this topic to ensure they are as productive as possible.

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 2

I.    **Plaintiffs' General Comments on Defendants' Proposal to Install Cages at CHCF PIP**

As Defendants well know, Plaintiffs fundamentally disagree with the foundational assumption that the solution for addressing clinical and/or custodial staff's fear of patients is through the use of cages or the regular use of any other sort of restraint. Security in a hospital should come from direct observation and adequate numbers of properly trained staff, not classification scores and cages that undermine and impede desperately needed mental health treatment.

We are obviously dismayed that Defendants are seeking to formalize and expand their reliance on cages in the licensed inpatient context by installing 14 new cages in CHCF's PIP, given our longstanding objection to their use in any setting within CDCR for anything more than individualized, temporary and short-term situations to manage imminent risks of serious harm. Cages, an extreme version of restraints, are a literal and psychological barrier to both the patient seeking treatment and the treatment provider. Like any visible restraint, cages negatively affect others' perceptions of the mentally ill patient, dehumanizing the patients in the eyes of both their clinicians and other patients. *See Claiborne v. Blauser*, No. 16-16077, 2019 WL 2676900, at *1, *10 (9th Cir. June 28, 2019) (noting, in trial context, that visible restraints prejudice others against the restrained individual, as the "sight of a shackled litigant is apt to make jurors think they're dealing with a mad dog" (quoting *Maus v. Baker*, 747 F.3d 926, 927 (7th Cir. 2014)); *see also* Expert Declaration of Craig Haney, ECF No. 4378, Mar. 14, 2013 ¶¶ 82-83, 179 (class members describing how being locked in cages for treatment makes them feel like animals and impedes their access to mental health care). Cages are an affront to class members' basic human dignity, which the Supreme Court has noted is "inherent in all persons," including mentally ill prisoners, and which "animates the Eighth Amendment prohibition against cruel and unusual punishment." *Brown v. Plata*, 563 U.S. 493, 510 (2011). The Supreme Court was so offended by Defendants' practice of holding high-acuity patients "for prolonged periods in telephone-booth-sized cages without toilets," *id.* at 503-04, that it attached to its opinion in this case a photograph of some of the cages CDCR seeks now to newly install in its highest acuity licensed hospital, *see id.* at App'x C. There is simply no question that cages are destructive to the therapeutic relationship and impede clinical care, as the evidence has shown in this case. *See* Expert Declaration of Edward Kaufman, ECF No. 4379, Mar. 14, 2013, ¶ 86 ("At a minimum, the treatment modules pose a challenge to meaningful therapeutic interactions. To use them for individuals in acute distress, who may be feeling deeply isolated, even when there is no documented need for the modules is counter-therapeutic and inhumane.").

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 3

There is no question that Defendants' purported need to install counter-therapeutic cages to "manage" their acutely mentally ill patients is a direct outgrowth of their serious staffing deficiencies. CDCR's PIPs are dangerously understaffed, with nowhere near the number of allocated staff. Although intensive medication management is key to stabilizing patients, CHCF PIP has only 14.90 psychiatry positions filled out of 36.50 allocated. *See* May 2019 Filing, ECF No. 6209 at 5. With coverage provided through 2.80 registry positions, and 2.00 telepsychiatry positions, CHCF PIP is still at an abysmal 19.70 filled positions (54% filled). CMF PIP is even worse off, with only 10.00 psychiatrist positions filled out of 32.00 allocated. With 4.23 positions of registry coverage, CMF PIP still has only 44% of its psychiatry positions filled. SVSP PIP has *zero* of its 10.00 psychiatry positions filled, although its heavy reliance on registry coverage results in a 75% filled rate. (CDCR does not break out CIW or SQ PIP staffing on this monthly filing.)

CHCF PIP's psychiatry staffing has plummeted since CDCR took over the hospital program in June 2017's Lift and Shift. As of Defendants' May 4, 2017 report showing data for March 2017, CHCF PIP had 27.00 civil service staff psychiatrists out of 33.00 authorized positions. *See* May 4, 2017 Ltr. from G. Maynard to Special Master Enclosing DSH Staffing Report at 5. But as of May 2019, even though the staffing allocation had increased by 3.5 positions, CHCF had only 14.90 civil service staff (a drop of 12.10, or 44.81%). ECF No. 6209 at 5. Combined, CHCF PIP, CMF PIP, and SVSP PIP had 57.00 civil service staff psychiatrists as of March 2017, before Lift and Shift, and have now lost a combined 32.10 (56.32%) of those civil service staff psychiatrists. *Compare* May 4, 2017 DSH Staffing Report at 4-6 *with* ECF No. 6209 at 5.

Sufficient numbers of nursing staff are also critical to providing safe levels of observation and security in psychiatric units. Yet CHCF PIP also has severe nursing shortages that it makes up only through heavy use of overtime, according to Defendants' Monthly Report Data, April 2019 Enclosure 1*l*, enclosed hereto as **Attachment A**. Out of 430.00 authorized psychiatric technician positions, which Plaintiffs understand to be currently filled with medical technical assistants (MTAs), CHCF PIP had only 337 civil service positions filled, and made use of 2.83 full-time equivalent (FTE) contract positions and 61.91 FTE overtime positions, to bring the functional vacancy rate to of 28.26 positions (6.57% vacant). *See* Attachment A at PDF page 7 (internal document numbering: "Page 1 of 3"). CHCF PIP apparently attempted to make up for the nursing coverage gap through heavy use of registered nurse overtime as well, with 174.00 allocated registered nurse positions, 165 filled, 0.61 FTE contract positions, and 47.68 FTE overtime positions (-29.27% vacant). *See id.* The very high use of overtime for direct care nursing staff—109.59 positions—shows that CHCF is struggling to meet its actual nursing needs. CHCF PIP also reported severe functional vacancy rates in other

CDCR Office of Legal Affairs
July 15, 2019
Page 4

positions including psychologists (24.14% vacant), clinical social workers (15.15% vacant), and rehabilitation therapists (21.88% vacant). *See id.*

Even if Defendants filled their currently allocated PIP positions, however, Plaintiffs have long contended that their existing ratios are insufficient to provide safe and appropriate mental health care to the acutely ill patients in these inpatient psychiatric hospitals. CDCR has represented that it carried over DSH's existing staffing ratios to the PIPs with Lift and Shift. DSH's ICF ratios at the time of Lift and Shift were 1 to 35, although those staffing ratios have never been accepted by Plaintiffs or approved by the Special Master or the Court given that DSH's staffing plan is still in progress.

