1  XAVIER BECERRA
   Attorney General of California
2  MONICA N. ANDERSON
   Senior Assistant Attorney General
3  ADRIANO HRVATIN
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   TYLER V. HEATH, State Bar No. 271478
5  KYLE A. LEWIS, State Bar No. 201041
   LUCAS HENNES, State Bar No. 278361
6  Deputy Attorneys General
     1300 I Street, Suite 125
7    P.O. Box 944255
     Sacramento, CA 94244-2550
8    Telephone:  (916) 210-7323
     Fax:  (916) 324-5205
9    E-mail:  Lucas.Hennes@doj.ca.gov
   Attorneys for Defendants

   ROMAN M. SILBERFELD, State Bar No. 62783
   GLENN A. DANAS, State Bar No. 270317
   ROBINS KAPLAN LLP
     2049 Century Park East, Suite 3400
     Los Angeles, CA 90067-3208
     Telephone:  (310) 552-0130
     Fax:  (310) 229-5800
     E-mail:  RSilberfeld@RobinsKaplan.com
   Special Counsel for Defendants

10

11                    IN THE UNITED STATES DISTRICT COURT

12                  FOR THE EASTERN DISTRICT OF CALIFORNIA

13                         SACRAMENTO DIVISION

14

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DECLARATION OF SERGEANT G. BROWN IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL OPPOSITION TO PLAINTIFF-INTERVENOR CHRISTOPHER LIPSEY'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| v. | |
| **GAVIN NEWSOM, et al.,** | |
| Defendants. | |

22        I, Sergeant G. Brown, declare:

23        1.    I am currently employed by the California Department of Corrections and

24  Rehabilitation (CDCR) as a Correctional Sergeant at Kern Valley State Prison, a position I have

25  held since November 2019.  I submit this declaration to support of Defendants' supplemental

26  briefing in opposition to Plaintiff-Intervenor Christopher Lipsey's motion for a temporary

27  restraining order regarding Guard One security checks.  I have personal knowledge of the

28  statements in this declaration and could testify to them if called to do so.

                                        1

1      2.    I began my career with CDCR as a Correctional Officer at Salinas Valley State Prison

2  in 2002. I transferred to Kern Valley in 2005 where I have been employed in various capacities,

3  including as an Investigative Services Unit Officer. In 2013, I promoted to Correctional Sergeant.

4      3.    I am currently a Correctional Sergeant in Kern Valley's Administrative Segregation

5  Unit. In this capacity, I oversee all custody operations, including the manner in which

6  correctional staff conduct the Guard One security checks in this unit. In addition, I am aware that

7  Guard One checks are conducted in the Short-Term Restricted Housing Unit, Correctional

8  Treatment Center, and the Enhanced Outpatient Program housing unit at Kern Valley.

9      4.    Beginning in January 2014, at the direction of the Court in the *Coleman v. Newsom*

10  class action, CDCR implemented the Guard One security checks.

11      5.    The Guard One security checks are conducted every two hours, twenty-four hours a

12  day. Attached as Exhibits A-C to this declaration are true and correct copies of Operating

13  Procedures 200, 210, and 301 pertaining to the Guard One security checks at Kern Valley.

14      6.    All Guard One security checks conducted during First Watch, between the hours of

15  10:00 p.m. and 6:00 a.m., are conducted on "silent" mode, meaning the device is operated in

16  silent mode so that no beeps or noises occur when the device is used. During Second Watch,

17  between the hours of 6:00 a.m. and 2:00 p.m., and Third Watch, between the hours of 2:00 p.m.

18  and 10:00 p.m., the silencer is turned off, so the device makes a beep.

19      7.    All units where the Guard One is utilized have a metal pad, where the staff member

20  touches the Guard One device to the metal pad to record the check. In the Administrative

21  Segregation Unit, the pads are located on the inmates' cell doors.

22      8.    Because the cell door is metal, the pad is metal, and the Guard One device is metal,

23  when contact is made between the pad and the Guard One device, that contact can make a sound.

24  In the past, inmates complained about the noise generated from this metal-on-metal clicking.

25      9.    Because of these inmate complaints regarding the metal-on-metal clicking, I began

26  walking the tiers with the officers to ensure they are gently tapping on the metal pad in the

27  quietest manner possible. The inmates appreciated that a sergeant was accompanying the officers

28  to make sure the checks are being conducted as quietly as possible.

1       10.   As a result, and with all officers being instructed to gently tap the Guard One device

2  to the pad to reduce the noise, there has only been one grievance regarding noise in the past

3  several months.

4       11.   I note that any complaints pertaining to the metal-on-metal contact noise arise during

5  either Second or Third Watch.  There have been no complaints about any noise from the Guard

6  One checks during First Watch (during 10:00 p.m. and 6:00 a.m.).  I am aware that the First

7  Watch officers take great care to gently complete the checks in as quiet a manner as possible.

8       12.   I am aware there was one complaint from an inmate concerning the beeping sound

9  emitted by the Guard One device.  I am not aware of any other complaints pertaining to the

10  beeping sound.

11       13.   Inmate Christopher Lipsey (CDCR No. F18039) is presently housed in Kern Valley's

12  Administrative Segregation Unit.  To my knowledge, inmate Lipsey has not made any complaints

13  regarding any noise associated with the Guard One checks.

14

15       I declare under penalty of perjury that the information in this declaration is true and correct

16  to the best of my knowledge.  Executed on July 14, 2020, at Delano, California.

17                        ___ /s/ G. Brown  _____

                               Sergeant G. Brown

18                              Kern Valley State Prison

CF1997CS0003

19  91265618

20

21

22

23

24

25

26

27

28

# Exhibit A

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

## I. PLAN TITLE AND NUMBER:

Operational Procedure Number:   200

Operational Procedure Title:   Administrative Segregation Units

## II. PURPOSE AND OBJECTIVE:

A. The purpose of this procedure is to establish specific security and operational guidelines for Administrative Segregation Unit (ASU) and ensure operational compliance with the California Code of Regulations (CCR), Title 15.

B. The objective of this procedure is to provide safe and secure segregated housing for inmates classified as either a threat to the safety and security of the institution; a threat to their own safety or the safety of others; or whose continued presence in the general population would jeopardize the integrity of an ongoing investigation into serious misconduct or criminal activity.

## III. REFERENCES:

The CCR, Title 15, Sections 3268 and Sections 3335 through 3344.

## IV. APPROVAL AND REVIEW:

A. This procedure requires the approval of the Warden.

B. This procedure will be reviewed annually in October, by the Associate Warden – Complex-II.

**ANNUAL REVIEW/REVISED: November 2019**

## V. RESPONSIBILITY:

A. The Associate Warden, Complex-II, shall be administratively responsible for the operation of ASU #2. The Facility C Captain shall be responsible for the functional operations of ASU #2. The Captain will ensure compliance with all policies and procedures, as well as any applicable court mandates.

B. The ASU Lieutenant shall be responsible for the day to day operations of ASU. They shall ensure strict compliance with policies and procedures is maintained at all times.

C. The Chief Executive Officer (CEO) shall be responsible for the overall health care services provided to inmates housed in the ASU.

D. All staff assigned to the ASU, or who provide services to the ASU, shall become familiar with this procedure.

## VI. POLICY STATEMENT:

It is the policy of the California Department Corrections and Rehabilitation (CDCR) to provide housing separate from General Population (GP) for Inmates who for various reasons, cannot be housed in a GP setting without endangering institution security or the safety of themselves and/or others. Such housing is defined as Administrative Segregation Unit.

## VII. CRITERIA FOR PLACEMENT IN ADMINISTRATIVE SEGREGATION:

An inmate may be placed into an ASU, when it has been determined his presence within the GP would:

A. Presents an immediate threat to the safety of self or others.

B. Jeopardizes integrity of an investigation of alleged serious misconduct or criminal activity.

C. Endangers institution security.

D. Upon release from segregation, no bed available in GP.

## VIII. DOCUMENTATION FOR ASU PLACEMENT:

Authority to place an inmate in the ASU may not be delegated below the staff level of Correctional Lieutenant and/or Correctional Counselor II (CCII) Supervisor. The sending facility is responsible for completing and forwarding all documents, appliances, and medication to the ASU. Staff shall utilize the ASU Placement Cover Sheet (**Attachment A**) to ensure all forms are completed as follows:

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

A. Administrative Segregation Unit Placement Notice (ASUPN) **(Attachment B).** When an inmate is placed on ASU status, the reason for the placement shall be documented on an ASUPN with the exception of ASU Lay-Overs staying overnight only. The official ordering the segregated housing shall complete this document. Pursuant to CCR Section 3335.5 *Exclusions, (b) Lay-Overs*; Lay-Overs may be placed in ASU without being on ASU status. As such a 128B-ASU Lay-Over Chrono **(Attachment C)** is sufficient and an ASUPN is not required.

In the event an inmate will be placed in ASU as a Lay-over exceeding 24 hours, an ASUPN shall be required to ensure due-process. In such cases the Classification and Paroles Representative (C&PR) is required to track these Inmates to ensure they are scheduled to depart as scheduled and not overlooked.

B. CDC 114-A1, Inmate Segregation Profile **(Attachment D)**, shall be completed on all inmates placed in ASU by the sending facility. This document shall be signed by a Correctional Lieutenant or higher ranking official. The CDC 114-A1 shall be updated at least every 90 days or as required to maintain current information.

C. A CDCR 7219, Medical Report of Injury or Unusual Occurrence **(Attachment E)**.

D. Form GA-154, Inmate Housing Assignment Change **(Attachment F)** shall be completed for single cell inmates.

E. Picture Identification.

F. Upon the determination that an Inmate/Patient's (I/P's) bed assignment change will cause the I/P to receive medications from a different medication administration location, the following procedure shall be followed:

The inmate pending bed assignments in the Strategic Offender Management System (SOMS) shall be processed by Central Control.

Central Control staff shall notify the sending facility sergeant that the Inmate Population Tracking Report (IPTR 149) form can be printed from: **SOMS>PRISON>REPORTS>POPULATIO N TRACKING REPORT>PENDING BED ASSIGNMENTS>CURRENT LOCATION (enter KVSP)>FACILITY (enter facility)>DATE>SUBMIT.**

The sending facility custody staff shall print out the IPTR 149 report prior to moving any I/P whose bed change will result in a change of medication administration location. Custody staff shall provide a copy of the IPTR 149 to each medication administration staff Licensed Vocational Nurse (LVN)/Psychiatric Technician (PT), in the sending facility clinic.

The sending LVN/PT will note whether the I/P has Nurse Administered (NA)/Direct Observation Therapy (DOT) and/or Keep-on-Person (KOP) medications and sign and date the IPTR 149. Once the IPTR 149 has been signed by the sending LVN/PT, the move can be completed.

Licensed nursing staff shall check the I/P on the report against the current electronic Medication Administration Record (eMAR) to determine the need to have medications relocated with the I/P to include NA/DOT and KOP medications.

Custody staff shall retain a signed copy of the IPTR 149 in the sending facility sergeant's office on a clip board. *NOTE: Notification to licensed nursing staff of I/P movement that does not change the medication administration location will no longer be required.*

Should SOMS be offline or the move accepted before the IPTR 149 could be printed, IPTR 150 may be printed and used in place of the IPTR 149. All signatures and routing shall remain the same as the IPTR 149. A short explanation shall be written on the IPTR 150 justifying its use.

G. CDC 128-B Health Care Appliances and Inventory Chrono **(Attachment H)**. A facility staff will collect, separate, and inventory all Health Care appliances prior to delivering to ASU. A facility supervisor will check SOMS

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

to ensure all appliances have been collected and complete the Inventory Chrono.

H. A CDCR 1083, Inmate Property Inventory **(Attachment I)**. This form shall be delivered with the inmate's property. It is the lieutenant's responsibility to ensure the CDCR 1083 is completed appropriately, signed, and included with the ASUPN. In the event the inmate refuses to sign the CDCR 1083, it must be signed by the author and the facility sergeant.

I. ASU staff shall not accept an inmate into an ASU without completion of a 128-MH7. The Mental Health 128-MH7 form shall be completed by the sending facility LVN, nurse, or psych tech. The ASU supervisor shall verify the 128-MH7 has been completed by noting the LVN, nurse, or psych tech signature on the 7219 noting the 128-MH7 has been completed. The 7219 shall be maintained in the inmate's segregation file and filed into Electronic Records Management System (ERMS) upon the inmates discharge from ASU. The 128-MH7 is a confidential mental health assessment of the inmate and shall not be included in the documents for ASU placement.

J. When two inmates are being celled together for ASU placement the sending facility shall complete a CDC 1882-B Double Cell Review form **(Attachment O)**.

K. Prior to the initial placement of two inmates into an assigned cell, the ASU Sergeant/Lieutenant will ensure a review of the enemy/victimization history is completed. The victimization history review shall include a review of each inmate's Precaution Alert Tab on the SOMS. If an inmate is identified as "At Risk as a Victim", they shall not be housed with an inmate identified as "At Risk as an Abuser".

## IX. INTAKE:

No inmate shall be accepted into the ASU without the required documentation. ASU staff shall process new arrivals in a timely manner. When possible and practical, ASU new arrival inmates

should be housed in cells in close proximity of each other near high traffic areas or control booths allowing for better observation by staff. The "clustering" of newly placed ASU inmates will better allow staff to complete required welfare checks as described in Section XXVII of this procedure.

Mental Health Clustering - Inmates in the Mental Health Services Delivery System (MHSDS) at the Correctional Clinical Case Management System (CCCMS) level of care being placed in ASU will be housed in STRH, inmates not in the MHSDS will be housed in ASU2.

When placing an inmate in ASU2 on single cell status, staff shall place those inmates in cells 101 to 105 for the first 72 hours of placement. If an inmate will be double celled for the first 72 hours of placement, it is not necessary to utilize these cells. If inmates housed together in their first 72 hours of placement are separated and become single celled they shall be housed in a designated intake cell within 8 hours after the cell partner has been moved from the cell if they cannot again be double celled. After 72 hours, inmates must be moved out of the designated intake cells and housed in alternate ASU housing consistent with their case factors.

A. The inmate shall be placed in an available holding cell and submit to an unclothed body search by ASU staff.

B. All state clothing shall be taken from the inmate and returned to the laundry, new clothing will be issued.

C. The inmates' personal property shall be processed and delivered to the ASU by the sending facility. All property will be logged in the ASU property log book. All health care appliances will be delivered to the ASU supervisor.

D. The ASU supervisor will verify and inventory all parts associated with each appliance and document the information on the Health Care Appliance Identification form **(Attachment J)**. Copies of this form shall be distributed as outlined in section XXIX Authorized Health Care Appliances.

E. The cell the inmate is being assigned to will be thoroughly searched and inspected before the inmate is permitted to occupy the cell. This inspection and any discrepancies found during

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

the search shall be noted on the Cell Search Log Sheet **(Attachment K)**, and the Exhibit B Cell Inspection Form **(Attachment L)**. The ASU Sergeant shall log all searches in the unit Master Cell Search Log book utilizing the Cell Search Monitoring Sheet **(Attachment Z)**.

F.   Staff shall place a white paper name tag, a copy of the inmate's picture ID and an intake marker on the door of the cell the inmate is occupying.

G.   Identifying Markers **(Attachment M)**, including the word "INTAKE", inmate's name, CDCR Number, and date of ASU placement, shall be maintained on the cell door for the first 21 days of placement.

H.   The Supervisor responsible for the ASU will ensure each inmate is issued an "ASU Activity Workbook" **(Attachment G) (Attachment X)** during their initial placement into ASU. This shall be documented on the "CDC 114-A Inmate Segregation Record" **(Attachment N)**. The ASU supervisor is to monitor the "ASU Activity Workbooks" and work with the "Suicide Prevention and Response Focused Improvement Team (SPR FIT) Coordinator" to ensure inventories of the "ASU Activity Workbook" are maintained for distribution to inmates initially placed in ASU.

**X.   DETENTION/SEGREGATION RECORDS:**

A.   ASU Isolation Log: An isolation log shall be maintained in the ASU. All staff and approved visitors shall sign in and out on this log. It is to be kept on a podium near the entrance to the unit. It is the responsibility of all ASU staff to ensure this log is utilized and maintained properly. All approved visitors shall be accompanied and escorted by custody staff at all times while on the tier. Inmate movement into and out of the unit, regardless of reason, shall be recorded in the isolation log.

B.   Segregation Records: A CDC 114-A Inmate Segregation Record File shall be prepared on each inmate placed in ASU. The left side of this file will consist of a copy of the ASPN, CDC 114-A1 Inmate Profile Sheet, Cell Inspection Sheet (Exhibit B), CDC 1882-B Double Cell Review form and any other

relevant document(s) pertaining to the individual inmate or cell. NOTE: the approving authority for the CDC 1882-B shall be at the level of Correctional Lieutenant or higher. The right side of the file shall contain completed CDC 114-A's.

1.   All segregation records are legal documents. The accuracy in maintaining these records is imperative. Staff members recording information on these documents must write LEGIBLY and sign their first initial and full last name.

2.   All staff assigned to the unit shall record all inmate activities on each inmate's individual CDC 114-A. Such activities shall include but are not limited to:

   a.) Showers
   b.) Yard release
   c.) Exercise yard times and refusal as applicable
   d.) No yard due to state of emergency, inclement weather etc…
   e.) Trash emptied – supplies issued
   f.) Clothing / linen exchange
   g.) Meals
   h.) Interviews and examinations
   i.) Leaving/ returning from ASU and reason
   j.) Suicide Prevention
   k.) Any other unusual or special circumstance
   l.) All Rule Violation Reports (RVR) hearing processes including Investigative Employee (IE) and Staff Assistant (SA) interviews
   m.) Medication and refusals to take medications
   n.) Cell Inspections

3.   Record of daily activity:

   All inmate activities/contacts must be documented in detail. Staff completing this record shall record all program, activities and services afforded segregated inmates. Staff shall additionally document any unusual behavior displayed by the inmate while confined in segregation.

   Appropriate Symbols to be used in columns:

   a.)   X   Item completed (applicable to; cell search cell inspection, shower, supplies issued, linen

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

exchange, clothing exchange, medical/psychiatric contact, administrative contact visit legal library, meal, trash disposal, cell maintenance /repair, count, time out to yard, time in from yard.

Item completed (applicable to; cell search cell inspection, shower, supplies issued, linen exchange, clothing exchange, medical/psychiatric contact, administrative contact visit legal library, meal, trash disposal, cell maintenance /repair, count, time out to yard, time in from yard.

b.) R   Refused
c.) S   Security
d.) M   Medication
e.) M   Doctor/Register Nurse (RN)
f.) D   Dental
g.) P   Psychiatric

All entries within the columns utilizing symbols R or S will be accompanied with an explanation in the "Staff Comment Section, i.e.., Refused yard due to weather, sick; refused lunch not hungry, hunger strike; refused to step to back of cell, etc.

4. Staff Comments:

The area denoted as staff comments will be used to record the following:

a.) Cell Search = List of confiscated items (logged in Cell Search Log Book)
b.) Cell Inspection
c.) Shower
d.) Supplies = specifically list supplies issued
e.) Linen Exchange
f.) Clothing Exchange
g.) Medical/Psychiatric Contact
h.) Administrative Contact
i.) Visit = Time out and return from visit
j.) Legal Library = Time out and return from Law Library (Logged in Law Library Book)
k.) Meal noted by B, L, D for Breakfast, Lunch or Dinner or R for a refusal
l.) Trash Disposal
m.) Cell Maintenance/Repair
n.) Count

o.) Yard = Time out to yard, Time in from yard.
p.) Any adaptive support for a Developmental Disability Program (DDP) inmate as well as the adaptive support logs
q.) Disruptive Behavior = Any and all acts of misbehavior will be recorded
r.) Any and all documents served (RVR, etc.)
s.) Disciplinary hearings results
t.) Interviews, inmate appeals etc.

ASU Sergeants and/or ASU Lieutenants shall document a review of every ASU inmate's CDC 114 A on the Weekly Review of Inmate Segregation Profile/Record Spreadsheet **(Attachment Y).** The spreadsheet shall be reviewed by the ASU Captain and Associate Warden weekly. The spreadsheet shall be forwarded to the Warden or designee weekly indicating any deficiencies and corrective action provided to appropriate staff(s). The purpose of this review is to ensure conditions of confinement are being met and documented, and appropriate remarks by other staff are being entered. Supervisors who complete the review shall record this review in the inmates individual CDC 114-A in red ink only.

5. Tracking

The ASU Sergeant Post# 270409 is tasked with inputting data relative to the tracking of the inmates placed in the retrofitted 72-hour intake cells on the "ASU Intake Cell Management Tracking Log" located on the Division of Adult (DAI) SharePoint.

http://teamsite/team/Ops/AO/DAI/SitePages/ ASU%20Intake%20Cell%20Management%2 0Tracking%20Log.aspx

C. Administrative Timelines:

1. ASU placement notice, administrative review hearing by the facility captains regarding the reason for placement into the ASU takes place the first business day following placement into ASU.

2. Institutional Classification Committee (ICC) review of ASU placements will be within ten (10) days, but no sooner than 72 hours, unless

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

waived by the inmate. There are no exceptions to this timeline.

3. Inmates in ASU for more than 30 days, at their 10-day review, will be referred to the Classification Services Representative (CSR) for retention authorization in accordance with CCR, Title 15, Section 3335 (d).

## XI. AUTHORIZED RELEASE FROM ASU:

Inmates who have been placed into ASU may be released only by one of the following:

A. The official ordering the placement, or staff member of higher rank in the same chain of command, may withdraw an ASU order before it is acted upon or prior to a hearing on the order after consulting with and obtaining the concurrence of the administrator of the general population unit in which the inmate shall be returned to or assigned.

B. The staff member conducting the administrative review. The administrative reviewer shall be at the rank of Captain or above. If the reviewer is functioning in an acting capacity, the review must be co-signed by an Associate Warden or above. The Captain shall complete the Administrative Segregation Release form **(Attachment P)** identifying all inmates being released. The form shall be signed by the Captain or designee. A copy of the form shall be distributed to the ASU Sergeant and Correctional Counselor.

C. Institutional Classification Committee. Upon completion of ICC, all inmates to be released from ASU shall be placed on the Administrative Segregation Release Form. Once this form is prepared for the Chairperson's signature, the form shall be signed. Copies of the form shall be made and distributed to the ASU Correctional Counselor, and the ASU Sergeant.

## XII. ASU MEDICAL/MENTAL HEALTH SERVICES:

A. All ASU staff shall receive annual training on Uniformed Heat Trigger (UHT) procedures. Inmates identified as being included in the designated CCCMS may have a red placard affixed to the outside of their cell for facilitating mental health needs. Staff shall follow all UHT procedures in accordance with departmental guidelines.

1. When phase 1 of the UHT procedures is activated, heat risk inmates shall be returned to their assigned cell. When phase II UHT procedures are activated, identified inmates shall be afforded access to running water and/or misting and iced water. Fans shall also be provided for additional cooling measures as applicable. When phase III UHT procedures are activated, a clinician trained in identifying heat related illness shall observe heat risk inmates every two hours. ASU staff shall ensure they, and clinician staff, performing any UHT procedure record their observations and actions on each individual inmates CDC 114-A.

2. Staff shall remain cognizant of concerns posed with heat risk inmates regardless of phase of UHT procedure in progress. Inmates exhibiting any form of heat related illness shall be immediately referred to medical staff. During a heat alert, heat risk inmates shall not be required to stand in direct sunlight to receive any authorized services.

3. The inmate shall keep in his cell certain medically prescribed life-sustaining medications directly issued to inmates for as needed use, such as inhalers and nitroglycerin tablets. Only authorized medical staff will distribute these items. Inmates are authorized to retain possession of "blister packs" in the amounts prescribed and dispensed by health care services in their cell.

If the blister pack is used for any reason constituting a safety or security threat, the inmate shall permanently lose the privilege of possessing the "blister pack" and the prescribed medication will be distributed via an alternate method. This loss of privilege shall be clearly documented on a CDCR 128B and recorded on the inmates respective CDC 114-A Inmate Segregation Record.

B. Medical Staff assigned to ASU on second and third watch will be responsible for the distribution of medication in the unit. Sick call will be conducted as outlined within the post orders and pursuant to standardized health care services policies.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

C. All requests for dental services will be made through the sick call process. Emergency appointments will be completed as needed.

D. Medication will be issued to the inmate within the time frame prescribed by the doctor/pharmacist and pursuant to institutional policy. Custody staff is prohibited from distributing medication.

E. When an inmate is given his medication, the assigned medical staff will follow approved medication administration protocol.

　　1. Refused medication will be returned to the pharmacy as per medical protocol. Such refusal of medication shall be noted in RED on the CDC 114-A.

　　2. The inmate shall keep in his cell, certain medically prescribed, life-sustaining medications directly issued to inmates for as needed use, such as inhalers and nitroglycerin tablets. Only authorized medical staff will distribute these items.

F. If medical or mental health staff determine an inmate needs to be seen by a doctor and it is not an emergency, an appointment will be scheduled. The doctor will examine all ASU inmates in the ASU exam room.

　　1. ASU inmates requiring emergency medical attention will be escorted to the designated treatment area via the Emergency Response Vehicle (ERV). ASU staff will remain with the inmate during the course of the visit and return the inmate if and when it is deemed appropriate.

　　2. Confidential mental health interviews: All inmates housed in ASU who meet with mental health staff should have their interviews in private settings (affording confidentiality of sight and sound from other inmates and confidentiality of sound from staff).

　　3. All individual/group therapy for inmates shall be conducted in a confidential setting. The officer(s) providing coverage will remain nearby, where the clinician can be seen but not overheard while the clinical interaction is taking place.

　　4. When the occasion occurs when the priority health care ducat(s) are not inclusive of the Daily Movement Sheet (DMS), custody staff in ASU will ensure the requested inmates are escorted to the appointment ensuring them access to health care services. Inmates not on a ducat list may need to be seen in emergency or non-emergency situations. In the event an inmate needs to be seen for a non-ducated, non-emergency contact, health care and custody staff will coordinate a time to see the inmate as soon as possible the same day.

G. Inmates in ASU shall have access to Health Care Services Request Form (CDCR 7362's). Health care staff shall distribute and collect CDCR Form 7362's from inmates on a daily basis. The RN/Licensed Vocational Nurse (LVN)/Licensed Psychiatric Therapist (LPT) shall distribute and collect CDCR Form 7362's during the daily medication administration rounds in the ASU. The RN/LVN/LPT shall document the rounds and sign in and out, noting the time in the CDCR Form 114, Isolation Log. The RN/LVN/LPT shall also document the services provided to each inmate on the respective CDCR Form 114 A, Inmate Segregation Record. Designated custody staff shall accompany health care staff during the daily rounds and at all times while on the tier. Inmates with clinical symptoms shall be seen the next business day in an appropriate medical setting for face-to-face triage.

A non-MHSDS inmate who becomes a part of the MHSDS and who is already housed at ASU will be moved to the Short Term Restricted Housing (STRH) within 24 hours. The MH staff shall notify the ASU Sergeant immediately to expedite the STRH. The sending facility is responsible for completing and forwarding all documents, appliances, and medication to the STRH. The ASU Sergeant shall notify the ASU Lieutenant and Captain of the special placement and/or problems needing to be resolved to meet the 24-hour requirement. During non-business hours, holidays and weekends, the watch commander shall be notified who will contact the Administrator of the Day (AOD) if the bed move will not be accomplished within the mandatory 24 hours. The Chief of Mental Health (CMH) shall be notified, if staff is unable to transfer the inmate within the mandatory 24-hour timeframe.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

### XIII. RESTRICTIONS:

Inmates, who become so disruptive they endanger the safe operation of the ASU or endanger the safety of themselves or others, may be placed on restriction status listed below. All status restrictions must be fully documented on the inmates CDC 114-A.

A. <u>Restriction Status:</u> An inmate who has proven to be disruptive in one or more areas of behavior may have specific restrictions imposed to control the behavior. The authority to place an inmate on restriction status shall be at a level of Correctional Lieutenant or above. Placement of restriction status will not exceed 10 days. Such placement will be fully documented on a CDC 128B as to the reason(s) for placement and the inclusive dates. The following controls will be implemented to effectively manage an unruly, disruptive or assaultive inmate:

1. Leg Restraint Status:

   a.) Inmates placed on leg restraint status must have their ankles secured in leg restraints any time they are removed/escorted from their cell for any reason. These inmates may not be placed on lead chains with inmates who are not on leg restraint status.

   b.) Leg restraint security precaution is imposed whenever there is risk the inmate will attempt to kick staff or other inmates, may try to run during escort, is threatening to injure others, or there is a possible security concern the use of leg restraints can limit.

   c.) Leg restraints must be used and placed on an inmate in compliance with the departmental use of force policy, CCR Title 15 Section 3268.2, and the procedures outlined in this operational procedure.

2. Spit Hood/Mask Status:

   a.) Spit Mask security precaution is imposed whenever an inmate has spit upon, attempted to spit upon, or threatened to spit upon staff or other persons. Inmates placed on Spit Mask security precaution must wear a Spit Mask any time they are removed from their cell.

   b.) Once the inmate is placed into restraints the inmate shall be instructed to face away from staff. The Spit Mask will then be placed over the inmate's head in the prescribed manner. The Spit Mask will remain in place for the entire time the inmate is out of his cell and under direct constraint supervision.

3. Paper Tray Status: Paper tray status is imposed whenever an inmate refuses to return his insulated food tray, uses the tray to commit a disciplinary offense, or attempts to break or deface the food tray. Inmates placed on paper tray status will be fed on paper trays for a period of up to 30 days, at the discretion of the ASU Lieutenant.

4. Property Restriction:

   Limits the amount of property allowed in the cell. Imposed when an inmate uses state/personal property to prevent staff from observing activity in the cell (covers cell windows) and creates a situation, which may require a cell extraction. Usually imposed for a period of <u>10 days</u>.

B. Policy on Flooding:

   Inmates who intentionally flood their cell or tier shall be issued a RVR and placed on 72-hour water restriction. The restriction entails the shut-off of the flush valve to the inmate's cell for a period not to exceed three calendar days. During this time, the inmate will be allowed to drink water and flush his toilet three times on each shift. In every instance when a 72-hour water restriction is imposed, the ASU Lieutenant will be advised and the incident noted in the inmate's CDC 114-A file.

C. Policy on Refusing to Relinquish Restraints:

   Any inmate who refuses to allow staff to remove handcuffs, waist chains or any other approved restraints shall receive a RVR. With the approval of the Facility Captain or AOD, the use of a controlled use of force may be utilized to recover these items.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

D.  Use of the Security Triangle:

Safety Triangle: This device is a handcuff retention device, used to prevent inmates from pulling restraint equipment into their cell and may be used at the discretion of on duty staff. Some reasons for using the safety triangle include, but are not limited to: rehousing an irate inmate who has threatened violence or an inmate who was just involved in a use of force incident. The safety triangle may remain attached to the handcuffs if the inmate is being relocated in the housing unit and if attaching and detaching the safety triangle to and from the handcuffs presents a safety concern. The safety triangle is not intended to control the inmate outside of the cell. The officer controlling the safety triangle must be vigilant and efforts should be directed to prevent the inmate from pulling their hands inside the cell while the door is being closed.

