1              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF CALIFORNIA
2                      --oOo--

3    RALPH COLEMAN, ET AL,       ) Docket No. 90-CV-520
                                 ) Sacramento, California
4                  Plaintiffs,   ) July 17, 2020
                                 ) 10:09 a.m.
5          v.                    )
                                 )
6    GAVIN NEWSOM, ET AL.,       ) Re: 2nd Quarterly Status
                                 ) conference
7                  Defendants.   )

8              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE KIMBERLY J. MUELLER
9            UNITED STATES DISTRICT JUDGE

10   APPEARANCES (Via Zoom):

11   For the Plaintiffs:    ROSEN BIEN GALVAN & GRUNFELD, LLP by
                            MR. ERNEST GALVAN
12                          MR. MICHAEL BIEN
                            MS. LISA ADRIENNE ELLS
13                          50 Fremont Street, 19th Floor
                            San Francisco, CA 94105
14
                            MS. JESSICA WINTER
15                          MR. MARC J. SHINN-KRANTZ
                            MS. JENNY SNAY YELIN
16                          MS. AMY XI
                            101 Mission Street, Sixth Floor
17                          San Francisco, CA 94105

18                          PRISON LAW OFFICE by
                            MR. DONALD SPECTER
19                          MR. STEVE FAMA
                            1917 Fifth Street
20                          Berkeley, CA 94710

21       (Appearances continued next page.)

22              JENNIFER COULTHARD, RMR, CRR
                  Official Court Reporter
23              501 I Street, Suite 4-200
                  Sacramento, CA 95814
24              jenrmrcrr2@gmail.com
                    (530)537-9312
25
         Mechanical Steno - Computer-Aided Transcription

```
 1    APPEARANCES (Via Zoom Cont'd)

 2    For the Defendant:        OFFICE OF THE ATTORNEY GENERAL by
                                MR. KYLE ANTHONY LEWIS
 3                              MR. ADRIANO HRVATIN
                                MS. ELISE THORN
 4                              455 Golden Gate Avenue, Suite 11000
                                San Francisco, CA 94102
 5
                                OFFICE OF THE ATTORNEY GENERAL by
 6                              MR. TYLER HEATH
                                MR. LUCAS L. HENNES
 7                              1300 I Street, Suite 125
                                Sacramento, CA 94244
 8
                                ROBINS KAPLAN, LLP
 9                              MR. ROMAN SILBERFELD
                                2049 Century Park East, Suite 3400
10                              Los Angeles, CA 90067

11                              HANSON BRIDGETT, LLP by
                                MS. SAMANTHA DERIN WOLFF
12                              425 Market Street, 26th Floor
                                San Francisco, CA 94105
13
                                MR. PAUL. B. MELLO
14                              1676 North California Blvd., Suite 620
                                Walnut Creek, CA 94596
15
      Also Present:            DIANA TOCHE,
16                              Undersecretary of Health, CDCR
                                ALISON HARDY
17                              Plaintiff class counsel in Plata
                                JENNIFER NEILL
18                              Assistant Secretary/Chief Counsel, CDCR
                                JOSEPH BICK, M.D.,
19                              Director, Health Services, CDCR
                                MELISSA BENTZ
20                              Legal Affairs, CDCR
                                NICK WEBER,
21                              Legal Affairs, CDCR
                                STEPHANIE CLENDENIN,
22                              Director, DSH
                                CHRISTINE CICCOTTI,
23                              General Counsel, DSH
                                CHRISTOPHER KENT
24                              General Counsel, DSH

25
```

```
 1    APPEARANCES (Via Zoom Cont'd):

 2                         ANTONINA RADDATZ
                          General Counsel, DSH
 3                         JAMES SPURLING
                          General Chief Counsel, OIG
 4                         GREGG ADAM
                          Counsel for CCPOA
 5                         DAVID SANDERS
                          Counsel for CCPOA
 6                         MATTHEW LOPES
                          Special Master
 7                         MOHAMEDU JONES
                          Special Master Team
 8                         MONICA ANDERSON
                          KERRY WALSH
 9                         Special Master Team
                          KRISTINA HECTOR
10                         Special Master Team
                          JEFF METZNER, M.D.
11                         Special Master Team
                          KERRY HUGHES, M.D.
12                         Special Master Team
                          HENRY DLUGACZ
13                         Special Master Team
                          HAVEN GRACEY
14                         Law Clerk for Chief Judge Mueller

15

16

17

18

19

20

21

22

23

24

25
```

1             SACRAMENTO, CALIFORNIA , FRIDAY, JULY 17, 2020

2                         --oOo--

3    (In open court.)

4        THE CLERK:  The United States District Court for the

5 Eastern District of California is now in session.  Chief Judge

6 Kimberly J. Mueller now presiding.

7        Calling Civil Case 90-520, Coleman, et al. v. Newsom,

8 et al.  This is on for a second quarterly status conference.

9        THE COURT:  All right.  I am going to ask for

10 appearances from those who will be speaking today on behalf of

11 plaintiffs, so beginning with Mr. Bien.

12        MR. BIEN:  Good morning, Your Honor.

13        THE COURT:  All right.  Who else from your team will

14 be speaking today, given the items on the agenda?

15        MR. BIEN:  Lisa Ells and Ernest Galvin.

16        THE COURT:  All right.  And I see each of them, so

17 their appearances are noted at this point.

18        This is our first quarterly status conference since

19 our corona virus working sessions.  I'm not going to call role.

20 I just want to identify for the record those who will be

21 speaking today.  The clerk has checked folks in, I can see

22 who's there, we have our notes as to who is appearing and

23 monitoring.  I can see you all.  I know who's there.

24        So for the defense, Mr. Lewis?

25        MR. LEWIS:  Good morning, Your Honor; Kyle Lewis.

1    Speaking for defendants will be Kyle Lewis, Elise Thorn, Paul

2    Mello and possibly Samantha Wolff.

3            THE COURT:  All right.  All right.  Those who are not

4    speaking, if you could turn off your video cameras, that will

5    assist the Court in focusing on who is speaking.

6            I am going to explore using the webinar function,

7    which will be consistent with this approach and perhaps a

8    little more user friendly at least for the Court.

9            I'm not going to ask the special master to make a

10    report as I have at the more informal sessions.  I see the

11    special master appearing.  Mr. Lopes, you can see and hear us?

12    So the special master is available if the Court has questions

13    for him, but I'm not going to ask him to give a report.  I've

14    reviewed the parties' report.  Thank you for your written

15    report on the ongoing working group meetings.  I appreciate

16    receiving that.  That is very helpful as we go forward.

17            In terms of the first item on the agenda, updates to

18    Electronic Health Records system, I will just ask if either

19    side has anything in particular it wants the Court to know.  I

20    have received a briefing from the special master on this topic.

