1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RALPH COLEMAN, et al.,                         No.  2:90-cv-0520 KJM DB P

12                     Plaintiffs,

13          v.

14    GAVIN NEWSOM, et al.,                          ORDER

15                     Defendants.

16

17

18          In an order filed October 10, 2017, this court directed the California Department of

19   Corrections and Rehabilitation (CDCR) defendants, within one year, to "come into complete

20   compliance with the staffing ratios in their 2009 Staffing Plan, ECF No. 3693, and the maximum

21   ten percent vacancy rate required by the court's June 13, 2002 order." ECF No. 5711 at 30.[1]  The

22   court set a further status conference for October 11, 2018 at 10:00 a.m. to address "as necessary,

23   issues pertaining to enforcement of [its] order and to durability of the staffing remedy." *Id*. at 31.

24

25          ---

              [1] The order also required "complete implementation of the [Department of State Hospital]
26   defendants' staffing plan within one year. . . ." *Id*.  In view of representations by the parties and
     the Special Master at the second quarterly status conference held on July 17, 2020, *see* Reporter's
27   Transcript of Proceedings (7/17 RT), at 21-25, that work on the DSH staffing plan continues, the
     enforcement hearing set in this order will not include the DSH programs.
28

                                                    1

As discussed below, defendants have not, at any point between October 10, 2018 and the present, come into compliance with the October 10, 2017 order.

<u>Procedural History</u>

Just before the court planned to convene the October 2018 hearing on staffing, CDCR Chief Psychiatrist Dr. Michael Golding submitted a whistleblower report (Golding Report). That report arose largely out of events that took place as defendants planned their response to the court's October 10, 2017 order. *See* December 17, 2019 Order, ECF No. 6427, *passim*. In its order following evidentiary proceedings on the Golding Report, the court expressly noted that by then the "time for compliance [with the Staffing Plan was] even more seriously past due." *Id*. at 3.

Following the third quarterly status conference in 2019, the court reset the enforcement hearing on the deadline set by the October 10, 2017 order for April 23, 2020. Order filed January 7, 2020, ECF No. 6441, at 5. The onset of the COVID-19 pandemic forced a second postponement of that hearing. *See*, *e.g.*, April 10, 2020 Order, ECF No. 6600, at 4.

At the second quarterly status conference for this year, held by videoconference on July 17, 2020, the court discussed with the parties the need for enforcement proceedings with respect to the staffing remedies to resume by September of this year. Reporter's Transcript of Proceedings (RT), ECF No. 6781, at 21. Plaintiffs had no objection. *Id*. at 22. Defendants, however, contended that the COVID-19 pandemic "is changing . . . how staffing is looked at" and bringing "an increased reliance on telepsychiatry. . . ." *Id*. at 23. Defendants repeated the suggestion, signaled in a footnote in a brief they filed on July 15, 2020, ECF No. 6769 at 15 n.5,[2] that they "are actively engaged in producing new staffing proposals and things like that that are being discussed with the special master." ECF No. 6781 at 23. They contended an adversarial proceeding on staffing right now would not be "appropriate." *Id*. at 24.

---

[2] Citations to page numbers in documents filed in this action are to the page number assigned by the Court's Electronic Case Filing (ECF) system located in the upper right hand corner of the page.

1    As the court stated at hearing, however, "[f]irm dates have a way of focusing

2 minds." *Id*. If, in fact, as defendants have repeatedly suggested, COVID-19 portends changes in

3 the way California staffs and manages its prison population, the time to understand what that

4 means is now, taking into account the experience of the court and the parties over the past twenty-

5 five years with standards for adequate mental health staffing in the prison system. If the court is

6 to bless changes to the standards previously agreed upon, it must do so on a principled basis

7 consistent with the law of the case and with an eye to the long run, rather than purportedly

8 effective temporary adjustments made in an effort to get by in the face of exigent circumstances

9 wrought by a pandemic.

