DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' RESPONSE TO DEFENDANTS' RESPONSE AND OBJECTIONS TO SPECIAL MASTER'S LABOR ECONOMIST REPORT, ECF NO. 6695** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Judge:   Hon. Kimberly J. Mueller |

---

PLAINTIFFS' RESPONSE TO DEFENDANTS' RESPONSE AND OBJECTIONS TO SPECIAL MASTER'S
LABOR ECONOMIST REPORT

1
2

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

I.  THE COURT SHOULD DISREGARD DEFENDANTS' ADDITIONAL EVIDENCE ............................................................................................... 2

II.  STANDARD OF REVIEW ...................................................................... 4

III.  THE SPECIAL MASTER WAS NOT REQUIRED TO REPORT ON DEFENDANTS' EXPERT REPORT AND THE SCOPE OF THE SPECIAL MASTER'S REPORT WAS APPROPRIATE ............................................ 5

IV.  THE SPECIAL MASTER'S REPORT IS GOVERNED BY THE ORDER OF REFERENCE, NOT THE FEDERAL RULES OF EVIDENCE, BUT IS IN ANY EVENT SOUND ............................................................................ 7

V.  THE EMPLOYSTATS SURVEY IS SOUND ...................................... 10

  A.  Defendants Failed to Demonstrate that the Scope of the Survey Was Improper ................................................................................ 11

  B.  The Survey Does not Suffer from "Self-Interest" Bias .............. 13

  C.  The Report's Interpretation of Results Is not Biased .................. 14

  D.  The Questions in the Survey Were Appropriate .......................... 16

  E.  The Survey Was Complete ............................................................ 18

VI.  THE REPORTS' FINDINGS SUPPORT THE NEED FOR LARGER SALARY INCREASES FOR PSYCHIATRISTS .................................. 21

VII.  THIS COURT SHOULD ADOPT THE SPECIAL MASTER'S WELL-SUPPORTED RECOMMENDATION THAT CDCR ADOPT PAY DIFFERENTIALS FOR INSTITUTIONS IN THE CENTRAL VALLEY ........... 24

VIII.  THE REPORT'S ANALYSIS SUPPORTS THE RECOMMENDATIONS ......... 27

IX.  THERE ARE ENOUGH PSYCHIATRISTS TO FULLY STAFF DEFENDANTS' INSTITUTIONS, AND DEFENDANTS' SUGGESTION TO THE CONTRARY IS MERITLESS ................................................ 28

X.  THE REPORT'S RECOMMENDATIONS ARE SUFFICIENTLY SPECIFIC TO DEVELOP A REMEDY ................................................ 30

XI.  THE SCOPE OF THE RECOMMENDATIONS TARGETED AT DSH IS APPROPRIATE ...................................................................................... 31

XII.  COVID-19 DOES NOT JUSTIFY HALTING PROGRESS TOWARD REMEDYING DEFENDANTS' LONGSTANDING NON-COMPLIANCE WITH THE COURT-ORDERED STAFFING REQUIREMENTS ...................... 32

CONCLUSION ................................................................................................. 34

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[3580534.15]

# TABLE OF AUTHORITIES

**Page**

## CASES

*Coleman v. Brown,*
No. 2:90-CV-0520 LKK JFM, 2013 WL 771898 (E.D. Cal. Feb. 28, 2013) ........... 6

*Cont'l Baking Co. v. Katz,*
68 Cal. 2d 512 (1968) ..................................................................................... 31

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.,*
618 F.3d 1025 (9th Cir. 2010) ..................................................................... 10

*In re Refco Securities Litigation,*
280 F.R.D. 102 (S.D.N.Y. 2011) ..................................................................... 9

*In re U.S.A. Motel Corp.,*
450 F.2d 499 (9th Cir. 1971) ........................................................................... 5

*Keith v. Volpe,*
858 F.2d 467 (9th Cir. 1988) ......................................................................... 16

*McCormack v. Hiedeman,*
694 F.3d 1004 (9th Cir. 2012) .................................................................. 5, 31

*Oil, Chemical and Atomic Workers Int'l Union, AFL-CIO v. N.L.R.B.,*
547 F.2d 575 (D.C. Cir. 1976) ......................................................................... 5

*Rufo v. Inmates of Suffolk Cty. Jail,*
502 U.S. 367 (1992) ................................................................................. 31, 33

*Senne v. Kansas City Royals Baseball Corp.,*
315 F.R.D. 523 (N.D. Cal. 2016), *on reconsideration in part,* No. 14-CV-
00608, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017), *aff'd in part, rev'd in
part and remanded,* 934 F.3d 918 (9th Cir. 2019) ................................... 13

*Stone v. City & Cty. of S.F.,*
968 F.2d 850 (9th Cir. 1992) ......................................................................... 33

*Toussaint v. McCarthy,*
801 F.2d 1080 (9th Cir. 1986) ............................................................ 30, 31, 33

*United States v. Zenon,*
711 F.2d 476 (1st Cir. 1983) ........................................................................... 9

## OTHER AUTHORITIES

A. Koseff, "Newsom signs California's $2.2.1 billion state budget," *San Francisco
Chronicle,* June 29, 2020 ............................................................................. 32

PLAINTIFFS' RESPONSE TO DEFENDANTS' RESPONSE AND OBJECTIONS TO SPECIAL MASTER'S
LABOR ECONOMIST REPORT

[3580534.15]

Charlie O. Trevor, Barry Gerhart, and John W. Boudreau, Voluntary Turnover and
    Job Performance: Curvilinearity and the Moderating Influences of Salary
    Growth and Promotions, *Journal of Applied Psychology* (1997) ............................ 21

Dave Smith, Most People Have No Idea Whether They're Paid Fairly, *Harvard
    Business Review* (Dec. 2015) .................................................................. 17

M. Karabarbounis and S. Pinto, "What Can We Learn from Online Wage Postings?
    Evidence from Glassdoor," *Economic Quarterly* 104(4), Q4 2018) ...................... 13

Stamolampros, et al., "Job Satisfaction and Employee Turnover Determinants in
    High Contact Services: Insights from Employees' Online Reviews," *Tourism
    Management*, 75 (2019) 130-147 .......................................................... 13

[3580534.15]

# INTRODUCTION

This Court has ordered Defendants to achieve a 90% staffing fill rate for psychiatrists as one component of the remedy to provide constitutionally adequate mental health treatment to incarcerated persons.  Order at 4 (June 13, 2002), ECF No. 1383.[1]  In 2017, the Court reaffirmed its order requiring Defendants to meet the 90% psychiatrist staffing fill rate and directed Defendants to achieve compliance within one year.  Order at 30 (Oct. 10, 2017), ECF No. 5711.  Defendants have never come close to achieving lasting, meaningful compliance with these orders.  To facilitate remediation, the Court appointed EmployStats as the Special Master's expert labor economist to study the "'potential efficacy of … collective bargaining salary and compensation increases' as part of an overall effort to bring defendants into compliance with required mental health staffing levels" by improving recruitment and retention of psychiatrists.  Order at 2 (Sept. 11, 2018), ECF No. 5919 ("Sept. 11, 2018 Order").

After soliciting and considering significant input from the parties, EmployStats conducted a comprehensive salary analysis and surveyed Defendants' psychiatrists. EmployStats then prepared a report wherein it found that CDCR's annual salary increases are lower than increases paid by other employers of psychiatrists; that many of Defendants' psychiatrists perceive that they are undercompensated and are dissatisfied overall with their jobs and working conditions; and that Defendants' psychiatrists' concerns are most acute at CDCR's Central Valley institutions.  To boost recruitment and retention of psychiatrists, EmployStats recommended that Defendants provide psychiatrists with larger salary increases, improve psychiatrists' working conditions, offer pay differentials for psychiatrists to work at CDCR's Central Valley institutions, and better publicize the compensation they offer psychiatrists.  After considering the parties' comments, the Special Master confirmed his labor economist's findings and recommendations and recommended that the Court adopt them.  Special Master's Report

---

[1] Page citations are based on ECF pagination.

[3580534.15]

on His Expert's Analysis of Psychiatrist Employment Conditions and Compensation at the California Department of Corrections and Rehabilitation and the Department of State Hospitals (May 29, 2020), ECF No. 6695 ("Special Master's Report" or "Report").

Defendants' objections to the Report lack merit. Defs.' Response and Objections to the Special Master's May 29, 2020 Report on his Expert's Analysis of Psychiatrist Employment Conditions and Compensation (June 29, 2020), ECF No. 6744 ("Defs.' Objections"). This Court should reject Defendants' new expert evidence, which was never provided to the Special Master for consideration in violation of the terms of the Order of Reference. The Court should also reject Defendants' objections in their entirety. Defendants' claim that the Report must comply with *Daubert* and the Federal Rules of Evidence is wrong, as it ignores the fact that the Order of Reference sets the standard of review for Special Master compliance reports like this one. Defendants further argue that the survey was inadequate, raising a number of concerns regarding its methodology. Even if the *Daubert* standard applied, the survey would meet it easily. The survey is sound, as are the findings arising from it, and there is no question Defendants cannot meet the clear error standard required for this Court to reject them. Defendants also assert that the Report provides insufficient support for the recommendations, but the Special Master and his expert provide a clear basis for this Court to conclude the recommendations will be effective in contributing to Defendants' ongoing efforts to hire and retain psychiatrists.

The Report's recommendations are reasonable and well supported, and Defendants failed to demonstrate that the Special Master's findings are clearly erroneous. The Court should therefore adopt the Special Master's Report and the recommendations therein and direct Defendants to promptly develop a plan to implement these important remedial measures.

