| | |
|---|---|
| 1    XAVIER BECERRA, State Bar No. 118517<br>Attorney General of California<br>2    ADRIANO HRVATIN, State Bar No. 220909<br>Supervising Deputy Attorney General<br>3    ELISE OWENS THORN, State Bar No. 145931<br>TYLER V. HEATH, State Bar No. 271478<br>4    KYLE A. LEWIS, State Bar No. 201041<br>LUCAS L. HENNES, State Bar No. 278361<br>5    Deputy Attorneys General<br>     1300 I Street, Suite 125<br>6     P.O. Box 944255<br>     Sacramento, CA 94244-2550<br>7     Telephone: (916) 210-7323<br>     Fax: (916) 324-5205<br>8     E-mail: Lucas.Hennes@doj.ca.gov<br>*Attorneys for Defendants* | ROMAN M. SILBERFELD, State Bar No. 62783<br>GLENN A. DANAS, State Bar No. 270317<br>ROBINS KAPLAN LLP<br>  2049 Century Park East, Suite 3400<br>  Los Angeles, CA 90067-3208<br>  Telephone: (310) 552-0130<br>  Fax: (310) 229-5800<br>  E-mail: RSilberfeld@RobinsKaplan.com<br>*Special Counsel for Defendants* |

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                   Plaintiffs,<br><br>    v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>                   Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**FOURTH JOINT UPDATE ON THE WORK OF THE COVID-19 TASK FORCE** |

At the June 26, 2020 status conference, the Court directed the parties to file a joint report with updates "on the work of the Task Force" by July 15, 2020 and "every two weeks thereafter." (ECF No. 6741.) The Court modified this schedule on August 26, 2020, directing the parties to file COVID-19 Task Force updates every other Friday by 12:00 p.m., beginning on August 28, 2020. (ECF No. 6837.) This report provides the parties' fourth COVID-19 Task Force joint update and covers issues discussed since the third joint update filed on August 12, 2020. This report covers the Thirty-First (August 18) and Thirty-Second (August 25) COVID-19 Task Force meetings, and various small workgroup meetings between representatives from Defendants and

the Special Master's team. Unless otherwise indicated, the small workgroup meetings include members of Defendants' leadership and the Special Master's team, and not Plaintiffs. The Special Master holds meetings with Plaintiffs to update them on the status of the workgroups.

I. UPDATE REGARDING COVID-19 CASES IN CDCR AND DSH

A. CDCR's Report On COVID-19 Cases And Testing

The following table shows, as of August 25, 2020, CDCR's report on the total number of confirmed COVID-19 cases, currently active, resolved to date, currently hospitalized, hospitalized to date, deaths to date, and the number and percentage of those cases who are *Coleman* class members and their level of care.

| COVID Result | Total Patients | MHSDS Patients Only | MHSDS patients as % of total |
|---|---|---|---|
| **Active** | 1,359 | 384 (380 CCCMS, 2 EOP, 1 ICF, 1 MHCB) | 28% |
| **Resolved** | 7,531 | 2,081 (10 ACUTE, 1,845 CCCMS, 201 EOP, 14 ICF, 11 MHCB) | 28% |
| **TOTAL active + Resolved** | 8,890 | 2,465 (10 ACUTE, 2,225 CCCMS, 203 EOP, 15 ICF, 12 MHCB) | 28% |
| **Currently Hospitalized** | 23 | 7 (6 CCCMS, 1 EOP) | 30% |
| **Cumulative Hospitalized** | 448 | 164 (138 CCCMS, 26 EOP) | 37% |
| **Deaths** | 57 | 24 (23 CCCMS, 1 EOP) | 42% |

CDCR reports the above hospitalization numbers include re-admissions of some patients who were discharged and then re-admitted. It also reports that the numbers exclude patients who were COVID-19 positive and admitted to outside hospitals for reasons other than COVID-19.

According to CDCR, as of August 25, it had tested 83,286 unique prisoners and former prisoners, 70,051 of whom are still in CDCR custody. Of the total number of in-custody prisoners tested, 21,206 or 30.3%, of those tested were part of the MHSDS. CDCR's rate of tests per 1,000 incarcerated people (692 per 1,000) is higher than the rates in California (266 per 1,000) and the United States (218 per 1,000) as a whole; CDCR's publicly available Population COVID-19 Tracking dashboard reports that CDCR's rate of confirmed cases per 1,000

incarcerated people (96.7 per 1,000 as of August 26, 2020) is higher than the rates in California (17.1 per 1,000 as of August 26, 2020) and the United States (17.4 per 1,000 as of August 26, 2020). On August 21, 2020, CDCR added a feature to the Institution View of its public tracking dashboard showing comparisons between the rate of confirmed COVID-19 cases per 1,000 people in each institution and the rate in the county where the institution is located.

