1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  ADRIANO HRVATIN, State Bar No. 220909
   Supervising Deputy Attorney General
3  KYLE A. LEWIS, State Bar No. 201041
   ELISE OWENS THORN, State Bar No. 145931
4  TYLER V. HEATH, State Bar No. 271478
   LUCAS HENNES, State Bar No. 278361
5  Deputy Attorneys General
     1300 I Street, Suite 125
6    P.O. Box 944255
     Sacramento, CA 94244-2550
7    Telephone: (916) 210-7318
     Fax: (916) 324-5205
8    E-mail: Elise.Thorn@doj.ca.gov
   *Attorneys for Defendants*

   ROMAN M. SILBERFELD, State Bar No. 62783
   GLENN A. DANAS, State Bar No. 270317
   ROBINS KAPLAN LLP
     2049 Century Park East, Suite 3400
     Los Angeles, CA 90067-3208
     Telephone: (310) 552-0130
     Fax: (310) 229-5800
     E-mail: RSilberfeld@RobinsKaplan.com
   *Special Counsel for Defendants*

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12                     SACRAMENTO DIVISION

13

| | |
|---|---|
| 14 **RALPH COLEMAN, et al.,** | Case No. 2:90-cv-00520 KJM-DB (PC) |
| 15         Plaintiffs, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MODIFY ORDERS UNDER RULE 60(b)** |
| 16   v. | |
| 18 **GAVIN NEWSOM, et al.,** | Judge: Hon. Kimberly J. Mueller |
| 19         Defendants. | Hearing Date: Sept. 24, 2020 at 9:00 a.m. Location: Robert T. Matsui U.S. Courthouse Courtroom: 3, 15th Floor |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................... 1

Factual and Procedural Background ............................................................................ 3

    I.      Recent Events Revealing a Need for Modification ...................................... 3

    II.     Relief Sought ................................................................................................ 5

Argument ...................................................................................................................... 7

    I.      The Court Should Grant Rule 60(b)(5) Relief Because, in Light of Recent Events, Application of Its Orders Is Not Equitable ................................................... 8

        A.     The Court Should Modify Its Prior Orders to Allow DSH to Take Immediate Action to Protect Patients From Imminent Danger Without First Bringing a Motion .................................................................................. 8

        B.     The Requested Modification Is Suitably Tailored ............................... 15

        C.     The Proposed Modification Is Consistent with the Constitution ........................ 16

    II.     Alternatively, Defendants Are Entitled to Relief Under Rule 60(b)(6) ..................... 19

Conclusion ................................................................................................................... 20

1

**TABLE OF AUTHORITIES**

2

<u>**Page**</u>

3

**CASES**

4

5

*Benner v. Wolf*
    No. 20-cv-775, 2020 U.S. Dist. LEXIS 89425 (M.D. Pa. May 21, 2020)............................ 17

6

7

*Brown v. Plata*
    563 U.S. 493 (2011)................................................................................................1, 7, 8

8

*Delay v. Gordon*
    475 F.3d 1039 (9th Cir. 2007) ...................................................................................... 19

9

10

*Frew ex rel. Frew v. Hawkins*
    540 U.S. 431 (2004)...................................................................................................... 13

11

12

*Gregg v. Georgia*
    428 U.S. 153 (1976)...................................................................................................... 16

13

*Hook v. State of Ariz.*
    120 F.3d 921 (9th Cir. 1997) ........................................................................................ 10

14

15

*Horne v. Flores*
    557 U.S. 433 (2009)...............................................................................................7, 8, 13

16

17

*Hudson v. McMillian*
    503 U.S. 1 (1992).......................................................................................................... 16

18

*In re Abbott*
    954 F.3d 772 (5th Cir. 2020) ........................................................................................ 17

19

20

*In re Rutledge*
    956 F.3d 1018 (8th Cir. 2020) ...................................................................................... 17

21

22

*Jackson v. Los Lunas Community Program*
    880 F.3d 1176 (10th Cir. 2018) .................................................................................... 11

23

*Jacobson v. Massachusetts*
    197 U.S. 11 (1905)...........................................................................................12, 16, 17, 18

24

25

*Liljeberg v. Health Servs. Acquisition Corp.*
    486 U.S. 847 (1988)...................................................................................................... 19

26

*Marshall v. United States*
    414 U.S. 417 (1974)...................................................................................................... 14

27

28

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Nicacio v. U.S. I.N.S.*
  797 F.2d 700 (9th Cir. 1985) ............................................................................ 7

*Noble v. Adams*
  646 F.3d 1138 (9th Cir. 2011) ......................................................................... 18

*Norwood v. Vance*
  591 F.3d 1062 (9th Cir. 2010) ......................................................................... 18

*Plata v. Newsom*
  No. 4:01-cv-01351, ECF No. 3256 ................................................................. 11

*Prince v. Massachusetts*
  321 U.S. 158 (1944) ......................................................................................... 17

*Reynolds v. McInnes*
  338 F.3d 1221 (11th Cir. 2003) ....................................................................... 11

*Rufo v. Inmates of Suffolk Cty. Jail*
  502 U.S. 367 (1992) .................................................................................. 7, 9, 11

*S. Bay United Pentecostal Church v. Newsom*
  140 S. Ct. 1613 (2020) ..................................................................................... 14

*Sandin v. Conner*
  515 U.S. 472 (1995) ......................................................................................... 13

*Spain v. Procunier*
  600 F.2d 189 (9th Cir. 1979) ........................................................................... 18

*Swain v. Junior*
  961 F.3d 1276 (11th Cir. 2020) ....................................................................... 12

*United States v. Alpine Land & Resevoir Co.*
  984 F.2d 1047 (9th Cir. 1993) ......................................................................... 19

*United States v. Asarco Inc.*
  430 F.3d 972 (9th Cir. 2005) ......................................................................... 7, 8

*Valdivia v. Schwarzenegger*
  599 F.3d 984 (9th Cir. 2010) ........................................................................... 14

*Wilson v. Williams*
  961 F.3d 829 (6th Cir. 2020) ........................................................................... 16

1

### TABLE OF AUTHORITIES
### (continued)

2

**Page**

3    *Woodford v. Ngo*
       548 U.S. 81 (2006)..................................................................................... 15
4

**STATUTES**

5

6    California Emergency Services Act........................................................................ 14

7    California Government Code
       § 8558(b) ................................................................................................ 15
8       § 8571 ....................................................................................................... 14
       § 8627 ....................................................................................................... 14
9

**CONSTITUTIONAL PROVISIONS**

10

11   United States Constitution
       Eighth Amendment ..........................................................10, 14, 16, 18
12      Fourteenth Amendment.................................................................. 10

