XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7325
  Fax: (916) 324-5205
  E-mail: Tyler.Heath@doj.ca.gov
*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone: (310) 552-0130
  Fax: (310) 229-5800
  E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF STEPHANIE CLENDENIN IN SUPPORT OF DEFENDANTS' MOTION TO MODIFY** |

I, Stephanie Clendenin, declare:

1. I am the Director of the California Department of State Hospitals (DSH). I have held this position since August 2019. I submit this declaration in support of Defendants' motion to modify orders under Federal Rule of Civil Procedure 60(b). I have personal knowledge of the statements in this declaration and could testify to them if called to do so.

2. Before being named DSH's Director, I served as the Acting Director since 2018 and DSH's Chief Deputy Director from 2015 to 2018.

1

3. DSH's Strategic Plan clearly sets forth the agency's mission: "[t]o provide evaluation and treatment in a safe and responsible manner, by leading innovation and excellence across a continuum of care and settings." DSH's values, also made clear by its Strategic Plan, include:

- safety ("Providing an environment where both patients and staff can interact without violence or coercion; a therapeutic and comfortable environment to live, work, and receive treatment");
- treatment ("Providing patient, employees, the public and stakeholders with care, compassion, and consideration. Intervening to improve someone's condition");
  responsibility ("Being accountable for actions taken. An obligation to have integrity and do the right thing always. Following through on commitments. An obligation to be good stewards of public resources");
- empowerment ("Instilling confidence in others. Granting authority where appropriate to allow others to act based on upon personal and professional knowledge. Encouraging and rewarding innovative thinking");
- respect ("recognizing each person's value and treating them professionally and humanely. Being kind in engagements with others"); and
- communication ("Instilling confidence in others. Granting authority where appropriate to allow others to act based upon personal and professional knowledge. Encouraging and rewarding innovative thinking").

4. Currently, DSH treats the following types of patients: 1) those deemed incompetent to stand trial under California Penal Code section 1370; 2) those found not guilty by reason of insanity under Penal Code section 1026; 3) those deemed to be an offender with a mental health disorder under Penal Code sections 2962 and 2972; 4) patients determined to be sexually violent predators under Welfare and Institutions Code section, 6600, *et seq.*; 5) certain patients committed by civil courts for being a danger to themselves or others under the Lanterman-Petris-Short Act, Welfare and Institutions Code Section 5000, *et seq.*; 6) wards from the CDCR Division of Juvenile Justice transferred to DSH for treatment under Welfare and Institutions Code section 1756; and 7) inmates serving prison sentences who are transferred to DSH for treatment under

2

Decl. Clendenin Supp. Defs.' Mot. Modify  (2:90-cv-00520 KJM-DB (PC))

Penal Code section 2684, which may include *Coleman* class members. DSH provides treatment to its patients at five different facilities, but not every patient classification is treated at each facility.

5. At any given time before the COVID-19 pandemic, DSH's hospitals treated approximately 6,000 patients and employ nearly 12,000 staff. However, DSH currently treats fewer patients due to its work preparing isolation and admission/observation units as part of its pandemic response. DSH makes available 336 beds to treat clinically and custodially appropriate *Coleman* class members referred for intermediate inpatient care at three hospitals: DSH-Atascadero (256 beds), DSH-Coalinga (50 beds), and DSH-Patton (30 beds). In fiscal year 2018-2019, DSH hospitals treated a total of 10,002 patients.

6. *Coleman* class members account for just three percent of DSH's patients. The rest of DSH's patient population is made up of its other commitments—the majority, or approximately 23 percent, are incompetent to stand trial and committed to DSH under Penal Code section 1370. DSH's patients are sent from counties and superior courts all over the state and, depending on the commitment type, may be discharged to a conditional release program, back to the county, superior court, or county jail after treatment. DSH does not prioritize other patient classes over *Coleman* class members and can admit up to 336 clinically and custodially appropriate *Coleman* class members. At the time that DSH temporarily suspended admissions in March 2020 in response to the worldwide COVID-19 public health crisis, there were seven *Coleman* patients and 1,042 non-*Coleman* patients pending admission into DSH's facilities.

