1    XAVIER BECERRA
     Attorney General of California
2    MONICA N. ANDERSON
     Senior Assistant Attorney General
3    ADRIANO HRVATIN
     Supervising Deputy Attorney General
4    ELISE OWENS THORN, State Bar No. 145931
     TYLER V. HEATH, State Bar No. 271478
5    KYLE A. LEWIS, State Bar No. 201041
     LUCAS HENNES, State Bar No. 278361
6    Deputy Attorneys General
       1300 I Street, Suite 125
7      P.O. Box 944255
       Sacramento, CA 94244-2550
8      Telephone:  (916) 210-7325
       Fax:  (916) 324-5205
9      E-mail:  Tyler.Heath@doj.ca.gov
     Attorneys for Defendants

     ROMAN M. SILBERFELD, State Bar No. 62783
     GLENN A. DANAS, State Bar No. 270317
     ROBINS KAPLAN LLP
       2049 Century Park East, Suite 3400
       Los Angeles, CA 90067-3208
       Telephone:  (310) 552-0130
       Fax:  (310) 229-5800
       E-mail:  RSilberfeld@RobinsKaplan.com
     Special Counsel for Defendants

10

11                 IN THE UNITED STATES DISTRICT COURT

12            FOR THE EASTERN DISTRICT OF CALIFORNIA

13                      SACRAMENTO DIVISION

14

15

16   **RALPH COLEMAN, et al.,**                    2:90-cv-00520 KJM-DB (PC)

17                              Plaintiffs,   **DECLARATION OF K. WARBURTON
                                              IN SUPPORT OF DEFENDANTS'**
18         **v.**                             **MOTION TO MODIFY**

19   **GAVIN NEWSOM, et al.,**

20                              Defendants.

21

22        I, K. Warburton, declare:

23        1.    I am the Medical Director and Deputy Director of Clinical Operations for the

24   California Department of State Hospitals (DSH), a position I have held since November 2011.  I

25   submit this declaration supporting Defendants' motion to modify the Court's orders under Federal

26   Rule of Civil Procedure 60(b).  I have personal knowledge of the statements in this declaration

27   and could testify to them if called to do so.

28

                                              1

1          2.     I received my Doctor of Osteopathic Medicine in 2001 from Midwestern University,

2   and completed my general adult psychiatry residency at Maine Medical Center.  I also completed

3   a fellowship in forensic psychiatry at the University of California, Davis.  I am licensed to

4   practice medicine by the Osteopathic Medical Board of California, and board certified in Forensic

5   Psychiatry and General Adult Psychiatry by the American Board of Psychiatry and Neurology.  I

6   am also currently an Associate Professor of Clinical Psychiatry at the University of California,

7   Davis, School of Medicine.

8          3.     Before becoming DSH's Medical Director, I worked as a psychiatrist in a number of

9   different settings inside and outside of DSH.  For example, I was an attending psychiatrist for the

10  Sacramento County Jail, attending psychiatrist at Napa State Hospital, acting Senior Psychiatrist

11  at Napa State Hospital, and Chief of Forensic Psychiatry at Napa State Hospital.

12         4.     As the Medical Director and Deputy Director of DSH's Clinical Operations, I oversee

13  the development and delivery of all clinical and medical care within DSH, the implementation

14  and evaluation of treatment protocols and policies, and communication with other systems and

15  experts to understand current standards and best practices.  I also oversee the clinical response to

16  emergencies and crises experienced by DSH's hospitals, such as the recent COVID-19 pandemic.

17  I am also familiar with the different types of patients DSH admits and treats and the general

18  demographic characteristics of those patients, including, but not limited to, clinical acuity and

19  medical comorbidity.  I am also familiar with the general physical characteristics of DSH's

20  hospitals, including the treatment and living environments for the different groups of patients, and

21  the particular risks that those spaces pose when infectious diseases are introduced into the

22  environment.

23         5.     I previously submitted a declaration in support of Defendants' response to the Court's

24  April 3, 2020 order to show cause.  At the time, DSH's temporary suspension of nearly all

25  admissions and discharges in response to the early spread of COVID-19 in California was still in

26  place.  I still support the statements made in that declaration based on the facts and information

27  available to me at the time.  It is still my opinion that DSH's decision to temporarily suspend

28

1   admissions and discharges was the clinically appropriate decision under the circumstances and

2   helped to prevent the spread of illness in DSH's population.

