UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

No.  2:90-cv-0520 KJM DB P

ORDER

In an order filed July 12, 2018, this court directed the Special Master to begin recommending "specific benchmarks that, when met, signal constitutional compliance" and to "include, as appropriate, specific recommended compliance percentage requirements for each benchmark," starting with the Twenty-Eighth Round Monitoring Report.  July 12, 2018 Order, ECF No. 5852 at 3.[1]  Subsequently, the court signaled it was "contemplating setting its own process for establishing benchmarks."  March 17, 2020 Order, ECF No. 6509, at 2.  The court discussed its proposed process with the parties at the second quarterly status conference for this year, held on July 17, 2020.  *See* Reporter's Transcript of Proceedings (July 17 RT), ECF No. 6781, at 11-16.  Specifically, the court proposed directing the parties to address why the

---

[1] References to page numbers in documents filed in the Court's Electronic Case Filing System (ECF) are to the page numbers assigned by ECF and located in the upper right hand corner of the page.

1  "benchmarks" the Special Master has in fact been using for years in his monitoring should not be

2  confirmed by the court. *Id*. at 11.  Defendants proposed an alternative, namely, that within one

3  hundred twenty days they propose benchmarks to the Special Master and the plaintiffs to start the

4  discussion. *Id*. at 13.  Plaintiffs opposed the defense proposal as a "delaying tactic." *Id*. at 15.

5  The defendants demurred, and the court accepted in good faith defendants' representation that

6  their proposal was not made for purposes of delay, *id*. at 16, noting their agreement to wait for the

7  court's clarification.  As explained below, the court now confirms the framework developed over

8  the past twenty-five years for the requirements defendants must satisfy to achieve compliance

9  with the Constitution and against which their progress toward constitutional compliance is being

10  measured.  In the context of that framework, the court also clarifies the proper role of

11  "benchmarks" going forward.  The court also directs the parties to file briefing addressed to

12  certain discreet matters.

13  I.  DEVELOPMENT OF REMEDIAL FRAMEWORK

14  A.  Eighth Amendment Violations

15  As the court explained in 2013, "[t]he Eighth Amendment violations in this case

16  predate 1994, when they were found by the magistrate judge after a lengthy trial."  February 28,

17  2013 Order, ECF No. 4361, at 3.  More recently, approximately one year ago, the court again

18  reviewed the district court's 1995 order confirming those findings and calling out twelve areas of

19  deficiency after consideration of numerous defense objections:

20  > To review again, in 1995 the court found defendants in violation of
> their Eighth Amendment duty to provide California's seriously
21  > mentally ill prison inmates with access to adequate mental health
> care. *Coleman v. Wilson*, 912 F.Supp. 1282. Specifically, the court
22  > found (1) defendants lacked "a systematic program for screening and
> evaluating inmates for mental illness," *id*. at 1305; (2) California's
23  > prison system was "significantly and chronically understaffed in the
> area of mental health care services "and defendants did "not have
24  > sufficient staff to treat large numbers of mentally ill inmates" in
> prison, *id*. at 1307; (3) defendants had no quality assurance program
25  > to ensure competence of staff, *id*. at 1308; (4) there were significant
> delays in access to mental health care throughout the system that
26  > "result[ed] in exacerbation of illness and patient suffering," *id*. at
> 1309; (5) "'defendants' supervision of the use of medication [was]
27  > completely inadequate; prescriptions [were] not timely refilled, there
> [was] no adequate system to prevent hoarding of medication, there
28  > [was] no adequate system to ensure continuity of medication,

2

inmates on psychotropic medication [were] not adequately monitored, and . . . some very useful medications [were] not available because there is not enough staff to do necessary post-medication monitoring,'" *id*. (quoting June 6, 1994 Findings and Recommendations at 50); (6) several deficiencies in the availability and utilization of involuntary medication, *id*. at 1311-13; (7) the absence of any adequate systemwide procedures for use of mechanical restraints on seriously mentally disordered inmates, *id*. at 1313-14; (8) an "'extremely deficient'" medical records system, *id*. at 1314 (quoting Findings and Recommendations at 61); (9) inadequate implementation of defendants' suicide prevention program, *id*. at 1315; (10) inadequate training of custodial staff "in the identification of signs and symptoms of mental illness," *id*. at 1320; (11) placement of seriously mentally ill inmates in administrative segregation and segregated housing units "without any evaluation of their mental status" and without access to necessary mental health care while housed in such units, *id*.; and (12) use of tasers and 37mm guns against class members without considering whether the behavior leading to use of the weapon was caused by mental illness, or the impact of such weapon's use on that illness, *id*. at 1321.

July 9, 2019 Order, ECF No. 6214, at 5-6.  In late 1995, the court appointed a Special Master to "monitor compliance with the court-ordered injunctive relief," *Coleman v. Wilson*, 912 F. Supp. 1282, 1324 (E.D. Cal. 1995); *see* ECF Nos. 639 (Order Appointing Special Master), 640 (Order of Reference setting out powers and duties of Special Master); *see also* ECF No. 6214 at 6 ("To remedy these violations, the court 'directed defendants to work with the Special Master to develop and implement' remedial plans. *Coleman v. Brown*, 938 F. Supp. 2d 955, 972 (E.D. Cal. 2013).").

Since 1995, the full development of a comprehensive remedy has taken up more than two decades.  Implementation of the remedy is ongoing, some interim deadlines have been set, and as reviewed here the court has identified the mechanism by which, ultimately, the durability of the remedy will be assessed.

B.     Remedial Plans

In the July 9, 2019 order, the court "clarifie[d] for the record that remedial planning for this action is substantially complete."  ECF No. 6214, at 4.  The court explained that

[t]he remedial phase of this action has been shaped by the court's early recognition that in a case of this magnitude and complexity "the standards for compliance with the Eighth Amendment must and indeed 'can only be developed contextually.'" *Coleman v. Brown*, 938 F.Supp.2d at 971 (quoting *Coleman v. Wilson*, 912 F.Supp. at

1

> 1301).  Thus, the complete remedy for the Eighth Amendment violations identified by the court has continued to evolve over the past two decades while implementation of court-approved and court-ordered components of the remedy has been ongoing.

*Id*. at 6-7.  The court also laid out the history of remedial planning in this action.  That history shows that over the course of twenty-three years the court has given first provisional and then final approval to a comprehensive set of plans for remediation of the identified constitutional violations.  *See id*. at 8-14.  In its order filed August 3, 2020, the court clarified that the primary court-approved remedial documents in this action are the California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) Program Guide (Program Guide) and the Compendium of Custody Related Remedial Measures (Compendium).  August 3, 2020 Order, ECF No. 6806, at, *e.g.*, 9.  These two remedial documents and the court-approved plans in aid of the remedies they contain are reviewed below.

### 1.   Program Guide

The Program Guide is defendants' plan, approved by the court, to remedy identified violations in the delivery of mental health care to the plaintiff class.  *See* ECF No. 4361 at 2-6 (discussing history of development of Program Guide as remedial plan for identified constitutional violations); *see also Coleman v. Brown*, 756 Fed. Appx. 677, 679 (9th Cir. 2018) (it is "established that the Program Guide sets out the objective standards that the Constitution requires in this context. . . .").  The operative edition of the Program Guide is the 2018 Program Guide Revision, ECF No. 5864-1, which the court approved in July 2019.  *See* ECF No. 6214.

> The 2018 Program Guide Revision consists of:  Chapters 1 through 10 of the Program Guide 2009 Revision; Appendix A, a glossary of terms; Appendix B, a list of 68 policies that the Special Master and the parties agree should be included in the current consolidated Program Guide . . . ; Appendix C, an index to the same policies listed in Appendix B and a complete copy of each policy, . . .; Appendix D,5 a memo clarifying "several changes to Chapter 6 of the Program Guide (2009 Revision) concerning inpatient care,"; and Appendix E,6 which contains "policies that are currently in flux and by agreement will be reviewed by the parties and the Special Master at a later time to determine whether they are appropriate for inclusion in the Program Guide." (citation omitted).

*Id*. at 2-3.

