DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:   (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **FIFTH JOINT UPDATE ON THE WORK OF THE COVID-19 TASK FORCE** |
| v. | |
| GAVIN NEWSOM, et al., | Judge:   Hon. Kimberly J. Mueller |
| Defendants. | |

At the June 26, 2020 status conference, the Court directed the parties to file a joint report with updates "on the work of the Task Force" by July 15, 2020 and "every two weeks thereafter." (ECF No. 6741.) The Court modified this schedule on August 26, 2020, directing the parties to file COVID-19 Task Force updates every other Friday by 12:00 p.m., beginning on August 28, 2020. (ECF No. 6837.) This report provides the parties' fifth COVID-19 Task Force joint update and covers issues discussed since the fourth joint update filed on August 28, 2020. This report covers the Thirty-Third (September 1) and Thirty-Fourth (September 8) COVID-19 Task Force meetings, and various small workgroup meetings between representatives from Defendants and the Special Master's team. Unless otherwise indicated, the small workgroup meetings include members of Defendants' leadership and the Special Master's team, and not Plaintiffs. The Special Master holds meetings with Plaintiffs to update them on the status of the workgroups.

# I.    UPDATE REGARDING COVID-19 CASES IN CDCR AND DSH

## A.    CDCR's Report On COVID-19 Cases And Testing

The following table shows, as of September 8, 2020, CDCR's report on the total number of confirmed COVID 19 cases, currently active, resolved to date, currently hospitalized, hospitalized to date, deaths to date, and the number and percentage of those cases who are Coleman class members and their level of care.

| COVID Result | Total Patients | MHSDS Patients Only | MHSDS patients as % of total |
|---|---|---|---|
| Active | 1,406 | 358 (351 CCCMS, 5 EOP, 1 MHCB, 1 ICF, 0 ACUTE) | 25% |
| Resolved | 8,587 | 2,379 (2,139 CCCMS, 204 EOP, 10 MHCB, 18 ICF, 8 ACUTE, ) | 28% |
| TOTAL active + Resolved | 9,993 | 2,737 (2,490 CCCMS, 209 EOP, 11 MHCB, 19 ICF, 8 ACUTE) | 27% |

[3611177.8]

| | | | |
|---|---|---|---|
| **Currently Hospitalized** | 20 | 10 (8 CCCMS, 2 EOP) | 50% |
| **Cumulative Hospitalized** | 465 | 169 (142 CCCMS. 27 EOP) | 36% |
| **Deaths** | 59 | 24 (23 CCCMS, 1 EOP) | 41% |

CDCR reports the above hospitalization numbers include re-admissions of some patients who were discharged and then re-admitted. It also reports that the numbers exclude patients who were COVID-19 positive and admitted to outside hospitals for reasons other than COVID-19.

According to CDCR, as of September 8, 2020, it had tested 88,907 unique incarcerated and formerly incarcerated people, 74,664 of whom are still in CDCR custody. Of the total number of in-custody prisoners tested, 23,064 or 30.9%, of those tested were part of the MHSDS. As of September 10, 2020, CDCR's rate of tests per 1,000 incarcerated people (745.2 per 1,000) is higher than the rates in California (310.5 per 1,000) and the United States (254.5 per 1,000) as a whole; CDCR's publicly available Population COVID-19 Tracking dashboard reports that CDCR's rate of confirmed cases per 1,000 incarcerated people (112.5 per 1,000 as of September 6, 2020) is higher than the rates in California (18.7 per 1,000 as of September 6, 2020) and the United States (19.0 per 1,000 as of September 6, 2020).

**B.     Update Regarding CDCR Institutions.**

As of September 9, 2020, in order to protect patients from COVID-19, twenty-six of CDCR's thirty-five institutions are closed or mostly closed to movement, including all five institutions with Psychiatric Inpatient Programs (PIPs). Out of the twenty-six institutions, three have been granted exceptions allowing movement for one of two purposes. Starting on September 8, 2020, North Kern State Prison and Wasco State Prison are closed to all movement except for the limited purpose of Reception Center intake. California Correctional Center (CCC) prison was partly re-opened to movement on August 23, 2020 for the limited purpose of allowing incarcerated people with resolved cases to transfer to

[3611177.8]

1  fire camps.

2  **C.      DSH Report Regarding COVID-19 Cases and Facilities**

3       As of September 9, 2020 there were no confirmed COVID-19 positive cases in

4  DSH's *Coleman* patient population.  As of September 9, 2020, DSH has performed 15,984

5  tests on a cumulative total of 4,566 patients across all five hospitals.  A total of 315

6  patients and 364 civil service staff have tested positive.

7       DSH-Patton resumed patient admissions on August 31, 2020.  All waitlist female

8  *Coleman* patients are housed at CDCR institutions currently closed to movement.  DSH-

9  Atascadero and DSH-Coalinga remain open to new admissions.  As of September 9, 2020,

10  DSH-Patton has four units on quarantine, none of which are *Coleman* units.  No *Coleman*

11  patients are symptomatic or have tested positive.

12       As of September 9, 2020, DSH-Atascadero has one unit on quarantine that houses

13  Offenders with Mental Health Disorders.  No *Coleman* patients are symptomatic or have

14  tested positive.

15       As of September 9, 2020, DSH-Coalinga has seven units on quarantine, including

16  their *Coleman* unit due to a positive COVID-19 test of a staff member on September 8,

17  2020.  No *Coleman* patients are symptomatic or have tested positive; serial testing began

18  on September 8, 2020.

19  **II.      UPDATES ON DSH CENSUS, WAITLIST, AND ADMISSIONS**

20       Task Force discussions regarding DSH focused primarily on admission and

21  discharge issues related to the August 19, 2020 Movement Matrix implemented by CDCR,

22  as discussed in the below section on that topic.

23       Since DSH lifted its temporary suspension of admissions effective April 16, 2020,

24  DSH has admitted a total of 81 *Coleman* class members.  Defendants provided the Task

25  Force with written reports on the status of DSH on September 9, 2020 current as of

26  September 4, 2020.  DSH received 12 new referrals over prior two weeks and admitted 0

27  patients due to all accepted patients coming from institutions that CDCR closed to

28  movement due to COVID-19 outbreaks.  As of the September 4, 2020 data, DSH had not

admitted any patients since the workweek of August 10-14, 2020, as all pending admissions were from institutions CDCR had closed to movement.  There are 177 *Coleman* class members at DSH-Atascadero (with 79 available beds), 37 at DSH-Coalinga (with 13 available beds), and 8 at DSH-Patton (with 22 available beds).  There are 47 patients awaiting admission to DSH-Atascadero and DSH-Coalinga, including 20 ICF patients awaiting admission for more than 30 days.  Of the 47 patients awaiting admission to DSH-Atascadero and DSH-Coalinga, all but three are on hold at CDCR institutions currently closed to movement.  There are four patients awaiting admission to DSH-Patton, three of whom have been awaiting admission for more than 30 days at a CDCR institution that is closed to movement.  Those four patients are already receiving inpatient care at California Institution for Women's Psychiatric Inpatient Program.

