XAVIER BECERRA, State Bar No. 118517
Attorney General of California
ADRIANO HRVATIN, State Bar No. 220909
Supervising Deputy Attorney General
KYLE A. LEWIS, State Bar No. 201041
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7318
 Fax: (916) 324-5205
 E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

HANSON BRIDGETT LLP
PAUL B. MELLO, SBN 179755
LISA M. POOLEY, SBN 168737
SAMANTHA D. WOLFF, SBN 240280
LAUREL E. O'CONNOR, SBN 305478
1676 N. California Blvd., Suite 620
Walnut Creek, California 94596
Telephone:    925-746-8460
Facsimile:    925-746-8490

*Attorneys for Defendants*

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
 2049 Century Park East, Suite 3400
 Los Angeles, CA 90067-3208
 Telephone: (310) 552-0130
 Fax: (310) 229-5800
 E-mail: RSilberfeld@RobinsKaplan.com
*Special Counsel for Defendants*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | Case No. 2:90-CV-00520 KJM-DB (PC) <br><br> **DEFENDANTS' RESPONSE TO THE COURT'S JULY 30, 2020 ORDER** <br><br> Date:      September 24, 2020 <br> Time:      9:00 a.m. <br> Crtrm.:   3, 15th Floor <br><br> Judge:   Hon. Kimberly J. Mueller |

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................................... 1

Factual Background and Procedural History ...................................................................... 2

   I.       Background Regarding Staffing Requirements ........................................................ 2

       A.     In 2002, the Court Set an Arbitrary 10% Vacancy Rate ...................................... 3

       B.     CDCR's 2009 Staffing Plan ............................................................................. 5

       C.     Development of Defendants' Updated Staffing Plans ........................................... 6

       D.     The October 10, 2017 Order on Staffing ........................................................... 7

       E.     CDCR Has Taken Proactive Steps to Modify the 2009 Staffing Plan to Reflect the Evolution of CDCR's Mental Health Program ...................................................... 7

       F.     CDCR's Current Staffing Proposals .................................................................. 8

   II.      Circumstances Have Changed Dramatically Since the Issuance of the Court's Prior Staffing Orders .................................................................................................. 11

       A.     CDCR's Prison Population Has Dropped Precipitously in Recent Months, and the Coleman Class Is Significantly Smaller Than It Was in 2017 .............................. 11

       B.     CDCR's System for Delivering Effective Mental Health Care Has Significantly Changed Since It Developed the 2009 Staffing Plan ......................................... 12

       C.     Changes in the Allocated Number of Providers Since 2017 ................................. 16

       D.     Current Efforts to Address CDCR's Staffing Needs .......................................... 17

Argument ........................................................................................................................ 17

   I.       This Court's First Question Proposing a Mental Health Population Reduction Lacks Foundation and Has No Relationship to Constitutional Access to Care ..................... 17

       A.     The Court's Inquiry Is Based on A Flawed Premise ............................................ 17

       B.     Defendants Can Provide Constitutionally Adequate Care at Current Staffing Levels .................................................................................................... 20

   II.      This Court's Second Question – Regarding the Development of a Plan to Reduce the Number of MHSDS Incarcerated Persons – Arises Out of Several Misguided Assumptions ....................................................................................................... 22

   III.    A Number of Alternative Remedies Available to the Court Exist to Enforce its October 10, 2017 Order ............................................................................................. 23

       A.     The Court Should Order A Time and Motion Study To Determine Appropriate Staffing Ratios ............................................................................................ 24

       B.     The Court Should Remove Unwarranted Restrictions on the Use of Telepsychiatry for Providing Essential One-On-One Treatment .............................................. 24

       C.     The Method of Calculating Staffing Needs Should be Revised ............................ 25

       D.     A Recruitment and Retention Report Is In the Process of Being Developed ........ 26

   IV.    Additional Remedies Are Also Available, in Response to this Court's Fifth Question, for the Shortfall in PIP Staffing .................................................................................. 26

   V.     Due Process Requires that Defendants Be Afforded a Full Opportunity to Defendant Themselves with Expert Testimony ....................................................................... 28

i

1

**TABLE OF CONTENTS**

2

(continued)

**Page**

3

Conclusion ...................................................................................................................... 30

Certification.................................................................................................................... 31

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

<u>Page</u>

CASES

*Brown v. Plata*
    563 U.S. 493 (2011) ...........................................................................................23

*Coleman v. Wilson*
    912 F.Supp. 1281 (E.D. Cal. 1995) .................................................................15

*Coleman v. Wilson*
    912 F.Supp. 1282 (E.D. Cal. 1995) ......................................................... *passim*

*Little v. Kern Cty. Superior Ct.*
    294 F.3d 1075 (9th Cir. 2002) .........................................................................30

*Plata v. Newsom*
    Case No. 01-1351 JST, ECF No. 3389 ...........................................................9, 11

STATUTES

18 U.S.C.
    § 3626(a)(1)(A) ................................................................................................22
    § 3626(a)(3) ......................................................................................................23
    § 3626(a)(3)(B) ................................................................................................23
    § 3626(a)(3)(E) ................................................................................................23
    § 3626(g)(4) ......................................................................................................23

CONSTITUTIONAL PROVISIONS

United States Constitution
    Eighth Amendment ...........................................................................................20

OTHER AUTHORITIES

https://www.calhr.ca.gov/labor-relations/Documents/ta-20200701-20220701-
    bu16.pdf; ..........................................................................................................11

https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2020/ ........................11

https://www.cdcr.ca.gov/research/wp-
    content/uploads/sites/174/2020/07/Tpop1d200708.pdf ...................................11

https://www.cdcr.ca.gov/research/wp-
    content/uploads/sites/174/2020/09/Tpop1d200909.pdf ...................................11

iii

## INTRODUCTION

Our society is facing the most significant public health crisis in more than a century. The world as we know it has changed, including within the California Department of Corrections and Rehabilitation's (CDCR's) institutions, as officials work to mitigate the risks associated with COVID-19. During this time, Defendants have taken bold and unprecedented steps aimed at keeping the incarcerated population and staff safe. These mitigation efforts have been multifaceted and have included reducing the prison population by more than 19,400 incarcerated persons since the beginning of March 2020.

In the midst of their efforts to confront the pandemic, the Court asks Defendants to address issues relating to the 2009 Staffing Plan and population levels. But, due in large part to the ongoing public health crisis, the delivery of mental health services to *Coleman* class members is far different now than it was in 2002, when the maximum ten percent psychiatry staffing vacancy rate was established; in 2009, when CDCR developed the existing Staffing Plan; or in 2017, when the Court directed Defendants to come into complete compliance with the staffing ratios set forth in the 2009 Staffing Plan. ECF No. 5711 at 30. Not only has the delivery of mental health services changed since 2002, 2009 and 2017, but the number of patients in CDCR's Mental Health Services Delivery System (MHSDS) has dropped dramatically in recent months from 35,751 patients on March 16, 2020, to 30,265 patients on September 8, 2020, a reduction of over 5,486 *Coleman* class members. (Decl. of J. Powell Supp. Defs.' Resp. (Powell Decl.) ¶¶ 5, 7.) And, 8,671 fewer patients since October 9, 2017. (*Id.* ¶ 6.)

Now is not the time for a hearing on the 2009 Staffing Plan. Not when the methods and persons providing mental health services to the *Coleman* class have changed and are still evolving, flaws exist in the assumptions underlying the 2009 Staffing Plan and methodology used to calculate the statewide psychiatry fill rate, and vacancy rates are vastly improved and all indications are that they will continue to improve. Indeed, when the State's population reductions are factored in, and psychiatric nurse practitioners are included in the staffing vacancy analysis, Defendants' fill rate approaches a number very close to the 90% rate mandated by the Court's October 2017 order. The Court should give these developments time to unfold and allow

1   Defendants to collaborate with the Special Master and the Plaintiffs on updating the 2009 Staffing

2   Plan accordingly.

3       If, however, this Court believes that it should conduct a hearing on the 2009 Staffing Plan,

4   it should afford Defendants the opportunity to meaningfully defend themselves against the relief

5   foreshadowed by the Court's questions.  The questions presented by the Court's July 30 and

6   August 25, 2020 orders, and the relief they seem to suggest, are not a matter of simple arithmetic.

7   Rather, they go to the heart of the issues in this case and require expert analysis.  The Court's

8   questions further require Defendants' experts and the Court to base their analysis, in part, on

9   verified data.  That is simply impossible here, where the Special Master's data expert has not

10  reported on his progress to date, let alone completed his analysis, assumptions based upon the data

11  will undoubtedly be questioned by Plaintiffs, the Court has stated that Defendants must wait for

12  the Special Master and his data expert to complete remediation of certain data management and

13  quality assurance issues, and where Defendants' experts cannot complete their analysis for some

14  time due to the ongoing pandemic.

15      For all these reasons, the Court should not issue any additional staffing-related orders in

16  connection with the 2009 Staffing Plan at this time.  Instead, it should allow Defendants the

17  opportunity to work with the Special Master to build on the recent and significant changes

18  impacting the delivery of mental health services to the *Coleman* class.

19  <u>**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**</u>

20  **I.    BACKGROUND REGARDING STAFFING REQUIREMENTS**

21      Staffing requirements for the MHSDS have been the product of multiple reports, plans, and

22  Court orders.  Following a 1994 trial, the Court announced Defendants' constitutional obligations

23  on staffing as requiring them to "employ mental health staff in 'sufficient numbers to identify and

24  treat in an individualized manner those treatable inmates suffering from serious mental

25  disorders.'"  *Coleman v. Wilson*, 912 F.Supp. 1282, 1306 (E.D. Cal. 1995) (quoting *Balla v. Idaho*

26  *State Board of Corrections,* 595 F.Supp. 1558, 1577 (D. Idaho 1984)).

