DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND, INC.
Ed Roberts Campus
3075 Adeline Street, Suite 210
Berkeley, California  94703-2578
Telephone:    (510) 644-2555

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
LISA ELLS – 243657
THOMAS NOLAN – 169692
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ALEXANDER GOURSE – 321631
AMY XU – 330707
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' BRIEF REGARDING STAFFING AND POPULATION**

Judge:   Hon. Kimberly J. Mueller
Date:     September 24, 2020
Time:    10:00 am
Crtrm.:  Videoconference

[3612777.10]

1

**TABLE OF CONTENTS**

Page

2

INTRODUCTION ................................................................................................ 1

A.      [WHAT IS], WITH SPECIFICITY, THE SIZE OF THE
        REDUCTION IN THE POPULATION OF SERIOUSLY
        MENTALLY ILL INMATES IN CALIFORNIA'S PRISON
        SYSTEM AT EACH LEVEL OF CARE THAT WOULD BE
        REQUIRED FOR DEFENDANTS TO COME INTO COMPLIANCE
        WITH THE RATIOS IN THE 2009 STAFFING PLAN? ............................. 3

B.      WHETHER DEFENDANTS CAN, WITHIN THIRTY DAYS OF
        ANY COURT ORDER DIRECTING THEM TO DO SO OR
        SOONER IF THE TASK IS PROMPTLY UNDERTAKEN,
        DEVELOP A PLAN IN CONSULTATION WITH THE SPECIAL
        MASTER AND, AS NECESSARY, PLAINTIFFS' COUNSEL
        THAT THEY WILL IMPLEMENT VOLUNTARILY AND THAT
        WILL, NOT LATER THAN THE END OF ONE YEAR,
        PERMANENTLY REDUCE THE NUMBER OF SERIOUSLY
        MENTALLY ILL INMATES TO THE NUMBER THAT WILL
        BRING DEFENDANTS INTO COMPLIANCE WITH THE
        REQUIREMENTS OF THE OCTOBER 10, 2017 ORDER. ......................... 8

C.      IF THE ANSWER TO QUESTION 1.b IS YES, A DESCRIPTION
        OF THE GENERAL CONTOURS OF THE PLAN. .................................... 8

D.      AS AN ALTERNATIVE TO A VOLUNTARY PLAN FROM
        DEFENDANTS, WHAT REMEDIES ARE AVAILABLE TO THE
        COURT TO ENFORCE ITS OCTOBER 10, 2017 ORDER WITH
        RESPECT TO DEFENDANTS' 2009 STAFFING PLAN? ........................ 15

        1.      The Court Should Order Defendants to Implement the Special
                Master's Labor Economist's Recommendations Regarding
                Salary Increases and Differential Pay. ................................................ 15

        2.      The Court Should Order Defendants to Address the Deplorable
                Working Conditions for CDCR Psychiatrists. .................................... 19

        3.      The Court Could Also Initiate Contempt Proceedings and
                Order Appropriate Relief, Including Monetary Sanctions. ................ 21

        4.      Any Plan to Provide Treatment At Current Population and
                Staffing Levels, or Even Increased Staffing Levels, Must Be
                Durable In Light of Realistic Forecasting of the Population. ............ 26

A.      WHAT REMEDIES ARE AVAILABLE FOR THE SHORTFALL IN
        STAFFING REQUIRED FOR THE PSYCHIATRIC INPATIENT
        PROGRAMS OPERATED BY THE CALIFORNIA DEPARTMENT

[3612777.10]

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

OF CORRECTIONS AND REHABILITATION? ....................................... 28

1.   Reverse the Lift and Shift.................................................................. 29

2.   If the PIPs Remain in CDCR, Create Retention and
Recruitment Incentives and Initiatives ............................................... 30

(a)   Compensation ........................................................................ 31

(a)   Shift work culture from prison-based to hospital-based ........ 31

(b)   Improve overall clinical staffing numbers .............................. 32

3.   Open More State Hospital Beds for *Coleman* Class Members .......... 33

CONCLUSION.................................................................................................. 34

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Balla v. Idaho State Bd. of Corr.*,
869 F.2d 461 (9th Cir. 1989) .......................................................................... 21

5

*Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014) ................................. 19

6

*F.T.C. v. Affordable Media*,
179 F.3d 1228 (9th Cir. 1999) ........................................................................ 22

7

*Gifford v. Heckler*,
741 F.2d 263 (9th Cir. 1984) .......................................................................... 22

8

*In re Dual–Deck Video Cassette Recorder Antitrust Litig.*,
9
10 F.3d 693 (9th Cir. 1993) ........................................................................... 22

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
10
512 U.S. 821 (1994) ......................................................................... 21, 22, 23

11

*Kelly v. Wengler*,
822 F.3d 1085 (9th Cir. 2016) ........................................................................ 22

12

*Lasar v. Ford Motor Co.*,
399 F.3d 1101 (9th Cir. 2005) ........................................................................ 21

13

*SEC v. Hickey*,
322 F.3d 1123 (9th Cir. 2003) ........................................................................ 22

14

*United States v. Asay*,
15
614 F.2d 655 (9th Cir. 1980) .......................................................................... 22

16

17

18

19

20

21

22

23

1

**INTRODUCTION**

2         California's correctional officials have spent many years trying to persuade this

3   Court that they can never meet the psychiatric staffing requirements of the 2009 Staffing

4   Plan.  CDCR contends that there are too few psychiatrists willing to work in California

5   prisons for any amount of money, and that compensation incentives are therefore futile.  It

6   is reasonable therefore for the Court to ask the questions posed in the July 30, 2020 Order

7   regarding how CDCR can bring down the mental health population to the level where care

8   can be delivered at staffing levels that CDCR can achieve.  Plaintiffs will address this

9   question below along with the Court's questions regarding other possible remedies for

10  Defendants' understaffing.

11        Events of the last week, however, suggest Defendants will not answer the Court's

12  questions, but will try to change the subject. On the evening of September 8, six days

13  before the deadline for the parties' briefs responding to the Court's July 30 Order, counsel

14  for Defendants sent a letter to the Special Master and Plaintiffs' counsel reiterating their

15  2018 proposal to cut psychiatric staffing by sharply increasing the number of patients each

16  doctor would be responsible for, by eliminating the crisis-intervention allocation of

17  psychiatric staffing, and by eliminating psychiatric staffing for class members not currently

18  on psychotropic medications, among other things.  Declaration of Ernest Galvan in

19  Support of Plaintiffs' Brief Regarding Staffing and Population ("Galvan Decl."), Ex. A.

20  The Court has repeatedly stated that CDCR has a "heavy burden" to show that the 2009

21  Staffing Plan no longer represents "the minima necessary to meet [CDCR's] constitutional

22

23

[3612777.10]

1

1   obligations." Order, July 30, 2020, ECF No. 6794 at 3.[1]   Without even attempting to

2   meet this burden, Defendants now seek to push staffing levels below the minimum levels

3   set in their own plan.

4       The September 8 letter also states that Defendants intend to undertake a "Mid-Cycle

5   Allocation Adjustment" during this month to account for recent pandemic related

6   population reductions.   Galvan Decl. Ex. A at 2.  Staff allocations under the Court-

7   approved 2009 Staffing Plan are made twice yearly, in January and July.  The

8   announcement of an unprecedented "mid-cycle" adjustment comes just days before the

9   briefing and hearing on staffing enforcement.  It comes less than a year after this Court

10  warned Defendants against tunnel vision on moving the metrics without regard for actual

11  compliance. *See* Order, Dec. 17, 2019, ECF No. 6427 ("Dec. 17, 2019 Order"), at 44-46.

12  Cutting psychiatric staff to match a sudden and temporary drop in population is contrary to

13  this Court's orders that Defendants base their staffing on projected increases in population.

14  *See* Order, Oct. 20, 2006, ECF No. 1998 at 2-3 (approving 2006 population projections

15  and directing future annual population projections).  Eliminating psychiatric positions can

16  be done instantly, but adding positions and filling them takes time.  It is completely

17  misguided to eliminate positions in haste that will take years to refill in the likely event

18  that CDCR's population climbs again, especially now that the pandemic-related intake

19  closures are being lifted.

