XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
ADRIANO HRVATIN
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
TYLER V. HEATH, State Bar No. 271478
KYLE A. LEWIS, State Bar No. 201041
LUCAS HENNES, State Bar No. 278361
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-7318
  Fax:  (916) 324-5205
  E-mail:  Elise.Thorn@doj.ca.gov
Attorneys for Defendants

ROMAN M. SILBERFELD, State Bar No. 62783
GLENN A. DANAS, State Bar No. 270317
ROBINS KAPLAN LLP
  2049 Century Park East, Suite 3400
  Los Angeles, CA 90067-3208
  Telephone:  (310) 552-0130
  Fax:  (310) 229-5800
  E-mail:  RSilberfeld@RobinsKaplan.com
Special Counsel for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GAVIN NEWSOM, et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION J. BICK IN SUPPORT OF DEFENDANTS' RESPONSE TO THE COURT'S JULY 30, 2020 ORDER**<br><br>Judge:  The Hon. Kimberly J. Mueller |

I, J. Bick, M.D., declare:

1.    I am currently the Director, Health Care Services, for the California Department of Corrections and Rehabilitation (CDCR) and the California Correctional Health Care Services (CCHCS).  In this capacity, I oversee all health care operations providing services to CDCR's inmate patients, including medical, nursing, quality management, mental health, and dental programs.  Before holding this position, I served as the Deputy Director overseeing CDCR's mental health and dental programs from January to July 2020, the Chief Medical Executive at

1

1   CDCR's California Medical Facility from 2010-2019, the facility's Chief Deputy for Clinical

2   Services from 2007-2010, and the facility's Chief Medical Officer from 1994-2007.  I make this

3   declaration in support of Defendants' Response to the Court's July 30, 2020 Order.  I have

4   personal knowledge of the statements in this declaration and could testify to them if called to do

5   so.

6          2.    I am familiar with CDCR's recent efforts to staff its Mental Health Services Delivery

7   System (MHSDS) providing treatment to inmate-patients.  During my time on the mental health

8   program's leadership team, I have observed and contributed to considerable efforts to identify,

9   recruit, hire, and retain qualified providers.  As described in greater detail below, some of these

10  efforts involve innovative staffing concepts and utilize modern technologies and provider models

11  to deliver state-of-the-art mental health treatment to CDCR's patients.

12         3.    The *Coleman* Court has mandated that CDCR must fill 90% of the psychiatry staff

13  positions contained in the department's 2009 Staffing Plan.  In 2018, CDCR presented a proposal

14  to the Plaintiffs and Special Master to modify the 2009 Staffing Plan that would have

15  significantly helped bring CDCR into compliance with the Court's order.  After extensive

16  discussions, the Special Master and Plaintiffs tentatively agreed to Defendants' proposal, but

17  declined to enter a stipulation regarding the staffing proposal when CDCR Chief Psychiatrist Dr.

18  Michael Golding alleged issues concerning mental health program data practices.

19         4.    In 2019 and 2020, CDCR continued to develop an updated staffing plan focused on

20  ensuring employment of sufficient psychiatric staff to provide class members with adequate

21  access to mental health care, including proposals that revisit the 2009 Staffing Plan's ratios and

22  those assumptions that are now inconsistent with actual staffing practices.  While Dr. Golding's

23  allegations revealed issues in some of CDCR's data collection and reporting, the rationale

24  underlying the updated staffing proposal was sound.  CDCR's ability to discuss the proposal with

25  the Special Master and Plaintiffs has been delayed by remedial measures resulting from Dr.

26  Golding's allegations, including the ongoing review of CDCR's data practices by the Special

27  Master's data experts, as well as the COVID-19 pandemic.

28

5.    Nevertheless, because CDCR is committed to providing mental health services to its patients, and because adequate staffing of the MHSDS is paramount for the delivery of care, the department recently delivered an updated staffing proposal to the Special Master and Plaintiffs.  I believe that this proposal represents CDCR's commitment to provide quality mental health care to patients in keeping with community standards and developments in the mental health field, and makes significant strides to improve CDCR's mental health staffing levels and bring CDCR's mental health system into compliance with the MHSDS Program Guide's requirements.  Attached as Exhibit A is a copy of correspondence dated September 8, 2020 describing CDCR's updated staffing proposal.

