| | |
|---|---|
| DONALD SPECTER – 083925<br>STEVEN FAMA – 099641<br>MARGOT MENDELSON – 268583<br>PRISON LAW OFFICE<br>1917 Fifth Street<br>Berkeley, California  94710-1916<br>Telephone:   (510) 280-2621<br><br>CLAUDIA CENTER – 158255<br>DISABILITY RIGHTS EDUCATION<br>AND DEFENSE FUND, INC.<br>Ed Roberts Campus<br>3075 Adeline Street, Suite 210<br>Berkeley, California  94703-2578<br>Telephone:   (510) 644-2555 | MICHAEL W. BIEN – 096891<br>JEFFREY L. BORNSTEIN – 099358<br>ERNEST GALVAN – 196065<br>LISA ELLS – 243657<br>THOMAS NOLAN – 169692<br>JENNY S. YELIN – 273601<br>MICHAEL S. NUNEZ – 280535<br>JESSICA WINTER – 294237<br>MARC J. SHINN-KRANTZ – 312968<br>CARA E. TRAPANI – 313411<br>ALEXANDER GOURSE – 321631<br>AMY XU – 330707<br>ROSEN BIEN<br>GALVAN & GRUNFELD LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, California  94105-1738<br>Telephone:   (415) 433-6830 |

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GAVIN NEWSOM, et al.,<br><br>　　　　Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**DECLARATION OF JESSICA WINTER IN SUPPORT OF PLAINTIFFS' BRIEF REGARDING STAFFING AND POPULATION**<br><br>Judge:   Kimberly J. Mueller |

[3613245.2]

I, Jessica Winter, declare:

1. I am an attorney duly admitted to practice before this Court. I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs. I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify. I make this declaration in support of Plaintiffs' Brief Regarding Staffing and Population.

2. Defendants provide Plaintiffs monthly reports on the status of the Mental Health Services Delivery System ("MHSDS"), including data on clinical staffing rates. Attached hereto as **Exhibit A** is a true and correct copy of the Department of State Hospitals' ("DSH") Staffing Report for March 2017, which was provided to Plaintiffs' counsel on May 4, 2017 as part of Defendants' ongoing monthly data reporting for this case. This document shows the staffing rates of various medical and mental health staff positions at DSH facilities.

3. Attached hereto as **Exhibit B** is a true and correct copy of the Defendants' staffing vacancy report for February 2020. This document shows the staffing rates of various medical and mental health staff positions at CDCR facilities including the PIPs.

4. In January 2017, the Governor included in the state budget a proposal that would, as of July 1, 2017, shift responsibility for operation of the inpatient psychiatric hospitals located within Salinas Valley State Prison ("SVSP"), California Medical Facility ("CMF"), and California Healthcare Facility ("CHCF") from DSH to CDCR. A true and correct copy of this budget change proposal, which can be found online at https://esd.dof.ca.gov/Documents/bcp/1718/FY1718_ORG5225_BCP1037.pdf, is attached hereto as **Exhibit C**. The proposal was called the "Lift and Shift," and did in fact take effect on July 1, 2017.

5. Attached hereto as **Exhibit D** is a true and correct copy of the DSH Staffing Report for June 2017, which was provided to Plaintiffs' counsel on July 3, 2017 as part of Defendants' ongoing monthly data reporting for this case. This document shows the staffing rates of various medical and mental health staff positions at DSH facilities.

6. Attached hereto as **Exhibit E** is a true and correct copy of the Psychiatric Inpatient Program ("PIP") Staffing Report for June 2020, which was provided to Plaintiffs' counsel on August 17, 2020 as part of Defendants' ongoing monthly data reporting for this case (Enclosure 1L). This document shows the staffing rates of various medical and mental health staff positions at PIP facilities within CDCR.

7. Defendants' MHSDS Management Information Summary Report ("MIS Report") provides population information on mental health patients in CDCR. Attached hereto as **Exhibit F** is a true and correct copy of the August 10, 2020 MIS Report, provided to Plaintiffs' counsel on August 17, 2020 via email from CDCR Office of Legal Affairs attorney Nick Weber.

8. Defendants' DSH CDCR Patient Census and Waitlist Report gives population and bed use information for patients in DSH. Attached hereto as **Exhibit G** is a true and correct copy of the September 4, 2020 DSH CDCR Patient Census and Waitlist Report, provided to Plaintiffs' counsel on September 9, 2020 by DSH attorney Antonina Raddatz.

9. In July and August 2019, I assisted my colleague Marc Shinn-Krantz in gathering evidence that overly restrictive custody conditions at the CHCF PIP were harming class members and had contributed to suicides that occurred shortly after discharge from the CHCF PIP. A true and correct copy of the resulting August 12, 2019 letter, redacted to remove personally identifiable health information, is attached hereto as **Exhibit H.**

10. The Special Master conducted tours of the CHCF PIP in September 2019 and March 2020, and of the CMF PIP in December 2019. I attended these tours. I also spent a day interviewing class members in person at the CMF PIP in November 2019, in preparation for the December 2019 tour. During the Special Master's tours, we were informed and observed that the policy for movement of MAX custody patients was that they had to be cuffed and escorted individually to and from treatment settings. At the CHCF PIP, staff also reported that if a single MAX custody patient was out of his cell for

1 movement, no other class member could be out of their cell at the same time.  This led to
2 serious challenges in managing MAX custody patients and necessary treatment for all PIP
3 patients when MAX patients were housed on the same units as non-MAX patients.

4     11. During the December 2019 Special Master tour of the CMF PIP, I observed
5 several instances of class members being placed on MAX custody status, or not removed
6 from that status, based on little or no individualized assessment of their risk for violence.
7 For example, I observed the Interdisciplinary Treatment Team meeting for a patient who
8 was on MAX status due to alleged acts of indecent exposure that occurred when the patient
9 was housed in an EOP unit.  This individual had become psychotic over the preceding
10 summer and believed he was receiving signals from the radio and television that directed
11 him to expose himself to others.  I reviewed his records to confirm that indecent exposure
12 was the only reason for his rules violations.  He had stabilized during the months he had
13 been at the CMF PIP, and he was no longer exposing himself.  But he was still on MAX
14 status at the CMF PIP, and this status was preventing his transfer from acute to
15 intermediate care due a shortage of MAX beds, and also was interfering with the amount
16 and types of treatment he could receive.  As class counsel I advocated for removal of his
17 MAX status, since the behavior used to justify it was no longer occurring, and his status
18 was eventually removed.  But his case demonstrates how patients linger on MAX status
19 long after any possible need for such restrictions; when I, along with my team, have
20 reviewed lists of class members placed on MAX status systematically, we typically find
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 ////

many cases like this one. This example also demonstrates how the reflexive use of MAX status makes little sense, as the behavior in this case, indecent exposure, can occur just as easily in a cage as it can out of a cage.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 14th day of September, 2020.

*/s/ Jessica Winter*
Jessica Winter