**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
    **Plaintiffs,**

    **vs.**                                    **No. CIV S-90-0520 KJM DB P**

**GAVIN NEWSOM, et al.,**
    **Defendants.**

**SPECIAL MASTER'S REPORT ON
HIS EXPERT'S FOURTH RE-AUDIT AND UPDATE OF SUICIDE PREVENTION
PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION**

Attached is the fifth report from the *Coleman* Special Master's expert, Lindsay M. Hayes, entitled, "The Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (CDCR). The attached is a follow-up to Mr. Hayes' fourth report to the Special Master and the Court on suicide prevention practices in CDCR prisons, "The Third Re-Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," filed on November 5, 2018. ECF No. 5993-1. These reports are submitted as part of the Special Master's continuing review of defendants' compliance with court-ordered remediation in this matter.

**I.      BACKGROUND**

On July 12, 2013, the *Coleman* court issued an order directing the establishment of the Suicide Prevention Management Workgroup (SPMW) to work under the guidance of the Special Master to address and resolve the problem of persistently elevated rates of suicide among inmates housed in CDCR prisons. ECF No. 4693 at 5-6. After several meetings, the SPMW

1

determined that an expert assessment of CDCR's suicide prevention practices was necessary. ECF No. 5259 at 1.  In response, the Special Master requested, and the Court approved the Mr. Hayes' appointment as an expert in suicide prevention practices.[1]  ECF No. 4857.

Upon his appointment, the Special Master directed Mr. Hayes to conduct an assessment of suicide prevention practices in CDCR prisons.  Mr. Hayes' first audit, which began on November 12, 2013 and concluded on July 24, 2014, covered all 34 prisons.  ECF No. 5259 at 1. On January 14, 2015, Mr. Hayes filed his initial audit report containing 33 recommendations.[2] *See* "An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation." *Id.*  On February 3, 2015, the Court issued an order directing defendants to adopt the recommendations and directing the Special Master to provide an update to the Court on defendants' progress in their implementation.  ECF No. 5271.

Mr. Hayes' first re-audit covered 18 prisons; it began on February 2, 2015 and concluded on July 24, 2015.  ECF No. 5396.  His second audit report, "A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation." was filed on January 13, 2016.  *Id.*  At the time of the writing of Mr. Hayes' second audit report, discussion on three of the initial 33 recommendations had been postponed for six months and they remained unresolved as a result.[3]  Id. at 31 n.7.  The second audit report

---

[1] Mr. Hayes is a Project Director of the National Center on Institutions and Alternatives and the foremost leading authority in the field of suicide prevention within jails, prisons, and juvenile facilities, having provided suicide prevention services to hundreds of local and state jurisdictions in all 50 states.  In addition to his work on the *Coleman* case, he has been appointed as a federal court monitor and as an expert to Special Masters/Court Monitors in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction.  Mr. Hayes has conducted the only five national studies of jail, prison, and juvenile suicide, and has authored more than [100] publications in the area of suicide prevention within jail, prison, and juvenile facilities. ECF No. 5993 at 2.

[2] A list of those 33 initial recommendations is attached as Appendix A to this report.

[3] Those three recommendations were:  Recommendation 14:  Any inmate discharged from suicide observation status and arriving in administrative segregation from either an MHCB or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan; Recommendation 15: Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled.  They should be placed in suicide-resistant, retrofitted

contained a recommendation that defendants continue to fully adopt the recommendations contained in Mr. Hayes' initial audit report.[4]  *Id.*  The report also included a recommendation that Mr. Hayes conduct a re-audit of those prisons which chronically struggled with their suicide prevention programs, in addition to almost all prisons with MHCBs.  *Id.* at 32.  On April 4, 2016, the Court issued an order adopting the report in full.  ECF No. 5429.

Mr. Hayes' second re-audit covered 23 prisons; it began on February 23, 2016, and concluded on November 9, 2016.  His third audit report, "The Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," was filed on September 7, 2017.  ECF No. 5671-1.  By the time of the writing of his third audit report, Mr. Hayes had determined that the three unresolved recommendations—14, 15, and 16—were no longer warranted.  He recommended that they be withdrawn and that the February 3, 2015 order adopting the recommendations be modified accordingly.  Mr. Hayes also recommended a further re-audit of those prisons that chronically struggled with their suicide prevention programs.

The Court issued an order adopting the third audit report in full on January 24, 2018.  ECF No. 5762.  The recommendation to withdraw the three unresolved recommendations was adopted and the February 3, 2015 order was deemed modified accordingly.  *Id.* at 3.  The Special Master was directed to provide the Court with an updated report on the status of "defendants'

---

cells; Recommendation 16:  Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.

[4] By the time of Mr. Hayes' first re-audit, it was determined that Recommendation 30 was duplicative of Recommendation 14.  Consequently, it has not been counted amongst the measures audited by Mr. Hayes beyond his initial 2015 audit.  Beginning with Mr. Hayes' second audit report, references to the initial recommendations count the total as 32.  A re-numbered list of the recommendations as referenced going forward is attached hereto as Appendix B.

continued implementation of the initial recommendations and the development of related

corrective action plans (CAPs)." *Id*. at 4.[5]

Mr. Hayes' third re-audit covered 23 prisons; it began on May 23, 2017 and concluded on

February 15, 2018.  His fourth audit report, "The Third Re-Audit and Update of Suicide

Prevention Practices in the Prisons of the California Department of Corrections and

Rehabilitation," was filed on November 5, 2018.  ECF No. 5993-1.  In his fourth audit report,

Mr. Hayes recommended that CDCR continue their efforts to fully implement his previous

recommendations, as well as develop CAPs based upon deficiencies he found during the third re-

audit.  *Id*. at 38.  As he had in past reports, Mr. Hayes also recommended a re-inspection of select

CDCR facilities that chronically struggled with their suicide prevention programs.  *Id*.

On July 3, 2019, the Court issued an order adopting Mr. Hayes' fourth audit report in full.

ECF No. 6212.  The Court found that although some progress was being made in the

implementation of the court-ordered suicide prevention measures, there nonetheless remained a

substantial amount of work to be done, and complete implementation was "dragging out and

taking too long."  *Id*. at 14.  The order further stated that if at the end of the fourth re-audit Mr.

Hayes was unable to report full compliance with his recommendations, "the court anticipate[d]

reviewing with defendants at a future status conference the specific steps necessary to enable Mr.

Hayes to report no later than after his fifth re-audit that all recommendations have by then been

implemented."  *Id*.  Defendants were ordered to "continue with, and expedite, implementation of

the remaining 29 initial recommendations and [] develop corrective action plans based upon

deficiencies found in Mr. Hayes' most recent assessment."  *Id*.  The Special Master was directed

---

[5] The Court also ordered defendants to complete additional steps related to the replacement of inadequate vent grates
at California State Prison/Corcoran, planned retrofit work at the California Institution for Men (CIM), and a revised
SPRFIT policy.  ECF No. 5762 at 4.  In his fourth re-audit report, Mr. Hayes reported that defendants had complied
with all three provisions of the Court's order.  ECF No. 5993-1 at 7, 24, 60 n.21, and 93 n.22.

to provide the Court with an updated report on "the status of defendants' implementation of the initial recommendations and the development of related corrective action plans." *Id.*

Following a December 13, 2019 third quarterly status conference, on January 7, 2020, the Court issued an order stating that if the Special Master and Mr. Hayes were unable to report defendants' full compliance at the end of the fourth re-audit period, their reporting should include specific recommendations for steps defendants must take to implement any recommendations that remained incomplete, and a date certain for the commencement of the fifth re-audit. ECF No. 6441 at 8.

On September 3, 2020, the Court issued an order confirming "the framework developed over the past twenty-five years for the requirements defendants must satisfy to achieve compliance with the Constitution and against which their progress toward constitutional compliance is being measured." ECF No. 6846 at 2. In that order, the Court directed defendants to complete any outstanding work on Mr. Hayes' initial recommendations prior to the commencement of the fifth re-audit. *Id.* at 22. "[T]he Special Master [was] directed to keep defendants informed of his plans for scheduling the fifth re-audit." *Id.*

The report on Mr. Hayes' fourth re-audit of CDCR's suicide prevention practices filed herewith is submitted as an update to his November 5, 2018 report. Pursuant to the Court's January 7, 2020 order, a list of the outstanding recommendations and the actions required to complete their implementation is outlined in Section III. B. below.

## II.    THE FOURTH RE-AUDIT OF CDCR SUICIDE PREVENTION PRACTICES AND DRAFT REPORT

For his fourth re-audit, Mr. Hayes selected 20 prisons based upon their operation of MHCB units, his findings during previous audits of chronic struggles with their suicide prevention programs, their housing a significant population of *Coleman* class members, and/or

5

the prison experiencing multiple suicides.  As with Mr. Hayes' previous audits, his fourth re-audit consisted of both on-site institutional inspections and reviews of inmate suicide case files from the selected institutions.  The fourth re-audit began on November 13, 2018, and concluded on December 18, 2019.

On May 14, 2020, Mr. Hayes' fourth re-audit report was distributed in draft form to the *Coleman* parties for comments and/or objections to be submitted to the Special Master no later than 30 days thereafter.  On June 15, 2020, defendants' counsel submitted their comments and objections to the draft report.[6]  Plaintiffs' counsel also submitted their response to the draft report on June 15, 2020.[7]  On June 22, 2020, plaintiffs' counsel submitted a revised response to the draft report, which corrected an error in their June 15th submission.[8]  On June 29, 2020, plaintiffs' counsel submitted a response to defendants' comments and objections to the draft report.[9]

**A. Parties' Responses to the Draft Report**

**1. Plaintiffs' Response to the Draft Report**

In their June 22, 2020 response, plaintiffs indicated their general agreement with the draft report's recommendations and conclusions.  Plaintiffs' response primarily focused on requests to include additional case examples and further discussion in the report section on suicides occurring in close proximity to inpatient discharge and/or mental health referrals.

---

[6] *See* Appendix C, Letter from Nick Weber, Attorney, CDCR Office of Legal Affairs to Special Master Lopes (June 15, 2020).

[7] *See* Appendix D, Letter from plaintiffs' counsel, Jenny Yelin, to Special Master Lopes (June 15, 2020). Plaintiffs' response to the draft report included certain confidential information, as a result, the letter attached as Appendix D is a redacted copy of plaintiffs' response with the confidential information omitted.

[8] *See* Appendix E, Letter from plaintiffs' counsel, Jenny Yelin to Special Master Lopes (June 22, 2020).  All mentions of plaintiffs' response to the draft report contained herein are in reference to the June 22, 2020 letter. Plaintiffs' response to the draft report included certain confidential information, as a result, the letter attached as Appendix E is a redacted copy of plaintiffs' response with the confidential information omitted.

[9] *See* Appendix F, Letter from plaintiffs' counsel, Jenny Yelin to Special Master Lopes (June 29, 2020).

Specifically, plaintiffs requested the inclusion of two additional suicide cases in the discussion on suicides occurring after level of care discharges.  Plaintiffs also requested that Mr. Hayes expand the discussion in the same report section by including six additional suicide cases "as examples of failures to refer patients for higher levels of care that may have resulted from [d]efendants' concerns about reducing usage of MHCBs and inpatient beds."[10]  Mr. Hayes decided not to make any changes in his draft report based upon the plaintiffs' suggestions for several reasons, including the fact that some of offered cases were already included in the report, others involved level of care decisions that did not occur in close proximity (i.e., eight days or less) to the deaths, and some of the level of care decision cases did not specifically involve suicidal behavior.  Although the cases cited by plaintiffs were troubling, it would be arguable whether or not the suicides were specifically the result of these level of care decisions.

### 2.   <u>Defendants' Response to the Draft Report</u>

Defendants' response to the draft report related to four areas: (1) establishing benchmarks for compliance with each suicide prevention measure; (2) outlining specific steps needed for defendants to achieve compliance with all of the recommendations, and methodology to enable CDCR to create more effective CAPs; (3) specific comments and objections to the draft report; and (4) a proposal to permit CDCR to conduct a self-audit prior to the commencement of Mr. Hayes' fifth re-audit.  Defendants' response, organized by topic, is discussed in further detail below.

### a.   <u>Establishing Compliance Benchmarks</u>

In their June 15, 2020 response, defendants asserted that the draft report lacked sufficient specificity regarding the benchmarks that CDCR must achieve to attain compliance.  Defendants

---

[10] *See* Appendix E, p. 3

argued that without benchmarks uniquely tailored to each recommendation they would be unable to determine how to comply with Mr. Hayes' recommendations.  In its September 3, 2020 order, the court explained how the "improper use of the term 'benchmark' risks an oversimplification that obscures the full scope of required remediation," and clarified that "a clearly identified framework accompanied by well-defined compliance measures that have been developed and defined contextually provides defendants with the notice and information they need to achieve full and durable remediation."  ECF No. 6846 at 15-16.  The Program Guide and each of Mr. Hayes' past reports provide defendants with both.

As documented in previous reports, defendants have been successful at implementing recommendations and maintaining compliance over the course of successive audits in a number of areas.  This a clear demonstration of defendants' comprehension of the recommendations as well as their ability to implement them and maintain compliance.  Defendants' asserted that because the recommendations "[were] not equally critical at resolving the suicide issues within CDCR" defendants should first focus on the "recommendations that [would] have the greatest impact on completed or attempted suicides [therefore] the benchmarks should reflect the relative importance of each recommendation."[11]

In the years that have passed since Mr. Hayes' initial recommendations were adopted by the Court, defendants have had ample opportunity to implement them, *in toto*, in whichever order they deemed appropriate.  The focus now must be on implementing all outstanding recommendations as expeditiously as possible.

---

[11] *See* Appendix C, p. 2.

### b.   Providing Specific Steps and Methodology

Defendants argued that the report did not include the specific auditing criteria used by Mr. Hayes in conducting his audits and preparing his reports and that without it, they were unable to design effective CAPs, which would allow them to achieve compliance.  Defendants requested that Mr. Hayes supplement his draft report to include that information.

Mr. Hayes' methodology and compliance indicators have remained unchanged throughout each of his audits and subsequent reports.  Defendants have never raised this issue before, nor have they ever given any indication that they were confused.[12]  On the contrary, as previously stated, a number of institutions have successfully implemented certain of the recommendations and sustained compliance over time.

As the court stated in its September 3, 2020 order, "what is required to remedy the Eighth Amendment violation in this action has been repeatedly identified in court orders and monitoring reports and neither the Special Master's time nor the court's will be spent relitigating settled matters."  ECF No. 6846 at 18.  Each of Mr. Hayes' previous reports and the subsequent court orders adopting them fall squarely within that definition.  Pursuant to the Court's January 7, 2020 order, Section III. B. below includes a description of the actions that defendants must take to implement the remaining recommendations.

### c.   Specific Comments and Objections

Defendants' specific comments on the draft report were limited to three areas: (1) the use of alternative housing for suicidal inmates, (2) mental health referrals and suicide risk

---

[12] It is important to note that methodology was not questioned and objections regarding the same were not raised in the preceding four reports.  At this late date, defendants' arguments are a red herring masking their unwillingness to comply with these important, life saving measures.

evaluations, and (3) local Suicide Prevention and Response Focused Improvement Teams (SPRFIT).

With regard to the section on the use of alternative housing, defendants disputed Mr. Hayes' findings that CCWF and CIW were not in compliance with transfer timeframes and requested modification of the draft report to reflect compliance.  Defendants also reported that they had remedied the issue of failing to provide every CHCF inmate in alternative housing a suicide-proof stack-a-bunk.

In the report section on mental health referrals and suicide risk evaluations, defendants took issue with the reported suicide risk evaluation (SRE) training compliance rates, stating that Mr. Hayes' report should reflect that at the time of the tours, the trainings were being revised and had been placed on hold.

Lastly, the draft report section on local SPRFITs included a recommendation from Mr. Hayes that per defendants' February 2, 2018 memorandum on enhancements to the SPRFIT, CDCR should initiate the SPRFIT responsibility to conduct root cause analyses (RCAs) for serious suicide attempts.  In their response to the draft report, defendants stated that their February 2, 2018 SPRFIT memorandum required SPRFITs to conduct semi-aggregate RCAs of the five most serious suicide attempts within the last six months, supplemented by a mental health clinical review.  Defendants stated that they did not conduct RCAs for every serious suicide attempt; instead, serious suicide attempts were reviewed every six months by the local SPRFITs, but not through an RCA process.  Defendants announced their intention to discard the RCA process outlined in the February 2018 memorandum "because the aggregate model has not

been effective at identifying commonalities between suicide attempts or allowing institutions to adopt changes to decrease self-harm and suicide."[13]

Defendants' sole stated objection to the draft report was to a recommendation in the section on reception center suicides. Defendants objected to Mr. Hayes' recommendation to place suicide prevention posters in all reception center nursing offices and pill call windows, arguing that it might be redundant in some places where posters were already mounted nearby. Defendants requested modification of the recommendation to reflect that concern.

Defendants' response also contained requests for certain revisions to the draft report. To the extent that defendants' requests were deemed appropriate, changes were incorporated into the report. (*See infra* pp. 15, 16, 22 n.7, 31, 40, 47, and 48.)

Mr. Hayes made 15 changes and/or additions to this report since it was submitted to the parties in draft form. (*See infra* pp. 5, 6, 7, 16, 22, 24, 40, 46, 49 n.14, and 248.)

### d. Proposed CDCR Self-Audit

Defendants' response to the draft report included a proposal that CDCR be allowed to complete development of their self-audit tool and perform a self-audit of their suicide prevention practices prior to the commencement of Mr. Hayes' fifth re-audit.

As previously indicated, it would be premature to permit defendants to begin self-monitoring prior to their full implementation of the outstanding recommendations. Defendants raised the issue of self-monitoring after Mr. Hayes issued his draft report on the third re-audit and the Special Master's position has not changed.[14] Further, and most importantly, the court

---

[13] *See* Appendix C, p. 7.

[14] "The Special Master rejects defendants' suggestion that they are ready to assume self-monitoring of suicide prevention practices as incredibly premature given the continued findings of problematic suicide prevention practices over the course of Mr. Hayes' audits, elevated suicide rates within CDCR prisons, and, perhaps most notably, the fact that the CQIT is still in the process of being tested and is nowhere near finalization…" ECF No. 5993 at 6.

has stated that it is not yet time to determine when defendants should assume the responsibility

for self-monitoring and reporting.  ECF No. 6846 at 22.  At the time of this writing, the

Continuous Quality Improvement Tool (CQIT) still had not been finalized.

