**The Fourth Re-Audit and Update of Suicide Prevention Practices
in the Prisons of the California Department of
Corrections and Rehabilitation**

Lindsay M. Hayes, M.S.
September 23, 2020

## I.     <u>Introduction</u>

This report is submitted as an update to this reviewer's preceding report, "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation [CDCR]" (ECF No. 5993-1, filed November 5, 2018). The preceding report covered this reviewer's findings from a third re-audit of suicide prevention practices at 23 selected CDCR prisons. That report recommended that prisons which chronically struggled with their suicide prevention programs, as well as almost all prisons that contained Mental Health Crisis Bed (MHCB) units, undergo continued re-inspection, and that the defendants continue to work with the Special Master and Suicide Prevention Management Workgroup (SPMW) on outstanding initiatives previously committed to by CDCR.

This report is the fifth overall audit of CDCR suicide prevention practices and covers this reviewer's recent re-audit at 20 selected CDCR prisons. The on-site re-audit began on November 13, 2018 and concluded on December 18, 2019.[1] The details and methodology of the re-audit/review process are discussed in Part II, below. Part III of this report contains a summary of this reviewer's findings during the re-audit, including a status update on defendants' progress in implementing prior recommendations as contained in this reviewer's initial audit report and the accompanying report by the Special Master (ECF No. 5258, filed January 14, 2015). Part IV summarizes an examination of 2019 inmate suicides occurring: 1) in close proximity to in-patient discharge, and, 2) after emergent/urgent mental health referrals in which CDCR Suicide Case Review Committees found in-patient discharges to be premature and clinical decisions not to refer to a higher level of care were inadequate and contributory to the inmates' subsequent suicides. Part V covers this reviewer's conclusion and recommendations. Lastly, Appendix A presents a prison-by-prison discussion of this reviewer's findings at each of the 20 re-audited prisons, together with summaries of CDCR Suicide Case Reviews of the 47 inmate suicides in those prisons during the review period of 2018-2019.

## II.     <u>Methodology</u>

This reviewer's selection of 20 CDCR prisons for on-site re-auditing was based on a variety of reasons, including their operation of MHCB units, findings during previous audit(s) that their suicide prevention practices were chronically problematic, having a significant population of inmates on the Mental Health Services Delivery System (MHSDS) caseload,

---

[1] Of note, all of this reviewer's on-site assessments and collection of relevant documents were completed prior to the COVID-19 pandemic.

and/or, the facility experiencing multiple inmate suicides.[2]  As in the previous audits, with one exception, this reviewer's re-audit consisted of a two-day on-site examination of suicide practices at each of the prisons.  The one exception was California State Prison, Sacramento, which necessitated a three-day on-site examination.  The 20 re-audited prisons and the dates of their on-site assessments were:

1.  California State Prison, Sacramento (CSP/Sac):  November 13-15, 2018
2.  California Correctional Institution (CCI):  November 27-28, 2018
3.  Wasco State Prison (WSP):  November 29-30, 2018
4.  California Institution for Women (CIW):  December 11-12, 2018
5.  California Institution for Men (CIM):  December 13-14, 2018
6.  Kern Valley State Prison (KVSP):  January 8-9, 2019
7.  Central California Women's Facility (CCWF):  January 10-11, 2019
8.  California Substance Abuse Treatment Facility (CSATF):  January 24-25, 2019
9.  Deuel Vocational Institution (DVI):  February 5-6, 2019
10.  California Health Care Facility (CHCF):  February 7-8, 2019
11.  California Medical Facility (CMF):  February 19-20, 2019
12.  California State Prison, Solano (CSP/Solano):  February 21-22, 2019
13.  California Men's Colony (CMC):  May 15-16, 2019
14.  Mule Creek State Prison (MCSP):  June 5-6, 2019
15.  California State Prison, Los Angeles County (CSP/LAC):  August 6-7, 2019
16.  California State Prison, Corcoran (CSP/Corcoran):  October 2-3, 2019
17.  North Kern State Prison (NKSP):  October 29-30, 2019
18.  San Quentin State Prison (SQ):  November 5-6, 2019
19.  Pleasant Valley State Prison (PVSP):  November 19-20, 2019
20.  Pelican Bay State Prison (PBSP):  December 17-18, 2019

At each site, this reviewer again examined the prison's performance with the following suicide prevention measurement tools:

- Thoroughness and degree of privacy afforded during the intake screening process at all facilities, as well as Reception Center (RC) process at six facilities
- Psychiatric technician (PT) practices in restrictive housing units
- MHCB practices, including verification of required observation of suicidal patients
- Use of suicide-resistant, retrofitted cells for MHCB patients and new-intake inmates assigned to administrative segregation units
- Use of alternative housing for inmates awaiting transfer to MHCBs
- Suicide risk assessments for emergent/urgent mental health referrals and admittance/ discharge from a MHCB/Alternative Housing
- Safety planning for suicidal inmates
- Appropriate follow-up services provided by clinical and custody staff to inmates discharged from a MHCB or alternative housing

---

[2]Of note, Richard J. Donovan Correctional Facility (RJD), High Desert State Prison, and Salinas Valley State Prison (SVSP) were not reviewed as part of this fourth re-audit because they were assessed during this reviewer's observation of CDCR's Continuous Quality Improvement (CQI) process in October 2018.  Each of these facilities will be assessed again during the fifth re-audit.

- Custody rounds in restrictive housing units
- Emergency medical response equipment in housing units
- Compliance with cardiopulmonary resuscitation (CPR) and suicide prevention training
- Review of meeting minutes, quorums, and required procedures of the local Suicide Prevention and Response Focused Improvement Teams (SPRFITs)

All inmate suicides which occurred during the review period in the 20 audited facilities were reviewed through examination of the inmates' health care records via the Electronic Health Record System (EHRS), CDCR Suicide Reports, and Quality Improvement Plans (QIPs).

In addition, this reviewer and several other members of the *Coleman* Special Master team attended two CDCR Statewide Mental Health Program (SMHP) multiple-day Suicide Prevention Summits on September 18-19, 2018 and October 14-16, 2019. From the later part of 2018 through 2019, the Special Master held multiple SPMW meetings with the *Coleman* experts, the parties, and CDCR management officials, to assist in effectuating defendants' implementation of the recommendations contained in this reviewer's prior audit reports. These meetings were held on November 9, 2018, April 24, 2019, May 2, 2019, August 27, 2019, and November 22, 2019. Further, during a larger *Coleman* policy meeting with the parties and CDCR management officials on January 16, 2020, this reviewer presented preliminary findings from this most recent suicide prevention audit. The following day (January 17, 2020), this reviewer and several other members of the *Coleman* Special Master team met with the parties during a *Coleman* settlement conference hearing to provide further clarification and assistance to defendants in their attempt to fully implement the recommendations contained in this reviewer's prior audit reports. Finally, by direction of the Special Master, this reviewer and other members of the *Coleman* Special Master team regularly observe (and participate in when necessary) various CDCR suicide prevention meetings and workgroups, including statewide SPRFIT meetings, monthly suicide prevention videoconferences, and chart audit tool (CAT) meetings on the Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) process.

On July 3, 2019, the *Coleman* court issued an order adopting this reviewer's third re-audit report in full (ECF No. 6212). In that order, the court found that "While some progress is being made in the implementation of the court-ordered suicide prevention measures, a substantial amount of work remains, and implementation is dragging out and taking too long. The court understands that Mr. Hayes' fourth re-audit is currently underway. If Mr. Hayes is not able to report full compliance with his recommendations at the end of the fourth re-audit, the court anticipates reviewing with defendants at a future status conference the specific steps necessary to enable Mr. Hayes to report no later than after his fifth re-audit that all recommendations have by then been implemented" (ECF No. 6212 at 14).

On January 7, 2020, the *Coleman* court issued another order that stated, in part, that "After further consideration and discussion with the parties, the court has determined that this matter must be moved forward expeditiously. To that end, if the Special Master and Mr. Hayes will not be able to report full compliance at the end of the fourth re-audit period, the Special Master and Mr. Hayes are directed to include in their reporting on Mr. Hayes' fourth re-audit specific recommendations for each step defendants must take to implement any items that remain incomplete, as well as a date certain on which the fifth re-audit round will commence. This will

allow the court to order defendants to take each of the remaining steps on or before the start of the fifth re-audit and to move to enforcement proceedings if substantial compliance is not shown in the fifth re-audit" (ECF No. 6441 at 8).

After the conclusion of this fourth re-audit, this reviewer remains unable to report full compliance with his initial recommendations.  As such, consistent with the court's order, this fourth re-audit report provides an update on current suicide prevention practices within CDCR facilities and the status of current and anticipated corrective actions to resolving existing deficiencies.  Where applicable, the report will reference the defendants' updated corrective action plan ("April 2020 CAP"), last revised and provided to this reviewer on April 28, 2020.

## III.    Summary of Suicide Prevention Practices in CDCR Facilities

Although the current reassessment again found continued progress at varied speeds, certain problematic practices continued to fester.  Significant improvement and/or sustained compliance continued to be found in the areas of alternative housing, suicide resistant MHCBs, and completion rates for annual suicide prevention block training of custody personnel and suicide case reviews.  In addition, all 20 audited facilities had compliance rates of well over 90 percent for custody checks in restrictive housing units via Guard One, but these high compliance rates were diminished by the fact that three inmates who committed suicide in restrictive housing units during 2019 were found to be in various states of rigor mortis and not observed at 30-minute intervals as required.  High rates of compliance continued to be found in CPR/Automated External Defibrillator (AED) training of custody and medical staff, as well as the presence of emergency response equipment in inspected housing units.

In the areas related to initial health screening, use of suicide-resistant cells for newly admitted administrative segregation inmates, and completion of SRASHEs for emergent/urgent mental health referrals related to suicide risk, there were varying degrees of progress.  Results were also mixed for areas related to clinically ordered possessions and privileges for MHCB patients and local SPRFIT policies and practices, whereas significant problems remained related to five-day clinical follow-up and custody welfare checks for patients discharged from MHCBs and Alternative Housing.  The review found little improvement with safety planning, as well as nursing staff adequately observing suicidal patients in MHCBs at required 15-minute intervals. There were also problems found in suicide risk identification during an inmate's entry into CDCR through the RCs.  Finally, a significant number of inmates who committed suicide during 2019 died within several days of expressing suicidal ideation (SI) and/or self-injurious behavior (SIB) and were not placed in a MHCB level of care.

The following report provides: (1) a brief summary of each of the main suicide prevention measurement tools and their relationship to this reviewer's original 29 recommendations, (2) current findings related to CDCR's adoption and implementation of the recommendations and the reassessment of the 20 audited CDCR facilities, and, (3) any further recommendations for the remedy of outstanding deficiencies.

**TABLE 1: Suicide Prevention Measure Compliance Rate Comparison Table**

| | Suicide Prevention Measure | Fourth Re-Audit Compliance Rate | Third Re-Audit Compliance Rate |
|---|---|---|---|
| **(A)** | Initial health screening and receiving and release unit environment (Page 7) | 75% (15 of 20) | 78% (18 of 23) |
| **(B)** | Psychiatric technician (PT) practices (Page 9) | 75% (15 of 20) | 100% (23 of 23) |
| **(C)** | Suicide-resistant MHCBs (Page 10) | 94% (17 of 18) | 86% (18 of 21) |
| **(D)** | Use of suicide-resistant cells for newly admitted inmates in administrative segregation units (Page 11) | 65% (13 of 20) | 57% (13 of 23) |
| **(E)** | Use of alternative housing for suicidal inmates (Page 12) | 85% (17 of 20) | 82% (18 of 22) |
| **(F)** | Practices for Observing MHCB Patients (Page 13) | 33% (6 of 18) | 14% (3 of 21) |
| **(G)** | MHCB practices for possessions and privileges (Page 16) | 67% (12 of 18) | 57% (12 of 21) |
| **(H)** | 30-minute welfare checks in restrictive housing units (Page 19) | 100% (20 of 20)[3] | 100% (23 of 23) |
| **(I)** | Mental health referrals and suicide risk evaluations (Page 20) | 65% (13 of 20) | 74% (17 of 23) |
| **(I)** | SRE training (Page 20) | 45% (9 of 20 – both seven-hour and mentoring training) | 30% (7 of 23 – both seven-hour and mentoring training) |
| **(J)** | Safety planning for suicidal inmates (Page 23) | 11% (2 of 18) | 5% (1 of 21) |
| **(J)** | Safety planning training (Page 23) | 45% (9 of 20) | 52% (12 of 23) |

---

[3]This high rate of compliance was diminished by the fact that three inmate suicides in restrictive housing during 2019 involved deficiencies in required observation at 30-minute intervals.

| | Suicide Prevention Measure | Fourth Re-Audit Compliance Rate | Third Re-Audit Compliance Rate |
|---|---|---|---|
| **(K)** | MHCB and alternative housing and efficacy of five-day clinical follow-up and custody welfare checks (Page 28) | 5% (1 of 20) | 13% (3 of 23) |
| **(L)** | Quorums at SPRFIT meetings (Page 30) | 40% (8 of 20) | N/A - revised SPRFIT policy not yet in effect. |
| **(L)** | Local operating procedures for SPRFITs (Page 30) | 70% (14 of 20) | N/A - revised SPRFIT policy not yet in effect. |
| **(L)** | Local SPRFIT had a High-Risk Management Program policy (Page 30) | 55% (11 of 20) | N/A - revised SPRFIT policy not yet in effect. |
| **(L)** | Local SPRFIT had a policy for identifying inmates who received "bad news." (Page 30) | 5% (1 of 20) | N/A - revised SPRFIT policy not yet in effect. |
| **(M)** | Suicide prevention training (Page 33) | 100% (20 of 20 – custody) 63% (12 of 19 – medical) 79% (15 of 19 – mental health) | 96% (22 of 23 – custody) 61% (14 of 23 – medical) 52% (12 of 23 – mental health) |
| | Emergency medical response equipment in housing units (see facility assessments in Appendix) | 100% (20 of 20) | 100% (23 of 23) |
| | Cardiopulmonary resuscitation (CPR) training (see facility assessments in Appendix) | 100% (custody) 100% (medical) | 100% (custody) 100% (medical) |
| **(N)** | Continuous Quality Improvement (CQI) (Page 35) | Not all 19 suicide prevention measures included in either CQI Guidebook or facility CQI audit reports | Not all 19 suicide prevention measures included in either CQI Guidebook or facility CQI audit reports |
| **(O)** | Suicide case reviews (Page 36) | Continued to be comprehensive | Comprehensive |
| **(P)** | Reception center suicides (Page 38) | Reasonable access and review of relevant documents remains problematic | Identify better process for diagnostic clinicians to receive and review relevant outside documents |

| | Suicide Prevention Measure | Fourth Re-Audit Compliance Rate | Third Re-Audit Compliance Rate |
|---|---|---|---|
| **(IV)** | 2019 suicides occurring in close proximity to mental health referrals | 26% (10 of 38) of 2019 suicide victims died with 8 days of expression of SI and/or SIB and were not referred to a higher level of care | N/A – not a significant issue at the time |

### A)    Initial Health Screening and Receiving and Release Unit Environment

**Summary**:

The original recommendations focused upon two areas of intake screening in receiving and release (R&R) units: (1) the adequacy of the intake screening form and ensuring that all questions were asked during the process, and, (2) the adequacy of inmate privacy and confidentiality during the process. The issue of intake screening form adequacy was related to the presence of certain compound questions on the form, as well as the thoroughness of form completion by nursing staff. The issue of privacy and confidentiality was related to the practice of the door to the nurse's office remaining open during the screening process and/or officers stationed inside the office or at the door.

**Current Findings**:

The issue of compound questions within the EHRS's Initial Health Screening form was previously resolved. However, there continued to be slow progress in completely resolving privacy and confidentiality issues in the R&R units. In the preceding assessment, 18 of 23 or 78 percent of audited facilities had adequate intake screening practices in their R&R units, with problems found at CCI, CMC, CSP/Corcoran, DVI, and RJD. During the current assessment, problems continued to be found at CCI, as well as four other facilities (CMC, CMF, PVSP, and SQ). For example, in both of CCI's A-Yard and B-Yard clinics, the wooden doors to the nurse's offices had been removed by the state fire marshal because they were deemed as hazards. Therapeutic treatment modules (TTMs), which had been installed inside the offices to allow nursing staff to feel more comfortable screening maximum-security inmates with the door closed, had also been removed by the state fire marshal. The C-Yard clinic did not have a separate nurse's office and the intake screening was conducted at a desk in a wide-open area. In the D-Yard clinic, the nurse's office still did not have a door that separated the office from the high-traffic R&R area. Since this reviewer's previous assessment, a cloth curtain had been positioned in the doorway, but the curtain obscured visibility into the nurse's office by custody staff and did not address voice privacy. In sum, privacy and confidentiality were severely compromised in all four R&R units at CCI.

At CMC, doors to both nurses' offices were open during the intake screening process, with an officer straddling the doorway, thus compromising privacy and confidentiality. One nurse repeated a concern from the prior assessment that staff were reluctant to have the door

closed during intake screening of maximum-security and administrative segregation unit inmates. Although this concern was certainly reasonable, a common solution implemented in other facilities would be installation of a TTM in the nurse's offices. Of note, a TTM could easily be accommodated in the R&R unit of the East Facility, but the nurse's office in the West Facility was observed to be too small to accommodate a TTM. At CMF, the nurse was observed to be conflating most of the questions regarding mental health and suicide risk, e.g., asking "do you have a current or prior history of mental illness, do you have any current or prior suicidal ideation," etc. The lack of distinction between "current" and "prior" mental health and/or suicide risk during questioning prevented the nurse from properly identifying potentially suicidal inmates. At SQ, the glass door to one of the nurse's offices was ajar with an officer standing directly outside during this reviewer's observation of the intake screening process.

At PVSP, two nurses were observed to be conducting intake screening in two separate offices. In the first office, the inmate was situated in a chair inside the office, but the door remained open with a privacy screen situated in the hallway. In the second office, the inmate was situated in a chair that was located in the hallway and another privacy screen surrounded the chair. An officer was lingering between both offices and complained to this reviewer that the privacy screens were obstructing his ability to provide observation and security. A nursing supervisor admitted that the privacy screens were installed the week prior to this reviewer's assessment in November 2019. Prior to that, doors to the nurse's offices had remained open during the intake screening.

The observed practices at PVSP were particularly disappointing because during this reviewer's previous assessment of the facility in February 2018, the door to the nurse's office remained closed during the process, with an officer stationed outside in the hallway providing adequate security. However, during the time period between this reviewer's third and fourth assessments, there was a change in PVSP nursing leadership which resulted in reversion to inadequate privacy and confidentiality practices.

Of note, the defendants had varying responses to the compliance status of Intake Screening in the R&R units during 2019-2020, including in their "Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation," dated October 1, 2019[4], whereby CDCR stated that "All CAPs in this area were completed by the end of 2018" (at page 18). Such a conclusion was clearly incorrect. Further, in the "April 2020 CAP," the completion date for this provision was unmarked by the defendants, an indication that progress was ongoing.

In conclusion, 15 of 20, or only 75 percent of audited facilities had adequate intake screening practices in their R&R units, a comparable level of compliance that was found during the previous assessment.

---

[4] "CA Senate Bill 960 (Chapter 782, Statues of 2018) added Penal Code Section 2064.1 to require CDCR to submit a report to the Legislature on or before October 1 of each year, to 'include, among other things, descriptions of progress toward meeting the department's goals related to the completion of suicide risk evaluations, progress toward completion of 72 hour treatment plans, and progress in identifying and implementing initiatives that are designed to reduce risk factors associated with suicide.'" Page 1.

**Recommendation**:

CDCR should develop CAPs for the five facilities (CCI, CMC, CMF, SQ, and PVSP) referenced above. In those facilities requiring physical plant renovation to ensure privacy and confidentiality, including installation of TTMs, the CAPs should include project request forms, verification that funds were authorized and received, and deadlines for project completion. Such documentation should be forwarded to the Special Master.

### B) Psych Tech Practices

**Summary**:

According to the MHSDS *Program Guide* (*Program Guide*), psychiatric technicians (PTs) are required to conduct daily rounds in all administrative segregation units and weekly rounds in Security Housing Units (SHUs)/Psychiatric Services Units (PSUs) "to attend to the mental health needs of all inmates, with documentation of their observations for each MHSDS inmate recorded on a Psych Tech Daily Rounds Form." This reviewer's previous audits found inconsistent and problematic PT rounding in these units, ranging from perfunctory rounds with little interaction with caseload inmates, to practices of PTs often completing the required forms following the completion of rounds rather than immediately following each inmate encounter as required by policy.

**Current Findings**:

This reviewer's previous (third) assessment found that all audited facilities had adequate PT rounding practices in their restrictive housing units. Unfortunately, this current assessment found adequate PT practices in only 15 of 20, or 75 percent of the audited facilities. For example, rounds by one of the PTs in the short-term restricted housing (STRH) unit at CSP/Sac were problematic because the PT simply approached each cell and asked, "Want to answer some questions today?" Due to the manner in which the question was asked, many inmates simply responded "No" and the PT moved to the next cell. At KVSP, the PT making rounds in the STRH unit only had very brief interactions with each inmate, with inquiry limited to "eating and sleeping okay" and "any medication concerns." At both CCWF and PVSP, PTs conducting rounds in the restrictive housing units were observed to be inconsistently inquiring about inmates' mental health status. Finally, at SQ, the PT conducting daily rounds in a section of the Assessment Center utilized for STRH inmates on RC status was inadequately conducting rounds by simply asking caseload inmates "any issues of concern?"

**Recommendation**:

CDCR should develop CAPs for the five facilities (CCWF, CSP/Sac, KVSP, PVSP, and SQ) referenced above to correct PT deficiencies in their restrictive housing units.

### C) __Suicide-Resistant MHCBs__

__Summary__:

Previous audits found that, although most MHCBs were suicide-resistant, some were not. Problems found in several MHCB units included rooms with square-shaped stainless-steel sinks protruding from the wall which could be used as attachment points for a noose and thus were conducive to suicide attempts by hanging. Other hazards included some rooms containing wall ventilation grates with holes that were larger than the industry standard 3/16-inch diameter, allowing for the possibility of being conducive to suicide attempts by hanging, as well as rooms with small gaps between the wall and window frame. Previous recommendations to CDCR included the development of a CAP for each facility that had hazards in its MHCB units.

__Current Findings__:

Previous court orders accelerated CDCR's efforts to fix non-suicide-resistant MHCB units at both CIM and CSP/Corcoran. Renovation projects in both facilities were successfully completed during 2018. In addition, this reviewer's third re-audit found a previously unidentified deficiency of wall and ceiling ventilation grates in each MHCB room at PBSP. CDCR completed the renovation project in January 2019, and this reviewer's inspection of the MHCB unit in December 2019 found that each MHCB room at PBSP was suicide-resistant. Finally, during the CCWF assessment in January 2019, this reviewer observed that one of the MHCB rooms (the designated observation room) continued to be offline for repair (as it was during the third re-audit). Although designated as a licensed MHCB, the room contained many protrusions including window bars, shower hoses attached to the wall, a blind spot to the shower area, etc. that deemed it to be non-suicide-resistant. In addition, this reviewer was informed that beginning on March 1, 2019, the entire unit would be temporarily closed for approximately 70 days for further renovation of rooms. The renovation would include encasement of exposed sink pipes and removal of toilet paper brackets that remained deficient from a previous retrofit. In March 2020, this reviewer was informed that the renovation project at CCWF had not yet commenced and the conditions within the MHCB unit remained unchanged since the assessment in January 2019.

In conclusion, 17 of 18, or 94 percent of audited facilities that had a MHCB unit contained suicide-resistant patient rooms.

__Recommendation__:

CDCR should develop a CAP for the designated observation room within the MHCB unit at CCWF. The CAP should include project request forms, verification that funds were authorized and received, and deadlines for project completion. Such documentation should be forwarded to the Special Master.

### D)     Use of Suicide-Resistant Cells for Newly-Admitted Inmates in Administrative Segregation Units

**Summary**:

Pursuant to CDCR policy, all inmates initially placed in administrative segregation in single-cells are required to be placed in cells that have been retrofitted to be suicide-resistant for the first 72 hours. This reviewer's previous audits found several problems regarding the housing of newly-admitted inmates in administrative segregation. Original recommendations offered to address these deficiencies included ensuring there were a sufficient number of suicide-resistant retrofitted cells to house newly-admitted inmates and enforcing existing policy requirements of only housing newly-admitted inmates in retrofitted cells (and re-housing other inmates into other cells).

**Current Findings**:

Despite the continued reduction in the overall administrative segregation census population statewide, this reviewer continued to find deficient practices in the placement of inmates into new intake cells. During the third re-audit, this reviewer found that only 13 of 23, or 57 percent of the audited facilities had adequate practices regarding the placement of newly-admitted administrative segregation inmates in new intake cells. During this current (fourth) assessment, only 13 of 20, or 65 percent of the audited facilities were found to have adequate practices. Problems found in seven facilities (CCI, CMF, CMC, CSATF, DVI, KVSP, and WSP) included inmates placed in unsafe cells because all new intake cells were occupied; in other cases, new intake cells were available, but custody staff had not appropriately relocated the inmates. At CCI, there were only three retrofitted new intake cells in the administrative segregation unit. On January 4, 2020, a newly admitted inmate was placed in an unsafe non-intake cell because the three new intake cells were occupied. Tragically, he was found hanging from the unsafe ventilation grate in his cell the following evening (January 5, 2020) and pronounced dead.

Unsafe housing of newly admitted inmates in administrative segregation continued to be very problematic at DVI. The facility's administrative segregation unit housing general population (GP), 3CMS, and Enhanced Outpatient Program (EOP) inmates had 11 designated new intake cells that continued to be unsafe and not suicide resistant. At least one cell had a gap between the bunk and wall, and all 11 cells had ventilation grates above the doors and windows with holes in excess of 3/16-inches in diameter. Several cells had gaps between the light fixtures and ceilings/walls. This reviewer identified these cells as being unsafe in 2017 and it remained unclear why these 11 cells designated for new intake inmates had still not been retrofitted to be suicide-resistant. Of note, the other segregation unit (K-1) had been closed for renovation since spring 2016 and was scheduled to be reopened in the summer of 2019. The K-1 Unit had contained 27 retrofitted suicide-resistant cells for new intake inmates. Of note, this reviewer inspected the closed K-1 Unit on February 6, 2019 and noticed that antiquated ventilation grates in the upper back wall of several cells had been painted over rather than replaced. These ventilation grates had holes in excess of 3/16-inches in diameter and would not be considered suicide-resistant if such cells were designated as new intake cells.

Of note, the defendants had varying responses regarding the compliance status with use of suicide resistant cells for newly admitted inmates in administrative segregation during 2019-2020, including their "Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation," dated October 1, 2019, whereby CDCR stated that "the following initiatives have been undertaken: 1) Standardized methodology for monitoring and determining the appropriate number of intake cells by institution has been developed, 2) Existing cells have been retrofitted to increase the number of available intake cells and identified institutions" (at page 19). Further, on January 10, 2020, the Governor's Proposed Budget Summary for 2020-2021 "includes $3.8 million one-time General Fund to retrofit 64 intake cells across the state to provide a safer environment for inmates entering segregated housing" (at page 139).[5] Finally, in the "April 2020 CAP," the completion date for this provision was given as December 2019 – Spring 2020, but on hold due to COVID-19."

In conclusion, only 65 percent (13 of 20) of the audited facilities provided adequate practices related to placement of newly-arrived inmates in suicide-resistant new intake cells for the first 72 hours of administrative segregation confinement.

**Recommendation**:

Similar to the previous assessments, CDCR should develop CAPs in all seven facilities (CCI, CMF, CMC, CSATF, DVI, KVSP, and WSP) to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in suicide-resistant new intake cells for the first 72 hours of administrative segregation confinement. Some of the CAPs will again involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available.

### E)     Use of "Alternative Housing" for Suicidal Inmates

**Summary**:

According to the *Program Guide*, an inmate who meets the criteria for MHCB admission is required to be transferred to a crisis bed within 24 hours of referral. In the interim, as well as in those cases in which physical transfer does not occur within that time frame, the inmate is required to be placed in "Alternative Housing." The most recent policy enacted following issuance of the *Program Guide* relevant to Alternative Housing is Policy 12.05.301 ("Housing of Patients Pending Mental Health Crisis Bed Transfer"), revised February 2020. The policy listed the following preferred locations for housing suicidal inmates pending transfer to an MHCB: Correctional Treatment Center (CTC) licensed medical beds, Outpatient Housing Unit (OHU), OHU overflow cells, large holding cells with toilets, large holding cells without toilets, Triage and Treatment Area (TTA) or other clinic exam room, and other housing where complete and constant visibility can be maintained.

This reviewer's previous assessments found that suicidal inmates placed in alternative housing were often placed in hazardous, unsafe cells and observed at intervals that varied

---

[5]See http://www.ebudget.ca.gov/budget/2020-21/#/BudgetSummary

between constant observation and 15-minute intervals.  In addition, many suicidal inmates were housed in these locations for more than 24 hours and oftentimes not provided a bunk, instead having to sleep on a mattress on the floor thus increasing the possibility that an otherwise suicidal inmate would deny their SI to avoid continued perceived punitive conditions.  As a result, previous recommendations by this reviewer focused on requirements for suicide-resistant alternative housing and/or constant observation of inmates placed in hazardous, unsafe alternative housing locations, as well as issuance of suicide-resistant bunks for any inmate in such housing for more than 24 hours.

Defendants agreed to implement the above recommendations and issued various directives indicating that all suicidal patients placed in alternative housing would be placed on continuous 1:1 observation until they were transferred to a MHCB, as well as provided portable suicide-resistant beds (referred to as "stack-a-bunks") in those locations that did not already have fixed bunks.

**Current Findings**:

With the exception of alternative housing lengths of stay in two facilities (CCWF and CIW) exceeding 24 hours and inadequate practices in another facility (CHCF), all of the other 17 audited facilities had adequate practices in this area.  At CCWF, only 42 percent of inmates placed in alternative housing were discharged within 24 hours as of January 2019, with the average length of stay for the 58 percent of inmates held in alternative housing over 24 hours at approximately 58 hours.  At CIW, only 69 percent of inmates placed in alternative housing were discharged within 24 hours as of December 2018, with the average length of stay for the 31 percent of inmates held in alternative housing over 24 hours at approximately 65 hours.  Finally, at CHCF, although almost all inmates housed in alternative housing were discharged within 24 hours, this reviewer observed that several inmates were not provided required stack-a-bunks in their respective cells during the on-site assessment.

In conclusion, 85 percent (17 of 20) of the audited facilities provided adequate practices for alternative housing, with each of the 17 facilities providing required bedding and discharge within 24 hours.  CDCR continued to demonstrate improvement in this area.

**Recommendation**:

CDCR should develop CAPs in each of the three facilities (CCWF, CIW, and CHCF) that continue to have alternative housing lengths of stay well in excess of 24 hours or inadequate practices in the provision of beds.

### F)     Practices for Observing MHCB Patients

**Summary**:

Previous assessments by this reviewer found that, despite clear *Program Guide* requirements for two levels of observation (i.e., Suicide Watch requiring continuous 1:1 observation and Suicide Precaution requiring observation at staggered 15-minute intervals),

some suicidal patients were being observed in MHCB units at 30- and 60-minute intervals under observational terms such as "psychiatric observation" or "crisis evaluation." In addition, inadequate practices were found in the timely completion of required "Suicide Watch/Suicide Precaution Record" observation forms by nursing staff, including the falsification of observation forms for patients on Suicide Precaution status. Recommendations were provided for CDCR to enforce *Program Guide* requirements utilizing only two levels of observation, to provide better guidance and consistent guidelines regarding an acceptable level of observation for non-suicidal patients housed in MHCB units, and to develop a process by which the observation of suicidal MHCB patients was audited on a regular basis.

**Current Findings**:

On April 18, 2018, CDCR reissued a memorandum entitled "Reminder: Level of Observation for Patients in Mental Health Crisis Beds" that specified orders for observation of non-suicidal MHCB patients "shall not be written for a frequency less often than permitted by the program's licensing requirements." This reviewer's most recent assessment found that, with one exception, observation levels of non-suicidal patients housed within the 18 facilities containing an MHCB unit were set at either 15- or 30-minute intervals. The exception was at CHCF where nursing rounds were permitted at two-hour intervals for non-suicidal patients.

In addition, CDCR finalized installation of its EHRS in 2018. Nursing personnel are required to enter the time into EHRS that they observed each patient on either suicide observation (Suicide Watch or Suicide Precaution) or non-suicide observation status. While on-site at the 18 facilities that contained MHCB units, this reviewer was able to verify the accuracy of observation rounds of patients on Suicide Precaution status (and requiring observation at staggered 15-minute intervals) by reviewing the EHRS charts of several sampled patients. Typically, four patient charts were selected at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m. Similar to the third re-audit which found inadequate practices in 18 of 21, or 86 percent of facilities, this current assessment found ongoing problems.

The current assessment found that, although six facilities (CIM, CSATF, CSP/Sac, PBSP, PVSP, and WSP) had either no or only minor problems, (e.g., a few observation checks of one or two patients that were in excess of required 15-minute intervals) practices at the remaining 12 facilities were very problematic, with violations attributable to multiple nursing personnel during multiple days at each facility. Many facilities typically had up to ten observation checks per patient that were in excess of the required 15-minute intervals during a nine-hour period. Some of the worst practices were found at CMF where the chart review found numerous observation checks (i.e., between 11 and 15 per patient) that were in excess of required 15-minute intervals in all four cases, with the longest gaps between checks being 64 minutes in two cases and 67 minutes in another case. One CMF case displayed 15 violations of 21-, 27-, 27-, 28-, 31-, 16-, 26-, 64-, 18-, 18-, 16-, 22-, 26-, 26-, and 18-minute gaps between the required 15-minute intervals. This reviewer determined that one of the reasons for this problem was that nursing staff were almost always documenting checks four times (rather than five times) an hour. A similar problem with inadequate nursing rounds for MHCB patients at CMF was found during this reviewer's previous assessment in 2018.

In a related problem, this reviewer observed a potentially troubling practice at CSP/LAC whereby only one of ten patients in the MHCB unit was on a suicide observation status during the on-site assessment. The remaining patients were on 30-minute "behavioral observation" checks, including four patients placed on 30-minute checks either upon admission or within 24 hours of admission despite referral to the MHCB unit for SI and/or danger to self. In one case, the patient was admitted into the MHCB unit on August 1, 2019 for "feeling suicidal with plan to cut his throat with a razor knife. Report also hearing voices telling him to hurt himself," and initially placed on 15-minute Suicide Precaution status before being downgraded to 30-minute checks the following day. In another case, the patient was admitted into the MHCB on August 1, 2019 for danger to self and grave disability, and immediately placed on 30-minute checks. In the third case, the patient was initially housed in the MHCB unit at CMC for SI and observed at 15-minute intervals before being transferred to the MHCB unit at CSP/LAC on August 5 (to attend a court hearing the following day). He returned from court during the afternoon of August 6, voiced SI to the R&R unit nurse, but was subsequently placed on 30-minute checks by a clinician who wrote in a progress note that "IP has a history of using MH [mental health] to manipulate housing." In the fourth case, the patient was admitted into the MHCB unit on August 6, 2019 for SI (with threats to cut himself with a razor), initially placed on Suicide Watch, then downgraded to Suicide Precaution a short time later, and then downgraded to 30-minute checks the following morning, resulting in three changes in observation status in less than 24 hours. This reviewer recommended to the mental health leadership at CSP/LAC that an in-depth review of observation orders within the MHCB unit be conducted to ensure that patients were not prematurely discharged from suicide observation status.

Of note, the defendants had varying responses regarding the compliance status for nursing observation of suicidal patients in the MHCB units during 2019-2020, including their "Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation," dated October 1, 2019, wherein CDCR stated that "many institutions experienced difficulties adjusting to the documentation requirements for nursing observation for patients on suicide precaution. The EHRS was modified in 2018 to trigger staggered observation rounding, with nursing staff trained on this adjustment by way of statewide webinar" (at page 19). Further, in the "April 2020 CAP," the defendants noted "on-going auditing by regional teams," an indication that the issue had not been resolved. Of note, CDCR's corrective action did not include facility-level nursing leadership oversight and responsibility to resolve the problem.

In conclusion, whereas this reviewer's third re-audit found only 14 percent (three of 21) of facilities with MHCB units provided adequate nursing observation of suicidal patients, and this current assessment found slight improvement to 33-percent (six of 18) compliance, the observation of suicidal patients in CDCR facilities containing MHCB units remained woefully inadequate.

**<u>Recommendation</u>**:

Deficiencies surrounding the observation of suicidal MHCB patients continued to be both acute and potentially dangerous. CDCR needs to accelerate its corrective actions in each of the 12 chronically deficient facilities (CCWF, CHCF, CIW, CMC, CMF, CSP/Corcoran, CSP/LAC,

CSP/Solano, KVSP, MCSP, NKSP, and SQ) by including facility-level nursing leadership oversight and responsibility to resolve the problem. In addition, the mental health leadership at CSP/LAC should conduct a comprehensive review of observation orders within their MHCB unit to ensure that patients are not prematurely discharged from suicide observation status.

### G)    MHCB Practices for Possessions and Privileges

**Summary**:

Previous assessments by this reviewer found disparate practices with regard to privileges provided to medical versus mental health patients within CTCs. Whereas patients admitted into a CTC for medical purposes were generally eligible for recreation, visits, or telephone calls, such privileges were generally prohibited for MHCB patients. Recommendations were provided for CDCR to develop a directive(s) regarding guidance on clothing and allowable privileges for both suicidal and non-suicidal MHCB patients.

CDCR subsequently issued several memoranda to address the issue. One such memorandum, "Level of Observation and Property for Patients in Mental Health Crisis Beds" was issued on March 15, 2016. The directive required that "all orders shall detail what specific items may be issued to a patient. Staff shall ensure all patients are provided with the clothing, bedding and allowable items permitted at the patient's level of observation." On June 23, 2016, CDCR issued a memorandum on MHCB privileges available to MHCB patients entitled "Mental Health Crisis Bed Privileges." The directive stated that "IPs admitted to the MHCB may be authorized for out-of-cell activities when specifically approved by the MHCB IDTT [Interdisciplinary Treatment Team]." Out-of-cell activities included, but were not limited to, dayroom, recreational activities, and yard. These activities would be the responsibility of the recreational therapist (RT) assigned to each MHCB unit, and "custody staff may provide supervision for unstructured out-of-cell activity to include yard and dayroom." In addition, the memorandum stated that MHCB patients were entitled to both telephone access and visiting privileges "unless specifically restricted by the MHCB IDTT." On February 14, 2017, a "Mental Health Crisis Bed Privileges Revision" memorandum was issued to reiterate that "the recreational therapist shall be responsible for facilitating all structured out-of-cell activity and is expected to remain with the IP during these activities." Finally, a 2020 draft memorandum entitled "Update - Level of Observation and Property for Patients in Mental Health Crisis Beds," once again reiterated long-established policies and procedures regarding levels of observation and property for MHCB patients but remained unsigned at the time of this writing.

**Current Findings**:

The third re-audit assessment found only 12 of 21, or 57 percent of facilities with MHCB units had adequate practices regarding the issuance of clothing and privileges to patients. The current assessment did not find much improvement, in fact, only 12 of 18, or 67 percent of audited facilities had adequate practices in this area. For example, patients on maximum-security or administrative segregation statuses at CCWF did not have access to the MHCB unit program room because a previously discussed "Restart Chair" or TTM had not been installed. These patients also did not receive yard privileges because it required their escort to the

administrative segregation unit.  At CSATF, there was uncertainty amongst patients as to whether telephone calls were permitted in the MHCB unit.

At WSP, this reviewer observed an RT inform a patient during an IDTT meeting in the MHCB unit that "as soon you are off Suicide Watch status and get whites, you can go out to the yard."  Such an instruction was incorrect, MHCB patients are immediately eligible for yard privileges based upon clinical judgment of the IDTT.  Subsequent review of 114-A forms determined that non-restricted housing unit patients were receiving only limited yard privileges, and restricted housing unit patients were not receiving yard at all because the CTC yard was not large enough to accommodate a "special management 'walk-alone' yard."  At CSP/LAC, review of 114-A forms indicated that although patients were offered showers on a regular schedule in the MHCB unit, access to the yard/dayroom was limited (approximately once per week), and telephone access was said to be offered on an intermittent basis.

At CSP/Solano, there was a disturbing practice of clinicians ordering 30-minute observation for patients expressing SI in the MHCB unit, as well as ordering 30-minute observation with "partial issue" clothing (i.e., shorts/t-shirt).  Such orders were clearly contrary to *Program Guide* requirements which specified that suicidal patients are to be observed at least every 15 minutes, and patients who are observed at 30-minute intervals are assessed as not being suicidal and should not have any clothing restrictions.  In addition, review of 114-A forms indicated that MHCB patients had limited out-of-cell and/or yard time.

Finally, practices regarding possessions and privileges afforded MHCB patients were found to be the most problematic at CSP/Corcoran.  For example:

- Similar to previous assessments, no patients on full-issue clothing status were issued either a uniform or shirts/pants.  As such, it was common to read provider orders that stated "full issue," with the patient clothed only in "whites" (i.e., t-shirt and shorts) and not in a uniform.

- Despite the fact that patients were clinically discharged from both Suicide Precaution status and the MHCB, but remained on the unit awaiting transfer, they still did not receive full-issue clothing.

- At least two patients from a Psychiatric Inpatient Program (PIP) intermediate care program were housed in the MHCB unit while attending court hearings.  Each patient was clothed in a safety smock despite the fact that they had not been assessed as suicidal and had not been clothed in safety smocks while housed in the PIP intermediate care program.

- MHCB patients on maximum-security/administrative segregation status were still not receiving yard privileges because the small management yard (SMY) attached to the MHCB unit had previously been determined to be unsecure.  This issue was first reported by this reviewer in 2014 and still had not been remedied.

- This reviewer was informed that, due to the above problem of maximum-security/administrative segregation patients not receiving yard privileges, they were given priority for "out-of-cell activity" (OCA) in the RT's office. However, when interviewed by this reviewer, the RT was unaware of this OCA protocol and, therefore, patients on maximum-security/administrative segregation status were not given any such priority.

- A PT who performed RT responsibilities on a part-time basis in the MHCB unit incorrectly stated to this reviewer that all patients were prohibited from having pencils or pen fillers. Again, such a clinical decision is made by the IDTT.

- Although the RT stated that they attempted to get each of the MHCB patients out of their cells two or three times per week, review of the 114-A forms of 11 patients found that only showers were documented in the vast majority of cases.

In sum, most of the above deficiencies at CSP/Corcoran were identified by this reviewer in the initial 2014 assessment, and remained very problematic.

As indicated in the previous section, CDCR has historically dealt with this issue by issuing multiple memoranda, including "Level of Observation and Property for Patients in Mental Health Crisis Beds" issued on March 15, 2016, "Mental Health Crisis Bed Privileges" issued on June 23, 2016, "Mental Health Crisis Bed Privileges Revision" issued on February 14, 2017, and a 2020 draft memorandum entitled "Update - Level of Observation and Property for Patients in Mental Health Crisis Beds," which once again reiterated long-established policies and procedures regarding levels of observation and property for MHCB patients, but remained unsigned at the time of this writing. Further, in the defendants' "Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation," dated October 1, 2019, it was stated that "Out-of-cell activities and privileges were also included as part of the CQIT auditing of MHCBs. Institutional CAPs were developed for units where improvements were not seen in 2008." Finally, in the "April 2020 CAP," the proposed correction was to "develop an on-site suicide prevention self-monitoring tool to require local institutions and regional teams to conduct review of this practice, report efficiency, and track ongoing compliance." The completion date for this provision was unmarked by the defendants, an indication that progress was ongoing, primarily attributable to a CQIT initiative that remained stagnant.

In conclusion, only 67 percent (12 of 18) of the audited facilities maintained adequate practices regarding possessions and privileges afforded to MHCB patients. Deficiencies at four facilities (CCWF, CSP/Corcoran, CSP/Solano, and WSP) have been long-standing, with lack of yard privileges for maximum-security/administrative segregation unit patients first reported by this reviewer in 2014. Some of the corrective actions involve renovation projects that have not been approved. The defendants' responses to the above deficiencies have included both issuance of memoranda, as well as the drafting of audit tools to track possible deficiencies. Unfortunately, these responses have not resulted in corrective action at specific facilities.

**Recommendation**:

      CDCR should stop focusing on reissuing memoranda and drafting audit tools and begin focusing on development of CAPs for each of the facilities (CCWF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Solano, and WSP) found to have deficient practices for possessions and privileges afforded MHCB patients. Deficient conditions at CCWF, CSP/Corcoran, and WSP can only be resolved by physical plant renovation that has not been proposed and/or approved by CDCR headquarters. In those facilities requiring physical plant renovation, the CAPs should include project request forms, verification that funds were authorized and received, and deadlines for project completion. Such documentation should be forwarded to the Special Master.

### H)    30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs, and Condemned Units

**Summary**:

      CDCR's requirement that inmates housed in administrative segregation be observed at 30-minute intervals has been in place since 2006, with inmates housed in SHUs requiring the same level of observation since 2013. Documentation was historically recorded by handwritten housing logs. In 2014, CDCR implemented the Guard One system to electronically verify 30-minute welfare checks of all inmates in administrative segregation during the first 21 days of their stays. Pursuant to a memorandum issued on May 9, 2014, the policy was subsequently revised to extend use of the Guard One system to all inmates in administrative segregation units, SHUs, PSUs, and condemned units at staggered intervals not to exceed 35 minutes for the duration of their stays. This expansion was a significant and commendable policy change. Due to unique architectural features of the SHU at PBSP and complaints of excessive noise generated from Guard One, particularly during First Watch (10:00 p.m. to 6:00 a.m.), the parties agreed to a permanent policy specific to the SHU at PBSP allowing for Guard One observation at 60-minute intervals during First Watch. The permanent stipulation was approved by the *Coleman* court on September 1, 2016 (ECF No. 5487). Finally, due to the unique architectural and program design of the 22-cell condemned unit at CCWF, Guard One rounds are only conducted during the First Watch (pursuant to a CDCR directive issued in 2014).

**Current Findings**:

      This reviewer's most recent assessment found all 20 audited facilities had Guard One compliance rates well above 90 percent in administrative segregation, SHUs, and PSUs. This high rate of compliance was diminished by the fact that two facilities (CSP/Sac and DVI) experienced three inmate suicides in PSUs and administrative segregation during 2019 in which decedents were either found in rigor mortis or irregularities were found in timely Guard One checks. These incidents were referred for further investigation and possible disciplinary action.

**Recommendation**:

      No recommendations are offered related to this issue.

I)        **Mental Health Referrals and Suicide Risk Evaluations**

**Summary**:

This reviewer's previous assessments found that, although all emergency mental health referrals for reported SI and SIB resulted in an almost immediate response from mental health clinicians, these emergency referrals did not always result in completion of the required suicide risk assessments. According to the MHSDS *Program Guide*, "Any CDCR employee who becomes aware of an inmate's current suicidal ideation, threats, gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN [registered nurse]) conducts a face-to-face evaluation" (12-10-7). The suicide risk assessment form has had various iterations, beginning with the Suicide Risk Assessment Checklist, Suicide Risk Evaluation (SRE), and the current SRASHE, which includes the Columbia-Suicide Severity Rating Scale screening form.

In addition, the quality of completed SRASHEs has historically been found to be problematic. Previous recommendations included revision of the SRE mentoring program and better auditing of SRE quality on a monthly basis by local SPRFIT committees. Defendants previously agreed with this reviewer's assessments that the quality of completed suicide risk assessments throughout CDCR was problematic and agreed to issue the "Revision to the Suicide Risk Evaluation Mentoring Program" memorandum, last revised on March 10, 2016, and the "Clarification of Suicide Risk Evaluation Training Requirements" memorandum, last revised on March 24, 2016. The memoranda included requirements for seven-hour SRE training every two years by clinical staff, annual training for clinicians regularly assigned to a MHCB unit, and the auditing of at least one of a clinician's SRASHEs every six months.

Finally, it is noteworthy that CDCR began to incrementally initiate crisis intervention teams (CITs) in its prison facilities beginning in October 2018. At the time of this writing, a systemwide CIT policy had not been implemented and there have been a variety of practices observed in the approximate 21 facilities that have initiated the CIT process. Generally, a CIT encompasses a mental health clinician, nurse, and custody supervisor (generally a lieutenant) who respond to, and attempt to, de-escalate a mental health crisis. When clinically indicated, the CIT is required to consult with a psychiatrist. CITs normally operate during Third Watch (2:00 p.m. to 10:00 p.m.), with those facilities without a formalized CIT process deploying designated clinicians to respond to mental health emergencies. When the mental health emergency involves an inmate presenting with SI and/or SIB, a SRASHE is required to be completed by the CIT clinician. The CIT process will be assessed by this reviewer during the fifth re-audit period when a systemwide policy is anticipated to be implemented.

**Current Findings**:

This writer's current assessment found continuing problems with the required completion of SRASHEs following an emergency mental health referral for SI or SIB. The assessment found that only 13 of 20, or 65 percent of facilities were over 90-percent compliant with

completed SRASHEs. This was a lower compliance rate from the previous assessment which found 74 percent completion. In those seven facilities (CCWF, CIW, CIM, CMF, CSATF, NKSP, and SQ) below 90 percent, compliance rates ranged from 78 to 88 percent. Problems were particularly acute at both CMF and NKSP. For example, a CMF inmate informed a PT during administrative segregation rounds that he was feeling suicidal, stating, "I've been feeling this way a couple of days, but did not tell anybody. I want to choke myself. I've been feeling anxious and been crying for the past few nights." The inmate was referred to a CIT clinician who subsequently saw the inmate and completed a mental health primary clinician (MHPC) Consult Emergent Progress Note, but not the required SRASHE. The clinician noted in the progress note that "Pt is low functioning DD2 who has been seen every day for the past three days on spurious claims of SI for secondary gain issues. It appears he understands no way to get what he needs other than say he is suicidal and waiting for a team response. This call, in person, he was able to contract for safety, and stated he would be okay with a vistaril PRN [as needed], that he does not like ad seg."[6] This reviewer's examination of the inmate's medical chart found that he had also voiced SI two days earlier, and the required SRASHE was again not completed. Rather, a different clinician completed a MHPC Inpatient Progress Note.

In another example, a NKSP clinician wrote a MHPC Progress Note on July 17, 2019 that stated "This writer received a call from Dr.____ from BPH who had met with IP [inmate/patient]. IP had reported to Dr. ____ that he wanted to 'jump off the tier' the day prior to BPH contact but did not because 'he did not think he would die.' IP reported he was 'thinking about his dad that had died' and about what was going on in the building which IP had reported to this writer the day prior that he had safety concerns in the building which were reported to custody. Dr.____ stated that IP was hesitant when he asked if he had any thoughts of harming himself today and would not commit to not harming himself. IP had reported that he has prior hospitalizations at Harbor UCLA Medical Center for 5150 holds. After consultation with the RC supervisor, an MHPC Consult Urgent was ordered and the crisis team was advised that IP was in a therapeutic module on the yard for contact." A few hours later, the inmate was seen by another clinician who stated in a MHPC Progress Note that "IP admits to some feelings of anxiety and safety concerns involving sex crime charges that were dropped, however other inmates intercepted a letter and found out about these molestation charges. Accordingly, IP reports paranoia for his safety and some SI with a plan (jump off 2nd tier), but without intent." Despite acknowledging SI with a plan, the required SRASHE was not completed. Instead, the clinician "set up 5-day follow-ups to check in daily with IP about any current SI or safety/housing concerns." The initiation of five-day follow-up checks absent completion of a SRASHE, as well as ordered without alternative housing/MHCB placement, was contrary to policy requirements. Of note, a similar mental health referral dated a week earlier on July 9, 2019 for the same inmate also failed to result in completion of a SRASHE.

Of note, this reviewer observed that monthly minutes from various facilities' SPRFIT meetings consistently reported substantial compliance with timely completion of SRASHEs. Although this reviewer would not disagree with the timeliness of the clinical response, much of the data collected and reviewed by SPRFITs simply looked at timeliness and not whether SRASHEs were being completed for mental health referrals related to SI and SIB. In addition,

---

[6] In addition to the failure to complete a SRASHE, it was inappropriate for the clinician to use "contract for safety" to inform their clinical judgement.

while this reviewer has historically reviewed both emergency mental health referrals, as well as urgent mental health referrals (because such referrals frequently refer to SI and SIB and are, therefore, mislabeled as "urgent"), CDCR has historically only reviewed emergency mental health referrals to assess compliance.

With regard to SRE training, the most recent assessment found the overall rate of compliance for seven-hour SRE training in the 20 audited facilities was 88 percent, whereas the compliance rate for the SRE mentoring program in the same facilities was 93 percent. The review also found that 16 of 20, or 80 percent of audited facilities had compliance rates under 90 percent for either the seven-hour SRE training or the mentoring program training.[7] Only nine of 20, or 45 percent of the facilities (CCWF, CIM, CSP/Corcoran, CSP/Sac, CSP/Solano, MCSP, PBSP, PVSP, and SQ) had completion rates above 90 percent for both the seven-hour SRE training and the SRE mentoring program training. Further, as detailed in the forthcoming section on Suicide Case Reviews, approximately 30 percent (72 of 244) of the QIP recommendations derived from recent inmate suicides were attributed to inadequate (or lack of) SRASHEs and/or safety plans.

The defendants' "Report on Suicide Prevention and Response within the California Department of Corrections and Rehabilitation," dated October 1, 2019, stated that the "SMHP and local SPRFIT committees began to monitor suicide risk evaluation compliance, and institutions who were out of compliance in this area developed internal CAPs. In 2018, the number of institutions that failed to meet compliance standards fell from 12 institutions to six institutions" (at page 20). In the "April 2020 CAP," the defendants stated "SRE timeliness is now reviewed monthly in SPRFIT. Institutions who are consistently not in compliance or who demonstrate downward trends over a three-month period will be required to develop the CAPs in conjunction with the regional teams. CDCR currently has a mechanism to track the reason for an urgent or emergent referral. Ongoing work to operationalize this information for institutional and headquarters monitoring continues." The completion date for this provision was unmarked by the defendants, an indication that progress was ongoing.

In conclusion, completion of suicide risk assessments for inmates presenting as possible risks for suicide should be automatic, with SRASHE compliance rates at 100 percent throughout CDCR—yet this issue continues to be problematic. Further, most of the audited facilities had compliance rates under 90 percent for either the seven-hour SRE training or the mentoring program training.

**<u>Recommendation</u>**:

Develop CAPs for the seven facilities (CCWF, CIW, CIM, CMF, CSATF, NKSP, and SQ) that continue to struggle with completion of required SRASHEs for emergent/urgent mental health referrals involving SI and SIB. Develop CAPs for the 11 facilities that had completion rates under 90 percent for either the seven-hour SRE training or the SRE mentoring program training.

---

[7] CDCR reported that SRE training was "paused" during a portion of this reviewer's on-site assessments.

**J)**     <u>**Safety Planning for Suicidal Inmates**</u>

<u>**Summary**</u>:

Safety planning includes a specific strategy that describes signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient and clinician can take if suicidal thoughts do occur.  This reviewer's previous assessments found that safety planning to reduce a MHCB patient's suicide risk was observed to be inconsistent during IDTT meetings, and the vast majority of safety plans developed by MHCB clinicians for suicidal patients were grossly inadequate and often simply repeated *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-Day Follow-Up by Primary Clinician (PC), provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce the inmate's suicide risk.  In addition, there was little concordance between safety planning strategies developed within the SRASHEs that justified the discharge from a MHCB unit and subsequent five-day follow-up check notes written by clinicians to indicate that safety plan objectives were being addressed.

In an effort to improve the quality of safety planning throughout the prison system, the SMHP subsequently decided to implement a safety plan model entitled Safety Planning Intervention (SPI).[8]  The SPI model was intended to provide a prioritized and specific set of coping strategies and sources of support that suicidal patients could utilize should suicidal thoughts reemerge.  Comprising seven steps, SPI was originally developed to be utilized in settings where emergency services or acute care services were provided, such as emergency rooms and crisis hotlines.  Other than CDCR, this reviewer is not aware of any other state or local correctional agency that currently utilizes SPI.

Members of the Special Master's team were first introduced to SPI during a SMHP presentation in July 2018.  The team was initially impressed by the presentation but remained concerned that the SPI model could not sufficiently be adapted to include specific risk reduction strategies for patients in a correctional environment.  Ultimately, subsequent support of the SPI model by the Special Master's team was primarily given based upon the need to provide an immediate alternative to woefully inadequate safety planning practices within CDCR.

A 120-slide PowerPoint presentation entitled "Safety Planning" was primarily developed by a senior psychologist specialist within CDCR in May 2019.  The training guide was very comprehensive, with members of the Special Master's team providing both review and recommendations.  Systemwide SPI training was provided to clinicians during the summer of 2019, and the requirement for clinicians to utilize SPI in their safety plans for patients discharged from inpatient level of care (and alternative housing) began in August 2019.

Finally, in a separate effort to address inadequacies in safety planning, this reviewer recommended in 2017 that CDCR develop a process by which each safety plan contained within the SRASHE of a patient released from a MHCB unit was reviewed in real time by an SRE

---

[8]For more information, see Stanley, B. and G. Brown (2012), "Safety Planning Intervention: A Brief Intervention to Mitigate Suicide Risk, *Cognitive and Behavioral Practice*, *19*: 256-264.

mentor at that facility.  Without interfering with the physical and administrative discharge of the
patient from the MHCB unit, any safety plan found to be deficient (i.e., not containing a
reasonably specific strategy to reduce SI) would immediately be returned to the authoring
clinician for revision. Almost three years later on March 10, 2020, CDCR finally released the
appropriate policy to address this issue.  The "Mental Health Crisis Bed: Supervisory Review of
Discharge Safety Plans" (12.05.200.P4) requires MHCB unit supervisors or designees to review
the safety plan section of SRASHEs for patients discharged from a MHCB unit to ensure that the
plans include "specific risk reduction strategies."  CDCR facilities that have ten or less MHCB
discharges per week are required to have all discharge SRASHEs reviewed, whereas facilities
that have more than ten MHCB discharges per week are required to have at least one SRASHE
per MHCB clinician reviewed per week.  This reviewer's current fourth re-audit was completed
well before the issuance of the "supervisory review" policy, therefore, compliance with this
directive could not be measured.

**Current Findings**:

        During this fourth re-audit assessment, this reviewer reviewed safety plans developed
both before and after the SPI model.  Overall, the results demonstrated ongoing failures.  The
review found continuing problems with adequate safety planning for SI in 16 of 18, or 89 percent
of audited facilities with MHCB units.  The review also found that only nine of 20 or 45 percent
of the audited facilities had compliance rates of 90 percent or more for safety planning training,
with an overall compliance rate of 85 percent for safety plan training of all clinicians in the 20
audited facilities.  Further, only two facilities (CIM and CSP/Solano) appeared to make any
strides in attaining adequate safety planning.  For example, during this reviewer's observation of
IDTT meetings in the MHCB unit at CIM, there were adequate discussions of safety planning
augmented by a practice of distributing a safety plan template worksheet to most patients during
the <u>initial</u> IDTT meeting.  It was also noteworthy that one of the treatment groups offered in the
MHCB unit was a newly created "safety planning group" to assist patients in developing
individual safety plans.  Availability of the safety planning group was mentioned during most of
the IDTT team meetings.

        Subsequent review of SRASHEs of patients released from the MHCB unit at CIM found
a mixture of attempts at safety plan strategies to reduce SI, as well as safety plan narrative that
simply deferred identification of coping skills strategies to the outpatient PC.  For example, in
one case, the patient had been admitted into the MHCB unit for passive SI related to chronic
lower back pain and a failed request to obtain lower bunk housing.  He had two prior suicide
attempts by drug overdose, and records indicated he often expressed SI for secondary gain to get
his needs met.  The safety plan narrative within the discharging SRASHE was promising and
stated the following:

        <u>Warning Signs</u>
        Patient recognizes that when he has elevated physical pain he can't prevent; he
        begins to have an increase of feelings of hopelessness.  The patient when not
        receiving the treatment he expects feels that his feelings are not acknowledged.

        <u>Internal Coping Strategies</u>

The patient reports that engaging in thinking of his wife coming to visit and continuing to have her support provided him with a relief that he does have something to look forward to.

People I Can Ask for Help
The patient reports that his family can be supportive but feels that he needs to make them understand that he can't hear issues on the outside because he has difficulty coping with not being able to help them. The patient wants to increase his social support on the outside to gather resources in the community to be more productive out in the community.

Staff I Can Contact During A Crisis
The patient recognizes that asking other inmates for help is no longer an option as he has acknowledged that they're not invested in his well-being. The patient is now willing to ask mental health staff for help as he wants to learn the proper ways to cope with his depression.

Making The Environment Safe
The patient endorses that when he is familiar with his environment, is able to feel safer and is able to function more properly.

Most Important Thing Keep On Living
The patient looks forward to seeing his wife and programming as he wants to complete the rest of his time at RJD.

In contrast, the vast majority of safety plans reviewed in the remaining facilities with MHCB units did not address modifiable risk factors, protective factors, and warning signs, nor specific strategies, including reasonable coping skills, that patients could utilize to reduce recurrence of SI. The following examples symbolize the continuing problem:

NKSP

Step 1 (Warning Signs): seeing cigarette burns on legs and feet, flashbacks to childhood abuse, increase sleep.

Step 2 (Independent Coping Skills): music, reading, exercise.

Step 3 (Distracting People & Places): going to yard.

Step 4 (People to Ask for Help): sister.

Step 5 (Professionals to Contact): officers, mental health clinician, chaplain.

Step 6 (Means Safety): being around people.

Step 7 (Reasons to Live): my kids.

<u>SQ</u>

<u>Step 1</u> (Warning Signs): WIP.

<u>Step 2</u> (Independent Coping Skills): WIP.

<u>Step 3</u> (Distracting People & Places): WIP.

<u>Step 4</u> (People to Ask for Help): WIP.

<u>Step 5</u> (Professionals to Contact): WIP.

<u>Step 6</u> (Means Safety): WIP.

<u>Step 7</u> (Reasons to Live): WIP.

Following considerable inquiry, this reviewer was subsequently informed that "WIP" referred to above was meant to convey a "work in progress."  Of further concern, this "WIP" phrase was reproduced in several days of "5-Day Patient Follow-Up Progress Notes" by multiple outpatient clinicians.

Of interest, there continued to be examples of safety plans, both before and after SPI implementation, that simply deferred safety plan development to the patient's EOP clinician:

<u>(PVSP – Pre SPI)</u>
IP would benefit from increased 1:1 care beyond CCCMS [Correctional Clinical Case Management System] LOC [level of care] to help IP begin to identify current cues and triggers for SI.

IP to notify mental health staff should he experience an increase in environmental stressors before acting upon SI.

IP to begin identifying positive coping strategies he can implement when experiencing stressors.

IP would benefit from increased substance abuse treatment due to long hx. of use as negative coping skill.

IP to continue taking medications as prescribed.

<u>(PBSP – Post SPI)</u>
<u>Step 1</u> (Warning Signs): feeling isolated in cell, thought 'I gotta get out of here, this is torture,' thought 'staff is blowing me off.'.

<u>Step 2</u> (Independent Coping Skills): 'reading for distraction, physical activity if not limited by current medical conditions/concerns.'

<u>Step 3</u> (Distracting People & Places): 'going to mental health appointment.'

<u>Step 4</u> (People to Ask for Help): to be further developed in out-patient setting.

<u>Step 5</u> (Professionals to Contact): nurse call light, to be further developed in out-patient setting.

<u>Step 6</u> (Means Safety): to be further developed in out-patient setting.

<u>Step 7</u> (Reasons to Live): 'just hoping to get the treatment I've been asking for.'

In sum, this reviewer's examination of safety plans specific to SPI found multiple problems, including:

- Narrative that indicated the safety plan was not collaborative between the patient and clinician, but rather simply listed, without correction, the patient's exact words;

- Narrative that suggested that the safety plan was generated as an afterthought during or following the patient's MHCB discharge IDTT meeting (e.g., "will work on a safety plan today" at WSP and "let's talk about safety planning" at KVSP), rather than within days of inpatient admission;

- Narrative that continued to deflect safety planning development to the outpatient clinician;

- Narrative that indicated the patient refused to participate in safety planning; and

- Most importantly, narrative that failed to include a specific strategy that described signs, symptoms, and the circumstances in which the risk for suicide was likely to recur, how recurrence of suicidal thoughts could be avoided, and actions the patient and clinician could take if suicidal thoughts reoccurred.

Finally, the SPI template contained within the SRASHE in EHRS has unintentionally resulted in clinicians developing bad habits.  For example, the template for each of the seven steps contains the question "refuse to answer?" which easily allows the clinician to answer "yes" if the patient was uncooperative.  By the patient refusing to answer, the clinician simply writes "refused to participate" into each of seven SPI steps and assumes the task is complete because all of the fields on the template are filled in.  In addition, the template includes the unnecessary question "reason for SPI?" followed by the typical response from clinicians of "required by policy."  Of course, the reason for SPI is to reduce SI and it is simply unnecessary for clinicians to continually write "required by policy" on each SPI when all documentation contained within the EHRS, including SPI, is required by policy.

In order to assess the future viability of the SPI model within CDCR, the SMHP team is currently evaluating SPI data from January 1, 2020 through March 31, 2020 through a chart audit tool (CAT) process. This reviewer anticipates that chart audit tool CAT results will mirror the findings from this fourth re-audit assessment. The SMHP has decided that any future safety planning training should be postponed until CAT results are analyzed.

In conclusion, there has been no improvement in safety planning since the previous assessment, and in many ways, safety planning throughout CDCR facilities has gotten worse. Only two of 18, or 11 percent of audited facilities had adequate practices in this area. Based upon review of hundreds of safety plans utilizing the SPI model since August 2019, it would be this reviewer's opinion that initial concerns of the Special Master's team that adapting the SPI model to include specific risk reduction strategies for patients in a correctional environment have been confirmed.

**Recommendation**:

The decision whether to retain the SPI model or return to the original concept of safety planning should be made immediately after the CAT data is analyzed and well before this reviewer's scheduled fifth re-audit. Finally, during this reviewer's forthcoming re-audit, facilities with MHCB units will be requested to provide evidence that they are complying with the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy, effective March 10, 2020.

### K)  **MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks**

**Summary**:

Consistent with the need for continued safety planning of patients released from MHCB units and alternative housing to GP, administrative segregation, and other housing units, this reviewer's prior recommendations included strengthening existing procedures for follow-up assessments by mental health clinicians and welfare checks by custody staff. Defendants developed several memoranda and compliance forms to strengthen the follow-up process. In March 2016, the "Interdisciplinary Progress Note – 5-Day Follow-Up" CDCR MH-7230-B form was released in final format. The accompanying policy, entitled "Release of Revised 5-Day Follow-Up Form," was released on May 31, 2016. On January 27, 2016, CDCR released a joint memorandum from the Director of the Division of Adult Institutions (DAI) and Deputy Director of the SMHP entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy." The policy required custody staff to observe an inmate at 30-minute intervals for a minimum of 24 hours following MHCB discharge. The policy also required that a clinician perform daily mental health assessments to determine whether the 30-minute discharge checks were necessary beyond the minimum 24-hour requirement (up to 72 hours), or whether the inmate required a referral back to a MHCB unit. On September 1, 2017, CDCR officials released a slightly revised memorandum to include inmates expressing SI and referred to, and discharged from, alternative housing "when clinically indicated." Finally, an "Updated Mental Health Crisis Bed - Referral

Rescission, and Discharge Policy and Procedures" memorandum and policy were issued on September 18, 2018 and October 15, 2018, respectively.


**Current Findings**:

This reviewer's most recent assessment continued to include an audit of both the "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form process by clinical staff, as well as the "Discharge Custody Check Sheet" (CDCR MH-7497) form process by both clinical and custody staff. Overall, this reviewer found that clinicians (and nursing staff in their absence) continue to almost consistently complete "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms in all 20 audited facilities. However, similar to the chronic problem of safety planning found in all of the facilities that had MHCB units, this reviewer continued to find problems with concordance between the safety plans contained within discharging SRASHEs and the safety plan summary sections of the CDCR MH-7497 forms. Although some progress was noted, the safety plan summary sections of most forms simply recited *Program Guide* requirements or contained narrative that was inconsistent with the safety plan of the discharging SRASHE.

With regard to the discharge custody check process, a two-page "Discharge Custody Check Sheet" (CDCR MH-7497) form was required to be completed on any inmate released from a MHCB unit or alternative housing ("when clinically indicated") placement.[9] The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer's most recent assessment found that only one (NKSP) of 20, or five percent of the audited facilities, had clinicians and custody personnel correctly complete both pages of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms in 90 percent or more of the cases. The preceding review found three of 23, or 13 percent of the facilities had adequate practices for "discharge custody checks." During this most recent assessment, problems found in the remaining 19 facilities included clinicians not completing the first page; clinicians discontinuing custody checks in less than the required 24 hours; custody checks performed at 60-minute, rather than 30-minute intervals, and gaps in performed checks. The overall compliance rate for the correct completion of Page 1 by clinical staff was 80 percent, whereas the compliance rate for the correct completion of Page 2 by custody staff was 85 percent. Both of these rates of compliance were better than the preceding assessment. Finally, clinicians ordered discontinuation of 30-minute custody checks after the 48-to-72 hours in 70 percent of the cases.

Of note, during this reviewer's recent examination of an inmate suicide occurring in March 2020, it was determined that a PT had conducted a daily follow-up and completed a "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form. Although PTs are permitted by policy to conduct daily follow-up assessments when clinicians are not available,

---

[9] The "Discharge Custody Check Sheet" (CDCR MH-7497) is not required to be completed for patients discharged back to restrictive housing units because those units are already required to conduct surveillance at 30-minute intervals via Guard One.

following the interaction with this inmate, the PT then consulted with a clinician by telephone and recommended that the inmate be released from further observation at 30-minute intervals pursuant to the "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy." Although the PT's action was consistent with policy, such a practice demonstrated a flaw in a policy that allowed clinical decisions to be made without a face-to-face assessment by a mental health clinician.

Finally, the Defendants' "April 2020 CAP" stated that an "Automated report was completed in Mental Health On-Demand Reports, discussions from regional teams on process occurred, modifications to the 7497 have begun, and training is pending." The completion date was marked as "to be determined."

In conclusion, this reviewer continued to find that clinicians (and nursing staff in their absence) consistently completed "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms in all 20 audited facilities. Although rates of compliance for both Page 1 and Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form had improved since the preceding assessment (e.g., facilities going from 55 percent to 75 percent compliance), 95 percent of the audited facilities (19 of 20) continued to have combined compliance rates (for both pages of the form) under 90 percent.

**Recommendation**:

Develop CAPs for the 19 facilities that were below 90-percent compliance with Page 1 and/or Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form. Revise the "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy," effective January 27, 2016, to indicate that all clinical decisions, including discontinuation of custody checks, can only be made following a face-to-face assessment by a mental health clinician.

L)    **Local SPRFITs**

**Summary**:

Each local SPRFIT is required to meet at least monthly and carry out various responsibilities including ensuring compliance with all CDCR suicide prevention policies and procedures, five-day clinical follow-ups, safety plans, etc. Previous assessments by this reviewer found that although the local SPRFIT concept was a valuable tool in CDCR's suicide prevention program, the process was not functioning as intended and needed to be rebooted. Most importantly, many of the deficiencies identified by this reviewer in each prison were easily observable and should not have been identified for the first time by a Special Master's expert and/or monitor, but rather by the local SPRFIT. Therefore, one of this reviewer's previous recommendations in 2016 was for CDCR, under the guidance of the Special Master, to re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool.

Due to a perceived lack of urgency by CDCR to finalize the revised SPRFIT policy, the *Coleman* court ruled on January 25, 2018 that "[g]ood cause appearing, defendants will be

directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised *Program Guide*, not later than thirty days from the date of this order." (ECF No. 5762 at 3.) On February 2, 2018, CDCR issued the "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum that "clarifies, modifies, and establishes requirements and responsibilities." It also reemphasized that a meeting "quorum" included <u>all</u> mandatory members or designees. The revised memorandum became effective on March 1, 2018 and contained 19 responsibilities that included, but were not limited to, monitoring suicide prevention training, treatment planning, and five-day follow-up compliance; conducting root cause analyses (RCA) of serious suicide attempts; providing assistance and coordination for the activities of visiting SMHP and DAI suicide case reviewers following an inmate suicide; and conducting self-assessments related to compliance with suicide prevention items developed by the SMHP's Quality Improvement Unit. In addition, each SPRFIT was required to develop a local operating procedure (LOP) that was consistent with the CDCR directive of February 2, 2018; as well as policies and procedures regarding establishment of a local "High Risk Management Program" and identifying inmates who received "bad news" following return from court and/or Board of Parole Hearings (BPH).

**<u>Current Findings</u>**:

This reviewer's current assessment was the first time that compliance with the new SPRFIT responsibilities arising out of the February 2018 directive was audited. The assessment focused on the following areas: did each SPRFIT have an LOP, did each SPRFIT achieve meeting quorums in three consecutive months, did each SPRFIT conduct RCAs of serious suicide attempts, and did each SPRFIT have policies and procedures for both a "High Risk Management Program" and identifying inmates who received "bad news" following return from court and/or BPH.

The current assessment found that only 14 of 20, or 70 percent of the SPRFITs had signed and/or dated LOPs that were consistent with the CDCR directive of February 2, 2018 and not simply cut and pasted narrative from the directive into their LOPs. In addition, only eight of 20, or 40 percent of the SPRFITs achieved three consecutive months of meeting quorums. For example, although many local SPRFITs mislabeled their meeting minutes as having achieved a quorum seemingly because multiple participants attended the meetings, the participants did not include all required members. The current assessment found only 11 of 20, or 55 percent of the SPRFITs had a signed and/or dated policy and procedure for their "High Risk Management Program" (a process that might be repackaged by the SMHP as the "Suicide Risk Management Program" at some point during 2020). Only one (PBSP) of 20, or five percent of the SPRFITs had a signed and/or dated policy and procedure for identifying inmates who received "bad news" following return from court and/or BPH. With that said, however, the PBSP policy was very basic and did not address the BPH. In fact, this reviewer observed that most SPRFIT coordinators were unfamiliar with the "bad news" policy requirement and incorrectly assumed that the question on the Initial Health Screening form completed by nurses in the R&R Unit which stated, "Has the patient recently received bad news?" was sufficient.

Of note, the compliance indicator of conducting RCAs of serious suicide attempts could not be audited during the assessment period because the SMHP suspended the process in August

2018 for various reasons, including consensus on a working definition of "serious suicide attempt." The SMHP did release a memorandum on October 28, 2019 entitled, "Clarification of Documenting and Reporting Suicide Attempts and Self-Harm Incidents" in an effort to provide guidance to local SPRFITs in their data collection responsibilities. The memorandum, however, did not address the RCA process.

This reviewer's most recent assessment continued to find a few positive SPRFIT practices at a handful of facilities. For example, the SPRFIT at CIW continued to be very active, meetings were generally 90 minutes in duration, and minutes reflected updated corrective action plans for continued suicide prevention deficiencies, as well as regular discussion regarding SRASHE review, high-risk list, safety planning, CIT, Suicide Prevention Outreach Committee (with inmate representative), and summaries of any recent serious suicide attempts, among other issues.

Finally, several local SPRFITs reported compliance with suicide prevention measures that were simply contrary to this reviewer's assessment. For example, this reviewer examined SPRFIT minutes at CSP/Corcoran that indicated a CAP dated October 2017 showed the issue of MHCB patients having allowable possessions, property, and privileges had been "completed." As indicated in other sections of this report, this reviewer found the MHCB unit at CSP/Corcoran to be very problematic and such a CAP was incorrect. At NKSP, each monthly report of SPRFIT minutes report suggested high compliance rates (e.g., 97 percent in September 2019) for SRASHE completion following a CIT response. However, such data was inaccurate. As detailed in another section of this report, only 78 percent of emergent/urgent mental health referrals at NKSP resulted in completion of the required SRASHEs, with most of the problems related to referrals mislabeled as urgent referrals. At SQ, each monthly SPRFIT minutes report suggested high compliance rates (e.g., 100 percent "after emergent MH consult for suicidality" in September 2019) for SRASHE completion. Such data was inaccurate. This reviewer's assessment found 86 percent of emergent/urgent mental health referrals resulted in completion of the required SRASHEs, with most of the problems related to referrals mislabeled as urgent referrals.

Defendants' "April 2020 CAP" for local SPRFITs stated that "Work on the QM [quality management] reboot process to enhance the meaningfulness of the SPRFIT" was underway, as well as "Develop a SPRFIT Coordinator Guidebook to expand on expectations of the SPRFIT Committee." The completion date for these initiatives was estimated to be "mid-2020." In addition, this reviewer was informed by the SMHP that the February 2018 SPRFIT memorandum was scheduled to be converted into a policy and procedure at some point during 2020.

In conclusion, the overall failure of local SPRFITs to establish LOPs, maintain meeting quorums, and develop policies and procedures for high risk management programs and bad news notifications were problematic. Once again, many of the deficiencies identified by this reviewer (e.g., the fact that maximum-security/administrative segregation unit patients in MHCB units received either limited or no out-of-cell yard activity) were easily observable, should have been identified by the SPRFIT committee, and continued to be unresolved.

**Recommendation**:

Rather than focusing on converting a SPRFIT memorandum into a policy and procedure or creating a SPRFIT Coordinator Guidebook, the SMHP should prioritize its efforts in assisting the local SPRFITs which lack not only LOPs for their SPRFIT, but policies and procedures for both a "High Risk Management Program" and identifying inmates who received "Bad News" following return from court and/or BPH. In addition, CDCR should initiate the long-delayed SPRFIT responsibility to conduct RCAs for serious suicide attempts without further delay. Most importantly, local SPRFITs should focus their energies on correcting deficiencies identified by this reviewer's current and previous suicide prevention assessment reports, as well as sustaining implemented corrective actions.

### M)    Suicide Prevention Training

**Summary**:

Previous assessments of both pre-service and annual suicide prevention in-service training (IST), including the *Mental Health Services Delivery System Instructor Guide*, found some concerns regarding content, length of training, and low completion rates for non-custody staff. As a result, this reviewer initially made recommendations to expand the length and content of both the pre-service and annual training workshops to include the following topics: (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative, (2) identifying inmates at risk for suicide despite their denials of risk, (3) updated research on CDCR suicides, (4) identified problem areas and corrective actions from previous CDCR Suicide Reports, and (5) results of recent *Coleman* audits of suicide prevention practices. This reviewer made further recommendations that CDCR ensure that all custody and health care staff received both pre-service and annual IST in suicide prevention, and that the workshops were conducted by qualified mental health staff.

As previously reported, CDCR did not initially agree to expand the length of the pre-service suicide prevention curriculum beyond 2.5 hours of the eight-hour pre-service *Mental Health Services Delivery System Instructor Guide* curriculum. The curriculum was revised on several occasions to include the recommended topics, and then again following this reviewer's critique of a full-day workshop at the Basic Correctional Officers Academy Training on December 7, 2015. Almost three years later in November 2018, the SMHP received approval from the BCOA to expand the pre-service suicide prevention training from 2.5 hours to four hours based upon this reviewer's previous recommendation.

In addition, the annual IST suicide prevention curriculum has been revised on several occasions. This reviewer's preceding assessment recommended—based upon observations during several workshops that instructors were struggling to adequately present all of the PowerPoint slide material within the two-hour allotted time frame and often using different versions of the material—that CDCR should determine the adequate number of PowerPoint slides that can reasonably be covered in a two-hour format and ensure instructors utilize the same PowerPoint presentation.

**Current Findings**:

This reviewer's most recent assessment found that all 20 of the audited facilities had compliance rates for annual suicide prevention IST of custody personnel that were well above 90 percent, with the overall rate of compliance at 98 percent. In addition, there was some improvement in annual suicide prevention IST of both medical and mental health personnel. The current assessment found that 12 of 19, or 63 percent of audited facilities had compliance rates for IST of medical staff that were above 90 percent, the overall rate of compliance at 92 percent. Further, 15 of 19, or 79 percent of audited facilities had compliance rates for IST of mental health staff that were above 90 percent, with the overall rate of compliance at 94 percent. Eight facilities (CCI, CHCF, CMF, CSP/Corcoran, CSP/LAC, MCSP, SQ, and PVSP) had compliance rates for either (or both) medical/mental health personnel under 90 percent. IST data for medical and mental health personnel at NKSP was not made available to this reviewer.

In addition, because a revised IST suicide prevention curriculum was not presented to any of the 20 audited facilities during 2018-2019, this reviewer chose not to observe any training workshops during the most recent assessment. CDCR's most recent IST suicide prevention curriculum (Version 4.0) was developed during 2019, with recommendations provided by this reviewer. The final 54-slide PowerPoint presentation was approved by CDCR's Office of Training and Professional Development in December 2019. The revised training program was initiated in CDCR facilities beginning on January 28, 2020.

Finally, this reviewer was provided with draft versions of the four-hour Basic Correctional Officers Academy Training "Inmate Suicide Prevention" Lesson Plan (Version 1.0) and PowerPoint presentation in January 2020. This reviewer provided a critique and recommended revisions to CDCR in early March 2020. To date, the four-hour Basic Correctional Officers Academy Training curriculum is under final revision and scheduled to be implemented in May 2020.

In conclusion, CDCR maintained high compliance rates for annual suicide prevention IST of custody personnel and showed significant improvement in annual IST of both medical and mental health personnel during this assessment period. This reviewer will begin observing IST suicide prevention workshops in CDCR facilities during the upcoming fifth re-audit period. This reviewer will also observe the newly created four-hour pre-service "Inmate Suicide Prevention" training at the BCOA during the same period.

**Recommendation**:

CDCR should develop CAPs for annual suicide prevention IST in the eight facilities (CCI, CHCF, CMF, CSP/Corcoran, CSP/LAC, MCSP, SQ, and PVSP) that were below 90-percent compliance for suicide prevention training for either medical and/or mental health personnel.

### N)     Continuous Quality Improvement

**Summary**:

     By order of the *Coleman* court (ECF No. 4232, filed August 30, 2012; ECF No. 4561, filed April 23, 2013; ECF No. 5092, filed March 3, 2014), defendants were directed to develop an improved quality improvement process by which CDCR could identify issues and improve its performance levels in the delivery of mental health care.  The result was the development of a Continuous Quality Improvement Tool (CQIT).  During an earlier portion of the SPMW process, CDCR agreed to incorporate this reviewer's "Suicide Prevention Audit Checklist" into its overall CQI process.  The checklist included 19 measures.[10]

**Current Findings**:

     A review of CDCR's revised Continuous Quality Improvement On-Site Audit Guidebook, last revised on August 15, 2019, found it included many, but not all, of this reviewer's 19 "Suicide Prevention Audit Checklist" measures.  During SPMW and All-Parties Workgroup meetings in 2019, CDCR repeatedly stated that all 19 measures would be incorporated into either the CQIT or other CQI processes.  During a larger *Coleman* Policy Meeting with the parties on November 22, 2019, this reviewer was presented with a rebranded version of the "Continuous Quality Improvement On-Site Audit Guidebook" entitled "Continuous Quality Improvement Suicide Prevention: Self-Audit Guidebook."  This rebranded version was still dated August 15, 2019 and contained most, but not all, of this reviewer's 19 suicide prevention audit measures.  During the meeting, CDCR reiterated that the 19 measures would be gathered by a variety of sources, including on-site CQI audits, chart audits by the SMHP, and utilization of "On-Demand" data.  It was further explained that the "Continuous Quality Improvement Suicide Prevention: Self-Audit Guidebook" was designed to be utilized by local SPRFITs in auditing of suicide prevention practices in their respective facilities.  It remained unclear why all 19 suicide prevention audit measures were not included in the Guidebook.

     In any event, this reviewer reiterated the position that any CQI audit report of an individual CDCR facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures.  During the *Coleman* Policy Meeting on November 22, 2019, a SMHP administrator interjected by stating that "if SPRFITs were going to be responsible for

---

[10]They were: Observation of R&R intake screening; Confirming intake screening completeness and privacy and confidentiality; Administrative segregation new intake inmates housed in retrofitted new intake cells for 72 hours; Clothing allowance for MHCB patients; Treatment/safety planning for suicidal ideation in MHCBs; Use of Alternative Housing; Annual suicide prevention training for custody staff, medical, and mental health staff; Five-day clinical follow-ups for MHCB, Alternative Housing, DSH, and Psychiatric Inpatient Program (PIP) returns; Clinical and Custody 30-minute Discharge Checks for non-ASU inmates (Form 7497); Guard One compliance; PT rounds in administrative segregation, SHU, and PSU; Suicide-resistant design of MHCBs; SRASHEs required for emergent/urgent mental health referrals for suicidal ideation; SRASHEs required for admission/discharge in MHCB and alternative housing; Observation and Privileges for MHCB patients; Emergency response equipment in housing units; CPR training for custody and medical staff; SRE Mentoring/7-hour SRE training/Safety Planning training for clinicians; and, SPRFIT responsibilities.

replicating Mr. Hayes's suicide prevention audits in the future, all of the (19) items needed to be included in the Guidebook."

The importance of including all 19 suicide prevention measures in any CQI Guidebook for suicide prevention, as well as ensuring that any CQI audit report of an individual facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures, was again reiterated by this reviewer when meeting with the parties during a *Coleman* Settlement Conference meeting on January 17, 2020.

Defendants' "April 2020 CAP" stated that "16 of the 19 items are in the Suicide Prevention Self-Monitoring Guidebook. The remaining three items are included in discussions through the [California Correctional Health Care Services] CCHCS [quality management] QM Reboot process for incorporation into the SPRFIT Committee metrics at the institutions."

In conclusion, despite an agreement to do so, CDCR has not yet incorporated this reviewer's 19-item "Suicide Prevention Audit Checklist" into either its overall CQI process or audits by local SPRFITs to date.

**Recommendation**:

As CDCR has previously committed to doing, it should immediately: 1) incorporate all of this reviewer's 19 "Suicide Prevention Audit Checklist" measures into any CQI Guidebook, and, 2) any CQI audit report of an individual facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures.

O)    **Suicide Case Reviews**

**Summary**:

The MHSDS *Program Guide* provides detailed procedures in the event of an inmate death by suicide. Following a suicide, the Division of Correctional Health Care Services' (DCHCS) SPRFIT coordinator appoints a Suicide Reviewer to begin reviewing the case. The primary purpose of the suicide review is to try to understand how the death occurred, what was the precipitant(s) to the suicide, as well as any system failures that, once corrected, will allow the agency to improve the suicide prevention program. The Suicide Reviewer examines all relevant documentation in the case, including, but not limited to, the decedent's central file, health care record, and all relevant CDCR policies and procedures. The Suicide Reviewer is assisted by both a custody supervisor from the Mental Health Compliance Team (MHCT) and a Nurse Consultant Program Reviewer. The review also includes inspection of the decedent's cell and its contents, as well as interviews with select custody, medical, and mental health personnel, inmates, and family members of the decedent, when appropriate. Within approximately 30 calendar days of the suicide, the Suicide Reviewer is required to complete a preliminary Suicide Report that contains relevant findings and recommendations, if any, for a QIP regarding the suicide. The preliminary report is forwarded to the DCHCS SPRFIT Coordinator and the report is subsequently discussed at a Suicide Case Review Committee meeting. Members of the Committee include SMHP staff, DAI and nursing leadership, MHCT members, and CDCR

36

Office of Legal Affairs representative(s).  In addition, leadership from the facility where the suicide occurred is represented at the meeting.  Members of the *Coleman* Special Master's team are also invited to observe and participate in the process as necessary.  Following the Suicide Case Review Committee meeting, the Suicide Report is finalized, and local facility leadership is required to implement any QIPs pursuant to a defined schedule.

**Current Findings**:

A considerable strength of the CDCR suicide prevention program continues to be the Suicide Case Review process.  Since at least June 2015, members of the Special Master's team have reviewed each preliminary Suicide Report and observed, as well as often participated in, the Suicide Case Review Committee meetings.  Although members of the Special Master's team have provided critiques of individual preliminary reports that have resulted in some revision of those reports, overall, Suicide Reports authored by the suicide reviewers have not only been very comprehensive but provided thoughtful and targeted QIPs for correcting deficiencies and improving suicide prevention practices.

During 2019, CDCR sustained 38 inmate suicides, with Suicide Reports developed in each case.  This reviewer examined each of those 38 Suicide Reports, as well as nine additional Suicide Reports arising from 2018 suicides that occurred during this reviewer's 2018-2019 re-audit period.  Of the 47 Suicide Reports summarized in the facility assessment sections of Appendix A, only six, or 13 percent, did not contain any QIPs, resulting in 41 Suicide Reports generating approximately 259 QIPs.  Of those, several QIPs were duplicative (e.g., multiple QIPs generated for custody and nursing staff based upon the same deficient emergency response, etc.), resulting in approximately 244 specific deficiencies requiring a QIP.  In sum, these 244 QIPs were categorized as follows:

- Missing a variety of mental health documentation: 74
- Inadequate/lack of SRASHEs and/or Safety Plans: 72
- Level of care errors: 30
- Delay in CPR initiation, cut-down kit retrieval, other: 18
- Psychiatric medication errors: 14
- Administrative Segregation Unit (ASU) deficiencies - new intake cell, Guard One, other: 9
- Problems encountered during MHCB placement: 8
- Nursing documentation (general): 8
- Nursing errors during emergency response: 5
- Problems encountered during RC process: 3
- Delay in 911 activation: 3

Similar to this reviewer's previous assessment, approximately 30 percent (72 of 244) of the QIPs listed above involved inadequate development/lack of SRASHEs and/or safety plans, as well as 12 percent (30 of 244) were related to errors in level of care decisions.  Of note, this recent data indicates a significant increase in QIPs for both inadequate SRASHEs and level of care decisions from this reviewer's third re-audit report, which noted 36 QIPs for inadequate SRE/SRASHEs and/ Safety Plans and nine level of care errors.  In conclusion, although the

Suicide Case Review process remains comprehensive and produces targeted QIPs when appropriate, these reviews continue to identify the same chronic deficiencies throughout the system.

**Recommendation**:

No recommendations are offered related to this issue.

**P)**    **Reception Center Suicides**

**Summary**:

During 2017, 30 percent (nine of 30) of CDCR suicides occurred when inmates were on RC status. The principal concern raised as a result of these suicides was that RC intake nursing and diagnostic center clinicians were not always receiving and/or reviewing timely information from local county jail systems. As a result, an RC Workgroup was initiated in 2018 and began to meet periodically to study the issue.

This reviewer was subsequently informed by the SMHP that the RC Workgroup was disbanded at some time during 2018 when it was determined that another CDCR workgroup (the Executive Learning Institute) was seemingly performing a similar function. One of the Executive Learning Institute's initiatives was creation of a "Transitional Help and Rehabilitation in a Violence-Free Environment (THRIVE)" program, a training curriculum designed to provide new inmates information regarding available CDCR services, how to submit a variety of requests, and what to expect upon entering the prison environment. When it was later determined that the curriculum did not include the topic of suicide prevention, THRIVE project staff were directed to work with the headquarters' SPRFIT staff in creating a suicide prevention module for the curriculum. In a related initiative, CDCR generated an "Expanded Telephone Access and Additional Canteen Draw for Reception Center Inmates" policy, effective April 21, 2017, allowing RC inmates to have "access to a telephone call within the first 7 days in the RC, and once each month thereafter."

In this reviewer's third re-audit report, it was recommended that the RC Workgroup include the following during its deliberations: (1) CAPs in each RC facility to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, nurse's offices where intake screening is administered, and pill call windows; (2) ensure review and distribution of the HQ SPRFIT memorandum regarding the results of the evaluation of "the process used by clinicians when reviewing jail records" as related to the WSP suicide in July 2017; (3) the necessity to provide direction to clinicians assigned to the RC diagnostic testing areas to ensure that they consistently review both the most recent Initial Health Screening forms and any available county jail records prior to and/or during completion of the Mental Health Screening Interview process; and (4) review Chapter 2 ("Reception Center Mental Health Assessment") of the MHSDS *Program Guide* to determine if unclear language regarding requirements for review of health care information from both county jails and prior CDCR confinements is in need of clarification.

Although the RC Workgroup has since been disbanded, and most of the above recommendations were not formally considered, CDCR did generate a "Clarification of Mental Health Documentation Review Requirements," effective August 22, 2019, which re-emphasized previously established responsibilities of RC diagnostic clinicians to review documents that include, but are not limited to, initial intake screening forms, county jail records, mental health records, and custody records. The directive also clarified that RC clinicians should request that the inmate sign a "CDCR 7385 Authorization for Release of Protected Health Information (or ROI)" form during the Mental Health Screening Interview process if a prior history of mental health treatment is reported.

**Current Findings**:

During this reviewer's most recent assessment, the mental health screening and diagnostic evaluation process within the RC facilities (CCWF, CIM, DVI, NKSP, SQ, and WSP) was observed. Overall, this reviewer observed that all diagnostic clinicians conducted appropriate screenings in private offices that ensured both privacy and confidentiality, although suicide prevention posters were not observed in most of the offices. In addition, although almost all RC diagnostic clinicians interviewed by this reviewer stated that they consistently reviewed outside documents relevant to the identification of suicidal inmates, some problematic practices were observed that ran contrary to such proclamations. For example, in one NKSP medical chart examined by this reviewer, the newly admitted inmate screened negative for mental health and suicidal behavioral histories during both the intake screening and mental health screening RC processes on July 26, 2019. However, the inmate's county jail transfer sheet was scanned into the EHRS two days earlier on July 24, 2019 and indicated histories of both suicide attempts and mental illness. As such, the transfer sheet was available to, but apparently not reviewed by, the RC diagnostic clinician as required by policy. In addition, this reviewer examined two cases at NKSP, one of which resulted in a suicide, in which the inmates' self-reports of passive SI did not result in completion of the required SRASHEs by RC diagnostic clinicians simply because they thought it was not their responsibility.

In addition, the mental health diagnostic testing in the RC at SQ was observed on November 5, 2019. This reviewer was informed by the observed RC clinician that they completed the Mental Health Screening Interview form within minutes after the inmate had completed the intake screening process by the nurse. Due to this expedited process, the RC diagnostic clinician stated they did not have time to review either the nurse's Initial Health Screening form or any county jail records. Further, despite the above referenced CDCR directive entitled "Clarification of Mental Health Documentation Review Requirements," which required RC clinicians to request that the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the Mental Health Screening Interview process if a prior history of mental health treatment was reported, this reviewer determined that RC diagnostic clinicians at SQ were not completing this requirement. (As result of this reviewer's finding, a corrective action memorandum was issued to all RC diagnostic clinicians at SQ on November 6, 2019.)

In conclusion, although the number of suicides (i.e., three) occurring in CDCR RCs during 2019 was less than previous years, practices regarding reasonable access and review of relevant documents related to the identification of suicidal inmates remained problematic.

**Recommendation**:

CDCR should provide verification to the Special Master that all RC facilities (CCWF, CIM, DVI, NKSP, SQ, and WSP) are aware of their suicide prevention responsibilities. These responsibilities include, but are not limited to: 1) placement of suicide prevention posters in the offices utilized for direct patient care by RC nurses and RC diagnostic clinicians, as well as RC housing unit bulletin boards and RC pill call windows; 2) diagnostic clinicians are required to review the nurse's Initial Health Screening form, any county jail records, and other pertinent documents contained within the EHRS and the Strategic Offender Management System (SOMS) for each inmate; 3) diagnostic clinicians completing the Mental Health Screening Interview form are to request that the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the screening process if a prior history of mental health treatment is reported; and 4) diagnostic clinicians completing the Mental Health Screening Interview form are required to complete a SRASHE if the screening and/or inmate's behavior suggest a possible current risk for suicide.

## IV.  2019 Suicides Occurring in Close Proximity to Inpatient Discharge and/or Mental Health Referrals

In 2015, only two of 24, or eight percent of suicides occurring in CDCR prisons involved inmates who died within 90 days from being discharged from an inpatient level of care (i.e., MHCB and PIP). In those two cases, the patients had been discharged from an MHCB unit within 30 days prior to their deaths [see this reviewer's "A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (ECF No. 5396, filed January 13, 2016)]. During 2019, however, CDCR reported that nine of 38, or 24 percent of the inmate suicides occurred within 90 days of discharge from either a MHCB unit or PIP, with six of the deaths occurring within five days of discharge (see SMHP's Suicide Prevention and Response Team's "Suicide Prevention Video Conference," January 8 2020). The SMHP had been following this trend during 2019, and due to the concern that some of these discharges were clinically premature, tasked the existing "Inpatient Review Unit/HQ Suicide Prevention Workgroup" to address the issue. To date, although members of the Special Master's team observe these monthly meetings, no corrective action plans of the Workgroup have been provided to the Special Master.

An inmate suicide that occurred on the last day of 2019 provided a tragic example of premature discharges from higher levels of care. According to the CDCR Suicide Report, the inmate (SAC 16) was discharged from the MHCB unit immediately after his IDTT meeting on the afternoon of December 31, 2019. He was still on Suicide Precaution status and clothed in a safety smock. During the meeting, the inmate became angry at being discharged and continuously threatened to kill himself, stating "'If you send me to EOP you are fast tracking me killing myself' and that if he was sent to DSH [Department of State Hospitals] 'That will prolong me killing myself.'" He had also superficially cut himself with a piece of metal the previous day

(December 30). A safety plan was not completed because "IP was upset about being discharged and was not asked to participate in SP, because it would have been therapeutically inappropriate to do so." Following the meeting, the inmate was directly escorted to administrative segregation and committed suicide several hours later on December 31, 2019. The Suicide Report stated that "The rationale for discharge did not address the inmate's ongoing reports of suicidal ideation, recent self-harm with a piece of an object, recent suicide attempt by hanging that perpetuated the MHCB admission, nor address his stressors related to his son's illness, court cases, possibility of serving a life sentence or safety concerns…..Given all these factors, it is unclear why a higher level of care referral was not considered."

In addition to CDCR's concerns for premature discharges from higher levels of care resulting in suicides during 2019, this reviewer also found a significant number of suicides that occurred when either MHCB referrals were not recommended or were rescinded following an emergent/urgent mental health referral for SI/SIB. The MHSDS *Program Guide* requires CDCR "to provide all services with strict observance of Utilization Management guidelines" (12-1-2). As a result of its utilization management efforts at placing patients in the most appropriate level of care, there has been a dramatic reduction in the transfer timelines to MHCB units, resulting in a corresponding decrease in the number of hours that inmates remain in alternative housing and awaiting an inpatient bed. These utilization management efforts have also resulted in dramatic shifts in the level of care for 3CMS and EOP inmates within the MHSDS.

Further, as detailed in the individual facility assessments found in Appendix A, this reviewer's current 2018-2019 assessment found very low censuses in many MHCB units, as well as a corresponding lower utilization of alternative housing compared to previous years. These observations were consistent with CDCR data. For example, according to CDCR's "Summary of Mental Health Population by Institution and Level of Care" data, there were 375 patients in 449 MHCBs as of January 29, 2018, resulting in a vacancy rate of 16 percent. Almost two years later on December 30, 2019, there were 261 patients in 448 MHCBs, resulting in a vacancy rate of 42 percent—a significant decrease in the use of MHCBs.

Such data was consistent with other CDCR data on MHCB rescission rates. According to CDCR's "Crisis Intervention Team: Statewide Data for MHCB Referrals, and MHCB Rescissions and Suicide Watch Cost, January - December 2019," the department reported an overall rescission rate of 24 percent for inmates referred to an MHCB but returned to their housing units. This reviewer's current assessment of 20 audited facilities during 2018-2019 documented similar data, with approximately 25 percent of inmates held in alternative housing subsequently having their MHCB referrals rescinded. Several of these facilities had rescission rates significantly higher than the average: CSP/Sac at 84 percent, CCWF at 59 percent, CSP/LAC at 53 percent, and PVSP at 46 percent at the time of the on-site assessment.

This reviewer identified ten of 38 or more than a quarter of all inmate suicides during 2019 involved cases in which inmates died within eight days of expressing SI and/or SIB, and the resulting clinical assessments did not recommend, or rescinded orders, for a higher level of care. Clinical decisions in these ten cases were later found by CDCR's Suicide Case Review Committee to be inadequate and contributory to the inmates' subsequent suicides. Seven of the

ten suicides took place between zero and three days of inmates' expression of SI and SIB. Summaries of these ten cases are as follows:

MCSP 8:  According to the CDCR Suicide Report, a SRASHE completed on January 11, 2019, following the inmate's expression of SI to correctional officers was problematic because it was done without the cooperation of the inmate and narrative on the form was simply pulled forward from a previous SRASHE.  The CDCR reviewer found that the inmate "refused to talk to the responding mental health clinician in the holding cell located in the middle of the day room without accommodating for confidentiality."  Despite the fact that the inmate did not retract his threat of suicide and did not cooperate with the clinician, a SRASHE was still completed and the clinician decided not to refer the inmate to either alternative housing or an MHCB.  The inmate committed suicide later that evening.

SAC 9:  According to the CDCR Suicide Report, the SRASHEs completed on both March 17, 2019 and March 19, 2019 were problematic because they significantly underestimated the inmate's suicide risk due to the perception that the inmate's behavior was an attempt to influence his housing.  The SRASHE completed on March 17 resulted in a MHCB rescission.  The inmate committed suicide three days later on March 20, 2019.

COR 7:  According to the CDCR Suicide Report, the inmate began expressing SI on almost a daily basis beginning on March 23, 2019.  He was seen multiple times by CIT clinicians, and all of the completed SRASHEs (on March 23, March 27, March 28, and April 10) were judged to be inadequate.  For example, on April 10, the inmate verbalized SI, as well as a crude sexual remark, to the intake nurse upon his discharge from the MHCB unit.  The CIT met with the inmate, but he was "unwilling to participate in the CIT evaluation…. Most of the assessment was completed via record review."  The inmate did not deny SI, and simply repeated the crude sexual remark to the clinician.  The inmate was returned to his cell and committed suicide the following morning (April 11).  The CDCR review found that these multiple SRASHEs "likely underestimated his acute risk as it ranged from low to low-moderate.  In these SRASHEs the justification for risk was inadequate as the SRASHEs did not take into consideration the inmate's increased reports of suicidal ideation, changes in his presentation related to his mental health symptoms, increased violent behavior and non-compliance with treatment and medication.  In addition, the belief the inmate's behavior was related to secondary gain to avoid housing changes likely contributed to the underestimation of risk as well."

SAC 12: According to the CDCR Suicide Report, the SRASHE completed on August 27, 2019 was only four minutes in length and without adequate assessment of the content of suicidal thoughts or the sources of anxiety (e.g., the clinician viewed the acute risk for suicide as low because "the SI was due to anxiety").  The clinician also neglected to assess that the inmate's risk for suicide

was historically elevated when he was anxious and/or agitated.  The inmate committed suicide the following day on August 28, 2019.

MCSP 9:  According to the CDCR Suicide Report, an inmate with an extensive history of SI and SIB behavior reported to a clinician on September 9, 2019 that he was scared of how he was going to die (referring to other inmates hurting him), which made him want to kill himself first to "get it over with."  The clinician assessed his acute risk for suicide as "moderate," stating that "These (acute risk factors) include passive suicidal ideation, suicide attempt within the last three months (July 2019), an RVR [Rules Violation Report] related to escape (ASU admittance).  He also presents with moderate level of paranoia, anxiety/feelings of being trapped, mostly due to long prison sentence and wanting to escape from the fear of believing that others are trying to kill him."  The inmate was not referred to an MHCB and committed suicide two days later on September 11, 2019.  As noted by the CDCR reviewer, "given the inmate's level of risk and overall presentation, he should have been referred to a higher level of care."

SAC 14:  According to the CDCR Suicide Report, Developmental Disability Program (DDP) clinicians observed evidence of the inmate engaging in SIB (head banging with fresh blood on his forehead and shirt) on August 30, September 5, and October 10, 2019.  The required SRASHEs were not completed as a result of any of these incidents.  The inmate committed suicide six days later on October 16, 2019.

KVSP 12:  According to the CDCR Suicide Report, the inmate was escorted to the TTA during the afternoon of November 20, 2019, after reporting both SI and auditory hallucinations.  The nurse contacted the on-call psychiatrist who verbally ordered that the inmate be placed on Suicide Watch in alternative housing.  The following morning (November 21), the inmate was seen by a CIT clinician and denied any SI during completion of the SRASHE.  Both his chronic and acute risk for suicide were assessed as "low."  He was removed from Suicide Watch, the MHCB admission was rescinded, but for unknown reasons, the inmate remained in the designated alternative housing cell and was not returned to his housing unit. The following morning (November 22), the same CIT clinician conducted a five-day follow-up check, with the inmate again denying any SI or any immediate mental health concerns.  At some point on November 22, the inmate was informed by his correctional counselor that his mother had died two days earlier on November 20.  According to the counselor, the inmate was "visibly upset, he cried a little bit," but was able to have a telephone call with his grandmother.  It appeared that clinicians conducting the required five-day follow-up checks were not informed of the inmate's loss.  The inmate committed suicide less than 24 hours later on November 23, 2019.  The CDCR reviewer determined that it was "unclear how acute justification of risk was determined when multiple acute risk factors were not asked as part of the clinical interview or expanded on further in the risk determination and disposition section of the SRASHE."

SAC 15: According to the CDCR Suicide Report, the inmate told an RT on December 5, 2019, that although not currently suicidal, "[he] may do something one day." This same RT stated that the inmate frequently commented that "he wakes up suicidal and goes to bed homicidal." Despite this information, the CDCR reviewer determined that the required mental health referral and SRASHE were not completed. The inmate committed suicide eight days later on December 13, 2019.

NKSP 13: According to the CDCR Suicide Report, the inmate was admitted into CDCR on December 17, 2019 and seen by an RC diagnostic clinician for completion of the Mental Health Screening Interview form two days later (December 19). The interview form had positive results for possible suicide risk, possible depressive disorder, and significant psychiatric history. County jail records indicated an active alert for "suicide risk." The diagnostic clinician noted that the inmate had made a suicide attempt "2.5 years ago 'slit wrists and throat' the scars are observable with the intent to die." Regarding the question on the Mental Health Screening Interview form entitled "Are you thinking of killing yourself at this time?" the inmate responded "Have some brief but not serious thoughts about it." A SRASHE was not completed and the diagnostic clinician later informed the CDCR reviewer that the suicide risk assessment was not completed because "it was going to be completed during his initial" (mental health evaluation). The clinician also stated that RC diagnostic clinicians did not complete SRASHEs during MH Screening process, but rather called the crisis clinician to conduct the evaluation. There were no records of a crisis clinician being called on December 19, and the inmate committed suicide the following day (December 20).

COR 9: According to the CDCR Suicide Report, the inmate reported increased distress with SI on December 20, 2019. The CIT was initiated and responded to the emergency mental health referral. The CIT observed a "superficial cut on his left wrist." According to the CIT clinician, the inmate initially reported feeling suicidal, but later denied SI during the assessment, stating "he was stressed out today because he is getting divorce with his second wife." Despite this information, the clinician marked "yes" to protective factors of "family support" and "spousal support" on the assessment form as a protective factor, and failed to reference the self-inflicted superficial cut on the inmate's wrist as noted by the nurse. The clinician noted in the SRASHE that the inmate's chronic and acute suicide risk were both "low" because "Pt. does not have suicidal history and denied suicidal (sic)." According to the CDCR reviewer, "overall risk was significantly underestimated which resulted in the decision to return the inmate to his housing unit." The inmate subsequently committed suicide the following week on December 27, 2019.

As detailed in Appendix A, two other inmate suicides occurred within 22 days (CCI 4) and 42 days (CMF 9) after the inmates expressed SI and/or exhibited SIB, but responding clinicians

were found by CDCR reviewers to have completed SRASHEs that failed to adequately consider a higher level of care referral.

In conclusion, there was a significant and unprecedented number of inmate suicides in CDCR during 2019. Compared to previous years, there was also a significant decrease in the use of MHCBs, as well as the corresponding lower utilization of alternative housing. CDCR has acknowledged a concern that the discharge of some patients from either the PIPs or MHCBs who subsequently committed suicide during 2019 were premature, resulting in initiation of a SMHP workgroup to address the issue. However, there has not been the same realization and/or acknowledgment that an unintended consequence of the notable decrease in the use of MHCBs and alternative housing has been the significant number of inmates who died within several days of expressing SI and/or SIB and were not admitted into a MHCB level of care. Clinical decisions resulting in inadequate assessments of suicide risk and found to be contributory to an inmate's subsequent suicide need to be immediately remedied by the SMHP if CDCR is to see a reduction of preventable suicides in the future.

## V.    Conclusion and Recommendations

As stated in all of this reviewer's previous assessments, it continues to be noteworthy that CDCR, its management team (including the SMHP and its Suicide Prevention and Response Unit) and legal counsel, as well as local custody, medical, and mental health leadership at each of the prison facilities assessed during 2018-2019, displayed total cooperation during the assessment process. CDCR's full implementation of this reviewer's initial recommendations, as well as the correction of existing and often chronic ongoing deficiencies, continues to progress at varying speeds.

As shown in Table 2 below, there continued to be an increase in the number of inmate suicides in CDCR during 2019, a great source of frustration for all parties in the *Coleman* case. As of December 25, 2019, CDCR housed 117,506 inmates (in-state within its institutions and camps) and experienced 38 inmate suicides, resulting in a suicide rate of 32.3 deaths per 100,000 inmates. The rate of inmate suicides within CDCR during 2019 was significantly higher than the suicide rate of 21 per 100,000 in state prison systems throughout the country.[11] Approximately 71 percent (27 of 38) of the suicide victims were participants in the MHSDS.

---

[11] The suicide rate in state prison systems throughout the country was approximately 21 deaths per 100,000 inmates in 2016. More recent data not available. See Carson, E. and M. Cowhig (2020), *Mortality in State and Federal Prisons, 2001-2016 - Statistical Tables*, Washington DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (BJS).

**TABLE 2**
**YEAR-END POPULATION, OVERALL SUICIDES/RESTRICTIVE HOUSING SUICIDES, AND SUICIDE RATES WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION 2015 THROUGH 2019[12]**

| Year | Population | All Suicides/Rate | Suicides in Restrictive Units/Percent |
|------|-----------|-------------------|---------------------------------------|
| 2015 | 116,467 | 23/19.7 | 9/39.1 |
| 2016 | 117,612 | 27/22.9 | 10/37.0 |
| 2017 | 118,232 | 30/25.3 | 11/36.6 |
| 2018 | 117,230 | 33/28.1[13] | 8/24.2 |
| 2019 | 117,506 | 38/32.3 | 12/31.5 |
| 2015-2019 | 587,047 | 151/25.7 | 50/33.1 |

As stated in previous reports, caution should always be exercised when viewing the above data. Suicide rates are most meaningful when viewed over a sustained period of time and, as stated in this reviewer's earlier reports, although the total number of inmate suicides and the corresponding suicide rate in any prison system can be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured. The best methodology for determining whether a correctional system has fully implemented its suicide prevention program continues to be: (1) the assessment of suicide prevention practices within each prison, and (2) a review of each inmate suicide in relation to practices in the prison and determining its degree of preventability.

However, even with the above disclaimer, the rising rate of inmate suicides within CDCR continued to be troubling, as was this reviewer's finding that ten of 38, or more than a quarter of all inmate suicides during 2019, involved cases in which inmates died within eight days of expressing SI and/or SIB and the resulting clinical assessments did not recommend, or rescinded orders, for a higher level of care. Better clinical decisions need to be made within the SMHP if CDCR is to see a reduction of preventable suicides in the future.

In conclusion, it is again recommended that CDCR continue their efforts to fully implement this reviewer's previous recommendations, as well as develop CAPs based upon deficiencies found in this most recent assessment. As shown below, most of these necessary corrective actions are not necessarily based upon new recommendations, but rather by CDCR's continuing challenge of implementing and sustaining adequate suicide prevention practices. As such, in cooperation with the Special Master and his experts through the SPMW process, CDCR should:

- Develop CAPs for the five facilities (CCI, CMC, CMF, SQ, and PVSP) referenced above. In those facilities requiring physical plant renovation to ensure privacy and confidentiality, including installation of TTMs, the CAPs should

---

[12]Source: California Department of Corrections and Rehabilitation.
[13]Does not include one inmate suicide in an out-of-state private facility.

include project request forms, verification that funds were authorized and received, and deadlines for project completion. Such documentation should be forwarded to the Special Master.

- Develop CAPs for the five facilities (CCWF, CSP/Sac, KVSP, PVSP, and SQ) referenced above to correct PT deficiencies in their restrictive housing units.

- Develop a CAP for the designated observation room within the MHCB unit at CCWF. The CAP should include project request forms, verification that funds were authorized and received, and deadlines for project completion. Such documentation should be forwarded to the Special Master.

- Develop CAPs in all seven facilities (CCI, CMF, CMC, CSATF, DVI, KVSP, and WSP) to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in suicide-resistant new intake cells for the first 72 hours of administrative segregation confinement. Some of the CAPs will again involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available.

- Develop CAPs in each of the three facilities (CCWF, CIW, and CHCF) that continue to have alternative housing lengths of stay well in excess of 24 hours or inadequate practices in the provision of beds.

- Accelerate its corrective actions for the observation of suicidal MHCB patients in each of the 12 chronically deficient facilities (CCWF, CHCF, CIW, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Solano, KVSP, MCSP, NKSP, and SQ). In addition, the mental health leadership at CSP/LAC should conduct a comprehensive review of observation orders within their MHCB unit to ensure that patients are not prematurely discharged from suicide observation status.

- Stop focusing on reissuing memoranda and drafting audit tools and begin focusing on development of CAPs for each of the facilities (CCWF, CSATF, CSP/Corcoran, CSP/LAC, CSP/Solano, and WSP) found to have deficient practices for possessions and privileges afforded MHCB patients. Deficient conditions at CCWF, CSP/Corcoran, and WSP can only be resolved by physical plant renovation that has not been proposed and/or approved by CDCR headquarters. In those facilities requiring physical plant renovation, the CAPs should include project request forms, verification that funds were authorized and received, and deadlines for project completion. Such documentation should be forwarded to the Special Master.

- Develop CAPs for the seven facilities (CCWF, CIW, CIM, CMF, CSATF, NKSP, and SQ) that continue to struggle with completion of required SRASHEs for emergent/urgent mental health referrals involving SI and SIB. Develop CAPs for

the 11 facilities which had completion rates under 90 percent for either the seven-hour SRE training or the SRE mentoring program training.

- Decide whether to retain the SPI model or return to the original concept of safety planning immediately after the recent CAT data is analyzed and well before this reviewer's scheduled fifth re-audit. Finally, during this reviewer's forthcoming re-audit, facilities with MHCB units will be requested to provide evidence that they are complying with the "Mental Health Crisis Bed: Supervisory Review of Discharge Safety Plans" policy, effective March 10, 2020.

- Develop CAPs for the 19 facilities that were below 90-percent compliance with Page 1 and/or Page 2 of the "Discharge Custody Check Sheet" (CDCR MH-7497) form. Revise the "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy," effective January 27, 2016, to indicate that all clinical decisions, including discontinuation of custody checks, can only be made following a face-to-face assessment by a mental health clinician.

- Rather than focus on converting a SPRFIT memorandum into a policy and procedure or creating a SPRFIT Coordinator Guidebook, the SMHP should prioritize its efforts in assisting the local SPRFITs which lack not only LOPs for their SPRFIT, but policies and procedures for both a "High Risk Management Program," and identifying inmates who received "bad news" following return from court and/or BPH. In addition, CDCR should initiate the long-delayed SPRFIT responsibility to conduct root cause analyses for serious suicide attempts without further delay. Most importantly, local SPRFITs should focus their energies on correcting deficiencies identified by this reviewer's current and previous suicide prevention assessment reports, as well as sustaining implemented corrective actions.

- Develop CAPs for annual suicide prevention IST in the eight facilities (CCI, CHCF, CMF, CSP/Corcoran, CSP/LAC, MCSP, SQ, and PVSP) that were below 90-percent compliance for suicide prevention training for either medical and/or mental health personnel.

- Immediately incorporate all of this reviewer's 19 "Suicide Prevention Audit Checklist" measures into any CQI Guidebook, and any CQI audit report of an individual facility's suicide prevention practices should be formatted to contain data on all 19 suicide prevention measures.

- Provide verification to the Special Master that all RC facilities (CCWF, CIM, DVI, NKSP, SQ, and WSP) are aware of their suicide prevention responsibilities. These responsibilities include, but are not limited to: 1) placement of suicide prevention posters in the offices utilized for direct patient care by RC nurses and RC diagnostic clinicians, as well as RC housing unit bulletin boards and RC pill call windows; 2) diagnostic clinicians are required to review the nurse's Initial Health Screening form, any county jail records, and other pertinent documents

48

contained within the EHRS and SOMS for each inmate; 3) diagnostic clinicians completing the Mental Health Screening Interview form are to request that the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the screening process if a prior history of mental health treatment is reported; and, 4) diagnostic clinicians completing the Mental Health Screening Interview form are required to complete a SRASHE if the screening and/or inmate's behavior suggest a possible current risk for suicide.

- Develop a CAP addressing inadequate clinical decisions that result in the failure to place suicidal inmates in higher levels of care.

- Defendants' "April 2020 CAP" should be revised accordingly to incorporate the recommendations contained within this assessment report. The CAP should be updated regularly and forwarded to the Special Master according to the following quarterly schedule: June 30, 2020, September 30, 2020, December 31, 2020, and March 31, 2021, etc.

Finally, as stated in previous reports by this reviewer, continuing re-inspection of select CDCR facilities which chronically struggle with their suicide prevention programs is necessary and would allow for continued provision of technical assistance, a measurement of the sustainability of CDCR's corrective actions, and observation of the department's CQI process at individual facilities, leading to decreased future monitoring and hopefully reduction of inmate suicides throughout the prison system. Pursuant to the *Coleman* court's January 7, 2020 order to provide "a date certain on which the fifth re-audit round will commence," this reviewer will begin the fifth re-audit assessments in selective CDCR facilities when it is safe to do so in light of the COVID-19 pandemic. In addition, and in an effort to expedite CDCR's full implementation and sustainability of adequate suicide prevention practices, this reviewer will begin to schedule monthly on-site meetings with the SMHP's Suicide Prevention and Response Unit (SPRU).[14]

---

[14] This reviewer currently observes weekly and monthly SPRU meetings by telephone. Pursuant to the Special Master's directive, on-site monthly meetings between this reviewer and the SPRU will commence after the reinstatement of in-person monitoring, which, at the time of this writing, remained suspended as a result of the COVID-19 pandemic.

# APPENDIX A

**Findings and Summaries of CDCR Suicide Case Reviews at 20 Re-Audited Prisons During 2018-2019**

       **1)**       **California State Prison - Sacramento (CSP/Sac)**

**Inspection**:  November 13-15, 2018 (previous suicide prevention audit was on May 23-25, 2017).  CSP/Sac housed approximately 2,047 inmates at the time of the most recent on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the intake screening process in the R&R unit on two different occasions on November 13, 2017.  The nurses were observed to be asking all of the questions and correctly entering the information into the EHRS.  The Nurse's Office door was closed during the process, thus ensuring both privacy and confidentiality.

Daily PT rounds in the STRH unit, EOP administrative segregation unit (A-5), and the two (A-1 and A-2) PSUs were observed by multiple PTs during the on-site assessment.  Overall, the PT rounds were performed appropriately, with Psych Tech Daily Rounds information entered into EHRS for each caseload inmate.  However, rounds by one of the PTs in the STRH unit were problematic because the PT simply approached each cell and asked, "Want to answer some questions today?"  Due to the manner in which the question was asked, many inmates responded "No" and the PT moved to the next cell.  The PT supervisor was informed of the problem.

**Housing**:  CSP/Sac had two CTCs; CTC-1 had 15 MHCBs and CTC-2 had 12 MHCBs.  This reviewer previously found that all 27 patient rooms within CTC-1 and CTC-2 were suicide-resistant.  Of note, several rooms in the MHCB units were vacant during the on-site assessment, with 11 of the 25 beds (or 44 percent) empty on November 15, 2018 (two of the 27 beds were red-lined for painting).

In addition, all cells in the 20-bed Mental Health Outpatient Housing Unit (MHOHU) were previously designated to provide temporary, unlicensed MHCB level of care.  Each cell was suicide-resistant and had solid cement beds, ventilation grates, and light fixtures.  However, as reported in all of this reviewer's previous assessments, the environment of the MHOHU remained sterile.  Cells appeared dark and offered limited visibility of their interiors.  Further, although IDTT meetings were conducted in an area outside of the housing unit, there continued to be no clinician offices in the MHOHU.  Therefore, clinical assessments were regularly conducted at cell-front or in therapeutic modules in the MHOHU.  Patients had limited access to out-of-cell time, including yard.  However, this reviewer was informed that the previously deactivated telephone located in the day room had been activated.

This reviewer was informed that use of the MHOHU fluctuated throughout the year.  According to recent data provided by CSP/Sac officials, the unit was occupied for approximately 113 days in 2019 or approximately 31 percent of the time.  As of February 20, 2020, the MHOHU had been reactivated because CTC-2 was closed for renovation.  When activated, mental health leadership at CSP/Sac is said to utilize the unit as overflow, as well as temporary housing for patients transferring to a PIP.

There were 17 designated new intake cells (106-109, 114-121, 217-221) in the administrative segregation EOP unit (A-5) previously found to be suicide-resistant.[15]  In addition, there were 11 designated new intake cells (100-111) in the STRH unit previously found to be suicide-resistant.  Of note, there were several additional new intake cells retrofitted since the previous assessment.  This reviewer did not observe any new intake inmates in non-new intake cells in either the administrative segregation EOP or STRH units.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on almost a daily basis and primarily found in the B-7 Unit.  According to the available data, approximately one to two inmates were in alternative housing each day, and there were inmates placed on the status from August 4 through November 2, 2018.  All were provided beds and required to be observed on a continuous 1:1 basis.  Almost all inmates (99 percent) were discharged from alternative housing within 24 hours, and a very large percentage (84 percent) of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer also examined a sample of 20 EHRS charts of inmates discharged from alternative housing and found that the required SRASHEs were completed in each case.  Of note, it appeared that the vast majority of inmates had expressed SI and/or engaged in superficial SIB due to safety concerns and/or recent downgrading from EOP to 3CMS level of care.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs and MHOHU.  In addition, patients not on suicide observation statuses were required to be observed at 15-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (SAC 1, SAC 2, SAC 3, and SAC 4) on Suicide Precaution status in CTC-1 and CTC-2 during a nine-hour period from 12:00 a.m. through 8:59 a.m. on November 10, November 11, November 12, and November 7, 2018, respectively.  The chart review found very few observation checks (i.e., SAC 1 and SAC 2 each had one violation, SAC 3 had three violations, and SAC 4 had no violations) that were in excess of required 15-minute intervals, with the longest gap between checks being 22 minutes in one case (SAC 3).  Violations in the three cases were committed by multiple nursing staff.

In addition, this reviewer observed only one small concern with the issuance of possessions and privileges for patients assigned to CTC-1 and CTC-2 during IDTT meetings, i.e., one patient was inappropriately clothed in a safety smock because a t-shirt was said not to be available for them on November 13.

Finally, a review of Guard One data for a recent 24-hour period found an overall combined 98-percent compliance rate with required checks not exceeding 35 minutes in STRH, administrative segregation EOP, and two PSU units.  However, as noted below, one recent suicide (SAC 8) at the facility involved a case in which the inmate was found in rigor mortis in his PSU cell, thus calling into question the veracity of Guard One checks at least on that unit, whereas another case (SAC 12) was referred for investigation due to irregularities with the Guard One checks in a PSU.

---

[15]For purposes of this report, "new intake cells" refer to designated cells in administrative segregation units that are retrofitted to be suicide-resistant and house new intake inmates during the initial 72 hours of their confinement.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals during the previous six months.  The TTA log was also reviewed.  This reviewer's sample EHRS review of 31 emergent/urgent referrals for SI/behavior during November 2018 revealed that clinical staff completed the required SRASHEs in 97 percent (30 of 31) of the cases.

However, as indicated below in the CDCR review of five inmate suicides during the reporting period, there were numerous deficiencies in the emergency mental health referral process.  For example, a required SRASHE was not completed in the case of SAC 6, an inmate who expressed SI to an officer (who then informed the PC) on August 27, 2018 and subsequently committed suicide on September 13, 2018.  In the case of SAC 9, SRASHEs completed on both March 17, 2019 and March 19, 2019 were problematic because they significantly underestimated the inmate's suicide risk.  There was a perception that the inmate's behavior was an attempt to influence his housing, resulting in a MHCB rescission.  The inmate committed suicide on March 20, 2019.  In the case of SAC 12, the SRASHE completed on August 27, 2019 was only four minutes in length and without adequate assessment of the content of suicidal thoughts or the sources of anxiety (e.g., the clinician viewed the acute risk for suicide as low because "the SI was due to anxiety").  The clinician also neglected to appreciate that the inmate's risk for suicide was historically elevated when he was anxious and/or agitated.  The inmate committed suicide the following day on August 28, 2019.  In the case of SAC 14, DDP clinicians observed evidence of the inmate engaging in SIB (head banging with fresh blood on his forehead and shirt) on August 30, September 5, and October 10, 2019, but the required SRASHEs were not completed as a result of any of these incidents.  The inmate committed suicide six days later on October 16, 2019.  In the case of SAC 15, the inmate told a RT on December 5, 2019 that although not currently suicidal, he "may do something one day."  This same RT stated that the inmate frequently commented that "he wakes up suicidal and goes to bed homicidal."  Despite this information, the required emergency mental health referral was not initiated for completion of a SRASHE.  The inmate committed suicide nine days later on September 13, 2019.

This reviewer also examined 13 charts of patients recently discharged from the MHCB units.  Despite efforts by mental health leadership at CSP/Sac (beginning in March 2018) in designating SPRFIT members to review the SRASHEs of patients discharged from the units, the review found that safety plans that included specific strategies to address the recurrence of SI continued to be problematic.  Most of the reviewed plans were verbose, and more closely resembled master treatment plans in which all of the patients' problem areas were listed, rather than a specific strategy to reduce SI.  In addition, most subsequent five-day clinical follow-up notes were not in concordance with the safety plans.

Further, this reviewer was able to observe the IDTT processes in both CTC-1 and CTC-2 during the on-site assessment.  Although eight IDTTs were scheduled, five patients refused to attend their respective meetings.  In the three observed IDTT meetings, there was limited discussion of safety planning.  In one case (SAC 5), the patient had been admitted to the MHCB unit two days earlier for SI and SIB.  He had a long history of SIB that included ingestion of objects and a very serious suicide attempt during December 2017 that required six sutures on both legs.  He had a previous PIP placement, as well as two prior MHCB stays within the past six months.  The patient had been diagnosed with Bipolar Disorder and, although there was discussion about his

current psychotropic medication needs, there was no discussion regarding initial safety planning. When asked if he was currently suicidal, the patient responded, "I want to die every day." The IDTT was non-responsive to this statement, and there was not any discussion regarding his observation status, possessions, or privileges.

The case of <u>SAC 1</u> was also very problematic. This reviewer conversed with the patient prior to the IDTT in CTC-1 on November 13. When asked about his status, the patient stated that he had been discharged from the MHCB by his PC that morning and was awaiting transfer back to administrative segregation. When asked to describe his discharge IDTT meeting, the patient responded that he did <u>not</u> have an IDTT meeting. He appeared agitated, conditionally suicidal based upon his desire to avoid administrative segregation, and frustrated by the MHCB process. When asked, the patient appeared unfamiliar with the concept of safety planning. This reviewer subsequently attended the IDTT meetings and inquired about the <u>SAC 1</u> case. Surprisingly, team members admitted that the patient was discharged from the MHCB unit <u>without</u> an IDTT meeting, and stated his case was not atypical. The team referred to the process as a "window discharge," whereby some patients were discussed during the treatment team's daily morning huddle and followed on a regular basis by the PC but did not always necessitate a discharge IDTT meeting. None of the treatment team members could clearly articulate the meaning of a "window discharge." The team also appeared disinterested that the patient should be a vital member of the IDTT process, and that the decision not to schedule a discharge IDTT meeting was contrary to *Program Guide* requirements. With regard to the <u>SAC 1</u> case, the PC stated that the discharging SRASHE had not yet been completed but would be by the end of the day (November 13) and that the PC needed to confer with the correctional counselor I (CC 1) to verify whether or not the patient had a "lock-up order." Of course, such a question could have been easily asked and answered during the IDTT meeting that never occurred.

Following that day's IDTT meetings, this reviewer subsequently conversed with mental health leadership at CSP/Sac to discuss the above findings. As a result, the chief psychiatrist/CTC medical director issued a memorandum to MHCB staff that prohibited any further use of "window discharges" from the MHCB units. Beginning on November 19, 2018, and consistent with long-standing *Program Guide* requirements, all patients were required to be clinically discharged from the MHCB by an IDTT meeting.

This reviewer subsequently examined the safety plan for <u>SAC 1</u> that was contained in the discharging SRASHE dated November 13, 2018. The safety plan was 1½ pages in length and contained such narrative as "PC may explore with IP a Thought Log to develop alternative thoughts to SI…. PC may encourage IP to create a schedule with identified coping skills to practice daily…. PC may discuss with IP self-soothing strategies to promote reduction in anxiety….and use distraction strategies (e.g., writing lyrics, reading the Bible, writing a letter to family, exercise)….PC may also continue discussion of Safe Coping Skills from Seeking Safety Manual discussed during present MHCBs admission." During observation of PT rounds in the STRH unit two days later on November 15, this reviewer again conversed with <u>SAC 1</u>. He again stated that he was unfamiliar with the concept of safety planning and had never heard of the terms "Thought Log" or "Safe Coping Skills from Seeking Safety Manual" that were contained in the safety plan. When asked if he had any coping skills to reduce the recurrence of SI, the patient spoke of writing poetry and music lyrics, as well as reading books. An examination of the

cell found that patient did not have any writing utensils or reading materials. Review of the first day of the five-day clinical follow-up note found that there was no concordance with the safety plan from the discharging SRASHE.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 279 cases of inmates discharged from a MHCB or alternative housing placement who remained at CSP/Sac and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from May 1 through October 31, 2018. The review found that only 72 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Most of the errors were attributable to blank forms or custody checks recommended for discontinuation prior to 24 hours by clinicians. When completed correctly, custody checks were recommended for 48 hours in approximately 62 percent of the cases. In addition, only 63 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with most problems attributable to gaps in observation. Of note, compliance rates were found to be higher in October than they were in May, an indication of some improvement through the review period.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (August through October 2018) found that meetings had quorums of all required mandatory members or designees in all three months. The meeting minutes were otherwise unremarkable. Further, the facility did not have a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum dated February 2, 2018. In addition, the facility did not have any policies and procedures for a "High Risk Management Program" and did not have any policy and procedures for intake nursing staff regarding "Bad News Notification" following the inmate's return from court or Board of Parole Hearings (BPH), both of which were required by the SPRFIT memorandum.

**Training**: According to training records, approximately 99 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 97 percent of medical staff, and 97 percent of mental health received IST suicide prevention training during 2017-2018. Finally, as of November 2018, 93 percent of mental health clinicians had completed the SRE mentoring program, 93 percent had received the seven-hour SRE training, and only 81 percent had received safety plan training.

**Recent Suicides**:  CSP/Sac experienced 11 inmate suicides during the review period, nine (9) of which occurred during 2019.  In the *first* case (SAC 6), the inmate was found unresponsive in his EOP GP unit cell during the morning of September 13, 2018.  The cause of death was later determined to be a suicide by drug overdose.  The inmate entered CDCR on March 15, 2001, to serve a 26-year to life sentence (with the possibility of parole) for first-degree murder and other offenses.  On February 9, 2018, he received a 15-year to life sentence (with the possibility for parole) for the murder of his cellmate.  He was transferred to CSP/Sac on March 26, 2018.  The inmate incurred 55 RVRs during his confinement, the most recent of which was the murder of his cellmate on October 11, 2016.  He was not known to be gang-affiliated.  The inmate never married and had one son from a prior relationship.  He did not have any family support nor recent visits or telephone calls.

The inmate was known to be a poor historian, but records reflected that his parents were divorced when he was approximately four years old.  He and his sister were raised by his mother, aunt and uncle.  The inmate subsequently confided to a clinician that he and his sister were both sexually molested by his uncle as children, and the uncle later committed suicide.  He dropped out of high school and had an extensive history of substance abuse.  Other than a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) as a child, the inmate did not have any other known mental health issues or treatment in the community.  He did, however, inconsistently report several suicide attempts between the ages of 14 and 17 from a medication overdose and cutting his wrist.  Upon entering CDCR, the inmate was diagnosed with Mood Disorder, NOS, and Polysubstance Dependence, and was initially treated at the 3CMS level of care within the MHSDS.  According to the CDCR reviewer in this case, "additional treatment concerns were low frustration tolerance, high entitlement, racing thoughts, expensive mood, nightmares, anxiety, hypervigilance, poor concentration, depressed mood and hopelessness."  The inmate vacillated between 3CMS and EOP level of care during his 17-year confinement and was consistently treated at the EOP level of care since his discharge from a MHCB in November 2014.  His diagnoses from 2014 through 2018 remained Bipolar Disorder, Most Recent Episode Depressed, Severe without Psychotic Features; Polysubstance Dependence in Institutional Remission; and Antisocial Personality Disorder.

The inmate had at least six MHCB admissions between May 2012 and December 2014.  All of these admissions were related to SI.  During his first MHCB admission, he told a clinician that "He wanted to kill himself and that he is 20-years-old and has a life sentence and just cannot handle it."  During an assessment in May 2008, the then 27-year-old inmate told his PC that "I'm going to stay in this program until on 30 and then I'm going to kill myself."  During another assessment on May 29, 2015, the inmate stated that he "always thinks of suicide, but I don't plan on acting on it."  Following the murder of his cellmate, he told an RT in group that "I'm going kill myself when sentenced."  Upon his transfer to CSP/Sac in March 2018, the inmate continued to report passive SI on a regular basis to his PC.  In a SRASHE dated August 27, 2018, a few weeks prior to his death, the inmate "candidly admitted he was struggling to accept his new life term and reported 'I don't know if I can do another 20 years.'"  His clinician noted his chronic risk for suicide was high and his acute risk was moderate. According to the CDCR reviewer, the inmate "was not placed into the MHCB but the risk justification for keeping him at EOP at that time and the safety/treatment plan were thoughtful, well-developed and individualized."

The CDCR reviewer, in this case, did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. However, subsequent interviews with other inmates in his housing unit suggested that he threatened to kill himself via overdose on a nearly daily basis since his arrival at CSP/Sac. These inmates also noted an increase in his drug use and SI in the days leading up to his death. Other than the self-report of SI to a correctional officer on August 27, 2018, this perceived increase in SI was apparently unknown to mental health staff. In addition, other than being diagnosed in April 2018 with Hepatitis C, the inmate did not have any significant medical issues that could be viewed as contributory to his suicide. As stated by the CDCR reviewer, in addition to his high chronic risk for suicide, "information gathered during the course of this review suggests whatever the inmate's hopes for an early release from prison might have been, these ended the day he was convicted of murdering his cellmate. At this point, he understood he would likely never be released from prison, thus closing the loop of a self-fulfilling prophecy that his life would end before he could grow old in prison."

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

1) <u>MCSP</u>: The clinical documentation by the inmate's ASU EOP primary clinicians (October 2016-mid January 2018) contained valuable information about the inmate's conditional suicidal intent. However, this information was not contained within the documentation of his new PC who started working with him in mid-January 2018. The documents provided details of his intent to kill himself if he received additional time, and the inmate's planned method (e.g., overdose by heroin). Further, the inmate's previous treatment plan (September 20, 2017) included a treatment goal to address suicidality; however, this treatment goal was not continued upon the transfer to a new clinician. The absence of this information and discontinuation of an unresolved treatment goal compromises continuity of patient care, and it is difficult to ascertain whether a thorough file review was conducted upon the transfer to care to the new treating clinician.

2) <u>MCSP</u>: The MCSP PC assigned to the inmate's case in mid-January 2018 did not follow the safety plan initiated by the prior EOP PC, which included a SRASHE upon return from court. The inmate was convicted of the murder of his cellmate on February 9, 2018, which resulted in an indeterminate 15-year-to-life sentence on top of his existing life term. There was no documentation of a mental health assessment or suicide risk evaluation, post court hearing.

3) <u>CSP-SAC</u>: In the Initial Mental Health Master Treatment Plan at CSP-SAC on April 4, 2018, the IPOC [Individual Plan of Care] initiated was for anger. By the following IDTT held on June 27, 2018, the focal points of the inmate's individual sessions with his PC centered on his struggles with sobriety, anger, and on-going passive suicidal thinking. However, in the subsequent treatment plan, anger continued to be the only issue listed. Given the specific frequency with which suicidality and substance abuse were discussed and focused on in weekly treatment sessions, they should have been included in the treatment plan.

4) <u>CSP-SAC</u>:  No SRASHE was completed by the EOP GP clinician at CSP-SAC when the inmate reported he experienced daily suicidal ideation during his MHPC initial assessment on April 13, 2018.  A SRASHE was not completed until August 27, 2018, when an officer reported to the PC that the inmate had thoughts of hanging himself.  (See *Discussion/Conclusion* section above for more details).

5) <u>CSP-SAC</u>:  Based on reports submitted by responding staff, there was a five-minute time lapse between the Code 1 radio call at 0640 hours and the entry into the inmate's cell at 0645 hours.  The inmate was classified as General Population and housed on single-cell status in a general population unit.

6) <u>CSP-SAC</u>:  Based on staff reports, reviewer's observations during the on-site review, and additional documents reviewed during the suicide case review, it is unclear if the inmate's cell was processed per policy or if his personal items, drawings, and notes remained in the cell.

7) <u>CSP-SAC</u>:  Based on staff reports, reviewer's observations during the on-site review, and additional documents reviewed during the suicide case review, it is unclear if information regarding the inmate's death was documented or communicated appropriately by staff.

8) <u>CSP-SAC</u>:  9/13/18: Only one dose of intranasal Narcan was administered in the TTA as documented in the progress notes.

In the ***second*** case (<u>SAC 7</u>), the inmate was found hanging from the bunk by a television cable in his GP cell during the late afternoon of December 12, 2018.  The inmate entered the CDCR system in July 2014 to serve a life sentence with the possibility for parole for inflection of corporal injury on a spouse/cohabitant (his ex-girlfriend), assault with a deadly weapon, and attempted manslaughter.  He was transferred to CSP/Sac on October 23, 2018.  The inmate incurred three RVRs during his confinement, the most recent of which occurred in March 2016 and involved battery on a peace officer.  He was known to be gang-affiliated until May 2016 when he requested Sensitive Needs Yard (SNY) status.  The inmate never married and three children.  He had good family support through both telephone calls and visits by one of his daughters.

According to available records, he and five siblings were raised by both parents.  The inmate was known to be a poor historian, and there was inconsistent reporting of history of domestic violence, alcoholism, and possible sexual abuse within the family.  He had a history of mental health treatment in the community, and self-reported that he was previously diagnosed with both paranoia and command auditory hallucinations (to kill himself and others).  The inmate began abusing drugs and alcohol as a teenager, as well as being gang affiliated.  He had an extensive criminal record that included two prior CDCR terms.

Upon entry into CDCR in July 2014, the inmate was initially diagnosed with Schizophrenia, Polysubstance Disorder, and Antisocial Personality Disorder.  He was treated at the 3CMS level of care within the MHSDS, remain compliant with prescribed psychotropic medication, and was

eventually stabilized resulting in his discharge from the MHSDS in December 2015. However, a few months later, in February 2016, the inmate began demonstrating bizarre behavior and assaulting officers on several occasions. The inmate was initially housed in an MHCB and then subsequently transferred to acute care at CHCF in March 2016. He was subsequently transferred to the intermediate care program at SVSP, where he remained until his discharge to SVSP at the EOP level of care in March 2017. His revised diagnoses were Schizophrenia, Post Traumatic Stress Disorder, and Cannabis Use Disorder.

The inmate appeared to program well in EOP and was eventually transferred to KVSP in August 2018 to be closer to his family. In fact, once transferred to KVSP, he began receiving regular family visits for the first time in seven years. However, in early October 2018, he informed his clinician that he had been endorsed for transfer to CSP/Sac. As result, the inmate began reporting sleeping difficulties and occasional anxiety. He was transferred to CSP/Sac on October 23, 2018 and suffered an unprovoked attack by his cellmate three days later. The inmate's injuries were serious, and he was sent to an outside hospital for treatment. He returned to the facility on November 1, 2018 and was placed in mainline EOP housing. His diagnosis was revised again to Schizophrenia.

The inmate reported a limited history of suicidal behavior, including one suicide attempt at age 16 in the community. There were also reports that he attempted suicide by cutting his wrist while confined in a county jail in 1996. His inpatient records from DSH indicated the following assessment: "The inmate may become suicidal when he experiences significant stress, which exacerbate his auditory hallucinations that command him to kill himself. In addition, the inmate has medical problems related to chronic pain and medical issues. He may attempt to end his life if he believes that the pain he is going through is too unbearable." A review of his medical records found that he suffered from diabetes, diabetic retinopathy, hyperlipidemia, and hypertension. The most recent SRASHE was completed in September 2017, and the inmate was assessed as being a moderate chronic risk and low acute risk for suicide. He met with his PC on December 10, 2018, and the clinician noted that the inmate appeared stable with no signs of acute decompensation.

The CDCR reviewer in this case, did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and it was thought that "a totality of stressors accumulated to the point where the inmate either no longer wanted to cope or wasn't able to." These stressors included a sudden prison transfer resulting in the end of visits with his daughter and recent serious assault by his cellmate.

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

> 1) A review of the CDCR 837-C Crime Incident Reports indicate that the ligature was cut from the inmate's neck, he was placed in restraints while staff began initiating CPR. The inmate was classified as a general population inmate housed in a general population housing unit.

In the _**third**_ case (SAC 8), the inmate was found hanging from the light fixture by a sheet in his PSU cell during the morning of January 21, 2019. His body was in the state of rigor mortis. The

inmate entered the CDCR system in April 2007 to serve a 16-year term for voluntary manslaughter with use of a firearm. During his term, the inmate was convicted of resisting an officer with threat of violence, which added another 32 months to his sentence. He was transferred to CSP/Sac on November 7, 2018. The inmate incurred 17 RVRs during his confinement, the most recent of which occurred on October 25, 2018, involving a failure to present for count. Many of the RVRs were for battery and fighting with other inmates. He was well known to be gang-affiliated and was granted SNY status in July 2013. The inmate was transferred to 22 different CDCR facilities during his almost 12 years of confinement, almost all of the transfers related to administrative segregation placements due to safety concerns and custody status. Since 2014, the inmate had been provided a "single cell chrono" due to his extensive history of mutual combat with other inmates. According to the CDCR review of this case, "he was described as an inmate who promoted racial unrest and pressured other inmates to join 'prison politics'." The inmate was unmarried at the time of his death and inconsistently reported having children. He appeared to have visits by family members (an aunt and cousin) until October 2016 when all such support ended for unknown reasons.

According to available records, the inmate and two siblings had turbulent childhoods. He was raised by his grandparents, as well as lived in group homes and foster care placements throughout his childhood and adolescence because his parents were involved in the criminal justice system and unable to raise him. The inmate reported an extensive history of being physically abused while in group homes and foster care placements. He reported abusing both alcohol and drugs at an early age and became involved in the juvenile justice system as a teenager. The inmate's adult criminal history was limited to the instant offense occurring in November 2005.

The inmate did not report a history of mental illness or treatment in the community and was not initially placed in the MHSDS upon his entry into CDCR in April 2007. However, he was placed at the 3CMS level of care in September 2013 following several mental health referrals regarding anxiety, impulse control issues, and aggressive behavior. He was initially diagnosed with a mood disorder. He was briefly placed in an MHCB in April 2014 for danger to self, and then again, the following year in both January and July 2015. Several months later, in November 2015, the inmate reported increasing anxiety and paranoia that contributed to significant SI. He was subsequently placed in the DSH at the acute level of care with an additional diagnosis of Psychotic Disorder. In March 2016, the inmate was again placed in the DSH at the intermediate level of care. He returned to CDCR in August 2016 at the EOP level of care.

The inmate functioned well within EOP for almost a year and then in June 2017 began to endorse SI, as well as persecutory delusions and auditory hallucinations. He was initially placed in an MHCB and then referred to the acute level of care at the CHCF-PIP. The inmate's diagnosis was revised to Schizoaffective Disorder, Bipolar Type. He remained in acute care at the CHCF-PIP until his discharge back to the EOP administrative segregation unit in December 2017, but quickly decompensated and was placed in intermediate care at the CHCF-PIP in January 2018. The inmate was mostly uncooperative in the intermediate care program, invariably saying "I don't need to be here" and "I have a right to refuse this treatment." He was eventually discharged and returned to CDCR in March 2018. He was briefly held in an MHCB after expressing SI during one of his five-day follow-up assessments. During the next few

months, the inmate was intermittently compliant with his mental health treatment in the EOP administrative segregation unit. He attended less than 50 percent of his groups but remained medication compliant. On June 19, 2018, the inmate did not attend his monthly IDTT and was noted to attend only three hours of treatment during the previous month. On July 20, 2018, he was transferred to the PSU at CSP/Sac. The inmate continued to resist group treatment, missed several IDTT meetings and psychiatrist appointments, and began refusing medication. On September 25, 2018, he again refused to attend his IDTT meeting, and the team subsequently opined that "while IP does exhibit mental health symptomology including delusional thought content and AH [auditory hallucinations] at times, it appears now that his symptoms are stabilized enough so is able to attend treatment if he chooses." Despite this view, his behavior continued to deteriorate, although he continued to consistently deny any SI. The inmate continued to refuse psychotropic medication.

On November 7, 2018, the inmate returned from an out-to-court appearance in which he was given an additional 32-month sentence for resisting an officer with the threat of violence. Although seen by his PC the following day (November 8), the inmate refused to speak with the clinician who later wrote in a progress note that "he presented with significant paranoia." There was no documentation in the note concerning inquiry regarding suicide risk or if he had received bad news in court. The CDCR reviewer in this case subsequently interviewed the PC who conceded that they were unaware the inmate had received bad news or an additional sentence when he returned from court.

The inmate continued to be resistant to treatment and refused to meet with his PC in a confidential setting or attend group. He continued to express irritation and verbalized a desire to be discharged to 3CMS level of care, reporting on January 2, 2019 that "people working in prison are blocking him from accomplishing anything or receiving any help that he feels he needs." He was unable to identify the areas that needed accomplishment and continued to present with paranoia while denying SI. The inmate refused his IDTT meeting on January 15 and met with his PC the following day (January 16), which was their last interaction prior to his suicide. According to the progress note, "he generally presents with a significant paranoid delusional thought process, and this was slightly evident today. His insight is limited and his judgment is fair attention and concentration were intact. IP did not report suicidal ideation, intent, or plan at this time."

Although the inmate did not report a history of suicidal behavior in the community, the CDCR reviewer in this case determined that the inmate had an inaccurate history of suicide attempts within CDCR documented in multiple SRASHEs. His final SRASHE was completed on November 6, 2018, as part of a routine follow-up assessment. According to the CDCR reviewer, "there were documentation errors related to past suicide attempts noted without collaboration. The previous on collaborated suicide attempts mentioned in previous paragraphs pulled forward from previous SRASHEs. The chroniclers for suicide was listed as moderate, where the clinician justified this rating due to his three past suicide attempts, history of assaultive behavior, history of psychosis, history of substance abuse, long history, and victimization as a child."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. In addition, he did not have any

significant chronic medical issues which were felt to be contributory to his death. During the last six months of his life, the inmate was, according to the CDCR reviewer, "primarily isolative as he did not attend his treatment groups, did not go out to yard, and seldom went to the treatment center for individual sessions with his primary clinician and psychiatrist. He also exhibited intermittent paranoia regarding peers and staff, as well as intermittent aggressive and disruptive behavior.... His paranoia and isolation were significant factors contributing to his suicide."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

> 1) PIP-CHCF-ICF: When the inmate was discharged from PIP-CHCF to EOP level of care on March 28, 2018, he did not receive a discharge SRASHE as required by PIP policy 'Treatment and Planning Procedures: Discharge Policy and Procedure 12.11.2101 (B).'

> 2) CMC: After the inmate was discharged from the PIP-CHCF and returned to CMC on March 29, 2018, there was no documentation of a clinician to clinician contact as required by PIP policy 'Treatment and Planning Procedures: Discharge Policy and Procedure 12.11.2101 (B).'

> 3) CSP-SAC and CSP-LAC: On November 6, 2018, and November 7, 2018, the primary clinician attempted to make clinician to clinician contact as required by ASU policy 'Mental Health Clinician to Mental Health Clinician Contact in the ASU 12.06.401,' but according to the documentation this was never achieved. Speaking to the primary clinician, this clinician to clinician contact was achieved, but it was not documented in the electronic health record.

> 4) CSP-SAC: On November 7, 2018, the inmate returned from court, and while the primary clinician appeared to be cognizant of his out to court appearance, she was not privy to information that the inmate received an additional sentence of 32 months, which can be considered bad news. This lack of information could have resulted in an underestimation of the inmate's suicide risk.

> 5) CSP-LAC and CMC: The SRASHEs on November 6, 2018, and March 30, 2018, listed the inmate's chronic suicide risk as moderate despite the recording of three previous suicide attempts which would indicate he was a high chronic risk. These SRASHEs contained inaccurate information regarding his suicide attempt history, which if accurate, would have supported a lower suicide risk determination, but these SRASHEs lacked appropriate justification for the risk level selected based on the information in the SRASHE.

> 6) CSP-SAC: Based on reports submitted by responding staff, the inmate was observed to have possible signs of rigor mortis evidenced by generalized stiffness of his body. Furthermore, staff reports indicated the inmate's cell window was obstructed with a bedsheet during the Guard One Security Welfare checks. The aforementioned information presents the possibility of the inmate's window being fully obstructed during the prior Guard One Security Welfare check. These staff

reports call into question the thoroughness of the previous Guard One Welfare
Checks completed during the prior and current watch.

In the **_fourth_** case (SAC 9), the inmate was found hanging from the ventilation grate by a sheet
in his PSU cell during the early morning of March 20, 2019. The inmate entered the CDCR
system on July 24, 2017 to serve a life sentence without parole for seven counts of murder. He
was transferred to CSP/Sac on March 6, 2019. The inmate incurred only one RVR during his
confinement, an incident that involved throwing a food tray and urine on nursing staff in a PIP
on December 24, 2018. As a result, the inmate was subsequently placed in the PSU. He was not
known to be gang affiliated. The inmate did not have a wife or children. He had limited contact
with his parents, and there was no record of any visiting or letter correspondence.

According to available records, the inmate and five siblings were raised by their parents until
their subsequent divorce, after which he resided primarily with his mother. The inmate
immigrated to the United States from South Korea at age 20 and had difficulty maintaining
steady employment. It was around this time that the inmate began experiencing depression, and
this included recurring SI and isolation. Records describe a pervasive pattern of difficulties in
interpersonal relationships, isolative behavior, paranoia and suspiciousness of others throughout
his late adolescence and early childhood. It did not appear that the inmate received any mental
health treatment for these symptoms. It was during this time in April 2012 that the inmate
walked into his former place of employment and shot and killed seven individuals. He was
subsequently arrested and twice attempted to commit suicide while housed in the county jail in
2012. The inmate was then placed on a psychiatric hold at Napa State Hospital (NSH) for five
years as result of being found incompetent to stand trial. His competency was ultimately
restored. Of note, despite his five-year NSH commitment, his medical records were never
requested by clinicians who treated the inmate in CDCR.

Upon entrance into CDCR, the inmate was initially placed at the 3CMS level of care within the
MHSDS with an initial diagnosis of Schizophrenia, Paranoid Type. However, shortly thereafter,
he was admitted to an MHCB on two different occasions in August 2017 for SI ("I'm better off
dead then dealing with all this"), followed by placement in a PIP at the acute level of care from
September 11, 2017 through November 20, 2017. The inmate was discharged to the EOP level
of care but was readmitted into a MHCB two days later on November 22, 2017. He remained in
this placement until December 8, 2017, whereupon he was placed in a PIP at the intermediate
level of care. According to records, the inmate was referred to intermediate care on the basis of
grave disability, as a "result of ongoing paranoia and persecutory delusions, guarded and
uncooperative behavior, auditory and visual hallucinations, hyper-religious thoughts and need for
longer stability in an inpatient unit. His diagnosis largely remained Schizophrenia, Paranoid
Type during the course of his mental health treatment." He was often not compliant with
psychotropic medication.

The inmate remained in the intermediate care program for over 12 months before being
discharged after incurring the RVR on December 24, 2018. The intermediate care discharge plan
stated that he "was unable to benefit from the treatment offered" in the intermediate care
program and that he would benefit from a "longer term mental health setting." This discharge
plan also recommended that the inmate "be placed in a modified EOP, was not suitable for group

treatment, and provided a detailed warning that he was at risk for suicide."  He was then placed in the administrative segregation unit at CHCF until March 6, 2019, when he was transferred to the MHCB at CSP/Sac due to grave disability.  Although he remained fairly stable in the MHCB, accepting meals and showering every other day, he refused most clinical contacts, refused to answer any question regarding suicidality, and continued to deny he had a mental illness.  The inmate was discharged from the MHCB on March 15 and placed in the PSU.

Clinical documentation from five-day follow-up assessments indicated that the inmate was observed to be laying on the floor underneath his bed (on March 16) refusing to interact with staff and refusing to take meals.  A PSU clinician documented there was "no evidence of distress or self-harm," and his current presentation "was attributed to a clinical diagnosis of psychosis."  However, an emergency mental health referral was initiated when the inmate became non-responsive during custody welfare checks.  The inmate was assessed, and a SRASHE was completed indicating both a "high" acute and chronic risk for suicide.  The inmate was placed in alternative housing awaiting MHCB placement.  The following morning (March 17), he was reassessed, the MHCB placement was rescinded, and the inmate was returned to PSU housing.

The inmate continued to be seen daily by clinicians as required of the five-day follow-up process on both March 18 and 19.  He was verbally combative, remained under his bed, refused meals, and again refused to respond to custody officers during wellness checks.  According to a PSU clinician, although the inmate did not make any direct statements endorsing suicidality, he stated on March 19 that "he did not want to live like this."  According to the SRASHE completed that day (March 19), he "reported belief that custody staff left materials in his cell to make a noose as to encourage him to kill himself.  IP stated he does not plan to eat or drink water, plans to sleep on the concrete floor, and continue hiding under his bed, until he is removed from the PSU."  The inmate was assessed as being at "low" acute risk and "moderate" chronic risk for suicide.  Despite the fact that he no longer had the support of family members, the clinician listed "family support" as one of his protective factors against suicide on the SRASHE and in a corresponding five-day follow-up form.  The clinician also wrote on March 19 that the inmate was informed: "his behavior is staff manipulation for secondary gain, and he could receive an RVR because he is misusing staff resources."  The inmate committed suicide less than ten hours later.

According to the CDCR reviewer in this case, although not able to "definitively state what the reasons for this inmate suicide were at this particular time, information gathered during the course of this review suggests the inmate was struggling to cope with the prison environment, had an increase in his mental health symptoms, including paranoia that staff were out to get him, and shame regarding the impact of his controlling offense on his family.  The inmate managed to maintain some degree of stability while in inpatient settings, however, once discharged and facing the stress of a prison environment, he rapidly decompensated."  The inmate did not have any significant chronic medical issues that were felt to be contributory to his death.

The Suicide Report contained nine (9) recommendations for corrective action through a QIP:

    1) <u>CHCF</u> and <u>NSH</u>:  There appeared to be both a misperception regarding the need for a Release of Information (ROI) to obtain records from Napa State Hospital, and lack of response to the record request at NSH. Policy states that the

Department of State Hospitals can release pre-incarceration records to CDCR without an ROI if the request for the records from CDCR is for continuity of care. There is also an emergency provision which allows CDCR staff to obtain state hospital records. The inability to obtain the NSH records compromised the inmate's treatment, including pursuing a PC2602, accurately identifying suicide risk, diagnostic clarification, and identifying and developing treatment goals.

Additionally, there appeared to be a misperception that staff were not able to speak to relatives without an ROI. Given that there appears to be a broader misconception regarding requirements for ROIs in the sharing of information between CDCR and DSH, this QIP will be assigned to the HQ SPRFIT team and NSH.

2) CHCF-PIP-ICF: The inmate was discharged to EOP level of care on December 27, 2018, despite a documented increase in mental health symptoms and recent CCAT with follow-up recommendations. In documenting the rationale for this clinical decision, the treatment team stated the inmate had reached full treatment benefit, and required longer term placement in a mental health program. The discharging psychologist documented the inmate was a potential danger to others, resulting in a single cell chrono, and at increased suicide risk in a prison setting. Given the escalation in his behavior in December 2018, extensive mental health history which impacted his ability to program in a prison setting, refusal to take psychiatric medications, and concern for both his safety and the safety of others, this did not appear to be a patient who had reached stability to discharge.

3) CHCF: While in EOP from December 27, 2018 to March 5, 2019, the inmate continued to have difficulties adjusting to the prison setting. Multiple instances of clinical nursing documentation describe ongoing erratic behavior, including extreme paranoia, refusals to shower or attend any treatment modalities, disheveled appearance, refusal to participate in custody welfare wellness checks resulting in multiple extractions, documented nursing concern of risk of self-harm, alternating between being mildly cooperative to verbally combative towards staff, and ongoing delusional thought patterns. Given the constellation of above symptoms, it did not appear the inmate was stable and may have benefited from further consideration of a higher level of care prior to his MHCB admission on March 6, 2019.

4) CHCF and SAC: The SRASHEs completed on March 5, 2019, March 6, 2019 (both at CHCF), and March 13, 2019 (at SAC), were comprehensive, with good record reviews, and comprehensive safety plans. However, all three indicate the inmate had no protective factors, was uncooperative with answering questions related to suicide, and described him to be chronically mentally ill. Risk determination remained either moderate or low for both acute and chronic risk. Given the lack of any identified protective factors, and refusal to answer questions regarding suicidality, it is likely risk was underestimated. It is recognized the primary concerns were regarding symptoms of grave disability, but given the

severity of mental health symptoms, refusal to take medication, refusal to communicate with family, either upcoming discharge to or current placement in a prison setting, and history of suicide ideation, the risk for suicide was likely higher.

5) <u>SAC</u>:  The SRASHEs completed on March 17, 2019 and March 19, 2019 were problematic.

6) <u>SAC</u>:  The 5-Day Follow-Up completed on March 19, 2019 was problematic.

7) Several psychiatrists chose not to pursue a non-emergent PC 2602, due in large part to their current understanding of PC 2602 regulation language regarding criteria and evidence considered.  Additionally, psychiatrists may have focused solely on current real-time symptoms or behaviors when considering if the patient met PC2602 criteria, failing to also include the totality of symptoms and sequelae over several months (symptoms and functioning that may have prevented the patient from surviving outside the structure and supervision of an inpatient setting, which may have bolstered a request for a PC 2602 court order).

8) Psychiatrists at both CHCF-PIP and CSP-SAC failed to add content to or update the 'Medication Review' tab of the MH Master Treatment Plan power form.

9) Activation of the Emergency Medical System (calling 911) did not take place until approximately 11 minutes into the emergency, which caused a significant delay in appropriate medical response.  In accordance with the memorandum issued January 22, 2018, titled 'Response to Suicide Attempts by Hanging or Asphyxiation, Introduction of the Replacement Cut-Down Tool, and Standardization of the Cut-Down Kit,' medical and custodial staff shall be informed of the nature of the emergency by the most expedient method available and Emergency Medical Services (911) call shall be initiated immediately.

In the ***fifth*** case (SAC 10), the inmate was found hanging from the ventilation grate by a sheet in his PSU cell during the afternoon of June 11, 2019.  The inmate entered the CDCR system in August 1999 to serve a life sentence with parole eligibility for three counts of robbery.  He was transferred to CSP/Sac on May 20, 2019.  The inmate incurred approximately 200 RVRs during his confinement, many of which were for IEX, and the most recent occurring on April 13, 2019, for threatening grave bodily injury.  He was not known to be gang affiliated.  The inmate was single and did not have any children.  He had little family support, and there was no record of any visiting or telephone calls since 2012.

According to available records, the inmate was primarily raised by his mother as his father's whereabouts were unknown.  He self-reported being physically abused by his mother and had been homeless as a child.  At age 13, the inmate often ran away from home and was placed in various group homes.  He did not graduate from high school, began to abuse drugs, and spent

time in the juvenile justice system.  Although diagnosed with ADHD while in juvenile hall, he did not receive any mental health treatment in the community prior to entering CDCR.

He was placed in the MHSDS at the 3CMS level of care in July 1999, with an initial diagnosis of Schizoaffective Disorder.  During his almost 20 years of confinement, he was primarily maintained in EOP, but had multiple admissions to MHCBs and PIPs.  In fact, the inmate was admitted to the inpatient acute and intermediate care programs approximately 15 times, with diagnoses of Psychotic Disorder, Exhibitionism, and Antisocial Personality Disorder.  His most recent diagnoses of Schizoaffective Disorder, Bipolar Type, Exhibitionistic Disorder, and Antisocial Personality Disorder was revised on May 20, 2019.  The inmate was on a PC 2602 order since at least 2008, primarily for danger to self or danger to others.

The inmate's six admissions to MHCBs during 2018 and 2019 were primarily due to SI.  The inmate was viewed by clinical staff as an inconsistent historian regarding his prior history of suicidal behavior.  He reported prior suicide attempts by hanging in 2007, 2010, and 2013, but collateral documentation suggested that these events were classified as plans to commit suicide or the inmate showing a ligature to staff.  He also had numerous documented incidents of SIB by superficially cutting and banging his head.  He had numerous SREs completed during his almost 20 years of CDCR confinement, and his risk levels from 2018 forward found that he averaged between both "moderate" chronic and acute risk for suicide.

The inmate's most recent inpatient placement occurred on January 3, 2019, when he again endorsed SI related to his psychotic symptoms and depression.  He was initially placed in an MHCB before being transferred to the CHCF-PIP from January 14, 2019 through May 19, 2019.  The inmate was initially assigned to the acute care program before being transferred to the intermediate care program on March 14, 2019.  The last SRASHE completed on the inmate occurred on May 17, 2019, prior to his discharge from the intermediate care program to the EOP level of care at CSP/Sac.  The treatment team determined that the inmate had met his treatment goals "to the best of his ability," had not engaged in self-harm for approximately one month and had "stabilized on his current medication regime so he was ready for discharge to EOP level of care."  He did, however, continued to report passive SI throughout his hospitalization.  Despite this SI, the subsequent safety plan contained within the SRASHE was viewed as inadequate by the CDCR reviewer in this case.

Upon his subsequent arrival at CSP/Sac on May 20, 2019, the inmate was placed in the PSU.  Two days later, on May 22, he met with his PC and endorsed auditory hallucinations and persecutory delusions concerning the government.  He stated the symptoms were increasing his depression but denied any SI.  The inmate's medications were adjusted.  According to records, his attendance in treatment groups was inconsistent during the next several weeks.  The inmate's last clinical contact occurred with his PC on June 5, one week before his suicide.  He complained about his psychotropic medication and "mentioned still feeling bothered by the voices despite the increase in meds."  The inmate requested to speak with the psychiatrist.  The PC note did not include any inquiry regarding SI.

According to the CDCR reviewer in this case, although not able to "definitively state what the reasons for this inmate suicide were at this particular time, information gathered during the

course of this review suggests his complex mental health history may have overwhelmed him and contributed to his decision to end his life. The inmate had complained of delusions and persecution/paranoia, auditory hallucinations, and associated mood symptoms for over 10 years according to the clinical documentation. Since 2008, he had spent approximately 66% of his incarceration in an inpatient setting at 33.99% in a segregated housing unit…..On the day of his suicide, the inmate wrote on a health care services request form he was experiencing increased paranoia and auditory hallucinations. It is possible his chronic psychotic and mood symptoms overwhelmed him as he could not obtain obvious long-term stability despite numerous inpatient hospitalizations and intense medication adjustments." The inmate did not have any significant chronic medical issues that were felt to be contributory to his death.

The Suicide Report contained 13 recommendations for corrective action through a QIP:

1) CHCF-PIP-APP: On June 20, 2018, the inmate was discharged from CHCF-PIP-Acute in a safety smock. This appears to be contrary to the 'PIP Discharge Policy 12.11.2101B' which states 'If discharged to a lower level of care, the patient can be satisfactory treated and function adequately at a lower level of care.' It is unlikely the inmate was able to function adequately at a lower level of care if the clinical treatment team assessed his risk to be high enough to require a safety suit. It is likely the inmate was not clinically appropriate for discharge to a lower level care at this time.

2) CHCF and CSP-SAC: After the inmate returned from the PIP on June 21, 2018 (CHCF) and May 20, 2019 (CSP-SAC), there was no clinician to clinician contact documented as required in 'PIP Discharge Policy 12.11.2101B.'

3) CSP-SAC: When the inmate returned to CSP-SAC from CHCF-MHCB on July 25, 2018 and from CHCF-PIP on May 20, 2019, Day One of the 5-Day Follow-Up was not completed as required per policy 'Intermediate and Acute Discharge Policy Follow-Up 12.06.501'. There was also no SRASHE completed as required in *Program Guide*, Chapter 10 after his return from PIP. This could have led to an underestimation of the suicide risk, warning signs, and triggers.

4) CSP-SAC: The SRASHEs on August 3, 2018 and September 7, 2018 rated the inmate's chronic and acute risk factors as low. His chronic risk rating of low does not appear clinically appropriate given his history of reported suicide attempts, self-harm, and numerous inpatient hospitalizations for danger to self. A moderate or high chronic risk would have been more clinically appropriate given his history. Additionally, the safety plan for these SRASHEs was found to be inadequate as it did not provide a plan for addressing triggers for crises. On a SRASHE completed October 30, 2018, his chronic risk was listed as moderate which was not likely clinically appropriate given the suicide attempt required a custodial use of force to prevent. This could have led to an unintended underestimation of his overall suicide risk.

5) <u>CSP-SAC</u> and <u>CHCF-PIP</u>:  The safety plan on the SRASHEs completed on June 18, 2018, September 14, 2018, November 28, 2018, and May 17, 2019 were not individualized, and did not include an adequate intervention for de-escalation in a crisis.  This could have led to a gap in the inmate's clinical continuity of care and did little to reinforce his coping skills to help manage crises.

6) <u>CSP-SAC</u> and <u>CHCF-PIP</u>:  In November 2018 while the inmate was in the MHCB level of care, his Schizoaffective Disorder, Bipolar Type diagnosis was removed.  This diagnosis remained absent during his entire PIP admission as well.  There was no rationale provided for why this diagnosis was removed, despite all evidence he continued to be treated for psychosis at CSP-SAC and at CHCF-PIP.  The inmate had a complex mental health history given his chronic psychotic symptoms and behavioral issues (i.e., namely indecent exposure), so it is no surprise there were concerns of genuineness regarding his endorsement of psychotic symptoms, but a clinical discussion at IDTT must be documented to explain the rationale for removing a patent's diagnosis.  The CHCF-PIP also should have addressed the lack of Schizoaffective Disorder from his diagnosis list and added it back to his list of diagnoses or justify its continued absence during IDTTs.  This was significant as their documentation noted the inmate continued to endorse psychotic symptoms and the PIP staff was treating his psychosis.  The diagnosis was added in May 2019 when he returned to CSP-SAC.

7) <u>CHCF-PIP-APP</u>:  On March 6, 2019, the inmate was discharged from APP to ICF level of care, but there was no rationale provided to suggest he was stable for a less restrictive inpatient level of care.  He was still on a suicide watch, in a safety smock, and made recent threats to harm members of his treatment team.  The decision by the treatment team to discharge him to ICF may have been premature and could be evidence of in underestimation of his suicide risk.

8) <u>CHCF-PIP-ICF</u>:  On SRASHEs completed on March 7, 2019 and March 14, 2019, the inmate's acute risk was noted as moderate.  The rationalization for this rating was he endorsed suicidal ideation or engaged in self-harm behavior to warrant a suicide watch so he could engage in exposure behavior.  Secondary to this moderate risk, psychotic symptoms were documented as a contributory factor.  It appears the clinicians who assessed him discounted his clinical distress, psychosis, and impulsive behavior because he was a behaviorally challenging patient.  This appears to be evidence of an underestimation of his suicide risk as the clinical rationale emphasized the inmate largely endorsed suicidal ideation for secondary gain.  The SRASHEs did not appear to factor in his chronic psychosis and clinical distress when estimating his suicide risk.

9) <u>CHCF-PIP-ICF</u>:  On May 17, 2019, the inmate was discharged from the PIP to EOP level of care during a special IDTT.  This is not in accordance with 'PIP Policy 12.11.2109' as special IDTTs should only be conducted during urgent/emergent situations, when treatment objectives must be added or changed, or when the patient is going to be referred to a less restrictive ICF setting.  The

policy does not allow for discharge IDTTs to be conducted as a special IDTT. Without a full membership IDTT, it is possible the inmate was not fully assessed for appropriateness to be discharged to a lower level of care.

10) <u>CHCF-PIP-ICF</u>:  The mental health IPOCs from March to May 2019 at CHCP-PIP-ICF were for delusions.  There was no IPOCs for hallucinations or danger to self despite the inmate endorsing auditory hallucinations and coming into the ICF level of care on a suicide watch due to danger to self.  The IPOCs are used to help track a patient's progression in treatment to help justify when interventions need to be used, modifications to a patient's treatment may be needed, and/or when a discharge to a lower level of care is appropriate.  Lack of IPOCs for these clinically important areas may have led to an underestimation of the inmate's suicide risk inappropriateness for discharge to a lower level of care.

11) <u>CSP-SAC</u>:  The Master Treatment Plan completed on May 28, 2019 appeared to be deficient as it provided no information on what was discussed during the inmate's IDTT or even if he attended.  Additionally, it did not appear to be updated as the information on the clinical summary page only provided historical information.  There was no documentation of treatment progress or specific clinical treatment indicators.  This could have led to an underestimation of his suicide risk and other mental health issues that could have contributed to his suicide risk (i.e., psychosis).

12) <u>CSP-SAC</u>:  Clinical progress note dated May 28, 2019 and June 5, 2019 do not contain verbiage that an assessment for suicide ideation was completed.  The primary clinician wrote the inmates thought content was "appropriate", but the clinical note did not indicate whether or not the inmate was experiencing suicidal ideation during this contact.  Standard mental status examination (MSE) protocol states suicidal ideation should be placed in the thought content section if present.  As a result of the lack of this information, it is unclear whether suicidal ideation was assessed during these contacts, which may have contributed to an underestimation of the inmate suicide risk.

13) <u>CSP-SAC</u>:  During the on-site review, it was noted there are video cameras located in the dayroom of the PSU unit and there are allegations of Guard One checks not being completed per policy.  This incident has been referred for investigation to the Office of Internal Affairs.

In the ***sixth*** case (<u>SAC 11</u>), the inmate was found hanging from the ventilation grate by a shoelace in his GP cell during the afternoon of August 28, 2019.  The inmate entered the CDCR system in January 2009 to serve a life sentence without parole for first-degree murder, and a five-year enhancement for prior felony convictions.  He was designated single cell status after attempting to murder his cellmate.  The inmate was transferred to CSP/Sac on March 22, 2018. The inmate incurred nine RVRs during his confinement, the most recent of which occurred on January 18, 2017, involving battery with a deadly weapon.  He was suspected of being gang affiliated.  The inmate was never married but had one child from a previous relationship.  He had

little, if any, family support by way of telephone calls or letter correspondence since July 2015, and his last family visit occurred in 2012.

According to available records, the inmate and two sisters were primarily raised by their mother. His father had been murdered when he was only five years old. The inmate and a younger sister immigrated to the United States in 2002 and lived with their grandmother. Shortly thereafter, he met a young woman and subsequently had a baby. The inmate did not complete any schooling in the United States and worked as an unskilled laborer. Eventually, he became extensively involved in substance use, primarily methamphetamine, and resulted in the instant offense. The inmate did not have a history of mental illness in the community.

Upon entry into CDCR in January 2009, the inmate was placed in the MHSDS at the 3CMS level of care after reporting passive SI following his life sentence. He was initially diagnosed with Major Depressive Disorder and prescribed medication. The following month, the inmate's level of care was increased to EOP as a result of self-reported auditory and visual hallucinations. His level of care was reduced back to 3CMS in December 2010 and he remained there until December 2015 when he was admitted into an MHCB for making superficial cuts to his abdomen and wrist. The inmate reported that he "cut secondary to hallucinations telling him to hurt himself. He reported feelings of depression, anxiety, anger, and hopelessness. He told a psychiatrist he felt sad and empty because he had not heard from his mother and his family was not visiting him," and believed his family had been harassed because of his crime. His diagnosis was changed to Schizoaffective Disorder, Depressive Type. The inmate also self-reported a previous suicide attempt in 2013 by jumping off a chair, but the incident was not documented in the medical chart. Between 2016 and 2018, the inmate continued to program at the EOP level of care and appear to be fairly stable during this time (apart from a brief MHCB placement in June 2018). There were also inconsistent reports that he had re-established contact with his family.

On January 4, 2019, the inmate reported to his PC that he was scratching and cutting on himself because of the "voices." The clinician opined that the inmate appeared to be cutting in order to relieve stress, while also suggesting he was engaging in SIB to avoid being downgraded to 3CMS level of care. A SRASHE was not completed as a result of the SIB. In February 2019, two SRASHEs were completed within a 24-hour period after the inmate reported SI and thoughts of cutting himself. His chronic risk for suicide was listed as "high," with his acute risk listed as "low to moderate." He remained at the EOP level of care.

In the inmate's Mental Health Master Treatment Plan dated March 6, 2019, the PC quoted a housing unit officer as saying: "He is the real deal in my opinion. I believe him when he reports feeling down. He had a history of serious self-harm and harming others. He has no family contact and typically keeps to himself. I legitimately cut him down from a hanging attempt at MCSP." Beginning in May 2019, clinical notes reflected that the inmate was stable, although reports of auditory hallucinations continued. In both June and July 2019, clinical notes continued to reflect that the inmate appeared more "content and stable," and "had less desire to engage in cutting." The inmate was generally compliant with his psychotropic medication, although it was noteworthy that "during the three or four days prior to his suicide, he was intermittently non-compliant" with his medication.

The medical chart indicated that the PC met with the inmate on August 28, 2019 (the day of his suicide) in the EOP treatment center "for a confidential 1:1 session. IP programming well and utilizing EOP services. We process family issues and discuss inmate's symptoms that are challenging on a daily basis. IP has self-harm history, however, and reports he is not engaged in several months. IP denies SI/HI and does not appear in any psychological distress." As part of the review of this case, the CDCR reviewer interviewed the PC and they denied seeing the inmate on August 28, suggesting that they had seen the inmate cell-front the previous day (although there was no progress note dated August 27). The CDCR reviewer further indicated that the review also found a consistent pattern of the PC utilizing exact phrases in multiple notes, suggesting "the PC was not consistently updating the information in his notes or was pulling through information from previous sessions which was no longer valid for the current contact." For example, in a progress note dated August 14, 2019, the PC stated that the inmate's "family situation appears to be going well. IP seems much more stable with the recent connection with mother." The content of this note is contrasted with other information suggesting that the inmate had not had regular communication with his family since 2015.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide and did not have any significant chronic medical issues that were felt to be contributory to his death. Interviews with other inmates in the housing unit suggested that the inmate had recently been desperate to re-establish contact with his family, stopped taking some of the medication during the past week, and "started staying in his cell more."

The Suicide Report contained nine (9) recommendations for corrective action through a QIP:

> 1) Self-harm behavior was noted in the SRASHEs dated February 27 and February 28, 2019, however, the self-harm power form was not completed in either case, nor was the inmate referred for a medical evaluation. Per policy, each institutional SPRFIT shall 'Monitor and track all self-harm incidents…SPRFIT shall accurately enter all self-harm incidents in the Electronic Health Record System within three calendar days after the incident occurred.'

> 2) On January 4, 2019, the inmate reported to his primary clinician he was scratching and cutting on himself because of the "voices" and showed the cuts on his stomach to his clinician. The clinician further noted this was a new act of self-harm that had not occurred since the inmate had been on his caseload. The primary clinician did not conduct a suicide risk evaluation in response to the inmate cutting his stomach. *Program Guide*, Chapter 12-10-8 states: 'When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data.'

> 3) In the MH Master Treatment Plan documentation dated March 6, 2019, a housing unit officer noted he had personally assisted in cutting down the inmate during a prior suicide attempt at MCSP. However, this information was not further queried by the clinician or added to the inmate suicide grid/suicide attempt

history in his suicide risk evaluations. Failure to include this information likely resulted in an underestimation of the inmate's suicide risk.

4) The overall documentation by the primary clinician at SAC was inadequate. Legacy notes were frequent from March 2018 (when the inmate arrived at SAC) through August 2019. Beginning May 24, 2018, the mental health assessment in clinical notes for the inmate were occasionally 'copy and paste.' This practice became more frequent beginning August 15, 2018, with two or three issues being occasionally traded. The clinical notes were often unclear about where clinical contacts were occurring or were contradictory in different parts of the note, indicating the PC was either not updating pertinent information in the notes consistently or was utilizing copy and paste format. Cutting and pasting also appeared prominent on February 28, 2019 SRASHE with significant portions of the Justification of Risk and Safety Plan sections coinciding with the SRASHE conducted by a different clinician less than 24 hours previous.

5) This review indicated clinical contacts between May 2018 and August 2019 were held in a confidential setting 44 times. In fact, the inmate was not seen in a confidential setting in August 2019 by his primary clinician. In most of the primary clinician's notes, information about where the session was held was either unclear or contradictory; occasionally, reasons for non-attendance at 1:1 confidential sessions were not well explained by the clinician in clinical documentation.

6) During the site visit, the primary clinician denied he had seen the inmate on August 28, 2019 (the day he died); however, there is a progress note in the EHRS (MH PC Note at 7:03 a.m.) from that day which indicates the inmate had been seen for a confidential individual session with the clinician in the treatment center that morning. The clinician reported in our interview he had seen the inmate cell front the previous day, although there was no progress note documented in the EHRS from August 27, 2019. The clinician further reported in our interview he would typically go to the housing unit on Monday to 'tell them (inmates) when her appointments were for the week.' If an inmate did not attend his scheduled appointment, the contact on Monday was documented as a clinical contact for that week. When asked, the clinician reported he did not see an inmate to investigate the reason the appointment was missed.

7) In IDTTs between September 9, 2018 and May 29, 2019, the inmate reported symptoms of impulsivity, anger, anxiety, paranoia, yet no IPOCs for these concerns were initiated. Treatment for self-harm was included but there were no IPOCs indicated for this serious behavior either. Without IPOCs, effectiveness of treatment could not be tracked. Additional IDTT concerns also included the following: the inmate did not attend his IDTTs on June 27, 2018, September 9, 2018, and August 21, 2019. Reasons for his absence were not reported in the treatment plan or in clinical notes. Rationale for level of care appeared to be cut-and-paste in IDTT documentation.

8) Both the February 27 and 29, 2019 SRASHEs stated there were 'no warning signs endorsed' in the Safety Treatment Plan section. In the first SRASHE (2/27/19), the assessing clinician indicated there was 'ideation' in the Additional Information and Warning Signs section, but then omitted it in the Safety Plan. In the SRASHE the next day (2/28/19), the primary clinician claimed that Acute Risk was seen as 'low to moderate due to no IS PATH WARM indicators wanting a higher level of care.' However, earlier in the same document, the PC checked the inmate had passive suicidal ideation and anxiety (both IS PATH WARM indicators) over a possible LOC change to CCCMS.

9) There was a short period of time (documented in notes crafted on 5/9/2019, 6/7/2019, and 7/25/2019) within which there was insufficient descriptions of Zoloft adjustment. These notes in question also contained small sections that were 'cut and paste' from previous notes, thereby reducing the quality of the notes slightly.

In the **_seventh_** case (SAC 12), the inmate was found hanging from the sprinkler head by a sheet in his GP cell during the early morning of August 28, 2019. The inmate entered the CDCR system in July 2004 to serve a 50-year-to-life sentence for first degree murder (of his brother-in-law). He was most recently transferred to CSP/Sac on August 21, 2019. The inmate incurred 14 RVRs during his confinement, the most recent of which occurred on June 20, 2018, involving battery on a peace officer (kicking two officers). Most of his RVRs were for assaultive behavior for which he received SHU terms that were typically served in a PSU setting. In fact, his first RVR occurred on July 27, 2004, the second day of his CDCR term. The inmate was not thought to be gang affiliated. The inmate was married and had two daughters. He had family support that was exemplified by regular visits from his parents.

According to available records, the inmate was raised by his parents in a traditional family environment and immigrated to the United States in 1960 at the age of 18. He attended school through the eighth grade, did not have a substance abuse history, and did not have a history of juvenile arrests. He had one minor adult criminal charge in 1987. Beginning in 1999, the inmate received both inpatient and outpatient treatment for Schizophrenia, Undifferentiated Type. He had reported auditory hallucinations, paranoia, SI, and a suicide attempt by cutting. Prior to committing the instant offense (the murder of his brother-in-law) in April 2001, the inmate had been unemployed for five years and alternated between living at home with his wife and two children and living with his parents. His wife subsequently told criminal investigators that he frequently made odd, suspicious, or paranoid statements leading up to the instant offense.

Upon entry into CDCR, the inmate was almost immediately placed in the MHSDS at the 3CMS level of care after displaying assaultive behavior, auditory hallucinations, and passive SI. He subsequently began to refuse psychotropic medication and was elevated to EOP in March 2005 with a diagnosis of Schizophrenia, Undifferentiated Type. He carried this diagnosis or Schizoaffective Disorder for the remainder of his incarceration. The inmate was admitted into the intermediate care program at the SVSP-PIP in June 2006 and discharged back to the PSU at CSP/Sac in December 2016. In January 2008, he was placed in an MHCB for grave disability

and placed on a PC 2602 order. The involuntary medication order seemed to stabilize his behavior until February 2011, when he was found attempting to hang himself in a cell. The inmate was placed in an MHCB for several weeks before being returned to the PSU. He returned to the MHCB in late March 2011 and remained in this placement for 55 days on Suicide Precaution status. The inmate was then placed in the acute care program at the CMF-PIP in May 2011 before being transferred to the intermediate care program at the SVSP-PIP in October 2011. He returned to CSP/Sac in May 2012.

During the next several years, the inmate was placed in MHCBs on several occasions, including in January and April 2013. He also had "acute psychotic agitation and anxious panic attacks" in February and March 2014. The inmate's functioning appeared to improve with a revised medication regime. In January 2017, he was described as "delusional, but stable" and remained so over the remainder of the year. Beginning in March 2018, the inmate appeared to again be more anxious, restless, and possibly manic. In June, he received RVRs for assault and was placed in the administrative segregation unit. The inmate's medication was again adjusted. By July, his mental health continued to deteriorate, as did his hygiene. During both August and September 2018, the inmate regularly refused showers and group treatment, appeared confused, and "depressed, delusional, and malodorous." Finally, the inmate was placed in the acute care program at the CHCF-PIP on November 29, 2018. During the next few months, he presented with bizarre and ongoing delusions, disorganization, and poor grooming. A PC 2602 order was reinstated in January 2019 due to grave disability. By March 2019, the inmate's behavior was less problematic, and he was referred to the intermediate care program on April 5, 2019. The inmate began to program and attended some groups. However, on June 20, the inmate became anxious and agitated, demanding PRN medications. According to the CDCR reviewer in this case, no psychiatry or primary clinician documentation was found in the medical chart from June 25 through July 22, 2019. In late July, the inmate demanded to be returned to the EOP program.

The inmate was seen for an IDTT meeting in the intermediate care program on August 20, 2019, and, although he was unable to rate his level of distress or "challenge a delusion" at the meeting, the team felt that he had reasonably met most of his treatment goals. He was discharged back to CSP/Sac that same day. The five-day follow-up progress notes completed by clinicians noted that he appeared stable and denied any SI. However, on both August 23 and August 27, the inmate requested medication for anxiety attacks. During an encounter with a nurse on August 27, he also voiced SI. The inmate was referred to a mental health clinician who spoke with the inmate briefly (less than four minutes according to the CDCR reviewer). According to the completed SRASHE, the clinician rated his acute risk for suicide as "low" because "IP reported SI due to anxiety, no plan/intent. IP was future oriented and advocating for himself. He was certain he would feel better after receiving his meds. He requested his meds and to have handcuffs removed as he reported they were uncomfortable. IP stated he would be safe back in his cell after he took his meds." The inmate was returned to his PSU cell and committed suicide the following day.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide and, although he did have several significant chronic medical issues (such as hypertension joint pain, a hernia, and gastroesophageal reflux disease), these ailments were not felt to be contributory to his death.

However, the CDCR reviewer did opine that the inmate was at highest risk for suicide "in periods of time when he reported significant anxiety, agitation, insomnia, and/or restlessness (or possible akathisia) and/or during periods of increasingly disturbing hallucinatory experiences (e.g., of hearing demons). Chart documentation clearly indicates the inmate was experiencing episodes of significant anxiety and agitation during the three weeks leading up to his death….the inmate's anxiety attacks and request for PRNs were indeed imminent warning signs for his suicide."

The Suicide Report contained 11 recommendations for corrective action through a QIP:

1) <u>CSP-LAC</u>: The clinician conducting a SRASHE with the inmate on June 21, 2018 erroneously documented the presence of a March 1, 2017 suicide attempt in the case, perhaps confusing 2011 for 2017 (there was no 2017 suicide attempt). The clinician checked that he/she reviewed the eUHR [Electronic Unit Health Record], which should have clarified this error. In addition, the suicide and self-harm summary of the SRASHE was not completed. The clinician commented the patient's prior attempt was 'crying for help and to get off PSU,' which is not accurate. These errors contributed to subsequent clinical confusion, as this information was automatically pulled into subsequent SRASHEs, and may have contributed to risk underestimation errors in the subsequent SRASHEs.

2) <u>CSP-LAC</u>: On July 26, 2018, the inmate noted stated to his PC, 'I am not doing well. I am in constant pain and have been ignored. I will tolerate this pain till April 1. I will kill myself to end the pain. I have done all I can.' The clinician who documented this statement did not conduct a suicide risk assessment as required by the MHSDS *Program Guide*, page 12-10-8, 'When an inmate expresses.… current suicidal ideation a suicide risk assessment shall be made.' The PC also did not document making a request for medical or nursing assessment of the patient's report of intolerable pain. The PC documented as her assessment, 'Wellness check completed no evidence of acute distress observed or reported.'

3) <u>CSP-LAC</u>: The IDTT in ASU decided not to refer the inmate to a higher level of care on August 27, 2018 despite the continued presence of his refusal to attend treatment or to leave his cell for confidential 'high refusal dailies' contacts. The inmate also reported suicidal ideation and intention (on July 26, 2018), insomnia (on August 15, 2018), 'difficulty engaging during the session due to delusional thoughts and paranoia' (on August 21, 2018), 'and being confused and grandiose delusion (sic) and irritable' during IDTT (on August 27, 2018). The author of the August 27, 2018 IDTT note reported referral to a higher level of care was not made as 'I/P's [inmate/patient] group refusal is not related to his mental illness….it is related to a lack of motivation for treatment and poor coping skills.' The IDTT appeared to minimize the severity of the inmate's mental illness, his deteriorating course, and his need for a higher level of care.

4) <u>CHCF-PIP-ICF</u>:  The primary clinician who completed the discharge SRASHE on August 14, 2019 did not indicate whether or not imminent risk signs were present in the case.  The PC documented the presence of anxiety and hopelessness, known warning signs for suicide (as in IS PATH WARM), and documented the inmate had endorsed a wish to be dead (suicidal ideation, either 'passive' or active, is considered a warning sign).  Warning signs for suicide were not considered, therefore, the acute risk for suicide in the case was underestimated.

5) <u>CHCF-PIP-ICF</u>:  The decision to discharge the inmate was made despite recent ongoing episodes of panic attacks and anxiety and/or hallucination-related insomnia and agitation, the existence of significant symptoms of psychosis, and despite treatment goals not being met.  At the discharge IDTT on August 20, 2019, the inmate was noted to be paranoid, grandiose, and declining to leave his cell for PC contacts or groups.  He was unable to report on his distress level (one of the treatment goals) and complained of being somewhat ('2 out of 5') bothered by his delusions (his other treatment goal).  The inmate stated he was helped by PRN medication, though it is not clear how the thought or symptoms underlying his requests for PRNs and were evaluated or if they were discussed.  The inmate also requested increased routine medications to control the symptoms prior to his discharge, speaking to the distress experienced related to the symptoms.

6) <u>CSP-SAC</u>:  The emergency mental health consult and SRASHE completed on August 27, 2019 was inadequate in the following ways:  The consult was completed in a brief manner (four minutes was recorded), without an adequate assessment of the content of suicidal thoughts or the sources of anxiety, despite these being identified as warning signs at the time of the evaluation.  Also, the inmate was reported to be cooperative and oriented to the reason for the contact, yet the clinician checked 'refused to participate' in the evaluation.  By checking 'refused to participate,' screens in the SRASHE used to assess suicidal ideation by content, intensity, frequency, duration, or controllability were not assessable.  The clinician also considered acute risk as low 'as SI due to anxiety,' despite anxiety being a known imminent risk factor for suicide.  Finally, the clinician did not note the inmate's history of being at risk for suicide when anxious/agitated.  For these reasons, acute and imminent risk were underestimated and the risk management response was inadequate for the clinical situation at hand.  Additionally, a higher level of care referral was not considered despite the presence of imminent risk signs (anxiety/agitation and suicidal ideation).

7) <u>CHCF-PIP-ICF</u>:  During the inmate's stay in ICF, there was a notable lack of documentation from the primary and/or covering clinicians involved, apart from IDTT recording.  One free text note was found on June 21, 2019 and one BPRS (Brief Psychiatric Rating Scale) was completed by the PC on June 25, 2019.  The other primary clinician documents in the record occurred in the context of admission and discharge.  The lack of regular contact between the primary

clinician and the patient may have contributed to misunderstanding what placed him at risk for suicide; namely, agitation, severe anxiety and/or hallucinations.

8) <u>CSP-SAC</u> Psychiatry:  While the inmate was housed in the MHCB at CSP/Sac in November 2018 for 18 days (due to florid psychosis and grave disability), clinical notes lacked detail and rationale regarding psychiatry's approach to the patient's noncompliance.  There appeared agreement the patient was so psychotic and gravely disabled he could not survive outside the structure and supervision of an inpatient setting, and these severe symptoms necessitated a referral to a higher level of care.  At the same time, it was mentioned patient's symptoms and behavior may have not met the criteria for PC 2602 (presumably referring to emergent or nonemergent options).  This resulted in no order for antipsychotic medication for the patient while he was housed in the mental health crisis bed.

9) <u>CHCF-PIP</u> Psychiatry:  While the patient was housed in the Acute-PIP during the month of February and March 2019, the patient consistently refused PO psychiatric medications that were ordered as daily standing medications.  When the patient refused PO psychiatric medications (in February and March 2019), no PC 2602 backup medications were administered.  The rationale for the medication orders and the approach to non-compliance were not sufficiently detailed in the notes.

10) <u>CHCF-PIP</u> Psychiatry:  Review of the electronic medical record reveals the frequency of the psychiatry documentation that was crafted during the patient's stay in the Acute-PIP and the Intermediate-PIP at CHCF was insufficient.  Frequency of psychiatry notes were not in keeping with contact timelines and expectations.

11) Psychiatric Technician (PT) Weekly Rounds November 30, 2018 through December 20, 2018 were documented late and at the same time.  For the weekly summary February 14, 2019 through February 21, 2019, two different PTs completed weekly summaries with wildly conflicting evaluations.

In the ***eighth*** case (<u>SAC 13</u>), the inmate was found hanging from the ventilation grate by a sheet in his PSU cell during the early evening of September 9, 2019.  The inmate entered the CDCR system in September 2008 to serve a 26-year term for second-degree murder and assault (on another inmate while confined in a county jail).  While incarcerated in CDCR, he was convicted of assault with a deadly weapon in 2010 and battery on a non-prisoner in 2016 for which an additional 14 years was added to his sentence.  He was transferred to CSP/Sac on July 10, 2018.  The inmate incurred 18 RVRs during his confinement, the most recent of which occurred on January 8, 2019 involving battery on a peace officer.  Most of his RVRs were for assaultive behavior for which he received SHU terms that were typically served in a PSU setting.  The inmate was previously gang-affiliated and had received SNY status in January 2015.  He was never married but had two children from a prior relationship.  There was no record of the inmate having any family support through visits, telephone calls, or letter correspondence.

According to available records, the inmate and seven siblings were raised by parents in a "semi-stable" family environment. He attended school through the tenth grade, began to use illegal substances at age 17, and joined a "street gang." The inmate had one minor juvenile offense, and several adult criminal convictions. He reported some employment prior to the instant offense. The inmate did not have a history of receiving any mental health services in the community, and he was not enrolled in the MHSDS during his prior CDCR term. The inmate first entered the MHSDS at the 3CMS level of care in March 2009, although the reasons for his enrollment were unclear from the medical chart. His level of care was elevated to EOP in April 2010. During the next few years, the inmate had multiple MHCB admissions, one DSH admission, and one PIP admission for harm to self and others. He was placed in the acute care program at DSH October 28, 2016 for command auditory hallucinations telling him to hurt himself or others. The inmate received various psychotropic medication adjustments while in DSH, was transferred to DSH intermediate care on December 19, 2016 and discharged back to CDCR at the EOP level of care on June 13, 2017.

The inmate was subsequently placed again in the acute care program at the CHCF-PIP from April 5, 2018 to May 9, 2018. He remained at CHCF until July 10, 2018 when he was transferred to CSP/Sac.

The inmate remained at EOP from September 18, 2018 through July 9, 2019 with diagnoses of Schizoaffective Disorder, Bipolar Type, and Antisocial Personality Disorder. He continued to struggle, incurring several RVRs for battery, and complaining of sleeping problems related to auditory hallucinations. His participation in group treatment was minimal. The inmate's medication was adjusted. On December 2, 2018, the inmate was referred to an MHCB for danger to self after reporting SI with a plan to hang himself. He reported to the clinician that his psychotropic medications were not working, and he was having difficulty adjusting to his recent release from the PSU. The inmate further stated his PSU discharge was the primary trigger for his SI due to "temptations of illicit drugs and gang activity which make him feel helpless." The MHCB referral was rescinded. The following month he received another RVR for battery, and subsequently explained that he was attending less group programming because "he did not want to get into an altercation with other inmates." He also confided being reluctant to leave his cell and attend both individual and group treatment in the EOP treatment center because of safety issues. Although denying any SI when meeting with his PC on March 13, 2019, the clinician noted "moderate levels of depression with isolative behavior, dysphoric mood, lack of energy, and difficulty sleeping." During regular sessions in June and early July, the inmate continued to endorse having the stressful auditory hallucinations. On June 13, he expressed SI to his PC, and a SRASHE was completed indicating a low acute risk for suicide. The PC opined that the inmate was feigning SI in an effort to secure MHCB placement.

During a meeting with his psychiatrist on July 3, 2019, the psychiatrist wrote in a progress note that "I have significant concerns about the possibility that he has decompensated from the discontinuation of Risperdal. On the other hand, his PC has concerns that IP is endorsing an increase in symptoms for secondary gain." The following week on July 10, the inmate attended his IDTT meeting and, despite the psychiatrist's concerns from the previous week, his level of care was changed to 3CMS because, as the PC wrote in a progress note, the treatment team felt that the inmate did not have any observable evidence of active symptoms of psychosis despite

his ongoing endorsement of hallucinations and delusions. A "Rule Out for Malingering and Unspecified Anxiety" was added to his current diagnoses of Schizoaffective Disorder, Bipolar Type, and Antisocial Personality Disorder.

The inmate had an IDTT on July 24, 2019 and, although not discussed during the meeting, his diagnosis of Schizoaffective Disorder, Bipolar Type, was removed. In a session with his new PC on August 6, the inmate continued to complain about auditory and visual hallucinations, as well as his medication. The following week on August 5, the inmate submitted a Health Care Services Request form to see the psychiatrist, and later informed a nurse that "I want to hurt myself and others." A mental health clinician responded and completed a SRASHE indicating that the inmate subsequently denied SI and simply wanted to have his medication changed. His chronic risk for suicide was rated as "moderate," with his acute risk rated as "low." A clinician (not the PC) last met with the inmate on August 20, 2019, and a progress note indicated that "IP denied issues related to hygiene, sleep or appetite. He denied current SI/HI, current AH/VH [visual hallucinations], or other distressing mental health symptoms."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have and significant chronic medical issues that were felt to be contributory to his death. However, the CDCR reviewer did opine that the inmate "may have suffered from an atypical presentation of a psychotic disorder and with his own inconsistent statements, or possibly over-exaggerating his symptoms, treatment teams may have felt he was not significantly mentally ill. The focus of the inconsistencies may have been a form of confirmation bias by treatment teams. This type of reaction by treatment teams may have led the inmate to feel helpless, so he chose to end his own life as he felt there was no hope in resolving his mental health issues."

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

> 1) CSP-SAC: The inmate was seen at Interdisciplinary Treatment Team (IDTT) meetings on September 18, 2018, January 17, 2019, and April 4, 2019. In these IDTTs, there were no updates made in the clinical summary concerning current symptoms, functional impairments, and recent/ relevant treatment history. Not providing information regarding the inmate's presentation or treatment team discussions makes it difficult, if not impossible, to gauge the direction of the progress of his current treatment.

> 2) CSP-SAC: SRASHEs completed on December 29, 2018, June 13, 2019, and June 18, 2019, did not provide adequate interventions in the safety plan. The lack of adequate interventions could have led to inadequate care or when the inmate was going through a crisis.

> 3) CSP-SAC: The SRASHE dated on March 28, 2019 rated the inmate with low acute and chronic risk, but there was no rationale for these ratings. This could have led to an underestimation of his suicide risk.

4) <u>CSP-SAC</u>:  An M-FAST (Miller-Forensic Assessment of Symptoms Test) was completed on the inmate on June 13, 2019.  Results suggested he was feigning or exaggerating his psychotic symptoms, but the clinician inferred he was feigning or exaggerating his entire mental illness based on the documentation.  The M-FAST is only sensitive to feigning psychotic symptoms, so it would be prudent to recognize this rationale.  In addition, because the M-FAST is used as a screening tool, it would have been imperative to refer the inmate for further psychological testing; further testing could clarify his diagnosis and if there was presence of malingering, and to what extent.  Emphasizing the results of a screening tool could have led to an overestimation of "malingering" for the inmate and underestimated his anxiety, distress, and suicide risk.

5) <u>CSP-SAC</u>:  The SRASHEs on June 13, June 18, and June 15, 2019, utilize the M-FAST results to justify the ratings for acute and chronic risk for suicide.  As stated in QIP No. 4, the M-FAST is a screening tool that is sensitive to when patients feign or exaggerate psychotic symptoms.  The screening tool does not assess for feigning anxiety, depression, or distress adequately.  At present, there are no psychological assessments to assess if someone is feigning or exaggerating suicide risk.  Thus using the M-FAST to justify suicide risk may have led to an underestimation of the inmate suicide risk.

6) <u>CSP-SAC</u>:  On July 10, 2019, the inmate's level of care was changed to CCCMS by the treatment team during IDTT, despite the treating psychiatrist dating 'significant concerns' the inmate has decompensated a week prior during an individual session on July 3, 2019.  This concern from July 3, 2019 was not documented in the IDTT on July 10, 2019.  If the inmate 'decompensated' then a move to a lower level of care may not have been appropriate and he may have needed more time to stabilize before a move to CCCMS was considered.

7) <u>CSP-SAC</u>:  On July 23, 2019, the inmate's diagnosis for Schizoaffective Disorder, Bipolar Type was discontinued by the primary clinician.  The following day, this removal of his diagnosis was not discussed (nor documented) at his IDTT.  The removal of a diagnosis should be a treatment team decision.  This suggests that not all of the treatment team members agreed to removing his diagnosis or even if it was discussed.  Further, lack of discussion about changing this diagnosis and proceeding solely with a Malingering and Antisocial Personality Disorder diagnosis discounted his long-term history of Schizoaffective Disorder by different clinical treatment teams.  This likely contributed to an underestimation of the suicide risk, and led to lapses in care.

8) <u>CSP-SAC</u>:  On August 15, 2019, the inmate endorsed suicidal and homicidal ideation.  When he saw a clinician, he recanted his earlier ideations, and asked to see his psychiatrist to discuss psychiatric medications.  The clinician stated 'she would email his psychiatrist about his desire to meet in a confidential setting,' but the inmate was never seen by a psychiatrist.  It would have been more appropriate to submit a routine consult order for psychiatry to see the inmate so the

appointment could have been scheduled. It is possible the inmate was having difficulties with his psychiatric medication (i.e., side effects, effectiveness, etc.) and while he was not imminently suicidal at the time, he could have felt he was decompensating.

In the **_ninth_** case (SAC 14), the inmate was found hanging from the light fixture by a sheet in his administrative segregation unit cell during the evening of October 16, 2019. The inmate entered the CDCR system on May 17, 2012, to serve a six-year term for assault with intent to commit a sex act. While incarcerated in CDCR, he was convicted of battery on a peace officer and received an additional four-year term in August 2013. He was most recently transferred to CSP/Sac on October 17, 2019. The inmate incurred 16 RVRs during his confinement, the most recent of which occurred on October 11, 2019, involving indecent exposure. Most of his RVRs were for assaultive behavior. The inmate was not known to be gang affiliated. He was single and did not have any children. The inmate had family support mostly through letter correspondence with his mother, as well as family visits with his parents last occurring in April 2019.

According to available records, the inmate and two older siblings were raised by parents in a traditional family environment. He previously reported that his mother had previously been diagnosed with Bipolar Disorder and that a grandmother had been diagnosed with Down Syndrome. The inmate attended school through the 11th grade before becoming involved in both substance abuse and the juvenile justice system. Although there was some indication that the inmate received treatment at the age of 15 for Down Syndrome, there were no records to substantial the claim. Although reporting a history of auditory hallucinations as a teenager, it did not appear that he received any other mental health treatment in the community.

The inmate was placed in a MHCB for SI ten days after his entry into CDCR in May 2012. The placement was in conjunction with medical treatment following an attack by other inmates on the yard. He reported SI, command auditory hallucinations, and was observed to have a flat affect, and appeared confused. He was subsequently discharged to the EOP level of care with a diagnosis of Psychosis Not Otherwise Specified and Polysubstance Abuse Disorder. Over the next three years, he was often referred to higher levels of care resulting in six MHCB admissions and one DSH placement by 2015. These admissions appear to be triggered by the same factors, which included SI, SIB (primarily head-banging, punching walls, and one incident of superficially cutting his wrist), increased auditory hallucinations, disorganized thought process and difficulties attending to his ADLs. His diagnosis was changed to Schizoaffective Disorder in February 2015. The inmate was also placed on a PC 2602 order following his transfer to CHCF-DSH-ICF on April 30, 2014. He remained in the intermediate care program until his return to the PSU at CSP/Sac on February 3, 2015. A few months later on July 2, 2015, the inmate was placed in a MHCB for grave disability, the last such placement during his CDCR confinement. He was stabilized and discharged on July 13, 2015 to EOP.

Thereafter, the inmate remained at EOP throughout the remainder of his CDCR confinement. He also remained on a PC 2602 order until May 2019, sporadically attended his individual treatment sessions, often refused group, but overall remained fairly stable in EOP. The inmate continued in mainline EOP from October 19, 2015, through April 3, 2018. Of note, he was included in the

DDP in May 2016 and designated as DD2 (cognitive deficits with a need for adaptive supports). (He would later be described by the DDP coordinator at CSP/Sac as "happy, child-like, and eager to please"). According to the CDCR reviewer in this case, the reasons for this period of stability were not clear from the records. It was speculated to be a combination of medication and placement in the DDP. In 2017, his diagnosis was changed to Schizophrenia, Paranoid Type. The reason for the diagnosis change was not clear from the records, but this diagnosis remained for the duration of his CDCR term. Treatment appeared to be provided per EOP policy, and he remained medication compliant.

In April 2018, the inmate was transferred to the administrative segregation unit following an RVR for battery (i.e., a mutual fight with another inmate). He consequently received a SHU term, which resulted in his return to the PSU. By December 2018, his MH Master Treatment Plan described the inmate as displaying a flat affect, withdrawn demeanor, and recurrent isolative behavior. He continued to refuse group but attended individual mental health sessions and intermittently went to yard. On June 7, 2019, the inmate was seen following an emergency mental health referral for intentionally banging his head on a table, which had resulted in seven staples to close the wound. He denied any SI and reported he was experiencing increased auditory hallucinations and anger at a peer who was asking for his food. He received four more RVRs from May until August 2019, with two of the RVRs for battery resulting in transfer to the administrative segregation unit on August 2. On August 19, a SRASHE was completed in response to an emergency mental health referral after the inmate engaged in another incident of head banging. A consideration for a higher level of care was documented on the form, and he was assessed as being a "moderate" chronic risk and "low" acute risk for suicide. On August 30, during a routine DDP contact, the inmate disclosed on-going SIB (head banging). Fresh blood was observed on his shirt. A SRASHE was not completed. An IDTT meeting was held on September 5, 2019, and the inmate refused to attend. Treatment goals remained focused on negative symptoms of schizophrenia and hallucinations, and there did not appear to be any discussion regarding recent SIB or RVRs. On September 19, during weekly DDP rounds, the inmate was observed with a fresh bleeding wound on his forehead and shirt. He reported picking a previous wound and denied recent engagement in SIB. A SRASHE was not completed.

A few weeks later, on October 10, 2019, during another weekly DDP contact, the clinician noted another fresh injury on the inmate's forehead and shirt. When asked to explain the injury, the inmate denied that he was engaging in SIB and simply stated "I fell." The clinician noted in a progress note that the injury seemed to be in the same spot in which he routinely engaged in SIB. A SRASHE was not completed. The inmate was seen by the clinician assigned to the administrative segregation unit on both October 15 and 16 (the morning of his death), and he denied any SI on both occasions. The notes did not contain any mention of the SIB observed by the DDP clinician. The administrative segregation unit clinician was interviewed following the suicide and acknowledged there had been rumors that other inmates on the unit had pressured the inmate to engage in SIB due to his DDP status.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant chronic medical issues that were felt to be contributory to his death. However, the CDCR reviewer did opine that "although the inmate had family support, his letters reflect feelings of

loneliness and isolation as well as shame regarding his criminal history. It appeared the combination of his mental health symptoms and cognitive deficits, layered with the discontinuation of Clozaril (the main medication found to be effective at managing his hallucinations), shame, and guilt are conceivable triggers that may have been associated with his decision to end his life at this time."

The Suicide Report contained 11 recommendations for corrective action through a QIP:

> 1) <u>CSP-SAC</u>:  When the inmate was placed in ASU on August 2, 2019, he was seen within 24 hours for his initial DDP contact.  However, per record review, weekly checks do not appear to have occurred for three weeks in August.  Per 'DDP Treatment Guidelines: Role of the DDP Psychologist, Administrative Segregation Unit (ASU),' 'While in ASU, the assigned PC will monitor the inmate on a weekly basis in the DDP to determine whether he/she is functioning at an adequate level.'

> 2) <u>CSP-SAC</u>:  Inmates in the DDP housed at DDP-designated institutions are required to have Interdisciplinary Support Team (IDST) committees on a scheduled, recurrent basis, based on the inmate's DDP designation.  Given the inmate DD2 designation, he should have had an IDST committee scheduled a minimum of every six months.  EHRS records only reflect IDST notes from April 12, 2018 and July 5, 2018.  Based on review of classification records in SOMS, the inmate had regularly scheduled IDST committees, consistent with policy.  However, based on review of the health care record, it appears the DDP clinician either did not attend the IDSTs consistently or did not document their attendance according to policy.

> 3) <u>HQ-SPRFIT</u>:  A review of the completed RVR mental health assessments (MHAs) revealed multiple deficiencies in the completion of documentation.  These include incorrectly checking the boxes, insufficient assessment of impact of cognitive deficits and mental health symptoms on offense, and insufficient recommendations.  The HQ DDP recognizes the overall quality of the responses on the RVR MHAs is lacking statewide and are in the process of developing revised policy and training to address these concerns.  As such, this QIP will be assigned to HQ.

> 4) <u>CSP-SAC</u>:  The inmate appeared to be experiencing an increase in his mental health symptoms from June to October 2019, as noted by ongoing self-harm behavior, refusal to attend treatment resulting in an approximate 80% treatment refusal rate, increase number of RVRs, intermittent difficulties attending to ADLs (as noted in DDP progress notes); however, no modifications were made to his multiple treatment plans through this period to address these symptoms and behaviors.  Additionally, there was no discussion regarding a referral to a higher level of care, such as a Psychiatric Inpatient Program at ICF level of care for stability of his ongoing symptoms and decrease of self-injurious behaviors.

5) <u>CSP-SAC</u>:  On December 12, 2018, a mental health progress note described reported side effects to medication (constipation), with a recommendation the inmate speak with psychiatry.  There did not appear to be a referral placed for psychiatry, and he did not see psychiatry until June 3, 2019 for a routine appointment which was completed at cell front because he refused to attend.

6) <u>CSP-SAC</u>:  Multiple incidents of self-harm were documented in EHRS in August, September, and October 2019.  Because the inmate often denied these incidents were the result of self-harm, there was some confusion regarding new versus exacerbation of old incidents (i.e., picking at old scabs), new wounds, and bloodstains on a shirt were observed, but were never documented on a self-harm power form, nor was an assessment of suicide risk (i.e., SRASHE) completed.  Per policy, all self-harm incidents must be documented on a self-harm power form within 72 hours of the incident.  This was reiterated on memorandum dated October 28, 2019: 'Clarification of Documenting and Reporting Suicide Attempts and Self-Harm Incidents.'

7) <u>CSP-SAC</u>:  Multiple concerns were found with the SRASHEs completed on June 7, 2019 and August 19, 2019.  Please see *Conclusions* section for further details.

8) <u>CSP-SAC</u> Psychiatry:  Details regarding the PC 2602 involuntary medication court order were irregular and, at times, confusing or contradicting.  A decision to not review the PC 2602 court order was made by the same psychiatrist who, six days previous, identified medication noncompliance.  In a three-month interim between the decision not to renew the court order and the expiration date of the order, the inmate conveyed a preference to stop the medications.  A decision to renew the court order could have been made prior to the expiration date in May 2019.  After the court order expired, some of the PC 2602 medication orders continued.  Psychiatry documentation on July 1, 2019 suggests some continued confusion regarding PC 2602 status.

9) <u>CSP-SAC</u> Psychiatry:  Psychiatry documentation on October 9, 2019 was inadequate in that it did not reflect a thorough evaluation.

10) <u>CSP-SAC</u>:  Although responding custody staff retrieved the cut down kit, custody reports state the Ambu bag was not retrieved with the cut down kit.  Policy requires retrieval of the complete cut down kit when responding to a suicide attempt by hanging.

11) <u>CSP-SAC</u>:  First responding nursing staff did not accurately document the results of the application of the AED and did not document the actions, if any, resulting from the initial AED application.  Specifically, the progress note dated October 17, 2019 at 20:33 states writer applied the AED and was with the patient until EMS detached the pads.

In the **_tenth_** case (SAC 15), the inmate was found hanging from the ventilation grate by a sheet in his PSU cell during the morning of December 13, 2019.  The inmate entered the CDCR system for his fourth term in August 2005 to serve a 36-years-to-life sentence for second-degree attempted murder, discharge of a firearm, and felon in possession of a firearm.  Of note, on June 2, 2010, he was found not guilty by reason of insanity for assault with a deadly weapon of a fellow DSH patient, resulting in an initial order that he be retained at DSH.  On September 10, 2010, however, the Departmental Review Board (DRB) approved DSH's recommendation for the inmate's retention in CDCR pursuant to Welfare and Institutions Code 7301.  He was most recently transferred to CSP/Sac on April 18, 2018.  The inmate incurred 29 RVRs during his confinement, the most recent of which occurred on October 10, 2019, for assault with a deadly weapon.  Most of his RVRs were for assaultive behavior.  The inmate was gang affiliated.  He was single and did not have any children.  Except for limited letter correspondence with a brother, there was no record of the inmate having any family support through visits or telephone calls since 2010.

According to available records, the inmate and at least two siblings were raised by their mother, with their father absent from the home due to drug addiction.  His mother also had a substance abuse history but was able to maintain custody of her children.  There were also reports of physical abuse by the mother.  The inmate did not finish high school, had an inconsistent employment history, and began an extensive substance abuse history as an adolescent.  He was known to be gang-affiliated in the community, and had an extensive juvenile and adult criminal history, including three prior CDCR terms.  The inmate also had an extensive history of receiving mental health services in the community.  Documentation indicated that he suffered from auditory hallucinations since the age of 11 and was psychiatrically hospitalized for "psychotic and dangerous behavior" at age 15.  The inmate had two previous suicide attempts, one by hanging in the county jail in 2004 and the second by drug overdose when he was 15.  Upon entry into CDCR in August 2005, he was immediately placed back into the MHSDS at 3CMS level of care, where he had been treated during previous terms.  For the next few years, he vacillated between 3CMS and EOP, with sporadic admissions to the MHCB, one acute care admission, and one intermediate care admission.  Since March 2007, the inmate was under a PC 2602 order which was renewed every year until his death.  Between 2009 and 2017, he was primarily housed at EOP with multiple missions to the administrative segregation unit and PSU.  He also had three admissions into an MHCB during this time, primarily attributed to either command auditory hallucinations to harm himself or others.  His last MHCB placement was in April 2017.  The inmate's diagnoses remained fairly consistent as Schizoaffective Disorder, Depressive Type, and Antisocial Personality Disorder.  Since August 2009, the inmate spent approximately 50 percent of his CDCR confinement in restrictive housing prior to his death.  He had been continuously housed in the PSU since September 12, 2018.  His last SRASHE was conducted on July 24, 2018, with the assessment showing a "high" chronic risk and "low" acute risk for suicide.

On October 10, 2019, the inmate appeared "possibly hypomanic and/or under the influence of drugs" as he was behaving oddly, yelling, and refusing to take his psychotropic medication.  Use of force was initiated to administer the PC 2602 medication.  During the incident, he attacked officers and received an RVR for assault with a deadly weapon.  On November 6, 2019, the inmate met with his primary clinician and reported symptoms of hopelessness, guilt and

depression, and commented that "I am always thinking about why I am ever still alive. I wonder 'what's the point' because I am a horrible person and have done horrible things.'" The CDCR reviewer in this case noted that, despite displaying passive SI, a SRASHE was not completed.

On December 5, 2019 the inmate told an RT that "he was anxious and stated, 'I am not suicidal but one day I will do something.'" He also submitted a Health Care Services Request form requesting to speak to the psychiatrist about additional medication to relieve his anxiety, stating that he was "feeling stressed out, I'm really anxious and I can't relax." The inmate told his PC that same day that he "was taken off my anxiety meds after I cell extracted, but I want to be put back on them… feel like I just worry and worry. The holidays are hard. I keep getting commands to hurt people. He gives me commands to hurt people and I'm trying to kill people and I haven't been able to do it because I've been trapped in a box. I want it to happen but part of me doesn't want to happen either." The clinician did not believe the inmate was imminently homicidal to warrant placement in an MHCB. The RT who was interviewed following the suicide told the CDCR reviewer that "the inmate attended nearly all of her groups for the last year and a half to two years and was considered 'very respectful' during treatment groups…. He frequently stated, 'he wakes up suicidal and goes to bed homicidal.'" The inmate saw the psychiatrist the following day (December 6) and reported an increase in his anxiety and depressive symptoms and requested to be placed back on Buspar. He denied both SI and HI. The inmate's Buspar was restarted. The inmate was last seen by a "covering" mental health clinician on December 12 (the day before his suicide). The interaction occurred at cell front as the clinician wrote that the inmate was "being restricted from the treatment center." There was no explanation for such a restriction. The inmate denied any concerns, and the clinician did not observe him "to be in distress or to exhibit bizarre behavior."

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant chronic medical issues that were felt to be contributory to his death. However, the CDCR reviewer did opine that the inmate had become attached to his PC and he had heard rumors that the clinician might be leaving the facility, which could have led him to feel a loss of support and hopelessness. In addition, the CDCR reviewer noted that, "In May 2019, there was a discussion among the treatment team concerning appropriate level of care for the inmate. There was no documentation suggesting the inmate would discharge to 3CMS, but it is possible he took these conversations to mean his level of care would be changed to 3CMS despite level of care discussions being a common occurrence in routine sessions and IDTTs. This could be evidence of catastrophic thinking by the inmate and may have led to increased anxiety and worry. This anxiety and worry, and not having regular access to his primary clinician, whom he felt was a protective factor, may have led him to spiral in a severe depression and anxiety to a point where he decided to end his life."

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

> 1) HQ IRU and DSH (Joint Concern): The 2009 WIC 7301 Memorandum of Understanding (MOU) outlined a requirement for a joint conference to occur every six months with DSH and CDCR legal team. Historically this has not occurred for several years due to a disagreement on the utility of such six-month

joint conferences.  There was no written agreement by DSH and CDCR eliminating the six-month joint conferences, thus not having them is a violation of the current MOU.  DSH and CDCR have had informal discussions regarding whether restarting the six-month joint conferences is clinically useful and have not yet reached a decision.

2) <u>CSP-SAC</u>:  The IDTT on May 22, 2019 occurred 119 days from the previous IDTT.  Per the MHSDS *Program Guide*, Chapter 4, 12-4-9 'Individual Treatment Planning involves a meeting of the IDTT and the inmate-patient at least every 90 days.'

3) <u>CSP-SAC</u>:  On December 5, 2019, the inmate reported to his group facilitator he was not suicidal, but 'may do something one day.'  He also reported he often 'wakes up suicidal and goes to bed homicidal.'  Given these statements, an emergency referral should have been placed so the inmate suicide risk could have been assessed.

4) <u>CSP-SAC</u>:  As part of this review it was identified that there were multiple opportunities to assess the inmate's suicide risk and/or complete a Suicide Risk Assessment and Self-Harm Evaluation in 2019.  On April 17 (MHMD contact), May 9 (MHPC contact), and November 6, 2019 (MHPC contact), he reported hopelessness and passive suicidal ideation without expressed intent.  A SRASHE was not completed during these clinical contacts, nor was one completed in 2019.  Since a baseline for his suicide risk was not established, his suicide risk remained unclear for his treatment team.  This likely also impacted treatment planning, as it did not appear suicidality was included as a treatment goal.

5) <u>CSP-SAC</u>:  The inmate had an extensive history of fluctuating mental health symptoms and had chronic psychosis, passive suicidal ideation and vague homicidal ideation throughout his incarceration.  During 2019, it was documented there were multiple incidents which may have indicated an intermittent increase in mental health symptoms, but the forcible cell extraction to administer psychiatric medication as well as an RVR for attempting to attack custody staff on October 10 was deemed unusual by the treatment staff and there was a question if he was intoxicated or hypomanic during the incident.  He had a chronic history of psychosis and mood symptoms, and even if he was under the influence of an illicit substance this can lead to exacerbation of his severe mental illness.  A higher level of care may have provided the inmate with the additional support and stabilization it appeared he needed.

6) <u>CSP-SAC</u>:  On December 12, 2019, the inmate was seen by a covering clinician for a routine MHPC contact.  The clinician documented that he was seen cell-front because he was 'restricted' from going to the treatment center for a confidential setting.  There was no further clarification regarding why he was restricted documented, nor was the clinician able to recall the details of this incident during clinical interviews.

7) <u>CSP-SAC</u>:  During the review of the emergency response, it was noted the complete cut down kit was not requested or brought to the incident scene. Specifically, custody only requested the cut down tool from the control booth. Although health care responders had a Bag Valve Mask on scene, it is a violation of policy to not respond with a complete kit.  This is to ensure custody has all safety equipment necessary to perform effective CPR.  Health care responders may not always be present when CPR is initiated.

8) <u>CSP-SAC</u>:  During the period of December 4, 2019 to December 12, 2019, it was discovered that documentation of Psych Tech rounds was incomplete.  There were few notes regarding whether the inmate was moving a breathing, or when lying in bed.  There was no documentation of inquiry of SI until the day prior to death.

In the ***eleventh*** case (<u>SAC 16</u>), the inmate was found hanging from the ADA rail by a sheet in his administrative segregation unit cell during the afternoon of December 31, 2019.  The inmate entered the CDCR system on October 2, 2014 to serve a seven-year sentence for multiple convictions, including inflicting corporal injury on spouse/cohabitant, criminal threat to cause great bodily injury/death, and false imprisonment.  In addition, he received another four-year term after being convicted of assaulting another inmate while at the RC.  The inmate was most recently transferred to CSP/Sac on November 15, 2019.  He incurred 14 RVRs during his confinement, the most recent of which occurred on February 13, 2019, for delaying a peace officer in the performance of duties.  The inmate was known to be gang-affiliated prior to and during the early part of his CDCR confinement.  He was never married but had an active relationship with the mother of two of his three children.  Records indicated that the inmate remained in close contact with his children and their mother through telephone conversations, had several visits from a brother and several other family members and friends, and was in regular letter correspondence with a sister.

According to available records, the inmate's parents separated when he was approximately three years old, and he and several siblings were raised separately by both parents.  The records also indicated childhood trauma in his life, including physical abuse by his father who was involved in criminal behavior.  The inmate ran away from home at age 12 and became gang-affiliated by age 16, resulting in the initiation of drug distribution.  The inmate had a sporadic employment history, and began using drugs, including methamphetamine, at age 13.  His drug use continued throughout his CDCR incarceration.  Due to numerous RVRs involving assault and possession of deadly weapons, the inmate served several SHU terms.  At the time of his death, he also had several active criminal cases arising from his assaultive behavior.

The inmate did not report a history of mental health treatment in the community but was placed in the MHSDS at the 3CMS level of care soon after his entry into CDCR in 2014.  His initial diagnosis was Major Depressive Disorder.  He also reported experiencing increased stress related to trying to end his gang affiliation, as well as coping with a lifetime of violence.  Following a few months of treatment, the inmate also began reporting an increase in symptoms related to auditory and visual hallucinations, nightmares of traumatic events, sleep disturbances, and angry

outbursts.  In January 2015, the inmate was placed in an MHCB for SI and safety concerns.  He was transferred to the intermediate care program in the PIP on March 16, 2015 and remained there until September 8, 2015.  Upon discharge, the inmate began vacillating between alternative housing and MHCB placements for either SI or HI.  From November 9, 2015 through August 17, 2017, the inmate remained at EOP.  Treatment continued to focus on depression and Post-Traumatic Stress Disorder (PTSD) symptoms.  He reported difficulty adjusting to SNY and frequently transferred to administrative segregation for either safety concerns or receiving RVRs related to violence toward others.  In December 2017, the inmate was again admitted into an MHCB following a suicide attempt.  While in the MHCB, he made conditional threats of self-harm if he was returned to administrative segregation, stating "I can't fight everyone….I don't see a light at the end of the tunnel."  He was subsequently transferred to the PIP at the acute level of care on December 27, 2017 to address his continued depression, SI, and paranoia.  On March 7, 2018, the inmate was transferred to the PIP intermediate care program for additional treatment of passive SI, impulsivity, and anger management.

On August 17, 2018, the inmate was discharged from the PIP and transferred to EOP at SVSP.  Shortly thereafter, he received an RVR for battery on an inmate and transferred to administrative segregation.  He was subsequently transferred to a number of other CDCR facilities, including the PSU at CSP/Sac.  During this period of time, the inmate continued to report struggles with auditory hallucinations, anxiety, paranoia, and anger.  He also continued to struggle with the choice to disavow his gang affiliation.  The inmate expressed concern related to his current court cases and the stress of possibly facing a life sentence.  During 2019, the inmate was housed in various CDCR facilities and vacillated between 3CMS and EOP.  On March 27, 2019, he was elevated to EOP where he remained except for several MHCB and PIP placements.  On April 8, 2019, the inmate was transferred to the acute care program at the CHCF-PIP and then to the CHCF-PIP intermediate care program on May 9, 2019.  He continued to voice SI and paranoia.  On September 30, 2019, the inmate was observed giving away his possessions before placing a drawstring around his neck.  The incident was his sixth suicide attempt during CDCR confinement.  He was eventually discharged from the CHCF-PIP intermediate care program on November 14, 2019, with the SRASHE stating "Acute risk high for recurring SI and plan to hang himself at lower LOC, despite potential contingent SI to manipulate housing."

Upon his return to CSP/Sac on November 15, 2019, the inmate remained unstable and self-reported ingesting 25 pills on December 2, 2019 due to both SI and safety concerns.  A SRASHE was completed, with his chronic risk for suicide listed as "high" and acute risk listed as "moderate."  The inmate was not placed in an MHCB and remained in administrative segregation.  A few weeks later on December 22, the inmate was seen by a clinician after he was observed with a ligature around his neck.  He reported that "couldn't take it anymore."  He was referred to the MHCB.  During the course of this placement, the inmate repeatedly stated that he was tired of living and want to die.  He remained concerned about the possibility of facing a life sentence and saw no reason for living.  The inmate was described as "uncooperative" and threatened to kill himself if he was removed from suicide observation.  He continued to be clothed in a safety smock.  According to clinical notes, the inmate "was doing very little to help himself as he refused any suggestions for medication adjustment."  On December 30, the inmate was found with a piece of metal and was superficially scratching his forearm.  One clinical note suggested his SIB was a means to relieve feelings of stress and frustration and not an intent to

die. Despite such documentation, the inmate continued to express SI and was not future-oriented.

The following day (December 31, 2019) was the tenth day of his MHCB placement and the inmate was discharged to EOP during his IDTT meeting while still on Suicide Precaution status and clothed in a safety smock. During the meeting, the inmate became angry at being discharged and continually threatened to kill himself, stating "'If you send me to EOP you are fast tracking me killing myself' and that if he was sent to DSH 'That will prolong me killing myself.'" According to treatment team members, the inmate's behavior did not warrant consideration for a higher level of care. Following the IDTT meeting, the inmate was physically escorted in a safety smock directly to administrative segregation. One of the MHCB clinicians later stated that "the inmate reported he was depressed and suicidal, but he also presented as 'gamie' because his presentation was incongruent. For instance, the clinician reported the inmate refused to participate in mental health or medical functions (such as IDTT meetings and nursing rounds), but he was observed as engaged and pleasant when interacting with custody on the unit. There was also speculation the inmate was involved in gang activity and had safety concerns on the yard which may have influenced his MHCB admission."

At the time of MHCB discharge on December 31, the inmate's diagnoses were Major Depressive Disorder, Methamphetamine Dependence, Psychotic Disorder (due to another medical condition with hallucinations), and Antisocial Personality Disorder. The discharge SRASHE estimated both his chronic and acute risk for suicide as "moderate." The rationale for his moderate acute risk was that "IP has shown different SX [symptoms] two different team members of TX [treatment] team, strongly suggestive of impression management…. While IP is unhappy with being incarcerated, there is no sign of acute distress that would indicate a lethal suicide attempt with grievous injury or intent to die" A safety plan was not completed because "IP was upset about being discharged and was not asked to participate in SP, because it would have been therapeutically inappropriate to do so." The inmate was directly escorted from the IDTT meeting room to administrative segregation and committed suicide several hours later on December 31, 2019.

The Suicide Report stated that "The rationale for discharge did not address the inmate's on-going reports of suicidal ideation, recent self-harm with a piece of an object, recent suicide attempt by hanging that perpetuated the MHCB admission, nor address his stressors related to his son's illness, court cases, possibility of serving a life sentence or safety concerns….. Given all these factors, it is unclear why a higher level of care referral was not considered."

Although the CDCR reviewer in this case "was not able to definitively state what the reasons for this inmate's suicide were at this particular time," he had multiple known acute risk factors for suicide, including active SI, recent SIB, safety concerns, and the potential of a life sentence if convicted of several pending criminal charges. Coupled with poor coping skills and difficulties controlling his anger, suicide became a viable option because these issues "became exhausting and were psychological torture for him. The feelings of fear and hypervigilance to maintain his safety without any perceived protection from others became unbearable. His perception of his situation was to relieve his pain by ending his life. As the inmate once stated his 'one ace in the hole (was) suicide'."

91

The Suicide Report contained 16 recommendations for corrective action through a QIP:

1) CSP-SAC:  Concerns were noted regarding the inmate's transfer from EOP to CCCMS LOC on January 11, 2019.  Please see *Conclusions* section for further details.

2) CSP-COR:  The patient received treatment in the MHCB from March 22, 2019 to March 27, 2019.  The Master Treatment Plan noted his reported suicidal ideation was conditional to his safety concerns.  However, at the time of his MHCB discharge, he was on partial issue, given a 90-day razor restriction chrono as a result of superficially cutting his arms (two days prior), and continued to report suicidal ideation during his treatment in the MHCB.  This does not suggest the patient was psychiatrically stable enough to discharge to an out-patient setting.

3) CSP-COR:  While the patient was in the MHCB on March 25, 2019, nursing staff observed the patient hoard medication.  Later on, that same day, he reportedly ingested a razor blade as well as cut his arm.  Nursing records noted he had multiple superficial lacerations on his left forearm, but there was no redness or active bleeding.  A SRASHE was not completed to assess the inmate's acute risk given he had cut his forearm and was witnessed by nursing staff hoarding medication.  Per policy, and assessment of suicidality must be completed following an incident of self-harm.

4) CSP-COR:  There will multiple concerns noted with a SRASHE completed on April 1, 2019.  Please see *Conclusions* section for further details.

5) CHCF PIP-ICF:  Multiple concerns were found in the SRASHEs completed while the patient was at the CHCF PIP-ICF.  Please see *Conclusions* section for further information.

6) CHCF PIP-ICF:  Multiple concerns were noted related to the documentation of justification of issue and observation, and with the provisioning and/or practice of only psychiatry completing those orders.  Please see *Conclusions* section for further details.

7) CHCF PIP-ICF:  Multiple concerns were noted regarding the decision to discharge the patient to EOP on November 14, 2019.  Please see *Conclusions* section for further details.

8) CHCF PIP-ICF:  Concerns were found with the discharge SRASHE dated November 14, 2019.  Please see *Conclusions* section for further details.

9) HQ IRU and CHCF PIP-ICF:  As part of the patient's discharge from the CHCF PIP-ICF, an agreement was made between HQ IRU and CHCF to schedule a pre-discharge CCAT.  Unfortunately, the patient was discharged from CHCF

and his CCAT was subsequently canceled.  Given the identified treatment concerns documented by the ICF treatment team, as well as the identified suicide risk and concerns related to the decision to discharged to EOP versus a higher LOC, this CCAT would have been an essential component of discharge planning and continuity of treatment.

10) CSP-SAC:  There were multiple issues identified in relation to the assessment of risk in the SRASHEs completed while at CSP-SAC.  Please see *Conclusions* section for further details.

11) CSP-SAC:  On December 30, 2019 while the patient was placed in the MHCB, he was found with a metal piece of an object and superficially scratched his forearm.  Nursing documentation noted there was no active bleeding, the scratches were reddened.  He also informed nursing staff he was feeling anxious and he was observed pacing in his cell and responded with pressured speech.  There are two components that were considered insufficient.  Please see *Conclusions* section for further details.

12) CSP-SAC:  The discharge from the MHCB on December 31, 2019 was problematic.  Please see *Conclusions* section for further details.

13) HQ-SPRFIT:  Review of the patient's MHCB placement revealed a repeated documentation pattern regarding the treatment team being under the impression MHCB patients must be discharged by Day 10 per policy.  As this is an inaccurate interpretation of policy, and has been identified as a statewide concern, this will be assigned to HQ SPRFIT.

14) CSP-SAC:  Joint mental health and custody concern.  During the course of the review it was discovered the patient was discharged from the MHCB and directly escorted to his ASU housing unit clothed in underclothes and a safety smock.  The issuance of a safety smock after discharge from a MHCB is noncompliant with statewide policy and procedures regarding MHCB discharge.  Additionally, there appeared to be some clinical staff confusion regarding what constitutes 'full issue' versus 'partial issue.'

15) CSP-SAC:  During the week of December 9, 2019, it appears there were only two entries documented on the 114-A for showers offered the patient.  The patient should have been offered a minimum of three showers a week.

16) CSP-SAC:  During the review, it was noted the patient did not possess any personal entertainment appliances, nor was he given a state issued hand-cranked radio or tablet when he was returned to administrative segregation on December 31, 2019.

**Summary**:  *CSP/Sac's delivery of adequate suicide prevention services is problematic.  The nine inmate suicides that occurred at the facility during 2019 was by far the largest number of*

*suicides at an individual CDCR facility in many years. Several of the suicides took place in the PSU. Other deficiencies found during this assessment included PT rounds in the STRH unit, overall conditions in the 20-bed MHOHU, safety planning in the MHCBs, an unknown number of patients released from the MHCBs without a discharge IDTT meeting (referred to by staff as "window discharges"), concerns regarding MHCB rescissions, and low rate of compliance for both clinical and custody completion of discharge custody checks. The suicide occurring on the last day of 2019 was symbolic of the institution's struggles to maintain adequate suicide prevention practices. On January 16, 2020, leadership from CCHCS's SMHP announced that an emergency support team would be created and dispatched to CSP/Sac to address the suicide crisis, as well as the corresponding increase in the level of violence in the facility's restrictive housing units. The support team was on-site at CSP/Sac on February 18-21, 2020.*

### 2) California Correctional Institution (CCI)

**Inspection**: November 27-28, 2018 (previous suicide prevention audit was on November 16-17, 2017). CCI housed approximately 3,940 inmates at the time of the on-site assessment.

**Screening/Assessment**: The facility had nurse's offices located on four yards (A-Yard Clinic, B-Yard Clinic, C-Yard Clinic, and D-Yard Clinic) that were utilized for the R&R intake screening process. This reviewer observed a few new admissions during the intake screening processes in both the A-Yard Clinic and D-Yard Clinic. The nurses were observed to be asking all of the questions and correctly entering information into the EHRS in both clinics. However, similar to previous assessments, there were problematic physical plant issues that negated reasonable privacy and confidentiality. In the A-Yard Clinic, the wooden door to the nurse's office had recently been removed by the state fire marshal because it was deemed a hazard. A TTM, which had been installed inside the office to allow nursing staff to feel more comfortable screening maximum-security inmates with the door closed, had also been removed by the state fire marshal. In the D-Yard Clinic, the nurse's office still did not have a door that separated the office from the high-traffic R&R area. Since this reviewer's previous assessment, a cloth curtain had been positioned in the doorway, but the curtain obscured visibility into the nurse's office by custody staff and did not address voice privacy.

This reviewer also inspected the nurse's offices in both the B-Yard and C-Yard clinics. Similar to the A-Yard, the wooden door to the nurse's office in the B-Yard Clinic had recently been removed by the state fire marshal because it was deemed a hazard, and the TTM was removed for the same reason. The C-Yard Clinic did not have a separate nurse's office and the intake screening was conducted at a desk in a wide-open area.

In conclusion, the intake screening process in all four yard clinics was very problematic because each lacked reasonable privacy and confidentiality.

Finally, this reviewer observed daily rounds by a PT in the administrative segregation unit (B-8) on November 28. The unit housed GP and 3CMS inmates. The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS for MHSDS inmates.

**Housing**:  CCI had eight of its 16 OHU cells designated to temporarily house inmates with mental illness and/or requiring suicide observation.  Although these OHU cells were designated as **alternative housing**, the unit had been closed for renovation since October 2018, and alternative housing was temporarily relocated in B-8 and A-8 (a GP unit).  The cells had either fixed beds or stack-a-bunks.  In addition, as observed during previous assessments, inmates awaiting transfer to an MHCB and housed in the OHU on 1:1 observation were not automatically placed in a safety smock.  Rather, because they were required to be observed on a continuous 1:1 basis, pursuant to a LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Alternative Housing-Mental Health"), each inmate was "provided with a safety mattress, sheets, safety blanket, state issued clothing, including pants, shirt, socks, underclothes, reading materials, hygiene items and a prescribed healthcare appliance as clinically indicated as per Policy 12.05.301."  Such a policy and practice continued to be very commendable.

From August through November 2018, there were approximately 68 inmates placed in alternative housing, and the vast majority (94 percent) was released within 24 hours.  Approximately 33 percent of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the 23 EHRS charts of inmates discharged from alternative housing and found that the required SRASHEs were completed in each case.

Finally, the B-8 administrative segregation unit still contained three retrofitted new intake cells (A103-A105), although one had been red-lined for repair.  Although there were not any new intake inmates observed in unsafe non-intake cells, a custody supervisor informed this reviewer that the unit exceeded its new intake cell capacity approximately every one to two weeks.  A similar admission had been made to this reviewer during the previous assessment.  A recommendation was made by CCI staff in November 2016 to create more retrofitted new intake cells, but a work order had not been generated regarding this recommendation to date.  Of note, an inmate (CCI 1) on new intake status and not housed in a new intake cell committed suicide on January 5, 2020 in the B-8 administrative segregation unit.

Similar to the previous assessment, this reviewer found another potentially problematic practice in the administrative segregation unit.  Five cells (101 through 105) in B-Section still did not contain any bunks.  This reviewer was previously informed that the bunks were removed several years ago when the unit was used for the special management of SHU inmates.  With the temporary closure of the OHU, these cells were currently utilized for alternative housing and each inmate were provided a stack-a-bunk.  This reviewer was informed that these five cells were only utilized for alternative housing, and not for regular administrative segregation inmates.

**Observation**:  Because CCI did not operate a MHCB unit, all suicidal inmates were required to be supervised on 1:1 observation until they were transferred to a MHCB.  No other levels of observation were permitted within the OHU.  As noted above, the OHU had been closed for renovation since October 2008.

Finally, a review of Guard One data for a recent 24-hour period found 98-percent compliance with the required checks not exceeding 35-minute intervals in the administrative segregation unit.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of September through November 2018.  This reviewer's sample EHRS review of 49 emergent/urgent referrals for SI/behavior found that clinical staff completed the required SRASHEs in 96 percent (47 of 49) of the cases.

It was noteworthy that the completion of required SRASHEs by mental health clinicians in an environment of reasonable privacy and confidentiality had become extremely challenging since the state fire marshal ordered the removal of TTMs from the facility in February 2018.  As a result, clinicians were forced to utilize visiting booths and tables in dining halls when available or conduct cell-front assessments when no other option was available.

This reviewer did not review discharging SRASHEs at CCI because the assessments were conducted by mental health clinicians at other MHCB facilities.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 65 cases of patients discharged from a MHCB or alternative housing placement who were returned or transferred to CCI and not transferred to the administrative segregation unit (where observation at 30-minute intervals was required) from June through November 2018.  The review found that 97 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (88 percent) of the custody checks recommended for 72 hours by clinicians.  In addition, 82 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.  The percentage of compliance with custody check forms was lower than the previous assessment when 92 percent compliance was found.

**Intervention**:  Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (August through October 2018) found that meetings had quorums for all required mandatory members or designees for all three months.  The meeting minutes were otherwise unremarkable.  Further, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was signed as a memorandum dated February 15, 2018.  However, the facility did not have any policies and procedures for a "High Risk Management Program" and did not have any policy and procedures for intake nursing staff regarding "Bad News

Notification" following the inmate's return from court or BPH, both of which were required by the SPRFIT memorandum.

**Training**:  According to training records, 99 percent of custody and 100 percent of nursing staff was currently certified in CPR.  In addition, approximately 99 percent of custody, 89 percent of medical, and 100 percent of mental health staff completed the annual suicide prevention block training during 2017-2018.  Finally, as of November 2018, 100 percent of mental health clinicians had completed the SRE mentoring program, only 75 percent had completed the seven-hour SRE training program, and only 78 percent had completed safety plan training.

**Recent Suicides**:  CCI experienced four (4) inmate suicides during the review period.  In the ***first*** case (CCI 2), the inmate was found hanging from a light fixture by a sheet in his GP cell during the morning of February 2, 2018.  The inmate had entered the CDCR system on May 12, 2015 to serve a seven-year sentence for second-degree robbery.  He was transferred to CCI on November 9, 2017.  He had two RVRs during his confinement, the most recent of which occurred on the day of his death for refusing to work.  The inmate was known to be gang-affiliated and was placed in SNY in February 2016.  He had good family support through visits from his stepmother and girlfriend, as well as almost daily telephone calls with his girlfriend (which often became volatile).  The inmate was unmarried and had a young daughter.

According to available records, the inmate was the youngest of three siblings who were raised by parents in a dysfunctional environment.  There was a family history of substance abuse and mental illness, as well as both physical and sexual abuse.  There was also a significant history of suicidal behavior in the family that included the suicides of both his uncle and grandmother, as well as his brother's attempted suicide.  The inmate once described his childhood as "unsure, walking on eggshells," and he was placed in foster care at age 11.  Four years later, he attempted suicide.  As a child and teenager, he was treated for ADHD, PTSD, and schizophrenia.  The inmate did not complete high school but did obtain a GED.  He had a minimal work history and was often homeless.  He had a significant history of substance abuse.  Prior to the instant offense, the inmate had several arrests for assault and theft.

Upon entry into CDCR, the inmate was not placed in the MHSDS until December 2015 when he was diagnosed with Psychotic Disorder, Not Otherwise Specified (NOS) and PTSD.  He was initially placed at the 3CMS level of care but was elevated to EOP following a MHCB placement for SI in April 2016.  The inmate was subsequently admitted to MHCBs on four other occasions, as well as an ICF program from July 2016 through January 2017.  He often admitted to clinical staff that he would periodically exaggerate his symptoms, including threatening suicide, in order to avoid administrative segregation and obtain a higher level of care.  The medical chart and institutional file often contained narrative related to manipulative behavior.  The medical chart also indicated that the inmate was not seen on a regular weekly basis by his PC, nor offered ten hours of group treatment per week, from January through April 2017, as required by his EOP level of care.

On April 27, 2017, the inmate attended his IDTT meeting in which his level of care was downgraded from EOP to 3CMS.  According to the CDCR reviewer in this case, the rationale for such a decision was unclear and the team simply stated that: "IP requested to be graduated to

CCCMS LOC so that he could participate in vocational training and utilize self-help groups. IP is currently stable, adequately functioning on his medication, has not had any MHCB admits or RVRs in the past 90 days, attending to ADLs, and can appropriately interact with others. As such, IP is being graduated to CCCMS." The inmate was not seen on a timely basis by either his new PC or psychiatrist. He was eventually seen by the psychiatrist on June 6, 2017 and diagnosed with Schizoaffective Disorder, Bipolar Type. His psychotropic medication was changed.

In July 23, 2017, the inmate was transported to an outside hospital following a drug overdose. He subsequently reported the overdose was a suicide attempt. The inmate was returned to KVSP and placed in alternative housing on Suicide Watch. The MHCB referral was later rescinded and the inmate was returned to his housing unit the following day because "It appears IP is falsifying symptoms and trying to utilize MHCB for secondary gain to assist in raising his level of care. IP has inconsistent reports of past suicide attempts and documented history of lying about symptoms. IP is possibly cheeking his medications. IP's protective factors outweigh his risk factors. They include family and social support, future oriented, he is serving a short-term with an EPRD of 2021. He does have children and a spouse at home."

The inmate remained in the 3CMS program, but frequently requested to return to the EOP level of care following his transfer to CCI in November 2017. He submitted several requests to be seen more frequently by his PC and, during an encounter on January 10, 2018, self-reported several recent stressors to his clinician, including "breaking up with his girlfriend, not hearing from his mother, feeling as though others were using subliminals to bring up child molestation." Of note, the inmate had three different PCs at CCI from November 2017 through January 2018. During an encounter with his third PC on January 25, 2018, he reported that he had made several attempts to end his life with pills and hanging, stating "No one knew the sheet broke." The PC did not document an assessment of current suicide risk. This was the inmate's last contact with his PC. He was seen by a psychiatrist five days before his death and, although insisting "he has psychosis," the psychiatrist found that the inmate "was seen to be demanding and argumentative, and his description of symptoms was atypical, inconsistent and not suggestive of genuine psychosis or bipolarity."

The CDCR reviewer concluded that the inmate was experiencing several stressors prior to his death, including the recent breakup with his girlfriend and concern about the inability to reach his stepmother about her deteriorating health. He did not have a significant medical history that was found to be contributory to his death. The CDCR reviewer theorized that the inmate "was impulsive in the sense that his emotions and thought process rapidly fluctuated within moments. This paired with the recent stressors are plausible contributory factors to his impulsive decision to end his life."

The Suicide Report contained nine (9) recommendations for corrective action through a QIP:

> 1) While that KVSP at the EOP level of care between January 18, 2017 and April 27, 2017, the inmate was not seen weekly for individual contact with his PC, nor was he offered 10 hours of group treatment per week.

2) On April 27, 2017 while that KVSP, the inmate's level of care was changed from EOP to CCCMS, however, documentation did not provide a rationale for the decision to lower his level of care consistent with program guidelines for decreasing a level of care. Per the MHSDS 2009 *Program Guide*, 'Discharge from the EOP will be based upon a decision utilizing the IDTT process when the inmate-patient satisfies any of the following conditions: 'Is able to function in a GP setting with CCCMS support.'

3) On April 27, 2017, while at KVSP, after the inmate's level of care was changed from EOP to CCCMS, the inmate was not seen for the CCCMS PC initial contact until seven weeks later. Per the 2009 MHSDS *Program Guide*, 'The PC completes a clinical intake assessment within 10 working days of the referral/arrival.'

4) On April 27, 2017, while at KVSP, after the inmate's level of care was changed from EOP to CCCMS, the IDTT was held almost seven weeks after the LOC change. Per the 2009 MHSDS *Program Guide*, 'The individualized treatment plan must be completed within 14 working days of the referral/arrival by the PC in consultation with the other IDTT members.'

5) While at KVSP, the inmate wrote two requests to meet with psychiatry about Remeron that had expired (May 12, 2017, May 24, 2017). When he was not seen, he wrote a healthcare appeal on May 30, 2017. He was seen on June 6, 2017. Per the MHSDS 2009 *Program Guide*, 'Inmates may also self-refer for a clinical interview to discuss their mental health needs. Inmate self-referrals shall be collected daily from each housing unit, and processed the same way as staff referrals…. A routine referral should be seen within five working days.'

6) While at KVSP, the inmate reported to have hoarded and ingested medications in an attempt to end his life. The day he returned from the hospital on July 23, 2017, he was assessed and estimated to be at high acute risk for suicide and was referred for MHCB admission. The following day on July 24, 2017, his acute risk for suicide was reduced to low and the MHCB referral was rescinded. The documentation did not provide a clinical rationale for the reduction in suicide risk and rescinded MHCB referral.

7) The inmate arrived to CCI on November 9, 2017, yet his initial IDTT was not held until December 4, 2017. Per the 2009 MHSDS *Program Guide*, 'The individualized treatment plan must be completed within for 14 working days of the referral/arrival by the PC in consultation with other IDTT members.'

8) On November 9, 2017, during the intake screening, the reception nurse sent an email to the psychiatrist to reconcile the medication but did not send a referral to Mental Health (MH) for a routine follow-up, per policy requiring a MH referral for all CCCMS patients received in R&R.

9) On November 15, 2017, during an am medication pass, the nurse documented that the patient was caught 'cheeking' his medication. While the nurse documented the patient was given a verbal warning, there was no documentation that states the patient's primary care physician or the inmate provider was notified. Additionally, there was no documentation that states the facility lieutenant was notified. Medication administration P&P requires notification of all three individuals.

In the ***second*** case (CCI 3), the inmate was found hanging from a ventilation grate by a sheet in his GP cell during the early morning of April 30, 2018. The inmate had entered the CDCR system on October 21, 2008 to serve a life sentence without the possibility for parole for first-degree murder. He was transferred to CCI on February 16, 2018. He had 18 RVRs during his confinement, the most recent of which occurred on April 2, 2018 "for behavior which could lead to violence." The inmate was known to be gang-affiliated and was placed in SNY in November 2017. He had good family support through visits and letter correspondence. The inmate received a visit from his mother and two sisters approximately two weeks prior to his death. He was single and did not have any children.

According to available records, the inmate and three siblings were raised by their mother. He did not have any contact with his biological father. Limited information was known about the inmate's upbringing, other than he initially described his childhood as chaotic with frequent periods of violence in the home. He struggled in school and did not complete high school. The inmate had a sporadic employment history. He also had a history of substance abuse, as well as an extensive juvenile criminal history and gang involvement which were strong contributors to his instant offense. The inmate was 16 at the time of the instant offense. He did not have any prior history of either mental illness or suicidal behavior.

Upon entry into CDCR, the inmate screened negative for any mental health problems and was not placed in the MHSDS. During his approximate ten years of confinement, he never submitted a referral for mental health services nor expressed any SI. His only known concern was "safety" and on September 9, 2017, the inmate reported that "I don't want to go to GP. I want to go to a Special Needs Yard because of safety concerns. I fear for my life due to disciplinary repercussions" (associated with his gang affiliation). He was designated SNY status on November 15, 2017.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant medical issues that could be viewed as contributory to his death. A suicide note was not found in his property. Posthumous interviews with both staff and inmates indicated that the inmate was quiet and often kept to himself. There were subsequent reports that the inmate's safety concerns might also have included a drug debt and his sexual orientation.

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

1) The CDCR 837s submitted by responding staff members identify there may have been a delay providing immediate life support, to include activation of 911 within an appropriate amount of time.

In the **_third_** case (CCI 4), the inmate was found hanging from a ventilation grate by an extension cord in his SNY cell during the late evening of March 9, 2019. The inmate had entered the CDCR system on May 22, 2003 to serve a 22-year and four-month sentence for first-degree robbery. He was transferred to CCI on October 26, 2018. He had nine RVRs during his confinement, the most recent of which occurred on October 16, 2018 involving battery on an inmate. The inmate was known to be gang-affiliated, but had safety concerns related to a drug debt that subsequently resulted in SNY placement. He had good family support through letter correspondence, telephone calls, and quarterly visits by his parents and various siblings. He was unmarried and had one daughter who last visited him in October 2016.

According to available records, the inmate was one of six children born into an intact family. His mother suffered from depression and his father used physical abuse as a form of punishment and control. The inmate did not finish high school. He was involved in numerous fights that resulted in both suspensions and juvenile hall. He had a history of substance abuse beginning at age 13. The inmate had no record of employment, and consistently denied any prior history of mental health treatment or prior suicidal behavior in the community.

Upon entry into CDCR in May 2003, the inmate screened negative for any mental health problems and was not initially placed in the MHSDS. During his approximate ten years of confinement, he never submitted a referral for mental health services nor expressed any SI. His only known concern was "safety" and on September 9, 2017, the inmate reported that "I don't want to go to GP. I want to go to a Special Needs Yard because of safety concerns. I fear for my life due to disciplinary repercussions" (associated with his gang affiliation). He was designated SNY status on November 15, 2017.

The inmate appeared to program without incident until July 2006 when he threatened suicide secondary to safety concerns and was placed in an OHU for several days. At the time, the inmate stated, "they want to get me, and I just don't feel safe going over there, if they want to kill me I just rather do it myself." At that time, he did not fit the criteria for enrollment in the MHSDS.

It was not until October 2010 that the inmate was placed into 3CMS level of care after complaining of depression, insomnia, anxiety, and low appetite. His initial diagnosis was Mood Disorder, NOS. The inmate appeared to program well until May 2011 when he was transferred to an administrative segregation unit and began to deny all mental health symptoms and refused to attend any appointments. The inmate was discharged from the MHSDS in July 2011 and later admitted to a clinician that the reason he sought 3CMS treatment in 2010 was to avoid being transferred to an out-of-state facility.

During the next few years (2016 through 2018), the inmate appeared to program well and did not incur any significant RVRs. However, he received an RVR for battery on an inmate on October 16, 2018 and was transferred to administrative segregation. During the pre-placement screening,

the inmate expressed SI and was subsequently placed in an MHCB. Upon discharge from the MHCB on October 24, 2018, the inmate was readmitted into 3CMS with a diagnosis of Unspecified Mood Disorder. However, on November 19, 2018, the inmate again reported thoughts of self-harm and later told the clinician that he was feeling "hopeless, helpless, seeing no options for himself other than to take his own life." He was placed overnight in alternative housing pending MHCB placement. The following morning, he admitted to both a clinician and custody supervisor that his main concern was safety and demanded a higher level of care. According to the SRASHE completed on November 20, the inmate began banging his head against the cell door while talking to the sergeant. He was returned to the yard after his safety concerns were addressed. During a follow-up contact the next day (November 21), the clinician determined that the inmate was suffering from paranoid thinking that was possibly related to methamphetamine use. Another SRASHE was completed and the inmate's acute risk for suicide was rated as "low."

On November 22, 2018, the inmate was again placed in an MHCB after making superficial cuts to his wrist and stating he "felt suicidal and had a plan to hang himself." He further indicated if "he was sent back to the yard he would continue to try and kill himself in his cell." He was prescribed psychotropic medication to address symptoms of depression. During sessions in the MHCB, the inmate reported that he was concerned about his father's health, as well as the fact that his daughter was no longer visiting him. He also subsequently admitted that he had an enemy and drug debt on his current yard and did not want to return there. He was discharged from the MHCB on November 28 with a diagnosis of Adjustment Disorder with mixed disturbance of emotions and conduct, and re-housed on another yard.

The inmate's behavior appeared to stabilize between December 2018 and January 2019, but he received multiple SRASHEs in February 2019 following self-reports of SI. For example, on February 6, 2019, the inmate reported active SI with intent and a plan to hang himself. He was placed in alternative housing. The following day (February 7), a follow-up SRASHE was completed in which the inmate reported mild SI without a plan. He was assessed to be at "low" acute risk for suicide and returned to his housing unit. According to the CDCR suicide reviewer in this case, the safety plan contained within the SRASHE dated February 7 "did not address modifiable risk factors such as substance abuse, drug debts, reported feelings of isolation and estrangement from family or his safety concerns, it also did not incorporate the presence of warning signs. The inmate's level of acute risk appeared to have been underestimated based on his risk factors." On February 16, 2019, the inmate again reported SI to custody personnel and was uncooperative with the responding clinician, who stated in the completed SRASHE that "IP's SI reporting was variable and vague....IP appears to be demanding MHCB for secondary gain." The assessment indicated that the inmate had significant anxiety secondary to safety concerns in a pattern of behavior of seeking MHCB when he felt unsafe. He was again returned to the yard. A few days later on February 20, 2019, the inmate received another SRASHE which was a 90-day follow-up post MHCB discharge. The clinician stated the following on the assessment form: "IP was encouraged to participate in evaluation, however, he declined. He was asked questions cell front, however, he declined to answer, reporting he is fine." The SRASHE indicated a "moderate" chronic risk and "low" acute risk for suicide. The inmate refused to attend his scheduled IDTT meeting on February 26, 2019 and his PC met with him briefly at cell front. He was seen again at cell-front by his PC a few days later on March 1, 2019, stating "he

has no concerns and is doing well." He committed suicide the following week on March 9, 2019.

Apart from an escalation of his suicide thoughts that were thought by his treating clinicians to be secondary to safety concerns, the CDCR reviewer did not find any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not have any significant medical issues that could be viewed as contributory to his death, and he did not leave a suicide note. The CDCR reviewer noted that "It appeared the inmate had begun using illegal substances, acquiring debt he was unable to pay, and his family support had reduced. MHCB and emergency referral records reveal as his safety concerns elevated, he was unable to cope with any small distress. The inmate indicated he was concerned about being jumped on the yard stating to his mother in a phone call, 'I can't take on six guys.' As he experienced the pressure of safety concerns, he likely became overwhelmed with anxiety, leading him to the impulsive decision to end his life."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) The SRASHEs completed on February 6, 2019, February 7, 2019, and February 20, 2019 (by the same clinician) contained multiple deficiencies. These SRASHEs failed to adequately address acute risk factors that may have led to an under-estimation of the inmate's current level of risk. Warning signs and protective factors were not adequately explored or integrated into a cohesive framework. None of the SRASHEs contained a comprehensive safety plan to address the inmate's on-going suicidal ideation at his current LOC, versus placing him at a higher LOC. Specific treatment interventions to address his suicidal ideation, anxiety, or safety concerns were not noted.

> 2) The SRASHE completed on February 16, 2019 contained multiple deficiencies. The clinician did not list sources of information or how he arrived at conclusions. No warning signs or IS PATH WARM indicators were checked, including the no indicators box. The mental status exam was insufficient. Both acute and chronic risk were under-estimated and did not have adequate risk justification for the low ratings. The safety plan did not address the inmate's modifiable risk factors or triggers, and did not discuss how his protective factors might mitigate his suicide risk. Additionally, specific treatment interventions to address his risk factors were vague and underdeveloped.

> 3) The inmate's treatment plan upon return from MHCB dated December 8, 2018 does not appear to have updated MHMD information. It still lists him as MHCB LOC and does not address his treatment at CCCMS LOC. Similarly, his MH Master Treatment Plan held on February 26, 2019 has the same information which appears to have carried over from MHCB. Two psychiatrists at CCI failed to include comments in the 'medication review' tab of the IDTT documentation.

> 4) At the time of the inmate's IDTT meeting on February 26, 2019, he was flagged on the sustainable process report for 3+ MHCB referrals within the last

six months.  This item was incorrectly documented in the Master Treatment Plan and a justification for non-referral to a higher LOC was not provided.

5) During the review of the inmate's classification process and timeliness, deficiencies were identified in regards to the timeliness of the 1030 Confidential Disclosure Form not being completed prior to his first committee on December 14, 2018.  In addition, there was a lapse of 17 working days between the subsequent committee action on February 7, 2019 and referral to the Classification Services Representative which occurred on March 5, 2019.

In the ***fourth*** case (CCI 5), the inmate was found hanging from a supply closet door by a sheet in the visiting area of his GP housing unit during the afternoon of October 28, 2019.  The inmate had entered the CDCR system for his second term on October 2, 2017 to serve a six-year sentence for first-degree burglary.  He was transferred to CCI on February 2, 2018.  He had only one RVR during his confinement for being intoxicated on August 10, 2019.  The inmate was not known to be gang affiliated.  He had good family support through regular telephone calls and letter correspondence with his wife and two children.

According to available records, the inmate was born into an intact family and, although describing his childhood as "good," also reported that there was significant alcohol abuse in the family.  Some clinical documentation also reported he and his mother suffered physical abuse by his father.  His parents were divorced when the inmate was 17 years old.  The inmate did not report any family psychiatric history.  He graduated from high school and attended three years of college. The inmate later had a history of employment as an electrical engineer and firefighter. He had a significant history of substance abuse beginning at age 15.  The inmate did not have a history of juvenile arrests, but had multiple arrests and one prior conviction (separate from the current offense) as an adult.

Upon entry into CDCR in October 2017, the inmate screened positive for mental health issues after reporting being prescribed psychotropic medication in the county jail for sleeping difficulties and depressive symptoms.  He was enrolled at the 3CMS level of care with diagnoses of Major Depressive Disorder, Chronic Depression, and Substance Abuse (history of alcohol and amphetamine abuse).  During the next several months, the inmate was mostly non-compliant with his medication as he complained of its side effects.  His psychotropic medication was discontinued in May 2018.  Available records indicated that the inmate programmed well within CDCR and had various jobs as a janitor, warehouse worker, and porter.

On August 11, 2018, the inmate expressed SI with an undisclosed plan.  In the completed SRASHE, the responding clinician noted that the inmate was inconsistent in his reporting of SI and could not identify any risk factors that "would make him have sudden suicidal ideation for the past couple weeks."  The inmate reported that "I just need to go somewhere where I can sit in the room and catch my breath….and I won't get that here."  After being informed that he would not be going to an MHCB, the inmate responded with anger and stated "I can't believe this! You're supposed to be mental health! You're supposed to help! I can't freaking believe I have to harm myself to get a couple of days alone to clear my head!"  The inmate was returned to his housing unit.  The following week on August 18, the inmate again met with his PC and

apologized for his behavior the previous week. He stated he felt overwhelmed by watching the California wildfires on television as they brought back memories of his previous life as a firefighter, which he believed was no longer attainable. The inmate was also concerned about having family problems that his wife had to manage alone. He continued to see his PC on a regular basis to discuss effective coping skills, and continued to deny any SI.

The inmate had a few other SRASHEs completed during his approximate two-year CDCR confinement. He provided an inconsistent history of possibly two suicide attempts in the community but did not provide further details. The inmate was consistently assessed as being both a "low" moderate and acute risk for suicide.

During an IDTT meeting on March 13, 2019, the inmate reported that he was "feeling pretty good" and wanted to be discharged from 3CMS. He had not been prescribed psychotropic medication since the previous year and had not reported any significant depressive or anxiety symptoms for at least six months. The team decided that he was appropriate for discharge from the MHSDS. The inmate was seen once again before his death on August 15, 2019 as a result of a routine mental health referral after the inmate had been found to be intoxicated. He denied any SI.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant medical issues that could be viewed as contributory to his death. A suicide note was not found in his property. The Suicide Report noted that "information gathered during the course of this review suggests recent events consisting of his most recent RVR, his wife having significant health issues, his daughter suffering from a domestic violence incident and what may he have perceived as a loss of support from his wife all culminated to him feeling hopeless, depressed, guilty, and shame. His wife wrote a number of times that the inmate was not welcome in their home when he paroled until he proved he was not using substances, so his most recent RVR for intoxication may have caused him to feel shame and doubt he would be able to abstain from substances and return home once he paroled. In addition, he felt guilt and shame for not being there for his wife and daughter, which could have contributed to his decision to end his life."

The Suicide Report did not contain any recommendations for corrective action through a QIP.

### 3) Wasco State Prison (WSP)

**Inspection**: November 29-30, 2018 (previous suicide prevention audit on June 8-9, 2017). WSP housed approximately 4,849 inmates at the time of the most recent on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during both the medical intake screening process and the mental health diagnostic testing in the RC. The nurse was observed to be asking all of the questions and correctly entering information into the EHRS. The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality. The door to the RC diagnostic clinician's office was also closed and the clinician was observed to be conducting thorough assessments. The clinician was observed to have access to (and used) the Patient Health Information Portal during the process, and the

diagnostic clinician informed this reviewer that SOMS, the county jail transfer sheet, and nurse's Initial Health Screening form were all reviewed for each inmate.

Daily PT rounds in the administrative segregation unit were observed on November 29. The rounds were unremarkable and both PTs were observed to be conversing with all inmates, with Psych Tech Daily Rounds information entered into EHRS for each caseload inmate.

**Housing**: WSP had an 18-bed CTC, with six rooms designated as MHCBs. A previously identified problem of several rooms not being suicide-resistant because of antiquated ADA grab bars (with openings between the bars and the walls that were conducive to suicide attempts by hanging) were corrected less than a month prior to this writer's assessment. Most of the MHCB beds were occupied during the on-site assessment.

The administrative segregation unit had 14 cells identified for new intake inmates. Although 12 of the cells had previously been retrofitted as suicide-resistant cells and were found to be appropriate by this writer during previous assessments, two ADA cells (117-118) were previously designated for new intake inmates and still not completely suicide-resistant. During the assessment in June 2017, several hazards were observed, including bunks situated in front of the exterior window allowing for a gap that was conducive to a suicide attempt by hanging, as well as antiquated ADA grab bars that were not suicide-resistant. Upon reinspection during the current assessment, this reviewer found that bunks had been relocated to a solid wall, thus eliminating the gap, and the ADA bars were retrofitted to be suicide resistant. However, the cell doors in these two cells (117-118) had large-gauge metal screening positioned on the interior of the doors that were conducive to a suicide attempt by hanging. This reviewer was subsequently informed that these two ADA cells were not officially designated as new intake cells and were only utilized for ADA inmates and primarily used after 72 hours of the administrative segregation confinement. Despite the intended purpose of not utilizing these ADA cells for new intake inmates, this reviewer was subsequently provided documentation that verified the cells were utilized at least 27 times between January 20, 2018 and November 30, 2018, or more than twice a month.

Despite the continued physical plant hazards of the two ADA cells, this reviewer observed that all new intake inmates were in new intake cells.

Finally, **<u>alternative housing</u>** to temporarily house inmates identified as suicidal and awaiting MHCB placement was used on less than a daily basis. Inmates were primarily housed in two GP units (A-4 or B-6, RC housing: B-2), or the administrative segregation unit (D-6). From August 1 through October 1, 2018, there were approximately 73 inmates placed in alternative housing. According to available data, all inmates were provided beds, required to be observed on a continuous 1:1 basis, and were released within 24 hours. Only 16 percent (12 cases) of the MHCB referrals were rescinded and inmates returned to their housing units. This reviewer examined the 12 EHRS charts of inmates discharged from alternative housing and found that the required SRASHEs were completed in each case.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were required to be observed

at 15-minute intervals by nursing staff. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (<u>WSP 1</u>, <u>WSP 2</u>, <u>WSP 3</u>, and <u>WSP 4</u>) on Suicide Precaution status in the MHCB unit during a nine-hour period from 12:00 a.m. through 8:59 a.m. on November 27, November 25, October 21, and November 28, 2018, respectively. The chart review found very few observation checks (i.e., <u>WSP 1</u> had two violations, <u>WSP 3</u> had seven violations, and both <u>WSP 2</u> and <u>WSP 4</u> had no violations) that were in excess of required 15-minute intervals, with the longest gap between checks being 30 minutes in one case (<u>WSP 3</u>). Violations in the two cases were committed by multiple nursing staff.

In addition, although a previous concern regarding confusion by members of the IDTT regarding the availability for patients on suicide observation status receiving telephone calls and visits had been corrected, there remained confusion regarding such patients having yard privileges. For example, during the observation of one patient's (<u>WSP 5</u>) initial IDTT meeting on November 30, the RT informed the patient that "as soon you are off Suicide Watch status and get whites, you can go out to the yard." Such an instruction was incorrect, MHCB patients are immediately eligible for yard privileges based upon clinical judgment of the IDTT. This reviewer subsequently reviewed documentation on the other three patients (<u>WSP 1</u>, <u>WSP 2</u>, and <u>WSP 4</u>) who were housed in the MHCB unit for more than seven days. The review found that the first patient (<u>WSP 1</u>) had been housed in the MHCB for eight days and had received yard on one occasion; the second patient (<u>WSP 2</u>) had been housed in the MHCB for ten days and had <u>never</u> been offered yard; and the third patient (<u>WSP 4</u>) had been housed in the MHCB for seven days and had received yard on two occasions.

When this reviewer inquired as to the reason why <u>WSP 2</u> had never received yard privileges, the response was that the CTC yard was not large enough to accommodate a "special management 'walk-alone' yard." Therefore, <u>no</u> MHCB patients on administrative segregation or maximum-security status were allowed yard privileges at WSP. This practice was very problematic and exacerbated by the fact that the WSP only employed one full-time RT, whose responsibilities encompassed the entire facility and included the provision of groups. The RT was scheduled to be in the CTC for limited hours three times a week (Monday, Wednesday, and Friday) and was responsible for providing activities for both the 12 medical patients and six MHCB patients. The RT schedule did not include regular IDTT meeting attendance.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 97-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of September through November 2018. A sample EHRS review of 21 emergent/urgent referrals for SI/behavior found that clinical staff completed the required SRASHEs in 95 percent (21 of 22) of the cases.

In addition, this reviewer was able to observe three IDTT meetings in the MHCB unit on November 30, 2018. The meetings were well attended by team members and there was good overall case presentation found in each case. However, discussion of safety planning to reduce SI and/or SIB was lacking, particularly in one case in which the patient was being discharged

that day by the IDTT. In that case (WSP 4), the patient had been admitted to the MHCB unit on November 22, 2018 for fleeting thoughts of suicide, paranoia, and auditory hallucinations. He had a history of over 50 incidents of both suicide attempts and SIB, with the most recent attempt occurring four weeks earlier that involved swallowing a razor and overdosing on pills. The patient was still on RC status, having been admitted into WSP on November 16, 2018. Although there was a good presentation of the patient's case during the IDTT meeting, there was little, if any, discussion regarding safety planning other than both the PC and RT separately indicating that they will "work on a safety plan today." The IDTT then discharged the patient from the MHCB unit.

This reviewer's subsequent review of WSP 4's discharging SRASHE found the following narrative in the safety planning section of the document: "The focus of his treatment should be CBT [Cognitive Behavioral Therapy] interventions, tx. compliance, and developing a self-calming routine. Individual therapy should be used to explore his triggers to his depression, mania and SIB. His main trigger seems to be anger. He gets angry if he doesn't get his way or has to follow orders/directions from others. The therapeutic relationship should be empathic and caring as he is very responsive to treatment when he feels like the other party cares and encourages them." The RT also wrote a progress note following the IDTT meeting that stated, in part, "RT helped patient complete a safety plan worksheet…." Review of the patient's chart found that none of the above was discussed with the patient during or before his discharge IDTT meeting of November 30. The following day (December 1), the patient cut himself with a razor and swallowed pieces of a razor blade in his RC housing unit. He was transported to an outside hospital for medical examination and treatment, returning to WSP two days later on December 3. The patient was not readmitted into a MHCB, rather he was continued on a five-day follow-up.

A review of ten other charts of patients discharged from the MHCB unit continued to reveal problematic safety planning. One case (WSP 6) was particularly troubling, with the safety plan section of the discharging SRASHE stating the following:

> Clinician asked to discharge patient by CTC lead. He is new to this clinician and as such information for discharge is based on documentation by clinicians seeing IP for last nine days and IP's report today…...He is currently not feeling suicidal but it seems feelings are triggered when he is down, i.e. comparing himself to others, most recently felt like he was not as good as the other inmates. On-going treatment and frequent contact with MH may help decrease such feelings. He was previously at CCCMS LOC and will now be released at the EOP LOC, a program in which he will receive 5 days of groups and weekly contact with his MH clinician. He is motivated for treatment, would like to work on goal setting so that over time his self-esteem may approve. He is particularly interested in returning to drawing. He is looking forward to his release from prison. He may also benefit from assistance with improving social skills as he feels he is lacking in this area. He is educated about the routine, urgent, and emergent referral process should his symptoms become unmanageable. He will receive 30-minute custody checks and five-day follow-up.

Another concern related to documentation of IDTT meetings and whether patients were being released from the MHCB unit without a discharge IDTT meeting. The MHCB supervisor assured this reviewer that patients always received two IDTT meetings at approximately Day 3 and Day 7 of their MHCB placement that were reflected in two "Mental Health Master Treatment Plans" for each patient. Despite such assurances, this reviewer's examination of ten charts of patients recently discharged from the MHCB unit found that, although discharging SRASHEs were completed for each patient, documentation was often lacking to verify that each patient received a secondary IDTT meeting, including a discharge team meeting.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 134 cases of patients discharged from a MHCB or alternative housing placement who remained at WSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from May 1, 2018 through November 29, 2018. The review found that only 72 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Most of the errors were attributable to blank forms or custody checks recommended for discontinuation prior to 24 hours by clinicians. When completed correctly, custody checks were recommended for 48 hours in approximately 54 percent of the cases. In addition, 96 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Of note, compliance rates for custody checks were found to be significantly higher than the previous assessment.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months (August through October 2018) of SPRFIT meeting minutes found that meetings had quorums for all required mandatory members or designees for all three months. The meeting minutes were otherwise unremarkable. Further, a revised SPRFIT LOP that was required to be issued by March 1, 2018, to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum, was signed on November 28, 2018. Entitled, Operational Procedure Suicide Prevention (WSP-039), the SPRFIT LOP referenced a "Management of High-Risk Inmates" Operating Procedure (OP 198), as well as briefly addressed "bad news notification." However, the narrative regarding "bad news notification" did not include any procedures whereby intake nursing staff were required to ask specific questions to inmates following their return from court or for inmates returning from a BPH proceeding.

**Training**: According to training records, both custody and nursing staff were at 100-percent compliance with current CPR certification. In addition, 100 percent of custody staff, 100 percent

of medical staff, and 98 percent of mental health staff received annual suicide prevention block training during 2017-2018. Finally, as of November 2018, approximately 95 percent of mental health clinicians had completed the SRE mentoring program, only 89 percent had received the seven-hour SRE training, and only 79 percent had completed safety plan training.

**Recent Suicides**: WSP did not experience any inmate suicides during the review period.

### 4)    California Institution for Women (CIW)

**Inspection**: December 11-12, 2018 (previous suicide prevention audits on June 19-20, 2017). CIW housed approximately 1,889 inmates at the time of the on-site assessment.

**Screening/Assessment**: The intake screening process within the R&R Unit was not observed because there were not any new inmates admitted to the facility during the two-day assessment. In addition, this reviewer observed daily PT rounds in the administrative segregation unit for GP and 3CMS inmates on December 11, 2018, and PT rounds in the administrative segregation EOP Unit Hub on December 12, 2018. The rounds were unremarkable and the PTs were observed to be correctly entering Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**: CIW had a CTC with ten designated MHCBs previously found to be suicide-resistant. The administrative segregation unit for GP and 3CMS inmates contained seven retrofitted cells for inmates on new intake status. Due to a low census during the on-site inspection, this reviewer observed very few new intake inmates, and all were appropriately assigned to new intake cells. Of note, all inmates assigned to the administrative segregation EOP Unit Hub were required to be housed in the new intake cells of the administrative segregation unit for GP and 3CMS inmates for the initial 72 hours.

In addition, the four "swing" medical beds (Rooms 7, 8, 9, and 11) in the CTC were primarily used as **alternative housing** cells to temporarily house inmates awaiting MHCB placement. The designated cells in the TTA (103 and 104) and PSU could also be used for alternative housing. All inmates in alternative housing were required to be observed on a 1:1 basis and were furnished with beds.

Alternative housing continued to be used extensively at CIW. From August through November 2018, there were approximately 128 inmates placed in alternative housing, with 69 percent discharged within 24 hours. The average length of stay for the 31 percent of inmates held in alternative housing over 24 hours was approximately 65 hours. Only 11 percent (14 cases) of the MHCB referrals were rescinded and inmates returned to their housing units. This reviewer examined ten EHRS charts of inmates discharged from alternative housing and found that the required SRASHEs were completed in each case (although one SRASHE did not provide adequate justification for rescission of the MHCB referral).

Finally, and as referenced in this reviewer's prior assessment report, CDCR began converting a GP unit at CIW (Walker A Unit) into a 19-bed unlicensed MHCB unit in early 2018. This reviewer previously inspected the renovation project in April 2018 and found the proposal to be

reasonable.  Upon reinspection on December 11, 2018, this reviewer observed that the project was near completion and almost all of the patient rooms had been retrofitted to be suicide resistant.  The MHCB unit was scheduled to be activated on December 31, 2018. Although the yard adjacent to the MHCB unit had not been completed nor landscaped, this writer was informed that the renovated yard would be completed shortly after the scheduled activation date of the MHCB unit.

During the December 11 inspection, this reviewer was informed that a "special management 'walk-alone' yard" had not been budgeted in the current renovation project.  Such a disclosure was concerning because it was contrary to what was previously told to this reviewer and subsequently reported in the suicide prevention assessment report (Document No. 5994) to the *Coleman* court on November 5, 2018: "An undetermined number of special management 'walk-alone' yards would be installed for patients on maximum security/ administrative segregation unit statuses."  As a result, no MHCB patients on administrative segregation or maximum-security status would be able to have yard privileges in the new unlicensed MHCB unit.  As an interim measure, the CIW warden informed this reviewer that MHCB patients on administrative segregation or maximum-security status would be designated to the licensed MHCB unit which had a secure yard within the CTC.

Of note, according to CDCR data, 25 of the 29 rooms in the MHCBs (or 86 percent of both the licensed and unlicensed units) were occupied as of February 25, 2019.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were regularly used in the MHCB units for patients identified as being suicidal.  In addition, inmates not on suicide observation status were required to be observed at 15-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status during a nine-hour period from 12:00 a.m. through 8:59 a.m. on December 8 for CIW 1, December 9 for CIW 2, and December 10 for CIW 3 and CIW 4.  The chart review found numerous observation checks (between seven and 13 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 32 minutes in one case (CIW 1).  In another case (CIW 3), there were 13 violations of 17-, 18-, 19-, 16-, 24-, 17-, 18-, 16-, 19-, 17-, 17-, 19-, and 17-minute gaps between the required 15-minute intervals.  Violations in the four cases were committed by multiple nursing staff.  Of note, this reviewer found similar problems with the observation of suicidal MHCB patients during the previous assessment, and assurances provided by CIW nursing leadership on December 11, 2018 that the problem had been remedied were found to be incorrect.

In addition, this reviewer observed the IDTT process in the licensed MHCB unit on December 11-12, 2018 and found that there were sound practices regarding approval of both possessions and privileges to patients.  MHCB patients were assigned clothing that was consistent with their level of observation.  A review of sample charts indicated that patients were offered yard, shower, and telephone privileges on a regular basis.

Finally, a review of Guard One data for a recent 24-hour period found a combined 95-percent compliance with required checks not exceeding 35-minute intervals in the two administrative segregation units, and 100-percent compliance with checks in the PSU.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals from June through November 2018.  This reviewer's sample EHRS review of 40 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in only 85 percent (34 of 40) of the cases, a decrease from the previous assessment when 93 percent compliance was found.

This reviewer observed IDTT meetings for four patients on December 11-12.  Overall, there were good presentations of each case, but uneven discussions regarding safety planning to reduce future recurrence of SI, particularly in one case in which the patient was being discharged from the MHCB unit.  In that case (CIW 2), the patient had a significant history of SIB and had recently been elevated to EOP following a similar MHCB discharge the previous week.  On December 3, the patient was readmitted into the MHCB unit.  During the IDTT meeting on December 12, which included attendance by the patient's outpatient PC (an excellent practice), the MHCB PC informed the treatment team that the patient had received a "homework" assignment the previous day (December 11) to complete a safety plan worksheet.  In fact, the patient arrived to the IDTT meeting with the completed worksheet.  However, the patient was discharged from the MHCB by the treatment team without any discussion regarding the safety plan.  Subsequent review of the safety plan section of the discharging SRASHE found that the patient's worksheet was simply copied into the SRASHE.  The patient had been in the MHCB for approximately ten days and, although the clinician's attempt to introduce the patient to the safety planning concept through a template worksheet was commendable, the homework assignment provided the day before discharge and lack of discussion of safety planning during the IDTT meeting was very problematic.  The process would have been far more beneficial had it been initiated upon MHCB admission and/or at the initial IDTT meeting.

A subsequent review of ten charts of patients discharged from the MHCB unit found uneven formulation of safety plans to reduce continued SI.  For example, several SRASHEs included the aforementioned safety plan template worksheet containing the following questions: "What triggered your MHCB admission?  How could I have cope with my triggers differently?  Name three things that relax you.  What will be your daily routine while on 5-day F/U?"  Other SRASHEs contained narrative in the safety plan section that simply deferred the development of coping strategies for the patient to the outpatient PC.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 180 cases of patients discharged from a MHCB or alternative housing placement who remained at CIW and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from June through November 2018.  The review found that 86 percent had Page 1 of the "Discharge

112

Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 83 percent of the custody checks recommended for discontinuation after 24 hours by clinicians. In addition, 94 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months (September through November 2018) of SPRFIT meeting minutes found that, although there were between 11 and 14 participants at each meeting, meetings consistently lacked all required mandatory members or designees and quorums were not reached in two (September and October) of the three months. With that said, the SPRFIT at CIW continued to be very active, meetings were generally 90 minutes in duration, and minutes reflected updated corrective action plans for continued suicide prevention deficiencies, as well as regular discussion regarding SRASHE review, High-Risk List, safety planning, Crisis Intervention Team, Suicide Prevention Outreach Committee (with inmate representative), and summaries of any recent serious suicide attempts, among other issues. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was signed on March 7, 2018 and entitled "Chapter 10: Suicide Prevention and Response Plan." The facility also had an LOP on the "High-Risk List" (Chapter 11) but did not have a comparable policy and procedure regarding "bad news notification" for intake nursing staff when inmates returned from court or a BPH.

**Training**: According to training records, 99 percent of custody staff and 100 percent of nursing staff were certified in CPR. In addition, 100 percent of custody, 95 percent of medical, and 100 percent of mental health staff had completed annual suicide prevention block training during 2017-2018. Finally, as of November 2018, only 75 percent of mental health clinicians had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and 98 percent had completed safety plan training.

**Recent Suicides**: CIW experienced one (1) inmate suicide during the review period. In that case (CIW 5), the inmate was found hanging from the electrical conduit pipe in her GP cell by a sheet during the late afternoon of August 26, 2019. The inmate had entered the CDCR system on November 20, 2018 to serve a 16-year sentence for multiple accounts of assault with a deadly weapon and child endangerment. She was transferred to CIW on August 20, 2019. The inmate did not have any RVRs during her confinement, and was not known to be gang-affiliated. She had good family support through visits and telephone calls with her boyfriend and daughter. The inmate was unmarried with one daughter.

According to available records, the inmate and four siblings were raised by both parents. Her father was reportedly an alcoholic and her parents eventually divorced when she was a teenager. The inmate subsequently resided with her mother. Records also suggested that there was a history of both physical and sexual abuse, as well as alcohol abuse in the family. The inmate graduated high school and attended several months of community college. She had a limited employment history that was primarily caused by her significant alcohol addiction. Although the

inmate did not have a juvenile record, she had a lengthy history of alcohol-related, non-violent offenses over a 15-year period. Her brother was incarcerated in CDCR at the same time. There were limited records available regarding any prior mental health treatment in the community, but the inmate did report a history of depression, anxiety, and anger issues which she attempted to mask with her extensive alcohol use. She reported overall "disgust with her life," occasional SI while growing up, with one possible prior suicide attempt around age 13 when she overdosed on pills.

Upon entry into CDCR, the inmate screened positive for mental health problems and was placed in the MHSDS at the 3CMS level of care. Her diagnoses were Adjustment Disorder, with Mixed Anxiety and Depressive Disorder, Alcohol Use Disorder, Severe, and Borderline Personality Disorder. She maintained these diagnoses throughout her confinement. The inmate's adjustment to prison was challenging, particularly the adjustment to an eight-person cell. She often complained of difficulty sleeping, anxiety, depression, racing thoughts, auditory hallucinations, and paranoia. For the most part, she consistently denied any SI. However, on April 20, 2019, the inmate was transferred to CIW as a result of a MHCB admission for SI and depression. She remained at CIW until the day of her death. The inmate reported feeling "overwhelmed" secondary to housing issues. Records indicated that she was pleased with the transfer to CIW and when told she was endorsed there, she tearfully stated "Oh thank God, I am so happy this is making me cry." The inmate was discharged from the MHCB on April 26 and remained at the 3CMS level care. She frequently requested bed moves due to continued reports of issues with cellmates. The inmate tried a variety of psychotropic medications and was non-compliant with many of them. She was thought to be "med-seeking," particularly for Seroquel, and all psychotropic medication was discontinued in June 2019.

The inmate had seven SRASHEs completed during her approximate ten-month CDCR confinement. She provided an inconsistent history of suicide attempts, at times denying any prior attempts while at other times acknowledging an intentional drug overdose at age 13. The inmate's most recently completed SRASHE assessed her as being a "moderate" chronic risk and "low" acute risk for suicide.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and she did not have any significant medical issues that could be viewed as contributory to her death. Although an old suicide note (dated December 31, 2018) was found in her property, more recent writings from a creative writing course were also found in her cell. The suicide note was written approximately a month after she entered CDCR and described her inability to adjust the prison and her disagreement with the length of her sentence. The more recent writings spoke about her struggles with sobriety, as well as the belief that her daughter was the only positive accomplishment in her life. The CDCR reviewer concluded that the inmate "was in a chronic state of readiness, meaning that she had viewed suicide as a readily accessible way out and an ultimate coping skill to take away her pain, even if she didn't overtly express it. The inmate was in constant agony during her incarceration and her inability to seek comfort with her daughter or substances became entirely too much to handle."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

1) Although there are no indications she was actively using any substances, given her extensive history of alcoholism, medication-seeking behaviors, and diagnosis of an Alcohol Use Disorder, it was not clear why substance abuse treatment was not identified as a recommendation.

2) During her incarceration, the inmate submitted 22 Health Care Services Requests (Form 7362); there were seven requests submitted between April 29, 2019 and May 31, 2019.  While these requests were responded to within policy timelines for routine referrals, some referrals were not process accordingly and identified as urgent, and the MHMD Consult Order was not utilized to schedule an appointment.  The identified areas are not consistent with *Program Guide* timelines and CIW's local operating procedures.

### 5)     California Institution for Men (CIM)

**Inspection**:  December 13-14, 2018 (previous suicide prevention audit was on June 21-22, 2017).  CIM housed approximately 3,550 inmates at the time of the on-site assessment.

**Screening/Assessment**:  The medical intake screening process in the R&R unit was observed on December 13.  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.  Due to scheduling conflicts, this reviewer was unable to observe the mental health screening by clinical psychologists during the RC process.  There were, however, no issues raised in this area during previous assessments.

Daily PT rounds in the administrative segregation unit (Palm Unit) were observed on December 14.  The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.  Of note, numerous inmates on new intake status had not received radios as required during the 21-day orientation process.  The problem, which had been occurring for several weeks and not related to the availability of new radios, was communicated to the warden.

**Housing**:  Two units of the CTC at CIM contained 34 MHCBs.  All of the MHCB rooms had previously been found by this reviewer (beginning in 2013) to be hazardous and not suicide-resistant.  Due to the slow response in correcting the problem, the *Coleman* court ruled on January 25, 2018 that "The ongoing existence of these conditions is unacceptable.  Good cause appearing, defendants will be directed to provide to the Special Master and file with the court a detailed plan for completion of all necessary work at CIM…"  ECF No. 5762 at 2.  As a result, the defendants notified the Special Master on September 28, 2018, that the MHCB unit renovations at CIM were complete.  This reviewer inspected the MHCB unit on December 13 and confirmed that the rooms were suicide resistant.  Of note, 23 of 34 rooms (or 68 percent) in the MHCB unit were occupied on December 14, 2018.

In addition, this reviewer found that the Palm Unit still contained 13 new intake cells that were suicide resistant.  All new intake inmates were observed to be in new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on almost a daily basis at CIM.  Although Cell 175 located in the CTC and several cells in Cypress Hall in Facility B (the RC building) were designated for alternative housing, this writer was provided with data indicating that both TTA cells and TTMs were also utilized.  The data also indicated that inmates were placed in the TTMs for extended hours, sometimes up to 17 hours.  If accurate, such a practice would be extremely problematic.  CIM officials subsequently informed this reviewer that TTMs were not being utilized for alternative housing and that reference to them in alternative housing documentation reflected a "miscoding error" that would be corrected.

The data also indicated that there were approximately 82 inmates placed in alternative housing from September through November 2018, and all were discharged within 24 hours.  Only five percent (four cases) of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the four EHRS charts of inmates discharged from alternative housing and found that the required SRASHEs were completed in each case.  All inmates in alternative housing were required to be observed on a 1:1 basis and furnished beds.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during a nine-hour period from 12:00 a.m. through 8:59 a.m. on November 9, 2018 for CIM 1, on December 5 for CIM 2, on December 6 for CIM 3, and on December 9 for CIM 4.  The chart review found very few observation checks (i.e., CIM 1 had four violations, CIM 2 had one violation, CIM 3 had two violations, and CIM 4 had no violations) that were in excess of required 15-minute intervals.  The longest gap between checks was 32 minutes in one case (CIM 1).  Violations in the three cases were committed by multiple nursing staff.

A previous concern regarding MHCB clinicians displaying confusion regarding the issuance of possessions and privileges to patients during the previous assessment appeared to have been corrected.  With one exception, during IDTT meetings in the MHCBs unit on December 13-14, this reviewer observed that patients were assigned clothing that was consistent with their level of observation.  The exception was one patient (CIM 5) who was observed in a safety smock on December 13, but he had been ordered to receive "partial issue" (t-shirt/shorts) the previous day (December 12).  A review of sample charts indicated that patients were offered yard, shower, and telephone privileges on a regular basis.

Finally, a review of Guard One data for a recent 24-hour period found a 99-percent compliance in the administrative segregation (Palm) unit with required checks not exceeding 35 minutes.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of June 1 through December 10, 2018.  A sample EHRS review of 60 emergency/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in only 83 percent (50 of 60) of the cases, a decrease from the 92-percent completion rate found during the preceding assessment.

This reviewer observed IDTT meetings for seven patients on December 13-14.  Overall, there were good presentations of each case, as well as preliminary discussion of safety planning that was augmented by a practice of distributing a safety plan template worksheet to most patients during the <u>initial</u> IDTT meeting.  It was noteworthy that one of the treatment groups offered in the MHCBs unit was a newly created "safety planning group" to assist patients in developing individual safety plans.  Availability of the safety planning group was mentioned during most of the IDTT meetings.

However, a subsequent review of ten sample SRASHEs of patients released from a MHCB during November and December 2018, found a mixture of attempts at safety plan strategies to reduce SI, as well as safety plan narrative that simply deferred identification of coping skills strategies to the outpatient, post-discharge PC.  For example, in one case (<u>CIM 6</u>), the patient had been admitted to the MHCB for passive SI related to chronic lower back pain and a failed request to obtain lower bunk housing.  He had two prior suicide attempts by drug overdose, and records indicated he often expressed SI for secondary gain to get his needs met.  In an attempt to begin utilizing other mechanisms to get his needs met, the following safety plan narrative within the discharging SRASHE utilized a "My Safety Plan" template offered during a previous CDCR Suicide Prevention Summit:

> <u>Warning Signs</u>
> Patient recognizes that when he has elevated physical pain he can't prevent, he begins to have an increase of feelings of hopelessness.  The patient when not receiving the treatment he expects feels that his feelings are not acknowledged.
>
> <u>Internal Coping Strategies</u>
> The patient reports that engaging in thinking of his wife coming to visit and continuing to have her support provided him with a relief that he does have something to look forward to.
>
> <u>People I Can Ask for Help</u>
> The patient reports that his family can be supportive but feels that he needs to make them understand that he can't hear issues on the outside because he has difficulty coping with not being able to help them.  The patient wants to increase his social support on the outside to gather resources in the community to be more productive out in the community.
>
> <u>Staff I Can Contact During A Crisis</u>
> The patient recognizes that asking other inmates for help is no longer an option as he has acknowledged that they're not invested in his well-being.  The patient is now willing to ask mental health staff for help as he wants to learn the proper ways to cope with his depression.
>
> <u>Making The Environment Safe</u>
> The patient endorses that when he is familiar with his environment, is able to feel safer and is able to function more properly.

    <u>Most Important Thing Keep On Living</u>
    The patient looks forward to seeing his wife and programming as he wants to
    complete the rest of his time at RJD.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute
intervals following release from either a MHCB or alternative housing placement was reviewed.
A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed
on each inmate. The first page contained "discharging information" that was completed daily by
the mental health clinician when determining whether the 30-minute custody checks were to be
continued up to 72 hours. The second page represented the "custody checks" form completed by
custody staff.

This reviewer was presented with documentation of 73 cases of inmates discharged from a
MHCB or alternative housing placement who remained at CIM and were not transferred to
administrative segregation (where observation at 30-minute intervals was required) during June
through November 2017. The review found that 92 percent had Page 1 of the "Discharge
Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians.
Of note, the majority (64 percent) of the custody checks were recommended for discontinuation
by clinicians after the maximum allowable 72 hours. In addition, only 84 percent of the "custody
check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down
tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months (September through November 2018) of SPRFIT
meeting minutes found that there were between 12 and 16 participants at each meeting, and all
required mandatory members or designees (CIM had not been allotted a correctional health
services administrator position) attended each meeting. The meeting minutes were otherwise
unremarkable. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018
to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response
Focused Improvement Teams" memorandum was signed on July 20, 2018 and entitled "Chapter
12.10.101: Suicide Prevention." Although the LOP briefly addressed "bad news notification," it
did not include any procedures whereby intake nursing staff were required to ask specific
questions to inmates following their return from court or a BPH. Finally, although the LOP also
briefly addressed the "high-risk management program," it lacked specific criteria for placement
on the list, as well as procedures for its management.

**Training**: According to training records, 100 percent of both custody and nursing staff were
currently certified in CPR. In addition, approximately 99 percent of custody staff, 98 percent of
medical staff, and 100 percent of mental health staff received annual suicide prevention block
training during 2017-2018. Finally, as of December 2018, 98 percent of mental health clinicians
had completed the SRE mentoring program, 100 percent had received the seven-hour SRE
training, and 90 percent had completed safety plan training.

**Recent Suicides**:  CIM experienced one inmate suicide during the review period.  In that case (CIM 7), the inmate jumped off the roof of a building in the facility during the morning of March 18, 2019.  The inmate entered the CDCR system in June 1997 to serve a life sentence with parole eligibility for first-degree murder (of the partner of his estranged second wife).  He was transferred to CIM on October 14, 2016.  The inmate incurred only one RVR during his almost 22-year confinement, which occurred on March 14, 2016 and involved being "out of bounds."  The inmate initially had good support from his family, principally two brothers, through telephone calls.  However, family visits ended in 2010 and letter correspondence with most family members ended in 2015.  Most recently, from January 2019 until shortly before his death, the inmate and one of his brothers had several contentious conversations by telephone and letter correspondence regarding financial issues, which included several disparaging remarks to the inmate by his brother.

According to available records, the inmate and six siblings were raised by both parents.  There were no known issues regarding abuse, substance use, or mental illness in the family.  The inmate, however, became addicted to alcohol as an adult which affected both his employment and marital histories.  He was married and divorced twice, and he fathered two daughters.  The inmate briefly attended counseling in the community for both alcohol abuse and anger management.

Upon his admission into CDCR, the inmate screened negative for any mental health problems and, therefore, was not initially admitted into the MHSDS.  However, he did self-report a suicide attempt while confined in the county jail in 1995 and he was briefly enrolled in the MHSDS at the 3CMS level of care during July 1997 for depression.  Almost ten years later in June 2017, the inmate again reported symptoms of depression and was briefly re-enrolled in the 3CMS program until November 2017, when his symptoms were stabilized.  Other than having brief contact with mental health clinicians during 2015 regarding concerns over possible dementia (which both parents suffered from), the inmate did not have any further contact with the MHSDS.

The inmate, 67-years-old at the time of his death, did not experience any significant medical issues that were thought to be precipitants to his suicide.  Although preoccupied with the possibility of dementia, initial testing gave no indication of the disease.  The inmate subsequently refused almost all contact with medical staff because he distrusted their abilities to provide an accurate diagnosis.

The CDCR reviewer in this case did not identify any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  However, immediately prior to jumping from the building roof, the inmate reportedly was heard to say, "I'm tired of doing this," and threw a piece of paper to the ground that was later identified as a suicide note.  The note read that "The night I was arrested, I passed out in the back of the police car.  When I woke up, I was sitting in a chair with two detectives laughing at me, saying 'is this the drunkest you've ever been.'  They convicted me of first-degree murder instead of second-degree murder.  I would like the victims to know that I did this for them.  And then tell them how sorry I am I killed their father."  In addition, and as previously noted, the inmate and his brother had several contentious exchanges during the last several weeks leading up to his suicide, including his

119

brother threatening to withhold further financial support and suggesting that he stop proclaiming his innocence and begin to take responsibility for the instant offense.

As a result of the review, there were not any recommendations for corrective action through a QIP.

### 6) **Kern Valley State Prison (KVSP)**

**Inspection**:  January 8-9, 2019 (previous suicide prevention audit was on July 11-12, 2017).  KVSP housed approximately 3,736 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on January 9, 2018.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, the inmate was placed in a TTM, and an officer was stationed in the hallway.  Privacy and confidentiality were maintained.

In addition, this reviewer observed daily rounds by two PTs assigned to GP administrative segregation and STRH units on January 8, 2019.  The rounds in the GP administrative segregation unit were unremarkable, whereas rounds in the STRH unit were problematic.  Although the PT was observed to be entering Psych Tech Daily Rounds information into EHRS for each caseload inmate, there was very brief interaction with each inmate, with inquiry limited to "eating and sleeping okay" and "any medication concerns."  There was no inquiry regarding SI/HI or out-of-cell programming.

**Housing**:  KVSP had a 20-bed CTC, with 12 designated MHCBs previously found to be suicide-resistant.  On January 9, 2019, seven of the 12 rooms (or 58 percent) in the MHCB unit were occupied.  The two administrative segregation units (ASU-1, which was recently converted to an STRH unit for 3CMS inmates and ASU-2, which housed GP inmates) contained ten retrofitted cells for inmates on new intake status.  (Of note, three STRH unit cells previously identified by KVSP as being new intake cells were deactivated following the previous assessment because they were not suicide-resistant).  During the tour of both ASU-1 and ASU-2, this reviewer found that two new intake inmates were housed in unsafe, non-new intake cells on each unit.  Supervisory personnel in each unit subsequently informed this reviewer that intake inmates were often placed in non-new intake cells.  This issue was identified as problematic during previous assessments.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily located in ASU-1 and SNY units, as well as occasionally in other designated cells throughout the facility.  Alternative housing was used on a daily basis, and inmates were required to be furnished beds and observed on a 1:1 basis.  From October 1 through January 6, 2019, there were approximately 80 inmates placed in alternative housing, and all were released within 24 hours.  Approximately 20 percent (16 cases) of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the EHRS charts for all of these 16 rescinded cases and found that the required SRASHEs were completed in each case.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on November 2, 2018 for KVSP 1, on December 12, 2018 for KVSP 2, on January 5, 2019 for KVSP 3, and on January 6, 2019 for KVSP 4.  The chart review found a variety of violations in observation checks (i.e., KVSP 1 had ten violations, KVSP 2 had five violations, KVSP 3 had six violations, and KVSP 4 had three violations) that were in excess of required 15-minute intervals.  The longest gap between checks was 65 minutes in one case (KVSP 4).  Violations in the four cases were by multiple nursing staff.

During the IDTT meetings in the MHCB unit on January 9, this reviewer observed that all patients were assigned clothing consistent with their level of observation.  A review of sample charts indicated that patients were offered yard and telephone privileges on a regular basis, with showers offered on a limited basis (and less than the required three times per week).

Finally, a review of Guard One data for a recent 24-hour period found a combined 99-percent compliance in both ASU-1 and ASU-2 with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a list of emergent/urgent mental health referrals for the period of July 6, 2018 through January 6, 2019.  A sample EHRS review of 62 emergency/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 92 percent (57 of 62) of the cases, an increase from the 76-percent completion rate found during the preceding assessment. Of note, however, as detailed below, two (KVSP 8 and KVSP 10) of the inmate suicides at KVSP involved multiple incidents of SI and/or SIB with corresponding inadequate (or lack of) SRASHE completion in close proximity to the inmates' suicides.

Four IDTT meetings were observed in the MHCB unit, including three patients being discharged that day (January 9).  Overall, there was inadequate discussion regarding both suicide risk and safety planning to reduce future recurrence of SI during the meetings.  In the first case (KVSP 3), the patient had been admitted to the MHCB unit five days earlier for SI.  During the discharge IDTT meeting, there was no discussion regarding current SI or safety planning.  In the second case (KVSP 4), the patient had also been admitted to the MHCB unit for five days earlier for SI, and although asked about any current ideation during the discharge IDTT meeting, the PC asked the patient for the first time – "Let's talk about safety planning."  In the third case (KVSP 5), there was no discussion about safety planning and, at the end of the IDTT meeting, the PC simply turned to other treatment team members and asked – "Is everyone okay with me discharging him back to EOP."  As the patient was leaving the room, and at the urging of the MHCB supervisor in attendance, the PC inquired about current SI.  Review of the patient's chart found that he had multiple prior suicide attempts and numerous chronic risk factors placing him at "high" chronic risk for suicide.  The safety plan contained within the discharging SRASHE stated the following:

Pt. is being discharged from the MHCB at this time and will return to EOP LOC. Pt. reports that he had increased passive suicidal ideation related to stressors on the yard. It is recommended that Pt.'s treatment continue to include increased communication skills (assertive) and problem-solving skills to help aid in reducing external stimuli that result in increased distress. Pt. has no overt warning signs, however, it does appear that Pt. may continue to utilize MHCB to get his immediate needs met (removal from distressing stimuli). It is also recommended that Pt's treatment focus on fact versus feeling, mindfulness, relaxation skills and incorporating the engagement in protective factors of being proactive in his treatment, utilizing grounding exercises and his religion, completing mantras when increased stress occur, to continue to aid in reducing precipitating factors that led to MHCB. Treatment team determined that Pt. would be discharged from MHCB at this time and return to EOP as it appears more appropriate at this time. Patient will be placed on a five-day follow-up and be seen by psychiatry for continued monitoring of symptoms.

In addition, this reviewer examined a sample of ten SRE/SRASHEs from patients released from the MHCB unit between October and December 2018. Most did not include specific strategies to reduce recurring SI.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 145 cases of inmates discharged from a MHCB or alternative housing placement who remained at KVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from July through December 2018. The review found that only 78 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the low completion percentage mostly related to clinicians discontinuing the checks prior to the minimum 24-hour requirement. Approximately one-third of the custody checks were recommended for 48 hours or more by clinicians. In addition, only 87 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation and/or checks completed at 60-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit. Of note, there were deficiencies in the emergency response in two inmate suicides (KVSP 11 and KVSP 12) during 2019 involving failure to respond to the incidents with the complete emergency response kit.

**SPRFIT Meetings**: A review of three months (September through November 2018) of SPRFIT meeting minutes found that there were between nine and 13 participants at each meeting, but

quorums were not reached in any of the meetings. The meeting minutes were otherwise unremarkable. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was said to have been completed but had not been issued. In addition, the facility did not have any policies and procedures for a "High Risk Management Program" nor any policy and procedures for intake nursing staff regarding "Bad News Notification" following the inmate's return from court or BPH.

**Training**: According to training records, approximately 96 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, approximately 100 percent of custody staff, 96 percent of medical staff, and 95 percent of mental health staff received annual suicide prevention block training during 2018. Finally, as of December 2018, only 84 percent of mental health clinicians had completed the SRE mentoring program, 89 percent had received the seven-hour SRE training, and only 62 percent had completed safety plan training.

**Recent Suicides**: KVSP experienced seven (7) inmate suicides during the review period of 2018-2019. In the *first* case (KVSP 6), the inmate was found hanging from the wall ventilation grate by a sheet in his GP cell during the morning of February 1, 2018. The inmate entered the CDCR system from the California Youth Authority in July 1996 to continue serving a 16-year-to-life sentence for second-degree murder. He was transferred to KVSP in January 2015. The inmate incurred more than 24 RVRs during his confinement, with almost all related to substance use, including the most recent infraction in January 2016 for possession of inmate manufactured alcohol. He had been known to be gang-affiliated, but he left the gang in December 2014 which led to safety concerns and SNY status. The inmate had good support from family, including regular visits until 2013, letter correspondence, and telephone calls with his father, the last of which occurred in January 2018. During that telephone call, the inmate's father informed his son that he would no longer send money to pay off his drug debts. The inmate was single and did not have any children.

According to available records, the inmate was initially raised by both parents until their divorce when he only five years old. He then lived with his mother and stepfather when she remarried three years later. The inmate was reportedly physically abused by his stepfather during his adolescence. As result, he began to engage in negative behaviors of both home and school, began using marijuana and alcohol, and joined a gang. The inmate did not finish high school nor obtain gainful employment. He had an extensive juvenile criminal record and he later developed an extensive history of substance abuse.

The inmate did not have a history of mental health treatment in the community. Upon entry into CDCR, the inmate did not screen positive for any mental health issues and was not initially enrolled in the MHSDS. From June through December 2008, he was placed at the 3CMS level of care with a diagnosis of Adjustment Disorder with mixed disturbance of emotions and conduct, and Morphine Abuse within CDCR. He was removed from the 3CMS program at his request when realizing – "I thought it would get me transferred closer to home. Now this doesn't look like it's going to happen, so I have no need for the program."

Approximately six years later in December 2014, the inmate reentered the 3CMS program after an altercation with another inmate and a clinician observing him "crying intermittently, somewhat disheveled, shaky and tired, fidgety, presenting with a slumped posture and a cast on his left arm." He was provided with a diagnosis of Major Depressive Disorder, recurrent, moderate. The inmate had intermittent contact with 3CMS clinicians and, according to the CDCR reviewer in this case, not seen at the frequency required by policy. In fact, the inmate was not seen by a clinician from November 2016 until June 28, 2017. He was last seen by mental health staff (individually by his psychiatrist and then by the IDTT) on January 2, 2018 following six missed clinical contacts. The MH Master Treatment Plan was subsequently found to be inadequate because it did not address any of the inmate's mental health symptoms, and simply noted that – "Per IP self-report the patient is stable and doing well."

The inmate did not have a history of suicidal behavior and, although briefly hospitalized in January 2017 following a drug overdose, the incident was not thought to be a suicide attempt. He consistently denied any SI during his CDCR confinement.

The CDCR reviewer did not identify any specific precipitating factors, including any serious medical concerns, that were known to staff indicating that the inmate was contemplating suicide. Although the inmate appeared to be future oriented with parole preparation, the CDCR reviewer opined that "he lacked adequate coping skills and he appeared to cope with many internal and external stressors by using narcotics. The inmate struggled with drug addiction and his father's refusal to continue to pay for his debts must have been stressful and left him with limited choices to pay his debts. Additionally, upon review it appears as though the inmate may have been minimizing his symptoms, resulting in underestimation of the severity of his symptoms, with individualized safety plans and treatment goals not being identified or relevant to the inmate."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

> 1) The SRE conducted on the inmate on January 20, 2017 by a clinician in the TTA at KVSP, following the inmate's returned to the institution from an outside hospital (after an overdose), was conducted in a non-confidential setting, which is problematic given the sensitive nature of the questions posed. The clinician failed to document the reason for conducting the interview in a non-confidential setting.

> 2) The SRE conducted on January 20, 2017 was problematic. The clinician did not review available documentation from the outside hospital, which noted the inmate reported his overdose was not intentional. The clinician only documented the inmate's report of the events, namely his intention was to get high, thus missing the opportunity to explore the discrepant information.

> Additionally, this SRE did not provide an adequate safety plan and only restated policy requirements (e.g., placement on a five-day follow-up) and failed to identify individualized treatment focus and specific steps to reduce risk. The reason the evaluation is being conducted (a drug overdose) was not noted. In regard to protective factors, spousal support was incorrectly identified, as was positive coping/conflict resolution skills.

124

3) The Treatment Plan dated January 24, 2017 did not acknowledge the inmate's overdose, nor was the overdose addressed by the IDTT. The overdose occurred only five days prior to the IDTT. The interventions included addressing the inmate's medication compliance which was not relevant for him as he was not prescribed psychiatric medication. No interventions were initiated for his drug abuse/dependence. It appeared the inmate's treatment plan was not individualized and document review did not occur.

4) The SRASHE dated June 28, 2017 was of poor quality. The safety plan did not identify a specific, individualized plan. His substance abuse history was not documented, nor was the overdose that occurred in January 2017. Additionally, the assessing clinician provided no rationale for either chronic or acute risk levels, other than to say the inmate has no history of suicide attempts (with possible the overdose in January 2017, although not investigated by clinicians). Also, the safety plan consisted of a 'no-harm' contract, which is not a safety plan nor does it address risk management.

5) The Mental Health Master Treatment Plan dated January 2, 2018 did not address any mental health symptoms, relying on the inmate's self-report wherein he denied all mental health symptomology. No IPOCs were initiated because he reported he was 'stable.' It does not appear as though the IDTT reviewed his prior records, which would have identified significant substance abuse issues. The treatment plan was not individualized.

6) Timelines for clinical contacts were not met while the inmate was at KVSP. The inmate was seen by a clinician on November 10, 2016 and did not receive another mental health contact until June 28, 2017 which was his final clinical contact and was conducted cell side. There were no other clinical contacts. Six clinical contacts were missed between November 2016 and January 2018.

In the **_second_** case (KVSP 7), the inmate was found hanging from the wall ventilation grate by a sheet in his GP cell during the morning of February 8, 2018. The inmate entered the CDCR system on May 30, 2014 to serve his second term for a 17-year sentence for attempted murder. He was transferred to KVSP on March 10, 2017. The inmate incurred more than four RVRs during his confinement, the most recent of which occurred in July 2017 for possession of an inmate manufactured weapon. He had been known to be gang-affiliated in the community, but left the gang in 2011 and requested SNY placement when re-entering CDCR for his second term. The inmate had good support from family, including regular weekly telephone calls with his sister, and letter correspondence with his parents and other sisters. The inmate was unmarried, but he had two eight-year-old twin children with whom he had limited contact.

According to available records, due to the significant criminal history of his parents, the inmate and six siblings were raised by their grandmother. Due to significant gang involvement and substance abuse, he dropped out of high school, later obtaining his GED while in CDCR. The inmate also had an extensive juvenile criminal record and limited employment record.

The inmate did not have a history of mental health treatment in the community nor was he included in the MHSDS during his first CDCR term.  Upon re-entry into CDCR in 2014, the inmate was placed at the 3CMS level of care in June 2014 after reporting symptoms of depressed mood, anxiety, difficulty sleeping, and headaches.  The inmate also self-reported a suicide attempt while confined in the county jail during 2013.  From 2004 through 2016, his diagnoses included Depressive Mood Disorder NOS, Cannabis Dependence, and Amphetamine Dependence. I n March 2015, the inmate was removed from the MHSDS after "reporting odd and unusual symptoms that did not meet the diagnostic criteria for a major mental health disorder."  However, on May 11, 2016, he re-entered the MHSDS at the EOP level of care following reports of psychotic and delusional behavior.  The inmate's diagnosis was changed to Delusional Disorder, with alternative consideration of a diagnosis of Methamphetamine-Induced Persisting Psychotic Disorder with delusions.

On August 10, 2017, the inmate's level of care was decreased to 3CMS; his IDTT stated that the "IP has met maximum benefit at this level of care and is able to function adequately at the CCCMS level of care."  His diagnosis was slightly changed to Delusional Disorder, Major Depressive Disorder, and Amphetamine-Type Substance Abuse Disorder.  During the next year, the inmate remained program adherent; he did not report experiencing any further psychotic symptoms, but he was not always medication adherent.  During his last interaction with his PC on January 29, 2018, the inmate requested to be removed from the MHSDS.  According to the progress note, he denied any mental health symptoms, appeared stable, and was instructed that he needed to wait six months after discontinuation of medication to be removed from the MHSDS.  He committed suicide the following week.

The inmate did not have a history of suicidal behavior, and a SRASHE completed on August 23, 2017 assessed him with "moderate" chronic and "low" acute risk for suicide.  The rationale for moderate chronic risk was "a history of psychiatric disorder, violence, substance abuse, and long sentence."

The CDCR reviewer in this case did not find any specific precipitating factors, including any serious medical concerns, that were known to staff indicating that the inmate was contemplating suicide.  However, on both February 3 and February 4, 2018, the inmate had two telephone calls with his sister whereby she informed him that she was unable to financially support him and only wanted him to call her on specific days.  Although the inmate did not leave a suicide note and the impact of those telephone calls was unknown, he committed suicide several days later.  According to the CDCR reviewer, "In the weeks prior to his death, there were a couple of events which may have been difficult for him to cope with.  These events included: loss of financial support from family and writing a personal statement regarding past substance abuse….There were no overt indicators that the inmate's mental health condition had deteriorated over the past several months; however, it is likely his ongoing struggles with depression, and anxiety regarding the length of the sentence were ultimately a conceivable trigger to his death by suicide."

The Suicide Report did not contain any recommendations for corrective action through a QIP.

126

In the ***third*** case (KVSP 8), the inmate was found hanging from the wall ventilation grate by a sheet in his administrative segregation cell during the early afternoon of July 17, 2018. The inmate entered the CDCR system on October 23, 2007 to serve a 13-year sentence for second-degree robbery. He was transferred to KVSP on March 15, 2017. The inmate incurred more than 15 RVRs during his confinement, the most recent of which occurred in September 2017 for a positive urinalysis. He had been known to be gang affiliated. The inmate and his girlfriend had regular contact through visits and letter correspondence, with any other family support being unknown.

According to very limited available records, little about the inmate's social history was known other than his family life appeared unstable and dysfunctional. He had significant gang involvement and substance abuse as a teenager, as well as an extensive juvenile criminal record and limited employment record. The inmate's gang activity continued during his CDCR confinement and this activity was related to the multiple RVRs incurred during his term. He was also housed in administrative segregation on multiple occasions due to gang activity, drug debt, and safety issues.

The inmate did not have a history of mental health treatment in the community, nor was he included in the MHSDS during his CDCR term. He consistently denied any mental health symptoms or SI. However, on July 15, 2018, the inmate told a PT conducting rounds in one of the administrative segregation units (ASU-2) that "I'm suicidal, I have a rope and voices are telling me to kill myself." A braided rope was found in the cell. The inmate was escorted to the TTA and seen by a mental health clinician who completed a SRASHE. The assessment noted that the inmate's SI was "conditional" based upon his need to be transferred to the other administrative segregation unit (ASU-1) due to enemy concerns. According to custody personnel, the "IP has been transitioning from GP to SNY and there are GP inmates in ASU-2 that had been giving him a hard time and that he has safety concerns." According to the inmate, he was told by other inmates that his brother had been murdered. (Such information was unsubstantiated.) The inmate interpreted the alleged death of his brother as a threat to himself, stating "that's how they get to you, they get to your family." He believed his gang was retaliating against he and his family for trying to drop out. The inmate was informed by the mental health clinician that relocation to ASU-1 was not possible because it was the STRH unit and he was not in the MHSDS. He was offered, but declined, a transfer to another cell within ASU-2. The clinician determined that the inmate was at "moderate" acute risk for suicide due to "warning signs of current pass of SI and anxiety related to safety concerns." He was returned to his administrative segregation housing unit cell with a safety plan that included "a temporary linen restriction chrono was issued for 72 hours to minimize tools."

Several hours later at approximately midnight on July 16, 2018, the inmate stabbed himself in the chest with a pen filler and was subsequently transported to a local hospital for examination and treatment. He was returned to KVSP during the early morning of July 16 and placed in alternative housing under 1:1 continuous observation. He was later seen by another mental health clinician who completed a SRASHE. The assessment found that, despite his SIB, his acute risk for suicide remained as "moderate" because, according to the clinician, the inmate "appears to be engaging in high rescue low risk self-harming behavior as a means of getting placed in the MHSDS and transferred from ASU-2 to STRH." The inmate was again returned to

his ASU-2 cell with a safety plan that stated he "could benefit from increased development of healthy problem-solving skills to get his needs met in an appropriate manner without misuse of MHCB. Should continue to make contact with his girlfriend who provides significant support. He could also benefit from outside correspondence self-help curriculum to increase support. He was encouraged to continue utilizing his healthy coping skills to maintain high protective factors." The inmate committed suicide shortly thereafter.

The inmate did not have any serious medical concerns that were thought to be precipitants to his suicide, and a suicide note was not found in his cell. However, the CDCR reviewer in this case noted that the inmate "was greatly troubled with the anxiety he experienced during his transition from GP to SNY….As he experienced the pressure of dropping out of his gang, he likely became overwhelmed with anxiety leading to his decision to end his life. He may have even seen this behavior as a way of saving his brother and girlfriend from harm."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

1) The SRASHE completed on July 15, 2018 was deficient in numerous areas (see *Discussion/Conclusion* section for details).

2) As identified in the QIP above, as a result of the July 15, 2018 suicide risk evaluation at KVSP, a decision to return the inmate back to a cell and not admit to a MHCB and issue a 72-hour linen restriction was documented in the SRASHE conducted on the date. In reading the SRASHE, the evaluating clinician documented that per custodial consultation, a braided rope was found in the inmate's cell. It is clear from the documentation the assessing clinician viewed the inmate as at some risk for self-harm, and the 72-hour linen restriction was documented as a way to 'minimize tools,' most likely for future self-harm attempts. A linen restriction is not a substitute for a MHCB admission. There was no clinical rationale provided about why a higher level of care (such as MHCB) was not considered, nor was reasoning provided on why a 72-hour linen restriction was viewed as the best clinical intervention.

3) The SRASHE completed on July 16, 2018 was deficient in numerous areas (see *Discussion/Conclusion* section for details).

4) The Safety plan section of the five-day follow-up dated July 17, 2018 does not reference the safety plan from the alternative housing discharge SRASHE dated July 16, 2018. The Chart Audit Tool Indicator 10: Five-Day Follow-Ups, question number 4 "Are the issues raised in the SRASHE discharge safety plan addressed in each day of the five-day follow-up, or are updates consistent with changes in patient status? This information is helpful to mental health staff as they assess his transition from suicide watch to a reduced level of care.

5) The inmate was discharged from alternative housing without the completion of an Initial/Intake Assessment. The inmate had no Initial/Intake Assessment sheets that worked well completed during his term. This information would have been

useful in determining the appropriate discharge level of care and was required as he was briefly placed in the Mental Health Services Delivery System at the MHCB level of care.

In the **_fourth_** case (KVSP 9), the inmate was found hanging from the top bunk by a sheet in his GP cell during the afternoon of August 5, 2018. The inmate entered the CDCR system on May 14, 2014 to serve a six-year sentence for penetration with force/violence/fear of immediate bodily injury. He was transferred to KVSP on November 6, 2017. Although initially designated as SNY during the RC process due to the sexual nature of the offense, the inmate was subsequently classified as GP. He incurred four RVRs during his confinement, the most recent of which occurred on November 2, 2016 and involved sexual disorderly conduct. He was not known to be gang affiliated. The inmate had good support from family, particularly his father, through both visitation and telephone conversations on a regular basis. He was single and did not have any children.

According to available records, the inmate and four sisters were raised by their parents, but his mother apparently "disappeared" from the family when he was 15. He graduated from high school but he had a limited employment history. He began experiencing both substance abuse and mental illness as a teenager, both thought to be related to his mother's sudden and unexplained absence from the family. Other family members also experienced mental illness. The inmate had both a juvenile and adult criminal history. Upon his admission into CDCR, he was initially diagnosed with a Mood Disorder, NOS and placed in the 3CMS program. Soon thereafter, however, he was referred to the acute care program at DSH for grave disability. At the time, his diagnosis was revised to Bipolar Disorder with psychotic features. He was discharged from DSH in January 2015 to the EOP level of care. In November 2015, the inmate was admitted to an MHCB for SI and, following an extended 48-day stay, again placed in acute care at DSH on January 26, 2016. He was returned to CDCR at the EOP level of care in March 2016. He was again admitted to a MHCB in both December 2016 and January 2017 for SI, resulting in his third acute care hospitalization in January 2017. The inmate was discharged back to CDCR at the EOP level of care on April 11, 2017. His behavior stabilized, and his level of care was reduced to 3CMS on March 22, 2018. The inmate's revised diagnoses were Bipolar Disorder, current episode depressed with psychotic features, and Polysubstance Disorder. He remained at the 3CMS level of care until his death, continued to deny any SI, and he was medication adherent.

The inmate did not report any history of suicidal behavior in the community and, although reporting two to three suicide attempts during confinement, there was no documented evidence to suggest that these incidents actually occurred within CDCR. His most recent SRASHE was completed on March 27, 2018 and assessed his chronic risk for suicide as "moderate" and acute risk as "low."

The CDCR reviewer in this case did not find any specific precipitating factors, including any serious medical concerns, that were known to staff indicating that the inmate was contemplating suicide. Although he did not leave a suicide note, the inmate kept a journal which he wrote in almost daily during the last year of his life. Examined following his death, contents of the journal reflected the inmate was experiencing psychotic symptoms, including auditory

hallucinations and delusional beliefs. One such belief was "that his only salvation, which would prevent him from committing suicide, would be for him to learn magic to counter the spells being cast on him by his father." According to the CDCR reviewer, "the journal also was notable for several entries on how he was intending to end his life if he was unable to gather enough knowledge about magic to counter what he described as spells causing the loss of his memories, intelligence, and muscular coordination."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

> 1) The SRASHEs completed at KVSP on October 4, 2017 and March 27, 2018 both were inadequate in the areas of risk justification and safety planning. Specifically, risk for suicide was not integrated into a clear formulation. Rather, on both evaluations, the assessing clinician listed the risk factors the inmate met without integrating how these factors contributed to his individual suicide risk. In addition, safety planning was minimal and few clinically relevant interventions for specific mental health risk factors were not targeted in a meaningful way. Given that inadequate risk formulation in SRASHE documentation has been a statewide trend, this concern will be addressed by the Statewide Mental Health Program (SMHP) Suicide Prevention Response and Focused Improvement Team (SPRFIT), who shall develop and implement a revised training on risk assessment and safety planning.

In the **_fifth_** case (KVSP 10), the inmate was found hanging from the top bunk by a sheet in his GP cell during the morning of September 6, 2018. The inmate entered the CDCR system on June 19, 2017 to serve a three-year, eight-month sentence for second- degree robbery. He was transferred to KVSP on August 24, 2018. The inmate incurred two RVRs during his confinement, the most recent of which occurred on January 4, 2018 involving battery on another inmate. He was known to be gang-affiliated, but as a result of his disassociation with the gang, he received SNY status in October 2017. The inmate had good support from family, particularly his mother. He was single and did not have any children.

According to available records, the inmate and three siblings were raised by their parents. He graduated from high school, but his substance use and gang affiliation precipitated his involvement in the criminal justice system, including the instant offense. The inmate had a history of mental health treatment for psychosis in the community beginning in approximately 2014. Upon entry into CDCR in June 2017, despite self-reporting histories of suicidal behavior, Major Depressive Disorder, and Anxiety Disorder, as well as suspected psychosis with grandiose thought content, he was not initially placed in the MHSDS. However, approximately two months later on August 13, 2017, the inmate expressed SI and auditory hallucinations. Although not placed in an MHCB, he entered the MHSDS at the 3CMS level of care. His initial diagnosis was Major Depressive Disorder, recurrent, severe, with psychiatric symptoms. Two weeks later on August 27, he again expressed SI and was admitted to the MHCB unit. His diagnoses were revised to "Psychosis and Depression." He was subsequently discharged from the MHCB and returned to the 3CMS level of care.

During an IDTT meeting in March 2018, the inmate presented with disorganization and difficulty focusing on the topics of discussion. He did report that his 3CMS treatment was ineffective, and his psychotropic medications were not working. The treatment team decided to elevate his level of care to EOP, and his diagnoses were changed to "Adjustment Disorder, History of Substance Abuse, Psychogenic Dysuria, and Schizophrenia." In May 2018, the inmate's behavior further deteriorated, and he was observed to be eating feces on the floor. Although denying any current SI, stripped pieces of bedsheets were found tied to his bed. He was thought to be experiencing psychosis and was referred to intermediate care at a PIP on June 11, 2018. During his intermediate care hospitalization, the inmate engaged in at least two SIB incidents and he was placed on Suicide Watch. On August 1, 2018, his level of care was increased to acute care at CHCF where he remained on Suicide Watch until August 7, 2018. His diagnoses were again revised to "Affective Psychosis, Bipolar, Anxiety, Impulsivity, and Schizophrenia." The inmate remained in the acute care program until August 24, 2018, whereupon he was discharged back to KVSP to the EOP level of care. During several days of his five-day follow-up, the inmate informed clinicians that he was passively suicidal due to his current housing situation, telling staff that "I'm an active Northerner, I can't be here 'cause I can get killed." According to custody staff, "IP has kept going through the suicidal process because he is not getting the answers he wants and is trying to manipulate the system."

On August 29, an emergency mental health referral was received following the inmate's continuing threat of suicide. He was assessed by a clinician and a SRASHE was completed with the inmate stating that he was "feeling a little suicidal," and had a plan to hang himself with a sheet. He rated his anxiety as a "10" and his depression as a "7." The clinician assessed his suicide risk as moderate for chronic and acute risk. The inmate was not referred to an MHCB; the clinician stated he had "warning signs of passive suicidal ideation conditional on receiving a housing change to another institution, as well as impulsiveness as he is unable to work with custody on receiving a level change and wants to go to a crisis bed while he waits."

During his IDTT meeting several days later on September 5, 2018, the inmate again reported that he was suicidal, but denied any intent or plan, stating "that the only way for him to get transferred to another prison is to report that he is suicidal." According to the MH Master Treatment Plan completed at the IDTT, "At this time, IP does not appear to be a danger to self or others and continues to demonstrate behaviors indicative of ability to function at EOP LOC. IP's appropriateness will continue to be assessed on a weekly basis." The required SRASHE was not completed. The inmate committed suicide the following day.

The inmate had a significant history, including two suicide attempts by hanging in 2015 and 2016, as well as multiple incidents of SI, suicide attempts, and SIB within the county jail prior to his CDCR confinement. Despite such history, his initial SRASHE completed on August 14, 2017, rated both his chronic and acute risk for suicide as "low." The final SRASHE completed on August 29, 2018, rated both his chronic and acute risk for suicide as "moderate."

The inmate did not have any serious medical concerns that were thought to be precipitants to his suicide, and a suicide note was not found in his cell. However, the CDCR reviewer in this case stated that "lack of accurate, timely historical mental health information in the health record and incomplete interpretation by several mental health clinicians may have played a role in

difficulties accurately diagnosing the inmate.  Moreover, seen through the prism of 'inmate manipulation,' a number of clinicians underestimated the severity of the inmate's mental disorder and the assessment of his suicide risk in several cases.  Whether additional environmental or other factors were involved in his death is unknown, due to the difficulties in assessing which statements may have reflected accurate perceptions, in which may have been associated with his delusional thinking patterns."

The Suicide Report contained eight (8) recommendations for corrective action through a QIP:

> 1) Deficiencies found in the Five-Day Follow-Ups occurred from August 25 through August 29, 2018: days two, three, and four made no mention of the Acute PIP discharge safety plan, and did not identify any safety planning interventions to reduce the inmate's specific triggers for suicidal ideation.  Per the Chart Audit Tool Indicator 10: Five-Day Follow-Ups, question number 4, 'Are the issues raised in the SRASHE discharge safety plan addressed in each day of the five-day follow-up, or, are updates consistent with changes in patient status?'  This information is helpful to mental health staff as they assess a patient's transition from a hospital setting to a reduced level of care.

> 2) Insufficient documentation on the Mental Health Master Treatment Plan at the inmate's initial IDTT, dated September 5, 2018 (see *Discussion/Conclusion* section for details).

> 3) No SRASHE was given to the inmate on September 5, 2018, despite reports of suicidal ideation on two occasions (in IDTT and UCC) on that date.  Per the MHSDS *Program Guide*, 2009 revision, 'When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data' [12-10-8].

> 4) There are concerns with the SRASHE completed on August 25, 2018 (see *Discussion/Conclusions* section for details).

> 5) SRASHEs completed on the following dates show difficulties in the areas of risk justification and safety planning: August 14, 2017 (NKSP); August 27, 2017 (NKSP); January 10, 2018 (CSP-COR); April 19, 2018 (KVSP); June 12, 2019 ICF-PIP SVSP); August 16, 2018 (Acute PIP CHCF); August 25, 2018 (KVSP); August 29, 2018 (KVSP).  Specifically, risk for suicide was not integrated into a clear formulation.  In addition, safety planning was minimal and few clinically relevant interventions for specific risk factors were targeted in a meaningful way.  Given that problems with the risk formulation and safety planning in SRASHE documentation has been a statewide trend, this concern will be addressed in the Statewide Mental Health Program (SMHP) Suicide Prevention Response and Focused Improvement Team (SPRFIT), who shall develop and implement a revised training on risk assessment and safety planning.

6) The inmate had a complicated diagnostic presentation. Problems with adequately obtaining and/or researching the record and subsequent difficulties identifying and documenting symptoms and accurate diagnosis were identified while the inmate was at CCI, Acute PIP-CHCF and KVSP. Because these issues spanned institutions and occurred over time, this concern will be addressed by the SMHP's SPRFIT team.

7) As identified in the previous concern, the inmate presented with a challenging diagnostic picture. Having county jail records accessible would have aided CDCR clinicians in better understanding the origins of the onset of his mental health symptomology, along with patterns and fluctuations in his presentation. Because this issue is not isolated in this particular case, this concern will be addressed by the SMHP's SPRFIT team.

8) Since March 2018, the inmate had regularly received mental health diagnoses that were not from the *Diagnostic and Statistical Manual of Mental Health Disorders*, 5th edition (DSM-5). The DSM is the handbook used by health care professionals as the authoritative guide to the diagnosis of mental disorders. Utilizing the diagnoses provided in the DSM-5 allows for continuity of care and communication of information in the mental health field. Because this issue is not isolated to this particular case, this concern will be addressed by the SMPH's SPRFIT team.

In the ***sixth*** case (KVSP 11), the inmate was found hanging from the top bunk by a sheet and extension cord in his SNY cell during the early morning of September 20, 2019. The inmate entered the CDCR system for a second term on January 27, 2012 to serve a life-sentence without parole for first-degree murder. He was transferred to KVSP on July 25, 2019. The inmate incurred nine RVRs during his confinement, the most recent of which occurred on September 28, 2018 for battery with a deadly weapon. He was known to be gang-affiliated, but as a result of his disassociation with the gang, he received SNY status in March 2014. The inmate had good support from his family, including his grandmother, wife, sister and one of his children. He was married and had three children from different relationships.

According to available records, the inmate and his sister were initially raised by his parents. However, his father was incarcerated when he was 11 years old, and his mother incarcerated when he was age 17. Subsequently, he was raised by his paternal grandmother. Records indicated that his mother had been physically and emotionally abusive when she was under the influence of alcohol. The inmate did not complete high school, began a history of substance abuse at age 11, and had an extensive juvenile and adult criminal record. He was gang-affiliated in the community and did not have a history of employment. The inmate did not have a history of mental health treatment in the community, nor was there any previous history of suicidal behavior documented.

Upon his entry into CDCR in January 2012, the inmate screened negative for any mental health problems and not initially enrolled in the MHSDS. However, in April 2015, he submitted a Health Care Services Request form stating that he "suffered from Bipolar Disorder, I've been

Bipolar for years, and now I've decided to get help."  He was initially assessed, followed by a mental health clinician for a few months, but not enrolled in the MHSDS until August 2015 when he submitted a second Health Care Services Request form indicating "I've been in High Desert for three years, my patience is running out, I am experiencing a lot of mental highs and lows. I am miserable."  He subsequently disclosed to the clinician that "he was having sleep difficulty, anxiety, sadness, lethargic, lack of interest, isolation, mental highs and lows, and generally feeling miserable.  He was seeking mental health services at this time to gain the skills to cope with his mood."  He denied any history or current SI.  The inmate was placed at the 3CMS level of care and provided with diagnoses of Adjustment Disorder with mixed anxiety and depressed mood, Substance Abuse Dependence in a controlled environment, and Antisocial Personality Disorder.

Records indicated that the inmate programmed adequately in the 3CMS program and began taking psychotropic medication in December 2015.  He reported to his clinician that he regularly exercised, maintained a healthy diet, and read his Bible to help improve his mood.  The inmate had only one SRASHE completed during his CDCR confinement, and that assessment, completed in January 2017, indicated both a "low" chronic and acute risk for suicide.  By August 2018, the inmate requested discontinuation of his psychotropic medication "to test myself to see if I can do it without it." However, the following month, he received an RVR for battery on another inmate and was transferred to the STRH unit.  By December 2018, the inmate had been refusing confidential appointments with his PC, as well as refusing to attend group treatment. He wanted to be removed from the 3CMS program.  During an IDTT meeting on January 9, 2019, the team decided to maintain the inmate in the MHSDS and to "monitor his transition out of STRH with the goal of maintaining stability and not incurring more write-ups."  On April 9, 2019, after remaining incident-free and not exhibiting any significant mental health symptoms, the inmate was removed from the MHSDS.

The CDCR reviewer in this case did not find any specific precipitating factors, including any serious medical concerns, that were known to staff indicating that the inmate was contemplating suicide.  He did leave a suicide note indicating a belief that "taking his own life was his way of making up for his wrongdoing in a way to make things right."  The CDCR reviewer noted that information gathered during the review suggested that the inmate "may have felt the only way to stop the distress associated with isolation from his family and gain some control over his future was to end his life."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

> 1) Although responding custody staff was able to quickly untie the knot and retrieve the Ambu bag, policy requires the retrieval of the complete cut-down kit itself when responding to a suicide attempt by hanging.  While it is not a violation of policy to untie the knot and elect not to use ResQhook, the ResQhook along with the Ambu bag is required to be present at the incident site and readily available if the knot were unable to be untied.

In the **_seventh_** case (KVSP 12), the inmate was found hanging from the cell door by a sheet in his GP cell during the early morning of November 23, 2019.  The inmate entered the CDCR

system for a second term on January 23, 2018 to serve a 14-year sentence for two counts of robbery. He was transferred to KVSP on September 18, 2019. The inmate incurred eight RVRs during his confinement, the most recent of which occurred on June 6, 2019 for disobeying an order. He was suspected of being gang affiliated. The inmate had good support through letter correspondence with his parents, a few siblings, and a female friend. His wife died in 2015, and he did not have any children.

According to available records, the inmate was raised by his mother and grandmother, as his father was incarcerated in CDCR for most of his childhood. His mother became drug addicted, and he spent considerable time with his grandmother. Records also indicated that he had three brothers and a sister who were all in foster care, but it was unknown why these siblings were removed from the home without him. The inmate reportedly graduated high school and had sporadic employment. He had an extensive history of substance abuse, as well as involvement in both the juvenile and adult justice systems.

Upon entry into CDCR in January 2018, the inmate screened negative for any mental health concerns and was not placed in the MHSDS. Similar to his previous term in CDCR, he consistently denied any mental health history or issues. Although incurring multiple RVRs from October 2018 through June 2019, the inmate programmed appropriately, maintained a job when permitted, and his confinement was uneventful until November 20, 2019.

According to available records, the inmate was observed to be acting strangely during the afternoon of November 20, 2019. He was escorted to the TTA by custody staff after initially reporting both SI and auditory hallucinations. Upon arrival, he then denied SI to the TTA nurse, but reiterated his complaint about hearing voices. The nurse contacted the on-call psychiatrist who verbally ordered that the inmate be placed on Suicide Watch in alternative housing. The following morning (November 21), the inmate was seen by a CIT clinician. He again denied any SI, stating "I never wanted suicide watch. I'm fine, I just want to be by myself." He denied any thoughts of harming himself or wanting any type of mental health treatment. The inmate also denied any housing or safety concerns, while acknowledging good family support. A SRASHE was completed which indicated an assessment of both "low" chronic and acute risk for suicide. He was removed from Suicide Watch and the MHCB admission was rescinded. For unknown reasons, the inmate remained in the designated alternative housing cell and not returned to his regular housing unit.

The following morning (November 22), the same CIT clinician conducted a five-day follow-up check on the inmate. He again denied any SI or any immediate mental health concerns. At some point on November 22, the inmate was informed by his correctional counselor that his mother had died two days earlier on November 20. According to a subsequent interview with the CDCR reviewer in this case, the counselor indicated that the inmate was "visibly upset, he cried a little bit," and was able to have a telephone call with his grandmother. It appeared that clinicians conducting the required five-day follow-up checks were not informed of the inmate's loss. The inmate committed suicide less than 24 hours later on November 23, 2019.

The CDCR reviewer did not find any specific precipitating factors, including any serious medical concerns, that were known to staff indicating that the inmate was contemplating suicide. He did

not leave a suicide note. The CDCR reviewer noted that information gathered during the review suggested that the "recent cumulative losses of his wife, cousin, and now his mother, coupled with a minimum of at least 10 more years to serve in prison away from his family was more than the inmate was able to effectively cope with."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) The SRASHE completed on November 21, 2019 was incomplete as the clinician did not complete the acute risk factors checkboxes. It is unclear how acute justification of risk was determined when multiple acute risk factors were not asked as part of the clinical interview or expanded on further in the risk determination and disposition section of the SRASHE.

> 2) The MHCB Discharge Custody Check Sheet (CDCR MH-7497) was not completed following Day No. 1 (November 22, 2019) of the 5-Day Follow-up after the clinical contact had been conducted at cell side.

> 3) During the review of the emergency response, it was noted the cut-down kit was not requested or brought to the incident scene. Although it is not a violation of policy to not use the ResQhook in removing the noose if it is not needed, the ResQhook along with the Ambu bag (the complete cut-down kit) is required to be present at the incident site and readily available if the noose was unable to be removed or in the event the Ambu bag is needed.

> 4) During the review of the incident, it was identified the inmate was not returned to his assigned cell within 24 hours after being cleared from alternative housing.

> 5) There was no Suicide Watch order or MHCB power plan for the placement in alternative housing on the night of November 20, 2019 by either the on-call psychiatrist or TTA nurse. Based on information found during the review, it appears the psychiatrist gave a verbal order when contacted by phone.

### 7)    Central California Women's Facility (CCWF)

**Inspection**: January 10-11, 2019 (previous suicide prevention audit was on December 7-8, 2017). CCWF housed approximately 2,816 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed both the intake screening process in the R&R unit and the mental health diagnostic testing in the RC on January 11. The R&R nurse was observed to be asking all of the questions and correctly entering the information into the EHRS. The door to the nurse's office was closed during the process, thus ensuring privacy and confidentiality. With regard to the RC screening process, the door to the psychologist's office was also closed and the clinician was observed to be conducting thorough assessments. The psychologist was also observed to have access to (and used) the Patient Health Information Portal during the process, and the clinician stated that SOMS, the county jail transfer sheet, and nurse's Initial Intake Screening form were reviewed for each inmate.

136

Finally, daily PT rounds in the restrictive housing unit (Building 504) were observed on January 11.  Building 504 contained GP inmates, STRH, administrative segregation EOP, condemned unit, and alternative housing.  The rounds were completed by a relatively new PT who appeared uncomfortable and, therefore, was observed to be not always consistently inquiring about a full mental health status.  Psych Tech Daily Rounds information was entered into the EHRS for each caseload inmate.

**Housing**:  CCWF had a Skilled Nursing Facility (or CTC) with 12 designated MHCBs in eight rooms.  At the time of the assessment, one room (the observation room) continued to be offline for repair (as it was during the previous assessment).  Although designated as a licensed MHCB, the room contained many protrusions including window bars, shower hoses attached to the wall, a blind spot to the shower area, etc. that deemed it to be non-suicide resistant.  In addition, this reviewer was informed that beginning on March 1, 2019, the entire unit would be temporarily closed for approximately 70 days for further renovation of rooms.  The renovation would include encasement of exposed sink pipes and removal of toilet paper brackets that remained deficient from a previous retrofit.  In March 2020, this reviewer was informed that the renovation project at CCWF had not yet commenced and the conditions within the MHCB unit remained unchanged since the assessment in January 2019.

Finally, this reviewer observed that provider order sheets that designated the level of observation and allowed possessions and privileges for each patient were not found on the room doors for each patient.  Of note, despite the extensive use of alternative housing at CCWF (see below), this reviewer observed that only seven of 11 (or 64 percent) beds in the MHCB unit were occupied during the on-site assessment.

The administrative segregation unit (Building 504) contained five retrofitted suicide-resistant cells (127 thru 131) for inmates on new intake status.  During this reviewer's tour of the unit, there were not any new intake inmates housed in unsafe, non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in Building 503 (RC housing), Building 504 (in the administrative segregation section), and A-73 (a holding cell in the CTC).  Alternative housing continued to be used extensively at CCWF, with multiple inmates on the status each day.  For example, from September 30, 2018 through January 4, 2019, there were 220 inmates placed in alternative housing, with only 42 percent discharged within 24 hours.  Of the 58 percent of inmates who remained in alternative housing for more than 24 hours, the average length of stay for these inmates was approximately 58 hours, with stays ranging from 25 hours to 146 hours during the sampled time period.  All inmates in alternative housing were required to be observed on a 1:1 basis and were furnished bunks.  Of note, 59 percent (129 of 220) of the MHCB referrals were rescinded and inmates returned to their housing units, and approximately half of these rescinded inmates were still housed in alternative housing for more than 52 hours.  This reviewer examined EHRS charts for a sample of ten rescinded cases and found that the required SRASHEs were completed in each case.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were being observed at 15-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on several sample days (November 15, 2018 for CCWF 1, December 6, 2018 for CCWF 2, January 5, 2019 for CCWF 3, and January 10, 2019 for CCWF 4).  The chart review found two observation checks that were in excess of required 15-minute intervals for one patient (CCWF 3), but between seven and ten violations in each of the remaining three patients (CCWF 1, CCWF 2, and CCWF 4).  One case (CCWF 4) was very problematic, with ten violations of 17, 21, 18, 21, 34, 55, 18, 23, 23, and 24 minutes.  Violations in the four cases were by multiple nursing staff.  This reviewer notified CCWF nursing leadership of this issue.

During the IDTT meetings in the MHCB unit on both January 10 and 11, 2019, this reviewer observed that all patients were assigned clothing consistent with a level of observation.  However, a previously identified problem of patients on maximum-security or administrative segregation statuses not having access to the program room and yard had not been corrected.  This reviewer had previously been informed that there was a pending work order to install a "Restart Chair" in the multi-purpose program room for such patients.  During the most recent on-site assessment, this reviewer observed that neither a "Restart Chair" or TTM had been installed.  As such, patients on maximum-security or administrative segregation statuses did not have access to the program room and, therefore, unlike other MHCB patients, did not participate in any group programming.  In addition, contrary to assurances from the IDTT that yard privileges were afforded to all patients, this reviewer was informed by officers assigned to the MHCB unit that yard privileges were not provided to patients on maximum-security or administrative segregation statuses because it required their escort to the administrative segregation unit (Building 504).  The chief of mental health subsequently informed this reviewer that a "side yard" attached to the MHCB unit was being considered for such inmates.

Finally, a review of Guard One data for a recent 24-hour period within Building 504 found 99-percent compliance with the required checks not exceeding 35 minutes.  It should be noted, however, that this level of compliance was not an accurate reflection of the overall level of observation of inmates housed in Building 504.  As detailed in previous assessments, Building 504 at CCWF was unique in that it housed the condemned unit containing 22 single cells.  Seventeen of the cells were located within an enclosed program area on the first floor of the unit, with five cells located outside the enclosed program area.  According to CCWF custody officials and staff, because condemned unit inmates had regular access to the enclosed program area outside their cells, but within the chain-link fenced area, Guard One rounds were not conducted except during the First Watch.  A May 9, 2014 directive from the DAI Director entitled, "Security/Welfare Check Procedure Utilizing the Guard One System to Supersede Administrative Segregation Unit Welfare Check and Security/Custody Rounds in Specialized Housing Procedures" supported such a practice by citing the "unique design and programs" of the enclosed condemned unit.  In addition, five of the condemned unit cells remained outside of the enclosed program area and adjacent to other administrative segregation unit cells that were subject to Guard One surveillance.  There continued to be no practical reasons why these five condemned unit cells should not be subject to Guard One surveillance.

138

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of July 1, 2018 through January 7, 2019.  A sample EHRS review of 81 emergent/urgent mental health referrals for SI/behavior revealed that clinical staff subsequently completed the required SRASHEs in only 88 percent (71 of 81) of the cases.  A similar problem with low compliance rates for SRASHE completion based upon emergency mental health referrals for SI/behavior was found during the previous assessment.

Of note, this reviewer observed a CIT clinician respond to an emergency mental health referral on January 11, 2019.  The assessment, which included the clinician's completion of a SRASHE, was appropriately conducted in an office with privacy and confidentiality.  This reviewer was informed that the formation of the full CIT program, including a nurse and lieutenant or sergeant, was still in transition.

Four IDTT meetings were observed in the MHCB unit on January 10 and 11, 2019, including two patients who were being discharged on January 10. Overall, although there was good participation from all team members, there was uneven discussion regarding safety planning for the two patients discharged from the MHCB unit.  One case (CCWF 4) was particularly problematic.  The patient had been placed in the MHCB unit on December 31, 2018 after spending four days in alternative housing (December 27 through December 31) following a suicide attempt by hanging.  Despite the fact that the patient had been seen on a daily basis by a mental health clinician for 14 days from December 27, 2018 through January 9, 2019, it appeared that the discharge IDTT meeting on January 10 was the first time that safety planning was being discussed.  During the meeting, the patient appeared to be confused regarding the concept of a safety plan, and the majority of the discussion centered around developing such a plan to include increased exercise, attending to ADLs, and journaling.  The patient's discharge SRASHE (dated January 10) was subsequently reviewed, and the safety plan section did not specifically address strategies to reduce SI.  Instead, the safety plan deferred the responsibility to a clinician in the administrative segregation unit:

> It is recommended that ASU MHPC teach I/P depression management skills including activities such as journaling, positive self-talk, and exercise.  While in MHCB, I/P has begun exercising in her room, therefore, it is recommended for MHPC to help I/P establish an exercise regime that she may utilize while in her cell in ASU, not only to help manage depression, but also increase healthy self-esteem through promoting healthy weight management. I/P has noted that she would like to exercise 3 hours a day and would benefit from education on a healthy exercise regime.  It is recommended for MHCP to work with I/P on healthy self-esteem and body image through positive self-talk and goal setting. I/P is known to have difficulty with self-expression, as she noted she did not know how to tell staff she was feeling suicidal, and would therefore benefit from learning words/phrases which help with self-expression of feelings.

In addition, despite narrative contained in the initial MH Master Treatment Plan dated January 2, 2019 that – "MHRT [mental health recreation therapist] will meet with I/P daily to review need

for treatment materials to aid in the improvement in socialization and coping skills. When ordered by the MH/MD NP, MHRT will provide I/P with treatment materials I/P may use in cell including reading materials, writing materials, and other activities such as cards or puzzles. MHRT will open up discussion with I/P regarding previous hobbies which may aid in improvement up coping skills, as I/P has indicated that she has no coping skills" –  subsequent EHRS chart review indicated that the RT assigned to the MHCB unit met with the patient only once (on January 8) cell-side during her ten-day MHCB placement. As noted above, MHCB patients on administrative segregation status were prohibited from leaving their cell for yard and other program activities.

In addition, this reviewer examined a sample of ten SRASHEs from patients released from the MHCB unit between October and December 2018. Similar to the cases detailed above, most did not include specific strategies to reduce recurring SI.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 262 cases of patients discharged from a MHCB or alternative housing placement who remained at CCWF and were not transferred to the administrative segregation unit (where observation at 30-minute intervals was required) from July through December 2018. The review found that only 82 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the low completion percentage mostly related to clinicians discontinuing the checks prior to the minimum 24-hour requirement. The majority (48 percent) of the custody checks were recommended for 48 hours by clinicians. In addition, 96 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months (September through November 2018) of SPRFIT meeting minutes found that quorums were achieved for all of the meetings. The meetings were otherwise unremarkable. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum, was issued in June 2018 and entitled "Operational Procedure MH-005: Suicide Prevention and Response." However, the LOP was deficient because it contained boilerplate language from the CCHCS memorandum and did not provide specific policies and procedures regarding the "high-risk management program" and "bad news notification" from court and/or BPH return, both of which were required by the SPRFIT memorandum.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody, 99 percent of medical, and 100 percent of mental health staff had received annual suicide prevention block training during 2018. Finally, as of December 2018, 92 percent of mental health clinicians had completed the SRE mentoring program, 93 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**: CCWF experienced one inmate suicide during the reporting period. In that case (CCWF 5), the inmate was found hanging from the shower head by a sheet in an eight-person RC housing unit dorm during the afternoon of April 23, 2018. The inmate entered CDCR for her third term on February 6, 2018 to serve a 16-month sentence for arson. The inmate did not have any RVRs during her brief confinement and she was not known to be gang affiliated. She was unmarried and had three young sons who were in the care of their paternal grandmother. The inmate had family support from her mother, primarily through telephone calls.

According to available records, the inmate and her sister were primarily raised by their mother, as their father was incarcerated for most of their lives due to substance abuse. Throughout childhood and adolescence, both sisters were subjected to an extensive history of parental substance use, emotional abuse, neglect, and domestic violence. The inmate did not graduate from high school and had a very limited employment history. Beginning at age 12, she had an extensive history of substance use that was primarily responsible for her juvenile and adult criminal behavior.

The inmate also had a significant history of mental illness beginning at age 8. During childhood and adolescence, primary mental health concerns were reportedly related to symptoms of anxiety and depression, which she attributed to witnessing extensive domestic violence in her home. The inmate also self-reported an extensive history of SIB. During her previous CDCR terms, she was treated at the 3CMS level of care with initial diagnoses of "Alcohol Dependence, Antisocial Personality Disorder; provisional diagnoses of Depression and Malingering were also under consideration." These initial diagnoses were later changed to "Psychosis NOS," Alcohol Dependence, and Bipolar Disorder. When the inmate returned to CDCR for her third term on February 6, 2018, she was placed in the EOP following "recurrent symptoms of anxiety (insomnia, overwhelmed), poor coping skills, a history of psychosis, and a history of suicidality and self-harm behavior. She was diagnosed with Unspecified Schizophrenia and Other Spectrum Disorder, Major Depressive Disorder, and Alcohol Use Disorder." Although she remained medication adherent and attended group programming on a regular basis, the inmate expressed on-going difficulties, including anxiety and outbursts of anger, associated with living in a dorm housing unit, and she continued to request a two-person cell. Such a request was pending at the time of her death.

On April 1, 2018, the inmate expressed thoughts of self-harm, stating she was having trouble breathing and "got the urge to choke yourself in the shower." She was placed in the MHCB unit for eight days. During the MHCB placement, the inmate repeatedly "reported that she didn't feel comfortable with the MHCB setting, namely because she was alone in her room. She repeatedly requested to be discharged back to her unit versus waiting for a double-cell placement. In an interview following her death, her MHCB PC described the inmate to be impulsive, and

questioned the validity of her suicidal statements at the time she was in the MHCB. She indicated the inmate was not observed to be in distress, rather the inmate was focused on obtaining a double-cell housing placement."

According to the CDCR reviewer this case, the inmate only met with a psychologist twice during her MHCB placement. The majority of the daily contacts were made by a psychiatrist, and documentation appeared to be solely focused on medication management. The CDCR reviewer also found that there was "no safety planning regarding suicide risk history or recent SI. In addition, the five-day follow-up documentation following her return to her housing unit was minimal in the area safety planning."

Although the inmate allegedly threatened suicide to her cellmates in the days leading up to her death, such threats were not communicated to any CDCR personnel. On the day of her suicide (April 22), the inmate apparently was informed during a telephone call with her mother that her grandfather had died and was observed to be crying by her cellmates. This information was also not known to any CDCR personnel. As such, although the CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and she did not leave a suicide note, it was surmised that the inmate was experiencing an increase in her depressive symptoms and "having difficulty coping with her current prison term, being away from her family, and the sudden loss of substance use as her main coping mechanism."

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

    1) The SRASHE conducted upon MHCB discharge on April 9, 2018 did not accurately provide a risk formulation justification and safety plan. In addition, the MHPC Discharge Summary did not address treatment planning for prior suicide history (see *Concerns* for more detail).

    2) The Mental Health Master Treatment Plan dated April 18, 2018 contained broad goals that did not address her recent reported suicide attempt or suicidal ideation. The Interdisciplinary Plan of Care goals within the treatment plan did not include a goal for self-harm, and although restrictions from sharp objects was written, safety planning was not addressed as part of the treatment plan.

    3) The five-day follow-up documentation dated April 10, 2018 through April 14, 2018 contained broad goals that did not address her recent suicide attempt or suicidal ideation. This documentation contained goals for the patient, but did not contain clinical interventions addressing the recent suicide attempt, recent suicidal ideation, increased isolation, and depression.

    4) SRASHEs dated February 13, 2018 to April 17, 2018 under-reported suicide attempt history, and included a copy and paste of supervisory review which subsequently pulled forward without revision.

### 8)    California Substance Abuse Treatment Facility (CSATF)

**Inspection**: January 24-25, 2019 (previous suicide prevention audit on October 12-13, 2017). CSATF housed approximately 5,605 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on January 24, 2019.  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  The nurse's office door was closed during the process, with officers stationed outside, thus ensuring both privacy and confidentiality.

Daily PT rounds in the STRH unit were observed on January 24.  The rounds were unremarkable and the two PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS.

**Housing**:  CSATF had 20 MHCBs that were previously found to be suicide resistant.  During the inspection, two of the rooms had been "redlined" for repairs, and ten of the rooms were vacant, resulting in only eight of 18 (or 44 percent) of available rooms occupied during the on-site assessment.

As noted above, the facility had one administrative segregation unit (STRH), with GP inmates requiring administrative segregation often transferred to CSP/Corcoran.  A few EOP inmates were in the unit and awaiting transfer.  The STRH unit contained nine new intake cells (100-108) that had been previously retrofitted to be suicide-resistant.  Upon inspection, all of the new intake cells were full on January 24, and three new intake inmates were housed in unsafe, non-intake cells.  A similar problem was found during the previous on-site assessment.  A custody supervisor had previously informed this reviewer that the STRH unit periodically exceeded its new intake cell capacity, and three additional new intake cells had been recommended.  To-date, the recommendation had not resulted in a work order.  In addition, this writer was informed that inmates transferred to CSATF from other administrative segregation units (thus not meeting the criteria for new intake inmates) were still treated as new intake inmates and placed in available new intake cells.  Due to this lack of distinction, new intake cells were not always available for new intake inmates.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement continued to be used on a daily basis.  Two wet (i.e., running water in sink and toilet) holding cells in the CTC and designated cells in E-1 unit (formally administrative segregation), and the STRH unit were primarily utilized for alternative housing.  All inmates had beds, with those housed in the CTC holding cells provided stack-a-bunks.  Inmates housed in the CTC holding cells were required to be observed on a 1:1 basis.  Of note, this reviewer was initially provided data indicating that two TTA examination rooms (No. 166 and No. 167) in the CTC were also utilized for alternative housing.  These rooms had been identified by this reviewer in a previous assessment as extremely problematic because inmates were being shackled to hospital beds in these rooms while on alternative housing status.  Upon closer examination, this reviewer was able to verify that although clinical assessments could occasionally occur in these TTA exam rooms, inmates were housed in the CTC holding cells.

143

This reviewer strongly recommended to CSATF leadership that these TTA exam rooms not be listed in the "Location and Cell Type" column of alternative housing data reports.

From October 1 through December 31, 2018, there were approximately 127 inmates placed in alternative housing, with all but one (26 hours) released within 24 hours. Approximately 28 percent (36 cases) of the MHCB referrals were rescinded and inmates returned to their housing units. This reviewer examined the EHRs charts for ten of these rescinded cases and found that the required SRASHEs were completed in nine of ten cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were required to be observed at 15-minute intervals. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the CTC for a nine-hour period from 12:00 a.m. through 8:59 a.m. on November 5, 2018 for <u>CSATF 1</u>, December 6, 2018 for <u>CSATF 2</u>, January 11, 2019 for <u>CSATF 3</u>, and January 18, 2019 for <u>CSATF 4</u>. The chart review found only one observation check that was in excess of the required 15-minute intervals for all four patients. These findings were excellent, and consistent with those noted during the previous assessment.

During the IDTT meetings in the MHCB unit on January 24, this reviewer observed that all patients were assigned clothing consistent with their level of observation. A sample of 114-A forms were reviewed and indicated patients were offered yard and shower privileges on a regular basis, although telephone privileges were problematic. For example, during one IDTT meeting, the patient (<u>CSATF 5</u>), who had been in the MHCB unit since January 18 and was being discharged that day (January 24), asked whether telephone calls were available to patients. Such an issue should have been explained to the patient during the initial IDTT meeting. In any event, the patient was informed that he needed to schedule the call by signing up in the telephone log located in the program room. Following the IDTT meetings, this reviewer attempted to locate and review the telephone log and was informed by both the RT and custody personnel that there was no such log and patients were permitted telephone calls upon request during their out-of-cell time. As such, despite an LOP that adequately addressed the issue, it appeared that the IDTT was not consistently informing patients of telephone privileges, as well as misinforming them of the protocol. Finally, it was noteworthy that a full-time RT had recently been assigned to the MHCB unit (correcting a previous problem) and attempted to interact with patients out-of-cell approximately twice a week.

Finally, a review of Guard One data for a recent 24-hour period found 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently reviewed a listing of emergent/urgent mental health referrals for the period of July 1, 2018 through January 15, 2019. A sample EHRS review of 80 emergent/urgent mental health referrals for SI/behavior found that mental health clinicians subsequently completed the required SRASHEs in only 78 percent (62 of 80) of the cases. This was a significant decrease from the previous assessment when a 95-percent compliance rate was found. In the vast majority of sampled cases that did not result in completion of the required SRASHEs, one particular CIT clinician was responsible. In

those cases, the clinician often wrote a "MHPC Consult Emergent Progress Note" that stated, in part, that "psychoeducation on potential negative outcomes to feigning SI for secondary gain was provided." The clinician also wrote "Mental Health Counseling Chrono" Notes (CDCR Form 128-A) in two of the sampled cases (CSATF 6 and CSATF 7) that stated, in part, "IP was again informed of potential outcomes of feigning SI for secondary gain and that should he continue this behavior he may receive progressive disciplinary action (a 115) for manipulating staff." CSATF mental health leadership was alerted to the above problematic practice.

In addition, a CIT protocol had been initiated at CSATF in October 2017 and included a clinician, nurse, and custody supervisor (normally a lieutenant) during the 12-hour period of 10:00 a.m. to 10:00 p.m. This reviewer observed a CIT response to an emergency mental health referral on January 25, 2019. The case involved an inmate (CSATF 8) who was referred for danger to others (with vague command hallucinations to assault a CC 1), danger to self, and grave disability. The CIT responded promptly to the emergency referral, met in the lieutenant's office to triage the case and review the medical chart, and then conversed with the inmate. The clinician completed the required SRASHE, and the CIT subsequently decided to refer the inmate to the MHCB unit. The involvement of the lieutenant was instrumental in convincing the inmate that his property would be secured during his MHCB placement. With the exception of the decision to conduct the assessment in a non-confidential setting (a TTM in a high traffic area of an EOP building) when the lieutenant's office was offered and available, the CIT response was very good.

Four IDTT meetings were observed in the MHCB unit, including three patients being discharged that day (January 24). All team members were active participants, particularly the CC 1 who tried to address any custody concerns. However, there was inadequate discussion regarding both suicide risk and safety planning to reduce future recurrence of SI during the meetings of the three patients being discharged. In each case, it appeared that safety planning was being discussed for the first time. In two of the cases (CSATF 5 and CSATF 9), the discharging SRASHEs contained safety plans that were not discussed with the patient during their respective IDTT meetings. As shown below, the safety plan in one case (CSATF 5) was simply deferred to the assigned PC in the EOP yard:

> 1) Pt will be placed on a five-day follow-up to continue to monitor his status, it is recommended that he is housed on G yard, Bldg. 1 in a six-man cell; 2) Pt. will be evaluated by yard psychiatrist for psychotropic medication to assist with stabilizing his mood and lowering his anxiety that prior functioning can be restored; 3) PC will work with Pt. to identify life areas he can assert control over to reduce his anxiety (sleep routine, exercise, hygiene, and grooming) while also teaching and mindfulness practice (e.g., deep breathing, grounding) that can help to eliminate his trauma response and prevent trauma/adjustment sxs from persisting so that PTSD diagnosis can be ruled out; 4) EOP group treatment and PC individual therapy sessions will focus on cognitive restructuring so that Pt. can develop appropriate responses to identify triggers, learn to adjust to prison, and reduce the emotional distress from this recent assault; 5) Pt. will be prompted to remain in consistent contact with his family and practice self-care daily.

In addition, this reviewer examined a sample of ten SRASHEs from patients released from the MHCB unit from November 2018 through January 2019. Most did not include specific safety plan strategies to reduce recurring SI.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 226 cases of patients discharged from either the MHCB unit or alternative housing who remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from July through December 2018. The review found that 85 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians either discontinuing the checks prior to the minimum 24-hour requirement or not completing the forms on a daily basis. The vast majority (82 percent) of the custody checks were recommended for either 48 or 72 hours by clinicians. In addition, 93 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. The few problems found included some gaps in observation by custody personnel or checks conducted at 60-minute intervals. Of note, all of the Discharge Custody Check Sheet (CDCR MH-7497) packets were again found to be extremely well-organized.

**Intervention**: Housing units toured by this reviewer contained an Ambu-bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months (October through December 2018) of SPRFIT meeting minutes found that quorums were achieved for all but one (December) of the meetings. The meetings were otherwise unremarkable. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was previously developed. Such an LOP was contained within the facility's LOP for Suicide Prevention (No. 144), but deficient because it contained boilerplate language from the CCHCS memorandum and did not provide specific policies and procedures regarding the "high-risk management program" and "bad news notification" from court and/or BPH return, both of which were required by the SPRFIT memorandum.

**Training**: According to training records, 100 percent of both custody and nursing personnel were currently certified in CPR. In addition, 98 percent of custody staff, 95 percent of medical staff, and 98 percent of mental health staff received annual suicide prevention block training during 2018. Finally, as of January 2019, 91 percent of mental health clinicians had completed the SRE mentoring program, only 68 percent had received the seven-hour SRE training, and only 64 percent had completed safety plan training.

**Recent Suicides**:  CSATF experienced one (1) inmate suicide during the review period.  In that case (CSATF 10), the inmate was found hanging from the upper bunk by a sheet in his SNY cell during the afternoon of October 29, 2019.  The inmate entered the CDCR system for a fourth term on March 25, 2019 to serve a seven-year and eight-month sentence for attempted robbery, injury to elder causing death, and other offenses.  He was transferred to CSATF on May 6, 2019.  The inmate did not have any RVRs during his brief six-month confinement.  He was provided SNY status after reporting safety concerns as a "gang drop-out."  Records indicated that the inmate did not have any known family support.  He was single and did not have any children.

According to available records, the inmate and two half-sisters were raised by his mother and stepfather.  He reported experiencing emotional abuse by his stepfather.  Both his mother and stepfather had histories of substance abuse.  He reported that his stepfather interfered in his relationship with his mother and sisters, as the stepfather did not allow them around the house.  As a youth, the inmate's parents placed him in a group home due to uncontrollable behavior.  He was later diagnosed with Attention Deficit Disorder and he ran away from the group home several times and "lived with girls" he met on the street.  The inmate was eventually placed in an out-of-state residential treatment center based upon a significant substance abuse problem; additionally, he was psychiatrically hospitalized on two occasions for behavioral problems.  The inmate did not complete high school and had a sporadic employment history.  He began abusing drugs at age 13, after his parents introduced him to marijuana.  He began experimenting with hard drugs, including methamphetamine and heroin, at age 16.  The inmate had a minor juvenile criminal history, but he had a significant history of both adult arrests and convictions.  Beginning in 2001 at age 20, he spent considerable time incarcerated in both county jails, CDCR, and the federal prison system.

Upon arrival to CDCR in March 2019, the inmate was immediately re-enrolled into the MHSDS at the 3CMS level of care.  During prior CDCR confinements, he was placed in a variety of levels of care, including 3CMS, EOP, and MHCB.  Previous diagnoses included "Psychotic Disorder, NOS, Adjustment Disorder, NOS, Psychosis, NOS, and Bipolar Disorder."  During this current term, he was provided with the following diagnoses: "Unspecified Anxiety Disorder, Methamphetamine Use Disorder, severe, in a controlled environment, and Opioid Use Disorder, severe, in a controlled environment."  He was not prescribed psychotropic medication.  The inmate reported one prior suicide attempt in the community during May 2015.  While in CDCR during a prior term, he was briefly placed in an MHCB unit for SI in September 2015, and then again in January 2016.  The inmate's most recent SRASHE was completed in May 2019 and assessed a "moderate" chronic risk and "low" acute risk for suicide.

From March 2019 through October 2019, the inmate consistently denied SI.  His 3CMS treatment centered around anxiety and substance use.  The inmate was enrolled in several substance use programs, attended most of them, and appeared hopeful for an earlier release from prison.  On October 22, 2019, he met with his PC for a routine individual session.  This was the inmate's last documented clinical contact prior to his death.  Although reporting he had been sober for approximately nine months, other records suggested that he had relapsed and was occasionally still using heroin.  The inmate denied any distress such as depression, anxiety, or other in any physical symptoms of his drug addiction.  He stated he did not have any current

contact with the family and the relationship with his parents "was non-existent due to his drug use and being in and out of prison of the last 20 years."

According to the CDCR reviewer for this case, there were not any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not have any significant medical issues, and a suicide note was not found in his property. The Suicide Report noted that the inmate believed "he had no support in the community, demonstrated difficulty with healthy functioning outside of prison and was aware of the possibility of an early release, what could have been a protective factor of hope for the future, may have actually served as a significant risk factor contributing to his decision to end his life."

The Suicide Report contained two (2) recommendations for corrective action through a QIP.

> 1) Although respondent custody staff retrieved the Ambu bag, custody reports state that the complete cut-down kit was not retrieved. Policy requires the retrieval of the complete cut-down kit when responding to a suicide attempt by hanging.

> 2) First responding nursing staff documented the patient had oxygen administered via a non-breathable mask (NRBM) during CPR. Patients without respirations should be mechanically ventilated, such as with a bag valve mask (Ambu bag).

### 9) **Deuel Vocational Institution (DVI)**

**Inspection**: February 5-6, 2019 (previous suicide prevention audit was on December 5-6, 2017). DVI housed approximately 2,523 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during both the medical intake screening process in the R&R unit and the mental health screening in the RC on February 6, 2019. The nurse was observed to be asking all of the questions and correctly entering information into the EHRS. The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality. The door to the RC diagnostic clinician's office was also closed and the clinician was observed to be conducting a thorough assessment. The clinician was observed to have access to (and used) the Patient Health Information Portal during the process, and told this reviewer the SOMS, county jail transfer sheet, and nurse's Initial Health Screening form were reviewed for each inmate.

In addition, daily PT rounds in one of the administrative segregation units (L-1) were observed on February 5. The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS for MHSDS inmates. Of note, PT rounds were still being performed twice a day following two inmate suicides in the administrative segregation unit in late 2017.

**Housing**: DVI had 24 OHU rooms, ten of which were designated as alternative housing to temporarily house inmates with serious mental illness and/or requiring suicide observation. Each of the rooms had a bunk and inmates were required to be under 1:1 observation prior to transfer

to a MHCB.  **Alternative housing** was only utilized a few times a week at the facility.  From November 2018 through January 2019, there were approximately 52 inmates placed in alternative housing, with all but one (at 30 hours) released within 24 hours.  Approximately 17 percent (nine cases) of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the EHRS charts on all nine cases and found that the required SRASHEs were completed in each case.

Finally, the administrative segregation unit (L-1) housed GP, 3CMS, and EOP inmates.  The unit had 11 cells (138 thru 148) that were designated as new intake cells.  However, as identified during the previous assessment, these 11 cells were not suicide resistant.  At least one cell (148) had a gap between the bunk and wall, and all 11 cells had ventilation grates above the doors and windows with holes in excess of 3/16-inches in diameter.  Several cells had gaps between the light fixtures and ceilings/walls.  It remained unclear why these 11 cells designated for new intake inmates had still not been retrofitted to be suicide resistant.  Of note, the other segregation unit (K-1) had been closed for renovation since spring 2016 and was scheduled to be reopened in the summer of 2019.  The K-1 Unit had contained 27 retrofitted suicide-resistant cells for new intake inmates.  Of note, this reviewer inspected the closed K-1 Unit on February 6, 2019 and noticed that antiquated ventilation grates in the upper back wall of several cells had been painted over (rather than replaced).  These ventilation grates had holes in excess of 3/16-inches in diameter and would not be considered suicide-resistant if such cells were designated as new intake cells.

In conclusion, and as stated during the previous DVI assessment, the continued practice of housing new intake inmates in unsafe cells within the L-1 Unit was particularly problematic.  This reviewer's previous report noted that two inmates who had not been placed in suicide-resistant new intake cells upon admission committed suicide on the unit in late 2017.  These problems continued during 2019 as there were deficiencies noted in the required placement of new intake inmates in retrofitted cells in the administrative segregation unit in one (DVI 3) of the inmate suicides, see below.

**Observation**:  Because DVI did not operate a MHCB unit, all suicidal inmates were required to be placed in alternative housing and supervised on 1:1 observation until they were transferred to a MHCB unit.  As noted above, almost all such inmates were housed in the OHU.  No other levels of observation were permitted within the OHU for suicidal inmates.

A review of Guard One data for a recent 24-hour period found 99-percent compliance in the L-1 administrative segregation unit with the required checks not exceeding 35-minute intervals.  Of note, there were deficiencies noted in adequate observation of inmates assigned to the administrative segregation unit in one (DVI 3) of the inmate suicides, see below.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of August 2018 through January 2019.  A sample EHRS review of 70 emergent/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 90 percent (63 of 70) of the cases, a slight increase from the 85-percent completion rate found during the preceding assessment.

In addition, although DVI did not have a formalized CIT protocol, the facility did have several designated crisis clinicians who responded to emergency mental health referrals throughout the day. This reviewer observed one of the crisis clinicians respond to an emergency mental health referral on February 5. The case involved an RC inmate who had been admitted into the facility only a few hours earlier. He was a first-time offender serving a sentence for child endangerment. The referral had been based upon his vague expression of SI that appeared secondary to perceived fears and safety concerns as a first-time offender. The clinician conducted a thorough assessment that included completion of both the RC mental health screening and SRASHE. The inmate was subsequently assessed as being at "low" acute risk for suicide and placed on a five-day follow-up. The assessment was conducted in a private office and, although the clinician attempted to answer multiple questions regarding the RC and classification processes, it would have been more beneficial if the process included a custody supervisor (lieutenant or sergeant) who would have been in a better position to alleviate the inmate's anxiety and fears.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 40 cases of patients discharged from a MHCB and alternative housing who returned or transferred to DVI and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from June 2018 through January 2019. The review found that 88 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most errors related to clinicians discontinuing the checks prior to the minimum 24-hour requirement. The vast majority (70 percent) of the custody checks were recommended for 48 hours by clinicians. In addition, 95 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. The few deficiencies were related to gaps in the observation by correctional staff.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months (October through December 2018) of SPRFIT meeting minutes found that quorums were only achieved for one (November) of the meetings. The meetings were otherwise unremarkable. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was previously developed. The SPRFIT LOP was contained within the facility's LOP for Suicide Prevention (No. 180, effective May 2018), but did not provide specific policies and procedures regarding "bad news notification" following court and/or BPH return. In addition, according to the CCHCS memorandum, "The SPRFIT, in conjunction with Facilities Management, shall monitor the progress of any needed retrofits" in the administrative segregation units. Given the

continuing problems previously identified in the L-1 Unit, and based upon review of DVI's monthly SPRFIT meeting minutes, such a responsibility was not being performed by the Committee.

Finally, the CCHCS memorandum required that each local SPRFIT maintain a "high risk management program." DVI had an LOP (No. 306, unsigned, effective May 2018) "to identify and track inmate/patients (I/Ps) who are considered to be at high risk for suicide, suicide attempts, severe or potentially life-threatening self-injurious behavior, or psychiatric decompensation." This reviewer requested and subsequently received a list of high-risk inmates at DVI as of January 31, 2019. The list contained two inmates, and a review of one of the cases found problematic practices. The inmate (<u>DVI 1</u>) was placed on the high-risk list on January 22, 2019 by one of the crisis clinicians. He had been in CDCR since early November 2018 and had initially been placed in an MHCB on November 29 for SI and SIB. He was discharged back to DVI at 3CMS level of care on December 5 to complete the RC process. Several days later on December 9, the inmate again engaged in SIB (cutting both arms with a razor) and was readmitted into a MHCB unit. On December 19, the inmate remained unstable and was transferred to acute care at a PIP. On January 15, 2019, he was discharged back to DVI in the EOP, received the required five-day follow-up checks and, as noted above, placed on the high-risk list on January 22. He had previously been assessed as a "high" chronic risk for suicide. The inmate met with his PC the following day (January 23), but there was no mention of the high-risk list placement in the progress note. The next day (January 24), the inmate attended his IDTT meeting. According to the MH Master Treatment Plan completed during the meeting, the team decided to reduce the inmate to 3CMS, but agreed to expedite his psychiatric appointment to review medication options. The treatment plan did not contain an IPOC for danger to self nor did it acknowledge the inmate's placement on the high-risk list.

Between the 14-day period of January 24 and February 7, 2019, the inmate was not seen by any mental health clinicians. On both January 30 and February 5, 2019, he submitted Health Care Request forms regarding getting back on his psychotropic medication and his concern that lack of medication may increase his SI. On February 7, the inmate was seen by his PC and again complained about the need to restart his psychotropic medication. According to the progress note, "IP denied any current SI but indicated that he could become suicidal if he does not get his medication soon. He was reminded that he refused all medication that was prescribed to him at PIP."

Four days later during the afternoon of February 11, the inmate was placed in administrative segregation for an alleged fight with another inmate and told nursing staff that "he does not know if he will become suicidal or homicidal in the future if he is placed in Ad-Seg." A concerned nurse called the mental health office and was told that the "mental health team needs a statement stating he is suicidal so mental health can see him for mental health crises issues." The inmate was placed in administrative segregation. Several hours later, the inmate was escorted to the TTA and stated, "I need my psych medications." He denied any current SI and was told he was scheduled to see his PC on February 14. The inmate was returned to administrative segregation. However, approximately an hour later, the inmate was returned to the TTA after expressing SI to a PT. He was placed on Suicide Watch in alternative housing. The following day (February 12),

the inmate was transferred to a MHCB unit, was assessed by a psychiatrist, and prescribed psychotropic medication.

In conclusion, DVI's LOP for the high-risk management program required that an inmate's "high-risk status should be explicitly and clearly documented in the Mental Health Master Treatment Plan in the EHRS. Mitigating suicide risk and psychiatric decompensation should be included as a treatment goal with planned clinical interventions. Treatment plans should include documentation of enhanced clinical services provided to those inmate-patients deemed to be a high risk….MHPC progress note will address treatment goals with a status update." Despite these requirements, there was no indication from the medical chart that any DVI clinician (other than the crisis clinician that initiated his placement on the high-risk list), nursing staff, or custody personnel were aware that this inmate (<u>DVI 1</u>) was placed on the high-risk list on January 22, 2019. It appeared that placement on the high-risk list had no impact whatsoever on his level of care and frequency of contact with clinical staff.

**Training**: According to training records, 97 percent of custody staff and 98 percent of medical staff were currently certified in CPR. In addition, 94 percent of custody staff, 93 percent of medical staff, and 94 percent of mental health staff received annual suicide prevention block training during 2018. Finally, as of January 2019, only 80 percent of all mental health clinicians had completed the SRE mentoring program, only 84 percent had received the seven-hour SRE training, and 92 percent had completed safety plan training.

**Recent Suicides**: DVI experienced four (4) inmate suicides during the review period. In the **_first_** case (<u>DVI 2</u>), the inmate was found hanging from the window bar by a sheet in his RC cell during the morning of June 8, 2018. The inmate entered the CDCR system on May 30, 2018 to serve a 45-years-to-life sentence with parole for multiple counts of sexual assault on a child (i.e., his two nieces). He only served nine days of CDCR confinement before committing suicide. The inmate did not have any RVRs and was not thought to be gang affiliated. Due to his RC status and short length of stay prior to death, any family support was unknown.

According to available records, the inmate was primarily raised in the foster care system. His mother had been addicted to crack cocaine and he never met his biological father. He had one brother with whom he was not raised but reconnected with as an adult. The inmate was placed in foster care beginning at age 2 and suffered both sexual and physical abuse from ages 3 through 15. He self-reported being a high school graduate, denied any history of substance use, but was homeless for most of his young adult life.

Although the inmate did not have a history of mental health treatment in the community, he was given a diagnosis of Adjustment Disorder with Mixed Anxiety and Depressed Mood during his county jail confinement. Upon arrival to CDCR, he told the RC psychologist that he was experiencing increased anxiety and feeling unsafe due to the nature of his committing offense. The inmate was subsequently provided with a diagnosis of Adjustment Disorder with Anxiety and placed at the 3CMS level of care. He denied any current SI or history of suicidal behavior. The inmate was started on psychotropic medication. According to available records, his level of anxiety and fear of assault remained high. The inmate requested single cell status, refused to go to yard, and never left his cell, even to shower.

The inmate did not have any serious medical concerns that were thought to be contributory to his suicide, and a suicide note was not found in his cell. Apart from the obvious risk factor of a committing offense involving sexual assault on a child that was known to other inmates in his housing unit, the CDCR reviewer in this case did not find any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. However, the CDCR reviewer theorized that it was possible that the inmate "suffered a narcissistic injury based upon his beliefs he did not do anything wrong and should not be in prison, which may have led to a moment of emotional deregulation. This emotional deregulation, past effects from trauma, and anxiety about his safety could have overwhelmed him to a point where he chose to commit suicide."

The Suicide Report did not contain any recommendations for corrective action through a QIP.

In the **_second_** case (DVI 3), the inmate was found hanging from the ventilation grate by a sheet in his RC-Special Processing Unit-SNY cell during the morning of June 13, 2019. The inmate entered the CDCR system for a second term on September 21, 2017 to serve a 21-year sentence for involuntary manslaughter and assault with force likely to cause great bodily injury. He remained at DVI his entire confinement. The inmate incurred four RVRs, the most recent of which occurred in April 2018. He was known to be gang-affiliated and began the process to disassociate himself from the gang and requested protective custody in June 2019, resulting in SNY status. With the exception of occasional visits and telephone calls with his girlfriend, it did not appear that the inmate had any other family support. The inmate was single and did not have any children.

According to very limited records, the inmate and four siblings were primarily raised by their mother, as the father's whereabouts were unknown. At least one brother was also incarcerated within CDCR. The inmate graduated high school and attended one semester of college. He had a history of substance abuse beginning at age 16. Although later denying any substance abuse problems, the inmate had multiple convictions as an adult for substance-related crimes. He was heavily involved in gang activity in the community. The inmate had sporadic employment and was unemployed at the time his arrest for the incident offense. He did not have any history of mental health treatment in the community, nor any known prior history of suicidal behavior.

Upon entry into CDCR in September 2017, the inmate screened negative for any mental health problems and was not placed in the MHSDS. On October 3, 2017, the inmate was charged with attempted murder of an inmate while on the main recreational yard. Between April 2018 and April 2019, he attended multiple out-of-court proceedings related to the incident. The inmate spent most of his confinement in administrative segregation. He consistently denied any SI or mental health issues when screened for administrative segregation placement. On May 9, 2019, the inmate was released from administrative segregation and placed in RC GP pending disposition of an RVR and pending SHU placement. The following month on June 8, 2019, the inmate requested protective custody in the SNY due to pressure and politics from his gang. A few days later on the day of his death (June 13, 2019), the inmate appeared before the Institutional Classification Committee at which time the committee agreed to release him from administrative segregation to the RC-Special Processing Unit-SNY.

According to the CDCR reviewer in this case, there were not any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not have any significant medical issues, and a suicide note was not found in his property. The Suicide Report noted that the inmate "had engaged in conduct that violated gang rules and regulations resulting in him being the target of violence by his gang associates. The combination of loss of social support provided by his gang affiliation, fear of either 'owing' or being 'targeted for violence' by the gang, potential shame associated with disassociation, impending District Attorney charges and additional time added to the sentence, suspected safety concerns in his statement 'answering to myself going forward,' may all be associated with the decision to end his life."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

1) During the review it was discovered the responding officer was conducting security checks and noted the window of the inmate's cell was covered with a white cloth. Multiple verbal orders were given to remove the window covering, yet the inmate did not comply nor did he verbally respond to the officer. The officer did not activate their alarm, instead it is noted the officer left the third tier of the incident location and proceeded to the first tier to get additional assistance from staff.

2) During the review it was noted the noose he had used to hang himself remained loosely on the inmate's neck for at least six minutes after custody staff reported he was cut down from the vent.

3) It was documented in the staff's reports the incident began at 1023 hours. During the review it was noted the Security/Welfare Check Manual Tracking Sheet which custody staff were using to conduct the mandatory checks in the Administrative Segregation Overflow Unit was pre-filled with check times and staff signatures for the entire shift ending at 1340 hours.

4) Based on the reviewer's observation of photographs taken of the cell during the incident which documented the presence of state issued property, it is unclear if the inmate's cell was processed per policy. His state issued property was not retained or stored and was not available for review during the on-site review.

5) During the SCR it was noted on June 8, 2019 during the inmate's initial 72 hours of ASU placement, he was not appropriately housed in a retrofitted intake cell as required. It is noted, although the inmate was past his initial 72 hours of ASU placement, and no longer required intake cell placement at time of his death, DVI custody staff did not initially house the inmate in accordance with memorandum dated September 29, 2010 'Administrative Segregation Unit Intake Cell Procedure.'

6) AED was not placed until the inmate arrived in TTA, seven minutes after he was found hanging.

In the ***third*** case (DVI 4), the inmate was found hanging from the ventilation grate by a sheet in his RC cell during the morning of August 26, 2019. The inmate entered the CDCR system for a second term on May 22, 2019 to serve a 16-year sentence for multiple counts of vehicle theft with prior felony convictions. He did not have any RVRs and was not thought to be gang affiliated. The inmate had some family support demonstrated by a few telephone calls with his mother. The inmate was divorced and had twin daughters.

According to very limited records, the inmate and three siblings were born into an intact family, but their parents were divorced at some point during his childhood. Some records indicated that both parents were heroin addicts and had prior criminal histories. He previously reported having a "scary" childhood and came from an "incredibly dysfunctional family." The inmate began using drugs and alcohol at age 13. He did not graduate high school, had a sporadic work history, and was homeless and unemployed at the time of arrest for his current offense. Although the inmate had a minor juvenile history, his adult criminal history was extensive, including one prior CDCR term. His brother was also incarcerated within CDCR. The inmate did not have any history of mental health treatment in the community, nor any known prior history of suicidal behavior.

Upon entry into CDCR in May 2019, the inmate screened negative for any mental health problems and was not placed in the MHSDS. He was also not provided any mental health treatment during his previous CDCR term. Sometime in August 2019, the inmate received legal paperwork regarding an upcoming Family Court hearing pertaining to the custody of his children. Review of county jail records that were apparently only requested (by the CDCR reviewer) after the inmate's death indicated that he was seen by jail mental health staff on three occasions in the month prior to his CDCR confinement. He reported to the jail clinician that he was "mildly depressed" as his wife had turned him in for his current offense, and he felt betrayed and abandoned. The inmate denied any previous mental health history or current SI at the time. He was seen again by a jail clinician in March 2019, following the suicide of a friend in the jail. The inmate also expressed anxiety about his upcoming transfer to CDCR.

According to the CDCR reviewer in this case, there were not any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not have any significant medical issues. A suicide note was found in his cell that simply indicated "I wasted my life on drugs and crime and failed as a man and father. I hate myself. That's it." The Suicide Report noted that the inmate's death was likely a culmination of several issues, including being "angry at himself for his poor life choices, including his chronic methamphetamine abuse and criminal lifestyle, which resulted in multiple prison terms. Unlike his other prison terms which were comparatively short in nature, his final term was a prolonged 16-year sentence based upon another series of crimes, which would essentially mean he would not be around to raise his two-year-old twin daughters in their formative years. He had just been served with a custody hearing notice where he may have found out he could lose his parental rights. Additionally, he was deeply troubled by the recent suicide of a close friend in the county jail who had killed himself in response to his own family issues."

The Suicide Report did not contain any recommendations for corrective action through a QIP.

In the **_fourth_** case (<u>DVI 5</u>), the inmate was found hanging from the window bar by a sheet in his RC cell during the afternoon of November 11, 2019. The inmate entered the CDCR system on November 8, 2019 to serve a three-year and eight-month sentence for assault with a deadly weapon and fleeing from a police officer. He spent only three days in DVI before committing suicide. The inmate did not have any RVRs and was not thought to be gang affiliated. Due to his RC status and short length of stay prior to death, any family support was unknown. The inmate was never married, but had a current girlfriend and two adult children.

According to very limited records, the inmate's family and upbringing were unknown. He previously reported graduating from high school and completing one year of community college. The inmate had a moderate employment history that included construction and auto repair jobs. He had an extensive history of substance abuse, including methamphetamine. The inmate was unemployed the year prior to his arrest as a result of mental health problems. These mental health issues included prior psychiatric hospitalization for disorganized and delusional thinking, as well as auditory hallucinations. The inmate also had at least one prior suicide attempt six years prior to his CDCR confinement and had been placed on suicide precautions several times in the county jail during July and September 2019. He was on psychotropic medication at the county jail until such medication was discontinued the day before his transfer. Unfortunately, the above information regarding the inmate's mental health and prior suicidal behavior came from probation department and county jail records that were not available to CDCR until after the inmate's death.

Upon entry into CDCR on November 8, 2019, the inmate screened negative for any mental health problems because he denied the above histories of mental illness and suicidal behavior. As a result, he was not placed in the MHSDS. The RC psychologist who conducted the mental health screening of the inmate reiterated to the CDCR reviewer in this case that the probation department and county jail records were not available to her at the time of the screening on November 8.

According to the CDCR reviewer, there were not any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not have any significant medical issues, and a suicide note was not found in his property. Following review of subsequent records in this case, the CDCR reviewer opined that the inmate "was experiencing increased symptoms of depression, suicidal ideation, and anxiety. It is likely the recent stress from arriving to prison, recent discontinuation of psychiatric medications while in the county jail, pressure from inmate peers, and adjustment to overall prison environment further exacerbated these symptoms."

The Suicide Report contained one (1) recommendation for corrective action through a QIP:

> 1) Airway Management was a concern. On November 11, 2019 at 1438, it was documented that the patient was provided oxygen via an Ambu bag connected to a non-breather mask. Oxygen delivered to a non-breathing patient must be

delivered directly by an Ambu bag.  On November 11, 2019 at 1442, it was documented that the patient had reddest vomitus in their oral cavity, no documentation was found regarding oral suctioning.

**10)**  **California Health Care Facility (CHCF)**

**Inspection**:  February 7-8, 2019 (previous suicide prevention audit was on August 8-9, 2017).  CHCF housed approximately 2,645 inmates at the time of the on-site assessment.

**Screening/Assessment**:  Due to a scheduling conflict, the intake screening process within the R&R unit (referred to as the Patient Management Unit) was not observed during the two-day assessment.  Daily PT rounds in the administrative segregation unit were observed on February 9.  The rounds were unremarkable and the PT was observed to be entering the Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**:  CHCF had 98 MHCBs in housing units A1A, A1B, and A2B that were previously found to be suicide resistant.  At the time of the assessment, the MHCB units had very low censuses, resulting in the temporary closure of Unit A2B.  The combined census of the other two MHCB units was approximately 40 patients, therefore, the 98-bed program was at 41 percent of its capacity during the on-site assessment.  The administrative segregation unit had five retrofitted suicide-resistant cells designated for new intake inmates, although the facility had identified eight new intake cells during the previous assessment.  During this inspection, all new intake inmates were observed to be housed in the five new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were used on a daily basis at CHCF.  From November 1, 2018 through February 7, 2019, there were approximately 149 inmates placed in alternative housing, with all but one case (at 27 hours) discharged within 24 hours.  Various units were utilized for alternative housing, including, but not limited to, D1A, D1B, 3CA, and E1A.  Although each inmate was required to be provided a stack-a-bunk and observed on a continuous 1:1 basis, this reviewer found that two of the three inmates in alternative housing on February 7, 2019 were not provided stack-a-bunks in their respective cells within C2B and D7B units.  In addition, this reviewer also observed that an acute care patient in the PIP did not have a stack-a-bunk in his D1B cell while under mental health observation on February 8, 2019.  In addition, approximately 24 percent (36 cases) of MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the EHRS charts of ten sample cases and found that the required SRASHEs were completed and provided adequate justification for the rescission.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB units.  In addition, patients not on suicide observation status were required to be observed at two-hour intervals by nursing staff as part of "nursing rounds."  Of note, this frequency of observation for non-suicidal patients was different than that found during the previous assessment in which observation at 15-minute intervals was required.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB units during a nine-hour period from 12:00 a.m. through 8:59 a.m. on November 17, 2018 for CHCF 1, on January 31, 2019 for CHCF 2, on

February 6, 2019 for CHCF 3, and on February 7, 2019 for CHCF 4. The chart review found a variety of violations in observation checks (i.e., CHCF 1 had nine violations, CHCF 2 had 15 violations, CHCF 3 had three violations, and CHCF 4 had 11 violations) that were in excess of required 15-minute intervals. The longest gap between checks was 39 minutes in case CHCF 4. Violations in the four cases were by multiple nursing staff. A similar problem of inadequate observation of patients on Suicide Precaution status was found during the previous assessment.

During the IDTT meetings in the MHCB units on February 7-8, 2019, this reviewer observed that all patients were assigned clothing consistent with their level of observation. A review of a sample of charts indicated that patients were offered showers, yard, and telephone privileges on a regular basis.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals from for the period of August 2018 through January 2019. A sample EHRS review of 55 emergent/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 98 percent (54 of 55) of the cases. In addition, this reviewer observed crisis clinicians responding to an emergency mental health referral on February 7, 2019. (Of note, a formalized CIT was scheduled to be activated in early March 2019.) The clinicians were observed to be very effectively de-escalating a very agitated inmate assigned to the administrative segregation unit who had been discharged from the MHCB unit the day before. The inmate was assessed for both SI and HI and had allegedly taken an overdose of Tylenol. Following the assessment, including completion of a SRASHE, the inmate was readmitted into the MHCB unit.

Nine IDTT meetings were observed in the MHCB units on February 7-8, 2019. Three of the patients refused to attend and the meetings were held in absentia. Six of the IDTT meetings involved patients who were being discharged. There was uneven discussion during the IDTTs regarding safety planning to reduce SI. One case (CHCF 5) was noteworthy for the fact that although safety planning was discussed, the patient refused to attend the IDTT. The patient had been admitted into the MHCB for SIB, i.e., re-opening sutures from a previous suicide attempt of cutting his arms. He had seven MHCB placements in the previous six months, as well as a significant history of suicide attempts and SIB. Despite the fact that the discharging SRASHE noted approximately 18 suicide attempts and/or SIB incidents, his chronic risk for suicide was rated as "moderate," and the following safety plan narrative, although lengthy, failed to specifically provide strategies to reduce future SI and SIB:

> I/P is being d/c [discharged] back to EOP LOC as he has requested to return to his program and will continue to reach out to family for emotional support. I/P would benefit from working with his clinician to increase frustration tolerance and reduce expectations of family members to maintain a relationship with him after 15 years of incarceration. I/P is noted to experience hopelessness and agitation per IS PATH WARM indicators as he is facing life in prison without parole. However, reported new laws in effect to allow him a board date in 10 years time

and he is optimistic to have legislation passed which would require he be tried as a minor and have his sentence reduced to 25 to life which would allow him earlier parole hearings. IP is reporting hopelessness but also speaks of wanting to be independent when he releases with hopes to marry for love before he becomes too old and to have a child he can be there for and watch grow from infancy. I/P is presently denying all SI/HI and was not observed responding to internal stimuli. I/P is medication compliant and would benefit from ongoing monitoring for possible side effects. With I/P's noted depression and borderline personality disorder, consider he would benefit from DBT [Dialectical Behavioral Therapy] groups or interventions geared toward regulating his emotions, specifically in how he would react to relationships as family support is both a strong protective factor and a trigger for him. I/P is being d/c with a 30-day supply of medications as well as a 5-day MH follow-up for continuity of care.

In addition, this reviewer examined a sample of nine other SRASHEs from patients discharged from the MHCB units between October 2018 through February 2019. Most did not include specific strategies to reduce recurring SI.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 171 cases of patients discharged from a MHCB or alternative housing placement who remained at CHCF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from August 2018 through January 2019. The review found that only 44 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the low completion percentage mostly related to clinicians discontinuing the checks prior to the minimum 24-hour requirement or noncompletion of the form on a daily basis. In addition, most of the custody checks were recommended for either 24 or 48 hours by clinicians. In addition, only 75 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the problems were related to gaps in documentation and pre-printed custody check sheets.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months (November 2018 through January 2019 of SPRFIT meeting minutes found that quorums were only achieved for one (November) of the meetings. The meeting minutes were otherwise unremarkable. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams"

159

memorandum was previously developed.  The required LOP was entitled, "Suicide Prevention Program Procedures" (Chapter 10: Quality Management, Section 3: Suicide Prevention Program Procedures of CHCF, Health Care Services Policy and Procedure Manual, Volume XVIII Mental Health Treatment Program - Outpatient, effective February 26, 2018).  The LOP referenced the facility's "High-Risk Program and High-Risk Tracking Procedure," dated January 16, 2019, as well as a "Bad News Notification to Mental Health" policy, unsigned, dated January 2019.

**Training**:  According to training records, 100 percent of both custody and medical staff were currently certified in CPR.  In addition, 95 percent of custody staff, only 78 percent of medical staff, and 95 percent of mental health staff received annual suicide prevention block training during 2018.  Finally, as of February 2019, 93 percent of mental health clinicians had completed the SRE mentoring program, 80 percent had received the seven-hour SRE training, and 88 percent had completed safety plan training.

**Recent Suicides**:  CHCF experienced one inmate suicide during the review period.  In that case (CHCF 6), the inmate was found exsanguinated in his cell in a CTC medical bed during the late morning of November 7, 2018.  He had entered the CDCR system for a seventh term on March 4, 2010 to serve a life sentence with eligibility for parole for second-degree murder.  The inmate was transferred to CHCF on February 15, 2018.  He incurred seven RVRs during his current term, the most recent of which occurred on July 21, 2018 for fighting.  The inmate self-reported being gang-affiliated in the community, but reportedly dropped-out.  It was unknown how long he was associated with his gang and under what circumstance he dropped-out.  He was, however, provided SNY status shortly after re-entering CDCR in March 2010.  The inmate had limited family support through letter correspondence with an aunt, as well as one visit with his sister in October 2017.

Although there were limited records available, it appeared that the inmate and two siblings were raised by their maternal grandmother and, although there was no information available as to why his biological parents were not raising him, there was clinical documentation theorizing that substance abuse caused them to be unfit parents.  Although the inmate had previously reported being married and having a daughter, records were inconsistent regarding his marital status and being a parent.  He had a long history of substance abuse beginning in childhood, as well as an extensive history within both the juvenile and adult criminal justice systems.

Information regarding the inmate's prior mental health history was said to be unreliable based upon his cognitive and memory deficits.  However, there was documentation stating that he received mental health services as a child after it was discovered he was both sexually and physically abused.  During his previous CDCR terms, the inmate was treated in both the 3CMS and EOP levels of care, as well as placed in the DSH.  Prior records indicated that the inmate suffered from delusions of persecution, paranoia, auditory hallucinations, and disorganized thought process.  Much of his paranoia was focused on an obsession of being sexually assaulted by other inmates.  During his current CDCR term, he was placed in the intermediate care programs in both August 2012 and March 2014.  The inmate fluctuated between 3CMS and EOP throughout his confinement and was being treated at 3CMS since July 2017.  His current diagnoses were "Schizophrenia Paranoid Type and Antisocial Personality Disorder."

160

The inmate reported approximately three to six suicide attempts in both the community and correctional settings, although these incidents were never verified. These alleged suicide attempts occurred between 1997 and 2011. He also claimed that a cousin previously committed suicide within CDCR, although the cousin's name and date of death were never provided for verification. The inmate had one prior MHCB placement in August 2011. His most recent SRE was completed in July 2017 and found a "moderate" chronic risk and "low" acute risk for suicide. He consistently denied any current SI during the last few years of his CDCR term.

The inmate had several serious medical issues that resulted in his placement at a CTC medical level of care. The most significant of these issues was "glaucoma, cataracts, and keratopathy (bilateral blindness)" that resulted from an altercation with another inmate in which a "caustic substance" was thrown in his face on May 19, 2016. In addition, the inmate suffered from cognitive and memory impairments during his CDCR confinement that were thought to be symptoms of dementia. However, his psychiatrist noted that the inmate's dementia diagnosis more likely resembled "pseudo-dementia" where cognitive deficits can appear as result of an acute psychosis or substance use.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and the inmate did not leave a suicide note. However, the CDCR reviewer theorized that the inmate's chronic mental health symptoms and recent stressors, including being denied medical parole in September 2018 and receiving a disparaging letter from his aunt (also in September) which threatened to stop providing further financial support, were contributory to his suicide. According to the CDCR reviewer, "he experienced significant paranoia, which led to isolation from others. His visual impairment during incarceration likely exacerbated his paranoia and isolation….The inmate expressed feeling hopeless about surviving in the community without his aunt's support. The increased isolation, paranoia, and recent bad news likely contributed to increase his depressive symptoms."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) <u>SATF</u> and <u>CHCF</u>: When the inmate received a diagnosis of dementia in late January 2018, he was not referred for a DDP evaluation, despite the documentation of his cognitive and memory deficits;

> 2) <u>SATF</u> and <u>CHCF</u>: Despite of clinical challenges posed by the inmate being occasionally uncooperative with psychiatry appointments, during the previous year (which encompassed time at both SATF and CHCF), the frequency of completed psychiatry appointments was insufficient given the clinical situation and given CCCMS appointment timelines.

### 11)    <u>California Medical Facility (CMF)</u>

**Inspection**: February 19-20, 2019 (previous suicide prevention audit was on January 4-5, 2018). CMF housed approximately 2,483 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on February 19, 2019.  Although the door to the nurse's office was closed during the process, thus ensuring privacy and confidentiality, the nurse was observed to be conflating most of the questions regarding mental health and suicide risk, e.g., asking "do you have a current or prior history of mental illness, do you have any current or prior suicidal ideation," etc.  The lack of distinction between "current" and "prior" mental health and/or suicide risk during questioning prevented the nurse from properly identifying potentially suicidal inmates.

In addition, this reviewer had the opportunity to observe required daily rounds by PTs assigned to two (Willis Unit for GP and M-3 for 3CMS and EOP inmates) of the three administrative segregation units on February 20.  The third administrative segregation unit (I-3) was closed due to a low census.  The rounds were unremarkable and the PTs were observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  CMF had 50 MHCBs located on two wings of the CTC that were previously found to be suicide resistant.  Of note, there were only 34 of 50 (or 68 percent) rooms in the MHCB unit occupied during the on-site assessment.  This reviewer inspected both the M-3 and Willis administrative segregation units and found that the two new intake cells in M-3 and the three new intake cells in Willis were retrofitted to be suicide-resistant.  However, although there were not any new intake inmates in non-intake cells within the Willis unit, this reviewer observed that there were two new intake inmates in non-intake cells within the M-3 unit  According to correctional supervisors in both units, new intake inmates exceed the capacity for the five new intake cells on at least a weekly basis.  Although this reviewer has consistently found a problem with new intake inmates housed in unsafe, non-intake cells on a regular basis since 2014, there continued to be no indication that a work order had been requested for any additional new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in MHCB observation cells.  Alternative housing was utilized a few times a week, and inmates were required to be furnished with beds and observed on a 1:1 basis.  From November 15, 2018 through February 4, 2019, there were 45 inmates placed in alternative housing, and all were discharged in approximately 24 hours.  Of note, for a comparable time period during the previous assessment in 2018, approximately 90 inmates were placed in alternative housing.  The vast majority (88 percent) of those inmates were subsequently transferred to a MHCB.  However, during this assessment, approximately 33 percent (14 cases) of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the EHRS files for all these 14 rescinded cases and found that required SRASHEs were completed in each case.  However, as confirmed by a SMHP clinician on-site during this reviewer's assessment, at least one inmate was inappropriately returned to his housing unit.

In that case (CMF 1), the inmate attempted suicide by hanging during the evening of December 21, 2018.  His injury was not serious; he sustained red marks on his neck and brief shortness of breath.  The responding clinician assessed the inmate, noted that was currently suicidal and had intermittent SI several times during the last week, and had a documented suicide attempt by

hanging in CDCR in January 2017. A SRASHE was completed and both the inmate's acute and chronic risk for suicide were rated as "high." The inmate was placed in alternative housing and a MHCB referral was initiated. The following morning (December 22), the inmate was assessed again by another clinician. According to the second SRASHE, the inmate "reported no emergent needs at this time. He was able to contract for safety. Patient is not suicidal, avoiding adseg and transfer, asked to go back now. Said he has a visit today or tomorrow and does not want to miss it." This clinician assessed his chronic risk for suicide as "moderate" and his acute risk as low," with the justification of risk level as follows: "Patient has a life sentence and now possible 2 SAs, is male with high statistical risk factors. Although he reports no current SI, these factors will likely lead to future SA. In the short-term, he has contracted for safety, and appears to be manipulating his housing and adseg placement. He is forward-looking."

The following safety plan was contained within the SRASHE: "At this time, the pt. is being elevated to EOP LOC. He is being Pl. on the adseg. unit due to custody factors. He will be checked on every 30 min. as part of the unit programming, and will be placed on a 5-day follow-up. EOP tx. plan will be developed by the receiving team."

A MH Master Treatment Plan was completed for the patient a few weeks later on January 3, 2019. Although noting the recent suicide attempt on December 21 and intermittent SI, the plan did not include any an IPOC for self-harm and/or safety plan strategies for reducing the ideation. Two months later in March 2019, the inmate was placed in a MHCB unit on two separate occasions and then referred to an intermediate care program at a PIP.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the CTC during the nine-hour period from 12:00 a.m. through 8:59 p.m. on February 12, 2019 (for CMF 2), February 13, 2019 (for CMF 3), February 14, 2019 (for CMF 4), and February 16, 2019 (for CMF 5). The chart review found numerous observation checks (i.e., between 11 and 15 per patient) that were in excess of required 15-minute intervals in all four cases, with the longest gaps between checks being 64 minutes in two cases (CMF 2 and CMF 3), and 67 minutes in another case (CMF 5). The following case (CMF 3), exemplified the significance of the problem: There were 15 violations of 21-, 27-, 27-, 28-, 31-, 16-, 26-, 64-, 18-, 18-, 16-, 22-, 26-, 26-, and 18-minute gaps between the required 15-minute intervals. Violations in these four cases were committed by multiple nursing staff. This reviewer determined that one of reasons for this problem was that nursing staff were almost always documenting checks four times (rather than five times) an hour. A similar problem with inadequate nursing rounds for MHCB patients was found during this reviewer's previous assessment in 2018. Of note, review of recent SPRFIT minutes found that, although "review suicide watch and precaution procedures" was a regular agenda topic during the monthly meetings, it was marked as being of "no concerns."

During the IDTT meetings in the MHCB unit on February 19-20, 2019, this reviewer observed that all patients were assigned clothing consistent with their level of observation. In addition, a review of 114-A forms for several MHCB patients found that they were consistently offered yard, shower, and telephone privileges as required.

Finally, a review of Guard One data for a recent 24-hour period in the two administrative segregation units found a combined 98-percent compliance rate with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the two-month period of December 2018 through January 2019.  A sample EHRS review of 45 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in only 78 percent (35 of 45) of the cases.  A similar low compliance rate for SRASHE completion was found during the 2018 assessment.  One case (CMF 6) was particularly problematic.  The inmate informed a PT during administrative segregation rounds on December 26, 2018 that he was feeling suicidal, stating "I've been feeling this way a couple of days, but did not tell anybody.  I want to choke myself. I've been feeling anxious and been crying for the past few nights."  The inmate was referred to a CIT clinician who subsequently saw the inmate and completed a MHPC Consult Emergent Progress Note, but not the required SRASHE.  The clinician noted in the progress note that "Pt is low functioning DD2 who has been seen every day for the past three days on spurious claims of SI for secondary gain issues.  It appears he understands no way to get what he needs other than say he is suicidal and waiting for a team response.  This call, in person, he was able to contract for safety, and stated he would be okay with a Vistaril PRN, that he does not like ad seg." Review of the EHRS found that the inmate had voiced SI two days earlier on December 24, 2018, and the required SRASHE was also not completed.  Rather, a different clinician completed a MHPC Inpatient Progress Note.

Finally, this reviewer followed a CIT emergency mental health response to an inmate who had expressed SI (as well as threatened to cut his neck) secondary to severe abdominal pain and vomiting blood resulting from end-stage liver disease.  The inmate (CMF 7) was seen in semi-private area of the B-1 clinic by a clinician and nurse.  The assigned CIT lieutenant did not respond to the emergency referral.  The inmate appeared very agitated and complained that the medical care he was receiving was not commensurate with the seriousness of his symptoms.  He denied SI to the clinician, stating "why would I kill myself when they (medical staff) are killing me."  Rather than complete the required SRASHE, the clinician completed a MHPC Consult Emergent Progress Note which stated "CIT call was received from RN staff in B-1 clinic stating that Pt. made conditional threats of self-harm if his pain issues were not resolved.  Recent case notes indicated he had made threats of self-harm over medical issues and can be paranoid.  In clinic, Pt. stated he was never suicidal and made no such statements, that he is expressing distress over medical issues.  RN was contacted and further elaborated that the Pt. statements were not of intentional self-harm, but more like 'this pain is killing me'…..He was able to contract for safety."  Review of the EHRS found that there were no nursing notes suggesting that the inmate stated anything similar to "this pain is killing me," rather the inmate expressed SI with a threat to cut his neck that could be interpreted as frustration secondary to his serious medical issues.

In conclusion, *the review of emergency mental health referrals for SI/behavior, many of which were responded to by the CIT (which was formally launched on December 3, 2018), found that it appeared several clinicians incorrectly assumed that if an inmate expressed SI for a perceived*

*secondary gain and/or later recanted such ideation, a SRASHE was <u>not</u> required to be
completed*. A few clinicians also utilized "contracting for safety" in their progress notes, a
practice that was not endorsed within the MHSDS *Program Guide*. Finally, it was noteworthy
that the continued problem of CMF clinicians not consistently completing required SRASHEs
was a deficiency found in a recent inmate suicide in January 2019, see below.

Six IDTT meetings in the MHCB unit were observed on February 19-20, 2019, including five
patients being discharged. Overall, although there was good treatment team representation and
case presentations during the meetings, there was inadequate discussion regarding both suicide
risk and safety planning to reduce recurrence of SI. In one case (<u>CMF 2</u>), the patient had
been admitted into the MHCB unit ten days earlier on February 9, 2019, for danger to self,
danger to others, and bizarre behavior. The first discussion of safety planning was initiated on
the day of discharge from the MHCB on February 19. Immediately prior to the meeting's
conclusion, the PC asked the patient a series of questions that appeared to be written on a piece
of paper, including "Let's talk about a safety plan, what are your warning signs based upon the
past four admissions? What do you use for coping skills? Who would you contact on the
outside to assist you with a safety plan? Who would you contact inside prison to assist you with
a safety plan?" The patient's responses to these awkwardly presented questions was limited. He
was subsequently discharged back to EOP. Subsequent review of the patient's discharging
SRASHE found the following safety plan:

> 1) Learn to manage anxiety/irritability (Learn how generalized anxiety involves
> excessive worry about unrealistic threats, various bodily expressions of tension,
> over-arousal, hypervigilance, and avoidance of what is threatening that interact to
> maintain the problem; Identify, challenge, and replace biased, fearful self-talk
> with positive, realistic and empowering self-talk. Learn problem-solving
> strategies involving specifically defining a problem, generating options for
> addressing it, evaluating options, implementing a plan and reevaluating and
> refining the plan. Learn relaxation skills (progressive muscle relaxation, guided
> imagery, deep breathing).

> 2) Learn to manage anger (identify triggers that lead to anger); List ways anger
> has negatively impacted daily life. Identify possible consequences of managing
> anger; Become aware of negative self-talk/process; Learn thought-stopping; Learn
> conflict resolutions skills (active listening, empathy, "I messages," assertiveness
> w/o aggression, compromise).

> 3) Increase impulse control (identify the triggers for impulsive behavior-
> cognitive, emotional, and situational. Identify the reasons or rewards that lead to
> the continuation of an impulsive behavior. Make connections between
> impulsivity and the negative consequences for self and others. Identify the
> impulsive behaviors, antecedents, mediators and consequences. Learn cognitive
> methods (thought stopping, thought substitution, reframing) etc. for gaining and
> improving control over impulse episodes.

4) Motivational interviewing (eliciting/evoking change talk) for substance abuse support.

The above overly verbose safety plan was not only not discussed during the IDTT meeting on February 19, but not found in any of the daily progress notes by clinicians during the patient's ten-day MHCB stay. It also did not address specific strategies to decrease the recurrence of SI. The review of seven other discharge SRASHEs found similar problems in safety plan formulation.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 91 cases of patients discharged from a MHCB or alternative housing placement who remained at CMF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from August 2018 through January 2019. The review found that only 65 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with low compliance percentage mostly related to clinicians discontinuing the checks prior to the minimum 24-hour requirement and/or the forms not being completed. Approximately 60 percent of the custody checks recommended for only 24 hours. In addition, only 88 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation and/or checks completed at 60-minute intervals. Similar low compliance rates were found during the previous assessment.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months (October through December 2018) of SPRFIT meeting minutes found that a quorum was achieved for all of the meetings. As indicated above, despite problems found by this reviewer regarding observation of MHCB patients by nursing personnel that SPRFIT minutes had termed to be "no issues," the meeting minutes were otherwise unremarkable. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was issued on July 10, 2018 and contained within the facility's LOP for "Suicide Prevention Program Procedures" (Chapter 4: Suicide Prevention, Section 3: Suicide Prevention Program Procedures, California Medical Facility Health Care Services Policy and Procedure Manual, Volume XVI Mental Health Treatment Program). In addition, the facility had a "High Risk Tracking Procedure" that was required by the SPRFIT memorandum, and also effective on July 10, 2018. However, the facility did not have any policies and procedures for intake nursing staff regarding "Bad News

166

Notification" following the inmate's return from court or BPH as required by the SPRFIT memorandum.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff, only 86 percent of medical staff, and 95 percent of mental health staff received annual suicide prevention block training during 2018.  Finally, as of February 2019, approximately 98 percent of mental health clinicians had completed the SRE mentoring program, only 88 percent had received the seven-hour SRE training, and only 85 percent had completed safety plan training.

**Recent Suicides**:  CMF experienced three suicides during the review period.  In the ***first*** case (CMF 8), the inmate was found to have exsanguinated himself during the early morning of January 6, 2019 in his administrative segregation cell.  The inmate entered the CDCR system on April 28, 1994 to serve an 18-year-to-life sentence for second-degree murder with a firearm.  He was transferred to CMF on August 28, 2018.  The inmate incurred 28 RVRs during his approximate 24-year confinement, the most recent of which occurred on February 17, 2017 for attempted murder of another inmate.  The incident occurred at CSP/Sac and was thought to be gang related.  The inmate was found guilty of this charge on October 17, 2018 and received an additional 12-year prison term.  Until her death in May 2018, the inmate had regular family support through letter correspondence with his mother, as well as occasional visits from his brother.  Following his mother's death, the inmate told his brother that "I am not sure how much longer I am going to last."  Of note, the inmate's brother allegedly contacted CMF in July 2018 out of concern after the inmate had mailed a box of photographs to him.  According to the CDCR reviewer in this case, there was no documentation of such a telephone call.

According to available records, the inmate and three half siblings were raised by his biological parents until the family immigrated to the United States at age 5.  At that point, he had little contact with his father.  The inmate had an unremarkable childhood but began a substance abuse history in high school that became a significant contributing factor to his commitment offense in 1993.  According to law enforcement records, it was believed that the inmate and victim were involved in a "conspiracy to cultivate marijuana" and a disagreement between the two was a motive for the murder.  The inmate had a limited employment history, was never married, and did not have any children.  He did not have a history of either mental illness or suicidal behavior in the community.

Upon entry into CDCR, the inmate screened negative for mental health issues and never reported any SI.  He was seen only once (in December 2016) by a mental health clinician after voicing frustrations regarding his medical care.  He was never enrolled in the MHSDS.

The inmate experienced several medical problems during his approximate 24-year CDCR confinement, including liver cirrhosis, hyperthyroidism, and chronic pain associated with a herniated cervical disc and shoulder pain.  Despite these issues, the CDCR reviewer did not feel that any were precipitants to his suicide.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  However, the review found several factors

that were thought to have been contributory to his death, including the death of his mother in May 2018 and the additional 12-year sentence in October 2018 which further delayed his possibility for parole. According to his brother, the inmate "just thought he was never going to leave prison." In addition, the inmate committed suicide the day before he was scheduled to be transferred back to CSP/Sac, the location of the February 2017 incident in which he subsequently received the additional prison sentence.

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

> 1) There was no mental health contact following the inmate's significant parole denial in May 2018 nor after he received an additional 12-year sentence for assault with a deadly weapon.

> 2) Based on reports submitted by responding staff, it appears there was a nine-minute time lapse between the initial time staff requested a Code 3 Ambulance to be called at 0245 hours and the time the actual call was made to request EMS which was documented at 0254 hours.

> 3) The CDCR 837s submitted by responding staff lacked an adequate timeline documenting the significant events as they occurred. Additionally, there are several discrepancies regarding timeline entries between reports submitted by responding staff.

> 4) Based on the Institution Classification Committee action that was finalized on 12/9/18, there was an approximate three-week lapse in time that the Statewide Scheduling Transportation Unit consolidated worksheet reflected a requested bus seat transfer.

In the **_second_** case (CMF 9), the inmate was found hanging from the wall ventilation grate by a sheet in his GP cell during the early evening of January 8, 2019. The inmate entered the CDCR system on August 30, 2017 to serve a five-year sentence for assault with a deadly weapon. He was transferred to CMF on November 13, 2018. The inmate incurred two RVRs during his confinement, the most recent of which occurred on December 27, 2017 for fighting. He was not known to be gang-affiliated. The inmate had limited family support and had not received any visits or telephone calls during his prison term. He was single and did not have any children.

According to available records, the inmate and three sisters were raised by their mother after the divorce of their parents when he was approximately four years old. There was a family history of both mental illness and substance abuse, with the mother reportedly experiencing Bipolar Disorder. Records also indicated that both his grandmother and uncle had committed suicide. Although the inmate did not report a history of childhood trauma or abuse, he began abusing drugs at an early age, and methamphetamine consistently after age 5. He was also sporadically homeless. Although the inmate did not have an extensive history of mental health treatment in the community, he did see a clinician several times in 2013 for anxiety that was reported to be secondary to methamphetamine use. In June 2017, he was briefly treated in a local emergency room for suicidality, chronic psychosis with hallucinations, and addiction. This treatment

occurred shortly after an unprovoked attack on a close friend that resulted in his arrest for the instant offense.

Upon entry into CDCR in August 2017, the inmate screened positive for several mental health issues and was subsequently placed at the 3CMS level of care in September 2017. His initial diagnoses were "Mood Disorder and History of Traumatic Brain Injury." The traumatic brain injury was thought to be related to a motor vehicle accident that occurred in 2002. Shortly thereafter, the inmate was placed in administrative segregation for an unprovoked attack on a porter. He later told a psychiatrist that "I hear voices in my head…. they told me to punch someone." The inmate subsequently received a diagnosis of "Adjustment Disorder with Depressed Mood." However, his mental health symptoms deteriorated, and he was observed to be agitated, depressed, pacing rapidly, flooding his cell, and was disheveled during an IDTT meeting in November 2017. His level of care was elevated to EOP. The inmate's diagnoses were changed to "Bipolar Disorder, Cluster B Personality Disorder, Mood Disorder Secondary to Substance Abuse, History of Traumatic Brain Injury, Polysubstance Dependence, Potential for Lack of Continuity of Care, and Psychosis Due to Substance Abuse."

Beginning on February 1, 2018 and continuing for several days thereafter, the inmate informed his clinician that he was no longer taking his psychotropic medication, that he expected "a lot of suffering," and began to voice SI. On February 8, he told his clinician that he had a plan to hang himself, as well as "voiced command hallucinations to harm himself." He was placed in an MHCB unit and remained there until February 14, 2018. The inmate was again placed in a MHCB a few weeks later on February 22, 2018 for grave disability and increased psychosis after refusing meals and his psychotropic medication, claiming that the "voices told me to stop." He was discharged back to EOP several days later on February 28, 2018. Both his chronic and acute risk for suicide were rated as "moderate." Two months later on April 1, 2018 the inmate was sent to the TTA after reporting SI with a plan to hang himself. He also stated that he was no longer eating. Records indicated that the inmate lost 30 pounds from October 2017 to April 2018. He was transferred to an MHCB unit the same day and remained there for 12 days. The inmate was readmitted into the MHCB unit for SI with a plan on June 12, 2018 and discharged on June 21. He continued to refuse both psychotropic medication and participation in most EOP treatment during the next several months.

The inmate was transferred to CMF on November 13, 2018 and refused to meet with his PC for a confidential session on November 19, telling the clinician at cell front that "We can talk here. I don't need to come out. I'm fine here. He briefly answered all of the clinician's questions, but maintained that he had no mental health concerns and did not need any treatment, including groups or psychotropic medication."

The following day (November 20), the inmate was observed by his psychiatrist to be "incessantly pacing in his cell wearing only boxer shorts." He appeared internally preoccupied. The psychiatrist observed "a triangulated string and piece of cloth between two points on his bed and cabinet in the cell that divided the cell roughly in half. The inmate continually paced as he traversed half of the cell outside the limit of the string." The psychiatrist's progress note suggested further observation to determine if involuntary medication criteria was met and to "strongly consider for higher level of care, as four MHCB admissions within a short time meet

criteria for such a referral." Several hours later, the inmate was observed by a correctional officer to be jogging in a stationary position and gesturing while naked in his cell. A PT was called for further observation and an emergency referral was initiated. A CIT clinician arrived approximately one hour later and the inmate was observed to be still running in place and naked. He did not respond to the clinician's questions. The clinician consulted with the on-call psychiatrist and both agreed the inmate should be brought to alternative housing for overnight observation.

However, the inmate's transfer to alternative housing was delayed by both a shift change and the inability of officers to convince the inmate to exit the cell without force. The inmate continued to run in place and refused to respond to the officers for almost three hours. Upon the clinician's return to the cell, the inmate still remained unresponsive but, according to the clinician's progress note, "finally sat down on the edge of his bed. He never looked at the door as the three officers and myself spoke to him on the other side of the door. He continued to look straight ahead toward the wall. Needless to say, he posed no threat to myself or others, he was not gravely disabled, and if anything….He was probably tired for running for nearly 3 hours." The clinician decided to rescind the alternative housing order and an officer agreed to watch the inmate "periodically throughout her post." A SRASHE was not completed.

Three days later on November 23, 2018, another CIT clinician responded to an officer's referral that the inmate was again acting bizarrely in his cell, observed to be naked, was making clotheslines from bedsheets and, although uninjured, had a string around his neck. Upon the clinician's arrival, the inmate was observed in his bed covered with a blanket. He minimally responded to questions and reported that he was "fine." A SRASHE was not completed, and the clinician's progress note stated that the "patient was marginally cooperative and appeared generally oriented to time, place, person and situation, thoughts were linear and not tangential and he had no problems focusing…At this time the patient is reporting no SI or HI." The note indicated that the CIT "will check in on the patient tomorrow as a precaution." The inmate was seen again the next day and appeared stable.

However, on November 28, 2018, an officer reported that the inmate was observed with two pieces of torn sheet tied together in his cell. In addition, an officer noted in the unit log book that the inmate had given his canteen away the previous day and told staff "sometimes there is no other option but to kill yourself." A CIT clinician responded and subsequently completed a SRASHE. The clinician assessed the inmate to be at "moderate" chronic and "low" acute risk for suicide, noting that "acute risk remains low at this time, I/P was seen by CIT this past week, due to I/P 'acting strange,' in room running, pacing naked, two pieces of torn sheet tied together found in room, I/P denied with making noose, 'it was for hanging up my clothes.' I/P was not deemed suicidal." The SRASHE also noted that the clinician had been advised by another clinician that the inmate's mother had recently called the facility and was concerned about her son's mental health status. She was advised that ROI form needed to be signed by the inmate prior to the release of any information regarding his status. The clinician subsequently asked the inmate if he would sign a ROI form, and he was non-responsive to the request. Therefore, there was no further contact between the clinician and the inmate's mother. Of note, the SRASHE dated November 28, 2018 referenced a telephone call between the inmate's mother and another CDCR clinician in April 2018 after another ROI form had been signed. During that telephone

conversation, the inmate's mother stated that "she had been afraid that this patient would be struggling with SI," and that he had previously attempted suicide in June 2017 and had been involved in a previous automobile accident in 2002 in which he suffered a traumatic brain injury and has "never been the same."

The CDCR reviewer in this case noted that it was unclear why the clinician who completed the SRASHE on November 28, 2018 "did not utilize the April referenced ROI or receive information from the mother's attempts to reach out to the clinician." In any event, the inmate subsequently declined to attend his IDTT meeting on November 28, and was retained at EOP. During the month of December 2018, he was seen on a weekly basis by his PC and once by his psychiatrist. Progress notes indicated that he was not in any acute mental health distress but appeared minimally responsive during contacts. The inmate was last seen by his PC on January 2, 2019. He denied any thoughts of self-harm and, according to the progress note, was "a little bit more verbal this time, smiling at times, and answering questions appropriately related to his mental status."

The inmate did not have any acute or chronic medical problems that were thought to be precipitants to his suicide, and he did not leave a suicide note. The CDCR reviewer noted that "information gathered during the course of this review suggests the inmate's long-term amphetamine use, complicated by the traumatic brain injury he sustained at age 17, may have contributed to the psychotic and depressive symptoms which persisted after his coming to prison."

The Suicide Report contained nine (9) recommendations for corrective action through a QIP:

> 1) On the date prior to his arrival to the CDCR, the California Forensic Medical Group (CFMG), who had evaluated the inmate while he was in the El Dorado County Jail, provided information to the Deuel Vocational Institution (DVI) that was scanned into the medical record. However, the nurse who screened the inmate upon arrival noted some parts of the information received, but did not note the history of suicidal ideation, the need for psychiatric consultation, or the mention of 'does not like medication.' Mental health clinicians in the reception center did not refer to the jail document in subsequent notes. Full jail health and mental health records were not requested despite the concerns noted in CFMG's fax information.

> 2) A SRASHE completed at COR on February 17, 2018 within days of release from the MHCB for suicidal ideation with a plan to hang himself, is incomplete (imminent warning signs and C-SSRS sections of the SRASHE were not completed). The author did not justify risk levels adequately and incorrectly ruled out an inpatient referral as 'a higher level of care is precluded by (his) non-med compliance.' A report of the patient refusing a $300 package from his sister (noted in a 5-day follow-up two days earlier) was not mentioned in the assessment.

3) On April 6, 2018, and while in the CHCF MHCB, the inmate signed a ROI for a clinician to speak with his mother. The conversation occurred and was documented in the health record. However, subsequent documentation did not note or integrate the information received, which revealed that the inmate has struggled with suicidal ideation prior to incarceration. The ROI was also not located in the health record.

4) On November 20, 2018, a week after his arrival at CMF, the inmate engaged in bizarre behavior. An on-call clinician and an on-call psychiatrist were consulted and agreed that the patient should be moved to Alternative Housing (considered a move to crisis bed level of care). However, the inmate resisted leaving his cell and the transfer ultimately did not occur. Of concern, no clinical evaluation or SRASHE was completed.

5) On November 23, 2018, a porter told custody officers that he saw the inmate with a rope around his neck. Custody entered the cell, noted a string around the patient's neck, and removed all 'lines and torn sheets' from the cell. Mental health was called and the Crisis Intervention Team (CIT) came to see the patient. However, no SRASHE was completed.

6) The SRASHE completed on November 28, 2018 at CMF does not adequately formulate risk of suicide. The author of the evaluation had been called by unit officers earlier in the day and told of a suicidal statement he made to them, yet the SRASHE does not reference the statement. The risk justification in this SRASHE is concerning, as imminent risk factors are not assessed and the acute risk is marked as low despite multiple concerning behaviors in the past five days (acting bizarrely, being found with torn sheets, being found with string around his neck, making suicidal statements to custody, and giving away items).

7) Within the November 28, 2018 SRASHE, the clinician noted '….I/P's mother did call into facility, advised that I/P would have to sign release of information for this writer to advise of status. I/P was advised mother called as to status, I/P did not respond. Will continue to engage.' Further within the same SRASHE the clinician noted, 'there is a free text note from (clinician's name) on 4/6/18 with I/P having signed an ROI to speak with I/P's mother who (sic) participate in his treatment.' It is unclear why this clinician did not utilize the April referenced ROI or receive information from the mother's attempts to reach out to the clinician, per the 'Release of Health Information: Family or Friend Access Policy and Procedure' and accompanying local operating procedures. The missed opportunity to speak to the inmate's mother may have provided valuable information during an unstable period for the inmate.

8) The MH Master Treatment Plan conducted on November 28, 2018 occurred in absentia. One of the (several) events of the preceding days is mentioned (being found with torn sheets), but the IDTT appears to accept the patient's report to custody of making a '16-24-inch clothesline.' Other recent events related to

suicidality or bizarre behavior are not documented in the treatment plan. Higher level of care concerns were marked 'no' despite these recent events. The interventions offered are inadequate in the face of recent preparatory suicidal behaviors and concerns of psychotic or psychotic-like behavior.

9) During the review of the Housing Unit Logbooks, it was noted custody staff documented bizarre and unusual behavior exhibited by the inmate during the months leading up to his death, including behaviors such as tying strings around his neck and leaving his canteen items on the tier to be taken by other inmates. Custody staff also documented reporting these occurrences to clinical staff. The on-site reviewers were unable to locate MH-5 referrals documenting these occurrences.

In the *third* case (CMF 10), the inmate was found hanging from the ventilation grate by a sheet in his GP cell during the early morning of August 25, 2019. The inmate entered the CDCR system on October 19, 2011, to serve a life-sentence with parole eligibility for second-degree murder with an enhancement for use of a deadly weapon. He was transferred to CMF on December 21, 2015. The inmate incurred four RVRs during his confinement, the most recent of which occurred in May 2013 for fighting. He was not known to be gang-affiliated. The inmate had family support through twice monthly telephone calls with his mother. He was single and did not have any children.

According to available records, the inmate and his sister were raised in an intact family with no significant problems identified during childhood. He denied any individual and/or family histories of mental illness or substance abuse. However, beginning at age 14, he reported daily use of methamphetamine and alcohol. The inmate graduated from high school and completed two years of college. He had sporadic employment. In addition to receiving substance abuse treatment in the community, the inmate also received psychiatric treatment for "social phobia" and prescribed psychotropic medication. He had at least five admissions to county inpatient psychiatric programs for drug induced psychosis, major depression, and methamphetamine abuse. The inmate was never arrested as a juvenile and had multiple minor convictions as an adult. His commitment offense involved stabbing the victim (his landlord) and purposely attempting to conceal the evidence by setting fire to the apartment. The inmate was allegedly under the influence of methamphetamine at the time of the offense, twice found incompetent to stand trial and transferred to Atascadero State Hospital, and eventually restored to competency. While confined in the county jail, he threatened to commit suicide by jumping off the second tier of a housing unit.

Upon entry into CDCR in November 2011, the inmate was initially placed in the 3CMS level of care but elevated to EOP two weeks later. His initial diagnoses were, "Schizophrenia, Cannabis Dependence." He was admitted to MHCB units twice in 2013 and once to a DSH intermediate care program placement from 2013 to 2014. His symptoms included SI and disorganized thinking. In August 2013, his diagnoses were changed to "Schizophrenia, Undifferentiated, Depressive Disorder NOS, and Polysubstance Disorder. With the exception of MHCB admissions, the inmate's SRASHEs consistently assessed "moderate" chronic risk and "low"

acute risk for suicide. He was under involuntary medication orders from July 2013 to June 2016, and compliant with his medication thereafter.

From August 2, 2018 to through September 27, 2018, the inmate was found to be participating in less than the minimum number of structured treatment hours per week caused by social anxiety and paranoia. He was placed on an EOP modified program and his level of participation subsequently improved. By March 2019, he was described by his PC in progress notes as "being more social on the unit, going to the library, and exercising in the yard. He denied suicidal ideation, homicidal ideation, distress and did not appear to be responding to internal stimuli." However, during the next few months, his social anxiety returned and non-participation in group treatment increased. According to the CDCR reviewer in this case, records indicated that "the treatment team did not refer the inmate to a higher level of care as he did not appear to be functionally impaired or in clinical distress to require in-patient psychiatric hospitalization." His last clinical contact with his PC occurred on August 23, 2019. The inmate was seen cell-front where he denied any SI and discussed "working on a self-discovery worksheet" that he planned on sharing with his clinician during the next session.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not have a significant history of medical problems and a suicide note was not found in this property. In addition to the fact that the inmate's cellmate was transferred to an MHCB a few days earlier, which might have increased his anxiety regarding the possibility of a new cellmate, the CDCR reviewer opined that "he may have felt too much guilt to talk about his commitment offense and/or he did not want to come to terms with the reality of what he did. If he was starting to process these thoughts and feelings, it may have overwhelmed him or caused him too much shame to where he did not want to live anymore or felt he did not deserve to live anymore. While the inmate never told his treatment team these feelings, he may have thought he would disappoint his treatment team if he told them how he was truly feeling or thinking."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) From August 2, 2018 to December 27, 2018, the inmate was seen at IDTTs where there were no updates made in the clinical summary concerning current symptoms, functional impairments and recent/relevant treatment history. Not providing information regarding the inmate's presentation or treatment team discussions make it difficult, if not impossible, to gauge the direction and progress of his current treatment.

> 2) From August 2, 2018 to December 27, 2018, the treatment modifications on the treatment plans stated his individual sessions will increase his 'amount of exposure to anxiety producing images, thoughts, or interpersonal interactions' and to 'target his symptoms in their arousal.' A review of the primary clinician notes during this time period did not specifically mention any modifications to his treatment in the treatment plans. Treatment modifications described in the master treatment plan should be followed through to ensure patients are receiving

appropriate treatment for their specific mental health issues. This was not done adequately and may have led to gaps in the inmate's treatment.

3) From August 2, 2018 to August 1, 2019, the inmate's treatment plan consistently discussed social anxiety as an issue the treatment team continues to work on. This is also well documented in progress notes during this time at N-1, but unfortunately no Anxiety IPOC was initiated by the treatment team. This IPOC would have helped to track the inmate's progress with his self-reported anxiety to determine if his current treatment was helpful or if it needed to be modified.

4) The first area of concern is in reference to the approximate four to five-minute delay for a Code 3 Ambulance to be called.

5) During the review of the incident reports authored by staff it was noted there were window coverings identified on the inmate's cell window during the initial response.

### 12)    California State Prison-Solano (CSP/Solano)

**Inspection**: February 21-22, 2019 (previous suicide prevention audit was on August 23-24, 2017). CSP/Solano housed approximately 4,235 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on February 21, 2019. The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS. The nurse's office door was closed during the process, thus ensuring both privacy and confidentiality.

In addition, this reviewer observed daily PT rounds in administrative segregation (Building 10) on February 21. The rounds were unremarkable and the PT was observed to be correctly entering Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**: CSP/Solano had nine MHCBs that had previously been found to be suicide-resistant. Of note, the MHCB unit did not have any patients during both days of the on-site assessment. In fact, during the six-month period from August 1, 2018 through January 31, 2019, only 37 patients had been admitted into the MHCB unit at CSP/Solano.

The administrative segregation unit (Building 10) contained a total of ten retrofitted new intake cells, including an additional cell renovated since the previous assessment. This reviewer observed that all new intake inmates were housed in new intake cells as required. A previous deficiency of exterior cell windows containing frosted screening that obscured natural light into the cells had been corrected.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was primarily found in Building 10 and continued to be used infrequently at the facility. In fact, from January 1, 2018 through January 31, 2019, only 24

inmates were placed in alternative housing and all were released within 24 hours.  Because alternative housing was located in the administrative segregation unit, all inmates were furnished bunks and required to be observed on a 1:1 basis.  Only one (four percent) of the MHCB referrals was rescinded and the inmate returned to his housing unit.  The completed SRASHE contained appropriate justification for the rescission.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on a suicide observation status were observed at 30-minute intervals by nursing staff under the term "Mental Health Observation."  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on October 16, 2018 for SOL 1, on November 17, 2018 for SOL 2, on January 30, 2019 for SOL 3, and February 14, 2019 for SOL 4.  The chart review found numerous observation checks (between five and 13 per patient) that were in excess of required 15-minute intervals in all but one case, with the longest gap between checks being 30 minutes in one case (SOL 1).  Violations in the three cases were by multiple nursing staff during multiple days.  Of note, in January 2019, the chief executive officer authorized the use of "rounding staff" to be specifically responsible for the observation of MHCB patients on Suicide Precaution status.  As a result, nursing observation of MHCB patients was said to be improved and, in fact, review of rounds for SOL 4 who was on Suicide Precaution status on February 14, 2019 did not find any violations.

Because the MHCB unit did not have any patients during the on-site assessment, this reviewer could not observe whether or not patients were assigned clothing consistent with their level of observation.  However, this reviewer attempted to locate the 114-A Forms for the 37 patients that were in the MHCB unit from August 1, 2018 through January 31, 2019 to determine whether or not patients were being provided with clinically ordered privileges.  The review found that the 114-A Forms for 11 patients could not be located and four patients were discharged from the MHCB unit within 72 hours and, therefore, unlikely to have been eligible for many clinically-order privileges.  Of the remaining 22 patients, 99 percent were offered showers, but only 60 percent were offered out-of-cell and/or yard time.  Of note, the MHCB unit did not have a program office and, although an "activity treatment center" was listed in records, the term euphemistically referred to the TTM located in the corridor.  Because there was no television or DVD player to play movies or a radio to play music, RT programming was limited to board games either cell-side or in the TTM by an RT that was only assigned to the MHCB unit on a part-time basis.  Due to such limited availability, records indicated that most patients were only out of their cells a few times during their MHCB placement.  Limited out-of-cell movement was previously identified during the 2018 assessment and remained unresolved.

Further, due to the lack of any patients in the MHCB unit during the on-site assessment, this reviewer subsequently reviewed several medical charts of CSP/Solano patients in the MHCB unit during July through September 2019.  The review found at least two suicidal patients that received observation contrary to their level of care.  In the first case (SOL 5), the patient arrived in the MHCB unit on August 27, 2019 for SI with a plan.  The patient was issued a safety smock and placed on Suicide Watch requiring 1:1 observation.  She remained on the same Suicide Watch status the following day (August 28), and then downgraded to Suicide Precaution status at

staggered intervals not to exceed 15 minutes from August 29 through September 31. The following day on September 2, a clinician downgraded the level of observation from Suicide Precaution to Mental Health Observation at 30-minute intervals, but with "partial issue," stating in a progress note that "Pt. continues to endorse SI with plan. She has nothing in her room nor has she had any SIB since admit. Therefore, she will remain in safety smock to limit access."

The following day on August 3, the patient was seen by a psychiatrist who stated in a progress note that the "Patient continues to endorse having suicidal ideations and wanting to actively commit suicide." The psychiatrist maintained the current order of 30-minute Mental Health Observation with partial issue. The following day on September 4, the patient was seen by another clinician, appeared uncooperative and, although the clinician wrote in a progress note "no changes in observation or issue," ordered Suicide Precaution status without indicating an order for either "partial issue" or "full issue" in the progress note. On September 5, the same clinician's progress note indicated that the patient "continued to endorse SI and is pending DSH transfer." The clinician again ordered 30-minute Mental Health Observation with "partial issue." The patient was transferred to a PIP on September 6, 2019. Review of the patient's medical chart found that nursing staff was observing the patient at 30-minute intervals from September 2 through September 6, 2019. In sum, contrary to policy requirements and despite the patient's continued expression of SI throughout the MHCB stay, she was ordered to be observed at 30-minute intervals by multiple clinicians with "partial issue" orders that included a safety smock.

In the second case (SOL 6), the patient was placed in the MHCB unit on July 23, 2019 for SI. He remained on Suicide Precaution status from July 23 through July 25. On July 26, a psychiatrist wrote a progress note that indicated that the patient would be placed on Suicide Precaution status at 30-minute intervals, a status that combine both Suicide Precaution and Mental Health Observation. The following day (July 27), the patient was on Suicide Watch status with the rationale listed in the clinician's progress note as "Pt. has stated he is suicidal and has not made a suicidal gesture the entire admission. However, Pt. stated if he had a t-shirt he would use it to hang himself." The following day (July 28), the patient's observation was reduced to Suicide Precaution and remained at that level until August 4 when another clinician indicated in a progress note that the patient denied any SI, resulting in observation being reduced to 30-minute intervals and "full issue." On August 5, a psychiatrist ordered Suicide Precaution status at 30-minute intervals. On August 6, the patient was seen by another clinician who indicated in a progress note that the patient "continues to endorse on SI," as well as "inconsistent with reported SI" as the rationale for 30-minute observation with "partial issue." On August 7, the patient met with a psychiatrist who wrote a progress note indicating that the "patient continues to endorse passive 'suicidal' thoughts. Patient states that he is not going to attempt suicide here as he has no means to do it." Despite his ongoing SI, the patient continued to be observed at 30-minute intervals with "full issue." The patient was transferred to the PIP later that day. A review of the patient's medical chart found that nursing staff was observing the patient at 30-minute intervals from August 5 through August 7, 2019, despite continued SI. In sum, contrary to policy requirements and despite the patient's periodic expression of SI throughout the MHCB stay, he was ordered to be observed at 30-minute intervals by multiple clinicians.

It should also be noted that multiple clinicians at CSP/Solano inserted a template into their progress notes that was inconsistent with the Order instructions contained in EHRS (e.g., allowing an option for "partial issue" for patients on 30-minute observation status). Further, contradictory orders for observation at 30-minute intervals for patients expressing SI was previously identified during the 2018 assessment and remained unresolved.

Finally, a review of Guard One data for a recent 24-hour period in administrative segregation found almost 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of July 1, 2018 through February 19, 2019. A sample EHRS review of 42 emergent/urgent referrals for SI/behavior found that clinical staff completed required SRASHEs in 90 percent (38 of 42) of the cases, a decrease from the previous assessment when there was 98-percent compliance.

Because the MHCB unit did not have any patients during the on-site assessment, this reviewer could not observe any pertinent discussion regarding the assessment of suicide risk and safety planning during IDTT meetings. However, this reviewer examined a sample of six SRASHEs from patients discharged from the MHCB from October 2018 through mid-February 2019. The review found that most of the safety plans contained adequate narrative regarding general strategies to address SI but were lacking specific strategies to reduce the recurrence of such ideation. Of note, the SPRFIT coordinator began providing specialized SPI training to clinicians in early February 2019.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of only 23 cases of inmates discharged from a MHCB or alternative housing placement who remained at CSP/Solano and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 2018 through January 2019. The review found that only 70 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the low completion percentage mostly attributable to blank or unsigned forms. The vast majority (91 percent) of custody checks were only recommended for 24 hours by clinicians. In addition, only 48 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to checks documented in excess of 30-minute intervals. Of note, there was significant improvement in the completion of "custody check" forms (Page 2) from August 2018 through January 2019, i.e., 86 percent completion, as opposed a completion rate of only 31 percent from January 2018 through July 2018.

178

**Intervention**:  Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**:  A review of three months (November 2018 through January 2019) of SPRFIT meeting minutes found that a quorum was achieved for two (December and January) of the meetings.  The meeting minutes were otherwise unremarkable.  Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was contained within the facility's LOP for "Suicide Prevention Program" (Chapter 7, California State Prison-Solano Health Care Services Policy and Procedure Manual, Volume 20: Out-Patient Mental Health Services, effective May 2018).  In addition, the facility had a "Mental Health High Risk Patient Evaluation and Monitoring" procedure" that was required by the SPRFIT memorandum, and effective in July 2017.  However, the facility did not have any policies and procedures for intake nursing staff regarding "Bad News Notification" following the inmate's return from court or BPH as required by the SPRFIT memorandum.

**Training**:  According to training records, 100 percent of both custody and nursing staff were certified in CPR.  In addition, approximately 100 percent of custody staff, 97 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2018.  Finally, as of February 2019, 95 percent of mental health clinicians had completed the SRE mentoring program, 97 percent had received the seven-hour SRE training, and 93 percent had completed safety plan training.

**Recent Suicides**:  CSP/Solano experienced one inmate suicide during the review period.  In that case (SOL 7), the inmate was found hanging from the top bunk by an extension cord in his GP cell during the morning of May 12, 2018.  The inmate entered the CDCR system on March 27, 2014 to serve a 27-year-to-life sentence for attempted murder of a peace officer.  He was transferred to CSP/Solano on June 5, 2014.  The inmate did not incur any RVRs during his confinement.  He was not known to be gang-affiliated.  The inmate had some family support with two sisters who exchanged almost weekly telephone calls during his confinement.

Very little information regarding the inmate's background was available for review, and the CDCR reviewer in this case was only able to piece together some social history information based upon a telephone interview with one of the inmate's sisters following his death.  The inmate and four siblings were raised by both parents.  There was extensive domestic violence within the family by his father toward his mother, as well as toward he and his siblings.  There was no reported history of mental illness or substance abuse.  The inmate remained gainfully employed during most of his adult life and was married and divorced three times.  He fathered three children, one of whom died of leukemia at age 3.  Of note, the child's death occurred on May 12, the same day of the inmate's suicide.

Upon entry into CDCR, the inmate screened negative for any mental health issues and was not a participant in the MHSDS.  During his four-year confinement, he had sporadic contact with mental health clinicians following self-reports of experiencing some anxiety from flashbacks surrounding the instant offense, as well as safety issues due to vulnerability associated with

partial paralysis of his right shoulder and arm. Although there was some discussion in his medical records regarding a pending diagnosis of PTSD, the inmate was reluctant to enter the MHSDS and clinical staff subsequently determined that he did not meet criteria for involuntary inclusion into the system. Further, although he never reported any SI or history of suicidal behavior, following his death, one of his sisters reported that both his father and grandfather had died from suicide.

The inmate had several medical problems, the most serious of which was vascular and nerve damage in his right shoulder and arm which caused partial paralysis. In addition, he used a sling because the first and second fingers of his right hand were also paralyzed. These injuries were sustained when he received gunshot wounds during the instant offense. He was also hearing-impaired, used hearing aids, and was included in the DDP. The inmate continually complained about chronic pain in his right shoulder and arm, as well as the inadequacy of prescribed pain medication.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. A suicide note found in his cell noted anger in a belief that he was wrongfully convicted and frustration regarding the adequacy of his medical care, stating, in part, that "I am old and tired. I cannot fight the system by myself, and I am not willing to spend the next 20 years in this pain and grief." The CDCR reviewer concluded that although "not able to definitively state what the reasons for this inmate's suicide were at this particular time, information gathered during the course of this review suggests the inmate believed everything that occurred in his life, beginning with his instant offense and continuing during his incarceration, was proof he was a victim of treachery. He had safety concerns and was soon to be transferred to dorm housing. He had on-going medical concerns and had just been denied a surgery he had hoped would relieve some of his pain. These concerns, layered with his family history of suicide and exposure to trauma are conceivable triggers."

The Suicide Report did not contain any recommendations for corrective action through a QIP.


### 13)   California Men's Colony (CMC)

**Inspection**: May 15-16, 2019 (previous suicide prevention audit on January 16-17, 2018). CMC housed approximately 3,424 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a sample of new admissions during the intake screening process in the R&R units in both East and West Facilities of CMC on May 15, 2019. The lack of privacy and confidentiality during the intake screening process continued to be a problem at CMC. Although both nurses were observed to be asking all of the questions and correctly entering the information into the EHRS, both doors to the nurse's offices were open during the processes, with an officer straddling the doorway, thus compromising privacy and confidentiality. One nurse repeated a concern from the prior assessment that staff were reluctant to have the door closed during intake screening of maximum-security and administrative segregation unit inmates. Although this concern was certainly reasonable, a common solution

implemented in other facilities would be installation of a TTM in the nurse's offices. Of note, a TTM could easily be accommodated in the R&R unit of the East Facility, but the nurse's office in the West Facility was observed to be too small to accommodate a TTM.

In addition, this reviewer observed daily PT rounds in the administrative segregation unit (Building 4) on May 15. The rounds were unremarkable and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for all caseload inmates.

**Housing**: CMC had a 50-bed MHCB unit which had previously been found to be suicide-resistant. Of note, only 29 of 50 beds, or 58 percent of the MHCB unit were occupied during the on-site assessment. The administrative segregation unit contained 16 new intake cells that were retrofitted to be suicide-resistant, however, four intake cells were offline for renovation. During inspection of this unit on May 15, this reviewer observed that there were at least three new intake inmates housed in unsafe, non-new intake cells despite the fact that several new intake cells were empty. Although this reviewer was informed that there had been a recent riot in E-Yard resulting in an influx of approximately 30 inmates between May 9 and May 13, 2019, there was no reason for there to be any empty new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were found in Building 7, a location formally utilized as an interim unlicensed MHCB unit. Alternative housing was used on a daily basis, and inmates were all furnished beds and required to be observed at staggered 15-minute intervals (because all of the cells were previously found to be suicide-resistant when it was utilized as an unlicensed MHCB unit). From February through April 2019, there were approximately 152 inmates placed in alternative housing, and all were released within 24 hours. Most (88 percent) were transferred to a MHCB, thus only 12 percent of the MHCB referrals were rescinded and inmates returned to their respective housing units. This reviewer examined the EHRS charts for several rescinded cases and found that the required SRASHEs were completed in all of the cases.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (CMC 1, CMC 2, CMC 3, and CMC 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on March 12, 2019 (for CMC 1), May 11, 2019 (for CMC 2), May 15, 2019 (for CMC 3), and May 4, 2019 (for CMC 4). The chart review found several observation checks (i.e. between two and five per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 31 minutes in two cases (CMC 2 and CMC 4).

This reviewer observed five IDTT meetings in both the A and B units of the MHCB unit on May 15. With one exception in which a patient was clothed in both a smock and t-shirt/shorts, all other patients were observed to be clothed and received possessions and privileges consistent with their respective observation levels. This reviewer heard several patients discussing both telephone calls and yard privileges during the IDTT meetings. The meetings, which were well represented by mental health, medical, and custody staff, were interactive. However, there was little discussion of adequate safety planning, particularly in the case of one patient (CMC 5) who

was being discharged from the MHCB back to EOP.  The patient was admitted into the MHCB on May 11, 2019, for SI with a plan.  The primary clinician vaguely mentioned developing coping skills to reduce future SI, but not a specific safety plan.

Subsequent review of the discharging SRASHE contained the following safety plan:

> I/P's modifiable risk factors are currently well-managed: depressed mood was rated as '10' on PHQ-9, such as I/P will continue to work with PC (he seems to respond well to CBT) targeting distorted cognitions and/or helplessness that arises (especially regarding his rash or stress regarding his legal paperwork). He has had recent anxiety and reported AH and did not resurface at all in MHCB (the AH may have been hypnogogic or hypnopompic in origin or due to stress), such that PC to work with I/P on stress management strategies when or if symptoms worsen over the weekend or when his program is modified program.  Mindfulness groups, acceptance groups, and treatment focused on self-building are recommended.  I/P thrives in arenas where he feels he is educating himself and growing himself as a person.  He understands and is in agreement with his PC that he will likely be looking to transition to CCCMS over the next 3-6 months should he maintain stability and meet tx goals by that time (without any more MHCB admits).

This reasonable safety plan was not discussed at all during the IDTT meeting on May 16 and it was unclear if it was discussed at all with the patient prior to his discharge.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 99-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of January through April 2019.  A sample EHRS review of 52 emergent/urgent mental health referrals for SI/behavior revealed that clinicians completed the required SRASHEs in 92 percent (48 of 52) of the cases.

This reviewer examined a sample of ten SRASHEs from patients released from a MHCB between April and May 2019.  Overall, there was uneven discussion of adequate safety planning to reduce SI, as well as uncertainty as to whether these safety plans were discussed during IDTT meetings in the MHCB unit.

In addition, a CIT protocol had been initiated at CMC on April 15, 2019 and included a clinician, nurse, and custody supervisor (normally a lieutenant) during the period of 1:00 p.m. to 9:00 p.m., during weekdays.  During other time periods, a single clinician responded to emergency referrals.  This reviewer observed two CIT responses to emergency mental health referrals on May 15-16, 2019.  Although both cases resulted in MHCB admissions, there were problematic practices in each case.  In the first case (CMC 6), the nurse was far more interactive with the inmate than the clinician, who failed to ask many of the pertinent questions required by the SRASHE (perhaps because the MHCB referral appeared obvious to the clinician).  In the second case (CMC 7), the inmate was observed to be in a holding cell pending the assessment, but not

on constant observation as required by policy. The same CIT nurse also responded to this emergency referral and was again very interactive with the inmate.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 149 cases of patients discharged from a MHCB or alternative housing placement who remained at CMC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from November 2018 through April 2019. The review found that only 40 percent had Page 1 "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most errors attributable to clinicians either discontinuing the checks prior to the minimum 24-hour requirement, or not completing the forms on a daily basis. When completed correctly, a majority of the custody checks were recommended for 48 hours by clinicians. In addition, 93 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (December 2018 through February 2019) found that quorums were achieved for all three meetings. Attendance averaged between 18 and 22 members. Meeting minutes were informative and included several case presentations each month. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was contained within the facility's LOP for "Suicide Reduction and Response," California Men's Colony Health Care Services, Mental Health Policy and Procedure Manual, No. 10-0006, effective May 2018). In addition, the facility had a "High Risk Management Program" procedure (No.10-0016) that was required by the SPRFIT memorandum, and effective April 2019. However, the facility did not have any policies and procedures for intake nursing staff regarding "Bad News Notification" following the inmate's return from court or BPH as required by the SPRFIT memorandum. There was some reference in the "High Risk Management Program" procedure to clinical staff being notified when inmates receive BPH denials.

**Training**: According to training records, 100 percent of custody and nursing personnel were currently certified in CPR. In addition, 100 percent of custody staff, 95 percent of medical staff, and 95 percent of mental health staff received annual suicide prevention block training during 2018. Finally, as of May 2019, 94 percent of mental health clinicians had completed the SRE mentoring program, 89 percent had received the seven-hour SRE training, and only 88 percent had completed safety plan training.

**Recent Suicides**:  CMC did not experience any inmate suicides during the review period.

### 14)    Mule Creek State Prison (MCSP)

**Inspection**:  June 5-6, 2019 (previous suicide prevention audit was on August 10-11, 2017).  MCSP housed approximately 4,035 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer was not able to observe the intake screening process because there were not any new admissions into the R&R unit during the on-site assessment.

This reviewer observed daily PT rounds in the administrative segregation unit (Building 12) on June 6.  The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Form and entering the information into the EHRS for all caseload inmates.

**Housing**:  MCSP had a ten-bed CTC with eight designated MHCBs that were previously found to be suicide-resistant.  Of note, only four of eight rooms in the MHCB unit were occupied during the on-site assessment.  Further, Building 12 (housing GP, EOP, and 3CMS inmates on administrative segregation status) had approximately 16 retrofitted suicide-resistant cells designated for new intake inmates.  During inspection of this unit, all new intake inmates were appropriately housed in new intake cells.  Due to a low census, Building 13 (previously also utilized for administrative segregation), was only utilized for **alternative housing**.  Alternative housing was used on a daily basis at MCSP, inmates were all furnished with beds and required to be observed on a 1:1 basis.  From March 1 through May 31, 2019, there were approximately 144 inmates placed in alternative housing, and all were released within 24 hours.  Most (79 percent) inmates were transferred to an MHCB, thus 21 percent (30 cases) of the MHCB referrals were rescinded and inmates returned to their respective housing units.  This reviewer examined the EHRS charts for several rescinded cases and found that the required SRASHEs were completed in all of the reviewed cases.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (MCSP 1, MCSP 2, MCSP 3, and MCSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on May 12, 2019 (for MCSP 1), May 17, 2019 (for MCSP 2), June 1, 2019 (for MCSP 3), and June 3, 2019 (for MCSP 4).  The chart review found significant problems in three cases, with observation checks (i.e. between eight and 11 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 78 minutes in one case (MCSP 1).  Another case (MCSP 2) had 11 violations, including gaps of 22-, 36-, 20-, 23-, 60-, 23-, 36-, 20-, 41-, 29-, and 45-minutes between the required checks.  One case (MCSP 4), had only two violations.  Violations in the four cases were by multiple nursing staff.

Given these deficiencies, during this reviewer's observation of the IDTT process in the MHCB unit on the morning of June 6, a member of the Region 1 MHCT observed nursing rounds of two patients (MCSP 4 and MCSP 5) that were on Suicide Precaution status and required to be observed at staggered intervals not to exceed every 15 minutes. The Region 1 staff observed that nursing rounds were conducted at the following approximate time intervals for these two patients: 9:05am, 9:17am, 9:30am, 9:49am, and 10:01am. Due to the 19-minute gap between 9:30 a.m. and 9:49 a.m., this reviewer subsequently reviewed the EHRS for both patients and discovered that nursing staff had entered the time of "9:38 a.m." into the medical charts despite the fact that this observation never occurred at that time.

In sum, this reviewer has found significant deficiencies in the observation of MHCB patients at MCSP during this and three other previous assessments.

A previous problem of MHCB patients having to choose between an out-of-room activity of either yard or the program office had been corrected. An RT was assigned to the MHCB unit for 40 hours a week and utilized both the program office and yard for out-of-room activities. In addition, documentation indicated that patients were being offered both telephone and visiting privileges following their first IDTT meeting.

Three IDTT meetings were observed in the MHCB unit on June 5-6, including that of a patient who was discharged to EOP. The meetings were well-attended by custody, medical, and mental health personnel. However, there was no inquiry regarding current suicide risk in any of the cases (including the patient that was being discharged) and limited discussion regarding safety planning; whereas each patient appeared to be in clothing consistent with their level of suicide risk, and patients appeared to be receiving all out-of-cell activities, including showers and yard. With regard to the patient (MCSP 6) who was being discharged to EOP, the PC provided an adequate summary of the safety plan during the IDTT. Subsequent review of the patient's chart found the following reasonable safety plan:

> IP is being discharged to EOP LOC with the following treatment recommendations/safety plan: 1) IP will monitor and observe his internal cues that he is in need of extra support and/or needs to engage in pro-active coping. These cues include: negative thoughts (paranoia, suspicious, feeling targeted), thoughts of hurting himself or others, increased feelings of anger/anxiety; 2) IP will utilize at least two means of coping including, grounding exercises, deep breathing exercises, mindfulness, guided imagery, read CBT handouts, identify negative thoughts-check facts, focus on parole plans/future goals, exercise to work through feelings of anger/anxiety, listen to music; 3) EOP treatment should continue to focus on CBT-based interventions focused on reducing cognitive distortions through fact checking and neutral statements; 4) Focus on IP's parole plans may also help reduce anxiety and focus IP's thoughts and energy on his future. IP will work with EOP PC to identify at least three housing options and 2 employment resources in the community.

Despite the reasonableness of the above safety plan, this reviewer's examination of several other SRASHEs from patients discharged from the MHCB during April and May 2019 found safety plans were uneven for specific strategies to reduce recurring SI.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation units found 98-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of January through May 2019. A subsequent EHRS review of 50 cases of emergent/urgent mental health referrals for SI/behavior found that clinicians completed the required SRASHEs in 90 percent (45 of 50) of cases.

In addition, a CIT protocol had been initiated at MCSP in mid-May 2019 and included a clinician, nurse, and custody supervisor (normally a lieutenant) from 2:00 p.m. until 10:00 p.m., with other clinicians responding to emergency mental health referrals from 6:00 a.m. until 2:00 p.m. This reviewer observed a clinician respond to an emergency mental health referral on June 6. The inmate (MCSP 7) had been admitted into the administrative segregation unit that morning and scored positive on the ASU Screening Questionnaire regarding possible SI. The transgender inmate was not in the MHSDS and viewed by custody as feigning SI in order to be housed closer to her partner in EOP. During their interaction, the clinician asked very few questions related to suicide risk inquiry contained on the SRASHE. Following the brief assessment, the inmate was returned to administrative segregation.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 277 cases of inmates discharged from a MHCB or alternative housing placement who remained at MCSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from November 2018 through May 2019. The review found that only 70 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most custody checks recommended for only 24 hours by clinicians. In addition, 94 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most errors found on Page 1 of the form were related to the failure of clinicians to sign the form on a daily basis.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (February through April 2019) found that quorums were only achieved for one (February 2019) of the monthly

meetings.  Meeting minutes were otherwise unremarkable.  Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was contained within MCSP's Operational Procedure entitled "Suicide Prevention and Treatment of the Suicidal Inmate/Patient," No. MC 59, effective February 2019.  In addition, the facility had a "High Risk Management Program" section within the above Operational Procedure, however, there was not an adequate procedure for intake nursing staff regarding "Bad News Notification" from court or a BPH other than asking the required routine question on the Initial Health Screening form (i.e., "recently received bad news?") that is not specific to a return from court.

**Training**:  According to training records, 99 percent of custody staff and 97 percent of nursing staff were currently certified in CPR.  In addition, 99 percent of custody staff, only 84 percent of medical staff, and 96 percent of mental health staff received annual suicide prevention block training during 2018.  Finally, as of May 2019, 92 percent of mental health clinicians had completed the SRE mentoring program, 93 percent had received the seven-hour SRE training, and only 83 percent had completed the safety plan training.

**Recent Suicides**:  MCSP experienced two inmate suicides during the review period.  In the ***first*** case (MCSP 8), the inmate was found hanging from the upper bunk by a sheet in his administrative segregation (new intake) cell during the late evening of January 11, 2019.  He had entered the CDCR system for a third term on November 22, 2017, to serve a 12-year sentence for evading a peace officer causing serious bodily harm, hit-and-run causing injury of a person other than self, and false imprisonment with violence.  The inmate was transferred to MCSP on October 4, 2018.  He was subsequently placed in SNY for safety concerns relating to prior gang-affiliation.  The inmate had nine RVRs during his confinement, the most recent of which occurred on December 24, 2018 for tattooing.  He was unmarried and had one child.  The inmate did not have any record of current family support.

According to available records, the inmate and four siblings were raised in a dysfunctional family environment.  His father was an alcoholic and engaged in domestic violence.  The inmate had some college education and sporadic employment that was interrupted by substance abuse and involvement in both the juvenile and criminal justice systems.  There was little information available regarding the inmate's mental health history outside of CDCR.  He previously denied any history of psychiatric inpatient hospitalization in the community.  The inmate's significant use of methamphetamine caused auditory hallucinations that resulted in several MHCB placements during a prior CDCR term.  During his second term in 2014, the inmate was diagnosed with Major Depressive Disorder and placed at the 3CMS level of care.

Upon re-entry into CDCR for his third term in November 2017, although screening positive during the initial mental health evaluation, the inmate was not initially placed in the MHSDS.  However, in July 2018 after being seen by a mental health clinician to address situational stressors related to losing custody of his daughter and conflict with his correctional counselor, he was placed in 3CMS after complaining of both chronic depression and anxiety.  He did not initially receive a diagnosis.  The following month on August 17, 2018, the inmate was placed in a MHCB for SI and diagnosed with Dysthymic Disorder.  During this admission, he also reported being in chronic physical pain "every day" that led him to having thoughts of "….had

blade open and thought about doing it, killing (himself)." The pain was attributed to the motor vehicle accident on the day of the day of the arrest in December 2016 which resulted in the instant incarceration. He was discharged from the MHCB the following week with revised diagnoses of "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Antisocial Personality Disorder, and Polysubstance Dependence." The inmate remained in 3CMS, maintained a job in the facility's garment factory, programmed effectively, and did not have any known issues with peers or staff (aside from several minor RVRs). Other than for a two-month period in late 2018, the inmate was not on any psychotropic medication during his confinement.

In the months leading to the inmate's suicide, mental health documentation suggested stable presentations without worsening mental health symptoms that would indicate elevated risk for suicide. Previous SRASHEs noted that he had several suicide attempts in his background, including an intentional overdose in 2002, superficial laceration to his abdomen in 2006, and an attempted hanging in 2009 during a previous CDCR confinement. As of November 2018, the inmate's chronic risk for suicide was assessed as "moderate" and acute risk was "low." However, as noted by the CDCR reviewer in this case, the inmate had threatened to harm himself or others on September 27, 2018 if he was not sent to an MHCB due to perceived secondary concerns regarding threats made by undisclosed inmates at CCI. The required SRASHE was not completed.

On January 7, 2019, the inmate was placed in the administrative segregation unit due to refusing housing reassignment and having safety concerns. He complained to correctional personnel that three inmates were making sexual comments to him but did not provide any additional information. A few days later on January 10, the inmate submitted a Health Care Services Request form complaining of being "severely ill with pain in stomach and vomiting." The inmate also submitted a separate Health Care Services Request form that same day to mental health that stated "Would like to speak with mental health regarding my hearing going out as I've been confused of my thinking."

A nurse responding to his medical complaint on January 11 was informed by an officer that the inmate was currently in a TTM in the administrative segregation unit dayroom awaiting assessment by a mental health clinician after threatening suicide. When the clinician subsequently arrived in the dayroom, the inmate refused to cooperate and there was no documentation to indicate whether or not the inmate was provided the option for confidentiality outside of the dayroom TTM. But according to the CDCR reviewer, "the inmate was evaluated by his new mental health clinician in ASU after reporting suicidal thoughts to custody staff. He refused to talk to the responding mental health clinician in the holding cell located in the middle of the day room without accommodating for confidentiality. The inmate indicated to custody staff that he wanted to return to his cell and did not intend to cooperate with his evaluation." As such, the SRASHE completed by the clinician on January 11, 2019 did not contain an adequate mental status examination or any responses from the inmate because "IP refused to talk to this clinician to assess for SI." Therefore, almost all of the narrative contained on the assessment was pulled forward from the most recent SRASHE conducted on November 26, 2018. Despite the fact that the inmate did not retract his expression of SI and did not cooperate with the clinician, a

SRASHE was still completed and the clinician decided not to refer the inmate to either alternative housing or an MHCB. The inmate committed suicide later that evening.

According to the CDCR reviewer, "information gathered during the course of this review suggested a combination of chronic physical pain, substance abuse, and possible undisclosed psychotic symptoms likely played significant roles in his decision to end his life." Two suicide notes were located in the inmate's cell following the suicide, with one indicating that "I have nothing to lose and more so I'm going to die in this cell because that's what the people want me to do to die in the cell. Though I am already dead so this is hell and I'm just staying alive for nothing…"

The Suicide Report contained 14 recommendations for corrective action through a QIP:

> 1) <u>CCI</u>: There was no Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) in EHRS completed on September 27, 2018 after the inmate had threatened to harm himself or others. Per the MHSDS *Program Guide*, 2009 Revision, 'When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data' (12-10-8).

> 2) <u>MCSP</u>: After mirtazapine (was ordered to taper off discontinued on 09/27/18) with consideration for continuing on sertraline, there was no follow-up on whether psychotropic medication was still being considered in subsequent Master Treatment Plan (10/24/18). Additionally, MH Master Treatment Plan documentation indicates there was no psychiatrist present at the IDTT conducted on October 24, 2018 which is a violation of *Program Guide* policy.

> 3) <u>ISP</u>: On July 6, 2019, the inmate was seen for an initial mental health evaluation which appeared to note moderate depression. However, he was then placed in CCCMS level care without a mental health diagnosis.

> 4) <u>ISP</u>: The SRASHEs completed on June 8, 2018 and July 6, 2018 (performed by the same clinician) were problematic in that they demonstrated inadequate risk formulation and safety planning. The initial SRASHE on June 6, 2018 occurred after a 'confrontation with staff yesterday' but did not explain what happened. The inmate did not report suicidality. Additionally, the warning signs for imminent suicide box we left blank. In the second SRASHE completed on July 6, 2018, multiple sections were left blank, including acute risk factors, warning signs, and lethality sections. It was unclear how the clinician arrived at an accurate risk level given several portions were left unchecked. Further, there was a change in the chronic risk level from low in the June 8 SRASHE to moderate in the July 6 SRASHE. However, the clinician did not explain why he felt the risk had increased since the first SRASHE one month previous.

> 5) <u>MCSP</u>: The mental health evaluation and resultant SRASHE completed on the date of death were problematic for the following reasons: the inmate was not

offered a confidential setting for the evaluation. He was seen in a holding module in the ASU dayroom; the PC could not complete an adequate mental status examination given the inmate refused to speak with PC; despite documentation referring to case consultation between the PC, custody, and another crisis team member, the rationale for returning the inmate to housing when the PC could not adequately assess him due to his refusal to engage appears insufficient, especially given the inmate was new to ASU and this was the first documented contact between the PC and the inmate.

6) CIM/CCI/MCSP: The SRASHEs completed at CIM (August 28, 2018), CCI (September 7, 2018), and MCSP (November 26, 2018) showed subpar risk justification and safety planning, as well as inadequate integration of individualized risk factors. (See *Discussion/Conclusions* section for more information).

7) Statewide SPRFIT: Reports submitted indicated the inmate was able to find and maneuver a tie-off point for a noose on a retrofitted intake cell bunk. After review of the tie-off point, which is a very narrow opening located behind the upper bunk, all retrofitted cell bunks at Mule Creek State Prison were inspected and renovated so the gaps were closed.

8) MCSP: Although the primary responder verbally notified staff in the unit, they did not sound an alarm (a personal alarm or if one is not issued, an alarm based on local procedures must be used) to summon necessary personnel.

9) MCSP: Reports submitted indicated while the inmate was being transported to the TTA via the Emergency Response Cart, it malfunctioned. This malfunction caused a delay in arrival to the TTA. Although life-saving measures continued while on the cart, this caused a delay in initiating additional life-saving measures.

10) MCSP: The morning huddles between mental health and custody were being conducted and documented in the Sergeant's logbook, but not consistently documented in the unit's Isolation logbook, as per policy. This was addressed to the SPRFIT coordinator and custody administration multiple times prior to this suicide.

11) MCSP: Per the CDCR 837s provided, the responding officer does not state whether they cut the noose above or below the knot. Although additional staff state the noose was cut above the knot in their reports, there was no clarification provided by the officer who cut the ligature.

12) MCSP: Details of the emergency medical response on scene and in TTA are limited, did not provide a clear picture of events.

13) MCSP: Narcan was administered but not documented on the MAR or reflected on MAR summary.

14: <u>CIM/CCI/MSCP</u>:  A brain CT scan was ordered on August 19, 2018 at CIM. The patient transferred three times after the CT scan was approved.  He did not receive the CT scan.  The order was not properly reconciled during the transfer process.

In the ***second*** case (<u>MCSP 9</u>), the inmate was found hanging from the ventilation grate by a sheet in his administrative segregation cell during the afternoon of September 11, 2019.  The inmate entered the CDCR system in December 2006 to serve a life sentence with the possibility of parole for multiple convictions, including kidnapping, robbery, oral copulation, lewd and lascivious acts with a child under age of 14 with force and violence, and criminal threat to cause great bodily injury or death.  He was transferred to MCSP on August 20, 2019.  The inmate had 19 RVRs during almost 13 years of confinement, the most recent of which occurred on August 26, 2019 involving possession of dangerous contraband.  He was known to be gang-affiliated.  Due to safety concerns related to his commitment offense, the inmate was housed on a SNY from 2006 until 2017 when he was placed on non-designated yards as a result of placement in EOP, as well as periodically housed in administrative segregation for safety issues.  The inmate had family support demonstrated by family visits and letter correspondence.  He was never married but had three children with whom he had limited or no contact.

According to available information, the inmate and six siblings were raised by both parents until age 14 when he immigrated to the United States and lived with a brother.  He had multiple behavioral problems as a child, including setting a cornfield on fire at age 6, as well as vandalizing public transportation in his home country.  The inmate began selling and using drugs as a teenager.  He previously disclosed a history of sexual abuse, absconding from home at the age of 9, as well as being kidnapped in Mexico, but the details of those events were not well documented.  He considered himself the "black sheep" of the family due to his behavioral problems and criminal history.  The inmate was a high school graduate and completed two years of college.  He had sporadic employment.

Upon entry into CDCR in December 2006, the inmate initially screened negative for any mental health problems but was placed in the MHSDS at 3CMS level of care in September 2017 after complaints about depression and anxiety regarding his long prison term and minimal contact with family.  He received an initial diagnosis of Adjustment Disorder with depressed mood and anxiety.  Soon thereafter, the inmate began reporting auditory hallucinations and was elevated to EOP in February 2008 after reporting SI.  During this time, the inmate had a range of mental health diagnoses, including "Schizoaffective Disorder and Psychotic Disorder, Not Otherwise Specified."  In December 2008 the inmate's level of care was decreased to 3CMS.  However, he ingested a razor blade the following month (January 2009) and was placed back into EOP until December 2010 when he was returned to 3CMS.  From 2011 through 2013, the inmate appeared to program adequately until August 2013, when he was admitted to an MHCB for SI.  He was subsequently discharged back to EOP, but continued to experience both SI and command auditory hallucinations to harm himself.

According to the CDCR reviewer in this case, records indicated that the inmate "reported feeling overwhelmed and believed he should die because he thought he was a failure in life.  He also

began to fluctuate between his regular housing units and alternative housing placements due to suicidal ideation." In November 2013, the inmate was transferred to the intermediate care program at DSH due to command hallucinations to kill himself and refusal to take psychotropic medication. He returned to CDCR in April 2014 and fluctuated between EOP and 3CMS until March 2017, when he was readmitted to an MHCB for SI and grave disability. For the next month, the inmate's level of care alternated between 3CMS and MHCB. He occasionally ingested metal screws and reported SI, anxiety, and auditory hallucinations that told him he was "worthless." Mental health records also reported the inmate might have been reporting mental health symptoms for secondary gain to affect housing and prison placement (as he continued to report a desire to be closer to his family). He was referred to the acute care program in the PIP in May 2017 due to frequent MHCB admissions. The inmate was discharged back to EOP in June 2017. From June 2017 through October 2018, he continued to fluctuate between EOP and MHCB levels of care. The inmate continued to report SI, depression, and auditory hallucinations such as "You're here (in prison) for the rest your life, just kill yourself to make it easier on everyone." The inmate continued to engage in such SIB such as cutting and ingestion of foreign objects. The inmate also intermittently reported safety concerns related to monetary debts and his commitment offense, resulting in several administrative segregation placements.

From October 1, 2018 through March 30, 2019, the inmate remained at EOP, but occasionally was placed in alternative housing for expressed SI. During this time, he continued to report some paranoia, depression related to his long sentence, as well as anxiety. He continued to attend both group and individual treatment and maintained "fair" compliance with his psychotropic medication. The inmate's diagnoses changed from "Schizoaffective Disorder, Bipolar Type, and Methamphetamine Addiction" to "Other (or Unknown) Substance-Induced Psychotic Disorder, Without Use Disorder and Methamphetamine Dependence." These latter diagnoses remained unchanged until his death.

On March 30, 2019, the inmate was admitted into an MHCB after ingesting a razor blade. He was later transferred to the acute care program at a PIP where he remained until discharging back to EOP on May 14, 2019. At the onset of his PIP admission, the inmate reported that he was never suicidal, but simply reported ingesting razor blades to "get attention." Upon return to EOP, the inmate continued to report SI and engage in such SIB as inserting fingernail clippers into his rectum. He also expressed safety concerns which resulted in administrative segregation placement. On June 23, 2019, the inmate was sent to an outside hospital after reportedly ingesting a razor blade. While at the hospital, he temporarily escaped from custody. Upon his capture, he was returned to administrative segregation, but later placed in an MHCB until July 3, 2019. During one conversation with his PC, the inmate stated, "It's not so much I wish I was dead, but just not in prison.…There was a part of me while I escaped I thought I'd rather die than come back (to prison). I'm not suicidal, I just don't want to be in prison." However, two days later on July 5, the inmate again reported SI with a plan to hang himself and was readmitted into the MHCB. He was discharged four days later on July 9, 2019 and returned to the EOP program. A few days later on July 12, the inmate reported to a clinician that the tried to hang himself the previous day, but the sheet kept breaking. A suicide note was later found in his cell by a correctional officer. He was readmitted into an MHCB and told a clinician that "as soon as (he) got a chance, (he) would try again (suicide)" and "I have enemies and it is better to just end my life."

On July 23, 2019, the inmate was referred to the acute care program in the PIP to continue treatment for SI and SIB. On August 20, the inmate was discharged back to EOP, but at the onset of his return, he again reported SI and ingestion of razor blades. He was referred back to an MHCB on August 22 and discharged to EOP on August 29, 2019. According to the CDCR reviewer, while in the MHCB, "the inmate reported a belief that other inmates were talking through the vents at him and conspiring to cut off his head and rape him. Documentation indicated in one clinical session a custody officer was brought in to talk with the inmate about his perceived safety concerns. It was not clear what the results of that follow-up were, as there was no further information found in records. While in the MHCB, he also reported chest pains and nursing staff noted he was shaking while stating, 'They are trying to get me here and hurt me, I'm scared.'" According to the CDCR reviewer, the inmate "appeared in great distress related to his belief other inmates were out to get him. In addition, he recently escaped from prison, he had a recent serious suicide attempt, was recently discharged from a PIP, and was demonstrating difficulty functioning in an outpatient setting marked by his repeated claims of suicidal ideation…..Given the totality of his presenting issues, the inmate would have benefited from a higher level of care."

Following his MHCB discharge on August 29, 2019, the inmate was returned to EOP at MCSP. Ironically, SRASHEs completed that day, as well as the following day (August 30), assessed his chronic risk for suicide as "low," despite multiple examples of self-harming behavior and suicide attempts (by swallowing razors in January 2013, April 2017, June 2018, and April 2019; drug overdose in February 2017; and cutting his wrist in December 2017). In fact, his hanging attempt on July 12, 2019 was not listed in either SRASHE. The inmate continued to intermittently report SI and ingest foreign body objects. For example, a few days later on September 3, 2019, he reported SI, but was not referred back to the MHCB. The following week on September 9, the inmate reported to a clinician that he still had thoughts of escaping and continued to report other inmates were out to get them. He was scared that he was going to die (referring to other inmates hurting him), which made him want to kill himself first to "get it over with." Although the required SRASHEs were completed on both September 3 and September 9, each assessed the inmate's chronic risk for suicide as "high" and acute risk as "moderate," with the clinician on September 9 stating that "These (acute risk factors) include passive suicidal ideation, suicide attempt within the last three months (July 2019), an RVR related to escape (ASU admittance). He also presents with moderate level of paranoia, anxiety/feelings of being trapped, mostly due to long prison sentence and wanting to escape from the fear of believing that others are trying to kill him." As noted by the CDCR reviewer, "Given the inmate's level of risk and overall presentation, he should have been referred to a higher level of care. It was also noted both SRASHEs documented SPI, but the SPI contained minimal information related to options for intervention." The inmate committed suicide two days later.

In sum, from September 2017 through August 2019, the inmate had approximately 13 MHCB placements, as well as multiple DSH and PIP admissions. Following the suicide, a MCSP lieutenant was interviewed and described the inmate as a "frequent flyer" to the MHCBs, and although acknowledging that he was "not problematic," complained that the inmate required "a lot of attention" because he was consistently reporting SI for perceived secondary gain. The inmate had significant medical problems, but the CDCR reviewer did not believe they were

precipitants to his suicide.  According to the Suicide Report, the inmate was informed on September 10 (the day before his death) that he was going to be transferred to the PSU at CSP/Sac to serve a SHU term for his attempted escape in June 2019.  Apart from the persistent threats of suicide and fears that other inmates were harm him, the CDCR reviewer did not offer any other obvious precipitating factors to his suicide, but did opine that "he likely came to the realization he was going to be under greater lock and key due to his SHU term at a prison he did not want to go to, and his chance of leaving prison was out of reach.  In his eyes, his existence in prison was unbearable and his only other option was to end his life."

The Suicide Report contained 18 recommendations for corrective action through a QIP:

1) MCSP:  The inmate did not attend his scheduled case management group on February 26, 2019, and although there was an IDTT held on February 28, 2019, there was no indication in records he was seen for his weekly contact.  Per the Mental Health *Program Guide* (2009), 12-4-9, required EOP treatment includes 'weekly clinical contact with PC either individually or in group psychotherapy.'

2) MCSP:  Multiple concerns were found regarding the documentation of self-harm incidents and/or mental health assessment of risk following self-harm incidents.  Please see *Conclusions* section for further details.

3) CMF:  On March 30, 2019, the inmate transferred to CMF to receive treatment at the MHCB LOC.  On April 6, 2019, while on the unit, the inmate was seen by medical for chest pain.  He then started banging his head 'lightly' against a glass door until he developed a small bump on his forehead (abrasion) which started bleeding.  Although documentation from nursing noted a psychologist and psychiatrist were informed of the situation, and spoke to the inmate as a result.  There was not any documentation noting an assessment of suicide risk (i.e., a SRASHE or modification to treatment plan) was completed nor was a self-harm power-form.  In addition, there was not any documented justification as to why he was not placed on suicide watch as result of his self-injurious behavior.  Per policy, a self-harm power-form must be completed within 72 hours of the incident, and an assessment of suicidality should be made following an incident of self-harm.

4) CMF:  On April 3, 2019, while at the MHCB LOC, a mental health clinician did not provide the inmate with a daily contact.  Per the Mental Health *Program Guide* (2009), 12-5-13, required MHCB treatment indicates an 'inmate-patient's conditions shall be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist.'

5) HQ SPRFIT:  The inmate engaged in several incidents of self-harm behaviors while in the CHCF PIP-Acute (April 16, April 23, and April 29, 2019).  These incidents were difficult to track as the PIPs currently do not have policy regarding self-harm documentation in EHRS.  The lack of this documentation may have

impacted suicide risk determinations during transitions between inpatient and outpatient levels of care.

6) <u>CHCF-PIP-Acute</u>:  During the inmate's stay in the CHCR-PIP (April 15 to May 15, 2019 and July 23 to August 20, 2019), he engaged in multiple incidents of self-harm, and was admitted on a basis of danger to self.  However, there did not appear to be any documentation regarding his level of observation or issue, so it is unclear if levels of observation or issue were modified in response to those incidents or what level of observation and issue he was placed on.  The assignment of observation and issue orders is given to psychiatry only, and does not permit a licensed psychologist to complete observation or issue orders.  This practice appears to be inconsistent with Title 22 79611 which states 'A psychiatrist or psychologist shall be responsible for examining, diagnosing, and classifying and prescribing treatment for patients.  The psychiatrist or psychologist shall also record progress notes, review and update treatment orders and make other appropriate entries in the patient record.'

7) <u>CHCF-PIP-Acute</u>:  There were multiple issues identified in relation to the assessment of risk in SRASHEs completed while at CHCF-PIP.  Please see *Conclusions* section for further details.

8) <u>CHCF-PIP-Acute</u>:  Multiple concerns were found regarding the amount of documentation of clinical contacts during the time the inmate was placed at the PIP.  Please see *Conclusions* section for further details.

9) <u>CMF</u>:  On July 13, 2019 and July 15, 2019, the inmate received SRASHEs as part of the admission and discharge process from the MHCB at CMF.  The initial SRASHE conducted on July 13, 2019 estimated the inmate's level of chronic and acute risk as high based on his historic and presenting concerns.  The SRASHE identified imminent warning signs, but it did not address what his modifiable risk factors or preventive factors were.  The discharge SRASHE completed on July 13 15, 2019 estimated both his level of chronic and acute risk as moderate.  Given his historic risk factors coupled with his current risk factors, which included a recent escape from prison, a serious suicide attempt that occurred days prior, ongoing self-harm, and the referral to PIP-Acute for longer-term stabilization as a result of ongoing suicidality, his estimated level of chronic and acute risk were underestimated.

10) <u>CHCF-PIP-Acute</u>:  Multiple concerns were found with the PIP discharges from May 14, 2019 and August 20, 2019.  Please see *Conclusions* section for further details.

11) <u>MCSP</u>:  The inmate returned to MCSP at EOP LOC on August 20, 2019.  During the ASU Pre-Placement Screening conducted by nursing at 2046 hours, he denied suicidal ideation and his presentation appeared unremarkable.  However, he was given a second ASU Pre-Placement Screening questionnaire completed by

nursing at 2050 hours. He reported he had recent thoughts of killing himself, had recent thoughts of acting on his intentions, and intended on carrying out a plan. At that time, the nurse submitted an emergent consult to mental health, but he was not seen by mental health until the following day (August 21, 2019) for a follow-up SRASHE unrelated to the emergent consult placed by nursing staff. Per MCSP Local Operating Procedure dated October 2018, Crisis Intervention Team Procedure: 'When an inmate reports an emergent mental health need to staff, or staff observe an inmate they believe to require emergent MH intervention between 1400 and 2200 hours, the CIT is activated and the inmate is moved to the appropriate facility program office.'

12) <u>MCSP</u>:  The inmate was discharged from the MHCB at MCSP on August 29, 2019.  At the time of discharge, documentation indicated although the inmate remained fearful of other inmates, he did not endorse suicidal ideation. Despite documentation, the inmate appeared in great distress related to his belief other inmates were out to get him, which did not appear to be addressed as part of his MHCB treatment.  In addition, he recently escaped from prison, had a recent serious suicide attempt, was recently discharged from a PIP, and was demonstrating difficulty functioning in an outpatient setting marked by his repeated claims of suicidal ideation and engagement in self-harm.  This does not describe someone who was clinically appropriate for discharge.  Given the totality of his presenting issues, the inmate would have benefited from a referral to a higher level of care.

13) <u>MCSP</u>:  Multiple concerns were found in the SRASHEs completed on August 29, August 30, and August 31, 2019.  Please see *Conclusions* section for further details.

14) <u>MCSP</u>:  After the inmate's discharge from the MHCB (on August 29, 2019), he was placed on five-day follow-up contact.  During the five-day follow-up contacts, he was seen twice by mental health providers and three times by nursing staff.  Five-day follow-up contacts on August 30, 2019 and September 3, 2019 conducted by the mental health providers were incomplete.  Although one five-day follow-up noted the Safety Plan Intervention (SPI) was reviewed, the other five- day follow-up noted SPI was not reviewed.  In addition, in both forms the SPI page was left blank.

15) <u>MCSP</u>:  Multiple concerns were noted regarding not re-referring the inmate back to a higher level of care given the acuity of his mental health symptoms in September 2019.  Please see *Conclusions* section for further details.

16) <u>MCSP</u>: Multiple concerns were found in the SRASHEs completed on September 3 and September 9, 2019.  Please see *Conclusions* section for further details.

17) <u>Psychiatry-CHCF-PIP-Acute</u>:  Review of the electronic medical record reveals that observation orders (such as Q11-15-minute check orders) were not entered into the electronic medical record by the psychiatrist(s).  Psychiatry documentation did not include sufficient observation rationale and/or rationale for changes to observation status/orders.

18) <u>CHCF-PIP-Acute</u>:  On July 15, 2019, the inmate was referred to the PIP-Acute program at CHCF to continue treatment to address his suicidal ideation, self-harm behavior and desire to die.  He remained in the MHCB pending transfer to the PIP-Acute program where he remained on partial issue and 11-minute observation checks were ordered.  However, the EHRS system indicates numerous observation checks were missed between July 18-July 21, 2019.

### 15)    **California State Prison – Los Angeles County (CSP/LAC)**

**Inspection**:  August 6-7, 2019 (previous suicide prevention audit was on November 13-15, 2017).  CSP/LAC housed approximately 3,164 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on August 6, 2019.  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  The door to the nurse's office remained closed, with officers stationed outside, thus ensuring both privacy and confidentiality.

Daily PT rounds in the EOP administrative segregation unit (D-5) were observed on August 7.  The rounds were unremarkable and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS.

**Housing**:  CSP/LAC had a 16-bed CTC, with 12 rooms designated as MHCBs that were previously found to be suicide-resistant.  Of note, only eight of 12 rooms (or 67 percent) of the MHCB unit were occupied during the on-site assessment.

The STRH unit had 12 retrofitted cells for inmates on new intake status and the EOP administrative segregation unit (D-5) had seven retrofitted new intake cells.  During inspection of both units, this reviewer observed that all new intake inmates were in new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were found in a variety of designated locations in most yards, as well as the STRH unit and EOP administrative segregation unit (D-5).  All inmates were furnished beds and required to be observed on a 1:1 basis.  From May through July 2019, there were 198 inmates placed in alternative housing, with all but one inmate released within 24 hours.  The majority (53% or 104 cases) of the MHCB referrals were rescinded and inmates returned to their housing units.  This reviewer examined the EHRS charts for a sample of rescinded cases and found that the required SRASHEs were completed in each case.  However, this reviewer also observed a clinician assessing an inmate in alternative housing on August 7.  Although the inmate was subsequently

placed in an MHCB and the required SRASHE completed, the clinician arrived at the assessment without any writing utensil or paper, and did not offer the inmate the opportunity for an out-of-cell interview.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals, an improvement from the previous assessment, which found that patients were not being observed at any interval by nursing staff.

This reviewer, however, observed a potentially troubling practice whereby only one of ten patients in the MHCB unit was on a suicide observation status during the on-site assessment. The remaining patients were on 30-minute "Behavioral Observation" checks, including four patients placed on 30-minute checks either upon admission or within 24 hours of admission despite referral to the MHCB for SI and/or danger to self.  In one case (LAC 1), the patient was admitted into the MHCB unit on August 1, 2019 for "feeling suicidal with plan to cut his throat with a razor knife.  Report also hearing voices telling him to hurt himself," and initially placed on 15-minute Suicide Precaution status before being downgraded to 30-minute checks the following day (August 2) despite the clinician finding "he continues to be suicidal."  In another case (LAC 2), the patient was admitted into the MHCB unit on August 1, 2019 for danger to self and grave disability and immediately placed on 30-minute checks.  In the third case (LAC 3), the patient was initially housed in the MHCB unit at CMC for SI and observed at 15-minute intervals before being transferred to the MHCB unit at CSP/LAC on August 5, 2019, to attend a court hearing the following day.  Despite continuing to express SI to the R&R unit nurse upon his return from court on August 6, the inmate was placed on 30-minute checks because "IP has a history of using MH to manipulate housing" according to the clinical note.  In the fourth case (LAC 4), the patient was admitted into the MHCB unit on August 6, 2019 for SI and threats to cut himself with a razor, was initially placed on Suicide Watch, then downgraded to Suicide Precaution a short time later, and then downgraded to 30-minute checks the following morning, resulting in three changes in observation status in less than 24 hours.  This reviewer recommended to the mental health leadership at CSP/LAC that an in-depth review of observation orders within the MHCB unit be conducted to ensure that patients were not prematurely discharged from suicide observation status.

Further, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on August 7, 2019 for LAC 4, on June 20, 2019 for LAC 5, on July 31, 2019 for LAC 6, and on August 4, 2019 for LAC 7.  The chart review found a variety of violations in observation checks (i.e., LAC 4 had eight violations, LAC 5 had two violations, LAC 6 had eight violations, and LAC 7 had five violations) that were in excess of required 15-minute intervals.  The longest gap between checks was 44 minutes in the case of LAC 4).  Violations in the four cases were by multiple nursing staff.

This reviewer observed one IDTT meeting in the MHCB unit during the on-site assessment. Because the case involved a patient admitted to the unit for grave disability and not SI, their safety plan was not reviewed.  The full IDTT was in attendance.  A subsequent review of 114-A forms indicated that although patients were offered showers on a regular schedule, access to the

yard/day room was limited (approximately once per week), and telephone access was said to be offered on an intermittent basis.

Finally, a review of Guard One data for a recent 24-hour period found 99-percent compliance with required checks not exceeding 35 minutes in the STRH unit and 97-percent compliance in administrative segregation EOP.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of March through July 2019.  A sample EHRS review of 50 emergent/urgent referrals for SI/behavior found that clinical staff subsequently completed the required SRASHEs in 96 percent (48 of 50) of the cases, an improvement from the previous assessment (when the compliance rate was only 85%).

In addition, a CIT protocol was initiated in May 2018 and included a clinician, nurse, and custody supervisor (normally a facility lieutenant) between the hours of approximately 5:00 p.m. to 10:00 p.m. during weekdays and 7:00 a.m. to 7:00 p.m. on weekends.  This reviewer observed a CIT response to an emergency mental health referral on August 7.  The case involved an inmate who was experiencing auditory hallucinations and SIB (cutting his wrist).  The CIT assessment took place in the D-Yard gymnasium.  The inmate was kept in a TTM and, although not in the vicinity of any inmates, an officer was unnecessarily standing next to the TTM.  Following collaboration of team members, as well as consultation with other clinicians, the inmate was admitted into the MHCB unit.

This reviewer examined a sample of ten SRASHEs from patients released from the MHCB unit during between June and July 2019.  There was uneven demonstration of specific safety plan strategies to reduce recurring SI in the safety plan section of the assessment.  For example, in one case (LAC 8), this safety plan simply recited *Program Guide* requirements and deferred coping strategies to the patient's PC in 3CMS:

> 1) Provide positive encouragement and use of Motivational Interviewing techniques to explain the stages of change.
> 2) Conduct risk of harm assessment periodically and if clinically indicated, monitor decompensation of symptoms.
> 3) Psychiatry to monitor for medication need as IP does not have a documented MH disorder, however, is currently being prescribed psychotropic medications.
> 4) Work with IP to identify coping skills to manage endorsed symptoms and maintain engagement in programming without any issues or incidents.
> 5) Help IP identify goals for treatment and for future to encourage active participation in his treatment at the CCS MS LOC.
> 6) PC to educate IP on distress tolerance and support IP in process of addressing concerns.
> 7) PC to engage IP and problem solving to identify ways IP can get his wants/needs met without having to over endorse/pain symptoms and/or make gestures to affect housing/LOC change.

Of note, the inmate was found "hanging unresponsive from the light fixture" in his cell the following day (July 12). He was taken to an outside hospital for treatment, returned to the facility, and readmitted into the MHCB unit.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 178 cases of patients discharged from a MHCB or alternative housing placement who remained at CSP/LAC and were not transferred to the administrative segregation units (where observation at 30-minute intervals was required) from February through August 2019. The review found that 98 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority of the custody checks recommended for the full 72 hours by clinicians. In addition, only 67 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the deficiencies found were gaps in observation by custody personnel. A low compliance rate for custody checks was also found in the previous assessment.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response bag.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (May through July 2019) found that a quorum was not achieved for one (May 2019) of the meetings. Meeting minutes were otherwise unremarkable. Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was not contained within any CSP/LAC LOP. In addition, the facility did not have a required LOP for both a "high-risk management program" and additional "bad news" screening of inmates returning from court or BPH.

**Training**: According to training records, only 87 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 90 percent of custody, only 71 percent of medical, and only 63 percent of mental health staff received annual suicide prevention block training during 2018. Similar low percentages of medical and mental health staff completing annual suicide prevention block training was found in two previous assessments. Finally, as of July 2019, 88 percent of mental health clinicians had completed the SRE mentoring program, only 52 percent had received the seven-hour SRE training, and only 63 percent had completed safety plan training.

**Recent Suicides**: CSP/LAC experienced two inmate suicides during the reporting period. In the **_first_** case (LAC 9), the inmate was found hanging from a ventilation grate by a sheet in his GP

cell during the afternoon of April 10, 2019. He had entered the CDCR system on October 22, 2013 for a third term to serve a nine-year and four-month sentence for vehicle theft. He was transferred to CSP/LAC on December 4, 2018. The inmate had 16 RVRs during his confinement, the most recent of which occurred on January 6, 2019 for fighting. He was not known to be gang affiliated. The inmate was placed on an SNY from December 31, 2014 to January 12, 2018 due to safety concerns arising out of other inmates' knowledge of his sex offense arrest when he was a juvenile. He did not appear to have any family support in the context of visits or telephone calls, although it appeared that he tried unsuccessfully to call both his father and another brother several times in the months leading up to his death. The inmate was single and did not have any children.

According to available information, the inmate and approximately 11 half-sisters and half-brothers were raised by his father and stepmother until age 8 when he was placed into the foster care system. He reported physical abuse by his stepmother. The inmate never graduated high school, began using illegal drugs at age 15, and was arrested for lascivious conduct at age 16. He received his first juvenile conviction at age 17 for breaking and entering. He served two previous CDCR terms for property offense convictions.

The inmate had been diagnosed with ADHD at age 7 and was reportedly hospitalized for 15 days as an adolescent due to on-going behavioral problems and aggressiveness. He was subsequently diagnosed with "Oppositional Defiant Disorder, ADHD, and Substance Abuse Disorder." During his previous CDCR terms, the inmate was treated at the 3CMS level of care. Upon entry into CDCR for his third term in October 2013, he was initially placed in 3CMS with diagnoses of "ADHD, Polysubstance Dependence, and Substance Induced Mood Disorder." On February 6, 2014, his level of care was changed to EOP after he started endorsing auditory hallucinations and demonstrating impulsive and unpredictable behavior towards staff and other inmates. His diagnoses were changed to "Psychotic Disorder, NOS, with a rule out for Schizophrenia." He remained in EOP until referred to the intermediate care program at DSH on June 18, 2014. The inmate returned to EOP in CDCR on December 31, 2014 with diagnoses of "Schizophrenia, Paranoid Type, and Antisocial Personality Disorder."

During the next few years, documentation indicated that the inmate was stable for significant periods of time and did not exhibit any psychotic symptoms, disorganized thinking, or appear to respond to internal stimuli. He was not prescribed any psychotropic medication. However, on October 13, 2017, the inmate was referred to a MHCB for danger to self after he was observed to be repeatedly punching a wall. He reported being upset and distressed about his family. The inmate was discharged back to EOP with a diagnosis of Schizoaffective Disorder. As noted by the CDCR reviewer in this case, "It is unclear why this diagnosis was selected as he did not endorse psychotic symptoms and was not prescribed antipsychotic medications." His diagnoses were later changed to "Major Depressive Disorder, ADHD, Adult Antisocial Behavior, multiple substance abuse, rule out Schizoaffective Disorder." During the next two years, although clinicians did not believe the inmate's behavior necessitated a higher level of care (to either a MHCB or PIP), he had a high treatment refusal rate (less than 50% compliance) and he missed approximately 63 percent of scheduled EOP appointments. However, the inmate maintained adequate compliance with his psychotropic medication.

The inmate did not have a significant history of SI and denied any previous suicide attempts in the community or while confined in CDCR. According to most of the completed SRASHEs, his chronic risk for suicide was consistently listed as "moderate" due to his history of psychosis, depression, poor impulse control, substance abuse and chronic pain (from arthritis). His acute risk for suicide was consistently listed as "low." The inmate's last SRASHE was completed in December 2018.

The CDCR reviewer did not opine on any specific precipitating factors that led to the inmate's suicide and, although he had several chronic medical conditions, none were thought to be related to his decision to commit suicide. According to the CDCR reviewer, "information gathered during the course of this review suggests the patient had significant persecutory ideation which most likely impacted his beliefs regarding his release from CDCR. The inmate wrote several letters and filed several appeals that implied he believed CDCR was illegally extending his release date. He believed he should have been released from prison. He was attacked on several occasions while in prison, and reported trauma and nightmares of being attacked, so a prolonged stay in a CDCR setting may have exacerbated his fear and anxiety…..Given his guarded demeanor, the fact that he did not disclose his delusions to mental health staff, and as he exhibited no signs of significant impaired function, it is reasonable to assume he did not trust staff enough to discuss the content of his delusions and concerns regarding his release date from prison. This may be why he remained guarded about his beliefs and the decision to end his life."

The Suicide Report contained three (3) recommendations for corrective action through a QIP:

> 1) CMC: On February 7, 2018, the inmate was transferred from one institution's ASU to another institution's ASU where no clinician-to-clinician contact was documented as required per ASU policy 'Mental Health Clinician to Mental Health Clinician Contact in the ASU,' 12.06.401.

> 2) COR: On October 16, 2018, the inmate was seen for IDTT. The treatment team did not select the higher level of care considerations for higher treatment refusal in the Master Treatment Plans. In addition, IPOCs were not updated during his Master Treatment Plan and high group refuse rate should have been added to his IPOC. It is possible these oversights contributed to an underestimation of the severity of his mental illness and suicide risk.

> 3) CSP-LAC: On December 18, 2018, the inmate was seen for IDTT. On this occasion, the treatment team did not select the higher level of care considerations for higher treatment refusal in the Master Treatment Plans. In addition, IPOCs were not updated during his Master Treatment Plan and high group refusal rate should have been added to his IPOC. It is possible these oversights contributed to an underestimation of the severity of his mental illness and suicide risk. CSP-LAC identified these areas as concerns in their internal review and will provide training to the clinicians involved in the treatment of the inmate.

In the **_second_** case (LAC 10), the inmate was found hanging from the top bunk by a sheet in his GP cell during the morning of June 3, 2019. He had entered the CDCR system on February 28,

2014 to serve a 17-year sentence for kidnapping and assault with force likely to produce great bodily harm (on his former girlfriend). He was transferred to CSP/LAC on December 20, 2016. The inmate had 15 RVRs during his confinement, including two for fighting within the last ten days of his life. He was known to be gang-affiliated in the community, but not within CDCR. There was no record of any family support in the context of visits or telephone calls, although the inmate's mother stated after his death that they had frequent letter correspondence. The inmate was unmarried and had one child.

According to available information, the inmate and his half-brother were raised by both parents. There was no reported history of any abuse, but the inmate had both developmental problems and behavioral problems in high school, resulting in many fights and he was unable to graduate. His employment history was sporadic. The inmate engaged in substance abuse at an early age and started using methamphetamine at age 12. He reported being gang-affiliated in the community, and had an extensive juvenile and adult criminal history.

The inmate a history of at least two psychiatric hospitalizations in 2011 prior to his CDCR confinement. He was also treated for depression, SI, and sleep disturbances in the county jail. Upon entry into CDCR, the inmate initially denied any mental health issues and did not want to be included in the MHSDS. However, the inmate received a mental health referral in December 2017 after displaying bizarre behavior, including an observation that he was talking to himself. When evaluated, he denied having any mental health problems and stated "I keep to myself. I am antisocial. I kept to myself in school and like to be left alone." He downplayed any symptoms of mental illness, but incurred multiple RVRs for fighting and indecent exposure.

On December 28, 2015, the inmate was placed at 3CMS level of care, but refused to consent to services. He was diagnosed with "Psychotic Disorder, NOS, Polysubstance Dependence, and Antisocial Personality Disorder." The inmate continued to refuse any programming or psychotropic medication. During the ensuing months, his behavior and symptoms of mental illness worsened. Finally, on January 26, 2016, his level of care was elevated to EOP. According to the CDCR reviewer in this case, the inmate was on the "high risk" list at RJD for treatment refusal and "He largely declined mental health contact, frequently just yelling at staff members to leave him alone. On some occasions he simply ignored the clinician and did not speak. He refused groups. He refused medical contacts and nursing assessments as well. He accepted meals. Psychiatric technician rounds increasingly reflected refusal to speak or guardedness." On February 17, 2016, the IDTT referred the inmate to the intermediate care program at DSH and, following his appeal of their decision with a *Vitek* hearing, he was subsequently placed in the program on March 25, 2016. While in DSH, the inmate was involuntarily medicated pursuant to PC 2602. He remained in the DSH program for nine months until December 20, 2016, when he was discharged to EOP at CSP-LAC. His diagnoses were changed to "Schizophrenia, Undifferentiated Type, and Polysubstance Dependence."

Upon his return to CDCR, the inmate initially attended many scheduled groups and most contacts with his PC. Although he continually advocated to be taken off of his involuntary medication, the PC 2602 order was continued in July 2017. By March 2018, he was telling his IDTT that "medications help me not hear voices, keep me from being paranoid, from fighting people, from attacking the walls." He continued to program in EOP. His PC 2602 order was

upheld again in May 2018.  However, by January 2019, the inmate began missing groups and confidential sessions with his PC.  He admitted using methamphetamine.  During February and March 2019, the inmate's programming improved, and he returned to both group and individual treatment.  In April, he began complaining of auditory hallucinations, telling his PC that "When I confront them, they don't say much….it could be sneak dissing, talking about me behind my back.…I'm gonna go back and birdbath after this one-on-one."  He continued to complain about auditory hallucinations to his PC, who noted "Consider the possibility IP may be exaggerating symptom complaints in an attempt to avoid CCCMS LOC due to fears for safety."

On May 3, 2019, the inmate's PC 2602 order was allowed to expire.  A few weeks later on May 20, 2019, he requested nursing assistance and had bloodied his hands punching the wall of the cell.  The inmate was treated for various cuts before being returned to his housing unit without a mental health referral.  In addition, the inmate incurred two RVRs for fighting on May 25 and May 30, 2019.  Both incidents involved unprovoked attacks on other inmates.  The inmate was seen by a psychiatrist on June 1, two days before his death.  He denied any SI or HI, and did not want to change his medications.  It was suspected that he was cheeking his medication.  His level of care and medications remained unchanged.

The inmate always denied a history of suicide attempts, although acknowledged "thinking of jumping off a 7-story building" while high on methamphetamine sometime around 2011-2012.  He did not have any MHCB admissions during his CDCR confinement.  His most recent SRASHE was completed in February 2018 and indicated a "moderate" chronic risk and "low" acute risk for suicide.

The CDCR reviewer did not opine on any specific precipitating factors that led to the inmate's suicide.  The inmate did not have any significant medical problems that were thought to be contributory to the decision to commit suicide.  However, according to the CDCR review, "information gathered during the course of this review suggests he had become acutely psychotic in the weeks before his death.  The psychosis was of such severity as to contribute to unprovoked attacks, bizarre and agitated behavior, such as punching walls, and obvious responses to auditory hallucinations.  He had contemplated and prepared for suicide during prior periods of acute psychosis, such as at DSH-ICF in 2016, and when stable had reported one of the benefits of his injectable medication was 'it helps me not be suicidal'….In hindsight, it is unfortunate the inmate was not moved to a higher level of care, particularly as medication issues could have been addressed in a safer and more controlled setting.  In addition, a suicide risk evaluation would have been required prior to discharge from a Mental Health Crisis Bed."

The Suicide Report contained five (5) recommendations for corrective action through a QIP:

> 1) No mental health documentation in the weeks prior to the suicide reflects consideration of inpatient care, which appeared to have been called for given the increasing acuity of psychotic symptoms, regular complaints of auditory hallucinations, aggressiveness, and bizarre behaviors presented (e.g., responding to auditory hallucinations during mental health visits).  A return of hallucinations and agitated behavior (e.g., punching walls) was noted from April 4, 2019 through the date of death, with paranoid symptoms reported even earlier (e.g., March 20,

2019). Additionally, although attempts at medication adjustment were made, no substantive changes were realized and no improvement in symptoms was accomplished in the EOP setting. As psychotic symptoms worsened, there appeared to be minimal consideration to reinstating or continuing PC 2602 involuntary forced medication and returning the patient to an inpatient setting to re-stabilize.

2) Despite a deteriorating course and despite by the inmate's statements his injectable medication had the benefit of reducing hallucinations and taking suicidal thoughts away, no formal suicide risk evaluation was conducted while he complained increasingly of 'voices.' There was only one incomplete SRASHE in the record from 2017 to the date of death.

3) On May 29, 2019, two RVR MHAs were completed regarding the inmate's recent behavior. In one (fighting), mental illness reasons were not seen as contributory. However, a different clinician and a specialist found evidence for a mental illness contribution on the same day for a separate charge (behavior that could lead to violence). The author of the RVR-MHA for fighting did not appear to carefully review the medical record from recent days in coming to her conclusion.

4) During the review of the responding staff report, it was noted there was a malfunction and the cut-down tool was unable to be opened. Although staff were able to quickly untied the ligature, this brings into question the functionality of the cut-down kit and if inventory is able to occur or if the kits are able to be utilized in future responses.

5) On May 20, 2019, the inmate was treated by a nurse for abrasions and lacerations on his hands from hitting the walls of the cell. He reported on several other occasions his behavior was related to agitation from auditory hallucinations. However, no referral was made to mental health after the inmate was treated, and subsequent mental health notes do not contain references to this information.

### 16)    California State Prison - Corcoran (CSP/Corcoran)

**Inspection**: October 2-3, 2019 (previous suicide prevention audit was October 10-11, 2017). CSP/Corcoran housed approximately 3,206 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on October 2. The nurse was observed to be asking all of the required questions and entering the information into the EHRS. Following this reviewer's previous assessment, a TTM has been installed inside the nurse's office. During this assessment, the nurse's office door was closed during the screening process, the inmate was placed in the TTM, and an officer was stationed in the hallway. Privacy and confidentially were maintained, a significant improvement from the previous assessment.

Daily PT rounds were observed in two (of four) administrative segregation units (EOP administrative segregation and STRH) on October 2. The rounds were unremarkable and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Form and entering the information into the EHRS.

**Housing**: CSP/Corcoran had 24 MHCBs that were previously found to be suicide-resistant. Of note, only 16 of 24 rooms, or 67 percent of the MHCB unit were occupied during the on-site assessment. There were five new intake cells (101-105) located in the STRH unit and five new intake cells (124 through 128) located in the EOP administrative segregation unit (3A03). The EOP unit had previously been located in 3A04. During inspection of both of these units, all new intake inmates were observed to be in new intake cells. However, many new intake inmates in the STRH unit complained about not having entertainment devices as required. Shortly thereafter, the problem was resolved when tablets were issued to those inmates.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in either a GP unit (4A3) or four designated OHU cells. All cells used for alternative housing had beds, with inmates in OHU cells provided stack-a-bunks, and required to be observed on a continuous 1:1 basis. Alternative housing was used extensively at CSP/Corcoran. During August and September 2019, there were approximately 142 inmates placed in alternative housing, with all but one released within 24 hours. Approximately 17 percent (24 cases) of the MHCB referrals were rescinded and inmates returned to their housing units. This reviewer examined the EHRS charts for all of these rescinded cases and found that the required SRASHEs were completed in all cases.

**Observation**: Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB unit. In fact, all patients in the MHCB remained on Suicide Precaution status until their discharge. As detailed below, this practice was problematic because stable patients never received "full-issue" possessions. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on July 20, 2019 for COR 1, on September 26, 2019 for COR 2, on September 27, 2019 for COR 3, and September 30, 2019 for COR 4. The chart review found a variety of violations in observation checks (i.e., COR 1 had seven violations, COR 2 had six violations, COR 3 had highly questionable exact 15-minute documented checks for a five-hour period despite being on Suicide Precaution status requiring staggered checks, and COR 4 had four violations) that were in excess of required 15-minute intervals. The longest gap between checks was 35 minutes in the case of COR 2. Violations in the four cases were by multiple nursing staff. Of note, deficiencies in MHCB observation were also found in one of the recent suicides (COR 6) at the facility.

This reviewer's previous assessment found numerous deficiencies regarding the issuance of both possessions and privileges for MHCB patients. Similar problems were found during this assessment. For example:

> First, similar to previous assessments, no patients on full-issue clothing status were issued either a uniform or shirts and pants. As such, it was common to read

provider orders that stated "full issue," but the patient clothed only in "whites" (i.e., t-shirt and shorts) and not in a uniform.

Second, despite the fact that patients are clinically discharged from both Suicide Precaution status and the MHCB, but remained on the unit awaiting transfer, such patients still did not receive full-issue clothing.

Third, at least two patients from a PIP-ICF program were housed in the MHCB unit while attending court hearings. Each patient was clothed in a safety smock despite the fact that they had not been assessed as suicidal and had not been clothed in safety smocks while housed in the PIP-ICF program.

Fourth, MHCB patients on maximum-security/administrative segregation status still were not receiving yard privileges because the small management yard (SMY) attached to the MHCB unit had previously been determined to be unsecure. This issue was first reported by this reviewer in 2014 and had still not been remedied. During the current site visit, this reviewer was presented with a "Project Request Form" to install security fencing on the roof area of the SMY that was attached to the CTC. The request was signed by the CEO at CSP/ Corcoran in January 2019. To date, no action has been taken.

Fifth, this reviewer was informed that, due to the above problem of maximum-security/administrative segregation patients not receiving yard privileges, they were given priority for "out-of-cell activity" (OCA) in the RT's office. However, when interviewed by this reviewer, the RT was unaware of this OCA protocol and, therefore, patients on maximum-security/administrative segregation status were not given any such priority.

Sixth, a PT who performed RT responsibilities on a part-time basis in the MHCB unit incorrectly stated to this reviewer that all patients were prohibited from having pencils or pen fillers.

Seventh, although the RT stated that they attempted to get each of the MHCB patients out of their cells two or three times per week, review of the 114-A forms of 11 patients found that only showers were documented in the vast majority of cases. Of note, the RT also informed this reviewer that they did not conduct an "RT Initial Assessment" on each patient, contrary to what is commonly completed in other CDCR facilities that have RTs assigned to MHCB units.

*In sum, most of the above deficiencies were identified by this reviewer in the initial 2014 assessment, and remained very problematic.*

Finally, a review of Guard One data for a recent 24-hour period found a combined 97-percent compliance in the STRH and EOP administrative segregation units with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of from April through September 2019.  A sample EHRS review of 20 cases of emergent/urgent mental health referrals for SI/behavior found that clinicians completed the required SRASHEs in all of the cases.

In addition, a CIT protocol had been initiated at CSP/Corcoran in October 2018 and included a clinician, nurse, and custody supervisor (lieutenant or sergeant).  Despite the fact that this reviewer was informed by a clinician that the overall goal of the CIT "was to reduce referrals to the MHCB," whereas the goal should simply be to respond to, and attempt to, de-escalate a mental health crisis, therefore reducing inappropriate referrals, a review of the LOP for the "Crisis Intervention Team," No. 1081 found that it was quite extensive, and included specific "CIT Review Checklist" requirements for the clinician, nurse, and custody supervisor.  Of note, deficiencies in CIT assessments of suicide risk were also found in one of the recent suicides (COR 7) at the facility.

This reviewer observed five IDTT meetings in the MHCB unit on October 2-3.  Most of the meetings were very problematic, and included inadequate discussion of case formulations, diagnoses, and safety planning for those patients being considered for discharge.  For example, in COR 5, the patient was admitted into the MHCB unit on September 27 for SI.  Although the patient was asked about any current SI during the IDTT meeting on October 2 and answered "no," there was no case formulation, no diagnoses discussed, and he was simply handed a copy of his safety plan that was developed the previous day, and informed he would be discharged back to EOP.  Subsequent review of the safety plan section of the patient's discharging SRASHE indicated the following:

> Step 1 (Warning Signs):  Pt stated 'Anxious feeling, don't sleep, when having cravings to drink for emotional release.'

> Step 2 (Independent Coping Skills):  Pt stated 'I reflect on myself and what I'm tripping on that I don't usually trip over.'

> Step 3 (Distracting People & Places):  Pt stated 'Now it's going to groups, working a job, exercise.'

> Step 4 (People to Ask for Help):  Pt stated 'I just got here to COR, I don't know anybody, I'm not sure I can find somebody, I'm social so it's okay. Actually, just want to go on with my day, I don't want to be distracted by people and get in trouble with drinking.'

> Step 5 (Professionals to Contact):  Pt stated 'clinicians, nursing staff.'

> Step 6 (Means Safety):  Pt stated 'Less people I talked to the less problems I have, so I'll be more careful with who I talked to.

Step 7 (Reasons to Live): Pt stated 'I am Batman.' Pt stated, 'I am awesome! Actually, I have a son and other family out there, he's a little sh..t so I need to deal with him when I get out.'

In another case (COR 3), a patient with paraplegia was admitted into the MHCB unit on September 24 for SI. During the IDTT meeting on October 2, although the issue of SI was briefly addressed, with the patient stating that he did not have a current plan to commit suicide, he readily acknowledged that he thought about "death and not living," and suicide every day. The issue was not addressed further nor was there any acknowledgment of his chronic suicidality contained in the MHPC Inpatient Progress Note or discharging SRASHE, both dated October 2. Subsequent review of the safety plan section of the patient's SRASHE indicated the following:

Step 1 (Warning Signs): Gets angry, out of control.

Step 2 (Independent Coping Skills): write poems, exercise.

Step 3 (Distracting People & Places): mom, religion, Judaism.

Step 4 (People to Ask for Help): friends, family.

Step 5 (Professionals to Contact): clinician, psychiatrist, nursing, some custody.

Step 6 (Means Safety): 'I will not talk to the people that use drugs.' 'I will use anger management techniques to calm myself down and be safe.' 'I will take my medication as prescribed.'

Step 7 (Reasons to Live): I still think there are things to live for although sometimes my disability gets discouraging.' 'I will distract myself when I have negative thoughts.'

In a third case (COR 4), the patient was admitted into the MHCB unit on September 25 for SI following a hanging attempt. He had a significant history of prior suicide attempts and his chronic risk for suicide had been assessed as "high." During the IDTT meeting on October 2, there was no case formulation, no diagnoses discussed, and little discussion regarding current SI. Safety planning appeared to be discussed for the first time during this IDTT meeting with the PC asking, "What coping skills do you have?" The patient replied, "exercise and drawing." He was subsequently discharged to EOP. Subsequent review of the safety plan section of the patient's discharging SRASHE indicated the following:

Step 1 (Warning Signs): patient acknowledged warning signs including holidays, not being able to see his daughter.

Step 2 (Independent Coping Skills): patient previously reported drawing but today said participating in 1:1s and possibly going to EOP.

Step 3 (Distracting People & Places):  patient reported thinking about his daughter in speaking with his family.  Exercising and writing to daughter.  Journaling.

Step 4 (People to Ask for Help):  mental health and PC.

Step 5 (Professionals to Contact):  mental health and PC.

Step 6 (Means Safety):  PC mental health, MHD medication evaluation.

Step 7 (Reasons to Live):  Patient reported 'My daughter, my family, my twin sister, religious beliefs, cultural beliefs.'

None of the above three safety plans (COR 3, COR 4, and COR 5), nor any of the other sampled safety plans for patients discharged from the MHCB unit during August and September 2019 contained addressed modifiable risk factors, protective factors, and warning signs, nor specific strategies, including reasonable coping skills, patients could utilize to reduce recurrence of SI. Of note, deficiencies in case formulation, premature MHCB discharge, and safety planning were also found in one of the recent suicides (COR 6) at the facility.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 204 cases of inmates discharged from either the MHCB unit or alternative housing who remained at CSP/Corcoran and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from mid-April through September 2019.  The review found that 95 percent had Page 1 of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with the majority of custody checks recommended for between 48 and 72 hours.  In addition, 88 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals, with problems related to time gaps for correctional officers consistently conducting checks at 30-minute intervals.  Despite less than 90-percent compliance for discharge custody checks by correctional officers, there was still significant improvement in this area since this reviewer's previous assessment.  Of note, however, deficiencies in discharge custody checks was found in one of the recent suicides (COR 6) at the facility.

**Intervention**:  Housing units toured by this reviewer contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (June through August 2019) found that quorums were not achieved for any of the meetings.  Lack of quorums was mostly related to the absence of psychiatry representation.  Meeting minutes were otherwise

unremarkable.  This reviewer was also presented with a CAP based upon the previous suicide prevention assessment.  Dated October 2017, the CAP indicated that the issue of MHCB patients having allowable possessions, property, and privileges had been "completed."  As indicated above, the status of the CAP was incorrect because this and other issues within the MHCB unit remained very problematic.  Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was contained in a CSP/Corcoran memorandum entitled "Addendum to Operational Procedure 1018, Suicide Prevention and Response," effective September 4, 2019.  The memorandum did have a procedure for the "high-risk management" program, but did not have the required procedure for additional "bad news" screening of inmates returning from court or BPH.

**Training**:  According to training records, 97 percent of custody and 99 percent of nursing staff were currently certified in CPR.  In addition, 99 percent of custody staff, 89 percent of medical staff, and 89 percent of mental health staff completed annual suicide prevention block training during 2018.  Finally, as of September 2019, 99 percent of mental health clinicians had completed the SRE mentoring program, 96 percent had received the seven-hour SRE training, and 96 percent had completed safety plan training.  These compliance rates for SRE and safety planning training were significantly improved since this reviewer's prior assessment.

**Recent Suicides**:  CSP/Corcoran experienced four inmate suicides during the review period.  In the _**first**_ case (COR 6), the inmate was found hanging from the upper bunk by a sheet in his SNY cell during the morning of January 30, 2019.  Of note, the inmate's body was found in the state of rigor mortis despite the fact that he was required to be observed at 30-minute intervals following his discharge from a MHCB unit the previous day (January 29).  The inmate entered the CDCR system on March 4, 2014 to serve a life-sentence without parole for first-degree murder, as well as five additional charges for rape with force/violence/fear of bodily injury, burglary, false imprisonment, terrorist threat, and robbery.  He was transferred to CSP/Corcoran on June 9, 2017.  The inmate had ten RVRs during his confinement, including two within 12 days of his death.  The inmate was known to be gang-affiliated.  His family support included letter correspondence, telephone calls, and visits.  The inmate was unmarried and had two children.

According to available documents, the inmate had a dysfunctional childhood and was raised by parents who were involved in the criminal justice system, and experienced both mental illness and substance use.  Although he dropped out of high school, the inmate had a steady history of employment in the community that included both administrative and manual labor positions.  However, he also had an extensive history of juvenile and adult arrests.  The inmate was first treated for mental illness in the community at age 16 when he was experiencing both ADHD and environmental stressors related to his parents' problems. Upon entry into CDCR, the inmate was not placed in the MHSDS until August 2004 following a self-report of depression, labile mood, sleep difficulties, and feelings of hopelessness.  He was placed at the 3CMS level of care where he remained until his death.  Prior to 2018, the inmate had a history of only one MHCB admission in October 2008.  Over the next ten years, he remained fairly stable in mental health treatment which focused on chronic symptoms of mild to moderate depression, anxiety, substance abuse, poor impulse control, and sleep difficulties.  His initial diagnosis was

Depressive Disorder, NOS, which was later revised in January 2019 to "Major Depressive Disorder, Mild, and ASPD [Antisocial Personality Disorder]."

On January 18, 2019, the inmate reportedly set his cell on fire in a suicide attempt and was placed in a MHCB. He reported that he had "relapsed on meth and weed," was unable to speak with his family, and had lost his jobs within CDCR. There were also reports that the inmate had deliberately set the cell on fire in order to be transferred from his current housing yard. He had alleged that correctional officers had "leaked" his prior sexual offense to other inmates, which caused safety concerns. He later reported SI because he felt custody staff "didn't care" and were planning to send him back to the yard. During his entire MHCB placement, he remained on Suicide Watch and in a safety smock which, according to the CDCR reviewer in this case, "there was no justification for the issue or observation level in any of the clinical documentation." There was, however, a progress note dated January 20, that indicated the patient "has safety concerns. He has lost two jobs, lost property, and he is life without [parole] and there is nothing to live for. He is depressed and suicidal. Patient said he will not change and stop trying to kill himself until he feels safe." Another brief progress note dated January 27 indicated that the inmate reported that "he is still depressed and having SI."

The inmate's stay in the MHCB unit was relatively uneventful until January 28, 2019, when he began to express extreme paranoia, mood lability, decreased need for sleep, and was observed to be not only agitated, but "disorganized and tangential in his speech and thought patterns." He also began refusing medication and was yelling and banging on the cell door. Multiple staff believed he was under the influence of substances and a toxicology screen subsequently found (after the MHCB discharge) that the inmate was positive for methamphetamine. Although initially scheduled to be discharged from the MHCB unit on January 28, the decision was postponed for one day given his behavior change. The psychiatrist met with the inmate at cell front on January 28 and the inmate stated "I'm going to be killed in this crisis cell. I need you to find three new officers to get me out of here. Everyone in here is planning to stab me." The inmate was given an emergency injection of Zyprexa.

The following day on January 29, 2019, MHCB staff reported that the inmate's behavior had changed, and he was now both "calm and cooperative." However, subsequent review of nursing documentation revealed that in the early morning of January 29, the inmate attempted to tear up his mattress and use pieces to make a noose. The documentation also stated that the inmate "had something from his mattress tied around his neck but was unable to hang it up." Such documentation did not appear in any mental health records and clinicians were apparently not aware of this incident. The inmate's discharge IDTT meeting was held in absentia because he refused to attend due to his paranoia against correctional officers. According to a mental health clinician who was interviewed by the CDCR reviewer following the suicide, there was concern that the inmate's behavior would escalate if they attempted to bring him to the IDTT meeting that day, thus the inmate was informed of the IDTT's decision at cell front that he was being discharged back to 3CMS. It was also determined that there was no discussion regarding the inmate's safety concerns by the correctional counselor during the IDTT meeting.

It was also unclear how the discharging SRASHE was completed that day (January 29) when the inmate refused to attend, or was not asked to attend, his IDTT meeting and he was only seen by

the clinician cell front. The SRASHE also did not contain reference to the suicidal gesture in his MHCB room that morning. The inmate was discharged from the MHCB unit later that day and placed on five-day follow-up, requiring that he would be seen daily by a clinician and observed that 30-minute intervals by correctional staff for between 24 and 72 hours based upon clinical judgment. As previously stated, the inmate committed suicide the following morning (January 30) while he was still required to be on 30-minute observation checks. His body was found in the state of rigor mortis, indicating that the documented checks were not accurate.

Apart from the inmate's continued expression of SI and suicide gestures that were thought to be secondary to his safety concerns, the CDCR reviewer did not find any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. The inmate did not leave a suicide note and had a minimal medical history. According to the CDCR reviewer, "While in the MHCB, the inmate may have initially felt safe, however, as he continued to use substances and was faced with his upcoming discharge, this illusion evaporated. Prior to his discharge, his behavior escalated resulting in acute paranoia and forced medication. Additionally, he engaged in self-injurious behavior and reported on-going suicidal thoughts. The combination of both financial and status losses, layered with an increase in substance use, anxiety, and safety issues were conceivable triggers that may have been associated with his decision to end his life."

The Suicide Report contained 12 recommendations for corrective action through a QIP:

> 1) The inmate was seen October 12, 2017 for his routine CCCMS contact, but was not seen again until April 11, 2018. Following this contact, he was not seen again until August 29, 2018. Per the Mental Health *Program Guide* 12.3.15, face-to-face individual contact between the PC and the CCCMS inmate-patients in a general population setting shall occur as often as clinical needs dictate but at least once every 90 days.

> 2) The discharge from the MHSDS on October 19, 2018 was problematic for the following reasons: the discharge IDTT was held in absentia with no documentation describing if the discharge plan had been discussed prior to discharge, the inmate only had routine contacts twice in 2018, the discharge MH Master Treatment Plan had minimal information related to a clinical summary and case formulation, and the rationale for discharge section was left blank.

> 3) On January 18, 2019, the inmate was seen for an emergent consult in response to reported suicidal ideation following his suicide attempt. It was noted in the emergent consult order information that this interview occurred in a non-confidential setting, however, the clinician failed to document the reason for conducting the interview in a non-confidential setting.

> 4) The SRASHE completed on January 18, 2019 as part of the inmate's referral to the MHCB had a number of deficiencies including: multiple areas of this form left blank including the majority of the 'Suicide and Self-Harm' page. Despite listing multiple chronic risk factors, chronic risk was deemed as 'low.' The inmate

reported a recent loss of family support and decreased communication, but these were defined as protective factors in this evaluation. The safety plan included a referral to the MHCB, but safety planning section was minimal.

5) The overall documentation from the MHCB placement at Corcoran from January 18, 2019 through January 29, 2019 had a number of deficiencies. (Please see *Conclusions* section for more details).

6) The inmate's discharge from the MHCB on January 29, 2019 was problematic in regards to paperwork and clinical decision. (Please see C*onclusions* section for more details).

7) MHCB Process and Treatment Team Communication. On January 28, 2019, a nursing document within the interactive view indicates observation of the inmate 'hitting his head on the door.' On January 29, 2019, in nursing document located in the same place, indicates observation of the inmate tearing up his mattress and tying something around his neck. Documentation indicates 'at this moment (sic) there talking to him so he can give it up.' However, there is no documentation of the result of these incidents, if mental health was contacted, and if the treatment team was aware of these incidents, as he was discharged approximately 12 hours after the second incident.

8) Both the assigned psychologist and assigned psychiatrist made the decision to discharge the patient from the MHCB. The discharge occurred shortly after significant agitation and other symptoms likely fueled by psychosis. A focus on substance abuse as a precipitant of psychotic symptoms, together with expectations that psychotic symptoms due to substance abuse would resolve quickly, may have led to treatment and discharge decisions that missed opportunities to adjust in response to continuing symptoms.

9) The first responder failed to announce the emergency immediately upon discovery, causing a delay of approximately two minutes.

10) Based on reports and information submitted by responding staff, the inmate's body was observed to have signs of rigor mortis. This calls into question the thoroughness of the Custody Welfare checks completed prior to his discovery. This incident is being referred for investigation to the Office of Internal Affairs.

11) The inmate was seen in IDTT on January 22, 2019 for his initial MHCB IDTT. During the on-site review it was noted the correctional counselor regularly attends two IDTTs at the same time, and often goes in and out of each IDTT.

12) Suicide watch was not consistently documented in Cerner. (Multiple days of documentation were done on paper and a few times were pre-written on paper forms prior to actual observation.)

In the **_second_** case (COR 7), the inmate was found hanging from the upper bunk by a sheet in his GP cell during the morning of April 11, 2019. The inmate entered the CDCR system exactly two years earlier on April 11, 2017 to serve an 11-year sentence for second attempted murder, inflecting great bodily injury, and possession of a deadly weapon. He was transferred to CSP/Corcoran on March 4, 2019. During his confinement, the inmate was on a SNY due to safety concerns for being a gang-dropout. He incurred 11 RVRs during his confinement, including one for fighting in the week prior to death. His family support included visits, telephone calls, and letter correspondence with his mother. The inmate was single and did not have any children.

Available documents regarding the inmate's background were very limited, with records indicating that he and several siblings were raised by his mother and stepfather. His upbringing was described as maladaptive, involving both abuse and neglect. Mental health records indicated that he had a learning disability, was bullied by peers, and eventually dropped out of high school. Limited information was available regarding substance use, employment, and involvement in the juvenile/criminal justice systems. The inmate previously reported that he was hospitalized for unknown psychiatric reasons in 2011, and also attempted suicide by drug overdose several days before the instant offense in 2016 that was allegedly caused by being harassed by co-workers at his job. Other records indicated that a suicide attempt by hanging occurred in 2011.

The inmate was not initially enrolled in the MHSDS when he entered CDCR in April 2017. The following year on June 10, 2018, he submitted a mental health referral for psychiatry. When seen five days later on June 15, the inmate told the psychiatrist that "I feel anxious and depressed. I hear voices which are talking bad things about me - telling me I'm not good and I should hit somebody." The inmate disclosed that he had been experiencing auditory hallucinations for "a long time," but had not previously disclosed the symptoms because he felt embarrassed. The psychiatric note also reflected that the inmate appeared "confused, withdrawn, and spaced out." Although placed on psychotropic medication, he was not formally placed in the MHSDS until several months later in September 2018.

On September 25, 2018, the inmate was seen by a mental health clinician after again complaining of auditory hallucinations, stating that "I was like suffering from depression and hearing voices in my head. He was placed at the EOP level of care with diagnoses of "Adjustment Disorder, Unspecified, and Schizophrenia." These diagnoses remained unchanged during his CDCR confinement. He continued to report depression and auditory hallucinations, as well as anxiety and paranoia, during October and November 2018. On November 28, 2018, the inmate told a clinician that he was paranoid and appeared to be responding to internal stimuli due to observed delayed responses. He was placed on a modified EOP program from November 28, 2018 to March 4, 2019, due to his overall lack of programming with groups and reports he was paranoid. According to records, the inmate was not referred to a higher level of care because "treatment was tailored to address his paranoid ideation at the LOP LOC by increasing reality testing, improving coping skills, and addressing problems with anger. Contact with psychiatry also targeted the inmate's presenting symptoms, although he was often non-compliant with psychotropic medication."

On January 23, 2019, the inmate refused to speak to a clinician during a routine contact and was described as "selectively mute" for the first time in the records. Records also documented speculation that the inmate was "hiding out" in administrative segregation (after a fight) due to safety concerns related to drug debts on the yard, and "his mutism was relational in nature because staff reported they witnessed him verbally talking with his mother during weekend visits." Regardless, records continued to indicate that the inmate presented as non-verbal, withdrawn, and began using hand gestures and head nods to communicate with others.

The inmate was transferred to CSP/Corcoran on March 4, 2019 and, beginning on March 23, began expressing SI on almost a daily basis. He was seen multiple times by CIT clinicians and, according to the CDCR reviewer in this case, all of the completed SRASHEs (on March 23, March 27, March 28, and April 10) "likely underestimated his acute risk as it ranged from low to low-moderate. In these SRASHEs the justification for risk was inadequate as the SRASHEs did not take into consideration the inmate's increased reports of SI, changes in his presentation related to his mental health symptoms, increased violent behavior and non-compliance with treatment and medication. In addition, the belief the inmate's behavior was related to secondary gain to avoid housing changes likely contributed to the underestimation of risk as well." For example, on March 23, the SRASHE noted a "low" acute risk for suicide despite observation by a nurse passing by his cell that the inmate was making a gesture as if he was going to put a ligature around his neck and, when asked, said he was suicidal. He also specifically threatened suicide again on March 28 and, although another SRASHE was completed, acute risk was assessed as "low" and the inmate was not referred to an MHCB.

On March 31, 2019, the inmate was admitted to the MHCB unit at CHCF following expressions of SI and superficial scratching on his left wrist. At the time of admission, the inmate reported that he planned "to kill himself via starvation." Records indicated he had missed six meals. During his MHCB stay, although the inmate resumed eating his meals, he did not program or cooperate in treatment. According to most progress notes, the inmate was always seen cell-front, rarely spoke, and gave hand gestures to respond to most questions. When he did speak, the inmate presented as hypersexual and made crude sexual comments to female staff. He also vacillated between expressing and denying SI. On April 9, a discharging SRASHE was completed based only upon a record review because the inmate refused to participate. According to the assessment, "IP refused to speak but documentation from nursing indicates that IP has not engaged in any SIB for the duration of his MHCB stay….The quality of IP's protective factors could not be determined as he refused to participate in the portion of the evaluation….IP denied suicidal ideation via gestures. Affect was constricted. AH/VH was not reported or observed. Insight and judgment are poor." The inmate's acute risk for suicide was listed as "low." The following day (April 10), he was returned to EOP at CSP/Corcoran.

Within hours of his return to CSP/Corcoran on April 10, an emergency mental health referral was generated after the inmate verbalized SI, as well as a crude sexual remark, to the intake nurse. The CIT responded and met with the inmate, but he was "unwilling to participate in the CIT evaluation….Most of the assessment was completed via record review." The inmate did not deny SI, and simply repeated the crude sexual remark to the clinician. The clinician noted in the SRASHE that "Acute risk is low. Patient has demonstrated an ability to speak but was unwilling to engage today. Per his record IP had a visit from his family and he could talk to them. There is

no evidence of acute distress or psychosis that would require higher LOC. No imminent risk of suicide at this time." The inmate was returned to his cell and committed suicide the following morning (April 11).

According to the CDCR reviewer, apart from the continued expression of SI during the last week of his life, there were not any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not leave a suicide note and had a minimal medical history. According to the CDCR reviewer, the inmate's "mental health symptoms continued to spiral down as he began reporting suicidality in March 2019. He also continued to experience greater decompensation when receiving treatment in the MHCB. His insight diminished, his ability to reach out for help weakened and his overall hope for life became nil. Coupled with that, he experienced guilt and self-hatred related to his crime, sorrow he could not be with his family and his view that life was worth living became narrower and narrower. He had no one to turn to and his feelings of helplessness and hopelessness magnified to the point of ending his life on the second anniversary of his incarceration."

The Suicide Report contained 13 recommendations for corrective action through a QIP:

> 1) <u>CSP-LAC</u>: Records indicated while the inmate was housed in CSP-LAC, he did not receive his weekly contact during the weeks of October 22, 2018 and November 12, 2018. Per the Mental Health *Program Guide* (2009), 12-4-9, required EOP treatment includes 'weekly clinical contact with PC either individually or in group psychotherapy.'

> 2) <u>CSP-LAC</u>: SRASHEs completed November 19, 2018 and January 17, 2019 were problematic. Please see *Conclusions* section for further details.

> 3) <u>CHCF</u>: The MHCB discharge was problematic. Please see *Conclusions* section for further details.

> 4) <u>CHCF</u>: The discharge SRASHE dated April 9, 2019 was problematic. Please see *Conclusions* section for further details.

> 5) <u>WSP</u>: The SRASHE completed on February 21, 2019 was problematic. Please see *Conclusions* section for further details.

> 6) <u>Joint HQ SPRFIT Team and CSP-COR</u>: SRASHEs completed on March 23, 25, 27, 28, 31, and April 10, 2019 were problematic. Additionally, there were concerns related to the inmate's return to regular housing. Please see *Conclusions* section for further details.

> 7) <u>CSP-COR</u>: It was noted although the inmate made a superficial scratch to his wrist on March 30, 2019, that incident was not documented as self-harm until April 16, 2019. It was unclear if this incident was reported to the suicide prevention coordinator in a timely manner so the incident could be documented within 72 hours of the incident, per the current policy.

8) <u>CSP-COR, CSP-LAC, and CHCF</u>:  The inmate's behavior and observed symptomology was conceptualized to be volitional and in response to unverified safety concerns or other custodial issues across multiple institutions and treatment teams despite documented increased bizarre behaviors, assaultive behaviors, reported suicidality, engagement in self harm, this inhibition and observed symptoms of psychosis.  This poor conceptualization resulted in significant underestimation of suicide risk, poor treatment planning and questionable decisions related to appropriate levels of care.

9) <u>CSP-LAC</u>:  Although a scheduling order with specific details requiring another appointment in less than 14 days was placed in June 2018, no appointment was scheduled.

10) <u>CSP-LAC</u>:  There was no 'place-in' order made by a staff psychiatrist in June 2018 to place the inmate in the MHSDS.

11) <u>CHCF</u>:  The staff psychiatrist (and other members of the treatment team) did not identify or recognize mutism, disinhibition, hypersexuality, inability or unwillingness to cooperate with interviews, non-compliance with offered medication and intermittent suicidal ideation as significant chronic risk to safety (especially if the inmate were transferred to a less structured setting, such as EOP level of care).  The staff psychiatrist (and other members of the treatment team) may not have fully considered these symptoms as driven by a psychotic process.  The staff psychiatrist (and other members of the treatment team) did not consider a referral to a higher level of care that would have provided additional supervision, evaluation, and treatment.  The staff psychiatrist (and other members of the treatment team) may not have recognized the totality of the symptoms and behaviors which might have justified a referral to PIP and consideration for non-emergent forced medications (or emergent forced medications).

12) <u>CSP-COR</u>:  During the on-site review, it was discovered the inmate had participated in a CIT meeting during 3W on April 10, 2019, the day prior to his suicide attempt.  It was noted a correctional sergeant served as the custody supervisor for the CIT.  This practice is inconsistent with current statewide CIT training and implementation which requires the participation of a correctional lieutenant upon activation of the CIT.

13) <u>CSP-COR</u>:  No AED periodic checks and analyzing results were documented from the time of placement to the time the inmate arrived to the TTA.

In the ***third*** case (COR 8), the inmate was found hanging from the upper bunk by a sheet in his SNY cell during the afternoon of April 13, 2019.  The inmate entered the CDCR system (through the California Youth Authority) in August 2003 to serve a 45-year sentence for oral copulation with force/violence, rape with force/violence, and two counts of robbery.  He was transferred to CSP/Corcoran on February 4, 2019.  During his confinement, the inmate was on a SNY due to

safety concerns associated with his committing offense. He incurred 14 RVRs during his confinement, the most recent of which occurred in January 2019 for "behavior which could lead to violence." Several of his RVRs were thought to be related to "mutual combat" incidents associated with his bisexual lifestyle. The inmate was known to be gang affiliated. He did not have any known family support.

According to available records, the inmate was born into a dysfunctional family caused by both of his parents being involved in the criminal justice system, including serving CDCR terms. His mother was a substance abuser and his father absent from the family. The inmate and two brothers were initially raised by his maternal grandmother. Both brothers were currently confined in CDCR. The inmate became involved in criminal behavior as early as age 9 and was frequently away from home and gang affiliated as a teenager. He had a significant history of substance abuse. At age 13, the inmate was charged with a sexual offense on 12-year-old boy and then committed the instant offense the following year at age 14. He was housed in the California Youth Authority (CYA) from ages 15 to 18. As such, the inmate had been incarcerated for much of his life (i.e., almost 17 years) prior to his death at age 31.

Upon his transfer from CYA to CDCR in July 2005, the inmate was enrolled in the MHSDS at the 3CMS level of care. From 2005 through March 2018, he remained in 3CMS with diagnoses of "Amphetamine Substance Use Disorder, Severe, Opioid Use Disorder, Severe, and Unspecified Depressive Disorder." The inmate had only one MHCB placement during this time, occurring in May 2014 following a suicide attempt caused by worsening depression, anxiety, and feeling isolated. At that time, the inmate also reported a prior suicide attempt in 2003 while housed in a county jail. His level of care was increased to EOP until June 2016 when he was returned to 3CMS. The inmate adequately programmed at this level of care, but often complained about the need for more frequent contacts and repeatedly asked for a return to EOP. In August 2018, the inmate complained of increased anxiety and depression, resulting in the decision for his PC to see him on a weekly basis while he was assessed for EOP. By December 2018, a progress note indicated that "While IP's primary problem is substance abuse, his increase in acute and imminent risk factors warrant a higher level of care to stabilize his sxs." He was formally reinstated into EOP on January 2, 2019.

Less than two weeks later on January 14, 2019, the inmate was admitted into an MHCB for SI, secondary to substance abuse and safety concerns. He was discharged back to EOP on January 18 with the following rationale: "IP has denied SI since admission. He described having felt hopeless prior to admission due to safety concerns, and was at elevated risk for suicide particularly due to his active IV heroin use. IP indicated that he reported suicidality in order to get off the yard after an inmate had spread information about his R suffix. IP's safety concerns have been resolved (IP will be going to ASU) and he is ready for discharge to lower LOC. IP was EOP prior to MHCB admission and will return." The inmate was subsequently transferred to CSP/Corcoran on February 4, 2019 in order to resolve housing issues. The most recent SRASHE was conducted on February 11, 2019 and found a "high" chronic risk and "moderate" acute risk for suicide.

On April 10, 2019, an IDTT meeting was held in which the inmate was informed that he was being downgraded to 3CMS. According to the MH Master Treatment Plan, "It appears that most

of his reported issues or (sic) related to substance abuse and not mental health related tx.  He continues to report on-going use of substance abuse with meth and heroin daily.  He is requesting to obtain substance abuse treatment.  Currently there is no substance abuse treatment on yard.  Prior to IDTT, he has already been referred to SAT and placed on list."  The inmate committed suicide three days later on October 13, 2019.

Although the CDCR reviewer in this case did not offer any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he had no acute medical problems nor left a suicide note, it was surmised that the inmate's decision to commit suicide was related to his daily drug use and perceived "insurmountable" drug debt, feelings of hopelessness and abandonment from his family, or a combination of both.

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) The inmate's discharge from EOP on April 10, 2019 was problematic.  The inmate had an extensive history of on-going reported substance use, impulsivity, and reported suicidal ideation related to perceived stressors.  At the time of his discharge from EOP, he was reporting increased substance use, anxiety related to perceived safety concerns, and the decision to lower the level of care was made after five clinical sessions, and five cell front sessions.  Additionally, treatment notes, including clinical documentation from his previous institution (as he was a recent transfer), did not support a decrease in the level of care at this time.  The COR treatment team recognized primary concerns were related to substance use, however conceptualized it as not related to mental health, which did not support the level of care decision.

> 2) There were some concerns with the last SRASHE completed on February 11, 2019 after the inmate's transferred to COR.  Chronic risk was seen as high, and acute risk as moderate at that time.  Despite the accurate risk determination, the risk formulation and safety plan were poor.  Safety plan noted some triggers related to suicidal ideation, but despite on-going reports of substance use, it did not address substance use as a component in treatment.  This SRASHE reflected the overall viewpoint of the treatment team at COR that the inmate's substance use was unrelated to mental health.

In the _**fourth**_ case (COR 9), the inmate was found hanging from the upper bunk by a sheet in his SNY cell during the afternoon of December 27, 2019.  The inmate entered the CDCR system in February 2006 for a second term to serve a life-sentence with parole possibility for criminal threats to cause great bodily injury or death and attempted robbery.  He was transferred to CSP/Corcoran on August 27, 2019.  The inmate was designated as SNY in October 2009 after being deemed a gang-dropout.  He incurred seven RVRs during his confinement, the most recent of which occurred in June 2019 for threatening staff.  Up until the last month of his life, the inmate had family support demonstrated by visits, letter correspondence, and telephone calls with his wife, ex-wife, and two sisters.  However, recent letter correspondence indicated that his current wife was in the process of filing for divorce.

According to available records, the inmate and eight siblings were born into an intact family. However, his parents divorced when he was only a year old, and he was primarily raised by his mother and stepfather. There was a family history of substance abuse and his uncle previously committed suicide. The inmate did not finish high school and had a long history of substance abuse beginning as an adolescent. He was also involved in both the juvenile and criminal justice systems and was gang-affiliated in the community. The inmate did not have a reported mental health history in the community, although he previously attempted suicide by cutting his wrist while housed in the county jail in January 2006.

Upon his entry into CDCR in February 2006, the inmate screened negative for any mental health problems and was not initially enrolled in the MHSDS. However, on December 10, 2013, he was admitted into an MHCB following reports of depression and SI related to his mother's cancer diagnosis. He was subsequently discharged to the 3CMS level of care with diagnoses of "Depressive Disorder, NOS, and Polysubstance Abuse." These diagnoses did not change significantly between 2013 and 2019. According to the Suicide Report, "He typically reported distress in the context of family problems and frustrations with staff, feeling stressed, occasional insomnia, and anger which he attributed to anxiety and mild mood dysregulation." The inmate consistently reported his psychotropic medication helped control his agitated depression.

During more than 13 years of confinement, the inmate appeared to program well in 3CMS, received his GED, and was taking college courses. He also had a job as a porter. The inmate had plans to appeal his life sentence and petition the court for earlier parole consideration. With a few exceptions, his behavior remained stable and he was compliant with psychotropic medication. On March 28, 2019, an emergent mental health referral was ordered by medical staff after the inmate made "suicidal remarks" after his physician denied a request for pain medication for a kidney stone. He told the responding mental health clinician that he was being sarcastic and "adamantly denied" any SI. The required SRASHE was not completed. On June 25, 2019, the inmate was transferred to administrative segregation unit after threatening an officer in his housing unit.

Starting around September 15, 2019, the inmate began to refuse psychotropic medication. However, when meeting with a tele-psychiatrist on November 14, 2019, the inmate reported he was "Going through a lot lately….They told me my release date is going to change and I'm not sure what's going to happen now." As a result, psychotropic medication was restarted. The following month on December 17, the inmate was treated for an abscess on his arm due to a relapse on illicit drug use since transferring to CSP/Corcoran.

A few days later on December 20, 2019, the inmate reported further distress with SI. The CIT was initiated and responded to the emergency mental health referral. According to the nurse's note from the CIT response, a "pre-existing superficial cut on his left wrist" was observed. This self-injury was different from, and subsequent to, a physician appointment to treat the abscess on his arm three days earlier. According to the CIT clinician, the inmate initially reported feeling suicidal, but later denied any SI during the assessment. According to the completed SRASHE, the inmate "reported he was stressed out today because he is getting divorced with his second wife." According to the Suicide Report, the inmate told staff "his communication with his wife was cut off and this was the first time that had happened in the three years they were together."

Despite this information, the clinician marked "yes" to protective factors of "family support" and "spousal support" on the assessment form. The clinician did not make reference to the self-inflicted superficial cut on the inmate's wrist as noted by the CIT nurse. The clinician noted in the SRASHE that the inmate's chronic and acute suicide risk were both "low" because "PT does not have suicidal history and denied suicidal (sic)." According to the CDCR reviewer, "overall risk was significantly underestimated which resulted in the decision to return the inmate to his housing unit." The inmate subsequently committed suicide the following week on December 27, 2019.

Other than the reported SI and SIB related to his wife filing for divorce, the CDCR reviewer did not offer any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. The inmate did not have any significant medical problems that were considered contributory to his death. However, the inmate did leave a suicide note in his cell that contained numerous complaints about the CDCR system and most of its staff. He also noted the incident "around the 17th or 18th of December, my ex-wife called up here and notifying the prison that I needed mental health help due to I had cut my left wrist. Your staff just asked me if I was okay, I said yes and that was it. Did not check my hands or wrist for cuts or anything. Then on Friday, December 20, I went to program office and let them know I had suicidal tendencies.... I told him (Sgt) I didn't feel like living anymore.... I told him I had cut my wrist and showed him. He then believed me, when mental health came I told them I'm okay, and just needed to think and they cleared me to go back to cell and do this a couple of days later...."

The Suicide Report contained four (4) recommendations for corrective action through a QIP:

    1) <u>CCI</u>: On March 28, 2019, the inmate was seen for an emergent consult in response to reported suicidal ideation during a medical appointment. The emergent referral was downgraded by the clinician to a routine consult and a SRASHE was not completed. Given the inmate's initial report of suicidality, as well as confusion regarding his suicide attempt history, completion of a SRASHE was warranted.

    2) <u>CSP-COR</u>: It was noted that although the inmate made a superficial scratch to his wrist on December 20, 2019, that incident was not documented as self-harm until December 30, 2019. It was unclear if this incident was reported to the suicide prevention coordinator in a timely manner so the incident could be documented within 72 hours of the incident, per the current policy.

    3) <u>CSP-COR</u>: The inmate received a SRASHE on December 20, 2019 as part of the CIT assessment in response to reported suicidal ideation. A number of concerns were found with this SRASHE including: inaccurate information regarding the recent history of self-harm and reported SI, as well as his prior suicide attempt, despite listing multiple chronic risk factors and reported recent stressors including loss of identified protective factors, both chronic and acute risk was seen as 'low' with a one sentence explanation which stated 'chronic and acute risk rated low due to Pt does not have suicidal history and denied suicidal,' and minimal information documented in SPI including a statement 'there was no

warning signs noted today.'  Overall risk was significantly underestimated which resulted in the decision to return the inmate to his housing unit.

4) <u>Joint Mental Health and Nursing, CSP-COR</u>:  The decision was made by the CIT to return the inmate to his housing unit despite reported stressors and observation of self-harm (as documented in the nursing documentation).  The MH Crisis Intervention Team (CIT) power-form in EHRS was left largely blank, with no documented explanation as to why the decision was made by the CIT on December 20, 2019.  The lack of documentation as well as the decision to return the inmate to his housing unit without a plan (to address his recent increase in stressors relational difficulties, substance use, reported SI, and overall increase in anxiety) was problematic and likely contributed to the subsequent reported increase in mental health symptoms.


### 17) <u>North Kern State Prison (NKSP)</u>

**Inspection**:  October 29-30, 2019 (previous suicide prevention audit was on July 13-14, 2017).  NKSP housed approximately 4,052 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on October 29, 2019.  The nurse was observed to be asking all of the questions and correctly entered the information into the EHRS.  The Mental Health Screening Interview by a diagnostic clinician in the RC was observed on October 30.  Because the EHRS was temporarily offline, a hard copy of the screening form was completed.  Doors to both the nurse's and clinician's offices were closed during the processes, thus ensuring privacy and confidentiality.  One concern subsequently found by this reviewer in the review of emergency mental health referrals (see below) was a case (<u>NKSP 1</u>) in which a newly admitted inmate screened negative for mental health and suicide attempt histories during both the intake screening and mental health screening processes, yet the medical/mental health transfer summary sheet from the county jail indicated that the inmate had both a history of suicide attempts and mental illness.  The inmate had been screened by the intake nurse and RC diagnostic clinician on July 26, 2019, with the county jail transfer sheet scanned into the EHRS two days earlier on July 24, 2019.  As such, the transfer sheet was available to, but apparently not reviewed by, the RC diagnostic clinician as required by policy.

Of note, deficiencies during the RC process were also found in both of the recent suicides (<u>NKSP 12</u> and <u>NKSP 13</u>) at the facility, see below.

Daily PT rounds in the administrative segregation unit (D-6) were observed on October 29.  The rounds were unremarkable and the PT correctly entered the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  NKSP had a 16-bed CTC, with ten designated MHCBs that were previously found to be suicide-resistant.  Of note, only six of the ten beds, or 60 percent of the MHCB unit were occupied during the on-site assessment.  In addition, the administrative segregation unit (D-6)

had a total of 11 new intake cells (101, 109-113, 134-138) that had been retrofitted to be suicide-resistant. This reviewer observed that all new intake inmates were correctly housed in new intake cells.

Finally, **alternative housing** cells continued to be designated in A-4 Unit to temporarily house suicidal patients prior to transfer to a MHCB, although some were occasionally held in the administrative segregation unit (D-6). All inmates were required to be observed on a 1:1 basis and bunks were found in each cell. During the period of August 12 through October 22, 2019, there were only 19 inmates physically placed in alternative housing, all stayed less than 24 hours, and 90 percent (17 cases) of the MHCB referrals rescinded and inmates returned to their housing. Of note, this rescission rate was deceitful because, due to the low census in the MHCB unit, almost all inmates initially designated for alternative housing went directly to the MHCB unit. Further, this reviewer also determined that of 75 patients admitted into the MHCB unit from July 25, 2019 through October 25, 2019, 25 percent (19 patients) had length of stays of only 24 to 72 hours. In October 2019, the overall length of stay in the MHCB unit was 5.7 days.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. In addition, patients not on suicide observation status were required to be observed at 15-minute intervals. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on August 8, 2019 for NKSP 2, on September 1, 2019 for NKSP 3, October 22, 2019 for NKSP 4, and October 28, 2019 for NKSP 5. The chart review found a few observation checks (i.e., between two and three per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 23 minutes in each of the four cases. Violations in the four cases were by multiple nursing staff.

Due to a low census in the MHCB unit, only one IDTT meeting was observed. In that case, the patient was clothed consistent with their level of suicide risk. A review of a sample 114-A forms from former MHCB unit patients indicated that they were offered yard, telephone, and shower privileges on a regular basis.

An RT continued to be assigned (or at least available) to the MHCB unit for 40 hours per week.

A review of Guard One data for a recent 24-hour period found 100-percent compliance with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a list of emergent/urgent mental health referrals for the period of April through October 2019. A sample EHRS review of 58 emergent/urgent referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in only 78 percent (45 of 58) of the cases. Of note, most of the referrals for SI/behavior that did not result in completion of SRASHEs were mislabeled as "urgent referrals." For example, in the case (NKSP 1) of a newly admitted inmate described above who went through the RC process on July 26, 2019, although the RC diagnostic clinician indicated he had screened negative for suicidal behavior, when asked "Are you thinking of killing yourself at this time?" on the Mental Health Screening Interview form, the inmate actually responded – "Have some brief but not serious thought about it." Such a response should

have resulted in completion of a SRASHE, but did not. The following day (July 27), the same inmate wrote a Health Care Services Request form (CDCR 7362) that stated "I need to see mental health right away. I'm starting to have suicide thoughts." An MHPC Urgent Order, rather than an emergent order, was generated and the inmate was seen by a clinician on July 29. Rather than completing the required SRASHE, the clinician completed a MHPC Progress Note.

In another case (NKSP 6), the inmate was most recently assessed for suicide risk in June 2019 and found to be at both "moderate" chronic and acute risk for suicide. On July 9, 2019, an officer submitted an MH-5 Form indicating the inmate was exhibiting bizarre behavior and "says he's so stressed he can't use the restroom or sleep." An urgent mental health referral was initiated, and the inmate was seen three days later (outside policy guidelines) by a mental health clinician. The clinician wrote a MHPC Consult Urgent Progress Note stating the "IP had initially reported SI, without plan/means. Medical/custody report upon further questioning IP reported safety concerns in his current housing and requested a building/bed move....IP was found sitting on the side of his bed when clinician arrived cell front. IP looked at the clinician when called, waving clinician off. IP would not respond or further participate." Because the inmate was uncooperative, the clinician did not assess suicide risk.

A few days later on July 17, 2019 another clinician wrote a MHPC Progress Note stating "This writer received a call from Dr.____ from BPH who had met with IP. IP had reported to Dr. ____ that he wanted to' jump off the tier' the day prior to BPH contact but did not because 'he did not think he would die.' IP reported he was 'thinking about his dad that had died' and about what was going on in the building which IP had reported to this writer the day prior that he had safety concerns in the building which were reported to custody. Dr.____ stated that IP was hesitant when he asked if he had any thoughts of harming himself today and would not commit to not harming himself. IP had reported that he has prior hospitalizations at Harbor UCLA Medical Center for 5150 holds. After consultation with the RC supervisor, an MHPC Consult Urgent was ordered and the crisis team was advised that IP was in a therapeutic module on the yard for contact." A few hours later on July 17, the inmate was seen by another clinician who stated in a MHPC Progress Note that "IP admits to some feelings of anxiety and safety concerns involving sex crime charges that were dropped, however other inmates intercepted a letter and found out about these molestation charges. Accordingly, IP reports paranoia for his safety and some SI with a plan (jump off 2nd tier), but without intent." Despite acknowledging SI, the required SRASHE was not completed. Instead, the clinician "set up 5-day follow-ups to check in daily with IP about any current SI or safety/ housing concerns." The initiation of five-day follow-up checks absent completion of an SRASHE, as well as ordered without alternative housing/MHCB placement, was contrary to policy requirements.

In sum, despite three separate notices of possible suicide risk on both July 9 and July 17, 2019, emergency mental health referrals were not initiated on either date for this inmate, nor were SRASHEs ever completed.

Of note, deficiencies in completion of timely SRASHEs was also found in both of the recent suicides (NKSP 12 and NKSP 13) at the facility, see below.

Further, a CIT protocol had been initiated at NKSP in February 2019 and included a clinician, nurse, custody supervisor (normally a lieutenant), with the LOP indicating that the full team would normally respond between the hours of 7:00 a.m. and 4:30 p.m.  This reviewer did not observe any CIT referrals during the on-site assessment.

Due to a low census in the MHCB unit, this reviewer was only able to observe one IDTT meeting on October 30.  The case involved a patient who had been in the MHCB for approximately seven days and was being discharged back to 3CMS after a determination that his SI was secondary to safety concerns.  The meeting was otherwise unremarkable.

This reviewer also examined a sample of ten SRASHEs from patients released from the MHCB unit between July and October 2019.  Most of the safety plans contained in the discharging SRASHEs were either inadequate or non-existent.  For example, safety plans were not completed in two cases (NKSP 7 and NKSP 8), whereas in two other cases (NKSP 9 and NKSP 10), the patients refused to participate in the safety plan process.  The following case (NKSP 11), exemplified most of the problems with safety plans that did not address modifiable risk factors, protective factors, and warning signs, nor specific strategies, including reasonable coping skills, patients could utilize to reduce recurrence of SI:

> Step 1 (Warning Signs):  seeing cigarette burns on legs and feet, flashbacks to childhood abuse, increase sleep.
>
> Step 2 (Independent Coping Skills):  music, reading, exercise.
>
> Step 3 (Distracting People & Places):  going to yard.
>
> Step 4 (People to Ask for Help):  sister.
>
> Step 5 (Professionals to Contact):  officers, mental health clinician, chaplain.
>
> Step 6 (Means Safety):  being around people.
>
> Step 7 (Reasons to Live):  my kids.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 86 cases of patients discharged from a MHCB or alternative housing placement who remained at NKSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from April 26, 2019 through October 22, 2019.  The review found that 93 percent had Page 1 of the

226

"Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 86 percent of the custody checks recommended for 48 hours or more by clinicians. In addition, 95 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. These compliance rates were a significant improvement from the previous assessment.

**Intervention**: Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (July through September 2019) found that quorums were not achieved for any of the meetings. Lack of quorums was mostly related to the absence of psychiatry and psychiatric technician representation. Of note, each monthly report of SPRFIT minutes suggested high compliance rates (e.g., 97 percent in September 2019) for SRASHE completion following a CIT response. However, such data was inaccurate. As detailed above in this reviewer's assessment, only 78 percent of emergent/urgent mental health referrals resulted in completion of the required SRASHEs, with most of the problems related to referrals mislabeled as urgent referrals. The meeting minutes were otherwise unremarkable.

Finally, a revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum was contained in a NKSP LOP entitled "Operational Procedure No. 181 – Suicide Prevention," effective March 2019. However, the LOP did not have the required procedures for the "high-risk management program" or for additional "bad news" screening of inmates returning from court or BPH.

**Training**: According to training records, 95 percent of custody and 99 percent of nursing staff were currently certified in CPR. In addition, approximately 96 percent of custody staff received annual suicide prevention block training during 2018. Completion percentages for both medical and mental health staff for annual suicide prevention block training could not be reported out by IST at NKSP. Finally, as of October 2019, 96 percent of mental health clinicians had completed the SRE mentoring program, 89 percent had received the seven-hour SRE training, and 89 percent had completed safety plan training.

**Recent Suicides**: NKSP experienced two (2) inmate suicides during the review period. In the *first* case (NKSP 12), the inmate was found hanging from the upper bunk by a sheet in his GP cell during the early morning of February 7, 2019. The inmate entered the CDCR system on March 22, 2017 to serve a 21-year and four-month sentence for two counts of rape with force and kidnapping. He remained at NKSP until his death. The inmate incurred four RVRs during his confinement, the most recent of which occurred in September 2018 for fighting. He was not known to be gang affiliated. The inmate had family support, with a few visits by his sister and girlfriend in 2017, as well as telephone calls, some of which were volatile, with his girlfriend throughout his confinement. The last such call with his girlfriend was the day before his suicide. The inmate was unmarried and had one young son.

According to very limited records, the inmate and his sister were initially raised by his mother and stepfather, but there were reports that he was in the foster care and group home systems for much of his adolescence. He did not graduate high school, had sporadic employment, and began using illicit drugs and alcohol as a teenager. The inmate had both prior juvenile and adult convictions. Although he did not report any prior mental health treatment in the community, the inmate reportedly received mental health treatment following a two suicide attempts (hanging and overdose) in the county jail system.

Upon his entry into CDCR on March 22, 2017, the inmate reported two previous suicide attempts, as well as a history of Bipolar Disorder, depression, and anxiety. He was eventually enrolled in the MHSDS at the 3CMS level of care the following month on April 25, 2017. His initial diagnoses were "Depressive Disorder and Antisocial Personality Disorder," which remained unchanged throughout his confinement. During his almost two years in 3CMS, treatment focused on his adjustment to prison, depressed mood, and on-going passive SI. He did not have any placements in either a MHCB or PIP. The inmate took psychotropic medication until January 2018 when both he and the treating psychiatrist decided it was no longer necessary.

Despite expressing passive SI on multiple occasions during his CDCR confinement, records indicated that clinicians only completed SRASHEs on two occasions (in July 2017). As noted in a progress note by clinician on January 3, 2018, the inmate indicated "that the biggest detriment for him to plan a suicide was feeling like he did not know how to kill himself, where to commit suicide, as well as not having access to the opportunity or means to commit suicide." In a similar conversation during a mental health contact the following month on February 7, 2018, the inmate reported "he woke up with suicidal thoughts every morning thinking he wished he could go back to sleep and never wake up. He reported that dreams were the only time he experienced peace." In both of these contacts, required SRASHEs were not completed.

On January 4, 2019, a clinician's progress note stated that "IP disclosed that he continues to experience passive SI, however he reported that the passive SI has decreased. He reported taking things day-by-day and shared that he continues to remain in contact with his girlfriend and family members. When queried about his motivation for living, he stated, 'I can't really say other than it's a feeling I have'…. Although IP continues to experience passive SI, he continues he manage to get up every morning to program and attend to his ADLs." A SRASHE was not completed on January 4, 2019, and this was the final mental health contact with the inmate prior to his death.

The CDCR reviewer in this case did not offer any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. The inmate did not have any significant medical problems that were considered contributory to his death, and he did not leave a suicide note. However, during the investigation of this case, it was determined that the inmate had multiple telephone conversations with his girlfriend on the day before his suicide. According to the Suicide Report, "It appeared that he and his girlfriend were in an argument about the possibility of her dating someone else. During the third telephone conversation, he expressed his frustration for the situation, indicating that he was tired of their arguments, and made questionable statements about his overall well-being related to life and death."

The Suicide Report contained six (6) recommendations for corrective action through a QIP:

1) The inmate's CDCR medical records did not document any review of, or efforts to obtain, his Los Angeles County Jail medical records.  Given his reported suicide history while in county jail, those records were central in assessment of suicide risk.  The absence of the records may have resulted in an under-representation of his suicide risk.

2) The inmate arrived at NKSP and received an initial mental health screening on March 22, 2017 but did not receive an initial mental health assessment until April 25, 2017.  Per the Mental Health *Program Guide*, 2009 revision, 12-2-5: 'Inmates referred for psychological evaluation who have been identified in the initial mental health screening as having a possible mental health need or who refused the screening shall be scheduled for a full psychological evaluation to be completed by the 18 calendar day evaluation period after arrival.'

3) The initial mental health assessment conducted on April 25, 2017 provided a summary of the inmate's suicide risk, but a full SRE was not completed in conjunction with the initial assessment and placement into CCCMS LOC.  The inmate recently reported suicidal ideation during initial screenings and there was inconsistent information regarding his suicide history with no medical records to verify his history.  Additionally, the inmate reported a suicide attempt possibly occurred as recently as a day prior to his CDCR placement.  Given these factors, a full SRE was clinically warranted and required per policy.  According to the Mental Health *Program Guide*, 2009 revision, 12-10-9: 'a suicide risk assessment shall be completed anytime the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.'

4) The inmate had frequent mental health clinical contacts until January 2018.  He was seen on June 28, 2018, but was not seen again until October 8, 2018, which is longer than the 90-day routine contact window as mandated in the Mental Health *Program Guide*.  Per the Mental Health *Program Guide*, 2009 Revision, 12-3-15: 'Face-to-face individual contact between the PC and the CCCMS inmate-patients in a GP setting shall occur as often as clinical needs dictate but at least every once every 90 days.'

5) There were multiple deficiencies noted in SRASHEs completed on July 26, 2017 and July 27, 2017.  (Please see *Conclusions* section for more details.)

6) The primary goal and focus of treatment were to manage the inmate's suicidal ideation as reflected in the Master Treatment Plans, IPOCs, and PLOs.  However, there were no SRASHEs completed in 2018 or 2019 despite on-going reports of passive suicidal ideation to his clinician, as documented in progress notes (last progress note was dated January 4, 2019).  Without completion of these SRASHEs, there was no way to determine current risk, adequately assess risk

when it changed, or appropriately assess for the need for a higher level of care.
Per the Mental Health *Program Guide*, 2009 Revision, 12-10-8: 'When the
inmate expresses current suicidal ideation, or makes threats or attempts, a suicide
risk assessment shall be made by collecting, analyzing, and documenting data.'

In the **_second_** case (NKSP 13), the inmate was found to have died by exsanguination in his RC
cell during the morning of December 20, 2019. The inmate entered the CDCR system three days
earlier on December 17, 2019, to serve a 13-year sentence for attempted murder and torture of
his girlfriend. The inmate did not incur any RVRs during his confinement and was not known to
be gang affiliated. The inmate did not have any known family support. It did not appear he was
married or had any children.

Records regarding this inmate were very limited because he was only in CDCR custody for a few
days. Information regarding his family and upbringing were unknown, other than the fact he did
not graduate high school, and was unemployed and a transient at the time of the instant offense.
According to a cellmate who was interviewed following the suicide, the inmate had been
estranged from his family for approximately "8 to 10 years." The inmate did not have a juvenile
criminal history and had a minor adult criminal history. County jail records indicated a history
of both alcohol and substance abuse. The instant offense involving his girlfriend was apparently
committed under the influence of methamphetamine.

Upon his entry into CDCR on December 17, 2019, county jail records indicated a history of
mental health treatment and a diagnosis of Major Depressive Disorder, Unspecified. Records
also indicated that the inmate had "legal issues, relationship problems, substance abuse, history
of homelessness and mental illness, and a history of self-inflicted lacerations to the neck and left
forearm." He had been placed on suicide precautions in the county jail shortly after his arrest
and had an active alert for "suicide risk." The inmate was also prescribed psychotropic
medication at the county jail. The inmate was seen by a psychiatrist on the first day of his
CDCR admission (December 17), and complained of increased anxiety, depressed mood, racing
thoughts, and mood swings. He denied any SI. An initial diagnosis of Unspecified Bipolar
Disorder was given and the inmate's psychotropic medication was continued.

Two days later on December 19, 2019, the inmate was seen by an RC diagnostic clinician for
completion of the Mental Health Screening Interview form. The interview form had positive
results for possible suicide risk, possible depressive disorder, and significant psychiatric history.
The clinician noted that the inmate had made a suicide attempt "2.5 years ago 'slit wrists and
throat' the scars are observable with the intent to die." Regarding the question on the Mental
Health Screening Interview form entitled "Are you thinking of killing yourself at this time?" the
inmate responded "Have some brief but not serious thoughts about it." A SRASHE was not
completed and the clinician ordered an initial mental health assessment to be completed within
ten days. The clinician later informed the CDCR reviewer in this case that a SRASHE was not
completed because "it was going to be completed during his initial." The clinician also stated
that RC clinicians did not complete SRASHEs during Mental Health Screening Interview
process, but rather called the crisis clinician to conduct the evaluation. There were no records of
a crisis clinician being called on December 19, and the inmate committed suicide the following

230

day (December 20). Of note, the inmate had not yet been enrolled into the MHSDS at the time of his death.

Apart from the expression of passive SI on the day before his death, the CDCR reviewer did not offer any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. The inmate did not have any significant medical problems that were considered contributory to his death, and he did not leave a suicide note. However, the CDCR reviewer noted that "torn handwritten notes were discovered that revealed his interest in personal spiritual growth, and showed the inmate's struggle with anxiety and depression, difficulty coping with his incarceration, and obsessive desire for self-help, specifically learning how to target negative thoughts and emotions." The inmate "had consistent passive thoughts of suicide and was experiencing increased anxiety, depression, mood lability, and overall despair (as evidenced by tearing his notes, which at one point, he hoped could help him cope). It is likely these symptoms, in combination with his stress from arriving to prison, worried about his safety, and adjustment to the overall prison environment, further exacerbated his symptoms."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) Although the inmate reported consistent passive thoughts of suicide and his MH Screening Interview results showed he was a possible suicide risk, a SRASHE was not completed. Per the *Program Guide*, 2009 Revision (12-10-9), a suicide risk evaluation shall be completed at minimum, 'any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.'

> 2) The CDCR 837s did not identify whether or not responding staff took the necessary precautions to avoid exposure to blood being present during the incident. California Code of Regulations, Title 15, Section 3365 (c) states in part, 'Security and safety procedures shall be followed, including the use of required equipment and procedures to deal with bodily fluids.'

### 18)    San Quentin State Prison (SQ)

**Inspection**: November 5-6, 2019 (previous suicide prevention audit was on January 2-3, 2018). SQ housed approximately 4,163 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the medical intake screening process in the RC on November 5. Two nurses were observed in two separate offices. Both nurses were observed to be asking all of the questions and correctly entering the information into the EHRS. Although the door to one of the nurse's office was closed during the process, thus ensuring privacy and confidentiality, the door to the second nurse's office was ajar and officer was standing directly outside, thus compromising privacy and confidentiality.

The mental health screening process in the RC was also observed on November 5. This reviewer was informed by the observed RC diagnostic clinician that they completed the Mental Health Screening Interview form within minutes after the inmate had completed the intake screening process by the nurse. Due to this expedited process, the RC diagnostic clinician stated they did not have time to review either the nurse's Initial Health Screening form or any county jail records. Despite a LOP ["SQ Health Care Policy and Procedure Manual, Volume 24 - Outpatient Mental Health Services, Chapter 10: Mental Health Screening and Evaluation," (24-10-01)] that required RC clinicians to review "the inmate's eUHR, EHRS, SOMS, and Central file," the RC clinician stated that the SOMS was only reviewed "if needed."

In addition, despite a CCHCS memorandum entitled "Clarification of Mental Health Documentation Review Requirements," dated August 22, 2019, and requiring the RC diagnostic clinician to request that the inmate sign a CDCR 7385 Authorization for Release of Protected Health Information (or ROI) form during the Mental Health Screening Interview process if a prior history of mental health treatment is reported, this reviewer determined that RC diagnostic clinicians were not completing this requirement. As result of this reviewer's finding, a corrective action memorandum was issued to all RC diagnostic clinicians at SQ on November 6, 2019.

Daily PT rounds in one of the administrative segregation units (Carson) were observed on November 5. The rounds were unremarkable and the PT was observed to be correctly entering information from the Psych Tech Daily Rounds Form into the EHRS for all caseload inmates. This reviewer also observed daily PT rounds in a section of the Assessment Center utilized for STRH inmates on RC status (since February 2018). The review found that the PT (who was not normally assigned to the post) was inadequately conducting rounds by simply asking caseload inmates "Any issues of concern?"

**Housing**: SQ had 40 PIP rooms originally designated for condemned inmates. However, due to a low census and problems at other PIPs, the mission of the SQ-PIP was revised on November 1, 2019 to allow the program to serve non-condemned inmates. Condemned inmates requiring MHCB level of care could be housed in the PIP, with all non-condemned SQ patients requiring a crisis level of care referred to outside MHCBs. All PIP rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The administrative segregation (Carson) unit contained approximately 30 new intake cells on the first (108-122) and second (201-215) tiers. All the new intake cells were retrofitted to be suicide-resistant. Due to a low census, many of the new intake cells were empty and all new intake inmates were observed to be in new intake cells.

Finally, **<u>alternative housing</u>** to temporarily house inmates identified as suicidal and awaiting MHCB placement was found in either the ten licensed medical beds in the CTC, TTA cells, or various large holding cells scattered throughout the Central Health Services Building. Alternative housing continued to be utilized on a daily basis, and inmates were all furnished beds and observed on a 1:1 basis. From August through October 2019, there were approximately 121 inmates placed in alternative housing and all but one was released within 24 hours. Approximately seven percent (eight cases) of the MHCB referrals were rescinded and inmates

returned to their housing units.  This reviewer examined the EHRS charts for all of the rescinded cases and found that the required SRASHEs were completed in each case

**Observation**:  All patients in the PIP at MHCB level of care were on either Suicide Precaution or Suicide Watch status.  All other PIP patients were observed at either 30-minute or 60-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the PIP during a nine-hour period from 12:00 a.m. through 8:59 a.m. on September 17, 2019 for SQ 1, on October 1, 2019 for SQ 2, on October 10, 2019 for SQ 3, and on November 1, 2019 for SQ 4.  The chart review found a variety of violations in observation checks (from two to five per patient) that were in excess of the required 15-minute intervals, with the longest gap between checks being 75 minutes in one case (SQ 1).  Violations in the four cases were committed by multiple nursing staff.

Utilization of the PIP to provide condemned inmates with an MHCB level of care was used infrequently at SQ, with six patients placed in September 2019 and five in October 2019.  This reviewer observed one patient's (SQ 5) IDTT meeting on November 6.  The team was well represented by mental health, medical, and custody staff.  In addition, an outpatient psychologist assigned to the Condemned Unit participated in the meeting.  The patient had been admitted on October 30, 2019 for HI but had a prior history of suicide attempts.  There was an excellent case presentation and formulation by the team.  Although denying SI, the patient appeared very hopeless and requested a "*Vitek* Hearing" to appeal the team's decision to transfer him to the PIP-APP program.

Finally, a review of Guard One data for a recent 24-hour period found 99-percent compliance with required checks that did not exceed 35-minute intervals in the adjustment center and 93-percent compliance in the administrative segregation (Carson) unit.  Requested data for the Condemned Units (Donner, East Block, and North Segregation) was not received.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of August and September 2019.  This reviewer's sample EHRS review of 35 emergent/urgent mental health referrals for SI/behavior revealed that clinical staff completed the required SRASHEs in only 86 percent (30 of 35) of the cases.  Of note, most of the referrals for SI/behavior that did not result in completion of SRASHEs were mislabeled as "urgent referrals."  For example, in one case (SQ 6), an MH-5 Form was submitted by an officer on September 1, 2019, indicating that the inmate was expressing SI in that "he hinted around to another inmate that he wanted to hang himself."  The inmate was seen by a clinician who later noted in a MHPC Consult Urgent Progress Note that the inmate denied current SI.  A SRASHE was not completed.  Of note, the inmate had been assessed as a "high" chronic and "moderate" acute risk for suicide three months earlier in June 2019.

Further, a CIT protocol had been initiated at SQ in November 2019 and included a clinician, nurse, and lieutenant, with the LOP indicating that the full team would respond between the hours of 2:00 p.m. and 9:30 p.m.  This reviewer observed two CIT referrals during the on-site assessment.  Both cases resulted in completed SRASHEs.

This reviewer examined a sample of ten SRASHEs from patients released from MHCB level of care during September and October 2019.  Most of the safety plans contained within these assessments were either inadequate or non-existent and did not include specific strategies to reduce recurring SI.  For example, in one case (SQ 7), the patient was admitted into the MHCB unit on October 31 and discharged five days later on October 4, 2019.  The following safety plan was contained within the SRASHE:

Step 1 (Warning Signs):  WIP.

Step 2 (Independent Coping Skills):  WIP.

Step 3 (Distracting People & Places):  WIP.

Step 4 (People to Ask for Help):  WIP.

Step 5 (Professionals to Contact):  WIP.

Step 6 (Means Safety):  WIP.

Step 7 (Reasons to Live):  WIP.

Following considerable inquiry, this reviewer was subsequently informed that "WIP" referred to above was meant to convey a "work in progress."  Of further concern, this "WIP" phrase was reproduced in several days of "5-Day Patient Follow-Up Progress Notes" by multiple outpatient clinicians.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.  A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 134 cases of patients discharged from a MHCB, alternative housing placement, or PIP who were returned to mainline SQ and not transferred to administrative segregation or the condemned unit (where observation at 30-minute intervals was required) between May through October 2019.  The review found that 96 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 88 percent of the custody checks recommended for the maximum period of 72 hours.   In addition, only 85 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.  Of note, although these compliance levels were still in need of improvement, they were substantially higher than this reviewer's previous assessment.

**Intervention**:  Housing units toured by this reviewer contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (July through September 2019) found that quorums were achieved for all of the meetings.  Of note, each monthly SPRFIT Minutes report suggested high compliance rates (e.g., 100 percent "after emergent MH consult for suicidality" in September 2019) for SRASHE completion.  However, such data was inaccurate.  As detailed above in this reviewer's assessment, only 86 percent of emergent/urgent mental health referrals resulted in completion of the required SRASHEs, with most of the problems related to referrals mislabeled as urgent referrals.  The meeting minutes were otherwise unremarkable.

Finally, a revised SPRFIT LOP was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams."  This reviewer was presented with a one-page, unsigned document entitled "Volume XX: Suicide Prevention and Response Focused Improvement Team," (November 2019).  The document was non-responsive because it did not address any of the revised SPRFIT responsibilities.  The facility did have a LOP on the "high risk management program" entitled "Chapter 39: High-Risk Tracking," but did not have any required procedure for additional "bad news" screening of inmates returning from court or BPH.

**Training**:  According to training records, 92 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 94 percent of custody staff, 93 percent of medical staff, and only 87 percent of mental health staff received annual suicide prevention block training during 2018.  Finally, as of November 2019, 99 percent of mental health clinicians had completed the SRE mentoring program, 94 percent had received the seven-hour SRE training, and 95 percent had completed safety plan training.

**Recent Suicides**:  SQ experienced one (1) inmate suicide during the review period.  In that case (SQ 8), the inmate was found hanging from the door by a sheet in his Condemned Unit cell during the early evening of August 29, 2019.  He entered the CDCR system through SQ's Condemned Unit on April 17, 2000 to serve a death sentence plus 25 years-to-life for multiple counts of homicide, robbery, and burglary.  The inmate incurred three RVRs during his 19 years of confinement, the most recent of which occurred in October 2018 for possession of a cell phone.  He was known to be gang-affiliated.  The inmate had family support through regular visits and letter correspondence with his current wife, daughter, sister, and other family members and friends.  He was very close to his mother, who died in November 2014.  The inmate was married at least three times and had one daughter.

According to available records, the inmate and several siblings were born into a dysfunctional family, with his father being involved in both gangs and criminal activity.  Although there were conflicting reports that he graduated from high school and had various jobs, the inmate's primary source of income was criminal activity.  His substance abuse history began at age 11, and he became involved in street gangs as a youth, resulting in an extensive juvenile and adult criminal histories.  The inmate had three CDCR terms between 1992 and 1997 and was on parole at the time of the instant offense.  He would later tell his probation officer that he had "a difficult

childhood, including witnessing abuse as well as being be abused himself. He ran with gangs, sold drugs, lived on the streets, cold and hungry."

Upon his entry into the CDCR in April 2000, the inmate denied any history of suicidal behavior and did not report any prior mental health treatment in the community. He was never enrolled in the MHSDS, either during the current or any previous CDCR term. During over 19 years of confinement, the inmate generally programmed well. He incurred only three RVRs, was not viewed by staff to be disruptive on the Condemned Unit, generally went to yard, and had no issues with daily activities such as to meals, showering or hygiene. The inmate remained a high-ranking member of his gang. In his occasional interaction with mental health clinicians, he never presented as suicidal or depressed.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although the inmate had several medical issues, these issues were not thought to be contributory to his suicide. Following his death, his personal property was reviewed and, according to the CDCR reviewer, "it appears the inmate occasionally dealt with issues related to depression, isolation and perhaps even suicidal ideation. However, it does not appear the inmate was willing to disclose any of these concerns to mental health staff at SQSP." It was also theorized that the inmate had been recently arguing with his current wife and increasing his drug use. Ultimately, the CDCR reviewer opined that "after 19 years (on this term), it appears he grew 'tired' of the isolation and confinement, and decided to end his life."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) During the review of the Inmate Segregation Record, CDCR 114-A, it was noted the inmate was not offered nor attended yard between the dates of August 6-24, 2019.

> 2) During the review of the housing unit logbook, it was noted the daily huddles between custody and mental health clinicians had not been documented.

### 19)    Pleasant Valley State Prison (PVSP)

**Inspection**: November 19-20, 2019 (previous suicide prevention audit was on February 6-7, 2018). PVSP housed approximately 3,140 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on November 20, 2019. Two nurses were observed in two separate offices. Both nurses were observed to be asking all of the questions and correctly entering the information into the EHRS. However, there were problems with privacy and confidentiality in both nurse's offices. In the first office, the inmate was situated in a chair inside the office, but the door remained open with a privacy screen situated in the hallway. In the second office, the inmate was situated in a chair that was located in the hallway and another privacy screen surrounded the chair. An officer was lingering between both offices and

complained to this reviewer that the privacy screens were obstructing his ability to provide observation and security. A nursing supervisor admitted that the privacy screens were installed the week prior to this reviewer's assessment. Prior to that, doors to the nurse's offices had remained open during the intake screening.

These observed practices were disappointing. During this reviewer's previous assessment in February 2018, the door to the nurse's office remained closed during the process, with an officer stationed outside in the hallway providing adequate security.

In addition, this reviewer observed daily PT rounds in STRH unit on November 19. The rounds were uneven, with the PT not consistently asking about inmates' mental health status as required on the Psych Tech Daily Rounds forms.

**Housing**: PVSP had six MHCBs previously found to be suicide resistant. The MHCB unit had been closed since November 30, 2018 due to renovation. The STRH unit contained six new intake cells (100-105) that were retrofitted to be suicide resistant. The unit had only one new intake inmate present during the inspection and he was housed in one of the new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was infrequently utilized at PVSP. When utilized, inmates on alternative housing status were housed in the STRH unit (or the R&R unit due to closure of the CTC). Inmates were provided bunks and required to be observed on a 1:1 basis. From August through October 2019, there were only 38 inmates placed in alternative housing, with all released within 24 hours. Of note, approximately 46 percent (18 cases) of the MHCB referrals were rescinded and inmates returned to their housing units. Of these 18 cases, 67 percent (12 cases) were assessed as unintentional drug overdoses.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff. Because the MHCB unit had been closed since late November 2018, this reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (PVSP 1, PVSP 2, PVSP 3, and PVSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on October 9, 2018 (for PVSP 1), October 30, 2018 (for PVSP 2), November 25, 2018 (for PVSP 3), and November 30, 2018 (for PVSP 4). The chart review found only two violations (in PVSP 2) in observation checks (both at 20 minutes) that were in excess of required 15-minute intervals. In the other three cases, no violations were found. This finding was a significant improvement from the previous assessment when numerous deficiencies were found in the observation of MHCB patients.

Because the MHCB unit had been closed for a significant amount of time, this reviewer could not assess the issue of levels of observation and possessions afforded to patients on suicide observation statuses.

Finally, a review of Guard One data for a recent 24-hour period in the STRH unit found 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of May through October 2019. A sample EHRS review of 30 emergent/urgent mental health referrals for SI/ behavior revealed that clinical staff completed the required SRASHEs in all of the cases.

A CIT process had not been initiated at PVSP and there were no emergency mental health referrals for this reviewer to observe during the on-site assessment.

This reviewer examined a sample of seven SRASHEs from patients released from the MHCB unit between October and November 2018 when it was operational. Most of the safety plans contained in the discharging SRASHEs were inadequate and did not address modifiable risk factors, protective factors, and warning signs, nor specific strategies, including reasonable coping skills, patients could utilize to reduce recurrence of SI. One case (<u>PVSP 2</u>) simply deferred development of a safety plan to the inmate's EOP clinician:

- IP would benefit from increased 1:1 care beyond CCCMS LOC to help IP begin to identify current cues and triggers for SI.
- IP to notify mental health staff should he experience an increase in environmental stressors before acting upon SI.
- IP to begin identifying positive coping strategies he can implement when experiencing stressors.
- IP would benefit from increased substance abuse treatment due to long hx. of use as negative coping skill.
- IP to continue taking medications as prescribed.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 40 cases of patients discharged from a MHCB unit or alternative housing placement who remained at PVSP and were not transferred to the STRH unit (where observation at 30-minute intervals was required) from October 2018 through October 2019.  The review found that 85 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) completed correctly by mental health clinicians, with most of the custody checks recommended for 48 hours by clinicians.  In addition, 85 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**:  Housing units toured by this reviewer all contained an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (July through September 2019) found that quorums were not achieved for any of the meetings.  The meeting minutes were otherwise unremarkable, with meetings lasting only about 20 minutes.  A revised SPRFIT LOP that was required to be issued by March 1, 2018 to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" was contained in "Operational Procedure No. 250: Suicide Prevention Plan."  Although this LOP also described procedures for PVSP's "high risk management program," it did not (nor did any other LOP) have any required procedure for additional "bad news" screening of inmates returning from court or BPH.

**Training**:  According to training records, 95 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 91 percent of custody staff, only 87 percent of medical staff, and only 83 percent of mental health staff received annual suicide prevention block training during 2018.  Similar low percentages of annual suicide prevention training for medical and mental health personnel were found during the previous assessment.  Finally, as of November 2019, 100 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**:  PVSP experienced one (1) inmate suicide during the review period.  In that case (PVSP 5), the inmate was found hanging from a pull-up bar by a sheet in the STRH unit's small management yard during the early evening of May 30, 2019.  He entered the CDCR system for a fifth term on May 11, 2015 to serve a life-sentence without parole for first-degree murder and attempted robbery.  The inmate was transferred to PVSP on February 14, 2019.  He incurred 13 RVRs during his confinement, the most recent of which occurred on February 2, 2019 for "behavior which could lead to violence."  Most of the inmate's RVRs involved assaultive behavior.  He was known to be gang-affiliated and was placed on SNY status in July 2015 following renunciation of his gang affiliation.  The inmate had family support through regular visits, letter correspondence, and telephone calls with his girlfriend, daughter, and parents. The inmate was unmarried and had one adult daughter.

According to limited available records, the inmate and his brother were born into an intact family that reportedly included violent behavior by his parents.  He dropped out a grade school after a number of physical altercations and disruptive behavior.  The inmate reportedly was diagnosed with ADHD and other "learning difficulties," but never treated for these disorders.  He consistently denied a significant substance abuse history.  The inmate's employment history was sporadic due to his involvement with a street gang that led to both juvenile and adult criminal behavior.  Beginning in 1997, he served four previous CDCR terms.  Prior to that, he had been sentenced to the CYA.

Upon his entry into the CDCR in May 2015, the inmate was placed in 3CMS, the same level of care for which he received treatment during his fourth term.  He received a range of diagnoses during his CDCR terms, from "Mood Disorder, NOS, with Psychotic Features," to "Psychotic Disorder, NOS, PTSD, and Antisocial Personality Disorder."  He also had two Mentally Disordered Offender evaluations during his fourth term that noted both auditory and visual hallucinations, as well as paranoia.  The inmate disclosed that his psychotic symptoms started as

239

an adolescent. His auditory hallucinations consisted of hearing deceased family members. Clinical staff, however, viewed his hallucinations and delusions as "vague, not typical of a psychotic disorder and overall inconsistent."

During his current CDCR term, the inmate was initially diagnosed with Adjustment Disorder and not prescribed any psychotropic medication. According to mental health records from September 2015 through October 2017, he did not seem to be responding to any internal stimuli, and consistently denied both SI and HI. In November 2017, the inmate began to endorse hallucinations and paranoia, and was subsequently prescribed psychotropic medication. His compliance became problematic and the medication was later discontinued. In addition, because of worsening symptoms, the inmate's primary clinician also discussed a referral to EOP, but he refused, stating "there will be problems" if he were to be referred to that level of care. During a meeting with a psychiatrist on November 30, 2017, although continuing to endorse auditory hallucinations, the inmate again refused any psychotropic medication and stated he was able to cope through meditation and reading. His diagnoses were revised to "Bipolar Disorder with Psychotic Features and Major Depressive Disorder with Psychotic Features." In May 2018, the inmate reported his hallucinations continued to be manageable and only increased in times of stress. He continued to report strong family support. A clinical note on October 22, 2018 reported that the inmate had recently received single-cell status. He continued to deny psychotic symptoms, as well as both SI and HI.

On January 26, 2019, during a visit with his girlfriend, correctional officers observed the inmate place an unknown object in his pants. It was subsequently discovered that his girlfriend had given him a package of cocaine with a street value of approximately $39,000. During a search, the inmate attempted to assault one of the officers. The visit was terminated with his girlfriend arrested and transported to the county jail. Subsequent letter correspondence from his girlfriend reflected both anger and anxiety regarding her arrest. Clinical notes indicated the inmate was concerned and remorseful regarding his girlfriend's legal predicament. On February 28, 2019, the inmate appeared hopeless, irritable and angry to his PC regarding a variety of issues, including his recent transfer to the STRH unit at PVSP, the recent RVR for assault (during visitation), and removal of his girlfriend from the visitation list. He reported moderate depressive symptoms, but denied any SI.

Although remaining at the 3CMS level of care, the inmate was being seen much more frequently by his PC during the last few months of his life. In addition to weekly mental health contacts due to his STRH unit housing, the inmate appeared to be seen more frequently due to placement on PVSP's "high-risk list." According to notes from an IDTT team meeting on May 15, 2019, which was conducted in absentia because the inmate refused to attend, "IP is monitored weekly for possible SI/SA/HI. He is on the high-risk list and sessions consist of addressing high-risk list. MH IPOC is focused on reducing levels of irritability, anxiety, and depression." The PC later told the CDCR reviewer in this case that the inmate had been placed on the high-risk list in response to his multiple RVRs, however, the CDCR reviewer noted that "there did not appear to be a completed SRASHE assessing his change in risk." The last SRASHE had been completed on February 20, 2019 and found a "moderate" chronic and "low" acute risk for suicide. The inmate did not have a history of any prior suicide attempts in CDCR custody, nor any MHCB or PIP placements.

The inmate saw his PC at cell-front on both May 28 and May 30, 2019, the day of his death. He reported feeling "better" and stated he was planning on going to his treatment groups that week. He denied any psychotic symptoms, as well as SI.

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant medical issues that were thought to be contributory to his suicide. The inmate did not leave a suicide note. According to the CDCR reviewer, in addition to the inmate's probable realization that his writ of habeas corpus to have his conviction overturned had little chance of success, "clinical documentation noted he expressed guilt regarding his girlfriend's legal issues and his role in her arrest. In addition, his mother reported he felt guilty not being there for her and he was tired of being in prison. He may have come to the conclusion his girlfriend and his mother would have a better life if he was no longer alive."

The Suicide Report contained two (2) recommendations for corrective action through a QIP:

> 1) On May 15, 2019, the inmate was taken to IDTT (in absentia) where it was noted that he was positive for three RVRs within the last 90 days on the higher level of care page of the MH Master Treatment Plan. This was later discovered to be marked in error. It was also noted that the inmate was included on the high-risk list, however, the rationale why was not found in documentation. Additionally, there do not appear to be an accurate assessment of risk at the time of his placement on the high-risk list found in records.

> 2) During the review of the responding staff reports, it was noted there was a period of approximately 36 minutes where staff were not monitoring the recreational yards. Additionally, it was documented the inmate utilized what appeared to be an altered state sheet as a ligature to hang himself while participating in yard. This calls into question the thoroughness of the required unclothed body search prior to his yard release. This incident has been referred for investigation to the Office of Internal Affairs.

### 20)    Pelican Bay State Prison (PBSP)

**Inspection**:  December 17-18, 2019 (previous suicide prevention audit was on February 14-15, 2018). PBSP housed approximately 2,578 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer did not have an opportunity to observe the intake screening process because there were no new admissions during the on-site assessment. The preceding assessment did not find any problems during the intake screening process.

This reviewer observed daily PT rounds in the STRH and GP sections of the administrative segregation unit on December 17. The rounds were unremarkable and the PTs were observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload

inmate.  This reviewer also observed rounds by a psychologist assigned to the SHUs. The rounds were unremarkable.  Of note, the SHU program at PBSP has been dramatically reduced in the last few years and currently had only six activated housing units, five of which were occupied. Six former SHUs were converted into administrative segregation units for GP inmates from other CDCR facilities, three of which were occupied.  The PSU was closed in 2018.

**Housing**:  PBSP had ten MHCBs.  A previously unidentified deficiency of unsafe ventilation grates was corrected in January 2019 and all MHCBs were now suicide resistant.  Of note, only three of ten rooms, or 30 percent of the MHCB unit were occupied during the on-site assessment. The STRH and GP sections of the administrative segregation unit had 24 retrofitted suicide-resistant cells (112-123; 188-199) designated for new intake inmates, with 12 new intake cells designated in both the STRH and GP administrative segregation sections of the unit.  During inspection, this reviewer did not observe any new intake inmates housed in non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in the CTC (Rm. 184).  Alternative housing was utilized on an infrequent basis. Inmates were provided stack-a-bunk or medical bed and required to be observed on a 1:1 basis. From September 1, 2019 through December 15, 2019, there were only 18 inmates placed in alternative housing, and all were released well within 24 hours.  All of the inmates were subsequently transferred to the MHCB unit, resulting in no rescissions.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (PBSP 1, PBSP 2, PBSP 3, and PBSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on November 14, 2019 (for PBSP 1), November 16, 2019 (for PBSP 2), December 13, 2019 (for PBSP 3), and December 15, 2019 (for PBSP 4).  The chart review found only two violations (one in PBSP 3 and one in PBSP 4) in observation checks (at 19 and 24 minutes) that were in excess of required 15-minute intervals.  In the other two cases, no violations were found.  This finding was a significant improvement from the previous assessment when numerous deficiencies were found in the observation of MHCB patients.

This reviewer also looked at 114-A forms for five patients recently placed in the MHCB unit and found that each was given multiple opportunities to shower and meet with the RT for out-of-cell activities, including yard.  Due to a low MHCB census (i.e. two patients), this reviewer was not able to observe any IDTT meetings during the on-site assessment.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit (housing both the STRH and GP administrative segregation sections) found 99-percent compliance with the required checks that did not exceed 35-minute intervals.  In addition, the combined compliance rate in the three administrative segregation units located in the former SHU building was 97-percent.  A review of Guard One data for a recent 24-hour period in the SHUs found compliance with the required checks that did not exceed 35-minute intervals during Second and Third Watches, and 60-minute intervals during the First Watch (pursuant to a

stipulation approved by the court on September 1, 2016) (ECF No. 5487) was a combined 99 percent.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergent/urgent mental health referrals for the period of June 1, 2019 through December 15, 2019.  This reviewer's subsequent sample EHRS review of 45 cases of emergent/urgent mental health referrals for SI/behavior revealed clinical staff completed the required SRASHEs in 96 percent (43 of 45) of the cases.

A CIT process had not been initiated at PBSP and there were no emergency mental health referrals for this reviewer to observe during the on-site assessment.

This reviewer examined a sample of five SRASHEs from patients released from the MHCB unit during November and December 2019.  Most of the safety plans contained in the discharging SRASHEs were inadequate or non-existent, and did not address modifiable risk factors, protective factors, and warning signs, nor specific strategies, including reasonable coping skills, patients could utilize to reduce recurrence of SI.  One case (PBSP 5) simply deferred development of a safety plan to the inmate's EOP clinician:

> Step 1 (Warning Signs):  feeling isolated in cell, thought 'I gotta get out of here, this is torture,' thought 'staff is blowing me off.'

> Step 2 (Independent Coping Skills):  'reading for distraction, physical activity if not limited by current medical conditions/concerns.'

> Step 3 (Distracting People & Places):  'going to mental health appointment.'

> Step 4 (People to Ask for Help):  to be further developed in out-patient setting.

> Step 5 (Professionals to Contact):  nurse call light, to be further developed in out-patient setting.

> Step 6 (Means Safety):  to be further developed in out-patient setting.

> Step 7 (Reasons to Live):  'just hoping to get the treatment I've been asking for.'

In two other cases (PBSP 4 and PBSP 6), the patients simply refused to participate in a safety planning process that seemed to have been attempted in close proximity to their respective dates of MHCB discharge.  In one case (PBSP 4), the clinician simply wrote "Refused to participate, said he will not come back to MHCB, SPI is not needed" for each of the seven steps.  In the other case (PBSP 6), the patient refused to participate, and the clinician simply wrote "To be developed further in OP setting with MHPC" for each of the seven steps.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed

on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with 26 cases of patients discharged from the MHCB unit or alternative housing placement who remained at PBSP and were not transferred to the administrative segregation unit or SHU (where observation at 30-minute intervals was required) from July 12, 2018 through December 12, 2019. The review found that only the 88 percent had Page 1 of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority (58%) the custody checks recommended for only 24 hours by clinicians. In addition, 85 percent of the "custody check" forms (Page 2) were completed correctly by correctional staff at 30-minute intervals. Most of the deficiencies in completion of the forms by mental health clinicians were attributable to recommending discontinuation of custody checks in less than the required 24 hours, as well as gaps in the required 30-minute checks by correctional staff.

**Intervention**: Housing units toured by this reviewer had an Ambu bag and cut-down tool in the same emergency response kit.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (October through December 2019) found that quorums were not achieved for any of the meetings, primarily attributable to the lack of psychiatry representation. The meeting minutes were otherwise unremarkable. A revised SPRFIT LOP that was required to be issued by March 1, 2018, to be consistent with the CCHCS's "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" was contained in "Chapter 07B-LOP: Suicide Prevention." There were also separate LOPs for PBSP's "high-risk management program" ("Chapter 02A-LOP: Mental Health High-Risk Management Program") and "bad news screening" ("Chapter 101-LOP: Bad News Screening").

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody, medical, and mental health staff received annual suicide prevention block training during 2018. Finally, as of December 2019, 94 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: PBSP did not experience any inmate suicides during the review period.

## ACRONYMS and ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Manager System |
| ADHD: | Attention Deficit Hyperactivity Disorder |
| AED: | Automated External Defibrillator |
| AH: | Auditory Hallucinations |
| Ambu bag: | Ambulatory Bag Used for CPR |
| APP: | Acute Psychiatric Program |
| ASH: | Atascadero State Hospital |
| ASU: | Administrative Segregation Unit |
| BCOA: | Basic Correctional Officers Academy |
| BPH: | Board of Parole Hearings |
| BPRS: | Brief Psychiatric Rating Scale |
| CAP: | Corrective Action Plan |
| CAT: | Chart Audit Tool |
| CBT: | Cognitive Behavioral Therapy |
| CCCMS: | Correctional Clinical Case Manager System |
| CCHCS: | California Correctional Health Care Services |
| CC I: | Correctional Counselor I |
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| CHCF: | California Health Care Facility |
| CIM: | California Institution for Men |

| | |
|---|---|
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| DAI: | Division of Adult Institutions |
| D/C: | Discharge |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disability Program |
| DSH: | Department of State Hospitals |
| DVI: | Deuel Vocational Institution |
| EHRS: | Electronic Health Record System |
| EOP: | Enhanced Outpatient Program |
| eUHR: | Electronic Unit Health Record |
| GP: | General Population |
| ICF: | Intermediate Care Facility |

| IDTT: | Interdisciplinary Treatment Team |
|---|---|
| IP or I/P: | Inmate Patient or Inmate/Patient |
| IPOC: | Individual Plan of Care |
| IST: | In-Service Training |
| KVSP: | Kern Valley State Prison |
| LOC: | Level of Care |
| LOP: | Local Operating Procedure |
| MCSP: | Mule Creek State Prison |
| MD: | Medical Doctor |
| MH: | Mental Health |
| MHA: | Mental Health Assessment |
| MHCB: | Mental Health Crisis Bed |
| MHCT: | Mental Health Compliance Team |
| MHOHU: | Mental Health Outpatient Housing Unit |
| MHPC: | Mental Health Primary Clinician |
| MHSDS: | Mental Health Services Delivery System |
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| NP: | Nurse Practitioner |
| NSH: | Napa State Hospital |
| OCA: | Out-of-Cell Activity |
| OHU: | Outpatient Housing Unit |
| PBSP: | Pelican Bay State Prison |

PC:                         Primary Clinician

PIP:                        Psychiatric Inpatient Program

PRN:                        As Needed

PSU:                        Psychiatric Services Unit

PT:                         Psychiatric Technician or Psych Tech

PTSD:                       Post-Traumatic Stress Disorder

PVSP:                       Pleasant Valley State Prison

QIP:                        Quality Improvement Plan

QM:                         Quality Management

R&R:                        Receiving and Release

RC:                         Reception Center

RCA:                        Root Cause Analysis

RJD:                        Richard J. Donovan Correctional Facility

RN:                         Registered Nurse

ROI:                        Release of Information

RT:                         Recreational Therapist

RVR:                        Rules Violation Report

SHU:                        Security Housing Unit

SI:                         Suicidal Ideation

SIB:                        Self-Injurious Behavior

SMHP:                       Statewide Mental Health Program

SMY:                        Small Management Yard

SNY:                        Sensitive Needs Yard

SOMS:                Strategic Offender Management System

SPI:                 Safety Planning Intervention

SPMW:                Suicide Prevention Management Workgroup

SPRFIT:              Suicide Prevention and Response Focused Improvement Team

SPRU:                Suicide Prevention and Response Unit

SQ:                  San Quentin State Prison

SRASHE:              Suicide Risk Assessment and Self-Harm Evaluation

SRE:                 Suicide Risk Evaluation

STRH:                Short-Term Restricted Housing

SVSP:                Salinas Valley State Prison

Sx:                  Symptoms

TTA:                 Triage and Treatment Area

TTM:                 Therapeutic Treatment Module

Tx:                  Treatment

VH:                  Visual Hallucinations

WSP:                 Wasco State Prison