1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   DISABILITY RIGHTS EDUCATION
6  AND DEFENSE FUND, INC.
   Ed Roberts Campus
7  3075 Adeline Street, Suite 210
   Berkeley, California  94703-2578
8  Telephone:   (510) 644-2555

   MICHAEL W. BIEN – 096891
   JEFFREY L. BORNSTEIN – 099358
   ERNEST GALVAN – 196065
   LISA ELLS – 243657
   THOMAS NOLAN – 169692
   JENNY S. YELIN – 273601
   MICHAEL S. NUNEZ – 280535
   JESSICA WINTER – 294237
   MARC J. SHINN-KRANTZ – 312968
   CARA E. TRAPANI – 313411
   ALEXANDER GOURSE – 321631
   AMY XU – 330707
   ROSEN BIEN
   GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
   Telephone:   (415) 433-6830

10  Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EXPEDITED MOTION FOR AN ORDER REGARDING QUARANTINE AND ISOLATION** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Judge:  Hon. Kimberly J. Mueller<br>Date:   October 1, 2020<br>Time:   2:00 PM<br>Crtrm.: 3, 15th Floor (Videoconference) |

[3620551.6]

## MEMORANDUM OF POINTS AND AUTHORITIES

The existing remedial orders in this case, including the Mental Health Services Delivery System Program Guide ("Program Guide"), have always required CDCR to house *Coleman* class members at the Enhanced Outpatient Program ("EOP") level of care in housing that is separate from the general population.  The orders also require CDCR to house patients requiring hospital-level care within CDCR either at designated Psychiatric Inpatient Programs ("PIPs"), or designated Mental Health Crisis Beds ("MHCBs").  CDCR is over six months into its response to the COVID-19 pandemic, and well over 13,000 cases have been confirmed among the incarcerated population and over 3,500 cases among staff according to CDCR's public online trackers.  *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/; https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/.  Yet even after extensive efforts in the *Plata* and *Armstrong* cases[1] to set aside quarantine and isolation space, Defendants still have not created any plan for separate quarantine units for *Coleman* class members at the EOP and higher levels of care, nor any policies or procedures governing programming and treatment for these patients during quarantine and isolation.  CDCR does not even have a plan for a plan and has staked out its position of opposition to even the idea of separating EOP patients in quarantine.  In the meantime, Defendants have presented their quarantine and isolation plan to the *Plata* court without reference to the EOP separation issue—that has been repeatedly raised in multiple meetings by the Special Master and his experts, and Plaintiffs' counsel—and the *Plata* court has ordered that the quarantine and isolation plan be rapidly implemented.  Plaintiffs request that the Court order Defendants to promptly revise their quarantine and isolation plan to include appropriate separate space for EOP and higher levels of care and so inform the *Plata* court. If CDCR cannot find the necessary space, then it cannot safely house these patients and

---

[1] *Plata v. Newsom*, Case No. 01-cv-1351-JST (N.D. Cal.); *Armstrong v. Newsom*, Case No. 94-cv-2307-CW (N.D. Cal.).

1   should place them in the community.

2   **I.     THE COURT SHOULD ORDER DEFENDANTS TO SET ASIDE
3           SEPARATE QUARANTINE SPACE, CREATE GOVERNING POLICIES
            FOR QUARANTINE AND ISOLATION, AND ISSUE AN INTERIM
4           DIRECTIVE TO PROTECT HIGH-ACUITY CLASS MEMBERS.**

        **A.     Defendants Have Failed To Account For The *Coleman* Class During
5               Their Quarantine And Isolation Bed Planning To Date.**

6       On July 22, 2020, the *Plata* court ordered CDCR to set aside isolation and

7   quarantine space at each institution. *Plata* ECF No. 3401. On July 28, as part of an order

8   generally addressing the pandemic's disruptions of mental health care, this Court

9   specifically addressed the *Plata* quarantine and isolation space process, directing that

10  CDCR work with the Special Master "to ensure no further harm results to the delivery of

11  mental health care to members of the *Coleman* class." ECF No. 6791 at 4-5. By

12  September 22, the designation of quarantine units was complete, and the *Plata* court

13  approved a deadline for activating the last few units. *See Plata* ECF No. 3455. CDCR is

14  declining to provide designated quarantine space for EOP patients, but instead plans to mix

15  such patients with the general population on the quarantine units.