Indeed, DSH's Acting Director Stephanie Clendenin recently agreed with Plaintiffs that DSH's existing staffing ratios are inadequate. At a March 4, 2019 hearing before Assembly Budget Subcommittee No. 1 on Health and Human Services, and in the agenda for that hearing, Director Clendenin acknowledged that DSH is woefully understaffed and requested additional funding. She admitted that DSH's official budgeted psychiatry ratio for intermediate care is 1 to 35, whereas the average psychiatrist-to-patient ratio for the Western Psychiatric State Hospital Association's member hospitals is 1 to 25. *See* Assembly Budget Subcommittee No. 1 on Health and Human Services, Monday March 4, 2019 Hearing Video, available at https://www.assembly.ca.gov/media/assembly-budget-subcommittee-1-health-human-services-20190304/video ("Hearing Video") at 2:04:11 to 2:04:36; March 4, 2019 Hearing Agenda ("Agenda") at 25 (ratio is "well above the average of other state hospitals"). The Agenda is enclosed hereto as **Attachment B**. Notably, DSH maintained the 1 to 25 ratio until late 2011 or early 2012 when, in the midst of California's financial crisis, DSH's CRIPA consent decree requiring the 1 to 25 ratio ended and DSH increased the ratio to the present 1 to 35 level. *See* July 25, 2019 Commitments Ltr from C. Trapani to Workgroup at 5; August 3, 2018 Ltr. from J. Mupanduki to Workgroup at 1 (confirming ratio change). Director Clendenin also testified that DSH currently is budgeted for the minimum ratios required for licensing compliance, but due to the need for additional staffing, DSH delivers more nursing hours. *See* Hearing Video at 1:32:25 to 1:33:00; Agenda at 21 (budgeted ratios "do not result in enough nurses to effectively deliver adequate care"). This need for additional staff results in DSH's heavy reliance on overtime (including mandatory overtime) and registry use that exacerbates the staffing problems. *See* Agenda at 27-28. A representative for the California Association of Psychiatric Technicians echoed Director Clendenin's concerns, testifying that DSH is dramatically understaffed for the patient population it serves, including requiring psychiatric technicians to work 1.4 million hours of overtime, including 600,000 of involuntary overtime in 2016 alone. *See* Hearing Video at 1:45:10 to 1:45:36.

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 5

Moreover, Defendants' persistent claim that they cannot treat Maximum Custody or other high-custody patients without locking them in cages is belied by the fact that other inpatient programs serving similar patient populations treat their patients without cages by employing sufficient numbers of staff with sufficient training and support.  This is the case, for example, in the San Francisco Veteran's Administration (VA) Psychiatric Inpatient Unit (PICU), which Plaintiffs, Defendants, and the Special Master team jointly toured in November 2018.  Patients in the PICU have the same clinical diagnoses and range of mental health acuity as patients in CDCR's PIPs.  The PICU is a richly staffed, locked facility that regularly treats individuals sent by the courts for treatment during criminal proceedings and patients on Section 5150 involuntary holds.  As we learned on the tour, the PICU employs a variety of strategies to successfully manage this potentially disruptive inpatient population without cages, including, inter alia, hiring enough on-site psychiatrists to appropriately manage and adjust patients' medication and ensure continuity of care; hiring sufficient numbers of nurses and training them (as well as other staff) in therapeutic containment management and de-escalation tactics; and ensuring buy-in for appropriate behavioral management philosophies and techniques from the top down.  As a result of these efforts, the PICU rarely resorts to the use of isolation or restrictive management methods such as restraints, which are employed only on a case-by-case basis at the order of a doctor.  This approach, of course, stands in stark contrast to CDCR's routinized use of cages and cuffs to manage entire categories of patients, including the most acutely ill ones.

As seen at the PICU, and as DSH Director Clendinin testified in March, nursing staff perform a critical role in inpatient settings.  We were surprised to learn recently that Defendants are planning to end the use of MTAs in the PIPs within the next six months, which Defendants did not disclose to the workgroup.  To Plaintiffs' knowledge, Defendants have not yet developed a proposal for replacement of the MTAs—or at least have not come forward with one to the *Coleman* workgroup participants, despite Plaintiffs' query on June 24, 2019.  *See* C. Trapani to Defs. Email, June 24, 2019.  Assuming Defendants intend to replace the MTAs with psychiatric technicians, we strongly encourage significantly increasing the ratio and total number of psychiatric technicians assigned to the PIPs, as they can play a key role in increasing the level of direct observation and security within these units.  We look forward to Defendants' proposal on this.

Staff in the PICU also identified the robust training they receive on appropriate de-escalation and management of assaultive behavior techniques as critical to the success of their program.  Are CDCR clinical staff working in the PIPs currently trained in these techniques?  If so, please provide us with the training materials.  If not, have Defendants considered developing such a training in lieu of expanding the use of cages?

CDCR Office of Legal Affairs
July 15, 2019
Page 6

## II.    Plaintiffs' Specific Comments about Defendants' Draft Policy and Proposed Pilot

In light of the above concerns, Plaintiffs have a number of specific comments and questions regarding the particulars of Defendants' draft Policy and proposed Pilot.

### A.    Consideration of Alternative Options

Initially, Plaintiffs need more information on Defendants' justification for proposing the installation of cages in their inpatient psychiatric hospitals. What is the problem that this proposal is designed to address? Are Defendants aware of any published and/or peer reviewed studies of the use of cages or treatment modules in a licensed inpatient psychiatric hospital or program or any study of the use of cages at all in any mental health program? What other options, if any, did CDCR consider using before proposing to instead install cages at CHCF's inpatient unit? Did Defendants study or evaluate whether increasing staffing (or filling existing staffing vacancies) and/or providing additional training similar to that employed at the PICU and other inpatients hospitals would provide an alternative to installing cages? If so, please provide us the results. Did Defendants consider developing a step-down program permitting patients to more quickly program without restraints such as the one CDCR briefly attempted in the SAC PSU before abandoning it in 2017? *See* Special Master 27th Round Report, ECF No. 5779, at 186-87.