• In the event that an inmate who is attached to a triangle refuses to place their hands in the food/security port to allow the handcuffs to be removed, it may be necessary to pull the safety triangle to retrieve the handcuffs. When it is necessary to pull the safety triangle, a single staff member shall slowly move away from the door while holding onto the safety triangle, in order to bring the inmate's hands through the port. This will be conducted with extreme caution in order to minimize the risk of injury to the inmate. Additional staff may be needed to assist with the safety triangle in the event that the one staff member is insufficient to get the inmate's hands through the food/cuff port. Once the inmate's hands, wrists, and forearms are through the port, staff will grasp the inmate's forearms, the tension on the safety triangle shall be released, and the handcuffs removed

E.  Cell door food/handcuff, holding cell handcuff port, window, door and light covering policy:
Inmates shall not be allowed to cover cell lights, windows, or doors at any time. food/handcuff ports and holding cell handcuff ports are utilized to apply and remove handcuffs, dispense medications, supply meals, pick up trash and exchange clothing and linen. Holding cell handcuff ports shall be locked at all times after use. Immediately after use, the food/handcuff port will immediately be

closed and locked. At no time shall the food/cuff port or holding cell food/handcuff port be left unattended when opened or unlocked. An unsecure food/handcuff port offers an inmate an unobstructed window through which he is able to expose body parts, partially or fully remove themselves from the cell or holding cell, propel darts, feces, urine, and other items capable of causing serious injury to staff and inmates.

1.  For staff safety, prior to the food/cuff port being opened, the inmate(s) shall be instructed to turn on the cell light. Staff shall be able to clearly see the inmate's hands and determine the food/cuff port can safely be opened. If the inmate refuses to turn on the cell light, remove coverings from the cell light, door or window, the port shall not be opened.

a.) The inmate shall be informed his failure to follow orders shall constitute a passive refusal of the service being offered. Any inmate who obstructs the view inside his cell shall be written a RVR. The matter shall be documented in the inmate's CDC 114-A file.

b.) An inmate who refuses to allow staff to close and lock the food/cuff port poses an immediate threat to the safety and security of staff and inmates alike, and mandates suspension of the programming of the other inmates housed in the ASU section. This seriously impacts the ability of staff to provide services as required by law and departmental policy.

If during routine duties, correctional officers encounter an inmate who refuses to allow staff to close and lock the food/handcuff port, an officer shall verbally order the inmate to relinquish control of the food/cuff port and allow staff to secure it. If the inmate refuses to relinquish control of the food/cuff port the officer is to relay to another custody staff to contact a supervisor while they back away from the cell and remain a safe distance from the open food/cuff port.

If the supervisor is unable to resolve the issue a controlled use of force will be recommended to an administrator through the chain of command while

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

custody staff continues to monitor the inmate and the unsecure food/handcuff port from a safe distance.

2. Occasions may arise when defiant inmates cover their cell door, window, thus blocking visual access into their assigned cell. If this occurs, the inmate shall be ordered to remove the item immediately. If the inmate refuses the order the ASU Sergeant shall be notified.

3. If the supervisor is unable to obtain the inmate's compliance in the above situations, notification shall be made to the appropriate authority (Facility Captain/AOD) to initiate cell extraction procedures. It is imperative this procedure is followed in a timely manner, as there is no ability to ascertain what activity is taking place in the affected cell, e.g. in cell assaults, medical emergencies, illegal activities, escape attempts.

## XIV. ESCORT PROCEDURES:

A. Prior to removing the inmate from his cell, staff shall positively identify the inmate. The inmate shall be instructed to turn his cell light on and remove all braids and ponytails. The inmate shall be instructed to remove all clothing items and submit to an unclothed body search prior to being removed from cell. The inmate shall then be instructed to place his back to the door and extend his arms through the food/cuff port with the back of his hands together, thumbs up. Once the handcuffs are applied, the inmate will retract his arms from the food/cuff port and remain standing with his back against the door.

If two inmates are assigned to the cell, both inmates shall be placed in handcuffs before the door is opened. Staff shall first place the inmate who is to remain in the cell in handcuffs, and instruct him to go to the rear of the cell, sit at the table and remain facing away from staff.

B. Once the handcuffs are secured on the inmate's wrist, custody staff shall place a hand directly on the cell door they want the control booth officer to open. The escorting officer will establish verbal and visual communication with the control booth officer in order to ensure

the correct door is being opened. In response, the control booth officer will be attentive to the direction being given by the escorting officer. The control booth officer will be required to acknowledge receipt of direction by communicating verbally and visually with the escorting officer. Once the cell door is opened custody staff will obtain control of the Inmate, instruct the inmate to back out of the cell, step to the side (same direction of door travel), and signal for the door to be closed. Once the door is secured the inmate shall submit to a search by staff with the hand held metal detector. Once complete, the inmate shall be escorted to destination within unit (i.e., yard, medical, etc.)

C. Care is to be taken in the course of the body search, ensuring a comprehensive visual inspection of the inmate's entire body inclusive of all body cavities, hair and extremities. All oral and physical prosthetic appliances shall be removed, by the inmate, and carefully examined and searched.

1. Handcuffs and leg irons shall be double locked.

2. At no time shall restraint devices be placed around an inmate's neck.

3. At no time shall inmates be handcuffed with their hands in front.

4. With the exception of an extreme emergency, inmates shall not be secured to stationary objects.

5. When escorting ASU inmates, the escorting officer(s) will have their expandable baton drawn in the closed position and the escort will be "hands-on" at all times unless a lead chain is utilized for multiple inmate escorts. The baton should not be carried in the extended position unless it is being utilized for the protection of inmates and staff.

6. During all in-house escorts (e.g. yard, shower, etc.) inmates shall be attired in boxer shorts, t-shirts and canvas shoes, orthopedic shoes or shower shoes. During escorts outside the ASU, inmates will be attired in a jumpsuit, t-shirt, under shorts, socks and canvas or orthopedic shoes. While under escort inmates shall not stop or impede the escort for any reason. ASU inmates shall be

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

secured in leg restraints for all escorts outside of the ASU. ASU inmates are not required to be in leg restraints while being escorted to the yard as this is considered an in-house escort. The ASU Sergeant shall identify inmates requiring additional escort coverage or restraint gear. Escorting officer(s) shall maintain hands-on control of the inmate(s) at all times and escort to the intended destination without delay.

7. A lead chain will be utilized when escorting more than two inmates at one time. They will be utilized most often when processing inmates from ASU to medical, visiting, etc. Lead chains can accommodate up to six inmates, requiring a minimum of three officers to conduct the escort.

8. If an ASU inmate is disabled, requiring the use of a medical assistive device, such as crutches, cane, or prosthesis, to assist him in walking, a wheelchair may be utilized during the escort. The inmate shall be escorted in waist restraints at all times. The following procedure shall be used for applying waist restraints on wheelchair bound inmates located in a secured area (cell, holding cell, etc.):

Staff shall place the padlock on the last two (2) rings of the waist restraint chain, making the chain into a large circle. Staff shall instruct the inmate to place both his hands through the security port. Staff shall place the handcuffs of the waist chain onto both wrists (key holes facing up) of the inmate and double lock. Staff shall then instruct the inmate to pull his hands, including the waist restraints, through the security port. Staff shall instruct the inmate to grab the lock on the waist chain, open up the waist chain into a circle, and place the waist chain over his head with the lock toward the inmates back. Staff shall instruct the inmate to place one (1) arm at a time through the waist chain. Staff shall instruct the inmate to lean forward slightly, which will allow the waist chain to slide down his back resulting in the chain completely around the inmate's waist. Staff shall open the cell door and instruct the inmate to "wheel" himself out of the cell. As soon as the inmate has exited the cell, staff shall

position themselves behind the inmate and instruct the inmate to lean forward in the wheel chair. Staff shall pull the waist chains tight around the inmate's waist, fold the waist chains together, and affix a second padlock, locking the waist chains securely around the inmate's waist. Staff shall assist the inmate out of the wheel chair to another chair, which has been searched and is free of contraband. Staff shall search the inmate and the inmate's wheelchair to ensure no contraband is present. Once the searches are complete, staff shall assist the inmate back into his wheelchair and complete the escort.

When the escort is complete, and the inmate is going to be removed from restraints, staff shall remove the restraints in the reverse order they were applied.

One 16-inch length of chain with loops at each end and two padlocks attached are available for use during this process for inmates whose abdominal girth exceeds the waist restraint.

Pursuant to the Armstrong decision, inmates will be allowed to retain in their cell, any and all medical device(s) prescribed for in cell use by a medical doctor. Staff should determine appropriate security precautions on an individual basis when escorting an inmate who is disabled.

XV. **INMATE MAIL:**

A. Inmates shall be allowed to possess no more than a combination of five (total) magazines, newspapers and paperback books in their cell at a time. Old newspapers will be destroyed. Magazines, paperback books and newspapers shall be exchanged on a one-for-one basis. Old magazines may be donated to the inmate library or sent home at the inmate's expense. Inmates shall not be permitted to exchange or pass any items with other inmates.

B. Inmate mail will be processed in accordance with local procedures. Incoming mail bags (Legal and Non-Legal) will be dropped off at ASU by institutional mailroom staff prior to third watch. Third watch ASU staff will distribute mail during the 1630-hour count.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

C. Third watch ASU staff will pick up outgoing mail during the 2115-hour count. The mail will be collected and delivered to the control booth officer for review by first watch staff. Institutional mailroom staff shall pick up the outgoing mailbag the following morning during second watch.

D. Incoming legal mail shall be distributed by designated ASU staff. This staff member shall open the mail in the presence of the inmate to ensure no contraband is present. Staff shall not read the contents of confidential mail. Staff will document the delivery of all legal mail on the inmates CDC 114-A, in addition to completing the legal mail log. Inmates must sign for all legal correspondence they receive. Failure to do so will be considered a refusal to accept the correspondence, which will then be returned to the mailroom for disposition. If contraband is discovered, the envelope and all contents will be confiscated. A supervisor will be notified immediately.

E. Outgoing legal mail will be picked up by ASU staff during the 2115-hour count. All incoming and outgoing confidential correspondence must be in compliance with CCR, Title 15, Sections 3142 and 3143, as well as current operating procedures.

XVI. **CANTEEN/PACKAGES:**

A. Inmates housed in ASU may purchase and receive some canteen items. Not all canteen items allowed to the general inmate population will be permitted to inmates housed in ASU. The abbreviated canteen list for inmates in ASU shall be approved by the Chief Deputy Warden or Warden.

B. The maximum allowable canteen draw for inmates housed in ASU is $55.00 each month (Privilege Group D).

C. Cosmetics and canteen items may be removed by staff from their original containers and placed into alternate containers if the original container or packaging presents a threat to the institutional security. Over The Counter (OTC) medications, Keep on Person (KOP) medications and canteen items may not be removed by staff from their original containers and placed into alternate containers unless the original container or packaging presents a threat to institutional security or safety.

D. A packaging restriction for safety and security concerns must be supported by a guilty finding in a disciplinary hearing for a serious rule violation involving the misuse of a product and/or its packaging by a specific inmate. The ASU Sergeant on duty shall generate a 128B Chrono identifying the specific product(s) to be restricted and the specific inmate. Restoration of access to original packaging shall be by written recommendation of the ASU Sergeant or ASU Lieutenant with review and approval by the Facility Captain.

E. The canteen draw schedule is based on the inmate's last two (2) digits of his identification number. First draw is 00-33; second draw is 34-66; and, third draw is 67-99.

F. Monthly schedules for draws will be published and distributed to ASU by canteen staff.

G. The inmate must turn in a Canteen Order Form, CDC 184, to an ASU officer by 1400 hours the Wednesday prior to their designated draw. Canteen will be processed and delivered by an ASU officer on the following Friday.

H. Inmates housed in ASU will be authorized to complete only one canteen order form each month. There will be no open lines or make-up draws.

I. Canteen orders will be confirmed by an ASU officer, and then delivered to the canteen. The officer will inventory the items and confirm the charges with the sales receipt. If the order is correct, the inmate will sign the canteen order form, which will be retained by the issuing officer in the ASU canteen order file.

J. Approval of the yearly package is at the discretion of the Warden or Chief Deputy Warden. Pursuant to the CCR, Title 15, Section 3044(g)(4)(E), inmates may be permitted to receive one package (not to

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

exceed 30 pounds) after completion of one year of Privilege Group D assignment.

K. Packages in excess of 30 pounds will be returned to the sender at the inmates' expense. Food items determined to be unauthorized for issuance to the inmate will be returned to the sender at the expense of the inmate. The inmate also has the option to donate or destroy unauthorized items. Controlling date will be the date received at Receiving and Release (R&R); postmark date will not be the deciding factor.

L. The ASU property officer will be responsible for the issuance of yearly packages to inmates housed in ASU. Any packages ordered after ASU placement and received prior to the 1-year date, shall be returned at the inmate's expense.

M. Special canteen purchases of magazines or books:

   1. Inmates who wish to order magazines or books shall fill out a CDC 193, Trust Account Withdrawal Order form, and a special purchase order form and have it approved by the Facility Captain.

   2. Books shall be recorded on the inmate's CDC 104, Property Card by R&R staff prior to being issued to the inmate.

   3. Each inmate will sign acknowledging receipt of the books. If an inmate is in possession of the allowable amount of books, the inmate must exchange, on a one-for-one basis, each new book. If the inmate does not wish to exchange any books, the inmate will sign receiving the items and will be added to his personal property stored in ASU. If the inmate refuses to sign for the purchase, the items will be returned at the inmate's expense. No inmate may purchase special canteen until they are endorsed for ASU retention by the CSR.

## XVII. ALLOWABLE PROPERTY:

A. The sending facility will inventory the inmate's personal property. The officer filling out the property inventory form will take the form to the inmate for a signature and/or verification of property. One (1) copy of the inventory form will be given to the inmate, one (1) copy will be placed inside the inmate's property box, one (1) copy will be firmly attached to the outside of the inventoried box and one (1) copy will be retained by the sending facility. All property will be boxed. No bags of any kind are authorized.

B. After the inmate has gone through his initial 10-day ICC review, he may request to receive the allowable ASU property. All requests must be approved by a unit supervisor and processed by the ASU property officer.

C. Prior to housing, unit staff will issue the inmate an appropriate issue of state clothing, writing supplies and initial issue of personal hygiene items.

D. State issue clothing and bedding. Each inmate assigned to the ASU is authorized the below listed standard clothing and bedding complement:

   1. Four under shorts (2 laundries weekly)

   2. Four T-shirts (2 laundries weekly)

   3. One blanket, two during winter months (exchanged every six months)

   4. Two sheets (exchanged weekly)

   5. Four pair of socks (2 laundries weekly)

   6. Two bath towels (1 laundry weekly)

   7. One denim jacket (Without metal buttons during inclement weather periods identified as October 1st through April 1st. Custody shall inspect the jackets to ensure they are free of metal and contraband prior to issuance. Inmates must sign a trust withdrawal form for the denim jacket)

   Inmates will be responsible to maintain state issued clothing. Failure to properly maintain the assigned clothing issue will result in disciplinary action and the inmate being charged for the cost of replacement or repair.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

E. Personal Clothing/Property:

Inmates in the ASU may not possess or purchase personal clothing of any kind with the exception of personal (inmate purchase) thermal underwear during inclement weather months only. The only approved personal articles an inmate will be allowed to possess are:

1. Personal thermal underwear (inmate purchased) during inclement weather months

2. Fifteen (15) photographs

3. Five (5) letters

4. Five (5) indigent envelopes

5. One (1) comb (non-metal, palm type)

6. Magazines, paperback books, newspapers, (any combination of 5 total)

7. One (1) tablet of lined paper (without staples)

8. Forty (40) envelopes and/or five indigent envelopes

9. Forty (40) stamps

10. One (1) address book

11. Prescription glasses one (1), Non-prescription reading glasses one (1)

12. Inmates housed in ASU2 – One (1) electrical appliance TV or Radio in cell based on mutual cellmate decision.

13. The cable will be three feet in length and have both ends crimped with a cable connector.

14. The coaxial cable shall be recorded on the ASU cell search log and the 114-A.

The allowance of personal appliances (television or radio) in ASU shall be limited to one (1) entertainment appliance per cell.

The television and/or Radio must be purchased through an approved vendor, and must meet appropriate size and dimension requirements to fit the shelving installed in the cells to accommodate the appliance. One (1) digital antenna receiver and one (1) digital signal amplifier are authorized. All items must be authorized and from an approved vendor. Additionally, one (1) set of ear buds is authorized per inmate. Any alteration to the appliance will result in the appliance being removed from the cell immediately and disposed of per Institutional procedures.

All Inmates housed in the ASU will have their property stored in the ASU property room. Inmates may request utilization of stored legal materials via written request of the ASU legal officer. All requests will be processed in an expedient manner.

F. State Issued Supplies:

The following supplies will be issued each Thursday by third watch staff:

1. One (1) roll of toilet paper (cardboard roll removed)

2. One (1) bar of soap (if "regular" size - one every two weeks, if small one a week)

3. Five (5) indigent envelopes (if qualified)

4. Five (5) sheets of writing paper

5. CDC forms 602, I/M request, Trust Withdraw, etc.

6. One (1) ounce of tooth powder

7. Dental Gliders (Indigent only, five 5 per week on one-for-one exchange)

8. Toothbrush - short handle / exchange every two (2) weeks (one-for-one)

9. Pen filler / exchange every two (2) weeks on a one-for-one basis only if needed.

G. Multi-Powered Radio Loaner Program

Upon completion of the administrative review, inmates shall be given the

DEPARTMENT OF CORRECTIONS AND REHABILITATION
KERN VALLEY STATE PRISON
Operational Procedure #200
Administrative Segregation Unit

opportunity to be issued a radio and a set of ear buds. The supervisor responsible for ASU will ensure the property officer issues a radio and ear buds to the inmate. The ASU property officer will ensure the inmate completes the CDC Form 128 B, General Chrono Multi-Powered Radio Loaner Program Agreement **(Attachment Q)** prior to issuance. Once the loaner agreement is completed, the inmate may be issued the radio and ear buds. The ASU property officer will track issuance of the radio and ear buds on the Multi-Powered Radio Distribution Log **(Attachment R)**. Staff shall ensure the radio is in proper working order prior to issuance and upon return from the inmate.

If the inmate refuses to participate it shall be documented on the Attachment R as "NOT RX" under the date issued section of the form with the property officer signing the "Staff Issued" section.

Inmates who elect to participate in the multi-powered radio loaner program will be required to sign a CDC 193 trust withdrawal order form and will be allowed to utilize the radio in 21-day increments. If at the conclusion of the initial 21-day period the inmate, has not been released or received his personal entertainment appliance or is determined to be indigent, he may request additional 21-day periods in the program. Prior to granting any extension requests, priority shall be given to all newly placed ASU inmates and then all indigent inmates.

Upon release from ASU, the inmate will relinquish the radio; however, may retain possession of the ear buds. ASU staff must ensure the ear buds are placed on the inmates CDC Form 160-H Inmate Property Control Card. If the radio and ear buds are altered or destroyed, the ASU supervisor shall determine if it was intentional or unintentional based on the circumstances and all available information. If it is deemed intentional, progressive discipline shall ensue as outlined in CCR, Title 15, Section 3312, Disciplinary Methods. In addition, the inmate will be charged the full replacement cost of the hand crank radio ($38.99) and the hand crank radio will be confiscated.

H.  Non Disciplinary Segregation (NDS)

Inmates placed in ASU for non-disciplinary reasons shall be tracked and recorded by the ICC on the ICC NDS Tracking Form **(Attachment T).** Inmates who have been designated as NDS inmates shall be allowed property in accordance with the NDS Personal Property Matrix (Rev 8/14/13).

XVIII.  **HOUSEKEEPING PROCEDURES:**

Inmates are required to keep their assigned cells neat and clean at all times consistent with institutional procedures.   Unit staff will ensure inmates are issued appropriate cleaning supplies as required.

A.  The cell will be swept and cleaned as necessary.

B.  Beds are to be made, and all personal property and state issued clothing        will be properly stored.

C.  No articles will be suspended or affixed to the ceiling or walls of the cell.

D.  Windows will not be covered.

E.  Most cleaning supplies are caustic substances. Unit staff will ensure inmates do not possess more than is necessary.

F.  When vector control is needed within a specific location in ASU, due to rodent and or insect infestation, the ASU Sergeant will complete/submit a work order, contact plant operations, and identify the specific nature of the problem. If interior vector control is needed within a specific cell, the inmate or inmates will be re-housed in an alternative cell pending the completion of the vector control process.

XIX.  **FEEDING PROCEDURES:**

A.  Inmates assigned to ASU will receive the same meals as inmates assigned to GP housing units with the following exceptions.   Inmates assigned to ASU will not be allowed:

- Sugar packets
- Regular punch (sugar) packets
- Pepper packets
- Chicken with bones

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

- Fresh fruit with pits
- Fresh chili peppers

1. Two (2) hot meals (breakfast and dinner) and one (1) sack lunch will be served daily.

2. All meals will be served in and consumed within the assigned cell.

3. All meals will be prepared at the ASU Satellite Kitchen for steam line feeding by ASU staff.

B. Serving utensils, trays and food carts will be inventoried and accounted for upon entrance to and prior to departure from the ASU. The ASU Sergeant will maintain a daily culinary inventory log to ensure accountability of all items.

C. Upon the arrival of the food carts, the food trays will be prepared by ASU staff and then distributed to the ASU inmates.   Prior to serving, the Correctional Supervising Cook (CSC) will take and log the temperature of sample hot food item(s). The temperature of the hot items must be at least 140°F at the time of serving.

D. The individual food trays will be placed on a serving cart and distributed to the assigned inmates.

E. All personnel assigned duties relevant to food preparation/distribution are to ensure hats and gloves are worn whenever handling food.

F. If an inmate refuses to eat, the refusal will be appropriately documented on their 114-A, and supervisory personnel will be notified.

**Hunger Strike:** Refer to Operational Procedure #804 Inmate Hunger Strikes (Custody) and Operational Procedure #1014 Inmate Hunger Strikes (Health Care).

1. The ASU Sergeant, Lieutenant will prepare meal sample reports and submit it to the Food Services Manager, Watch Office (to be placed with the Daily Activity Report), and one (1) copy will remain on file in the unit.

2. At no time will there be more than one food/cuff port open per section in ASU.

3. After allowing the inmates an ample amount of time to finish their meal (not to exceed 15 minutes), all food trays (hot and cold) will be picked up and accounted for from each cell. Inmates are only allowed to retain one piece of fruit. They will surrender all trash and unconsumed food (i.e. milk carton, cereal box, etc.).

## XX.   PERSONAL CLEANLINESS:

Inmate's assigned to ASU, shall be provided the means to keep themselves clean and well-groomed. Showering and shaving shall be permitted at least three times a week.

When escorted to the shower, the inmate will be attired only in boxer shorts, t-shirt and soft shoes or shower shoes.

A. Authorized items to be taken to the shower are:

1. One bar of soap

2. One towel

3. Shampoo

B. Inmates will be allowed to use nail clippers once every two (2) weeks. When requested, the inmate will be placed in a holding cell; staff will inspect the clippers and issue them to the inmate. Upon return, staff will again inspect the clippers to ensure they are intact. Any discrepancies will be reported immediately to a unit supervisor. For sanitary purposes, ASU staff will ensure nail clippers are sanitized after each use. The use of nail clippers will be done before the inmate showers.

C. Shaving will be accomplished by utilizing an electric clipper unit with electrical clippers during the inmate's assigned yard period and/or before their assigned shower period. ASU will maintain on its tool inventory, a supply of clipper units and assorted clipper heads for clipping hair. Only one clipper head (regardless of size) will be issued at any time for use with the clipper unit, along with a small container of Barbicide to sterilize the clipper heads after each use.   Barbicide will be issued to the inmates so they may sterilize the clipper heads

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

following each use. All clipper units and heads will be inventoried before and after each use by the unit staff to ensure accountability.

## XXI. CELL SEARCHES:

ASU staff will conduct routine cell searches. Each cell search will be completed in a systematic and concise manner. All areas within the cell, to include vents, fixtures, mattresses, toilet, sink, desk, bunks and inmate property will be searched.

A. Second and third watch will each conduct at least three random cell searches a shift, not including empty cell inspections prior to and after inmate(s) occupy a cell.

B. A thorough cell search will be conducted prior to assignment of an inmate to a cell. Additionally, a search will be conducted upon the departure of an inmate from a cell.

C. During the course of normal daily activities, visual searches and inspections will be conducted to ensure all cell fixtures and equipment are serviceable and the cell is clean.

D. All cell searches shall be documented in all applicable areas of the cell search log, and CDC 114-A file for each inmate. All discrepancies will be noted and disciplinary action taken when appropriate. A cell search receipt will be issued after every cell search.

E. Every cell will be searched a minimum of once every 30 days.

## XXII. LAW LIBRARY:

ASU inmates are provided law library access primarily via a computer work station; however, they may request access via "Paging." ASU-2 is equipped with a computer workstation containing mandated legal reference material and case law. Each ASU is equipped with a holding cell designed for use with this mobile computer system.

The inmate will submit a request for interview to the law library officer by Monday of each week.

The inmate will be scheduled and given access Tuesday, Wednesday, and Friday (within the same week), depending on the number of requests received and hours available. Preferred Legal User's (PLU's) will have priority. A list is generated weekly by the Librarian.

The inmate will be allowed a maximum of two hours (if time permits) of research time per visit, however the inmate is not required to use the entire two hours.

A. Copying:

The legal officer will complete all copying requests. The inmate will turn in a request by Monday and the copies/materials will be delivered within the same week.

B. Book Exchange:

Leisure reading book exchange will be done every week by the ASU Legal Officer. The inmate must sign and submit a Trust Account Withdrawal Form to participate. If the inmate loses or damages a book, his signed trust account withdrawal will be submitted.

If the inmate moves out of the unit, they do not take books with them. They shall return all books to the floor staff prior to moving or their signed trust account withdrawal will be submitted.

Only one book per inmate, per week is allowed.

Inmates are required to fill out a trust account withdrawal form prior to being issued law books from the law library.

## XXIII. VISITING PROCEDURES:

A. ASU inmates are permitted visits with their approved visitors. All visits will be non-contact in the designated visiting rooms. All attorney contact visits will be allowed at the attorney's request, except in circumstances where there is documented evidence of extremely violent behavior demonstrated by the inmate.

B. All visits will be by appointment only, and will be restricted to 1-hour time limits, pursuant to local Visiting Procedures.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

## XXIV. ACCESS TO TELEPHONES:

A. ASU inmates in privilege group 'D' are permitted telephone calls only in the following situations:

1. Verified family emergencies.

2. Per the Litigation coordinator (i.e., court ordered, attorney contacts).

B. The Facility Captain, ASU Lieutenant or Correctional Counselor I or II must authorize telephone calls.

C. ASU inmates deemed to be NDS are entitled to phone access in accordance with CCR, Title 15, Section 3282.

## XXV. ASU EXERCISE YARD PROCEDURES:

When KVSP DOM Supplement 52020.5.8, Limited Visibility Procedure is implemented, ASU Yard activities may continue. Yard activities will be initiated in ASU when the yard video cameras can clearly see to the back of all the small exercise yards. The decision to initiate ASU yard activities during limited visibility is at the discretion of the ASU Lieutenant based on visibility of the yard area and appropriate safety and security through observation.

A. ASU Yard Procedures:

ASU has twenty (20) management control yards. Inmates newly assigned to ASU will be offered exercise yard at the next available yard for their assigned cell, and no sooner than 24-hours after placement. Inmates housed in ASU are not required to be seen by classification committee prior to being offered exercise yard.

1. The control booth will announce yard call ten minutes and five minutes prior to yard release, over the unit public address system. A supervisor is to be present prior to removing any inmate from their cell.

2. When "Yard Call" is given, inmates scheduled and desiring to participate in yard will turn on their cell lights, stand at the door, and tell the floor officer they want to participate in yard.

3. The inmates clothing to be taken to the yard will be placed on the cell food/cuff port.

4. The escorting officer will conduct a thorough search of all clothing and property and conduct an unclothed body search of the inmate within his assigned cell.

5. In instances where two inmates are assigned to a cell, both inmates' property will be removed from the cell prior to the commencement of the unclothed body search. At no time will inmates retrieve items once the search has been initiated. Once the inmate is restrained and removed from the cell, he will be allowed to carry his property to the yard.

6. Upon completion of the search, the inmate(s) will be handcuffed and escorted from the cell to the assigned yard.

7. Once placed on the yard, the inmate will be unrestrained.

8. Yard recall will be conducted the reverse of yard release. Escorting officers will report to the yard and individually remove each inmate from the yard.

9. All inmate clothing and items authorized for the yard will be thoroughly searched by the officer. Upon completion of an unclothed body search, the inmate will be placed in restraints and removed from the yard. An officer will be positioned at the sally port and will conduct a search of the inmate utilizing a hand held metal detector. If clear, the inmate will be returned to his cell.

10. Inmates will not impede the progress of yard by stopping or conversing with others during the escort.

11. Inmates will be removed from the exercise yard upon approval by the ASU Sergeant or Lieutenant for the following reasons:

a) Illness /UHT Procedures
b) Attorney Visits
c) RVR Hearings
d) Ducats

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

e) Committee appearance
f) Needs to be seen by a staff member
g) Emergencies
h) Disciplinary problems
i) Completion of allotted yard time

12. Yard procedures will continue six days per week with the following exceptions:

    a) Limited Visibility (dependent upon visibility of the Yard area)
    b) Emergencies
    c) Lockdown
    d) Per institutional needs

13. The following items will be allowed out on the ASU exercise yards:

    a) One (1) T-Shirt
    b) One (1) Pair Boxer Shorts
    c) One (1) Pair of socks
    d) One (1) Towel
    e) One (1) Pair of Soft Shoes (or medically
       prescribed orthopedic boots)
    f) A small amount of toilet paper not to exceed 1/8th of a roll
    g) One (1) state issue soap
    h) One (1) jumpsuit (during Inclement weather and laundered as needed)
    i) One (1) jacket during winter months as outlined in section XVII
    j) One (1) personal set of thermal underwear (shirt/pants) - inclement weather
    k) Assistive devices

B. Emergency Yard Procedures:

1. In the event of an emergency, the officer monitoring the yard will immediately activate the building alarm and notify staff.

2. If time permits, (great bodily injury or possible death is not imminent) ample warning (whistle or verbal commands) will be given before using any other force options.

3. Responding staff will not enter the yard area until sufficient staff has arrived and all inmates are lying face down on the yard. Staff will then enter upon orders from the ASU supervisor in charge.

**XXVI.** **EMERGENCIES:**

A. Fire / Emergency Evacuation:

1. All assigned personnel will be familiar with existing institutional procedures relevant to emergency response and fire evacuation procedures.

2. The ASU Sergeant will ensure all assigned staff is familiar with fire evacuation routes within the unit and knowledgeable in the use of appropriate firefighting equipment. Simulated monthly fire/emergency evacuation drills will be conducted by each shift under the direction of the ASU Sergeant in order to audit the effectiveness of the procedure.