21            I understand that fixes are being made to address

22    issues raised during the Golding proceedings.

23            The data expert the special master has retained is

24    onboard, has been working for several months now to complete a

25    first round of work and then shift to more of an auditing

1    function.

2         I understand there are reliability and transparency

3    issues outstanding.  The special master is focusing on those

4    with the support of his data expert.  Dr. Leidner has been

5    helpful, the receiver has been helpful.  That's what I

6    understand.

7         So is there more that the plaintiffs want me to know

8    on electronic health records?  Mr. Bien or whoever on your team

9    you would yield to?

10        MR. BIEN:  No, Your Honor.

11        THE COURT:  For the defendants, Mr. Lewis?

12        MR. LEWIS:  Just, Your Honor, that we are continuing

13   to work with Dr. Potter.  He is being granted access to various

14   aspects of the data warehouse upon request and defendants will

15   continue to honor any request that he has and work with him and

16   the special master to get the information he needs so that he

17   can understand CDCR's data systems.

18        THE COURT:  All right.  Special Master Lopes, I see

19   that you're unmuted.  Did you want to weigh in on this topic?

20        SPECIAL MASTER LOPES:  No, Your Honor.

21        THE COURT:  All right.  Moving on, then, to

22   coordination.  Again, I've received a report from the special

23   master, coordination between the special master and the

24   receiver.  I understand that the teams, the Plata and Coleman

25   teams are in touch regularly, there is good communication.

1          I am aware, of course, of Dr. Bick's role.  The only

2    question I would have for reference, I understand Dr. Bick

3    shows up on the org chart as a CDCR employee and as receiver's

4    staff.  So perhaps Mr. Lewis, you or someone on your team

5    can -- just so I can conceptualize Dr. Bick's role now and for

6    the foreseeable future, is he 50/50?  What's his role

7    particularly vis-á-vis Coleman?

8          MR. LEWIS:  Thank you, Your Honor.  So Dr. Bick, you

9    are correct that he is overseeing both aspects that fall within

10   the receiver's office and then aspects which fall under his

11   role in CDCR overseeing mental health.  I can't speak to the

12   exact percentage of his time, but I know that he is still

13   overseeing mental health programming and that he is working

14   with CDCR to make sure that its mental health programs

15   continue, so he is -- I work with him; he's working with CDCR

16   staff.  He also then works for the receiver's office as well in

17   his role overseeing healthcare.  So while I can't speak to the

18   percentage, I do know that he is still integrally involved in

19   mental health operations and is overseeing all operations of

20   the mental health program system.

21         THE COURT:  All right.  I do see Dr. Bick.

22         MR. LEWIS:  He is available, Your Honor, if you'd like

23   to speak to him.  He may have some connectivity issues, but if

24   you'd like to ask him, I do believe Dr. Bick is able to speak

25   to Your Honor.

1          THE COURT:  All right.  Dr. Bick, are you able to see

2     and hear us and anything you want to further clarify based on

3     the Court's question and what you've heard from Mr. Lewis?

4          MR. BICK:  Good morning, Your Honor.  Yes, I am able

5     to see and hear the proceedings this morning and I'm available

6     if you have any questions.

7          THE COURT:  Do you have any clarification to add to

8     what Mr. Lewis just said about your new role and how that

9     affects your responsibilities in Coleman?

10          MR. BICK:  No.  I believe that was accurate.  It's --

11     my new position is director of healthcare services for all

12     clinical services.  I think he accurately described that.

13          THE COURT:  And it's a joint assignment, so part of

14     your time is on CDCR's payroll and part on the receiver's?

15          MR. BICK:  The way I envision it is it moves more

16     toward the way it's always been in my head anyway, which is

17     it's impossible to divorce mental health from mental -- from

18     medical, from nursing.  It's just -- that's an arbitrary kind

19     of way to set things up.  So in a way this is much more fluid

20     and cohesive for me.  I don't know if that's answers your

21     question, Your Honor.

22          THE COURT:  What does it mean for Coleman?  Do you

23     have a sense of that?

24          MR. BICK:  Well, what I would say is that in order to

25     ensure that we manage the workload for Coleman, we promptly

1    assigned a deputy director who reports directly to me, Dr. Amar

2    Mehta who has been within our program for some time.  He's very

3    knowledge, very skilled and he has really hit the ground

4    running.  I think there's been excellent continuity.  He and I

5    speak or communicate multiple times every day.  We're also in

6    the process of hiring into other vacant positions in the mental

7    health organizational structure.  So my anticipation is that

8    there will be no interruption in our focus on Coleman-related

9    matters.

10           THE COURT:  All right.  And you remain available to

11   this Court.

12           MR. BICK:  Absolutely, Your Honor.

13           THE COURT:  All right.  Understood.  Thank you for

14   that.  You may turn your video off if you would like.  Anything

15   further to say on this point, Mr. Lewis?

16           MR. LEWIS:  Nothing, Your Honor.

17           THE COURT:  Any questions, Mr. Bien?

18           MR. BIEN:  Yes, Your Honor.  I think that we have had

19   an ongoing process of trying to understand the exact structure

20   of healthcare within the joint entity, CDCR-CCHCS, and one

21   thing I can report is we are having very good access to

22   information from everyone when we ask questions and including

23   access to information about, you know, spreadsheets of the

24   class, granular information that the Court has requested that

25   we've been able to obtain so we can analyze.

1      I can't say that I fully understand exactly how the

2   structure works, but I can say that we don't seem to be having

3   a problem, you know, dealing with it at the moment at all, you

4   know.  And I think that I've been able to obtain information

5   from people who were clearly directly in the receiver's office

6   or people who were jointly.  It doesn't seem to really matter.

7   And as long as things are working, it doesn't seem to be an

8   issue, especially the transparency of information and data.  I

9   think that was the most important thing that came up.  I think

10  the -- down the road if the Court, you know, has to assert

11  jurisdiction over a particular function or person, that may be

12  an issue down the road, but right now it doesn't seem to be a

13  problem.

14      THE COURT:  All right.  Understood.

15      Special Master Lopes, anything to say on this point?

16      SPECIAL MASTER LOPES:  Thank you, Your Honor.  I share

17  Mr. Bien's concerns.  Dr. Bick is highly responsive, so it's a

18  pleasure working with him, but I think down the road clarity in

19  terms of jurisdictional issues may be necessary.  But for the

20  moment, I am in constant contact with Dr. Bick and he has,

21  again, been very responsive to us in his new role as he was in

22  his former role.

23      THE COURT:  All right.  I'm prepared to accept that

24  things are working well at this point and focus on

25  functionality while noting what's been said this morning.