10                    Review of October 10, 2017 Order and Telepsychiatry Stipulation

11    As the court observed in 2014, the obstacles to successful remediation in this

12 action generally are enormous given "the inevitable tensions created by the distinct needs of

13 custody supervision and the distinct need for mental health care." *Coleman v. Brown*, 28

14 F.Supp.3d 1068, 1073, n.5 (E.D. Cal. 2014). These tensions are a consequence of long-term

15 policy decisions that have resulted in the de facto "'criminaliz[ation] of mental illness'" and

16 prison systems, including California's, becoming "'de facto mental hospital[s].'" *Id*.

17 Policymakers in the state are empowered to change these policies and avert their attendant

18 consequences. Unless or until they do so, this court must enforce the requirements of the Eighth

19 Amendment as they have become clear in the context of this case. To that end, for the reasons

20 explained in this order, proceedings to enforce this court's October 10, 2017 order are reset for

21 September 10, 2020 beginning at 10:00 a.m. by videoconference.

22    The October 10, 2017 order explains the need for enforcement of defendants'

23 Staffing Plan and the June 13, 2002 order requiring a maximum ten percent vacancy rate in

24 mental health staffing. *See* ECF No. 5711, *passim.* The court found the 2009 Staffing Plan was

25 developed by defendants to meet their constitutional obligations to the plaintiff class and the

26 staffing ratios in that plan are properly viewed as the minima necessary to meet those

27 constitutional obligations. *Id*. at 16-17. The court discussed defendants' heavy burden

28 particularly where, as here, defendants have not come forward with any evidence that would

1   justify further increases in those ratios, i.e., in the number of inmates per mental health staff

2   person.  *Id*. at 16-20.  The order also describes the then-emerging need for "adoption of an

3   addendum to the Revised Program Guide that will govern the use of telepsychiatry going

4   forward," *id*. at 20-23; and includes a discussion of additional options available to defendants to

5   meet their staffing obligations.  *Id*. at 23-26 (discussing possible salary increases and clustering of

6   seriously mentally ill inmates).

7   　　　　　On March 27, 2020, in accordance with a stipulation of the parties, the court

8   provisionally approved a CDCR telepsychiatry policy.  ECF No. 6539.  Under that order,

9   defendants had a period of 120 days to fully implement the policy, with implementation followed

10   by an eighteen month "provisional period" of monitoring by the Special Master.  *Id*. at 2.

11   Thereafter, the parties were to meet and confer with the Special Master to determine whether any

12   changes are required for a final policy.  *Id*.  The eighteen month period began shortly after the

13   onset of the novel coronavirus (COVID-19) pandemic; the court's order giving provisional

14   approval to the telepsychiatry policy makes clear that "[w]hile the coronavirus pandemic may

15   require the use of emergency provisions of the policy, . . . these emergency provisions of the

16   policy were intended for short-term staffing shortages and not for pandemics."  ECF No. 6539 at

17   3.

18   　　　　　　　　Use of Telepsychiatry Distinguished from Staffing Ratios

19   　　　　　There is an important distinction between staffing ratios and the extent to which

20   the ratios for psychiatrists can be met through the use of telepsychiatry.  The provisionally

21   approved telepsychiatry policy provides parameters for use of telepsychiatrists at each level of the

22   mental health care delivery system, but it does not change the caseload assigned to psychiatrists

23   by the 2009 Staffing Plan.  *See* ECF No. 6539 at 7 (use of telepsychiatry at each level of care);

24   ECF No. 5711 at 17-18 (listing psychiatry staffing ratios).  On February 15, 2018, the court

25   ordered defendants to "file monthly reports identifying the psychiatrist vacancy rates at each

26   CDCR institution and in the aggregate systemwide."  ECF No. 5786 at 4.  Over the past twenty-

27   eight months, the systemwide psychiatrist vacancy rate has not fallen below 24 percent, where it