## I.    THE COURT SHOULD DISREGARD DEFENDANTS' ADDITIONAL EVIDENCE

The Court should reject Defendants' new expert evidence , including Defendants' arguments predicated on that new evidence. Where the Special Master provides the parties

2

1  an opportunity to review and comment on draft reports, the Order of Reference bars

2  Defendants from submitting new evidence to the Court after the Special Master submits

3  his final report.  The Order of Reference limits parties' formal objections filed with the

4  Court to only those previously submitted for the Special Master's consideration while a

5  given report was in draft form.  *See* Order of Reference at 8 (Dec. 11, 1995), ECF No. 640

6  ("The court will entertain no objection to the report unless an *identical* objection was

7  previously submitted to the special master in the form of a specific written objection in

8  accordance with the provisions of paragraph A(5) above." (emphasis added)).  This

9  provision bars the submission of new evidence and comments in support of previously

10 submitted objections because new evidence and comments inherently modify the

11 objections, thereby violating the Order of Reference's mandate to submit to the Court only

12 objections that are identical to those previously submitted to the Special Master.  This

13 process ensures the Special Master can address the parties' concerns prior to finalizing and

14 filing his reports so that the Court can have a full and complete record for consideration in

15 resolving any objections.  *See* Joint Status Report at 23-24 (discussing Order of Reference

16 process, including for draft reports modified in response to Defendants' objections prior to

17 filing in final form).

18     In accordance with this process, the parties received ample opportunity to comment

19 on, and Defendants extensively commented on, both the survey and the draft report of the

20 Special Master's Labor Economist.  *See* Special Master's Report at 12-18.  Despite this

21 complete participation, Defendants submitted additional new evidence from their experts

22 with their Objections after the Special Master issued his Report.  *See* Ex. 1 to Defs.'

23 Objections (June 29, 2020), ECF No. 6744-1.

24     The Court should disregard the new evidence that Defendants submitted with their

25 Objections, as well as any objections relying on that new evidence.  *See id*.  Defendants'

26 submission of additional evidence violates the longstanding court-ordered reporting

27 process and is unjustified.  In preparing their Report, the Special Master and his experts

28 did not receive the opportunity to respond to and account for the new evidence that

3

[3580534.15]

1  Defendants submitted from their experts.  Accepting Defendants' submission of new

2  evidence in violation of the Order of Reference will only encourage Defendants to

3  continue to flout the court-ordered remedial processes in this case and to undermine the

4  Special Master's reporting function.  If the Court is considering relying on the new

5  evidence to grant one or more of Defendants' objections, it should first provide the Special

6  Master and his experts the opportunity to address that evidence before so ruling in order to

7  ensure the Court's neutral factfinder has the last word concerning this court-ordered

8  compliance report, rather than Defendants' paid experts.

9  **II.     STANDARD OF REVIEW**

10         The Court ordered that the Special Master issue this Report to evaluate Defendants'

11  ability to comply with the Court's remedial orders in this case.  The Special Master's

12  Report is indisputably a compliance report within the meaning of paragraph A(5) of the

13  Order of Reference.  Sept. 11, 2018 Order at 2 (approving appointment of Special Master's

14  experts "'to determine the potential efficacy of … collective bargaining salary and

15  compensation increases' as part of an overall effort to bring defendants into compliance

16  with required mental health staffing levels"); *see also* Order of Reference at 4.  The Order

17  of Reference therefore governs the process for evaluating Defendants' objections,

18  including the applicable standard of review.[2]

19         The Order of Reference makes clear that the Court shall adopt the findings of fact in

20  the Special Master's reports "unless they are clearly erroneous."  Order of Reference at 8;

21  *see also* Order at 2 n.1 (Nov. 23, 2009), ECF No. 3731 (affirming that "clearly erroneous"

22  is applicable standard of review for Special Master's reports).  A finding is "clearly

23  erroneous" when  "on review of the entire evidence, the reviewing court arrives at the firm

24

25  _____

26  [2] Defendants have claimed that the Report is not a compliance report within the meaning
of the Order of Reference, but never articulated any rationale for that assertion, much less
why it matters for the purposes of this Court's review.  *See* Joint Status Report at 25-26.

27  Regardless, they do not object to the Special Master's authority to issue the Report, nor do
they claim the procedures laid out in the Order of Reference do not apply here.  *See*

28  *generally* Defs.' Objections.

1   conviction that the finding is mistaken." *In re U.S.A. Motel Corp.*, 450 F.2d 499, 503 (9th

2   Cir. 1971); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("To

3   be clearly erroneous, a decision must strike the court as more than just maybe or probably

4   wrong; it must … strike [the court] as wrong with the force of a five-week-old,

5   unrefrigerated dead fish."). The party objecting to the Special Master's findings has the

6   burden of proving that they are clearly erroneous. *Oil, Chemical and Atomic Workers Int'l*

7   *Union, AFL-CIO v. N.L.R.B.*, 547 F.2d 575, 580 (D.C. Cir. 1976).

8   **III.    THE SPECIAL MASTER WAS NOT REQUIRED TO REPORT ON**
        **DEFENDANTS' EXPERT REPORT AND THE SCOPE OF THE SPECIAL**
9       **MASTER'S REPORT WAS APPROPRIATE**

10      Defendants' chief complaint appears to be that the Special Master's expert

11  conducted his own labor economy analysis pursuant to this Court's order rather than

12  simply adopting Defendants' expert report. Defs.' Objections at 5-8. They assert that the

13  Special Master improperly "dismissed" their expert report and should be faulted for failing

14  to "determine whether EmployStats' findings and recommendations could be married with

15  the analysis completed by Defendants' experts in a way to benefit the *Coleman* class." *Id.*

16  at 6, 7-8. This argument misapprehends the purpose of the Special Master's report, as well

17  as his role vis a vis this Court.

18      The Court did not order the Special Master or his expert to analyze or report on

19  Defendants' expert report, and Defendants failed to identify any requirement that the

20  Special Master or his labor economist do so. *See id.* Instead, the Court ordered him to

21  conduct a neutral, independent expert analysis of labor conditions affecting Defendants'

22  ability to hire and retain psychiatrists and to make recommendations thereon. *See* Sept. 11,

23  2018 Order at 2. And despite their complaints, Defendants admit that their expert's views

24  were directly addressed in the Special Master's draft report and in the response to

25  Defendants' objections to that report. *See* Defs.' Objections at 6 n.2.

26      More significantly, Defendants seem to misunderstand the role of the Special

27  Master in relation to this Court. It is not the Special Master's job to weigh evidence and

28  make ultimate findings of compliance or non-compliance. That job is uniquely within the

5

1   province of this Court.  *See* Order of Reference at 3 (purpose of special master

2   appointment "is to assist the court in fulfilling *its obligation* to fashion a remedy for the

3   constitutional violations" (emphasis added)); *id.* at 7-8 (prohibiting special master from

4   directing defendants to take specific actions to achieve compliance, and expressly

5   reserving that power for the court); *see also Coleman v. Brown*, No. 2:90-CV-0520 LKK

6   JFM, 2013 WL 771898, at *1 (E.D. Cal. Feb. 28, 2013) (noting Special Master is not

7   tasked with assessing whether system is constitutional, as that is Court's role).  That is

8   precisely why this Court ordered the Special Master to build a full factual record

9   concerning salary adjustments and other methods to boost recruitment and retention of

10  psychiatrists for consideration by this Court, *see* Order at 3 (Feb. 15, 2018), ECF No. 5786

11  ("Feb. 15, 2018 Order"), and why the Special Master included Defendants' expert report

12  with his Report, *see* Special Master's Report at 92-135.

13          When the parties fully litigate Defendants' ongoing staffing non-compliance or if

14  Defendants' file a motion to modify the governing staffing ratios, Defendants can submit

15  whatever expert testimony and argument they would like in support of their position.  This

16  Court can then give that evidence and argument due weight.  *See Coleman*, 2013 WL

17  771898, at *4 ("To the extent that defendants' objections go to the weight to be given any

18  particular finding or conclusion in connection with the issues raised by their motion to

19  terminate, they are overruled without prejudice to defendants' right to make appropriate

20  argument in connection with said motion.").  Notably, Defendants hired their labor

21  economist expressly in anticipation of litigation designed to convince this Court to ease

22  Defendants' compliance burdens, reflecting the inherent bias of their views that is not

23  present in the Special Master's neutral assessment.  *See* Joint Status Report at 6 n.2 (June

24  21, 2018), ECF No. 5841 (stating that Defendants had retained a labor economics group

25  "[i]n anticipation of the possible need to move to modify the 2009 Staffing Model should

26  the parties be unable to reach agreement on Defendants' staffing proposal").

27          Defendants also incorrectly assert that EmployStats exceeded the scope of its

28  appointment by reporting on working conditions and making ensuing recommendations.