### B. Update Regarding Specific CDCR Institutions.

As of August 25, 2020, twenty-five of CDCR's thirty-five institutions are closed to movement, including all five institutions with Psychiatric Inpatient Programs (PIPs).

San Quentin State Prison (SQ) reported that cases continue to resolve. Defendants report that on August 24, 2020, SQ's two EOP H-Units began having outside yard and groups each day, and each patient is being offered at least one hour of group treatment per day, for a total of five per week. Individual appointments are occurring via tele-health. At the August 18, 2020 Task Force meeting, SQ also reported that class members have access to legal calls, but not to in-person or non-contact visiting. CDCR agreed to provide a later update regarding telephone access for the quarantined population. SQ has since confirmed there is telephone access for all incarcerated individuals, including those housed in the isolation areas and those required to use the phones on rolling carts. SQ reports it has decreased the capacity of its large tent to 45 beds, and as of August 26, there are no incarcerated individuals housed in tents at SQ.

The California Institution for Men (CIM) reported that class members continue to have yard and dayroom access on a rotating basis in smaller numbers than normal operations. As of August 18, 2020, of the 100 people housed in tents at CIM, 24 were CCCMS.

On August 18, 2020, the California Health Care Facility (CHCF) in Stockton reported that the EOP General Population was not receiving group treatment due to a staff member testing positive for COVID-19. CHCF also reported that it was implementing a plan to provide clinical out-of-cell group treatment in the immediate future. CHCF committed to providing updates to the return-to-work process. CHCF has since provided information confirming its return-to-work process, which includes multiple follow up phone calls to the employees to ensure their medical needs are being met and to ensure they understand the return-to-work process. In addition, the

return-to-work coordinator(s) and manager notify each employee's supervisor of their off-work status and return-to-work date.

The California Medical Facility (CMF) reported that, as of the August 18, 2020 Task Force meeting, of the 82 people housed in its tents, 20 are CCCMS. CDCR confirmed that some groups have resumed in the Mental Health Crisis Bed and EOP general population on a rotating schedule.

Salinas Valley State Prison (SVSP) reported that the TC2 PIP unit was still being used as a quarantine space. As reported in the prior update, SVSP, including the PIP, had been closed to movement on June 24, but reopened on July 16, 2020. On August 17, 2020, SVSP and its PIP were again closed to movement and remain closed. Otherwise, SVSP reported no changes from the previous joint update filing.

The California Men's Colony (CMC) reported that as of August 18, 2020, all units were operating under a modified program due to an increase in the population, but access to yard and telephone calls was still being provided. CMC also reported that it was erecting tents on Facility C, and it committed to providing additional information on the tent occupancy rates in a future Task Force meeting. CDCR reported that core clinical MHCB and EOP groups had been cancelled and other programming had stopped, but recreation therapists were providing some yard groups.

Mule Creek State Prison (MCSP) reported at the August 18, 2020 Task Force meeting that it had been operating under modified program since March, limiting yard and dayroom time. MCSP committed to providing additional details about the modified program, especially in terms of mental health treatment, yard, and dayroom time, at a future Task Force meeting.

**C.     Update Regarding DSH Psychiatric Inpatient Admissions Units.**

Defendants reported that the written policy for transferring patients for inpatient care at DSH negotiated during the Task Force meetings in June and July had not yet been issued to the field and was being finalized after some edits, including aligning DSH and CDCR's transfer policies. *See* August 18, 2020 Program Guide Departures Appendix A at A-23 through A-24 & n.2, ECF No. 6831.

### D. DSH Report Regarding COVID-19 Cases and Facilities.

On July 24, 2020, Unit 21, the *Coleman* treatment unit at DSH-Coalinga, was quarantined due to a staff member testing positive. The quarantine was lifted on August 19 with guidance and approval by the California Department of Public Health's Healthcare Associated Infections team.