13   **COURT RULES**

14   Federal Rule of Civil Procedure
       Rule 60 ................................................................................1, 5, 10, 14
15      Rule 60(b)................................................................................... 7, 9
       Rule 60(b)(5)...........................................................................3, 7, 8, 9
16      Rule 60(b)(6) ............................................................................... 7, 19
       Rule 60(b)(6) .................................................................................. 19
17      Rule 60(c)(1) ....................................................................................... 7

18

**OTHER AUTHORITIES**

19

20   Exec. Order No. N-33-20 (Mar. 19, 2020) https://www.gov.ca.gov/wp-
       content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-
21      ORDER.pdf .................................................................................................. 3

22   Proclamation of State of Emergency (Mar. 4, 2020) https://www.gov.ca.gov/wp-
       content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.................... 3
23

24

25

26

27

28

Table of Contents & Table of Authorities (2:90-cv-00520 KJM-DB (PC))

**INTRODUCTION**

This Court has a "continuing duty and responsibility to assess the efficacy and consequences of its orders," *Brown v. Plata*, 563 U.S. 493, 542 (2011), and must "formulate its orders to allow the State and its officials the authority necessary to address contingencies that may arise during the remedial process." *Id.* at 544. Given Defendants' constitutional duty to protect patients from harm, they understood that they had authority to take immediate action to respond to an emergency that poses an imminent threat to life and limb—including actions that temporarily restricted the transfer of class members to beds managed by the Department of State Hospitals (DSH) to prevent the introduction and spread of the highly-contagious COVID-19 virus into its facilities. The Court, however, recently stated that existing orders *require* DSH to delay such preventative measures, regardless of how exigent the circumstances. (ECF No. 6639 (finding that "Director Clendenin relied exclusively on discretionary authority granted her under state law and gubernatorial executive orders to close DSH hospitals to *Coleman* class members," but she "has not at any time been relieved of her duty to follow this court's orders to provide access to *Coleman* class members to the full complement of DSH hospital beds"); *id.* at 8 ("defendants here are subject to such remedial orders and may not act in violation of those orders without first seeking and obtaining necessary modifications" and that "[t]he emergency nature of the pandemic does not excuse this requirement"); *id.* at 9 ("Here, Director Clendenin acted unilaterally to suspend admission of *Coleman* class members to DSH beds in violation of multiple court orders"); *id.* ("Defendants did not seek modification of any of those orders, and the Director's discretionary authority, without more, is insufficient to support her violation of this court's orders," and "[t]his is particularly true where, as here, defendants made no effort to seek relief, however expedited, from this court under Rule 60"); *id.* at 9-10 ("Director Clendenin also violated the court's March 8, 2017 order requiring consultation with the Special Master before closing DSH inpatient beds to *Coleman* class members," as "[s]he notified him of her decision to suspend admissions the day the decision was made and she did not, as the order required, consult with him in any way about the decision").)

/ / /

1    To address the Court's concerns, Defendants collaborated internally and then raised this

2    topic during a special, smaller meeting of the Special Master's weekly COVID-19 task-force

3    meetings, which this Court established to provide a forum for the Special Master and stakeholders

4    to debate and resolve issues like this one in the midst of an ongoing international pandemic.

5    (Lewis Decl. ¶ 2.)  Defendants also proposed separate more focused discussions with Plaintiffs'

6    counsel and the Special Master.  (*Id.*)  To this end, Defendants on August 4 circulated a proposed

7    stipulation with a framework for notification of emergent circumstances and follow-on discussion

8    regarding actions taken by Defendants effecting a temporary change in the number and/or use of

9    mental health beds for Coleman class members needing inpatient care, including patients at the

10   Mental Health Crisis Bed, Intermediate Care Facility, or Acute Psychiatric Program levels of

11   care.  (*Id.* ¶ 3 & Ex. A.)  The Special Master thereafter told Defendants that he believed the

12   Court's orders concerning the notification process were controlling and should be examined first,

13   and he declined to provide comments on the proposal for Defendants' consideration.  (*Id.* ¶ 5.)

14   Plaintiffs have not responded to the proposal.  (*Id.* ¶¶ 4-5.)  Defendants sought to avoid litigation.[1]

15   Defendants therefore bring this motion to modify the orders the Court believes constrain

16   DSH's ability to make emergency decisions to save lives, absent sufficient "consultation" with

17   the Special Master and this Court's permission.  Under the Court's explanation of its past orders,

18   DSH may not take life-saving actions in an emergency like it did in March 2020 without first

19   *litigating* whether it may do so.  That would effectively require some responses to be delayed

20   until it is already too late to protect patients, including *Coleman* patients.  And it places DSH in

21   an untenable position: when exigencies require immediate life-saving actions that might deviate

22   from past orders concerning bed plans, DSH must commit contempt to discharge its constitutional

23   / / /

24

25       [1] Given the importance of being able to act rapidly in the face of an emergency to protect
     the health and safety of patients and staff in State facilities, Defendants are moving to modify
26   orders concerning the bed change notification and consultation procedures.  Nevertheless,
     Defendants welcome further negotiation with the Special Master and Plaintiffs to reach
27   agreement concerning a bed change emergency notification process that provides sufficient
     flexibility and clarity for Defendants to manage inpatient beds at State facilities when confronted
28   with emergency situations that threaten the welfare of patients and staff.  (Lewis Decl. ¶ 6.)

2

1    duties.  This conundrum extends beyond the current health crisis and obstructs the Defendants'

2    ability to respond in a future emergency, be it earthquake, fire, or the next global contagion.

3         Recent events establish that prospective, strict application of inpatient bed-availability

4    orders is no longer equitable, and so this Court should modify them under Federal Rule of Civil

5    Procedure 60(b)(5) or (b)(6).  Specifically, Defendants move to modify the Court's orders

6    concerning DSH's inpatient-bed availability and transfers to create a workable framework that:

7    (1) defines specific conditions that will allow DSH to take temporary, emergency actions without

8    pre-approval litigation; (2) provides notice to the Special Master in advance when possible, or

9    otherwise as soon as practicable, and in no event more than 48 hours after taking the actions, as

10   well as establish procedures for him to evaluate the actions taken and determine whether class

11   members were adversely affected; and (3) creates transparency for Plaintiffs to know the effect, if

12   any, of DSH's action on their clients.