7. In my current position as Director, I oversee the overall management of DSH operations, including the treatment of *Coleman* class members at DSH facilities.

8. Based on my experience at DSH, I have knowledge of, among other things, DSH's policies for the treatment and transfer of *Coleman* class members.

9. I have reviewed and I am familiar with the Program Guide and the Court's orders relevant to DSH's provision of care to *Coleman* class members, and I understand DSH's obligations under the Court's remedial plans.

3

Decl. Clendenin Supp. Defs.' Mot. Modify  (2:90-cv-00520 KJM-DB (PC))

10. I am familiar with the Court's March 8, 2017 order and the requirements it places on the parties when making certain types of changes to prior bed plans. Specifically, the order states that "[u]ntil further order of court, defendants shall meet and confer with the Special Master at least thirty days before making any changes, additions, or reductions in the number and/or use of any inpatient beds or mental health crisis beds. If an emergency situation precludes such meet and confer thirty days in advance, defendants shall consult with the Special Master immediately upon learning of the need to make any changes, additions, or reductions in the number and/or use of inpatient beds or mental health crisis beds." The order defined the term "consult" as requiring "a conference in person or by telephone and not mere written notice or communication."

11. In an emergency, it is not possible to have an in-person meeting with the Special Master before having to change, add, or reduce the number or use of inpatient beds at DSH because the Special Master lives and works in Rhode Island. Accordingly, DSH's typical and expected practice, if possible, is to call the Special Master in an emergency situation to give him the notice required under the March 8, 2017 order.

12. In the past, DSH has provided the Special Master notice via email and telephone calls when units, including those treating *Coleman* class members, have been placed on quarantine and suspended from intake due to communicable diseases such as the flu or norovirus. The Special Master and Plaintiffs have never raised concerns about these notifications in the past, which DSH considered emergency circumstances.

13. On March 16, 2020, before DSH temporarily suspended admissions of *Coleman* patients to its hospitals to patient admissions, I called the Special Master to inform him that, due to the developing emergency caused by COVID-19, DSH needed to temporarily suspend almost all patient admissions to all of its hospitals, including the hospitals treating *Coleman* class members. During my telephone call with the Special Master, he informed me that he understood the decision. The Special Master did not indicate any disapproval of the decision or that DSH should reconsider its decision.

14. I am also aware that, after my conversation with the Special Master, DSH's Chief Counsel, Christine Ciccotti, called Plaintiffs' counsel, and sent a confirming email, to inform

4

them of DSH's emergency action. After both of these phone calls occurred, I issued the directive on March 16, 2020 temporarily suspending *Coleman* patient admissions for 30 days to ensure the health and safety of *Coleman* class members then in our hospitals, as well as all other patients and staff.

15. It was my understanding based on past conduct in prior emergency notifications, and my telephone conversation with the Special Master that I fulfilled the requirements of the March 8, 2017 order. It was not my understanding that "consultation," as used in the March 8, 2017 order, required that the Special Master approve DSH's decision on what steps it took to address an emergency.

16. It was not until several days after my conversation with the Special Master that I learned that he had concerns with DSH's temporary suspension of patient admissions.

17. In advance of the decision to suspend *Coleman* and other patient admissions, I also contacted the California Department of Corrections and Rehabilitation (CDCR) on March 15 and 16, 2020, and spoke with their executive leadership and General Counsel about DSH's decision to temporarily suspend admissions to its hospitals to almost all patient admissions. CDCR also did not object to DSH's emergency decision.