3        6.      A number of factors changed since that time, allowing DSH to start admitting and

4   discharging patients beginning on April 15, 2020, when DSH ended its temporary suspension of

5   *Coleman* class member admissions.  Specifically, COVID-19 testing became more available to

6   DSH, and DSH used the time during the temporary suspension to prepare plans and space to

7   safely admit patients.  DSH was also able to partner with public health experts from the California

8   Department of Public Health (CDPH) to develop plans for safe admissions and discharges and

9   outbreak response.  That collaborative work is ongoing.

10       7.      Based on my experience as DSH's Medical Director and knowledge of its facilities,

11  staff and patients, my research and understanding of COVID-19, my ongoing experience

12  responding to the COVID-19 pandemic, my discussions with officials from other state hospital

13  systems and review of information about those other systems, my opinion is that DSH requires

14  flexibility to respond to emergencies that threaten the life and health of its patients and staff.  In

15  certain circumstances, DSH does not have time to delay decisions, such as the decision to

16  temporarily suspend patient admissions and discharges, and wait for approval by the Special

17  Master, Court, and Plaintiffs.

18       8.      Even a short delay, while we wait for approval from the Special Master, Plaintiffs,

19  and the Court, could have devastating effects on DSH's patient population.  Before DSH's

20  temporary admission suspension, it was admitting new patients to all of its hospitals from up to

21  58 county jails and 35 CDCR prisons on a daily basis.  Without rapid widespread testing and

22  sufficient isolation and quarantine space, each of those patients presented a potential vector for

23  introducing COVID-19 into DSH.  During the suspension of admissions, DSH adopted new

24  admission protocols and prepared isolation and quarantine space to appropriately mitigate

25  potential introduction of the disease.  Now that admissions have resumed, even with these new

26  protocols, DSH's population remains vulnerable to this highly infectious disease and DSH may

27  need to take rapid and significant steps to prevent the spread of that disease.  In these

28  circumstances, DSH needs flexibility to make rapid decisions regarding patient admissions and

3

1    discharges to avoid the introduction of disease and possible illness and death.  DSH and its

2    medical officials are in the best position to make these decisions because they are familiar with

3    DSH's overall population, overall hospital structure and policies, and capabilities in a crisis.

4         9.    My experience, research, and ongoing consultation with CDPH have made me aware

5    that introduction of COVID-19 and other highly contagious viruses into DSH's facilities has the

6    potential to cause rapid disease spread, and a devastating loss of life in its susceptible patient

7    population.  DSH's patient population and the design of its physical facilities make it particularly

8    vulnerable.  DSH units are much larger than most other state hospitals, and most patients live in

9    dormitory-style bedrooms with multiple other roommates.  On DSH's units, most patient dining,

10   bathroom, congregate, and bedroom space is shared by patients and patients cannot be separated

11   to prevent COVID-19 spread.  Even after DSH worked to identify space for quarantine and

12   isolation, it remains limited due to the design of its physical facilities.

13        10.   DSH's patient population includes a large number of patients with conditions that

14   make them more vulnerable to the more severe effects of COVID-19 and other contagious

15   diseases.  A high percentage of DSH patients have complex medical co-morbidities, and a portion

16   of the patient population is housed in skilled nursing facilities.  Approximately 25 percent of

17   DSH's nearly 6,000 patients are over the age of 60.  And many of DSH's patients have serious

18   mental illnesses that make it difficult for them to follow masking, hygiene, and social distancing

19   requirements in its congregate setting.

20        11.   Severe disease and loss of life are not the only harms that would result from DSH

21   experiencing an outbreak in one of its facilities.  An outbreak would also severely limit DSH's

22   ability to provide mental health care to its patients.  Already staff must wear personal protective

23   equipment and patient movement has been significantly limited.  An outbreak requiring isolation

24   and quarantine would further reduce DSH's treatment milieu and the ability to deliver mental

25   health care to patients.  An outbreak also could require DSH to close an entire hospital to new

26   admissions, cutting off access to additional patients from across the state who may need care.

27        12.   The negative effects of an outbreak, from COVID-19 or another infectious disease,

28   are not isolated to DSH, but also impact the surrounding community.  DSH facilities are not

4

1 similar to acute medical care hospitals in the community.  They are not designed to treat medical

2 emergencies or psychiatric emergencies, such as those patients placed on a 72-hour hold for

3 assessment under Welfare and Institutions Code section 5150 because they are a danger to

4 themselves or others.  DSH only provides routine primary medical care.  Patients with more

5 serious or emergent illnesses must be sent out to community hospitals.  This would include those

6 patients who experience the more severe effects of COVID-19.  Those patients must be taken to a

7 community acute care hospital for treatment.  Moving the patients to community hospitals

8 impacts community resources and risks infecting staff at the community hospital and transport

9 staff.  Comparisons of DSH facilities to community acute medical care hospitals and the guidance

10 for managing COVID-19 for those hospitals are completely inaccurate and inappropriate.