1    The court has ordered development of several additional remedial measures in aid

2 of full implementation of the Program Guide, including (1) semi-annual mental health population

3 projection plans, *see* October 20, 2006 Order, ECF No. 1998 & July 9, 2009 Order, ECF No.

4 3629; (2) short-term, intermediate, and long-range bed plans, *see, e.g.*, March 31, 2009 Order,

5 ECF No. 355; and (3) a staffing plan, *see* June 18, 2009 Order, ECF No. 3613, at 2, *see also*

6 Defendants' Staffing Plan, ECF No. 3693.[2]

7    In addition, in February 2015 the court ordered defendants to adopt specific

8 measures recommended by the Special Master, ECF No. 5258 at 5-9, following an audit report by

9 his suicide prevention expert, Lindsay Hayes, ECF No. 5259.  February 3, 2015 Order, ECF No.

10 5271, at 3.[3]  On January 25, 2018, the court adopted the Special Master's recommendation to

11 withdraw three of the measures, items 14, 15, and 16 on the list, included as Attachment A to this

12 order.  January 25, 2018 Order, ECF No. 5762, at 3.  Defendants' work on full implementation of

13 the remaining action items is ongoing, *see*, *e.g.*, Special Master's Report on His Expert's Third

14 Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department

15 of Corrections and Rehabilitation, ECF No. 5993, at 8-9, and the court has signaled a deadline for

16 their completion, July 3, 2019 Order, ECF No. 6212, at 12-14.  By this order, the court confirms

17 that defendants must complete any and all remaining work so that Mr. Hayes can report full

18 compliance in his fifth re-audit report.  As noted below, the court anticipates reviewing with

19 defendants, as necessary, the steps remaining to full compliance after the Special Master files

20

21

_____

22    [2] The Program Guide provides the structure for delivery of mental health care in CDCR's
MHSDS, including but not limited to diagnostic criteria and treatment requirements at each level
23 of care.  The population projections, bed planning and staffing plan are all key to implementation
of the Program Guide, but are not directly incorporated in the Program Guide.  The population
24 projections forecast the size of the mental health population for five year periods and support
planning for future bed and treatment space needs as well as staffing requirements.
25

26    [3] The complete list of recommendations contained in the Special Master's Report, ECF
No. 5258, is set out in Attachment A to this order.  One of those recommendations, identified as
27 number 30 on the list in Attachment A, was subsequently identified as redundant of number 14
and Mr. Hayes has not separately re-audited it.  *See*, *e.g.*, ECF No. 5396 at 22.
28

1  Mr. Hayes' fourth re-audit report.  The Special Master has circulated that report in draft form and

2  currently anticipates filing it soon.

3                  2.    <u>Compendium</u>

4          Remedies for defendants' Eighth Amendment violations in custodial practices are

5  found in state regulations and provisions of the CDCR Department Operations Manual (D.O.M.)

6  as well as in departmental memoranda and court orders.  The custody remedies are set out in a list

7  styled "Negotiated Court-Ordered Remedial Measures Related to Custodial Issues Not Included

8  in the 2018 Program Guide,"  Appendix A to Parties' Supplemental Joint Submission of Custody-

9  Related Policies and Orders Required by July 9, 2018 Order , ECF No. 6431, and now referred to

10 as the Compendium; the court approved the Compendium on February 11, 2020, as the complete

11 list of custodial remedies.  February 11, 2020 Order, ECF No. 6460, at 2.

12         The court also has required development of a Custody and Mental Health

13 Partnership Plan (CMHPP) in aid of attaining a "collaborative culture between custody and

14 mental health staff in each prison institution that houses mentally ill inmates," a necessary

15 component of a constitutionally adequate prison mental health care delivery system.  August 9,

16 2016 Order, ECF No. 5477, at 6.  The initial CMHPP was filed September 10, 2018, ECF No.

17 5916, and the court approved it in February 2019, requiring that it be "expanded to provide for

18 training focused at the CCCMS (Correctional Clinical Case Management System) programs and

19 the custody staff who interact with inmates and mental health staff in those programs," February

20 20, 2019 Order, ECF No. 6095, at  6.  Defendants filed the required update on September 12,

21 2019.  ECF No. 6278.  In October 2019, the court approved the update and ordered its

22 implementation under the timelines specified in the update.  October 8, 2019 Order, ECF No.

23 6314.[4]

---

[4] Currently only the court's February 20, 2019 order is included in the Compendium.  The initial and updated CMHPP and the court's October 8, 2019 order will be added to the Compendium in the update to the Program Guide and the Compendium due September 1, 2021.

1    II.      PRIOR EFFORTS TO FOCUS IMPLEMENTATION

2                As the court reviewed in its February 28, 2013 order, on June 27, 1997, the court

3    ordered defendants to start implementing the first set of provisionally-approved remedial plans[5]

4    and "directed the Special Master to begin monitoring defendants' implementation of and

5    compliance with those plans, and to file quarterly monitoring reports."  ECF No. 4361 at 5.  As of

6    this date, the Special Master has filed twenty-seven monitoring reports, which the court has

7    adopted in full or in part after review of any objections made by the parties.  In this section, the

8    court recaps the last decade of effort to focus implementation efforts in aid of completion of a

9    durable remedy and the end of federal court oversight.[6]

10   _____

11       [5] The first set of plans comprised "six volumes of materials, including program guides,
     policies, plans, policy and procedure manuals, forms, training materials and memoranda."
12   Special Master's Report on Plans, Dkt. No. 850, at 1.  Volume I was identified as "California
     Department of Corrections (CDC) Mental Health Services Delivery System Program Guides";
     Volume II was identified as "Mental Health Services Delivery Systems Training Materials";
13   Volume III was identified as "*Coleman* Documents, the so-called Blue Book, which contains a
     miscellany of materials including memoranda, reports, bulletins, procedures, etc., keyed to the
14   *Coleman* court order; Volume IV contained the prison system's drug formulary; Volume V was
     identified as the "Mental Health Services Delivery System Mental Health Forms Orientation
15   Handbook"; and Volume VI was identified as the "Correctional Treatment Center Policy and
     Procedure Manual:  Health Records Service; Pharmacy; and Mental Health Volumes."  *Id*. at 2.
16   In the June 6, 1997 Report on Plans,  the Special Master reported on the status of remedial efforts
     in all twelve areas identified in the court's original order.  *Id*. at 2-20.  The Special Master
17   reported the parties had agreed that policies adopted "for the use of force against seriously
     mentally disordered inmates" would be integrated into CDCR's "general policies governing use
18   of force."  *Id*. at 2.  The Special Master also reported that, while defendants did not agree mental
     health clinicians should "influence decisions on institutional, staff and inmate safety, unless, of
19   course, the accused inmate is undergoing some sort of mental health crisis and in need of acute
     inpatient care," there was general agreement that input from mental health clinicians "into the
20   subsequent disposition of disciplinary adjudications is both critical and appropriate."  *Id*. at 14-15.
     The Special Master also reported he and the parties had "reviewed and discussed the defendants'
21   policy on the use of mechanical restraints and agreed to a mutually acceptable version of that
     policy" in spite of a legal question about whether the September 13, 1995 order required such
22   relief, and that questions existed about "the extent to which defendants' suicide prevention plan,
     policies and practices are subject to the remedial order and the master's review."  *Id*. at 20.
23   "Suicide prevention and policy became an issue subject to monitoring by the special master in
     late 1998 when the court approved the parties' agreement for the merger of *Gates v. Deukmejian*,
24   No. CIV S-87-1636 LKK JFM P (*Gates*) into this action and for dismissal of the *Gates* action."
     December 22, 2000 Order, ECF No. 1229, at 1 n.1.
25
26       [6] The decade covered by this section began after the court's July 23, 2007 order
     recommending a three-judge court be convened to address overcrowding as the primary cause of
27

28

                                        7

A.      The Seven General Goals

In his Twenty-Second Round Monitoring Report, filed in March 2011, the Special Master identified seven "projects" to be completed by defendants as part of a "comprehensive" effort in aid of full implementation of the two primary remedial plans in this action, the Program Guide and the Compendium:

> (1) re-evaluate and update CDCR suicide prevention policies and practices; (2) make sure that seriously mentally ill inmates are properly identified, referred, and transferred to receive the higher levels of mental health care that they need and that are only available from [the Department of State Hospitals (DSH)]; (3) review and comply with all elements of their Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days; (4) complete the construction of mental health treatment space and beds for inmates at varying levels of care; (5) implement fully their new mental health staffing plan; (6) train staff for greater collaboration between custody and mental health; and (7) refine and implement MHTS.net to its fullest extent and benefit.