## III.   UPDATES ON THE CDCR AND DSH SMALL WORKGROUP ACTIVITIES.

### A.   CDCR Workgroup

The Special Master's experts have held small workgroups with CDCR and DSH leadership, without Plaintiffs or Defendants' counsel, focused on specific topics.  In the past two weeks, the CDCR workgroup has covered topics including:  (1) Quarantine and Isolation, (2) the August 19, 2020 COVID-19 Screening and Testing Matrix for Patient Movement, (3) meeting Program Guide requirements during the pandemic, (4) individual case reviews regarding whether patients identified by the Special Master's team should have met emergency inpatient transfer requirements, and (5) the TMHU 114-A log reporting and related policies.

### B.   EOP ASU Hub Certification Workgroup

As reported in the prior Joint Update, the workgroup has suspended regular meetings so that the Special Master's data expert can work regularly with CDCR staff. The data expert and other members of the Special Master's team will meet with CDCR periodically to bring up issues as needed.

On September 8, 2020, Defendants provided a response to Plaintiffs' August 10,

2020 letter regarding the draft interim ASU EOP Hub and PSU certification process discussed at the August 4, 2020 Task Force meeting.  In Defendants' letter, they report their plan to finalize the policy and complete ASU EOP hub certifications for the last several months pursuant to this interim policy.

Defendants plan to respond by September 30, 2020 to Plaintiffs' June 19, 2020 letter outlining Plaintiffs' broader concerns about the overarching self-certification process.

### C.   DSH Workgroup

The DSH small workgroup met once since the August 28, 2020 joint status report and focused on issues with admissions and discharges related to the new August 19, 2020 Movement Matrix, which are discussed further below.

### D.   Behavioral Treatment Workgroup

The Behavioral Treatment small workgroup, which includes members of CDCR and DSH leadership and the Special Master's experts, reported meeting for a presentation by CDCR's Chief Psychiatrist Dr. Michael Golding.  The presentation covered a review of literature regarding the use of Clozaril to address behavioral treatment issues such as self-injurious behavior.  The workgroup reported it would meet to discuss follow-up questions and then discuss if and when it would continue to meet.

## IV.   Quarantine and Isolation; Movement Matrix

Task Force representatives from Plaintiffs and the Office of the Special Master participated as observers in an August 31, 2020 meeting in which representatives from CDCR and CCHCS answered questions from the *Plata* plaintiffs' counsel on the topics of quarantine and isolation, and the August 19, 2020 COVID-19 Screening and Testing Matrix for Patient Movement ("Movement Matrix").  The Thirty-Third Task Force meeting, on September 1, 2020, focused primarily on discussing the Movement Matrix and quarantine and isolation issues.  On September 4, 2020, Plaintiffs sent a letter to Defendants memorializing Plaintiffs' significant concerns about CDCR's quarantine and isolation bed planning to date and several requests.  The parties did not extensively discuss

[3611177.8]

the Movement Matrix at the September 8, 2020 Task Force meeting except to confirm that Defendants have not determined which policies listed in the most recent Program Guide Departures Appendix A filing (ECF No. 6831) are superseded or otherwise affected by the Movement Matrix, or to what extent, but are working on such an analysis.  These meetings and Plaintiffs' letter are discussed further below.

At the August 31, 2020 meeting, CCHCS explained that the Movement Matrix does not mean that incarcerated people will transfer to or from closed institutions, and that, for the most part, statewide leadership does not permit movement except for reasons relating to medical, mental health, or restrictive housing status.  CDCR stated that whether movement is considered "necessary" under the terms of the Movement Matrix is always determined subjectively on a case-by-case basis, and generally moves for mental health reasons are more subjective while other medical moves are more objective.  CDCR also explained that it has been using the terms "essential" and "necessary" as they relate to clinical movement interchangeably, and additional clarification on those terms would be provided at some point in the future.  CDCR noted that the determination whether an institution or unit should be considered an "outbreak institution" or "outbreak unit" is fairly subjective and it is working to refine those concepts with the goal of not needing to close down an entire institution when COVID-19 exposure is identified for only parts of the institution.  CDCR also noted that test turnaround times have improved such that more than 90% of standard PCR COVID-19 test results come back within 72 hours, and over 70% come back within 48 hours.  And if no results are received by the time a patient is ready to move, CDCR can run a rapid test.  CDCR explained this process is used for transferring non-*Coleman* patients designated as Offenders with Mental Health Disorders ("OMHD") to DSH, as well as for expedited paroles.

At the September 1, 2020 Task Force meeting, the parties continued their discussion of the Movement Matrix.  In response to questions about current procedures for transfers from CDCR to DSH, Defendants explained that the July 16, 2020 transfer guidelines are still in effect.  CDCR and DSH reported discussing whether to modify current testing

procedures.   Beyond the testing issue, CDCR and DSH stated that the Movement Matrix does not affect transfers into DSH.  DSH and CDCR reported they recently identified an issue in the Movement Matrix's language stating patients should be in-cell quarantined at DSH for two weeks prior to discharge from DSH.  DSH does not have celled housing. Plaintiffs and the Special Master expressed concerns that this issue would delay admissions and observed that the *Coleman* census at DSH continues to decrease. Defendants reported that this issue was related to discharges and was not currently delaying admissions, and they hoped to have a resolution by the end of the week ending September 4 that would correct this language.  Defendants have not to date provided any proposed resolution to this issue.

CDCR reported it has drafted a proposal regarding setting aside PIP intake units for quarantines of newly admitted patients and those returning from outside hospital and court movement.  CDCR further reported that the set-aside units in the PIPs would not be used for quarantine of patients suspected of COVID-19 exposure or for isolation of patients confirmed to have COVID-19.  At the time of the September 1, 2020 meeting, CDCR had provided the proposal to the Special Master's team to review, but CDCR reported it was not yet ready to be presented to the full Task Force including Plaintiffs.  CDCR provided a copy of the plan to Plaintiffs on September 4, 2020 and has requested it be discussed at an upcoming Task Force meeting.

Also at the September 1, 2020 Task Force meeting, one of the Special Master's experts asked for additional clarity on the definition of "clinically essential" movement and "clinically necessary" movement.  A representative from CDCR referenced his comments made during the August 31, 2020 meeting, i.e., that CDCR was using the terms interchangeably, and did not commit to a timeframe to provide additional guidance to the field concerning this clarification.

At the September 1, 2020 Task Force meeting, CDCR Mental Health leadership stated that CDCR had decided not to quarantine EOP class members separately from non-EOP class members, contrary to information reported as of the August 28, 2020 Joint

1   Update.  *See* Fourth Joint Task Force Update, ECF No. 6841 at 9 ("A member of the

2   Special Master's team indicated understanding that CDCR planned to follow general

3   principles of keeping EOP patients in EOP housing and, if patients must be moved,

4   moving them into separate EOP housing unless CDCR is unable to do so.").  The Task

5   Force discussed the issue at length and identified that CDCR disagrees with the Special

6   Master's experts' views that CDCR should quarantine EOP patients separately from non-

7   EOP incarcerated people for clinical reasons.

8         CDCR's position is that quarantine and isolation units are primarily medical in

9   nature and that CDCR does not provide separate medical units for EOP patients, i.e. such

10  as those in an Outpatient Housing Unit or a Correctional Treatment Center medical bed.

11  Movement in quarantine space is strictly controlled by medical and custody staff.  Patients

12  are carefully monitored in those units as well.  And the duration of quarantine is short and

13  finite in nature.  Given these facts, CDCR finds no clinical reason to create separate EOP

14  quarantine space.