27      After being appointed in 1995, then-Special Master Keating wrote a series of reports on his

28  assessment of mental health staffing, including staffing ratios and staffing vacancy rates.  Those

16829598.8

1   reports and his assessment of mental health staffing were summarized in Special Master Lopes'

2   2017 report on staffing.  *See* Special Master's Report on the Status of Mental Health Staffing and

3   Implementation of Defendants' Staffing Plan, ECF No. 5564.  That report documents Defendants'

4   14-year effort (from 1995 and 2009), in collaboration with the Special Master, his team of experts,

5   and Plaintiffs' counsel, to improve mental health staffing.  During that 14-year period, CDCR

6   pursued various proposals to address staffing issues, including with respect to staffing ratios.  *See*

7   Special Master's Recommendations for Staffing Ratios, ECF No 994.

8        On June 15, 1998, the Court directed the Special Master to file recommendations for

9   staffing ratios.  ECF No. 948.  On May 19, 1999, the Special Master recommended that

10  Defendants reduce the vacancy rate among psychiatrists to 25% or less and to 10% or less for

11  psychiatric social workers, while keeping vacancy rates among other categories of mental health

12  staff at present or comparable levels.  ECF No. 1032.  On July 26, 1999, the Court ordered

13  Defendants to reduce vacancy rates as recommended by the Special Master within 90 days.  ECF

14  No. 1055.

15       **A.    In 2002, the Court Set an Arbitrary 10% Vacancy Rate.**

16       Defendants worked for over two years to comply with the July 26, 1999 order that set the

17  25% vacancy goal for psychiatry.  Initially, Defendants requested an extension of time to achieve

18  that vacancy rate.  ECF No. 1072.  When asked by the Court for his input, the Special Master filed

19  a report on December 27, 1999 describing Defendants' five-year effort to search for effective

20  ways to fill psychiatrist vacancies and recommended the Court grant Defendants' request for more

21  time.  ECF No. 1102 at 4-8.  The Special Master filed another report on July 20, 2000, explaining

22  both improvements in mental health staff salaries and the challenges Defendants had in filling

23  mental health staff vacancies.  ECF No. 1184.  The Court approved the Special Master's

24  recommendation to provide Defendants additional time to comply with the July 26 order (ECF No.

25  1198), and on December 20, 2000, the Special Master again reported on Defendants' compliance,

26  noting that Defendants reduced the psychiatry vacancy rate to roughly 10%, well within the 25%

27  goal. ECF No. 1227 at 5.  On April 1, 2001, the Court issued an order adopting the December 20,

28  2000 report in full, and ordering Defendants to pursue alternative solutions to staffing, including

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1  privatization.  ECF No. 1262.

2       On September 26, 2001, the Special Master reported on those efforts, including

3  Defendants' failed attempt at privatization, and Defendants' continued success at meeting the 25%

4  vacancy goal with the use of contract psychiatrists.  ECF No 1304 at 7.  The Special Master issued

5  a second report on February 26, 2002, again touting Defendants' success at keeping psychiatrist

6  vacancies under 25% by using contract psychiatrists.  ECF No. 1351 at 4-5.  Then, presumably to

7  maintain pressure on Defendants to sustain staffing levels, the Special Master unexpectedly

8  recommended the Court change the 25% vacancy goal to 10%:

9  
> Nonetheless, the defendants' use of expanded contracted services
> and the concentration of case management services in psychologists

10
> to counter weaknesses in their ability to attract sufficient numbers of
> permanent clinical staff have been largely successful. It is absolutely

11
> critical that the defendants maintain their current patterns of
> contracting for clinical services and resist any temptation to reduce

12
> such services in response to calls for budget reductions. Indeed, the
> monitor recommends that the court require the defendants to

13
> maintain the vacancy rate among psychiatrists and case managers at
> no greater than ten percent, including contracted service.

14

15  *Id*. at 6.  The Special Master's recommendation for a 10% vacancy threshold is not justified or

16  explained further in the report.  Nor has there has there ever been a finding that vacancy rates of

17  10% or less are required to provide "sufficient" mental health treatment to the *Coleman* class.

18  And the February 26, 2002 report recommends a 10% vacancy rate while at the same time

19  acknowledging Defendants' inability to meet the 25% vacancy goal established in 1999 without

20  the use of contract staff.  *Id*. at 12.

21       On June 13, 2002, with the knowledge that Defendants had struggled over a three-year

22  period to achieve the 25% vacancy goal without the use of contract staff, the Court adopted the

23  recommendation and ordered Defendants to maintain a vacancy rate of no less than 10% for

24  psychiatrists and case managers, who are psychologists and social workers.  ECF No. 1383.  Less

25  than a month later, the Special Master offered the following justification for the drastic change:

26
> That recommendation represented less a retreat from mandated
> standards than acknowledgement that there is more than one way to

27
> skin a cat.  The focus on the hiring of permanent staff overlooked

28
> the contribution of contracted staff to vacancy reduction, especially

-4-

Case No. 2:90-CV-00520 KJM-DB (PC)

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

in light of the department's successful efforts to improve substantially its contracting practices by, among other measures, requiring fewer contractors to provide expanded hours of service consistently.

ECF No. 1392 at 6.

### B.    CDCR's 2009 Staffing Plan.

On June 18, 2009, the Court ordered Defendants to "continue to take all steps necessary to resolve all outstanding staffing allocation issues" and to "complete a staffing plan by the end of August 2009." ECF No. 3613 at 2-3.  Defendants filed a staffing plan on September 30, 2009.  ECF No. 3693.  The 2009 Staffing Plan was supplemented to add custody and correctional counselor positions on November 23, 2009.  ECF No. 5564 at 4 and 33.

On March 4, 2010, the Special Master informed the parties in a letter that CDCR's staffing plan is the "best-designed and most comprehensive effort to cover staffing offered to date," and noted it would "**of course** [be subject] to any necessary modifications as they may become apparent in the future."  ECF No. 5564 at 30-36 (original emphasis).  The Special Master considered the ratios and allocations for different programs set forth in the plan to be reasonable as long as they could be adjusted based on actual experience and as future analyses unfold.  *Id.* at 31-33.  The Special Master noted that Plaintiffs did not object to the staffing plan.  *Id.* at 34.  But the Special Master did not file the March 4, 2010 letter with the Court that year, and, in a departure from his prior practice, submitted no report and made no recommendations to the Court regarding Defendants' 2009 Staffing Plan.[1]  Following the filing of the 2009 Staffing Plan, the Court did not immediately issue an order on Defendants' implementation or adoption of the 2009 Staffing Plan or find that it was necessary to provide constitutional staffing, although since that time, the Court has issued orders addressing Defendants' obligations under the plan and signaling the need for Defendants to reconsider the staffing ratios set forth in that plan.[2]

---

[1] Defendants have reviewed the court docket and been unable to locate any filing with the March 4, 2010 letter until the Special Master's February 6, 2017 report on staffing.

[2] Defendants acknowledge those prior orders where the Court restates the 1994 holding that requires them to "employ mental health staff in 'sufficient numbers to identify and treat in an

**C.    Development of Defendants' Updated Staffing Plans.**

On March 18, 2014, the Court ordered CDCR to review whether the current salary schedule for prison psychiatrists was competitive.  ECF No. 5116.  Following Defendants' report that psychiatrists' salaries were within the range of comparable private and public sector salaries within California and nationally (ECF No. 5123 at 3), on June 19, 2014, the Court acknowledged that Defendants' staffing difficulties might require more than salary increases and suggested that reconsideration and revision of the staffing ratios set forth in the 2009 Staffing Plan could be warranted:

> The ongoing difficulties with staffing even with a competitive salary structure suggest, and the Special Master confirms, that it is necessary to revisit and, as appropriate, revise the existing staffing plan in order to resolve the continuing problem of mental health staffing shortages and ensure that defendants come into compliance with the requirements of the June 13, 2002 order concerning maximum mental health staff vacancy rates.

ECF No. 5171 at 3.  Defendants chose to focus their staffing-related efforts between 2015 and 2016 on developing plans to improve hiring and retention, rather than revisit the staffing ratios set forth in the 2009 Staffing Plan.  But the Court's observation that Defendants should consider revisiting staffing ratios was consistent with the Special Master's recommendation that the staffing ratios are subject to modification under the right circumstances.  *See* ECF No. 5564 at 33.

On February 2, 2015, Defendants filed their Report on Review of Mental Health Staffing, which set forth proposals to improve hiring and retention for mental health staff.  ECF No. 5269.  On May 18, 2015, the Court approved Defendants' proposals to improve mental health staffing.  ECF No. 5307.  Over the ensuing two years, Defendants presented three updates of their staffing proposals to the Special Master and Plaintiffs for input.  On August 9, 2016, the Court adopted the Special Master's Twenty-Sixth Round Monitoring Report and ordered Defendants to provide monthly updates on the implementation of their staffing plan and to meet monthly with the Special Master to confer and consider strategies and initiatives to resolve staffing issues.  ECF No. 5477.

individualized manner those treatable inmates suffering from serious mental disorders.'"  *See* ECF No. 5711 at 3-4.

1    Those meetings culminated in a focused set of updated staffing plan proposals, which CDCR

2    submitted to the Special Master on January 10, 2017.  ECF No. 5564 at 38-47.