20      While Plaintiffs will meet and confer in good faith about CDCR's proposed

21  _____

22  [1] All citations are to the ECF pagination, unless otherwise specified.

23

[3612777.10]                                    2

renewed staffing cuts, that process should not be an excuse for Defendants to duck the Court's July 30 questions.  Plaintiffs' answers to these questions follow.

**A.   [WHAT IS], WITH SPECIFICITY, THE SIZE OF THE REDUCTION IN THE POPULATION OF SERIOUSLY MENTALLY ILL INMATES IN CALIFORNIA'S PRISON SYSTEM AT EACH LEVEL OF CARE THAT WOULD BE REQUIRED FOR DEFENDANTS TO COME INTO COMPLIANCE WITH THE RATIOS IN THE 2009 STAFFING PLAN?**

Plaintiffs partially answered this question in briefing submitted on July 15, 2020.
Plaintiffs' Response to Order of July 2, 2020 ("Plaintiff's July 15 Response"), July 15, 2020, ECF No. 6766 at 21; Declaration of Michael W. Bien in Support of Plaintiff's Response to Order of July 2, 2020 ("July 15 Bien Decl."), ECF No. 6767, ¶¶ 14-15.  Most of the required staffing allocation for psychiatrists is driven by the size of the patient caseload.  A smaller portion is driven by fixed numbers for the facility or function, i.e., a certain number of psychiatrists are required for Crisis Intervention Teams.  Ex. O to July 15, 2020 Bien Decl., ECF No. 6768-1 at 95.  The July 15 Bien Declaration addresses the following question at Paragraphs 14 and 15:  If the CCCMS and EOP populations had declined at the same rate that the general prison population declined from 2009 to February 2020, would psychiatric staffing now be in compliance with Defendants' 2009 Staffing Plan and the Court's orders?  The answer is yes.  For the CCCMS level of care, the population would now be approximately 20,214 persons (18,663 men and 1,551 women), instead of the current (as of August 25, 2020) population of 22,705 persons (21,103 men and 1,602 women).  Corrected Ex. N to July 15 Bien Decl., Aug. 26, 2020, ECF. No. 6839 at 4; Declaration of Lisa Ells in Support of Plaintiffs' Brief Regarding Staffing and Population ("Ells Decl."), filed herewith, ¶ 8 & Ex. B (Aug. 25, 2020 caseload census).

1    For the EOP level of care, the population would now be approximately 3,184 persons

2    (3,095 men and 89 women), instead of the current population of 6,292 persons (6,147 men

3    and 145 women).  Corrected Ex. N to July 15 Bien Decl., Aug. 26, 2020, ECF No. 6839 at

4    4; Ells Decl. Ex. B.

5          With these reduced population levels and assuming a proportionate reduction of

6    bed-driven need, CDCR's psychiatrist allocation, without the PIPs and without

7    supervisors, would drop to 184.46 psychiatrists.  As Plaintiffs pointed out in the July 15,

8    2020 filing, as of February 2020, CDCR employed 171.45 non-PIP, onsite staff

9    psychiatrists—well within the 90% level if only 184.46 psychiatrists were needed.  July 15

10   Bien Decl. ¶ 16.  If telepsychiatry is included, Defendants employed 216.14 psychiatrists

11   in February 2020, well in excess of the staffing plan's requirements for a system with

12   20,000 CCCMS patients and 3,200 EOP patients.  *Id.*

13         Plaintiffs have now updated this analysis and added PIP psychiatrists, supervising

14   psychiatrists, and chief psychiatrists.  Ells Decl. ¶¶ 2-71.  In the updated analysis, we have

15   shown an example of targeted population reductions.  Under the 2009 Staffing Plan, the

16   program-specific ratios[2] are:

17

18

---

19   [2] The 2009 Staffing Plan is in the record at Docket No. 3693.  The plan's exhibits (in Dkt.

20   No. 3693-2) include the provider-patient ratios for each program and level of care.  ECF
     No. 3693, Exhibits 11 (CCCMS-GP), 12 (Reception Intake and Screening), 13 (CCCMS-

21   Reception Center), 14 (CCCMS-ASU), 15 (CCCMS-SHU), 16 (EOP-GP), 17 (EOP-RC),
     18 (EOP ASU and Condemned), 19 (PSU).

22

23

| Program | Patients Per Clinician |
|---|---|
| CCCMS GP | 280 |
| Reception Intake and Screening | 33 |
| CCCMS Reception Center (RC) | 200 |
| CCCMS: STRH/Condemned/NDS | 125 |
| CCCMS: LTRH | 200 |
| EOP GP/RC | 120 |
| EOP - Any segregation unit | 64 |

In the analysis at Exhibit A of the Ells Declaration, we have set targeted reductions for each of these programs, and calculated the resulting reduction in the need for psychiatrists. In our example, the reductions are in the table below. The choice to make high reductions in the segregation programs, including the EOP segregation programs (EOP ASU Hubs and the Psychiatric Services Unit), the CCCMS segregation programs (Short Term Restricted Housing and Long-Term Restricted Housing), and Non-Disciplinary Segregation, is a deliberate one. Prolonged incarceration in these settings is harmful to class members, leads to disproportionately high rates of suicide, increases class members' symptoms and mental health treatment needs, and therefore increases staffing needs and the staff burnout that makes it harder to retain psychiatrists. *See Coleman v. Brown*, 28 F. Supp. 3d 1068, 1094-95 (E.D. Cal. 2014); *see also* July 15, 2020 Bien Decl. ¶ 49 (2019 suicide rate in CDCR's segregation units was 211.2 suicides per 100,000, compared to 23.2 in the CDCR non-segregation population).

| Program | Percentage Reduction | Males | Females | TOTAL |
|---|---|---|---|---|
| CCCMS GP | 15% | 2870 | 219 | 3089 |
| Reception Intake and Screening | 0% | 0 | 0 | 0 |
| CCCMS Reception Center (RC) | 0% | 0 | 0 | 0 |
| CCCMS: STRH/Condemned/NDS | 50% | 544 | 38 | 582 |
| CCCMS: LTRH | 50% | 71 | 4 | 75 |
| EOP GP/RC | 25% | 1359 | 34 | 1393 |
| EOP - Any segregation unit | 50% | 355 | 4 | 359 |
| TOTAL | | 5199 | 299 | 5498 |

In Exhibit A to the Ells Declaration, we have also taken into account the MHCB workload, and projected that a population reduction could result in a 5% reduction in MHCB beds. We did not project any reduction in inpatient beds, based on CDCR's most recent bed need study, which projects a substantial increase in Acute and ICF bed needs through 2024. Ells Decl. ¶ 72, Ex. H at 11. We also took into account CDCR's supervising psychiatrist and chief psychiatrist staffing, both on the supply and demand sides.

The result of the analysis is that if CDCR undertook to reduce the mental health population by 5,498 persons, distributed across programs as shown above, CDCR would achieve a 91.33% fill rate. With that reduction, CDCR would need approximately 358 full-time equivalent psychiatrists, and has approximately 322 positions filled as of the July

1   2020 vacancy report.  Defendants' Monthly Psychiatry Vacancy Report, Aug. 31, 2020,

2   ECF No. 6842 at 5 (showing 290.67 line psychiatrists); Ells Decl. ¶ 63 & Ex. G (June

3   Enclosure 1(f) showing 14 chief psychiatrists and 18 senior psychiatrist supervisors).

4          CDCR could, of course, achieve this result through many possible different mixes

5   of population reductions in each program.  The above analysis is provided to the Court to

6   show that it is *feasible* to bring the program demand into line with the psychiatrist supply

7   with targeted population reductions on the order of 5,500 persons.  This is a readily

8   achievable target when compared to the larger voluntary population reductions CDCR has

9   carried out since the pandemic began.

10         There are important details in addition to this numerical analysis of psychiatric

11  staffing ratios.  With movement stopped or slowed by the pandemic, many hundreds of

12  class members are now outside their proper levels of care.  *See* Ells Decl. ¶ 73, Ex. I at 7

13  (COVID-19 Dashboard from 9/9/20 showing 301 class members awaiting inpatient care).