6.    While this proposal contains innovative initiatives to recruit and retain psychiatrists, sets conditions for improved collaborative leadership within CDCR's mental health program, and recalibrates existing staffing proposals, it also builds upon previous initiatives to hire and retain qualified mental health professionals.  Among other things, the updated proposal recognizes previous recruiting efforts, including CDCR's partnership with CCHCS in 2019 to contract Merritt Hawkins for the targeted recruitment of psychiatrists and advertising for mental health positions, and to create a comprehensive website to assist psychiatry applicants with the application process.  While those measures have not significantly improved CDCR's mental health staffing, the department has learned from these efforts.  As a result, CDCR has reassessed its mental health program staffing needs and engaged new ideas and to spur further positive developments in psychiatrist hiring and retention.

7.    Defendants' updated staffing plan proposal addresses significant changes in CDCR's current mental health population.  To ensure that the staffing allocations reflect the MHSDS's current Clinical Correctional Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) populations—which have decreased significantly since 2017 and even more over the past few months due to CDCR's voluntary accelerated releases to promote physical distancing and protect the inmate population and staff from the risks associated with the COVID-19 pandemic—CDCR is in the process of performing a psychiatrist staffing allocation adjustment.  It is anticipated that this adjustment will more accurately report the number of allocated psychiatrist

3

1    staff for CDCR's current patient population, promote appropriate hiring practices and use of

2    resources, and impact the staffing fill rate.

3        8.    Defendants' updated staffing proposal also looks to capitalize on the use of

4    telepsychiatry to treat patients.  In recent years, CDCR has made substantial infrastructure and

5    technology investments which can and will improve the delivery of mental health care to

6    *Coleman* class members, such that CDCR presently has 103 dedicated telepsychiatrist offices

7    operating at hub locations across the state.  CDCR's embrace of telepsychiatry follows a trend

8    throughout the mental health care community that recognizes the value of this treatment modality,

9    and the department's telepsychiatry program is a model for other correctional system in the

10   country.  CDCR's utilization of telepsychiatry reduces delays in care and improves continuity of

11   care and follow-up for patients.  Telepsychiatrists operating from dedicated hubs see patients at

12   institutions, interact with on-site staff, and are supported by local telepresenters who initiate

13   appointments, operate telecommunication systems, and provide in-person observation during the

14   telepsychiatry session.  Furthermore, telepsychiatry is especially helpful in delivering mental

15   health treatment to patients at CDCR facilities that have been historically difficult to staff given

16   their remote geographic location.  This progressive modality generates increased staffing and

17   treatment efficiencies, and shows that CDCR's mental health program is continually evolving and

18   is very different from even a few years ago.

19       9.    Given the efficiencies and opportunities associated with telepsychiatry, CDCR is

20   continuing to actively recruit providers for its growing telepsychiatry program.  Over the past few

21   months, CDCR has employed and retained higher numbers of telepsychiatrists, and is exploring

22   cutting edge options for attracting more telepsychiatrists.  With the onset of the COVID-19

23   pandemic, CDCR and CCHCS has aggressively expanded its use of telehealth including

24   telepsychiatry, an approach which is rapidly becoming a community standard for the delivery of

25   care that both leverages technology to broaden access to care and promotes physical distancing  to

26   decrease the likelihood of ongoing transmission of this potentially fatal virus.   Consistent with

27   what is being seen in non-correctional health care systems, CDCR and CCHCS are allowing more

28   clinicians including psychiatrists to provide treatment to patients through remote means while

4

working from home.  Expanding upon this successful experience, CDCR is assessing other innovative opportunities to expand the telepsychiatry program by directly hiring telepsychiatrists to work from home, rather than CDCR telepsychiatry hubs, thus allowing it to utilize more telepsychiatrists without being limited by the availability of office space.  CDCR sees tremendous potential to add telepsychiatry staff living in urban cores, including the San Francisco Bay Area, and Orange and San Diego counties.  Along with this bold initiative to hire at-home telepsychiatrists, CDCR is also considering rapid means of adding new telepsychiatry hubs or space to existing hubs.  All of these promising initiatives reflect developments in the mental health community and demonstrate forward-thinking that will increase CDCR's ability to provide mental health services to its patients throughout the pandemic and afterwards.