### 3.  <u>Plaintiffs' Reply to Defendants' Response to the Draft Report</u>

In their June 29, 2020 reply to defendants' comments on the draft report, plaintiffs

opened by strongly objecting to defendants' suggestion that they be allowed to conduct a self-

audit before the commencement of Mr. Hayes' fifth re-audit.  Plaintiffs noted their previous

comments submitted prior to the filing of Mr. Hayes' third re-audit report, wherein they

addressed defendants' assertion that it was time to begin discussions on the transition of suicide

prevention monitoring to CDCR.  At that time, plaintiffs raised concerns regarding CDCR's

ability to self-monitor due to deficiencies in the CQIT and Continuous Quality Improvement

process and further noted that the whistleblower report that had recently been released by

CDCR's chief psychiatrist, Dr. Michael Golding cast doubt on the accuracy of data collected by

CDCR and thus CDCR's ability to self-monitor.

Plaintiffs noted that since that time, the Court had found that defendants knowingly

presented misleading information to the Court and the Special Master and declared that the

*Coleman* data collection and reporting system must be fixed to serve the policies and orders in

the case.  Plaintiffs reasoned that allowing defendants to perform a self-audit prior to Mr. Hayes'

fifth re-audit would, given defendants' history, result in an inordinate delay before full

implementation of Mr. Hayes' recommendations.  Plaintiffs made clear their lack of confidence

in defendants' capability to develop and implement "a comprehensive suicide prevention self-

audit tool that will produce reliable results and succeed in preventing suicides"— "even with the involvement of Mr. Hayes and other members of the Special Master's team."[15]

With regard to defendants' claim that they did not understand the compliance benchmarks or Mr. Hayes' methodology, plaintiffs stated that Mr. Hayes had been consistently transparent regarding his methodology and recommendations and defendants had been present during all of his site visits and exit calls, and had the opportunity to review and submit comments and objections to each of Mr. Hayes' reports, as well as discuss any questions they had with him. Plaintiffs also expressed their strong disagreement with defendants' contention that after years of non-compliance, CDCR should implement the recommendations based upon a hierarchy of importance, noting that the annual suicide rate had continued to increase each year. Plaintiffs asserted that defendants must implement all of the recommendations immediately, and if they failed to comply by the next re-audit, additional court enforcement would be appropriate.

Plaintiffs objected to defendants' decision to abandon the RCA process for serious suicide attempts. Plaintiffs stated that defendants had not provided adequate information regarding what would replace the RCA process and without that information plaintiffs did not agree that defendants should be able to cancel the RCA process mandated by the February 2, 2018 memorandum. Plaintiffs agreed with Mr. Hayes' recommendation that defendants should initiate the RCA process without further delay and stated that it should remain in the report.

### 4. **Hayes Response to Parties' Comments and Objections to the Draft Report**

Mr. Hayes' detailed response addressing the parties' comments and objections to the draft report is attached hereto as Appendix G.

---

[15] See Appendix D, p. 2.

### III.    CURRENT COMPLIANCE STATUS AND REMAINING STEPS

As previously stated, the Court's January 7, 2020 order directed that if the Special Master and Mr. Hayes were unable to report defendants' full compliance at the conclusion of the fourth re-audit, the reporting on the fourth re-audit should include "specific recommendations for each step defendants must take to implement any items that remain incomplete, as well as a date certain on which the fifth re-audit round will commence." ECF No. 6441 at 8. In response to the Court's order, on page 4 of his fourth re-audit report, Mr. Hayes reports the following:

> After the conclusion of this fourth re-audit, this reviewer remains unable to report full compliance with his initial recommendations. As such, consistent with the court's order, this fourth re-audit report provides an update on current suicide prevention practices within CDCR facilities and the status of current and anticipated corrective actions to resolving existing deficiencies.

Consistent with the Court's January 7, 2020 directive, a list of the recommendations that remain to be implemented and the steps defendants must take to do so are outlined below. Also included below is a list of the recommendations that have successfully been implemented by defendants.

### A.    Recommendations Successfully Implemented by Defendants

The subsequent withdrawal of Recommendations 14, 15, and 16 (and by extension, Recommendation 30) left a total of 29 recommendations to be implemented. Defendants have succeeded in fully implementing 11 and have had success with the partial implementation of another, leaving 17 recommendations that remain to be fully implemented, and one that requires further partial implementation to achieve full compliance.[16] The recommendations that defendants have successfully implemented include the following:

---

[16] Recommendation 32 has multiple parts, resulting in separate compliance statuses for each measure. Consequently, it is included on both the list of recommendations that have been successfully implemented and the list of recommendations that remain to be implemented.

- Recommendation 2 – Expand the length and content of the annual "Crisis Intervention and Suicide Prevention" training workshop to include the following topics: (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative, (2) identifying inmates at risk for suicide despite their denials of risk, (3) updated research on CDCR suicides, (4) identified problem areas and corrective actions from previous CDCR suicide reports, and (5) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices.

- Recommendation 4 – Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel.

- Recommendation 5 – The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?"

- Recommendation 11 – Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at PBSP and at the CHCF (Phase 3, per the directive).  Note: This recommendation was revised in Mr. Hayes' first re-audit report to include auditing of Guard One electronic surveillance compliance within all restrictive housing units.  ECF No. 5396 at 9-10.

- Recommendation 19 – The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar.

- Recommendation 22 – CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure.

- Recommendation 23 – The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide-resistant.

- Recommendation 24 – Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB.

- Recommendation 25 – Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15

minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk.

- Recommendation 27 – The "Interdisciplinary Progress Note – 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the "Interdisciplinary Progress Note" utilized at CTF that allows clinicians to use a separate sheet for each day of follow-up.

- Recommendation 30 – Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing suicidal ideation and/or engaging in self-injurious behavior.

- Recommendation 32 – CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues: Suicide-Resistant MHCBs, Informal Recommendations within CDCR Suicide Reports, Frosted Exterior Cell Windows and Sensory Deprivation, and High Refusal Rates for New Admit Screens in Administrative Segregation.

With regard to the recommendations listed above, defendants' successful implementation, coupled with their sustained compliance over the course of successive audits, is a clear demonstration to the Court and the Special Master of defendants' comprehension of the recommendations and the steps required for implementation and sustainability. Defendants must now turn their complete attention towards the implementation of the remaining recommendations.

B. **Roadmap to Full Implementation of the Remaining Recommendations**

Recommendations 1, 3, 6, 7, 8, 9, 10, 12, 13, 17, 18, 20, 21, 26, 28, 29, 31, and 32 remain in varying stages of implementation. Each recommendation and the necessary steps preceding a determination of compliance with its full implementation are detailed below.

- Recommendation 1 – Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention training workshop to include topics as described above [i.e., including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR

16

Suicide Reports; and (5) results of any recent *Coleman* and/or SPRFIT audits of suicide prevention practices.

At the time of this writing, defendants' four-hour Basic Correctional Officers Academy Training curriculum was still under final revision.  In January 2020, draft versions of the curriculum were provided to Mr. Hayes for review.  He provided defendants with feedback and recommendations in March 2020.  Upon completion of the final revision of the curriculum, Mr. Hayes will attend a Basic Correctional Officers Academy training session.  If Mr. Hayes finds that the entire content of the "Inmate Suicide Prevention" lesson plan is presented during the required four-hour workshop, defendants will have achieved compliance with implementation of this recommendation.  The current status of defendants' compliance with implementation of this recommendation is reported in Section M of Mr. Hayes' fourth re-audit report at page 34.

- Recommendation 3 – Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training.

The current status of defendants' compliance with implementation of this recommendation is reported in Table 1 on page 6 and Section M on page 34 of Mr. Hayes' fourth re-audit report.  In order to achieve compliance with implementation of this recommendation, defendants must ensure that at least 90 percent of custody, medical, and mental health staff at all audited CDCR facilities receive annual suicide prevention training.  Each discipline must have at least 90 percent compliance.  Mr. Hayes will audit this item during the fifth re-audit.

- Recommendation 6 – Intake screening should be conducted only in the nurse's office within an R&R unit.

The current status of defendants' compliance with the implementation of this recommendation is reported in Table 1 (p. 5) and Section A (pp. 7-8) of Mr. Hayes' fourth re-audit report.  Compliance with implementation of this recommendation requires defendants to

ensure that intake screening is *only* conducted in the nurse's office within R&R units at all audited CDCR facilities.   Mr. Hayes will audit this item during the fifth re-audit.

- Recommendation 7 – The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process.

The current status of defendants' compliance with the implementation of this recommendation is reported in Table 1 (p. 5) and Section A (pp. 7-8) of Mr. Hayes' fourth re-audit report.  Compliance with the implementation of this recommendation requires defendants to ensure that all audited CDCR facilities maintain adequate physical plants for privacy and confidentiality during the intake screening process.  Defendants should develop and implement CAPs for the four facilities (CCI, CMC, SQ, and PVSP) that require physical plant renovation to ensure privacy and confidentiality, including installation of therapeutic treatment modules.  The CAPs should include project request forms, verification that funds were authorized and received, and deadlines for project completion, with such documentation forwarded to the Special Master.  Compliance with the implementation of this recommendation will be achieved upon completion of all of the aforementioned steps.

- Recommendation 8 – Nurse and officer safety should remain the top priority during the intake screening process.  If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality.

The current status of defendants' compliance with the implementation of this recommendation is reported in Table 1 (p. 5) and Section A (pp. 7-8) of Mr. Hayes' fourth re-audit report.  As Recommendation 8 is closely tied to Recommendation 7, the steps required to achieve compliance are identical.  Upon completion of the steps outlined for Recommendation 7 above, compliance with the implementation of Recommendation 8 will be also achieved.

- Recommendation 9 – CDCR should revise its SRE Mentoring Program to eliminate its "graduation" component after completion of two adequate assessments, conduct ongoing mentoring throughout the year, and audit clinicians' SREs on a regularly scheduled basis.

Compliance with the implementation of this recommendation will require defendants to ensure that at least 90 percent of mental health clinicians at each audited CDCR facility are compliant with the requirements of both the seven-hour SRE training and SRE mentoring program. The current status of defendants' compliance with this recommendation is reported in Table 1 (p. 5) and Section I (pp. 20-22) of Mr. Hayes' fourth re-audit report. Mr. Hayes will audit this item during the fifth re-audit.

- Recommendation 10 – Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis.

Completion of suicide risk evaluations for inmates presenting as possible risks for suicide must be automatic; therefore, 100 percent compliance is required for this measure, because failure to complete such evaluations can result in death by suicide within CDCR facilities. In order to achieve compliance with the implementation of Recommendation 10, defendants should ensure through the SPRFIT or other process that Suicide Risk Assessment and Self Harm Evaluations (SRASHEs) are always completed for inmates presenting as possible risk for suicide at each audited CDCR facility. The current status of defendants' compliance with this recommendation is reported in Table 1 (p. 5) and Section I (pp. 20-22) of Mr. Hayes' fourth re-audit report. Mr. Hayes will audit this item during the fifth re-audit.

- Recommendation 12 – CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and the inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).

The current status of defendants' implementation of this recommendation is reported in

Table 1 (p. 5) and Section D (pp. 11-12) of Mr. Hayes' fourth re-audit report.  In order to achieve

compliance, CDCR should develop and implement CAPs in all seven facilities where problems

were identified (CCI, CMF, CMC, CSATF, DVI, KVSP, and WSP) to ensure that newly-arrived

administrative segregation inmates assigned to single cells are placed in suicide-resistant new

intake cells for the first 72 hours of administrative segregation placement.  Some of these CAPs

reinforce the requirement that new intake inmates should not be placed in non-new intake cells

when new intake cells are available.

- Recommendation 13 – CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.

The current status of defendants' implementation of this recommendation is reported in

Table 1 (p. 5) and Section D (pp. 11-12) of Mr. Hayes' fourth re-audit report.  To achieve

compliance with the implementation of this recommendation, defendants must ensure that each

audited CDCR facility maintain at least 90 percent compliance with adequate practices regarding

the suicide-resistant housing of newly admitted inmates into administrative segregation during

their first 72 hours of placement.  Mr. Hayes will audit this item during the fifth re-audit.

- Recommendation 17 – CDCR should adopt the recommendations made in connection with SREs set forth above,[17] which will also improve treatment planning contained in the SREs section above.

Defendants' compliance with safety plan development for suicidal patients is reported in

Table 1 (p. 5) and Section J (pp. 24-28) of Mr. Hayes' fourth re-audit report.  To achieve

compliance with the implementation of this recommendation, defendants should ensure that each

audited CDCR facility maintain adequate treatment (safety) plans in at least 90 percent of

reviewed cases.  Mr. Hayes will audit this item during the fifth re-audit.

---

[17] Recommendations 9 and 10.

- Recommendation 18 – CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment."

The current status of defendants' compliance with implementation of this recommendation is reported in Table 1 (p. 5) and Section D (pp. 11-12) of Mr. Hayes' fourth re-audit report.  In order to achieve compliance, defendants must ensure that at least 90 percent of mental health clinicians at each audited CDCR facility are compliant with the requirements of safety planning training.

- Recommendation 20 – CDCR should develop a corrective action plan (CAP) to ensure that supervising nursing staff regularly audits psych tech practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.

Although Mr. Hayes' third re-audit report found that supervising nursing staff auditing of psych tech practices resulted in improvements, his fourth re-audit refocused on psych tech practices when observation of deficiencies was found in some facilities.  The current status of defendants' implementation of this recommendation is reported in Table 1 (p. 5) and Section B (p. 9) of Mr. Hayes' fourth re-audit report.  Compliance will require defendants to ensure that each audited CDCR facility maintain at least 90 percent compliance with adequate psych tech practices by accurately completing Psych Tech Daily Rounds Forms for all MHSDS inmates in administrative segregation and SHUs.  Mr. Hayes will audit this item during the fifth re-audit.

- Recommendation 21 – CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.

This recommendation was revised in Mr. Hayes' third re-audit report to include nursing observation of MHCB patients.  ECF No. 5993-1 at 12-13.  Although practices now consistently reflect use of only two levels of observation (Suicide Precaution and Suicide Watch), practices

21

remain deficient in the actual observation of the suicidal patients.  The current status of

defendants' implementation of this recommendation is reported in Table 1 (p. 5) and Section F

(pp. 14-15) of Mr. Hayes' fourth re-audit report.  Observation of suicidal patients must be

automatic; therefore, 100 percent compliance is required because failure to observe a suicidal

patient can result in death by suicide within CDCR facilities.  To achieve compliance with the

implementation of this recommendation, defendants should ensure that all suicidal patients are

always observed on either Suicide Precaution or Suicide Watch at each audited facility.  Mr.

Hayes will audit this item during the fifth re-audit.

- Recommendation 26 – Any inmate housed in an OHU for more than 24 hours
  should be provided with a suicide-resistant bed.

This recommendation was revised in Mr. Hayes' first re-audit report to include auditing

the length of stay for inmates housed in any alternative housing for more than 24 hours.  The

current status of defendants' implementation of this recommendation is reported in Table 1 (p. 5)

and Section E (p. 13) of Mr. Hayes fourth re-audit report.  To achieve compliance, defendants

should ensure that each audited CDCR facility maintain at least 90 percent compliance with

adequate alternative housing practices of inmates being released within 24 hours and provided

with suicide-resistant bunks.  Mr. Hayes will audit this item during the fifth re-audit.

- Recommendation 28 – All inmates discharged from an MHCB or alternative
  housing, where they had been housed due to suicidal behavior, should be
  observed at 30-minute intervals by custody staff, regardless of the housing units
  to which they are transferred.

The current status of compliance with the implementation of this recommendation is

reported in Table 1 (p. 6) and Section K (pp. 29-30) of Mr. Hayes' fourth re-audit report.  In

order to achieve compliance, defendants should ensure that custody personnel in each audited

CDCR facility adequately complete the second page of the two-page "Discharge Custody Check

Sheet" (CDCR MH-7497) form in at least 90 percent of reviewed cases.  Mr. Hayes will audit

this item during the fifth re-audit.

- Recommendation 29 – The length of time an inmate is observed at 30-minute
  intervals following MHCB or alternative housing discharge should be determined
  on a case-by-case basis by the mental health clinician and clinically justified in
  the inmate's treatment plan.  No other frequency of observation should be
  authorized.

The current status of the implementation of this recommendation is reported in Table 1

(p. 6) and Section K (pp. 29-30) of Mr. Hayes' fourth re-audit report.  In order to achieve

compliance, defendants should ensure that mental health personnel in each audited CDCR

facility adequately complete the first page of the two-page "Discharge Custody Check Sheet"

(CDCR MH-7497) form in at least 90 percent of reviewed cases.[18]  Mr. Hayes will audit this

item during the fifth re-audit.

- Recommendation 31 – CDCR under the guidance of the Special Master, should
  re-examine and revise its local SPRFIT model to make the local SPRFITs a more
  effective quality assurance/improvement tool.

The current status of the implementation of this recommendation is reported in Table 1

(p. 6) and Section L (pp. 31-32) of Mr. Hayes' fourth re-audit report.  In order to achieve

compliance, defendants should ensure that each audited CDCR facility maintain at least 90

percent compliance with adequate SPRFIT practices that are consistent with the SPRFIT policy.

Mr. Hayes will audit this item during the fifth re-audit.

- Recommendation 32 – CDCR, under the guidance of the Special Master, should
  examine and consider taking reasonable corrective actions to address these
  additional miscellaneous issues: Privileges for Inmates in MHCBs, Continuous
  Quality Improvement, and Reception Centers.

---

[18] Compliance with treatment planning is addressed in Recommendation 17.

Findings regarding Continuous Quality Improvement and Reception Centers were first raised in the second and third re-audit reports, respectively. They are now incorporated into this recommendation. The current status of the implementation of this recommendation as it relates to Privileges for Inmates in MHCBs is reported in Table 1 (p. 5) and Section G (pp. 16-18) of Mr. Hayes' fourth re-audit report. In order to achieve compliance, defendants should ensure that each audited CDCR facility with a MHCB unit maintain at least 90 percent compliance with adequate practices regarding possessions and privileges afforded MHCB patients as required by policy. Mr. Hayes will audit this item during the fifth re-audit.