16      CDCR's intransigence regarding the EOP patients is in contrast with their

17  willingness to address the needs of other incarcerated persons with disabilities. On July

18  20, 2020, after Plaintiffs' counsel in *Armstrong* filed an emergency motion, CDCR

19  stipulated to an order requiring the *Armstrong* Court Expert to conduct a review of the

20  sufficiency of CDCR's supply of accessible housing for isolation and quarantine, and

21  requiring Defendants to house all *Armstrong* plaintiffs in safe, accessible housing, and in

22  any circumstances where a class member is not housed appropriately, to provide notice

23  within 24 hours to Plaintiffs, the *Armstrong* Expert, and the *Plata* Receiver, among other

24  protections. *Armstrong* ECF No. 3015 at 2. This process has led to revisions of the

25  quarantine plans to address disability access. *See Armstrong* ECF No. 3072 at 2-3.

26      In August, CDCR decision-makers appeared open to respecting EOP housing

27  requirements in quarantine. *See* Fourth Joint Update on COVID-19 Task Force, ECF No.

28

[3620551.6]

6841 at 9 (during the August 25, 2020 Task Force meeting discussion regarding quarantine plans, a "member of the Special Master's team indicated understanding that CDCR planned to follow general principles of keeping EOP patients in EOP housing and, if patients must be moved, moving them into separate EOP housing unless CDCR is unable to do so").  By early September, however, CDCR announced that it would not quarantine EOP class members separately from non-EOP class members.  *See* Fifth Joint Update on COVID-19 Task Force, ECF No. 6850 at 9 (report on the September 1, 2020 Task Force meeting that "CDCR disagrees with the Special Master's experts' views that CDCR should quarantine EOP patients separately from non-EOP incarcerated people for clinical reasons.").  On September 4, Plaintiffs' counsel asked in writing that CDCR reconsider.  *See id.* at 15-25.  On September 23, 2020, CDCR confirmed in writing that it would not reconsider.  *See* Shinn-Krantz Decl. at ⸢ 2 & Ex. A (Defendants' September 23, 2020 Letter ("Defs.' Ltr.")).  At the Third Quarterly Status Conference the next day, Defendants confirmed their position.

**B.    Defendants Are Deliberately Indifferent To The Substantial Risk Of Serious Harm To *Coleman* Class Members In Quarantine and Isolation.**

Health emergencies require careful planning.  The highest number of COVID-19 deaths in CDCR occurred at San Quentin after poorly planned prisoner transfers brought the virus there.  Now, patients at EOP and higher levels of care are already being housed in the isolation and quarantine units recently set aside, with no plan or instruction being given to the institutions about how to protect and manage the patients, provide necessary mental health care and programming, or to protect them from harm from others.

Defendants argue that the practice of quarantine and isolation is nothing new in CDCR, which routinely deals with patients' "influenza-like illness, tuberculosis, and gastroenteritis."  *See* Defs.' Ltr. at 1.  The current pandemic is far different in scope and deadliness.  As of September 8, 2020 the total number of positive cases (active plus resolved) among the incarcerated population was 9,993, including 2,737 *Coleman* class members of whom 247 were at the EOP or higher level of care.  *See* Fifth Joint Task Force

1   Update, ECF No. 6850 at 2.  CDCR's rate of confirmed cases (112.5 per 1,000 people)

2   was six times higher than in the general public in California (18.7 per 1,000) and the

3   United States (19.0 per 1,000).  *See id.* at 3.  To date, the *Coleman* class, which is now

4   roughly 30% of the CDCR population, represents 27% of the known infections, yet 36% of

5   cumulative cases severe enough to require hospitalization, and 41% of deaths.  *See*

6   *id.* at 2-3.

7           Defendants argue that because the number of EOP and higher patients requiring

8   isolation—i.e. those with confirmed currently active cases—is relatively low at any one

9   time, COVID-19 is not a big enough problem to justify creating separate housing space for

10  them.  *See* Defs.' Ltr. at 3.  This misses the point.  The number of EOP and higher patients

11  requiring quarantine—i.e. those without confirmed cases but with some exposure—is

12  much higher.  Likely a majority of high-acuity class members have already faced at least

13  some time in quarantine, whether they were housed in a designated *Coleman* unit or not.