Plaintiffs understand that Defendants—first DSH, and then CDCR after Lift and Shift—have used cages in the inpatient program at SVSP for several years (despite Plaintiffs' objection), as well as in EOP ASU Hubs and the PSU (again, despite Plaintiffs' objection). Have Defendants ever studied their use of cages in any of these settings from a clinical perspective, e.g., to determine whether the use of caged treatment for psychiatric patients improves or impedes care? In particular, SVSP's PIP is the same level of care and security as CHCF's PIP. In lieu of expanding cages to new licensed inpatient programs without evaluating their efficacy in existing, substantially similar programs, Plaintiffs request that Defendants study and report on the clinical effects of their use in treating inpatient psychiatric patients in the SVSP PIP.

### B.    Existing Treatment for Maximum Custody Class Members in PIPs

With regard to Defendants' Pilot proposal, Plaintiffs are in the first instance deeply disturbed by Defendants' report that Maximum Custody patients at CHCF

CDCR Office of Legal Affairs
July 15, 2019
Page 7

currently receive no groups and potentially some limited individual therapeutic contacts,[1] and that their Maximum Custody policy interferes with the treatment of non-Maximum Custody patients at CHCF, as CDCR shuts down all programming anytime a Maximum Custody patient is outside of his or her cell even though that patient is restrained and escorted by staff. Pilot at 1-2. While Defendants blame the absence of cages at CHCF for their failure to provide constitutionally adequate—or indeed any—treatment to patients whom CDCR itself has determined need inpatient psychiatric hospitalization, *see id.* at 1, that is a Hobson's choice for the reasons outlined above. Furthermore, providing zero hours of therapy to patients at the inpatient level of care is a clear violation of the Eighth Amendment, particularly when Defendants' representatives have previously testified that the standard of care for ICF class members is between 35 and 40 hours per week of patient programming, and that failure to provide such care both threatens to violate ethical principles regarding patient care and causes acutely ill class members' mental health to further deteriorate. *See* Decl. of Victor Brewer, SVPP Executive Director, Sept. 16, 2010, ECF No. 3913-3 at ¶ 5; Decl. of Richard Lipon, CMF-VPP Acting Medical Director, October 12, 2010, ECF No. 3932-2 at ¶¶ 3, 6-9; *see also* ECF No. 3932 at 2, 5-6, 11-12.

Please provide us with information regarding how much programming, including yard and other out of cell activities plus group and individual treatment, patients on Maximum Custody status receive at CHCF PIP, and where and how they receive that treatment. Please also explain why Defendants are proposing to install 4 cages on the yard, including specifying the size of those cages and what Defendants propose to use them for. If, in fact, Defendants are failing to provide adequate outdoor exercise or mental health treatment to Maximum Custody prisoners in CHCF or other PIPs due to the lack of cages, then Defendants are in clear violation of their Eighth Amendment obligations to provide inpatient psychiatric care to these most vulnerable human beings. Plaintiffs do not and will not accept that cages are the only way class members needing inpatient care can receive treatment, given Defendants' failure to properly staff their inpatient programs and the many other methods employed by other inpatient hospitals across the country.

### C.    Operation of Maximum Custody Status in PIPs

Nor is it clear from Defendants' proposed Pilot and draft Policy what the precise scope of their planned use of cages would be given ambiguities surrounding their current and planned use of Maximum Custody status. Plaintiffs have a number of questions

---

[1] Although Defendants' policy does not clearly state whether and how Maximum Custody patients at CHCF receive individual clinical contacts, it appears that they may receive such treatment only if a walk-alone yard is available.

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 8

about Maximum Custody status generally, and about how and why it is utilized in CDCR's inpatient psychiatric hospitals.  Below, Plaintiffs first summarize the relevant portions of the materials and then outline their questions.

Defendants' draft Policy would formalize the use of cages in licensed inpatient programs for the treatment of all patients designated as Maximum Custody status pursuant to Title 15, and whose status cannot be waived by committee.  According to Defendants' proposed Policy, while the ICC (which contains no clinical staff and is chaired by the Warden) would ostensibly be required to consider clinical input regarding a patient's behavior, the ICC alone would decide whether a patient will be treated in a cage and/or subjected to mechanical restraints while in the inpatient program.  Furthermore, the ICC would make that determination based on unspecified "custody factors," without further consideration of clinical factors.

Concurrently, Defendants' proposed six-month Pilot would install 14 new cages at CHCF PIP to be used for providing mental health treatment to Maximum Custody prisoners.  Pilot at 1.  The Pilot outlines the existing Maximum Custody review process apparently used in the PIPs, which makes clear that the ICC does not review the appropriateness of a patient's Maximum Custody status for the first two weeks the patient is in the licensed psychiatric hospital.  *Id.*  After that, the ICC does not reconsider a patient's placement on Maximum Custody status until their Pre-MERD and MERD reviews, or unless a patient's IDTT has referred the patient to the ICC after determining the patient complied with certain treatment goals.  *Id.*  The decision to suspend a patient's Maximum Custody status is left to the sole discretion of the ICC chair, i.e., the Warden.  *Id.*  Finally, Defendants' Pilot document does not identify any methodologies by which they would propose to evaluate the efficacy of the Pilot, including identification of any outcome measures, comparisons to other programs, or discussing what a successful pilot might look like.

Plaintiffs initially note that no policy or directive governing the use of Maximum Custody status in the PIPs, including outlining the specific procedures and requirements discussed in the Pilot document, has ever been provided to Plaintiffs or discussed in the workgroups.  Does one exist?  Plaintiffs are not aware of any requirement in Title 15 or the DOM that Defendants must confine patients to cages before giving them mental health treatment.  Per Title 15, patients classified as Maximum Custody merely "shall be under the direct supervision and control of custody staff."  15 CCR § 3377.1(a)(1)(C).  What is Defendants' authority for requiring all patients on Maximum Custody to be caged during mental health treatment?  Do medical patients on Maximum Custody status, or any other category of patients, receive treatment in cages?

CDCR Office of Legal Affairs
July 15, 2019
Page 9

Similarly, Plaintiffs are concerned that the vague rules governing Defendants' placement and retention of class members on Maximum Custody status imposes an unconstitutional custodial barrier to needed mental health treatment. The fact that the Warden alone has the discretion to suspend or maintain Maximum Custody status for hospitalized patients in need of the system's most intensive mental health treatment is deeply problematic. *See Estelle v. Gamble*, 429 U.S. 97 at 104-05 (1976) (custodial interference with prescribed medical treatment constitutes deliberate indifference). It is not apparent why Defendants' Maximum Custody practices could not or should not be modified in order to permit these extremely sick patients to receive constitutionally adequate mental health care in a licensed inpatient setting like the PIP. Defendants should develop alternative custodial security measures that do not interfere with treatment rather than incorporating the existing Maximum Custody designation and restrictions wholesale in the psychiatric hospital setting reserved for the most acutely ill class members. CHCF's PIP is already the highest custody inpatient program Defendants offer, which Defendants intentionally built inside prison walls based on the SVPP model in order to ensure CDCR could control security with electric fences to eliminate the risk to public safety of escape, in contrast to the DSH programs. This high-custody hospital setting should require little, if any, use of restraints for treatment and programming, much less the use of cages.