3. Based upon custody/security requirements, the following specific procedures for fire emergency evacuation of the ASU will be followed in the event of major fire or natural disaster within the unit.

    a.) The ASU Sergeant will determine the severity of the situation and supervise the evacuation.
    b.) ASU staff is responsible for conducting an orderly/safe evacuation of the unit under the direct supervision of the ASU Sergeant. The ASU control booth officer will provide gun coverage inside the unit and release inmates from their cells electronically if appropriate. In the event the cells cannot be electronically operated, floor staff will manually release inmates.
    c.) All inmates will be individually restrained, released, escorted to and secured inside the small management yards. The inmate's will be placed in to the small management yards. Staff will attempt to place inmates in groups according to compatibility. However, dependent on the severity of the situation, compatibility will not be a determining factor for placement. If circumstance dictates, ASU staff may conduct an unlock of all cells, and will direct all affected inmates to the area in front of the ASU building instructing them to assume a sitting position.
    d.) To ensure the unit has been entirely evacuated, staff will conduct a cell-by-

DEPARTMENT OF CORRECTIONS AND REHABILITATION
KERN VALLEY STATE PRISON
Operational Procedure #200
Administrative Segregation Unit

cell security check to assure all inmates have been evacuated.

e.) ASU staff will report to the area in front of the ASU building upon the completion of the evacuation and summon/render appropriate medical assistance. Additionally, all inmates' status/whereabouts will be accounted for and staff will stand by for further instructions.

f.) When the situation has returned to normal, the inmates will be re-housed.

g.) ASU overflow units will release inmates to the ASU exercise yard. All inmates will assume a seated position until ordered otherwise.

4. Fires, which do not require evacuation, will be extinguished by responding staff/and or the institution fire department.

5. The control booth officer will vent excessive amounts of smoke from the unit. The control booth officer will familiarize him/herself with the operation of the ASU vent zones.

6. Fire Prevention:

a.) Containers of flammable items will not be stored in ASU.

b.) Clean laundry will be kept in storage cabinets with doors closed at all times, except when clothing is being issued.

c.) Accumulations of dirty laundry will be kept in containers away from areas readily accessible to inmates.

d.) Accumulations of waste paper will be kept in trash receptacles with fitted covers and kept away from areas readily accessible to inmates.

e.) The exhaust fan system will be checked weekly and plant operations notified promptly if the system is not functioning properly.

7. Reporting Fires/Emergencies:

a.) In case of fire, dial the emergency number for the Fire Department (Ext. 222). Report all emergencies to the ASU Sergeant, ASU Lieutenant and Watch Commander.

b.) Give the Fire Department the following information:

1) Location of fire
2) Person placing the call
3) Type of fire, (i.e., electrical, fuel, etc.)

c.) If a fire extinguisher or fire hose is used to extinguish a fire, staff will promptly notify the fire chief for replacement or recharge.

B. Staff Responding to Emergencies:

1. The ASU Sergeant will respond to all emergencies and direct all operations. Although the presence of an ASU Sergeant is preferred, the presence of a supervisor, manager or health care staff is not required to conduct an immediate extraction.

2. All ASU custody floor staff will respond to all emergencies in the yard and building areas.

3. Sufficient staff will only enter the yard at the direction of the supervisor.

4. Additional staff will be held in reserve outside the yard area until the situation is under control.

5. For an immediate extraction or emergency cell entry from a confined area such as a cell, holding cell, shower, or small exercise yard, extraction/entry team members shall be issued and utilize a riot helmet with protective face shield, protective vest, protective shield (22" wide by 48" long), hand held baton and handcuffs in accordance with DOM section 51020.12.2.

6. Action Taken:

a.) Emergency response medical staff will assess inmates requiring medical attention and take them immediately to the Correctional Treatment Center (CTC), if necessary.

b.) All other inmates involved in the incident will be immediately searched and medically evaluated prior to

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

determining if they can be returned to their cells.

7. Emergency Yard Evacuation:

  a.) The primary goal if an inmate has been seriously injured is to remove the victim in need of emergency medical attention without jeopardizing the safety of staff or inmates.

  b.) The ASU Sergeant will ascertain which victim(s) need to be immediately removed due to injuries sustained. ASU staff will proceed to the staff office and don protective gear and shields.

  c.) Staff will instruct the non-injured inmate to exit the yard (restraints will be applied before the yard gate is opened) while the injured inmate lies face down on the ground. Once the non-injured inmate has been removed, the remaining inmate will be instructed to exit the yard. If the inmate is unable to move due to his injuries, staff will enter the yard with a shield and batons and place the inmate in restraints. Medical staff will conduct an evaluation and determine the extent of the injuries. The inmate will be moved only when it is reasonably safe to do so.

  d.) If the inmates on the affected yard refuse to comply with staff's instructions for being restrained and removed from the yard, a determination will be made on the need to use force.

  e.) Following an incident, the yard will be searched and evidence gathered and processed in accordance with Institutional Procedures.

C. Emergency Response Drills:

Monthly Emergency Response Drills **(Attachment S)** are to be conducted by all ASU's on each watch. These drills shall include regularly assigned custody staff, as well as medical personnel assigned to the ASU. The Facility Captains over each of the ASU's shall submit a memorandum to their supervising Associate Warden for review and submission to the Chief Deputy Warden (CDW)/Warden for review and submission to Associate Director (AD) by the final day of each month in the form of a memorandum confirming compliance. The memorandum shall clearly spell out the specifics of each incident.

The type of emergency addressed in each month's drill shall be varied, for example, in January, response to a cell with an inmate trying to hang himself, and in February response to an inmate with self-inflicted cuts threatening additional cuts. This training shall be inclusive of custody and medical staff.

XXVII. **INMATE WELFARE CHECKS:**

A. An inmate security/welfare check is defined as a "personal observation" of the welfare of the inmate and the security of the cell in which an inmate is housed in any of the KVSP ASUs. The security/welfare check shall include a visual/physical observation of a living, breathing inmate, free from obvious injury, ensuring the view into the cell is clear and unobstructed, and no damage to the cell and/or signs of any misconduct or self-injurious behavior.

B. Designated Correctional Officer positions are responsible for conducting Inmate welfare checks in each ASU as denoted below.

Post 162660 - ASU2 Floor   1/W
Post 272661 - ASU2 Floor 1  2/W
Post 272663 - ASU2 Floor 2  2/W
Post 272680   ASU2 S/E #1  2/W
Post 272682   ASU2 S/E #2  2/W
Post 372662 - ASU2 Floor 1  3/W
Post 372664 - ASU2 Floor 2  3/W
Post 372681   ASU2 S/E #1  3/W
Post 372683   ASU2 S/E #2  3/W

C. **GUARD ONE:**

1. Use of the Guard One Rounds Tracker (Pipe):

Staff will use the "Pipe" to record security/welfare checks. The assigned officer shall conduct a security/welfare check on each cell, twice an hour not to exceed 35 minutes between checks. The "Pipe" captures two levels of information, the time the security/welfare check was made and the location where the security/ Welfare

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

Checks were conducted. The officer will touch the "Pipe" to each button which is affixed to each cell in their unit. This will electronically validate the officer was at a specific cell, at a specific time.

Any disruptions to the security/welfare checks shall be documented in the housing unit isolation log book

2. Inmate Removal from Cell:

   During times when an inmate is out of their assigned cell for (yard, Classification committee, appointments, visiting, etc.), the assigned Correctional Officer will continue to conduct Security/Welfare Checks looking for damage and potential security concerns to that inmate(s) cell.

   Vacant cells:

   Officers are not required to conduct Security/Welfare Checks on cells where there are no inmate(s) assigned.

3. InterMaskProtocol Download and Unit Supervisory Review:

   At the completion of each shift, the officer conducting the Security/Welfare Checks will insert the "PIPE" into the InterMaskProtocol (IP) Downloader located in the Unit/Program Office for the unit supervisor's review. Once the IP download has been completed, the unit supervisor shall review all Security/Welfare Checks made during their shift using the Guard One Rounds Tracker Software installed on their designated work station. This review will ensure all Security/Welfare Checks have been completed at least twice an hour at staggered intervals not to exceed 35 minutes between checks.

   After the review, the unit supervisor will print the Guard One Rounds Tracker report and provide their signature and date of review. Should there be any discrepancies discovered during this review, the unit supervisor shall address the discrepancy, and if necessary, provide appropriate training with the responsible staff prior to the end of shift. The reports

shall be retained in accordance to CDCR's records retention policies.

The Facility Captain responsible for oversight of their respective ASUs shall review the security/welfare checks made on a weekly basis using the Guard One Rounds Tracker Software to ensure proper documentation review and training are being completed in accordance with this procedure. The captain shall forward their findings in a memorandum format to their respective Associate Warden by the end of each working week with their findings, to include any training and/or adverse action recommended.

The Associate Warden is responsible for oversight of his respective ASUs shall review the security/welfare checks made on a monthly basis using the Guard One Rounds Tracker Software to ensure proper documentation review and training are being completed in accordance with this procedure.

Training:

The unit supervisor shall ensure all Officers tasked with conducting security/welfare checks are provided training regarding this procedure and the Guard One System equipment.

4. Equipment Malfunction:

   In the event the Guard One Rounds Tracker software or equipment is not functioning properly staff will immediately notify the custody supervisor for follow up. For any technical assistance regarding the Guard One Rounds Tracker System staff will contact Enterprise Information Services staff. If staff cannot return the Guard One Rounds Tracker software or equipment to service in a timely manner, staff will utilize the manual methods detailed on the Security/Welfare Check Manual Tracking Sheet **(Attachment V)** Original completed ASU Welfare Check Tracking Sheets will be retained in the ASU for a minimum of three years and an additional four years in KVSP records archives.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

## XXVIII. SAFETY EQUIPMENT / KEY / TOOL CONTROL:

The ASU Sergeant will ensure all safety equipment, i.e., cut down kit, chemical agents, mechanical restraints, batons, protective vests, keys and any assigned tools are accounted for, and properly secured at all times.

A. A unit inventory log will be maintained and all equipment, weapons and padlocks will be inventoried at the beginning and end of each shift by unit staff. All deficiencies / discrepancies will be immediately reported to the ASU Sergeant or appropriate supervisor.

B. Maintenance Staff/Tools:

When maintenance staff enters the unit with assorted tools, only those tools needed to accomplish the job will be allowed to remain with the workers. All tools will be inventoried when entering and upon exit from the unit.

C. Emergency Inmate Work Crew:

Inmate workers are not authorized in ASU unless under emergency conditions, and with the approval from the Facility Captain.

ASU officers will conduct an unclothed body search of all inmate workers when entering and exiting the unit.

Upon completion of work, the cell will be searched and the floor officer will do a complete inventory of the tools.

If a tool cannot be accounted for, the ASU Sergeant will be notified. The ASU Sergeant will notify the ASU Lieutenant who will notify the Facility Captain or AOD within 30 minutes of learning of the situation, and a complete search of the area will be conducted.

D. Protective Vests:

A protective vest pool will be maintained in each ASU control booth. The ASU Lieutenant has overall responsibility to ensure an effective system is in place to ensure accurate inventory, distribution, and cleaning of the vest pool. Each vest will be issued via the chit system.

1. Protective vest use is mandatory for all staff assigned a vest and designated staff

under the following situations or conditions:

a) All staff working within ASU.
b) All staff performing escorts of inmates assigned to ASU.
c) All designated staff working in the vicinity of inmates assigned to ASU, inclusive of inmates housed in or being treated in the CTC.

2. The following custodial and non-custodial personnel are mandated to wear a protective vest when working with ASU inmates:

a) Correctional Officer
b) Correctional Sergeant
c) Correctional Lieutenant
d) Correctional Counselor I
e) Correctional Counselor II
f) All Medical Staff
g) Psychiatrist/Psychologist
h) Psychiatric Technician
i) Any Staff with Direct Contact with ASU Inmates

3. The wearing of the protective vest is optional for classification committee members, when serving on an ASU Classification Committee [ICC or Unit Classification Committee (UCC)].

4. Protective vests shall be worn only in the manner prescribed by the manufacturer and departmental guidelines. Protective vests shall not be worn in any manner to reduce their designed level of effectiveness. Uniform staff shall wear the vest under the uniform shirt.

5. Protective vest covers:

The cleaning and care of the protective vest pool carriers located in ASU and the CTC will be as follows:

a.) Each vest will have two carriers. One carrier for each vest will be laundered each week. On Monday morning, the supervisor for the affected area will assign a staff member to remove the soiled carrier from each vest and replace it with the clean carrier assigned to the particular vest. The area supervisor will contact the Vest Control

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

Person (VCP) and inform them of the number of vest carriers needing to be picked up and laundered. The VCP will deliver them to a local vendor for cleaning. After the newly cleaned carriers have been picked up from the vendor, the VCP will deliver them back to their assigned areas.

b.) Protective vests are to be maintained in good repair. Damage is to be reported to the ASU Sergeant and VCP for replacement as necessary.

6. Protective vest insert plates:

a.) Protective vests will be maintained in the ASU control booth area.

b.) The vest insert plates will be wiped down with a clean, damp cloth on a weekly basis.

E. Protective Face Shield:

All ASU staff shall wear the protective face shield at all times when having any inmate contact. Protective face shields shall be worn by staff, at all levels and classifications, when in close contact with un-handcuffed inmates. Close contact situations include those where staff is near an un-handcuffed inmate in the shower, inmates being processed to or from an exercise yard, inmates being provided items through the food/cuff port, or when staff is on a tier.

## XXIX. AUTHORIZED HEALTH CARE APPLIANCES

When an inmate is re-housed in ASU, the sending facility staff shall ensure all medically prescribed Health Care Appliances (HCA's) are delivered to the ASU Sergeant, for immediate issuance (unless the appliance was removed due to safety and security issues, i.e., evidence or weapon).

A. The sending facility shall inventory all property in the inmate's cell and complete a CDCR 128B, ASU HCA Inventory Chrono.

B. The completed ASU HCA Inventory chrono shall accompany the inmate to ASU along with the ASUPN.

C. The ASU Sergeant shall sign the aforementioned CDCR 128B, indicating receipt of the appliance. A copy of the CDCR 128B shall be given to the inmate, a copy shall be placed in the inmate's CDC 114-A, segregation log and the original shall be placed in the inmate's ERMS File.

D. The ASU Sergeant shall generate a HCA identification form to be placed in the inmate's 114 file identifying the appliance and all removable parts for accountability and verify through health care services the inmate has a current prescription for the appliance (s). The ASU Sergeant shall ensure the appliance (s) and all removable parts are clearly marked with the inmate's CDCR number and the appliance (s) is listed on the inmate's property card in R&R. A copy of the HCA identification form shall be placed on the inmate's assigned door in a manila folder out of the view of inmates. A third Copy of the form shall be placed in an American Disabilities Act (ADA) Appliance Accountability Binder stored in the ASU Sergeant's office.

E. If any discrepancies are noted, the ASU Sergeant shall contact the sergeant of the sending facility who shall initiate a search for the missing HCA. If the HCA cannot be located, the Facility Sergeant shall write a memo to their Facility Captain explaining how and why the HCA was lost with a copy to the ADA Coordinator and the ASU Sergeant shall refer the inmate to medical staff for a replacement appliance.

F. If the sergeant determines the inmate does not have a current prescription for the appliance, the sergeant shall submit a referral to health care services requesting evaluation for the medical necessity of the appliance. The appliance shall not be removed pending evaluation by health care services, unless the appliance presents a direct and immediate threat to the safety of others in accordance with section IV. I. 22 of the Armstrong Remedial Plan.

G. If the appliance was confiscated due to security issues, The Facility Captain shall consult with the Chief Medical Officer (CMO) or designee for alternate accommodations.

H. All ASU Floor #1 Officers shall take the ADA appliance accountability binder and complete a daily inventory of all appliances and their parts. This shall be documented on a Daily Health

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #200**
**Administrative Segregation Unit**

Care Appliance Inspection Log **(Attachment W)** and retained in ASU for accountability.

## XXX. DEPARTMENTAL POLICY REGARDING PRISONERS WITH DISABILITIES BEING HOUSED IN ASU DUE TO LACK OF ACCESSIBLE BED SPACE

It is the policy of the CDCR to make every effort not to house Armstrong class members in an ASU due solely to a lack of appropriate accessible GP housing. As a result, an Armstrong class member's placement, retention and release from ASU will be in accordance with OP 802 DDP.

## XXXI. ALTERNATE HOUSING FOR DPW INMATES ON ASU STATUS:

When an inmate, classified as a Fulltime Wheelchair User (DPW) in the DDP, is placed in an ASU and there are no available DPW ASU cells, the following steps shall be taken.

A. The Facility Lieutenant shall contact the C&PR. The C&PR will review DPW inmates housed in ASU to identify any DPW inmates who can be cleared for release (i.e. Imminent Maximum Estimated Release Date (MERD), resolved safety concerns, RVR's which have been heard, etc…). If any of the ASU DPW inmates can be released, the C&PR will schedule an emergency ICC, to release the inmate.

B. If none of the ASU DPW inmates can be released, the C&PR will identify ASU DPW inmates endorsed for transfer to an alternate institution. If any are identified, the C&PR will arrange a transfer of the inmate to the endorsed institution.

C. If none of the ASU DPW inmates are endorsed for transfer, the C&PR will contact other institutions in an effort to locate an available DPW ASU cell. Once located, the C&PR will arrange a temporary transfer of the inmate, for ASU placement.

D. If temporary housing is required during this process, the inmate will be confined to quarters in his assigned general population DPW cell and placed on single cell status. All personal property will be removed from the cell and inventoried by Facility staff pending placement into ASU.

**Attachments:**

| | | |
|---|---|---|
| Attachment | A - | ASU Placement Cover Sheet |
| Attachment | B - | ASU Placement Notice |
| Attachment | C - | 128B-ASU Lay-Over Chrono |
| Attachment | D - | CDC 114-A1 Inmate Segregation Profile |
| Attachment | E - | CDC 7219 Medical Report of Injury or Unusual Occurrence |
| Attachment | F - | GA 154 Inmate Housing Assignment Change |
| Attachment | G - | ASU Activity Workbook (English) |
| Attachment | H - | CDC 128-B ASU Health Care Appliance Inventory Chrono |
| Attachment | I - | CDC 1083 Inmate Property Inventory Sheet |
| Attachment | J - | Health Care Appliance Identification Form |
| Attachment | K - | Cell Search Log |
| Attachment | L - | Exhibit B Cell Inspection Form |
| Attachment | M - | Identifying Marker |
| Attachment | N - | CDC 114-A Inmate Segregation Record |
| Attachment | O - | CDC 1882-B Double Cell Review |
| Attachment | P - | ASU Release Form |
| Attachment | Q - | CDC Form 128 B, General Chrono Multi-Powered Loaner Program Agreement |
| Attachment | R - | Multi-Powered Radio Distribution Log |
| Attachment | S - | Medical Emergency Response Drill Report |
| Attachment | T - | ICC Non-Disciplinary Segregation (NDS) Tracking Form |
| Attachment | U - | Non Disciplinary Segregation (NDS) Personal Property Matrix (Rev 8/14/13) |
| Attachment | V - | Welfare Check Tracking Sheet |
| Attachment | W - | Daily Health Care Appliance Inspection Log |
| Attachment | X - | ASU Activity Workbook (Spanish) |
| Attachment | Y - | Weekly Review of Inmate Segregation Profile Record |
| Attachment | Z - | Cell Search Monitoring Sheet |

Approved:

CHRISTIAN PFEIFFER
Warden
Kern Valley State Prison

Date: 11/27/19

# Exhibit B

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

I. **PLAN TITLE AND NUMBER:**

Operational Procedure Number: 301

Operational Procedure Title:    Administrative Segregation Overflow Unit (ASOU)

II. **PURPOSE AND OBJECTIVE:**

A. The purpose of this procedure is to establish specific security and operational guidelines for the ASOU and ensure operational compliance with the California Code of Regulations (CCR), Title 15.

B. The objective of this procedure is to provide safe and secure segregated housing for inmates classified as either a threat to the safety and security of the institution; a threat to their own safety or the safety of others; or whose continued presence in the general population would jeopardize the integrity of an ongoing investigation into serious misconduct or criminal activity.

C. In the event a need for an Administrative Segregation Unit (ASU) bed is needed and there is no available space in Short Term Restricted Housing (STRH) or ASUII the Warden shall authorize an additional ASU in Facility B Building 1 (B1).

III. **REFERENCES:**

The CCR, Title 15, Sections 3275 through 3281 and Sections 3335 through 3345.

IV. **APPROVAL AND REVIEW:**

A. This procedure requires the approval of the Warden.

B. This procedure will be reviewed annually in January, by the Associate Warden, Complex I.

**ANNUAL/REVISED: January 2020**

V. **RESPONSIBILITY:**

A. The Associate Warden, Complex I shall be administratively responsible for the operation of the ASOU. The Facility B Captain shall be responsible for functional operations of ASOU. Facility B Captain will ensure compliance with all policies and procedures, as well as any applicable court mandates.

B. The Facility B Lieutenant shall be responsible for the day to day operations of the ASOU. They shall ensure strict compliance with policies and procedures is maintained at all times.

C. The Chief Executive Officer (CEO) shall be responsible for the overall health care services provided to inmates housed in the ASOU.

D. All staff assigned to the ASOU, or who provide services to the ASOU, shall become familiar with this procedure.

VI. **POLICY STATEMENT:**

It is the policy of the Department of Corrections and Rehabilitation to provide housing separate from General Population for Inmates who for various reasons, cannot be housed in a General Population setting without endangering institution security or the safety of themselves and/or others. Such housing is defined as an Administrative Segregation Unit.

VII. **ASOU STAFFING PROFILE:**

180 Design ASOU (i.e. B1):

Anytime an additional 180 design-housing unit is activated as an ASU due to unavailable bed space for inmates requiring ASU housing, additional staffing will be established uniformly, above base staffing, in compliance with the standardized staffing model **(Attachment A)** for Facility B, Building 1 ASOU as follows:

First Watch:
- One (1) Floor Officer if one (1) inmate is housed in ASOU.

Second Watch:
- One (1) Security Patrol (SEC PAT) Officer if there are a minimum of ten (10) inmates housed in ASOU.

- Two (2) Escort Officers if there are a minimum of twenty (20) inmates housed in the ASOU.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

- One (1) Yard Officer if there are a minimum of twenty (20) inmates housed in the ASOU.

- Second (2nd) SEC PAT Officer if there are a minimum of thirty (30) inmates housed in the ASOU.

Third Watch:
- One (1) SEC PAC Officer if there are a minimum of twenty (20) inmates housed in the ASOU.

- Second (2nd) SEC PAT Officer if there are a minimum of thirty (30) inmates housed in the ASOU.

VIII. **CRITERIA FOR PLACEMENT IN AN ASU:**

An inmate may be placed into an ASU, when it has been determined, his presence within the General Population (GP) would:

A. Presents an Immediate Threat to the Safety of Self or Others.

B. Jeopardizes Integrity of an Investigation of Alleged Serious Misconduct or Criminal Activity.

C. Endangers Institution Security.

D. Upon Release from Segregation, No Bed Available in General Population.

IX. **DOCUMENTATION FOR ASU PLACEMENT:**

Authority to place an inmate in an ASU may not be delegated below the staff level of Correctional Lieutenant and/or Correctional Counselor II (CCII) Supervisor. The sending facility is responsible for completing and forwarding all documents, appliances, and medication to the ASU. Staff shall utilize the ASU Placement Cover Sheet **(Attachment B)** to ensure all forms are completed as follows:

A. Administrative Segregation Unit Placement Notice (ASUPN) **(Attachment C)**. When an inmate is placed on ASU status, the reason for the placement shall be documented on an ASUPN with the exception of ASU Lay-Overs staying overnight only. The official ordering the

segregated housing shall complete this document. Pursuant to CCR Section 3335.5 *Exclusions, (b) Lay-Overs*; Lay-Overs may be placed in ASU without being on ASU status. As such a 128B-ASU Lay-Over Chrono **(Attachment D)** is sufficient and an ASUPN is not required.

In the event an Inmate will be placed in an ASU as a Lay-over exceeding 24 hours, an ASUPN shall be required to ensure due-process. In such cases the Classification and Paroles Representative (C&PR) is required to track these Inmates to ensure they are scheduled to depart as scheduled and not overlooked.

B. CDC 114-A1, Inmate Segregation Profile **(Attachment E)**, shall be completed on all inmates placed in an ASU by the sending facility. This document shall be signed by a Correctional Lieutenant or higher ranking official. The CDC 114-A1 shall be updated at least every 90 days or as required to maintain current information.

C. A CDCR 7219, Medical Report of Injury or Unusual Occurrence **(Attachment F)**.

D. Form GA-154, Inmate Housing Assignment Change **(Attachment G)** shall be completed for single cell inmates.

E. Picture Identification.

F. Upon the determination that an Inmate/Patient's (I/P's) bed assignment change will cause the I/P to receive medications from a different medication administration location, the following procedure shall be followed:

The inmate pending bed assignments in the Strategic Offender Management System (SOMS) shall be processed by Central Control.

Central Control staff shall notify the sending facility sergeant that the Inmate Population Tracking Report (IPTR 149) form can be printed from: **SOMS>PRISON>REPORTS>POPULATION TRACKING REPORT>PENDING BED ASSIGNMENTS>CURRENT LOCATION**

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

(enter KVSP)>FACILITY (enter facility)>DATE>SUBMIT.

The sending facility custody staff shall print out the IPTR 149 report prior to moving any I/P whose bed change will result in a change of medication administration location. Custody staff shall provide a copy of the IPTR 149 to each medication administration staff Licensed Vocational Nurse (LVN)/Psychiatric Technician (PT), in the sending facility clinic.

The sending LVN/PT will note whether the I/P has Nurse Administered (NA)/Direct Observation Therapy (DOT) and/or Keep-on-Person (KOP) medications and sign and date the IPTR 149. Once the IPTR 149 has been signed by the sending LVN/PT, the move can be completed.

Licensed nursing staff shall check the I/P on the report against the current electronic Medication Administration Record (eMAR) to determine the need to have medications relocated with the I/P to include NA/DOT and KOP medications.

Custody staff shall retain a signed copy of the IPTR 149 in the sending facility sergeant's office on a clip board. *NOTE: Notification to licensed nursing staff of I/P movement that does not change the medication administration location will no longer be required.*

Should SOMS be offline or the move accepted before the IPTR 149 could be printed, IPTR 150 may be printed and used in place of the IPTR 149. All signatures and routing shall remain the same as the IPTR 149. A short explanation shall be written on the IPTR 150 justifying its use.

G. CDC 128-B Health Care Appliances and Inventory Chrono **(Attachment H)**. A facility staff will collect, separate, and inventory all Health Care appliances prior to delivering to ASOU. A facility supervisor will check SOMS to ensure all appliances have been collected and complete the Inventory Chrono.

H. A CDCR 1083, Inmate Property Inventory **(Attachment I)**. This form shall be delivered with the inmate's property. It is the lieutenant's responsibility to ensure the CDCR 1083 is completed appropriately, signed, and included with the ASUPN. In the event the inmate refuses to sign the CDCR 1083, it must be signed by the author and the facility sergeant.

I. B1 staff shall not accept an inmate into an ASOU without completion of a 128-MH7. The Mental Health 128-MH7 form shall be completed by the sending facility LVN, nurse, or psych tech. The Facility B supervisor shall verify the 128-MH7 has been completed by noting the LVN, nurse, or psych tech signature on the 7219 noting the 128-MH7 has been completed. The 7219 shall be maintained in the inmate's segregation file and filed into Electronic Records Management System (ERMS) upon the inmates discharge from ASOU. The 128-MH7 is a confidential mental health assessment of the inmate and shall not be included in the documents for ASU placement.

J. When two inmates are being celled together for ASU placement the sending facility shall complete a CDC 1882-B Double Cell Review form **(Attachment J)**.

K. Prior to the initial placement of two inmates into an assigned cell, the Facility B Sergeant/Lieutenant will ensure a review of the enemy/victimization history is completed. The victimization history review shall include a review of each inmate's Precaution Alert Tab on the SOMS. If an inmate is identified as "At Risk as a Victim", they shall not be housed with an inmate identified as "At Risk as an Abuser".

X. **INTAKE:**

**No inmate shall be accepted into an ASOU without the required documentation. B1/ASOU staff shall process new arrivals in a timely manner. When placing an inmate in the ASOU, staff shall place single cell inmates in cells 116 to 120 or 216 to 220 for the first 72 hours of placement. If an inmate will be double celled for the first 72 hours of placement, it is not necessary to utilize these**

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

cells. **After 72 hours, inmates may be housed in alternate ASOU housing consistent with their case factors.**

A.  B1 B-Section shall be initially utilized until the section is full. Once full, C-Section will intake ASOU inmates until this section is full. Once B and C-Sections are full, A-Section will be utilized.

B.  The inmate shall be placed in an available holding cell and submit to an unclothed body search by B1/ASOU staff.

C.  All state clothing shall be taken from the inmate and returned to the laundry, new clothing will be issued.

D.  The inmates' personal property shall be processed and delivered to the ASOU by the sending facility. All property will be logged in the ASOU property log book. All Health Care Appliances will be delivered to the Facility B Supervisor.

E.  The Facility B Supervisor will verify and inventory all parts associated with each appliance and document the information on the Health Care Appliance Identification form **(Attachment K)**. Copies of this form shall be distributed as outlined in section XXX Authorized Health Care Appliances.

F.  The cell the inmate is being assigned to, will be thoroughly searched and inspected before the inmate is permitted to occupy the cell. This inspection and any discrepancies found during the search shall be noted on the Cell Search Log Sheet **(Attachment L)**, and the Exhibit B Cell Inspection Form **(Attachment M)**. The Facility B supervisor shall log all searches in the unit Master Cell Search Log book utilizing the Cell Search Monitoring Sheet **(Attachment N)**.

G.  B1/ASOU staff shall place a color coded name tag, a copy of the inmates picture ID, and an Intake Marker on the door of the cell the inmate is occupying.

H.  Identifying Markers **(Attachment O)**, including the word "INTAKE", inmate's name, CDCR Number, and date of ASOU

placement, shall be maintained on the cell door for the first 21 days of placement.

I.  The Facility B supervisor responsible for the ASOU will ensure each inmate is issued an "ASU Activity Workbook" **(Attachment P) (Spanish - Attachment Q)** during their initial placement into ASU. This shall be documented on the "CDC 114-A Inmate Segregation Record" **(Attachment R)**. The Facility B supervisor is to monitor the "ASU Activity Workbooks" and work with the "Suicide Prevention and Response Focused Improvement Team (SPR FIT) Coordinator" to ensure inventories of the "ASU Activity Workbook" are maintained for distribution to inmates initially placed in ASOU.

**XI.  DETENTION/SEGREGATION RECORDS:**

A.  ASU Isolation Log: An isolation log shall be maintained in the ASOU. All staff and approved visitors shall sign in and out on this log. It is to be kept on a podium near the entrance to the unit. It is the responsibility of all B1/ASOU staff to ensure this log is utilized and maintained properly. All approved visitors shall be accompanied and escorted by custody staff at all times while on the tier. Inmate movement into and out of the unit, regardless of reason, shall be recorded in the isolation log.