1          In terms of benchmarks -- let me just cut to the chase

2    on benchmarks, which has been deferred, in terms of at least

3    clarifying.  The Court actually sees clarifying benchmarks for

4    the defendants, who profess the need for clarification as

5    fairly straightforward, and so my thought would be I think

6    there's no question but that the special master has been

7    applying -- has a rubric for monitoring.

8          The Court has addressed benchmarks in a couple of

9    areas with respect to transfers and clarified the benchmark

10   there with respect to staffing; at least I'm holding out a

11   benchmark in staffing.  We need to resolve staffing sooner

12   rather than later now, and we'll get to that.

13         My tentative plan subject to hearing from you this

14   morning would be to clearly put out there the benchmark the

15   special master has been using reflected in his reports to the

16   Court for quite some time now and ask why these should not be

17   confirmed as the benchmarks.  They're the de facto benchmarks.

18   I don't know that we need a lot of litigation.  If there are

19   objections, they can be recorded, I can rule on those

20   objections.  So why is that not a streamlined way, particularly

21   given the history here of clarifying the question of the

22   benchmarks?

23         Mr. Bien, are you the person to address this, or is

24   there someone else on your team?

25         MR. BIEN:  I can address it, Your Honor.  I think that

1    that process might be -- save time and energy in a time when we

2    have a lot of other issues going on.  We don't think that there

3    is a lot of dispute about benchmarks.  The Court has made them

4    clear.  I do think that there are areas where both sides will

5    probably weigh in with other issues or other ways of

6    evaluating, but I think there's no reason why we can't come to

7    a rapid resolution of that through the Court's guidance.

8           THE COURT:  All right.  Mr. Lewis?

9           MR. LEWIS:  Your Honor, benchmarks are a priority for

10   defendants.  As this Court's aware, two years ago the Court had

11   ordered the special master to bring up the issue of benchmarks

12   within its 28th round monitoring report, and obviously other

13   situations got in the way of that.

14          Since then, defendants have consistently said this is

15   something they're interested in pursuing, and we believe it's

16   important because the benchmarks will help inform not only how

17   the case can resolve but also how all the parties can focus on

18   something to improve for the purposes of the patient class and

19   we believe that it's important that we get defined benchmarks

20   that are current.  Sometimes things in this case, they tend to

21   obviously be either recycled or be benchmarks that have existed

22   for a while, but situations change in terms of just the way

23   that operations happen or things like COVID happen.

24          Defendants believe that this is something that we

25   would like to take on, as Your Honor noted in its order from a

1  few months ago.  You wanted the parties to think about ways

2  that we could expedite this process.  Defendants believe that

3  there's an option that we could take, and we've started to

4  think about this and we've actually talked with Judge Drozd

5  about this in the settlement context and other things that

6  defense would like to propose within a set time, say 120 days,

7  what they believe benchmarks should be and propose them to the

8  special master to plaintiffs to begin the interior process of

9  discussing these things so that all the parties can align their

10 thinking on what the appropriate benchmarks should be and then

11 move that forward to the Court because the benchmarks will

12 inform some of the other things that Your Honor has brought up

13 in this agenda:  Data management, integration, things like

14 that.  Getting those benchmarks are important because they will

15 inform so many other things that are going on in this case as

16 we move forward.

17         So defense proposes that we come forward with some

18 proposed benchmarks within 120 days and then we start the

19 process of negotiating those or talking those through with the

20 parties so that we can then come to the Court with a package of

21 what we believed the benchmarks should be.

22         THE COURT:  The Court's proposal doesn't prevent your

23 responding to what the Court understands the current benchmarks

24 are with a counterproposal, correct?

25         MR. LEWIS:  You're correct, Your Honor, but perhaps

1    with the defendants putting forth their thoughts first, that

2    could help inform the Court's ideas a little bit more to get

3    the Court thinking, and perhaps the special master as well,

4    thinking about some of the ideas that defendants may have for

5    how the benchmarks can be set, they can be reviewed, things

6    like that.  We believe that would promote efficiency for both

7    the Court's time and the parties' time.

8         THE COURT:  Well, the Court's trying to -- I have a

9    notion, perhaps silly me, that this could be resolved as

10   efficiently as possible.  And to the extent there are

11   benchmarks, if not clear enough already, implicit in the

12   process that has been going on for years, why would I not put

13   those out there so it's clear what the Court understands the

14   benchmarks in fact have been and are currently?

15        MR. LEWIS:  Your Honor, if that was to come out from

16   the Court, that would be something that would be assisting us

17   in clarifying some of those issues, so we would be happy in

18   that instance to work with the special master or work with the

19   parties to identify those, but there are some thoughts I think

20   maybe that we can -- if we can all collaboratively come

21   together with the benchmarks, we think it would help move

22   everything forward within the case and can be integral in terms

23   of just advancing the case along.

24        THE COURT:  If it's not unnecessarily delaying, of

25   course, nothing the Court would do to move this forward would

1    prevent a collaborative approach to responding.

2         Mr. Bien, your response to what you're hearing from

3    Mr. Lewis?

4         MR. BIEN:  Yes, Your Honor.  I believe that what

5    Mr. Lewis is proposing is a delaying tactic that fits in with

6    the strategy of delaying the population remedy.  As the Court

7    will note in the response that defendants filed to your July

8    2nd order, defendants raised the idea that they have no idea

9    what the benchmarks are and it's confusing and blamed it on the

10   special master.

11        We all know what the benchmarks are on very critical

12   issues and by delaying this process, defendants will be able to

13   argue that there are no benchmarks in Coleman and we don't know

14   what's going on and, therefore, that's the reason we don't know

15   how to comply.

16        I think it's a tactic and this issue has been pending

17   for years and years and years, and perhaps that's part of the

18   defense strategy.  I don't think there's a lot of ambiguity

19   about the benchmarks in this case, and I clearly perceive it,

20   perhaps, as a strategy rather than as a way of moving forward.

21        THE COURT:  All right.  I'll take your comments under

22   submission and you'll hear from me on the benchmarks.  I put it

23   on the agenda precisely to get some clarity and get this issue

24   resolved.

25        MR. LEWIS:  Your Honor, if I may be heard for one

1    minute, please.

2            THE COURT:  Mr. Lewis.

3            MR. LEWIS:  Absolutely not did we intend this as a

4    delaying tactic.  And while I appreciate Mr. Bien's comments, I

5    don't believe that they are accurate.  Defendants want to move

6    the case forward.  We think this is an important issue.  I do

7    believe that we definitely can start with the special master's

8    benchmarks and go from there.  We would be happy to take that

9    option, Your Honor, in terms of starting up the conversation.

10   So to the extent that if I'm sounding like we are trying to

11   delay things, I did not mean that at all.  We do want to engage

12   on this issue.  So if the Court decides that the special

13   master -- the special master's current benchmarks or some of

14   the statements that he's made can be a starting point, we would

15   welcome that.