28

4

stood in August 2018,[3] and the vacancy rate has increased this year, hovering consistently between 33 and 34 percent. *See* ECF Nos. 6491, 6563, 6649, 6694 and 6745. In sum, defendants have not come close to compliance with the required staffing levels in the two years that preceded the onset of the COVID-19 pandemic, and the staffing situation has only deteriorated since then. The monthly reports demonstrate that the use of telepsychiatry is not offsetting this serious and significant shortfall. *See id.*

It also bears noting that, since the onset of the COVID-19 pandemic, the parties have presented a separate stipulation and proposed order to the court that discloses the extent to which defendants are departing from provisions of the Program Guide in light of the COVID-19 pandemic, including the provisionally approved telepsychiatry policy. *See* ECF No. 6679 at 9-10. The court has received supplemental briefing on this stipulation. *See* June 2, 2020 Order, ECF No. 6700; ECF Nos. 6724, 6729. Although the issues discussed in the supplemental briefing are still pending resolution, the court has declined "to recognize the stipulated provisions as a floor below which delivery of mental health care may not fall during the exigencies of the COVID-19 pandemic" and emphasized its expectation that "defendants will comply with the requirements of the Program Guide to the full extent possible while also complying with the best public health practices applicable to those persons in the *Coleman* class under the circumstances of the COVID-19 pandemic." July 28 Order, ECF No. 6791, at 3. Even if the COVID-19 pandemic presented some opportunity for exploration of the efficacy of expanded use of telepsychiatry in the prison context, a finding the court does not here make, defendants' ongoing substantial psychiatrist vacancy rates suggest telepsychiatry is not the panacea for which defendants had hoped.

/////

/////

---

[3] The monthly vacancy reports are filed on the last day of each month and contain the vacancy rates for the preceding month. The first monthly vacancy report was filed March 30, 2018, ECF No. 5813, and the succeeding reports are found at ECF Nos. 5820, 5839, 5856, 5900, 5934, 5991, 6019, 6059, 6080, 6102, 6117, 6137, 6174, 6209, 6232, 6260, 6299, 6375, 6400, 6437, 6491, 6563, 6649, 6694 and 6745.

1

<u>Psychiatric Inpatient Programs Cause For Great Concern</u>

2

In particular, the critical staffing shortages in the psychiatric inpatient programs

3 (PIPs) operated by CDCR are extremely troubling.  In 2009, when the CDCR defendants filed

4 their court-ordered staffing plan, all inpatient mental health care was provided by the Department

5 of State Hospitals (DSH), which had its own staffing ratios for inpatient mental health care agreed

6 to during litigation brought by the U.S. Government under the Civil Rights of Institutionalized

7 Persons Act (CRIPA).  *See* ECF Nos. 1807, 1807-1. CDCR has subsequently taken over

8 operation of the PIPs located in prison institutions.  The Special Master informs the court that

9 CDCR has continued to use the DSH staffing ratios in the institutional PIPs, and the number of

10 staff required are reflected in annual allocations.  Most recently, on July 16, 2020, defendants

11 reported that only 23.79 of the 36.5 psychiatrist positions allocated in January 2020 to the

12 California Health Care Facility (CHCF) PIP are filled, and 6.54 of those are telepsychiatrists.[4]

13 ECF No. 6763 at 98.  There are 7.81 fewer psychologists than the 29 positions allocated to the

14 CHCF PIP, and 12 fewer social workers than the 33 positions allocated.  *Id*.  The California

15 Medical Facility (CMF) PIP is critically short of key staff:  12.52 of the 28.5 allocated

16 psychiatrists positions are filled, 11.25 of the 27.5 allocated psychologist positions are filled, and

17 16.5 of the 27 allocated social worker positions are filled.  *Id*. at 99.  Only the Salinas Valley

18 State Prison (SVSP) PIP, to which ten psychiatrist positions were allocated in January 2020, is

19 close numerically, with 1 civil service psychiatrist, 3.75 registry psychiatrists, 2 teleworking

20 psychiatrists and 3.14 telepsychiatrists; the heavy reliance on telepsychiatry apparently brought

21 on by the pandemic still leaves this PIP critically short of on-site psychiatrists.  *Id*. at 101.  The

22 SVSP PIP also has 9.1 of the required 10 psychologists and 7 of the 10 required social workers.

23 *Id*.