[3580534.15]

Defs.' Objections at 7.  The Court appointed EmployStats "to perform the discreet duties set forth in the Special Master's Request for the Appointment of Additional Staff," which included both "evaluation of … the recruitment and retention of psychiatrists" within CDCR and conducting a "labor market and salary analyses."  Sept. 11, 2018 Order at 3; Mem. in Supp. of Special Master's Request for the Appointment of Additional Staff 1-3 (Sept. 4, 2018), ECF No. 5903-1 ("Special Master's Request for Additional Staff").  Examining working conditions and job satisfaction falls squarely within the ambit of evaluating CDCR's recruitment and retention of psychiatrists, and it is reasonable to examine non-monetary issues of potential concern to psychiatrists such as facilities and work environment as part of a labor market and salary analysis because such factors can impact the salaries that employees will accept.  For those same reasons, EmployStats' recommendations are also all related to the efficacy of compensation and salary increases to improve recruitment and retention of psychiatrists and consequently within the scope of EmployStats' appointment.  The Special Master's recommendations are therefore fully consistent with the Court's order directing him to work with the parties to improve recruitment and retention of psychiatrists.  *See* Feb. 15, 2018 Order at 3; Special Master's Report at 19-20.  Defendants' objection regarding scope here also rings hollow because, when earlier given the opportunity, Defendants did not object to the Special Master's Labor Economist surveying psychiatrists about working conditions such as office space and perceived standing amongst colleagues.  *See id.* at 50 ("CDCR … believes the current questions on pages 14 and 15 of the proposed salary survey are sufficient to understand the impact working in an institutional setting may have on the hiring or retention of psychiatrists within CDCR"); Nunez Declaration Ex. B (draft CDCR psychiatrist survey).

## IV.   THE SPECIAL MASTER'S REPORT IS GOVERNED BY THE ORDER OF REFERENCE, NOT THE FEDERAL RULES OF EVIDENCE, BUT IS IN ANY EVENT SOUND

Defendants incorrectly argue that the requirements for a party expert in the Federal Rules of Evidence and related case law should be used to evaluate the Special Master's Labor Economist report.  Defs.' Objections at 9.  As the Court has already held, the work

7

of the Special Master's experts is not an independence source of evidence in this action. Sept. 11, 2018 Order at 3.  Furthermore, Federal Rule of Evidence 702 does not apply because the Special Master and his experts are judicial officers and surrogates of this Court, and thus *ipso facto* cannot and will not ever present testimony in this case.  Fed. R. Evid. 702(a); *cf.* Order at 3-4 (Nov. 29, 2007), ECF No. 2577 (three-judge court holding *Plata* Receiver cannot be deposed by a party because he, like a court-appointed special master, is an arm of the court itself).

That the Federal Rules of Evidence do not apply is logical given that concerns about expert bias are not at issue here, where the Special Master and his experts are a neutral arm of the Court itself.  Here, the Special Master and his experts faithfully fulfilled their role as neutrals in preparing their Report.  For example, both Plaintiffs and Defendants submitted extensive comments regarding the Labor Economist's survey instrument, including suggested revisions to questions and proposed additional questions.  Special Master's Report at 12-14.  The Special Master and his Labor Economist adopted some proposals but declined to adopt many others advanced by either Plaintiffs or Defendants, reflecting their independence.  *Compare id.* at 39-50 (comment letter from Plaintiffs and comment email from Defendants), *with id.* at 275-82 (final CDCR psychiatrist survey); *see also id.* at 300-01 (describing changes made to survey in response to Defendants' comments, and reasons for rejecting other suggestions made by both parties).  This is a far cry from the traditional role played by party experts, including Defendants' labor economist experts who were hired expressly in anticipation of litigation seeking to convince this Court to alleviate Defendants' psychiatry hiring obligations.  *See* Joint Status Report at 6 n.2 (June 21, 2018), ECF No. 5841 (stating that Defendants had retained a labor economics group "[i]n anticipation of the possible need to move to modify the 2009 Staffing Model should the parties be unable to reach agreement on Defendants' staffing proposal").

Nor do Defendants provide any authority supporting their novel argument that the Special Master should be treated like a party expert for the purposes of the Rules of Evidence, much less for the notion that the Special Master's careful work here is so

1   unreliable or faulty that it should be disregarded.  The cases that Defendants cite are

2   inapposite.  *See* Defs.' Objections at 9.  In *In re Refco Securities Litigation*, 280 F.R.D.

3   102, 105 (S.D.N.Y. 2011), the Special Master made a factual determination based solely

4   on a conclusory statement in a single declaration filed under seal despite available

5   evidence to the contrary.  That scenario bears no relationship to the voluminous and

6   detailed survey results and salary analysis upon which the Special Master's conclusions are

7   based here.  *United States v. Zenon*, 711 F.2d 476, 478 (1st Cir. 1983), is similarly

8   irrelevant because it does not even involve a special master, and stands simply for the

9   uncontroversial proposition that court orders must be based on evidence.  Neither case

10  supports Defendants' argument that reports of the Special Master are governed by the

11  evidentiary rules pertaining to party experts, or that the Special Master's Report is so

12  fundamentally flawed that it must be completely rejected.

13          Defendants failed to carry their burden to demonstrate that the Special Master erred

14  even if *Daubert* applied.  While Defendants attempt to analogize the Report to party expert

15  reports "developed specifically for litigation," it is clear it is akin to the type of

16  independent research that bears indicia of reliability.  Defs.' Objections at 10.  The Special

17  Master and his expert did not prepare the Report for litigation as Defendants claim, much

18  less to support one party or the other in that litigation.  The Report was prepared by the

19  Special Master—a neutral officer—to inform and guide this Court.  And it is not

20  independent evidence, as this Court has already held, but potential findings and

21  recommendations for this Court's consideration.

22          As Defendants acknowledge, the Report relies on responses to the survey and on a

23  comparison of salary data, and provides information on the basis of the methodology used.

24  *See* Defs.' Objections at 10-11.  Defendants nonetheless object that the Report's

25  articulation of its methodology and the various choices made are not detailed enough.  *See*

26  *id*.  However, Defendants cite no authority demonstrating that the Special Master must

27  painstakingly describe in detail the rationale for every single survey question and

28  methodological choice, particularly where Defendants had every opportunity to ask about

9

1   these things during the survey's development and EmployStats' credentials are so

2   unassailable that Defendants made no attempt to object to them. *Id.* And despite

3   Defendants' insinuation that only one methodological approach can ever suffice, they cite

4   no support for that position and indeed the very fact that EmployStats' methodology has

5   been accepted as reliable by other federal and state courts proves they are wrong. *Id.*

6   Finally, despite Defendants' claims that the Report failed to "follow well-established

7   survey methodologies and principles," *id.* at 11, each of the specific attacks they levy,

8   discussed in Section V below, fail.

9   **V.    THE EMPLOYSTATS SURVEY IS SOUND**

10          Defendants first generally argue that the Special Master failed to adequately justify

11  the methodology used by the survey, citing cases interpreting and applying Rule 702 to

12  parties' expert reports. Defs.' Objections at 12 (citing *Fortune Dynamic, Inc. v. Victoria's*

13  *Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1036-38 (9th Cir. 2010) (involving

14  admissibility of survey evidence proffered by a party under Rule 702)). As stated,

15  Defendants have offered no authority to demonstrate that rule applies to Special Master

16  reports, nor is that conclusion logical. But regardless, the Report clearly provides ample

17  support for the methodology used as well accepted within the field of the Special Master's

18  Labor Economist's expertise. Special Master's Report at 198 n.4 & 299-300.

19          Defendants also object that the Special Master's report fails to recognize that "the

20  lack of a labor pool" is "the heart of the staffing challenges." Defs.' Objections at 12.

21  However, the overall supply of psychiatrists in the entire United States does not justify

22  non-compliance with court-ordered staffing rates here, where it is undisputed that there are

23  more than enough psychiatrists in the relevant labor market to fully staff all of CDCR's

24  vacant psychiatrist positions. *See* Defs.' Objections at 31 (acknowledging that there are

25  thousands of psychiatrists in California). The size of the overall supply of psychiatrists

26  and the resulting market power that psychiatrists wield is something that Defendants must

27  account for in their recruitment and retention strategy, and in their other policy and

28  funding choices affecting how many psychiatrists they need to treat the class; it is not an

1    excuse for Defendants' ongoing failure to meet the court-ordered psychiatrist staffing

2    rates.  Furthermore, contrary to Defendants' claims, the Special Master's report

3    acknowledges the available supply of psychiatrists.  *See* Special Master's Report at 251,

4    316.

5         Defendants also object to the survey because they contend that it does not comply

6    with standards set forth by the American Association for Public Opinion Research.  Defs.'

7    Objections at 12.  However, Defendants have never disputed the unassailable expert

8    qualifications of the Special Master's Labor Economists, and different experts may

9    reasonably choose to take different approaches in constructing surveys.  Indeed,

10   Defendants are fully able to conduct their own competing salary survey, using their

11   preferred methodology, and submit it as evidence to this Court if they wish.  But in the

12   meantime, Defendants fail to provide any authority demonstrating that surveys must meet

13   the standards established by the American Association for Public Opinion Research to be

14   valid, or that applying different methodologies renders a survey so inherently faulty that

15   any results are clearly erroneous or inadmissible.  And indeed, it is undisputed that the

16   Special Master's expert has successfully employed the exact same methodology applied

17   here in other cases, indicating that even if Rule 702 and *Daubert* applied here the

18   methodology withstands scrutiny.  *See* Special Master's Report at 198 n.4 & 299-300.

19        In addition to their generalized complaints about the Special Master's experts'

20   methodology, Defendants offer five specific objections, all of which lack merit and are

21   addressed in turn next.

22        **A.    Defendants Failed to Demonstrate that the Scope of the Survey Was**
             **Improper**

23

24        Defendants first fault the Report's survey because it did not survey psychiatrists

25   outside of DSH and CDCR.  Defs.' Objections at 13.  Defendants assert that not surveying

26   other psychiatrists was an error because it is not clear whether concerns raised by

27   responding psychiatrists are unique to CDCR and DSH or are common across the industry.