As of August 25, there were no confirmed positive cases in DSH's *Coleman* patient population. As of August 25, DSH has performed 13,847 tests on a cumulative total of 4,230 patients across all five hospitals. A total of 305 patients and 328 staff have tested positive.

DSH-Patton remains closed to new admissions. DSH-Atascadero and DSH-Coalinga are currently open to new admissions.

## II. UPDATES ON DSH CENSUS, WAITLIST, AND ADMISSIONS

At the Task Force meetings, DSH and CDCR provided their census, waitlist, and admission reports. Since DSH lifted its temporary suspension of admissions effective April 16, 2020, DSH has admitted a total of 81 *Coleman* class members. Since the August 11, 2020 Task Force meeting, DSH has admitted three class members, including one level of care transfer and two LRH transfers. The one patient transferring to a new level of care did not wait longer than 30 days from time of referral to DSH for admission. Of the two LRH transfers, both patients waited longer than 30 days from time of referral to DSH for admission due to being on holds from a closed CDCR institution.

As of the August 21, 2020 data discussed at the August 25 Task Force meeting, there were 183 *Coleman* class members at DSH-Atascadero (with 73 available beds), 39 at DSH-Coalinga (with 11 available beds), and 8 at DSH-Patton (with 22 available beds).

Defendants' report there are 38 patients awaiting admission to DSH-Atascadero and DSH-Coalinga, including 15 ICF patients awaiting admission for more than 30 days. Of the 38 patients awaiting admission to DSH-Atascadero and DSH-Coalinga, all are on hold at CDCR institutions currently closed to movement. There are three patients awaiting admission to DSH-Patton, all of whom have been awaiting admission for more than 30 days, and are currently at closed CDCR institutions.

## III. UPDATES ON THE CDCR AND DSH SMALL WORKGROUP ACTIVITIES.

### A. CDCR Workgroup

The Special Master's experts have held small workgroups with CDCR and DSH leadership, without Plaintiffs or Defendants' counsel, focused on specific topics. In the past two weeks, the CDCR workgroup has covered topics including: (1) meeting Program Guide requirements during the pandemic, (2) updates on the COVID-19 Dashboard, (3) moving patients out of TMHUs and the use of TMHUs as alternative housing, and (4) the telepsychiatry agreement and proposed stipulation.

### B. ASU EOP Hub Certification Workgroup

During the August 25, 2020 taskforce meeting, one of the Special Master's experts reported that the workgroup discussing certification of ASU EOP Hubs and the PSUs, held earlier that day included discussion of areas of agreement among the workgroup members and areas for further work. The workgroup members agreed that the indicators from CDCR's Continuous Quality Improvement Tool (CQIT) were the proper indicators to use, and that the workgroup was discussing how many of those indicators should be considered core items requiring 90% compliance, and there were some concerns about the process for non-core items and how those affect compliance. The workgroup also reported agreement between the monitors and Defendants that CDCR's process appeared reasonable at this time, with two outstanding issues. First is that not all indicators are automated, making it difficult to look at trends, and second is that the Special Master does not yet know whether the indicator measures themselves are valid. The Special Master's data expert is still evaluating whether those indicators are being measured in a valid manner and determining whether CDCR can automate its data where appropriate, a process that he estimates will take three months to complete. After that, the small workgroup will consider whether some aspects of the certification process should be changed. In the meantime, the workgroup is suspending regular meetings, though the Special Master's data expert will work regularly with CDCR staff, and other members of the Special Master's team will meet with CDCR periodically to bring up issues as needed.

Plaintiffs noted that they have not been privy to these small workgroup conversations and

requested a response to their letter sent to Defendants on June 19, 2020 outlining Plaintiffs' concerns about the certification process. Plaintiffs also inquired about the status of the COVID-19 interim certification process. Defendants reported that they had made some revisions to their interim process and planned to re-start performing certifications shortly. Defendants agreed to provide the Taskforce with a response to Plaintiffs' letter and a copy of their updated interim COVID-19 certification plan. Plaintiffs noted that additional discussion would be required after receiving those written responses, as Plaintiffs continue to have significant concerns about the EOP ASU Hub and PSU Certification process notwithstanding the discussions in the small workgroup.

### C. DSH Workgroup

The DSH small workgroup has met twice since the August 12, 2020 joint update and reported its activities to the Task Force. At the August 25, 2020 Task Force meeting, the DSH small workgroup reported they continue to review referrals to DSH hospitals. The small workgroup reported that the process between CDCR and DSH regarding clinical assessments is working well.