13                    **FACTUAL AND PROCEDURAL BACKGROUND**

14   **I.    RECENT EVENTS REVEALING A NEED FOR MODIFICATION.**

15        "We are living in unprecedented times.  The spread of COVID-19 is a global crisis, a crisis

16   that is heightened in the most vulnerable groups among us."  (Three-Judge Court, No. 4:01-cv-

17   01351, ECF No. 3261 at 1.)  On March 19, 2020, the Governor of California issued an

18   unprecedented Executive Order for all Californians to shelter in place to prevent the spread of

19   COVID-19 and save lives.  (Exec. Order No. N-33-20 (Mar. 19, 2020)

20   https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-

21   HEALTH-ORDER.pdf.)  The Governor issued the order shortly after he declared a state of

22   emergency on March 4, 2020.  (Proclamation of State of Emergency (Mar. 4, 2020)

23   https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-

24   Proclamation.pdf.)

25        In response, DSH temporarily suspended admissions and discharges to and from its

26   facilities for 30 days to similarly shelter in place, and protect its patients, including 298 of whom

27   were *Coleman* class members, and its staff.  (Clendenin Decl. ¶¶ 14, 21.)  DSH recognized that its

28   regular daily practice of admitting and discharging patients from 58 county jails and 35 CDCR

                                          3

1    prisons presented the most serious threat of introducing the virus into DSH's facilities.

2    (Clendenin Decl. ¶ 26; Warburton Decl. ¶ 8.)  DSH acted decisively and responsibly to

3    immediately eliminate this dangerous vector and develop an emergency plan to treat patients as

4    safely as possible during a pandemic for which worldwide public health experts then (and now)

5    could not forecast a "horizon."  (Clendenin Decl. ¶¶ 18, 21-22, 24, 26; Warburton Decl. ¶¶ 16-

6    18.)  DSH's decision to temporarily suspend patient admissions gave it valuable time to ensure it

7    had sufficient personal protective equipment supplies, secure testing resources, identify and

8    develop isolation space, and develop and implement protocols to safely admit and discharge

9    patients, and treat the patients in DSH custody in an unprecedented and uncertain pandemic

10   environment.  (Clendenin Decl. ¶¶ 18, 21-22; Warburton Decl. ¶¶ 17-18.)

11        Before DSH suspended admissions, DSH's Director called the Special Master to advise him

12   of DSH's planned response to the pandemic.  (Clendenin Decl. ¶ 13; ECF No. 6565 at 3 (the

13   Special Master stated in his April 2, 2020 report that "[o]n March 16, 2020, the Special Master

14   received a phone call from the director of DSH, Stephanie Clendenin, notifying him that DSH

15   would be suspending admissions of *Coleman* class members to their hospitals".)  During that

16   telephone call, the Special Master informed DSH's Director that he understood her decision—the

17   Special Master did not question the Director's decision, let alone disapprove DSH's decision.

18   (*Id.* ¶ 13; *see also* ECF No. 6565 at 4 (providing that the Special Master had teleconference

19   meetings with Director Clendenin and her staff on March 17 and 18, 2020 regarding DSH's

20   decision to halt admissions, without complaint.)  DSH's chief counsel separately notified

21   Plaintiffs' counsel.  (Clendenin Decl. ¶ 14; ECF No. 6565 at 3, 38.)  The suspension of *Coleman*

22   admissions was temporary, lasting 30 days, and ended on April 16, 2020.  (Hendon Decl. ¶¶ 8-9,

23   ECF No. 6612-1.)  And, at the time of the temporary suspension of admissions, there were no

24   COVID-positive patients in DSH's care.  (Clendenin Decl. ¶ 23.)

25        Smart, evasive, and early action by DSH paid dividends.  DSH did not have a COVID-

26   positive patient until two weeks after the suspension was lifted.  (*Id.*)  And, as of August 25, not

27   one *Coleman* class member at DSH has tested COVID-positive so far during the entirety of the

28   COVID-19 pandemic.  (*See* Status Report, ECF No. 6841 at 6.)  DSH's prudent and proactive

4

1    measures to protect patients were just some of the "numerous and significant measures the State

2    of California has taken and continues to take in response to COVID-19." (Three-Judge Court,

3    No. 4:01-cv-01351, ECF No. 3291 at 2.)  And it was because of such measures that the Three-

4    Judge Court in April 2020 rejected Plaintiffs' claims that "State officials" had been "deliberately

5    indifferent to a substantial risk of serious harm to inmate health or safety." (*Id.* at 1-2.)

6         However, this Court—rather than credit DSH for taking steps to save and promote patients

7    and staff's well-being in response to the pandemic—issued an order to show cause concerning

8    whether the 30-day suspension of transfers constituted contempt because it violated a March 8,

9    2017 order, and bed plans indicating DSH would make 256 beds available to class members at

10   Atascadero State Hospital (ASH) (*see* ECF No. 4199).  (ECF No. 6572.)  The Court ordered

11   discovery and a trial, which has been continued several times based on the parties' joint

12   representation that DSH is following Program Guide requirements for patient admissions that

13   have been supplemented with additional COVID-19 protocols.  (ECF Nos. 6600, 6622, 6676,

14   6734.)  Although Defendants asked that the trial be taken off calendar given ongoing positive and

15   transparent discussions with extensive data regarding patient referrals, admissions, and discharges

16   provided during weekly COVID-19 task force sessions, the trial is now set for October 23, 2020.

17   (ECF Nos. 6800 & 6807.)  In subsequent proceedings, this Court clarified that existing orders do

18   not permit Defendants to immediately respond to an emergency without first seeking relief under

19   Rule 60, and engaging in a more robust pre-decisional negotiation process with the Special

20   Master.  (*See*, *e.g.*, ECF No. 6639 at 9-10 (finding that Director Clendenin "violated the court's

21   March 8, 2017 order requiring *consultation* with the Special Master before closing DSH inpatient

22   beds to *Coleman* class members," as "[s]he notified him of her decision to suspend admissions

23   the day the decision was made *and she did not, as the order required, consult with him in any way*

24   *about the decision*" (emphasis added)); ECF No. 6660 at 2 (providing that "with the exception of

25   a temporary modification to include COVID-19 screening, the *Coleman* Program Guide

26   requirements for transfer of class members to inpatient DSH hospital beds are in full force and

27   effect unless and until they are modified by order of this court").)