18. The physical layout of each of DSH's five hospital facilities make them particularly vulnerable to the spread of communicable diseases, including COVID-19. DSH's hospitals are mostly dormitory space with congregate sleeping, dining, bathroom, and gathering space. DSH's hospitals have limited space available to isolate patients who have contracted a communicable disease, such as COVID-19, or quarantine patients who have been exposed or are suspected of having a communicable disease. This was true before COVID-19, and remains true today, although DSH used the period of suspended admissions for each of its hospitals to identify and prepare available space for isolation of individuals who are under investigation for COVID-19 and for the treatment of individuals who are positive for COVID-19, to the extent necessary, obtain personal protective equipment, establish protocols, and obtain testing capacity. This is only a representative, and not exclusive list, of what DSH did to prepare during the time.

5

Decl. Clendenin Supp. Defs.' Mot. Modify  (2:90-cv-00520 KJM-DB (PC))

19. DSH's patient population is also particularly vulnerable to the more severe effects of communicable diseases, such as COVID-19. DSH treats many patients who are more vulnerable due to their age or co-morbid medical conditions.

20. Leading up to the decision to temporarily suspend admissions of almost all patient intake to DSH's hospitals, and thereafter, I, or my staff, have continuously consulted with medical and mental health experts within and outside DSH regarding the steps DSH needed to take to prepare for COVID-19 and the consequences of a potentially longstanding pandemic.

21. Based on my understanding of DSH, its hospitals, its population, my understanding of COVID-19, and my own and my staff's consultation with health experts, it was necessary to temporarily suspend admissions to DSH's hospitals to almost all patient admissions while DSH prepared its hospitals for COVID-19, to prevent the introduction and spread of COVID-19, and prevent harm to DSH's patients and staff, including the 298 *Coleman* class members in DSH's hospitals at the time of the temporary suspension.

22. It is my belief, based on my knowledge of COVID-19 and experience managing DSH's hospitals during this pandemic, as well as discussions with, and reports from, other state hospital systems across the country that experienced COVID-19 outbreaks, that immediate action was necessary and that a delay of even one day could have resulted in the introduction and spread of COVID-19 in DSH's hospitals. That situation could have led to a longer-term suspension of admissions and a decrease in DSH's ability to provide mental health care to its existing patients. The recent introduction and spread of COVID-19 at DSH-Patton—despite DSH's precautions—confirms that belief and supports the proactive and immediate decision DSH made to halt admissions of *Coleman* patients on March 16, 2020.

23. To the best of my knowledge, DSH did not have any confirmed COVID-19 positive patients in any of its hospitals when it temporarily suspended patient admissions and discharges. As of August 25, 2020, DSH did not have any confirmed COVID-19 positive patients in any of the units that treat *Coleman* class members. Indeed, DSH did not have its first confirmed COVID-19 positive patient until May 16, 2020, which was four weeks after DSH resumed

6

Decl. Clendenin Supp. Defs.' Mot. Modify  (2:90-cv-00520 KJM-DB (PC))

admissions of *Coleman* class members, and one week before it resumed admissions of its other patient classes.

24.  It is not possible for DSH to predict, prepare, and respond to every possible emergency situation without it having an effect on operations as they exist during non-emergent times.  DSH may have to take immediate action in the future to respond to a sudden emergency that threatens the health and wellness of its patient population and staff, and a delayed response could result in a tragic loss of health or life.  DSH may need to make emergency decisions in the future to save lives, and needs the ability to make those decisions quickly without delaying for a meet-and-confer process or litigation.

25.  Following the Court's April 24, 2020 and May 7, 2020 orders addressing DSH's temporary transfer suspension, it is my understanding that the Court expects DSH to not merely consult the Special Master before making an emergency decision to save lives, but DSH must also request permission from the Court to take emergency action that reduces the number or type of beds DSH provides to treat *Coleman* class members.