11        13.    It is also possible for the disease to spread out of DSH's facilities.  DSH and its staff

12 are taking extreme precautions to protect themselves and patients with daily screenings and the

13 use of personal protective equipment, among other measures.  However, its staff are still in close

14 contact with patients and risk contracting the disease, and taking it home to their families and

15 surrounding community.

16        14.    If a facility is forced to close to admissions due to an outbreak at that location, DSH

17 will likely also have to halt the admissions of new patients to that facility, including those referred

18 to DSH by the counties and superior courts around the state, as DSH is the primary provider of

19 inpatient mental health care for justice-involved persons with serious mental illness in California.

20        15.    An immediate closure could be required of an individual unit or an entire hospital.  At

21 any time when a patient living, or employee working, on a unit tests positive for COVID-19, DSH

22 would immediately quarantine those units, while it serially tests all patients and employees living

23 and working on the unit to determine if additional patients or employees become positive for

24 COVID-19.  The patients and employees continue to be tested and the unit quarantined until it is

25 determined that transmission is no longer occurring on the unit.  When a unit is quarantined, DSH

26 pauses patient admissions and discharges to the unit or units so that additional patients are not

27 exposed to COVID-19.  Depending on the extent of the positive cases, DSH may need to halt

28 admissions and discharges to the entire hospital.  For example, DSH-Patton is currently

5

1    experiencing a COVID-19 outbreak.  As of August 28, 2020, the cumulative total of confirmed

2    positive cases is 148 among patients and 135 positive cases among staff.  The hospital is

3    temporarily closed to all admissions except those that are required by state law and cannot be

4    suspended and 6 of its units are on quarantine, including all of its admissions units.  COVID-19

5    spread extremely fast at DSH-Patton and has been challenging to contain.  The most effective

6    measures at preventing illness are limiting the introduction of the disease, rather than trying to

7    contain it once patients are already infected.

8        16.    I am in regular contact with my colleagues in other states about COVID-19.  We are

9    sharing best practices, protocols, and information in real time.  I am also regularly reviewing

10    media and other reports about COVID-19's effects on other state hospital systems.  Based on

11    those conversations and my review, I believe that hospital systems that did not immediately limit

12    or suspend patient admissions during the initial spread of COVID-19 in the United States

13    experienced serious outbreaks and loss of life.  For example, according to an April 17, 2020 NBC

14    News report, at least 1,450 patients tested COVID-19 positive in state mental health facilities in

15    23 states.

16        17.    To the best of my knowledge, DSH did not have any confirmed COVID-19 positive

17    patients at the time it temporarily suspended admissions and discharges to DSH hospitals.  DSH

18    did not have its first confirmed COVID-19 positive patient until May 16, 2020, and as of August

19    25, 2020, none of DSH's *Coleman* class member patients test positive for COVID-19.  To the

20    best of my knowledge, DSH did not experience its first confirmed positive patient case until 4

21    weeks after DSH resumed admissions of *Coleman* class members, and one week before it

22    resumed admissions of its other patient classes.  I believe that DSH's temporary suspension of

23    patient admissions prevented DSH from having confirmed positive cases for as long as it did.

24    The suspension prevented transfers from vulnerable prison institutions and allowed DSH time to

25    acquire testing capacity and to work in partnership with CDPH to develop and follow careful

26    admission and discharge procedures.  These essential measures have helped prevent and contain

27    outbreaks throughout our system, including DSH's *Coleman* population.

28

6

18.     The COVID-19 pandemic is not at an end and it does not appear that its threat will abate soon.  With cases recently rising across the United States and in California, it remains critical that DSH be able to take immediate action, including closing admissions and discharges to its hospitals, to prevent widespread outbreak and emergencies that threaten the lives and well-being of its patients and staff, as well as its ability to provide mental health treatment to its current and future patients.

19.     Despite the need to act quickly and decisively in this emergency, I understand the Court's concern with closing or limiting the number of beds available for patients in need of mental health care, and I remain committed to continuing to work with the Special Master and his experts regarding any actions we take in the face of this emergency and future emergencies that affect the beds available to treat *Coleman* class members in DSH.  I also remain committed to work with the Special Master and his experts in the Task Force meetings and small group meetings during the COVID-19 pandemic to address this current ongoing emergency.

I declare under penalty of perjury that the information in this declaration is try to the best of my knowledge.  Executed on August 31, 2020, Sacramento, California.

_____
K. Warburton
*Original Signature Retained by Attorney*

CF1997CS0003

7