ECF No. 3990 at 474-75.

As reviewed in Section I(A) above, the court identified twelve areas of major deficiency in its 1995 order:  (1) the absence of a systematic mental health screening and evaluation program; (2) significant and chronic understaffing; (3) the absence of a quality assurance program; (4) significant delays in access to necessary mental health care throughout the system; (5) inadequate medication management; (6) several deficiencies in the availability and utilization of involuntary medication; (7) no systemwide procedures for use of mechanical restraints on class members; (8) completely inadequate medical records system; (9) inadequate implementation of defendants' suicide prevention program; (10) inadequate training of custodial

---

ongoing violations in the delivery of mental health care to California's prisons.  July 23, 2007 Order, ECF No. 2320.  That order found "ongoing violations includ[ing] delays in access to mental health crisis beds, acute inpatient care, and intermediate inpatient care; inadequate capture, collection, and analysis of data necessary to long-range planning for adequate delivery of mental health care; unacceptably high staffing vacancies; insufficient program space; and insufficient beds for mentally ill inmates."  *Coleman v. Brown*, 938 F. Supp. 2d at 970 (citing ECF No. 2320 at 6).

8

1  staff "in the identification of signs and symptoms of mental illness," *Coleman v. Wilson*, 912

2  F. Supp. at 1320; (11) placement of seriously mentally ill inmates in administrative segregation

3  and segregated housing units "without any evaluation of their mental status" and without access

4  to necessary mental health care while housed in such units, *id*.; and (12) use of tasers and 37mm

5  guns against class members without considering whether the behavior leading to use of the

6  weapon was caused by mental illness, or the impact of such weapon's use on that illness, *id*. at

7  1321.

8        The seven projects the Special Master identified in 2011 were directly connected

9  to and focused attention on several of those twelve areas.  The Special Master reported that these

10  "system-wide projects . . . promise to result in improved institutional capability to treat and

11  manage mentally ill inmates," ECF No. 3990 at 17, and that "[t]he scale of these projects is

12  matched only by the enormity of improvement that is promised upon their successful

13  completion."  *Id*. at 475.  In his Twenty-Third Monitoring Report, the Special Master referred to

14  these projects as "seven general goals" and found "progress toward some of" them.  ECF No.

15  4214 at 85.

16        In its August 30, 2012 order adopting the findings and recommendations of the

17  next Twenty-Fourth Monitoring Report in full, the court held that "[m]eeting each of these goals

18  is critically important."  August 30, 2012 Order, ECF No. 4232, at 5 n.3.  And in its April 5, 2013

19  order denying defendants' motion to terminate these proceedings, the court noted "[t]he specific

20  goals track ongoing violations identified by this court in its July 23, 2007 order recommending

21  that a three-judge court be convened to consider a prisoner release order"; the court observed that

22  several of the goals "are tied to constitutional deficiencies described by the United States

23  Supreme Court in its 2011 Opinion affirming the three-judge court's population reduction order."

24  *Coleman v. Brown*, 938 F. Supp. 2d at 970 (quoting *Brown v. Plata*, 563 U.S. 493 (2011)).  In

25  other words, progress toward these seven goals has informed the court's assessment of

26  defendants' remedial efforts for more than a decade.

27  /////

28  /////

B.      The Continuous Quality Improvement Tool (CQIT)

The continuous quality improvement tool, known as CQIT, is a comprehensive tool that, once finalized, defendants will ultimately use as part of a process to "self-monitor" the key components of the remedy in this action.  *See* ECF No. 5439 at 108.  Work on CQIT started in late 2012, and by early January 2013 "key indicators" for the tool "had been identified and a prototype of the audit tool had been developed."  *Id.*  After the court's 2013 denial of defendants' termination motion  as well as a summer pilot of CQIT and its associated auditing process, it became clear "that CQIT's capacity to accommodate and utilize information on the quality of mental health care needed expansion in order for the tool" to encompass measures to assess the need for and accomplishment of improvements in quality of care.  *Id.* at 110.

In early 2014, the court declined to set additional deadlines for completion of the continuous quality improvement process, and instead reiterated

> that defendants' development and implementation of an improved quality improvement process is fundamental to ending federal court oversight in this action. It is grounded in this court's obligation to end its supervision of defendants' delivery of mental health care to members of the plaintiff class when defendants have implemented a durable remedy for the Eighth Amendment violations in the delivery of that care. A key component of a durable remedy is the development and implementation of an adequate quality improvement process by which defendants will self-monitor, and as necessary, self-correct inadequacies in the delivery of mental health care to the thousands of seriously mentally ill inmates incarcerated in California's prisons. Defendants are required to work under the guidance of the Special Master, with input from plaintiffs' counsel, on this task until it is completed.

February 27, 2014 Order, ECF No. 5092, at 4-5.  In his Twenty-Sixth Round Monitoring Report, filed in May 2016, the Special Master reported that CQIT had been updated and vetted with all stakeholders and that CDCR would "conduct a trial implementation of the tool at ten selected institutions during the upcoming Twenty-Seventh Monitoring Round."  ECF No. 5439 at 113.

In his Twenty-Seventh Round Monitoring Report, the Special Master reported that developments in the use of CQIT "were promising," ECF No. 5779 at 17, and that work to improve the audit process and report writing was ongoing, *id.* at 55-64.  As discussed below in Section III(B)(1), during this initial pilot period, defendants attempted to unilaterally change the

1    compliance monitoring standard from 90 percent to 85 percent.  The court disapproved this

2    change in its July 12, 2018 order adopting the Twenty-Seventh Round Monitoring Report and

3    required defendants to report "all degrees of compliance with monitored Program Guide

4    requirements, from zero percent to 100 percent."  ECF No. 5852 at 2.

5        C.    Order on Defendants' January 2013 Termination Motion.

6              On January 7, 2013, defendants filed the motion to terminate this action under

7    18 U.S.C. § 3626(b), referenced above.  ECF No. 4275.  In denying the motion, the court

8    articulated an important principle that remains relevant today:  it reiterated the need for contextual

9    development of Eighth Amendment standards in this case and reminded all stakeholders that

10                  [a]s the history of this "complex and intractable constitutional
                    violation" shows, the prospective relief required for the delivery of
11                  constitutionally adequate mental health care to over 32,000 mentally
                    ill prison inmates is not "susceptible of simple or straightforward
12                  solutions." *Brown v. Plata*, 131 S. Ct. at 1936. *See also Armstrong
                    v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010)
13                  ("Prospective relief for institutions as complex as prisons is a
                    necessarily aggregate endeavor, composed of multiple elements that
14                  work together to redress violations of the law.")

15   *Coleman v. Brown*, 938 F. Supp. 2d at 971-72.  The court found ongoing constitutional violations

16   in multiple areas covered by the Program Guide, including suicide prevention, treatment of

17   mentally ill inmates in administrative segregation units, inadequate numbers of mental health

18   crisis beds, insufficient treatment space and program beds, and inadequate staffing levels which,

19   as the court observed, "has plagued the delivery mental health care in CDCR prisons for

20   decades."  *Id*. at 973-88.

21             At the same time, the court found "new" "gains in timely and adequate access to

22   inpatient care."  *Id*. at 982.  While the court observed that these gains represented "significant

23   progress in remedying one of the most tragic failures in the delivery of mental health care," more

24   work remained.  *Id*.  The gains did not in fact hold and, as discussed below, in 2017 the court

25   issued an enforcement order to address slippage in the timeliness of transfer to inpatient care.