15        The Special Master's experts discussed their views that EOP patients should be

16  quarantined separately, whenever possible, because, unlike isolation, quarantine is not for

17  medical treatment and thus patients' psychiatric symptoms remain predominate, and that

18  mixing EOP and non-EOP individuals increases the potential for victimization and

19  disruptions.

20        Plaintiffs noted their serious concern about CDCR's position and, as noted below,

21  sent a letter on September 4, 2020 detailing Plaintiffs' position.  A copy of Plaintiffs' letter

22  is attached hereto as **Exhibit A**.

23  **V.    Class Members Awaiting Inpatient Care in Temporary Mental Health Units**

24  **       (TMHUs) or on Treat In Place (TIP) Status**

25        The Thirty-Fourth Task Force meeting, on September 8, 2020, focused primarily on

26  issues related to CDCR's April 10 and 17, 2020 temporary COVID policies governing

27  class members awaiting inpatient transfers in TMHUs and on TIP status.

28        CDCR reported that it is reviewing and preparing to propose updates to its April 10

[3611177.8]

and 17, 2020 policy memoranda regarding the procedure and criteria for placing patients in TMHUs/Max TMHUs, Treat in Place (TIP) locations, and EOP beds in response to Plaintiffs' comments on August 9 and 12, 2020 noting that the vast majority of class members awaiting inpatient care in outpatient settings, including MAX custody class members, were not being placed in TMHUs/MAX TMHUs, and that CDCR's weekly reporting in its TMHU/TIP Patient List failed to include significant numbers of class members with pending inpatient referrals.  CDCR reports that the report's inability to capture all patients awaiting inpatient care stems from a varying and conflicting interpretations of the April 10 and April 17 policies, which CDCR is working to revise. CDCR believes that the policies have been interpreted to allow some patients to be classified as neither TMHU or TIP, thereby avoiding capture on a TMHU/TIP Report. CDCR reported the goal was to improve the overall consistency and clarity of the documents, and to better codify the intent of the TMHUs.  CDCR confirmed that its intent is for internal PIP/MHCB placements to be the preferred placement, TMHUs the second choice, and TIP/ELOC (enhanced level of care)—meaning managing the patient in their current housing—to be the third choice.

CDCR clarified that the terms ELOC and TIP are meant to be synonymous in the COVID-19 context, and CDCR intends to use only one term in the revised proposed policy, which will also merge the April 10 and 17 policies into a uniform policy governing both general population and MAX custody patients awaiting inpatient care.

CDCR also reported it is working on clarifying guidance in the April 10 and 17, 2020 policies regarding the point at which a patient should qualify for an emergency mental health transfer if they are not improving, or are further decompensating.  One of the Special Master's experts noted that in some patient records he had reviewed, clinicians are not appropriately considering or documenting their consideration of whether patients should transfer.  CDCR requested those patients' CDCR numbers so it could independently investigate this issue.

Plaintiffs asked about the requirement to transfer patients in segregation units with

pending inpatient referrals to a MAX TMHU pursuant to the April 17, 2020 policy and whether CDCR envisions any such patients would be treated in place in a segregation unit on TIP/ELOC status.  The Special Master's experts reported they had explained their position to the small workgroup that if such patients are kept on TIP/ELOC status, they should be subject to the same 10-day time limit as patients in a MAX TMHU before they must be transferred to an MHCB if their clinical condition has not improved sufficient to discharge them to an outpatient level of care under the April 17 policy.  Plaintiffs noted their agreement and that the other protections identified in the April 17, 2020 memorandum must apply to MAX custody patients awaiting inpatient care no matter where they are held.  CDCR noted that the 10-day requirement is far stricter than the timeframe laid out in existing policy for Intermediate Care Facility referrals – 30-days – and may not make sense for all Max Custody patients.  Plaintiffs also noted their position that CDCR should always place MAX custody patients with inpatient referrals in MAX TMHUs rather than treating them in place in a segregated unit.  Plaintiffs noted they are open to further discussion about the possibility of retaining MAX custody patients with inpatient referrals in EOP ASU Units rather than moving them to MAX TMHUs if CDCR or the Special Master's experts believe there are compelling clinical reasons to do so, as long as the other minimum protections in the April 17 policy apply.  CDCR reported it is still considering these issues.

Plaintiffs discussed their position that the April 10 and 17 policies require patients with an inpatient referral to go to a TMHU or receive enhanced treatment in place promptly at the time of their inpatient referral rather than only after the expiration of the 10 and 30 days transfer timelines for Acute and ICF transfers.  CDCR agrees with that position.

Plaintiffs noted their position that as Defendants refine their policies and practices, their primary goal must be the safe resumption of Program Guide-level treatment and in particular the resumption of planned, careful movement of patients to the appropriate levels of care.  Plaintiffs also noted concerns about their observation from the real-time

data on the COVID-19 Dashboard that referrals to inpatient care at the MHCB, ICF, and Acute levels all appear to be occurring at only approximately half the levels as they were during the comparable timeframe in 2019, even though rates of self-injurious behavior, and in particular self-injurious behavior with the intent to die, were as high or higher than this time last year.  Defendants did not identify reasons for this trend, but agreed to look at some examples identified by one of the Special Master's experts of patient records where clinicians documented that they were not making or considering an inpatient referral because patients were not transferring to higher levels of care due to COVID restrictions. CDCR has requested to be provided with these examples.  Plaintiffs encouraged Defendants to immediately send guidance to the field reinforcing the need to continue to refer patients to higher levels of care as clinically appropriate, regardless of whether physical movement to a new setting may be delayed due to COVID-19 restrictions. Defendants agree that the field should be reminded of the need to continue referring patients to higher levels of care despite any COVID related restrictions, but did not commit to a timeframe for doing so.

In response to an observation by Plaintiffs that some institutions were much less likely to use TMHUs than others, Defendants noted receiving some feedback from institutional leadership at certain institutions that they were relying on their pre-existing internal processes for EOP patients referred to ICF care, which were designed around the 30-day transfer timeframe.  CDCR reports that its revision to the April 10 and April 17 policy should clarify this issue.

Plaintiffs asked whether Defendants have a way of tracking and reporting at the headquarters level on the programming and mental health treatment being provided to patients with pending inpatient referrals who are being treated in place pursuant to the April 10 and 17 policies, given that the COVID Dashboard only provides this type of data for patients in TMHUs and the TMHU Registry does not include patients on TIP/ELOC status.  Defendants reported that they do not currently have a systematic method for tracking the mental health treatment or programming provided to patients who are on

1   TIP/ELOC status, but they are working to modify the TMHU Registry to include such

2   patients. Defendants reported that they have prioritized the project with the hope of

3   completing it in September, but could not commit to have the report completed by the end

4   of the month.  Plaintiffs raised concerns that without a centralized or systemic tracking

5   process, Defendants have no way of knowing what, if any, care is being provided to the

6   vast majority of patients awaiting inpatient care and not housed in a TMHU or of ensuring

7   local compliance with their policies.  Similarly, the Special Master cannot monitor

8   compliance with the Program Guide or the interim COVID-19 emergency policies.