3        **D.    The October 10, 2017 Order on Staffing.**

4        On February 6, 2017, the Special Master filed his report on CDCR's 2017 staffing

5    proposals.  ECF No. 5564.  Defendants objected to the Special Master's report on the basis that,

6    due to advances in technology and changes in the mental-health job market, "the need and

7    feasibility of maintaining outdated staffing ratios and vacancy rate mandates are outdated and

8    should be reconsidered."  ECF No. 5591 at 17.  The Court adopted the report's recommendations,

9    in part, on October 17, 2017, rejected Defendants' request to revisit the 2009 Staffing Plan and

10   instead mandated compliance with the plan's staffing ratios within one year.  ECF No. 5711.  In a

11   subsequent orders, however, the Court made clear that "in accordance with the court's October 10,

12   2017 order," psychiatrist staffing ratios may be "on the table for the parties' discussion."  ECF No.

13   5774 at 4.  And it asked the parties to consider in an All-Parties Workgroup, "[k]eeping in mind

14   that the staffing levels that preceded the current ratios were constitutionally inadequate, [whether

15   there] are [] any adjustments to the psychiatry staffing ratios that could be made to alleviate the

16   psychiatrists staffing shortages without compromising the constitutionally required access to

17   adequate mental health care."  ECF No. 5786 at 4.  The Court noted, The Special Master is

18   working with the parties on a range of issues related to solving the ongoing shortage of prison

19   psychiatrists. The court has every expectation that with clear direction and focused effort, the

20   outstanding staffing issues can be resolved in the All-Parties Workgroup."  *Id.* at 3.

21       **E.    CDCR Has Taken Proactive Steps to Modify the 2009 Staffing Plan to
              Reflect the Evolution of CDCR's Mental Health Program.**
22

23       Because the 2009 Staffing Plan is based on assumptions that are inconsistent with the

24   current MHSDS, in 2017 and 2018, Defendants took a number of steps to address CDCR's

25   staffing vacancy issues.  ECF Nos. 5841 at 2-3, 8-9; 5841-2; and 5841-3.  Defendants retained

26   staffing consultants and labor economists to examine, among other issues, the impact of the

27   nationwide shortage of psychiatrists on CDCR's ability to consistently fill 90% of all psychiatry

28   positions and whether any changes in salary or conditions of employment would be likely to

16829598.8

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1   improve vacancy rates.  ECF No. 5841 at 5-6.  Defendants also reviewed whether CDCR was

2   properly allocating psychiatrists, worked to negotiate a telepsychiatry policy, and considered the

3   possibility of further clustering mental health patients.  *Id.* at 6.

4        Based on these efforts, CDCR developed several proposals for psychiatrist staffing,

5   including adjusting the ratios for required psychiatry staff and increasing operational efficiencies.

6   ECF No. 5841-2.  If fully approved and implemented, CDCR's proposals to modify the 2009

7   Staffing Plan would have significantly helped bring CDCR further into compliance with the 10%

8   vacancy order.  After extensive discussions in workgroups, the Special Master and Plaintiffs

9   agreed "in principle" to Defendants' proposals.  ECF No. 5874 at 2 ("The parties and Special

10  Master have agreed in principle to Defendants' proposal to adjust specific staffing ratios in the

11  2009 Staffing Plan.").  But they ultimately backed away from entering into a stipulation on the

12  proposals when Dr. Golding published his allegations on October 3, 2018.  While Dr. Golding's

13  allegations revealed issues in some of CDCR's data collection and reporting, the rationale

14  underlying the proposals remains sound.

15       In 2019 and 2020, CDCR continued to develop a plan focused on ensuring employment of

16  sufficient psychiatric staff to provide class members with adequate access to mental health care,

17  including proposals that revisit the 2009 staffing ratios and those assumptions that are now

18  inconsistent with actual staffing practices.  (Declaration of J. Bick Supp. Defs.' Response (Bick

19  Decl.) ¶ 4.)  These plans were delayed while the Court considered Dr. Golding's allegations, and

20  although those proceedings have since concluded, the remedial efforts, including the Special

21  Master's data expert's review of CDCR's data are still ongoing.  ECF Nos. 6435, 6705 at 21, and

22  6847.

23  **F.    CDCR's Current Staffing Proposals.**

24       In the midst of completing the steps to remedy any issues with CDCR's data system and

25  develop a revised staffing proposal, the world was plunged into a pandemic.  CDCR rightfully

26  turned its attention to establishing comprehensive life-saving measures to provide safe mental

27  health care in the midst of a global threat.  *See e.g.*, ECF Nos. 6616 (Defendants' Strategic

28  COIVD-19 Management Plan); 6679; 6718; 6761.  CDCR's pandemic response efforts have

-8-

1 further informed CDCR's proposed staffing model, including confirming the need to revisit the

2 Court's current parameters on staffing.

3     Defendants recently submitted a letter to the Special Master and Plaintiffs that proposes

4 innovative initiatives to recruit and retain psychiatrists, sets conditions for improved collaborative

5 leadership within CDCR's mental health program, and recalibrates existing proposals.  (Bick Decl.

6 ¶ 5, Exhibit A.)   This represents Defendants' commitment to provide quality mental health care to

7 patients in keeping with community standards and developments in the mental health field.

8     Defendants' updated staffing proposals build upon previous initiatives to hire and retain

9 qualified mental health professionals.  (Bick Decl. ¶ 6.)   CDCR partnered with the *Plata* Receiver

10 and California Correctional Health Care Services (CCHCS) in 2019 to contract Merritt Hawkins

11 for the targeted recruitment of psychiatrists and advertising for mental health positions, and to

12 create a comprehensive website to assist psychiatry applicants with the application process.  (*Id*.)

13 Although this contract did not result in a significant staffing improvements, Defendants learned

14 from these measures and reassessed CDCR's mental health program staffing needs to generate

15 fresh ideas that will lead to positive staffing developments.  (*Id*.)

16     Foremost, Defendants' updated staffing proposals address significant changes in CDCR's

17 current mental health population and the rapidly evolving technologies and modalities available to

18 provide treatment to patients.  Since March 2020, CDCR has implemented accelerated releases

19 that have benefited *Coleman* class members, such that there are now over 5,400 fewer *Coleman*

20 class members in CDCR custody.  (Powell Decl. ¶ 7.)  Indeed, just from June 29, 2020 to July 27,

21 2020 alone, CDCR released over 1,300 *Coleman* class members.  (*Id.* ¶ 8.)  Because CDCR's

22 current mental health position allocations are based on population statistics from June 2020,

23 CDCR is performing a mid-cycle allocation adjustment that will accurately report the staffing

24 allocations and fill rates and ensure appropriate hiring and use of resources.  (Declaration of A.

25 Ponciano Supp. Defs.' Response (Ponciano Decl.) ¶ 2.)

26     Moreover, given the efficiencies and opportunities associated with telepsychiatry, CDCR is

27 continuing to actively recruit providers for its growing telepsychiatry program.  (Bick Decl. ¶ 9.)

28 Over the past few months, CDCR has employed and retained higher numbers of telepsychiatrists,

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1    and expects its program to grow. (*Id.*) CDCR is also exploring hiring telepsychiatrists to work

2    from home, rather than CDCR telepsychiatry hubs, thus allowing Defendants to utilize more

3    telepsychiatrists without being limited by the availability of office space. (*Id.*) Indeed, due to

4    COVID-19, some of CDCR's psychiatrists, as well as and other classes of clinicians, are

5    successfully providing telepsychiatry and other tele-mental health from their homes. (ECF No.

6    6761 at 8, 17; Bick Decl. ¶ 9.) This practice is already prevalent in the community. (Bick Decl.

7    ¶ 9.)

8         CDCR also instituted significant changes to its mental health program leadership structure,

9    recognizing that the psychology and psychiatry disciplines must be equals within the

10   organizational structure. (Bick Decl. ¶ 10.) CDCR has revised its organizational charts at all

11   levels to ensure that psychiatry is a component of the leadership team at every level. (*Id.*) CDCR

12   has also created regional psychiatry positions and proposed a second Assistant Deputy Director

13   Position to be filled by a psychiatrist, and is broadening other mental health program leadership

14   opportunities for psychiatrists. (*Id.*)

15        Defendants propose that the parties discuss and resolve two sets of flaws in the 2009

16   Staffing Plan. First, the parties need to revisit the assumptions surrounding the frequency of

17   routine psychiatric contacts for CCCMS and Enhanced Outpatient Program (EOP) patients, the

18   application of the CCCMS psychiatry ratio to those patients who, under the Program Guide, do not

19   require routine psychiatry contacts, and the need for psychiatry positions for crisis intervention on

20   weekends and holidays that were never implemented. (*Id.*) This will provide greater clarity for

21   clinicians and mental health leadership, and permit a better use of CDCR's valuable psychiatry

22   resources. (*Id.*)

23        Second, the parties need to correct the methodology for calculating the statewide psychiatry

24   fill rate. (Bick Decl. ¶ 12.) Psychiatric nurse practitioners (PNPs), who carry a patient case load

25   and perform direct care under a psychiatrist's supervision, should be included in the psychiatry fill

26   rate. (*Id.*) Additionally, because the current methodology used to calculate the statewide

27   psychiatry fill rate fails to reflect the actual staffing needs in the inpatient levels of care,

28   Defendants propose discussing this issue with the Special Master to determine if there is a more

-10-

1    appropriate way to calculate the statewide psychiatry vacancy rate. (*Id*.)