14  Approximately 500 patients at the EOP level of care are waiting to get in to the program.

15  *See id.* (COVID-19 Dashboard from 9/9/20 showing 496 EOP class members not in EOP

16  beds).  In addition, even before the pandemic, there was unmet need for inpatient care.  *See*

17  Sept. 3, 2020 Order, ECF No. 6846, at 27; Transcript of June 29, 2020 Status Conference,

18  ECF No. 6753, at 21; Order, Oct. 8, 2019, ECF No. 6312 at 5-6 ("[T]he Special Master

19  informed the court … [of] a likely need for a study . . . to determine whether there is an

20  unmet need for MHCB care and inpatient care in CDCR's inmate population."); *see also*

21  Pls.' Response to Oct. 8, 2019 Order, Nov. 27, 2019, ECF No. 6401; Pls' Reply to Defs.'

22  Response to Oct. 8, 2019 Order, Dec. 9, 2019, ECF No. 6410.  And Defendants' policies

23

[3612777.10]

7

1  and this Court's order approving them restrict Defendants from employing telepsychiatry

2  to serve patients at higher levels of care.  *See generally* Mar. 27, 2020 Stipulated Order,

3  ECF No. 6539.  All of these factors must be considered in applying the 2009 Staffing

4  Ratios to prevent understaffing of the system.

5       **B.    WHETHER DEFENDANTS CAN, WITHIN THIRTY DAYS OF ANY**
            **COURT ORDER DIRECTING THEM TO DO SO OR SOONER IF**
6           **THE TASK IS PROMPTLY UNDERTAKEN, DEVELOP A PLAN IN**
            **CONSULTATION WITH THE SPECIAL MASTER AND, AS**
7           **NECESSARY, PLAINTIFFS' COUNSEL THAT THEY WILL**
            **IMPLEMENT VOLUNTARILY AND THAT WILL, NOT LATER**
8           **THAN THE END OF ONE YEAR, PERMANENTLY REDUCE THE**
            **NUMBER OF SERIOUSLY MENTALLY ILL INMATES TO THE**
9           **NUMBER THAT WILL BRING DEFENDANTS INTO**
            **COMPLIANCE WITH THE REQUIREMENTS OF THE OCTOBER**
10          **10, 2017 ORDER.**

11          This is primarily a question for the Defendants.  Their answer should be yes, they

12  can certainly develop such a plan.  Defendants' filings in this case and in *Plata* regarding

13  the pandemic population reductions show that they have the tools needed to identify

14  persons suitable for release and advance their release dates as necessary.  *See* Defendants'

15  Response to July 2, 2020 Order ("Defs.' July 15 Response"), July 15, 2020, ECF No.

16  6769, at 16-17; Joint Status Conference Statement, *Plata v. Newsom*, N.D. Cal. Case No.

17  01-1351 ("*Plata*"), July 15, 2020, ECF No. 3389.

18       **C.    IF THE ANSWER TO QUESTION 1.b IS YES, A DESCRIPTION OF**
            **THE GENERAL CONTOURS OF THE PLAN.**

19          Defendants have already set out the general contours of a plan to advance release

20  dates in their *Plata* filings.  The only additional element needed here is a focus on the

21  people in the Mental Health Services Delivery System.  The *Plata* advance release system

22  targets persons within 180 days of release and within one year of release.  The *Plata*

23

1   system considers people in these two groups eligible if they are not serving time for

2   domestic-violence related crimes or certain other violent crimes, and have no current or

3   prior sentences that require registration as a sex offender.  Defs.' July 15 Response at 16-

4   17.  The one-year group has two additional criteria: no high risk score for violence, and

5   being housed at certain institutions deemed to present higher risks for COVID-19

6   transmission.  *Id.*

7        In addition to targeting persons close to release, CDCR's *Plata* program also

8   includes special program credits.  CDCR created a Positive Programming Credit (PPC) of

9   12 weeks that applies to certain incarcerated persons.  *Id.* at 17.  Finally, the *Plata* program

10  has a mechanism for review of persons at high risk of complications from COVID-19 for

11  early release.  *Id*

12       CDCR has reported to the *Plata* Court that from July 1, 2020 through August 26,

13  2020, 5,952 people were released "as a result of the COVID-19 early release programs

14  Defendants announced on July 10, 2020."  Joint Case Management Statement, Aug. 31,

15  2020 ("*Plata* Aug. 31 Joint Statement"), *Plata* ECF No. 3436 at 3.

16       As Defendants informed this Court in their population brief on July 15, 2020, the

17  *Plata* pandemic releases are not specifically intended to benefit the *Coleman* class and are

18  not designed to reach any particular target population level.  Defendants have stated that

19  they will only continue the pandemic early releases until they are deemed no longer

20  necessary to address the COVID-19 crisis.  Defs.' July 15 Response at 17.

21       Defendants can, however, create a parallel early release program to benefit the

22  *Coleman* class and continue it as necessary to bring the MHSDS caseload down to levels

23

1   allowing patients to be cared for with achievable staffing levels, and adjust it as necessary

2   to make the remedy durable.  A *Coleman*-targeted population reduction plan could be built

3   on similar lines as the *Plata* program—but adding *Coleman*-specific criteria.  The

4   *Coleman*-specific criteria could be based on the person's level of care status.  For example,

5   the criteria could focus on CCCMS or EOP status.  To avoid incentives for people to

6   quickly acquire such status, there could be a time factor—such as opening eligibility only

7   to people who have been in the MHSDS for a certain period of time.

8       CDCR has the ability to focus population reduction in a way that protects public

9   safety.  Dr. James Austin, a criminologist whose expertise has previously been recognized

10  by this Court and by the Three-Judge Court, has studied the risk levels of the CDCR

11  population using the California Static Risk Assessment (CSRA).  Dr. Austin has found that

12  the percentage of low risk inmates (those scoring Level I on the CSRA) has increased

13  during the past ten years, from 35% in 2009 to 50% more recently.  Declaration of James

14  Austin Ph.D. in Support of Plaintiffs' Reply Brief ("Austin Decl."), Apr. 1, 2020, ECF No.

15  6560 at 3-4, ¶¶ 15-17.  Dr. Austin has opined that "[s]iginifcant reductions in the current

16  prison population can be quickly achieved without increasing recidivism or crime rates."

17  *Id.* at 6, ¶ 25.

18      Based on data that Plaintiffs' counsel received in July 2020, the *Coleman* class does

19  not differ from the rest of the CDCR population in distribution of risk scores.  The

20  distribution as of mid-July 2020 is shown in the table below.[3]  The non-*Coleman*

21  _____

22  [3] *See* Galvan Decl. ¶¶ 3-4.

23

1   population was about 54% low-risk according to the CSRA score.  That is 42,135 people

2   outside the *Coleman* class.  The *Coleman* population was approximately 56% low risk.

3   Within the *Coleman* population that is 18,612 people.  Even if the approximately 6,000

4   pandemic releases since mid-July were entirely low-risk, there would still be many low-

5   risk people left in prison to include in a *Coleman*-targeted advance release program.

| | Non-MHSDS | | MHSDS | | Total Number | Total Percentage |
|---|---|---|---|---|---|---|
| | | | | | | |
| **CSRA Scores** | **Number** | **Percentage** | **Number** | **Percentage** | | |
| **Low** | **42,135** | **54.05%** | **18,612** | **55.78%** | **60,747** | **54.57%** |
| **Moderate** | **16,996** | **21.80%** | **6,743** | **20.21%** | **23,739** | **21.32%** |
| **High** | **18,249** | **23.41%** | **7,815** | **23.42%** | **26,064** | **23.41%** |
| High Drug | 1,349 | 1.73% | 521 | 1.56% | 1,870 | 1.68% |
| High Property | 3,371 | 4.32% | 1,509 | 4.52% | 4,880 | 4.38% |
| High Violent | 13,529 | 17.35% | 5,785 | 17.34% | 19,314 | 17.35% |
| **None** | **577** | **0.74%** | **199** | **0.60%** | **776** | **0.70%** |
| **Grand Total** | **77,957** | **100.00%** | **33,369** | **100.00%** | **111,326** | **100.00%** |

14        CDCR has in place the basic infrastructure to handle a population reduction

15   program safely and responsibly.  Systems of community mental health care exist and can

16   be leveraged to assist in reducing the prison population of persons with mental illness.