10.  CDCR has also instituted significant changes to its mental health program leadership structure, recognizing that the psychology and psychiatry disciplines must be equals within the organizational structure.  The department has also created regional psychiatry positions and proposed a second Assistant Deputy Director Position to be filled by a psychiatrist, and is broadening other mental health program leadership opportunities for psychiatrists.  And although not part of these structural leadership changes, CDCR recently hired Dr. Amar Mehta, a psychiatrist, as Deputy Director, Mental Health Programs.  Dr. Mehta's presence ensures that the psychiatric discipline has immediate representation in program leadership.

11.  CDCR's updated staffing proposal also seeks to address two flaws in the 2009 Staffing Plan, which should be discussed among the parties.  First, the parties should revisit the assumptions surrounding the frequency of routine psychiatric contacts for CCCMS and EOP patients, the application of the CCCMS psychiatry ratio to those patients who, under the Program Guide, do not require routine psychiatry contacts, and the need for psychiatry positions for crisis intervention on weekends and holidays that were never implemented.  This will provide greater clarity for clinicians and mental health leadership, and permit a better use of CDCR's valuable psychiatry resources.

12.  Second, the parties should correct the methodology for calculating the statewide psychiatry fill rate.  Psychiatric nurse practitioners (PNPs), who—like their counterparts in the

5

civilian mental health care community—carry a patient case load and perform direct care under a psychiatrist's supervision, should be included in the psychiatry fill rate. In the 2017 staffing proposals, CDCR proposed using PNPs to evaluate, diagnose, and craft treatment plans for patients, determine patient needs for psychiatric medication and crisis intervention, and assess and monitor patients' continued use of prescribed psychotropic medications. These concepts were positively received by Plaintiffs and the Special Master, and adopted by the Court.

13. In practice, CDCR's use of PNPs reflects current civilian community mental health treatment standards, in which nurse practitioners are valuable members of the mental health treatment team providing front-line services to patients in collaboration with supervising psychiatrists, utilizing their knowledge of psychotherapy modalities and psychopharmacology to put their patients on a regimen of therapy and prescription medication to improve their mental health. CDCR's successful utilization of PNPs in recent years to augment and support psychiatrists is consistent with the use of nurse practitioners within CCHCS and further demonstrates that CDCR's psychiatrist staffing conditions have changed. Thus, PNPs should be considered when calculating CDCR's psychiatry staffing vacancy rate, as they are within CCHCS. Additionally, because the current methodology used to calculate the statewide psychiatry fill rate fails to reflect the actual staffing needs in the inpatient levels of care, CDCR proposes discussing this issue with the Special Master to determine if there is a more appropriate way to calculate the statewide psychiatry vacancy rate.

14. Aside from the concepts raised in its updated staffing proposal, CDCR can initiate actions that will advance its mental health treatment delivery system. For instance, CDCR should reassess how its CCCMS level-of-care population utilizes mental health services. As the largest group within the MHSDS, these patients' mental health needs are diverse, but not as acute as the programs' higher levels of care. By comparing the CCCMS population's most prevalent needs with current staffing and treatment programs, CDCR can better understand the demands on the system. Drawing on data, technology, evidence-based practices, and the experience of providers to the CCCMS population, CDCR can then adjust its treatment model and implement a care

6

1    model that aligns mental health services to the population's needs, thus maximizing the correct

2    number of staff and opening resources for mental health programs at higher levels of care.

3        15.   Additionally, CDCR can continue refining its mental health records system, which

4    has significantly evolved in recent years.  From late 2015 through late 2017, CDCR implemented

5    the Electronic Health Records System (EHRS), an electronic medical record system created by

6    Cerner Corporation.  This system is used by numerous large health care organizations throughout

7    the United States and around the world, and brings CDCR in line with community and federal

8    standards for health records.  EHRS is fully implemented, further demonstrating that CDCR's

9    mental health system is different from only a few years ago, and CDCR continues to refine the

10   system to meet the needs of its patients and mental health disciplines.  As EHRS improves and

11   clinicians become more familiar with the system, staff can be more productive, thus improving

12   both patient access to care and outcomes.

13

14        I declare under penalty of perjury under the laws of the United States of America that the

15   foregoing is true and correct.  Executed in Davis, California on September 14, 2020.

16

17                    */s/ J. Bick*
                     J. Bick, M.D.