The current status of the implementation of the recommendation as related to Continuous Quality Improvement is reported in Table 1 (p. 6) and Section N (pp. 35-36) of Mr. Hayes' fourth re-audit report. In order to achieve compliance, two steps are required. First, defendants should incorporate all of Mr. Hayes' 19 Suicide Prevention Audit Checklist measures into their CQI guidebook(s). Second, any CQI audit report of a facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures.

The current status of the implementation of the recommendation as it relates to Reception Centers is reported in Table 1 (p. 6) and Section P (pp. 39-40) of Mr. Hayes' fourth re-audit report. In order to achieve compliance, defendants should certify to the Special Master that all reception center facilities[19] are aware of their suicide prevention responsibilities. Those responsibilities include the following: (1) placement of suicide prevention posters in the offices utilized for direct patient care by reception center nurses and diagnostic clinicians, as well as reception center housing unit bulletin boards and pill call windows; (2) diagnostic clinicians being required to review the nurse's Initial Health Screening form, any county jail records, and

---

[19] At the time of this writing those included CCWF, CIM, DVI, NKSP, SQ, and WSP.

other pertinent documents contained within the Electronic Health Records System and the

Strategic Offender Management System for each inmate; (3) diagnostic clinicians completing the

Mental Health Screening Interview form are to request that the inmate sign a CDCR 7385

Authorization for Release of Protected Health Information (or ROI) form during the screening

process if a prior history of mental health treatment is reported; and (4) diagnostic clinicians

completing the Mental Health Screening Interview form are required to complete a SRASHE if

the screening and/or inmate's behavior suggests a possible current risk for suicide.

## IV.    CONCLUSION AND RECOMMENDATIONS

In his report on Mr. Hayes' third re-audit, the Special Master wrote, "[i]t is approaching

four years since defendants were first ordered to implement Mr. Hayes' initial recommendations,

yet implementation remains incomplete and successive audits continue to find deficiencies as a

result."  ECF No. 5993 at 9.  Now, nearly two years later, unfortunately, the same remains true.

In that same report, the Special Master also wrote, "[i]f defendants would put as much effort into

complying with the Court's orders as they seem to do attempting to find a shortcut to the end of

federal court oversight, undoubtedly progress in a variety of ongoing remedial efforts would be

much further along."  *Id*.

Disappointingly, defendants have again attempted to circumvent the court's longstanding

orders to complete implementation of Mr. Hayes' recommendations.  Now, in addition to their

proposal to self-audit (a concept raised previously in their response to Mr. Hayes' draft report on

his third re-audit) defendants—after seven years of monitoring, four audit reports, countless

suicide prevention workshops, workgroups, and summits, and meetings with the Special Master,

Mr. Hayes, members of the Special Master's team, and plaintiffs—now raise never before voiced

concerns regarding benchmarks and methodology.  Further, defendants blame their claimed

ignorance of the benchmarks and methodology used by Mr. Hayes for their failures to adhere to the court's orders and implement the recommended suicide prevention measures.

As reported above, by the time of this writing, defendants had successfully implemented nearly a dozen of Mr. Hayes' initial recommendations, demonstrating both their comprehension and ability to execute.  Now is the time for defendants to build upon that momentum and finally complete implementation of the remaining recommendations. As the court stated in its September 3, 2020 order, "[t]he twenty-nine recommendations must be completely and durably implemented to allow comprehensive assessment of their efficacy in reducing the ongoing number of foreseeable and/or preventable inmate suicides in California's prison system.  ECF No. 6846 at 22.

The Special Master continues to share the concerns expressed by Mr. Hayes in each of his audit reports.  The following statement from his report on the third-re audit still stands. "[D]efendants should work on full implementation of the court-ordered recommendations *without further delay*."  ECF 5993 at 9.  (emphasis added).  It is with that in mind and pursuant to the Court's January 7, 2020 order, that the remaining steps to implementation of the outstanding recommendations were carefully outlined above.

The Court's January 7, 2020 order directed the Special Master to provide a date certain on which the fifth re-audit would commence.  ECF No. 6441 at 8.  At the time of this writing, the Special Master's suspension of in-person monitoring due to the continuing COVID-19 pandemic remained in effect.  As a result, he is unable to provide the Court with a date certain for the commencement of the fifth re-audit; however, Mr. Hayes will begin the fifth re-audit assessments in selected CDCR facilities immediately upon the resumption of in-person monitoring.  Currently, in an effort to expedite CDCR's full implementation and sustainability of

adequate suicide prevention practices, Mr. Hayes observes the statewide mental health program's weekly and monthly Suicide Prevention and Response Unit (SPRU) meetings by telephone. Upon the resumption of in-person monitoring, he will schedule monthly on-site meetings with the SPRU.

In view of all of the foregoing, the Special Master requests that:

(1) The Court find defendants in compliance with the implementation of Recommendations 2, 4, 5, 11, 19, 22, 23, 24, 25, 27, 30, and parts of 32;

(2) The Court order defendants to complete the implementation of Recommendations 1, 3, 6, 7, 8, 9, 10, 12, 13, 17, 18, 20, 21, 26, 28, 29, 31, and the remaining parts of 32 as outlined above.

Respectfully submitted,


/s/*Matthew A. Lopes, Jr.*
Matthew A. Lopes, Jr.
Special Master


September 23, 2020

Appendix A

# List of 33 Initial Recommendations

**Suicide Prevention Training**

1. Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e. including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.]
2. Expand the length and content of the annual "Crisis Intervention and Suicide Prevention" training workshop to include the topics described above;
3. Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training; and
4. Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel.

**Initial Health Screening and Receiving and Release Unit Environment**

5. The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?";
6. Intake screening should be conducted only in the nurse's office within an R & R unit;
7. The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and
8. Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality.

**Suicide Risk Evaluations**

9. CDCR should revise its SRE Mentoring Program to i. eliminate its "graduation" component after completion of two adequate assessments, ii. conduct ongoing mentoring throughout the year, and iii. audit clinicians' SREs on a regularly scheduled basis
10. Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis.

**30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs and Condemned Units**

11. Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at PBSP and at the CHCF (Phase 3, per the directive).

1

**Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units**

12. CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).

13. CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.

14. Any inmate discharged from suicide observation status and arriving in administrative segregation from either an MHCB or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan;

15. Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled. They should be placed in suicide-resistant, retrofitted cells.

16. Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.

**Treatment Planning for Suicidal Inmates**

17. CDCR should adopt the recommendations made in connection with SREs, set forth above, which will also improve treatment planning contained in the SREs section above; and

18. CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment," described above.

**Perception of Suicidal Inmates as Manipulative**

19. The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar.

**Psych Tech Practices**

20. CDCR should develop a CAP to ensure that supervising nursing staff regularly audit PT practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.

2

**Use of "Psychiatric Observation" and "Crisis Evaluation" Statuses for Suicidal Inmates**

21. CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.

22. CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure.

**Use of "Alternative Housing Cells" and OHUs for Suicidal Inmates**

23. The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide resistant.

24. Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB.

25. Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15 minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk.

26. Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed.

**OHU/MHCB Discharge and Efficacy of Five-Day Clinical Follow-Up and 60- Minute Custody Welfare Checks**

27. The "Interdisciplinary Progress Note – 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the "Interdisciplinary Progress Note" utilized at California Training Facility (CTF) that allows clinicians to use a separate sheet for each day of follow-up.

28. All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred.

29. The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by- case basis by the mental health clinician and clinically justified in the inmate's treatment plan. No other frequency of observation should be authorized.

30. All inmates discharged from an MHCB or alternative housing and immediately re-housed in an administrative segregation unit should only be placed in a suicide-resistant, retrofitted cell for a period to be determined on a case-by-case basis by the mental health clinician and clinically justified in the inmate's

31. Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing SI and/or engaging in self-injurious behavior.

**Local SPRFITs**

32. CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.

**Other Miscellaneous Issues**

33. CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues: Suicide-Resistant MHCBs, Privileges for Inmates in MHCBs, Informal Recommendations Within CDCR Suicide Reports, Frosted Exterior Cell Windows and Sensory Deprivation, High Refusal Rates for New Admit Screens in Administrative Segregation.

Appendix B

# <u>List of 29 Initial Recommendations</u>

**Suicide Prevention Training**

1. Expand the length and content of the pre-service "Crisis Intervention and Suicide Prevention" training workshop to include topics as described above [i.e. including (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative; (2) identifying inmates at risk for suicide despite their denials of risk; (3) updated research on CDCR suicides; (4) identified problem areas and corrective actions from previous CDCR Suicide Reports; and (5) results of any recent Coleman and/or SPRFIT audits of suicide prevention practices.
2. Expand the length and content of the annual "Crisis Intervention and Suicide Prevention" training workshop to include the topics described above;
3. Ensure that all custody and health care staff receive both pre-service and annual suicide prevention training; and
4. Ensure that all pre-service and annual suicide prevention training is conducted by qualified mental health personnel.

**Initial Health Screening and Receiving and Release Unit Environment**

5. The Initial Health Screening form (CDCR Form 7277) should be revised to omit compound questions and include separate direct questions, such as "Have you ever attempted to commit suicide?" and "Are you currently thinking of hurting yourself?";
6. Intake screening should be conducted only in the nurse's office within an R & R unit;
7. The nurse's office should be of sufficient size to conduct adequate intake screening, and the door to the office (which should contain a large viewing window) should remain closed during the screening process; and
8. Nurse and officer safety should remain the top priority during the intake screening process. If an inmate's security classification or unknown security status creates a safety concern, the screening should be conducted in the least restrictive setting that ensures both staff safety and inmate confidentiality.

**Suicide Risk Evaluations**

9. CDCR should revise its SRE Mentoring Program to i. eliminate its "graduation" component after completion of two adequate assessments, ii. conduct ongoing mentoring throughout the year, and iii. audit clinicians' SREs on a regularly scheduled basis
10. Each facility's SPRFIT should audit the quality of completed SREs on a monthly basis.

**30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs and Condemned Units**

11. Continued implementation and monitoring of the May 9, 2014 directive, including implementation at Facilities C and D at PBSP and at the CHCF (Phase 3, per the directive).

**Use of Suicide-Resistant Cells for Newly Admitted Inmates in Administrative Segregation Units**

12. CDCR should ensure that there are a sufficient number of suicide-resistant retrofitted cells to house newly admitted inmates (i.e., those within their first 72 hours of their housing in the unit) and inmates of special concern or heightened risk of suicide (e.g., inmates recently released from suicide observation status).
13. CDCR should enforce its existing policy of housing only newly admitted inmates in retrofitted cells, and immediately re-house inmates remaining in the retrofitted cells beyond their first 72 hours.

**Treatment Planning for Suicidal Inmates**

17. CDCR should adopt the recommendations made in connection with SREs, set forth above, which will also improve treatment planning contained in the SREs section above; and
18. CDCR should develop a specific timetable for the training of all of its mental health clinicians on treatment planning for the suicidal inmate, using its PowerPoint presentation, "Safety/Treatment Planning for Suicide Risk Assessment," described above.

**Perception of Suicidal Inmates as Manipulative**

19. The perception that all inmates who threaten suicide are manipulative persists among the treatment teams as a misguided mindset that should be repeatedly addressed at different levels including pre-service and annual suicide prevention trainings, the SRE Training and Mentoring Program, and the newly created SRE treatment planning webinar.

**Psych Tech Practices**

20. CDCR should develop a CAP to ensure that supervising nursing staff regularly audit PT practices during daily rounds of mental health caseload inmates in administrative segregation and during weekly and bi-weekly rounds in the SHUs.

**Use of "Psychiatric Observation" and "Crisis Evaluation" Statuses for Suicidal Inmates**

21. CDCR should enforce its Program Guide requirements authorizing only the two levels of observation which may be provided for suicidal inmates: (1) observation at staggered intervals not exceeding every 15 minutes for inmates on Suicide Precaution, and (2) continuous observation for inmates on Suicide Watch.
22. CDCR, under the guidance of the Special Master, should examine the use of "psychiatric observation" status or other similarly-named practices for use in MHCBs and alternative housing cells for non-suicidal inmates and clarify when it may be used, via a directive or policy and procedure.

**Use of "Alternative Housing Cells" and OHUs for Suicidal Inmates**

23. The CDCR "Alternative Housing Cell Prioritization" memorandum dated December 12, 2012 should be revised to require that all cells utilized for alternative housing must be suicide resistant.
24. Until all alternative housing cells are suicide-resistant, any inmate housed in an alternative housing cell that is not suicide-resistant should be observed on a continuous basis until transferred to an MHCB.
25. Any inmate housed in an alternative housing cell that is suicide-resistant should be observed at staggered intervals not to exceed every 15 minutes (Suicide Precaution), or be on continuous observation (Suicide Watch), depending on the level of the inmate's suicide risk.
26. Any inmate housed in an OHU for more than 24 hours should be provided with a suicide-resistant bed.

**OHU/MHCB Discharge and Efficacy of Five-Day Clinical Follow-Up and 60- Minute Custody Welfare Checks**

27. The "Interdisciplinary Progress Note – 5-Day Follow-Up" form that contains five days of notes on a single page should be replaced by a form similar to the "Interdisciplinary Progress Note" utilized at California Training Facility (CTF) that allows clinicians to use a separate sheet for each day of follow-up.
28. All inmates discharged from an MHCB or alternative housing, where they had been housed due to suicidal behavior, should be observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred.
29. The length of time an inmate is observed at 30-minute intervals following MHCB or alternative housing discharge should be determined on a case-by- case basis by the mental health clinician and clinically justified in the inmate's treatment plan. No other frequency of observation should be authorized.
30. Five-day follow-up assessments and 30-minute checks by custody staff should never be utilized as an alternative to MHCB or alternative housing for an inmate expressing SI and/or engaging in self-injurious behavior.

**Local SPRFITs**

31. CDCR, under the guidance of the Special Master, should re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.

**Other Miscellaneous Issues**

32. CDCR, under the guidance of the Special Master, should examine and consider taking reasonable corrective actions to address these additional miscellaneous issues: Suicide-Resistant MHCBs, Privileges for Inmates in MHCBs, Informal Recommendations Within CDCR Suicide Reports, Frosted Exterior Cell Windows and Sensory Deprivation, High Refusal Rates for New Admit Screens in Administrative Segregation.

Appendix C

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 15, 2020

VIA ELECTRONIC MAIL

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Dear Special Master Lopes,

I write regarding Lindsay Hayes's draft report "The Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (Re-Audit) provided to Defendants on May 15, 2020. CDCR thanks Mr. Hayes for the Fourth Re-Audit's recommendations.

CDCR agrees that Mr. Hayes's recommendations are helpful for establishing a healthy correctional suicide prevention program. His recommended programs and practices are important tools to minimize self-harm and suicide throughout CDCR. CDCR also agrees that Corrective Action Plans (CAPs) are necessary to remediate deficiencies found in practices at some institutions. CDCR is committed to ensuring that all institutions not only have a robust suicide prevention system, but are consistently compliant with all aspects of it.

On January 7, 2020, the Court ordered the Special Master and Mr. Hayes to include in their reporting "specific recommendations for each step defendants must take to implement any items that remain incomplete, as well as a date certain on which the fifth re-audit round will commence." (ECF No. 6441 at 8.) According to the order, this information will allow the court to order defendants to take each of the remaining steps "on or before the start of the fifth re-audit and to move to enforcement proceedings if substantial compliance is not shown in the fifth re-audit." (Id.) Although CDCR is working closely with Mr. Hayes to ensure that it is taking appropriate steps to achieve compliance, CDCR remains concerned that the Re-Audit lacks sufficient specificity in some areas to help CDCR understand how to come into compliance.

For CDCR to show compliance with the myriad suicide prevention measures, this Re-Audit must clearly outline the methodology used to determine compliance with each item assessed. For instance, when assessing Practices for Observing MHCB Patients, the Re-Audit employs a methodology of selecting "four patient charts…at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m." (Re-Audit at 14.) A shared understanding of the methodologies and benchmarks used to measure compliance is essential for CDCR to develop its own self-auditing tools and achieve a durable and sustainable suicide prevention program.

A critical part of CDCR's implementation of Mr. Hayes's recommendations is CDCR's development and implementation of its Continuous Quality Improvement Tool to conduct self-monitoring. (See Section IV, *infra*.) The suicide prevention criteria used in Mr. Hayes's own audit have nearly been incorporated into the tool and once the tool is complete it will allow regular on-site review of all suicide prevention practices which is an essential key to increase and sustain compliance.

I.  The Re-Audit Must Establish Benchmarks for Compliance with Each Suicide Prevention Measure.

The January 7, 2020 order directed the Special Master and Mr. Hayes to provide "specific recommendations for each step defendants must take to implement any items that remain incomplete." (Order, January 7, 2020, ECF no. 6441 at 8.) Accordingly, the report must clearly spell out the standards to which CDCR is being held. Clear benchmarks and methodology are essential for CDCR to determine what must be done to substantially comply Mr. Hayes's recommendations.

In its July 12, 2018, order adopting the 27th Round Monitoring Report, the court ordered the Special Master to include benchmarks that "signal constitutional compliance" and to provide "specific recommended compliance percentage requirements for each benchmarks." (ECF No. 5852 at 3.) Relatedly, the court has anticipated "reviewing with defendants at a future status conference the specific steps necessary" needed to implement all recommendations following Mr. Hayes's fifth re-audit. (Order, July 3, 2019, ECF No. 6212 at 14.)

The court has recommended benchmarks to measure Defendants' requirements with the remedy in this case. Similarly, the Fourth Re-Audit must also include specific benchmarks for each suicide prevention practice assessed in the report. The need for these benchmarks is especially important for suicide prevention given its critical role in saving lives and the court's intention to order defendants to substantially comply with recommendations by the end of the next re-audit. (Id.)

Benchmarks must be uniquely tailored to each recommendation in the Fourth Re-Audit. And the benchmarks should reflect the relative importance of each recommendation. CDCR agrees that Mr. Hayes's recommendations are the basis for a robust suicide prevention program, but the recommendations are not equally critical at resolving the suicide issues within CDCR. Specifically, CDCR has identifies several common areas of deficiencies in its own suicide case reviews that beg greater attention than other recommendations. For instance, certain recommendations such as adequate safety planning, custody discharge checks, five day follow ups, suicide resistant cells, and rounding and observation within crisis beds are critical components that, through higher levels of compliance, can have a positive impact on the number of suicides occurring within CDCR. Others, while important, may not have as great of an impact on reducing suicides, regardless of the level of compliance achieved. Because CDCR should focus first on those recommendations that will have the greatest impact on completed or attempted suicides the benchmarks should reflect the relative importance of each recommendation.