14  The point of setting aside space now is so that Defendants have a plan to provide safe

15  treatment and programming to patients as more outbreaks inevitably spread throughout the

16  system.  Defendants admit that they do not know how many *Coleman* class members are

17  quarantining in non-*Coleman* units.  *See id.*  CDCR must both determine who are the EOP

18  and higher level of care class members currently housed outside of the settings required by

19  the *Coleman* Program Guide and make plans to set aside separate quarantine units for these

20  individuals and the future class members who will otherwise be put in this position.  For

21  example, on September 25, 2020 there were almost 500 EOP patients housed outside of

22  EOP programs, plus 150 patients at an inpatient level of care who are being housed in an

23  outpatient setting.  *See* Shinn-Krantz Decl. at ¶ 3 & Ex. B (Defendants' Defendants'

24  COVID-19 Mental Health Operational Impact Dashboard).

25          Defendants also attempt to minimize the need for separate quarantine units by

26  contending that housing units designated for quarantine are medical units.  *See* Defs. Ltr. at

27  2.  There is no evidence that CDCR is using only medical units for quarantine and

28

1   isolation, and there is evidence to contrary in the maps they filed showing non-medical

2   housing units designated for these purposes.  *See* ECF 6870 (under seal).  A regular

3   housing unit does not suddenly become more therapeutic when a cellblock or dormitory is

4   placed on quarantine.  CDCR may try to provide increased symptom screenings and

5   COVID-19 testing to people in quarantined housing units.  That does not make the housing

6   "medical."  The people living there receive *reduced* or no mental health treatment, and

7   face sharper restrictions on programming.  In the absence of polices governing aspects of

8   routine prison unit life such as phone calls, showers, and medication lines, many

9   quarantine units also are not the buttoned-up settings Defendants make them out to be.

10          Defendants contend that EOP housing requirements should not apply because

11  quarantine is short term.  *See* Defs.' Ltr. at 2.  Defendants have not come forward with data

12  on the average length of stay for patients in quarantine, or how long it takes patients to

13  transfer to an appropriate setting after completing the quarantine.  Indeed, while some

14  quarantines may last for a matter of weeks for asymptomatic class members, many class

15  members face repeated quarantine periods, and each period is indefinite and can stretch on

16  for months because every additional identified positive case or potential exposure in the

17  unit resets the clock.  And for EOP and higher level of care class members placed in non-

18  *Coleman* quarantine units, it is highly unlikely that they will quickly transfer out to a

19  *Coleman* unit even after the formal quarantine period ends because Defendants have all but

20  shut down movement for mental health transfers.  *See, e.g.*, Fifth Joint Update on COVID-

21  19 Task Force, ECF No. 6850 at 3 (about three-fourths of CDCR institutions are closed to

22  external movement, including all PIPs); *id.* at 7 (most patients cannot move to or from

23  closed institutions); *id.* at 4-5 (CDCR has not transferred a single patient requiring mental

24  health hospitalization to the Department of State Hospitals since the workweek of August

25  10-14, 2020).

26          The Court should require Defendants to engage in serious bed planning and

27  policymaking to ensure patients can be housed in a setting appropriate to their needs, in

28

1    accordance with the existing remedial orders in this case.

2    **C.    Separate Housing At The Enhanced Outpatient Program (EOP) Level**
     **Of Care Is A Necessary Cornerstone of the Remedy In This Case.**

3

4    Clinicians designate people for the EOP based on a determination that the patient

     cannot function safely in the general population.  *See* 2018 Program Guide, ECF 5864-1 at
5
     52 (Program Guide page 12-4-3).  The need for a sheltered treatment program was
6
     recognized early in this case:
7

8           Inmates with severe mental illness often have difficulty with the
            stresses of prison and are especially vulnerable to victimization
9           while in the general population.  Creating a psychologically (and
            perhaps physically) safer environment can reduce psychiatric
10          distress and crisis, disciplinary violations, and suicide attempts.

11   February 16, 1993 Mental Health Services Delivery System Study, Final Report, Scarlett

12   Carp and Associates, ECF No. 4399-2 at 58.  Sheltered housing units are important not

13   only for treatment, but also to protect the lives and safety of EOP patients.  *See* March 14,

14   2019 Memorandum to the Special Master from M. Shinn-Krantz at 7-10 (submitted *in*

15   *camera* on February 25, 2020 pursuant to Minute Order, ECF No. 6483).  This Court

16   explained in its July 3, 2018 Order that "the Revised Program Guide makes clear EOP is a

17   residential program, synonymous with an inpatient setting."  *See* July 3, 2018 Order, ECF

18   No. 5850 at 5-6.

19   Separate housing is important to facilitate treatment.  To the extent group treatment

20   can resume in a quarantined unit, it requires proximity among the patients.  Individual

21   therapy requires getting the clinicians to the patients, and not having the clinicians

22   wandering among widely separated units.  Access to treatment is all the more critical if the

23   quarantine patient is locked down, and suffers the risks of decompensation associated with

24   isolation in a cell for most of the day.