Why are Defendants unable to conduct the initial ICC in a shorter period of time than ten business days, i.e., two weeks, for this relatively small group of prisoners? Under what circumstances can the ICC waive Maximum Custody status, and what proportion of patients are eligible for such consideration? Why can't the ICC waive or suspend every prisoner's Maximum Custody status for the duration of their inpatient hospitalization, or at least for those prisoners whose underlying RVRs do not involve violence and/or occurred well before their PIP admission? Why should custodial factors and decision-makers have total and unilateral control over the Maximum Custody determination in this licensed inpatient setting, with the discretion to totally disregard clinical input on the effect this highly restrictive status may be having on a patient's mental health and treatment progress? And why should Maximum Custody status only be reconsidered in the three narrow circumstances identified by Defendants in the Pilot, which could result in class members remaining on Maximum Custody status for their entire inpatient stays?

Plaintiffs have previously requested information about Defendants' use of Maximum Custody status in the PIPs in an effort to fully evaluate this proposal, but have not yet received responsive data that would allow for evaluation, for instance, of how long patients in the PIP remain on Maximum Custody status currently. *See* M. Shinn-Krantz to N. Weber June 18, 2019 Email Request and Related Thread, attached as **Attachment C**. There are no timeframes in Defendants' proposal, beyond the ten-day

[3409364.4]

CDCR Office of Legal Affairs
July 15, 2019
Page 10

timeframe for an initial ICC, for how long a Maximum Custody classification may last. Plaintiffs are concerned that the lack of timeframes will lead many patients to remain on Maximum Custody indefinitely. The Special Master has expressed serious concern about similar indefinite and prolonged custodial interference with patients' access to treatment in prior reports on Defendants' inpatient programs. *See, e.g.*, Special Master Inpatient Report, May 30, 2014, ECF No. 5156, at 25, 28. Plaintiffs reiterate their request for this information in advance of further discussions.

Information Defendants have provided, however, raises concerns because it shows that PIP patients are much more likely to be classified as Maximum Custody than the CDCR population as a whole. Enclosed as **Attachment D** is an Excel chart provided by Defendants on March 5, 2019, showing the point-in-time inpatient census as of that date. At that time, approximately 14% of the 391 patients at CHCF's PIP were Maximum Custody, slightly higher than the roughly 13% of patients across all of the PIPs. Each of these percentages is much higher than the system-wide average of 5% reported in a recent Legislative Analyst's Office report enclosed hereto as **Attachment E**. *See* LAO Report, Improving California's Prison Inmate Classification System, May 2019 at 9, Fig. 8 (reporting 2018 data). Without additional data or explanation from Defendants, it is unclear how long patients at CHCF PIP are classified at Maximum Custody, or how many other patients are classified as Maximum Custody at some point during their inpatient stays.

Plaintiffs look forward to further discussion and information sharing on this topic.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Marc J. Shinn-Krantz*

By: Marc J. Shinn-Krantz

MSK:MSK
Enclosures

cc: *Coleman* Special Master     *Coleman* Co-Counsel
       Adriano Hrvatin             Elise Thorn
       Tyler Heath                 Damon McClain
       Robert Henkels            Christine Ciccotti
       Sean Rashkis              Joanna Mupanduki

[3409364.4]

Exhibit CCC

| From: | Nick Weber |
|---|---|
| To: | Michael W. Bien; Kyle.Lewis@doj.ca.gov; RSilberfeld@robinskaplan.com; Adriano Hrvatin; Damon McClain; Lucas Hennes; Elise Thorn; Tyler Heath |
| Cc: | Toche, Diana@CDCR; Bick, Joseph@CDCR; Daye, Eureka@CDCR; Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama; Donald Specter; Barrow, Roscoe@CDCR; Neill, Jennifer@CDCR; Kelso, Clark@CDCR; Armstrong Team - RBG only; Melissa Bentz |
| Subject: | RE: Coleman: 489-3, Armstrong 581-3 [IWOV-DMS.FID6429] |
| Date: | Monday, June 22, 2020 4:40:39 PM |
| Attachments: | 2020-0619 Update Immediate Cancellation of All Non Essential Inmate Movement.pdf<br>COVID-19 Mandatory 14-Day Modified Program (2).pdf |

Michael,

Please see the attached memorandum regarding the 14-Day Modified Program as well as an email regarding the immediate cancellation of all non-essential inmate movement.  We will discuss these during the taskforce tomorrow.

Thanks.

Nick Weber
Attorney
Department of Corrections & Rehabilitation
1515 S Street, Suite 314S
Sacramento, CA  95811-7243
(916) 323-3202

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**From:** Michael W. Bien <MBien@rbgg.com>
**Sent:** Monday, June 22, 2020 10:03 AM
**To:** Kyle.Lewis@doj.ca.gov; Weber, Nicholas@CDCR <Nicholas.Weber@cdcr.ca.gov>; RSilberfeld@robinskaplan.com; Adriano Hrvatin <Adriano.Hrvatin@doj.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Lucas Hennes <Lucas.Hennes@doj.ca.gov>; Michael W. Bien <MBien@rbgg.com>; Elise Thorn <Elise.Thorn@doj.ca.gov>; Tyler Heath <Tyler.Heath@doj.ca.gov>
**Cc:** Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Daye, Eureka@CDCR <Eureka.Daye@cdcr.ca.gov>; Coleman Special Master Team <ColemanSpecialMasterTeam@rbgg.com>; Coleman Team - RBG Only <ColemanTeam-RBGOnly@rbgg.com>; Steve Fama <sfama@prisonlaw.com>; Donald Specter <dspecter@prisonlaw.com>; Barrow, Roscoe@CDCR <Roscoe.Barrow@cdcr.ca.gov>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Kelso, Clark@CDCR <Clark.Kelso@cdcr.ca.gov>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>
**Subject:** Coleman: 489-3, Armstrong 581-3 [IWOV-DMS.FID6429]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