B.  Segregation Records: A CDC 114-A Inmate Segregation Record File **(Attachment R)** shall be prepared on each inmate placed in ASOU. The left side of this file will consist of a copy of the CDC 114-D Administrative Segregation Placement Notice, CDC 114-A1 Inmate Profile Sheet, Cell Inspection Sheet (Exhibit B), CDC 1882-B Double Cell Review form **(Attachment J)**, and any other relevant document(s) pertaining to the individual inmate or cell. The right side of the file shall contain completed CDC 114-A's.

   1.  All segregation records are legal documents. The accuracy in maintaining these records is imperative. Staff members recording information on these documents must write LEGIBLY and sign their first initial and full last name.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

2.  All staff assigned to the unit shall record all inmate activities on each inmate's individual CDC 114-A. Such activities shall include but are not limited to:

    - Showers
    - Yard release
    - Exercise yard times and refusal as applicable
    - No yard due to state of emergency, inclement weather etc...
    - Trash emptied – supplies issued
    - Clothing / linen exchange
    - Meals
    - Interviews and examinations
    - Leaving/ returning from ASOU and reason
    - Suicide Prevention
    - Any other unusual or special circumstance
    - All RVR hearing processes including Investigative Employee and Staff Assistant interviews
    - Medication and refusals to take medications
    - Cell Inspections

3.  Record of daily activity:

    All inmate activities/contacts must be documented in detail. Staff completing this record shall record all program, activities and services afforded segregated inmates. Staff shall additionally document any unusual behavior displayed by the inmate while confined in segregation.

    Appropriate Symbols to be used in columns:

    a.  X    Item completed (applicable to; cell search cell inspection, shower, supplies issued, linen exchange, clothing exchange, medical/psychiatric contact, administrative contact visit legal library, meal, trash disposal, cell maintenance /repair, count, time out to yard,

    time in from yard.

    Item completed (applicable to; cell search cell inspection, shower, supplies issued, linen exchange, clothing exchange, medical/psychiatric contact, administrative contact visit legal library, meal, trash disposal, cell maintenance /repair, count, time out to yard, time in from yard.

    b.  R    Refused
    c.  S    Security
    d.  M    Medication
    e.  M    Doctor/Register Nurse (RN)
    f.  D    Dental
    g.  P    Psychiatric

    All entries within the columns utilizing symbols R or S will be accompanied with an explanation in the "Staff Comment Section, i.e.., Refused yard due to weather, sick; refused lunch not hungry, hunger strike; refused to step to back of cell, etc.

4.  Staff Comments:

    The area denoted as staff comments will be used to record the following:

    a.  Cell Search = List of confiscated items (logged in Cell Search Log Book)
    b.  Cell Inspection
    c.  Shower
    d.  Supplies = specifically list supplies issued
    e.  Linen Exchange
    f.  Clothing Exchange
    g.  Medical/Psychiatric Contact
    h.  Administrative Contact
    i.  Visit = Time out and return from visit
    j.  Legal Library = Time out and return from Law Library (Logged in Law Library Book)
    k.  Meal noted by B, L, D for Breakfast, Lunch or Dinner or R for a refusal
    l.  Trash Disposal

DEPARTMENT OF CORRECTIONS AND REHABILITATION
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

m. Cell Maintenance/Repair

n. Count

o. Yard = Time out to yard, Time in from yard.

p. Any adaptive support for a Developmental Disability Program (DDP) inmate as well as the adaptive support logs

q. Disruptive Behavior = Any and all acts of misbehavior will be recorded

r. Any and all documents served (RVR, etc.)

s. Disciplinary hearings results

t. Interviews, inmate appeals etc.

Facility B Sergeants and/or Lieutenants shall document a review of every ASOU inmate's CDC 114 A on the Weekly Review of Inmate Segregation Profile/Record Spreadsheet **(Attachment S).** The spreadsheet shall be reviewed by the Captain and Associate Warden weekly. The spreadsheet shall be forwarded to the Warden or designee weekly indicating any deficiencies and corrective action provided to appropriate staff(s). The purpose of this review is to ensure conditions of confinement are being met and documented, and appropriate remarks by other staff are being entered. Supervisors who complete the review shall record this review in the inmates individual CDC 114-A in red ink only.

5. Tracking

The Facility B Sergeants are tasked with inputting data relative to the tracking of the inmates placed in the retrofitted 72-hour intake cells on the "ASU Intake Cell Management Tracking Log" located on the Division of Adult (DAI) SharePoint.

http://teamsite/team/Ops/AO/DAI/SiteP ages/ASU%20Intake%20Cell%20Mana gement%20Tracking%20Log.aspx

C. Administrative Timelines:

1. CDC 114-D, Administrative Review Hearing by the Facility Captains regarding the reason for placement into

an ASU takes place the first business day following placement into an ASU.

2. Initial Institution Classification Committee (ICC) review of ASOU placements will be within ten (10) days, but no sooner than 72 hours, unless waived by the inmate. There are no exceptions to this timeline.

3. All inmates in an ASU, at their 10 day review, shall be referred to the Classification Services Representative (CSR) for retention authorization. Instead of ICC reviewing each inmate's case every 30 days, inmates in an ASU for non-disciplinary reasons shall require routine review no more frequently than every 90 days or when scheduled by staff for specific action. Inmates segregated for disciplinary reasons shall be reviewed by ICC at least every 180 days or when scheduled by staff for specific action, such as, yard assignment, cell status, or change in reason for segregation. These cases shall be closely monitored by classification staff and shall be returned to ICC within 10 days of necessary action being completed, i.e. Rules Violation Report Hearing, determination of a referral to the District Attorney for criminal prosecution, court action, Investigative Services Unit action, etc. All cases must be referred to the CSR for retention at least 180 days after obtaining initial authority to retain.

XII. **AUTHORIZED RELEASE FROM AN ASU:**

Inmates who have been placed into an ASU may be released only by one of the following:

A. The official ordering the placement, or staff member of higher rank in the same chain of command, may withdraw an ASOU order before it is acted upon or prior to a hearing on the order after consulting with and obtaining the concurrence of the administrator of the general population unit in which the inmate shall be returned to or assigned.

B. The staff member conducting the administrative review. The administrative reviewer shall be at the rank of Captain or above. If the reviewer is functioning in an

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

acting capacity, the review must be co-signed by an Associate Warden or above. The Captain shall complete the Administrative Segregation Release form **(Attachment T)** identifying all inmates being released. The form shall be signed by the Captain or designee. A copy of the form shall be distributed to the Facility B Sergeant and Correctional Counselor.

C. Institutional Classification Committee. Upon completion of ICC, all inmates to be released from an ASU shall be placed on the Administrative Segregation Release Form. Once this form is prepared for the Chairperson's signature, the form shall be signed. Copies of the form shall be made and distributed to the B1 Correctional Counselor, and the Facility B Sergeant.

XIII.  **ASOU MEDICAL/MENTAL HEALTH SERVICES:**

A. All B1 and ASOU staff shall receive annual training on Uniformed Heat Trigger (UHT) procedures. Inmates identified as being included in the designated CCCMS may have a red placard affixed to the outside of their cell for facilitating mental health needs. Staff shall follow all UHT procedures in accordance with departmental guidelines.

1. When phase 1 of the UHT procedures is activated, heat risk inmates shall be returned to their assigned cell. When phase II UHT procedures are activated, identified inmates shall be afforded access to running water and/or misting and iced water. Fans shall also be provided for additional cooling measures as applicable. When phase III UHT procedures are activated, a clinician trained in identifying heat related illness shall observe heat risk inmates every two hours. B1/ASOU staff shall ensure they, and clinician staff, performing any UHT procedure record their observations and actions on each individual inmates CDC 114-A.

2. Staff shall remain cognizant of concerns posed with heat risk inmates regardless of phase of UHT procedure in progress. Inmates exhibiting any

form of heat related illness shall be immediately referred to medical staff. During a heat alert, heat risk inmates shall not be required to stand in direct sunlight to receive any authorized services.

3. The inmate shall keep in his cell certain medically prescribed life-sustaining medications directly issued to inmates for as needed use, such as inhalers and nitroglycerin tablets. Only authorized medical staff will distribute these items. Inmates are authorized to retain possession of "blister packs" in the amounts prescribed and dispensed by health care services in their cell.

If the blister pack is used for any reason constituting a safety or security threat, the inmate shall permanently lose the privilege of possessing the "blister pack" and the prescribed medication will be distributed via an alternate method. This loss of privilege shall be clearly documented on a CDCR 128B and recorded on the inmates respective CDC 114-A Inmate Segregation Record.

B. Medical Staff assigned to Facility B on second and third watch will be responsible for the distribution of medication in the unit. Sick call will be conducted as outlined within the post orders and pursuant to standardized health care services policies.

C. All requests for dental services will be made through the sick call process. Emergency appointments will be completed as needed.

D. Medication will be issued to the inmate within the time frame prescribed by the doctor/pharmacist and pursuant to institutional policy. Custody staff is prohibited from distributing medication.

E. When an inmate is given his medication, the assigned medical staff will follow approved medication administration protocol.

1. Refused medication will be returned to the pharmacy as per medical protocol. Such refusal of medication shall be noted in RED on the CDC 114-A.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

2. The inmate shall keep in his cell, certain medically prescribed, life-sustaining medications directly issued to inmates for as needed use, such as inhalers and nitroglycerin tablets. Only authorized medical staff will distribute these items.

F. If medical or mental health staff determine an inmate needs to be seen by a doctor and it is not an emergency, an appointment will be scheduled. The doctor will examine all ASOU inmates in the ASU Primary Care Clinic.

1. ASOU inmates requiring emergency medical attention will be escorted to the designated treatment area via the Emergency Response Vehicle (ERV). B1/ASOU staff will remain with the inmate during the course of the visit and return the inmate if and when it is deemed appropriate.

2. Confidential mental health interviews: All inmates housed in ASOU who meet with mental health staff should have their interviews in private settings (affording confidentiality of sight and sound from other inmates and confidentiality of sound from staff).

3. All individual/group therapy for inmates shall be conducted in a confidential setting. The officer(s) providing coverage will remain nearby, where the clinician can be seen but not overheard while the clinical interaction is taking place.

4. When the occasion occurs when the priority health care ducat(s) are not inclusive of the Daily Movement Sheet (DMS), custody staff in ASOU will ensure the requested inmates are escorted to the appointment ensuring them access to health care services. Inmates not on a ducat list may need to be seen in emergency or non-emergency situations. In the event an inmate needs to be seen for a non-ducated, non-emergency contact, health care and custody staff will coordinate a time to see the inmate as soon as possible the same day.

G. Inmates in ASOU shall have access to Health Care Services Request Form (CDCR 7362's). Health care staff shall distribute and collect CDCR Form 7362's from inmates on a daily basis. The RN/LVN/Licensed Psychiatric Therapist (LPT) shall distribute and collect CDCR Form 7362's during the daily medication administration rounds in the ASU. The RN/LVN/LPT shall document the rounds and sign in and out, noting the time in the CDCR Form 114, Isolation Log. The RN/LVN/LPT shall also document the services provided to each inmate on the respective CDCR Form 114 A, Inmate Segregation Record. Designated custody staff shall accompany health care staff during the daily rounds and at all times while on the tier. Inmates with clinical symptoms shall be seen the next business day in an appropriate medical setting for face-to-face triage.

XIV. **RESTRICTIONS:**

Inmates, who become so disruptive they endanger the safe operation of the ASOU or endanger the safety of themselves or others, may be placed on restriction status listed below. All status restrictions must be fully documented on the inmates CDC 114-A.

A. Restriction Status: An inmate who has proven to be disruptive in one or more areas of behavior may have specific restrictions imposed to control the behavior. The authority to place an inmate on restriction status shall be at a level of Correctional Lieutenant or above. Placement of restriction status will not exceed 10 days. Such placement will be fully documented on a CDC 128B as to the reason(s) for placement and the inclusive dates. The following controls will be implemented to effectively manage an unruly, disruptive or assaultive inmate:

1. Leg Restraint Status:

   a. Inmates placed on leg restraint status must have their ankles secured in leg restraints any time they are removed/escorted from their cell for any reason. These inmates may not be placed on lead chains with inmates who are not on leg restraint status.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

b. Leg restraint security precaution is imposed whenever there is risk the inmate will attempt to kick staff or other inmates, may try to run during escort, is threatening to injure others, or there is a possible security concern the use of leg restraints can limit.

c. Leg restraints must be used and placed on an inmate in compliance with the departmental use of force policy, CCR Title 15 Section 3268.2, and the procedures outlined in this operational procedure.

2. Spit Hood/Mask Status:

   a. Spit Mask security precaution is imposed whenever an inmate has spit upon, attempted to spit upon, or threatened to spit upon staff or other persons. Inmates placed on Spit Mask security precaution must wear a Spit Mask any time they are removed from their cell.

   b. Once the inmate is placed into restraints the inmate shall be instructed to face away from staff. The Spit Mask will then be placed over the inmate's head in the prescribed manner. The Spit Mask will remain in place for the entire time the inmate is out of his cell and under direct constraint supervision.

3. Paper Tray Status:
   Paper tray status is imposed whenever an inmate refuses to return his insulated food tray, uses the tray to commit a disciplinary offense, or attempts to break or deface the food tray. Inmates placed on paper tray status will be fed on paper trays for a period of up to 30 days, at the discretion of the Facility B Lieutenant.

4. Property Restriction:
   Limits the amount of property allowed in the cell. Imposed when an inmate uses state/personal property to prevent staff from observing activity in the cell (covers cell windows) and creates a situation, which may require a cell extraction. Usually imposed for a period of 10 days.

B. Policy on Flooding:
   Inmates who intentionally flood their cell or tier shall be issued a RVR and placed on 72-hour water restriction. The restriction entails the shut-off of the flush valve to the inmate's cell for a period not to exceed three calendar days. During this time, the inmate will be allowed to drink water and flush his toilet three times on each shift. In every instance when a 72-hour water restriction is imposed, the Facility B Lieutenant will be advised and the incident noted in the inmate's CDC 114-A file.

C. Policy on Refusing to Relinquish Restraints:
   Any inmate who refuses to allow staff to remove handcuffs, waist chains or any other approved restraints shall receive a RVR. With the approval of the Facility Captain or AOD, the use of a controlled use of force may be utilized to recover these items.

D. Use of the Security Triangle:
   Safety Triangle: This device is a handcuff retention device, used to prevent inmates from pulling restraint equipment into their cell and may be used at the discretion of on duty staff. Some reasons for using the safety triangle include, but are not limited to: rehousing an irate inmate who has threatened violence or an inmate who was just involved in a use of force incident. The safety triangle may remain attached to the handcuffs if the inmate is being relocated in the housing unit and if attaching and detaching the safety triangle to and from the handcuffs presents a safety concern. The safety triangle is not intended to control the inmate outside of the cell. The officer controlling the safety triangle must be vigilant and efforts should be directed to prevent the inmate from pulling their hands inside the cell while the door is being closed.

   In the event that an inmate who is attached to a triangle refuses to place their hands in the food/security port to allow the handcuffs to be removed, it may be necessary to pull the safety triangle to retrieve the handcuffs. When it is necessary to pull the safety triangle, a single staff member shall slowly move away from the door while holding onto the safety triangle, in order to bring the inmate's hands through the port. This will be conducted with extreme caution in order to

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

minimize the risk of injury to the inmate. Additional staff may be needed to assist with the safety triangle in the event that the one staff member is insufficient to get the inmate's hands through the food/cuff port. Once the inmate's hands, wrists, and forearms are through the port, staff will grasp the inmate's forearms, the tension on the safety triangle shall be released, and the handcuffs removed

E. Cell door food/handcuff, holding cell handcuff port, window, door and light covering policy:
Inmates shall not be allowed to cover cell lights, windows, or doors at any time. food/handcuff ports and holding cell handcuff ports are utilized to apply and remove handcuffs, dispense medications, supply meals, pick up trash and exchange clothing and linen. Holding cell handcuff ports shall be locked at all times after use. Immediately after use, the food/handcuff port will immediately be closed and locked. At no time shall the food/cuff port or holding cell food/handcuff port be left unattended when opened or unlocked. An unsecure food/handcuff port offers an inmate an unobstructed window through which he is able to expose body parts, partially or fully remove themselves from the cell or holding cell, propel darts, feces, urine, and other items capable of causing serious injury to staff and inmates.

1. For staff safety, prior to the food/cuff port being opened, the inmate(s) shall be instructed to turn on the cell light. Staff shall be able to clearly see the inmate's hands and determine the food/cuff port can safely be opened. If the inmate refuses to turn on the cell light, remove coverings from the cell light, door or window, the port shall not be opened.

   a. The inmate shall be informed his failure to follow orders shall constitute a passive refusal of the service being offered. Any inmate who obstructs the view inside his cell shall be written a RVR. The matter shall be documented in the inmate's CDC 114-A file.

   b. An inmate who refuses to allow staff to close and lock the food/cuff port poses an immediate threat to the safety and security of staff and inmates alike, and mandates suspension of the programming of the other inmates housed in the ASU section. This seriously impacts the ability of staff to provide services as required by law and departmental policy.

   If during routine duties, correctional officers encounter an inmate who refuses to allow staff to close and lock the food/handcuff port, an officer shall verbally order the inmate to relinquish control of the food/cuff port and allow staff to secure it. If the inmate refuses to relinquish control of the food/cuff port the officer is to relay to another custody staff to contact a supervisor while they back away from the cell and remain a safe distance from the open food/cuff port.

   If the supervisor is unable to resolve the issue a controlled use of force will be recommended to an administrator through the chain of command while custody staff continues to monitor the inmate and the unsecure food/handcuff port from a safe distance.

2. Occasions may arise when defiant inmates cover their cell door, window, thus blocking visual access into their assigned cell. If this occurs, the inmate shall be ordered to remove the item immediately. If the inmate refuses the order the Facility B Sergeant shall be notified.

3. If the supervisor is unable to obtain the inmate's compliance in the above situations, notification shall be made to the appropriate authority (Facility Captain/AOD) to initiate cell extraction procedures. It is imperative this procedure is followed in a timely manner, as there is no ability to ascertain what activity is taking place in the affected cell, e.g. in cell assaults, medical emergencies, illegal activities, escape attempts.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

## XV. ESCORT PROCEDURES:

A. Prior to removing the inmate from his cell, staff shall positively identify the inmate. The inmate shall be instructed to turn his cell light on and remove all braids and ponytails. The inmate shall be instructed to remove all clothing items and submit to an unclothed body search prior to being removed from cell. The inmate shall then be instructed to place his back to the door and extend his arms through the food/cuff port with the back of his hands together, thumbs up. Once the handcuffs are applied, the inmate will retract his arms from the food/cuff port and remain standing with his back against the door.

If two inmates are assigned to the cell, both inmates shall be placed in handcuffs before the door is opened. Staff shall first place the inmate who is to remain in the cell in handcuffs, and instruct him to go to the rear of the cell, sit at the table and remain facing away from staff.

B. Once the handcuffs are secured on the inmate's wrist, custody staff shall place a hand directly on the cell door they want the control booth officer to open. The escorting officer will establish verbal and visual communication with the control booth officer in order to ensure the correct door is being opened. In response, the control booth officer will be attentive to the direction being given by the escorting officer. The control booth officer will be required to acknowledge receipt of direction by communicating verbally and visually with the escorting officer. Once the cell door is opened custody staff will obtain control of the inmate, instruct the inmate to back out of the cell, step to the side (same direction of door travel), and signal for the door to be closed. Once the door is secured the inmate shall submit to a search by staff with the hand held metal detector. Once complete, the inmate shall be escorted to destination within unit (i.e., yard, medical, etc.)

C. Care is to be taken in the course of the body search, ensuring a comprehensive visual inspection of the inmate's entire body

inclusive of all body cavities, hair and extremities. All oral and physical prosthetic appliances shall be removed, by the inmate, and carefully examined and searched.

1. Handcuffs and leg irons shall be double locked.

2. At no time shall restraint devices be placed around an inmate's neck.

3. At no time shall inmates be handcuffed with their hands in front.

4. With the exception of an extreme emergency, inmates shall not be secured to stationary objects.

5. When escorting ASU inmates, the escorting officer(s) will have their expandable baton drawn in the closed position and the escort will be "hands-on" at all times unless a lead chain is utilized for multiple inmate escorts. The baton should not be carried in the extended position unless it is being utilized for the protection of inmates and staff.

6. During all in-house escorts (e.g. yard, shower, etc.) inmates shall be attired in boxer shorts, t-shirts and canvas shoes, orthopedic shoes or shower shoes. During escorts outside the ASOU, inmates will be attired in a jumpsuit, t-shirt, under shorts, socks and canvas or orthopedic shoes. While under escort inmates shall not stop or impede the escort for any reason. ASOU inmates shall be secured in leg restraints for all escorts outside of the ASOU. ASOU inmates are not required to be in leg restraints while being escorted to the yard as this is considered an in-house escort. The Facility B Sergeant shall identify inmates requiring additional escort coverage or restraint gear. Escorting officer(s) shall maintain hands-on control of the inmate(s) at all times and escort to the intended destination without delay.

7. A lead chain will be utilized when escorting more than two inmates at one time. They will be utilized most often when processing inmates from ASU to medical, visiting, etc. Lead chains can accommodate up to six inmates, requiring

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

a minimum of three officers to conduct the escort.

8. If an ASU inmate is disabled, requiring the use of a medical assistive device, such as crutches, cane, or prosthesis, to assist him in walking, a wheelchair may be utilized during the escort. The inmate shall be escorted in waist restraints at all times. The following procedure shall be used for applying waist restraints on wheelchair bound inmates located in a secured area (cell, holding cell, etc.):

Staff shall place the padlock on the last two (2) rings of the waist restraint chain, making the chain into a large circle. Staff shall instruct the inmate to place both his hands through the security port. Staff shall place the handcuffs of the waist chain onto both wrists (key holes facing up) of the inmate and double lock. Staff shall then instruct the inmate to pull his hands, including the waist restraints, through the security port. Staff shall instruct the inmate to grab the lock on the waist chain, open up the waist chain into a circle, and place the waist chain over his head with the lock toward the inmates back. Staff shall instruct the inmate to place one (1) arm at a time through the waist chain. Staff shall instruct the inmate to lean forward slightly, which will allow the waist chain to slide down his back resulting in the chain completely around the inmate's waist. Staff shall open the cell door and instruct the inmate to "wheel" himself out of the cell. As soon as the inmate has exited the cell, staff shall position themselves behind the inmate and instruct the inmate to lean forward in the wheel chair. Staff shall pull the waist chains tight around the inmate's waist, fold the waist chains together, and affix a second padlock, locking the waist chains securely around the inmate's waist. Staff shall assist the inmate out of the wheel chair to another chair, which has been searched and is free of contraband. Staff shall search the inmate and the inmate's wheelchair to ensure no contraband is present. Once the searches are complete, staff

shall assist the inmate back into his wheelchair and complete the escort.

When the escort is complete, and the inmate is going to be removed from restraints, staff shall remove the restraints in the reverse order they were applied.

One 16-inch length of chain with loops at each end and two padlocks attached are available for use during this process for inmates whose abdominal girth exceeds the waist restraint.

Pursuant to the Armstrong decision, inmates will be allowed to retain in their cell, any and all medical device(s) prescribed for in cell use by a medical doctor. Staff should determine appropriate security precautions on an individual basis when escorting an inmate who is disabled.

XVI.   **INMATE MAIL:**

A. Inmates shall be allowed to possess no more than a combination of five (total) magazines, newspapers and paperback books in their cell at a time. Old newspapers will be destroyed. Magazines, paperback books and newspapers shall be exchanged on a one-for-one basis. Old magazines may be donated to the inmate library or sent home at the inmate's expense. Inmates shall not be permitted to exchange or pass any items with other inmates.

B. Inmate mail will be processed in accordance with local procedures. Incoming mail bags (Legal and Non-Legal) will be dropped off at Central Control by institutional mailroom staff prior to third watch. Third watch B1/ASOU staff will distribute mail during the 1630-hour count.

C. Third watch B1/ASOU staff will pick up outgoing mail during the 2115-hour count. The mail will be collected and delivered to the control booth officer for review by first watch staff. First watch B1/ASOU staff shall bring the mailbag to Central Control at the end of their shift. Institutional mailroom staff shall pick up the outgoing mailbag the following morning during second watch.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

D. Incoming legal mail shall be distributed by designated Facility B staff. This staff member shall open the mail in the presence of the inmate to ensure no contraband is present. Staff shall not read the contents of confidential mail. Staff will document the delivery of all legal mail on the inmates CDC 114-A, in addition to completing the legal mail log. Inmates must sign for all legal correspondence they receive. Failure to do so will be considered a refusal to accept the correspondence, which will then be returned to the mailroom for disposition. If contraband is discovered, the envelope and all contents will be confiscated. A supervisor will be notified immediately.

E. Outgoing legal mail will be picked up by B1/ASOU staff during the 2115-hour count. All incoming and outgoing confidential correspondence must be in compliance with CCR, Title 15, Sections 3142 and 3143, as well as current operating procedures.

XVII. **CANTEEN/PACKAGES:**

A. Inmates housed in ASOU may purchase and receive some canteen items. Not all canteen items allowed to the general inmate population will be permitted to inmates housed in an ASU. The abbreviated canteen list for inmates in ASU shall be approved by the Chief Deputy Warden or Warden.

B. The maximum allowable canteen draw for inmates housed in ASU is $55.00 each month (Privilege Group D).

C. Cosmetics and canteen items may be removed by staff from their original containers and placed into alternate containers if the original container or packaging presents a threat to the institutional security. Over The Counter (OTC) medications, Keep on Person (KOP) medications and canteen items may not be removed by staff from their original containers and placed into alternate containers unless the original container or packaging presents a threat to institutional security or safety.

D. A packaging restriction for safety and security concerns must be supported by a guilty finding in a disciplinary hearing for a serious rule violation involving the misuse of a product and/or its packaging by a specific inmate. The Facility B Sergeant on duty shall generate a 128B Chrono identifying the specific product(s) to be restricted and the specific inmate. Restoration of access to original packaging shall be by written recommendation of the Facility B Sergeant or Lieutenant with review and approval by the Facility Captain.

E. The canteen draw schedule is based on the inmate's last two (2) digits of his identification number. First draw is 00-33; second draw is 34-66; and, third draw is 67-99.

F. Monthly schedules for draws will be published and distributed to ASOU by canteen staff.

G. The inmate must turn in a Canteen Order Form, CDC 184, to a B1/ASOU staff by 1400 hours the Wednesday prior to their designated draw. Canteen will be processed and delivered by a B1/ASOU staff on the following Friday.

H. Inmates housed in ASOU will be authorized to complete only one canteen order form each month. There will be no open lines or make-up draws.

I. Canteen orders will be confirmed by a B1/ASOU staff, and then delivered to the canteen. The officer will inventory the items and confirm the charges with the sales receipt. If the order is correct, the inmate will sign the canteen order form, which will be retained by the issuing B1/ASOU staff and maintained canteen order file.

J. Approval of the yearly package is at the discretion of the Warden or Chief Deputy Warden. Pursuant to the CCR, Title 15, Section 3044(g)(4)(E), inmates may be permitted to receive one package (not to exceed 30 pounds) after completion of one year of Privilege Group D assignment.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

K. Packages in excess of 30 pounds will be returned to the sender at the inmates' expense. Food items determined to be unauthorized for issuance to the inmate will be returned to the sender at the expense of the inmate. The inmate also has the option to donate or destroy unauthorized items. Controlling date will be the date received at Receiving and Release (R&R); postmark date will not be the deciding factor.

L. A B1/ASOU staff will be responsible for the issuance of yearly packages to inmates housed in ASOU. Any packages ordered after ASU placement and received prior to the 1-year date, shall be returned at the inmate's expense.

M. Special canteen purchases of magazines or books:

1. Inmates who wish to order magazines or books shall fill out a CDC 193, Trust Account Withdrawal Order form, and a special purchase order form and have it approved by the Facility Captain.

2. Books shall be recorded on the inmate's CDC 104, Property Card by R&R staff prior to being issued to the inmate.

3. Each inmate will sign acknowledging receipt of the books. If an inmate is in possession of the allowable amount of books, the inmate must exchange, on a one-for-one basis, each new book. If the inmate does not wish to exchange any books, the inmate will sign receiving the items and will be added to his personal property stored in B1. If the inmate refuses to sign for the purchase, the items will be returned at the inmate's expense. No inmate may purchase special canteen until they are endorsed for ASU retention by the CSR.

XVIII. **ALLOWABLE PROPERTY:**

A. The sending facility will inventory the inmate's personal property. The officer filling out the property inventory form will take the form to the inmate for a signature and/or verification of property. One (1) copy of the inventory form will be given to the inmate, one (1) copy will be placed inside the inmate's property box, one (1) copy will be firmly attached to the outside of the inventoried box and one (1) copy will be retained by the sending facility. All property will be boxed. No bags of any kind are authorized.

B. After the inmate has gone through his initial 10-day ICC review, he may request to receive the allowable ASU property. All requests must be approved by the Facility B supervisor and processed by the B1/ASOU staff.

C. Prior to housing, B1/ASOU staff will issue the inmate an appropriate issue of state clothing, writing supplies and initial issue of personal hygiene items.

D. State issue clothing and bedding. Each inmate assigned to the ASOU is authorized the below listed standard clothing and bedding complement:

- Four under shorts (2 laundries weekly)
- Four T-shirts (2 laundries weekly)
- One blanket, two during winter months (exchanged every six months)
- Two sheets (exchanged weekly)
- Four pair of socks (2 laundries weekly)
- Two bath towels (1 laundry weekly)
- One denim jacket (Without metal buttons during inclement weather periods identified as October 1st through April 1st. Custody shall inspect the jackets to ensure they are free of metal and contraband prior to issuance. Inmates must sign a trust withdrawal form for the denim jacket)

  Inmates will be responsible to maintain state issued clothing. Failure to properly maintain the assigned clothing issue will result in disciplinary action and the inmate being charged for the cost of replacement or repair.

E. Personal Clothing/Property:

---

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

Inmates in an ASU may not possess or purchase personal clothing of any kind with the exception of personal (inmate purchase) thermal underwear during inclement weather months only. The only approved personal articles an inmate will be allowed to possess are:

- Personal thermal underwear (inmate purchased) during inclement weather months
- Fifteen (15) photographs
- Five (5) letters
- Five (5) indigent envelopes
- One (1) comb (non-metal, palm type)
- Magazines, paperback books, newspapers, (any combination of 5 total)
- One (1) tablet of lined paper (without staples)
- Forty (40) envelopes and/or five indigent envelopes
- Forty (40) stamps
- One (1) address book
- Prescription glasses one (1), Non-prescription reading glasses one (1)
- Inmates housed in ASOU -- One (1) electrical appliance TV or Radio in cell based on mutual cellmate decision.
- The cable will be three feet in length and have both ends crimped with a cable connector.
- The coaxial cable shall be recorded on an ASU cell search log and the 114-A.