16           THE COURT:  All right.  Thank you for that, Mr. Lewis.

17   I accept that clarification in good faith.

18           I see no reason not to put the special master's

19   benchmarks out there for clarification, for transparency, and I

20   think it can drive the process most efficiently.

21           MR. LEWIS:  Yes, Your Honor.

22           THE COURT:  And I've already resolved benchmarks, so

23   I'll issue something following this hearing shortly that does

24   provide direction on how to ultimately achieve clarification on

25   all benchmarks as efficiently as possible.

1          Moving on to data integration, I don't know that

2    there's much more to say here that I didn't cover under the

3    EHRS review.  I understand there are reliability and

4    transparency concerns.  I think there's a process in place and

5    the people in place to address those in the first instance

6    before requiring this Court's attention, so my question would

7    be do I have that right and is there anything more you want me

8    to know on the data integration topic, Mr. Bien?  You need to

9    unmute.  Yeah.  There you go.

10          MR. BIEN:  Ms. Ells will address this.

11          THE COURT:  All right.  Ms. Ells.

12          MS. ELLS:  Good morning, Your Honor.

13          Yeah.  We understand that the special master's data

14   expert has recently received access to the materials that he

15   needs to take the first pass at this, and it's been a slow

16   process to date, but we're hopeful it's going to pick up and

17   resolve.

18          I think we continue, as you've mentioned, to have some

19   concerns about the integrity of the data.  Our request that

20   defendants certify data submitted to the Court remains before

21   the Court, and we continue to think that that's an appropriate

22   way to build trust and transparency.

23          We will note that there have been some instances

24   recently where defendants' data reported to the Court was not

25   accurate; for instance, there have been 13 beds offline at the

1    CMS PIP for over a year that were not reflected in the monthly

2    reports to this Court as being unavailable to class members.

3         That was only recently corrected in a narrative

4    portion of one of the reports and it did not reflect that that

5    reduction in beds had been in place for approximately a year.

6    And those reports were not corrected going back either, so we

7    do continue to have concerns that some of the data presented to

8    the Court is not fully transparent and/or is not accurate and

9    that when inaccuracies or misleading information are presented

10   to the Court and identified as such that they are not always

11   corrected in a timely fashion.  So we do think that the concept

12   of a certification continues to be important, so we would

13   request that the Court act on that process.

14        THE COURT:  All right.  I'm nodding just to

15   acknowledge that that issue is before the Court.

16        MS. ELLS:  Yes.

17        THE COURT:  So your position is that that's fully

18   submitted and I should act on it now?

19        MS. ELLS:  Yes.  I mean, we are happy to brief the

20   Court if there are additional questions, but we believe that

21   the briefing following the Golding trial fully addressed what

22   we think the appropriate certification should be.

23        There was some overlap between the parties as to

24   defendant's willingness.  We wanted additional certification

25   that they didn't think was appropriate, but we do think that

1    that issue is fully briefed before the Court.

2              THE COURT:  All right.  Mr. Lewis, are you handling

3    this?

4              MR. LEWIS:  Yes, Your Honor.

5              THE COURT:  All right.

6              MR. LEWIS:  This issue, the data integration

7    management integrity is inextricably intertwined with some of

8    the other issues the Court has raised today, including EHRS

9    changes and things like that, but defendants are absolutely

10   committed to data integrity and transparency.  We have said

11   that numerous times.  Dr. Toche has stated that personally to

12   Your Honor and we continue to do that and continue to want to

13   get there.

14             You've heard how we have been working with Dr. Potter,

15   the special master's expert, on this.  We will do anything

16   possible to give him the access he needs because I believe

17   there was also a question about access.  As I said earlier, we

18   would do anything we can to give him the appropriate access.

19             And as to transparency, this highlights exactly why we

20   think that the data management or data integrity piece of this

21   is so important because if there are changes that need to be

22   made, the system needs to be in a place where those changes can

23   be made and defendants need to have their committees set up and

24   things that have been changed since the end of the Golding

25   hearing that need to get into effect and need to go into place

1   so that we can start getting the accuracy and transparency

2   questions answered.  So I would just say, Your Honor,

3   defendants are very interested in this particular topic.  Some

4   of the briefing on this is now months old and there have been

5   some changes that have been put in place in the psychiatry

6   reporting and things like that, that could alleviate some of

7   these things, and there are things being discussed with the

8   special master about some of these topics, so defense will

9   continue to work with both the plaintiffs and the special

10  master to bring integrity and transparency issues to the fore

11  and address them.

12          THE COURT:  Mr. Lewis, do you agree with Ms. Ells that

13  the plaintiff's request for certification is fully submitted

14  and the Court can decide that now?

15          MR. LEWIS:  I do believe it's fully submitted, your

16  Honor.  The one thing I can't speak to is whether or not there

17  needs to be supplemental briefing to bring up new facts or new

18  information.  I'd have to go back and look at that.

19          THE COURT:  Can the parties meet and confer and let me

20  know within seven days if there is a request for supplemental

21  briefing by any party?

22          MR. LEWIS:  Yes, Your Honor.

23          THE COURT:  Ms. Ells?

24          MS. ELLS:  Yes, Your Honor.

25          THE COURT:  All right.  That's the order then.

1        Anything on this point you'd like to share with the
2   Court or the parties on the record, Special Master Lopes?
3        SPECIAL MASTER LOPES:  No.  Thank you, Your Honor.
4        THE COURT:  All right.  Let's turn to issues raised in
5   my July 2nd order and then I did -- I added an "Other" at the
6   end of the agenda, just so you know.  I have a few things I
7   just want to touch on very briefly, and those are the DSH
8   hearing currently set for August 7th, Lipsey and Armstrong.
9        But in the meantime, the July 2nd order, I have
10  reviewed your responses.  Thank you.  Those are very helpful.
11  I note the defendant's intriguing footnote regarding staffing.
12  Let's first talk about staffing because I think it is, as some
13  of the briefing highlights, intertwined with the overall
14  capacity question.  And as I've said, this is our -- this
15  status, this quarterly status is our getting back on track with
16  Coleman and recognizing how the landscape has significantly
17  changed is there any reason not to set a hearing to focus on
18  staffing in September, so 30 days, 45 days to brief what
19  remedies are currently available for defendant's ongoing
20  noncompliance and then full argument?  Any reason not to
21  refocus on that question in that way, Mr. Bien?
22        MR. BIEN:  Your Honor, staffing has plagued this case
23  for a long, long time, as you know.  There has been no real
24  movement on staffing in a long time.  I do think that the DSH
25  part of staffing is another important part that lingers, and it

1    trails a little bit in terms of the process here.  I think we

2    just received -- and I haven't even had a chance to look at

3    something on DSH staffing I think recently, but I do think

4    putting -- bringing this -- bringing this to -- forward as soon

5    as possible would be valuable and, you know, we're prepared to

6    address it.