24

25

26

[4] The provisionally approved telepsychiatry policy prohibits use of telepsychiatry in PIPs "except as a last resort in emergency situations when an on-site psychiatrist is not assigned to the program" and provides that use of a telepsychiatrist in a PIP for more than "30 consecutive calendar days [is not] consistent with this policy's objective."  ECF No. 6539 at 8.

27

28

1    Staffing in all of the CDCR PIPs violates the maximum ten percent vacancy rate

2    requirement of the June 13, 2002 order and, therefore, the October 10, 2017 order.  While the

3    court will not proceed with enforcement of a staffing plan for DSH programs in the enforcement

4    proceedings set by this order, the enforcement proceedings set will cover remediation of this

5    violation.

6              Previously Recognized Implications of Longstanding Staffing Deficiencies

7    It has been three years since the court described the record with respect to mental

8    health staffing as follows:

9              With respect to staffing, the stark reality of the record before this
               court is that defendants have for fifteen years been under orders to
10             keep their mental health staff vacancy rate below ten percent. For
               most of that fifteen year period, and for several classifications of
11             mental health staff, defendants have been in violation of that order.
               As is clear from the Special Master's most recent report, defendants
12             are still in violation of the court's order, particularly with respect to
               psychiatrists. *See* ECF No. 5590-1 at 23. The long history of failure
13             to hire a sufficient number of psychiatrists, combined with
               defendants' position on the matters before the court on the Special
14             Master's report, raises a question about whether defendants will ever
               be able to hire sufficient staff to meet their constitutional obligations
15             to members of the plaintiff class, as long as the size of the seriously
               mentally ill inmate population in California's prison system remains
16             at current levels or continues to grow. The time is now to resolve that
               question.
17

18   ECF No. 5711 at 28.  In this way, the court signaled then that targeted reduction of the mentally

19   ill prison population might be the only path remaining for defendants to achieve constitutional

20   compliance in this case.  While much has changed in the intervening three years, nothing has

21   brought defendants closer to compliance or suggested that defendants can adequately staff their

22   Mental Health Care Delivery System given the present size of the plaintiff class.

23             The hearing to be held now in September will refocus the attention of the court and

24   parties on this longstanding predicament.

25   /////

26   /////

27   /////

28   /////

7

Accordingly, good cause appearing, IT IS HEREBY ORDERED that:

1.  Within thirty days from the date of this order the parties shall file briefs that address the following:

    a.  With specificity, the size of the reduction in the population of seriously mentally ill inmates in California's prison system at each level of care that would be required for defendants to come into compliance with the ratios in the 2009 Staffing Plan.

    b.  Whether defendants can, within thirty days of any court order directing them to do so or sooner if the task is promptly undertaken, develop a plan in consultation with the Special Master and, as necessary, plaintiffs' counsel that they will implement voluntarily and that will, not later than the end of one year, permanently reduce the number of seriously mentally ill inmates to the number that will bring defendants into compliance with the requirements of the October 10, 2017 order.

    c.  If the answer to question 1.b. is yes, a description of the general contours of such a plan.

    d.  As an alternative to a voluntary plan from defendants, what remedies are available to the court to enforce its October 10, 2017 order with respect to defendants' 2009 Staffing Plan.

    e.  What remedies are available for the shortfall in staffing required for the psychiatric inpatient programs operated by the California Department of Corrections and Rehabilitation.

2.  This matter is set for videoconference  hearing on September 10, 2020 at 10:00 a.m.

DATED:  July 30, 2020.

CHIEF UNITED STATES DISTRICT JUDGE

8