28   *Id.* at 13-14.  However, the survey appropriately focused on the concerns of CDCR and

11

1   DSH psychiatrists given the Court's order authorizing an analysis of what can be done to

2   improve recruitment and retention of Defendants' psychiatrists.  Directly surveying

3   psychiatrists outside of Defendants' employment is well beyond the scope of this Court's

4   authorization.

5          Defendants appear to suggest that dissatisfaction reported by CDCR and DSH

6   psychiatrists who responded to the survey can be disregarded if other psychiatrists share

7   those concerns.  *Id.*  This suggestion is illogical.  Employees choose to change jobs based

8   on the information available to them, which typically includes information about their own

9   circumstances and information that they have about other opportunities.   Defendants

10  provide no authority demonstrating that dissatisfaction with compensation and working

11  conditions do not adversely impact recruitment and retention at CDCR and DSH merely

12  because psychiatrists employed elsewhere may share some of those concerns.

13         Moreover, Defendants criticize the Report's use of satisfaction data for non-DSH

14  and CDCR psychiatrists gleaned from Glassdoor.  *Id.*  The Glassdoor issue is a red herring,

15  as it cannot obscure the fact that majorities of both CDCR and DSH psychiatrists reported

16  being less than satisfied with their jobs.  *See* Special Master's Report at 264.  Moreover,

17  Defendants ignore the fact that the Special Master's expert also used a second source of

18  salary satisfaction data—Medscape—in addition to Glassdoor, and expressly stated that

19  the Report's findings would be no different without Glassdoor's data.  *Id.* at 302.

20  Whatever their concerns about Glassdoor, Defendants make no claim that the Medscape

21  data, which EmployStats states "was consistent with the salary satisfaction Glassdoor

22  data," is unreliable in any way.  *Id.*

23         And in any event, Defendants fail to identify any authority demonstrating that

24  comparing survey data to data from Glassdoor amounts to clear error.  *See* Defs.'

25  Objections at 13-14.  Neither they nor their experts contest the fact that "Glassdoor data is

26  routinely used as survey data in peer reviewed articles."  *See* Special Master's Report at

27  302.  And while Defendants disagree with the Special Master's expert's analysis of an

28  academic article on Glassdoor's reliability, they failed to provide the article in question for

                                          12

1   this Court to even consider, essentially just asking this Court to trust them over the Court's

2   own neutral expert. *See* Defs.' Objections at 13 n.4 (discussing M. Karabarbounis and S.

3   Pinto, "What Can We Learn from Online Wage Postings? Evidence from Glassdoor,"

4   *Economic Quarterly* 104(4), Q4 2018); *see also* Special Master's Report at 302–303

5   (EmployStats' response to M. Karabarbounis and S. Pinto study).  And they have no retort

6   for the second article proffered by the Special Master's expert attesting to the

7   appropriateness of utilizing the Glassdoor data, beyond merely noting it addressed a

8   different industry without explaining why that matters. *See* Defs.' Objections at 13 n.4

9   (discussing Stamolampros, et al., "Job Satisfaction and Employee Turnover Determinants

10   in High Contact Services: Insights from Employees' Online Reviews," *Tourism*

11   *Management*, 75 (2019) 130-147); *see also* Special Master's Report at 303 (EmployStats'

12   response to Stamolampros, et al. study).  Defendants' mere speculation, unsupported by

13   evidence, about possible bias in the Glassdoor data falls far short of satisfying their burden

14   to demonstrate that the Special Master and his Labor Economist committed clear error in

15   making findings based upon the instant survey.

16       **B.       The Survey Does not Suffer from "Self-Interest" Bias**

17       Defendants also object to the survey because they contend that it does not protect

18   against possible self-interest bias, once again relying on caselaw that is specific to surveys

19   conducted by parties to litigation and not neutral analyses performed by special masters

20   and their experts.  Defs.' Objections at 14-15 (citing *Senne v. Kansas City Royals Baseball*

21   *Corp.*, 315 F.R.D. 523, 589 (N.D. Cal. 2016), *on reconsideration in part*, No. 14-CV-

22   00608, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017), *aff'd in part, rev'd in part and*

23   *remanded*, 934 F.3d 918 (9th Cir. 2019)).  Mere speculation about the possibility of survey

24   bias, unsupported by evidence that such bias indeed infected the survey, falls far short of

25   Defendants' burden to demonstrate that the Special Master committed clear error,

26   particularly where Defendants had extensive opportunities to comment on the survey prior

27   to implementation and did not raise concerns about potential bias. *See* Special Master's

28   Report at 305; *see also* Defs.' Objections at 15 (claiming the survey's approach "could

13

[3580534.15]

1  lead to biased responses," but admitting Defendants and their experts do not know whether

2  any bias exists or if it is of any significance).  The Special Master's expert specifically

3  considered the potential for bias in designing the survey and took steps to mitigate that

4  risk.  *See* Special Master's Report at 303-05.  The stated reason for the survey in the

5  survey's instructions is neutrally worded and does not mention salary.  *Id.* at 276, 285.

6  Furthermore, the salary analysis that the Special Master's Labor Economist performed is a

7  check on possible self-interest bias in answering questions regarding salary and

8  compensation because it provides an objective comparison of salaries of CDCR and DSH

9  psychiatrists against salaries of other psychiatrists.  *See id.* at 198.  Finally, Defendants'

10  complaints ignore the fact that the Special Master's expert performed statistical analyses

11  afterwards to confirm that self-interest bias had not infected the survey's results.  *See id.* at

12  304-05.  Simply put, the Special Master's expert took reasonable steps to mitigate possible

13  self-interest bias in the survey design (especially given that Defendants raised no concerns

14  in this respect when given the chance to comment), and confirmed after the fact that no

15  such bias tainted the results.  That is more than sufficient for this Court to reject

16  Defendants' objection.

17      **C.    The Report's Interpretation of Results Is not Biased**

18      Defendants next incorrectly object that the Special Master's Labor Economist

19  interpreted survey results in a manner biased against Defendants.  Defs.' Objections at 15-

20  17.  Defendants assert that, in questions that called for a rating on a scale of one to seven,

21  the Report incorrectly categorized a rating of four, the middle rating, as unsatisfied.  *Id.* at

22  15-16.  However, the Report correctly and clearly designated ratings of one through four as

23  less than satisfied given that only ratings of five and above convey any degree of

24  satisfaction.  *See id.* at 199 ("Ratings of 5 and higher were classified as satisfied, ratings of

25  4 and below were classified as less than satisfied, and ratings of 3 and below were

26  classified as unsatisfied.").  Furthermore, the Report transparently conveys both the

27  percentage of clinicians who provided ratings of three or lower ("unsatisfied"), and

28  clinicians who gave ratings of four or lower ("less than satisfied").  *See, e.g.*, *id.* at 219.

1  With this information, it is easy to determine the percentage of psychiatrists who answered

2  questions with a "neutral" rating (4), a rating of "satisfied" (5-7), and a rating of better than

3  "unsatisfied" (4-7), undermining Defendants' assertion that the Report attempts to mislead

4  the Court. *See* Defs.' Objections at 17.

5      Defendants also assert that the Report confuses terminology. *Id.* The single

6  example Defendants point to where the Report asserts that a majority of psychiatrists are

7  "dissatisfied" with the medical assistant program (referring to ratings of "less than

8  satisfied"), is transparent and is not confusing because the Report presents the breakdown

9  of "unsatisfied" and "less than satisfied" responses immediately thereafter. Special

10  Master's Report at 219. At most, the one example of alleged confusing terminology is a

11  harmless typographical error that does not appear in the Report's findings or

12  recommendations and does not actually create any confusion.

13      Defendants also object to the fact that the Report does not list how many

14  psychiatrists chose each and every option for the questions that presented a seven-point

15  response scale. Defs.' Objections at 17. However, aggregating responses into categories

16  of unsatisfied and less than satisfied is logical. Defendants suggest that disaggregated

17  responses are important to understand the intensity of psychiatrists' satisfaction or lack

18  thereof. *Id.* at 17. But drawing such distinctions when assessing qualitative data such as

19  respondents' satisfaction is minimally relevant to the Report's conclusions. Defendants

20  have provided no support for the idea that policy recommendations should differ based on

21  exactly how unsatisfied psychiatrists said they were on the scale of one to three—all of

22  which reflect fundamental dissatisfaction—in response to a particular question.

23      Nor does the Report skew the results as Defendants assert. *Id.* at 17. The Report

24  presents the percentage of psychiatrist respondents who were unsatisfied (answered 1-3)

25  and less than satisfied (answers 1-4), and Defendants do not challenge the accuracy of

26  these numbers. *Id.*; *see, e.g.*, Special Master's Report at 221. With this data, it is a simple

27  and obvious mathematical exercise to determine what percentage of psychiatrists answered

28  satisfied (5-7) or not unsatisfied (4-7) in response to each of the questions that provided the

15

[3580534.15]

1  seven-point answer scale.  Furthermore, Defendants' argument misses the central point

2  that, in a competitive labor market where psychiatrists are in short supply, Defendants

3  must focus on ensuring that their psychiatrists are satisfied with their jobs to retain them.

4  The Report's presentation of survey results is in keeping with that reality and skewed

5  nothing.

6      **D.      The Questions in the Survey Were Appropriate**

7          Defendants' fourth specific methodological objection is that the survey is unreliable

8  because it did not include additional questions that Defendants proposed seeking to probe

9  the basis for respondents' answers to questions about compensation.  Defs.' Objections at

10  18-20.  However, Defendants ignore that the purpose of the survey was not to compare

11  CDCR and DSH psychiatrist salaries against salaries for other psychiatrists.  Instead, the

12  survey aims to measure employees' perceptions, which is an inherently subjective

13  endeavor.  The case that Defendants cite, *Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988),

14  does not in any way demonstrate that the survey instrument was inadequate.  *See* Defs.'