### D. Behavioral Treatment Workgroup

Members of CDCR and DSH leadership had been meeting with the Special Master's experts for the last few months as part of a Behavioral Treatment small workgroup discussing options to address class members with predominate behavioral disorders in addition to serious mental illness. Predominant behavioral issues are chronic, maladaptive behaviors that are secondary to poor coping skills in the context of environmental stressors. At the August 18, 2020 Task Force meeting, CDCR reported that they were discussing the best way to move forward on long-term projects while working on short-term projects that could be implemented quickly. At the August 25, 2020 Task Force meeting, the small workgroup confirmed it had not met the prior week and would resume meetings on August 26, 2020.

## IV. ADDITIONAL COVID-19 RELATED UPDATES.

### A. Movement Matrix

At the August 25, 2020 Task Force meeting, CDCR reported that it had implemented a new movement matrix, effective August 19, 2020, to direct movement throughout CDCR's institutions. Members of the Special Master's team asked questions about the processes for intake from county jails, movements out of restrictive housing, and movement of high risk class members from dormitories to cells, and whether CDCR had analyzed the collateral effects of the movement matrix on *Coleman* class members. CDCR did not report any specific analysis relating to the *Coleman* class. CDCR confirmed it plans to resume intake from county jails to reception centers, which now have over 1,000 empty cells, and a plan to determine how to move patients out of the reception centers after observing how well the movement matrix functions. CDCR did not have specific information available about the process for moving high-risk patients from dormitories to celled housing. CDCR reported it is still working on details about moving class members held past required timeframes in restrictive housing into general population settings. CDCR confirmed that language regarding clinical staff in the movement matrix encompasses mental health staff.

In response to questions from the Special Master's experts and Plaintiffs, Defendants noted that the movement matrix primarily set forth procedures by which transfers were to take place, not necessarily who was to be transferred. Defendants confirmed that the movement matrix provisions regarding inter-institutional movement, including class member movements to higher levels of care, would apply to CDCR facilities open for movement, but that movement would be more restricted to or from closed institutions. Defendants agreed to provide more information regarding how the movement matrix affects or supersedes existing policies. On August 27, 2020, Plaintiffs requested additional specific information about which policies listed in the most recent Program Guide Departures Appendix A filing, ECF No. 6831, the matrix supersedes or otherwise affects, and to what extent.

**B.     Quarantine and Isolation Space**

At the August 25, 2020 Task Force meeting, there was an initial discussion regarding the *Plata* Court-ordered quarantine and isolation space. A member of the Special Master's team asked about the status of work related to designated quarantine and isolation tents and other housing, including whether determinations had been made about coverings for partly-solid doors, and whether *Coleman* class members had already been moved into certain settings. Plaintiffs and members of the Special Master's team asked questions about CDCR's plans for quarantining EOP patients. A member of the Special Master's team indicated understanding that CDCR planned to follow general principles of keeping EOP patients in EOP housing and, if patients must be moved, moving them into separate EOP housing unless CDCR is unable to do so. CDCR also indicated that patients in MHCB and PIP settings would quarantine or isolate in place. Plaintiffs raised concerns about where patients in PIP units that are double-celled or in dorms would be placed for isolation and quarantine. Because necessary CDCR representatives were not present to discuss these topics, the parties agreed to discuss the issues further on the next Task Force call with the appropriate representatives available.

**C.     Other Matters**

The parties anticipate discussing two additional issues at a future meeting that the Taskforce did not have time to discuss at the August 25, 2020 meeting: Update on Impact of Wildfires, and CDCR's Roadmap to Reopening plan.

| | | |
|---|---|---|
| DATED: August 28, 2020 | | Respectfully submitted, |

ROSEN BIEN GALVAN & GRUNFELD LLP

By: *Marc J. Shinn-Krantz*
    Marc J. Shinn-Krantz

Attorneys for Plaintiffs

DATED: August 28, 2020

XAVIER BECERRA
Attorney General
Adriano Hrvatin
Supervising Deputy Attorney General

By: *Lucas L. Hennes*
    Lucas L. Hennes
    Deputy Attorney General

Attorneys for Defendants

[3604308.6]    10

Fourth Joint Update on the Work of the COVID-19 Task Force (2:90-cv-00520 KJM-DB (PC))