28   / / /

## II. RELIEF SOUGHT.

Defendants bring this motion to modify earlier orders to make explicit what DSH understood to be its authority to make reasonable, short-term adjustments to the number or use of mental health beds for class members at the Intermediate Care Facility (ICF)[2] level of care in the event of flood, fire, contagion, contamination, earthquake, active-shooter incident, hostage crisis, or other imminently dangerous circumstance beyond its control. Defendants propose that:

- DSH be permitted, in such circumstances, to advise the Special Master in advance when possible, or otherwise as soon as practicable, and in no event more than 48 hours after emergency action is taken;

- consistent with his existing powers and duties under the 1995 Order of Reference (ECF No. 640), the Special Master would review the action taken and, if the Special Master determined that a report was necessary, report to the Court on the effect, if any, on *Coleman* class members; and

- under the July 2019 modification to the Order of Reference (ECF No. 6230), the parties would have thirty days to file objections to, or move to modify, reject, or adopt, the report (*see*, *e.g.*, Lewis Decl. ¶ 3 & Ex. A).

This proposed modification would supersede existing procedures and enable the State to take immediate, temporary action to save lives; allow prompt evaluation, analysis, and reporting to the Court; and allow Plaintiffs' counsel to know whether their clients were affected.

1. Specifically, Defendants seek to modify the following orders to incorporate the proposed emergency protocols insofar as DSH bed usage may be implicated: March 8, 2017 order requiring that, where "an emergency situation precludes [a] meet and confer thirty days in advance, defendants shall consult with the Special Master immediately upon learning of the need to make any changes, additions or reductions in the number and/or use of inpatient beds or mental health crisis beds" and that "[a]s used in this order, consultation requires a conference in person or by telephone and not mere written notice or communication" (ECF No. 5573);

---

[2] DSH only provides care to *Coleman* class members at the ICF level of inpatient care.

6

1    2.    December 15, 2017 order (ECF No. 5750) allowing transfer timelines to be

2    suspended in "unusual circumstances" outside CDCR's control; and

3    3.    April 24, 2020 order (ECF No. 6639) indicating that DSH Director Clendenin was

4    required to seek modification of orders before DSH suspended admissions in response to

5    the COVID-19 pandemic, and stating "defendants here are subject to remedial orders and

6    may not act in violation of those orders without first seeking and obtaining necessary

7    modifications," and that "[t]he emergency nature of the pandemic does not excuse this

8    requirement."

9        For the reasons discussed below, this Court should grant Defendants' motion to modify

10   these orders to allow for immediate, reasonable responses to emergency situations followed

11   closely by notice to the Special Master and his review and analysis of the effect, if any, on the

12   Plaintiffs' class.

13                                        **ARGUMENT**

14       Under Federal Rule of Civil Procedure 60(b)(5), a court may relieve a party from a final

15   order when, among other things, the order's prospective application is no longer equitable.  And

16   under Rule 60(b)(6), courts may grant such relief for "any other reason that justifies relief."  A

17   motion for relief under either provision must be filed within a "reasonable time."  Fed. R. Civ. P.

18   60(c)(1).  Rule 60(b) codifies the courts' inherent authority to modify or vacate the prospective

19   effect of their judgments.  *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005)

20   (applying Rule 60(b)(5)); *Nicacio v. U.S. I.N.S.*, 797 F.2d 700, 706 (9th Cir. 1985) (applying Rule

21   60(b)(6)).

22       A court that issues an injunction mandating systemic changes to an institution has the

23   continuing duty and responsibility to assess the efficacy and consequences of its order.  *Brown v.

24   Plata*, 563 U.S. at 542.  Court-ordered institutional reform implicates "sensitive federalism

25   concerns" because it intrudes on elected officials' ability to govern.  *Horne v. Flores*, 557 U.S.

26   433, 447-50 (2009).  Accordingly, district courts must take a "flexible approach" to requests to

27   modify orders that dictate the state's core responsibilities.  *Id.*; *Rufo v. Inmates of Suffolk Cty.

28   Jail*, 502 U.S. 367, 384-85 (1992).  As the Supreme Court has instructed, the district court "must

7

1  remain open" to altering an order to ensure that the rights and interests of the parties are

2  protected. *Plata*, 563 U.S. at 543. This includes "[p]roper respect for the State and for its

3  governmental processes." *Id*. A court must "formulate its orders to allow the State and its

4  officials the authority necessary to address contingencies that may arise during the remedial

5  process." *Id*. at 544.

6      The COVID-19 global pandemic has presented Defendants, and specifically DSH, and this

7  Court with such a contingency. This epic public health crisis has forced the State to take

8  unprecedented actions to safeguard the lives of Californians, especially those committed to its

9  custody. As DSH's evidence unequivocally shows, and as current events around the country

10  make clear, discharging this duty requires lightning-quick decision-making by state officials. It is

11  beyond dispute that delay can result in catastrophic consequences.

12

13  **I.    THE COURT SHOULD GRANT RULE 60(b)(5) RELIEF BECAUSE, IN LIGHT OF RECENT EVENTS, APPLICATION OF ITS ORDERS IS NOT EQUITABLE.**

14      Under Rule 60(b)(5), Defendants, as the moving party, must first show a significant change

15  either in factual conditions or in the law warranting modification of the Court's remedial orders.

16  *Asarco Inc.*, 430 F.3d at 979 (citing *Rufo*, 502 U.S. at 384). This Court then determines whether

17  the proposed modification is suitably tailored to resolve the problems created by the changed

18  factual or legal conditions. *Id*. If changed circumstances have been shown, this Court cannot

19  refuse to rescind or modify an injunctive order. *Horne*, 557 U.S. at 447.

20      Here, the COVID-19 pandemic has revealed that the injunction, as interpreted by recent

21  court orders, is dangerously inflexible and should be modified to allow DSH to take immediate

22  life-saving actions in time of emergency, just as it did in March 2020.

23

24      **A.    The Court Should Modify Its Prior Orders to Allow DSH to Take Immediate Action to Protect Patients From Imminent Danger Without First Bringing a Motion.**

25

26      Under the Supreme Court's flexible approach, modification of an order under Rule 60(b)(5)

27  is appropriate when changed factual or legal conditions make compliance with the order

28  substantially more onerous, when an order proves to be unworkable because of unforeseen

8

1   obstacles, or when enforcement of the order without modification would be detrimental to the

2   public interest.  *Rufo*, 502 U.S. at 384-85.  A court does not need to find that the change in

3   circumstances was both unforeseen and unforeseeable.  "[L]itigants are not required to anticipate

4   every exigency that could conceivably arise during the life of a consent decree."  *Id.* at 385.

5        There can be no dispute that the COVID-19 pandemic constitutes not only a "substantially

6   changed circumstance," but an extraordinary one that has fundamentally altered our nation's

7   public health landscape.  Indeed, the Three-Judge Court so concluded, explaining that Defendants

8   are confronting an "unprecedented pandemic" that "the entire world was unprepared for."  (Order

9   at 9, Apr. 4, 2020, ECF No. 6574.)[3]  Defendants are in the midst of fighting a "unique threat" that

10  "could not have been foreseen only a few months ago," let alone years earlier when this Court

11  entered its orders concerning inpatient-bed planning and availability.  (*See id.* at 11.)