26.  I am concerned that even on a shortened or expedited schedule, a formal request to the Court, or final approval from the Special Master, will hinder DSH's ability to respond proactively to emergencies and result in harm to its patients and staff.  For example, before COVID-19, between January 2020 and February 2020, DSH hospitals received an average of approximately 10 *Coleman* admissions per week, and approximately 75 patient admissions per week overall.  Each of those transfers presented a risk to introducing COVID-19 into a DSH facility at a time when DSH had not had an opportunity to prepare and plan for space to safely admit patients and respond to any patients who contract the disease.  Given COVID-19's aggressive infectious nature, DSH was not prepared to appropriately mitigate the impacts of admitting a COVID-19 positive patient and the potential for a widespread outbreak in its facilities.

27.  If DSH is not able to respond immediately to an emergency, there is a great risk of potential harm to DSH staff and patients, as well as the community.  At any time when a patient living, or employee working, on a unit tests positive for COVID-19, DSH would immediately

7

quarantine those units, while it serially tests all patients and employees living and working on the unit to determine if additional patients or employees become positive for COVID-19. The patients and employees continue to be tested and the unit quarantined until it is determined that transmission is no longer occurring on the unit. When a unit is quarantined, DSH pauses patient admissions and discharges to the unit or units so that additional patients are not exposed to COVID-19. For example, if DSH had experienced a widespread COVID-19 outbreak at its hospitals it may have had to suspend admissions for a much longer period of time and greatly curtailed the amount of treatment available to patients already in its hospitals. This would have resulted in patients having to remain in county facilities longer. The same may be true for a future outbreak. Moreover, DSH is a forensic inpatient psychiatric hospital, and is not a community acute care hospital. DSH must transfer patients with severe COVID-19 symptoms to community hospitals for care as it does not have facilities equipped for that level of medical intervention. A severe outbreak could result in an increased number of hospitalizations in the community. And, a severe outbreak could expose more staff to COVID-19, decreasing staff levels in the hospital, and increasing exposure to members of the community who come in contact with staff members.

28.   My concerns are not limited to COVID-19 or similar emergencies. They also extend to wildfires, earthquakes, hostage situations, and other similar events. Wildfires and earthquakes are both unpredictable and not uncommon to California. For example, in 2017, a wildfire nearly required the evacuation of Napa State Hospital. If one of DSH's hospitals was threatened by, or suffered such an event, it would have to quickly evacuate and relocate a substantial patient population with significant mental health needs. The relocation of the population would likely require around the clock work for a number of days, as DSH found sufficient space and resources for its patients based on their individual medical, mental health, security, and other needs. DSH would not be able to admit or discharge any patients in such a situation. DSH would need to act in hours, if not minutes, and would not have the time to seek leave of the Court before or simultaneously while it carried out a task as large and intricate as evacuating and relocating a state hospital.

8

Decl. Clendenin Supp. Defs.' Mot. Modify  (2:90-cv-00520 KJM-DB (PC))

29. I understand that DSH has obligations in this case. DSH and I remain committed to continuing to timely communicate any actions, emergent or otherwise, to the Special Master that affect the *Coleman* class and the reasons for those actions. As DSH has done throughout this litigation, it will cooperate with the Special Master and his team's monitoring of DSH's actions as they relate to the *Coleman* litigation.

30. By allowing DSH to make immediate decisions in the face of life threatening or significantly dangerous emergencies, I believe that Defendants' proposed notification procedures concerning inpatient bed program changes accomplishes the flexibility that DSH needs to safely address emergency circumstances. It does not require DSH to pause its emergency response and potentially lose valuable response time. At the same time, the proposal requires DSH to notify the Special Master in a short period of time after any decision is made to close or change the number of mental health beds available. I believe this will maintain transparency and communication with the Special Master in a manner and within certain time parameters to ensure collaborative and informed decision-making. It also provides clarity to me and DSH regarding what is expected of us in our emergency response actions.

I declare under penalty of perjury that the information in this declaration is true and correct to the best of my knowledge. Executed on August 31, 2020, Sacramento, California.

*Stephanie Clendenin, Director*

CF1997CS0003

9

Decl. Clendenin Supp. Defs.' Mot. Modify  (2:90-cv-00520 KJM-DB (PC))