26             In denying the termination motion, the court found outstanding orders for

27   prospective relief, that it had issued in the preceding four years, "remain necessary to correct

28   current and ongoing violations in the delivery of adequate mental health care to plaintiff class

1   members." *Id*. at 990 (citing ECF No. 4409 (plaintiffs' separate statement of court orders issued

2   over four years preceding termination motion)[7]).

3        D.    <u>Litigation in 2013 and 2014</u>

4          The court denied defendants' termination motion on April 5, 2013.  *Coleman v.*

5   *Brown*, 938 F. Supp. 2d at 990.  On April 11, 2013, plaintiffs filed the first of three motion for

6   enforcement of existing orders and additional relief, a motion regarding inpatient mental health

7   treatment.  ECF No. 4543.  The second, filed May 6, 2013, focused on "improper housing and

8   treatment of seriously mentally ill prisoners in segregation," ECF No. 4580, and the third, filed

9   May 29, 2013, focused on the use of force and disciplinary measures on class members, ECF

10   No.4638.

11         From June 19, 2013 through June 24, 2013, the court held evidentiary proceedings

12   on seven issues raised in the first motion concerning care and treatment of class members at

13   inpatient mental health programs operated by DSH.  *See* ECF Nos. 4663, 4664, 4670, 4671.

14   Approximately two weeks later, on July 11, 2013, the court issued an order granting in part and

15   denying in part this aspect of the first motion.  July 11, 2013 Order, ECF No. 4688.  The court

16   directed the Special Master to "report to the court on the adequacy of staffing levels at the Salinas

17   Valley Psychiatric Program SVPP; and on whether the so-called cuff or orientation status, either

18   as designed or as implemented, unduly interferes with or delays the provision of necessary care to

19   class members at SVPP" and to "complete one round of monitoring the adequacy of all inpatient

20   programs and report to the court thereon not later than March 31, 2014."  *Id*. at 13-14.

21         Over two separate periods, the first between October 1, 2013 and November 7,

22   2013, and the second between November 19, 2013 and December 19, 2013, the court held

23   twenty-eight days of evidentiary proceedings on the remaining part of the first motion and the

24   issues raised by plaintiff's second and third motions.  *See*, *e.g.*, ECF Nos. 4855, 4916, 4942,

25   4972.  On December 10, 2013, the court granted in part and denied in part the issues that

26

27       [7] These orders covered availability of necessary mental health beds and program treatment
space, access to inpatient care, suicide prevention, and the quality improvement/assurance
process. *See* ECF No. 4409, *passim*.

28

1    remained from the first motion; the court ordered defendants, under the supervision of the Special

2    Master, to conduct a study of unmet needs for inpatient mental health care on San Quentin's death

3    row and develop a durable remedy to provide these class members with access to necessary

4    inpatient care.  December 10, 2013 Order, ECF No. 4951, at 27-28.  On April 10, 2014, the court

5    granted in part and denied in part the other two motions.  *Coleman v. Brown*, 28 F. Supp. 3d 1068

6    (E.D. Cal. 2014).  The court made extensive findings and ultimately made the following orders:[8]

> (1)  Defendants were directed to work under the Guidance of the Special Master to revise their use of force policies and procedures and to complete the required revisions by August 1, 2014.
>
> (2)  The Special Master was directed to report to the court within six months of the April 10, 2014 order whether defendants had adequately implemented the RVR policies and procedures agreed to in 2011.
>
> (3) Defendants were directed to work with the Special Master on a timeline for completion of their review of the use of management status so that this practice could be reviewed by the Special Master as part of his review of the implementation of defendants' RVR policies and procedures.
>
> (4)  Defendants were required to file, not later than August 1, 2014, a plan to limit or eliminate altogether placement of class members removed from the general population for non-disciplinary reasons in administrative segregation units that house inmates removed from the general population for disciplinary reasons and to be prepared to fully implement the plan not later than September 1, 2014. Defendants were also direct to, if feasible, commence forthwith to reduce the number of Coleman class members housed for non-disciplinary reasons in any administrative segregation unit that houses disciplinary segregation inmates; feasibility shall be determined by the Special Master. Starting September 1, 2014, defendants were prohibited from placing any class members removed from the general population for non-disciplinary reasons for more than seventy-two hours in administrative segregation units that

---

[8] The court made a series of orders in the April 10, 2014, *see* 28 F. Supp. 3d at 1108-09. By order filed May 13, 2014, ECF No. 5150, some of those orders were modified and deadlines were extended and another order was modified in an August 29, 2014 order, ECF No. 5212.  In addition, in orders filed July 25, 2014, ECF No. 5189, August 15, 2014, ECF No. 5195, and August 27, 2014, ECF No. 5207, the court granted additional extensions of some of the deadlines originally set in the April 10, 2014 order and extended by the May 13, 2014 order.  The list provided in the body of the order here is the ultimate list of orders that followed the proceedings on plaintiffs' May 6, 2013 and May 29, 2013 motions, incorporating all amendments, modifications, and ultimate deadlines.

house inmates removed from the general population for disciplinary reasons.

(5)  Defendants were required to  work under the guidance of the Special Master to develop by August 29, 2014 a protocol for administrative segregation decisions, including, as appropriate, a plan for alternative housing, that would preclude placement of any *Coleman* class member in existing administrative segregation units when clinical information demonstrates substantial risk of exacerbation of mental illness, decompensation, or suicide from such placement.

(6)  Beginning August 1, 2014, defendants were required to provide to the court and the Special Master monthly reports on whether each EOP ASU hub meets Program Guide requirements for an EOP ASU level of care. Commencing October 1, 2014, defendants were prohibited from admitting any Coleman class member at the EOP level of care to any EOP ASU hub that has failed to meet or exceed Program Guide requirements for a period of more than two consecutive months. Commencing October 1, 2014, defendants were prohibited from placing any class member at the EOP level of care in any administrative segregation unit during any period in which there are an insufficient number of EOP Ad Seg Hub beds available unless failure to remove the inmate from the general population presents an imminent threat to life or safety.

(7)  Defendants were required to filed by August 1, 2014  a revised policy concerning strip searches in EOP ASU hubs.

(8) Beginning August 29, 2014, defendants were required to follow their court-approved CCCMS-Long Term Restricted Housing (CCCMSLTRH) plan instead of placing class members in security housing units (SHUs).

E.     Road Map to End of Federal Court Oversight

In 2016, in yet another effort to focus remaining work and achieve "complete remediation . . . in the foreseeable future," the court laid out a "road map to the end of federal court oversight."  ECF No. 5477 at 2.  As the court described in that order, it included in the road map as key markers completion of the seven goals first identified by the Special Master in 2011, and additional duties added by the December 2013 and April 2014 court orders described in Section II(D) above.  *See* ECF No. 5477 at 3.  The court also required durable implementation of the provisions of the "final settlement in *Hecker v. CDCR*, No. 2:05-cv-2441 KJM DAD, a class action brought under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA), which merged some remaining ADA and RA issues into this action and its monitoring process. *See* ECF No. 5439 at 67-75." *Id.*  The remedial requirements the court referenced in the

14

1   2016 order were nothing new; they all are consolidated in the two primary remedial documents,

2   the Program Guide and the Compendium, and the accompanying plans described in Section I(B)

3   above.[9]

4           Finally, and significantly for purposes of this order, the road map contemplates full

5   development and implementation of the robust continuous quality improvement process described

6   in Section II(B), *supra*.  Reiterating prior orders, the court in its August 9, 2016 order again

7   emphasized the importance of the continuous quality improvement process:

8               [I]n adopting the Special Master's Twenty-Fourth Round Monitoring
                Report in 2012, the court "emphasize[d] in particular its complete
9               concurrence with the Special Master's finding that '[a]n important
                goal of the remedial phase of this case is, . . ., for CDCR itself to
10              assume the mantle of ultimate responsibility for diagnosing of its
                own problems, i.e., conduct its own 'qualitative analysis,' and create
11              a quality improvement process that it can use to achieve and maintain
                compliance, and *move on to eventual removal from federal court*
12              *oversight*." ECF No. 4232 at 4-5 (quoting Twenty-Fourth Round
                Monitoring Report at 65) (emphasis in order).
13

14  ECF No. 5477 at 3.  The court also emphasized defendants' recognition that "the successful

15  implementation of CQIT is a key marker of success on the road to ultimate termination of this

16  court's oversight."  *Id*. at 8.