9   Defendants committed to modifying the TMHU Registry as soon as possible to allow for

10  such reporting and monitoring.  On September 10, 2020, Defendants confirmed they will

11  not change the TMHU/TIP Report to show class members with inpatient referrals who are

12  not in TMHUs, due to their plan to eventually include those class members in the TMHU

13  Registry.

14          In response to Plaintiffs' request for a list of all patients who had met the

15  emergency mental health transfer criteria under the April 10 and 17, 2020 policies to date,

16  Defendants confirmed they would produce a list soon and would look into whether that

17  information can be produced on an ongoing basis.

18  **VI.    ADDITIONAL COVID-19 RELATED UPDATES**

19          **A.    Roadmap to Reopening**

20          On August 21, 2020, CDCR provided the Task Force with an Institutional Roadmap

21  to Reopening document that was issued to the field on August 14, 2020.  At the September

22  1, 2020 Task Force meeting, one of the Special Master's experts asked for information

23  about what mental health care would be provided at Phases 1 and 2 of the Roadmap.  The

24  Task Force did not have enough time for a full discussion of these or other issues related to

25  the Roadmap; Plaintiffs committed to sending a letter with additional questions and

26  comments, along with their comments on the Matrix.  CDCR received the letter on

27  September 10, 2020 and it is attached hereto as **Exhibit B**.

28

[3611177.8]

**B.      COVID-19 Dashboard**

On September 2, 2020 Defendants hosted a webinar for Plaintiffs and the Special Master's team in which Defendants demonstrated the COVID-19 Dashboard and answered questions.

DATED:  September 11, 2020          Respectfully submitted,

                                    ROSEN BIEN GALVAN & GRUNFELD LLP


                                    By: _/s/ Marc J. Shinn-Krantz_
                                        Marc J. Shinn-Krantz

                                    Attorneys for Plaintiffs

DATED:  September 11, 2020          XAVIER BECERRA
                                    Attorney General
                                    Adriano Hrvatin
                                    Supervising Deputy Attorney General


                                    By: _/s/ Lucas L. Hennes_
                                        Lucas L. Hennes
                                        Deputy Attorney General

                                    Attorneys for Defendants

[3611177.8]

# EXHIBIT A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

September 4, 2020

<u>VIA ELECTRONIC MAIL ONLY</u>

Dr. Joseph Bick                            Dr. Diana Toche
Director, Health Care Services            Undersecretary for Health Care Services
CCHCS                                     California Department of Corrections and
Joseph.Bick@cdcr.ca.gov                   Rehabilitation
                                          Diana.Toche@cdcr.ca.gov

      Re:    *Coleman v. Newsom*
           Plaintiffs' Request for Separate Isolation and Quarantine Spaces for EOP
           and Higher Level Of Care Patients, and for Development of Policies
           Governing Quarantine and Isolation for these Patients
           <u>Our File No. 0489-03</u>

Dear Dr. Bick and Dr. Toche:

      We write regarding CDCR's failure to plan for separate quarantine and isolation
units for *Coleman* class members at the EOP and higher levels of care.  We also ask that
the Department provide specific, detailed direction to individual CDCR institutions about
how to manage higher acuity mental health patients in quarantine and isolation, including
patients at the EOP, Acute Inpatient, Intermediate Inpatient, and MHCB level of care.[1]
We also request that CDCR develop proof of practice requirements to ensure institutions
are prepared to manage mental health populations in quarantine and isolation safely and
appropriately.

      Patients at these levels of care are no doubt already being housed in the isolation
and quarantine units recently set aside, with little or no instruction being given to the

---

      [1]  We assume that MHCB level of care patients are all housed in single cells with
solid front doors and can be isolated or quarantined in place.  Please let us know if this is
correct.  We have been told that all cell doors at Calipatria and many at LAC are
perforated.  Does that include the MHCB units at these prisons?  If these units have
perforated doors, then there does need to be isolation and quarantine plans for patients in
these units.

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 2

institutions about how to manage them.  Institutions must be told that they must house
EOP and higher level of care mental health patients in separate housing units.

In many places, this is a relatively simple task.  For example, at CMC, the building
set aside for quarantine and isolation, C-Yard, Building 5, has two distinct sides on each
of its three floors.  CMC should be told to set aside one of the six distinct and separate
spaces in this building for EOP patients.  This kind of separation is particularly important
in order to facilitate confidential treatment.  It also helps custody staff keep track of the
diverse populations in quarantine that must be kept separate.

In the short term, until separate EOP isolation and quarantine spaces are identified
at each EOP prison, staff will need to be instructed to carefully provide separate yard,
shower, medication lines, canteen, and telephone calls for EOPs and any higher level of
care patients in the currently operating quarantine units, for their protection.  As CDCR
well knows, it is not safe for EOPs to mix with general population prisoners for any of
these activities, which is why the Program Guide requires them to be separately housed.
Additionally, as CDCR committed to do during the recent task force call, clinical and
custodial staff will also be required to ensure that these class members can access
required mental health treatment while they are confined to these units.  All of this will
require specific and explicit direction from the Department to ensure this actually
happens, as well as ongoing, close oversight to ensure compliance.

As recent experience has shown, advance planning is critical to avoiding negative
outcomes when a health emergency occurs.  For that reason, we are also asking that
CDCR require proof of practice, in the form of detailed plans for EOP and higher level of
care housing in quarantine and isolation, for every institution that houses this population.

We write separately about our concerns with each of the higher level of care
mental health programs.

## I.      Enhanced Outpatient Program (EOP) Level Of Care

A central part of the mission of EOP programs is to provide a "sheltered"
treatment unit for individuals who are made vulnerable by their serious mental illness.
Throughout the history of this case, individuals at the EOP level of care have been
clustered in separate housing units with other EOP patients.  This has been done in part to
provide for the efficient delivery of mental health care.  However, even more importantly,
EOP patients have been clustered together in separate units for their own protection.

The CDCR's present day EOP programs were an outgrowth of the
recommendations in the 1993 Mental Health Services Delivery System Study Report for
the CDCR by Scarlett, Carp and Associates, which noted that "Inmates with severe

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 3

mental illness often have difficulty with the stresses of prison and are especially vulnerable to victimization while in the general population.  Creating a psychologically (and perhaps physically) safer environment can reduce psychiatric distress and crisis, disciplinary violations, and suicide attempts."  *See* February 16, 1993 Mental Health Services Delivery System Study, Final Report, Scarlett Carp and Associates, at 10.

The separate housing of EOPs is also embedded in the Program Guide, which explains that one of the clinical prerequisites for placement into the EOP program is an "inability to function in general population."  *See* 2018 Program Guide, ECF 5864-1, at 12-4-3 (ECF Page 52).  As Judge Mueller explained in her July 3, 2018 Order, "the Revised Program Guide makes clear EOP is a residential program, synonymous with an inpatient setting."  7/3/18 Order, ECF. No. 5850, at 5:21-6:1.

CDCR must continue to provide necessary mental health treatment to patients in quarantine.  We appreciate that CDCR has committed to doing so during the September 1, 2020 task force meeting, and we request additional information on what exactly those services will entail and how they will be tracked and implemented.  As we have repeatedly stated, CDCR must make affirmative plans to return to Program Guide requirements for care, and that includes patients on quarantine status.  We look forward to working with CDCR on such plans in the near term.

Additionally, given the vulnerability of individuals with mental illness to decompensation when isolated in their cells for prolonged periods, we appreciate that CCHCS has taken the position that individuals on quarantine status should be given access to yard and other key privileges.  As set forth in the CCHCS Interim Guidance dated July 17, 2020, under the heading "Quarantine Precautions and Condition":

- Quarantine does not include restricting the patient to his/her cell for the duration of the quarantine without opportunity for exercise or yard time.  Quarantined patients can have yard time as a group, but should not mix with non-quarantined patients.