2    Beyond CDCR's updated staffing proposal, psychiatrist recruitment and retention could be

3    aided by efforts outside of this litigation. For example, current bargaining among CDCR and

4    CCHCS, the California Department of Human Resources, and the Union of American Physicians

5    and Dentists—which represents CDCR psychiatrists for the purposes of collective bargaining—

6    will lead to the development of a recruitment and retention report in the next few months

7    concerning many of the issues that the Court seems to suggest can only be addressed through

8    population reduction.[3]

9    **II.    CIRCUMSTANCES HAVE CHANGED DRAMATICALLY SINCE THE ISSUANCE OF THE
     COURT'S PRIOR STAFFING ORDERS**

10

11   **A.    CDCR's Prison Population Has Dropped Precipitously in Recent Months,
     and the *Coleman* Class Is Significantly Smaller Than It Was in 2017.**

12   More than any correctional system in the country, CDCR has taken bold and aggressive

13   measures to mitigate the risks associated with COVID-19. CDCR has voluntarily accelerated the

14   release of tens of thousands of inmates. As a result, CDCR's total institution population has been

15   reduced by 19,411 incarcerated persons (from 114,304 on March 4, 2020 to 94,893 as of

16   September 9, 2020).[4] A significant proportion of these releases have occurred since early July

17   2020, when the Secretary announced additional population reduction plans. *See Plata v. Newsom*,

18   Case No. 01-1351 JST, ECF No. 3389 at 2-5. Due to these measures and naturally-occurring

19   releases, CDCR's total institution population has been reduced from 104,725 incarcerated persons

20   on July 8, 2020 to 94,893 incarcerated persons on September 9, 2020, or a decrease of nearly

21   10,000 incarcerated persons in a mere two-month period.[5]

22   CDCR's significant population reduction efforts have also meaningfully impacted the size

23   of the *Coleman* class. To date, these releases have helped reduce the number of incarcerated

24

25   _____

26   [3] *See* https://www.calhr.ca.gov/labor-relations/Documents/ta-20200701-20220701-bu16.pdf; last
     retrieved September 4, 2020.

27   [4] *See* https://www.cdcr.ca.gov/research/weekly-total-population-report-archive-2020/

28   [5] *See* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/07/Tpop1d200708.pdf
     and https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/09/Tpop1d200909.pdf

persons in CDCR's MHSDS from 35,751 patients on March 16, 2020, to 30,265 patients on September 8, 2020, a reduction of 5,486 *Coleman* class members.  (Powell Decl. ¶¶ 5, 7.)  This represents a 15% reduction in the *Coleman* class over just the past six months.  The effect of this significant reduction of patients on CDCR's mental health program operations or staff capabilities in such a compressed timeframe has not yet been examined by Defendants or the Special Master, but nonetheless constitutes a substantially changed circumstance that did not exist when the Court issued the October 2017 staffing order.  In fact, there are presently 8,671 fewer patients in CDCR's MHSDS than on October 9, 2017.  (Powell Decl. ¶ 6.)  That represents an incredible 22% decrease in the population requiring regular mental health care since the time the Court issued the October 2017 order.  The EOP population, too, has declined over this same time period.  Whereas there were 7,958 total EOP patients on October 9, 2017, there are currently 6,252—a reduction of approximately 21% of the total EOP population.  (Powell Decl. ¶ 10.)  These reductions will continue as individuals' release dates are expedited as a result of population reduction measures taken in response to the pandemic.

**B.    CDCR's System for Delivering Effective Mental Health Care Has Significantly Changed Since It Developed the 2009 Staffing Plan.**

In their objections to the Special Master's report on CDCR's 2017 staffing proposals, Defendants requested that "the need and feasibility of maintaining outdated staffing ratios and vacancy rate mandates are outdated and should be reconsidered" due to, among other things, changes in CDCR's MHSDS.  ECF No. 5591 at 17.  Indeed, since the 2002 order mandating a vacancy rate of no less than 10% for psychiatrists and case managers, there have been tremendous developments in the psychiatry field that have led to greater treatment efficiencies, such that the MHSDS is operating differently than it was 18, 11, or even 3, years ago.  In particular, since 2017, CDCR has expanded the use of telepsychiatry and PNPs and implemented the Electronic Health Records System (EHRS).  Furthermore, Defendants recently provided an updated set of staffing proposals to the Special Master and Plaintiffs that contain innovative plans to hire, utilize, and retain staff, foster collaborative leadership within CDCR's mental health program, and address flaws in current staff ratio calculations.

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1    **1.    Expanded Use of Telepsychiatry To Provide Treatment.**

2    Like other innovative mental health systems across the country, Defendants have used

3    telepsychiatry to provide mental health treatment services to CDCR's patients for over twenty

4    years.  ECF No. 974 at 2-3.  Use of this progressive treatment modality has consistently expanded

5    throughout CDCR in recent years.  ECF No. 5564 at 41.  In March 2020, following considerable

6    negotiations among Defendants, Plaintiffs, and the Special Master, the parties stipulated to a

7    provisional telepsychiatry policy.  ECF No. 6539.  Under this provisional policy, CDCR may use

8    telepsychiatry to provide mental health services to all inmates at the Correctional Clinical Case

9    Management System (CCCMS) level of care and may, under specified circumstances, utilize it for

10   inmates at higher levels of mental health care.  *Id*. at 7-8.

11   With the expanded use of telepsychiatry, Defendants have made substantial infrastructure

12   and technology investments which can and will improve the delivery of mental health care to

13   *Coleman* class members.  CDCR presently has 103 dedicated telepsychiatrist offices operating at

14   hub locations across the state.  (Declaration of J. Bick Supp. Defs.' Response (Bick Decl.) ¶ 8.)

15   Telepsychiatry reduces delays in care and improves continuity of care and follow-up for patients.

16   (*Id*.)  Telepsychiatrists are supported by telepresenters at the institutions, initiating appointments,

17   operating systems, and providing in-person observation during the telepsychiatry session.  (*Id*.)

18   Telepsychiatry hiring is positively impacting CDCR's compliance with the Court's 2002

19   order directing Defendants to maintain a vacancy rate of no less than ten percent for psychiatrists

20   and case managers.  According to the July 2020 Psychiatry Vacancy Report, CDCR employed the

21   equivalent of 71.76 full-time telepsychiatrists.  ECF No. 6842 at 5.  By contrast, CDCR had 56.83

22   full-time telepsychiatrists in March 2020.  ECF No. 6649 at 5.  Not only has CDCR been able to

23   hire additional telepsychiatrists, but the recent increase contributed to an overall 75% psychiatry

24   position fill rate in July 2020, excluding PNPs.  ECF No. 6842 at 5.  Moreover, CDCR hired four

25   telepsychiatrists in July 2020, who were not included in the recent vacancy report but whose

26   hiring will be reflected in the August 2020 report.  (Bick Decl., Ex. A.)  Contrary to the Court's

27   suggestion, telepsychiatry is having a palpable positive impact on CDCR's psychiatry vacancy

28   rate.  *See* ECF No. 6794 at 5.  The increased staffing and efficiencies generated by this progressive

-13-

1    treatment modality show that CDCR's mental health program is very different from even just

2    three years ago when the Court issued the October 2017 staffing order.

    **2.    Use of Psychiatric Nurse Practitioners To Provide Treatment.**

4        In their 2017 staffing proposals, Defendants proposed using PNPs to evaluate, diagnose,

5    and craft treatment plans for patients, determine patient needs for psychiatric medication and crisis

6    intervention, and assess and monitor patients' continued use of prescribed psychotropic

7    medications. *See* Bick Decl. ¶ 12 and ECF No. 5564 at 42. Plaintiffs and the Special Master

8    agreed that the use of PNPs could positively impact mental health treatments. ECF No. 5564 at

9    19. The Court adopted the Special Master's report and recommendations concerning the use of

10   PNPs. ECF No. 5711 at 8, 29.

11       The introduction of PNPs in 2017 has produced tangible benefits for CDCR's mental health

12   program, which Defendants account for in CDCR's monthly psychiatry vacancy reports. In

13   practice, CDCR's use of PNPs reflects current civilian community mental health treatment

14   standards, in which nurse practitioners are valuable members of the mental health treatment team

15   providing front-line services to patients in collaboration with supervising psychiatrists, utilizing

16   their knowledge of psychotherapy modalities and psychopharmacology to put their patients on a

17   regimen of therapy and prescription medication to improve their mental health. (Bick Decl. ¶ 13.)

18   CDCR's successful utilization of PNPs in recent years to augment and support psychiatrists is

19   consistent with the use of nurse practitioners within CCHCS and further demonstrates that

20   CDCR's psychiatrist staffing conditions have changed. (*Id.*) Thus, PNPs should be considered for

21   purposes of calculating CDCR's psychiatry staffing vacancy rate, as they are within CCHCS. (*Id.*)

22       In California, mental health nurse practitioners are the only non-psychiatrist behavioral

23   health professionals who can prescribe medications as well as provide psychotherapy. Their

24   expanded utilization in the community is viewed as a key strategy to bridge the gap between the

25   / / /

26   / / /

27

28

16829598.8

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1    supply and demand for psychiatric services.[6]  CDCR is no different.  For example, in August

2    2019, CDCR filled 71% of its allocated psychiatry positions.  ECF No. 6299 at 4.  Adding PNPs,

3    the psychiatric position fill rate rose to 75%.  *Id.*  In February 2020, inclusion of PNPs increased

4    the rate from 66% to 70% (ECF No. 6563 at 4), and in July 2020, PNPs increased the rate from

5    75% to 80%.[7]  ECF No. 6842 at 5.  The steady use of PNPs since 2017 has improved Defendants'

6    ability to provide mental health services to CDCR patients, and including PNPs in the fill rate

7    generates noticeable advancement towards the Court's staffing vacancy goal.