17   With this brief Plaintiffs include the declaration of Elizabeth Jones, a nationally recognized

18   expert on safe and effective transitions from institutionalized mental health care to

19   community-based care.  Ms. Jones has developed transition systems for other states,

20   including as the Court-appointed receiver of a public psychiatric hospital in Maine, and as

21   a top administrator of mental health systems in Massachusetts and the District of

22   Columbia.  Declaration of Elizabeth Jones in Support of Plaintiffs' Brief Regarding

1   Staffing and Population ("Jones Decl."), filed herewith, at ¶ 2.  Ms. Jones is currently the

2   Independent Reviewer for the United States Department of Justice and the State of Georgia

3   regarding a settlement agreement on community-based services for the mentally ill.  *Id.*

4   The agreement targets, among other populations, adults being discharged from prisons and

5   jails.  *Id.*  Ms. Jones has recently toured one of the largest jails in California and reviewed

6   reentry systems for persons with serious mental illness who have experienced repeated jail

7   stays there.  *Id.* ¶ 4.

8        Ms. Jones in her declaration reviews the successful models of community-based

9   care that have emerged in the past two decades and that have proven to reduce recidivism

10  and promote public safety.   *Id.* ¶¶ 7-14.  Ms. Jones notes that CDCR has already laid the

11  groundwork for the necessary reentry linkages through its Transitional Case Management

12  Program that deploys benefits workers to prisons for individualized pre-release planning.

13  *Id.* ¶ 15.  Ms. Jones points to the evidence that community based approaches are far more

14  cost-effective than prison, based on figures provided by the California Legislative

15  Analyst's Office and a recent RAND Corporation study of housing-based programs in Los

16  Angeles.  *Id.* ¶ 16.  Federal benefits funding is also available for persons in the community,

17  while the same sources of funding, such as social security benefits, Veterans Affairs health

18  care, and Medicaid are stopped during incarceration.  *Id.* ¶ 17.

19       On August 31, 2020, CDCR informed the *Plata* Court that the State of California

20  has established a new public-private partnership "with nonprofit organizations and

21  philanthropies to support the reentry of incarcerated people who have been and will be

22  released from CDCR's institutions since July 1, 2020."  *Plata* Aug. 31 Joint Statement at

23

22-23.  The project is called "Returning Home Well," and according to CDCR, it "provides essential services, such as housing, health care, treatment, transportation, direct assistance, and employment support."  *Id.* at 23.  The program is funded with $15 million from the State to be matched by philanthropic contributions to a total of $30 million, to go to "organizations providing transportation home from prison, quarantine housing, emergency supportive housing, residential treatment, access to health care, employment services, direct assistance, and more."  *Id.*

In the August 26 Order extending time for this brief and the hearing, this Court directed the parties to address durability of the remedy, either with voluntary reduction in population or without it.  Order, Aug. 26, 2020, ECF No. 6838, at 4.   In order for a voluntary population reduction to achieve a durable remedy, it will require long-term follow through.  Right now, the CDCR population is at a historic low point due to one-time-only emergency measures taken because of the pandemic.  The population in CDCR's thirty-five institutions dropped from 117,394 persons on March 18, 2020 to 97,515 persons on August 26, 2020[4], a drop of 16.9%.  The *Coleman* class decreased in

_____

[4] CDCR Weekly Report of Population, Aug. 26, 2020, https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/08/Tpop1d200826.pdf. CDCR Weekly Report of Population, March 18, 2020, https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/03/Tpop1d200318.pdf.

1  size during the same period from 35,834 persons to 30,644 persons, a drop of 14.4%.

2  *Compare* Declaration of J. Powell Supporting Defendants' Response to the Order of July

3  2, 2020, July 15, 2020, ECF No. 6769-1 at Ex. B (Mar. 28, 2020 MHSDS population),

4  *with* Ells. Decl. Ex. B (Aug. 25, 2020 MHSDS population).  During this period, intake to

5  CDCR was closed.  Typically intakes from the counties add 3,000 persons per month to

6  CDCR's population.  *See* Declaration of Ralph Diaz Supporting Defendants' Opposition

7  To Plaintiffs' Emergency Motion To Modify Population Reduction Order, Mar. 31, 2020,

8  ECF No. 6553, ¶ 4.  Intakes resumed on August 24, 2020.  *See Plata* Aug. 31 Joint Status

9  Conf. Statement at 10.  The population reduction measures used during the pandemic,

10  consisting of one-time 12-week programming credits, and early release reviews for some

11  persons within 180 and 365 days of release, are not expected to continue after the public

12  health crisis is over.  Defs.' July 15 Response at 17.   There has been no overall sentencing

13  reform in response to the pandemic.  Moreover, the sentencing reforms that brought the

14  population down before the pandemic may be rolled back if Proposition 20 is approved by

15  voters in the November election.  *See* July 15 Bien Decl. ¶ 3, Ex. B (ECF No. 6768)

16  (California Secretary of State Summary of Proposition 20 noting that it would "[r]estrict[]

17  parole for Non-Violent Offenders," "[a]uthorize[] felony Sentences for certain offenses

18  currently treated only as misdemeanors," and "[c]hange[] standards and requirements

19  governing parole decisions" among other things); *id.* ¶ 3, Ex. C (ECF No. 6768)

20  (explaining that Proposition 20 would change AB 109 and Propositions 47 and 57).

21      Defendants now have a unique opportunity to end decades of unconstitutional

22  mental health care in CDCR prisons by bringing the mental health caseload in line with the

23

available staffing resources.  Defendants have built a model for careful and planned early

release as part of their response to the pandemic.  They can now adopt this model to

achieve an effective and durable remedy in the *Coleman* case.  To make the remedy

durable will require more than a one-time only program, but rather ongoing reviews of

class members for early release, or sentencing reform, or a combination thereof.

**D.  AS AN ALTERNATIVE TO A VOLUNTARY PLAN FROM DEFENDANTS, WHAT REMEDIES ARE AVAILABLE TO THE COURT TO ENFORCE ITS OCTOBER 10, 2017 ORDER WITH RESPECT TO DEFENDANTS' 2009 STAFFING PLAN?**

**1.  The Court Should Order Defendants to Implement the Special Master's Labor Economist's Recommendations Regarding Salary Increases and Differential Pay.**

The Court has shown great deference to CDCR's salary-setting judgment.  For

example, in the October 10, 2017 Order, the Court reviewed the compelling evidence that

salary adjustments could remedy the staff shortages, but nevertheless declined to issue any

orders requiring such adjustments, leaving it up to CDCR to act on the evidence.  Order,

Order, Oct. 10, 2017 ("Oct. 10, 2017 Order"), ECF No. 5711, at 25.  Three years later,

Defendants still have not acted, and mental health staffing vacancies have increased

further, with psychiatry vacancies hovering at one-third in the period immediately

preceding the COVID-19 pandemic.  *Compare* Defs.' Feb. 2018 Monthly Psychiatry

Vacancy Report, March 30, 2018, ECF No. 5813 at 5 (reporting 75% fill rate for

psychiatrists systemwide, excluding psychiatric nurse practitioners), *with* Defs.' Feb. 2020

Monthly Psychiatry Vacancy Report ("February 2020 Psychiatry Report"), April 1, 2020,

ECF No. 6563 at 4 (reporting 66% fill rate for psychiatrists systemwide, excluding

psychiatric nurse practitioners).