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



September 8, 2020


Special Master Matthew A. Lopes. Jr.
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919


*Coleman* Plaintiffs' Counsel
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105


*VIA EMAIL ONLY*


Dear Special Master Lopes and *Coleman* Plaintiffs' Counsel:

I write to provide an update on the California Department of Corrections and Rehabilitation's (CDCR) staffing plan and proposals. Adequate staffing is critical to ensuring that Defendants can provide timely and high-quality care to patients. To provide such staffing, CDCR, in conjunction with the California Correctional Health Care Services (CCHCS), are addressing both the recruitment and retention of psychiatrists with boldness and creativity. Some of these efforts were detailed in the November 27, 2019 letter from Jerome Hessick to the Special Master and Plaintiffs' counsel.

More recently, CDCR's staffing needs have changed due to the declining Mental Health Services Delivery System (MHSDS) population. The COVID-19 pandemic has resulted in substantial changes to the way in which mental health care is provided in the community and within correctional settings. Therefore, CDCR will continue to explore new, innovative approaches to improving psychiatry staffing and delivering adequate care. Consistent with the nationwide expansion of telepsychiatry in the community, the expansion of the telepsychiatry program and retention initiatives are helping increase psychiatry hiring and retention. Further, updating the 11-year-old 2009 Staffing Plan and the methodologies for calculating the statewide psychiatry fill rate will ensure that the psychiatry positions used in the fill rate are necessary to provide constitutionally adequate care.

## 1. Staffing Initiatives Previously Implemented

CDCR and CCHCS have worked together for years to improve recruitment and retention in a number of ways, including the following:

- In 2016, in an effort to recruit and retain more psychiatrists, CDCR modified the on-call compensation options for staff to include cash compensation. Previously, psychiatrists had only received compensated time off for the hours spent on-call. The modification to allow cash compensation provided an additional incentive to stay with CDCR. In 2016, CDCR also authorized dual appointments, which allows current psychiatrists to be hired at another institution on a 0.25 time basis. This provided the psychiatrist with additional opportunity to increase their salary and provides part-time coverage at the institutions.

- In 2017, CDCR and CCHCS increased registry rates at most institutions to $265 per hour. CDCR and CCHCS continuously review and increase the registry rates as necessary at harder-to-recruit locations. Currently, the registry rates at CDCR's institutions range from $265 to $390 per hour.

- CDCR also implemented a psychiatric fellowship program through the University of California, San Francisco to allow licensed post-graduate residents to treat inmates, while also learning the concepts and practices of psychiatry within a prison setting.

- In 2017, CCHCS began to recruit psychiatric nurse practitioners (PNPs) who, under the supervision of a supervising psychiatrist, are able to provide direct patient care. As of July 31, 2020, CDCR employed the equivalent of 20 full-time PNPs.

- In August 2019, CDCR and CCHCS entered into a contract with Merritt Hawkins to assist in the targeted recruitment of psychiatrists and advertising for mental health positions. This contract has allowed CDCR and CCHCS to identify ways to improve the recruitment process, such as developing an interview panel with standardized interview training and applying a more personal approach to the interview process.

- In 2019, CDCR and CCHCS undertook the creation of a comprehensive website to assist psychiatry applicants with the application process.

These programs are just a few of the initiatives CDCR and CCHCS have launched to identify, hire, and retain qualified mental health clinicians.

### 2. Mid-Cycle Allocation Adjustment

To promote physical distancing and protect the inmate population and staff from the risks associated with the COVID-19 pandemic, CDCR has voluntarily implemented accelerated releases. As a result, 19,827 inmates have been released from CDCR institutions and camps between March 2020 and August 26, 2020, bringing CDCR's current population in the institutions and camps to well below 100,000. To date, the number of inmates in the MHSDS has decreased from 35,834 patients on March 18, 2020, to 30,415 patients on September 8, 2020, a reduction of over 5,400 *Coleman* class members.

The staffing for the Clinical Correctional Case Management System (CCCMS) and Enhanced Outpatient Program (EOP) is allocated based on a ratio of psychiatrists to a certain number of patients. For example, one staff psychiatrist is allocated for every 280 CCCMS mainline patients and for every 120 EOP mainline patients. Generally, the mental health allocations are adjusted in

January and July as part of the budget and population processes. However, the July 2020 adjustment was based on the CCCMS and EOP population in June 2020.[1] The MHSDS population decreased by over 3,000 *Coleman* class members between July 9, 2020 and September 8, 2020. As a result, the July 2020 adjustment to the mental health allocations substantially overstates the current staffing needs at the institutions.

To ensure that the staffing allocations reflect the current CCCMS and EOP populations, CDCR will release a mid-cycle allocation adjustment in September 2020. An updated staffing adjustment is required to accurately report the staffing allocations and fill rates and ensure appropriate hiring and use of resources. The gradual resumption of intake is highly unlikely to exceed normal releases before January 2021, the time for the next scheduled allocation adjustment.