//

/

II. The Re-Audit Should Outline Specific Steps Needed to Achieve all of the Recommendations and Provide Methodology so that CDCR can Create More Effective Corrective Action Plans.

Consistent with this court's order to provide "specific recommendations" to come into compliance with each recommendations, CDCR requests that Mr. Hayes supplement his draft report to provide specific auditing criteria, including sample sizes where applicable, used to measure compliance and put forth objective standards or benchmarks needed to achieve substantial compliance with each recommendation.

As stated above, it is important for CDCR to use the same methodology used in the Fourth Re-Audit to ensure its internal audit findings are consistent with those observed and reported by the Special Master.  In the past, when CDCR measured compliance with suicide prevention requirements, such as urgent and emergent referrals, in a way that differed from the way Mr. Hayes measured those items, CDCR's remedial efforts to improve compliance were delayed.  In order to substantially comply with the recommendations, CDCR requests clarification on how Mr. Hayes measures compliance with his recommendations so that CDCR can better tailor its corrective action plans to address deficiencies.

    A.  Initial Health Screening and Receiving and Release Unit Environments (pages 7-9)

Mr. Hayes identified intake screening deficiencies at five institutions ranging from needed physical plant renovations, privacy during intake screening, installing Therapeutic Treatment Modules, and interviewers using compound questions.  Specifically, Mr. Hayes recommends that "CDCR should develop [Corrective Action Plans] for the five facilities (CCI, CMC, CMF, SQ, and PVSP) . . . ." (Re-Audit at 9.)

The methodology for determining the adequacy of intake screening is unclear.  The Re-Audit's findings are based on the reviewer's on-site observations.  Specifically, the report notes "*several* new admissions during the intake screening . . .", and "*a few* new admissions during the intake screening . . ."  (Re-Audit at 51, 94, emphasis added.)  CMF was deficient because one "nurse was observed to be conflating most of the questions regarding mental health and suicide risk, e.g., asking 'do you have a current or prior history of mental illness, do you have any current or prior suicidal ideation,' etc." (Re-Audit at 8.)[1]

CDCR requests that Mr. Hayes clarify the required sample size and methodology for onsite observations of initial health screenings.  The report fails to indicate the number of observations included in the sample size, making it difficult to assess the level of compliance at each institution.  As intake screenings occur regularly and at a high frequency, a larger sample size and more frequent observations would be more statistically appropriate and would more accurately represent the health of any institution's intake screening process.

Additionally, the underlying metrics should be broken out so that institutions are clear on which part of the recommendation has not been met and the actual percent of compliance.  By bundling the information into one score, it is difficult to discern whether an institution is non-compliant because of confidentiality issues, quality of administering the screening questionnaire, or the

---

[1] To the extent not already done so during the site visit, CDCR requests that, outside of the Re-Audit, Mr. Hayes provide the identity of any staff he finds to be non-compliant with policy so CDCR can help improve performance and patient care.

overall physical environment.  These three items should be broken out in the Re-Audit and given separate scores so that a corrective action plans can be properly tailored to each institution.

B.  Psychiatric Technician Practices (page 9)

The Re-Audit found issues with psychiatric technician rounds in five institutions.  Specifically, problems were observed with how psychiatric technicians approached inmates and asked questions.  (Re-Audit at 9.)  The Re-Audit recommends developing Corrective Action Plans at these five institutions, which in the previous round had shown adequate practices.  (Id.)

As with the assessment of intake procedures at Receiving and Release, CDCR requests clarity on the sample size, the number of observations made, and methodology for onsite observations of psychiatric technician practices.  CDCR needs to know the criteria used and how compliance is calculated is essential for each institution to design effective corrective action plans.

C.  Practices for Observing MHCB Patients (pages 13-16)

The Re-Audit states that Mr. Hayes reviewed the Electronic Health Record System (EHRS) "charts of several sampled patients" to "verify the accuracy of observation rounds of patients on Suicide Precaution status."  (Re-Audit at 14.)  The reviewer looks at "four patient charts…selected at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m."  (Id.)  Despite this, it is not clear from the Re-Audit how Mr. Hayes measures compliance with suicide precaution checks.[2]

The Re-Audit should state whether it measures the time between checks based on the time the check is actually logged into the EHRS or whether it measures the time between when the provider *documents* that he or she conducted the observation.  To the extent that it is the former, CDCR objects to this methodology because it does not measure compliance with a recommendation or with an actual suicide prevention practice.  CDCR requests that the reviewer measure observation rounds by auditing the times manually entered into the record by the provider, rather than the time the provider accessed EHRS to log the observation.  It is common practice to conduct rounds on several patients and subsequently log them into EHRS following the completion of the round.  Measuring the time the actual observation occurred would give an adequate and accurate rating of compliance.

Also, measuring the frequency of the checks should not be the sole factor in determining compliance with policy.  The frequency of the checks may vary depending on individual patient needs, causing some checks to deviate from the fifteen minute requirement.  For instance, checks may be delayed when clinicians need to spend more time with certain patients or when a provider is called away to an emergency situation.  These factors may help explain why some log entries exceeded fifteen minutes.  CDCR requests that these factors be taken into account when determining compliance, or at the very least that these factors to be discussed alongside the compliance score.

CDCR also requests clarification of whether program flex rounds, which are separate from suicide precaution rounds, are being excluded from Mr. Hayes's methodology.  For instance, some licensed units do not have working nurse call systems in each cell and, in order to maintain

---

[2] CDCR believes samples should be taken from all three watches to properly assess compliance.

licensure, the institution is required to conduct thirty-minute rounds on all patients. These rounds do not require documentation in the EHRS as they are not part of the suicide observation/precautions requirements.

Also, on page 14 of the Re-Audit, the reviewer states that California Institution for Men, California Substance Abuse Treatment Facility, California State Prison, Sacramento, Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), and Wasco State Prison, had either no or only minor problems. However, on pages fifteen and sixteen of the Re-Audit, Mr. Hayes includes PBSP and PVSP as deficient institutions. CDCR recommends that the reviewer clarify whether PBSP and PVSP were deficient, or whether the reviewer intended to include San Quentin and California State Prison, Corcoran as deficient institutions that should implement CAPs.

D.  Mental Health Referrals and Suicide Risk Evaluations (pages 20-22)

Mr. Hayes audits compliance with both timeliness for completion of Suicide Risk Evaluations and compliance with completing an evaluation following a triggering event, such as when an inmate reports suicidal ideation. In order to better understand the specific needs of each non-compliant institution, the need for tailored corrective action, and any refinements to the Electronic Health Records System, CDCR requests clarification on the methodology used to determine compliance and the sample size used for completing this portion of the Re-Audit. For instance, CDCR requests clarification on whether completion and timeliness is blended into one score for each institution, and to what extent. And because Mr. Hayes "has historically reviewed both emergency mental health referrals, as well as urgent mental health referrals," CDCR requests a clear understanding of Mr. Hayes's expectations regarding both types of referrals and how assessment of these types of referrals differ. (Id. at 22.)

While it is not immediately clear from this portion of the Re-Audit whether Mr. Hayes assessed quality of the SRASHEs, to the extent he did so, CDCR also requests the criteria used to assess quality and the sample size utilized to make such a determination. Understanding the criteria used to make the assessment will allow CDCR to take steps necessary to come into compliance.

E.  Safety Planning (pages 23-28)

The Fourth Re-Audit has found that CDCR has low compliance with adequate safety planning, regardless of whether the safety plan was crafted under the old safety planning model or newer Safety Planning Intervention[3]. CDCR agrees that improvements in quality are needed. However, Mr. Hayes should disclose his audit criteria that he uses to determine whether a safety plan is adequate. While the Re-Audit provides *examples* of both good and bad safety plans, it is not immediately clear what criteria is used to assess quality. CDCR generally agrees with Mr. Hayes's examples of bad safety plans. But it is not always clear to CDCR why safety plans he notes as good are in fact quality safety plans. Because inadequate safety plans are common factors among completed suicides achieving consistent quality safety planning throughout CDCR is critical. A

---

[3] The Fourth Re-Audit recommends that CDCR make a prompt decision whether to abandon the Safety Planning Intervention (SPI) model and return to the "original concept of safety planning." (Re-Audit at 28.) CDCR converted to the SPI model in August 2019. (Id. at 23.) The transition to the SPI model was prompted in part because there was a "need to provide an immediate alternative to woefully inadequate safety planning practices within CDCR." (Id.) Regardless of the model chosen, the Re-Audit should provide specific steps to develop quality safety plans.

better understanding of Mr. Hayes's criteria for determining quality safety plans will help improve training and oversight of this task.[4]

## III. Specific Objections and Comments

### A. Use of "Alternative Housing" for Suicidal Inmates (pages 12-13)

According to the Fourth Re-Audit, CDCR was not in compliance with the twenty-four-hour timeframe to transfer patients to a crisis bed at two institutions:  California Institution for Women (CIW) and Central California Women's Facility (CCWF).  However, according to CDCR's internal data both institutions have been largely compliant since the activation of the CIW Walker unit in January 2019.  Between February 1, 2019 and January 31, 2020, CIW and CCWF were 99 percent and 93 percent[5] compliant with transfer timeframes according to CDCR's MHCB Referrals Report.[6]  Data on referrals has been provided monthly to the Special Master and has been consistently high until the onset of COVID-19 restrictions in late March 2020.

Given longstanding compliance with this issue, it is unclear what additional steps are necessary to come into compliance with this recommendation.  CDCR requests that the findings, conclusion, and recommendation be modified to reflect CDCR's compliance with the transfer timeframes at CIW and CCWF.

Additionally, the Re-Audit recommends that CDCR develop a CAP for California Healthcare Facility (CHCF) in order to cure inadequate practices of not providing every inmate in alternative housing a suicide-proof stack-a-bunk.  This CAP is unnecessary as CHCF staff members have since supplied portable beds (stack-a-bunks) to the alternative housing unit.  CHCF conducted follow-up audits and determined that the issue had been resolved.

### B. Mental Health Referrals and Suicide Risk Evaluations (pages 20-22)

On page 22 of the Re-Audit, Mr. Hayes reports that there is a very low compliance rate for Suicide Risk Evaluation (SRE) training.  Specifically, Mr. Hayes notes that "16 of 20, or 80 percent of audited facilities had compliance rates under 90 percent for either the seven-hour SRE or the mentoring program training." (Re-Audit at 22).  During the monitoring rounds, however, the SRE training and mentoring program training was placed on hold as the trainings were being revised.  Mr. Hayes was involved in the revision process.  The trainings were not reissued until June 2019 by which time Mr. Hayes had audited thirteen of twenty institutions.  Mr. Hayes should reflect this pause in trainings in his Re-Audit.

//

/

---

[4] Likewise, for any audit assessing quality, Mr. Hayes should disclose the criteria used to make such determination.
[5] It is unclear what benchmark Mr. Hayes applies to this recommendation, but notes that other institutions "had adequate practices in this area." (Re-Audit at 13)  Defendants request benchmarks be disclosed for *all* items audited, including compliance with the use of alternative housing.
[6] The MHCB Referrals Report measures from the time HCPOP receives notification from the institution or when a level of care change order is entered into the electronic health record to the time the patient is recorded as being placed in a crisis bed.

C.  Local Suicide Prevention and Response Focused Improvement Teams (pages 30-33)

The Re-Audit incorrectly summarizes the February 2, 2018, Suicide Prevention and Response Focused Improvement Teams (SPRFIT) memorandum, stating that it requires "conducting root cause analyses (RCA) of any serious suicide attempts."  (Re-Audit at 31.)  Mr. Hayes audited compliance with the February 2018 policy during his Fourth Re-Audit, including the RCA requirement.  Mr. Hayes recommended that CDCR initiate the process.  (Id at 31, 33.)  However, the February 2018 memorandum does not require an RCA of "*any* serious suicide attempt."  The memo states that SPRFITs shall "[c]onduct semi-annual aggregate Root Cause Analyses (RCA) of serious suicide attempts supplemented by a mental health clinical review."  The aggregate review shall look at the "five most serious incidents during the prior six months…"  (February 2, 2018, Memorandum, Enhancements to the Suicide Prevention and Response Focused Improvement Teams.)

CDCR is not conducting Root Cause Analyses of every serious suicide attempt.  Rather, every six months, serious suicide attempts are reviewed by the local SPRFITs, though not through an RCA process.  CDCR plans to move away from the RCA process as contemplated by the 2018 memorandum because the aggregate model has not been effective at identifying commonalities between suicide attempts or allowing institutions to adopt changes to decrease self-harm and suicide.

CDCR will continue to review suicide attempts on a semi-annual basis, but the process for the review will move to a different process that yield results.  Institution staff have been directed to continue submitting comprehensive summaries of incident reviews including mental health history, a discussion of unique factors that influenced the patient's decision, identification of risk factors, contributing findings, and plans of action, among other things.  To the extent patterns can be identified, institutions are directed to do so.  Instead of using the RCA process, institutions are authorized to use existing processes such as patient safety committees, staff meetings, SPRFIT committee meetings, and the Emergency Medical Response Committee.

D.  Reception Center Suicides (pages 38-40)

On page 40 of the Re-Audit, CDCR objects to the recommendation to place suicide prevention posters in all reception center nursing offices and pill call windows.  While CDCR agrees that suicide posters should be mounted in visible and high trafficked areas within an institution, it may be redundant in some situations where posters are mounted near pill lines and within bulletin boards in the same housing unit.  CDCR requests that this recommendation be modified to require placement in these locations only when a poster is not already placed nearby in the housing unit.

Relatedly, CDCR should only be required to post suicide prevention posters in nursing offices where direct patient care is provided.  Under the current recommendation, CDCR would be required to place posters in nursing staffing offices or the Utilization Management nurse's office.

IV. CDCR Should Conduct A Self-Audit Prior to the Fifth Re-Audit

Since 2012, with input from the Special Master and Plaintiffs, CDCR has developed its own self-monitoring tool, the Continuous Quality Improvement Tool (CQIT).  Using the CQIT framework, CDCR is developing a standalone suicide prevention self-audit tool to audit suicide prevention

practices within CDCR.  The tool will incorporate all nineteen suicide prevention items used by Mr. Hayes, sixteen of which have been finalized.  The last three items, pertaining to the adequacy of local Suicide Prevention and Response Focused Improvement Teams (SPRFIT), are being finalized by the headquarters SPRFIT committee that is currently focused on refining local SPRFIT practices.

Although Mr. Hayes has opined that "CDCR should stop focusing on reissuing memoranda and drafting audit tools and begin focusing on development of CAPs for each of the facilities found to have deficient practices," CDCR believes that pursuing the self-audit process can only help increase oversight and compliance while allowing CDCR to proactively address issues.  (Re-Audit at 19.)  Once the self-audit tool is finalized, CDCR will be able to analyze its own suicide prevention and practices.  Coupled with chart review audits, CDCR's suicide case reviews, and headquarters' SPRFIT, CDCR will be well positioned to provide strong suicide prevention oversight and implement CAPs as needed.

The SPRFIT Committee will work to finalize the audit tool and CDCR will consult with Mr. Hayes to ensure the audits are in accordance with his methodology.  However, to do so, it is essential that CDCR understands the methodologies and benchmarks underlying Mr. Hayes's own audit so that the same methodology can be programmed into CDCR's self-audit.  As discussed below, CDCR proposes to meet and confer with Mr. Hayes and other members of the Special Master team to finalize the self-audit.

In order to finalize the self-audit process, CDCR and the Special Master team should determine how the audit questions, methods, and overall processes are constructed and organized.  Particular focus should be given to determining specifically what should be evaluated, the criteria used to judge performance, standards of performance, evidence analyzed, and conclusions to be drawn from those findings.  The audit must also be designed to provide appropriate feedback to CDCR. This feedback must be sufficient to determine skill development by program participants, compare changes in behavior over time, decide where to allocate resources for improvement, document the level of success, demonstrate accountability, and be useful to predict the likely effects of similar programs.

Additionally, CDCR believes that the methodology for the self-audit is best drawn from behavioral science and social research and should be developed with agreement from all stakeholders.  The methodology must describe how the audit activities will be implemented.  As with other steps of the audit process, it is critical to understand how Mr. Hayes implements his own audits so that the self-audit can mirror that to the extent possible.  Any agreement should include statements about the intended purpose, users, uses, methodology, sampling as well as a summary of the deliverables, timelines, and those responsible.

Finally, Working collaboratively on designing the self-audit will help ensure that the conclusions ultimately drawn by the audit are well substantiated and justified.  Conclusions are justified when they are linked to the evidence gathered and assessed against benchmarks agreed to by stakeholders.  Stakeholders in the design process must agree that the conclusions are valid in order to use the audit results with confidence.

Once the tool is finalized, CDCR proposes that the tool be tested, with Mr. Hayes in attendance, for at least one round prior to the commencement of Mr. Hayes Fifth Re-Audit.  Finalizing this

tool will allow CDCR to more regularly audit its own practices, provide oversight of mental health programs and applicable corrective action plans, and more quickly bring non-compliant institutions into compliance.

CDCR thanks you for your consideration of these objections and comments.


Sincerely,


*/s/ Nick Weber*

Nick Weber
Attorney
CDCR, Office of Legal Affairs

Appendix D



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jenny S. Yelin
Email: jyelin@rbgg.com

June 15, 2020

VIA ELECTRONIC MAIL ONLY

> PRIVILEGED AND
> CONFIDENTIAL
>
> SUBJECT TO
> PROTECTIVE ORDERS

Matthew A. Lopes, Jr.
Coleman Special Master
Pannone Lopes Devereaux & O'Gara
317 Iron Horse Way, Suite 301
Providence, RI
mlopes@pldolaw.com

Re:    *Coleman v. Newsom*: Plaintiffs' Comments on Draft Fourth Re-Audit and
Update of Suicide Prevention Practices in the CDCR
Our File No. 0489-03

Dear All:

We write to provide Plaintiffs' comments on the Draft Fourth Re-Audit and
Update of Suicide Prevention Practices in the CDCR by Lindsay M. Hayes, M.S., dated
May 14, 2020 ("Draft Report"). The Draft Report details serious deficiencies in the
suicide prevention practices at the 20 re-audited prisons. Plaintiffs generally agree with
Mr. Hayes' recommendations and conclusions and appreciate the thoroughness of his
review and analysis.