25   But even if the patients are locked down and receiving no treatment, separate

26   housing is still critical.  Certain patients at EOP and higher levels of care are verbally

27   disruptive—for example talking or shout to themselves, which can provoke reactions from

28

1  people in other cells.  One of the reasons for the sheltered aspect of the EOP program is to

2  prevent this kind of disruption from escalating.  In addition, providing time out of cell is

3  critical, including for patients on quarantine, as CDCR's COVID-19 guidelines

4  acknowledge.  *See* July 17, 2020 Updated Control Strategies for Contacts to Cases of

5  COVID-19, https://cchcs.ca.gov/covid-19-interim-guidance/, at "Quarantine Precautions

6  and Conditions for COVID-19 and Influenza."  This means safely allowing patients time in

7  a dayroom or on a yard with others in the quarantine cohort.  For EOP patients it means

8  time with other EOP patients, not time in the general population.

9       The Court should order Defendants to engage in bed planning and policymaking to

10  make available appropriate, Program Guide-required, separate housing for EOP patients.

11       **D.    In EOP, Inpatient, and MHCB Units, CDCR Needs Single-Celled Isolation and Quarantine Space.**

12

13       For the purposes of isolation and quarantine, most PIP units already feature single-

    occupancy cells with solid doors.  But some patients are double-celled or in dorm settings.[2]

14  Many EOP patients are double-celled.  Public health recommendations for quarantined

15  housing is that patients be housed alone, in a single cell behind a solid door.  Defendants

16  have failed to follow these recommendations for incarcerated persons in dorm housing and

17  double cells.  Defendants must modify their quarantine and isolation plan to address this

18  deficiency for Coleman class members at all levels of care, especially for those at EOP and

19  higher levels of care.

20       Defendants also must plan for new PIP arrivals and discharges.  Although Plaintiffs

21  understand that the current plan is to isolate and quarantine PIP patients who are new

22  arrivals in the PIP admissions units, this plan does not address the need for quarantine and

23  isolation space for individuals in the dorms and double cells.  Also, given that the August

24

25  _____

26  [2] The following PIP units are dorms or double celled units where a patient may need to be moved to a single cell for quarantine:  The PIP Intermediate Care Facility ("ICF") at CMF has many patients in dorms on A-2 (44 total beds) and A-3 (40 total beds); the ICF patients in the L-1 Unit at CMF are double celled; the ICF patients in units C-5/C-6 at SVSP are double celled; there are ICF patients in the four-person rooms in unit TC-1 at SVSP.

27

28

PLTFS' MPA ISO EXPEDITED MOT. FOR AN ORDER RE QUARANTINE AND ISOLATION

19, 2020 COVID-19 Screening and Testing Matrix for Patient Movement requires 14-day quarantines of all discharging patients as well as for new admissions, PIP admissions units may not have enough space for managing this movement.  Defendants must set aside adequate space to quarantine incoming and outgoing patients, as well as for existing patients in dorm or double-celled housing.

In addition to setting aside sufficient space, Defendants must plan for how these PIP quarantine spaces will operate.  Plaintiffs understand that, most of the time, single-celled individuals already housed in PIP units will remain in their cells for isolation and quarantine.  Defendants must develop governing procedures to allow treatment to continue, ideally through individual and group face-to-face contact in a patient's unit in a manner allowing social distancing or, if absolutely necessary, at a patient's cell with the door open to provide for maximum confidentiality and therapeutic engagement.  Similarly, Defendants must develop guidance for PIP clinicians on how to manage their patients during any outbreak impacting their caseloads.

### E.    Defendants Have Multiple Ways To Accomplish Setting Aside Adequate Quarantine and Isolation Space, Including Releasing Class Members If Necessary.

Defendants have already identified quarantine and isolation space in every prison and mostly prepared that space for use.  Through the *Armstrong* process, Defendants have made space specially available to people with disabilities requiring accessible housing features, including making physical alterations to existing spaces.  The Court should order Defendants to likewise set aside separate *Coleman* housing everywhere EOP and higher level of care patients reside.