The following was posted on CDCR's website on Friday, June 21:
**June 21, 2020 update:**

- We sincerely regret to inform you that an incarcerated person from Avenal State Prison (ASP) died June 20 at an outside hospital from what appear to be complications related to COVID-19. The exact cause of death has not yet been determined. The individual's next of kin has been notified. This is the 19th death of an incarcerated person within the California Department of Corrections and Rehabilitation (CDCR) related to COVID-19, and the first of an incarcerated person from ASP. No additional information is being provided to protect individual medical privacy. The online Patient Tracker has been updated. ASP currently has 132 incarcerated persons who are actively positive for COVID-19. CDCR takes the health and safety of all those who live and work in our state prisons very seriously and will continue to work diligently to address the COVID-19 pandemic.
- There are 1,875 incarcerated persons with active cases of COVID-19 statewide. To view more detailed case and testing information, see the CDCR and CCHCS Patient Testing Tracker.
- There are currently 342 active CDCR/CCHCS employee COVID-19 cases statewide (627 cumulative; 285 returned to work). See the CDCR/CCHCS COVID-19 Employee Status webpage for a breakdown by location.
- A few weeks ago we invited the community to share Father's Day messages with our population and we received nearly 45 minutes of content. This **video** includes messaging from our partners from the Center for Restorative Justice Works, local Inmate Family Councils and CCI Friends and Family. These messages will be playing on the institution television systems starting this weekend for at least the next week. Videos received after the submission deadline will be added next week.
- Effective Monday, June 22, 2020, all institutions will implement a mandatory 14-day modified program to further prevent the spread of COVID-19 within our facilities. Individuals will have access have access to health care services, yard time, phone calls, canteen, packages and religious programming while allowing for physical programming while allowing for physical distancing and proper

Please provide plaintiffs' counsel and the Special Master with any documents or memorandum imposing a new "mandatory 14-day modified program to further prevent the spread of COVID-19 within our facilities." Please also provide answers to the following questions:

1. Has CDCR/CCHCS imposed new restrictions on movement of incarcerated persons between CDCR prisons or additional requirements

for testing or quarantine related to movement?
2.  The sentence highlighted in yellow is incomplete and somewhat incomprehensible.  Please explain and/or correct.  What programming and activities are allowed?  Where are the standards and guidelines written?  What instructions have been given to Wardens and Health Care CEO's?
3. How does the new "mandatory modified program" change or modify programming or treatment for Coleman patients?

Thanks.


Michael Bien

ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street
Sixth Floor
San Francisco, CA 94105
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
mbien@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

# Memorandum

Date:   June 19, 2020

To:   Associate Directors, Division of Adult Institutions
Wardens

Subject:   **COVID-19 MANDATORY 14-DAY MODIFIED PROGRAM (2)**

The California Department of Corrections and Rehabilitation's priority is to protect the health and well-being of our staff and the inmate population, as well as providing a safe environment. The purpose of the memorandum is to announce measures intended to reduce staff and inmate exposure to the Coronavirus (COVID-19).

Effective Monday, June 22, 2020, all institutions will implement a mandatory 14-day modified program. Each institution will be responsible for either creating or amending their current Program Status Report taking all of the following information into consideration:

- The entire institution will be affected, except for Restricted Housing Units, Correctional Treatment Centers, and Psychiatric Inpatient Programs, etc.
- Movement will be via escort - maintain increased physical distancing unless security would dictate otherwise (i.e. Administrative Segregation Unit placement). Movement will be in such a fashion as to not mix inmates from one housing unit with another housing unit
- Feeding – Cell feeding or one housing unit at a time, maintaining physical distancing and disinfecting tables and high touch areas between each use
- Ducats – priority only
- Visiting – none
- Family visiting – none
- Legal visits – urgent/emergency, via telephone or video conference where available. Board of Parole Hearings will continue with attorney contacts as required
- Workers – critical and porters. All workers shall use appropriate PPEs at all times
- Showers – maintain distancing and disinfect between each use per memoranda: *COVID-19 Guidance for Daily Program Regarding Social Distancing for Cell or Alternative/Dorm Style Housing of Eight Person Cohort* dated, May 11, 2020, and *COVID-19 Related Cleaning Protocols for Institutions* dated, April 8, 2020.
- Health care services – limited to essential clinical services including urgent/emergent and by priority ducats. When applicable, such as no inmate movement at all, conduct 7362 rounds in the housing units.
- Medication(s) distribution – Wardens, please work with your Chief Executive Officers and Chief Nurse Executives to establish a process. When applicable, conduct podium pass within the unit. If movement to the yard, canteen, and/or feeding in the dining halls continues, med pass shall be maintained at the pill windows, maintaining physical distancing and not mixing inmates from different housing units.

Associate Director, Division of Adult Institutions
Wardens
Page 2

- Law Library – PLU or paging option while maintaining physical distancing in the library
- Dayroom–maintain reduced occupancy to ensure increased physical distancing
- Recreation - One housing unit/dorm at a time. Do not mix inmates from different units.
- Canteen is permitted - shall be conducted in a manner to ensure physical distancing. If unable to accommodate physical distancing, facilitate delivery method
- Packages are permitted
- Phone calls are permitted - ensure physical distancing and disinfect between each use
- Religious programs shall be cell front, or deliver materials to the housing unit/dorm/cells
- Educational materials to be provided either cell front, or to the dorm
- Request for Health Care Services Forms, CDCR-Form 7362, will be distributed and picked up in the housing units by staff

During this time, Community Resource Managers, Education Department staff, and others designated by the Warden shall facilitate the delivery of increased games, program materials, reading books, or other items to the housing units. Housing unit/dorm officers and supervisors are expected to conduct additional rounds, and spot checks of inmates in an effort to reduce self-harm and/or suicide attempts.

All institutions will be required to provide a copy of their Program Status Report, Part-A, to their respective Associate Director each day for this 14-day period. Institutions are expected to brief staff and inmate advisory committees on this directive as this modified program is currently only slated to be in effect for 14 days, through July 5, 2020.

Thank you for you continued efforts in managing this COVID-19 event. If you have any additional questions, please contact your respective Associate Director.

CONNIE GIPSON
Director
Division of Adult Institutions

cc:  Kimberly Seibel
     Charles Callahan
     Patrice Davis
     Justin Penney

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date:    May 27, 2020

To:      Associate Directors, Division of Adult Institutions
         Wardens

Subject:   **COVID-19 OPERATIONAL GUIDELINES MONITORING AND ACCOUNTABILITY**

The purpose of this memorandum is to provide expectations for monitoring and accountability of operational guidelines for the California Department of Corrections and Rehabilitation (CDCR) Division of Adult Institutions as it relates to our efforts to provide a safe and healthy environment during the statewide emergency caused by COVID-19.