The allowance of personal appliances (television or radio) in ASOU shall be limited to one (1) entertainment appliance per cell. The television and/or Radio must be purchased through an approved vendor, and must meet appropriate size and dimension requirements to fit the shelving installed in the cells to accommodate the appliance. One (1) digital antenna receiver and one (1) digital signal amplifier are authorized. All items must be authorized and from an approved vendor. Additionally, one (1) set of ear buds is authorized per inmate. Any alteration to the appliance will result in the appliance being removed from the cell immediately and disposed of per Institutional procedures.

All Inmates housed in the ASOU will have their property stored in the B1 property room. Inmates may request utilization of stored legal materials via written request of the B1/ASOU staff. All requests will be processed in an expedient manner.

F. State Issued Supplies:

G. The following supplies will be issued each Thursday by third watch staff:

1. One (1) roll of toilet paper (cardboard roll removed)

2. One (1) bar of soap (if "regular" size - one every two weeks, if small one a week)

3. Five (5) indigent envelopes (if qualified)

4. Five (5) sheets of writing paper

5. CDC forms 602, I/M request, Trust Withdraw, etc.

6. One (1) ounce of tooth powder

7. Dental Gliders (Indigent only, five 5 per week on one-for-one exchange)

8. Toothbrush - short handle / exchange every two (2) weeks (one-for-one)

9. Pen filler / exchange every two (2) weeks on a one-for-one basis only if needed.

H. Multi-Powered Radio Loaner Program

Upon completion of the administrative review, inmates shall be given the opportunity to be issued a radio and a set of ear buds. The supervisor responsible for ASOU will ensure the B1/ASOU staff issues a radio and ear buds to the inmate. The B1/ASOU staff will ensure the inmate completes the CDC Form 128 B, General Chrono Multi-Powered Loaner Program Agreement **(Attachment U)** prior to issuance. Once the loaner agreement is completed, the inmate may be issued the radio and ear buds. The B1/ASOU staff

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

will track issuance of the radio and ear buds on the Multi-Powered Radio Distribution Log **(Attachment V)**. B1/ASOU staff shall ensure the radio is in proper working order prior to issuance and upon return from the inmate.

If the inmate refuses to participate it shall be documented on the Attachment R as "NOT RX" under the date issued section of the form with the property officer signing the "Staff Issued" section.

Inmates who elect to participate in the multi-powered radio loaner program will be required to sign a CDC 193 trust withdrawal order form and will be allowed to utilize the radio in 21-day increments. If at the conclusion of the initial 21-day period the inmate, has not been released or received his personal entertainment appliance or is determined to be indigent, he may request additional 21-day periods in the program. Prior to granting any extension requests, priority shall be given to all newly placed ASOU inmates and then all indigent inmates.

Upon release from ASOU, the inmate will relinquish the radio; however, may retain possession of the ear buds. B1/ASOU staff must ensure the ear buds are placed on the inmates CDC Form 160-H Inmate Property Control Card. If the radio and ear buds are altered or destroyed, the Facility B supervisor shall determine if it was intentional or unintentional based on the circumstances and all available information. If it is deemed intentional, progressive discipline shall ensue as outlined in CCR, Title 15, Section 3312, Disciplinary Methods. In addition, the inmate will be charged the full replacement cost of the hand crank radio ($38.99) and the hand crank radio will be confiscated.

I.   Non Disciplinary Segregation (NDS)

Inmates placed in an ASU for non-disciplinary reasons shall be tracked and recorded by the ICC on the ICC NDS Tracking Form **(Attachment W).**

Inmates who have been designated as NDS inmates shall be allowed property in accordance with the NDS Personal Property Matrix (Rev 8/14/13).

**XIX.   HOUSEKEEPING PROCEDURES:**

Inmates are required to keep their assigned cells neat and clean at all times consistent with institutional procedures. Unit staff will ensure inmates are issued appropriate cleaning supplies as required.

A.   The cell will be swept and cleaned as necessary.

B.   Beds are to be made, and all personal property and state issued clothing will be properly stored.

C.   No articles will be suspended or affixed to the ceiling or walls of the cell.

D.   Windows will not be covered.

E.   Most cleaning supplies are caustic substances. Unit staff will ensure inmates do not possess more than is necessary.

F.   When vector control is needed within a specific location in B1, due to rodent and or insect infestation, the Facility B Sergeant will complete/submit a work order, contact plant operations, and identify the specific nature of the problem. If interior vector control is needed within a specific cell, the inmate or inmates will be re-housed in an alternative cell pending the completion of the vector control process.

**XX.   FEEDING PROCEDURES:**

A.   Inmates assigned to ASOU will receive the same meals as inmates assigned to GP housing units.

1.   Two (2) hot meals (breakfast and dinner) and one (1) sack lunch will be served daily.

2.   All meals will be served in and consumed within the assigned cell.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

3. All meals will be prepared at the Facility B Satellite Kitchen for cell feeding by B1/ASOU staff.

B. Serving utensils, trays and food carts will be inventoried and accounted for upon entrance to and prior to departure from the B1. The Facility B Satellite Kitchen will maintain a daily culinary inventory log to ensure accountability of all items.

C. Upon the arrival of the food carts, the food trays will be prepared by B1/ASOU staff and then distributed to the ASOU inmates.

D. The individual food trays will be placed on a serving cart and distributed to the assigned inmates.

E. All personnel assigned duties relevant to food preparation/distribution are to ensure hats and gloves are worn whenever handling food.

F. If an inmate refuses to eat, the refusal will be appropriately documented on their 114-A, and supervisory personnel will be notified.

**Hunger Strike:** Refer to Operational Procedure #804 Inmate Hunger Strikes (Custody) and Operational Procedure #1014 Inmate Hunger Strikes (Health Care).

1. The Facility B Sergeant, Lieutenant will prepare meal sample reports and submit it to the Food Services Manager, Watch Office (to be placed with the Daily Activity Report), and one (1) copy will remain on file in the unit.

2. At no time will there be more than one food/cuff port open per tier per section in B1.

3. After allowing the inmates an ample amount of time to finish their meal (not to exceed 15 minutes), all food trays (hot and cold) will be picked up and accounted for from each cell. Inmates are only allowed to retain one piece of fruit. They will surrender all trash and unconsumed food (i.e. milk carton, cereal box, etc.).

**XXI. PERSONAL CLEANLINESS:**

Inmate's assigned to ASOU, shall be provided the means to keep themselves clean and well-groomed. Showering and shaving shall be permitted at least three times a week.

When escorted to the shower, the inmate will be attired only in boxer shorts, t-shirt and soft shoes or shower shoes.

A. Authorized items to be taken to the shower are:

- One bar of soap
- One towel
- Shampoo

B. Inmates will be allowed to use nail clippers once every two (2) weeks. When requested, the inmate will be placed in a holding cell; staff will inspect the clippers and issue them to the inmate. Upon return, staff will again inspect the clippers to ensure they are intact. Any discrepancies will be reported immediately to a facility supervisor. For sanitary purposes, B1/ASOU staff will ensure nail clippers are sanitized after each use. The use of nail clippers will be done before the inmate showers.

C. Shaving will be accomplished by utilizing an electric clipper unit with electrical clippers during the inmate's assigned yard period and/or before their assigned shower period. B1/ASOU staff will maintain its tool inventory, a supply of clipper units and assorted clipper heads for clipping hair. Only one clipper head (regardless of size) will be issued at any time for use with the clipper unit, along with a small container of Barbicide to sterilize the clipper heads after each use. Barbicide will be issued to the inmates so they may sterilize the clipper heads following each use. All clipper units and heads will be inventoried before and after each use by the unit staff to ensure accountability.

**XXII. CELL SEARCHES:**

B1/ASOU staff will conduct routine cell searches. Each cell search will be completed in a systematic and concise manner. All areas within the cell, to include vents, fixtures,

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

mattresses, toilet, sink, desk, bunks and inmate property will be searched.

A. Second and third watch will each conduct at least three random cell searches a shift, not including empty cell inspections prior to and after inmate(s) occupy a cell.

B. A thorough cell search will be conducted prior to assignment of an inmate to a cell. Additionally, a search will be conducted upon the departure of an inmate from a cell.

C. During the course of normal daily activities, visual searches and inspections will be conducted to ensure all cell fixtures and equipment are serviceable and the cell is clean.

D. All cell searches shall be documented in all applicable areas of the cell search log, and CDC 114-A file for each inmate. All discrepancies will be noted and disciplinary action taken when appropriate. A cell search receipt will be issued after every cell search.

E. Every cell will be searched a minimum of once every 30 days.

XXIII. **LAW LIBRARY:**

ASOU inmates are provided law library access primarily via a computer work station; however, they may request access via "Paging." STRH is equipped with a computer workstation containing mandated legal reference material and case law. Each ASU is equipped with a holding cell designed for use with this mobile computer system.

The inmate will submit a request for interview to the B1/ASOU staff by Monday of each week.

The inmate will be scheduled and given access depending on the number of requests received and hours available. Preferred Legal User's (PLU's) will have priority. A list is generated weekly by the Librarian.

The inmate will be allowed a maximum of two hours (if time permits) of research time per visit, however the inmate is not required to use the entire two hours.

A. Copying:

The B1/ASOU staff will complete all copying requests. The inmate will turn in a request by Monday and the copies/materials will be delivered within the same week.

B. Book Exchange:

Leisure reading book exchange will be done every week by the B1/ASOU staff. The inmate must sign and submit a Trust Account Withdrawal Form to participate. If the inmate loses or damages a book, his signed trust account withdrawal will be submitted.

If the inmate moves out of the unit, they do not take books with them. They shall return all books to the floor staff prior to moving or their signed trust account withdrawal will be submitted.

Only one book per inmate, per week is allowed.

Inmates are required to fill out a trust account withdrawal form prior to being issued law books from the law library.

XXIV. **VISITING PROCEDURES:**

ASOU inmates are permitted visits with their approved visitors. All visits will be non-contact in the designated visiting rooms. All attorney contact visits will be allowed at the attorney's request, except in circumstances where there is documented evidence of extremely violent behavior demonstrated by the inmate.

All visits will be by appointment only, and will be restricted to 1-hour time limits, pursuant to local Visiting Procedures.

XXV. **ACCESS TO TELEPHONES:**

A. ASU inmates in privilege group 'D' are permitted telephone calls only in the following situations:

- Verified family emergencies.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

- Per the Litigation coordinator (i.e., court ordered, attorney contacts).

B. The Facility B Captain, Lieutenant or Correctional Counselor I or II must authorize telephone calls.

C. ASOU inmates deemed to be NDS are entitled to phone access in accordance with CCR, Title 15, Section 3282.

XXVI. **ASU EXERCISE YARD PROCEDURES:**

When KVSP DOM Supplement 52020.5.8, Limited Visibility Procedure is implemented, ASOU Yard activities may continue. Yard activities will be initiated in STRH when the yard video cameras can clearly see to the back of all the small exercise yards. The decision to initiate ASOU yard activities during limited visibility is at the discretion of the Facility B Lieutenant based on visibility of the yard area and appropriate safety and security through observation.

A. ASOU Yard Procedures:

STRH has twenty (20) management control yards. Inmates newly assigned to ASOU will be offered exercise yard at the next available yard for their assigned cell, and no sooner than 24-hours after placement. Inmates housed in ASOU are not required to be seen by classification committee prior to being offered exercise yard.

ASOU inmates will utilize the STRH management control yards until the ASOU meets twenty (20) or more capacity of Administration Segregation inmates.

A collaboration between STRH and B1/ASOU staff will be done to facilitate a yard schedule for both ASOU and STRH inmates. ASOU inmates will have a minimum of ten (10) hours of yard available to therm.

Once the ASOU inmate population has reached more than twenty (20) inmates, ASOU inmates will utilize the B1 small exercise modules adjacent to the B1 concrete yard. Inmates shall be afforded

access to yard in accordance with the following schedule:

**ASOU B-1 YARD SCHEDULE**

**MONDAY & WEDNESDAY**
0800-1200 – Cells 101 to 113
1200-1600 – Cells 114 to 126

**TUESDAY**
1400-1600 – Cells 221 to 232

**THURSDAY & SATURDAY**
0800-1200 – Cells 127 to 207
1200-1600 – Cells 208 to 220

**FRIDAY**
0800-1200 – Cells 221 to 232
1200-1400 – Cells 101 to 113
1400-1600 – Cells 114 to 126

**SUNDAY**
0800-1000 – Cells 127 to 207
1000-1200 – Cells 208 to 220
1200-1600 – Cells 221 to 232

**Yard hours will change every other week for identified cells mentioned above (e.g. am yard will go in pm and pm yard will go in am).**

1. The control booth will announce yard call ten minutes and five minutes prior to yard release, over the unit public address system.

2. When "Yard Call" is given, inmates scheduled and desiring to participate in yard will turn on their cell lights, stand at the door, and tell the floor officer they want to participate in yard.

3. The inmates clothing to be taken to the yard will be placed on the cell food/cuff port.

4. The escorting officer will conduct a thorough search of all clothing and property and conduct an unclothed body search of the inmate within his assigned cell.

5. In instances where two inmates are assigned to a cell, both inmates' property will be removed from the cell prior to the

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

commencement of the unclothed body search. At no time will inmates retrieve items once the search has been initiated. Once the inmate is restrained and removed from the cell, he will be allowed to carry his property to the yard.

6. Upon completion of the search, the inmate(s) will be handcuffed and escorted from the cell to the assigned yard.

7. Once placed on the yard, the inmate will be unrestrained.

8. Yard recall will be conducted the reverse of yard release. Escorting officers will report to the yard and individually remove each inmate from the yard.

9. All inmate clothing and items authorized for the yard will be thoroughly searched by the officer. Upon completion of an unclothed body search, the inmate will be placed in restraints and removed from the yard. A B1/ASOU staff will be positioned at the sally port and will conduct a search of the inmate utilizing a hand held metal detector. If clear, the inmate will be returned to his cell.

10. Inmates will not impede the progress of yard by stopping or conversing with others during the escort.

11. Inmates will be removed from the exercise yard upon approval by the Facility B Sergeant or Lieutenant for the following reasons:

- Illness /UHT Procedures
- Attorney Visits
- RVR Hearings
- Ducats
- Committee appearance
- Needs to be seen by a staff member
- Emergencies
- Disciplinary problems
- Completion of allotted yard time

12. Yard procedures will continue seven (7) days per week with the following exceptions:

- Limited Visibility (dependent upon visibility of the Yard area)
- Emergencies
- Lockdown
- Per institutional needs

13. The following items will be allowed out on the ASOU exercise yards:

- One (1) T-Shirt
- One (1) Pair Boxer Shorts
- One (1) Pair of socks
- One (1) Towel
- One (1) Pair of Soft Shoes (or medically prescribed orthopedic boots)
- A small amount of toilet paper not to exceed 1/8th of a roll
- One (1) state issue soap
- One (1) jumpsuit (during Inclement weather and laundered as needed)
- One (1) jacket during winter months as outlined in section XVII
- One (1) personal set of thermal underwear (shirt/pants) - inclement weather
- Assistive devices

B. Emergency Yard Procedures:

1. In the event of an emergency, the officer monitoring the yard will immediately activate the building alarm and notify staff.

2. If time permits, (great bodily injury or possible death is not imminent) ample warning (whistle or verbal commands) will be given before using any other force options.

3. Responding staff will not enter the yard area until sufficient staff has arrived and all inmates are lying face down on the yard. Staff will then enter upon orders from the supervisor in charge.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

## XXVII. EMERGENCIES:

A. Fire / Emergency Evacuation:

1. All assigned personnel will be familiar with existing institutional procedures relevant to emergency response and fire evacuation procedures.

2. The Facility B Sergeant will ensure all assigned staff is familiar with fire evacuation routes within the unit and knowledgeable in the use of appropriate firefighting equipment. Simulated monthly fire/emergency evacuation drills will be conducted by each shift under the direction of the Facility B Sergeant in order to audit the effectiveness of the procedure.

3. Based upon custody/security requirements, the following specific procedures for fire emergency evacuation of the ASOU will be followed in the event of major fire or natural disaster within the unit.

   a. The Facility B Sergeant will determine the severity of the situation and supervise the evacuation.
   b. B1/ASOU staff is responsible for conducting an orderly/safe evacuation of the unit under the direct supervision of the Facility B Sergeant. The B1 control booth officer will provide gun coverage inside the unit and release inmates from their cells electronically if appropriate. In the event the cells cannot be electronically operated, floor staff will manually release inmates.
   c. All inmates will be individually restrained, released, escorted to and secured inside the small management yards. The inmate's will be placed in to the small management yards. Staff will attempt to place inmates in groups according to compatibility. However, dependent on the severity of the situation, compatibility will not be a determining factor for placement. If circumstance dictates, B1/ASOU

staff may conduct an unlock of all cells, and will direct all affected inmates to the area in front of the B1 instructing them to assume a sitting position.
   d. To ensure the unit has been entirely evacuated, staff will conduct a cell-by-cell security check to assure all inmates have been evacuated.
   e. B1/ASOU staff will report to the area in front of the B1 upon the completion of the evacuation and summon/render appropriate medical assistance. Additionally, all inmates' status/whereabouts will be accounted for and staff will stand by for further instructions.
   f. When the situation has returned to normal, the inmates will be re-housed.
   g. ASOU will release inmates to the B1 exercise yard. All inmates will assume a seated position until ordered otherwise.

4. Fires, which do not require evacuation, will be extinguished by responding staff/and or the institution fire department.

5. The control booth officer will vent excessive amounts of smoke from the unit. The control booth officer will familiarize him/herself with the operation of the B1 vent zones.

6. Fire Prevention:

   a. Containers of flammable items will not be stored in B1.
   b. Clean laundry will be kept in storage cabinets with doors closed at all times, except when clothing is being issued.
   c. Accumulations of dirty laundry will be kept in containers away from areas readily accessible to inmates.
   d. Accumulations of waste paper will be kept in trash receptacles with fitted covers and kept away from areas readily accessible to inmates.
   e. The exhaust fan system will be checked weekly and plant operations notified promptly if the system is not functioning properly.

7. Reporting Fires/Emergencies:

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

a. In case of fire, dial the emergency number for the Fire Department (Ext. 222). Report all emergencies to the Facility B Sergeant, Lieutenant and Watch Commander.

b. Give the Fire Department the following information:

- Location of fire
- Person placing the call
- Type of fire, (i.e., electrical, fuel, etc.)

c. If a fire extinguisher or fire hose is used to extinguish a fire, staff will promptly notify the fire chief for replacement or recharge.

B. Staff Responding to Emergencies:

1. The Facility B Sergeant will respond to all emergencies and direct all operations. Although the presence of a Sergeant is preferred, the presence of a supervisor, manager or health care staff is not required to conduct an immediate extraction.

2. All B1/ASOU staff will respond to all emergencies in the yard and building areas.

3. Sufficient staff will only enter the yard at the direction of the supervisor.

4. Additional staff will be held in reserve outside the yard area until the situation is under control.

5. For an immediate extraction or emergency cell entry from a confined area such as a cell, holding cell, shower, or small exercise yard, extraction/entry team members shall be issued and utilize a riot helmet with protective face shield, protective vest, protective shield (22" wide by 48" long), hand held baton and handcuffs in accordance with DOM section 51020.12.2.

6. Action Taken:

a. Emergency response medical staff will assess inmates requiring

medical attention and take them immediately to the Correctional Treatment Center (CTC), if necessary.

b. All other inmates involved in the incident will be immediately searched and medically evaluated prior to determining if they can be returned to their cells.

7. Emergency Yard Evacuation:

a. The primary goal if an inmate has been seriously injured is to remove the victim in need of emergency medical attention without jeopardizing the safety of staff or inmates.

b. The Facility B Sergeant will ascertain which victim(s) need to be immediately removed due to injuries sustained. B1/ASOU staff will proceed to the staff office and don protective gear and shields.

c. Staff will instruct the non-injured inmate to exit the yard (restraints will be applied before the yard gate is opened) while the injured inmate lies face down on the ground. Once the non-injured inmate has been removed, the remaining inmate will be instructed to exit the yard. If the inmate is unable to move due to his injuries, staff will enter the yard with a shield and batons and place the inmate in restraints. Medical staff will conduct an evaluation and determine the extent of the injuries. The inmate will be moved only when it is reasonably safe to do so.

d. If the inmates on the affected yard refuse to comply with staff's instructions for being restrained and removed from the yard, a determination will be made on the need to use force.

e. Following an incident, the yard will be searched and evidence gathered and processed in accordance with Institutional Procedures.

C. Emergency Response Drills:

Monthly Emergency Response Drills **(Attachment X)** are to be conducted by all ASU's on each watch. These drills shall include regularly assigned custody staff, as well as medical personnel assigned to Facility B. The Facility Captains over the ASU's shall

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

submit a memorandum to their supervising Associate Warden for review and submission to the Chief Deputy Warden (CDW)/Warden for review and submission to Associate Director (AD) by the final day of each month in the form of a memorandum confirming compliance. The memorandum shall clearly spell out the specifics of each incident.

The type of emergency addressed in each month's drill shall be varied, for example, in January, response to a cell with an inmate trying to hang himself, and in February response to an inmate with self-inflicted cuts threatening additional cuts. This training shall be inclusive of custody and medical staff.

## XXVIII. INMATE WELFARE CHECKS:

A. An inmate security/welfare check is defined as a "personal observation" of the welfare of the inmate and the security of the cell in which an inmate is housed in any of the KVSP ASUs to include the ASOU. The security/welfare check shall include a visual/physical observation of a living, breathing inmate, free from obvious injury, ensuring the view into the cell is clear and unobstructed, and no damage to the cell and/or signs of any misconduct or self-injurious behavior.

B. Designated Correctional Officer positions are responsible for conducting Inmate welfare checks in each ASU as denoted below.

| | |
|---|---|
| Post OFO001 – ASOU Floor | 1/W |
| Post 221756 – B1 Floor 1 | 2/W |
| Post 221760 – B1 Floor 2 | 2/W |
| Post OFO004 - ASOU B1 Flr 1 | 2/W |
| Post OFO005 - ASOU SEC PAT 1 | 2/W |
| Post OFO006 - ASOU SEC PAT 2 | 2/W |
| Post OFO007 - ASOU Escort 1 | 2/W |
| Post OFO008 - ASOU Escort 2 | 2/W |
| Post 321757 – B1 Floor 1 | 3/W |
| Post 321761 – B1 Floor 2 | 3/W |
| Post OFO009 - ASOU B1 Flr 1 | 3/W |
| Post OFO010 - ASOU SEC PAT 1 | 3/W |
| Post OFO011 - ASOU SEC PAT 2 | 3/W |

C. **GUARD ONE:**

1. Use of the Guard One Rounds Tracker (Pipe):

   Staff will use the "Pipe" to record security/welfare checks. The assigned officer shall conduct a security/welfare check on each cell, twice an hour not to exceed 35 minutes between checks. The "Pipe" captures two levels of information, the time the security/welfare check was made and the location where the security/ Welfare Checks were conducted. The officer will touch the "Pipe" to each button which is affixed to each cell in their unit. This will electronically validate the officer was at a specific cell, at a specific time.

   Any disruptions to the security/welfare checks shall be documented in the housing unit isolation log book

2. Inmate Removal from Cell:

   During times when an inmate is out of their assigned cell for (yard, Classification committee, appointments, visiting, etc.), the assigned Correctional Officer will continue to conduct Security/Welfare Checks looking for damage and potential security concerns to that inmate(s) cell.

   Vacant cells:
   Officers are not required to conduct Security/Welfare Checks on cells where there are no inmate(s) assigned.

3. InterMaskProtocol Download and Unit Supervisory Review:

   At the completion of each shift, the officer conducting the Security/Welfare Checks will insert the "PIPE" into the InterMaskProtocol (IP) Downloader located in the Unit/Program Office for the unit supervisor's review. Once the IP download has been completed, the unit supervisor shall review all Security/Welfare Checks made during their shift using the Guard One Rounds Tracker Software installed on their designated work station. This review will ensure all Security/Welfare Checks have been completed at least twice an hour at staggered intervals not to exceed 35 minutes between checks.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

After the review, the unit supervisor will print the Guard One Rounds Tracker report and provide their signature and date of review. Should there be any discrepancies discovered during this review, the unit supervisor shall address the discrepancy, and if necessary, provide appropriate training with the responsible staff prior to the end of shift. The reports shall be retained in accordance to CDCR's records retention policies.

The Facility Captain responsible for oversight of their respective ASUs shall review the security/welfare checks made on a weekly basis using the Guard One Rounds Tracker Software to ensure proper documentation review and training are being completed in accordance with this procedure. The captain shall forward their findings in a memorandum format to their respective Associate Warden by the end of each working week with their findings, to include any training and/or adverse action recommended.

The Associate Warden is responsible for oversight of his respective ASUs shall review the security/welfare checks made on a monthly basis using the Guard One Rounds Tracker Software to ensure proper documentation review and training are being completed in accordance with this procedure.

Training:
The unit supervisor shall ensure all Officers tasked with conducting security/welfare checks are provided training regarding this procedure and the Guard One System equipment.

4. Equipment Malfunction:

In the event the Guard One Rounds Tracker software or equipment is not functioning properly, staff will immediately notify the custody supervisor for follow up. For any technical assistance regarding the Guard One Rounds Tracker System staff will contact Enterprise Information Services staff. If staff cannot return the Guard One Rounds Tracker software or equipment to

service in a timely manner, staff will utilize the manual methods detailed on the **(Attachment Y)** Original completed ASOU Welfare Check Tracking Sheets will be retained in Facility B records for a minimum of three years and an additional four years in KVSP records archives.

## XXIX.  SAFETY EQUIPMENT / KEY / TOOL CONTROL:

The Facility B Sergeant will ensure all safety equipment, i.e., cut down kit, chemical agents, mechanical restraints, batons, protective vests, keys and any assigned tools are accounted for, and properly secured at all times.

A. A unit inventory log will be maintained and all equipment, weapons and padlocks will be inventoried at the beginning and end of each shift by unit staff. All deficiencies / discrepancies will be immediately reported to the Facility B Sergeant or appropriate supervisor.

B. Maintenance Staff/Tools:

When maintenance staff enters the unit with assorted tools, only those tools needed to accomplish the job will be allowed to remain with the workers. All tools will be inventoried when entering and upon exit from the unit.

C. Emergency Inmate Work Crew:

Inmate workers are not authorized in the ASOU unless under emergency conditions, and with the approval from the Facility Captain.

B1/ASOU staff will conduct an unclothed body search of all inmate workers when entering and exiting the unit.

Upon completion of work, the cell will be searched and the floor officer will do a complete inventory of the tools.

If a tool cannot be accounted for, the Facility B Sergeant will be notified.  The Facility B Sergeant will notify the Facility B Lieutenant who will notify the Facility Captain or AOD within 30 minutes of learning of the situation, and a complete search of the area will be conducted.

D. Protective Vests:

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

A protective vest pool will be maintained in each B1 control booth. The Facility B Lieutenant has overall responsibility to ensure an effective system is in place to ensure accurate inventory, distribution, and cleaning of the vest pool. Each vest will be issued via the chit system.

1. Protective vest use is mandatory for all staff assigned a vest and designated staff under the following situations or conditions:

   - All staff working within the ASOU.
   - All staff performing escorts of inmates assigned to the ASOU.
   - All designated staff working in the vicinity of inmates assigned to ASOU, inclusive of inmates housed in or being treated in the CTC.

2. The following custodial and non-custodial personnel are mandated to wear a protective vest when working with ASOU inmates:

   - Correctional Officer
   - Correctional Sergeant
   - Correctional Lieutenant
   - Correctional Counselor I
   - Correctional Counselor II
   - All Medical Staff
   - Psychiatrist/Psychologist
   - Psychiatric Technician
   - Any Staff with Direct Contact with ASOU Inmates

3. The wearing of the protective vest is optional for classification committee members, when serving on an ASOU Classification Committee [ICC or Unit Classification Committee (UCC)].

4. Protective vests shall be worn only in the manner prescribed by the manufacturer and departmental guidelines. Protective vests shall not be worn in any manner to reduce their designed level of effectiveness. Uniform staff shall wear the vest under the uniform shirt.

5. Protective vest covers:

The cleaning and care of the protective vest pool carriers located in B1 and the CTC will be as follows:

   a. Each vest will have two carriers. One carrier for each vest will be laundered each week. On Monday morning, the supervisor for the affected area will assign a staff member to remove the soiled carrier from each vest and replace it with the clean carrier assigned to the particular vest. The area supervisor will contact the Vest Control Person (VCP) and inform them of the number of vest carriers needing to be picked up and laundered. The VCP will deliver them to a local vendor for cleaning. After the newly cleaned carriers have been picked up from the vendor, the VCP will deliver them back to their assigned areas.
   b. Protective vests are to be maintained in good repair. Damage is to be reported to the Facility Sergeant and VCP for replacement as necessary.

6. Protective vest insert plates:

   a. Protective vests will be maintained in the B1 control booth area.
   b. The vest insert plates will be wiped down with a clean, damp cloth on a weekly basis.

C. Protective Face Shield:

All B1/ASOU staff shall wear the protective face shield at all times when having any inmate contact. Protective face shields shall be worn by staff, at all levels and classifications, when in close contact with un-handcuffed inmates. Close contact situations include those where staff is near an un-handcuffed inmate in the shower, inmates being processed to or from an exercise yard, inmates being provided items through the food/cuff port, or when staff is on a tier.

## XXX.  AUTHORIZED HEALTH CARE APPLIANCES

When an inmate is re-housed in the ASOU, the sending facility staff shall ensure all medically prescribed Health Care Appliances (HCA's) are delivered to the Facility B Sergeant, for immediate issuance (unless the appliance was removed due

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

to safety and security issues, i.e., evidence or weapon).

A. The sending facility shall inventory all property in the inmate's cell and complete a CDCR 128B, ASU HCA Inventory Chrono.

B. The completed ASU HCA Inventory chrono shall accompany the inmate to ASU along with the ASUPN.

C. The Facility B Sergeant shall sign the aforementioned CDCR 128B, indicating receipt of the appliance. A copy of the CDCR 128B shall be given to the inmate, a copy shall be placed in the inmate's CDC 114-A, segregation log and the original shall be placed in the inmate's ERMS File.

D. The Facility B Sergeant shall generate a HCA identification form to be placed in the inmate's 114 file identifying the appliance and all removable parts for accountability and verify through health care services the inmate has a current prescription for the appliance (s). The Facility Sergeant shall ensure the appliance (s) and all removable parts are clearly marked with the inmate's CDCR number and the appliance (s) is listed on the inmate's property card in R&R. A copy of the HCA identification form shall be placed on the inmate's assigned door in a manila folder out of the view of inmates. A third Copy of the form shall be placed in an American Disabilities Act (ADA) Appliance Accountability Binder stored in the Facility B Program office.

E. If any discrepancies are noted, the Facility B Sergeant shall contact the sergeant of the sending facility who shall initiate a search for the missing HCA. If the HCA cannot be located, the Facility Sergeant shall write a memo to their Facility Captain explaining how and why the HCA was lost with a copy to the ADA Coordinator and the Facility B Sergeant shall refer the inmate to medical staff for a replacement appliance.

F. If the sergeant determines the inmate does not have a current prescription for the appliance, the sergeant shall submit a referral to health care services requesting evaluation for the medical necessity of the appliance. The appliance shall not be removed pending evaluation by health care services, unless the

appliance presents a direct and immediate threat to the safety of others in accordance with section IV. I. 22 of the Armstrong Remedial Plan.