7          I don't know -- we haven't heard any new proposals

8    from defendants or any new ideas.  We actually think that

9    defendants' position on staffing appears to be that they've

10   done everything that they can do, which is why we, you know,

11   believe that the remedy, to some extent, is in the population

12   order that we hoped would go before the three-judge court.  And

13   I think that while we should still pursue staffing in the

14   single-judge court, I think we have to be in both places at

15   this point.  We have to be both before the three-judge court --

16   because the reality is defendants apparently have exhausted all

17   efforts on staffing, but we still have to push to see if

18   there's anything else they can do.

19         THE COURT:  All right.  So that would not object.  The

20   plaintiffs would not object to something that tees this up for

21   hearing in September?

22         MR. BIEN:  That's correct, Your Honor.

23         THE COURT:  All right.  Mr. Lewis, recognizing that

24   COVID has made things worse but staffing has been out there

25   from before this Court inherited this case, so any reason not

1    to tee it up for consideration fully -- on fully adversarial

2    proceedings in September?

3              MR. LEWIS:  Yes, Your Honor.  Two things.  First of

4    all, your point about COVID is well taken, but I would note

5    that COVID actually is changing in terms of I think how

6    staffing is looked at because of obviously the physical

7    distancing measures that are out there.  We're seeing an

8    increased reliance on telepsychiatry and things like that, so I

9    think that that's one aspect that should be considered in the

10   long-term staffing plan.  I think defendants are starting to

11   talk about this and try to assess this issue.  So although

12   COVID will not be here forever, it is going to change, as we've

13   all talked about, what's going on with operations and it could

14   evolve the entire medical profession as we go forward.  So I

15   think that it would be a little bit premature at this time for

16   that issue alone to have the hearing in September when things

17   could change dramatically within the next few months as other

18   treatments come online or things like that.

19              Furthermore, defendants are actively engaged in

20   producing new staffing proposals and things like that that are

21   being discussed with the special master.  DSH specifically, I

22   believe that there have been, by my count now, at least three

23   meetings with the special master's team about DSH staffing, so

24   that's an issue that's currently going through the process and

25   I believe that a hearing, an adversarial hearing within 30

1   days, 45 days, could potentially throw a wrench in that and

2   would not be helpful to the good progress that's been made I

3   believe by all parties involved to try to move that issue

4   forward.

5         And CDCR has its own staffing issue coming online as

6   well.  Obviously things have been changed because of budgets

7   and COVID and things like that, so long story short, Your

8   Honor, I don't believe that hearing -- an adversarial hearing

9   set for 45 days from now would be beneficial and I would ask

10  that it not be set for September.  I can't really give a date,

11  but I don't think that a hearing on staffing right now is

12  appropriate.

13        THE COURT:  All right.  Understood.  Firm dates have

14  ways of focusing minds and I know everyone is working overtime

15  and I know we are all human.  There's a limit to what we can do

16  and, yet, I know no one in these proceedings is not affected by

17  what's happening in the state prisons and there is just a

18  need -- the Court has accommodated informal discussions for a

19  good half of this year and I -- it may well be time to focus

20  minds and take advantage of everything we've learned and how

21  that may affect what's happening going forward.  And this is

22  the Court's call, Special Master Lopes.  I'm not acting on your

23  recommendation here.  Is there anything that you want to say on

24  this point?

25        SPECIAL MASTER LOPES:  Your Honor, to Mr. Lewis's

1    point, I have been working with the DSH defendants on their

2    staffing plan and it was just sent to the plaintiffs a day or

3    so ago.  Prior efforts to hammer out a staffing plan with DSH

4    proved to be complicated and we put that planning process on

5    the back burner behind the CDCR staffing process, which failed

6    because of the Golding report.

7         It's unclear whether -- there are two parts to this,

8    Your Honor.  There's a part that's about the planning and then

9    there's the part that's about the implementation.  So even if

10   someone were to make the representation that the planning is

11   good, it's all in the numbers and at least on the CDCR side,

12   pre-COVID/COVID, the staffing vacancies in psychiatry have been

13   woeful and there has not been a narrowing of that gap and the

14   Court's 10 percent order has not been complied with for years.

15        So again, I'll go back and say that the DSH staffing

16   process, the recent one has been a very positive experience but

17   the plaintiffs haven't had a chance to weigh in and there will

18   be more work over the course of the next 30, 60 days on that

19   plan.  I'm not opining on what the vacancy rates are like, I'm

20   just talking about the plan itself.

21        In terms of CDCR, the planning process stalled over

22   Golding's -- Dr. Golding's report, but whether it's pre-COVID

23   or COVID, the staffing vacancies -- that gap hasn't been

24   narrowed.

25        It is true, to Mr. Lewis's point, that there has been

1    good effort on using telepsychiatry and there's been an

2    expanded effort in telepsychiatry, but we haven't had a chance

3    to evaluate that closely to determine whether the expanded use

4    of telepsychiatry is going to be helpful.  All we know is that

5    the numbers today still lead to a violation of the Court's 10

6    percent order.

7          THE COURT:  All right.  Thank you for that review.

8    The numbers do speak for themselves, and ultimately the Court

9    would be taking a close look at those.

10          I also -- I noted that Dr. Mehta has come from

11    telepsychiatry, so I've made that mental note.

12          Just so I understand, Mr. Bien, with respect to DSH,

13    are you suggesting DSH staffing would be folded into any motion

14    practice and hearing on staffing generally?

15          MR. BIEN:  I think given the timing, the lag of this,

16    that if the special master believes there's something that we

17    should look at and evaluate, then it would not make sense to

18    fold it into the schedule.  They're on a different schedule.  I

19    do think it's something we shouldn't lose track of because

20    those resources are critical for Coleman and the fact that they

21    also are understaffed must be addressed sooner rather than

22    later, but I think it would -- if we folded them in, it would

23    tend to delay the process.

24          THE COURT:  All right.  Response to that observation,

25    Mr. Lewis?

1    MR. LEWIS:  Your Honor, I would just take note that I

2    don't believe that DSH is understaffed.  I believe they have

3    been making -- they've been meeting Your Honor's benchmarks as

4    to staffing numbers, but I know that's an issue that we will

5    discuss, and that's one of the things that the whole purpose of

6    approaching the special master with DSH's plan has been.

7    On the issue of timing, I believe that CDCR also is

8    trying to do a similar thing with DSH to try to work through

9    and come up with a plan in light of technologies coming online.

10   Frankly, telepsychiatry is something that is being -- as it's

11   being brought out to the field, we're learning more about it.