15  Objections at 18.

16          Defendants argue that the fact that many survey respondents are wrong in their

17  perception that they are underpaid proves the survey is unreliable.  That argument makes

18  no sense and must be rejected.  The survey was assessing respondents' perceptions, not

19  whether their perceptions align with reality.  Moreover, Defendants offer no support for

20  their assertion that responding psychiatrists did not take working conditions into account

21  when assessing whether they were underpaid.  *See id.* at 19.  It would be logical for

22  responding psychiatrists to incorporate working conditions into their assessments of how

23  their pay compares to other psychiatrists' pay through, at a minimum, selection of peers to

24  whom responding psychiatrists compared their compensation.  Second, the data in the

25  Report asserts only that average CDCR pay is higher than average pay received by other

26  psychiatrists.  Special Master's Report at 215, 258-59.  Because some psychiatrists earn

27  more or less than the averages, this is consistent with some of Defendants' individual

28  psychiatrists accurately perceiving their incomes to be lower than incomes of other

16

[3580534.15]

1  individual psychiatrists.

2      Even if CDCR and DSH psychiatrists' incorrectly perceive that they are underpaid,

3  the study that Defendants cite demonstrates that such a finding would be normal and is not

4  a sign that the survey is unreliable.  *See* Defs.' Objections at 18 (citing Dave Smith, Most

5  People Have No Idea Whether They're Paid Fairly, *Harvard Business Review* (Dec. 2015),

6  https://hbr.org/2015/10/most-people-have-no-idea-whether-theyre-paid-fairly).  The study

7  also shows that employees are more likely to leave if they perceive that they are underpaid,

8  however accurate or complete those perceptions are.  *Id.*  Perceptions of low pay may

9  adversely impact retention of CDCR and DSH psychiatrists regardless of the actual

10  underlying salary data.

11      Defendants complain that the survey did not ask questions to understand how

12  respondents identified their peer groups.  Defs.' Objections at 18.  How precisely

13  individual respondents conceive of their peer groups would not alter findings about

14  psychiatrists' perceptions of whether they are over or underpaid relative to their peers.  In

15  addition, it is reasonable that different CDCR and DSH psychiatrists would conceive of

16  their peer groups differently given that each psychiatrist has a unique educational

17  background and amount and type of work experience.

18      Defendants also point to their experts' conclusion that wage differentials were not

19  effective in generating desired employment outcomes.  *Id.* at 20.  But even Defendants'

20  own experts found that "on average there were more [psychiatrist] hires in months when

21  CDCR [psychiatrist] salaries were relatively higher" and that there was an increase in

22  registry psychiatrist hours after Defendants increased the hourly registry pay rate.  Special

23  Master's Report at 128-130.  These findings support using pay differentials to boost

24  recruitment.  In addition, the analysis of Defendants' experts did not account for other

25  factors, such as working conditions, that the Special Master and his labor economist agree

26  also influence recruitment and retention.  *Compare id.* at 125-29 (Defendants' experts'

27  analysis of salary premiums), *with id.* at 19-20 (EmployStats' recommendations based on

28  consideration of working conditions), 193-94 (same); *see also* Feb. 15, 2018 Order at 3-4

17

[3580534.15]

1  (citing salary increases as only one of several factors that may influence recruitment and

2  retention of psychiatrists).  As EmployStats reported, Defendants' analysis suffered from

3  other flaws as well, including failing to account for an increase in psychiatrist recruitment

4  and retention resulting after pay increases and well-established economic literature

5  supporting compensating wage differentials.  *See* Special Master's Report at 250-51; *see*

6  *also* the Receiver's 43d Tri-Annual Report at 14 (Feb. 3, 2020), ECF No. 6454 (noting

7  recruiting and retention gains for medical doctors in hard-to-hire locations due to pay

8  differentials).[3]

9      Once again, Defendants dislike the findings of the Special Master and his expert,

10  and so attempt to poke holes in the survey methodology.  But the methodology is sound,

11  and certainly not infected by clear error sufficient to disturb the Report's resulting findings

12  of fact.

13      **E.**      **The Survey Was Complete**

14      Defendants' last specific methodological objection is that the survey was deficient

15  because it did not ask more questions to tie specific issues to respondents' overall job

16  satisfaction.  Defs.' Objections at 20-21.  Defendants failed to identify any reason why it is

17  necessary to tie each respondents' overall job satisfaction to a specific list of discrete

18  issues.

19      In a reversal from their previous position, Defendants also fault the survey for not

20  asking additional questions about office space, treatment by peers, opportunities for

21  promotion, other working conditions, and benefits of employment.  *Id.* at 20.  When

22  Defendants commented on a draft version of the survey that contained even fewer

23  questions about working conditions, Defendants stated "CDCR … believes the current

24  questions on pages 14 and 15 of the proposed salary survey are sufficient to understand the

25  impact working in an institutional setting may have on the hiring or retention of

26

27  [3] The analysis of Defendants' experts was also limited to staff psychiatrists, so it does not
address the impact of salary increases on more senior psychiatrists.  Special Master's

28  Report at 125 n.196.

PLAINTIFFS' RESPONSE TO DEFENDANTS' RESPONSE AND OBJECTIONS TO SPECIAL MASTER'S
LABOR ECONOMIST REPORT

1  psychiatrists within CDCR."  Special Master's Report at 50 (November 21, 2018 email

2  from Dillon Hockerson); Nunez Declaration Ex. B (draft CDCR psychiatrist salary

3  survey).  Indeed, Defendants do not contest that they never raised the instant objections nor

4  suggested the questions they now fault the survey for lacking when the Special Master's

5  expert sought input in the survey's design.  *See id.* at 308.  Given the limited time and

6  resources and the need to induce voluntary responses to the survey, it was appropriate for

7  the Special Master's expert to limit the number of questions, and the range of questions

8  that the survey asked regarding working conditions was reasonable.  *See id.*  Defendants

9  argue that the survey should have asked follow up questions about treatment by peers

10  (Defs.' Objections at 20), but such questions were unnecessary because they would not

11  alter the finding that a majority of psychiatrists are less than satisfied with their perceived

12  standing amongst their colleagues.  Special Master's Report at 236.  And, as always,

13  Defendants can conduct their own survey of their employees if they want to ask different

14  questions or explore certain topics in greater depth.  *Id.* at 308.  But that does not change

15  the fact that Defendants failed to demonstrate that not asking about perceived benefits of

16  employment infected the survey results with error, particularly when Defendants never

17  raised this issue with the Special Master's expert during the development of the survey

18  when they had their chance.

19        Defendants also object that the Report should have included more detail regarding

20  the survey results.  Defs.' Objections at 20-21.  Defendants argue that the Report should

21  have stated the percentage of responding psychiatrists who answered "satisfied" to the

22  questions that provided a seven point answer scale.  *Id.* at 21.  However, the Report

23  effectively conveys this information; determining the percentage of psychiatrists who

24  answered "satisfied" to each of these questions is a simple matter of subtracting the

25  percentage of psychiatrists who answered less than satisfied from 100.  Defendants also

26  complain that the Report should have included survey responses indicating by how much

27  psychiatrists believed their salaries differed from those of their peers.  *Id.*  But they fail to

28  explain why that information matters, given that the Report makes clear (and Defendants

[3580534.15]

1    emphasize) that the responding psychiatrists' perception does not reflect reality.  *Id.* at 18.

2    It is not apparent why it matters precisely how wrong that perception is, particularly when

3    the Report includes a detailed factual comparison of salaries of CDCR and DSH

4    psychiatrists against the salaries of other psychiatrists.  *See* Special Master's Report at 213,

5    15.  Indeed the Special Master's labor economist expert makes clear he included the

6    questions about how much psychiatrists felt they were under or overpaid relative to their

7    peers not because those questions were expected to elicit important substantive

8    information in their own right, but rather as part of a carefully constructed survey design

9    that would "allow for the checking of the accuracy of the survey responses."  *See id.* at

10    306-07.

11         Defendants also argue that the Report did not comply with best practices for

12    reporting survey results.  Defs.' Objections at 21.  However, the Report conveys the most

13    relevant survey results—psychiatrists' overall attitudes toward their compensation and

14    working conditions—which is precisely what this Court asked be evaluated.  *See* Special

15    Master's Report at 219-56, 262-74.  Defendants failed to provide any authority

16    demonstrating that reporting every single survey result—even to questions that were

17    included not for substantive purposes, but instead to ensure reliability in the survey's

18    design and results—is necessary or that declining to relay survey responses to all questions

19    so fundamentally infects the survey itself that it amounts to an error, much less clear error.

20    *See* Defs.' Objections at 21.

21         Finally, Defendants' purported concern regarding sample sizes is meritless.  *See id.*

22    The Report provides the number of psychiatrists who took the survey (214 CDCR

23    psychiatrists responded to the survey and 210 of those psychiatrists completed the survey)

24    and provides the number of psychiatrists who responded to each survey question discussed

25    in the Report.  Special Master's Report at 199; *see also, e.g.*, *id.* at 219-25.  The Report

26    also makes clear that the Labor Economist took measures to prevent small samples from

27    skewing the survey results.  *Id.* at 199 n.6 (excluding responses from Report where number

28    of responses was small).