12       DSH's ability to immediately respond to this unprecedented public health emergency

13  further changed when, in response to its good-faith actions to protect patients from infection, this

14  Court concluded that those actions violated prior orders unrelated to exigencies, and instead,

15  related to planning for bed availability while it was not under the press of a global emergency,

16  and announced a new procedural requirement for emergencies.  As explained below, a

17  modification is warranted under Rule 60(b)(5) because the Court's order imposes a condition that

18  is unworkable, onerous, and detrimental to the public interest.

19       **1.    By Requiring DSH to Litigate Emergency Actions, the Court's April
              24 Order Imposes an Unworkable Condition that Makes Compliance
20            with Earlier Orders Substantially More Onerous and Interferes With
              DSH's Ability to Take Immediate Life Saving Measures.**
21

22       The Court's requirement that Defendants bring a Rule 60(b) motion before DSH may take

23  immediate action in response to an unforeseen emergency, such as the COVID-19 global

24  pandemic, should be modified because it is both unworkable and substantially more onerous.

25  _____

26       [3] Plaintiffs conceded that the pandemic is a changed circumstance in their own Rule
     60(b)(5) motion to modify the Three-Judge Court's population-reduction order.  (Three-Judge
27   Court, No. 4:01-cv-01351, ECF No. 3219 at 28-29.)  The Three-Judge Court denied the motion
     because the alleged constitutional injury was unrelated to the basis of that order: the delivery of
28   constitutionally adequate medical and mental-health care.

                                        9

1        Compliance is unworkable because the required Rule 60 procedure will necessarily delay

2   emergency responses that require temporary suspension of patient movement, and such delays

3   will have catastrophic results.  (Clendenin Decl. ¶¶ 22, 26; Warburton Decl. ¶¶ 7-14; Siegel Decl.

4   ¶¶ 13-14.)  An example here is helpful—at any time when a patient living, or employee working,

5   on a unit tests positive for COVID-19, DSH would immediately quarantine those units, while it

6   serially tests all patients and employees living and working on the unit to determine if additional

7   patients or employees become positive for COVID-19.  The patients and employees continue to

8   be tested and the unit quarantined until it is determined that transmission is no longer occurring

9   on the unit.  When a unit is quarantined, DSH pauses patient admissions and discharges to the

10   unit or units so that additional patients are not exposed to COVID-19.  (Clendenin Decl. ¶ 27;

11   Warburton Decl. ¶ 15.)  Depending on the extent and location of the outbreak, that could halt

12   admissions to the entire hospital.  (Clendenin Decl. ¶ 27; Warburton Decl. ¶ 15.)  DSH cannot

13   wait to litigate through a Rule 60 motion, even on an expedited basis, whether it can continue to

14   admit patients into its facilities—patient and staff lives are at stake.  (Clendenin Decl. ¶¶ 26-27;

15   Warburton Decl. ¶¶ 7-14.)  The mandated delay stands in tension with DSH's constitutional

16   obligations to keep patients reasonably safe from a substantial risk of serious harm, as well as the

17   State's overarching responsibility for public health and safety.[4]

18        Moreover, DSH must be able to immediately respond to protect people in its custody while

19   maintaining security of the institution in the event of an emergency, such as a pandemic, fire,

20   earthquake, or hostage crisis, to name a few.  (Clendenin Decl. ¶ 28.)  For example, DSH-Napa

21   was almost evacuated due to the 2017 life-threatening fires in Northern California, particularly in

22   Napa County.  (*Id.*)  DSH could not wait for a court order to move *Coleman* patients out of a

23   facility subject to a mandatory evacuation order, nor could it guarantee admission to such a

24   facility under these emergency circumstances just to comply with a bed-planning order.  (*Id.*)  To

25   hold otherwise would expose the patients under DSH's care to undue risk.  *See Hook v. State of*

26   *Ariz.*, 120 F.3d 921, 924-25 (9th Cir. 1997) (holding the district court abused its discretion by

27

28        [4] This includes Defendants' Eighth Amendment duty to incarcerated patients, as well as DSH's Fourteenth Amendment duty to civilly detained patients.

1    denying modification where the defendants presented evidence showing compliance with decree

2    raised institutional security concerns).

3        The requirement to litigate first and await a written order makes compliance substantially

4    more onerous—if not impossible.  As explained below, some emergencies do not permit such

5    delay.  The Court's requirement would force DSH either to disobey the Court, or to delay and

6    subject patients and others to dangerous—potentially deadly—conditions, pending the outcome of

7    litigation.  Consequently, the Court's existing orders could have the unintended effect of

8    subjecting those in the State's care to unconstitutional conditions when Defendants need to take

9    decisive action to avoid that result.  Indeed, Plaintiffs during this pandemic have criticized

10   Defendants for failing to act quickly enough.  (*See*, *e.g*., Three-Judge Court, No. 4:01-cv-01351,

11   ECF No. 3219 at 29-30 (Plaintiffs argued that CDCR's suspension of intake was inadequate to

12   address COVID-19, and Defendants "failure to act more quickly to reduce the prison population

13   in light of this unprecedented crisis is troubling and constitutes further evidence of the need for

14   urgent action by this [Three-Judge] Court"); *Plata v. Newsom*, No. 4:01-cv-01351, ECF No. 3256

15   at 6-7 ("The steps that Defendants have proposed to date—temporarily pausing intake from

16   county jails, expediting the release of people who were scheduled to be released in the next 60

17   days, and relocating fewer than 600 people from a few dorms at three prisons to cells—do not

18   adequately address the magnitude of the problem and the needs of medically vulnerable class

19   members.").)  Modification is necessary to resolve this tension.  *See Reynolds v. McInnes*, 338

20   F.3d 1221, 1228 (11th Cir. 2003) (modification to consent decree warranted where, despite the

21   defendants' good-faith efforts, compliance with provision would effectively "preclude best

22   professional practices"); *see also Jackson v. Los Lunas Community Program*, 880 F.3d 1176,

23   1205 (10th Cir. 2018) (district court's finding that the defendants' obligations under injunction

24   were "onerous" should suffice to show changed circumstances under either "onerous" or

25   "unworkable" prongs of the *Rufo* analysis).