17  III.    THE ROLE OF "BENCHMARKS" IN THIS REMEDIAL PROCEEDING

18          As the United States Supreme Court observed, the "complex and intractable"

19  Eighth Amendment violations in this action are not "susceptible of simple or straightforward

20  solutions."  *Brown v. Plata*, 536 U.S. at 525-26.  While the court has adopted the term

21  "benchmark" in certain orders, upon reflection and review of the record of this case, the court

22  clarifies that improper use of the term "benchmark" risks an oversimplification that obscures the

23  full scope of required remediation.  On the other hand, a clearly identified framework

24  accompanied by well-defined compliance measures that have been developed and defined

25          [9] The court is currently updating the chart filed by plaintiffs in March 2013, *see* ECF No.
26  4409 at 3-13, to identify in one document all outstanding orders for prospective relief.  While this
    order is intended as a complete description of the established framework for remediation of the
27  identified Eighth Amendment violations, it is subject to supplementation to whatever extent
    necessary to ensure it comprehensively captures the totality of the remedy in this complex case.
28

1  contextually provides defendants with the notice and information they need to achieve full and

2  durable remediation.  Along the way, some interim deadlines have aided and may continue to aid

3  ultimate full remediation.  The purpose of this order, then, is to confirm the framework that exists

4  and the interim deadlines that have been set.  As necessary for clarity and transparency, the court

5  also identifies remaining, though not redundant, steps to define the compliance measures against

6  which remediation has been and will be measured.

7        A.    Prior Use of "Benchmarks"

8            1.    Three Judge Court and Supreme Court

9        The three-judge court convened to address prison overcrowding used the term

10  "benchmark" to refer to the remedy ordered in those proceedings, namely a systemwide

11  institutional population cap of 137.5 percent of design capacity.  *See, e.g., Coleman v. Brown*, 960

12  F. Supp. 2d 1057, 1060-61 (E.D. Cal./N.D. Cal. 2013).  The three judge court used four specific

13  benchmarks to guide implementation of that order; specifically, it set four sequential six-month

14  "benchmarks":  reduction of population "[t]o no more than 167% of design capacity" in the first

15  six months; to no more than 155 percent of design capacity in the second six month period; to no

16  more than 147.5 percent of design capacity in the next six month period; and, finally, to no more

17  than 137.5 percent of design capacity within the final six month period, i.e., within two years

18  from the order.  January 12, 2010 Order of Three-Judge Court, ECF No. 3767, at 4; *see also*

19  *Coleman v. Brown*, 922 F. Supp. 2d 1004 (E.D. Cal./N.D. Cal. 2013).  The United States

20  Supreme Court also used the term "benchmark" in its decision affirming the three judge court,

21  suggesting that if the state sought modification of the order to extend the time for compliance, the

22  three-judge court might "condition an extension of time on the State's ability to meet interim

23  benchmarks in the provision of medical and mental health care."  *Brown v. Plata*, 563 U.S. 493,

24  544 (2011).

25            2.    This Court

26        In the proceedings in this court, most of the discussion about "benchmarks" has

27  centered on identification of measures necessary to achieve full compliance with the Program

28  Guide.  In 2012, defendants presented the Special Master with objections to his draft Twenty-

16

Fourth Round Monitoring Report in which they contended, among other things, "the report 'lacks clear benchmarks and qualitative analysis designed to assist Defendants in achieving Program Guide requirements.'"  ECF No. 4205 at 73 (internal citation omitted).  The Special Master rejected this objection:

> This criticism is somewhat difficult to reconcile with the record of defendants' tepid implementation of past feedback and recommendations from the special master. On the one hand, defendants complain that they do not know what is required of them in clear and practicable terms, and that the special master is not giving them the kind of analysis which can show them why they are falling short of benchmarks. Yet, year after year, they continue to resist implementation of the practices recommended by the special master and his staff which are geared to bring them into compliance. Simply stated, defendants cannot have it both ways.
>
> Insofar as "clear benchmarks," defendants need not await the issuance of the special master's compliance reports to learn the standards of mental health care which they are required to meet. These benchmarks are well-known to them, as they are found in the Program Guide and in relevant orders of the Coleman court. If the Program Guide and the orders are not enough by themselves to set the benchmarks, the record of 4,204 docket entries in this case, including 302 orders, and 107 reports by the special master, certainly provide a wealth of information by which defendants can be guided. Thus, what defendants mean by their complaint of a "lack of clear benchmarks" is mystifying.

*Id*. (emphases omitted).  Defendants raised three objections to the final Twenty-Fourth Round Monitoring Report filed with the court.  As the court noted in its order fully adopting the Twenty-Fourth Monitoring Round Report's findings and recommendations, defendants had made a series of "Overall Objections" to the draft Twenty-Fourth Round Monitoring Report, including one to the alleged "lack of clear benchmarks and qualitative analysis designed to assist Defendants in achieving program guide requirements," that were not included in the objections they raised with the court.  August 30, 2012 Order, ECF No. 4232, at 4 n.2.  After explaining that the Special Master had responded to the "Overall Objections" "in detail," the court stated

> [t]he Special Master's time is a resource that going forward need not be spent on objections that have been raised and, as evidenced by defendants' decision not to tender them to this court, he has resolved. While the parties are required to raise before the Special Master any objection they intend to raise here, the Special Master is not required

1    to respond to any objections that are frivolous or repetitive of
     objections that were previously resolved or withdrawn.
2

3    *Id*.  The Twenty-Fourth Round Monitoring Report and the order adopting it sent a clear message:

4    what is required to remedy the Eighth Amendment violation in this action has been repeatedly

5    identified in court orders and monitoring reports and neither the Special Master's time nor the

6    court's will be spent relitigating settled matters.

7            In 2014, this court used the term "benchmark" to refer to a specific requirement in

8    the Program Guide.  *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1103 (E.D. Cal. 2014)

9    (describing as "benchmark" requirement to provide "at least ten hours per week of structured

10   therapeutic activity" in Enhanced Outpatient Program-Administrative Segregation Unit (EOP-

11   ASU) hubs, a "critical part of EOP care in general" and "particularly true in segregation units").

12   For the reasons explained below the court finds this most recent use of the term signals its proper

13   use in these proceedings:  as a synonym for the "key indicators" that have been and are being

14   developed in CQIT.[10]

15        B.    Prior Decisions Regarding Compliance Standard for Program Guide Requirements

16           On December 28, 2012, the Special Master circulated his Twenty-Fifth Round

17   Monitoring Report to the parties.  *See* ECF No. 4361 at 1.  As noted above, on January 7, 2013,

18   defendants filed a motion "to terminate this action and vacate the judgment and orders of this

19   court, . . . ."  *Id*. at 1 n.1.  Consequently, on the same day the court directed the Special Master to

20   file his Twenty-Fifth Round Monitoring Report "forthwith" and directed any objections be filed

21   with the court "on or before thirty days from December 28, 2012."  *Id*. at 1.  Defendants' primary

22   objection to the Twenty-Fifth Round Monitoring Report was "that the Special Master 'has not

23   even attempted to assess' defendants' mental health care delivery system against a constitutional

24   standard."  *Id*. at 2 (internal citation omitted).  Defendants also objected to the Special Master's

25   use of the term "compliance" as (1) not tied to constitutional requirements; and (2) generally

26   _____

27        [10] In the August 9, 2016 order, the court described "the successful implementation of
     CQIT" as "a key marker of success on the road to ultimate termination of this court's oversight."
     ECF No. 5477 at 8.
28

18

1    failing to include specific explanations of what led to a finding of non-compliance.  *Id*. at 8.

2    Defendants also asserted that the Special Master's operative definition of "compliance" as

3    requiring "'a minimal score of 90% against Program Guide requirements is one of the primary

4    reasons the reports are not useful in determining whether the mental health system is

5    constitutionally adequate.'"  *Id*. at 9.