*See* CCHCS Website at https://cchcs.ca.gov/covid-19-interim-guidance/, at July 17, 2020 Updated Control Strategies for Contacts to Cases of Covid-19, at "Quarantine Precautions and Conditions for Covid-19 and Influenza."

Dr. Bick's comments at the Task Force Meeting on Tuesday September 1, 2020 suggest that he is unsure what out of cell activities should be allowed when someone is on quarantine, and it is not clear whether or not this existing CCHCS guidance is currently being followed, and what other out of cell activities CCHCS and CDCR believe must continue when patients are on quarantine status.  We urge CCHCS and CDCR to

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 4

continue to ensure class members receive yard and to enhance the policy's requirements by setting forth clear standards for ensuring yard, treatment and other out of cell activities are provided to EOP and higher level of care patients on quarantine status in a safe and appropriate manner.  Out of cell privileges for individuals on quarantine are especially important for some of the first mental health patients we expect to move under the new movement matrix – patients who have been waiting in restrictive TMHUs for the chance to move to a higher level of care.

In practice, in addition to yard, institutions should be given guidance on managing other aspects of routine prison unit life, including phone calls, showers, and medication lines.  Our understanding is that all of these out of cell activities are currently taking place for people in quarantine and thus, there needs to be guidance about them given to institutions.  For example, on Friday August 28, 2020, we spoke with *Armstrong* class members at DVI who were not on quarantine status, but who were inappropriately sharing a housing unit with new arrivals on quarantine status.  The unit in question, H-Wing, has solid-front cells, but the class members were inappropriately mixing with those on quarantine status when making phone calls, and when lining up for medications.  In units with EOPs, instructions will need to be given to staff to keep EOPs separate from other incarcerated individuals during yard and other activities that take place inside and outside of the designated EOP housing unit.

As described by the Special Master's Expert Dr. Kerry Hughes during the September 1, 2020 Task Force Meeting, the *Coleman* experience early in the case with mixed ASU units housing EOPs together with other non-mentally ill individuals is a cautionary tale.  Part of the reason for creating the specialized, separate EOP ASU hubs was that it was harder to ensure the delivery of programming like treatment and yard to EOP patients when they were housed in mixed EOP and general population segregation units.  *See* 5/11/01 Eighth Special Master Monitoring Report at 186 (discussing EOP patients with long stays in segregation being "consolidated" into hub EOP administrative segregation units and noting that "transferred inmates typically have access to better mental health care in the hub EOP administrative segregation units"), and at 188 (noting that mental health patients "are loathe to confide in clinicians in shouted exchanges at cell-front in an administrative segregation unit, where neighbors often become disruptive participants in the clinical conversation.").

Having separate isolation and quarantine units for EOPs is also consistent with the approach of using TMHUs – which bring together individuals needing higher levels of mental health care so their treatment needs and safety can be efficiently addressed and subjected to appropriate oversight.

[3609541.2]

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 5

CDCR should utilize separate housing units for EOP and higher level of care patients in quarantine.  Although we believe this should be done everywhere EOP and higher level of care patients reside, it can be done with the currently designated quarantine and isolation spaces at many prisons:

- CMF, which has designated 5 housing units for isolation and quarantine on the most recent designations chart, can and should designate one of the five units as an EOP-only unit.

- SVSP, CSP-SAC, and other prisons with 180-degree style housing units should make one of the three pods in a designated 180-degree building into an EOP and higher level of care quarantine space.

- Similarly, for prisons with 270-degree style housing units with solid walls separating sections of the buildings, one physically separate portion of the building could be used for EOP and higher levels of care.

- At places like E-Yard at CHCF, where multiple small 20 person tents will be used for isolation and quarantine, it should be relatively easy to designate an EOP-only tent for quarantine, and possibly one for isolation as well should the need arise.

- At the prisons with Level II dorm EOP programs, including at RJD, MCSP, VSP, and CCWF, the institutions should be instructed to empty out a dorm unit for isolation of EOP patients, and to find celled housing to serve as separate quarantine space for these patients.

CDCR and CCHCS must develop a plan in conjunctions with each CDCR prison housing EOP and higher level of care individuals for housing EOPs in separate isolation and quarantine units and for managing their programming and mental health treatment in the unit or units.

II.     **Psychiatric Inpatient Program (PIP) Level of Care:  Acute and Intermediate Hospital Level Care**

Patients in the intermediate and acute inpatient PIP programs in the CDCR are among the most vulnerable and have the most intensive and urgent mental health treatment needs.  Under the Program Guide, these individuals generally have "marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour inpatient care" or are a danger to themselves or others.  2018 Program Guide, Docket 5864-1, 7/20/18, at 12-6-2 (docket page 107). The

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 6

mental health treatment for many or most these individuals cannot be safely interrupted when they need to be quarantined or in isolation.

Fortunately, for the purposes of isolation and quarantine, most PIP units already feature single-occupancy cells with solid doors. Our understanding is that most of the time, single-celled individuals already housed in PIP units will remain in their cells for isolation and quarantine, allowing their intensive mental health treatments need to continue to be addressed, despite the need to be on quarantine or isolation status (and any corresponding need for medical monitoring and/or medical care). It is hoped that this treatment can safely and effectively be provided through individual and group face-to-face contact in the patient's unit in a manner allowing social distancing or, if absolutely necessary, at a patient's cell with the door open to provide for maximum confidentiality and clinical contact.

This is consistent with the general principles set forth in the August 19, 2020 COVID-19 Screening and Testing Matrix for Patient Movement, which notes several times that "for individual cases, the preference is for quarantine in a private room with a solid, closed door." *See, e.g,* 8/19/20 Matrix at p. 8; see also, Public Health Workgroup Recommendations at 1 ("Under optimal circumstances, residents, in quarantine, should be housed individually, in a setting that has solid walls and doors, to ensure that if an exposed person tests positive the risk of transmission to others is significantly reduced."). The Matrix also specifies that "Inmates moving into higher level of care (HLOC) beds (medical CTC, OHU, MHCB, PIP) shall be quarantined in the HLOC." *Id.* at 1.

While we agree with this approach, there are a number of inpatient units (and other HLOC beds like OHU dorms and even CTC dorms) that are not single celled units. We understand, as Dr. Bick explained in this week's meetings, that doubled celled patients with similar exposures may sometimes be quarantined together, but at the same time, when cell-mates have different exposures (for example, from a group, or job, or differential escort staff exposure), they need to be moved to single cells for quarantine. For these cases, the Department needs to set aside quarantine space and have a plan to move patients to single cells. The following PIP units are dorms or double celled units where a patient may need to be moved to a single cell for quarantine:

- The Intermediate Care Facility (ICF) at CMF has many patients in large dorms on A-2 (44 beds) and A-3 (40 beds). Although Vince Cullen asserted that these are dorms of no more than 10 people, individuals in that size dorm should be moved to single cells for quarantine if needed. Moreover, our recollection is that the dorms on these units are much larger than 10 people. In any event, designated quarantine space in a part of the

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 7

> CMF PIP with single cells needs to be emptied out set aside for the PIP patients in these dorms should the need arise.