8         Defendants' successful utilization of PNPs in recent years to augment and support

9    psychiatrists further demonstrates that CDCR's psychiatrist staffing conditions have changed and

10   that the October 2017 staffing order is outdated.

### 3.    Implementation of the Electronic Health Records System.

12        In its 1995 judgment, the Court found that CDCR's medical records system was

13   unconstitutionally deficient and harmed class members.  *Coleman v. Wilson*, 912 F.Supp. 1281,

14   1314-15 (E.D. Cal. 1995).  From late 2015 through late 2017, CDCR implemented the Electronic

15   Health Records System (EHRS) throughout its institutions.  Bick Decl. ¶ 15; ECF No. 5864-1 at

16   575-79.  EHRS is based on an electronic medical record system created by Cerner Corporation,

17   which is used by numerous large health care organizations throughout the United States and

18   around the world, thus bringing CDCR in line with community and federal standards for health

19   records.  (Bick Decl. ¶ 15.)

20        EHRS is fully implemented and CDCR continues to refine the system to meet the needs of

21   its patients and mental health disciplines.  As EHRS improves and clinicians become more

22   familiar with the system, staff can be more productive, thus improving both patient access to care

---

[6] Coffman, Janet, "California's Current and Future Behavioral Health Workforce," Healthforce Center at University of California San Francisco, 11, 56 (February 2018).

[7] Comparing the June 2020 and July 2020 Psychiatry Vacancy Reports demonstrates another important reality: even with the challenges posed by COVID-19, CDCR is hiring providers.  ECF No. 6803 at 4; ECF No. 6842 at 5.  The July 2020 report shows an increase in filled positions equivalent to 12.22 on-site registry providers, 7.37 telepsychiatrists (on-site/registry) offset by a reduction of 3 on-site civil service positions, and 2.29 PNPs.  ECF No. 6842 at 5.

-15-

1  and outcomes.  (Bick Decl. ¶ 15.)   These efficiencies have become more pronounced in recent

2  years, and could not have been considered by the Court in its October 2017 staffing order or

3  earlier staffing decisions.  This further demonstrates that the mental health system has evolved

4  since the October 2017 staffing order.[8]

5      **C.    Changes in the Allocated Number of Providers Since 2017.**

6      Staffing for the CCCMS and EOP levels of care is allocated based on a ratio of one staff

7  psychiatrist for every 280 CCCMS mainline patients and one for every 120 EOP mainline patients.

8  ECF No. 3693.  CDCR utilizes a staffing model sanctioned by the Court to bi-annually reassess

9  the number of authorized psychiatry positions.  ECF No. 3693; Ponciano Decl. at ¶ 2. This allows

10  CDCR to determine staff hiring and resource needs on a regular basis.

11      CDCR's mental health population has substantially decreased since the October 2017

12  staffing order was issued, such that there are now 8,671 fewer *Coleman* class members housed in

13  California prisons.  (Powell Decl. ¶ 6.)  Because the number of CDCR psychiatrist positions is, in

14  part, linked to the composition of the mental health population, this decrease impacts the number

15  of positions allocated to CDCR.  In fact, as explained below, the number of allocated positions is

16  much lower than in 2017, such that Defendants are now approaching the Court's mandated 90%

17  psychiatry provider fill rate.

18      On October 9, 2017, CDCR housed 29,231 CCCMS patients, and 7,958 EOP patients.

19  (Powell Decl. ¶ 4.)  In accordance with this population, CDCR averaged 321.3 authorized staff

20  psychiatrist positions per month during 2017.  (Ponciano Decl. ¶ 3, 4.)   In 2018, the number of

21  CDCR's average monthly staff psychiatrist authorized positions rose to 325.9.  (*Id.*)  But in 2019,

22  as the mental health population decreased, the average monthly number of positions fell to 312.3.

23  (*Id.*)  Accounting for the current *Coleman* class population generates even more significant results

24

25  [8] The Court deemed implementation of a mental health records system one of seven goals to correcting the constitutional deficiencies in this case.  ECF No. 6846 at 9.  But the Court recently

26  informed Defendants that that their completion of this goal "must await complete remediation of those data management and quality assurance issues" raised by the 2018 Golding Report.  *Id.* at

27  28.  As discussed further below, Defendants have not been allowed to complete that remediation, thus placing them at a distinct disadvantage for responding to the July 30 order or formulating a

28  defense for the approaching "fully adversarial proceeding."

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1   concerning CDCR's allocated psychiatry positions.  Calculating the psychiatry staffing allocation

2   according to recent population statistics, including 22,589 CCCMS and 6,283 EOP patients as of

3   August 26, 2020, the staffing model generates 25 fewer psychiatrist positions, down to 362.  (*Id.* ¶

4   5.)   Based on this number of authorized positions, CDCR's estimated psychiatry fill rate increases

5   to 80%.  (*Id.*)   When PNPs are included, the estimated psychiatry fill rate rises to 86%.  (*Id.*)

6          Accounting for the State's substantial population management efforts that have resulted in

7   CDCR's decreased mental health population, and the addition of PNPs to the staffing vacancy

8   analysis, Defendants are very close to the 90% fill rate mandated by the October 2017 staffing

9   order.

10         **D.      Current Efforts to Address CDCR's Staffing Needs.**

11         Throughout the course of this case, Defendants have proposed innovative plans to address

12   their mental health program staffing needs and invited dialogue with the Special Master and

13   Plaintiffs concerning staffing strategies.  Many times, the parties have reached consensus

14   regarding staffing proposals and Defendants implemented action plans that advanced the goal of

15   achieving an appropriately staffed mental health program.  As described above, Defendants

16   recently submitted an updated staffing plan proposal to the Special Master and Plaintiffs.  That

17   process should be allowed to proceed.

18                                        **ARGUMENT**

19   **I.   THIS COURT'S FIRST QUESTION PROPOSING A MENTAL HEALTH POPULATION**
20        **REDUCTION LACKS FOUNDATION AND HAS NO RELATIONSHIP TO CONSTITUTIONAL**
     **ACCESS TO CARE.**

21         **A.     The Court's Inquiry Is Based on A Flawed Premise.**

22         The Court's July 30 order directed the parties to identify, "with specificity, the size of the

23   reduction in the population of seriously mentally ill inmates in California's prison system at each

24   level of care that would be required for defendants to come into compliance with the ratios in the

25   2009 Staffing Plan."  ECF No. 6794 at 8.  This inquiry mistakenly assumes that reducing the

26   mental health population is the same as a straight population reduction that would ease staffing

27   resources required to treat all *Coleman* class members.  A population cap on the total number of

28   patients in the MHSDS as a whole would not automatically resolve the staffing issues.  The

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER        Case No. 2:90-CV-00520 KJM-DB (PC)

1    number of seriously mentally ill patients who should be treated at each level of care is a fluid

2    number that changes daily.  Thus, this question is based on a flawed premise—the notion that

3    mental health needs in the incarcerated population are static and can be affected by either a one-

4    time reduction or a cap on the population currently receiving mental health care (from only

5    certain, but not all, mental health providers).

6         Mentally ill inmates are added to the population every day in a number of ways and those

7    already in the MHSDS move through the different levels of care in unpredictable patterns.

8    Because the 2009 Staffing Plan sets ratios for each level of care, variability in the size of the

9    overall population and each level of care changes the staffing needs and makes estimating a

10   population cap based on staffing ratios difficult at best and would result in an estimate that is

11   likely to change week-to-week.  For example, patients at the CCCMS level of care require very

12   few resources, such that a large reduction in the CCCMS population will not necessarily result in

13   improved compliance with staffing ratios because that population requires fewer contacts with

14   psychiatrists and other mental health clinicians.  Similarly, a MHSDS population at current levels

15   with very few patients at the inpatient or crisis bed levels of care (with the statewide psychiatry fill

16   rate calculated based on patient population instead of patient beds) might show compliant staffing

17   ratios.

18        Before the pandemic, new persons were committed to CDCR's custody on a daily basis.

19   Even now, upon arrival, each incarcerated person receives a standardized mental health screening,

20   and, if necessary, in-depth clinical screening to "ensure that all inmates in need of mental health

21   treatment are identified and provided necessary services at the earliest possible time."  MHSDS

22   Program Guide 12-2-1 (2018 Revision), ECF No. 5864-1.  Some incarcerated persons committed

23   to CDCR arrive with already-diagnosed mental illness.  CDCR cannot control those individuals

24   who are received into its custody, nor can it turn away those in need of mental health services.

25   Others will be diagnosed for the first time during screening.  Thus, the addition of patients to the

26   MHSDS caseload upon commitment will not be uniformly affected by any cap or targeted

27   reduction.  Further, an incarcerated person may not have a diagnosable mental illness upon intake,

28   but instead may develop signs or symptoms of illness and receive a diagnosis at a later time.  The

-18-

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1   number of mentally ill patients added to the system in this manner is not insignificant.