1      The evidence supporting adoption of specific salary adjustments as a remedy

2  continues to build.  Defendants will surely repeat the refrain that the nationwide

3  psychiatrist shortage makes all efforts futile.  Defendants have been saying this same thing

4  for years but have been hiding the facts to support or refute their argument behind a veil of

5  collective bargaining secrecy.  *See* Special Master's Report on His Expert's Analysis of

6  Psychiatrist Employment Conditions and Compensation at the California Department of

7  Corrections and Rehabilitation and the Department of State Hospitals ("Labor Economist

8  Report"), May 20, 2020, ECF No. 6695 at 10.  To get around this obstruction, the Court

9  authorized the Special Master to retain a labor economist, Dwight Steward, to conduct an

10  objective labor market and salary analysis.  *Id.* at 10-11.  Defendants then tasked their own

11  retained labor economist to review Dr. Steward's work.  *Id.* at 16-17.  Dr. Steward's final

12  report was filed with the Court on May 29, 2020, along with the response by Defendants'

13  labor economist.  *Id.* at Appendix A, 186-317.  Dr. Steward made six findings and five

14  recommendations:

15      The six findings are:

16         ● CDCR and DSH psychiatrist salaries were initially
competitive with other employers, however salary increases
17      diminish through a psychiatrist's employment tenure.

18         ● CDCR and DSH psychiatrists' perception of the adequacy of
their salary diminishes over time; psychiatrists that have been
19      employed at either CDCR or DSH for 10 or more years report
higher dissatisfaction with their current salary.

20         ● A reduction in CDCR vacancy rates and an increase in
CDCR retention rates occurred in recent years in which
21      psychiatrists received salary increases.

22         ● CDCR and DSH psychiatrists earn higher salaries than
psychiatrists at other private and public California employers,
23

however CDCR and DSH psychiatrists report overall job dissatisfaction related to a variety of factors including office space, professional standing, limited promotional opportunities and limited institutional support from the medical assistant program.

● On-site, registry, and telepsychiatry CDCR and DSH psychiatrists all report job dissatisfaction, but job dissatisfaction was most pronounced among on-site psychiatrists.

● Vacancy rates are twice as high at CDCR institutions in the Central Valley compared to those outside the Central Valley; CDCR psychiatrists in the Central Valley consistently report higher dissatisfaction with their employment conditions than CDCR psychiatrists at institutions outside of the Central Valley.

*Id.* at 191-92.   Dr. Steward made five recommendations.  For the sake of brevity only the summary first statement of each recommendation is quoted below:

● Provide a system of consistent and larger salary increase opportunities for psychiatrists throughout their employment tenure at CDCR and DSH.

● Provide a system of compensation differentials to incentivize psychiatrists to fill Central Valley positions, and to retain incumbents in those positions.

● Increase and improve the office space and facilities provided to psychiatrists to perform their job functions at its facilities.

● Improve the working environment for CDCR and DSH psychiatrists.

● In conjunction with improving CDCR and DSH psychiatrists' overall working conditions, better inform psychiatrists of the value of their compensation and their compensation relative to their peers.

*Id.* at 192-93.  Defendants filed extensive objections to the Labor Economist recommendations, supported with Defendants' own expert analysis.  Defs.' Resp. and Obj. to the Special Master's May 29, 2020 Report on His Expert's Analysis of Psychiatrist

1    Employment Conditions and Compensation, June 29, 2020, ECF No. 6744.  Plaintiffs have

2    responded in detail, demonstrating that the Special Master's Labor Economists'

3    recommendations are sound, and were developed with full input from Defendants.

4    Plaintiffs' Resp. to Defs.' Resp. and Obj. to Special Master's Labor Economist Report,

5    Aug. 7, 2020, ECF No. 6808.  It is well within this Court's authority to weigh the

6    competing expert statements, decide the disputed issues and issue an order.  That order

7    should require Defendants to implement the recommendations of the Special Master's

8    Labor Economist.  These recommendations are modest.  They require Defendants to

9    address specific problems in their salary structure—namely a lag in salary increases for

10   experienced psychiatrists, failure to address the need for pay differentials for psychiatrists

11   working in the Central Valley, and basic attention to working conditions, such as providing

12   adequate office space and training other prison employees to understand and appreciate

13   psychiatrists' role.  Labor Economist Report at 192-93.  These are not radical or disruptive

14   interventions.

15        The Court has in the past affirmatively ordered Defendants to modify their pay

16   scales, and in particular to increase salaries for some psychiatrists and other mental health

17   staff employed by Defendants in order to address severe staffing shortages.  *See* Order,

18   May 23, 2007, ECF No. 2236, at 4-6 (ordering Defendants to create a plan ensuring pay

19   parity for clinical staff employed by DMH consistent with pay for CDCR-employed

20   mental health staff in order "to remedy the staffing shortage at ASH" preventing admission

21   of *Coleman* patients); Order, June 28, 2007, ECF No. 2301, at 3 (ordering Defendants to

22   implement the pay scales for DMH clinicians set forth in the plan generated in response to

23

1   Court's May 23, 2007 Order); Order, Mar. 8, 2005, ECF 1654 (ordering plan for

2   differential pay for psychiatrists at several prisons); Order, Jan. 13, 2000, Dkt. 1111, at 4

3   (ordering Defendants to increase annual compensation for full-time psychiatrists by no less

4   than $20,000 per year); *see also* Order, Aug. 28, 2000, Dkt. 1198, at 3 (ordering

5   Defendants to restore compensation differentials for remote prisons).  The Court should

6   similarly order Defendants to adopt the Special Master's Labor Economist's

7   recommendations now.

8   **2.   The Court Should Order Defendants to Address the Deplorable Working Conditions for CDCR Psychiatrists.**

9   CDCR has allowed working conditions for mental health staff, particularly

10   psychiatrists, to deteriorate.  CDCR psychiatrists are expected to practice a healing art in

11   an environment dominated by custodial interference, lockdowns, and inhumane practices

12   such as placing patients in cages for their clinical appointments.  *See, e.g*., Special

13   Master's 27th Round Monitoring Report ("27th Round Report"), Feb. 13, 2018, ECF No.

14   5779 at PDF 97-106 (describing custodial interference with mental health care delivery at

15   several institutions, including custody officers' violence against and harassment of

16   *Coleman* patients); *Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014) (detailing

17   harsh environment of segregation settings and challenges of providing therapeutic mental

18   health care to patients in such settings); July 15 Bien Decl., Ex. BBB, ECF No. 6770-3, at

19   9-18 (Plaintiffs' July 15, 2019 letter objecting to use of cages for treatment of patients in

20   inpatient care as counter-therapeutic and a barrier for the mental health provider as well as

21   the patient)**.**

22   Not surprisingly, then, the majority of CDCR psychiatrists reported low levels of

23

1   job satisfaction regarding their overall working conditions to the Special Master's Labor

2   Economist, with job dissatisfaction the most pronounced among on-site psychiatrists.  *See*

3   Labor Economist Report at 192, 219, 223.  Psychiatrists are not provided with decent

4   clinical space in which to meet their patients, and in far too many cases are forced to walk

5   the yards and tiers to find their patients, often reduced to trying to treat them at the cell-

6   front by shouting through a food port or with custodial staff standing nearby.  *See* Labor

7   Economist Report at 191-193, 227-230 (psychiatrists reported low levels of satisfaction

8   with their office space, especially those in the Central Valley, and Labor Economist

9   recommended "increase[ing] and improv[ing] office space and facilities" could "help

10   increase psychiatrist recruitment and retention"); *see also* 27th Round Report at 129-30

11   (noting that inadequate office and treatment space results in non-confidential clinical

12   contacts); CDCR Mental Health System Report, Oct. 13, 2018, ECF No. 5988-1 at ECF

13   Pages 11, 42, 54, 65-66, 68, 76, 80, 82, 141 ("Golding Report") (detailing how

14   psychiatrists frequently must see their patients cell-front or otherwise non-confidentially,

15   with custodial staff nearby, or locate their patients on the yard).

16       The coronavirus pandemic has only worsened these conditions, forcing more

17   treatment to be provided non-confidentially and in brief encounters.  July 15 Bien Decl.,

18   ECF No. 6767, ¶¶ 18, 50-53; Ex. Q to July 15 Bien Decl., ECF No. 6768-1, at 99-113; Ex.

19   WW to July 15 Bien Decl., ECF No. 6770, at 8-9.

20       The Labor Economist Report stated that CDCR needs to improve working

21   conditions in order to attract psychiatrists, including by improving office space and

22   facilities and "creating human resource programs to better inform facility employees about

23

[3612777.10]

20

the role and functions of psychiatrists" so that their "medical and professional opinions and their role within the facility" are valued.  Labor Economist Report at 193.  CDCR should be required to take these recommendations seriously and put resources into implementing them.