### 3. Expansion of the Telepsychiatry Program

Over the last few years, CDCR has stated that the expansion of telepsychiatry is a key part of achieving compliance with the maximum ten percent vacancy rate for psychiatrists. For most of 2019, the number of full-time positions filled by telepsychiatrists hovered between 45 and 50. However, over the last ten months, the Telepsychiatry Program has seen exciting increases in both recruitment and retention.

As of July 31, 2020, CDCR officially employed the equivalent of 71.76 full-time telepsychiatrists, a significant increase from just a few months earlier. An additional four telepsychiatrists have been onboarded, and are anticipated to be reflected in the August 2020 psychiatry vacancy report.[2] Furthermore, in August 2020, an additional four telepsychiatrists were hired and onboarded, and are anticipated to be reflected in the September 2020 psychiatry vacancy report. Mental Health also has over 16 additional applicants in various stages of the hiring process.

CDCR has been successful not only in hiring telepsychiatrists but also in retaining them. Between January and June 2020, there were four telepsychiatry separations. However, three of those separations were due to promotions to leadership positions within CDCR. Between the successes in hiring and retention, CDCR expects the telepsychiatry program to continue its growth.

Currently, CDCR has 103 offices for telepsychiatrists. However, with the increase in telepsychiatry hiring, CDCR may be put in the position of having to turn away qualified and interested telepsychiatrists. CCHCS has looked into acquiring more office space, but locating, purchasing, and retrofitting office space will take approximately one year. To support continued growth and mitigate COVID-19 risks, CDCR is exploring the feasibility of hiring telepsychiatrists to work from home, instead of from a hub. This would allow CDCR to hire more telepsychiatrists without being limited by the availability of office space. In the community, telepsychiatrists can provide care from home to their patients. Patients at CDCR in need of care deserve no less, assuming care can be provided in a secure and professional manner.

---

[1] As detailed below, the methodology used to calculate the statewide psychiatry fill rate is based on the number of inpatient beds, not the inpatient population. Therefore, although there has been a decrease in the inpatient population that decrease is not reflected in the staffing allocation or in the statewide psychiatry fill rate.

[2] The number of telepsychiatrists provided represents the number of people, not necessarily the number of positions those people fill. The psychiatry fill rate is calculated by looking at the number of civil service positions filled (which could include part time positions) and the number of hours worked by registry psychiatrists.

**4. Leadership Changes to Support Psychiatry**

To model a cohesive and collaborative leadership approach for a successful mental health program, leaders for the disciplines of psychology and psychiatry must be equals within the organizational structure. To enhance the importance of all mental health disciplines in our leadership structures, CDCR has revised organizational charts at all levels and added additional psychiatry resources at the headquarters and regional levels. In doing so, CDCR is ensuring that psychiatry is represented as part of the leadership team at every level. CDCR believes that this inclusion and representation will increase psychiatry job satisfaction, increase retention, and improve patient care from the unified treatment team.

a) Altering the Psychiatry Chain of Command

As mentioned in the November 27, 2019 letter, CCHCS, with input from CDCR Mental Health, has reorganized the psychiatry chain of command at the institutions. Under the new structure, the most senior psychiatrist in the institution reports directly to each institution's Chief Executive Officer, instead of the Chief of Mental Health. Such a change in the institutional structure ensures the inclusion of the most senior psychiatrist as a key member of the executive leadership team at each institution. Memos were sent to the field on November 26, 2019, and again on March 3, 2020, implementing this change.

b) Creation of Regional Psychiatry Positions

In addition to the changes at the institutional level, CDCR is adding a psychiatry representative to each of the regional teams. For years, the regional teams have been comprised of psychology, custody, and nursing representatives. The addition of a psychiatrist to each of the regional teams demonstrates the importance of psychiatry as part of the teams and will provide more support to psychiatrists in the field in each region. The four regional positions are currently in the recruitment process, and the applications are being screened.

c) Creation of Second Assistant Deputy Director Position

Finally, CDCR Mental Health is considering creating a second Assistant Deputy Director. The Mental Health Administrator classification for the current Assistant Deputy Director position requires a psychology license. The second Assistant Deputy Director position will be filled by a psychiatrist. Thus, with the activation of the second position, the Mental Health Program will have a parallel Assistant Deputy Director psychologist and psychiatrist working side by side on all initiatives and efforts to improve and sustain an effective mental health program.

d) Further Opportunities for Psychiatric Leadership and Executive Involvement

CDCR will consider the changes necessary to broaden the criteria for other administrative positions within Mental Health in areas such as Quality Management and Inpatient Services to include psychiatrists. Currently, all of the Mental Health Administrator positions are limited to psychologists.