In Part IV of his Draft Report, Mr. Hayes discusses 2019 suicides that occurred in
close proximity to inpatient discharges and/or mental health referrals. As you know, the
increasing number of suicides attributable to Defendants' utilization management efforts
in 2018 and 2019 has been an issue of great concern to Plaintiffs, and we have been
carefully tracking suicides that follow discharges from and/or failures to refer to higher
levels of care. *See, e.g.*, ECF No. 6401; ECF No. 6410; Yelin and Nunez letter re:
Plaintiffs' Comments re 2018 Suicides, March 27, 2020, at 4-5.

PRIVILEGED AND CONFIDENTIAL
Matthew A. Lopes, Jr.
June 15, 2020
Page 2

The Draft Report notes that according to CDCR, nine of the 38 suicides in CDCR in 2019 occurred within 90 days of the person's discharge from a MHCB or inpatient unit, with six suicides occurring within 5 days after such a discharge.  Draft Report at 40.  From our review, there appears to have been a tenth suicide in 2019 that occurred within 90 days of the patient's discharge from a crisis bed: COR 8                    , whose suicide occurred three days after discharge from EOP level of care and 85 days after his last discharge from MHCB.  There were also two suicides that occurred within 90 days of a discharge from the EOP level of care (▮▮▮▮▮▮▮ and SAC 13                   , who killed himself 61 days after his discharge from the EOP level of care).

We request that Mr. Hayes include these two suicides in the discussion of suicides occurring after level of care discharges, even though CDCR did not include them in the Suicide Prevention and Response Team's Suicide Prevention and Video Conference on January 8, 2020.  *See* Draft Report at 40.  The discussion CDCR's "Inpatient Review Unit/HQ Suicide Prevention Workgroup" will have of possibly "clinically premature" discharges from MHCB and inpatient levels of care, *see id.*,  should also include a review of clinically premature discharges from the EOP level of care resulting in suicides, and should also result in corrective action plans.  *See id.*; *see also id.* at 41 ("[CDCR's] utilization management efforts have also resulted in dramatic shifts in the level of care for 3CMS and EOP inmates within the MHSDS.").

Plaintiffs appreciate and agree with Mr. Hayes's statement that although "CDCR has acknowledged a concern that the discharge of some patients from either the PIPs or MHCBs who subsequently committed suicide during 2019 were premature, resulting in initiation of a SMHP workgroup to address the issue … there has not been the same realization and/or acknowledgment that an unintended consequence of the notable decrease in the use of MHCBs and alternative housing has been the significant number of inmates who died within several days of expressing SI and/or SIB and were not admitted into a MHCB level of care."  Draft Report at 45.

But Plaintiffs request that Mr. Hayes expand the discussion on pp. 41-45 of the Draft Report.  Currently that section focuses only on the ten 2019 suicides that occurred within eight days of a rescission of an MHCB referral or a failure to refer a patient to MHCB care when the patient had expressed suicidal ideation and/or self-injurious behavior and had a "resulting clinical assessment," and briefly mentions two additional suicides that occurred within 22 days and 42 days after the patients received SRASHEs but were not referred for higher levels of care.

There were, however, a number of additional suicides in 2019 in which clinical staff failed to refer the patients for higher levels of care, despite strong indications that

**PRIVILEGED AND CONFIDENTIAL**

Matthew A. Lopes, Jr.
June 15, 2020
Page 3

such care was warranted—where, for example, the patient expressed suicidality and did not even receive a SRASHE, or an IDTT did not consider a referral to a higher level of care even though there were clear signs of serious decompensation. We request Mr. Hayes consider including the following additional suicides as examples of failures to refer patients for higher levels of care that may have resulted from Defendants' concerns about reducing usage of MHCBs and inpatient beds:

- **LAC 10** ███████████: In the weeks prior to suicide, staff did not consider a referral for inpatient care, which according to CDCR's suicide reviewer "appears to have been called for given the increasing acuity of psychotic symptoms," and staff also did not perform a SRASHE.

- ███████████: ███████ was discharged from CHCF-PIP-Acute to EOP two days prior to death, but Defendants' Suicide Report notes that given his "history of suicide attempts during periods of time he discharged from inpatient units" and given that he was giving away his belongings, staff should have instead referred him for ICF care rather than discharging him to EOP.

- **SAC 13** ███████: ███████ endorsed suicidal and homicidal ideation three weeks prior to death, but later "recanted" his ideations; ███████ CCCMS clinician said she would arrange for him to see his psychiatrist to discuss his medications, but he was never seen, nor was he considered for a higher level of care.

- ███████████: At an IDTT meeting three weeks prior to his death, ███████ reported increased safety concerns, increased auditory hallucinations, engagement in self-harm, and ongoing suicidal ideation and anxiety, but the team did not consider a higher level of care referral.

- **LAC 9** ███████: ███████ Suicide Report notes in the six months prior to his death, IDTTs at two institutions—COR and LAC—failed to address higher level of care considerations for ███████, despite high treatment refusals.

- **PVSP 5** ███████: According to CDCR's Final Suicide Report, at an IDTT two weeks prior to death, ███████ treatment team placed ███████ on the high risk list, but failed to document the rationale, and did not provide an accurate assessment of his risk for suicide.

**PRIVILEGED AND CONFIDENTIAL**
Matthew A. Lopes, Jr.
June 15, 2020
Page 4


We hope Mr. Hayes will consider making these changes in the final report.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jenny S. Yelin*

By:   Jenny S. Yelin

JSY
cc:
*Coleman* Special Master Team
*Coleman* Co-Counsel
Attorney General Team
CDCR OLA Team
DSH Legal Team
Roman Silberfield
Glenn Danas

[3562015.1]

Appendix E



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Jenny S. Yelin
Email: jyelin@rbgg.com

June 22, 2020

<u>VIA ELECTRONIC MAIL ONLY</u>

> | PRIVILEGED AND |
> | CONFIDENTIAL |
> | SUBJECT TO |
> | PROTECTIVE ORDERS |

Matthew A. Lopes, Jr.
Coleman Special Master
Pannone Lopes Devereaux & O'Gara
317 Iron Horse Way, Suite 301
Providence, RI
mlopes@pldolaw.com

Re:     *Coleman v. Newsom*: Plaintiffs' Revised Comments on Draft Fourth Re-Audit and Update of Suicide Prevention Practices in the CDCR
<u>Our File No. 0489-03</u>

Dear All:

We write to provide Plaintiffs' comments on the Draft Fourth Re-Audit and Update of Suicide Prevention Practices in the CDCR by Lindsay M. Hayes, M.S., dated May 14, 2020 ("Draft Report"). The Draft Report details serious deficiencies in the suicide prevention practices at the 20 re-audited prisons. Plaintiffs generally agree with Mr. Hayes' recommendations and conclusions and appreciate the thoroughness of his review and analysis.

In Part IV of his Draft Report, Mr. Hayes discusses 2019 suicides that occurred in close proximity to inpatient discharges and/or mental health referrals. As you know, the increasing number of suicides attributable to Defendants' utilization management efforts in 2018 and 2019 has been an issue of great concern to Plaintiffs, and we have been carefully tracking suicides that follow discharges from and/or failures to refer to higher levels of care. *See, e.g.*, ECF No. 6401; ECF No. 6410; Yelin and Nunez letter re: Plaintiffs' Comments re 2018 Suicides, March 27, 2020, at 4-5.

PRIVILEGED AND CONFIDENTIAL
Matthew A. Lopes, Jr.
June 22, 2020
Page 2

The Draft Report notes that according to CDCR, nine of the 38 suicides in CDCR in 2019 occurred within 90 days of the person's discharge from a MHCB or inpatient unit, with six suicides occurring within 5 days after such a discharge. Draft Report at 40. There were also two suicides that occurred within 90 days of a discharge from the EOP level of care (COR 8          , whose suicide occurred three days after discharge from EOP level of care, and SAC 13              , who killed himself 61 days after his discharge from the EOP level of care).

We request that Mr. Hayes include these two suicides in the discussion of suicides occurring after level of care discharges, even though CDCR did not include them in the Suicide Prevention and Response Team's Suicide Prevention and Video Conference on January 8, 2020. *See* Draft Report at 40. The discussion CDCR's "Inpatient Review Unit/HQ Suicide Prevention Workgroup" will have of possibly "clinically premature" discharges from MHCB and inpatient levels of care, *see id.*, should also include a review of clinically premature discharges from the EOP level of care resulting in suicides, and should also result in corrective action plans. *See id.*; *see also id.* at 41 ("[CDCR's] utilization management efforts have also resulted in dramatic shifts in the level of care for 3CMS and EOP inmates within the MHSDS.").

Plaintiffs appreciate and agree with Mr. Hayes's statement that although "CDCR has acknowledged a concern that the discharge of some patients from either the PIPs or MHCBs who subsequently committed suicide during 2019 were premature, resulting in initiation of a SMHP workgroup to address the issue … there has not been the same realization and/or acknowledgment that an unintended consequence of the notable decrease in the use of MHCBs and alternative housing has been the significant number of inmates who died within several days of expressing SI and/or SIB and were not admitted into a MHCB level of care." Draft Report at 45.

But Plaintiffs request that Mr. Hayes expand the discussion on pp. 41-45 of the Draft Report. Currently that section focuses only on the ten 2019 suicides that occurred within eight days of a rescission of an MHCB referral or a failure to refer a patient to MHCB care when the patient had expressed suicidal ideation and/or self-injurious behavior and had a "resulting clinical assessment," and briefly mentions two additional suicides that occurred within 22 days and 42 days after the patients received SRASHEs but were not referred for higher levels of care.

There were, however, a number of additional suicides in 2019 in which clinical staff failed to refer the patients for higher levels of care, despite strong indications that such care was warranted—where, for example, the patient expressed suicidality and did not even receive a SRASHE, or an IDTT did not consider a referral to a higher level of

**PRIVILEGED AND CONFIDENTIAL**
Matthew A. Lopes, Jr.
June 22, 2020
Page 3

care even though there were clear signs of serious decompensation. We request Mr. Hayes consider including the following additional suicides as examples of failures to refer patients for higher levels of care that may have resulted from Defendants' concerns about reducing usage of MHCBs and inpatient beds:

- **LAC 10** ▮▮▮▮▮▮▮▮ : In the weeks prior to suicide, staff did not consider a referral for inpatient care, which according to CDCR's suicide reviewer "appears to have been called for given the increasing acuity of psychotic symptoms," and staff also did not perform a SRASHE.

- ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ was discharged from CHCF-PIP-Acute to EOP two days prior to death, but Defendants' Suicide Report notes that given his "history of suicide attempts during periods of time he discharged from inpatient units" and given that he was giving away his belongings, staff should have instead referred him for ICF care rather than discharging him to EOP.

- **SAC 13** ▮▮▮▮▮▮ endorsed suicidal and homicidal ideation three weeks prior to death, but later "recanted" his ideations; ▮▮ ▮▮▮▮ CCCMS clinician said she would arrange for him to see his psychiatrist to discuss his medications, but he was never seen, nor was he considered for a higher level of care.

- ▮▮▮▮▮▮▮▮▮ : At an IDTT meeting three weeks prior to his death, ▮▮▮▮▮▮ reported increased safety concerns, increased auditory hallucinations, engagement in self-harm, and ongoing suicidal ideation and anxiety, but the team did not consider a higher level of care referral.

- **LAC 9** ▮▮▮▮▮▮ Suicide Report notes in the six months prior to his death, IDTTs at two institutions—COR and LAC—failed to address higher level of care considerations for ▮▮▮▮▮, despite high treatment refusals.

- **PVSP 5** ▮ : According to CDCR's Final Suicide Report, at an IDTT two weeks prior to death, ▮▮▮▮▮ treatment team placed ▮▮ ▮▮ on the high risk list, but failed to document the rationale, and did not provide an accurate assessment of his risk for suicide.

We hope Mr. Hayes will consider making these changes in the final report.

**PRIVILEGED AND CONFIDENTIAL**
Matthew A. Lopes, Jr.
June 22, 2020
Page 4

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jenny S. Yelin*

By:   Jenny S. Yelin

JSY
cc:
*Coleman* Special Master Team
*Coleman* Co-Counsel
Attorney General Team
CDCR OLA Team
DSH Legal Team
Roman Silberfield
Glenn Danas

[3562015.1]

Appendix F



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Jenny S. Yelin
Email:  jyelin@rbgg.com

June 29, 2020

<u>VIA ELECTRONIC MAIL ONLY</u>

Matthew A. Lopes, Jr.
Coleman Special Master
Pannone Lopes Devereaux & O'Gara
317 Iron Horse Way, Suite 301
Providence, RI
mlopes@pldolaw.com

Re:    *Coleman v. Newsom*: Plaintiffs' Response to Defendants' Comments on
Draft Fourth Re-Audit and Update of Suicide Prevention Practices in the
CDCR
<u>Our File No. 0489-03</u>

Dear All:

We write to provide Plaintiffs' response to Defendants' June 15, 2020 Comments
("Defs.' Comments") on the Draft Fourth Re-Audit and Update of Suicide Prevention
Practices in the CDCR by Lindsay M. Hayes, M.S., dated May 14, 2020 ("Draft
Report").

## I.    Defendants Should Not Be Permitted to Complete a Self-Audit Prior to the Start of the Fifth Hayes Re-Audit

Plaintiffs strongly object to Defendants' suggestion that CDCR should be allowed
to finalize its CQI Suicide Prevention Self-Audit Tool and then conduct a full self-audit
before Mr. Hayes starts the Fifth Re-Audit process.  *See* Defs.' Comments at 7-9.  In
2018, when the Special Master was preparing to issue Mr. Hayes's Third Re-Audit
Report, Plaintiffs commented that "CDCR Has Not Demonstrated that It Is Ready to
Assume Self-Monitoring of Suicide Prevention," due to serious deficiencies in the CQI
tool and process, and noted that the recent revelations by Dr. Michael Golding "cast into
serious doubt CDCR's ability to self-monitor in any area reliant on the collection of
accurate data, including this one."  *See* Ltr. From Stone-Manista to Defs. and Special

[3566257.4]

PRIVILEGED AND CONFIDENTIAL

Matthew A. Lopes, Jr.
June 29, 2020
Page 2

Master re: Plaintiffs' Response to Defendants' "Comments and Objections" to Lindsay Hayes' August 27, 2018 Suicide Prevention Audit, Oct. 9, 2018, at 1-3.

Unfortunately, the truth of these statements has only become more apparent in the nearly twenty months since that letter.  In that time, the Court has found, after a trial, that Defendants "engaged in knowing presentation of misleading information to the court and to the Special Master," and noted that "*Coleman* data collection and reporting must be fixed, and it must be fixed to serve the policies and orders in this case, not the other way around."  Order, December 17, 2019, ECF No. 6427, at 22, 49.  Plaintiffs simply have no confidence that—even with the involvement of Mr. Hayes and other members of the Special Master's team—Defendants are currently capable of developing and using a comprehensive suicide prevention self-audit tool that will produce reliable results and succeed in preventing suicides.

Moreover, pursuing Defendants' suggested course of action would result in years of delay before Mr. Hayes's recommendations are fully implemented.  Given Defendants' history, it is likely to take at least a few years for them to finalize their tool and incorporate input from the Special Master and Plaintiffs, and additional years for Defendants to complete a full audit round using the tool.  Defendants simply have no track record to give anyone confidence they could timely complete this self-audit if given the opportunity.  Indeed, Defendants never provided even draft reports from their CQI tours conducted over the course of 2018, and their draft suicide report for suicides completed five years ago has still not issued.

As the court has recognized, "implementation of the suicide prevention steps required by prior orders adopting Mr. Hayes' recommendations is [already] taking too long."  Order, ECF No. 6441, Jan. 7, 2020, at 7; *see also* Order, ECF No. ECF No. 6212, July 3, 2019, at 14.  In January, the Court ordered that Mr. Hayes include in the Fourth Re-Audit report "a date certain on which the fifth re-audit round will commence," so the Court can "order defendants to take each of the remaining steps on or before the start of the fifth re-audit and to move to enforcement proceedings if substantial compliance is not shown in the fifth re-audit."  Order, ECF No. 6441, at 8.  CDCR had its highest suicide rate on record in 2019, *see* Draft Report at 45, and the rate has increased each year since 2014.  There simply is not time to wait and test out Defendants' purported ability to self-monitor before Defendants are required, finally, to achieve full compliance with all of Mr. Hayes's 19 recommendations, to which Defendants agreed years ago.  Defendants' attempt to buy time before the Court moves toward enforcement of their long-standing obligations to cure these constitutional deficiencies is unwarranted and risks class member lives.

PRIVILEGED AND CONFIDENTIAL
Matthew A. Lopes, Jr.
June 29, 2020
Page 3

II.    **The Draft Report Provides Clear Benchmarks and Defendants Have Had Notice of Mr. Hayes's Recommendations and an Opportunity to Implement Them for Years**

Defendants' letter asserts that the Draft Report "must clearly spell out the standards to which CDCR is being held" so that CDCR can "determine what must be done to substantially comply [with] Mr. Hayes's recommendations." Defs.' Comments at 2. It is disingenuous and inappropriate for Defendants to claim that they do not understand Mr. Hayes's methodology or the benchmarks they must meet. It is Defendants' obligation to implement a plan to remedy their constitutionally-deficient suicide prevention program, in consultation with the Special Master and his experts. *See, e.g.*, Order, ECF No. 4361, Feb. 28, 2013, at 2-3. Mr. Hayes has been auditing CDCR's suicide prevention practices since 2013, *see* Report re First Hayes Audit, Jan. 14, 2015, ECF No. 5259 at 1, and has been fully transparent about his methodology and his recommendations; Defendants have been present during each of Mr. Hayes's on-site visits, have participated in his exit calls during which he provides initial findings, and have had an opportunity to review, comment on, and object to all of his prior reports, which contain his 19 recommendations. They have also had numerous opportunities to discuss any questions they had with Mr. Hayes, including during lengthy in person conversations about suicide prevention issues at the January 2020 policy meeting and the November 2019 settlement conference that Plaintiffs attended, as well as ex parte discussions Defendants have had with Mr. Hayes directly, including the "SMHP's Suicide Prevention and Response Team's 'Suicide Prevention Video Conference'" on January 8 2020, which is referend in the Draft Report. *See* Draft Report at 40.