Some prisons can likely rely on those already-designated quarantine and isolation spaces.  At CMC, the building set aside for quarantine and isolation, C-Yard, Building 5, has two distinct sides on each of its three floors.  CMC can set aside one of the six distinct and separate spaces in this building for EOP patients.  CMF, which has designated five housing units for isolation and quarantine on the most recent designations chart, can

1   designate one of the five units as an EOP-only unit.  Prisons with 180-degree style housing

2   units, like SVSP and CSP-SAC, can make one of the three pods in a designated 180-degree

3   building into an EOP and higher level of care quarantine space.  In 270-degree style

4   housing units with solid walls separating sections of the buildings, one physically separate

5   portion of the building can be used for EOP and higher levels of care.  At places like E-

6   Yard at CHCF, where multiple 20-person tents will be used for isolation and quarantine, it

7   should be relatively easy to designate an EOP-only tent for quarantine.

8          Where there are no physical plant solutions to provide safe, single-celled quarantine

9   space for persons at the EOP and higher levels of care, CDCR must face the reality that it

10  cannot safely hold these people.  CDCR must identify non-custody options, including early

11  release and community placement in such cases.

12          **F.     Defendants Must Issue Immediate Interim Guidance To Protect EOP
               And Higher Level Of Care Class Members.**

13

14          In the immediate term, until Defendants identify and prepare separate quarantine

15  spaces at each prison where EOP and higher level of care class members reside, and create

16  governing policies, the CDCR must instruct staff to carefully provide separate yard,

17  shower, medication lines, canteen, and telephone calls for EOP and higher level of care

18  patients in the currently-operating quarantine units.  Clinical and custodial staff must be

19  instructed to ensure that these class members can access required mental health treatment

20  commensurate with their level of care while they are confined to these units.

21  **II.    PLAINTIFFS' REQUESTED RELIEF COMPLIES WITH THE PRISON
            LITIGATION REFORM ACT.**

22          Plaintiffs' requested relief satisfies the needs-narrowness-intrusiveness

23  requirements of the Prison Litigation Reform Act.  *See* 18 U.S.C. § 3626(a)(1)(A) in light

24  of the long history of this litigation, Defendants' long-standing failure to provide

25  constitutional mental health treatment, Defendants' outright refusal to provide the separate

26  and safe quarantine spaces as required by this Court's remedial orders, Defendants' failure

27  to create adequate governing policies for *Coleman* patients in the quarantine and isolation

28

1  spaces it has set aside in recent months, and the additional harm this is causing to higher

2  acuity class members in violation of this Court's July 28, 2020 Order. *See* ECF No. 6791

3  at 4-5.  The requested relief affords Defendants the latitude to craft the means by which

4  they provide adequate housing spaces to class members.  For example, Defendants may

5  provide quarantine spaces within their already-existing quarantine spaces set aside

6  pursuant to the *Plata* and *Armstrong* processes, or they may set aside new spaces, erect

7  temporary housing, or release *Coleman* class members from CDCR custody into

8  community or parole supervision.

9  **CONCLUSION**

10          For all of these reasons, Plaintiffs respectfully request that the Court grant

11  Plaintiffs' expedited motion and order Defendants to engage in prompt, focused bed

12  planning to ensure Defendants (1) develop, within two weeks, a safe plan to set aside and

13  maintain during the COVID-19 pandemic sufficient separate quarantine space for class

14  members at the EOP and higher levels of care, (2) create policies, within two weeks,

15  governing these higher-acuity mental health patients in both quarantine and isolation

16  settings, and (3) issue an interim directive requiring all CDCR institutions to ensure

17  separate programming and appropriate mental health care for these patients in existing

18  quarantine and isolation spaces.  Additionally, we request that the Court order the Special

19  Master to monitor Defendants' compliance with these requirements.

20

21  DATED:  September 25, 2020              Respectfully submitted,
                                           ROSEN BIEN GALVAN & GRUNFELD LLP
22
                                           By: */s/ Marc J. Shinn-Krantz*
23                                         _____
                                               Marc J. Shinn-Krantz
24
                                           Attorneys for Plaintiffs
25

26

27

28

[3620551.6]

10

Case No. 2:90-CV-00520-KJM-DB