During weekly inspection tours, Captains or area managers shall be required to fill out the attached COVID-19 TOUR CHECKLIST, in order to verify staff are following the COVID-19 protocols. This checklist will be completed to provide verification of compliance with relation to the following memoranda: *COVID-19 Guidance for Daily Program Regarding Social Distancing for Cell or Alternative/Dorm Style Housing of Eight Person Cohort* dated, May 11, 2020, and *COVID-19 Related Cleaning Protocols for Institutions* dated, April 8, 2020. The checklist shall be submitted to the respective Associate Director by noon on Monday for the preceding week. The following are items that will need to be taken into consideration when inspecting an area which include:

- Social distancing
- Wearing of mask (staff and inmates)
- Dorms and tent cohorts separated by six feet apart in all directions
- COVID-19 announcements
- Increased cleaning/disinfecting
- Poster Display
- Hand Sanitizer

Wardens shall ensure that shower schedules are created to ensure cleaning in between each use. For example, showers might be opened from 0800-0900, closed from 0900-0930 for cleaning, opened again at 1000-1100, then closed again at 1100-1130 for cleaning. Inmate porters shall clean showers, toilets and sinks between uses, and this cleaning activity shall be documented on the cleaning logs. Inmate porters must be provided ample cleaning supplies and protective equipment (including gloves and masks). This too must be documented on the cleaning logs.

Associate Directors, Division of Adult Institutions
Wardens
Page 2

Additionally, when a cell or bunk is vacated, the assigned inmate porter shall be responsible for disinfecting the space. For restrictive housing units, this task will be performed by staff. The cleaning of vacated bunks will be documented on the cleaning logs. When cleaning, inmates and staff shall wear, at a minimum, gloves and masks.

Captains and area managers shall continue to review the cleaning logs on a weekly basis for the housing units and kitchens, etc. Every Monday by noon, Wardens shall submit the cleaning logs for the prior week to their respective Associate Director by uploading the information to the Mission SharePoint site. Associate Directors shall review the information to ensure compliance.

If you have any questions or concerns, please contact your respective Mission Associate Director.

*Original Signed*

CONNIE GIPSON
Director
Division of Adult Institutions

Attachments

cc:  Kimberly Seibel
     Patrice Davis



State of California
Department of Corrections and Rehabilitation
Case 2:90-cv-00520-KJM-SCR    Document 6770-3    Filed 07/15/20    Page 27 of 32

# Memorandum

Date:    April 8, 2020

To:    Associate Directors, Division of Adult Institutions
Wardens

Subject:    **COVID-RELATED CLEANING PROTOCOLS FOR INSTITUTIONS**

The California Department of Corrections and Rehabilitation's priority is to protect the health and well-being of our staff and the offender population as well as providing a safe environment. The purpose of the memorandum is to reduce staff and inmate exposure to the coronavirus (COVID-19) within our institutions by providing guidance on cleaning and disinfection protocols as recommended by the Centers for Disease Control and Prevention (CDC). Due to the current COVID-19 pandemic, and out of an abundance of caution, we are distributing information on best practices for cleaning and disinfecting your work areas.

According to the CDC definitions, retrieved March 3, 2020, from: https://cdc.gov/Coronavirus/2019-ncov/comunity/organizations/cleaning-disinfection:

*Cleaning – refers to the removal of dirt and impurities, including germs, from surfaces. Cleaning alone does not kill germs. But by removing the germs, it decreases their number and therefore any risk of spreading infection.*

*Disinfecting – works by using chemicals, for example EPA-registered disinfectants, to kill germs on surfaces. This process does not necessarily clean dirty surfaces or remove germs. But killing germs remaining on a surface after cleaning further reduces any risk of spreading infection.*

Staff are to ensure that assigned porters are thoroughly cleaning communal areas (dayrooms, showers, restrooms, offices, etc.) a minimum of twice per shift during second and third watches with the option to clean more often if needed. The area porters will initial the cleaning schedule template (see attachment) documenting the time it was complete. Staff will sign the sheet verifying that they have reviewed and ensured the additional cleaning was completed. As we increase our cleaning times, we must continue to practice social distancing when possible.

It is recommended staff increase the frequency in which they disinfect the touchpoints (i.e. telephones, tables, door knobs, desk areas, etc.) by using Sani Guard 24/7 in their work area. Once the Sani Guard has been applied to a surface, it should be allowed to set for 10 minutes to maximize its effectiveness.

Attached is essential information on the cleaning solutions used in the institutions, and dilution ratios for mixing Cell Block and Sani Guard 24/7.

If you have any additional questions, please contact your Mission Associate Director.

CONNIE GIPSON
Director
Division of Adult Institutions

# PROTOCOL:  CLEAN AND DISINFECT for emerging pathogen COVID-19

**Best Practices** :  CLEAN AND DISINFECT for emerging pathogen COVID-19

## Option 1 -

CELL BLOCK 64 - Refer to label instructions for Adenovirus type7.  Mix 8oz of CELL BLOCK 64 to one gallon of water. Apply to surface, lightly agitate and let disinfectant set on the surface for a minimum of 10 minutes, then wipe clean.

## Option 2  -

Clean with Cell Block 64 at the normal dilution ratio of 2 oz per gallon of water (chemical dispensers are set to this ratio). Apply Cell Block 64, agitate and let set on surface for a minimum of 10 minutes and wipe dry.  Apply SANI-GUARD 24/7 at 3 oz per 5 gallons of water (refer to Sani Guard 24/7 label instructions for H1N1).  Allow disinfectant to remain wet on the surface for a minimum of 10 minutes and wipe off or let air dry.

## Option 3-

Disinfect only - **PLEASE NOTE**, surface must be free of debris and clean before applying Sani Guard 24/7.

Refer to product label instructions for H1N1.  Dilute 3oz of Sani Guard 24/7 to 5 gallons of water. Apply solution to non porous surfaces and remain wet for a minimum of 10 minutes.  Wipe or let air dry.

# CELL BLOCK 64 LABEL

Please review the entire bottle label before use.