G. If the appliance was confiscated due to security issues, The Facility Captain shall consult with the Chief Medical Officer (CMO) or designee for alternate accommodations.

H. All B1 Floor Officers shall take the ADA appliance accountability binder and complete a daily inventory of all appliances and their parts. This shall be documented on a Daily Health Care Appliance Inspection Log **(Attachment W)** and retained in ASU for accountability.

XXXI. **DEPARTMENTAL POLICY REGARDING PRISONERS WITH DISABILITIES BEING HOUSED IN ASU DUE TO LACK OF ACCESSIBLE BED SPACE**

It is the policy of the CDCR to make every effort not to house Armstrong class members in an ASU due solely to a lack of appropriate accessible GP housing. As a result, an Armstrong class member's placement, retention and release from ASU will be in accordance with OP 802 DDP.

XXXII. **ALTERNATE HOUSING FOR DPW INMATES ON ASU STATUS:**

When an inmate, classified as a Fulltime Wheelchair User (DPW) in the DDP, is placed in an ASU and there are no available DPW ASU cells, the following steps shall be taken.

A. The Facility B Lieutenant shall contact the C&PR. The C&PR will review DPW inmates housed in ASOU to identify any DPW inmates who can be cleared for release (i.e. Imminent Maximum Estimated Release Date (MERD), resolved safety concerns, RVR's which have been heard, etc...). If any of the ASU DPW inmates can be released, the C&PR will schedule an emergency ICC, to release the inmate.

B. If none of the ASU DPW inmates can be released, the C&PR will identify ASU DPW inmates endorsed for transfer to an alternate institution. If any are identified, the C&PR will arrange a transfer of the inmate to the endorsed institution.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #301**
**Administrative Segregation Overflow Unit**

C. If none of the ASU DPW inmates are endorsed for transfer, the C&PR will contact other institutions in an effort to locate an available DPW ASU cell. Once located, the C&PR will arrange a temporary transfer of the inmate, for ASU placement.

D. If temporary housing is required during this process, the inmate will be confined to quarters in his assigned general population DPW cell and placed on single cell status. All personal property will be removed from the cell and inventoried by Facility staff pending placement into ASU.

**Attachments:**

| Attachment | A | - | ASOU Standardized Staffing |
| Attachment | B | - | ASU Placement Cover Sheet |
| Attachment | C | - | ASU Placement Notice |
| Attachment | D | - | 128B-ASU Lay-Over Chrono |
| Attachment | E | - | CDC 114-A1 Inmate Segregation Profile |
| Attachment | F | - | CDC 7219 Medical Report of Injury or Unusual Occurrence |
| Attachment | G | - | GA 154 Inmate Housing Assignment Change |
| Attachment | H | - | CDC 128-B ASU Health Care Appliance Inventory Chrono |
| Attachment | I | - | CDC 1083 Inmate Property Inventory Sheet |
| Attachment | J | - | CDC 1882-B Double Cell Review |
| Attachment | K | - | Health Care Appliance Identification Form |
| Attachment | L | - | Cell Search Log |
| Attachment | M | - | Exhibit B Cell Inspection Form |
| Attachment | N | - | Cell Search Monitoring Sheet |
| Attachment | O | - | Identifying Marker |
| Attachment | P | - | ASU Activity Workbook (English) |
| Attachment | Q | - | ASU Activity Workbook (Spanish) |
| Attachment | R | - | CDC 114-A Inmate Segregation Record |
| Attachment | S | - | Weekly Review of Inmate Segregation Profile/Record Spreadsheet |
| Attachment | T | - | ASU Release Form |
| Attachment | U | - | CDC Form 128 B, General Chrono Multi-Powered Loaner Program Agreement |
| Attachment | V | - | Multi-Powered Radio Distribution Log |
| Attachment | W | - | ICC Non-Disciplinary Segregation (NDS) Tracking Form |
| Attachment | X | - | Medical Emergency Response Drill Report |
| Attachment | Y | - | Security/Welfare Check Manual Tracking Sheet |

Approved: _____

CHRISTIAN PFEIFFER
Warden
Kern Valley State Prison

Date: _1/28/2020_

# Exhibit C

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

## I. PLAN TITLE AND NUMBER:

Operational Procedure (OP) Number: 210

OP Title: Short Term Restricted Housing (STRH)

## II. PURPOSE AND OBJECTIVE:

A. This procedure establishes specific operating guidelines for the approved program within Correctional Clinical Case Management System (CCCMS) Short Term Restricted Housing (STRH) as mandated by the California Code of Regulations (CCR), Title 15, Division 3, Chapter 1, Rules and Regulations of Adult Institutions, and the California Department of Corrections and Rehabilitation (CDCR) Department Operations Manual (DOM).

B. The objective of this procedure is to establish an OP clearly delineating the multiple missions within the CCCMS STRH. The CCCMS STRH provides temporary segregation for inmates pending investigation, evaluation and/or disciplinary action. To achieve this goal, the Mental Health Services Delivery System (MHSDS) procedures have been interfaced into this plan to ensure the overall function of the CCCMS STRH.

## III. REFERENCES:

The CCR, Title 15, Sections 3275 through 3281 and Sections 3335 through 3345.

CDCR Memorandum dated February 11, 2020, authorization of over the ear headphones for inmates in Administrative Segregation Units (ASU), Security-Housing Units, and Psychiatric Services Units (PSU) authored by Connie Gipson, Director, Division of Adult Institutions.

Memorandum co-authored by K. Harrington, Director (A), Division of Adult Institutions and T. Belavich, Director (A), Division of Health Care Service and Deputy Director, Statewide Mental Health Program.

## IV. APPROVAL AND REVIEW:

A. This procedure requires the approval of the Warden and Chief Executive Officer (CEO).

B. This procedure will be reviewed annually in October, by the Associate Warden, Complex I (AWCI).

**ANNUAL REVIEW/REVISED: May 2020**

## V. RESPONSIBILITY:

A. The Warden and CEO have the overall responsibility for this procedure. The AWCI shall be responsible for the implementation as well as administrative oversight of this procedure. The Facility B Captain is responsible for the functional operation of CCCMS STRH and compliance with all applicable policies and procedures.

B. A copy of this OP shall be maintained in the OP Manual in the Warden's Office. The Administrative Assistant to the Warden is responsible for placing the approved OP on KVSP Forms for staff access.

C. It is the responsibility of all staff to familiarize themselves and comply with this OP.

## VI. POLICY STATEMENT:

It is the policy of the CDCR to provide housing separate from General Population for Inmates who for various reasons, cannot be housed in a General Population (GP) setting without endangering institution security or the safety of themselves and/or others. Such housing is defined as an Administrative Segregation Unit (ASU).

A. Purpose of CCCMS STRH

When an inmate's presence in an institution's GP presents an immediate threat to the inmate's safety or others, endangers institution security, or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity, the inmate shall be immediately removed from GP and placed in segregated housing. Segregation may be accomplished by confinement in a designated segregation unit or, in an emergency, to any single cell unit capable of providing secure segregation.

**Note:** For inmate participants at the CCCMS level of care, secure segregation will be conducted within the CCCMS STRH. It is CDCR intent to not mix CCCMS participants with non-MHSDS participants; however, this will not

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

preclude staff from housing non-MHSDS participants in wings not housing CCCMS inmates.

B. Physical Description

The CCCMS STRH has the capability and adequate space for double cell occupancy. All cells are equipped with solid steel cell doors, a food/cuff port in the door, a skylight providing natural light, a toilet, a sink, two (2) beds, and a writing table. Electrical supply and television cable to all cells, if applicable. The CCCMS STRH standalone unit is equipped with walk-alone Small Management Yards (SMY), which provide outdoor exercise space for the inmates housed in the unit. Each SMY is equipped with pull up bars.

## VII. CRITERIA FOR PLACEMENT IN AN ASU:

An inmate may be placed into an ASU, when it has been determined, his presence within the GP would:

A. Presents an immediate threat to the safety of self or others.

B. Jeopardizes integrity of an investigation of alleged serious misconduct or criminal activity.

C. Endangers institution security.

D. Upon release from segregation, no bed available in GP.

## VIII. DOCUMENTATION FOR ASU PLACEMENT:

Authority to place an inmate in an ASU may not be delegated below the staff level of Correctional Lieutenant and/or Correctional Counselor II (CCII) Supervisor. The sending facility is responsible for completing and forwarding all documents, appliances, and medication to the ASU. Staff shall utilize the ASU Placement Cover Sheet **(Attachment A)** to ensure all forms are completed as follows:

A. Administrative Segregation Unit Placement Notice (ASUPN) **(Attachment B).** When an inmate is placed on ASU status, the reason for the placement shall be documented on an ASUPN with the exception of ASU Lay-Overs staying overnight only. The official ordering the

segregated housing shall complete this document. Pursuant to CCR Section 3335.5 *Exclusions, (b) Lay-Overs;* Lay-Overs may be placed in ASU without being on ASU status. As such, a 128B-ASU Lay-Over Chrono **(Attachment C)** is sufficient and an ASUPN is not required. In the event an inmate will be placed in a CCCMS STRH as a Lay-over exceeding 24-hours, an ASUPN shall be required to ensure due-process.

In such cases the Classification and Paroles Representative (C&PR) is required to track these inmates to ensure they are scheduled to depart as scheduled and not overlooked.

B. CDC 114-A1, Inmate Segregation Profile **(Attachment D)**, shall be completed on all inmates placed in a CCCMS STRH by the sending facility. This document shall be signed by a Correctional Lieutenant or higher ranking official. The CDC 114-A1 shall be updated at least every 90-days or as required to maintain current information.

C. A CDCR 7219, Medical Report of Injury or Unusual Occurrence **(Attachment E)**.

D. Form GA-154, Inmate Housing Assignment Change **(Attachment F)** shall be completed for single cell inmates.

E. Picture Identification (ID).

F. Upon the determination that an Inmate Patient's (IP's) bed assignment change will cause the I/P to receive medications from a different medication administration location, the following procedure shall be followed:

The inmate pending bed assignments in the Strategic Offender Management System (SOMS) shall be processed by Central Control.

Central Control staff shall notify the sending facility sergeant that the Inmate Population Tracking Report (IPTR 149) form can be printed from:

**SOMS>PRISON>REPORTS>POPULATION TRACKING REPORT>PENDING BED ASSIGNMENTS>CURRENT LOCATION (enter KVSP)>FACILITY (enter facility)>DATE>SUBMIT.**

Case 2:90-cv-00520-KJM-SCR    Document 6776-4    Filed 07/16/20    Page 61 of 87

DEPARTMENT OF CORRECTIONS AND REHABILITATION
KERN VALLEY STATE PRISON
Operational Procedure #210
Short Term Restricted Housing- CCCMS STRH

The sending facility custody staff shall print out the IPTR 149 report prior to moving any I/P whose bed change will result in a change of medication administration location. Custody staff shall provide a copy of the IPTR 149 to each medication administration staff Licensed Vocational Nurse (LVN) / Psychiatric Technician (PT), in the sending facility clinic.

The sending LVN/PT will note whether the I/P has Nurse Administered (NA) / Direct Observation Therapy (DOT) and/or Keep-on-Person (KOP) medications and sign and date the IPTR 149. Once the IPTR 149 has been signed by the sending LVN/PT, the move can be completed.

Licensed nursing staff shall check the I/P on the report against the current electronic Medication Administration Record (eMAR) to determine the need to have medications relocated with the I/P to include NA/DOT and KOP medications.

Custody staff shall retain a signed copy of the IPTR 149 in the sending facility sergeant's office on a clipboard. *NOTE: Notification to licensed nursing staff of I/P movement that does not change the medication administration location will no longer be required.*

Should SOMS be offline or the move accepted before the IPTR 149 could be printed, IPTR 150 may be printed and used in place of the IPTR 149. All signatures and routing shall remain the same as the IPTR 149. A short explanation shall be written on the IPTR 150 justifying its use.

G. CDC 128-B Health Care Appliances and Inventory Chrono **(Attachment G)**. A facility staff will collect, separate, and inventory all Health Care appliances prior to delivering to CCCMS STRH. A facility supervisor will check SOMS to ensure all appliances have been collected and complete the Inventory Chrono.

H. A CDCR 1083, Inmate Property Inventory **(Attachment H)**. This form shall be delivered with the inmate's property. It is the STRH Sergeant's responsibility to ensure the CDCR 1083 is completed appropriately, signed, and included with the ASUPN. In the event the inmate refuses to sign the CDCR 1083, it must be signed by the author and the facility sergeant.

I. CCCMS STRH custody staff shall not accept an inmate into a CCCMS STRH without completion of a 128-MH7. The Mental Health 128-MH7 form shall be completed by the sending facility LVN, nurse, or PT. The CCCMS STRH custody supervisor shall verify the 128-MH7 has been completed by noting the LVN, nurse, or PT signature on the 7219 noting the 128-MH7 has been completed. The 7219 shall be maintained in the inmate's segregation file and filed into Electronic Records Management System (ERMS) upon the inmates discharge from CCCMS STRH. The 128-MH7 is a confidential mental health assessment of the inmate and shall not be included in the documents for ASU placement.

J. When two (2) inmates are being housed together for ASU placement the sending facility shall complete a CDC 1882-B Double Cell Review form **(Attachment I)**.

K. Prior to the initial placement of two (2) inmates into an assigned cell, the CCCMS STRH custody supervisor will ensure a review of the enemy/victimization history is completed. The victimization history review shall include a review of each inmate's Precaution Alert Tab on the SOMS. If an inmate is identified as "At Risk as a Victim", they shall not be housed with an inmate identified as "At Risk as an Abuser".

IX.  **INTAKE:**

**No inmate shall be accepted into a CCCMS STRH without the required documentation. CCCMS STRH custody staff shall process new arrivals in a timely manner. When placing an inmate in the CCCMS STRH, staff shall place single cell inmates in cells 100 thru 105 for the first 72-hours of placement. If inmates housed together in their first 72-hours of placement are separated and become single-celled, they shall be housed in a designated intake cell within 8 hours after the cell partner has been moved from the cell, if they cannot again be double-celled. After 72-hours, inmates may be housed in alternate STRH housing consistent with their case factors. If an inmate will be double celled for the first 72-hours of placement, it is not necessary to utilize these cells. After 72-hours, inmates may be housed in alternate CCCMS**

DEPARTMENT OF CORRECTIONS AND REHABILITATION
KERN VALLEY STATE PRISON
Operational Procedure #210
Short Term Restricted Housing- CCCMS STRH

STRH housing consistent with their case factors.

*Tracking* - Either the **Z 1 BLDG LT or Z 1 BLDG SGT are tasked with inputting data relative to the tracking of inmates placed in retrofitted 72-hour intake cells on the "ASU Intake Cell Management Tracking Log" located on the Division of Adult Institutions (DAI) SharePoint.**

http://teamsite/team/Ops/AO/DAI/SitePages/ASU%20Intake%20Cell%20Management%20Tracking%20Log.aspx

A. The inmate shall be placed in an available holding cell and submit to an unclothed body search by CCCMS STRH custody staff.

B. All state clothing shall be taken from the inmate and returned to the laundry, new clothing will be issued.

C. The inmates' personal property shall be processed and delivered to the CCCMS STRH by the sending facility. All property will be logged in the CCCMS STRH property log book. All health care appliances will be reviewed by CCCMS STRH custody supervisor.

D. The CCCMS STRH custody supervisor will verify and inventory all parts associated with each appliance and document the information on the Health Care Appliance Identification form **(Attachment J)**. Copies of this form shall be distributed as outlined in section XXX Authorized Health Care Appliances.

E. The cell the inmate is being assigned to, will be thoroughly searched and inspected before the inmate is permitted to occupy the cell. This inspection and any discrepancies found during the search shall be noted on the Cell Search Log Sheet **(Attachment K)**, and the Exhibit B Cell Inspection Form **(Attachment L)**. The CCCMS STRH custody supervisor shall log all searches in the unit Master Cell Search Log book utilizing the Cell Search Monitoring Sheet **(Attachment M)**.

F. CCCMS STRH custody staff shall place a color coded name tag, a copy of the inmates

picture ID, and an Intake Marker on the door of the cell the inmate is occupying.

G. The CCCMS STRH custody staff will ensure the inmate's photograph is posted on the unit picture board. In lieu of a recent photograph, the inmate's name and CDCR number will be annotated on a tag and posted on the unit picture board and control booth. The CCCMS STRH Security Patrol (SEC PAT) officer will obtain a photograph of the inmate as soon as practical

H. Identifying Markers **(Attachment N)**, including the word "INTAKE", inmate's name, CDCR Number, and date of CCCMS STRH placement, shall be maintained on the cell door for the first 21 days of placement.

I. The CCCMS STRH custody supervisor will ensure each inmate is issued an "ASU Activity Workbook" **(Attachment O) (Spanish - Attachment P)** during their initial placement into ASU. This shall be documented on the "CDC 114-A Inmate Segregation Record" **(Attachment Q).** The CCCMS STRH custody supervisor is to monitor the "ASU Activity Workbooks" and work with the "Suicide Prevention and Response Focused Improvement Team (SPR FIT) Coordinator" to ensure inventories of the "ASU Activity Workbook" are maintained for distribution to inmates initially placed in CCCMS STRH.

J. Each inmate placed in the CCCMS STRH unit will receive the following items:
1. One (1) pen filler
2. Three (3) sheets of writing paper
3. One (1) Envelope
4. Two (2) copies of the following forms: Inmate/Parolee Appeal (CDCR 602) and Inmate Request for Interview (GA22)
5. One (1) CDCR 1824, Reasonable Modification or Accommodation Request, will be distributed to Americans Disability Act (ADA) inmates
6. One (1) roll toilet paper
7. One (1) toothbrush with tooth powder
8. One (1) Dental Flosser
9. One (1) bar soap
10. One (1) cup and one (1) spoon
11. Clothing: One (1) jumpsuit, one (1) towel, two (2) t-shirts, two (2) pairs of boxer shorts, two (2) pairs of socks, one (1) pair of state

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

shoes (soft canvas type), and one (1) denim jacket (without metal buttons) during inclement weather. Custody staff shall inspect the jackets to ensure they are free of metal and contraband prior to issuance, to include ensuring inmates sign a Trust Withdrawal form for the denim jacket.

12. Bedding: One (1) mattress, two (2) sheets, one (1) pillow case, two (2) blankets and one (1) pillow

13. Personal TV or radio if owned or purchased for CCCMS STRH.

X. **DETENTION/SEGREGATION RECORDS:**

A. <u>ASU Isolation Log</u>: An isolation log shall be maintained in the CCCMS STRH. All staff and approved visitors shall sign in and out on this log. It is to be kept on a podium near the entrance to the unit. It is the responsibility of all CCCMS STRH staff to ensure this log is utilized and maintained properly. All approved visitors shall be accompanied and escorted by custody staff at all times while on the tier. Inmate movement into and out of the unit, regardless of reason, shall be recorded in the isolation log.

B. <u>Segregation Records</u>: A CDC 114 Inmate Segregation Record File shall be prepared on each inmate placed in CCCMS STRH. The left side of this file will consist of a copy of the Administrative Segregation Placement Notice **(Attachment B)**, CDC 114-A1 Inmate Profile Sheet **(Attachment D)**, Cell Inspection Sheet (Exhibit B) **(Attachment L)**, CDC 1882-B Double Cell Review form **(Attachment I)**, and any other relevant document(s) pertaining to the individual inmate or cell. The right side of the file shall contain completed CDC 114-A's **(Attachment Q)**.

1. All segregation records are legal documents. The accuracy in maintaining these records is imperative. Staff members recording information on these documents must write LEGIBLY and sign their first initial and full last name.

2. All staff assigned to the unit shall record all inmate activities on each inmate's individual CDC 114-A **(Attachment Q)**.

Such activities shall include but are not limited to:
- Showers
- Yard release
- Exercise yard times and refusal as applicable
- No yard due to state of emergency, inclement weather etc...
- Trash emptied – supplies issued
- Clothing / linen exchange
- Meals
- Interviews and examinations
- Leaving/ returning from CCCMS STRH and reason
- Suicide Prevention
- Any other unusual or special circumstance
- All RVR hearing processes including Investigative Employee and Staff Assistant interviews
- Medication and refusals to take medications
- Cell Inspections

3. Record of daily activity:

All inmate activities/contacts must be documented in detail. Staff completing this record shall record all program, activities and services afforded segregated inmates. Staff shall additionally document any unusual behavior displayed by the inmate while confined in segregation.

Appropriate Symbols to be used in columns:

a. X Item completed (applicable to; cell search cell inspection, shower, supplies issued, linen exchange, clothing exchange, medical/psychiatric contact, administrative contact visit legal library, meal, trash disposal, cell maintenance /repair, count, time out to yard, time in from yard.

Item completed (applicable to; cell search cell inspection, shower, supplies issued, linen exchange, clothing exchange, medical/psychiatric contact, administrative contact visit legal library, meal, trash disposal, cell

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

maintenance /repair, count, time out to yard, time in from yard.

b. R Refused
c. S Security
d. M Medication
e. M Dr./Register Nurse (RN)
e. D Dental
g. P Psychiatric

All entries within the columns utilizing symbols R or S will be accompanied with an explanation in the "Staff Comment Section, i.e.., Refused yard due to weather, sick; refused lunch not hungry, hunger strike; refused to step to back of cell, etc.

4. Staff Comments:

The area denoted as staff comments will be used to record the following:

a. Cell Search = List of confiscated items (logged in Cell Search Log Book)
b. Cell Inspection
c. Shower
d. Supplies = specifically list supplies issued
e. Linen Exchange
f. Clothing Exchange
g. Medical/Psychiatric Contact
h. Administrative Contact
i. Visit = Time out and return from visit
j. Legal Library = Time out and return from Law Library (Logged in Law Library Book)
k. Meal noted by B, L, D for Breakfast, Lunch or Dinner or R for a refusal
l. Trash Disposal
m. Cell Maintenance/Repair
n. Count
o. Yard = Time out to yard, Time in from yard.
p. Any adaptive support for a Developmental Disability Program (DDP) inmate as well as the adaptive support logs
q. Disruptive Behavior = Any and all acts of misbehavior will be recorded
r. Any and all documents served (RVR, etc.)
s. Disciplinary hearings results
t. Interviews, inmate appeals etc.

Facility CCCMS STRH custody supervisors shall document a review of every CCCMS STRH inmate's CDC 114 A on the Weekly Review of Inmate Segregation Profile/Record Spreadsheet **(Attachment R)**. The spreadsheet shall be reviewed by the Captain and Associate Warden weekly. The spreadsheet shall be forwarded to the Warden or designee weekly indicating any deficiencies and corrective action provided to appropriate staff(s). The purpose of this review is to ensure conditions of confinement are being met and documented, and appropriate remarks by other staff are being entered. Supervisors who complete the review shall record this review in the inmates individual CDC 114-A in red ink only.

C. Administrative Timelines:

1. CDC 114-D, Administrative Review Hearing by the Facility Captains regarding the reason for placement into an ASU takes place the first business day following placement into an ASU.

2. Initial Institution Classification Committee (ICC) review of CCCMS STRH placements will be within 10-days, but no sooner than 72-hours, unless waived by the inmate. There are no exceptions to this timeline.

3. All inmates in an ASU, at their 10-day review, shall be referred to the Classification Services Representative (CSR) for retention authorization. Instead of ICC reviewing each inmate's case every 30-days, inmates in an ASU for non-disciplinary reasons shall require routine review no more frequently than every 90-days or when scheduled by staff for specific action. Inmates segregated for disciplinary reasons shall be reviewed by ICC at least every 180-days or when scheduled by staff for specific action, such as, yard assignment, cell status, or change in reason for segregation. These cases shall be closely monitored by classification staff and shall be returned to ICC within 10-days of necessary action being completed, i.e. RVR Hearing, determination of a referral to the District Attorney (DA) for criminal

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

prosecution, court action, Investigative Services Unit (ISU) action, etc. All cases must be referred to the CSR for retention at least 180-days after obtaining initial authority to retain.

## XI. AUTHORIZED RELEASE FROM AN ASU:

Inmates who have been placed into an ASU may be released only by one of the following:

A. The official ordering the placement, or staff member of higher rank in the same chain of command, may withdraw an CCCMS STRH order before it is acted upon or prior to a hearing on the order after consulting with and obtaining the concurrence of the administrator of the general population unit in which the inmate shall be returned to or assigned.

B. The staff member conducting the administrative review. The administrative reviewer shall be at the rank of Captain or above. If the reviewer is functioning in an acting capacity, the review must be co-signed by an Associate Warden or above. The Captain shall complete the Administrative Segregation Release form **(Attachment S)** identifying all inmates being released. The form shall be signed by the Captain or designee. A copy of the form shall be distributed to the STRH Sergeant and Correctional Counselor.

C. Institutional Classification Committee. Upon completion of ICC, all inmates to be released from an ASU shall be placed on the Administrative Segregation Release Form. Once this form is prepared for the Chairperson's signature, the form shall be signed. Copies of the form shall be made and distributed to the CCCMS STRH Correctional Counselor, and the CCCMS STRH Sergeant.

## XII. DAILY SCHEDULE (TIMES ARE APPROXIMATE)

| Time | Activity |
|------|----------|
| 0600 | **2/W Shift Change**/ Equipment Inventory/unit securities |
| 0600 | Security Checks as per Guard One Process during entire shift /Building Inspection/ Search of Exercise Yards and Common Areas |
| 0600 | Bright cell lights on Announce Yard Release |
| 0605 | Commence Morning Meal Ensuring Yard Participants are Fed First |
| 0630 | Initiate Yard Release |
| 0630 | LVN Rounds |
| 0715 | Meal Tray and Refuse Collection |
| 0730 | 1st Treatment Group |
| 0830 | Conduct three (3) Cell Searches |
| 0930 | Switch 2nd Treatment Group inmates |
| 0930 | Yard recall Search of Exercise Yards and Common Areas Announce and Initiate Yard Release |
| 1130 | Switch 3rd Treatment Group Inmates |
| 1200 | **Close Custody Count Time** |
| 1230 | Announce Yard recall Search of Exercise Yards and Common Areas Announce and Initiate Yard Release |
| | Complete CDC 114-A Entries |
| 1330 | Switch 4th Treatment Group Inmates |
| 1400 | **3/W Shift Change**/ Equipment Inventory/Unit securities as per Guard One Process during entire shift |
| 1430 | Initiate Shower Program |
| 1500 | Yard Recall Search of Exercise Yards and Common Areas Announce |
| 1530 | Recall Treatment Group |
| 1600 | Food Delivered |
| 1615 | LVN Rounds |
| 1630 | Count Time (standing count) |
| 1645 | Initiate Meal Cleanup and Refuse Collection |
| 1700 | Announce and Initiate Yard Release |
| 1730 | Conduct Searches/complete all CDC 114A Entries |
| 2000 | Conclude Shower Program |
| 2030 | Yard Recall and Search of Exercise Yard and Common Areas |
| 2115 | **Count Time**/Outgoing Mail Pickup |
| 2200 | **1W Shift** Change/Equipment Inventory/ unit securities |
| 2200 | Bright cell lights off |
| 2215 | Conduct Security Checks of Units per Guard One Process during entire shift. Initiate CDC 114, Isolation Log, for the Day |
| 0015 | **Count Time** |
| 0100 | Initiate CDC 114-A1 File Reviews and Updates |
| 0300 | **Count Time (negative)** |
| 0400 | Initiate Cleaning of Office, Rotunda |
| 0500 | **Count Time** |
| 0530 | Conclude File Updates |
| 0545 | Unit Wake Up Call/Activate All Unit Lights |
| 0600 | **Shift Change** |

DEPARTMENT OF CORRECTIONS AND REHABILITATION
KERN VALLEY STATE PRISON
Operational Procedure #210
Short Term Restricted Housing- CCCMS STRH

## XIII. CCCMS STRH MEDICAL/MENTAL HEALTH SERVICES:

A. All CCCMS STRH staff shall receive annual training on Uniformed Heat Trigger (UHT) procedures. Inmates identified as being included in the designated CCCMS may have a red placard affixed to the outside of their cell for facilitating mental health needs. Staff shall follow all UHT procedures in accordance with departmental guidelines.

1. When Phase 1 of the UHT procedures is activated, heat risk inmates shall be returned to their assigned cell. When Phase II UHT procedures are activated, identified inmates shall be afforded access to running water and/or misting and iced water. Fans shall also be provided for additional cooling measures as applicable. When Phase III UHT procedures are activated, a clinician trained in identifying heat related illness shall observe heat risk inmates every two (2) hours. CCCMS STRH staff shall ensure they, and clinical staff, performing any UHT procedure record their observations and actions on each individual inmates CDC 114-A.

2. Staff shall remain cognizant of concerns posed with heat risk inmates regardless of phase of UHT procedure in progress. Inmates exhibiting any form of heat related illness shall be immediately referred to medical staff. During a heat alert, heat risk inmates shall not be required to stand in direct sunlight to receive any authorized services.

3. The inmate shall keep in his cell certain medically prescribed life-sustaining medications directly issued to inmates for as needed use, such as inhalers and nitroglycerin tablets. Only authorized medical staff will distribute these items. Inmates are authorized to retain possession of "blister packs" in the amounts prescribed and dispensed by health care services in their cell.

   If the blister pack is used for any reason constituting a safety or security threat, the inmate shall permanently lose the privilege of possessing the "blister pack" and the prescribed medication will be distributed via an alternate method. This loss of privilege shall be clearly documented on a CDCR 128B and recorded on the inmates respective CDC 114-A Inmate Segregation Record.

B. Medical Staff assigned to CCCMS STRH on second and third watch will be responsible for the distribution of medication in the unit. Sick call will be conducted as outlined within the post orders and pursuant to standardized health care services policies.

C. All requests for dental services will be made through the sick call process. Emergency appointments will be completed as needed.

D. Medication will be issued to the inmate within the time frame prescribed by the doctor/pharmacist and pursuant to institutional policy. Custody staff is prohibited from distributing medication.

E. When an inmate is given his medication, the assigned medical staff will follow approved medication administration protocol.

1. Refused medication will be returned to the pharmacy as per medical protocol. Such refusal of medication shall be noted in RED on the CDC 114-A.

2. The inmate shall keep in his cell, certain medically prescribed, life-sustaining medications directly issued to inmates for as needed use, such as inhalers and nitroglycerin tablets. Only authorized medical staff will distribute these items.

F. If medical or mental health staff determine an inmate needs to be seen by a doctor and it is not an emergency, an appointment will be scheduled. The doctor will examine all CCCMS STRH inmates in the ASU Primary Care Clinic.

1. CCCMS STRH inmates requiring emergency medical attention will be escorted to the designated treatment area via the Emergency Response Vehicle (ERV). CCCMS STRH custody staff will remain with the inmate during the course of the visit and return the inmate if and when it is deemed appropriate.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

2. Confidential mental health interviews: All inmates housed in CCCMS STRH who meet with mental health staff should have their interviews in private settings (affording confidentiality of sight and sound from other inmates and confidentiality of sound from staff).