12   There are ways that we can look at our staffing plan and try to

13   meet the benchmarks that Your Honor has set or meet the numbers

14   Your Honor has set, so I would believe that there should be

15   time for telepsychiatry to work.

16   And as you noted, Dr. Mehta has been elevated to an

17   acting position in charge of mental health services, so I

18   believe that that's an important -- that demonstrates both the

19   importance that defendants are placing on telepsychiatry but

20   also that they're trying to think outside the box here about

21   how to meet their staffing needs.

22   So I think at this time a hearing, that would put the

23   parties on an adversarial footing, would not be appropriate

24   when we could use kind of the model that we're seeing now,

25   looking forward and trying to be collaborative about these

1    things.  And I'm not trying to delay this, Your Honor.  I just

2    think that there are good things happening where we can get the

3    litigation out but get the people talking to bring results that

4    I think is what we need.

5          THE COURT:  All right.  I'm listening.  I hear you.  I

6    will think about how to handle that aspect of what's before the

7    Court.

8          In terms of the question of referral to a three-judge

9    court, I've received the parties' briefing on that question.

10   You've given me a lot of food for thought there as well.

11         My question for the plaintiffs is even if you believe

12   this Court could make a sua sponte referral, is the better

13   practice to construe plaintiffs' filing as a motion and have

14   motion practice resolve the question of referral?

15         And for example, a hearing on such a motion could be

16   also set in September.

17         MR. BIEN:  Your Honor, I would like Ms. Ells to

18   address this.

19         THE COURT:  All right.  Ms. Ells?

20         MS. ELLS:  Your Honor, we believe that the issue is

21   fully teed up for the Court at this point.

22         As you know, the PLRA allows for two separate tracks.

23   Your order of July 2nd permitted the parties to brief this on

24   the merits as to whether or not the PLRA requirements have been

25   met.  We did so.  Defendants had the opportunity to do so and

1    chose not to, with the exception of generally pointing to

2    population reductions that have occurred over time, but we

3    think that this issue has been festering in this case for a

4    long time.  We view the opportunity presented by the Court as

5    one to present the full case.

6           Procedurally I don't think it much matters.  The

7    requirements are what they are, and we have put forth our case

8    as to why those requirements are met.  This Court has the

9    power, under the statute, to sua sponte convene the court, and

10    we feel like at this point all motion practice does when both

11    parties had an opportunity to brief the merits is to further

12    delay the process.  So we think that the issue is ripe and that

13    this Court has the authority and should convene the three-judge

14    court sua sponte.

15           THE COURT:  Just so I'm clear on what the plaintiff

16    argues has been filed, the plaintiffs' position is that the

17    record on staffing is clear enough so that, for example, for

18    sake of argument -- I'm still mulling it, but if I have a

19    hearing on staffing in September, that would not in some way

20    complete a record on staffing with respect to a potential

21    referral?

22           MS. ELLS:  We don't believe any further orders are

23    necessary.  There have been so many prior orders, including

24    essentially the order from October 10th, 2017, effectively

25    giving a one-year deadline that two years later has not been

1   met.  So we don't think there is any need for any further court

2   orders.

3           The PLRA doesn't contemplate endless litigation when

4   prior orders exist, and there's absolutely no question on

5   staffing that very clear prior orders already exist and that

6   long-standing noncompliance still remains, so we don't think

7   there's any need for any further litigation on that front

8   before the court convenes.

9           That's not to say that this Court shouldn't continue

10  attempting to enforce orders during the existence and

11  proceedings before the three-judge court.  We think that that

12  is something that is within the Court's authority as well.

13  They can proceed on parallel tracks, essentially.

14          THE COURT:  All right.  Mr. Lewis, are you handling

15  this, or are you deferring to someone?

16          MR. LEWIS:  Your Honor, Mr. Mello will be handling

17  this particular issue as it pertains to three-judge panel

18  issues.

19          THE COURT:  I somehow thought that might be the case.

20          Mr. Mello?  I have read what's been filed with the

21  Court.

22          MR. MELLO:  Thank you, Your Honor.  Our point is very

23  simple.  We do not believe that this Court can convene a new

24  three-judge court; rather, plaintiffs should file a

25  modification motion to the existing three-judge court.  So the

1    issue of referral was not really necessary.  If they believe

2    that a modification of the prisoner release order is necessary

3    to have a targeted population cap with respect to Coleman class

4    members, then the proper place to go is the existing

5    three-judge court by way of a modification and the U.S. Supreme

6    Court made that very clear in its order and we put those cites

7    in the record.

8         The U.S. Supreme Court contemplated modification.  It

9    contemplated the possibility of a targeted cap on the mental

10   health population and it said that the appropriate place to do

11   that would be before the existing three-judge court.  So if

12   plaintiffs wish to file a modification motion, that motion

13   should be filed before the three-judge court.  That is our

14   position.  Glad to answer any questions, Your Honor.

15        THE COURT:  Is it your position the statute simply

16   does not allow a district judge to make a sua sponte referral?

17        MR. MELLO:  No.  The statute clearly allows, when the

18   criteria are met, for a district court to convene a three-judge

19   panel.  However, under the facts and circumstances and the

20   procedural posture of this case, as set forth in the Supreme

21   Court's decision, any effort to modify the existing cap, even

22   if it is to have a specifically targeted cap with respect to

23   the Coleman class members must go, by way of a modification

24   motion, to the existing three-judge court.

25        THE COURT:  Is that an argument that the Supreme Court

1    narrowed the application of the statute?

2         MR. MELLO:  That is not an argument.  That is the

3    Court saying that there is an existing injunction based upon

4    the alleged unconstitutional delivery of medical care -- mental

5    healthcare via population and, therefore, if you seek

6    modification, you must do so under *Rufo* and Rule 60.  That's

7    what the Supreme Court said at 50 --

8         THE COURT:  You've cited it.  Yeah.  I see it in your

9    briefing.

10        MR. MELLO:  Yes.

11        THE COURT:  I'm just trying to clarify your argument.

12        So on that point, Ms. Ells, anything to say in

13   response to that position?

14        MS. ELLS:  Just making sure I'm off mute.

15        Your Honor, the statute says what it says.  The

16   Supreme Court did not circumscribe the statutory language.

17   There is no question that there is authority under the PLRA for

18   this Court to act.

19        The language from the Supreme Court that the defense

20   have cited isn't particularly relevant to this context only

21   because there was no question of who would do what at that

22   point.  The Supreme Court was simply inviting the State, in

23   fact, to come back if they could establish that a lower

24   population cap or a different population cap would suffice to

25   cure the constitutional violations, so I don't think that

1    language is binding on this Court in this particular context.

2    The statute clearly provides you the authority to sua sponte

3    act.