## VI.     THE REPORTS' FINDINGS SUPPORT THE NEED FOR LARGER SALARY INCREASES FOR PSYCHIATRISTS

Defendants argue that higher salary increases are unnecessary because, on average, Defendants pay psychiatrists more than other employers.  Defs.' Objections at 22-23.  Defendants miss the mark.  Whether larger annual salary increases will boost retention is a separate question from how Defendants' psychiatrists' existing salaries compare with salaries paid to other psychiatrists, and the Report provides ample support for its conclusion that higher annual salary increases would improve recruitment and retention of psychiatrists.  The Report found that CDCR and DSH psychiatrists receive lower annual salary increases than other employers.  Special Master's Report at 208-14, 258.  The Report also shows that an increase in retention and staffing accompanied prior higher increases in CDCR psychiatrists' salaries, and that economics research shows that higher salary increases improve retention of employees.  *Id.* at 303, 309-10 (identifying studies that discuss the relationship between income growth and turnover rates).  Those findings are not clearly erroneous and more than support the recommendation.

In addition, despite Defendants' argument to the contrary, EmployStats provided research showing that higher salary increases increase retention.  *See, e.g.*, Special Master's Report at 312 (citing Charlie O. Trevor, Barry Gerhart, and John W. Boudreau, Voluntary Turnover and Job Performance: Curvilinearity and the Moderating Influences of Salary Growth and Promotions, *Journal of Applied Psychology* (1997), which explains on page 2 that "salary growth effects on turnover were greatest for high performers, with high salary growth predicting rather low turnover for these employees, whereas low salary growth predicted extremely high turnover"); *see also* Defs.' Objections at 21, Ex. 1 at 15.  Defendants suggest that the supporting research EmployStats cited should be disregarded because it does not address the precise factual circumstances present here, but Defendants not only fail to provide the articles they assert do not support the relevant findings, but also offer no authority demonstrating that the studies' findings are inapplicable to salary increases for their psychiatrists or showing that larger salary increases will not boost

21

1    retention of Defendants' psychiatrists. *See id.* at 15-16.

2         Defendants complain that the Special Master and his labor economist should have

3    explained why larger salary increases are more important for recruitment and retention

4    than overall salary levels. Defs.' Objections at 24. But the Special Master and his labor

5    economist do not claim that salary increases are more important for recruitment and

6    retention than overall salary levels. *See* Special Master's Report at 18-19, 191-93.

7    Instead, EmployStats found and recommended only that implementing larger salary

8    increases could boost recruitment and retention of psychiatrists, separate and apart from

9    overall salary levels. *Id.* The Court's order appointing EmployStats does not mandate the

10   explanation that Defendants claim is lacking. *See* Sept. 11, 2018 Order at 1, 3. Nor do

11   Defendants assert that any other applicable order or authority mandates the purportedly

12   missing explanation.

13        In addition, reporting on whether larger salary increases paid by other employers of

14   psychiatrists solved their staffing shortages was both unnecessary and mischaracterizes the

15   role of salary increases. *See* Defs.' Objections at 24. EmployStats provided economic

16   research supporting their recommendation that Defendants provide larger salary increases,

17   and Defendants offer no reason that providing additional support for this recommendation

18   was necessary. *See id.*; Special Master's Report at 312-13 (listing and describing

19   economic research). In addition, Defendants' demand for proof that salary increases alone

20   resolved any and all recruitment and retention needs of other employers ignores the fact

21   that the Court and the Special Master both recognize that salary increases are one

22   component of a multipronged strategy for boosting recruitment and retention of

23   psychiatrists. *See* Feb. 15, 2018 Order at 3-4 (describing various measures to meet staffing

24   levels for psychiatrists, including "salary adjustments, forensic psychiatric fellowships,

25   exhaustion of clustering, and other recruiting and retention efforts"); Special Master's

26   Report at 19-20. Defendants essentially insist on proof that salary increases are a silver

27   bullet for psychiatrist staffing shortages, which is unnecessary here given that neither the

28   Special Master nor his Labor Economist make such a claim.

[3580534.15]

1   Defendants further object to the Report's compensation analysis because it does not

2   compare total compensation paid to Defendants' psychiatrists with total compensation paid

3   to other psychiatrists.  Defs.' Objections at 23-24.  But Defendants prevented the very

4   analysis that they now claim was necessary.  The Report did not include a comparison of

5   total compensation because, although the Special Master's Labor Economist requested

6   total compensation data for Defendants' psychiatrists, Defendants failed to provide that

7   data.  Special Master's Report at 308-09.  Crediting this objection will only encourage

8   Defendants to stymie the Special Master's future monitoring and reporting efforts.

9   Furthermore, Defendants did not and could not demonstrate that not including a

10  total compensation comparison was in error under these circumstances or that it would in

11  any way alter the Report's findings.  Defs.' Objections at 23-24.  The absence of a total

12  compensation analysis does not alter the finding that psychiatrist retention rates are

13  declining, indicating that however total compensation paid to Defendants' psychiatrists

14  stacks up to that paid to other psychiatrists, many of Defendants' psychiatrists do not

15  consider it enough to stay.  Special Master's Report at 201 (showing an increase in CDCR

16  psychiatrist vacancy rates over time).  Nor does it negate the survey finding that majorities

17  of Defendants' psychiatrists, who know their total compensation, are less than satisfied

18  with their jobs overall and perceive their compensation to be lower than that of their peers.

19  *Id.* at 219, 243, 261-62, 272.

20  The Report also accounts for the salaries that Defendants pay psychiatrists despite

21  Defendants' assertion to the contrary.  *Compare* Special Master's Report at 191, 215, 260,

22  310, *with* Defs.' Objections at 24-25.  Defendants fault the Report for not describing the

23  nature of salary increases at other employers, but fail to explain why the nature and source

24  of those salary increases is relevant to the analysis, do not demonstrate that including the

25  nature of those salary increases would alter the Report's conclusions, and do not even

26  attempt to explain why omitting the nature of the salary increases was in any way

27  improper.  *See id.* at 25.  Furthermore, that the Report did not address Defendants'

28  psychiatrist salary increases in the collective bargaining agreement covering 2016 through

1  2020 was reasonable given that the Report addressed annual salary increases only up

2  through 2017–presumably because salary increase data was not available for many CDCR

3  and DSH's competitors at the time EmployStats prepared the Report.  Special Master's

4  Report at 215-16, 258.  Moreover, it would not have been appropriate for the Report to

5  address the 5% salary increases available to only a small portion of Defendants'

6  psychiatrists, given that the Report's analysis focused on comparing overall average salary

7  increases.  *Id.* at 213-15, 258; Nunez Declaration. Ex. A (Letter from Andrea Moon at 1

8  (May 31, 2018)) (explaining that "[c]urrently, approximately 80% of psychiatrists

9  statewide are at maximum salary" so are ineligible for the 5% annual increase).

10      Defendants failed to satisfy their burden to show that the Special Master clearly

11  erred by recommending that Defendants pay psychiatrists larger annual salary increases.

12  **VII.  THIS COURT SHOULD ADOPT THE SPECIAL MASTER'S WELL-SUPPORTED RECOMMENDATION THAT CDCR ADOPT PAY**

13  **DIFFERENTIALS FOR INSTITUTIONS IN THE CENTRAL VALLEY**

14      The Special Master's recommendation that CDCR implement pay differentials to

15  attract and retain psychiatrists in the Central Valley is well supported despite Defendants'

16  argument to the contrary.  *See* Special Master's Report at 19; *see also* Defs.' Objections at

17  26-28.  The Report found higher vacancy rates and lower job satisfaction for psychiatrists

18  at institutions in the Central Valley.  Special Master's Report at 192, 315.  These findings,

19  Defendants' own assertions regarding psychiatrist preferences for positions in locations

20  other than the Central Valley, and research showing that higher pay boosts recruitment and

21  retention collectively form a reasonable basis for the Special Master's recommendation

22  that CDCR implement pay differentials to boost recruitment and retention of psychiatrists

23  at institutions in the Central Valley.  *See* Special Master's Report at 172, 316.  None of

24  these findings are clearly erroneous, and thus should be adopted by this Court.  *See* Order

25  of Reference at 8.

26      A shortage of psychiatrists in the Central Valley might impact the size of the pay

27  *differentials* needed to attract psychiatrists from other locations, but it supports the Special

28  Master's recommendation.  *See* Defs.' Objections at 26.  Indeed, the Receiver has had

1    tremendous success in recruiting and retaining new medical doctors in hard-to-hire

2    locations such as the Central Valley by offering significant pay differentials. *See*

3    Receiver's 43d Tri-Annual Report at 14 (Feb. 3, 2020), ECF No. 6454. Despite this

4    evidence and the common sense notion that offering people a lot more money will induce

5    them to live and work in places they otherwise would not, Defendants assert that

6    implementing pay differentials for their Central Valley psychiatrists should be abandoned

7    because it is not guaranteed to resolve staffing shortages there. *See* Defs.' Objections at

8    27. But this argument disregards the applicable standard. The Special Master need not

9    prove that his recommended salary adjustments are guaranteed to remedy the staffing

10   shortages wholesale, only that they are part of an appropriate overall remedial scheme to

11   address Defendants' ongoing noncompliance with constitutional minima. *See* Order of

12   Reference at 8. In fact, the Court recognized that, even if salary adjustments were

13   implemented, they would be only one of several measures needed to work toward

14   achieving the court-ordered psychiatrist staffing rate. *See* Feb. 15, 2018 Order at 3-4

15   (identifying "forensic psychiatric fellowships, exhaustion of clustering, and other

16   recruiting and retention efforts" as other possible measures to address psychiatrist

17   vacancies); *see also* Order at 4-7, 8 (July 3, 2018), ECF No. 5850 (approving limited use

18   of telepsychiatry as part of plan to address longstanding onsite psychiatry vacancies).