26        **2.    Modification of the Order Is in the Public Interest.**

27        The Court's categorical restriction on DSH's ability to take immediate emergency action

28   affecting patient movement and bed use without first litigating the issue, harms the public interest

11

1    in two critical ways.  First, requiring DSH to litigate before responding to an emergency

2    jeopardizes public health and safety, including the health and safety of *all* 6,000 DSH patients,

3    DSH's non-*Coleman* custodial population, community hospitals, and the public at large.  In

4    custodial situations no less than elsewhere, there is a "paramount necessity" to protect against "an

5    epidemic of disease." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905).

6        The consequences of even a brief delay in the face of an emergency, such as a pandemic,

7    could be catastrophic.  (*See* Clendenin Decl. ¶¶ 21-22, 26-27; Warburton Decl. ¶¶ 7-8, 16; Siegel

8    Decl. ¶¶ 13-15.)  Time is of the essence.  Once contagion begins to spread in a congregate setting,

9    it can become difficult to contain, given the proximity of patients to one another and the ease with

10   which a disease can be transmitted among a confined population.  (Warburton Decl. ¶¶ 9-10;

11   Siegel Decl. ¶¶ 10-12.)  Furthermore, geophysical and climatic events, such as an earthquake,

12   brush fire, or flood, could pose emergent threats to the structures housing patients that demand

13   immediate action to move patients or prevent the transportation or admission of additional

14   patients into those beds.  (Clendenin Decl. ¶ 28.)  In these situations, DSH needs to act within

15   hours, if not minutes, to adjust movement in efforts to protect patients and staff.  (*Id.*)

16       Moreover, by a large margin, the majority of DSH's inpatients, or approximately 96-97

17   percent, are not *Coleman* class members but Californians living with serious mental illnesses.

18   (*See* Clendenin Decl. ¶ 3.)  Patients are sent to DSH from counties and superior courts all over the

19   state; depending on the commitment type, they may be discharged back to the county, superior

20   court, or county jail after treatment—raising additional potential opportunities for spread among

21   vulnerable individuals within the State's custody between correctional and inpatient settings.

22   (Clendenin Decl. ¶ 6; Warburton Decl. ¶¶ 8, 14.)  "[T]o be clear, this is not (solely) about

23   weighing health and safety against security and administrative efficiency; it is also about

24   weighing health and safety against health and safety."  *Swain v. Junior*, 961 F.3d 1276, 1293

25   (11th Cir. 2020).  And, because staff return to their communities at the end of each workday,

26   delays in responding to a pandemic may place their families and neighbors at risk, and ultimately

27   could consume scarce healthcare resources both within and outside the custodial environment.

28   (*See* Siegel Decl. ¶ 15; Warburton Decl. ¶ 13.)  *See also* Bakersfield Californian, "Hospital

12

1  Staffing an Emerging Concern in Kern's COVID-19 Effort, July 13, 2020 (reporting on shortages

2  of community hospital beds and staff).)  In short, allowing contagion to be introduced into a DSH

3  facility could have wide-ranging impact on communities throughout the state.  (Siegel Decl.

4  ¶¶ 14-15; Warburton Decl. ¶¶ 12-14.)

5       Second, the Court's restriction harms the public interest because it fails to give sufficient

6  deference to the Governor and DSH officials in responding to public health emergencies at a

7  moment of peril unrivaled in our lives.  Such interference conflicts with state officials' core

8  responsibilities to safely manage the populations entrusted to their care.  As the Supreme Court

9  has explained, in institutional-reform cases the public interest is harmed when a federal court's

10  judgment impedes the democratic process by improperly depriving state officials of their

11  designated legislative and executive powers.  *Horne*, 557 U.S. at 448-50.  Courts must remain

12  attentive to the fact that "federal-court decrees exceed appropriate limits if they are aimed at

13  eliminating a condition that does not violate [federal law] or does not flow from such a violation."

14  *Id*. at 450 (internal quotation marks omitted).  "[P]rinciples of federalism and simple common

15  sense require the [district] court to give significant weight" to the views of governmental officials.

16  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004).  State officials with "front-line

17  responsibility" must be given "latitude and substantial discretion."  *Id*.; *see also Sandin v.*

18  *Conner*, 515 U.S. 472, 482-83 (1995) ("federal courts ought to afford appropriate deference and

19  flexibility to state officials trying to manage a volatile environment [in a prison]").  Indeed, as the

20  Three-Judge Court emphasized in April 2020 in the specific context of COVID-19, "Defendants

21  have broad authority to voluntarily take steps that may prevent the life-threatening spread of

22  COVID-19 within their prisons, and we recognize the deference that is due to prison authorities to

23  determine which additional measures must be taken to avoid catastrophic results.  (Three-Judge

24  Court, No. 4:01-cv-01351, ECF No. 3261 at 13 (citing *Turner v. Safley*, 482 U.S. 78, 84-85

25  (1987).)

26       In its April 24 order, this Court concluded that its prior bed-planning orders conflicted with,

27  and therefore vitiated, DSH's authority to respond to emergencies and how to handle its beds

28  under state law and the Governor's executive orders.  However, the determination is not so

13

Defs.' Memo Ps. & As. Supp. Mot. Modify Orders (2:90-cv-00520 KJM-DB (PC))

1   simple.  The fact that a state law conflicts with a federal injunction is insufficient legal

2   justification to deny a needed modification of the injunction.  *Valdivia v. Schwarzenegger*, 599

3   F.3d 984, 995 (9th Cir. 2010).  In *Valdivia*, defendants sought to modify certain procedural

4   aspects of an injunction to conform with changes to state law.  *Id.*  The Ninth Circuit explained

5   that although the procedures were put in place to remedy a claimed constitutional violation, they

6   were not necessary or required by the Constitution.  *Id.*  Therefore, as a matter of federalism, the

7   district court was obligated to reconcile the state law with the injunction.  *Id.*  The court could not

8   simply deny the modification based on the inconsistency.  *Id.*  So too, here, the requirement of

9   bringing a motion under Rule 60 before taking emergency action is not required by the

10  Constitution, and conflicts with the Governor's statutory authority to respond swiftly and

11  decisively to emergencies.[5]  The Court should grant this motion to modify DSH bed plan orders

12  to reconcile its orders with state law.

13      "The Constitution principally entrusts the safety and the health of the people to the

14  politically accountable officials of the States to guard and protect."  *S. Bay United Pentecostal*

15  *Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring in denial of

16  injunctive relief) (citing *Jacobson*, 197 U.S. at 38 (internal quotes and brackets omitted).  When

17  those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their

18  latitude "must be especially broad."  *Id.*; *Marshall v. United States*, 414 U.S. 417, 427 (1974).