6           The court rejected all three objections.  As to the general objection that the Special

7    Master was not monitoring to a constitutional standard, the court observed the objection

8    "betray[ed] a fundamental misunderstanding of the history of this action and its remedial

9    process."  *Id*. at 2.  As the court explained, the Program Guide "is defendants' plan, approved by

10   this court, to remedy the Eighth Amendment violations identified in this court's 1995 order. . . .

11   Because the . . . Program Guide is the operative remedial plan in this action, the degree to which

12   defendants have implemented the requirements of the . . . Program Guide is extremely relevant

13   and useful to assessment of whether they are meeting their constitutional obligations.'"  *Id*. at 6,

14   9.

15          On February 13, 2018, the Special Master filed his Twenty-Seventh Round

16   Monitoring Report.  ECF No. 5779.  Among other items, the Special Master reported defendants

17   had submitted "their own draft monitoring reports for the first ten institutions monitored using the

18   continuous quality improvement tool (CQIT). . . . "  ECF No. 5852 at 2.  Despite the court's

19   February 28, 2013 order overruling defendants' objection to the established 90 percent

20   compliance measure, as noted above defendants had in these draft monitoring reports decided to

21   "unilaterally adjust the compliance monitoring standard to 85 percent from the 90 percent

22   standard that has been used consistently throughout the remedial phase of this litigation."  *Id*.

23   The court, noting it had "expressly approved  the 90 percent standard over defendants' objection

24   recently," held that "[d]efendants' unilateral adjustment of the monitoring standard, if accepted,

25   would deprive the court of information that is 'extremely relevant and useful' to the court's

26   assessment of their constitutional compliance."  *Id*.  The court therefore ordered defendants "[i]n

27   preparing their [self-monitoring] reports, . . . to follow the standard practice, set by the Special

28

1   Master and approved by the court, and . . . report all degrees of compliance with monitored

2   Program Guide requirements, from zero percent to 100 percent." *Id.*

3          The court also provided the direction to the Special Master noted at the beginning

4   of this order, to "begin recommending specific benchmarks that, when met, signal constitutional

5   compliance." *Id.* at 3.  The court explained, "As a means of projecting when the sun might

6   reasonably set on this case, the court will require the Special Master to include in his Twenty-

7   Eighth Round Monitoring Report recommendations for development of a process for determining

8   when constitutional compliance has been durably achieved in the areas subject to monitoring, as

9   well as whether partial termination may be appropriate if certain benchmarks are achieved before

10  total compliance is reached." *Id.*  By this time, the court had in fact already begun a process to

11  enforce key remedial requirements with specific compliance standards for each, as reviewed

12  below.

13  IV.    REMEDIAL DEADLINES SET TO DATE

14         This court has never set a firm deadline by which defendants must complete all

15  remediation in this complex action.  Particularly in view of the recent detours occasioned by the

16  Golding proceedings, which exposed the need to ensure the quality and accuracy of defendants'

17  data, and the onset of the COVID-19 pandemic, it would be premature to set an overall deadline.

18  Since 2017, the court has, however, set several deadlines by which certain remedial requirements

19  must be met.

20         A.     Transfer Timelines to Inpatient Care

21         On April 19, 2017, the court set a deadline of May 15, 2017 for defendants to

22  achieve compliance with Program Guide requirements for transfer to inpatient care.  ECF No.

23  5610.  In the April 19, 2017 order, the court specifically required "full and complete" compliance

24  with Program Guide timelines for transfer to inpatient care, while allowing modifications to the

25  Program Guide by way of specific exceptions to the transfer timeline requirements.  *Id.* at 13.

26  The April 19, 2017 order included a provision for enforcement through civil contempt

27  proceedings and, if necessary, monetary sanctions.  *Id.*  After approximately six months and the

28  accumulation of over $445,000 in unpaid sanctions defendants achieved substantial compliance

1   with that order by September 2017, and they have remained consistently in compliance, at least

2   until the onset of the COVID-19 pandemic, when CDCR's efforts to comply with public health

3   measures have directly impacted inmate transfers.  Also in the April 19, 2017 order, the court

4   signaled it will, at an appropriate time, "issue an enforcement order requiring 100 percent

5   compliance with the twenty-four hour timeline for transfers to MHCBs [Mental Health Crisis

6   Beds], subject to exceptions." *Id*. at 11-12.  On September 27, 2019, the court approved an

7   addendum to the Program Guide that specifically identifies exceptions to the MHCB transfer

8   timeline.  ECF No. 6295.  The court has not yet issued an enforcement order for compliance with

9   the MHCB transfer timeline and will revisit the question of the timing of such an order at the first

10  quarterly status conference in 2021, to be set by subsequent order.

11          B.      Staffing

12          On October 10, 2017, the court set a one year deadline for defendants to come into

13  compliance with the 2009 Staffing Plan and the court's June 13, 2002 order requiring a maximum

14  ten percent vacancy rate in mental health staffing.  ECF No. 5711.  Defendants are nearly two

15  years past the deadline for compliance with the October 10, 2017 order.  The court has delayed

16  enforcement of that order in light of the whistleblower report from CDCR Chief Psychiatrist Dr.

17  Michael Golding, which directly implicated staffing compliance, and the proceedings on that

18  report, which culminated in an evidentiary hearing in October 2019 and extensive findings by the

19  court memorialized in the order it filed December 17, 2019.  ECF No. 6427.  While the court has

20  separately set staffing for resumption of enforcement proceedings in September 2020, ECF No.

21  6794, the record over the past two years gives rise to a strong inference that while the October 10,

22  2017 order focused minds on the woeful shortages in staffing, defendants have not been able to

23  identify meaningful ways of achieving compliance with the remedial staffing requirements, which

24  have been clear for more than a decade.

25          C.      Suicide Prevention Measures

26          For over twenty years, the Special Master has had "responsibility for monitoring

27  suicide prevention and policy in California's prisons."  ECF No. 6212 at 12.  His first suicide

28  prevention expert, Dr. Raymond Patterson, resigned after almost fifteen years on the Special

1   Master's team "'because of his frustration arising from the defendants' repeated failure to

2   implement his recommendations.'"   *Id.* at 13 (*quoting Coleman v. Brown,* 938 F. Supp. 2d at 971

3   n.26).   Between November 2013 and July 2014, the Special Master's current suicide prevention

4   expert, Mr. Lindsey Hayes, "conducted a comprehensive audit 'of suicide prevention practices

5   and individual suicide case files in all 34 CDCR institutions.' ECF No. 5258 at 1."   *Id.*   As

6   discussed in Section I(B)(1) above, in early 2015 the Special Master filed a report of that audit,

7   which contained a series of recommendations "aimed at addressing the ongoing problem of a

8   disproportionately high rate of inmate suicide in California's prisons.   *Id.* at 2, 5-9.   Neither party

9   objected to the report or its recommendations."   *Id.*   For over five years, defendants have been

10   under court order to adopt and implement the twenty-nine recommendations that remained after

11   Mr. Hayes' second re-audit.   *Id.* (citing ECF No. 5271).

12               On July 3, 2019, the court signaled its intention to set a long overdue deadline for

13   compliance with court-ordered suicide prevention measures.   ECF No. 6212 at 14.   Specifically,

14   "the court anticipates reviewing with defendants at a future status conference the specific steps

15   necessary to enable Mr. Hayes to report no later than after his fifth re-audit that all

16   recommendations have by then been implemented."   *Id.*   The court anticipates this review will

17   take place as soon as practicable after the Special Master files Mr. Hayes' fourth re-audit report,

18   currently estimated for September 2020.   Moreover, while no specific timetable has been set for

19   the fifth re-audit the court now confirms defendants must complete any outstanding work on these

20   recommendations before that auditing round begins.   In aid of this order, the Special Master is

21   directed to keep defendants informed of his plans for scheduling the fifth re-audit.

22               The twenty-nine recommendations  must be completely and durably implemented

23   to allow comprehensive assessment of their efficacy in reducing the ongoing number of

24   foreseeable and/or preventable inmate suicides in California's prison system.   Ultimately,

25   defendants will assume full responsibility for quality management of their suicide prevention

26   program as well as the review and reporting requirements currently provided by the Special

27   Master.   The time is not yet ripe to determine when defendants should assume those particular

28   responsibilities.