- The PIP Intermediate Care Facility (ICF) patients in the L-1 Unit at CMF are double celled.

- The PIP Intermediate Care Facility (ICF) patients in the C-5/C-6 PIP units at SVSP are double celled.

- There are PIP ICF patients in the four-man rooms in the TC-1 PIP unit at SVSP

We are also concerned about how quarantine space will work for new PIP arrivals and for discharges. Although we understand that the current plan is to isolate and quarantine PIP patients who are new arrivals from lower levels of care in the PIP admissions units, this plan does not address the need for quarantine and isolation space for individuals in the dorms and double cells above. Also, given that the August 19, 2020 COVID-19 Screening and Testing Matrix for Patient Movement requires 14 days quarantines of all discharging patients as well as for new admissions, it is not clear PIP admissions units will have enough space for managing this movement. Has any assessment been done to determine if PIP admissions units have adequate space in which to quarantine *both incoming and outgoing* patients for 14 days?

It is also not clear that incoming and outgoing patients should or could safely be quarantined together. CDCR and CCHCS need to determine whether there is enough quarantine space available in these units and prepare a plan for how these PIP quarantine spaces will work. The plan should address whether additional space needs to be set aside, for example at CMF, so that class members in dorms and double cells can be moved to quarantine spaces in single cells as needed during an outbreak

We also request that CDCR and CCHCS provide guidance to the PIPs on how to manage their patients during any outbreak impacting their caseloads.

### III.   The Movement Matrix and the Sufficiency of the Beds Currently Set Aside in the Event of an Outbreak

Defendants also need to ensure that overall, there is an adequate amount of isolation and quarantine space. Given the recent August 19, 2020 COVID-19 Screening and Testing Matrix for Patient Movement, we believe additional space may need to be set aside at each prison to facilitate quarantine for movement, as outline in the matrix. Our

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 8

understanding of the methodology of the Public Health experts' report is that they assessed the need for set aside or "reserve" quarantine and isolation space at each prison based on the estimated need in a moderate sized outbreak at the institution, setting aside enough space for re-housing all of the individuals in the two largest open air units.

Indeed, the Public Health Workgroup Recommendations explain the logic of the set asides as follows:  "It is expected that if an outbreak were to occur that has the potential of infecting significant numbers of residents it would likely start and spread within congregate living spaces such as dormitories or cells with open bars or porous doors."  Public Health Workgroup Recommendations at 1.  Moreover, it is clear that the *Plata* Orders charging the Public Health Workgroup with developing this methodology focused on the need in the event of an outbreak:  "At yesterday's case management conference, the Court discussed with the parties whether it should order Defendants **to set aside sufficient space** at each institution to allow the institution to follow public health guidance on isolating and quarantining patients **in the event of a COVID-19 outbreak**." 7/07/20 Order in *Plata v. Newsom,* Docket 3381 at 1:13-16 (emphasis supplied); *see also*, 7/22/20 Order in *Plata*, Docket 3401, at 2:15-16 ("No one disputes that setting aside space for isolation and quarantine in the event of an outbreak is necessary.").

Given the significant additional quarantine space required to implement the 14-day quarantines on each end of the vast majority of transfers under the August 19, 2020 COVID-19 Screening and Testing Matrix for Patient Movement, we believe that additional isolation and quarantine space need to be set aside at every CDCR institution. We do not think the difficulty of further set asides means that such set asides are any less important.  The *Plata* court, in its July 22, 2020 Order, required the following, noting that "the assessments shall be guided by public health considerations, **without regard to whether sufficient space can be reserved at the institution without a further reduction in population.**" 7/22/20 Order in *Plata* at 4:10-12 (¶ 3) (emphasis supplied).

IV.     <u>Conclusion</u>

For all of these reasons, we believe additional focused bed planning is required by CDCR and CCHCS in order to ensure sufficient separated space is set aside for *Coleman* patients at the EOP level of care and higher levels of care.  In addition, CCHCS needs to consider whether additional space should be set aside in order to permit the quarantines associated with the new movement matrix to be adequately housed without impinging on the set asides made to help manage a future COVID-19 outbreak at each prison.

We also believe the CCHCS and DAI need to issue guidance to each institution on how to manage diverse populations, including EOP individuals and other higher LOC individuals, when they are on quarantine status.  This guidance should cover, and provide

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 9

procedures for safely running yard, phone calls, showers, meals, mental health groups and any other essential programming that must continue while individuals are on quarantine.  They must also cover the provision of adequate mental health treatment as required by the Program Guide to patients in quarantine, as well as appropriate oversight and reporting to ensure such treatment is actually occurring.  Experience with past outbreaks, and the fact that the new Matrix for transfers will require 14 days of quarantine on each side of any transfer – for a total of at least 28 days of quarantine – make clear that, particularly for EOPs and other mental health patients likely to decompensate when isolated for prolonged periods, yard and other key out of cell activities like phone calls need to continue when someone is in isolation or quarantine.

We also think CDCR and CCHCS need to require proof of practice from all institutions documenting the steps they have taken to set aside appropriate space for EOPs and PIP patients, and documenting that they have trained staff in the appropriate procedures for managing housing units on quarantine and isolation status.

We look forward to further discussions regarding these critical issues in the hopes of forestalling litigation.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

/s/  Thomas Nolan

By:   Thomas Nolan
*Of Counsel*

TN:TN
cc:     Co-Counsel
        Coleman Special Master Matthew A. Lopes
        Coleman Special Master Team
        Ed Swanson
        *Armstrong* Co-Counsel
        *Plata* Co-Counsel
        Adriano Hrvatin
        Elise Thorn
        Tyler Heath
        Damon McClain
        Roman Silberfeld
        Glenn Danas
        Kyle Lewis

[3609541.2]

Dr. Timothy Bick, Dr. Diana Toche
September 4, 2020
Page 10

       Lucas Hennes
       Carrie Stafford
       Nick Weber
       Melissa Bentz
       Dillon Hockerson
       Sean Rashkis
       Nina Raddatz
       Christine Ciccotti
       Kristopher Kent
       Connie Gibson
       Vincent Cullen
       Joe Moss
       Dawn Lorey
       Jennifer Neill

# EXHIBIT B



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email:  jwinter@rbgg.com

September 10, 2020

<u>VIA ELECTRONIC MAIL ONLY</u>

CDCR OLA Team
CDCR Office of Legal Affairs
Carrie.Stafford@cdcr.ca.gov
Nicholas.Weber@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

Re:    *Coleman v. Newsom*: Comments and questions regarding the revised
          Movement Matrix and CDCR-CCHCS Institutional Roadmap to Reopening
          <u>Our File No. 489-3</u>

Dear CDCR OLA Team:

Plaintiffs have ongoing concerns regarding both the August 19, 2020 revision of the Movement Matrix and the August 14, 2020 Roadmap to Reopening, and specifically those policies' failure to account for *Coleman* class members' needs and the constitutional minima in this case.  We describe our main concerns, requests for clarification, and questions below.