2       The Court's question is also based on the false premise that CDCR can ignore Program

3   Guide requirements requiring the referral of inmates to the MHSDS or referral of class members

4   to different levels of care.  Placing a cap on the number of patients that could be accepted into the

5   different levels of care is inconsistent with the Program Guide, which is designed to move a

6   dynamic population constantly through the various levels of care.  ECF No. 5964-1 at 18 (table in

7   the Program Guide that sets forth the required transfer intervals between levels of care).  In

8   addition, the number of patients at each level of care is highly variable, so even if an overall

9   population cap for the MHSDS were established, the number of patients at each level of care

10  within the capped population could rapidly change the overall staffing needs.  Patients frequently

11  move between levels of care depending on the acuity of their illness.  In 2019, there were 4,366

12  transfers into acute and intermediate levels of care, and 9,933 patients transferred into crisis beds.

13  (Powell Decl., Ex. F.)  Patient movement between levels of care can have an expansive impact on

14  staffing needs depending on the number of patients moving to any particular level of care.  If more

15  patients are moving from a lower level of care to a higher level of care, the number of staff

16  required will increase as the higher levels of care require significantly more staff.  *See e.g.,* ECF

17  No. 3693 at 12 (General Population CCCMS program requires 1:280 ratio for staff psychiatrists;

18  *compare* ECF No. 5894 at 28 (Acute Psychiatric Programs require 1:15 ratio for staff

19  psychiatrists, and Intermediate Care Facilities requires 1:35 ratio).  Similarly, if more patients are

20  moving to the lower levels of care, fewer staff will be required.  This internal movement is highly

21  variable and unpredictable.

22      Due to the instability and variability described above, the Court's question does not lend

23  itself to simple arithmetic based upon a moment in time.  Because the Court's question is based

24  upon a flawed premise, the Court should allow Defendants to pursue their staffing proposals with

25  the Special Master and engage experts to provide a thorough, thoughtful analysis on this issue.

26  / / /

27  / / /

28  / / /

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

**B.    Defendants Can Provide Constitutionally Adequate Care at Current Staffing Levels.**

The Court's conclusion that current staffing levels are unconstitutional is also built on a faulty premise—that 90% of psychiatry and case manager positions must be filled to comply with the Eighth Amendment.  The 2002 order adopting this standard was not based upon any constitutional consideration; there is no analysis that explains why a 10% psychiatry vacancy rate is the maximum allowable under the Constitution.  *See* ECF No. 1383.  Rather, as set forth above, the Special Master recommended the 10% psychiatry vacancy rate as a "target" to keep pressure on the State to continue its aggressive use of contracted services during a time of economic turmoil.  *See* ECF Nos. 1304, 1381.  Before making this recommendation, the Special Master was satisfied with a 25% psychiatry vacancy rate—a rate with which CDCR is currently in compliance.  Neither of the Special Master's quarterly reports on Defendants' staffing needs before the 2002 order analyze the constitutional underpinnings of this 10% psychiatry vacancy rate, and the 2002 order did not alter the analysis.  Instead, the 2002 order simply adopted the Special Master's recommendation without making a determination that it was constitutionally required.  ECF No. 1383.

Similarly, there is no indication in the 2009 staffing plan that the 90% fill rate set by the Special Master was the benchmark for constitutional treatment and compliance.  As with the Court's previous orders on the subject, nothing in the October 10, 2017 order justifies the Court's self-propagating decree that a 10% vacancy rate is the appropriate standard of measuring constitutional compliance under the 2009 staffing plan.

The actual constitutional standard is far more nebulous.  Indeed, the Court in its April 5, 2013 order held that "[t]o meet the requirements of the Eighth Amendment, defendants are required to employ mental health staff in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders."  ECF No. 4539 at 61.  But the Court still did not justify the 10% vacancy rate from a constitutional standpoint or under the PLRA—instead it simply pointed to the 2009 staffing plan and asserted that *Defendants* allegedly had represented it was the constitutional floor.  *See id.*  Notably, the

-20-

1    2009 staffing plan indicates the contrary, stating: "Defendants do not concede that the proposed

2    staffing and services are constitutionally required, nor do they believe that this Plan would satisfy

3    the Prison Litigation Reform Act's requirements that prospective relief be narrowly drawn, extend

4    no further than necessary to correct the alleged violation of the federal right, and be the least

5    intrusive means necessary to correct the alleged violation."  ECF 3696 at 3, fn. 1.

6        This Court should not continue to require Defendants to meet a seemingly arbitrary target

7    without some analysis of its constitutional underpinnings.  The standard should be based on

8    verified data and expert analysis, not a "target" set by the Special Master whose primary

9    justification was to encourage the State to continue hiring practices during a budget

10    shortfall.   ECF No. 1351 at 6.

11        Moreover, until the onset of this unprecedented and catastrophic pandemic, Defendants

12    were generally in compliance with many key Program Guide requirements, such as transfer

13    timelines to inpatient levels of care.   ECF Nos. 6505, 6670 and 6611.  Even now, any compliance

14    issues are directly attributable to protocols put into place by Defendants to manage the threat of

15    widespread COVID-19 infection, which qualifies as a valid exception under the Program Guide

16    addendum.  *See* ECF No. 5711.   Defendants' ability to come forward with "verified" data and

17    information on the Court's shortened timeframe is not possible while the Court and parties

18    continue to wait for the Special Master's data expert to report on let alone complete his work.[9]

19    And, as the Court informed the parties in its September 8 minute order, that work will not be ready

20    for review and discussion until December 2020, at the earliest.  ECF No. 6847.

21    / / /

22    / / /

23    / / /

24    _____

25    [9] For instance, the "Timely MH Referrals" indicator, which was used in support of Defendants'
2018 staffing proposals, was called into question by Dr. Golding's allegations.  If this measure,

26    among others, was validated, Defendants would be better positioned to propose solutions to
staffing issues, or possibly show that Defendants have achieved greater compliance with Program

27    Guide requirements given current staffing.  However, the long delay in verifying CDCR's

28    indicators—now two years old, and over which Defendants have no control—has put Defendants
at a distinct disadvantage in responding to the July 30, 2020 order.

Case No. 2:90-CV-00520 KJM-DB (PC)

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1   **II.    THIS COURT'S SECOND QUESTION – REGARDING THE DEVELOPMENT OF A PLAN TO
2        REDUCE THE NUMBER OF MHSDS INCARCERATED PERSONS – ARISES OUT OF
         SEVERAL MISGUIDED ASSUMPTIONS.**

3        This Court's second question asks whether Defendants can develop, within 30 days of any

4   court order, a plan that they will implement within one year to permanently reduce the number of

5   MHSDS incarcerated persons to a number that will bring Defendants into compliance with the

6   staffing ratio requirements of the October 10, 2017 order.  ECF No. 6794.  However, this single-

7   judge District Court lacks jurisdiction to order Defendants to implement any such plan calling for

8   the reduction of the MHSDS population without convening a three-judge panel.[10]

9        The PLRA establishes the procedural framework courts must follow in fashioning an order

10  for prospective relief.  Orders must be narrowly drawn, extend no further than necessary to correct

11  the constitutional violation at issue, and be the least intrusive means necessary to correct that

12  violation.  18 U.S.C. § 3626(a)(1)(A).  When considering prospective relief, the PLRA requires

13  courts to give "substantial weight" to any adverse impact the relief may have on public safety or

14  the operation of a criminal justice system.  *Id.*  In short, prospective relief cannot be ordered unless

15  the relief is necessary and "no other relief will correct the violation of the Federal right."  *Id.* at

16  § 3626(a)(1)(B).  But as explained above, the order contemplated here – a reduction in the number

17  of MHSDS patients through release of *Coleman* class members – would violate the PLRA insofar

18  as less-intrusive alternatives exist.  Those alternatives are far more likely to result in improved

19  compliance with Program Guide requirements for the reasons described *infra*, and are more

20  narrowly-tailored toward that end.

21       Moreover, the PLRA imposes even more onerous requirements before a prisoner release

22  order may be issued.  As the *Plata/Coleman* three-judge court recently observed, it may only

23  consider whether a prisoner release order is appropriate after a single-judge court finds a

24

25  _____

26  [10] Moreover, and as discussed above, this question improperly assumes that the staffing ratio
    requirements of the October 10, 2017 order are required to ensure the constitutional delivery of
27  mental health care, that only a reduction in the number of MHSDS patients can bring Defendants
    into compliance with those staffing ratios, and that Defendants can control the number of MHSDS
28  patients who require treatment.  These assumptions are incorrect for the reasons explained
    previously.

-22-

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1    constitutional violation, issues an order to address that violation short of a release order, and

2    affords Defendants adequate time to comply with that order.  ECF No. 6574 at 6:23-7:1, 12:28-

3    13:4; 18 U.S.C. § 3626(a)(3).  Only after those steps have been taken may a three-judge court be

4    convened to determine whether a prisoner release order is appropriate.  ECF No. 3261 at 13:2-4;

5    18 U.S.C. § 3626(a)(3)(B).  But under no circumstances may a single district court judge enter a

6    prisoner release order.  18 U.S.C. § 3626(a)(3)(B); *see also* ECF No. 6769 at 15-17.

7          This Court's July 30, 2020 order labors under the false assumption that this Court could

8    order Defendants to implement a plan to permanently reduce the number of MHSDS patients.

9    This Court does not have the authority to issue such an order, which would have the purpose or

10   effect of reducing or limiting the prison population in California.  18 U.S.C. § 3626(g)(4).  Only a

11   three-judge court may do so.  *Id.* at § 3626(a)(3)(B).  Further, while an order requiring Defendants

12   to create a plan to reduce CDCR's population may not trigger PLRA protections, an order calling

13   for implementation of that plan certainly would.  *Brown v. Plata*, 563 U.S. 493, 510 (2011).