### 3. The Court Could Also Initiate Contempt Proceedings and Order Appropriate Relief, Including Monetary Sanctions.

The Court also has the authority to initiate contempt proceedings and issue appropriate remedies, including monetary sanctions.  Contempt, while an extraordinary remedy, is appropriate where, as here, a party has failed to comply with existing court orders for years.  *See, e.g.,* July 30 Order at 7 (citing October 10, 2017 Order regarding Defendants' fifteen-year lack of compliance with staffing orders and noting that "in the intervening three years, nothing has brought defendants closer to compliance or suggested that defendants can adequately staff" the MHSDS).  The threat of monetary sanctions has previously motivated Defendants to comply with court orders regarding inpatient hospital transfers and is an alternative the Court should consider employing to enforce the October 10, 2017 Order.

Prior to holding a defendant in civil contempt, a court must find by clear and convincing evidence that:  (1) a valid court order exists that is sufficiently "specific and definite," *see Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989); (2) the defendant had knowledge of the order, the potential penalties for failing to comply with said order, and an opportunity to be heard about the alleged non-compliance, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109-10 (9th Cir. 2005); and (3) the defendant failed to take "*all*

1   reasonable steps" to comply with the order, *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th

2   Cir. 2016) (emphasis in original).

3       To be found in civil contempt, Defendants' non-compliance "need not be willful,

4   and there is no good faith exception to the requirement of obedience to a court order." *In*

5   *re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)

6   (citations omitted).  Impossibility cannot be a valid defense if Defendants are "responsible

7   for the inability to comply." *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980); *see*

8   *also F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (suggesting that

9   impossibility may not be a defense if the inability to comply is self-induced).  "A court has

10   wide latitude in determining whether there has been contemptuous defiance of its order."

11   *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984).

12       Once a defendant has been found in civil contempt, a court has "broad equitable

13   power to order appropriate relief in civil contempt proceedings." *SEC v. Hickey*, 322 F.3d

14   1123, 1128 (9th Cir. 2003).  When considering a sanction to make a defendant comply

15   with a court order, a court should consider "the character and magnitude of the harm

16   threatened by continued contumacy, and the probable effectiveness of any suggested

17   sanction in bringing about the result desired." *United Mine Workers*, 330 U.S. at 304.

18       The Court has the authority to issue monetary sanctions if it determines that such

19   sanctions are necessary to coerce compliance by Defendants.  *Id*. at 303–04 (a contempt

20   fine is considered civil and remedial if it either "coerce[s] the defendant into compliance

21   with the court's order, [or] … compensate[s] the complainant for losses sustained"); *see*

22   *also Bagwell*, 512 U.S. at 829 (explaining that one of the paradigmatic civil contempt

23

1  sanctions "is a per diem fine imposed for each day a contemnor fails to comply with an

2  affirmative court order").  Should the Court decide to impose non-compensatory civil

3  contempt fines, however, it must afford Defendants an opportunity to reduce or avoid any

4  proposed fine through compliance.  *See id.* ("[A] flat, unconditional fine totaling even as

5  little as $50 announced after a finding of contempt is criminal if the contemnor has no

6  subsequent opportunity to reduce or avoid the fine through compliance." (citation

7  omitted)).

8       Legally, the criteria for the Court to find Defendants in contempt of its staffing

9  orders and order monetary sanctions are plainly met.  Defendants have had nearly three

10 years to come into compliance with the October 10, 2017 Order, which was highly specific

11 and definite, and warned them that the Court would need to employ "enforcement orders"

12 if Defendants failed to meet the one-year deadline for compliance with the 2009 Staffing

13 Plan.  Oct. 10, 2017 Order at 28-31.  Defendants failed to take all reasonable steps to

14 comply with the Order, instead spending their time and effort to manipulate their data to

15 mislead the Court and Special Master.  *See* Dec. 17, 2019 Order at 44-46.  To the extent

16 Defendants claim that compliance is impossible, that impossibility is entirely of their own

17 making—they have refused to take the Court's suggestion of utilizing significant salary

18 increases as a tool to improve recruitment and retention, and while they have repeatedly

19 suggested that the requirements in their own 2009 Staffing Plan are inappropriate, they

20 have never moved to modify the plan.

21       The threat of monetary sanctions is also likely to coerce compliance by Defendants.

22 When faced with that possibility in 2017, Defendants swiftly took action to come into

23

1   compliance with the long-standing Program Guide requirement regarding transfer

2   timelines into Acute and ICF levels of care, even after more than ten years had passed

3   since they had been ordered to "immediately implement" the timelines, so that they could

4   avoid accumulating $1,000 per patient per day fines.  *See* Order, March 24, 2017, ECF No.

5   5583, at 4-8 (reciting history of non-compliance); Order, April 19, 2017, ECF No. 5610, at

6   10, 13-15 (ordering that fines would start accumulating if Defendants' monthly reports

7   showed patients waiting beyond transfer timelines and setting contempt hearing).  Within

8   just a few months of the order requiring accrual of monetary sanctions, Defendants began

9   meeting the Program Guide's transfer timeline requirements for patients waiting for

10  inpatient care and they remained largely in compliance until the beginning of the COVID-

11  19 pandemic.  *Compare* Defs.' Census and Waitlists Reports for Inpatient MH Care,

12  March 15, 2017, ECF No. 5577, at 7 (pre-April 19, 2017 Order report showing seven

13  patients waiting over 10 days for acute care and 40 patients waiting over 30 days for ICF

14  care), *with* Defs.' Census and Waitlists Reports for Inpatient MH Care, May 15, 2017,

15  ECF No. 5619, at 6 (post-April 19, 2017 Order report showing no patients waiting over

16  timelines for acute or ICFs level of care), *and* Defs.' Census and Waitlists Reports for

17  Inpatient MH Care, Nov. 15, 2017, ECF No. 5731, at 8, 10 (report at the time of scheduled

18  contempt hearing showing zero patients waiting over timelines for acute or ICF levels of

19  care), *and* Defs.' Census and Waitlists Reports for Inpatient MH Care, Mar. 16, 2020, ECF

20  No. 6505 at 7, 9 (pre-pandemic report showing only one patient waiting over ten days for

21  acute care and two patients waiting over 30 days for ICF level of care).  Given this

22  precedent, there is a significant likelihood that if the Court were to employ contempt and

23

[3612777.10]

24

1   monetary sanctions in the context of staffing shortages, Defendants would be incentivized

2   to take necessary steps to meet the 90% staffing benchmarks in their 2009 Staffing Plan.

3       The recent trial regarding misleading compliance data, however, shows that the

4   contempt threat alone cannot improve actual conditions for class members.  *See generally*

5   Dec. 17, 2019 Order.  The trial shows that tunnel vision of making the metrics look good

6   can have perverse results, and that Defendants lost sight of the substantive mission of

7   providing humane mental health care and instead manipulated the metrics to hide the

8   results of understaffing the system.  *Id.* at 44 ("Defendants adopted a laser focus in an

9   effort to obtain termination of court supervision, which lead to a stark 'ends justify the

10  means' approach" that has "missed the significance of the constitutional rights of the

11  thousands of mentally ill persons defendants have in their custody.").