**5. Addressing Potentially Flawed and Outdated Assumptions and Ratios in the 2009 Staffing Plan**

During 2018, CDCR put forth proposals to adjust potentially inaccurate assumptions within the 2009 Staffing Plan. The parties, with the guidance of the Special Master, were on the precipice of an agreement when Dr. Golding called into question some of the data used to support the number of positions reduced by the proposals. It has now been nearly two years and CDCR would again like to discuss the following issues with Plaintiffs and the Special Master: a) the assumption surrounding the frequency of routine psychiatric contacts for CCCMS and EOP patients; b) the application of the CCCMS psychiatry ratio to those patients who, per the Program Guide, do not require routine psychiatry contacts; and c) the need for psychiatry positions for crisis intervention on weekends and holidays that were never implemented.

   a) Assumption Regarding Frequency of Routine Psychiatry Contacts for CCCMS and EOP Patients

As part of the 2018 staffing proposals, CDCR put forth a proposal to adjust the assumption for the frequency of routine psychiatry contacts for CCCMS patients. The Program Guide requires that a CCCMS patient on medication be seen every 90 days and that an EOP patient be seen every 30 days. In contrast, the 2009 Staffing Plan assumes that a psychiatrist will see each patient for a routine contact an average of 1.5 times every 90 days or 30 days, respectively.

Previously, the parties were close to an agreement on revising the assumption regarding the frequency of routine psychiatry visits for CCCMS and EOP patients to 1.25 times every 90 or 30 days, respectively. This left room for psychiatrists to see patients more frequently than the minimum Program Guide requirement if needed. Implementation of this revised assumption resulted in a revised psychiatry ratio of 1:336 for CCCMS, and a revised psychiatry ratio of 1:144 for EOP.

This agreement did not come to fruition due to the release of Dr. Golding's allegations. Since that time, CDCR has worked with the Special Master to revise policies to address some of the concerns raised. CDCR has revised policy to ensure that non-confidential contacts are only counted as compliant if the patient refuses the confidential contact or the patient is confined to quarters for a medical reason. Further, several policies were revised to clearly state that cell-front contacts by telepsychiatrists are never counted as compliant, and the Electronic Health Records System (EHRS) was revised to remove the default setting and to include a mandatory drop-down that requires the psychiatrist to choose what type of setting the contact occurred in.

In light of these changes, CDCR proposes exploring what the appropriate frequency is for routine psychiatry visits for CCCMS and EOP patients with the Special Master's team, including developing a methodology that is supported by data validated by the Special Master's data expert.

   b) Application of the 2009 Staffing Ratio for Psychiatry in CCCMS as Required by the Program Guide

The Program Guide requires that "[e]ach CCCMS inmate-patient on psychiatric medication… be reevaluated by a psychiatrist a minimum of every 90 days." (Program Guide at 12-3-11.) Despite

the limitation in the Program Guide that only patients on medication need to see a psychiatrist routinely, CDCR has historically applied the ratio set forth in the 2009 Staffing Plan to all CCCMS patients. The application of the ratio in this way goes above and beyond what is required by the Program Guide.

CDCR had previously put forth a proposed methodology for applying the CCCMS psychiatry ratio only to those patients who required routine psychiatry care. However, upon the release of Dr. Golding's allegations, concerns were raised with that methodology and some of the data used to support the methodology. Given these concerns, CDCR proposes working with the Special Master's team to review, and revise as necessary, the proposed methodology for application of the CCCMS ratio that is supported by data validated by the Special Master's data expert.

    c)  Redirecting Psychiatry Crisis Intervention Positions for Holidays and Weekends to Provide On-Call Coverage

The 2009 Staffing Plan allocates 0.52 psychiatry positions at every institution to provide crisis intervention on weekends and holidays. However, as discussed during the 2018 staffing negotiations, this allocation was never implemented as intended in the 2009 Staffing Plan. Instead, weekend and holiday crisis intervention is currently covered by on-call psychiatrists. At some institutions, the number of calls handled by the on-call psychiatrists are manageable. However, there have been complaints at some institutions that there are too many calls during the on-call period or that psychiatrists are required to take calls too often. CDCR is concerned that the stresses of call at busy or understaffed institutions can lead to burnout and job dissatisfaction.