If, after nearly seven years of observing and working closely with Mr. Hayes to implement his recommendations, Defendants claim not to understand his methodology or how to meet the benchmarks necessary to achieve substantial compliance with his recommendations, then they certainly are not ready to self-audit. *See* Section I, above.

For the same reason, Plaintiffs strongly disagree that "CDCR should focus first on those recommendations that will have the greatest impact" so the benchmarks Defendants request from Mr. Hayes "should reflect the relative importance of each recommendation." Defs.' Comments at 2. CDCR has failed to implement fully and successfully the recommendations that have been included in Mr. Hayes's three prior reports, while simultaneously the annual suicide rate has continued to skyrocket year-over-year. Defendants must fully implement *all* of the recommendations now, and if they cannot substantially comply by the time of the next Re-Audit, additional court enforcement is appropriate.

[3566257.4]

PRIVILEGED AND CONFIDENTIAL
Matthew A. Lopes, Jr.
June 29, 2020
Page 4

Defendants' specific concerns regarding Mr. Hayes's methodology are also unfounded. Plaintiffs highlight only a few examples here for purposes of illustration. For instance, their complaint that the "criteria for determining quality safety plans" are not clear does not make sense and should be ignored. Assessment of safety plans is necessary qualitative, and regardless, as the Draft Report notes, Mr. Hayes and other members of the Special Master team have worked closely with CDCR officials to improve safety planning in institutions and to develop the new Safety Planning Intervention tool. *See* Draft Report at 23-24.

Similarly, while Defendants complain that the section regarding Psychiatric Technician rounding in segregation units should provide "clarity on the sample size, the number of observations made, and methodology for onsite observations of psychiatric technician practices," Defs.' Comments at 4, the Draft Report makes clear that the deficiencies Mr. Hayes identified with PT rounding in this audit were with the quality of the questioning by those PTs he did observe, not with the frequency of observations, and Defendants know Mr. Hayes's methodology, because they accompanied him on observation of those rounds. Draft Report at 9. Moreover, in Mr. Hayes's very first Report, he noted issues with Psych Techs completing "drive by" rounds without sufficient observation and interaction, and recommended regular auditing by nursing supervisors; Defendants have therefore been on notice of the quality issues with PT rounds for nearly seven years, and cannot legitimately claim to be surprised about the methodology or results. Report re First Hayes Audit, Jan. 14, 2015, ECF No. 5259, at 23-24.

III.    **The Draft Report's Recommendation that CDCR Initiate the RCA Process for Serious Suicide Attempts Should be Adopted**

Plaintiffs also take issue with and object to Defendants' unilateral decision to abandon the Root Cause Analysis ("RCA") process for serious suicide attempts established by the February 2, 2018 Memorandum regarding Local SPRFITS, and instead, to encourage individual institutions to use "existing processes such as patient safety committees, staff meetings, SPRFIT committee meetings, and the Emergency Medical Response Committee." Defs.' Comments at 7. The February 2, 2018 Memorandum requires local SPRFITs to conduct semi-annual aggregate RCAs of serious suicide attempts, including the five most serious incidents from the prior six months. Defendants' June 15, 2020 letter was the first time Plaintiffs learned that Defendants had ceased conducting the aggregate RCAs. Apparently, Defendants also did not disclose to Mr. Hayes that they were abandoning the RCA process, since the Draft Report recommends that "CDCR [] initiate the long-delayed SPRFIT responsibility to conduct RCAs for serious suicide attempts without further delay." Draft Report at 33.

[3566257.4]

**PRIVILEGED AND CONFIDENTIAL**
Matthew A. Lopes, Jr.
June 29, 2020
Page 5


Defendants' complaint about Mr. Hayes's comments on the RCA process is inapposite, since the Draft Report makes clear that Mr. Hayes was not able to audit the RCA process during the Fourth Re-Audit due to CDCR's suspension of it. Draft Report at 31. Defendants' June 15 letter includes only vague statements that CDCR will replace the RCA process with "a different process that yields results" and that institutions will employ "existing processes such as patient safety committees, staff meetings, SPRFIT committee meetings, and the Emergency Medical Response Committee." Defs.' Comments at 7. Without more information about what process will replace the RCA process for review of serious suicide attempts, Plaintiffs do not agree that Defendants should be able to cancel the RCA process mandated by the February 2, 2018 memo, which is apparently still in effect and has not been modified. The Draft Report should retain the recommendation that Defendants implement the process immediately. If Defendants develop a different process that is more effective, and Mr. Hayes, the Special Master and Plaintiffs approve it, it may make sense to move away from the RCA process. But that is not the case right now. Abandoning the RCA process in the midst of CDCR's urgent suicide crisis, with no viable alternative—much less one that has been vetted with Mr. Hayes—is dangerous and should not be countenanced.

We hope these comments are helpful as Mr. Hayes finalizes the Draft Report.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jenny S. Yelin*

By:    Jenny S. Yelin

JSY
cc:
*Coleman* Special Master Team
*Coleman* Co-Counsel
Attorney General Team
CDCR OLA Team
DSH Legal Team
Roman Silberfield
Glenn Danas

[3566257.4]

Appendix G

**Hayes Response to Defendants' letter dated June 15, 2020, regarding "The Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation"**

Lindsay M. Hayes
September 23, 2020

## Overall Hayes Response

Defendants' responses to this reviewer's draft report utilized terms such as "methodologies" and "benchmarks" that have not been raised before.

The methodology and compliance indicators (i.e., 90 percent) used by this reviewer have remained consistent throughout all of the suicide prevention assessment reports,[1] and those facilities who have achieved and/or maintained compliance with suicide prevention practices did not appear confused by them. It is only those facilities who chronically struggle that seem to be confused and/or ill-equipped, and that apparently remains a source of frustration to defendants.

For example, if 15 of the audited facilities were found to have corrected their intake screening practices and are now compliant, and five facilities continued to struggle in that area, why do defendants assume the report's methodology and/or benchmarks are to blame rather than there might be problems specific to the five facilities which resulted in their failures to achieve compliance?

The best example to illustrate the problem with defendants' comment related to methodology and benchmarks comes from Pleasant Valley State Prison (PVSP). When this reviewer previously assessed the facility in February 2018, the door to the nurse's office was observed to be closed during the intake screening process, with an officer stationed outside in the hallway providing adequate security. PVSP was found to be compliant with this suicide prevention measure. Yet when this reviewer returned to PVSP in November 2019, two nurses were observed to be conducting intake screening in two separate offices. In the first office, the inmate was situated in a chair inside the office, but the door remained open with a privacy screen situated in the hallway. In the second office, the inmate was situated in a chair that was located in the hallway, and a second privacy screen surrounded the chair. An officer was lingering between both offices and complained to this reviewer that the privacy screens were obstructing his ability to provide observation and security. A nursing supervisor admitted that the privacy screens were installed the week prior to this reviewer's scheduled assessment in November 2019. It was subsequently determined that there was a change in PVSP nursing leadership, which resulted in a reversion to inadequate privacy and confidentiality practices. This finding had nothing to do with this reviewer's methodology and/or benchmark; it was simply representative of defendants' failure to sustain compliance.

---

[1] To this point, in an order issued September 3, 2020, the court stated, "what is required to remedy the Eighth Amendment violation in this action has been repeatedly identified in court orders and monitoring reports and neither the Special Master's time nor the court's will be spent relitigating settled matters." ECF No. 6846 at 18.

There are no secrets or surprises with this reviewer's overall methodology for auditing. Consistent with all *Coleman* reports, members of the local facility (usually the SPRFIT), regional and/or headquarters staff routinely follow this reviewer around and observe what this reviewer observes. In addition, during PT rounds and R&R screening, a nursing supervisor is usually shadowing this reviewer. All of these findings and observations are reported out at each facility exit meeting, and there are ample opportunities for clarification at that time.

In addition, defendants' proposal that they conduct their own suicide prevention practices self-audit before this reviewer's Fifth Re-Audit is bewildering because: 1) they have previously failed to adequately conduct a self-audit of suicide prevention practices during a prior CQI audit, 2) the proposal runs contrary to the court's January 7, 2020 order which requires this reviewer's current report to include specific recommendations for CDCR compliance and a date certain for the Fifth Re-Audit, and 3) it would grossly and unnecessarily delay the initiation of this reviewer's next assessment.

As stated in past reports, CDCR needs to fully *understand their deficiencies, implement compliance measures, and sustain such compliance* before being in a position to self-audit their suicide prevention practices.

After seven years of court monitoring of suicide prevention practices, defendants insist that they need more clarity, but there have been numerous Suicide Prevention Management Workgroups, a special *Coleman* settlement conference meeting with Judge Drozd in January 2020, this reviewer's regular teleconference participation on CDCR suicide prevention team meetings, several CDCR "suicide prevention summits" hosted by CDCR (in which presentations highlight accomplishments, but ignore issues of chronic non-compliance), and, most recently, a meeting with mental health, custody, and nursing leadership on June 3, 2020, to specifically discuss this reviewer's draft report. Finally, this reviewer (and other members of the Special Master's team) has established regularly scheduled monthly meetings with CDCR leadership (mental health, custody, and nursing) beginning July 10, 2020.

**<u>Paragraph-by-Paragraph Response to Defendants' June 15, 2020 Comments and Objections to the Draft Report</u>**

This reviewer's specific responses to each of the 41 paragraphs contained in defendants' June 15, 2020 letter follows below.

**Paragraph 1**: No response required.

**Paragraph 2**: No response required.

**Paragraph 3**: "*On January 7, 2020, the Court ordered the Special Master and Mr. Hayes to include in their reporting "specific recommendations for each step defendants must take to implement any items that remain incomplete, as well as a date certain on which the fifth re-audit round will commence." (ECF No. 6441 at 8.) According to the order, this information will allow the court to order defendants to take each of the remaining steps "on or before the start of the fifth re-audit and to move to enforcement proceedings if substantial compliance is not shown in*

2

*the fifth re-audit." (Id.) Although CDCR is working closely with Mr. Hayes to ensure that it is taking appropriate steps to achieve compliance, CDCR remains concerned that the Re-Audit lacks sufficient specificity in some areas to help CDCR understand how to come into compliance.*"

**Hayes Response:**  Although there was a meeting with defendants on June 3, 2020, specifically to discuss the draft report, this is the first mention of defendants' concern that the Fourth Re-Audit Report "lacks sufficient specificity" and there was no such complaint during that meeting.

**Paragraph 4**: "*For CDCR to show compliance with the myriad suicide prevention measures, this Re-Audit must clearly outline the methodology used to determine compliance with each item assessed.  For instance, when assessing Practices for Observing MHCB Patients, the Re-Audit employs a methodology of selecting "four patient charts...at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m." (Re-Audit at 14.)  A shared understanding of the methodologies and benchmarks used to measure compliance is essential for CDCR to develop its own self-auditing tools and achieve a durable and sustainable suicide prevention program.*"

**Hayes Response:**  Defendants chose a poor example to attack the report's methodology and benchmarks.  It is unclear what defendants do not understand about the practice of selecting charts of four patients on Suicide Precaution status at each facility and examining nine hours (12 a.m. to 9 a.m.) of documentation.  Defendants' criticism regarding the review of nursing observational rounds in the MHCBs will be addressed below in response to Paragraphs 18 through 21.

It is worth noting that while observing defendants' CQI tour in 2018, a regional auditor asked this reviewer how to audit observation of patients on Suicide Precaution status via the EHRS. The regional auditor subsequently informed this reviewer that the CQIT audit only required ONE case to be reviewed.

**Paragraph 5**: "*A critical part of CDCR's implementation of Mr. Hayes's recommendations is CDCR's development and implementation of its Continuous Quality Improvement Tool to conduct self-monitoring. (See Section IV, infra.) The suicide prevention criteria used in Mr. Hayes's own audit have nearly been incorporated into the tool and once the tool is complete it will allow regular on-site review of all suicide prevention practices which is an essential key to increase and sustain compliance.*"

**Hayes Response:**  This paragraph reiterates defendants' previous commitment to incorporate this reviewer's 19 suicide prevention measures into their CQI process.  Such commitment was made in 2013 and, seven years later, still has not been completed.  It is difficult to understand how defendants have both agreed to incorporate this reviewer's 19 CQI measures and complain about its methodology and benchmarks.

**Paragraph 6**: "*The January 7, 2020 order directed the Special Master and Mr. Hayes to provide 'specific recommendations for each step defendants must take to implement any items that remain incomplete.' (Order, January 7, 2020, ECF no. 6441 at 8.)  Accordingly, the report must clearly spell out the standards to which CDCR is being held.  Clear benchmarks and*

*methodology are essential for CDCR to determine what must be done to substantially comply Mr. Hayes's [sic] recommendations."*

**Hayes Response:**  The "standard to which CDCR is being held" is clear and repeatedly cited in this reviewer's initial and subsequent Re-Audit Reports, i.e., the Mental Health Services Delivery System Program Guide, 2019 revision, and all subsequent CDCR memoranda and directives related to suicide prevention.  Consistent with all *Coleman* monitoring reports, this reviewer utilizes a 90 percent benchmark to measure adequate compliance with most suicide prevention provisions.  One notable exception would be completion of a Suicide Risk Assessment and Self-Harm evaluation (SRASHE) in response to mental health referrals for inmates identified as potentially suicidal.  A 100 percent threshold is required.  It would be extremely dangerous to allow 90 percent compliance for a measure in which ten percent of cases involved failure to assess suicidal inmates, deficiencies which might directly result in their deaths.

**Paragraph 7**: "*In its July 12, 2018, order adopting the 27th Round Monitoring Report, the court ordered the Special Master to include benchmarks that "signal constitutional compliance" and to provide "specific recommended compliance percentage requirements for each benchmarks." [sic] (ECF No. 5852 at 3.) Relatedly, the court has anticipated "reviewing with defendants at a future status conference the specific steps necessary" needed to implement all recommendations following Mr. Hayes's fifth re-audit. (Order, July 3, 2019, ECF No. 6212 at 14.)*"

**Hayes Response:** No response required.

**Paragraph 8**: "*The court has recommended benchmarks to measure Defendants' requirements with the remedy in this case. Similarly, the Fourth Re-Audit must also include specific benchmarks for each suicide prevention practice assessed in the report. The need for these benchmarks is especially important for suicide prevention given its critical role in saving lives and the court's intention to order defendants to substantially comply with recommendations by the end of the next re-audit. (Id.)*"

**Hayes Response:** No response required.

**Paragraph 9**: "*Benchmarks must be uniquely tailored to each recommendation in the Fourth Re-Audit.  And the benchmarks should reflect the relative importance of each recommendation. CDCR agrees that Mr. Hayes's recommendations are the basis for a robust suicide prevention program, but the recommendations are not equally critical at resolving the suicide issues within CDCR.  Specifically, CDCR has identifies [sic] several common areas of deficiencies in its own suicide case reviews that beg greater attention than other recommendations.  For instance, certain recommendations such as adequate safety planning, custody discharge checks, five-day follow ups, suicide resistant cells, and rounding and observation within crisis beds are critical components that, through higher levels of compliance, can have a positive impact on the number of suicides occurring within CDCR.  Others, while important, may not have as great of an impact on reducing suicides, regardless of the level of compliance achieved.  Because CDCR should focus first on those recommendations that will have the greatest impact on completed or*

*attempted suicides the benchmarks should reflect the relative importance of each recommendation.*"

**Hayes Response:**  It is unclear what defendants mean by the phrase "resolving the suicide issues within CDCR," yet because they are also referencing suicide case reviews, they are apparently referencing inmate suicides.  Defendants are also suggesting that they should prioritize compliance with suicide prevention measures that have an immediate impact on the reduction of inmate suicides.  This reviewer would agree that certain suicide prevention measures have a direct impact on the reduction of inmate suicides, while other measures may be secondary to actual prevention, but important to the maintenance of a comprehensive suicide prevention program.  This reviewer has never been critical of the strategy utilized by defendants to prioritize the implementation of recommendations.  With that said, it is noteworthy that this reviewer's 29 recommendations were first offered in 2013 and, regardless of priority, remain in various stages of compliance after seven years. *The time for assigning priority has long passed*.

Finally, it must be noted that, as this reviewer has repeatedly stressed to defendants, one of the most critically important suicide prevention measures, i.e., timely completion of SRASHEs following identification of potential suicide risk, remains chronically out of compliance in 35 percent of audited CDCR facilities and such non-compliance, as identified in the Fourth Re-Audit Report, resulted in several preventable suicides.

**Paragraph 10**: "*Consistent with this court's order to provide "specific recommendations" to come into compliance with each recommendations [sic], CDCR requests that Mr. Hayes supplement his draft report to provide specific auditing criteria, including sample sizes where applicable, used to measure compliance and put forth objective standards or benchmarks needed to achieve substantial compliance with each recommendation.*"

**Hayes Response:** As noted throughout the Fourth Re-Audit Report, this reviewer's findings have always referenced specific deficiencies and included specific recommendations requiring corrective action plans for compliance.  Those audited facilities that have attained and maintained compliance have not had difficulty following such recommendations.  Again, it is disappointing that defendants are raising this issue after seven years of suicide prevention assessment reports by this reviewer.

In addition, there are no secrets or surprises with this reviewer's methodology for auditing.  Members of the local facility (usually the SPRFIT), regional and/or headquarters mental health (and custody) leadership routinely follow this reviewer around and see the deficiencies.  In addition, during PT rounds and R&R screening, a nursing supervisor is usually following this reviewer.  All of these findings are reported out at the facility's exit meeting during the final day of the assessment.  There are ample opportunities for clarification before and at each exit meeting.  There are rarely any questions about, or disagreements with, this reviewer's preliminary findings, and almost invariably, the facility warden will promise this reviewer that the deficiencies will be corrected.

After seven years, defendants now insist they need more clarity, but as noted above, there have been numerous Suicide Prevention Management Workgroups, a special *Coleman* settlement

conference meeting with Judge Drozd in January 2020, this reviewer's regular teleconference participation on CDCR suicide prevention team meetings, and several CDCR "suicide prevention summits" hosted by CDCR (in which, it must be noted, presentations highlight accomplishments, but ignore issues of chronic non-compliance as cited in this reviewer's reports). Most recently, this reviewer and other members of the Special Master's team held a teleconference with mental health, custody, and nursing leadership on June 3, 2020, to specifically discuss this reviewer's draft report. This meeting occurred almost two weeks *before* defendants' June 15 letter. Finally, this reviewer (and other members of the Special Master's team) have established regularly scheduled monthly meetings with CDCR mental health, custody, and nursing leadership beginning July 10, 2020.