## From the Cell Block 64 Label:

| DILUTION (1:64)<br>(660 ppm quat) | 2 oz. per gallon of water<br>4 oz. per 2 gallons of water | 8 oz. per 4 gallons of water<br>10 oz. per 5 gallons of water | 12 oz. per 6 gallons of water |

### DIRECTIONS FOR USE

It is a violation of Federal law to use this product in a manner inconsistent with its labeling.

This product is not for use on medical device surfaces.

DISINFECTION /CLEANING/DEODORIZING DIRECTIONS: Remove heavy soil deposits from surface, then thoroughly wet surface with a use-solution of 2 ounces of the concentrate per gallon of water. Use 8 oz. per gallon of water to kill Adenovirus Type 7. The use-solution can be applied with a cloth, mop, sponge, or coarse spray or by soaking. For sprayer applications, use a coarse spray device. Spray 6-8 inches from the surface, rub with a brush, cloth or sponge. Do not breathe spray. Let solution remain on surface for a minimum of 10 minutes. Rinse or allow to air dry. Rinsing of floors is not necessary unless they are to be waxed or polished.

Food contact surfaces must be thoroughly rinsed with potable water. This product must not be used to clean the following food contact surfaces: utensils, glassware and dishes.

(Continued directions for use )

CLEANING AND DISINFECTING HARD NONPOROUS SURFACES ON PERSONAL PROTECTIVE EQUIPMENT RESPIRATORS:
Preclean equipment if heavily soiled to ensure proper surface contact. Add 2 oz. of this product to one gallon of water. Use 8 oz per gallon of water to kill Adenovirus Type 7. Gently mix for a uniform solution. Apply solution to hard, nonporous surfaces of the respirator with a brush, coarse spray device, sponge, or by immersion. Thoroughly wet all surfaces to be disinfected. Treated surfaces must remain wet for 10 minutes. Remove excess solution from equipment prior to storage. Comply with all OSHA regulations for cleaning respiratory protection equipment (29 CFR §1910.134).

## From the Sani-Guard 24-7 Label:

**Sani-Guard 24-7** is a hospital Disinfectant, Bactericidal according to the current AOAC Disinfectants Use-Dilution Method. Fungicidal according to the AOAC Fungicidal Test, and Virucidal* according to the virucidal qualification, modified in the presence of 5% organic serum against Bacteria

| | | |
|---|---|---|
| Burkholderia cepacia | Staphylococcus aureus [Staph] | *Hepatitis C Virus [HCV] |
| Campylobacter jejuni [Campylobacter] | Staphylococcus aureus - | *Herpes Simplex Virus Type 1 [Herpes] |
| Corynebacterium ammoniagenes | Community Associated Methicillin- | *Herpes Simplex Virus Type 2 [Herpes] |
| Escherichia coli [E. coli] | Resistant [CA-MRSA] [NRS123] | *Human Coronavirus |
| Escherichia coli pathogenic strain O157:H7 | [USA400] | *Human Immunodeficiency Virus Type 1 [HIV-1] |
| [pathogenic E. coli] | Staphylococcus aureus - | [AIDS Virus] |
| Klebsiella pneumoniae [Klebsiella] | Methicillin-Resistant [MRSA] | *Influenza A2 / Hong Kong Influenza Flu Virus |
| Listeria monocytogenes [Listeria] | Yersinia enterocolitica | *Norovirus - Feline Calicivirus |
| Pseudomonas aeruginosa [Pseudomonas] | Viruses | *SARS Associated Human Coronavirus |
| Salmonella enterica [Salmonella] | *Adenovirus Type 5 | *Vaccinia Virus [Pox Virus] |
| Salmonella typhi [Salmonella] | **Adenovirus Type 7** | Fungi |
| Shigella dysenteriae [Shigella] | *Hepatitis B Virus [HBV] | Aspergillus niger |
| | | Trichophyton mentagrophytes |

### DILUTION:

| | |
|---|---|
| Disinfection (1:213) ..........3 oz. per 5 gallons of water<br>[450 ppm active quat]<br>Sanitizer (1:256) .......... 1/2 oz. per gallon of water<br>..[2 1/2 oz. per 5 gallons of water]<br>..[400 ppm active quat] | Sanitizer (1:512) .......... 1/4 oz. per gallon of water<br>[1 oz. per 4 gallons of water]<br>[1 1/4 oz. per 5 gallons of water]<br>.......... [200 ppm active quat]<br>Sanitizer (1:640).......... 1/5 oz. per gallon of water<br>[1 oz. per 5 gallons of water]<br>[150 ppm active quat] |

### DIRECTIONS FOR USE

It is a violation of Federal law to use this product in a manner inconsistent with its labeling.

### DISINFECTION / VIRUCIDAL*/ FUNGICIDAL / MOLD AND MILDEW CONTROL DIRECTIONS:

Add 3 oz. of Sani-Guard 24-7 per 5 gallons of water (or equivalent dilution) to disinfect hard, nonporous surfaces.

Before use in federally inspected meat and poultry food processing plants and dairies, food products and packaging materials must be removed from the room or carefully protected. When used on surfaces in areas such as locker rooms, dressing rooms, shower and bath areas and exercise facilities, this product is an effective fungicide against Trichophyton mentagrophytes (the athlete's foot fungus). Apply use-solution with a cloth, mop, sponge, sprayer or by immersion, thoroughly wetting surfaces. For sprayer applications, use a coarse spray device. Spray 6 - 8 inches from surface, rub with brush, sponge or cloth. Do not breathe spray.

**Note:** For spray applications, cover or remove all food products.

Treated surfaces must remain wet for 10 minutes. Wipe dry with a clean cloth, sponge or mop or allow to air dry. Rinse food contact surfaces such as counter tops, tables, picnic tables, exteriors of appliances and/or stove tops with potable water prior to reuse. Do not use on glasses, dishes or utensils as a disinfectant. For heavily soiled areas, preclean first.

**CALPIA**

Quality Products ★ Changed Lives ★ A Safer California

# Memorandum

**Date:** March 25, 2020

**To:** CALPIA Healthcare Customers

**From:** California Prison Industry Authority • 560 East Natoma Street • Folsom, California 95630-2200

**Subject: SARS-CoV-2 Supplemental Communication**

CALPIA was notified by Lonza, LLC, manufacturer of components used in the production of Cell Block 64 and Sani-Guard 24-7, of the following:

On March 13, 2020 (updated March 19), EPA published an updated list N (https://www.epa.gov/pesticide-registration/list-n-disinfectants-use-against-sars-cov-2) for disinfectant products with emerging viral pathogen and Human Coronavirus claims for use against SARS-CoV-2, the cause of COVID disease.