3. All individual/group therapy for inmates shall be conducted in a confidential setting. The officer(s) providing coverage will remain nearby, where the clinician can be seen but not overheard while the clinical interaction is taking place.

4. When the occasion occurs when the priority health care ducat(s) are not inclusive of the Daily Movement Sheet (DMS), custody staff in CCCMS STRH will ensure the requested inmates are escorted to the appointment ensuring them access to health care services. Inmates not on a ducat list may need to be seen in emergency or non-emergency situations. In the event an inmate needs to be seen for a non-ducated, non-emergency contact, health care and custody staff will coordinate a time to see the inmate as soon as possible the same day.

G. Inmates in CCCMS STRH shall have access to Health Care Services Request Form (CDCR 7362's). Health care staff shall distribute and collect CDCR Form 7362's from inmates on a daily basis. The RN/ LVN/Licensed Psychiatric Therapist (LPT) shall distribute and collect CDCR Form 7362's during the daily medication administration rounds in the ASU.

The RN/LVN/LPT shall document the rounds and sign in and out, noting the time in the CDCR Form 114, Isolation Log. The RN/LVN/LPT shall also document the services provided to each inmate on the respective CDCR Form 114 A, Inmate Segregation Record. Designated custody staff shall accompany health care staff during the daily rounds and at all times while on the tier. Inmates with clinical symptoms shall be seen the next business day in an appropriate medical setting for face-to-face triage.

H. **MENTAL HEALTH SERVICES PROGRAM AND ACTIVITIES:**
Overall institutional responsibility for the CCCMS STRH Unit program shall rest jointly with the CEO and the Warden. Institutional operational oversight of the STRH shall be the responsibility of the Chief of Mental Health (CMH) at each institution. Mental Health Services (MHS) will provide 90 minutes of therapeutic group activity each week for each IP in the STRH, along with one weekly Primary Clinician (PC) contact. Custodial responsibilities, including initial placement, disciplinary actions, correctional counseling services, classification, inmate movement, and daily management shall rest with the Warden or designee. The assigned psychiatrist or PC shall attend all ICC meetings to provide mental health input.

1. The STRH MHS shall provide weekly PC contacts, crisis intervention, daily Psychiatric Technician (PT) rounds seven (7) days per week, medication education and management, group therapy, monitoring and assistance with daily living skills, and recreation therapy both within cell and out of cell activities

2. The PT shall make initial contact with each IP placed into any STRH within 24-hours of placement and begin the process of developing rapport with IPs. Clinical Rounds shall be conducted seven (7) days per week in all STRH units to attend to the mental health needs of all IPs usually performed by a PT. All Health Care Services Requests (CDCR 7362) shall be collected by nursing staff.

3. The Interdisciplinary Treatment Team (IDTT) shall generally be responsible for developing and updating clinical treatment plans for all identified CCCMS STRH IPs. Initial and subsequent sessions for CCCMS IPs in STRH will include a review of the IP's 114-A to be informed of each IP's restricted housing unit programming. Existing clinical pre-screening and screening requirements along with clinical evaluations will be reviewed to determine if a more thorough assessment is needed for the IP within the STRH. The IDTT shall consist of, at minimum, the assigned Correctional

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

Counselor, assigned psychiatrist, PT, PC, and Program Supervisor.

4. Any IP requiring an inpatient placement (Mental Health Crisis Bed; MHCB) will be transferred to the appropriate level of care immediately (MHSDS Program Guide, 2009 Revision, pp. 12-7-11).

5. Any IP in STRH who is identified as needing Enhanced Outpatient Program (EOP) level of care will be housed in the STRH while waiting to be transferred to an EOP ASU Hub within 30-calendar days of the identification (MHSDS Program Guide, 2009 Revision, pp 12-7-8).

I. MENTAL HEALTH TREATMENT GROUP ACTIVITIES ESCORT PROCEDURES:

1. Mental Health STRH staff will provide 90-minutes of therapeutic group activity each week for each IP by utilizing Secure Desks/Restart Chairs. All CCCMS STRH IPs will be escorted to the modules located within the housing unit. They will be restrained with the use of waist restraints and leg restraints. Staff will secure the IP into the desk. The CCCMS STRH IPs will remain in the modules in restraints for the duration of the session. Upon completion of the first session the CCCMS STRH IPs will be rotated to offer each IPs the 90-minute a week session. The custody escort supervisor is expected to track any safety or security incidences occurring within the group.

2. All individual and group therapy for IPs shall be conducted in a confidential setting. The correctional officer(s) providing safety and security coverage will provide intermittent visual coverage, where the clinician can be seen but the clinical interaction between the IP and attending clinician cannot be overheard. All psychiatric appointments will occur in a completely confidential space.

3. Psychiatric appointments will be scheduled in advance except for urgent and emergent requests. IPs scheduled to see their psychiatrist and/or PC will be escorted to the treatment space and will

be secured in a treatment module (TM) while they await their time with their MH provider. Custody staff will escort the IP to and from the psychiatrist and/or PC's office, holding space, and their housing unit.

J. PLACEMENT OF AN IP INTO THE SECURE DESK.

1. Prior to placing an IP into the Secure Desk, escorting staff will have the IP kneel onto the designated chair and place leg irons on the IP, ensuring they are double locked.

2. Escorting staff will escort one IP to the first open desk, having the IP turn his back to the chair. The escort officer will maintain control of the IP and instruct the IP to place one foot on each side of the foot bar. The IP will be instructed to "back" into the Secure Desks/Restart Chairs, ensuring the leg restraint chain is under the foot bar. At this point the officer will position him/herself at the front of the Secure Desk and pushing the lever inward locking the bolt over the leg restraint chain.

3. When removing IPs from the chair the escort officer will proceed to the first desk containing an IP. The escort officer will assume a position at the front of the desk unlock the front level bar and shall gain control of the IP. The IP will be instructed to stand up, the leg irons will be removed, and the escort officer shall escort the IP to his assigned cell.

XIV. **RESTRICTIONS:**

Inmates, who become so disruptive they endanger the safe operation of the CCCMS STRH or endanger the safety of mental health staff (IDTT) or others, may be placed on restriction status listed below. All status restrictions must be fully documented on the inmates CDC 114-A.

A. Restriction Status: An inmate who has proven to be disruptive in one or more areas of behavior may have specific restrictions imposed to control the behavior. The authority to place an inmate on restriction status shall be at a level of Correctional Lieutenant or above. Placement of restriction status will not exceed 10-days. Such placement will be fully documented on a CDC

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

128B as to the reason(s) for placement and the inclusive dates. The following controls will be implemented to effectively manage an unruly, disruptive or assaultive inmate:

1.  Leg Restraint Status:

    a.  Inmates placed on leg restraint status must have their ankles secured in leg restraints any time they are removed/escorted from their cell for any reason. These inmates may not be placed on lead chains with inmates who are not on leg restraint status.
    b.  Leg restraint security precaution is imposed whenever there is risk the inmate will attempt to kick staff or other inmates, may try to run during escort, is threatening to injure others, or there is a possible security concern the use of leg restraints can limit.
    c.  Leg restraints must be used and placed on an inmate in compliance with the departmental use of force policy, CCR Title 15 Section 3268.2, and the procedures outlined in this operational procedure.

2.  Spit Hood/Mask Status:

    a.  Spit Mask security precaution is imposed whenever an inmate has spit upon, attempted to spit upon, or threatened to spit upon staff or other persons. Inmates placed on Spit Mask security precaution must wear a Spit Mask any time they are removed from their cell.
    b.  Once the inmate is placed into restraints the inmate shall be instructed to face away from staff. The Spit Mask will then be placed over the inmate's head in the prescribed manner. The Spit Mask will remain in place for the entire time the inmate is out of his cell and under direct constraint supervision.

3.  Paper Tray Status:

    Paper tray status is imposed whenever an inmate refuses to return his insulated food tray, uses the tray to commit a disciplinary offense, or attempts to break or deface the food tray. Inmates placed on paper tray status will be fed on paper trays for a period of up to 30-days, at the discretion of the CCCMS STRH Lieutenant.

4.  Property Restriction:

    Limits the amount of property allowed in the cell. Imposed when an inmate uses state/personal property to prevent staff from observing activity in the cell (covers cell windows) and creates a situation, which may require a cell extraction. Usually imposed for a period of <u>10-day.</u>

B.  Policy on Flooding: Inmates who intentionally flood their cell or tier shall be issued a RVR and placed on 72-hour water restriction. The restriction entails the shut-off of the flush valve to the inmate's cell for a period not to exceed three (3) calendar days. During this time, the inmate will be allowed to drink water and flush his toilet three (3) times on each shift. In every instance when a 72-hour water restriction is imposed, the CCCMS STRH Lieutenant will be advised and the incident noted in the inmate's CDC 114-A file.

C.  Policy on Refusing to Relinquish Restraints: Any inmate who refuses to allow staff to remove handcuffs, waist restraints or any other approved restraints shall receive a RVR. With the approval of the Facility Captain or AOD, the use of a controlled use of force may be utilized to recover these items.

D.  Use of the Security Triangle: Safety Triangle: This device is a handcuff retention device, used to prevent inmates from pulling restraint equipment into their cell and may be used at the discretion of on duty staff. Some reasons for using the safety triangle include, but are not limited to rehousing an irate inmate who has threatened violence or an inmate who was just involved in a use of force incident. The safety triangle may remain attached to the handcuffs if the inmate is being relocated in the housing unit and if attaching and detaching the safety triangle to and from the handcuffs presents a safety concern. The safety triangle is not intended to control the inmate outside of the cell. The officer controlling the safety triangle must be vigilant and efforts should be directed to prevent the

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

inmate from pulling their hands inside the cell while the door is being closed.

In the event that an inmate who is attached to a triangle refuses to place their hands in the food/security port to allow the handcuffs to be removed, it may be necessary to pull the safety triangle to retrieve the handcuffs. When it is necessary to pull the safety triangle, a single staff member shall slowly move away from the door while holding onto the safety triangle, in order to bring the inmate's hands through the port. This will be conducted with extreme caution in order to minimize the risk of injury to the inmate. Additional staff may be needed to assist with the safety triangle in the event that the one staff member is insufficient to get the inmate's hands through the food/cuff port. Once the inmate's hands, wrists, and forearms are through the port, staff will grasp the inmate's forearms, the tension on the safety triangle shall be released, and the handcuffs removed

E. Cell door food/cuff, holding cell handcuff port, window, door and light covering policy:
Inmates shall not be allowed to cover cell lights, windows, or doors at any time. food/cuff ports and holding cell handcuff ports are utilized to apply and remove handcuffs, dispense medications, supply meals, pick up trash and exchange clothing and linen. Holding cell handcuff ports shall be locked at all times after use. Immediately after use, the food/cuff port will immediately be closed and locked. At no time shall the food/cuff port or holding cell food/cuff port be left unattended when opened or unlocked. An unsecure food/cuff port offers an inmate an unobstructed window through which he is able to expose body parts, partially or fully remove themselves from the cell or holding cell, propel darts, feces, urine, and other items capable of causing serious injury to staff and inmates.

1. For staff safety, prior to the food/cuff port being opened, the inmate(s) shall be instructed to turn on the cell light. Staff shall be able to clearly see the inmate's hands and determine the food/cuff port can safely be opened. If the inmate refuses to turn on the cell light, remove coverings from the cell light, door or window, the port shall not be opened.

a. The inmate shall be informed his failure to follow orders shall constitute a passive refusal of the service being offered. Any inmate who obstructs the view inside his cell shall be written a RVR. The matter shall be documented in the inmate's CDC 114-A file.

b. An inmate who refuses to allow staff to close and lock the food/cuff port poses an immediate threat to the safety and security of staff and inmates alike, and mandates suspension of the programming of the other inmates housed in the CCCMS STRH section. This seriously impacts the ability of staff to provide services as required by law and departmental policy.

If during routine duties, correctional officers encounter an inmate who refuses to allow staff to close and lock the food/cuff port, an officer shall verbally order the inmate to relinquish control of the food/cuff port and allow staff to secure it. If the inmate refuses to relinquish control of the food/cuff port the officer is to relay to another custody staff to contact a supervisor while they back away from the cell and remain a safe distance from the open food/cuff port.

If the supervisor is unable to resolve the issue a controlled use of force will be recommended to an administrator through the chain of command while custody staff continues to monitor the inmate and the unsecure food/cuff port from a safe distance.

2. Occasions may arise when defiant inmates cover their cell door, window, thus blocking visual access into their assigned cell. If this occurs, the inmate shall be ordered to remove the item immediately. If the inmate refuses the order, the STRH Sergeant shall be notified.

3. If the supervisor is unable to obtain the inmate's compliance in the above situations, notification shall be made to the appropriate authority (Facility Captain/AOD) to initiate

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

cell extraction procedures. It is imperative this procedure is followed in a timely manner, as there is no ability to ascertain what activity is taking place in the affected cell, e.g. in cell assaults, medical emergencies, illegal activities, escape attempts.

## XV.   ESCORT PROCEDURES:

A.   Prior to removing the inmate from his cell, staff shall positively identify the inmate. The inmate shall be instructed to turn his cell light on and remove all braids and ponytails. The inmate shall be instructed to remove all clothing items and submit to an unclothed body search prior to being removed from cell. The inmate shall then be instructed to place his back to the door and extend his arms through the food/cuff port with the back of his hands together, thumbs up. Once the handcuffs are applied, the inmate will retract his arms from the food/cuff port and remain standing with his back against the door.

If two (2) inmates are assigned to the cell, both inmates shall be placed in handcuffs before the door is opened. Staff shall first place the inmate who is to remain in the cell in handcuffs, and instruct him to go to the rear of the cell, sit at the table and remain facing away from staff.

B.   Once the handcuffs are secured on the inmate's wrist, custody staff shall place a hand directly on the cell door they want the control booth officer to open. The escorting officer will establish verbal and visual communication with the control booth officer in order to ensure the correct door is being opened. In response, the control booth officer will be attentive to the direction being given by the escorting officer. The control booth officer will be required to acknowledge receipt of direction by communicating verbally and visually with the escorting officer. Once the cell door is opened custody staff will obtain control of the Inmate, instruct the inmate to back out of the cell, step to the side (same direction of door travel), and signal for the door to be closed. Once the door is secured the inmate shall submit to a search by staff with the hand held metal detector. Once complete, the inmate shall be

escorted to destination within unit (i.e., yard, medical, etc.)

C.   Care is to be taken in the course of the body search, ensuring a comprehensive visual inspection of the inmate's entire body inclusive of all body cavities, hair and extremities. All oral and physical prosthetic appliances shall be removed, by the inmate, and carefully examined and searched.

1.   Handcuffs and leg irons shall be double locked.

2.   At no time shall restraint devices be placed around an inmate's neck.

3.   At no time shall inmates be handcuffed with their hands in front.

4.   With the exception of an extreme emergency, inmates shall not be secured to stationary objects.

5.   When escorting ASU inmates, the escorting officer(s) will have their expandable baton drawn in the closed position and the escort will be "hands-on" at all times unless a lead chain is utilized for multiple inmate escorts. The baton should not be carried in the extended position unless it is being utilized for the protection of inmates and staff.

6.   During all in-house escorts (e.g. yard, shower, etc.) inmates shall be attired in boxer shorts, t-shirts and canvas shoes, orthopedic shoes or shower shoes. During escorts outside the CCCMS STRH, inmates will be attired in a jumpsuit, t-shirt, under shorts, socks and canvas or orthopedic shoes. While under escort inmates shall not stop or impede the escort for any reason. ASU inmates shall be secured in leg restraints for all escorts outside of the CCCMS STRH. ASU inmates are not required to be in leg restraints while being escorted to the yard as this is considered an in-house escort. The CCCMS STRH Sergeant shall identify inmates requiring additional escort coverage or restraint gear. Escorting officer(s) shall maintain hands-on control of the inmate(s) at all times and escort to the intended destination without delay.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

7. A lead chain will be utilized when escorting more than two (2) inmates at one time. They will be utilized most often when processing inmates from ASU to medical, visiting, etc. Lead chains can accommodate up to six (6) inmates, requiring a minimum of three (3) officers to conduct the escort.

8. If an ASU inmate is disabled, requiring the use of a medical assistive device, such as crutches, cane, or prosthesis, to assist him in walking, a wheelchair may be utilized during the escort. The inmate shall be escorted in waist restraints at all times. The following procedure shall be used for applying waist restraints on wheelchair bound inmates located in a secured area (cell, holding cell, etc.):

Staff shall place the padlock on the last two (2) rings of the waist restraint chain, making the chain into a large circle. Staff shall instruct the inmate to place both his hands through the security port. Staff shall place the handcuffs of the waist chain onto both wrists (key holes facing up) of the inmate and double lock. Staff shall then instruct the inmate to pull his hands, including the waist restraints, through the security port. Staff shall instruct the inmate to grab the lock on the waist chain, open up the waist chain into a circle, and place the waist chain over his head with the lock toward the inmates back. Staff shall instruct the inmate to place one (1) arm at a time through the waist chain. Staff shall instruct the inmate to lean forward slightly, which will allow the waist chain to slide down his back resulting in the chain completely around the inmate's waist. Staff shall open the cell door and instruct the inmate to "wheel" himself out of the cell. As soon as the inmate has exited the cell, staff shall position themselves behind the inmate and instruct the inmate to lean forward in the wheel chair. Staff shall pull the waist restraints tight around the inmate's waist, fold the waist restraints together, and affix a second padlock, locking the waist restraints securely around the inmate's

waist. Staff shall assist the inmate out of the wheel chair to another chair, which has been searched and is free of contraband. Staff shall search the inmate and the inmate's wheelchair to ensure no contraband is present. Once the searches are complete, staff shall assist the inmate back into his wheelchair and complete the escort.

When the escort is complete, and the inmate is going to be removed from restraints, staff shall remove the restraints in the reverse order they were applied.

One (1) 16-inch length of chain with loops at each end and two (2) padlocks attached are available for use during this process for inmates whose abdominal girth exceeds the waist restraint.

Pursuant to the Armstrong decision, inmates will be allowed to retain in their cell, any and all medical device(s) prescribed for in cell use by a medical doctor. Staff should determine appropriate security precautions on an individual basis when escorting an inmate who is disabled.

## XVI. INMATE MAIL:

A. Inmates shall be allowed to possess no more than a combination of five (5) total magazines, newspapers and paperback books in their cell at a time. Old newspapers will be destroyed. Magazines, paperback books and newspapers shall be exchanged on a one-for-one basis. Old magazines may be donated to the inmate library or sent home at the inmate's expense. Inmates shall not be permitted to exchange or pass any items with other inmates.

B. Inmate mail will be processed in accordance with local procedures. Incoming mail bags (Legal and Non-Legal) will be dropped off at CCCMS STRH by institutional mailroom staff prior to third watch. Third watch CCCMS STRH custody staff will distribute mail during the 1630-hour count.

C. Third watch CCCMS STRH custody staff will pick up outgoing mail during the 2115 hour count. The mail will be collected and delivered to the control booth officer for review by first watch staff. First watch CCCMS STRH custody staff

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

shall bring the mailbag to south entrance of the CCCMS STRH at the end of their shift. Institutional mailroom staff shall pick up the outgoing mailbag the following morning during second watch.

D. Incoming legal mail shall be distributed by designated CCCMS STRH custody staff. This staff member shall open the mail in the presence of the inmate to ensure no contraband is present. Staff shall not read the contents of confidential mail. Staff will document the delivery of all legal mail on the inmates CDC 114-A, in addition to completing the legal mail log. Inmates must sign for all legal correspondence they receive. Failure to do so will be considered a refusal to accept the correspondence, which will then be returned to the mailroom for disposition. If contraband is discovered, the envelope and all contents will be confiscated. A supervisor will be notified immediately.

E. Outgoing legal mail will be picked up by CCCMS STRH custody staff during the 2115 hour count. All incoming and outgoing confidential correspondence must be in compliance with CCR, Title 15, Sections 3142 and 3143, as well as current operating procedures.

## XVII. CANTEEN/PACKAGES:

A. Inmates housed in CCCMS STRH may purchase and receive some canteen items. Not all canteen items allowed to the general inmate population will be permitted to inmates housed in an ASU. The abbreviated canteen list for inmates in ASU shall be approved by the Chief Deputy Warden or Warden.

B. The maximum allowable canteen draw for inmates housed in ASU is $55.00 each month (Privilege Group D).

C. Cosmetics and canteen items may be removed by staff from their original containers and placed into alternate containers if the original container or packaging presents a threat to the institutional security. Over The Counter (OTC) medications, Keep on Person (KOP) medications and canteen items may not be removed by staff from their original containers and placed into alternate containers unless the original container or packaging presents a threat to institutional security or safety.

D. A packaging restriction for safety and security concerns must be supported by a guilty finding in a disciplinary hearing for a serious rule violation involving the misuse of a product and/or its packaging by a specific inmate. The CCCMS STRH Sergeant on duty shall generate a 128B Chrono identifying the specific product(s) to be restricted and the specific inmate. Restoration of access to original packaging shall be by written recommendation of the CCCMS STRH Sergeant or Lieutenant with review and approval by the Facility Captain.

E. The canteen draw schedule is based on the inmate's last two (2) digits of his identification number. First draw is 00-33; second draw is 34-66; and, third draw is 67-99.

F. Monthly schedules for draws will be published and distributed to CCCMS STRH by canteen staff.

G. The inmate must turn in a Canteen Order Form, CDC 184, to a CCCMS STRH custody staff by 1400 hours the Wednesday prior to their designated draw. Canteen will be processed and delivered by a CCCMS STRH custody staff on the following Friday.

H. Inmates housed in CCCMS STRH will be authorized to complete only one (1) canteen order form each month. There will be no open lines or make-up draws.

I. Canteen orders will be confirmed by a CCCMS STRH custody staff, and then delivered to the canteen. The officer will inventory the items and confirm the charges with the sales receipt. If the order is correct, the inmate will sign the canteen order form, which will be retained by the issuing CCCMS STRH custody staff and maintained canteen order file.

J. Approval of the yearly package is at the discretion of the Warden or Chief Deputy Warden. Pursuant to the CCR, Title 15, Section 3044(g)(4)(E), inmates may be permitted to receive one (1) package (not to

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

exceed 30 pounds) after completion of one (1) year of Privilege Group D assignment.

K. Packages in excess of 30-pounds will be returned to the sender at the inmates' expense. Food items determined to be unauthorized for issuance to the inmate will be returned to the sender at the expense of the inmate. The inmate also has the option to donate or destroy unauthorized items. Controlling date will be the date received at Receiving and Release (R&R); postmark date will not be the deciding factor.

L. A CCCMS STRH Z 1 Legal ASU Officer will be responsible for the issuance of yearly packages to inmates housed in CCCMS STRH. Any packages ordered after ASU placement and received prior to the 1-year date, shall be returned at the inmate's expense.

M. Special canteen purchases of magazines or books:

1. Inmates who wish to order magazines or books shall fill out a CDC 193, Trust Account Withdrawal Order form, and a special purchase order form and have it approved by the Facility Captain.

2. Books shall be recorded on the inmate's CDC 104, Property Card by R&R staff prior to being issued to the inmate.

3. Each inmate will sign acknowledging receipt of the books. If an inmate is in possession of the allowable amount of books, the inmate must exchange, on a one-for-one basis, each new book. If the inmate does not wish to exchange any books, the inmate will sign receiving the items and will be added to his personal property stored in CCCMS STRH property storage area. If the inmate refuses to sign for the purchase, the items will be returned at the inmate's expense. No inmate may purchase special canteen until they are endorsed for ASU retention by the CSR.

XVIII. **ALLOWABLE PROPERTY:**

A. The sending facility will inventory the inmate's personal property. The officer filling out the property inventory form will take the form to the inmate for a signature and/or verification of property. One (1) copy of the inventory form will be given to the inmate, one (1) copy will be placed inside the inmate's property box, one (1) copy will be firmly attached to the outside of the inventoried box and one (1) copy will be retained by the sending facility. All property will be boxed. No bags of any kind are authorized.

B. After the inmate has gone through his initial 10-day ICC review, he may request to receive the allowable ASU property. All requests must be approved by the CCCMS STRH supervisor and processed by the CCCMS STRH Z 1 Legal ASU Officer.

C. Prior to housing, CCCMS STRH custody staff will issue the inmate an appropriate issue of state clothing, writing supplies and initial issue of personal hygiene items.

D. State issue clothing and bedding. Each inmate assigned to the CCCMS STRH is authorized the below listed standard clothing and bedding complement:

- Four (4) under shorts (2 laundries weekly)
- Four (4) T-shirts (2 laundries weekly)
- One (1) blanket, two (2) during winter months (exchanged every six (6) months
- Two (2) sheets (exchanged weekly)
- Four (4) pair of socks (2 laundries weekly)
- Two (2) bath towels (1 laundry weekly)
- One (1) denim jacket (Without metal buttons during inclement weather periods identified as October 1st through April 1st. Custody shall inspect the jackets to ensure they are free of metal and contraband prior to issuance. Inmates must sign a trust withdrawal form for the denim jacket)

Inmates will be responsible to maintain state issued clothing. Failure to properly maintain the assigned clothing issue will result in disciplinary action and the inmate being charged for the cost of replacement or repair.

E. Personal Clothing/Property:

Inmates in an ASU may not possess or purchase personal clothing of any kind with the exception of personal (inmate purchase) thermal underwear during inclement weather months

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

only. The only approved personal articles an inmate will be allowed to possess are:

- Personal thermal underwear (inmate purchased) during inclement weather months
- Fifteen (15) photographs
- Five (5) letters
- Five (5) indigent envelopes
- One (1) comb (non-metal, palm type)
- Magazines, paperback books, newspapers, (any combination of 5 total)
- One (1) tablet of lined paper (without staples)
- Forty (40) envelopes and/or five (5) indigent envelopes
- Forty (40) stamps
- One (1) address book
- Prescription glasses one (1), Non-prescription reading glasses one (1)
- Inmates housed in CCCMS STRH – One (1) electrical appliance TV or Radio in cell based on mutual cellmate decision.
- The cable will be three (3) feet in length and have both ends crimped with a cable connector.
- The coaxial cable shall be recorded on an ASU cell search log and the 114-A.

The allowance of personal appliances (television or radio) in CCCMS STRH shall be limited to one (1) entertainment appliance per cell. The television and/or Radio must be purchased through an approved vendor, and must meet appropriate size and dimension requirements to fit the shelving installed in the cells to accommodate the appliance. One (1) digital antenna receiver and one (1) digital signal amplifier are authorized. All items must be authorized and from an approved vendor. Additionally, one (1) set of ear buds or one (1) over the ear headphones is authorized per inmate. Any alteration to the appliance will result in the appliance being removed from the cell immediately and disposed of per Institutional procedures.

All Inmates housed in the CCCMS STRH will have their property stored in the CCCMS STRH property room. Inmates may request utilization of stored legal materials via written request of the CCCMS STRH Z 1 Legal ASU Officer. All requests will be processed in an expedient manner.

F. State Issued Supplies:
The following supplies will be issued each Thursday by third watch staff:

1. One (1) roll of toilet paper (cardboard roll removed)

2. One (1) bar of soap [if "regular" size - one (1) every two (2) weeks, if small one (1) a week]

3. Five (5) indigent envelopes (if qualified)

4. Five (5) sheets of writing paper

5. CDC forms 602, I/M request, Trust Withdraw, etc.

6. One (1) ounce of tooth powder

7. Dental Gliders (Indigent only, five (5) per week on one-for-one exchange)

8. Toothbrush - short handle / exchange every two (2) weeks (one-for-one)

9. Pen filler / exchange every two (2) weeks on a one-for-one basis only if needed.

G. Multi-Powered Radio Loaner Program

Upon completion of the administrative review, inmates shall be given the opportunity to be issued a radio and a set of ear buds. The supervisor responsible for CCCMS STRH will ensure the CCCMS STRH custody staff issues a radio and ear buds to the inmate. The CCCMS STRH custody staff will ensure the inmate completes the CDC Form 128 B, General Chrono Multi-Powered Loaner Program Agreement **(Attachment T)** prior to issuance. Once the loaner agreement is completed, the inmate may be issued the radio and ear buds. The CCCMS STRH custody staff will track issuance of the radio and ear buds on the Multi-Powered Radio Distribution Log **(Attachment U).** CCCMS STRH custody staff shall ensure the radio is in proper working order prior to issuance and upon return from the inmate.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

If the inmate refuses to participate it shall be documented on the **(Attachment U)** as "NOT RX" under the date issued section of the form with the property officer signing the "Staff Issued" section.

Inmates who elect to participate in the multi-powered radio loaner program will be required to sign a CDC 193 trust withdrawal order form and will be allowed to utilize the radio in 21-day increments. If at the conclusion of the initial 21-day period the inmate has not been released or received his personal entertainment appliance or is determined to be indigent, he may request additional 21-day periods in the program. Prior to granting any extension requests, priority shall be given to all newly placed CCCMS STRH inmates and then all indigent inmates.

Upon release from CCCMS STRH, the inmate will relinquish the radio; however, may retain possession of the ear buds. CCCMS STRH custody staff must ensure the ear buds are placed on the inmates CDC Form 160-H Inmate Property Control Card. If the radio and ear buds are altered or destroyed, the CCCMS STRH custody supervisor shall determine if it was intentional or unintentional based on the circumstances and all available information. If it is deemed intentional, progressive discipline shall ensue as outlined in CCR, Title 15, Section 3312, Disciplinary Methods. In addition, the inmate will be charged the full replacement cost of the hand crank radio ($38.99) and the hand crank radio will be confiscated.

H. Non Disciplinary Segregation (NDS)

Inmates placed in an ASU for non-disciplinary reasons shall be tracked and recorded by the ICC on the ICC NDS Tracking Form **(Attachment V)**. Inmates who have been designated as NDS inmates shall be allowed property in accordance with the NDS Personal Property Matrix (Rev 8/14/13).

## XIX.   HOUSEKEEPING PROCEDURES:

Inmates are required to keep their assigned cells neat and clean at all times consistent with institutional procedures. Unit staff will ensure inmates are issued appropriate cleaning supplies as required.

A. The cell will be swept and cleaned as necessary.

B. Beds are to be made, and all personal property and state issued clothing will be properly stored.

C. No articles will be suspended or affixed to the ceiling or walls of the cell.

D. Windows will not be covered.

E. Most cleaning supplies are caustic substances. Unit staff will ensure inmates do not possess more than is necessary.

F. When vector control is needed within a specific location in CCCMS STRH, due to rodent and or insect infestation, the CCCMS STRH Sergeant will complete/submit a work order, contact plant operations, and identify the specific nature of the problem. If interior vector control is needed within a specific cell, the inmate or inmates will be re-housed in an alternative cell pending the completion of the vector control process.

## XX.   FEEDING PROCEDURES:

A. Inmates assigned to CCCMS STRH will receive the same meals as inmates assigned to GP housing units with the following exceptions. Inmates assigned to ASU will not be allowed:

- Sugar packets
- Regular punch (sugar) packets
- Pepper packets
- Chicken with bones
- Fresh fruit with pits
- Fresh chili peppers

1. Two (2) hot meals (breakfast and dinner) and one (1) sack lunch will be served daily.

2. All meals will be served in and consumed within the assigned cell.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

3. All meals will be prepared at the CCCMS STRH Satellite Kitchen for steam line feeding by CCCMS STRH staff.

B. Serving utensils, trays and food carts will be inventoried and accounted for upon entrance to and prior to departure from the CCCMS STRH. The CCCMS STRH Sergeant will maintain a daily culinary inventory log to ensure accountability of all items.