4         To the same degree we think there's no question that

5    the Rule 60 standard has been met regardless.  The population

6    of the Coleman class vis-á-vis the overall population is the

7    changed circumstance, so we don't think there's any question

8    that that is sufficient and could be established, but we think

9    that the sua sponte action of this Court is the most efficient

10   method at this point to move forward, and this Court has the

11   authority to do it.

12        THE COURT:  All right.  Understood.  I'll let you know

13   if I need more on this subject.

14        In terms of the other issues, I'm just noting for the

15   record I have the DSH hearing currently on my calendar for

16   August 7th.  I know in the past you've stipulated to

17   continuances; however, until I see such a stipulation with good

18   justification, that hearing remains on calendar.

19        Is there anything you want me to note today about

20   that, Mr. Bien?

21        MR. BIEN:  Your Honor, I think there's been some good

22   progress made in our negotiations, and I'm hopeful that we will

23   be able to, again, stipulate to a continuance.  I think the

24   special master and his team have been doing an excellent job

25   and that both sides have been, you know, engaged in good faith

1    in balancing, you know, the difficulty of transfer in this

2    environment with the overwhelming need for additional

3    in-patient psychiatric hospitalization.

4        Once again, this is an issue that just demonstrates

5    the population challenges that we seem to be running up against

6    in lots of different areas, but I think that the parties are

7    negotiating changes and issues pretty well with the guidance of

8    the special master team.

9        We just received a draft of a changed policy that we'd

10   been awaiting, and we'll have a chance to discuss that next

11   week.  And hopefully we'll be able to not come right up against

12   the hearing; I know that's inconvenient for the Court.  We'll

13   try to get information to the Court as soon as possible about

14   whether or not the hearing can be continued.

15       THE COURT:  All right.  Mr. Lewis, anything to say, or

16   do you want to yield to Mr. Silberfeld?  I see him out there.

17       MR. LEWIS:  Nothing, Your Honor, just we appreciate

18   plaintiffs' comments and the work that's has been going on on

19   all sides, both from defendants and plaintiffs and the special

20   master about trying to resolve some of these issues and

21   continuing to discuss the DSH transfers, which are very

22   important to both CDCR, DSH and plaintiffs, obviously.

23       THE COURT:  All right.  All right.  Counsel for Lipsey

24   is not on this call.  I just acknowledged -- I saw some

25   briefing come in, I think it was late yesterday, so that issue

1    is moving forward.

2         And just finally -- just for your information, I am,

3    of course, monitoring what's happening in Armstrong.  Many of

4    the persons affected by the current proceedings are Coleman

5    class members.

6         So I have nothing else.  If there's anything else

7    either side would like me to know, you can bring that to my

8    attention now.  I'll ask the special master if he has anything

9    as well.

10        Mr. Bien?

11        MR. BIEN:  Yes, Your Honor.  I'd like to mention

12   several issues just to put them on the agenda.  One is in

13   relationship to mental health care being delivered during the

14   COVID pandemic.  In addition to the staffing shortages and the

15   normal challenges, we also have just the reality of the

16   pandemic and what it -- you know, how is it that defendants can

17   replace, for example, group treatment?  How can they replace

18   face-to-face confidential sessions?

19        We have started -- we've asked for there to be a

20   special task force on that; it hasn't really started.  We think

21   that that is urgent that that move forward.  I'm not faulting

22   the special master team, who is putting a lot of time in, but

23   we do think that -- you know, here we are a hundred days in.

24   We really need to have a mechanism for delivering mental health

25   care beyond medication and walking by to see if people are

1    alive or dead.

2         And I also think that having spent a lot of time and

3    energy on San Quentin over the last few weeks -- almost every

4    day and every hour I'm trying to see what's going on and

5    watching there.  It's very close to home for all of us here.

6    We should have been just as focused on CIM and that's still a

7    problem, but in both those places we have large numbers of

8    mental health patients and we're receiving little or no care in

9    the midst of an outbreak.

10        I think we also need to have a special plan for how

11   are we delivering services to an institution addressing an

12   outbreak.  In Plata and in the emergency program, they're

13   working on medical care delivery, bringing in emergency

14   services, all this kind of stuff, setting up tents, but there

15   is not the same focus that we've been aware of on how are you

16   going to address the other needs of the population, including

17   mental health care, which is going up not only for our class

18   members but for nonclass members who are in very difficult

19   positions without access to visiting.

20        San Quentin just cut off telephone calls for a public

21   health reason, and that's a good example of something we want

22   to bring to fore.  Is it appropriate to cut off telephone calls

23   when you also have cut off visiting?  Defendants say that's a

24   public health issue.  There's some clear balancing that needs

25   to go on there.  People are desperate to talk to their family,

1   to have some contact in this area.  People are dying almost

2   once a day there right now at San Quentin.  It's a frightening

3   situation and it calls for increased resources for mental

4   health care, increased ingenuity and some real effort at the

5   same level that we're doing on the medical care side on the

6   mental health side.  So I want to raise that issue and just

7   have it go -- have something that we're not asking for a court

8   order, but we're asking for that issue to be focused on.

9          THE COURT:  And you've raised that before and I saw

10  the information included in your filing for this status.  I'll

11  give Mr. Lewis a chance to respond.  Perhaps Dr. Bick can weigh

12  in on this issue.

13         And Special Master Lopes, once we get to you, the

14  question will be:  Can you make this a priority in the ongoing

15  working group sessions?

16         But you wanted to raise other issues before I turn to

17  Mr. Lewis, Mr. Bien?

18         MR. BIEN:  The only other one is more of a

19  housekeeping matter that we have raised informally with the

20  defendant several times over the last several months and

21  haven't had a response.  We haven't had a no or a yes, but I

22  just wanted to bring it to the Court's attention because it

23  might require a motion.  I think as it came out in the Lipsey

24  briefing, we only have one named plaintiff, Ralph Coleman, who

25  exists right now as our class rep.  We have identified and

1   signed up several additional class members who are willing and

2   able to serve as class reps.  We would like -- we have

3   requested that defendants stipulate to substitution, which is

4   an ordinary kind of process that happens in long-living class

5   actions like this one, and we have not had a response.  I'm not

6   faulting anyone, I just want to bring it to the Court's

7   attention that at this point we think it's necessary.  Ralph

8   Coleman is in his 70s and I'm not going to talk more about his

9   health conditions, but we do think it's important that we put

10  that housekeeping issue to rest soon so that we're not left

11  without a class rep.

12          We're also hoping that maybe Mr. Coleman could be

13  released, who knows; either one of those things could happen.

14  But we hope for his good health and long life, but we do think

15  it's important for the class to have representatives and we've

16  suggested to defendants that they stipulate to a process.

17          THE COURT:  Any reason not to put that on the next

18  quarterly status to see if you've resolved it by then?