19       Defendants assert that the higher rates of job dissatisfaction reported by their

20   Central Valley psychiatrists are not relevant. *See* Defs.' Objections at 26. But their

21   argument is both meritless and misleading. Defendants claim that their Central Valley

22   psychiatrists' reported job dissatisfaction should be disregarded because EmployStats did

23   not survey other Central Valley psychiatrists. *Id.* However, surveying other Central

24   Valley psychiatrists is irrelevant given that Defendants can and should recruit psychiatrists

25   from across California and beyond to fill Central Valley vacancies. And if other Central

26   Valley psychiatrists are unhappy where they are, higher salaries could induce them to join

27   CDCR locally. Although Defendants argue that the recommended pay differentials are

28   unnecessary because CDCR already pays Central Valley psychiatrists competitive salaries,

25

[3580534.15]

1  this argument ignores history, which has demonstrated that current psychiatrist salaries are

2  inadequate to reduce Central Valley psychiatrist vacancies to even the vacancy levels at

3  institutions outside the Central Valley.  *Id.* at 26-27; Special Master's Report at 200.

4          Defendants also argue that the comparison of salary increases against vacancy rates

5  in the Report demonstrates that pay differentials will not help with recruitment and

6  retention.  Defs.' Objections at 27-28.  However, as the Report makes clear, the

7  comparison of salary increases to vacancy rates supports pay differentials because the

8  comparison shows that the vacancy rate was the highest when the annual salary increase

9  was the lowest and the vacancy rate declined from 2016 to 2017 as the salary increase

10  grew.  Special Master's Report at 204, 315.  Economic literature showing that higher pay

11  boosts recruitment and retention also supports the recommended pay differentials.  Special

12  Master's Report at 312-13, 315-16; Defs.' Objections Ex. 1 at 15-16, 18.

13          Defendants also contend that there is not really an acute staffing problem in the

14  Central Valley because years ago the vacancy rates inside and outside the Central Valley

15  were similar.  Defs.' Objections at 28.  Whatever the situation was years ago, it does not

16  negate the fact—accurately described in the Report—that the disparity in vacancy rates

17  between CDCR institutions inside and outside of the Central Valley has significantly

18  grown to the point where the Central Valley's vacancy rate was twice as high as the rest of

19  CDCR's in the most recent year for which Defendants provided salary data.  Special

20  Master's Report at 200.

21          Defendants cannot show clear error in the Special Master's findings that Central

22  Valley vacancy rates have grown disproportionately compared to the rest of CDCR, or that

23  history shows differential pay can induce psychiatrists to work in the Central Valley.

24  Indeed, those findings are echoed and supported by the Receiver's 15% differential pay

25  initiatives for medical doctors in the same hard-to-hire areas, which have produced

26  sustained recruiting and retention gains.  *See* Receiver's 43d Tri-Annual Report at 14

27  (Feb. 3, 2020), ECF No. 6454.  While Defendants worry that a Central Valley pay

28  differential "may not be as successful as suggested," and their experts "believe it may be

26

difficult to attract physicians to move to the Central Valley," Defs.' Objections at 27, their wishy washy statements cannot disguise the fact that Defendants have offered no authority proving that pay differentials will not boost recruitment and retention of psychiatrists in the Central Valley, in the face of the Special Master's well-founded recommendation to the contrary.  The Court should adopt this recommendation.

## VIII.  THE REPORT'S ANALYSIS SUPPORTS THE RECOMMENDATIONS

Defendants claim that the Special Master and his labor economist failed to analyze whether Defendants could meet the court-ordered staffing rate through salary adjustments.  Defs.' Objections at 28-29.  However, the Court appointed EmployStats to report on whether salary and compensation increases would be potentially effective at boosting recruitment and retention of psychiatrists, not whether salary adjustments alone would bring Defendants into compliance with the court-ordered psychiatrists staffing rates as Defendants misleadingly argue.  Defs.' Objections at 28-29; Sep. 11, 2018 Order at 3; Special Master's Request for Additional Staff at 3.  Such a directive from the Court would not even make sense here where both the Court and the Special Master have identified salary increases as one component of a multifaceted approach to boosting recruitment and retention of psychiatrists.  *See* Feb. 15, 2018 Order at 3-4; Special Master's Report at 19-20.

Defendants also complain that the Report lacks sufficient evidentiary support for its recommendation to provide larger annual salary increases.  Defs.' Objections at 29.  Defendants' assertion is incorrect.  The Report both cites to economic research showing that higher salaries boost recruitment and retention and found that larger salary increases at CDCR are associated with reductions in the psychiatrist vacancy rate.  *See* ECF No. 312-13, 315-16.  In addition, the Court did not order EmployStats to project by precisely how much salary increases would boost recruitment and retention of psychiatrists.  *Compare*, Defs.' Objections at 29, *with* Sep. 11, 2018 Order.  Indeed, asking EmployStats to predict the magnitude of recruitment and retention gains that would result specifically from salary increases would be unrealistic because, as even Defendants recognize, factors aside from

27

[3580534.15]

salary simultaneously influence recruitment and retention. Defs.' Objections at 30. Nor did the Court charge EmployStats' with proposing the precise amount of salary increases that Defendants should adopt despite Defendants' suggestion to the contrary. *Compare* Defs.' Objections at 29, *with* Sep. 11, 2018 Order at 3, and Special Master's Request for Additional Staff.

Defendants further fault the Report for not controlling for other variables that impact recruitment and retention when analyzing the relationship between salaries and vacancy rates. Defs.' Objections at 30. However, the Report extensively addresses several other factors such as working environment, facilities, resources, and the COVID-19 pandemic that impact recruitment and retention of psychiatrists. *See, e.g.*, Special Master's Report at 18-20, 192-94. Defendants failed to prove that anything more was required or that conducting the analysis that they claim is lacking would alter any of the Report's findings or recommendations.

Finally, Defendants criticize the Report's comparison of average annual pay increases against average annual vacancy rates for masking mid-year salary increases and intra-year variations in vacancy rates. Defs.' Objections at 30. But despite Defendants' suggestion of impropriety, there is nothing untoward about using averages. Averages summarize data; they do not mask it. Importantly, Defendants did not assert that presenting the comparison of salary increases and vacancy rates without averages would alter the findings or that using averages constituted error. *Id.*

## IX.  THERE ARE ENOUGH PSYCHIATRISTS TO FULLY STAFF DEFENDANTS' INSTITUTIONS, AND DEFENDANTS' SUGGESTION TO THE CONTRARY IS MERITLESS

Defendants' objection that the Report did not sufficiently address the supply of psychiatrists is a red herring. *See* Defs.' Objection at 30-32. Defendants must satisfy the Court-ordered psychiatrist staffing fill rates, unless they can prove lower levels than their own staffing plan requires will comport with the Eighth Amendment. Order at 12-20 (Oct. 10, 2017), ECF No. 5711; *see also* Order (Jun. 13, 2002), ECF No. 1383. The Constitution will permit nothing less.

1    Defendants essentially acknowledge that there are more than enough psychiatrists in

2  California, no less the country, to fill all of their psychiatrist vacancies.  *See* Defs.'

3  Objections at 31 (noting over five thousand psychiatrists in California).  Beyond this fact,

4  the supply of psychiatrists is irrelevant.  Despite Defendants' assertion to the contrary, the

5  supply of psychiatrists in no way impedes Defendants' ability to implement the Special

6  Master's recommendations to offer higher salaries, improve working conditions, and better

7  publicize compensation information to psychiatrists.  The Report's findings make clear

8  that each of those steps can be expected to bring Defendants closer to compliance with the

9  Court's orders.  That was the Court's charge, and it has been fulfilled.

10   At bottom, Defendants' stated concern about a bidding war is an acknowledgment

11  that salary increases impact employee retention and that psychiatrists have market power.

12  Defs.' Objections at 30.  It is not a reason to refrain from using all available measures,

13  including salary increases, to work toward compliance with the Court-ordered psychiatrist

14  staffing rates.  If Defendants are prepared to tell this Court that nothing they do will ever

15  result in compliance with the Court-ordered ratios, their only option is to reduce the

16  *Coleman* class.  *See generally* Pls' Response to July 2, 2020 Order (July 15, 2020), ECF

17  No. 6766.  Until then, they must keep making all reasonable efforts to comply, and there is

18  no question the Special Master's recommended measures are reasonable and can be

19  expected to be effective.

20   Nor does the Special Master or his expert need to justify the Court-ordered

21  psychiatrist staffing requirements, despite Defendants' insinuation that the rates from their

22  own staffing plan are too high.  Defs.' Objections at 31-32.  The Court-ordered staffing fill

23  rate and Court-ordered psychiatrist staffing levels have been required for years, and

24  Defendants cannot unilaterally alter them simply because they now contend without

25  support that the ratios amount to overstaffing.  This Court invited Defendants almost three

26  years ago to move to modify if they could establish lesser levels of staffing comport with

27  the Constitution.  *See* Order at 12-20 (Oct. 10, 2017), ECF 5711.  Unless and until they can

28  make that showing, Defendants are obliged to either comply or reduce the size of the

*Coleman* class to levels where they can.  *See generally* Pls' Response to July 2, 2020 Order (July 15, 2020), ECF No. 6766.