19  The "federal judiciary," in contrast, "lacks the background, competence, and expertise to assess

20  public health and is not accountable to the people."  *S. Bay United Pentecostal Church*, 140 S. Ct.

21  at 1614.  The judiciary has a vital role in assuring that constitutional requirements under the

22  Eighth Amendment and Due Process Clauses are met for those under the State's care.  But in the

23  extraordinary and limited circumstances of a true emergency, the courts must allow leeway for

24  the Executive's immediate response, in order that the underlying goals of such judicial oversight

25  _____

26      [5] Under the California Emergency Services Act, the Legislature centralized authority to
    respond to state emergencies within the Governor and Governor's Office of Emergency Services.
    In an emergency, the Governor has "complete authority over all agencies of the state government
27  . . . and all police power vested in the state," Cal. Gov. Code § 8627, and he may exercise his
    emergency authority to "suspend any statute prescribing the procedure for conduct of state
28  business, or the orders, rules, or regulations of any state agency."  Cal. Gov. Code § 8571.

14

1  not suffer due to inflexible formality.  DSH's Director, appointed by the Governor and confirmed

2  by the Legislature to oversee an executive department, must be able to take decisive action to

3  protect its patients without first litigating such actions.

4        **B.    The Requested Modification Is Suitably Tailored.**

5        Defendants' proposed modification is suitably tailored to the circumstances.  It provides a

6  procedural framework that reconciles the Court's overall remedial plan with the State's need to

7  act quickly to protect life and limb in a true emergency.

8        DSH seeks only the authority to take immediate, temporary action affecting ICF bed usage

9  in an emergency.  DSH recognizes that the term for such temporary emergency action must be

10  limited.  State law provides a suitably defined, limited, and administrable starting point, through a

11  longstanding provision that is designed to recognize true, severe emergencies whose

12  circumstances require immediate action.  Looking to state law for guidance is appropriate because

13  "it is difficult to imagine an activity in which a State has a stronger interest, or one that is more

14  intricately bound up with state laws, regulations, and procedures, than the administration of"

15  those that have been committed to its care for serious mental illness.  *Woodford v. Ngo*, 548 U.S.

16  81, 94 (2006) (internal quotes omitted).

17        California Government Code § 8558(b) defines "state of emergency" as:

18        "conditions of disaster or of extreme peril to the safety of persons and property within
         the state caused by conditions such as air pollution, fire, flood, storm, epidemic, riot,
19        drought, cyberterrorism, sudden and severe energy shortage, plant or animal
         infestation or disease, the Governor's warning of an earthquake or volcanic
20        prediction, or an earthquake, or other conditions, . . . which, by reason of their
         magnitude, are or are likely to be beyond the control of the services, personnel,
21        equipment, and facilities of any single county, city and county, or city and require the
         combined forces of a mutual aid region or regions to combat[.]"
22

23  Cal. Gov. Code § 8558(b).  Because the Governor's general authority to take action in an

24  emergency is grounded in state law, it is appropriate to tailor the definition of "emergency" to

25  align with § 8558(b).

26        To facilitate the Special Master's monitoring, any action taken in response to an emergency

27  should be closely followed with notice to the Special Master and an opportunity for post-hoc

28  analysis of the emergency response.  Circumstances such as a fire or earthquake requiring

15

1    evacuation of patients and staff require *immediate* action to save lives.  These measures would be

2    closely followed by efforts to safely rehouse displaced individuals considering case factors such

3    as medical conditions, disabilities, mental health needs, and security concerns.  (Clendenin Decl.

4    ¶ 28.)  Depending on the conditions on the ground, even working around the clock, this process

5    could take one to two days.  (*Id*.)  Therefore, Defendants request that the Court modify its orders

6    to direct DSH to notify the Special Master in advance when possible, or otherwise as soon as

7    practicable, and in no event more than 48 hours of initiating any emergency action affecting ICF

8    bed usage.  Such notice would be followed by evaluation, analysis, and—if the Special Master

9    determined it was necessary—a report containing recommendations consistent with the Special

10   Master's existing powers and duties.  And there is already a mechanism in place for the parties to

11   file objections to, or move to modify, reject, or adopt, the Special Master's report.  (*See* ECF No.

12   6230.)  Thus, under DSH's proposed modification, the parties, the Special Master, and the Court

13   will have a clear framework and process in place to implement, review, and adjust emergency

14   actions.

15       **C.    The Proposed Modification Is Consistent with the Constitution.**

16       Defendants' proposed modification does not create or perpetuate a constitutional violation.

17   Even accepting arguendo the Court's prior conclusions that the Program Guide sets the objective

18   requirements of the Eighth Amendment, a modification of DSH bed planning orders to allow

19   emergency action is justified under *Jacobson*'s reasoning and consistent with the remedial

20   scheme.  The Eighth Amendment is "contextual and responsive to contemporary standards of

21   decency," *Hudson v. McMillian*, 503 U.S. 1, 8 (1992), and "has been interpreted in a flexible and

22   dynamic manner."  *Gregg v. Georgia*, 428 U.S. 153, 171 (1976).  And, individual liberties,

23   "under the pressure of great dangers," may be reasonably restricted "as the safety of the general

24   public may demand."  *Jacobson*, 197 U.S. at 29.  Indeed, limiting DSH's flexibility to take

25   emergency action could perpetuate a different constitutional violation—namely, deliberate

26   indifference to COVID-19's serious threat of harm.  *See*, *e.g.*, *Wilson v. Williams*, 961 F.3d 829,

27   840 (6th Cir. 2020) (holding that COVID-19 represented an obvious objective risk of harm in the

28   Federal Bureau of Prison's dormitory housing, but prison's six-part plan to mitigate the virus's

16

1  risk did not amount to deliberate indifference).  Had DSH done nothing to mitigate the

2  dangerousness of constant admissions and discharges, and experienced a rampant outbreak in its

3  facilities, despite knowing about possible risks, it would have been accused of deliberate

4  indifference.  Modification is necessary—DSH cannot have its hands tied from acting in an

5  emergency due to outdated orders unrelated to such exigent circumstances, and then be blamed

6  for failing to act quickly or decisively enough to protect its patients.

7          In *Jacobson*, the Supreme Court determined that exigent circumstances threatening public

8  health and safety can outweigh and even override constitutional rights.  197 U.S. at 27

9  (addressing an "epidemic of disease which threatens the safety of [a community's] members");

10  *see also Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) ("The right to practice religion

11  freely does not include liberty to expose the community or the child to communicable disease or

12  the latter to ill health or death."); *Benner v. Wolf*, No. 20-cv-775, 2020 U.S. Dist. LEXIS 89425,

13  at *11 (M.D. Pa. May 21, 2020) ("[T]he necessity of quick action by the State or the

14  impracticality of providing a pre-deprivation process may mean that a post-deprivation remedy is

15  constitutionally adequate.") (quoting *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 436 (1982)).