D.    <u>Desert Institutions</u>

On September 27, 2019, the court approved a policy for expedited transfer of class members from six desert prison institutions.  ECF No. 6296.  The policy was implemented on December 16, 2019.  ECF No. 6678 at 1 n.1.  In accordance with the agreement of the parties that led to that stipulation, the Special Master now monitors these institutions using monthly reports filed by defendants setting out "census and tracking information for [class members] housed in one of the six desert institutions for the prior calendar month" rather than by onsite visits.  *See* ECF No. 6678.

E.    <u>Custody and Mental Health Partnership Plan</u>

On October 8, 2019, the court approved defendants' court-ordered Update to CDCR's Custody and Mental Health Partnership Plan (CMHPP), directing its implementation "in accordance with the timelines set forth in the Update," and requiring certification to the Special Master by April 30, 2020.  ECF No. 6314.  Defendants timely complied with the April 30, 2020 certification required by the October 8, 2019 order.  *Id*. at 2.  At the court's request, the Special Master has provided a copy of defendants' certification letter to the court.  That letter shows that defendants have met five deadlines set in the CMHPP, that several others have been reset due to the COVID-19 pandemic and that defendants have committed to filing monthly reports with the Special Master until the CMHPP is fully implemented.

In light of defendants' specific commitment to monthly updates and their apparent commitment to resetting specific deadlines as necessary, the court finds no need for additional orders to further progress toward this goal at this time.

F.    <u>Context Remains Key to Overall Systemic Remedy</u>

Taken together, these orders illustrate the care required to set proper compliance standards for all components of the multi-faceted remedy in this case.  In a prison system where the size of the mentally ill inmate population is approximately 30,000 inmates, even a 90 percent compliance standard risks leaving thousands of mentally ill inmates without access to one or more components of a constitutionally adequate mental health delivery system or receiving custodial treatment that falls below constitutional minimum requirements.  Even if separate

1  components of the remedy can be addressed through focused orders, the remedy remains one that

2  is systemic, requiring (1) plans for a constitutionally adequate mental health care delivery system

3  and constitutionally adequate custody practices; (2) adequate implementation of those plans/

4  completion of "tasks essential to full implementation of those component parts of their mental

5  health delivery system," *Coleman v. Brown*, 938 F. Supp. 2d at 989; and (3) a showing that the

6  implemented remedy is durable.

7  V.      TOWARD FULL REMEDIATION

8      A.     The Continuous Quality Improvement Tool (CQIT)

9      As discussed above, CQIT is a comprehensive tool, which, once it is finalized and

10  fully implemented, defendants will ultimately use as part of a process to "self-monitor" the key

11  components of the remedy in this action.  *See* Section II(B) *supra*.  In particular, it will be used to

12  monitor compliance with the material provisions of the Program Guide and the Compendium

13      As discussed above, CQIT includes a list of "key indicators" developed in 2012

14  and 2013 for use in monitoring institutional compliance with the Program Guide.  The Program

15  Guide was updated in 2018; as a consequence, the key indicators may require immediate

16  updating.[11]  As noted, the court has already determined that defendants must report compliance

17  with each indicator from zero to 100 percent; the court ultimately will use the CQIT reports as

18  part of an overall determination of compliance with constitutional standards and durability of the

19  remedy.  Consequently, the court must confirm the percentage of compliance with each key

20  indicator that must be achieved to meet constitutional requirements.[12]  In the briefs required by

21  ────────────────

22      [11] The "key indicators" in CQIT are likely equivalent to the material provisions of the
Program Guide and the Compendium that may not be modified without court approval.  *See* ECF

23  No. 6806.  In their briefing provided for by this order, the parties shall address whether the CQIT
tool, once finalized, should be subject to annual updates when the Program Guide and the

24  Compendium are updated.

25      [12] Ultimately the entire continuous quality improvement process must be fully

26  implemented and durably used for some remaining period of court supervision.  Full deployment
and durable use of CQIT cannot be completed before full remediation of the accuracy and

27  reliability of defendants' data reporting is finished.  That process is underway; currently, the
Special Master's newly hired data expert is obtaining and evaluating relevant data to assist in

28  guiding the necessary corrective action.  Therefore, it is premature to set a deadline for full

this order, the parties shall address why the court should not require the following as interim steps toward full and durable implementation of the Program Guide:

- First, allow a period of six months for defendants, under the supervision of the Special Master who may seek input from plaintiffs as appropriate, to update the key indicators in CQIT to reflect any changes required by the 2018 Update to the Program Guide;

- Second, confirm that the updated list of key indicators in CQIT that pertain to Program Guide requirements may properly be considered a comprehensive list of the material provisions of the Program Guide, that, taken as a whole and met at the requisite degree of compliance, signal constitutionally adequate compliance with the Program Guide; and

- Third, confirm that a 90 percent compliance rate for each key indicator for which the court has not previously expressly established a different compliance requirement will indicate, as to that key indicator, the constitutional minimum has been met.

In directing this briefing, the court reminds all parties that a substantial amount of time and effort has gone into development of all of the remedies in this action, including the all-important CQIT and, more generally, the entire continuous quality improvement process. The Special Master has provided extensive guidance in his many monitoring and other reports. The parties are responsible for understanding the complete history of and record in this action. The direction contained in this order is neither an invitation nor an opportunity to reinvent the wheel, including through revisiting the set of key indicators agreed to in 2012 and 2013, except as minimally necessary to bring them current with the 2018 Update to the Program Guide; nor is it an invitation to depart from the law of the case. Rather, the court's present order provides

---

implementation and durability of the continuous quality improvement process or by extension the Program Guide overall at this time.

direction to complete a necessary task, the seeds of which are firmly embedded in the work that began nearly a quarter of a century ago.

As a comprehensive tool for monitoring the key remedies in this case, CQIT is also appropriate for use in measuring institutional compliance with the court-approved custody remedies. In the briefs required by this order, the parties shall also address why the court should not require the following as interim steps toward full and durable implementation of the Compendium:

■ First, allow a period of six months for defendants, under the supervision of the Special Master who may seek input from plaintiffs as appropriate, to identify key indicators for CQIT to reflect the material provisions of the Compendium;

■ Second, confirm that the updated list of key indicators in CQIT that pertain to the Compendium may properly be considered a comprehensive list of the material provisions of the Compendium, that, taken as a whole and met at the requisite degree of compliance, signal constitutionally adequate compliance with the Compendium; and

■ Third, confirm that a 90 percent compliance rate for each key indicator, for which the court has not previously expressly established a different compliance requirement will indicate, as to that key indicator, the constitutional minimum has been met.

B.     The Seven General Goals

As discussed above, the seven general goals are significant projects in aid of full implementation of the two primary remedial plans in this action, the Program Guide and the Compendium. Two of the goals, staffing and transfer to inpatient care, are already the subject of the court's enforcement orders and deadlines have been set for completion of two others, suicide prevention and custody collaboration. The status of the remaining three is addressed below.

1.   Review of and compliance with all elements of defendants' Administrative Segregation Unit Enhanced Outpatient Program Treatment Improvement Plan, including the conduct of a review every 30 days of all EOP inmates housed in ASU hubs for over 90 days.

The parties should address why the compliance rate for this goal should not be confirmed at 90 percent, consistent with the court's August 30, 2012 order.  Further deadlines must await completion of data and quality assurance remediation.  The court anticipates discussing the schedule for completion of this remediation at the final quarterly status conference of this year, which the court now sets for Friday, December 18, 2020, at 10:00 a.m.

2.   Complete the construction of mental health treatment space and beds for inmates at varying levels of care

The Program Guide sets out four distinct levels of mental health care provided in CDCR's mental health services delivery system.  *See* ECF No. 5864-1 at 9-11.  The three higher levels of care, Enhanced Outpatient Program (EOP), MHCB and inpatient care, have for more than a decade been the subject of focused planning and construction efforts.  *See, e.g.,* Defendants' Court-Ordered Detailed Long-Range Bed Plan, ECF No. 3724-1.   Defendants use mental health population projection reports prepared twice a year to forecast future need for necessary mental health treatment space and beds.  *See, e.g.*, July 9, 2009 Order, ECF No. 3629 (requiring defendants to renew contract with mental health program population consultant).