**I.     Movement Matrix**

While the recent revisions to the Movement Matrix are a fundamental step toward ensuring class members and others are transferred between CDCR institutions safely, the Matrix does not answer the questions critical to the *Coleman* class:  What is Defendants' plan for assuring class members are able to resume transfers to higher levels of mental health care safely?  What is CDCR's plan to ensure that the transfer of class members from harmful segregation settings resumes?  Relatedly, the Matrix does not address transfers to and from closed institutions—the vast majority of institutions—and does not provide a mechanism for refining COVID-19-related closures, so that they do not preclude movements for entire institutions.  Plaintiffs have expressed since the onset of the pandemic our very grave concerns regarding class members' constitutional right to

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA team
September 10, 2020
Page 2

access higher levels of care and to be released from unduly punitive, isolating settings that exacerbate their mental health conditions.  These problems are decades-old, but since the pandemic began, they have become much worse.  As the pandemic moves into its sixth month, there is no end in sight to Defendants' failure to meet class members' need to transfer to higher levels of mental health care and to be released from high-security housing that exacerbates the acuity of their mental health conditions.

> A. **The Movement Matrix does not resolve the need for Defendants to develop a plan to move patients to higher levels of mental health care.**

The Movement Matrix's restrictions on transfers, coupled with the closure of roughly two-thirds of CDCR institutions to transfers, only reinforces the current status quo of denying patients' access to higher levels of mental health care.  Unfortunately, this stagnation continues against the backdrop of Defendants creating at least two politically-oriented exceptions to their own limitations on transfers to and from closed CDCR institutions—to allow the resumption of intake from county jails and to permit individuals with resolved COVID-19 cases to transfer to fire camps—and another politically-motivated exception for patients designated as Offenders with a Mental Health Disorder ("OMHDs") to continue to transfer from CDCR to DSH.  Given that Defendants are willing to craft these exceptions in response to political pressure, they should be developing a means of ensuring they can meet well-established constitutional and court-ordered standards for access to mental health treatment.

Defendants' failure to develop a plan to ensure class members resume movement to higher levels of mental health care is not only unconstitutional, it is dangerous.  Transfers to higher levels of mental health care have basically ceased in the last six months and will continue to remain essentially unavailable from closed institutions under the Matrix, and the rate of referrals for MHCB, acute, and intermediate inpatient treatment have all plummeted.  These two facts are connected, and strongly suggest, as has happened too often in the history of the case, that clinicians who otherwise would refer patients to higher levels of mental health care for clinically necessary treatment are choosing not to do so in the face of what they perceive as futility.  That the rates of self-injurious behavior with and without the intent to die have *increased* over the comparable period last year, while referrals have dropped by roughly half as compared to 2019, is just one piece of evidence corroborating the resurgence of this trend.  *Compare* **Exhibit 1** at 1 (September 9, 2020 COVID Dashboard Safety page showing rates of self-injurious behavior over time), *with id.* at 2-4 (September 9, 2020 COVID Dashboard pages for MHCB, acute, and ICF levels of care).  Indeed, for the first months of 2020, referral rates for all three categories of inpatient psychiatric hospitalization were significantly higher than the same months in 2019—until the trend dramatically reversed after Defendants

[3604356.4]

PRIVILEGED AND CONFIDENTIAL
CDCR OLA team
September 10, 2020
Page 3

imposed the pandemic-related restrictions this spring.  *See id.* at 2-4. Meanwhile, rescissions of MHCB referrals after 3 or more days, which were basically non-existent in 2019, occur between 5 and 15% of the time in any given week now.  *See id.* at 2.

In addition to what is likely a very substantial unidentified need and culture of failing to refer for inpatient-level mental health care, Defendants confirmed during the September 8, 2020 Taskforce meeting that they still have no real means of accurately tracking and monitoring even those who have actually been referred for such care, much less what level of mental health treatment and programming those patients are receiving while they await inpatient care.  Plaintiffs have repeatedly pointed out to Defendants that their court-ordered reporting and tracking systems do not identify or provide accurate information for dozens, if not hundreds, of individuals being treated in place (whether formally designated as such or not), while awaiting a transfer to inpatient care that is likely not to come.  Defendants also confirmed that, five months after issuing the April 10 and 17 policies requiring enhanced treatment and oversight of all patients awaiting inpatient care, they have no way systematically to report, track, or monitor compliance with those policies, or indeed to know whether patients awaiting inpatient care are receiving even the bare minimum of treatment and programming Defendants committed to provide during the indefinite pendency of their referrals.

Additionally, Defendants have essentially ceased all transfers of class members from CDCR to DSH institutions.  For the last three weeks for which Plaintiffs have received reports, not a single *Coleman* class member transferred from CDCR to DSH. During the same time period, 29 OMHD individuals were transferred to DSH, most directly from CDCR institutions.  In the last week that admissions of *Coleman* class members from CDCR to DSH occurred—the week ending on Friday, August 14, 2020— three *Coleman* class members transferred from CDCR to DSH, along with 10 OMHD individuals.  CDCR and DSH also have not agreed on a system for quarantining discharges from DSH to CDCR, reportedly making DSH unable to accommodate both intakes and discharges for *Coleman* class members on top of OMHD intakes, which they continue to prioritize.

Similar to the trends in inpatient transfers, Defendants have not developed a plan to prioritize transfers of class members out of the desert institutions.  By design and pursuant to negotiated agreement, Defendants are not required to staff the desert institutions sufficiently to meet the current need for mental health care at those institutions.  In Taskforce discussions, Defendants have admitted they do not have the means to provide Program-Guide-level care to at least some of the individuals who remain in the desert institutions, including the two EOP and one MHCB class members

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA team
September 10, 2020
Page 4

the COVID-19 Dashboard currently show as awaiting transfer to higher levels of care at CAC, CAL, and ISP.

**B.      Defendants are not transferring class members out of segregation settings.**

Defendants have not committed to prioritizing moving class members out of segregation settings. Defendants reported on September 1 that of the 1,283 people currently in segregation who should not be there, a full one-half—627—are class members. As of September 9, 2020, Defendants' COVID-19 Dashboard showed that 176 of the 501 EOP patients not housed in an EOP bed are in an inappropriate and dangerous segregation unit: 73 are in a regular non-mental health ASU, 93 in an STRH, and 10 in an LTRH. Forty-two of those 176 EOP class members are in a non-EOP segregation unit at SAC, which last year had the highest number of suicides ever.

Defendants must commit to prioritizing class members' transfers out of segregation over non-class members, but their Matrix and related comments at the recent taskforce meeting reveal they have no commitment to doing so. Defendants know, and the *Coleman* Court has held, that segregation is exceedingly dangerous for class members. The segregation suicide rates have been sky high for years, and 2020 is no exception: Over forty percent of all suicides this year to date have been in segregation units (7 out of 17). That is a ten percent increase from last year, when 12 of 38 completed suicides occurred in segregation units. Confining class members in segregation who should not be there, and treating their transfers out as one more administrative task rather than the high priority they must be, is dangerous and could well result in additional needless and avoidable death.

**C.      The Movement Matrix creates rigorous protocols to move patients between institutions safely, and those protocols should be used to resume mental health transfers on a non-emergent basis.**

While the Movement Matrix imposes rigorous measures to manage the risk of COVID-19 infections due to transfers, they have not led to Defendants' development of a means to open their system, even a small amount, to increased transfers for the purpose of ensuring class members receive adequate mental health treatment.

Defendants have reported, for example, that they now have strong testing capabilities: 70% of their PCR tests are returned within 48 hours, and more than 90% are returned within 72 hours. CDCR's access to the less reliable, but still effective, rapid-

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA team
September 10, 2020
Page 5

response tests is a useful supplement to the PCR tests, to reduce the COVID-19 risk associated with transfers even further.