14   Therefore, this Court would have no jurisdiction to order Defendants to implement any plan

15   calling for a reduction in the number of MHSDS patients.  *See* 18 U.S.C. § 3626(a)(3)(B).

16         Finally, even if this matter were referred to the existing Three-Judge Court for

17   consideration, before Defendants could be ordered to implement a plan calling for a reduction in

18   the MHSDS population, the Three-Judge Court would first have to make the requisite findings

19   under the PLRA, including that crowding is the primary cause of the violation at issue, and that no

20   other relief will remedy that violation.  18 U.S.C. § 3626(a)(3)(E).  But such findings cannot be

21   made on the record before this Court, where less-restrictive alternatives to a prisoner reduction

22   exist.

23   **III.  A NUMBER OF ALTERNATIVE REMEDIES AVAILABLE TO THE COURT EXIST TO**
          **ENFORCE ITS OCTOBER 10, 2017 ORDER.**
24

25         As described in detail above, the 2009 Staffing Plan is based on outdated data and does not

26   account for changes in population or methods of treatment available today.  In lieu of providing a

27   plan to reduce the mental health population, Defendants propose that the Court allow them to

28   work with the Special Master to evaluate their recent staffing plan proposals.  At a minimum, this

-23-

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1    Court must explore less-intrusive remedies.

2    **A.    The Court Should Order A Time and Motion Study To Determine**
      **Appropriate Staffing Ratios.**

3

4         The staffing ratios set by the 2009 staffing plan are not based on current, evidence-driven

5    methodology.  Instead, they are based upon what appear to be Defendants' good-faith efforts to

6    pull together a staffing plan in less than six months after the Special Master rejected a staffing

7    analysis model completed in 2008.  ECF No. 5564 at 32-35.  While the 2008 study was rejected as

8    not comprehensive, it seems clear that such a study, if allowed to proceed, is not only the

9    appropriate way to address current needs, but can be used to make staffing adjustments going

10   forward.  The 2009 Staffing Plan is based on 2009 staffing positions, then-current bed plan and

11   staffing data from other systems.  *Id*. at 33.  And the Special Master's own experts considered the

12   ratios and allocations "reasonable as long as they can be adjusted based on actual experience and

13   as future analyses unfold."  *Id.*  There was an express expectation that the plan would be revisited

14   based on changed conditions.  There is no dispute that the MHSDS has undergone significant

15   changes over the past 11 years.  Indeed, there have been significant changes to the statewide

16   mental health program, with new programs and procedures, including the responsibility for

17   providing inpatient care in the PIPs, the implementation of the Short-Term Restricted Housing

18   units and Long-Term Restricted Housing units, the Electronic Health Record System, and stream-

19   lined involuntary medication process, to name a few.  A new staffing study would be based on

20   updated programs and processes.  But any study could only be completed once program deviations

21   related to COVID-19 are no longer required or any long term modifications regarding Program

22   Guide requirements are made.

23   **B.    The Court Should Remove Unwarranted Restrictions on the Use of**
      **Telepsychiatry for Providing Essential One-On-One Treatment.**

24

25        In its current permitted use, telepsychiatry has helped Defendants provide essential care,

26   particularly in a field facing a serious shortage of clinicians, both in California and nationwide.

27   This Court should lean into using technology to address this issue, in particular through the

28   expansion of telepsychiatry for non-acute, non-emergent levels of care.  ECF No. 6539 at 5

                                                    -24-                    Case No. 2:90-CV-00520 KJM-DB (PC)

1   ("Telepsychiatry Program provides mental health services to the Correctional Clinical Case

2   Management System (CCCMS) level of care and may, under specified circumstances outlined in

3   this policy and procedure, be used for higher levels of mental health care."). Plaintiffs and Special

4   Master have accepted and agreed to this expanded use. *Id.* at 3. And despite challenges posed by

5   COVID-19 for the implementation of some aspects of the provisional telepsychiatry policy—for

6   which Defendants have proactively sought an extension of time to implement (ECF No. 6833)—

7   Defendants are using this modality to provide the maximum amount of services possible to its

8   patients. Indeed, this Court should grant Defendants' motion for an extension of time to

9   implement this telepsychiatry program so that it can be further refined to improve delivery of care

10  to patients while also protecting both patients and staff from COVID-19.

11      **C.    The Method of Calculating Staffing Needs Should be Revised.**

12      The 2009 Staffing Plan makes several assumptions regarding staffing needs that are

13  potentially flawed. Defendants suggest that the Court address these assumptions as part of any

14  orders on staffing or, more appropriately, permit the parties and the Special Master to address

15  these undeniable flaws.

16          **1.    Frequency of Routine Psychiatry Contacts**

17      The Program Guide requires that a CCCMS patient on medication be seen every 90 days

18  and that an EOP patient be seen every 30 days. ECF No. 5864 at 43, 58. The 2009 Staffing Plan,

19  by contrast, assumes that each patient will be seen by a psychiatrist for a routine contact an

20  average of 1.5 times during that time. ECF No. 3693 at 22. As part of its 2018 Staffing Plan,

21  CDCR proposed that the assumption for the frequency of routine psychiatry contacts for CCCMS

22  patients be adjusted to reflect this incongruence, revising the assumed routine contact to 1.25

23  times during the respective timeframes for CCCMS and EOP patients. ECF No. 5841-2 at 9-10.

24  Defendants believe that this adjustment would result in a lower psychiatrist-to-patient ratio while

25  still allowing clinicians to see patients more frequently than the minimum Program Guide

26  requirement as needed. This Court should order the parties to work with the Special Master to

27  determine the appropriate frequency of routine contacts and implement the results of that

28  collaboration into the eventual staffing compliance standard.

### 2. Application of the 2009 Staffing Ratio for Patients on Medication

Similarly, although the Program Guide requires that CCCMS patients on psychiatric medication be reevaluated by a psychiatrist a minimum of every 90 days, CDCR has applied this ratio to *all* CCCMS patients, regardless of their medication status. This application skews the psychiatry ratio. This Court should order the parties to revise the methodology for applying the CCCMS psychiatry ratio so that it applies only to patients who require routine psychiatric care, rather than the entire patient population.

### 3. Reallocation of Crisis Intervention Positions for Holidays and Weekends

The 2009 Staffing Plan allocates 0.52 psychiatry positions at every institution to provide crisis intervention on weekends and holidays, but this allocation was never implemented—holiday and crisis intervention is currently handled by on-call psychiatrists, leaving the appearance of open positions when those duties are by and large being handled by existing positions. Defendants have suggested redirecting some of these vacant positions to those institutions where additional crisis intervention cannot be handled by the on-call staff, while eliminating those positions that are not redirected. This Court should allow this to occur.

### D. A Recruitment and Retention Report Is In the Process of Being Developed.

As part of contract negotiations with the State, Bargaining Unit 16—the union representing state-employed physicians, dentists, and podiatrists—has agreed to develop a recruitment and retention report by February 1, 2021, which will focus on, among other things, encouraging the application of contractors into vacant civil service positions and improving the recruitment and retention of civil service employees. Because this bears directly on staffing vacancies related to this Court's October 10, 2017 order, this Court should permit this process to develop.

### IV. ADDITIONAL REMEDIES ARE ALSO AVAILABLE, IN RESPONSE TO THIS COURT'S FIFTH QUESTION, FOR THE SHORTFALL IN PIP STAFFING.

The July 30 order seeks input concerning remedies available for the staffing shortfalls in CDCR's PIPs. ECF No. 6794 at 8. But the order inappropriately considers the staffing rates at the PIPs alone, rather than in the context of CDCR's entire mental health care program, and the PIP

-26-

1   staffing ratios are based on a different allocation methodology.  Furthermore, CDCR is working

2   on a PIP staffing plan and recently presented that plan to the Special Master.  As such, it is

3   premature to propose remedies for PIP staffing shortfalls, and the Court should allow the process

4   to continue for Defendants to develop a unified PIP staffing plan.

5         As the order points out, CDCR's PIP staffing was not addressed in Defendants' 2009

6   Staffing Plan.  ECF No. 6794 at 6.  Rather, in 2017, when CDCR assumed operation of the PIPs at

7   its institutions from the Department of State Hospitals (DSH), the department did so subject to

8   staffing plans were in place that DSH had previously put in place in those locations.  *Id*.  The July

9   30 order holds CDCR's individual PIP programs to the 10% vacancy rate requirement of the June

10  2002 order, and therefore, declares that PIP staffing violates the October 2017 staffing order.  *Id*.

11  at 7.  But the June 2002 order states that "Defendants shall maintain the vacancy rate among

12  psychiatrists and case managers at a maximum of ten percent, including contract services [,]" and

13  does not differentiate among specific programs or institutions.  ECF No. 1383 at 2, 4.  Indeed,

14  Defendants have applied the psychiatry vacancy rate statewide, not based on program or

15  institution as the July 30 order's PIP discussion suggests, and reported on the statewide vacancy

16  rate consistently.  ECF No. 6794 at 4-5, FN 3.

17        Moreover, the methodology for calculating the fill rate for CDCR's PIP psychiatry

18  positions is flawed because it is based on number of beds in a unit, not the number of patients.