12      Defendants have repeatedly shown that when the Court's and/or Special Master's

13  focus is on enforcement of one of the many long-standing violations in the case, they can

14  improve compliance on those requirements.  But such single-minded focus can then have

15  the harmful, if potentially unintended, consequence of hindering Defendants' remedial

16  action on other requirements.  *See, e.g.*, Special Master's Monitoring Report on the Mental

17  Health Inpatient Programs for Inmates of CDCR, May 25, 2016 ("Special Master 2016

18  Inpatient Report"), ECF No. 5448 at 24-40 (describing Defendants' historical pattern of

19  failing to refer patients to DSH inpatient beds unless Court or Special Master are closely

20  monitoring the issue); *see also* Plaintiffs' Opening Brief Regarding MHCB Construction

21  and Unmet Bed Need Study, Nov. 27, 2019, ECF No. 6401, at 20-24.  As Plaintiffs have

22  shown, Defendants' recent concerted efforts to restrict patient usage of inpatient

23

psychiatric beds in order to comply with the Program Guide timelines and avoid fines have contributed to pressure on clinicians to refer fewer class members for higher levels of care and a concomitant rise in unmet psychiatric need among the *Coleman* class. *See* Declaration of Jenny S. Yelin in Support of Plaintiffs' Opening Brief Regarding MHCB Construction and Unmet Bed Need Study ("Nov. 27, 2019 Yelin Decl."), Nov. 27, 2019, ECF No. 6401-1, ¶¶ 16-21; Declaration of Jenny S. Yelin In Support of Plaintiffs' Reply to Defendants' Response to October 8, 2019 Order ("Dec. 9, 2019 Yelin Decl."), Dec. 9, 2019, ECF No. 6410-1, ¶ 13. It has also been linked to a dramatic increase in suicides related to failures to refer to, or premature discharges from, higher levels of care, and an overall stark rise in the rate of suicides in the last few years. *See* Special Master Corrected Report on Status of Class Member Access to Inpatient Care, Apr. 6, 2020, ECF No. 6579, at 1-2, 29-30; *see also* July 15 Bien Decl. ¶¶ 34-35; Nov. 27, 2019 Yelin Decl. ¶¶ 6-15; Dec. 9, 2019 Yelin Decl. ¶¶ 13-15. While contempt is an available remedy for the Court, the Court should carefully consider the possible unintended consequences of utilizing it to address Defendants' non-compliance with the October 10, 2017 Order. Contempt must be accompanied by rigorous monitoring to ensure that plugging one hole in the dike does not cause multiple others to spring up.

### 4. Any Plan to Provide Treatment At Current Population and Staffing Levels, or Even Increased Staffing Levels, Must Be Durable In Light of Realistic Forecasting of the Population.

In the August 26 Order extending time for this brief and the upcoming hearing, the Court stated: "If application of the 2009 Staffing Plan ratios to the existing population of seriously mentally ill inmates shows that the existing workforce can serve that population,

1    the issue posed by the court's second question then becomes the durability of those

2    population reductions, i.e., forecasting whether the population of seriously mentally ill

3    inmates will continue to decline, will stabilize or will rise again if and when the current

4    population measures defendants have implemented in light of the COVID-19 pandemic are

5    lifted."  Aug. 26 Order at 4.

6            Unfortunately, Defendants signaled last week that they are taking the opposite

7    approach.  They wrote to the Special Master and Plaintiffs' counsel about their intention to

8    perform a "mid-cycle" adjustment to staffing allocations in order to quickly capitalize on

9    the current low population levels to lock in lower psychiatric staffing allocations.  Galvan

10   Decl. Ex. A.  This is shortsighted and violates this Court's prior orders requiring that life-

11   saving clinical resources be allocated based on reasonable future projections.  *See* Order,

12   Oct. 20, 2006, ECF No. 1998, at 2-3 (approving 2006 population projections and directing

13   future annual population projections).  Just one month ago, Defendants informed this Court

14   that their COVID-19 population reduction programs "are designed to respond to the

15   current public health crisis" and therefore are temporary.  Defs.' July 15, 2020 Response at

16   18.  Defendants have already re-opened the prisons to intake from the counties, a process

17   which typically adds 3,000 persons per month to the prison population.  *See Plata* Aug. 31

18   Joint Status Conf. Statement at 10 ("CDCR resumed intake the week of August 24");

19   Declaration of Ralph Diaz Supporting Defendants' Opposition To Plaintiffs' Emergency

20   Motion To Modify Population Reduction Order, Mar. 31, 2020, ECF No. 6553 ¶ 4.

21           Establishing and filling psychiatric positions takes months and years; eliminating

22   them takes the stroke of a pen.  Positions eliminated now will not be there when needed as

23

1     CDCR resumes post-pandemic operations.  Rather than chasing "mid-cycle" excuses to cut

2     positions, CDCR should be re-doubling their efforts to fill the current allocations.  Any

3     Order regarding salaries and working conditions should include periodic review by the

4     Special Master's Labor Economist to evaluate the efficacy of the measures taken and to

5     recommend necessary adjustments.

6          A voluntary reduction in the mental health population—or if Defendants refuse to

7     reduce the population voluntarily, a referral from this Court to the Three-Judge Court to

8     consider a population reduction order—is the alternative most likely to result in sustained

9     compliance with the staffing order without the risk that Defendants' attempts to avoid

10     sanctions in this one compliance area will cause serious harm to the class in another way.

11     Plaintiffs have already made a showing that Defendants' chronic and intractable failure to

12     remedy its psychiatry staffing shortages has caused significant harm to the Plaintiff class.

13     *See* Plaintiffs' Response to Order of July 2, 2020, July 15, 2020, ECF No. 6766, at 16-22,

14     55-58.  Together with Defendants' other serious unabated Eighth Amendment violations,

15     this harm clearly satisfies the criteria for this Court to refer the case to a three-judge court

16     for consideration of a population reduction order.  The Court can and should make such a

17     referral without delay.

18       **A.     WHAT REMEDIES ARE AVAILABLE FOR THE SHORTFALL IN STAFFING REQUIRED FOR THE PSYCHIATRIC INPATIENT**
19             **PROGRAMS OPERATED BY THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION?**

20          CDCR has several possible remedies available to address the extreme shortfall in

21     PIP staffing.

22

23

1          **1.      Reverse the Lift and Shift**

2          Staffing at the PIPs dropped drastically following the July 1, 2017 "Lift and Shift,"

3     where CDCR took over management of the PIPs from DSH.  *See, e.g.*, Jt. Status Report re

4     Oct. 11, 2018 Status Conference, Sept. 14, 2018, ECF No. 5922, at 5 ("A significant

5     number of clinical staff left the PIPs following the lift and shift, and as of July 2018.");

6     Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for

7     Inmates of CDCR, Aug. 30, 2018, ECF No. 5894, at 28-29 (explaining that all DSH

8     inpatient psychiatric facilities treating *Coleman* class members were meeting staffing ratios

9     for clinical disciplines during the reporting period, while most of the CDCR PIPs were

10    not).  Just before Lift and Shift, the inpatient programs at CHCF, CMF and SVSP were

11    running with psychiatric vacancy rates of 12%, 26% and 10%, respectively.  *See*

12    Declaration of Jessica Winter in Support of Plaintiffs' Brief Regarding Staffing and

13    Population ("Winter Decl."), filed herewith, ¶ 2 & Ex. A.  By February 2020, the PIP

14    version of these inpatient programs at CHCF, CMF and SVSP were running with

15    psychiatric vacancy rates of 44%, 51%, and 32%, respectively.  Defs' Feb. 2020 Monthly

16    Psychiatric Vacancy Report, Apr. 1, 2020, ECF No. 6563, at 4; Winter Decl. ¶ 3 & Ex. B.

17    That is roughly double the pre-Lift and Shift vacancy rate at CMF, and more than treble at

18    CHCF and SVSP – even with the use of telepsychiatry at all three PIPs, which is

19    prohibited under this Court's October 10, 2017 order.  Defendants may point to lower

20    figures after the pandemic—but this is the result of Defendants pandemic related

21    "departure" from this Court's orders prohibiting telepscyhiatry at inpatient units.  August

22    18, 2020 Joint Report Addressing Current Covid-19- Related Departures From Program

23

1   Guide Requirements And Resumption Of Program Guide Mental Health Care, ECF No.

2   6831 at 23.  Temporary emergency backfilling of inpatient care with telepsychiatry is not

3   an acceptable long-term solution.  Order, July 28, 2020, ECF No. 6791 at 3 (departures are

4   not a new constitutional floor).