Therefore, instead of eliminating all of the positions currently allocated for crisis intervention on weekends and holidays, CDCR proposes redirecting some or all of these positions to on-call telepsychiatry coverage. Those positions that are not redirected would be eliminated. Redirecting these positions is an important retention tool that would improve the job satisfaction for those caseload carrying psychiatrists by reducing the number of emergencies they would need to handle overnight or on the weekends or holidays, to only those emergencies that require an in-person assessment.

## 6. Flaws in the Methodology for Calculating the Statewide Psychiatry Fill Rate

While assessing the issue of psychiatry staffing, CDCR found potential flaws in the methodology used to calculate the statewide psychiatry fill rate. These flaws include the exclusion of Psychiatric Nurse Practitioners and the use of inpatient beds to determine the fill rate.

    a)  Inclusion of Psychiatric Nurse Practitioners in the Fill Rate

In recognition of the nationwide shortage of psychiatrists, CDCR proposed in 2017 to begin the recruitment of Nurse Practitioners (NPs) specializing in Psychiatry and Mental Health to treat patients. As of July 2020, CDCR has filled 20 PYs with PNPs. Given the PNPs' ability to carry a caseload and provide direct patient care under the supervision of a psychiatrist, PNPs should count in the psychiatry fill rate. This proposal is similar to the way in which Nurse Practitioners and Physician Assistants are counted in the fill rate for Primary Care Physicians at the institutions.

CDCR has preliminarily discussed this proposal with Plaintiffs' counsel and an expert on the Special Master's team and there was support assuming a policy is put in place to govern the PNP's scope of practice and supervision requirements. CDCR is working on a PNP policy that will address these issues. CDCR anticipates being able to share a draft PNP policy with the Special Master's team within the next 30 days.

b) Calculation of the Statewide Psychiatry Fill Rate Based on the Number of Inpatient Beds

The purpose of the staffing ratios is to ensure that CDCR has the appropriate number of psychiatrists to meet the needs of the actual patient population in the various levels of care. For the CCCMS and EOP levels of care, psychiatry positions are allocated based on a ratio of psychiatrists to patients. For example, one staff psychiatrist is allocated for every 280 CCCMS mailing patients and for every 120 EOP mainline patients. Under this methodology, the allocation fluctuates based on the population.

However, the current methodology used to calculate the statewide psychiatry fill rate fails to reflect the actual staffing needs in the inpatient levels of care (Mental Health Crisis Beds (MHCBs), Intermediate Care Facilities, and Acute Psychiatric Programs). The methodology is instead based on inpatient bed capacity, which includes beds that serve no patients and are empty for prolonged periods. This means that even when the population utilizing the inpatient beds decreases, there is no corresponding decrease in the allocation of psychiatrists to those units.

This methodology effectively penalizes CDCR for failing to assign psychiatrists to empty beds. For example, as of July 2020, the California Health Care Facility (CHCF) had a fill rate for psychiatrists of just 48 percent not including PNPs. However, the MHCBs at CHCF have been 80 percent vacant for months. Therefore, CDCR is out of compliance in part because it has not assigned psychiatrists to provide care to empty beds.

CDCR proposes discussing this issue with the Special Master to determine if there is a more appropriate way to calculate the statewide psychiatry vacancy rate, particularly with respect to the calculation of psychiatrists needed in inpatient beds, to appropriately reflect the number of psychiatrists needed to provide care to patients.

///

///

///

///

///

///

///

**7. Conclusion**

CDCR recognizes the critical importance of improving both recruitment and retention of psychiatry staff for patient care. The proposals above will help CDCR achieve compliance with this goal while ensuring that CDCR has an updated staffing plan. CDCR would like to set time soon to discuss these proposals, as well as any other proposals that Plaintiffs or the Special Master may have, to improve psychiatry fill rates. As always, CDCR will continue to look for new ways to recruit and retain psychiatry staff and augment the above proposals to ensure there are adequate staffing levels to serve the actual patient population.


Respectfully,

*/s/ Melissa C. Bentz*

Melissa C. Bentz
Attorney
Office of Legal Affairs
California Department of Corrections and Rehabilitation