**Paragraph 11**: "*As stated above, it is important for CDCR to use the same methodology used in the Fourth Re-Audit to ensure its internal audit findings are consistent with those observed and reported by the Special Master. In the past, when CDCR measured compliance with suicide prevention requirements, such as urgent and emergent referrals, in a way that differed from the way Mr. Hayes measured those items, CDCR's remedial efforts to improve compliance were delayed. In order to substantially comply with the recommendations, CDCR requests clarification on how Mr. Hayes measures compliance with his recommendations so that CDCR can better tailor its corrective action plans to address deficiencies.*"

**Hayes Response:** Defendants' response to the above paragraph is indicative of their inability to successfully implement some of the recommendations in this reviewer's reports. First, this reviewer has utilized the same methodology in each of the reports; thus, the methodology used in the Fourth Re-Audit Report is the same as that used in the first assessment.

Second, defendants use the example of urgent and emergent referrals and suggest that the reviewer has somehow changed the measurement of compliance by including a review of urgent referrals. According to the Program Guide, emergency referrals are required to be generated when an inmate is identified as potentially suicidal. They require an immediate response by a mental health clinician. Urgent referrals are not to be utilized for potentially suicidal inmates because they only require a response within 24 hours. However, during this reviewer's previous suicide prevention assessments, it was determined that a significant number of referrals to mental health for inmates who were expressing suicidal ideation were mislabeled as urgent referrals. As such, a significant number of those referrals did not result in completion of the required SRASHEs. Therefore, while individual SPRFITs were espousing high compliance rates for timely responses to emergency mental health referrals during their monthly meetings, this reviewer's audit determined that a significant number of referrals for suicidal ideation were mislabeled as urgent referrals and did not result in SRASHE completion. This reviewer's subsequent change in methodology to include urgent referrals was only necessary because such referrals were being mislabeled. The basic methodology remained the same, i.e., review of referrals for suicidal ideation (regardless if they were labeled as urgent or emergent).

*It is deeply disappointing that defendants would be critical of audit practices that uncovered a significant problem that would otherwise have gone undetected.*

6

Headquarters mental health leadership appeared appreciative when this reviewer brought the problem to their attention; therefore, it is surprising defendants are now complaining about it.

**Paragraph 12**: "*Mr. Hayes identified intake screening deficiencies at five institutions ranging from needed physical plant renovations, privacy during intake screening, installing Therapeutic Treatment Modules, and interviewers using compound questions. Specifically, Mr. Hayes recommends that 'CDCR should develop [Corrective Action Plans] for the five facilities (CCI, CMC, CMF, SQ, and PVSP)....' (Re-Audit at 9.)*"

<u>**Hayes Response:**</u> No response required.

**Paragraph 13**: "*The methodology for determining the adequacy of intake screening is unclear. The Re-Audit's findings are based on the reviewer's on-site observations. Specifically, the report notes 'several new admissions during the intake screening....,' and 'a few new admissions during the intake screening....' (Re-Audit at 51, 94, emphasis added.) CMF was deficient because one 'nurse was observed to be conflating most of the questions regarding mental health and suicide risk, e.g., asking 'do you have a current or prior history of mental illness, do you have any current or prior suicidal ideation, etc.' (Re-Audit at 8.)*"

<u>**Hayes Response:**</u>  The methodology for determining the adequacy of intake screening has always been clear, and simply entails ensuring that the nurse asks all of the questions on the intake screening form and that the process is completed with reasonable privacy and confidentiality. Reasonable privacy and confidentiality includes either the door to the nurse's office being closed and the officer providing security from outside or, if the nurse feels uncomfortable, placement of a therapeutic treatment module (TTM) in the nurse's office. With that said, rather than use the terms "several" or "a few," future reports by this reviewer will specifically identify the number of cases reviewed.

In the footnote to this paragraph, defendants request that this reviewer provide the identity of any staff "he finds to be non-compliant with policy so CDCR can help improve performance and patient care." This is a disingenuous request from defendants. As a result of shadowing this reviewer during suicide prevention assessments, as well as observing exit meetings at each facility, defendants are well aware that whenever this reviewer identifies a deficiency that appears to be an individualized and not a systemic problem, the appropriate supervisor is notified.

Finally, it is surprising that defendants are critical of this reviewer's assessment on this issue and continue to appear unclear about the methodology utilized for determining the adequacy of intake screening when the audit found only one nurse incorrectly completing the intake screening form. Although defendants now appear confused, it did not seem that the nursing personnel at the other CDCR facilities in which intake screening could be observed were confused by the requirements for accurate completion of the intake screening form.

**Paragraph 14**: "*CDCR requests that Mr. Hayes clarify the required sample size and methodology for onsite observations of initial health screenings. The report fails to indicate the number of observations included in the sample size, making it difficult to assess the level of*

7

*compliance at each institution. As intake screenings occur regularly and at a high frequency, a larger sample size and more frequent observations would be more statistically appropriate and would more accurately represent the health of any institution's intake screening process.*"

**Hayes Response:** This reviewer will not be changing the sample size of observed cases during the intake screening process. During the assessment process, this reviewer has a defined amount of time to observe intake screening because most facilities only receive inmates on selective days of the week and at specific times. Most, but not all, facilities also assign only one nurse to the process. In those facilities in which two nurses are assigned, the reviewer will observe the process for both nurses. Defendants suggest that a larger sample size and observation would more accurately represent the facility's intake screening process. Such an assertion is incorrect. The nurse at CMF that conflated the intake screening questions during the "few" observed screenings would, in all likelihood, have conflated such questions during ten observed screenings. The nurse that conducted intake screening on a "few" observed screenings with the door open would, in all likelihood, have the door open if ten inmates were observed during the screening process. This reviewer's methodology for intake screening is more than generous to defendants. If the nurse is observed to be consistently completing the intake screening form on two consecutive inmates, the review is completed, and the process is found to be compliant.

In sum, given the fact that this reviewer found that only one facility (CMF) had problems with adequate completion of the intake screening form, it is surprising that defendants are questioning this reviewer's methodology and sample size. Having the door to the nurse's office closed and/or placement of a TTM in the office has long been acknowledged by defendants to be reasonable. Defendants should focus their efforts on correcting this deficiency in the non-compliant facilities.

**Paragraph 15**: "*Additionally, the underlying metrics should be broken out so that institutions are clear on which part of the recommendation has not been met and the actual percent of compliance. By bundling the information into one score, it is difficult to discern whether an institution is non-compliant because of confidentiality issues, quality of administering the screening questionnaire, or the overall physical environment. These three items should be broken out in the Re-Audit and given separate scores so that a corrective action plans [sic] can be properly tailored to each institution.*"

**Hayes Response:** Facility assessments are found in Appendix A of the Fourth Re-Audit report and could not be clearer regarding non-compliance with intake screening at five facilities. At CMF, the facility was non-compliant because the nurse was observed to be conflating intake screening questions. At CCI, CMC, PVSP, and SQ, each facility was cited for compromised privacy and confidentiality during the intake screening process because doors to the nurse's offices remained open during the screening process. The issue was raised at exit meetings in each facility. The problem at CCI has been ongoing for several years. No further clarification is necessary.

**Paragraph 16**: "*The Re-Audit found issues with psychiatric technician rounds in five institutions. Specifically, problems were observed with how psychiatric technicians approached inmates and asked questions. (Re-Audit at 9.) The Re-Audit recommends developing Corrective*

*Action Plans at these five institutions, which in the previous round had shown adequate practices. (Id.)*"

**Hayes Response:**  This paragraph is peculiar and defendants' response that the current re-audit found deficiencies in five facilities, whereas "the previous round had shown adequate practices," is either suggesting that this reviewer's methodology had changed or once a facility is compliant in an area there should be no reason to be found to be non-compliant during subsequent reviews**.**

**Paragraph 17**: "*As with the assessment of intake procedures at Receiving and Release, CDCR requests clarity on the sample size, the number of observations made, and methodology for onsite observations of psychiatric technician practices.  CDCR needs to know the criteria used and how compliance is calculated is essential for each institution to design effective corrective action plans.*"

**Hayes Response:**  See response above regarding in Paragraphs 13-15.  The 15 facilities re-audited by this reviewer and found to have adequate PT rounding practices in their restrictive housing units apparently were not confused nor needed clarity on this reviewer's methodology.  Nursing supervisors and/or other CDCR personnel in the five facilities that exhibited deficiencies accompanied this reviewer on each of the rounds and witnessed the same deficiencies.  No further clarification is necessary.

**Paragraph 18**: "*The Re-Audit states that Mr. Hayes reviewed the Electronic Health Record System (EHRS) 'charts of several sampled patients' to 'verify the accuracy of observation rounds of patients on Suicide Precaution status.' (Re-Audit at 14.)  The reviewer looks at 'four patient charts…selected at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m.' (Id.)  Despite this, it is not clear from the Re-Audit how Mr. Hayes measures compliance with suicide precaution checks.*"

**Hayes Response:**  It is difficult to understand what is unclear about this reviewer's methodology in assessing the observation of suicidal patients in the MHCB units.  As contained on page 14 of the Fourth Re-Audit Report, the methodology was stated as follows: "Nursing personnel are required to enter the time into EHRS that they observed each patient on either suicide observation (Suicide Watch or Suicide Precaution) or non-suicide observation status.  While onsite at the 18 facilities that contained MHCB units, this reviewer was able to verify the accuracy of observation rounds of patients on Suicide Precaution status (and requiring observation at staggered 15-minute intervals) by reviewing the EHRS charts of several sampled patients.  Typically, four patient charts were selected at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m."

The following is a description of findings in one facility: "Some of the worst practices were found at CMF where the chart review found numerous observation checks (i.e., between 11 and 15 per patient) that were in excess of required 15-minute intervals in all four cases, with the longest gaps between checks being 64 minutes in two cases and 67 minutes in another case.  One CMF case displayed 15 violations of 21-, 27-, 27-, 28-, 31-, 16-, 26-, 64-, 18-, 18-, 16-, 22-, 26-, 26-, and 18-minute gaps between the required 15-minute intervals. This reviewer determined that one of the reasons for this problem was that nursing staff were almost always documenting

checks four times (rather than five times) an hour. A similar problem with inadequate nursing rounds for MHCB patients at CMF was found during this reviewer's previous assessment in 2018.

The above documents the exact number of minutes of each violation during a nine-hour period, as well as the primary reason for the violations (i.e., nursing staff were documenting observation at four times rather than five times per hour).

This reviewer's methodology and the deficiencies (and solutions) at CMF could not be clearer.

In the footnote to this paragraph, defendants state that "samples should be taken from all three watches to properly assess compliance." Expanding the methodology to include 24 hours of observation would not change the conclusion at CMF (or any other facility found out of compliance) that 15 violations over a nine-hour period was utterly unacceptable.

**Paragraph 19**: "*The Re-Audit should state whether it measures the time between checks based on the time the check is actually logged into the EHRS or whether it measures the time between when the provider documents that he or she conducted the observation. To the extent that it is the former, CDCR objects to this methodology because it does not measure compliance with a recommendation or with an actual suicide prevention practice. CDCR requests that the reviewer measure observation rounds by auditing the times manually entered into the record by the provider, rather than the time the provider accessed EHRS to log the observation. It is common practice to conduct rounds on several patients and subsequently log them into EHRS following the completion of the round. Measuring the time the actual observation occurred would give an adequate and accurate rating of compliance.*"

**Hayes Response:** Defendants are questioning the time intervals by which this reviewer measures compliance, asking are times based upon "the time the check is actually logged into the EHRS or whether it measures a time between when the provider documents he or she has conducted the observation." This reviewer's methodology is simple and has been previously discussed with defendants, specifically nursing supervisors. This reviewer accesses the Interactive View tab of the EHRS on a patient to gain access to the Suicide Watch/Precaution/Medical Observation form that is embedded in the chart. By clicking on an hourly column, the Result Details template pops up and contains an Action List tab, which automatically documents the exact date and time that nursing staff entered information. This reviewer examines the only time (e.g., "1:17 PST") that is listed in the Result Details template. That time is compared to the preceding time that had been entered and, if it is in excess of 15 minutes, it is recorded as a violation.

Further, it is very disappointing and problematic that defendants have admitted in their response that "*it is common practice to conduct rounds on several patients and subsequently log them into EHRS following completion of the round*." Such a practice is certainly contrary to standard correctional practice in correctional facilities, as well as CDCR directives. For example, instructional questions in CDCR's own "Continuous Quality Improvement Suicide Prevention On-Site Audit Guidebook (all draft versions) state "Are checks being conducted and documented at the cell front while observing the I/P." Thus, defendants' acknowledgment that it is common

practice for nursing staff to document a cell check "following the completion of the round" in a MHCB unit is contrary to CQIT instructions that it should be "documented at the cell front."

Overall, defendants' responses in this paragraph are alarming.

**Paragraph 20**: "*Also, measuring the frequency of the checks should not be the sole factor in determining compliance with policy. The frequency of the checks may vary depending on individual patient needs, causing some checks to deviate from the fifteen-minute requirement. For instance, checks may be delayed when clinicians need to spend more time with certain patients or when a provider is called away to an emergency situation. These factors may help explain why some log entries exceeded fifteen minutes. CDCR requests that these factors be taken into account when determining compliance, or at the very least that these factors to be discussed alongside the compliance score*."

**Hayes Response:**  This is another disingenuous response from defendants. It suggests that the frequency of some checks may exceed 15-minute intervals because of "individual patient needs," such as when "clinicians need to spend more time with certain patients or when a provider is called away to an emergency situation."

This reviewer intentionally chose the nine-hour interval of 12:00 a.m. to 9:00 a.m. because it is the most likely time period in which the patient would be confined to their rooms, not likely to be experiencing an emergency, and would not be scheduled with their clinicians or involved in other out-of-cell activities. In addition, should an emergency occur that would preclude a timely room check, such an occurrence is required to be documented in EHRS. If the facility lost power and EHRS was inoperable, staff would be required to manually document the room checks on an observation form. Any of these situations would be noted by this reviewer.

**Paragraph 21**: "*CDCR also requests clarification of whether program flex rounds, which are separate from suicide precaution rounds, are being excluded from Mr. Hayes's methodology. For instance, some licensed units do not have working nurse call systems in each cell and, in order to maintain licensure, the institution is required to conduct thirty-minute rounds on all patients. These rounds do not require documentation in the EHRS as they are not part of the suicide observation/precautions requirements.*"

**Hayes Response:**  Program flex rounds conducted by nursing staff in the MHCB units are not part of this reviewer's methodology for the obvious reason that they are undocumented and cannot be measured. As clearly stated in *all* of this reviewer's reports, only patients on Suicide Precaution status requiring nursing observation at staggered 15-minute intervals as documented in EHRS or hand-written on observation forms (pre-EHRS) are measured.

Instead of listing possible explanations for non-compliance, the defendants should focus their efforts on correcting the long-standing nursing observation deficiencies in the 12 recently audited MHCB units.

**Paragraph 22**: "*Also, on page 14 of the Re-Audit, the reviewer states that California Institution for Men, California Substance Abuse Treatment Facility, California State Prison, Sacramento,*"

*Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), and Wasco State Prison, had either no or only minor problems. However, on pages fifteen and sixteen of the Re-Audit, Mr. Hayes includes PBSP and PVSP as deficient institutions. CDCR recommends that the reviewer clarify whether PBSP and PVSP were deficient, or whether the reviewer intended to include San Quentin and California State Prison, Corcoran as deficient institutions that should implement CAPs.*"

**Hayes Response:** PVSP and PBSP were not deficient; CSP/Corcoran and SQ were deficient. The report will be revised to correct the errors.

**Paragraph 23**: "*Mr. Hayes audits compliance with both timeliness for completion of Suicide Risk Evaluations and compliance with completing an evaluation following a triggering event, such as when an inmate reports suicidal ideation. In order to better understand the specific needs of each non-compliant institution, the need for tailored corrective action, and any refinements to the Electronic Health Records System, CDCR requests clarification on the methodology used to determine compliance and the sample size used for completing this portion of the Re-Audit. For instance, CDCR requests clarification on whether completion and timeliness is blended into one score for each institution, and to what extent. And because Mr. Hayes "has historically reviewed both emergency mental health referrals, as well as urgent mental health referrals," CDCR requests a clear understanding of Mr. Hayes's expectations regarding both types of referrals and how assessment of these types of referrals differ. (Id. at 22.)*"

**Hayes Response:** Defendants are again raising the issue of timely completion of SRASHEs for inmates who express suicidal ideation and/or engage in self-injurious behavior. This was previously addressed in Paragraph 11. The reason that this reviewer examines urgent mental health referrals is that CDCR staff have *historically mislabeled* emergent referrals as urgent referrals for inmates who expressed suicidal ideation and/or engage in self-injurious behavior. The problem does not need not be corrected by changes to the EHRS; rather, corrective action should occur by instructing CDCR staff to properly label an emergency referral. Finally, this reviewer has consistently informed defendants that compliance with this item has always been measured by whether a SRASHE is completed for an inmate who expresses suicidal ideation, engages in self-injurious behavior, or is otherwise identified as potentially suicidal. The reviewer has previously stated that timeliness of SRASHE completion has not been a systemic issue, and defendants have previously acknowledged that the quality of SRASHE has historically been a problem, resulting in various revisions to both the SRE Mentoring and 7-hour training programs.

**Paragraph 24**: "*While it is not immediately clear from this portion of the Re-Audit whether Mr. Hayes assessed quality of the SRASHEs, to the extent he did so, CDCR also requests the criteria used to assess quality and the sample size utilized to make such a determination. Understanding the criteria used to make the assessment will allow CDCR to take steps necessary to come into compliance.*"

**Hayes Response:** Defendants are repetitive regarding this reviewer's criteria for assessing SRASHEs. As clearly indicated in all of these assessment reports, as well as throughout this

above response, the criteria are simple: 1) is a SRASHE completed for an inmate who expresses suicidal ideation, engages in self-injurious behavior, or is otherwise identified as potentially suicidal, and 2) is the SRASHE accurate based upon available information?  In addition, the sample size utilized is clearly identified in each facility assessment, which is located in Appendix A.