**"Inclusion on this list does not constitute an endorsement by EPA. There may be additional disinfectants that meet the criteria for use against SARS-CoV-2. EPA will update this list with additional products as needed."**

Lonza, LLC offers many registrations that were evaluated and accepted by EPA under the Emerging Viral Pathogen program (EVP) listed in Annex 1, and Human Coronavirus listed in Annex 2.

**Key clarification:**
Annex 1 listed products can make efficacy claims against SARS-CoV-2 in accordance with EPA's Emerging Viral Program.

Annex 2 listed products can be used against SARS-CoV-2 by people only when Annex 1 products are not available. Lonza has submitted Annex 2 products to the EPA to make efficacy claims against SARS-CoV-2 in accordance with EPA's Emerging Viral program. This communication will be updated when Annex 2 product reviews are completed and accepted by the EPA to make claims.

For any supplemental registration based upon any of these listed EPA registered products, customers may make off-label* communications in the following formats:

Cell Block 64 (HWS-64)
COVID-19 is caused by SARS-CoV-2, a novel coronavirus. Cell Block 64 kills similar viruses and therefore can be used against SARS-CoV-2 when used in accordance with the directions for use against Adenovirus type 7 on hard, non-porous surfaces. Refer to the CDC website at https://www.cdc.gov/coronavirus/2019-ncov/index.html for additional information.

Sani-Guard 24-7 (BARDAC 205M-10)
COVID-19 is caused by SARS-CoV-2, a novel coronavirus. Sani-Guard 24-7 (BARDAC 205M-10) kills similar viruses and therefore can be used against SARS-CoV-2 when used in accordance with the directions for use against Norovirus on hard, non-porous surfaces. Refer to the CDC website at https://www.cdc.gov/coronavirus/2019-ncov/index.html for additional information.

If you have any questions, please contact CALPIA at chemicals@calpia.ca.gov.

*Label: The written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers. (https://www.epa.gov/sites/production/files/2018-04/documents/chap-03-mar-2018_1.pdf)



**Specialty Ingredients**



## ANNEX 1

| NUGEN® MB⁵A Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| NUGEN® MB⁵A-256 | 6836-361 | Norovirus (Norwalk Virus) or Rotavirus |
| NUGEN® MB⁵A -128 | 6836-362 | Norovirus (Norwalk Virus) or Rotavirus |
| NUGEN® MB⁵A -64 | 6836-363 | Norovirus (Norwalk Virus) or Rotavirus |

| NUGEN® MB⁵N Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| NUGEN® MB⁵N-256 | 6836-364 | Norovirus (Norwalk Virus) |
| NUGEN® MB⁵N-128 | 6836-365 | Norovirus (Norwalk Virus) |
| NUGEN® MB⁵N-64 | 6836-366 | Norovirus (Norwalk Virus) |

| Lonzagard® RCS™ Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Lonzagard® RCS-256 Plus | 6836-349 | Enterovirus D68 or Norovirus |
| Lonzagard® RCS-256 | 6836-346 | Enterovirus D68 or Norovirus |
| Lonzagard® RCS-128 Plus | 6836-348 | Enterovirus D68 or Norovirus |
| Lonzagard® RCS-128 | 6836-347 | Enterovirus D68 or Norovirus |

| Lonzagard® R-82 Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Lonzagard® R-82 | 6836-78 | Norovirus (Norwalk Virus) |
| Lonzagard® S-18 | 6836-77 | Norovirus (Norwalk Virus) |
| Lonzagard® S-21 | 6836-75 | Norovirus (Norwalk Virus) |
| Lonzagard® DC-103 | 6836-152 | Norovirus (Norwalk Virus) |
| Lonzagard® R-82F | 6836-139 | Norovirus (Norwalk Virus) |
| Lonzagard® S-18F | 6836-136 | Norovirus (Norwalk Virus) |
| Lonzagard® S-21F | 6836-140 | Norovirus (Norwalk Virus) |

| Lonzagard® HWS Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Lonzagard® HWS-256 | 47371-129 | Adenovirus type 7 |
| Lonzagard® HWS-128 | 47371-130 | Adenovirus type 7 |
| Lonzagard® HWS-64 | 47371-131 | Adenovirus type 7 |
| Lonzagard® HWS-32 | 47371-192 | Adenovirus type 7 |

| Lonzagard® Bardac® 205M Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Bardac® 205M 1.3% | 6836-277 | Norovirus (Norwalk Virus) |
| Bardac® 205M 2.6% | 6836-302 | Norovirus (Norwalk Virus) |
| Bardac® 205M 5.2% | 6836-303 | Norovirus (Norwalk Virus) |
| Bardac® 205M 7.5% | 6836-070 | Norovirus (Norwalk Virus) |
| Bardac® 205M 10% | 6836-266 | Norovirus (Norwalk Virus) |
| Bardac® 205M 14.08% | 6836-278 | Norovirus (Norwalk Virus) |
| Bardac® 205M 23% | 6836-305 | Norovirus (Norwalk Virus) |
| Bardac® 205M RTU | 6836-289 | Norovirus (Norwalk Virus) |

| Disinfecting Wipes Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| Lonzagard® Disinfectant Wipes | 6836-313 | Rotavirus |
| Lonzagard® Disinfectant Wipes Plus 2 | 6836-340 | Norovirus (Norwalk Virus) |

| NUGEN® EHP Family | EPA Reg. # | Supporting Viral Claim |
|---|---|---|
| NUGEN® EHP RTU | 6836-385 | Norovirus (Norwalk Virus) |
| NUGEN® EHP Wipe | 6836-388 | Norovirus (Norwalk Virus) |

COVID-19 Communication 3-25-2020



**Specialty Ingredients**



## ANNEX 2

| Bardac® 205M Family | EPA Reg. # | Coronavirus Claim |
|---|---|---|
| Bardac® 205M 50% | 6836-233 | Human Coronavirus<br>SARS Associated Coronavirus |

| Disinfectant wipes Family | EPA Reg. # | Coronavirus Claim |
|---|---|---|
| NUGEN® 2M Disinfectant wipes | 6836-372 | Human Coronavirus<br>SARS Associated Coronavirus |
| Lonzagard® Disinfectant Wipes Plus | 6836-336 | Human Coronavirus<br>SARS Associated Coronavirus |

COVID-19 Communication 3-25-2020