C. Upon the arrival of the food carts, the food trays will be prepared by CCCMS STRH staff and then distributed to the CCCMS STRH inmates. Prior to serving, the Correctional Supervising Cook (CSC) will take and log the temperature of sample hot food item(s). The temperature of the hot items must be at least 140°F at the time of serving.

D. The individual food trays will be placed on a serving cart and distributed to the assigned inmates.

E. All personnel assigned duties relevant to food preparation/distribution are to ensure hats and gloves are worn whenever handling food.

F. If an inmate refuses to eat, the refusal will be appropriately documented on their 114-A, and supervisory personnel will be notified.

**Hunger Strike:** Refer to Operational Procedure #804 Inmate Hunger Strikes (Custody) and Operational Procedure #1014 Inmate Hunger Strikes (Health Care).

1. The CCCMS STRH Sergeant, Lieutenant will prepare meal sample reports and submit it to the Food Services Manager, Watch Office (to be placed with the Daily Activity Report), and one (1) copy will remain on file in the unit.

2. At no time will there be more than one (1) food/cuff port open per section in CCCMS STRH.

After allowing the inmates an ample amount of time to finish their meal (not to exceed 15-minutes), all food trays (hot and cold) will be picked up and accounted for from each cell. Inmates are only allowed to retain one (1) piece of fruit. They will surrender all trash and unconsumed food (i.e. milk carton, cereal box, etc.).

## XXI.   PERSONAL CLEANLINESS:

Inmate's assigned to CCCMS STRH, shall be provided the means to keep themselves clean and well-groomed. Showering and shaving shall be permitted at least three (3) times a week.

When escorted to the shower, the inmate will be attired only in boxer shorts, t-shirt and soft shoes or shower shoes.

A. Authorized items to be taken to the shower are:
   - One (1) bar of soap
   - One (1) towel
   - Shampoo

B. Inmates will be allowed to use nail clippers once every two (2) weeks. When requested, the inmate will be placed in a holding cell; staff will inspect the clippers and issue them to the inmate. Upon return, staff will again inspect the clippers to ensure they are intact. Any discrepancies will be reported immediately to a facility supervisor. For sanitary purposes, CCCMS STRH custody staff will ensure nail clippers are sanitized after each use. The use of nail clippers will be done before the inmate showers.

C. Shaving will be accomplished by utilizing an electric clipper unit with electrical clippers during the inmate's assigned yard period and/or before their assigned shower period. CCCMS STRH custody staff will maintain its tool inventory, a supply of clipper units and assorted clipper heads for clipping hair. Only one (1) clipper head (regardless of size) will be issued at any time for use with the clipper unit, along with a small container of Barbicide to sterilize the clipper heads after each use. Barbicide will be issued to the inmates so they may sterilize the clipper heads following each use. All clipper units and heads will be inventoried before and after each use by the unit staff to ensure accountability.

## XXII.   CELL SEARCHES:

CCCMS STRH custody staff will conduct routine cell searches. Each cell search will be completed in a systematic and concise manner. All areas

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

within the cell, to include vents, fixtures, mattresses, toilet, sink, desk, bunks and inmate property will be searched.

A. Second and third watch will each conduct at least three (3) random cell searches a shift, not including empty cell inspections prior to and after inmate(s) occupy a cell.

B. A thorough cell search will be conducted prior to assignment of an inmate to a cell. Additionally, a search will be conducted upon the departure of an inmate from a cell.

C. During the course of normal daily activities, visual searches and inspections will be conducted to ensure all cell fixtures and equipment are serviceable and the cell is clean.

D. All cell searches shall be documented in all applicable areas of the cell search log, and CDC 114-A file for each inmate. All discrepancies will be noted and disciplinary action taken when appropriate. A cell search receipt will be issued after every cell search.

E. Every cell will be searched a minimum of once every 30-days.

## XXIII.  LAW LIBRARY:

CCCMS STRH inmates are provided law library access primarily via a computer work station; however, they may request access via "Paging." CCCMS STRH is equipped with a computer workstation containing mandated legal reference material and case law. Each ASU is equipped with a holding cell designed for use with this mobile computer system.

The inmate will submit a request for interview to the CCCMS STRH Z 1 Legal ASU Officer by Monday of each week.

The inmate will be scheduled and given access depending on the number of requests received and hours available. Preferred Legal User's (PLU's) will have priority. A list is generated weekly by the Librarian.

The inmate will be allowed a maximum of two (2) hours (if time permits) of research time per visit,

however the inmate is not required to use the entire two (2) hours.

A. Copying:

The CCCMS STRH Z 1 Legal ASU Officer will complete all copying requests. The inmate will turn in a request by Monday and the copies/materials will be delivered within the same week.

B. Book Exchange:

Leisure reading book exchange will be done every week by the CCCMS STRH custody staff. The inmate must sign and submit a Trust Account Withdrawal Form to participate. If the inmate loses or damages a book, his signed trust account withdrawal will be submitted.

If the inmate moves out of the unit, they do not take books with them. They shall return all books to the floor staff prior to moving or their signed trust account withdrawal will be submitted.

Only one (1) book per inmate, per week is allowed.

Inmates are required to fill out a trust account withdrawal form prior to being issued law books from the law library.

## XXIV.  VISITING PROCEDURES:

CCCMS STRH inmates are permitted visits with their approved visitors. All visits will be non-contact in the designated visiting rooms. All attorney contact visits will be allowed at the attorney's request, except in circumstances where there is documented evidence of extremely violent behavior demonstrated by the inmate.

All visits will be by appointment only, and will be restricted to 1-hour time limits, pursuant to local Visiting Procedures.

## XXV.  ACCESS TO TELEPHONES:

A. CCCMS STRH inmates in privilege group 'D' are permitted telephone calls only in the following situations:

- Verified family emergencies.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

- Per the Litigation coordinator (i.e., court ordered, attorney contacts).

B. The Facility B Captain, Lieutenant or Correctional Counselor I or II must authorize telephone calls.

C. CCCMS STRH inmates deemed to be NDS are entitled to phone access in accordance with CCR, Title 15, Section 3282.

XXVI. **CCCMS STRH EXERCISE YARD PROCEDURES:**

When KVSP DOM Supplement 52020.5.8, Limited Visibility Procedure is implemented, CCCMS STRH Yard activities may continue. Yard activities will be initiated in CCCMS STRH when the yard video cameras can clearly see to the back of all the small exercise yards. The decision to initiate CCCMS STRH yard activities during limited visibility is at the discretion of the CCCMS STRH Sergeant/Lieutenant based on visibility of the yard area and appropriate safety and security through observation.

A. Yard Searches:

Yard modules and sally port doors will be inspected for proper operation and structural integrity on each watch. This inspection includes testing of the control booth's electronic door operation and override function. The CCCMS STRH Sergeant must be notified of any discrepancies immediately. CCCMS STRH supervisors shall ensure all yard searches are logged in the Unit Isolation Log Book.

Yard sinks and toilets will be inspected for proper operation.

B. CCCMS STRH Yard Procedures:

STRH has twenty (20) management control yards. Inmates newly assigned to CCCMS STRH will be offered exercise yard at the next available yard for their assigned cell, and no sooner than 24-hours after placement. Inmates housed in CCCMS STRH are not required to be seen by classification committee prior to being offered exercise yard.

CCCMS STRH Yard Officer will facilitate a yard schedule for CCCMS STRH inmates. CCCMS STRH inmates will have a minimum of eighteen and one half (18.5) hours of yard available to therm.

1. The control booth will announce yard call ten minutes and five (5) minutes prior to yard release, over the unit public address system.

2. When "Yard Call" is given, inmates scheduled and desiring to participate in yard will turn on their cell lights, stand at the door, and tell the floor officer they want to participate in yard.

3. The inmates clothing to be taken to the yard will be placed on the cell food/cuff port.

4. The escorting officer will conduct a thorough search of all clothing and property and conduct an unclothed body search of the inmate within his assigned cell.

5. In instances where two (2) inmates are assigned to a cell, both inmates' property they are taking to yard will be removed from the cell prior to the commencement of the unclothed body search. At no time will inmates retrieve items once the search has been initiated. Once the inmate is restrained and removed from the cell, he will be allowed to carry his property to the yard.

6. Upon completion of the search, the inmate(s) will be handcuffed and escorted from the cell to the assigned yard.

7. Once placed on the yard, the inmate will be unrestrained.

8. Yard recall will be conducted the reverse of yard release. Escorting officers will report to the yard and individually remove each inmate from the yard.

9. All inmate clothing and items authorized for the yard will be thoroughly searched by the officer. Upon completion of an unclothed body search, the inmate will be placed in restraints and removed from the yard. A CCCMS STRH custody staff will be positioned at the sally port and will conduct a search of the inmate utilizing a hand held

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

metal detector. If clear, the inmate will be returned to his cell.

10. Inmates will not impede the progress of yard by stopping or conversing with others during the escort.

Inmates will be removed from the exercise yard upon approval by the CCCMS STRH Sergeant or Lieutenant for the following reasons:

- Illness /UHT Procedures
- Attorney Visits
- RVR Hearings
- Ducats
- Committee appearance
- Needs to be seen by a staff member
- Emergencies
- Disciplinary problems
- Completion of allotted yard time

11. Yard procedures will continue seven (7) days per week with the following exceptions:

- Limited Visibility (dependent upon visibility of the Yard area)
- Emergencies
- Lockdown
- Per institutional needs

12. The following items will be allowed out on the CCCMS STRH exercise yards:

- One (1) T-Shirt
- One (1) Pair Boxer Shorts
- One (1) Pair of socks
- One (1) Towel
- One (1) Pair of Soft Shoes (or medically prescribed orthopedic boots)
- A small amount of toilet paper not to exceed 1/8th of a roll
- One (1) state issue soap
- One (1) jumpsuit (during Inclement weather and laundered as needed)
- One (1) jacket during winter months as outlined in section XVII
- One (1) personal set of thermal underwear (shirt/pants) – inclement weather
- Assistive devices

C. Emergency Yard Procedures:

1. In the event of an emergency, the officer monitoring the yard will immediately activate the building alarm and notify staff.

2. If time permits, (great bodily injury or possible death is not imminent) ample warning (whistle or verbal commands) will be given before using any other force options.

3. Responding staff will not enter the yard area until sufficient staff has arrived and all inmates are lying face down on the yard. Staff will then enter upon orders from the supervisor in charge.

**XXVII. EMERGENCIES:**

A. Fire / Emergency Evacuation:

1. All assigned personnel will be familiar with existing institutional procedures relevant to emergency response and fire evacuation procedures.

2. The CCCMS STRH Sergeant will ensure all assigned staff is familiar with fire evacuation routes within the unit and knowledgeable in the use of appropriate firefighting equipment. Simulated monthly fire/emergency evacuation drills will be conducted by each shift under the direction of the CCCMS STRH Sergeant in order to audit the effectiveness of the procedure.

3. Based upon custody/security requirements, the following specific procedures for fire emergency evacuation of the CCCMS STRH will be followed in the event of major fire or natural disaster within the unit.

   a. The CCCMS STRH Sergeant will determine the severity of the situation and supervise the evacuation.
   b. CCCMS STRH staff is responsible for conducting an orderly/safe evacuation of the unit under the direct supervision of the CCCMS STRH Sergeant. The CCCMS STRH control booth officer will provide gun coverage inside the unit and release inmates from their cells electronically if appropriate. In the event

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

the cells cannot be electronically operated, floor staff will manually release inmates.

c. All inmates will be individually restrained, released, escorted to and secured inside the small management yards. The inmate's will be placed in to the small management yards. Staff will attempt to place inmates in groups according to compatibility. However, dependent on the severity of the situation, compatibility will not be a determining factor for placement. If circumstance dictates, CCCMS STRH staff may conduct an unlock of all cells, and will direct all affected inmates to the area in front of the CCCMS STRH instructing them to assume a sitting position.

d. To ensure the unit has been entirely evacuated, staff will conduct a cell-by-cell security check to assure all inmates have been evacuated.

e. CCCMS STRH staff will report to the area in front of the CCCMS STRH upon the completion of the evacuation and summon/render appropriate medical assistance. Additionally, all inmates' status/whereabouts will be accounted for and staff will stand by for further instructions.

f. When the situation has returned to normal, the inmates will be re-housed.

g. CCCMS STRH staff will release inmates to the CCCMS STRH exercise yard. All inmates will assume a seated position until ordered otherwise.

4. Fires, which do not require evacuation, will be extinguished by responding staff/and or the institution fire department.

5. The control booth officer will vent excessive amounts of smoke from the unit. The control booth officer will familiarize him/herself with the operation of the CCCMS STRH vent zones.

6. Fire Prevention:

a. Containers of flammable items will not be stored in CCCMS STRH.

b. Clean laundry will be kept in storage cabinets with doors closed at all times, except when clothing is being issued.

c. Accumulations of dirty laundry will be kept in containers away from areas readily accessible to inmates.

d. Accumulations of waste paper will be kept in trash receptacles with fitted covers and kept away from areas readily accessible to inmates.

e. The exhaust fan system will be checked weekly and plant operations notified promptly if the system is not functioning properly.

7. Reporting Fires/Emergencies:

a. In case of fire, dial the emergency number for the Fire Department (Ext. 222). Report all emergencies to the CCCMS STRH Sergeant, Lieutenant and Watch Commander.

b. Give the Fire Department the following information:
   • Location of fire
   • Person placing the call
   • Type of fire, (i.e., electrical, fuel, etc.)

c. If a fire extinguisher or fire hose is used to extinguish a fire, staff will promptly notify the fire chief for replacement or recharge.

B. Staff Responding to Emergencies:

1. The CCCMS STRH Sergeant will respond to all emergencies and direct all operations. Although the presence of a Sergeant is preferred, the presence of a supervisor, manager or health care staff is not required to conduct an immediate extraction.

2. All CCCMS STRH staff will respond to all emergencies in the yard and building areas.

3. Sufficient staff will only enter the yard at the direction of the supervisor.

4. Additional staff will be held in reserve outside the yard area until the situation is under control.

5. For an immediate extraction or emergency cell entry from a confined area such as a cell, holding cell, shower, or small exercise

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

yard, extraction/entry team members shall be issued and utilize a riot helmet with protective face shield, protective vest, protective shield (22" wide by 48" long), hand held baton and handcuffs in accordance with DOM section 51020.12.2.

6. Action Taken:

   a. Emergency response medical staff will assess inmates requiring medical attention and take them immediately to the Correctional Treatment Center (CTC), if necessary.
   b. All other inmates involved in the incident will be immediately searched and medically evaluated prior to determining if they can be returned to their cells.

7. Emergency Yard Evacuation:

   a. The primary goal if an inmate has been seriously injured is to remove the victim in need of emergency medical attention without jeopardizing the safety of staff or inmates.
   b. The CCCMS STRH Sergeant will ascertain which victim(s) need to be immediately removed due to injuries sustained. CCCMS STRH staff will proceed to the staff office and don protective gear and shields.
   c. Staff will instruct the non-injured inmate to exit the yard (restraints will be applied before the yard gate is opened) while the injured inmate lies face down on the ground. Once the non-injured inmate has been removed, the remaining inmate will be instructed to exit the yard. If the inmate is unable to move due to his injuries, staff will enter the yard with a shield and batons and place the inmate in restraints. Medical staff will conduct an evaluation and determine the extent of the injuries. The inmate will be moved only when it is reasonably safe to do so.
   d. If the inmates on the affected yard refuse to comply with staff's instructions for being restrained and removed from the yard, a

determination will be made on the need to use force.

   e. Following an incident, the yard will be searched and evidence gathered and processed in accordance with Institutional Procedures.

C. Emergency Response Drills:

Monthly Emergency Response Drills **(Attachment W)** are to be conducted by all ASU's on each watch. These drills shall include regularly assigned custody staff, as well as medical personnel assigned to CCCMS STRH. The Facility Captains over the ASU's shall submit a memorandum to their supervising Associate Warden for review and submission to the Chief Deputy Warden (CDW)/Warden for review and submission to Associate Director (AD) by the final day of each month in the form of a memorandum confirming compliance. The memorandum shall clearly spell out the specifics of each incident.

The type of emergency addressed in each month's drill shall be varied, for example, in January, response to a cell with an inmate trying to hang himself, and in February response to an inmate with self-inflicted cuts threatening additional cuts. This training shall be inclusive of custody and medical staff.

## XXVIII. INMATE WELFARE CHECKS:

A. An inmate security/welfare check is defined as a "personal observation" of the welfare of the inmate and the security of the cell in which an inmate is housed in any of the KVSP ASUs to include the CCCMS STRH. The security/welfare check shall include a visual/physical observation of a living, breathing inmate, free from obvious injury, ensuring the view into the cell is clear and unobstructed, and no damage to the cell and/or signs of any misconduct or self-injurious behavior.

B. Designated Correctional Officer positions are responsible for conducting Inmate welfare checks in CCCMS STRH as denoted below.

| Post 172705 – Z1 Floor | 1/W |
| Post 272706 – Z1 Floor 1 | 2/W |
| Post 272709 – Z1 Floor 2 | 2/W |
| Post 272710 – Z 1 SEC PAT 1 | 2/W |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

| | |
|---|---|
| Post 272712 – Z1 SEC PAT 2 | 2/W |
| Post 372707 – Z1 Floor 1 | 3/W |
| Post 372708 – Z1 Floor 2 | 3/W |
| Post 372711 – Z1 SEC PAT 1 | 3/W |
| Post 372713 – Z1 SEC PAT 2 | 3/W |

C. **GUARD ONE:**

1.  Use of the Guard One Rounds Tracker (Pipe):

    Staff will use the "Pipe" to record security/welfare checks. The assigned officer shall conduct a security/welfare check on each cell, twice an hour not to exceed 35 minutes between checks. The "Pipe" captures two levels of information, the time the security/welfare check was made and the location where the security/ Welfare Checks were conducted. The officer will touch the "Pipe" to each button which is affixed to each cell in their unit. This will electronically validate the officer was at a specific cell, at a specific time.

    Any disruptions to the security/welfare checks shall be documented in the housing unit isolation logbook

2.  Inmate Removal from Cell:

    During times when an inmate is out of their assigned cell for (yard, Classification committee, appointments, visiting, etc.), the assigned Correctional Officer will continue to conduct Security/Welfare Checks looking for damage and potential security concerns to that inmate(s) cell.

    Vacant cells:

    Officers are not required to conduct Security/Welfare Checks on cells where there are no inmate(s) assigned.

3.  InterMaskProtocol Download and Unit Supervisory Review:

    At the completion of each shift, the officer conducting the Security/Welfare Checks will insert the "PIPE" into the InterMaskProtocol (IP) Downloader located in the Unit/Program Office for the unit supervisor's review. Once the IP download has been completed, the unit supervisor shall review all Security/Welfare Checks made during their shift using the Guard One Rounds Tracker Software installed on their designated work station. This review will ensure all Security/Welfare Checks have been completed at least twice an hour at staggered intervals not to exceed 35-minutes between checks.

    After the review, the unit supervisor will print the Guard One Rounds Tracker report and provide their signature and date of review. Should there be any discrepancies discovered during this review, the unit supervisor shall address the discrepancy, and if necessary, provide appropriate training with the responsible staff prior to the end of shift. The reports shall be retained in accordance to CDCR's records retention policies.

    The Facility Captain responsible for oversight of their respective ASUs shall review the security/welfare checks made on a weekly basis using the Guard One Rounds Tracker Software to ensure proper documentation review and training are being completed in accordance with this procedure. The captain shall forward their findings in a memorandum format to their respective Associate Warden by the end of each working week with their findings, to include any training and/or adverse action recommended.

    The Associate Warden is responsible for oversight of his respective ASUs shall review the security/welfare checks made on a monthly basis using the Guard One Rounds Tracker Software to ensure proper documentation review and training are being completed in accordance with this procedure.

    Training:
    The unit supervisor shall ensure all Officers tasked with conducting security/welfare checks are provided training regarding this procedure and the Guard One System equipment.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

4.  Equipment Malfunction:

In the event the Guard One Rounds Tracker software or equipment is not functioning properly, staff will immediately notify the custody supervisor for follow up. For any technical assistance regarding the Guard One Rounds Tracker System staff will contact Enterprise Information Services staff. If staff cannot return the Guard One Rounds Tracker software or equipment to service in a timely manner, staff will utilize the manual methods detailed on the Security/Welfare Check Manual Tracking Sheet **(Attachment X).** The original completed CCCMS STRH Welfare Check Tracking Sheets will be retained in CCCMS STRH records for a minimum of three (3) years and an additional four (4) years in KVSP records archives.

## XXIX. SAFETY EQUIPMENT / KEY / TOOL CONTROL:

The CCCMS STRH Sergeant will ensure all safety equipment, i.e., cut down kit, chemical agents, mechanical restraints, batons, protective vests, keys and any assigned tools are accounted for, and properly secured at all times.

A.  A unit inventory log will be maintained and all equipment, weapons and padlocks will be inventoried at the beginning and end of each shift by unit staff. All deficiencies / discrepancies will be immediately reported to the CCCMS STRH Sergeant or appropriate supervisor.

B.  Maintenance Staff/Tools:

When maintenance staff enters the unit with assorted tools, only those tools needed to accomplish the job will be allowed to remain with the workers. All tools will be inventoried when entering and upon exit from the unit.

C.  Emergency Inmate Work Crew:

Inmate workers are not authorized in the CCCMS STRH unless under emergency conditions, and with the approval from the Facility Captain.

CCCMS STRH custody staff will conduct an unclothed body search of all inmate workers when entering and exiting the unit.

Upon completion of work, the cell will be searched and the floor officer will do a complete inventory of the tools.

If a tool cannot be accounted for, the CCCMS STRH Sergeant will be notified. The CCCMS STRH Sergeant will notify the CCCMS STRH / CCCMS Lieutenant who will notify the Facility Captain or AOD within 30-minutes of learning of the situation, and a complete search of the area will be conducted.

D.  Protective Vests:

A protective vest pool will be maintained in CCCMS STRH Armory. The CCCMS STRH Lieutenant has overall responsibility to ensure an effective system is in place to ensure accurate inventory, distribution, and cleaning of the vest pool. Each vest will be issued via the chit system.

1.  Protective vest use is mandatory for all staff assigned a vest and designated staff under the following situations or conditions:

    *   All staff working within the CCCMS STRH.
    *   All staff performing escorts of inmates assigned to the CCCMS STRH.
    *   All designated staff working in the vicinity of inmates assigned to CCCMS STRH, inclusive of inmates housed in or being treated in the CTC.

2.  The following custodial and non-custodial personnel are mandated to wear a protective vest when working with CCCMS STRH inmates:

    *   Correctional Officer
    *   Correctional Sergeant
    *   Correctional Lieutenant
    *   Correctional Counselor I
    *   Correctional Counselor II
    *   All Medical Staff
    *   Psychiatrist/Psychologist
    *   Psychiatric Technician

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

- Any Staff with Direct Contact with CCCMS STRH Inmates

3. The wearing of the protective vest is optional for classification committee members, when serving on a CCCMS STRH Institution Classification Committee (ICC) or Unit Classification Committee (UCC).

4. Protective vests shall be worn only in the manner prescribed by the manufacturer and departmental guidelines. Protective vests shall not be worn in any manner to reduce their designed level of effectiveness. Uniform staff shall wear the vest under the uniform shirt.

5. Protective vest covers:

   The cleaning and care of the protective vest pool carriers located in CCCMS STRH and the CTC will be as follows:

   a. Each vest will have two (2) carriers. One (1) carrier for each vest will be laundered each week. On Monday morning, the supervisor for the affected area will assign a staff member to remove the soiled carrier from each vest and replace it with the clean carrier assigned to the particular vest. The area supervisor will contact the Vest Control Person (VCP) and inform them of the number of vest carriers needing to be picked up and laundered. The VCP will deliver them to a local vendor for cleaning. After the newly cleaned carriers have been picked up from the vendor, the VCP will deliver them back to their assigned areas.

   b. Protective vests are to be maintained in good repair. Damage is to be reported to the STRH Sergeant and VCP for replacement as necessary.

6. Protective vest insert plates:

   a. Protective vests will be maintained in the CCCMS STRH armory.

   b. The vest insert plates will be wiped down with a clean, damp cloth on a weekly basis.

C. Protective Face Shield:

   All CCCMS STRH staff shall wear the protective face shield at all times when having any inmate contact. Protective face shields shall be worn by staff, at all levels and classifications, when in close contact with un-handcuffed inmates. Close contact situations include those where staff is near an un-handcuffed inmate in the shower, inmates being processed to or from an exercise yard, inmates being provided items through the food/cuff port, or when staff is on a tier.

## XXX. AUTHORIZED HEALTH CARE APPLIANCES

When an inmate is re-housed in the CCCMS STRH, the sending facility staff shall ensure all medically prescribed Health Care Appliances (HCA's) are delivered to the CCCMS STRH Sergeant, for immediate issuance (unless the appliance was removed due to safety and security issues, i.e., evidence or weapon).

A. The sending facility shall inventory all property in the inmate's cell and complete a CDCR 128B, ASU HCA Inventory Chrono.

B. The completed ASU HCA Inventory chrono shall accompany the inmate to ASU along with the ASUPN.

C. The CCCMS STRH Sergeant shall sign the aforementioned CDCR 128B, indicating receipt of the appliance. A copy of the CDCR 128B shall be given to the inmate, a copy shall be placed in the inmate's CDC 114-A, segregation log and the original shall be placed in the inmate's ERMS File.

D. The CCCMS STRH Sergeant shall generate a HCA identification form to be placed in the inmate's 114 file identifying the appliance and all removable parts for accountability and verify through health care services the inmate has a current prescription for the appliance (s). The CCCMS STRH Sergeant shall ensure the appliance (s) and all removable parts are clearly marked with the inmate's CDCR number and the appliance (s) is listed on the inmate's property card in R&R. A copy of the HCA identification form shall be placed on the inmate's assigned door in a manila folder out of the view of inmates. A third copy of the form shall be placed

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

in an American Disabilities Act (ADA) Appliance Accountability Binder stored in the CCCMS STRH Sergeant's office.

E. If any discrepancies are noted, the CCCMS STRH Sergeant shall contact the sergeant of the sending facility who shall initiate a search for the missing HCA. If the HCA cannot be located, the Facility Sergeant shall write a memo to their Facility Captain explaining how and why the HCA was lost with a copy to the ADA Coordinator and the CCCMS STRH Sergeant shall refer the inmate to medical staff for a replacement appliance.

F. If the sergeant determines the inmate does not have a current prescription for the appliance, the sergeant shall submit a referral to health care services requesting evaluation for the medical necessity of the appliance. The appliance shall not be removed pending evaluation by health care services, unless the appliance presents a direct and immediate threat to the safety of others in accordance with section IV. I. 22 of the Armstrong Remedial Plan.

G. If the appliance was confiscated due to security issues, The Facility Captain shall consult with the CEO or designee for alternate accommodations.

H. All CCCMS STRH custody staff shall take the ADA appliance accountability binder and complete a daily inventory of all appliances and their parts. This shall be documented on a Daily Health Care Appliance Inspection Log **(Attachment Y)** and retained in ASU for accountability.

**XXXI. DEPARTMENTAL POLICY REGARDING PRISONERS WITH DISABILITIES BEING HOUSED IN ASU DUE TO LACK OF ACCESSIBLE BED SPACE**

It is the policy of the CDCR to make every effort not to house Armstrong class members in an ASU due solely to a lack of appropriate accessible GP housing. As a result, an Armstrong class member's placement, retention and release from ASU will be in accordance with OP 802 Developmental Disability Program (DDP).

**XXXII. ALTERNATE HOUSING FOR DPW INMATES ON ASU STATUS:**

When an inmate, classified as a Fulltime Wheelchair User (DPW) in the DDP, is placed in an ASU and there are no available DPW ASU cells, the following steps shall be taken.

A. The CCCMS STRH Lieutenant shall contact the C&PR. The C&PR will review DPW inmates housed in CCCMS STRH to identify any DPW inmates who can be cleared for release (i.e. Imminent Maximum Estimated Release Date (MERD), resolved safety concerns, RVR's which have been heard, etc...). If any of the ASU DPW inmates can be released, the C&PR will schedule an emergency ICC, to release the inmate.

B. If none of the ASU DPW inmates can be released, the C&PR will identify ASU DPW inmates endorsed for transfer to an alternate institution. If any are identified, the C&PR will arrange a transfer of the inmate to the endorsed institution.

C. If none of the ASU DPW inmates are endorsed for transfer, the C&PR will contact other institutions in an effort to locate an available DPW ASU cell. Once located, the C&PR will arrange a temporary transfer of the inmate, for ASU placement.

D. If temporary housing is required during this process, the inmate will be confined to quarters in his assigned general population DPW cell and placed on single cell status. All personal property will be removed from the cell and inventoried by Facility staff pending placement into ASU.

**Attachments**

| | | |
|---|---|---|
| Attachment | A | ASU Placement Cover Sheet |
| Attachment | B | ASU Placement Notice |
| Attachment | C | 128B-ASU Lay-Over Chrono |
| Attachment | D | CDC 114-A1 Inmate Segregation Profile |
| Attachment | E | CDC 7219 Medical Report of Injury or Unusual Occurrence |
| Attachment | F | GA 154 Inmate Housing Assignment Change |
| Attachment | G | CDC 128-B ASU Health Care Appliance Inventory Chrono |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #210**
**Short Term Restricted Housing- CCCMS STRH**

| Attachment | H | CDC 1083 Inmate Property Inventory Sheet |
| Attachment | I | CDC 1882-B Double Cell Review |
| Attachment | J | Health Care Appliance Identification Form |
| Attachment | K | Cell Search Log |
| Attachment | L | Exhibit B Cell Inspection Form |
| Attachment | M | Cell Search Monitoring Sheet |
| Attachment | N | Identifying Marker |
| Attachment | O | ASU Activity Workbook (English) |
| Attachment | P | ASU Activity Workbook (Spanish) |
| Attachment | Q | CDC 114-A Inmate Segregation Record |
| Attachment | R | Weekly Review of Inmate Segregation Profile/Record Spreadsheet |
| Attachment | S | ASU Release Form |
| Attachment | T | CDC Form 128 B, General Chrono Multi-Powered Loaner Program Agreement |
| Attachment | U | Multi-Powered Radio Distribution Log |
| Attachment | V | ICC Non-Disciplinary Segregation (NDS) Tracking |
| Attachment | W | Medical Emergency Response Drill Report |
| Attachment | X | Security/Welfare Check Manual Tracking Sheet |
| Attachment | Y | Daily Health Care Appliance Inspection Log |

Approved: _M. Felder (signature)_

M. FELDER
Chief Executive Officer
Kern Valley State Prison

Date: _5-11-2020_

Approved: _C. Pfeiffer (signature)_

C. PFEIFFER
Warden
Kern Valley State Prison

Date: _5/18/2020_