19          MR. BIEN:  That would be appropriate, Your Honor.

20          THE COURT:  All right.  All right.  That would be my

21  plan unless Mr. Lewis has something else to say about that

22  issue.

23          So Mr. Lewis, on programming alternatives to -- here

24  as well you must agree that alternatives to the programming at

25  least in the interim?

1          MR. LEWIS:  Yes, Your Honor.  And I will simply say

2    that I know and I appreciate -- defendant's appreciate Mr. Bien

3    and plaintiffs bringing up these issues.  This kind of talk and

4    these kinds of conversations are important because it's ideas,

5    fresh idea, new ideas that he's proposed, so absolutely we

6    fully support.  I believe actually we're trying to set the

7    meetings right now.  And I know the special master has paid

8    attention to this and that's all I will say.  This is something

9    that we will be moving forward on, Your Honor, with the

10   plaintiffs to discuss with them about the programming needs.

11         THE COURT:  The plaintiffs indicated -- just let me

12   ask on that.  The plaintiffs indicated there appear to be

13   private groups that are willing to help fund.  If it's a matter

14   of tablets that are secure and provide, is CDCR well set up to

15   efficiently accept donations to fill the gap in programming for

16   any interim period?

17         MR. LEWIS:  I will say, Your Honor, I don't have

18   specific information, but I am familiar with the issue of

19   tablets and things like that.  There are some very heightened

20   security issues that happen with tablets that are not obviously

21   the correct technology.  I'll talk to my clients about that

22   more.  I am aware generally that there are some offers out

23   there, but there are some very specific programs that need to

24   be addressed and assessed before any of those things can be

25   accepted, so we'll look into that further, Your Honor.

1           THE COURT:  All right.  Would it be all right with you

2  if I just see if Dr. Bick has anything to say on this front?

3           MR. LEWIS:  Certainly, Your Honor.

4           THE COURT:  Dr. Bick?  Any further details on how to

5  fill the programming gap?

6           MR. BICK:  Yes, I can speak to that, Your Honor.  I

7  also wanted to speak to what Mr. Bien said, as far as telephone

8  calls.  We agree 100 percent.  There's a unified command at

9  San Quentin that involves staff from OES and California

10 Department of Public Health and we found out there was a

11 recommendation from the California Department of Public Health

12 to not have patients using communal telephones because of their

13 concern about transmission from one person or other.  Obviously

14 we have ways to clean phones in between use, and so we agree

15 100 percent that that's not an appropriate step and we've

16 already given direction to resume that access to telephones.

17 That was one things.

18          On the other issue of tablets, I'm a very enthusiastic

19 supporter.  We've had a number of working groups on this

20 through our Department of Rehabilitative Programs and a

21 separate effort to provide tablets to patients.  One of the

22 challenges we're finding is in-cell connectivity is very hard

23 to achieve.  There are ways around that, but we are moving

24 forward with what we think is going to be a very robust tablet

25 program.  It's not going to happen in the next month or two,

1   it's not going to be the immediate fix that we would hope, but

2   I think it's our future and our hope would be that if and when

3   we have another experience like this, we would be able to use

4   technology like we are using right now to actually communicate

5   with patients regardless of where they are, but that's not

6   going to be a rapid fix.

7            And the last thing I would say is that we have tasked

8   staff with collecting all of the in-cell activity information

9   that's being used around the state, looking at best practices

10  and creating a format for people to share that from one

11  facility to another.  So hopefully as we continue to endure

12  these limitations on movement, we'll be able to enhance our

13  in-cell activities.

14           THE COURT:  Are there immediate gap fillers available

15  until you can get these other ideas implemented?

16           MR. BICK:  We are exploring some.  Tablets are being

17  provided.  We're attempting to obtain more radios and

18  televisions, for example, for people to use in cell.  And

19  beyond that, it is challenging figuring out how to get good

20  content to people while they are in a cell environment.

21           THE COURT:  Is CDCR set up to accept donations?

22  Plaintiffs indicated that there are organizations, perhaps

23  individuals willing to make donations.  Is it clear to those

24  persons how they can help now?

25           MR. BICK:  What I would say is that CDCR has a long

1    history of accepting donations and if there are groups there

2    that we can work with that have available things to donate,

3    we'd be glad to explore that.  I would encourage the plaintiffs

4    just to provide the specific contact information and we can

5    explore how to make that happen.

6              THE COURT:  All right.  All right.  Back to you,

7    Mr. Lewis.  Anything further from you in terms of other topics

8    or responding to what you heard from plaintiffs?

9              MR. LEWIS:  The only thing I would add, Your Honor, is

10   that we are aware of plaintiffs' request for additional

11   plaintiffs.  And I apologize we haven't gotten back to that.  I

12   will tell that to plaintiffs right now.  Obviously there's been

13   so much going on in this case.  We are going to work on this

14   immediately.  We have no problem setting it for the next status

15   conference and we hope that it would be resolved before that.

16             THE COURT:  All right.  Very good.

17             MR. LEWIS:  And then I do have one piece of -- one

18   thing I wanted to clarify.  Mr. Mello's Wi-Fi crashed, so he is

19   not able to stay with us, Your Honor, but to the extent that

20   planning a 7/15 or July 15th response to your July 2nd order

21   would be construed a motion for the purposes of whatever it was

22   saying, your Honor, we would ask that we have the

23   opportunity -- defendants have the opportunity to respond to it

24   if Your Honor does consider their July 15th filing of the

25   motion.

 1          THE COURT:  All right.  Understood.

 2          All right.  Special Master Lopes, anything you would

 3   like to say, given what you have heard?

 4          SPECIAL MASTER LOPES:  Your Honor, you asked if

 5   programming could be placed as a priority in the workgroup --

 6          THE COURT:  Thank you.

 7          SPECIAL MASTER LOPES:  -- on workgroup agendas and

 8   we -- by agreement, we've already decided to do that.  So in

 9   the next meeting on Tuesday, we're going to start having those

10   discussions.  That's all I have.

11          THE COURT:  All right.  Thank you for reminding me

12   that I said I would ask you about that.

13          All right.  I believe we've covered everything we need

14   to.  I'll follow up with some orders after hearing and set the

15   next quarterly status, if I haven't already done that; I'll

16   confirm a date.  I'll continue to look for your status reports

17   on the working group.  Thank you again.  I've found what I've

18   received so far very helpful.  So you may all sign off.  Take

19   good care.

20          THE CLERK:  Court is in recess.

21          (Concluded at 11:11 a.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3        I certify that the foregoing is a true and correct

4    transcript of the record of proceedings in the above-entitled

5    matter.

6
     /s/ JENNIFER L. COULTHARD              July 17, 2020
7                                              DATE

8

9    JENNIFER L. COULTHARD, RMR, CRR
     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25