## X.  THE REPORT'S RECOMMENDATIONS ARE SUFFICIENTLY SPECIFIC TO DEVELOP A REMEDY

Defendants next argue that the Court should disregard the recommendations in the Special Master's Report because the Special Master and his expert have not told them exactly what to do.  Defs.' Objections at 32-33 (complaining Report does not tell Defendants how to better inform psychiatrists of their value and improve working conditions, or what precise amount of salary increases and pay differentials to adopt).  There is a deep irony to this complaint given the many years Defendants have spent criticizing the Special Master for micromanaging their affairs.  *See, e.g.*, Defs.' Response to Special Master's Report on Proposed Processes for Updating 2018 Program Guide Revision at 12-13 (March 16, 2020), ECF No. 6506; Defs.' Objections to Special Master's Report re Proposed Telepsychiatry Policy Addendum at 5, 8-9 (Aug. 13, 2018), ECF No. 5879; Defs.' Response to Special Master's Report on Program Guide Update at 5-6 (July 20, 2018), ECF No. 5861; *see also* Defs.' Opp. to Pls' Emergency Motion for Population Relief at 7, 12 (Mar. 31, 2020), ECF No. 6552 (asserting that three-judge court is required to defer to Defendants' policy choices for addressing COVID-19).

Indeed, this argument fundamentally mischaracterizes the Special Master and his expert's role in making these recommendations.  The Court appointed the Special Master's Labor Economist "to evaluate current salary rates and the efficacy, if any, of compensation increases on defendants' ability to recruit and retain necessary mental health staff to comply with the October 10, 2017 order and the prior court orders described therein." Sep. 11, 2018 Order at 2.  EmployStats performed these tasks.  EmployStats was not charged with creating specific and finalized policies ready for adoption, nor was the Special Master.  That is Defendants' job, as part of their overall obligation to develop plans for compliance with the Court's decades-worth of staffing vacancy orders.  *Cf.* Defs.' Objections at 32 (quoting *Toussaint v. McCarthy*, 801 F.2d 1080, 1086 (9th Cir. 1986), for

30

[3580534.15]

1  proposition that courts must ensure minimal intrusion into Defendants' affairs); *see also*

2  *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 392 (1992).  To the extent Defendants

3  need help effectively implementing the recommendations, they have the full assistance of

4  the Special Master and his experts.  *See* Order of Reference at 2 (tasking Special Master

5  with assisting Defendants with developing remedial plans to address constitutional

6  violations). The Special Master's recommendations advance remediation of the long-

7  standing constitutional violations in this case, but properly leave development of the

8  specific policies to Defendants.

9          Furthermore, the cases that Defendants cite are inapposite as they do not address

10  injunctions in any way relevant to the Special Master's recommendations here.  *See*

11  *McCormack v. Hiedeman*, 694 F.3d at 1019 (finding overbroad injunction barring

12  prosecution of women other than plaintiff under statute regulating abortions); *Toussaint v.*

13  *McCarthy*, 801 F.2d at 1086 (injunction addressing placement of prisoners in

14  administrative segregation); *Cont'l Baking Co. v. Katz*, 68 Cal. 2d 512, 533-34 (1968)

15  (injunction under state law, not PLRA, restricting private citizen's activities on private

16  property).  The recommendations are proper and should be adopted.

17  **XI.    THE SCOPE OF THE RECOMMENDATIONS TARGETED AT DSH IS**
        **APPROPRIATE**

18

19          Defendants next object that the scope of the Special Master's recommendations for

20  DSH are overly broad.  Defs.' Objections at 33-34.  Defendants first object that *Coleman*

21  patients make up only part of DSH's population.  *Id.*  But they do not, and cannot, contest

22  the Special Master's finding that "CDCR and the DSH defendants share[] the same labor

23  market, and [have been] known to compete for psychiatrists" over the history of this case.

24  Special Master's Report at 11.  Indeed, Defendants already are ordered to establish pay

25  parity between DSH and CDCR for that very reason—further supporting the need for the

26  recommendations to reach both Defendants.  *See* Order at 2 (June 28, 2007), ECF

27  No. 2301.  And despite their unsubstantiated claims that DSH's hospitals are appropriately

28  staffed, *see* Defs.' Objections at 34, DSH has never had a Court or Special Master

31

1    approved staffing plan, despite being ordered to develop one years ago. *See* Special

2    Master's Report at 5-6 (recounting series of court orders starting in 2017 requiring DSH to

3    develop a staffing plan). Moreover, nothing in the Special Master's recommendations

4    would require DSH to implement changes beyond the scope of this action. *See id.* at 19-

5    20. In fashioning a remedy that implements the Special Master's recommendations,

6    Defendants can tailor their policies to apply to the DSH facilities and programs that

7    provide care to *Coleman* patients as necessary.

8          More fundamentally, Defendants cannot contest the factual findings underpinning

9    the recommendations: DSH psychiatrists earn lower salary increases compared with other

10   California psychiatrists, and DSH psychiatrists reported higher rates of job dissatisfaction

11   compared with other psychiatrists. *See* Special Master's Report at 191-92, 257, 261-74.

12   Defendants failed to demonstrate that the scope of the Special Master's recommendations

13   for DSH are improper, much less that they are founded on clearly erroneous facts. The

14   Court should adopt the recommendations as to Defendant DSH.

15   **XII.  COVID-19 DOES NOT JUSTIFY HALTING PROGRESS TOWARD
     **     REMEDYING DEFENDANTS' LONGSTANDING NON-COMPLIANCE
16   **     WITH THE COURT-ORDERED STAFFING REQUIREMENTS**

17         Defendants' final argument is that this Court should reject the Report's

18   recommendations because the COVID-19 pandemic has negatively impacted California's

19   budget. Defs.' Objections at 34-36. This Court has made clear that COVID-19 does not

20   relieve Defendants from their obligation to comply with the Court-ordered psychiatrist

21   staffing rate and staffing levels necessary to meet their constitutional obligation to provide

22   adequate mental health treatment to class members. *See* Order at 1-3 (July 28, 2020), ECF

23   No. 6791. California has a $202.1 billion budget. *See* A. Koseff, "Newsom signs

24   California's $2.2.1 billion state budget," *San Francisco Chronicle*, June 29, 2020,

25   https://www.sfchronicle.com/politics/article/Newsom-signs-California-s-202-1-billion-

26   state-15375429.php. The resources exist to hire the requisite psychiatrists to treat the

27   *Coleman* class if Defendants choose to do so. And it is black letter law that lack of funds

28   to remedy constitutional violations does not absolve Defendants of the obligation to do so.

32

[3580534.15]

1   *See Stone v. City & Cty. of S.F.*, 968 F.2d 850, 858 (9th Cir. 1992); *Toussaint v. McCarthy*,

2   801 F.2d at 1110; *see also Rufo*, 502 U.S. at 392-93.  While Plaintiffs are certainly

3   sensitive to the State's budgetary constraints, in the past decade, Defendants have made

4   policy choices that dramatically increased the number and psychiatric acuity of class

5   members in their prisons.  *See* Pls' Response to July 2, 2020 Order at 13-15 (July 15,

6   2020), ECF No. 6766.  Their options are to marshal the resources necessary to provide

7   constitutionally adequate care, or to reduce the *Coleman* class to levels they are able to

8   treat within the confines of the Eighth Amendment and this Court's orders.  *See, e.g.*,

9   Order at 8 (Apr. 24, 2020), ECF No. 6639 (rejecting Defendants' unilateral action to

10  restrict transfers of class members to inpatient care in violation of remedial court orders

11  and explaining that "defendants here are subject to such remedial orders and may not act in

12  violation of those orders without first seeking and obtaining necessary modifications," and

13  that "[t]he emergency nature of the pandemic does not excuse this requirement").

14          Furthermore, nothing in the Special Master's recommendations prevents the parties,

15  the Special Master, or the Court from accounting for the pandemic and its impact on

16  Defendants' resources when fashioning a plan to implement those recommendations.  *See*

17  Special Master's Report at 19-20.  If the Court deems it necessary, the Court is free to craft

18  measures, or direct the parties to develop measures, to account for the COVID-19

19  pandemic's impact on Defendants' resources when developing a plan to implement the

20  Special Master's recommendations and achieve constitutional compliance.

21          Finally, contrary to Defendants' assertions, the Special Master's Labor Economist

22  considered the impact that the pandemic would have on recruitment and retention of

23  psychiatrists.  *See* Defs.' Objections at 36; *see also* Special Master's Report at 194.  The

24  Report reasonably and transparently acknowledges that the full impact of the pandemic is

25  difficult to predict but then outlines pandemic-related factors that may impact the market

26  for psychiatrists.  Special Master's Report at 194.  Addressing the pandemic in this manner

27  was reasonable given that the rapidly evolving nature of COVID-19 and its impact on the

28  healthcare industry render fully and accurately predicting the impact on the labor market

[3580534.15]

for psychiatrists virtually impossible.  Defendants failed to demonstrate that the way in which the Report addressed the pandemic amounted to clear error or any error at all.

## CONCLUSION

The Special Master's recommendations are reasonable and well supported.  The Court should reject Defendants' objections because Defendants failed to demonstrate that the Special Master committed clear error in making any of his findings and recommendations.  Plaintiffs respectfully request that, in accordance with the Order of Reference, the Court adopt the Special Master's Report, including the recommendations therein, and promptly direct Defendants to develop a plan to implement the Special Master's recommendations.

DATED:  August 7, 2020                    Respectfully submitted,

                                          ROSEN BIEN GALVAN & GRUNFELD LLP

                                          By:  */s/ Michael S. Nunez*
                                               Michael S. Nunez

                                          Attorneys for Plaintiffs

[3580534.15]