16  The emergency magnifies the State's inherent police power, granting it more flexibility to take

17  actions in pursuit of public health and safety.  *See Jacobson*, 197 U.S. at 24-31.  Thus, if the

18  State's action has a "real or substantial relation" to the public health emergency, courts should

19  find the action unconstitutional only if it is "beyond all question, a plain, palpable invasion of

20  rights secured by the fundamental law."  *Id*. at 31; *see also In re Abbott*, 954 F.3d 772, 784 (5th

21  Cir. 2020) ("The bottom line is this: when faced with a society-threatening epidemic, a state may

22  implement emergency measures that curtail constitutional rights so long as the measures have at

23  least some 'real or substantial relation' to the public health crisis and are not 'beyond all question,

24  a plain, palpable invasion of rights secured by the fundamental law.'" (quoting *Jacobson*)); *In re*

25  *Rutledge*, 956 F.3d 1018, 1027 (8th Cir. 2020) ("[I]n the context of a public health crisis, a state

26  action is susceptible to constitutional challenge only if it, 'purporting to have been enacted to

27  protect the public health, the public morals, or the public safety, has no real or substantial relation

28  / / /

17

1    to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the

2    fundamental law.'" (quoting *Jacobson*)).

3          The Ninth Circuit agrees that the temporary denial of constitutional rights, including those

4    under the Eighth Amendment, is reasonable in certain situations.  For instance, in *Norwood v.*

5    *Vance*, 591 F.3d 1062 (9th Cir. 2010), the Court recognized that the Eighth Amendment right to

6    outdoor exercise may be temporarily denied where officials must quickly respond to violence

7    threatening inmate safety.  And in *Noble v. Adams*, 646 F.3d 1138, 1143-47 (9th Cir. 2011), a

8    post-riot lockdown of prison that resulted in denial of Eighth Amendment rights was reasonable

9    because prison officials have a duty to keep inmates safe.  Further, the Ninth Circuit has

10   recognized that Eighth Amendment remedies are flexible, permitting exceptions if unexpected

11   circumstances make the remedy infeasible.  *See Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir.

12   1979) (affirming order requiring inmates to receive a specific quantity of outdoor exercise "unless

13   inclement weather, unusual circumstances, or disciplinary needs made that impossible").

14         This Court has similarly recognized that flexibility in the remedial scheme is necessary to

15   account for unforeseen circumstances and is consistent with the Eighth Amendment.  The Court

16   has also acknowledged that there must be exceptions—exceptions which have been adopted into

17   the Program Guide.  (*See, e.g.*, ECF No. 5610 (ordering the parties to develop rules for when

18   periods may be excluded when gauging compliance with transfer timelines); *see also* ECF No.

19   5744 & ECF No. 5750 at 4 (adopting the parties' Program Guide Addendum).)

20         As this Court has observed, emergencies like the current pandemic do not "suspend the

21   Constitution."  (May 29, 2020 Hrg. Tr. at 31:23–24.)  But that is not the end of the analysis.

22   Rather, as explained in *Jacobson*, such circumstances shift the relevant legal standard, lowering

23   the constitutional floor.  Given the flexibility in both the Eighth Amendment and the remedial

24   plan in this case, a modification that allows for a temporary emergency deviation from DSH's

25   bed-plan requirements, including procedural safeguards, is not "beyond all question, a plain,

26   palpable invasion rights secured by the fundamental law."  *See Jacobson*, 197 U.S. at 31.

27   / / /

28   / / /

18

## II.    ALTERNATIVELY, DEFENDANTS ARE ENTITLED TO RELIEF UNDER RULE 60(b)(6).

Federal Rule of Civil Procedure 60(b)(6) is a "catch-all" provision that authorizes a court to relieve a party from a final order for any reason not covered by the other provisions of the rule. *Delay v. Gordon*, 475 F.3d 1039, 1044 (9th Cir. 2007). Rule 60(b)(6) enables courts to grant relief "whenever such action is appropriate to accomplish justice," but should only be applied in "extraordinary circumstances." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988). The moving party must generally demonstrate injury and circumstances beyond its control that prevented timely action to protect its interests. *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993).

Here, given Defendants' constitutional duty to protect patients from harm—including those who are *Coleman* class members and those who are not—DSH believed it had authority as part of the State's executive branch, as well as explicit authority under the March 8, 2017 order, to take immediate action to address an emergency that poses an imminent threat to life and limb. Yet, in this Court's recently announced view, DSH *must* delay before it can act, regardless of how exigent the circumstances. DSH could not have anticipated the current pandemic, let alone that the Court would limit its ability to immediately respond to it. And if another emergency arises in the future, manifest injustice would result if DSH cannot take immediate action to save life and limb exactly like it did in March 2020. *See Alpine Land & Reservoir Co.*, 984 F.2d at 1049 ("Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice."). Because the pandemic has revealed how restrictive the Court's orders are in time of crisis, and because Defendants' proposed modification to those orders is "appropriate to accomplish justice," *see Liljeberg*, 486 U.S. at 864, the Court should grant modification under Rule 60(b)(6)'s catch-all provision.

/ / /

/ / /

/ / /

1

**CONCLUSION**

The Court should grant Defendants' motion to modify bed plan orders. The modification would (1) allow the State to temporarily deviate from DSH bed plans in the event of an emergency without pre-approval litigation; (2) provide notice to the Special Master in advance when possible, or otherwise as soon as practicable, and in no cases more than 48 hours after taking emergency actions, and establish procedures for him to evaluate the actions taken and determine whether class members were adversely affected; and (3) report to the Court and Plaintiffs the effect, if any, of DSH's action on *Coleman* class members.

**CERTIFICATION**

Defendants' counsel certifies that he reviewed the following orders relevant to this filing: ECF No. 1800, ECF No. 1855, ECF No. 1998, ECF No. 2236, ECF No. 3613, ECF No. 4199, ECF No. 5343, ECF No. 5573, ECF No. 5583, ECF No. 5610, ECF No. 5750, ECF No. 6600, ECF No. 6639, and ECF No. 6660.

Dated:  August 31, 2020

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

*/s/ Tyler V. Heath*

TYLER V. HEATH
Deputy Attorney General
*Attorneys for Defendants*

Defs.' Memo Ps. & As. Supp. Mot. Modify Orders (2:90-cv-00520 KJM-DB (PC))