In July 2019, the court identified a key remedial task remaining in this action as completion of "a sufficient number of licensed MHCBs so that defendants can take [all] remaining temporary MHCBs offline and accomplish the required timely transfers to regional MHCBs" operating, as required, in licensed facilities.  ECF No. 6212 at 11.  As the court has indicated to the parties, it anticipates issuing an order shortly requiring defendants to conduct an unmet bed need study, under the guidance and supervision of the Special Master, as an essential component of determining whether defendants have a sufficient number of inpatient hospital beds and MHCBs.  This unmet bed need study will also be an essential first step in assessing the durability of defendants' bed planning process.

/////

1          3.      Refine and implement MHTS.net to its fullest extent and benefit.

2          The Mental Health Tracking System (MHTS.net) was the name previously given

3   to defendants' electronic mental health information tracking system; it has been replaced by the

4   Electronic Health Records System (EHRS).  *See* ECF No. 5864-1 at 575-79 (March 26, 2018

5   Memorandum updating all Program Guide references to MHTS.net to refer to EHRS).  Going

6   forward, all discussion of this goal shall refer to progress on refinement and implementation of

7   EHRS.  As noted above, proceedings on the Golding Report called into question the accuracy and

8   reliability of defendants' data management and quality assurance programs.  Although work is

9   ongoing, defendants' completion of this goal must await complete remediation of those data

10  management and quality assurance issues.  The court also will review the status of this goal at the

11  last quarterly status conference for this year, on the date set in this order.

12  VI.    CONCLUSION

13         In this order, the court reviews and confirms the remedial framework for this

14  action and the road map to the end of federal court oversight.  It identifies and confirms those

15  areas in which compliance standards have been set and, in some instances, enforcement ordered.

16  It identifies CQIT's "key indicators" as the functional equivalent of "benchmarks" that, as used in

17  this order, signify the material provisions of the Program Guide and the Compendium that must

18  be durably implemented at a degree of compliance the court will confirm in a subsequent order.

19  It invites narrow briefing on whether additional remedial measures are ripe for establishment of

20  compliance standards or deadlines for completion.

21         The Eighth Amendment violation here is undeniably "complex and intractable."

22  And "'many of the problems giving rise to this suit and ongoing efforts at remediation arise from

23  the inevitable tensions created by the distinct needs of custody supervision and the distinct need

24  for mental health care.'"  *Coleman v. Newsom*, 424 F. Supp. 3d 925, 958 (E.D. Cal. 2019)

25  (quoting *Coleman v. Brown*, 28 F. Supp. 3d at 1073 n.5).  In moving toward full and durable

26  implementation of and compliance with the remedies in this action it is important to bear in mind

27  that the Eighth Amendment remedies in this case have been developed in the context of

28  California's prison system.  For most of the remedial phase of this action, at least, California's

28

prisons have been overcrowded and the number of seriously mentally ill inmates has climbed. While the overall prison population has declined,[13] seriously mentally ill inmates continue to comprise  approximately thirty-one percent of the total prison population,[14] and serious questions remain about whether the number of seriously mentally ill inmates exceeds the resources the prison system can bring to the daunting task of providing adequate mental health care in a prison context.

Because of the significant ongoing implementation tasks that remain, the court is not in a position to consider how long a fully implemented remedy must be sustained for the court to find the remedy, once achieved, is durable.  Such a determination must await a future date, once all the trend lines demonstrate compliance is reliably taking hold.

Finally, the court emphasizes this order merely reviews what the court has previously decided, providing a compilation and synthesis in order to avoid the need for revisiting the contours of the established and comprehensive remedy in this case.  This review demonstrates there are relatively few remaining areas where the remedial requirements may need clarifying, following the parties' input.  Even as the court elicits that input, it is implementation of the remedy that must remain defendants' primary focus.

In accordance with the above, IT IS HEREBY ORDERED that:

1.   The parties shall file the briefs directed by this order within sixty days; and

2.   The fourth quarterly status conference for 2020 is set for videoconference on Friday, December 18, 2020 at 10:00 a.m.

DATED:  September 2, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE

---

[13] In the wake of the COVID-19 pandemic, defendants voluntarily undertook additional measures to reduce the general prison population.  It is unclear whether the population reductions caused by these additional measures will be permanent.

[14] As of Tuesday, September 1, 2020, defendants reported to the Special Master a total of 30,490 inmates in the MSHDS.

1
2
3
4
5
6
7
8
9
10                              ATTACHMENT A
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORIGINAL LIST OF SUICIDE PREVENTION MEASURES

ORDERED BY COURT ON FEBRUARY 3, 2015

I. Suicide Prevention Training

(1) Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e. including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.]

(2) Expand the length and content of the annual "Crisis Intervention and Suicide Prevention" training workshop to include the topics described above;

(3) Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training, and

(4) Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel.

II. Initial Health Screening and Receiving and Release Unit Environment

(5) The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?";

(6) Intake screening should be conducted only in the nurse's office within a reception and receiving (R&R) unit;

(7) The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and

(8) Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a

31

safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality

III. Suicide Risk Evaluations (SREs)

(9) CDCR should revise its SRE Mentoring Program to

- eliminate its "graduation" component after completion of two adequate assessments,
- conduct ongoing mentoring throughout the year, and
- audit clinicians' SREs on a regularly scheduled basis.

(10) Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis.

IV. 30-Minute Welfare Checks in Administrative Segregation, Security Housing Units (SHUs), and Condemned Units

(11) Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at Pelican Bay State Prison and at the California Health Care Facility (Phase 3, per the directive).

V. Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units

(12) CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).

(13) CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.

(14) Any inmate discharged from suicide observation status and arriving in administrative segregation from either a Mental Health Crisis Bed or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan.

(15) Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled. They should be placed in suicide-resistant, retrofitted cells.

(16) Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.

VI. Treatment Planning for Suicidal Inmates

(17) CDCR should adopt the recommendations made in connection with SREs, set forth above, which will also improve treatment planning contained in the SREs section above; and

(18) CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment," described above.

VII. Perception of Suicidal Inmates as Manipulative

(19) The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar.

VIII. Psych Tech Practices

(20) CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.

IX. Use of "Psychiatric Observation" and "Crisis Evaluation" Statuses for Suicidal Inmates

(21) CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.

(22) CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure.

X. Use of "Alternative Housing Cells" and Outpatient Housing Units (OHUs) for Suicidal Inmates

(23) The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide-resistant.

(24) Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB.

(25) Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15 minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk.

(26) Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed.

XI. Outpatient Housing Unit/Mental Health Crisis Bed Discharge and Efficacy of Five-Day Clinical Follow-Up and 60-Minute Custody Welfare Checks

(27) The "Interdisciplinary Progress Note – 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the

"Interdisciplinary Progress Note" utilized at the California Training Facility (CTF) that allows clinicians to use a separate sheet for each day of follow-up.

(28) All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred.

(29) The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan. No other frequency of observation should be authorized.

(30) All inmates discharged from an MHCB or alternative housing and immediately re-housed in an administrative segregation unit should only be placed in a suicide-resistant, retrofitted cell for a period to be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's treatment plan.

(31) Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing suicidal ideation and/or engaging in self-injurious behavior.

XII. Local Suicide Prevention and Response Focused Improvement Teams

(32) CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.

XIII. Corrective Actions to Address Additional Miscellaneous Issues

(33) CDCR, under the guidance of the Special Master within the Suicide Prevention Management Workgroup, should examine and consider taking corrective actions to address the problems identified in the attached Report in the following areas:

- Forms for Documentation of Observation
- Non-Suicide-Resistant Mental Health Crisis Beds
- Privileges for Inmates in Mental Health Crisis Beds
- Informal Recommendations Within CDCR Suicide Reports

- ▪ Frosted Exterior Cell Windows and Sensory Deprivation
- ▪ High Refusal Rates for New Admit Screens in Administrative Segregation