Defendants also report having ample PPE supplies, and space set aside to facilitate quarantining individuals who transfer:  They should be able to resume non-emergent transfers, at least on a measured basis, and to prioritize mental health transfers above purely administrative transfers.  As noted above, Defendants must also develop a more nuanced approach to transfers to and from closed institutions—for example, closing and keeping closed all of CHCF based on one to three positive patient tests at any given time is excessive, in light of the significant resources invested in that facility for the purpose of providing mental health services.[1]  That Defendants have found ways to resume transfers due to political expediency—and never stopped transferring OMHDs—only underscores that transfers for the purpose of providing mental health treatment can and should be accomplished in a safe manner.

## II.    Roadmap to Reopening

We were concerned to learn that the CDCR-CCHCS policy Institutional Road Map to Reopening was issued on August 14, 2020 without input from Plaintiffs.  We hope that our comments below will have some impact on at least the interpretation and implementation of the policy, if not lead to appropriate revisions, given that we have been unable to address this document in depth in Taskforce meetings to date.

First, the last paragraph under the heading "Phases Defined" states that "movement between phases may apply to the entire institution or individual facilities within an institution, at the discretion of the Warden and CEO."  We appreciate that institutional leadership will have this flexibility, so that both safety and programming can be maximized.  To be clear, however, what is the definition of "facility" in this paragraph?  Does "facility" mean an entire yard (e.g., A Yard or B Yard), or does it mean down to the housing unit, assuming individual housing units are sufficiently physically separated from other housing units?  We hope not only that the latter is true—that "facility" can refer to spatial divisions within institutions that are smaller than yard-size,

---

[1] At least part of the basis for the ongoing wholesale closure of CHCF seems to be the number of staff-positive COVID-19 cases there.  While the Movement Matrix and Roadmap to Reopening acknowledge to a certain extent staff's role in the pandemic, neither adequately accounts for, much less adequately addresses, the reality that due to their interactions in the community outside the institutions, staff are the most likely vectors for infecting patients, and therefore causing institutions to close and to remain closed for extended periods of time.

[3604356.4]

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA team
September 10, 2020
Page 6

so long as they can be sufficiently physically separated to maintain safety—and that this point is emphasized with institutional leadership. Programming and mental health treatment offerings have been severely limited thus far in the pandemic. Institutional leadership should understand the message that they are obligated to find ways to provide these essential offerings to class members wherever safe to do so.

Second, the memo requires institutional leadership to report daily to the Department Operations Center both "their current phase, and any plans to move to different phases in subsequent days." Please provide reports on institutions' movement through the phases at least weekly, so we have an idea of impacts to programming. This reporting should include any movement between phases that occurs in a subdivision of an institution, like a yard or housing unit.

Third, the factors to consider in moving between phases seem to be missing at least one important element: Because staff members are the main sources of virus transmission into facilities, each institution should be considering the extent to which staff are moving between and interacting with patients on different units. This factor is referenced in the paragraph describing leadership's decisionmaking, but is not specified as a factor for moving between phases.

Fourth, other than the Roadmap's first and sixth factors—addressing patient case rates and employee testing and contact tracing—the factors use the words "adequate" or "inadequate" to describe what protective measures are in place at the institutions. Have institutional leadership been provided any concrete or enumerated direction as to what constitutes "adequate" or "inadequate?" As used in the policy, these terms are quite vague and therefore easily could be misinterpreted or misapplied, or cause confusion that will yield inconsistent application in the field. If these terms are meant to be interpreted by reference to another operational policy, such policy should be linked or specifically referenced in the Roadmap.

Fifth, while we understand that the Roadmap is intended to be protective of COVID risk, we are concerned that nearly all the factors used to determine whether an institution or facility should move from one phase to another mean that an institution or facility will remain at Phase I for extended periods of time, and may never be able to move from Phase I effectively. Particularly because of this strong default to Phase I, the terms under the "General Operation Provisions" and "Health Care Operations" subheadings must be defined to permit mental health treatment to be provided at all phases. Specifically, the term "essential and critical health care appointments"—those allowed at Phase I—must include, for example 1:1 primary clinician contacts; 1:1 psychiatry contacts; SRASHE and Columbia screener interviews; IDTTs; and mental

[3604356.4]

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA team
September 10, 2020
Page 7

health treatment groups provided in a socially distanced setting with PPE for all attendees and staff, as well as the minimal requirements set forth in the April 10 and 17, 2020 policies.  Class members must start receiving constitutional levels of mental health treatment again, with safety precautions in place to manage the risk of COVID-19.  Similarly, "mental health services" that resume during Phase II must be defined.

Sixth, we appreciate that limited visitation can resume at Phase II.  But visitation behind glass partitions or by video should be safe during Phase I.  Please consider safe options to allow visitation at Phase I, or explain why such measures cannot happen given the longstanding nature of the pandemic and the outsized effect on the *Coleman* class.

* * *

As the Court has recently directed, "Defendants shall comply with the requirements of the Program Guide to the full extent possible consistent with public health best practices for members of the *Coleman* class in the circumstances of the COVID-19 pandemic."  Order, ECF No. 6791 at 4-5 (July 28, 2020); *see also id.* at 4 (stating that Defendants must work with the Special Master in planning for quarantine and isolation space "to ensure no further harm results to the delivery of mental health care to members of the *Coleman* class").  Notwithstanding obligations in other cases, Defendants must implement future COVID-19 policies with understanding of and while accounting for their constitutional obligations to the *Coleman* class.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jessica Winter*

By:   Jessica Winter

JW:JW
cc:   Adriano Hrvatin
     Elise Thorn
     Tyler Heath
     Damon McClain
     Kyle Lewis
     Lucas Hennes
     Roman Silberfeld

[3604356.4]

**PRIVILEGED AND CONFIDENTIAL**
CDCR OLA team
September 10, 2020
Page 8


      Glenn Danas
      Sean Rashkis
      Nina Raddatz
      Christine Ciccotti
      Kristopher Kent
      *Coleman* Special Master team
      Co-counsel

# Exhibit 1





Glossary

# COVID-19 MH Operational Impact Dashboard - MHCB

Region

All



# COVID-19 MH Operational Impact Dashboard - Acute

Glossary

Region

All ▾

## Acute Location

Institution ● CHCF ● CIM ● CIW ● CMC ● CMF ● COR ● KVSP ● LAC ▶



## Bed Type



PIP   MCB   ICF

### Referrals

● 2020 ● 2019

## Acute in THMU & ELOC



Inpatient_ELOC   82

Outpatient_ELOC   2

---

| FSP | ASP | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | CAC | HDSP | ISP | KVSP | LAC | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |

# COVID-19 MH Operational Impact Dashboard - ICF

Glossary

Region
All

## ICF Location



## Bed Type



## ICF in THMU & ELOC

| | |
|---|---|
| Outpatient_ELOC | 139 |
| Inpatient_ELOC | 50 |
| TMHU | 2 |
| TMHU MAX | 2 |

| FSP | ASP | CAL | CCC | CCI | CCWF | CEN | CHCF | CIM | CIW | CMC | CMF | COR | CRC | CTF | CVSP | DVI | CAC | HDSP | ISP | KVSP | LAC | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SQ | SVSP | VSP | WSP |