19  Defendants identified this methodological flaw in their updated staffing plan provided to the

20  Special Master and Plaintiff.  (Bick Decl., Ex. A.)

21        Additionally, the July 30 order appears to discount the use of telepsychiatry in the PIPs,

22  noting that the Salinas Valley State Prison PIP is the only program approaching the required

23  staffing level, but that the "heavy reliance on telepsychiatry apparently brought on by the

24  pandemic still leaves this PIP critically short of on-site psychiatrists."  ECF No. 6794 at 6.  But the

25  provisional CDCR telepsychiatry policy approved by the Court expressly allows for the use of

26  telepsychiatry in the PIPs "as a last resort in emergency situations when an on-site psychiatrist is

27  not assigned to the program."  ECF No. 6539 at 8.  Treatment provided by telepsychiatrists in the

28  PIPs, even in emergency situations, including those posed by the current COVID-19 pandemic,

-27-

1   should be considered for purposes of both calculating the psychiatry fill rate and assessing

2   Defendants' constitutional compliance, particularly where there is no evidence, as in the case of

3   CDCR, that use of this modality causes harm to any patients at any level of care.

4          Finally, assessing remedies in response to the PIP staffing shortfall is premature at this

5   time given the ongoing discussions surrounding this issue.  CDCR has been working with CCHCS

6   to create a standardized PIP staffing plan that will harmonize staffing across all of the programs.

7   The Special Master's team has participated in some of these internal staffing discussions among

8   CDCR mental health program staff, and a meeting was held on September 10, 2020 to discuss the

9   revised PIP staffing plan with the Special Master and his team.  Because CDCR is actively

10  engaged in address its PIP staffing plan with CCHCS and the Special Master, and because there

11  are questions concerning allocation methodology as applied to the PIPs, the Court should forbear a

12  discussion of potential staffing remedies for this program so that Defendants can first resolve these

13  issues.

14  **V.   DUE PROCESS REQUIRES THAT DEFENDANTS BE AFFORDED A FULL OPPORTUNITY**
    **TO DEFENDANT THEMSELVES WITH EXPERT TESTIMONY.**

15

16         It is clear that this highly uncertain moment is not the time to conduct a hearing on

17  compliance with the outdated and substantially flawed 2009 Staffing Plan.  But if this Court insists

18  on doing so, Defendants should be afforded a fair opportunity to defend themselves with expert

19  testimony consistent with their due process rights.  Although the Court had previously expressed

20  its desire to conduct a staffing hearing, the subject of this hearing as announced by the Court's

21  July 30 order is substantially different from the Court's earlier orders.  The Court ordered

22  Defendants to consider a potential prisoner release order—an entirely different question that

23  requires different analysis and expertise.  Any assessment of CDCR's current population and

24  staffing needs requires detailed consultation and examination, which, despite Defendants' best

25  efforts, cannot occur during the COVID-19 pandemic or in the time allotted before the scheduled

26  hearing.

27         Immediately after the July 30 order was issued, Defendants commenced a search to

28  identify subject matter experts in the area of correctional mental health services and staffing to

-28-

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

Case No. 2:90-CV-00520 KJM-DB (PC)

1    assist in their defense.  *See* ECF No. 6830-2, ¶ 2.  Defendants retained an expert group to provide

2    consultation, and if needed, expert testimony, regarding the novel issues presented by the Court's

3    order.  ECF No. 6830-2, ¶ 3.  Neither this group, nor any group, however, could adequately

4    prepare for this briefing or the scheduled hearing in such a short timeframe, and particularly under

5    current pandemic conditions.  *Id.*  Indeed, Defendants' retained experts at VRJS/FALCON

6    prepared a detailed project scope, which requires onsite facility tours to "develop a firm

7    understanding of each facility's unique operations, activities, and programs."  (Robertson Decl., ¶

8    6.)  These tours are necessary to understand the physical plant, layout of housing units, and to

9    better inform how the design and space at each institution influences staffing and day-to-day

10    operations.  (*Id.*)  Furthermore, the Court's ordered timeframes do not allow adequate time for any

11    necessary expert depositions by the parties or any pre-trial motions practice.  Accordingly,

12    Defendants cannot reasonably prepare a proper defense utilizing witnesses and their retained

13    expert group.

14         Moreover, the sheer scale of the issues contemplated by the July 30 order and the

15    compressed timeline do not allow Defendants and their expert group sufficient time to analyze and

16    obtain or provide consultation regarding topics unique to this three decades-long civil rights action

17    involving the nation's largest prison system.  ECF No. 6830-2, ¶ 4.  As stated above, Defendants

18    expeditiously reviewed the order, in which for the first time this Court seems to assume that a

19    prisoner release order is the *only* means to come into compliance with a prior staffing order.  *Id.* ¶¶

20    2, 4.  But the various actions needed to prepare for, brief, and conduct the hearing contemplated by

21    the July 30 order cannot be conducted during an unprecedented pandemic within the extremely

22    constricted schedule set by the Court.  *Id.* ¶¶ 4, 5.  As Defendants' experts' project scope

23    demonstrates, the type of analysis that would need to be conducted before these issues may be

24    fully briefed and considered by this Court would require approximately six months, with an

25    immediate start date in mid-to-late September or early October.  (Robertson Decl., ¶ 10.)  Such a

26    timeline, however, anticipates *onsite* inspections.  (*Id.*)

27         Further complicating Defendants' ability to fairly respond to the Court's inquiries is the

28    fact that the Special Master's data expert has yet to complete his analysis and report on the

-29-

DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER

1  reliability of data that this Court and the parties rely upon to determine compliance with the

2  Program Guide.  As a result, any proceedings that require an analysis of assumptions based upon

3  this data are, at best, premature.

4  Finally, the Court's recent order on benchmarks establishes a process for identifying

5  relevant standards and indicators.  This order was issued only 11 days ago and anticipates further

6  briefing and discussion by and between the parties, and therefore a hearing on compliance with the

7  staffing levels in the 2009 Staffing Plan is premature at this time.

8  Forcing Defendants to defend against mandatory population reduction and other

9  enforcement remedies (ECF No. 6794 at 8) within the extraordinary confines of the present

10  schedule and under current conditions impairs Defendants' due process rights.  *See Little v. Kern*

11  *Cty. Superior Ct.*, 294 F.3d 1075, 1080-81 (9th Cir. 2002) (citations omitted) (a contemnor must

12  be afforded "'reasonable notice of the specific charges and an opportunity to be heard,' and such

13  notice of the contempt charge "must be explicit in order to conform to the requirements of due

14  process").  The Court's August 26, 2020 order granting Defendants a two-week extension is

15  insufficient to address the issues raised in this instant response given that the extent of the work

16  that would need to be completed by Defendants' experts cannot be completed in two weeks' time,

17  the current conditions restricting their access will not abate, the Special Master's team is in the

18  process of evaluating the reliability of the data upon which this Court's inquiry is premised, and

19  only recently did this Court issue an order on benchmarks, which anticipates further work by the

20  parties.  *See* ECF Nos. 6830 & 6846.

21  <u>**CONCLUSION**</u>

22  This Court cannot issue an order requiring Defendants to develop and implement a plan to

23  reduce the MHSDS population.  Nor should it issue additional staffing orders based upon outdated

24  information, faulty assumptions and vastly different circumstances.  To do so fails to recognize

25  significant changed circumstances and unfairly prohibits Defendants from defending themselves.

26  Rather, the Court should afford the parties and the Special Master the opportunity to evaluate the

27  staffing proposals set forth in Defendants' September 8, 2020 letter to the Special Master and

28  Plaintiffs' counel and allow Defendants' experts to evaluate this important issue.

-30-

1

## CERTIFICATION

2      Defendants' counsel certifies that she/he reviewed the following orders relevant to this

3   filing: 6/6/94 Findings and Recommendations, ECF No. 547; 9/13/95 Order, ECF No. 612;

4   6/16/98 Order, ECF No. 694; 1/19/99 Order, ECF No. 1010; 7/26/99 Order, ECF No. 1055; 4/4/01

5   Order, ECF No. 1262; 8/01/06 Order, ECF No. 1929; 4/24/07 Order, ECF No. 2204; 6/16/09

6   Order, ECF No. 3613; 9/04/09 Order, ECF No. 3666; 4/5/13 Order, ECF No. 4539; 6/19/14 Order,

7   ECF No. 5171; 5/18/15 Order, ECF No. 5307; 2/15/18 Order, ECF No. 5786; 10/10/17 Order,

8   ECF No. 5711; 7/3/18 Order, ECF No. 5850; 7/12/18 Order, ECF No. 5852; 9/20/18 Order, ECF

9   No. 5928; 12/18/18 Order, ECF No. 6050; 09/27/19 Order, ECF No. 6296; 10/08/19, ECF No.

10  6312; 12/17/19 Order, ECF No. 6427; 07/30/20 Order, ECF No. 6794; and 8/26/20 Order, ECF

11  No. 6863.

12  DATED:  September 14, 2020                    HANSON BRIDGETT LLP

13

14                                        By:     */s/ Paul B. Mello*
                                                 PAUL B. MELLO
15                                               LISA M. POOLEY
                                                 SAMANTHA D. WOLFF
16                                               Attorneys for Defendants

17   Dated:  September 14, 2020                   Respectfully Submitted,

18                                                Xavier Becerra
                                                 Attorney General of California
19                                               Adriano Hrvatin
                                                 Supervising Deputy Attorney General
20

21                                               */s/ Adriano Hrvatin*

22                                                Deputy Attorney General
                                                 *Attorneys for Defendants*
23

24  DATED:  September 14, 2020                    ROBINS KAPLAN LLP

25                                        By:     */s/ Roman Silberfeld*
26                                               ROMAN SILBERFELD
                                                 GLENN A. DANAS
27                                               Special Counsel for Defendants

28

16829598.8
DEFS.' RESPONSE TO COURT'S JULY 30, 2020 ORDER