5          DSH is a hospital system, not a prison system, and it is not surprising that clinical

6   staff would prefer to provide treatment in a therapeutic setting, rather than in a prison-

7   based culture.  If Defendants cannot find a way to staff the CDCR-run PIPs adequately,

8   one obvious remedy would be to undo the Lift and Shift and bring clinically-focused

9   mental health staff back into the fold.  Another, discussed further below, would be to

10  secure several hundred additional beds for class members at existing DSH facilities.

11  Certainly, this would be less expensive than building (and staffing) the many hundreds of

12  additional licensed inpatient beds still required for CDCR to come into compliance with

13  the demand for this level of care, let alone to close down the "temporary," unlicensed PIP

14  beds at CMF and SVSP.  *See* Ells Decl. ¶ 72, Ex. H; *see also* Defs.' 2012 Mental Health

15  Bed Plan, ECF No. 4196-2, at 62 (pledging that "[t]he remaining temporary programs at…

16  SVSP (242 ICF-H), and CMF (20 MHCBs, 68 Acute, 140 ICF-H) will be decommissioned

17  [when] there is adequate capacity to accommodate future need in that level of care"); Stip.

18  & Order Waiving State Law, Apr. 6, 2017, ECF No. 5592, at 3 (ordering "state licensing

19  requirements shall be waived with respect to the 70 temporary Intermediate Care Facility

20  beds and two observation and restraint rooms in the L Wing, L-1, at California Medical

21  Facility").

22          **2.      If the PIPs Remain in CDCR, Create Retention and Recruitment**

23

[3612777.10]

### Incentives and Initiatives

### (a)    Compensation

Given the challenge of working in the PIPs, CDCR should create a pay scale that incentivizes working in inpatient psychiatric hospitals located inside prisons.  A safety-pay differential for PIP staff would be most important for psychiatrists, given the court-ordered requirement that psychiatrists in the PIPs work in-person, rather than via telepsychiatry (other than in emergency situations).  *See* Stip. & Order Approving CDCR's Telepsychiatry Policy, Mar. 27, 2020, ECF No. 6539.  CDCR currently employs many telepsychiatrists who work from hubs, and it could re-weight incentives for working in the PIPs by aggressively increasing differential pay.  If CDCR focuses its financial resources on hiring psychiatrists willing to work in person in the PIPs, it then would be able to backfill positions in the lower levels of care with telepsychiatrists, maximizing its psychiatry workforce and providing more options for potential psychiatrist-recruits.

### (a)    Shift work culture from prison-based to hospital-based

PIP staffing needs would be served by the same general working conditions improvements that would aid CDCR's staffing of its outpatient mental health programs, as discussed in Section I.D.2 above.  Creating and implementing more workforce development initiatives—like forensic internships and loan forgiveness, for example— would help CDCR staff its high-acuity mental health programs.

In addition, to bring clinicians back to the CDCR-run PIPs, and to retain those currently treating patients there, Defendants must make sustainable concerted efforts to reverse the overly punitive, custodial-based measures CDCR has unnecessarily imposed on PIP patients in high-custody programs, which interfere with treatment and undermine the

1   purpose and culture of what is meant to be a clinical setting.  *See* July 15 Bien Decl., Ex.

2   BBB (ECF No. 6770-3) at 9-18.  These class members require inpatient psychiatric

3   hospitalization, yet since CDCR took over, PIP patients are subjected to the extremes of

4   prison-based restrictions on their movement and treatment modalities, such as the reflexive

5   imposition in many cases of "MAX" custody status without an identifiable means of

6   shedding that restrictive status, and the use of "therapeutic treatment modules"—or

7   cages—as a precondition to treatment.  Winter Decl. ¶¶ 9-11, Ex. H; July 15 Bien Decl. ¶

8   60.  With sufficient clinical staffing in place to manage challenging patients, CDCR would

9   not need overly restrictive measures like cages or regular cuffing.  These measures prevent

10  clinicians from delivering care, and have been implicated in recent suicides.  Winter Decl.

11  ¶ 9 & Ex. H.

12              **(b)     Improve overall clinical staffing numbers**

13          While the focus in this case is often on psychiatry staffing numbers, CDCR's ability

14  to improve overall clinical staffing rates—for psychiatric technicians, registered nurses,

15  clinical social workers, clinical psychologists, recreation therapists ("RTs"), and office

16  technicians, who all play a role in the delivery of mental health services in CDCR—will

17  help line staff feel safer in their work environment, thereby making the PIPs a more

18  attractive option to new recruits and increasing job satisfaction and retention.

19          As of the last PIP staffing report, for example, the CMF PIP had an overall 42%

20  vacancy rate across the major mental health staffing classifications, including a 60%

21  vacancy rate for clinical psychologists, a 41% vacancy rate for clinical social workers, and

22  a 20% vacancy rate for RTs.  *See* Winter Decl. ¶ 6 & Ex. E at 5.  The CHCF PIP had a

23

[3612777.10]                                    32

36% overall mental health staffing vacancy rate, including 33% vacancy rates for clinical psychologists and social workers, and a 28% vacancy rate for RTs. *See id.* at 4. The SVSP PIP had an overall 21% mental health staffing vacancy rate, including a 10% vacancy rate for clinical psychologists, a 23% vacancy rate for clinical social workers, and a 22% vacancy rate for RTs. *See id.* at 6. Increasing the fill rates for all mental health classifications at the PIPs could go a long way toward helping all mental health staff feel safer and better supported, and therefore improve the quality of their work environment.

### 3.   Open More State Hospital Beds for *Coleman* Class Members

If CDCR cannot unwind Lift and Shift or its impacts, then Defendants must open more DSH beds to *Coleman* class members. Doing so would counteract the multiple negative impacts, described above, of having a prison system run an inpatient psychiatric program. Of course, it remains critical that Defendants identify and implement sustainable methods to ensure class members actually are able to access existing DSH beds, along with any new *Coleman* beds. *See* Order, Apr. 24, 2020, ECF No. 6639, at 3-4, 8 & nn.2, 5 (referencing history of Defendants' failure to fill *Coleman* beds at ASH and noting that "the availability of the full complement of ASH beds in particular is essential to avoid long waitlists for access to inpatient care"); *see also* Special Master 2016 Inpatient Report at 24-40. Dozens of beds at ASH have remained empty—and the numbers continue to plummet—notwithstanding this Court's April 24, 2020 order to ensure transfers to DSH beds continue during the pandemic. *Compare* Apr. 24, 2020 at 6 (noting that 20 ASH beds were vacant as of March 30, 2020); *with* Winter Decl. ¶ 7 & Ex. F. (August 10, 2020 MHSDS Management Information Summary Report, showing 58 available *Coleman* beds

1   at ASH); *id.* ¶ 8 & Ex. G (September 4, 2020 DSH CDCR Patient Census and Waitlist

2   Report showing 79 available *Coleman* beds at ASH).

3                                   <u>**CONCLUSION**</u>

4           The answer to the Court's first question is that CDCR can use a modest early

5   release program, targeting approximately 5,500 *Coleman* class members, to come into

6   compliance with long-violated staffing ratios.  The answer to the Court's second and third

7   questions is that CDCR has a practical path forward to achieve this population reduction

8   safely and in a way that protects public safety.  The answer to the Court's fourth and fifth

9   questions is that the remedies now available to bring staffing into compliance without a

10  voluntary release program are a combination of court orders on compensation, working

11  conditions, and increased bed capacity, with orders to show cause regarding contempt if

12  compliance is not achieved promptly.

13                      **CERTIFICATION OF ORDERS REVIEWED**

14          Plaintiffs' counsel certifies that he reviewed the following orders relevant to this

15  filing: ECF and Dkt. Nos. 1111, 1198, 1383, 1654, 1998, 2236, 2301, 3761, 5116, 5171,

16  5307, 5477, 5564, 5583, 5610, 5711, 6312, 6427, 6639, 6846, and 6794.

17  DATED:  September 14, 2020          Respectfully submitted,

18                                      ROSEN BIEN GALVAN & GRUNFELD LLP

19

20                                      By:  */s/ Ernest Galvan*
                                             Ernest Galvan

21                                      Attorneys for Plaintiffs

22

23