**Paragraph 25**: "*The Fourth Re-Audit has found that CDCR has low compliance with adequate safety planning, regardless of whether the safety plan was crafted under the old safety planning model or newer Safety Planning Intervention.  CDCR agrees that improvements in quality are needed.  However, Mr. Hayes should disclose his audit criteria that he uses to determine whether a safety plan is adequate.  While the Re-Audit provides examples of both good and bad safety plans, it is not immediately clear what criteria is used to assess quality.  CDCR generally agrees with Mr. Hayes's examples of bad safety plans.  But it is not always clear to CDCR why safety plans he notes as good are in fact quality safety plans.  Because inadequate safety plans are common factors among completed suicides achieving consistent quality safety planning throughout CDCR is critical.  A better understanding of Mr. Hayes's criteria for determining quality safety plans will help improve training and oversight of this task*."

**Hayes Response:** This reviewer's criteria for determining the adequacy of the safety plan is simple; it mirrors Program Guide requirements, as well as subsequent CDCR training and directives.  Such criteria is repeatedly found within this reviewer's previous assessment reports.  For example, this reviewer's 2014 report ("An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," January 14, 2014, at pages 18-19) quoted the following Program Guide narrative: "Treatment recommendations should be as specific as possible, leaving as little room as possible for misinterpretation or confusion.  A brief rationale for each recommendation shall be provided.  They shall also address how the treatment plan will be implemented and any required follow-up procedures" (Program Guide, Chapter 10, p. 12-10-11).  In addition, CDCR's 2014 report, the "'Suicide Risk Assessment for CDCR Clinicians" PowerPoint presentation observed by this reviewer on November 20, 2013, offered some additional instruction on development of treatment plans for suicidal inmates.  For example, one of the slides stated the following: '(1) How to decrease acute risk and warning signs; (2) How to increase protective factors; (3) Does current treatment plan need to be changed (if MHSDS); (4) Be concrete/behavioral; (5) Need for psychiatric intervention - medication consult; (6) Plan should include crisis management (3 days) and short-term (1-2 weeks); and (7) what resources are available to the patient (internal and external)?'"

A footnote to this paragraph also contains a demand by the defendants that the "Re-Audit should provide specific steps to develop quality safety plans."  It is not the reviewer's responsibility to craft or write defendants' safety plans.  When requested, this reviewer has provided input to headquarters mental health leadership regarding safety planning, as well as included examples of reasonable safety plans in not only the Fourth Re-Audit Report but in all previous assessment reports.

In sum, it is disingenuous of defendants to state after seven years of audits that they need a better understanding of this reviewer's criteria for safety planning.  It is and has always been contained within Program Guide requirements, as well as subsequent CDCR training and directives.

**Paragraph 26**: "*According to the Fourth Re-Audit, CDCR was not in compliance with the twenty-four-hour timeframe to transfer patients to a crisis bed at two institutions: California Institution for Women (CIW) and Central California Women's Facility (CCWF). However, according to CDCR's internal data both institutions have been largely compliant since the activation of the CIW Walker unit in January 2019. Between February 1, 2019 and January 31, 2020, CIW and CCWF were 99 percent and 93 percent compliant with transfer timeframes according to CDCR's MHCB Referrals Report. Data on referrals has been provided monthly to the Special Master and has been consistently high until the onset of COVID-19 restrictions in late March 2020.*"

**Hayes Response:** Compliance was determined by observations and documentation available at the time of the on-site facility assessments. This reviewer was on-site at CIW on December 11-12, 2018, and on-site at CCWF on January 10-11, 2019. CDCR's own alternative housing data indicated both facilities exceeded 24-hour timelines. Any subsequent corrective action, as well as the sustainability of that corrective action, would be assessed during a subsequent audit of suicide prevention practices.

**Paragraph 27**: "*Given longstanding compliance with this issue, it is unclear what additional steps are necessary to come into compliance with this recommendation. CDCR requests that the findings, conclusion, and recommendation be modified to reflect CDCR's compliance with the transfer timeframes at CIW and CCWF.*"

**Hayes Response:** Defendants have not had "long-standing compliance with this issue." The Second Re-Audit Report found that only 14 of 23 or 61 percent of the audit facilities had adequate practices regarding the use of alternative housing for suicidal patients referred to MHCB placement, whereas the Third Re-Audit Report found that 18 of 22 or 82 percent of the audit facilities housed inmates in alternative housing for 24 hours or less. This Fourth Re-Audit Report found that 17 of 20 or 85 percent, had adequate practices. While compliance has certainly improved, it would be inappropriate to refer to it as "long-standing." The report will not be modified based upon additional information regarding CIW and CCWF. The use of alternative housing at those facilities will be reassessed during a future audit.

**Paragraph 28**: "*Additionally, the Re-Audit recommends that CDCR develop a CAP for California Healthcare Facility (CHCF) in order to cure inadequate practices of not providing every inmate in alternative housing a suicide-proof stack-a-bunk. This CAP is unnecessary as CHCF staff members have since supplied portable beds (stack-a-bunks) to the alternative housing unit. CHCF conducted follow-up audits and determined that the issue had been resolved.*"

**Hayes Response:** Defendants report that they have subsequently resolved a deficiency at CHCF in which each inmate housed in alternative housing is now provided with a stack-a-bunk. Although it would appear that a corrective action plan (CAP) was instituted to correct the deficiency, defendants now report that a CAP is unnecessary because the issue has been corrected. As stated above, compliance was determined by observations and documentation available at the time of the on-site facility assessment in February 2019. The determination as to

whether a CAP was successfully implemented and sustained will be determined during a future audit.

**Paragraph 29**: "*On page 22 of the Re-Audit, Mr. Hayes reports that there is a very low compliance rate for Suicide Risk Evaluation (SRE) training. Specifically, Mr. Hayes notes that "16 of 20, or 80 percent of audited facilities had compliance rates under 90 percent for either the seven-hour SRE or the mentoring program training." (Re-Audit at 22). During the monitoring rounds, however, the SRE training and mentoring program training was placed on hold as the trainings were being revised. Mr. Hayes was involved in the revision process. The trainings were not reissued until June 2019 by which time Mr. Hayes had audited thirteen of twenty institutions. Mr. Hayes should reflect this pause in trainings in his Re-Audit.*"

**Hayes Response:** Contrary to the above representation by defendants, this reviewer was *not* involved in the SRE revision process. The report will be revised to reflect a "pause" in SRE training, but the findings remain intact.

**Paragraph 30**: "*The Re-Audit incorrectly summarizes the February 2, 2018, Suicide Prevention and Response Focused Improvement Teams (SPRFIT) memorandum, stating that it requires 'conducting root cause analyses (RCA) of any serious suicide attempts.' (Re-Audit at 31.) Mr. Hayes audited compliance with the February 2018 policy during his Fourth Re-Audit, including the RCA requirement. Mr. Hayes recommended that CDCR initiate the process. (Id at 31, 33.) However, the February 2018 memorandum does not require an RCA of 'any serious suicide attempt.' The memo states that SPRFITs shall '[c]onduct semi-annual aggregate Root Cause Analyses (RCA) of serious suicide attempts supplemented by a mental health clinical review.' The aggregate review shall look at the 'five most serious incidents during the prior six months…' (February 2, 2018, Memorandum, Enhancements to the Suicide Prevention and Response Focused Improvement Teams.)*"

**Hayes Response:** The report will be corrected to delete the word "any."

**Paragraph 31**: "*CDCR is not conducting Root Cause Analyses of every serious suicide attempt. Rather, every six months, serious suicide attempts are reviewed by the local SPRFITs, though not through an RCA process. CDCR plans to move away from the RCA process as contemplated by the 2018 memorandum because the aggregate model has not been effective at identifying commonalities between suicide attempts or allowing institutions to adopt changes to decrease self-harm and suicide.*"

**Hayes Response:** Defendants' response that they are moving "away from the RCA process" is surprising since such an action was never communicated to this reviewer, other members of the Special Master's team, or the Special Master. In addition, the RCA process has continued to be discussed during the regular meetings between the CCHCS Quality Management Program and the Statewide Mental Health Program in discussion of a revised data reporting system for the SPRFITs. The Special Master's team have been regular participants in these meetings.

The RCA process for review of serious suicide attempts was conceptualized within the February 2018 memorandum ("Enhancements to the Suicide Prevention and Response Focused

Improvement Teams") in part because the Program Guide requirement that local SPRFIT "monitor and track suicide attempts" was found to be unhelpful to CDCR's suicide prevention efforts.

Defendants have been ordered by the *Coleman* court to implement all of this reviewer's recommendations, including initiation of the RCA process. Consistent with the court's order, the RCA process should be initiated, or an alternative morbidity review process presented to the Special Master for consideration.

**Paragraph 32**: "*CDCR will continue to review suicide attempts on a semi-annual basis, but the process for the review will move to a different process that yield results. Institution staff have been directed to continue submitting comprehensive summaries of incident reviews including mental health history, a discussion of unique factors that influenced the patient's decision, identification of risk factors, contributing findings, and plans of action, among other things. To the extent patterns can be identified, institutions are directed to do so. Instead of using the RCA process, institutions are authorized to use existing processes such as patient safety committees, staff meetings, SPRFIT committee meetings, and the Emergency Medical Response Committee.*"

**Hayes Response:** See above response to Paragraph 31.

**Paragraph 33**: "*On page 40 of the Re-Audit, CDCR objects to the recommendation to place suicide prevention posters in all reception center nursing offices and pill call windows. While CDCR agrees that suicide posters should be mounted in visible and high trafficked areas within an institution, it may be redundant in some situations where posters are mounted near pill lines and within bulletin boards in the same housing unit. CDCR requests that this recommendation be modified to require placement in these locations only when a poster is not already placed nearby in the housing unit.*"

**Hayes Response:** No response necessary. The report will not be revised.

**Paragraph 34**: "*Relatedly, CDCR should only be required to post suicide prevention posters in nursing offices where direct patient care is provided. Under the current recommendation, CDCR would be required to place posters in nursing staffing offices or the Utilization Management nurse's office.*"

**Hayes Response:** The recommendation regarding nurse's office placement was intended to be specific to offices utilized for direct patient care. The report will be revised accordingly.

**Paragraph 35**: "*Since 2012, with input from the Special Master and Plaintiffs, CDCR has developed its own self-monitoring tool, the Continuous Quality Improvement Tool (CQIT). Using the CQIT framework, CDCR is developing a standalone suicide prevention self-audit tool to audit suicide prevention practices within CDCR. The tool will incorporate all nineteen suicide prevention items used by Mr. Hayes, sixteen of which have been finalized. The last three items, pertaining to the adequacy of local Suicide Prevention and Response Focused Improvement Teams (SPRFIT), are being finalized by the headquarters SPRFIT committee that is currently focused on refining local SPRFIT practices.*"

**Hayes Response:** Defendants' CQI process for suicide prevention is most recently exemplified in an August 2019 draft entitled in "Continuous Quality Improvement Suicide Prevention On-Site Audit Guidebook," and is much farther from completion than suggested above.

**Paragraph 36**: "*Although Mr. Hayes has opined that 'CDCR should stop focusing on reissuing memoranda and drafting audit tools and begin focusing on development of CAPs for each of the facilities found to have deficient practices,' CDCR believes that pursuing the self-audit process can only help increase oversight and compliance while allowing CDCR to proactively address issues. (Re-Audit at 19.) Once the self-audit tool is finalized, CDCR will be able to analyze its own suicide prevention and practices. Coupled with chart review audits, CDCR's suicide case reviews, and headquarters' SPRFIT, CDCR will be well positioned to provide strong suicide prevention oversight and implement CAPs as needed.*"

**Hayes Response:** This reviewer's recommendation that defendants "should stop focusing on reissuing memoranda and drafting audit tools and begin focusing on development of CAPs for each of the facilities found to have deficient practices," was specifically in reference to the section of the report on "MHCB Practices for Possessions and Privileges" and not defendants' larger CQIT efforts.

**Paragraph 37**: "*The SPRFIT Committee will work to finalize the audit tool and CDCR will consult with Mr. Hayes to ensure the audits are in accordance with his methodology. However, to do so, it is essential that CDCR understands the methodologies and benchmarks underlying Mr. Hayes's own audit so that the same methodology can be programmed into CDCR's self-audit. As discussed below, CDCR proposes to meet and confer with Mr. Hayes and other members of the Special Master team to finalize the self-audit.*"

**Hayes Response:** Defendants' uncertainty regarding this reviewer's methodology and benchmarks were previously addressed above.

**Paragraph 38**: "*In order to finalize the self-audit process, CDCR and the Special Master team should determine how the audit questions, methods, and overall processes are constructed and organized. Particular focus should be given to determining specifically what should be evaluated, the criteria used to judge performance, standards of performance, evidence analyzed, and conclusions to be drawn from those findings. The audit must also be designed to provide appropriate feedback to CDCR. This feedback must be sufficient to determine skill development by program participants, compare changes in behavior over time, decide where to allocate resources for improvement, document the level of success, demonstrate accountability, and be useful to predict the likely effects of similar programs.*"

**Hayes Response:** No response required.

**Paragraph 39**: "*Additionally, CDCR believes that the methodology for the self-audit is best drawn from behavioral science and social research and should be developed with agreement from all stakeholders. The methodology must describe how the audit activities will be implemented. As with other steps of the audit process, it is critical to understand how Mr. Hayes*

17

*implements his own audits so that the self-audit can mirror that to the extent possible. Any agreement should include statements about the intended purpose, users, uses, methodology, sampling as well as a summary of the deliverables, timelines, and those responsible.*"

**Hayes Response:** Defendants' responses to this issue are overly repetitive and unhelpful. No further response is necessary other than to reiterate that defendants raising the issue of methodology and benchmarks for the first time following seven years of suicide prevention monitoring is dubious.

**Paragraph 40**: "*Finally, working collaboratively on designing the self-audit will help ensure that the conclusions ultimately drawn by the audit are well substantiated and justified. Conclusions are justified when they are linked to the evidence gathered and assessed against benchmarks agreed to by stakeholders. Stakeholders in the design process must agree that the conclusions are valid in order to use the audit results with confidence.*"

**Hayes Response:** No response required.

**Paragraph 41**: "*Once the tool is finalized, CDCR proposes that the tool be tested, with Mr. Hayes in attendance, for at least one round prior to the commencement of Mr. Hayes Fifth Re-Audit. Finalizing this tool will allow CDCR to more regularly audit its own practices, provide oversight of mental health programs and applicable corrective action plans, and more quickly bring non-compliant institutions into compliance.*"

**Hayes Response:** Defendants have struggled to come into compliance with this reviewer's suicide prevention recommendations since the issuance of the first audit report in 2013. Following the issuance of this reviewer's draft Third Re-Audit Report in August 2018, defendants responded by suggesting that they were ready to assume the responsibility for self-monitoring of suicide prevention practices, even suggesting that "CDCR is thoroughly analyzing its own suicide prevention practices and is in the best position to assess its prevention practices and respond to identify deficiencies with corrective action." (see letter from Nick Weber, Office of Legal Affairs, dated October 3, 2018, page 1-2).

Defendants once again raise the issue of self-monitoring despite the fact that they have failed to demonstrate the ability to fully implement all of this reviewer's previous 29 recommendations, as well as sustain compliance during the past seven years.

It is also notable that defendants' response to this reviewer's draft Third Re-Audit Report in 2018 did *not* include any criticism of the report's methodology and/or benchmarks. It is only now, after seven years of repeated failure to fully implement this reviewer's court-approved recommendations, that defendants choose to raise such an issue.

Most importantly, the *Coleman* court's January 7, 2020 order regarding this reviewer's Fourth Re-Audit Report and commencement of the Fifth Re-Audit was very clear and does not allow CDCR to set its own timetable for compliance. The order stated in pertinent part: "After further consideration and discussion with the parties, the court has determined that this matter must be moved forward expeditiously. To that end, if the Special Master and Mr. Hayes will not be able

to report full compliance at the end of the fourth re-audit period, the Special Master and Mr. Hayes are directed to include in their reporting on Mr. Hayes' fourth re-audit specific recommendations for each step defendants must take to implement any items that remain incomplete, as well as a date certain on which the fifth re-audit round will commence.  This will allow the court to order defendants to take each of the remaining steps on or before the start of the fifth re-audit and to move to enforcement proceedings if substantial compliance is not shown in the fifth re-audit" (ECF No. 6441 at 8).

**Response to Plaintiffs' letters dated June 15, 2020, and June 22, 2020, regarding "The Fourth Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation"**

**Hayes Response:** Plaintiffs' letters primarily focused upon two issues in this reviewer's report: 1) the number of suicides during 2019 that occurred within 90 days of an inmate's discharge from a MHCB unit or PIP, and 2) a suggestion that this reviewer expand the discussion regarding inmate suicides during 2019 to include those that involved level of care decisions by clinical staff.

Regarding the **first** issue, plaintiffs' initial letter dated June 15 suggested that this reviewer's statement on page 40 of the draft report that "CDCR reported that nine of 38, or 24 percent of the inmate suicides occurred within 90 days of discharge from either a MHCB unit or PIP, with six of the deaths occurring within five days of discharge" was incorrect. Plaintiffs initially contended that the correct number was ten inmate suicides. Subsequently, this reviewer again reviewed all of the 2019 inmate suicides and determined that CDCR had correctly identified nine of the 38 suicides occurring within 90 days of discharge from a MHCB or PIP. Plaintiffs subsequently issued a revised letter dated June 22 that corrected their initial assertion.

Regarding the **second** issue, plaintiffs requested that this writer expand the discussion of 2019 suicides to include "level of care" decisions. Section IV of this reviewer's report, entitled "2019 Suicides Occurred in Close Proximity to Inmate Discharge and/or Mental Health Referrals," was specifically presented to not only highlight the possible premature discharge of patients from higher levels of care that were already acknowledged by CDCR and resulted in a review by an existing workgroup but to identify a significant number of suicides that occurred within eight days of the inmates presenting as risks of suicide. The latter issue had not previously been identified by CDCR and is of great concern.

Plaintiffs' requested that seven additional suicides be incorporated into the draft report based upon level of care decisions. According to plaintiffs, these seven additional suicides occurred "weeks" and "months" following level of care decisions. However, this reviewer's examination of these seven cases indicated that two of them were already on the CDCR list of premature discharges; most of the remaining cases involved level of care decisions that did not occur in close proximity (i.e., eight days or less) to the deaths, and some of the level of care decision cases did not specifically involve SI/SIB. Although the cases cited by plaintiffs were troubling, it would be arguable whether or not the suicides were specifically the result of these level of care decisions.

Section IV of the report will remain unchanged.